REDACTED

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------x
In re:                                    :      Chapter 11 Cases
                                          :      Case No. 08-13141 (KJC)
TRIBUNE COMPANY, et al.,                  :      (Jointly Administered)
                                          :
                          Debtors.        :
------------------------------------------------------x
```

**LAW DEBENTURE TRUST COMPANY OF NEW YORK'S SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF ITS MOTION TO TERMINATE DEBTOR AFFILIATES' UNDISCLOSED PAYMENT OF LBO LENDERS' FEES AND EXPENSES, FOR AN ACCOUNTING, AND FOR DISGORGEMENT OF PAST PAYMENTS**

Dated: March 2, 2010

Garvan F. McDaniel (No. 4167)
**BIFFERATO GENTILOTTI LLC**
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Tel:  (302) 429-1900
Fax:  (302) 429-8600

– and –

David S. Rosner
Andrew K. Glenn
Sheron Korpus
Daniel A. Fliman
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
Tel:  (212) 506-1700

**REDACTED**

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................. iii

PRELIMINARY STATEMENT ........................................................... 1

STATEMENT OF FACTS .................................................................. 4

    A.   The Debtors' Pre-Petition Bank Fee Payments. .................................. 4

    B.   The Bankruptcy Filings ..................................................................... 5

    C.   The Scheme ....................................................................................... 5

        1.   The Abandoned Forbearance Agreement. ............................... 5

        2.   The Unwritten Undisclosed "Agreement". .............................. 7

        3.   The Blackstone Engagement Letter Was Also Carefully Drafted To Avoid Court Approval. .................................................. 7

        4.   The Creditors' Committee And U.S. Trustee "Disclosures". ....... 8

    D.   The Debtors Direct That Payments Be Made By TCV With Funds Due To The Debtors. ......................................................................... 10

    E.   Non-Disclosure To The Court And Interested Parties. ........................ 12

ARGUMENT ................................................................................... 12

I.   THE SCHEME TO AVOID DISCLOSURE AND COURT REVIEW ............ 12

II.   THERE IS NO VALID BASIS FOR TCV'S PAYMENT OF THE BANK FEES. ........ 14

    A.   Depletion Of Funds Available To The Debtors And Their Estates. ........ 14

    B.   TCV's Funds Used To Make The Bank Fee Payments Were Property Of The Debtors' Estates. ......................................................... 15

    C.   There Is No Basis Under The Bankruptcy Code To Pay The Bank Fees. ........... 17

III.   THE BANK FEE PAYMENTS VIOLATE THE AUTOMATIC STAY. ........ 20

IV.   THIS COURT IS EMPOWERED TO AND SHOULD ORDER DISGORGEMENT OF THE BANK FEES AND TO ENJOIN FURTHER SUCH PAYMENTS ........... 20

CONCLUSION ................................................................................. 22

## TABLE OF AUTHORITIES

**Page**

CASES

*A.H. Robins Co. v. Piccinin,*
    788 F.2d 994 (4th Cir. 1986) ...................................................................18

*In re Allied Tex. Invs., Inc.,*
    1989 Bankr. LEXIS 2785 (Bankr. N.D. Tex. Oct. 13, 1989) .........................12

*In re Centennial Textiles, Inc.,*
    227 B.R. 606 (Bankr. S.D.N.Y. 1998) .........................................................19

*Floyd v. Shindler (In re Rodriguez),*
    204 B.R. 510 (Bankr. S.D. Tex. 1995) .......................................................16

*In re Fruehauf Trailer Corp.,*
    444 F.3d 203 (3d Cir. 2006)......................................................................15

*In re Kingston Turf Farms, Inc.,*
    176 B.R. 308 (Bankr. D.R.I. 1995)............................................................21

*In re Lavigne,*
    114 F.3d 379 (2d Cir. 1997)......................................................................18

*In re Lionel Corp.,*
    722 F.2d 1063 (2d Cir. 1983).....................................................................18

*In re Loewen Group International, Inc.,*
    274 B.R. 427 (Bankr. D. Del. 2002) ..........................................................17

*In re NextWave Personal Communications Inc.,*
    244 B.R. 253 (Bankr. S.D.N.Y. 2000) .......................................................18

*Ogle v. Fid. & Deposit Co.,*
    586 F.3d 143 (2d Cir. 2009)......................................................................20

*Segal v. Rochelle,*
    382 U.S. 375 (1966)..................................................................................15

*In re Valladares,*
    415 B.R. 617 (Bankr. S.D. Fla. 2009)........................................................16

*In re Venturelink Holdings, Inc.,*
    299 B.R. 420 (Bankr. N.D. Tex. 2003).......................................................12

*In re W.T. Mayfield Sons Trucking Co., Inc.*,
   225 B.R. 818 (Bank. N.D. Ga. 1998)........................................................................16

**STATUTES**

11 U.S.C. § 105(a) ........................................................................................................18, 20

11 U.S.C. § 330............................................................................................................17

11 U.S.C. § 331............................................................................................................17

11 U.S.C. § 362(a)(3)....................................................................................................20

11 U.S.C. § 362(a)(6)....................................................................................................20

11 U.S.C. § 363(b)........................................................................................................19

11 U.S.C. § 363(b)(1)....................................................................................................18

11 U.S.C. § 503(b)........................................................................................................17

11 U.S.C. § 506(b)........................................................................................................17

11 U.S.C. § 541(a)(1)....................................................................................................15

**RULES**

Fed. R. Civ. Proc. 30(b)(6) ........................................................................................4, 6

Bankr. R. Civ. Proc. 2002 ..........................................................................................12

Bankr. R. Civ. Proc. 2004 ..........................................................................................11

Bankr. R. Civ. Proc. 2015.3 ........................................................................................12

Bankr. R. Civ. Proc. 7001(9) ......................................................................................18

