# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>**Related to Docket Nos. 2407, 3657, 3660, 3665 and 3669** |

## DEBTORS' MEMORANDUM IN RESPONSE TO LAW DEBENTURE TRUST COMPANY OF NEW YORK'S SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF ITS MOTION TO TERMINATE DEBTOR AFFILIATES' UNDISCLOSED PAYMENT OF LBO LENDERS' FEES AND EXPENSES, FOR AN ACCOUNTING, AND FOR DISGORGEMENT OF PAST PAYMENTS

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a/ Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ...........................................................................................................................2

    I.     There Was No "Scheme" To Avoid Disclosure And Court Review. .......................2

    II.    The Senior Lender Fee Payments Did Not Deplete The Funds Available to the
          Debtors, Were Not Funded With Property Of The Estates, And Did Not Violate
          The Bankruptcy Code. ............................................................................................7

          A.     Use of TCV's Assets To Pay Fees Did Not Deplete
                  Assets of Tribune. ...............................................................................7

          B.     The Senior Lender Fee Payments Were Not Made
                  With Property Of The Debtors' Estate.......................................................9

          C.     The Senior Lender Fee Payments Do Not Violate
                  The Bankruptcy Code. ..............................................................13

    III.   The Senior Lender Fee Payments Do Not Violate The Automatic Stay. ..............14

    IV.   Law Debenture Has Failed To Show That An Injunction Pursuant To Section
          105(a) Is Available.................................................................................................15

CONCLUSION......................................................................................................................17

## TABLE OF AUTHORITIES

### Cases

*A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986) ........................................................ 13

*In re Aldan Indus., Inc.*, 2000 WL 357719 (Bankr. E.D. Pa. Apr. 3, 2000) ................................ 15

*Amphenol Corp. v. Shandler (In re Insilico Techs., Inc.)*,
351 B.R. 313 (Bankr. D. Del. 2006) ......................................................................................... 7

*Bailey v. Social Security Admin.*, 2007 WL 2049007 (Bankr. S.D.N.Y. July 10, 2007).............. 15

*In re CareMatrix Corp.*, 306 B.R. 478 (Bankr. D. Del. 2004) ...................................................... 1

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003) ................................................................. 8, 11

*du Pont v. du Pont*, 208 A.2d 509 (Del. 1965) ............................................................................ 7

*EBG Holdings, LLC v. Vredezicht's Gravenhage 109 B.V.*,
2008 WL 4057745 (Del. Ch. Sept. 2, 2008) ....................................................................... 5, 10

*Enron Corp. v. Port of Houston Authority (In re Enron Corp.)*,
2006 WL 2385194 (Bankr. S.D.N.Y. June 2, 2006)............................................................... 12

*Equity Broadcasting Corp. v. Shubert (In re Winstar Comms. Inc.)*,
284 B.R. 40 (Bank. D. Del. 2002) ............................................................................... 9, 10, 16

*Floyd v. Shindler (In re Rodriguez)*, 204 B.R. 510 (Bankr. S.D. Tex. 1995) .............................. 12

*Harco Nat'l Ins. Co. v. Green Farms*, 1989 WL 110537 (Del. Ch. Sept. 8, 2004)...................... 10

*Holywell Corp. v. Smith*, 118 B.R. 876 (S.D. Fla. 1990)......................................................... 8, 12

*Kreisler v. Goldberg*, 478 F.3d 209 (4th Cir. 2007) ................................................................. 8, 9

*In re La Russo*, 2008 WL 2557500 (Bankr. D.N.J. June 20, 2008)............................................... 4

*Miller v. Barenberg (In re Bernard Tech., Inc.)*, 398 B.R. 526 (Bankr. D. Del. 2008)........... 2, 16

*In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005).......................................................... 1, 9, 10

*In re RBGSC Inv. Corp.*, 242 B.R. 851 (Bankr. E.D. Pa. 2000) .................................................... 9

*Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc.*
*(In re Regency Holdings (Cayman), Inc.)*, 216 B.R. 371 (Bankr. S.D.N.Y. 1998) .............. 9, 12

*Shields v. Zuccarini*, 254 F.3d 476 (3d Cir. 2001)........................................................ 16

*Spirco, Inc. v. Copelin (In re Spirco, Inc.)*, 221 B.R. 361 (W.D. Pa. 1998) .................................. 2

*Stalbosky v. Belew*, 205 F.3d 890 (6th Cir. 2000)........................................................ 4

*In re Stein & Day, Inc.*, 113 B.R. 157 (Bankr. S.D.N.Y. 1990) ......................................... 2

*Universal Am-Can, Ltd. v. Northwestern Steel & Wire Co.*,
  2002 WL 88924 (N.D. Ill. 2002) ........................................................................ 15

*V.I. Tel. Corp. v. Rural Tel. Fin. Coop.*, 2006 WL 319002 (D.V.I. Feb. 10, 2006) .................. 8, 9

