**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------x
In re:                                     :        **Chapter 11 Cases**
                                           :        **Case No. 08-13141 (KJC)**
**TRIBUNE COMPANY, et al.,**                :        **(Jointly Administered)**
                                           :
                        **Debtors.**        :
-------------------------------------------------------x

**LAW DEBENTURE TRUST COMPANY OF NEW YORK'S BRIEF**
**(A) IN RESPONSE TO DEBTORS' AND JPMORGAN'S**
**SUPPLEMENTAL BRIEFS AND (B) IN FURTHER SUPPORT OF ITS**
**MOTION TO TERMINATE DEBTOR AFFILIATES' UNDISCLOSED**
**PAYMENT OF LBO LENDERS' FEES AND EXPENSES, FOR**
**AN ACCOUNTING, AND FOR DISGORGEMENT OF PAST PAYMENTS**

Dated: March 15, 2010

Garvan F. McDaniel (No. 4167)
**BIFFERATO GENTILOTTI LLC**
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Tel:  (302) 429-1900
Fax:  (302) 429-8600

– and –

David S. Rosner
Andrew K. Glenn
Sheron Korpus
Daniel A. Fliman
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
Tel:  (212) 506-1700

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................................ii

PRELIMINARY STATEMENT ...................................................................................... 1

I.  THE DEBTORS AND JPMORGAN CANNOT REFUTE THAT TCV PAID
    THE BANK FEES WITH ESTATE PROPERTY ............................................... 2

II.  THE EVIDENCE REFUTES ASSERTIONS OF GOOD FAITH OR
     TRANSPARENCY.............................................................................................. 5

    A.  The Real, Undisputed Evidence Of The Scheme...................................... 6

    B.  The Real, Undisputed Evidence Of Insufficient Disclosure. ................... 8

III.  THE BANK FEE PAYMENTS' HARM OUTWEIGHS ANY PURPORTED
      BENEFITS ........................................................................................................ 10

    A.  The Payment Blockage Notice Was Unnecessary And Actually
        Benefited JPMorgan And The Lenders................................................... 10

    B.  The Bank Fee Payments Were Unnecessary To Protect The Non-Debtor
        Guarantors............................................................................................... 11

    C.  Harms To The Estates From The Bank Fee Payments Are Real And
        Well-Documented And Outweigh Any Purported Benefits .................... 14

CONCLUSION............................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.H. Robins Co. v. Piccinin*,
788 F.2d 994 (4th Cir. 1986) ...................................................................................13

*Amphenol Corp. v. Shandler (In re Insilco Techs., Inc.,)*,
351 B.R. 313 (Bankr. D. Del. 2006) ...........................................................................4

*Bird v. Wilmington Soc. of Fine Arts*,
43 A.2d 476 (Del. 1945) ..............................................................................................3

*Buechner v. Farbenfabriken Bayer Aktiengesellschaft*,
154 A.2d 684 (Del. 1959) ............................................................................................3

*Church v. State of Maryland*,
180 F.Supp.2d 708 (D. Md. 2002) ..............................................................................8

*In re Commercial Mortgage and Finance Co.*,
414 B.R. 389, 395 (Bankr. N.D. Ill. 2009) .................................................................3

*Dole Food Co. v. Patrickson*,
538 U.S. 468 (2003) .....................................................................................................3

*du Pont v. du Pont*,
208 A.2d 509 (Del. 1965) ............................................................................................3

*Duggan v. Sansberry*,
327 U.S. 499 (1946) .....................................................................................................3

*Holywell Corp. v. Smith*,
118 B.R. 876 (S.D. Fla. 1990) .....................................................................................4

*Kreisler v. Goldberg*,
478 F.3d 209 (4th Cir. 2007) ...............................................................................5, 13

*Norte & Co. v. Manor Healthcare Corp.*,
Nos. 6827, 6831, 1985 Del. Ch. LEXIS 526 (Del. Ch. Nov. 21, 1985) ...................3

*Seshadri v. Kasraian*,
130 F.3d 798 (7th Cir. 1997) ......................................................................................8

*In re Valladares*,
415 B.R. 617 (Bankr. S.D. Fla. 2009)........................................................................3

*V.I. Tel. Corp. v. Rural Tel. Fin. Coop.*,
  No. 2006-18, 2006 U.S. Dist. LEXIS 5943 (D.V.I. Feb. 10, 2006) ..........................................4

*In re Winstar Comm., Inc.*,
  284 B.R. 40 (Bankr. D. Del. 2002) ............................................................................................4

