## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| In re: | : Chapter 11 |
|  | : Case No. 08-13141 (KJC) |
|  | : (Jointly Administered) |
| TRIBUNE COMPANY et al., | : |
|  | : **Re: Dkt. Nos. 2407, 2597, 2631, 3478,** |
| Debtors. | : **3657, 3660, 3668, 3669 and 3670** |
|  | : |
|  | : **Hearing Date: March 26, 2010 at 10:00 a.m.** |
|  | : **(ET)** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## JPMORGAN CHASE BANK, N.A.'S REPLY BRIEF ON
## REIMBURSEMENT OF THE SENIOR LENDERS' FEES AND EXPENSES

Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Drew G. Sloan (No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Dennis E. Glazer
Karen E. Wagner
Sharon Katz
Michael Russano
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

*Attorneys for JPMorgan Chase Bank, N.A.*

Dated:  March 15, 2010

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 3

     A.     JPMorgan Acted in Good Faith ................................................................. 3

     B.     TCV Was and Is Legally Obligated To Make Payment .............................. 7

     C.     TCV's Assets Are Not Estate Property ........................................................ 8

CONCLUSION ............................................................................................................... 12

# TABLE OF AUTHORITIES

## CASES

PAGE

*Butner v. United States*, 440 U.S. 48 (1979)....................................................................... 9

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003)........................................................... 9

*du Pont v. du Pont*, 208 A.2d 509 (Del. 1965) ................................................................. 9

*Floyd v. Shindler (In re Rodriguez)*, 204 B.R. 510 (Bankr. S.D. Tex. 1995) ..................... 9

*In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001)....................... 10

*In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005).......................................................... 10

*In re Patchell*, 344 B.R. 8 (Bankr. D. Mass. 2006) .......................................................... 8

*In re Stein & Day, Inc.*, 113 B.R. 157 (Bankr. S.D.N.Y. 1990) ......................................... 9

*In re Valladares*, 415 B.R. 617 (Bankr. S.D. Fla. 2009) ................................................... 9

*In re W.T. Mayfield Sons Trucking Co.*, 225 B.R. 818 (Bankr. N.D. Ga. 1998) ................ 9

*Morse Operations, Inc. v. Robins Le-Cocq, Inc. (In re Lease-a-Fleet, Inc.)*,
    141 B.R. 869 (Bankr. E.D. Pa. 1992) ................................................................... 10, 11

*Nobelman v. Am. Sav. Bank*, 508 U.S. 324 (1993) ........................................................... 9

*Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf
    Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*,
    444 F.3d 203 (3d Cir. 2006)........................................................................................ 9

*Raslavich v. Ira S. Davis Storage Co., Inc. (In re Ira S. Davis, Inc.)*,
    No. 92-14259S, 1993 Bankr. LEXIS 1383 (Bankr. E.D. Pa. Sept. 22, 1993) ............ 11

## STATUTES AND RULES

11 U.S.C. § 303(h) ............................................................................................................ 11

11 U.S.C. § 541(a)(1).......................................................................................................... 9

## OTHER AUTHORITIES

Mary Elisabeth Kors, Altered Egos:  Deciphering Substantive Consolidation,
    59 U. Pitt. L. Rev. 381 (1998)...................................................................................... 11

William L. Norton, Jr., Norton Bankruptcy Law and Practice 2d § 4:113 (2007) ............. 9

## INTRODUCTION

Law Debenture Trust Company of New York ("Law Debenture") has failed to establish any factual or legal basis in support of its motion for disgorgement of reimbursements made by a non-Debtor pursuant to valid, enforceable contractual obligations. Instead, it has attempted to manufacture a bad-faith "scheme" by offering unsupported rhetoric and innuendo. These efforts have already wasted the valuable resources of this Court and of the parties to this dispute. Law Debenture's motion should be denied.

