# EXHIBIT B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                     ) Chapter 11 Cases
                                           )
TRIBUNE COMPANY, et al.                    ) Case No. 08-13141 (KJC)
                                           )
          Debtors.                         ) (Jointly Administered)
                                           )
                                           ) **Hearing Date**: April 13, 2010 at 10:00 a.m. (Eastern)
                                           )
                                           ) **Objection Deadline**: April 9, 2010 (Eastern)
                                           )

## DECLARATION OF JAMES O. JOHNSTON IN SUPPORT OF MOTION OF CREDIT AGREEMENT LENDERS FOR LEAVE TO CONDUCT DISCOVERY PURSUANT TO BANKRUPTCY RULE 2004 OF CENTERBRIDGE PARTNERS, L.P., CENTERBRIDGE CREDIT ADVISORS LLC, AND THEIR AFFILIATES

I, James O. Johnston, hereby declare that:

1.      I am a partner in the law firm of Hennigan, Bennett & Dorman LLP ("HBD"), counsel to the Credit Agreement Lenders identified in the "Third Amended Joint Verified Statement Of Representation Of More Than One Creditor By Hennigan Bennett & Dorman LLP And Young, Conaway, Stargatt & Taylor, LLP."

2.      Except where otherwise indicated below, I have personal knowledge of the facts set forth in this Declaration, and if called and sworn as a witness, I could and would testify competently such facts.

3.      Attached hereto as Exhibit A is a true and correct copy of an excerpt from the transcript of a hearing held in the above-captioned cases on December 1, 2009.

4.      Attached hereto as Exhibit B is a true and correct copy of an excerpt from the transcript of a hearing held in the above-captioned cases on February 18, 2010.

5.      Attached hereto as Exhibit C is a true and correct copy of the document bearing Bates numbering CITI-TRIB-CC 00011495-500, which was produced to HBD pursuant to the Bankruptcy Court's Order (I) Authorizing The Debtors To Establish A Document Depository And Directing The Committee To Deliver Certain Documents To The Depository Pursuant To

Federal Rule Of Bankruptcy Procedure 2004 And (II) Establishing Settlement Negotiation Protections Pursuant To 11 U.S.C. Section 105(a) (the "Depository Order").

6.    Attached hereto as Exhibit D is a true and correct copy of the document bearing Bates numbering ML-TRIB-0608439, which was produced to HBD pursuant to the Depository Order.

7.    Attached hereto as Exhibit E is a true and correct copy of the document bearing Bates numbering JPM_00404633, which was produced to HBD pursuant to the Depository Order.

8.    I am informed and believe that, on or about March 29, 2010, my partner Michael Swartz spoke with Daniel Golden, counsel to Centerbridge Partners, L.P., Centerbridge Credit Advisors LLC, and their affiliates (collectively, "Centerbridge") in the above-captioned cases, and that Mr. Swartz subsequently sent Mr. Golden the letter attached hereto as Exhibit F regarding the Credit Agreement Lenders' document requests to Centerbridge.

9.    On April 1, 2010, I spoke telephonically with Mr. Golden regarding those document requests.  Mr. Golden informed me that Centerbridge would not voluntarily produce documents to the Credit Agreement Lenders on the grounds that the document requests were not within the scope of Rule 2004 of the Federal Rules of Bankruptcy Procedure.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 1st day of April, 2010, at Los Angeles, California.

_____
James O. Johnston

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                        .   Case No. 08-13141-KJC
                              .
                              .
TRIBUNE COMPANY,              .
                              .   824 North Market Street
                              .   Wilmington, DE 19801
                              .
        Debtor.               .   December 1, 2009
. . . . . . . . . . . . . .       10:04 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE


APPEARANCES:

For the Debtor:          Sidley Austin, LLP
                         By:  BRYAN KRAKAUER, ESQ.
                              JAMES F. CONLAN, ESQ.
                              JANET E. HENDERSON, ESQ.
                              JAMES DUCAYET, ESQ.
                         One South Dearborn Street
                         Chicago, IL 60603

                         Cole, Schotz, Meisel, Forman &
                          Leonard, P.A.
                         By:  NORMAN L. PERNICK, ESQ.
                         500 Delaware Avenue
                         Wilmington, DE  19801


Audio Operator:          Al Lugano


Proceedings recorded by electronic sound recording, transcript
produced by transcription service

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311   Fax No. (609) 587-3599**

1  resolution is the preferred course.  He was also right that

2  uncontrolled litigation is a disaster.  Controlled and surgical

3  litigation, including specific issues to unstick the

4  negotiation and standing might be one of them, makes a lot of

5  sense.  That's another part of what was said today that made

6  sense.  But frankly, the standing issue, and that's what most

7  of what Mr. Bennett had to say boils down to, there's

8  absolutely no reason that has to occur in context of a cram

9  down subsidiary plan.  He knows that.  It doesn't even have to

10  occur in context of a cram down global plan, although that's a

11  possibility, and he knows that.  And it may be that we'll have

12  to litigate surgically the standing issue if we can't come too

13  quickly to a global resolution consensually, and it's possible,

14  as Your Honor knows well, you negotiate, you get stuck, you

15  litigate, and then you start negotiating again against the

16  backdrop of that litigation.

