UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .    Chapter 11
                                    .
TRIBUNE COMPANY, *et al.*,          .    Case No. 08-13141(KJC)
                                    .    (Jointly Administered)
                                    .
                                    .
                                    .    March 26, 2010
                                    .    10:00 a.m.
            Debtors.                .    (Wilmington)
                                    .


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE


<u>APPEARANCES:</u>

For the Debtors:          Janet E. Henderson, Esq.
                          James W. Ducayet, Esq.
                          Sidley Austin, LLP

                          Norman L. Pernick, Esq.
                          Cole, Schotz, Meisel, Forman
                          & Leonard, P.A.

For the Committee:        Rebecca L. Butcher, Esq.
                          Landis, Rath & Cobb, LLP

                          Douglas E. Deutsch, Esq.
                          Chadbourne & Parke, LLP

For the US Trustee:       Patrick Tinker, Esq.
                          Office of the United States Trustee

For the Law Debenture:    David S. Rosner, Esq.
                          Sheron Korpus, Esq.
                          Kasowitz, Benson, Torres
                          & Friedman, LLP

```
                                    Garvan F. McDaniel, Esq.
                                    Bifferato Gentilotti, LLC

For Centerbridge Credit
Advisors:                           Daniel H. Golden, Esq.
                                    Deborah Newman, Esq.
                                    Akin, Gump, Strauss, Hauer
                                    & Feld, LLP

For JP Morgan Chase:                Dennis E. Glazer, Esq.
                                    Michael J. Russano, Esq.
                                    Michael E. McGovern, Esq.
                                    Davis, Polk & Wardwell, LLP

                                    Robert J. Stearn, Jr., Esq.
                                    Richards, Layton & Finger, P.A.

For GreatBanc:                      Thomas M. Horan, Esq.
                                    Womble, Carlyle, Sandridge
                                    & Rice, PLLC

For the Credit Agent
Lenders:                            Edmon L. Morton, Esq.
                                    Young, Conaway, Stargatt
                                    & Taylor, LLP

                                    James O. Johnson, Esq.
                                    Hennigan, Bennett & Dorman, LLP

Audio Operator:                     Al Lugano

Transcriptionist:                   Jennifer Ryan Enslen
                                    43 Bay Boulevard
                                    Newark, De 19702
                                    (302)836-1905
```

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE CLERK: All rise.  You may be seated.

2          THE COURT: Good morning, everyone.

3          ALL: Good morning, Your Honor.

4          THE COURT: Anything, well, anything preliminarily,

5    or should we address agenda items?  Okay.  Nothing

6    preliminarily.  Anyone have an objection to the seal motion

7    listed at number 2?  I hear no response.  I don't have any

8    questions, so I'm prepared to enter an order if someone wants

9    to give me a form of order.  Well, don't everybody rush up at

10   once.

11         UNIDENTIFIED SPEAKER: Your Honor, we'll locate it

12   and hand it up in a minute.

13         THE COURT: All right.  Okay.  Are we ready for the

14   main event?

15         MR. ROSNER: Yes, Your Honor.

16         THE COURT: Okay.  Let me make a confession.  The

17   answer is no clearer to me today than it was when we had a

18   preliminary discussion about it before.  There are clearly

19   competing dynamics involved here.  One of them is, as I

20   indicated at our last session on this, you know, the better

21   thing to have done would have been to really disclosed, not

22   selectively as it was, the arrangement.  I struggle still,

23   however, to find a basis in the Code to say that such

24   disclosure was required.  But you know, the odor lingers.  So

25   here I remain stuck in the middle.  So I ask that for

1    purposes of the argument, as you might expect, give me your

2    best, give me your best couple or three arguments in

3    advancing each of your respective positions.  Okay.  Let's

4    start with the movant.

5          MR. ROSNER: Thank you, Your Honor.  David Rosner

6    from Kasowitz, Benson, Torres & Friedman on behalf of Law

7    Debenture.  I'm here with two of my colleagues, Sheron Korpus

8    and Dan Fliman, as well as my co-counsel, from the Bifferato

9    firm.  Your Honor, I want to have a few preliminary comments,

10   not in the nature of what you asked about before, but in

11   terms of the motion.  And to talk to you today about why we

12   believe the stipulated facts and the documents that are

13   before Your Honor, and the scheme that we think that they

14   demonstrate, tie together with the Court's ability to enter

15   the relief, and in fact mandate that the Court should enter

16   the relief that we seek.  And we think it's a view of not

17   only what the parties have done, but how that inter-relates

18   with this Court's jurisdiction and view of the property, of

19   property that it has jurisdiction over.  The unusual

20   circumstances, which I'm going to get to towards the latter

21   part of my presentation.  I think you know some of the basic

22   facts.  I'm sure you know the basic facts.  There's $25

23   million that was paid out to the banks unbeknownst to the

24   creditors of this estate, other than the Committee members

25   themselves.  And when Law Debenture learned it, we filed our

1    motion, and now a lot of people know about it because we

2    filed a motion.  And the Debtors have made some disclosure on

3    that.  We've moved to stop the payment.  But we've moved to

4    stop the payment of those, those payments from an

5    instrumentality of the Debtor.  And the instrumentality being

6    this Tribune FN Cable Ventures, or TCV, which we recognize is

7    a non-Debtor subsidiary.  But we view it very much as an

8    instrumentality being used for this sole purpose.  And Your

9    Honor held a hearing on December 1st, which resulted in this

10   being a preliminary hearing, and scheduled this evidentiary

11   hearing for today.  I just want you to know, I think you have

12   it in front of you, there has been document discovery, there

13   were depositions, joint exhibits, exhibits to the

14   depositions.  And I would submit that the record before Your

15   Honor will be sufficient for you to make a ruling on the

16   matter.  Bankruptcy cases give Debtors extraordinary amounts

17   of protection.  Debtors that are on their heels are able to

18   walk into this Court before Your Honor, and they are able to

19   get extraordinary relief.  They are able to break contracts,

20   they're able to hold off people from being paid, they're able

21   to sell assets free and clear, they're able to maintain the

22   exclusive right to manage their estate and then propose a

23   plan, as you know, through successive exclusivity rights.

24   And you know, as you said at the initial hearing, your

25   concern, you said, this is a quote of what you said, "I'm

1    concerned that if, in fact, there was a scheme here to avoid

2    that which otherwise should have been done, should have been

3    brought before the Court, as undertaken by one of the

4    constituents in the case, I certainly don't feel as the Court

5    is without power or authority to do something about it."

6        THE COURT: Sounds like something I would say.

7        MR. ROSNER: Right.  And it does to me too, because

8    it's absolutely correct.  And what you're talking about

9    there, and what we're talking about is is that for all of

10   these huge benefits, these great rights that the Debtors

11   have, and have exercised in this case before Your Honor,

12   there are costs.  And they're not huge costs.  I mean,

13   they're huge costs in terms of paying the lawyers, no

14   question about that.  That's dollar cost.  And here there are

15   huge costs of paying the banks.  But the costs in terms of

16   the fairness of the proceeding relate to transparency,

17   notice, court approval.  Even when it's a close call.  Not

18   in, not when it's absolutely directed, but even when it's a

19   close call, you give notice to creditors.  And I think Your

20   Honor directed that at the last hearing.  The Debtors chose

21   not to do that in this case, but they chose not to do that

22   - - when I say that, I mean the Debtors chose not to give

23   transparency, to give case wide notice, and chose not to come

24   to this Court in concert with their lenders.

25       THE COURT: I will, and the facts, I think, bear

1    that out.  And just putting aside for the moment what the

2    better avenue might have been, notice was given to the US

3    Trustee's Office.  Now this is exactly the kind of thing that

4    if the US Trustee smelled a rat, she'd come in screaming to

5    Bankruptcy Court.  Or would have raised such a ruckus before

6    the deal was actually, the informal arrangement was actually

7    implemented, might have stopped it.  That didn't happen.  And

8    that's not a criticism of the US Trustee.  The other

9    constituent, the other obvious constituency, which was

10    consulted and did impose conditions to their non-objection,

11    was informed, and again didn't come running into court.  So

12    while the notice was limited, it was given to two what I

13    think we all would concede are important constituencies who

14    normally, if something were awry, would be making a lot of

15    noise about it.  Here that did not happen.

16        MR. ROSNER: But here, there was - - and I think the

17    facts bear it out - - there was manipulated notice given to

18    those parties.  There was pre-programmed notice given to

19    those parties with a design to achieve a certain outcome.

20    And this was a pre-planned outcome once the Debtors and the

21    lenders had reached the agreement by which they were going to

22    go forward.  And I think it's important to walk through the

23    facts on what, how we see the actual scheme developing, the

24    progression of the scheme, to keep this out of court, and

25    then to be able to manipulate the, the Committee as well as

1    the US Trustee.

2            THE COURT: Mr. Rosner, let me - - I should have

3    said this ten minutes ago when I first came out.  I have two

4    hours today.  So I don't know who, I know a lot of pleadings

5    and joinders have been filed.  I don't know who wishes to be

6    heard today besides the main players.  But at 12 o'clock I

7    need to leave the bench, period.  So let me just take two

8    minutes and poll folks and ask who wants to be heard and how

9    much time they think they will need.  And I'll start with

10   you.

11           MR. ROSNER: I think I'm going to need about an

12   hour.

13           MR. GLAZER: Your Honor, Dennis Glazer, Davis Polk,

14   for JP Morgan.  Probably 20 minutes.  Depending on how the

15   conversation with the Court goes.

16           THE COURT: Okay.

17           MR. DUCAYET: Your Honor, Jim Ducayet on behalf of

18   the Debtors.  I would also estimate about 20 minutes.  Again,

19   depending on what Mr. Rosner's presentation shows.

20           THE COURT: All right.  Who else?

21           MS. NEWMAN: Your Honor, Deborah Newman from Akin

22   Gump on behalf of Centerbridge Credit Advisors.  My colleague

23   Danny Golden will be joining me as soon as he finishes in

24   another courtroom I think on another floor.  And I expect

25   that he'll have about 20 minutes.

1          MR. DEUTSCH: Your Honor, Doug Deutsch from

2    Chadbourne & Parke on behalf of the Committee.  I don't

3    believe we're going to need any time unless matters arise

4    that require us to comment.

5          THE COURT: I read your statement.

6          MR. JOHNSTON: Your Honor, Jim Johnston of Hennigan,

7    Bennett & Dorman on behalf of the Credit Agreement Lenders.

8    We're in a similar position.  We did file a pleading back in

9    the original round.  I do not anticipate having a

10   presentation to the Court unless in reaction to something

11   that's said this morning.

12         THE COURT: Okay.  Let's press on.

13         MR. ROSNER: Okay.  Your Honor, let's talk about the

14   scheme for a minute.  And I'll go through it quickly, because

15   the facts are before Your Honor.  There was, the banks

16   immediately made a request for funds from the Debtors pre-

17   petition, prior to there ever being an instance of Court

18   approval.  They got that money from Tribune Company before

19   they filed.

20         THE COURT: $2 million.

21         MR. ROSNER: $2 million.  From Tribune Company while

22   Tribune Company was considering whether to file bankruptcy.

23   And that's admitted by the parties.  They then went into a

24   stage where the lender said, We need to be ahead.  We need to

25   be getting continued payment, and we need to work out a

1    mechanism with you in order to get payment.  And the bank

2    said, We're worried somebody could act as to one of the, to

3    one of the valuable non-Debtor subsidiaries.  We will give up

4    that right in exchange for getting payment.  We want payment

5    from you.  So there was an aborted forbearance period that

6    the Debtors went down with the banks.  And although the

7    parties, the banks strenuously object to the reasons for why

8    the forbearance was ultimately abandoned, it is crystal

9    clear, unquestionably, that the need for Court approval was

10   one of the reasons that the forbearance agreement went away.

11   That was a provision that the Debtors wanted, and it was not

12   one that the banks wanted to agree to.  What you've got is

13   you've got Davis Polk first circulating a forbearance

14   agreement, which included the Tribune parties.  You've got

15   the Debtors imposing a condition, and then there's a

16   progression.  And the progression goes from JPM saying, Where

17   - - and this is Ms. Colson's (phonetic) email, which is at

18   stipulated fact 37 and Larson 12.  Some are wondering if the

19   company really wants the Court to reject this so the company

20   has an excuse not to pay.  She raises that question, Nils

21   Larson, EGI, Zell guy, now a Tribune guy, he says, No.  We're

22   not being cute.  We're not trying to tee something up the

23   Court will reject.  And then is the transformation.  And the

24   transformation is the Debtors propose to the banks, Let's do

25   this without going to the Court.  Let's do this in a way that

1    we don't need to go to the Court.

