IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

ROBERT HENKE

    Claimant

THE TRIBUNE COMPANY, et al.,

    Debtors

Chapter 11

Case No. 08–13141 (KJC)

## CLAIMANT'S RESPONSE TO DEBTORS' OBJECTION TO CLAIM NO. 3697 OF CLAIMANT ROBERT HENKE

**1.** This document is a response to an objection, filed by the debtors and the debtors in possession in the subject chapter 11 bankruptcy cases ("the debtors"), to Claim No. 3697 ("the claim") filed against debtor *The Baltimore Sun* Company ("*The Sun*"). The claim was filed by Robert Henke.

## **Abbreviations and Acronyms**

FHWA ---------------------------------- Federal Highway Administration

FOIA ----------------------------------- Freedom of Information Act

NIST ------------------------------------ National Institute of Standards and Technology

NSF ------------------------------------- National Science Foundation

The claim ----------------------------- the claim of Robert Henke

The debtors -------------------------- the debtors or debtors in possession

The objection ----------------------- the objection to which claimant is responding herein

The firm ------------------------------- claimant's and his wife's firm

The article ---------------------------- the news article in question

The Bankruptcy Court ------------- The U.S. Bankruptcy Court for the District of Delaware

The campaign ----------------------- a possible campaign against claimant and his firm

The Circuit Court ------------------- The Circuit Court for Baltimore City

Response to Objection to Claim No. 3697: Case No. 08-13141(KJC)
Page 2
April 7, 2010


The downfall or undoing ------------the collapse of claimant's firm and family

The Office --------------------------- The Office of NSF's Inspector General

The Processing Center ------------ the Tribune Company Claims Processing Center

*The Sun* ------------------------------ *The Baltimore Sun*

The technology--------------------------the technology invented by claimant and his wife

The undertaking------------------------the bringing to practice of the technology

The University ------------------------ The Johns Hopkins University


## Contents that Follow

Page

Summary of Matter ------------------------------------------------------------------------------- 3

Relevant History of Case ------------------------------------------------------------------------ 5

Restatement of Debtors' Objection ------------------------------------------------------------ 9

Introduction to Claimant's Response --------------------------------------------------------- 9

Relevant Law and Proof of Claim Form Requirement ------------------------------------ 10

Circumstances of Complaint --------------------------------------------------------------------- 11

Violation of Statute of Limitations ------------------------------------------------------------- 11

Specificity of Complaint: Failure to State Claim ------------------------------------------- 13

Specificity of Complaint: Failure to Name Harm -------------------------------------------- 26

Monetary Remedy Sought by Claimant -------------------------------------------------------- 28

Conclusion ----------------------------------------------------------------------------------------------- 41

Appendix A: Debtors' Misstatements ----------------------------------------------------------- 43

Appendix B: Draft Amendment to Narrative of Complaint --------------------------------- 44

### **Summary of Matter**

**2.** On Sunday, October 7, 2007, *The Sun* published a two and one-half page front page news article entitled "A modern-day Ahab" ("the article")(Exhibit A). *Sun* education reporter Mr. Gadi Dechter authored the article. On October 6, 2008, claimant submitted a defamation complaint ("the complaint") to the Circuit Court for Baltimore City ("the Circuit Court") against both *The Sun* and Mr. Dechter.

**3.** Claimant believes the article was a well-crafted defamatory fabrication that, when stripped to its essence, was little more than a cover-up of the possibility of official and professional misconduct. Claimant believes the article was only the most recent of a string of injuries inflicted on him and his firm and so, by extension, on his family, in a decades-long, intense, and well-shielded campaign committed to driving him and his firm from his profession. Claimant believes *The Sun's* intent with the article was to protect the campaign. The campaign, claimant believes, grew from his tenure (1985-89) as a faculty member at The Johns Hopkins University ("the University"). His tenure was marked by several controversies and he was dismissed from the University.

**4.** During the time frame of the article, claimant was pressing heavily to have his circumstances investigated. The campaign, he believed, had brought his family to a state of ruin without just cause. Claimant believed that an objective and complete investigation of his circumstances would bring out the wrongdoing to which he believes he and his family had fallen victim and so, would enable him to restore to the extent possible, - for example, through litigation - the family's well-being.

Response to Objection to Claim No. 3697: Case No. 08-13141(KJC)
Page 4
April 7, 2010

**5.** In claimant's quest for an investigation, he approached *The Sun*. Claimant did so because he believed *The Sun*, which may have taken part in the campaign, could help him define the make-up of the campaign. *The Sun* responded to claimant's approach by saying it wished to write an article on his circumstances. Claimant did not approach *The Sun* for an article. But, in the belief that a truthful and complete article could lead to the investigation he had sought and that *The Sun* would write such an article, he agreed to an article. In hindsight, claimant believes *The Sun's* intent with an article was to quash the possibility of an investigation. *The Sun* is close to the University and objective scrutiny, claimant believes, would have placed both in a dark light.

**6.** The article protected the campaign, claimant believes, by turning on its victims – claimant, his family, and his firm's undertaking – while concealing its possible misdeeds. In essence, *The Sun*, claimant believes, artfully remolded a story of wrongdoing into a broad attack that thoroughly and illegitimately discredited claimant, his firm's undertaking, and his family, and so, repelled any interest that may otherwise have grown in investigating his circumstances. For example, by creating and reshaping facts, it appears *The Sun* manufactured both the prominent and defamatory theme of the article and compelling evidence for that theme. The seemingly invented theme falsely held that claimant was a reckless pioneer who was willing to and ultimately did bring about his and his family's downfall for scientific glory. Not only did this discredit claimant, it also displaced the rather credible possibility that the downfall may have been the doings of the campaign. *The Sun* further concealed this possibility by omitting, sanitizing, or otherwise altering – on a grand scale – the overwhelming evidence of the possibility. The contents of the article, the conduct of *The Sun* and the University, and the existence of motives suggest *The Sun* acted recklessly as well as maliciously.

Response to Objection to Claim No. 3697: Case No. 08-13141(KJC)
Page 5
April 7, 2010

**7.** Regarding damages, claimant is seeking redress for what he believes to be the essence of *The Sun's* article; a particularly maliciously defamatory fabrication that illegitimately harmed reputations to protect a decades-long campaign to violate claimant's pursuit of happiness without just cause. Basically, claimant believes the article flagrantly snuffed out the possibility that claimant's circumstances would be investigated and so obstructed his progress towards justice. This obstruction of justice, claimant believes, denied him, and so, his family, a long-overdue resolution of the matter, leaving the family in a continuing nightmare of deprived well-being without prospects for escape. Evidence suggests an objective and complete investigation of his circumstances would have revealed that he and his firm and family had fallen victim to decades of egregious misconduct by the campaign. For this, he believes, they would have been awarded substantial redress, because of the irreversible injuries inflicted and the duration, intensity, and deep malice of the campaign. So, claimant seeks redress for the redress that he believes was denied to him as a result of the article as well as for the injuries that the article inflicted on him directly - such as the undermining of his position prospects just when, after many disappointing years, they had taken an uplifting turn.

## Relevant History of Case

**8.** On October 6, 2008, the Circuit Court received and signed for (Exhibit B) claimant's complaint against *The Sun* and *Sun* reporter, Mr. Gadi Dechter. Claimant is not an attorney but will continue with self-representation until appropriate representation can be obtained. With an October 11, 2008 mailing, the Circuit Court informed claimant that he needed to provide further information and payment with a money order instead of a personal check (Exhibit C) and returned to him the complaint, stamped October 8, 2008. He complied with an October 13, 2008 letter (Exhibit D).

Response to Objection to Claim No. 3697: Case No. 08-13141(KJC)
Page 6
April 7, 2010

**9.** Concerned over not having received a response from the Circuit Court, on December 18, 2008, claimant telephoned the Circuit Court about the status of his case. Claimant was told that there was no record of his case. He wrote a letter, dated December 30, 2008, (timed to avoid the holiday) to Ms. B.L. Bowman to inform her of his findings (Exhibit E) and to resubmit his complaint.

**10.** On February 4, 2009, claimant received from the Circuit Court a copy of the complaint and copies of a Writ of Summons and a Sheriff's Return for each of the two defendants (Exhibit F).

