www.baltimoresun.com/news/nation/bal-
te.md.henke07oct07,0,1618962.story?coll=bal_tab01_layout

# baltimoresun.com

*Exhibits*

## A modern-day Ahab

**In pursuit of geologic immortality, inventor Robert Henke has sacrificed everything: comfort, career, family**

By Gadi Dechter

Sun reporter

October 7, 2007

APEX, N.C.

*Exhibit A*

*Article and letter to editor*



Find at Comfort Inn hotels.

Comfort INN    LEARN MORE →

In a small North Carolina garage are Robert Henke's two remaining worldly possessions: a slightly banged-up 1967 Lotus Elan sports car and something that resembles a slim, 6-foot torpedo suspended from an aluminum frame.

When he takes it out for the rare spin, the cherry-colored ragtop gets admiring looks from passers-by - though it is the metal cylinder that ought to grab the world's attention.

But nobody cares.

The product of more than $2 million and 25 years of development, the device might just be the holy grail of earthquake engineering: a probe that can accurately predict the way various soils will react in a major quake. It could prevent building collapses and save lives. If it works.

On that score, the geotechnical jury is still out, though belated recognition and its attendant rewards will offer scant comfort to Henke, 60, a former Johns Hopkins engineering professor and McDonogh School graduate who lives alone in a tiny one-bedroom apartment outside Raleigh filled with little more than dozens of cardboard file boxes for furniture.

If success ever comes for Henke, "I won't be breaking out the champagne," he says, managing a wobbly laugh. A short, reedy man with a frizzled gray ponytail, Henke peers at his invention with drooping eyes from behind oversized eyeglasses. He continues in a sandy, quavering voice. "The human cost has been too high. It hasn't been worth it."

American culture valorizes the uncompromising dreamers, single-minded in their pursuit of greatness, and delights when they are plucked from obscurity, as in the case of some recent MacArthur Foundation "genius" grantees. Robert Henke's monastic life is a testament to that ideal, but he is also, as a former boss says, a "Captain Ahab of our generation," willing to wreck everything - including his family - chasing a dream that has become an obsession.

"If you to look at the life of a another man who fits every description of my father, but who made it, you will probably find they made just as many bad decisions, and are as singularly self-involved and selfish," says Henke's eldest son, Michael, 33, with a hint of bitterness. "When they make it, they're off the hook."

By Henke's accounting, the probe has cost him $1 million in personal investment and an aborted academic career that began promisingly at Hopkins in 1985 and ended five years later. In 2002, he lost his Lutherville home. His wife and research partner, Wanda, left him soon afterward.

Their 17-year-old son, Kevin, was hospitalized for clinical depression in middle school and recently faced a stint in adult prison, partly the consequence, the teenager and his mother say, of an intermittently neglectful and overbearing father who demanded of his family the same ruthless hunt for monumental accomplishment.

At an age when former university colleagues are contemplating comfortable retirements, Henke is unemployed and living off a meager allowance from his ailing mother in Potomac. He has no job prospects, no savings, few friends and little hope, he admits, of a happy ending.

Still, Henke works obsessively on the soil probe, shunning even in penury any gainful employment that would distract him from his research. It is no longer a labor of love - it never really was - but an increasingly desperate bid to make a privileged upbringing amount to something more than a cautionary tale about excessive ambition and idealism.

With his absent-minded-professor fashion sense (polo shirt neatly tucked into sweat pants), oddly winning personality quirks (giggling fits, mild obsessive-compulsive disorder) and mad-scientist digs, Robert Henke is the very picture of the eccentric genius archetype - like mathematicians John Nash or Kurt Goedel - whose human failings history forgives because of their larger contributions to humanity.

But Henke knows all too well that history takes note of marginal lives such as his only when their accomplishments are as brilliant as their promise. In the absence of ultimate triumph, posterity might well remember Henke, if it memorializes him at all, as the ghostly shadow of genius.

And so he works.

Already has a job
At 6:45 a.m. on a Friday in early May, Henke leaves his apartment for his daily run, shielded beneath a visor and old transparent poncho bandaged by electrical tape. Hobbled by a recent knee injury, he fixes his gaunt face into a determined grimace, clenches his fists and shuffles off, merging minutes later onto the shoulder of a busy highway.

His seven-mile jogging route is not picturesque, but then, Henke runs for principle, not pleasure. "I'm not an exercise enthusiast," he says. "It makes me feel sick."

But to abandon the morning routine at this point would carry too much symbolic significance for a man whose main accomplishment so far has been a refusal to quit.

At Apex High School, where son Kevin is a sophomore, Henke turns back, jogging 3.5 miles against the tide of morning commuters on their way to jobs.

With a doctorate in civil engineering from the University of Michigan, Henke could probably get decent work somewhere here in North Carolina's Research Triangle, a metropolitan thicket of large universities and private research-and-development laboratories.

But, he points out, he already has a job.

By 8:00 a.m., he is back at his makeshift desk: a plank of wood suspended between file boxes. With no more money to conduct costly site experiments on his soil probe - the last meager grant, from the Federal Highway Administration, was discontinued for budgetary reasons in 2004 - Henke is reduced to making theoretical design improvements to his device, such as replacing embedded electronics with a sophisticated wireless system.

"He refuses to work under his level," says Kevin with a mixture of admiration and pity. "My father said, 'F--- furniture, I'll put a whole bunch of boxes together and make a couch.' And decided he would keep on going after it until he can't breathe anymore."

Not that Henke would refuse the right sort of job, one that would allow him to continue his research in more suitable surroundings. He still applies regularly for faculty positions at research universities, such as the one he lost at Hopkins in 1989 for failing to publish a single research paper in five years.



With wife Wanda as co-author, Henke has since published several papers in peer-reviewed journals and has sent out scores of queries to universities.

Not a single bite.

That unpromising track record hasn't prompted Henke from lowering his sights to, say, adjunct work as a community college lecturer. "The problem with that idea," he explains, "is it would take me away from groundbreaking research, and it's not clear to me why I should have to do that."

His family says the reasons are obvious: to help his wife - herself an engineer who recently worked in a dry-cleaning shop and is now a high school teacher - put food on the table. To give comfort to his 88-year-old mother, distraught that her 60-year-old son is still living off her.

But that is precisely why Henke cannot in good conscience make concessions to practicality. Though paid employment "would give my family relief," he says, "in the longer term it would deprive them of something we've all sacrificed for."

The sacrifice has been for a rather esoteric branch of civil engineering not likely to capture the popular imagination even under happier circumstances. The stainless steel tube in Henke's garage doesn't predict earthquakes, after all, just how various soils will behave in quakes of different magnitudes.

Still, a quantum leap is a quantum leap.

That's what the Henke soil probe - if it works - represents for geotechnical engineering, according to University of Washington professor Steven L. Kramer, an expert on the branch of civil engineering concerned with the behavior of earth materials.

The device Henke conceived at Houston's Exxon Production Research Corp. in the early 1980s and began to build at Hopkins is designed to predict how soil "deforms" in earthquake-like conditions. He was so convinced of the probe's possibilities that he persuaded Exxon to allow him to take the patent with him. It was his boss at Exxon, Jack Templeton, who likens him to Herman Melville's Captain Ahab because of his messianic pursuit of his invention.

Depending on their density and other characteristics, some soils can well withstand the compression and shear waves that travel underground in a major seismic event. Others transform into sandy liquids, providing no support to structures built atop the soil.

Precise knowledge of how the earth will respond to major disturbances would be prized by engineers designing sensitive projects such as power plants and off-shore oil-drilling platforms.

"I'm working on a consulting project now involving a nuclear waste treatment facility," Kramer says. "This kind of information ... would be enormously useful," potentially saving millions of dollars in earthquake-resistant construction.

Current technology does allow fairly sophisticated soil tests to be conducted in laboratories, but not at the actual site of interest. Because lab-tested soil samples are necessarily disturbed in the

process of gathering and transporting them to labs, the results of laboratory tests are subject to major error.

