*Attachment E*
*Amendments to*
*Original Complaint*

ROBERT HENKE

        Plaintiff

vs.

THE BALTIMORE SUN, et al.

        Defendant(s)

IN THE

CIRCUIT COURT

FOR BALTIMORE CITY

Case No. 24–C–09–000340

## AMENDMENTS TO ORIGINAL OCTOBER 3, 2008 COMPLAINT

1. In accordance with Md. Rule 2-341, I, Robert Henke, plaintiff in the above-captioned action, request that the Circuit Court for Baltimore City ("the Court") allow two amendments to my original October 3, 2008 complaint. I state the amendments on the page that follows.

2. Plaintiff deeply appreciates the Court's efforts in addressing his requests. Plaintiff asks the Court not to hesitate to contact him if the Court has any questions or needs more information.

Robert Henke, Plaintiff

May 19, 2009

725 Cameron Woods Drive, Apex, North Carolina 27523

919-303-5801 (home telephone); 919-610-5865 (cell telephone)

Amendments to Complaint: Case No. 24-C-09-000340
Page 2
May 19, 2009

## Amendment #1 to October 3, 2008 Complaint

Plaintiff asks the Court to include as a defendant Mr. Timothy E. Ryan, Publisher, President, and Chief Executive Officer of *The Baltimore Sun.* Mr. Ryan's address is:

> Mr. Timothy E. Ryan
>
> Publisher, President, and Chief Executive Officer
>
> *The Baltimore Sun*
>
> 501 North Calvert Street
>
> Baltimore, Maryland 21278

## Amendment #2 to October 3, 2008 Complaint

Plaintiff is seeking, in addition to the monetary redress stated in the original October 3, 2008 complaint, the following:

> Legal and other appropriate assistance to restore, for plaintiff, to the extent possible, the sense of well-being and dignity, the standings (legal, social, financial, professional, and the like), the prospects (professional and the like), and the health that plaintiff believes have been taken unjustly from him in relation to the matters in question.

CIRCUIT COURT FOR BALTIMORE CITY
Frank M. Conaway
Clerk of the Circuit Court
Courthouse East
111 North Calvert Street
Room 462
Baltimore, MD 21202-
410-333-3722, TTY for Deaf: (410)-333-4389

*Attachment F*
*Notification from*
*Court*

Robert Henke
725 Cameron Woods Drive
Apex NC 27523

NOTIFICATION TO PARTIES OF CONTEMPLATED DISMISSAL

Case Number: 24-C-09-000340   OT

Robert Henke vs The Baltimore Sun, et al


Pursuant to Maryland Rule 2-507, this proceeding will be "DISMISSED FOR LACK OF JURISDICTION WITHOUT PREJUDICE" as to:

Gadi Dechter

30 days after service of this notice unless, prior to that time, a written motion showing good cause to defer the entry of an order of dismissal is filed.


Costs will be assessed in accordance with Maryland Rules.

Direct all inquires to:                    410-333-3722, TTY for Deaf: (410

Frank M. Conaway
Clerk of the Circuit Court



Date Issued: 05/21/09

CC: Gadi Dechter

*Exhibit 0*
*Court order*

| | |
|---|---|
| Robert Henke<br><br>          Plaintiff<br><br>     vs.<br><br>The Baltimore Sun, et al<br>          Defendants | IN THE<br>CIRCUIT COURT<br>FOR<br>BALTIMORE CITY<br><br>File Number:<br>24-C-09-000340 |

## ORDER
## DEFERRING DISMISSAL
## UNDER RULE 2-507(c)

Upon consideration of Plaintiff's Motion to Suspend the Operation of Maryland Rule 2-507 and the pending Bankruptcy proceedings in this case, it is hereby

ORDERED that on this $\underline{12^{th}}$ day of August 2009, the case is STAYED in accordance with continuing proceedings in Bankruptcy Court. Counsel shall notify the Court promptly at the termination of the Bankruptcy proceedings so that this case may be reactivated; and it is further

ORDERED that the stay continues subject to Maryland Rule 2-507.

**JUDGE MARCELLA A. HOLLAND**
The Judge's signature appears
on the original document

Judge



Circuit Court for Baltimore City, Maryland

**EXHIBIT B**

**Docket Report**

Exhibit P

Circuit Court
record from
objection.

Circuit Court of Maryland

Go Back

## Case Information

Court System: **Circuit Court for Baltimore City - Civil System**
Case Number: **24C09000340**
Title: **Robert Henke Vs The Baltimore Sun, Et Al**
Case Type: **Other Tort**  Filing Date: **01/12/2009**
Case Status: **Open/Active**
Case Disposition:   Disposition Date:

## Plaintiff/Petitioner Information

*(Each Plaintiff/Petitioner is displayed below)*
Party Type: **Plaintiff**  Party No.: **1**
Name: **Henke, Robert**
Address: **725 Cameron Woods Drive**
City: **Apex**  State: **NC**  Zip Code: **27523**
Address: **4104 Hearthside Drive**
City: **Wilmington**  State: **NC**  Zip Code: **28412**

## Defendant/Respondent Information

*(Each Defendant/Respondent is displayed below)*
Party Type: **Defendant**  Party No.: **2**
Name: **Dechter, Gadi**
Address: **The Baltimore Sun**
City: **Baltimore**  State: **MD**  Zip Code: **21278**

Party Type: **Defendant**  Party No.: **1**
Business or
Organization Name: **The Baltimore Sun**
Address: **501 North Calvert Street**
City: **Baltimore**  State: **MD**  Zip Code: **21278**
*Attorney(s) for the Defendant/Respondent*
Name: **Siegel, Esq, Nathan E**
Practice Name: **Levine, Sullivan, Koch & Schulz, L L P**
Address: **1050 17th Street N W**
**Suite 800**
City: **Washington**  State: **DC**  Zip Code: **20036-5514**

## Document Tracking

*(Each Document listed. Documents are listed in Document No./Sequence No. order)*
Doc No./Seq No.: **1/0**
File Date: **01/12/2009**  Close Date:   Decision:
Party Type: **Plaintiff**  Party No.: **1**
Document Name: **Complaint**

Doc No./Seq No.: **2/0**

File Date: **01/23/2009**  Close Date:  Decision:
Document Name: **Order Clarifying Pltff**
**that the Clerk is directed to list Pltff as Robert Henke only (Cannon J)**

---

Doc No./Seq No.: **2/1**
File Date: **02/02/2009**  Close Date:  Decision:
Document Name: **Copies Mailed**

---

Doc No./Seq No.: **3/0**
File Date: **02/19/2009**  Close Date: **03/06/2009**  Decision: **Granted**
Party Type: **Defendant**  Party No.: **1**
Document Name: **Notice Of Filing Of Voluntary Petition Under Chapter 11 of The**
**Bankruptcy Code By Defendant The Baltimore Sun Company**

---

Doc No./Seq No.: **3/1**
File Date: **03/17/2009**  Close Date:  Decision:
Document Name: **Order of Court**
**that the deft The Baltimore Sun is STAYED from this casee and the proceedings**
**deferred to the Bankruptcy Court (Cannon J)**

---

Doc No./Seq No.: **3/2**
File Date: **03/17/2009**  Close Date:  Decision:
Document Name: **Copies Mailed**

---

Doc No./Seq No.: **3/3**
File Date: **04/08/2009**  Close Date:  Decision:
Party Type: **Plaintiff**  Party No.: **1**
Document Name: **Correspondence/ Plaintiff's Response To February 17, 2009 Requests Of**
**Defendants**

---

Doc No./Seq No.: **4/0**
File Date: **03/10/2009**  Close Date:  Decision:
Party Type: **Plaintiff**  Party No.: **1**
Document Name: **Correspondence**
**sent Michie.com website address to Plaintiff.**

---

Doc No./Seq No.: **5/0**
File Date: **05/21/2009**  Close Date:  Decision:
Document Name: **Notice of Cont. Dismissal Lack of Juris.**
**Gadi Dechter**

