## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| | ) Case No. 08-13141 (KJC) |
| TRIBUNE COMPANY, et al., | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) Re: Docket No. 3903 |
| | ) |
| | ) **Hearing date**: April 13, 2010, at 10:00 a.m. (Eastern) |
| | ) |
| | ) **Objection deadline**: April 12, 2010 |
| | ) |

### CREDIT AGREEMENT LENDERS'
### (A) STATEMENT REGARDING PURPORTED "SETTLEMENT"
### OF "LBO-RELATED CAUSES OF ACTION"; AND
### (B) REQUEST FOR TERMINATION OF PLAN EXCLUSIVITY

The Credit Agreement Lenders[1] collectively hold over $3.6 billion principal amount of

claims arising under the Tribune Company Senior Secured Credit Agreement, dated as of

May 17, 2007, or approximately 42% of the $8.7 billion principal amount of Credit Agreement

claims outstanding. The Credit Agreement Lenders are the largest creditors in these cases,

holding the senior-most claims in the Debtors' capital structure, and are not remotely like those

junior stakeholders who, as this Court has observed, frequently "invoke expensive and time-

consuming procedures merely to extract a payout exceeding their entitlements."[2]

To the contrary, given the size of their holdings and their position in the capital structure,

the Credit Agreement Lenders are a critical constituency without whom a consensual

reorganization in these cases is impossible. Given this, the Debtors' announcement of

"resolution of these cases" pursuant to a "Settlement Term Sheet" filed last Thursday night is

premature and misleading. That "resolution" purports to embody a "global settlement" – not

only of each and every "LBO-Related Cause of Action" that various factions previously

---

[1]    The Credit Agreement Lenders are the entities identified in the "Fourth Amended Joint
       Verified Statement Of Representation Of More Than One Creditor By Hennigan Bennett &
       Dorman LLP And Young, Conaway, Stargatt & Taylor, LLP".

[2]    *In re Spansion, Inc.*, Case No. 09-10690 (KJC), Opinion on Confirmation at 11 n.16 (Bankr.
       D. Del. April 1, 2010) (quoting Douglas G. Baird & Donald S. Bernstein, *Absolute Priority,
       Valuation Uncertainty, and the Reorganization Bargain*, 115 YALE L.J. 1930, 1932 (2006)).

clamored to bring but also of thorny issues relating to valuation of the Debtors, allocation of that value among the Debtors, allowance of billions of dollars of intercompany claims against the Debtors, and even the propriety and nature of future management compensation.

As shown below, the "settlement" is internally inconsistent and unfair.  If in fact there is meaningful exposure with respect to the avoidance and other claims that the Committee and others previously sought to pursue, that exposure extends not only to current holders of the Credit Agreement debt but also to the agent banks and others who received more than $2 billion of prepetition payments in respect of the allegedly-avoidable debt and to Sam Zell and the various Tribune directors and officers who were involved in structuring the allegedly-fraudulent transactions.  Simply put, there is no conceivable scenario under which Credit Agreement debt could be avoided without also opening the door to recoveries from those who received the $2 billion in prepetition payments on the avoidable debt and from Zell and the directors and officers.

Yet, the "settlement" extracts from the Credit Agreement Lenders and other current holders of Credit Agreement debt the entirety of the settlement consideration, thus compelling them to pay for the alleged sins of others.  To wit –

- <u>Claims against Sam Zell – by everyone's account, the person for whose benefit the allegedly-avoidable transfers and obligations were made</u>? *Released for free, without any payment or consideration, accompanied by unlimited indemnities from the reorganized enterprise.*

- <u>Claims against the Debtors' other current and former directors and officers</u>? *Released for free, without any payment or consideration, accompanied by unlimited indemnities from the reorganized enterprise.*

- <u>Claims against JPMorgan, Merrill Lynch, Citibank, and others involved in the formulation of transactions previously decried by settling creditor parties as "the worst LBO in history"</u>? *Released for free, without any payment or consideration, accompanied by indemnities from the reorganized enterprise.*

