**FILED UNDER SEAL –**
**CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 Cases |
| | ) Case No. 08-13141 (KJC) |
| TRIBUNE COMPANY, et al. | ) (Jointly Administered) |
| Debtors. | ) **Hearing Date**: April 13, 2010 at 10:00 a.m. (Eastern) |
| | ) **Objection Deadline**: April 9, 2010 |

## REPLY OF CREDIT AGREEMENT LENDERS IN SUPPORT OF
## MOTION FOR LEAVE TO CONDUCT RULE 2004 DISCOVERY OF CENTERBRIDGE

Centerbridge's Objection to the Credit Agreement Lenders'[1] motion for Rule 2004 discovery (the "Motion") fails to address two fundamental and dispositive points.

*First*, Centerbridge does not acknowledge *even a single word* of the text of Rule 2004. Centerbridge's Objection fails because the Rule's language expressly establishes the propriety of the discovery sought here. Indeed, Centerbridge never acknowledges that it successfully argued earlier in these cases that Rule 2004 is the appropriate vehicle for creditors (like the Credit Agreement Lenders) to discover information about the potential fraudulent conveyance claims that Centerbridge and others have deemed to be the critical issue in this reorganization.

*Second*, Centerbridge does not mention that it unquestionably has information that is directly relevant to those alleged causes of action as a result of Centerbridge's involvement in the competing bid for Tribune the Chandler Trusts submitted during the auction process that ultimately produced the Transactions Centerbridge now attacks. Centerbridge undoubtedly has documents, created contemporaneously with the Transactions, that relate to and reflect upon Centerbridge's own contemporaneous view of Tribune's value and the propriety of the Transactions that Centerbridge was bidding against – Transactions that ███████████████████

---

[1] The Credit Agreement Lenders are the entities identified in the "Fourth Amended Joint Verified Statement Of Representation Of More Than One Creditor By Hennigan Bennett & Dorman LLP And Young, Conaway, Stargatt & Taylor, LLP" [D.I. 3998].

784889.2

FILED UNDER SEAL –
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

The case law establishes that Rule 2004 discovery is allowed for multiple purposes, including to determine "*whether* wrongdoing has occurred." *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) (emphasis added). What's good for the goose is good for the gander. Just as Centerbridge sought discovery to attempt to establish a fraudulent conveyance, Centerbridge must provide discovery that may well defeat any contention of a fraudulent conveyance (or which, at a minimum, would be relevant to the parties' assessment of the strengths and weaknesses of the claims that Centerbridge has loudly advocated).

## Rule 2004 Broadly Authorizes Discovery Of

## The Relevant Materials Requested By The Credit Agreement Lenders

Centerbridge contends that Rule 2004 allows discovery only to locate or "marshal" assets of the debtor.[2]  Obj. ¶¶ 8-9.  The language of the Rule refutes this contention.  While Rule 2004 authorizes discovery relating to "property . . . of the debtor," it does not stop there.

Rule 2004 also expressly authorizes discovery relating to the following broad topics, among others:

- "any matter which may affect the administration of the debtor's estate";

- "liabilities . . . of the debtor";

- any "matter relevant to the case"; and

- any matter relevant "to the formation of a plan."

---

[2]  Centerbridge's Objection does not contest several important points established by the Credit Agreement Lenders in the Motion.  For example, Centerbridge does not contest that Rule 2004 is the "basic discovery device" in bankruptcy cases. *In re French*, 145 B.R. 991, 992 (Bankr. D.S.D. 1992).  Centerbridge also does not contest that individual creditors and parties in interest may use Rule 2004 discovery to obtain discovery so that they may present a full factual record to the bankruptcy court, *In re Lehman Bros. Inc.*, Case No. 08-01420 (JMP), 2008 Bankr. Lexis 3543 (Bankr. S.D.N.Y. Nov. 26, 2008), at *7-11, or that Rule 2004 discovery may be obtained from third parties, such as Centerbridge, that had dealings with a debtor, *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 432 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994); *In re Valley Forge Plaza Assocs.*, 109 B.R. 669, 674 (Bankr. E.D. Pa. 1990); *In re Fearn*, 96 B.R. 135, 138 (Bankr. S.D. Ohio 1989).

**FILED UNDER SEAL –**
**CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER**

Case law confirms that Rule 2004's text defines the scope of its permissible use. *Lehman Bros.*, 2008 Bankr. Lexis 3543, at *8 (court turns to text of Rule 2004 to conclude, even without considering the enhancements applicable in a chapter 11 case, that: "The broad scope of Rule 2004 is well recognized. An examination under the Rule 'may relate only to the acts, conduct or property or to the liabilities and financial condition of the debtor or to any matter which may affect the administration of the debtor's estate . . . .'").

