# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------X
In re:                                    :      **Chapter 11 Cases**
                                          :      **Case No. 08-13141 (KJC)**
**TRIBUNE COMPANY, et al.,**               :      **(Jointly Administered)**
                                          :
**Debtors.**                               :      **Hearing Date and Time:  April 13,**
                                          :      **2010 at 10:00 a.m.**
                                          :
--------------------------------------------------------X      **Related to Docket Nos. [3968, 3993]**

**WILMINGTON TRUST COMPANY'S RESPONSE TO: (I)
THE OFFICIAL COMMITTEE'S STATEMENT IN SUPPORT
OF CERTAIN MOTIONS FILED BY JPMORGAN CHASE BANK,
N.A. AND THE DEBTORS [DOCKET NO. 3968]; AND (II) THE DEBTORS'
REPLY TO WILMINGTON TRUST'S OBJECTION TO MOTION TO HALT
EQUITABLE SUBORDINATION ADVERSARY PROCEEDING [DOCKET NO. 3993]**

Wilmington Trust Company ("Wilmington Trust"), Successor Indenture Trustee for the

Exchangeable Subordinated Debentures due 2029 in the aggregate principal amount of $1.2

billion (generally referred to as the "PHONES") issued in April 1999 by Debtor Tribune

Company ("Tribune" and, together with its Chapter 11 affiliates, the "Debtors" or the

"Company"), by and through its undersigned counsel, hereby respectfully submits this Response

to the:

*Statement of the Official Committee of Unsecured Creditors in Connection with
(A) Motion of JPMorgan Chase Bank, N.A. for Sanctions Against Wilmington
Trust Company for Improper Disclosure of Confidential Information in Violation
of Court Order, and (B) Motion of the Debtors for an Order (I) Determining that
Wilmington Trust Company has Violated Automatic Stay, (II) Requiring
Wilmington Trust Company to Show Cause Why It Should Not Be Held in
Contempt of Court, and (III) Halting All Proceedings with Respect to the
Complaint,* dated April 7, 2010 [Docket No. 3968] (the "Official Committee's
Statement"); and

*Reply of Debtors in Support of Motion for an Order (I) Determining that
Wilmington Trust Company Has Violated Automatic Stay, (II) Requiring
Wilmington Trust Company to Show Cause Why It Should Not Be Held in*

1

*Contempt of Court, and (III) Halting All Proceedings with Respect to the Complaint*, dated April 9, 2010 [Docket No. 3993] (the "Debtors' Reply").

In response to the Official Committee's Statement and the Debtors' Reply, and in further support of the *Motion of Wilmington Trust Company for Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code*, dated Janaury 13, 2010 [Docket No. 3062] (the "Examiner Motion") and *Wilmington Trust's Complaint For Equitable Subordination And Disallowance Of Claims, Damages, And Constructive Trust*, filed on March 4, 2010 [Adv. Case No. 10-50732; Adv. Docket Entry No. 1.] (the "Equitable Subordination Complaint"),[1] Wilmington Trust respectfully states as follows:

## PRELIMINARY STATEMENT

1.    Both the Official Committee's Statement and the Debtors' Reply raise new 11th hour arguments directed against Wilmington Trust's Examiner Motion and Wilmington Trust's Equitable Subordination Complaint, and in support of the *Motion of the Debtors for an Order (I) Determining that Wilmington Trust Company Has Violated Automatic Stay, (II) Requiring Wilmington Trust Company to Show Cause Why It Should Not Be Held in Contempt of Court, and (III) Halting All Proceedings with Respect to the Complaint*, dated March 18, 2010 [Docket No. 3759] (the "Automatic Stay Motion").    These are facially weak papers: the Official Committee's Statement is really only a non-substantive (but fairly amusing) ad hominen attack against Wilmington Trust's counsel; and the Debtors' Reply (with extremely thin legal authority) is really more in the nature of a status report of settlement efforts.    Nevertheless, the matters before the Court are of critical case importance and, therefore, Wilmington Trust is compelled to interpose this Response.

---

[1]    Capitalized terms not otherwise defined herein have the meaning given to them in the Equitable Subordination Complaint.

2.      Notwithstanding Tribune's press release and other hoopla surrounding its recent "global" settlement of estate claims, it bears emphasis that Wilmington Trust is not a party to such settlement and intends to oppose it with vigor.  In fact, Wilmington Trust was not informed of any settlement discussions by counsel to the Official Creditors' Committee (the "Official Committee") and was intentionally excluded from all negotiating sessions and deliberations of the Official Committee concerning the settlement.[2]  This is especially important since Wilmington Trust made public its case views and intentions more than four months ago (example point of reference: Wilmington Trust's Examiner Motion was filed January 13, 2010).

3.      Wilmington Trust filed the Examiner Motion for two reasons.  First, it was concerned that disabling conflicts among members of the Official Committee, its counsel, and the Debtors had resulted in a utter failure to vigorously prosecute claims arising out of the Debtors' failed LBO.[3]  Second, it was concerned that these same conflicts would yield "smoky-backroom" negotiations and, in turn, an inappropriate settlement outside the crucible of litigation and/or the kind of arm's-length bargaining that ordinarily ensures fairness.  As it became

---

[2]     This, in and of itself, may give rise to claims and causes of action, In re Granite Partners L.P., 210 B.R. 508, 517 (Bankr. S.D.N.Y. 1997) (noting that a well-plead complaint can sustain a claim against a creditor's committee member for breach of fiduciary duty given egregious facts), and/or a basis for an examination into counsel's handling of the Official Committee engagement, In re Fibermark, No. 04-10463 [Docket No. 1422] (Bankr. D. Vt. April 15, 2005) (appointing an examiner to investigate, among other things, whether an Official Committee member breached its fiduciary duty).  It also may also give grounds for rejecting any notion that the "global" settlement was the product of arm's-length and good faith dealing, especially in light of already articulated concerns surrounding conflicts of interest burdening counsel to the Official Committee. See In re Exide Techs., 303 B.R. 48, 70 (Bankr. D. Del. 2003) (rejecting a proposed settlement of valuable estate claims that was not fully supported by all creditors).  Although these are matters to be developed further another day, all rights are hereby expressly and fully reserved.

