# EXHIBIT A

EXECUTION VERSION

## SETTLEMENT SUPPORT AGREEMENT

This Settlement Support Agreement (this "Agreement") is made and entered into as of April 8, 2010 by and among the holders and indenture trustees for holders of Claims against Tribune Company ("Tribune") and its subsidiaries and affiliates who are debtors and debtors in possession (collectively, the "Debtors") in the chapter 11 cases pending and jointly administered in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under Case No. 08-13141 (KJC) listed on the signature pages hereto, including any that may sign joinders after the date hereof (each such party a "Party" and collectively the "Parties").

## RECITALS

WHEREAS, the Debtors filed for protection under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") in the Bankruptcy Court on December 8, 2008; and

WHEREAS, the Debtors' chapter 11 cases are being jointly administered as *In re Tribune Company, et al.,* Chapter 11 Case No. 08-13141 (KJC) (together with the voluntary cases, if any, hereafter commenced by any of the Subsidiary Non-Debtors under chapter 11 of the Bankruptcy Code, the "Bankruptcy Cases"); and

WHEREAS, certain of the Debtors and Subsidiary Non-Debtors are obligated under the Senior Loan Agreement and the Bridge Loan Agreement and Tribune is obligated under the Senior Notes Indentures; and

WHEREAS, the Parties hold Senior Loan Claims and Senior Noteholder Claims as set forth opposite each such Party's name on Schedule 1 hereto (such Claims the "Subject Claims") and have agreed to certain restrictions and obligations set forth herein with respect to the Subject Claims; and

WHEREAS, on February 1, 2010, the official committee of unsecured creditors appointed by the U.S. Trustee pursuant to Section 1102(a) of the Bankruptcy Code in the Bankruptcy Cases (the "Creditors' Committee") filed a motion (the "Standing Motion") [Docket No. 3281] for standing to pursue certain LBO-Related Causes of Action (as hereinafter defined) that constitute property of certain of the Estates and appended a draft complaint to the Standing Motion; and

WHEREAS, on October 23, 2009, Law Debenture filed a motion (the "Fee Motion") [Docket No. 2407] to terminate reimbursements of certain fees and expenses incurred by the Senior Loan Agent and the Senior Lenders by certain Subsidiary Non-Debtors (the "Fee Payments") and for an accounting and disgorgement of past Fee Payments, among other relief; and

WHEREAS, on November 24, 2009, Centerbridge Credit Advisors LLC ("Centerbridge") [Docket No. 2630] and Deutsche Bank Trust Company Americas [Docket No. 2620] joined in the Fee Motion; and

EXECUTION VERSION

WHEREAS, on March 26, 2010, the Bankruptcy Court heard but did not issue a decision on the Fee Motion [Docket No. 3866]; and

WHEREAS, each of the Parties has agreed to support a settlement (the "Settlement") of any and all claims, causes of action, avoidance actions, powers or rights and legal or equitable remedies against any Person, whether or not a Party, or property of such Person, arising from or relating to any transaction related to the leveraged buy-out of Tribune that occurred in 2007 (the "LBO"), including, without limitation, the purchase by Tribune of its common stock on or about June 4, 2007, the merger and related transactions involving Tribune on or about December 20, 2007, and any financing committed to, incurred or repaid in connection with any such transaction, regardless of whether such claims, causes of action, avoidance actions, powers or rights, or legal or equitable remedies may be asserted pursuant to the Bankruptcy Code or any other applicable law (the "LBO-Related Causes of Action") pursuant to terms and on conditions substantially as set forth herein and in Exhibit A hereto (the "Settlement Terms"); and

WHEREAS, counsel to the Creditors' Committee has delivered to the Debtors a letter in the form attached hereto as Exhibit B; and

WHEREAS the Debtors, after consultation with the Creditors' Committee, have advised the Parties that they support the Settlement Terms;

## AGREEMENT

**NOW THEREFORE**, in consideration of the promises hereof and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.  Definitions.  Unless the context dictates otherwise and except to the extent the terms are otherwise defined herein, as used in this Agreement, the following terms have the respective meanings indicated in this Section 1.

    1.1.   6.61% Senior Notes means those certain 6.61% Debentures due 2027 issued pursuant to and governed by the Senior Notes 1996 Indenture.

    1.2.   6.61% Direction means a written direction executed and delivered to Law Debenture by holders that Law Debenture reasonably determines hold a majority in principal amount of the 6.61% Senior Notes (which majority shall not include any 6.61% Senior Notes held by Centerbridge or its assignees) pursuant to and in accordance with the terms of the Senior Notes 1996 Indenture.

    1.3.   Angelo Gordon means Angelo Gordon & Co LP.

    1.4.   Barclays Swap Claim means any Claims asserted by Barclays Bank PLC under that certain 1992 ISDA Master Agreement, dated as of July 2, 2007, between Barclays Bank PLC and Tribune.

EXECUTION VERSION

1.5.     Bridge Lenders means the lenders from time to time party to the Bridge Loan Agreement as Lenders thereunder, including former lenders and any applicable assignees and participants thereof.

1.6.     Bridge Loan Agent means Merrill Lynch Capital Corporation as administrative agent, or any successor administrative agent, under the Bridge Loan Agreement.

1.7.     Bridge Loan Agreement means that certain Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007, among Tribune, the Bridge Lenders, the Bridge Loan Agent, JPMorgan Chase Bank, N.A., as syndication agent, and Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time.

1.8.     Bridge Loan Claim means a Claim arising under the Bridge Loan Agreement.

1.9.     Bridge Loan Guaranty Agreement means the Guarantee Agreement, dated as of December 20, 2007, among Tribune, each of the subsidiaries of Tribune listed on Annex I thereto, and the Bridge Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.10.    Bridge Loan Guaranty Claim means a Claim arising under Bridge Loan Guaranty Agreement, including, without limitation, any Claims thereunder that arise and/or become fixed and non-contingent upon or after the Effective Date.

1.11.    Claim means a "claim," as defined in section 101(5) of the Bankruptcy Code.

1.12.    Confirmation Order means an order of the Bankruptcy Court confirming a Plan pursuant to Section 1129(a) or (b) of the Bankruptcy Code, as applicable.

1.13.    Disclosure Statement means a disclosure statement relating to a Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code.

1.14.    Estate(s) means, individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.15.    Fee Motion Withdrawal Stipulation means a stipulation among Law Debenture, Centerbridge and JPMorgan wherein they each agree, inter alia, (1) to the withdrawal without prejudice of the Fee Motion and Centerbridge's joinder thereto, (2) to resumption of reimbursement by the relevant Subsidiary Non-Debtors of the fees, costs and expenses at issue in the Fee Motion, including those already incurred and those to be incurred, (3) to oppose any motion similar to the Fee Motion filed by any other party in the Bankruptcy Cases, so long as this Agreement is in effect, (4) that if this Agreement is terminated, Law Debenture may file a new motion seeking relief comparable to that sought in the Fee Motion upon no less than 5 Business Days' notice (and Centerbridge may join in any such

motion) and (5) that if such a new motion seeking comparable relief is permitted to be brought and is brought, no additional briefing would be permitted and the record presented to the Bankruptcy Court in connection with the Fee Motion would be restored and the Bankruptcy Court would be asked to rule on the refiled Fee Motion based solely on the prior record and prior pleadings.

1.16.  JPMorgan means JPMorgan Chase Bank, N.A

1.17.  Law Debenture means Law Debenture Trust Company of New York, not personally but solely in its capacity as successor indenture trustee under that certain Indenture, dated as of March 19, 1996, as amended, restated or otherwise modified from time to time, between Tribune and Law Debenture Trust Company of New York.

1.18.  Law Debenture Continuing Obligations shall have the meaning as defined in Section 10 of this Agreement.

1.19.  Loan Claims Classes means the Parent Loan Claims Class and the Guaranty Claims Classes (as that term is defined in Exhibit A hereto).

1.20.  Other Parent Claims Class means a class comprised of Senior Noteholder Claims and other general unsecured claims against Tribune that are not in the Parent Loan Claims Class.

1.21.  Parent Loan Claims means the Senior Loan Claims, the Bridge Loan Claims, and the Barclays Swap Claims.

1.22.  Parent Loan Claims Class means a class comprised of Senior Loan Claims and Bridge Loan Claims and Barclays Swap Claims.

1.23.  Person means an individual, corporation, partnership, association, joint stock company, joint venture, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity, or any government, governmental agency or any subdivision, department or other instrumentality thereof.

1.24.  Petition Date means (i) for Tribune and for all Debtors other than Tribune CNLBC, LLC, December 8, 2008, the date on which such Debtors commenced their Bankruptcy Cases, (ii) for Tribune CNLBC, LLC, October 12, 2009, the date on which such Debtor commenced its Bankruptcy Case, and (iii) with respect to the Subsidiary Non-Debtors, the date on which any such Subsidiary Non-Debtor commences its Bankruptcy Case, if any.

1.25.  Plan means a chapter 11 plan of reorganization for the Debtors in the Bankruptcy Cases.

1.26.   <u>Pledge Agreement</u> means that certain Pledge Agreement, dated as of June 4, 2007, between Tribune and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.27.   <u>Senior Lender Settlement Committee</u> means a committee comprised of Senior Lenders that become party to this Agreement prior to the hearing to approve a Disclosure Statement for the Settlement Plan.

1.28.   <u>Senior Lenders</u> means the lenders from time to time party to the Senior Loan Agreement as Lenders thereunder, including former lenders and any applicable assignees and participants thereof.

1.29.   <u>Senior Loan Agent</u> means JPMorgan Chase Bank, N.A. as administrative agent, or any successor administrative agent, under the Senior Loan Agreement.

1.30.   <u>Senior Loan Agreement</u> means, collectively, (a) that certain Credit Agreement, dated as of May 17, 2007, among Tribune, the Senior Lenders, the Senior Loan Agent, Merrill Lynch Capital Corporation, as syndication agent, and Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time and (b) those certain increase joinders, dated as of December 20, 2007, among Tribune, certain of the Senior Lenders and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.31.   <u>Senior Loan Claim</u> means a Claim arising under the Senior Loan Agreement and any Claim of the Senior Lenders or the Senior Loan Agent arising under the Pledge Agreement.

