```
                    UNITED STATES BANKRUPTCY COURT
                     EASTERN DISTRICT OF DELAWARE

                              )
IN RE:                        )         Bankruptcy Action
                              )         08-13141-KJC
TRIBUNE COMPANY, et al.,      )
                              )         Chapter 11
                              )         Wilmington, DE
              Debtors,        )         April 13, 2010
                              )         10:00 a.m.

                        TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE KEVIN J. CAREY
             UNITED STATES BANKRUPTCY COURT JUDGE

    APPEARANCES:

    For the Debtors:          JAMES CONLAN, ESQUIRE
                              BRIAN KRAKAUER, ESQUIRE
                              JAMES BENDERNAGEL, ESQUIRE
                              Sidley, Austin, LLP
                              One South Dearborn Street
                              Chicago, Illinois 60603


    Audio Operator:           Al Lugano


    Transcribed by:           DIANA DOMAN TRANSCRIBING
                              P.O. Box 129
                              Gibbsboro, New Jersey  08026-129
                              PHONE:  (856)435-7172
                              FAX:    (856) 435-7124
                              Email:  Dianadoman@comcast.ne
```

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

(Appearances Continued)

```
For Creditors Committee:    HOWARD SEIFE, ESQUIRE
                            Chadbourne & Parke, LLP
                            30 Rockefeller Plaza
                            New York, New York 10112

                            GRAEME BUSH, ESQUIRE
                            Zuckerman Spaeder, LP
                            1800 M Street NW
                            Suite 1000
                            Washington, DC 20036

For U.S. Trustee:           WILLIAM HARRINGTON, ESQUIRE
                            Office of the U.S. Trustee
                            844 King Street
                            Wilmington, Delaware

For JPMorgan:               DON BERNSTEIN, ESQUIRE
                            DENNIS GLAZER, ESQUIRE
                            Davis, Polk & Wardwell, LLP
                            450 Lexington Avenue
                            New York, New York

For Retiree Claimants:      JAY TEITELBAUM, ESQUIRE
                            Teitelbaum & Baskin, LLP
                            White Plains, NY

For Wilmington Trust:       ROBERT STARK, ESQUIRE
                            WILLIAM M. DOLAN, ESQUIRE
                            Brown, Rudnick
                            7 Times Square #47
                            New York, New York 10036

For Centerbridge:           DANIEL GOLDEN, ESQUIRE
                            ABID QURESHI, ESQUIRE
                            Akin, Gump, Strauss, Hauer & Feld
                            One Bryant Park
                            New York, New York 10036

For Credit Party            BRUCE BENNETT, ESQUIRE
Lender:                     Hennigan, Bennett & Dorman
                            865 South Figueroa Street
                            Suite 2900
                            Los Angeles, CA 90017

For Law Debenture:          DAVID ROSNER, ESQUIRE
                            Kasowitz, Benson, Torres & Friedman
                            1633 Broadway
                            New York, New York 10019
```

I N D E X

MOTION TO TERMINATE EXCLUSIVITY

Mr. Conlan                  5, 10
Mr. Bush                       6
Mr. Seife                     12
Mr. Bernstein                 13
Mr. Riley                     14
Mr. Teitelbaum                15
Mr. Rosner                    18
Mr. Golden                    19
Mr. Stark                     22
Mr. Bennett                   25

THE COURT: Ruling             32

EXAMINER MOTION

Mr. Stark                     33
Mr. Glazer                    34
Mr. Seife                     36
Mr. Harrington               38, 60
Mr. Conlon                   42, 52
Mr. Stark                    43, 49, 54, 60
Mr. Bendernagel               47
Mr. Glazer                    59

MOTION TO CONDUCT DISCOVERY
Mr. Bennett                   67
Mr. Qureshi                   69

4

1       (Call to the Order of the Court)

2           THE COURT:  Good morning, everyone.

3           MR. CONLAN:  Good morning, Your Honor.  Jim Conlan

4       from Sidley, Austin on behalf of the debtors.  Your Honor,

5       first, if I may, an introduction to provide some context for

6       today's agenda.

7           What we took from the February 18th hearing,

8       including Your Honor's remarks, were that we needed to file a

9       plan with diverse support, and that support of the Creditor's

10      Committee would be good.

11          We've done that.  It starts with the settlement

12      support agreement, which I'll sometimes refer to as the SSA.

13      The SSA includes signatories, JPMorgan Chase, as well as

14      Angelo, Gordon, both senior loan claimants.

15          It includes as a signatory, Centerbridge, as a senior

16      note holder, a very big senior note holder, they hold about 37

17      percent of the issue.  It includes Law Debenture, the

18      indentured trustee for senior notes.  Importantly, the

19      Committee supports the SSA and Mr. Bush will rise in a moment

20      to describe that support.

21          The retirees support and have filed a pleading

22      regarding same.  The deal, Your Honor, came together on or

23      about March 30th.  Accordingly, we have filed a motion to

24      extend front end exclusivity to today.  Sorry, we filed a

25      motion to extend front end exclusivity to March 30th, but,

Conlan - Argument                                              5

1   frankly, we've altered it since then, because we don't need the

2   front end extension beyond today, because we filed the plan and

3   disclosure statement yesterday.

4           THE COURT:  Sorry.  Is there a hearing date set on

5   that?

6           MR. CONLAN:  For the motion?  Yes.  Today.  We filed

7   the motion to extend, Your Honor, so that the terms of the SSA,

8   which were -- the deal for which was struck on March 30th could

9   be finalized.  It was finalized last week, and notice was filed

10  last week by the debtor, with a term sheet describing the SSA

11  attached.

12          The SSA itself was filed yesterday afternoon by

13  JPMorgan.  We then continued work on the plan and disclosure

14  statement to reflect the terms of the SSA.  Yesterday, we filed

15  that plan and disclosure statement reflecting the SSA.  We have

16  set May 20th through your clerk's office as a hearing date on

17  the disclosure statement that was filed yesterday.

18          We will also tee up for that date, for May 20th, a

19  motion for approval of notice and balloting procedures.  We

20  will also tee up for that day, May 20th, a motion to extend

21  back end exclusivity to track the balloting and notice order.

22          I want to pause for a moment to ask Mr. Bush, co-

23  counsel, special counsel to the Official Unsecured Creditors

24  Committee to join me to describe their support.

25          THE COURT:  Before you do, let me just take the

1    scheduling proposal one step further, and that is, if you were

2    to have a approved disclosure statement on May 20, when is it

3    the debtor would contemplate looking for a confirmation hearing

4    date?  Just ballpark.

5         MR. CONLAN:  End of July, beginning of August.

6         THE COURT:  Thank you.

7         MR. BUSH:  Good morning, Your Honor.  Graeme Bush

8    from Zuckerman, Spaeder.  Zuckerman, Spaeder was retained as

9    special counsel to provide independent counsel and advice to

10   the Creditor's Committee in connection with the LBO related

11   claims.

12        We have done exactly that.  We -- the scope of our

13   retention was to investigate the potential fraudulent

14   conveyance and related claims relating to the LBO, to make an

15   evaluation of those claims, to represent the Committee in

16   connection with any settlement negotiations that may occur.

17        And to pursue litigation, if that became necessary.

18   We were retained by the Committee in mid-August of last year,

19   and Your Honor approved our retention on September 3rd.

20        Since that time, we have reviewed a very large number

21   of documents.  As Your Honor will recall from prior

22   proceedings, over 3.2 million pages of documents have been

23   produced from over 46 parties in the case.

24        We deposed 7 people from the debtors, from the

25   solvency consultants involved in the transaction, and from

1    JPMorgan, and we interviewed others.  We worked with financial

2    consultants to evaluate the solvency issues.  We conducted an

3    extensive legal and factual evaluation and analysis of the

4    claims that the debtor may have that might be asserted by the

5    Committee on behalf of the debtor.

6          We were not constrained in anyway in the work that we

7    did.  We reported to the Committee, we did not report, or take

8    direction from any other professional representing the

9    Committee, it was always the Committee that was our client.

10          We coordinated our work with other interested

11   parties, including, importantly, Centerbridge and Law

12   Debenture, and some other parties who were interested in the

13   case.

14          We gave our views to the Committee and made our

15   recommendations to the Committee.  And as Your Honor knows, the

16   Committee authorized and instructed us to prepare a complaint

17   and to file a standing motion.  That standing motion was before

18   Your Honor on February 18th.

19          We have also been involved in all of the settlement

20   negotiations that have occurred in which the Committee was

21   involved, and we believe that our work has been a significant

22   factor in achieving the settlement that's here before you, or

23   that will be before you in due course.

24          We believe that that settlement is a fair and

25   reasonable settlement, and is in the best interests of the

1    creditors as a whole.  I note that today is not the day to

2    discuss the merits of the settlement, but just by way of

3    background, under a strict priority here, if there were no

4    fraudulent conveyance and related claims, the bonds and the

5    general unsecured creditors of the Tribune Company would get

6    about 2 percent of their claims.

7            And under the settlement, the bonds and the general

8    unsecured creditors are getting over 35 -- a little over 35

9    percent of their claims, and the subsidiary general unsecured

10   creditors are being paid in full.

11           Unfortunately, there are some creditors who will be

12   getting nothing from the settlement, and that's because of

13   where they stand in the capital structure of the company.  And

14   just, again, by way of setting a framework in order for those

15   creditors to achieve any recovery, we would have to be 100

16   percent successful.

17           I don't mean 70 percent, or 60 percent, a hundred

18   percent successful on the claims, in order to produce enough of

19   a recovery for those creditors to get anything out of the

20   settlement, or out of the claims.

21           As Mr. Conlan says, the Creditor's Committee has

22   determined to support the settlement.  And as part of that, it

23   will be adjourning the standing motion that is pending before

24   Your Honor sine die, pending the outcome of the settlement

25   approval process.

1          Let me just talk very briefly about that.  The time

2     will come when the Court will make a determination whether the

3     settlement meets the standards for approval under the

4     Bankruptcy Code.  At that point, there will be a full adversary

5     process in which those parties who believe that the settlement

6     is inadequate will have a full opportunity to try and make

7     their case in front of the Court.  All the parties who are

8     involved here are very sophisticated and have access to all of

9     the documents and all of the testimony.

10         And the ability to conduct their own financial and

11    legal analysis and present their case to the Court.  There's no

12    reason that we can see to deviate from the normal process of

13    presenting this to the Court for a determination of whether the

14    settlement is fair and reasonable and in the best interests of

15    the creditors and the estate.

16         I would make one further observation, which is that

17    we were hired, or retained specifically in order to be an

18    independent voice, it's taken us -- or give an independent

19    view.  It's taken us 6 to 7 months since we were retained to

20    conduct the evaluation that's, in part, contributed to us being

21    here today.

22         It's very hard to imagine how anybody else could come

23    in now and do it in any substantially -- in any substantially

24    less -- or shorter period of time.

25         And we think that to do that would be -- to go down

Conlan - Argument                                        10

1    that path would be, not only unnecessary delay, but a waste of

2    time and resources of the debtor.  And that's particularly true

3    in light of the fact that, when the settlement is presented to

4    Your Honor there will be every opportunity to test the bona

5    fides of it.

6         And ultimately it's Your Honor's decision whether the

7    settlement's fair and reasonable.

8         That's all I have right now.  If you have any

9    questions, I'm happy to answer them.

