# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TRIBUNE COMPANY, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 08-13141 (KJC)<br><br>Jointly Administered<br><br>Status Conference: May 10, 2010, 11:00 a.m.<br><br>Re: Docket Nos. 4212, 4213 |

## WORK AND EXPENSE PLAN OF EXAMINER-DESIGNATE
## KENNETH N. KLEE, ESQ.

Kenneth N. Klee, the Examiner-designate ("Examiner") appointed in the above-captioned chapter 11 cases of Tribune Company and its affiliates (collectively, the "Debtors") by and through his undersigned, proposed counsel, respectfully submits his proposed work and expense

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); FOn/M Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

593345.1 5/7/10

plan ("Work and Expense Plan"), pursuant to the "Agreed Order Directing the Appointment of an Examiner" entered by the Court on April 20, 2010 [Docket No. 4120] ("Examiner Order").

## I.

## INTRODUCTION

1. On January 13, 2010, Wilmington Trust Company ("WTC") filed its "Motion for Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code" (the "Examiner Motion"). On April 20, 2010, the Court entered the Examiner Order, directing the United States Trustee to appoint an examiner in these cases pursuant to Bankruptcy Code section 1104(c)(1).

2. On April 30, 2010, Roberta A. DeAngelis, the Acting United States Trustee for Region 3 ("United States Trustee"), filed her "Notice of Appointment of Examiner" [Docket No. 4212] appointing Kenneth N. Klee, Esq. as the Examiner, subject to Court approval. Contemporaneously therewith, the United States Trustee filed her Application of the United States Trustee for "Order Approving Appointment of Examiner" [Docket No. 4213], which is pending before the Court.

3. The Examiner Order directs the examiner appointed by the United States Trustee to:

> (i) evaluate whether there are potential claims and causes of action held by the Debtors' estates in connection with the leveraged buy-out of Tribune that occurred in 2007 (the "LBO") which may be asserted against any entity which may bear liability, including, without limitation, the Debtors, the Debtors' former and/or present management, including former/present members of Tribune's Board, the Debtors' lenders and the Debtors; advisors, said potential claims and causes of action including, but not being limited to, claims for fraudulent conveyance (including both avoidance of liability and disgorgement of payments), breach of fiduciary duty, aiding and abetting the same, and equitable subordination and whether there are any potential defenses which may be asserted to such potential claims and causes of action,

> (ii) evaluate whether Wilmington Trust Company violated the automatic stay under 11 U.S.C. § 362 by its filing, on March 3, 2010, of its Complaint for Equitable Subordination and Disallowance of Claims, Damages, and Constructive Trust (docketed at Adv. No. 10-50732, D.I. 1),
>
> (iii) evaluate the assertions and defenses made by certain of the Parties in connection with the Motion of JPMorgan Chase Bank, N.A., for Sanctions Against Wilmington Trust Company for Improper Disclosure of Confidential Information in Violation of Court Order (D.I. 3714),
>
> (iv) otherwise perform the duties of an examiner set forth in 11 U.S.C. §§ 1106(a)(3) and (4) (as limited by the Examiner Order) (collectively, the "Investigation").

Examiner Order at Paragraph 2. The preceding is referred to as the "Investigation."

4. The Examiner Order directs the Examiner to prepare and file a report in respect of the Investigation in accordance with Bankruptcy Code section 1106(a)(4) on or before July 12, 2010, unless such time shall be extended by order of the Court upon application by the Examiner, on notice to the "Parties," as defined therein.

5. Prior to commencing the Investigation, the Examiner Order contemplates that the Examiner will meet and confer with the Parties and, no later than seven days after the filing of the notice of appointment of the Examiner, file a work and expenses plan, including a "good faith estimate of the fees and expense of the Examiner and the Examiner's proposed professionals for conducting the Investigation (the 'Budget')."

6. The Examiner Order further provides that the "Court will hold a status conference on May 10, 2010 at 11:00 a.m. to (i) consider the Work and Expense Plan (along with any responses thereto, including an opportunity for any of the Parties to be heard on the appropriateness of the Budget) and (ii) order, if appropriate, further relief as will aid the Examiner in the performance of the Examiner's duties and/or to accommodate the needs of the estates."

