

Terry Godbey
830 Ellwood Ave.
Orlando, FL 32804
Case No. 08-13141
Claim No. 3672

May 3, 2010

United States Bankruptcy Court
    for the District of Delaware
824 Market St.
3rd floor
Wilmington, Delaware 19801

To the Honorable Kevin J. Carey, Chief U.S. Bankruptcy Judge:

I strenuously object to the attempt by Tribune Co. et al, debtors, to lump my claim for
$15,667.77 in severance due me after 26 years of employment into "Twenty-fourth Omnibus
Objection: Exhibit A – No Liability Claims."  #4091

A company that pays its top executives millions after filing for bankruptcy protection should
not be allowed to treat its longtime, loyal employees like garbage. I am a single mother with
a special-needs son and have not been able to find steady employment in the year since I
was let go from the "Orlando Sentinel" in April 2009.

Here is why I deserve severance:

I worked as a copy editor for the *Orlando Sentinel* for nearly 26 years, from 1983 to 2009, the
first 11 years full-time and then part-time. I worked more than 20 hours a week in 2008,
through Nov. 8, but when the *Sentinel's* owner, the Tribune Co., filed for bankruptcy on
Dec. 8, 2008, my hours were cut so that I worked an average of 18.08 hours a week through
April 17, 2009, the day I was laid off.

Unbeknownst to me, the severance policy reportedly was changed on Feb. 4, 2009, to define
eligible employees as those who worked 20 hours a week or more, so after I was laid off the
company told me I would not receive any severance. Only months earlier, people who
worked fewer than 20 hours a week received severance. The timing also becomes important
in another way. The *Sentinel* warned in January 2009 that most of the copy editors would be
laid off, and promised it would happen very soon, but the company dragged its heels until
April. Had I been laid off right away as promised I would have been eligible for the
severance because my hours were more than 20 a week at that time.

My claim for $15,667.77 in severance pay due me under the previous severance policy (the
title page and first three pages of that 2008 policy are attached) was arrived at thusly: 26 (2
weeks of pay for the first year of service, plus 1 week for each of the other 24 years) x 18.08
(the hours the Tribune Co. says I worked weekly in 2009) x $33.33 (my hourly wage).

I have sent a similar letter via registered mail to the lawyers as well, as required.

Please do not let Tribune Co. get away with wiping out my claim in the hearing set for May 18. Thank you.

Sincerely,

Terry Godbey

# ORLANDO SENTINEL COMMUNICATIONS COMPANY
# EMPLOYEE INVOLUNTARY SEPARATION PLAN SUMMER 2008
# ("ISP SUMMER 2008")

## PLAN DOCUMENT/SUMMARY PLAN DESCRIPTION

**(June 16, 2008)**

ORLANDO SENTINEL COMMUNICATIONS COMPANY EMPLOYEE INVOLUNTARY SEPARATION PLAN SUMMER 2008 ("ISP SUMMER 2008")

## ESTABLISHMENT AND PURPOSE OF THE PLAN

ORLANDO SENTINEL COMMUNICATIONS COMPANY (hereinafter the "Company") hereby adopts the ORLANDO SENTINEL COMMUNICATIONS COMPANY EMPLOYEE INVOLUNTARY SEPARATION PLAN SUMMER 2008 (hereinafter the "ISP SUMMER 2008"), effective June 16, 2008 (the "Effective Date"), for the benefit of eligible employees as described herein. The ISP SUMMER 2008 is an unfunded welfare benefit plan for purposes of the Employee Retirement Income Security Act of 1974, as amended (hereinafter "ERISA") and a severance pay plan within the meaning of the United States Department of Labor regulations section 2510.3-2(b), except that the portion of the ISP SUMMER 2008 providing additional pension benefits is funded through the Tribune Company Cash Balance Pension Plan, which is a pension plan within the meaning of Section 3(2) of ERISA.

The ISP SUMMER 2008 is established in response to current and anticipated business conditions that require the reduction in the number of employees in order for the Company to control costs and operate competitively.    Through the ISP SUMMER 2008, the Company provides eligible employees who are involuntarily terminated from employment with the Company in connection with the Company's 2008 restructuring a measure of financial security in the form of certain benefits, as described below (the "ISP SUMMER 2008 benefits").

This document shall serve as both a Plan Document governing the terms of the ISP SUMMER 2008 as well as a Summary Plan Description describing the features of the ISP SUMMER 2008.

## ELIGIBLE EMPLOYEES

The ISP SUMMER 2008 is offered only to an eligible employee. An "eligible employee" means each actively employed, regular full-time or part-time non-union employee of Orlando Sentinel Communications Company who is notified of his/her involuntary termination and eligibility for the ISP SUMMER 2008.

For purposes of the ISP SUMMER 2008, "actively employed" is defined as being actively at work, on vacation, on sick leave, on a paid leave of absence, on an unpaid leave of absence that has not exceeded one year, or on leave under the Family & Medical Leave Act (FMLA) as of June 16, 2008. Employees on an unpaid leave of absence that exceeds one year (other than as noted above) or on long-term disability as of June 16, 2008 are not eligible for the ISP SUMMER 2008. Employees who have submitted a resignation notice prior to June 16, 2008 are not eligible for the ISP SUMMER 2008.

