# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
IN RE:                        )  Case No. 08-13141(KJC)
                              )  (JOINTLY ADMINISTERED)
TRIBUNE COMPANY, et al.,      )  Chapter 11
                              )
                              )  Courtroom 5
                              )  824 Market Street
                   Debtors.   )  Wilmington, Delaware 19801
                              )
                              )  May 10, 2010
                              )  11:41 A.M.
```

TRANSCRIPT OF STATUS CONFERENCE (I) CONSIDER THE WORK
AND EXPENSE PLAN (ALONG WITH ANY RESPONSES THERETO,
INCLUDING AN OPPORTUNITY FOR ANY PARTY TO BE HEARD ON THE
APPROPRIATENESS OF THE BUDGET); (II) ORDER, IF APPROPRIATE,
RELIEF AS WILL AID THE EXAMINER IN THE PERFORMANCE OF THE
EXAMINER'S DUTIES AND/OR TO ACCOMMODATE THE NEEDS OF THE
ESTATES, IN ACCORDANCE WITH THE AGREED ORDER DIRECTING THE
APPOINTMENT OF AN EXAMINER (DOCKET NO. 4120)
BEFORE HONORABLE KEVIN J. CAREY
UNITED STATES CHIEF BANKRUPTCY JUDGE

**APPEARANCES:**

```
For the Debtors:        Cole Schotz Meisel, Forman
                        & Leonard, P.A.
                        By:  NORMAN PERNICK, ESQ.
                        1000 N. West Street, Suite 1200
                        Wilmington, Delaware 19801

                        Sidley Austin LLP
                        By:  KEVIN LANTRY, ESQ.
                             JIM BENDERNAGEL, ESQ.
                        One South Dearborn
                        Chicago, Illinois 60603

ECRO:                   AL LUGANO
```

**TRANSCRIPTION SERVICE:**     **TRANSCRIPTS PLUS, INC.**
**435 Riverview Circle**
**New Hope, Pennsylvania 18938**
**Telephone:  215-862-1115**
**Facsimile: 215-862-6639**
**e-mail CourtTranscripts@aol.com**

```
Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.
```

**APPEARANCES:**
(Continued)

```
For the Examiner,      Saul Ewing
Kenneth Klee:          By:  MARK MINUTI, ESQ.
                            CHARLES MONK, ESQ.
                            NICHOLAS NASTASI, ESQ.
                       222 Delaware Avenue, Suite 1200
                       P.O. Box 1266
                       Wilmington, Delaware 19899

                       Klee, Tuchin, Bogdanoff & Stern LLP
                       By:  MARTIN BARASH, ESQ.
                            LEE BOGDANOFF, ESQ.
                            KENNETH KLEE, ESQ.
                       1999 Avenue of the Stars
                       Thirty-Ninth Floor
                       Los Angeles, California 90067-5061

For Unsecured Creditors' Landis Rath & Cobb
Committee:             By:  ADAM LANDIS, ESQ.
                       919 Market Street, Suite 1800
                       P.O. Box 2087
                       Wilmington, DE 19801

                       Chadbourne & Park, LLP
                       By:  HOWARD SEIFE, ESQ.
                            DOUGLAS E. DEUTSCH, ESQ.
                            MARC ASHLEY, ESQ.
                       30 Rockefeller Plaza
                       New York, New York 10112

                       Zuckerman Spaeder, LLP
                       By:  GRAEME W. BUSH, ESQ.
                            JAMES SOTTILE, ESQ.
                       One Commerce Center
                       1201 Orange Street, Suite 650
                       Wilmington, Delaware 19801

For JPMorgan Chase:    Richards Layton & Finger, PA
                       By:  MARK COLLINS, ESQ.
                       One Rodney Square, P.O. Box 551
                       Wilmington, Delaware 19899

                       Davis Polk & Wardwell LLP
                       By:  DENNIS GLAZER, ESQ.
                            DON BERNSTEIN, ESQ.
                       450 Lexington Avenue
                       New York, NY 10017
```

**APPEARANCES:**
(Continued)

| | |
|---|---|
| For the Credit<br>Agreement Lenders: | Young Conaway Stargatt & Taylor, LLP<br>By:  BLAKE CLEARY, ESQ.<br>       MICHAEL NESTOR, ESQ.<br>The Brandywine Building<br>1000 West Street, 17th Floor<br>Wilmington, Delaware 19899-0391 |
| | Hennigan, Bennett & Dorman, LLP<br>By:  JAMES O. JOHNSTON, ESQ.<br>865 South Figueroa Street, Suite 2900<br>Los Angeles, California 90017 |
| For Wells Fargo: | Fox Rothschild LLP<br>By:  JEFFREY SCHLERF, ESQ.<br>Mellon Bank Center,<br>919 North Market Street, Suite 1400<br>14th Floor<br>Wilmington, Delaware 19801-3046 |
| | White & Case<br>By:  THOMAS E. LAURIA, ESQ.<br>Wachovia Financial Center<br>200 South Biscayne Boulevard<br>Suite 4900<br>Miami, Florida |
| For Law Debenture: | Bifferato Gentilotti<br>By:  GARVAN F. MCDANIEL, ESQ.<br>800 North King Street, Plaza Level<br>Wilmington, Delaware 19801 |
| | Kasowitz, Benson, Torres<br>& Friedman LLP<br>By:  DAVID ROSNER, ESQ.<br>      MATT STEIN, ESQ.<br>1633 Broadway<br>New York, New York 10019 |
| The U.S. Trustee: | United States Department of Justice<br>Office of the U.S. Trustee<br>By:  JOSEPH J. McMAHON, JR., ESQ.<br>844 King Street<br>Wilmington, Delaware 19899 |

**APPEARANCES:**
(Continued)


For Wilmington Trust:    Benesch Friedlander Coplan
        & Aronoff LLP
        By:  RAY LEMISH, ESQ.
        222 Delaware Avenue, Suite 801
        Wilmington, Delaware 19801-1611

        Brown Rudnick LLP
        By:  ROBERT J. STARK, ESQ.
           MARTIN SIEGEL, ESQ.
           KATE BROMBERG, ESQ.
        Seven Times Square
        New York, New York 10036

For Centerbridge Credit  Akin Gump Strauss Hauer & Feld LLP
        By:  DANIEL H. GOLDEN
           DEBORAH J. NEWMAN, ESQ.
        One Bryant Park
        New York, New York 10036

For Barclays:        Edwards Angell Palmer & Dodge LLP
        By:  R. CRAIG MARTIN, ESQ.
        919 North Market Street
        Wilmington, Delaware 19801

For Merrill Lynch:    Potter Anderson & Corroon, LLP
        By:  LAURIE SELBER SILVERSTEIN, ESQ.
        Hercules Plaza, P.O. Box 951
        1313 N. Market Street
        Wilmington, Delaware 19899-0951

For Deutsche Bank:    McCarter & English, LLP
        By:  KATE ROGGIO BUCK, ESQ.
        Renaissance Centre
        405 N. King Street, 8th Floor
        Wilmington, Delaware 19801

**TELEPHONIC APPEARANCES:**
**(As reflected on the Confirmed Telephonic Appearance Schedule)**

| | |
|---|---|
| For Barclays: | Mayer Brown, LLP<br>By:  JEAN-MARIE ATAMIAN, ESQ. |
| For Barclays: | Mayer Brown, LLP<br>By:  AMIT TREHAM, ESQ. |
| For Barclays: | Mayer Brown, LLP<br>By:  BRIAN TRUST, ESQ. |
| For Contrarian Capital Management: | Contrarian Capital Management<br>By:  JOSHUA TRUMP |
| For SuttonBrook Capital Management, LP: | SuttonBrook Capital Management, LP<br>By:  CAROL L. BALE |
| For Tribune Company: | Tribune Company<br>By:  CHANDLER BIGELOW |
| For Tribune Company: | Tribune Company<br>By:  GARY WEITMAN |
| For David E. Blabey, Jr.: | Kramer Levin Naftalis & Frankel, LLP<br>By:  DAVID E. BLABEY, JR., ESQ. |
| For David E. Blabey, Jr.: | Kramer Levin Naftalis & Frankel, LLP<br>By:  JOSEPH FRIEDMAN, ESQ. |
| For Bank of America: | O'Melveny & Myers<br>By:  DANIEL CANTOR, ESQ. |
| For Bank of America: | O'Melveny & Myers<br>By:  EVAN JONES, ESQ. |
| For Bank of America: | O'Melveny & Myers<br>By:  STEVEN ROSENSTEIN, ESQ. |
| For CitiGroup: | Paul Weiss Rifkind Wharton<br>By:  ANDREW GORDON, ESQ. |
| For CitiGroup: | Paul Weiss Rifkind Wharton<br>By:  ANDREW LEVY, ESQ. |
| For JPMorgan Chase: | JPMorgan Chase<br>By:  KEVIN C. KELLEY |

**TELEPHONIC APPEARANCES:**
**(As reflected on the Confirmed Telephonic Appearance Schedule)**
**(Continued)**

```
For the Debtor:          Sidley Austin
                         By:  CANDICE KLINE, ESQ.

For the Debtor:          Sidley Austin
                         By:  BRYAN KRAKAUER, ESQ.

For the Debtor:          Sidley Austin
                         By:  JILLIAN LUDWIG

For JPMorgan Chase:      JPMorgan Chase
                         By:  SHACHAR MINKOVE

For Michael Ching:       Allen & Company
                         By:  MICHAEL CHING

For Bank of America:     Bank of America
                         By:  ESTER CHUNG

For Tribune:             Tribune Company
                         By:  DAVID ELDERSVELD

For Tribune:             Tribune Company
                         By:  DON LIEBENTRITT

For Wilmington Trust:    Brown Rudnick
                         By:  WILLIAM DOLAN, ESQ.

For Wilmington Trust:    Brown Rudnick
                         By:  JARED ELLIAS, ESQ.

For the Unsecured        Chadbourne & Park, LLP
Creditors' Committee:    By:  DAVID LeMAY, ESQ.

For the Unsecured        Chadbourne & Park, LLP
Creditors' Committee:    By:  MARC ROITMAN, ESQ.

For Perry Capital:       Perry Capital
                         By:  JAMES FREEMAN

For Morgan Stanley:      Weil Gotshal & Manges, LLP
                         By:  EVAN LEDERMAN, ESQ.

For Morgan Stanley:      Barnes & Thornburg, LLP
                         By:  DAVID M. POWLEN, ESQ.
```

**TELEPHONIC APPEARANCES:**
**(As reflected on the CourtCall Confirmed Telephonic Appearance Schedule)**
**(Continued)**

```
For Dennis A. Prieto:      Aurelius Capital Management
                           By:  DENNIS A. PRIETO

For Merrill Lynch          Kaye Scholer, LLP
Capital Corp:              By:  MADLYN G. PRIMOFF, ESQ.

For Arrowgrass Capital     Arrowgrass Capital Services UK
Services UK:               By:  SIMON WEST

