## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| TRIBUNE COMPANY, et al., | ) Case No. 08-13141 (KJC) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) Re: Docket Nos. 4008 and 4204 |
| | ) **Hearing date**: May 20, 2010, at 10:00 a.m. (Eastern) |
| | ) |
| | ) **Objection deadline**: May 13, 2010 |
| | ) |

### CREDIT AGREEMENT LENDERS'
### OBJECTION TO DISCLOSURE STATEMENT AND
### MOTION FOR APPROVAL OF PLAN SOLICITATION PROCEDURES

The Credit Agreement Lenders[1] hereby object to the proposed "Disclosure Statement For Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries" [docket # 4008] (the "Disclosure Statement") and the "Motion Of The Debtors For An Order (I) Establishing Procedures For Solicitation And Tabulation Of Votes To Accept Or Reject Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries; (II) Establishing Deadline For Return Of Media Ownership Certifications; (III) Scheduling Confirmation Hearing; (IV) Establishing Notice And Objection Procedures In Respect Of Confirmation Of Joint Plan Of Reorganization; And (V) Granting Related Relief" [docket # 4204] (the "Solicitation Procedures Motion").

---

[1] The Credit Agreement Lenders are the entities identified in the "Sixth Amended Joint Verified Statement Of Representation Of More Than One Creditor By Hennigan Bennett & Dorman LLP And Young Conaway Stargatt & Taylor, LLP".

## Table of Contents

Page

I.     PRELIMINARY STATEMENT ............................................................................1

II.    INADEQUATE DISCLOSURE REGARDING THE
       NATURE OF THE LBO-RELATED CAUSES OF ACTION
       AND THE BASIS FOR THE "SETTLEMENT" ...........................................2

       A.    Lack Of Disclosure Regarding Subsidiary Guarantors...........................4

       B.    Lack Of Disclosure Regarding Independence Of Tender Offer And Merger .........5

       C.    Lack Of Disclosure Regarding Other Defects In
             The LBO-Related Causes Of Action .........................................7

             1.    *Market Process* ...............................................................7

             2.    *Surviving Claims* ..........................................................8

             3.    *Tax Benefits*...................................................................9

             4.    *Section 546(e)* ...........................................................10

III.   INADEQUATE DISCLOSURE REGARDING RELEASES,
       INDEMNITIES, AND DISPROPORTIONATE
       CONTRIBUTIONS TO THE "SETTLEMENT".........................................11

       A.    Disgorgement Claims..........................................................12

       B.    Claims Against Zell And Others.............................................13

       C.    Indemnification For Non-Estate Claims Against Citibank ....................16

IV.    INADEQUATE DISCLOSURE REGARDING THE EXAMINER ......................17

V.     UNFAIR PROCEDURES REGARDING
       COERCED THIRD PARTY RELEASES..................................................19

VI.    OTHER MISSING OR INADEQUATE DISCLOSURES ...........................23

       A.    New Senior Secured Term Loan............................................23

       B.    Uncapped And Potentially Unlimited Cash Payments To
             Parent-Level Trade And Employee/Retiree Creditors..................23

       C.    Retiree Claim Settlement ...................................................24

       D.    TMIP And KOB....................................................................25

VII.   CONCLUSION ..........................................................................25

# Table of Authorities

**Page**

## *Cases*

*Adelphia Recovery Trust v. Bank of America, N.A.*, 390 B.R. 80 (S.D.N.Y. 2008) ........................4

*In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004)................................................21

*In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000) ...............................................20

*In re Harstad*, 39 F.3d 898 (8th Cir. 1994)................................................................4

*Hartford Underwriters Ins. Co. v. Union Planters*, 530 U.S. 1 (2000) .........................22

*HBE Leasing Corp. v. Frank.* 48 F.3d 623 (2d Cir. 1995) ...........................................9

*In re Iridium Operating, LLC*, 373 B.R. 283 (Bankr. S.D.N.Y. 2007)................................7

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Company*,
   910 F. Supp. 913 (S.D.N.Y. 1995) ...............................................................8

*In re New Century TRS Holdings*, 390 B.R. 140 (Bankr. D. Del. 2008) ......................17

*In re New Century TRS Holdings, Inc.*, 407 B.R. 576 (D. Del. 2009)............................21

*In re Nutritional Sourcing Corp.*, 398 B.R. 816 (Bankr. D. Del. 2008) ........................17

*In re Spansion, Inc.*, Case No. 09-10690 (KJC), 2010 Bankr. LEXIS 913
   (Bankr. D. Del. Apr. 1, 2010) ..................................................................22

*VFB LLC v. Campbell Soup Co.*, 482 F.3d 624 (3d Cir. 2007) ......................................7

*Wellman v. Wellman*, 933 F.2d 215 (4th Cir. 1991) ...................................................5

*In re Zenith Electronics Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999)................................20

## *Statutes*

11 U.S.C. § 546(e) ..........................................................................................10

11 U.S.C. § 548(d)(2)(A)..................................................................................9

11 U.S.C. § 1123(a)(4)....................................................................................22

## I.    PRELIMINARY STATEMENT

As the Court is aware, the Credit Agreement Lenders do not support the so-called "settlement" on which the Debtors' proposed plan of reorganization (the "Plan") is based.[2]  That Plan is not confirmable for many reasons, not least of which is that it cannot be crammed down over the objection and dissenting vote of the Credit Agreement Lenders and other holders of Credit Agreement claims.

The Credit Agreement Lenders are mindful of the Court's admonition to refrain from raising confirmation issues in conjunction with Disclosure Statement proceedings.  Accordingly, while the Plan itself is patently unconfirmable on its face, and the Debtors' insistence on moving forward with the Plan under the shelter of plan exclusivity will only serve to prolong these cases and cost the bankruptcy estates millions of dollars, the Credit Agreement Lenders will not fight the confirmation battle now, and simply reserve their rights to contest confirmation at the appropriate time.

Setting aside confirmation issues, at a minimum, the Disclosure Statement must adequately explain the proposed settlement and the Plan for which the Debtors intend to solicit votes.  Put simply, creditors must understand what it is they are being asked to support and the consequences of their vote.  The Disclosure Statement and the other proposed solicitation materials are severely deficient in this regard.  The Credit Agreement Lenders therefore request that the Court not authorize the solicitation of votes absent substantial additional and corrected disclosure with respect to the critical topics summarized below.[3]

---

[2]    Disclosure Statement at 6 ("the Plan reflects and seeks to implement the terms of the Settlement Term Sheet").

