## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
|  | Jointly Administered |
| Debtors. | |
|  | **Related to Docket No. 4008** |
|  | **Hearing Date: May 20, 2010 at 10:00 a.m.** |

## WELLS FARGO BANK N.A.'S OBJECTION TO THE DEBTORS'
## DISCLOSURE STATEMENT FOR JOINT PLAN OF REORGANIZATION
## FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Necomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

Wells Fargo Bank, N.A., as successor administrative agent (in such capacity, the "Administrative Agent") under that certain $1.6 billion Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007 (the "Bridge Loan Agreement"), by and among Tribune Company ("Tribune" and, collectively with its affiliated debtors and debtors in possession, the "Debtors" or the "Company"), each lender from time to time party thereto (the "Bridge Lenders"), JPMorgan Chase Bank, N.A. ("JPM"), as Syndication Agent, Citicorp North America, Inc. and Bank of America, N.A., as Co-Documentation Agents, J.P. Morgan Securities Inc. ("JPMS"), Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC, as Joint Lead Arrangers and Joint Bookrunners, hereby files this objection (the "Objection") to the Disclosure Statement for Joint Plan of Reorganization for Tribune Company and Its Subsidiaries dated April 12, 2010 (the "Disclosure Statement"). [Docket No. 4008] The Administrative Agent respectfully represents as follows:

## PRELIMINARY STATEMENT

1.    As this Court is well aware, the fundamental purpose of a disclosure statement is to ensure that creditors are able to cast their votes for or against a plan on an informed basis. To achieve this objective, a disclosure statement can only be used to solicit votes after the court has determined that the document contains "adequate information;" that is, information that would permit a reasonable business person to fully and fairly assess the pros and cons of the proposed plan and the alternatives to the confirmation thereof.

2.    Against this backdrop, the Debtors' April 12 Disclosure Statement is more fairly characterized as a "non-disclosure statement." The Debtors' proposed plan is constructed around and largely implements a purported global settlement (the "Settlement") of complex fraudulent conveyance claims and other causes of action (the "LBO-Related Causes of Action")

2

arising from the leveraged buy-out of Tribune in 2007 (the "LBO Transaction"). And yet, the

Disclosure Statement is totally devoid of any information that would enable a creditor to form an

independent, informed view regarding the propriety of the Settlement—other than the fact that

the principal parties thereto and architects thereof are not the Debtors, but rather, certain

potential targets of the LBO-Related Causes of Action who (although not disclosed in the

Disclosure Statement) may have received substantial payments that may be subject to

disgorgement as fraudulent transfers.

        3.      Rather than providing creditors with sufficient information to form even a

rudimentary understanding of the LBO-Related Causes of Action and the potential results and

recoveries from the prosecution thereof, on the one hand, and the details of and bases for the

proposed resolution, on the other, the Debtors instead offer nothing more than the glib, totally

unsubstantiated conclusion that the settlement is fair, reasonable and in the best interests of the

estates and their creditors. Such non-disclosure is per se inadequate and should not be approved

by the Court. Among other things, the Disclosure Statement is missing the following salient and

seemingly-required information:

- A reasonably detailed description of the LBO Transaction, including: (a) a description of the material terms of the primary deal documents; (b) a funds flow-chart showing the sources and uses of funds; (c) disclosure of the parties who provided funding (when and in what amounts) and received payments in connection with the LBO Transaction (when and in what amounts); (d) the Company's balance sheets before and after each purported phase of the LBO Transaction; (e) disclosure of projections prepared by or for the Company showing basic financial assumptions and anticipated liquidity; (f) a description of the Company's financial performance after the LBO Transaction and an explanation of any variances from the projections prepared in connection therewith; and (g) disclosure of all advisors retained in connection with the LBO Transaction and what they were paid.

3

- A reasonably detailed discussion of (a) the LBO-Related Causes of Action against each potential defendant, including: (i) the Senior LBO Lenders,[2] (ii) the Bridge Lenders; (iii) the Debtors' former and current directors and officers; (iv) the Debtors' former and current shareholders; and (v) the advisors and agents of the above-mentioned parties; (b) an assessment of the strengths and weaknesses of the foregoing LBO-Related Causes of Action; and (c) a discussion of potential defenses to the LBO-Related Causes of Action, including an explanation of solvency issues in connection with any claims for avoidance or disgorgement.

- A reasonably detailed discussion of the range of potential outcomes from the assertion and prosecution of LBO-Related Causes of Action, including: (a) the expected range of recoveries in the event no settlement was achieved and the LBO-Related Causes of Action were, or were not, successful; (b) the potential consequences of avoidance of claims and the disgorgement of payments; (c) the impact on stakeholder recoveries at the parent and subsidiary levels (with an explanation of any material differences); and (d) the possible time and expense associated with such litigation scenarios.

- A comparison of the terms of the Settlement to the potential range of results from litigating the LBO-Related Causes of Action, including an explanation of the differences; and factual and legal support for why the Debtors believe the Settlement is fair and reasonable and in the best interests of the estates and their creditors (on an entity-by-entity basis unless the Debtors believe that substantive consolidation should occur).

4.    As the stakeholders of these estates have invested millions of dollars in the Debtors' analysis and assessment of the LBO-Related Causes of Action, there is simply no credible justification for the Debtors' failure to provide creditors a meaningful digest of that effort when asking them to vote on a plan that purports to globally resolve such claims and causes of action. Without such information, creditors—particularly those who are not subject to disgorgement of material payments made in connection with the LBO Transaction but nevertheless bear almost the entire burden of the Settlement—are simply not in a position to fairly assess the propriety of the Settlement.

