## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | **Chapter 11 Cases** |
| | : | **Case No. 08-13141 (KJC)** |
| **TRIBUNE COMPANY, et al.,** | : | **(Jointly Administered)** |
| | : | |
| Debtors. | : | |
| | : | |
| | : | |

-----------------------------------------------------X        **Re: Docket Nos. 4008, 4204**

## WILMINGTON TRUST COMPANY'S OBJECTION TO THE DEBTORS' (1) PROPOSED DISCLOSURE STATEMENT FOR THEIR JOINT PLAN OF REORGANIZATION; AND (2) MOTION TO ESTABLISH PLAN CONFIRMATION PROCEDURES

Wilmington Trust Company ("Wilmington Trust"), Successor Indenture Trustee for the Exchangeable Subordinated Debentures due 2029 in the aggregate principal amount of $1.2 billion (generally referred to as the "PHONES") issued in April 1999 by Tribune Company ("Tribune" and, together with its Chapter 11 affiliates, the "Debtors" or the "Company"), by and through its undersigned counsel, hereby respectfully submits this Objection to: (1) the *Disclosure Statement for the Joint Plan of Reorganization for Tribune Company and its Subsidiaries,* dated April 12, 2010 [Docket Number 4008] (the "Disclosure Statement" and, the Debtors' annexed joint plan of reorganization, the "Plan"); and (2) the *Motion of The Debtors For An Order (I) Establishing Procedures For Solicitation And Tabulation Of Votes To Accept Or Reject Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries; (II) Establishing Deadline For Return of Media Ownership Certifications; (III) Scheduling Confirmation Hearing; (IV) Establishing Notice And Objection Procedures In Respect Of Confirmation Of Joint Plan Of Reorganization; And (V) Granting Related Relief,* dated April 29, 2010 [Docket Number 4204]

(the "<u>Procedures Motion</u>").  In support of its Objection, Wilmington Trust respectfully states as follows:

## <u>PRELIMINARY STATEMENT</u>

1.       During the April 13, 2010 hearing, Wilmington Trust heard the Court request that parties try to avoid using the Disclosure Statement hearing as a platform for previewing confirmation objections.  Wilmington Trust will honor that request, and can do so comfortably in light of the Court's reference at an early proceeding to <u>In re Exide Technologies,</u> 303 B.R. 48 (Bankr. D. Del. 2003) (Court denied confirmation of inappropriate plan, notwithstanding case inertia and significant pressure from settling parties to "steam roll" over junior creditors). Wilmington Trust does believe the Plan is facially unconfirmable and that it will suffer the same fate as the plan at issue in <u>Exide Technologies</u>; but, it will reserve its many points of objection for a later stage, per the Court's stated preference.

2.       The Disclosure Statement and Procedures Motion do, however, raise three important  questions that need to be considered at this interim stage: (1) Should the Disclosure Statement be considered now, or would the process benefit from a few-week adjournment? (2) Does the Disclosure Statement, in its proposed state, contain adequate disclosure of pertinent information? (3) Does the Procedures Motion request relief that is both only procedural in nature and consistent with an objectively-appropriate path towards a confirmation hearing?  As discussed below, Wilmington Trust believes that a short adjournment would help the Chapter 11 process and that the relief now requested by the Debtors should be denied, in certain respects.

3.       First, there is good reason for a few-week adjournment.  Presently before the Court is a draft Disclosure Statement that was prepared by admittedly conflicted professionals (benefitting at least in part insider-targets for estate litigation) intended to be distributed to voting

creditors weeks before the anticipated July 12, 2010 filing of Mr. Klee's examiner's report (the "<u>Examiner Report</u>").  To be a proper Disclosure Statement, this draft should do more than make passing reference to the Examiner's investigation, although it does not even do that.  Rather, it should detail the Examiner's fact findings and proposed legal conclusions.  The confirmation hearing is now scheduled to begin thirty-five (35) days after the scheduled issuance of the Examiner Report.  Since Bankruptcy Rules 3017 and 2002 require only twenty-eight (28) days for vote solicitation, there appears to be sufficient time to adjourn consideration of the Disclosure Statement until after the Examiner files his report -- and still largely keep to the present confirmation schedule.  Such an adjournment will allow the Debtors to revise the Disclosure Statement to reflect the Examiner's findings and proposed conclusions.  Absent such adjournment, the Disclosure Statement will not contain adequate information for a hypothetical investor to be able to make an informed judgment about the Plan and decision about how to vote (thus suggesting that the Debtors will not be able to satisfy their confirmation burden under Bankruptcy Code Section 1129(a)(2)).

