## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |
| | **Related to Docket Nos. 4153, 4154, 4310, 4348, 4368, 4373, 4376, 4377, 4378, 4382, 4383, 4385, 4403, 4424** |

## DEBTORS' OMNIBUS RESPONSE TO OBJECTIONS TO APPROVAL OF THE DISCLOSURE STATEMENT FOR THE JOINT PLAN OF REORGANIZATION OF TRIBUNE COMPANY AND ITS SUBSIDIARIES

The debtors and debtors-in-possession in the above-captioned cases (collectively,

the "Debtors") respectfully submit this omnibus response (the "Response") to the Objections

(defined below) to approval of the proposed disclosure statement and solicitation procedures for

the Joint Plan of Reorganization of Tribune Company and Its Subsidiaries.[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS 1, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Disclosure Statement, Plan, or relevant Objection as applicable.

## INTRODUCTION

This Response is submitted in connection with the fourteen (14) Objections (as defined herein) filed on or about Thursday, May 13. The Debtors have made significant progress in addressing these Objections, and they continue to work diligently with the Objectors (as defined herein) to resolve outstanding issues, most of which the Debtors anticipate will be resolved through additional disclosure. As an example, the Debtors have invited various Objectors to provide their own submissions, which the Debtors have indicated they will try to accommodate in the Disclosure Statement. In light of the objection deadline late last week, the Debtors asked the parties to provide their submissions by the evening of Monday, March 17. After reviewing any submissions received, the Debtors anticipate submitting a revised Disclosure Statement with these and other additions and revisions by late Tuesday, May 18.

## BACKGROUND

1.      On April 12, 2010, the Debtors filed the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries (as may be amended, supplemented, or modified, the "Plan") and the related disclosure statement [Docket No. 4008] (as may be amended, supplemented, or modified, the "Disclosure Statement"). The Plan was attached to the Disclosure Statement as Exhibit A.

2.      On April 29, 2010, the Debtors filed their Motion for an Order (I) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries, (II) Establishing a Deadline for Return of Media Ownership Certifications, (III) Scheduling Confirmation Hearing, (IV) Establishing Notice and Objection Procedures in Respect of Confirmation of Joint Plan of Reorganization, and (V) Granting Related Relief [Docket No. 4204] (the "Solicitation Motion").

46429/0001-6748262v1

3.     The Debtors have received objections to the Disclosure Statement and/or Solicitation Motion from fourteen (14) parties: (i) the Office of the United States Trustee [Docket No. 4424] (the "United States Trustee");[3] (ii) the Wilmington Trust Company [Docket No. 4385] ("Wilmington Trust"), as Successor Indenture Trustee to the PHONES Notes; (iii) County of San Bernardino, California, a California Taxing Authority [Docket No. 4383]; (iv) Wells Fargo Bank, N.A. [Docket No. 4382] ("Wells Fargo"), as successor administrative agent to the Bridge Lenders; (v) Deutsche Bank Trust Company of Americas ("Deutsche Bank"), as Indenture Trustee to certain of the Senior Lenders [Docket No. 4378]; (vi) the Secretary of the United States Department of Labor [Docket No. 4377] (the "DOL"); (vii) the Credit Agreement Lenders [Docket No. 4376]; (viii) ACE American Insurance Company and certain of its affiliates [Docket No. 4373]; (ix) the Plaintiffs in *Crabhouse of Douglaston Inc. d/b/a Douglaston Manor, et al. v. Newsday, Inc., et al.*, Case No. CV 04-558 (E.D.N.Y. Feb. 10, 2004) [Docket No. 4368]; (x) Virginia W. Thomson [Docket No. 4348]; (xi) Robert Henke [Docket No. 4310]; (xii) Maureen Dombeck [Docket No. 4154], (xiii) Kevin Millen [Docket No. 4153], and (xiv) Dilip Patel [Docket No. 4403] (the aforementioned informal comments and objections collectively, the "Objections").

4.     The Objections can be classified into four (4) principal categories: (a) Objections arguing that the Disclosure Statement lacks adequate information within the meaning of section 1125 of the Bankruptcy Code; (b) substantive Objections to confirmation of the Plan; (c) Objections to the Debtors' proposed procedures for the solicitation of votes on the

---

[3] As a courtesy, the United States Trustee provided comments to the Debtors' Disclosure Statement and solicitation procedures in advance of the May 13 objection deadline. The Debtors have endeavored to accommodate many of these comments in the various revisions to the Disclosure Statement. The United States Trustee has reserved her right to raise at the Disclosure Statement hearing any of the issues informally raised to the extent she believes such issues have not been resolved.

46429/0001-6748262v1

Plan;[4] and (d) Objections requesting an adjournment of the hearing to consider the adequacy of the Disclosure Statement.

5.     To assist the Court and all parties in interest with the task of ensuring that each of the objections is addressed, the Debtors have provided a comprehensive summary of the Objections in a chart attached hereto as <u>Exhibit A</u> (the "<u>Summary Chart</u>").  The Summary Chart identifies each objecting party (each an "<u>Objector</u>"), summarizes the substance of each of the Objections, and provides the Debtors' responses thereto, including references to any supplemental disclosures or revisions incorporated into the Disclosure Statement and/or Plan to address such Objections.  In addition, certain Objections that were raised by multiple Objectors are separately addressed below.

