IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| TRIBUNE COMPANY, et al., | ) Case No. 08-13141 (KJC) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) Re: Docket Nos. 4008 and 4204 |
| | ) |
| | ) <u>Hearing date</u>: May 20, 2010, at 10:00 a.m. (Eastern) |
| | ) |
| | ) |

## CREDIT AGREEMENT LENDERS' SUBMISSION OF DISCLOSURE STATEMENT POSITION STATEMENT

The Credit Agreement Lenders[1] previously objected to the Debtors' proposed Disclosure Statement and Plan Solicitation Motion.[2]

On Friday, May 14, 2010, the Debtors informed counsel for the Credit Agreement Lenders of the opportunity to "provide the Debtors with a proposed submission for the Disclosure Statement concerning the LBO claims and settlement," provided that the submission was limited to two pages. On Monday, May 17, 2010, obviously having coordinated with the Debtors, a group of "Settlement Supporters" responded to the Credit Agreement Lenders' Objection in part by suggesting that "it should be more than sufficient to fairly and efficiently resolve the conflicting disclosure objections and to fairly present the competing views of the LBO-Related Causes of Action and the Plan, to allow each of Wilmington Trust, Wells Fargo, the Credit Agreement Lenders, the Unsecured Creditors Committee and the Settlement Supporters to include a two-page statement of their respective views in the Disclosure Statement."[3] The Official Committee of Unsecured Creditors subsequently filed a response also

---

[1] The Credit Agreement Lenders are the entities identified in the "Sixth Amended Joint Verified Statement Of Representation Of More Than One Creditor By Hennigan Bennett & Dorman LLP And Young, Conaway, Stargatt & Taylor, LLP".

[2] See "Credit Agreement Lenders' Objection To Disclosure Statement And Motion For Approval Of Plan Solicitation Procedures" [docket # 4376].

[3] See "Reply Of Settlement Supporters To Objections . . . To Proposed Disclosure Statement And Motion For Approval Of Plan Solicitation Procedures" [docket # 4436], ¶ 7.

suggesting that the Credit Agreement Lenders and others "draft a two-page summary of their own analysis of the LBO-Related Matters to be included in the Disclosure Statement."[4]

The Credit Agreement Lenders have no objection to submission of position statements, and attach a draft statement in this regard as *Exhibit A*.[5] The Credit Agreement Lenders' proposed statement is substantially longer than the requested two pages, as it is not remotely possible to cure the woefully inadequate disclosures in the Disclosure Statement in only two pages. In fact, the Credit Agreement Lenders do not believe that the submission of competing position statements alleviates the Debtors of their responsibility to submit a Disclosure Statement with adequate information or somehow cures the substantial defects in the proposed Disclosure Statement, which contains virtually no meaningful disclosure about the so-called LBO-Related Causes of Action or the proposed settlement of those claims.

Further, the position statements will be meaningless if buried somewhere in an exhibit to the 150-page Disclosure Statement (which itself has hundreds of pages of exhibits). If the Court is inclined to permit position statements from the parties in lieu of the more fulsome disclosure that otherwise would be required (or, hopefully, in addition to substantially enhanced disclosures from the Debtors), *a mechanism must be developed for ensuring that creditors actually see and consider the position statements*. Specifically, the Credit Agreement Lenders submit that:

1. The position statement should be printed and transmitted *separately* from the Disclosure Statement, in the solicitation package with the ballots.

2. *The Disclosure Statement and ballots should expressly and prominently direct parties to the position statements and recommend that no creditor cast a ballot until reviewing the position statements and considering the forthcoming Examiner report*. This disclosure should be made on the ballots and at least in the following places

---

[4] *See* "Reply Of The Official Committee Of Unsecured Creditors To Various Objections To The Disclosure Statement" [docket # 4447], ¶ 9.

[5] This draft remains under review by the Credit Agreement Lenders and is subject to revision and modification, including changes necessary to address statements made in position papers submitted by other parties or in any revised Disclosure Statement filed by the Debtors.

in the Disclosure Statement: (a) the introduction; (b) the summary of the LBO-Related Causes of Action and the proposed settlement; and (c) the summary of the releases and indemnities to be provided as part of the settlement.