**REDACTED**

Law Debenture Trust Company of New York ("Law Debenture"), by and through its undersigned counsel, hereby files this supplemental brief in further support of Law Debenture's *Motion to Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees and Expenses, For an Accounting, and For Disgorgement of Past Payments* [Docket No. 2407] (the "Motion"), and respectfully submits as follows:

## PRELIMINARY STATEMENT

In its Motion, Law Debenture asks the Court to enjoin each Debtor[1] and Non-Debtor Guarantor from making any further payments or funding any retainers on account of fees and expenses incurred by the Agent or the Steering Lenders (the "Bank Fees") and to require the Agent and the Steering Lenders (the "Lenders") to disgorge all Bank Fees previously paid (the "Bank Fee Payments").[2] Law Debenture brought the Motion based on information that, while limited, strongly indicated that the Debtors and JPMorgan had entered into a scheme to structure the Bank Fee Payments to avoid scrutiny by parties-in-interest and, most troubling, to avoid any oversight by the Court. The parties then engaged in substantial discovery including numerous depositions and document productions. Discovery has provided uncontroverted facts that support the relief sought in the Motion. Among other things, the undisputed record reflects the following essential facts:

Only seven days before the Debtors commenced these cases, the Debtors paid the Agent $2,000,000 as supposed "retainers" for the Agent's professional fees. (That payment in itself is

---

[1]    All capitalized terms used herein but not defined, are ascribed the definitions in the *Stipulated Facts In Connection With March 26, 2010 Hearing On Law Debenture Trust Company Of New York's Motion To Terminate Debtor Affiliates' Undisclosed Payment Of LBO Lenders' Fees And Expenses, For An Accounting, And For Disgorgement Of Past Payments* [Docket No. 3657], filed on March 2, 2010 (the "Stipulated Facts").

[2]    In the Motion, Law Debenture sought an accounting of all Bank Fee Payments. In the course of discovery, Law Debenture received relevant information from the parties and the parties have stipulated regarding the amount and recipient of the Bank Fee Payments. Accordingly, Law Debenture presently does not expect to seek an accounting, but reserves the right to do so at the hearing if issues arise regarding the accuracy or credibility of such information.

likely subject to avoidance as a preference or fraudulent conveyance).  Then, after the Debtors filed their bankruptcies, the Lenders – recognizing that the Court would not authorize the Debtors' continued payment of unsecured creditor's professional fees – looked for some other way to continue receiving the Bank Fee Payments.

At first, the Debtors and the Lenders negotiated a forbearance agreement whereby the Lenders would not enforce rights against Non-Debtor Guarantors in exchange for continued Bank Fee Payments.  E-mail exchanges and deposition testimony reflect that this process was abandoned, however, when it became apparent that Court authority was required, which the Debtors and the Lenders wanted to avoid.  Indeed – as e-mail exchanges also demonstrate – the Lenders believed that the Court would not approve the forbearance agreement, and that various parties including the Creditors' Committee would oppose it.

Instead, to fly under the radar, the Debtors and the Lenders structured their agreement for the Bank Fee Payments as an "unwritten arrangement" between the Non-Debtor Guarantors and the Lenders.  The record shows that the Debtors orchestrated the Bank Fee Payments.  TCV, a shell and an instrumentality of the Debtors, made the Bank Fee Payments, but it was the Debtors' management that decided TCV would do so.  TCV's directors (who in any event are not independent) were not asked to approve the payments.  The deposition testimony confirms that the Bank Fee Payments were funded with cash that otherwise would have been swept up from the Non-Debtor Guarantors to the Debtors.  Those funds could have been used by the Debtors to finance their operations and for the administration of their bankruptcy cases.  But, instead, the funds were siphoned off to pay fees incurred by the Lenders' professionals including in defending the Lenders from the fraudulent conveyance investigations conducted by the estates and their fiduciaries.

Apparently acknowledging that the Bank Fee Payments were relevant to the Debtors and their estates, the Debtors and the Lenders informed the U.S. Trustee, but did not actually solicit his views or approval. JPMorgan also informed the Creditors' Committee, on which it sits, which temporarily agreed not to object, but JPMorgan also consented to the Creditors' Committee's rights to object to reasonableness of fees – an acknowledgment inimical to JPMorgan's current view that the Non-Debtor Guarantors are beyond the reaches of the Court's scrutiny. And, until Deutsche Bank, a member of the Creditors' Committee, identified the Bank Fee Payments in a public filing, the Court and constituents in these bankruptcy cases were never informed of the Bank Fee Payments nor of the "unwritten arrangement" between the Non-Debtor Guarantor and the Lenders.

Based on the undisputed evidence, it is clear that funds used to make the Bank Fee Payments constituted property of the Debtors' estate or, at the very least, depleted the amount of funds otherwise available to the Debtors. Using those funds, which clearly was not in the ordinary course, required Court approval. Indeed, the Debtors' obligations to disclose and seek approval, were especially heightened since funds were used to compensate adversaries defending against estate causes of action. The lack of disclosure was not a harmless oversight. If all parties-in-interest had been given notice of the Bank Fee Payments and the opportunity to object, it is likely that the Court would not have approved the payments. Based on the documents produced by them, it is clear that the Debtors and the Lenders knew that fact when they entered into the scheme to circumnavigate the Court's scrutiny.

For these reasons, and those set forth below, the Court should enjoin any further payments of the Bank Fees, and require the Agent and the Lenders to disgorge prior payments.

## STATEMENT OF FACTS

**A.    The Debtors' Pre-Petition Bank Fee Payments.**

On November 20, 2008 – just 18 days before the Petition Date – the Agent notified

Tribune that it had retained Davis Polk, as counsel and FTI, as financial advisor and that it

wanted to discuss obtaining a retainer from Tribune for the fees and expenses of the

professionals. (SF ¶ 17).[3]  On November 26, 2008, Tribune "agreed to pay the reasonable and

documented fees, non-professional charges and expenses of [the Agent's] professionals, which

amounts shall be invoiced on a monthly basis." (SF ¶ 18).  Before that time, other than in

connection with closing of the Credit Agreement transactions in 2007, Tribune had never paid

the Agent's fees and expenses. (SF ¶ 18).