*In re Valladares*, 415 B.R. 617 (Bankr. S.D. Fla. 2009) ........................................... 11, 12

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*,
  386 B.R. 17 (Bankr. D. Del. 2006) ..................................................................... 16

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*,
  591 F.3d 164 (3d Cir. 2009)........................................................................... 15

*In re W.T. Mayfield Sons Trucking Co.*, 225 B.R. 818 (N.D. Ga. 1998) .......................... 11, 12

*In re White*, 415 B.R. 696 (Bankr. N.D. Ill. 2009) ................................................. 15

*In re Winer*, 158 B.R. 736 (N.D. Ill. 1993) ....................................................... 10

## Statutes

11 U.S.C. § 362........................................................................................ 14, 15

28 U.S.C. § 157........................................................................................ 15

## Rules

Fed. R. Evid. 802 ....................................................................................... 4

The debtors and debtors-in-possession in the above-captioned chapter 11 cases (each a "Debtor" and collectively, the "Debtors") respectfully submit this memorandum in response to Law Debenture Trust Company of New York's Supplemental Brief In Further Support Of Its Motion To Terminate Debtor Affiliates' Undisclosed Payment Of LBO Lenders' Fees And Expenses, For An Accounting, And For Disgorgement Of Past Payments (the "Brief" or "LD Brief") filed on March 2, 2010.

## PRELIMINARY STATEMENT

Law Debenture's Brief confirms that they cannot make the required showing to obtain the extraordinary injunctive and equitable relief they seek. *See In re CareMatrix Corp.*, 306 B.R. 478, 484 (Bankr. D. Del. 2004). As discussed in more detail below, in an effort to substantiate their claim that Tribune and JPMorgan[2] engaged in a coordinated "ruse" or "subterfuge" (12/01/2009 Tr. of Proc. at 80), Law Debenture asks the Court to draw a series of unwarranted inferences from the Stipulated Facts, ignores or distorts the clear and undisputed testimony and other documents in the record, and seeks a remedy that would disregard the corporate forms of the Non-Debtor Guarantors and the Debtors without even citing, much less discussing, the pertinent legal standards for doing so. *See, e.g., In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2007) ("[T]he general expectation of state law and of the Bankruptcy Code … is that courts respect entity separateness.")

As Debtors previously established, the payments at issue were entirely consistent with TCV's legal obligations and applicable bankruptcy law. TCV had independent contractual obligations, which it entered into with appropriate corporate authorization, and those obligations were not relieved by Tribune's bankruptcy filing. None of the Senior Lender Fee Payments

---

[2] Debtors hereby incorporate the definitions of defined terms as given in their supplemental brief filed on March 2, 2010 (D.I. 3665).

made after the bankruptcy filing were made with funds obtained from or earned by any Debtor. Moreover, far from engaging in "subterfuge," Tribune insisted that no payments be made without disclosure to and consultation with the UCC, which included broad representation of virtually every major creditor constituency in these cases (including Law Debenture's predecessor trustee), as well as the U.S. Trustee, to ensure that they understood the nature and basis of the payments and had an opportunity to voice any concerns or objections. Law Debenture makes no meaningful effort to rebut these facts. Simply put, the record establishes that the Senior Lender Fee Payments were proper and entirely consistent with the Bankruptcy Code. Law Debenture's Motion to Terminate should be denied.

## ARGUMENT

### I.    There Was No "Scheme" To Avoid Disclosure And Court Review.

1.    As Tribune previously noted, bankruptcy courts regularly uphold payments made by a non-debtor subsidiary using non-debtor assets pursuant to the subsidiary's contractual obligations. *See, e.g., Miller v. Barenberg (In re Bernard Tech., Inc.)*, 398 B.R. 526, 529 (Bankr. D. Del. 2008) (dismissing trustee's challenge to payments made by a wholly-owned non-debtor subsidiary to the former CEO of the debtor-parent for services rendered to the non-debtor subsidiary); *see also Spirco, Inc. v. Copelin (In re Spirco, Inc.)*, 221 B.R. 361, 371 (W.D. Pa. 1998) (finding that non-debtor parent was a co-obligor with its debtor-subsidiary on an employment contract with the subsidiary's former CEO and that the former CEO could collect against the parent on a judgment for a breach of the contract). Such payments do not involve assets of a bankruptcy estate, and as such, no bankruptcy court approval is required. *See Miller*, 398 B.R. at 529; *see also In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990). In an effort to avoid this clear law, Law Debenture suggests four reasons why the Senior Lender

2

Fee Payments were part of a corrupt "scheme" that made the bankruptcy process "unfair." (LD Brief at 12-13.)  None of these has merit.