*In re W.T. Mayfield Sons Trucking Co., Inc.*,
  225 B.R. 818 (Bank. N.D. Ga. 1998).........................................................................................3

Law Debenture Trust Company of New York ("Law Debenture"), by and through its undersigned counsel, hereby files this brief (A) in response to the supplemental briefs filed by the Debtors[1] [Docket No. 3665] (the "Debtors Supp. Brief") and by JPMorgan [Docket No. 3668] (the "JPMorgan Supp. Brief" and together with the Debtors Supp. Brief, the "Opposition Supp. Briefs") and (B) in further support of *Law Debenture's Motion to Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees and Expenses, For an Accounting, and For Disgorgement of Past Payments* [Docket No. 2407] (the "LD Motion"), and respectfully submits as follows:

## PRELIMINARY STATEMENT

The factual record is clear:  the Debtors and JPMorgan (the "Objectors") schemed to structure the Bank Fee Payments to avoid scrutiny by parties-in-interest and to avoid any oversight by the Court.  In the Opposition Supp. Briefs, the Debtors and JPMorgan play the ostrich.  Burying their heads in the sand, they fail even to acknowledge the contemporaneous documents evidencing these undisputed facts.  Much like the ostrich, their efforts fail.

The real, undisputed, facts are set forth in the Stipulated Facts[2] agreed to by all the parties including the Debtors and JPMorgan, and the full record provides the bases for Law Debenture's relief.[3]  The Debtors and JPMorgan devised a scheme[4] for the Bank Fee Payments to avoid court

---

[1]     Each capitalized term used herein but not defined, is ascribed the definition set forth in *Law Debenture Trust Company Of New York's Supplemental Brief In Further Support Of Its Motion To Terminate Debtor Affiliates' Undisclosed Payment Of LBO Lenders' Fees And Expenses, For An Accounting, And For Disgorgement Of Past Payments* [Docket No. 3669] (the "LD Supp. Brief").

[2]     *See Stipulated Facts In Connection With March 26, 2010 Hearing On Law Debenture Trust Company Of New York's Motion To Terminate Debtor Affiliates' Undisclosed Payment Of LBO Lenders' Fees And Expenses, For An Accounting, And For Disgorgement Of Past Payments* [Docket No. 3657], filed on March 2, 2010 (the "Stipulated Facts").  Citations herein to "SF ¶ __" are to Stipulated Facts.

[3]     In it recitation of facts, JPMorgan characterizes the May 2007 and December 2007 parts of the 2007 LBO as "two distinct transactions."  (JPMorgan Supp. Brief at 3).  Law Debenture disagrees with this characterization and believes the evidence, in a more appropriate context, will demonstrate that the 2007 LBO was one transaction accomplished in two steps.  Regardless, this issue is not germane to this dispute.

scrutiny, and, in doing so, harmed the estates by using the Debtors' property to finance

opposition to estate causes of action and the investigation of those claims by estate fiduciaries.

To right this wrong, the Court should direct the Lenders to disgorge the Bank Fee Payments and

order the Debtors to stop all further payments.

## RESPONSE

### I.
### THE DEBTORS AND JPMORGAN CANNOT REFUTE THAT
### TCV PAID THE BANK FEES WITH ESTATE PROPERTY

The Objectors' arguments that TCV's funds used to pay the Bank Fees were not property

of the Debtors' estates are flawed on the law and the facts.

First, the contention that TCV is a separate distinct legal entity and, therefore, its funds

are not property of the estates,[5] ignores the undisputed facts in the record[6] including that:

o   The Debtors' management caused TCV to pay the Bank Fees.

o   TCV's board of directors and officers were not specifically approached for authorization
    to pay the Bank Fees.[7]

o   TCV's Board of Directors and officers are comprised of employees of Debtors.

o   TCV has no employees and no offices separate from Tribune's offices.

o   TCV is included in Tribune's consolidated financial statements.

o   The Debtors' employees controlled treasury functions at TCV.

The undisputed evidence demonstrates that the Debtors did not treat TCV as a separate legal

entity, and it is disingenuous to ask the Court to do so now.

---

[4]       "Scheme" as used here is Merriam Webster's third usage:  "a plan or program of action; *esp.* a crafty or secret one."  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 2000).

[5]       (Debtors Supp. Brief at ¶ 28); (JPMorgan Supp. Brief at 13).

[6]       (SF ¶¶ 63, 69).

[7]       Skirting the issue, the Debtors point out that TCV's Board of Directors approved the Credit Agreement, which of course does not mean they approved the Bank Fee Payment, which they did not.  (Debtors Supp. Brief at 2).