As set forth in greater detail in the brief previously submitted by JPMorgan Chase Bank, N.A. ("JPMorgan"),[1] the salient facts are as follows:

- All reimbursements have been made by a non-Debtor, Tribune (FN) Cable Ventures, Inc. ("TCV"), using non-Debtor assets. (Stip. ¶¶ 25, 64, 67.)[2]

- Pursuant to Sections 8.04(a) and (b) of the senior secured credit agreement (the "Credit Agreement" or "Agreement"), Tribune Company ("Tribune") is obligated to reimburse JPMorgan, as administrative agent ("Agent"), and certain other

---

[1] JPMorgan hereby incorporates by reference (1) the points it previously advanced in *JPMorgan Chase Bank, N.A.'s Brief on Reimbursement of the Senior Lenders' Fees and Expenses*, dated March 2, 2010 (Dkt. No. 3668) (the "March 2nd Brief"); (2) the points it previously advanced in *JPMorgan Chase Bank, N.A.'s Objection to "Motion of Law Debenture Trust Company of New York To Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees and Expenses, for an Accounting, and for Disgorgement of Past Payments" [Dkt. No. 2407]*, dated November 20, 2009 (Dkt. No. 2597); and (3) the arguments previously advanced by the Credit Agreement Lenders in *Credit Agreement Lenders' Statement and Joinder in JPMorgan Chase Bank N.A.'s Opposition to Motion of Law Debenture Trust Company of New York To Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees and Expenses, for an Accounting, and for Disgorgement of Past Payments*, dated November 20, 2009 (Dkt. No. 2602).

[2] "Stip. __" citations are to the *Stipulated Facts in Connection with March 26, 2010 Hearing on Law Debenture Trust Company of New York's Motion To Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees and Expenses, for an Accounting, and for Disgorgement of Past Payments*, dated March 2, 2010 (Dkt. No. 3657).

lenders ("Senior Lenders") for professional fees and expenses (collectively, the "Credit Agreement Expenses"). (Larsen Ex. 8 (Jt. Ex. 5) §§ 8.04(a), (b).)[3]

- Tribune's obligations under the Credit Agreement were independently guaranteed by more than fifty of Tribune's subsidiaries (the "Guarantors") pursuant to a Guarantee Agreement ("Guarantee"). (Jt. Ex. 8.) TCV is a Guarantor, and is obligated to reimburse the Agent and Senior Lenders for professional fees and expenses pursuant to the Guarantee. (*Id.* § 1, annex I.)

- On December 8, 2008, when Tribune and certain of its subsidiaries filed for bankruptcy, there were important business reasons for TCV and other Tribune subsidiaries not to file. (Stip. ¶ 25; Larsen 17:2-20:23, 54:21-55:16, 143:21-144:22.) JPMorgan and the Senior Lenders were not involved in any decisions about which subsidiaries would file. (Kulnis 29:5-24; Larsen 48:9-21.)

- The Agent and a group of Senior Lenders ("Steering Lenders"), pursuant to the Guarantee, demanded reimbursement for the Credit Agreement Expenses from the Tribune subsidiaries that did not file (collectively, the "Non-Debtor Guarantors"). (Stip. ¶¶ 52-54; Jt. Ex. 17.)

- TCV agreed to make payment pursuant to the Guarantee provided certain conditions were met, including disclosure of the agreement to the Official Committee of Unsecured Creditors (the "Committee") and to the Office of the United States Trustee (the "U.S. Trustee"); regular reporting to the Committee regarding the fee reimbursement; and delivery by the Agent of a payment blockage notice to the agent under the Bridge Agreement ("Bridge Agent"). (Stip. ¶¶ 40, 46, 56; Larsen 72:20-73:16.) The terms of the reimbursement agreement are memorialized in writing. (Stip. ¶ 56; Kulnis Ex. 13 (Jt. Ex. 4).)

- In addition to the conditions listed above, the Agent and Steering Lenders informally agreed not to seek full enforcement of the Guarantee – which provides for payment in full of all monies advanced under the Credit Agreement, with interest (Larsen Ex. 8 (Jt. Ex. 5) § 6.01) – against the Non-Debtor Guarantors for so long as the fees and expenses were being reimbursed. (Kulnis 76:22-77:6; Larsen 72:13-25.)