17      With respect to how much Mr. Bennett's clients have

18  studied the subsidiary plan concept, frankly, Your Honor, it

19  would be a mess trying to separate these companies.  They are

20  highly integrated.  There are billions in inter-company claims

21  that we are analyzing.  It simply doesn't make sense.  These

22  are highly integrated companies.  It certainly doesn't make

23  sense to jump to that now, it would be chaotic.

24      With respect to what Mr. Golden had to say on behalf

25  of Centerbridge, which we believe is the largest of the public

1 debt holders.  I want to be clear about this.  We have not

2 concluded, and I'll say what I said at the beginning again, but

3 perhaps with even more emphasis.  We have not concluded that if

4 negotiations fail that we are going to cram the bank's plan

5 down on the public debt.  We have not concluded that.  It may

6 well be that we will tee up apart from confirmation, in advance

7 of confirmation, surgical issues that separate the parties.

8 And I understand Mr. Golden's point that he prefers the latter,

9 and we understand the bank's view that they prefer the former.

10 We get it.  That's frankly one of the dynamics that we and the

11 Committee are using in these discussions.

12           And one point with respect to Mr. Bennett.  And I

13 hope I'm not talking too much out of school, but this is rather

14 free form at this point.  We're meeting with Mr. Bennett's

15 clients on Thursday, Thursday this week.  We've been meeting

16 constantly for months with Mr. Bernstein and his clients, with

17 Mr. Bennett over the phone, with Mr. Mayer, who also represent

18 the banks, with the Chadbourne firm, with Centerbridge.  We've

19 been meeting with everybody constantly.  The formality of the

20 meeting to which Mr. Seife referred to in January is just that.

21 It is a formal set piece meeting.  We don't wait until those

22 formal meetings.  Frankly, a lot happens outside of an advance

23 and around those meetings, as Your Honor knows.  Frankly, the

24 meetings have been continuous, as you would expect.

25           Mr. Rosner's comments on behalf of Law Debenture, and

# EXHIBIT B

```
 1              IN THE UNITED STATES BANKRUPTCY COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3    IN RE:                        :
                                    : Chapter 11
 4    TRIBUNE COMPANY, et al.,      :
                                    : Case No. 08-13141 (KJC)
 5         Debtors.                 :
      . . . . . . . . . . . . . .   :
 6
                          Wilmington, Delaware
 7                        February 18, 2010
                              10:06 a.m.
 8
                          TRANSCRIPT OF HEARING
 9              BEFORE THE HONORABLE KEVIN J. CAREY
                    UNITED STATES BANKRUPTCY JUDGE
10
      APPEARANCES:
11
      For the Debtors:              Norman L. Pernick, Esquire
12                                  Cole, Schotz, Meisel, Forman &
                                    Leonard, P.A.
13
                                    Bryan Krakauer, Esquire
14                                  James F. Conlan, Esquire
                                    James Bendernagel, Esquire
15                                  James Ducayet, Esquire
                                    Sidley, Austin, LLP
16
      For JP Morgan Chase           Robert Stearn, Esquire
17    Bank:                         Richards, Layton & Finger

18    For Citi Group:               Stephen J. Shimshak, Esquire
                                    Jeffrey M. Gorris, Esquire
19                                  Paul, Weiss, Rifkind, Wharton &
                                    Garrison, LLP
20
      For TM Retirees and           Jay Teitelbaum, Esquire
21    William Niese:                Teitelbaum & Baskin, LLP

22                                  Donna Harris, Esquire
                                    Pinckney, Harris & Weidinger, LLC
23
      For Aurelius Capital          Nancy Mitchell, Esquire
24    Management:                   Scott Cousins, Esquire
                                    Greenberg, Traurig, LLP
25
```

66

1    Honor, and then I'll conclude.

2              THE COURT:  Go ahead.

3    BY MR. SOTTILE:

4    Q.  Mr. Kurtz, I want to return to the global resolution of

5    LBO claims that you've testified about.  If there are

6    third-party claims that may be brought against former

7    shareholders or Mr. Samuel Zell, are those claims that you

8    envision being resolved as part of a global resolution of LBO

9    claims?