2         THE COURT: Look, Mr. Rosner, I'll allow those who

3    oppose your position to tell me their views about it, but I'm

4    ready to assume the facts, at least based upon my review of

5    the submissions, bear that out.  I mean, I, you don't have to

6    convince me that there was a concerted effort here to limit

7    notice and to avoid Court approval.  But I, I don't think the

8    analysis ends there.

9         MR. ROSNER: Well, if we take it, if you agree, as

10   we submit, that you go from, that proceeds through the

11   forbearance agreement, that proceeds through the Blackstone

12   agreement, we then get to the United States Trustee, and you

13   see with the United States Trustee that the proposal to the,

14   the parties actually agree on a plan to go to the United

15   States Trustee and ensure that they're not acting, asking the

16   US Trustee for her consent, and not actually asking for when

17   payments can go.  And I think that's an important part.

18   Because you raised it a moment ago.  That the US Trustee knew

19   about this.  And the Trustee knew about this, but the parties

20   had pre-planned not, to make sure that they didn't ask for

21   consent of the US Trustee.  So I think that we can't rely as

22   an ombudsman for the US Trustee for what should go out to all

23   creditors and what kind of notice should go out to all

24   creditors.  So we know, if we're going to stipulate that

25   there is a scheme, and the scheme is to keep it out of the,

1    out of the Court's purview, right?  So what does that mean?

2    Why does that in any way change what, what this Court can do

3    in order to obviate that scheme?  I would tell you, Your

4    Honor, that there is no question, that I think that you said

5    it yourself, that the company cannot do indirectly that which

6    it can't do directly.  If the company wanted to pay $25

7    million to unsecured creditors who are nowhere near over

8    secured and they're not secured creditors other than the

9    stock at the parent, it would have to come here.  And it

10   would have to make some kind of showing.  It could never make

11   that kind of showing.  So the Debtors know they can't do

12   that.  So they did it indirectly.  And if they do it

13   indirectly through an instrumentality, does that mean it's

14   outside of the purview of this Court?

15          THE COURT: Well - -

16          MR. ROSNER: And I - -

17          THE COURT: - - what makes that, as a general

18   matter, Debtors often, for various reasons, file a parent and

19   a number of entities, but not others.  Isn't it always true

20   - - maybe we talked a little bit about this at the last

21   hearing, I don't recall specifically - - but isn't it always

22   true that the parent can accomplish indirectly pretty much

23   anything with respect to the subsidiaries that it controls.

24   Whether they're in or out of bankruptcy?

25          MR. ROSNER: No.

1        THE COURT: Whether it requires Court approval or

2   not.

3        MR. ROSNER: It's not true in the context of a

4   Bankruptcy Court proceeding.  There's no question that - -

5   well, I don't want to say there's no question.  Because there

6   could be some very nefarious facts, and I'm not asserting

7   that there are some now.  But let's just say in this

8   instance, where a company is kept out of bankruptcy, and the

9   company is kept out of bankruptcy, and there's some vagaries

10  in the record as to why it was kept out.  And certainly that

11  would be a business judgment test that a Debtor could maybe

12  argue one day and hasn't argued to this Court.  But let's say

13  the company makes a decision to keep a company out of

14  bankruptcy, that decision is the decision where it ends.  I

15  mean, the decision to say, I'm going to keep this company out

16  of bankruptcy for a business reason, in this case - - and

17  this isn't a matter of the record, so I'm just, I'm adding

18  it, let's say - - I'm keeping this out because I think that

19  it would be good for that business not to be into a

20  bankruptcy.  That's where that determination ends.  You can't

21  then, in a Bankruptcy Court, you can't then effectuate a

22  corporate policy of all of the companies that are in

23  bankruptcy, through the company that you kept out of

24  bankruptcy.  Nobody here is talking about whether Tribune,

25  you know, TCV is allowed to pay its utilities.  It doesn't

1   have any utilities, because it doesn't have any offices.

2   Nobody is saying that it can't pay its officers their

3   ordinary salary, doesn't have any officers, so there aren't

4   any salaries.  Nobody is saying that it can't do the things

5   that a non-debtor would do.  This company does nothing but

6   own a general partnership interest.  What we are saying this

7   company can't do is it can't do Tribune Company's bidding,

8   and it can't do the banks' bidding, and be set up solely for

9   that purpose.  Now, I'm not saying when they set up TCV as a

10  corporate entity to hold the general partnership interest in

11  the Food Network, that they designed, you know, ten years ago

12  that they were going to one day be in bankruptcy.  I think

13  they knew that two years ago.  But they didn't know ten years

14  ago they were going to be in bankruptcy, and that they would

15  be utilizing this as a vehicle.  But that's what they're

16  doing now.  And they're effectuating corporate policy through

17  that vehicle.  So they got it wrong when they say that what

18  we're talking about is substantive consolidation that we are

19  looking to pierce some veils.  What we're saying is, The

20  Debtors cannot use a non-Debtor vehicle as an instrumentality

21  to effectuate corporate policy.  These decisions were made,

22  and it's on the record in Mr. Larson's deposition, who made

23  the decision to pay the fees?  The decisions were made by Don

24  Lieventrich (phonetic), David Eldersfell (phonetic), Chandler

25  Bigelow (phonetic), Nils Larson, the general counsel,

1  associate general counsel, Chief Financial Officer, Chief

2  Information Officer, of Tribune Company.  Those are the

3  people, and that is the entity who's policy is being

4  forwarded by actions at TCV.  Your Honor, there's not a

5  single person in this courtroom, or in the country, that

6  could tell you that TCV's ordinary operations include paying

7  $25 million to the bank lenders for a pre-petition credit

8  facility.  It's never paid a dime before.  It's never paid a

9  dime, you know, even at the time that the company was signing

10  up the agreement.  But it's being used here to do it, in

11  order to avoid getting in front of Your Honor.  And in order

12  to avoid getting in front of all of the unsecured creditors.

13       THE COURT: Well, let's just posit one thing here.

14  Let's say you're right, that this is an out of ordinary

15  course transaction that because it was a, an agreement or

16  transaction in which the parent was necessarily involved, and

17  approved, should have been approved by the Bankruptcy Court.

18  And what if such a motion had been filed?  And the Debtor had

19  said, Look.  Among the reasons that we agreed to do this was

20  that we wanted no disruption to the non-Debtor entities who

21  are guarantors of this indebtedness.  And one of the major

22  reasons is we've had this potentially 7 or $800 million Cubs

23  transaction in the works, which will bring a lot of value to

24  the estate, and we don't want that mucked up by anyone taking

25  precipitous action.  And there may have been other reasons

1   offered.  Would that have been good enough?

2          MR. ROSNER: Well, it certainly would have been the

3   first step to act consistently with the Bankruptcy Code.  But

4   would it have been good enough, you mean, to grant that

5   relief?

6          THE COURT: Yes.

7          MR. ROSNER: There would need to be an evidentiary

8   showing, before Your Honor, with parties having the ability

9   to make their own demonstrations - -

10         THE COURT: Oh, I know what there needs to be.  I've

11  done that before.

12         MR. ROSNER: I don't think it would have been good

13  enough, in this circumstance.  I'm not talking about the

14  Cubs, you know, every transaction has to stand on its own.

15  If the Debtors - - remember the Debtors filed the Cubs in

16  order to effectuate that transaction when they needed relief

17  form the Court.

18         THE COURT: You point that out in your papers.

19         MR. ROSNER: Right.  And we don't think there is

20  anything wrong with that.  We certainly didn't object to

21  that.  But that was, they utilized the Court's good offices

22  when they needed to accomplish something.  And that was

23  putting the Cubs in, and they might have had a very good

24  reason for keeping it out.  They said, major league baseball

25  doesn't really like to truck with Debtors in bankruptcy until

1   there is a sale transaction.  That might be true.  What would

2   they have said here?  What would they have said?  Would it

3   have been enough?  I don't think it would have been enough.

4   If they said, Your Honor, we're going to, we're worried that

5   our bridge lenders are going to act against the assets of

6   TCV.  Really?  They can't act against the assets of TCV.

7   There's been a payment default.  You don't even have to issue

8   a payment blockage notice.  That was part of the subterfuge

9   to say that that was part of the consideration that the

10  company was getting by virtue of agreeing to pay $25 million

11  in fees, was that the lenders were going to issue a payment

12  blockage notice to stop the sub-debt, I'm sorry, the bridge,

13  subordinated bridge debt from going after TCV.  There's no

14  payment blockage notice needed under the guarantee.  If

15  there's a payment default, they're blocked.  So there was

16  nothing that was being given.  So do I think it would have

17  been sufficient?  No, I don't think it would have been

18  sufficient.  If they said, We need to keep this company out

19  of bank - - they would have, the company would have made a

20  decision at that point, as all companies do.  Will we, are

21  the lenders going to actually point a gun against their head

22  and shoot it, because this is a valuable company, and what

23  the unsecured creditors of this company are going to do is

24  they're going to bring a lawsuit in state court, and try to

25  get a judgment on that, and then try to enforce that judgment

1   against TCV.  No lender that thinks it has valuable assets

2   against which it wants to collect one day is ever going to do

3   that.  But if it were, that would be the just the reason that

4   the Debtors would come into Court and would seek an

5   injunction to stop that from happening.

6          THE COURT: Well let's talk about injunctive relief.

7   Typically, injunctive relief is available only when monetary

8   relief would be insufficient to make the allegedly injured

9   party whole.  Here aren't we just talking about the payment

10  of money?

11         MR. ROSNER: I don't, you mean, in terms of the

12  disgorgement, Your Honor.

13         THE COURT: Well, yes.

14         MR. ROSNER: Well, that's what we are asking for is

15  the disgorgement of the funds that have been paid.

16         THE COURT: Well, in part you're asking for

17  injunctive relief too.

18         MR. ROSNER: Well, we've asked for an order of the

19  Court to have the Debtor stop making the payments.

20         THE COURT: Which I understand has occurred by

21  agreement.  At this point, yes?

22         MR. ROSNER: I believe that's occurred through

23  today?

24         MR. DUCAYET: Yes, Your Honor.  We've agreed not to

25  make the payments pending further guidance from Your Honor.

1           THE COURT: Okay.

2           MR. ROSNER: And if you're asking whether if the

3   Debtors continue to not make payments and the banks disgorge

4   the amounts that they've been paid, whether that can be an

5   issue that could be dealt with at confirmation, I think that

6   it probably could.

7           THE COURT: Well, that's actually the second part of

8   the question.  Doesn't really, well, at least on one level,

9   doesn't the issue raised relate directly to what ultimately

10  happens, either at the upcoming hearing or if and after a

11  lawsuit is filed, or if a settlement plan is proposed at

12  confirmation, if not a consensual plan, doesn't that all get

13  wrapped into, at least on one level, whether such a plan is

14  proposed in good faith, if it doesn't resolve this issue?

15          MR. ROSNER: You know, Your Honor, without

16  prejudicing any objections that Law Debenture may raise in

17  the future, I think this is a discrete issue.  I think that

18  this is, I think it's, it may be perchance, but it shouldn't

19  be perchance that this hearing is not on April 13th.  There

20  were statements made at the last hearing that things were

21  being done strategically.  I'm sorry, I did this.  That

22  doesn't get picked up by the records.  I put that in quotes.

23  "Strategically."

24          THE COURT: Air quotes, I think they're called.

25          MR. ROSNER: Yeah.  Quote, "strategically".  This is

1    a discrete issue of disgorgement of funds by an unsecured

2    creditor to be repaid into the Debtors' cash management

3    system.  I don't think this has anything to do with when the

4    LBO gets overturned.  I don't think that these unsecured

5    creditors are ever entitled to be paid for their fees coming

6    out of when they're general unsecured creditors.  Nothing in

7    the Bankruptcy Code allows them to get paid.  So I don't

8    think this has, really, anything to do with what ultimately

9    may be determined at confirmation.  At confirmation, once

10   this money is returned to TCV, and TCV can then go back to

11   operating like it has always operated.  Pre-petition, TCV had

12   zero dollars in its bank account.  TCV put all of its money

13   into the Tribune Company's cash management system.  Since the

14   bankruptcy, $117 million of TCV's money has been cash trapped

15   at TCV solely for one purpose.  And that's to pay the banks.