**11.** On February 19, 2009, claimant received materials, dated February 17, 2009, which seemed to have been a response from both defendants to the complaint. This suggested to claimant that each had received a Writ of Summons. The materials were copies of materials the apparent counsel for the defendants, Mr. Nathan E. Siegel, had sent to the Circuit Court. With his correspondence (Exhibit G), Mr. Siegel alerted the Circuit Court that, on December 8, 2008, *The Sun* had filed a voluntary petition for bankruptcy with the U.S. Bankruptcy Court for the District of Delaware ("the Bankruptcy Court"). Mr. Siegel also requested that a stay be imposed on the complaint as a result of the petition, that the case be transferred to the Bankruptcy Court (claimant's interpretation of the request), and that the stayed case be subject to rules of dismissal for the state of Maryland. Mr. Siegel, though, did not address the substance of the complaint.

**12.** So that claimant could respond appropriately to defendants' February 17, 2009 correspondence, on March 4, 2009, he submitted to the Circuit Court a request for information as to Circuit Court procedures.

Response to Objection to Claim No. 3697: Case No. 08-13141(KJC)
Page 7
April 7, 2010

**13.** On April 1, 2009, claimant received from the Circuit Court the name of an Internet site that presented "Maryland Court Rules."

**14.** On April 6, 2009, claimant submitted to the Circuit Court a request for relief from the stay, that the Circuit Court deny the transfer of the case to the Bankruptcy Court, and that the Circuit Court deny the request regarding rules for dismissal (Exhibit H is an amended version of the request).

**15.** On April 15, 2009, claimant received from the Tribune Company Claims Processing Center ("the Processing Center") a "Proof of Claim" form along with instructions (Exhibit J) prepared by the Bankruptcy Court. The Center had sent these in relation to *The Sun's* bankruptcy petition.

**16.** On April 25, 2009, claimant received a copy of a March 6, 2009 Circuit Court order (predated his April 6, 2009 requests) signed by Judge Evelyn Omega Cannon that granted most of defendants' requests (Exhibit K). However, the order seemed to allow the case against Mr. Dechter to proceed as originally intended.

**17.** On May 19, 2009, claimant submitted to the Circuit Court an amended version of his April 6, 2009 requests (Exhibit H) and amendments to his original complaint (Exhibit I). Claimant added to the complaint, as defendant, the publisher of *The Sun* as it appeared the Circuit Court was allowing the case to proceed against individuals. Claimant believed that *The Sun's* management was at fault in the matter as well as Mr. Dechter.

Response to Objection to Claim No. 3697: Case No. 08-13141(KJC)
Page 8
April 7, 2010

**18.** On May 23, 2009, claimant received from the Circuit Court a May 21, 2009 letter entitled "Notification to Parties of Contemplated Dismissal" (Exhibit L) The letter stated that the Circuit Court would dismiss the subject proceedings against Mr. Dechter unless claimant submitted a written motion that provided "good cause" to do otherwise.

**19.** On May 26, 2009, claimant telephoned the Circuit Court to inquire as to the cause for the contemplated dismissal. Ms. Wencai Zheng stated that claimant had not served Mr. Dechter a Writ of Summons within the 120 days allotted for this. So, though defendants' February 17, 2009 correspondence (para. 11) suggested otherwise, Mr. Dechter had not been served a Writ of Summons.

**20.** On June 5, 2009, claimant submitted to the Processing Center a completed Proof of Claim form along with a summary of his circumstances (Exhibit M) and a condensed account of the history of his case in the Circuit Court.

**21.** On June 12, 2009, claimant submitted to the Circuit Court (attention Ms. Zheng) a motion requesting that the dismissal of the proceedings against Mr. Dechter be deferred and that these proceedings be allowed to continue as originally intended (Exhibit N).

**22.** On August 29, 2009, claimant received from the Processing Center an "acknowledgement of receipt of proof of claim" and his claim was assigned No. 3697.

**23.** On September 2, 2009, claimant received a copy of an August 12, 2009 Circuit Court order (Exhibit O) entitled "Deferring Dismissal under Rule 2-507(c)" and signed by Judge Marcella A.

Response to Objection to Claim No. 3697: Case No. 08-13141(KJC)
Page 9
April 7, 2010

Holland. Presumably, this order was the Circuit Court's response to claimant's May 19, 2009 amended submission to the Circuit Court (para. 17). Judge Holland 1) upheld the stay "in accordance with continuing proceedings in Bankruptcy Court," 2) instructed claimant to inform the Circuit Court of the "termination of the Bankruptcy proceedings" so that claimant's case may be "reactivated," and 3) upheld the stay being subjected specifically to Md. Rule 2-507(c). Plus, it appears that Judge Holland placed a stay on the case against Mr. Dechter and so, apparently on claimant's entire case.

24. On March 23, 2010, claimant received from the Processing Center the debtors' objection that is the subject of the response that follows. That left claimant facing the rather severe schedule of a response date of April 12, 2010 and hearing date of April 19, 2010.

## Restatement of Debtors' Objection

25. It appears to claimant that debtors had three main objections to his claim. In essence, these were: 1) that claimant violated the statute of limitations in filing his complaint, 2) that the complaint fell short on specificity, and 3) that, in his complaint/claim, claimant did not justify the monetary award he sought.

## Introduction to Claimant's Response

26. Claimant believes he did not violate the statute of limitations for the underlying case. Also claimant believes he submitted an appropriate complaint for that case that met the official requirements.

Response to Objection to Claim No. 3697: Case No. 08-13141(KJC)
Page 10
April 7, 2010

## Relevant Law and Proof of Claim Form Requirement

**27.** Since the complaint was filed in the state of Maryland, Maryland rules apply. Relevant excerpts of the rules of interest follow. Claimant also provides a relevant requirement from the instructions of the Proof of Claim form.

### Maryland Rule 2-305. Claims for relief

**28.** "A pleading that sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain a clear statement of the facts necessary to constitute a cause of action and a demand for judgment for relief sought. Unless otherwise required by law, a demand for money judgment shall include the amount sought. Relief in the alternative or several different types may be demanded."

### Maryland Rule 2-341. Amendment of pleadings

**29.** "(a) ..... A party may file an amendment to a pleading without leave of court ........ , if there is no scheduling order, no later than 30 days before a scheduled trial date. Within 15 days after service of an amendment, any other party to the action may file a motion to strike setting forth reasons why the court should not allow the amendment. If an amendment introduces new facts or varies the case in a material respect, an adverse party who wishes to contest new facts or allegations shall file a new or additional answer to the amendment within ..........

**30.** (c) *Scope.* – An amendment may seek to ......(2) set forth a better statement of facts concerning any matter already raised in a pleading, .......... Amendments shall be freely allowed when justice so permits. ........"

Response to Objection to Claim No. 3697: Case No. 08-13141(KJC)
Page 11
April 7, 2010

**Requirement from Instructions on Proof of Claim Form**

**31.** The Proof of Claim form (Exhibit J) states that "You may be required to provide additional disclosure if the trustee or another party in interest files an objection to your claim."

## Circumstances of Complaint

**32.** Claimant should note that he filed the complaint under difficult circumstances. Claimant did not intend to represent himself; he spent much of the year preceding the submission of the complaint in search of representation. In a costly and consuming effort, claimant sent materials on his concerns to roughly 50 attorneys throughout the nation. It should be noted that, as a result of his financial circumstances, claimant's case would have had to have been a pro bono case. While several attorneys were encouraging, none was willing to argue the case. On September 25, 2008, with the October 7, 2008 statute of limitations deadline for a defamation lawsuit looming, claimant saw that, without counsel and with *The Sun's* defamatory article, his prospects for redress for harm unjustly inflicted on him and his family were fading. In view of his family's suffering, within the next few days he decided to file a lawsuit himself. On October 2, 2008 claimant telephoned the Circuit Court on how to prepare a complaint. Claimant's diary shows the Circuit Court's representative to have said "just give your side and write 'complaint [on the outside of the envelope, he recalls].' Claimant brought this out in the complaint stating "I am following procedures described on October 2, 2008 by staff of the Circuit Court for Baltimore City." Claimant was also told to include a fee of $105. On October 3, 2008, claimant mailed the complaint along with a personal check for $105 to the Circuit Court.

## Violation of Statute of Limitations

**33.** Regarding debtors' concerns that claimant violated the 1 year statute of limitations for

defamations complaints set by the State of Maryland, debtors state that claimant's action "was not commenced until …. months after the statute of limitations had run." Actually, as shown by Exhibit B, the complaint arrived at the Circuit Court on October 6, 2008. Furthermore, much of the delay of which debtors expressed concern seems to have been seated in a clerical error by the Circuit Court.