An on-site - or in situ - test is an exceedingly difficult nut to crack, according to experts, and no researchers have been able to devise a method that meets civil engineers' standards of predictive accuracy, ease of use and cost effectiveness, according to Kenneth Stokoe, a civil engineer at the University of Texas who has been working on competing technology.

Henke compares his entrepreneurial drive to those of Apple Computer founders Steve Jobs and Steve Wozniak, who started their company in a Silicon Valley home. But an in situ soil test, requiring millions of dollars of research and development, is not the sort of invention readily suited to basement development.

"You don't have enough money for the long haul," Stokoe says. "Technology like this takes several decades to be accepted. This is not simple stuff."

Striking out on one's own, as Henke did, without the backing of a major institution, says Stokoe, "is the dumbest thing you could do."

It didn't seem like such a dumb idea in 1989.

Henke had just lost his job at Hopkins for failing to heed his department chair's recommendation that the engineer diversify his research and get his name on peer-reviewed publications.

"Publishing is very important ... to disseminate the results of your research and to become respected by your peers," civil engineering chairman Ross B. Corotis wrote Henke two years before his dismissal, according to Henke's transcription of the letter. "I know major research efforts involving extensive laboratory experimentation you are doing does not lend itself easily to this."

Henke ignored the publish-or-perish warning, believing that the university would appreciate the "cancer-curing" potential of his probe project. "I thought of myself as really important at that time," he says.

More troubling, federal grant dollars that had flowed in regularly during his first three years at Homewood suddenly slowed to a trickle.

Convinced that grant-application rejections were linked to personal animus within his department, Henke began filing formal objections with the National Science Foundation - an impolitic move that would foreshadow later lawsuits against the federal hand that feeds the nation's scientific research.

In the meantime, he kept his worries a secret from his students, many of whom recall him as an unusually dedicated and patient instructor.

"He was one of my favorite professors," says Tim Rosenzweig, chief financial officer for a Massachusetts wind power company who worked in Henke's lab as an undergraduate. "He definitely had a passion for what he was doing."



Then a junior, Rosenzweig remembers the spring day in 1989 when Henke told him his contract would not be renewed. "He was very much an adult about it," Rosenzweig says. "He said it would be a growing period."

But in his heart, Henke was devastated at what he calls "the seismic shift" in his life. "When I left Johns Hopkins," he says, "I felt the world was over for me. ... I don't know if I did anything right afterward."

Point of no return
It was his Christopher Columbus moment.

Over days of conversation this spring, Henke repeatedly turned to the Italian explorer's discovery of America as an analogue to his own journey.

"Columbus charted his course to the New World," Henke says, "and when he reached a certain point, he was halfway out of his supplies."

Just like Columbus at the point of no return, Henke chose to stay the course, despite the risk to his own crew, his family. "In many ways, I think it was irresponsible." But, he points out, "Columbus came out a winner."

In the beginning, Henke felt the wind at his back. He had a spacious house in Lutherville - a gift from his mother that served as laboratory and offices for his start-up company, Dynamic In Situ Geotechnical Testing Inc.

In his wife, Wanda, he had a devoted partner, who in addition to being an engineer also knew how to manage the business, coordinate projects with contractors and handle money without having to put on gloves. "I was Robert's buffer to the world," she says.

The timing of their risky enterprise seemed auspicious. The 1989 earthquake in San Francisco had killed more than 60 people and caused massive infrastructure collapse, giving rise to government interest in earthquake research.

The Henkes figured all they needed to do was a series of tests to confirm the probe's accuracy and publish their findings. Soon afterward, engineering firms or governments would come calling, and they would have a tidy income from the licensing of their technology.

Instead, the Henkes were "rejected left and right" for grants, Robert says, and he was reduced to asking his mother for money to pay the bills.

A retired doctor who profited from real estate investments, Maria Benzinger would end up pouring about $1 million into supporting her son's mission, Robert Henke says.

"It was pretty weird," Kevin Henke says. "The whole basement was this laboratory. The walls had plastic on them, and they always had a lot of high-tech equipment around. And the probe would always be sitting on this table."



Kevin recalls a tumultuous household: "There were always money problems, everybody was mad, the family was fighting all the time."

By 1994, Robert and Wanda were convinced that their difficulty in winning grants was not because they had bitten off more science than any two people could chew - but because the fruits of their labor were being poisoned by rivals. That year, they sued the National Science Foundation and the National Institute of Standards and Technology.

The Henkes believed that competing scholars sitting on private peer-review panels were giving low marks to applications, but they needed to know the names of their reviewers to prove it. The lawsuit threatened the secret peer review process - a pillar of modern science - and developments were covered in Science magazine, The Sun and The Chronicle of Higher Education.

Ultimately a federal judge in Washington ruled against the Henkes in their suit against the NSF. In May 1994, the same judge ruled in their favor in the NIST case, ordering the agency to open its files, but that judgment was overturned on appeal.

Privately, Henke's colleagues say that the lawsuits were tantamount to professional suicide.

Henke's mounting social and professional isolation from the outside world led him to focus his energies inwardly. As the decade dragged on, the man who resented any impingement on his academic freedom at Hopkins began to exert at home a dictator's control, his children say.

"When you grow up without religion, someone must supplant God," Michael says. "And my father became that for me and ... I could not help but fear his wrath," he says. While the young Robert had found social refuge in clowning and cartoons, he rarely permitted his sons to traffic in popular culture. No movies, no video games, no television save the occasional videotaped History Channel documentary. Even books were suspect.

"If I spent too long reading, I was being lazy," Kevin says.

Michael, who maintains a deep love for his father, recalls having to read books in secret. "It was crazy," he says. "It was unbelievable, especially from someone as intelligent as my father, who reads a lot."

Concerned the boys would grow up shiftless, Henke forced them to wake early each day and submit to a grueling exercise regimen of running, sit-ups, push-ups and pull-ups.

When Michael tried to push back, he found his father as obstinate in his parenting style as he was with his research program. "The same characteristics that made him so unilaterally focused made him a bad listener," he says.

Over time, Kevin developed a hatred of the word "probe" and a fear of going to sleep at night. "I knew that I was that much closer to having to exercise again."

For Wanda, life at home was increasingly unbearable. Though she accepted Henke's unrelenting schedule, she was almost never rewarded with praise or affection. "I felt like I was totally worthless for a long time," she says.



She often thought about leaving him but couldn't tear herself away from the probe. "You have no idea how much I wanted to say, 'This is no good, let's stop.'"

But it was good. When they had the money to conduct site tests, the results were promising. Whenever they were so beaten down that going on seemed pointless, another small grant would trickle in - proof that other people believed, too.

And no matter what anyone else thought, Wanda's faith in her husband's genius never faltered, even when her love did. "This is a man who did something really special," she says, "and got knocked down for it."

Sweet but tough

Robert Henke was introduced to hard knocks at the McDonogh School in the mid-1960s, where he was a mediocre student and nicknamed "Hanky Do-Right," for his wont to act out scenes from the animated cartoon, Dudley Do-Right.

"He was a sweet person," says classmate Jeffrey Fountain, who played the villainous Snidley Whiplash to Henke's super-virtuous Canadian Mountie.

The pastoral Owings Mills campus was still being run as an all-boys, semi-military boarding school, with an emphasis on athletics and rank. Henke's childish preoccupations with model airplanes and his failure to achieve distinction in the classroom, drill or sport field relegated him to marginal status.

But even then, there were glimpses of the future engineer's propensity for self-sacrifice.

"When he was a junior, he decided that he was going to be a wrestler," says Fountain. "I think he wanted some respect." But Henke's only shot at making the team was in a lower weight class, so he embarked on a starvation diet.

"He dieted and dieted," Fountain recalls, "and he became this tough little guy. And everybody admired how tough he was and how hard he worked."