---

Doc No./Seq No.: **6/0**
File Date: **05/20/2009**  Close Date:  Decision:
Party Type: **Plaintiff**  Party No.: **1**
Document Name: **Amendments To Original October 3, 2008 Complaint**

---

Doc No./Seq No.: **7/0**
File Date: **05/20/2009**  Close Date:  Decision:
Party Type: **Plaintiff**  Party No.: **1**
Document Name: **Amended Pltff's Respone To Feb. 17, 2009 Requests Of Defendants**

---

Doc No./Seq No.: **8/0**
File Date: **05/20/2009**  Close Date:  Decision:

Party Type: **Plaintiff**   Party No.: **1**
Document Name: **Amended Pltff's Response To Feb. 17, 2009 Requests of Defendants (Shows Amendments In Brackets And Bold)**

---

Doc No./Seq No.: **9/0**
    File Date: **06/15/2009**   Close Date: **08/12/2009**   Decision: **Granted**
    Party Type: **Plaintiff**   Party No.: **1**
Document Name: **Motion to Defer Dismissal - Md. Rule 2-507(b) (Lack of Jurisdiction)**

---

Doc No./Seq No.: **9/1**
    File Date: **08/22/2009**   Close Date:    Decision:
    Party Type: **Plaintiff**   Party No.: **1**
Document Name: **Order Deferring Dismissal Under Rule 2-507(c)**
        **case is STAYED in accordance with continuing proceedings in Bankruptcy Court - stay continues subject to MD Rule 2-507, Holland J**

---

Doc No./Seq No.: **9/2**
    File Date: **08/22/2009**   Close Date:    Decision:
Document Name: **Copies Mailed**

---

Doc No./Seq No.: **10/0**
    File Date: **01/22/2010**   Close Date:    Decision:
    Party Type: **Plaintiff**   Party No.: **1**
Document Name: **Notice Of Change Of Address**

---

*The complete case file can be obtained from the Circuit Courthouse.*

Exhibit Q

Discharge,



# Honorable Discharge

from the Armed Forces of the United States of America

*This is to certify that*

ROBERT HENKE, FR 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, AIRMAN BASIC, REGULAR AIR FORCE

*was Honorably Discharged from the*

# United States Air Force

*on the* 6 *day of* SEPTEMBER 1972 *This certificate is awarded as a testimonial of Honest and Faithful Service*

Bonnie S. Porter

BONNIE S. PORTER, CAPT., USAF
LACKLAND AFB, TEXAS

DD FORM 256 AF
1 NOV 51

PREVIOUS EDITIONS OF THIS FORM MAY BE USED.

**THIS IS AN IMPORTANT RECORD — SAFEGUARD IT!**

**DRAFT**

Gadi:

In response to your request of February 13, below I have listed my closer acquaintances. I've included a mix of individuals who I feel likely would be supporters and individuals who I feel likely would be detractors. I don't identify the class into which the individuals fall so you won't have biases. Of course, some of this will be obvious to you on the basis of our past discussions and materials I have sent you. I provide what information I know of the whereabouts of the individuals. Also, with the exceptions of the references, the orderings of the names were dictated solely by the orders in which I thought of the individuals. Please let the individuals you contact know that they are free to discuss the matters at hand (except for the family problems matter with respect to the Air Force - thanks).



**Abbreviations**

FHWA = Federal Highway Administration

NIST = National Institute of Standards and Technology

NSF = National Science Foundation

*Exhibit R*
*Attachment to*
*February 16, 2007*
*email.*

**References I Use for Applications for University Positions**

Prof. Richard D. Woods; thesis advisor; Department of Civil and Environmental Engineering; University of Michigan; 2340 G.G. Brown, Ann Arbor, Michigan 48109-2125; Phone: 734-764-8495/Fax: 734-764-4292/Email: rdw@engin.umich.edu.

Prof. Emeritus Harvey Wahls; advisor for my Master's program; Department of Civil Engineering; North Carolina State University; 215 Mann Hall, Box 7908, Raleigh, North Carolina 27695; Phone: 919-515-7244/Fax: 919-515-7908/Email: wahls@eos.ncsu.edu.

Prof. W.D. Liam Finn; Anabuki Chair of Foundation Geodynamics; Safety Systems Construction Engineering Department; Kagawa University; 2217-20 Shinmachi, Hayashi-cho, Takamatsu, Kagawa 761-0396, Japan; Phone: 81-087-864-2170/Fax: 81-087-864-2031/Email: finn@eng.kagawa-u.ac.jp. **Try the contact information that follows first.**

Professor Finn is also a Professor Emeritus in the Department of Civil Engineering of the University of British Columbia, Vancouver, British Columbia, Canada (Phone: 604-228-1667/Email: finn@civil.ubc.ca).

Prof. Emeritus Shamsher Prakash; Department of Civil Engineering; University of Missouri, Rolla; 1870 Miner Circle, 308 Civil Engineering, Rolla, Missouri 65409; Phone: 573-341-4489/Fax: 573-341-4729/Email: prakash@umr.edu.

Mr. Al DiMillio; supervised much of our work for FHWA; Formerly, Geotechnical Research Program Manager; Federal Highway Administration; 6300 Georgetown Pike, McLean, Virginia 22101; Home Address: 403 Country Club Drive, Leesburg, Virginia 20175; Phone: 703-777-6416/Email: private.

**Other Faculty Who Have Had a Strong Impact on My/Our Thinking**

Prof. E. Benjamin Wylie; thesis advisor; Department of Civil and Environmental Engineering; University of Michigan.

Prof. Paul Zia; advisor for my Master's program, I believe; Department of Civil Engineering; North Carolina State University.

Prof. Kenneth H. Stokoe, II; Department of Civil Engineering; University of Texas, Austin.

Prof. Mladen Vucetic; Department of Civil Engineering (?); University of California, Los Angeles.

**Individuals with Whom We Have Worked in Our Undertaking**

**DRAFT**

Mac Minor; Was critical to most of undertaking. Supervised much of work and gave us crucial guidance; retired mechanical engineer, formerly of The Bechdon Company, Inc. in Upper Marlboro, Maryland.

Frank Rybak; Was also critical to most of undertaking. Carried out much of the electronics work throughout. Provided much advice and guidance; electronics engineer; of Artek Associates of Glen Arm, Maryland.

Yoshinori ("Yoshi") Iwasaki; Supported the design and construction of a greatly advanced version of the impulse shear test. Essentially, Yoshi requested certain features beyond those of the standard impulse shear test and we agreed to this; seismologist/earthquake engineer; Director, Geo-Research Institute of Osaka, Japan. (He speaks English quite well.)

W. ("Bill") Gingras; Carried out the design and construction of our laboratory prototype testing system; electronics engineer (?); of Friendship Engineering Company, Maryland (?).

W. Aiken; Carried out feasibility studies of our technology; mechanical engineer; of Sweet and Aiken, Inc., Houston, Texas.

Robert Greguras, Perfecto, Jaime, Miguel, and Hugo; Provided drilling services for tests in San Francisco; of HEW Drilling Company, Palo Alto California.

M. Suggs, Gary, Huey, and Otis; Provided drilling services for tests in Pensacola, Florida; of the Florida Department of Transportation.

Dino, Jeff, and Juan; Provided drilling services for tests in Los Angeles; of Gregg Drilling and Testing, Inc., Southern California.

Steve, John, and Patrick; Provided drilling services for tests in Massachusetts; of Connecticut Test Borings, Inc., Connecticut (?).

Richard, Josh, and Alonzo; Provided drilling services for tests in Alabama; of Christian Testing Laboratories, Inc., Alabama (?).

**Program Officers on Grants of Ours**

Al DiMillio; see above; Supervised all our FHWA work for the past sixteen years or so.

Carl Ealy; Co-supervised, along with Al DiMillio, much of our FHWA work; of FHWA; may be retired.