784888.5

- <u>Claims for recovery and disgorgement of more than $2 billion in payments made in respect of the allegedly-avoidable obligations now subject to the "settlement"? **Released for free, without any payment or consideration, accompanied by indemnities from the reorganized enterprise.**</u>

For the beneficiaries of the free releases and indemnities, this is a "settlement" made possible with "other people's money" – specifically, that of the Credit Agreement Lenders and other current holders of Credit Agreement claims left holding the bag for the agent banks who sold them (or their predecessors) the debt in the first place, for Zell and the others who allegedly conspired to defraud the Debtors' preexisting creditors, and for those lucky entities who received prepetition payments and then sold out before the Debtors hit the wall.

One can easily see why the Debtors (still controlled by Zell and his designees) love this arrangement – it accomplishes their number one objective (releases for Zell and management) painlessly and freely.  It also is easy to see why JPMorgan and other agent banks would leap at this deal, given their outsized exposure to disgorgement claims and claims arising from their participation in the allegedly-fraudulent transactions.[3]  And it is easy to understand why Centerbridge, Law Debenture, and the Committee are on board, as the arrangement transfers to them and their constituencies at least $400 million in value (and probably more)[4] otherwise distributable to current holders of Credit Agreement claims.

---

[3]  JPMorgan had an added incentive to sign on to the "settlement".  Apparently, there is an undisclosed "Settlement Support Agreement" that accompanies the filed "Settlement Term Sheet" and, among other things, provides for Law Debenture and Centerbridge to withdraw their motion seeking disgorgement of the $25 million in fees already paid to JPMorgan by non-debtor guarantors *and* for such payments to "resume without objection" on an ongoing basis.  *See* Stipulation withdrawing fee disgorgement motion [docket # 3995] at 2.  The Court should require that the "Settlement Support Agreement" immediately be filed on the public docket so that parties in interest and the Court can determine whether other inducements to settlement have been offered.

[4]  This figure is calculated using the conservative, likely inaccurate, enterprise value that the "settlement" imposes by fiat, apparently without possibility of judicial review or revision.  Trading prices for Tribune debt indicate that the market places a much higher value on Tribune, such that the forced "give up" by holders of Credit Agreement claims is substantially greater than $400 million.

- 3 -

It is much harder to see why the Credit Agreement Lenders or other holders of Credit Agreement debt would support the deal. And without such support, the "global settlement" is dead on arrival, as it is, of course, hornbook law that no settlement can be implemented without the assent of the putative defendants in the case subject to compromise. Accordingly, the "settlement" represents a costly detour that ultimately will not advance the ball or bring about resolution of these cases. Fortunately, as shown below, there are alternatives available, including those that would enable creditors to have their "day in court" with respect to the alleged avoidance and other claims while enabling the Debtors to exit chapter 11 rapidly and remove the bankruptcy overhang that is continually (and unnecessarily) draining value from the enterprise.

Thus, as requested last December and last February, the Credit Agreement Lenders again request that the Court terminate the Debtors' plan exclusivity – which is now plainly being used in an effort to bludgeon the Credit Agreement Lenders and others into submitting to a one-sided and unfair "settlement" – to enable them to propose a competing plan that will enable Tribune's operating businesses to exit bankruptcy immediately (on or faster than the timetable under on which the Debtors' not-yet-filed plan would proceed) while providing all creditors with a better, more viable restructuring alternative, one that may provide higher returns to all parties in interest (other than those to whom the Debtors now purport to give free releases).