While Centerbridge's Objection does not acknowledge that the express language of Rule 2004 authorizes discovery on each of these broadly defined categories of information delineated by the Rule, one of the cases it cites makes clear that Rule 2004 discovery is allowed unless the discovery is not relevant to any of those categories. *In re Continental Forge Co.*, 73 B.R. 1005, 1007 (Bankr. W.D. Pa. 1987) (discovery unavailable under Rule 2004 because the subject matter had "no relationship to the debtor's affairs [and] no effect on the administration of his estate"). As it avoids altogether the discovery categories expressly covered by Rule 2004, Centerbridge also does not contest that the discovery sought here is relevant to each of the authorized subject matters. Nor could it do so.

Centerbridge's involvement in the Chandler Trusts' bid and its contemporaneous assessment regarding Tribune's value are topics that fall within each of the categories for which Rule 2004 expressly authorizes discovery. This information bears upon the "liabilities . . . of the debtor." It will "affect the administration of the debtor's estate" with regard to whether or not the Debtors must honor the Credit Agreement claims. And it is directly relevant "to the formation of a plan" that, absent claim avoidance, must account for the Credit Agreement obligations in the manner provided for by the Bankruptcy Code. Just as Centerbridge said when it sought its own Rule 2004 discovery, the facts regarding fraudulent conveyance are plainly a "matter relevant to the case."

The discovery sought by the Credit Agreement Lenders is designed to shed light on a number of facts critical to the establishment of the alleged fraudulent conveyance claims that Centerbridge first wanted to bring and now wants to settle (through a "settlement" that would

- 3 -

FILED UNDER SEAL –
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

result in a transfer of at least $400 million in value away from the Credit Agreement Lenders and other current holders of Credit Agreement claims), including the value of Tribune at the time of the disputed Transactions. As a participant in a bid for Tribune, Centerbridge had information and a view as to Tribune's value. And, when outbid, Centerbridge did not cry "fraud."

Centerbridge does not and cannot contest the fact that it has information that is highly relevant to the alleged fraudulent conveyance claims and that likely will disprove its current assertion that Tribune was insolvent at the time the Transactions were executed. In early 2007, just months before the Tribune share repurchase transaction was consummated, the *Wall Street Journal* published an article reporting that the Chandler/Centerbridge offer valued Tribune at $31.70 per share, a price that implies an enterprise value that makes Tribune clearly solvent at the time of the Transactions. *See* Exhibit A. The contemporaneous views of an actual participant in the Tribune auction are clearly relevant and probative and should be part of the record before the Court, far more so than the press and analyst statements about the Transactions that Centerbridge and others repeatedly cite as "evidence" of Tribune's supposed insolvency.

Unsurprisingly, and contrary to Centerbridge's unsupported assertions, Rule 2004 also applies evenhandedly. Rule 2004 exists not merely to help the debtor and other parties establish claims that may enhance the bankruptcy estate, but also to determine "whether wrongdoing has occurred." *Enron*, 281 B.R. at 840 ("As a general proposition, Rule 2004 examinations are appropriate for revealing the nature and extent of the bankruptcy estate, and for 'discovering assets, *examining transactions, and determining whether wrongdoing has occurred*.' In this regard, courts have recognized that Rule 2004 examinations are broad and unfettered and in the nature of fishing expeditions.") (emphasis added and citations omitted). Thus, just as Rule 2004 allowed the discovery Centerbridge wanted to aid its efforts to establish a fraudulent conveyance, Rule 2004 allows discovery from Centerbridge seeking to determine whether there are grounds for the assertion of a fraudulent conveyance claim at all.

- 4 -

FILED UNDER SEAL –
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

### Rule 26 Is A Red Herring

In addition to its unjustifiably narrow view of Rule 2004, Centerbridge contends that the

Credit Agreement Lenders should be limited to discovery available under Rule 26. This

contention, however, has two basic flaws.

*First*, Rule 26 isn't available at all. There is no pending adversary proceeding against the

Credit Agreement Lenders, and there is no pending contested matter involving them. *In re*

*Buick*, 174 B.R. 299, 306 (Bankr. D. Col. 1994) (Rule 26 discovery limitations do not apply to

parties not affected by, and issues not raised in, pending adversary proceedings). This fact

distinguishes the one case on which Centerbridge relies. *Valley Forge Plaza*, 109 B.R. at 674-75

(Rule 26 applies "once an adversary proceeding or a particular contested matter is under way" –

concern regarding conflict with Rule 26 particularly serious in that case because debtor sought to

use Rule 2004 to obtain discovery of the experts employed by its litigation adversaries beyond

that allowed by Rule 26(b)(4)).

As of this moment there is neither a proposed plan nor a disclosure statement nor a

motion seeking approval of the alleged "settlement" adopted by Centerbridge. Indeed, even if

there is a plan and disclosure statement by the time of the hearing on the Motion, there will be no

contested matter at hand. Against this backdrop, Centerbridge cannot invoke a potential,

hypothetical future contested matter to resist the present use of Rule 2004.