[3]     It bears repeating that the Official Committee only sought standing to commence estate litigation *after* Wilmington Trust started agitating for an examiner.

increasingly clear that this fear was becoming reality, and that all parties in the "backroom" shared the view that any value entitlement belonging to the PHONES should be sacrificed (to those responsible for the LBO, no less), Wilmington Trust was compelled to supplement the Examiner Motion with the Equitable Subordination Complaint.

4.     The Debtors and now (incredibly) the Official Committee interpose pleadings opposing both the Examiner Motion and the Equitable Subordination Complaint.  To them, apparently, no one is to owe a fiduciary duty to holders of the PHONES and, thus, it is offensive to them that Wilmington Trust will not join them in turning a blind-eye to an innocent slaughter. The Official Committee's Statement and Debtors' Reply are obvious manifestations of that cruel sentiment; but, to be sure, emotional advocacy (or, worse, an unsavory attempt to disincentivize zealous advocacy by attacking a professional) does not withstand analysis of fact and review of legal principle.

5.     Regardless of motive, neither the Official Committee's Statement nor the Debtors' Reply enlightens a reasoned dialogue (the pleadings only serve to obfuscate with invective) over whether Wilmington Trust has standing to assert the causes of action contained in the Equitable Subordination Complaint.  The scant and inapposite law cited in the Official Committee's Statement and the Debtors' Reply, and the selective citations of facts that ignore

the specific targeting of the PHONES in the construction of the LBO (and now in the construction of the "global" settlement), do nothing to change that ineluctable conclusion.[4]

6.    Contrary to the Official Committee's Statement, Wilmington Trust did not waive its right -- indeed its legal obligation -- to protect the interests of holders of the PHONES when it was appointed to the Official Committee.  The law fully authorizes a member of the Official Committee to (i) zealously advocate positions before the Court in an effort to protect its own entitlement to value from the estates; (ii) disagree with the views of the Official Committee or its counsel; and (iii) take positions in Court that are completely adverse to the Official Committee's preferences or adopted strategy.  See, e.g., In re Microboard Processing, Inc., 95 B.R. 283, 285 (Bankr. D. Conn. 1989) (discussing that an impermissible conflict does not arise merely because one of the members of the committee has an adverse interest to the others); In re Grant Broadcasting of Philadelphia, Inc., 71 B.R. 655, 664 (Bankr. E.D. Pa. 1987) (stating that there is no prohibition against an entity's serving on a Creditors' Committee which has an interest adverse to other creditors); Kenneth N. Klee and K. John Shaffer, Creditors' Committees under Chapter 11 of the Bankruptcy Code, 44 S.C. L. Rev. 995, 1019 (1993) ("Committee members may act individually to protect their own interests notwithstanding a contrary position of the committee").  This is hornbook law taught to every law school student taking an introductory course in bankruptcy.

---

[4]    Relatedly, the Debtors and the Committee offer no persuasive legal support for the propositions that Wilmington Trust cannot assert and adjudicate its independent claims outside the plan confirmation process or in support of their contention that the Debtors can settle Wilmington Trust's claims without its consent.  The reason is simple: there is none.  Plans of reorganization cannot unilaterally resolve non-estate claims.  See, e.g., Coram Health Care Corp., 315 B.R. 321, 335 (Bankr. D. Del. 2004).  Indeed, even in respect of estate claims, the lesson of other failed LBO Chapter 11 cases such as Tousa and Lyondell is to the contrary: claims arising out of failed LBO's can, and in many such cases often are, asserted and adjudicated outside the Chapter 11 plan process.

7.      With nothing left in its arsenal, the Official Committee lodges claims of breaches of fiduciary duty (when, in light of its own behavior, one might have thought it strategically advisable not to start that kind of war). The attack could not be less meaningful. Contrary to the Official Committee's assertion, the Equitable Subordination Complaint is not a verbatim, mirror image of the Official Committee's filed Complaint; rather it pleads myriad facts and asserts unique counts not found in such Complaint. Further, because the Official Committee does not enjoy ownership and control over the facts of the LBO or pleadings that are a matter of public record (such as the Official Committee's filed draft Complaint), Wilmington Trust was free to use such sources in asserting its claims as a matter of law.

8.      Lastly, and all of the above notwithstanding, the grounds asserted by Wilmington Trust for the appointment of an examiner here have not been vitiated one bit by the "global" settlement or the filing of the Equitable Subordination Complaint; rather, they have been substantially extended and exacerbated by the terms "negotiated" and memorialized in the settlement. Indeed, the current facts and circumstances more than ever warrant the appointment of an examiner.  In addition to the appointment being mandated as a matter of law, the appointment would be in the best interests of the estates and would substantially assist the Court in evaluating the proposed settlement. That is especially true in light of all the surrounding facts -- strongly suggesting that the settlement is the product of negotiations among hopelessly compromised parties (including Mr. Zell and other insiders who are released without contributing any value) -- and the law's mandate that "insider-friendly" settlements pass the most exacting of Court scrutiny.  Similarly important questions abound that require analysis and answer: Why such a meager settlement was achieved; Why the Debtor's management is receiving releases from third-party claims without having paid any additional consideration;

Why was Wilmington Trust intentionally excluded from the negotiations? These questions go to the heart of a fair Chapter 11 process and adjudication, and are the very things that examiners are called upon to investigate.  See, e.g., In re A.H. Robbins Co., 88 B.R. 755 (E.D. Va. 1988); Extended Stay Examiner's Report, In re Extended Stay, No. 09-13764 [Docket No. 913] (Bankr. S.D.N.Y. April 8, 2010) ("Extended Stay Examiner Report").[5]

9.      For all of the foregoing reasons, as discussed more fully herein, Wilmington Trust respectfully requests that this Court: (1) find unpersuasive and disregard the Official Committee's Statement and the Debtors' Reply; (2) overrule the Debtors' Automatic Stay Motion, with prejudice; and (3) grant Wilmington Trust's Examiner Motion.