1.32.   <u>Senior Loan Guaranty Agreement</u> means the Guarantee Agreement, dated as of June 4, 2007, among Tribune, each of the subsidiaries of Tribune listed on Annex I thereto, and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.33.   <u>Senior Loan Guaranty Claim</u> means a Claim arising under the Senior Loan Guaranty Agreement, including, without limitation, the guaranty of the Barclays Swap Claim.

1.34.   <u>Senior Noteholder(s)</u> means, individually or collectively, the holder(s) of a Senior Noteholder Claim(s).

1.35.   <u>Senior Noteholder Claims</u> means all Claims for principal or interest arising under or evidenced by the Senior Notes Indentures and related documents and any Claim of the Senior Noteholders arising under the Pledge Agreement.

1.36.   <u>Senior Notes 1996 Indenture</u> means that certain Indenture, dated as of March 19, 1996, between Tribune and Law Debenture Trust Company of New York, as successor indenture trustee, as amended, restated or otherwise modified from time to time.

EXECUTION VERSION

1.37. <u>Senior Notes Indenture(s)</u> means, individually or collectively (a) that certain Indenture, dated as of January 1, 1997, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time; (b) the Senior Notes 1996 Indenture; (c) that certain Indenture, dated as of January 30, 1995, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time; and (d) that certain Indenture, dated as of March 1, 1992, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time.

1.38. <u>Settlement</u> means the settlement contemplated hereby of all LBO Related Causes of Action on the Settlement Terms, including, without limitation, the terms and conditions thereof referred to herein or included in the Settlement Plan.

1.39. <u>Settlement Plan</u> means a Plan implementing the Settlement and including other terms and conditions that are not directly or indirectly inconsistent with the Settlement Terms and that shall not delay approval or implementation of the Settlement.

1.40. <u>Subsidiary Debtors</u> means those subsidiaries of Tribune that as of the date of this Agreement are Debtors.

1.41. <u>Subsidiary Non-Debtors</u> means those subsidiaries of Tribune that as of the date of this Agreement are not Debtors.

2. <u>Effective Date</u>. This Agreement shall become effective upon execution by the Parties and the satisfaction of the following conditions:

2.1. Within one Business Day of this Agreement being executed, the Debtors shall have filed with the Bankruptcy Court a notice of the existence of this Agreement and the primary economic terms of the Settlement, stating the support of the Debtors for the Settlement Terms and the intention of the Debtors to file the Settlement Plan on or prior to April 13, 2010 and to use all commercially reasonable efforts and to take all steps reasonably necessary to seek and use their best efforts to obtain Bankruptcy Court approval of the Settlement pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure and to obtain confirmation of the Settlement Plan pursuant to Section 1129(a) or (b) of the Bankruptcy Code, as applicable.

2.2. On or prior to April 13, 2010, the Debtors shall have filed with the Bankruptcy Court the Settlement Plan and a Disclosure Statement for the Settlement Plan.

2.3. On or prior to April 12, 2010, Law Debenture, Centerbridge and JPMorgan shall have filed with the Bankruptcy Court the Fee Motion Withdrawal Stipulation.

3. <u>Settlement Support</u>. In consideration of the mutual premises herein and the consideration detailed herein, the Parties in their individual capacities, other than Law Debenture which

acts not in its individual capacity but solely as successor indenture trustee, agree to accept and actively support the Settlement, and to actively seek and support approval of the Settlement by the Bankruptcy Court and, subject to the provisions of paragraph 12 hereof, implementation of the Settlement pursuant to the Settlement Plan or otherwise.

4.   <u>Obligations of the Parties</u>. Each Party shall:

  4.1.   Actively support the Settlement and the implementation thereof, whether pursuant to the Settlement Plan or otherwise, including, without limitation, filing with the Bankruptcy Court such court papers as are necessary or prudent in support or furtherance thereof;

  4.2.   Actively support reimbursement of all fees, costs and expenses in respect of legal and financial advisors incurred by the Senior Loan Agent and Angelo Gordon on a current basis during the pendency of the Bankruptcy Cases, including with respect to any amounts heretofore incurred and not previously reimbursed, as well as any amounts that may be incurred in the future by the Senior Loan Agent and/or Angelo Gordon;

  4.3.   Actively support reimbursement of all fees, costs and expenses of the legal and financial advisors of Centerbridge and Law Debenture in accordance with the Settlement Terms;

  4.4.   Not directly or indirectly object to the approval of, take any actions against, or appeal any order approving the Settlement, the Settlement Plan, or any other agreement implementing the Settlement;

  4.5.   Not directly or indirectly support in any way any Plan that is not the Settlement Plan;

  4.6.   Consent to, and not opt out of, if applicable, the granting of third-party releases contained in and contemplated by the Settlement; and

  4.7.   Not take any action directly or indirectly inconsistent with the terms or conditions of the Settlement or that may reasonably delay approval or implementation of the Settlement or the Settlement Plan, including, without limitation, not filing, encouraging or supporting, directly or indirectly, any other party to take any steps inconsistent with regard to any of the foregoing.

5.   <u>Additional Obligations Of Centerbridge</u>.   Pursuant to the Fee Motion Withdrawal Stipulation, Centerbridge shall withdraw without prejudice its joinder to the Fee Motion on or prior to April 12, 2010.   Centerbridge hereby confirms that it has irrevocably (except as expressly set forth herein) directed Law Debenture, and Law Debenture hereby confirms that it has been so directed, pursuant to and in accordance with the terms of the Senior Notes 1996 Indenture, to (i) support and become a party to this Agreement, (ii) withdraw without prejudice the Fee Motion on or prior to April 12, 2010, pursuant to the Fee Motion Withdrawal Stipulation and (iii) support the resumption and current continuation of the reimbursement of fees, costs and expenses at issue in the Fee Motion

and as set forth in the Fee Motion Withdrawal Stipulation (such directions, the **"Centerbridge Directions"**). So long as this Agreement is in effect neither Centerbridge nor any successor shall withdraw or modify the Centerbridge Directions or issue conflicting directions, in each case without the consent of the Senior Lender Settlement Committee.

6.    <u>Further Disposition of Claims/Successors and Assigns</u>.  The Parties shall not assign, transfer or otherwise dispose of any of their claims against Tribune and/or the Subsidiary Debtors (their "<u>Subject Claims</u>"), except as provided in this Section 6.  Any assignee or transferee of any Subject Claim held by a Party must agree, as a condition to the transfer of such Subject Claim, to be bound by this Agreement as though it were a party thereto, and the Parties agree that they shall not sell, assign, transfer or otherwise dispose of any Subject Claims without first obtaining such agreement; otherwise, any such transfer shall be null and void ab initio, and the transferor shall remain the holder of the Subject Claim and subject to and liable under this Agreement.  Notwithstanding any other provision hereof, (i) Centerbridge and JPMorgan each agree to retain at (x) least 50% of the Subject Claims held by such Party as of the date of this Agreement until the earlier of (A) the date that is 120 days following the date of this Agreement and (B) the date on which the Bankruptcy Court has entered an order approving a Disclosure Statement for the Settlement Plan and (y) at least 20% of the Subject Claims held by such Party as of the date of this Agreement until the earlier of (A) November 30, 2010 and (B) the date on which the Bankruptcy Court has entered an order confirming the Settlement Plan and (ii) Angelo Gordon agrees to retain at (x) least 25% of the Subject Claims held by it as of the date of this Agreement until the earlier of (A) the date that is 120 days following the date of this Agreement and (B) the date on which the Bankruptcy Court has entered an order approving a Disclosure Statement for the Settlement Plan and (y) at least 10% of the Subject Claims held by it as of the date of this Agreement until the earlier of (A) November 30, 2010 and (B) the date on which the Bankruptcy Court has entered an order confirming the Settlement Plan.  Notwithstanding the foregoing, no assignee or transferee of any Subject Claims shall have any obligation to provide active support for the Settlement or the implementation thereof in any manner that would require the incurrence of professional fees or expenses or that would require appearing in the Bankruptcy Cases, but for the avoidance of doubt, all assignees and transferees of any Subject Claims shall otherwise be obligated to support the Settlement Plan and to not take any action directly or indirectly inconsistent with the terms or conditions of the Settlement or that may reasonably delay approval or implementation of the Settlement or the Settlement Plan.

7.    <u>Remedies; Specific Performance</u>.

This Agreement is intended as a binding commitment enforceable in accordance with its terms against the Parties.  It is understood and agreed by each of the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled solely to specific performance and injunctive or other equitable relief as a remedy of any such breach.  If a Party breaches any obligation, term, or provision of this Agreement, such Party shall not be liable for money damages other than, to the extent permitted by applicable law, the recovery of any costs and expenses necessary to specifically enforce this Agreement; <u>provided</u>, <u>however</u>,

that to the extent any party seeks to enforce the terms (such party, an "Enforcing Party") of this Agreement against one or more of the Parties, and a court of competent jurisdiction enters a Final Order denying such specific performance, the Enforcing Party shall pay the costs and expenses of the Parties in defending against any such action. The provisions of this Section 7 shall survive termination of this Agreement.

8.   Termination.

  8.1.   This Agreement shall terminate, and the provisions of this Agreement shall be of no further force and effect, upon the occurrence of any of the following (each, an "Automatic Termination Event"):

    8.1.1.   Entry of an order by the Bankruptcy Court, or any other court of competent jurisdiction, declaring this Agreement to be unenforceable; or

    8.1.2.   Dismissal or conversion to cases under chapter 7 of the Bankruptcy Code of the Debtors' Bankruptcy Cases; or

    8.1.3.   Confirmation of a Plan, or approval of a Confirmation Order or a Disclosure Statement that is inconsistent with the terms hereof or of the Settlement.

  8.2.   Any Party may withdraw from this Agreement upon the occurrence of any of the following (each, a "Withdrawal Event"):

    8.2.1.   The Bankruptcy Court shall not have entered an order approving a Disclosure Statement for the Settlement Plan on or prior to the date that is 120 days following the filing with the Bankruptcy Court of the Settlement Plan; or

    8.2.2.   The Bankruptcy Court shall have entered an order expressly denying approval of the Disclosure Statement for the Settlement Plan; or

    8.2.3.   The Bankruptcy Court shall not have entered an order confirming the Settlement Plan on or prior to November 30, 2010; or

    8.2.4.   The Debtors or the Creditors' Committee files with the Bankruptcy Court a Plan that provides for, or is revised, supplemented, modified or amended to provide for, any terms that are not permitted by, or are substantially inconsistent with, this Agreement or the Settlement; or

    8.2.5.   The material breach of any provision of the Settlement or this Agreement by any other Party that has not been cured within 10 days of receipt of notice of such material breach by the breaching Party; or

    8.2.6.   The Debtors at any time announce the withdrawal of their support for the Settlement or the Settlement Plan and/or withdraw the Settlement Plan at any time after the filing of the Settlement Plan with the Bankruptcy Court.