10        MR. CONLAN:  Your Honor, Jim Conlan, again, on behalf

11   of the debtor.  As described by Mr. Bush, but in my words, the

12   plan and the disclosure statement we have filed and the process

13   we have now set in motion, should, in our view, be the prism

14   through which all matters, including those that are up today,

15   are viewed, in order to efficiently administer these cases.

16   That process, the disclosure statement approval process, the

17   approval of the balloting and procedures motion, and ultimately

18   the confirmation hearing, should act as the funnel,

19   procedurally and otherwise, for all other matters.

20        Consequently, and this is a suggestion, and I want to

21   put exclusivity aside for just a moment and deal with that

22   separately, we believe that like the standing motion, which has

23   been continued sine die, that the examiner motion and related

24   matters should be adjourned sine die.

25        And I won't say that again, I'll just refer to it as

1    carry, because I'm sure I'll mess it up.

2         Our stay motion, stay violation motion and the

3    Wilmington complaint, as well as any obligation to respond to

4    it, should be adjourned, carried.  The sanctions motion, which

5    is up for a status conference today, but the merits of which

6    will be heard on May 18th, we think should go a similar

7    direction.  Be carried.  With -- that's a suggestion.

8         With respect to exclusivity, Your Honor, it's in a

9    special category, we recognize, we no longer require any

10   extension beyond today, because the plan and disclosure

11   statement were filed yesterday, and they are very matured

12   documents.

13        There will be additional modifications, but they're

14   matured and, Your Honor, I believe the statements that we've

15   already made, together with any statements you would like to

16   have us make on -- or they can come out of the mouths of JPM,

17   Angelo, the Committee, the retirees with respect to the

18   process, the last several weeks which have been fulsome,

19   establish cause for the granting of front end exclusivity

20   through today.

21        THE COURT:  Well I have an amended agenda dated

22   yesterday.  But I don't see where listed on it is the motion to

23   extend exclusivity.

24        MR. CONLAN:  It should be item 14, Your Honor.  It

25   should be item 14, which is on page 14 of my copy.

1      THE COURT:  Okay.  I have it.

2      MR. CONLAN:  You know, we were delicate with respect

3  to the status on the bottom.

4      THE COURT:  I'm trying to interpret the note that I

5  wrote beside this item on the agenda.  I now understand it.

6  Maybe that would be the place to start.

7      So let me first ask, who wishes to be heard in

8  connection with the debtors' request for extension of

9  exclusivity?

10      MR. CONLAN:  Your Honor, people can respond, but I

11  would ask that the signatories to the SSA be allowed to go

12  first, to just to give you some background, as well as their

13  position.

14      THE COURT:  Okay.  I'll hear the pro's first, and any

15  con's, because I see Mr. Stark pacing, afterwards.

16      MR. CONLAN:  Thank you, Your Honor.

17      MR. SEIFE:  Good morning, Your Honor, Howard Seife.

18  Chadbourne & Parke for the Official Committee of Unsecured

19  Creditors.

20      As Mr. Bush explained to the Court, the Committee is

21  supportive of the settlement term sheet, and we're very

22  actively engaged with the debtors in terms of review and

23  comment on the plan of reorganization, which has been filed.

24      It is a plan which reflects the terms in the term

25  sheet.  We feel that it is a very substantial step forward in

Bernstein - Argument                                    13

1    the process toward confirmation.  I'm very pleased with the

2    efforts of the debtor and the other parties that are part of

3    the process and the term sheet.  And we think it's appropriate

4    to continue to extend exclusivity, take it to the next step,

5    which is the hearing on the disclosure statement, and

6    ultimately to plan confirmation hearings.  And we think the

7    filing of the plan obviates the need for a ruling on the actual

8    motion, given the automatic extension.

9         So the Committee is fully supportive of the debtors'

10   efforts to continue the process with the plan.  The Committee

11   will continue its efforts to comment on the plan and attain

12   changes it feels is appropriate.  So we are fully supportive of

13   the debtor in this process.

14        MR. BERNSTEIN:  Your Honor, Don Bernstein from Davis,

15   Polk & Wardwell, representing JPMorgan Chase as a supporter of

16   the proposed settlement.  Your Honor, one of the most difficult

17   things in a reorganization case is getting people in a room

18   together who are willing to have a conversation about a

19   reasonable bargaining range for a resolution in the case.

20        And, typically, these negotiations are characterized

21   by positional bargaining, where the parties are very far apart.

22   And what the debtor has done over the last six weeks or so, is

23   they have coaxed some parties who were very far apart into the

24   room together.  We have come up with a fair and reasonable

25   proposal as a settlement, and this constitutes substantial

1    progress in the case.

2          We think that, to the extent the Court needs to rule

3    on exclusivity, the extension should be granted to continue

4    exclusivity through today.  The debtor has filed a plan, and we

5    hope that expeditiously a disclosure statement can be approved,

6    and that the plan can go out for a vote.

7          We are very optimistic, certainly based on just three

8    days of information about other supporters beginning to come

9    out of the woodwork for this proposal, that when people are

10   given a fair opportunity to evaluate it, they will support the

11   settlement idea that's represented by the proposal.

12         THE COURT:  Thank you.

13         MR. BERNSTEIN:  Thank you, Your Honor.

14         MR. RILEY:  Good morning, Your Honor.  Richard Riley

15   from Duane, Morris on behalf of Angelo, Gordon & Company.

16   Angelo, Gordon & Company does support the settlement that's

17   outlined and incorporated in the plan, Your Honor.

18         However, there are some details that remain to be

19   worked out, and we assume will be as part of plan supplements

20   and other documents.

21         The one major issues which remains open that Angelo,

22   Gordon wanted to bring to the Court's attention, is that there

23   has not been a resolution of the company's compensation

24   programs, including the management equity, the transition

25   management incentive plan and the bonus programs.

1          And, accordingly, all parties in interest, including

2     the senior lenders and the Unsecured Creditor's Committee, will

3     continue to have the right to object to any such programs

4     proposed by the company.

5          Angelo, Gordon recalls that the Court had issues with

6     the proposed compensation programs earlier in the case.  The

7     current versions of the compensation programs that have been

8     preliminarily discussed and presented to the senior lenders,

9     are currently not acceptable to Angelo, Gordon.

10          Your Honor, but resolving the management equity, the

11     MIP, or the bonus plans are not issues for today, but may come

12     up at the confirmation hearing if they're not resolved prior to

13     that time.

14          Today Angelo, Gordon, you know, supports the

15     settlement and is supportive of the disclosure statement

16     hearing being set, and confirmation hearing ultimately being

17     held.  And, Your Honor, I guess along that line, we would be

18     supportive of the extension of exclusivity.

19          THE COURT:  Very well.  Thank you.

20          MR. TEITELBAUM:  Good morning, Your Honor.  Jay

21     Teitelbaum, Teitelbaum & Baskin on behalf of the TM retirees.

22     Your Honor, as you may recall, we represent approximately 194

23     retirees who filed claims in this case, abrogating 112.4

24     million dollars.  And I rise today, Your Honor, to advise the

25     Court that over the past few weeks, particularly the past

Teitelbaum - Argument                                16

1   weekend, there was some very, very hard fought negotiations,

2   which resulted in the plan that was actually filed.

3         And yesterday, we were able to file a pleading, which

4   reflected that of our group, over the course of the past few

5   days, of 194 people, we had 185 individuals, representing in

6   excess of 111.5 million dollars worth of -- actually, at that

7   time, 111.3 million dollars worth of claims, who support the

8   settlement, support what's set forth in the plan, support the

9   extension of exclusivity, and support the prospect that we may

10  actually have peace breaking out, and the opportunity to

11  reduce, or at least curtail some of the administrative expenses

12  that could be achieved through this approach, rather than off

13  on side litigation.

14        As of this morning, Your Honor, we actually have 188

15  affirmative responses, 111.6 million dollars worth of claims.

16  There were 6 retirees who we haven't heard from yet.  They

17  don't have computers, and they've been a little difficult to

18  reach.  We've had zero negative responses.

19        Your Honor, I will advise you, this was not easy.

20  This was trying to convince people the glass is a third full,

21  not two-thirds empty for them, frankly.  Because they are still

22  looking at 20 plus years of service, and potentially leaving 65

23  cents on the dollar on the table.  It's not an easy decision

24  for these people.

25        But I can tell you, it deeply effects their day=to-

Teitelbaum - Argument                    17

1    day life for the great majority of them.

2         It effects their wealth, it effects their ability to

3    do things for the good of society, donate money and do

4    different things.

5         So we are wholeheartedly in support of the process,

6    which would minimize diluting distributions to creditors and

7    moving this toward a prompt confirmation.

8         THE COURT:  All right.  Before you leave the podium,

9    let me just comment.  I did receive that, what I'll call

10   position paper.  And I wanted to express my hope that I receive

11   no more.

12        Requests to the Court for relief should be embodied

13   in the appropriate pleadings and other briefing.  I understand

14   the circumstances which generated the debtors' happy notice,

15   I'll call it, and the responses that have come in since then.

16        But to the extent the parties wish to inform the

17   Court of their positions, let's keep them within the confines

18   of motions, and complaints, and other appropriate vehicles.

19        MR. TEITELBAUM:  Your Honor, we apologize, if there

20   was any inconvenience, and we also apologize for the late

21   notice.  But given the timing of the filing, we were

22   constrained.

23        THE COURT:  I understand.

24        MR. TEITELBAUM:  Thank you, Your Honor.

25        MR. ROSNER:  Good morning, Your Honor.  David Rosner,

Rosner - Argument                                        18

1    Kasowitz, Benson, Torres & Friedman for Law Debenture.  As the

2    Court is aware, Law Debenture acts as an indentured trustee for

3    18 percent of the senior notes.

4         The standard for an extension of exclusivity is

5    cause.  The debtors have represented to the Court, and it's

6    true, that they reached an agreement to settle this case

7    amongst most of, but not all, of the parties that have been in

8    contention since the outset of the case.

9         That was done during the time of exclusivity, and

10   that constitutes cause for an extension of exclusivity for just

11   the period of two weeks necessary to get to today.

12        People have focused on the plan and the disclosure

13   statement, and what that plan and disclosure statement will

14   ultimately yield.  I think it's important for the Court to

15   focus upon the fact that a plan and disclosure statement was

16   actually filed, and that it was filed on top of a settlement

17   that was accomplished during the period of exclusivity.  The

18   debtors had the opportunity during their last motion to seek to

19   extend it to, I think, today, until to April 13th.

20        They elected to extend it to March 30th as -- to give

21   themselves enough time to bring these parties to the table.

22   The Court has often seen me on the other side of the table from

23   the debtors and the banks, arguing, at times, that certain

24   actions should go forward in this Court.

25        I think the debtors have worked with the other

1    parties, including Law Debenture, in order to bring us to a

2    framework for settling this case.

3         It is not a total settlement.  However, the

4    Bankruptcy Code and the ideas underlying the Bankruptcy Code,

5    are designed to have a debtor bring the constituents together

6    in order to propose a plan that can be confirmed.

7         It is not necessary, I believe, at the time of an

8    extension of exclusivity, to have a plan that is confirmed.

9    Otherwise, the voting process would be unnecessary.  I think

10   the debtors have satisfied the cause standard by virtue of what

11   they accomplished during that 30 days, such that they are

12   entitled to the two weeks necessary to bring it to today.

13        And within that period, if Your Honor agrees, they

14   have already filed a plan and disclosure statement, which then

15   would moot any further, you know, any further need for, as Mr.