7.      This Work and Expense Plan is filed in accordance with these directives.

## II.

## INITIAL MEETINGS AND CONFERENCES

8.      Beginning immediately after the Examiner's appointment by the United States Trustee, late in the day on Friday, April 30, 2010, the Examiner and his proposed counsel held telephonic conferences with counsel to the United States Trustee and other Parties, in order to begin discussing the Investigation and arrange for an in-person meet and confer of the Parties. These telephonic conferences continued throughout the weekend. During this period, the Examiner and his proposed counsel began reviewing various pleadings in these cases relating to the subject matter of the Investigation, as well as pleadings relating to the examinations ordered in other large cases in recent years. In light of the July 12, 2010 deadline specified in the Agreed Order, the Examiner determined to proceed immediately to convene all of the Parties to a meet and confer as rapidly as possible. The Debtors and the other Parties agreed that a prompt meeting was appropriate under the circumstances.

9.      For two full days, beginning on Tuesday, May 4, 2010, the Examiner conducted in-person meetings with the Parties in New York City, in order to discuss with them his preliminary views – and in turn solicit the Parties' views – regarding the work plan for conducting the Investigation, the manner in which the Parties would be expected to cooperate and assist with the Investigation, the Examiner's preliminary cost estimates for the Investigation, the manner in which issues of confidentiality and privilege should be addressed, and the need for certain clarifications or modifications to the Examiner Order. The Examiner also invited the Parties to share their views on the preceding, as well as the merits of the factual and legal issues raised by the Investigation. These meetings began with a plenary session of all Parties, during

which the Examiner believes he formally discharged his meet and confer obligations under the Agreed Order, followed by a series of "one-on-one" meetings between the Examiner and particular Parties (or in some cases groups of Parties).

10. The Examiner has developed this Work and Expense Plan after considering the Examiner Order, various pleadings filed in these cases in respect of the subject matter of the Investigation, various non-public documents provided by the Parties in respect of that subject matter, and his extensive consultations with the Parties.

### III.

### WORK PLAN

11. In just a few days, it has become readily apparent to the Examiner that the tasks he has been assigned are daunting, and the remaining 63-day timeframe in which he has been asked to perform those tasks is exceedingly limited. The Investigation relates to a series of transactions involving billions of dollars, potential claims against numerous parties, intricate financial analyses and other factual matters as to which the Parties have substantial disagreements, and a lengthy list of wide-ranging legal claims, defenses and issues arising under state and federal law. The record adduced to date includes over 3,000,000 pages of documents that have been collected in a document "depository" but have not been topically indexed.[2] Examinations of this magnitude have taken examiners appointed in other cases many, many months to conduct.

12. Faced with the preceding, the Examiner attempted to craft an approach to this Investigation that makes sense under the circumstances presented, and maximizes the possibility that the Examiner will timely generate a product that is helpful to the Court. The Examiner

---

[2] The "Document Repository" created by the parties is not a single, electronic database containing the documents produced to date, but rather a collection of over 150 compact discs containing documents produced by various parties in connection with these cases.

effectively has been directed to investigate and opine, in just over two months, on matters that the parties have been investigating, researching and evaluating for many months. From the Examiner's perspective, the most sensible way to approach this project in the time given is to capitalize upon the work performed by the Parties to date and, at least in the first instance, to look to the Parties and the adversarial process to flesh out the issues and facts in dispute and the relative strength and weakness of the positions of the Parties.

13. To this end, the Examiner has indicated to the Parties that he expects their participation and cooperation in at least two principal areas. First, the Examiner has invited all Parties, on an informal basis, to provide as soon as possible whatever documentary evidence, legal analyses and financial analyses that have been prepared to date that demonstrate their respective views on the subject matter of the Investigation that they wish to share with the Examiner.