The Company shall provide each eligible employee with a list, classified by department, job title, and date of birth, of Company employees who have been selected for involuntary termination and are eligible for the ISP SUMMER 2008 and Company employees who have not been selected for involuntary termination and are not eligible for the ISP SUMMER 2008. **In no event will any**

**employee who participates in the ISP SUMMER 2008 be eligible for more than one Company-sponsored severance plan, policy, or program.**

## NOTIFICATION PROCESS

The Company will notify each eligible employee in writing if he or she is eligible for the ISP SUMMER 2008. At that time, the Company will communicate to each eligible employee the date upon which he or she will involuntarily terminate. The Company will choose this date in its sole discretion. This date is the "Involuntary Separation Date" for purposes of the ISP SUMMER 2008. It is anticipated that an eligible employee's Involuntary Separation Date will be between June 1, 2008 and August 31, 2008. However, the Company reserves the right, in its sole discretion, to accelerate or delay the Involuntary Separation Date.

## WAIVER AND RELEASE

In order to be eligible to receive the ISP SUMMER 2008 Benefits, an eligible employee must sign and submit a Waiver and Release (attached as **Attachment I**) to the person(s) identified at the end of **Attachment I** on or within forty-five (45) days after the Company gives to the eligible employee this document. However, if the eligible employee's Involuntary Separation Date is more than 45 days from the date the Company gives to the eligible employee this document, the eligible employee must sign and submit a Waiver and Release to the designated person(s) within five days of his/her Involuntary Separation Date. (No Waiver and Release may be submitted earlier than his/her Involuntary Separation Date).

An eligible employee may revoke his/her signed Waiver and Release within seven (7) days after the date on which he/she signs the Waiver and Release. Any such revocation must be made in writing and must be received by the designated person(s) within such seven (7) day period. An eligible employee who revokes his/her Waiver and Release shall not be eligible to receive any ISP SUMMER 2008 Benefits but will remain a terminated employee.

An eligible employee who submits a signed Waiver and Release and does not exercise his/her right of revocation shall be considered a "Participant" in the ISP SUMMER 2008 and shall be eligible to receive ISP SUMMER 2008 Benefits.

Eligible employees are encouraged, if they so desire, to contact their personal attorney, at their own expense, to review the Waiver and Release.

## ISP SUMMER 2008 BENEFITS

**Cash Balance Benefit**

A Participant shall have credited to his or her account balance under the Tribune Company Cash Balance Pension Plan an amount equal to the product of (a) the Participant's weekly rate of base pay multiplied by (b) the Participant's consecutive periods of six months of completed service as of the Involuntary Separation Date. The number in (b) shall be no less than six (6) and no greater than fifty-two (52). In addition, the amount derived in this paragraph shall be increased by 3%.

For purposes of (a) above, the weekly rate of base pay for a *Participant whose compensation did not include a commission component* shall be the Participant's annual base pay rate divided by 52.

For purposes of (a) above, the weekly rate of base pay for a *Participant who compensation included a commission component* shall be calculated as follows: For a Participant who actively worked for the entire 2007 calendar year: (Participant's annual base pay rate as of the Involuntary Separation Date + all commissions earned over the period January 1, 2007-December 31, 2007) divided by 52. For a Participant who did NOT actively work for the entire 2007 calendar year: (Participant's annual base pay rate as of the Involuntary Separation Date + all commissions earned during the period actively worked in 2007 annualized) divided by 52.

For purposes of the ISP SUMMER 2008, "base pay" is pay received for a regularly scheduled work week, excluding overtime, shift differential and bonus pay.

For purposes of the ISP SUMMER 2008, "years of service" and "months of service" include all continuous periods of employment with the Company or affiliates between the most recent date of hire and the Involuntary Separation Date, provided there is no break in employment with the Company or affiliates during that period. A break in employment will not be deemed to have occurred if an employee previously terminated from the Company but was rehired within six (6) months of their termination date and did not receive a severance payment at the time of their prior termination. An approved leave of absence does not constitute a break in employment with the Company.

The Company reserves the right to limit participation in all or part of the ISP SUMMER 2008 in order to meet certain Internal Revenue Code limitations regarding the receipt of retirement benefits by highly-compensated employees or for such other reasons as the Company may determine in its sole discretion. For purposes of the preceding sentence, the Company may pay the Cash Balance Pension Plan Benefit described above in a lump sum through its normal payroll directly from the Company. In that event, individuals who are paid outside of the Tribune Company Cash Balance Pension Plan will not be entitled to the 3% increase in benefits described above.

**AND**

## Benefit(s) Continuation

A Participant will continue to participate in the medical, dental, vision, life and personal accident insurance coverages, if he/she participates in such benefits as of the Involuntary Separation Date for a period following the Involuntary Separation Date equal to one week for each of the Participant's consecutive periods of six months of completed service as of the Involuntary Separation Date. Benefits Continuation shall be provided under the same terms and conditions as are then applicable to employees of the Company, provided the Participant timely pays any required contributions for these benefits. The minimum period of Benefits Continuation shall be at least three (3) months following Participant's Involuntary Separation Date. Payment for benefits shall be made on an after-tax basis. The maximum period of Benefits Continuation shall be 52 weeks following the Involuntary Separation Date.

**AND**