For Matthew Zloto:         MATTHEW ZLOTO, Pro Se
```

1          THE COURT:  Good morning.

2          MULTIPLE SPEAKERS:  Good morning, Your Honor.

3          THE COURT:  My Judicial Assistant thanks you for the

4   reception you gave her, and asked me to convey her

5   appreciation.

6                         (Laughter)

7          THE COURT:  All right.  Are we ready to proceed?

8   You're from the debtor?  Examiner?  Mr. Minuti?

9          MR. MINUTI:  Good morning, Your Honor.  Mark Minuti

10  from Saul Ewing, Your Honor.  We are proposed Delaware counsel

11  to the examiner.

12         I rise, Your Honor, to introduce the proposed

13  examiner, Kenneth Klee, who is to my right.

14         THE COURT:  Welcome.

15         MR. MINUTI:  Also at counsel table, Your Honor, are

16  Lee Bogdanoff and Martin Barash, all of the Klee Tuchin

17  Bogdanoff & Stern firm.  I had filed motions pro hac vice for

18  their admission, so I would orally move their admission for

19  today.

20         THE COURT:  Very well.

21         MR. MINUTI:  Very well.  With Your Honor's permission

22  then, I'll turn it over to the proposed examiner.

23         THE COURT:  All right.  Thank you.

24         MR. MINUTI:  Thank you.

25         MR. KLEE:  Good morning, Your Honor.  Kenneth N.

1 | Klee, examiner designate.

2 | Your Honor, on April 30th, I received a call from the

3 | United States Trustee advising me that they had selected me as

4 | the examiner in the Tribune case, subject to this Court's

5 | approval under an order that requires a report to be filed on

6 | July 12th, unless further extended.

7 | I understand that the examiner's investigation in

8 | this case is primarily focused on three prongs:  The 2007

9 | leverage buyout and allegations with respect to violation of

10 | the automatic stay by Wilmington Trust, and breach of

11 | confidentiality.

12 | The process of examination will, indeed, be

13 | formidable in this case, and it really will depend on the

14 | cooperation of the parties.  Because this Court's order did not

15 | permit the investigation to begin until there was a meet and

16 | confer, we acted immediately to organize a meet and confer and,

17 | in fact, held one in New York City with the cooperation of all

18 | of the parties at 10 o'clock, or in one case 10:30, on May 4th

19 | and 5th.  And we have had substantial meetings with the parties

20 | and have proposed some revisions to the order appointing

21 | examiner to clarify it.

22 | In particular, the Court's order asks for the

23 | examiner to investigate whether there are possible claims and

24 | causes of actions and defenses.  And we propose to strike the

25 | "whether there are" and to instead make clear that it's to

1 evaluate the claims, potential claims, causes of action, and

2 defense and we would further seek to limit that to those

3 asserted by the parties.  Because in the abstract, I could

4 construct many different causes of action, and perhaps defenses

5 that the parties have not asserted.  But for purposes of this

6 examination, we wanted to seek clarification from the Court to

7 examine the things that are at issue in this case.

8         And so we appear here today not only to seek the

9 approval of becoming examiner, but to clarify the scope of the

10 order.

11         Now, it's there, Your Honor, that -- well, there's

12 actually one other area of agreement among the parties.  The

13 parties are substantially agreed that with respect to matters

14 delivered to the examiner, there should be no subject matter

15 waiver with respect to other issues that are related to the

16 documents distributed to the examiner.

17         So, any privilege that would be assertable with

18 respect to matters arising out of that transaction would be

19 proposed.

20         However, there are two areas where the parties are

21 not agreed:  One having to do with confidentiality and one with

22 privilege.

23         With respect to confidentiality, we have proposed a

24 procedure.  And I think the parties have pretty much agreed to

25 this, to, in effect, kick this issue down the road in this

1 | respect.

2 |      This case, like many of the other cases in bankruptcy

3 | law today, has an excessively high number of confidential

4 | documents.  Almost every critical document in this case has

5 | been labeled "confidential."  And there are over three million

6 | pages or documents in the depository that the debtor has set

7 | up.

8 |      Yet this Court has mandated that the examiner file a

9 | report that will be made public.  There is a conflict between

10 | the confidentiality of the documents on which the report is to

11 | be based and the public nature of the report.

12 |      So, what the examiner designate has proposed to the

13 | parties is that at such time as they submit briefs -- because

14 | we are urging an adversarial process here to bring the examiner

15 | team up-to-speed -- that they designate the documents after

16 | they replied that are critical documents -- and hopefully it

17 | will be a small number -- that we can then deal with after the

18 | report is filed under seal with respect to that small number in

19 | July.  So, that issue has been deferred somewhat.

20 |      Then there is the issue of privilege.  The examiners

21 | position is that anything given to the examiner loses its

22 | privilege.

23 |      Some of the parties in the case, wanting to be

24 | forthcoming and open to the  examiner, are purporting that

25 | anything they give to the examiner retains its privilege unless

1  the examiner decides to use it in the report.  In which case,

2  it will lose privilege if it is referenced in the report.

3      Other parties, primarily bearing in mind that there

4  is a contested confirmation in this case and a settlement, want

5  to have immediate access to everything given to the examiner.

6  And they take the position that nothing given to the examiner

7  is privileged.

8      So, there is a tension there.  And the tension is one

9  for this Court, I think, to resolve because the forthcomingness

10 of the parties is critical to the success of an examination in

11 this matter.

12      I might mention, since I did reference the parallel

13 process of the plan, which is going to confirmation in August

14 if the current schedule holds, with a statutory exclusivity

15 that expires in August, and with a settlement that is

16 contested.  That I understand the examination that the examiner

17 conducts in this case will have an impact on the plan process

18 and the settlement.  Yet, I do not see it within the scope of

19 this Court's order ordering the appointment of an examiner that

20 the investigation of the settlement is within the purview of

21 what the examiner is to be doing.

22      Based on the Court's order, as I interpret it, there

23 are three discrete areas of examination.  They will have an

24 impact on the settlement, but it's not an evaluation of the

25 settlement, per se.  That is for this Court to do at the

13

1  confirmation hearing.  And so I raise this in order to seek

2  clarification from the Court.

3        There is one last point, Your Honor.  Some of the

4  parties believe that it is unfair for the examiner to meet

5  privately with parties to get their views of models of

6  insolvency or unreasonably small capital.  The examiner

7  disagrees, and believes that we must be able to meet with

8  independent parties' financial advisors and to have that

9  process remain confidential.  Otherwise, the parties are not

10  going to be forthcoming if all parties have to be present

11  whenever there's a communication to the examiner.  So, this is

12  something that I'm sure you'll hear from other parties on today

13  and requires clarification.

14        In this respect, Your Honor, we are very sensitive of

15  the fact that this case is heavily contested and would ask that

16  the examiner be given traditional quasi judicial immunity and

17  not be subject to discovery from the parties with respect to

18  what was communicated to the examiner.  It may be whatever the

19  Court decides that other parties would be subject to discovery,

20  but I think under no circumstance should the examiners or his

21  professionals be subject to discovery.

22        And that concludes what I have to say.  Lee, do you

23  have something you'd like to add?

24        Your Honor, may I turn this over to my proposed

25  counsel?

1          THE COURT:  You may.

2          MR. KLEE:  Thank you.

3          THE COURT:  Thank you.

4          MR. BOGDANOFF:  Thank you, Your Honor.  Lee Bogdanoff

5     on behalf of the examiner.

6          Just to be specific with respect to the change that

7     we are seeking on the agreed order with respect to the first

8     item of the examination.  This is reproduced at Page 9,

9     Paragraph 20 of the pleading that we filed.  In the first

10    instance, we're seeking to delete the words "whether there are"

11    to add the word "the" and to add "that are asserted by the

12    parties."

13         And then at the end -- and this is something that we

14    just missed, but the parties have pointed it out to us.  At the

15    bottom, the phrase, "whether there are any" would be replaced

16    with the word "the," and "potential defenses" would then

17    follow.  And then the words, "which may be" would be deleted.

18    The word "asserted" and then "by the parties to such potential

19    claims and causes of action."

20         The point, Your Honor, is that the examination will

21    be conducted with respect to potential -- an evaluation of

22    potential claims, causes of action, and defenses asserted by

23    the parties.

24         And I might add that the gloss to that is the

25    assertion that we're looking for are the assertions that are

1  going to be contained in the briefs that the examiner is going

2  to be requesting of the parties today.  And we would expect

3  that there will be replies so that if a claim or defense is

4  raised by a party in a brief, but not anticipated by another

5  party, they'll have an opportunity to address it.

6          With respect to the issue of privilege, as Mr. Klee

7  indicated, I think there is broad agreement on the -- what

8  we've called the subject matter privilege retention.  The

9  specific language that we proposed drawn from the language that

10  was proposed by the parties is at Page 13 of the pleading at

11  the very -- well, Page 12 and then Page 13 at the very top.

12  And that essentially says if you give it to the examiner, you

13  haven't lost any applicable privilege with respect to that

14  which is withheld.

15          With respect to the issues in dispute, and we're

16  still collecting the disputes as of this morning.  But I

17  believe there are three distinct issues that are in dispute

18  that we would like to get direction from Your Honor:

19          The first is whether, if stuff is given to the

20  examiner that is privileged, that the privilege would be

21  preserved, except insofar as the examiner uses or refers to

22  that stuff in his report.  That's the first question.

23          The second question is irrespective of privilege,

24  whether stuff that is given to the examiner is discoverable

25  through subpoenas or otherwise on the parties.  Now, not on the

1  examiner, but on the parties.

2         So, as we indicate, we expect our proposed financial

3  advisor to meet with parties -- to meet with financial advisors

4  next week on one-on-one sessions, and we would expect that

5  information will be furnished.  The question is whether another

6  party can come along and say I want to see what you gave the

7  examiner.

8         And obviously if that stuff is fair game, then that's

9  going to affect what we get.

10         The third issue is whether the meetings that occur

11  between our financial advisor and -- the various financial

12  advisors in this case must be open to other parties.  And on

13  that issue, we feel very strongly that the examiner should be

14  able to meet with any party without interference by other

15  parties.  And by "interference," I mean participation,

16  observation or otherwise.  We just don't think that that's

17  appropriate.

18         As to the first two issues, Your Honor, we think that

19  that is a matter for the Court.  We certainly believe that to

20  the extent information is furnished to the examiner on a free

21  and open basis, that that will expedite the examination, and

22  will increase the likelihood that we achieve the July 12

23  deadline with something that is meaningful for the Court and

24  the parties.

25         On the other hand, we do recognize issues of

1  fundamental fairness that go with respect to parties providing

2  information to us, and then utilizing an umbrella of privilege

3  or confidentiality to prevent third parties from getting that

4  information when that information is being submitted to us for

5  purposes of impacting our report.

6           Thank you, Your Honor.

7           THE COURT:  Thank you.

8           MR. KLEE:  Your Honor, let me just conclude briefly

9  by saying this morning I filed an amended verified statement of

10 Kenneth N. Klee, Esquire setting forth the conclusion of my

11 firm's conflict check in the case.

12          And I wanted to make sure that was before the Court

13 in determining whether to approve the appointment as examiner.

14          THE COURT:  I've received it, and I have reviewed it.

15          MR. KLEE:  Thank you, Your Honor.

16          THE COURT:  Okay.  Well, let's start with that

17 threshold issue.  The U.S. Trustee has submitted an application

18 for an order approving the appointment of Mr. Klee as examiner.

19 He has, as he's indicated, submitted an amended verified

20 statement.

21          Is there any reason why I should not enter the order

22 now?

23                  (No audible response heard)

24          THE COURT:  I hear no response.  That order has been

25 signed.

1           MR. KLEE:   Thank you, Your Honor.

2           THE COURT:   Okay.   Let me hear from others.

3           MR. BENDERNAGEL:   Jim Bendernagel, Sidley & Austin,

4  for the debtor.

5           The -- let me start with just making a statement that

6  the debtor is committed to working with the examiner.   We met

7  with them once in the big session last week, and then again in

8  a smaller session.   There were these out sessions that the

9  examiner had with each of the parties.   And we've committed to

10  working with them.

11           In terms of the changes that he's proposing in the

12  one paragraph of the order with respect to the language whether

13  the claims and whether the defenses, we don't have any problem

14  with that at all; it makes a lot of sense.

15           With respect to the confidentiality issue that he

16  proposed, I think that the procedure that he's proposing that

17  the examination proceed under the confidentiality order until

18  the report comes out, and then we work out the difference and

19  hopefully with respect to the documents that matter, the number

20  confidential documents can be minimized to the extent possible.

21  If there are disputes, we can deal with them then.   That seems

22  like a rational way of dealing with it.   So, we don't have any

23  problem with that procedure.

24           With respect to the privilege issue, we fully endorse

25  the concept that there shouldn't be any waiver of scope, and I

1 haven't heard anybody really arguing that by giving them one

2 thing, you're waiving privilege with respect to something else.

3 And that makes a lot of sense to us.

4　　　　　With respect to the issue of privilege with respect

5 to things that are given to him, I think it's important to talk

6 about the fact that there's both a formal process, as we

7 understand it, that they're contemplating, and an informal

8 process.  The formal process, as I understand it, is going to

9 involve briefing in which we've been -- the debtors have been

10 told to come up with a joint statement of facts of -- hopefully

11 that everybody will agree to that basically lay out the basic

12 facts.  And we've committed to doing that.

13　　　　　Then I think there's going to be an exchange of

14 briefs later on in this month, and the beginning of -- then

15 reply briefs sometime in the beginning of June.  And my sense

16 is that no one is contending that with respect to that material

17 that if you put something in that brief that you would have

18 somehow preserved a privileged.  I mean I think whatever people

19 are going to say in those briefs, whatever privilege may have

20 asserted with respect to those positions is going to be lost

21 simply because, as I understand the process, that's going to be

22 shared with the other parties so they can reply to it.  So, I

23 don't think you have an issue with respect to that process.

24　　　　　It's this informal process that is a little bit more

25 challenging in terms of just getting the ground rules square.

1 And I think there's at least three or four different issues
2 that are affected here:

3          One is this question with respect to if, in the
4 informal process, you provide material to the examiner to help
5 getting him up to speed, are you waiving the privilege with
6 respect to that material, that's issue number one.

7          With respect to issue number two, there's these
8 informal meetings with the advisors -- the financial advisors
9 and whether, in fact, information that is provided to the
10 financial advisor is going to be made available to all the
11 other parties.  And I presume that goes beyond the financial
12 advisors, to some degree, because they've asked -- the examiner
13 has asked that the parties provide legal analysis, whatever we
14 feel comfortable providing to them, to get them up to speed as
15 quickly as possible so that they can keep their expenses down
16 and move along quickly and try to make the July 12th date.

17          So, I think you have this basic question of material
18 that is provided to them, whether it's financial, whether it's
19 legal, whatever it is, is that somehow going to be made
20 available to all the other parties if it's not part of the
21 formal process, if it's just part of this informal process.

22          The third issue is whether, in fact, there can be
23 these conferences with the financial advisors that are one-on-
24 one, essentially, between the financial advisor that they have
25 from LECG and the individual parties' financial advisors and

1  the like.

2          The fourth issue, and this wasn't brought up by Mr.

3  Bogdanoff, is as I understand it, the examiner is contemplating

4  in June conducting interviews, and may take depositions.  But I

5  think his preferred approach is to interview people, that the

6  interviews would not be under oath, and would not be

7  transcribed.  And it's not clear to me that other people would

8  be invited to the interviews, other than the examiner.  And the

9  question is, is that acceptable to people and the like?

10          And it just seems to me that there's a whole list of

11  ground rules that need to get worked out at the beginning so

12  everybody knows what the ground rules are going in.

13          I do think that to the extent that you could preserve

14  the privilege, and the way it's proposed by some parties that

15  basically says if you give it, you're not waiving the privilege

16  unless he wants to utilize it in some form, whether it's in

17  talking to other parties or in making a presentation to the

18  judge, that that will facilitate the disclosure of information

19  that might not otherwise be provided.

20          Secondly, I think the same rule applies with respect

21  to these meetings with the financial advisor.  That they'll

22  just be easier to do, and it will be faster to get people up to

23  speed if, in providing the information, you're not thinking

24  about, geeze, do I need to vet this thing because it's going to

25  be discoverable to other people.

1          And I think the same rule applies with respect to the

2   interviews and the examinations.  It's just going to have a

3   different tone.

4          Now, you can do it either way, but the more formality

5   that's introduced into this process, the longer it's going to

6   take and the more expensive it's going to get.  And at this

7   process, with a lot of informality, the estimate is that the

8   budget could be as much as four to $5 million, which is a big

9   ticket item.  And my guess is the more formality you put into

10  the process, the more expensive it's going to be.

11         I think the debtor would prefer to try to streamline

12  this process and have as much informality as it can, and allow

13  people to lay out their position without having to waive

14  things.