[3]    The Credit Agreement Lenders have provided these comments on an informal basis to the Debtors, who indicated that additional disclosure on some of the points raised below may be made.  The Credit Agreement Lenders file this Objection as a consequence of the pending objection deadline, and reserve all rights with respect to any additional or modified disclosures made by the Debtors.

## II.     INADEQUATE DISCLOSURE REGARDING THE NATURE OF THE LBO-RELATED CAUSES OF ACTION AND THE BASIS FOR THE "SETTLEMENT"

The settlement embodied in the Plan purports to resolve any and all "LBO-Related Causes of Action," which the Disclosure Statement summarizes as claims "based on the assertion that the debt incurred as part of the Leveraged ESOP Transactions rendered Tribune insolvent and/or left Tribune with relatively small capital, harming all of the Debtors' creditors."[4]  The Disclosure Statement specifically describes the LBO-Related Causes of Action as claims to:

> (i)      avoid all of the guarantees provided by the Subsidiary Guarantors and avoid the obligations incurred and liens provided by Tribune in connection with the Leveraged ESOP Transactions as fraudulent transfers,

> (ii)     avoid and recover for the benefit of the Debtors' Estates the amounts paid to certain third-parties [sic] in connection with the Leveraged ESOP Transactions as fraudulent transfers,

> (iii)    avoid, recover and/or subordinate to all creditors, including Tribune's creditors, for the benefit of the Debtors' Estates the obligations incurred and collateral granted to certain lenders in connection with the Leveraged ESOP Transactions as fraudulent transfers,

> (iv)     equitably and/or statutorily disallow all claims by certain third-parties [sic],

> (v)      recover for the benefit of the Debtors' Estates damages caused by breaches of fiduciary and other duties in engineering, facilitating and/or approving the Leveraged ESOP Transactions,

> (vi)     recover for the benefit of the Debtors' Estates damages caused by certain third-parties [sic] having aided and abetted alleged breaches of fiduciary duties with respect to the Leveraged ESOP Transactions,

> (vii)    recover for the benefit of the Debtors' Estates damages caused by the negligence of certain third-parties related to the Leveraged ESOP Transactions,

---

[4]    Disclosure Statement at 57.

(viii)    recover for the benefit of the Debtors' Estates damages caused by the negligent misrepresentation of certain third-parties, and

(ix)    obtain declaratory judgment to disregard the corporate structures of certain Tribune subsidiaries on the basis of alter ego, veil piercing, substantive consolidation, or any other doctrine of law or equity.[5]

*The Disclosure Statement, however, contains no substantive explanation, description, or summary of any of these alleged claims.* For example, the Disclosure Statement provides that "the most significant" of the LBO-Related Causes of Action "are claims for constructive fraudulent conveyance."[6] The following is the *entirety* of the Disclosure Statement's description of those "most significant" claims and the basis for the settlement of them, which now forms the cornerstone of the Plan:

> To prevail on such claims, it must be shown that the Leveraged ESOP Transactions rendered the Debtors insolvent and that reasonably equivalent value was not provided to the Debtors in good faith. The LBO Lenders are expected to vigorously contest each of these points and to raise other defenses as well. Two issues that will have a significant impact on the resolution of these claims and recoveries pursuant thereto are (i) whether the subsidiary guarantees can be successfully challenged and (ii) whether the debt incurred in connection with the step two transactions should be taken into account in assessing solvency at the time of the step one transactions. The proposed settlement takes each of these two issues as well as other issues into account and, in the Debtors' view, constitutes a reasonable resolution of the LBO-Related Causes of Action against the LBO Lenders.[7]

This is meaningless pabulum that explains nothing. The Disclosure Statement does *not* summarize any of the facts necessary to prevail on any of the alleged claims; it does *not* describe what the putative plaintiffs would have to prove to achieve a material recovery; and it does *not* explain the alleged bases for the claims or their relative strengths and weaknesses. For example:

---

[5]    Disclosure Statement at 57-58.

[6]    Disclosure Statement at 58.

[7]    Disclosure Statement at 58-59.

A.    **Lack Of Disclosure Regarding Subsidiary Guarantors**.

Although it identifies as important the question of "whether the subsidiary guarantees can be successfully challenged," the Disclosure Statement says nothing about *why* viability of the subsidiary guarantees is a critical issue. The answer is that, as of the time of the transactions, the Tribune subsidiary guarantors had more than *$2 billion less debt* than Tribune Company, the parent entity. This means that, to prevail on a constructive fraudulent conveyance claim with respect to the subsidiary guarantors, the putative plaintiffs would have to establish that the value of the guarantors (who held substantially all of Tribune's valuable operating assets) was less than the amount of the Credit Agreement obligations at the times of incurrence, *without taking into account $2 billion in preexisting Tribune parent bond and other debt*. In other words, the putative plaintiffs would need to prove that the consolidated Tribune enterprise was insolvent by more than $2 billion to prevail on avoidance claims relating to the subsidiary guarantors. This is, to say the least, a highly unlikely litigation result.

Further, the Disclosure Statement does not mention the very serious question as to whether creditors of the Tribune parent entity (including the noteholders agitating for pursuit of the avoidance claims) even have standing to prosecute or the ability to benefit from avoidance actions commenced on behalf of the Tribune subsidiary estates. This is a major issue because, as previously explained,[8] the avoiding powers exist "only for the benefit of creditors, and not for the benefit of the debtor itself." *Adelphia Recovery Trust v. Bank of America, N.A.*, 390 B.R. 80, 94 (S.D.N.Y. 2008). Shareholders of the debtor (or, as in this case, creditors of a shareholder of the debtor) cannot benefit from an avoidance action. *See, e.g., id.* at 92-97 (dismissing fraudulent conveyance and avoidance actions brought on behalf of subsidiary debtors where litigation would benefit only creditors of parent entity); *In re Harstad*, 39 F.3d 898, 903-05 (8th

---

[8]    *See* "Credit Agreement Lenders' Objection To Debtors' Motion For An Order Pursuant To 11 U.S.C. § 1121(d) Further Extending Debtors' Exclusive Periods Within Which To File A Chapter 11 Plan And Solicit Acceptances Thereof" [docket # 2617], at 7-9; "Credit Agreement Lenders' Objection To Debtors' Motion For An Order Pursuant To 11 U.S.C. § 1121(d) Further Extending Debtors' Exclusive Periods Within Which To File A Chapter 11 Plan And Solicit Acceptances Thereof" [docket # 3408], at 2-4.