---

[2] As used herein, "Senior LBO Lenders" means the financial institutions from time to time party to that certain $8.028 billion Credit Agreement, dated as of May 17, 2007, with Tribune, as borrower, and JPMorgan Chase Bank, N.A., as administrative agent (the "Senior LBO Credit Agreement").

4

5.      In addition, the Settlement suffers from a number of material infirmities which make the Plan patently unconfirmable and solicitation (without cure) wasteful.  Among other things, the Plan's proposed settlement of the LBO-Related Causes of Action, (a) misallocates substantially all of the burden of settling to the Bridge Lenders; (b) results in unsustainable, disparate recoveries among the lenders to the LBO Transaction; (c) improperly classifies the Bridge Lender claims in the same class as the other LBO-related debt obligations thereby disenfranchising the Bridge Lenders' voting rights; and (d) effectively wipes out the Bridge Lender claims without any contribution being made by the parties who received payments in connection with the LBO Transaction or thereafter.

6.      Accordingly, and as more fully set forth below, the Disclosure Statement should not be approved absent material amendment thereto and to the Plan.  At a minimum, if the Debtors purport to be unable or unwilling to provide adequate information (despite having spent millions of dollars investigating and considering these very matters), the Court should defer approval of the Disclosure Statement until the completion of the recently-appointed Examiner's report.

## BACKGROUND[3]

### Tribune's Leveraged Buy-Out

7.      On April 1, 2007, Tribune's board of directors approved consummation of the LBO Transaction, which ultimately resulted in the then-publicly traded Tribune going private and becoming wholly-owned by a newly-formed employee stock ownership plan (the "ESOP"). (Disclosure Statement at 27; Tribune Co., 2007 Annual Report (SEC Form 10-K) at 37)

---

[3] The Background of these Cases, including the LBO Transaction, has been extensively addressed in numerous pleadings filed in these Cases and has been the subject of extensive discussions before the Court.  We highlight here only certain facts relevant to the Objection.

8.      Tribune financed the LBO Transaction mainly with the proceeds of the credit facilities issued under the Senior LBO Credit Agreement and the Bridge Loan Agreement (respectively, the "Senior LBO Credit Facility" and the "Bridge Facility"). (Disclosure Statement at 30, 56) Samuel Zell, through EGI-TRB, LLC (the "Zell Entity"), contributed $315 million to finance the LBO Transaction in exchange for subordinated promissory notes and equity, as described more fully below. (Id. at 27-28)

9.      In connection with the LBO Transaction, Tribune redeemed approximately 50% of its common stock in May 2007 (corresponding to the initial closing of the Senior LBO Credit Facility) pursuant to a tender offer totaling approximately $4.3 billion in the aggregate. (Disclosure Statement at 28) Tribune cancelled the remaining half of its common stock in December 2007 (corresponding to the closing of the Bridge Facility and incremental financing under the Senior LBO Credit Facility (in the amount of $2.105 billion)) and provided the holders of cancelled shares with the right to receive $34 a share, approximately $4 billion in the aggregate. (Id.) In total, in connection with the LBO Transaction, Tribune used approximately $8.3 billion of loan proceeds to pay existing shareholders and approximately $2.825 billion to refinance existing debt. (Tribune Co., Quarterly Report, May 9, 2007 (SEC Form 10-Q) at 17-20; Tribune Co., 2007 Annual Report (SEC Form 10-K) at 1-6)

10.     As part of the LBO Transaction, Samuel Zell was elected to Tribune's Board of Directors in May 2007 and became Chairman of the Board and Chief Executive Officer in December 2007. (Tribune Co., 2007 Annual Report (SEC Form 10-K) at 21)

6

**Prepetition Debt Structure**

11.    The LBO Transaction left Tribune and its subsidiaries with the following

debt structure:

- Senior LBO Credit Facility. Approximately $10.1 billion outstanding; comprised of a $1.5 billion two-year Tranche X term loan facility[4], a $5.515 billion seven-year Tranche B term loan facility, a $263 million delayed draw facility, a $750 million revolving credit facility and $2.105 billion of incremental term loans under the Tranche B facility.[5]

- Bridge Facility. Approximately $1.6 billion outstanding.

- The EGI-TRB LLC Notes. Approximately $225 million in subordinated promissory notes in favor of the Zell Entity (the "EGI-TRB LLC Notes").[6]

- Senior Notes. Approximately $1.263 billion of existing senior notes (the "Senior Notes") issued by Tribune pursuant to indentures entered into between 1992 and 1997 survived the LBO Transaction and remain outstanding.

- The PHONES. Approximately $759 million of pre-existing Exchangeable Subordinated Debentures due 2029 (the "PHONES") issued by Tribune in April of 1999 also survived the LBO Transaction and remain outstanding.

(Disclosure Statement at 29-32)

12.    Tribune's obligations under the Senior LBO Credit Facility, the Bridge

Facility and the Senior Notes (collectively, the "Senior Tribune Indebtedness") are all pari passu.

(Id. at 29)  Tribune's obligations under the EGI-TRB LLC Notes and the PHONES are

subordinated to the Senior Tribune Indebtedness.[7]  (Id.)

---

[4] Approximately $988 million of the Tranche X term loan facility was repaid and $512 million remained outstanding on the Petition Date.  (Disclosure Statement at 30)  As of the Petition Date, approximately $8.472 billion in the aggregate remained outstanding under the Senior LBO Credit Facility. (Id.)

[5] In addition, on July 2, 2007, Tribune entered into an ISDA Master Agreement and on July 3, 2007 entered into three interest rate swap confirmations related thereto (collectively, the "Swap Documents") with Barclays Bank PLC.  (Disclosure Statement at 30)  The Swap Documents were terminated on the Petition Date, resulting in a $150.9 million liability to Barclays.  (Id.)