4.    There is another good reason for a short adjournment.  The Debtors are media outlets governed by the Federal Communications Commission (the "<u>FCC</u>").  As the Debtors admit in the Disclosure Statement, the ownership change contemplated by the Plan must be approved, not only by this Court, but also by the FCC.  The Communications Act of 1934 and regulations promulgated thereunder impose a series of prohibitions on foreign ownership and control of entities regulated by the FCC.  <u>See</u> 47 U.S.C. § 310 (2006).  FCC law also prohibits "attributable interest holders" from holding quantities of stock in media companies competing in similar markets.  <u>See</u> 47 C.F.R. 73.3555 (2010).  These rules are sacrosanct and the FCC looks past transaction structuring intended to evade their letter or spirit.  Here, these rules present a

significant problem because, as the Disclosure Statement admits, the Plan calls for the distribution of Reorganized Company stock (i) to foreign hedge funds or banks in quantities exceeding the foreign ownership rules; and/or (ii) in impermissible concentrations to institutions with ownership interests in competing media outlets.

5.      On April 28, 2010, the Debtors filed applications with the FCC for approval of the ownership change contemplated by the Plan and, in those applications, the Debtors acknowledge the regulatory obstacles discussed above.  But, not to worry, contend the Debtors, because the Plan will issue non-voting stock, limiting "true" ownership levels below FCC-mandated thresholds.  This artifice does not seem at all consistent with FCC law.  More troubling, the applications do not inform the FCC that the issuance of non-voting shares is a facial violation of Bankruptcy Code Section 1123(a)(6); thus, it would appear that the Debtors are pursuing regulatory approval on a questionable pretense.  This raises significant issues that, again, will be reserved for confirmation.  But, at this point in time, the Debtors clearly have considerable work to do with the FCC, and the Chapter 11 process would seem to benefit from a short adjournment so that: (i) these issues may be truthfully presented to the FCC (the objection deadline for submitting objections to the FCC is June 14, 2010); (ii) the Debtors, the Court and creditors may learn the FCC's initial views before a full-scale confirmation effort has been launched; and/or perhaps (iii) interim briefing may be presented to this Court as to whether the Debtors' proposed method for resolving the Plan's FCC problem is legal.

6.      If the Court is disinclined to grant a short adjournment of the Disclosure Statement hearing (thus, triggering the second question posed in Paragraph 2 above), then Wilmington Trust hereby objects to the Disclosure Statement, in certain respects.  The Disclosure Statement "spins" the discussion of the LBO-related causes of action, garishly

advertising the "Global Settlement" without objectivity or presentation of the alternative viewpoint (and, again, no mention of Mr. Klee's examination).  Wilmington Trust respectfully submits that this is not a fair presentation of the "risk / reward" profile of an affirmative vote on the Plan, especially in light of In re Tousa, 422 B.R. 783 (Bankr. S.D. Fla. 2009) (lender claims avoided in full as fraudulent conveyances, and the holders also compelled to disgorge over $400 million in interest and professional fee payments).

7.    As the Court noted during the April 13th hearing, interspersing language here-and-there in a lengthy draft is a common method for resolving disclosure statement objections. In light of the fundamental opinion difference (and the dramatic resulting implications of the Debtors being found wrong), Wilmington Trust believes that the "interspersing" strategy will end up inappropriately diluting an important message.  It, therefore, respectfully urges the Court to consider an alternative approach, one that was endorsed recently by Judge Shannon in In re Motor Coach Industries (Bankr. D. Del., Case No. 08-12136 (BLS)).  That case, like this one, involved a plan facing a significant confirmation objection by a so-called "out-of-the-money" junior constituency (there represented by the official creditors' committee).  Rather than engaging in a belabored discussion over here-and-there language interspersing, the official creditors' committee asked Judge Shannon to include in the solicitation package a letter from that committee and, in that letter, the committee gave a simple cogent statement of its position, and provided its own profile of the "risk/reward" presented to those asked to vote.  Judge Shannon adopted this approach as a better resolution of the very same disclosure problem presented here.  Before the Disclosure Statement hearing, Wilmington Trust will supplement this filing with a draft form of such letter.