6.     With respect to those Objections concerning the adequacy of disclosure, the Debtors submit that the Disclosure Statement is a full and fair disclosure document which should be approved under section 1125 of the Bankruptcy Code as containing "adequate information," and the Objections should therefore be overruled.  Nevertheless, in responding to objections to approval of a disclosure statement, the Debtors believe that it is generally more efficient to add additional disclosure with respect to issues raised rather than argue whether such additional disclosure is in fact required.  Accordingly, the Debtors have implemented a series of changes to the Disclosure Statement and, in certain instances, to the Plan to address certain of the Objections.  To that end, the Debtors are filing a revised Disclosure Statement and amended Plan, which they believe address the vast majority of material issues raised in the Objections. The Debtors believe that these modifications render the majority of arguments raised in the Objections moot.

---

[4] Certain other Objections raise issues regarding the merits of pending claims against the Debtors, which the Debtors submit are beyond the scope of the hearing to consider the Disclosure Statement, are discussed more fully in the Summary Chart.

46429/0001-6748262v1

7.      With respect to certain Objections directly applicable to the terms of the Plan, the Debtors submit that because such Objections do not individually or collectively raise issues that render the Plan patently unconfirmable as a matter of law, the arguments raised therein are more properly considered in the context of the Confirmation Hearing. While the Debtors believe that the provisions of the Plan are appropriate, permissible and supported by applicable case law and relevant provisions of the Bankruptcy Code, the hearing on approval of the Disclosure Statement should be focused exclusively on the adequacy of disclosure and should not be transformed into a "mini" confirmation hearing. Accordingly, while in certain instances the Debtors have made modifications to the Plan to circumvent confirmation objections or clarify Plan provisions that parties have asserted are ambiguous, the Debtors reserve the right to respond to arguments related to confirmation of the Plan at the appropriate time.

8.      With respect to the Objections relating to the solicitation procedures, the proposed solicitation procedures and the forms of ballot are well-precedented in all respects and collectively provide for an appropriate, efficient and permissible process for voting on the Plan and providing related information. Specifically, and as discussed more fully below, the Debtors also believe that the releases and the mechanisms for granting or withholding the releases are fair and permissible under prevailing case law.

9.      With respect to the request for an adjournment, as further discussed below, there is no basis for delay in considering the Disclosure Statement. The current Disclosure Statement provides the Debtors' constituents with information that is adequate to enable such parties to make an informed decision on the Plan. Accordingly, it is appropriate to move forward with the Disclosure Statement hearing at this time. Neither the appointment of an examiner to investigate certain claims, causes of action and defenses thereto in connection with the

5

Leveraged ESOP Transactions,[5] nor alleged FCC concerns (which are, in any event, misplaced),

warrant delay in approving the Disclosure Statement and solicitation procedures.

## ARGUMENT

I.    **The Disclosure Statement Contains "Adequate Information," Within the Meaning of Section 1125 of the Bankruptcy Code, and Therefore Should Be Approved**

10.    Pursuant to section 1125(b) of the Bankruptcy Code, a debtor-in-

possession may not solicit votes to accept or reject a plan of reorganization without first

receiving court approval of a written disclosure statement that contains "adequate information."

Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably
> practicable in light of the nature and history of the debtor and the
> condition of the debtor's books and records that would enable a
> hypothetical reasonable investor typical of holders of claims or
> interests of the relevant class to make an informed judgment about the
> plan, but adequate information need not include such information
> about any other possible or proposed plan.

11 U.S.C. § 1125(a)(1).  A disclosure statement as a whole must provide information

"reasonably practicable" to permit an "informed judgment" by those entitled to vote on a plan of

reorganization.  See Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 417 (3d

Cir. 1988); see also Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp., 337

F.3d 314, 321 (3d Cir. 2003).

11.    In determining whether a contested disclosure statement contains adequate

information, courts consider the sophistication of the audience to whom disclosure is directed.

See In re Zenith Elec. Corp., 241 B.R. 92, 99 (Bankr. D. Del. 1999) (finding that when

determining whether disclosure was adequate that courts should consider the audience requesting

---

[5] On May 11, 2010 the Court appointed Kenneth N. Klee as examiner (the "Examiner") to investigate, among other things, certain potential claims and causes of action held by the Debtors' Estate that are asserted in connection with the Leveraged ESOP Transactions and defenses asserted thereto [Docket Nos. 4320, 4321].

46429/0001-6748262v1

additional information and that disclosure should be tailored to the sophistication of the investor).

12.     Similarly, when information beyond that in the disclosure statement is otherwise available to creditors, courts consider such information in determining whether a disclosure statement meets the requirements of section 1125(a).  See First Am. Bank of New York v. Century Glove, Inc, 81 B.R. 274, 279 (D. Del. 1988) ("Because §1125(a)(2)(C) contemplates that the typical investor will have information available to it regarding debtor's affairs through sources other than the disclosure statement, the adequacy of information will be determined with a view to a typical investor's outside sources."); In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 979 (Bankr. N.D.N.Y. 1988) ("[I]n ascertaining the adequacy of information in a disclosure statement, the bankruptcy court must consider each creditor's access to outside sources of information.").  See also Zenith, 241 B.R. at 99 ("In considering the adequacy of a disclosure statement, it is important to keep in mind the audience. Here, those entitled to vote on the Plan are sophisticated, institutional investors . . . [with] competent professionals. . .  They have also been involved in negotiations. . . [and] Significant documents and information (in addition to the Disclosure Statement) were made available . . . during that time.").