* * *

The Credit Agreement Lenders reserve all of their previously-stated objections to the Disclosure Statement, including without limitation their objection to the improperly-coercive ballot language with respect to the so-called "opt out" releases of third party claims, as well as to the revised proposed Disclosure Statement (which has *not* been shared with the Credit Agreement Lenders to date) that the Debtors apparently intend to file with the Court before the hearing on May 20, 2010.

Dated: May 18, 2010                           YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Robert S. Brady
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899 0391
Telephone: (302) 571-6600
Telecopier: (302) 571-1253

- and -

HENNIGAN, BENNETT & DORMAN LLP
Bruce Bennett
James O. Johnston
Joshua D. Morse
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Telephone: (213) 694-1200
Telecopier: (213) 694-1234

*Counsel to the Credit Agreement Lenders*

YCST01:9674645.1                                                                                       068968.1001

# **EXHIBIT A**

PRELIMINARY DRAFT; SUBJECT TO SUBSTANTIAL REVISION

To: **All holders of "Senior Loan Claims" and "Senior Loan Guaranty Claims" as defined in the Tribune Plan (collectively, the "Credit Agreement Claims").**

From: **Certain holders of Credit Agreement Claims (collectively, the "Credit Agreement Lenders").**[1]

Re: **The Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries (the "Tribune Plan").**[2]

---

*The Credit Agreement Lenders Recommend That You Vote To **Reject** The Tribune Plan*

---

The Tribune Plan is premised upon a one-sided "settlement" of so-called LBO-Related Causes of Action.[3] That settlement is objectionable for three primary reasons:

1. The settlement reduces the consideration otherwise distributable to holders of Credit Agreement Claims by more than ***$425 million*** (potentially much more). This is substantially higher than any reasonable, probability-weighted assessment of the value of litigation that may be commenced in respect to the Credit Agreement Claims.

2. Holders of Credit Agreement Claims bear virtually the entire burden of the settlement, under which others alleged to be liable for the LBO-Related Causes of Action are to be released and indemnified for no consideration whatsoever. For example:

    a. The agent banks and others who received more than $2 billion in pre-bankruptcy payments of principal, interest, and fees under the Credit Agreement are to be ***released and indemnified for free***;

    b. JPMorgan, Merrill Lynch, Morgan Stanley, Citibank, and others involved in the formulation of the Credit Agreement transactions are to be ***released and indemnified for free***; and

---

[1] The Credit Agreement Lenders are Brownstone Asset Management, L.P.; CFIP Master Fund, Ltd.; Contrarian Funds LLC; CVI GVF (Lux) Master S.a.r.l.; certain funds managed by Franklin Resources, Inc.; Goldman Sachs Loan Partners; Greywolf Capital Partners II LP and affiliated funds; Knighthead Master Fund, L.P.; Latigo Master Fund Ltd. and affiliated funds; Luxor Capital Group, LP; Oaktree Capital Management, L.P., and its affiliates as general partner or investment manager of certain funds and accounts; Onex Credit Partners on behalf of its advisory clients; Special Situations Investing Group, Inc.; Taconic Capital Partners 1.5 LP and affiliated funds; Thracia LLC; Värde Investment Partners, L.P.; Waterstone Market Neutral Master Fund, Ltd. and affiliated funds; and York Capital Management, L.P.

[2] Capitalized terms not defined here have the meanings given to them in the Tribune Plan and the accompanying Disclosure Statement. The "Credit Agreement" means the Credit Agreement, dated as of May 17, 2007, among Tribune Company and the various agents and lenders thereto, which is defined in the Tribune Plan as the "Senior Loan Agreement".

[3] This document represents the views of the Credit Agreement Lenders. Certain of the Credit Agreement Lenders' positions are subject to disagreement and may be the subject of litigation over the Tribune Plan. The views of the Debtors are set forth in the Disclosure Statement.

881746.3
YCST01:9674646.1

068968.1001

PRELIMINARY DRAFT; SUBJECT TO SUBSTANTIAL REVISION

    c.    Sam Zell and other insiders who currently control the Debtors (and hence the terms of the Tribune Plan) are to be ***released and indemnified for free***.

The free indemnities in favor of these released parties are payable by the Reorganized Debtors and thus will further devalue recoveries of holders of Credit Agreement Claims, who are to receive a substantial portion of the equity in the Reorganized Debtors.