On December 1, 2008 – seven days before the Petition Date – Tribune paid a $2,000,000

retainer to the Agent for alleged retainers and future fees and expenses of the Agent's

professionals. (SF ¶ 19).  The Agent then distributed the $2,000,000 (a) to Davis Polk via a

$750,000 retainer on December 2, 2008 and a $500,000 retainer on December 5, 2008 and (b) to

FTI via a $500,000 retainer on December 2, 2008, and a $250,000 retainer on December 4, 2008.

(SF ¶¶ 20, 21).  When the payment was made, the Agent was aware of the possibility the Debtors

would file for bankruptcy. (Debtors/TCV Tr., 39:18-24)[4] ("Q.  You were having discussions

with the agent around this time; right? A.  Correct. Q.  And in those discussions, I assume, part

of the discussions were the possibility of a bankruptcy filing; right?  A.  Sure.").

---

[3]        Citations herein to "SF ¶ __" are to Stipulated Facts.

[4]        Citations herein to "Debtors/TCV Tr. __" are to corresponding parts of the transcript of the February 1, 2010 deposition of Nils Larsen, who was designated as the Rule 30(b)(6) witness for both the Debtors and TCV, a copy of which is included in the Joint Exhibit List filed on March 2, 2010 [Docket No. 3660] (the "Joint Exhibit List"), at Ex. 5.

**B.**    **The Bankruptcy Filings.**

On December 8, 2008, Tribune and 110 of its subsidiaries filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. (SF ¶ 22). Certain subsidiaries of Tribune, including Tribune (FN) Cable Ventures, Inc. ("TCV"), did not file bankruptcy petitions on the Petition Date. (SF ¶ 25).

On December 18, 2008, the U.S. Trustee appointed an eight-member statutory committee of unsecured creditors (the "Creditors' Committee"). (SF ¶ 26). On December 30, 2009, the U.S. Trustee added Wilmington Trust Company as the ninth member of the Creditors' Committee. (SF ¶ 26). Deutsche Bank and Wilmington Trust Company were appointed to the Creditors' Committee in their capacities as Indenture Trustees. (SF ¶ 27). JPMorgan was appointed to the Creditors' Committee in its capacity as a lender under the Credit Agreement. (SF ¶ 28).

**C.**    **The Scheme.**

As discussed below, the record reflects that the Lenders were aware that after the Petition Date, the Court would not approve the Debtors' continued payments of the Lenders' fees and expenses. Accordingly, the Lenders sought payments of fees and expenses from the Non-Debtor Guarantors. (SF ¶ 29).

**1.**    **The Abandoned Forbearance Agreement.**

At first, the Agent, Davis Polk (counsel for the Agent), Tribune, and Sidley (counsel for Tribune) discussed a potential Forbearance Agreement whereby the Non-Debtor Guarantors would pay the Lenders' costs and expenses. (SF ¶¶ 30, 31).

Davis Polk prepared the first draft Forbearance Agreement, which was circulated to Sidley on January 10, 2009. (SF ¶ 33). It provided for the Non-Debtor Guarantors to pay the Lenders' reasonable fees, costs and expenses including paying to the Agent, $7,500,000 and to

Kramer Levin (Steering Lenders' counsel), $1,000,000 to be used as advances that could be

applied in satisfaction of the reasonable fees, costs and expenses of the Agent and Kramer Levin.

(SF ¶ 33).

On January 20, 2009, Sidley provided comments and revisions to the draft Forbearance

Agreement, primarily targeted at injecting Bankruptcy Court oversight. (SF ¶ 36).  The revisions

added a condition precedent that "**the Bankruptcy Court has entered an order authorizing**

**the Debtors to enter into and perform in accordance with this Forbearance Agreement**".

(SF ¶ 36) (emphasis added).

The record shows that adding Bankruptcy Court oversight of the Forbearance Agreement

deeply concerned the Agent and the Steering Lenders. *See* (SF ¶ 37).  On January 22, 2009,

Miriam Kulnis, JPMorgan's representative on the Creditors' Committee, sent an email to Nils

Larsen and Chandler Bigelow at Tribune regarding Sidley's revisions.  (SF ¶ 37); (Kulnis Ex.

6)[5].  In that email, Kulnis stated as follows:

> well I can tell you that one of the big issues is the desire to make
> the Debtors parties to the agmt.  **I think the [Steering Committee]**
> **feels that it's best if only non-debtors are parties and it would**
> **be more likely to get approved by the court if the debtors were**
> **not a party.  We are worried that if the debtors are parties the**
> **UCC may object to it and it would get denied.**  I will be frank
> (as I always am with you) that some are wondering if the company
> really wants the court to reject this so that the company has an
> excuse not to pay the fees.  So that's a big heads up and you should
> think about that in advance of tomorrow's call.

(SF ¶ 37) (emphasis added).

Indeed, the Debtors had similar concerns.  Larsen responded to Kulnis that same day in

an email that included the following statements: "**I understand the concern surrounding the**

---

[5]     Citations herein to "Kulnis Ex. __" correspond with exhibits from the deposition of Miriam Kulnis
(designated as a Rule 30(b)(6) witness for JPMorgan) included in the Joint Exhibit List, along with the transcript, at
Ex. 4.

**inclusion of the Debtors**.  We can discuss further in the morning.  **The intent of our mark-up is not to proffer something the court and the UCC are likely to reject.**  We are not being cute on the fee question."  (SF ¶ 38) (emphasis added).