2.      *First*, Law Debenture claims that Tribune and JPMorgan allegedly "abandoned negotiations of a formal written forbearance agreement … when they realized Court authority was required for that agreement, which the Debtors and the Lenders wanted to avoid." (LD Brief at 12-13.)  But the clear and undisputed testimony is that the forbearance agreement approach was abandoned because the parties could not agree on certain deal terms, including termination rights and the extent of financial disclosure, and not to avoid Court scrutiny. (Kulnis Dep. at 65-66; Larsen Dep. at 67-70.)  Indeed, the only evidence that Law Debenture offers to the contrary is an email exchange between Tribune and JPMorgan. (LD Brief 12-13.)  But Law Debenture misreads the email – as is clear from the language they quote, both sides at the time expected the agreement to be presented to the Court, regardless of whether or not the Debtors were formally included as a party. (Stipulated Facts ¶ 37 ("[forbearance agreement] would be *more likely to get approved by the court* if the debtors were not a party") (emphasis added).)

3.      *Second*, Law Debenture claims that the parties entered into "an unwritten 'understanding' that would not be disclosed to the Court nor [*sic*] the parties-in-interest." (LD Brief at 13.)  But again, the evidence is to the contrary.  As to the "parties-in-interest," Tribune insisted that the proposed arrangement be fully disclosed to the UCC and they be given an opportunity to object prior to the time that the arrangement was finalized. (Stipulated Facts ¶¶ 46, 55-56.)  To that end, the Senior Lenders had "numerous discussions with the UCC and its advisors on the fee request and the non-debtor guarantors' decision to make these payments." (Joint Exhibit 18; *see also* Kulnis Dep. at 67-68, 75-76.)  At the time, the UCC was comprised of virtually every major creditor constituency in the Debtors' bankruptcy cases, including, most

3

notably, Deutsche Bank Trust Company Americas, which served as Indenture Trustee for all of

Tribune's public notes, including those now held by Centerbridge, and those for which Law

Debenture has become Indenture Trustee. (Stipulated Facts ¶¶ 11-14, 27.) And, both the

Debtors and the Senior Lenders discussed the arrangement with the U.S. Trustee, who likewise

did not object. (Stipulated Facts ¶¶ 57-62.)[3]

    4.    Nor is there any basis to infer that the parties opted for an informal agreement to

avoid disclosure to the Court. To the contrary, the testimony makes clear that the decision to

proceed on a different path was motivated by other concerns. (*See, e.g.*, Larsen Dep. at 71-72

(parties took informal approach because "the conversations [concerning the forbearance

agreement] that were going on looked like they had the potential to take longer and expose the

non-debtor entities to incremental risk…. But the primary concern was to keep the Cubs process

going and preserve the value of the entities that held the various partnership entities –

interests."); Kulnis Dep. at 66-67) (Debtors wanted to enter into an informal agreement because

the Debtors "wanted to have the ability at any time to decide to stop paying the fees if they

thought it was appropriate").) And given Tribune's insistence on the disclosures to the UCC and

its members as well as to the U.S. Trustee as described above, as well as the fact that the

payments were being made by a non-debtor with non-debtor assets, Tribune and the parties

---

[3] Law Debenture implies that Tribune's communications with the U.S. Trustee were perfunctory and that Tribune would have proceeded regardless of the U.S. Trustee's position. (LD Brief 10.) There is nothing to support this claim. In fact, both Tribune and JPMorgan had a number of conversations with the U.S. Trustee, provided the U.S. Trustee with a legal memorandum and additional information, and would have taken the U.S. Trustee's position into account had the U.S. Trustee voiced any concerns or objections, which it did not. (Stipulated Facts ¶¶ 57-62; Larsen Dep. 130-31.) Law Debenture points to an email in which JPMorgan's counsel purports to characterize a conversation between Tribune and the U.S. Trustee (to which JPMorgan's counsel was not a party) (LD Brief at 10), but that document is at odds with the testimony of Mr. Larsen and, in any event, is hearsay if offered to establish what Tribune told the U.S. Trustee. Fed. R. Evid. 802; *see In re La Russo*, 2008 WL 2557500, at *5 n.4 (Bankr. D.N.J. June 20, 2008) (explaining that testimony contained "multiple levels of hearsay" when a witness testified not only "to what the illegal runners said, but she was also testifying as to what the illegal runners alleged Dr. La Russo said to them"); *see also Stalbosky v. Belew*, 205 F.3d 890, 894 (6th Cir. 2000) ("Under Rule 801(d)(2)(A), a party's statement is admissible as non-hearsay only if it is offered against that party.")

4

reasonably believed that such additional disclosure was not necessary. Law Debenture's allegation to the contrary is based on a single email in which an employee of one of the Senior Lenders (not JPMorgan) stated that a potential "benefit" of the agreement was that it would not require court approval. (LD Brief at 13.) But Law Debenture do not point to any evidence that suggests that that either Tribune or JPMorgan shared this view, or that it was the reason the parties determined not to enter into a formal forbearance agreement.