<u>Second</u>, the Objectors misstate the applicable precedent in arguing that, as matter of law, this Court cannot find that TCV's assets were property of the Debtors' estates.[8]  In fact, courts, in similar circumstances, have found that a non-debtor subsidiary's assets are property of the parent's bankruptcy estate.  *See* (LD Supp. Brief at 16) (*citing In re Valladares*, 415 B.R. 617, 625 (Bankr. S.D. Fla. 2009); *In re W.T. Mayfield Sons Trucking Co., Inc.*, 225 B.R. 818, 827 (Bank. N.D. Ga. 1998)); *see also In re Commercial Mortgage and Finance Co.*, 414 B.R. 389, 395 (Bankr. N.D. Ill. 2009) ("[C]ourts may extend jurisdiction to the assets of a debtor's subsidiaries to restrain the subsidiaries from using their assets to the detriment of the interests of the debtor's creditors" and as such "the assets of subsidiaries should [b]e subject to the debts of creditors of the parent corporation where necessary to avoid fraud and injustice.") *citing Duggan v. Sansberry*, 327 U.S. 499, 511 (1946) ("It does not follow. . . that the court has no jurisdiction to restrain subsidiaries over whose action the debtor company has control, from so dealing with their assets as to dilute the equity of the debtor company and thus to endanger the interests of creditors on whose behalf the jurisdiction of the court was invoked.").

The cases cited by the Objectors are distinguishable or wholly inapplicable.  A vast majority of the cases cited have nothing to do with a bankruptcy or considerations of what is property of a debtor's estate.[9]  Other cases cited by the Objectors actually recognize that in the

---

[8]     (Debtors Supp. Brief at ¶¶ 29-31); (JPMorgan Supp. Brief at 14-16).

[9]     *See, e.g., Dole Food Co. v. Patrickson*, 538 U.S. 468, 470, 474-75 (2003) (determining whether an entity was subject to the Foreign Sovereign Immunities Act); *du Pont v. du Pont*, 208 A.2d 509, 512 (Del. 1965) (interpreting a will and noting that shareholder did not have an interest in the assets of the corporation it owned; wholly unrelated to a debtor parent's interest in subsidiary's assets); *Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 154 A.2d 684, 686-87 (Del. 1959) (Delaware state court breach of employment contract suit; stating that "corporate fiction may be disregarded to prevent fraud"); *Bird v. Wilmington Soc. of Fine Arts*, 43 A.2d 476, 483, 486-87 (Del. 1945) (interpreting will and reasoning that shareholder did not own corporate property, but making sure to state that it was "not considering the case of a corporate structure all the shares of which are united in one person.  As to such corporations some cases hold that, at times, other and distinct principles may apply."); *Norte & Co. v. Manor Healthcare Corp.*, Nos. 6827, 6831, 1985 Del. Ch. LEXIS 526, at *9 (Del. Ch. Nov. 21, 1985) (Delaware state court considering duties owed to plaintiffs challenging a merger transaction and, in the context of

right circumstances (such as here) a subsidiary's assets may constitute property of the estate.

*See, e.g., Holywell Corp. v. Smith*, 118 B.R. 876, 879 (S.D. Fla. 1990) (recognizing that "unusual

circumstances" will lead to treating a subsidiaries assets as property of the parent); *V.I. Tel.*

*Corp. v. Rural Tel. Fin. Coop.*, No. 2006-18, 2006 U.S. Dist. LEXIS 5943, at *13-14 (D.V.I.

Feb. 10, 2006) (same).

　　　The Debtors' citation to *In re Winstar Comm., Inc.* is misplaced because the facts are

distinguishable.  284 B.R. 40, 50-51 (Bankr. D. Del. 2002).  The plaintiff in that case sought to

compel the non-debtor subsidiary to transfer membership interests in construction permits.  *Id.* at

49.  The court found that such transfer did "not alter the estate's rights, liabilities, options or

freedom of action" such that the only possible effect the action could have had on the estate

would have been on the ultimate value the estate received for the stock it owned in the

subsidiary.  *Id.*  It is undisputed here that the Bank Fee Payments utilized cash that prior to the

Petition Date was funneled through the cash management system and made available to the

Debtors.  (SF ¶ 64).  Thus, the payments most certainly did alter the estate's rights, liabilities,

options and freedom of action.  Indeed, as of year end 2009, TCV held approximately

$93,000,000[10] in its bank accounts – that's after paying more than $23,700,000 of Bank Fee

Payments.  The Debtors and the Lenders' scheme, thus, deprived the Debtors' estates of access

---

explaining that directors rather than stockholders manage a corporation, solely addressing a shareholder's interests
in the assets of the company it owns, not a subsidiary).