- The Committee and the U.S. Trustee voiced no objection to the reimbursement agreement. (*See* Stip. ¶¶ 45-47, 51, 55-57, 59, 61-62; Jt. Exs. 18, 19, 20.)

---

[3] "Jt. Ex. __" citations are to the *Joint Exhibit List in Connection with March 26, 2010 Hearing on Law Debenture Trust Company of New York's Motion To Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees and Expenses, for an Accounting, and for Disgorgement of Past Payments*, dated March 2, 2010 (Dkt. No. 3660).

2

- The Agent and the Steering Lenders have complied with all of the conditions set forth in the reimbursement agreement, and no enforcement actions have been initiated against the Non-Debtor Guarantors. (Stip. ¶¶ 54, 73-76, 80.)

## ARGUMENT

Unable to point to any evidence in the record of a bad-faith "scheme" among Tribune, the Agent, and the Steering Lenders, Law Debenture misrepresents and distorts that record in an attempt to manufacture impropriety.[4] The reason for this is clear: after months of discovery, the facts do not support Law Debenture's rhetoric.

### A.    JPMorgan Acted in Good Faith

In its Supplemental Brief, Law Debenture advances four alleged "facts" as evidence of a bad-faith scheme. None withstand scrutiny.

>    1.    *The Debtors' Decision Not To Execute a Formal Forbearance Agreement Had Nothing To Do with Avoiding Disclosure to the Court*

Law Debenture incorrectly and repeatedly asserts that the parties abandoned the idea of a formal forbearance agreement in order to avoid this Court's review. (LD Br. 1, 2, 3, 5-7, 12-13, 19.)[5] No evidence supports this conclusion. In fact, the January 22, 2009, email from Miriam Kulnis to Nils Larsen and Chandler Bigelow upon which Law Debenture relies actually undermines its claim. In that email, Ms. Kulnis makes clear that she believes "[the forbearance agreement] would be *more likely* to get approved by the court if the debtors were not a party." (Stip. ¶ 37 (emphasis added).) As the email

---

[4] Appendix A consists of a chart listing many of Law Debenture's false statements, omissions, and factual misrepresentations.

[5] "LD Br. __" citations are to *Law Debenture Trust Company of New York's Supplemental Brief in Further Support of Its Motion To Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees and Expenses, for an Accounting, and for Disgorgement of Past Payments*, dated March 2, 2010 (Dkt. No. 3669).

3

exchange demonstrates and as the deposition testimony confirms, both Ms. Kulnis and

JPMorgan were operating under the assumption that a forbearance agreement *would* be

submitted to the Court *whether or not Debtors were a party*.[6]   (Larsen 71:16-22, 86:3-18;

*see* Kulnis 84:3-8 ("I thought it was fine to inform the bankruptcy court [of the informal

agreement]. I had no problem with that. But it wasn't my decision.").)  This hardly

evidences a scheme to avoid Court scrutiny.

Indeed, the record demonstrates that the Debtors opted not to proceed with a

formal forbearance agreement because of disagreements relating to other terms of the

agreement, including the rights of the respective parties to terminate the agreement, the

duration of the agreement, and Tribune's obligation to provide information to the Senior

Lenders pursuant to the agreement.  (Kulnis 49:13-22, 65:18-66:25; Larsen 67:10-69:21;

*see also* Jt. Ex. 14 (describing "important differences" between the parties regarding the

forbearance agreement without mentioning Court approval as one such difference).)

Although Law Debenture insists the parties should have notified the Court, it has not

identified, and JPMorgan is unaware of, what relief the parties should or could have

requested from the Court given that the reimbursement agreement created no obligation

for the Debtors and the payments were made using non-Debtor assets.