10   A.  That would be part of the global resolution, correct.

11   Q.  Have you or anyone else acting for the Debtors, to your

12   knowledge, had communications about settlement with former

13   shareholders who were bought out in the LBO or Mr. Zell?

14   A.  I have not.

15   Q.  Do you know whether others have?

16   A.  I'm not sure.  I can only speak to my own involvement and

17   I have not and I'm not aware of any such discussions.

18   Q.  Do you have in front of you, sir, the chart of meetings

19   that was presented to you on direct testimony?

20   A.  Yes, I do.

21   Q.  Let me direct your attention to an entry dated January

22   12th, 2010, which describes a meeting attended by the Senior

23   Lenders, Centerbridge and UCC advisors at Chadbourne & Parke.

24   A.  Right.

25   Q.  Do you see that reference, sir?

67

1   A.  I do.

2   Q.  The topics discussed are identified as, quote, "Senior

3   Lenders and Centerbridge present settlement amounts," close

4   quote.  Do you see that, sir?

5   A.  I do.

6   Q.  Is it correct that that's the only occasion to your

7   knowledge when the Senior Lenders and Centerbridge have

8   presented settlement amounts or have there been other

9   occasions?

10  A.  My understanding is that there have been direct

11  conversations between Centerbridge and certain of the Senior

12  Lenders that I did not participate in.  So I don't know if the

13  answer to your question is yes or no.  That may have happened

14  outside within the framework of those conversations.

15  Q.  Setting aside discussions you haven't been a party to --

16  A.  Right.

17  Q.  -- is it correct the only discussions you've been a party

18  to where settlement offers have actually been made occurred on

19  January 12th, 2010?

20  A.  No.

21  Q.  What other occasions have there been when settlement

22  offers were made to you or in your presence?  I'm not asking

23  for the substance, I'm asking when it happened.

24  A.  I don't remember the exact date, but it was subsequent to

25  that meeting.  And I would say that almost every conversation

68

1   I had with everyone involves some discussion around

2   settlement.  And let me just make a comment on the process

3   because you're touching on it here.

4        You know, there are two ways to make a settlement.

5   There's the two parties kind of get there incrementally making

6   offers to each other and I call that settling from the outside

7   in.  And it's great if it happens that way here, we would

8   applaud.  But what we're trying to do is something quite

9   different and I would describe that as settlement from the

10  inside out.  And so it's not terribly important to me whether

11  formal offers of settlement are made.  What is much more

12  important to me and, frankly, is the subject of many if not

13  most of the conversations I've had is that people give me

14  unofficial, informal indications that, gee, if you can get

15  that guy to here, maybe I'm willing to go there.  And so I

16  don't call that a formal settlement offer because it isn't

17  and, in fact, it's explicitly not.  But I think the benefit of

18  this process is that it gives me on a confidential basis a

19  fair amount of understanding as to how we might be able to

20  steer things toward a middle ground that people can accept.

21       So there hasn't been a lot of formal settlement offering

22  and, frankly, I think it would be counterproductive, not

23  something that we've encouraged.  Instead what we've tried to

24  do is work both sides and gain an understanding as to how we

25  can move them toward the middle without putting people in the

69

1   position where they have to make a settlement offer that they

2   may view as strategically or tactically to their disadvantage.

3   Q.   Has anyone made a formal settlement offer of the type

4   you've described to you or in your presence since --

5   A.   These informal --

6   Q.   -- January 12th?

7   A.   These informal conversations, many times.

8   Q.   The question was a formal settlement offer of the type

9   you've described at any --

10  A.   I haven't --

11  Q.   -- occasion other than on January 12th, 2010?

12  A.   I think I told you, yes.   There was one subsequent to

13  that.

14  Q.   When was that?

15  A.   I told you I don't recall exactly which meeting, but it

16  was subsequent to the session that you orchestrated in your

17  office on the 12th.

18  Q.   What party or parties made offers?

19          MR. BENDERNAGEL:   Your Honor, we're getting pretty

20  close to --

21          THE COURT:   Sustained.

22          MR. BENDERNAGEL:   Thank you.

23          MR. SOTTILE:   Thank you, Your Honor.   Thank you, Mr.

24  Kurtz.

25          THE COURT:   All right.   Do the Credit Agreement

70

1  Lenders wish to cross-examine Mr. Kurtz?

2          UNIDENTIFIED SPEAKER:  No, Your Honor.

3          THE COURT:  Does JP Morgan Chase wish to

4  cross-examine Mr. Kurtz?