16   And that's the 90 some odd million that's there now, plus the

17   $25 million that have been paid out.  That should be

18   returned, and that should be put into the cash management

19   system for use by the Debtors.  It has nothing to do with

20   confirmation.  I want to answer your question very directly

21   about this Court's jurisdiction.  You know, I'll make one

22   side note.  When they did come in for a cash management

23   order, they did ask for permission, for certain rights as to

24   non-Debtor cash, and how it could be utilized.  And I think

25   it puts them in an odd position to now be saying that the

1    Court can't act as to the same non-Debtor cash that they had

2    already come into the Court and sought some relief as to.

3    Which talks about this Court's jurisdiction as to issues that

4    it's already at least touched.

5         THE COURT: Well, as we all know, the parties can't

6    grant the Court subject matter jurisdiction that it doesn't

7    otherwise have.

8         MR. ROSNER: Sure.  But the Court can obtain its own

9    in rem jurisdiction over assets that touch these estates.

10   And I think that's something to consider under the cash

11   management order and where these funds would - -

12        THE COURT: Well, isn't typically the Bankruptcy

13   Court's historical in rem jurisdiction limited to that which

14   is actually property of the estate?

15        MR. ROSNER: But that's where, that's the nub of it.

16   All, what do the cases say?  They cases say, Absent unusual

17   circumstances, this is the limitation of which a Bankruptcy

18   Court will observe.  Absent unusual circumstances.  And what

19   are those unusual circumstances?  Those, you know, that's the

20   phrase.  And I cannot fathom more unusual circumstances than

21   you will find in this case.  Based upon what the record

22   demonstrates for Your Honor.  This company is being used,

23   used solely as an instrumentality in a manner that it has

24   never, ever been used before.  It has trapped cash for a

25   singular reason that creates a disparity amongst creditors.

1    It's providing cash.  I mean, think about, us, we and the

2    banks, Law Debenture and the Banks, we are in a contest right

3    now where we have been taking discovery and working towards

4    either the prosecution of claims, the elimination of claims,

5    whatever is going to happen.  We've been doing this on our

6    dime.  No Debtor has been paying us to do this.  But the

7    Debtors have been, through their corporate policy, been

8    paying the banks to defend against the very claims that the

9    Debtor owns against the banks.  That is an unusual

10   circumstance.  There's no independent corporate decision

11   making.  Tribune Company made the call to do this.  TCV did

12   not make the call to do this.  The witnesses have testified

13   the only thing TCV ever did was have a board meeting three

14   years ago to approve the guarantee.  And they didn't think

15   anything else would be necessary.  They've removed the Court

16   - - you know, we jumped over the scheme part of this, which I

17   appreciate, because I'm hoping that we're stipulating as to

18   that.  But I want to, I just want to point back to it for one

19   reason.  One of the unusual circumstances that puts this

20   within Your Honor's purview, and jurisdiction, and raw power,

21   is the conduct of the parties where they removed,

22   specifically acted to remove agreements to keep them from the

23   Courts purview.  They did it with Blackstone, they did it

24   with the forbearance agreement.  And in both cases, they went

25   from a beginning to an end in formal agreement, or in

1    Blackstone's case, an unsigned agreement, taking off

2    signatures such that there would not be written agreements

3    that had either the non-Debtors or the Debtors as parties.

4    Such that there wouldn't be an argument that they could be

5    brought to this Court.  That is the scheme, but it's an

6    unusual circumstance, which is one that should have this

7    Court exercise its power to stop these payments and to force

8    the disgorgement of these payments.  The depletion of $117

9    million, we're not talking about $50 thousand that didn't go

10   into the cash management system, we're talking of $117

11   million.

12           THE COURT: Well, it hasn't, the large part of it

13   hasn't gone anywhere yet.

14           MR. ROSNER: Well, I don't, right.  25, well, it

15   matters how you measure large.  I mean, the larger part has,

16   but $25 million is a lot of money wherever anybody lives,

17   right?

18           THE COURT: I would agree with that.

19           MR. ROSNER: And - -

20           THE COURT: Even here.

21           MR. ROSNER: Here.  Even anywhere, I would think.

22   The Debtors' opportunity to receive the economic benefit in

23   the future from that $117 million is property which the Third

24   Circuit, Freuhauf, has a very, very expansive reading of what

25   is property of the estate, or property that this Court can

1    act against.  It says, Property with value under the

2    Bankruptcy Code.  Property that the Debtor can get the

3    enjoyment of in the future.  Not here.  Can't do it here.

4    Funds that would have, could have been dividended up to a

5    Debtor entity, could have been used by an actual Debtor

6    entity.  Hasn't happened her.  In fact, if you go back to the

7    way that the forbearance agreements flowed from the beginning

8    forbearance agreement to the one that they never ended up

9    signing, that was a key condition by the banks was, We want a

10   cash trap at guarantor's subsidiaries.  We want to make sure

11   that cash doesn't go anywhere.  So there shall be no

12   dividending.  The Debtors' control over these decisions is an

13   unusual circumstance.  This is not, you know, there's, the

14   key point is not that that Debtor is acting as to its stock,

15   it's the Debtor is acting as to the asset that the stock

16   represents.  And it is utilizing that asset.  It's, the most,

17   I don't want to bury my lead, but the most unusual

18   circumstance in this case is the use to which the money was

19   paying banks to defend the estate claims, and the manner in

20   which it was, does so.  Secret from the Court and secret from

21   the creditors.  Now there's one Court that I think really

22   spelled it out well.  And it's starts at the Supreme Court

23   and then it runs down to a District Court in New York.  And I

24   think that it really talks about what I'm talking about, to a

25   certain extent.  It's the Commercial Mortgage case, which is

1    414 Bankruptcy at 389.  And through a series of quotes, the

2    Court specifically states that the Bankruptcy Court can

3    recognize assets of subs to avoid injustice.  The Bankruptcy

4    Court can extend jurisdiction to restrain subs from using

5    assets as here, as here, to the detriment of other creditors.

6    And then right on the money, in my opinion, it's citing a

7    District Court of New York case called Associates Gas &

8    Electric, 11 F.Supp. 359, which itself cites the Supreme

9    Court of the United States.  So we've gone Bankruptcy,

10   District Court, Supreme Court of the United States, Duggan

11   vs. Sansberry, 327 U.S. 499.  And describing what I am trying

12   to do in this case, and what they were trying to do in that

13   case, is that we're not asking you to say it how they said

14   it.  The plaintiff doesn't want the Court to administer the

15   assets of the subsidiary.  I'm not asking you to take the

16   non-Debtor and put it under your wing as if the decision has

17   been made to make it a Debtor.  Quote, "They aim only to

18   prevent the Debtor from dissipating - - the non-Debtor from

19   dissipating it's - - I'm sorry.  Let me start again, because

20   I have a - - how do you do this, when I've substituted the

21   word in the quote?

22          THE COURT: Brackets?

23          MR. ROSNER: I'll just say brackets.  Okay.  Thank

24   you.  I should know that at this point, right?  The quote

25   from the case says, quote, "They aim only to prevent",

1    bracket, "[the Debtor]", end bracket, "from dissipating its

2    assets under the guise of independent action on the part of

3    the non-Debtor subsidiaries." That's exactly the situation

4    here. We are not seeking to have you take administration

5    over any of the non-Debtors. We are seeking to have you stop

6    having the Debtor use its control under the guise of acting

7    through it's non-Debtor subsidiary. There's cases, you know,

8    we've cited a bunch of cases, they've cited - - we've cited a

9    bunch of cases where we say Courts have done so in the

10   interest of justice, and have done so to alleviate this

11   specific concern. But you certainly have the jurisdiction

12   and the power to do so. Be it under 105, where you would be

13   entering an order to present, to prevent the abuse of

14   process, or be it a view that this is really a look through

15   property of the estate because of the use and instrumentality

16   of that cash.

17          THE COURT: Well under the decisional law, don't,

18   must you not link the use of 105 to a specific Bankruptcy

19   Code section?

20          MR. ROSNER: I think Your Honor, under 105, I think

21   you have the, in *sua sponte* you have, and here it wouldn't be

22   *sua sponte*, you have the inherent power to enter any order or

23   judgment to prevent an abuse of process. And I think that

24   that is not, I agree that you can't take 105, necessarily,

25   and create new substantive rights. But I'm not asking you to

1    create a new substantive right.  I'm asking you to take a

2    look at the economic reality of what's going on here.  And

3    Bankruptcy Courts do that all the time.  And by virtue of

4    using the raw power that Bankruptcy Courts have, either

5    through 105 or through recognition under 363, that taking the

6    economic reality that these, that the Tribune Company is

7    using an instrumentality to accomplish, indirectly, under the

8    guise of its non-Debtor subsidiary, a policy of the Tribune

9    Company, the Court has the power to do that.  And it can

10   issue that order under 105.  I'd refer Your Honor to the

11   Freuhauf case again.  I don't know if I'm pronouncing it

12   correctly, in terms of the breadth of what this Court's

13   jurisdiction is over property and how they see it not only

14   limited to what may be a draconian drawing of that limitation

15   would be under state law.  But also what is a view of the

16   enjoyment that a debtors' estate can get from property.  See,

17   these are the unusual circumstances.  And these are the ones

18   that I would ask Your Honor to focus on.  These are the

19   circumstances.  You know, Courts often say, But for unusual

20   circumstances.  And then it's up to us, it's, actually it's

21   up to you to decide what are the unusual circumstances.  I

22   can't think of a case that doesn't present more unusual

23   circumstances than this.  In each one of the cases, and you

24   know, authorities that my opposition cites, they cite general

25   corporate law that says that a non-debtor, I mean that a

1    parent company and it's subsidiary are separate entities.

2    Nobody disputes that.  The distinction is that we're not

3    seeking to have you administer it, we want to avoid the

4    dissipation to the detriment of creditors.  Why else should

5    the Court grant the relief that has been requested?  We've

6    talked about there being a scheme.  We talked about it

7    briefly.  And I'll go back to that, Your Honor, if the Court

8    has any questions about what the evidence indicates in terms

9    of the progression of that scheme - -

10        THE COURT: I think - -

11        MR. ROSNER:  - - because I think it's important.

12        THE COURT: I think it's pretty clear.  I mean,

13   others can tell me it's not when they get up and have their

14   turn.  But - -

15        MR. ROSNER: Good.

16        THE COURT:  - - it's pretty clear to me.

17        MR. ROSNER: The harm to the estate, I think, is

18   demonstrated by the use to which the funds are being put.

19   And that is to defend against claims of the estate.  I

20   understand from counsel, we've looked at bills, and I don't

21   think that we saw anything that indicated they were using it

22   for their UCC functions.  Because they do sit as the co-chair

23   of the UCC.  But they are using it to defend against claims

24   of the estate.  There is absolutely no basis to pay these

25   claims under either 506 or 503.  I told you, Your Honor, and

1    I want to reiterate, that there was no consideration provided

2    for this, no payment blockage notice was necessary, and this

3    quote, unquote "informal agreement", which is what Ms.

4    Coleness (phonetic) describes it at page 77 of her

5    deposition, that they went for an informal agreement, has

6    provided no forbearance to anybody.  We believe, Your Honor,

7    that if they had a legitimate business interest in this

8    company that needed to be protected, that it just logically

9    follows that the creditors wouldn't act against it, and if

10   they would, the Court would protect it.  So it's no answer to

11   say that they had to pay the creditors in order to stop any

12   actions against the, against the non-Debtors.  By the way,

13   the scrips transaction went nowhere, so that excuse for why

14   the company was kept out doesn't fly anymore.  We think the

15   credit agreement doesn't permit the payment of financial

16   advisors.  It doesn't permit payment in all of these

17   circumstances.  That's an analysis of the credit agreement

18   itself, but we think that if the Court were to determine that

19   it could look at those individual instances, the individual

20   entries, we would find that we don't think that they fit

21   within the actual credit agreement itself.  You said before

22   that the US, that the US Trustee was informed about this, and

23   therefore we should all get some kind of great comfort from

24   that.

25           THE COURT: No I didn't - -

1           MR. ROSNER: Not, you didn't say - -

2           THE COURT: - - I didn't say that.

3           MR. ROSNER:  - - great comfort.  You said that they

4    are, what did you say exactly?