**34.** Regarding details, as brought out under Relevant History of Case, p. 5, the Circuit Court received the complaint on October 6, 2008; a T. Lane signed for the complaint at 11:33 AM (Exhibit B). On October 11, 2008, claimant received a notice (Exhibit C) from the Circuit Court that the Court needed further information to progress with the complaint. The Circuit Court also returned to claimant the complaint, apparently in the event he needed it. The returned complaint was stamped with the date of October 8, 2008 (Exhibit B). (Claimant sees debtors as being excessive in describing the complaint as having been "rejected" and claimant as having failed "to provide proper payment." Regarding the latter, being unaware of Circuit Court practices, claimant simply paid by personal check instead of money order.) Claimant complied with the Circuit Court's request with an October 13, 2008 mailing (Exhibit D). The mailing was received by the Circuit Court on October 17, 2008 and was signed for by W. Estep (Exhibit D). Not having heard from the Circuit Court in a timely manner, claimant telephoned the Circuit Court on December 18, 2008 to inquire as to the status of the complaint. Claimant was informed there was no record of his complaint. Also, he found his money order had not been cashed. Apparently, claimant's paperwork had been misplaced. So on January 5, 2009 (timed to avoid the holiday), claimant simply resubmitted the complaint along with a statement of what had happened from his standpoint (Exhibit E). This time Circuit Court processing proceeded.

**35.** It is unclear to claimant as to why the Circuit Court record cited by debtors (Exhibit P) does not show correspondence between claimant and the Circuit Court before January 12, 2009.


## Specificity of Complaint: Failure to State Claim

**36.** Debtors argued that claimant's complaint did not "state a claim upon which relief can be granted." More specifically, debtors claimed that claimant did not establish the four elements of a defamation case: "(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm." Claimant does not believe debtors to be correct.


**37.** In the following subsections, claimant first addresses debtors' concerns over his original complaint and then he provides draft amendments that he is now preparing that address those concerns. The amendments give two examples of statements claimant sees as defamatory and an example of *The Sun's* conduct that suggests *The Sun* intended to harm claimant and his family. The amendments are not admissions of the inadequacy of the original complaint; rather, they are additions that obviously would likely have been brought out in the natural evolution of the case. Claimant presents the amendments herein to show the sincerity of his case. With time, claimant expects to bring out all of his concerns, either through amendments or other communications.


**Response to Concerns over Original Complaint**

**38.** Claimant believes he submitted a complaint that meets requirements and one that was appropriate for the initial stage of litigation. Maryland Rule 2-305 states that a pleading "shall contain a clear statement of facts necessary to constitute a cause of action." The rule provides

no guidance as to what constitutes such a statement; guidance that especially those without

counsel would need. This suggests much freedom as to the content of a complaint.

**39.** In the complaint, claimant stated:

**39a.** "My [claimant's] complaint stems from a Sunday front page news article ("the

article") published by *The Sun* on October 7, 2007......

**39b.** The article appears to have been a material and well-crafted defamatory

fabrication. Facts were created, facts were reshaped, and facts were omitted – on a

large scale. For example, both the prominent theme of the article and compelling

evidence for that theme were untrue. Evidence suggests that the untruths and

misrepresentations were reckless and deliberate....... I believe the article will do little

more than further obstruct progress towards justice for my firm and me and, therefore,

also for my family.

**39c.** Much evidence suggests *The Sun's* lapses were intentional. For example, *The Sun*

gained my family's cooperation through false pretenses; *The Sun* violated our privacy;

*The Sun* carried out an insincere facts check; and *The Sun* misrepresented the origin of

the article. Additionally, *The Sun* appears to have been pressured by the University."

**40.** These excerpts embody all the elements of a defamation case. In direct prose, the

Response to Objection to Claim No. 3697: Case No. 08-13141(KJC)
Page 15
April 7, 2010

passages say *The Sun* made many untrue statements; the statements were made to the world; the statements were unkind; the statements seem to have been made intentionally; and the statements caused harm.

**41.** Debtors' concern that claimant did not cite a false statement does not appear to be substantive. Claimant is of the understanding that, initially, a complaint may simply be an introduction to a case. Claimant's intention was to provide details as needed, at first through the normal communications of the case and then through amendments to the complaint, as is allowed by Md. Rule 2-341. Claimant believes it would have been inappropriate for him to have provided a listing of the offending statements along with explanations (he has been preparing such a list and, along with discussions, it now exceeds 80 pages); any court would have been overwhelmed with trees and lost sight of the forest. Instead, claimant put forth, as an example, the particularly glaring and harmful untruth of *The Sun's* deeply flawed theme – in essence, a collection of statements.

**42.** It would appear to be a violation of the practice of viewing a complaint in a favorable light for a court to question whether claimant could cite specific false statements.

**43.** Furthermore, the complaint seems like an efficient path to justice. Claimant provided *The Sun* all that was needed to put forth a sensible response. *The Sun* could have replied yes, it did make false statements; no, it did not make false statements; or, it needs to know which statements are of concern, in which case claimant would have provided them.

**Draft Amendments to Original Complaint: Two Examples of Defamatory Statements**

**44.** In the following subsections, claimant (plaintiff in the subsections) provides two examples of what he believes to be defamatory statements or the like.

**45. Manufactured Defamatory Theme -** The theme of the article, plaintiff believes, was a bold, defamatory fabrication that falsely represented plaintiff as a reckless pioneer who was willing to and ultimately did destroy his family in a quest for scientific glory. This fabrication, plaintiff believes, was intended to discredit him and to place blame for the downfall of plaintiff, Ms. W. Henke (plaintiff's wife), and their family and firm ("the downfall") on him rather than on what plaintiff believes to be the far more credible possibility that the downfall may have been the doings of a campaign to drive plaintiff and Ms. Henke from their profession.

**46.** *The Sun* introduced the theme, as fact, at the head of the article, in large bold type:

"In pursuit of geologic immortality, inventor Robert Henke has sacrificed everything: comfort, career, family."

*The Sun* reinforced that theme. In the body of the article, *The Sun* claimed, as fact, plaintiff was "willing to wreck" his family in this obsessive pursuit and likened him to "dreamers, single-minded in their pursuit of greatness." And, at the head of the second page, *The Sun* stated, in large bold type:

"Obsession comes at high cost."

**47.** *The Sun* provided extraordinarily convincing evidence for the theme. That evidence, though, was false. For example, *The Sun* put forth, as fact, that plaintiff admitted that he was "willing to hurt those" he loved "for a long shot at glory." As will be brought out as plaintiff's case evolves, *The Sun* further strengthened the false theme throughout the article and on various fronts.

**48.** Regarding the truth, when plaintiff left the University as a result of his being dismissed, plaintiff and Ms. Henke faced difficult circumstances. First, they had invested heavily in the earthquake engineering technology they had invented and had been developing for 6 years. For instance, just before plaintiff was told of his dismissal, they had invested roughly $200,000 of their own resources in an elaborate testing chamber they were having constructed at the University for initial evaluations of their technology. Fortunately, they were able to carry out a series of prototype tests before plaintiff left. Second, the test results were particularly promising and revealing (not long after, some of the results were published in what plaintiff believes to be the leading peer-reviewed journal on earthquake matters); that greatly reduced future technical risk, making it that much more difficult to abandon the technology. Third, there was great need for the technology. So, plaintiff and Ms. Henke decided to continue to develop the technology. They also did so because plaintiff had it in mind, ultimately, to return to academia. Plaintiff is very narrowly gifted; his only strengths were his expertise and his abilities in research and teaching. Plaintiff felt academia was one of the few routes he could take to secure his family's future. Given the interest in and importance of the area of plaintiff's and Ms. Henke's technology, plaintiff felt the technology provided an especially strong means to realize his goal. This was no quest for "geologic immortality."

**49.** What fully upended plaintiff's and Ms. Henke's sound plan and drew them into their existing

Response to Objection to Claim No. 3697: Case No. 08-13141(KJC)
Page 18
April 7, 2010

nightmare was the unexpected: the possibilities of manipulated government grant competitions, biased oversight, theft from proposals, retaliation, blacklisting, and media misconduct – possibilities that *The Sun*, for all practical purposes, fully concealed in its article. Plaintiff believed he and his family suffered untold losses as a result of these. If plaintiff has been obsessed, it has been in seeking to recover, for the family, that which he believes was taken from it without just cause and for which it sacrificed so greatly. Plaintiff has been doing this through the only means he felt he has had – plaintiff's and Ms. Henke's technology. Plaintiff's diaries support this narrative; in contrast, no traces of *The Sun's* theme can be found.