Dudley Ives, a standout wrestler at McDonogh, remembers Henke with some admiration. "Bob would challenge me, and occasionally he'd beat me," Ives says. "I learned to stay away from him. ... He just kept coming back, kept hammering."

Ives and Fountain remember Henke as "brainy" and introspective, a "quiet guy," Ives says, "but the wheels were turning, and when his time came, he had something to say and it was pretty profound."

But in Henke's own coming-of-age narrative, he was nothing more than a quitter. To this day, he resents his wrestling coaches at McDonogh for discouraging his diet, for counseling him to come to terms with his in-born physical disadvantages and accept being "average."

He graduated without concrete plans or aspirations and enrolled at North Carolina State, because "it was the only place that accepted me," he says.



His college career began no more auspiciously than his prep years. By the time he met his future wife three years later, he was a 21-year-old who had already failed out of college three times for low grades and spent much of his time playing poker and racing cars.

Wanda Kelly recognized Henke's potential for greatness even before he did. "He was just so different and so exciting," she says of their first encounter in 1968. "I just thought life with him would be an exciting journey."

She was 18, the valedictorian of nearby Apex High School, attending college with help from a scholarship she won in a beauty pageant. Wanda's roommate was dating one of Henke's fraternity brothers, so she agreed to a group date.

"He had dark hair that was kind of curly," she says. "I thought he was really good-looking."

She was intrigued by the shy boy's life growing up in boarding schools in New York, Cleveland and finally Baltimore, as his German-born mother moved from one hospital job to another.

He told Wanda about his stepfather Theodor H. Benzinger, a celebrated researcher at Bethesda's Naval Medical Research Institute who invented the ear thermometer. By the time he reached high school, Henke's mother was chief anesthesiologist at D.C. General, an accomplishment for a woman that seemed impossibly glamorous to Wanda, who grew up on a tobacco farm.

While Wanda worked on her studies, Henke was more interested in playing poker and racing his Lotus hard-top convertible, a gift from his mother. He taught her how to drive it on their first road trip up to Maryland several months later, to visit his parents.

She was cowed by the elegant house in Potomac, by the formality of having to dress for dinner. The courtship was quick. They met in October. By summer, Henke proposed, after winning in a poker game enough money for an engagement ring.

Wanda's parents opposed the marriage because of her age, but she was afraid of losing Henke. "I had this horrible fear that I would be an old maid."

After finally graduating with a mechanical engineering degree from N.C. State, Henke signed up for an Air Force officer's training course. Just two months later, Henke had arranged for a "self-initiated elimination" discharge and was back in North Carolina.

The reason, Robert and Wanda Henke agree: His bride had had an affair.

The reaction: Hanky Do-Rite became a serious man.

'Bottom of the heap'
The transformation was almost instantaneous. Back in North Carolina, with no skills, an unhappy young wife and no direction, Henke was gripped with an all-consuming fear.

"When I left the Air Force, I found myself with no credentials, no future, nothing, and I was afraid," he says. "Here I had gone 26 years and everyone else was dancing and doing fine, and I was at the bottom of the heap."



He re-enrolled at N.C. State as an undergraduate and completed a second bachelor's degree, this time in two years and with nearly straight A's.

He chose earthquake studies because he was "narrowly gifted in math" but was also attracted to the idea of working on research that would directly help people, he says.

After graduating, he stayed on in the department, earning a master's degree, and then transferred to the Ph.D. program at Michigan, which had one of the top earthquake-research specialties in the country.

For his doctoral thesis, he developed the mathematical formula that would become the brain of his soil probe, translating the numerical data measured by accelerometers in the tube into predictive data.

The fruits of his dissertation research are still in use in the profession today. "I'm writing a paper that's based on some of the stuff that Bob and some of his advisers did back then," says Richard Ray, a civil engineer at the University of South Carolina.

It was a remarkable about-face for a formerly dissolute young man who developed an almost religious faith in his own willpower.

But it could not sustain his family. Things finally fell apart at the end of the 1990s. In 1997, the Henkes won a lucrative contract with the Japanese Geo-Research Institute in Osaka, to build a soil probe for the earthquake-riddled island nation.

The project was supposed to last one year. It dragged on for four. Though the Japanese paid the Henke's $450,000 over the years, Henke and Wanda say they funneled all the money into development rather than paying themselves a salary - in the hope that a licensing deal would be the payoff.

In the meantime, they mortgaged their Lutherville home. When the Geo-Research Institute decided against using the probe, the Henkes were left destitute. They sold the house and moved to an apartment near Mount Washington.

To make matters worse, their son Kevin was diagnosed with depression and hospitalized three times while at the Gilman School, and had to leave school before the end of seventh grade.

That was Wanda's breaking point. She asked Henke to leave. A year later, when Kevin started running with a rough crowd of kids from Pikesville Middle School, Wanda decided to move to North Carolina, to be near her parents. The couple remain separated but have not divorced.

"I wish he had chosen us," Michael says now. "I wish he had given up his dreams for us."

Alone and broke, Henke moved back in with his recently widowed mother in Potomac and continued to work on the probe. He ignored Maria Benziger's pleas that he give up the probe project and get a job.

His only relief, he says, were Sunday drives in the Lotus, when he allowed his mind to wander and think about "anything other than the probe."

But when Kevin was arrested in North Carolina on a concealed-weapon charge, Henke felt his family needed him around. In 2004, he moved to Apex and now tries to spend as much time with his son as Kevin will allow. Sometimes that's only for a few hours a week.

"I got love for him," Kevin says. "But I can't be around him all the time."

Failure's lessons

Robert Henke has no retirement savings or much money invested in Social Security. When his mother dies, her Potomac property will go to Henke's stepsister, who lives in South Africa.

He tries not to dwell on such things. "It's a frightening thing," he says. "I can't think about it because it would be paralyzing."

In any event, Henke is not, by nature, self-reflective. "I'm entirely focused on the future," he says. "I try to think about how I'm going to get out of these circumstances. I don't reflect."

But he has taken to sending darkly worded and lengthy missives to various politicians and to Johns Hopkins officials, demanding the university investigate and acknowledge its responsibility for his downfall.

"No one has this much bad luck," Henke says. The university has declined to investigate his claims.

Henke knows that it's a "tough story to swallow" and that its airing might only cement his reputation as unsuitable for mainstream work. But he sees no other option than to lay bare the facts of his life in the hopes that some "angel" will come to his rescue.

In the meantime, he tinkers with the probe. He appears remarkably cheerful for a man who has weathered so much rejection and loss. He has sad eyes but an easy smile.

When pressed to contemplate the prospect that the soil probe will die with him, Henke admits in a rare moment of sustained melancholy that, more than defeat, he fears the lessons of his failure:

"Play the system. Do what you're told. Be average," he says. "Be careful when you strive for high goals." He removes his enormous glasses and stares at his sweat pants. "Diversify in life so if you do lose on one count, you haven't lost it all."

Henke gathers his features into an apologetic smile. "I wish I could come up with something more uplifting."

His youngest son already has.

"He's a proud person, and I think he'll be happy that he held onto his ideals," Kevin says. "I draw from his values, and a lot of them are mine. I don't quit. That's something that's been ingrained in me. My mother lost her whole life to that, but for me, it's all I've ever known."

Kevin says he has noticed recent changes in Henke's behavior. "He's become a lot more understanding."

Henke's capacity for empathy was recently put to the test. In May, Kevin faced a hearing in Wake County Superior Court that could have sent him to prison for several months.

Kevin's case manager asked Judge Ronald L. Stephens to imprison the boy - already on probation for a second arrest - with adult murderers and thieves after an unannounced search of his room unearthed a pellet-gun and a personal journal containing intimate thoughts that authorities found disturbing.

"The stuff I've read in this journal frightened me," Stephens said from the bench.

Kevin, who has the words "Thug Life" tattooed across his chest, in homage to murdered Baltimore rapper Tupac Shakur, said later that his writings were mainly just hip-hop lyrics.