Dr. A.J. Eggenberger (?); Was the program officer for our 1986 NSF Phase II Small Business Innovation Research grant; formerly of NSF.

Dr. Clifford Astill; Was the NSF program officer for our 1994 (?) NSF Northridge Earthquake grant; of NSF.

Dr. Inam (?) Jawed; Was the program officer for our 2001 (?) Innovations Deserving Exploratory Analysis contract; of the National Academy of Sciences (?).

**Main Competitors**

Prof. Kenneth H. Stokoe, II; see above; Is an internationally renowned authority on geotechnical testing for earthquake engineering purposes. Is developing a testing approach that addresses issues addressed by our technology.

Dr. Clifford Roblee; Lead investigator in the development, for the California Department of Transportation ("Caltrans"), of a technology comparable to ours; formerly of Caltrans.

List – G. Dechter
Page 3
February 16, 2007

**DRAFT**

### Colleagues in the Department of Civil Engineering at The Johns Hopkins University

Nicholas Jones

Robert Morris; I do not believe he is with the University now.

Robert Scanlan; now deceased.

Ross Corotis; University of Colorado.

Annalingam Anandarajah

### Students at The Johns Hopkins University who Were Reasonably Close to Me

Tim Rosenzweig; undergraduate student

Deborah Nykyforchyn; graduate student

Edward Davis; undergraduate student

Michael Stello; graduate student

Deepak Agarwal; graduate student

### The Attorney Who Argued Our Federal Lawsuit against NSF and NIST

Eric Glitzenstein, Esq.; of Meyer Glitzenstein & Crystal, Washington, D.C.

### My Son's Wrestling Coaches

Paul Kretschmer (? Spelling); Michael's junior league coach; the Parkville team; mid to late 1980s.

Joey Tartal (? Spelling); Michael's junior league coach; the Parkville team; mid to late 1980s.

Chris Legg; Michael's high school coach; the Gilman team; early 1990s.

(? Name); Kevin's junior league coach; the Dulaney team; late 1990s.

Guy Pritzker (? Spelling); Kevin's junior league coach; the Owings Mills team; late 1990s.

Steve (? Last name); Kevin's junior league coach; the Owings Mills team; late 1990s.

Nate (? Last name); Kevin's junior league coach; the Owings Mills team; late 1990s.

### Colleagues at Exxon Production Research Company (now ExxonMobil Upstream Research Company), Houston, Texas

Richard Raines

Tony Toneatto (? Spelling)

Farhad Boniadi (? Spelling)

Ray Steinmetz

Don Murff

Lou Klejbuk

Jack Templeton

### Students at the University of Michigan

Prof. Peter Bosscher (? Spelling); the University of Wisconsin, Madison.

**DRAFT**

Prof. Richard Ray (? Spelling); the University of South Carolina, I believe.

**Peers in Officer Candidate School in Air Force at Lackland Air Force Base in San Antonio, Texas**

Greg Ebsen (? Spelling; again, I'd rather the family problems of which I spoke not be discussed)

**Fraternity (Delta Sigma Phi) Brothers at North Carolina State University**

Davis Crater

Joe Thompson

Jim Johnson

Steve Dicksen (? Spelling)

**Students at McDonogh School (past roommates and the like; class of 1964)**

Jeffrey Fountain

Jeffrey (?) Robbins

Steve Phillips

Bill Plack

**Members of the McDonogh Wrestling Team (class of 1964 except where noted)**

"Chip" Chew

Steve Koch

"Chuck" Campbell (Class of 1968, I believe.)

Steve Phillips

Dudley Ives (Class of 1965, I believe.)

Hobart Buppert

**Treasured Motorcar Services, LTD.; the Main Shop that has Restored and Maintained, for about Two Decades, my 1967 Lotus Elan. They do incredible work. Reisterstown, 410-833-2329**

Geoffrey Griffiths, owner

Bill, mechanic

**Friends during My High School Years**

Mark McInturff (? Spelling)

Jeff McInturff (? Spelling)

Exhibit S
Letters, enclosure,
and postal record.

**Dynamic In Situ Geotechnical Testing**
**725 Cameron Woods Drive**
**Apex, North Carolina 27523**

———————

**Phone: (919) 303-5801**
**E-Mail: hroberthenke@aol.com**

May 1, 2008

Mr. Timothy E. Ryan
Publisher, President, and Chief Executive Officer
*The Baltimore Sun*
501 North Calvert Street
Baltimore, MD 21278

Dear Mr. Ryan:

I am writing regarding an article ("the article") published by *The Baltimore Sun* ("*The Sun*") on Sunday, October 7, 2007. The front page article was entitled "A modern-day Ahab." The article addressed a matter that I have been seeking to resolve over a number of years.

Over the past months, I have reviewed, with great care, the article, my records and recollections of the discussions and interviews leading to the article, related correspondence, and my records and recollections of the matter in question. On the basis of the review, I have come to the belief that the article was a well-coordinated fabrication that gave materially false impressions. By creating key facts, by reshaping key facts, by reassembling key facts, and by omitting key facts, *The Sun*, I believe, deliberately concealed the very real possibility of calculated misconduct – misconduct in which it may have taken part – and discredited the innocent victims. I believe the senior staff of *The Sun* should have detected the glaring inconsistencies that naturally arose from the fictions. Additionally, *The Sun* took advantage of my obviously vulnerable family and gained access to the family under false pretenses. Moreover, it seems *The Sun* was pressured in the writing of the article by The Johns Hopkins University and *The Sun* may have even threatened me. I believe the article will do little more than further block progress toward justice and inflict further harm on innocent individuals that have already suffered immeasurably.

Regarding my purpose in writing, I first approached *The Sun* over the matter in question late 2006 (November 30 letter/enclosure to Ms. R.J. Matthews, then Publisher). I did so in hope of obtaining information that I felt might help me move closer to a resolution of the matter. I believed *The Sun* may have been involved in the matter and could provide such information. Specifically, I sought the origins of certain articles that *The Sun* had published over a period of years (for example, the identities of the individuals who had suggested the articles and their motives). The articles suggested to me that perhaps *The Sun* had been stalking my firm, me, and possibly my family. ("A modern-day Ahab" and *The Sun's* related conduct did nothing to relieve my concerns.) Of particular relevance were articles that may have played pivotal roles in interfering with our ability to succeed professionally. Most of the articles are listed and/or discussed in the enclosed document. The document is a copy of a December 14, 2006 email attachment I sent to Mr. Gadi Dechter, the Reporter for "A modern-day Ahab." (Presumably, Ms. Matthews had assigned the handling of the matter to Mr. Dechter.) I sent the attachment to Mr. Dechter as he asked me about the articles in a December 12, 2006 telephone conversation. In

Mr. Ryan
Page 2
May 1, 2008

our next conversation, January 3, 2007, according to my records and recollections, Mr. Dechter made no mention of the articles. Rather, he told me *The Sun* wished to write an article about our circumstances. I did not have an article in mind; and I certainly didn't have it in mind "to lay bare the facts of [my] life." I cooperated with *The Sun* only because I felt a truthful and appropriate article could well bring me closer to a long-overdue resolution of the matter and because, for various reasons, I believed *The Sun* would write such an article. In fact, *The Sun* did not do so. As a result, I am now returning to my purpose for first approaching *The Sun*. I would appreciate your letting me know of the origins of the articles in question so that I can take meaningful steps toward freeing my family from an undeserved nightmare, brought about, I believe, by nothing less than some fairly ugly scheming.

I appreciate your efforts in this matter. If you have any questions, please do not hesitate to contact me.

Sincerely,

Robert Henke

Enclosure

Cc: Ms. Pamela P. Flaherty
    Chair, Board of Trustees
    The Johns Hopkins University

# Memory-Based
# Summary of Concerns Regarding
# *The Baltimore Sun*

## by Robert Henke

**725 Cameron Woods Drive**
**Apex, North Carolina 27523**
**Phone: (919) 303-5801**
**E-Mail:** hrobert@aol.com

### December 13, 2006

This document provides a summary of concerns I have regarding a number of articles that have appeared in *The Baltimore Sun (The Sun)* over roughly the past sixteen years. I prepared the document for Gadi Dechter of *The Sun*. The document is intended to supplement the materials (dated November 30, 2006) I sent to Ms. Rondra J. Matthews, Publisher and CEO of *The Sun*. The reader should refer to those materials for background and definitions of abbreviations.