## A LOPSIDED "SETTLEMENT"

For the last eight months, the Committee, Law Debenture, and Centerbridge have been agitating for pursuit of various causes of action that they say arise from Tribune's stock repurchases in June 2007 and Tribune's merger in December 2007, transactions that Law Debenture's counsel colorfully described as the type "that helped bring down our economy."[5] Each has emphasized that those causes of action are far more than simply claims for avoidance of the Credit Agreement debt. Again quoting Law Debenture's counsel:

---

[5]    Transcript of hearing held on December 1, 2009 ("December Transcript"), at 23 (remarks of David Rosner).

> *[W]e're not just simply talking about fraudulent conveyance*
> *claims. . . .* [Y]ou know, in the Third Circuit very well developed
> fraudulent conveyance claims that arise out of a leverage buyout,
> but, in addition, *the breach of fiduciary duty claims that can*
> *affect, you know, current directors as well as current managers,*
> *the aiding and abetting type claims, and then recovery claims for*
> *[disgorgement] . . . of interest and advisory fees that were paid*
> *out of the Tribune Company.* So there's a mix here of claims that
> I think is necessary for people to understand.[6]

Centerbridge agreed:

> *The Derivative Causes of Action have the potential of recovering*
> *billions of dollars in fees, principal and interest payments, and*
> *expenses paid to the LBO Lenders,* as well as avoiding all of the
> outstanding LBO Debt.  These potential benefits would have a
> profound impact on the recoveries to be distributed to the Debtors'
> remaining creditors, and therefore *must be pursued aggressively,*
> *and not settled away simply to fulfill the Debtors' desire to exit*
> *chapter 11 and, presumably, to secure releases for its past and*
> *present officers and directors.*[7]

---

[6]  *Id.* at 21 (remarks of David Rosner) (emphasis added); *see, e.g.*, Motion Of Law Debenture Trust Company Of New York For Leave To Conduct Discovery Pursuant To Rule 2004 Of The Federal Rules Of Bankruptcy Procedure Of Tribune Company, Its Affiliates, And Certain Third Parties, Or Alternatively, For The Appointment Of An Examiner [docket # 2031] ("Law Debenture Motion") at ¶ 13 n.25 ("the estates need to investigate potential claims against the recipients of this $224 million in fees in connection with value to the estates and adherence to professional and fiduciary duties").

[7]  Joinder Of Centerbridge Credit Advisors LLC To Motion Of The Official Committee Of Unsecured Creditors For Entry Of An Order Granting Leave, Standing And Authority To Commence, Prosecute And Settle Claims And Counterclaims of the Debtors' Estates [docket # 3407] ("Centerbridge Joinder") at 4-5 (emphasis added).

Ultimately, when the Committee sought standing to pursue the claims on behalf of the bankruptcy estates, the Committee requested authority to bring causes of action that "*seek to avoid and recover very large transfers made by the Debtors in connection with the LBO, including (a) almost $2 billion in principal and interest repaid on the LBO Debt, (b) over $200 million in fees paid to the Lead Banks, (c) over $30 million paid to the Debtors' financial advisors, and (d) over $2.5 billion paid to the administrative agent for the 2006 Bank Debt that was satisfied in connection with the LBO.*"[8]

These creditors also suggested that independent claims existed against Zell and the Debtors' other directors and officers, and vocally questioned the Debtors' ability to analyze and pursue such claims.  Centerbridge, for example, argued that the Debtors' reluctance to bring suit was "unsurprising, given that Samuel Zell and several of the Debtors' officers and directors were intimately involved in the LBO Transaction, and could potentially be defendants or witnesses in the Derivative Causes of Action."[9]  Likewise, Law Debenture has asserted that that "[t]he Debtors are plainly conflicted:  they consummated the LBO,"[10] and the Committee has agreed: "the Debtors themselves approved the LBO and will not want to pursue an action that attacks the LBO Debt."[11]  Indeed, Zell and his controlled companies already are defendants in class action litigation (the *Neil* case) pending in federal court in the Northern District of Illinois, facing

---

[8]  Motion Of The Official Committee Of Unsecured Creditors For Entry Of An Order Granting Leave, Standing And Authority To Commence, Prosecute And Settle Claims And Counterclaims Of The Debtors' Estates [docket # 3281] ("Committee Motion") at 8.  *See id.* at 4 ("The Committee believes there is substantial evidence that . . . related transfers should be avoided and recovered, including: (a) fees paid relating to the LBO and the Facilities, (b) principal and interest repaid on the LBO Debt prior to the Petition Date, and (c) payment at closing to satisfy preexisting debt.  Moreover, the Lead Banks (as defined below) are liable to the Debtors for damages relating to breaches of fiduciary duty in connection with the LBO Debt.").