*Second*, even if there eventually is a contested matter, the requested Rule 2004 discovery

would remain permissible and appropriate. The case cited by Centerbridge stands at most for the

proposition that Rule 2004 discovery becomes unavailable when the information subject to the

request is relevant *only* to the adjudication of a live and pending adversary proceeding or

contested matter as to which Rule 26 applies. *Valley Forge Plaza*, 109 B.R. at 674 ("once an

adversary proceeding or a particular contested matter is under way, discovery *sought in*

*furtherance of litigation* is subject to the F.R.Civ.P. rather than the broader bounds of R2004")

(emphasis added). Even after an adversary proceeding is commenced, Rule 2004 discovery is

- 5 -

allowed so long as that discovery seeks information beyond the scope of the pending proceeding. *Buick*, 174 B.R. at 306 ("a creditor may conduct Rule 2004 examinations regarding issues in addition to or beyond the scope of its pending adversary proceeding(s), or the trustee's pending adversary proceeding(s)").

Here, the information that the Credit Agreement Lenders seek from Centerbridge goes to the heart of the propriety of the Transactions and is relevant to an array of topics broader than those likely raised by the hypothetical, not-yet-arisen contested matter that Centerbridge seeks to use as a shield, including (a) whether and to what extent Credit Agreement claims are allowable; and (b) whether the bankruptcy estates have claims and causes of action against other third parties, including Sam Zell, the Debtors' directors and officers, and JPMorgan and the other agent banks who negotiated the Credit Agreement and received hundreds of millions of dollars of fees in the process.

Centerbridge's reliance on Rule 26 appears to be little more than an attempt at obfuscation. Notably, Centerbridge does not explain what protections it thinks it would receive if the Credit Agreement Lenders were required to seek discovery under Rule 26 instead of Rule 2004. Centerbridge clearly wants delay, but that is likely not its only aim. As demonstrated in the email exchange that Centerbridge provided to the Court, the Credit Agreement Lenders' counsel repeatedly offered to negotiate a reasonable production schedule – an offer rejected by Centerbridge's counsel. *See* Golden Decl., Ex. A.

Centerbridge's additional goal is the narrowing of the scope of its required production. However, when counsel to the Credit Agreement Lenders asked Centerbridge to explain how its production obligations would be narrower or different under Rule 26, Centerbridge refused to answer, and its Objection similarly fails to state how the Credit Agreement Lenders' narrowly-tailored discovery requests would be limited or circumscribed in any way by Rule 26. Centerbridge simply says that "some of the requested documents may be relevant if a contested matter is initiated" (Golden Decl., Ex. A) – but does not explain what it thinks would be or would not be relevant in the hypothetical, not-yet-existing contested matter.

784889.2

**FILED UNDER SEAL –**
**CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER**

Rule 26 simply provides no basis to limit or delay Centerbridge's production of documents under Rule 2004.

## The Requests Have An Appropriate Scope

The Credit Agreement Lenders' requests have a narrow scope that is appropriately focused on the enterprise value of Tribune at the time of the disputed Transactions and Centerbridge's contemporaneous view of the Transactions. There are only eleven requests, and the notion that they reflect a "scorched-earth" approach (Obj. ¶ 3) is hard to take seriously. All eleven requests are targeted at obtaining the documents in Centerbridge's possession that would provide information regarding the enterprise value of Tribune and its guarantor subsidiaries and the related Chandler/Centerbridge bid. Of the eleven requests, Centerbridge does not even attempt to contest the propriety of eight of them. The three that Centerbridge highlights in its Objection are intended to be catch-all categories to ensure that Centerbridge will produce all documents shedding light on the Transactions, the Chandler/Centerbridge bid, and Centerbridge's contemporaneously-formed views of the value of Tribune and its assets. To the extent Centerbridge has any reasonable concerns with the breadth of these catch-all requests, the Credit Agreement Lenders will negotiate clarification in the discovery process. Those purported concerns are no basis for denial of the Motion.

## Conclusion

For the reasons set forth above and those stated in our moving papers, the Credit Agreement Lenders respectfully request entry of an order authorizing and directing the production of documents by Centerbridge in substantially the form of the proposed order attached as Exhibit A to the Motion.

784889.2

**FILED UNDER SEAL –**
**CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER**

Dated:  April 12, 2010                 YOUNG CONAWAY STARGATT & TAYLOR, LLP

Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899 0391
Telephone: (302) 571-6600
Telecopier: (302) 571-1253

- and -

HENNIGAN, BENNETT & DORMAN LLP
Bruce Bennett
James O. Johnston
Joshua D. Morse
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Telephone:  (213) 694-1200
Telecopier:  (213) 694-1234

*Counsel to the Credit Agreement Lenders*

784889.2

# EXHIBIT A



36 of 36 DOCUMENTS

Copyright 2007 Factiva ®, from Dow Jones
All Rights Reserved

## Dow Jones Factiva

(Copyright (c) 2007, Dow Jones & Company, Inc.)