## ARGUMENT IN RESPONSE

### I.     Wilmington Trust Is Entitled To Adjudicate Its Claims To Conclusion Outside The Plan Confirmation Process.

#### A.     Neither The Debtors Nor The Official Committee Cite To Any Law Or Facts Depriving Wilmington Trust Of Standing.

##### 1.     The Official Committee's Statement And The Debtors' Reply Simply Ignore The Law.

10.     Conspicuously absent from the Official Committee's Statement and the Debtor's Reply is any attempt whatsoever to distinguish, or even discuss, the authority cited in the *Objection of Wilmington Trust Company* to the Debtors' Automatic Stay Motion [Docket 3942] (the "Objection to Automatic Stay Motion").   No response is offered to the well-reasoned decision issued by the Seventh Circuit Court of Appeals in In re Vitreous Steel Prods. Co., 911 F.2d 1223 (7th Cir. 1996), or to the many other consistent decisions cited in Wilmington Trust's Objection to Automatic Stay Motion, including In re Elrod Holdings Corp., 392 B.R. 110, 116

---

[5]     We refrain from attaching the Extended Stay Examiner Report due to its voluminous nature (458 pages), but we refer parties to the docket reference cited above where the report has been publicly filed.

(Bankr. D. Del. 2008) (Shannon, J.), In re Franklin Indus., 2007 WL 250 9709 (Bankr. N.D.N.Y.

Aug. 30, 2007), In re J.S.II LLC, 389 B.R. 570 (Bankr. N.D. Ill. 2005), In re LWD, 342 B.R. 514

(Bankr. W. D. Ky. 2001), In re Hoffinger, 327 B.R. 389 (Bankr. E.D. Ark. 2005), In re Conley,

159 B.R. 323 (Bankr. D. Id. 1993), In re SRJ Enters., 151 B.R. 189 (Bankr. N.D. Ill. 1992).

11.    As more particularly discussed in the Objection to Automatic Stay Motion, each

of the aforementioned cases establish that an individual creditor may bring a direct claim for

equitable subordination under Bankruptcy Code Section 510(c).  The reasoning and logic of

those cases - that equitable subordination claims affect various creditors in different ways and

may therefore be brought by an individual aggrieved creditor - apply with equal vigor here.  As

in Vitreous Steel, the LBO Banks in this case do not share in the harm occasioned by their

conduct.  Rather they are the perpetrators of that harm (and, in fact, they are the beneficiaries of

the absurd "global" settlement).  Thus, holders of the PHONES have a "particularized" injury

and, thus, have standing to seek equitable subordination and other relief.

### 2.    The Single Case Cited By The Debtors, Is Inapposite And Only Begs The Question At Issue.

12.    The Debtors instead hang their entire argument on an 18-year old case from

Florida, In re Prime Motors, 135 B.R. 917, 920 (Bankr. S.D. Fla. 1992), contending that that case

instructs the Court not to allow a creditor to hijack estate causes of action to improve its own

bargaining position.  That opinion has absolutely no bearing on the immediate question before

this Court.  In Prime Motors, a creditor challenged the claims of other creditors on the grounds

that the interests securing those claims were preferential transfers voidable under Bankruptcy

Code Section 547.  By its own admission, the objecting creditor invoked estate causes of action;

the creditor did not assert an independent claim for equitable subordination.  Thus, Prime Motors

does not even address, let alone contravene, the undisputed case authority cited above.

Wilmington Trust's right to assert an independent claim for equitable subordination is undeniable.[6]

### 3. The Official Committee And The Debtors Simply Ignore The Undisputed Allegations In The Equitable Subordination Complaint That Establish Particularized Injury.

13.     Apparently, both parties are plagued by remarkably severe case of myopia.  Of the one hundred ninety one (191) paragraphs of the Equitable Subordination Complaint, the Debtors' Reply focuses only on five (5) paragraphs, and then exclaims that Wilmington Trust only alleges harm common to all LBO creditors.  Such irresponsible advocacy cannot go unanswered: Wilmington Trust invites the parties to review (this time, far more carefully) the more than fifty (50) paragraphs previously identified for the Court specifically pleading particularized injury to the PHONES. See Equitable Subordination Complaint ¶¶ 3-9, 25, 27, 37-39, 41, 44, 47, 56-64, 72-73, 76, 78, 81-82, 89-90, 92, 95, 97-104, 107-111, 113, 116-117, 120, 122, 136, 146, 148, 162-165, 168-169, 173, 178-181, 185, 187, 189 and 191; Proposed Amended Equitable Subordination Complaint ¶¶ 3-10, 24-28, 34, 36, 47, 52, 54, 56, 69-77, 85-86, 89, 91, 94-99, 113-114, 116, 119, 121-129, 132-136, 138, 145, 147, 161, 172, 174, 188-191, 198-199, 215, 217, and 219-220.  These paragraphs make clear that the LBO Banks proceeded with LBO in the face of a known resulting insolvency because it would be borne by the PHONES. The undisputed evidence – documented in emails and other materials – proves that the LBO Banks did the deal, "assuming the risk" of the Company's insolvency, because all such

---

[6]     Furthermore, Wilmington Trust may have standing, as a creditor, to assert otherwise estate claims against third-parties under the so-called "Wagoner Rule." See Shearson Lehman Hilton Inc. v. Wagoner, 944 F.2d 119, 120 (2nd Cir. 1990) (creditors have standing to assert claims otherwise belonging to the corporation against third-parties complicit in management's wrongdoing). The Wagoner Rule is a rule of the Second Circuit, and has not been fully addressed by the Third Circuit Court of Appeals. Wilmington Trust welcomes the opportunity to brief this issue more fully, should the Court find its many other arguments unpersuasive.