8.3.  If the Other Parent Claims Class fails to accept the Settlement Plan and the Senior Lender Settlement Committee determines in good faith that such Settlement Plan is not reasonably likely to be confirmed pursuant to Section 1129(b), the Senior Lender Settlement Committee may, in its sole discretion, elect to terminate this Agreement.

8.4.  Notwithstanding anything herein to the contrary, Law Debenture may withdraw from, and no longer shall be bound by, this Agreement solely with respect to the 6.61% Senior Notes if such series fails to accept the Settlement Plan (determined in accordance with the standard set forth in Section 1126(c) of the Bankruptcy Code as if such holders comprised a separate class of claims under the Settlement Plan) or holders of a majority in principal amount of the 6.61% Senior Notes (which majority shall not include any 6.61% Senior Notes held by Centerbridge or its assignees) execute and deliver a 6.61% Direction directing Law Debenture to withdraw from this Agreement with respect to such series or to take any other action in violation of or contrary to the terms of this Agreement.   Law Debenture's representation set forth in Section 11.3 hereof is qualified in its entirety by the provisions of this Section 8.4.

8.5.  If any Loan Claims Class fails to accept the Settlement Plan, the Senior Lender Settlement Committee may, in its sole discretion, elect to terminate this Agreement.

8.6.  Any termination or withdrawal referred to in this Section 8 (other than pursuant to an Automatic Termination Event) shall be accomplished by delivery of an email or other writing from the terminating or withdrawing Party to the other Parties stating that the terminating Party is terminating, or withdrawing from (as applicable), this Agreement and stating the grounds therefor with specific reference to the relevant provisions hereof.

9.  <u>Effect of Termination.</u>  Upon the occurrence of any unwaived Automatic Termination Event, or any other termination event upon provision of notice, this Agreement shall terminate (except as expressly provided otherwise herein including the provisions of Section 7) with respect to the obligations of all Parties and without further notice to or further act or failure to act by any Party; <u>provided, however,</u> that any claim for breach of this Agreement shall survive termination and all rights and remedies with respect to such claims shall not be prejudiced in any way whatsoever; <u>provided, further,</u> however, that any breach of this Agreement by one or more Parties shall not create any rights or remedies by such Parties against any other Party, other than as set forth in Section 7 and any other agreement among such Parties.

10.  <u>Effect of Withdrawal.</u>  After the occurrence of any Withdrawal Event, upon provision of notice, this Agreement shall terminate (except as expressly provided otherwise herein including the provisions of Section 7) with respect to the obligations of the withdrawing Party and without further notice to or further act or failure to act by any Party; <em>provided, however,</em> that (i) any claim for breach of this Agreement shall survive such withdrawal and all rights and remedies with respect to such claims shall not be prejudiced in any way

EXECUTION VERSION

whatsoever; (ii) that any breach of this Agreement by one or more Parties shall not create any rights or remedies by such Parties against any other Party, other than as set forth in Section 7 and any other agreement among such Parties; (iii) the withdrawal of any Party shall not terminate this Agreement as to the other Parties or affect the rights or obligations of any other Party in any way except that all rights of the withdrawing Party under this Agreement shall terminate (except as expressly provided otherwise herein including the provisions of Section 7); and (iv) following any withdrawal by Law Debenture pursuant to Section 8.4 hereof with respect to the 6.61% Senior Notes, unless Law Debenture shall have received a contrary 6.61% Direction, Law Debenture shall not (a) directly or indirectly object to the approval of, take any actions against, or appeal any order approving the Settlement, the Settlement Plan, or any other agreement implementing the Settlement; (b) directly or indirectly support in any way any Plan that is not the Settlement Plan; or (c) take any action directly or indirectly inconsistent with the terms or conditions of the Settlement or that might reasonably delay approval or implementation of the Settlement or the Settlement Plan (such continuing obligations hereinafter referred to as the "Law Debenture Continuing Obligations"). Notwithstanding anything else in this Agreement to the contrary, if Law Debenture receives a 6.61% Direction inconsistent with the Law Debenture Continuing Obligations, or otherwise takes any action inconsistent with the Law Debenture Continuing Obligations, the fees and expenses of Law Debenture with respect to the 6.61% Senior Notes that are incurred from and after the date of Law Debenture's withdrawal from this Agreement shall not be reimbursable as contemplated hereby or pursuant to the Settlement Plan.

11.   Representations And Warranties of the Parties.

Each Party represents and warrants to each other Party, severally but not jointly (and solely with respect to itself), that the following statements are true, correct and complete as of the date hereof:

11.1.   Corporate Power And Authority.   It has been duly organized and is validly existing as a corporation or other form of entity, where applicable, in good standing under the laws of its jurisdiction of organization, with the requisite power and authority to own its properties and conduct its business as currently conducted, subject, as applicable, to the restrictions that result from any such entity's status as a debtor-in-possession under chapter 11 of the Bankruptcy Code;

11.2.   Authorization.   The execution and delivery of this Agreement and the performance of obligations hereunder by it has been duly authorized by all necessary corporate, partnership or other action on its part, and, in the case of Law Debenture, pursuant to the Centerbridge Directions;

11.3.   Binding Obligation.   This Agreement has been duly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable in accordance with the terms hereof, except as enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws limiting creditors' rights

EXECUTION VERSION

generally, by general principles of equity relating to enforceability or by ruling of the Bankruptcy Court; and

11.4.    No Conflicts.    The execution, delivery and performance by it (when such performance is due) of this Agreement do not and shall not (a) violate any provision of law, rule or regulation applicable to it or its certificate of incorporation or bylaws or other organizational documents or (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or is a party.

11.5.    Subject Claims.    As of the date hereof, it is the legal or beneficial owner of the Subject Claims in the amounts set forth for such Party on Schedule 1 hereto.

11.6.    Released Claims.    All claims waived or released pursuant to this Agreement by the Parties have not been assigned or otherwise transferred.

12.    Acknowledgment.    While the Parties agree herein to support this Agreement and the implementation of the Settlement, including, without limitation, by supporting the implementation of the Settlement in connection with the Settlement Plan, this Agreement is not and shall not be deemed to be a solicitation for votes in favor of any Plan in contravention of applicable non-bankruptcy law or Section 1125(b) of the Bankruptcy Code. Notwithstanding anything to the contrary contained herein, the acceptance of any Party of a Plan shall not be solicited until, and any obligation to support confirmation of a Plan is expressly conditioned on the receipt by such Party of a Plan and a copy of a Disclosure Statement related to such Plan that shall have previously been approved by the Bankruptcy Court, after notice and a hearing, as containing adequate information as required by Section 1125 of the Bankruptcy Code.    Notwithstanding the foregoing provisions, nothing in this Agreement shall require any Party to take any action prohibited by the Bankruptcy Code, the Securities Act of 1933 (as amended), the Securities Exchange Act of 1934 (as amended), any rule or regulations promulgated thereunder, or by any other applicable law or regulation or by an order or direction of any court or any state or federal governmental authority.

13.    Miscellaneous.

13.1.    Notices.    Any notice required or desired to be served, given or delivered to any Party under this Agreement shall be in writing, and shall be deemed to have been validly served, given or delivered upon receipt if provided by personal delivery, sent by recognized overnight courier, or sent by facsimile, email or similar electronic means to such Party's notice address as set forth beneath its signature block hereto.

13.2.    Entire Agreement.    This Agreement constitutes the entire agreement among the Parties as to the subject matter hereof and supersedes all prior and contemporaneous agreements, representations, warranties, and understandings of the Parties, whether oral, written, or implied, as to the subject matter hereof.

- 12 -

13.3.  Modification; Waiver.  No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by the Party against which it is sought to be enforced.  No waiver of any of the provisions of this Agreement shall be deemed or constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver constitute a continuing waiver.

13.4.  No Admission of Liability.  Nothing in this Agreement shall be construed as an admission of liability or fault by any Party, which liability and fault are expressly denied.  If this Agreement is terminated or a Party withdraws, then, except as expressly set forth herein, the rights, remedies and claims of the relevant Parties shall not be prejudiced, this Agreement may not be introduced into any court proceeding for any purpose other than for enforcement hereof and each Party shall be restored to its position as if this Agreement had not been executed (except as expressly set forth herein), the Settlement had not been reached and the Settlement Plan had not been agreed to and filed.

13.5.  Third-Party Beneficiaries.  Nothing contained in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any person or entity other than the Parties hereto, nor shall anything in this Agreement relieve or discharge the obligation or liability of any third party to any Party to this Agreement.

13.6.  Consideration.  It is hereby acknowledged by the Parties that no consideration, other than that provided for in the Settlement, shall be due or paid to the Parties for their support of the Settlement Plan.

13.7.  Further Assurances.  Subject to the terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate this Agreement and/or to implement the Settlement.

13.8.  Automatic Stay.  The Parties acknowledge that the giving of notice by any Party pursuant to this Agreement or the termination by any Party of this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code.

13.9.  Several and Not Joint for the Parties.  The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.  Any breach of this Agreement by any Party shall not result in any liability in any manner whatsoever for any other non-breaching Party.

13.10.  Headings.  The descriptive headings of the paragraphs of this Agreement are inserted for convenience of reference only and do not constitute a part of this Agreement.

13.11.  Interpretation.  This Agreement is the product of negotiations among the Parties, adequately represented by counsel and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to

**EXECUTION VERSION**

interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. This Agreement is executed without reliance on any representations by any person or entity concerning the nature, cause or extent of injuries, or legal liability therefor, or any other representations of any type or nature except as set forth herein. No contrary or supplementary oral agreement shall be admissible in a court to contradict, alter, supplement, or otherwise change the meaning of this Agreement.

13.12.  <u>Counterparts; Fax Signatures</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page by facsimile transmission or e-mail shall be effective as delivery of a manually executed counterpart.