16   Conlan refers to it, as front end exclusivity.

17        And having met, in our opinion, in my view, I'm

18   sorry, the cause standard, we would urge Your Honor to extend

19   exclusivity from March 30th to today, and then allow the plan

20   to go forward.

21        THE COURT:  Thank you.

22        MR. ROSNER:  Thank you, Your Honor.

23        MR. GOLDEN:  Good morning, Your Honor.  Daniel

24   Golden, Akin, Gump, counsel for Centerbridge.  Your Honor, as

25   you've already heard this morning from Mr. Conlan, Centerbridge

Golden - Argument                                    20

1    is one of the signatories to the document entitled Settlement

2    Support Agreement, and the underlying settlement term sheet.

3          I stand in what I consider to be somewhat a unique

4    position, having recently been involved with two other Chapter

5    11 cases.  The centerpiece of which, in both of those cases,

6    was a putative fraudulent conveyance litigation.

7          The first case was Tusa (phonetic) pending in the

8    Southern District of Florida, where we represented the

9    Committee and was prosecuting that fraudulent conveyance

10   litigation.

11         And in that case we were unable to resolve that

12   litigation, and it went to a full-blown trial, and a judgment

13   in favor of the estate.  But that case is still pending.

14         All of the defendants who lost that litigation have

15   taken a variety of appeals to the District Courts, and that

16   case is nowhere close to being confirmed.  I contrast that

17   experience with another recent case we were involved in,

18   Lyondell Chemical Company, pending in the Southern District of

19   New York.

20         And there, again, a fraudulent conveyance litigation

21   was the centerpiece brought by the Creditor's Committee in that

22   case.  But unlike Tusa in the Lyondell case, there was a

23   settlement of the fraudulent conveyance litigation and the

24   issues arising from that fraudulent conveyance litigation.

25         In that case, unlike Tusa, but much more like what we

1       have here today, that case is well on its way to confirmation.

2       The confirmation should be accomplished by the end of this

3       month.

4               The point, I think, Your Honor, is Chapter 11 is

5       about consensus building and reaching ultimately a consensus so

6       that a plan can be developed, filed, voted on and ultimately

7       attempted to be confirmed to allow a company to emerge from

8       Chapter 11.

9               And while there is always in-fighting, and

10      scrabbling, and scraping during the course of that period,

11      ultimately, parties need to get to a consensus.  Your Honor has

12      said as much in prior hearing on exclusivity.

13              Centerbridge, Law Debenture, JPMorgan, Angelo,

14      Gordon, took those lessons to heart and worked hard and long to

15      achieve the settlement which is now the centerpiece of this

16      plan and disclosure statement that has recently been filed.

17              Is it a perfect settlement?  No.  Is it a settlement

18      that currently has the approval of all parties in interest?

19      No.  You'll hear today, later today, from Mr. Bennett,

20      representing a very large number of bank creditors who don't

21      currently support the settlement.

22              That's not a reason not to allow this plan, premised

23      upon this settlement, to have its day in Court.  The debtor has

24      worked hard with its advisors and professionals to get us to

25      this juncture.

1      We believe that this settlement and this plan has the

2  right to be head, to be ultimately determined by this Court

3  whether to be approved or not.

4      As a consequence, we do support the requested

5  exclusivity extension.  We think it would be a grave error to

6  allow exclusivity to be terminated, because we will then simply

7  be mired in competing plan litigation.

8      Give this plan a opportunity to see if it will

9  ultimately pass muster.  I am actually confident that, as we

10  inch closer to confirmation, through the disclosure statement

11  process, through the confirmation process, the amount and the

12  decibel of the creditors currently not supporting this plan

13  will lower, and lower, and lower, to a point where I believe we

14  will ultimately get to a consensual confirmation hearing with

15  respect to this plan.

16      That's a speculation on my part, borne 30 years of

17  experience, for what that's worth, Your Honor.  I do believe

18  that it's important to allow this process to unfold, and we do

19  support the current exclusivity request.  Thank you.

20      THE COURT:  Thank you.

21      MR. STARK:  Good morning, Your Honor.  I would have

22  thought Mr. Golden would know me well enough about my decibel

23  levels.  Robert Stark from Brown, Rudnick on behalf of

24  Wilmington Trust.  Perhaps fitting that I follow Mr. Golden,

25  preaching the gospels of consensus building, being that we were

1     excluded intentionally, more than a little bit, but in all

2     candor and directly on the point on the agenda, we're fairly

3     agnostic to exclusivity.

4            Whether it's this plan, whether it's Mr. Bennett's

5     plan, which you'll hear about in a minute at length, it's World

6     War III, and it does unleash World War III, as far as we're

7     concerned.

8            We've asked many time in this Court, out of the

9     Court, to be included in the discussions, all to be shunted

10    aside.  And I don't have to prattle on.  There's more on the

11    agenda, and I would like a opportunity to speak.  But I do rise

12    for two particular reasons, at this juncture.

13           One is, Mr. Bush's presentation, and I do think the

14    record needs to be eminently clear.  We were intentionally

15    excluded from any and every discussion, negotiation,

16    deliberation and voting on the settlement.

17           I didn't -- we asked many times, how's this coming

18    along?  Nothing to tell you.  I showed up at Chadbourne's

19    offices on Thursday for the in-person meeting, and was told by

20    Mr. Seife to go home.  There was a big presentation

21    electronically on the board.

22           I was told I wasn't allowed to see it.  A couple of

23    hours later they said, okay, you can come over now for a

24    sandwich.  And at that point in time, actually, the meeting was

25    over.  And I said, okay, what happened?  And nobody would tell

Stark - Argument                                    24

1   me.

2          I found out about the settlement by reading it on the

3   Court's docket later on in the day.  So the notion that the

4   settlement was approved by a Creditor's Committee, it's an

5   issue that needs to be resolved.  All hands up, it's an issue,

6   perhaps, for another day, about what they did, their methods,

7   and the voting and the methodologies.

8          We don't need to talk about that today, but it's

9   important for purposes of understanding that we were certainly

10  not a part of this, and we remain so.

11         THE COURT:  Well how was the sandwich?

12         MR. STARK:  Not bad.  Not bad.  I do have a second

13  point, though.

14         THE COURT:  All right.

15         MR. STARK:  The way this issue got teed up now with

16  respect to exclusivity, moving it from the back of the agenda

17  forward, predicated on Mr. Bush's comments and Mr. Conlan's

18  comments, and his request that my motions -- my motion be

19  adjourned at his request, effective pocket vetoing of the

20  request for a second time, is something that, number one, we

21  didn't know about before, and we don't agree with it.

22         THE COURT:  All right.  Then stop there.  Because I

23  have some thoughts about that.  But I want to finish

24  exclusivity first.  And you're telling me you have no objection

25  to the request?

1          MR. STARK:  I'll sit down.

2          THE COURT:  Thank you.

3          MR. BENNETT:  Your Honor, Bruce Bennett of Hennigan,

4    Bennett & Dorman on behalf of a series of credit agreement

5    lenders that are listed on the 2019 statement that we filed.

6          Because I don't want to go on for very long, I want

7    to ask if Your Honor had a chance to read our papers that we

8    filed yesterday morning.

9          THE COURT:  Yes.

10         MR. BENNETT:  Okay.  Then I think Your Honor knows we

11   do not agree with the concept that there ought to be a plan in

12   this case.  We do -- we think there should be.  We do not

13   disagree with the idea that the plan should be broadly

14   consensual, we think it should be.

15         We think discussions do often lead in that direction.

16   We also actually don't disagree with the fundamental idea,

17   which sounds like it ripples through most of the plan, that if

18   there is to be a settlement of litigation in this case, the

19   number should be extremely modest, in light of the fact that

20   it's a very weak case.

21         We part company with the idea that the only way to a

22   consensual plan, or even the best way to a consensual plan, is

23   to allow the continuation of a monopoly of the plan process

24   controlled by the debtors.

25         Or put another way, if we're cruising toward approval

1   of a plan, is the plan that's been filed the only plan that

2   creditors should be allowed to see, before they have to vote on

3   a plan.

4           And on this I want to be very clear.  Mr. Golden's

5   fear that this plan will not see the light of day, is

6   completely unfounded.  This plan, meaning the debtors' plan.

7   The debtors' are going to solicit, try to solicit votes and try

8   to get their plan approved.  I have no doubt about that.

9           And they should.  The question is whether -- not

10  whether they should be able to pursue that plan, it's whether

11  they should be able to pursue that plan holding all

12  alternatives at bay, until they go through a process that they

13  just told you will take a minimum of 90 days.

14          And only then, after people expressed

15  dissatisfaction, or this Court decides there's something in it

16  that he's unwilling to confirm, other parties will finally get

17  a opportunity to propose something systematic and comprehensive

18  as well.

19          And that's what we want to do.  Now why do we think

20  it's appropriate that be given that chance?  Well, you know, we

21  fully understand, Your Honor, that -- and hate to be in your

22  position when the problem with the plan depends upon competing

23  expert's views of something, or competing perceptions of facts.

24          THE COURT:  I seem to find myself there quite

25  frequently lately.

1           MR. BENNETT:  I've noticed.  And maybe it's the

2    favorite part of your job.

3                         (Laughter)

4           THE COURT:  Well it's one of the more challenging

5    parts of my job, we'll just say it that way.

6           MR. BENNETT:  But here, in our papers, we tried to

7    focus on what the plan itself is saying.  And whether what the

8    plan itself is saying makes sense.

9           And I'm not going to belabor it, because Your Honor's

10   read it.  But I want to just reemphasize a couple of points.

11   Is that Your Honor has heard, and we quoted some selections of

12   the argument before you about what this fraudulent transfer

13   case is supposedly all about.  And, Your Honor, the debtors'

14   disclosure statement, which we got late last night, and was

15   reading -- the type is really small, but trying to get through

16   it.

17          They've described the fraudulent transfer case in

18   essentially the same ways that many people have described the

19   case when they stood at the podium.

20          And so then we go through it and we kind of compare

21   where the exposure supposedly is, and where the payments are

22   supposedly coming from.

23          And we lay it out in the papers.  When it comes to

24   Mr. Zell, the plan says not only -- no problem, Mr. Zell, but

25   you'll never have a problem, because the estate's going to

1    indemnify you form everything, even a pending case.

2         THE COURT:  I know.  And you go seriatim through the

3    groups who are gratuitously let off the hook.

4         MR. BENNETT:  Yes.  And we -- and we step back, and

5    we say, well, how do you make sense of this when you get to the

6    bottom line, and it's our constituency paying money?  And you

7    ask yourself, okay, is the truth there's really no problem

8    here, then why are we paying?

9         Or is the truth, there's modest exposure here, and if

10   there is why, isn't it more equitably distributed.  What's the

11   truth about this plan?

12        And the plan doesn't tell you.  It is a -- you're

13   right, it's -- or the -- my opponents are right.  It says, plan

14   on top, it's a plan of reorganization, but it's the triumph of

15   expedience, over anyone trying really hard to figure out what

16   would be a correct solution, a reasonable solution, in light of

17   the facts that have been unearthed.

18        And, Your Honor, there's this other issue about facts

19   to be unearthed, which is another relatively smaller motion,

20   that I think is going to wind up further down on the calendar.

21        So we ask the opportunity -- there are many other

22   ways to go about this.  We've talked before about resolving the

23   subsidiary problems only, because we think there are fewer, not

24   none, fewer legal and factual issues that the Court will have

25   to resolve if it focuses on the subsidiaries alone.