14. Second, the Examiner has indicated that he will look to the Parties to prepare and submit electronically annotated legal briefs and documentary appendices that set forth their respective positions and links to copies of the documentary support for those positions. Following submission of those briefs, which will be shared among all of the Parties, the Examiner will ask the Parties to file written responses, again identifying the specific documents that support the Parties' contentions.

15. Additionally, the Examiner has asked that the Debtors to prepare a written narrative describing the 2007 leveraged buyout transactions ("Basic Factual Statement"), solicit input from the Parties in respect of that Basic Factual Statement, and deliver it to the Examiner by a date certain, so that, in their submissions. the Parties need not draft multiple versions of the basic factual background as to which there is little or no dispute among the parties. Toward that

end, the Examiner respectfully submits that it is appropriate for the Court to order that the Parties' discussions and communications amongst one another in respect of the draft Basic Factual Statement be treated as "Settlement Material" within the meaning of the "Order (I) Authorizing the Debtors To Establish A Document Depository And directing The Committee To Deliver Certain Documents To The Depository Pursuant To Federal Rule of Bankruptcy Procedure 2004 and (II) Establishing Settlement Negotiation Protections Pursuant to 11 U.S.C. § 105(a)" [Docket No. 2858] ("Depository Order").

16.     The Examiner's investigation ultimately will be independent, and will in no way be limited to the materials presented formally or informally by the Parties. The Examiner intends to supplement those materials with his own review of documents and interviews (or depositions) of witnesses that the Examiner deems necessary and feasible. Nevertheless, the Examiner believes that the submission of materials by the Parties (which already is underway), and the more formal use of a quasi-adversarial process under which the positions of the Parties are advocated against the backdrop and based upon the factual record, should enable the Examiner to quickly marshal and utilize the Parties' collective knowledge and expertise on the subject matter of the Investigation, and also help him to identify those factual or legal issues that may have received inadequate investigation to date. The Examiner readily acknowledges that he is not aware of any other examination that has proceeded in this fashion.

17.     Based upon the Examiner's initial consultations with the Parties and their feedback, the Examiner believes that the Parties are amenable to the Examiner's proposed work plan for the Investigation. Further, the Examiner respectfully submits that his proposed approach to the Investigation is consistent with the following directive, which is set forth in the Examiner Order:

> The Parties shall use their respective best efforts to coordinate with the Examiner and to avoid unnecessary interference with, or duplication of, the Investigation, and the Examiner, in his or her conduct of the Investigation, shall use best efforts to utilize relevant materials obtained by the Parties via informal and/or formal discovery to avoid unnecessary duplication of work performed to date.

Examiner Order at Paragraph 3.

18. In accordance with the foregoing, the Examiner notes his expectation that the report he will prepare will not be a treatise, as has become the practice in connection with certain examinations. Without in any way being critical of those other products, given the short deadline to prepare the report required here and the massive amount of information that the Examiner must review and evaluate, it simply will not be possible for the examiner to generate anything approaching the multi-hundred page products that have been produced in other similarly complicated examinations prepared with the luxury of time. The Examiner anticipates preparing a report that speaks specifically to the questions presented by the Examiner Order. The Examiner does not believe he has been directed to prepare, nor would it be feasible to do so, a dissertation on all of the transactions and events preceding the filing of these cases, or all of the conceivable causes of action that may exist as a result of those transactions and events.

19. Further, the Examiner notes that given the short time frame he has been afforded to complete the Investigation, it is at least conceivable that the report filed on July 12, 2010 may identify certain matters as to which a complete investigation and analysis was not feasible and as to which further investigation may be necessary, if the Court so directs.