15         But more importantly from the debtors' perspective, I

16  just think it's important to know what the ground rules are

17  going in and people can make their judgment based on whatever

18  those ground rules are in that regard.

19         And just so it's clear on the record, the idea of

20  having this privilege in place and the like is not to enhance

21  the ability to whisper in the person's ear.  My sense is to the

22  extent that you're not playing above the board with the

23  examiner, you're going to lose credibility with him pretty

24  quickly.  And with this consequence, you're going to want to

25  try to be as frank as you can, but you don't want to be putting

1 yourself into a position where by being frank, you're

2 penalizing yourself.

3         Now, I don't know that that's as big a deal to the

4 debtor as it may be to other parties and the like, but I do see

5 the -- you know, I think that to the extent you have more

6 protection built into the system with respect to disclosure to

7 other people, the examiner will benefit from that, and the

8 estate will benefit in the sense that it won't be as expensive.

9         On the other hand, if there are going to be other

10 rules, I'd just like to know what they are.

11         And, you know, the parties have tried to work this

12 out, but we haven't gotten there yet.  I'll stand aside.

13         THE COURT:  All right.

14         MR. BENDERNAGEL:  Sure.

15         THE COURT:  What's the precise status of that?  Have

16 drafts of guidelines, or procedures, or protocols been

17 circulated?  Or are the parties in the talking stage still

18 basically?

19         MR. BENDERNAGEL:  I think that -- we started -- this

20 all started with the privilege issue.  And a protocol -- or a

21 proposed order was circulated and it got pushed back on the

22 issue of whether, in fact, if you gave it to the examiner, all

23 bets were off.

24         As people realized there was going to be push back on

25 that issue, people started to talk about these other issues.

1  And that was going on in the hallway while we were waiting to

2  come in here.

3          And the reality is that -- my sense is people have a

4  pretty good idea where people are at, and it would be helpful

5  to get some guidance from the Court on these issues as to what

6  you want to see happen.

7          But, you know, there's no formal protocol that's been

8  circulated.  But I think at the end of the day, we can draft,

9  and draft, and draft, but the bottom line is some people are

10 going to want more disclosure than others.  And people are

11 going to be looking to you to provide some guidance in that

12 regard.

13         THE COURT:  All right.  Thank you.

14         MR. BENDERNAGEL:  Thank you.

15         MR. SEIFE:  Good morning, Your Honor.  Howard Seife,

16 Chadbourne & Park, for the Committee.

17         First, focusing on the scope of the examiner's

18 investigation and the clarification of the scope put on the

19 record.  The Committee is fully supportive of those changes.

20         We think the work plan, as proposed, makes sense.  It

21 takes advantage of all the work done by the various parties, in

22 particular, the extensive investigation which has been

23 performed by the Committee.

24         The Committee has met with the examiner and his

25 counsel.  We also intend to fully cooperate.  I'm sure we'll

1 have many meetings and communications down the road, and we'll

2 provide the benefit of our work product.

3         And it's our intention to do so in the hope that this

4 process will stay on schedule, and will not face any delays in

5 the confirmation process.

6         We would be supportive -- without getting into the

7 various nuances of the privilege and confidentiality issues,

8 we'd be supportive of a process that supports and induces the

9 parties to cooperate as much as possible because I think that

10 would be to the benefit of the examiner and him getting his

11 work done.  So, we certainly feel it important that the

12 Committee's financial advisors be able to meet informally, one-

13 on-one, with the examiner and his professionals.  To have that

14 -- some kind of adversarial group meeting would not make a lot

15 of sense to us.

16         Certainly on privilege and confidentiality issues,

17 the broader the protections that we can get comfortable with, I

18 think will facilitate the process.  So, we welcome the

19 appointment of the examiner and fully intend to cooperate with

20 him.

21         THE COURT:  Thank you.

22         MR. GLAZER:  Good morning, Your Honor.  Dennis Glazer

23 from Davis Polk for JPMorgan.

24         We also, as you've just heard from the debtors and

25 from the Committee, we support the changes in the order.  We

1 support the work plan.

2        We also support any parts of the process that have

3 been proposed that would open up the free and easy

4 communication with the examiner so that the process can be

5 completed in the time frame set forth by the Court.

6        We believe that these informal meetings, not just

7 between the financial advisors, but also between the parties

8 and the examiner, make a lot of sense and will facilitate the

9 examiner coming up to speed on all the work that has been done,

10 and all the thinking that has been done about the various

11 subjects.

12        We would also point out that the examiner has

13 sophisticated counsel to work through the wheat and the chaff,

14 and understand what is posturing impositions and what are

15 factual.

16        So, we don't think that the informal processes will

17 lead to a problem.  We think it will actually be quite

18 facilitating to the examiner and his work.

19        So, in that regard, with regard to the four issues

20 laid out by Mr. Bendernagel on behalf of the debtor, we support

21 each and every aspect of a resolution of those issues that

22 would open up the informal process.

23        THE COURT:  Well, when you say "open up the informal

24 process," tell me precisely what you mean.

25        MR. GLAZER:  Certainly.  With regard to the informal

1  meetings between the examiner's financial advisor and the

2  parties' financial advisors, we would suggest that those

3  meetings should, in fact, be informal.  That they should not be

4  subject to discovery by either -- by going to the examiner for

5  discovery or going to any party for discovery.

6        Similarly, with regard to meetings that the examiner

7  may ask for, or that may be -- occur between the parties and

8  the examiner, whether it be counsel, whether it be their

9  informal interviews, we believe those should not be

10  discoverable.

11        Nor do we think that other parties should have the

12  right to force their way into the room during those

13  presentations, and during those meetings, as well.  So --

14        THE COURT:  See, I think -- I think of that more of

15  building a protective shell, than opening it up, that's why I

16  asked.

17        MR. GLAZER:  Well --

18        THE COURT:  I thought that's what you meant, but I

19  wanted to be clear on that.

20                    (Laughter)

21        MR. GLAZER:  Thanks for the clarification.  I believe

22  that what will happen is that the parties will feel restricted

23  in what they can say and what they feel comfortable saying in a

24  way that will not aid the process.  We have a July 12th date

25  here.  The examiner has discussed with each of us the problems

1  of doing his work in that short period of time.

2           THE COURT:  And he's made it clear in his report.

3           MR. GLAZER:  Yes, he has.  And we agree that whatever

4  we can do to keep that on track and to move it forward, and

5  that the informality of his meetings without the access to

6  discovery, and also without waiving privilege would, in fact,

7  be very helpful in that.  And that's what I meant by opening up

8  the communication.

9           THE COURT:  Thank you.

10          MR. STARK:  Good morning, Your Honor.  Robert Stark

11 from Brown Rudnick on behalf of Wilmington Trust Company.

12          I'd like to address those three issues, but I'm

13 actually going to defer, if I may, Your Honor, to my partner,

14 Marty Siegel, to discuss the privilege and confidentiality

15 issue.

16          THE COURT:  Okay.

17          MR. STARK:  First of all, Your Honor, we're very

18 thankful that Mr. Klee is available for this assignment, and

19 very thankful we're moving on this dual track.  And we expect a

20 very good report coming out of this, and we're very pleased by

21 that development.

22          There is an aspect, and I think it's throughout the

23 work and expense plan pleading that Mr. Klee and his firm

24 filed, that this is an unusual examination in the sense that it

25 has sort of a quasi adversarial componentry to it.  And, in

1 | fact, I think --

2 | THE COURT:  I don't know, is there -- I mean aside

3 | from the framework that the examiner here proposes, is there

4 | really an examiner situation where there isn't --

5 | MR. SIEGEL:  Well, I've been involved --

6 | THE COURT:  -- adverse interest and adversarial

7 | interest involved?

8 | MR. SIEGEL:  Oh, well, I mean there's adversary that

9 | creates the need for an examination.

10 | But I think what's unusual and a point of discussion

11 | for analyzing all these issues is because of the very narrow

12 | time frame that we have -- or the examiner has to do his job,

13 | and it is a daunting task, he, at our meeting and confer

14 | meeting, suggested, and I think all the parties agreed that

15 | enabling him, initially anyway, to hear the various different

16 | points of view through a brief writing and other sorts of quasi

17 | pleading mechanism whereby we can inform him on our various

18 | different viewpoints in the case will be enabling for him to be

19 | able to reach a conclusion.  It's not -- I don't think I ever

20 | heard Mr. Klee ever say that he would take any particular view,

21 | but sort of the way that a judge does it.  You hear both sides

22 | of the story, and you try to resolve the issues as the evidence

23 | unfolds.  We thought that a very good way of handling a rather

24 | complicated and daunting task in a very short period of time.

25 | So, there is an overlay, at least initially about the

1  manner in which Mr. Klee has designed his examination, and we

2  think it's a good one, but it goes borrow from an adversarial

3  process.

4         We're prepared to deliver our brief.  Mr. Klee asked

5  for all briefs at the initial stage, I think, May 24th.  So,

6  it's a very short band of time that we have to produce these

7  pleadings, and then there will be a reply period, I think, two

8  weeks later.  So, he's going to have a long holiday weekend to

9  read an awful lot of paper.

10         And I presume there will be further conversations.

11  And I know that there will be questions posed to various

12  different parties.  And the idea is to ferret out through this

13  quasi adversarial nature -- quasi adversarial approach the

14  right answer, and get a report in by July 12th.  And every

15  party, including Wilmington Trust, is working towards that end.

16  I think that was the condition pressing for us moving.

17         THE COURT:  It sounds like there's a "but" coming at

18  the end of all of this, Mr. Stark.

19         MR. STARK:  Well, I --

20                      (Laughter)

21         MR. STARK:  Well, there usually is, isn't there?

22  It's just I want to -- you know, we're talking about how we're

23  -- as Mr. Bendernagel, I think, appropriately addressed it to

24  the Court:  How do we handle these three issues as ground rules

25  for proceeding?  Everybody wants to get the information to the

1 examiner so that he can do his job, recognizing it's a daunting

2 task.  But it is adversarial in this regard.  And that does

3 color the manner by which we view the questions of getting

4 everything in front of him.  What does it mean to get

5 everything in front of him?

6         Let me work in reverse order, if I may, Your Honor,

7 and talk for a moment about the financial advisors.  The

8 meetings between LECG and perhaps Mr. Klee and his lawyers with

9 the various different financial advisors.  It is troubling for

10 us that these meetings could be done informally.  And I'm going

11 to bifurcate this between meetings with lawyers, and factual

12 witnesses, which we don't have a dispute.  He should have those

13 meetings.  He should meet with Mr. Zell absent -- without us

14 being in the room because that will ferret out Mr. Zell's

15 communication with him, and hopefully we'll learn something

16 from that, as well, because I don't think he'd speak if we were

17 in the room. Okay?

18         So, that's the difference.  We know the fact and we

19 know the legal arguments.  We've all spent lots of time outside

20 of this courtroom talking about them.  He needs to get up to

21 speed, and we shouldn't fetter that, and I appreciate that.

22         But the financial advisors are different.  Hallmark

23 of a busted LOB, fraudulent conveyance, breach of fiduciary

24 duty type lawsuit is solvency.  And this is a solvency question

25 that is surrounded by a lot of color, downgrades and commentary

1 and all sorts of different stuff.

2        So, I envision that quite a bit of effort will be

3 extended on was this company insolvent or have unreasonably

4 small capital at around the time of the transaction and the

5 collapsing of the stages of that transaction.

6        We've had a fair amount of litigation in this case

7 already about the banks' professionals.  There's this nondebtor

8 subsidiary guarantor, and that's been paying bank professional

9 fees, lots of lawyers, lots of financial advisors, they've had

10 investment bankers, accountants, other sorts of advisors for

11 many, many months, probably the better part of a year.  And

12 they've had access to, I presume, untolled resources, in terms

13 of evidence, because they, like Mr. Zell and others on

14 management, are targets for litigation.  Plus they were part of

15 the deal at the time.

16        So, they all organized, and they got together, and

17 they've hired these professionals, and they've been laying in

18 wait for this day.

19        Wilmington Trust, on the other hand, is coming to

20 this being a part of reviewing the document depository, being

21 object of the contrarian view, we're going to have to take

22 discovery and we're going to take it right now.  And, in fact,

23 part of that -- it's not on the agenda but we'd like to talk to

24 Your Honor today about discovery plans.  But we're not in the

25 same position as the banks are.  If this is a quasi adversarial

1  process, we ought to be able to meet them on the same footing

2  to be able to deliver our views about solvency or insolvency

3  and reasonable small capital at the same time.

4          But I think what I envision in my head, and I don't

5  think there's a secret about this, what's going to happen if we

6  do this informal route where LECG and the examiners, other

7  professionals get to meet with the bank's advisors without us

8  being there, it's going to be a secret meeting, there won't be

9  an expert report, there may not be even a document that they

10 put their name onto.  We won't know how it is that they derive

11 the viewpoints that they're expressing.  They won't have to put

12 their own credibility in question when you file an expert

13 report.  You have to put your own credibility in question as to

14 whether or not the assumptions that you've made and the

15 conclusions that you've reached are sustainable.  Absent an

16 expert report and testifying, you don't have to do that.

17         We're not going to have access to Mr. Klee because of

18 the quasi judicial immunity.  So, I'm going to have to then

19 depose all of these people just to figure out what he --

20 they've said to Mr. Klee, and has been viewed in the report,

21 but I won't know it.  And then I have to do this all in a very

22 truncated time frame, or I'm going to have to do it

23 retroactively just to figure out what was said.

24         And it's all done to the point where I'm just trying

25 to prepare the case, because we're dual tracking it, and I've

1   got a trial date in the middle of August.  So, I'm a little bit

2   behind -- not a little bit, a lot behind.  And they're ready to

3   go.  And that just doesn't seem fundamentally fair to us.

4          I'm not saying that they shouldn't be able to

5   communicate with the examiner.  We just want to be there.  We

6   want to know what it is that they're saying to him.  And I'm

7   not saying that this is all other aspects of the examination.

8   Again, he should meet with Mr. Zell.  And he should meet with

9   Mr. Bigelow.  And he should have -- and the lawyer should do

10  whatever it is that Mr. Bogdanoff, Mr. Barash, and Mr. Klee ask

11  of them in terms of responding to questions and legal theories.

12         But on the solvency question, that's discrete.  And

13  that's important.  And that should have a more -- a ring of

14  more formality to it.

15         The other -- the second issue that I wanted to

16  address is also the ability to see what it is that people are

17  delivering to each other.  And, again, this is tied up with

18  confidentiality and privilege, and I do want to defer to Mr.

19  Siegel on those particular issues.  But we are going to talk, I

20  think hopefully today, about a discovery plan.  And we all know

21  how this game plays, right?  We deliver document demands, and

22  they sit on them for a while, and they object, then we have

23  lots of issues, then we have to negotiate, and the document is

24  never produced, and then I call Your Honor up, and I say

25  they're not producing, then we negotiate some more.

1          And, again, I'm supposed to get information to the

2  examiner to be me versus everyone, effectively, to tell the

3  other side of the story that I am collecting.  And to me it

4  seems that we need the documents now, and Mr. Siegel will talk

5  about our proposed discovery plan.  But also as they're

6  delivering documents to the examiner, we should get

7  simultaneous delivery; we'll do the same.  It just ought to be

8  a fair process in the sense that if there's information being

9  delivered, we should all get it, it helps the dual process, it

10 helps ferret it out, it gives us an opportunity to respond.

11 And if that means that people won't talk to the examiner, or

12 somehow it feels like there's encroachment on their ability to

13 free speech, I'd say then it probably wasn't an appropriate

14 document or information to say to begin with.

15          Those are our views, Your Honor.

16          THE COURT:  All right.

17          MR. SIEGEL:  Martin Siegel from Brown Rudnick.

18          Just to supplement at least one issue Mr. Stark dealt

19 with, and that's the attorney/client privilege.  Your Honor,

20 it's Hornbook law in the Third Circuit, and anywhere else, that

21 the attorney/client privilege is both a sword and a shield.

22 You have a right to withhold things if you believe that it is

23 subject to a privilege.  But you can't selectively disclose

24 those issues, and still maintain the privilege at least as to

25 the document that you've disclosed.

1         For whatever it's worth, we're not citing cases, but

2    if Your Honor wanted to look at In Re: Teleglobe Communications

3    Corporation at 493 F. 3d 345 at Page 361, it's also found at

4    2007 U.S. App. Lexus 16942 at Star 29, it's a Third Circuit

5    case.  I'm just going to read just one sentence that will tell

6    you what our problem is -- or two sentences.  "If a client

7    subsequently shares a privileged communication with a third

8    party, then it is no longer confidential and the privilege

9    ceases to protect it."

10         And skipping a line, "In addition, it prevents

11   clients from engaging in strategic selective disclosures."

12         And that's really the issue that we have here, Your

13   Honor.  Nobody disagrees.  We certainly have agreed with the

14   proposition that if parties want to waive the attorney/client

15   privilege, to give it to the examiner, that doesn't count as a

16   subject matter waiver.

17         But where we are disturbed is that people will

18   selectively produce -- waive the privilege for documents that

19   help them preserve the privilege with documents that don't help

20   them, and that no one may ever know what information of

21   privilege nature the examiner gets to see.

22         While parties are willing to concede that if at the

23   end the examiner puts it in his report, then the privilege, at

24   that point, would be lost.

25         But during the course of it, if people get to waive

1  the privilege, produce helpful documents, there's no ability