Cir. 1994) (affirming dismissal of avoidance action where creditors of the debtor estate seeking to pursue avoidance action would not benefit from recovery on claims); *Wellman v. Wellman,* 933 F.2d 215, 217-19 (4th Cir. 1991) (same). Here, creditors of the subsidiary debtors are likely to be paid in full (as proposed by the Plan) or otherwise offered plan treatment acceptable to them, meaning that no creditor of the subsidiary guarantors possibly could benefit from an action to avoid the guarantees, and Tribune parent noteholders have no standing to bring such claims.

Finally, the Disclosure Statement also does not describe the significance of the subsidiary guarantees to the recoveries of Tribune parent creditors in these cases. Simply put, under all realistic scenarios, ***avoidance of Credit Agreement claims against Tribune parent alone (keeping the subsidiary guarantees intact) would not materially improve the recoveries of Tribune parent creditors*** or materially diminish recoveries of holders of Credit Agreement claims. Thus, the putative plaintiffs' probable inability to avoid the subsidiary guarantees is highly relevant to any Credit Agreement lender's assessment of the proposed settlement of the LBO-Related Causes of Action.

In light of the foregoing, in order to enable holders of Credit Agreement debt to assess the nature of the settlement they are being asked to support and exclusively fund, the Disclosure Statement must explain the challenges to avoidance of the subsidiary guarantees and the impact on recoveries of holders of Credit Agreement claims in the event that those guarantees ultimately are enforced.

### B.    Lack Of Disclosure Regarding Independence Of Tender Offer And Merger.

Although it identifies as important the question of "whether the debt incurred in connection with the step two transactions should be taken into account in assessing solvency at the time of the step one transactions," the Disclosure Statement similarly says nothing about *why* this is a significant issue. The answer is that the Credit Agreement debt was incurred in connection with two separate and entirely distinct transactions – a recapitalization and tender offer consummated in June 2007 and the highly-contingent ESOP merger consummated in

December 2007, more than six months later.[9]  These two transactions were not multiple "steps" of the same transaction, the Debtors' nomenclature notwithstanding.  They were separate and independent, with the June 2007 tender offer having purposes completely independent of (and chosen by the Debtors as preferable to) the ESOP merger.  In fact, there was substantial uncertainty as to whether the ESOP merger ultimately would close (and hence no guarantee that Tribune would incur even a dollar of additional debt under the Credit Agreement), as the ESOP merger was conditioned, among other things, on obtaining waiver of the media cross-ownership rules from the Federal Communications Commission, the approval by Major League Baseball of a transfer of the Chicago Cubs franchise, and a second independent, contemporaneous opinion of solvency.

It defies logic to suggest that $2.1 billion in debt incurred in December 2007 in connection with the ESOP merger somehow should be considered in assessing whether Tribune and its subsidiaries were insolvent six months earlier at the conclusion of the tender offer (or even earlier, in April 2007, when the Credit Agreement lending commitments were procured).  Yet, if the putative plaintiffs cannot prove this logic defying proposition, all of the Credit Agreement debt incurred in connection with the June 2007 tender offer will remain valid and unavoidable.

Critically, it produces virtually no economic benefit to Tribune parent creditors to separately avoid the Credit Agreement and other debt (*i.e.*, the Bridge Facility) incurred in connection with the December 2007 ESOP merger, because the remaining Credit Agreement debt incurred in connection with the June 2007 tender offer exceeds the Debtors' current enterprise value.  This means that *holders of Credit Agreement debt would be entitled to substantially all of the currently existing value of the bankruptcy estates even if the December 2007 merger debt was avoided*.

---

[9]    Disclosure Statement at 27-28.

Here again, in order to enable holders of Credit Agreement debt to assess the nature of the settlement they are being asked to support and pay for, the Disclosure Statement must explain the significance of the issues – acknowledged by the Debtors – regarding the putative plaintiffs' attempts to collapse the ESOP merger into the tender offer that predated it by six months, and the impact on recoveries of holders of Credit Agreement claims in the event that the plaintiffs ultimately cannot prove that the debt incurred in connection with those separate transactions should be considered together.

### C.    Lack Of Disclosure Regarding Other Defects In The LBO-Related Causes Of Action.

The Disclosure Statement also omits any discussion of a number of other facts that are highly relevant and material to a creditor's consideration of the Plan and the proposed settlement of the LBO-Related Causes of Action, including the following:

### 1.    Market Process.

The Disclosure Statement does not disclose that the June 2007 tender offer and December 2007 ESOP merger transactions were the culmination of a year-long auction process with respect to Tribune, run by sophisticated (and highly paid) investment banks. That process resulted in bids made by existing shareholders (the Chandler Trusts), with equity sponsorship from Centerbridge Partners (now a Tribune noteholder and, prior to settlement, a leading agitant in favor of pursuit of the LBO-Related Causes of Action), and by a consortium of Eli Broad and Ronald Burkle. The Broad/Burkle team submitted several bids in the range bid by Sam Zell, prompting Zell to raise his bid and ultimately prevail in the auction.

The results of this process are highly relevant to, if not dispositive of, the question of Tribune's solvency at the time the Credit Agreement debt was incurred. As the Third Circuit has held, the results of a fairly-run auction establish value. *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) ("Absent some reason to distrust it, the market price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.") (quotation omitted); *In re Iridium Operating, LLC*, 373 B.R. 283, 348 (Bankr.

S.D.N.Y. 2007) ("'A powerful indication of contemporary, informed opinion as to value' comes from private investors who 'with their finances and time at stake, and [w]ith access to substantial professional expertise, . . . concluded at the time . . . that the business was indeed one that could be profitably pursued.'") (quoting *In re Longview Aluminum, L.L.C.*, Case No. 03 B 12184, 2005 WL 2030501 (N.D. Ill. July 14, 2005, at *7)).

This is particularly true in the context of this case: "Although not determinative, purchase price may be highly probative of a company's value immediately after a leveraged buyout. *Where a transaction is consummated after arms-length negotiations, and particularly where other potential purchasers expressed interest in buying the company on similar terms, the sale price is a good indicator of the value of the target's assets*." *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Company*, 910 F. Supp. 913, 939 (S.D.N.Y. 1995) (emphasis added) (citations omitted).