[6] As of the Petition Date, the outstanding amount of the EGI-TRB LLC Notes, including accrued payment-in-kind interest, was $235.3 million. (Disclosure Statement at 31) The Zell Entity also received a warrant entitling it to purchase approximately 40% of Tribune's common stock. (Id. at 28)

[7] The Senior LBO Credit Facility and the Senior Notes are equally and ratably secured by pledges of the equity of two of Tribune's subsidiaries, Tribune Finance, LLC and Tribune Broadcasting Holdco, LLC.  (Disclosure

7

13.    Certain of Tribune's subsidiaries (the "Subsidiary Guarantors") have guaranteed (the "Subsidiary Guarantees") the indebtedness under the Senior LBO Credit Facility and the indebtedness under the Bridge Facility; however, the Subsidiary Guarantee of the Bridge Facility provides that it is subordinated to the Subsidiary Guarantee of the Senior LBO Credit Facility.[8] Also, payments of intercompany claims owed by Tribune to the Subsidiary Guarantors are subordinated to the payment in full of the Senior LBO Lenders' guarantee claims and to the Bridge Lenders' guarantee claims.[9] The Senior Notes, the EGI-TRB LLC Notes and the PHONES are not guaranteed.  (Disclosure Statement at 29)

**The Tribune Bankruptcy Filing**

14.    Tribune and certain of its subsidiaries commenced cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") on December 8, 2008 (the "Petition Date"), less than one year after the completion of the LBO Transaction.[10] On December 18, 2008, the Office of the United States Trustee of the District of Delaware appointed the official committee of unsecured creditors (the "Creditors Committee").  [Docket No. 101]

**Investigation of the LBO-Related Causes of Action and Related Proceedings**

15.    The Debtors and others have repeatedly acknowledged that the predominant issue driving the above-captioned cases (the "Cases") since their inception has been the investigation and potential resolution of the LBO-Related Causes of Action.  (See, e.g.,

---

Statement at 29-31)  Otherwise, the Senior Tribune Indebtedness, as well as the EGI-TRB LLC Notes and PHONES, are unsecured.

[8] See Bridge Facility Guarantee Agreement, dated as of December 20, 2007, at § 3.  The liability owed by Tribune pursuant to the termination of the Swap Documents is also subject to the Subsidiary Guarantees in favor of the Senior LBO Credit Facilities.  (Disclosure Statement at 30)

[9] See Senior LBO Credit Facility Guarantee Agreement dated as of May 11, 2007 at § 7; Bridge Facility Guarantee Agreement dated as of December 20, 2007, at § 7).

[10] With the exception of Tribune's subsidiary, Tribune CNLBC, LLC, which filed for chapter 11 relief on October 12, 2009.

Disclosure Statement at 56)  The Debtors purport to have, with their counsel and financial advisors, extensively investigated the LBO-Related Causes of Action.  (Id.)  The Creditors Committee, with the assistance of counsel and other professionals, also appear to have conducted an extensive investigation of the LBO-Related Causes of Action.  (Id.)

16.      In addition, numerous parties in interest independently investigated the LBO-Related Causes of Action for their own purposes.  Representatives of pre-LBO Transaction indebtedness, which stand to directly benefit from an unwinding of the LBO Transaction—such as Law Debenture Trust Company of New York ("Law Debenture"), as indenture trustee for the Senior Notes, and WTC—have engaged in discovery and vigorously advocated prosecution of the LBO-Related Causes of Action.  By contrast, certain Senior LBO Lenders have criticized the process and the cost of the Creditors Committee's investigation [Docket No. 2618 at 2].

17.      To streamline and facilitate the multiple investigations of the LBO-Related Causes of Action, the Court entered an order authorizing the Debtors to establish a depository of documents and deposition transcripts on December 15, 2009.  [Docket No. 2858] The depository system contains millions of pages of documents produced and transcripts of depositions taken by various parties from more than thirty entities and persons in connection with the investigations.  (Disclosure Statement at 56)

18.      On January 13, 2010, WTC filed a motion seeking the appointment of an examiner pursuant to section 1104(c) of the Bankruptcy Code to investigate the LBO-Related Causes of Action. [Docket No. 3062]

19.      On February 1, 2010, the Creditors Committee filed a motion (the "Standing Motion") seeking authority to prosecute certain LBO-Related Causes of Action.

9

[Docket No. 3281]   The Debtors, JPM, certain other Senior LBO Lenders and creditor constituencies opposed the Standing Motion.  [Docket Nos. 3363, 3366, 3371, 3374, 3376, 3389]

20.     On March 1, 2010, WTC commenced an adversary proceeding against certain potential defendants of LBO-Related Causes of Action (including the agents under the Senior LBO Credit Facility and the Bridge Facility) requesting equitable subordination, disallowance of claims, damages, and the creation of a constructive trust.  [Adv. Proc. No. 10-50732, Docket No. 1]

**The Exclusive Periods and Plan Filing**

21.     Certain Senior LBO Lenders have sought to terminate the Debtors' exclusive periods within which to file a chapter 11 plan and to solicit acceptances thereof and have actively opposed the Debtors' various requests to extend exclusivity.  [Docket Nos. 2617, 3408, 3409]  The Court has previously granted the Debtors' various requests to extend exclusivity, but typically for shorter periods than the Debtors had initially requested.  [Docket Nos. 1936, 2839]  On February 25, 2010, the Court extended the Debtors' exclusive period to file a plan to March 31, 2010 and the period to solicit acceptances until May 31, 2010.  [Docket No. 3533 at 2]