8.      There are other, important areas where the Disclosure Statement lacks critical information: (i) the value of to-be-filed affiliated companies (since Wilmington Trust may have "aiding and abetting" claims against those entities that are not hindered by the Court's historic claims bar date order); (ii) the value of often referenced, never explained, Chapter 5 avoidance claims against Morgan Stanley; (iii) the value of other avoidance claims at the Tribune (parent-company) level that are to be released under the Plan, including inter-Company avoidance claims; (iv) what is meant by oblique Disclosure Statement and Plan references to "Restructuring Transactions" that are to be advance-approved by creditors, but never revealed; (v) a clear statement that the "third-party releases" to be solicited from creditors as part of the proposed voting ballot are really a ruse, since (irrespective of a voting creditor's refusal to release) the Plan purports to enjoin the assertion of all such third-party claims; (vi)  clear identification of which parties are being released of estate liability and third-party liability, their relationship to the Debtors and the LBO, and what consideration they are giving for such releases; and (vii) what are the parameters of anticipated management incentive programs, and why such programs are being implemented.

9.      The final question posed in Paragraph 2 above focuses on whether the Procedures Motion requests relief that is inappropriate.  It does, in certain respects.  First, neither the Plan, Disclosure Statement, nor Procedures Motion clarifies whether Wilmington Trust is supposed to vote (or to file a Bankruptcy Rule 3018 motion) respecting its claim for compensation and expense indemnity as Successor Indenture Trustee, which claim is not contractually subordinated.  Wilmington Trust similarly questions what is to be done with "aiding and abetting" claims that it and holders of the PHONES may have against to-be-filed Tribune affiliates.  Further, Paragraph 52 of the Procedures Motion and, commensurately, Paragraph 41

of the proposed form of order request pre-confirmation plan-related relief that is inappropriate prior to the confirmation hearing.  Finally, Wilmington Trust respectfully requests that it be included as a simultaneous notice party on all confirmation-related objections and other pleadings.

10.    For these reasons, as discussed further herein, Wilmington Trust asks this Court to adjourn or, alternatively, deny (to the extent inconsistent with the points raised herein) the relief requested in the Disclosure Statement and Procedures Motions.

## BASES FOR THE OBJECTION

I.    **An Adjournment of the Disclosure Statement And Procedures Motion Is Appropriate and Necessary Under The Law.**

A.    **A Disclosure Statement Requires Adequate Information To Be Acceptable Under The Bankruptcy Code.**

11.    The Bankruptcy Code requires a disclosure statement to contain "adequate information," that is, "information of a kind, and in sufficient detail, as far as is reasonably practicable . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1) and (b); see also Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 417 (3d Cir. 1988) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court.  Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'"), cert. denied, 488 U.S. 967 (1988); In re Scioto Valley Mortgage Co., 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988) ("The disclosure statement was intended by Congress to be the primary source of information upon

which creditors and shareholders could rely in making an informed judgment about a plan of reorganization.").

12.      As the legislative history of Bankruptcy Code Section 1125 notes:

> If adequate disclosure is provided to all creditors and stock holders whose rights are to be affected, then they should be able to make an informed judgment of their own rather than having a court or the Securities Exchange Commission inform them in advance whether the proposed plan is a good plan.

House Rep. No. 95-595, 95th Cong., 1st Sess. 226-31 (1977).

13.      Dissemination of adequate information - as a condition precedent to plan voting - is at the very heart of the reorganization process. In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990).  As such, "[a] disclosure statement . . . is evaluated . . . in terms of whether it provides sufficient information to permit enlightened voting by holders of claims or interest."  In re BSL Operating Corp., 57 B.R. 945, 950 (Bankr. S.D.N.Y. 1986).  A Court should thus examine each proposed disclosure statement to discern whether the Bankruptcy Code's "adequate information" requirement is satisfied.  See In re Worldcom, Inc., 2003 WL 21498904, *10 (S.D.N.Y. June 30, 2003) ("the approval of a disclosure statement . . . involves a fact specific inquiry into the particular plan to determine whether it possesses 'adequate information' under § 1125");  In re Filex, Inc., 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990) ("A court approval of a disclosure statement for a plan which will not, nor can not, be confirmed by the Bankruptcy Court is a misleading and artificial charade which should not bear the imprimatur of the court.").