13.     These considerations are particularly relevant here, where most of the major objecting parties, e.g., Wells Fargo, the Credit Agreement Lenders, Wilmington Trust and Deutsche Bank, are sophisticated institutional investors, represented by sophisticated legal and financial advisors, each of which (or its predecessor, in the case of Wells Fargo) has a long and active history in these cases and each of which has had and continues to have access to

7

substantial public and non-public information concerning, among other things, the Leveraged

ESOP Transaction and the LBO-Related Causes of Action.[6]

14.    Moreover, courts have broad discretion in determining whether a

disclosure statement contains "adequate information," employing a flexible approach based on

the unique facts and circumstances of each case.  See, e.g., Oneida Motor Freight, 848 F.2d at

417 ("from the legislative history of section 1125, we discern that adequate information will be

determined by the facts and circumstances of each case"); In re Lisanti Foods, Inc., 329 B.R.

491, 507 (D.N.J. 2005) ("section 1125 affords the Bankruptcy Court substantial discretion in

considering the adequacy of a disclosure statement"); In re River Village Assocs., 181 B.R. 795,

804 (E.D. Pa. 1995)("under section 1125(a), the Bankruptcy Court is thus given substantial

discretion in considering the adequacy of a disclosure statement").

15.    Employing a flexible approach to the approval of disclosure statements,

courts have identified several categories of information which, based on the facts of a particular

case, should typically be included in a disclosure statement.  See, e.g., In re Scioto Valley Mtg.

Co., 88 B.R. 168, 170-71 (Bankr. S.D. Ohio 1988) (listing 19 categories of information that

should typically be included in a disclosure statement).  Here, the Disclosure Statement includes

approximately 150 pages of information regarding the Plan and the Debtors' finances and

operations for parties in interest to consider when voting on the Plan, including the following:

> A.    an overview of chapter 11; a description of the parties entitled to vote on
> the Plan; a summary of the solicitation package, voting procedures, ballots
> and voting and objection deadline; (Art. I);
>
> B.    an overview of the Plan; a summary of classification and treatment of
> allowed claims against and interests in each of the Debtors under the Plan;
> and the estimated recovery of Allowed Claims (Art. II);

---

[6] Wells Fargo is the successor agent to the Bridge Lenders, who were participants in the Leveraged ESOP
Transaction. The Debtors are currently providing Wells Fargo with financial and other information and analyses
and, barring any objection, Wells Fargo will have full access to the Document Depository (as defined below) as of
4:00 p.m. (ET) on May 17, 2010.

46429/0001-6748262v1

C.      general information, including: descriptions of the Debtors' businesses and properties, operations and management (Art. III);

D.      a summary of prepetition liabilities, including: descriptions of the prepetition funded debt and capital structure, trade payables and other operating liabilities, compensation and benefit programs, and pending litigation and certain other legal matters involving the Debtors (Art. IV);

E.      a summary of the events leading up to the chapter 11 (Art. V);

F.      a summary of events during the chapter 11 cases, (Art. VI);

G.      a description of the proposed settlement of claims related to the Leveraged ESOP Transactions (Art. VII);

H.      a discussion of the Debtors' exclusivity period and the relevant motions relating to the extension of the exclusivity period (Art. VII);

I.      a detailed description of the material Plan provisions, including descriptions of the Plan in general, classification and allowance of claims and equity interests generally, provisions for payment of administrative expense claims, DIP facility claims and priority tax claims, classification of claims, provisions for treatment of claims and interests, identification of classes of claims and interests that are impaired; acceptance or rejection of the Plan, means of implementation, provisions governing distributions, treatment of executory contracts, unexpired leases and pension plans, provisions for treatment of disputed claims and disputed interests, confirmation and consummation of the Plan, effect of Plan confirmation and miscellaneous Plan provisions (Art. IX);

J.      a summary of the voting procedures; a description of voting and ballot tabulation; and the voting deadline (Art. X);

K.      a summary of the Plan confirmation process, including the confirmation hearing and statutory requirements for confirmation of the Plan (Art. XI);

L.      projected financial information for the Reorganized Debtors and the reorganization value of the Reorganized Debtors (Art. XII; Ex. D);

M.      a description of the debt and capital structure of the reorganized debtors (Art. XIII);

N.      a description of risk factors (Art. XIV);

O.      a description of certain federal income tax consequences of the Plan (Art. XV);

P.      a description of certain federal, state and foreign securities law considerations (Art. XVI);

Q.      a description of alternatives to confirmation and consummation of the Plan (Art. XVII); and

R.      a detailed liquidation analysis for the Debtors (Ex. E).

16.      The extensive and detailed information set forth in the Disclosure Statement, particularly in light of the additional disclosures added in response to the Objections, constitutes "adequate information" under section 1125 of the Bankruptcy Code. Accordingly, the Disclosure Statement should be approved.

9

II.     **The Debtors' Revisions to the Disclosure Statement Should Resolve Each "Adequate Information" Objection to the Disclosure Statement**

17.     The Objections cite several instances where the objecting parties believe that the Disclosure Statement fails to provide "adequate information" required by section 1125 of the Bankruptcy Code.  In response, the Debtors have incorporated additional disclosures, each of which is discussed below and/or on the Summary Chart, and the inclusion of such additional information has resulted in the resolution of several Objections.  To the extent the remaining Objections are not resolved through the inclusion of such additional information, they should be overruled.

A.      **Leveraged ESOP Transactions and Settlement**

18.     The Debtors believe that Article VII of the Disclosure Statement, describing the settlement of claims related to the Leveraged ESOP Transactions, provides adequate disclosure of the LBO-Related Causes of Action and the proposed settlement thereof. The adequacy of such disclosure is buttressed by the fact that those Objections relating to the discussion of the settlement and LBO-Related Causes of Action are primarily made by large sophisticated institutions who are active participants in these cases and who have had and continue to have access to massive amounts of public and non-public information, documents and analyses concerning the Leveraged ESOP Transactions, the LBO-Related Causes of Action and the settlement.  Indeed, certain of these objecting parties were participants in the Leveraged ESOP Transactions.  Other of the Objectors sit on the Creditors Committee and thus have had access to the Committee's investigation and analyses of these claims and the settlement.