3.    Adding insult to injury, the Tribune Plan also proposes to provide an "Equity Incentive Pool" of ___% of the equity of the Reorganized Debtors to the officers and directors who negotiated the settlement on behalf of Zell and the Debtors, even further diluting the diminished consideration to be distributed on account of Credit Agreement Claims. [to be updated upon disclosure of Equity Incentive Pool amount; all rights reserved]

The Credit Agreement Lenders urge you to consider the issues outlined below, as well as the forthcoming report by the Court-appointed examiner regarding the LBO-Related Causes of Action and the Credit Agreement Lenders' previously-filed objection to the Disclosure Statement [docket # 4376], before casting your ballot.

---

### *A $425 Million Settlement Payment By Holders Of Credit Agreement Claims Is Unwarranted*

With respect to current holders of Credit Agreement Claims, the primary claim to be "settled" under the Tribune Plan is an alleged claim for "constructive" fraudulent conveyance. According to the Debtors, "to prevail on such claims, it must be shown that the Leveraged ESOP Transactions rendered the Debtors insolvent and that reasonably equivalent value was not provided to the Debtors in good faith."

It will be extremely difficult for any representative of the bankruptcy estates to accomplish this. Among a number of significant barriers to recovery are the following:

- **Inability To Avoid Credit Agreement Guarantees**

Tribune's Credit Agreement obligations are guaranteed by almost all of Tribune's debtor subsidiaries, and by several additional subsidiaries that are not debtors in the bankruptcy cases. At the time of the relevant transactions, the subsidiary guarantors had approximately $2.35 billion less debt than Tribune Company, the parent entity. This means that, to prevail on a constructive fraudulent conveyance claim with respect to the subsidiary guarantors, a plaintiff would have to establish that the value of the guarantors (who held substantially all of Tribune's valuable operating assets) was less than the amount of the Credit Agreement obligations at the times of incurrence, without taking into account $2.35 billion in preexisting Tribune parent bond and other debt. The Credit Agreement Lenders submit that this is a highly unlikely result.

Further, there is a very serious question as to whether creditors of the Tribune parent entity (including bondholders who have agitated for pursuit of the avoidance claims) have standing to prosecute or the ability to benefit from avoidance actions commenced on behalf of the Tribune subsidiary estates. The avoiding powers exist "only for the benefit of creditors, and not for the

PRELIMINARY DRAFT; SUBJECT TO SUBSTANTIAL REVISION

benefit of the debtor itself." *Adelphia Recovery Trust v. Bank of America, N.A.*, 390 B.R. 80, 94 (S.D.N.Y. 2008). Shareholders of the debtor (or, as in this case, creditors of a shareholder of the debtor) cannot benefit from an avoidance action. Because creditors of the subsidiary debtors are likely to be paid in full (as proposed by the Tribune Plan) or otherwise offered plan treatment acceptable to them, no creditor of the subsidiary guarantors possibly could benefit from an action to avoid the guarantees, and Tribune parent bondholders and creditors have no standing to bring such claims or to benefit from any claim once brought.

These are highly significant issues because, ***under all realistic scenarios, avoidance of Credit Agreement claims against Tribune parent alone (keeping the subsidiary guarantees intact) would not materially improve the recoveries of Tribune parent creditors or materially diminish recoveries of holders of Credit Agreement claims***. Thus, the probable inability to avoid the subsidiary guarantees dramatically reduces the probability-weighted value of the claims and is a critical component of any evaluation of the proposed settlement embodied in the Tribune Plan.

- **Inability To "Collapse" Tender Offer And ESOP Merger Transactions**

The Credit Agreement debt was incurred in connection with two separate and distinct transactions – a recapitalization and tender offer consummated in June 2007 (as to which the Debtors borrowed approximately $8 billion under the Credit Agreement) and the highly-contingent ESOP merger consummated in December 2007, more than six months later (as to which the Debtors borrowed approximately $2.1 billion under the Credit Agreement and an additional $1.6 billion under a separate "Bridge Facility"). These two transactions were not multiple "steps" of the same transaction, as the Disclosure Statement inaccurately implies. They were separate and independent, with the June 2007 tender offer having purposes completely independent of (and chosen by the Debtors as preferable to) the ESOP merger. In fact, there was substantial uncertainty as to whether the ESOP merger ultimately would close, as it was conditioned, among other things, on obtaining waiver of the media cross-ownership rules of the Federal Communications Commission, the approval by Major League Baseball of a transfer of the Chicago Cubs franchise, and a second independent, contemporaneous opinion of solvency.