2.    **The Unwritten Undisclosed "Agreement".**

The draft Forbearance Agreement was never finalized nor executed.  (SF ¶ 41).  Instead, the Debtors and the Lenders proceeded down the path of an informal, unwritten agreement; one that would not have to be approved by the Bankruptcy Court.  (SF ¶ 39) (emphasis added); (Larsen Ex. 11)[6] (January 25, 2009 email from Baiera of Angelo Gordon Co LP to Larsen:  "I heard the counter proposal, which has the company simply make payments under the guarantee demands.  **There are clear benefits to this approach (no court approval/notice).** . .".  (SF ¶ 43); (Ex. 15)[7] (Feb. 1, 2009 email from Jones of KKR to other employees of KKR which stated in part that "[p]rofessional fees of the steering committee will be paid by non-debtor subsidiaries under the conditions of our guarantees versus a forbearance agreement as previously contemplated.  Should the company file its non-debtor subsidiaries, we will need to secure payment through the bankruptcy court.").

No written agreement exists for the Agent and/or the Steering Lenders to not exercise remedies against the Non-Debtor Guarantors in exchange for payment of the Bank Fees.  (SF ¶ 68).

3.    **The Blackstone Engagement Letter Was Also Carefully Drafted To Avoid Court Approval.**

On February 6, 2009, Davis Polk sent Sidley a draft engagement letter for the retention of Blackstone by Davis Polk in connection with Davis Polk's representation of the Agent.  (SF

---

[6]    Citations herein to "Larsen Ex. __" correspond with exhibits from the deposition of Nils Larsen, included in the Joint Exhibit List, along with the transcript, at Ex. 5.

[7]    Citations herein to "Ex. __" correspond with exhibits in the Joint Exhibit List.

¶ 44).  The draft engagement letter specified that the "fees and expenses payable to Blackstone pursuant to this Agreement shall be payable by **the Company**" (meaning, the Debtors and Non-Debtor Guarantors).  (SF ¶ 44) (emphasis added); *see also* (Larsen Ex. 17).  The draft engagement letter called for a monthly fee of $200,000 and a restructuring fee of $5,500,000 payable upon either an out of court restructuring or a plan confirmation order.  Blackstone, Davis Polk, the Agent, and **Tribune** were listed as signatories.  (SF ¶ 44).

On February 23, 2009, Davis Polk sent Sidley a proposed final execution copy of the Blackstone engagement letter.  (SF ¶ 50).  The proposed final execution copy of the engagement letter provided that "[a]ll fees and expenses payable to Blackstone pursuant to this Agreement are obligations of the **Tribune Company**" (meaning, the Debtors and the Non-Debtor Guarantors).  (SF ¶ 50) (emphasis added); *see also* (Ex. 21).  Unlike the first draft, which would have been signed by the Debtors, the signatories listed were Blackstone, Davis Polk, the Agent, and the Non-Debtor Guarantors.  (SF ¶ 50).

The Blackstone engagement letter was signed and executed on February 27, 2009.  (SF ¶ 50); *see also* (Larsen Ex. 19).  Blackstone, Davis Polk, and the Agent were listed as signatories to and signed the engagement letter.  (*Id.*).  Mysteriously, the signature line for the Non-Debtor Guarantors was removed from the "final execution copy".  Accordingly, neither the Debtors nor the Non-Debtor Guarantors signed the final engagement letter, although the letter purported to obligate them to pay Blackstone.

4.    **The Creditors' Committee And U.S. Trustee "Disclosures".**

Apparently recognizing that the Bank Fee Payments contemplated in the undisclosed agreement impacted the Debtors' bankruptcy cases, the Debtors and the Lenders decided after the undisclosed agreement was finalized, to inform the Creditors' Committee and the U.S. Trustee.

8

On February 8, 2009, Davis Polk informed Sidley that the Agent was invited to discuss the undisclosed agreement with the Creditors' Committee at their next meeting on Thursday February 12, 2009. (SF ¶ 45). The following day, on February 9, 2009, Sidley responded that Tribune wanted "to make sure that [the Creditors' Committee members] are appraised as to the amount and nature of the retainers and the amount presently due on fees, and also the proposed terms of the Blackstone engagement before their Thursday meeting" and invited Davis Polk to join Sidley on a phone-call to Chadbourne, counsel to the Creditors' Committee. (SF ¶ 46).

On February 26, 2009, Sidley notified Tribune that "[t]he UCC's counsel confirmed to me today the UCC has no objection to the payment of the SC professional fees" and that Sidley has "a call scheduled with [the U.S. Trustee] tomorrow morning at 9:30 am est to advise him of the proposed SC professional fee payments by the non-debtors." (SF ¶ 55). On February 27, 2009, the Creditors' Committee confirmed in writing that it would not object to the payment of fees and expenses by the Non-Debtor Guarantors subject to agreed-upon conditions, including (1) the Lenders would provide quarterly summaries of all fees to the Creditors' Committee; (2) the Agent and/or Tribune would notify the U.S. Trustee of the Non-Debtor Guarantor's intent to reimburse the professional fees before any payment is made; and (3) with respect to Blackstone that (i) Blackstone's $1,000,000 retainer would not be used to pay Blackstone's restructuring fee, (ii) the Agent would notify the Creditors' Committee before requesting payment of any restructuring fee and the Creditors' Committee reserved the right to object to such fee on any basis, including reasonableness, and (iii) the Agent would report and discuss with the Creditors' Committee the scope of and continuing need for Blackstone's work in five months. (SF ¶ 56). The Creditors' Committee expressly reserved its rights to object to the reasonableness of any fees and/or expenses to be reimbursed by the Non-Debtor Guarantors. (SF ¶ 56).