5.      *Third*, Law Debenture's claim that "Debtors' management" made the decision to make the payments and that TCV's board of directors was never "consulted" (LD Brief at 13), is wholly misplaced. Because the TCV board of directors had *already* authorized various of its officers to perform all of its obligations pursuant to the Credit Agreement Guarantee, there was no need for TCV's board of directors to provide authorization or be "consulted" with respect the Senior Lender Fee Payments. ("6/4/2007 Unanimous Written Consent of the Board of Directors of Tribune (FN) Cable Ventures, Inc.," Joint Exhibit 5 (Larsen Ex. 4).) Likewise, the fact that the TCV officers authorized by the TCV board were also employees of Tribune itself is entirely unremarkable and does not provide any basis to disregard the corporate form. *See EBG Holdings, LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *13 (Del. Ch. Sept. 2, 2008) (fact that wholly-owned subsidiary and parent have common officers insufficient to disregard corporate form). Moreover, the record is clear that those individuals who were involved in the decision-making process were, in fact, authorized to cause TCV to fulfill its obligations under the Guarantee. (Stipulated Facts ¶¶ 65, 69.)

6.      *Fourth*, Law Debenture's claim the "Blackstone engagement letter was drafted purposefully to avoid Court scrutiny" is also wrong. (LD Brief at 13.) Law Debenture notes that an early draft of the engagement letter had the Debtors acknowledging the letter by signing it.

From this, Law Debenture asserts that the "clear inference is that the Lenders believed that if the Debtors signed, Court approval was more likely to be sought, which they wanted to avoid." (*Id.*) This allegedly "clear inference" is hardly clear.[4]  Indeed, once again, the evidence is to the contrary:  Tribune was unwilling to and did not enter into a new and separate contractual arrangement separate from any rights JPMorgan may have had under the Credit Agreement. More importantly, Tribune insisted that the details of the Blackstone engagement be fully explained to the UCC.  (Stipulated Facts ¶ 46.)  The Senior Lenders agreed and informed the UCC of the engagement.  (*Id.* ¶ 47.)  And the parties also discussed the Blackstone engagement with the U.S. Trustee and, upon request by the U.S. Trustee, counsel for the Senior Lenders sent the U.S. Trustee a copy of the engagement letter.  (*Id.* ¶ 58.)  Such action is hardly reflective of a desire to avoid scrutiny of the payments.[5]

       7.     In short, none of the "evidence" that Law Debenture musters supports their claim that the parties engaged in a coordinated "scheme" to avoid "scrutiny" or to circumvent their obligations under the bankruptcy laws or otherwise.  In fact, the evidence shows precisely the opposite:  the payments were entirely consistent with TCV's legal obligations and applicable

---

[4] Law Debenture quotes a portion of the Blackstone engagement letter in an apparent attempt to show that it bound the Debtors to pay the Blackstone fees.  (LD Brief at 8 ("The draft engagement letter specified that the 'fees and expenses payable to Blackstone pursuant to this Agreement shall be payable by **the Company**' (meaning the Debtors and Non-Debtor Guarantors).") (emphasis in original).)  The full section of the Blackstone engagement letter, however, indicates that the parties were simply stating the belief that the Blackstone fees were reimbursable under Section 8.04 of the Credit Agreement.  (Stipulated Facts ¶ 44.)

[5] Law Debenture claims that the Senior Lender Fee Payments should be viewed against the "backdrop" of what they speculate Tribune intends to propose as a Plan of Reorganization, which they suggest will include releases of claims against Tribune's officers and directors and against the Senior Lenders themselves.  (LD Brief at 13.)  Apart from the fact that the Payments were made in connection with an existing contractual obligation, and that the Payments began nearly a year ago, long before negotiations over a possible plan began, Law Debenture simply offers nothing but speculation, as opposed to evidence, for its insinuation that the arrangement was intended to be some sort of "quid pro quo."  And their insinuations do not account for the fact that, following the December 1, 2009 hearing, no further payments have been or will be made until the matter was resolved by this Court.

bankruptcy law, and Tribune consistently sought to ensure that the payments were disclosed to an appropriately broad range of parties with an interest in these proceedings.

**II.    The Senior Lender Fee Payments Did Not Deplete The Funds Available to the Debtors, Were Not Funded With Property Of The Estates, And Did Not Violate The Bankruptcy Code.**

8.    Law Debenture claims that there was no valid basis under the Bankruptcy Code for the Senior Lender Fee Payments.  (LD Brief at 14-20.)  This argument rests on the assumption that payments made by a non-debtor using non-debtor assets require approval by the Bankruptcy Court.  Law Debenture offers two bases for such a claim:  (i) the payments depleted the funds available to the Debtors and their estates and (ii) the payments were made using property of the bankruptcy estates.  Neither has any merit.