　　　JPMorgan's citation to *Amphenol Corp. v. Shandler (In re Insilco Techs., Inc.,)*, is wholly misplaced.  351
B.R. 313, 321-22 (Bankr. D. Del. 2006).  The issue in that case was whether a debtor's release of a purchaser that
bought the debtor's stock in a subsidiary served to release not just the purchaser, but also the subsidiary itself.  The
case contains no determination of what constitutes property of the estate.

[10]　　　The Debtors originally agreed in the Stipulated Facts that the amount in TCV's account at JPMorgan, as of
December 31, 2009 was $40,517,337.57 (SF ¶ 79).  After the Stipulated Facts were filed, the Debtors informed Law
Debenture that this amount was actually $93,241,688.52, nearly $53,000,000 higher.  *See Notice of Correction to the
Stipulated Facts in Connection with March 26, 2010 Hearing on Law Debenture Trust Company of New York's
Motion to Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees and Expenses, For an
Accounting, and for Disgorgement of Past Payments*, filed March 15, 2010 [Docket No. 3730].

to nearly $117,000,000 that otherwise would have flowed to the Debtors.  As reflected in the Debtors' last filed 10K (for 2007), TCV generated more equity income than any other of the Debtors' equity investments.

Finally, *Kreisler v. Goldberg*, which presents a set of facts materially different from those here, nonetheless stands for a proposition that supports the LD Motion.  478 F.3d 209, 214 (4th Cir. 2007).  In that case, the debtor sought to treat a non-debtor subsidiary's real property as property of the estate.  The court, in denying the relief, pointed out that the debtor's own actions – in creating the subsidiary to hold title separate from the debtor – diminished the debtor's ability to now argue the property belonged to its estate.  *Id.*  The Fourth Circuit's logic, applied to this case, supports the LD Motion because the Debtors' treatment of TCV as an instrumentality at its control for the purpose of making the Bank Fee Payments precludes the Debtors' current argument of separateness.

## II.
## THE EVIDENCE REFUTES ASSERTIONS OF GOOD FAITH OR TRANSPARENCY

The Debtors and JPMorgan repeatedly assert that they proceeded in good faith and in a transparent manner.[11]  The evidence shows exactly the opposite.  The record simply does not support the Objectors' primary good faith argument – that the decision to abandon the "forbearance agreement was not motivated by concerns as to whether court approval was necessary for such an agreement, and if so, whether the court would approve such an agreement".[12]

---

[11]    *See, e.g.,* (Debtors Supp. Brief at 2,3); (JPMorgan Supp. Brief at 13).

[12]    (Debtors Supp. Brief ¶ 14); *see also* (JPMorgan Supp. Brief at 8).

A.    <u>The Real, Undisputed Evidence Of The Scheme</u>.

The evidence is clear that the Debtors and the Lenders abandoned negotiation of a formal written forbearance agreement (which contemplated the Bank Fee Payments) when they determined that the Court would need to approve that agreement, which the Debtors and the Lenders wanted to avoid.  *See* (SF ¶ 37); (Kulnis Ex. 6)[13] (Kulnis:  "We are worried that if the debtors are parties the UCC may object to it and it would get denied"); (SF ¶ 38) (Larsen: "I understand the concern surrounding the inclusion of the Debtors.").  Instead, the Debtors and the Lenders opted for an unwritten "understanding" that that they would not disclose to the Court.  *See* (SF ¶ 39) (Larsen Ex. 11)[14] (Baiera (another Steering Lender employee): "There are clear benefits to this approach (no court approval/notice) . . .).

The negotiation history of the Blackstone engagement letter tells a similar story.  The parties drafted it carefully to avoid Court approval and notice to interested parties.  The parties abandoned drafts containing signature lines for the Debtors and the final executed copy, while expressly recognizing the Debtors' purported obligation to pay Blackstone's fees (including a whopping $5.5 million "restructuring fee"), omits an overt signature line for any Debtor or non-Debtor Guarantor entities.  *See* (LD Supp. Brief at 7-8).  Remarkably, JPMorgan touts the removal of the Debtors' signature line.[15]  However, the document obligates the Debtors, and the purposeful removal of the signature demonstrates rather than disproves the scheme.

---

[13]     Citations herein to "Kulnis Ex. __" correspond with exhibits from the deposition of Miriam Kulnis (co-chair of the Creditors' Committee yet designated as a Rule 30(b)(6) witness for JPMorgan) included in the Joint Exhibit List filed on March 2, 2010 [Docket No. 3660] (the "Joint Exhibit List"), along with the transcript, at Ex. 4 and citations herein to "Kulnis Tr. ____" are to that deposition transcript.