---

[6] As the record reflects, JPMorgan resisted including the Debtors as parties to the forbearance agreement not because doing so required Court approval, but rather because JPMorgan believed that the Non-Debtor Guarantors, who stood to benefit from a forbearance agreement, were the appropriate parties to include. (Kulnis 55:17-56:13, 58:11-18, 59:20-60:10.) Kulnis' January 22, 2009 email does nothing more than raise a legitimate concern that unnecessarily including the Debtors as parties could make Court approval less likely. (Stip. ¶ 37.)

2.     *The Informal Agreement Was Memorialized in Writing and Was Disclosed*

Law Debenture incorrectly and repeatedly asserts that Tribune and the Agent entered into an "unwritten" and "undisclosed" understanding. (LD Br. 1, 2, 3, 7, 12, 13, 20.) However, it is undisputed that the terms pursuant to which the Non-Debtor Guarantors agreed to reimburse the Credit Agreement Expenses were memorialized in writing in a detailed email from the Committee on February 27, 2009 (Stip. ¶ 56; Kulnis Ex. 13 (Jt. Ex. 4)),[7] and the terms of that agreement were fully disclosed to the Committee and the U.S. Trustee (Stip. ¶¶ 47, 51, 56, 57-59, 61-62).[8]

Notably, Law Debenture acknowledges that payments made by TCV did not require disclosure to the Committee or the U.S. Trustee. (LD Br. 14 n.9 ("[T]he parties informed the U.S. Trustee, which has no oversight over TCV as a non-debtor.").) JPMorgan agrees, and as the record makes clear, the additional disclosures to the Committee and to the U.S. Trustee, while not legally required, were motivated by a desire to be transparent. (Kulnis 67:20-68:14, 69:15-70:6; Larsen 130:8-14.)

---

[7] Contrary to Law Debenture's assertion (LD Br. 8), the decision to disclose the agreement to the Committee and the U.S. Trustee was made well before the agreement's terms were finalized. (*Compare* Stip. ¶ 40, *with* Stip. ¶¶ 51, 56.)

[8] Law Debenture incorrectly states that "until Deutsche Bank, a member of the Creditors' Committee, identified the Bank Fee Payments in a public filing, the Court and constituents in these bankruptcy cases were never informed of the Bank Fee Payments nor of the 'unwritten agreement' between the Non-Debtor Guarantor and the Lenders." (LD Br. 3.) Putting aside the disclosures to the Committee, which represents all unsecured creditors in these cases, Law Debenture's *own counsel* was informed of the reimbursement payments on September 2, 2009 (Heaney Ex. 6 (Jt. Ex. 3)), more than *two weeks* before Deutsche Bank's public filing (Heaney Ex. 5 (Jt. Ex. 3)). In fact, Tribune's response to the inquiry from Law Debenture's counsel further demonstrates that the parties made no attempt to hide the agreement. (*See* Heaney Ex. 6 (Jt. Ex. 3).)

5

3.    *The Reimbursements Were Properly Authorized and Did Not*
      *Deplete Funds Available to the Debtor*

Law Debenture incorrectly and repeatedly tries to imply that the reimbursements

were illicit based upon the misleading premise that TCV's board of directors did not

approve the reimbursements.  (LD Br. 2, 11, 13.)  However, separate TCV board

approval was not required because the board had already authorized TCV to "cause the

Company to . . . perform all of its obligations pursuant to the Guarantee" (Larsen Ex. 4

(Jt. Ex. 5)) – including the obligation to reimburse the Credit Agreement Expenses

(Larsen Ex. 8 (Jt. Ex. 5) § 8.04; Jt. Ex. 8, § 1).

Pursuant to this valid authorization, TCV paid the Credit Agreement Expenses

with funds earned after the Debtors' bankruptcy filings, which are held in an account in

TCV's name.  (Stip. ¶ 64; Larsen Ex. 25 (Jt. Ex. 5).)  There is no evidence that these

funds would have been available to the Debtors had TCV not paid the Credit Agreement

Expenses, and Law Debenture's statements to the contrary are both uninformed and

misleading.  The assets of non-Debtors that receive cash are held in accounts belonging

to those non-Debtors and are held by the non-Debtors.[9]  (*See infra* Section C; Larsen

24:11-25:4 ("[T]he non-debtor entities, to the extent that they receive cash, they hold that

cash.").)