5          MR. STEARN:  No, Your Honor.

6          THE COURT:  Does Wilmington Trust wish to

7  cross-examine Mr. Kurtz?

8          MR. STARK:  Yes, Your Honor.

9  BY MR. STARK:

10  Q.  Good morning, Mr. Kurtz.

11  A.  Good morning.

12  Q.  You talked a bit about your efforts to achieve -- and I'll

13  quote, "A global comprehensive settlement."  Did I quote that

14  accurately?

15  A.  It sounds like you did, yes.

16  Q.  Okay.  And you said you were personally involved in

17  negotiations with -- and I believe I quoted you as "Principal

18  parties in this case."  Did I appropriately --

19  A.  You did.

20  Q.  -- quote you?

21  A.  Yes.

22  Q.  Can you define for me who are principal parties in this

23  case?

24  A.  The principal party participants in this process have been

25  JP Morgan, as agent for the Senior Lenders.

71

1   Q.   I'm going to write these down, excuse me.   JP Morgan.

2   A.   Sure.

3   Q.   Go on, I'm sorry.

4   A.   The -- a group of holders of bank debt that is represented

5   by Mr. Bennett.   I think that group is in the four plus

6   billion dollar range.   The Creditors --

7   Q.   At least as of now?

8   A.   Sorry?

9   Q.   At least as of now, excuse me.

10  A.   At least as of now, Creditors' Committee has been an

11  active participant, and a large holder of bond debt by the

12  name of Centerbridge has --

13  Q.   (Indiscernible.)

14  A.   -- also been an active participant.

15  Q.   Forgive me.   I didn't mean to interrupt you.   Do you know

16  what kind of debt Centerbridge holds?

17  A.   I am -- I've been led to believe that they own

18  approximately one-third of the pre-LBO bonds, the non-funds,

19  not yours, but the pre-LBO Senior --

20  Q.   Explain that for me just a minute or for the Court the

21  differences between the bond structure pre-LBO.

22  A.   Yeah.   The funds are subordinate to the bonds that

23  Centerbridge owns.

24  Q.   Okay.   How much of the Senior Notes are there?

25  A.   I think it's 1 billion, $260 million.

72

1   Q.   And how much are the PHONES are there?

2   A.   About the same.

3   Q.   Okay.  And so your list included JP Morgan, Mr. Bennett's

4   banks, the Creditors' Committee, Centerbridge owns a third of

5   the Senior Notes.

6   A.   Right.

7   Q.   Any PHONES' Holder?

8   A.   No.

9   Q.   Wilmington Trust?

10  A.   Well, you did participate in, at least, one of the

11  meetings that I'm aware of.

12  Q.   I did?

13  A.   Well, maybe not you, but --

14  Q.   What did I say?

15  A.   -- somebody -- Wilmington Trust was present.  Maybe you

16  weren't there, but --

17  Q.   How many people were in that meeting?

18  A.   It was a big meeting.

19  Q.   What did I say in that meeting?

20  A.   If you were there, you didn't stand out.

21  Q.   Was I given a seat --

22          THE COURT:  Now, that's --

23          MR. STEARN:  -- at the table?

24          THE COURT:  -- a shocking statement.

25      (Laughter in the courtroom.)

# EXHIBIT C
# [REDACTED]

# EXHIBIT D
# [REDACTED]

# EXHIBIT E
# [REDACTED]

# EXHIBIT F

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
865 SOUTH FIGUEROA STREET
SUITE 2900
LOS ANGELES, CALIFORNIA 90017
TELEPHONE (213) 694-1200
FACSIMILE (213) 694-1234

DIRECT PHONE (213) 694-1068
SWARTZM@HBDLAWYERS.COM

March 29, 2010

**VIA EMAIL AND U.S. MAIL**

Daniel H. Golden, Esq.
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036

**Re:    Tribune 2004 discovery**

Dear Mr. Golden:

As we have briefly discussed on the phone, the Credit Agreement Lenders would like to obtain Rule 2004 document discovery from Centerbridge. The proposed document requests are attached.

Under Local Rule 2004-1(a), we wish to confer regarding whether Centerbridge will agree to provide this Rule 2004 discovery, or whether the Credit Agreement Lenders need to make a motion before Judge Carey. I look forward to discussing this with you.

Sincerely,

Michael Swartz

MS/ocs

Enclosure

Cc:    Bruce Bennett, Esq.
       James O. Johnston, Esq.

783000.1

**[REDACTED]**