5           THE COURT: I said was that if there were a problem,

6    they would usually come in noisily.  Something to that

7    effect.

8           MR. ROSNER: Right.  Well, they were given a

9    memorandum that just told them that non-Debtor subs are

10   liable for, for guaranteed debt.  And that there is

11   guaranteed debt owed to the banks.  I don't think that they

12   were told the magnitude of the money at the time.  I don't

13   think they, she, I don't think that she told that the money

14   was going to be used to pay the, be paid to the LBO lenders

15   for the defense of the LBO fees.  And although I think

16   ultimately they determined, they certainly didn't say that

17   the, that the Debtors had to come to court, I don't think

18   they were told that the Debtors weren't going to go to Court,

19   they could certainly have figured, you know, had figured that

20   out.  Ms. Coleness is the chairperson, co-chairperson of the

21   Creditors Committee.  And I understand that the record says

22   that she was kept out of all of the discussions relating to

23   this at the Committee level.  But nevertheless, she was the

24   front person for JPM in making the, in making the

25   determination that this is what they wanted to get, and this

1   is how they were going to get it from the Debtors.  So, as

2   much as she's out of the Committee, I think there's, you

3   know, some, there's an issue with the fact that there is an

4   overlap there.  Although I take the Committee at its word

5   that they were, that she was excluded.  If you, you have one

6   non-Debtor sub paying all of these fees, you've created a

7   tremendous number of contribution claims that you wouldn't

8   otherwise have.  And you know, Your Honor, I would like to

9   say that, I'd like to say that this is a very, very bad

10  precedent.  Last time we talked, we were starting to give

11  hypotheticals, and you said, Well, lawyers could sit in a

12  room all day and come up with bad, you know, hypotheticals as

13  to what people can do.  This is a particularly bad one.  And

14  because of the way that it was developed, and because of the

15  money at stake, and because of the visibility of this case,

16  and the people that are interested in this case.  But you can

17  see it in almost any case where there's a limitation on an

18  ability to pay a creditor.  And all you do is you just move

19  that creditor to another entity that you keep out.  A holding

20  company, that you keep out of bankruptcy, and then you make

21  sure there's cash down there, and you make the payment.  And

22  if that's, if the use of instrumentalities is going to be

23  blessed by this Court as a means to pay pre-petition

24  creditors, then I think that you are actually opening up the

25  door to these types of hypotheticals that lawyers will

1  actually seek to do.

2          THE COURT: Look, there's strategic behavior in

3  literally every case that I see.  You could call it

4  manipulation, you know, but it comes down to the same

5  question.  It is good or is it bad.  And is it permissible or

6  is it not.  Okay.  My thought, Mr. Rosner, would be for you

7  to reserve a little time for rebuttal.

8          MR. ROSNER: That's fair enough, Your Honor.

9          THE COURT: All right.

10          MR. ROSNER: Thank you.

11          MR. GLAZER: Good morning, Your Honor.  Dennis

12  Glazer, Davis Polk for JP Morgan.  You'll be hearing

13  opposition to this motion today from us as well as from

14  counsel to the Debtors.  I'll let them speak to the issues

15  that relate to what's been said about the Debtors.  But for

16  starters, I want to accept your invitation to tell you that

17  we don't stipulate at all that there was a scheme.  We don't

18  think there was one.  And we think the record shows that as

19  well.

20          THE COURT: Well, scheme, when I use the word scheme

21  in this context, I don't, I don't mean, I mean it in it's

22  denotative sense not its connotative sense.  Do you

23  understand what I'm telling you?

24          MR. GLAZER: No.  But if it is that it's not

25  necessarily evil and it's not necessarily intended to defraud

1    or to conceal from somebody, then I accept that.

2            THE COURT: Well, that's close.  I mean,

3    specifically what I mean was people intentionally chose to

4    follow the course of action that they did with at least one

5    specific goal in mind.  And that was to structure it in such

6    a way that Court approval, at least in their view, was not

7    necessary.  Now whether, you know, as I said to Mr. Rosner,

8    that's a good thing or a bad thing, I have yet to determine.

9            MR. GLAZER: Yeah.  Your Honor, I would agree with

10   the second half of your statement.  And that is that the

11   parties thought that no Court approval was required.  In fact

12   that's one of the reasons that they thought that giving

13   notice to the Committee and having those discussions, and

14   giving notice to the United States Trustee was much more than

15   was necessary under the circumstances.

16           THE COURT: Well - -

17           MR. GLAZER: But I don't accept the idea that they

18   designed what they did, and I think the record will show that

19   if you give me a chance, I'll tell you why - -

20           THE COURT: Well, let me ask this question.

21           MR. GLAZER: Yes, sir.

22           THE COURT: In many cases, even if Court approval

23   may not be required, it's wise and prudent to tell some of

24   the constituents what it is you're doing.  And if it was your

25   goal to inform the constituents who you thought might be most

1    likely to object to such an arrangement, why would you not

2    have told Law Debenture?

3          MR. GLAZER: I think the answer to your question is

4    that sometimes people do things that are not necessarily

5    wise, however permissible, however it follows the law, and

6    however it follows the Court rules.  I think the Debtor has

7    said in its papers, and I would expect they would say in

8    front of you this morning, that they accept the Court's

9    notion that it should have been more broadly disclosed.  The

10   fact that it was not, however, does not mean that the amounts

11   should be disgorged, or that the amounts were not properly

12   paid.  Those two things don't follow.  And so it, I will be

13   happy to concede that it would have been wise for the parties

14   who have done that, but they didn't.  And that does not give

15   substantive rights to Law Debenture as a result of that

16   unwise failure.  So, Your Honor, I want to take issue with a

17   lot of the, and I"m going to use air quotes, "facts" that Mr.

18   Rosner tried to rely on.  They are in fact, many of them, not

19   facts.  Attached to our reply, as Appendix A, is a list of 13

20   different significant, relevant facts that Mr. Rosner in his

21   papers mis-cites, or misquotes, or misrepresents.  I have a

22   copy of that if you'd like.  I can hand that up for ease.

23          THE COURT: I would.  Thank you.  Thank you.

24          MR. GLAZER: And because I've been here before, and

25   I know Your Honor likes citation to the evidentiary record,

1    in each of the cases there, the evidentiary record cites are

2    included, as well as a short description.  We think that the

3    presentation of Law Debenture is in fact, it doesn't hold up

4    either on the law or on the facts.  And that's why I start

5    with the idea that we don't stipulate that there was a scheme

6    in the nefarious sense, as Mr. Rosner would - -

7              THE COURT: Well - -

8              MR. GLAZER:  - - translate.

9              THE COURT:  - - the only stipulation of which I"m

10   aware, and to which I will hold the parties are the

11   stipulated facts which were submitted.

12             MR. GLAZER: And we intend to hold the parties to

13   that as well.  They were carefully discussed, and carefully

14   agreed to.

15             THE COURT: I'm certain of it.

16             MR. GLAZER: Yes.  Let's start with the fact that no

17   estate property was involved here.  If you look at stipulated

18   facts 66 and 67, Your Honor, all the reimbursement payments

19   made to the banks were made by the non-Debtor, TCV, they were

20   all made with non-Debtor assets derived from the joint

21   venture that TCV has with The Food Network, and no Debtor

22   assets were involved at all.  The definition, as Mr. Rosner

23   seemed to concede under Delaware State Law about whose

24   property it is, it's the property of the subsidiary, not the

25   parent.  And the allegations, and the argument that somehow

1    estate property was used is not accurate.  That is simply

2    false.  And the evidentiary record makes that absolutely

3    clear.  The, because no estate assets were involved, §363,

4    and its notice and hearing requirements do not apply.  And it

5    is clear to me that Mr. Rosner's presentation, as he keeps

6    like, he keeps wanting to go back to his story of the scheme,

7    he doesn't have a legal basis for the request that he's made.

8              THE COURT: Well, let's say a non-Debtor subsidiary

9    proposed to sell all of its assets.  Would that require the

10   Debtor parent to seek Court approval of that transaction?

11             MR. GLAZER: I don't believe so, Your Honor.

12             THE COURT: Would whatever corporate action would be

13   required at the parent level, if any, to facilitate or aid in

14   effecting that transaction, require bankruptcy Court

15   approval?

16             MR. GLAZER: I believe that's a may.  Yes.

17             THE COURT: All right.

18             MR. GLAZER: But this is just my understanding.  And

19   I don't think either of those facts are what we are dealing

20   with here at all.  The - -

21             THE COURT: No.  I'm just trying to put a box around

22   the limitations of the Court's jurisdiction and authority.

23             MR. GLAZER: Thank you.  It is a limited

24   jurisdiction.  And we do need to find, if the Court is going

25   to act as Mr. Rosner would have you act, we are going to need

1   to take up 363, and we are going to need to take up 105(a),

2   and we are going to have to talk about the fact that what

3   he's essentially asking you to do is substantively

4   consolidate this subsidiary in with the parent.

5           THE COURT: Well, let me ask you a question.  Well,

6   no.  I won't ask that question.  Go ahead.

7           MR. GLAZER: Any time you want, Your Honor.  The,

8   let's, I want to talk about the substantive consolidation

9   that essentially Mr. Rosner is asking.  He does not even try

10  to satisfy the 3rd Circuit's standards for that, because, in

11  fact, TCV, as a subsidiary, has in fact been held separate,

12  has in fact been used separately.  There has been no

13  intermingling that either pre-petition or post-petition that

14  would qualify for a substantive consolidation here.

15          THE COURT: Well, okay.  Now I'm going to ask the

16  question.

17          MR. GLAZER: Okay.

18          THE COURT: Because you mentioned substantive

19  consolidation which, although it's not limited to

20  consideration at the time of confirmation, that's usually

21  when it arises.  Let's say the Debtor proposes a plan that

22  the effect of which is with respect to various non-Debtor

23  subsidiaries who've built up cash pots doesn't propose, well,

24  or proposes to use that cash for some creditors, but not for

25  others.

1           MR. GLAZER: Um-hum.

2           THE COURT: Do you think that would be a confirmable

3    plan?

4           MR. GLAZER: I think it may depend, Your Honor,

5    whether those subsidiaries separately owed the money that was

6    being claimed against them, as here.  Where TCV had

7    guaranteed the payments under the, under the loan agreements.

8    They have a separate obligation.  I think it might be,

9    depending on that fact.

10          THE COURT: All right.  Thank you.

11          MR. GLAZER: Your Honor, I want to take up some of

12   the, air quote, "facts".  Because I think they've been

13   misrepresented to you.  And because they've been

14   misrepresented to you, it may be that the Court, Court's

15   statements earlier about buying into the, Mr. Rosner's

16   definition of scheme was attractive.  I want to talk about

17   the idea about entering into the informal agreement, and why

18   it was informal.  There was testimony on that subject.

19   Uncontradicted testimony from Ms. Coleness and from Mr.

20   Larson.  And that uncontradicted testimony was that there

21   were business disagreements that prevented that agreement

22   from being signed and reached.  Those disagreements included

23   the ordinary things like the rights of the parties to

24   terminate, the duration of the agreement, the disclosure of

25   sensitive information relating to a Cubs transaction, and

1   whether or not Major League Baseball might hold up approval

2   of such a transaction.  And both of those representatives,

3   the two people involved in that, both testified, again

4   without contradiction, that it was those business reasons,

5   not disclosure to the Court, that caused that agreement not

6   to be signed.  In addition, they refer constantly to

7   nondisclosure.  The Court has said with accuracy that that

8   disclosure was made to the Creditors Committee.  It was also

9   made to the US Trustee.  What has not yet been said in this

10  courtroom this morning is that the Creditors Committee

11  included Deutsche Bank, the predecessor to Law Debenture in

12  its capacity as Trustee.  So it was made to the interests

13  represented by Law Debenture when they were represented by

14  Deutsche Bank on that Creditors Committee.  So the, they come

15  to Court and they say, Surprise!  We weren't told.  And now

16  we know for the first time.  And that's quite disingenuous,

17  Your Honor.  There is an allegation that the, there is an

18  unwritten agreement, and that there was never a writing.  In

19  fact, there is a writing.  And that writing is in, described

20  in detail the agreement.  And it's a writing between the

21  Creditors Committee and JP Morgan, and it's Joint Exhibit 4,

22  Your Honor, and also Exhibit 13 to the Coleness deposition.

23  Again air quotes around "facts", those are not facts.  The

24  Blackstone engagement letters.  There were nine such drafts.

25  The first draft wrongly included a signature line for the

1    Debtors.  That was fixed.  It wasn't because the Debtors

2    shouldn't be allowed to sign the Blackstone agreement.  It

3    was fixed because the Debtors weren't engaging Blackstone.