50. Regarding *The Sun's* claim that plaintiff admitted he was willing to hurt his family for glory, plaintiff did no such thing. According to plaintiff's diaries and recollections, during a May 4, 2007 interview, Mr. Dechter did ask him if he would let his family starve. After deep thought, plaintiff replied that he would allow his family to suffer ("starve," he felt, was excessive in description) if he thought that the family would benefit from that suffering in the long term; but, he then said he sure wouldn't like that. That's all he said. He does not recall or have record of his ever having discussed the possibility of his seeking geologic immortality, glory, or anything comparable. Plaintiff believes defendants' electronic recordings of *The Sun's* interview in which he made his statement will confirm his claims.

51. Regarding defamation legal issues, plaintiff believes *The Sun* acted maliciously, harming plaintiff through defamation. Regarding intent, plaintiff believes *The Sun* deceived deliberately. With its theme, *The Sun* unbecomingly violated standard practices of responsible journalism. Since the theme dominated the impression left by the article, the violations were particularly egregious. The violations follow.

Response to Objection to Claim No. 3697: Case No. 08-13141(KJC)
Page 19
April 7, 2010

52. First, *The Sun* advanced a theme was strikingly at odds with essentially all the facts. An individual who didn't aggressively follow his chairman's advice to seek recognition, who shunned attention, who placed effort into teaching at an institution that does not emphasize teaching, who charged students with plagiarism, who was unwilling to engage in grade inflation, and who gave his children a great deal of attention is not an individual in search of geologic immortality or glory. *The Sun* was aware of most if not all of these facts, either through documents provided by plaintiff or interviews. Plaintiff believes the misfit could not have escaped *The Sun*.

53. Second, for what seems to have been the basis of *The Sun's* theme, *The Sun* turned to a source, Dr. J. Templeton, who was unreliable on the matters of his testimony. And plaintiff believes that *The Sun* should have uncovered that considering the apparent impact of that testimony on *The Sun's* article. *The Sun* stated, as fact, "but he [plaintiff] is also, as his former boss [Dr. Templeton, who was plaintiff's project leader, not supervisor] says,............willing to wreck everything – including his family – chasing a dream that has become an obsession." And later *The Sun* stated "It was his boss at Exxon, Jack Templeton, who likens him to Herman Melville's Captain Ahab because of his messianic pursuit of his invention." That is, apparently, Dr. Templeton stated, falsely, that plaintiff was willing to destroy his family for his technology; and, to this, *The Sun* added its own false slant that plaintiff did so for glory. Dr. Templeton was not a reliable source on the specific subjects of the undertaking and plaintiff's mindset; plaintiff and Dr. Templeton haven't been in contact since 1984.

54. Moreover, it should be noted that plaintiff is suspect of *The Sun's* reporting regarding Dr.

Response to Objection to Claim No. 3697: Case No. 08-13141(KJC)
Page 20
April 7, 2010

Templeton. Dr. Templeton's statement seems unfittingly reckless; plaintiff recalls Dr. Templeton as having been cautious.

**55.** Third, astoundingly, *The Sun* did not inform plaintiff of, ask him to verify, or invite him to comment on its theme and related statements. It appears *The Sun* withheld the theme from Ms. Henke as well. She was the only other person who had any true sense of plaintiff's mindset. *The Sun's* failure to verify its theme with plaintiff and Ms. Henke is particularly noteworthy in view of the obvious harm of the theme and the effort *The Sun* placed in developing the theme indirectly throughout the article. *The Sun* was fully aware of at least some of the potential harm of the theme. First, *The Sun* stated "American culture valorizes the uncompromising dreamers, single-minded in their pursuit of greatness, and delights when they are plucked from obscurity, as in the case of some recent MacArthur Foundation 'genius' grantees. Robert Henke's monastic life is a testament to that ideal, but he is also, as a former boss says, a 'Captain Ahab of our generation,' willing to wreck everything – including his family – chasing a dream that has become an obsession." Apparently *The Sun* believed plaintiff was eligible for the highest of honors save for his willingness to destroy his family for his technology, let alone for scientific glory. Second, *The Sun* stated, as fact, "He [plaintiff] is reluctant to express love but admits he is willing to hurt those he loves for a long shot at glory. Perhaps that is why Wanda Henke's summary of her husband is ultimately so uncharitable." That is, *The Sun* recognized that its theme would subject plaintiff to contempt. Plaintiff believes the glaring potential of *The Sun's* theme to inflict harm would, under normal circumstances, as a matter of course, have drawn special effort from *The Sun* to insure its authenticity – and, in this case, special effort wasn't even required. *The Sun's* failure to fully verify its theme suggests intent to deceive – not just by the reporter of the article but also by any other of *The Sun's* staff that had been charged with the

Response to Objection to Claim No. 3697: Case No. 08-13141(KJC)
Page 21
April 7, 2010

responsibility of insuring the legitimacy of the article.

56. Though it is self evident that *The Sun's* theme harmed plaintiff's reputation, plaintiff cites

evidence of such harm. One Larry Bonander of Timonium, Maryland wrote, in a letter published

by *The Sun* on October 9, 2007 (Exhibit A) under a boldfaced title:

> 56a. **"Soil pioneer leaves but a shabby legacy"**

> 56b. "I was sad after reading the story of Robert Henke and his soil probe
> ('A modern-day Ahab,' Oct. 7).

> 56c. Here's a gifted man whose brilliance is overshadowed by his
> selfishness.

> 56d. It's too bad that Mr. Henke's legacy will be a shattered, dysfunctional
> family."

57. **Falsification of Air Force Discharge** - For all practical purposes, *The Sun* falsified

plaintiff's discharge from the Air Force. This appears to have been an effort by *The Sun* to

discredit plaintiff in any way possible, in this case, by representing plaintiff falsely as less than

honorable. *The Sun* stated "...Henke had arranged for a "self-initiated elimination" discharge

[from the Air Force]....."

58. Regarding truth, as his discharge papers show, plaintiff actually received an honorable

discharge. Plaintiff did leave the Air Force through a self-initiated elimination. However, with *The Sun's* wording, most of the public, plaintiff believes, would have been under the false impression that plaintiff received something less than an honorable discharge.

59. Regarding relevant history, as plaintiff's diaries show, on January 4, 2007, in the course of a telephone interview, plaintiff told Mr. Dechter that plaintiff had resigned from the Air Force for family problems. On July 19, 2007, Mr. Dechter telephoned plaintiff to say that his editor at *The Sun* had asked how plaintiff had been able to withdraw from the Air Force and Mr. Dechter asked plaintiff for his discharge papers. Plaintiff explained that he withdrew through a "self-initiated elimination." Plaintiff recalls telling and his diary suggests he told Mr. Dechter that he received an honorable discharge but said he didn't think he would be able to find the papers without huge effort; he had no idea where they were, or even if he still had them, and his belongings were in disarray from three recent moves. So plaintiff gave *The Sun* permission to look into the record and even provided *The Sun* his social security number for this. Plaintiff was under the impression that *The Sun* would follow through. *The Sun* did so only partially. On October 5, 2007, as plaintiff recalls, seemingly only because plaintiff asked Mr. Dechter about his findings regarding the discharge, as his diary shows, Mr. Dechter told plaintiff he had found out about the self-initiated elimination policy but said he couldn't find whether plaintiff's discharge was honorable because he needed plaintiff's signature to access plaintiff's records. As plaintiff recalls, he offered to provide his signature. However, Mr. Dechter declined the offer and so he never confirmed officially plaintiff's honorable discharge.