"I'm not going to revoke [the probation]," Stephens ruled, because the pellet-gun is not technically considered a firearm. "I feel like my hands are tied on this one."

A rail-thin teenager with an awkward page-boy haircut, Kevin turned back to his parents, sitting together in the courtroom, and grinned.

"But let me tell you," the judge continued angrily, "there's enough here in my mind to have you committed." Stephens paged through Kevin's journal, excoriating the boy for his "deviant thoughts and crazy thoughts and weird thoughts."

Robert Henke's mouth twisted in outrage as the judge railed against his son for several minutes more. Wanda repeatedly poked him to keep him silent.

Moments later, on the steps outside the courtroom, Henke awkwardly reached out to his son. "Let me give you a hug," he said.

Such gestures have always embarrassed Henke, and he is clearly unpracticed at them. But he's trying. "I love the kid," he says later. It's a declaration he very rarely makes to his own sons, though Kevin often says it to him.

"Every once in a while I'll give in and say it," Henke says with a laugh.

He is reluctant to express love but admits he is willing to hurt those he loves for a long shot at glory. Perhaps that is why Wanda Henke's summary of her husband is ultimately so uncharitable.

"He would starve" for the soil probe, she says. "Whether or not he would let his family starve, I don't know."

It's a question that has been troubling Henke in the months since Wanda posed it.

In June, he interviewed for a position with the federal Nuclear Regulatory Commission in Rockville. The job is to evaluate the earthquake-readiness of U.S. nuclear power plants, and would pay a salary over $90,000, he says.

"We've come to this question about whether I'd let my family starve to achieve my goals," he says with a hint of reluctance. "I guess this is the answer to that. I would be willing to give up the research in order to have a future that I think is respectable and that allows me to contribute to my family."

Three months later, he has not heard back about the job. Such positions become available only rarely, Henke says, but he would consider similar opportunities, provided they meet his requirements.

In the meantime, he works.

gadi.dechter@baltsun.com

Copyright © 2007, The Baltimore Sun

## Soil pioneer leaves but a shabby legacy

I WAS SAD AFTER READING the story of Robert Henke and his soil probe ("A modern-day Ahab," Oct. 7).

Here's a gifted man whose brilliance is overshadowed by his selfishness.

It's too bad that Mr. Henke's legacy will be a shattered, dysfunctional family.

**LARRY BONANDER**
*Timonium*

**e-mail us**
letters@baltsun.com

**fax us**
410-332-6977

**Dynamic In Situ Geotechnical Testing**
725 Cameron Woods Drive
Apex, North Carolina 27523

Phone: (919) 303-5801
E-Mail: hroberthenke@aol.com

*Exhibit B*
*Original complaint but*
*with Circuit Court*
*stamp. Also, postal*
*record.*

October 3, 2008

Circuit Court for Baltimore City
Attention: Room 462
111 North Calvert Street
Baltimore, Maryland 21202

Subject: Defamation Complaint

Herein, I, Robert Henke, present a complaint I have against a newspaper, *The Baltimore Sun* ("*The Sun*") and a *Sun* reporter, Mr. Gadi Dechter. I am not an attorney; however, I am planning to represent myself until I obtain appropriate representation. I am following procedures described on October 2, 2008 by staff of the Circuit Court for Baltimore City. In the following sections, I first summarize my complaint. Then, I summarize the harm to my firm and me and the resulting harm to my family.

## Complaint

My complaint stems from a Sunday front page news article ("the article") published by *The Sun* on October 7, 2007. The article was entitled "A modern-day Ahab" and was written by Mr. Dechter. The article covered experiences of my small firm in bringing a new earthquake engineering technology to practice and effects of the undertaking on my family. My complaint follows.

The article appears to have been a material and well-crafted defamatory fabrication. Facts were created, facts were reshaped, and facts were omitted – on a large scale. For example, both the prominent theme of the article and compelling evidence for that theme were untrue. Evidence suggests that the untruths and misrepresentations were reckless and deliberate. I believe the defamation is the most recent of a string of injuries in a lengthy, intense, and well-shielded campaign ("the campaign") committed to driving my firm and me from our profession. I believe the campaign grew from my tenure (1985-89) as a faculty member at The Johns Hopkins University ("the University"). My tenure was marked by several controversies and I was dismissed from the University. I believe the campaign has inflicted unthinkable harm on my family, me, and my firm. I believe *The Sun*, which is close to the University, took part in the campaign and the article was intended to protect the campaign. Essentially, it appears that *The Sun* concealed the very real possibility of professional misconduct and maligned the victims. I believe *The Sun's* intent was to discourage further scrutiny of the matter; such scrutiny may have placed the University in an unfavorable light. I believe the article will do little more than further obstruct progress towards justice for my firm and me and, therefore, also for my family.

Much evidence suggests *The Sun's* lapses were intentional. For example, *The Sun* gained my family's cooperation through false pretenses; *The Sun* violated our privacy; *The Sun* carried out an insincere facts check; and *The Sun* misrepresented the origin of the article. Additionally, *The Sun* appears to have been pressured by the University.

Complaint – Circuit Court for Baltimore City
Page 2
October 3, 2008

## Damages

The article has harmed my firm's and my well-being, prospects, and standing and, so, those of my family and has obstructed our progress toward justice.

Before the article, my family, me, and my firm had already suffered immeasurable harm, evidence suggests, as a direct or indirect result of the campaign. Our ability to function as a family was greatly disrupted; we lost our home; my younger son, as a youth, experienced serious difficulties and now faces the possibility of a prison term; my older son experienced serious difficulties and we were not able to provide him the help that a family normally could; our firm – whose technology has shown great promise for contributing significantly to public safety - lies in ruins and I have been unable to progress with that technology; we suffered huge firm-related financial losses including our personal investment in our technology (roughly $1M) and patent-related losses; we were driven from our profession and have been denied the privilege of continuing to contribute to that profession; I have been blacklisted, it seems, and have been unable to secure positions for which I believe I am strongly qualified; I have no income or security; our professional, financial, and social standings have been blackened greatly; my wife and son have been subjected to immense legal indignities; we have endured great mental anguish; our health has suffered; and our relationships with our parents have been strained.

*The Sun's* article only intensified our plight. By obstructing progress towards a resolution to the matter, *The Sun* and any of its accomplices behind the article have caused my firm and me and, so, my family, to be continued to be deprived of justice. In turn, our well-being, prospects, and standing continue to deteriorate.

My request is driven by intangibles and my deep belief that the defamation is only the most recent expression of a long-standing retaliatory campaign. On the basis of the extraordinary levels of malice and recklessness to which I believe my firm and me and, so, my family have fallen victim; the duration and relentlessness of the campaign against us; and the irreversible harm to my family, my firm, and me, I am requesting a sum of $100M.

## Conclusion

I greatly appreciate your efforts in processing my complaint. As instructed, I have enclosed a check for the filing fee of $105.00 and have enclosed a self-addressed envelope. I will be sending a copy of this letter to Mr. Timothy E. Ryan; Publisher, President, and Chief Executive Officer; *The Baltimore Sun*; 501 North Calvert Street; Baltimore, Maryland; 21278. Please do not hesitate to contact me if you have any questions.

Sincerely,

Robert Henke

Cc: Mr. Timothy E. Ryan



UNITED STATES
POSTAL SERVICE®

Home | Help

Track & Confirm

# Track & Confirm

## Search Results

Label/Receipt Number: **2301 3460 0001 8065 5686**
Status: **Delivered**

Your item was delivered at 11:33 AM on October 6, 2008 in
BALTIMORE, MD 21202 to CIRCUIT CT . The item was signed for by T
LANE.

( Additional Details > )    ( Return to USPS.com Home > )

Track & Confirm

Enter Label/Receipt Number.