## Some Qualifiers

To give *The Sun* an idea of my concerns in a timely manner, I have prepared this document largely on the basis of memory. I have omitted many details, significant matters may be missing, and some of what I present may prove to be incorrect. Additionally, there are some articles I have not mentioned; I prefer to wait on these until I have a better understanding of our circumstances. Nevertheless, the thrust of document is accurate. I can provide supporting details (dates and names, for example) on request the

I should also note that it is not any single or group of articles that is of concern. Rather, it is the sum of the articles in the context of all else that has happened to us (my firm and family) that is unsettling.

Lastly, I would guess that some of the articles I cite may not have sinister origins.

## Overall Concerns

Essentially, my overall concerns are that *The Sun* appears to be stalking my firm, me, and possibly my family and that *The Sun* has affected our ability to succeed professionally.

## Articles

### Group of Articles (early 1990s)

Shortly after I left the University, a number of students of mine either were the subject of or were mentioned in articles or photographs that appeared in *The Sun*. Most, if not all, of the students were from an engineering statics course I taught. I believe there were 13 instances of this. I would tend to rule out coincidence. I can only guess at the purposes of the articles.

### Article on Our Firm (early 1990s)

On February 8, 1990, *The Sun* presented a large article on our firm and its technology. Amy Davis was the photographer on the story. The article included an error in the caption of the large centrally located photograph; the caption referred to us as Robert and Wanda Davis. I would think that the probability for such an error would be infinitesimally small for an organization as competent as is *The Sun*. To us at least, the error degraded the article considerably. Also, in the body of the article, Wanda was referred to as Wanda Wenke. Predictably, on the day the article appeared, to our friends we were Robert and Wanda Davis or Wenke; the content of the article had been fully overshadowed. This was all good fun, until one fast-forwards to our existing circumstances. Assuming these mishaps were deliberate, I can only guess at the motive.

Summary for G. Dechter
Page 2
December 13, 2006

### Article on NIST Earthquake Engineering Researcher (early 1990s)

During the early 1990s, a front page headline article appeared in a Sunday edition of *The Sun* that featured an earthquake engineering researcher at The National Institute of Standards and Technology (NIST). I believe the reporter was Douglas Birch. Coincidentally, a month earlier, we had submitted a large earthquake engineering proposal to NIST's Advanced Technology Program. The proposal was a revision of a proposal we had submitted to that program a year earlier. Though that earlier proposal was declined, it received favorable technical reviews. The proposal was declined on the basis of business issues. The fate of the revised proposal was a striking contrast. I would describe the technical reviews as hostile. Even the NIST evaluation board conceded that the reviews were "unduly negative." In the setting of all else that has happened to us, I would have to ask, was the review linked in any way to the article in *The Sun*? It was almost a certainty that earthquake engineering researchers from NIST would be selected to review the proposal or would select reviewers for the proposal. This was one of the proposals for which we sought reviewer identities with our federal lawsuit.

### Article on the School of Engineering of The Johns Hopkins University (mid 1990s)

During the mid 1990s, a front page center article by Richard O'Mara appeared in *The Sun* that covered heavily the School of Engineering at The Johns Hopkins University and included comments from the Dean of the School and the National Science Foundation. Coincidentally, the day before, *The Chronicle of Higher Education* had published a major article on our federal lawsuit against the National Science Foundation. And the Dean was the individual who, as Chairman of the Department of Civil Engineering during my tenure at the University, chose to terminate my contract with the University. Chances are that *The Sun's* article was a response to *The Chronicle's* article. Assuming this to be the case, the article in *The Sun* and its timing suggest there existed rather close ties between *The Sun* and central figures/organizations in the matters in question.

### Article on Our Federal Lawsuit (mid 1990s)

During the mid 1990s, Douglas Birch wrote a major article on our lawsuit. I think the article was respectable as far as it went. However, if I recall, the article did not bring out the true character of the matter – that is, the very real possibility that grant competitions were being manipulated to cause harm. I do not know if this was intentional or whether our plight just did not come out that way in the interview of Wanda for the article.

### Various Articles on Legal Matters (2005-2006)

A fair number of articles have appeared recently in *The Sun* in which a C. Tobias has been quoted. If I recall, he even wrote a piece for the opinions/editorials pages. C. Tobias is a professor of law at the University of Richmond. As it happens, my son, Michael is a third year law student at the University of Richmond. He is also reasonably close to C. Tobias.

### Article on the New Madrid Seismic Zone (2005)

Late 2005, a major article on the New Madrid Seismic Zone by David Kohn appeared in a Sunday *Sun* Perspective section. The article featured scientists of the U.S. Geological Survey (USGS) who specialized in that zone and are stationed in Memphis, Tennessee. For the preceding several months, I had been in the process of trying to interest this very group in our technology. Coincidentally, the article was written two weeks before I was to present a poster on our technology at a seismology meeting in Memphis. The USGS scientists were to be attendees at the meeting. I presented the poster in hopes of attracting their interest. I was not successful in

Summary for G. Dechter
Page 3
December 13, 2006

this, even though the technology I was advancing met critical needs for the New Madrid Seismic Zone.

## Conclusion

In view of all that has happened to my firm, my family, and me, the above listing of articles is troubling.

**Dynamic In Situ Geotechnical Testing**

725 Cameron Woods Drive

Apex, North Carolina 27523

———————

Phone: (919) 303-5801

E-Mail: hroberthenke@aol.com

May 1, 2008

Ms. Pamela P. Flaherty
Chair, Board of Trustees
The Johns Hopkins University
242 Garland Hall
The Johns Hopkins University
3400 N. Charles Street
Baltimore, MD 21218

Dear Ms. Flaherty:

I am writing to you, the Chair of the Board of Trustees ("the Board") of The Johns Hopkins University ("the University"), with it in mind that the Board is "entrusted with the final responsibility for the conduct of the affairs of the University." I wish to bring to your attention a troubling matter in which the University, I suspect, is involved, deeply. The matter is the most recent in what appears to be a lengthy sequence of improprieties that, I believe, has brought down an undeserved nightmare on some truly innocent individuals. The matter is summarized in the enclosure. Further background may be found in my letters/enclosures to Dr. William R. Brody (June 4, 2006 and November 30, 2006), Dr. Nicholas P. Jones (July 24, 2006), Mr. Raymond A. Mason (November 30, 2006), and Mr. Stephen S. Dunham (January 16, 2007).

Sincerely,

Robert Henke

Enclosure



**UNITED STATES POSTAL SERVICE** ®

Home | Help

Track & Confirm

# Track & Confirm

## Search Results

Label/Receipt Number: **0306 3030 0000 4336 9570**
Status: **Delivered**

Your item was delivered at 9:37 AM on May 4, 2008 in BALTIMORE, MD 21278.

( Additional Details > )  ( Return to USPS.com Home > )

Track & Confirm

Enter Label/Receipt Number.

Notification Options

**Track & Confirm by email**

Get current event information or updates for your item sent to you or others by email.  ( Go > )

Site Map    Contact Us    Forms    Gov't Services    Jobs    Privacy Policy    Terms of Use    National & Premier Accounts

Copyright© 1999-2007 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA

**U.S. Postal Service™ Delivery Confirmation™ Receipt**

Postage and Delivery Confirmation fees must be paid before mailing.