[9]  Centerbridge Joinder ¶ 13; *see also* December Transcript at 35 ("For, after all, the debtors have a board of directors and have a management team, the extent of which remains to be seen but may well be subject to potential fraudulent conveyance and other related claims.  So it's not far afield to suggest that it may be difficult for the debtor to be the 100 percent honest broker in these negotiations.") (remarks of Daniel Golden).

[10]  Law Debenture Motion at 6.

[11]  Committee Motion at 10.

claims for breach of fiduciary duty and other causes of action arising in connection with the

Tribune transactions.

These creditor constituents previously claimed that the highly-material "other" claims

could not be waived or released without consideration. Again quoting Law Debenture's counsel:

"[N]oting that there are a lot of LBO claims, *people can't just be handed releases*. Particularly

in the Third Circuit they just can't be handed releases on claims that are at Tribune Company for

aiding and abetting and claims of breach of fiduciary duty."[12]

Yet, *that is exactly what Centerbridge, Law Debenture, and the Committee now seek to*

*accomplish through the purported settlement announced by the Debtors*. Specifically, they

would have current holders of Credit Agreement debt shoulder the entire burden of "settlement",

through a give up of more than $400 million in value (and probably more)[13] to bondholders and

other unsecured creditors, while giving releases to all other potential defendants of all other

potential claims arising from the Tribune transactions. Thus, Zell and his associates are *released*

*for free*. JPMorgan and other recipients of $200 million in transaction fees and $2 billion in

prepetition payments on the allegedly-avoidable debt are *released for free*. JPMorgan and the

agent banks who structured the deal and sold the debt to third-party purchasers also are *released*

*for free*, even with respect to third-party claims by the Credit Agreement Lenders and other

innocent purchasers. Instead, *every single penny of settlement consideration is to come from*

*the Credit Agreement Lenders and other current holders of debt, the least culpable of all*

*parties allegedly responsible for the contested transactions*.

Adding insult to injury, the deal also provides for these released parties to be indemnified

by the Debtors, in the case of Zell and the directors and officers in unlimited amounts. This

means that if the third-party releases that the "settlement" freely grants turn out not to be

enforceable (as they surely are not) and the indemnified parties wind up being found liable for

---

[12]   December Transcript at 28 (remarks of David Rosner) (emphasis added).

[13]   See footnote 4, above.

claims relating to the transactions (whether in the *Neil* litigation or otherwise), the Credit

Agreement Lenders and other current holders of Credit Agreement debt – as the owners of the

majority of the reorganized enterprise – would have to pay yet again for those liabilities, with

their new equity interests devalued by (and subordinated to) indemnification payments made to

the very entities found to be liable for the transactions in the first place.

At its core, the "settlement" therefore is riddled with irreconcilable inconsistencies.  On

one hand, if free releases and indemnities are appropriate from some of those alleged to be liable

for the transactions (Zell, JPMorgan, and others), the Credit Agreement Lenders and other

current holders of Credit Agreement debt logically should not be responsible for paying anything

to "settle" the alleged claims.  On the other hand, if a material settlement payment is in order, all

parties allegedly responsible (including Zell, JPMorgan, and others) must make a proportionate

contribution to the settlement.  It bears repeating that there is no conceivable scenario under

which Credit Agreement debt could be avoided without producing recoveries from those who

received the $2 billion in prepetition payments on the avoidable debt and from Zell and the

directors and officers.  Demanding a contribution from some (current holders of Credit

Agreement debt) and not others (Zell, JPMorgan, and other recipients of prepetition payments on

the allegedly avoidable debt) is utterly illogical and unfair.[14]

The "settlement" contains other objectionable provisions as well.  To name just a few –

- The deal provides for current management (including those receiving the
free releases and unlimited indemnities) to be rewarded with up to 7.5% of the equity of
the reorganized enterprise, thus further diluting recoveries of the Credit Agreement
Lenders.