## THE WALL STREET JOURNAL.

The Wall Street Journal

January 19, 2007 Friday

**SECTION:** LEADING THE NEWS; Pg. A3

**LENGTH:** 827 words

**HEADLINE:** Variety of Bids Gives Tribune Negotiating Leverage

**BYLINE:** By Sarah Ellison

**BODY:**

Armed with starkly different proposals from the Carlyle Group, the Chandler family and Los Angeles businessmen Ron Burkle and Eli Broad, Tribune Co. is now in a position to try to negotiate a deal to satisfy its restive shareholders.

The Carlyle Group emerged yesterday as the private-equity firm that had submitted an offer for Tribune's TV station group, according to a person familiar with the situation. While Tribune could use the Carlyle offer to negotiate better terms from the other two bidders, whose proposals involve more-sweeping restructurings, it may also hold some attractions for the company, a person close to the situation said. It would provide Tribune with a big chunk of cash that the company could use to pay out a big dividend or undertake a stock buyback, this person said. The offer is expected to value the stations at less than $4.2 billion, but details of the bid remained unclear. Carlyle declined to comment.

In contrast, the two other proposals, from the Chandler family, which owns 20% of Tribune, and Messrs. Burkle and Broad, drew a tepid response from both the Tribune camp and Wall Street. The Chandler offer, which involves spinning off the TV stations and taking the newspapers private, is pitched at a price barely above the current market price -- and well below the value that the family put on the company just six months ago.

The Burkle-Broad proposal is a recapitalization that the company's current management could approximate on its own, involving the payment of a $27-a-share dividend to shareholders funded out of borrowings. The deal would load Tribune up with a heavy amount of debt that could wipe out the value of its equity, said Lehman Brothers analyst Craig Huber.

"Bids for Tribune are 'takeunders,'" Mr. Huber said in a note to investors, arguing that the value of both proposals is

Variety of Bids Gives Tribune Negotiating Leverage The Wall Street Journal January 19, 2007 Friday

below the company's current market value. Still, Tribune stock was up 56 cents to $30.90 in 4 p.m. New York Stock Exchange composite trading, as investors bet that the offers would lead to some restructuring.

The Chandler offer, in particular, is likely to be scrutinized by Tribune's board, as it was the Chandlers who pushed Tribune to put itself on the auction block in the fall by complaining about the company's strategy. Details of the Chandlers' offer, outlined in a Securities and Exchange Commission filing, also show that the family proposes to cash out a significant portion of its roughly $1.4 billion stake in Tribune as a result of its bid.

As outlined in the filing, the Chandlers would offer existing Tribune shareholders $19.30 a share -- about $4.7 billion -- for Tribune's newspaper properties. The Chandlers' offer would be backed by private-equity partners including Evercore Partners and Centerbridge Partners LP as well as strategic investors, possibly including companies such as News Corp., an investment that could give the media giant a chance to acquire certain Tribune newspapers eventually. The Chandlers are putting only $672 million in equity into the bid, however, taking out an unspecified amount of cash and converting the rest of their Tribune stock to a loan to the newspaper company.

Separately, they would spin off Tribune's TV station business into a new company. In their proposal, the Chandlers say the value of shares in the TV company would be worth an additional $12.40 a share for Tribune holders -- bringing the combined value of their offer to $31.70. Still, analysts and people involved in the auction questioned the value being put on the stations by the Chandlers, suggesting it was too high.

Anticipating complaints about the value of the overall offer, the Chandlers said in the filing that Tribune stock -- which has traded between $30 and $33 in recent months -- has been "inflated by the expectations of a transaction" and that their offer "represents a premium of approximately 18%" to the "estimated unaffected trading price of Tribune."

In a note to employees, Tribune Chief Executive Dennis FitzSimons said the company had received offers and the board's special committee would evaluate them. "This will be a rigorous exercise, with an announcement in the first quarter still expected," he said.

The Burkle-Broad offer would retain current management and the two men feel that their control of the company would improve Tribune's prospects, particularly in the TV station group, according to people familiar with the proposal. One possibility is to take advantage of rules allowing broadcasters to own two stations in one market. Tribune could, for instance, swap Tribune's stations in big markets such as New York and Los Angeles for stations in smaller markets where the company already has a station. Such an approach could yield improvements in cash flow. The other advantage of the offer is its immediacy for shareholders, who would be paid a $27 dividend in short order, these people said.

License this article from Dow Jones Reprint Service

NOTES:
PUBLISHER: Dow Jones & Company, Inc.

LOAD-DATE: January 19, 2007