risk actually fell on others – holders of the PHONES.[7]

**B.     Neither The Debtors Nor The Official Committee**
**Cite To Any Law Supporting Their Contention That**
**The Plan Confirmation Process Must Be The Exclusive**
**Forum For Adjudication of Wilmington Trust's Claims.**

14.     There is no legal support for the proposition advanced by the Debtors and the

Official Committee that Wilmington Trust's Equitable Subordination Complaint can only be

adjudicated as an objection to plan confirmation.  See Reply at 5.  Wilmington Trust has

appropriately commenced an adversary proceeding in respect to its claims against the LBO

Banks.  As a party with independent claims that are properly plead, Wilmington Trust is entitled

to a response to its claims, discovery and a trial on the merits.  See Fed. R. Bankr. P. 7001, et.

seq.  Neither Bankruptcy Code Section 1123 nor Bankruptcy Rule 9019 enable the Debtors or

anyone else to advance a plan that settles Wilmington Trust's direct claims against the LBO

Banks, without Wilmington Trust's Consent or full adjudication consistent with all applicable

principles of due process.  See, e.g., Coram Health Care Corp., 315 B.R. 321, 335 (Bankr. D.

Del. 2004).

**II.     Wilmington Trust Did Not Lose Its Right To Assert Individual**
**Claims By Reason Of Its Membership On The Official Committee.**

**A.     Individual Creditors May Assert Their**
**Claims Notwithstanding Official Committee Membership.**

15.     The Official Committee seems to be under the mistaken view that Wilmington

Trust lost the ability to pursue its own interest when it agreed to serve on the Official Committee.

See Statement at 8. There is no support for this view in the Bankruptcy Code or in terms of

---

[7]     This fact also lays waste the Debtors' contention that the PHONES' injury results from
nothing more than their contractually subordinated position.  See Reply at 8-9.  In fact, as
the Complaint alleges, the PHONES were specifically targeted by the Banks because of
their position, and the LBO Banks specifically undertook the risk of the insolvency
because it would be borne by the PHONES.

bankruptcy policy. In fact, the opposite is true: Chapter 11 would not function properly if dissenting creditors were not allowed to serve on a creditor's committee, and any contention that a member of the committee is consigned to a vow of silence by its participation must be disregarded.

16.    Indeed, from the outset of a case, certain creditors may recognize that, for various reasons, their preferences could diverge significantly from the goals of other creditors who may also sit on an Official Court Committee.[8] See Microboard, 95 B.R. at 285 ("It is axiomatic that each unsecured creditor has a conflict with every other unsecured creditor in the sense that absent a 100% distribution, the elimination or reduction of any such claim will benefit all others.") Moreover, not only is Wilmington Trust entitled to pursue its rights as a matter of law, it has a fiduciary duty to do so. See LNC Invs., Inc. v. First Fed. Bank, 173 F.3d 454, 459-60, 462 (2d Cir. 1999) (noting that an indenture trustee owes a fiduciary duty to bondholders). Wilmington Trust would have breached its own fiduciary duty had it not acted in the manner it has, asserting rights that the Official Committee intended to, and now has, squandered.

17.    Accordingly, the Official Committee is deeply mistaken when it asserts that Wilmington Trust's seat on the Official Committee acts to strip it of its rights to act on its own behalf. See Statement at 7-10. In order to facilitate the participation of a committee that "adequately represents" the creditor body, the law explicitly preserves the right of a creditor to

---

[8]    Without Wilmington Trust's active participation (as trustee for over $1.2 billion in debt), the Official Committee would not be constituted to "adequately represent" the general creditor base and would lack legitimacy and credibility. See Kenneth N. Klee and K. John Shaffer, Creditors' Committees under Chapter 11 of the Bankruptcy Code, 44 S.C. L. Rev. 995, 1011-1012 (1993) (discussing the requirement that the committee's membership reflect the underlying demographics of the unsecured creditor body); H.R. REP. 95-595, H.R. Rep. No. 595, 95TH Cong., 1ST Sess. 1977, 1978 U.S.C.C.A.N. 5963, 6065 (1977) (explicitly noting the importance of representative committees).

pursue his or her own interests, even if the majority of committee members disagree.[9] See In re Rickel & Associates, Inc., 272 B.R. 74, 100 (Bankr. S.D.N.Y. 2002) ("Although Committee members owe fiduciary duties, they are hybrids who serve more than one master. Every member of the Committee is, by definition, a creditor. Thus, he is competition with every other creditor for a piece of a shrinking pie. He may assert his rights as a creditor to the detriment of the creditor body as a whole without running afoul of his fiduciary obligations."); Greg M. Zipes and Lisa L. Lambert, Creditors' Committee Formation Dynamics: Issues in the Real World, 77 Am. Bankr. L.J. 229, 233 (2003) ("A committee member should, therefore, be prepared to exercise its fiduciary duties to the extent that it acts on behalf of the committee, even as it concurrently exercises its rights as a creditor."); Kenneth N. Klee and K. John Shaffer, Creditors' Committees under Chapter 11 of the Bankruptcy Code, 44 S.C. L. Rev. 995, 1019 (1993) ("Committee members may act individually to protect their own interests notwithstanding a contrary position of the committee . . . ");Grant Broadcasting, 71 B.R. at 664 ("[T]here is no prohibition . . . against an entity's serving on a Creditors' Committee which has an interest adverse to other creditors. Indeed, if there were, many otherwise eligible committee members would be disqualified."); In re Mclean Industries, Inc., 70 B.R. 852, 861 (Bankr. S.D.N.Y. 1987) ("creditors committees often contain creditors having a variety of view-points. Some members may favor liquidation; others may favor continuation of the business in order to preserve jobs or the viability of an important customer . . . . In most cases they can be expected among creditors **acting to protect their separate business interests**.") (emphasis added). .