13.13.  <u>Governing Law</u>.  Except to the extent that the Bankruptcy Code or Federal Rules of Bankruptcy Procedure are applicable, this Agreement shall be governed by, and construed in accordance with, the laws of the state of New York, without giving effect to the conflicts of laws principles thereof.

13.14.  <u>Jurisdiction</u>.  The Bankruptcy Court shall retain jurisdiction to resolve any dispute arising out of or relating to this Agreement.

13.15.  <u>Public Statements</u>.  Each of the Parties agrees that neither it nor its professionals, agents, affiliates or employees will make any disparaging or negative statements or comments to the public or to the press regarding the Settlement, the Settlement Plan or any Party.

[SIGNATURE PAGES FOLLOW]

- 14 -

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered as of the date first above written.

ANGELO GORDON & CO LP, ON BEHALF OF CERTAIN FUNDS AND MANAGED ACCOUNTS:

By: _Thomas M. Fuller_

Name: **Thomas M. Fuller**

Title: **Authorized Signature**

Date:

Notice Address:

CENTERBRIDGE SPECIAL CREDIT PARTNERS, L.P.

BY:     CENTERBRIDGE SPECIAL CREDIT PARTNERS GENERAL PARTNER, LLC , ITS
GENERAL PARTNER

By: _____

Name: Jeff Aronson

Title: Authorized Person

Date: 4/2/10

Notice Address: 375 Park Avenue, 12th Floor
New York, NY 10152

CENTERBRIDGE CREDIT PARTNERS MASTER, L.P

BY:    CENTERBRIDGE CREDIT PARTNERS OFFSHORE GENERAL PARTNER, LLC ,
ITS GENERAL PARTNER
By:
Name: *Jeff Aronson*
Title: Authorized Person
Date: 4/7/10
Notice Address: 375 Park Avenue, 12th Floor
                New York, NY 10152

CENTERBRIDGE CREDIT PARTNERS, L.P.

BY:   CENTERBRIDGE CREDIT PARTNERS GENERAL PARTNER, LLC, ITS GENERAL
PARTNER

By: _____

Name: Jeff Aronson

Title: Authorized Person

Date: 4/2/10

Notice Address: 375 Park Avenue, 12th Floor
New York, NY 10152

JPMORGAN CHASE BANK, N.A.:

By: _____

Name:      Miriam T. Kulnis
Title:      Executive Director

Date: APRIL 8, 2010
Notice Address: 383 MADISON Ave.
                New York, NY 10179

LAW DEBENTURE TRUST COMPANY OF NEW YORK, SOLELY IN ITS CAPACITY AS
SUCCESSOR TRUSTEE UNDER THE SENIOR NOTES 1996 INDENTURE

By: _____

Name: JAMES D. HEANEY

Title: MANAGING Director

Date: APRIL 8, 2010

Notice Address:

**LAW DEBENTURE
TRUST COMPANY OF NEW YORK
400 MADISON AVENUE, 4th FLOOR
NEW YORK, NEW YORK 10017**

[SIGNATURE PAGE TO SETTLEMENT SUPPORT AGREEMENT]

**EXECUTION VERSION**

## Schedule I
## Parties and Respective Subject Claims

| Holder | Subject Claim Type | Principal Amount |
|---|---|---|
| Angelo Gordon & Co LP, on behalf of certain funds and managed accounts | Senior Loan Claims | $[REDACTED] |
| JPMorgan Chase Bank, N.A. | Senior Loan Claims | $[REDACTED] |
| Centerbridge Credit Partners Master L.P. | Senior Noteholder Claims | $[REDACTED] |
| Centerbridge Credit Partners, L.P. | Senior Noteholder Claims | $[REDACTED] |
| Centerbridge Special Credit Partners, L.P. | Senior Noteholder Claims | $[REDACTED] |

EXECUTION VERSION

# EXHIBIT A

## Select Terms of Settlement[1]

Set forth below is a summary of the primary terms of a settlement of the LBO-Related Causes of Action.  The terms of such a settlement shall be reflected in a plan of reorganization (the "**Settlement Plan**").

| | |
|---|---|
| **Plan Classification** | Senior Loan Claims and Bridge Loan Claims against Tribune shall be treated together in a single class (the "**Parent Loan Claims Class**"). |
| | Senior Noteholder Claims and other general unsecured claims against Tribune that are not in the Parent Loan Claims Class shall be treated together in a single class (the "**Other Parent Claims Class**"); provided, however, that with the consent of the Senior Lender Settlement Committee, Claims against Tribune arising under non-tax qualified pension plans or individual agreements providing for retirement compensation or deferred compensation arrangements ("**Non-Qualified Former Employee Benefit Claims**") of Tribune or one of the subsidiaries of Tribune that are chapter 11 debtors (the "**Subsidiary Debtors**" and together with Tribune, the "**Debtors**") and/or other general unsecured claims against Tribune that are not Senior Noteholder Claims may be placed in a separate class and receive separate treatment, as set forth below, and the Senior Lender Settlement Committee intends to discuss in good faith such separate classification and treatment with counsel to certain holders of such claims. |
| | Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims against a given Subsidiary Debtor shall be treated together (such classes with respect to all of the Subsidiary Debtors being collectively referred to herein as the "**Guaranty Claims Classes**" and, together with the Parent Loan Claims Class, the "**Loan Claims Classes**"). |
| **Allocation of Distributable Enterprise Value** | The Settlement Plan will provide that, on the effective date of the Settlement Plan (the "**Plan Effective Date**"), the distributable value of Tribune and its subsidiaries (the "**Distributable Enterprise Value**", which is comprised of the aggregate distributable value, as of the Plan Effective Date, of all of the Distributable Cash, New Debt and New Common Stock, each as hereinafter defined ) shall be allocated as follows: |
| | (i)  8.8% of such Distributable Enterprise Value shall be |

---

[1] Capitalized terms used but not defined herein shall have the meanings given to such terms in the agreement to which this term sheet is attached.

| | |
|---|---|
| | allocated for distribution to holders of claims against Tribune as hereinafter set forth (for the avoidance of doubt, the 8.8% of Distributable Enterprise value allocated to Tribune shall be distributed such that the Senior Noteholders receive 7.4% of such Distributable Enterprise Value on account of their Claims against Tribune as set forth below); and |
| | (ii) 91.2% of such Distributable Enterprise Value shall be allocated for distributions to holders of claims against the subsidiaries of Tribune that are guarantors of the obligations of Tribune under the Senior Loan Agreement and the Bridge Loan Agreement (the "**Guarantor Subsidiaries**"), as hereinafter set forth. |
| | This allocation of Distributable Enterprise Value of $6.1 billion shall be fixed for purposes of the Settlement Plan, and distributions to holders of claims against Tribune and against the Subsidiary Debtors shall be based on such allocation, as more fully set forth below. |
| **Treatment of Claims of Senior Noteholders and Other Parent General Unsecured Creditors** | Except to the extent set forth below, the holders of claims in the Other Parent Claims Class shall receive Distributable Cash (as defined below), new debt issued by reorganized Tribune (the "**New Debt**", as described below) and common stock of reorganized Tribune (the "**New Common Stock**")[2] such that when distributed pro rata among the Other Parent Claims Class, the Senior Noteholders shall receive, in the aggregate, 7.4% of the Distributable Enterprise Value (for the avoidance of doubt, such consideration shall be a "strip" of the consideration to be received by holders of allowed Claims in the Loan Claims Classes under the Settlement Plan (*i.e.* the same consideration in form, substance and relative pro ration) not taking into account any modification of such consideration pursuant to the Parent Creditor Cash Distribution).[3]  Specifically, each Senior Noteholder shall receive such Senior Noteholder's pro rata share of: |
| | (i) 7.4% of the total cash remaining available for distribution to unsecured creditors of Tribune and the Subsidiary Debtors calculated after the payment only of administrative expenses, priority claims, cure costs paid by Tribune, cash posted to collateralize outstanding letters of credit, employee benefit claims for plans continuing |

---

[2] To the extent any specific holder that would receive a distribution of New Common Stock cannot receive New Common Stock for FCC compliance purposes, such holder will receive the economic equivalent thereof in warrants to purchase such stock.

[3] For example, at Distributable Enterprise Value of $6.1 billion, the value of the distribution to the Senior Noteholders would be approximately $451.4 million in the aggregate.

with current employees, Noteholder fees and expenses, Senior Lender fees and expenses, fees and expenses associated with exit financing or any other new indebtedness, and the reservation by Tribune of not more than $350 million of cash for operating purposes (the "**Distributable Cash**")

(ii) 7.4% of the New Debt and

(iii) 7.4% of the New Common Stock.

*provided, however*, that the New Common Stock to be received by all creditors entitled thereto under the Settlement Plan, including holders of claims in the Other Parent Claims Class, shall be subject to dilution as of the Plan Effective Date, pro rata, through the issuance pursuant to or as contemplated in the Settlement Plan of New Common Stock or options to purchase New Common Stock on account of management grants or for other purposes, including such grants as are contemplated in the Settlement Plan to be distributed over time as determined by the board of directors of reorganized Tribune, all as expressly provided for under the Settlement Plan with the consent of the Senior Lender Settlement Committee in its discretion and having an aggregate number of shares and/or value not to exceed 7.5% of the equity value of reorganized Tribune or such lower amount as may be determined by the Senior Lender Settlement Committee. Such issuances of New Common Stock or options to purchase New Common Stock shall be expressly provided for in the Settlement Plan and shall be subject to the consent of the Senior Lender Settlement Committee in its sole discretion.