Bennett - Argument                          29

1        For various reasons, the debtor hates that.  Some may

2    be legitimate, some not so legitimate.  But that's one way.

3    Another approach, which we've talked about frequently, not just

4    in papers supplied to you, is to say, okay, if there's certain

5    groups that are prepared to pay money to resolve their issues,

6    but other groups that don't want to, well that cries out for

7    litigation trust.

8        Which, by the way, what Mr. Golden didn't mention

9    about Lyondell, is there some parties settled, credit agreement

10   debtors settled, and there's a litigation trust for the groups

11   that didn't.

12       And all of this would have the -- again, if we were

13   able to fashion a plan, we think we would have a situation

14   where ultimately there would be more rational contributions

15   across different interests that have exposure, and, therefore,

16   a much easier job for Your Honor when it came time to

17   determining whether the granting of gratuitous releases and

18   indemnities were in fact fair.

19       All we ask, Your Honor, is too this on a parallel

20   track.  We won't interfere with anybody, we will spend our own

21   money, not the estate's money generating a plan and generating

22   the appropriate disclosure statement, and we will have lots of

23   meetings, and it's conceivable we will even be talked out of

24   it.

25       One more point.  There's been another consequence of

Bennett - Argument                                    30

1    this monopoly of a plan process.  There are two aspects to a

2    monopoly.  One, you get bad service.  And I think in what we've

3    just been talking about are attributes of bad service.

4         The second thing you get with a monopoly is high

5    prices.  And, Your Honor, one of the things that's happened

6    here with the indemnity is that, even the limited indemnities

7    have to be described with 9 digits, for the potential exposure.

8         And it's the potential exposure that the creditors,

9    who own this going forward, are going to have.  The debtors

10   clearly wanted that.  Their indemnities, by the way, Mr. Zell's

11   indemnity, the directors and officers indemnity, they're

12   unlimited, notwithstanding pending litigation going on in

13   Chicago right now.

14        And the banks said, well, if they're getting some, we

15   ought to get some, too.  So they have indemnities and, again,

16   quantified with 9 digits.

17        The other thing that you've heard about that there's

18   even disagreement among the settlement parties, and quite

19   frankly, it's terrific to hear that, is the discussion of the

20   management compensation programs.

21        Now I know Your Honor's familiar with this in problem

22   and issue expansion, and this is 7.5 percent, which sounds

23   smaller, but it's a much bigger company.  And the 7.5 percent

24   we're told in the disclosure statement and plan, can be used

25   for grants or options, we don't know what mix of the two it

1    would be.

2           But if it was all grants, it's something on the order

3    of 350 million of equity value, assuming you take out the debt

4    first and take out the expected cash distributions first.

5           Those are approximate numbers.  Obviously, to the

6    extent it's options, it could be less, it depends upon the

7    price and duration of the options that are given.

8           So a consequence of the debtor being the only person

9    that can file a plan is, surprise, people that currently

10   control the debtor do exceptionally well.

11          We think, under all of the circumstances, the

12   creditors deserve alternatives.  We don't think by allowing the

13   only party that's ever asked to put a competing plan on the

14   table, to do so is going to create plan chaos, or a procedural

15   environment that this Court can't efficiently handle, and it

16   won't cause any delay.

17          We will move very quickly.  But we will provide

18   choices.  We hope we will provide better choices.  And we hope

19   as a result confirmation and a settlement is expedited, not

20   delayed.

21          Thank you.

22          THE COURT:  All right.  Thank you.  So on

23   exclusivity, so that I'm clear, the proposed form of order in

24   the binder calls for the filing period exclusivity to be

25   extended through April 30.

Ruling                                                      32

1        MR. CONLAN:  It should say through April 13th, we

2   modified.  We have a modified order.

3        THE COURT:  Okay.  Well I -- I am not inclined to

4   open up the door, at this point.  The debtor has filed a plan.

5   The request at this point for further extension is a modest

6   one.  And I think, under the circumstances, given how far the

7   debtor and many parties have progressed toward a consensual

8   plan, this very minimal extension of exclusivity is warranted.

9        So I'm prepared to approve it.

10        MR. CONLAN:  Thank you, Your Honor.

11        THE COURT:  Do you have a form of order for me?

12        MR. CONLAN:  Yes, we do.  May I approach?

13        THE COURT:  You may.

14        All right.  That order has been signed.  Now the next

15   thing I would like to take up is the motion for appointment of

16   an examiner.

17        I'm going to take just a five minute break, and then

18   my first exercise when I return will be to go down the agenda

19   find out -- well confirm that Wilmington Trust is still

20   pressing its motion, and then I'll hear -- I'd like to know

21   whether others who filed pleadings and joinder's are still

22   pressing them, or not, based on the partial resolution that's

23   been reported.

24        And then we'll decide what, if anything, to do today

25   with the examiner motion.  And as part of that, Mr. Stark, I

1    would ask that you be prepared to tell me what, in the way of

2    an evidentiary presentation you have, witness or documents.

3    And same request to the others who would wish to participate in

4    the hearing, if it were to go forward.  Take a 5 minute recess.

5              MR. CONLAN:  Thank you.

6                      (Recess)

7              MR. STARK:  Thank you, Your Honor.  Again, for the

8    record, Robert Stark from Brown, Rudnick appearing on behalf of

9    Wilmington Trust.  Your Honor, the answer is yes, we do want to

10   join issue today and press forward with our objection.

11   Especially because of the settlement.  And we do -- we've

12   prepared extensively.

13             We prepared extensively for the prior hearing, and

14   we've prepared extensively further for today's hearing.  I do

15   have an evidentiary presentation to make today, Your Honor, but

16   it is in the form of documents.

17             Hopefully, Your Honor's Chambers have received

18   binders appropriately tabbed and highlighted.  I know the other

19   parties have as well, indicating what documents we'd be using

20   today.

21             THE COURT:  Oh, we have all kinds of binders.  But no

22   witnesses.

23             MR. STARK:  There are no witnesses, and by agreement

24   of the parties, of everybody who objected, we sent letters and

25   they sent responses, no one else would be providing any other

1    evidence today.

2          THE COURT:   Okay.   About how much time will you need

3    to --

4          MR. STARK:   To walk you through the documents, Your

5    Honor, perhaps 40 minutes.

6          THE COURT:   Okay.

7          MR. STARK:   It's somewhat based upon, Your Honor, may

8    I ask this, has Your Honor had the opportunity to read the

9    complaint or the proposed amended complaint that were attached

10   to our responsive papers?

11         THE COURT:   No.   I read the, some time ago the

12   Committee's draft complaint.

13         MR. STARK:   Okay.   Our draft complaints are longer

14   and more detailed, and they do have a lot of, what I've

15   referred to in the past, salacious e-mails.   Some of those, I'm

16   going to give to Your Honor today, so it may take a little bit

17   of time for Your Honor to read them.

18         THE COURT:   All right.

19         MR. GLAZER:   Good morning, Your Honor, Dennis Glazer,

20   Davis, Polk for JPMorgan.   I would point out to Your Honor that

21   the documents that Mr. Stark is referring to contain numerous

22   documents which are under seal and would create a

23   confidentiality problem if they were to be discussed in the

24   open courtroom.

25         THE COURT:   Well let's put it this way, as with most

Glazer - Argument                                    35

1    hearings, and I will say that will be the case with this one, I

2    will not close the courtroom.  So the parties will have to, if

3    we go forward, find a way to deal with the use of documents in

4    an open courtroom.

5              MR. STARK:  I'm prepared to address that, Your Honor,

6    if I may.

7              Please, having tried one or two of these, just before

8    Your Honor, I'm aware of Your Honor's views in that regard.

9              I have labored very hard to prepare myself for a

10   presentation, whereby, since the documents are highlighted and

11   documented, if I am allowed by the parties who produced them,

12   simply to identify the document, it's an e-mail from somebody,

13   and focus Your Honor's attention on particular words by saying,

14   I'd like to focus Your Honor on a sentence that begins with the

15   following and ends with the following word.

16             If that's agreeable to everyone, I think we can avoid

17   the disclosure of the substantive components of those documents

18   and still go forward today.

19             MR. GLAZER:  Your Honor, we can't agree to that in

20   advance, because some of those words are in fact the words that

21   are subject to confidentiality and under seal.  So I don't -- I

22   really don't understand the need for Mr. Stark to do more than

23   to say to Your Honor, look at exhibit 12, look at exhibit 15.

24   And if he needs to go into the detail of what's in a sealed

25   document, we can't in advance agree that that will be

1   antiseptic enough.

2          THE COURT:  Then we'll just have to deal with it

3   individually.

4          MR. GLAZER:  Yes, Your Honor.

5          THE COURT:  But we'll use that as a starting point.

6          MR. GLAZER:  Thank you.

7          THE COURT:  All right.  Let me just run down the

8   agenda.  Starting with responses received, I'll start with the

9   -- I'll skip the responses on the motion to shorten, which I

10  ultimately denied, I think, effectively.  Start with the

11  Committee.

12         MR. SEIFE:  Yes, Your Honor.  The Committee intends

13  to continue its objection to the motion for the appointment of

14  an examiner, and in fact we do support the debtors' suggestion

15  that, in light of recent events, including the settlement

16  agreement and term sheet and the filing of the plan, that the

17  examiner motion should be adjourned to a more appropriate time.

18         THE COURT:  Okay.  Thank you.  JPMorgan still press

19  it's objection?

20         MR. GLAZER:  Yes, Your Honor.

21         THE COURT:  All right.  Merrill Lynch?

22         COUNSEL:  Yes, Your Honor, we join in that objection.

23         THE COURT:  Debtor?

24         MR. CONLAN:  Yes, Your Honor, we continue to object,

25  and I will just mention that Mr. Stark said on February 18th at

Colloquy                                                37

1    some length that we could only keep the tiger, referring to

2    himself, I guess, or the issue in a paper bag for so long, that

3    if his various issues weren't addressed now, they'd be

4    addressed at the confirmation hearing, and we think that's the

5    time to do it.

6           So, yes, we continue to object.

7           THE COURT:  All right.  Credit agreement lenders?

8           MR. BENNETT:  We won't be taking a position, Your

9    Honor.

10          THE COURT:  No position?  TM Retirees?

11          MR. TEITELBAUM:  Your Honor, we continue to object

12   and join in the request that this be put over so that the plan

13   can move forward.

14          THE COURT:  All right.  Citicorp and Citigroup

15   Global?

16          COUNSEL:  Yes, Your Honor.

17          THE COURT:  Bank of America, Bank of America

18   Securities joiner?

19          COUNSEL:  Yes, Your Honor.

20          THE COURT:  U.S. Trustee?  Mr. Harrington, how nice

21   to see you.

22          MR. HARRINGTON:  Thank you, Your Honor.  William

23   Harrington from the Office of the United States Trustee.  Very

24   nice to be here.  Very nice for Joe McMahon to be away today.

25          Your Honor, we do still support the appointment of an

1    examiner here, not for all of the reasons that are set forth in

2    the pleadings filed by Wilmington Trust, but we actually think

3    an examiner here may assist the Court in efficiency.

4            And I think, Your Honor, looking at this courtroom,

5    you really need some efficiency with respect to this case.