### IV.

### <u>CLARIFICATIONS TO EXAMINER ORDER</u>

20. Based upon his consultations with the Parties, the Examiner has concluded that the Examiner Order should be modified in certain respects to clarify the scope of the

Investigation. Specifically, the Examiner proposes that Paragraph 2(i) of the Examiner Order be modified as indicated below:

> (i) evaluate ~~whether there are~~ the potential claims and causes of action held by the Debtors' estates <u>that are asserted by Parties,</u> in connection with the leveraged buy-out of Tribune that occurred in 2007 (the "LBO") which may be asserted against any entity which may bear liability, including, without limitation, the Debtors, the Debtors' former and/or present management, including former/present members of Tribune's Board, the Debtors' lenders and the Debtors; advisors, said potential claims and causes of action including, but not being limited to, claims for fraudulent conveyance (including both avoidance of liability and disgorgement of payments), breach of fiduciary duty, aiding and abetting the same, and equitable subordination and whether there are any potential defenses which may be asserted to such potential claims and causes of action,

21.  There are several good reasons for these proposed modifications. First, with the inclusion of the language "whether there are" in the foregoing, the passage reasonably may be read to charge the Examiner simply with determining whether there are or are not potential claims, causes of action and defenses that *might* be asserted (and, in this day and age, virtually any legal claim or defense *might* be asserted by some party), rather than investigating and evaluating the basis of those claims, causes of action and defenses, and engaging in a meaningful process of weighing the relative positions. The Examiner believes that it was the intention of the Parties and the Court that the Examiner undertake the latter inquiry, rather than the former. Along these lines, in connection with the Examiner's evaluation of potential fraudulent transfer or conveyance claims and defenses, the Examiner believes that it may be helpful to the Court for the Examiner to evaluate the potential remedies that may be available to the estate(s) if one or more transfers are avoided and the effect of such remedies on distributions on account of prepetition claims.

22.  Second, absent inclusion of the additional qualifying phrase indicated above, the foregoing passage may reasonably be read to charge the Examiner with considering all manner

of theoretical claims, causes of action and defenses that have not been raised by the Parties over the course of the last two years. The proposed qualifying language reasonably limits the Investigation to those potential theories of liability and defenses that the Parties have identified to the Examiner, rather than charging the Examiner to consider, research and comment upon every *conceivable* legal theory that may exist. The Examiner respectfully submits that this clarification will ensure that his Investigation and resulting report are useful to the Court, rather than being burdened by purely academic consideration of potential theories that the Parties have not themselves raised or considered.

23.     In respect of Paragraph 2(ii) of the Examiner Order, regarding investigation of the alleged violation of the automatic stay by WTC, the Examiner does not believe that the Examiner Order requires modification *per se*, but the Examiner wishes to share with the Court certain observations concerning that Paragraph. First, after meeting with the Parties and conducting his preliminary review of the matter, the Examiner believes that the essence of the question presented is whether any of the claims or causes of action asserted by WTC belong to the Debtors' estates and, if so, which ones. The Examiner certainly intends to evaluate whether a violation of the automatic stay occurred, but in addressing that question the Examiner believes it is appropriate to evaluate whether an estate action has been asserted. Second, the Examiner believes that in connection with the Investigation it is appropriate for the Examiner to review and consider the amended complaint that was filed under seal as an attachment to one of WTC's pleadings, subsequent to the filing of WTC's complaint. See Docket No. 3942 (Exhibit A). The Examiner has made no determination whether the subsequent filing is legally significant to the question presented by Paragraph 2(ii), but believes it is reasonable and appropriate for him to review the subsequent complaint in connection with the Investigation. Finally, the Examiner

believes that unlike Paragraph 2(i) of the Examiner Order, the Examiner is not being requested to and should not evaluate any remedies that may be available if it is determined that WTC violated the automatic stay.

24. Finally, the Examiner notes the subject matter of the Investigation does not include the proposed "Global Settlement" that is embodied in the Debtors' pending chapter 11 plan. As would be expected, during the course of the Examiner's initial consultations, nearly every one of the Parties referenced or discussed that proposed settlement, in connection with its effort to educate the Examiner on the events that preceded and/or resulted in entry of the Examiner Order. As he indicated to the Parties during those sessions, the Examiner is sensitive to the fact that the Investigation ultimately may have an impact on the Court's consideration of that proposed settlement, but the Examiner believes that it is <u>not</u> within his charge under the Examiner Order to investigate or comment upon the merits of the proposed settlement.