2  for other parties to respond to it, to even know what's there

3  because we're not even going to know which of those various

4  documents the examiner is going to put into his report until

5  after the report is prepared.

6         So, the dispute has come and, once again, Wilmington

7  Trust may be the only one sitting there on one side of the

8  issue.  But we don't believe that it's appropriate for

9  selective waiver of the attorney/client privilege and people

10  not getting copies of those documents.  And that's one of the

11  disputes that we've had.  And we respectfully request that the

12  Court rule that you can't have your cake and eat it, too in

13  this instance.

14         And we don't think, Your Honor, that this is going to

15  inhibit parties from giving information to the examiner.  I

16  mean the fact is they're only going to be giving document -- we

17  all know from the first instance, parties are only going to

18  give the examiner things that help them.  And the fact that

19  that document may become known to other parties, they're still

20  going to give those documents that they think that will help

21  the examiner.  But at least Wilmington Trust and other parties

22  will have an opportunity to respond to it if we know what the

23  documents are and won't have an opportunity if the suggestion

24  that it keeps it privilege, even if they give it to the

25  examiner.

1          So, we respectfully request that Your Honor -- the

2    order preserve the subject matter of the disclosure, but not

3    the actual disclosure itself.

4          THE COURT:  All right.  Thank you.

5          MR. SIEGEL:  Thank you, Your Honor.

6          THE COURT:  Does anyone else wish to be heard?

7          MR. JOHNSTON:  Good morning, Your Honor.  Jim

8    Johnston of Hennigan, Bennett & Dorman on behalf of the credit

9    agreement lenders.

10         Very briefly.  We support the modification to the

11   scope of the examination as described by Mr. Klee and clarified

12   by Mr. Bogdanoff.

13         With respect to the maintenance or waiver of the

14   privilege issues, we're supportive of any process that

15   encourages full and frank communication with the examiner.  The

16   examiner and its counsel are sophisticated parties, they've

17   been around the block.  And they will be able to assess whether

18   or not a party's providing selective disclosure to them or not.

19   They will be free to use whatever information's provided to

20   them in their report.  So, we do not think provision of

21   materials to the examiner should automatically open it up to

22   the world.

23         Two points that were touched upon by Mr. Klee, and I

24   think not by anyone else yet that are important to us:

25         The first is with respect to the confidential nature

1  of the report, the underlying discovery documents, and the

2  like.  Your Honor may recall that when we were talking about a

3  schedule for the examiner's report, I indicated, and I think

4  Your Honor agreed, that making this report public, and making

5  it available in time for creditors to have a reasonable time to

6  read it, assess it before casting their ballots would be very

7  important.  Because even though the scope of the examination

8  doesn't include an assessment of the merits of the settlement,

9  obviously what Mr. Klee will be examining and opining on are

10  the building blocks of this settlement, the causes of action

11  and defenses thereto, and that will be a critical part of

12  creditors' assessments as to whether or not the proposed

13  settlement in the plan makes sense.

14       We heard this morning a proposal by which parties

15  would identify to the examiner those documents that they

16  really, really think are confidential and they really want to

17  maintain confidentiality as to as opposed to the current state

18  of affairs where everything's labeled confidential.  And then a

19  report would be filed, I guess, in a redacted version while

20  parties worked out any differences they may have with respect

21  to the limited subset of confidential documents.

22       My concern is that that process haggling back and

23  forth after filing on the 12th is going to eat up the period of

24  time between the 12th and the proposed balloting deadline.

25       So, I think we can probably address this more

1  appropriately at the hearing on the disclosure statement and

2  the balloting procedures, which is on the 20th, but I did want

3  to note our concern there.

4         And actually that's it.  I touched my second point,

5  which was that obviously, even though scope doesn't include

6  settlement, the building blocks of the settlement and the key

7  components of the settlement here, and parties' assessment of

8  them will be essentially what this report's all about.

9         THE COURT:  Thank you.

10         MR. JOHNSTON:  Thank you.

11         THE COURT:  Does anyone else wish to be heard?

12         MR. KLEE:  Your Honor, if I may just very briefly.

13         First of all, with respect to the timing on the

14  issuance of the report, assuming it is issued on the 12th, and

15  portions of it are, if Your Honor permits, filed in a redacted

16  form, we would anticipate an exceedingly short period of time

17  for an adjudication regarding whether the remaining portions of

18  the report should be made public.  And I mean on 48 hours'

19  notice, we would expect to be back in front of Your Honor and

20  discussing with the parties and the Court issues concerning the

21  remaining portions of the report that are under seal.

22         So, we certainly recognize the time frame, and we

23  think we can work within the time frame to address that issue

24  on an expedited basis.  And hopefully it won't be a major

25  issue.

41

1              THE COURT:  Well, let me give you a heads up about

2   that time frame.

3              MR. KLEE:  Okay.

4              THE COURT:  I will say the weeks of July 12th and

5   July 19th, I have a Circuit related program out-of-town the

6   beginning of the week, and I begin a vacation on the 16th of

7   July, which will not bring me back to the office until -- well,

8   the 28th.

9              So, it's literally going to have to be within 48

10  hours if you'd like to talk to me.

11             MR. KLEE:  Right.

12             THE COURT:  And that's not something that I would

13  push off to a duty judge.

14             MR. KLEE:  Right.  Your Honor, with respect to Mr.

15  Bendernagel's question concerning interviews, nothing is set in

16  concrete, although I'll certainly advise the parties where we

17  intend to go on that.  We would think that if we conducted an

18  interview, that individual's counsel would be in attendance,

19  and that would be it.

20             Now, we recognize that some individuals with whom we

21  may speak may be acting in more than one capacity, both an

22  individual and corporate capacity, and we're cognizant of that.

23  But that would be our view.

24             Your Honor, we do very strongly believe, as I

25  indicated, that we need to be in a position where our financial

1  advisors can speak one-on-one with other financial advisors

2  without others in the room.  We think that that would be --

3  requiring others to be there would constitute an undue

4  interference with what we have to do.  And we do hope that

5  however Your Honor comes out on the issues in dispute, that

6  we'll obtain the cooperation that we need in order to deliver a

7  meaningful report.

8             Thank you.

9             MR. BOGDANOFF:  Your Honor, can I say one last thing?

10             THE COURT:  Just one last thing, I'm not interested

11  in Round 2.

12             MR. BOGDANOFF:  No, I understand.

13             THE COURT:  Generally speaking.

14             MR. BOGDANOFF:  Just on this selective disclosure

15  issue, I think the concern is that if you don't have these

16  protections in place, you're going to get less disclosure, not

17  more.

18             I think the real issue here is whether people will be

19  candid as to the weaknesses.  They're going to use the

20  opportunity to say what their strengths are.  The real problem

21  here is getting them to talk about the weaknesses in their

22  claims.  And I think they'll be more inclined to do that if

23  they're not sharing it with other parties that they see as

24  adverse.

25             THE COURT:  All right.

1          MR. BOGDANOFF:  Thank you.

2          THE COURT:  Is there anyone from whom I have not yet

3 heard who wishes to be heard?

4          MR. LAURIA:  Your Honor, if I may go back to Round 1,

5 I guess?

6          We represent the newly appointed agent, Wells Fargo

7 Bank, N.A. for the $1.6 billion of so-called bridge loans that

8 were made to the debtors to partially fund the 2007 LBO

9 transaction.

10          As far as we can tell, Your Honor, the bridge lenders

11 comprise the largest creditor constituency that has not been

12 actively represented in the settlement process that has led up

13 to the debtors' plan.

14          The reasons for this exclusion are unknown to us.  It

15 may have something to do with the fact that Merrill Lynch, the

16 bridge lender's former agent, wore a number of hats; we don't

17 know.

18          But what we do know is that the bridge lenders did

19 not get an opportunity to participate in the settlement

20 discussions that led to the plan.

21          And suffice it to say that the bridge lenders joined

22 some of the others in the room, I believe, in being extremely

23 displeased with the result at this point, although I would

24 imagine for different reasons.

25          Fundamentally, as the Court may be aware, the

1  settlement provides for a recovery on the bridge loans of

2  approximately one-half of a penny, while the other LBO lenders

3  are to receive somewhere north of 50 cents on the dollar.

4       As I will briefly explain in a moment, it appears to

5  us that, in fact, what's happened is the bridge lender's

6  rightful recovery is being used to fund the settlement with the

7  estate's senior and general unsecured creditors.

8       Now, the ongoing exclusion of the bridge lenders from

9  the settlement process and related proceedings is aptly

10 demonstrated by the fact that in the proposed order appointing

11 the examiner, the term "Parties," with a capital P, does not

12 include the agent or any other representative on behalf of the

13 $1.6 billion of bridge loans.

14      As such, the initial meetings -- I think they were

15 referred to as the meet and confer by the examiner or his

16 counsel -- were conducted without the participation of the

17 agent or any representative on behalf of the bridge lenders,

18 and the exclusion continued.

19      Now, that said, the examiner and his counsel were,

20 however, kind enough to extend us the courtesy of an audience

21 after the fact.  Although, they were clearly under no

22 obligation to do so.

23      We believe it is neither fair to the bridge lenders,

24 quite frankly, nor in the best interest of the estate that this

25 process of exclusion continue.

1          The continuance of the exclusion of the bridge

2    lenders is going to leave us with no alternative but to pursue

3    our rights and remedies through litigation, which I certainly

4    believe is not generally the most efficient way to achieve

5    resolution.

6          THE COURT:  I don't disagree with that proposition,

7    Mr. Lauria.  But what would you have me order today?

8          MR. LAURIA:  Well, the simplest thing that we need is

9    the definition of "Parties" needs to be amended to include

10   Wells Fargo Bank, N.A. as agent for the bridge lenders so that

11   we have all of the ability and rights as the other parties to

12   review submissions of the other parties, including the fact

13   statement submitted by the debtors, to file briefs and reply

14   papers, and to participate in meetings with the examiner,

15   however the Court ultimately determines that those are to be

16   conducted.

17         What I want to call the Court's attention to -- and

18   this has to do with the question that we have about the scope

19   of the examination.  The settlement of the estate's fraudulent

20   transfer claims, as proposed in the plan, is odd, we believe,

21   in at least two major respects:

22         Number one, it produces materially different results

23   for lenders to the debtor in connection with the LBO.

24         As I previously mentioned, whereas the lenders under

25   the senior secured credit facility are going to recover over 50

1 cents, the bridge lenders are going to get approximately one-

2 half a cent.

3         And just to put that in context, that contemplates

4 the senior lenders getting somewhere on the order of $4.3

5 billion on their approximately $8.5 billion of claims, whereas

6 the bridge lenders are to recover somewhere on the order of $8

7 million on their $1.6 billion of claims.

8         The second thing that I want to call the Court's

9 attention to is that this phenomenon is achieved without

10 requiring the parties who ultimately received the proceeds of

11 the bridge loans, or otherwise were paid pursuant to the

12 transaction or thereafter, to return any of those proceeds.  It

13 so a -- it is totally foreign to our experience, and we found

14 no precedent for the proposition that principals of fraudulent

15 transfer can be used effectively to wipe out $1.6 billion of

16 claims while, at the same time, permitting the recipients of

17 that money to keep it and go unscathed.

18         So, odd are these results, Your Honor, that we would

19 ask that it be made clear that the examiner's mandate include

20 attempting to ascertain and assess the purported

21 justifications, other than the convenience of the, cap P,

22 "Parties," therefore.

23         From a legal and factual perspective, Your Honor, we

24 believe that the underlying issues are closely tied to the

25 examiner's assessment of fraudulent transfer in these cases.

1          Fundamental issues that need to be considered, we

2    believe, include the following:

3          Whether a fraudulent transfer may be partially

4    avoided.  We know of no precedent for this treatment which

5    appears to underlie the settlement.  And I mention the word

6    "appear" because the disclosure statement nowhere explains or

7    provides any basis for the disproportionate allocation of

8    responsibility for the fraudulent transfer.

9          We think that courts typically, in assessing

10   fraudulent transfers, collapse all of the transactions and

11   transfers, and determine if the collapsed transaction is

12   fraudulent.  And if so, then all component steps will be

13   avoided, not just some of them.  We think this needs to be

14   addressed in connection with the examiner's report.

15         Secondly, we think that there's a significant

16   question about whether or not contractual subordination may be

17   enforced as between claims that are equally subject to

18   avoidance.  We think that once claims are avoided, if the

19   claims subsequently come back into the money, that is they

20   become entitled to a recovery because the unavoided claims get

21   paid, then those claims come back in without the benefit of the

22   preexisting contractual subordination.

23         Number three, we think the examiner should consider

24   whether or not any of the debtors' subsidiaries properly valued

25   are solvent.  And thus, should be excluded from the effect of

1 avoidance.

2          There is, again, no explanation for the

3 disproportionate impact of the avoidance issue settlement in

4 the disclosure statement.  But it is important because whereas

5 recoveries at the parent level are, in effect, appropriated to

6 fund the settlement, recoveries at the subsidiary levels are,

7 in effect, completely unadjusted.

8          We also think that the Court should direct that the

9 examiner assess whether or not value has been improperly

10 allocated as between the parent and its subsidiaries.  As I'm

11 sure the Court is aware, the parent gets only approximately 8.5

12 percent of the value.  And at the same time, we think the Court

13 should also direct that the examiner consider whether or not

14 responsibility for the fraudulent transfer risk has been

15 misallocated as between the parent and subs.

16          Interestingly, although the parent only has 8.5

17 percent of the value, over 90 percent -- or at least 90 percent

18 of the responsibility for the purported fraudulent transfer

19 settlement is absorbed at the parent level.

20          Through this gymnastic, Your Honor, most of the value

21 going to the subs, and most of the claim responsibility at the

22 parent, essentially all of the value that goes to the parent is

23 used to settle the fraudulent transfer claims resulting in a

24 great difference in recovery for my clients.

25          Now, Your Honor, I really believe that most of these

1  issues are at least inferentially included in what the Court

2  has already directed.  But I think it would be helpful for the

3  Court to clarify that these issues relate to fraudulent

4  transfer in this case, and should be addressed by the

5  examiner's report.

6          We would also ask that, as a final matter, that

7  although the examiner's commitment to getting the report done

8  by July 12th is certainly there in the papers, the examiner

9  also, reading between the lines, is very concerned about the

10 ability to really do this job and give it justice in that time

11 frame.  And we share that concern, and are hopeful that the

12 Court will keep an open mind, if not adjust the time line so

13 that we can really get a report that will be constructive and

14 helpful to pulling the parties into what will ultimately

15 hopefully become a global resolution.

16         Now, I want to be clear on one thing, Your Honor.

17 We're not here today advocating the viability of a fraudulent

18 transfer claim in these cases.  What we are concerned about,

19 however, is that the settlement that is baked into the plan

20 clearly contemplates that there is sufficient fraudulent

21 transfer risk for recoveries at certain levels of certain

22 creditors to be adjusted.

23         And we believe in the end, there either is or is not

24 fraudulent transfer liability.  And it will either be resolved

25 through litigation or by settlement, but the outcome needs to

1 be one that is fair to all parties, not just beneficial to

2 some.

3         So, in sum, we're concerned that the estate is,

4 today, gearing up for a plan process that is premised on what

5 may well be a fundamentally flawed settlement and that does not

6 enjoy the support of many of the estate's key constituencies.

7 And we're concerned that the examiner's mandate, as currently

8 construed by the examiner, ignores the elephant in the living

9 room, namely the settlement.  And we think that what we need is

10 no just a theoretical discussion of fraudulent transfer, but a

11 discussion that is connected to the relevant facts of this

12 case, which include some assessment of the priority of the

13 settlement.

14         So, what are we looking for, the Court's question?

15 We're looking to make sure that Wells Fargo, as agent, is

16 included as a party and has all the rights of the other

17 parties.

18         We're looking for some clarification that the

19 settlement, to the extent it's premised on fraudulent transfer

20 principles, is assessed by the examiner in the context of

21 preparing his report.

22         And we're asking that the Court consider that the

23 time line, though apparently driven by the debtors' desire to

24 have a confirmation hearing before the expiry of exclusivity,

25 may simply be unrealistic given the magnitude, complexity, and

1  importance of the issues.

2          I do want to mention one point.  There's been a lot

3  of discussion this morning about the issues of confidentiality

4  and privilege, which we are certainly sensitive to, as well.

5  And here, I think that the parties and the Court face a bit of

6  a dilemma.  On the one hand, it's easy to say that we all hope

7  for a process that fosters openness so that the examiner gets

8  the most information possible to form a view, and to develop a

9  report that will be useful.

10          On the other hand, we need to have protections in the

11  system to ensure the veracity of the information that's

12  provided to the examiner, in effect, to provide accountability

13  for what the examiner is told, and to give parties who have an

14  interest an opportunity to reply.

15          Now, in that regard, maybe what should be done is

16  that not only should parties have the ability to designate

17  information that they view as confidential or privileged, but