Because the auction here resulted in a price that exceeds the amount of Tribune's liabilities following closing of the tender offer and ESOP merger transactions, there is a strong argument that Tribune was, by definition, solvent and that the Credit Agreement debt therefore is not now subject to avoidance. The Disclosure Statement thus must describe the sales and auction process and explain the potential relevance of the bids received in that process to the question of solvency (and, hence, potential avoidability of any Credit Agreement debt).[10]

2.    Surviving Claims.

The Disclosure Statement provides that, "in order to finance the tender offer, Tribune entered into the $8.028 billion Senior Credit Agreement."[11] This is misleading and only partially

---

[10]    The Disclosure Statement also should disclose that existing Tribune shareholders commenced litigation challenging the tender offer and ESOP merger on the grounds that the purchase price was *too low* – in other words, Tribune's owners asserted that Tribune was much more valuable than the price implied by the tender offer and merger transactions. *See Garamella v. Fitzsimons, et al.*, Case No. BC362110 (Cal. Sup. Ct.). This runs directly contrary to the putative plaintiffs after-the-fact assertions that Tribune was insolvent as a consequence of the transactions.

[11]    Disclosure Statement at 56.

accurate.  In fact, ***more than $3 billion of the loan proceeds were used to repay preexisting Tribune debt and provide working capital to the Debtors, and not to repurchase shares***.  As will be shown at confirmation, almost ***all*** of the loan proceeds were used in the first instance for purposes other than payments to shareholders.  It is axiomatic that a lender provides reasonably equivalent value when extending credit to repay preexisting debt.  11 U.S.C. § 548(d)(2)(A) ("'value' means property, or satisfaction or securing of a present or antecedent debt of the debtor"); *HBE Leasing Corp. v. Frank*. 48 F.3d 623, 637 (2d Cir. 1995) (portion of loan used for "legitimate corporate expenditures" was not subject to avoidance even if other loan proceeds transferred without reasonably equivalent value).

Accordingly, even if the putative plaintiffs were able to prevail in establishing that the portion of Credit Agreement debt used to fund the tender offer is avoidable as a fraudulent conveyance, holders of Credit Agreement claims would still have a claim of $3 billion or more in respect of the loan proceeds used to repay existing debt and fund working capital.  This claim would benefit from the subordination provisions of the PHONES and share ratably with other creditors of Tribune Company.  In fact, due to the potential for recovery of more than $2 billion in prepetition payments made by Tribune (as described below), under many scenarios Credit Agreement lenders fare equally well, if not better, in the event that Credit Agreement claims against Tribune actually are avoided (due to the preservation of a $3 billion or greater claim and the increase in value of the bankruptcy estate caused by disgorgement of the $2 billion in prepetition payments).

This too is a highly relevant consideration for Credit Agreement lenders being asked to consider and fund the proposed settlement, and the Disclosure Statement must explain the potential ramifications of partial avoidance of the Credit Agreement debt.

   3.  Tax Benefits.

The Disclosure Statement also says nothing about one of the primary motivating factors for the ESOP merger itself.  In connection with the ESOP merger Tribune converted to a subchapter S corporation and, as a consequence of the ESOP share ownership, was able to avoid

liability for any federal income tax to itself or its shareholders.[12]  At the time of the transactions,

valuation experts assigned *a present value to these tax savings of $1 billion or more*, a fact

highly relevant to any assessment of Tribune's solvency and capitalization (and therefore highly

relevant to any assessment of the alleged fraudulent conveyance claims and the proposed

settlement of them).  The Disclosure Statement must describe the value generated by the

transactions that the putative plaintiffs have sought to challenge.

        4.      Section 546(e).

The Disclosure Statement does not disclose that section 546(e) of the Bankruptcy Code

poses a substantial hurdle to any recovery by the putative plaintiffs on the alleged fraudulent

conveyance claims.  Section 546(e) was amended in 2006 to expand the "safe harbor" from

avoidance to include transfers "made by or to (or for the benefit of) a . . . financial institution [or]

financial participant . . . in connection with a securities contract." 11 U.S.C. § 546(e).  This new

statutory language goes beyond the previous safe harbor for settlement payments to shareholders

to protect transfers (obligations and liens) to lenders (as "financial institutions" or "financial

participants") incurred "in connection with" the underlying securities contracts pursuant to which

the settlement payments are made.  As such, it corrects the historical statutory anomaly that

permitted shareholders in a leveraged buy out to retain payments from the debtor (payments truly

without reasonably equivalent value) while subjecting the lenders who loaned real funds (and

hence departed with real value) to enable the debtor to make those payments to avoidance risk in

respect of their loans.

---

[12]    The tax section of the Disclosure Statement (located eighty pages after the description of the LBO-Related Causes of Action and proposed settlement, and sure to be read by no one) discloses only that: "[As a consequence of the subchapter S corporation status], Tribune and its qualified subchapter S subsidiaries are not currently subject to corporate level federal income tax.  Instead, the income of Tribune and such subsidiaries is required to be reported by its stockholders.  The ESOP, which, as of the Petition Date, was the sole stockholder of Tribune, does not pay taxes on the income that is passed through to it because the ESOP is an employee benefit plan that qualifies for favorable tax treatment under Section 401(a) of the IRC." Disclosure Statement at 136.

Given the newness of the statutory language, no court has yet confronted this issue, but it certainly poses a material risk for the putative plaintiffs. As such, a discussion of section 546(e) is a material component of any analysis of the LBO-Related Causes of Action and a decision by current Credit Agreement lenders as to whether or not to support and fund the settlement embodied in the Plan.

## III.    INADEQUATE DISCLOSURE REGARDING RELEASES, INDEMNITIES, AND DISPROPORTIONATE CONTRIBUTIONS TO THE "SETTLEMENT"

The "global settlement" around which the Plan is structured provides for current holders of Credit Agreement claims to fund the *entirety* of the settlement, through diversion of $400 million or more in value that otherwise would be distributable on account of Credit Agreement debt to other Tribune creditors (primarily Tribune parent noteholders). The Disclosure Statement provides no explanation whatsoever regarding how that settlement amount was derived, and how such a large settlement amount, funded almost entirely by current holders of Credit Agreement debt, is justified or appropriate in light of all of the material hurdles and issues described above with respect to the LBO-Related Causes of Action.

At the same time, while purporting to settle the claims for an amount that vastly exceeds any reasonable, probability-weighted value for the causes of action, the Plan provides for a host of free releases and indemnities in favor of Sam Zell, Tribune insiders, JPMorgan and other parties who otherwise would be liable for LBO-Related Causes of Action but who are to contribute *nothing* to the settlement.