22.     On March 31, 2010, the Debtors filed a motion to further extend their exclusive periods to file a chapter 11 plan until April 30, 2010.  [Docket No. 3902]  As this motion was set to be heard on April 13, 2010 (and plan filing exclusivity was automatically extended to such date under the local rules), the Debtors were facing imminent expiration of exclusivity and potential loss of control over the plan confirmation process in the weeks leading up to the Settlement.  [Docket No. 4012]

10

23.     On April 12, 2010, the Debtors filed their Disclosure Statement and Plan,

which incorporate the Settlement. [Docket No. 4008] The Debtors subsequently moved to

extend the period to solicit acceptances of the Plan through and including August 8, 2010 (the

last day of the 20-month exclusivity period set forth in section 1121(d)(2)(B) of the Bankruptcy

Code). [Docket No. 4211] That motion is scheduled to be heard on May 20, 2010.

**The Settlement and Plan**

24.     On April 8, 2010, Angelo Gordon, Centerbridge, JPM and Law Debenture

(collectively, the "Settling Parties") entered into the Settlement Support Agreement, dated as of

April 8, 2010 (the "Settlement Support Agreement"). [Docket No. 3970 at 3] The Settlement

and Plan are complex and contain numerous terms and provisions. As they relate specifically to

the Bridge Facility and this Objection, the principal terms of the Settlement and Plan are as

follows:

- The Settlement requires that the Debtors place the Senior LBO Lenders and the Bridge Lenders in the same class at Tribune (the "Tribune Loan Claims Class") and at the Subsidiaries (the "Subsidiary Guarantee Claims Class"). (Settlement Support Agreement, Ex. A at 18, 25) The Plan complies with this directive. (Plan at 12 (definition of "Loan Claims"))

- The Settlement requires that the Debtors' "Distributable Value" be fixed at $6.1 billion in the aggregate, and that 8.8% of such value be allocated to Tribune and 91.2% of such value be allocated to the Guarantor Subsidiaries. (Settlement Support Agreement, Ex. A at 18-19) The Plan appears to comply with this directive. (Disclosure Statement at 10-12, 113)

- The Settling Parties have agreed that 8.4% of the Debtors' aggregate Distributable Value (the "Settlement Amount") be paid to settle the LBO-Related Causes of Action in their entirety. (Disclosure Statement at 6-7) The Plan complies with this directive. (Id. at 55)

- The Settling Parties have agreed that at least 83.8% of the Settlement Amount (7.0% of the Debtors' aggregate Distributable Value—approximately $427 million), will be paid to the holders of Senior Notes (the "Senior Noteholders") and holders of Other Parent Claims (i.e., general unsecured claims and claims of former employees under qualified

11

pension plans), from Tribune distributions that would have otherwise been
paid to the Tribune Loan Claims Class. (Settlement Support Agreement,
Ex. A at 19-20; Disclosure Statement at 6, 113)  The Plan complies with
this directive. (Plan at 26)

- The Settling Parties have agreed that at most only 16.2% of the Settlement
  Amount (1.4% of the Debtors' total aggregate Distributable Value up to
  $150 million—approximately $83 million), will be paid to general
  unsecured creditors of the Subsidiary Guarantors from distributions that
  would have otherwise been paid to the Subsidiary Guarantee Claims
  Class. (Settlement Support Agreement, Ex. A at 21; Disclosure Statement
  at 6-7)  The Plan complies with this directive. (Plan at 30-31)

25.      In sum, the so-called "global" Settlement and Plan are structured so that

almost the entire Settlement Amount (at least 83.8% or $427 million) is paid from Tribune Loan

Claims Class distributions, where the claims of the Bridge Lenders and of the Senior LBO

Lenders are pari passu.  Only a small fraction (at most 16.2%) of the Settlement Amount is paid

from distributions that otherwise would have been made by the Subsidiary Guarantors to the

Subsidiary Guarantee Claims Class, where the Bridge Lenders' claims are subordinated to the

claims of the Senior LBO Lenders.

26.      The Settlement and Plan provide for broad releases to potential defendants

of the LBO-Related Causes of Action, including the Debtors, JPM and its affiliates, the Senior

LBO Lenders, the Debtors' present and former directors, officers, employees and shareholders

(including, presumably, Samuel Zell), and the Debtors' agents and advisers from, among other

things, the LBO-Related Causes of Action. (Plan at 17, 59-60)  The Plan further provides that all

guarantee claims against guarantor non-Debtors shall be deemed on the Effective Date to have

been released. (Id. at 60)[11]

---

[11] The Plan states that each holder of a claim or interest that has not returned a ballot with the appropriate opt-out
box checked shall be deemed to have released each and all of the released parties from almost all non-estate claims
existing on or before the effective date of the Plan. (Plan at 59)  Any holder of a claim or interest that elects not to
grant this release shall not receive the benefit of any other release under the Plan to which it might otherwise be
entitled. (Id. at 60).  The releases granted to the guarantor non-Debtors, however, are not subject to an opt-out
provision; they are unconditional and automatic. (Id.)

12

27.     The Settlement and Plan do not contemplate the disgorgement or recoupment of any funds paid to third parties (whether fees paid to the architects of the LBO Transaction or amounts paid to shareholders to redeem Tribune's shares).  Moreover, none of the other potential defendants of LBO-Related Causes of Action (including the architects of the LBO Transaction) appear to be contributing anything to the Settlement.  The net effect of the Settlement is that the Bridge Lenders' total recovery in the Cases is basically eliminated, while the Senior LBO Lenders' distributions are reduced by approximately 7.5%.