14.      The principal of adequate disclosure requires, among other things, "information relevant to the risks posed to creditors under the plan."  In re Phoenix Petroleum Co., 278 B.R. 385, 393 n.6 (Bankr. E.D. Pa. 2001) (citing In re Metrocraft Pub. Servs., Inc., 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984)); see also In re Radco Props., Inc., 2009 WL 612149, *12 (Bankr.

E.D.N.C. Mar. 9, 2009) ("Creditors not only rely on the disclosure statement to form their ideas about what sort of distribution or other assets they will receive but also what risks they will face.").

15.     Where the centerpiece of a proposed plan is the settlement of numerous, complex disputes, the plan proponent should be required to disclose to stakeholders exactly what is being compromised and the reasons therefore.  See e.g., In re PC Liquidation Corp., 383 B.R. 856, 865 (Bankr. E.D.N.Y. 2008) (approving disclosure regarding settlement that "fairly communicated the specifics of the Settlements, including the reasons behind the Settlements and the merits of the potential litigation behind those Settlements.").  In this regard, stakeholders should be given facts, rather than just the opinions of those who would seek to implement the settlement.  See In re East Redley Corp., 16 B.R. 429, 430 (Bankr. E.D. Pa. 1982) ("opinions without factual support are not proper content of a disclosure statement and do not provide the parties voting on the plan with adequate information" within the meaning of Bankruptcy Code Section 1125).

B.      **The Legal Standard Cannot Be Met At This Time,
Suggesting That A Few-Week Adjournment Is Appropriate.**

1.      **Consideration Of The Disclosure
Statement Is Premature Without The Examiner's
Findings Of Fact And Proposed Legal Conclusions**.

16.     No one can seriously contest that the case now hinges on – and probably has always hinged on – what is to be done with the LBO-related causes of action.  Much time and much talk in the Courtroom has been dedicated to this very subject.  And now, finally, an Examiner has been appointed to conduct a full examination and report his findings to the Court and all parties-in-interest.  Those voting on the Plan are essentially voting on the "Global Settlement" but the Debtors ask that they do so without the benefit of what Mr. Klee has to say.

17.     Soliciting creditor votes on that "Global Settlement" before the examination has

concluded and based on a Disclosure Statement that does not even mention Mr. Klee's appointment seems entirely inconsistent with Section 1125 and the cases cited above. See In re EnCap Golf Holdings, LLC, 2008 WL 5955350 at *5 (Bankr. D. N.J. December 24, 2008) (noting that the hearings on the disclosure statement had been twice adjourned to afford the debtor additional time to perform certain evaluations); Official Committee of Unsecured Creditors ex. rel. Estates of Polaroid Corp. v. Barron, 2004 WL 1397582 at *1 (Bankr. D. Del. June 22, 2004) (plan process delayed by the "[c]ourt's decision to hold up consideration of the Plan pending receipt of the examiner's report"); see also In re 50-Off Stores, Inc., 213 B.R. 646, 654 (Bankr. W.D. Tex. 1997) (Chapter 11 is supposed to be "conducted under the harsh glare of public scrutiny, exposing to public view (at least potentially) a wide scope of information which, in a nonbankruptcy context, would normally be thought to enjoy a certain expectation of privacy.").

18.    As indicated above, the present confirmation schedule seems to allow for a short adjournment, without disturbing the now anticipated August 16th confirmation trial date, and thus enabling Mr. Klee to complete his examination, file his Examiner's Report, and the Debtors to revise the draft Disclosure Statement.  Accordingly, a short adjournment should be granted.