19.     To the extent that additional disclosure is required, the Debtors believe the Objections can be addressed by incorporating the Objectors' views on the topic.  Accordingly, the Debtors invited the Objectors, as well as the parties to the Settlement Support Agreement and

10

the Creditors Committee, to provide, on or before the close of business on May 17, their own

submissions regarding the LBO-Related Causes of Action and settlement for inclusion in the

Disclosure Statement.  The Debtors shall try to integrate any submissions received into the

Disclosure Statement.  Additionally, the Debtors have added language to the Disclosure

Statement and proposed form of Plan Ballot directing interested parties to the website of the

Debtors' voting agent, Epiq Bankruptcy Solutions, LLC ("Epiq"), where the Examiner's report,

reflecting the results of his investigation of the asserted LBO-Related Causes of Action, should

be available no later than July 12, 2010.

       20.     As to the adequacy of disclosure concerning the Leveraged ESOP

Transactions themselves, extensive information is already available through SEC and other

public filings, including, for example, the extremely detailed description and background

contained in the proxy materials and the "Offer to Purchase" filed by Tribune with the SEC in

connection with the Leveraged ESOP Transactions, which are publically available on the SEC's

EDGAR data base.  Additional voluminous information is available through the Debtors'

document depository, which contains documents produced in connection with discovery related

to the Leveraged ESOP Transactions (the "Document Depository").

**B.**      **Miscellaneous Objections to the Disclosure Statement Based on "Adequate Information"**

       21.     In addition to the Objections relating to the adequacy of disclosure

concerning the Leveraged ESOP Transactions and settlement, certain Objectors have raised

various other concerns regarding adequacy of disclosure.  The Debtors have endeavored to

address each of these Objections by adding additional disclosure to the Disclosure Statement

where appropriate.[7]  However, in some instances, the Debtors were either not able to resolve the

_____

[7] The Debtors believe, in agreement with this Court, that the inclusion of additional disclosure in the Disclosure

Objection or felt that the Objection was without merit and did not warrant further disclosure. The Debtors have detailed the actions taken in response to these Objections on the Summary Chart, which is attached to this Response as Exhibit A.

**III.    Absent Extraordinary Circumstances, Substantive Objections to Confirmation of the Plan Should Not Be Considered at the Disclosure Statement Hearing**

22.    In addition to the Objections which seek additional information regarding certain aspects of the Plan or the Debtors' operations, five (5) of the Objections raised substantive objections regarding certain aspects of the Plan. These Objections were primarily in connection with the classification of the Bridge Loan Claims and the permissibility of the releases contained in the Plan.

23.    It is well settled, however, that disclosure statement hearings should not be converted into "mini" confirmation hearings, but should instead be limited to issues relating to the adequacy of disclosure. See, e.g., In re Monroe Well Service, Inc., 80 B.R. 324, 332 (Bankr. E.D. Pa. 1987) (noting that confirmation objections should generally not be considered at the disclosure statement hearing and deferring plan objections raised at the disclosure statement hearing, which included alleged violations of the absolute priority rule and the best interests test); In re Cardinal-Congregate I, 121 B.R. 760, 763-64 (Bankr. S.D. Ohio 1990) (objections to, inter alia, classification, treatment of claims, and protection of creditor interests are more properly addressed at the confirmation hearing"); In re United States Brass Corp., 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996) (stating that the court must be careful not to convert the disclosure statement hearing into a mini-confirmation hearing).

---

Statement, certain of which was provided by the relevant Objector, is the preferred way to handle most objections that are properly brought at a Disclosure Statement hearing. See Unofficial Transcript of Record, at *28-29, In re Tribune Co., et al., Case No. 08-13141 (KJC) (Bankr. D. Del. Apr. 19, 2010) ("[I]n a case like this. . . just put [the requested disclosure] in and the Debtors are free to disagree with it.").

46429/0001-6748262v1

24.     Although on rare occasions the court may withhold approval of a disclosure statement when the disclosure statement describes a plan of reorganization which on its face is patently unconfirmable, such precedent does not apply to the case at hand, and the Debtors believe that none of these objections rise to the level of rendering the Plan "patently unconfirmable." See, e.g., In re Eastern Maine Electric Cooperative, 125 B.R. 329, 333 (Bankr. D. Maine 1991) ("if the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible' the court should exercise its discretion to refuse to consider the adequacy of disclosures"); Cardinal-Congregate I, 121 B.R. at 764 (holding that approval of a disclosure statement should sometimes be withheld where confirmation of the plan would be "impossible."); Monroe Well Service, 80 B.R. at 332 (finding that disapproval of an otherwise proper disclosure statement may be appropriate "when a court is convinced that the plan could not possibly be confirmed"). The Debtors believe that none of these objections rise to the level of rendering the Plan "patently unconfirmable" and should instead be addressed in connection with the Plan confirmation process.

25.     For example, certain parties have taken issue with the permissibility of the "opt-out" release mechanic in the ballot and/or the Disclosure Statement's description of the release and indemnification provisions in the Plan, including that the Debtors fail to disclose that the Plan provides for allegedly impermissible, non-consensual third-party releases and that the Plan's indemnification provisions are overly-broad and unjustified. The Debtors' response to arguments raised concerning the "opt-out" release mechanic is set forth in Section IV herein. As for any complaints concerning the Plan's release and indemnification provisions and any disclosure relating thereto, the Debtors' response is two-fold. First, the Debtors have added meaningful disclosure to the Disclosure Statement and have clarified certain Plan provisions.