The Credit Agreement Lenders submit that the $3.7 billion in debt incurred in December 2007 in connection with the ESOP merger cannot logically be considered in assessing whether Tribune and its subsidiaries were insolvent six months earlier at the conclusion of the tender offer (or even earlier, in April 2007, when the Credit Agreement lending commitments were procured). Yet, if the plaintiff cannot prove this logic-defying proposition, all of the Credit Agreement debt incurred in connection with the June 2007 tender offer will remain valid and unavoidable.

Critically, it produces virtually no economic benefit to Tribune parent creditors to separately avoid the Credit Agreement and other debt (*i.e.*, the Bridge Facility) incurred in connection with the December 2007 ESOP merger, because the remaining Credit Agreement debt incurred in connection with the June 2007 tender offer approximates the Debtors' current enterprise value. ***This means that holders of Credit Agreement Claims would be entitled to substantially all of the currently existing value of the bankruptcy estates even if the December 2007 merger debt was avoided.***

Here again, the probable inability to consider the debt incurred at the time of the December 2007 ESOP merger in assessing Tribune's solvency at the time of the June 2007 tender offer substantially reduces the probability-weighted assessment of the value of the claims and is a critical component of any evaluation of the proposed settlement embodied in the Tribune Plan.

- **Tribune's Solvency Is Established By The Market Value Set By Zell's Bid**

The June 2007 tender offer and December 2007 ESOP merger transactions were the culmination of a year-long auction process with respect to Tribune, run by sophisticated (and highly paid) investment banks. That process resulted in bids made by, among others, existing shareholders (the Chandler Trusts, with equity sponsorship from Centerbridge Partners) and by a consortium of Eli Broad and Ronald Burkle. The Broad/Burkle team submitted several bids in the range bid by Sam Zell, prompting Zell to raise his bid and ultimately prevail in the auction.

The results of this process are highly relevant to, if not dispositive of, the question of Tribune's solvency at the time the Credit Agreement debt was incurred. As held by the Third Circuit (the federal court of appeals with ultimate jurisdiction over the Tribune bankruptcy cases), the results of a fairly-run auction establish value. *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) ("Absent some reason to distrust it, the market price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.") (quotation omitted); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149 (3d Cir. 1986) ("Generally speaking, an auction may be sufficient to establish that one has paid 'value' for the assets of a bankruptcy.").

The Third Circuit specifically has held that *"purchase price may be highly probative of a company's value immediately after a leveraged buyout."* *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1067 (3d Cir. 1992) (emphasis added). "Where a transaction is consummated after arms-length negotiations, and particularly where other potential purchasers expressed interest in buying the company on similar terms, the sale price is a good indicator of the value of the target's assets." *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Company*, 910 F. Supp. 913, 939 (S.D.N.Y. 1995) (emphasis added) (citations omitted).

Because the auction here resulted in a price that exceeds the amount of Tribune's liabilities following closing of the tender offer and ESOP merger transactions, there is a strong argument that Tribune was, by definition, solvent and that the Credit Agreement debt therefore is not now subject to avoidance. In fact, existing Tribune shareholders commenced litigation challenging the tender offer and ESOP merger on the grounds that the purchase price was *too low* – in other words, Tribune's owners asserted that Tribune was much more valuable than the price implied by the tender offer and merger transactions. This runs directly contrary to after-the-fact assertions that Tribune was insolvent as a consequence of the Credit Agreement debt.

All of this reduces the probability-weighted assessment of the value of the claims and is important to evaluation of the proposed settlement embodied in the Tribune Plan.