On February 27, 2009, Sidley advised the U.S. Trustee of the agreement of the Non-Debtor Guarantors to reimburse fees and expenses pursuant to the Guarantee. (SF ¶ 57). On March 5, 2009, Davis Polk sent an email to Sidley stating: "Bryan, Based on your description of your conversation last week and [the U.S. Trustee's] description of the same conversation when we spoke, **you didn't ask for his permission and you didn't tell him you were waiting for his consent (both correctly) but instead told him the non-debtors intended to pay around the middle of this week.**" (SF ¶ 60); (Larsen Ex. 21) (emphasis added).

**D.    The Debtors Direct That Payments Be Made
         By TCV With Funds Due To The Debtors.**

All the Bank Fee Payments were paid by TCV. (SF ¶ 67). TCV is a corporation incorporated in Delaware whose stock is wholly owned by Debtor Tribune Broadcasting Company. (SF ¶ 63). TCV's Board of Directors and officers are comprised of employees of Debtors. (SF ¶ 63). TCV has no employees and no offices separate from Tribune's offices. (SF ¶ 63). TCV is included in Tribune's consolidated financial statements and the Debtors' employees controlled treasury functions at TCV. (SF ¶ 63).

TCV is a 31.3% general partner of Television Food Network, G.P., which operates the Food Network. (SF ¶ 63). Other than its partnership interest in Television Food Network, G.P. ("TFN GP") (and proceeds thereof), TCV has no other assets and conducts no other business. (SF ¶ 63).

TCV paid the Bank Fees from funds generated by TCV by virtue of its partnership with TFN GP, which operates the Food Network. (SF ¶ 66). Before the Petition Date, cash distributions received by TCV under the TFN GP partnership agreement were swept into the Tribune cash management system and placed into an account held in Tribune's name. (SF ¶ 64). After the Petition Date, all such distributions received by TCV have been held by TCV in an

10

account in TCV's name and not placed in the Tribune cash management system. (SF ¶ 64). As a result, as of December 23, 2009, TCV's bank account at JPMorgan had a balance of $40,517,337.57 after paying the Bank Fees. (SF ¶ 79).

TCV's board of directors and officers were not specifically approached for authorization to pay the Bank Fees. (SF ¶ 69). The decision to pay the fees was made by management of Tribune, including Don Liebentritt, David Eldersveld, Chandler Bigelow, and Nils Larsen. (SF ¶ 69). Liebentritt and Eldersveld were directors of TCV at the time of the decision, and Bigelow was an officer. (SF ¶ 69).

To date, TCV has paid the Agent and the Lenders nearly $23,700,000. *See* (SF ¶ 69). Those payments consist of the following:

| Davis Polk & Wardwell | Agent's Counsel | $8,651,033.06 |
|---|---|---|
| Richards Layton & Finger | Agent's Local Counsel | $59,606.97 |
| Wiley Rein and Fielding | Agent's FCC Counsel | $1,460,719.32 |
| FTI Consulting | Agent's Financial Advisor | $2,264,561.74 |
| Blackstone Advisory Services | Agent's Investment Banking Advisor | $1,861,882.42 |
| JPMorgan Chase Bank, N.A. | Agent, for reimbursement of fees paid to Epiq and Huron as vendors in connection with the production of documents requested by the Creditors' Committee | $793,871.57 |
| Eaton Vance Investment Managers | Steering Lender, for out-of-pocket costs | $3,105.86 |
| Kramer Levin Naftalis & Frankel | Steering Lenders' Counsel | $1,100,022.59 |
| | **SUB-TOTAL** | **$16,194,803.53** |
| Retainer paid to Agent | | $7,500,000.00 |
| | **TOTAL** | **$23,694,803.53** |

(SF ¶¶ 69, 72).

The Bank Fee Payments include substantial fees related to the Lenders' defense from estate causes of action investigated by the Creditors' Committee. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ (Ex. 22). ████████████████████████████

████████████████████████████████████

███████████████████████ (Ex. 23).

**E.** **Non-Disclosure To The Court And Interested Parties.**

The Debtors and the Lenders never disclosed the Bank Fee Payments to this Court or to

the interested parties. On July 29, 2009, Tribune filed and served a Rule 2015.3 report on all

creditors included in the Debtors' Rule 2002 notice list. (SF ¶ 78); *see also* (Larsen Ex. 22).

The report included unaudited balance sheets for various non-debtor entities for the six month

period ending June 28, 2009. (SF ¶ 78). Included in the category of "Current Assets" was a sub-

category entitled "pre-paid expenses and other." (*Id.*). The balance sheet for TCV identified

$7,500,000 in this category but did not identify to whom the expenses were paid. (*Id.*).

**ARGUMENT**

For the reasons set forth below, the Court should order all the Bank Fee Payments

disgorged to TCV and enjoin any further Bank Fee Payments.

**I.**

**THE SCHEME TO AVOID DISCLOSURE AND COURT REVIEW.**

"The bankruptcy process must both be fair and appear fair." *In re Venturelink Holdings,*

*Inc.*, 299 B.R. 420, 423 (Bankr. N.D. Tex. 2003); *see also In re Allied Tex. Invs., Inc.*, 1989

Bankr. LEXIS 2785 at *4 (Bankr. N.D. Tex. Oct. 13, 1989) ("The bankruptcy courts are

obligated to insure that the bankruptcy system not only is fair, but seems fair.").

The Debtors and Lenders orchestrated a scheme that attempted to avoid Court scrutiny of

the Bank Fee Payments, which avoided anybody testing whether the payments were fair to the

Debtors' estates. Their scheme is evidenced through the following facts in the record:

- The Debtors and the Lenders abandoned negotiations of a formal written forbearance
  agreement (which contemplated the Bank Fee Payments) when they realized Court
  authority was required for that agreement, which the Debtors and the Lenders wanted to
  avoid. (SF ¶ 37); (Kulnis Ex. 6) (Kulnis: "We are worried that if the debtors are parties

the UCC may object to it and it would get denied"); (SF ¶ 38) (Larsen: "I understand the concern surrounding the inclusion of the Debtors.").