**A.    Use of TCV's Assets To Pay Fees Did Not Deplete Assets of Tribune.**

9.    According to Law Debenture, the Senior Lender Fee Payments "usurp[ed] funds that otherwise would have flowed to the Debtors."  (LD Brief at 14.)  In support, it points to the fact that *prior* to the Petition Date, cash received by TCV in the ordinary course of business was included in Tribune's central cash management system.  Law Debenture argues that because at one point in time TCV's income was included in the cash management system, those funds "could have gone and, indeed, previously were used, to fund the Debtors' operations and other cash outlays."  (*Id.*)

10.    This is a *non sequitur*.  The fact that affiliated companies utilize a centralized cash management system has no bearing whatsoever on the ownership of the cash generated by those entities.  Indeed, the law is to the contrary.  A shareholder, even where a company has a single shareholder, "has no specific interest in the corporate assets" of the corporation in which it owns shares.  *See, e.g., du Pont v. du Pont*, 208 A.2d 509, 512 (Del. 1965); *see also Amphenol Corp. v. Shandler (In re Insilico Techs., Inc.)*, 351 B.R. 313, 321 (Bankr. D. Del. 2006) (rejecting

7

argument because it "merges its interest as the sole shareholder of [the subsidiary] with a direct interest in the assets and liabilities of [the subsidiary]"). Thus, "[a] corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of that subsidiary." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003); *see also Kreisler v. Goldberg*, 478 F.3d 209, 214 (4th Cir. 2007) ("The fact that a parent corporation has an ownership interest in a subsidiary, however, does not give the parent any direct interest in the *assets* of the subsidiary."); *V.I. Tel. Corp. v. Rural Tel. Fin. Coop.*, 2006 WL 319002, at *4 (D.V.I. Feb. 10, 2006) ("Indeed, it is well settled that 'absent unusual circumstances, the property of the debtor's subsidiary is not considered property of the debtor by virtue of the debtor's sole ownership of the subsidiary.'") (quoting *Holywell Corp. v. Smith*, 118 B.R. 876, 879 (S.D. Fla. 1990)). In the absence of any agreement between TCV and Tribune or any other subsidiary by which TCV obligated itself to dividend cash, which is not present here, the mere fact that TCV's funds may have been held in a consolidated cash management system does not mean that these funds were the property of Tribune, as opposed to being held by Tribune for TCV's benefit and reflected in an appropriate intercompany receivable and corresponding payable. In essence, Law Debenture is equating a cash management convention commonly used for convenience of the corporate family with substantive consolidation/disregard of corporate form. There is no legal or factual basis for such an assertion.

11.    Moreover, after the Senior Lender Fee Payments began to be made, the Debtors' interest in TCV remained unchanged and unaffected – *i.e.*, TCV remained and remains a corporation whose stock is wholly owned by Debtor Tribune Broadcasting Corporation. (Stipulated Facts ¶ 63.) The fact that an action by or against a non-debtor subsidiary may impact the *value* of the debtor's stockholdings is insufficient to bring that action within the scope of the

8

Bankruptcy Code.  *See, e.g., Equity Broadcasting Corp. v. Shubert (In re Winstar Comms. Inc.)*,

284 B.R. 40, 51 (Bank. D. Del. 2002) ("EBC's actions may have an effect on the ultimate value

with the estate receives for the stock it owns, but it does not alter the estate's rights, liabilities,

options or freedom of action."); *Kreisler*, 478 F.3d at 214 (refusing to extend automatic stay to

enforcement action against non-debtor subsidiary because "[t]he nature and extent of Bask's

interest in Just remains unchanged by Just's loss of the property"); *Regency Holdings (Cayman)*,

*Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.)*, 216 B.R. 371, 377 (Bankr.

S.D.N.Y. 1998) ("At most, the transfers diminished the underlying value of the Cruises shares,

but this does not amount to a transfer of Holding's property.").

> **B.**    **The Senior Lender Fee Payments Were Not Made With Property Of The Debtors' Estate.**

12.    Law Debenture also attempts to argue that the Senior Lender Fee Payments were

made with property of the Debtors' bankruptcy estate.  (LD Brief at 15-17.)  Generally, however,

assets of a non-debtor subsidiary are not part of debtor-parent's bankruptcy estate.  *Kreisler*, 478

F.3d at 214 (finding that "assets of [subsidiary] belonged to [subsidiary] and did not form part of

[debtor-parent's] bankruptcy estate"); *V.I. Tel. Corp.*, 2006 WL 319002, at *4 ("Indeed, it is well

settled that absent unusual circumstances, the property of the debtor's subsidiary is not

considered property of the debtor by virtue of the debtor's sole ownership of the subsidiary.")

(internal quotation marks omitted).