[14]     Citations herein to "Debtors/TCV Tr. __" are to corresponding parts of the transcript of the February 1, 2010 deposition of Nils Larsen, who was designated as the Rule 30(b)(6) witness for both the Debtors and TCV, a copy of which is included in the Joint Exhibit List, at Ex. 5.

[15]     (JPMorgan Supp. Brief, n.7).

The Objectors totally ignore these highly probative items in the record, relying instead on deposition testimony made in connection with this litigation.[16]  The passages cited by the Objectors, however, do not support their own arguments.  The Rule 30(b)(6) witnesses designated by the Debtors/TCV, including the co-chair of the Creditors' Committee (presumably making Creditors' Committee consent somewhat easier), testified that they had no recollections of the discussions concerning bankruptcy court approval as of the time of their depositions.[17]  That is a far cry from rebutting contemporaneous e-mails evidencing those discussions.  Also, a passage that the Debtors cite in the Debtors Supp. Brief plainly contradicts their argument.  Larsen testified that the "concern regarding bankruptcy court approval being needed for the Forbearance Agreement" was "one of a series of open items."  (Debtors/TCV Tr. 70:22-71:8).

Larsen, the Debtors' Rule 30(b)(6) designee, also testified that the Lenders' emails clearly reflect a concern about court approval for the Bank Fee Payments.  (Debtors/TCV Tr. 78:23-79:11) (Larsen testified regarding Larsen Ex. 11, "Q.  Mr. Baiera did perceive as one of the clear benefits to this approach the fact that there would be no court approval or notice. That's what he said to you in this E-mail; right?  A. That's what it says . . . A. That's what it reads.  Q. And that's what you understood him to say at this time; right? . . . A. Yeah, I read it. I mean, the words on the paper I understand."); (*Id.* at 87:10-20) (Larsen testified regarding Larsen Ex. 12, "Q.  But sitting here today as . . . TCV's and debtor's representative, do you recall that the steering lenders expressed to the debtor or the debtor's representatives concerns that if the debtor was to become a party to this arrangement concerning fees, there was a risk that the bankruptcy

---

[16]        *See* (Debtors Supp. Brief at ¶ 14) *citing* (Kulnis Tr. at 65-66; Debtors/TCV Tr. at 70-71); (JPMorgan Supp. Brief at 8) *citing* (Kulnis Tr. 46:7-47:5, 65:18-65:66:11; Debtors/TCV Tr. at 69:17-69:21, 86:11-86:18.).

[17]        *See, e.g.,* (Debtors/TCV Tr. 86:16-18) ("But I don't have specific recollections of conversations as to who was to be the appropriate signatory."); (Debtors/TCV Tr. 69:17-21) (Q. And do you recall any disagreement about the question of bankruptcy court approval? A.  Not directly.  Q.  Do you recall any indirectly? A.  No."); (Kulnis Tr. 47:6-11) ("Q.  Did you have any discussions, not with counsel, about the requirement of bankruptcy court approval of the forbearance agreement? . . . A.    Not that I recall.").

court would not approve the arrangement?  A. Sitting here today, as I read what's in front of me, there was at least a contemplation there was a different risk profile.").

Even if the deposition testimony the Debtors and the Agent cite actually said what they posit, it should carry minimal persuasive weight compared with the directly contradictory contemporaneous e-mail exchange.  *See Church v. State of Maryland*, 180 F.Supp.2d 708, 743 (D. Md. 2002) (quoting *Seshadri v. Kasraian,* 130 F.3d 798, 801 (7th Cir. 1997)) ("'[I]ndeed documents. . . having been composed before litigation would carry more conviction than a deposition, even though a deposition is given under oath.'").

**B.**     **The Real, Undisputed Evidence Of Insufficient Disclosure**.

The Debtors and JPMorgan contend that they provided full and adequate disclosure by informing the U.S. Trustee and the Creditors' Committee.[18]  As a threshold matter, these "disclosures" completely belie the Debtors and JPMorgan's arguments that the Bank Fee Payments were not made from estate property and had nothing to do with the Debtors.  If that is the case, why were these so-called "disclosures" necessary or made at all?  Why did the Creditors' Committee reserve the right to object to the Bank Fees, particularly to the Blackstone restructuring fee payments?  Object to whom?  For what relief and in what forum?  In any event, the record shows that the Debtors and JPMorgan were motivated by a desire to avoid full disclosure, rather than make it:

o   The Debtors testified that they purposely avoided providing global notice of the Bank Fee Payments out of concern that other creditors would seek the same treatment. (Debtors/TCV Tr. 94:19-95:6) ("Q.  What was the benefit of not broadcasting publicly for people, as you put it, the fact that the debtor agreed for its non-debtor guarantor to make the payment of the professional fees? . . . A.  One potential benefit if this became