---

[9] Law Debenture implies that TCV's retention of its assets following bankruptcy is improper and
inconsistent with Debtors' request to maintain its global cash management system ("CMS").  (LD Br. 16.)
Law Debenture is mistaken.  The cash management order entered by this Court merely authorizes non-
Debtors' continued participation in the CMS to allow non-Debtors without cash management capabilities to
continue to rely on Tribune's cash management services; it by no means compels participation by all non-
Debtors.  (*See* Dkt. No. 1116.)

4.    *The Blackstone Engagement Letter Does Not Evidence Bad Faith*

Finally, Law Debenture incorrectly and repeatedly tries to make much of a series

of *draft* Blackstone engagement letters in support of a specious argument that the final

Blackstone engagement letter was "drafted purposefully to avoid Court scrutiny." (LD

Br. 13.) This accusation is based purely on speculation – besides being wrong.  Although

a very early *draft* of the letter included Tribune as a signatory, there is nothing in the

record to support Law Debenture's speculation that the signature line was removed from

subsequent drafts to avoid Court review.[10]  (*See* Larsen 123:14-124:6; Kulnis 88:3-12.)

The correct – and more reasonable – inference to be drawn is that neither the Debtors nor

the Non-Debtor Guarantors signed the Blackstone *engagement* letter because they did not

*engage* Blackstone.

**B.    TCV Was and Is Legally Obligated To Make Payment**

The record evidence leads to a single conclusion – that TCV is contractually

obligated under the Credit Agreement and Guarantee to reimburse the Credit Agreement

Expenses.  Law Debenture attacks Section 8.04(a) of the Credit Agreement but then

ignores Section 8.04(b) – which covers the Credit Agreement Expenses, all of which

were incurred in connection with the Credit Agreement.  (Stip. ¶ 4.)  Section 8.04(b)

alone is fatal to Law Debenture's claim.  Moreover, Law Debenture cannot identify a

single case in support of its contention that Section 8.04(a)'s "enforcement" language

does not cover "large portions" of the reimbursements or retainers. (LD Br. 19.)  To the

---

[10] Further, Law Debenture misrepresents the contents of the final draft Blackstone engagement letter in its factual recitation. (LD Br. 8.)  The draft does correctly specify that "[a]ll fees and expenses payable to Blackstone pursuant to this Agreement are obligations of the Tribune Company," but notes that such obligations arise "in accordance with the provisions of Section 8.04 of the Credit Facilities and [are] presently payable by the Guarantors (as defined in the Credit Agreement) whom are not the subject of a case under Chapter 11 of Title 11 of the Bankruptcy Code." (Jt. Ex. 21.)

7

contrary, the plain language of Section 8.04(a) mandates a broad interpretation of enforcement "whether through negotiations, legal proceedings, or otherwise." *Cf. In re Patchell*, 344 B.R. 8, 13 (Bankr. D. Mass. 2006); *see* March 2nd Brief at 18-19.

Unable to advance a cogent legal argument, Law Debenture resorts to speculating about alternative paths TCV might have taken to avoid honoring its contractual obligations. (LD Br. 18.) This ignores a critical point: A direct result of TCV fulfilling its contractual obligations to reimburse the Credit Agreement Expenses has been that the Agent and the Steering Lenders have so far refrained from exercising all of their rights under the Guarantee against the Non-Debtor Guarantors – including the right to demand payment of the entire amount of principal and interest due under the Credit Agreement. That forbearance has allowed the non-Debtors to remain non-Debtors. Had the Non-Debtor Guarantors decided not to comply voluntarily with their obligations or, importantly, if they do not do so in the future, the Senior Lenders would have the right and incentive to enforce their right to full payment under the Guarantee. (*See* Kulnis 30:15-31:23, 34:2-9, 76:22-77:6, 80:24-81:12.) Any such demand would undoubtedly cause the Non-Debtor Guarantors to file for protection under the Code, thereby causing the very business harm Tribune sought to avoid by not filing the Non-Debtor Guarantors in the first place.