4    And the eight subsequent drafts, not the one that Mr. Rosner

5    waived around the courtroom here on December 1st, those eight

6    subsequent drafts didn't have any reference to a signature

7    line for the Debtors, nor should it have had in the first

8    place.  What they do is, they try to pick and choose among

9    hundreds of thousands of pages of documents little mistakes

10   made by corporate lawyers, and try to bring a litigation

11   benefit to it by weaving a tale.  And that tale is woven out

12   of cloth that doesn't hold together, Your Honor.  Both as a

13   matter of fact and as a matter of law.  They, Law Debenture,

14   in its papers and this morning, doesn't talk about the

15   obligation that TCV had to pay the monies that we're talking

16   about.  The reimbursement amounts.  They focus on 804, they

17   focus on 804(a), which I believe still requires the money to

18   be paid by TCV.  But in fact, there's also another provision

19   they don't deal with, 804(b), which clearly creates that

20   contractual right.  That contractual obligation by TCV.  And

21   Your Honor, I want to talk about 105(a).  Because 363 doesn't

22   apply, because these are not assets of the Debtor.  And

23   105(a) doesn't apply for many reasons, including the fact

24   that, well, that under, a request for relief under §105 must

25   also meet the standards for injunctive relief.  We shouldn't

1   forget what Law Debenture is asking for this morning.

2   They're asking for an injunction against the, against TCV

3   paying money owed under a valid contract that it owes to the

4   banks.  And in, what they're asking you to do is to issue

5   that injunction, and yet they haven't shown A, a likelihood

6   of success on the merits, 2, irreparable harm, 3, the balance

7   of equities, or 4 the injunction being in the public

8   interest.  They haven't even tried to make those showings.

9   And I suggest to you, Your Honor, that they haven't tried to

10  make those showings, because they cannot meet those

11  standards.  I know you said to give you my best three

12  arguments, and I think I've gone over.

13          THE COURT: Well, it's because you just have so

14  many.

15          MR. GLAZER: I tried to do them efficiently.

16          THE COURT: Hard to keep them out, right?

17          MR. GLAZER: I tried to do them efficiently, Your

18  Honor.  Anyway, we think the, the way this started with the

19  Court ready to assume that the facts as stated by Mr. Rosner

20  show a scheme as he set forth, are in fact not accurate.  We

21  also don't believe that they have demonstrated what they have

22  to demonstrate to the Court in order to obtain the relief

23  that they're seeking.  And I think there's a reason we

24  haven't heard about 363, and I think there's a reason we

25  haven't heard about their ability or inability to meet the

1  standards of 105(a).  And we think this has not been an

2  abusive process.  This has not been, this has not been a,

3  something that requires the Court or even would be

4  appropriate for the Court to intervene in.  And in fact, I

5  want to make one point about precedent as well.  Mr. Rosner

6  thinks it would be a bad precedent if these payments were to

7  resume and continue.  I think it would be actually a bad

8  precedent the other way.  If the Court were, in fact, to

9  ignore the separateness of TCV, ignore the legal obligation

10 that TCV has to pay these amounts, and basically told future

11 debtors that if they did not file subsidiaries, those

12 subsidiaries could not really rely upon their separateness,

13 and rely upon their own assets to pay their bills as due.

14      THE COURT: Thank you.  All right.  I'm going to

15 take just a two minute break.  Really, literally two minutes,

16 so don't go far.  And we'll pick up with the Debtor next.

17      (Whereupon at 10:59 a.m. a recess was taken in the

18 hearing in this matter.)

19      (Whereupon at 11:04 a.m. the hearing in this matter

20 reconvened and the following proceedings were had:)

21      THE CLERK: All rise.  You may be seated.

22      THE COURT: All right.  Let's resume.

23      MR. DUCAYET: Good morning, Your Honor.  Jim Ducayet

24 from Sidley Austin on behalf of the Debtors here.  Your

25 Honor, let me do my best to articulate what the Debtors'

1   interests are, and what our concerns are.  And I'll do my

2   best not to duplicate the comments from Mr. Glazer.  But let

3   me tell you at the outset Your Honor, that we have, at all

4   times, attempted to act in good faith, to act with

5   transparency.  We have attempted to ensure that the Debtors

6   and the subsidiaries are honoring their contractual

7   obligations, their pre-existing, valid contractual

8   obligations as well as their obligations under the Bankruptcy

9   Code.  We tried to get it right, Your Honor, and we think we

10  did get it right in that regard.  And you know, we stand here

11  having been accused of engaging in some kind of nefarious

12  scheme to, you know, put one over on the Court.  And I have

13  to tell you that that is absolutely and categorically false.

14  And I think the evidence simply does not bear that out, Your

15  Honor.  And so I want to spend a little bit of time first

16  talking about this issue of a scheme.  Because I don't think

17  the evidence supports the notion that there was a scheme.

18  And I'm, frankly, Your Honor, a little troubled at the notion

19  that Your Honor may think that the Debtors schemed with the

20  senior lenders.  And I understand Your Honor's, the

21  distinction here, but I still think, Your Honor, that the

22  fact remains that we were trying to ensure that we both

23  complied, and our subsidiaries complied, with their

24  contractual obligations on the one hand.  And that we did

25  what we were required to do under the Bankruptcy Code.  And

1    you know, with respect to the issue of notice, Your Honor,

2    well we just, before I get to the issue of notice.  I think

3    there are a couple of important, undisputed facts that make

4    this case very different from the kind of scenario that Mr.

5    Rosner has posited.  And the most important of that is that

6    these claims involve obligations, valid obligations owed by a

7    non-Debtor.  That non-Debtor, which has been around for, you

8    know, 20 years, Your Honor, for a long time, entered into an

9    agreement, a guarantee, with all appropriate corporate

10    authorization.  It was authorized by the TCV board of

11    directors.  And that authorization, Your Honor, included

12    specific authorization to perform under that agreement.

13        THE COURT: Well, let's assume that's all true.  Did

14    the Debtor consider that Law Debenture or other creditors

15    might not approve of that arrangement.  If they knew about

16    it.

17        MR. DUCAYET: Of which arrangement, Your Honor?

18        THE COURT: To make the payments of millions of

19    dollars in fees to the LBO lenders.

20        MR. DUCAYET: Your Honor, that's precisely why we

21    went to the Creditors Committee.  And I think it cannot be

22    emphasized enough, Your Honor, that Law Debenture's

23    predecessor was on that Committee.  So disclosure was made.

24    You asked at the outset of Mr. Glazer's presentation whether,

25    what would happen if Law Debenture had been told.  Well, the

1    answer, Your Honor, is Law Debenture wasn't on the Committee

2    at the time, it didn't exist at the time.  But the fact is

3    its predecessor was told.  And that is precisely why we went

4    to the Committee, it's precisely why we went to the United

5    States Trustee.  Because as Your Honor said, those are

6    precisely the entities and the institutions that one would

7    expect, if there was a concern, they would have let us know.

8    They would have, as you said, come in noisily.  And so we

9    made absolutely clear, Your Honor, to all the parties, that

10   we were not prepared to go forward unless there was

11   disclosure and transparency.  And you know, the suggestion

12   that this was some sort of, you know, perfunctory exercise

13   here I think is not born out by the facts.  Your Honor, we

14   had, you know, numerous conversations with the United States

15   Trustee.  We provided the Trustee with legal analysis.  The

16   Trustee asked for copies of the retention agreements from JP

17   Morgan.  And with respect to the Creditors Committee, there

18   were a number of meetings.  The record reflects that.  The

19   Creditors Committee imposed certain conditions which we

20   agreed to.  And so looking at the facts on the ground, Your

21   Honor, at the time we felt, I think legitimately so, that in

22   terms of disclosure, in terms of transparency, that we had

23   made the kind of disclosure to an appropriately broad group

24   of creditor constituencies.  And all that, of course, is in

25   the background of the fact that these are legitimate, valid

1   obligations owed by a non-Debtor, and that those obligations

2   would be paid.  By funds generated by that non-Debtor through

3   it's interest in the TV Foods partnership.  And so, you know,

4   the idea that this somehow involves estate assets, I think is

5   simply not legally accurate.

6          THE COURT: Well, you would agree the inevitable

7   effect of, not to pick a color word, but the dissipation of a

8   subsidiary's assets reduces worth otherwise available to the

9   parent and its creditors.

10         MR. DUCAYET: Well Your Honor, I wouldn't

11  necessarily agree with that.  And there's been a, kind of

12  very casual discussion here about the cash management system

13  and the cash flow situation.  And there's an assumption built

14  into the papers that cash which TCV received in the ordinary

15  course, as a result of its general partnership interest in

16  the TV Foods Network is somehow automatically property of the

17  estate.  That's not true.  And that doesn't that doesn't

18  depend on whether or not there was a consolidated cash

19  management system in place, or whether or not the cash that

20  was generated from that partnership went into the

21  consolidated cash management system, or whether it simply

22  sits in an account under TCV's name.  Fact of the matter is,

23  Your Honor, those are funds that are generated, and they

24  belong to that entity.

25         THE COURT: So I don't think you responded to my

1    question.  But - - well, you responded, but didn't answer.

2    So let me put it in bleaker terms.

3         MR. DUCAYET: Okay.

4         THE COURT: Let's say the $100 million sitting in

5    the bank account belonging to the sub goes somewhere else.

6         MR. DUCAYET: Um-hum.

7         THE COURT: You don't think that reduces value that

8    would otherwise be available to the parent?

9         MR. DUCAYET: Well Your Honor, it would be subject

10   to a series of claims.  But the fact is it is not the

11   Debtors' cash.

12        THE COURT: I didn't say that it was.

13        MR. DUCAYET: Okay.  What I think Your Honor is

14   asking is if there's some kind of relationship between

15   whether or not this cash goes out the door from TCV to, you

16   know, JP Morgan, and whether or not that has an effect of

17   reducing an asset to the estate, and I'm suggesting, Your

18   Honor, that I don't think that there is such a relationship.

19        THE COURT: I think you're wrong.  Proceed.

20        MR. DUCAYET: Okay.  Let me just say, Your Honor,

21   with respect to the issue of an instrumentality.  We heard

22   this word used by Mr. Rosner.  Again, it ignores the fact

23   that TCV is a separate entity.  And you know, Mr. Rosner

24   makes a big point about there being case law out there that

25   talks about unusual circumstances.  And he tries to suggest

1    that this is a set of unusual circumstances, Your Honor.  And

2    the fact is that the case law that he's referring to talks

3    about unusual circumstances in the context of piercing the

4    corporate veil.  And you know, the Law Debenture has really

5    made no factual showing whatsoever to suggest that that would

6    be appropriate here.  These, this is a situation in which the

7    decision to enter into the obligations was approved by the

8    board.  And moreover, Mr. Rosner's focus on the fact that the

9    decision to make the payments involved Mr. Lieventrich or Mr.

10   Eldersfell, or Mr. Bigelow, and that those individuals had

11   positions at Tribune.  Well, the fact of the matter is they

12   all had positions at TCV as well.  And so the suggestion that

13   this is sort of, that it's out of the ordinary course, Your

14   Honor, for a non-Debtor subsidiary, with a set of valid

15   contractual obligations, to make payments that have been

16   requested pursuant to those obligations, that's not out of

17   the ordinary course at all, Your Honor.  Couple of additional

18   points, Your Honor.  TCV was an entity that was not filed as

19   part of the filing in December of 2008.  There were valid,

20   legitimate business reasons why it was not filed.  I think

21   Your Honor is quite familiar with the situation involving the

22   Cubs entity, and the reasons why that entity was not filed.

23   And you know, frankly, there were legitimate considerations

24   that went into the decision not to file TCV as well.  And so

25   having made a decision, Your Honor, based upon legitimate

1    business judgement, and by the way I will take issue with Mr.

2    Rosner's comment that that's not in the record.  That is in

3    the record, Your Honor.  And I point Your Honor to Mr.