60. With respect to defamation legal issues, plaintiff believes *The Sun* falsified plaintiff's Air Force discharge maliciously. Regarding intent, plaintiff believes *The Sun's* falsification was

Response to Objection to Claim No. 3697: Case No. 08-13141(KJC)
Page 23
April 7, 2010

intentional. With the falsification, *The Sun* unbecomingly violated standard practices of responsible journalism. No one would question that plaintiff's discharge was substantive with respect to the impressions left by the article. *The Sun's* need to verify the discharge is a testament to that and also to the awareness of *The Sun's* of the need for truth in representing a discharge. Furthermore, *The Sun's* unwillingness to publish a substantive truth favorable to plaintiff (an honorable discharge) without proof but its willingness to publish an untruth unfavorable to plaintiff (less than an honorable discharge) without proof is, plaintiff believes, evidence of intent to harm plaintiff. Since *The Sun* did not access plaintiff's records, *The Sun* had no proof that plaintiff sought a self-initiated elimination. Plaintiff believes this matter to be a clear example of *The Sun's* guile; instead of putting forth the easily accessible truth, *The Sun* put forth a claim harmful to plaintiff that *The Sun*, plaintiff believes, felt it could loosely defend. Moreover, plaintiff believes *The Sun* showed intent to harm by choosing to publish what it knew likely to be a substantive and harmful untruth; as brought out above, plaintiff recalls telling *The Sun* he was discharged honorably and enabled *The Sun* to turn to official records to verify this. What's more, *The Sun* did not inform plaintiff of how it was going to represent the discharge to allow plaintiff to object. Plaintiff is certain *The Sun* would have recognized the potential harm of its falsification of plaintiff's discharge and so, under normal circumstances, as a matter of course, would have placed special effort towards insuring absolute truth and clarity in representing the discharge. *The Sun's* failure to do so suggests intent to deceive.

61. Plaintiff does not believe that a reasonable person would question that plaintiff's reputation had been immensely harmed by *The Sun's* representation of his discharge from the Air Force.

62. As an aside, in moving from Apex, North Carolina, to Wilmington, North Carolina, during December 2009, plaintiff did find his discharge papers (Exhibit Q gives an example). These show that he was discharged honorably.

**Draft Amendment to Original Complaint: Example of Deceit by *The Sun* and Intent to Harm**

63. In what seems to be not only evidence of deceit on the part of *The Sun* with intent to do harm but also an unbecomingly disgraceful invasion of privacy, *The Sun* failed to honor an agreement plaintiff believed he had with *The Sun* regarding his leaving the Air Force. *The Sun* published the reason why plaintiff left the Air Force; *The Sun* stated "His [plaintiff's] bride had had an affair."

64. *The Sun's* statement, plaintiff believes, was a breach of a good faith agreement plaintiff believes he had with *The Sun*. Plaintiff's diary entree of January 4, 2007 states that in a conversation, plaintiff told Mr. Dechter he "[plaintiff] left [the Air Force] after 2 months – family problems. He [Mr. Dechter] wanted to know what they were. I [plaintiff] said I wanted to keep that private." Plaintiff was under the impression that Mr. Dechter was in agreement with that; he never said he wasn't. Plaintiff reiterated his wish twice in the attachment of a February 16, 2007 email (Exhibit R). Plaintiff stated "Please let the individuals you contact know that they are free to discuss the matters at hand (except for the family problems matter with respect to the Air Force – thanks)" and, later, on the Air Force, plaintiff stated "……again, I'd rather the family problems of which I spoke not to be discussed)". And again, Mr. Dechter didn't comment on the wish. In her May 2, 2007 interview with Mr. Dechter, Ms. Henke told him details of plaintiff's leaving the Air Force. During a May 4, 2007 interview, Mr. Dechter told plaintiff of that. Plaintiff

responded with disbelief; his diary shows he replied, "your [you're] not going to write about that[,] are you. [?]" Mr. Dechter said he would.

65. Regarding legal issues, plaintiff believes *The Sun's* silence on this matter was malicious. Regarding legality, plaintiff believes that, even though *The Sun* did not make an explicit promise, because of the standing of *The Sun* as trustworthy and principled, plaintiff believes its blaring silence would have been taken, by a reasonable person, as equivalent to a promise. That is, plaintiff believes it fell on *The Sun* to conduct itself in a manner consistent with its standing and that a reasonable person had the right to expect *The Sun* to be forthright and to make its position clear. Plaintiff would have had entirely different expectations of a tabloid. In view of this thinking, plaintiff believes *The Sun* violated a legal commitment based on "detrimental reliance" in failing to honor its implied promise. That failure, plaintiff believes, led to, at least, the harms of defamation and an invasion of plaintiff's and Ms. Henke's privacy. Had *The Sun* told plaintiff it could not agree to his requirement, likely, the article would not have come into being; plaintiff and his family would not have cooperated with *The Sun* in the writing of the article.

66. Regarding intent, plaintiff believes *The Sun* was deliberately silent. With its silence, *The Sun*, plaintiff believes, unbecomingly violated standard practices of responsible journalism. The matter in question was substantive and clearly pivotal to the gaining of the cooperation of plaintiff and his family. Plaintiff believes *The Sun* was fully aware that plaintiff was relying on *The Sun* to honor what he believed was a commitment. Placing himself in the mind of Mr. Dechter, plaintiff, after having been informed at least three times from the subject that he did not wish to reveal details over his leaving the Air Force, finds it hard to see how being silent in

response could be anything but deceit with the intent to harm; that is, being noncommittal in hopes of uncovering compromising information. Especially with the article having been *The Sun's* idea, plaintiff's rights to privacy over certain personal matters, and plaintiff's clearly and repeatedly stated unwillingness to reveal the private matter in question, plaintiff believes it fell on *The Sun* to make clear beyond any doubt whatsoever as to whether or not it would agree to his terms. Given these circumstances, plaintiff is certain that, *The Sun*, as an organization of standing, under normal circumstances, as a matter of course, would have placed special effort toward insuring plaintiff was absolutely clear over its position on the matter. *The Sun's* failure to be so suggests intent to deceive and reinforced plaintiff's belief that *The Sun's* sought to harm plaintiff with the article.

## Specificity of Complaint: Failure to Name Harm

**67.** Debtors' stated "the Henke Claim does not allege any particular harm or damages suffered as a result of the allegedly defamatory article that are attributable to the Debtors; rather, Mr. Henke describes a series of unfortunate events that occurred prior to the time the article was published that in no way implicate the Sun." This is not correct.

**68.** In the complaint, claimant stated

    **68a.** "I (claimant) believe the article will do little more than further obstruct progress towards justice for my firm and me and, therefore, also for my family.

**68b.** The article has harmed my firm's and my well-being, prospects, and standing and, so, those of my family and has obstructed our progress toward justice.

**68c.** Before the article, my family, me, and my firm had already suffered immeasurable harm, evidence suggests, as a direct or indirect result of the campaign. Our ability to function as a family was greatly disrupted; we lost our home; my younger son, as a youth, experienced serious difficulties and now faces the possibility of a prison term; my older son experienced serious difficulties and we were not able to provide him the help that a family normally could; our firm – whose technology has shown great promise for contributing significantly to public safety -  lies in ruins and I have been unable to progress with that technology; we suffered huge firm-related financial losses including our personal investment in our technology (roughly $1M) and patent-related losses; we were driven from our profession and have been denied the privilege of continuing to contribute to that profession; I have been blacklisted, it seems, and have been unable to secure positions for which I believe I am strongly qualified; I have no income or security; our professional, financial, and social standings have been blackened greatly; my wife and son have been subjected to immense legal indignities; we have endured great mental anguish; our health has suffered; and our relationships with our parents have been strained.

**68d.** *The Sun's* article only intensified our plight. By obstructing progress towards a resolution to the matter, *The Sun* and any of its accomplices behind the article have caused my firm and me and, so, my family, to be continued to be deprived of justice. In turn, our well-being, prospects, and standing continue to deteriorate."

69. These passages bring out that the main harm of the article was that it obstructed claimant's progress towards justice and so, to a resolution to his and his family's dire circumstances. The complaint was aimed at *The Sun*; *The Sun* would have fully understood claimant's description of the harm he believes was inflicted on him. For example, in a letter to the publisher of *The Sun*, dated May 1, 2008 (Exhibit S) plaintiff put forth his position in some detail.

70. What's more, neither Md. Rule 2-305 nor the instructions of the Proof of Claim form give much guidance as to what must be covered regarding harm. That suggests that the requirements of an initial complaint are far less stringent than debtors imply. And Md. Rule 2-341 and the instructions to the Proof of Claim allow either for amendment or additional disclosure suggesting that further explanation and clarification of complaints/claims is a matter of course – which makes infinite sense from logic, human, and justice standpoints.

71. Claimant is now preparing an amendment to the complaint that will explain as to how *The Sun's* article harmed him through the denial of justice. A draft of that amendment is presented below under the following section.