## Notification Options

**Track & Confirm by email**

Get current event information or updates for your item sent to you or others by email.    ( Go > )

**Proof of Delivery**

Verify who signed for your item by email, fax, or mail.    ( Go > )

---

Site Map    Contact Us    Forms    Gov't Services    Jobs    Privacy Policy    Terms of Use    National & Premier Accounts

Copyright© 1999-2007 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA

---

### U.S. Postal Service Signature Confirmation Receipt

Postage and Signature Confirmation fees must be paid before mailing.

Article Sent To: (To be completed by mailer)

(Please Print Clearly)

*Cou~*

SIGNATURE CONFIRMATION NUMBER:

2301 3460 0001 8065 5686

Waiver of Signature    ☐ YES    ☐ NO

Postmark
Here

**POSTAL CUSTOMER:**
Keep this receipt. For inquiries:
Access internet web site at
www.usps.com
or call 1-800-222-1811

CHECK ONE (POSTAL USE ONLY)

☐ Priority Mail®
☐ Package Services

PS Form 153, July 2001                    (See Reverse)

## Circuit Court for Baltimore City - Civil Division
### Frank M. Conaway, Clerk
### 111 North Calvert Street, Room 462
### Baltimore, Maryland 21202
### Phone: 410-333-3722

*Exhibit C*

*Reply from Circuit Court.*

_____

_____

_____

Case #: **24-C-** _____

The enclosed papers are being returned for the following reason(s):

_____ Filing Fee/Open Costs of $ _____ required. (Personal checks not accepted.)

_____ You must attach to your pleading or paper a certificate of service which states that you have mailed or hand-delivered a copy of your pleading or paper to all parties not in default or their attorney(s). See Md. Rule 1-321. (Form enclosed.)

_____ Sent to wrong court/Case number missing/No records found

_____ Does not comply with Md. Rule 2-401(d)(2) regarding service of discovery material.

_____ The Information Report cannot be used in place of an Answer to the Complaint.

_____ Signature required

___✓___ Other: *You must give us the name and addresses of the parties you are filing suit against so that the summons can be processed for service.*

Date mailed: ___**10/8/08**___

*D. Bailey*

*B.X Bowman*
Management Signature

ROBERT HENKE
725 Cameron Woods Dr
Apex, NC 27523

66-21/530
BRANCH 18138

Oct 3, 2008 DATE

PAY TO THE ORDER OF Circuit Court for Baltimore City $ 105.00

—One hundred and five and 00/100 — DOLLARS

WACHOVIA
Wachovia Bank, N.A.
wachovia.com

Robert Henke

FOR Complaint fee

⑈053000219⑈ 1010143576 1761⑈ 1233

Circuit
Attentio
111 No
Baltimo

---

**Subject: Defamation Complaint**

Herein, I, Robert Henke, present a complaint I have against a newspaper, *The Baltimore Sun* ("*The Sun*") and a *Sun* reporter, Mr. Gadi Dechter. I am not an attorney; however, I am planning to represent myself until I obtain appropriate representation. I am following procedures described on October 2, 2008 by staff of the Circuit Court for Baltimore City. In the following sections, I first summarize my complaint. Then, I summarize the harm to my firm and me and the resulting harm to my family.

## Complaint

My complaint stems from a Sunday front page news article ("the article") published by *The Sun* on October 7, 2007. The article was entitled "A modern-day Ahab" and was written by Mr. Dechter. The article covered experiences of my small firm in bringing a new earthquake engineering technology to practice and effects of the undertaking on my family. My complaint follows.

The article appears to have been a material and well-crafted defamatory fabrication. Facts were created, facts were reshaped, and facts were omitted – on a large scale. For example, both the prominent theme of the article and compelling evidence for that theme were untrue. Evidence suggests that the untruths and misrepresentations were reckless and deliberate. I believe the defamation is the most recent of a string of injuries in a lengthy, intense, and well-shielded campaign ("the campaign") committed to driving my firm and me from our profession. I believe the campaign grew from my tenure (1985-89) as a faculty member at The Johns Hopkins University ("the University"). My tenure was marked by several controversies and I was dismissed from the University. I believe the campaign has inflicted unthinkable harm on my family, me, and my firm. I believe *The Sun*, which is close to the University, took part in the campaign and the article was intended to protect the campaign. Essentially, it appears that *The Sun* concealed the very real possibility of professional misconduct and maligned the victims. I believe *The Sun's* intent was to discourage further scrutiny of the matter; such scrutiny may have placed the University in an unfavorable light. I believe the article will do little more than further obstruct progress towards justice for my firm and me and, therefore, also for my family.

Much evidence suggests *The Sun's* lapses were intentional. For example, *The Sun* gained my family's cooperation through false pretenses; *The Sun* violated our privacy; *The Sun* carried out an insincere facts check; and *The Sun* misrepresented the origin of the article. Additionally, *The Sun* appears to have been pressured by the University.

Complaint – Circuit Court for Baltimore City
Page 2
October 3, 2008

## Damages

The article has harmed my firm's and my well-being, prospects, and standing and, so, those of my family and has obstructed our progress toward justice.

Before the article, my family, me, and my firm had already suffered immeasurable harm, evidence suggests, as a direct or indirect result of the campaign. Our ability to function as a family was greatly disrupted; we lost our home; my younger son, as a youth, experienced serious difficulties and now faces the possibility of a prison term; my older son experienced serious difficulties and we were not able to provide him the help that a family normally could; our firm – whose technology has shown great promise for contributing significantly to public safety - lies in ruins and I have been unable to progress with that technology; we suffered huge firm-related financial losses including our personal investment in our technology (roughly $1M) and patent-related losses; we were driven from our profession and have been denied the privilege of continuing to contribute to that profession; I have been blacklisted, it seems, and have been unable to secure positions for which I believe I am strongly qualified; I have no income or security; our professional, financial, and social standings have been blackened greatly; my wife and son have been subjected to immense legal indignities; we have endured great mental anguish; our health has suffered; and our relationships with our parents have been strained.

*The Sun's* article only intensified our plight. By obstructing progress towards a resolution to the matter, *The Sun* and any of its accomplices behind the article have caused my firm and me and, so, my family, to be continued to be deprived of justice. In turn, our well-being, prospects, and standing continue to deteriorate.

My request is driven by intangibles and my deep belief that the defamation is only the most recent expression of a long-standing retaliatory campaign. On the basis of the extraordinary levels of malice and recklessness to which I believe my firm and me and, so, my family have fallen victim; the duration and relentlessness of the campaign against us; and the irreversible harm to my family, my firm, and me, I am requesting a sum of $100M.

## Conclusion

I greatly appreciate your efforts in processing my complaint. As instructed, I have enclosed a check for the filing fee of $105.00 and have enclosed a self-addressed envelope. I will be sending a copy of this letter to Mr. Timothy E. Ryan; Publisher, President, and Chief Executive Officer; *The Baltimore Sun*; 501 North Calvert Street; Baltimore, Maryland; 21278. Please do not hesitate to contact me if you have any questions.

Sincerely,

Robert Henke

Cc: Mr. Timothy E. Ryan

**Dynamic In Situ Geotechnical Testing**
725 Cameron Woods Drive
Apex, North Carolina 27523

*Exhibit D*
*Letter plus*
*Postal record.*

Phone: (919) 303-5801
E-Mail: hroberthenke@aol.com

Circuit Court for Baltimore City – Civil Division                    October 13, 2008
Room 462 – Courthouse East
111 North Calvert Street
Baltimore, Maryland 21201

Subject: Defamation Complaint of October 3, 2008; Case # 24-C-

Dear Madam or Sir;

I am writing to provide the information requested of me in a form dated 10/8/08. The information is needed to allow you to begin processing the subject complaint.