Article Sent To: (to be completed by mailer)

(Please Print Clearly)

T.E. Ryan

delivered
May 4 2008

DELIVERY CONFIRMATION NUMBER: 0306 3030 0000 4336 9570

Postmark Here

APEX HORE 27502-9966

MAY 2 2008 USPS

**POSTAL CUSTOMER:**
Keep this receipt. For inquiries:
Access internet web site at
*www.usps.com* ®
or call 1-800-222-1811

**CHECK ONE (POSTAL USE ONLY)**
☑ Priority Mail™ Service
☐ First-Class Mail® parcel
☐ Package Services parcel

(See Reverse)

PS Form 152, May 2002




**UNITED STATES**
**POSTAL SERVICE**®

Home | Help

Track & Confirm

# Track & Confirm

### Search Results

Label/Receipt Number: **0306 3030 0000 4336 9587**
Status: **Arrival at Unit**

Your item arrived at 10:09 AM on May 5, 2008 in BALTIMORE, MD 21218. Information, if available, is updated every evening. Please check again later.

( Additional Details > )    ( Return to USPS.com Home > )

| Track & Confirm |
| --- |
| Enter Label/Receipt Number. |

### Notification Options

**Track & Confirm by email**

Get current event information or updates for your item sent to you or others by email.    ( Go > )

Site Map    Contact Us    Forms    Gov't Services    Jobs    Privacy Policy    Terms of Use    National & Premier Accounts

Copyright© 1999-2007 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA

**.S. Postal Service**™ **Delivery Confirmation**™ **Receipt**

Postage and Delivery Confirmation fees must be paid before mailing.

Article Sent To: (to be completed by mailer)

*(Please Print Clearly)*

Ms. Flaherty

DELIVERY CONFIRMATION NUMBER
0306 3030 0000 4336 9587

Arrival @ Unit - May 5, 2008

Redmark X Have
MAY 2 2008
NC 27502-9698
USPS

**POSTAL CUSTOMER:**
Keep this receipt. For inquiries:
Access internet web site at
www.usps.com ®
or call 1-800-222-1811

**CHECK ONE (POSTAL USE ONLY)**
☑ **Priority Mail**™ **Service**
☐ **First-Class Mail**® **parcel**
☐ **Package Services parcel**
(See Reverse)

Form 152, May 2002

Letter was not returned so apparently it was delivered.

such Proof of Claim;[6] and (ii)
Indentures that asserts a clair
relating to the Indentures oth
a Proof of Claim on account
Date, unless another excepti



j.     any Debtor asserting a claim.

k.     any wholly-owned non-debtor subsidiary of a Debtor asserting a claim against a Debtor; and

l.     any person or entity whose claim against the Debtors has been allowed by an order of the Court entered on or before the Bar Date.

**Any person or entity (including, without limitation, any individual, partnership, joint venture, corporation, limited liability company, estate, trust or governmental unit) that is required to file a timely proof of claim in the form and manner specified by the Bar Date Order and this Notice and that fails to do so on or before the bar date associated with such claim shall not be treated as a creditor in these chapter 11 proceedings, and therefore, shall not be permitted to (i) vote on any plan of reorganization or plan of liquidation or (ii) receive any distribution under any confirmed plan.**

Acts or omissions of the Debtors, if any, that occurred prior to the Petition Date, including acts or omissions related to any indemnity agreements, guarantees, or services provided to or rendered by the Debtors, may give rise to claims against the Debtors notwithstanding the fact that such claims (or any injuries on which they are based) may be contingent or may not have matured or become fixed or liquidated prior to the Petition Date. Therefore, any person or entity that holds or asserts a claim or a potential claim against the Debtors, no matter how remote or contingent, must file a proof of claim on or before the General Bar Date.

You should not file a Proof of Claim if you do not have a claim against the Debtors. The fact that you received this Notice does not necessarily mean that you have a claim or that either the Debtors or the Bankruptcy Court believe that you have a claim.

---

[6] The filing of a Proof of Claim by any of the Indenture Trustees under any of the Indentures should not affect the right of any Noteholder under the respective documents to vote separately the amount of its respective claims with respect to any plan of reorganization.

[7] Tribune issued Notes pursuant to (i) Indenture, dated as of January 1, 1997 between Tribune Company and Citibank, N.A. (successor to Bank of Montreal Trust Company and Bank of New York), as trustee; (ii) Indenture, dated as of April 1, 1999 between Tribune Company and Citibank, N.A. (successor to Bank of Montreal Trust Company and Bank of New York), as trustee; (iii) Indenture, dated as of January 30, 1995 between Tribune Company (as successor pursuant to the First Supplemental Indenture to The Times Mirror Company, f/k/a New TMC Inc.) and Citibank, N.A. (successor to Bank of New York, Wells Fargo Bank, N.A. and First Interstate Bank of California), as trustee; (iv) Indenture, dated as of March 19, 1996 between Tribune Company (successor pursuant to the Second Supplemental Indenture to The Times Mirror Company) and Citibank, N.A., as trustee; (v) Indenture, dated as of March 1, 1992 between Tribune Company and Citibank, N.A. (successor to Continental Bank, National Association, Bank of Montreal Trust Company and Bank of New York), as trustee; and (vi) Indenture, dated as of April 13, 1999 between Tribune Company and Wilmington Trust Company (successor to Bank of Montreal Trust Company), as trustee.

## DYNAMIC IN SITU GEOTECHNICAL TESTING, INC.

7 Wyndam Court

Lutherville, Maryland 21093

~~440~~
~~(301)~~ 252-4474

Exhibit U
Letter.

October 19, 1992

Dr. Joseph Bordogna
Assistant Director for Engineering
National Science Foundation
1800 G Street, N.W.
Washington, DC 20550

Dear Dr. Bordogna:

This letter is a response to your letter of July 20, 1992.  In your
letter, you suggested that we should bring to your attention "departures from
[the National Science Foundation's] high standards of integrity in the review
process or other aspects of the Foundation...so that corrective action can be
taken."  In this letter, we provide a chronology of experiences of ours that
we feel indicates that there are serious problems with the peer review process
of the National Science Foundation (NSF).

Our experiences reveal a review process that contrasts markedly with the
process you set forth - one in which "the possibility of error is vanishingly
small..." (your letter to us of May 13, 1992) and one that is not vulnerable
to retaliation.  We believe that we have suffered not only from general
systemic problems but also from a malice directed specifically at us - a
malice that NSF's peer review process has allowed to thrive.  Moreover, our
experiences show that the potential consequences of such problems are not
trivial.

With respect to general problems, we feel we have been subjected to,
among other things, ineptness, retaliation, and arbitrariness in NSF's peer
review process.  We feel that NSF encourages such abuses through secrecy and
unresponsiveness.  It is not surprising to us that the document you sent us
(PROPOSAL REVIEW AT NSF: Perceptions of Principal Investigators, Feb., 1988,
revised Apr., 1990) stated that almost 40% of NSF's grant applicants "were
dissatisfied" with NSF's peer review process.

With respect to malice toward us, we believe that the chronology we
present below suggests that NSF's peer review process was manipulated, rather
flagrantly, with the intent of derailing either one or both of our careers or
thwarting progress on the technology we have been advancing.  This chronology
brings out a relatively sudden change in NSF's attitude toward us and our
technology.  There does not seem to be a legitimate reason for this change.
We do not know the origin of our difficulties with NSF.  We suspect, for
various reasons, that a harmful rumor may have been circulated.  NSF has been
less than open in dealing with us and will not provide us with relevant
information that NSF officials surely know could likely shed light on the
matter (meaningful minutes of panel meetings, notes on telephone
conversations, reviewer names, etc.).  With such secrecy, it is impossible for
us to confirm our suspicions just as it is impossible not to conclude that
something went wrong.

Dr. Bordogna
Page 2
October 19, 1992

In the following sections, we put forth the chronology of experiences that helped form our opinions and discuss important implications of these experiences and some of our concerns.