- The deal provides for payment by the reorganized enterprise (and, hence,
the current holders of Credit Agreement debt) of an unlimited amount of attorneys' fees

---

[14]    Indeed, according to the testimony of David Kurtz, the Debtors have not even bothered to ask
Zell for a settlement contribution.  Transcript of hearing held on February 18, 2010
("February Transcript") at 66.

incurred by Centerbridge, Law Debenture, JPMorgan (recipient of a free release and indemnity), and even the individual members of the Committee ("in their capacity as such").

In short, the proposed settlement is unwise and unfair and, as will be shown at the appropriate time, the proposed plan incorporating that settlement is unconfirmable for multiple reasons.

## EXCLUSIVITY SHOULD BE TERMINATED TO ENABLE THE CREDIT AGREEMENT LENDERS TO PROPOSE A BETTER ALTERNATIVE

The Credit Agreement Lenders previously requested, both last December and again last February, that exclusivity be terminated so that they could propose their own plan of reorganization. Each time, the Court afforded the Debtors additional time and the opportunity to negotiate a consensual plan in the context of further extensions of exclusivity, noting in February that one last short extension would provide the Debtors "the last best opportunity to put together a global resolution."[15]

It is now clear, however, that the Debtors have failed in their efforts, instead plowing ahead with a "resolution" that is not supported by holders of over $3.6 billion in Credit Agreement claims yet provides releases and indemnities to Zell, the directors and officers, and other parties (including JPMorgan) whose support the Debtors deemed necessary to provide the appearance of a "settlement". This is exactly the scenario envisioned by the Court when it expressed "concern about what would happen in the absence of a global resolution and the filing of the Plan in the absence of that."[16]

In any event, a plan embodying that resolution cannot be confirmed over the objection of the Credit Agreement Lenders (who hold approximately 42% of the total Credit Agreement

---

[15]  February Transcript at 97; *see id.* at 53 (testimony of David Kurtz that "global means everyone").

[16]  *Id.* at 89.

debt).  Accordingly, the time has come for the consideration of other options, free from the yoke

of exclusivity that the Debtors have exploited to put forth a plan with the apparent primary

objective of providing releases and indemnification to Zell and other insiders (in the process

buying support from JPMorgan and other agent banks with the promise of free releases and

indemnities).

If and when exclusivity is terminated, the Credit Agreement Lenders are prepared to file

an alternative plan that provides for the alleged fraudulent conveyance and related claims to be

adjudicated for the benefit of unsecured creditors – leaving open the possibility of a settlement

involving fair consideration and contributions from all prospective litigation targets (including

Zell, JPMorgan, and other disgorgement defendants) – while enabling the Debtors to exit

bankruptcy rapidly and to begin the process of healing the wounds that these cases have created.

There are several different plans the Credit Agreement Lenders may propose if given the

opportunity.  The Credit Agreement Lenders may propose a "subsidiary only" plan with terms

similar to those previously outlined for the Court.  As explained, a plan for Tribune's

subsidiaries makes sense given the indisputable facts that the subsidiaries had $2 billion less debt

than the Tribune parent company (and hence are much less likely to be found to have been

insolvent at the time of the 2007 transactions) and that Centerbridge, Law Debenture and the

bondholders clamoring for pursuit of the fraudulent conveyance claims are not creditors of the

subsidiaries (and therefore have no standing to pursue or benefit from avoidance actions brought

on behalf of the subsidiaries' bankruptcy estates).