---

[9]     It is textbook legal practice to note that an attorney is ethically bound to zealously advocate on behalf of his client. See U.S. v. Washington, 417 F.3d 780, 787 (7th Cir. 2005) (noting that "it is an attorney's duty to zealously advocate for her client even in the face of difficult facts."); Dorsett v. American Isuzu Motors, Inc., 805 F.Supp. 1212, 1219 (E.D. Pa. 1992) (stating same); Draper v. Airco, Inc., 580 F.2d 91, 95 (3d Cir. 1978) (noting that advocacy should not be "devoid of passion.")

18.     The cases cited by the Official Committee do not contradict this proposition.  In

FAS Mart Convenience Stores, Inc., 265 B.R. 427 (Bankr. E.D. Va. 2001) (Statement at 5-6), the

unsecured creditor who was kept off the Committee was in litigation to establish himself as a

secured creditor.  See FAS Mart at 433.  For obvious reasons, a secured creditor has no place on

an unsecured creditor's committee, and this case cannot be analogized to the facts here, which

involves an unsecured party pursuing unsecured creditor remedies.[10]  The Official Committee's

other cases, cited in passing, also fail to support its claim that Wilmington Trust violated its

fiduciary duty.  See Westmoreland Human Opportunities, Inc., 246 F.3d 233 (3d Cir. 2001)

(third circuit remands case to determine whether trade creditor's usurpation of business

opportunity amounts to breach of fiduciary duty); In re ABC Automotive Products Corp., 210

B.R. 437 (Bankr. E.D. Pa. 1997) (addressing question of procedures used to select counsel for

committee); In re Haskell-Dawes, Inc., 188 B.R. 515 (Bankr. E.D.Pa. 1995) (considering the

propriety of a creditor's committee in a small business case and concluding that an active

creditor's committee is important).

**B.     Wilmington Trust Owes A Fiduciary Duty To Holders Of
The PHONES And, Therefore, Is Legally Obligated To
Disagree With And Advocate Against Official Committee Passivity.**

19.     The Official Committee also operates under the mistaken assumption that, by

joining the Official Committee, Wilmington Trust became contractually obligated to support its

passive case strategy of protecting Zell and the LBO Banks.  This proposition is comical as

Tribune's bankruptcy is entirely the fault of the LBO Banks and Zell and their fraudulent

conduct, for the reasons outlined at length in the Equitable Subordination Complaint.  In the face

---

[10]     While there are secured creditors in this case masquerading as unsecured creditors (and, in turn, Official Committee members), those parties are most assuredly not Wilmington Trust.

of the wreckage of one of the worst leveraged buy-outs of all time, and a landscape cluttered with culpable parties asserting claims born out of fraud, the Official Committee chose a strategy of unilateral disarmament and appeasement intended solely to disenfranchise the PHONES. Sadly, this situation is common in many Chapter 11 cases. See In re Gusam Restaurant Corp., 32 B.R. 832, 834 n. 1 (Bankr. E.D.N.Y. 1983) (". . . in too many cases where creditors' committees are formed, the creditors' committees exist in name only and are completely ineffectual.")

20.    There is nothing in Wilmington Trust's status as a member of the Official Committee or anything inherent in the Official Committee process that requires Wilmington Trust's passivity. Congress intended for Chapter 11 to be an adversarial process, given the broad powers available to a debtor under the bankruptcy code, and Wilmington Trust's decision to exercise its individual rights fits squarely within that scheme, as well as the overall course of this particular Chapter 11 case. See Elizabeth Warren, Bankruptcy Policy, 54 U. Chi. L. Rev. 775, 785 (1987) ("In bankruptcy, with an inadequate pie to divide and the looming discharge of unpaid debts, the disputes center on who is entitled to shares of the debtor's assets and how these shares are to be divided. Distribution among creditors is not incidental to other concerns; it is the center of the bankruptcy scheme.")

21.    That the Official Committee distorts the record in familiar ways that Wilmington Trust addressed at length in its Objection does not alter the reality that Wilmington Trust has simply been advocating for the holders of the PHONES, as is its duty.  While we will refrain from revisiting all of the allegations *ad infinitum*, we again note that despite the Official Committee's statements to the contrary: (i) the Court did not prohibit or in any way discourage Wilmington Trust from bringing its action for equitable subordination (See Statement at 9;

14

Objection ¶¶ 59-60) and (ii) the remedies sought by Wilmington Trust do not belong to the estate (See Statement at 9; Objection ¶¶ 19-56).[11]

### C.    Wilmington Trust Did Not Disclose Confidential Information.

22.    As a threshold matter, the Official Committee is incorrect that the Equitable Subordination Complaint is a verbatim, mirror image of the Committee Complaint.    The Committee Complaint contains 162 paragraphs, only asserts estate claims for and does not address the specific treatment of the PHONES.    By contrast, the Equitable Subordination Complaint contains 191 paragraphs, asserts claims specific to the PHONES, and has over fifty (50) paragraphs addressing the special treatment of the PHONES.

23.    In addition, that the claims in each complaint rest on some of the same facts is of no significance.    The Committee does not own, posses or control use of the facts pertaining to the LBO.    Moreover, the authority cited in Wilmington Trust's Objection makes clear that the existence of estate claims based upon the same nucleus of operative facts does not deprive Wilmington Trust of its right to assert equitable subordination claims. See Objection ¶¶ 20-28.