Holders of allowed claims in the Other Parent Claims Class that are not Senior Noteholder Claims will receive distributions on their claims of Distributable Cash, New Debt and New Common Stock pari passu to those received by the Senior Noteholders as set forth above, which shall provide such holders with recoveries on their claims equal and ratable to the recoveries of the Senior Noteholders; *provided, however*, that, with the consent of the Senior Lender Settlement Committee, Non-Qualified Former Employee Benefit Claims against Tribune and/or other general unsecured claims against Tribune that are not Senior Noteholder Claims may be separately classified and receive their comparable distributions of equivalent value in cash alone, rather than in a combination of Distributable Cash, New Common Stock and New Debt (any such claims so classified the "**Separately Classified Parent Claims**"). If this modification of the distribution to such creditors (the "**Parent Creditor Cash Distribution**") occurs, the required additional cash that the Senior Lender Settlement Committee consents to have paid on account of the Separately

EXECUTION VERSION

| | |
|---|---|
| | Classified Parent Claims shall be reallocated from that portion of the Distributable Cash otherwise distributed to the Guaranty Claims Classes as set forth below, and the New Common Stock and New Debt that otherwise would have been allocable to the Separately Classified Parent Claims shall be reallocated to the Guaranty Claims Classes. |
| **Treatment of Subsidiary General Unsecured Creditors** | General unsecured claims against the Subsidiary Debtors that are not in the Guaranty Claims Classes shall be paid in full in cash; provided, however, that post-petition interest shall not be allowed or paid on any such claims and the Debtors shall make a good-faith, reasonable estimate of the amount to be paid on account of such claims in the aggregate, which estimate they shall disclose in a Plan Supplement and which estimate shall be subject to review by the Parties. If the Debtors estimate that the sum of all such allowed claims will be greater than $150 million in the aggregate on the Plan Effective Date, the distributions to the holders of such claims shall be limited to their pro rata share of $150 million unless the Senior Lender Settlement Committee decides, in its sole discretion, to provide additional consideration to such creditors. |
| **Treatment of Loan Claims** | *Parent Loan Claims Class* – All of the Distributable Cash, New Debt and New Common Stock allocated for distribution to creditors of Tribune (as set forth above under "Allocation of Distributable Enterprise Value") remaining after the payment of the distributions to the Other Parent Claims Class and the Separately Classified Parent Claims, if any, shall be allocated to the Parent Loan Claims Class pro rata (treating claims under the Senior Loan Agreement and the Bridge Loan Agreement pari passu for such purpose). |
| | *Guaranty Claims Classes* – Claims in these classes will receive all of the Distributable Cash, New Debt and New Common Stock allocated to Guarantor Subsidiaries (as set forth above under "Allocation of Distributable Enterprise Value") remaining after a portion of such Distributable Cash is used to pay general unsecured claims against the Subsidiary Debtors that are not in the Guaranty Claims Classes as described above, *minus* any cash paid pursuant to the Parent Creditor Cash Distribution, and *plus* any New Debt and New Common Stock reallocated to the Guaranty Claims Classes as a result of the Parent Creditor Cash Distribution |
| | All of the Distributable Cash, New Debt and New Common Stock distributable to the Guaranty Claims Classes as set forth above shall be distributed solely to the holders of Senior Loan Guaranty Claims pursuant to enforcement of the applicable subordination and turn-over provisions for the benefit of Senior Lenders under |

|  | the terms of the Bridge Loan Agreement and related guaranty agreement in accordance with Section 510 of the Bankruptcy Code. |
|  | All unreimbursed fees, costs and expenses of the legal and financial advisors for the Senior Loan Agent and Angelo Gordon shall be paid in full in cash on the Plan Effective Date. Senior Lenders that become party to the Agreement prior to the hearing to approve a Disclosure Statement for the Settlement Plan shall be entitled to reimbursement of reasonable and documented legal fees incurred in connection with the Bankruptcy Cases on the Plan Effective Date upon the receipt of reasonably detailed invoices, which shall include descriptions of services provided in summary form without individual time records; *provided, however*, that all such reimbursements to such Senior Lenders shall not exceed $5.0 million in the aggregate unless otherwise reasonably determined by the Senior Lender Settlement Committee, notice of which determination shall be provided to counsel to the Creditors' Committee. |
| **Reimbursement of Certain Fees of Other Parties to the Agreement** | On the Plan Effective Date, there shall be allowed and reimbursed to Centerbridge and Law Debenture (i) up to $5.25 million in the aggregate on account of reasonable and documented fees, costs and expenses of their legal and financial advisors and the reasonable and documented internal fees, costs and expenses of Law Debenture, in each case in connection with the Bankruptcy Cases incurred on or after the Petition Date and on or prior to the date of the Agreement and (ii) any additional reasonable and documented fees, costs and expenses of their legal and financial advisors incurred in connection with the Bankruptcy Cases on or after the date of the Agreement and on or prior to the Plan Effective Date in respect of actions taken that are not inconsistent with the Settlement or confirmation of the Settlement Plan, in each case upon the receipt of reasonably detailed invoices, which shall include descriptions of services provided in summary form without individual time records. |
| **Reimbursement of Certain Fees of Members of the Creditors' Committee** | On the Plan Effective Date, there shall be allowed and reimbursed to the members of the Creditors' Committee that are not indenture trustees up to $1.5 million in the aggregate on account of reasonable and documented fees, costs and expenses of their legal and financial advisors incurred by such members of the Creditors' Committee solely in their capacity as such during the pendency of the Bankruptcy Cases, upon the receipt of reasonably detailed invoices, which shall include descriptions of services provided in summary form without individual time records. Issues relating to the reimbursement of fees and expenses of members of the Creditors' Committee that are indenture trustees will be |

EXECUTION VERSION

| | considered subsequently. |
|---|---|
| **Capital Structure of Reorganized Debtors and Affiliates** | On the Plan Effective Date, the debt capital structure for the reorganized Debtors and their affiliates will be comprised of (i) a new revolving credit facility to fund working capital and letters of credit (exact size and other terms to be determined) and (ii) the New Debt in a principal amount to be determined by the Senior Lender Settlement Committee, but which principal amount shall in no event exceed two times TTM EBITDA, as determined at the time of the Plan Effective Date. The terms and conditions of such new revolving credit facility and the New Debt shall be satisfactory in form and substance to the Senior Lender Settlement Committee and shall be set forth in a supplement to the Settlement Plan. |
| **Distributions to Holders of PHONES Notes Claims and EGI-TRB LLC Notes Claims** | Based on the subordination thereof under their applicable terms, the holders of PHONES notes and EGI-TRB LLC notes will not receive any distributions under the Settlement Plan. |
| **Global Settlement** | Pursuant to Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided for thereunder, the Settlement (and the related provisions of and the distributions under the Settlement Plan) shall constitute a good faith compromise and settlement of all LBO-Related Causes of Action among Tribune and its affiliates, the Debtors' Estates, the parties to the Agreement, all other persons that are deemed to be bound thereto and all parties otherwise released under the Settlement Plan (including, without limitation, the Senior Loan Agent, the Senior Lenders, the Bridge Loan Agent and the Bridge Lenders, in each case in all of their respective capacities that could give rise to any LBO-Related Cause of Action, the Senior Noteholders, Centerbridge, Law Debenture, Deutsche Bank, the present and former members of the Creditors' Committee (in their capacity as members of the Creditors' Committee) and the present and former officers, directors, agents and advisors of the Debtors and each of the foregoing parties, in each case only if the applicable party is bound by the release sections of the Settlement Plan and, if entitled to vote on the Settlement Plan, has voted to accept the Settlement Plan, such released parties, together with such parties' respective present and former officers, directors, employees, members, managers and partners, being collectively referred to herein as the "**Released Parties**"). |
| **Releases and Exculpation** | The reorganized Debtors on their own behalf and as representatives of their respective estates shall release and shall cause the Subsidiary Non-Debtors to release unconditionally, and |

EXECUTION VERSION

be deemed to release unconditionally the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claims), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Plan Effective Date in connection with the Debtors or any of them, or their respective assets, property and estates, the Bankruptcy Cases or the Settlement Plan, the Disclosure Statement related to the Settlement Plan or any restructuring transactions consummated to effectuate the Settlement Plan (the "**Debtor Released Claims**").

Each of the Released Parties that is entitled to vote on the Settlement Plan and that has not opted out of the releases contained in the Settlement Plan, if such an option is provided in the Settlement Plan (and for the avoidance of doubt no Party shall exercise any such opt-out option) or who otherwise agrees to provide the releases set forth herein shall unconditionally release each other Released Party of and from the LBO-Related Causes of Action and any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Plan Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and estates, the Bankruptcy Cases or the Settlement Plan, the Disclosure Statement related to the Settlement Plan or any restructuring transactions consummated to effectuate the Settlement Plan; *provided* that no agent or indenture trustee is, by virtue of giving its own release hereunder, releasing individual claims, if any, of lenders or noteholders for which it acts as agent or indenture trustee that are not themselves Released Parties (the "**Holder Released Claims**" and together with the Debtor Released Claims the "**Released Claims**").

The Settlement Plan shall contain customary provisions exculpating the Released Parties and the present and former members of the Creditors' Committee (in their capacity as members of the Creditors' Committee) whether or not such

EXECUTION VERSION

| | |
|---|---|
| | members are otherwise Released Parties. |
| **Indemnities** | The reorganized Debtors shall jointly and severally indemnify and hold harmless the Senior Loan Agent, the Senior Lenders, the Bridge Loan Agent, the Bridge Lenders (collectively, the "**Indemnified Creditor Parties**") and all of their respective related persons, in each case in all capacities related to the LBO, and any natural persons who are or were officers or directors of any of the Debtors (each an "**Indemnified Party**" and collectively, with the Indemnified Creditor Parties, the "**Indemnified Parties**"), on account of and with respect to any claim, cause of action, liability, judgment, settlement, cost or expense (including without limitation attorneys' fees) on account of claims or causes of action threatened or asserted by any person against such parties that seek damages, contribution, indemnity, equitable indemnity, or any similar claim, based upon or as the result of (x) the Released Claims, including without limitation any claims on account of and with respect to any LBO-Related Causes of Action; or (y) Barred Claims (defined below) or any similar claim based upon or as the result of the assertion of primary claims against any other person by any representative of the Debtors' Estates (the "**Covered Claims**"); *provided, however*, that in no event shall the aggregate liability of the reorganized Debtors to any individual Indemnified Creditor Party and all related persons of such Indemnified Creditor Party on account of such indemnity exceed the sum of (i) such Indemnified Creditor Party's pro rata share (calculated based on the proportion that the allowed Parent Loan Claims held by such Indemnified Creditor Party bears to the aggregate amount of all allowed Parent Loan Claims held by all Indemnified Creditor Parties) of $427,582,000, (ii) such Indemnified Creditor Party's pro rata share (calculated based on the proportion that the allowed Senior Loan Guaranty Claims held by such Indemnified Creditor Party bears to the aggregate amount of all allowed Senior Loan Guaranty Claims held by all Indemnified Creditor Parties) of $83,129,000 and (iii) all costs and/or expenses (including without limitation attorneys' fees) incurred in connection with any Covered Claims by such Indemnified Creditor Party and such related persons. |
| | The reorganized Debtors shall further jointly and severally indemnify and hold harmless the present and former members of the Creditors' Committee and their related persons (in their capacity as members of the Creditors' Committee), on account of and with respect to any costs and/or expenses (including without limitation attorneys' fees) incurred in connection with any Covered Claims. |
| **Bar Order** | The confirmation order approving the Settlement Plan shall |