6            And I think Mr. Bennett put it best when he said, you

7    know, what is the truth?  And until you get an independent view

8    here, Your Honor, I think the lingering suspicions as to who

9    got releases, why they got releases, who got their fees paid,

10   why they got their fees paid, will linger.

11           I do think the continuance amounts to a pocket veto.

12   I think we're going to be in exactly the same position we were

13   in in expansion, Your Honor, if we continue it to the

14   confirmation hearing.  At that point there will be nothing for

15   an examine to do.

16           But we're now 90 days before that, which is different

17   than where we are in expansion, although I know maybe 30 days

18   before they had filed the motion to vacate and continue

19   expansion.

20           But I do think it amounts to a pocket veto, if you

21   don't go forward today with the examiner motion.

22           But, Your Honor, I think really the examiner could be

23   narrowly tailored here.  A lot of -- all of the documents, the

24   3 million documents that are always referred to, are in a

25   centralized depository.  This would not be an examiner that has

1    to ferret out the documents.

2         The documents are there.  You get a roadmap that the

3    Committee filed a complaint, Wilmington Trust has filed a

4    complaint.  So the examiner would have a roadmap, Your Honor,

5    into what areas to look at, so you could have a very efficient

6    examiner here, who could give you an independent and unbiased

7    opinion as to what is the truth here.

8         So it would go very far in assisting the Court, I

9    think, in being prepared for confirmation and addressing all of

10   these issues that continue to linger in this case.

11        I think that could be cleared up by an independent

12   party, and you take away sort of the advocates taint that's

13   associated with Wilmington Trust, that's associated with the

14   other parties to the litigation, if you have an independent

15   examiner.

16        And I think, Your Honor, all of the parties in this

17   courtroom show you why you need efficiency here.  And I think

18   this could be a way to get there.  So, yes, we are supporting

19   the examiner.

20        THE COURT:  I know we have a hearing on the motion

21   coming up.  But I have to say that Mr. Harrington has almost

22   spot on expressed the preliminary views that I have about what

23   should happen here, for the reasons he has stated.

24        We haven't talked.  And when -- I don't know, maybe

25   it was Mr. Bennett who talked about being on a parallel track.

1    Frankly, that was the parallel that I thought might be

2    appropriate here, again, for the reasons that Mr. Harrington

3    stated.

4          And yet, with those sentiments, the parties,

5    including, and especially those who are opposing the relief,

6    are entitled to their day in court, and I'm inclined to give it

7    to them.

8          But I have another thought, too.  And that was, if I

9    hear an evidentiary record and arguments, and after which I am

10   -- I do conclude that an examiner should be appointed, then

11   that party will be subject to the confines of what the examiner

12   should look at.  And I'm thinking it also should look at the,

13   you know, violation of stay issue with Wilmington Trust.

14         And I thought that might be helpful to everybody, as

15   well.  If we get to that far.

16         But understanding that, I guess another thought

17   occurred to me.  That if the parties thought it possible, I

18   might be willing to give them, understanding that was my

19   sentiment, at least preliminarily, some time to see if they

20   could bring everybody into the fold, before going through that

21   exercise.  And I would only give a very brief period of time

22   for that.

23         But I people think that would be an unhelpful

24   exercise, I don't mean to have the parties bang their heads

25   together unnecessarily.  It wastes everybody's time and just

1    makes everybody madder.

2              I'd be willing just to proceed with the examiner

3    motion today.  Any thoughts about that?  Let me turn to the

4    debtor first.  Thank you, Mr. Harrington.

5              MR. HARRINGTON:  Thank you, Your Honor.

6                        (Tape Change)

7              MR. CONLAN:  Jim Conlan on behalf of the debtor.  Your

8    Honor, we don't think it should proceed today.  May 20th is

9    coming.  We will undoubtedly continue to talk and fight and

10   argue with all the parties who aren't presently supportive of

11   the settlement support agreement that's reflected in the plan.

12             Candidly, I don't think Wilmington is in search of the

13   truth or clarity.  I think there is --

14             THE COURT:  But the Court is.

15             MR. CONLAN:  Yes.  I understand, Your Honor, and we

16   have to show you that at the disclosure statement hearing.  We

17   have to show you that at the confirmation hearing.  Perhaps

18   most importantly, we're going to have to show that at the

19   ballot box.

20             With respect to -- and I'll go back -- I'll go back to

21   Mr. Bennett, and I do think it's worth noting.  On

22   February 11th, his purported 2019 statement, because it's not

23   fully compliant with 2019, listed 4.6 billion in his group.  By

24   April 2nd, that had shrunk to 3.8.  The most recent one shrinks

25   to 3.6.  Only one of the 24 clients he purports to represent

1    have signed a confi, could even have the kind of information I

2    think that they will see in the disclosure statement, and we

3    better obtain class acceptance of those classes that contain

4    the senior loan claims.

5         The ballot box is the test here.  The Court is the

6    test.  It is the funnel to which I referred earlier through

7    which all of the things should be dealt with.  I have no doubt

8    that the parties who are seeking an examiner if they are not

9    brought into the fold will be vociferously fighting us at the

10   disclosure statement and at the confirmation hearing and will

11   be fully able to do so.

12        So, Your Honor, we do recognize and appreciate the

13   preliminary sentiments.  We do think, however, that the

14   examiner motion should not go forward today.  Whether it's

15   continued sine die to the disclosure statement hearing and then

16   to confirmation or some briefer period, we would certainly be

17   more supportive of that.

18        THE COURT:  All right.  Thank you.  I've heard enough

19   of a response to my question.  Mr. Stark, you may proceed.

20        MR. STARK:  Thank you, Your Honor.  I have the cap on

21   my water.  I appreciate Your Honor's rule.  I'll keep it here.

22   And the tiger is the causes of action, not me.

23        For the record, Robert Stark from Brown, Rudnick,

24   again, on behalf of Wilmington Trust.  Wilmington Trust is the

25   successor indenture trustee for $1.2 billion in exchangeable

1   debentures that are commonly referred to as the PHONES, and

2   I'll continue to refer to them that way.  I presume everybody

3   knows what I'm referring to when I refer to them as the PHONES.

4          And I'd like to organize my presentation, Your Honor,

5   into four segments.  We're going to talk about Tribune, the

6   story, at least in brief.  Your Honor had indicated you hadn't

7   had an opportunity to review the complaint or the proposed

8   amended complaint that was attached to one of our responsive

9   papers.  So I'm going to walk through some of the highlights.

10          In walking through some of the highlights of the

11   documents, we'll give you a taste, give you a flavor, but a

12   meaningful bite into the evidence that we have here and what

13   actually transpired and what the parties' intents and agendas

14   were when it did transpire.

15          The second segment of my presentation will focus on

16   what estate claims arise from this nucleus of fact directly,

17   out of the law.  I'm not making stuff up.  Okay?

18   Notwithstanding Mr. Conlon's notion that I'm not really here to

19   get to the truth, I posit to Your Honor the contrary is true.

20   I'm asking for an examiner, after all, instead of litigating,

21   but we'll talk about all that.

22          Third, the applicable legal principles, why,

23   notwithstanding the global settlement or perhaps even because

24   of it, an examiner is appropriate under the facts and as we've

25   said in the papers, and I appreciate Your Honor's expansion

1   ruling we think is appropriate under the law.

2          Finally, I'd like to respond --

3          THE COURT:  I'm sorry.  I should have -- I should have

4   mentioned ahead of time for those who haven't yet read it.  I

5   did find that C2 (phonetic) was not mandatory despite the

6   shell.  There is more to it, but that's the short version.

7          MR. STARK:  And -- okay, and we'll talk about that in

8   a bit.  Finally, I'd like to conclude by responding to some of

9   the objections that have been filed, and I think implicitly

10  stated in the comments that we heard this morning, the motion

11  is untimely, it's going to delay things, it's going to cost a

12  lot of money, case administration is all going to send

13  everything out.

14         THE COURT:  Actually, I did have those issues in

15  expansion, but here, despite the fact we're approaching

16  confirmation, actually, as things have coalesced, I think it's

17  actually a good time, as the U.S. Trustee has asserted.

18         MR. STARK:  Good.  Then I'll be happy to move quickly

19  or not even at all touch upon some of those issues.

20         THE COURT:  Because there is -- for example, I think

21  there is enough time between today and confirmation, especially

22  given the previous collection of information, for an examiner

23  to do whatever needs to be done.

24         MR. STARK:  We absolutely agree.  It took us,

25  Your Honor, something like six weeks to get through the

1  information and draw the conclusion that we have asserted in

2  our pleadings, and we think an examiner are appropriately

3  focused and advised now with a lot more pleadings, and with the

4  help of the parties, we'll get there quicker.

5         My hope, Your Honor, is at the end of my presentation

6  to you, you're going to have a better understanding of the

7  facts here.  You're going to have a better understanding of the

8  estate causes of action.  We talk around them, but we never

9  talk through them.  So I'd like to present them to you and

10  understand them better, and why more than just, as Mr. Conlon

11  suggests, this is just a terrorist tactic to blow stuff up,

12  really, what we are trying to do is get an understanding from

13  which deals can be cut, and if our theory on the case is right,

14  then they have to include us in.  If our theory of the case is

15  wrong, then we'll just have to deal with it in a different way

16  and under a different forum, but ultimately, the goal, as

17  Mr. Golden said, is to get to a fully consensual plan that

18  includes us.

19         We've submitted the documents, Your Honor.  The binder

20  heading, just to make sure that Your Honor found my binder, has

21  the Benesch firm and the Brown, Rudnick firm.  At the bottom,

22  it has in indentures -- it has in italics counsel to the

23  indentured trustee for the PHONES.  Has Your Honor been able to

24  find it?  We may have another copy if Your Honor would like.

25         THE COURT:  I'm getting there.  No.  They're in sealed

1    binders.  So I'm having them unsheathed.  I have --

2           MR. STARK:  I have another copy if it would be easier,

3    Your Honor.

4           THE COURT:  It won't take long.

5           MR. STARK:  Understood.

6           COUNSEL:  Mr. Stark, may we have a copy at our table

7    as well?

8           MR. STARK:  Sure.  I thought we had provided it.  If

9    we hadn't, I apologize.

10          MR. BENDERNAGEL:  Your Honor, while we're at this

11   break, can I ask a procedural question as to how this is going

12   to work so that I'm not jumping up and interfering with

13   Mr. Stark's presentation?

14          We've been a little confused as to what exactly he's

15   going to rely on today.  Just so that it's clear, our

16   understanding is there have been three separate affidavits

17   submitted in connection with the examiner motion, one by

18   Mr. Stark that was submitted back in January, another by

19   Mr. Segal that was submitted in February, and one that was

20   recently submitted by Mr. Dolan.

21          We've gone through those.  There appears to be

22   material in Mr. Stark's affidavit that does not appear to be in

23   the Dolan or Segal affidavits.  Our understanding is that the

24   Segal affidavit essentially at this juncture has been

25   superceded by the Dolan affidavit, because we couldn't find

BENDERNAGEL - Argument                                    48

1    anything in Segal that wasn't in Dolan and the like, but now

2    he's talking about a fourth binder, and the question is is that

3    the Stark binder, is that the Dolan binder, or is it a third

4    binder, and that's question number one.

5          The second issue that I want to address at this

6    juncture is there are all sorts of evidentiary issues beyond

7    the issue that was raised before about confidentiality relating

8    to these documents.  Most of them are hearsay.  A lot of them

9    are newspaper articles and the like.  I don't think they're

10   admissible in evidence, certainly for the truth of the matter

11   asserted.  They're just newspaper articles.