## V.

## CONFIDENTIALITY AND PRIVILEGES

25. During their initial conferences, the Examiner and the Parties addressed at length the issues of confidentiality and privilege with respect to materials that are provided to the Examiner for review. The Examiner observes that there is an internal tension within the Examiner Order when it comes to confidentiality. The Court has made clear on the Record that it expects the Examiner to file a public report. On the other hand, the Examiner Order appears to extend to the Examiner the prohibitions on disclosure of confidential information that are contained in the Depository Order. Based upon the Parties' representations, nearly *every* document that has been produced in these cases already has been marked "Confidential" and its

contents may not be publicly disclosed. This makes it extremely difficult for the Examiner to discharge his obligation to file a thorough public report, and needs to be changed.

26. In an effort to reconcile this conflict, the Examiner has proposed to the Parties that following the formal exchange of briefs and documents described above, each of them shall identify to the Examiner those particular documents that the Party believes in good faith are entitled to protection from public disclosure under applicable law and as to which the Examiner should not publicly disclose in his report. Absent relief prior to July 12, 2010, the report publicly filed on such date will be redacted so as not to disclose the contents of the documents designated by the Parties for protection in response to a deadline that will be established by the Examiner.

27. The Examiner has advised Parties that the standard they should utilize in whether to designate documents for non-disclosure is not whether disclosure would be embarrassing to a Party, or harmful to its position in existing or future litigation, but whether there is a bona fide legal basis to prevent its public disclosure. The Examiner hopes and expects that the universe of non-disclosable documents identified by the Parties will be few. In order to address those documents that ultimately may be designated for non-disclosure by a Party, the Examiner will propose that the Court adopt an expedited process for determining whether to lift the protection of any document or information and permit the public filing of the report without redaction – similar to the process utilized in the Lehman case following the filing of the examiner's report.

28. As for matters of privilege, and to facilitate the free flow of information to the Examiner, the Examiner believes it is appropriate for the Court to enter an order providing that the production to the Examiner or to any of the Parties of any document or communication that may be privileged shall not be the basis for any third party or any other Party to assert that any of the Parties or their counsel or other professionals have waived, in whole or in part, any privilege,

protection, immunity, or confidentiality with respect to such documents or information or with respect to any other documents or information that may concern the same subject matter. The Examiner does not believe any Parties oppose such relief. Certain of the Parties have requested that the Court's order *further* provide that the delivery of any documents or information by any of the Parties, or by counsel or other professionals engaged by any of the Parties, to the Examiner or to any of the Parties in connection with the Investigation, does not constitute a waiver of attorney-client privilege, attorney work product protection, confidentiality or any other applicable privilege, protection, immunity, or confidentiality, provided that, notwithstanding the foregoing, should the Examiner choose to incorporate any of the documents or information in the Examiner's report, the Parties will not assert attorney-client privilege, attorney work product protection, or any other applicable privilege, protection or immunity with respect to the specific documents or information so incorporated. The Examiner understands that not all of the Parties have agreed that the Court should order that privileges are preserved notwithstanding a Party's decision voluntarily to furnish otherwise privileged document or information to the Examiner (unless such matter is disclosed by the Examiner in his report); and the Examiner has heard the view expressed that Parties should understand that if previously privileged materials are voluntarily given to the Examiner, the applicable privilege should be lost as to such materials (and such materials only). The Examiner believes that it is appropriate for the Parties to address this matter with the Court at the upcoming status conference. In the interests of candor, while the Examiner remains interested in the Parties' views on this matter, the Examiner did not propose that the Court grant this boarder protection in his meetings with the Parties.

VI.