18  that they should be required to designate and provide to the

19  other parties a log of that information so that at some point

20  in time, if there are issues or questions raised about what's

21  been shared and what hasn't been, the issue is preserved and

22  can be raised with the Court in due course as to whether or not

23  a piece of information really is confidential or privileged,

24  and should be available or not.

25          THE COURT:  Thank you.

1          MR. LAURIA:   thank you.

2          THE COURT:   Does anyone who's not yet been heard wish

3    to be heard?

4          MR. McMAHON:   Your Honor, good afternoon.   Joseph

5    McMahon for the Acting United States Trustee.

6          A footnote point on the issue with respect to back

7    end confidentiality concerns that were referenced by both the

8    examiner's counsel and also counsel to the credit agreement

9    lenders.   To the extent that there is going to be relief

10   ordered in that direction today, we believe that the order

11   should provide that there should be no burden shifting on the

12   seal issue.   Meaning that the obligation to demonstrate that

13   the material should be filed under seal, as the case may be,

14   should rest with the party who is asserting the confidentiality

15   interest in the document, and not the examiner as the filing

16   party.

17          Thank you, Your Honor.

18          THE COURT:   All right.   Thank you.   Anyone else from

19   whom I have not yet heard who wishes to be heard?

20          MR. ROSNER:   I'll be brief, Your Honor.   David

21   Kasowitz, Benson, Torres & Friedman for Law Debenture.

22          The only thing I would state is that I've heard a

23   bunch of parties talk about what would be affirmative claims

24   and what would be defensive -- defenses to those claims.   We

25   agree with the examiner that the scope of the examination

53

1 should not include an examination of the settlement itself, the

2 reasonableness of the settlement.  We believe that's the

3 province of the Court.

4        So, we would leave, as stated, the examiner's

5 existing three prongs, I think, as Mr. Bogdanoff and Mr. Klee

6 identified.

7        Thank you, Your Honor.

8        THE COURT:  Thank you.  Anyone else?

9             (No audible response heard)

10       THE COURT:  Does the examiner wish to comment on any

11 of the positions that have been staked out here?

12       MR. KLEE:  Yes.  As the Court is well aware, and the

13 examiner is becoming accustom to, the main focus in this case

14 is on plan confirmation and the settlement.  My main focus is

15 on the examination.  And every time we focus on the items that

16 the Court identified in its order, the response from several

17 parties, not just from Mr. Lauria, is to focus on the

18 settlement.

19       We don't believe in the time available that we should

20 be analyzing the settlement; that is the Court's province.  We

21 don't think that by July 12th this can be done, in addition to

22 all of the other tasks the Court has set forth.

23       That being said, we are here to please the Court.

24 And if the Court clarifies the scope of examination, we will do

25 what the Court wants.

1          With respect to designating the bridge lenders as

2   parties, we have no objection to that going forward.  But

3   because the Court's order appointing the examiner requires the

4   investigation start only after the meet and confer, we would

5   want Mr. Lauria to stipulate that the phone conversation we had

6   with him constitutes that meet and confer, and that we are not

7   crippled from starting the investigation further by designating

8   them as a party going forward.

9          MR. LAURIA:  So stipulated, Your Honor.

10          THE COURT:  Well, it would have been ordered anyway,

11   and I'm sure you recognize that.

12                    (Laughter)

13          MR. LAURIA:  I wanted to beat you to it.

14          THE COURT:  Thank you.  Appreciate that.

15          MR. KLEE:  And with respect to confidentiality, Your

16   Honor, we do agree with the point made by the U.S. Trustee and

17   others, the burden should not be on the examiner with respect

18   to confidential information at the end of the day.

19          Thank you, Your Honor.

20          THE COURT:  All right.  Thank you.  Let me take just

21   a five-minute recess.  I'll reconvene at 1, and then I'll give

22   you some reaction to what I've heard this morning.  Just five

23   minutes.

24                    (Recess 12:52 P.M./Reconvene 1:01 P.M.)

25          THE COURT:  All right.  Overall, the larger issues,

1  as I look at them, aren't that difficult.  And, you know, with

2  respect to Wilmington Trust, all I'll say is the examiner is

3  not here to serve as the aid to your discovery.  You have your

4  discovery rights, you can take it as the rules permit.  But I

5  don't think it's at all appropriate for copies to be served on

6  other parties with respect to information that's delivered in

7  confidence.

8          And I do think it's important for the examiner to

9  have the ability to consult parties informally without others

10 present, or to share information that others don't want shared.

11         I understand he's not a mediator.  And while he needs

12 the cooperation of the other parties and the process may very

13 well end up in a good place, his role is to make a report to

14 the Court, whom he serves.

15         I think the proposal that the information given and

16 privileged is preserved, unless it's used by the examiner.  I

17 don't think the examiner should be subject to discovery during

18 this process.  You know, it may be we'll have to deal later if

19 all the issues aren't resolved, or there are other issues in

20 other fora in which people may seek information from the

21 examiner.  You know, when it comes time for him to exit, I'm

22 sure what he'll do is ask me for all kinds of releases and the

23 termination of his responsibilities, and insulation from other

24 things.  That's an issue I think we'll probably just have to

25 address at that point in terms of what further, if anything,

1  may be sought or required of the examiner.  I don't think he

2  has to make informal meetings open to anyone else, and can

3  decide to invite whomever, and in whatever combination he

4  thinks it's necessary to fulfill his responsibilities.  Is

5  there a potential evil in letting the examiner talk to the

6  financial advisors and having financial advisors talk to each

7  other under the umbrella of an examiner's investigation?  I

8  don't know.  I guess in a case in which everyone is -- one side

9  is suspicious of the other, you could conjure up a situation in

10 which that might occur.

11          But, you know, insolvency issues, because they're so

12 easily debatable and discoverable in the ordinary course of

13 litigation, I don't think it's necessary that the examiner

14 share that information with others as it's being developed.

15          Well, let me ask this, in general terms, that's my

16 initial reaction to all the comments.  Do I need to drill down

17 deeper today?

18          I'm sorry, let me say one other thing.  I, frankly,

19 had -- well, I'm trying to be careful in what I say because I

20 don't want to fuel anybody's thirst for the vindication of

21 their position respectively.  So, let me just say this:  It's a

22 natural request to ask that under the circumstances the

23 examiner opine on the appropriateness of the proposed

24 settlement under the plan.  You know, and in a sense, I'm sure

25 the Court would appreciate his view.

1          But I can understand his reluctance -- I'll put it

2   this way.  I could understand his request now to carve out from

3   any responsibility so that there is clarity to it, any

4   requirement that he opined on the appropriateness or fairness

5   of the settlement.

6          On the one hand, I say to myself, well, if I were to

7   require it, assuming he were inclined to agree to appointment

8   under those circumstances, would that fuel the fires even more?

9   And I guess under the circumstances, I say on the other hand,

10  probably not.  But it may cloud a little bit the -- maybe call

11  it the "purity" of his investigation.

12         So, at least at this stage, I'm not going to ask him

13  for that opinion.  And it may be that as a result of the

14  report, in whatever form it comes, that it will provide

15  sufficient information, not just for the Court, but for others

16  to draw their own conclusions on that topic.  But I'm content

17  at this stage not to order that he do so.

18         So, let me ask again, need I drill down farther on

19  the issues that have been raised by the parties today?  And

20  while you think about that for a minute, let me just say this:

21  I understand that parties have not come together yet on the

22  form of an order,  needing to have the discussions we've had

23  today.  You're all here.  If you can finish those discussions

24  today, that would be wonderful.

25         As it turns out, my morning hearings tomorrow were

1 canceled.  I'll bring you back in the morning if after hearing

2 what I've said today, and after further discussion, there are

3 still disputes, I'll resolve them then.  Otherwise, I'd

4 consider submission of an order under certification.

5          And -- I'm sorry, one further thing.  Mr. Lauria, I

6 do think, aside from the comment that I'm not going to ask the

7 examiner to opine on the appropriateness of the settlement, I

8 do agree with you that inherent in the examiner's exercise is

9 likely all of the things that you've identified.  I'll leave it

10 to him to choose how he wishes to frame his report and issues.

11 But others have pointed out, you know, we have about as

12 sophisticated an examiner here as we could get, represented by

13 sophisticated counsel.  I don't think he'll miss anything.

14          Okay.  Any feedback from the parties?

15          MR. BOGDANOFF:  Your Honor, I think we would

16 appreciate a little more direction on the question of

17 privilege.  And that is whether it's Your Honor's view that if

18 information stuff is furnished to us that would otherwise be

19 privileged, that that privilege is preserved, except to the

20 extent the examiner utilizes that information or reports it in

21 his report.

22          THE COURT:  Well, that was the examiner's proposal,

23 and I agree with that.

24          MR. BOGDANOFF:  Okay.

25          THE COURT:  Any other questions?

1        MR. BOGDANOFF:  And then I think the second issue

2   that was raised is whether the information that is furnished to

3   the examiner should be discoverable?

4        THE COURT:  Well, I'll -- no, not during the course

5   of the examination.  And to the extent -- and, again, typically

6   I would expect this to come up at the time of exit, that

7   somebody wants something other than that, they'll have to make

8   a request, which I would consider at that time.

9        MR. BOGDANOFF:  Thank you, Your Honor.

10       MR. KLEE:  Your Honor, Kenneth N. Klee, Examiner.

11       The clarification that I need now, Your Honor, is if

12  a party provides a privilege document to me, and I want to show

13  that document to a witness, not from that party, may I do so?

14  Or will that wind up waiving the privilege?  Or am I not free

15  to use the document in my work?

16       THE COURT:  Well, let me ask this.  Is that the type

17  of exercise you would intend to undertake in your informal

18  meetings or as part of the 2004 process, which you indicate in

19  your work report you intend to undertake, or both?

20       MR. KLEE:  Your Honor, my hope is that we would not

21  have to go through the 2004 process.  We will seek authority.

22  I was thinking of it in the context of an informal interview,

23  but it also could arise if we have to take a formal 2004

24  examination or deposition.

25       THE COURT:  Well, would you be showing a party's

1 document that was otherwise privileged and submitted to you in

2 confidence with a witness with or without that party's

3 knowledge or approval?  I guess the way to ask the question is

4 would you be arguably giving away the privilege over the

5 objection of the party who provided the document?

6        MR. KLEE:  Well, there are really two independent

7 circumstances where it could come up:

8        One is where we have the permission of the party to

9 show the document, but only if the privilege is preserved;

10        And the second would be if we want to show the

11 document to a witness where they haven't agreed that we can

12 show the document to a witness.

13        THE COURT:  Well, it seems to me the former is the

14 easier one.  And that the privilege should be preserved under

15 those circumstances.

16        Have the parties had discussions about the latter

17 situation that you pose?

18        MR. KLEE:  No.  To my knowledge, I have not had

19 discussion with the parties about it.

20        THE COURT:  It seems to me to be more problematic.

21        MR. BENDERNAGEL:  Can I address this, Your Honor?

22        THE COURT:  Yes.

23        MR. BENDERNAGEL:  I actually think we have addressed

24 this issue.  Mr. Johnston, last week, sent around a

25 modification to the protocol that had been sent around.  And

1 the protocol originally said anything that's given stays under

2 the privilege unless the examiner decides to utilize it in his

3 report, in which case it's not privileged any longer.

4         And the modification was that if he wanted to utilize

5 it in connection with his examination work, in other words, he

6 wanted to go to ask somebody about it, he could do that.  And I

7 don't think anybody objected to that.

8         So, I think the answer to his question is people are

9 giving it to him with the understanding that if he decides he

10 needs to use it, he can use it, and they're not going to insert

11 the privilege objection.

12         THE COURT:  So long as they know that the privilege

13 is preserved.

14         MR. BENDERNAGEL:  Well, I think the privilege is gone

15 at that juncture, as I understand it.

16         THE COURT:  Well, I just want to understand what the

17 request is.

18         MR. BENDERNAGEL:  But I think the answer to his

19 question is that if he wants to use it, he can use it.  And at

20 that juncture, the privilege is lost.  That's how I understood

21 what the draft was that circulated.   That nobody seemed to be

22 -- that wasn't -- people seemed to say that was okay with

23 respect to the faction that wanted the privilege.

24         THE COURT:  Well, if there's no dispute about it then

25 I wouldn't impose a restriction.

1           MR. BENDERNAGEL:  I think that's right.  If I've got

2 the -- somebody can correct me if I'm wrong, but that's what I

3 thought the parties had agreed to.

4           THE COURT:  All right.  Anyone have a view on that?

5           MR. SIEGEL:  Your Honor, Martin Siegel from Brown

6 Rudnick on behalf of Wilmington Trust.

7           We agree with that proposition.

8           THE COURT:  Okay.

9           MR. SIEGEL:  And it's sort of what everybody has

10 agreed up til now.  The examiner clearly has the right to use

11 it in his report, which is not disputed by anybody.  The

12 examiner shouldn't be hamstrung -- if he could use it in his

13 report, that shouldn't be the only time.  If the examiner

14 believes that it is something that's useful in his examination,

15 show it to a witness or not, that's the -- since it's in his

16 discretion, that should lose the privilege.

17           THE COURT:  Okay.

18           MR. SIEGEL:  And he's allowed to use it and -- to

19 compile his record.

20           THE COURT:  Then if there's no dispute, I won't

21 insert myself into that aspect.

22           MR. KLEE:  Your Honor, then I will use the documents

23 in the report and the investigation.

24           The second point would go to confidentiality.  The

25 Court's order appointing the examiner subjects the examiner to

1  the confidentiality orders in this case.  But there is a view

2  that the report will be public.

3       If I show a confidential document to a party that is

4  within the scope of the confidentiality agreement and

5  restrictions in the case, there shouldn't be a problem.

6       But if I want to show a document to a third party

7  witness, and the document has been denominated "confidential,"

8  I feel that I would be hamstrung in not being able to use

9  confidential documents, and almost every document in this case

10 has been designated confidential, if I want to take the

11 examination of a party that is outside the scope and the veil

12 of the confidentiality order in this case.  And I seek

13 clarification on that, as well.

14      THE COURT:  All right.  What have the discussions of

15 the parties revealed in the way of objection to that?

16      MR. BENDERNAGEL:  I think the standard way that

17 that's handled is you ask the witness whether he's willing to

18 abide by the protective order.  If he is, there's no problem at

19 all.

20      And generally, most witnesses will agree to abide by

21 the protective order.  That's the standard way in which

22 confidentiality is handled.  And I don't think anybody's got a

23 problem with doing that.  I think you'd like to tell a person

24 that it's confidential, and the expectation is they would abide

25 by the protective order.

1          I think where you'd get into trouble -- you know, you

2  might have a problem is if the person said "I'm not abiding by

3  the protective order if you show it to me.  Don't show it to me

4  then."  And that could be a problem.

5          But I don't see that -- that's true in every

6  litigation I've ever been involved in, and generally that's not

7  a big problem.  People say, "yeah, I'll abide by the protective

8  order."

9          THE COURT:  Okay.  Is there any -- does anyone have

10  any issue with that?

11              (No audible response heard)

12          THE COURT:  All right.  I hear no response.

13          MR. BENDERNAGEL:  There's one other clarification

14  that somebody asked me to ask about.  I take it when you say

15  "no discovery of the examiner process" that that includes

16  examination of -- discovery of the parties as --

17          THE COURT:  About what was discussed during the

18  informal meetings, that's correct.

19          MR. BENDERNAGEL:  Thank you, Your Honor.

20          THE COURT:  Now, that doesn't preclude discovery of

21  witnesses in the course of whatever ongoing litigation there

22  is.

23          MR. BENDERNAGEL:  No, no, it's just they can't ask,

24  "well, what did you tell the examiner?"  Yeah.

25          Thank you.

1          THE COURT:  Are there any other questions?

2                    (No audible response heard)

3          THE COURT:  Okay.  Look, other -- parties -- everyone

4   has talked about time frame.  And I don't mean to encourage or

5   discourage anyone in their respective views about whether we

6   have enough, too much.  All I'll say is I'll do what I think

7   any court would do, and that is as circumstances develop, and

8   as situations arise, and as parties request relief, it will be

9   considered under the circumstances that exist at the time.

10         You know, the benefit in making the process longer is

11  that, you know, maybe the examiner can eliminate all of the

12  caveats he's placed in his preliminary work report, and will

13  undoubtedly appear in the report that he ultimately issues.

14         But, you know, then expense increases.  I was going

15  to say more opportunity for "mischief," but I was -- for those

16  of you who were here listening to the prior hearing, maybe I

17  should watch how I use the word anymore.

18                    (Laughter)

19         THE COURT:  So, let's proceed along the time frame

20  that's been embodied in the order, and see where we go from

21  there.

22         Now, tell me, how would the parties like to finish

23  getting to a form of order?

24         MR. BARASH:  Thank you, Your Honor.  Martin Barash,

25  Klee, Tuchin, Bogdanoff & Stern.

1          Your Honor, we're prepared to circulate a draft this

2    afternoon, which we can certainly do by electronic mail, and

3    see if we can get everyone to sign off and proceed by

4    certification of counsel.

5          And if by tomorrow morning we're unresolved, you

6    know, return to Your Honor in person or telephonically to sort

7    it out.

8          THE COURT:  Does anyone else care to comment?

9          MR. LAURIA:  Your Honor, I presume that that will

10   include Wells Fargo at this point?

11         THE COURT:  I sure hope so.

12                        (Laughter)

13         MR. BARASH:  Thank you, Your Honor.  There are a

14   couple other housekeeping matters, if I may.