At its core, the "settlement" therefore is riddled with irreconcilable inconsistencies. On one hand, if free releases and indemnities are appropriate from some of those alleged to be liable for the transactions (Zell, JPMorgan, and others), Credit Agreement lenders logically should not be responsible for paying anything to "settle" the alleged claims. On the other hand, if a material settlement payment is in order, all parties allegedly responsible (including Zell, JPMorgan, and others) must make a proportionate contribution to the settlement. As explained below, there is

no conceivable scenario under which a material amount of Credit Agreement debt could be avoided without producing recoveries from those who received the $2 billion in prepetition payments on the avoidable debt and from Zell and the directors and officers. Demanding a contribution from some (current holders of Credit Agreement debt) and not others (Zell, JPMorgan, and other recipients of prepetition payments on the allegedly avoidable debt) is utterly illogical and unfair.

In particular, much more fulsome disclosure is required on the following topics:

### A.    Disgorgement Claims.

While defining the LBO-Related Causes of Action to include claims to "avoid and recover for the benefit of the Debtors' Estates the amounts paid to certain third-parties [sic] in connection with the Leveraged ESOP Transactions," the Disclosure Statement does not disclose that those "amounts paid to certain third parties" exceed *$2 billion*. As the Creditors' Committee previously noted,[13] Tribune made almost $2 billion in principal and interest payments on Credit Agreement and Bridge Facility obligations prior to filing for bankruptcy in December 2008, and Tribune paid over $230 million in fees in connection with the tender offer and ESOP merger transactions.

The Disclosure Statement does not explain that, if there is meaningful exposure with respect to avoidance of the Credit Agreement debt (notwithstanding the serious hurdles and issues summarized above), that exposure logically extends to those who received the $2+ billion of prepetition payments in respect of the allegedly-avoidable debt. After all, if the debt is avoidable, prepetition payments on the debt obviously and inexorably are avoidable as well.

---

[13]    Specifically, the Committee sought authority to bring causes of action that "seek to avoid and recover very large transfers made by the Debtors in connection with the LBO, including (a) almost $2 billion in principal and interest repaid on the LBO Debt, (b) over $200 million in fees paid to the Lead Banks, [and] (c) over $30 million paid to the Debtors' financial advisors." "Motion Of The Official Committee Of Unsecured Creditors For Entry Of An Order Granting Leave, Standing And Authority To Commence, Prosecute And Settle Claims And Counterclaims Of The Debtors' Estates" [docket # 3281] at 8

Further, as explained above, the Disclosure Statement similarly does not reveal that, under most likely recovery scenarios, existing Credit Agreement lenders actually achieve higher recoveries, or are not negatively impacted, by disallowance of Credit Agreement claims against Tribune, provided that recovery of some or all of those $2 billion in prepetition payments is achieved.

Most importantly, *the Disclosure Statement does not set forth <u>any</u> reason why, under the proposed settlement, those potentially liable to return the prepetition payments are to be released without providing consideration to the estates, and then indemnified against loss for any claims that might survive Plan confirmation*.

All of this is highly material and relevant information that holders of Credit Agreement debt must be provided in order to assess the nature of the settlement they are being asked to fund (without any contribution whatsoever from those receiving free releases and indemnifications).

**B.    Claims Against Zell And Others**.

The Debtors define the "LBO-Related Causes of Action" also to include claims for "damages caused by breaches of fiduciary and other duties in engineering, facilitating and/or approving the Leveraged ESOP Transactions" and claims for "damages caused by certain third-parties [sic] having aided and abetted alleged breaches of fiduciary duties with respect to the Leveraged ESOP Transactions."[14] The Disclosure Statement makes it clear that these include claims against "certain former major shareholders (*i.e.*, the Chandler Trusts, the McCormick Foundation and the Cantigny Foundation), the directors and officers of Tribune and its subsidiaries, the Zell Entity and [Sam] Zell, and Tribune's principal advisors."[15]

As with the claims against Credit Agreement lenders, however, *there is not a single word about the nature or bases for such claims*.  In fact, the Disclosure Statement contains only the

---

[14]    Disclosure Statement at 57.
[15]    Disclosure Statement at 59.

following paragraph purporting to summarize potential defenses to the alleged (but undescribed) claims:

> The proposed Global Settlement also takes into account the potential LBO-Related Causes of Action against other parties, including certain former major shareholders (*i.e.*, the Chandler Trusts, the McCormick Foundation and the Cantigny Foundation), the directors and officers of Tribune and its subsidiaries, the Zell Entity and Mr. Zell, and Tribune's principal advisers. Like the LBO Lenders, each of these groups would be expected to vigorously oppose the LBO-Related causes of Action. In that regard, they would likely put forward defenses similar to those asserted by the LBO Lenders as well as ones unique to their particular circumstances. For example, in addition to contesting the existence of a fraudulent conveyance, the major shareholders would almost certainly argue that the repurchases of their stock are shielded from disgorgement by section 546(e) of the Bankruptcy Code. Similarly, the directors and officers would assert that they fully satisfied their fiduciary duties and in support of that position raise various related defenses. For their part, the Zell Entity and Mr. Zell would point out, among other things, that they did not participate in Tribune's decisions to approve or move forward with the Leveraged ESOP Transactions but instead lost over $300 million. In addition, Tribune's principal advisers can be expected to argue that Tribune received reasonably equivalent value for the services that those advisers provided. In assessing the proposed settlement, each of these issues was taken into account and the settlement, in the Debtors' view, reasonably accounts for the LBO-Related Causes of Action against these parties.[16]

Notably, the Disclosure Statement does not say how the alleged settlement takes these potential claims "into account." The Debtors' estates certainly are receiving no consideration for them. To the contrary, ***Zell, the former shareholders, and the advisors all receive comprehensive releases and unlimited indemnities, without having to pay a penny for them***. The only way the potential claims against these third parties were taken "into account" in the settlement was in ensuring that the prospective defendants (some of whom, not coincidentally, happen to be in control of the Debtors to this day) are completely immunized from any liability for the claims for which current holders of Credit Agreement debt are being forced to "settle" for

---

[16]    Disclosure Statement at 59.

$400 million or more. And all of this is proposed despite the fact that *the Debtors failed to undertake any independent examination* (*i.e.*, one conducted without the influence of and control by Zell and other insiders who are potential targets) of the claims and causes of action to be freely released and indemnified.

In fact, *the "settlement" makes the Credit Agreement lenders pay twice in this respect – once to fund the settlement and then again to fund the unlimited indemnities to be handed to Zell and other insiders*. Credit Agreement claims that are now the senior-most obligations in the capital structure are to be converted into equity in the reorganized debtors, which equity will be devalued by and subordinated to the assumed indemnification obligations that otherwise would be disallowed and/or subordinated pursuant to section 510(b) of the Bankruptcy Code.