**The Settling Parties**

28.     The Debtors repeatedly characterize the Settlement as a "global" one reached with "key constituents".  (Disclosure Statement at 6, 9, 55, 57-60)  In fact, the Settlement represents an agreement among a few singular constituents, only two of which are potential defendants of LBO-Related Causes of Action—JPM and Angelo Gordon.  JPM appears to make limited or no economic contribution to the Settlement but will receive in exchange substantial benefits.  In short, the Settling Parties, without the participation or consent of the Bridge Lenders, have purchased releases of the LBO-Related Causes of Action using distributions that would otherwise have been paid to the Bridge Lenders.

29.     For example, JPM, is the administrative agent for the Senior Credit Agreement, and JPM's affiliate, JPMS, served as one of the lead arrangers for the Senior Loan Facility and Bridge Facility.  It is unclear if either JPM or JPMS hold any claims for which distributions would be reduced to pay for the Settlement.  They are, however, receiving releases of potentially substantial LBO Transaction fee disgorgement and other claims under the Settlement.  In addition, Law Debenture and Centerbridge have agreed to withdraw their motion

13

to disgorge payment of fees to JPM's advisors (Settlement Support Agreement at 7-8), and to the resumption of JPM's fee reimbursements.[12]  [Docket No. 3995, Ex. A at 2]

   30. JPM and Angelo Gordon have also agreed in the Settlement Support Agreement to provide Centerbridge and Law Debenture with the right of reimbursement from the estates of up to $5.25 million in the aggregate of reasonable and documented fees, costs and expenses incurred on or after the Petition Date and on or prior to April 8, 2010, and any additional reasonable and documented fees incurred after April 8, 2010 and on or prior to the Plan's effective date.  (Settlement Support Agreement, Ex. A at 22)

   31. The individual members of the Creditors Committee (except for indenture trustees sitting on the Creditors Committee) are also provided with the right to be reimbursed up to $1.5 million in the aggregate of reasonable and documented fees, costs and expenses incurred during the pendency of the Bankruptcy Cases.[13]  (Id. at 22)

## The Examiner Appointment

   32. On April 20, 2010, the Court entered an Agreed Order Directing the Appointment of an Examiner (the "Examiner Appointment Order").  [Docket No. 4120]  On April 30, 2010, the United States Trustee filed an application for an order to approve the appointment of Kenneth N. Klee, Esq. as examiner (the "Examiner").  [Docket No. 4213]  On May 7, 2010, the Examiner proposed a work and expenses plan (the "Work and Expenses Plan"), which included a good faith estimate of the fees and expenses of the Examiner and the Examiner's professionals for conducting their investigation.  [Docket No. 4261]  On May 11,

---

[12] The Debtors appear to have resumed paying those fees. [Docket No. 3997]

[13] The Settlement Support Agreement also notes that "[i]ssues relating to the reimbursement of fees and expenses of members of the Creditors Committee that are indenture trustees will be considered subsequently. (Settlement Support Agreement, Ex. A at 22-23)

14

2010, the Court approved the Examiner's proposed Work and Expenses Plan. [Docket No. 4321]

33.     Pursuant to the Examiner Appointment Order, the Examiner must prepare and file a report on or before July 12, 2010, unless such time shall be extended by order of the Court upon application by the Examiner. [Docket No. 4120 at 4]

**The Disclosure Statement**

34.     The entire discussion in the Disclosure Statement of the reasonableness of the Settlement is found on pages 58 through 60. These disclosures contain mainly conclusory statements about the Settlement and its reasonableness. For example, the Debtors state on page 58 that they "believe that the Global Settlement provides a recovery to the Senior Noteholders and Holders of General Unsecured Claims that is within the range of reasonably possible outcomes considering all relevant circumstances." The Debtors provide no further description or explanation about what outcomes were considered.

35.     The Debtors also acknowledge that "the most significant" LBO-Related Causes of Action are "claims for constructive fraudulent conveyance." They further state that

> Two issues that will have a significant impact on the resolution of these claims [against the LBO Lenders] and recoveries pursuant thereto are (i) whether the subsidiary guarantees can be successfully challenged and (ii) whether the debt incurred in connection with the step two transactions should be taken into account in assessing solvency at the time of the step one transactions. The proposed settlement takes each of these two issues as well as other issues into account and, in the Debtors' view, constitutes a reasonable resolution of the LBO-Related Causes of Action against the LBO Lenders.

(Disclosure Statement at 58-59) There are no other disclosures about the Debtors' settlement calculus or why the Settlement should not be more fairly allocated across the Debtors' entire enterprise.

36.     There is no disclosure as to any contributions to the Settlement being made by any party other than the Bridge Lenders or the Senior LBO Lenders, in exchange for their releases or otherwise. And there is no disclosure about the competing or conflicting interests, if any, of JPM or Angelo Gordon, the only two potential defendants of LBO-Related Causes of Action who are Settling Parties.

## OBJECTION

## I.    The Court Should Not Approve the Disclosure Statement Because It Lacks Adequate Information with Respect to the Settlement and other Material Issues, Preventing Creditors from Making an Informed Decision on the Plan

37.     A plan proponent must provide holders of impaired claims with adequate information so that creditors can make an informed decision on whether they should support a proposed chapter 11 plan. 11 U.S.C. § 1125(a)(1).[14] See also Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 417 (3d Cir. 1988), cert. denied, 488 U.S. 967 ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court."); Cohen v. TIC Fin. Sys. (In re Ampace Corp.), 279 B.R. 145, 161 (Bankr. D. Del. 2002) (section 1125 requires sufficient information to "enable a hypothetical reasonable investor . . . to make an informed judgment about the plan"). Where a Disclosure Statement includes the conclusions of the plan proponents, such opinions must be supported by factual information. In re Civitella, 15 B.R. 206, 208 (Bankr. E.D. Pa. 1981) (denying reconsideration of decision denying approval of disclosure statement which provided no factual support for proponent's conclusions regarding valuation of assets and debts).