>    **2.    The Disclosure Statement Should Not Be Approved Prior to (a) Greater Clarity For The FCC Process And/Or (b) An Interim Ruling That The "Class B" Stock Approach Is Consistent With Section 1123(b)(6) And Other Provisions Of The Bankruptcy Code.**

19.    As indicated above, the Plan rests upon FCC approval.  Among other FCC law implicated by the Plan is the "foreign-ownership" rule, to wit: no more than 25% of a company ultimately owning broadcast licenses may be owned or controlled by foreigners (such as Cayman Island hedge funds or European banks), measured in the aggregate. 47 U.S.C. § 310

(2006).   The FCC is scrupulous in enforcing this restriction, broadly interpreting  "control" to mean "every form of control, actual or legal, direct or indirect, negative or affirmative." WWIZ, Inc., 36 F.C.C. 561, 579 (1964) (stating same).  Thus, the Plan's New Warrants in lieu of New Common Stock approach to solving its foreign-ownership problem may not surpass exacting FCC inquiry.  See Stereo Broadcasters, Inc., 55 F.C.C. 2d 819, 821 (1975) (identifying control "necessarily calls for an investigation beyond stock ownership in order to determine effectively where actual control resides.").

20.     Other important FCC law limits cross and multiple ownership of competing broadcasting and media outlets. See, e.g., 47 C.F.R. § 73.3555(a) (2010) (limiting ownership interests in competing radio stations); 47 C.F.R. § 73.3555(b) (2010) (limiting ownership interests in competing television stations); 47 C.F.R. § 73.3555(c) (2010) (limiting ownership of radio and television broadcast licenses in similar markets).  The goal is "diversification of viewpoints." Huddy v. FCC, 236 F.3d 720, 723 (D.C. Cir. 2001).  Here, too, the FCC looks at deal realities, not structural artifice.  So, here, the Plan's "Class B" (non-voting stock) approach to solving its "duopoly" problem may not pass FCC muster.

21.     The Debtors' FCC applications hope to explain-away the issue, but the 30-day deadline for objections has not yet passed.  When objections are asserted, there is reason to suspect the New Warrants and "Class B" problem will not receive FCC approval, at least not prior to the Bankruptcy Court so advising the FCC that the approach is consistent with the Bankruptcy Code.  See In re Ahead Communications Systems, Inc., 195 B.R. 512 (D. Conn. 2008) (finding that stock restrictions prohibiting voting for three years violates 1123(a)(6)); In re Tharp Ice Cream Co., 25 F. Supp. 417 (E.D. Pa. 1938) (voting rights that could only be used following payment default were improper, and all shares needed to possess "full voting rights on

11

an equality, share for share [with the unrestricted stock]");  see also Huddy, 236 F.3d at 722 ("To

be sure, in the interests of "preserv[ing] the integrity" of its operations … the Commission is

entitled to consider a would-be licensee's deceptive behavior as grounds for rejecting an

application, id., and even to make denial of a license virtually automatic on evidence of

intentional misrepresentations in license applications.").

22.    In a matter of weeks, objections will be filed with the FCC.  Hopefully, the

Debtors will soon thereafter know the likely investigatory path the FCC will take.  A short

adjournment likely will enable considerably more disclosure that will inform Plan voting.

Alternatively, it might enable a briefing schedule before this Court as to whether the Debtor has

appropriately submitted the "Class B" non-voting stock and New Warrant strategy to the FCC.

A few-week adjournment should be granted.


**II.      The Disclosure Statement Should Not Be Approved
          Because It Fails To Include Necessary And Important Information.**

**A.      The Disclosure Statement Lacks Objectivity
         Regarding The LBO-Related Causes Of Action
         And, Thereby, Lacks A Cogent Statement Of The
          "Downside" Risks Associated With An Affirmative Plan Vote.**

23.    Page after page, the Disclosure Statement downplays the LBO-related causes of

action, as if they should be swatted away like a meaningless gadfly.  See Disclosure Statement

at 55-61.  It trumpets the "Global Settlement" as a triumphant case development, facilitating

extraordinary value distribution to the voting creditor.  It is a garish advertisement, a subjective

spin of fact, without fair disclosure of  downside risk.  Of course, the Debtors may be very

wrong in this advertisement. See In re Tousa, 422 B.R. 783 (Bankr. S.D. Fla. 2009) (lender

claims avoided in full as fraudulent conveyances, and the holders also compelled to disgorge

over $400 million in interest and professional fee payments).  If that were to transpire, how

honest would voting creditors feel about this draft Disclosure Statement?