For example, as requested by Wilmington Trust, the Disclosure Statement has been revised to provide a clear list of which parties are "Released Parties" under the Plan, and, consistent with the DOL's request, the risk factors in the Revised Disclosure Statement now contain a reference to the Plan's releases.  Additionally, the Debtors have modified, Section 11.4 of the Plan (Supplemental Injunction) to clarify that the scope of the Supplemental Injunction only pertains to "Released Claims," which include only estate claims and causes of action that are released and third-party claims and causes of action that are consensually released.  Moreover, in response to an objection raised by the Credit Agreement Lenders, the Debtors have revised Section 11.7.2 of the Plan (Plan Indemnity) to limit the scope of the indemnification for Creditor Indemnified Parties.

26.     Second, and more fundamentally, the Debtors will demonstrate at the Confirmation Hearing that the Plan's release provisions are fully defensible under applicable Third Circuit law.  As a threshold matter, the Plan does not force a non-consensual third-party release of any third-party claim or cause of action, with the possible exception of the Loan Guaranty Claims against the Guarantor Non-Debtors, which the Debtors believe they can accomplish through class acceptance and under applicable legal precedent, including, without limitation, the standard announced by the Third Circuit in In re Continental Airlines.  203 F.3d 203, 214 (3d Cir. 2000).  As a result, to the extent Wilmington Trust (or any other third-party) holds valid third-party claims against any of the Released Parties (except for the Debtors, which receive the benefit of the bankruptcy discharge), nothing in the Plan precludes Wilmington Trust from pursuing those third-party claims.  Indeed, as will be more fully briefed in connection with Plan confirmation, courts in the Third Circuit have concluded on countless occasions that consensual releases contained in a plan of reorganization are permissible.  See, e.g., In re

14

Continental, 203 F.3d at 214 n.11 (noting that several bankruptcy courts in the Third Circuit

permit non-debtor releases if such releases are consensual); In re Zenith Elecs. Corp., 241 B.R.

92, 111 (Bankr. D. Del. 1999) (permitting the release of claims against non-debtors held by

creditors voting in favor of the plan); In re Spansion, Inc., 2010 WL 1292837, *22 (Bankr. D.

Del. Apr. 1, 2010) (noting that consensual third-party releases may be included in a plan of

reorganization).

          27.      Finally, the Credit Agreement Lenders' contention that the Plan's releases

are somehow "coercive" is baseless and inappropriate prior to Plan confirmation.  In particular,

the Credit Agreement Lenders are apparently taking issue with the notion set forth in Section

11.2.3 of the Plan (which is also incorporated in the definition of "Released Parties")[8] that

essentially provides that any party who wishes to be the beneficiary of the Plan's releases as a

"Released Party" must also grant the third-party releases set forth in Section 11.2.2 of the Plan.

In other words, the Plan recognizes that it would be fundamentally unfair if a party were to "opt-

out" of granting the third-party releases but remain a beneficiary thereof.   As fully described in

the Disclosure Statement, the Plan reflects a global settlement, and the Credit Agreement

Lenders simply cannot have their cake and eat it too; i.e., not grant the third-party release but

remain a "Released Party" under the Plan, as such a result is not supported by the nature of the

Plan as a global settlement.  Similar structures have been approved by other courts.  See

Spansion, 2010 WL1292837, *21 (Bankr. D. Del. 2010) (noting that release provision bound

each entity that obtained a release under the plan of reorganization to the third-party releases); In

re Adelphia Commc'n Corp., 368 B.R. 140, 250-51 (Bankr. S.D.N.Y. 2007) (approving a plan of

---

[8] Consistent with Section 11.2.3 of the Plan, the definition of "Released Parties" provides that a Person shall only be
a Released Party "only if the applicable party has not returned a Ballot opting out of the releases set forth in Section
11.2.2 of the Plan and, if entitled to vote on the Plan, has voted to accept the Plan."

reorganization that provided third-party releases in favor of the senior noteholders that elected to support the settlement and the plan).

        28.     Moreover, the Plan does not run afoul of section 1123(a)(4) of the Bankruptcy Code because the definition of Released Parties includes all members of the Loan Claims Class such that each member of the Class is entitled to receive the benefit of the Plan's releases <u>unless</u> any particular Class member voluntarily agrees to opt-out of the Plan's releases. The cases cited by the Credit Agreement Lenders concerning section 1123(a)(4) of the Bankruptcy Code are inapposite and, in fact, support a finding that the Plan provides equal treatment. <u>See</u> <u>In re Combustion Eng'g</u>, 391 F.3d 190, 239 (3d Cir. 2004) (stating that a plan must provide the same treatment for each claim or interest in a particular class pursuant to section 1123(a)(4) of the Bankruptcy Code and remanding the case for further findings); <u>Adelphia</u>, 368 B.R. at 250-51 (holding that the release and exculpation provisions applying to senior noteholders that supported the plan and settlement did not cause the plan's treatment of the senior noteholders' claims to violate section 1123(a)(4) because, among other reasons, all members of the class had the same opportunity to become released parties).

        29.     The Plan, on its face, does not violate any requirement for confirmation under section 1129, and there is thus no confirmation issue appropriate for consideration at the Disclosure Statement hearing. Indeed, none of the confirmation issues raised in the Objections renders the Plan unconfirmable on its face, and the Debtors reserve the right to respond to such arguments at the appropriate time – in connection with the Confirmation Hearing. Accordingly, the Court should defer until the Confirmation Hearing any objections to the Plan's confirmation that are disguised as objections to approval of the Disclosure Statement.