PRELIMINARY DRAFT; SUBJECT TO SUBSTANTIAL REVISION

- **If The Debt Is Avoided, Credit Agreement Lenders Would Have Large Surviving Claims**

A substantial portion of the proceeds of Credit Agreement debt incurred in connection with the tender offer was not used to tender for Tribune shares. Specifically, more than $3 billion of the loan proceeds was used to repay preexisting Tribune debt and provide working capital to the Debtors. An additional $155 million was used to pay transaction fees and expenses, and an additional $3.9 billion was used to capitalize Tribune subsidiaries and ultimately to repay preexisting obligations of those subsidiaries to non-debtor L.A. Times International. Similarly, not all of the proceeds of Credit Agreement debt incurred in connection with the ESOP merger were used to purchase Tribune shares. Rather, $206 million was used to repay a note to Sam Zell and $123 million was used for transaction fees and expenses. The debt incurred in connection with the ESOP merger also enabled Tribune to realize a host of material benefits, including more than $1 billion in tax savings resulting from Tribune's conversion to a subchapter S corporation and a present value of $430 million in savings relating to Tribune no longer having to make 401k contributions or to file public financial statements.

It is axiomatic that a lender provides reasonably equivalent value when extending credit to repay preexisting debt and satisfy other legitimate corporate expenditures. 11 U.S.C. § 548(d)(2)(A) ("'value' means property, or satisfaction or securing of a present or antecedent debt of the debtor"); *In re Aphton Corp.*, 423 B.R. 76, 89 (Bankr. D. Del. 2010) ("Courts have held that when a transfer is made to pay an antecedent debt, the transfer may not be set aside as constructively fraudulent."). Moreover, courts have held that "indirect benefits", including tax benefits, constitute value for purposes of section 548.

Accordingly, even if a plaintiff was able to establish that the portion of Credit Agreement debt used to fund the tender offer is avoidable as a fraudulent conveyance, holders of Credit Agreement Claims would nevertheless have a claim of well over $3 billion (and perhaps much more) in respect of the loan proceeds used to repay existing debt, fund working capital, capitalize subsidiary guarantors, and achieve tax savings. This claim would benefit from the subordination provisions of the PHONES and share ratably with other creditors of Tribune Company.

This is a critical point that demonstrates the unreasonable nature of the proposed settlement. Even if the Credit Agreement lenders "lose" the fraudulent conveyance case, they will retain a multi-billion dollar claim against Tribune. Due to the potential for recovery of more than $2 billion in pre-bankruptcy payments made by Tribune (as described below), *under many scenarios holders of Credit Agreement Claims fare equally well, if not better, in the event that Credit Agreement claims against Tribune Company actually are avoided (due to the preservation of a $3 billion or greater claim and the increase in value of the bankruptcy estate caused by disgorgement of $2 billion in prepetition payments)*. The settlement takes no account of this whatsoever.

Here again, this fact reduces the probability-weighted assessment of the value of the claims and is important to evaluation of the proposed settlement embodied in the Tribune Plan.

- **Summary Regarding Settlement Value**

Notwithstanding all of the foregoing hurdles that a plaintiff would have to overcome to achieve any material recovery in respect of the alleged avoidance claims as to Credit Agreement debt, the Tribune Plan provides for a settlement of those claims in which current holders of Credit Agreement Claims are to give up more than *$425 million* in value to junior constituencies (potentially much more due to dilutive indemnities, management options, and bankruptcy expenses). The Credit Agreement Lenders submit that this makes no sense under the circumstances.

> *Holders Of Credit Agreement Claims Unfairly Bear The Entire Cost Of Settlement*

The "global settlement" around which the Tribune Plan is structured provides for current holders of Credit Agreement Claims to fund the entirety of the settlement, through diversion of $425 million or more in value that otherwise would be distributable on account of Credit Agreement debt to other Tribune creditors (primarily Tribune parent bondholders).

At the same time, while purporting to settle the claims for an amount that vastly exceeds any reasonable, probability-weighted value for the causes of action, the Tribune Plan provides for a host of free releases and indemnities in favor of Sam Zell, Tribune insiders, JPMorgan and other parties allegedly liable for LBO-Related Causes of Action but who are to contribute nothing to the settlement.

At its core, the "settlement" is riddled with irreconcilable inconsistencies. On one hand, if free releases and indemnities are appropriate from some of those alleged to be liable for the transactions (Zell, JPMorgan, and others), holders of Credit Agreement Claims logically should not be responsible for paying anything to "settle" the alleged claims. On the other hand, if a material settlement payment is in order, all parties allegedly responsible (including Zell, JPMorgan, and others) must make a proportionate contribution to the settlement.