- Instead, the Debtors and the Lenders opted for an unwritten "understanding" that would not be disclosed to the Court nor the parties-in-interest. (SF ¶ 43); *see also* (Ex. 15) (Jones (a Steering Lender employee): "[p]rofessional fees of the steering committee will be paid by non-debtor subsidiaries under the conditions of our guarantees versus a forbearance agreement as previously contemplated."); (SF ¶ 39); (Larsen Ex. 11) (Baiera (another Steering Lender employee): "There are clear benefits to this approach (no court approval/notice) . . .).

- The Debtors controlled TCV and directed the Bank Fee Payments. It was the Debtors' management that made the decision for TCV to make the payments. (SF ¶ 69). TCV's board of directors was never even consulted. (*Id.*).

- The Blackstone engagement letter was drafted purposefully to avoid Court scrutiny. That letter purports to obligate the Debtors to pay Blackstone's massive monthly and success fees. However, the parties revised earlier iterations of that letter to remove the Debtors and even the Non-Debtor Guarantors as signatories. *See* (SF ¶ 50). Meaning, while the Debtors purportedly remain obligated to pay, the Lenders agreed to remove them as signatories. Why would the Lenders and Blackstone agree to do this? The clear inference is that the Lenders believed that if the Debtors signed, Court approval was more likely to be sought, which they wanted to avoid.

\* \* \*

For some time now, the Debtors and the Lenders have been negotiating terms for a potential plan in the Debtors' cases. As reported in the last exclusivity hearing, that plan likely would attempt to release the Debtors' officers and directors, for, among other things, their involvement in the LBO, as well as releasing the Lenders in connection with same. (Feb. 18, 2010 Hrg. Transcript., 52:6-15). Such a plan would be highly advantageous to the Debtors' officers and directors and to the Lenders who – Law Debenture believes – face substantial exposure if the LBO claims are prosecuted against them.

It is against this backdrop, that the Lenders demanded payment of nearly $23,700,000 of Bank Fees, and the Debtors acquiesced. The Debtors and the Lenders structured the scheme discussed above, to effectuate their agreement without public or Court scrutiny. The Debtors'

management, who at all times had and continues to have strong ties with Zell[8], directed TCV's payments of the Bank Fees. Kulnis was the point person at JPMorgan and was the one that presented the payment agreement to the Creditors' Committee, of which she was also the co-chair.

The bankruptcy process only works if the parties provide full and adequate disclosure to the Court and parties in interest. The Debtors and the Lenders did not give such notice because they were rightly concerned that parties would raise objections to the propriety of the Bank Fee Payments and that the Court may not approve them.

## II.
## THERE IS NO VALID BASIS FOR TCV'S PAYMENT OF THE BANK FEES.

Had the Debtors sought authority for TCV to make the Bank Fee Payments, which they did not do, parties-in-interest would have objected and it is likely that the Court would have denied that relief, as inconsistent with the Bankruptcy Code. The Bank Fee Payments depleted funds available to the Debtors, were funded with property of the Debtors' estates, and there is no justifiable basis for the Debtors' decisions to make the payment.

### A.  Depletion Of Funds Available To The Debtors And Their Estates.

The Bank Fee Payments harmed the Debtors and their estate by usurping funds that otherwise would have flowed to the Debtors.[9] Prior to the Petition Date, TCV routinely

---

[8]    (Debtors/TCV Tr., 7:5-9:8).

[9]    The record shows that the Debtors and the Lenders were well aware that the Bank Fee Payments impacted the Debtors' estates, not just TCV. First, when the parties originally contemplated proceeding through a forbearance agreement that provided for Non-Debtor Guarantors to pay the Bank Fees, the Debtors marked up the Lenders' initial draft adding a requirement for bankruptcy court approval. (SF ¶ 36). Second, the Debtors and the Lenders decided to seek input from the Creditors' Committee, a fiduciary body in the Debtors' bankruptcy estate that would be agnostic to truly non-debtor issues. Third, the Debtors and the Lenders agreed to give the Creditors' Committee rights to object to reasonableness of the Bank Fee Payments – there would be no reason to give the Creditors' Committee those rights if, in fact, the payments were totally remote from the Debtors' estate. See (SF ¶ 56). Fourth, the parties informed the U.S. Trustee, which has no oversight over TCV as a non-debtor. Accordingly, the Debtors and Lenders' actions confirm they clearly appreciated that the Bank Fee Payments would have an impact on the Debtors and their estate.

transferred all cash into accounts in Tribune's name, which then flowed through the company's global cash management system. (SF ¶ 64). On the Petition Date, however, the Debtors began to reroute these funds and had TCV – which the Debtors wholly controlled – stop sending money to the Debtors. (SF ¶ 64). Instead, TCV started storing up its cash, amassing more than $40,000,000 in its accounts through December 2009, with an additional $23,700,000 of TCV's cash used to pay the Bank Fees. (SF ¶¶ 69, 72, 79). Accordingly, funds that could have gone and, indeed, previously were used, to fund the Debtors' operations and other cash outlays, were diverted to pay the Lenders' professionals.[10]

**B.    TCV's Funds Used To Make The Bank Fee Payments Were Property Of The Debtors' Estates.**

The Debtors' bankruptcy estates include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "The main thrust of [the Bankruptcy Code] is to secure for creditors everything of value the bankrupt may possess in alienable or leviable form when he files his petition. To this end the term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed." *Segal v. Rochelle*, 382 U.S. 375, 379 (1966). "Property of the estate includes all interests, such as contingent interests and future interests, whether or not transferable by the debtor. It is also well established that the mere opportunity to receive an economic benefit in the future is property with value under the Bankruptcy Code." *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 211 (3d Cir. 2006) (internal citations omitted).

---

[10]    Moreover, since it appears that TCV paid all Bank Fee Payments, not just some proportional share based on its smaller part in the global Tribune family, it is possible the payments may have created contribution claims by TCV against the Debtors.