13.    There is good reason for such a rule.  Both the Bankruptcy Code and Delaware

law respect the separate legal identities of related corporations.  *See, e.g., In re Owens Corning*,

419 F.3d at 211 ("courts respect entity separateness absent compelling circumstances calling

equity … into play."); *In re RBGSC Inv. Corp.*, 242 B.R. 851, 858 (Bankr. E.D. Pa. 2000)

(noting that "[e]lementary principles of corporate law" provide that "a corporation is a legal

9

entity which is ordinarily deemed to be separate and distinct from its officers, directors, and stockholders"). Nowhere in their memorandum does Law Debenture address the legal standards for disregarding corporate separateness, whether through substantive consolidation or piercing the corporate veil. The reason for this omission is clear: Law Debenture cannot possibly meet the rigorous standard needed to invoke those extraordinary remedies. *See In re Owens Corning*, 419 F.3d at 209 (noting that substantive consolidation "is a remedy to be used sparingly"); *Harco Nat'l Ins. Co. v. Green Farms*, 1989 WL 110537, at *4 (Del. Ch. Sept. 8, 2004) ("It should be noted at the outset that persuading a Delaware Court to disregard the corporate entity is a difficult task.").[6]

14.    Instead, Law Debenture attempts an end run around these standards by claiming that because TCV is wholly-owned by Debtor Tribune Broadcasting Company, "TCV could have made a dividend or distribution with those funds to its Debtor parent. Thus, the funds constitute property of the Debtors' estates." (LD Brief at 16.) This proves far too much, as it would bring into a bankruptcy proceeding assets of *every* subsidiary of a debtor-parent, and indeed, *every* corporation that has a debtor-stockholder. Courts have consistently rejected arguments that would reach a similar result. *See, e.g., Equity Broadcasting Corp.*, 284 B.R. at 51 ("If the court were to find that this action was under the jurisdiction of the Bankruptcy Court, the decision would have the result of bringing every wholly owned subsidiary into every Bankruptcy case regardless of the circumstances."); *In re Winer*, 158 B.R. 736, 743 (N.D. Ill. 1993)

---

[6] Law Debenture states, without any factual support, that TCV was a "shell" corporation. (LD Brief at 2.) This is wrong. As Law Debenture itself admits, TCV owns a valuable interest in a general partnership. (*Id.* at 10-11.) Nor does Law Debenture ever argue or point to any evidence that TCV failed to follow the requisite corporate formalities. Further, the parties have stipulated that TCV "maintains separate books and records from Tribune." (Stipulated Facts ¶ 63.) The fact that TCV shares officers and directors with the Debtors, shares office space with the Debtors, and is a wholly-owned subsidiary of a Debtor is an insufficient reason to ignore the corporate form. *See EBG Holdings, LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *13 (Del. Ch. Sept. 2, 2008) (refusing to ignore the corporate form even though the wholly-owned subsidiary and parent "share offices, officers, and letterhead").

(rejecting argument that automatic stay should extend to non-debtor subsidiary based on the "degree of control exercised by a majority-shareholder or sole-shareholder debtor over the nondebtor subsidiary" and noting that "[a]ny such exception would swallow up the rule itself"). Indeed, any rule similar to the one Law Debenture proposes would ignore the basic principle of corporate law, as explained above, that a "corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of that subsidiary." *Dole Food Co.*, 538 U.S. at 474.

15.     Neither case cited by Law Debenture, *In re Valladares* and *In re W.T. Mayfield Sons Trucking Co.*, supports their position. To the contrary, both cases involved situations in which a non-debtor subsidiary paid the fees of their debtor-parent's bankruptcy attorneys without complying with the disclosure requirements of 11 U.S.C. 329(a) and Bankruptcy Rule 2016. *In re Valladares*, 415 B.R. 617, 623 (Bankr. S.D. Fla. 2009); *In re W.T. Mayfield Sons Trucking Co.*, 225 B.R. 818, 825 (N.D. Ga. 1998). Neither cases involves the situation presented here, where a non-debtor is seeking to fulfill an independent, pre-existing contractual obligation using non-debtor funds. Moreover, unlike those cases, the parties here disclosed the arrangement to the major creditor constituencies and the U.S. Trustee. Law Debenture does not quote from the portion of *W.T. Mayfield Sons Trucking Co.* expressly limiting its holding to the facts presented:

> This ruling is not to say that the property of a wholly owned, nondebtor subsidiary ordinarily constitutes assets of its parent's bankruptcy estate. "Absent unusual circumstances, the property of a debtor's subsidiary is not considered property of the debtor by virtue of the debtor's sole ownership of the subsidiary." Nor should this court's holding be interpreted to mean that transactions by a nondebtor subsidiary outside the ordinary course of its business necessarily require bankruptcy court approval.