---

[18]        *See, e.g.,* (Debtors Supp. Brief ¶ 17) ("Tribune was willing to proceed on this basis, but insisted on full disclosure to the UCC and the U.S. Trustee to ensure that they were both informed of, and did not object to, this arrangement."); (JPMorgan Supp. Brief at 13) ("the evidence demonstrates that the parties acted in good faith, in a transparent manner . . .").

publicly filed is it may give a constituency a roadmap on how to exert a disproportionate amount of leverage by moving quickly against [TCV], for example.").

o   There is no evidence that the U.S. Trustee was fully informed of the salient facts including (a) that TCV's funds being used for the Bank Fee Payments flowed pre-petition through the Debtors' cash management system, (b) that as a result of the scheme, substantial funds will be trapped in TCV and not used for the benefit of the Debtors' estates, and (c) that the Bank Fee Payments would compensate professionals defending against estate causes of action. *See generally* (Ex. 19) (Sidley Memorandum to the U.S. Trustee).

o   It is utterly misleading for the Debtors to argue that "Tribune [] insisted that . . . the U.S. Trustee be consulted and afforded an opportunity to object." (Debtors Supp. Brief ¶ 18). A March 5, 2009 e-mail from Davis Polk to Sidley states: "Bryan, Based on your description of your conversation last week and [the U.S. Trustee's] description of the same conversation when we spoke, *you didn't ask for his permission and you didn't tell him you were waiting for his consent (both correctly)* but instead told him the non-debtors intended to pay around the middle of this week." (SF ¶ 60); (Larsen Ex. 21) (emphasis added).

o   While the Debtors informed the Creditors' Committee, JPMorgan expected the members of the Creditors' Committee to keep those discussions confidential. (Kulnis Tr. 107:19-23) ("Q.  When the members of the UCC were informed, were they asked to keep this confidential?  A.  All discussions in creditors' committee meetings are confidential is my understanding.").  This severely limited the parties that received notice and also derails JPMorgan's argument that notifying Deutsche Bank imputed knowledge to noteholders. *See* (JPMorgan Supp Brief at n.14).  There is no independent evidence that Deutsche Bank informed any noteholders or that the Creditors' Committee permitted it to do so.

Perhaps the most absurd statement in the Opposition Supp. Briefs is JPMorgan's defense that "[f]or more than a year, no one disputed the validity of these provisions or their applicability to the circumstances presented here." (JPMorgan Supp. Brief at 18).  Well, of course; without notice and disclosure, nobody knew about the Bank Fee Payments and would not object.  Indeed, that was the Debtors' stated purpose of non-disclosure. *See* (Debtors/TCV Tr. 94:19-95:6). Also, JPMorgan's statement is not exactly accurate.  During that "more than a year" parties specifically including Law Debenture were actively investigating and disputing the validity of the leveraged buy out debt giving rise to the fee reimbursement "obligation" in the first place.

**III.**
**THE BANK FEE PAYMENTS' HARM**
**OUTWEIGHS ANY PURPORTED BENEFITS**

The Objectors attempt to justify the Bank Fee Payments by claiming corresponding

benefits to the Debtors[19] and the Non-Debtor Guarantors.[20]  Those purported benefits, according

the Objectors, include providing the Payment Blockage Notice and the Lenders not exercising

remedies against Non-Debtor Guarantors.[21]  As discussed below, these were not real benefits,

and moreover, the estates' harm outweighs any purported benefits.

**A.**      **The Payment Blockage Notice Was Unnecessary**
         **And Actually Benefited JPMorgan And The Lenders.**

The Bridge Agreement Guarantee precludes guarantors from making payments under the

Bridge Loan "if (a) a payment default under the [Credit Agreement] occurs and is continuing; _or_

(b) any other default occurs and is continuing under the [Credit Agreement] that permits lenders

under the [Credit Agreement] to accelerate its maturity and the Agent receives a written notice of

such default (a "Payment Blockage Notice") from the agent under the [Credit Agreement]."  (Ex.