## C.    TCV's Assets Are Not Estate Property

TCV is a non-Debtor and the reimbursements were made exclusively by TCV using TCV's assets. (Stip. ¶¶ 25, 64, 66-67.) Law Debenture's stubborn insistence that TCV's assets are estate property (LD Br. 3, 15-17) does not make it so.

8

Fundamental to the operation of the Bankruptcy Code is the principle that a *non-debtor's* assets are outside of the bankruptcy estate of any debtor affiliate. *See* 11 U.S.C. § 541(a)(1); March 2nd Brief at 13-16; *see also In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("A bankruptcy court's jurisdiction does not extend to a wholly-owned subsidiary of the debtor, unless the subsidiary is a 'mere sham or conduit rather than a viable entity.'") (citation omitted); William L. Norton, Jr., Norton Bankruptcy Law and Practice 2d § 4:113 (2007) ("In [disputes involving assets of a non-debtor subsidiary], because the debtor parent merely owns the corporate stock of the financially healthy subsidiary, a dispute involving the subsidiary's assets will not be related to the parent's bankruptcy and thus will be beyond the jurisdiction of the bankruptcy court of the parent."). Likewise, fundamental to the operation of corporate law is the principle that a subsidiary corporation is legally distinct from a parent corporation. *See, e.g.*, *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003) ("A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities.").[11]

---

[11] Law Debenture fails to cite a single case from Delaware, the state of TCV's incorporation and therefore the state whose law controls on the question of what constitutes estate property. *See Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 329 (1993); *see also Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law."). Additionally, the cases Law Debenture does cite are inapposite. Law Debenture cites *Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203 (3d Cir. 2006), for the principle that "[p]roperty of the estate includes all interests, such as contingent interests and future interests, whether or not transferable by the debtor." *Id.* at 211. Ownership of a subsidiary's shares, however, plainly does *not* create an interest in the subsidiary's assets. *du Pont v. du Pont*, 208 A.2d 509, 512 (Del. 1965). Meanwhile *In re Valladares*, 415 B.R. 617 (Bankr. S.D. Fla. 2009), and *In re W.T. Mayfield Sons Trucking Co.*, 225 B.R. 818, 827 (Bankr. N.D. Ga. 1998), concern payments made to a professional employed *by a debtor* and *on behalf of the debtor*, not to a third party pursuant to live contractual obligations. Finally, *Floyd v. Shindler (In re Rodriguez)*, 204 B.R. 510, 515 (Bankr. S.D. Tex. 1995), concerns payments made from accounts that contained cominged debtor and non-debtor assets and/or were controlled by a debtor.

9

In substance, Law Debenture wants this Court to order relief equivalent to the

drastic remedy of substantive consolidation of TCV and the Debtors, without having to

make a showing that it is entitled to such extraordinary relief.  The facts here do not come

close to the "nearly 'perfect storm'" required for substantive consolidation in this circuit.

*In re Owens Corning*, 419 F.3d 195, 211, 216 (3d Cir. 2005) (substantive consolidation is

an "extreme" and "imprecise" remedy, which "should be rare and, in any event, one of

last resort after considering and rejecting other remedies"); *In re Genesis Health Ventures,*

*Inc.*, 266 B.R. 591, 618 (Bankr. D. Del. 2001) ("Substantive consolidation should be

considered with extreme caution and granted only in extraordinary situations.").  The

Third Circuit's test for substantive consolidation requires that:

> (i) prepetition [the entities for whom substantive consolidation is sought] disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

*In re Owens Corning*, 419 F.3d at 211 (footnotes omitted).  Law Debenture cannot meet,

and has not even tried to meet, this standard.[12]  Indeed, the factual record is replete with

evidence that Tribune and TCV are separate and distinct corporate entities.  (Stip. ¶ 63;

Larsen 11:9-18, 12:5-12, 22:13-19, 30:10-12, 30:15-17, 31:15-20.)