4    Larson's testimony.  But the fact of the matter is keeping

5    those entities out of bankruptcy has implications.  And among

6    those implications are the fact that it has valid and

7    existing obligations under the guarantee.  And it has to

8    honor those obligations.  Couple of additional points, Your

9    Honor.  With respect to the case law that Mr. Rosner has

10   cited.  He refers to a case called Commercial Mortgage, which

11   comes from a court in Chicago.  And Mr. Rosner suggests that

12   this is authority for your jurisdiction to enter the kind of

13   relief that he is seeking.  Let me just point out, Your

14   Honor, that he quoted a section from that case.  But what he

15   didn't mention was that that was a situation in which there

16   was a contemplated liquidation.  And indeed, in the sentence

17   prior to the one that Mr. Rosner quoted, the Court says,

18   Typically in a Chapter 11 reorganization, the UCC's request

19   for control of a Debtor's wholly owned subsidiaries would be

20   denied, because, under 11 USC §1107(a), a Debtor-in-

21   Possession may exercise its business judgment pursuant to the

22   reasonable expectations test, §363.  But this is not a sub

23   rosa plan of reorganization.  This is a liquidation.  And so

24   I think the authority, Your Honor, that the Law Debenture is

25   seeking for this relief simply isn't there.  The other cases

1   that they cite are truly different from what's going on here.

2   Those do not involve valid, pre-existing, contractual

3   obligations owed by a non-Debtor.  Your Honor, one other

4   point.  Mr. Rosner has suggested that the payment of the

5   fees, and this may get back to the issue that you raised

6   earlier, Your Honor.  With respect to the payment of the

7   fees, and whether or not those give rise to contribution

8   claims back against the Debtor.  The couple points on that.

9   First of all, Your Honor, the position of Law Debenture here

10  has been that there would be no obligation on the part of the

11  Debtor to make any payments directly under these obligations.

12  And so it's hard to see how you got a contribution claim back

13  against the, an entity which didn't have an obligation in the

14  first place.  So that doesn't make sense.  But more

15  importantly, Your Honor, there is an agreement among the

16  guarantors, it's an indemnity, subrogation, and contribution

17  agreement.  And what it provides, Your Honor, is that any

18  contribution rights among the guarantors are subordinated to

19  the full payment of the obligations.  That is to say, no

20  contribution rights are going to arise until and unless the

21  senior lenders are paid in full.  And that's obviously not

22  going to be the case here.  Finally, Your Honor, I'll just

23  emphasize what Mr. Glazer said.  The issue of precedent here

24  I think is important.  And I do think it's absolutely

25  critical to understand the kind of structure that we're

1    talking about here with respect to the credit agreements and

2    the subsidiary guarantees, extremely commonplace.  This is

3    sort of Lending 101.  And as I said, the decision to file

4    some guarantors and not others gives rise to certain

5    consequences.  And I will just say, Your Honor, we did our

6    best to try to navigate those consequences.  We did so with

7    the express objective of ensuring that there was appropriate

8    disclosure and appropriate transparency to the parties.  We

9    felt, as Your Honor indicated, that if anybody had an issue,

10   the UCC would be the first to jump up and down, and the same

11   is true with respect to the US Trustee.  We gave them full

12   and ample opportunity to do that, they didn't come back and

13   indicate that they had an objection.  We felt that under the

14   circumstances we did what was appropriate and warranted under

15   the circumstances.  Now Your Honor indicated the last time

16   that you thought in hind sight probably some additional

17   disclosure was appropriate.  And we'll certainly, you know,

18   we respect that judgment, Your Honor, and I will say again

19   our effort at all times was to do this the right way.  All

20   right?  And we feel we did it the right way.  But if Your

21   Honor has, you know, guidance or direction, we're obviously

22   willing to follow that, to listen to that, and consider it.

23   You know, again, our sole objective here is to ensure that we

24   both honor our contractual obligations and that we also act

25   in full compliance with our obligations under the Bankruptcy

1    laws.

2              THE COURT: Tell me where the Debtor stands with

3    respect to proposal of a plan.  If you're able.

4              MR. DUCAYET: Your Honor, I'm really not able.  Let

5    me defer on that.

6              THE COURT: Okay.  Thank you.

7              MR. DUCAYET: Thank you.

8              THE COURT: All right.  Centerbridge indicated that

9    it wished to be heard.

10             MR. GOLDEN: Thank you, Your Honor.  Daniel Golden,

11   Akin, Gump, Strauss, Hauer & Feld.  First, Your Honor, I'd

12   like to apologize.  I was detained by a court hearing in

13   front of Judge Walsh earlier this morning.

14             THE COURT: So you like him better, do you?

15             MR. GOLDEN: No, but he schedules his calendar

16   earlier.

17             THE COURT: He's got that old fashioned work habit.

18             MR. GOLDEN: Yes he does.

19             THE COURT: You know, and it - -

20             MR. GOLDEN: And he comes out in the court - -

21             THE COURT: - - and it starts early.

22             MR. GOLDEN:  - - right on time.

23             THE COURT: Yeah.

24             MR. GOLDEN: Your Honor, what is shocking here to

25   Centerbridge, it's not what JPM did.  Banks do this all the

1  time.  They bring as much leverage to bear as they can under

2  their documents to get what they want from a Debtor-in-

3  Possession.  So I'm not surprised at all that JPM leaned as

4  hard as they could on these Debtors to get these payments to

5  be made.  They knew they couldn't get them from the Debtors.

6  Although they took their pound of flesh immediately prior to

7  the filing by insisting upon a huge retainer only days before

8  these Chapter 11 companies actually filed.  But when that

9  spigot was going to be turned off, they turned their

10  attention to the only source that was left available to them,

11  the non-Debtor subsidiaries.  And I don't think that Mr.

12  Rosner or Law Debenture has ever argued that the banks didn't

13  have a contractual right under the guarantee agreements as

14  executed by the non-Debtor subsidiaries.

15          THE COURT: Oh, no.  Unless I misread their papers,

16  I think they're questioning that as well.

17          MR. GOLDEN: I think they acknowledge the existence

18  and the effect of the guarantee agreement executed by the

19  non-Debtor subsidiaries.  I think what they're arguing, and I

20  think these were the questions Your Honor had asked both

21  Debtors' and JPM's counsel, is the effect of the agreement.

22  But what's shocking here to Centerbridge is that the Debtors,

23  our fiduciary in these cases, our supposed fiduciary in these

24  cases, succumbed to the pressure brought by JPM, when there

25  were a myriad of other alternatives to deal with that

1    leverage, or those threats.  And these Debtors are

2    represented by experienced, highly expensive professionals,

3    both counsel and financial advisors, who have dealt with

4    these kind of issues day in and day out in representing

5    Chapter 11 Debtors.  And they took the easy way out and they

6    got nothing in exchange for it.  Now they say they got things

7    in exchange for it.  JPM says they gave consideration in

8    exchange for the continuation of these payments.  But when

9    you look through that, that's not the case at all.  So what

10   did they say, what did the Debtors say, and what does JPM say

11   they gave and the Debtors got in exchange for this

12   arrangement?  I won't even call it a scheme.  I don't want to

13   offend my brethren to the right.  For this arrangement for

14   the continuation of these payments?  Well, the first thing

15   they say is they got a forbearance so that JPM would not take

16   any enforcement action against these non-Debtor subsidiaries.

17   Well, number one, as the testimony has born out, there is no

18   written forbearance agreement.  So JPM is not contractually

19   bound to forbear from taking an enforcement action.  I guess

20   they're doing it out of the kindness of their hearts, though.

21           THE COURT: Well, I don't think so.

22           MR. GOLDEN: Well, neither do I, Your Honor.  I

23   agree with you on it.

24           THE COURT: I think they're doing it out of a sense

25   of good old-fashioned wisdom.  That to do otherwise - -

1          MR. GOLDEN: Exactly, Your Honor.  Because everybody

2     in this courtroom knows that these banks, who believe they

3     are the owners of all of these assets, would never have taken

4     an enforcement action against a non-Debtor subsidiaries.  It

5     would have been economic suicide for them to take an

6     enforcement action against the Cubs, or TCV, or any of the

7     non-Debtor subsidiaries.  So they created this smoke screen

8     in order to justify their action of having the non-Debtor

9     subsidiaries continue to make these payments.  And let's not

10    forget what the real implication of this arrangement is.

11    Unlike most of the cases that are in front of Your Honor

12    where pre-petition lenders are secured and have a first lien

13    on the assets of the Debtor, here, the entire pre-petition

14    bank facility is unsecured.  And Your Honor knows well, and

15    so does JPM and the Debtors, as unsecured creditors, they

16    have no legal entitlement to have their fees and expenses

17    paid post-petition.  The petition date acts as a cleavage for

18    the payment of the fees and expenses of JPM and the other

19    lenders in this syndicate.  But by virtue of this

20    arrangement, the Debtors have either wittingly, or

21    unwittingly, and I'll suggest wittingly, have elevated $25

22    million of unsecured claims to the status of administrative

23    expenses that have gone out of the estate and potentially

24    never to be able to be recovered, although we will talk about

25    that.  Because if nothing else, Centerbridge, and I believe

1    Law Debenture, will reserve all of their rights in connection

2    with an ultimate plan negotiation, as to whether these

3    payments should be reclassified not as payment of ongoing

4    fees and expenses incurred by JPM and other lenders, but as

5    payments against the principle, because they should have

6    never received these payments for fees and expenses in the

7    first place.  Number two, JPM says, quite proudly, that what

8    they gave in exchange for this ongoing arrangement to keep

9    their professionals well employed, was they delivered the

10   payment blockage notice to the bridge lenders.  Well, that's

11   laughable, Your Honor.  They did deliver the notice.  That

12   part isn't laughable.  It's laughable to suggest that the

13   reason they did it was in exchange for this agreement to get

14   their ongoing payment of these fees and expenses.  What

15   senior lender do you know who had the ability to block a

16   junior lender from getting payment would not exercise that

17   right by simply signing a payment block notice on a piece of

18   paper and tendering it over to the agent for the bridge

19   lenders?  JPM didn't do that for the benefit of the Debtors,

20   they did it for the benefit of themselves.  No senior lender

21   is going to allow a junior creditor to get payment of fees

22   and expenses or payment against principle and interest when

23   they have the ability to block that.  They, JPM did have the

24   ability to block it, they did block it.  They blocked it for

25   their own benefit, not for the benefit of the Debtors.  Why

1    in the world did these Debtors, if they truly believed that

2    JPM and the other senior lenders were going to take

3    enforcement actions, why didn't they come to this Court and

4    attempt to stop them?  I'll give learned counsel three

5    possibilities that they could have tried out, before just

6    simply throwing up their hands and saying, Okay.  Take our

7    money.  They could have come to this Court and sought a

8    further application of the automatic stay to apply to the

9    non-Debtor subsidiaries.  It's been done dozens of times in

10   dozens of courts.  It's not a novel legal theory.  They could

11   have come to this Court and asked for a preliminary

12   injunction for the benefit of the non-Debtor subsidiaries to

13   prevent JPM and the other senior lenders, from enforcing

14   their rights against the assets of the non-Debtor subsidiary.

15   And third, as an absolute fallback, if it ever came to the

16   point where these, where JPM and the senior lenders were, not

17   only were planning to, but actually took an enforcement

18   action against any of these non-Debtor subsidiaries, a highly

19   improbably likelihood, they could have filed a Chapter 11

20   petition for the benefit of the non-Debtor subsidiaries.  And

21   it's not enough to say, Well, we didn't want to.  We didn't

22   want to have to.  It may be disruptive to operations, because

23   when confronted with an actual enforcement action, that's

24   what good, common sense would have dictated would have been

25   the result.  I think Your Honor, that the answer as to why

1    these Debtors, counseled by able counsel and financial

2    advisors, chose the expedient route has more to do with

3    upcoming events.  They understood that there was going to be

4    a plan of reorganization.  They understood, because it didn't

5    take a lot to understand, that there was going to be a

6    contest over this leveraged buyout.  They understood that

7    their officers and directors were going to be implicated in

8    that contest.  And they understood that they wanted a partner

9    in this restructuring process.  And they bought the goodwill

10   of that partner by agreeing to make these payments.  How

11   ironic it is that estate assets - - strike that.  How ironic

12   it is that assets that would have otherwise enured to the

13   enterprise value of the filed Debtors are now being used by

14   the banks in defending against potential estate causes of

15   action in connection with the LBO.  That's unseemly, Your

16   Honor, we believe.  Why did the Debtors stop upstreaming the

17   excess cash that was generated by the network ultimately that

18   went to TC, the Food Network station, that ultimately went to

19   TCV, that had historically been upstreamed through the

20   Debtors' cash management system to Tribune, why did that stop

21   doing that?  As of the petition date.  Why did they let cash

22   accumulate at TCV when historically that cash had been swept

23   up to the Debtors?  I think that that's a pretty obvious

24   answer.  And why, given everything that's been suggested and

25   complained about, why have the Debtors not said to

1   themselves, Okay, maybe we made a mistake back then, Maybe we

2   were under extreme pressure at the petition date, or right

3   before the petition date, but we're no longer subject to that

4   leverage?  Why are the Debtors continuing to desire to make

5   these ongoing payments to JPM and the other senior lenders

6   when there are a myriad of responses that they could make?