### Monetary Remedy Sought by Claimant

72. Debtors expressed concern that the monetary remedy sought by claimant is excessive. Debtors pointed out that the amount is "by far the highest-value litigation-related claim presently asserted in the Debtors' chapter 11 cases." Plus, debtors state "the Henke Claim does not provide any comprehensible basis for the assertion that *The Sun* owes him $100,000,000." On this latter issue, it should be noted that claimant specifically stated in his summary for his Proof

Response to Objection to Claim No. 3697: Case No. 08-13141(KJC)
Page 29
April 7, 2010

of Claim (Exhibit M) that "since my [claimant's] complaint has not yet been adjudicated, my claim is only a potential claim..."

73. Regarding the relative amount of claimant's claim, claimant is unclear as to how what others seek is relevant to what claimant seeks. It seems that the redress claimant seeks would be determined solely by the circumstances of his case.  Regarding debtors' concern that claimant provided no "comprehensible" basis for the amount of his claim, on a monetary award, Md. Rule 2-305 only states "…. a demand for money judgment shall include the amount sought." Claimant's complaint met that requirement. And the instructions of the Proof of Claim form (Exhibit J) provided very little guidance as to what was required. Claimant believed the summary he provided of his defamation lawsuit served as the basis for his claim. The Form does state though that "You may be required to provide additional disclosure if the trustee or another party in interest files an objection to your claim." So, in the spirit of disclosure, claimant provides the following discussion, which he is also including as an amendment to the complaint.

**Draft Amendment to Original Complaint: Basis for Monetary Award Sought**

74. Regarding the absolute value of the monetary relief sought by claimant, the main harm claimant believes the article inflicted – beyond the obvious harm to reputation, prospects, and the like - was the article's obstruction to claimant's progress towards the justice that he believes would have freed him and his family from the nightmarish circumstances that had befallen them. This, claimant argues, is no small matter.

75. At the time of the writing of the article, claimant was steadfastly seeking an objective and complete investigation of his circumstances. He was doing so in hopes of restoring for his family

all he believed had been taken from the family without just cause leaving it in a state of ruin. Claimant believed the findings of a complete and objective investigation would have allowed him to seek substantial redress through the courts. Claimant believes such an investigation would likely have uncovered the following:

**75a.** 1) Claimant had been dismissed from the University not for the main official reasons of inadequate success in grant competitions and failure to publish but for i) charging three students with plagiarism and ii) his unwillingness to engage in grade inflation and the like. These were the seeds from which grew claimant's and his family's nightmare.

**75b.** Evidence for this includes an overpowering retaliatory mindset against claimant for the plagiarism charges. For example, after the charges, the chairman of claimant's department assigned one of the students claimant charged to work with claimant as a teaching assistant – a potentially explosive act.

**75c.** 2) In order to justify the dismissal, at least one faculty member from the University and at least one program official from the National Science Foundation (NSF) had colluded to manipulate NSF grant competitions through various means, to insure that at least claimant's University proposals would fail. (Claimant submitted University proposals to NSF during his tenure and Ms. Henke and claimant submitted proposals for their firm to NSF and other agencies.)

**75d.** Evidence for this includes a striking change in the fortunes of claimant and Ms.

Henke in government grant competitions that appears to have been groundless. Initially, claimant and Ms. Henke attracted much government support for their technology and related work. But, during claimant's tenure at the University (1985-89), as described in Exhibit U, abruptly they began facing a string of glaring irregularities in a wide range of government grant competitions. For example, during the period of 1984-1986/87, they were highly successful in attracting support from NSF; 3 of 4 NSF proposals were funded. Their relationship with NSF seemed strong and comments provided by reviewers of their proposals were quite favorable. In contrast, from 1986/87 through the present, only 2 of 15 NSF proposals of theirs were funded. And those two, claimant believes, were funded only as a result of intervention by NSF's then Inspector General. What's more, claimant's and Ms. Henke's relationship with NSF had soured and review comments had become hostile. By 2005, claimant and Ms. Henke had suffered similarly mysterious reversals at five different agencies.

**75e.** 3) As suggested by para. 75d, the irregularities that started during claimant's tenure continued following claimant's dismissal. Proposals submitted by Ms. Henke and claimant to funding agencies were also manipulated by various means to insure their failure. For example, agency officials had willfully and repetitiously selected reviewers known to be hostile to claimant and Ms. Henke to review proposals of theirs. [During 1994, they filed lawsuits against NSF and the National Institute of Standards and Technology (NIST) to verify this possibility. Ultimately, however, the lawsuits, which were centered on technicalities of privacy law, were unsuccessful.] Essentially, their right to the pursuit of happiness had been violated; they were preparing countless proposals to grant competitions in which the outcomes were predetermined. This was done to drive

claimant and Ms. Henke from their profession, in protection of the wrongdoing cited in para. 75c and in retaliation for their formally contesting grant competitions.

**75f.** Evidence for this includes the dismal record of success seen by Ms. Henke and claimant in government grant competitions following claimant's dismissal (see para. 75d), the continued irregularity of the treatments of their proposals, and the hostility and absurdity of the review comments their proposals received. Claimant and Ms. Henke formally expressed concerns over the possibility of manipulated grant competitions; Exhibit U provides an example. These were not dismissed; for instance, NSF's then Inspector General, it appears, was so moved by the possibility, brought out by the letter of Exhibit U, she offered them the grant of their choice in compensation.

**75g.** 4) Ideas presented, in particular, by claimant in University proposals of his had been taken up improperly by other researchers.

**75h.** Evidence for this includes 1) the coincidental appearances in the scientific literature, not long after claimant's dismissal, of research overly similar to research claimant had presented in proposals and on which he had started to work and 2) the corresponding circumstances (for example, the research represented sudden changes in the directions of the researchers in question). The dismissal had disrupted his ability to follow the ideas and claimant believes that, perhaps, various researchers had taken advantage of this. (It should be noted that idea theft was not claimant's and Ms. Henke's main concern; rather, that was the growth in the body of individuals with a need to expel them from their profession.)

**75i.** 5) A 5 year inquiry/review that was carried out at the request of claimant and Ms. Henke by two investigators of the Office of the Inspector General of the National Science Foundation ("the Office"), which addressed the matter of item 4) and other matters and concluded there was insufficient substance for further investigation, was deliberately slanted against them.

**75j.** Evidence for this includes the contents of the investigative reports of the inquiry and review. The former was obtained by claimant and Ms. Henke with an FOIA request. The two reports suggested blatant bias by the Office's investigators. For example, on the possibility of idea theft by a colleague of claimant's at the University – one of the few matters that were investigated in which claimant and Ms. Henke knew the precise truth - it appears that either the Office had manufactured seemingly pivotal evidence, likely, claimant believes, to protect the University, or the University had misled the inquiry, likely, claimant believes, to protect itself. Particularly irregular was the fact that the Office did not turn to claimant or Ms. Henke to verify or comment on its findings.

**75k.** 6) The two-decade long undertaking by Ms. Henke and claimant to bring to practice a truly promising new earthquake engineering technology of high potential value to public safety they had invented, patented, developed, and evaluated through, among other things, great personal investment was brought to a standstill through sabotage. This was in protection of the wrongdoing to which they fell victim and in retaliation for their efforts to restore the well-being they believed had been taken from them illegitimately.

**75l.** Evidence for this includes the break-ups of even the strongest of relationships claimant and Ms. Henke had with collaborators and potential collaborators. Eventually, against all odds, each relationship disintegrated, irregularly – this despite the demonstrated promise of and great need for their technology. (For example, claimant's and Ms. Henke's work on their technology was published in three articles in what claimant believes is widely viewed as the foremost peer-reviewed journal on earthquake matters – this while, apparently, they were seen as outcasts.)

**75m.** 7) Claimant was blacklisted from university and other positions for which he applied.

**75n.** Evidence for this includes *The Sun's* article, which stated "Privately, Henke's colleagues say that the lawsuits [that claimant and Ms. Henke filed against NSF and NIST] were tantamount to professional suicide."

**75o.** 8) In an utterly perverted matter that contradicts debtors' apparent suggestion that *The Sun* played no role in claimant's circumstances prior to the article ( see para. 96), *The Sun*, at the bidding of the campaign to drive claimant and Ms. Henke from their profession, over a period of two decades following claimant's dismissal from the University, through a large number of articles, at the very least, had stalked claimant, his firm, and his family and had protected key figures of the campaign. (It should be noted that these articles inflicted on claimant and his family immense emotional distress and, giving him the deep sense that he was under surveillance by *The Sun*, greatly distracted

Response to Objection to Claim No. 3697: Case No. 08-13141(KJC)
Page 35
April 7, 2010

claimant from his sons and wife.)