The parties I am filing suit against are 1) *The Baltimore Sun* and 2) Mr. Gadi Dechter, *Sun* Reporter. The addresses follow:

> *The Baltimore Sun*
> Attention: Mr. Timothy E. Ryan
>                 Publisher, President, and Chief Executive Officer
> 501 North Calvert Street
> Baltimore, Maryland 21278

> Mr. Gadi Dechter
> *Sun* Reporter
> *The Baltimore Sun*
> 501 North Calvert Street
> Baltimore, Maryland 21278

Additionally, I have enclosed an official check for $105 to replace the personal check I sent for that amount along with my October 3, 2008 complaint. I have also enclosed a self addressed envelope in the event you need to contact me.

I greatly appreciate your efforts in processing my complaint. Please do not hesitate to contact me if you have any questions.

Sincerely,

Robert Henke

JSPS - Track & Confirm

 **UNITED STATES POSTAL SERVICE**®

Home | Help

Track & Confirm

# Track & Confirm

## Search Results

Label/Receipt Number: **2301 3460 0001 8065 5679**
Status: **Delivered**

Your item was delivered at 11:30 AM on October 17, 2008 in BALTIMORE, MD 21202 to CLERK BALT CITY CIR . The item was signed for by W ESTEP.

( Additional Details > )  ( Return to USPS.com Home > )

Track & Confirm

Enter Label/Receipt Number.

### Notification Options

**Track & Confirm by email**

Get current event information or updates for your item sent to you or others by email.  ( Go > )

**Proof of Delivery**

Verify who signed for your item by email, fax, or mail.  ( Go > )

Copyright© 1999-2007 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA        



# Dynamic In Situ Geotechnical Testing
## 725 Cameron Woods Drive
## Apex, North Carolina 27523

---

**Phone: (919) 303-5801**
**E-Mail: hroberthenke@aol.com**

December 30, 2008

Circuit Court for Baltimore City
Attention: Room 462
111 North Calvert Street
Baltimore, Maryland 21202

Exhibit E

Letter, enclosures, and postal record.

Subject: Defamation Complaint, Case # 24-C-

Attention: B.L. Bowman

I am writing to resubmit a defamation complaint I had first submitted in a letter dated October 3, 2008. I have enclosed various materials.

Regarding background, in response to my October 3, 2008 letter, the Circuit Court for Baltimore City ("the Court") sent to me a form, dated October 8, 2008, that assigned a case number (#24-C-), requested additional information, and, presumably, requested a payment form other than the personal check I had sent for the filing fee of $105.00. I provided the information requested in an October 13, 2008 letter and, with the letter, I included a money order for $105.00 and a self-addressed envelope. On December 18, 2008, I telephoned the Court to check on the status of my complaint. I was informed that there was no record of my complaint. I also found that the money order had not been cashed. I should note that both my letters were signature confirmation mailings. T. Lane signed for the October 3, 2008 letter on October 6, 2008 and W. Estep signed for the October 13, 2008 letter on October 17, 2008.

Regarding the enclosures, I have enclosed the resubmitted complaint. The complaint consists of a copy of my original complaint letter dated October 3, 2008 and a copy of my October 13, 2008 letter in which I provided to the Court the additional information requested by the Court in its October 8, 2008 form. Along with these, I have enclosed a self-addressed envelope and a new money order for the filing fee of $105.00.

Second, for your information and convenience, I have also enclosed copies of all previous correspondence and related documents. These include a copy of the material that was sent to me by the Court in response to my October 3, 2008 letter; copies of my receipts for the signature confirmation deliveries of my October 3 and October 13, 2008 letters; and a copy of the receipt for the original money order for $105.00 I sent with the October 13, 2008 letter. I am now having the original money order voided.

I greatly appreciate your efforts in processing my complaint. Please do not hesitate to contact me if you have any questions.

Sincerely,

Robert Henke

Enclosures

New Money order

**WESTERN UNION | MONEY ORDER**

THE BACK OF THIS DOCUMENT CONTAINS AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW

**INTEGRATED PAYMENT SYSTEMS, INC. - ISSUER**
*Englewood, Colorado*

\*\*\*PAY EXACTLY $105.00 **09-005740849**

82-40/1021

AGENT 320737 DATE 122708
TIME 1154 17 **105.00**
090057408498 LOCATION 001496   \*\*\*\*

\*\* PAY EXACTLY ONE HUNDRED FIVE DOLLARS AND NO CENTS \*\*\*\*\*\*

**PAY EXACTLY**
**PAY TO THE**
**ORDER OF** Circuit Court for Baltimore City        PAYMENT FOR/ACCT. #

PURCHASER'S ADDRESS

725 Cameron Woods Drive, Apex, N.C. 27523        *Robert Blunk*

PURCHASER SIGNER FOR DRAWER
PURCHASER BY SIGNING YOU AGREE TO THE TERMS ON THE REVERSE SIDE.

Western Union Money Order and Design is a service mark of Western Union Holdings, Inc./Payable at Wells Fargo Bank Grand Junction - Downtown, N.A., Grand Junction, Colorado

⑈:1021004001: 400900574084981⑈

---

**MONEY ORDER RECEIPT - NON NEGOTIABLE**

The Holidays are coming! If you can't be there in person give a
gift they'll be sure to appreciate. Cash the perfect gift. Money
Order!Money Transfer!&Bill Pay! Give the gift of Western Union.

AGT 320737 LOC 001496 DT 122708 $105.00 \*\*1HUNDRED5DOLLARS \*\*\*
AND NO CENTS\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Payable to _____

RETAIN THIS MONEY ORDER RECEIPT. IT MUST BE INCLUDED WITH ALL REFUND REQUESTS. BE SURE TO READ IMPORTANT
INFORMATION BELOW AND ON BACK.
PURCHASE AGREEMENT: You the purchaser agree that Integrated Payment Systems Inc. (IPS) need not stop payment on, or
replace, or refund a lost or stolen IPS Money Order unless (1) you fill in the face of the Money Order at the time of purchase,
and (2) you report the loss or theft to Integrated Payment Systems Inc. in writing immediately, and (3) You provide IPS with this
original Money Order receipt issued by Integrated Payment Systems Inc., Englewood, Colorado. For customer service, call
1-800-999-9660.

★ 0 9 0 0 5 7 4 0 8 4 9 ★



LOAD THIS DIRECTION, THIS SIDE UP

LOAD THIS DIRECTION, THIS SIDE UP

USA FIRST-CLASS FOREVER

2008

Robert Henke
725 Cameron Woods Drive
Apex, North Carolina 27523

Copies of all previous correspondence and related documents

# Circuit Court for Baltimore City - Civil Division
## Frank M. Conaway, Clerk
111 North Calvert Street, Room 462
Baltimore, Maryland 21202
Phone: 410-333-3722

_____

_____

_____

Case #: **24-C-** _____

The enclosed papers are being returned for the following reason(s):

_____ Filing Fee/Open Costs of $ _____ required. (Personal checks not accepted.)

_____ You must attach to your pleading or paper a certificate of service which states that you have mailed or hand-delivered a copy of your pleading or paper to all parties not in default or their attorney(s). See Md. Rule 1-321. (Form enclosed.)

_____ Sent to wrong court/Case number missing/No records found

_____ Does not comply with Md. Rule 2-401(d)(2) regarding service of discovery material.

_____ The Information Report cannot be used in place of an Answer to the Complaint.

_____ Signature required

___✓___ Other: _You must give us the name and addresses of the parties you are filing suit against so that the summons can be processed for service._

Date mailed: __10/8/08__

_N. Bailey_

_B. X. Bowman_
Management Signature

**Dynamic In Situ Geotechnical Testing**
725 Cameron Woods Drive
Apex, North Carolina 27523

Phone: (919) 303-5801
E-Mail: hroberthenke@aol.com

October 3, 2008

Circuit Court for Baltimore City
Attention: Room 462
111 North Calvert Street
Baltimore, Maryland 21202

Subject: Defamation Complaint

Herein, I, Robert Henke, present a complaint I have against a newspaper, *The Baltimore Sun* ("*The Sun*") and a *Sun* reporter, Mr. Gadi Dechter. I am not an attorney; however, I am planning to represent myself until I obtain appropriate representation. I am following procedures described on October 2, 2008 by staff of the Circuit Court for Baltimore City. In the following sections, I first summarize my complaint. Then, I summarize the harm to my firm and me and the resulting harm to my family.