## ABBREVIATIONS

ATP  - Advanced Technology Program

DOE  - Department of Energy

EERI - Earthquake Engineering Research Institute

NIST - National Institute of Standards and Technology

NRC  - Nuclear Regulatory Commission

NSF  - National Science Foundation

SBIR - Small Business Innovation Research

## RELEVANT EXPERIENCES (1985 - Present)

The chronology that follows is presented in outline form. We cover only items that we feel are most relevant and these we summarize very briefly. We can provide details if needed. Essentially all our work, completed, in progress, and proposed, is related to the development of a specific testing technology in the area of geotechnical earthquake engineering.

Feb., 1985 - Our firm awarded Phase I SBIR grant by NSF. Grant for feasibility studies of proposed testing technology. Principal investigator - W. Henke, amount - $40,000.

Reviews positive. Reviewers stated:

"Resolution of this problem would be welcomed by all...."

"There is a very real need for new testing methods in this area."

"Improved procedures for determining dynamic soil properties are needed."

Relationship with NSF seemed positive. NSF program officer described Ms. Henke as "highly qualified to conduct the research on this most important problem...."

July, 1985 - R. Henke assumed position of Assistant Professor at The Johns Hopkins University.

Apr., 1986 - NIST, under Energy-Related Inventions Program, recommended testing technology to DOE "as worthy of consideration for possible Government support." We requested support from DOE for construction of prototype testing system.

Dr. Bordogna
Page 3
October 19, 1992

Review positive.  NIST reviewer commented:

"Quite conceivably the device can be used in every
important and critical civil engineering project where
[various soil properties] are required to evaluate the
seismic safety, and to ensure the dynamic stability of the
structure."

May, 1986 – W. Henke informed by NSF official that Phase II SBIR proposal for
laboratory testing of prototype system had been recommended for
award and that no eligible Phase II SBIR proposal with
technical recommendation and satisfactory follow-on funding
commitment (which we had) had ever been denied support.

Reviews (received by us Aug., 1986) positive.  Reviewers stated:

"The work done by Ms. Henke under Phase I is
overwhelming...The practical implications of such a
procedure, if it is effective and accurate, are immense."

"If it can be demonstrated that the torsional testing
device works, the development will significantly improve
earthquake soil mechanics technology...."

"I believe in the method, however, and see a need."

Relationship with NSF seemed positive.

July, 1986 – W. Henke requested meeting with NSF staff to discuss NSF's
rapidly building and frequently changing concerns over awarding
of Phase II SBIR support.

During meeting, which lasted about 4 hours, NSF officials
hostile.  They stated that awarding of support "definitely" in
jeopardy and questioned legitimacy of Ms. Henke's role as
principal investigator.  Seemed to Ms. Henke that NSF's main
intent was to intimidate and harass (see our letter to Dr. White,
June 22, 1990).

We can only speculate as to cause of deterioration in our
relationship with NSF.  At this time, we believe a rumor may have
been started that W. Henke was a front for R. Henke's research.
(In fact, throughout, each played critical roles with little
overlap.)

NSF was particularly concerned about university involvement in
project.  (In SBIR proposal solicitations, university involvement
is encouraged.)  During meeting, NSF was adamantly opposed to any
university involvement other than consulting by R. Henke.  W.
Henke informed NSF that this was acceptable.  Just one week
later, NSF reversed itself by requesting that we subcontract
testing of prototype system (focus of project) to The Johns
Hopkins University.  Turnaround was surprising to us, but, for
various reasons, this condition also acceptable.

Dr. Bordogna
Page 4
October 19, 1992

Aug., 1986 – Our firm awarded Phase II SBIR grant by NSF.  Grant was for laboratory testing of prototype testing system.  Principal investigator – W. Henke, amount – approx. $190,000.

Though NSF had apparently become antagonistic toward us, we feel granting process had advanced too far for NSF to block this award.

Sept., 1986 – The Johns Hopkins University awarded Engineering Research Equipment Grant by NSF.  Grant for general laboratory testing equipment and computing system for University.  Principal investigator – R. Henke, co-principal investigator – A. Anandarajah, amount – approx. $133,000 (approx. $55,000 provided by University).

We now feel that either antagonism toward us had not spread sufficiently to prevent award or University (main beneficiary of grant) influenced NSF's decision.

Dec., 1986 – Nomination of R. Henke by The Johns Hopkins University for Presidential Young Investigator Award declined by NSF.  Dr. Henke ruled ineligible (graduation date fell 10 days outside limit).

Disturbing elements:  Dr. Henke had discussed eligibility with a program officer prior to submission of nomination and issue was not one of substance.

Dr. Henke sent letter to NSF expressing concern over matter.

Dec., 1986 – Our firm awarded DOE Energy-Related Inventions Program grant based on recommendation by NIST.  Grant for construction of prototype testing system.  Principal investigator – W. Henke, amount – approx. $80,000.

June, 1987 – Proposal by R. Henke for Engineering Initiation Award declined by NSF.

Disturbing inconsistency:  Seems all four of NSF's reviewers judged Dr. Henke to be inappropriate for competition due to level of experience.  One reviewer did not even complete evaluation form.  (Dr. Henke was fully eligible for competition.)  In sharp and puzzling contrast, The Johns Hopkins University, which was fully aware of Dr. Henke's history and has considerable experience with NSF programs, encouraged, endorsed (by signature), and even committed support to proposal.

Sept., 1987 – Harassment of W. Henke by NSF intensified.  Examples follow.

An NSF officer (main source of hostility during July, 1986 meeting) complained that budget for 2nd year of Phase II SBIR project "gave him heartburn" and that he "refused to waste the government's money in such a way."  Budget over which he was distressed was that which incorporated all of NSF's previous requests and had been approved by NSF one year earlier.

Dr. Bordogna
Page 5
October 19, 1992

Same officer suggested that even more work be subcontracted to The Johns Hopkins University. One year earlier individual had declared: "looks like a university project."

In telephone conversation with W. Henke, previously supportive NSF program officer stated:

"Projects like yours are an embarrassment to our program."

Official later apologized but we were stunned – particularly since we were willing to accommodate NSF completely on its often changing and contradictory requests concerning conduct of our SBIR project.

Dec., 1987 – In compliance with NSF requests, subcontract executed between The Johns Hopkins University and our firm for Phase II SBIR laboratory testing program. Our firm took steps toward having large, costly test chamber installed at University in preparation for testing prototype system.

Jan., 1988 – In letter to R. Henke, his department chairman at The Johns Hopkins University suggested he divert his attention to research other than that on testing system to increase publication productivity. Chairman stated:

"...publishing is very important...in order to dissemi-
nate the results of your research and to become respected
by your peers. I know this major research effort
involving extensive laboratory experimentation you are
doing does not lend itself easily to this. It may be
necessary for you to broaden the scope of some of your
research efforts to accomplish this."

Suggestion seems most irregular and gives rise to questions. For example, why, less than a month earlier, did University execute contract, approved by chairman, that fully committed R. Henke's research time for upcoming year when chairman apparently believed it would be harmful to his career for him to follow through on commitment?

In hindsight, it appears to us that there was a definite effort, possibly coordinated, to manipulate our progress on project.

Mar., 1988 – Second nomination of R. Henke by The Johns Hopkins University for NSF Presidential Young Investigator Award declined (eligibility requirements changed).

Disturbing element: Nomination was clearly an engineering proposal, yet was placed in science directorate (Geosciences: Seismology) for review. In our opinion, placement doomed proposal.

It is inconceivable to us that mishandling of this magnitude could be accidental. We are forced to conclude that placement, and therefore declination, was contrived.

Dr. Bordogna
Page 6
October 19, 1992

Apr., 1989 – R. Henke notified that his position as Assistant Professor at The Johns Hopkins University to be terminated. Reason given: inadequate accomplishments and promise.

We believe NSF's peer review system played pivotal role in termination. In our opinion, University's characterization of R. Henke was less than forthright. We believe that either University engineered termination by adversely influencing NSF's review process, NSF schemed to thwart our progress by manipulating review process and termination was a not-so-innocent by-product, or termination was result of coordinated effort. In our opinion, it would have been difficult to terminate R. Henke's position if he had been granted any one of the three awards discussed above (see Dec., 1986, June, 1987, Mar., 1988 entries). We feel he likely was strong contender in each of corresponding competitions and that extraordinary measures were taken in at least two of these to insure his failure.