Alternatively, in an extension of the subsidiary plan concept, the Credit Agreement

Lenders may propose a plan for all the Tribune Debtors that would:

- Make an offer to settle the claims for avoidance and disallowance of the
  Credit Agreement claims, against the Tribune guarantor subsidiaries only, through
  delivery of guaranteed value to other constituents (similar to the structure of the
  resolution proposed by the "settlement" the Debtors now are pursuing); and

- Preserve and transfer to a litigation trust all causes of action available to Tribune Company (the parent entity) relating to the 2007 transactions (plus all causes of action belonging to the Tribune guarantor subsidiaries in the event of rejection of the settlement offer described above), including all claims against Zell, directors and officers, and JPMorgan and the other disgorgement defendants, such that claims allegedly worth $2 billion or more could be pursued for the benefit of all Tribune Company creditors (including Centerbridge and Law Debenture).

Either plan would enable the Tribune businesses to exit bankruptcy immediately while avoiding the unfairness of a "settlement" forced upon and funded by only one group of potentially-liable parties. Each would give Tribune creditors the prospect of a greater recovery in the event they are able to back up their overheated rhetoric with actual facts and law supporting the claims they previously claimed to be available. And each would establish a framework for settlement negotiations involving *all* of the potentially-liable parties, eliminating the unseemly specter of the Debtors (still controlled by Zell) negotiating for free releases and indemnities for Zell and other insiders and of the Committee (led by JPMorgan as Chair) negotiating for free releases and indemnities for JPMorgan and other agent banks and disgorgement defendants.

Indeed, the only reason the Debtors have resisted the "subsidiary only" and "litigation trust" plan concepts to date is because such alternative plans would cause the Debtors to lose their stranglehold over the plan process and leave open the possibility that Zell and the insiders would be subjected to future litigation. This is a compelling reason by itself to terminate plan exclusivity.

The Credit Agreement Lenders could and would prepare and file their plan rapidly, so that it could be set on the same schedule for consideration as the Debtors' not-yet-filed plan that will embody the alleged "settlement". There is no reason not to give all creditors a choice.[17]

---

[17]    The Debtors have said they intend to file a plan before the April 13 hearing on their pending exclusivity motion, thereby allegedly rendering that motion "moot". This plainly reveals that

784888.5

**CONCLUSION**

The "global settlement" around which the Debtors apparently will base their plan of reorganization is anything but.  It is impossibly tainted by the Debtors' attempt to give a free pass to their insiders.  And it is not a settlement that has the approval or agreement of the lion's share of the entities being asked to fund it.

Plan exclusivity should be terminated immediately to enable the Credit Agreement Lenders to propose a fairer and less rank plan alternative.  Maintaining exclusivity at this point would serve no purpose other than aiding the Debtors in their illicit pursuit of releases and indemnities at all costs – to the ultimate detriment of all legitimate stakeholders in these cases.

Dated:  April 12, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899 0391
Telephone: (302) 571-6600
Telecopier: (302) 571-1253

- and -

HENNIGAN, BENNETT & DORMAN LLP
Bruce Bennett
James O. Johnston
Joshua D. Morse
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Telephone:  (213) 694-1200
Telecopier:  (213) 694-1234

*Counsel to the Credit Agreement Lenders*

---

the filing of the exclusivity motion was nothing more than an artifice, designed to take advantage of the automatic "bridge" order provided by the local rules.  The bridge order provision in the local rules is intended to maintain the status quo until the Court can consider the relief requested.  It is not intended to give the movant a free extension without judicial review.  Unfortunately, such gamesmanship is reflective of the Debtors' approach to the plan process as a whole.  In any event, to the extent the Debtors fail to do so, the Credit Agreement Lenders hereby object to the requested extension of plan exclusivity.

- 12 -

784888.5