24.    Further, any comparability between the two Complaints is inconsequential.    The Committee's Draft Complaint was publicly filed and available to all who were signatories to the Court's December 15, 2009 Order establishing a document depository ("Depository Order") [Docket No. 2858].    Thus, it is Wilmington Trust's status as trustee to $1.2 billion of bonds that allows it access to view the Complaint and is unrelated to Wilmington Trust's membership in the

---

[11]    In its Statement, the Official Committee joins JPMorgan in beating the very dead horse of the inadvertent redaction error that occurred when Wilmington Trust filed its original complaint. See Statement at 4. JPMorgan's motion regarding same is pending and not being heard at the April omnibus hearing, so Wilmington Trust will refrain from responding at length other than to state how disappointing it is to see one's own counsel (as Wilmington Trust is a member of the Creditor's Committee) offering aid and comfort to JPMorgan's determined efforts to distract this Court from uncovering the truth about the disastrous LBO through baseless harassment and motion practice.

Committee. No case law holds that a publicly filed complaint is copyrightable or protected work product that cannot be utilized by persons other than the authors. A complaint, as a mere recitation of facts, is simply not entitled to copyright protection. See David M. Young, Can the Lawsuit Industry Copyright its Class Action Complaints?, 18 Legal Backgrounder, Washington Legal Foundation, (April 11, 2003) ("It is clear that the facts set forth in a legal complaint are not the proper subject of copyright."); Gerald Lebovits et al., Ethical Judicial Opinion Writing, 21 Geo. J. Legal Ethics, 237, 265 (2008) ("'lifting' language from a public document filed with the court should be permitted because legal documents are not copyrighted material."); Steven J. Melamut, Pursuing Fair Use, Law Libraries, and Electronic Reserves, 92 Law Libr. J. 157, 173 (2000) (". . . [C]ourt documents such as legal briefs cannot be copyrighted").

## III. Notwithstanding Wilmington Trust's Clear Entitlement to Independently Assert Its Claims to Final Adjudication, The Current Circumstances Compel Appointment Of An Examiner.

### A. Appointment of an Examiner is Mandatory under 11 U.S.C. 1104(c)(2).

25. Lest it be overlooked in the numerous submissions over these issues, Wilmington Trust respectfully submits that appointment of an examiner is mandatory under Section 1104(c)(2) as the request was made by a creditor, before plan confirmation, where no trustee has been appointed and where the debtors unsecured debts exceed $5 million dollars.[12] Accordingly, an examiner must be appointed and should be directed to investigate the efficacy of the estate claims arising out of the LBO and, for reasons hereinafter discussed, the propriety of the

---

[12]   Wilmington Trust is aware of the existence of opinions in this and other Courts holding that appointment of an examiner remains discretionary notwithstanding the existence of the 1104(a)(3) factors. In re Spansion, slip. op. at 15-19 (Bankr. D. Del. Apr. 1, 2010) (KJC). On this point of law, Wilmington Trust respectfully disagrees with the Court, noting that the only appellate court to consider the issue, every district court, and most bankruptcy courts have held otherwise. See Wilmington Trust Company's Omnibus Reply to Objections to Examiner Motion [Docket No. 3420] at 3-5.

settlement being proposed. Each of these inquiries properly focus on the "acts, conduct, assets, liabilities and financial condition of the debtors . . ." and, now that a settlement has been negotiated that will be part of a proposed plan, clearly constitute "other matter[s] relevant to the case or to the formation of a plan." 11 U.S.C. § 1106(a)(3) (emphasis added).

**B.    Appointment Of An Examiner Is In The Best Interests Of The Estate.**

**1.    Because the Settlement Was Negotiated Between Hopelessly Conflicted Constituencies And Contemplates Releases To Insiders, It Requires Heightened And Exacting Scrutiny.**

26.    When evaluating the settlement that will be proposed by the Debtor, the Committee and the LBO Banks, the Court will be required to consider several factors including (1) the probability of success on the merits; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay attendant to it; and (4) the paramount interests of the creditors. In re RFE Industries Inc., 283 F.3d 159, 165 (3d Cir. 2002). Given that the settlement will be proposed in the context of a plan of reorganization, the Court will also apply the so-called Texaco factors: (1) the balance between the likelihood of plaintiff's or defendant's successes should the case go to trial vis-a-vis the concrete present and future benefits of the settlement, (2); the prospect of complex and protracted litigation if the settlement is not approved; (3) the proportion of the class members who do not object or who alternatively support the proposed settlement; (4) the competency and experience of counsel who supported the settlement; (5) the relative benefits to be received by individuals or groups within the class; (6) the nature and benefit of releases to be obtained by the directors and officers as a result of the settlement; and (7) the extent to which the settlement is truly the product of "arms length" bargaining, and not a product of collusion. In re Exide Technologies, 303 B.R. 48, 67-68 (Bankr. D. Del. 2003) (citing In re Texaco, Inc., 84 B.R. 893, 901 (Bankr. S.D.N.Y. 1985)).

27.    The settlement's contemplation of releases to insiders including the Debtor's management for no consideration whatsoever[13] mandates exacting scrutiny. In cases involving insiders, non-consensual releases in favor of non-debtor third parties are to be granted only in "extraordinary cases." Matter of Genesis Health Ventures Inc., 266 B.R. 591, 608 (Bankr. D. Del. 2001) (citing Gillman v Continental Airlines (In re Continental Airlines), 203 F.3d 203, 212 (3rd Cir. 2000)). Settlements that contemplate such releases to insiders must receive a higher and more intensive scrutiny. In re Drexel Burnham Lambert Group Inc., 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991) ("We subjected the agreement to closer scrutiny because it was negotiated with an insider, and hold that closer scrutiny of insider agreements should be added to the cook book list of factors that Courts use to determine whether a settlement is fair and reasonable."); see also In re Exaeris, Inc, 380 B.R. 741, 746-747 (Bankr. D. Del. 2008) ("Whether courts are required to apply a stricter standard when evaluating settlements negotiated by insiders of a debtor is not necessary to decide now . . . what is clear is that a court can and should consider whether an insider is receiving a release when evaluating the 'good faith' criterion.")