EXECUTION VERSION

provide, among other things (and the inclusion of such language, or language substantially similar to the following, shall be a condition to the Plan Effective Date):

"ORDERED that all Persons, including without limitation (i) any Persons that are not Released Parties, (ii) Released Parties and (iii) Persons who have voted for or against the Plan or who are presumed to have voted for or against the Plan under Section 1126(f)-(g) of the Bankruptcy Code (collectively, the "Barred Persons"), are hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any claim for non-contractual indemnity or contribution against any Released Party (including any other non-contractual claim against the Released Parties, whether or not denominated as for contribution or indemnity, where the injury to the Person is the liability of the Person to the plaintiffs), arising out of or reasonably flowing from the claims or allegations in any of the Released Claims, whether arising under state, federal or foreign law as claims, cross-claims, counterclaims, or third-party claims (collectively, the "Barred Claims"), and with respect to the Barred Claims, the Barred Persons are also entitled to the judgment reduction provisions set forth herein. This Order (the "Bar Order") is without prejudice to the position of any party as to the existence, in the absence of this Bar Order, of any Barred Claim; and it is further;

"ORDERED that no Person acting on behalf of the estate, including any successor to the Debtors, any committee appointed in the Bankruptcy Case, any chapter 7 trustee, any committee appointed in the Bankruptcy Case, any trustee of a litigation trust or any estate representative appointed or selected pursuant to Section 1123(b)(3) of the Bankruptcy Code (any of the above, a "**Plaintiff**"), may commence any cause of action or seek any judgment or award based upon, arising from, or related to the Released Claims. In the event any Plaintiff obtains a judgment or award (a "**Judgment**") against any Person with respect to one or more causes of action based upon, arising from, or related to the Released Claims or any transactions underlying any Released Claims then, with respect to any actual, potential or asserted liability of a Released Party to any Person for the Barred Claims in respect of such Judgment, the Plaintiff shall, prior to or in connection with the entry of such Judgment, provide notice of this Bar Order to the court or tribunal in which such Judgment was obtained, and the court or tribunal shall reduce such Judgment against such Person in an amount that is the greater of (i) the

**EXECUTION VERSION**

<table>
<tr>
<td></td>
<td>amount of the consideration provided pursuant to the Global Settlement by the Released Party or Parties against whom there would have been a Barred Claim in the absence of this Bar Order, or (ii) the amount equal to the Judgment against any such Person times the aggregate proportionate share of fault (expressed as a percentage) of the Released Party or Parties against whom there would have been a Barred Claim in the absence of this Bar Order. In the event that Judgment shall be entered against any Person without a prior or concurrent determination as to the existence of a Barred Claim (and, in the event of a determination of the existence of a Barred Claim, without a reduction of such Judgment), such Judgment shall not, and shall be deemed not to, give rise to any Barred Claim; and it is further

"ORDERED that if any Plaintiff enters into a settlement with any Person with respect to one or more causes of action based upon, arising from, or related to the Released Claims or any transaction underlying any Released Claim, then such Plaintiff shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Barred Claims with respect to such settlement."</td>
</tr>
<tr>
<td><strong>Other Terms of Settlement Plan and Disclosure Statement</strong></td>
<td>The initial terms of the Disclosure Statement, the Settlement Plan and all supplements thereto other than those specified herein shall be satisfactory to the Senior Lender Settlement Committee in their good faith judgment, and no amendments to the Settlement Plan or any supplements thereto shall be made without the consent of the Senior Lender Settlement Committee, which consent shall not be unreasonably withheld; <em>provided, however,</em> that in no event shall any terms of the Settlement Plan be materially inconsistent with the terms of the Settlement.  In addition to the provisions above, any descriptions of the LBO-Related Causes of Action or the Settlement set forth in the Disclosure Statement shall be reasonably acceptable to the Parties.</td>
</tr>
</table>

EXECUTION VERSION

## **EXHIBIT B**

### **Letter from Counsel to Creditors' Committee**

[see attached]

30 Rockefeller Plaza, New York, NY 10112
tel (212) 408-5100  fax (212) 541-5369

# CHADBOURNE
## & PARKE LLP

Howard Seife
direct tel (212) 408-5361
hseife@chadbourne.com

April 8, 2010

Tribune Company
435 North Michigan Avenue
Chicago, IL 60611

   Re: In re Tribune Company, et al., Debtors

Dear Tribune Company:

   One major element of the Debtors' bankruptcy cases involves resolution of claims, causes of action, avoidance powers and rights and legal and equitable remedies arising from transactions related to the leveraged buy-out of Tribune Company and its affiliated entities (the "**LBO-Related Causes of Action**"). For a number of months, the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") has engaged in extensive negotiations with the Debtors, certain Noteholders, certain Senior Lenders and their respective professionals in an effort to achieve a comprehensive and equitable resolution of the LBO-Related Causes of Action.

   You have advised the Creditors' Committee that certain creditors of the Debtors (the "**Settling Parties**") would be willing to resolve (such resolution the "**Settlement**") all LBO-Related Causes of Action on the terms and subject to the conditions outlined in the term sheet attached hereto as Exhibit A (such terms and conditions, as a whole, the "**Settlement Terms**") and that the Settling Parties intend to enter into a Settlement Support Agreement (the "**Support Agreement**") relating to the Settlement. You have further provided the Creditors' Committee with a "Notice of Supplemental Filing" in the form annexed hereto as Exhibit B.

   In our capacity as counsel to the Creditors' Committee, we are writing to advise you that the Creditors' Committee has considered the Settlement Terms and has voted to support them. Such support, however, is expressly conditional upon the inclusion of the Settlement Terms within a Plan of Reorganization, Disclosure Statement, and related documentation that are in all respects (other than as expressly provided in the Settlement Terms) in form and substance satisfactory to the Creditors' Committee, and the Creditors' Committee reserves all its rights to review, comment upon, seek changes and modifications to, and if necessary, object to such documents in any manner not inconsistent with the express provisions of the Settlement Terms. For the avoidance of doubt, the Creditors' Committee's support of the Settlement Terms shall in no way prejudice the ability of the Creditors' Committee to review, comment upon, and if necessary object to any term of any plan of reorganization for the Debtors that is not dealt with under the express provisions of the Settlement Terms, including, without limitation, provisions related to management equity incentives and compensation, distributions to creditors other than as expressly provided in the Settlement Terms, the specific terms and conditions of exit financing, settlements with parties who do not accept the Settlement Terms, the reasonableness of any fees or expenses proposed to be paid or reimbursed under the Settlement Terms, and any other matters not expressly provided for in the Settlement Terms.



CHADBOURNE
& PARKE LLP

       The Creditors' Committee also hereby advises the Debtors that in order to facilitate the consensual settlement process, it will adjourn *sine die* its Standing Motion (as that term is defined in the Support Agreement) and will not seek to prosecute any similar motion, subject to its right to seek to reinstate any such motion on the calendar of the Bankruptcy Court on at least 10 days' written notice to all the Settling Parties.  It is not the present intention of the Creditors' Committee to resume the prosecution of any such motion so long as the Support Agreement (embodying the Settlement Terms) is not terminated and there has been no Withdrawal Event (as defined therein) by any party who is a party thereto on the date hereof.

       Sincerely yours,

       Howard Seife

2

## EXHIBIT A

### Select Terms of Settlement[1]

Set forth below is a summary of the primary terms of a settlement of the LBO-Related Causes of Action. The terms of such a settlement shall be reflected in a plan of reorganization (the "**Settlement Plan**").

| Plan Classification | Senior Loan Claims and Bridge Loan Claims against Tribune shall be treated together in a single class (the "**Parent Loan Claims Class**"). |
|---|---|
| | Senior Noteholder Claims and other general unsecured claims against Tribune that are not in the Parent Loan Claims Class shall be treated together in a single class (the "**Other Parent Claims Class**"); provided, however, that with the consent of the Senior Lender Settlement Committee, Claims against Tribune arising under non-tax qualified pension plans or individual agreements providing for retirement compensation or deferred compensation arrangements ("**Non-Qualified Former Employee Benefit Claims**") of Tribune or one of the subsidiaries of Tribune that are chapter 11 debtors (the "**Subsidiary Debtors**" and together with Tribune, the "**Debtors**") and/or other general unsecured claims against Tribune that are not Senior Noteholder Claims may be placed in a separate class and receive separate treatment, as set forth below, and the Senior Lender Settlement Committee intends to discuss in good faith such separate classification and treatment with counsel to certain holders of such claims. |
| | Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims against a given Subsidiary Debtor shall be treated together (such classes with respect to all of the Subsidiary Debtors being collectively referred to herein as the "**Guaranty Claims Classes**" and, together with the Parent Loan Claims Class, the "**Loan Claims Classes**"). |
| **Allocation of Distributable Enterprise Value** | The Settlement Plan will provide that, on the effective date of the Settlement Plan (the "**Plan Effective Date**"), the distributable value of Tribune and its subsidiaries (the "**Distributable Enterprise Value**", which is comprised of the aggregate distributable value, as of the Plan Effective Date, of all of the Distributable Cash, New Debt and New Common Stock, each as hereinafter defined ) shall be allocated as follows: |

---

[1] Capitalized terms used but not defined herein shall have the meanings given to such terms in the agreement to which this term sheet is attached.