12         Secondly, there is a bunch of e-mails.  A lot of them

13   are written by various of the banks, and not to demean the

14   e-mails, but we've heard that there were 3.2 million documents

15   -- pages of documents produced, and here, we have a handful

16   essentially of e-mails without any foundation, and again, there

17   are hearsay issues, and this is not a jury trial and I

18   understand that Your Honor can sort all those things out, but I

19   think that has to be known ahead of time, and the question is

20   is this being presented.  I'm not exactly sure why you need an

21   evidentiary presentation where you essentially are orally

22   presenting what you've already presented in your motion papers,

23   but --

24         THE COURT:  Well, because what comes --

25         MR. BENDERNAGEL:  You've already --

1      THE COURT:  What comes in motion papers are pleadings.

2      MR. BENDERNAGEL:  Well, I -- well, yeah, but usually

3  when documents are --

4      THE COURT:  What Courts should look to is a record,

5  and I'm assuming that's what Mr. Stark is attempting to make

6  here.  Now, that's not to say that there aren't evidentiary

7  problems, and if there are, you'll object, and I'll resolve

8  them.

9      MR. BENDERNAGEL:  So every -- just so I'm clear as to

10  the procedure, each time he uses a document, if there is an

11  evidentiary problem, we should rise and object, is that

12  correct?

13      THE COURT:  Well, I think so.

14      MR. BENDERNAGEL:  Thank you.

15      MR. STARK:  Your Honor, I'll make my presentation at

16  the end.  I'll move collectively for it all to be in evidence.

17  If there are issues, we can resolve them on a one off basis.

18      THE COURT:  All right.

19      MR. BENDERNAGEL:  I'm sorry.  I didn't hear you.

20      MR. STARK:  I said at the end of my presentation, I

21  will move for collective admission into evidence.  If you've

22  got a problem, you can make a one off objection.

23      MR. BENDERNAGEL:  Well, my sense, Your Honor, is that

24  the document is being presented on the record, and all of a

25  sudden, you have in the record a document, the usual procedure

1    in that regard is that the document can't be considered ahead

2    of time.  So I'm not sure that a one off objection is going to

3    work.  That's the reason I rose to raise this issue is that I

4    don't want to be in a situation where later on when we move to

5    admit all these documents, we're having this battle, but the

6    battle should have been fought earlier.

7            THE COURT:  Well, if I'm being asked to consider

8    something that's not otherwise admissible, you need to object.

9            MR. BENDERNAGEL:  At the -- and I have to do it at the

10   time you're being considered, not afterwards when he tries to

11   move it into evidence.

12           THE COURT:  I'm afraid that we might have to do it

13   that way.

14           MR. STARK:  That's fine, Your Honor.  I'm afraid,

15   Your Honor, we're going to be here for quite a while

16   apparently.

17           THE COURT:  Well, we'll -- whatever it's going to

18   take.

19           MR. STARK:  Okay.  Mr. Dolan will handle -- my

20   partner, Mr. Dolan, will handle those one off objections as

21   they arise.

22           THE COURT:  All right.

23           MR. STARK:  And, Your Honor, again, my --

24           THE COURT:  Well, let me ask this.

25           MR. STARK:  Sure.

1          THE COURT:  Mr. Stark, would it serve any purpose, any

2     useful purpose to have the parties take a little time now and

3     consult about that?

4          MR. STARK:  Your Honor, unfortunately, I'm afraid when

5     you asked a question about gee, if you guys sat in the room,

6     maybe you guys would actually figure something out, he wouldn't

7     even go in the room with me on that issue, on whether or not we

8     can agree on Your Honor's preliminary views.

9          So I'm happy to do it, but I don't think that these

10    parties will ever reach agreement on anything, especially 70

11    pages of -- 70 exhibits, but I'm happy to try.  As I've said

12    from day one, I'm happy to try.  I think this is more about

13    them preventing me from presenting a record.

14         THE COURT:  Well, I'm sure given the adverse

15    interests, the design is not to make it any easier than need

16    be.

17         MR. STARK:  I -- I know how this works.

18         THE COURT:  From the Court's standpoint, I'd like to

19    conduct the hearing in as efficient a manner as possible,

20    because we are going to do it, and we are going to get through

21    it.  So if there is some useful purpose to having the parties

22    sit and try to work out some of the issues ahead of time or at

23    least a method of proceeding, I'd be willing to give you some

24    time now.  Otherwise, we'll just press forward.

25         MR. SEIFE:  Your Honor, on behalf of the Committee, we

1   think that would be a productive thing to do.  We'd certainly

2   be willing to sit down with Mr. Stark.

3            MR. DOLAN:  Your Honor, we're certainly -- William

4   Dolan on behalf of Wilmington Trust.  We're certainly willing

5   to do that.  Let me just clarify one thing.

6            The third declaration, which is my declaration, is the

7   declaration that contains the exhibits that Mr. Stark was going

8   to refer to.  The prior to declarations were merely prior

9   iterations, and the current one simply has additional documents

10  in it.

11           We're happy to sit down with opposing counsel and go

12  through it and try to come to some agreement.

13           THE COURT:  Okay.  Well, it sounds like some of the

14  problems may be solved already.  How much time would you like?

15           MR. DOLAN:  I think if we -- if we took 15 minutes,

16  perhaps we could try to come to some consensus on this.

17           THE COURT:  All right.  Fifteen minute break.

18                         (Recess)

19           THE CLERK:  All rise.

20           MR. CONLAN:  Your Honor, Jim Conlan on behalf of the

21  debtor.  The parties met.  As you can imagine, some difficulty

22  with respect to the efficient way to present information today.

23           A suggestion.  Perhaps this is your suggestion or a

24  version of your suggestion.  There are lots of different

25  interpretations, but the suggestion would be to continue this

Conlon - Argument                    53

1    for two weeks.  During that period, we would meet with

2    Mr. Stark on -- I'll define we in a minute -- to see if we can

3    fold him in to the resolution.  If we can't fold him into the

4    resolution or at the same time is talking about the possibility

5    of folding him into the resolution, we would see if we could

6    reach agreement with him on the scope of an examiner as well as

7    time limits, because we do intend to have a disclosure

8    statement hearing on May 20 and be a confirmation.

9           THE COURT:  When I said earlier that I intended -- I

10   would intend that to be a parallel activity, I do mean that,

11   and the schedule that the debtor is proposing, and I've yet to

12   approve it, but is one that I would not intend to disturb for

13   purposes of the examiner, because it seems to me there is

14   sufficient time for any such exercise to be concluded.

15          I would also want to see a budget and have the parties

16   comment on that.  We can talk about those things if it comes to

17   that, but those are the other things that I would also like to

18   wrap into such an arrangement.

19          MR. CONLAN:  Very well.  I also said I would define

20   the we, and if any of the people I define in the we disagree, I

21   ask them to rise, but that would include the debtor meeting

22   with Mr. Stark.  It would -- which would include Mr. Kurtz, our

23   financial advisor.  It would include the signatories to the

24   settlement support agreement as well as the Committee, and we

25   will actually meet.

1          MR. STARK:  I'm happy to meet anyone anywhere over the

2    terms of a settlement, and I have for many months.  I did, in

3    fact, have a meeting, and it really wasn't a very substantive

4    useful meeting.

5          When Mr. Conlon gets up and says gee, if you just will

6    agree to adjournment for another two weeks, maybe we'll get

7    around to talking to you and this time we mean it, I'm a little

8    skeptical.  If everyone were to stand up and say we heard

9    Your Honor loud and clear about your preliminary views and the

10   papers that have been submitted are voluminous, that's all the

11   record we need, and that's the examiner, and all we're talking

12   about is the scope of the examination and the budget, that's a

13   very different story.  I'll sit down, and we're done, but I

14   don't hear Mr. Conlon saying that.  What I hear is we'll talk

15   to you for two weeks, and then at the conclusion of two weeks,

16   maybe if we don't agree on things, we'll come back and reissue

17   today's hearing date coming forward.  That's not acceptable to

18   me.

19         MR. CONLAN:  Let me clarify.  I'm including both

20   things within those two weeks, which essentially means that we

21   hear the Court saying that you are presently inclined to at

22   least have a -- a limited scope examiner if we can't reach

23   resolution.  So we will be talking about both matters, that is,

24   wrapping Mr. Stark's clients into the resolution and at the

25   same time, if we can't, what a limited scope examiner would do,

1   including budget, time line, and the like.

2        Now, that examiner, if -- if that's where we end up

3   and we would hope to resolve things, may say things Mr. Stark

4   doesn't like, may say things others don't like.  So it's -- I

5   don't regard it as a concession.  I regard it as trying to move

6   this forward and pick up at least on what some of us heard the

7   suggestion to be.

8        THE COURT:  Yeah, and let me just repeat.  I -- I

9   hesitate most of the time to say things which makes the parties

10  think I've already made up my mind without their having had

11  their day in court, both the proponent and opponents of the

12  relief that's being requested, but -- and I was probably not

13  going to say that until I heard the U.S. Trustee who just so,

14  as I said, accurately mirrored my preliminary feelings.  At

15  that point, I felt compelled to say what I say.

16       We haven't had a hearing yet, and I haven't

17  technically made a decision, but I did give you preliminary

18  views.  So yes.

19       MR. STARK:  And if I may, Your Honor, then perhaps it

20  is an opportunity for those who object to the notion of

21  effectively, an order being entered that there will be an

22  examiner and the question of scope and budget being a matter

23  for -- for two weeks from now.

24       THE COURT:  I'm not going to make a ruling today.  I

25  mean, I'll let the parties talk.  Hopefully, they'll have

1  sandwiches again, and there will be some -- put it this way.

2  It's not that it's the only opportunity, but it seems to me it

3  is a good opportunity to see if, you know, plan consensus can't

4  be -- can't be joined.

5        I know there are issues.  I mean, you're -- in the

6  view of most of the constituents, a deeply subordinated

7  position, and you know the consequences of that typically, but

8  there are other issues here, and I'm aware of that as well.

9  Where they will lead, I don't know, but I do think -- put it

10  this way.  I will take the debtor at its word that the purpose

11  of an upcoming meeting would be to have a meaningful discussion

12  about drawing you into the process.

13        MR. STARK:  But, Your Honor, I don't think then, since

14  we do have -- still have a live issue, then I think we have to

15  go forward with the hearing and we'll just have our meeting.

16  If that --

17        THE COURT:  Well --

18        MR. STARK:  If I'm misunderstanding the Court or

19  Mr. Conlon, please correct me, but --

20        THE COURT:  Well, they're trying to -- what they're

21  trying to do is what I would view as one last attempt to work

22  around the examiner issue and pull you consensually into the

23  process.  If they're not able to do that, then so be it.  We'll

24  move forward.  I don't think the two-week delay, frankly -- and

25  I'll look at my calendar, and we'll see what room I have.

1          MR. STARK:  Well, then, Your Honor, I'd ask you why

2     two weeks?  We have a hearing, an Omnibus hearing in this case

3     I believe on the 19th.  Why does it need two weeks for people

4     to decide these issues?

5          THE COURT:  Let me look at my calendar.  You know, I

6     find it hard to find two hours anymore.  So let me --

7          MR. STARK:  I understand.

8          THE COURT:  Let me consult my calendar, and then we'll

9     deal with --

10          MR. STARK:  I know the feeling.

11          THE COURT:  -- with the realities.

12                              (Pause)

13          THE COURT:  Let's -- if the hearing were to go

14     forward, how much time would the parties need?