DISCOVERY

29.     Based upon his consultations with the Parties, the Examiner expects and anticipates that the Parties will be cooperative with the Investigation. Moreover, to the extent the Examiner seeks information from an individual, the Examiner expects to obtain such information through an informal interview, rather than a formal deposition. Nevertheless, the Examiner may determine that it is necessary and appropriate to conduct depositions or other formal discovery with respect to one or more of the Parties or third-parties. To that end, the Examiner anticipates filing shortly a motion seeking blanket authority under Bankruptcy Rule 2004 to issue subpoenas and conduct formal discovery in connection with the Investigation, as was requested and granted by the examiners in recent cases such as New Century, Lehman Brothers and Enron.

VII.

BUDGET

30.     Subject to Court approval, the Examiner has determined that he needs to engage the following professionals: (i) Klee, Tuchin, Bogdanoff & Stern LLP to serve as his counsel, (ii) Saul Ewing LLP to serve as his Delaware counsel, and (iii) LECG to serve as his financing advisors. The Examiner expects that applications to employ these professionals will be filed shortly. The Investigation and the drafting of the Examiner's report is a massive endeavor, given the scope of the issues and the breadth of the factual record that must be considered and analyzed. This effort will require a team of professionals in many instances working at or near full time between now and July 12, 2010, when the Examiner's report is due.

31.     As discussed above, the Examiner has designed a preliminary work plan that seeks to avoid "reinventing the wheel," using the adversarial process and the cooperation of the

parties to fine tune the issues and the investigation. Nevertheless, there is a great deal of independent work that likely must be performed by the Examiner and his legal and financial professionals so that the Examiner may discharge his obligation to conduct an independent investigation, and a compressed period in which that work may be performed.

32. Among other things, the Examiner's financial advisors will need to assess the projections and solvency analysis prepared in connection with the various transactions, as well as the Debtor's financial performance before (and after) the LBO. The Examiner also is mindful of the fact that there are separate estates and separate avoidance actions that may be asserted by different Debtors against different parties. An independent assessment of these issues will require factual and legal investigation in respect of the various subsidiaries, intercompany claims, and the flow of funds between and among them.

33. The Examiner's proposed financial advisors will be meeting next week with the financial advisors to various Parties to obtain more information regarding the nature of the financial analyses performed to date, and make a better assessment of the original and/or comparative analysis that the Examiner's financial advisors must independently perform. As the Examiner's financial advisors learn more in this regard, they may determine that the work they must perform in order to supplement the work performed to date is less than currently contemplated. The Examiner expects to have a better sense of these matters after this week's meeting among the financial advisors.

34. It is exceedingly difficult at this time to estimate what this project will cost. Based upon the information that is *currently* available to the Examiner at this stage, the Examiner's preliminary estimate is that the Investigation and preparation of the report required by the Examiner Order will cost approximately $4 to $5 million in fees and costs. As discussed

above, however, the Examiner intends to build upon the work that has been done to date by the Parties' professionals, and hopes that this estimate may be reduced, among other things, if his financial advisors determine that there is less independent financial analysis to be performed than is currently contemplated. Nevertheless, there is a substantial amount of work to be performed in a short amount of time and the cost will be substantial. The Examiner has no desire to devote more of his time, and the time of his professionals, to this project than is reasonable and appropriate; and formulating ways to discharge his responsibilities in a cost efficient manner has been, and will continue to be, an exceedingly important consideration for the Examiner throughout this expedited process.

## VIII.

## CONCLUSION

35. The Examiner respectfully submits that the foregoing Work and Expense Plan is reasonable and appropriate and should be approved by the Court, subject to such additional input and guidance the Court may provide the Examiner with respect thereto.

Dated: May 7, 2010                    Respectfully Submitted,

 

KLEE TUCHIN BOGDANOFF & STERN LLP
Lee R. Bogdanoff (CA. Bar No. 119542)
Martin R. Barash (CA Bar No. 162314)
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067-6059
Telephone (310) 407-4000
Facsimile (305) 407-9090

Proposed Counsel to the Examiner

and

SAUL EWING LLP

_/s/ Mark Minuti_____
Mark Minuti (Bar No. 2659)
Michael J. Farnan (Bar No. 5165)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6840
Facsimile: (302) 421-5873
Email: mminuti@saul.com

Proposed Delaware Counsel to the Examiner