15         THE COURT:  I just -- I'm sorry.  Mr. Lauria, one

16   suggestion, Mr. Stark likes to have sandwiches at meetings, so

17   I think you should insist on that, too.

18                        (Laughter)

19         THE COURT:  I'm sorry.  Go ahead.

20         MR. BARASH:  No, Your Honor, it's your courtroom.

21         The -- a couple of other housekeeping matters.  We

22   did allude in the examiner's work plan to a motion that we

23   intend to file to seek authority under Rule 2004 for his --

24   generally in advance so that the examiner has the power to

25   issue subpoenas for depositions, or documents, or both.

1          We can have that on file by Wednesday, as well as the

2   employment applications of my firm, Mr. Minuti's firm, and the

3   LECG firm, which is the proposed financial advisor.

4          We understand that there's a hearing scheduled in

5   this case on the 20th of May, and would kindly request that the

6   Court allow us to be heard on those applications and that

7   motion on the 20th.

8          THE COURT:  Well, let me first ask the U.S. Trustee

9   if that provides enough time for the U.S. Trustee to review

10  such applications.

11          MR. McMAHON:  Your Honor, good afternoon.  Joseph

12  McMahon.

13          We would be able to handle the issues, yes, Your

14  Honor.

15          THE COURT:  Okay.  Before I answer, let me ask

16  another question.  And that is that's the date set for hearing

17  on disclosure.  What kind of time do the parties expect with

18  respect to that hearing?  Anyone?  Can you give me a hint?

19          (Attorneys engaged in off-the-record colloquy)

20          THE COURT:  Someone?  Anyone?

21          MR. STARK:  Your Honor, it's Robert Stark again.

22          I anticipate we'll be filing an objection to the

23  disclosure statement.  We heard Your Honor loud and clear at

24  the last hearing not to preview confirmation objections.  So,

25  we don't intend to do that.  But there are issues that need to

68

1  be resolved.

2          I have received a number of telephone calls from

3  Sidley & Austin to talk about it.  We haven't yet formulated

4  our opinion on a lot of different things, and we're looking at

5  them now, and we will be talking.  So, maybe we can streamline

6  it.  I suspect we'll still have issues.

7          And based upon what I now know are issues for us, I

8  don't -- I expect some argument but no evidence.  So, perhaps

9  it won't be that long.  Maybe that's helpful.

10          MR. LANTRY:  Your Honor, Kevin Lantry on behalf of

11  the debtors.

12          Obviously we haven't seen formal objections, and

13  won't until the 13th.  We've gotten a number of informal

14  objections at this stage.  To the extent it is like you have

15  indicated, simply a disclosure statement hearing, not a

16  confirmation hearing, I suspect we could resolve things in

17  about three hours from what we're seeing far.  But it's hard

18  too predict until after the 13th.

19          THE COURT:  Okay.  Then you may file those engagement

20  applications.  File notices, motions of notice to shorten,

21  scheduling them for the 20th.

22          Objections -- let me look to the U.S. Trustee.  Mr.

23  McMahon, could you do it by the close of business on the 17th,

24  or do you need another day?

25          MR. McMAHON:  My thoughts exactly, Your Honor.

1           THE COURT:  Okay.

2           MR. McMAHON:  The 17th would be fine.

3           THE COURT:  Okay.  4 o'clock on the 17th.

4           MR. BARASH:  Thank you, Your Honor.  And that time

5  frame would apply to the 2004, the procedural motion, as well.

6           THE COURT:  Yes, unless anyone has an objection to

7  that.

8           MR. BARASH:  And just to clarify, I apologize.  I was

9  taking a comment from my client, Mr. Klee.

10          Did the Court want, at this point, a motion to

11 shorten time?

12          THE COURT:  Yes.

13          MR. BARASH:  Okay.  Thank you.

14          THE COURT:  Yes.  And --

15          MR. BOGDANOFF:  Your Honor, when might we be back in

16 the morning if we can't resolve the order?

17          THE COURT:  Well, I'll let you choose, 10 o'clock or

18 11 o'clock, either one?

19          MR. BARASH:  10.

20          THE COURT:  All right.  We'll carry this hearing for

21 calendar purposes til 10 o'clock tomorrow morning to resolve

22 any remaining objections to any proposed form of order.

23          To the extent all of the parties have agreed on the

24 form, based on the discussions and rulings today, I'll be

25 content to take the order under certification.

1          MR. BARASH:  Thank you, Your Honor.  And we intend to

2    circulate it to the "Parties," as defined in the order.  But

3    now including Mr. Lauria.

4          THE COURT:  Okay.  Anything further for today?

5          MR. STARK:  Yes, Your Honor.  It's not on the agenda,

6    we did ask that it be included.  We do have some issues about

7    discovery, and since Your Honor is ruling, we understand it,

8    and we'll abide by it, and I think we'll be able to document it

9    pretty clearly.

10         But it does raise the issue, again, what our

11   discovery rights are, as Your Honor indicated.  So, we do want

12   to talk.  We have had some conversations with the parties about

13   discovery plan, per Your Honor's suggestion at the last

14   hearing.  If I may turn the podium over to my partner, Mr.

15   Siegel, again.

16         THE COURT:  All right.

17         MR. SIEGEL:  Thank you, Your Honor.  Martin Siegel

18   from Brown Rudnick again.

19         In accordance with Your Honor's directive, we

20   discussed a discovery plan first with the debtor, believed we

21   had reached agreement, but then we circulated it for comments

22   to other parties so that we could try to have a general

23   consensus.

24         And we reached general consensus some, what we

25   wanted, some what other parties wanted, on everything but one

1  issue.  And that is an issue that the parties just don't agree

2  upon, and we thought it was necessary to raise that issue with

3  Your Honor.

4        In essence, what it boils down to is when do parties

5  have to respond to discovery requests, and what's the form of

6  that discovery?

7        From Wilmington Trust's standpoint, we are mindful of

8  the time constraints, both the -- and the dual track that we're

9  proceeding on.  There is information that may come up during

10  the discovery process that might be useful for the examiner,

11  separate and apart, that we may obtain from our request that

12  would be very useful for the examiner.

13        There's also confirmation issues, and the need to get

14  a complete record before we start depositions so that we're not

15  having to go back again.

16        And we proposed that we serve -- parties can serve

17  requests starting tomorrow.  Then obviously, thereafter there

18  may be supplemental requests.  And we had requested that

19  parties respond to those requests and make good faith efforts

20  to complete their production within that two-week time frame.

21        And we did so, Your Honor, because this case --

22  people have been at this case for quite some time.  Most

23  parties produced some documents to the Creditors' Committee

24  during their request, and others who have not yet produced any

25  documents, but have had requests outstanding, but it's been

1 going on for a long time.

2          THE COURT:  Are we talking only about document

3 request?

4          MR. SIEGEL:  Well, that's the only dispute remaining,

5 Your Honor.  I can walk you through what the parties agreed to

6 see if it's okay with you.

7          THE COURT:  I don't need to know what they agreed

8 to.

9          MR. SIEGEL:  Right.  And the dispute right now is

10 over the document requests.  As I said from -- because of the

11 time constraints, principally because of the desire, need to

12 obtain information so that we may supplement our positions to

13 the examiner, we thought that that was a reasonable response.

14 The suggestion from the --

15          THE COURT:  So, two weeks -- two weeks from the

16 request is --

17          MR. SIEGEL:  When they're -- right.  Originally the

18 proposal was two weeks from tomorrow, or the day we served

19 them.  And then parties correctly said they may not be involved

20 in the first round, they want the time frame to run from that.

21          THE COURT:  Okay.

22          MR. SIEGEL:  The dispute is that some parties say,

23 "no, that's too quick.  We shouldn't be bound to that, we'll

24 respond in two weeks and then attempt to complete the

25 production in good faith as soon as reasonably practicable."

1          And obviously just from that word, we said, "well, we

2     don't know what that is.  We have different parties."  As I

3     said, parties have been at this for a long time, most people

4     have their documents or know what they're going to be doing.

5          And given the time constraints with the examiner, and

6     upcoming confirmation hearings, having such an indefinite

7     period just doesn't work.  I mean if parties can produce most,

8     if not all, the documents within that two-week time frame.  If

9     they have a problem, we'll work with them and try to get the

10    rest as soon as possible.  But there's no reason why this

11    should drag on.

12              THE COURT:  Well, under the --

13              MR. SIEGEL:  And that's the remaining dispute.

14              THE COURT:  -- almost agreed discovery schedule, when

15    are depositions scheduled to begin?

16              MR. SIEGEL:  The way we've proposed it -- and, as I

17    said, I don't think there is any dispute -- fact depositions of

18    any witness may commence on or after June 2, which is, again,

19    when we said we'll produce -- we'll expect -- we'll propound

20    our request within the next day or two, you have two weeks to

21    respond, we'll get most, if not all, of the documents within --

22    before the end of May, around May 26th.  May 25th or 26th.  And

23    then a week thereafter to start depositions.  And that way we

24    thought it would be organized as much as possible.

25              The problem is if you go to this much more flexible

1  standard, "well, we'll respond within the two weeks, but we

2  won't complete the production until as soon as practicable," we

3  don't know when we can start depositions because we just won't

4  have all the documents.  And we know we're going to get

5  objections if we want to start depositions without having the

6  documents completed.

7          So, that's the remaining dispute.  I think while the

8  order, frankly, is not exactly the way -- is not what we

9  wanted, there was a compromise on all of the other provisions

10  so that the parties could live with it, except on this one

11  issue.  We just are unable to reach agreement because if we

12  don't get all the remaining documents, we're not going to be

13  able to start depositions.

14          So, we respectfully request Your Honor's viewpoints

15  on that topic.

16          THE COURT:  Thank you.

17          MR. BENDERNAGEL:  Your Honor, Jim Bendernagel for the

18  debtor.

19          Mr. Siegel's account is fairly accurate.  When they

20  first came to me with respect to the proposal, they basically

21  said they wanted the responses in two weeks.  And I said, well,

22  two weeks isn't going to work, people should use their best

23  faith, good faith, best efforts to produce the material as soon

24  as they can, and that they should respond in two weeks.

25          The dispute over the language, it seems to me, is, in

1  some respects, much ado about nothing.  Because I think that no

2  matter how this is worded, the question is going to be "when

3  can you produce the documents?"  And the basic rule in both

4  instances is you should produce them as soon as you can, using

5  your good faith and best efforts.  And some of that's going to

6  depend on what they ask.

7           We've asked them, "well, what have you got in mind?"

8  We've already produced 3.2 million documents.  And they said,

9  "we don't know yet."

10          And I think people are reluctant to sign on to a

11 proposal that basically says all the documents will be produced

12 within the two-week period without knowing how extensive the

13 discovery is, given the fact that there's been a lot of

14 discovery and it's not clear at this juncture what more it is.

15          And we really are just arguing about words here.  I

16 mean in my -- you know, I think we could live with either word,

17 but I think it's helpful to just have the understanding of what

18 we're going to try and do.

19          I mean under the Federal rules, you've got 30 days to

20 respond.  Here we're saying we'll cut it to two weeks.  You

21 have to put in a response, and I believe this is all about

22 documents, not about interrogatories and the like, although

23 it's right now formulated as written discovery.

24          And the idea was you respond in two weeks for sure,

25 and if you use your best efforts, to produce it as soon as you

1 can, which could be sooner than two weeks if you can do it.

2         And that's all people are asking for.  They just

3 don't want to make the document production two weeks without

4 knowing what the extent of the document request is, and that's

5 all.

6         THE COURT:  All right.  So, that's a legitimate

7 concern.  But how do we avoid the legitimate concern that Mr.

8 Siegel raises, which is in the case of -- let's say there's a

9 legitimate complaint that the production is incomplete, and

10 would be unfair or inefficient to proceed with a particular

11 deposition, in light of that?  How do you guard against that

12 problem?

13         MR. BENDERNAGEL:  well, I think the answer to that is

14 you're going to guard against it the way you're going to do it

15 no matter how this is formulated.  If somebody is making an

16 argument it's taking them longer than the other person thinks

17 is reasonably practicable, or reasonably possible, whatever

18 words you want to use, it's going to get in front of Your

19 Honor, unless it can get worked out.  And, you know, I'm quite

20 sure that's not the answer you want, but I think that's going

21 to be the answer no matter how you formulate this.

22         THE COURT:  You're right, that's not the answer I

23 want.

24                         (Laughter)

25         MR. BENDERNAGEL:  Well, if somebody has a better

1  answer, maybe I should be replaced here.

2        THE COURT:  I'll keep plumbing until I find one.

3        MR. BENDERNAGEL:  Okay.  Thank you, Your Honor.

4        THE COURT:  Thank you.  Does anyone else wish to be

5  heard on that issue?

6        MR. LAURIA:  Your Honor, if I just might ask that,

7  you know, we obviously just received a copy of the draft order.

8  If we could just ask that the parties work with us.  And if we

9  have any issues, we would like to have that on the docket for

10 tomorrow at 10, as well.

11       THE COURT:  Well, let's do this.  To the extent the

12 parties can come to an agreement, or wish to have further

13 discussion tomorrow morning, I'd be willing to do that.

14       But understand that, you know, we have the May 20th

15 hearing coming up.  So, at that point, everyone will know the

16 universe of what the requests are and, frankly, whether there

17 are disputes to be raised.

18       So, I guess I'd prefer to save any of the heavy

19 lifting because actually there may be none to be done.

20       But to the extent there's further discussion on this

21 tomorrow morning, I'd be willing to take a couple of minutes on

22 it.

23       MR. LAURIA:  Thank you, Your Honor.

24       THE COURT:  Okay.  And I will say further that to the

25 extent people need to go home tonight, and would rather join by

1  telephone tomorrow, I'd be willing to consider that.

2          The only caveat I give you is that I do not like to

3  hear extensive argument by phone.  If there's -- and I hope

4  there isn't, but to the extent there is more extensive argument

5  to be had, I'd rather have you be here in person.

6          Okay.  Any questions about that?

7                    (No audible response heard)

8          THE COURT:  Is there anything further for today?

9                    (No audible response heard)

10         THE COURT:  Thank you, all, very much.  That

11  concludes this hearing.  Court will stand in recess.

12         MULTIPLE SPEAKERS:  Thank you, Your Honor.

13      (Whereupon, at 1:33 P.M., the hearing was adjourned.)

14

15                         CERTIFICATE

16

17     I certify that the foregoing is a correct transcript from

18  the electronic sound recording of the proceedings in the

19  above-entitled matter.

20

21

22   /s/  Karen Hartmann      AAERT CET**D0475 Date: May 11, 2010

23  TRANSCRIPTS PLUS, INC.

24

25

## $

**$1.6-** 43:7 44:13 46:7,15
**$4.3-** 46:4
**$5-** 22:8
**$8-** 46:6
**$8.5-** 46:5

## &

**&-** 8:17 18:3 24:16 38:8 52:21 65:25 68:3

## /

**/S/-** 78:22

## 1

**1-** 43:4 54:21
**10-** 9:18 69:17, 19,21 77:10
**10:30-** 9:18
**11-** 69:18 78:22
**12-** 15:11 16:22
**12:52-** 54:24
**12TH-** 9:6 20:16 27:24 30:14 39:23,24 40:14 41:4 49:8 53:21
**13-** 15:10,11
**13TH-** 68:13,18
**16942-** 36:4
**16TH-** 41:6
**17TH-** 68:23 69:2, 3
**19TH-** 41:5
**1:01-** 54:24
**1:33-** 78:13

## 2

**2-** 42:11 73:18
**20-** 14:9
**2004-** 59:18,21, 23 66:23 69:5
**2007-** 9:8 36:4 43:8
**2010-** 78:22
**20TH-** 40:2 67:5, 7 68:21 77:14
**24TH-** 30:5
**25TH-** 73:22
**26TH-** 73:22
**28TH-** 41:8
**29-** 36:4

## 3

**3.2-** 75:8
**30-** 75:19
**30TH-** 9:2
**345-** 36:3
**361-** 36:3
**3D-** 36:3

## 4

**4-** 69:3
**48-** 40:18 41:9
**493-** 36:3
**4TH-** 9:18

## 5

**50-** 44:3 45:25
**5TH-** 9:19

## 8

**8.5-** 48:11,16

## 9

**9-** 14:8
**90-** 48:17

## A

**ABIDE-** 63:18,20, 24 64:7 70:8
**ABIDING-** 64:2
**ABILITY-** 22:21 34:16 35:12 37:1 45:11 49:10 51:16 55:9
**ABLE-** 13:7 16:14 25:12 29:19 33:1, 2 34:4 38:17 63:8 67:13 70:8 74:13
**ABOVE-** 22:22
**ABSENT-** 31:13 33:15
**ABSORBED-** 48:19
**ABSTRACT-** 10:3
**ACCEPTABLE-** 21:9
**ACCESS-** 12:5 28:5 32:12 33:17
**ACCORDANCE-** 70:19
**ACCOUNT-** 74:19
**ACCOUNTABILITY-** 51:12
**ACCOUNTANTS-** 32:10
**ACCURATE-** 74:19
**ACCUSTOM-** 53:13
**ACHIEVE-** 16:22

45:4
**ACHIEVED-** 46:9
**ACTED-** 9:16
**ACTING-** 41:21 52:5
**ACTION-** 10:1,4 14:19,22 39:10
**ACTIONS-** 9:24
**ACTIVELY-** 43:12
**ACTUAL-** 38:3
**ADD-** 13:23 14:11, 24
**ADDITION-** 36:10 53:21
**ADDRESS-** 15:5 28:12 34:16 39:25 40:23 55:25 60:21
**ADDRESSED-** 30:23 47:14 49:4 60:23
**ADJOURNED-** 78:13
**ADJUDICATION-** 40:17
**ADJUST-** 49:12
**ADJUSTED-** 49:22
**ADMISSION-** 8:18
**ADO-** 75:1
**ADVANCE-** 66:24
**ADVANTAGE-** 24:21
**ADVERSARIAL-** 11:14 25:14 28:25 29:6 30:2, 13 31:2 32:25
**ADVERSARY-** 29:8
**ADVERSE-** 29:6 42:24
**ADVISE-** 41:16
**ADVISING-** 9:3
**ADVISOR-** 16:3,11 20:10,24 21:21 27:1 67:3
**ADVISORS-** 13:8 16:3,12 20:8,12, 23,25 25:12 26:7 27:2 31:7,9,22 32:9,10 33:7 42:1 56:6
**ADVOCATING-** 49:17
**AFFAIRS-** 39:18
**AFFECT-** 16:9
**AFFECTED-** 20:2
**AFTERNOON-** 52:4 66:2 67:11
**AGAINST-** 76:11,14
**AGENDA-** 32:23

**AGENT-** 43:6,16 44:12,17 45:10 50:15
**AGREE-** 19:11 28:3 52:25 54:16 57:7 58:8,23 62:7 63:20 71:1
**AGREED-** 10:13,21, 24 14:7 29:14 36:13 39:4 60:11 62:3,10 69:23 72:5,7 73:14
**AGREEMENT-** 10:12 15:7 38:9 52:8 63:4 70:21 74:11 77:12
**AHEAD-** 66:19
**AID-** 27:24 55:3
**ALLEGATIONS-** 9:9
**ALLOCATED-** 48:10
**ALLOCATION-** 47:7
**ALLOW-** 22:12 67:6
**ALLOWED-** 62:18
**ALLUDE-** 66:22
**ALTERNATIVE-** 45:2
**AMENDED-** 17:9,19 45:9
**AMONG-** 10:12
**AMOUNT-** 32:6
**ANALYSIS-** 20:13
**ANALYZING-** 29:11 53:20
**ANSWER-** 30:14 61:8,18 67:15 76:13,20,21,22 77:1
**ANTICIPATE-** 40:16 67:22
**ANTICIPATED-** 15:4
**ANYBODY'S-** 56:20 63:22
**ANYMORE-** 65:17
**ANYWAY-** 29:15 54:10
**ANYWHERE-** 35:20
**APOLOGIZE-** 69:8
**APP-** 36:4
**APPARENTLY-** 50:23
**APPEAR-** 10:8 47:6 65:13
**APPEARS-** 44:4 47:5
**APPLICABLE-** 15:13
**APPLICATION-** 17:17

67:2,6,10 68:20
**APPLIES-** 21:20
22:1
**APPLY-** 69:5
**APPOINTED-** 43:6
**APPOINTING-** 9:20
44:10 54:3 62:25
**APPOINTMENT-**
12:19 17:13,18
25:19 57:7
**APPRECIATE-**
31:21 54:14
56:25 58:16
**APPRECIATION-** 8:5
**APPROACH-** 21:5
30:13
**APPROPRIATE-**
16:17 35:13 37:8
55:5
**APPROPRIATED-**
48:5
**APPROPRIATELY-**
30:23 40:1
**APPROPRIATENESS-**
56:23 57:4 58:7
**APPROVAL-** 9:5
10:9 60:3
**APPROVE-** 17:13
**APPROVING-** 17:18
**APPROXIMATELY-**
44:2 46:1,5 48:11
**APRIL-** 9:2
**APTLY-** 44:9
**AREA-** 10:12
**AREAS-** 10:20
12:23
**AREN'T-** 55:1,19
**ARGUABLY-** 60:4
**ARGUING-** 19:1
75:15
**ARGUMENT-** 68:8
76:16 78:3,4
**ARGUMENTS-** 31:19
**ARISE-** 59:23 65:8
**ARISING-** 10:18
**ASCERTAIN-** 46:20
**ASPECT-** 26:21
28:22 62:21
**ASPECTS-** 34:7
**ASSERTABLE-** 10:17
**ASSERTED-** 10:3,5
14:11,18,22 19:20