This is not merely a theoretical outrage. Zell and his controlled companies already are defendants in class action litigation (the *Neil* case) pending in federal court in the Northern District of Illinois, facing claims for breach of fiduciary duty and other causes of action arising in connection with the Tribune transactions, and the District Court recently denied Zell's motion to dismiss those claims.[17] Despite Zell's very real risk of exposure to such claims, under the Plan and "settlement" *Zell is to be completely immunized from the cost of defending against that litigation and from any liability that might be imposed*, with the Credit Agreement lenders forced to pay for that liability through their devalued equity in the reorganized debtors.

This is an outcome that boggles the mind. At a minimum, the Disclosure Statement should clearly and explicitly explain the nature of the claims against Zell and other insiders (including the claims asserted in the *Neil* litigation), state that estate claims against Zell and other insiders are to be released for free, with no contribution whatsoever, and that the consideration to be given under the Plan in respect of Credit Agreement debt could be materially devalued by the indemnities that the Debtors propose to give those insiders as part of the Plan.

---

[17]   Disclosure Statement at 43.

### C.    Indemnification For Non-Estate Claims Against Citibank.

Citicorp North America, Inc., Citibank, N.A., and Citigroup Global Markets, Inc., are named as defendants in the Complaint filed by Wilmington Trust Company (indenture trustee for the PHONES) for claims and causes of action relating the Credit Agreement transactions.[18] Wilmington Trust's Complaint includes claims for alleged breaches of duty arising from Citibank's actions and inactions as prior indenture trustee for the PHONES.[19]  It also includes claims against JPMorgan, Merrill Lynch, Bank of America, Morgan Stanley, and Sam Zell for aiding and abetting Citibank's alleged breaches of duty.[20]

These claims are unquestionably personal to holders of the PHONES and cannot be released as part of the purported releases by the estates.[21]  The Plan, however, provides for Citibank, JPMorgan, Merrill Lynch, Bank of America, Morgan Stanley, and Zell all to be indemnified for liability associated with Wilmington Trust's personal, non-estate claims.  This indemnity is **unlimited** with respect to each defendant's defense costs and with respect to the liability of Zell and his firm, and "limited" to a maximum of $510,711,000 for liability of the bank defendants.[22]  ***It bears repeating that none of these defendants are to pay anything for***

---

[18]  *See* "Objection Of Wilmington Trust Company To The Motion Of The Debtors For An Order (I) Determining That Wilmington Trust Company Has Violated The Automatic Stay, (II) Requiring Wilmington Trust Company To Show Cause Why It Should Not Be Held In Contempt Of Court, And (III) Halting All Proceedings With Respect To The Complaint" [docket # 3942], Ex. A ("Wilmington Trust Complaint").

[19]  Wilmington Trust Complaint, Count Three ("Citibank breached its fiduciary duty to the PHONES by its involvement through its agent in a self-interested transaction that clearly conflicted with the PHONES' interests and in breach and violation of covenants of the indenture for which it was trustee and as a result of which the PHONES sustained damages, in an amount to be proven at trial.").

[20]  Wilmington Trust Complaint, Count Four ("[A]s a result of aiding and abetting defendant Citibank's breach of its fiduciary duty, each of said defendants . . . are liable for all damages caused to the PHONES in an amount to be proven at trial.").

[21]  The Debtors expressly acknowledged that the claims against and relating to Citibank "sound in state law and thus are not part of this Court's core jurisdiction."  "Motion Of The Debtors For An Order (I) Determining That Wilmington Trust Company Has Violated The Automatic Stay, (II) Requiring Wilmington Trust Company To Show Cause Why It Should Not Be Held In Contempt Of Court, And (III) Halting All Proceedings With Respect To The Complaint" [docket # 3759], at ¶ 6 n.8.

[22]  Disclosure Statement at 100-01.

*this indemnity*.  This obviously represents a highly-material potential liability of the reorganized debtors and thus further serves to devalue the equity to be distributed to holders of Credit Agreement debt.

Yet, there is not a word in the Disclosure Statement about Wilmington Trust's alleged claims, the fact that the Debtors propose to indemnify Zell, JPMorgan and the other defendants from liability from and the costs of defending against those claims, or any purported basis for such indemnities.  This is a yet another textbook example of inadequate disclosure.

*     *     *

In sum, the Disclosure Statement says next to nothing about the alleged LBO-Related Causes of Action or the purported bases for settling them in the manner proposed by the vaunted "global settlement."  Holders of Credit Agreement claims who are being asked to fund that settlement – to the tune of $400+ million plus exposure to unlimited indemnities – are entitled to a modicum of disclosure of the basic facts necessary to make an informed decision as to whether the settlement makes sense – the same facts that the Debtors and the Creditors' Committee presumably considered in determining that the proposed settlement was appropriate and that the Court will have to consider in assessing the reasonableness of the proposed settlement at the time of confirmation (in the event that the requisite classes actually vote to accept the Plan).  *See, e.g.*, *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 832 (Bankr. D. Del. 2008) ("the standards for approving settlements as part of a plan of reorganization are the same as the standards for approving settlements under Fed. R. Bankr. P. 9019") (citing *In re New Century TRS Holdings*, 390 B.R. 140, 167 (Bankr. D. Del. 2008)).

Without that information, the Disclosure Statement cannot and does not contain adequate information within the meaning of section 1125 of the Bankruptcy Code.

## IV.    INADEQUATE DISCLOSURE REGARDING THE EXAMINER

The complexity of the issues outlined above, and the Debtors' attempt to "settle" the claims prior to litigation, prompted the Court to order the appointment of an examiner to evaluate

the LBO-Related Causes of Action.  The Court has agreed that the examiner's report on these issues will be an important component in creditors' assessment of the proposed settlement and decision as to whether to accept or reject the Plan, and has directed that the report be filed and made public several weeks before the proposed deadline for voting on the Plan.  The importance of this report is particularly acute for the Credit Agreement Lenders and other holders of Credit Agreement claims, who are being asked to fund the proposed settlement – both through a diversion to other creditors of distributions that otherwise would be available to them and through open-ended indemnities that will devalue the stock in the reorganized debtors that is to be distributed under the Plan.  However, the Disclosure Statement – which was filed before an examiner was appointed and has not been updated since – fails to mention the examiner's appointment or the scope of the issues to be investigated.  This obviously is highly relevant information that needs to be added to the Disclosure Statement.