---

[14] Section 1125(a)(1) provides:

"[A]dequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . .

16

38.     The Disclosure Statement describes the Settlement as "[a] central

component of the Plan," and indicates that all "distributions to be made pursuant to the Plan shall

be on account of and in consideration of the Global Settlement." (Disclosure Statement at 6)

Yet, the Disclosure Statement fails to provide any information that would enable a creditor to

meaningfully assess the basis for and fairness of the Settlement and its impact on respective

creditor constituencies, in particular, on the Bridge Lenders. In addition, the Disclosure

Statement fails adequately to address classification, valuation and other risks that the Plan is not

confirmable.

## A.     The Disclosure Statement Lacks Adequate Information Regarding the Settlement

39.     Although the question of whether the Settlement can be approved is not

yet before the Court, the Debtors ultimately bear the burden of convincing the Court that the

Settlement is "fair, reasonable and in the interest of the estate." In re Marvel Entm't Group, Inc.,

222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211 B.R. 798, 801 (D. Del.

1997). To conclude that a settlement is fair, "the court must reach an informed, independent

judgment supported by the factual background underlying the litigation and bankruptcy." In re

Exide Techs., 303 B.R. 48, 67 (Bankr. D. Del. 2003) (internal citations omitted). In particular,

the court must scrutinize the settlement from the perspective of non-settling parties, and conclude

that it is fair to them. In re Nutritional Sourcing Corp., 398 B.R. 816, 833 (Bankr. D. Del. 2008)

("Under the 'fair and equitable' standard, we look to the fairness of the settlement to other

persons, i.e., the parties who did not settle." (quoting Will v. Northwestern Univ. (In re

Nutraquest, Inc.), 434 F.3d 639, 645 (3d Cir. 2006))). See also In re CDECO Maritime

Construction Inc., 101 B.R. 499, 502 (Bankr. N.D. Ohio 1989) (requiring plan proponents to

17

provide rationale behind settlement's treatment of debtors' claim where debtors were not party to settlement negotiations).

40.    As set forth below, the Disclosure Statement fails to provide adequate disclosure concerning the propriety and fairness of the Settlement to the Bridge Lenders.  Given that such information resides solely in the possession of the Debtors and other privileged creditor constituencies that participated in the negotiations, these deficiencies cannot be remedied by a creditor supplement to the Disclosure Statement.

41.    As an initial matter, the Disclosure Statement is misleading to the extent that it characterizes the Plan as incorporating a "global settlement" of LBO-Related Causes of Action.  In fact, the Settlement was entered into by only two of the many potential defendants of LBO-Related Causes of Action (JPM and Angelo Gordon), who attempt to foist the financial burden of the deal on the Bridge Lenders while extracting substantial benefits for themselves. The Bridge Lenders were not represented during settlement discussions, and they certainly did not consent to the treatment that is being proposed under the Plan.  Accordingly, the proposed resolution of LBO-Related Causes of Action can hardly be characterized as either "global" or a "settlement" from the Bridge Lenders' perspective.

**1)    The Disclosure Statement Lacks a Detailed Description of the LBO Transaction**

42.    The Disclosure Statement's discussion of the LBO Transaction is insufficient. Notably absent from this discussion is disclosure of how and why Tribune entered into the LBO Transaction in the first place.  For example, there is no disclosure of the financial and business reasons justifying the Debtors' decision to enter into the LBO Transaction, the basis for the Tribune directors' determination that the Company should enter into the Transaction, the projections and assumptions relied upon by the Company in entering into the Transaction, and

18

the parties who were responsible for structuring the Transaction for the Company and potential investors.

43.     In addition, the Disclosure Statement fails to adequately describe the financial mechanics of the LBO Transaction, explaining the sources and uses of proceeds from the Senior Credit Agreement and the Bridge Loan Agreement only as follows: "The proceeds of the additional borrowings under the Senior Credit Agreement and of the borrowings under the Bridge Loan Agreement were used for, among other things, the consummation of the merger." (Disclosure Statement at 56)  Moreover, the Disclosure Statement fails to provide any detail concerning the Company's financial state before and after the LBO Transaction or how the Company's financial performance in the months leading up to the completion of the LBO Transaction compared to the projections the Company relied upon in entering the Transaction.

44.     Finally, the Disclosure Statement does not disclose the payments of principal, interest and fees that certain lenders and others have received following consummation of the LBO Transaction.  This information is relevant because it will allow creditors to asses the Settling Parties' motivations in agreeing to the Settlement and the fairness of the proposal.

45.     At a minimum, the Debtors should be required to disclose the following: (a) the material terms of the primary deal documents; (b) a funds flow-chart showing the sources and uses of funds; (c) disclosure of the parties who provided funding (when and in what amounts) and received payments under the LBO Transaction and post-closing (when and in what amounts); (d) the Company's balance sheets before and after each purported phase of the LBO Transaction; (e) disclosure of projections prepared by or for the Company showing basic financial assumptions and anticipated liquidity; (f) a description of the Company's financial performance after the LBO Transaction and an explanation of any variances from the projections

19

prepared in connection therewith; and (g) disclosure of all advisors retained in connection with the LBO Transaction and what they were paid.  All such information is necessary for a reasonable investor to assess the merits and exposure of potential defendants in connection with the LBO-Related Causes of Action.