24.    The law, as discussed above, requires objectivity and a clear presentation to the voting creditor of the "risk / reward" profile of his or her Plan vote.  The Disclosure Statement, thus, is inconsistent with the law.

25.    Wilmington Trust would, if the Court asks, riddle the draft with sentences and paragraphs affording creditors the alternative view, the "downside" risk.  That seems a less efficient method to a fair Disclosure Statement.  As indicated above, Judge Shannon recently accepted a more efficient method: in In re Motor Coach Industries (Bankr. D. Del., Case No. 08-12136 (BLS)), the so-called "out-of-the-money" junior constituency was authorized to present its case perspective in a letter that was inserted in the solicitation package.  Wilmington Trust respectfully urges the Court to consider this as an alternative method to fair disclosure.  In advance of the Disclosure Statement hearing, Wilmington Trust will supplement this filing with a draft letter that the Court may consider at that hearing.

## B.    The Disclosure Statement Lacks Other, Important Information.

26.    As indicated above, there are a number of areas where additional disclosure would substantially inform voting.  Wilmington Trust objects to the Disclosure Statement unless it is amended to address the following points of inquiry:

- Additional information should be provided as to the value of to-be-filed affiliated companies (since Wilmington Trust may have "aiding and abetting" claims against those entities that are not hindered by the Court's historic claims bar date order);

- Additional information should be provided as to the value of often referenced, never explained, Chapter 5 avoidance claims against Morgan Stanley;

- Additional information should be provided as to the value of other avoidance claims at the Tribune (parent-company) level that are to be released under the Plan, including inter-Company avoidance claims;

- Additional information should be provided as to what is meant by oblique Disclosure Statement and Plan references to "Restructuring Transactions" that are to be advance-approved by creditors, but never revealed;

- The Disclosure Statement should provide, in appropriate places, a clear statement indicating that the "third-party releases" to be solicited from creditors as part of the proposed voting ballot are really a ruse, since (irrespective of a voting creditor's refusal to release) the Plan purports to enjoin the assertion of all such third-party claims;

- The Disclosure Statement should include a chart that clearly identifies which parties are being released of estate liability and third-party liability, their relationship to the Debtors and the LBO, and what consideration each party is giving for such releases;

- Additional information should be provided as to what are the parameters of anticipated management incentive programs, and why such programs are being implemented.

### III.    The Procedures Motion Should Not Be Approved Absent Certain Important Modifications.

#### A.    The Procedures Motion Does Not Provide For Wilmington Trust's Fee And Indemnity Claim.

27.    Pursuant to the terms of the PHONES Indenture, Wilmington Trust is entitled to compensation for its services, as well as the fees and expenses of its agents and counsel incurred throughout these proceedings.  Specifically, Section 6.07 of the PHONES Indenture provides that the Tribune Company agrees to pay the PHONES indenture trustee "reasonable compensation in Dollars for all services rendered."  The PHONES Indenture further obligates the Debtors to "reimburse the Trustee in Dollars upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of [the] Indenture (including the reasonable compensation and the expenses and disbursements

of its agents and counsel)  Id.  The PHONES Indenture also obligates the Tribune Company to indemnify the Trustee for expenses incurred arising out of or in connection with the administration of the trust, including claims and liabilities in connection with the performance of any of its powers under the PHONES indenture.  Id.

28.     On June 5, 2009, Wilmington Trust filed a proof of claim against Tribune, which claim also demanded "fees, costs, expenses (including professional fees and expenses) and other charges."  Wilmington Trust's claim for post-petition fees and indemnity is enforceable. Ogle v. Fidelity & Deposit Co. of Md., 586 F.3d 143 (2d Cir. 2009) (unsecured creditor can recover attorneys fees incurred postpetition under prepetition credit documents). And, per the PHONES Indenture, it is not contractually subordinated. See PHONES Indenture, §14.13 (subordination provisions do not "apply to claims of, or payments to, the Trustee under or pursuant to Section 6.07 [the trustee compensation section].")