46429/0001-6748262v1

IV.    **The Debtors' Response to the Objections to Solicitation Procedures**

30.    Objections to the Solicitation Motion were received from (i) Wilmington Trust, (ii) the United States Trustee, and (iii) the DOL.  The Debtors address each of the issues raised by Wilmington Trust, and the single issue raised by the United States Trustee and the DOL, in order below.

A.    **Wilmington Trust**

31.    First, Wilmington Trust states that it does not understand how to vote that portion of its claim relating to fees and expenses of counsel it asserts it is owed.  (WTC Objection at ¶ 27.)  The Debtors note that Wilmington Trust has claimed these amounts by inserting a single sentence into its 2½ page proof of claim, in which it unremarkably reserves the right to seek fees, costs, expenses, and other charges.  The Debtors further note that Wilmington Trust has taken no steps to quantify or support its purported claim for fees, costs, expenses, and other charges.  As a result, given Wilmington Trust's election in its proof of claim to include its claim for fees, costs, expenses and other charges as an undifferentiated and unliquidated element of its single overall proof of claim, the Debtors intend to include such claim, solely for purposes of voting on the Plan, as part of the Class 1J PHONES Notes Claims, which are neither receiving nor retaining any property under the Plan and are hence deemed to reject the Plan.

32.    This approach is without prejudice to Wilmington Trust's rights to file a 3018 Motion, with appropriate and complete documentary support, seeking to have its claim allowed solely for voting purposes in some other amount.  The Debtors do not affirm any of the various statements made in Wilmington Trust's response with respect to its purported entitlement to the payment of fees, costs, expenses, and other items.

46429/0001-6748262v1

33.     Wilmington Trust next states that it does not understand how the Solicitation Motion affects claims it apparently believes it might have against certain Subsidiary Non-Debtors that might commence chapter 11 cases, as contemplated by Section 3.4 of the Plan. Id, at ¶¶ 30-31. The Debtors are unable to ascertain from the Objection what precisely Wilmington Trust's concern is in this respect, but any "complicity claims" that might be asserted against any Subsidiary Non-Debtors would presumably be classified as Securities Litigation Claims pursuant to Section 3.4.5 of the Plan and would not be entitled to vote on the relevant Prepackaged Plan.

34.     Wilmington Trust next contends that the proposed solicitation procedures request pre-confirmation authorization from the Court to issue shares of New Class B Common Stock. Id, at ¶ 32. Wilmington Trust lacks standing to raise this point and, even if that were not fatal, Wilmington Trust is wrong in its conclusion as to what the solicitation procedures accomplish here. On the standing issue, the possible issuance of New Class B Common Stock to parties that do not timely return a Media Ownership Certification is only of relevance to parties that may potentially receive five percent (5%) or more of the common stock of Reorganized Tribune. Wilmington Trust is indenture trustee for the PHONES Notes, which receive no distribution under the Plan, let alone a five percent (5%) distribution of the New Common Stock. Accordingly, Wilmington Trust is unaffected by and has no standing to object to this provision. It is well-settled that a party lacks standing to object to a plan provision that does not affect that party. As the Third Circuit has stated, a party will "have standing to challenge a provision of a chapter 11 plan only if that provision 'diminishes their property, increases their burdens, or impairs their rights." See Combustion Eng'g, 391 F.3d at 218 (citing In re PWS Holding Corp., 228 F.3d 224, 249 (3d Cir. 2000)). The Debtors further note that none of the handful of parties

to which this provision might plausibly apply has raised any objection to the Motion, casting

further doubt on Wilmington Trust's ability to raise any objection to this provision.

35.    Even if Wilmington Trust had standing to bring this objection (and it does

not), the objection also fails substantively because Wilmington Trust misunderstands the effect

of the Motion.  The proposed issuance of the New Class B Common Stock is not an effort to

"obviate the FCC rules and regulations" as Wilmington Trust alleges, but is instead an effort to

ensure compliance with those rules and regulations by ensuring that actual or potential holders of

five percent (5%) or more of the New Class A Common Stock become parties to the FCC

Applications and make appropriate disclosures to the FCC.  Id.  The Debtors are already working

cooperatively with several Potential 5% Holders to ensure that appropriate information is

provided to the FCC, as disclosed in the Motion.  Id, at ¶ 53.

36.    It is self-evident that the Media Ownership Certifications and the

mechanisms for providing them, as well as the distribution of New Class A Common Stock and

New Class B Common Stock, are only relevant in the event the Plan is confirmed.  To make that

point clear, however, the Debtors propose to add the following sentence at the end of paragraph

41 of the proposed Solicitation Order:

> The provisions of this paragraph are subject to confirmation of the
> Plan, and the rights of all parties respecting the distribution and
> terms of the New Common Stock are preserved for the hearing on
> confirmation of the Plan; provided, however, that nothing in this
> paragraph shall be interpreted as conferring standing to raise such
> issues on any party not otherwise having standing with respect
> thereto.

This provision addresses any legitimate concern respecting the Media Ownership Certifications,

again assuming *arguendo* that Wilmington Trust has standing to raise such issues.

37.    Wilmington Trust demands in its final objection to the Solicitation Motion that it be "included as a notice party in the Plan, Disclosure Statement, 'tombstone' ads, and solicitations [sic] packages for simultaneous service of all Plan-related objections and other pleadings." Id, at ¶ 33. Wilmington Trust bases this demand on its purported "recognition" "that it is now serving as the Debtors' primary case 'counter-balance'..." Id. Whatever the self-perception of Wilmington Trust or its counsel may be in respect of their position in these cases, the fact remains that Wilmington Trust is a representative of unsecured subordinated creditors that has evidenced an intent to object to confirmation of the Plan, no more. Assuming that Wilmington Trust has filed an appropriate Rule 2002 request and requests for electronic service of notices, it will be served with all pleadings respecting the Plan at the same time those pleadings are filed with the Court, and hence will receive "real-time" notice of all Plan-related filings. Wilmington Trust's objection on this point, like its other objections, should be overruled.