- **Those Subject To Disgorgement Claims Are To Be Released And Indemnified Without Contribution To The Settlement**

Before filing for bankruptcy, Tribune made *more than $2 billion* in payments of principal, interest, and fees pursuant to the Credit Agreement. If there is meaningful exposure with respect to avoidance of the Credit Agreement Claims (notwithstanding the serious hurdles and issues summarized above), that exposure logically extends to those who received the $2+ billion of prepetition payments in respect of the allegedly-avoidable debt. If the debt is avoidable, prepetition payments on the debt obviously and inexorably are avoidable as well.

Yet, *under the proposed settlement, those potentially liable to disgorge the prepetition payments are to be released without providing consideration to the estates, and then indemnified against loss for any claims that might survive Plan confirmation.*

PRELIMINARY DRAFT; SUBJECT TO SUBSTANTIAL REVISION

The Credit Agreement Lenders submit that this is unfair and unreasonable, and that any settlement of the LBO-Related Causes of Action must provide for material contributions from those potentially liable for these disgorgement claims.

- **Zell And Other Insiders Are To Be Released And Indemnified Without Contribution To The Settlement**

The Disclosure Statement explains that the "LBO-Related Causes of Action" include claims for "damages caused by breaches of fiduciary and other duties in engineering, facilitating and/or approving the Leveraged ESOP Transactions" and claims for "damages caused by certain third-parties [sic] having aided and abetted alleged breaches of fiduciary duties with respect to the Leveraged ESOP Transactions." It makes it clear that these include claims against "certain former major shareholders (*i.e.*, the Chandler Trusts, the McCormick Foundation and the Cantigny Foundation), the directors and officers of Tribune and its subsidiaries, the Zell Entity and [Sam] Zell, and Tribune's principal advisors."

Yet, under the Tribune Plan, *Zell, the former shareholders, and the advisors all receive comprehensive releases and unlimited indemnities, without having to pay a penny for them.* This notwithstanding that the Debtors failed to undertake any independent examination (*i.e.*, one conducted without the influence of and control by Zell, the current Chairman and CEO of Tribune, and other insiders who are potential targets) of the claims and causes of action to be freely released and indemnified.

To make matters worse, *the "settlement" in the Tribune Plan makes holders of Credit Agreement Claims pay twice in this respect – once to fund the settlement and then again to fund the unlimited indemnities to be handed to Zell and other insiders.* Credit Agreement Claims that are now the senior-most obligations in the capital structure are to be converted into equity in the Reorganized Debtors, which equity will be devalued by and subordinated to the assumed indemnification obligations that otherwise would be disallowed and/or subordinated.

This risk of dilution is real. Zell and his controlled companies already are defendants in class action litigation (the *Neil* case) pending in federal court in the Northern District of Illinois, facing claims for breach of fiduciary duty and other causes of action arising in connection with the Tribune transactions, and the District Court recently denied Zell's motion to dismiss those claims. Despite Zell's very real risk of exposure to such claims, under the Tribune Plan and "settlement" Zell is to be completely immunized from the cost of defending against that litigation and from any liability that might be imposed, with current holders of Credit Agreement Claims forced to pay for that liability through their devalued equity in the Reorganized Debtors.

Here again, the Credit Agreement Lenders submit that this is unfair and unreasonable. Any settlement providing for a release of Zell and other insiders must include material contributions from Zell and the insiders.

- **Citibank Claims Are To Be Released And Indemnified Without Contribution To The Settlement**

Citicorp North America, Inc., Citibank, N.A., and Citigroup Global Markets, Inc., are named as defendants in the Complaint filed by Wilmington Trust Company (indenture trustee for the PHONES) for claims and causes of action relating the Credit Agreement transactions. Wilmington Trust's Complaint includes claims for alleged breaches of duty arising from Citibank's actions and inactions as prior indenture trustee for the PHONES. It also includes claims against JPMorgan, Merrill Lynch, Bank of America, Morgan Stanley, and Sam Zell for aiding and abetting Citibank's alleged breaches of duty.