Property of the estate includes funds that could be paid as dividends or distributions to the debtor by virtue of its equity interests in non-debtor subsidiaries. *See In re Valladares*, 415 B.R. 617, 625 (Bankr. S.D. Fla. 2009) (ordering disgorgement of fees paid by non-debtor subsidiary because the court could not "with any degree of certainty conclude that the payments to [counsel] were not corporate distributions."); *In re W.T. Mayfield Sons Trucking Co., Inc.*, 225 B.R. 818, 827 (Bank. N.D. Ga. 1998).

In *W.T. Mayfield Sons Trucking Co., Inc.*, debtor's counsel was secretly paid by non-debtor subsidiaries. In ordering disgorgement, the court held as follows:

> Here, the transactions, collapsed, reveal unauthorized transfers of valuable property rights of the Debtor's estate. The scheme was a sham designed to circumvent the very important functions of full disclosure and court approval of employment and compensation of professionals representing a Chapter 11 debtor. Where a wholly owned and solvent subsidiary of a Chapter 11 debtor secretly pays a professional employed by the debtor for services rendered to the debtor in its capacity as debtor in possession, the property transferred is, for purposes of § 541(a), property of the estate at the moment of the transfer.

225 B.R. at 827.

TCV is wholly owned by Debtor Tribune Broadcasting Company. It holds nearly $40,000,000 in its bank accounts, and before paying the Bank Fees, had an additional approximately $23,700,000. TCV could have made a dividend or distribution with those funds to its Debtor parent. Thus, the funds constitute property of the Debtors' estates.

The funds used by TCV also constitute property of the Debtors' estates because the Debtors had the ability to control how they were used. *See Floyd v. Shindler (In re Rodriguez)*, 204 B.R. 510, 515 (Bankr. S.D. Tex. 1995) (holding that an account held in the name of a non-debtor was nevertheless property of the estate because the account was controlled by the debtor). The Debtors on the first day of this bankruptcy requested and received permission to continue the sweep of TCV cash to an account held by Tribune Company. Yet, in order to facilitate this

16

secret arrangement, the Debtors allowed cash to accumulate at TCV so that it could be used to

pay the Bank Fees without notice and Court approval. *See* (SF ¶ 64).

**C.    There Is No Basis Under The Bankruptcy Code To Pay The Bank Fees.**

The Bankruptcy Code outlines specific and limited circumstances in which a party may

look to the bankruptcy estate to have professional fees paid.  Generally, a professional can be

paid by the estate only under sections 330 and 331.  In certain limited circumstances, a non-

estate professional may also be paid under sections 506(b) or 503(b).  That is it.  The filing of the

bankruptcy petition relieves a debtor of non-bankruptcy obligations to pay professional fees to

third parties unless, and to the extent, such payment is provided for in the Bankruptcy Code. *In*

*re Loewen Group International, Inc.*, 274 B.R. 427, 445, n.36 (Bankr. D. Del. 2002) ("Although

a contractual provision providing for the recovery of attorneys' fees and costs may enable an

unsecured creditor to pursue recovery of such fees and costs in an action in state court, in the

context of bankruptcy, the creditor's right to assert such claims is limited by the provisions of the

Bankruptcy Code.").

The Bank Fees do not fall into any of the limited circumstances providing for

professional fee payments.  The Lenders' professionals were not retained by the estates, so they

are not entitled to compensation under sections 330 or 331.  Because the Lenders are unsecured,

they have no rights to fee payments under section 506(b), which provides for fees only "[t]o the

extent that an allowed secured claim is secured by property the value of which . . . is greater than

the amount of such claim . . . ." 11 U.S.C. § 506(b).  The Lenders have not asserted

administrative expense claims for the Bank Fees, nor could they since the Bank Fees are not

"actual, necessary costs and expenses of preserving the estate," 11 U.S.C. § 503(b), and

regardless, section 503(b) only contemplates allowance, not payment. *See* 11 U.S.C. § 503(b)

("After notice and a hearing, there shall be allowed administrative expenses . . .").

17

The Debtors also could not have utilized section 363(b)(1) to seek authority for the Bank

Fee Payments.  To obtain authority to use estate property outside the ordinary course, a debtor

needs to demonstrate a sound business purpose justifying the intended use.  *See In re Lionel*

*Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).  "In fashioning its findings, a bankruptcy judge must

not blindly follow the hue and cry of the most vocal special interest groups; rather, he should

consider all salient factors pertaining to the proceeding and, accordingly, act to further the

diverse interests of the debtor, creditors and equity holders, alike."  *Id.*

The Debtors could not have established, and still cannot establish, a sound business

justification for the Bank Fee Payments because the payments were unnecessary.  Even if the

Debtors were concerned that absent the payments the Lenders would try to foreclose on Non-

Debtor Guarantors' assets, the Debtors had other options:  The Debtors could have requested a

determination that the automatic stay applied to the Non-Debtor Guarantors, *see generally*

Bankruptcy Rule 7001(9) and 11 U.S.C. § 105(a); the Debtors could have asked the Court to

extend the automatic stay to apply to the Non-Debtor Guarantors or to TCV's funds specifically,

*see A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986) ("[T]here are cases [under

362(a)(1)] where a bankruptcy court may properly stay the proceedings against non-bankrupt co-

defendants"); or the Non-Debtors Guarantors could have sought bankruptcy protection like the

Debtors.  But, in any event, the discussion is irrelevant because the Debtors never made any

showing or requested any relief, choosing instead to keep the Court (and other interested parties)

out of the process.  The failure to obtain approval of the Bank Fee Payments voids such

payments as a matter of law.  *In re Lavigne*, 114 F.3d 379, 385 (2d Cir. 1997) (purported

cancellation of policy was void as an extraordinary disposition of property of the estate without

notice or hearing); *In re NextWave Personal Communications Inc.*, 244 B.R. 253 (Bankr.