11

*Id.* (quoting *Holywell Corp.*, 118 B.R. at 879) (internal citations omitted).  In short, except for

the fact that the case involves a wholly-owned non-debtor subsidiary of a debtor parent, the facts

here bear no resemblance at all to *W.T. Mayfield Trucking* and *Valladares.*

16.    In addition, Law Debenture claims that the TCV funds used to make the Senior

Lender Fee Payments were estate property because "the Debtors had the ability to control how

they were used."  (LD Brief at 16.)  Law Debenture does not explain what it means by "control,"

but the law is clear that "control" of a non-debtor subsidiary by a debtor parent company through

corporate governance mechanisms is not sufficient to bring the non-debtor's assets within the

definition of "property of the estate."  *Enron Corp. v. Port of Houston Authority (In re Enron*

*Corp.)*, 2006 WL 2385194, at *6 (Bankr. S.D.N.Y. June 2, 2006) ("[A] parent's control, through

an ownership structure or other corporate governance mechanism, of a subsidiary entity does not

constitute control of the subsidiary's assets, such as a bank account, where there is no legal title

to a subject asset held by the parent."); *Regency Holdings (Cayman), Inc.*, 216 B.R. at 377

(rejecting argument that "Holding's ability to exercise corporate control over its subsidiary (and

its subsidiary's subsidiary) permits it to recover the transfer of their assets").[7]

17.    Nor is there any merit to Law Debenture's suggestion that the Court's Cash

Management Order somehow permits the Debtors to ignore the corporate structure of TCV and

"control" TCV's assets so as to make them part of the bankruptcy estate.  (LD Brief at 16-17.)

But the Cash Management Order permits Debtors to continue using their existing cash

management system (subject to certain conditions) without including non-debtor subsidiary

---

[7] The single case that Law Debenture cites does not support their argument.  The debtors in that case, *Floyd v.*
*Shindler (In re Rodriguez)*, were the perpetrators of a Ponzi scheme that collapsed.  204 B.R. 510, 512-13 (Bankr.
S.D. Tex. 1995).  The Court permitted recovery of certain "commingled investor funds" from the account of a non-
debtor, holding "funds obtained from investors in a Ponzi scheme are property of the debtor."  *Id.* at 515.  Here, by
contrast, the funds used to make the Payments were not kept in an account that also contained Debtors assets.
TCV's assets were kept separate from any property of the Debtors.  (Stipulated Facts ¶¶ 65-67.)

12

funds; it certainly does not *require* the Debtors to place non-debtor funds into the consolidated cash management system. In fact, the Cash Management Order establishes the opposite of what Law Debenture suggests – it expressly provides that documented intercompany transactions involving the company's cash management system will give rise to a priority allowed claim by the subsidiary against the parent or other subsidiary debtor. (*See* Final Order (I) Approving Cash Management Systems, (II) Authorizing Use of Prepetition Bank Accounts and Business Forms, And (III) Granting Superpriority Expense Status to Postpetition Intercompany Transactions, D.I. 1116.) This is consistent with the law that the mere fact a cash management system includes funds from subsidiaries does not mean that those funds are assets of the parent. (*See* pp. 7-8, *supra*).

### C.    The Senior Lender Fee Payments Do Not Violate The Bankruptcy Code.

18.    Law Debenture argues that there is no basis under the Bankruptcy Code for the Senior Lender Fee Payments. (LD Brief at 17.) This turns the proper inquiry on its head – as noted above, Law Debenture, as the movant for the equitable relief, bears the burden of showing that the Payments somehow violated a provision of the Bankruptcy Code. (*See* p. 1, *supra*). Because the assets of TCV are not property of the bankruptcy estates, the Payments did not violate the Bankruptcy Code. [8]

---

[8] Law Debenture complains the Payments were "unnecessary" because "[e]ven if the Debtors were concerned that absent the payments the Lenders would try to foreclose on Non-Debtor Guarantors' assets, the Debtors had other options." (LD Brief 18.) Specifically, Law Debenture argues that the Debtors could have requested this Court enforce the automatic stay, requested this Court to extend the automatic stay, or filed for bankruptcy themselves. (*Id*.) Because the Senior Lender Fee Payments do not involve property of the estate, however, the automatic stay does not apply. *See A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986). And while courts do at times extend the automatic stay to cover litigation involving third-parties, they do so only in "unusual circumstances." *Id*. Finally, as Tribune previously explained in detail, there were a variety of legitimate business reasons why TCV and certain other subsidiaries did not file for bankruptcy. (See Debtors' Memorandum in Opposition, D.I. 3665, ¶¶ 10-11). Law Debenture offers no explanation as to how filing the Non-Debtor Guarantors in bankruptcy would at all be preferable here to fulfilling a legitimate contractual obligation.

13

19.    Law Debenture also asserts that "the Court would not have approved the Bank Fee Payments because they are not even provided for in the Credit Agreement." (LD Brief at 19.) In support, Law Debenture claims that the Credit Agreement "makes no allowance for pre-payment retainers, only payment of documented out-of-pocket costs and expenses." (*Id.*) But Law Debenture does not explain how a retainer fee paid by JPMorgan to its law firm would not be constitute "reasonable and documented counsel fees and expenses" for JPMorgan under section 8.04(a). And Law Debenture ignores section 8.04(b), which requires the borrower (and, through the guarantees, any guarantor) to "indemnify and hold harmless" the Senior Lenders for "any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel)" which arise from "any investigation, litigation or proceeding or preparation of a defense in connection" with the Credit Agreement. And, Law Debenture's claim that "large portions of the Bank Fees were not incurred in connection with enforcement, but rather (as discussed above) in the course of the Lenders' efforts to shield themselves from fraudulent conveyance litigation by the Creditors Committee" is likewise without merit. (LD Brief at 19.) Law Debenture also offers no authority to support the proposition that such costs and expenses would be excluded from section 8.04(b) in any event.