9) (emphasis added).  In other words, a Credit Agreement payment default _automatically_ triggers

payment blockage, without the need for a Payment Blockage Notice.  The issued Payment

Blockage Notice itself states "that a payment default has occurred under Section 6.01(a) of the

[Credit Agreement]."  (Ex. 17).  Accordingly, the Bridge Agreement Guarantee already and

automatically prevented the Non-Debtor Guarantors from making payments under the Bridge

Loan.  The Payment Blockage Notice simply was unnecessary.  It would be reasonable for the

---

[19]      _See_ (Debtors Supp. Brief at 1) ("[ … ] Tribune received benefits in return . . .").  This, of course, contradicts the Debtors' position that the Bank Fee Payments were totally remote to the Debtors, their estates,  and Court oversight.

[20]      (Debtors Supp. Brief at 1, ¶ 27); (JPMorgan Supp. Brief at 19-20).

[21]      _Id._

Court to infer that an unnecessary notice that the parties used to justify payment of more than $25,000,000[22] in undisclosed fees was a subterfuge.

Moreover, JPMorgan's calling the Payment Blockage Notice a "benefit" is especially spurious because JPMorgan and the Lenders were beneficiaries. The Non-Debtors Guarantors' obligations under the Bridge Loan are subordinated to the Credit Agreement debt. *See generally* (Ex. 9). It was clearly in the Lenders' best interests to prevent the Non-Debtor Guarantors from paying a junior creditor before the Lenders were repaid. If the notice were necessary, the Lenders would have issued it under any circumstance.

JPMorgan argues it issued the Payment Blockage Notice "[i]n exchange" for an agreement to have Non-Debtor Guarantors pay the Bank Fees.[23] As discussed, the Payment Blockage was unnecessary and JPMorgan would have issued it anyway because it primarily benefited the Lenders. The Debtors and TCV received no real consideration for JPMorgan's delivery of the Payment Blockage Notice.

**B.      The Bank Fee Payments Were Unnecessary
          To Protect The Non-Debtor Guarantors.**

The Objectors argue that TCV's paying the Bank Fees was necessary to protect the Non-Debtor Guarantors from the Lenders exercising remedies.[24] As part of this argument, the Objectors maintain that (a) the Non-Debtor Guarantors were obligated to pay the Bank Fees, (b) absent payment the Lenders would have sought to exercise remedies, and (c) had the Lenders tried to exercise remedies, they could not be stopped. The record simply does not support these points, and actually contradicts them in material ways.

---

[22]      Including $2,000,000 the Debtors paid pre-petition and more than $23,700,000 TCV paid post-petition.

[23]      (JPMorgan Supp. Brief at 9).

[24]      (Debtors Supp. Brief at 1, ¶ 27); (JPMorgan Supp. Brief at 19-20).

As an initial matter, there is substantial doubt whether the Non-Debtor Guarantors were obligated to pay the Bank Fees.  *See* (LD Supp. Brief at 19) (discussing inapplicability of Section 8.04(a) of the Credit Agreement).[25]  Moreover, there is no evidence that the Lenders, absent payment, would have actually exercised remedies.  Certainly, and not surprisingly, the Lenders discussed it with the Debtors, but there is no evidence of the Agent commencing enforcement actions.  Indeed, it seems doubtful that the Lenders, holders of unsecured guarantees, could have gotten judgments and taken them to foreclosure on assets before the Debtors acted.  It is also doubtful that the Lenders would have wanted to do so while the Debtors were in midst of discussions regarding potential transactions that could have been value maximizing for the Lenders themselves.  But, regardless, even if the Lenders were on the verge of exercising their remedies, the Debtors had other options.

The Debtors could have, would have, and should have, sought protection from this Court. For instance, they could have sought an extension of the automatic stay.  The Debtors now argue that such a request would not be granted absent showing "unusual circumstances".[26]  They do not explain why they definitively concluded that the circumstances here do not rise to that standard. Surely if the Debtors were close to a deal with Scripps or the Cubs, there was a colorable basis to seek stay extension.  The bottom line is that the Debtors just never tried, choosing instead to appease their Lenders in virtual secrecy.  And Larsen's testimony sheds some light as to why.

---

[25]      Section 8.04(b) of the Credit Agreement also does not provide for paying the Bank Fees because it only provides for indemnity "from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) *incurred by or asserted or awarded against* . . . except to the extent such claim, damage, loss, liability or expenses is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Parties' *gross negligence or willful misconduct.*" (SF ¶ 4) (emphasis added). The Bank Fee Payments were not provided for in Section 8.04(b) of the Credit Agreement because (a) it makes no allowance for pre-payment retainers, only payment of actual liabilities incurred by the Lenders, and (b) as discussed in connection with other proceedings, there is substantial evidence that the Lenders acted with gross negligence or willful misconduct relating to the LBO.

[26]      (Debtors Supp. Brief, n.6).