Substantive consolidation is particularly inappropriate here as the relief requested

would involve the consolidation of debtor assets with non-debtor assets.  *See Morse*

*Operations, Inc. v. Robins Le-Cocq, Inc. (In re Lease-a-Fleet, Inc.)*, 141 B.R. 869, 869

(Bankr. E.D. Pa. 1992) ("Because we believe that the involuntary substantive

---

[12] A party seeking substantive consolidation of separate corporate entities bears the burden of establishing the required elements.  *In re Owens Corning*, 419 F.3d at 212.

consolidation of the case of a debtor with the non-case of a non-debtor is a type of relief fraught with conceptual problems, we believe that such relief, if ever appropriate, should be granted in only extraordinary situations . . . ."); *see also* Mary Elisabeth Kors, <u>Altered Egos: Deciphering Substantive Consolidation</u>, 59 U. Pitt. L. Rev. 381, 412 n.193 (1998) ("Substantive consolidation of a non-debtor with a debtor essentially casts the non-debtor into bankruptcy on the request of neither the debtor nor its creditors but some third party, without forcing that party to make either of the showings required by § 303(h).") (citing *Raslavich v. Ira S. Davis Storage Co. (In re Ira S. Davis, Inc.)*, No. 92-14259S, 1993 Bankr. LEXIS 1383 (Bankr. E.D. Pa. Sept. 22, 1993)).

11

## CONCLUSION

For the foregoing reasons, JPMorgan requests that the Court deny Law

Debenture's Motion.

Dated: March 15, 2010
      Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Drew G. Sloan (No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Dennis E. Glazer
Karen E. Wagner
Sharon Katz
Michael Russano
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

*Attorneys for JPMorgan Chase Bank, N.A.*

**APPENDIX A**

| Law Debenture's Inaccurate Statements | Actual Record |
|---|---|
| Tribune and the Agent abandoned the forbearance agreement and structured the reimbursement payments in order to avoid oversight by the Court and disclosure to parties-in-interest. (LD Br. 1, 2, 12, 13, 19.) | The reason the forbearance agreement was not executed related to business differences completely unrelated to oversight by the Court. (Stip. ¶ 41; Kulnis 49:14-22, 66:2-25; Larsen 66:23-69:8.) |
| Law Debenture repeatedly refers to the reimbursement agreement as an "undisclosed" or "covert" agreement. (LD Br. 7, 8, 9, 20.) | The terms of the reimbursement agreement were fully disclosed to parties-in-interest (including Law Debenture's predecessor indenture trustee, Deutsche Bank) when the Agent and Non-Debtor Guarantors voluntarily disclosed to both the Committee and the U.S. Trustee. (Stip. ¶¶ 45-47, 51, 55-59, 61, 62.) |
| The reimbursement agreement was not disclosed to the "constituents in these bankruptcy cases" until Deutsche Bank identified the payments in a public filing. (LD Br. 3; *see id.* 12, 13.) | The terms of the reimbursement agreement were fully disclosed to parties-in-interest (including Law Debenture's predecessor indenture trustee, Deutsche Bank) when the Agent and Non-Debtor Guarantors voluntarily disclosed the agreement to both the Committee and the U.S. Trustee. (Stip. ¶¶ 45-47, 51, 55-59, 61, 62.) Additionally, counsel for Law Debenture was informed of the reimbursement agreement more than two weeks before the Deutsche Bank filing. (Heaney Ex. 6 (Jt. Ex. 3).) |
| The Agent and certain Senior Lenders believed that the Court would not approve the forbearance agreement. (LD Br. 2, 3, 19.) | Miriam Kulnis wrote that the Agent believed the Court would be *more likely to approve* the agreement if it did not include the Debtors. (Kulnis Ex. 6 (Jt. Ex. 4).) Although Kulnis expressed concern regarding the possibility the Court would not approve the forbearance agreement if Debtors were included, she did not state the likelihood that this would occur. (*Id.* ("We are worried that if the debtors are parties the UCC *may* object to it and it would get denied.") (emphasis added).) |