7   It is shocking to Centerbridge, and to the other senior

8   noteholders in this case that our Debtor, our alleged or

9   supposed fiduciaries, want to continue this process.  We

10   think this process should be stopped and stopped now.  We

11   think we should have a full and factual determination as to

12   the ability to recover these funds.  And we will certainly

13   reserve our rights to try to reclassify these payments, if

14   they're not able to be disgorged, as payments against the

15   principle of the senior lenders' claims. Because as Your

16   Honor well knows, unsecured creditors are not entitled to get

17   ongoing claims for fees and expenses once a petition has been

18   filed.  We think that the Debtors have shown a shocking lack

19   of good judgment in entering into this arrangement and for

20   arguing to continue this arrangement.  And we think with the

21   help of the Court's intervention, this arrangement needs to

22   stop now.  Thank you, Your Honor.

23          THE COURT: Thank you.

24          UNIDENTIFIED SPEAKER: May I respond briefly?

25          THE COURT: Not yet.  Okay.  Is there anyone else

1    who wishes to be heard?  Initially?

2          MR. JOHNSTON: Good morning Your Honor.  Jim Johnson

3    of Hennigan, Bennett & Dorman on behalf of credit agreement

4    lender clients.  I said I didn't have anything prepared for

5    Your Honor except maybe in reaction to what was said.  And

6    Mr. Rosner, and then Mr. Golden just put me over the edge on

7    one point that I wanted to remark on.  You heard repeated

8    references to TCV as an instrumentality of the Debtors.  You

9    say it once or twice, and maybe it's just a loose use of the

10   term, you say it 20 or more times and it starts to sound

11   intentional and deliberate.  And like an argument, maybe

12   disguised maybe not, that substantive consolidation or

13   piercing the corporate veil is something that's appropriate

14   here.

15         THE COURT: Well, neither of those issues are before

16   me.

17         MR. JOHNSTON: That's precisely my point, Your

18   Honor.  And the stipulated facts would not support that point

19   or that relief at this point in time.  That may be an issue

20   for another day.  But that loose language, I think, spills

21   over into what I see as the heart of the matter.  Which is

22   whether this money that's been used to pay the agents' fees

23   is property of the estate.  Mr. Rosner repeatedly said, and

24   you heard Mr. Golden say this too, that if the money hadn't

25   been paid, the cash would have been deposited into, quote

1    unquote, "the Debtors' cash management system".  That may or

2    may not have been true.  But even if true, that doesn't mean

3    that that cash would have been available to pay claims.  To

4    satisfy pre-petition obligations of Tribune Company or the

5    other creditors here.  Per the cash management order, non-

6    Debtor cash, like cash of TCV, that is deposited into the

7    system, which Your Honor authorized, gets an administrative

8    claim.  It gets a super-priority claim.  So that cash isn't

9    something that otherwise would enure to the benefit of

10   creditors, absent further relief.  Absent TCV becoming a

11   Debtor in the case.  Absent substantive consolidation or the

12   like.  And I think that there's been an effort in the

13   presentations to Your Honor this morning to blur that

14   distinction.  To say, It would have all gone into the cash

15   management system and thus the estates as a whole would have

16   been benefitted.

17        THE COURT: Well that, you know, I will tell you

18   your statement implicates what I view as the Debtors'

19   stubborn refusal to acknowledge that, you know, what happens

20   at the subsidiary doesn't have an impact economically on the

21   parent.  And it does.  Directly or indirectly.  What you say,

22   strictly speaking, is true.  But I think it puts to the side

23   what in part is at the heart of the objection here and that

24   is, Look, there's value that the Debtor is manipulating here.

25   Making some of it available to one group but not to another.

1    And I know there are disagreements, but that's what's

2    happening.  And it may be entirely appropriate.  I'm not

3    suggesting that it isn't.  That's what I'm, that's what the

4    parties are asking me to decide.  But that's in fact what's

5    happening.

6         MR. JOHNSTON: And I think Mr. Golden used the term

7    correctly in looking at it from an enterprise value term.

8    The money goes out the door and it impacts enterprise value.

9    And at the end of the day, I think, Your Honor, that's what a

10   plan is going to come down to.  In this case.  In the plan

11   determinations.  That's the right time to deal with this

12   matter.  I think you've heard all the reasons why the motion

13   that's before you is an inappropriate vehicle.  And should

14   plan time come, this issue is going to come up again.  You've

15   already heard it.  And that very well may be the right time

16   to deal with it.

17        THE COURT: Well, you know, you touch on something

18   that I did discuss before, and that is while I think Law

19   Debenture is correct that this is a discrete issue, it is

20   certainly something that could be rolled into confirmation.

21   But you know, based on what looks to be developing, I may be

22   facing a contested confirmation.  So I say to myself, is it a

23   good or a bad thing to add one more issue to the pot?  It

24   could go either way, you know.  All right.  Thank you.

25        MR. JOHNSTON: I predict there will be plenty.

1    Thank you.

2         THE COURT: All right.  Anyone else wish to be heard

3    for the first time.  Okay.  I typically wouldn't, wouldn't

4    permit a sur-rebuttal.  I'd let counsel for Law Debenture go

5    first and give a little rebuttal.  But I am going to ask you

6    to come up, Mr. Glazer, because I have a - - not right now.

7    I'm going to let Mr. Rosner go first.  Because I do have a

8    question for you before you leave here.  Mr. Rosner, you're

9    up for I'll say five or ten minutes of rebuttal.

10        MR. ROSNER: I'll have less, Your Honor.

11        THE COURT: Bless you for that.

12        MR. ROSNER: The points on which I want to make

13   rebuttal are as follows.  Mr. Glazer was quibbling as to

14   showing some deposition testimony that he says contradicts

15   with other deposition testimony on which we relied.  Your

16   Honor, you have the stipulated facts in front of you, you

17   have the joint exhibits, you have the depositions, you have

18   the exhibits to the depositions, you have the transcripts,

19   and you have the recitals of the parties.

20        THE COURT: Well, now let me just remind the parties

21   about one thing we discussed when it was decided to put the

22   factual record to me on a written stipulated basis.  And that

23   is, you know, I find it difficult, although I can't say it's

24   always impossible, but difficult to judge credibility from,

25   of witnesses from deposition transcripts.  And if I, as I go

1    through them, which I haven't yet done, I bump up against

2    that problem, I may just bring you right back here.

3            MR. ROSNER: I certainly understand that.  I find in

4    reading without, well, you know where I'd go with the answer

5    to this, but I find in reading the four transcripts you can

6    judge somewhat by the way people are handling their answers

7    and handling their questions.

8            THE COURT: And there are times when I've been able

9    to do that.  I just, I can't say whether I can or can't in

10   this case.

11           MR. ROSNER: Yeah.  But that's on what we rely for

12   the factual record of this case.  And we think that the

13   testimony is there.  We think all of the points and the

14   citations we made to both testimony and to exhibits support

15   the relief that we're seeking today, and we rely on those

16   stipulated facts.  And if there's quibbles, there's no

17   question in any deposition transcript that we'll find a

18   statement that we want to say, and then somebody else will

19   find a half word that they want to say in reply.  But in

20   terms of the points we made, they're good faith

21   representations of what the record says.  You asked a

22   question before about whether, if a company, if a subsidiary

23   was going to sell all of its assets, and the parent company

24   had to take corporate action in order to make that happen,

25   would they have to come to the Bankruptcy Court for approval.

1   I think the answer to that is yes.

2           THE COURT: And I, generally I do too.

3           MR. ROSNER: What we see - -

4           THE COURT: Generally.

5           MR. ROSNER: Generally.  Absent usual circumstances.

6   What we seek to do today, again, is to aim to prevent the

7   Debtor from dissipating its assets under the guise of

8   independent action on the part of its subsidiaries.  I want

9   to crystalize that and keep that clear.  I don't want it to

10  get obfuscated by the idea that what we're trying to do in

11  that, in a scheme ourselves, is to bring into the bankruptcy

12  case non-Debtors.  That's not what we're seeking to do.

13  We're trying to protect these estates from their use of, of

14  the non-Debtor subs under the guise of that, under the guise

15  of independent action by those subsidiaries.  The Blackstone

16  agreement, we were told there were various versions.  And

17  there was, just in the course of corporate transactions,

18  people make mistakes.  You know, it is, it's coincidental.

19  I've had two cases with, where we were cross examining

20  somebody from Blackstone, and in both cases they testified

21  that mistakes were made on their valuations by summer

22  associates.  And so it's the second, that's not a great

23  excuse for Blackstone, but here I'm told that there is an,

24  there was an error in the way that a document was drafted.

25  The document never changed to say that what was being, the

1   payments were being made were Tribune Company's obligations.

2   That's the central point.  It was Tribune Company's

3   obligations are what was being paid.  And first, the Debtors

4   were signing on, then the non-Debtors were signing on, and

5   then none of the Debtors or the non-Debtors were signing on.

6   That was the progression, we think, to keep it away from this

7   Court.  Certainly they are acting for JPM and, or acting for

8   Davis Polk & Wardwell, but the obligations themselves are

9   Tribune Company's obligations.  In terms of your absolute

10  power, Your Honor, I think to quote - - well, I would just

11  say under §105 I think in and of itself, separate and apart

12  from injunctive relief, you have the power, nothing precludes

13  the Court from taking any action or to enforce any right,

14  take any action, or to prevent any abuse of process, how Your

15  Honor sees fit.  That is not, does not give you, you know, a

16  wild card to do anything that the Court wants.  What it does

17  give the Court the ability to do is to exercise its power

18  over issues that have been brought in front of it, to which

19  it sees corporate policy by Debtors being executed outside of

20  the courtroom without notice to the parties.  And without an

21  opportunity to be heard.  You know, we have not decided, Your

22  Honor, you have not decided whether this is appropriate.  I

23  will tell you this is outrageously inappropriate for this

24  conduct to have occurred.  Both the substance of it, because

25  it did occur, and secondly the procedural aspect of it,

1    because of the manner in which it occurred.  It should never

2    have happened.  But nevertheless, we didn't know about it.

3    And on that point, and this has been written in everybody's

4    papers, and it one case it was written twice by JPM, and I

5    have to respond to it.  They point to Deutsche Bank as a

6    member of the Creditors Committee, and they say, You,

7    Deutsche Bank was Law Debenture's predecessor, and therefore

8    we somehow have knowledge of what Deutsche Bank learned as a

9    member of the Creditors Committee.  Well that would mean I

10   had learned what, you know, what, anything that happens in

11   the Creditors Committee meetings, which are confidential, and

12   I, which I think counsel here for the Creditors Committee

13   would stand up and tell you are confidential, would somehow

14   be infused into the mind of Law Debenture, whether we knew

15   about it or not.  We didn't know about it because our

16   predecessor sat on the Creditors Committee.  When we found

17   out about it, we looked at it, we studied it, we determined

18   to take action, and we took action.  The other thing that JPM

19   says about it is that they cry to the Court - - and this is,

20   to me is the most ridiculous - - they cry to the Court, this

21   has been going on for a year and nobody has complained about

22   it.  Well, I think it's very obvious why nobody complained

23   about it until we did, and that's because nobody else knew

24   about it.

25              THE COURT: Well, I wonder whether the ultimate

1    solution is to make an amendment to the official form that

2    goes in connection with Rule 2015.3 to ferret out related

3    entity transactions.

4         MR. ROSNER: Well you know, Your Honor, you

5    shouldn't have to do that.  I mean, there are obligations

6    that Debtors have, and this is what I opened with to tell

7    you, there's obligations that Debtors have just by virtue of

8    being a Debtor.