**75p.** The articles provide evidence for this; claimant has clippings of each. *The Sun* publicized, prominently and in separate articles, following his dismissal, an eye-catchingly large number of students in a particular course of his; *The Sun* published an article linked to a pivotal grant competition to which claimant and Ms. Henke had, coincidentally, submitted a proposal; *The Sun* publicized faculty of the University that played decision-making roles in the plagiarism matter; *The Sun* publicized individuals whom, coincidentally, claimant was approaching over his technology; *The Sun* publicized close friends of claimant's sons; *The Sun* publicized, separately, individuals with whom claimant and Ms. Henke worked in the development of their technology; *The Sun* publicized likely key figures of the campaign against claimant and Ms. Henke, coincidentally, right after claimant's and Ms. Henke's lawsuit was publicized nationally; and *The Sun* even publicized the attorney that held the most promise for taking up a defamation lawsuit for claimant against *The Sun*, coincidentally, just when it seemed possible that he might be interested in claimant's circumstances.

**76.** Claimant believes the above listed matters brought him and his family to the state of ruin described in his complaint. That state is repeated below:

**76a.** Before the article, my ["claimant's"] family, me, and my firm had already suffered immeasurable harm, evidence suggests, as a direct or indirect result of the campaign. Our ability to function as a family was greatly disrupted; we lost our home; my younger son, as a youth, experienced serious difficulties and now faces the possibility of a prison

term; my older son experienced serious difficulties and we were not able to provide him the help that a family normally could; our firm – whose technology has shown great promise for contributing significantly to public safety - lies in ruins and I have been unable to progress with that technology; we suffered huge firm-related financial losses including our personal investment in our technology (roughly $1M) and patent-related losses; we were driven from our profession and have been denied the privilege of continuing to contribute to that profession; I have been blacklisted, it seems, and have been unable to secure positions for which I believe I am strongly qualified; I have no income or security; our professional, financial, and social standings have been blackened greatly; my wife and son have been subjected to immense legal indignities; we have endured great mental anguish; our health has suffered; and our relationships with our parents have been strained.

77. The build-up to the article provides further signs of wrongdoing. As part of claimant's quest for an objective and complete investigation, with a November 30, 2006, letter, claimant approached the Publisher of *The Sun* in hopes that *The Sun* would shed light on his circumstances. Claimant believed that *The Sun* could help him identify the make-up of the campaign he believed existed against him and Ms. Henke by revealing to him the names and motives of the individuals who had suggested to *The Sun* the articles he believed were related to him and Ms. Henke. Apparently, the publisher turned the matter over to Mr. Dechter, the reporter of the article.

78. On December 12, 2006, Mr. Dechter telephoned claimant to inquire as to the nature of claimant's concerns regarding *The Sun*. Claimant told Mr. Dechter about his concerns over

stalking by *The Sun*. Mr. Dechter asked claimant about the articles of concern. In response, claimant composed a December 14, 2006 email that provided a partial memory-based list of the articles of concern along with discussions (Exhibit V). With claimant's preparations for his case, many more articles in this vein resurfaced.

79. Apparently, *The Sun* took claimant's email quite seriously. On January 3, 2007, Mr. Dechter telephoned claimant. Mr. Dechter did not address claimant's email. Rather, he told claimant *The Sun* wished to write an article about his circumstances. Though claimant did not approach *The Sun* for an article, because he believed a truthful and appropriate article could bring about the investigation he had been seeking and because he believed that *The Sun* would write such an article, claimant agreed to the article.

80. The article was a substantial effort; during a time of ever contracting newspaper revenues. The article consumed 9 months. Claimant provided *The Sun* many written materials. Mr. Dechter carried out several telephone discussions with or interviews of claimant's family and claimant and May 1-4, 2007 he conducted direct interviews of them in Apex, North Carolina. *The Sun* even sent, for a day, a photographer to Apex.

81. Claimant was stunned by the article that emerged. In essence, all of the matters on which claimant expected the article to center – those of the numbered list above and related matters – were omitted. Instead, the article presented a sanitized G-rated version of events that 1) skillfully concealed the possibility of official and professional misconduct and 2) carried out what claimant sees as an absurdly heavily-handed personal attack not only on him but also on his family.

**82.** For its prominent theme, *The Sun*, it seems, concocted the false tale of claimant as a reckless pioneer who was willing to and ultimately did destroy his family in a quest for glory. And in support of or in complement to that theme, through countless false or misleading statements and guile, *The Sun* represented claimant, demonstrably false for the most part, as uncooperative, vindictive, delusional, neglectful as a parent, callous towards his family's needs, parasitic, godless, less than honorable, vulgar, selfish, hypocritical, desperate, paranoid, raving, unbalanced, greed-driven, flighty, unaccomplished, and impulsive. While *The Sun* did speak favorably of claimant, claimant believes the demonizing swamped that obligatory kindness. In support of this thought, claimant repeats the previously cited letter by a Larry Bonander of Timonium, Maryland that *The Sun* published on October 9, 2007 with a boldfaced title (Exhibit A):

> **82a.** **"Soil pioneer leaves but a shabby legacy":**

> **82b.** "I was sad after reading the story of Robert Henke and his soil probe ('A modern-day Ahab,' Oct. 7).

> **82c.** Here's a gifted man whose brilliance is overshadowed by his selfishness.

> **82d.** It's too bad that Mr. Henke's legacy will be a shattered, dysfunctional family."

**83.** In an indication of the level of the intensity of its malice, *The Sun* published what claimant

believes *The Sun* knew to be a harmful fabrication during a period when one of the few promising applications he had submitted for a position was under evaluation. An application of claimant's to the Nuclear Regulatory Commission - the only organization which had interviewed him formally during his multi-year position search – was under review. And, as the article shows, *The Sun* was fully aware of this.

**84.** Most distressingly, *The Sun* exploited claimant's younger son, Kevin, a juvenile at the time; this, after *The Sun* assured claimant and his family, several times (for example, on February 10 and April 20, 2007), quite sincerely and convincingly, that *The Sun* would not do so. *The Sun* was fully aware of claimant's and Ms. Henke's feelings for and concern over Kevin, who had been experiencing serious juvenile difficulties. The promises were pivotal in gaining their cooperation. And, according to claimant's recollections and his diary, on May 1,2007, Mr. Dechter told claimant that he wished to attend a May 3, 2007 hearing for Kevin, not to write about it directly but just because it relates to the story. Claimant agreed. Well, Mr. Dechter wrote about the hearing and in an especially hurtful manner. In hindsight, claimant is suspect of *The Sun's* scheduling a visit to North Carolina that was centered on a court date for Kevin.

**85.** Both *The Sun* and the University were inappropriately unresponsive towards claimant over the article. Claimant expressed his concerns over the article in a May 1, 2008 letter to the Publisher of *The Sun* (Exhibit S) and copied the letter to the Chairperson of the Board of Trustees of the University. Neither responded to the letter.

**86.** On the basis of the contents of article and the conduct of *The Sun* and the University, claimant came to the belief that *The Sun* had no intention of publishing anything that would

deeply compromise *The Sun* or the University. The true purpose of the article, claimant came to believe, was to carry out a character attack of claimant that would insure an end to his search for an investigation of his circumstances and so, the burial of the truth of those circumstances. Claimant believes that *The Sun* found this not to be possible with truth alone and so turned to harmful fabrication, harmful omission, and other forms of deceit.

87. Regarding harm, claimant has no doubt whatsoever that *The Sun's* grand fabrications as to claimant's character and the countless number of omissions as to matters that would give him credibility dashed any hope for an objective and complete investigation. Given the relevance of the matters in question to public well-being from various standpoints and the history of claimant's circumstances, claimant believes a truthful and complete article would have been followed by investigation(s). And, claimant believes, any investigation, because of visibility, likely would have been objective and complete. Moreover, claimant believes the flagrancy of *The Sun's* article is a measure of the gravity of what an investigation would have uncovered.

88. So, regarding the amount claimant seeks, not only did *The Sun* obviously harm claimant's reputation, his current well-being, his prospects for future well-being, and his ability to provide for his family with dignity, in thwarting any hope for an investigation, *The Sun* also deprived him – and so by extension, his family - of the possibility of redress for decades of past injustice, which claimant believes would have proved to be monumental.