## Complaint

My complaint stems from a Sunday front page news article ("the article") published by *The Sun* on October 7, 2007. The article was entitled "A modern-day Ahab" and was written by Mr. Dechter. The article covered experiences of my small firm in bringing a new earthquake engineering technology to practice and effects of the undertaking on my family. My complaint follows.

The article appears to have been a material and well-crafted defamatory fabrication. Facts were created, facts were reshaped, and facts were omitted – on a large scale. For example, both the prominent theme of the article and compelling evidence for that theme were untrue. Evidence suggests that the untruths and misrepresentations were reckless and deliberate. I believe the defamation is the most recent of a string of injuries in a lengthy, intense, and well-shielded campaign ("the campaign") committed to driving my firm and me from our profession. I believe the campaign grew from my tenure (1985-89) as a faculty member at The Johns Hopkins University ("the University"). My tenure was marked by several controversies and I was dismissed from the University. I believe the campaign has inflicted unthinkable harm on my family, me, and my firm. I believe *The Sun*, which is close to the University, took part in the campaign and the article was intended to protect the campaign. Essentially, it appears that *The Sun* concealed the very real possibility of professional misconduct and maligned the victims. I believe *The Sun's* intent was to discourage further scrutiny of the matter; such scrutiny may have placed the University in an unfavorable light. I believe the article will do little more than further obstruct progress towards justice for my firm and me and, therefore, also for my family.

Much evidence suggests *The Sun's* lapses were intentional. For example, *The Sun* gained my family's cooperation through false pretenses; *The Sun* violated our privacy; *The Sun* carried out an insincere facts check; and *The Sun* misrepresented the origin of the article. Additionally, *The Sun* appears to have been pressured by the University.

Complaint – Circuit Court for Baltimore City
Page 2
October 3, 2008

## Damages

The article has harmed my firm's and my well-being, prospects, and standing and, so, those of my family and has obstructed our progress toward justice.

Before the article, my family, me, and my firm had already suffered immeasurable harm, evidence suggests, as a direct or indirect result of the campaign. Our ability to function as a family was greatly disrupted; we lost our home; my younger son, as a youth, experienced serious difficulties and now faces the possibility of a prison term; my older son experienced serious difficulties and we were not able to provide him the help that a family normally could; our firm – whose technology has shown great promise for contributing significantly to public safety - lies in ruins and I have been unable to progress with that technology; we suffered huge firm-related financial losses including our personal investment in our technology (roughly $1M) and patent-related losses; we were driven from our profession and have been denied the privilege of continuing to contribute to that profession; I have been blacklisted, it seems, and have been unable to secure positions for which I believe I am strongly qualified; I have no income or security; our professional, financial, and social standings have been blackened greatly; my wife and son have been subjected to immense legal indignities; we have endured great mental anguish; our health has suffered; and our relationships with our parents have been strained.

*The Sun's* article only intensified our plight. By obstructing progress towards a resolution to the matter, *The Sun* and any of its accomplices behind the article have caused my firm and me and, so, my family, to be continued to be deprived of justice. In turn, our well-being, prospects, and standing continue to deteriorate.

My request is driven by intangibles and my deep belief that the defamation is only the most recent expression of a long-standing retaliatory campaign. On the basis of the extraordinary levels of malice and recklessness to which I believe my firm and me and, so, my family have fallen victim; the duration and relentlessness of the campaign against us; and the irreversible harm to my family, my firm, and me, I am requesting a sum of $100M.

## Conclusion

I greatly appreciate your efforts in processing my complaint. As instructed, I have enclosed a check for the filing fee of $105.00 and have enclosed a self-addressed envelope. I will be sending a copy of this letter to Mr. Timothy E. Ryan; Publisher, President, and Chief Executive Officer; *The Baltimore Sun*; 501 North Calvert Street; Baltimore, Maryland; 21278. Please do not hesitate to contact me if you have any questions.

Sincerely,

Robert Henke

Cc: Mr. Timothy E. Ryan

ROBERT HENKE
725 Cameron Woods Dr
Apex, NC 27523

1233

66-21/530
BRANCH 18138

PAY TO THE ORDER OF _Circuit Court For Baltimore City_    $ 105.00

Oct 3, 2008    DATE

— One hundred and five and 00/100 —    DOLLARS

WACHOVIA
Wachovia Bank, N.A.
wachovia.com

FOR _Complaint fee_

Robert Henke    VP

⑆053000219⑆ 1010143576 76⑈ 1233

Circui
Atten
111 N
Baltin

Subject: Defamation Complaint

Herein, I, Robert Henke, present a complaint I have against a newspaper, *The Baltimore Sun* ("*The Sun*") and a *Sun* reporter, Mr. Gadi Dechter. I am not an attorney; however, I am planning to represent myself until I obtain appropriate representation. I am following procedures described on October 2, 2008 by staff of the Circuit Court for Baltimore City. In the following sections, I first summarize my complaint. Then, I summarize the harm to my firm and me and the resulting harm to my family.

## Complaint

My complaint stems from a Sunday front page news article ("the article") published by *The Sun* on October 7, 2007. The article was entitled "A modern-day Ahab" and was written by Mr. Dechter. The article covered experiences of my small firm in bringing a new earthquake engineering technology to practice and effects of the undertaking on my family. My complaint follows.

The article appears to have been a material and well-crafted defamatory fabrication. Facts were created, facts were reshaped, and facts were omitted – on a large scale. For example, both the prominent theme of the article and compelling evidence for that theme were untrue. Evidence suggests that the untruths and misrepresentations were reckless and deliberate. I believe the defamation is the most recent of a string of injuries in a lengthy, intense, and well-shielded campaign ("the campaign") committed to driving my firm and me from our profession. I believe the campaign grew from my tenure (1985-89) as a faculty member at The Johns Hopkins University ("the University"). My tenure was marked by several controversies and I was dismissed from the University. I believe the campaign has inflicted unthinkable harm on my family, me, and my firm. I believe *The Sun*, which is close to the University, took part in the campaign and the article was intended to protect the campaign. Essentially, it appears that *The Sun* concealed the very real possibility of professional misconduct and maligned the victims. I believe *The Sun's* intent was to discourage further scrutiny of the matter; such scrutiny may have placed the University in an unfavorable light. I believe the article will do little more than further obstruct progress towards justice for my firm and me and, therefore, also for my family.

Much evidence suggests *The Sun's* lapses were intentional. For example, *The Sun* gained my family's cooperation through false pretenses; *The Sun* violated our privacy; *The Sun* carried out an insincere facts check; and *The Sun* misrepresented the origin of the article. Additionally, *The Sun* appears to have been pressured by the University.

Copy of receipt for original money order

LOAD THIS DIRECTION, THIS SIDE UP ←

LOAD THIS DIRECTION, THIS SIDE UP ↓

**MONEY ORDER RECEIPT - NON NEGOTIABLE**



Apply for your Western Union Prepaid Visa Card and the $9.95
Activation Fee will be waived No credit check Enroll today at
www.mycardplace.com/wuvisa2 Valid to: December 31, 2008

AGT 320737 LOC 001496 DT 101308 $105.00 ***1HUNDRED5DOLLARS ***
AND NO CENTS*********************************************

Payable to: _____
**RETAIN THIS MONEY ORDER RECEIPT. IT MUST BE INCLUDED WITH ALL REFUND REQUESTS. BE SURE TO READ IMPORTANT
INFORMATION BELOW AND ON BACK.** You the purchaser agree that Integrated Payment Systems Inc. (IPS) need not stop payment on, or
**PURCHASE AGREEMENT:** You the purchaser agree that Integrated Payment Systems Inc. (IPS) need not stop payment on, or
replace, or refund a lost or stolen IPS Money Order unless (1) you fill in the face of the Money Order at the time of purchase,
and (2) you report the loss or theft to Integrated Payment Systems Inc., in writing immediately, and (3) You provide IPS with this
original Money Order receipt issued by Integrated Payment Systems Inc., Englewood, Colorado. For customer service, call
1-800-999-9660.