Dec., 1989 – Completed laboratory testing of prototype system (NSF Phase II SBIR work). In our opinion, results promising and exceeded expectations of original reviewers.

Dr. Henke left The Johns Hopkins University.

Jan., 1990 – Phase I SBIR proposal by our firm declined by NSF. We proposed to develop simplified testing system that was logical derivative of original prototype system. Principal investigator – W. Henke.

Review comments technically absurd and untrue. Reviewers commented:

"...could not introduce except in softer soils..."

It is common knowledge that soft soils are generally the most troublesome during earthquakes.

"Would obtain site specific values only."

It is common knowledge that obtaining site specific information is a major and critical activity of geotechnical earthquake engineering.

"PI has had funding on similar concept before, but shows no results."

In fact, even though not required, we devoted one and one-half pages (pp. 14, 15, and 16) of the strictly limited proposal (25 pages) to presentation of results.

Utter absurdity of reviews made us suspect possibility of malice directed specifically at us through NSF's peer review process.

Dr. Bordogna
Page 7
October 19, 1992

May, 1990 – Loma Prieta earthquake proposal by our firm to NSF recommended
for funding but declined due to budgetary constraints and rank
among recommended proposals.

We feel our proposal was, in subtle manner, not evaluated either
fairly or reasonably.

Seemed key elements of proposal (section on results from prior
NSF support and education and human resources statement) not
addressed by reviewers.

While overall ratings positive, various review comments seemed
unreasonable – for example, reviewers criticized proprietary
aspects of work and lack of student participation.

Grant competition seemed highly irregular (for example, review
comments not provided on standard forms).

Concern over this competition and earlier experiences with NSF
triggered us to request formal reconsideration of proposal and to
obtain copies of all relevant funded proposals.

Study of funded proposals confirmed our suspicions over grant
competition.

Apparently, key elements of proposals were not considered and
therefore, various evaluation criteria were ignored.  Found
many funded proposals did not satisfy key requirements (for
example, required statement on education and human resources
and section on results from prior NSF support not included)
and yet received overall ratings of excellent (see memorandum
to Dr. F. Bernthal, Aug. 13, 1990).

Seemed we were treated differently than others.  For example,
one funded proposal involved proprietary technology and a
number of funded proposals apparently did not involve
students.

Despite these findings, NSF upheld original decision and declared
that its actions "were fair and reasonable, both substantively
and procedurally."  However, when pressed by us for basis of
position, NSF official responded: "...I consider this matter
closed" (see letter from Dr. Bernthal to us, Oct. 24, 1990).

Jan., 1991 – Phase I SBIR proposal by our firm declined by NSF.  We proposed
analytical work related to testing technology.

Possibility of retaliation stands out.

Dr. Bordogna
Page 8
October 19, 1992

Reviews mixed, ranging from poor to excellent.

Reviewers that viewed proposal negatively attacked proposal to degrees that were quite evidently absurd and made clearly untrue statements (see memorandum to Dr. Senich, Apr. 2, 1991).

For example, on our prototype testing system, one negative reviewer declared:

"The present proposal will bring us no closer to critical appraisal or field proofing of this tool."

It was incredibly clear from proposal that one large focus of Phase II work was to be the first field tests of prototype system. (Generally, Phase II is bulk of SBIR research effort. Phase I is simply relatively small but required lead-in study. Separate proposals required for each.) Appears reviewer deliberately misrepresented scope of work.

We requested reconsideration of proposal even though NSF had adopted policy of not formally reconsidering Phase I SBIR proposals. NSF reviewed decision and concluded that it could not "find any bias or fault in the review process."

Feeling reconsideration was not meaningful, we requested review of NSF's decision at higher level. NSF responded: "...no further review is warranted" (see letter from Dr. Bernthal to us, July 15, 1991). We responded by bringing to NSF's attention key issues that were not addressed by NSF (see our letter to Dr. Bernthal, Aug. 8, 1991). We were particularly concerned that subprogram assigned to handle proposal was same subprogram that administered the Loma Prieta earthquake grant competition, which we were questioning at the same time the SBIR proposal was being evaluated. Apparently, NSF simply accepted negative review comments and dismissed very positive comments - despite a high degree of inconsistency in doing so. We were forced to believe our proposal had been handled in a manner to insure hostile reviews. NSF rejected our concerns outright and official stated: "...I consider this matter closed" (see letter from Dr. Bernthal to us, Sept. 11, 1991).

Feb., 1991 - Above experiences pushed us to seek legal assistance. Engaged E. Glitzenstein to represent us.

Mar., 1991 - ATP proposal by our firm, on essentially same technology proposed to NSF (see Jan., 1991 entry), declined by NIST.

Proposal scored high on technical criteria (but fell short on business-related criteria). Original technical reviews received by NIST were mixed - 2 high, 1 low. In sharp contrast to NSF, NIST sought further review. Based on further review, NIST concluded negative review was "off base" and did not consider it.

Dr. Bordogna
Page 9
October 19, 1992

Experience raises questions concerning legitimacy of NSF's negative reviews and its treatment of mixed reviews.

June, 1991 - E. Glitzenstein submitted request, on our behalf, to NSF's Inspector General to investigate Loma Prieta earthquake grant competition.

Jan., 1992 - Two Phase I SBIR proposals by our firm, on essentially same technology proposed to NSF (see Jan., 1991 entry), declined by NRC.

However, in contrast to NSF, NRC reviews positive. Presumably, proposals declined because of priorities.

Positive reviews bring NSF's negative reviews into greater question.

Jan., 1992 - Two Phase I SBIR proposals by our firm, on technology previously proposed to NSF, declined by NSF. Proposals essentially same as those submitted to NRC (see Jan., 1992 entry above).

Comments from one reviewer suggest key page of proposal not read. Supporting comments suggest NSF staff did not read page either. Comments from other reviewers suggest they did not read proposals. (See letter of Feb. 12, 1992 from E. Glitzenstein to NSF's Inspector General).

We wished to request formal reconsiderations but NSF's policy of exempting Phase I SBIR proposals from such reconsiderations prevented us from doing so. We have been trying, unsuccessfully, to uncover a rational basis for this policy.

May, 1992 - ATP proposal by our firm, essentially same as that submitted previously to NIST (see Mar., 1991 entry), declined by NIST.

Received only average or below average technical ratings. Technical review comments quite harsh and included absurd and untrue statements. NIST evaluation board concluded reviews "unduly negative" but apparently did not try to resolve deep discrepancies among these and past evaluations.

Since proposal was centered on prototype testing system that DOE funded based on recommendation from NIST (see Apr., 1986 entry) and technology was viewed favorably by NIST as recently as Mar., 1991 (see corresponding entry), we fear that review of proposal was adversely influenced, possibly by NSF.

Dr. Bordogna
Page 10
October 19, 1992

May, 1992 to Present - Had various experiences that bring into even greater
            question legitimacy of NSF reviews of our proposals.

            W. Henke awarded travel grant by EERI to present paper at 10th
            World Conference on Earthquake Engineering in Madrid, Spain.
            Funds provided by NSF.

            Government agency purchased from us simplified field testing
            system comparable to one attacked by NSF's reviewers (see Jan.,
            1990 entry).

            Manuscript on laboratory tests of prototype testing system
            accepted for publication by highly respected journal.

### IMPLICATIONS OF EXPERIENCES

Our experiences suggest, inescapably, that NSF's peer review system is
vulnerable to abuses.  The system seems to allow

    1) inept (or malicious) reviews of proposals by reviewers and NSF
    staff,

    2) retaliation (deliberate seeking of hostile reviews, deliberate
    mishandling of proposals, etc.) and harassment,

    3) arbitrariness (imposing different standards on different grant
    applicants, etc.), and

    4) inappropriate influence.

Our experiences also suggest that the consequences of these abuses on public
safety, careers, etc. can be significant.  Furthermore, we believe that NSF's
susceptibility to abuses is aggravated greatly by its secrecy and its apparent
unwillingness to address rather evident problems.

### CONCERNS

As a result of our experiences, we have developed concerns over our
personal situation and also more general concerns.  Some of the former are

    1) the perverted treatment to which we have been subjected by NSF
    and its reviewers over the past several years and the various deep
    costs we have borne because of this treatment,

    2) NSF's apparent failure to act in the face of serious allegations
    supported by a great deal of circumstantial evidence and its
    withholding of or otherwise circumventing our access to direct
    evidence that NSF officials no doubt know is likely pivotal
    (meaningful minutes of panel meetings, notes on telephone
    conversations, reviewers' names, etc.),

Dr. Bordogna
Page 11
October 19, 1992

   3) the likelihood that our proposals can no longer be treated fairly and reasonably by NSF and its reviewers, and

   4) the possibility that what we have been experiencing with NSF is spreading beyond NSF (to NIST, for example).

Some of our general concerns are the following:

   1) the secrecy of NSF's peer review process,

   2) the blatant abuses that this secrecy seems to encourage, and

   3) NSF's apparent unwillingness to address the possibility of such abuses.

### CONCLUSION

   We believe in the fundamental concept of peer review. However, based on our experiences, we feel the execution of the process by NSF falls far short of acceptable. NSF's relatively sudden reversal in its position on our technology and in its attitude toward us is not reasonable. NSF's secrecy and unresponsiveness are truly inappropriate and do not inspire either trust or confidence. In our opinion, at least in our case, NSF has allowed abuses that fully undermine the intent of the peer review process.

                Sincerely,

                *Wanda Henke*

                Ms. Wanda Henke
                President

                *Robert Henke*

                Dr. Robert Henke
                Technical Advisor

cc: Ms. Linda Sundro, NSF
    Dr. William Richardson, The Johns Hopkins University
    Mr. Frank DeGeorge, Department of Commerce

# Memory-Based
# Summary of Concerns Regarding
# *The Baltimore Sun*

### by Robert Henke

**725 Cameron Woods Drive
Apex, North Carolina 27523
Phone: (919) 303-5801
E-Mail:** hroberthenke@aol.com

*Exhibit V
Attachment to
December 14, 2006
email,*

### December 13, 2006

This document provides a summary of concerns I have regarding a number of articles that have appeared in *The Baltimore Sun (The Sun)* over roughly the past sixteen years. I prepared the document for Gadi Dechter of *The Sun*. The document is intended to supplement the materials (dated November 30, 2006) I sent to Ms. Rondra J. Matthews, Publisher and CEO of *The Sun*. The reader should refer to those materials for background and definitions of abbreviations.

## Some Qualifiers

To give *The Sun* an idea of my concerns in a timely manner, I have prepared this document largely on the basis of memory. I have omitted many details, significant matters may be missing, and some of what I present may prove to be incorrect. Additionally, there are some articles I have not mentioned; I prefer to wait on these until I have a better understanding of our circumstances. Nevertheless, the thrust of the document is accurate. I can provide supporting details (dates and names, for example) on request.

I should also note that it is not any single or group of articles that is of concern. Rather, it is the sum of the articles in the context of all else that has happened to us (my firm and family) that is unsettling.

Lastly, I would guess that some of the articles I cite may not have sinister origins.

## Overall Concerns

Essentially, my overall concerns are that *The Sun* appears to be stalking my firm, me, and possibly my family and that *The Sun* has affected our ability to succeed professionally.

## Articles

### Group of Articles (early 1990s)

Shortly after I left the University, a number of students of mine either were the subject of or were mentioned in articles or photographs that appeared in *The Sun*. Most, if not all, of the students were from an engineering statics course I taught. I believe there were 13 instances of this. I would tend to rule out coincidence. I can only guess at the purposes of the articles.

### Article on Our Firm (early 1990s)

On February 8, 1990, *The Sun* presented a large article on our firm and its technology. Amy Davis was the photographer on the story. The article included an error in the caption of the large centrally located photograph; the caption referred to us as Robert and Wanda Davis. I would think that the probability for such an error would be infinitesimally small for an organization as competent as is *The Sun*. To us at least, the error degraded the article considerably. Also, in the body of the article, Wanda was referred to as Wanda Wenke. Predictably, on the day the article appeared, to our friends we were Robert and Wanda Davis or Wenke; the content of the article had been fully overshadowed. This was all good fun, until one fast-forwards to our existing circumstances. Assuming these mishaps were deliberate, I can only guess at the motive.

Summary for G. Dechter
Page 2
December 13, 2006

### Article on NIST Earthquake Engineering Researcher (early 1990s)

During the early 1990s, a front page headline article appeared in a Sunday edition of *The Sun* that featured an earthquake engineering researcher at The National Institute of Standards and Technology (NIST). I believe the reporter was Douglas Birch. Coincidentally, a month earlier, we had submitted a large earthquake engineering proposal to NIST's Advanced Technology Program. The proposal was a revision of a proposal we had submitted to that program a year earlier. Though that earlier proposal was declined, it received favorable technical reviews. The proposal was declined on the basis of business issues. The fate of the revised proposal was a striking contrast. I would describe the technical reviews as hostile. Even the NIST evaluation board conceded that the reviews were "unduly negative." In the setting of all else that has happened to us, I would have to ask, was the review linked in any way to the article in *The Sun*? It was almost a certainty that earthquake engineering researchers from NIST would be selected to review the proposal or would select reviewers for the proposal. This was one of the proposals for which we sought reviewer identities with our federal lawsuit.

### Article on the School of Engineering of The Johns Hopkins University (mid 1990s)

During the mid 1990s, a front page center article by Richard O'Mara appeared in *The Sun* that covered heavily the School of Engineering at The Johns Hopkins University and included comments from the Dean of the School and the National Science Foundation. Coincidentally, the day before, *The Chronicle of Higher Education* had published a major article on our federal lawsuit against the National Science Foundation. And the Dean was the individual who, as Chairman of the Department of Civil Engineering during my tenure at the University, chose to terminate my contract with the University. Chances are that *The Sun's* article was a response to *The Chronicle's* article. Assuming this to be the case, the article in *The Sun* and its timing suggest there existed rather close ties between *The Sun* and central figures/organizations in the matters in question.

### Article on Our Federal Lawsuit (mid 1990s)

During the mid 1990s, Douglas Birch wrote a major article on our lawsuit. I think the article was respectable as far as it went. However, if I recall, the article did not bring out the true character of the matter – that is, the very real possibility that grant competitions were being manipulated to cause harm. I do not know if this was intentional or whether our plight just did not come out that way in the interview of Wanda for the article.

### Various Articles on Legal Matters (2005-2006)

A fair number of articles have appeared recently in *The Sun* in which a C. Tobias has been quoted. If I recall, he even wrote a piece for the opinions/editorials pages. C. Tobias is a professor of law at the University of Richmond. As it happens, my son, Michael is a third year law student at the University of Richmond. He is also reasonably close to C. Tobias.

### Article on the New Madrid Seismic Zone (2005)

Late 2005, a major article on the New Madrid Seismic Zone by David Kohn appeared in a Sunday *Sun* Perspective section. The article featured scientists of the U.S. Geological Survey (USGS) who specialized in that zone and are stationed in Memphis, Tennessee. For the preceding several months, I had been in the process of trying to interest this very group in our technology. Coincidentally, the article was written two weeks before I was to present a poster on our technology at a seismology meeting in Memphis. The USGS scientists were to be attendees at the meeting. I presented the poster in hopes of attracting their interest. I was not successful in



Summary for G. Dechter
Page 3
December 13, 2006

this, even though the technology I was advancing met critical needs for the New Madrid Seismic Zone.

## Conclusion

In view of all that has happened to my firm, my family, and me, the above listing of articles is troubling.