28.    Where a settlement does not come to the court for approval having been forged in the fires of an authentic adversarial interaction, the process by which the terms of the release of estate claims have been arrived assumes a much greater significance. See In re Painewebber L.P. Litig., 171 F.R.D. 104, 132 (S.D.N.Y. 1997) (in class action context, "[i]f proven . . . collusion might prevent the approval of the Settlement, and at the very least would raise the Court's scrutiny and rebut the presumption of deference to the recommendations of counsel."); see also

---

[13]    As understood by Wilmington Trust, the releases among Debtor's management are not contributing a penny notwithstanding their receipt of millions of dollars in connection with the LBO. See Proposed Amended Complaint ¶¶ 7, 97-103.

In re Adelphia Commc'ns. Corp., 368 B.R. 140, 238 (Bankr. S.D.N.Y. 2007) (Adelphia II) ("the first and most fundamental of the factors relevant to an assessment of the wisdom of a compromise is each side's likelihood of success") (giving consideration of whether the settlement was the result of arm's-length bargaining a "moderate weight" but noting it would have "much greater weight if [the Court] ever thought it had not been satisfied.").

29.    The burden ultimately lies upon the settlement proponents to establish that the settlement was a result of arm's length bargaining and occurred without collusion. See In re Matco Elecs. Group, Inc., 287 B.R. 68, 76 (Bankr. N.D.N.Y. 2002) ("The parties proposing the settlement must show that it is reasonable and that . . . [among other factors] 'the settlement was not collusive . . .'") (quoting In re Del Grosso, 106 B.R. 165, 168 (Bankr. N.D. Ill. 1989)). Perhaps the most compelling evidence of a bargain arrived at arm's length is a history of adversarial interactions between the parties. See, e.g., Adelphia V, 327 B.R. at 165 (arm's length bargaining where, as to one party, Debtors were engaged with negotiations with one party for nearly a year, had met more than 10 times, and repeatedly tried to negotiate a more favorable settlement and, as to other party, Debtors fought with "extraordinary vigor," met on numerous occasions, and tried to resolve issues through negotiation and litigation); Adelphia II, 368 B.R. at 243 (settlement was "plainly" result of arm's length bargaining process where was "the result of weeks of effort to bring seemingly intractable disagreements to a consensual conclusion," and where counsel participated "with incredible tenacity and skill, and had a knowledge of the MIA record, and the strengths and weaknesses of every party's position, second to none."). Such a history, in which "plaintiffs attempt to obtain as much as possible and defendants seek to pay as little as possible," Dacotah Mktg. & Res. LLC v Versatility, 21 F. Supp. 2d 570, 577-578 (E.D. Va. 1995), assures the Court that "the settlement is the result of hard bargaining," see

Continental Cas. Co. v. Westerfield, 961 F. Supp. 1502, 1506 (D.N.M. 1997), and such settlements will enjoy a presumption of fairness. See In re Hibbard Brown & Co., Inc., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) ("As long as the integrity of the negotiation process is preserved, a strong initial presumption of fairness attaches to the proposed settlement, and the recommendation of counsels are accorded great weight.").

30.    Where, by contrast, the parties had a common economic interest, and, as a consequence, were incapable of engaging in arm's length negotiations, collusion may be present. See Berry v. School Dist. of Benton Harbor, 184 F.R.D. 93, 105 (W.D. Mich. 1998) ("Two types of collusive conduct have been identified by the courts. The first is where counsel or a named representative has benefited at the expense of the class as a whole. The second is where the parties have failed to approach the settlement as true adversaries."); cf. Cohen v. Nat'l Union Fire Ins. Co. (In re County Seat Stores, Inc.), 280 B.R. 319, 327 (Bankr. S.D.N.Y. 2002) (". . . a truly adverse party does not (or should not) invoke fears of collusion.")

31.    Here, the settlement is not the result of any litigation at all, let alone the hard fought variety.  Issue has not been joined, no active discovery has been taken beyond the exchange of documents and severely limited Rule 2004 examinations, no formal testifying expert reports have been commissions or obtained, no dispositive motions have been filed and the strengths of the parties' relative cases at trial cannot possibly have been assessed.  The absence of these efforts suggest that the proposed settlement should receive more exacting scrutiny.  See e.g. In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 461 (S.D.N.Y. 2004) (in class action context, settlement entitled to strong initial presumption of fairness where it is the result of arm's length negotiations by experienced counsel after adequate discovery).

32.    In this case, the conflicted positions of the Official Committee, its counsel, and the Debtors have been repeatedly well-documented and constitute further cause for exacting scrutiny of this settlement. See Examiner Motion at 24-31. The Official Committee included JPMorgan Chase Bank, a driving force behind the disastrous LBO and principal target of the prospective litigation. The remaining members of the Official Committee, save for the holders of the senior notes, had little economic incentive to advocate for the holders of pre-LBO debt. Similarly, the Official Committee's principal counsel represented the LBO Banks in other similar cases including In re Tousa. Further, Official Committee counsel owed a fiduciary duty of inclusion to Wilmington Trust. See In re Mesta Mach. Co., 67 B.R. 151, 157 (Bankr. W.D. Pa. 1986) ("Counsel to a creditors' committee owes fiduciary duty to the committee and the individual creditors that the committee represents."); In re Oliver's Stores, Inc., 79 B.R. 588, 597 (Bankr. D. N.J. 1987) (" . . . the integrity of the bankruptcy system demands that the professionals serving the committee not place themselves in a situation where their independence, loyalty and integrity can be questioned by the unsecured creditor body whom they represent"); Matter of Bohack Corp., 607 F.2d 258, 262 n. 4 (2d Cir. 1979) ("Moreover, the committee owes a fiduciary duty to the creditors, and must guide its actions so as to safeguard as much as possible the rights of minority as well as majority creditors."). Notwithstanding this clear duty, Wilmington Trust was intentionally excluded from any settlement dialogue between the Debtors, the Official Committee and the LBO Banks. Indeed, Wilmington Trust first learned that a settlement had been reached just before the Debtors issued a press release, and was not told of the details until the Debtors filed their public Notice of Supplemental Filing in support of their further request for an extension of exclusivity. All these facts call into serious question whether

the settlement is the product of an arm's length negotiation, or rather was the result of a collusive effort among hopelessly compromised constituencies.

**2.    An Examiner Would Assist The Court In Evaluating The Estate Claims And The Propriety Of The Claimed Settlements.**

33.    Conflicts of interest similar to those existing among the Official Committee, its counsel, the LBO Banks and the Debtors have been held sufficient to justify the appointment of a trustee under Section 1104. This principle should apply with even more force in the context of motions to appoint an examiner, where the remedy is much less intrusive. See e.g., In re Cajun Elec. Power Coop., Inc., 74 F.3d 599, 600 (5th Cir. 1995), adopting on rehearing the dissent in 60 F.3d 746, 751 (5th Cir. 1995) (appointing trustee because of "inherent conflict" caused by utility cooperative's board members also serving in various capacities at the cooperative's member utility companies); In re Marvel Entm't Group, Inc., 140 F.3d 462, 472-3 (affirming appointment of trustee because conflicts of interest that existed between former creditor turned debtor-in-possession and other creditors were beyond "healthy" conflicts that always exist in bankruptcy); In re Sharon Steel Corp., 871 F.2d 1217, 1226-28 (affirming appointment of trustee because of debtor's internal conflicts of interest and inability to fulfill fiduciary duties as debtor-in-possession to creditors); In re Fiesta Homes Ga., 125 B.R. 321, 325-26 (Bankr. S.D. Ga. 1990) ("the presence of conflict of interest constitutes cause for removal of the Debtor in Possession from administration of this case."); In re Nautilus New Mex., Inc., 83 B.R. 784, 789 (Bankr. D.N.M. 1988) (where individual who controlled debtor-in-possession had conflicts with interests of the estate, trustee was warranted).

34.    Further, an examiner would assist the Court and be of benefit to the estate by bringing to bear an objective assessment of the LBO claims and the propriety of any settlement. See In re New Century TRS Holdings, Inc., 407 B.R. 558, 566 (Bankr. D. Del. 2009) ("The

Examiner performs his duties at the request of the Court, for the benefit of the debtor, its creditors and shareholders."); In re FiberMark, Inc., 339 B.R. 321, 325 (Bankr. D. Vt. 2006) ("The benefit of appointing an independent examiner is that he or she will act as an objective nonadversarial party who will review the pertinent transactions and documents, thereby allowing the parties to make an informed determination as to their substantive rights."); In re Apex Oil Co., 101 B.R. 92, 99 (Bankr. E.D. Mo 1989) ("The Examiner is appointed to act as an independent party to review, without monetary interest, transactions and documents. He is first and foremost disinterested and nonadversarial. The benefits of his investigative efforts flow solely to the debtor and to its creditors and shareholders.") (internal citations omitted).

35.     The appointment of an examiner to assess the efficacy of claims arising from a failed leveraged buyout, even in the face of settlement of these claims and an impending plan, is well-established in law. See In re A.H. Robbins Co., 88 B.R. at 755; Extended Stay Examiner Report. In A.H. Robbins, the District Court was asked to approve a proposed settlement of litigation and found no collusion based its observation the "[I]t would be ludicrous to assert that collusion would have escaped the attention of the Court's Examiner . . .". A.H. Robbins, 88 B.R. at 761. Similarly, in Extended Stay, former Bankruptcy Judge Ralph Mabey[14] was appointed to independently evaluate the efficacy of claims arising from the leveraged buyout in that case. In addition to finding cause to believe that a fraudulent transfer had occurred, the Extended Stay examiner determined that the owners had unjustly benefited from the sale. See Extended Stay Examiner Report at 434. The examiner's report came just as the Debtor was proceeding with its plan of reorganization.

---

[14]     Judge Mabey was also the examiner in A.H. Robbins.

36.     Similarly, the facts and circumstances of this case cry out for an examiner.  The Debtors, the Official Committee and the LBO Banks were each hopelessly compromised and conducted exclusive and secret negotiations to reach a settlement of substantial claims unduly beneficial to insiders without one moment of actual litigation.  While their conflicts alone would, as noted above, warrant the appointment of an examiner, the settlement of the underlying claims at a substantial discount outside the adversarial process that would otherwise ensure a fair and equitable result, demand the appointment of an examiner.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## CONCLUSION

**WHEREFORE**, Wilmington Trust respectfully requests that this Court: (1) find unpersuasive and disregard the Official Committee's Statement and the Debtors' Reply; (2) overrule the Debtors' Automatic Stay Motion, with prejudice; and (3) grant Wilmington Trust's Examiner Motion and such and further relief and is just and proper.

Dated: April 12, 2010

Respectfully submitted,

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

By:        _/s/ Raymond H. Lemisch_
Raymond H. Lemisch, Esq. (Del. Bar No. 4204)
Jennifer R. Hoover, Esq. (Del. Bar No. 5111)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone:  (302) 442-7010
Facsimile: (302) 442-7012
Email: rlemisch@beneschlaw.com
Email: jhoover@beneschlaw.com

-and-

**BROWN RUDNICK LLP**
Robert J. Stark, Esq.
Martin S. Siegel, Esq.
William M. Dolan III, Esq.
Katherine S. Bromberg, Esq.
Seven Times Square
New York, New York 10036
Telephone  (212) 209-4800
Facsimile:  (212) 209-4801
Email: rstark@brownrudnick.com
Email: msiegel@brownrudnick.com
Email: wdolan@brownrudnick.com
Email: kbromberg@brownrudnick.com

_Counsel to Wilmington Trust Company, as_
_Successor Indenture Trustee for the $1.2 Billion_
_Exchangeable Subordinated Debentures Due 2029,_
_Generally Referred to as the PHONES_

25