l

|  | (i) 8.8% of such Distributable Enterprise Value shall be allocated for distribution to holders of claims against Tribune as hereinafter set forth (for the avoidance of doubt, the 8.8% of Distributable Enterprise value allocated to Tribune shall be distributed such that the Senior Noteholders receive 7.4% of such Distributable Enterprise Value on account of their Claims against Tribune as set forth below); and |
|  | (ii) 91.2% of such Distributable Enterprise Value shall be allocated for distributions to holders of claims against the subsidiaries of Tribune that are guarantors of the obligations of Tribune under the Senior Loan Agreement and the Bridge Loan Agreement (the "**Guarantor Subsidiaries**"), as hereinafter set forth. |
|  | This allocation of Distributable Enterprise Value of $6.1 billion shall be fixed for purposes of the Settlement Plan, and distributions to holders of claims against Tribune and against the Subsidiary Debtors shall be based on such allocation, as more fully set forth below. |
| **Treatment of Claims of Senior Noteholders and Other Parent General Unsecured Creditors** | Except to the extent set forth below, the holders of claims in the Other Parent Claims Class shall receive Distributable Cash (as defined below), new debt issued by reorganized Tribune (the "**New Debt**", as described below) and common stock of reorganized Tribune (the "**New Common Stock**")[2] such that when distributed pro rata among the Other Parent Claims Class, the Senior Noteholders shall receive, in the aggregate, 7.4% of the Distributable Enterprise Value (for the avoidance of doubt, such consideration shall be a "strip" of the consideration to be received by holders of allowed Claims in the Loan Claims Classes under the Settlement Plan (*i.e.* the same consideration in form, substance and relative pro ration) not taking into account any modification of such consideration pursuant to the Parent Creditor Cash Distribution).[3]  Specifically, each Senior Noteholder shall receive such Senior Noteholder's pro rata share of:<br><br>(i) 7.4% of the total cash remaining available for distribution to unsecured creditors of Tribune and the Subsidiary Debtors calculated after the payment only of administrative expenses, priority claims, cure costs paid by Tribune, cash posted to collateralize outstanding letters |

---

[2] To the extent any specific holder that would receive a distribution of New Common Stock cannot receive New Common Stock for FCC compliance purposes, such holder will receive the economic equivalent thereof in warrants to purchase such stock.

[3] For example, at Distributable Enterprise Value of $6.1 billion, the value of the distribution to the Senior Noteholders would be approximately $451.4 million in the aggregate.

of credit, employee benefit claims for plans continuing with current employees, Noteholder fees and expenses, Senior Lender fees and expenses, fees and expenses associated with exit financing or any other new indebtedness, and the reservation by Tribune of not more than $350 million of cash for operating purposes (the **"Distributable Cash"**)

(ii) 7.4% of the New Debt and

(iii) 7.4% of the New Common Stock.

*provided, however*, that the New Common Stock to be received by all creditors entitled thereto under the Settlement Plan, including holders of claims in the Other Parent Claims Class, shall be subject to dilution as of the Plan Effective Date, pro rata, through the issuance pursuant to or as contemplated in the Settlement Plan of New Common Stock or options to purchase New Common Stock on account of management grants or for other purposes, including such grants as are contemplated in the Settlement Plan to be distributed over time as determined by the board of directors of reorganized Tribune, all as expressly provided for under the Settlement Plan with the consent of the Senior Lender Settlement Committee in its discretion and having an aggregate number of shares and/or value not to exceed 7.5% of the equity value of reorganized Tribune or such lower amount as may be determined by the Senior Lender Settlement Committee. Such issuances of New Common Stock or options to purchase New Common Stock shall be expressly provided for in the Settlement Plan and shall be subject to the consent of the Senior Lender Settlement Committee in its sole discretion.

Holders of allowed claims in the Other Parent Claims Class that are not Senior Noteholder Claims will receive distributions on their claims of Distributable Cash, New Debt and New Common Stock pari passu to those received by the Senior Noteholders as set forth above, which shall provide such holders with recoveries on their claims equal and ratable to the recoveries of the Senior Noteholders; *provided, however*, that, with the consent of the Senior Lender Settlement Committee, Non-Qualified Former Employee Benefit Claims against Tribune and/or other general unsecured claims against Tribune that are not Senior Noteholder Claims may be separately classified and receive their comparable distributions of equivalent value in cash alone, rather than in a combination of Distributable Cash, New Common Stock and New Debt (any such claims so classified the **"Separately Classified Parent Claims"**). If this modification of the distribution to such creditors (the **"Parent Creditor Cash Distribution"**) occurs, the required additional cash that the Senior Lender Settlement

| | |
|---|---|
| | Committee consents to have paid on account of the Separately Classified Parent Claims shall be reallocated from that portion of the Distributable Cash otherwise distributed to the Guaranty Claims Classes as set forth below, and the New Common Stock and New Debt that otherwise would have been allocable to the Separately Classified Parent Claims shall be reallocated to the Guaranty Claims Classes. |
| **Treatment of Subsidiary General Unsecured Creditors** | General unsecured claims against the Subsidiary Debtors that are not in the Guaranty Claims Classes shall be paid in full in cash; provided, however, that post-petition interest shall not be allowed or paid on any such claims and the Debtors shall make a good-faith, reasonable estimate of the amount to be paid on account of such claims in the aggregate, which estimate they shall disclose in a Plan Supplement and which estimate shall be subject to review by the Parties.  If the Debtors estimate that the sum of all such allowed claims will be greater than $150 million in the aggregate on the Plan Effective Date, the distributions to the holders of such claims shall be limited to their pro rata share of $150 million unless the Senior Lender Settlement Committee decides, in its sole discretion, to provide additional consideration to such creditors. |
| **Treatment of Loan Claims** | *Parent Loan Claims Class* – All of the Distributable Cash, New Debt and New Common Stock allocated for distribution to creditors of Tribune (as set forth above under "Allocation of Distributable Enterprise Value") remaining after the payment of the distributions to the Other Parent Claims Class and the Separately Classified Parent Claims, if any, shall be allocated to the Parent Loan Claims Class pro rata (treating claims under the Senior Loan Agreement and the Bridge Loan Agreement pari passu for such purpose). |
| | *Guaranty Claims Classes* – Claims in these classes will receive all of the Distributable Cash, New Debt and New Common Stock allocated to Guarantor Subsidiaries (as set forth above under "Allocation of Distributable Enterprise Value") remaining after a portion of such Distributable Cash is used to pay general unsecured claims against the Subsidiary Debtors that are not in the Guaranty Claims Classes as described above, *minus* any cash paid pursuant to the Parent Creditor Cash Distribution, and *plus* any New Debt and New Common Stock reallocated to the Guaranty Claims Classes as a result of the Parent Creditor Cash Distribution |
| | All of the Distributable Cash, New Debt and New Common Stock distributable to the Guaranty Claims Classes as set forth above shall be distributed solely to the holders of Senior Loan Guaranty Claims pursuant to enforcement of the applicable subordination |

|  | and turn-over provisions for the benefit of Senior Lenders under the terms of the Bridge Loan Agreement and related guaranty agreement in accordance with Section 510 of the Bankruptcy Code. |
|---|---|
|  | All unreimbursed fees, costs and expenses of the legal and financial advisors for the Senior Loan Agent and Angelo Gordon shall be paid in full in cash on the Plan Effective Date. Senior Lenders that become party to the Agreement prior to the hearing to approve a Disclosure Statement for the Settlement Plan shall be entitled to reimbursement of reasonable and documented legal fees incurred in connection with the Bankruptcy Cases on the Plan Effective Date upon the receipt of reasonably detailed invoices, which shall include descriptions of services provided in summary form without individual time records; *provided, however*, that all such reimbursements to such Senior Lenders shall not exceed $5.0 million in the aggregate unless otherwise reasonably determined by the Senior Lender Settlement Committee, notice of which determination shall be provided to counsel to the Creditors' Committee. |
| **Reimbursement of Certain Fees of Other Parties to the Agreement** | On the Plan Effective Date, there shall be allowed and reimbursed to Centerbridge and Law Debenture (i) up to $5.25 million in the aggregate on account of reasonable and documented fees, costs and expenses of their legal and financial advisors and the reasonable and documented internal fees, costs and expenses of Law Debenture, in each case in connection with the Bankruptcy Cases incurred on or after the Petition Date and on or prior to the date of the Agreement and (ii) any additional reasonable and documented fees, costs and expenses of their legal and financial advisors incurred in connection with the Bankruptcy Cases on or after the date of the Agreement and on or prior to the Plan Effective Date in respect of actions taken that are not inconsistent with the Settlement or confirmation of the Settlement Plan, in each case upon the receipt of reasonably detailed invoices, which shall include descriptions of services provided in summary form without individual time records. |
| **Reimbursement of Certain Fees of Members of the Creditors' Committee** | On the Plan Effective Date, there shall be allowed and reimbursed to the members of the Creditors' Committee that are not indenture trustees up to $1.5 million in the aggregate on account of reasonable and documented fees, costs and expenses of their legal and financial advisors incurred by such members of the Creditors' Committee solely in their capacity as such during the pendency of the Bankruptcy Cases, upon the receipt of reasonably detailed invoices, which shall include descriptions of services provided in summary form without individual time records. Issues relating to the reimbursement of fees and expenses of members of the |

| | |
|---|---|
| | Creditors' Committee that are indenture trustees will be considered subsequently. |
| **Capital Structure of Reorganized Debtors and Affiliates** | On the Plan Effective Date, the debt capital structure for the reorganized Debtors and their affiliates will be comprised of (i) a new revolving credit facility to fund working capital and letters of credit (exact size and other terms to be determined) and (ii) the New Debt in a principal amount to be determined by the Senior Lender Settlement Committee, but which principal amount shall in no event exceed two times TTM EBITDA, as determined at the time of the Plan Effective Date. The terms and conditions of such new revolving credit facility and the New Debt shall be satisfactory in form and substance to the Senior Lender Settlement Committee and shall be set forth in a supplement to the Settlement Plan. |
| **Distributions to Holders of PHONES Notes Claims and EGI-TRB LLC Notes Claims** | Based on the subordination thereof under their applicable terms, the holders of PHONES notes and EGI-TRB LLC notes will not receive any distributions under the Settlement Plan. |
| **Global Settlement** | Pursuant to Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided for thereunder, the Settlement (and the related provisions of and the distributions under the Settlement Plan) shall constitute a good faith compromise and settlement of all LBO-Related Causes of Action among Tribune and its affiliates, the Debtors' Estates, the parties to the Agreement, all other persons that are deemed to be bound thereto and all parties otherwise released under the Settlement Plan (including, without limitation, the Senior Loan Agent, the Senior Lenders, the Bridge Loan Agent and the Bridge Lenders, in each case in all of their respective capacities that could give rise to any LBO-Related Cause of Action, the Senior Noteholders, Centerbridge, Law Debenture, Deutsche Bank, the present and former members of the Creditors' Committee (in their capacity as members of the Creditors' Committee) and the present and former officers, directors, agents and advisors of the Debtors and each of the foregoing parties, in each case only if the applicable party is bound by the release sections of the Settlement Plan and, if entitled to vote on the Settlement Plan, has voted to accept the Settlement Plan, such released parties, together with such parties' respective present and former officers, directors, employees, members, managers and partners, being collectively referred to herein as the "**Released Parties**"). |
| **Releases and** | The reorganized Debtors on their own behalf and as representatives of their respective estates shall release and shall |

| Exculpation | cause the Subsidiary Non-Debtors to release unconditionally, and be deemed to release unconditionally the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claims), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Plan Effective Date in connection with the Debtors or any of them, or their respective assets, property and estates, the Bankruptcy Cases or the Settlement Plan, the Disclosure Statement related to the Settlement Plan or any restructuring transactions consummated to effectuate the Settlement Plan (the "**Debtor Released Claims**").

Each of the Released Parties that is entitled to vote on the Settlement Plan and that has not opted out of the releases contained in the Settlement Plan, if such an option is provided in the Settlement Plan (and for the avoidance of doubt no Party shall exercise any such opt-out option) or who otherwise agrees to provide the releases set forth herein shall unconditionally release each other Released Party of and from the LBO-Related Causes of Action and any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Plan Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and estates, the Bankruptcy Cases or the Settlement Plan, the Disclosure Statement related to the Settlement Plan or any restructuring transactions consummated to effectuate the Settlement Plan; *provided* that no agent or indenture trustee is, by virtue of giving its own release hereunder, releasing individual claims, if any, of lenders or noteholders for which it acts as agent or indenture trustee that are not themselves Released Parties (the "**Holder Released Claims**" and together with the Debtor Released Claims the "**Released Claims**").

The Settlement Plan shall contain customary provisions exculpating the Released Parties and the present and former members of the Creditors' Committee (in their capacity as members of the Creditors' Committee) whether or not such |
|---|---|

| | |
|---|---|
| | members are otherwise Released Parties. |
| **Indemnities** | The reorganized Debtors shall jointly and severally indemnify and hold harmless the Senior Loan Agent, the Senior Lenders, the Bridge Loan Agent, the Bridge Lenders (collectively, the **"Indemnified Creditor Parties"**) and all of their respective related persons, in each case in all capacities related to the LBO, and any natural persons who are or were officers or directors of any of the Debtors (each an **"Indemnified Party"** and collectively, with the Indemnified Creditor Parties, the **"Indemnified Parties"**), on account of and with respect to any claim, cause of action, liability, judgment, settlement, cost or expense (including without limitation attorneys' fees) on account of claims or causes of action threatened or asserted by any person against such parties that seek damages, contribution, indemnity, equitable indemnity, or any similar claim, based upon or as the result of (x) the Released Claims, including without limitation any claims on account of and with respect to any LBO-Related Causes of Action; or (y) Barred Claims (defined below) or any similar claim based upon or as the result of the assertion of primary claims against any other person by any representative of the Debtors' Estates (the **"Covered Claims"**); *provided, however*, that in no event shall the aggregate liability of the reorganized Debtors to any individual Indemnified Creditor Party and all related persons of such Indemnified Creditor Party on account of such indemnity exceed the sum of (i) such Indemnified Creditor Party's pro rata share (calculated based on the proportion that the allowed Parent Loan Claims held by such Indemnified Creditor Party bears to the aggregate amount of all allowed Parent Loan Claims held by all Indemnified Creditor Parties) of $427,582,000, (ii) such Indemnified Creditor Party's pro rata share (calculated based on the proportion that the allowed Senior Loan Guaranty Claims held by such Indemnified Creditor Party bears to the aggregate amount of all allowed Senior Loan Guaranty Claims held by all Indemnified Creditor Parties) of $83,129,000 and (iii) all costs and/or expenses (including without limitation attorneys' fees) incurred in connection with any Covered Claims by such Indemnified Creditor Party and such related persons. <br><br> The reorganized Debtors shall further jointly and severally indemnify and hold harmless the present and former members of the Creditors' Committee and their related persons (in their capacity as members of the Creditors' Committee), on account of and with respect to any costs and/or expenses (including without limitation attorneys' fees) incurred in connection with any Covered Claims. |

| | |
|---|---|
| **Bar Order** | The confirmation order approving the Settlement Plan shall provide, among other things (and the inclusion of such language, or language substantially similar to the following, shall be a condition to the Plan Effective Date): |
| | "ORDERED that all Persons, including without limitation (i) any Persons that are not Released Parties, (ii) Released Parties and (iii) Persons who have voted for or against the Plan or who are presumed to have voted for or against the Plan under Section 1126(f)-(g) of the Bankruptcy Code (collectively, the "Barred Persons"), are hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any claim for non-contractual indemnity or contribution against any Released Party (including any other non-contractual claim against the Released Parties, whether or not denominated as for contribution or indemnity, where the injury to the Person is the liability of the Person to the plaintiffs), arising out of or reasonably flowing from the claims or allegations in any of the Released Claims, whether arising under state, federal or foreign law as claims, cross-claims, counterclaims, or third-party claims (collectively, the "Barred Claims"), and with respect to the Barred Claims, the Barred Persons are also entitled to the judgment reduction provisions set forth herein.  This Order (the "Bar Order") is without prejudice to the position of any party as to the existence, in the absence of this Bar Order, of any Barred Claim; and it is further; |
| | "ORDERED that no Person acting on behalf of the estate, including any successor to the Debtors, any committee appointed in the Bankruptcy Case, any chapter 7 trustee, any committee appointed in the Bankruptcy Case, any trustee of a litigation trust or any estate representative appointed or selected pursuant to Section 1123(b)(3) of the Bankruptcy Code (any of the above, a "**Plaintiff**"), may commence any cause of action or seek any judgment or award based upon, arising from, or related to the Released Claims.  In the event any Plaintiff obtains a judgment or award (a "**Judgment**") against any Person with respect to one or more causes of action based upon, arising from, or related to the Released Claims or any transactions underlying any Released Claims then, with respect to any actual, potential or asserted liability of a Released Party to any Person for the Barred Claims in respect of such Judgment, the Plaintiff shall, prior to or in connection with the entry of such Judgment, provide notice of this Bar Order to the court or tribunal in which such Judgment was obtained, and the court or tribunal shall reduce such Judgment |

<table>
<tr><td></td><td>against such Person in an amount that is the greater of (i) the amount of the consideration provided pursuant to the Global Settlement by the Released Party or Parties against whom there would have been a Barred Claim in the absence of this Bar Order, or (ii) the amount equal to the Judgment against any such Person times the aggregate proportionate share of fault (expressed as a percentage) of the Released Party or Parties against whom there would have been a Barred Claim in the absence of this Bar Order. In the event that Judgment shall be entered against any Person without a prior or concurrent determination as to the existence of a Barred Claim (and, in the event of a determination of the existence of a Barred Claim, without a reduction of such Judgment), such Judgment shall not, and shall be deemed not to, give rise to any Barred Claim; and it is further<br><br>"ORDERED that if any Plaintiff enters into a settlement with any Person with respect to one or more causes of action based upon, arising from, or related to the Released Claims or any transaction underlying any Released Claim, then such Plaintiff shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Barred Claims with respect to such settlement."</td></tr>
<tr><td>**Other Terms of Settlement Plan and Disclosure Statement**</td><td>The initial terms of the Disclosure Statement, the Settlement Plan and all supplements thereto other than those specified herein shall be satisfactory to the Senior Lender Settlement Committee in their good faith judgment, and no amendments to the Settlement Plan or any supplements thereto shall be made without the consent of the Senior Lender Settlement Committee, which consent shall not be unreasonably withheld; *provided, however,* that in no event shall any terms of the Settlement Plan be materially inconsistent with the terms of the Settlement. In addition to the provisions above, any descriptions of the LBO-Related Causes of Action or the Settlement set forth in the Disclosure Statement shall be reasonably acceptable to the Parties.</td></tr>
</table>

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| | Jointly Administered |
| Debtors. | |

**NOTICE OF SUPPLEMENTAL FILING IN SUPPORT OF DEBTORS' MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. § 1121(D) FURTHER EXTENDING DEBTORS' EXCLUSIVE PERIOD WITHIN WHICH TO FILE A CHAPTER 11 PLAN**

PLEASE TAKE NOTICE that the above caption debtors and debtors in possession (collectively, the "Debtors") have been advised by certain significant holders of senior loans (J.P. Morgan and Angelo Gordon) and bonds (Centerbridge Partners), as well as an indenture trustee for certain series of the senior bonds, that they support a resolution of these cases on terms consistent with those set forth in the attached settlement term sheet (the "Settlement Term Sheet"). The Debtors support resolution of these cases on the terms set forth in the Settlement Term Sheet, and the Debtors have been advised that the Official Committee of Unsecured Creditors also supports a resolution of these cases on terms consistent with those set forth in the Settlement Term Sheet.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC (KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

PLEASE TAKE FURTHER NOTICE that before April 13th, the Debtors intend to file both a Plan of Reorganization that the Debtors believe tracks, incorporates and implements the Settlement Term Sheet (the "Plan") and a Disclosure Statement describing the same (the "Disclosure Statement"). The Debtors intend expeditiously to seek approval of the Disclosure Statement and notice and balloting procedures, and following such approval expeditiously to solicit votes on the Plan pursuant thereto. The Debtors believe that such resolution of these cases is fair, and that the Plan presents the best opportunity to garner acceptance by all impaired classes of claims entitled to distributions there under and the best opportunity to obtain approval pursuant to 1129(a) and/or (b) of the Bankruptcy Code and Bankruptcy Rule 9019(a).

Dated: April 8, 2010

SIDLEY AUSTIN LLP

James F. Conlan
Bryan Krakauer
Janet E. Henderson
Kevin T. Lantry
Jessica C.K. Boelter
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

COLE SCHOTZ MEISEL FORMAN & LEONARD, P.A.

Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

Counsel for Debtors and Debtors In Possession