15          MR. STARK:  Well, Your Honor, as I said before, my

16     presentation was about 40 minutes of walking through documents,

17     a little bit more than an hour for the full argument, including

18     that apparently, the defendants want to slog through each

19     document, and there is 70 out of them.  I propose the better

20     procedure would be let them file motions in limine, and let's

21     resolve that as -- as a normal pleading matter before the next

22     hearing, and that should resolve things.  Otherwise, we can

23     today or whatever hearing date Your Honor has just do them on

24     mass real quick -- hopefully quick -- and set this --

25          THE COURT:  Does anyone -- does anyone else have --

1    would anyone else have an evidentiary presentation, witness or

2    documents?

3              MR. SEIFE:  The Committee has two affidavits it's

4    previously filed with the Court, Your Honor, and we would offer

5    those.  One is a declaration from September 16, 2009, docket

6    number 2136, which was filed in response to the original motion

7    for an examiner brought by Law Debenture, and the other is also

8    an affidavit by Mr. Graeme Bush in support of the standing

9    motion filed by the Committee on February 15th, which was

10   docket number 3410.  It was the reply filed by the Committee.

11             Your Honor, just if I could add my two cents

12   procedurally on where we are, I found Mr. Conlon's suggestion

13   to be a helpful one.  I think what you're hearing from some of

14   the parties, certainly, the Committee's view, is that going

15   forward with the motion for an examiner may not be a good use

16   of the Court's resources since I think there is a sense among

17   the parties the focus should be more on the scope and timing

18   and cost of the examiner rather than whether there should be an

19   examiner, and I think if the parties had a short period of time

20   to put their heads together to go down that track, it could be

21   quite fruitful, and at the same time, while Mr. Stark may not

22   seem to think it would bear fruit, we should have discussions

23   as to the existing settlement agreement and how they might fit

24   in it.

25             So my suggestion is we could use a short period of

Seife - Argument/Glazer - Argument                    59

1    time to talk about the scope of the examiner, the timing, the

2    cost, take Your Honor up on his suggestion that we include

3    within the scope the motion for violation of the automatic

4    stay, and I would suggest the other outstanding motion brought

5    by JPMorgan on disclosure of confidential information also be

6    included within the scope of the examiner and, you know, maybe

7    we can clear out a good deal of the underbrush all at the same

8    time.

9          MR. STARK:  I have absolutely no problem with that.

10   The only point is that, again, I'm wary of pocket vetoes.

11   Happy to meet with anybody any time about settlement on this

12   and any other issue, and I'm happy to come back.  I don't

13   necessarily see the difference between an evidentiary

14   presentation about the scope and the -- and the need.  To me,

15   they're somewhat inexplicably entwined, but Your Honor has

16   indicated where your head is at, and I don't have a problem

17   with that.

18         MR. GLAZER:  Your Honor, Dennis Glazer, Davis, Polk

19   for JPMorgan.  In response to your specific question about who

20   else might want to put evidence into the record, JPMorgan and

21   perhaps other banks as well might be in that position once

22   we've worked through what evidence it is that Mr. Stark and his

23   colleagues are putting in.

24         MR. STARK:  Your Honor, I don't want to do this per

25   seriatim, and I apologize for doing that.  If we're going to

1    try the issue, then let's try it.  Okay?  If I put in evidence

2    and now he looks at the evidence and he no longer likes the

3    fact that some of his bad e-mails are now before Your Honor, so

4    we he wants to put in some good e-mails, you know, then we're

5    never going to get this done.

6              THE COURT:  Sure we are.

7              COUNSEL:  That's the way it works.

8              THE COURT:  Sure we are.  Are counsel available on the

9    afternoon of Thursday, April 22nd?

10             COUNSEL:  My guess is we'll make ourselves available.

11             THE COURT:  All right.  1:30.  Mr. Harrington --

12             MR. HARRINGTON:  We are available.

13             THE COURT:  -- anything to add?

14             MR. HARRINGTON:  Just very briefly, Your Honor, and we

15   are available or will be -- someone will be available on that

16   day.  We just want to be part of the discussions when people

17   talk about scope.  We are -- we did file a statement in

18   support, and then our only other concern, Your Honor, sort of a

19   reservation of rights with respect to the budget idea.

20             In the past, we've agreed to -- our concern is the

21   examiner probably should be involved in that when he takes a

22   look at what --

23             THE COURT:  Oh, I agree.

24             MR. HARRINGTON:  -- we actually has to do.

25             THE COURT:  I agree.

1          MR. HARRINGTON:  And in the past, we've suggested that

2   there be a provision added that the examiner present a work

3   plan and budget, and that way, you know, everyone can comment

4   on the scope.  We just don't want it to be decided before the

5   examiner steps in and then finds out they have to do X.

6          THE COURT:  No.  I didn't mean to suggest that.  I

7   think your suggestion is a good one.  Just based on past

8   experience, I think that's the better way to go.

9          MR. HARRINGTON:  Yeah, and we've been successful on a

10  couple recent cases where that's worked well.

11         THE COURT:  Okay.

12         MR. HARRINGTON:  Thank you, Your Honor.

13         THE COURT:  All right.  Are there any other questions?

14                      (No verbal response)

15         THE COURT:  Okay.  Now, related to -- before we leave

16  this motion, are the matters listed at number 8 and at number

17  19 on today's agenda, is number 8 still live, Mr. Stark?

18         MR. STARK:  Your Honor, it's withdrawn as moot.

19         THE COURT:  Okay.  So number 8 is moot.

20         MR. STARK:  Do you want a formal withdrawal?

21         THE COURT:  That would be helpful.

22         MR. STARK:  We'll do that.  We'll file that today.

23         THE COURT:  All right.  Thank you.  And with respect

24  to number 19, is there any objection?  That's the motion of

25  Wilmington Trust to file the Dolan declaration under seal.

1          MR. BENDERNAGEL:  We don't have any objection to that.

2          THE COURT:  Anyone else care to be heard on that?

3                    (No verbal response)

4          THE COURT:  All right.  Do you have a form of order,

5     Mr. Stark?

6          MR. STARK:  Tell you what.  I think we're struggling

7     to find it.  If we do find it before the hearing is over, I'll

8     ask to approach.  Otherwise, we'll submit it in the

9     certification later.

10         THE COURT:  All right.  Thank you.

11         MR. STARK:  May I approach?

12         THE COURT:  Yes.  Thank you.  All right.  That order

13    has been signed.  Now, let's address the remaining issues.

14    I'll just run down the agenda.

15         Both numbers 4 and 5 are continued at the request of

16    the movant without date, and it seems to me that the matters at

17    6 and 7 I guess would follow that.  If anyone disagrees, speak

18    up now.

19         MR. STARK:  No disagreement.

20         THE COURT:  All right.  Okay.  8 we've addressed --

21    now, 9 seems tome to be tied in with, you know, 4, 5, 6, and 7.

22         MR. STARK:  Agreed, Your Honor.

23         THE COURT:  All right.  Same treatment there then.

24    number 10 related to number 11.

25         MR. DOLAN:  Your Honor, I believe that matter -- the

1  hearing on that matter had been continued to a date in May.

2          THE COURT:  May 18.

3          MR. DOLAN:  It was on for status today.  I don't know

4  there is anything specifically to address with the Court at

5  this time.

6          THE COURT:  Yeah.  Well, the 11 -- matter at number 11

7  said it was going forward today, but it seems to me they were

8  tied together or should be.

9          MR. DOLAN:  Your Honor, Mr. Dolan.  We were prepared

10  to address that.  I take it based on the Court's remarks that

11  given the potential for the appointment of an examiner and

12  perhaps that issue being wrapped up in that, the Court's

13  preference would be to continue that as well and --

14          THE COURT:  It would be.  I thought that if we end up

15  going that way, it might be a convenient mechanism to try to

16  resolve it if it can be.

17          MR. DOLAN:  And would Your Honor prefer to continue

18  that for the time being also to the -- the Thursday day I think

19  which you just selected --

20          THE COURT:  The --

21          MR. DOLAN:  -- for status perhaps?

22          THE COURT:  I would say why don't we push it to

23  May 18th as well.

24          MR. DOLAN:  Okay.

25          THE COURT:  Unless someone has a contrary view.  I

1    hear no response.  Okay.  All right.  12 is a status.

2              MR. CONLAN:  Your Honor, I think that matters with

3    respect to the complaint Wilmington filed, including whether

4    people need to respond and when should go the same way.

5              THE COURT:  All right.  Does anyone have a contrary

6    view?

7              MR. GLAZER:  Your Honor, instead of keep rolling it

8    forward hearing by hearing, what we do know from the filings is

9    that the complaint that's been served on the banks is not going

10   to be the complaint, the operative complaint, even if it's

11   allowed to be filed, and what we would suggest is that we get

12   30 days after Your Honor rules on these other motions about the

13   appropriateness of -- of the complaints and their contents so

14   that we don't -- so that we don't keep coming back and rolling

15   this forward.  We'll -- we suggest it be 30 days after a

16   complaint -- a new complaint is filed.  As Wilmington said it

17   will be filing a new complaint if it is allowed to file at all.

18             MR. DOLAN:  We're prepared to file a motion to file

19   that new complaint under seal as well, Your Honor, and I think

20   we should probably do that straight away.

21             THE COURT:  Well, would that moot out these motions

22   then?

23             MR. DOLAN:  Well, I believe it would to the extent

24   that there would be a new time period then for the defendants

25   to respond.

1    MR. GLAZER:  What it -- what it wouldn't moot is the

2   debtor's motion about the appropriateness of them filing a

3   complaint at all or our motion for sanctions, one sanction of

4   which we asked that they not be allowed to use the confidential

5   information in that complaint.  So I don't think it makes sense

6   for us to respond until those other motions are decided and

7   would ask the Court to extend for 30 days after those

8   decisions.

9    THE COURT:  Well, I'll tell you what.  I'd be inclined

10   to do that since, in light of the new filing, it may not make

11   much of a difference.

12    MR. DOLAN:  Well, I think the new filing does make a

13   difference, Your Honor, and I --

14    THE COURT:  I mean to the pending motions.

15    MR. DOLAN:  Well, that's true relative to the pending

16   motions.  I think --

17    THE COURT:  That's what I mean.

18    MR. DOLAN:  -- to the extent that the motion is -- is

19   filed to seal and -- and a new amended complaint is filed, it

20   gives the defendants the additional time by -- by that act, and

21   it's filed under seal.  Only those who have access to -- to the

22   document through the confi order can see it.

23    THE COURT:  But I guess the point is until what's now

24   pending is withdrawn, there is a clock running technically.

25    MR. DOLAN:  That's true.  We could file our motion

1    today.

2         MR. GLAZER:  Why don't -- can we reach agreement that

3    we -- the defendants need not answer the complaint that has

4    been served to date?

5         MR. DOLAN:  I don't have any difficulty with that so

6    long as it's clear we can file our motion to file the amended

7    complaint under seal.

8         THE COURT:  Well, I'm not ruling on that.

9         MR. DOLAN:  All right.  Then I think --

10        THE COURT:  Yet anyway.

11        MR. DOLAN:  -- we're free to file the motion in the

12   absence of that.

13        MR. GLAZER:  And just for clarity, are we free not to

14   answer the complaint?

15        THE COURT:  Well, I think the answer on that is yes.

16        MR. GLAZER:   Thank you, Your Honor.

17        THE COURT:  All right.  But let's -- I don't know.

18   Let's somehow embody that in a stipulation that doesn't besides

19   that issue waive anybody else's rights or constitute a consent

20   to anything that nobody wants to consent to.  All right.

21   That's 12 and 13.  All right.  14 has been disposed of.  Okay.

22   15 and 16.

23        MR. BENNETT:  Those are our motions, Your Honor.  As

24   to number 16, which is, of course, related, there has been no

25   objection, and we'll just prepare a form of order.

1        THE COURT:  All right.  Does anyone wish to be heard

2    on that?

3                    (No verbal response)

4        THE COURT:  I hear no response.  All right.  And with

5    respect to 15?

6        MR. BENNETT:  We'd like that to go forward,

7    Your Honor.  I mean, whether -- whether there is an examiner

8    appointed or whether we're dealing with a disclosure statement

9    hearing, these are documents at the core of what everyone is

10   talking about settling.

11       We -- from the redacted documents that I will not

12   quote, we -- and actually, one press account, which we missed

13   earlier, Center Ridge was a part of one of the bidding groups,

14   and they -- the price is -- is redacted.  So I won't refer to

15   it, but I know Your Honor saw it, and it is pretty clear to us

16   that they have absolutely probative and relevant evidence

17   concerning exactly what was going on at the relevant point of

18   time, a point of time that they are now complaining about, and,

19   Your Honor, if you compare, for example, that many people are

20   trying to capture the 2007 era through newspaper accounts,

21   through analysts reports, and through other kinds of things of

22   quite dubious admissibility, this is -- this is actually

23   evidence that will show what an active participant at the time

24   who's now complaining about everything that happened at the

25   time.

1          They clear had views as to valuation.  They clearly

2     had views as to an appropriate price for this company.  We

3     ought to know what they are, and we ought to have all of the

4     relevant surrounding information so that you can evaluate the

5     specific information concerning valuation and concerning

6     appropriate transaction structures.

7          This is no different than the evidence that we heard

8     earlier has already been collected from numerous entities,

9     generally without objection, made available in a depository to

10    all parties in interest.  We, of course, would have no

11    objection, and would, in fact, contemplate that whatever

12    documents were produced by Centerbridge would go into exactly

13    the same depository and be available to other parties in

14    interest on exactly the same terms and conditions.

15          THE COURT:  All right.  Let me hear from others.

16          MR. BENNETT:  Well, the real issue, Your Honor, is

17    about scope, as you will hear.  I mean, if you take a look at

18    paragraph 14 of the opposition, the -- Centerbridge indicates

19    that these documents are effectively -- have to be produced

20    sooner or later or at least some subset of the documents have

21    to be produced sooner or later.

22          What -- what Your Honor does not have before you is

23    any objection to any of the specific 11 categories, which is

24    the universe of documents requested.  It's kind of a targeted

25    request, Your Honor, and so while -- while we've -- we have

1    most certainly heard and there have certainly been discussions

2    about whether this is 2000 -- properly 2004 or whether it's

3    properly Rule 26, no one has said what's wrong with the 11

4    categories, and frankly, if there is any dispute, I suspect

5    it's going to be about that.  in light of the fact that no one

6    can come up with any complaint about any of the 11 categories,

7    we think that the 2004 subpoena should be issued and that

8    should be the end of it.

9            MR. QURESHI:  Good afternoon, Your Honor.  For the

10   record, Abid Qureshi, Akin, Gump, Strauss, Hauer & Feld on

11   behalf of Centerbridge.

12           Your Honor, I'm afraid this -- this dispute really

13   amounts to much ado about nothing.  Your Honor, Centerbridge

14   does not dispute that, certainly, some of the information

15   requested in the document requests that were attached to their

16   2004 motion is, indeed, relevant, assuming, as we suspect will

17   be the case, that the lenders will, in fact, object to the

18   settlement that has been filed with the Court today, whether

19   separately or as part of the plan.

20           Your Honor, our issue is more of a procedural one.  As

21   made clear in our papers, we're willing to provide the

22   information.  We're willing to start the process now.  We do,

23   however, think that it is inappropriate for that information to

24   be produced pursuant to Rule 2004.

25           As the debtors made clear in their presentation, the

1    settlement was reached some time around March the 30th.  It was

2    on April 2nd that the 2004 motion was filed.  Clearly, what is

3    going on here is an attempt to take the broader Rule 2004 that

4    doesn't have the benefit for Centerbridge of the protections of

5    Rule 26 to try to get at that discovery, and, Your Honor, we

6    think that's inappropriate, and we think the case law is very

7    clear on that point.  Where there is an adversary proceeding or

8    a contested matter, discovery is properly conducted through the

9    Federal Rules of Civil Procedure, through Rule 26.

10            It is absolutely form over substance to suggest here

11    that there is no contested matter.  The statement that was

12    filed by the lenders makes very clear that they have

13    substantial objections to the settlement, that they intend to

14    prosecute.  They tried to preempt the formal creation of a

15    contested matter by filing a 2004 motion, and we think that's

16    not appropriate.

17            Your Honor, in the 2004 motion itself, they make clear

18    that what they are seeking in their discovery is Centerbridge's

19    contemporaneous views with respect to valuation of Tribune back

20    in the 2006 and 2007 time frame.  It was not until their reply

21    papers that there was a suggestion that, in fact, the

22    investigation that they would like to conduct here is broader

23    than that and extends to whether any causes of action may exist

24    any Sam Zell or any of the officers and directors, and,

25    Your Honor, that is -- is plainly indicative of the fact that

Qureshi - Argument                                    71

1    what they're trying to do is get discovery under the broader

2    2004 that really should take place under Rule 26.

3           So at the end of the day, they will have the documents

4    that they are seeking.  We think it is important and

5    appropriate that Centerbridge has the procedural protections of

6    -- of the Rule 26 process and are prepared to proceed

7    expeditiously with that.  Your Honor, we're not at all

8    suggesting that it should be form over substance here.  We

9    clearly understand that they will object to the settlement, and

10   we are prepared to begin the process immediately of meeting and

11   conferring, getting an agreement on the scope, and commencing

12   our production.

13          THE COURT:  Well, let me ask you this.  Except for

14   timing, what would the protections of Rule 26 give you with

15   respect to the specific requests in front of you that 2004 does

16   not give you?

17          MR. QURESHI:  Your Honor, the specific protection we

18   need is the requirement in Rule 26 that -- that the discovery

19   being sought be relevant to the dispute that is before the

20   Court.  The issue that we have with the requests as drafted is

21   they are broad.  They basically ask for every document in

22   Centerbridge's possession with respect to Tribune for a two-

23   year period, and, Your Honor, we're a little hampered today in

24   that we -- we simply have not had the opportunity in advance of

25   today's hearing to conduct that search and to have an

1    understanding of whether we are talking about a fairly limited

2    universe of documents that could be produced in fairly short

3    order or whether we're talking about hundreds upon thousands of

4    e-mails that would require much more burden in order to

5    produce, and so the protection we're looking for is simply that

6    to the extent that we have a dispute -- and we may not.  That

7    -- that remains to be seen and we'll -- through the traditional

8    meet and confer, we will get there I suspect relatively

9    quickly, but ultimately, we're simply looking for the

10   protection that the information that they seek is, in fact,

11   relevant to the disputes that will be before the Court.

12            THE COURT:  Which you tell me you know what they are.

13            MR. QURESHI:  I'm sorry?

14            THE COURT:  Which you tell me you're aware of.

15            MR. QURESHI:  Well, we certainly are.  What we don't

16   yet know, Your Honor, is the what the universe of documents is,

17   and given --

18            THE COURT:  Okay.  Here is what I'm going to do.  I

19   will direct you to meet and confer, and I'll continue the

20   hearing to the 22nd at 1:30 at which time the parties can

21   report to me on where they stand, and I'll decide whether

22   relief is warranted.

23            MR. QURESHI:  Thank you, Your Honor.

24            THE COURT:  All right.

25            MR. STARK:  Your Honor, may others be a part of that

1    meet and confer?

2              THE COURT:  Is there any objection?

3              COUNSEL:  None here, but I suspect Centerbridge is

4    more important.

5              THE COURT:  Mr. Qureshi --

6              MR. QURESHI:  No.

7              THE COURT:  -- no objection?  Okay.

8              MR. QURESHI:  Thank you, Your Honor.

9              THE COURT:  Okay.  All right.  All right.  17 and 18 -

10   - well, 17 is related to the earlier matters.  18, also

11   related.

12             COUNSEL:  Yes.

13             THE COURT:  Okay.  Be carried along as well.  Now,

14   there was one thing.  Well, first let me ask, is there anything

15   listed for hearing on today's amended agenda that we have

16   failed to address or about which anyone has a question?

17             MR. KRAKAUER:  Your Honor, just one small thing.

18   Aurelius filed a motion -- an objection to filing the

19   Committee's complaint under seal.  I talked to the council last

20   night, and they said they were amenable to continuing that and

21   would just ask they wanted to be heard on it on

22   May 20th, but we have an objection to that.  So at least from

23   the debtor's standpoint, if they wanted to notice their

24   objection to filing the complaint under seal, we could do that

25   for May 20th.  It would be the same day as our next motion.

1          THE COURT:  Okay.

2          MR. PERNICK:  Your Honor, I'm not sure that it was on

3     for today, but it was on the agenda.  Item number 20.  I'm not

4     sure if the Court covered that or not.  That was the debtor's

5     motion for an order authorizing the late filing of a reply.

6          THE COURT:  I signed that order --

7          MR. PERNICK:  Thank you, Your Honor.

8          THE COURT:  -- this morning.  Okay.  I received

9     yesterday a certification of counsel regarding the stipulation

10    between JPMorgan Chase, Law Debenture, Centerbridge concerning

11    the matter of nondebtor subsidiary payments and resolving that,

12    and given the nature of the dispute which the parties intend to

13    resolve, I think what I would be willing to do is to sign an

14    order approving the withdrawal of the fee motion and leave the

15    parties to whatever other agreements they've made in the

16    stipulation, but as far as my blessing, I think that's as far

17    as I'm willing to go.

18         COUNSEL:  That would be fine.  Thank you, Your Honor.

19         THE COURT:  So if a revised form of order would be

20    submitted under certification, I will sign it.  Any questions?

21         COUNSEL:  Your Honor --

22         THE COURT:  Yes.

23         COUNSEL:  I'm sorry.  Just to clarify, that would be a

24    withdraw without prejudice.

25         THE COURT:  All right.  Okay.  Is there anything

Colloquy                                    75

1    further for today?

2              MR. CONLAN: Your Honor, I don't believe so.

3              THE COURT:  All right.  Good luck to you.  That

4    concludes this hearing.  Court is adjourned.

5              COUNSEL:  Thank you, Your Honor.

6                        (Court Adjourned)

7                        * * * * *

8                   C E R T I F I C A T I O N

9         I, Maureen Emmons, court approved transcriber, certify

10   that the foregoing is a correct transcript from the official

11   electronic sound recording of the proceedings in the above-

12   entitled matter.

13

14

15   _____    Date:

16   JOSETTE JONES

17   DIANA DOMAN TRANSCRIBING

18

19

20   _____    Date:

21   MAUREEN EMMONS

22   DIANA DOMAN TRANSCRIBING

23