**ASSERTING-** 52:14
**ASSERTION-** 14:25
**ASSERTIONS-** 14:25

39:6 46:20 48:9
**ASSESSED-** 50:20
**ASSESSING-** 47:9
**ASSESSMENT-** 39:8
40:7 46:25 50:12
**ASSESSMENTS-**
39:12
**ASSIGNMENT-** 28:18
**ASSISTANT-** 8:3
**ASSUMING-** 40:14
57:7
**ASSUMPTIONS-**
33:14
**ATTEMPT-** 72:24
**ATTEMPTING-** 46:20
**ATTENDANCE-** 41:18
**ATTENTION-** 45:17
46:9
**ATTORNEY/CLIENT-**
35:19,21 36:14
37:9
**ATTORNEYS-** 67:19
**AUDIENCE-** 44:20
**AUGUST-** 12:13,15
34:1
**AUSTIN-** 18:3 68:3
**AUTHORITY-** 59:21
66:23
**AUTOMATIC-** 9:10
**AUTOMATICALLY-**
38:21
**AVAILABLE-** 20:10,
20 28:18 39:5
51:24 53:19
**AVOID-** 76:7
**AVOIDANCE-** 47:18
48:1,3
**AVOIDED-** 47:4,13,
18
**AWARE-** 43:25
48:11 53:12
**AWFUL-** 30:9

___

B
**BACK-** 23:21,24
39:22 40:19 41:7
43:4 47:19,21
52:6 58:1 69:15
71:15
**BAKED-** 49:19
**BALLOTING-** 39:24
40:2
**BALLOTS-** 39:6
**BAND-** 30:6
**BANK-** 32:8 43:7
45:10

**BANK'S-** 33:7
**BANKERS-** 32:10
**BANKRUPTCY-** 11:2
**BANKS-** 32:25
**BANKS'-** 32:7
**BARASH-** 8:16
34:10 65:24
66:13,20 69:4,8,
13,19 70:1
**BASED-** 11:11
12:22 22:17 68:7
69:24
**BASIC-** 19:11
20:17 75:3
**BASIS-** 16:21
40:24 47:7
**BEARING-** 12:3
**BEAT-** 54:13
**BECOME-** 37:19
47:20 49:15
**BECOMING-** 10:9
53:13
**BEGINNING-** 19:14,
15 21:11 41:6
**BEHIND-** 34:2
**BELIEVED-** 70:20
**BELIEVES-** 13:7
62:14
**BENDERNAGEL-**
18:3 23:14,19
24:14 26:20
30:23 60:21,23
61:14,18 62:1
63:16 64:13,19,
23 74:17 76:13,
25 77:3
**BENDERNAGEL'S-**
41:15
**BENEFICIAL-** 50:1
**BENEFIT-** 23:7,8
25:2,10 47:21
65:10
**BENNETT-** 38:8
**BENSON-** 52:21
**BETS-** 23:23
**BETWEEN-** 11:9
16:11 20:24 26:7
27:1,7 31:8,11
39:24 47:17
48:10,15 49:9
**BIFURCATE-** 31:11
**BIG-** 18:7 22:8
23:3 64:7
**BIGELOW-** 34:9
**BILLION-** 43:7
44:13 46:5,7,15

**BIT-** 19:24 32:2
34:1,2 51:5 57:10
**BLOCK-** 38:17
**BLOCKS-** 39:10
40:6
**BOARD-** 22:22
**BOGDANOFF-** 8:16,
17 14:4 21:3
34:10 38:12 42:9,
12,14 43:1 53:5
58:15,24 59:1,9
65:25 69:15
**BOILS-** 71:4
**BORROW-** 30:2
**BOTH-** 19:6 29:21
35:21 41:21 52:7
59:19 66:25 71:8
75:3
**BOTTOM-** 14:15
24:9
**BOUND-** 72:23
**BREACH-** 9:10
31:23
**BRIDGE-** 43:7,10,
16,18,21 44:1,5,
8,13,17,23 45:1,
10 46:1,6,11 54:1
**BRIEF-** 15:4
19:17 29:16 30:4
52:20
**BRIEFING-** 19:9
**BRIEFS-** 11:13
15:1 19:14,15,19
30:5 45:13
**BROAD-** 15:7
**BROADER-** 25:17
**BROUGHT-** 21:2
**BROWN-** 28:11
35:17 62:5 70:18
**BUDGET-** 22:8
**BUILDING-** 27:15
39:10 40:6
**BUILT-** 23:6
**BUNCH-** 52:23
**BURDEN-** 52:11
54:17
**BUSINESS-** 68:23
**BUSTED-** 31:23
**BUYOUT-** 9:9

___

C
**CAKE-** 37:12
**CALENDAR-** 69:21
**CALL-** 9:2 34:24
45:17 46:8 57:10
**CALLED-** 15:8

CALLS- 68:2
CAN- 11:17 16:6
18:20,21 19:22
20:15,22 22:4,12,
17,25 24:8 25:17
26:4 27:23 28:4
29:17 31:1 39:25
40:23 42:1,9
43:10 46:15
49:13 51:22
53:21 55:4 56:2
57:1,23 60:11,21
61:10,19 62:2
65:11 66:2,3
67:1,18 68:5
71:16 72:5 73:7
74:3,24 75:3,4
76:1,19 77:12
CAN'T- 35:23
37:12 64:23 69:16
CANCELED- 58:1
CANDID- 42:19
CAP- 46:21
CAPACITY- 41:21,
22
CAPITAL- 13:6
32:4 33:3 44:11
CARE- 66:8
CAREFUL- 56:19
CARRY- 69:20
CARVE- 57:2
CASE- 9:4,8,13,
18 10:7 11:2,4,
23 12:1,4,17
13:15 16:12
17:11 29:18 32:6
33:25 36:5 49:4
50:12 52:13
53:13 56:8 61:3
63:1,5,9,12 67:5
71:21,22 76:8
CASES- 11:2 36:1
46:25 49:18
CASTING- 39:6
CAUSES- 9:24
10:1,4 14:19,22
39:10
CAVEAT- 78:2
CAVEATS- 65:12
CEASES- 36:9
CENT- 46:2
CENTS- 44:3 46:1
CERTAIN- 49:21
CERTAINLY- 16:19
25:11,16 26:25
36:13 40:22

41:16 45:3 49:8
51:4 66:2
CERTIFICATE-
78:15
CERTIFICATION-
58:4 66:4 69:25
CERTIFY- 78:17
CHADBOURNE- 24:16
CHAFF- 26:13
CHALLENGING-
19:25
CHANGE- 14:6
CHANGES- 18:11
24:19 25:25
CHECK- 17:11
CHOOSE- 58:10
69:17
CIRCUIT- 35:20
36:4 41:5
CIRCULATE- 66:1
70:2
CIRCULATED-
23:17,21 24:8
61:21 70:21
CIRCUMSTANCE-
13:20
CIRCUMSTANCES-
56:22 57:8,9
60:7,15 65:7,9
CITING- 36:1
CITY- 9:17
CLAIM- 15:3
48:21 49:18
CLAIMS- 9:23
10:1 14:19,22
18:13 42:22
45:20 46:5,7,16
47:17,18,19,20,
21 48:23 52:23,24
CLARIFICATION-
10:6 13:2,13
24:18 27:21
50:18 59:11
63:13 64:13
CLARIFIED- 38:11
CLARIFIES- 53:24
CLARIFY- 9:21
10:9 49:3 69:8
CLARITY- 57:3
CLEAR- 9:25 21:7
22:19 27:19 28:2
46:19 49:16
67:23 75:14
CLEARLY- 44:21
49:20 62:10 70:9
CLIENTS- 36:11

48:24
CLOSE- 68:23
CLOSELY- 46:24
CLOUD- 57:10
COGNIZANT- 41:22
COLLAPSE- 47:10
COLLAPSED- 47:11
COLLAPSING- 32:5
COLLECTING-
15:16 35:3
COLLOQUY- 67:19
COLOR- 31:3,25
COMBINATION- 56:3
COME- 16:6 19:10
24:2 37:6 47:19,
21 57:21 59:6
60:7 71:9 77:12
COMES- 18:18
42:5 55:21 57:14
COMFORTABLE-
20:14 25:17 27:23
COMING- 26:9
28:20 30:17
32:19 77:15
COMMENCE- 73:18
COMMENT- 53:10
58:6 66:8 69:9
COMMENTARY- 31:25
COMMENTS- 56:16
70:21
COMMITMENT- 49:7
COMMITTED- 18:6,
9 19:12
COMMITTEE- 24:16,
19,23,24 25:25
71:23
COMMITTEE'S-
25:12
COMMUNICATE- 34:5
COMMUNICATED-
13:18
COMMUNICATION-
13:11 26:4 28:8
31:15 36:7 38:15
COMMUNICATIONS-
25:1 36:2
COMPANY- 28:11
32:3
COMPILE- 62:19
COMPLAINT- 76:9
COMPLETE- 71:14,
20 72:24 74:2
COMPLETED- 26:5
74:6
COMPLETELY- 48:7

COMPLICATED-
29:24
COMPONENT- 47:12
COMPONENTRY-
28:25
COMPONENTS- 40:7
COMPRISE- 43:11
COMPROMISE- 74:9
CONCEDE- 36:22
CONCEPT- 18:25
CONCERN- 39:22
40:3 42:15 49:11
76:7
CONCERNED- 49:9,
18 50:3,7
CONCERNING-
40:20 41:15
CONCERNS- 52:7
CONCLUDE- 17:8
CONCLUDES- 13:22
78:11
CONCLUSION-
17:10 29:19
CONCLUSIONS-
33:15 57:16
CONCRETE- 41:16
CONDITION- 30:16
41:17 44:16 45:16
CONDUCTING- 21:4
CONDUCTS- 12:17
CONFER- 9:16
29:13 44:15 54:4,
6
CONFERENCES-
20:23
CONFIDENCE- 55:7
60:2
CONFIDENTIAL-
11:3,5 13:9
18:20 36:8 38:25
39:16,18,21
51:17,23 54:18
63:3,7,9,10,24
CONFIDENTIALITY-
9:11 10:21,23
11:10 17:3 18:15,
17 25:7,16 28:14
34:18 39:17 51:3
52:7,14 54:15
62:24 63:1,4,12,
22
CONFIRMATION-
12:4,13 13:1
25:5 50:13 53:14
67:24 68:16

71:13 73:6
**CONFLICT-** 11:9
17:11
**CONJURE-** 56:9
**CONNECTED-** 50:11
**CONNECTION-**
45:23 47:14 61:5
**CONSENSUS-** 70:23,
24
**CONSEQUENCE-**
22:24
**CONSIDER-** 47:23
48:13 50:22 58:4
59:8 78:1
**CONSIDERED-** 47:1
65:9
**CONSTITUENCIES-**
50:6
**CONSTITUENCY-**
43:11
**CONSTITUTE-** 42:3
**CONSTITUTES-** 54:6
**CONSTRAINTS-**
71:8 72:11 73:5
**CONSTRUCT-** 10:4
**CONSTRUCTIVE-**
49:13
**CONSTRUED-** 50:8
**CONSULT-** 55:9
**CONTAINED-** 15:1
**CONTEMPLATES-**
46:3 49:20
**CONTEMPLATING-**
19:7 21:3
**CONTENDING-** 19:16
**CONTENT-** 57:16
69:25
**CONTESTED-** 12:4,
16 13:15
**CONTEXT-** 46:3
50:20 59:22
**CONTINUANCE-** 45:1
**CONTINUE-** 44:25
**CONTINUED-** 44:18
**CONTRACTUAL-**
47:16,22
**CONTRARIAN-** 32:21
**CONVENIENCE-**
46:21
**CONVERSATION-**
54:5
**CONVERSATIONS-**
30:10 70:12
**CONVEY-** 8:4
**CONVEYANCE-** 31:23

**COOPERATION-**
9:14,17 42:6
55:12
**COPIES-** 37:10
55:5
**COPY-** 77:7
**CORPORATE-** 41:22
**CORPORATION-** 36:3
**CORRECT-** 62:2
64:18 78:17
**CORRECTLY-** 72:19
**COUNSEL-** 8:10,15
13:25 24:25
26:13 27:8 38:16
41:18 44:16,19
52:8 58:13 66:4
**COUNT-** 36:15
**COUPLE-** 66:14,21
77:21
**COURSE-** 36:25
51:22 56:12 59:4
64:21
**COURT'S-** 9:4,14,
22 12:19,22
45:17 46:8 50:14
53:20 54:3 62:25
**COURTESY-** 44:20
**COURTROOM-** 31:20
66:20
**COURTS-** 47:9
**CREATES-** 29:9
**CREDIBILITY-**
22:23 33:12,13
**CREDIT-** 38:8
45:25 52:8
**CREDITOR-** 43:11
**CREDITORS-** 39:5
44:7 49:22
**CREDITORS'-**
39:12 71:23
**CRIPPLED-** 54:7
**CRITICAL-** 11:4,
16 12:10 39:11
**CURRENT-** 12:14
39:17
**CURRENTLY-** 50:7
**CUT-** 75:20

---
D
---

**DATE-** 20:16
27:24 34:1 67:16
78:22
**DAUNTING-** 29:13,
24 31:1
**DAVID-** 52:20

**DAVIS-** 25:23
**DAY-** 24:8 32:18
54:18 68:24
72:18 73:20
**DAYS-** 75:19
**DEADLINE-** 16:23
39:24
**DEAL-** 11:17
18:21 23:3 32:15
55:18
**DEALING-** 18:22
**DEALT-** 35:18
**DEBATABLE-** 56:12
**DEBENTURE-** 52:21
**DEBTOR-** 8:8 11:6
18:4,6 22:11
23:4 26:20 45:23
70:20 74:18
**DEBTORS-** 19:9
25:24 43:8 45:13
68:11
**DEBTORS'-** 22:15
43:13 47:24 50:23
**DECIDE-** 56:3
**DECIDES-** 12:1
13:19 61:2,9
**DEEPER-** 56:17
**DEFENSE-** 10:2
15:3
**DEFENSES-** 9:24
10:4 14:16,22
18:13 39:11 52:24
**DEFENSIVE-** 52:24
**DEFER-** 28:13
34:18
**DEFERRED-** 11:19
**DEFINED-** 70:2
**DEFINITION-** 45:9
**DEGREE-** 20:12
**DELAWARE-** 8:10
**DELAYS-** 25:4
**DELETE-** 14:10
**DELETED-** 14:17
**DELIVER-** 30:4
33:2 34:21 42:6
**DELIVERED-** 10:14
35:9 55:6
**DELIVERING-**
34:17 35:6
**DELIVERY-** 35:7
**DEMANDS-** 34:21
**DEMONSTRATE-**
52:12
**DEMONSTRATED-**
44:10

**DENOMINATED-** 63:7
**DEPEND-** 9:13 75:6
**DEPOSE-** 33:19
**DEPOSITION-**
59:24 76:11
**DEPOSITIONS-**
21:4 66:25 71:14
73:15,17,23 74:3,
5,13
**DEPOSITORY-** 11:6
32:20
**DERIVE-** 33:10
**DESCRIBED-** 38:11
**DESIGNATE-** 9:1
11:12,15 51:16,18
**DESIGNATED-** 63:10
**DESIGNATING-**
54:1,7
**DESIGNED-** 30:1
**DESIRE-** 50:23
72:11
**DETERMINE-** 47:11
**DETERMINES-** 45:15
**DETERMINING-**
17:13
**DEVELOP-** 51:8
65:7
**DEVELOPED-** 56:14
**DEVELOPMENT-**
28:21
**DIFFERENCE-**
18:18 31:18 48:24
**DIFFERENCES-**
39:20
**DIFFERENT-** 10:4
20:1 22:3 29:15,
18 30:12 31:9,22
32:1 43:24 45:22
68:4 73:2
**DIFFICULT-** 55:1
**DILEMMA-** 51:6
**DIRECTED-** 49:2
**DIRECTION-** 15:18
52:10 58:16
**DIRECTIVE-** 70:19
**DISAGREE-** 45:6
**DISAGREES-** 13:7
36:13
**DISCLOSE-** 35:23
**DISCLOSED-** 35:25
**DISCLOSURE-**
21:18 23:6 24:10
38:2,3,18 40:1
42:14,16 47:6
48:4 67:17,23

DISCLOSURES- 36:11

DISCOURAGE- 65:5

DISCOVERABLE- 15:24 21:25 27:10 56:12 59:3

DISCOVERY- 13:17, 19,21 27:4,5 28:6 32:22,24 34:20 35:5 39:1 55:3,4,17 64:15, 16,20 70:7,11,13, 20 71:5,6,10 73:14 75:13,14,23

DISCRETE- 12:23 34:12

DISCRETION- 62:16

DISCUSS- 28:14

DISCUSSED- 27:25 64:17 70:20

DISCUSSING- 40:20

DISCUSSION- 29:10 50:10,11 51:3 58:2 60:19 77:13,20

DISCUSSIONS- 43:20 57:22,23 60:16 63:14 69:24

DISPLEASED- 43:23

DISPROPORTIONATE- 47:7 48:3

DISPUTE- 15:15, 17 31:12 37:6 42:5 61:24 62:20 72:4,9,22 73:13, 17 74:7,25

DISPUTED- 62:11

DISPUTES- 15:16 18:21 37:11 58:3 77:17

DISTINCT- 15:17

DISTRIBUTED- 10:16

DISTURBED- 36:17

DOCKET- 77:9

DOCUMENT- 11:4 32:20 33:9 34:21, 23 35:14,25 37:16,19 52:15 59:12,13,15 60:1, 5,9,11,12 63:3,6, 7,9 70:8 72:2,10 76:3,4

DOCUMENTS- 10:16 11:4,6,10,15,16 18:19,20 35:4,6

36:18,19 37:1,4, 10,20,23 39:1,15, 21 62:22 63:9 66:25 71:23,25 73:4,8,21 74:4,6, 12 75:3,8,11,22

DOESN'T- 34:3 36:15 39:8 40:5 64:20 73:7

DOLLAR- 44:3

DORMAN- 38:8

DOWNGRADES- 31:25

DRAFT- 24:8,9 61:21 66:1 77:7

DRAFTS- 23:16

DRAG- 73:11

DRAW- 57:16

DRAWN- 15:9

DRILL- 56:16 57:18

DRIVEN- 50:23

DUAL- 28:19 33:25 35:9 71:8

DUE- 51:22

DUTY- 31:24 41:13

E

EACH- 19:9 26:21 27:25 34:17 56:6

EAR- 22:21

EASIER- 21:22 60:14

EASILY- 56:12

EASY- 26:3 51:6

EAT- 37:12 39:23

EFFECT- 10:25 47:25 48:5,7 51:12

EFFECTIVELY- 35:2 46:15

EFFICIENT- 45:4

EFFORT- 32:2

EFFORTS- 71:19 74:23 75:5,25

ELECTRONIC- 66:2 78:18

ELEPHANT- 50:8

ELIMINATE- 65:11

EMBODIED- 65:20

EMPLOYMENT- 67:2

ENABLING- 29:15, 18

ENCOURAGE- 65:4

ENCOURAGES- 38:15

ENCROACHMENT-

ENDORSE- 18:24

ENFORCED- 47:17

ENGAGED- 67:19

ENGAGEMENT- 68:19

ENGAGING- 36:11

ENHANCE- 22:20

ENJOY- 50:6

ENSURE- 51:11

ENTER- 17:21

ENTITLED- 47:20

ENVISION- 32:2 33:4

EQUALLY- 47:17

ESQUIRE- 17:10

ESSENCE- 71:4

ESSENTIALLY- 15:12 20:24 40:8 48:22

ESTATE- 23:8 44:24 50:3

ESTATE'S- 44:7 45:19 50:6

ESTIMATE- 22:7

EVALUATE- 10:1

EVALUATION- 12:24 14:21

EVERYBODY- 19:11 21:12 30:25 62:9

EVERYONE- 35:2 56:8 65:3 66:3 77:15

EVERYTHING- 12:5 31:4,5 70:25

EVERYTHING'S- 39:18

EVIDENCE- 29:22 32:13 68:8

EVIL- 56:5

EWING- 8:10

EXACTLY- 68:25 74:8

EXAMINATION- 9:12 10:6 12:10, 16,23 14:8,20 16:21 18:17 28:24 29:9 30:1 34:7 38:11 39:7 45:19 52:25 53:1, 15,24 59:5,24 61:5 62:14 63:11 64:16

EXAMINATIONS- 22:2

EXAMINE- 10:7

EXAMINER- 8:8,11,

23 10:9,14,16 11:8,12,14,21,24, 25 12:1,5,6,16, 19,21 13:4,6,11, 16,18 14:5 15:1, 12,20,21,24 16:1, 7,13,20 17:13,18 18:6,9 20:4,12 21:3,8 22:23 23:7,22 24:24 25:10,13,19 26:4, 8,9,12,18 27:4,6, 8,25 29:3,4,12 31:1 34:5 35:2,6, 11 36:15,21,23 37:4,15,18,21,25 38:15,16,21 39:15 44:11,15, 19 45:14 47:23 48:9,13 49:8 50:8,20 51:7,12, 13 52:15,25 53:10,13 54:3,17 55:2,8,16,17,21 56:1,5,13,23 58:7,12,20 59:3, 10 61:2 62:10,12, 13,25 64:15,24 65:11 66:24 71:10,12 72:13 73:5

EXAMINER'S- 9:7 24:17 27:1 39:3 46:19,25 47:14 49:5,7 50:7 52:8 53:4 56:7 58:8, 22 66:22

EXAMINERS- 11:20 13:20 33:6

EXAMINING- 39:9

EXCEEDINGLY- 40:16

EXCEPT- 15:21 58:19 74:10

EXCESSIVELY- 11:3

EXCHANGE- 19:13

EXCLUDED- 47:25

EXCLUSION- 43:14 44:8,18,25 45:1

EXCLUSIVITY- 12:14 50:24

EXERCISE- 58:8 59:17

EXISTING- 53:5

EXIT- 55:21 59:6

EXPECT- 15:2

16:2,4 28:19
40:19 59:6 67:17
68:8 73:19
**EXPECTATION-**
63:24
**EXPEDITE-** 16:21
**EXPEDITED-** 40:24
**EXPENSE-** 28:23
65:14
**EXPENSES-** 20:15
**EXPENSIVE-** 22:6,
10 23:8
**EXPERIENCE-** 46:13
**EXPERT-** 33:9,12,
16
**EXPIRES-** 12:15
**EXPIRY-** 50:24
**EXPLAIN-** 44:4
**EXPLAINS-** 47:6
**EXPLANATION-** 48:2
**EXPRESSING-** 33:11
**EXTENDED-** 9:6
32:3
**EXTENSIVE-** 24:22
75:12 78:3,4
**EXTENT-** 16:20
18:20 21:13
22:22 23:5 50:19
52:9 58:20 59:5
68:14 69:23 76:4
77:11,20,25 78:4

---

**F**

**FACE-** 25:4 51:5
**FACILITATE-**
21:18 25:18 26:8
**FACILITATING-**
26:18
**FACILITY-** 45:25
**FACTION-** 61:23
**FACTUAL-** 26:15
31:11 46:23
**FAIR-** 16:8 32:6
34:3 35:8 44:23
50:1
**FAIRLY-** 74:19
**FAIRNESS-** 17:1
57:4
**FAITH-** 71:19
72:25 74:23 75:5
**FAR-** 43:10 68:17
**FARGO-** 43:6
45:10 50:15 66:10
**FARTHER-** 57:18
**FASTER-** 21:22
**FEDERAL-** 75:19

**FEEDBACK-** 58:14
**FEEL-** 16:13
20:14 25:11
27:22,23 63:8
**FEELS-** 35:12
**FEES-** 32:9
**FERRET-** 30:12
31:14 35:10
**FETTER-** 31:21
**FIDUCIARY-** 31:23
**FIGURE-** 33:19,23
**FILE-** 11:8 33:12
45:13 66:23 67:1
68:19,20
**FILED-** 8:17 9:5
11:18 14:9 17:9
28:24 39:19
40:15 52:13
**FILING-** 39:23
52:15 67:22
**FINAL-** 49:6
**FINANCIAL-** 13:8
16:2,3,11 20:8,
10,11,18,23,24,
25 21:21 25:12
26:7 27:1,2 31:7,
9,22 32:9 41:25
42:1 56:6 67:3
**FIND-** 77:2
**FINE-** 69:2
**FIRES-** 57:8
**FIRM-** 8:17 28:23
67:2,3
**FIRM'S-** 17:11
**FIRST-** 14:7,9
15:19,22 16:18
24:17 28:17
37:17 38:25
40:13 67:8 70:20
72:20 74:20
**FIVE-** 54:22
**FIVE-MINUTE-**
54:21
**FLAWED-** 50:5
**FLEXIBLE-** 73:25
**FOCUS-** 53:13,14,
15,17
**FOCUSED-** 9:8
**FOCUSING-** 24:17
**FOLLOW-** 14:17
**FOLLOWING-** 47:2
**FOOTING-** 33:1
**FOOTNOTE-** 52:6
**FORA-** 55:20
**FORCE-** 27:12

**FORM-** 21:16
40:16 51:8 57:14,
22 65:23 69:22,
24 71:5
**FORMAL-** 19:6,8
20:21 24:7 59:23
68:12
**FORMALITY-** 22:4,
9 34:14
**FORMER-** 43:16
60:13
**FORMIDABLE-** 9:13
**FORMULATE-** 76:21
**FORMULATED-** 68:3
75:23 76:15
**FORTH-** 17:10
26:5 39:23 53:22
**FORTHCOMING-**
11:24 13:10
**FORTHCOMINGNESS-**
12:9
**FORWARD-** 28:4
54:2,8
**FOSTERS-** 51:7
**FOUND-** 36:3 46:13
**FOUR-** 20:1 22:8
26:19
**FOURTH-** 21:2
**FRAME-** 26:5
29:12 33:22
40:22,23 41:2
49:11 58:10 65:4,
19 69:5 71:20
72:20 73:8
**FRAMEWORK-** 29:3
**FRANK-** 22:25
23:1 38:15
**FRANKLY-** 44:24
56:18 74:8 77:16
**FRAUDULENT-**
31:23 45:19
46:14,25 47:3,8,
10,12 48:14,18,
23 49:3,17,20,24
50:10,19
**FREE-** 16:20 26:3
35:13 38:19 59:14
**FRIEDMAN-** 52:21
**FRONT-** 31:4,5
40:19 76:18
**FUEL-** 56:20 57:8
**FULFILL-** 56:4
**FULL-** 38:15
**FULLY-** 18:24
24:19,25 25:19
**FUND-** 43:8 44:6

48:6
**FUNDAMENTAL-**
17:1 47:1
**FUNDAMENTALLY-**
34:3 43:25 50:5
**FURTHER-** 9:6
10:2 30:10 54:7
55:25 58:2,5
70:4 77:12,20,24
78:8

---

**G**

**GAME-** 16:8 34:21
**GAVE-** 8:4 16:6
23:22
**GEARING-** 50:4
**GEEZE-** 21:24
**GENERAL-** 44:7
56:15 70:22,24
**GENERALLY-** 42:13
45:4 63:20 64:6
66:24
**GET-** 13:5 15:18
16:9 20:14 21:11,
22 22:6 24:5
25:17 30:14,25
31:4,20 33:7
35:1,6,9 36:25
42:16 43:19 46:1
47:20 49:13
58:12 64:1 66:3
71:13 73:9,21
74:4,12 76:18,19
**GETS-** 36:21
48:11 51:7
**GIVE-** 11:25
15:12 21:15
36:15 37:18,20,
24 41:1 49:10
51:13 54:21
67:18 78:2
**GIVEN-** 11:21
12:5,6 13:16
15:19,24 19:5
50:25 55:15 61:1
73:5 75:13
**GIVES-** 35:10
**GLAZER-** 25:22
26:25 27:17,21
28:3
**GLOBAL-** 49:15
**GLOSS-** 14:24
**GO-** 17:1 34:3
41:17 43:4 46:17
59:21 61:6 62:24
65:20 66:19

71:15 73:25 77:25
**GOING-** 12:13
13:10 15:1 16:9
19:8,13,19,20,21
20:10,19 21:12,
24 22:2,5,6,10,
17,23,24 23:9,24
24:1,10,11 27:4,
5 28:13 30:8
31:10 32:21,22
33:5,8,17,18,22
34:19 36:5 37:3,
4,14,16,17,20
39:23 41:9 42:16,
19 45:2,25 46:1
48:21 52:9 54:2,
8 57:12 58:6
61:10 65:14 72:1
73:4 74:4,12,22
75:2,5,18 76:14,
18,20
**GONE-** 61:14
**GOOD-** 8:1,2,9,25
24:4,15 25:22
28:10,20 29:23
30:2 38:7 52:4
55:13 67:11
71:19 72:25
74:23 75:5
**GOT-** 23:21 32:16
34:1 62:1 63:22
75:7,19
**GROUND-** 19:25
21:11,12 22:16,
18 30:24
**GROUP-** 25:14
**GUARANTOR-** 32:8
**GUARD-** 76:11,14
**GUESS-** 22:9
39:19 43:5 56:8
57:9 60:3 77:18
**GUIDANCE-** 24:5,11
**GUIDELINES-** 23:16
**GYMNASTIC-** 48:20

---
H
---

**HAC-** 8:17
**HAGGLING-** 39:22
**HALF-** 46:2
**HALLMARK-** 31:22
**HALLWAY-** 24:1
**HAMSTRUNG-** 62:12
63:8
**HAND-** 16:25 23:9
32:19 51:6,10
57:6,9

**HANDLE-** 30:24
67:13
**HANDLED-** 63:17,22
**HANDLING-** 29:23
**HAPPEN-** 24:6
27:22 33:5
**HAPPENED-** 44:5
**HARD-** 68:17
**HASN'T-** 51:21
**HATS-** 43:16
**HAVEN'T-** 15:13
19:1 23:12 60:11
68:3,12
**HE'D-** 31:16
**HE'LL-** 55:22
58:13
**HE'S-** 17:19
18:11,16 28:2
30:8 55:11 62:18
63:17 65:12
**HEAD-** 33:4
**HEAR-** 13:12
17:24 18:2 29:15,
21 64:12 78:3
**HEARD-** 17:23
19:1 25:24 29:20
38:6 39:14 40:11
43:3 52:2,3,19,
22 53:9 54:22
64:11 65:2 67:6,
23 77:5 78:7,9
**HEARING-** 13:1
40:1 50:24 58:1
65:16 67:4,16,18,
24 68:15,16
69:20 70:14
77:15 78:11,13
**HEARINGS-** 57:25
73:6
**HEAVILY-** 13:15
**HEAVY-** 77:18
**HELD-** 9:17
**HELP-** 20:4 36:19
37:18,20
**HELPFUL-** 24:4
28:7 37:1 49:2,
14 68:9 75:17
**HELPS-** 35:9,10
**HENNIGAN-** 38:8
**HIGH-** 11:3
**HINT-** 67:18
**HIRED-** 32:17
**HOLDS-** 12:14
**HOLIDAY-** 30:8
**HOME-** 77:25

58:17 70:13,19
74:14
**HOPE-** 25:3 42:4
51:6 59:20 66:11
78:3
**HOPEFUL-** 49:11
**HOPEFULLY-** 11:16
18:19 19:10
31:15 34:20
40:24 49:15
**HORNBOOK-** 35:20
**HOURS-** 41:10
68:17
**HOURS'-** 40:18
**HOUSEKEEPING-**
66:14,21
**HOWARD-** 24:15

---
I
---

**IDEA-** 22:19 24:4
30:12 75:24
**IDENTIFIED-** 53:6,
16 58:9
**IDENTIFY-** 39:15
**IGNORES-** 50:8
**IMAGINE-** 43:24
**IMMEDIATE-** 12:5
**IMMEDIATELY-** 9:16
**IMMUNITY-** 13:16
33:18
**IMPACT-** 12:17,24
48:3
**IMPACTING-** 17:5
**IMPORTANCE-** 51:1
**IMPORTANT-** 19:5
22:16 25:11
34:13 38:24 39:7
48:4 55:8
**IMPORTANTLY-**
22:15
**IMPOSE-** 61:25
**IMPOSITIONS-**
26:14
**IMPROPERLY-** 48:9
**INC-** 78:23
**INCLINED-** 42:22
57:7
**INCOMPLETE-** 76:9
**INCREASE-** 16:22
**INCREASES-** 65:14
**INDEED-** 9:12
**INDEFINITE-** 73:6
**INDEPENDENT-**
13:8 60:6
**INDICATED-** 15:7
17:19 39:3 41:25

68:15 70:11
**INDIVIDUAL-**
20:25 41:22
**INDIVIDUAL'S-**
41:18
**INDIVIDUALS-**
41:20
**INDUCES-** 25:8
**INEFFICIENT-**
76:10
**INFERENTIALLY-**
49:1
**INFORM-** 29:17
**INFORMAL-** 19:7,
24 20:4,8,21
26:6,16,22,23,25
27:3,9 33:6 56:2
59:17,22 64:18
68:13
**INFORMALITY-**
22:7,12 28:5
**INFORMALLY-**
25:12 31:10 55:9
**INFORMATION-**
16:5,20 17:2,4
20:9 21:18,23
30:25 35:1,8,14
36:20 37:15 51:8,
11,17,19,23
54:18 55:6,10,15,
20 56:14 57:15
58:18,20 59:2
71:9 72:12
**INFORMATION'S-**
38:19
**INHERENT-** 58:8
**INHIBIT-** 37:15
**INITIAL-** 30:5
44:14 56:16
**INITIALLY-** 29:15,
25
**INSERT-** 61:10
62:21
**INSIST-** 66:17
**INSOFAR-** 15:21
**INSOLVENCY-** 13:6
33:2 56:11
**INSOLVENT-** 32:3
**INSTANCE-** 14:10
37:13,17
**INSTANCES-** 75:4
**INSTEAD-** 9:25
**INSULATION-** 55:23
**INTEND-** 24:25
25:19 41:17
59:17,19 66:23

67:25 70:1
**INTENTION-** 25:3
**INTEREST-** 29:6,7
44:24 51:14 52:15
**INTERESTED-** 42:10
**INTERESTINGLY-**
48:16
**INTERFERENCE-**
16:14,15 42:4
**INTERPRET-** 12:22
**INTERROGATORIES-**
75:22
**INTERVIEW-** 21:5
41:18 59:22
**INTERVIEWS-** 21:4,
6,8 22:2 27:9
41:15
**INTRODUCE-** 8:12
**INTRODUCED-** 22:5
**INVESTIGATE-** 9:23
**INVESTIGATION-**
9:7,15 12:20
24:18,22 54:4,7
56:7 57:11 62:23
**INVESTMENT-** 32:10
**INVITE-** 56:3
**INVITED-** 21:8
**INVOLVE-** 19:9
**IRRESPECTIVE-**
15:23
**ISN'T-** 29:4
30:21 74:22 78:4
**ISSUANCE-** 40:14
**ISSUE-** 10:7,25
11:19,20 15:6
16:10,13 17:17
18:15,24 19:4,23
20:6,7,22 21:2
23:20,22,25
28:15 34:15
35:18 36:12 37:8
40:23,25 42:15,
18 48:3 51:21
52:6,12 55:24
59:1 60:24 64:10
66:25 70:10 71:1,
2 74:11 77:5
**ISSUED-** 40:14
**ISSUES-** 10:15
15:15,17 16:18,
25 20:1 23:25
24:5 25:7,16
26:19,21 28:12
29:11,22 30:24
34:19,23 35:24
38:14 40:20 42:5

46:24 47:1 49:1,
3 51:1,3,20
54:25 55:19
56:11 57:19
58:10 65:13
67:13,25 68:6,7
70:6 71:13 77:9
**IT'S-** 9:25 10:11
12:24 19:5,24
20:18,20,21 21:7,
14,16,24 22:2,5,
6,10,16,19 25:3
28:22 29:19 30:2,
6,22 31:1 32:23
33:8,24 35:20
36:1,3,4 37:8
41:9 50:19 51:6
55:5,8,16 56:4,
13,14,21 58:17
61:3 62:9,15
63:24 64:23
66:20 67:21
68:17 70:5 71:25
72:6 75:14,17,23
76:16,18
**ITEM-** 14:8 22:9
**ITEMS-** 53:15

---
J
---

**JIM-** 18:3 38:7
74:17
**JOB-** 29:12 31:1
49:10
**JOHNSTON-** 38:7,8
40:10 60:24
**JOIN-** 77:25
**JOINED-** 43:21
**JOINT-** 19:10
**JOSEPH-** 52:4
67:11
**JPMORGAN-** 25:23
**JUDGE-** 21:18
29:21 41:13
**JUDGMENT-** 22:17
**JUDICIAL-** 8:3
13:16 33:18
**JULY-** 9:6 11:19
16:22 20:16
27:24 30:14 41:4,
5,7 49:8 53:21
**JUNCTURE-** 61:15,
20 75:14
**JUNE-** 19:15 21:4
73:18
**JUSTICE-** 49:10
**JUSTIFICATIONS-**

46:21

---
K
---

**KASOWITZ-** 52:21
**KEEPS-** 37:24
**KENNETH-** 8:13,25
17:10 59:10
**KEVIN-** 68:10
**KEY-** 40:6 50:6
**KICK-** 10:25
**KINDLY-** 67:5
**KINDS-** 55:22
**KLEE-** 8:13,16,25
9:1 14:2 15:6
17:8,10,15,18
18:1 28:18,23
29:20 30:1,4
31:8 33:17,20
34:10 38:11,23
39:9 40:12 41:3,
11,14 53:5,12
54:15 59:10,20
60:6,18 62:22
65:25 69:9
**KNOWING-** 75:12
76:4
**KNOWLEDGE-** 60:3,
18
**KNOWN-** 37:19
**KNOWS-** 21:12

---
L
---

**LABELED-** 11:5
39:18
**LAID-** 26:20
**LANGUAGE-** 15:9
18:12 74:25
**LANTRY-** 68:10
**LARGER-** 54:25
**LARGEST-** 43:11
**LATER-** 19:14
30:8 55:18
**LATTER-** 60:16
**LAUGHTER-** 8:6
27:20 30:20
54:12 65:18
66:12,18 76:24
**LAURIA-** 43:4
45:7,8 52:1
53:17 54:5,9,13
58:5 66:9,15
70:3 77:6,23
**LAWSUIT-** 31:24
**LAWYER-** 34:9
**LAWYERS-** 31:8,11
32:9

**LAYING-** 32:17
**LBO-** 43:8 44:2
45:23
**LEAD-** 26:17
**LEARN-** 31:15
**LEAVE-** 45:2 53:4
58:9
**LECG-** 20:25 31:8
33:6 67:3
**LED-** 43:12,20
**LEE-** 8:16 13:22
14:4
**LEGAL-** 20:13,19
31:19 34:11 46:23
**LEGITIMATE-** 76:6,
7,9
**LENDER'S-** 43:16
44:5
**LENDERS-** 38:9
43:10,18,21 44:2,
8,17,23 45:2,10,
23,24 46:1,4,6
52:9 54:1
**LET'S-** 17:16
65:19 76:8 77:11
**LETTING-** 56:5
**LEVEL-** 48:5,19
**LEVELS-** 48:6
49:21
**LEVERAGE-** 9:9
**LEXUS-** 36:4
**LIABILITY-** 49:24
**LIFTING-** 77:19
**LIGHT-** 76:11
**LIKELIHOOD-** 16:22
**LIMIT-** 10:2
**LIMITED-** 39:21
**LINE-** 24:9 36:10
49:12 50:23
**LINES-** 49:9
**LIST-** 21:10
**LISTENING-** 65:16
**LITERALLY-** 41:9
**LITIGATION-** 32:6,
14 45:3 49:25
56:13 64:6,21
**LOANS-** 43:7 44:1,
13 46:11
**LOB-** 31:23
**LOG-** 51:19
**LONG-** 30:8 61:12
68:9 72:1 73:3
**LONGER-** 22:5
36:8 61:3 65:10
76:16

65:3 68:22
**LOOKING-** 14:25
24:11 50:14,15,
18 68:4
**LOSE-** 12:2 22:23
62:16
**LOSES-** 11:21
**LOST-** 15:13
19:20 36:24 61:20
**LOT-** 18:14 19:3
22:7 25:14 26:8
30:9 31:25 34:2
51:2 68:4 75:13
**LOTS-** 31:19 32:9
34:23
**LOUD-** 67:23
**LYNCH-** 43:15

**M**

**MAGNITUDE-** 50:25
**MAIL-** 66:2
**MAIN-** 53:13,14
**MAINTAIN-** 35:24
39:17
**MAINTENANCE-**
38:13
**MAJOR-** 40:24
45:21
**MAKING-** 18:5
21:17 39:4 65:10
76:15
**MANAGEMENT-** 32:14
**MANDATE-** 46:19
50:7
**MANDATED-** 11:8
**MANNER-** 30:1 31:3
**MANY-** 10:4 11:2
25:1 32:11 50:6
**MARK-** 8:9
**MARTIN-** 8:16
35:17 62:5 65:24
70:17
**MARTY-** 28:14
**MATERIAL-** 19:16
20:4,6,17 52:13
74:23
**MATERIALLY-** 45:22
**MATERIALS-** 38:21
**MATTER-** 10:14
12:11 15:8 16:19
18:19 36:16 38:2
49:6 75:2 76:15,
21 78:19
**MATTERS-** 10:13,
18 66:14,21
**MCMAHON-** 52:4,5

67:11,12 68:23,
25 69:2
**MEANINGFUL-**
16:23 42:7
**MEANS-** 35:11
**MEANT-** 27:18 28:7
**MECHANISM-** 29:17
**MEDIATOR-** 55:11
**MEET-** 9:15,16
13:4,7 16:3,14
25:12 31:13 33:1,
7 34:8 44:15
54:4,6
**MEETING-** 25:14
29:13,14 33:8
**MEETINGS-** 9:19
16:10 20:8 21:21
25:1 26:6 27:1,3,
6,13 28:5 31:8,
10,11,13 44:14
45:14 56:2 59:18
64:18 66:16
**MERITS-** 39:8
**MERRILL-** 43:15
**MET-** 18:6 24:24
**MILLION-** 11:5
22:8 46:7 75:8
**MINDFUL-** 71:7
**MINIMIZED-** 18:20
**MINUTI-** 8:8,9,15,
21,24
**MINUTI'S-** 67:2
**MISALLOCATED-**
48:15
**MISCHIEF-** 65:15
**MISS-** 58:13
**MISSED-** 14:14
**MODELS-** 13:5
**MODIFICATION-**
38:10 60:25 61:4
**MONEY-** 46:17
47:19
**MONTH-** 19:14
**MONTHS-** 32:11
**MORNING-** 8:1,2,9,
25 15:16 17:9
24:15 25:22
28:10 38:7 39:14
51:3 54:22 57:25
58:1 66:5 69:16,
21 77:13,21
**MOTION-** 66:22
67:7 69:5,10
**MOTIONS-** 8:17
68:20
**MOVE-** 8:18 20:16

28:4
**MOVING-** 28:19
30:16
**MUCH-** 10:24 22:8,
12 25:9 65:6
73:24,25 75:1
78:10
**MULTIPLE-** 8:2
78:12

**N**

**NA-** 43:7 45:10
**NARROW-** 29:11
**NATURAL-** 56:22
**NECESSARY-** 56:4,
13 71:2
**NEEDING-** 57:22
**NEGOTIATE-** 34:23,
25
**NEITHER-** 44:23
**NEVER-** 34:24
**NEW-** 9:17
**NEWLY-** 43:6
**NOBODY-** 36:13
61:21
**NONDEBTOR-** 32:7
**NOR-** 27:11 44:24
**NORTH-** 44:3
**NOTE-** 40:3
**NOTICE-** 40:19
68:20
**NOTICES-** 68:20
**NUANCES-** 25:7

**O**

**OBJECT-** 32:21
34:22
**OBJECTED-** 61:7
**OBJECTION-** 54:2
60:5 61:11 63:15
67:22 69:6
**OBJECTIONS-**
67:24 68:12,14,
22 69:22 74:5
**OBLIGATION-**
44:22 52:12
**OBSERVATION-**
16:16
**OBTAIN-** 42:6
71:11 72:12
**OBVIOUSLY-** 16:8
39:9 40:5 68:12
71:17 73:1 77:7
**OCCUR-** 16:10
27:7 56:10
**ODD-** 45:20 46:18

**OFFICE-** 41:7
**ONE-** 9:17,18
10:12,21 12:8
13:3 18:12 19:1,
16 20:3,6,24
25:12 30:2 35:18
36:5,20 37:7,10
41:21 42:9,10
45:22 46:1 49:16
50:1 51:2,6 56:8,
18 57:6 58:5
60:8,14 64:13
66:15 69:18
70:25 74:10 77:2
**ONE-HALF-** 44:2
**ONE-ON-ONE-** 16:4
20:23 25:13 42:1
**ONGOING-** 44:8
64:21
**OPEN-** 11:24
16:12,21 26:3,22,
23 38:21 49:12
56:2
**OPENING-** 27:15
28:7
**OPENNESS-** 51:7
**OPINE-** 56:23 58:7
**OPINED-** 57:4
**OPINING-** 39:9
**OPINION-** 57:13
68:4
**OPPORTUNITY-**
15:5 35:10 37:22,
23 42:20 43:19
51:14 65:15
**OPPOSED-** 39:17
**ORALLY-** 8:18
**ORDER-** 9:5,14,20,
22 10:10 12:19,
22 13:1 14:7
17:18,21,24
18:12,17 23:21
25:25 31:6 38:2
42:6 44:10 45:7
46:4,6 52:10
53:16 54:3 57:17,
22 58:4 62:25
63:12,18,21,25
64:3,8 65:20,23
69:16,22,25 70:2
74:8 77:7
**ORDERED-** 52:10
54:10
**ORDERING-** 12:19

ORDERS- 63:1
ORDINARY- 56:12
ORGANIZE- 9:16
ORGANIZED- 32:16 73:24
ORIGINALLY- 61:1 72:17
OTHERWISE- 13:9 15:25 16:16 21:19 46:11 58:3, 18 60:1
OUTCOME- 49:25
OUT-OF-TOWN- 41:5
OUTSTANDING- 71:25
OVERALL- 54:25
OVERLAY- 29:25
OWN- 33:12,13 57:16

P

PAID- 46:11 47:21
PAPERS- 45:14 49:8
PARALLEL- 12:12
PARENT- 48:5,10, 11,15,16,19,22
PARK- 24:16
PARTIALLY- 43:8 47:3
PARTICIPATE- 43:19 45:14
PARTICIPATION- 16:15 44:16
PARTICULAR- 9:22 24:22 29:20 34:19 76:10
PARTIES- 9:14,18, 19 10:3,5,12,13, 20,24 11:13,23 12:3,10 13:4,5,9, 10,12,17,19 14:12,14,18,23 15:2,10,25 16:1, 3,12,15,24 17:1, 3 18:9 19:22 20:11,13,20 21:14,17 23:4,11, 17 24:21 25:9 26:7 27:7,11,22 29:14 30:12 36:14,22 37:2,15, 17,19,21 38:16 39:14,20 40:20 41:16 42:23 44:11 45:9,11,12

46:10,22 49:14 50:1,17 51:5,13, 16,19 52:23 53:17 54:2 55:6, 9,12 57:19,21 58:14 60:16,19 62:3 63:15 64:16 65:3,8,22 67:17 69:23 70:2,12,22, 25 71:1,4,16,19, 23 72:5,19,22 73:2,3,7 74:10 77:8,12
PARTIES'- 13:8 20:25 27:2 40:7
PARTNER- 28:13 70:14
PARTS- 26:2
PARTY- 15:4,5 16:6,14 27:5 30:15 36:8 50:16 52:14,16 54:8 59:12,13 60:5,8 63:3,6,11
PARTY'S- 38:18 59:25 60:2
PAYING- 32:8
PENALIZING- 23:2
PENNY- 44:2
PEOPLE- 19:18 21:5,7,9,22,25 22:13,17 23:7,24, 25 24:3,4,9,10 33:19 34:16 35:11 36:17,25 37:9 42:18 55:20 61:8,22 64:7 71:22 73:3 74:22 75:10 76:2 77:25
PERCENT- 48:12,17
PERFORMED- 24:23
PERHAPS- 10:4 31:8 68:8
PERIOD- 28:1 29:24 30:7 39:23 40:16 73:7 75:12
PERMISSION- 8:21 60:8
PERMIT- 9:15 55:4
PERMITS- 40:15
PERMITTING- 46:16
PERSON- 63:23 64:2 66:6 76:16 78:5
PERSON'S- 22:21
PERSPECTIVE-

22:15 46:23
PHENOMENON- 46:9
PHONE- 54:5 78:3
PHRASE- 14:15
PIECE- 51:23
PLACE- 22:20 42:16 55:13
PLACED- 65:12
PLAN- 12:13,17 24:20 26:1 28:23 34:20 35:5 39:13 43:13,20 45:20 49:19 50:4 53:14 56:24 66:22 70:13,20
PLANS- 32:24
PLAYING- 22:22
PLAYS- 34:21
PLEADING- 14:9 15:10 28:23 29:17
PLEADINGS- 30:7
PLEASED- 28:20
PLUMBING- 77:2
PM- 54:24 78:13
PM/RECONVENE- 54:24
PODIUM- 70:14
POINTED- 14:14 58:11
POINTS- 29:16 38:23
POLK- 25:23
PORTIONS- 40:15, 17,21
POSE- 60:17
POSED- 30:11
POSITION- 11:21 12:6 22:13 23:1 32:25 41:25 56:21
POSITIONS- 19:20 53:11 72:12
POSTURING- 26:14
POTENTIAL- 10:1 14:16,18,21,22 56:5
POWER- 66:24
PRACTICABLE- 72:25 74:2 76:17
PRECEDENT- 46:14 47:4
PRECISE- 23:15
PRECISELY- 26:24
PRECLUDE- 64:20
PREDICT- 68:18
PREEXISTING-

PREFER- 22:11 77:18
PREFERRED- 21:5
PRELIMINARY- 65:12
PREMISED- 50:4,19
PREPARE- 33:25
PREPARED- 30:4 37:5 66:1
PREPARING- 50:21
PRESENT- 13:10 55:10
PRESENTATION- 21:17
PRESENTATIONS- 27:13
PRESERVE- 21:13 36:19 38:2
PRESERVED- 15:21 19:18 51:21 55:16 58:19 60:9, 14 61:13
PRESSING- 30:16
PRESUME- 20:11 30:10 32:12 66:9
PREVENT- 17:3
PREVENTS- 36:10
PREVIEW- 67:24
PREVIOUSLY- 45:24
PRIMARILY- 9:8 12:3
PRINCIPALLY- 72:11
PRINCIPALS- 46:14
PRINCIPLES- 50:20
PRIOR- 65:16
PRIORITY- 50:12
PRIVATELY- 13:5
PRIVILEGE- 10:17, 22 11:20,22,25 12:2 15:6,8,13, 20,23 17:2 18:24 19:2,4,19 20:5 21:14,15 22:20 23:20 25:7,16 28:6,14 34:18 35:19,21,23,24 36:8,15,18,19,21, 23 37:1,9,24 38:14 51:4 58:17, 19 59:12,14 60:4, 9,14 61:2,11,12, 14,20,23 62:16
PRIVILEGED- 12:7 15:20 19:18 36:7 51:17,23 55:16

58:19 60:1 61:3
**PRO-** 8:17
**PROBABLY-** 32:11
35:13 39:25
55:24 57:10
**PROBLEM-** 18:13,
23 26:17 36:6
42:20 63:5,18,23
64:2,4,7 73:9,25
76:12
**PROBLEMATIC-**
60:20
**PROBLEMS-** 27:25
**PROCEDURAL-** 69:5
**PROCEDURE-** 10:24
18:16,23
**PROCEDURES-**
23:16 40:2
**PROCEED-** 8:7
18:17 65:19 66:3
76:10
**PROCEEDINGS-**
44:9 78:18
**PROCEEDS-** 46:10,
12
**PROCESS-** 9:12
11:14 12:13,17
13:9 19:6,8,21,
23,24 20:4,21
22:5,7,10,12
25:4,5,8,18 26:2,
4,22,24 27:24
30:3 33:1 35:8,9
38:14 39:22
43:12 44:9,25
50:4 51:7 55:12,
18 59:18,21
64:15 65:10 71:10
**PROCESSES-** 26:16
**PRODUCE-** 30:6
36:18 37:1 73:7,
19 74:23 75:3,4,
25
**PRODUCED-** 34:24
71:23,24 75:8,11
**PRODUCES-** 45:22
**PRODUCING-** 34:25
**PRODUCT-** 25:2
**PRODUCTION-**
71:20 72:25 74:2
76:3,9
**PROFESSIONAL-**
32:8
**PROFESSIONALS-**
13:21 25:13 32:7,
17 33:7

**PROGRAM-** 41:5
**PRONGS-** 9:8 53:5
**PROPERLY-** 47:24
**PROPOSAL-** 39:14
55:15 58:22
72:18 74:20 75:11
**PROPOSE-** 9:24
**PROPOSED-** 8:10,
12,22 9:20 10:19,
23 11:12 13:24
15:9,10 16:2
18:16 21:14
23:21 24:20 26:3
35:5 39:12,24
44:10 45:20
56:23 67:3 69:22
71:16 73:16
**PROPOSES-** 29:3
**PROPOSING-** 18:11,
16
**PROPOSITION-**
36:14 45:6 46:14
62:7
**PROPOUND-** 73:19
**PROTECT-** 36:9
**PROTECTION-** 23:6
**PROTECTIONS-**
25:17 42:16 51:10
**PROTECTIVE-**
27:15 63:18,21,
25 64:3,7
**PROTOCOL-** 23:20
24:7 60:25 61:1
**PROTOCOLS-** 23:16
**PROVIDE-** 20:4,13
24:11 25:2 51:12,
18 52:11 57:14
**PROVIDED-** 20:9,
18 21:19 38:19
51:12 60:5
**PROVIDES-** 44:1
47:7 59:12 67:9
**PROVIDING-** 17:1
20:14 21:23 38:18
**PROVINCE-** 53:3,20
**PROVISION-** 38:20
**PROVISIONS-** 74:9
**PUBLIC-** 11:9,11
39:4 40:18 63:2
**PULLING-** 49:14
**PURITY-** 57:11
**PURPORTED-** 46:20
48:18
**PURPORTING-** 11:24
**PURPOSES-** 10:5
17:5 69:21

**PURSUANT-** 46:11
**PURSUE-** 45:2
**PURVIEW-** 12:20
**PUSH-** 23:24 41:13
**PUSHED-** 23:21
**PUTS-** 36:23
**PUTTING-** 22:25

——— Q ———

**QUASI-** 13:16
28:25 29:16
30:13 32:25 33:18
**QUESTIONS-** 30:11
31:3 34:11 51:20
58:25 65:1 78:6
**QUICK-** 72:23
**QUICKLY-** 20:15,
16 22:24

——— R ———

**RAISE-** 13:1
70:10 71:2
**RAISED-** 15:4
51:20,22 57:19
59:2 77:17
**RAISES-** 76:8
**RATHER-** 29:23
77:25 78:5
**RATIONAL-** 18:22
**RE-** 36:2
**REACH-** 29:19
74:11
**REACHED-** 33:15
70:21,24
**REACTION-** 54:22
56:16
**READING-** 49:9
**READY-** 8:7 34:2
**REALITY-** 24:3
**REALIZED-** 23:24
**REASON-** 17:21
73:10
**REASONABLE-** 33:3
39:5 72:13
**REASONABLENESS-**
53:2
**REASONABLY-**
72:25 76:17
**REASONS-** 43:14,24
**RECEIVE-** 44:3
**RECEIVED-** 9:2
17:14 46:10 68:2
77:7
**RECEPTION-** 8:4
**RECIPIENTS-** 46:16
**RECOGNIZE-** 16:25

40:22 41:20 54:11
**RECOGNIZING-** 31:1
**RECONVENE-** 54:21
**RECORDING-** 78:18
**RECOVER-** 45:25
46:6
**RECOVERIES-** 48:5,
6 49:21
**RECOVERY-** 44:1,6
47:20 48:24
**REDACTED-** 39:19
40:15
**REFERENCED-** 12:2
52:7
**REFERRED-** 44:15
**REFERS-** 15:21
**RELATE-** 49:3
**RELEASES-** 55:22
**RELIEF-** 52:9 65:8
**RELUCTANCE-** 57:1
**RELUCTANT-** 75:10
**REMAIN-** 13:9
**REMAINING-** 40:17,
21 69:22 72:4
73:13 74:7,12
**REMEDIES-** 45:3
**REPLACED-** 14:15
77:1
**REPLIED-** 11:16
**REPLIES-** 15:3
**REPLY-** 19:15,22
30:7 45:13 51:14
**REPORT-** 9:5 11:9,
10,11,18 12:1,2
15:22 17:5 18:18
28:2,20 30:14
33:9,13,16,20
36:23 37:4,5
38:20 39:1,3,4,
19 40:14,18,21
42:7 47:14 49:5,
7,13 50:21 51:9
55:13 57:14
58:10,21 59:19
61:3 62:11,13,23
63:2 65:12,13
**REPORT'S-** 40:8
**REPORTS-** 58:20
**REPRESENTATIVE-**
44:12,17
**REPRESENTED-**
43:12 58:12
**REPRODUCED-** 14:8
**REQUEST-** 37:11
38:1 56:22 57:2
59:8 61:17 65:8

67:5 71:11,24
72:3,16 73:20
74:14 76:4
REQUESTED- 71:18
REQUESTING- 15:2
REQUESTS- 71:5,
17,18,19,25
72:10 77:16
REQUIRE- 57:7
REQUIRED- 51:18
56:1
REQUIREMENT- 57:4
REQUIRES- 9:5
13:13 54:3
REQUIRING- 42:3
46:10
RESOLUTION-
26:21 45:5 49:15
RESOLVE- 12:9
29:22 58:3 68:16
69:16,21
RESOLVED- 49:24
55:19 68:1
RESOURCES- 32:12
RESPECT- 9:9
10:13,15,18,23
11:1,18 13:14,17
14:6,7,21 15:6,
13,15 17:1 18:12,
15,19,24 19:2,4,
16,20,23 20:3,6,
7 21:20 22:1
23:6 38:13,25
39:20 40:13
41:14 52:6 54:1,
15,17 55:2,6
61:23 67:18 74:20
RESPECTFULLY-
37:11 38:1 74:14
RESPECTIVE- 65:5
RESPECTIVELY-
56:21
RESPECTS- 45:21
75:1
RESPOND- 35:10
37:2,22 71:5,19
72:24 73:21 74:1,
24 75:20,24
RESPONDING- 34:11
RESPONSE- 17:23,
24 53:9,16 64:11,
12 65:2 72:13
75:21 78:7,9
RESPONSES- 74:21
RESPONSIBILITIES-
55:23 56:4

RESPONSIBILITY-
47:8 48:14,18,21
57:3
RESTRICTED- 27:22
RESTRICTION-
61:25
RESTRICTIONS-
63:5
RESULT- 43:23
57:13
RESULTING- 48:23
RESULTS- 45:22
46:18
RETAINS- 11:25
RETENTION- 15:8
RETROACTIVELY-
33:23
RETURN- 46:12
66:6
REVEALED- 63:15
REVERSE- 31:6
REVIEWED- 17:14
REVIEWING- 32:20
REVISIONS- 9:20
RIGHTFUL- 44:6
RIGHTS- 45:3,11
50:16 55:4 70:11
RING- 34:13
RISE- 8:12
RISK- 48:14 49:21
ROAD- 10:25 25:1
ROBERT- 28:10
67:21
ROLE- 55:13
ROOM- 27:12
31:14,17 42:2
43:22 50:9
ROSNER- 52:20
ROUND- 42:11
43:4 72:20
ROUTE- 33:6
RUDNICK- 28:11
35:17 62:6 70:18
RULE- 21:20 22:1
37:12 66:23 75:3
RULES- 19:25
21:11,12 22:16,
18 23:10 30:24
55:4 75:19
RULING- 70:7
RULINGS- 69:24
RUN- 72:20

───── S ─────

SANDWICHES- 66:16

SAVE- 77:18
SCHEDULE- 12:14
25:4 39:3 73:14
SCHEDULED- 67:4
73:15
SCHEDULING- 68:21
SCOPE- 10:9
12:18 18:25
24:17,18 38:11
39:7 40:5 45:18
52:25 53:24 63:4,
11
SEAL- 11:18
40:21 52:12,13
SECOND- 15:23
34:15 40:4 46:8
59:1 60:10 62:24
SECONDLY- 21:20
47:15
SECRET- 33:5,8
SECURED- 45:25
SEE- 12:18 16:6
23:4 24:6 27:14
34:16 36:21
42:23 64:5 65:20
66:3 72:6
SEEING- 68:17
SEEK- 10:2,6,8
13:1 55:20 59:21
63:12 66:23
SEEKING- 14:7,10
SEEN- 68:12
SEIFE- 24:15
SELECTED- 9:3
SELECTIVE- 36:11
37:9 38:18 42:14
SELECTIVELY-
35:23 36:18
SENIOR- 44:7
45:25 46:4
SENSITIVE- 13:14
51:4
SENT- 60:24,25
SENTENCE- 36:5
SENTENCES- 36:6
SEPARATE- 71:11
SERVE- 55:3 71:16
SERVED- 55:5
72:18
SERVES- 55:14
SESSION- 18:7,8
SESSIONS- 16:4
18:8
SET- 11:6 26:5
41:15 53:22 67:16

SETTLE- 48:23
SETTLEMENT- 12:4,
15,18,20,24,25
39:8,10,13 40:6,
7 43:12,19 44:1,
6,9 45:19 47:5
48:3,6,19 49:19,
25 50:5,9,13,19
53:1,2,14,18,20
56:24 57:5 58:7
SEVERAL- 53:16
SHARE- 49:11
55:10 56:14
SHARED- 19:22
51:21 55:10
SHARES- 36:7
SHARING- 42:23
SHELL- 27:15
SHIELD- 35:21
SHIFTING- 52:11
SHORTEN- 68:20
69:11
SHOULDN'T- 18:25
31:21 34:4 62:12,
13 63:5 72:23
SHOW- 59:12 60:9,
10,12 62:15 63:3,
6 64:3
SHOWING- 59:25
SIDE- 35:3 37:7
56:8
SIDES- 29:21
SIDLEY- 18:3 68:3
SIEGEL- 28:14
29:5,8 34:19
35:4,17 38:5
62:5,9,18 70:15,
17 72:4,9,17,22
73:13,16 76:8
SIEGEL'S- 74:19
SIGN- 66:3 75:10
SIGNED- 17:25
SIGNIFICANT-
47:15
SIMILARLY- 27:6
SIMPLEST- 45:8
SIMPLY- 19:21
50:25 68:15
SIMULTANEOUS-
35:7
SIT- 34:22
SITTING- 37:7
SITUATION- 29:4
56:9 60:17
SITUATIONS- 65:8

**SMALL-** 11:17,18 13:6 32:4 33:3
**SMALLER-** 18:8
**CO-CALLED-** 43:7
**SOLVENCY-** 31:24 33:2 34:12
**SOLVENT-** 47:25
**SOMEWHAT-** 11:19
**SOONER-** 76:1
**SOPHISTICATED-** 26:13 38:16 58:12,13
**SORTS-** 29:16 32:1,10
**SOUGHT-** 56:1
**SOUND-** 78:18
**SOUNDS-** 30:17
**SPEAKERS-** 8:2 78:12
**SPECIFIC-** 14:6 15:9
**SPEECH-** 35:13
**SPEED-** 20:5,14 21:23 26:9 31:21
**SPENT-** 31:19
**SQUARE-** 19:25
**STAGE-** 23:17 30:5 57:12,17 68:14
**STAGES-** 32:5
**STAKED-** 53:11
**STAND-** 23:12 78:11
**STANDARD-** 63:16, 21 74:1
**STANDPOINT-** 71:7
**STAR-** 36:4
**STARK-** 28:10,17 30:18,19,21 35:18 66:16 67:21 70:5
**START-** 17:16 18:5 54:4 71:14 73:23 74:3,5,13
**STARTED-** 23:19, 20,25
**STARTING-** 54:7 71:17
**STATE-** 39:17 52:22
**STATEMENT-** 17:9, 20 18:5 19:10 40:1 45:13 47:6 48:4 67:23 68:15
**STATUS-** 23:15

**STAY-** 9:10 25:4
**STAYS-** 61:1
**STEPS-** 47:12
**STERN-** 8:17 65:25
**STIPULATE-** 54:5
**STIPULATED-** 54:9
**STORY-** 29:22 35:3
**STRATEGIC-** 36:11
**STREAMLINE-** 22:11 68:5
**STRENGTHS-** 42:20
**STRIKE-** 9:24
**STRONGLY-** 16:13 41:24
**SUBJECTS-** 26:11 62:25
**SUBMISSION-** 58:4
**SUBMISSIONS-** 45:12
**SUBMITTED-** 17:4, 17,19 45:13 60:1
**SUBORDINATION-** 47:16,22
**SUBPOENAS-** 15:25 66:25
**SUBS-** 48:15,21
**SUBSEQUENTLY-** 36:7 47:19
**SUBSET-** 39:21
**SUBSIDIARIES-** 47:24 48:10
**SUBSIDIARY-** 32:8 48:6
**SUBSTANTIAL-** 9:19
**SUBSTANTIALLY-** 10:13
**SUCCESS-** 12:10
**SUFFICE-** 43:21
**SUFFICIENT-** 49:20 57:15
**SUGGESTED-** 29:14
**SUGGESTION-** 37:23 66:16 70:13 72:14
**SUM-** 50:3
**SUPPLEMENT-** 35:18 72:12
**SUPPLEMENTAL-** 71:18
**SUPPORT-** 25:25 26:1,2,20 38:10 50:6
**SUPPORTIVE-** 24:19 25:6,8 38:14

**SUPPOSED-** 35:1
**SURROUNDED-** 31:25
**SUSPECT-** 68:6,16
**SUSPICIOUS-** 56:9
**SUSTAINABLE-** 33:15
**SWORD-** 35:21
**SYSTEM-** 23:6 51:11

---

T

**TABLE-** 8:15
**TAKING-** 69:9 76:16
**TARGETS-** 32:14
**TASK-** 29:13,24 31:2
**TASKS-** 53:22
**TEAM-** 11:15
**TELEGLOBE-** 36:2
**TELEPHONE-** 68:2 78:1
**TELEPHONICALLY-** 66:6
**TENSION-** 12:8
**TERM-** 44:11
**TERMINATION-** 55:23
**TERMS-** 18:11 19:25 32:12 34:11 55:25 56:15
**THANKFUL-** 28:18, 19
**THANKS-** 8:3 27:21
**THEORETICAL-** 50:10
**THEORIES-** 34:11
**THEREFORE-** 46:22
**THERETO-** 39:11
**THEY'LL-** 15:5 21:21 42:22 59:7
**THIRD-** 16:10 17:3 20:22 35:20 36:4,7 63:6
**THIRST-** 56:20
**THREE-** 9:8 11:5 12:23 15:17 20:1 28:12 30:24 47:23 53:5 68:17
**THRESHOLD-** 17:17
**THUS-** 47:25
**TICKET-** 32:9
**TIED-** 34:17 46:24
**TIL-** 62:10 69:21
**TIME-** 11:13 26:5

30:6 31:19 32:4, 15 33:3,22 39:5, 24 40:16,22,23 41:2 46:16 48:12 49:10,12 50:23 51:20 53:15,19 55:21 59:6,8 62:13 65:4,9,19 67:9,17 69:4,11 71:8,20,22 72:1, 11,20 73:3,5,8
**TIMING-** 40:13
**TODAY-** 8:19 10:8 11:3 13:12 15:2 32:24 34:20 45:7 49:17 50:4 52:10 56:17 57:19,23, 24 58:2 69:24 70:4 78:8
**TOGETHER-** 32:16 57:21
**TOMORROW-** 57:25 66:5 69:21 71:17 72:18 77:10,13, 21 78:1
**TONE-** 22:3
**TONIGHT-** 77:25
**TOP-** 15:11
**TOPIC-** 57:16 74:15
**TORRES-** 52:21
**TOUCHED-** 38:23 40:4
**TOWARDS-** 30:15
**TRACK-** 28:4,19 71:8
**TRACKING-** 33:25
**TRADITIONAL-** 13:16
**TRANSACTION-** 10:18 32:4,5 43:9 46:12 47:11
**TRANSACTIONS-** 47:10
**TRANSCRIBED-** 21:7
**TRANSCRIPT-** 78:17
**TRANSCRIPTS-** 78:23
**TRANSFER-** 45:20 46:15,25 47:3,8 48:14,18,23 49:4, 18,21,24 50:10,19
**TRANSFERS-** 47:10, 11
**TREATMENT-** 47:4
**TRIAL-** 34:1

TRIBUNE- 9:4
TRIED- 23:11
TROUBLE- 64:1
TROUBLING- 31:9
TRUNCATED- 33:22
TRUST- 9:10
28:11 30:15
32:19 37:7,21
55:2 62:6
TRUST'S- 71:7
TRUSTEE- 9:3
17:17 52:5 54:16
67:8,9 68:22
TUCHIN- 8:16
65:25
TURN- 8:22 13:24
70:14
TURNS- 57:25
TWO- 10:20 16:18
20:7 30:7 36:6
38:23 45:21 60:6
72:15,18,24
73:20 74:1,21,22,
24 75:20,24 76:1,
3
TWO-WEEK- 71:20
73:8 75:12
TYPICALLY- 47:9
59:5

U

ULTIMATELY-
45:15 46:10
49:14 65:13
UMBRELLA- 17:2
56:7
UNABLE- 74:11
UNADJUSTED- 48:7
UNAVOIDED- 47:20
UNDERLIE- 47:5
UNDERLYING- 39:1
46:24
UNDERSTANDING-
61:9 75:17
UNDERSTOOD- 61:20
UNDERTAKE- 59:17,
19
UNDOUBTEDLY-
65:13
UNDUE- 42:3
UNFAIR- 13:4
76:10
UNFOLDS- 29:23
UNITED- 9:3 52:5
UNIVERSE- 77:16
UNKNOWN- 43:14

UNLESS- 9:6
11:25 21:16
55:16 61:2 69:6
76:19
UNREALISTIC-
50:25
UNREASONABLY-
13:6 32:3
UNRESOLVED- 66:5
UNSCATHED- 46:17
UNSECURED- 44:7
UNTOLLED- 32:12
UNUSUAL- 28:24
29:10
UPCOMING- 73:6
UP-TO-SPEED-11:15
URGING- 11:14
USED- 44:6 46:15
48:23 55:16
USEFUL- 51:9
62:14 71:10,12
USES- 15:21
USING- 75:4
UTILIZE- 21:16
61:2,4
UTILIZES- 58:20
UTILIZING- 17:2

V

VACATION- 41:6
VALUE- 48:9,12,
17,20,22
VALUED- 47:24
VARIOUS- 16:11
24:21 25:7 26:10
29:15,17 30:11
31:9 37:3
VEIL- 63:11
VERACITY- 51:11
VERIFIED- 17:9,19
VERSION- 39:19
VERSUS- 35:2
VET- 21:24
VIABILITY- 49:17
VICE- 8:17
VIEW- 29:16,20
31:3 32:21 41:23
51:8,17 56:25
58:17 62:4 63:1
VIEWED- 33:20
VIEWPOINTS-
29:18 33:11 74:14
VIEWS- 13:5 33:2
35:15 65:5
VINDICATION-

VIOLATION- 9:9

W

WAIT- 32:18
WAITING- 24:1
WAIVER- 10:15
18:25 36:16 37:9
38:13
WAIVING- 19:2
20:5 21:15 28:6
59:14
WALK- 72:5
WANTING- 11:23
WANTS- 21:16
30:25 53:25 59:7
61:19
WASN'T- 21:2
35:13 61:22
WATCH- 65:17
WE'RE- 14:10,25
15:15 28:17,19,
20 30:4,22 32:21,
22,24 33:17,25
36:1 37:3 38:14
41:22 49:17 50:3,
7,15,18,22 66:1,
5 68:4,17 71:8,
14 74:4,12 75:18,
20
WEAKNESSES-
42:19,21
WEDNESDAY- 67:1
WEEK- 16:4 18:7
41:6 60:24 73:23
WEEKEND- 30:8
WEEKS- 30:8 41:4
72:15,18,24
73:20 74:1,21,22,
24 75:20,24 76:1,
3
WELCOME- 8:14
25:18
WELLS- 43:6
45:10 50:15 66:10
WHEAT- 26:13
WHEREAS- 45:24
46:5 48:4
WHEREBY- 29:17
WHEREUPON- 78:13
WHISPER- 22:21
WHO'S- 52:2
WHOLE- 21:10
WILL- 9:12,13
11:9,17 12:2,17,
23 14:20 15:3
16:5,21,22 19:11

21:18,22 23:7,8
25:4,18 26:8,16,
17 27:22,24
29:18 30:7,10,11
31:14 32:2 35:4
36:5,17 37:20,22
38:17,19 39:9,11
40:8 41:4,7
42:18 44:4 47:12
49:12,13,14,24
51:9 53:24 57:14
59:14,21 62:22
63:2,20 65:8,12
66:9 68:5 75:11
77:15,24 78:11
WILLING- 36:22
63:17 77:13,21
78:1
WILMINGTON- 9:10
28:11 30:15
32:19 37:6,21
55:2 62:6 71:7
WIND- 59:14
WIPE- 46:15
WISH- 38:6 40:11
52:2 53:10 77:4,
12
WISHES- 43:3
52:19 58:10
WITHHELD- 15:14
WITHHOLD- 35:22
WITNESS- 59:13
60:2,11,12 62:15
63:7,17 73:18
WITNESSES- 31:12
63:20 64:21
WON'T- 23:8 33:8,
10,11,21 35:11
37:23 40:24
62:20 68:9,13
74:2,3
WONDERFUL- 57:24
WORD- 14:11,16,
18 47:5 65:17
73:1 75:16
WORDED- 75:2
WORDS- 14:10,17
61:5 75:15 76:18
WORE- 43:16
WORK- 18:18
23:11 24:20,21
25:2,11 26:1,9,
13,18 28:1,23
31:6 40:23 59:15,
19 61:5 65:12
66:22 73:7,9

74:22 77:8
**WORKED-** 21:11
39:20 76:19
**WORKING-** 18:6,10
30:15
**WORLD-** 38:22
**WORTH-** 36:1
**WOULDN'T-** 61:25
**WRITING-** 29:16
**WRITTEN-** 75:23

### Y

**YEAR-** 32:11
**YORK-** 9:17
**YOU'D-** 13:23
41:10 63:23 64:1
**YOU'LL-** 13:12
**YOU'RE-** 8:8 19:2
21:15,23 22:22,
23,24 23:1 42:16
57:23 76:14,22
**YOU'VE-** 25:24
33:14,15 35:25
58:9 75:19

### Z

**ZELL-** 31:13
32:13 34:8