More importantly, *the Disclosure Statement and the proposed forms of ballots should prominently disclose* – in the introductory section to the Disclosure Statement and the face page of the ballots – *that an examiner has been appointed to investigate the LBO-Related Causes of Actions, that the examiner will file a report on or before July 12, and that the examiner's conclusions will provide important information that all creditors should consider before casting their ballots*.  Further, the Disclosure Statement and ballots should clearly and conspicuously explain how creditors can receive a copy of the report when it is filed, and enable creditors to request that the Debtors deliver a copy of the report to them immediately upon its filing.

Anything less than these fulsome disclosures would defeat a primary purpose of the examiner's appointment and risk voting results tainted by an uninformed or misinformed creditor constituency.

## V.    UNFAIR PROCEDURES REGARDING COERCED THIRD PARTY RELEASES

As noted above, one of the primary problems with the Plan and the proposed settlement is that it provides free releases to those who received prepetition payments on the allegedly avoidable debt, Sam Zell, and others potentially liable for damages in connection with the tender offer and ESOP merger transactions.  The releases are incredibly broad and extend to "all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including without limitation, the LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claim), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in any part upon nay act, omission, transaction, event or other occurrence taking place or existing on or before the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Debtors' Estates" against any and all Released Parties.[23]  The "Released Parties" include "the LBO Lenders, the Debtors' present and former directors, officers, employees and shareholders, and the Debtors' agents and advisors."[24]

The Debtors barely even attempt to justify these third party releases in the Disclosure Statement, asserting only that:

> Substantial financial contributions to the reorganization also have been and will be made either directly or indirectly on behalf of the Released Parties.  The LBO Lenders will contribute significant value to the Senior Noteholders and Holders of General Unsecured Claims in connection with the Global Settlement.  The directors, officers and employees of the Debtors also have made substantial non-financial contributions by designing and implementing the operational restructuring of the Debtors and participating in the informal discovery process relating to the LBO-Related Causes of Action and in the negotiations relating to the Plan.  The LBO Lenders, the advisers and others have also likewise made substantial non-financial contributions by

---

[23]    Disclosure Statement at 96.

[24]    Disclosure Statement at 60.

participating in the informal discovery process and settlement negotiations.[25]

This is a woefully insufficient basis under Third Circuit law to justify the Debtors' release of the third parties. *See, e.g., In re Continental Airlines*, 203 F.3d 203, 214 (3d Cir. 2000) (the "hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, and specific factual findings to support theses conclusions"); *In re Zenith Electronics Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (a debtor's release of a third party requires consideration of whether there is: "(1) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) substantial contribution by the non-debtor of assets to the reorganization; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes 'overwhelmingly' votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.").

The Credit Agreement Lenders recognize that this is an issue for confirmation and reserve all rights in this regard. The proposed releases, however, extend not only to claims held by the bankruptcy estates but also to claims held by any and all creditors who vote in favor of the plan and to creditors who vote to reject the Plan but fail to opt out of the forced release by checking a box on their ballot. Egregiously, the Debtors attempt to coerce creditors from opting out of the forced releases by providing that any creditor who fails to give a release in favor of Sam Zell and other insiders "shall not receive the benefit of the releases set forth in Section 11.2 of the Plan."[26] (Section 11.2 of the Plan, among other things, provides for a release by the Debtors' estates of the LBO-Related Causes of Action against holders of Credit Agreement debt.)

---

[25]    Disclosure Statement at 60.

[26]    Disclosure Statement at 97.

Thus, any Credit Agreement lender who disapproves of the proposed settlement and therefore votes no on the Plan, in the process opting out of the far-reaching forced releases of the lender's own personal claims and causes of action, would be deprived of the very consideration provided by the settlement that the lender is forced to fund – a release of the estates' avoidance claims. In other words, *under this proposed scheme, a lender who rejects the plan and opts out of the releases could find itself in the position of being forced to "settle" its Credit Agreement claims against the estate (through a forced diversion of distributions to other constituents) while remaining completely exposed to future claims and lawsuits by the bankruptcy estates in respect of the LBO-Related Causes of Action purportedly compromised through the "global settlement."*[27]

In contrast, Zell, Tribune's directors and officers, and recipients of the $2+ billion in payments on the potentially-avoidable prepetition debt do not need to cast any votes, grant any releases, or provide any consideration in order to receive the blanket releases and indemnities.

This is truly outrageous and wholly improper, in that it provides disparate and unequal treatment to members of the same class, all of whom are contributing equally to the proposed settlement. *See, e.g., In re Combustion Eng'g, Inc.*, 391 F.3d 190, 239 (3d Cir. 2004) ("Section 1123(a)(4) requires that a plan of reorganization 'provide the same treatment for each claim or interest of a particular class.'"); *In re New Century TRS Holdings, Inc.*, 407 B.R. 576, 592 (D. Del. 2009) ("To be confirmable, a plan must 'provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less

---

[27]    The Plan also provides for *all* holders of Credit Agreement claims to "be deemed" to have fully released the *non-debtor* entities that guaranteed Tribune's Credit Agreement obligations. Unlike the coerced, but nominally voluntary, "opt out" releases described above, Credit Agreement lenders have no ability to opt out of these releases. Each and every Credit Agreement lender, regardless of whether or not it votes in favor of the Plan or opts out of the third party releases described above, is "deemed" to have released the entities that guaranteed the Credit Agreement debt, notwithstanding that those entities chose not to file a bankruptcy case, will not be receiving a discharge, and otherwise have not had to abide by the bankruptcy "rules of the game" (*see, e.g.*, the payment of $25 million and counting in JPMorgan fees and expenses by non-debtor guarantor TCV). Disclosure Statement at 97. The Credit Agreement Lenders are aware of no basis for these extraordinary forced releases and reserve all rights in this regard.

favorable treatment of such particular claim or interest.' 11 U.S.C. § 1123(a)(4). Courts are to enforce this provision according to its plain language. *See Hartford Underwriters Ins. Co. v. Union Planters*, 530 U.S. 1, 6, 120 S. Ct. 1942, 147 L. Ed. 2d 1 (2000). Accordingly, if claims within the same class are not receiving the same treatment, and the holders of those claims being treated less favorably have not consented to the discrimination, the plan is not confirmable.").

In the abstract, the illegality of this provision might be considered a confirmation issue. However, it is plain that the Debtors desire to use the threat of exposure to litigation over the purportedly settled claims as a way to leverage acceptances of the Plan and to coerce lenders not to opt out of the release of their own personal claims and causes of action. This is made clear by the proposed forms of ballot for holders of Credit Agreement claims, which ominously warn, in bold type (in the only emphasized language on the entire ballot) right above the "opt out" check box, that "**[i]f you choose not to grant the releases contained in Section 11.2.2 of the Plan, you shall not receive the benefit of the releases set forth in Section 11.2 of the Plan.**"[28] Moreover, in the Solicitation Procedures Motion, the Debtors have asked that the Court expressly find that "[t]he procedures associated with the Ballots with respect to a party's rights to grant the releases contained in section 11.2.2 of the Plan are fair and reasonable."[29]

Accordingly, the propriety of these coerced releases is a live issue that the Court must address in conjunction with approval of the Disclosure Statement and the Solicitation Procedures Motion. *See, e.g., In re Spansion, Inc.*, Case No. 09-10690 (KJC), 2010 Bankr. LEXIS 913 (Bankr. D. Del. Apr. 1, 2010), at *79 (time to raise issue regarding nature of "opt out" releases was "in connection with the motion for approval of the voting procedures").

---

[28]   Solicitation Procedures Motion, Ex. A (emphasis in original).

[29]   Solicitation Procedures Motion, Proposed Order, at 4 ¶ I (emphasis added).

## VI.    OTHER MISSING OR INADEQUATE DISCLOSURES

Finally, additional disclosure needs to be made regarding the following:

### A.    New Senior Secured Term Loan.

The Plan provides for the distribution of interests in a new loan, and treats the new loan as a "par" obligation – the equivalent of cash.[30]  The Disclosure Statement, however, provides next to no disclosure regarding the terms of the new loan, stating only that it "shall (a) be guaranteed by the U.S. subsidiaries of Reorganized Tribune . . . , (b) be secured by certain assets of Reorganized Tribune and the guarantors thereof subject to specified exceptions and customary intercreditor arrangements, (c) have interest payable in Cash quarterly, (d) have principal payable in Cash quarterly, with the unpaid balance payable on the final maturity date thereof, (e) mature on the fifth anniversary of the Effective Date, (f) include usual and customary affirmative and negative covenants for term loan facilities of this type and (g) be repayable by Reorganized Tribune at any time prior to schedule maturity without premium or penalty."[31]

Notably missing from this cursory description is such rudimentary information as the *interest rate*, the *rate of amortization*, and the *collateral* (the disclosure of a lien on "certain assets" is tantamount to no disclosure at all).  This is critical information that any creditor would need to determine whether the consideration that the Debtors purport to provide is actually worth what the Debtors say it is.

### B.    Uncapped And Potentially Unlimited Cash Payments To Parent-Level Trade And Employee/Retiree Creditors.

The "global settlement" purportedly provides a fixed amount of distributable value to be distributed to holders of "Other Parent Claims" against Tribune Company (primarily trade and retiree claims).[32]  The Plan, however, provides for the holders of "Other Parent Claims" to receive cash payments of 35.18% percent of their claims, without any cap or maximum total

---

[30]  Disclosure Statement at 7.

[31]  Disclosure Statement at 82-83.

[32]  Disclosure Statement at 11.

distribution.[33]  As a result, notwithstanding the contrary disclosure that holders of "Other Parent

Claims" will only receive 1.4% of distributable value, the Debtors' exposure in respect of such

claims is actually unlimited, and could substantially exceed an amount equal to 1.4% of

distributable value.

This is not a hypothetical concern.  The Disclosure Statement indicates that there exist

more than 100 pending lawsuits against the Debtors, for potential big-dollar claims like

defamation, slander, libel, personal injury, and wrongful termination.[34]  The Disclosure

Statement makes no attempt to quantify those claims or estimate the Debtors' total cash liability

(paid at 35.18% of the allowed claim amount) for the claims under the Plan.  These disclosures

must be made, and the inconsistency with the purportedly fixed set aside of distributable value

explained and reconciled.

### C.    Retiree Claim Settlement.

The Disclosure Statement indicates that "the Plan implements and incorporates by

reference the terms of the Retiree Claimant Settlement Agreement, which will be filed with the

Plan Supplement as Exhibit 5.14.3 to the Plan, including, without limitation, the Allowance of

the Claims of certain Retiree Claimants.  Entry of the Confirmation Order shall constitute the

Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Retiree Claimant

Settlement Agreement and the Bankruptcy Court's finding that the Retiree Claimant Settlement

Agreement is in the best interests of the Debtors, the Reorganized Debtors, their respective

Debtors' Estates, and the Holders of Claims and Interests, and is fair, equitable and

reasonable."[35]

This is the entirety of the disclosure regarding the alleged retiree "settlement" (which, the

Court may recall, was announced together with the announcement of the alleged "global

settlement" – not coincidentally given that the retirees whose claims allegedly have been settled

---

[33]   Disclosure Statement at 55.

[34]   Disclosure Statement at 45.

[35]   Disclosure Statement at 86.

previously advocated pursuit of the LBO-Related Causes of Action). The Disclosure Statement does not describe (a) the nature of the retirees' claims, (b) the nature of the defenses to those claims, and (c) how and why the claims were settled. Here again, the Disclosure Statement fails to provide even the most rudimentary information regarding "settlements" that the Debtors ask the Court to approve as being in "the best interests of the Debtors, the Reorganized Debtors, their respective Debtors' Estates." More information is need to enable creditors to make an informed decision about this compromise.

### D.    TMIP And KOB.

The Disclosure Statement indicates that "[t]he Debtors will address the inclusion in the Plan of the TMIP and the KOB [management compensation programs] in a supplement that will be filed by the Debtors prior to the hearing on approval of the Disclosure Statement."[36]

To date, no such supplemental disclosure has been made, and the Credit Agreement Lenders reserve all rights in this regard.

---

[36]    Disclosure Statement at 37.

## VII.    CONCLUSION

For all of the foregoing reasons, neither the Disclosure Statement nor the Solicitation Procedures Motion should not be approved until accurate and adequate disclosure is made with respect to the points discussed above.

Dated:  May 13, 2010                               YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____

Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899 0391
Telephone: (302) 571-6600
Telecopier: (302) 571-1253

- and -

HENNIGAN, BENNETT & DORMAN LLP
Bruce Bennett
James O. Johnston
Joshua D. Morse
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Telephone:  (213) 694-1200
Telecopier:  (213) 694-1234

*Counsel to the Credit Agreement Lenders*