2)      **The Disclosure Statement Lacks a Detailed Description of the LBO-Related Causes of Action**

46.     The Disclosure Statement identifies a laundry list of potential LBO-Related Causes of Action without any detail as to these potential claims; it merely states that, "in the Debtors' view, [the Settlement] constitutes a reasonable resolution of the LBO-Related Causes of Action against the LBO Lenders."  (Disclosure Statement at 57-59)  The Disclosure Statement is inadequate in that it fails to provide any detail concerning the elements of such causes of action, the potential defendants for each, and the potential exposure of those parties. This information should be readily available based on the exhaustive and expensive analyses conducted by the Debtors and other parties.

47.     The Disclosure Statement also lacks adequate information by which a creditor can assess the likelihood of success of the possible LBO-Related Causes of Action it identifies.  The Disclosure Statement asserts that potential defendants of LBO-Related Causes of Action "are expected to vigorously contest" any such litigation and raise numerous defenses, but then merely states that "these issues [were] taken into account and the settlement, in the Debtors' view, reasonably accounts for the LBO-Related Causes of Action against these parties." (Disclosure Statement at 58-59)

48.     At a minimum, an amended disclosure statement should provide a detailed description of the LBO-Related Causes of Action, including: (a) an assessment of their strengths and weaknesses of the various causes of action; (b) the potential amounts that could be recovered

20

in connection with such claims; (c) identification of the potential defendants for each; and (d) an assessment of the potential defenses that may be raised, including a discussion of the Debtors' view on solvency issues in connection with any claims for avoidance or disgorgement. As the Settlement is the cornerstone of the Plan, creditors must be provided with information concerning the underpinnings of each potential LBO-Related Cause of Action that the Settlement is intended to compromise.

### 3)   The Disclosure Statement Fails to Describe the Potential Results of Litigating the LBO-Related Causes of Action

49.    The Disclosure Statement also fails to describe adequately how the Settlement impacts the recoveries of various creditor constituencies. In this respect, the Disclosure Statement does not provide any information that would allow creditors to assess what their recoveries would be if the Settlement was not implemented. In order to assess in a meaningful way whether the Settlement is fair and reasonable and in their best interests, creditors need to know the range of percentage recoveries they could expect to receive in the event no settlement was achieved and the LBO-Related Causes of Action either failed or succeeded.

50.    At a minimum, an amended disclosure statement should provide the following: (a) the potential consequences of avoidance of claims and the disgorgement of payments for each LBO-Related Causes of Action; (b) the impact on stakeholder recoveries at the parent and subsidiary levels (with an explanation of any material differences); and (c) the possible time and expense associated with such litigation scenarios. Without such "guideposts" to evaluate the Settlement, there is no basis for a creditor constituency to decide whether to support the Settlement and Plan.

21

**4)   The Disclosure Statement Does Not Provide an
Adequate Comparison of the Settlement Outcome to
Possible Litigation Outcomes**

51.     The Disclosure Statement fails to disclose the Debtors' assessment of the

merits of the LBO-Related Causes of Action or provide any indication as to how the Settlement

Amount was calculated and the basis for the Debtors' conclusion that the Settlement reflects "a

fair, equitable and reasonable compromise and settlement of the potential LBO-Related Causes

of Action." (Disclosure Statement at 55)  It is not clear whether the Debtors determined that the

Settlement Amount was reasonable based on their assessment of potential litigation risk or other

factors.  Accordingly, the Debtors should be required to disclose the basis for their contention

that the aggregate amount of the Settlement was reasonable in light of the prevailing

circumstances.

52.     In addition, the Disclosure Statement provides no information regarding

why the Plan allocates most of the Company's total enterprise value to the Subsidiary Guarantors

where the Bridge Lenders' guarantee claims are subordinated to the guarantee claims of the

Senior LBO Lenders, while nearly all of the settlement consideration is to be taken from

distributions that would be made to creditors of Tribune.  The net effect of the Settlement is to

strip from the Bridge Lenders' almost their entire recovery in the Cases without their consent,

while allowing the Senior LBO Lenders to retain the vast majority of their recovery.  The

Disclosure Statement provides no legal or factual justification for this disparate treatment.[15]

53.     Moreover, given that only select creditor constituencies participated in

"settlement" discussions, the Debtors should be required to disclose the respective competing or

conflicting interests, if any, of those parties so that constituencies who were excluded can assess

---

[15] Based on the Debtors' allocation of value and estimation of claims at Tribune, the Bridge Lenders would be
entitled to a substantially higher recovery were it not for the distribution of settlement proceeds to the recipients.

22

for themselves whether their interests were properly represented.  In particular, the Disclosure

Statement should reflect in detail the role of the Settling Parties in the LBO Transaction, the

extent of their potential exposure for disgorgement and other liabilities, and the actual financial

and non-financial contributions of such Settling Parties to the proposed Settlement.  Such

information is critical because a number of the potential defendants of LBO-Related Causes of

Action appear to contribute no monetary value to the Settlement while nevertheless receiving

broad releases and/or recouping their legal fees and costs under the Plan.  (See Settlement

Support Agreement at 18-25)  The Debtors need to provide adequate disclosure justifying why it

is reasonable for the Bridge Lenders to shoulder the financial burden of the Settlement while

these persons enjoy its benefits under the Plan.

54.     At a minimum, an amended disclosure statement should provide: (a) a

comparison of the terms of the Settlement to the potential range of results from litigating the

LBO-Related Causes of Action and an explanation of the differences; (b) factual and legal

support for why the Debtors believe the Settlement is fair and reasonable and in the best interests

of the estates and their creditors (on an entity-by-entity basis unless the Debtors believe that

substantive consolidation should occur); and (c) a description of each Settling Party's

contributions to and benefits from the Settlement.  Without an ability to compare recoveries with

the Settlement and without, and to understand what each party is giving and getting under the

Settlement, creditors cannot determine whether the Settlement is fair to them.

**B.     The Disclosure Statement Lacks Adequate
Information Regarding Other Critical
Components of the Plan That Directly Relate to
the Treatment of the Bridge Lenders' Claims**

55.     The Disclosure Statement fails to provide adequate information regarding

other key aspects of the Plan, many of which would directly impact the Bridge Lenders' recovery

23

and inform their vote. At a minimum, the Disclosure Statement must include the following

information in order for the Bridge Lenders to be able to fairly assess the Plan:

(a)     As the Debtors are not seeking substantive consolidation, and as the allocation of value between Tribune, the Subsidiary Guarantors and the non-guarantor subsidiaries materially impacts creditor recoveries under the Plan, the Disclosure Statement must provide more detailed valuation analyses, including (i) a separate valuation of each Debtor entity; and (ii) support for the allocation of value as between the enterprise, Tribune and its subsidiaries.

(b)     More detailed disclosure of the Tribune claims pool and the extent and treatment of the intercompany claims.[16]

(c)     The basis and justification for placing the Bridge Lenders' claims in the same class with the Senior LBO Lenders' claims, other than to gerrymander the requisite acceptances and disenfranchise the creditor constituency that is being compelled to pay for the Settlement against its will.

(d)     Factual support for the conclusion that the guarantor non-Debtor releases and the Settlement releases granted in the absence of any financial or substantial non-financial contribution to the Debtors' estates pass muster under existing Third Circuit jurisprudence.

56.     In sum, the Disclosure Statement obscures the fact that the Settlement has

a disproportionate and unfair economic impact on the recovery of certain creditor constituencies,

including in particular the Bridge Lenders. Among the causes of this disparate treatment that are

not adequately disclosed or explained in the Disclosure Statement are:

(a)     The risk that the valuation contained in the Disclosure Statement under-values the enterprise;

(b)     The allocation of value within the enterprise, as required by the Settlement, over-values the Guarantor Subsidiaries and under-values Tribune, where the Bridge Lenders' claims are pari passu with the Senior LBO Lenders;

---

[16] Among other things, the Disclosure Statement appears to ignore that intercompany claims owed by Tribune to Subsidiary Guarantors are subordinated to repayment of the Bridge Facility. The Disclosure Statement misleadingly discloses only that the intercompany claims owed to the Subsidiary Guarantors are subordinate to the Senior Loan Guaranty Claims, while failing to mention that these intercompany claims are also subordinate to the Bridge Loan Guaranty Claims. (Disclosure Statement at 8)

(c)     The structuring of the Settlement in a fashion that disproportionately impacts recoveries at Tribune, which appears to be premised on the potential of an unprecedented partial avoidance of the LBO Transaction (i.e., avoidance at the parent level with no risk of avoidance at the Guarantor Subsidiaries) thereby over-allocating avoidance risk to Tribune;

(d)     The Settlement assumes some risk of fraudulent conveyance, as it reallocates recoveries of creditors at Tribune, but requires no contribution from those entities who have received payments that would be otherwise subject to disgorgement claims, and provides for releases of such claims;

(e)     The Plan disenfranchises the Bridge Lenders' voting rights by classifying the Bridge Lenders' claims with the claims of the Senior LBO Lenders; and

(f)     The Plan purports to settle the Bridge Lenders' rights against third parties without their consent.

As explained above, these factors are not fully disclosed or explained in the Disclosure Statement.  The Administrative Agent submits that these defects are so profound that it would be wasteful to move forward with Disclosure Statement approval and solicitation at this time.

## II.     At a Minimum, the Court Should Delay Consideration of the Disclosure Statement Until After the Conclusion of the Examiner's Investigation

57.     As discussed above, an Examiner has been appointed to investigate the LBO-Related Causes of Action.  The Examiner is expected to issue a report on or before July 12, 2010.  That report will likely shed objective light on many of the issues inadequately disclosed in the Disclosure Statement.  Accordingly, the Administrative Agent respectfully requests that if the Debtors are unwilling or unable to amend the Disclosure Statement to address the deficiencies described herein, the Court defer consideration of the Disclosure Statement until such time as the Examiner has issued his report.

## RESERVATION OF RIGHTS

58.     The Administrative Agent is seeking discovery and expressly reserves its right to supplement or amend this Objection and raise any additional objections following

25

discovery. Further, the Administrative Agent reserves the right to respond, further object, join

in, or amend any objection herein with respect to any argument or objection made by any person

relating to the Disclosure Statement, the Plan, or any hearing in connection therewith.

## CONCLUSION

For the forgoing reasons, approval of the Disclosure Statement should be denied.

Dated: May 13, 2010
      Wilmington, Delaware

          FOX ROTHSCHILD LLP

By: _____
          Jeffrey M. Schlerf, Esq. (No. 3047)
          Eric M. Sutty, Esq. (No. 4007)
          Citizens Bank Center
          919 North Market Street, Suite 1600
          Wilmington Delaware 19801
          Telephone: (302) 654-7444

              -and-

          WHITE & CASE LLP
          Thomas E Lauria
          Gerard Uzzi
          David Hille
          Andrew Hammond
          Scott Greissman
          1155 Avenue of the Americas
          New York, NY 10036
          Telephone: (212) 819-8200
          Facsimile: (212) 819-8113

          Attorneys for the Administrative Agent

WM1A 953907v1 05/13/10