29.     The Plan does not contemplate this claim and, so, the Procedures Motion does not indicate how it is supposed to be resolved under the Plan.  Wilmington Trust does not know, for example, if it is supposed to vote on the Plan (like other General Unsecured Creditors), file a motion pursuant to Bankruptcy Rule 3018, or whether it is simply merged into the PHONES treatment as a deemed vote to reject.  Wilmington Trust objects to the Procedures Motion to the extent that this issue remains unresolved.

**B.      The Procedures Motion Does Not Provide
        For "Aiding And Abetting" Claims Against To-Be-Filed Affiliates.**

30.     In the *Objection of Wilmington Trust Company to the Motion of the Debtors for an Order (I) Determining that Wilmington Trust Company has Violated the Automatic Stay, (II) Requiring Wilmington Trust Company to Show Cause Why it Should Not Be Held in Contempt of Court and (III) Halting All Proceedings with Respect to the Complaint*, dated April 5, 2010,

and annexed *Amended Complaint for Equitable Subordination and Disallowance of Claims, Damages, and Constructive Trust*, Wilmington Trust both alleged facts and laid the legal foundation for claims against Citibank, the bank simultaneously serving as the PHONES' Indenture Trustee and principal architect of the LBO in March 2007.  The Motion and Amended Complaint also alleged facts and laid the legal foundation for claims against other parties involved in the LBO on "aiding and abetting" complicity theories.

31.     The Plan contemplates the filing of 18 Tribune affiliates that might also bear complicity liability to Wilmington Trust and holders, the PHONES.  This Court has not entered an Order imposing a claims bar date in connection with those entities and the Procedures Motion does not make clear what impact the relief requested has on Wilmington Trust's complicity claims.  Wilmington Trust objects to the Procedures Motion to the extent that this issue remains unresolved.

## C.     **The Procedures Motion Advance Requests Plan-Related Relief.**

32.     Paragraph 52 of the Procedures Motion requests pre-confirmation authorization from this Court to issue the new "Class B" shares as necessary to obviate the FCC rules and regulations discussed above.  This is inappropriate, at least absent additional briefing on the subject.  Accordingly, Wilmington Trust objects to the Procedures Motion to the extent that this relief remains requested (and included in Paragraph 41) of the proposed form of order.

## D.     **Wilmington Trust Requests Simultaneous Notice Of All Plan-Related Objections And Pleadings.**

33.     Wilmington Trust recognizes that it is now serving as the Debtors' primary case "counter-balance," especially regarding all matters related to the Plan.  As such, it is fitting that it receives simultaneous copy of all Plan-related objections and pleadings.  Wilmington Trust

objects to the Procedures Motion to the extent that Wilmington Trust is not included as a notice party in the Plan, Disclosure Statement, "tombstone" ads, and solicitations packages for simultaneous service of all Plan-related objections and other pleadings.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## CONCLUSION

**WHEREFORE**, Wilmington Trust respectfully requests that this Court: (1) adjourn consideration of the Disclosure Statement; (2) or, decline to approve the Disclosure Statement at this time; and (3) grant Wilmington Trust's any such further relief as is just and proper.

Dated: May 13, 2010

Respectfully submitted,

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

By:           */s/ Raymond H. Lemisch*
Raymond H. Lemisch, Esq. (Del. Bar No. 4204)
Jennifer R. Hoover, Esq. (Del. Bar No. 5111)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone:  (302) 442-7010
Facsimile: (302) 442-7012
Email: rlemisch@beneschlaw.com
Email: jhoover@beneschlaw.com

-and-

**BROWN RUDNICK LLP**
Robert J. Stark, Esq.
Martin S. Siegel, Esq.
William M. Dolan III, Esq.
Katherine S. Bromberg, Esq.
Seven Times Square
New York, New York 10036
Telephone:  (212) 209-4800
Facsimile:  (212) 209-4801
Email: rstark@brownrudnick.com
Email: msiegel@brownrudnick.com
Email: wdolan@brownrudnick.com
Email: kbromberg@brownrudnick.com

*Counsel to Wilmington Trust Company, as Successor Indenture Trustee for the $1.2 Billion Exchangeable Subordinated Debentures Due 2029, Generally Referred to as the PHONES*