**B.    <u>Objections of the United States Trustee and DOL</u>**

**i.    Office of the United States Trustee**

38.    The Office of the United States Trustee raises one (1) objection to the Solicitation Motion in its objection (the "<u>UST Objection</u>"); namely, that it believes the "opt-out" mechanism relating to the third-party releases in the Plan is objectionable. (UST Objection at ¶ 7.) In support, the United States Trustee cites to this Court's decision in <u>Spansion</u>. 2010 WL 1292837 at *22 (Bankr. D. Del. Apr. 1, 2010). The opt-out releases approved by this Court in <u>Spansion</u>, however, are *identical in all relevant respects* to the opt-out release election included on the proposed forms of ballot here. <u>See, e.g.</u>, <u>Exhibit B</u> hereto (showing opt-out release provision from <u>Spansion</u> ballot). The proposed release mechanism in the ballots in these cases

thus reflects what has recently been approved by this Court as satisfying the relevant standards

for consensual third-party releases in this District.

        39.     The Debtors also note that the proposed opt-out mechanism here is similar

not just to <u>Spansion</u> but is structured in a manner that is consistent with other case law

interpreting the permissible mechanisms relating to third-party releases.  The decision in <u>In re</u>

<u>Conseco, Inc.</u>, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003), for example, entirely supports the type

of "opt-out" release mechanism present in <u>Spansion</u> and present here.  In that case, the Court

expressly considered the mechanisms that could result in the granting of third-party releases, and

approved as "purely consensual" a third-party release provision in a plan where such provision

"binds only those creditors who agreed to be bound, *either by voting for the plan or by choosing*

*not to opt out of the release"*(emphasis added).  The same scenario applies here – creditors may

agree to be bound by the releases either by voting to accept the plan or by electing not to opt out

of the third-party releases, which they are otherwise free to choose to do.[9]

        40.     The United States Trustee also attempts in its Objection to re-argue its

opposition to opt-out releases generally, stating that "[i]deally, consent to a third-party release

would be measured by means that would separate approval of the release from a creditor's vote

on the plan…" and objecting that in its view opt-out releases are somehow inherently coercive.

<u>Id</u>, at ¶ 7.  This position was argued by the United States Trustee in <u>Spansion</u> and was considered

and rejected by this Court in that case, and it should likewise be rejected here.  As in <u>Spansion</u>

and numerous other cases, holders of claims that vote to accept the Plan are deemed to grant the

releases in question, while holders of claims that vote to reject the Plan have the opportunity to

opt out of the releases, in which case they will neither grant nor receive the benefit of such

---

[9] At least one court has suggested that creditors who do not vote to accept a plan, but accept distributions thereunder, may be bound by third-party release provisions.  <u>See</u> <u>In re Keck, Mahin & Cate</u>, 241 B.R. 583, 592 (Bankr. N.D. Ill. 1999).

46429/0001-6748262v1

releases.[10] See, e.g., In re Metromedia Fiber Network, Inc., 416 F.3d 136, 142 (2d Cir. 2005) ("nondebtor releases may...be tolerated if the unaffected creditors consent").

41.      The proposed forms of ballot make express in multiple places, on both the face of the ballot and in the instructions thereto, the optional nature of the releases and the opportunity for a rejecting creditor to withhold the releases at its option. Id. Such a release is not "coercive" on its face. Instead, it is what it says – an optional release that may be withheld by a rejecting creditor at the option of that creditor. Such a release is non-coercive and should be approved by this Court, as it was previously in Spansion.

**ii.      United States Department of Labor**

42.      Similar to the United States Trustee, the United States Department of Labor raises certain objections to the release mechanisms contained in the ballots. Even assuming *arguendo* that the DOL has standing to raise that issue, the DOL's objection fails because it misreads the law. The DOL's objections cover two (2) points. First, the DOL alleges that creditors in unimpaired classes must be allowed the opportunity to "opt out" of the releases. This ignores this Court's rejection of that view in Spansion, in which the Court expressly held that creditors whose claims were unimpaired under a plan had received full payment and adequate consideration under the Plan, and hence were not required to be provided with an "opt out" election. See Spansion, 2010 WL 1292837 at *22.

43.      The DOL's second point – that creditors who vote to accept the Plan must be afforded an "opt out" election – fails on similar grounds. Courts have time and again held that a creditor who votes to accept a plan may be presumed to have affirmatively consented to

---

[10] In response to informal comments received on the Solicitation Motion, the Debtors have revised the proposed form of order granting the Solicitation Motion to confirm that holders of Claims and Interests that are deemed to reject the Plan because they will neither receive nor retain any property under the Plan on account of such Claims or Interests are also deemed not to grant the releases contained in section 11.2.2 of the Plan.

46429/0001-6748262v1

the releases provided for in that plan.  See, e.g., Conseco, 301 B.R. at 528 (concluding that third-

party releases are "purely consensual" where the releases bind "only those creditors who agreed

to be bound, *either by voting for the plan or by choosing not to opt out of the release"*(emphasis

added); see also In re Specialty Equip. Co., 3 F.3d 1043, 1047 (7th Cir. 1993) (creditors voting to

accept plan may be deemed to consent to third-party releases).  The DOL's position should thus

be rejected, and the release mechanisms contained in the ballots should be approved.

**V.      The Disclosure Statement Hearing Should Not Be Adjourned**

          44.     Despite the Court's stated view that the appointment of the Examiner

should not interfere with the scheduled Disclosure Statement hearing and the subsequent

confirmation process and that the Examiner's investigation and the confirmation process should

be "parallel,"[11] Wilmington Trust now seeks an adjournment of the Disclosure Statement hearing

until after the Examiner's report is issued.  Apart from being contrary to the parties' expectations

and the Court's stated views on the topic, delaying the disclosure statement hearing until after the

Examiner's report is filed on July 12 would serve no useful purpose.  Indeed, in scheduling the

proposed dates for the submission of the Examiner's report and the Confirmation Hearing, the

Court expressly contemplated that creditors would have the benefit of the Examiner's report

prior to the Plan voting deadline.[12]  To facilitate creditors' access to the Examiner's report, the

Disclosure Statement will now include a link to obtain the Examiner's report once it becomes

available.  Additionally, the proposed form of ballots will likewise refer to the Examiner's report

---

[11] See Unofficial Transcript of Record, at *48-49, In re Tribune Co., et al., Case No. 08-13141 (KJC) (Bankr. D. Del. Apr. 13, 2010) (following Mr. Conlan's statement that "we do intend to have a disclosure statement hearing on May 20 . . . ." the Court responded "I would intend that to be a parallel activity, I do mean that, and the schedule that the debtor is proposing . . . is one that I would not intend to disturb for purposes of the examiner, because it seems to me there is sufficient time for any such exercise to be concluded."

[12] See Id.; see also Id, at *41 ("I think there is enough time between today and confirmation, especially given the previous collection of information, for an examiner to do whatever needs to be done").

23

and the Epiq website where the report may be obtained.[13]  In short, the Disclosure Statement will provide creditors both with information concerning, and the means of obtaining, the Examiner's report before they cast their ballots.  Delaying the hearing on the Disclosure Statement is clearly unwarranted and will therefore provide no material benefit to creditors.

45.    In contrast, adjourning the Disclosure Statement hearing until after July 12 would almost certainly render impossible an August 16 confirmation hearing.  Wilmington Trust argues to the contrary, relying on its calculation that there are thirty-five (35) days between July 12 and August 16.  However, Wilmington Trust fails to add to its calculation (i) the time needed to amend the Disclosure Statement to take into account the results of the Examiner's investigation, which would take at least a few days, (ii) the lead time required by the voting agent to finalize and prepare the solicitation packages for mailing once the Disclosure Statement has been approved, which the voting agent has calculated at ten (10) days, (iii) the availability of hearing dates on the Court's calendar, and (iv) the requirement under Rule 2002 of twenty-eight (28) days' notice prior to the Plan objection deadline, which deadline would necessarily be at least several days and, in a case of this magnitude, more likely at least a week prior to the confirmation hearing.  When all of these timing factors are added to the equation, it becomes readily apparent that, under any scenario, the thirty-five (35) day window is insufficient to preserve the August 16 confirmation hearing date.

---

[13]  Specifically, the forms of ballot have been revised to include the following paragraph:

> On April 20, 2010, the Bankruptcy Court entered an order appointing an examiner (the "Examiner") to investigate certain matters, including certain potential claims and causes of action held by the Debtors' estates in connection with the 2007 leveraged buyout of Tribune Company. The Examiner will file a report concerning that investigation no later than July 12, 2010.  When filed, that report will be available to you without cost on the Debtors' reorganization website at http://chapter11.epiqsystems.com/tribune, or you may obtain a copy by contacting the Voting Agent.  You are encouraged to review the Examiner's report in connection with preparing and submitting your Ballot.

46.    Similarly misplaced is Wilmington Trust's unsupported assertion that FCC approvals for the change of ownership under the Plan militate in favor of delaying the Disclosure Statement hearing.  (Wilmington Trust Objection, ¶5.)  These arguments are inaccurate in substance and reflect a complete misapprehension of the facts and the law relating to FCC approvals.  They are also irrelevant to Disclosure Statement approval and relate instead to alleged Plan deficiencies.  Nevertheless, in the interest of correcting the record, the Debtors note the following:

- FCC Counsel for various parties have been involved in crafting the Plan provisions implicating FCC approvals, including, without limitation, the characteristics of the New Common Stock (and the New Warrants).  These kinds of provisions are not unique or novel and have been employed in other media reorganizations.

- Contrary to Wilmington Trust's suggestions, the New Class B Common Stock is not "non-voting" stock that would call into question section 1123(1)(b) of the Bankruptcy Code.  In fact, Section IX.G.2 of the Disclosure Statement expressly describes the voting rights of the New Class B Common Stock.  This stock contains characteristics that have been found by courts interpreting the FCC requirements not to result in a recipient holding an attributable interest.

- Most importantly, the view of the Debtors' FCC advisors is that the FCC is not likely to opine on the restructuring or any component thereof until after the Bankruptcy Court confirms the Plan.  Accordingly, any delay in the confirmation process will only serve to further delay the FCC process and the Debtors' emergence from Chapter 11.

For all of the foregoing reasons, the Debtors respectfully submit that the Disclosure Statement should be approved as containing "adequate information," within the meaning of section 1125 of the Bankruptcy Code, and the Objections should be overruled to the extent they have been resolved through the additional disclosures herein.

Dated: Wilmington, Delaware
      May 18, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Janet E. Henderson
Kevin T. Lantry
Kerriann S. Mills
One South Dearborn Street
Chicago, IL  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

ATTORNEYS FOR THE DEBTORS
AND DEBTORS-IN-POSSESSION

46429/0001-6748262v1