These claims cannot be released as part of the purported releases by the estates. The Tribune Plan, however, provides for Citibank, JPMorgan, Merrill Lynch, Bank of America, Morgan Stanley, and Zell all to be indemnified for liability associated with Wilmington Trust's personal, non-estate claims. This indemnity is *unlimited* with respect to each defendant's defense costs and with respect to the liability of Zell and his private investment firm, and "limited" to a maximum of $510,711,000 for liability of the bank defendants. Yet, *none of these defendants are to pay anything for this indemnity*. This obviously represents a highly-material potential liability of the Reorganized Debtors and thus further serves to devalue the equity to be distributed to holders of Credit Agreement debt.

Yet again, the Credit Agreement Lenders submit that this is unfair and unreasonable, and that any settlement providing for indemnification in respect of the Citibank-related claims must provide for material contributions from those receiving indemnification.

### *The Examiner's Report Will Be Important To Consideration Of The Settlement*

On May 11, 2010, the Bankruptcy Court entered an order appointing Kenneth N. Klee as Examiner. The Examiner is charged with evaluating, among other things, "the potential claims and causes of action held by the Debtors' estates that are asserted by Parties, in connection with the leveraged buy-out of Tribune that occurred in 2007 (the "LBO") which may be asserted against any entity which may bear liability, including, without limitation, the Debtors, the Debtors' former and/or present management, including former/present members of Tribune's Board, the Debtors' lenders and the Debtors; advisors, said potential claims and causes of action including, but not being limited to, claims for fraudulent conveyance (including both avoidance of liability and disgorgement of payments), breach of fiduciary duty, aiding and abetting the same, and equitable subordination and the potential defenses asserted by the parties to such potential claims and causes of action."

The Examiner's report is due on July 12, 2010. The matters touched upon in that report will be highly relevant to your consideration and analysis of the Tribune Plan and the proposed settlement. *The Credit Agreement Lenders urge you not to vote until you have had the chance to read and digest the Examiner's report*, which will be available [_____] [details to be provided by the Debtors].

## *Superior Alternatives Are Available*

The Credit Agreement Lenders objected to the Debtors' three prior requests for extension of plan exclusivity, indicating that they are prepared to file a plan of reorganization providing for a fairer and more equitable reorganization alternative than the Debtors' proposed "settlement" plan now up for consideration. Although exclusivity has not yet terminated, it will expire without possibility of further extension on August 8, 2010.

When exclusivity is terminated, the Credit Agreement Lenders are prepared to file an alternative plan that provides for the alleged fraudulent conveyance and related claims to be adjudicated for the benefit of unsecured creditors, after Tribune and its affiliates exit bankruptcy, without forcing holders of Credit Agreement Claims to pay hundreds of millions of dollars in respect of a forced settlement in which none of the other potentially liable parties are to contribute anything – while also providing a framework for a settlement involving fair consideration and contributions from *all* prospective litigation targets (including Zell, JPMorgan, and other disgorgement defendants).

The Credit Agreement Lenders' plan would enable the Tribune businesses to exit bankruptcy immediately while avoiding the unfairness of a "settlement" forced upon and funded by only one group of potentially-liable parties. It would give all parties their day in court with respect to the claims as to which the Debtors now propose that current holders of Credit Agreement Claims pay $425 million. And it would establish a framework for settlement negotiations involving all of the potentially-liable parties, eliminating the unseemly specter of the Debtors (still controlled by Zell) negotiating for free releases and indemnities for Zell, other insiders, and JPMorgan and other agent banks, all funded by current Credit Agreement lenders.

## *Your Vote Matters*

If holders of over ⅓ of the amount of the Loan Claims, or holders of more than a majority of holders of Loan Claims, vote to reject the Tribune Plan, the Tribune Plan and proposed settlement embodied therein is not likely to be confirmed.

The parties to the Settlement Term Sheet incorporated into the Tribune Plan do not hold Loan Claims in sufficient amounts to cause the class of Loan Claims to vote to accept the Tribune Plan. Accordingly, *your vote on the Tribune Plan is likely to be highly consequential in determining whether the Tribune Plan is accepted by creditors and, potentially, confirmed by the Bankruptcy Court.*

**FOR ALL OF THE FOREGOING REASONS, THE CREDIT AGREEMENT LENDERS RECOMMEND THAT YOU VOTE TO <u>REJECT</u> THE TRIBUNE PLAN, AFTER REVIEWING AND CONSIDERING THE EXAMINER'S REPORT**