S.D.N.Y. 2000) (unapproved transactions subject to section 363(b) of the Bankruptcy Code are void). The Debtors' decision to pay the Bank Fees also calls into question whether they were properly exercising their fiduciary duties "to treat all parties to the case fairly, maximize the value of the estate, and protect and conserve the debtor's property" *In re Centennial Textiles, Inc.*, 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998) (citations omitted).

Finally, the Court would not have approved the Bank Fee Payments because they are not even provided for in the Credit Agreement. Section 8.04(a) of the Credit Agreement, which is the provision the Debtors and the Lenders assert gave rise to the Bank Fee Payments provides for payments of "all reasonable and documented out-of-pocket costs and expenses" incurred "in connection with the enforcement (whether through negotiations, legal proceedings or otherwise)" of the Credit Agreement and related documents. (SF ¶ 3). The Bank Fee Payments were not provided for in the Credit Agreement because (a) it makes no allowance for pre-payment retainers, only payment of documented out-of-pocket costs and expenses, and (b) large portions of the Bank Fees were not incurred in connection with enforcement, but rather (as discussed above) in the course of the Lenders' efforts to shield themselves from fraudulent conveyance litigation by the Creditors Committee.

\* \* \*

Had the Debtors sought approval of the Bank Fee Payments, it likely would have been denied. The foregoing analysis is no surprise to the Debtors and the Lenders. The record demonstrates that they were well aware the Court likely would not approve any arrangement where TCV paid the Bank Fees. Accordingly, they took active steps to avoid any Court scrutiny. The Court should not countenance the parties' intentional avoidance of Court review. Allowing

the Debtors' and Lenders' scheme to go unchecked would encourage the type of covert

agreements and undisclosed payments seen here.

### III.
### THE BANK FEE PAYMENTS VIOLATE THE AUTOMATIC STAY.

The Bankruptcy Code stays "any act to obtain possession of property of the estate or of

property from the estate or to exercise control over property of the estate" or "to collect, assess,

or recover a claim against the debtor that arose before the [Petition Date]". 11 U.S.C. §§

362(a)(3), 362(a)(6).

As discussed in Section II, *supra*, TCV's funds used to make the Bank Fee Payments

were property of the Debtors' estates. Accordingly, the Lenders' demands for payments

constituted acts to obtain possession of property of the estate. 11 U.S.C. § 362(a)(3). Moreover,

the Bank Fees, which arose under the Credit Agreement, even if validly due and owing,

constituted claims against the Debtors that arose pre-petition. *See Ogle v. Fid. & Deposit Co.*,

586 F.3d 143, 146 (2d Cir. 2009) ("A claim will be deemed to have arisen pre-petition if the

relationship between the debtor and the creditor contained all of the elements necessary to give

rise to a legal obligation--a right to payment--under the relevant non-bankruptcy law.")

Collection of the Bank Fees was nothing more than an attempt to collect on that debt. 11 U.S.C.

§ 362(a)(6).

### IV.
### THIS COURT IS EMPOWERED TO AND SHOULD
### ORDER DISGORGEMENT OF THE BANK FEES
### AND TO ENJOIN FURTHER SUCH PAYMENTS.

This Court is empowered to "issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Ordering disgorgement

is necessary and appropriate to ensure adherence to the Bankruptcy Code including its mandated

oversight over non-ordinary course use and depletion of estate assets. *See In re Kingston Turf*

20

*Farms, Inc.*, 176 B.R. 308, 310 (Bankr. D.R.I. 1995) ("[D]isgorgement is required as a matter of law, just to adhere to the mandatory payment scheme of the Code, i.e., to ensure that all creditors of the same class share [pro rata] in the available pool of funds.").

Equitable considerations certainly weigh in favor of the relief sought. The Debtors and the Lenders orchestrated a scheme to avoid Court scrutiny. Their hidden actions harmed the Debtors' estates, violated the automatic stay, and caused the estates essentially to fund the Lenders' defenses against the Creditors' Committee's investigation of estate causes of action. Finally, it is dangerous precedent to permit fiduciaries, like the Debtors, to conspire with their Lenders to hide their actions from Court and constituent scrutiny.

In the interest of ensuring the Debtors' and future parties' strict adherence with the Bankruptcy Code including the disclosure and Court authority mandated therein, the Court should order the Bank Fee Payments disgorged and enjoin any further payments.

## CONCLUSION

The record shows that the Debtors and the Lenders structured a deal aimed to ensure that the Lenders' fees would continue to be paid, pretending the bankruptcy filing never happened. They did so through an unwritten, undisclosed agreement that nearly went undetected by the Court and the constituents. The Debtors and Lenders proceeded in this clandestine fashion because they recognized that the Court would not approve the Bank Fee Payments and that if constituents found out, the Debtors and Lenders would be dragged into Court to explain their actions. Considering the harm caused by the Bank Fee Payments, their use to fund fees of litigation targets adverse to the estates, and their violation of various provisions of the Bankruptcy Code, those payments should be disgorged, with all further payments stopped.

Dated: March 2, 2010
      Wilmington, Delaware

             /s/ Garvan F. McDaniel
             Garvan F. McDaniel (No. 4167)
             **BIFFERATO GENTILOTTI LLC**
             800 N. King Street, Plaza Level
             Wilmington, Delaware 19801
             Tel:  (302) 429-1900
             Fax:  (302) 429-8600

                  – and –

             David S. Rosner
             Andrew K. Glenn
             Sheron Korpus
             Daniel A. Fliman
             Kasowitz, Benson, Torres & Friedman LLP
             1633 Broadway
             New York, New York 10019
             Tel:  (212) 506-1700

             *Co-Counsel for Law Debenture Trust Company*
             *of New York*