**III.    The Senior Lender Fee Payments Do Not Violate The Automatic Stay.**

20.    Law Debenture contends that the Senior Lender Fee Payments violate the automatic stay because they "constituted acts to obtain possession of property of the estate." (LD Brief at 20.) This conclusion rests on the notion that the Senior Lender Fee Payments involved property of the estate. They do not, for all the reasons discussed above.

21.    In addition, Law Debenture suggests the Senior Lender Fee Payments violate the automatic stay because they seek "to collect, assess, or recover a claim against the debtor that arose before the [Petition Date]." (*Id.* (quoting 11 U.S.C. § 362(a)(6)).) This provision of the

14

automatic stay, however, is limited to claims "against the debtor." *Universal Am-Can, Ltd. v. Northwestern Steel & Wire Co.*, 2002 WL 88924, at *1 (N.D. Ill. 2002) ("[Section 362(a)(6)] affords protection to the debtor only and does not extend to third parties."). It does not apply to non-debtors, such as TCV and the other Non-Debtor Guarantors. *Id.* at *2 (finding that "the automatic stay of 11 U.S.C. § 362(a)(6) does not prohibit collection efforts against a non-debtor on an independent claim"). Courts have held that collection efforts against non-debtors, even if on obligations of a debtor, do not fall within section 362(a)(6). *See, e.g., Bailey v. Social Security Admin.*, 2007 WL 2049007, at *2 (Bankr. S.D.N.Y. July 10, 2007) ("Section 362(a)(6) does not prohibit actions to collect the debtor's obligations from nondebtors.") Indeed, courts routinely have held that the automatic stay does not apply to non-debtor guarantors. *See, e.g., In re White*, 415 B.R. 696, 698 (Bankr. N.D. Ill. 2009) ("Generally, the automatic stay protects the bankruptcy debtor and does not bar suits against third parties, such as nondebtor entities, even when wholly owned by the debtor, or the debtor's insurers, guarantors, and sureties."); *In re Aldan Indus., Inc.*, 2000 WL 357719, at *3 (Bankr. E.D. Pa. Apr. 3, 2000) ("[A]s a general rule, the automatic stay does not affect proceedings against guarantors."),

**IV.    Law Debenture Has Failed To Show That An Injunction Pursuant To Section 105(a) Is Available.**

22.     Finally, Law Debenture claims that this Court should use its equitable powers under section 105(a) to order disgorgement of the Senior Lender Fee Payments. But Law Debenture fails to offer any jurisdictional basis for injunctive relief under section 105(a). *See W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 591 F.3d 164, 170 (3d Cir. 2009). The Senior Lender Fee Payments do not fall under any definition of a "core proceeding," *see* 28 U.S.C. § 157(b)(2); *In re Exide Techs.*, 544 F.3d 196, 219 (3d Cir. 2008) (rejecting argument that "the close-knit indemnitor and subsidiary relationships between the" non-debtors and debtors

brought claims against the non-debtors within a bankruptcy court's "core matter jurisdiction") or "related to" jurisdiction. *See, e.g., Equity Broadcasting Corp.*, 284 B.R. at 49-51 (dismissing for lack of jurisdiction action against wholly-owned non-debtor subsidiary to turn over property rights); *Miller*, 398 B.R. at 529 (dismissing avoidance action against non-debtor subsidiary for lack of jurisdiction).  Moreover, although Law Debenture is seeking injunctive relief under section 105, it has made no effort to meet the standard required for injunctive relief.  *See W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 386 B.R. 17, 32-33 (Bankr. D. Del. 2006) (analyzing traditional four factor test for preliminary injunction in granting an injunction pursuant to 105(a)).  In this regard, it is notable that Law Debenture is seeking, in essence, permanent injunctive relief.  As such, it faces an even higher standard than the one for preliminary injunctions:  in addition to the other factors, Law Debenture must show "*actual* success on the merits." *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001) (emphasis added). As it has made no showing whatsoever on whether the requirements for injunctive relief are available here, Law Debenture has failed to meet its burden.

46429/0001-6399128v1

## CONCLUSION

For the foregoing reasons, the Debtors respectfully request this Court deny Law

Debenture's Motion to Terminate.

Dated:  March 15, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
James W. Ducayet
One South Dearborn Street
Chicago, IL  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _Kate Stickles_____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

46429/0001-6399128v1