He testified that the Debtors were hesitant to disclose the Bank Fee Payments because they feared other lenders would make similar demands in exchange for forbearance.  *See* (Debtors/TCV Tr. 94:19-95:6).  Of course, preferring one creditor over another is not a legitimate basis to withhold disclosure, and directly contradicts the most fundamental tenets of an organized bankruptcy process.

The Debtors' citation to *Kreisler v. Goldberg* is misplaced and shows a misunderstanding of that case.  478 F.3d at 214.  In *Kreisler*, the debtor, among other things, asked for an extension of the automatic stay to protect property held by its non-debtor subsidiary. In denying that relief, the court found that foreclosure would not deprive the debtor of an interest in property, but would only affect the value of its equity in the subsidiary.  *Id.* at 214-15.  Here, however, as the Debtors concede in their papers, foreclosure would have had a substantial impact on the Debtors and their estates.  *See* (Debtors Supp. Brief at 1, ¶ 27).  It would have deprived the Debtors of potential access to substantial funds that pre-petition were used for operations.  *See* (SF ¶ 64). One other portion of *Kreisler* should be pointed out.  The court explained that even if the automatic stay did not apply, the debtor "could have sought injunctive relief if he believed that the ejectment action would deprive them of funds needed for their reorganization or put detrimental pressure on their reorganization effort" under section 105(a).  478 F.3d at 215.  Here, like in *Kreisler*, the Debtors never availed themselves of that relief.  In fact, the more that the Debtors argue that TCV enjoys exceptional value that they must protect, the less likely it is that the Lenders would act to damage that value; but, if they did, the more likely it is that the Court would have granted TCV protection.  This would not be the first time a bankruptcy court granted protection to an asset or company whose value could diminish greatly in bankruptcy and thereby affect its affiliate debtors.  *See A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)

("[T]here are cases [under 362(a)(1)] where a bankruptcy court may properly stay the proceedings against non-bankrupt co-defendants").  Additionally, moving past why the Debtors initially agreed to make the Bank Fee Payments, the other question is why they continued to do so.  The record is undisputed that the Debtors continued to make the Bank Fee Payments throughout 2009 and only stopped when the LD Motion came before the Court.  However, the justifications cited by the Debtors for doing so disappeared much earlier.  The Cubs sale closed in September 2009 and the negotiations with Scripps regarding TCV went nowhere.  (Debtors Supp. Brief at ¶ 11).  Thus, the Debtors could very well have stopped the Bank Fee Payments months before they were forced to do so.

* * *

It is no viable defense for the Debtors to claim they were forced to make the payments by the Lenders' threats.  The Bankruptcy Code and other laws provide the Debtors and the Non-Debtor Guarantors the ability to resist the Lenders' chicanery here.  The Debtors' failure to avail themselves of those protections – or at least to try – in order to maintain the veil of secrecy over the scheme shows a disregard for the obligations to their estates, creditors, and this Court.

C.    **Harms To The Estates From The Bank Fee Payments Are Real And Well-Documented And Outweigh Any Purported Benefits**

Neither the Debtors nor JPMorgan provide an answer or defense to the evidence showing that money that otherwise the Debtors' estates could have accessed funded the Bank Fee Payments.  Nor do the Debtors or JPMorgan provide any explanation for why the Court should overlook that the Bank Fee Payments funded defense costs for adversaries of the estates.  These harms are real and well-documented and clearly outweigh the benefits, if any actually exist, from the Bank Fee Payments.

14

## <u>CONCLUSION</u>

In their supplement briefs, the Debtors and JPMorgan misconstrue the truth including the most relevant, undisputed facts.  The complete and honest record here tells a story that the Objectors rather not be told, and which they took extensive steps to hide.  Based on those facts as applied to the legal precedent implicated, it is clear that the Bank Fee Payments were improper and should never have been made.  They should be disgorged and stopped.

Dated: March 15, 2010
        Wilmington, Delaware

                          /s/ Garvan F. McDaniel
                        Garvan F. McDaniel (No. 4167)
                        **BIFFERATO GENTILOTTI LLC**
                        800 N. King Street, Plaza Level
                        Wilmington, Delaware 19801
                        Telephone:  (302) 429-1900
                        Facsimile:  (302) 429-8600

                                – and –

                        David S. Rosner
                        Andrew K. Glenn
                        Sheron Korpus
                        Daniel A. Fliman
                        Kasowitz, Benson, Torres & Friedman LLP
                        1633 Broadway
                        New York, New York 10019
                        Telephone:  (212) 506-1700

                        *Co-Counsel for Law Debenture Trust Company*
                        *of New York*