| Law Debenture's Inaccurate Statements | Actual Record |
|---|---|
| The terms of the agreement to reimburse professionals' fees were unwritten. (LD Br. 2, 3, 7, 13.) | The terms of the agreement to reimburse professionals' fees were memorialized in an email between counsel for the Agent and the Committee. (Kulnis Ex. 13 (Jt. Ex. 4).) |
| TCV is a "shell and an instrumentality of the Debtors." (LD Br. 2.) | TCV is a separate corporate entity incorporated in Delaware that maintains separate books and records from Tribune. (Stip. ¶ 63.) |
| Funds for reimbursement payments were "siphoned off" from and depleted funds that would otherwise be available to the Debtors. (LD Br. 3, 14; *see also id.* 2 ("Bank Fee Payments were funded with cash that otherwise would have been swept up from the Non-Debtor Guarantors to the Debtors.").) | All reimbursement payments made by TCV have come from an account held in TCV's name that is separate from Tribune's cash management system and that contains funds generated by virtue of TCV's partnership interest in the Food Network. (Stip. ¶¶ 64, 66; *see also* Larsen 24:11-25:4 ("[T]he non-debtor entities, to the extent that they receive cash, they hold that cash.").) |
| "Debtors and the Lenders informed the U.S. Trustee, but did not actually solicit his views or approval." (LD Br. 3.) | The U.S. Trustee was given ample disclosure of the reimbursement agreement and had numerous opportunities to communicate his views or object to the agreement. (Stip. ¶¶ 57, 58, 59, 61, 62.) |
| The proposed final execution copy of the Blackstone engagement letter stated that "[a]ll fees and expenses payable to Blackstone pursuant to this Agreement are obligations of Tribune Company." (LD Br. 8.) | Law Debenture omits language immediately following the quoted passage that makes clear the Non-Debtor Guarantors are responsible for all payments. The draft engagement letter states: "All fees and expenses payable to Blackstone pursuant to this Agreement are obligations of the Tribune Company *in accordance with the provisions of Section 8.04 of the Credit Facilities and presently payable by the Guarantors (as defined in the Credit Agreement) whom are not the subject of a case under Chapter 11 of Title 11 of the Bankruptcy Code* . . . ." (Jt. Ex. 21 (emphasis added).) |

| Law Debenture's Inaccurate Statements | Actual Record |
|---|---|
| The decision to inform the Committee of the reimbursement agreement was not made until after the agreement was finalized.  (LD Br. 8.) | The proposed reimbursement agreement always contemplated disclosure to the Committee.  (Stip. ¶ 40.)  The terms of the reimbursement agreement were not finalized until after disclosure to and subsequent negotiations with the Committee regarding the proposed agreement.  (*Compare* Stip. ¶ 40, *with* Stip. ¶¶ 51, 56.) |
| "The decision to pay the fees was made by management of Tribune . . . ."  (LD Br. 11, 13.) | The board of directors of TCV authorized the company to "perform all of its obligations pursuant to the Guarantee," (Larsen Ex. 4 (Jt. Ex. 5); Kulnis 90:11-22), prior to TCV's decision to reimburse professionals' expenses. |
| Law Debenture implies that Ms. Kulnis' role as co-chair of the Committee may have influenced the Committee's decision to not object.  (LD Br. 14.) | Ms. Kulnis was excused from the room and did not participate in the Committee's discussion or the Committee's decision not to object to the reimbursement agreement (Dkt. No. 2596), unlike Law Debenture's predecessor indenture trustee, Deutsche Bank, who fully participated. |
| "[T]he Debtors and the Lenders agreed to give the Creditors' Committee rights to object to reasonableness of the Bank Fee Payments."  (LD Br. 14 n.9.) | Neither the Agent nor the Non-Debtor Guarantors *gave* the Committee a right to object to the reasonableness of the payments or to anything else; rather, the Committee reserved for itself "any and all rights *it might have* to object . . . ."  (Kulnis Ex. 13 (Jt. Ex. 4) (emphasis added).) |

3-A