9         THE COURT: Well, if it were in, you may not be

10   wrong about that, but if it were in the Rule, in the form, we

11   wouldn't be here today.

12        MR. ROSNER: Well - -

13        THE COURT: Maybe.

14        MR. ROSNER:  - - I don't know, we might be arguing

15   about what that Rule says, right, and what it actually means.

16   So I hope not.  But I think if the Debtor just did what it

17   - -

18        THE COURT: That's why the Committee is in the

19   process of cleaning up Rule 2019.

20        MR. ROSNER: Yeah, I know.

21        THE COURT: To the chagrin of many, I know.

22        MR. ROSNER: To the chagrin of many.  There's no

23   question, and it's stated in the stipulated facts, that pre-

24   petition, every dollar that came into TCV went into the

25   Debtors' accounts.  These are Tribune Company accounts.  They

1  were all swept up into Tribune Company's.  It's absolutely

2  false to say that these were segregated, or that there was

3  never an instance in which TCV wouldn't - - and by the way,

4  the fact that TCV may, under the cash collateral, under the

5  cash management order have a claim, that's fine.  That may be

6  a truism.  But then there may be cash to pay that claim, and

7  there may be cash to pay other's claims by virtue of a

8  working cash management system.  There's going to be $25

9  million less to pay administrative claims based upon what the

10 Debtors have accomplished here.  I have 1, 2, 3, 4 quick

11 ones.  Okay?  To answer your question, if I heard it

12 correctly, I think you asked if similar creditors could be

13 treated differently if a non-Debtor, if a non-Debtor obligor

14 contributed money.  I thought that's how I understood it.

15 And I don't think that plan is confirmable.  I think that a

16 plan has to treat all creditor equally vis a vis the Debtor,

17 and then under 524(e), any creditor has the right, that's not

18 a discharge of a non-Debtor, if they have an independent

19 right.  That's my opinion on that, but I don't sit in your

20 seat, I just sit here to advocate.

21          THE COURT: You couldn't afford to sit in my seat.

22          MR. ROSNER: To be clear, to correct one thing Mr.

23 Golden stated, we don't think that the credit agreement or

24 the guarantees permit the payments that have been made here,

25 and they certainly don't permit any kind of retainer being

1    paid.  Certainly, the size of these, not even just putting on

2    the whopping size of these retainers, but they don't permit

3    them, and under no circumstances do they permit for the

4    payment of a financial advisor.  We seek disgorgement.  We do

5    not seek to roll this into confirmation.  I understand that

6    at times, and at times it says, I've got this big thing

7    coming up, maybe everybody is going end up at the gate.  I

8    can't tell tales out of school, but I don't think we want to

9    be rolling things into confirmation in this case, if they are

10   discrete.  And this is a discrete matter, and I think that

11   the funds absolutely require to be disgorged.  If at the end

12   of the day, you know, plans can work both ways.  If at the

13   end of the day, there is a basis for why they should be un-

14   disgorged, because there is a determination at confirmation

15   or there is a settlement at confirmation, then they can be

16   un-disgorged.  We will have $117 million to pay it.  Just

17   from TCV alone.  So I think that the disgorgement is the

18   remedy we seek, and the disgorgement is the remedy to which

19   we're entitled, and to which these estates are entitled.  And

20   the inverse of that, if it should ever be considered at

21   confirmation, is what we think the Court should be

22   considering.  My final point is I'd like to follow up on one

23   of the points that Mr. Golden made, which I think is

24   important.  And he said, he made the point in words or

25   substance that, you know, the reason that the company did

1   this, he understood why JPM did this, we all understand why

2   JPM did this.  But the reason the company did this is because

3   where the company wants to be, expects to be, is with its

4   lenders as new owners, or otherwise to be acting with its

5   lenders.  I would like to just close by reading one of the

6   exhibits to Larson.  It's Mr. Nils Larson's deposition. It's

7   Exhibit 11 to his deposition.  And it think it lays it out.

8   And this is the response when, this is the response that

9   Angelo Gordon, Mr. Baera, Gavin Baera of Angelo Gordon, who's

10  one of the, Angelo Gordon being one of the largest holders of

11  assigneed bank debt.  His response to the company after the

12  company made its proposal to do what they did here. And he

13  writes, "Nils, I tried to call your cell.  I heard the

14  counter-proposal, which has the company simply making, make

15  payments under the guarantee demands.  There are clear

16  benefits to this approach - - open paren - - (no Court

17  approval/notice) - - close paren - - but the downside is it

18  leaves the senior lenders exposed if the payments stop or the

19  non-Debtors file.  I'm willing to push the group on this, but

20  I don't want to negotiate the evergreen amount under this

21  type of arrangement as it is our only protection.  At the end

22  of the day the 8.5 million gives us some downside protection

23  and is really our money eventually anyway.  Also, the

24  evergreen is not relevant if you don't ever expect to stop

25  making payments, which we have been assured is not a likely

1  scenario, since it would mean the company was at odds with

2  its lenders.  Please advise so I can go back to the group and

3  try to support this."  I think that in a nutshell is where

4  the company was, and why it engaged in this transaction for

5  which we ask the Court to reverse.

6          THE COURT: Thank you.

7          MR. GLAZER: I will be very brief, because I want to

8  give the company a chance too, Your Honor.

9          THE COURT: I have five minutes left.

10          MR. GLAZER: Yes, sir.

11          THE COURT: Literally.

12          MR. GLAZER: I want to start where Mr. Rosner spoke

13  with regard to his saying we didn't know just because

14  Deutsche Bank was on the Committee representing our interest

15  previously.  The answer to that is simple, he's charged with

16  knowing.  Whether he actually knew or not, I have no idea.

17  It's not in the record.  But he's charged with knowing

18  because Deutsche Bank served on the Committee before, and

19  when Law Debenture took over from Deutsche Bank, they should

20  have had whatever conversations were necessary to bring Law

21  Debenture up to speed as the new Trustee.  With regard to Mr.

22  Golden, I think he made the most outrageous allegation of the

23  day.  He said that the Debtors bought the goodwill of the

24  banks with these payments.  Not only is that outrageous, and

25  not only does it attack the good faith and bona fides of the

1   Debtors, of the group of banks, literally everybody around

2   this transaction, but it's, totally unsupported by the

3   evidence.  They had every chance to ask their questions when

4   the four people were deposed about this subject.  There was

5   no evidence of this whatsoever.  It is not in the stipulated

6   facts.  It is not in the depositions.  It is not in any

7   exhibit.  And I think it's an outrageous allegation and I

8   stand to say that.

9           THE COURT: Mr. Glazer, look, I take the discussion

10   surrounding that issue to relate to a dynamic that exists in

11   everything I see before me.  And that is parties act in their

12   own best interest.  Frankly, that's what makes this system

13   work in many ways.  Sometimes parties are well motivated,

14   sometimes they are not.  But as far as that discussion is

15   concerned, it is true.  People act in their own best

16   interest, and for them to do otherwise would be, that would

17   be shocking.

18           MR. GLAZER: I would only limit what Your Honor said

19   to say that people act in their own best interest limited by

20   appropriateness, by ethics, and their own standards.  And at

21   JP Morgan, they have lived for more than 100 years by the

22   slogan, We do first class business in a first class way.

23           THE COURT: Well, let me ask you this.

24           MR. GLAZER: And what Mr. Golden was alleging would

25   not be first class business, and it would not be in a first

1    class way.

2         THE COURT: Would the LBO lenders agree to maintain

3    the status quo until further order of this Court?

4         MR. GLAZER: The answer is that we do not agree with

5    that.  We think we're entitled to be paid.  We were entitled

6    to be paid currently, even as of December 1st.  And we agreed

7    to defer for what has been the five months now, and to go on

8    our own nickel for that period of time, because the, we

9    wanted to give the Court an opportunity to hear it.  We would

10   not, we do not agree that it should be just deferred on an

11   open-ended basis.  And Your Honor, I have one last thing if I

12   may?  And that is I want to quote what you said about two

13   issues on December 1st.  You said, "As I look at this

14   situation, anything you take out in the way of value from a

15   subsidiary, Debtor or non-Debtor, ultimately reduces value in

16   the parent, or somewhere up the chain.  Maybe in more than

17   one entity.  So it seems to me that that can't be the basis

18   of the relief that you request."  And you're talking to Mr.

19   Rosner then.  "Because if it were, then what would be the

20   difference between a sub and a parent, and Debtor sub and a

21   non-Debtor sub?"  And that's the very point.  And neither Mr.

22   Rosner nor Mr. Golden can tell you where in the Bankruptcy

23   Code they are looking for this relief.  And if so, how they

24   have satisfied the requirements, for example, of 105(a).

25   There are specific requirements there, and they are not

1  satisfied for the injunction they seek.  Then I'll give the

2  Debtor the last few moments.

3       MR. DUCAYET: Thank you, Your Honor.  I'll be brief.

4  First of all, let me just, as Mr. Glazer did, also respond to

5  the suggestion by Mr. Golden that we were out seeking a

6  partner.  And Your Honor, let me just say that's complete and

7  rank speculation.  It's not supported by the record.  You

8  know, they - -

9       THE COURT: You can move off that issue now.  I

10 assume, and I see frequently that Debtors and other parties

11 involved explore many alternatives in connection with an exit

12 strategy.  And there's not necessarily anything wrong about

13 any of that.  So let's leave that there.

14      MR. DUCAYET: Okay.  But Mr. Golden was suggesting a

15 *quid pro quo*, and that's simply not accurate.  I need to make

16 that clear.

17      THE COURT: No, I don't think he was suggesting it.

18 I think he was saying it.

19      MR. DUCAYET: I think he was saying it.

20      THE COURT: Yeah.

21      MR. DUCAYET: Absolutely.  He was, he was, and

22 that's just absolutely baseless, Your Honor.  Let me also say

23 that Mr. Golden said, Well, why are the Debtors here asking

24 to continue to pay these fees?  And the answer to that, Your

25 Honor, is we're not here asking to continue to pay these

 1    fees.  As I said at the outset of my presentation, we're here

 2    simply to ensure that Your Honor understands that we tried to

 3    get it right at the time.  We had to make some real time

 4    judgements balancing a lot of different considerations.  We

 5    looked very closely at the case law.  We tried to consult

 6    with as many of the relevant constituencies as we could.  We

 7    tried to get it right.  And let me make clear, we have not

 8    made any further payments since the hearing on December 1st.

 9    And we are - -

10          THE COURT: Well, it looks like absent a decision by

11    this Court, the lenders are going to ask you to resume those

12    payments.  Maybe make up that which you've missed.

13          MR. DUCAYET: Well Your Honor, I would just say we

14    are prepared to agree to the proposal that you made to Mr.

15    Glazer with respect to holding this matter sort of in

16    abeyance going forward.  And we're also - -

17          THE COURT: I just think there's some wisdom right

18    now to, you know, a consent decree type of arrangement where

19    nobody admits having done anything wrong, but the payments,

20    until further order of the Court would stop.  I would make no

21    decision on disgorgement at this point.

22          MR. DUCAYET: Um-hum.

23          THE COURT: But I'm not going to bend arms.  If

24    parties want to stay where they stay, I'll make the decision.

25          MR. DUCAYET: Very well, Your Honor.  I just want to

1   make clear we're willing to follow whatever direction the

2   Court has to doff in that regard.

3          THE COURT: Understood.  All right.

4          MR. DUCAYET: Thank you.

5          THE COURT: Listen, as I said at the outset, this is

6   a difficult issue for me, although I know various of the

7   parties see it with clarity.  I appreciate the efforts that

8   you've undertaken, both with respect to submission of the

9   written record and the legal arguments and the discussion

10  we've had today.  Which is very helpful to me.  With that, if

11  there's nothing further, we'll conclude this hearing.  Court

12  is adjourned.

13         ALL: Thank you, Your Honor.

14     (Whereupon at 12:00 p.m. the hearing in this matter was

15  concluded for this date.)

16

17

18         I, Jennifer Ryan Enslen, approved transcriber for

19  the United States Courts, certify that the foregoing is a

20  correct transcript from the electronic sound recording of the

21  proceedings in the above entitled matter.

22

23   _/s/Jennifer Ryan Enslen_                  _March 30, 2010_
     Jennifer Ryan Enslen
24   43 Bay Boulevard
     Newark, DE 19702
25   (302)836-1905