89. Claimant does not know how to quantify the harm inflicted by *The Sun* on him. But claimant believes that, considering the totality of the circumstances, what he seeks falls well below the enormity of the crime.

## Conclusion

90. Claimant finds fault with debtors' objection to Claim #3697 and requests that the Bankruptcy Court deny the objection.

91. As claimant sees it, in essence, the debtors and, in particular, *The Baltimore Sun* – a symbol of truth fundamentally charged with holding power accountable – have asked the Bankruptcy Court to be freed from having to answer for the credible possibility that *The Sun* engaged in an immensely malicious and harmful deception that protected power. That deception not only savaged a family and denied the family prospects for the future, but also concealed the credible possibility of over two decades of egregious official and professional misconduct that may have left the family in a state of complete ruin and intense suffering - even as the debtors enjoyed a year and a half of protection. To date, neither the debtors nor *The Sun* have denied claimant's allegations.

92. As claimant sees it, in essence, debtors have argued that the Bankruptcy Court should relieve them of having to account for claimant's allegations because, they allege, claimant violated, by several months, the statute of limitations for a defamation complaint and did not provide sufficient detail in the complaint.

93. Even if debtors were correct – which claimant does not believe is the case –, in view of the gravity of the circumstances, claimant could not imagine a less compelling argument for erasing claimant's claim. A review of the history of the case indicates that claimant complied with the statute of limitations for a defamation complaint. Additionally, claimant's complaint met the

Response to Objection to Claim No. 3697: Case No. 08-13141(KJC)
Page 42
April 7, 2010

requirements set forth for an initial complaint. Claimant is now amending his complaint to

include specific instances of his charges and to provide information such as specifics as to the

basis for the redress he seeks. Claimant expects to continue provide further details through

amendments and the like as his case evolves.

Robert Henke

4104 Hearthside Drive, Apt. # 101

Wilmington, North Carolina    28412

919-610-5865;    hroberthenke@AOL.com

## Appendix A: Debtors' Misstatements

**94.** Debtors made errors of substance in the objection. In this section, claimant addresses those that are not addressed in context in the main body. Claimant brings these errors to the attention of the Bankruptcy Court so that the record of the case is accurate.

**95.** Debtors' stated under <u>INTRODUCTION, p.</u> 2, "As far as the Debtors can discern, the Henke Claim is predicated on Mr. Henke's apparent belief that The Johns Hopkins University ... somehow 'pressured' the Sun to publish an allegedly defamatory article about him in 2007 to 'protect' the University's 'lengthy, intense, and well-shielded campaign' to drive him out of his profession ..." Actually, claimant did not identify the campaign as being the University's; he doesn't know this to be the case as the campaign has been "well-shielded" and there are other possibilities. Regarding the University's pressuring of *The Sun*, claimant simply listed that as a last example of evidence that suggested that *The Sun's* apparent fabrication was intentional. And while it certainly seems the University applied pressure to *The Sun* over the article, claimant does not know as to what end and did not say. According to claimant's records, during a May 4, 2007 interview, claimant asked Mr. Dechter, the reporter of the article, whether or not he would get into trouble over the article. Mr. Dechter replied that the University's engineering (claimant believes) school said that you might want to think about writing the article. Mr. Dechter did *not* say that the University pressed him to write a defamatory article.

**96.** The debtors incorrectly state, on p. 2 of the objection, that "....... Mr. Henke describes a series of unfortunate events that occurred prior to the time the article was published that in no

way implicate the Sun." In the complaint (Exhibit B), claimant stated "Before the article, my [claimant's] family, me, and my firm had already suffered immeasurable harm, evidence suggests, as a direct or indirect result of the campaign." Claimant then listed that harm, the "series of unfortunate events." Earlier in the complaint, claimant had stated "I [claimant] believe the campaign has inflicted unthinkable harm on my family, me, and my firm. I believe *The Sun*, which is close to the University, took part in the campaign ........" That is, claimant did link past harm and *The Sun*.

97. At the bottom of the footnote on page 5 of the objection, debtors seem to have erred in stating that "The Sun has not been served in this case, and it has not filed any answer or dispositive pleading." As claimant brought out in para. 11, the apparent attorney for *The Sun* sent materials to the Circuit Court and claimant. This and the fact that the Circuit Court did not send to claimant a notice of a contemplated dismissal as it did for Mr. Dechter (see para. 18. and 19.) suggest that *The Sun* had been served a Writ of Summons. And, the attorney's mailings (Exhibit G) suggest *The Sun* did answer the complaint, but solely with bankruptcy matters.

## Appendix B: Draft Amendment to Narrative of Complaint

98. In order to improve claimant's prospects for justice, as allowed and even encouraged by Md. Rule 2-341, claimant is preparing an amendment to his complaint that strengthens the narrative. The amendment is not a concession of the inadequacy of the initial complaint; rather, it is a product of the natural evolution of the case. Claimant believes the changes to fall within the scope of the original complaint; that is, they provide greater detail or are explanatory but do not cover new ground. Claimant plans to replace the second and third paragraphs under Complaint

on the first page of the complaint (Exhibit B) with the following paragraphs in which the changes are shown in bold:

**98a.** The article appears to have been a material and well-crafted defamatory fabrication **that, when stripped to its essence, was little more than a cover-up of the possibility of professional and official misconduct.** Facts were created, facts were reshaped, and facts were omitted – **in concert and on a grand scale** – **to produce a compelling fiction. Below, I [claimant] list** evidence that suggests that the untruths and misrepresentations were reckless and deliberate. I believe the defamation is **only** the most recent of a string of injuries **inflicted on me and my firm and so, by extension, on my family,** in a **decades-long,** intense, and well-shielded campaign ("the campaign") committed to driving my firm and me from our profession. I believe the campaign grew from my tenure (1985-89) as a faculty member at The Johns Hopkins University ("the University"). My tenure was marked by several controversies and I was dismissed from the University. I believe the campaign has inflicted unthinkable harm on my family, me, and my firm.

**98b. I believe** *The Sun's* **intent with the article was to protect the campaign. During the time frame of the article, I was pressing heavily to have my circumstances investigated, objectively and completely. My hope was to have restored for my family and me, to the extent possible, all I believe that had been taken from us unjustly.**

**98c. In my quest for an investigation, I approached** *The Sun.* **I did so because I**

believed *The Sun*, which may have taken part in the campaign, could help me define its make-up. *The Sun* responded to my approach by saying it wished to write an article on my circumstances. I did not approach *The Sun* for an article. But, in the belief that a truthful and complete article could lead to the investigation I had sought and that *The Sun* would write such an article, I agreed to an article. In hindsight, I believe *The Sun's* intent with an article was to quash the possibility of an investigation. *The Sun* is close to the University and objective scrutiny, I believe, would have placed both in a dark light.

98d. The article protected the campaign, I believe, by attacking its victims – me, my family, and my firm's undertaking – while concealing the campaign's possible misdeeds. In essence, *The Sun*, I believe, guilefully remolded a story of wrongdoing into a broad attack that thoroughly, but illegitimately, discredited me, my firm's undertaking, and my family. For example, by creating and toying with facts, it appears *The Sun* manufactured both the prominent and defamatory theme of the article and concrete evidence for that theme. The seemingly invented theme falsely held that I was a reckless pioneer who admittedly was willing to and ultimately did harm his family for scientific glory. Not only did this fatally discredit me, it also displaced the far more credible possibility that my and my family's downfall may have been the doings of the campaign. *The Sun* further concealed this possibility by omitting, sanitizing, or otherwise altering – again, consistently and on a grand scale – the overwhelming evidence of this possibility.

98e. It goes without saying that the article harmed my reputation and prospects;

Response to Objection to Claim No. 3697: Case No. 08-13141(KJC)
Page 47
April 7, 2010

but, its main harm, I believe, was that it fully crippled my ability to draw the interest in investigating my circumstances that I had sought through, among other things, the article. And so the article met what I believe was its aim - to bury truth by obstructing my progress towards justice.

**98f. The contents of the article, the conduct of *The Sun* and the University, and the existence of motives suggest *The Sun's* lapses were intentional.** For example, *The Sun* gained my family's cooperation through false pretenses; *The Sun* violated our privacy; *The Sun* carried out an insincere facts check; and *The Sun* misrepresented the origin of the article. Additionally, *The Sun* appears to have been pressured by the University.