✶ 0 8 9 5 4 1 8 7 7 3 5 ✶



USA FIRST-CLASS

CIRCUIT COURT FOR BALTIMORE CITY.
CIVIL DIVISION
Room 462 - Courthouse East
111 N. Calvert Street
Baltimore, Md., 21201

Robert Henke
725 Cameron Woods Drive
Apex, North Carolina
27523

27523&3725 R027

Resubmitted defamation complaint

**Dynamic In Situ Geotechnical Testing**
725 Cameron Woods Drive
Apex, North Carolina 27523

Phone: (919) 303-5801
E-Mail: hroberthenke@aol.com

*RECEIVED
08 OCT -7 PM 8: 22
BALTIMORE CITY
CIVIL DIVISION*

October 3, 2008

Circuit Court for Baltimore City
Attention: Room 462
111 North Calvert Street
Baltimore, Maryland 21202

Subject: Defamation Complaint

Herein, I, Robert Henke, present a complaint I have against a newspaper, *The Baltimore Sun* ("*The Sun*") and a *Sun* reporter, Mr. Gadi Dechter. I am not an attorney; however, I am planning to represent myself until I obtain appropriate representation. I am following procedures described on October 2, 2008 by staff of the Circuit Court for Baltimore City. In the following sections, I first summarize my complaint. Then, I summarize the harm to my firm and me and the resulting harm to my family.

## Complaint

My complaint stems from a Sunday front page news article ("the article") published by *The Sun* on October 7, 2007. The article was entitled "A modern-day Ahab" and was written by Mr. Dechter. The article covered experiences of my small firm in bringing a new earthquake engineering technology to practice and effects of the undertaking on my family. My complaint follows.

The article appears to have been a material and well-crafted defamatory fabrication. Facts were created, facts were reshaped, and facts were omitted – on a large scale. For example, both the prominent theme of the article and compelling evidence for that theme were untrue. Evidence suggests that the untruths and misrepresentations were reckless and deliberate. I believe the defamation is the most recent of a string of injuries in a lengthy, intense, and well-shielded campaign ("the campaign") committed to driving my firm and me from our profession. I believe the campaign grew from my tenure (1985-89) as a faculty member at The Johns Hopkins University ("the University"). My tenure was marked by several controversies and I was dismissed from the University. I believe the campaign has inflicted unthinkable harm on my family, me, and my firm. I believe *The Sun*, which is close to the University, took part in the campaign and the article was intended to protect the campaign. Essentially, it appears that *The Sun* concealed the very real possibility of professional misconduct and maligned the victims. I believe *The Sun's* intent was to discourage further scrutiny of the matter; such scrutiny may have placed the University in an unfavorable light. I believe the article will do little more than further obstruct progress towards justice for my firm and me and, therefore, also for my family.

Much evidence suggests *The Sun's* lapses were intentional. For example, *The Sun* gained my family's cooperation through false pretenses; *The Sun* violated our privacy; *The Sun* carried out an insincere facts check; and *The Sun* misrepresented the origin of the article. Additionally, *The Sun* appears to have been pressured by the University.

Complaint – Circuit Court for Baltimore City
Page 2
October 3, 2008

## Damages

The article has harmed my firm's and my well-being, prospects, and standing and, so, those of my family and has obstructed our progress toward justice.

Before the article, my family, me, and my firm had already suffered immeasurable harm, evidence suggests, as a direct or indirect result of the campaign. Our ability to function as a family was greatly disrupted; we lost our home; my younger son, as a youth, experienced serious difficulties and now faces the possibility of a prison term; my older son experienced serious difficulties and we were not able to provide him the help that a family normally could; our firm – whose technology has shown great promise for contributing significantly to public safety - lies in ruins and I have been unable to progress with that technology; we suffered huge firm-related financial losses including our personal investment in our technology (roughly $1M) and patent-related losses; we were driven from our profession and have been denied the privilege of continuing to contribute to that profession; I have been blacklisted, it seems, and have been unable to secure positions for which I believe I am strongly qualified; I have no income or security; our professional, financial, and social standings have been blackened greatly; my wife and son have been subjected to immense legal indignities; we have endured great mental anguish; our health has suffered; and our relationships with our parents have been strained.

*The Sun's* article only intensified our plight. By obstructing progress towards a resolution to the matter, *The Sun* and any of its accomplices behind the article have caused my firm and me and, so, my family, to be continued to be deprived of justice. In turn, our well-being, prospects, and standing continue to deteriorate.

My request is driven by intangibles and my deep belief that the defamation is only the most recent expression of a long-standing retaliatory campaign. On the basis of the extraordinary levels of malice and recklessness to which I believe my firm and me and, so, my family have fallen victim; the duration and relentlessness of the campaign against us; and the irreversible harm to my family, my firm, and me, I am requesting a sum of $100M.

## Conclusion

I greatly appreciate your efforts in processing my complaint. As instructed, I have enclosed a check for the filing fee of $105.00 and have enclosed a self-addressed envelope. I will be sending a copy of this letter to Mr. Timothy E. Ryan; Publisher, President, and Chief Executive Officer; *The Baltimore Sun*; 501 North Calvert Street; Baltimore, Maryland; 21278. Please do not hesitate to contact me if you have any questions.

Sincerely,

Robert Henke

Cc: Mr. Timothy E. Ryan

**Dynamic In Situ Geotechnical Testing**
725 Cameron Woods Drive
Apex, North Carolina 27523

*Addition to original complaint*

Phone: (919) 303-5801
E-Mail: hroberthenke@aol.com

October 13, 2008

Circuit Court for Baltimore City – Civil Division
Room 462 – Courthouse East
111 North Calvert Street
Baltimore, Maryland 21201

Subject: Defamation Complaint of October 3, 2008; Case # 24-C-

Dear Madam or Sir;

I am writing to provide the information requested of me in a form dated 10/8/08. The information is needed to allow you to begin processing the subject complaint.

The parties I am filing suit against are 1) *The Baltimore Sun* and 2) Mr. Gadi Dechter, *Sun* Reporter. The addresses follow:

> *The Baltimore Sun*
> Attention: Mr. Timothy E. Ryan
>        Publisher, President, and Chief Executive Officer
> 501 North Calvert Street
> Baltimore, Maryland 21278

> Mr. Gadi Dechter
> *Sun* Reporter
> *The Baltimore Sun*
> 501 North Calvert Street
> Baltimore, Maryland 21278

Additionally, I have enclosed an official check for $105 to replace the personal check I sent for that amount along with my October 3, 2008 complaint. I have also enclosed a self addressed envelope in the event you need to contact me.

I greatly appreciate your efforts in processing my complaint. Please do not hesitate to contact me if you have any questions.

Sincerely,

Robert Henke



UNITED STATES
POSTAL SERVICE®

Home | Help

Track & Confirm

# Track & Confirm

## Search Results

Label/Receipt Number: 2301 3460 0001 8064 4871
Status: **Delivered**

Your item was delivered at 11:53 AM on January 7, 2009 in
BALTIMORE, MD 21202 to CIRCUIT CT . The item was signed for by W
ESTEP.

( Additional Details > )   ( Return to USPS.com Home > )

**Track & Confirm**

Enter Label/Receipt Number.

Notification Options

### Track & Confirm by email

Get current event information or updates for your item sent to you or others by email.   ( Go > )

### Proof of Delivery

Verify who signed for your item by email, fax, or mail.   ( Go > )

Site Map    Contact Us    Forms    Gov't Services    Jobs    Privacy Policy    Terms of Use    National & Premier Accounts

Copyright© 1999-2007 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA



