## **EXHIBIT 1**

### *BLACK LINED PROPOSED DISCLOSURE STATEMENT*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

## PROPOSED DISCLOSURE STATEMENT FOR PROPOSED AMENDED JOINT PLAN OF REORGANIZATION FOR
## TRIBUNE COMPANY AND ITS SUBSIDIARIES

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Janet E. Henderson
Kevin T. Lantry
Kerriann S. Mills
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue; Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

~~April 12,~~ May 19, 2010
Counsel to the Debtors, Debtors in Possession, and Certain Non-Debtor Affiliates

> THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS A SOLICITATION OF ACCEPTANCES OF THE PLAN. ACCEPTANCES OF THE PLAN MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE. THE DEBTORS MAY SUPPLEMENT OR AMEND

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

THIS DISCLOSURE STATEMENT OR ANY EXHIBITS ATTACHED HERETO AT ANY TIME PRIOR TO THE HEARING TO APPROVE THE DISCLOSURE STATEMENT.

**IMPORTANT DATES**

- Date by which Ballots and Master Ballots must be received: [●]

- Date by which objections to Confirmation of the Plan must be filed and served: [●]

- Hearing on Confirmation of the Plan: [●] at [●].m. (Prevailing Eastern Time)

TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................................ 1
    A.    OVERVIEW OF CHAPTER 11. ......................................................... 3
    B.    PARTIES ENTITLED TO VOTE ON THE PLAN. ............................. 4
    C.    SOLICITATION PACKAGE. ............................................................. 4
    D.    VOTING PROCEDURES, BALLOTS, AND VOTING DEADLINE. ... 4
    E.    CONFIRMATION HEARING AND DEADLINE FOR OBJECTIONS TO
        CONFIRMATION. ............................................................................ 5
II. OVERVIEW OF THE PLAN ......................................................................................... 6
    A.    GENERAL OVERVIEW. .................................................................. 6
    B.    PLAN TREATMENT ........................................................................ 7
    C.    SUMMARY OF ALLOWED CLAIMS AGAINST AND INTERESTS IN EACH
        OF THE DEBTORS AND OF ESTIMATED RECOVERIES IN RESPECT
        THEREOF. ........................................................................................ 8
        1.    Summary of Estimated Unclassified Claims Against all Debtors and of
            Estimated Recoveries in Respect Thereof. ...................................... 10
        2.    Summary of Estimated Allowed Claims and Interests against Tribune and
            the Filed Subsidiary Debtors and of Estimated Recoveries in Respect
            Thereof. ...................................................................................... ~~10~~11
        3.    Summary of Estimated Allowed Claims Against and Interests for Each
            Guarantor Non-Debtor, if any, that becomes a Debtor and of Estimated
            Recoveries in Respect Thereof. ................................................... ~~12~~13
    D.    FCC APPROVAL. .......................................................................... ~~13~~14
        1.    Required FCC Consents. ........................................................... ~~13~~14
        2.    Information Required from Prospective Stockholders of Reorganized
            Tribune. .................................................................................... ~~14~~15
III. GENERAL INFORMATION ...................................................................................... ~~16~~17
    A.    THE DEBTORS' BUSINESSES AND PROPERTIES. ..................... ~~16~~17
        1.    Company Overview. ................................................................. ~~16~~17
        2.    The Debtors' Properties. .......................................................... ~~17~~18
    B.    OPERATIONS OF THE DEBTORS. .............................................. ~~17~~18
        1.    Publishing Segment. ................................................................ ~~17~~18
        2.    Broadcasting Segment. ............................................................ ~~21~~22
        3.    Additional Investments. ........................................................... ~~23~~24
    C.    RECENT OPERATIONS. ............................................................... ~~25~~26
    D.    CURRENT MANAGEMENT OF THE DEBTORS. ......................... ~~26~~27
        1.    Board of Directors. .................................................................. ~~26~~27
        2.    Subcommittees of the Board of Directors. ................................. ~~26~~27
        3.    Compensation of Directors. ...................................................... ~~26~~27
        4.    Executive Officers. .................................................................. ~~27~~28
IV. SUMMARY OF CERTAIN PREPETITION LIABILITIES ...................................... ~~27~~28
    A.    PREPETITION FUNDED DEBT AND CAPITAL STRUCTURE OF THE
        TRIBUNE ENTITIES. ................................................................... ~~27~~28
        1.    Prepetition Capital Structure. ................................................... ~~27~~28
        2.    Prepetition Funded Debt Structure. ........................................... ~~28~~29
    B.    PREPETITION TRADE PAYABLES & OTHER OPERATING LIABILITIES. ...... ~~32~~33
    C.    PREPETITION COMPENSATION AND BENEFIT PROGRAMS ..... ~~32~~33
        1.    Compensation and Benefit Programs in Effect as of the Petition Date that
            will be continued Pursuant to the Plan. ..................................... ~~33~~34

2.     Compensation and Benefit Programs in Effect as of the Petition Date that will not be continued Pursuant to the Plan. ........................................................ 40

D.    PENDING LITIGATION AND CERTAIN OTHER LEGAL MATTERS INVOLVING THE DEBTORS ........................................................ 42/43

     1.    *Newsday* and *Hoy* Circulation Misstatements. .............................. 42/43

     2.    ESOP Lawsuit. ........................................................................ 43/44

     3.    FCC Related Matters. ............................................................... 44/45

     4.    Miscellaneous Other Litigation. .............................................. 45/46

V. EVENTS LEADING UP TO CHAPTER 11 ........................................................ 45/46

VI. EVENTS DURING THE CHAPTER 11 CASES ................................................ 46/47

A.    PROCEDURAL MOTIONS. ............................................................ 46/47

B.    "FIRST-DAY" MOTIONS. ............................................................. 46/47

C.    EMPLOYEE COMPENSATION AND BENEFITS. .......................... 47/48

D.    CASH MANAGEMENT. ................................................................ 48/49

E.    POST-PETITION FINANCING. ..................................................... 48/49

F.    PROFESSIONAL RETENTIONS. ................................................... 49/50

     1.    Retention of Professionals by the Debtors' Estates. ................ 49/50

     2.    The Creditors Committee and its Advisors. ............................ 50/51

G.    CERTAIN ADMINISTRATIVE MATTERS AND OTHER MOTIONS. ...... 50/51

     1.    Disposition of Certain Executory Contracts and Unexpired Leases. ...... 50/51

     2.    Certain other Motions filed by the Debtors. ........................... 52/53

     3.    Fee Disgorgement Motion. ....................................................... 52/53

     4.    Schedules of Assets and Liabilities; Statements of Financial Affairs. ...... 53/54

     5.    Filed Claims and Bar Date. ...................................................... 53/54

     6.    Bankruptcy Rule 2015.3 Reports. ........................................... 53/54

     7.    Analysis of Potential Preferential Payments. ............................. 55

H.    CHICAGO CUBS TRANSACTION. ............................................... 53/56

I.    MORGAN STANLEY SWAP AGREEMENT .................................. 57

J.    APPOINTMENT OF AN EXAMINER ............................................ 58

VII. SETTLEMENT OF CLAIMS RELATING TO THE LEVERAGED ESOP TRANSACTIONS... 55/59

A.    THE LEVERAGED ESOP TRANSACTIONS. ................................. 56/60

B.    INVESTIGATION OF THE LBO-RELATED CAUSES OF ACTION. ...... 56/60

C.    PROCEEDINGS RELATED TO LEVERAGED ESOP TRANSACTIONS. ...... 56/60

D.    LBO-RELATED CAUSES OF ACTION. ......................................... 57/61

E.    EFFORTS TO SETTLE THE LBO-RELATED CAUSES OF ACTION. ...... 58/62

F.    THE REASONABLENESS OF THE PROPOSED SETTLEMENT. ...... 58/62

VIII. EXCLUSIVITY PERIOD. ............................................................................ 61/64

IX. THE PLAN OF REORGANIZATION ............................................................... 61/64

A.    CLASSIFICATION AND ALLOWANCE OF CLAIMS AND EQUITY INTERESTS GENERALLY. ............................................................. 61/64

B.    PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS, DIP FACILITY CLAIMS, AND PRIORITY TAX CLAIMS. ...... 62/65

     1.    DIP Facility Claims. ................................................................ 62/65

     2.    Administrative Expense Claims. ............................................. 62/65

     3.    Priority Tax Claims. ................................................................ 63/66

C.    TREATMENT OF CLAIMS AND EQUITY INTERESTS. ................ 63/67

     1.    The Debtors, Filed Subsidiary Debtors, and Guarantor Non-Debtors. ...... 63/67

     2.    Classification of Claims against the Debtors under the Plan. ...... 67/70

D.    PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. ............................................................................ 68/71

     1.    Classification and Treatment of Claims Against Tribune (Debtor 1). ...... 68/71

ii

2.      Classification and Treatment of Claims Against and Interests in Filed Subsidiary Debtors (Debtors 2 through 111). .................................................. 74̶75

3.      Prepackaged Plans for and Treatment of Claims Against and Interests In Guarantor Non-Debtors, If Any, That Become Debtors. ................................... 74̶78

E.    MEANS FOR IMPLEMENTATION OF THE PLAN. ............................................ 75̶79
1.      Restructuring Transactions. .................................................................................. 75̶79

F.    CORPORATE GOVERNANCE, DIRECTORS, OFFICERS AND CORPORATE ACTION. ................................................................................................................... 76̶80
1.      Certificate of Incorporation, By-Laws, Limited Liability Company Agreement; Limited Liability Partnership Agreement. ................................... 76̶81
2.      Directors and Officers of Reorganized Tribune. ............................................. 76̶81
3.      Ownership and Management of Reorganized Debtors Other Than Reorganized Tribune. ....................................................................................... 76̶81

G.    ISSUANCE AND DISTRIBUTION OF NEW SECURITIES AND RELATED MATTERS. ............................................................................................................... 77̶81
1.      Issuance of New Securities. .................................................................................. 77̶81
2.      Distribution of New Common Stock and New Warrants. ............................ 77̶82
3.      New Senior Secured Term Loan Agreement. .................................................. 82̶87
4.      Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors. .................................................................................................................... 83̶88
5.      Cancellation of Loan Agreements, Loan Guaranty Agreements, the Pledge Agreement, Notes Issued Under the Loan Agreements, Senior Notes, Debentures, Instruments, Indentures, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock and Other Tribune Interests. .............................. 83̶88
6.      Cancellation of Liens and Guaranties. ............................................................. 84̶89
7.      Exit Facility. ............................................................................................................ 85̶89
8.      Equity Incentive Plan. .......................................................................................... 85̶90
9.      Sources of Cash for Plan Distributions. ........................................................... 85̶90
10.    Additional Transactions Authorized Under the Plan. ................................... 85̶90
11.    Settlement of Claims and Controversies. ......................................................... 85̶90
12.    Preservation of Rights of Action and Settlement of Litigation Claims. ...... 86̶92
13.    FCC Applications. .................................................................................................. 86̶92

H.    ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES. ................................................................................................................................... 87̶92
1.      Assumption, Rejection and Cure Obligations. ............................................... 87̶92
2.      Cure of Defaults of Assumed Executory Contracts and Unexpired Leases. ................................................................................................................................... 87̶93
3.      Rejection of Executory Contracts and Unexpired Leases. ............................ 88̶94
4.      Rejection Damages Bar Date. ............................................................................. 88̶94
5.      Compensation and Benefit Programs. .............................................................. 88̶94
6.      Collective Bargaining Agreements. ................................................................... 88̶94
7.      Post-Petition Contracts and Leases. .................................................................. 88̶94
8.      Termination of ESOP. .......................................................................................... 88̶95

I.    PROVISIONS GOVERNING DISTRIBUTIONS TO HOLDERS OF CERTAIN ALLOWED CLAIMS AND INTERESTS UNDER THE PLAN. ............................ 88̶95
1.      General. .................................................................................................................... 88̶95
2.      Distributions for Certain Claims. ....................................................................... 88̶95
3.      Distributions to Holders of General Unsecured Claims Against Filed Subsidiary Debtors. .............................................................................................. 88̶96
4.      Special Provisions Governing Distributions to Holders of Loan Claims and Loan Guaranty Claims. ................................................................................ 90̶96

|    | 5.  | Interest on Claims. | 9097 |
|    | 6.  | Distributions by Disbursing Agent. | 9097 |
|    | 7.  | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 9197 |
|    | 8.  | Record Date for Distributions | 9198 |
|    | 9.  | Allocation of Plan Distributions Between Principal and Interest. | 9298 |
|    | 10. | Means of Cash Payment. | 9298 |
|    | 11. | Withholding and Reporting Requirements. | 9299 |
|    | 12. | Setoffs. | 9299 |
|    | 13. | Fractional Shares. | 9399 |
|    | 14. | De Minimis Distributions. | 9399 |
|    | 15. | Special Provision Regarding Unimpaired Claims. | 9399 |
|    | 16. | Subordination. | 93100 |
| J. | PROVISIONS FOR RESOLVING DISPUTED CLAIMS AND DISPUTED INTERESTS. | | 93100 |
|    | 1.  | Objections to and Estimation of Claims. | 93100 |
|    | 2.  | Payments and Distributions on Disputed, Contingent, and Unliquidated Claims and Interests and On Claims for Which Proofs of Claim are Filed. | 94100 |
| K. | CONFIRMATION AND CONSUMMATION OF THE PLAN. | | 94100 |
|    | 1.  | Conditions to Effective Date of the Plan. | 94100 |
|    | 2.  | Waiver of Conditions. | 95101 |
|    | 3.  | Consequences if Confirmation Order is Vacated. | 95101 |
| L. | INJUNCTIONS, RELEASES AND DISCHARGE. | | 95101 |
|    | 1.  | Discharge. | 95101 |
|    | 2.  | Releases. | 96102 |
|    | 3.  | Bar Order. | 98106 |
|    | 4.  | Supplemental Injunction. | 99107 |
|    | 5.  | Disallowed Claims and Disallowed Interests. | 100107 |
|    | 6.  | Exculpation. | 100108 |
|    | 7.  | Corporate Indemnities. | 100108 |
|    | 8.  | Term of Bankruptcy Injunction or Stays. | 101109 |
| M. | RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT. | | 101109 |
| N. | CERTAIN ADDITIONAL PROVISIONS OF THE PLAN. | | 102110 |
|    | 1.  | Surrender of Instruments. | 102110 |
|    | 2.  | Creditors Committee. | 102110 |
|    | 3.  | Post-Confirmation Date Retention of Professionals | 102110 |
|    | 4.  | Effectuating Documents and Further Transactions. | 102110 |
|    | 5.  | Exemption from Transfer Taxes. | 102110 |
|    | 6.  | Paid-in Capital of Corporate Reorganized Debtors. | 103111 |
|    | 7.  | Payment of Statutory Fees. | 103111 |
|    | 8.  | Amendment or Modification of the Plan. | 103111 |
|    | 9.  | Certain Provisions Pertaining to Senior Lender Settlement Committee | 103 and Centerbridge. |
| X. VOTING PROCEDURES AND REQUIREMENTS. | | | 104112 |
| A. | VOTING DEADLINE. | | 104112 |
| B. | HOLDERS OF CLAIMS ENTITLED TO VOTE. | | 104112 |
| C. | VOTE REQUIRED FOR ACCEPTANCE BY A CLASS. | | 105113 |
|    | 1.  | Class of Claims. | 105113 |
|    | 2.  | Class of Interests. | 105113 |
| D. | VOTING PROCEDURES | | 105113 |
|    | 1.  | Ballots. | 105113 |
|    | 2.  | Special Instructions for Beneficial Holders of Senior Noteholder Claims. | 106114 |

3. Special Instructions for Holders of General Unsecured Claims Against Tribune Concerning the Convenience Class Election..................~~106~~114

4. ~~Special Instructions for Media and Foreign Ownership Certifications...... 106~~

5. Withdrawal or Change of Votes on the Plan. ...........................................~~107~~114

XI. CONFIRMATION OF THE PLAN .....................................................................~~107~~115

 A. CONFIRMATION HEARING ................................................................~~107~~115

 B. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN. ......~~108~~116

  1. Acceptance. ................................................................................~~108~~116

  2. Fair and Equitable Test. .............................................................~~109~~117

  3. Feasibility. .................................................................................~~110~~118

  4. Best Interests Test and Liquidation Analysis. .............................~~111~~118

XII. PROJECTED FINANCIAL INFORMATION AND REORGANIZATION VALUE...............~~112~~120

 A. PROJECTED FINANCIAL INFORMATION. ...........................................~~112~~120

 B. REORGANIZATION VALUE...............................................................~~113~~120

  1. Overview. ...................................................................................~~113~~120

  2. Valuation Methodology. .............................................................~~114~~122

XIII. DESCRIPTION OF DEBT AND CAPITAL STRUCTURE OF REORGANIZED DEBTORS~~118~~126

 A. NEW SENIOR SECURED TERM LOAN AGREEMENT. ..........................~~118~~126

 B. DESCRIPTION OF EXIT FACILITY. ....................................................~~119~~126

 C. DESCRIPTION OF CAPITAL STOCK. ..................................................~~119~~126

XIV. RISK FACTORS..........................................................................................~~119~~126

 A. GENERAL BANKRUPTCY LAW CONSIDERATIONS AND RISKS RELATED TO THE PLAN.....................................................................~~119~~127

  1. Objections to the Classification of Claims May Change the Composition of the Classes and the Vote Required of Each Class for the Approval of the Plan. ........................................................................................~~119~~127

  2. Failure to Obtain Confirmation of the Plan May Result in Liquidation or Alternative Plan on Less Favorable Terms. ....................................~~120~~127

  3. Undue Delay in Confirmation of the Plan May Disrupt the Debtors' Operations. ................................................................................~~120~~128

  4. If the Effective Date Fails to Occur, the Debtors May Liquidate or Adopt an Alternative Plan with Less Favorable Terms. ...........................~~120~~128

 B. FCC-RELATED CONSIDERATIONS AND RISKS RESPECTING THE DEBTORS' BUSINESSES. ..................................................................~~121~~128

  1. The FCC Must Approve the Debtors' FCC Applications before Emergence from Bankruptcy.......................................................~~121~~128

  2. Inability to Obtain FCC Approval and Media Ownership Waivers Would Adversely Affect Ability to Consummate the Plan. ....................~~123~~130

 C. RISKS RELATED TO THE DEBTORS' BUSINESSES..............................~~125~~132

  1. The Debtors' Actual Financial Results May Vary Significantly From the Projections.................................................................................~~125~~132

  2. Failure to Attract and Maintain Employees May Adversely Affect the Debtors' Financial Results. .........................................................~~125~~133

  3. Adverse Publicity in Connection with the Chapter 11 Cases or Otherwise Could Negatively Affect Business.................................................~~126~~133

  4. Advertising Demand Will Continue to be Impacted by Changes in Economic Conditions and Fragmentation of the Media Landscape. ...........~~126~~133

  5. Circulation and Audience Share May Continue to Decline as Consumers Migrate to Other Media Alternatives. ..........................................~~127~~134

  6. Changes in the Regulatory Landscape Could Affect the Debtors' Business Operations and Asset Mix..........................................................~~127~~135

7.     The Availability and Cost of Quality Network-Provided and Syndicated Programming May Impact the Debtors' Television Ratings. ...................... ~~129~~136

8.     Newsprint Prices May Continue to be Volatile and Difficult to Predict and Control. .......................................................................................................... ~~129~~137

9.     The Debtors' Ability to Grow Depends on the Development of the Debtors' Interactive Businesses. ........................................................................ ~~129~~137

10.    The Debtors' Success Will Depend on the Debtors' Ability to Adapt to Technological Change. ................................................................................. ~~130~~138

11.    Historical Financial Information Will Not be Comparable. ....................... ~~131~~138

12.    The Debtors May be Required to Write Down Goodwill or Other Intangible Assets Which May Adversely Affect Their Financial Position and Results of Operations. ............................................................................ ~~131~~138

13.    Events Beyond the Debtors' Control May Result in Unexpected Adverse Operating Results. ....................................................................................... ~~131~~139

14.    Changes in Accounting Standards Can Significantly Impact the Debtors' Reported Earnings and Operating Results. .................................................. ~~131~~139

15.    Adverse Results from Litigation or Governmental Investigations can Impact the Debtors' Business Practices and Operating Results. ................. ~~131~~139

16.    The Debtors Could be faced with Additional Tax Liabilities. ................... ~~132~~139

17.    The Debtors' Company-Sponsored Pension Plans are Currently Underfunded, and Over Time the Debtors Will Likely be Required to Make Cash Contributions to the Plans, Reducing the Cash Available for Working Capital and Other Corporate Uses. ............................................. ~~132~~140

18.    Labor Strikes, Lock-Outs and Protracted Negotiations can Lead to Business Interruptions and Increased Operating Costs. ............................ ~~132~~140

19.    Acquisitions, Investments and Dispositions Pose Inherent Financial and Other Risks and Challenges. ....................................................................... ~~133~~140

20.    The Reorganized Debtors May Continue to Have Substantial Indebtedness. .............................................................................................. ~~133~~140

D.    RISKS TO CREDITORS WHO WILL RECEIVE SECURITIES ........................ ~~134~~141

1.     The Lack of an Established Market for the Securities May Adversely Affect the Liquidity of the New Common Stock and the New Warrants. ... ~~134~~141

2.     Lack of Dividends May Adversely Affect Liquidity of the New Common Stock. ......................................................................................................... ~~134~~142

3.     Future Sales or Issuances of Equity, Including Issuances in Respect of New Warrants to Purchase New Class A Common Stock, May Depress the Stock Price of the New Common Stock. ...................................................... ~~134~~142

4.     The Limited Voting Rights of the New Class B Common Stock and the Lack of Voting Rights of the New Warrants Could Impact their Attractiveness to Investors and, as a Result, their Market Value. .............. ~~135~~142

5.     Certain Holders May be Restricted in Their Ability to Transfer or Sell Their Securities. .......................................................................................... ~~135~~143

XV. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........................... ~~136~~143

A.    FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS ................... ~~136~~144

1.     Termination of Subchapter S Corporation Status. ..................................... ~~136~~144

2.     Cancellation of Debt and Reduction of Tax Attributes. ............................. ~~136~~144

B.    FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS. ................................................................................................ ~~137~~145

1.     General. ....................................................................................................... ~~138~~145

2.     Market Discount. ........................................................................................ ~~138~~146

|     | 3. | U.S. Holders of Loan Claims and Loan Guaranty Claims (not including the Barclays Swap Claim). | ~~139~~146 |
|     | 4. | U.S. Holders of Senior Noteholder Claims. | ~~140~~148 |
|     | 5. | U.S. Holders of General Unsecured Claims (not including Claims arising from a Non-Qualified Former Employee Benefit Plan). | ~~140~~148 |
|     | 6. | U.S. Holders of Convenience Claims. | ~~141~~149 |
|     | 7. | U.S. Holders of Claims arising from a Non-Qualified Former Employee Benefit Plan. | ~~141~~149 |
|     | 8. | U.S. Holders of EGI-TRB LLC Notes Claims. | ~~141~~149 |
|     | 9. | U.S. Holders of PHONES Notes Claims. | ~~141~~149 |
|     | 10. | U.S. Holders of Securities Litigation Claims. | ~~141~~149 |
|     | 11. | U.S. Holders of Tribune Interests. | ~~142~~150 |
|     | 12. | Definition of "Security." | ~~142~~150 |
|     | 13. | Federal Income Tax Treatment of the New Senior Secured Term Loan. | ~~142~~150 |
|     | 14. | Non-United States Persons. | ~~143~~151 |
|     | 15. | Information Reporting and Backup Withholding. | ~~143~~151 |
| C. | | FEDERAL INCOME TAX TREATMENT OF OTHER PARENT CLAIMS RESERVES AND SUBSIDIARY GUC RESERVES. | ~~143~~151 |
| D. | | IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE. | ~~143~~151 |
| E. | | RESERVATION OF RIGHTS. | ~~144~~152 |
| XVI. CERTAIN FEDERAL, STATE AND FOREIGN SECURITIES LAW CONSIDERATIONS | | | ~~144~~152 |
| A. | | FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS. | ~~144~~152 |
| B. | | SUBSEQUENT TRANSFERS OF NEW SECURITIES. | ~~144~~152 |
| XVII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN. | | | ~~145~~153 |
| A. | | CONTINUATION OF THE CHAPTER 11 CASES | ~~145~~153 |
| B. | | LIQUIDATION UNDER CHAPTER 7 OR CHAPTER 11 | ~~145~~153 |
| XVIII. CONCLUSION AND RECOMMENDATION | | | ~~145~~153 |

### INDEX OF EXHIBITS

Exhibit A      -    Proposed Amended Joint Plan of Reorganization for Tribune Company and Its
                      Subsidiaries

Exhibit B      -    Settlement Term Sheet

Exhibit C      -    Corporate Organizational Chart

Exhibit D      -    Submissions by Certain Interested Parties Regarding the Leveraged ESOP
                      Transactions

Exhibit E      -    Offer to Purchase, filed by Tribune April 27, 2007

Exhibit F      -    Collective Bargaining Agreements

Exhibit G      -    Financial Projections

Exhibit EH     -    Liquidation Analysis

Exhibit FI     -    Selected Historical Financial Information

# I. INTRODUCTION

On December 8, 2008 (the "Petition Date"), Tribune Company ("Tribune") and certain of its subsidiaries (collectively, the "Debtors")[2] filed voluntary petitions for relief (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). An additional Debtor, Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club, LLC) ("Tribune CNLBC"), Tribune's subsidiary that held the majority of the assets related to the business of the Chicago Cubs Major League Baseball franchise (the "Chicago Cubs"), commenced a Chapter 11 Case on October 12, 2009 as one of the steps necessary to complete a transaction involving the Chicago Cubs and certain related assets. In all, the Debtors now comprise 111 entities.

On April 12, 2010, the Debtors filed the Joint Plan of Reorganization for Tribune and Its Subsidiaries (as the same may be amended from time to time, the "Plan") with the Bankruptcy Court. A copy of the Plan is attached hereto as Exhibit A. The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan also constitutes a Prepackaged Plan for any Guarantor Non-Debtors for which the commencement of a chapter 11 case becomes necessary or appropriate to conclude the restructuring provided under the Plan.

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in each of the Debtors in connection with (i) the solicitation of acceptances of the Plan and (ii) the hearing to consider confirmation of the Plan scheduled for [●], 2010, commencing at [●].m. prevailing Eastern Time. The purpose of this Disclosure Statement is to describe the Plan and its provisions, provide certain information, as required under section 1125 of the Bankruptcy Code, to creditors who will have the right to vote on the Plan so that they can make an informed decision in doing so, and to urge such creditors to vote to accept the Plan. Creditors entitled to vote to accept or reject the Plan will receive a Ballot (as defined herein) together with this Disclosure Statement to enable them to vote on the Plan. **Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan; provided, however, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.**

This Disclosure Statement includes, among other things, information pertaining to the Debtors' prepetition business operations and financial history and the events leading to the filing of the above-captioned Chapter 11 Cases. This Disclosure Statement also contains information respecting significant events that have occurred during these Chapter 11 Cases. In addition, an overview of the Plan is included, which sets forth certain terms and provisions of the Plan, the effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. This Disclosure Statement also discusses the confirmation process and the procedures for voting, which must be followed by the Holders of Claims entitled to vote under the Plan for their votes to be counted.

A Ballot for the acceptance or rejection of the Plan is also enclosed with the Disclosure Statement transmitted to each Holder of a Claim entitled to vote on the Plan.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES, AND CONFIRMATION, OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS.

---

[2] The Debtors are set forth on the cover page of this Disclosure Statement.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND SCHEDULES ATTACHED TO THE PLAN, WHICH CONTROL IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW OR THE LAWS OF ANY FOREIGN JURISDICTION.

THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE OR FOREIGN SECURITIES REGULATOR, AND NEITHER THE SEC NOR ANY STATE OR FOREIGN SECURITIES REGULATOR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF OR CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. ACCEPTANCES OF THE PLAN MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

CERTAIN INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND FINANCIAL PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED IN SECTION XIII, "RISK FACTORS." IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. NONE OF THE DEBTORS, NOR ANY OF THE REORGANIZED DEBTORS, UNDERTAKE ANY OBLIGATION TO UPDATE PUBLICLY OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND IN ITS EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

THE DEBTORS' MANAGEMENT, IN CONSULTATION WITH THEIR PROFESSIONAL ADVISORS, PREPARED THE FINANCIAL PROJECTIONS. WHILE THE DEBTORS HAVE PRESENTED THESE FINANCIAL PROJECTIONS WITH NUMERICAL SPECIFICITY, THEY HAVE NECESSARILY BASED THE FINANCIAL PROJECTIONS ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE DEBTORS' AND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT THEY DO NOT AND CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO THE DEBTORS' OR THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHERMORE, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES. ALTERNATIVELY, ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE FINANCIAL PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

SUBJECT TO APPLICABLE THIRD CIRCUIT LAW, AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN EITHER THE DEBTORS OR THE REORGANIZED DEBTORS.

A.    **Overview of Chapter 11.**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote the equality of treatment of similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from all debts that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

After a plan of reorganization has been filed in a chapter 11 case, certain holders of claims against or equity interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of

the proposed plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan. The Debtors are submitting this Disclosure Statement to Holders of Claims against and Interests in each Debtor in order to satisfy the requirements of section 1125 of the Bankruptcy Code.

**B.    Parties Entitled to Vote on the Plan.**

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan. Creditors or equity interest holders whose claims or interests are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote. Creditors or equity interest holders whose claims or interests are impaired by a plan, but who will receive no distribution under the plan, are also not entitled to vote because they are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code. For a discussion of these matters, see Article X, "Voting Procedures and Requirements" and Article XI, "Confirmation of the Plan."

For a detailed description of the Classes of Claims and Interests and their treatment under the Plan, see Article IX.A-D of this Disclosure Statement. In addition, the following summary chart sets forth the Classes that are entitled to vote on the Plan:

| Class | Description |
|---|---|
| 1C | Senior Loan Claims against Tribune |
| 1D | Bridge Loan Claims against Tribune |
| 1DE | Senior Noteholder Claims against Tribune |
| 1EF | Other Parent Claims against Tribune |
| 50C-111C | Senior Loan Guaranty Claims against relevant Guarantor Debtors |
| 2E-111E | General Unsecured Claims against relevant Filed Subsidiary Debtors |

\* As further explained in Article IX.D of this Disclosure Statement, in respect of the Plan, the votes cast by Holders of Allowed Loan Guaranty Claims in Classes 50C through 111C will also be counted as votes cast on the Prepackaged Plan of the relevant Guarantor Non-Debtors that may become Debtors.

**C.    Solicitation Package.**

Accompanying this Disclosure Statement (which is provided on CD-ROM) is a package of hard copy materials called the "Solicitation Package." The Solicitation Package contains copies of, among other things:

- the Bankruptcy Court order approving the Disclosure Statement and procedures for soliciting and tabulating votes on the Plan (the "Solicitation Order") which, among other things, approves this Disclosure Statement as containing adequate information, schedules the Confirmation Hearing, sets the voting deadline, sets out the procedures for distributing Solicitation Packages to the Holders of Claims against the Debtors, establishes the procedures for tabulating Ballots used in voting on the Plan, and sets the deadline for objecting to confirmation of the Plan;
- the Notice of the Hearing to Consider Confirmation of the Joint Plan of Reorganization for Tribune and Its Subsidiaries;
- a Foreign Ownership Certification (as defined below) and, if applicable, a Media Ownership Certification (as defined below)Plan; and
- one or more Ballots and a postage-paid return envelope (Ballots are provided only to Holders of Claims that are entitled to vote on the Plan), which will be used by creditors and interest holders who are entitled to vote on the Plan.

4

D.      **Voting Procedures, Ballots, and Voting Deadline.**

After carefully reviewing the materials in the Solicitation Package and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan. Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

In order for your vote to be counted, you must complete and sign your original Ballot and return it in the envelope provided. Only original signatures will be accepted. Please return your completed Ballot to the Voting Agent, unless you are a beneficial holder of a Senior Noteholder Claim (as defined below) who receives a Ballot from a broker, bank, commercial bank, trust company, dealer, or other agent or nominee (each, a "Voting Nominee"), in which case you must return the Ballot to such Voting Nominee. Ballots should not be sent to the Debtors or to the indenture trustee(s) for the Senior Notes.

**If you are a beneficial holder of a Senior Noteholder Claim who receives a Ballot from a Voting Nominee, in order for your vote to be counted, your Ballot must be completed in accordance with the voting instructions on the Ballot and received by the Voting Nominee in enough time for the Voting Nominee to transmit a Master Ballot to the Voting Agent so that it is received no later than [●], 2010 at 4:00 p.m. (prevailing Eastern time) (the "Voting Deadline"). If you are the Holder of any other type of Claim, in order for your vote to be counted, your Ballot must be properly completed in accordance with the voting instructions on the Ballot and received by Epiq Bankruptcy Solutions, LLC (the "Voting Agent") no later than the Voting Deadline. Any Ballot received after the Voting Deadline shall be counted at the sole discretion of the Debtors. Do not return any debt instruments or equity securities with your Ballot.**

**Any executed Ballot that does not indicate either an acceptance or rejection of the Plan or indicates both an acceptance and rejection of the Plan will not be counted as a vote either to accept or reject the Plan.**

If you are a Holder of a Claim who is entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, please call the Voting Agent at (646) 282-2400 or toll-free at (800) 622-1125.

If you have any questions about the procedure for voting your Claim, the packet of materials that you have received, the amount of your Claim, or if you wish to obtain, at your own expense, an additional copy of this Disclosure Statement and its appendices and Exhibits, please contact the Voting Agent.

FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE ARTICLE X, "VOTING PROCEDURES AND REQUIREMENTS."

Before voting on the Plan, each Holder of Claims in Classes that are entitled to vote on the Plan should read, in its entirety, this Disclosure Statement, the Plan, the Solicitation Order, the notice of the Confirmation Hearing, and the instructions accompanying the Ballots. These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated.

E.      **Confirmation Hearing and Deadline for Objections to Confirmation.**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. The Confirmation Hearing pursuant to section 1128 of the Bankruptcy Code will be held on [●], 2010 at [●].m., prevailing Eastern Time, before the Honorable Kevin J. Carey, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Fifth Floor, Courtroom No. 5, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned

from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing. Any objection to Confirmation of the Plan must be made in accordance with the requirements of section 1128(b) of the Bankruptcy Code, Bankruptcy Rule 9014, and the procedures set forth in Article XI.A of this Disclosure Statement.

## II. OVERVIEW OF THE PLAN

The following summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan. For a more detailed description of the terms and provisions of the Plan, see Article IX, "The Plan of Reorganization." The Debtors, moreover, reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

### A.    General Overview.

The Plan described herein constitutes a separate plan of reorganization for each Debtor, and, to the extent they commence chapter 11 cases prior to the Confirmation Date, a prepackaged plan of reorganization for the Guarantor Non-Debtors. The Plan, which incorporates a Global Settlement, is supported by certain key constituents in these Chapter 11 Cases who have entered into a Settlement Support Agreement, pursuant to which such parties agree to support a settlement of the LBO-Related Causes of Action in accordance with the term sheet (the ("Settlement Term Sheet") summarizing certain primary terms of such settlement. The ~~Settlement Support Agreement~~ was filed with the Bankruptcy Court on April 12, 2010, and a copy of the Settlement Term Sheet is attached hereto as Exhibit B. The Debtors are not a party to the Settlement Support Agreement; however the Plan reflects and seeks to implement the terms of the Settlement Term Sheet. The initial signatories to the Settlement Support Agreement are Angelo Gordon & Co LP; Centerbridge Credit Partners, L.P.; Centerbridge Credit Partners Master, L.P.; Centerbridge Special Credit Partners, L.P.; Law Debenture; and JPMorgan Chase Bank, N.A. The Debtors believe that the Plan represents a good faith, fair, equitable and reasonable compromise that is in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests in these Cases, and provides the greatest likelihood for achieving the Debtors' goal of a fair plan that will be accepted by the Impaired Classes of Claims entitled to distributions thereunder (i.e., the Holders of Loan Claims; the Holders of Senior Loan Guaranty Claims; the Holders of Senior Noteholder Claims; the Holders of Other Parent Claims; and the Holders of General Unsecured Claims). ~~Certain parties to the Settlement Support Agreement have requested that the Settlement Support Agreement not be appended hereto due to confidentiality concerns; please refer to Exhibit B, however, for specific key terms thereof.~~ The Creditors Committee supports the Plan and has prepared a letter ("Plan Support Letter") to all unsecured creditors urging them to vote in favor of the Plan. A copy of the Plan Support Letter is included with the solicitation package that will be transmitted to creditors entitled to vote on the Plan.

The Plan sets forth the terms of the Debtors' reorganization and provides for the resolution of all Claims against and Interests in the Debtors. A central component of the Plan is the Global Settlement of all LBO-Related Causes of Action held by the Tribune entities, the Debtors' Estates and any Person that is deemed to grant the Releases in Section 11.2.2 of the Plan. Any distributions to be made pursuant to the Plan shall be on account of and in consideration of the Global Settlement, which upon the Plan's Effective Date, shall be fully binding and effective. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Global Settlement and the Bankruptcy Court's finding that the Global Settlement is in the best interests of the Debtors, the Reorganized Debtors, their respective Debtors' Estates, and the Holders of Claims and Interests and is fair, equitable, and reasonable. By providing a complete resolution of the LBO-Related Causes of Action, the Global Settlement embodied in the Plan allows the Debtors to exit bankruptcy in a timely and efficient manner, unhampered by the enormous costs, distraction and likely damage to operations occasioned by years of litigation. Please refer to Article VII herein for a more detailed discussion of the Global Settlement.

The following Plan Treatment section provides an overview of the treatment of different classes of Claims and Interests under the Plan, and reflects the allocation, pursuant to the Global Settlement, of (i) approximately 7.0% of total Distributable Value (to which Holders of Allowed Loan Claims would otherwise claim entitlement) to the Holders of Senior Noteholder Claims and Other Parent Claims and (ii) approximately 1.4% of total Distributable Value (to which Holders of Allowed Loan Guaranty Claims would otherwise claim entitlement) to the Holders of General Unsecured Claims against Filed Subsidiary Debtors, resulting in the payment in full (without post-petition interest) of these General Unsecured Claims, assuming the Allowed amount of such Claims does not exceed $150 million.[3]  The Debtors value the aggregate additional consideration to be provided to Holders of Senior Noteholder Claims, Other Parent Claims, and General Unsecured Claims against Filed Subsidiary Debtors pursuant to the Global Settlement at more than $510 million.

**B.     Plan Treatment**

Under the Plan generally, all Allowed Administrative Expense Claims, Allowed DIP Facility Claims, Allowed Priority Tax Claims, and Allowed Convenience Claims against Tribune will be paid in full. Convenience Claims, however, will not receive post-petition interest.  All Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, and Interests in the Filed Subsidiary Debtors will be Reinstated.  The Plan provides no recovery to the Holders of Securities Litigation Claims, Tribune Interests, PHONES Notes Claims, or EGI-TRB LLC Notes Claims, and Bridge Loan Guaranty Claims and further provides that Intercompany Claims shall be deemed satisfied, discharged, and extinguished in full and shall be eliminated as of the Effective Date.

As more fully described in the Plan and Article II.D hereof, which sets forth the estimated recoveries on account of each Class of Claims against and Interests in the Debtors, the Plan provides the following:

- Holders of Allowed Senior Loan Claims (Class 1C) shall receive, subject to Section 5.4.2 of the Plan, a Pro Rata share of (i), calculated together with the Holders of Claims in Class 1D that are Allowed pursuant to Section 3.2.4(i), of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation, and the Loan Claims Stock Allocation.  Loan Claims Loan Allocation means 8.8% of the New Senior Secured Term Loan minus (a) the amount of the New Senior Secured Term Loan to be distributed to the Holders of Allowed Senior Noteholder Claims (in Class 1D)E and (b) the portion of the Other Parent Claims Allocation that is the New Senior Secured Term Loan; (ii). Loan Claims Cash Allocation means 8.8% of the Distributable Cash minus (aA) the amount of the Distributable Cash to be distributed to the Holders of Allowed Senior Noteholder Claims in Class 1E, (bB) the portion of the Other Parent Claims Allocation that is Distributable Cash, and (cC) the amount of Cash to be distributed to Holders of Allowed ConvenienceClaims in Class 1G. Loan Claims; and (iii) Stock Allocation means 8.8% of the New Common Stock (subject to dilution by the Equity Incentive Plan) minus (aA) the amount of the New Common Stock to be distributed to the Holders of Allowed Senior Noteholder Claims and (bB) the portion of the Other Parent Claims Allocation that is New Common Stock.

- The following treatment shall apply to (i) all Holders of Bridge Loan Claims if Class 1D votes to accept the Plan, or (ii) each Holder of a Bridge Loan Claim that votes to accept the Plan if Class 1D votes to reject the Plan: Each such Holder of a Bridge Loan Claim shall (a) as of the Effective Date, have its Claim Allowed in an amount equal to the principal amount of such Claim plus accrued interest as of the Petition Date, and (b) on or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release

---

[3] Please refer to Article XII for a discussion of the term "Distributable Value."

and discharge of and in exchange for such Allowed Bridge Loan Claim against Tribune, subject to Section 5.4.2 of the Plan, receive such Holder's Pro Rata share, calculated together with the Holders of Allowed Claims in Class 1C, of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation.

If Class 1D votes to reject the Plan, the following treatment shall apply to each Holder of a Bridge Loan Claim that votes to reject the Plan: Each such Holder of a Bridge Loan Claim shall (a) have its Claim treated as a Disputed Claim until Allowed by Final Order, and (b) in full satisfaction, settlement, release and discharge of and in exchange for such Bridge Loan Claim against Tribune, subject to Section 5.4.2 of the Plan, receive, if ultimately Allowed, such distribution and treatment as may be proposed by the Debtors that would satisfy the requirements of section 1129(b) of the Bankruptcy Code not to exceed an amount determined by application of the mid-point estimate of total "Distributable Value" as defined and set forth herein and the allocation of such "Distributable Value" underlying the recoveries of Holders of Claims against Tribune under the Plan if such Bridge Loan Claims becomes Allowed.

- Holders of Allowed Senior Noteholder Claims (Class 1D̶E) shall receive, subject to section 5.4.2 of the Plan, a Pro Rata Share of (i) 7.4% of the New Senior Secured Term Loan; (ii) 7.4% of the Distributable Cash; and (iii) 7.4% of the New Common Stock, subject to dilution by the Equity Incentive Plan.

- Holders of Allowed Other Parent Claims (Class 1E̶F) shall each receive an amount of Distributable Cash equal to 35.18% of the aggregate amount in U.S. dollars of such Holder's Allowed Other Parent Claim.

- Holders of Allowed Senior Loan Guaranty Claims (Classes 5O̶C-111C) shall receive, subject to Section 5.4.2 of the Plan, a Pro Rata share of (i) 91.2% of the New Senior Secured Term Loan plus the portion of the Other Parent Claims Allocation that is New Senior Secured Term Loan; (ii) 91.2% of the Distributable Cash minus the amount of Distributable Cash to be distributed to Holders of Allowed General Unsecured Claims against the relevant Filed Subsidiary Debtors (Classes 2E-111E) and the amount of Distributable Cash to be distributed to Holders of Allowed Other Parent Claims (Class 1E) in excess of the portion of the Other Parent Claims Allocation that is Distributable Cash; and (iii) 91.2% of the New Common Stock plus the portion of the Other Parent Claims Allocation that is New Common Stock, subject to dilution by the Equity Incentive Plan.

- Holders of Allowed General Unsecured Claims against the relevant Filed Subsidiary Debtors shall receive payment in full in Cash (paid out of the Distributable Cash), provided; however, that if the Debtors estimate, pursuant to the procedures set forth in Section 3.3.4 of the Plan, that the aggregate sum of Allowed General Unsecured Claims against the relevant Filed Subsidiary Debtors shall exceed $150 million and the Senior Lender Settlement Committee does not elect in writing after such estimate is filed with the Bankruptcy Court but prior to the conclusion of the Confirmation Hearing to provide additional consideration to such Holders, each Holder of an Allowed General Unsecured Claims against the relevant Filed Subsidiary Debtors shall instead receive its Pro Rata share of $150 million in Cash; provided further, however, that post-petition interest shall not accrue or be paid on any General Unsecured Claim.

In addition, the Plan constitutes a prepackaged plan for the Guarantor Non-Debtors, if any, that commence Chapter 11 Cases to effectuate the restructuring contemplated under the Plan.  With the exception of Senior Loan Guaranty Claims, Bridge Loan Guaranty Claims, Intercompany Claims, and Securities Litigation

Claims, each Holder of an Allowed Claim against or Interest in a Guarantor Non-Debtor that becomes a Debtor shall have its Claim or Interest Reinstated. In addition, except for Senior Loan Guaranty Claims, Bridge Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims, Allowed Claims against and Interests in any Guarantor Non-Debtor that becomes a Debtor are Unimpaired and conclusively deemed to have accepted the Prepackaged Plan.

**C.    Summary of Allowed Claims Against and Interests in Each of the Debtors and of Estimated Recoveries in Respect Thereof.**

In order to determine the treatment of creditors of Tribune and each of its Subsidiary Debtors, management and its advisors reviewed the relationship between the value of each legal entity and third-party claims and intercompany claims at each such legal entity, including the Guarantor Non-Debtors. For purposes of this analysis, this relationship was modeled to calculate the value available for distribution to each legal entity's creditors and stockholders taking into account the flow of value between legal entities on account of Intercompany Claims. The treatment provided to the various Classes of Claims and Interests under the Plan is derived from estimates for Allowed Claims against Tribune, its Subsidiary Debtors, and each Non-Guarantor Debtor. Certain key assumptions utilized in formulating the aforementioned estimates are summarized below.

---

**KEY FACTORS AND ASSUMPTIONS**

- Guarantor Debtors. Claims against the Guarantor Debtors include, among others, Intercompany Claims, Senior Loan Guaranty Claims, General Unsecured Claims, and Bridge Loan Guaranty Claims. The Bridge Loan Guaranty Claims are contractually subordinated to the Senior Loan Guaranty Claims and the Plan gives effect to such contractual subordination. These claims are otherwise *pari passu* in priority of payment against the Subsidiary Debtors.

- Tribune. Claims against Tribune include, among others, Loan Claims (which include Senior Loan Claims, the Bridge Loan Claims, and the Barclays Swap Claims), EGI-TRB LLC Notes Claim, PHONES Notes Claims, and Senior Noteholder Claims. The PHONES Notes Claims and the EGI-TRB LLC Notes Claims are subordinated to the Senior Loan Claims, Bridge Loan Claims, Senior Noteholder Claims and Non-Qualified Former Employee Benefit Claims against Tribune. Additionally, based on the terms of the Senior Loan Guarantee Agreement, the right to recoveries on Intercompany Claims of any Guarantor Debtor or Guarantor Non-Debtor against Tribune are subordinated to the Senior Loan Guaranty Claims. The Plan gives effect to the foregoing subordination provisions.

- Intercompany Claims. The Debtors and their advisors have reviewed the Intercompany Claims as reflected in their books and records at the Petition Date in order to determine an appropriate estimate of Allowed Intercompany Claims. The Intercompany Claims are comprised of hundreds of thousands of individual transactions over the history of the Debtors. The review of these claims included a focus on (i) the most significant portion of these amounts which arose in the seven years preceding the Petition Date and (ii) amounts related to large, "one time" transactions. In addition, due to the prepetition debt structure which creates distinctions between Guarantor Debtors (and Guarantor Non-Debtors), Non-Guarantor Debtors, and Tribune, the review also focused on claims amongst these groups. The review resulted in the identification of certain categories of transactions, which were then assessed on both the legal and financial merits in terms of the transaction(s) likely creating Allowed Intercompany Claims. Based on this review and the assessment of strength of potential legal arguments, estimates were made of likely Allowed Intercompany Claims. Certain significant prepetition intercompany transactions assessed during this review include the following:

- Immediately prior to the Petition Date, Tribune transferred approximately $368.8 million in cash from its concentration and investment accounts at JPMorgan Chase Bank, N.A. and Bank of America, N.A. to new investment accounts at Fidelity Investments Institutional Services Company held by (i) Chicago Tribune Company and WGN Continental Broadcasting Company (which became Filed Subsidiary Debtors on December 8, 2008), (ii) Tribune CNLBC (which became a Filed Subsidiary Debtor on October 12, 2009), and (iii) Tribune Interactive, Inc. (which is a Guarantor Non-Debtor). These transfers were done in order to implement certain business objectives, including the preservation of liquidity and the continued availability of funding for subsidiary operations. These intercompany transfers were appropriately accounted for on the books and records of Tribune and its subsidiaries. For purposes of calculating distributions to Holders of Allowed Claims against and Interests in the Debtors, the aforementioned $368.8 million is deemed to have been returned to Tribune.

- During the 12 months prior to the Petition Date, the Tribune Entities engaged in a series of third-party and intercompany real property transactions involving the "KTLA Studio Lot" owned by Tribune California Properties, Inc., a Guarantor Debtor; the "SCNI Property" owned by Southern Connecticut Newspapers, Inc., a Guarantor Debtor; and properties in Los Angeles, CA, St. Louis, MO, Baltimore, MD, Hartford, CT, Melville, NY, and Conklin, NY (collectively, the "TMCT Properties"), which were

---

leased by Tribune from TMCT, LLC pursuant to an Amended and Restated Lease Agreement entered December 22, 2006 (the "Master Lease"). On January 30, 2008 and April 22, 2008, the KTLA Studio Lot and the SCNI Property were sold for approximately $119 million and $28 million, respectively, and the proceeds of each sale were placed into escrow.[4]

In January 2008, Tribune exercised its option to purchase the TMCT Properties for $175 million. Tribune closed the deal on April 28, 2008. This transaction was partially structured as a "like-kind exchange" for tax purposes and was funded with the escrowed proceeds from the KTLA Studio Lot and SCNI Property sales plus an additional approximately $28 million contributed by Tribune. At the conclusion of these transactions, Tribune owned the TMCT Properties and became both the landlord and tenant under the Master Lease. Most of the properties were then leased (pursuant to a series of sublease agreements that were in place prior to the acquisition) by Tribune to the various Tribune Entities which utilized the TMCT Properties in the operation of their businesses. Tribune initially explored various financing alternatives for the TMCT Properties; however, Tribune ultimately was not able to achieve such financing and thus determined to transfer certain of the properties to the respective Tribune Entity lessee which utilized the specific property. Accordingly, in November 2008, Tribune transferred title of certain TMCT Properties as follows: the Los Angeles, CA property (Times Mirror Square) was transferred from Tribune to Los Angeles Times Communication LLC, a Guarantor Debtor; the Hartford, CT property was transferred from Tribune to The Hartford Courant Company, a Guarantor Debtor; and the Melville, NY Properties were transferred to Tribune ND, Inc., a Non-Debtor.[5]

The economic result of these transactions is that certain of Tribune's subsidiaries collectively provided approximately $147 million of the funds for the acquisition of the TMCT Properties and collectively retain TMCT Properties to which $124.7 million of the purchase price was allocated, while Tribune provided approximately $28 million of the funds for the acquisition of the TMCT Properties and retains (or subsequently benefited from the proceeds of the sale of) properties to which $50.3 million of the purchase price was allocated.

- The Plan implements the Global Settlement and thereby effects a re-allocation of 7.0% of total Distributable Value for the benefit of Senior Noteholder Claims and Other Parent Claims as well as a re-allocation of 1.4% of total Distributable Value for the benefit of General Unsecured Claims against Filed Subsidiary Debtors, in each case representing value that would otherwise be claimed by the Holders of Loan Claims and Loan Guaranty Claims, respectively.

The following charts summarize the projected distributions to Holders of Allowed Claims and Interests under the Plan. The projections of estimated recoveries are only an estimate. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries received. In addition, the ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain confirmation of the Plan and meet the conditions to confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement. Accordingly, the recoveries set forth below are projected recoveries only and may change based upon changes in the amount of Allowed Claims and Interests as well as other factors related to the Debtors' business operations and general economic conditions. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims against and Interests under the Plan.

    1.       Summary of Estimated Unclassified Claims Against all Debtors and of Estimated Recoveries in Respect Thereof.

    (a)

---

[4] A portion of the KTLA Studio Lot was leased back to KTLA, Inc., a Guarantor Debtor.

[5] The Melville, NY properties are leased to Newsday LLC and that lease was assigned from Tribune to Tribune ND, Inc. contemporaneously with a transfer of the property from Tribune to Tribune ND, Inc. in 2008. The Conklin, NY property was sold to a third-party in October 2008. The St. Louis property was also sold to a third-party in June 2009, pursuant to an order of the Bankruptcy Court. The Baltimore properties continue to be owned by Tribune. See Tribune's Quarterly Report on Form 10-Q for the third quarter ending September 28, 2008 for additional information concerning the history of Tribune's relationship with TMCT, the resulting option to purchase the properties, and the monetization of an interest in the Newsday business.

| Description | Estimated Allowed Claims | Treatment | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| **DIP Facility Claims:** | $0 | **Unimpaired** | **100%** in the form of Cash. <u>See</u> Article IX.B.1. |
| **Administrative Expense Claims:** | $100 to $150 million[6] | **Unimpaired** | **100%** in the form of Cash. <u>See</u> Article IX.B.2. |
| **Priority Tax Claims:** | $150 to $175 million | **Unimpaired** | **100%** in the form of Cash in full or in installments over a period ending not later than the fifth anniversary of the Petition Date, together with interest compounded annually from the Effective Date on any outstanding balance. <u>See</u> Article IX.B.3. |

        2.       Summary of Estimated Allowed Claims and Interests against Tribune and the Filed Subsidiary Debtors and of Estimated Recoveries in Respect Thereof.

| (a) | | | |
|---|---|---|---|
| **Class & Description** | Estimated Allowed Claims | Treatment | Estimated Recovery to Holders of Allowed Claims and Interests |
| **Priority Non-Tax Claims (Class 1A):** | $0 to $1 million | **Unimpaired** | **100%** in the form of Reinstatement. <u>See</u> Article IX.D.1.a. |
| **Other Secured Claims (Class 1B):** | Undetermined | **Unimpaired** | **100%** in the form of Reinstatement. <u>See</u> Article IX.D.1.b. |
| <u>Senior</u> **Loan Claims (Class 1C):** | $~~10.34~~8.722 billion | **Impaired** | **0.44%** in the form of a Pro Rata share ~~of (i) 8.8% of the New Senior Secured Term Loan minus (a) the amount of the New Senior Secured Term Loan to be distributed to Holders of Allowed Claims in Class 1D~~ , calculated together with the Holders of Claims in Class 1D ~~and (b) the portion of the Other Parent Claims Allocation that is New Senior Secured Term Loans; (ii) 8.8% of the Distributable Cash minus (a) the amount of the Distributable Cash to be distributed to Holders of Allowed Claims in Class 1D, (b) the portion of the Other Parent Claims Allocation that is Distributable Cash, and (c) the amount of Cash to be distributed to Holders of Allowed Claims in Class 1E; and (iii) 8.8% of the New Common Stock (subject to dilution by the Equity Incentive Plan) minus (a) the amount of the New Common Stock to be distributed to Holders of Allowed Claims in Class 1D and (b) the portion of the Other Parent Claims Allocation that is the New Common Stock.[7]~~ that are Allowed pursuant to Section 3.2.4(b)(i), of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation. See Article IX.D.1.c. |
| <u>**Bridge Loan Claims (Class 1D)**</u> | <u>$1.619 billion</u> | <u>**Impaired**</u> | **0.44%,** which treatment shall apply to (i) all Holders of Bridge Loan Claims if Class 1D votes to accept the Plan, or (ii) each Holder of a Bridge Loan Claim that votes to accept the Plan if Class 1D votes to reject the Plan. Each such Holder of a Bridge Loan Claim shall (a) as of the Effective Date, have its Claim Allowed in an amount equal to the principal amount of such Claim plus accrued interest as of the Petition Date, and (b) on or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for |

---

[6] This estimate does not include amounts outstanding for goods or services provided in the ordinary course of business and excludes Intercompany Claims that are also Administrative Expense Claims. The Debtors intend to pay such amounts as they become due in the ordinary course of business.

[7] ~~The estimated recovery percentages for Holders of Loan Claims take into account the application of the contractual subordination PHONES Notes Claims and EGI-TRB LLC Notes Claims and any required turnover related thereto.~~

| | | | |
|---|---|---|---|
| | | | such Allowed Bridge Loan Claim against Tribune, subject to Section 5.4.2 of the Plan, receive such Holder's Pro Rata share, calculated together with the Holders of Allowed Claims in Class 1C, of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation.<br><br>If Class 1D votes to reject the Plan, the following treatment shall apply to each Holder of a Bridge Loan Claim that votes to reject the Plan: 0% through a % recovery not to exceed an amount determined by application of the mid-point estimate of total "Distributable Value" as defined and set forth herein and the allocation of such "Distributable Value" underlying the recoveries of Holders of Claims against Tribune under the Plan if such Bridge Loan Claims becomes Allowed. See Article IX.D.1.d. |
| Senior Noteholder Claims (Class 1DE): | $1.283 billion | Impaired | 35.18% in the form of each Holder of an Allowed Senior Noteholder Claim's Pro Rata share of 7.4% of the New Senior Secured Term Loan, 7.4% of the Distributable Cash, and 7.4% of the New Common Stock, subject to dilution by the Equity Incentive Plan. See Article IX.D.1.de. |
| Other Parent Claims (Class 1EF): | $100 to 125 million | Impaired | 35.18% in the form of an amount of Distributable Cash equal to 35.18% of the aggregate amount in U.S. dollars of such Holder's Allowed Other Parent Claim. See Article IX.D.1.ef. |
| Convenience Claims (Class 1FG): | $0 to $1 million | Unimpaired | 100% in the form of Cash; provided, however, that post-petition interest shall not be paid to any Holder on any Convenience Claim. A Convenience Claim is a Claim against Tribune that would otherwise be a General Unsecured Claim that is (i) in an amount equal to or less than $1,000 or (ii) in an amount that has been reduced to $1,000 pursuant to a Convenience Class Election. See Article IX.D.1.fg. |
| EGI-TRB LLC Notes Claims (Class 1I): | $235 million | Impaired | 0%, all EGI-TRB LLC Notes Claims shall be extinguished. See Article IX.D.1.gh. |
| PHONES Notes Claims (Class 1J): | $761 million | Impaired | 0%, all PHONES Notes Claims shall be extinguished. See Article IX.D.1.hi. |
| Intercompany Claims (Class 1K): | N/A | Impaired | N/A, all Intercompany Claims against Tribune shall be deemed satisfied, discharged, and extinguished in full. See Article IX.D.1.ij. |
| Securities Litigation Claims (Class 1L): | Undetermined | Impaired | 0%, all Securities Litigation Claims against Tribune shall be extinguished. See Article IX.D.1.jk. |
| Tribune Interests (Class 1M): | N/A | Impaired | 0%, all Tribune Interests in Tribune shall be extinguished. See Article IX.D.1.kl. |

**(b)**

| Class & Description | Estimated Allowed Claims | Treatment | Estimated Recovery to Holders of Allowed Claims and Interests |
|---|---|---|---|
| Priority Non-Tax Claims (Classes 2A – 111A): | $0 to $1 million | Unimpaired | 100% in the form of Reinstatement. See Article IX.D.2.a. |
| Other Secured | Undetermined | Unimpaired | 100% in the form of Reinstatement. See Article IX.D.2.b. |

| Claims (Classes 2B-111B): | | | |
|---|---|---|---|
| **Senior Loan Guaranty Claims (Classes 50C -111C):** | $10.34~~28.722~~ billion*7 | **Impaired** | ~~52.64% (which represents a recovery of 62.41% with respect to Allowed Senior Loan Guaranty Claims and, in accordance with the contractual subordination provisions in the Loan Guaranty Agreements, zero percent (0%) with respect to Allowed Bridge Loan Guaranty Claims)~~62.41% in the form of a Pro Rata share of (i) 91.2% of the New Senior Secured Term Loan plus the portion of the Other Parent Claims Allocation that is New Senior Secured Term Loan; (ii) 91.2% of the Distributable Cash minus the amount of Distributable Cash to be distributed to Holders of Allowed Claims in Classes 2E-111E and the amount of Distributable Cash to be distributed to Holders of Allowed Claims in Class 1E in excess of the portion of the Other Parent Claims Allocation that is Distributable Cash; and (iii) 91.2% of the New Common Stock plus the portion of the Other Parent Claims Allocation that is New Common Stock.  See Article IX.D.2.c. |
| **Bridge Loan Guaranty Claims (Classes 50D-111D)** | $1.619 billion[8] | **Impaired** | **0%,** in order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions of (i) the New Senior Secured Term Loan, (ii) the Distributable Cash and (iii) the New Common Stock that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall instead be distributed to the Senior Loan Agent for distribution on account of Allowed Senior Loan Guaranty Claims.  Accordingly, on the Effective Date, all Bridge Loan Guaranty Claims against the Guarantor Debtors shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such Bridge Loan Guaranty Claims. See Article IX.D.2.d. |
| **General Unsecured Claims (Classes 2E-111E):** | $85 to $150 million | **Impaired** | **100%** in the form of Cash (paid out of the Distributable Cash); provided, however, that if the Debtors estimate, pursuant to Section 3.3.4 of the Plan, that the sum of Allowed Claims in Classes 2E-111E shall exceed $150 million in the aggregate and the Senior Lender Settlement Committee does not elect in writing after any such estimate is filed with the Bankruptcy Court but prior to the conclusion of the Confirmation Hearing to provide additional consideration to such Holders, each Holder of an Allowed Claim in Classes 2E-111E shall instead receive its Pro Rata share of $150 million in Cash; provided further, however, that post-petition interest shall not accrue or be paid to any Holder on any General Unsecured Claim.  See Article IX.D.2.~~d~~e. |
| **Intercompany Claims (Classes 2K-111K):** | N/A | **Impaired** | **N/A**, all Intercompany Claims against the Filed Subsidiary Debtors shall be deemed satisfied, discharged and extinguished in full.  See Article IX.D.2.~~e~~f. |
| **Securities Litigation Claims (Classes 2L-111L):** | Undetermined | **Impaired** | **0%**, all Securities Litigation Claims against the Filed Subsidiary Debtors shall be extinguished.  See Article IX.D.2.~~f~~g. |
| **Interests in the Filed Subsidiary Debtors (Classes 2M-111M):** | N/A | **Unimpaired** | **100%** in the form of Reinstatement.  See Article IX.D.2.~~g~~h. |

3.      Summary of Estimated Allowed Claims Against and Interests for Each Guarantor Non-Debtor, if any, that becomes a Debtor and of Estimated Recoveries in Respect Thereof.

---

*7 This amount is asserted against each of the Guarantor Subsidiaries.  The estimated recovery set forth herein was calculated by taking the cumulative recovery from the Claims against each Guarantor Debtor and Guarantor Non-Debtor divided by this amount.

[8] This amount is asserted against each of the Guarantor Subsidiaries.

The Plan also constitutes a Prepackaged Plan for the Guarantor Non-Debtors, if any, that commence cases under chapter 11 of the Bankruptcy Code. For any Guarantor Non-Debtor that commences a chapter 11 case, such Prepackaged Plan shall classify Allowed Claims and Interests in the same manner as set forth above for the Filed Subsidiary Debtors.

Except for Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims, each Holder of an Allowed Claim against or Interest in a Guarantor Non-Debtor that becomes a Debtor shall have its Claim or Interest Reinstated. In addition, except for Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims, Allowed Claims against and Interests in any Guarantor Non-Debtor that becomes a Debtor are Unimpaired, and the Holders of such Claims and Interests are conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of such Claims and Interests are not entitled to vote to accept or reject the Prepackaged Plan.

The treatment of Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims under the Prepackaged Plan is as follows:

| (a) | | | |
|---|---|---|---|
| **Description** | **Estimated Allowed Claims** | **Treatment** | **Estimated Recovery to Holders of Allowed Claims** |
| **Senior Loan Guaranty Claims:** | ~~$10.34~~28.722 billion[9] | **Impaired** | ~~52.64% (which represents a recovery of 62.41% with respect to Allowed Senior Loan Guaranty Claims and, in accordance with the contractual subordination provisions in the Loan Guaranty Agreements, zero percent (0%) with respect to Allowed Bridge Loan Guaranty Claims)~~62.41% in the form of the distributions provided to such Holder under Article IX.D.2.c of this Disclosure Statement. See Article IX.D.3.b~~c.i~~. |
| ~~Intercompany~~Bridge Loan Guaranty Claims: | ~~Undetermined~~ 1.619 billion[10] | **Impaired** | ~~N/A, all Intercompany~~0%, in order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions of (i) the New Senior Secured Term Loan, (ii) the Distributable Cash and (iii) the New Common Stock that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall instead be distributed to the Senior Loan Agent for distribution on account of Allowed Senior Loan Guaranty Claims. Accordingly, on the Effective Date, all Bridge Loan Guaranty Claims against Guarantor Non-Debtors that become Debtors shall be ~~deemed satisfied, discharged and extinguished in full~~extinguished and the Holders of such Claims shall not receive or retain any property under the relevant Prepackaged Plan on account of such Bridge Loan Guaranty Claims. See Article IX.D.3.c.ii. |
| ~~Securities Litigation~~Intercompany Claims: | Undetermined | **Impaired** | ~~0%~~N/A, all ~~Securities Litigation~~Intercompany Claims against Guarantor Non-Debtors that become Debtors shall be deemed satisfied, discharged and extinguished in full. See Article IX.D.3.d. |
| **Securities Litigation Claims:** | Undetermined | **Impaired** | 0%, all Securities Litigation Claims against Guarantor Non-Debtors that become Debtors shall be extinguished. See Article IX.D.3.e. |

**D.     FCC Approval.**

---

[9] This amount is asserted against each of the Guarantor Subsidiaries. The estimated recovery set forth herein was calculated by taking the cumulative recovery from the Claims against each Guarantor Debtor and Guarantor Non-Debtor divided by this amount.

[10] This amount is asserted against each of the Guarantor Subsidiaries.

14

Certain of the Debtors' business operations are subject to regulation by the Federal Communications Commission (the "FCC"). Television and radio stations may not operate in the United States without the authorization of the FCC and FCC approval is required for the issuance, renewal, transfer and assignment of station operating licenses. The FCC also regulates the multiple and combined ownership of television and radio broadcast stations as well as the cross-ownership of broadcast stations and newspapers in the same market. Because the Debtors' operations include newspapers, television stations, and a radio station, the Plan must comply with certain FCC-related multiple and cross-ownership requirements and restrictions. The Plan also must comply with limitations on foreign ownership of broadcast licensees administered by the FCC. Consummation of the Plan will be subject to obtaining the requisite approvals and waivers from the FCC. On April 28, 2010, the Debtors filed with the FCC applications for the consents of the FCC necessary to implement the Plan and related requests for waiver of FCC multiple ownership rules.

There are specific FCC-related ownership restrictions and requirements for equity holders of entities that hold FCC broadcast licenses. Each Holder of an Allowed Claim that is entitled to receive a distribution of New Common Stock pursuant to the Plan will be required to demonstrate to the Debtors' satisfaction that the issuance of New Common Stock to such Holder would not impair the ability of the Reorganized Debtors to comply with FCC-related ownership requirements and restrictions.

THE FOLLOWING SUMMARY OF CERTAIN FCC RULES AND POLICIES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN ADVISORS AS TO FCC OWNERSHIP ISSUES AND OTHER CONSEQUENCES OF THE PLAN.

1.    Required FCC Consents.

Both the Debtors' commencement of the Chapter 11 Cases and their emergence from bankruptcy require the consent of the FCC. The FCC previously granted consent for the assignment of the Debtors' FCC licenses from the Debtors to the Debtors as "debtors-in-possession" under chapter 11 of the Bankruptcy Code. For the Reorganized Debtors to continue the operation of the Debtors' broadcast stations, the Debtors will be required to file applications with the FCC (the "FCC Applications") to obtain prior approval of the FCC for the assignment of the FCC licenses from the Debtors as "debtors-in-possession" to the Reorganized Debtors (the "FCC Approval"). Because consummation of the transactions proposed in the Plan requires FCC Approval, the FCC's favorable action on the Debtors' FCC Applications will affect when and whether those transactions may be consummated.

As part of the FCC Applications, the Debtors will be required to demonstrate compliance with a number of the FCC's rules and policies, including its broadcast multiple and cross-ownership rules and the foreign ownership limitations set forth in Section 310(b) of the Communications Act of 1934, 47 U.S.C. § 151 *et seq.*, as amended (the "Communications Act"). In addition, in order for certain combinations of the existing broadcasting and newspaper assets of the Debtors to continue to be held by Reorganized Tribune under the Plan, waivers of certain FCC broadcast multiple and cross-ownership rules must be obtained. Specifically, the Debtors will need to obtain waivers of the FCC's newspaper/broadcast cross-ownership rule and local television ownership or "duopoly" rule, including a waiver to continue to operate a television station in one market as a "satellite" station. The Debtors will not request any waivers, however, to accommodate separate media interests held by prospective stockholders independent of their interest in the Debtors. Instead, any prospective stockholders that might need independent waivers will receive New Class B Common Stock (or New Warrants) such that waivers are no longer necessary.

2.    Information Required from Prospective Stockholders of Reorganized Tribune.

(a)    Media Ownership Certifications

15

In processing the FCC Applications, the FCC will consider, among other things, whether the prospective licensees and those considered to be "parties" to the applications possess the legal, character, and other qualifications to hold an interest in a broadcast station. The FCC Applications require the Debtors to include information about the Reorganized Debtors and the "parties" to the applications – including certain of the proposed stockholders of the Reorganized Debtors – sufficient for the FCC to grant its consent to the transactions contemplated by the Plan. Prospective stockholders of the Reorganized Debtors, including those under common ownership or control, that would hold or control five percent (5%) or more of the New Class A Common Stock in Reorganized Tribune under the Plan will be parties to the FCC Applications and required to report certain information for FCC regulatory purposes. However, under certain circumstances, the Debtors may allocate such Holders as many shares of New Class B Common Stock as they deem necessary to ensure that the Holder will hold, in the aggregate, less than five percent (5%) of the shares of New Class A Common Stock upon the Effective Date. The New Class B Common Stock will have more limited voting rights than the New Class A Common Stock and has been designed to be non-cognizable (or "non-attributable") for purposes of determining the "parties" to the FCC Applications. Please refer to Article IX.G.2 for a further discussion of the rights of the New Class B Common Stock.

In order to be eligible to receive five percent (5%) or more of the New Class A Common Stock, a Claim Holder will be required to submit a Media Ownership Certification that provides information about the Holder and its affiliates to establish that the issuance of New Class A Common Stock to that Holder would not result in a violation of law, impair the qualifications of the Reorganized Debtors to hold FCC broadcast licenses, or impede the grant of any FCC Applications on behalf of the Reorganized Debtors. In general, the information provided in the Media Ownership Certifications will enable the Debtors to establish that prospective "parties" to the FCC Applications (i) have the requisite "character" qualifications required by the FCC and (ii) do not hold media interests that, together with their prospective interest in the Reorganized Debtors, would create an unlawful media combination under the FCC's rules. Specifically, to be eligible to receive five percent (5%) or more of New Class A Common Stock, each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to the Plan will be required to provide a Media Ownership Certification by the ~~Voting Deadline or such other~~ deadline established by the Bankruptcy Court~~, which may be earlier than the Voting Deadline~~, in accordance with the instructions set forth in the Media Ownership Certification document that may be distributed to any such Holder. Such Holders will also be required to certify to and inform the Debtors of any changes in the information provided in their Media Ownership Certifications between the submission of the certification and the Effective Date by executing an amended Media Ownership Certification. Any such Holder that fails to provide the Media Ownership Certification by the ~~Voting Deadline or such other~~ deadline established by the Bankruptcy Court, or that does not do so to the reasonable satisfaction of the Debtors, may be allocated New Class B Common Stock in lieu of New Class A Common Stock at the Debtors' discretion. Specifically, Reorganized Tribune in its discretion, may issue shares of New Class B Common Stock in lieu of shares of New Class A Common Stock if Reorganized Tribune determines, based on the Holder's Media Ownership Certification (or failure to provide the Media Ownership Certification or otherwise comply with applicable provisions of the Plan), that such Holder may have other media interests that could impair the ability of Reorganized Tribune to comply with the Communications Act or the FCC's rules if such Holder were issued the shares of New Class A Common Stock that it otherwise would be eligible to receive pursuant to the Plan. Except as otherwise provided in the Plan, each Holder of a Claim that is eligible to receive a distribution of New Common Stock will be issued New Class A Common Stock, provided that any such Holder will be entitled to receive all or a portion of its shares of New Common Stock in the form of New Class B Common Stock if such Holder informs the Debtors of its intent to receive such New Class B Common Stock by the date announced by the Debtors in a filing with the Bankruptcy Court and that will be no earlier than the first day of the Confirmation Hearing.

(b)     Foreign Ownership Certifications

The Communications Act generally prohibits alien (non-U.S.) persons or entities from having direct or indirect ownership or voting rights in the aggregate of more than twenty-five percent (25%) in a corporation that

16

controls the licensee of a broadcast television or radio station. To ensure that Reorganized Tribune complies with this limitation, all prospective stockholders of the Reorganized Debtors (except the Holders of Senior Noteholder Claims), whether or not they will be "parties" to the FCC Applications, will be required to execute and submit a Foreign Ownership Certification that provides information about the extent of their direct and indirect ownership or control by non-U.S. persons or entities.

Each Holder of a Claim, with the exception of Senior Noteholder Claims, that is eligible to receive a distribution of New Common Stock pursuant to the Plan will be required (i) to provide the Foreign Ownership Certification by the deadline established by the Bankruptcy Court and (ii) to report any changes in foreign ownership percentages between the submission of the Foreign Ownership Certification and the Effective Date or such other deadline established by the Bankruptcy Court by providing an amended Foreign Ownership Certification and, upon request of the Debtors, confirm the absence of any changes. Any such Holder, other than a Holder of a Senior Noteholder Claim, that fails to provide the Foreign Ownership Certification by the deadline established by the Bankruptcy Court, that fails to provide an amended Foreign Ownership Certification if one is required, that does not provide a Foreign Ownership Certification that is reasonably satisfactory to the Debtors or that fails to provide a timely confirmation, if required, that its foreign ownership and voting rights percentages have not changed may be deemed to be an entity that is foreign-owned and controlled for purposes of determining the allocation of New Common Stock and New Warrants.

Each Holder of a Senior Noteholder Claim that is eligible to receive a distribution of New Common Stock pursuant to the Plan will have the option to submit a Foreign Ownership Certification and to tender its Senior Notes by the deadline established by the Bankruptcy Court. Any Holder of a Senior Noteholder Claim that does not submit a reasonably satisfactory Foreign Ownership Certification and tender its Senior Notes by such deadline will be deemed to be an entity that is foreign-owned and controlled for purposes of determining the allocation of New Common Stock and New Warrants.

Any Holder of a Claim that is eligible to receive New Common Stock under the Plan that, based on the Holder's Foreign Ownership Certification (or failure to provide the Foreign Ownership Certification or otherwise comply with the applicable provisions of the Plan), is or is deemed pursuant to the applicable provisions of the Plan to be, more than twenty-five percent (25%) foreign owned or controlled, on either a voting or an equity basis, as determined pursuant to section 310(b) of the Communications Act, shall receive New Warrants, New Common Stock, or a combination of New Warrants and New Common Stock based on an allocation mechanism that is to be determined. The allocation mechanism shall ensure, based on the aggregated results of the Foreign Ownership Certifications, the compliance of Reorganized Tribune with section 310(b) of the Communications Act.

**HOLDERS OF CLAIMS ELIGIBLE TO RECEIVE NEW COMMON STOCK UNDER THE PLAN THAT ARE REQUIRED TO EXECUTE MEDIA OWNERSHIP CERTIFICATIONS MUST COMPLETE AND RETURN A MEDIA OWNERSHIP CERTIFICATION PRIOR TO THE ~~VOTING~~ DEADLINE ~~OR SUCH OTHER DATE AS MAY BE SET~~ESTABLISHED BY THE BANKRUPTCY COURT~~, WHICH MAY BE EARLIER THAN THE VOTING DEADLINE,~~ AND TO SUPPLEMENT SUCH CERTIFICATIONS AS AND WHEN REQUIRED. EXCEPT FOR THE SENIOR NOTEHOLDERS, ALL HOLDERS OF CLAIMS ELIGIBLE TO RECEIVE NEW COMMON STOCK UNDER THE PLAN MUST COMPLETE AND RETURN A FOREIGN OWNERSHIP CERTIFICATION BY THE ~~VOTING~~ DEADLINE ~~OR SUCH OTHER DATE THAT MAY BE SET~~ESTABLISHED BY THE BANKRUPTCY COURT AND SUPPLEMENT SUCH CERTIFICATIONS AS AND WHEN REQUIRED. ANY HOLDER OF A SENIOR NOTEHOLDER CLAIM ELIGIBLE TO RECEIVE NEW COMMON STOCK UNDER THE PLAN WILL HAVE THE OPTION TO RETURN A FOREIGN OWNERSHIP CERTIFICATION AND TENDER ITS SENIOR NOTES BY THE DEADLINE ESTABLISHED BY THE BANKRUPTCY COURT. ALL SUCH HOLDERS ARE ENCOURAGED TO CONSULT THEIR OWN ADVISORS CONCERNING THE**

**COMPLETION OF THE MEDIA OWNERSHIP CERTIFICATION AND FOREIGN OWNERSHIP CERTIFICATION AND THEIR TREATMENT UNDER THE PLAN.**

### III. GENERAL INFORMATION

A.    **The Debtors' Businesses and Properties.**

      1.    Company Overview.

      Tribune is a leading media and entertainment company reaching more than eighty percent (80%) of households in the United States through its newspapers, other publications and websites, its television and radio stations, its "Superstation" WGN America, and its other news and entertainment offerings.  Tribune was founded in 1847 and incorporated in Illinois in 1861.  In 1968, as a result of a corporate restructuring, Tribune became a holding company incorporated in Delaware.  In 1983, after 136 years of private ownership, Tribune became a public company.  Throughout the 1980s and 1990s, Tribune grew rapidly through a series of acquisitions.  In 2000, Tribune acquired The Times Mirror Company ("Times Mirror").

      Tribune returned to private ownership in 2007 when its board of directors, based on the recommendation of a special committee of the board comprised entirely of independent directors, approved a series of transactions (collectively, the "Leveraged ESOP Transactions") with a newly formed Tribune employee stock ownership plan (the "ESOP"), EGI-TRB, LLC (the "Zell Entity"), a Delaware limited liability company wholly-owned by Sam Investment Trust (a trust established for the benefit of Samuel Zell and his family), and Samuel Zell.  On December 20, 2007, Tribune completed the Leveraged ESOP Transactions, culminating with the cancellation of all issued and outstanding shares of Tribune's common stock as of that date, other than shares held by the ESOP, and with Tribune becoming wholly-owned by the ESOP.

      Tribune directly or indirectly owns all (or substantially all) of the equity in 128 subsidiaries (Tribune and its subsidiaries collectively, the "Tribune Entities"), of which 110 are Debtors.  Tribune and certain of its subsidiaries also have equity interests, which are generally minority interests, in various businesses in which one or more third-parties are also holders of equity interests.  These particular businesses are not Debtors as of the date of this Disclosure Statement.  A corporate organizational chart detailing the ownership structure for Tribune and its majority and wholly-owned subsidiaries as of the date of this Disclosure Statement is attached as Exhibit C to this Disclosure Statement.

      On March 13, 2008, Tribune filed an election to be treated as a subchapter S corporation under the Internal Revenue Code of 1986, as amended (the "IRC"), which election became effective as of the beginning of Tribune's 2008 fiscal year.  Tribune also elected to treat nearly all of its subsidiaries as qualified subchapter S subsidiaries.  Subject to certain limitations, Tribune and its qualified subchapter S subsidiaries are not currently subject to corporate level federal income tax.  Instead, the income of Tribune and such subsidiaries is required to be reported by its stockholders.  As of the date of this Disclosure Statement, the ESOP was the sole stockholder of Tribune and is not taxed on the income that is passed through to it because the ESOP is an employee benefit plan that qualifies for favorable tax treatment under Section 401(a) of the IRC.  Although most states in which Tribune and its subsidiaries operate recognize the subchapter S corporation status, some impose taxes at a reduced rate.

      2.    The Debtors' Properties.

The corporate headquarters of the Tribune Entities is located at 435 North Michigan Avenue, Chicago, Illinois 60611. The Tribune Entities own an aggregate of approximately 7,710,000 square feet of office, production and other space in approximately 54 locations. The Tribune Entities also lease parking lots, offices, and other space which aggregate to approximately 3,567,748 square feet in approximately 166 separate locations and also lease or own towers and transmitter space in approximately 84 locations.

**B.     Operations of the Debtors.**

The Tribune Entities' primary sources of revenue are from (i) the sale of advertising in newspapers and other publications and on websites owned by or affiliated with the Tribune Entities, (ii) the distribution of preprinted insert advertisements, (iii) the sale of newspapers and other publications to distributors and individual subscribers, (iv) the provision of commercial printing and delivery services to third- parties, primarily other newspaper companies, (v) the sale of entertainment listings data and syndicated content, (vi) the sale of advertising on the Tribune Entities' television and radio stations, and on its "Superstation" WGN America, and (vii) the distribution of WGN America through cable, satellite, and other similar distribution methods. The Tribune Entities' operations are divided into two primary industry segments: (a) publishing (the "Publishing Segment") and (b) broadcasting (the "Broadcasting Segment").[11] These segments operate almost completely in the United States.[12]

1.     Publishing Segment.

The Publishing Segment, which accounted for seventy percent (70%) of the Tribune Entities' consolidated revenues in 2009, currently operates eight major-market daily newspapers, distributes preprinted insert advertisements, provides commercial printing and delivery services to third- parties, and distributes entertainment listings and syndicated content through its Tribune Media Services business unit. The daily newspapers published by the Tribune Entities, which have collectively garnered 84 Pulitzer Prizes, include the following market leading papers: the *Los Angeles Times*, the *Chicago Tribune*, *The Baltimore Sun*, the *Orlando Sentinel*, the *South Florida Sun Sentinel*, the *Hartford Courant*, *The Morning Call*, and the *Daily Press*.

The Tribune Entities' newspapers collectively have paid circulation of approximately 2 million copies daily and 3.1 million copies on Sundays. In addition, the Tribune Entities publish over 100 "niche" publications that target various geographic, ethnographic and demographic audiences and include the upscale *Chicago Magazine*, the Spanish language newspaper *Hoy*, which is published in Chicago and Los Angeles, and Chicago's *RedEye*, which targets a younger demographic.

The table below sets forth information concerning the Tribune Entities' average paid circulation for the six months ended September 2009, as reported to the Audit Bureau of Circulations, for its daily newspapers (in thousands). Average daily circulation is based on a five-day (Monday-Friday) average.

|  | **Daily** | **Sunday** |
|---|---|---|
| *Los Angeles Times* | 657 | 984 |
| *Chicago Tribune* | 466 | 803 |
| *The Baltimore Sun* | 187 | 322 |
| *Orlando Sentinel* | 181 | 281 |
| *South Florida Sun Sentinel* | 154 | 239 |
| *Hartford Courant* | 144 | 210 |
| *Allentown Morning Call* | 101 | 124 |

---

[11] Certain administrative activities are not included in either segment and are instead considered as general corporate operations.

[12] These segments also reflect the way the Tribune Entities sell their products to the marketplace, manage operations, and make business decisions.

19

| | | |
|---|---|---|
| *Daily Press* (Newport News, VA) | 66 | 91 |
| **Total Net Paid Circulation** | **1,956** | **3,054** |

The Publishing Segment also manages the websites of the Tribune Entities' daily newspapers, television stations, and other branded products that target specific areas of interest.  In 2009, those websites collectively averaged 49 million monthly unique visitors and over 510 million monthly page views.  The Publishing Segment employed approximately 10,300 full-time equivalent employees in the fourth quarter of 2009.  The primary businesses of the Publishing Segment are described below.

      (a)      Los Angeles Times Media Group

The Los Angeles Times Media Group is a leading provider of news and information in the Los Angeles metropolitan area.  Its operations are principally comprised of the publication of the *Los Angeles Times* and its related businesses.  The *Los Angeles Times* has been published continuously since 1881.  The newspaper has won 39 Pulitzer Prizes and is the largest daily metropolitan newspaper in the United States in circulation.  The Los Angeles market ranks second in the nation in terms of population.  In its primary circulation areas of Los Angeles, Orange, Ventura, San Bernardino and Riverside Counties, the *Los Angeles Times* competes for advertising and circulation with 18 local daily newspapers and three national newspapers, with its largest local competitor having almost 243,000 in average daily circulation.  The *Los Angeles Times* ranks fourth in the United States for average daily paid circulation and second on Sundays for paid circulation.  Approximately seventy-eight percent (78%) and eighty-two percent (82%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2009, with the remainder primarily sold at newsstands and vending boxes.

The *Los Angeles Times* publishes two daily editions: the East edition and the West edition.  Additional daily and semi-weekly community newspapers are either inserted into the paper in selected geographic areas or distributed to homes and through vending boxes to provide targeted local news coverage.  The Los Angeles Times Media Group operates latimes.com, an online expanded version of the newspaper, providing local, national and international news along with features reporting, findlocal.latimes.com, covering entertainment, reviews and things to do in Southern California, and theenvelope.com, a comprehensive year-round entertainment awards website.  In 2009, the Los Angeles Times Media Group's digital media reached an average of almost 9 million monthly unique visitors and averaged over 135 million monthly page views.  The Los Angeles Times Media Group also operates several targeted publications and their related websites, including (i) the free Spanish language newspaper, *Hoy*, which provides local, national and international news and features of interest to the largest Hispanic market in the United States and (ii) *Brand X*, which focuses on lifestyle and entertainment features.  In addition, the Los Angeles Times Media Group's production facility prints the local edition of *The Wall Street Journal*, and its outside carriers deliver the *Orange County Register*, *The Wall Street Journal*, *The New York Times* and numerous other local publications.

      (b)      Chicago Tribune Media Group

The Chicago Tribune Media Group is a leading provider of news and information in Chicagoland.  Its operations are principally comprised of the publication of the *Chicago Tribune* and its related businesses.  Founded in 1847, the *Chicago Tribune* has won 25 Pulitzer Prizes and its print and online coverage attracts the largest news-seeking audience in the Midwest.  The Chicago market ranks third in the nation in terms of population.  The *Chicago Tribune* ranks eighth in the United States for average daily paid circulation and fourth on Sunday for paid circulation.  Approximately eighty-seven percent (87%) and seventy-eight percent (78%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2009, with the remainder primarily sold at newsstands and vending boxes.

The Chicago Tribune Media Group is a multi-product, multi-channel news and information source.  The Chicago Tribune Media Group operates chicagotribune.com, the web edition of the newspaper, and ChicagoNow.com, a local blog network.  In 2009, the Chicago Tribune Media Group's digital media reached an

average of 4.5 million monthly unique visitors and averaged over 102 million monthly page views. The Chicago Tribune Media Group also operates several targeted publications, including (i) *RedEye*, a free daily publication targeting young, urban commuters; (ii) *Hoy*, a free Spanish language newspaper; (iii) *Chicago Magazine*, an upscale monthly paid magazine; (iv) *TheMash*, a weekly newspaper for high school students; and (v) *Triblocal*, the largest community-driven weekly newspaper in Chicagoland. Additionally, the Chicago Tribune Media Group provides an integrated and comprehensive direct mail service and is the leading distributor of third-party print publications in the Chicagoland area. Its production facility prints the local edition of *The Wall Street Journal* and *The New York Times*, and its outside carriers deliver the *Chicago Sun-Times*, *The Wall Street Journal*, and *The New York Times* along with other national and local publications.

(c)    Baltimore Sun Media Group

The Baltimore Sun Media Group publishes *The Baltimore Sun*, Maryland's largest newspaper, which has won 15 Pulitzer Prizes since it began publishing a daily newspaper in 1837. The Baltimore market ranks 20th in the nation in terms of population. It competes with other Maryland and Washington, D.C. based daily and weekly newspapers as well as regional editions of national daily newspapers. Approximately eighty-one percent (81%) and sixty-eight percent (68%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2009, with the remainder primarily sold at newsstands and vending boxes.

The Baltimore Sun Media Group's operations also include 18 community newspapers, the largest of which are *The Howard County Times, The Columbia Flier*, *The Towson Times* and *The Aegis*, along with *b*, a free daily publication targeting young adults, six magazines, and eight directories. The Baltimore Sun Media Group also operates the market-leading website, baltimoresun.com, along with numerous niche online properties. In 2009, the Baltimore Sun Media Group's digital media reached an average of more than 1.7 million monthly unique visitors and averaged over 36 million monthly page views. It also has a custom media division that works with local companies to produce more than 40 specialized publications.

In addition, The Baltimore Sun Media Group prints the full circulation of the *Washington Times*, and also has printing contracts with the *New York Daily News* and *The Korea Daily*. The Baltimore Sun Media Group has distribution and delivery agreements with 33 publications including *The Washington Post*, *USA Today*, the *New York Post*, and *The Wall Street Journal*.

(d)    Florida Media Group

The Florida Media Group is a leading provider of news and information in Southern and Central Florida. Its operations are principally compromised of the publication of the *South Florida Sun Sentinel*, the *Orlando Sentinel*, and their related businesses. The Tribune Entities' Florida properties share significant resources in the areas of advertising sales, editorial coverage, and back office administration and have implemented significant regionalization and integration strategies.

The *Orlando Sentinel* primarily serves a six-county area in Central Florida. The newspaper is the only major daily newspaper in the Orlando market, although it competes with other Florida and national newspapers, as well as with other media. The *Orlando Sentinel* has been published since 1876 and has won three Pulitzer Prizes. The Orlando market ranks 26th in the nation in terms of population. Approximately eighty-six percent (86%) and eighty-one percent (81%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2009, with the remainder primarily sold at newsstands and vending boxes.

To serve the Central Florida market, the Florida Media Group also operates (i) orlandosentinel.com, a breaking news and information website; (ii) *Sentinel Express*, a free weekly publication used to distribute advertising and content to newspaper non-subscribers in Central Florida; (iii) *el Sentinel*, a weekly Spanish language newspaper, and its companion website, elsentinel.com; and (iv) *Everything Orlando*, a free niche product, and its companion website Everythingorlando.com. In 2009, the *Orlando Sentinel's* digital media

reached an average of over 1.8 million monthly unique visitors and averaged over 43 million monthly page views. The Florida Media Group offers direct marketing and direct mail services through Tribune Direct/Orlando in addition to printing and distribution services for other publications.

The *South Florida Sun Sentinel* is the major daily newspaper serving the Broward/Palm Beach County market. The Miami/Fort Lauderdale/Miami Beach metropolitan area, which includes Broward and Palm Beach counties, ranks seventh in the nation in terms of population. Approximately eighty percent (80%) and seventy-five percent (75%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2009, with the remainder primarily sold at newsstands and vending boxes.

The Florida Media Group also serves the news and information needs of South Florida through (i) sunsentinel.com, a breaking news and information website; (ii) *el Sentinel*, a weekly Spanish language newspaper; (iii) *Teenlink*, a weekly newspaper distributed in Broward County high schools; (iv) several weekly community newspapers; and (v) other niche publications. In 2009, the *South Florida Sun Sentinel's* digital media reached an average of 1.3 million monthly unique visitors and averaged over 43 million monthly page views.

Other publications produced by the Florida Media Group in South Florida include: *City & Shore*, a bimonthly lifestyle magazine; *City Link*, an alternative weekly newspaper; *Home Source*, a comprehensive monthly guide to South Florida real estate and home improvement; *Jewish Journal*, a collection of weekly newspapers serving South Florida's Jewish community; and *South Florida Parenting*, a monthly magazine providing parenting information and resources for local families. The *South Florida Sun Sentinel* currently prints and transports all of the *Palm Beach Post's* circulation and its outside carriers deliver approximately eighty percent (80%) of the *Palm Beach Post's* single copy and approximately thirty percent (30%) of their home delivery copies. The *South Florida Sun Sentinel* also has printing contracts with *The New York Times* and *USA Today* for their daily papers and has distribution agreements with major dailies such as the *Miami Herald*, *The Wall Street Journal*, *USA Today*, *The New York Times*, and several other daily publications.

      (e)    CT1 Media

CT1 Media is a leading provider of news, information and entertainment in Connecticut. Its operations are principally comprised of the publication of the *Hartford Courant* and its related businesses. The *Hartford Courant*, founded in 1764, is the oldest continuously published newspaper in the United States. It is the most widely circulated and read newspaper in Connecticut. Winner of two Pulitzer Prizes and twice named among the best-designed newspapers in the world, the *Hartford Courant* serves the state's northern and central regions. The *Hartford Courant's* primary market is the Hartford market, which ranks 45th in the nation in terms of population and includes Hartford, Tolland and Middlesex counties. Approximately ninety percent (90%) and seventy-eight percent (78%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2009, with the remainder primarily sold at newsstands and vending boxes. CT1 Media also operates courant.com, Connecticut's leading online news site, publishes three weekly alternative newspapers in Connecticut and operates a shared-mail company that distributes advertising supplements to more than one million households in Connecticut and Massachusetts. In 2009, the *Hartford Courant's* digital media reached an average of almost 900 thousand monthly unique visitors and averaged over 21 million monthly page views.

      (f)    *The Morning Call*

*The Morning Call*, published since 1895, is the major regional newspaper for nine counties in eastern Pennsylvania and one county in western New Jersey. Its primary market, the Allentown-Bethlehem-Easton metropolitan area, is the 62nd largest market in the nation in terms of population. Approximately seventy-nine percent (79%) of the paper's daily and Sunday circulation was home delivered in 2009, with the remainder primarily sold at newsstands and vending boxes and to schools. *The Morning Call* also offers full service direct marketing and saturation preprint delivery through non-subscriber distribution and owns and operates the

premier regional website, themorningcall.com.  In 2009, *The Morning Call's* digital media reached an average of over 440,000 monthly unique visitors and averaged nearly 14 million page views.

      (g)    *Daily Press*

      Founded in 1896, the *Daily Press* serves the Virginia Peninsula market, which includes Newport News, Hampton, Williamsburg and eight other cities and counties.  This market, together with Norfolk, Portsmouth, Virginia Beach and Chesapeake, is known as Virginia's Hampton Roads region and is the 35th largest market in the nation in terms of population.  The *Daily Press* is the only major daily newspaper in its primary market, although it competes with other regional and national newspapers, as well as with other media.  Approximately eighty-nine percent (89%) and eighty-four percent (84%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2009, with the remainder primarily sold at newsstands and vending boxes.  The *Daily Press* also publishes *The Virginia Gazette*, a semi-weekly publication which primarily serves Williamsburg, Virginia, and the surrounding counties, the weekly *Tidewater Review*, published for the greater West Point, Virginia community, and several special interest publications.  The *Daily Press* also distributes news, advertising and other information through various multimedia channels, including its online affiliates dailypress.com, hrtownsquare.com, hrvarsity.com and hrmilitary.com.  In 2009, the *Daily Press'* digital media reached an average of over 360,000 monthly unique visitors and averaged over nine million monthly page views.

      (h)    Tribune Media Services

      Tribune Media Services ("TMS") is a leading provider of information and entertainment products for print, electronic and on-air media.  Through its Entertainment Products division, TMS distributes television and movie listings and related editorial content under the TMS and Zap2it brands.  This division also publishes monthly television listings magazines and offers direct marketing services for cable and satellite operators.  TMS's News & Features division (i) syndicates comics, editorial cartoons, feature articles, opinion columns, games and puzzles; (ii) creates and distributes a variety of online information products; and (iii) licenses editorial content from national periodicals.  TMS also markets news, features, information graphics and multimedia content to media clients around the world through McClatchy-Tribune Information Services.  In 2009, TMS's Zap2it.com web site reached an average of 3.3 million monthly unique visitors and averaged over 33 million monthly page views.

      2.     Broadcasting Segment.

      The Broadcasting Segment, which accounted for thirty percent (30%) of the Tribune Entities' consolidated operating revenues in 2009, includes 23 television stations in 19 markets, of which seven stations are in the top ten markets in the United States.  The Tribune Entities also own and operate the "Superstation" WGN America, which is seen in over 71 million homes, the Chicago radio station WGN-AM, which first went on the air in 1924, and CLTV, Chicago's first and only 24-hour cable news channel.  Through its television stations and WGN America, the Broadcasting Segment reaches more than eighty percent (80%) of television households in the United States.  The Broadcasting Segment employed approximately 2,750 full-time equivalent employees in the fourth quarter of 2009.

      Thirteen of the Tribune Entities' television stations are affiliates of The CW Network.  These stations are located in New York, Los Angeles, Chicago, Dallas, Washington, D.C., Houston, Miami, Denver, St. Louis, Portland, Indianapolis, Hartford and New Orleans.  The Tribune Entities also have seven television stations affiliated with the FOX Network.  These stations are located in Seattle, Sacramento, Indianapolis, Hartford, San Diego, Grand Rapids and Harrisburg.  In addition, the Tribune Entities have an ABC Network television station affiliate in New Orleans and two independent stations in Philadelphia and Seattle.

Prior to the consummation of the transactions involving the Chicago Cubs' business, the Broadcasting Segment included Tribune's subsidiaries that operated the Chicago Cubs' business and held a twenty-five percent (25%) equity interest in regional sports network Comcast SportsNet Chicago, LLC. As discussed in Article V.H of this Disclosure Statement, in October 2009, the Tribune Entities contributed their interest in the Chicago Cubs' business and their twenty-five percent (25%) equity interest in Comcast SportsNet Chicago to Chicago Baseball Holdings, LLC. Results discussed herein for 2009 exclude results relating to the Chicago Cubs' business.

      (a)     Television

The programming on the Tribune Entities' television stations consists of network-provided shows, syndicated series, news, local and regional sports coverage, feature films, and children's programs. These stations acquire most of their programming from outside sources, including The CW Network, the FOX Network, the ABC Network and major studios such as Warner Bros. A portion of the programming, including news and sports programming, is produced locally. Select information regarding the Tribune Entities' television stations is shown in the following summary table.

| | National Market Rank | % of U.S. Households | Channel | Major Over the Air Affiliation | Expiration of FCC License | Year Acquired |
|---|---|---|---|---|---|---|
| WPIX —New York, NY | 1 | 6.5 | 11 | CW | 2015 | 1948 |
| KTLA—Los Angeles, CA | 2 | 4.9 | 5 | CW | 2014 | 1985 |
| WGN—Chicago, IL | 3 | 3.0 | 9 | CW | 2013 | 1948 |
| WPHL—Philadelphia, PA | 4 | 2.6 | 17 | IND | 2015 | 1992 |
| KDAF—Dallas, TX | 5 | 2.2 | 33 | CW | 2014 | 1997 |
| WDCW—Washington, D.C. | 9 | 2.0 | 50 | CW | 2012 | 1999 |
| KIAH—Houston, TX | 10 | 1.8 | 39 | CW | 2014 | 1996 |
| KCPQ—Seattle, WA | 13 | 1.6 | 13 | FOX | 2015 | 1999 |
| KMYQ—Seattle, WA | 13 | 1.6 | 22 | IND | 2015 | 1998 |
| KWGN—Denver, CO* | 16 | 1.3 | 2 | CW | 2014 | 1966 |
| WSFL—Miami, FL | 17 | 1.4 | 39 | CW | 2013 | 1997 |
| KTXL—Sacramento, CA | 20 | 1.2 | 40 | FOX | 2014 | 1997 |
| KPLR—St. Louis, MO* | 21 | 1.1 | 11 | CW | 2014 | 2003 |
| KRCW—Portland, OR | 22 | 1.0 | 32 | CW | 2015 | 2003 |
| WTTV—Indianapolis, IN** | 25 | 1.0 | 4 | CW | 2013 | 2002 |
| WXIN—Indianapolis, IN | 25 | 1.0 | 59 | FOX | 2013 | 1997 |
| KSWB—San Diego, CA | 28 | 0.9 | 69 | FOX | 2014 | 1996 |
| WTIC—Hartford, CT | 30 | 0.9 | 61 | FOX | 2015 | 1997 |
| WTXX—Hartford, CT | 30 | 0.9 | 20 | CW | 2015 | 2001 |
| WPMT—Harrisburg, PA | 39 | 0.6 | 43 | FOX | 2015 | 1997 |
| WXMI—Grand Rapids, MI | 41 | 0.6 | 17 | FOX | 2013 | 1998 |
| WGNO—New Orleans, LA | 51 | 0.6 | 26 | ABC | 2013 | 1983 |
| WNOL—New Orleans, LA | 51 | 0.6 | 38 | CW | 2013 | 2000 |

*This television station is party to a local marketing agreement with the FOX Network television station affiliate in the market owned by Local TV, LLC.
** WTTK (also in the Indianapolis market) is owned and operated as a satellite station, with a license expiration date in 2013.

In 2009, television contributed ninety-seven percent (97%) of the Broadcasting Segment's operating revenues. Approximately eighty-one percent (81%) of these revenues were derived from advertising. The Tribune Entities' television stations compete for audience and advertising with other television and radio stations, cable television and other media serving the same markets. Competition for audience and advertising is based upon various interrelated factors including programming content, audience acceptance and price.

The television group also includes WGN America, a broad entertainment network distributed in over 71 million homes across America by cable, satellite, and telcos. Its programming emphasis is entertainment and consists of first-run programs, syndicated sit-coms, blockbuster movies, cable exclusives, and live sports.

      (b)     Radio/Other

WGN-AM, Chicago, is a news and talk radio station.  It operates on frequency 720-AM and is the flagship station of the Chicago Cubs (MLB) radio network and the Chicago Blackhawks (NHL) and also airs Northwestern University (NCAA) Men's basketball and football games.  WGN-AM is the only radio station owned by the Tribune Entities.  In 2009, radio/other operations contributed three percent (3%) of the Broadcasting Segment's operating revenues.

      3.     Additional Investments.

Various Tribune Entities (including non-Debtors) have investments (typically minority equity interests) in private corporations, limited liability companies and partnerships that are not Debtors in these Chapter 11 Cases.  The Tribune Entities' significant investments are as follows:

| Investment | Description | Tribune Entities' Ownership | Partners[12] |
|---|---|---|---|
| Television Food Network | Lifestyle cable network and website with a focus on food and entertaining | 31.3% | Scripps Networks Interactive Inc. |
| CareerBuilder | Online recruitment company that connects job seekers and employers | 30.8% | Gannett Co., Inc.<br>The McClatchy Company<br>Microsoft Corporation |
| Classified Ventures | A network of automotive and real estate classified advertising websites, including cars.com, apartments.com and homegain.com | 27.8% | The McClatchy Company<br>Gannett Co., Inc.<br>The Washington Post Company<br>A.H. Belo Corporation |
| Homefinder | An online real estate company that connects home buyers, sellers and real estate professionals | 33.3% | The McClatchy Company<br>Gannett Co., Inc. |
| Topix | Provider of news and community information on the web, connecting people to the information and discussions that matter to them in every U.S. town and city | 33.7% | Gannett Co., Inc.<br>The McClatchy Company<br>Former and Current Management |
| quadrantONE | National premium advertising network of websites of the leading media companies in the U.S. | 25.0% | The New York Times Company<br>Hearst Corporation<br>Gannett Co., Inc. |
| Legacy.com | Provider of online obituaries | 49.1% | Individual Investors |
| Metromix | National network of local entertainment websites | 48.9% | Gannett Co., Inc. |
| Newsday Holdings LLC | Parent company of the entity that owns and operates *Newsday*, the leading daily newspaper in Long Island, and its related websites and other media properties | 2.8% | Cablevision Systems Corp. |
| Chicago Baseball Holdings, LLC | Owns and operates the Chicago Cubs Major League Baseball franchise and related businesses | 5.0% | Ricketts Acquisition LLC |

---

[12] As used in this summary table, the term "Partners" refers to the parent company of each partner or in the case of an LLC, the parent company of each member.  Actual legal partners, or, in the case of LLCs, members, may be affiliates of such parent companies.

## C.    Recent Operations.

The Tribune Entities' consolidated operating results for the fiscal years ended December 27, 2009 and December 28, 2008 are shown in the table below.[14]

| TRIBUNE ENTITIES CONSOLIDATED STATEMENTS OF OPERATIONS ($ in millions) | | |
|---|---|---|
| | **Year Ended** | |
| | **Dec. 27, 2009** | **Dec. 28, 2008** |
| **Revenues** | | |
| Publishing | $    2,243.2 | $    2,765.3 |
| Broadcasting | 939.4 | 1,165.0 |
| **Total Revenues** | $    3,182.6 | $    3,930.3 |
| | | |
| **Cash Operating Expenses** | | |
| Publishing | $    1,915.8 | $    2,303.2 |
| Broadcasting | 713.3 | 804.3 |
| Corporate | 60.0 | 36.7 |
| **Total Cash Operating Expenses** | $    2,689.0 | $    3,144.2 |
| | | |
| **Operating Cash Flow** | | |
| Publishing | $    327.4 | $    462.1 |
| Broadcasting | 226.2 | 360.6 |
| Corporate | (60.0) | (36.7) |
| **Total Operating Cash Flow** | $    493.6 | $    786.1 |
| | | |
| **Income on Equity Investments, Net** | $    123.0 | $    85.0 |

At the end of 2009, the Tribune Entities' cash balance was approximately $1.5 billion, up from approximately $600 million at the end of 2008. The increase in cash reflects $701 million in proceeds from the Chicago Cubs transaction received in the fourth quarter of 2009 and net cash flow generated from operations.

During 2009, core operations produced approximately $596 million of cash. In addition, the Company received approximately $40 million from the operations of the Chicago Cubs and Comcast SportsNet and $89 million from TV Food Network in 2009. Offsetting these cash inflows was $112 million of capital

---

[14] The Tribune Entities' results of operations are preliminary and unaudited and exclude discontinued operations (Chicago Cubs group and Newsday) and Comcast SportsNet Chicago. The Debtors use cash operating expenses and operating cash flow to evaluate internal performance. "Cash operating expenses" are defined as operating expenses before depreciation and amortization, write-downs of intangible assets and properties, stock-based compensation, ESOP expense, certain special items (including severance), non-operating items, and reorganization items. "Operating cash flow" is defined as earnings before interest income, interest expense, equity income and losses, depreciation and amortization, write-downs of intangible assets and properties, stock-based compensation, ESOP expense, certain special items (including severance), non-operating items, and reorganization items. Cash operating expenses and operating cash flow are not measures of financial performance under Generally Accepted Accounting Principles ("GAAP") and should not be considered as a substitute for measures of financial performance prepared in accordance with GAAP.

expenditures, $91 million of capital gains and other tax payments, $225 million of repayments of the Tribune Entities' DIP Facility, $14 million to collateralize the Tribune Entities' letters of credit and $96 million of reorganization costs.

**D.        Current Management of the Debtors.**

    1.        Board of Directors.

        In accordance with the Amended and Restated Bylaws of Tribune, the board of directors of Tribune (the "Board of Directors") currently consists of ten directors. Set forth below are the directors of Tribune, as of the date of the filing of this Disclosure Statement.[15]

| Name | Title |
| --- | --- |
| Samuel Zell | Chairman |
| Jeffrey S. Berg | Board Member |
| Brian L. Greenspun | Board Member |
| Betsy D. Holden | Board Member |
| Randy Michaels | Board Member[16] |
| William A. Osborn | Board Member |
| William C. Pate | Board Member |
| Mark Shapiro | Board Member |
| Mary Agnes Wilderotter | Board Member |
| Frank E. Wood | Board Member |

    2.        Subcommittees of the Board of Directors.

        The Board of Directors has a standing audit committee (the "Audit Committee") whose function includes reviewing and monitoring Tribune's financial reporting and accounting practices and internal controls. Betsy D. Holden, William A. Osborn (chair) and Frank E. Wood currently serve on the Audit Committee.

        The Board of Directors also has a standing compensation committee (the "Compensation Committee"), which has the responsibility to review annually and approve corporate goals and objectives relevant to the compensation of Tribune's principal executive officer, to evaluate Tribune's principal executive officer's performance in light of those goals and objectives and, based on that evaluation, to determine and approve the principal executive officer's compensation level. The Compensation Committee also has the responsibility to review annually with the principal executive officer and approve the compensation for the other senior executive officers, including the three most highly-compensated executive officers other than the principal executive officer and principal financial officer. Furthermore, the Compensation Committee has the responsibility to review and approve incentive and other compensation plans, if any, covering certain other management employees of the Debtors. The current members of the Compensation Committee are Brian L. Greenspun, William C. Pate, and Mary Agnes Wilderotter (chair).

    3.        Compensation of Directors.

        Directors who are employees of the Tribune Entities receive no additional compensation for service as a director. In 2010, the non-employee directors will receive cash compensation in the form of a $125,000 retainer and will be reimbursed for actual out-of-pocket expenses incurred in attending meetings. In addition,

---

[15] This Disclosure Statement contains only information pertaining to Tribune's Board of Directors, which information does not apply in the case of each of Tribune's subsidiaries.

[16] Randy Michaels is also President and Chief Executive Officer of Tribune.

the chair of the Audit Committee will be paid an additional $15,000 cash retainer and each member of the Audit Committee, including the chair, will be paid an additional $6,000 cash retainer.

    4.    Executive Officers.

Set forth below are the members of the executive management team of the Tribune Entities as of the date of this Disclosure Statement and each member's position.

| Name | Position |
| --- | --- |
| Randy Michaels | President and Chief Executive Officer, Tribune |
| Gerald A. Spector | Chief Operating Officer, Tribune |
| ~~Ed Wilson~~ | ~~Chief Revenue Officer and Chief Sales Officer, Tribune; President, Tribune Broadcasting~~ |
| Jerry Kersting | ~~Executive Vice~~ President~~, Tribune;~~ ~~Chief Operating Officer,~~ Tribune Broadcasting |
| Marc Chase | President, Tribune Interactive |
| Nils Larsen | Executive Vice President and Chief Investment Officer, Tribune |
| Donald J. Liebentritt | Executive Vice President and Chief Legal Officer, Tribune |
| Chandler Bigelow III | ~~Senior~~Executive Vice President and Chief Financial Officer, Tribune |

## IV. SUMMARY OF CERTAIN PREPETITION LIABILITIES

**A.**      **Prepetition Funded Debt and Capital Structure of the Tribune Entities.**

    1.    Prepetition Capital Structure.

As mentioned in Article III.A and further discussed in Article VII of this Disclosure Statement, Tribune returned to private ownership in 2007.[17] On April 1, 2007, Tribune entered into an Agreement and Plan of Merger (the "Merger Agreement") with GreatBanc Trust Company,[18] the Zell Entity,[19] and Tesop Corporation, a Delaware corporation wholly-owned by the ESOP (the "Merger Sub"). The Merger Agreement provided for a series of transactions that, if various conditions were satisfied, would ultimately culminate in the Merger Sub merging with and into Tribune, and following such merger, for Tribune to continue as the surviving corporation wholly-owned by the ESOP (the "Merger"). On April 1, 2007, pursuant to the terms of that certain ESOP Purchase Agreement, dated as of April 1, 2007, by and between Tribune and GreatBanc Trust Company, the ESOP purchased 8,928,571 shares of Tribune's common stock from Tribune at a price of $28 per share.[20] The ESOP paid for this purchase with a promissory note of the ESOP in favor of Tribune in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from Tribune to the ESOP and/or distributions paid on the shares of Tribune common stock held by the ESOP.

On April 23, 2007, pursuant to a purchase agreement dated April 1, 2007 (the "Zell Entity Purchase Agreement"), the Zell Entity made an initial investment of $250 million in Tribune in exchange for (i) the purchase of 1,470,588 shares of Tribune's common stock at a price of $34 per share and (ii) an unsecured subordinated exchangeable promissory note of Tribune in the principal amount of $200 million.

---

[17] The descriptions contained in this Disclosure Statement provide only a brief overview of the Leveraged ESOP Transactions. Additional details concerning the Leveraged ESOP Transactions are available in Tribune's Quarterly Report on Form 10-Q for the third quarter ending September 28, 2008.

[18] GreatBanc Trust Company was not party to the Merger Agreement in its individual or corporate capacity, but solely as trustee of Tribune Employee Stock Ownership Trust, a separate trust created under the ESOP.

[19] The Zell Entity was party to the Merger Agreement solely for the limited purpose provided therein.

[20] GreatBanc Trust Company was not a party to the ESOP Purchase Agreement in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust created under the ESOP.

On April 25, 2007, Tribune commenced a tender offer to repurchase up to 126 million shares (approximately fifty percent (50%) of the then-outstanding shares) of Tribune's common stock that were then-outstanding at a price of $34 per share in cash. The tender offer expired on May 24, 2007 and 126 million shares of Tribune's common stock were repurchased and subsequently retired on June 4, 2007 utilizing proceeds from the Senior ~~Credit~~Loan Agreement (as defined and discussed below).

On December 20, 2007, Tribune merged with Merger Sub, with Tribune surviving the Merger. Upon consummation of the Merger, the 8,928,571 shares of Tribune's common stock held by the ESOP were converted into 56,521,739 shares of common stock and represented the only outstanding shares of capital stock of Tribune after the Merger. Pursuant to the terms of the Merger Agreement, each share of common stock of Tribune, par value $0.01 per share, issued and outstanding immediately prior to the Merger, other than shares held by Tribune, the ESOP or Merger Sub immediately prior to the Merger (in each case, other than shares held on behalf of third- parties) and shares held by stockholders, was cancelled and automatically converted into the right to receive $34, without interest and less any applicable withholding taxes, and Tribune became wholly-owned by the ESOP.

Pursuant to the Zell Entity Purchase Agreement, on December 20, 2007, the Zell Entity tendered the shares of Tribune common stock it had acquired pursuant to the Zell Entity Purchase Agreement. Tribune also retired the unsecured subordinated exchangeable promissory note held by the Zell Entity, including approximately $6 million of accrued interest. Following the consummation of the Merger, the Zell Entity purchased from Tribune, for an aggregate of $315 million, a $225 million subordinated promissory note and a 15-year warrant. As the $315 million investment was greater than the cash due from Tribune to the Zell Entity for the shares tendered and notes retired, accrued interest, and legal fees, the amounts were netted against each other and the balance of $56 million was paid by the Zell Entity to Tribune. The warrant entitles the Zell Entity to purchase 43,478,261 shares of Tribune's common stock (subject to adjustment), which represented approximately forty percent (40%) of the economic equity interest in Tribune following the Merger (on a fully-diluted basis). The initial aggregate exercise price for the warrant was $500 million (subject to adjustment), increasing by $10 million per year for the first ten years of the warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). Thereafter, the Zell Entity assigned minority interests in the subordinated promissory note and the warrant to certain permitted assignees.

The terms of the ESOP provide that common shares held by the ESOP are to be allocated on a noncontributory basis to eligible employees of Tribune. As of December 27, 2009, approximately 1.6 million of the common shares held by the ESOP have been allocated to eligible employees of Tribune. However, as discussed in Article IV.C hereof, no distributions will be made to eligible employees on account of such shares.

2.    Prepetition Funded Debt Structure.

In connection with the Leveraged ESOP Transactions and in order to fund ongoing general corporate and working capital needs, Tribune entered into financing facilities in May 2007 and December 2007.~~20~~21 Tribune is also the obligor on (i) a series of outstanding note and debenture issuances and (ii) exchangeable subordinated debentures that predated the Merger, as well as a subordinated promissory note, which was issued immediately following the Merger. Additionally, Tribune (in its capacity as servicer) and Tribune Receivables LLC, a wholly-owned special purpose subsidiary which is not a Debtor, were parties to a trade receivables securitization facility for which Barclays Bank PLC ("Barclays") was the administrative agent and Tribune Receivables LLC was the borrower.~~21~~22 Accordingly, Tribune's prepetition debt structure was comprised of the

---

~~20~~21 Please refer to Article VII for a further discussion of the financing facilities entered in connection with the Leveraged ESOP Transactions.

~~21~~22 The trade receivables securitization facility was amended and continued post-petition pursuant to orders entered by the Bankruptcy Court on January 15, 2009 and April 8, 2009. The trade receivables securitization facility was terminated on

following components: (a) a Senior ~~Credit~~Loan Agreement; (b) a Bridge Facility (as defined below); (c) various issuances of outstanding notes and debentures (the "Senior Notes"); (d) the EGI-TRB LLC Notes (as defined below); (e) exchangeable subordinated debentures (the "PHONES Notes"); and (f) a Receivables Facility (as defined below). As of the Petition Date, Tribune's funded debt totaled approximately $12.706 billion in principal amount, as follows:

| Debt Instrument | Approximate Principal Amount Outstanding as of the Petition Date |
|---|---|
| Senior Credit Facility | $8.622 billion [223] |
| Bridge Facility | $1.600 billion |
| Senior Notes | $1.263 billion |
| EGI-TRB LLC Notes | $0.235 billion |
| PHONES | $0.759 billion |
| Receivables Facility | $0.225 billion |
| **Total** | **$12.706 billion** |

A brief overview of Tribune's debt facilities, outstanding note and debenture issuances, and any guarantees of such facilities and issuances by Tribune's subsidiaries is set forth below. All of the indebtedness described in subparagraphs (a) through (e) below – the Senior ~~Credit~~Loan Agreement indebtedness, the Bridge Facility indebtedness, the Senior Notes, the EGI-TRB LLC Notes, and the PHONES Notes – are obligations of the parent company, Tribune. This indebtedness is *pari passu* in payment priority at Tribune, except for the EGI-TRB LLC Notes and the PHONES. The EGI-TRB LLC Notes and the PHONES Notes are contractually subordinated to all funded indebtedness at Tribune. The Senior ~~Credit~~Loan Agreement indebtedness and the Senior Notes are secured, equally and ratably, by a stock pledge (the "Stock Pledge") of the equity in two subsidiaries. None of the Bridge Facility, the EGI-TRB LLC Notes, or the PHONES Notes are secured. Additionally, the indebtedness under the Senior ~~Credit~~Loan Agreement and the indebtedness under the Bridge Facility constitute unsecured obligations at those Tribune subsidiaries (the "Guarantor Subsidiaries"), [224] which have guaranteed (i) the Senior ~~Credit~~Loan Agreement indebtedness on a senior priority basis, and (ii) the Bridge Facility indebtedness on a subordinate basis to the Senior ~~Credit~~Loan Agreement indebtedness. None of the Senior Notes, PHONES Notes, or the EGI-TRB LLC Notes are guaranteed by, or constitute obligations of, any of Tribune's subsidiaries. Instead, they are liabilities solely of Tribune.

---

February 26, 2010.

[223] The amount outstanding on account of the Senior Credit Facility includes the Barclays Swaps Claim (which is defined and described below).

[224] The Guarantor Subsidiaries are those subsidiaries deemed material under the Credit Agreement, and are comprised of the following: 5800 Sunset Productions Inc.; California Community News Corporation; Channel 39, Inc.; Channel 40, Inc.; Tribune CNLBC, LLC; Chicago Tribune Company; Chicagoland Publishing Company; Chicagoland Television News, Inc.; Courant Specialty Products, Inc.; Distribution Systems of America, Inc.; Eagle New Media Investments, LLC; Eagle Publishing Investments, LLC; Forsalebyowner.com corp.; Forum Publishing Group, Inc.; Gold Coast Publications, Inc.; Homeowners Realty, Inc.; Homestead Publishing Company; Hoy Publications, LLC; Internet Foreclosure Service, Inc.; KIAH Inc.; KPLR, Inc.; KSWB Inc.; KTLA Inc.; KWGN Inc.; Los Angeles Times Communications LLC; New Mass. Media, Inc.; Orlando Sentinel Communications Company; Patuxent Publishing Company; Southern Connecticut Newspapers, Inc.; Star Community Publishing Group, LLC; Stemweb, Inc.; Sun-Sentinel Company; The Baltimore Sun Company; The Daily Press, Inc.; TMLH 2, Inc.; TMLS I, Inc.; TMS Entertainment Guides, Inc.; Tower Distribution Company; Tribune (FN) Cable Ventures, Inc.; Tribune Broadcast Holdings, Inc.; Tribune Broadcasting Company; Tribune Broadcasting Holdco, LLC; Tribune California Properties, Inc.; Tribune Direct Marketing, Inc.; Tribune Entertainment Company; Tribune Finance LLC; Tribune Interactive, Inc.; Tribune Los Angeles, Inc.; Tribune Manhattan Newspaper Holdings, Inc.; Tribune Media Net, Inc.; Tribune Media Services, Inc.; Tribune National Marketing Company; Tribune ND, Inc.; Tribune New York Newspaper Holdings, LLC; Tribune NM, Inc.; Tribune Television Company; Tribune Television Holdings, Inc.; Tribune Television New Orleans, Inc.; Tribune Television Northwest, Inc.; Virginia Gazette Companies, LLC; WDCW Broadcasting, Inc.; WGN Continental Broadcasting Company; WPIX, Inc.; and WTXX Inc.

     (a)     Senior ~~Credit~~Loan Agreement.

On May 17, 2007, Tribune entered into an $8.028 billion senior secured credit agreement (the "Senior ~~Credit~~Loan Agreement") with JPMorgan Chase Bank, N.A., as administrative agent and financial institutions from time to time party thereto.[24][25]  The Senior ~~Credit~~Loan Agreement consists of the following loan facilities: (i) a $1.5 billion Senior Tranche X Term Facility (the "Tranche X Facility"), (ii) a $5.515 billion Senior Tranche B Term Facility (the "Tranche B Facility"), (iii) a $263 million Delayed Draw Senior Tranche B Term Facility (the "Delayed Draw Facility") and (iv) a $750 million Revolving Credit Facility (the "Revolving Credit Facility").[25][26]  The Senior ~~Credit~~Loan Agreement also provided a commitment for an additional $2.105 billion in new incremental term loans under the Tranche B Facility (the "Incremental Facility").  On December 27, 2007, Tribune entered into a number of increase joinders pursuant to which the Incremental Facility became a part of the Tranche B Facility under the Senior ~~Credit Agreement.~~ Loan Agreement.  On June 4, 2007, the Company used the proceeds from the Tranche X Facility and the Tranche B Facility in connection with the consummation of a tender offer to repurchase certain shares of the Company's common stock that were then outstanding and to, among other things, refinance the Company's former five-year credit agreement and former bridge credit agreement.

Under the terms of the Senior ~~Credit~~Loan Agreement, Tribune was required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Senior ~~Credit~~Loan Agreement and other debt with respect to borrowed money.  On July 2, 2007, Tribune entered into an International Swap and Derivatives Association, Inc. ("ISDA") Master Agreement, a schedule to the 1992 ISDA Master Agreement and on July 3, 2007, entered into three interest rate swap confirmations (collectively, the "Swap Documents") with Barclays, which Swap Documents provide for (i) a two-year hedge with respect to $750 million in notional amount, (ii) a three-year hedge with respect to $1 billion in notional amount, and (iii) a five-year hedge with respect to $750 million in notional amount.  The Swap Documents were terminated on the Petition Date.  As of that date, Tribune's aggregate liability in connection with the Swap Documents was approximately $150.9 million, which liability is subject to the guarantee of the Senior ~~Credit~~Loan Agreement indebtedness by the Guarantor Subsidiaries on a *pari passu* basis with Tribune's Senior ~~Credit~~Loan Agreement indebtedness.[26][27]

As of the Petition Date, with the exception of the aforementioned liability in connection with the Swap Documents, the total principal amount outstanding under the Senior ~~Credit~~Loan Agreement was approximately $8.472 billion, including approximate outstanding balances on the Tranche X Facility, Tranche B Facility and the Revolving Credit Facility of $512 million, $7.723 billion[27][28] and $237 million, respectively.[28][29]  The Senior ~~Credit~~Loan Agreement indebtedness is secured by a pledge of the equity interests of Tribune Finance, LLC and Tribune Broadcasting Holdco, LLC, both of which are Debtors, and is guaranteed, on a senior priority basis, by the Guarantor Subsidiaries.

     (b)     Bridge Facility.

---

[24][25] The Senior ~~Credit~~Loan Agreement was subsequently amended on June 4, 2007, and all references thereto include the June 4, 2007 amendment.

[25][26] The Revolving Credit Facility includes a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million.

[26][27] Tribune was also party to an interest rate swap agreement with Morgan Stanley, which was terminated as of the Petition Date.  Morgan Stanley, as the non-defaulting party under the swap agreement, calculated that approximately $52 million was owing to Tribune under that agreement as of the Petition Date.  Approximately $9.5 million of this amount was paid to Tribune post-petition.  While Tribune asserts a claim for the balance of approximately $42 million, Morgan Stanley has asserted a right to set-off approximately $38 million of this amount.

[27][28] The outstanding indebtedness under the Tranche B Facility includes amounts outstanding under the Incremental Facility and the Delayed Draw Facility.

[28][29] As of the Petition Date, Tribune had $99.8 million of letters of credit outstanding under the Revolving Credit Facility.

On December 20, 2007, Tribune entered into a $1.6 billion Senior Unsecured Interim Loan Agreement (the "Interim Credit Agreement") with Merrill Lynch ~~Capital Corporation~~ as administrative agent, JPMorgan Chase Bank, N.A. as Syndication Agent, Citicorp North America, Inc. and Bank of America, N.A. as Co-Documentation Agents, and the Initial Lenders named therein. Pursuant to the Interim Credit Agreement, Tribune borrowed $1.6 billion under a 12 month bridge facility (the "Bridge Facility"). The total proceeds of $3.705 billion from the Bridge Facility and the Incremental Facility were used by Tribune, among other ways, in connection with the consummation of the Merger and for general corporate purposes. The Bridge Facility indebtedness is unsecured but is guaranteed, on a senior subordinated basis, by the Guarantor Subsidiaries. As of the Petition Date, the approximate outstanding balance of the Bridge Facility was $1.6 billion.

      (c)     The Senior Notes.

Pursuant to Indentures entered into between 1992 and 1997, Tribune is obligated on Senior Notes in the aggregate approximate amount of $1.263 billion. Each outstanding series and the approximate principal amounts owing as of the Petition Date are as follows:

| Indenture | Interest Rate | Maturity Date | Outstanding Amount[30] | CUSIP # |
|---|---|---|---|---|
| 1992 | 6.25% | November 10, 2026 | $.120 million | 89605HBY9 |
| 1995 | 7.25% | March 1, 2013 | $ 82.083 million | 887364AA5 |
| 1995 | 7.5% | July 1, 2023 | $ 98.750 million | 887364AB3 |
| 1996 | 6.61% | September 15, 2027 | $ 84.960 million | 887364AF4 |
| 1996 | 7.25% | November 15, 2096 | $148.000 million | 887360AT2 |
| 1997 | 4.875% | August 15, 2010 | $450.000 million | 896047AE7 |
| 1997 | 5.25% | August 15, 2015 | $330.000 million | 896047AF4 |
| 1997 | 5.67% | December 8, 2008 | $ 69.550 million | 89604KAN8 |
| **Total** | | | **$1.263 billion** | |

The Senior Notes are not guaranteed. The Senior Notes are secured by the Stock Pledge on a *pari passu* basis with the indebtedness under the Senior ~~Credit~~Loan Agreement.

      (d)     The EGI-TRB LLC Notes.

On December 20, 2007, Tribune executed a $225 million subordinated promissory note in favor of the Zell Entity, which thereafter assigned minority interests in such notes to certain permitted assignees (collectively, the "EGI-TRB LLC Notes"). The notes are obligations solely of Tribune and are not guaranteed by Tribune's subsidiaries. As of the Petition Date, the aggregate outstanding principal balance of the EGI-TRB LLC Notes, including accrued payment-in-kind interest, totaled $235.3 million. The EGI-TRB LLC Notes mature in 2018.

      (e)     The PHONES Notes.

In April 1999, Tribune issued eight million Exchangeable Subordinated Debentures due 2029 (the "PHONES Notes") for an aggregate principal amount of $1.256 billion. At the time of issuance, the value of one PHONES Notes was related to the value of one "reference share" of America Online ("AOL") common stock, which was then trading at $157 per share. On November 22, 1999, AOL common stock split on a two-to-one basis, changing the reference to two shares of AOL for each PHONES Notes. On January 11, 2001, AOL and Time Warner Inc. merged to form AOL Time Warner Inc. with the merged entity continuing to trade under the ticker AOL. On October 16, 2003, AOL Time Warner Inc. changed its name to Time Warner Inc. and

---

[30] "The "Outstanding Amount" does not include accrued interest or fees as of the Petition Date. In addition, the "Outstanding Amount" does not purport to represent the Allowed amount of the Senior Noteholder Claims.

began trading as TWX.  As a result of the split and subsequent merger, two shares of TWX common stock now represent the "reference shares" for each PHONES Notes.  Tribune was eligible to redeem the PHONES Notes at any time for the higher of the principal value of the PHONES Notes or the then-current market value of two shares of Time Warner common stock, subject to certain adjustments.  In addition, prior to the Petition Date, Holders of PHONES Notes were contractually entitled to exchange a PHONES Notes for an amount of cash equal to ninety-five percent (95%) (or one hundred percent (100%) under certain circumstances) of the then-current market value of two shares of Time Warner stock.  The approximate carrying value of PHONES Notes on the Petition Date was $759 million comprised of $703 million for PHONES Notes not submitted for exchange and a $56 million liability for PHONES Notes exchanged that were not settled in cash.  The Debtors have been informed by the Trustee for the PHONES Notes that the Trustee and certain holders of the PHONES have disputed that the outstanding amount of the PHONES Notes that were submitted for redemption and not settled for cash has been reduced as a result of such submission.  The PHONES Notes are obligations solely of Tribune and are not guaranteed by Tribune's subsidiaries.

(f)      The Receivables Facility.

Prior to the Petition Date, Tribune, Tribune Receivables, LLC, a non-Debtor special purpose subsidiary of Tribune (the "Receivables Subsidiary"), and certain other subsidiaries of Tribune entered into a $300 million trade receivables securitization facility (the "Receivables Facility") led by Barclays, as administrative agent.  The Receivables Facility, entered into in July 2008, enabled certain of Tribune's subsidiaries (the "Operating Subsidiaries") to sell certain trade receivables and related assets (the "Receivables") to Tribune on a daily basis.  Tribune, in turn, sold such Receivables to the Receivables Subsidiary, also on a daily basis.  Receivables transferred to the Receivables Subsidiary are considered assets of the Receivables Subsidiary and not of Tribune or any of the Operating Subsidiaries.

As of the Petition Date, the total amount outstanding under the Receivables Facility was $225 million.  As discussed in Article VI below, following the Petition Date, the Receivables Facility was amended, restated and incorporated into the Amended DIP Facility (defined below).  On November 19, 2009, the outstanding term and revolving loan balances under the Amended DIP Facility were repaid.  On February 25, 2010, the Debtors provided written notice to the Administrative Agent for the Amended DIP Facility terminating the Amended DIP Facility effective February 26, 2010.

**B.      Prepetition Trade Payables & Other Operating Liabilities.**

In addition to the funded debt described above, Tribune and its Debtor subsidiaries had liabilities as of the Petition Date to various trade vendors.  Such liabilities related to the purchase of broadcast rights, newsprint and ink, and other goods and services used in the Debtors' business operations.  As of the Petition Date, the Debtors had approximately $115 million of trade payables, including accruals for goods or services received but not invoiced. These amounts remain subject to the claims reconciliation process, which is discussed further in Article VI.G.4 of this Disclosure Statement.

**C.      Prepetition Compensation and Benefit Programs.**[20][11]

The Debtors employed approximately 11,929 full-time and 2,555 part-time employees as of December 31, 2009, and the Debtors' gross expenses for their employees' compensation and benefit programs were approximately $1.1 billion during calendar year 2009.  In addition to standard wages, such costs include a number of programs which were implemented by the Debtors in the ordinary course of business and are designed to reward the Debtors' management and non-management employees for excellent service, incentivize future performance, and provide employees with a competitive compensation and benefit package.

---

[20][11] Unless otherwise specified, the Compensation and Benefit Programs discussed in this Section were implemented by the Debtors prior to the Petition Date.

Certain of these compensation and benefit programs are generally described below, with the exception of insured and self-insured programs (e.g., health plans), customary fringe benefit policies (e.g., vacation, sick leave), individual employment agreements and collectively bargained agreements (except for the information set forth in sections 1-2 below). The descriptions included below generally identify compensation and benefit programs for current and former employees that, in addition to certain other employee compensation and benefit programs not specifically described herein, the Debtors intend to continue pursuant to the Plan. The descriptions also set forth those compensation and benefit programs that, though in effect as of the Petition Date, have either been suspended, have expired by their terms or are programs which the Debtors otherwise do not intend to continue following the Effective Date of the Plan.

As further described below, the Plan generally contemplates that the Tribune Company Pension Plan (defined below), the Debtors' other qualified defined benefit pension plans, the 401(k) Plans (defined below), the Management Incentive Plan (or the "MIP", as described below), Local Bonus Programs (defined below), collective bargaining agreements, and certain salary continuation programs will be continued following the Debtors' emergence from the Chapter 11 Cases. The Plan further contemplates that certain compensation and benefit programs in effect as of the Petition Date will not be continued following the Effective Date, including the Management Equity Incentive Plan (defined below), the Incentive Compensation Plan (defined below) (other than those provisions involving the MIP), the ESOP, the Transitional Compensation Plan (defined below), certain nonqualified retirement and deferred compensation programs, and certain individual letter agreements.

The descriptions set forth below are not, and are not intended to be, comprehensive and, as previously noted, do not include certain customary employee benefits provided by the Debtors. All such benefit programs and the Debtors' other compensation and benefit programs are governed by applicable program terms and conditions, as in effect or amended from time to time. In addition, the Debtors reserve the right to modify, amend or terminate any or all of their employee benefit and compensation programs in the ordinary course of business in their sole discretion, subject to applicable modification, amendment or termination provisions and/or applicable law. Moreover, nothing in this Disclosure Statement shall limit the Debtors' rights to implement or seek implementation of any compensation and benefit programs as may be appropriate.

      1.     Compensation and Benefit Programs in Effect as of the Petition Date that will be continued Pursuant to the Plan.

      (a)     Retirement Programs.

The Debtors provide retirement benefits to employees through numerous defined benefit pension plans and defined contribution 401(k) plans sponsored either by the Debtors or by unions. These benefits are generally described below.

      i)     Single Employer Pension Plans

The Debtors currently maintain four qualified single-employer defined benefit pension plans.[32] A description of the Debtors' single-employer pension plans follows.

      1.     Tribune Company Pension Plan

The Tribune Company Pension Plan is the Debtors' primary pension plan and is a tax-qualified, non-contributory, defined benefit pension plan for eligible employees.[33] Substantially all of the accrued

---

[32] Two additional plans, the Major League Baseball Pension Plan for Non-Uniformed Personnel and the Minor League Players Pension Plan, were previously maintained by one of the Debtors. However, these plans were assumed and assigned as a part of the Chicago Cubs transaction.

benefits provided under the plan were earned by employees based on final average pay benefit formulas used in other defined benefit plans sponsored by the Debtors that were merged into the Tribune Company Pension Plan. Although the Tribune Company Pension Plan most recently provided benefits using a cash balance allocation, its assets and liabilities are almost entirely attributable to the benefits earned under prior plan formulas, the majority of which were frozen prior to January 1, 2006 and the last of which was frozen as of December 31, 2006.

As discussed above, from December 31, 2007 through December 31, 2009, the Tribune Company Pension Plan provided benefits in the form of an annual cash balance allocation to a hypothetical account established for each eligible employee participating in the plan in an amount equal to three percent (3%) of the employee's eligible compensation. In addition, each eligible employee's account was credited with interest quarterly to provide an annual effective rate equal to the ten-year, United States Treasury rate in effect on November 30th of the preceding year. Beginning in 2010, the Debtors discontinued the annual cash balance allocations; however, the Debtors continue to credit employees' accounts with the aforementioned interest. In place of the cash balance allocation, the Debtors currently provide retirement benefits through matching contributions to employees' accounts under the existing defined contribution 401(k) Plans, discussed below. These changes did not affect any benefits earned prior to 2010 under the Tribune Company Pension Plan.

The Debtors estimate that, as of January 1, 2009, there were approximately 13,057 active employees participating in the Tribune Company Pension Plan, as well as approximately 9,280 retirees receiving benefits from the Tribune Company Pension Plan. As of that date, there were also approximately 15,933 additional persons who were neither active employees of the Debtors nor currently receiving benefits under the Tribune Company Pension Plan, but that were eligible to receive benefits thereunder in the future.

The funding status of the Tribune Company Pension Plan is generally determined either in accordance with GAAP ("Accounting Funding") or in accordance with the Pension Protection Act ("Cash Funding"). On an Accounting Funding basis, the Tribune Company Pension Plan was approximately eighty-eight percent (88%) funded at the end of 2009. On a Cash Funding basis, the Tribune Company Pension Plan was between approximately ninety-five percent (95%) and one hundred percent (100%) funded at the end of 2009.[32][34]

As of January 1, 2010, the Tribune Company Pension Plan maintained assets with a market value of approximately $1.3 billion. Based on current actuarial analyses, various assumptions, and the Debtors' business plans, the Debtors anticipate that there will not be any Cash Funding requirements for the plan in 2010-2011, but that such Cash Funding requirements will be approximately (in millions) $53 in 2012, $49 in 2013, and $43 in 2014. Actual funding requirements are highly dependent on assumptions and could vary considerably from these estimates.

## 2. Other Single Employer Qualified Defined Benefit Pension Plans

In addition to the Tribune Company Pension Plan, the Debtors maintain the following three qualified defined benefit pension plans for eligible employees:

- *Baltimore Sun Company Employees Retirement Plan.* As of January 1, 2010, the Baltimore Sun Company Employees Retirement Plan maintained assets with a market value of approximately $46 million. Based on current actuarial analyses and the Debtors' business plans, the Debtors anticipate

---

[31][33] The formal name of the Tribune Company Pension Plan is the Tribune Company Cash Balance Pension Plan.

[32][34] The Cash Funding calculation yields a lower deficit than the Accounting Funding calculation for a number of reasons. For example, for purposes of the Cash Funding calculation, assets are "smoothed" by averaging the three most recent year-end asset values, with the benefit of averaging limited to one hundred and ten percent (110%) of the actual most recent year-end asset value. Under the Pension Protection Act rules, the Cash Funding calculation also applies a different discount rate to discount liabilities than the Accounting Funding method.

35

that the Cash Funding requirements for the Baltimore Sun Company Employees Retirement Plan will be approximately (in millions) $2 in 2010, $4 in 2011, $5 in 2012, $4 in 2013, and $4 in 2014. Actual Cash Funding requirements are highly dependent on assumptions and could vary considerably from these estimates.

- *Tribune Company Hourly Pension Plan.* As of January 1, 2010, the Tribune Company Hourly Pension Plan maintained assets with a market value of approximately $17.6 million. Based on current actuarial analyses, various assumptions, and the Debtors' business plans, the Debtors anticipate that there will be no Cash Funding requirements for the Tribune Company Hourly Pension Plan in 2010-2014. Actual Cash Funding requirements are highly dependent on assumptions and could vary considerably from these estimates.

- *Baltimore Mailers Union Local No. 888 Plan.*[225] As of January 1, 2010, the Baltimore Mailers Union Local No. 888 Plan maintained assets with a market value of approximately $8.1 million. Contributions, funded by concessions negotiated in collective bargaining, occur each pay period. Based on current actuarial analyses, various assumptions, and the Debtors' business plans, the Debtors anticipate that there will be no additional Cash Funding requirement for the Baltimore Mailers Union Local No. 888 Plan in 2010 and that additional Cash Funding of approximately $0.3 million will be required each year in 2011-2014. Actual funding requirements are highly dependent on assumptions and could vary considerably from these estimates. These estimates do not include routine contractual contributions that continue to be made each year.

As set forth in Section 6.5 of the Plan, the Debtors will continue performing their obligations under the above defined benefit pension plans on and after the Effective Date.

       ii)     Multiemployer Pension Plans

The Debtors also participate in 16 multiemployer plans at various locations pursuant to certain of their collective bargaining agreements. These plans, which are summarized in the below table, generally require monthly contributions based on hours worked. On and after the Effective Date of the Plan, the Debtors intend to perform their obligations with respect to the multiemployer plans.

| Business Unit/Department | Department Union/Local | Plan Name | Estimated Number Current Employees of Debtors Covered | CBA Expiration Date | Estimated Total Number of Participants | Approximate Contribution | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | 2007 | 2008 | 2009 |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) |

---

[225] The formal name of the Baltimore Mailers Union Local No. 888 Plan is the Baltimore Mailers Union Local No. 888 and the Baltimore Sun Company Retirement Plan.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| (1) Chicago Tribune – Pressmen | ~~Pressmen GCC/#7~~ | GCIU-Employer Retirement Fund | 150 | 05/2012 | 56,367 | $ 464,118 | $ 467,830 | $ 451,612 |
| (2) Chicago Tribune – Drivers | ~~Drivers IBT/#706~~ | Chicago Newspaper Publishers Drivers Union Pension Plan | 140 | 12/2010 | 1,039 | 1,813,473 | 1,696,538 | 1,661,276 |
| (3) Baltimore Sun – Pressroom | ~~Pressroom GCC/#31~~ | GCIU-Employer Retirement Fund | 80 | 04/2012 | 56,367 | 304,725 | 276,049 | 366,168 |
| (4) Chicago Tribune – Machinists | ~~Machinists IAM/#126~~ | IAM National Pension Fund | 47 | 09/2008 | 227,988 | 226,741 | 207,052 | 204,588 |
| (5) KTLA – Newsroom | ~~Newsroom AFTRA~~ | AFTRA Health and Retirement Plan | 40 | 08/2011 | 40,859 | 592,191 | 544,431 | 656,898 |
| (6) WPIX – Directors | ~~Directors DGA~~ | Directors Guild of America Producers Pension Plan | 32 | 10/2008 | 17,141 | 74,445 | 80,391 | 80,487 |
| (7) WGN-TV – Newsroom | ~~Newsroom AFTRA~~ | AFTRA Health and Retirement Plan | 30 | N/A ** | 40,859 | 593,528 | 587,836 | 717,151 |
| (8) Baltimore Sun – Drivers | ~~Drivers IBT/#355~~ | Truck Drivers and Helpers Local 355 Pension Fund | 25 | 12/2010 | 3,490 | 141,138 | 105,754 | 137,783 |
| (9) WPIX – Newsroom | ~~Newsroom AFTRA~~ | AFTRA Health and Retirement Plan | 25 | 05/2009 | 40,859 | 489,995 | 508,626 | 478,933 |
| (10) WPIX – Stagehands | ~~Stagehands IATSE/#1~~ | IATSE Local #1 Pension Plan and Annuity Funds ** | 14 | 03/2011 | 11,195 | 97,746 | 110,313 | 129,565 |
| (11) WGN-TV – Stagehands | ~~Stagehands IATSE/#2~~ | Stagehands Local #2 Pension Plan and Annuity Funds *** | 10 | 05/2011 | ~~1,035~~ 1,035 | 54,485 | 47,252 | 57,082 |
| KTLA (12) KLTA-TEC Electricians | ~~TEC Electricians IBEW/#40~~ | Motion Picture Association Pension Plan | 3 | 07/2010 | 328 | 46,276 | 28,336 | 29,141 |
| (13) WGN-TV 9 Op. Engs. | ~~Operations Engineers IUOE/#399~~ | IUOE Central Pension Fund | 3 | 05/2011 | 167,959 | 10,567 | 8,893 | 10,162 |
| (14) Baltimore Sun – Composers | ~~Composers CWA/ITU~~ | CWA/ITU Negotiated Pension Fund | 1 | 12/2004 | 50,957 | 2,603 | 2,603 | 2,893 |
| TOTAL * | | | 600 | | | $4,912,031 | $4,672,804 | $4,983,739 |

* ~~The Debtors' multiemployer pension plans generally require contributions based on the hours worked by participating employees, which may vary from year to year. Accordingly, the Debtors' contributions to such Plans may vary from year to year. Each contribution set forth in this summary chart is applicable only to the specific year noted.~~

** The parties have entered into an open-ended contract extension that may be terminated by either party upon 30 days prior written notice.

** *** WPIX Stagehands and WGN-TV Stagehands each participate in two separate multiemployer pension plans: a local pension plan and a local annuity fund.

iii)    401(k) Plans.

The Debtors maintain various tax-qualified 401(k) retirement plans, which permit eligible employees to make voluntary contributions on a pre-tax basis and some of which also provide for contributions by the Debtors (the "401(k) Plans"). The 401(k) Plans allow participants to invest their account balances in various investments. As of January 1, 2008, the Debtors ceased contributions to the 401(k) Plans for non-union employees in conjunction with the introduction of the ESOP and the cash balance allocations under the Tribune Company Pension Plan.

As described above, the Debtors discontinued allocations under the Tribune Company Pension Plan as of January 1, 2010 and, as discussed in Article IV.C.2, intend to terminate the ESOP in connection with consummation of the Plan. Accordingly, the Debtors modified the 401(k) Plans for non-union employees effective January 1, 2010. The Debtors currently match each dollar an employee contributes up to two percent (2%) of such employee's eligible pay and match $0.50 for each dollar contributed between two percent (2%)

and six percent (6%) of such employee's eligible pay. The Debtors also may make annual discretionary contributions based on the achievements of certain performance goals. The Debtors intend to continue performing such obligations on and after the Effective Date of the Plan.

iv)    Retiree Welfare Benefit Programs.

Historically, the Debtors maintained numerous medical, dental, prescription drug and life insurance programs for eligible retired union and non-union employees. Effective January 1, 2009, the Debtors consolidated the majority of these retiree welfare benefit programs, and they are now administered or insured by United Healthcare Services, Inc. These programs provide coverage to retirees at different levels based on which Debtor employed the individual, the retiree's year of retirement, collective bargaining agreement requirements and the retiree's eligibility for Medicare coverage.

As of January 1, 2010, the Debtors estimate that there were approximately 5,000 active employees who may be eligible for a retiree medical program, and 530 active employees who will be eligible for retiree life insurance upon retirement. As of January 1, 2010, the Debtors estimate that there were approximately 1,500 retirees covered by a retiree medical program and 2,185 retirees covered by retiree life insurance. As provided in Section 6.5 of the Plan, the Debtors will honor their obligations with respect to the retiree welfare benefits described in this Section on and after the Effective Date of the Plan.

(b)    Severance Programs.

Prior to the Petition Date and in the ordinary course of business, the Debtors customarily provided employees whose employment was terminated without cause (the "Terminated Employees") with severance payments (the "Severance Payments") equal to their base wages for specified periods of time that correlated with their number of years of employment (the "Severance Period"). Terminated Employees typically received Severance Payments either (i) in a single, lump-sum Severance Payment (the "Lump-Sum Severance") or (ii) through salary continuation in the form of regular biweekly paychecks for the duration of the Severance Period (the "Salary Continuation Severance"). On February 4, 2009, the Bankruptcy Court entered an order authorizing the Debtors to implement a severance program for employees whose employment is terminated in certain circumstances after the Petition Date (the "Post-Petition Severance Program").

(c)    Management Incentive Plan ("MIP").

The Debtors maintain a management incentive plan, also referred to as the "MIP," which historically has been part of the Incentive Compensation Plan (defined and discussed further below). The MIP provides cash compensation to certain of the Debtors' management employees to the extent that performance goals approved by the Compensation Committee are met. MIP participants typically consist of those management employees, other than those in sales positions, with target cash incentive award opportunities of at least fifteen percent (15%) of their base salary. Approximately 700 of the Tribune Entities' employees participated in the MIP in 2009.

The Debtors have used a consistent methodology over the years in setting annual MIP targets and in subsequently determining MIP cash awards. During this time, each MIP participant had an annual target award opportunity expressed as a percentage of his or her base salary. The Debtors then used these individual bonus opportunities to determine target bonus pools for each business unit and segment, as well as a consolidated company-wide bonus pool. Within the Publishing Segment, each individual newspaper (combined with any subsidiaries) was measured as a separate business unit; within the Broadcasting Segment, each television and radio station (or station group in duopoly markets) was measured as a separate business unit; and certain other operations considered to be general corporate operations as well as certain group offices that oversee the entire Publishing Segment or Broadcasting Segment also constituted distinct business units. In the fourth quarter of each year, a budget and operating plan was developed by each business unit for the following year, as well as a

38

consolidated budget and operating plan for the Tribune Entities as a whole. The operating cash flow goals established in the planning process for a given business unit served as the primary performance target for that year's MIP. Business units were generally eligible for business pools ranging from forty percent (40%) to two hundred percent (200%) of the applicable target pool based on performance ranging from threshold-level to maximum-level achievement of applicable MIP goals, respectively. Additionally, in accordance with the MIP, prior to the Petition Date, the Debtors historically made discretionary MIP cash awards to participants whose business units did not satisfy one or more of their stated goals (even at threshold levels), and otherwise adjusted pool amounts and individual awards, both positively and negatively, in their discretion even in cases where applicable goals were met in whole or in part. Any such adjustments were consistent with the MIP parameters discussed above.

By orders entered on May 12, 2009 and September 30, 2009, respectively, the Bankruptcy Court authorized the Debtors to pay awards for 2008 under the MIP totaling approximately $12.2 million to eligible employees other than certain executives and up to $3.1 million to such executives. In addition, as discussed in Article VI.C of this Disclosure Statement, on July 22, 2009 the Debtors filed a motion with the Bankruptcy Court seeking authority to implement a 2009 Management Incentive Plan consisting of a self-funding ordinary course MIP program consistent with the Debtors' historical MIP programs, but containing certain modifications relative to prior years (including, for example, reductions to payout percentages at various levels of goal achievement compared with historical levels), as well as a new self-funding Transition MIP ("TMIP") program and a self-funding Key Operators Bonus ("KOB") program for certain participants (the "2009 MIP Motion"). By order entered January 28, 2010, the Bankruptcy Court authorized the Debtors to implement the ordinary course MIP component of the 2009 Management Incentive Plan and to pay ordinary course MIP awards in an aggregate amount not to exceed $45.6 million. Payment of 2009 MIP bonuses totaling $42.1 million was made on February 26, 2010. As noted in Article IX.H.5 below, at a hearing held on January 27, 2010, the Bankruptcy Court suggested that the Debtors consider incorporating the TMIP and the KOB into a chapter 11 plan of reorganization. In the meantime, the Bankruptcy Court took under advisement, and did not rule with respect to, the TMIP and KOB programs. The Debtors followed the Bankruptcy Court's suggestion, and filed a motion on March 4, 2010, to voluntarily dismiss, without prejudice, their request in the 2009 MIP Motion for entry of an order authorizing the implementation of the TMIP and KOB. The Bankruptcy Court granted the Debtors' motion by order dated March 23, 2010. The Debtors will address the inclusion in the Plan of the TMIP and the KOB in ~~a supplement that will be filed by the Debtors prior to the hearing on approval of the Disclosure Statement.~~ the Plan Supplement.

The Debtors intend to continue the ordinary course annual MIP program (without any of the special limitations implemented for 2009) in 2010 and subsequent years, including after the Effective Date of the Plan.

(d)    Local Bonus Programs.

The Debtors maintain a variety of commission and incentive bonus programs for certain sales and other personnel who generally do not participate in the MIP. These programs are implemented locally and designed to incentivize and reward achievements of the Debtors' employees based upon specific metrics relevant to the respective employees' local or departmental line of work (the "Local Bonus Programs"). During 2009, approximately 2,500 of the Debtors' employees participated in the Local Bonus Programs. Generally, these programs are developed and implemented locally by individual newspapers, broadcast stations and corporate office departments. The majority of these programs are based on performance factors such as revenue generation, increasing market share, expense targets, and some discretionary factors. Payouts under most of the Local Bonus Programs are based upon year-end, quarter-end or month-end performance. The Debtors paid an aggregate of approximately $24.8 million, $22.2 million, and $20.7 million, respectively during 2007, 2008, and 2009 in connection with the Local Bonus Programs.[126]

---

[126] As further discussed in Article VI of this Disclosure Statement, on February 3, 2009 and May 12, 2009, the Bankruptcy Court entered orders authorizing the Debtors to pay prepetition amounts outstanding in connection with the Local Bonus

(e)    Collective Bargaining Agreements.

As of December 31, 2009, approximately eleven percent (11%) of the Debtors' employees in the Publishing Segment and approximately thirty-four percent (34%) of the Debtors' employees in the Broadcasting Segment were represented by unions and covered under various collective bargaining agreements.  Specifically, the Tribune Entities in the Publishing Segment are party to ten collective bargaining agreements and the Tribune Entities in the Broadcasting Segment are party to 15 collective bargaining agreements.  The following table summarizes certain information concerning the union representation of the Tribune Entities' employees. [37]

---

Programs in an aggregate amount of up to $8.8 million and $1.1 million, respectively.

[37] A list of all Collective Bargaining Agreements, including full names of such agreements, is attached hereto as Exhibit F.

| | Department | Union/Local Name | Approximate Number of Employees | | | Expiration Date |
|---|---|---|---|---|---|---|
| | | | Full-Time | Part-Time | Per Diems/ Seasonal | |
| *Publishing* | | | | | | |
| *Baltimore Sun* | Packagers | GCC-IBT/888 | 108 | 72 | 0 | 12/ 2008** |
| *Baltimore Sun* | Transportation | GCC-IBT/355 | 19 | 12 | 0 | 12/2010 |
| *Baltimore Sun* | Pressroom | GCC-IBT/31 | 81 | 0 | 0 | 4/2012 |
| *Baltimore Sun* | Various* | TNG/Baltimore-Washington | 209 | 11 | 0 | 6/2012 |
| *Baltimore Sun†* | Prepress | GCC-IBT/582 | 1 | 0 | 0 | 4/2012 |
| *Chicago Tribune* | Machinists | IAM/126 | 45 | 0 | 0 | 9/ 2008** |
| *Chicago Tribune* | Pressroom | GCC-IBT/7 | 138 | 3 | 0 | 5/2012 |
| *Chicago Tribune* | Drivers | IBT/706 | 138 | 6 | 0 | 12/2010 |
| *LA Times* | Pressroom | GCC-IBT | 185 | 1 | 0 | 5/2011 |
| *Morning Call* | Pressroom | GCC-IBT/160M | 20 | 0 | 0 | 6/ 2009** |
| **Subtotal** | | | **945** | **99** | **0** | |
| *Broadcasting and Entertainment* | | | | | | |
| KTLA (Los Angeles) | Newspersons | AFTRA | 22 | 0 | 15 | 8/2011 |
| WPIX (New York) | Directors | DGA | 8 | 1 | 21 | 10/ 2008** |
| WPIX (New York) | Newswriters | TNG/3 | 29 | 3 | 16 | 12/2012 |
| WGN-TV (Chicago) | Newspersons | AFTRA | 27 | 5 | 13 | *** |
| WGN-AM (Chicago) | Engineers | IBEW/1220 | 2 | 1 | 6 | 3/ 2012 |
| WPIX (New York) | Newspersons | AFTRA | 16 | 1 | 9 | 5/ 2009** |
| WPIX (New York) | Engineers | IBEW/1212 | 73 | 1 | 102 | 6/ 2009** |
| WGN-TV (Chicago) | Engineers | IBEW/1220 | 80 | 1 | 107 | 3/ 2009** |
| WGN-TV (Chicago) | Newswriters | IBEW/1220 | 5 | 0 | 18 | 3/ 2009** |
| WPHL (Philadelphia) | Technicians | IBEW/98 | 10 | 2 | 3 | 12/ 2009 |
| KTLA (Los Angeles) | Technicians | IATSE | 72 | 2 | 369 | 7.2010 |
| KTLA (Los Angeles) | Electricians | IBEW/40 | 2 | 0 | 2 | 7/2010 |
| WPIX (New York) | Stagehands | IATSE/1 | 0 | 0 | 2 | 3/2011 |
| WGN-TV (Chicago) | Stagehands | IATSE/2 | 0 | 0 | 79 | 5/2011 |
| WGN-TV (Chicago) | Engineers | IUOE/399 | 3 | 0 | 0 | 5/2011 |
| *Subtotal* | | | *356* | *17* | *780* | |
| **TOTAL** | | | **1,301** | **116** | **780** | |

\*   Includes editorial, advertising, circulation, administrative and marketing employees.

†  No employees are employed under this particular collective bargaining agreement. However, approximately 10 former bargaining unit members with lifetime job guarantees continued to be employed at the Baltimore Sun in other capacities.

\*\*   In the case of each expired collective bargaining agreement included in this summary chart, the Debtors are currently in the process of negotiating the terms of a renewed collective bargaining agreement. During such negotiations, the Debtors intend to continue performing their obligations under the collective bargaining agreement as required by applicable law.

\*\*\* The parties have entered into an open ended contract extension that may be terminated by either party upon 30-days written notice.

Section 6.5 of the Plan provides that any Collective Bargaining Agreement entered into by the Debtors that has not expired by its terms and that is in effect as of the Effective Date, shall be deemed to have been assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1113 of the Bankruptcy Code.

      2.      Compensation and Benefit Programs in Effect as of the Petition Date that will not be continued Pursuant to the Plan.

      (a)      Management Equity Incentive Program.

On December 20, 2007, Tribune's Board of Directors approved a management equity incentive plan (the "MEIP") pursuant to which certain of the Debtors' key employees were eligible to receive benefits. The MEIP provided for units that represented a right to receive cash equal to the fair market value of Tribune's common stock. MEIP awards were made to eligible members of the Debtors' management and other key employees at the discretion of the Board of Directors.

The Debtors do not intend to continue the MEIP described in this Section after the Effective Date of the Plan. Instead, the Plan provides for the implementation of a new equity incentive plan, the terms of which are generally described in Article IX.G.9.

      (b)      Equity-Based Compensation Provisions of Incentive Compensation Plan.

In 1997, Tribune established the Tribune Company Incentive Compensation Plan (as amended and restated effective in 2004, the "Incentive Compensation Plan"). The Incentive Compensation Plan authorized grants of various forms of incentive compensation to management and other employees, as well as certain non-employee agents, of the Debtors. Historically, awards under the Incentive Compensation Plan were made to certain eligible members of the Debtors' management and other key employees at the discretion of the Board of Directors or, as applicable, of senior executives. As stated, the MIP program, providing for annual cash incentive awards, is one component of the Incentive Compensation Plan. The Incentive Compensation Plan also authorized other forms of incentive awards comprised of equity-based compensation grants, including grants of stock options, stock appreciation rights, restricted or unrestricted stock, or restricted stock units.

As discussed, the Debtors intend to continue the ordinary course annual MIP program (without any of the special limitations implemented for 2009) in 2010 and subsequent years, including after the Effective Date of the Plan. The Debtors do not intend to continue the equity-based compensation provisions of the Incentive Compensation Plan after the Effective Date of the Plan. Rather, as also stated above, the Plan provides for the implementation of a new management equity incentive plan.

      (c)      Employee Stock Ownership Plan.

As discussed in Article IV.A.1 of this Disclosure Statement, on April 1, 2007, Tribune established the ESOP as an employee retirement benefit plan. Pursuant to the terms of the ESOP, each eligible employee received a pro rata allocation of stock for the 2008 plan year and will receive another for the 2009 plan year based upon such employee's relative eligible compensation, including base salary, wages and commissions, but excluding bonuses and overtime. ESOP participants were to receive a distribution of the value of the shares allocated to their accounts if during 2008 or 2009 such participants retired after age 65, became disabled or died. With respect to each such participant, the distribution was to be based on the value of the shares determined by the trustee of the ESOP as of December 31 of such participant's year of retirement, disability, or death, with the ESOP receiving the cash value of the shares from Tribune. As of both December 31, 2009 and December 31, 2008, the trustee of the ESOP determined the value of the shares to be $0; therefore, no distributions have been made under the ESOP. The Plan provides for the termination of the ESOP.

      (d)      Transitional Compensation Plan

In 1985, the Debtors implemented a transitional compensation plan for executive employees (as amended and restated in 2006, the "Transitional Compensation Plan"). The Transitional Compensation Plan provided for benefits upon a qualifying event or circumstances occurring as a result of a "change in control" (as defined in the Transitional Compensation Plan) of Tribune. Generally, and subject to certain exceptions specified in the Transitional Compensation Plan, eligible employees received benefits for their termination of employment within a defined time period (length of period varies by individual) following a change in control, prior to a change in control if the termination was at the request of any third-party participating in or causing the change in control, or otherwise in anticipation of a change in control.

As of the date of this Disclosure Statement, no benefits were outstanding under the Transitional Compensation Plan. The Plan does not provide for continuation of the Transitional Compensation Plan.

      (e)      Nonqualified Retirement / Deferred Compensation Plans.

      i)      Noncontributory Plans.

The IRC limits the amount of annual earnings that may be considered when calculating benefits under qualified pension and 401(k) plans. As a result, Tribune and Times Mirror (prior to its merger with Tribune) established various supplemental retirement plans. These plans include the Tribune Company Supplemental Retirement Plan, Tribune Company Supplemental Defined Contribution Plan, and Times Mirror Excess Pension Plan. These were unfunded plans providing benefits substantially equal to the difference between the amount that would have been provided under the corresponding qualified plan in the absence of applicable IRC limits, and the amount actually provided under the qualified plan. In accordance with the provisions of the plans, in connection with the completion of the Merger, amounts accrued under the Tribune Company Supplemental Retirement Plan and Tribune Company Supplemental Defined Contribution Plan (with a few exceptions) were paid at the end of fiscal year 2007. Approximately $94,000 in accrued benefits remained in the Tribune Company Supplemental Defined Contribution Plan as of the Petition Date.

The Times Mirror Excess Pension Plan did not contain a provision for payouts upon a change in control; therefore, accrued amounts were not distributed at the time of the Merger and payments were suspended as of the commencement of the Chapter 11 Cases. As of the date the Chapter 11 Cases commenced, the estimated aggregate present value liability under the Times Mirror Excess Pension Plan was approximately $10.1 million.

In connection with Tribune's acquisition of Times Mirror, Tribune also assumed The Times Mirror Company Supplemental Retirement Plan for Certain Times Mirror Officers, and The Times Mirror Pension Plan for Directors. By December 2005, all accruals under these plans had ceased. The Times Mirror Company Supplemental Retirement Plan for Certain Times Mirror Officers provided additional retirement benefits for certain executives of Times Mirror. The Times Mirror Pension Plan for Directors provided benefits for a period following a director's service on the board of directors of Times Mirror, with such period based on the number of years during which the director served on such board. Payments under both of these plans were suspended as of the commencement of the Chapter 11 Cases. As of the date the Chapter 11 Cases commenced, the estimated aggregate present value liability under these plans was approximately $43.3 million.

Payments to former directors, officers or employees under the normal terms of these various noncontributory plans will not re-commence after the Effective Date of the Plan.

      ii)      Contributory Plans.

Tribune sponsored The Times Mirror Deferred Compensation Plan for Executives and the Times Mirror Deferred Compensation Plan for Directors, which Tribune assumed in connection with the Times Mirror acquisition. A participant's benefit under these plans was based on his or her "account balance," which was

43

based on the amount of a participant's compensation that was deferred under the plan, adjusted for hypothetical earnings or losses based on investment benchmarks selected by the participant or credited interest designated under the plan, as applicable. Payments under each of these plans, as well as adjustments for hypothetical earnings and losses, were suspended as of the commencement of the Chapter 11 Cases. As of the date the Chapter 11 Cases commenced, the estimated aggregate present value liability under these plans was approximately $22.1 million.

Payments to former directors, officers or employees under the normal terms of these various contributory plans will not re-commence after the Effective Date of the Plan.

          (f)      Certain Individual Letter Agreements.

In addition to the nonqualified deferred compensation plans described above, the Debtors are parties to individual agreements that entitle certain former employees to various retirement-related payments. The individual agreements vary with respect to benefit amounts, benefit formulas, and payment provisions. Payments under the individual agreements were suspended as of the commencement of the Chapter 11 Cases. As of the date the Chapter 11 Cases commenced, the estimated aggregate present value liability under these agreements was approximately $17.0 million. Payments to former directors, officers or employees under the normal terms of these individual letter agreements will not re-commence after the Effective Date of the Plan.

**D.**     **Pending Litigation and Certain Other Legal Matters Involving the Debtors**

The Debtors are involved from time to time in a variety of litigation and legal matters that are incidental to their businesses. As a consequence of the Debtors' commencement of these Chapter 11 Cases, all pending claims and litigation against the Debtors in the United States have been automatically stayed pursuant to section 362 of the Bankruptcy Code. Certain pending litigation related to prepetition causes of action and certain other legal matters which may result in litigation following the Effective Date are described below. The descriptions below are not, and are not intended to be, a comprehensive list of all actions or matters involving the Debtors and specifically exclude, among others, administrative actions, workers compensation actions and actions involving union grievances. In addition, the matters discussed below are included for disclosure purposes only and are not an admission, and are not intended to be an admission, of liability with respect to any claim or action.

The Debtors anticipate that, to the extent any of the litigation set forth below is not resolved prior to the Effective Date of the Plan or removed by the Debtors to federal court consistent with the Bankruptcy Code, and to the extent the plaintiffs timely filed proofs of claim, such litigation will continue after the Effective Date in the forum(s) in which it was initiated in order to liquidate the amount of the Claim. Any adverse judgment in any of these actions would constitute a Claim that will be treated in accordance with the provisions of the Plan, so long as such Claim was otherwise allowable because it complied with the applicable requirements of the Chapter 11 Cases and the Bankruptcy Code.

As of the date of this Disclosure Statement, the face-value of all litigation-related proofs of claim against the Tribune that have not already been disallowed by Bankruptcy Court order, including all unliquidated amounts, is approximately $67,000,000. That amount, however, assumes that all pending litigation-related proofs of claim against Tribune are not frivolous and will be successfully prosecuted for the full amount demanded. It also includes duplicate claims filed against Tribune. After accounting for duplicate claims, the face-value of claims arising from litigation pending against Tribune is approximately $36,000,000. The Debtors continue to review and defend the various litigation claims and the ultimate allowed amount is uncertain; however, based on the preceding information and the review to date, the Debtors believe the estimated range of Allowed Other Parent Claims of $100 million to $125 million is appropriate.

As of the date of this Disclosure Statement, the face-value of all litigation-related proofs of claim against the Filed Subsidiary Debtors that have not already been disallowed by Bankruptcy Court order,

including all unliquidated amounts, is approximately $306,649,896. That amount, however, assumes that all pending litigation-related proofs of claim against the Filed Subsidiary Debtors are not frivolous and will be successfully prosecuted for the full amount demanded. It also includes duplicate claims filed against the Subsidiary Debtors. After accounting for (i) duplicate claims, (ii) claims that are the subject of objections either pending before the Bankruptcy Court or to be filed with the Bankruptcy Court on May 17, 2010, and (iii) claims that have been settled in principle as of May 17, 2010, the face-value of claims arising from litigation pending against the Filed Subsidiary Debtors is approximately $44,505,987. The Debtors continue to review and defend the various litigation claims and the ultimate allowed amount is uncertain; however, based on the preceding information and the review to date, the Debtors believe the estimated range of Allowed Subsidiary General Unsecured Claims of $85 million to $150 million is appropriate.

      1.      *Newsday* and *Hoy* Circulation Misstatements.

In February 2004, a purported class action lawsuit was filed in New York federal court by certain advertisers in *Newsday* and an affiliate publication, *Hoy,* New York, alleging that they were overcharged for advertising as a result of inflated circulation numbers at these two publications (the "New York Circulation Action"). Plaintiffs in the New York Circulation Action also allege that certain entities that paid Distribution Systems of America, Inc., a *Newsday* subsidiary, to deliver advertising flyers were overcharged. Due to the commencement of these Chapter 11 Cases, the New York Circulation Action, captioned *Crabhouse of Douglaston Inc. d/b/a/ Douglaston Manor, et al., v. Newsday, Inc. et al.,* Case No. CV 04-558 (E.D.N.Y. Feb. 10, 2004), has been stayed with respect to the remaining Debtor defendants: Hoy, LLC (the publisher of *Hoy,* New York) and Distribution Systems of America, LLC. The litigation is ongoing with respect to Tribune ND, Inc., a Guarantor Non-Debtor, as successor to Newsday, Inc.

In addition to the New York Circulation Action, a stockholder derivative suit was filed against the Debtors and certain of their current and former directors and officers in the United States District Court for the Northern District of Illinois captioned *Hill v. Tribune Co.,* Case No. 05-2602 (WTH). The suit, which was filed as a result of the circulation misstatements at *Newsday* and *Hoy,* alleged breaches of fiduciary duties and other managerial and director failings under Delaware law and the federal securities laws. The consolidated securities class action lawsuit was dismissed with prejudice on September 29, 2006. The dismissal was appealed to the United States Court of Appeals for the Seventh Circuit (the "Seventh Circuit"). On April 2, 2008, the Seventh Circuit issued an opinion affirming the dismissal of the securities class action lawsuit. Plaintiffs in the securities class action lawsuit have filed a petition for a rehearing *en banc* by the Seventh Circuit. Due to the commencement of the Chapter 11 Cases, this action is currently stayed.

On December 17, 2007, *Newsday* and *Hoy,* New York reached a non-prosecution agreement with the United States Attorneys' Office for the Eastern District of New York that ended a federal inquiry into the circulation practices of Newsday, Inc. and Hoy Publications LLC, as successor-in-interest to Hoy, LLC. The agreement recognized (i) *Newsday's* and *Hoy,* New York's full cooperation with the investigation, (ii) the implementation of new practices and procedures to prevent fraudulent circulation practices, (iii) the payment as of December 2007 of approximately $83 million in restitution to advertisers, and (iv) a civil forfeiture payment of $15 million.

      2.      ESOP Lawsuit.

In September 2008, a lawsuit was filed in the United States District Court for the Central District of California (the "California District Court") by current and former employees of the *Los Angeles Times.* The lawsuit named as defendants a former director and current directors of Tribune, the trustee of the ESOP, the Tribune Employee Benefits Committee, and certain current and former members, EGI-TRB, LLC, and, nominally, the ESOP. The lawsuit alleged breaches by defendants of duties and obligations under the Employer Retirement Income Security Act of 1974, as amended ("ERISA") and state law. On November 17, 2008, the California District Court transferred the case to the United States District Court for the Northern District of

45

Illinois. The lawsuit, captioned, *Neil v. Zell*, Case No. 08-6833 (RRP), seeks relief, including damages, for the benefit of the ESOP (the "Neil Litigation"). In an amended complaint filed on December 30, 2008, plaintiffs added as defendants several current and former Tribune officers who had allegedly served on the Employee Benefits Committee.

On March 13, 2009, Tribune filed an adversary proceeding (the "Neil Adversary Proceeding") captioned *Tribune Company v. Dan Neil, et al.* (*In re Tribune Company*), Adv. Pro. No. 09-50445 (KJC) (Bankr. D. Del. Mar. 13, 2009), which sought declaratory and injunctive relief to stay all further prosecution of the Neil Litigation. On May 20, 2009, Tribune withdrew its preliminary injunction motion without prejudice to its right to refile because the plaintiffs dropped Tribune as a defendant from the underlying lawsuit in an amended complaint filed December 30, 2008. At a status conference held on June 25, 2009, Tribune advised the Bankruptcy Court that the parties had agreed that the underlying lawsuit would go forward solely with respect to briefing and decision on a motion to dismiss for failure to state a claim upon which relief could be granted (the "Motion to Dismiss"). In connection therewith, Tribune negotiated the terms under which its primary fiduciary liability insurance carrier agreed to advance the defense costs associated with the Motion to Dismiss to Tribune's directors and officers named in the suit. Tribune filed a motion to authorize the payment and advancement of insurance proceeds on August 17, 2009, which was granted on September 2, 2009. On November 16, 2009, upon agreement by the parties, the Bankruptcy Court stayed the Neil Adversary Proceeding pending resolution of the motion to dismiss filed in the Neil Litigation.

On December 17, 2009, the Illinois District Court granted in part and denied in part the Motion to Dismiss. The court dismissed all claims against the directors and officers of Tribune, except that it denied the Motion to Dismiss as to certain claims against Tribune board member Samuel Zell. The court also denied the Motion to Dismiss as to claims against the ESOP trustee and EGI-TRB. On March 2, 2010, EGI-TRB and Zell filed an answer to the amended complaint. On the same day, they filed a motion for judgment on the pleadings. Also on March 2, 2010, GreatBanc Trust Company, the ESOP trustee, filed a motion for reconsideration of the Illinois District Court's December 17, 2009, ruling.

On March 5, 2010, Tribune filed in the Neil Adversary Proceeding a motion for preliminary injunction enjoining the Neil plaintiffs from seeking any equitable relief that would affect property of Tribune's bankruptcy estates (the "Preliminary Injunction Motion"). The parties in the Neil Adversary Proceeding stipulated to a briefing schedule that provides for briefing on the Preliminary Injunction Motion after the resolution of the motions for judgment on the pleadings and reconsideration filed in the Neil Litigation.

On March 18, 2010, the Illinois District Court requested briefing on certain issues regarding equitable relief raised in EGI-TRB's and Zell's motion for judgment on the pleadings and GreatBanc Trust Company's motion for reconsideration.

The ESOP has also been the subject of ongoing investigation by the United States Department of Labor ("DOL") and an audit by the Internal Revenue Service ("IRS"). On May 28, 2009, the DOL filed an unliquidated proof of claim against Tribune, and on June 10, 2009, the DOL filed a similar claim against 70 other Debtors. The DOL's claims state that it is conducting an investigation of the ESOP for possible violations of ~~Title I of the Employee Retirement Income Security Act of 1974 ("ERISA")~~ERISA, including ERISA sections 404 and 406. Pursuant to its investigation, the DOL has sought and obtained documents from the ESOP Trustee, GreatBanc Trust Company, and its financial advisor, Duff & Phelps, and the DOL has conducted interviews of personnel of both of those entities. The IRS did not file a proof of claim relating to the ERISA issues being investigated by the DOL, but has conducted an interview of a representative of Duff & Phelps.

3.      FCC Related Matters.

Various aspects of the Debtors' operations are subject to regulation by governmental authorities in the United States. The Debtors' television and radio broadcasting operations are subject to FCC jurisdiction under the Communications Act. FCC rules govern, among other things, the term, renewal and transfer of radio and television broadcasting licenses and limit concentrations of broadcasting ownership that the FCC considers to be inconsistent with the public interest. Federal law also regulates the rates charged for political advertising and the quantity of advertising within children's programs.

On November 30, 2007, the FCC issued an order (the "FCC Order") granting the Debtors' applications to transfer control of the Debtors from the existing stockholders to the ESOP in connection with the Leveraged ESOP Transactions. In the FCC Order, the FCC rejected the Debtors' request for "permanent" waivers of the newspaper/broadcast cross-ownership rule, which generally restricts the common ownership of a daily newspaper and a television station or radio station in the same local market, in order to permit continued common ownership of (i) WSFL-TV and the *South Florida Sun-Sentinel* in Miami, Florida; (ii) WTXX-TV/WTIC-TV and the *Hartford Courant in* Hartford, Connecticut; (iii) KTLA-TV and the *Los Angeles Times* in Los Angeles, California; and (iv) WPIX-TV and *Newsday* in New York, New York. The "permanent" waivers would have continued as long as the Debtors owned the properties; they would not have permitted subsequent sales of the properties intact. The FCC granted the Debtors "temporary" or time-limited waivers with respect to these cross-owned properties for a six-month period beginning January 1, 2008, and provided for extension of these waivers in three circumstances. First, the FCC ruled that if it were to adopt a revised newspaper/broadcast cross-ownership rule before January 1, 2008, it would grant applicants a two-year waiver of the rule, to among other things, allow parties an opportunity to make individualized waiver showings and the FCC to consider them. The date on which the two-year period is to commence is open to interpretation. On December 18, 2007, the FCC voted to adopt a revised rule (the "2008 Order"). Second, the FCC ordered that, if Tribune should challenge the denial of the requested "permanent" waivers in court, it would grant a waiver that would last either for two years or until six months after the conclusion of the litigation, whichever is longer, provided that the applicants did not abandon that litigation before a court decision was reached. Third, the FCC ordered that, in the event the applicants were not able to come into compliance with any revised cross-ownership rule during the two-year period because the revised rule was subject to a judicial stay, then the waiver would extend until six months after the expiration of any such stay. On December 3, 2007, the applicants appealed the FCC Order to the United States Court of Appeals for the District of Columbia Circuit (the "D.C. Circuit"), captioned *Tribune Co. v. FCC*, Case No. 07-1488. That appeal is pending, but the D.C. Circuit has held the appeal in abeyance pending the resolution of petitions for reconsideration of the FCC Order pending before the FCC. The terms of any waivers the FCC may grant in connection with the FCC Applications may affect the course of the pending appeal.

The FCC Order also granted the Debtors a "permanent" waiver of the newspaper/broadcast cross-ownership rule to permit continued common ownership of WGN-AM, WGN-TV and the *Chicago Tribune* in Chicago, Illinois; a "permanent" "failing station" waiver of the television duopoly rule to permit continued common ownership of WTIC-TV and WTXX-TV in Hartford, Connecticut; and continued satellite station status to WTTK-TV, licensed to Kokomo, Indiana, to permit continued common ownership with WTTV-TV in Bloomington, Indiana. Both WTTK-TV and WTTV-TV are in the Indianapolis market. Various parties have petitioned for reconsideration of the FCC Order with the FCC; the Debtors have filed an opposition to such filings with the FCC.

In the 2008 Order, the FCC announced new liberalized waiver standards for the newspaper/broadcast cross-ownership rule. Under the revised waiver standards, the Debtors would be entitled to a presumption in favor of common ownership in three of four of the Debtors' cross-ownership markets which are the subject of FCC temporary waivers (Los Angeles, CA; Miami, FL; and New York, NY). Various parties, including the Debtors, have sought reconsideration before the FCC or judicial review of the 2008 Order, and proceedings for such judicial review are pending in the United States Court of Appeals for the Third Circuit (the "Third Circuit"). On March 23, 2010, the Third Circuit lifted the stay that had been in effect and set a briefing schedule

for the challenges to the 2008 Order, which commences on May 17, 2010 and concludes approximately 44 days later.

4.      Miscellaneous Other Litigation.

As of the Petition Date, there were approximately 50 prepetition personal injury cases pending against the Debtors. There were also at least 45 prepetition cases pending against the Debtors involving media-related claims, such as defamation, slander and libel. In addition, the Debtors were subject to at least 15 employment–related cases (such as wrongful termination and breach of employment contract). Approximately two-thirds of the plaintiffs in these lawsuits filed a proof of claim prior to the Bar Date (defined below), and the Claims reflected therein will be evaluated during the claims reconciliation process (discussed in Article VI.G.4 below) and treated in accordance with the provisions of the Plan, provided that such Claims otherwise comply with the applicable requirements of the Bankruptcy Code and applicable orders of the Bankruptcy Court.

## V.  EVENTS LEADING UP TO CHAPTER 11

In 2008, the newspaper publishing industry experienced an unprecedented decline which was exacerbated by the recent recession. While the Debtors' newspaper advertising revenue continued to be in line with, and in some cases superior to, other large metropolitan newspapers during that time, newspaper advertising revenue generally has been in significant decline, down industry-wide approximately fifteen to twenty percent (15-20%) in 2008 over the preceding year in major metropolitan markets, and down industry-wide nearly $2 billion, or eighteen percent (18%), in the third quarter of 2008 alone. Further, while the Debtors' television broadcasting stations outperformed the broader television broadcasting industry, the Debtors' 2008 broadcasting revenue nevertheless lagged behind their 2007 performance, again largely as a result of declining advertising revenue. Through November 2008, Tribune's consolidated revenue was down ten percent (10%) versus 2007, with publishing advertising revenues down eighteen percent (18%) and broadcasting and entertainment revenues down three percent (3%). On a consolidated basis, Tribune's operating cash flow (excluding equity compensation, one-time items and discontinued operations) was down thirty-three percent (33%) in 2008.

Prior to the Petition Date, the Debtors implemented and continue to implement aggressive strategic initiatives to enhance operating cash flow and mitigate the impact of the severe economic downturn. Strategic initiatives aimed at generating incremental cash flow through cost savings included improvements in operating efficiencies, reductions in workforce, web width (newspaper page size) reductions and newspaper redesigns. They also included revenue enhancement initiatives such as entering into arrangements to print and deliver other companies' newspapers, increasing the number of hours of television news programming, and improving the efficiency and effectiveness of the sales force. Additionally, in 2008 the Debtors implemented a strategy to monetize various assets including the July 2008 joint venture involving the Newsday operations, the April 2008 sale of real estate associated with the Debtors' former Southern Connecticut newspapers, the January 2008 sale of a studio production lot in Hollywood, California and the September 2008 sale of an equity stake in CareerBuilder LLC. Tribune also continued its efforts to select a winning bidder for the Chicago Cubs baseball operations and related assets, consistent with Tribune's announcement in April 2007 that it intended to pursue the disposition of an interest in that business. The consummation of certain transactions pursuant to which the Chicago Cubs and related assets and liabilities were contributed to a newly formed limited liability company, Chicago Baseball Holdings, LLC and its subsidiaries, is described in more detail in Article VI.H of this Disclosure Statement.

Notwithstanding the Debtors' aggressive efforts to enhance revenue, reduce expenses and monetize various assets, the impact of the unprecedented economic downturn left them with weak operating results and significant liquidity challenges. In December 2008 alone, the Debtors faced debt service and related payments of approximately $200 million, with another $1.3 billion due in 2009, including $512 million of the Tranche X debt maturing in June 2009.

Against a backdrop of declining revenues in a recession, uncertainty in the capital markets and substantial debt service requirements, the Debtors concluded that the most responsible course of action was to restructure their balance sheet in order to restore liquidity and return to financial health.

## VI.  EVENTS DURING THE CHAPTER 11 CASES

On the Petition Date, the Debtors filed voluntary petitions for reorganization under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  The Debtors' bankruptcy cases have been assigned to United States Bankruptcy Judge Kevin J. Carey.  The following is a brief description of certain major events that have occurred during the Chapter 11 Cases.  Because of the size of the Debtors' cases, not all events have been described below.  For a complete overview of the proceedings in the Chapter 11 Cases, please refer to the publicly-available docket located, free of charge, on the Debtors' website: http://chapter11.epiqsystems.com/tribune.

**A.    Procedural Motions**

On the Petition Date, the Debtors filed the Motion of the Debtors for an Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Administration Motion"), which requested procedural consolidation of these Chapter 11 Cases for ease of administration.  The Bankruptcy Court approved the Joint Administration Motion on December 10, 2008.  A supplemental joint administration order was entered by the Bankruptcy Court on October 14, 2009 jointly administering the Chapter 11 Cases of Tribune CNLBC with the Chapter 11 Cases of the other Debtors, and making certain "first day" orders and other orders previously entered in the Debtors' Chapter 11 Cases applicable to Tribune CNLBC.

**B.    "First-Day" Motions**

On the Petition Date, the Debtors also filed several motions seeking typical "first day" relief in the Chapter 11 Cases.  The purpose of such motions was to ensure that the Debtors were able to transition into the Chapter 11 process with as little disruption to their businesses as possible and to enable the Debtors' businesses to function smoothly while the Chapter 11 process was pending.

The "first day" motions filed by the Debtors sought authority to, among other things, (i) make tax payments to federal, state and local taxing authorities on an uninterrupted basis; (ii) continue prepetition insurance programs and pay premium installments outstanding in connection therewith; (iii) honor prepetition customer obligations and continue customer programs; (iv) pay prepetition wages and other benefits to the Debtors' employees; (v) continue use of the Debtors' existing cash management system, bank accounts and business forms; (vi) prevent utility companies from discontinuing, altering or refusing service; (vii) pay the prepetition commissions of the Debtors' brokers; (viii) pay certain prepetition claims of shippers, warehousemen and other lien claimants; (ix) make payments to certain prepetition creditors that are vital to the Debtors' uninterrupted operations; and (x) continue selling receivables and related rights and to obtain post-petition financing, among other similar relief.  All of the Debtors' first-day motions were ultimately granted by the Bankruptcy Court in substantially the manner requested by the Debtors.  A summary of certain material relief sought in connection with the "first-day" motions and other related relief is set forth below.

**C.    Employee Compensation and Benefits.**

On the Petition Date, the Debtors filed a motion seeking court authority to continue, among other things, to pay employee wages, reimburse business expenses, and continue contributions to employee benefit plans (the "Employee Wage Motion").  Specifically, the Debtors requested (i) the ability to pay employee wages that were outstanding as of the Petition Date, (ii) satisfy obligations outstanding with respect to employee expense reports and various federal, state and local taxes withheld from the employees' wages, and (iii) pay amounts outstanding in connection with various benefit programs maintained by the Debtors for their

49

employees, including employee health care programs, vacation, sick day and holiday benefits, employee savings plans, disability and other types of insurance, retiree medical programs and workers compensation. By order entered on December 10, 2008, the Bankruptcy Court granted the relief requested in the Employee Wage Motion in substantially the manner requested by the Debtors.

In addition, on December 24, 2008, the Debtors moved the Bankruptcy Court for authority to pay certain prepetition contributions owed to certain union pension plans pursuant to collective bargaining agreements and to continue making contributions to those union pension plans post-petition in the ordinary course of business (the "Union Pension Motion"). Also on December 24, 2008, the Debtors filed a motion requesting authority to implement a retention plan for certain key, non-insider and non-management employees who were necessary for an effective and orderly transition of operations under a local marketing agreement in Denver and a shared services agreement in St. Louis (the "Incentive Plan Motion"). The Bankruptcy Court granted both the Union Pension Plan Motion and the Incentive Plan Motion on January 13, 2009.

On January 13, 2009, the Debtors moved the Bankruptcy Court to implement a severance policy for non-union employees and to continue severance for union employees (the "Severance Motion"), which asked for the authority to allow, but not require, the Debtors to pay severance based on time employed for non-union employees, and, in regard to union employees, to honor the severance provisions of the respective collective bargaining agreements. Also on January 13, 2009, the Debtors filed a motion to allow the payment of prepetition non-insider incentive programs in an amount not to exceed $8.8 million (the "Incentive Motion"). By order dated February 3, 2009, the Bankruptcy Court granted the Incentive Motion and authorized the Debtors to fund the non-insider incentive plan. The Bankruptcy Court granted the Severance Motion by order entered February 4, 2009.

On April 22, 2009, the Debtors moved the Court for the authority to make certain payments under the 2008 MIP and to comply with certain other local bonus obligations (the "2008 MIP Motion"). The MIP payments were analyzed by Mercer (U.S.), Inc. ("Mercer"), an independent compensation consultant engaged by the compensation committee of Tribune's Board of Directors. The MIP payments totaled approximately $12.243 million, with respect to approximately 670 participants, and specifically excluded certain of the Debtors' executives. The 2008 MIP Motion also sought authority to pay approximately $1.1 million in the aggregate under certain local bonus programs maintained by the Debtors. The order granting the relief requested in the 2008 MIP Motion was granted on May 12, 2009.

Finally, on July 22, 2009, the Debtors filed the 2009 MIP Motion requesting authority to pay earned 2008 MIP awards to the certain of the Debtors' executives and to implement a 2009 Management Incentive Plan (i) continuing the self-funding ordinary course MIP for 2009 for approximately 720 management employees, (ii) including a self-funding pay-for-performance TMIP bonus opportunity to incentivize 21 members of the Debtors' core management team to deliver strong operating results while performing substantial restructuring duties, and (iii) including a self-funding pay-for-performance bonus opportunity for 23 leaders of key operations (six of whom also participate in the TMIP) to incentivize such key leaders to achieve transformation of their respective operations by exceeding certain "stretch" operating cash flow goals. On September 30, 2009, the Bankruptcy Court entered an order approving only the payment of earned but unpaid 2008 MIP awards to certain of the Debtors' executives. On January 28, 2010, the Bankruptcy Court entered an order authorizing the payment of earned but unpaid 2009 MIP awards to all participants in the MIP in an aggregate amount not to exceed $45.6 million. The Bankruptcy Court continues to take under advisement the TMIP and KOB programs. On March 4, 2010, the Debtors filed a motion to voluntarily dismiss, without prejudice, their request in the 2009 MIP Motion for entry of an order authorizing the implementation of the ~~MIP~~TMIP and KOB programs. The Bankruptcy Court granted the Debtors' motion by order dated March 23, 2010. The Debtors will address the inclusion in the Plan of the TMIP and the KOB in ~~a supplement that will be filed by the Debtors prior to the hearing on approval of the Disclosure Statement~~the Plan Supplement.

**D.**    **Cash Management.**

50

Prior to the Petition Date, the Debtors utilized a centralized cash management system (the "Cash Management System") to collect funds from their operations and to pay operating and administrative expenses in connection therewith. In order to, among other things, avoid administrative inefficiencies, the Debtors moved the Bankruptcy Court for an order (i) approving the Cash Management System; (ii) authorizing the continued use of their existing, prepetition bank accounts and business forms; (iii) waiving the requirements of section 345(b) of the Bankruptcy Code on an interim basis; (iv) granting administrative priority status to intercompany claims between and among the Debtors and between and among the Debtors and their non-Debtor affiliates; and (v) authorizing use of cash collateral in their deposit accounts as of the Petition Date and providing adequate protection to the cash management banks for the Debtors use of the cash collateral (the "Cash Management Motion"). By order signed December 10, 2008, the Bankruptcy Court approved the Cash Management Motion and waived the requirements of section 345(b) on an interim basis (the "Interim Order"). The Interim Order granted administrative priority status to intercompany claims and transactions on an interim basis. The final hearing on the Cash Management Motion was initially set for January 5, 2009, but was continued several times to April 30, 2009. The order granting administrative superpriority status to post-petition intercompany claims and transactions was entered on April 30, 2009 (the "Final Order"). The Final Order granted relief under section 345(b) in regard to certain foreign accounts but continued the interim waiver of section 345(b) guidelines on an interim basis. After entry of the Final Order, the Debtors and the U.S. Trustee resolved their remaining investment guidelines issues under section 345(b), and the Bankruptcy Court entered an order in respect of such issues on July 30, 2009.

## E.    Post-Petition Financing.

As discussed in Article VI above, prior to the Petition Date, Tribune established the Receivables Facility. After the Petition Date, the Debtors and Barclays amended the Receivables Facility to allow for it to be utilized as interim debtor-in-possession financing (the "Interim DIP Facility") and to provide liquidity for continued operations during the Chapter 11 Cases. On December 8, 2008, the Debtors filed motions seeking Bankruptcy Court authorization for the (i) continued post-petition transfers of certain of the Debtors' receivables to the Receivables Subsidiary and (ii) Receivables Subsidiary to continue to obtain loans up to $300 million. The Debtors also sought Bankruptcy Court approval to permit the Debtors to (a) guarantee certain of the obligations of the Receivables Subsidiary and provide security in respect of such guaranty and (b) perform its reimbursement, cash collateral and other obligations under a new post-petition letter of credit facility (the "Letter of Credit Facility") to be provided by Barclays, as issuer and as administrative agent, and permitting the Debtors to obtain letters of credit in an aggregate amount up to $50 million. On December 11, 2008, the Bankruptcy Court granted interim approval of the Debtors' motions and, on January 15, 2009, the Bankruptcy Court granted final approval.

The Debtors and Barclays subsequently amended the Receivables Facility to allow its use as a more permanent asset-backed debtor-in-possession financing (the "Amended DIP Facility"). The Amended DIP Facility is comprised of a $75 million revolving line of credit, a $150 million term loan on terms similar to the Interim DIP Facility, and a letter of credit facility. The scheduled termination date of the Amended DIP Facility was amended to the earlier of April 10, 2010 or the Debtors' emergence from the Chapter 11 Cases. The Amended DIP Facility was approved by the Bankruptcy Court on April 8, 2009.

On November 19, 2009, the outstanding term and revolving loan balances under the Amended DIP Facility were repaid. On February 25, 2010, the Debtors provided written notice to the Administrative Agent for the Amended DIP Facility terminating the Amended DIP Facility effective February 26, 2010.

Although the Debtors have terminated the Amended DIP Facility, they recently amended and extended the Letter of Credit Facility. On March 2, 2010, the Debtors filed a motion with the Bankruptcy Court seeking authorization to enter into an amendment extending the term of the Letter of Credit Facility to the earlier to occur of (i) April 9, 2011 or (ii) certain contingencies specified in the proposed amendment, and permitting,

among other things, the Debtors to obtain letters of credit in an aggregate amount up to $30 million.[1]  The Bankruptcy Court approved the amendment to the Letter of Credit Facility by order entered March 22, 2010.

A letter of credit in the amount of $13 million has been issued and is outstanding under the Letter of Credit Facility.

## F.    Professional Retentions.

1.    Retention of Professionals by the Debtors' Estates.

The Debtors applied for orders authorizing (i) the retention of Sidley Austin LLP ("Sidley") as its general reorganization and bankruptcy counsel and (ii) Cole, Schotz, Meisel, Forman & Leonard, P.A. ("Cole Schotz") as Delaware bankruptcy co-counsel under section 327(a) of the Bankruptcy Code on December 26, 2008.  The order approving Sidley's retention was entered on February 20, 2009, and the order approving Cole Schotz's was entered on February 3, 2009.

The Debtors also retained Alvarez & Marsal North America, LLC ("Alvarez") as restructuring advisor.  The application to retain Alvarez was filed on December 26, 2008, and the order approving Alvarez's retention was entered on February 11, 2009.  In addition, the Debtors filed an application to retain Lazard Frères & Co., LLC ("Lazard") as their investment banker and financial advisor.  The application to retain Lazard was filed on December 26, 2008.  The order approving Lazard's retention was entered on March 13, 2009.  Finally, the Debtors filed an application to retain Deloitte & Touche LLP ("Deloitte") as their provider of certain financial, accounting, and advisory services on July 24, 2009.  The order approving Deloitte's retention was entered on August 11, 2009.

To further assist them in carrying out their duties as debtors in possession and to otherwise represent their interests in the Chapter 11 Cases, the Debtors also retained the following professionals with the Bankruptcy Court's approval:  (i) Daniel J. Edelman, Inc., as corporate communications and investor relations advisor; (ii) Dow Lohnes PLLC, as special counsel for certain regulatory matters; (iii) Ernst and Young LLP, to provide valuation, business modeling services, and market survey services to the Debtors; (iv) Jenner & Block LLP, as special counsel for certain litigation matters; (v) Jones Day, as special counsel for certain litigation matters; (vi) McDermott Will & Emery, LLP, as special counsel for general domestic legal matters; (vii) Mercer, as compensation consultant; (viii) Paul Hasting Janofsky & Walker LLP, as special counsel for general real estate and related matters; (ix) PricewaterhouseCoopers, LLP, as compensation and tax advisor and independent auditor; (x) Reed Smith LLP, as special counsel; and (xi) Seyfarth Shaw LLP, as special counsel for certain employment litigation matters.

In addition, the Debtors filed a motion seeking authorization to continue paying certain professionals utilized in the ordinary course of the Debtors' businesses (the "Ordinary Course Motion").  The Ordinary Course Motion was approved by order entered January 15, 2009.

2.    The Creditors Committee and its Advisors.

On December 18, 2008, the U.S. Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Creditors Committee") and subsequently amended that appointment on December 30, 2008 and May 26, 2009 to add and/or replace certain Creditors Committee members.  The Creditors Committee is currently comprised of the following parties: (i) JPMorgan Chase Bank, N.A.; (ii) Deutsche Bank Trust Company Americas; (iii) Warner Bros. Television; (iv) Buena Vista Television; (v) William Niese; (vi) Pension Benefit Guaranty Corporation; (vii) Wilmington Trust Company; and (viii) Washington-Baltimore Newspaper Guild, Local 32035.

---

[1] See Motion of the Debtors for an Order Authorizing Debtors to Amend the Letter of Credit Facility Pursuant to Sections 105, 362(d), 363(b)(1), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e) and 365 of the Bankruptcy Code and Granting Other Related Relief [Docket No. 3666].

On January 16, 2009, the Creditors Committee applied for an order authorizing the retention of (i) Chadbourne & Parke, LLP ("Chadbourne"), as counsel for the Creditors Committee and (ii) Landis, Rath & Cobb, LLP ("Landis"), as Delaware bankruptcy co-counsel. The orders approving the retention of Chadbourne and Landis were entered on February 20, 2009. Also on January 16, 2009, the Creditors Committee applied for an order to retain AlixPartners, LLP ("AlixPartners") as its financial advisor. The order approving the retention of AlixPartners was entered on February 20, 2009. On January 30, 2009, the Creditors Committee subsequently moved to allow them to retain Moelis & Company, LLC ("Moelis") as investment bankers. The order approving the retention of Moelis was signed on March 13, 2009. Finally, on August 13, 2009, the Creditors Committee requested authorization to retain Zuckerman Spaeder LLP ("Zuckerman") as special counsel. An order approving the retention of Zuckerman was entered on September 3, 2009.

**G.      Certain Administrative Matters and Other Motions.**

　　　　1.      Disposition of Certain Executory Contracts and Unexpired Leases.

　　　　　　　(a)      Unexpired Leases

In an effort to streamline business operations and reduce inefficiencies, the Debtors began the process of examining their real property leases in order to determine whether any of their operations could be consolidated. Since the Petition Date, the Debtors have obtained five orders from the Bankruptcy Court authorizing the rejection of over 70 real estate leases and subleases for certain office, operational, and studio properties that were no longer required for the Debtors' ongoing business operations.[2]  On July 28, 2009, the Debtors also obtained authority from the Bankruptcy Court to abandon certain property and related obligations located at 2 Park Avenue, New York, New York.

The Debtors also sought and obtained authority to assume 226 real estate leases that are valuable assets and useful to the Debtors' ongoing businesses.[3]  In addition, Debtor WGN Continental Broadcasting Company ("WGN") sought and obtained authority to assume two leases relating to the operation of WGN's digital transmitters located atop Chicago's Willis (Sears) Tower.[4]  Los Angeles Times Communication LLC ("LATC") also sought and obtained authority to assume a lease pertaining to certain non-residential real property valuable to LATC's business operations.[5]

　　　　　　　(b)      Motions to Assume Certain Executory Contracts.

The Debtors also sought authority to assume, assume and assign or reject various agreements, including the following:

---

[2] See Order Authorizing Debtors' First Omnibus Motion to Reject Certain Leases of Nonresidential Real Property, dated January 15, 2009; Order Authorizing Debtors' Second Omnibus Motion to Reject Certain Leases of Nonresidential Real Property, dated February 20, 2009; Order Authorizing Debtors' Third Omnibus Motion to Reject Certain Leases of Nonresidential Real Property, dated March 23, 2009; Order Authorizing Debtors' Fourth Omnibus Motion to Reject Certain Leases of Nonresidential Real Property, dated June 24, 2009 [Docket No. 1629]; Order Authorizing Debtors' Fifth Omnibus Motion to Reject Certain Leases of Nonresidential Real Property, dated September 2, 2009.

[3] See Order Authorizing Debtors to (I) Assume Certain Unexpired Leases of Nonresidential Real Property and (II) Set Cure Amounts with Respect Thereto, dated June 24, 2009 [Docket No. 1628].

[4] See Order Authorizing Debtor WGN Continental Broadcasting Company to (I) Assume Certain Unexpired Leases of Nonresidential Real Property and (II) Setting Cure Amount with Respect Thereto, dated September 2, 2009.

[5] See Order (I) Authorizing Debtor Los Angeles Times Communications LLC to Assume a Certain Unexpired Lease of Nonresidential Real Property Pursuant to Section 365 of the Bankruptcy Code and (II) Setting Cure Amount with Respect Thereto, dated December 14, 2009 [Docket No. 2834].

- On July 8, 2009, Debtor Tribune Media Services, Inc. filed a motion seeking authority to assume certain prepetition local advertising sales agreements and to assign prepetition and post-petition local advertising sales agreements to Advantage Newspaper Consultants Inc., which was approved by order of the Bankruptcy Court on July 24, 2009. The Debtors also moved, on November 10, 2009, for an order to reject the service agreement between Tribune and Kenexa Brassring, Inc. (the "Kenexa Agreement"). The Bankruptcy Court entered an order authorizing the Debtors' to reject the Kenexa Agreement on November 25, 2009. Finally, the Debtors requested authority to assume a service agreement entered into between Debtor Tribune Publishing Company and Hewlett-Packard Company covering certain services to its advertisers (the "Hewlett-Packard Agreement"). The Debtors were granted authority to assume the Hewlett-Packard Agreement, as amended, on November 25, 2009.
- On May 21, 2009, Tribune Broadcasting Company, WGN Continental Broadcasting Company, ChicagoLand Television, News, Inc., Tribune Entertainment Company, and certain Broadcast Subsidiaries (as defined in the Nielsen Assumption Motion, defined below) moved the Bankruptcy Court for an order authorizing the assumption of certain amended ratings services agreements and ancillary agreements with the Nielsen Company (US), LLC and the waiver and release of certain claims pursuant to a settlement and release agreement (the "Nielsen Assumption Motion"). The Nielsen Assumption Motion was approved by an order signed June 9, 2009.
- On June 26, 2009, certain of the Debtors filed a motion seeking the authority, pursuant to section 365 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure, to assume various syndicated program agreements entered into with King World Productions, Inc., and CBS Studios, Inc., and/or CBS Television Distribution and CBS Studios, Inc. (collectively, "CBS") and to compromise, waive, and release one-half of the prepetition amounts owed to CBS (the "CBS Motion"). An order approving the CBS Motion was signed July 14, 2009 (the "CBS Order"). Pursuant to the CBS Order, the Debtors were only required to pay one-half of the outstanding prepetition amounts owed to CBS under the various agreements in order to assume the agreements.
- On July 22, 2009, Tribune and Chicago Tribune Company ("CTC") filed a motion seeking authority (i) to assume the Metromix LLC limited liability agreement, as amended (the "Metromix Agreement"), (ii) compromise and release claims, and (iii) enter into new agreements (the "Metromix Motion"). The Metromix Motion sought the authority to assume the Metromix Agreement as amended to permit, but not require, Tribune to make additional capital contributions to the Metromix LLC joint venture, if required. In addition, the Metromix Motion sought the authority to enter into four new agreements resolving certain disputes, among other things. An order approving the Metromix Motion was entered by the Bankruptcy Court on August 10, 2009.
- On August 14, 2009, Tribune and the Publishing Debtors (as defined in the Classified Ventures Motion) filed a motion to approve the assumption by Tribune of the Limited Liability Company Agreement of Classified Ventures, LLC, and the assumption by the Publishing Debtors of their Affiliate Agreements with Classified Ventures, LLC (the "Classified Ventures Motion").[6] The Classified Ventures Motion sought authority for Tribune and the subsidiary Debtors which publish daily newspapers to assume certain agreements with Classified Ventures necessary to enable such Debtors to continue generating revenue from the sale of certain online classified advertising in their respective markets. The Classified Ventures Motion also requested authority to pay certain cure amounts related to the requested assumption. An order granting this relief was entered on September 2, 2009.
- On January 6, 2010, Tribune Broadcasting Company, WGN Continental Broadcasting Company, Tribune Television Company, Tribune Television Holdings, inc., Tribune Television Northwest, Inc., Tribune Television New Orleans, Inc., Channel 39, Inc., Channel 40, Inc., KSWB, Inc.,

---

[6] As used in the Classified Ventures Motion, the term "Publishing Debtors" refers to Chicago Tribune Company, Los Angeles Times Communications LLC, The Hartford Courant Company, Orlando Sentinel Communications Company, Sun-Sentinel Company, The Daily Press, Inc., The Morning Call, Inc., and The Baltimore Sun Company.

KTLA Inc., WPIX, Inc., KIAH Inc. (f/k/a KHCW Inc.), WTXX Inc., and WDCW Broadcasting, Inc., sought approval to assume certain amended syndicated program agreements with Universal City Studios Productions LLP, a subsidiary of NBC Universal, Inc., and the compromise, waiver and release of certain claims (the "NBC Motion"). An order granting the relief requested in the NBC Motion was entered on January 25, 2010.

2.    Certain other Motions filed by the Debtors.

On April 29, 2009, the Debtors filed a motion seeking authorization to enter into a post-petition station affiliation agreement and related agreements with the CW Network (the "CW Motion"), pursuant to which the CW Network would provide programming for broadcast on certain of the Debtors' television stations. An order granting the CW Motion was entered by the Bankruptcy Court on May 12, 2009.

On January 6, 2010, the Debtors filed a motion for authorization to compromise and settle a certain working capital account and related amounts with Hearst Danbury Holdings LLC, et al., in connection with a prepetition sale transaction involving Debtors Tribune and Southern Connecticut Newspapers, Inc. (the "SCNI Motion"). An order granting the SCNI Motion was entered by the Bankruptcy Court on January 26, 2010.

3.    Fee Disgorgement Motion.

On March 26, 2010, the Bankruptcy Court heard oral arguments with respect to a motion filed by Law Debenture and joined by Centerbridge Credit Advisors LLC and Deutsche Bank Trust Company Americas seeking the disgorgement of fees and expenses paid by non-Debtor Tribune (FN) Cable Ventures, Inc. ("TCV") to certain professionals retained by the ~~Agent~~agent to the Senior Lenders under the Senior Loan Agreement and/or a former steering committee that was formed by the Debtors' Senior Lenders since the Petition Date (the "Fee Disgorgement Motion"). The Debtors, the Agent and the aforementioned steering committee opposed the Fee Disgorgement Motion on the grounds, among other things, that such payments were made by a non-Debtor on account of its own contractual obligations, were appropriately disclosed and vetted with the Creditors' Committee and the U.S. Trustee's office, and were made in furtherance of valid business considerations. The Bankruptcy Court did not rule on the Fee Disgorgement Motion at the March 26 hearing. However in connection with the Settlement Support Agreement, on April 9, 2010, a stipulation by and among JPMorgan Chase Bank, N.A., Law Debenture, and Centerbridge Credit Advisors LLC was filed with the Bankruptcy Court pursuant to which the Fee Disgorgement Motion was withdrawn without prejudice and the parties thereto agreed to the resumption of the fee reimbursements at issue in such motion. Also, on April 9, 2010, the Debtors filed a notice with the Bankruptcy Court indicating, in view of the stipulation, the intention of the Non-Debtor Guarantors and subsidiaries, including TCV, to recommence such fee reimbursements upon the expiration of five business days' notice. Such fee reimbursements were resumed following expiration of the aforementioned notice period. On April 29, 2010, the Debtors filed a notice with the Bankruptcy Court reflecting certain fees and expenses that were paid on or about April 22, 2010 and April 29, 2010 by TCV to certain professionals retained by the agent to the Senior Lenders under the Senior Loan Agreement and/or the former steering committee that was formed by the Senior Lenders.

4.    Schedules of Assets and Liabilities; Statements of Financial Affairs.

On March 23, 2009, the Debtors filed their Schedules of Assets and Liabilities (the "Schedules") and Statements of Financial Affairs (the "Statements") with respect to each of the Debtors. Certain of the Schedules and Statements were amended on April 13, 2009, June 12, 2009, and March 2, 2010, and Schedules and Statements for Tribune CNLBC were filed with the Bankruptcy Court on October 12, 2009. Among other things, the Schedules contain information identifying the Debtors' executory contracts and unexpired leases, the creditors holding claims against the Debtors, and the nature of such claims. The Statements provide information including, among other things, payments or other transfers of property made by the Debtors to

55

creditors on or within 90 days before the Petition Date or, in the case of "insiders", payments or other transfers of property made by the Debtors on or within one year before the Petition Date.

5.      Filed Claims and Bar Date.

By order entered March 25, 2009, the Bankruptcy Court set June 12, 2009 at 4:00 p.m. (prevailing Eastern Time) (the "Bar Date") as the final date and time for filing certain proofs of claim in the Debtors' Chapter 11 Cases. As of the Bar Date, over 6,000 claims asserting approximately $606 billion in the aggregate were filed in the Chapter 11 Cases. The Debtors and their professionals have assembled specialized teams to review and reconcile the various categories of claims. While the claims reconciliation process is still ongoing, preliminary analysis suggests that the filed claims that are likely to be allowed may not vary substantially from the aggregate liabilities of approximately $13.7 billion reflected in the Schedules.

6.      Bankruptcy Rule 2015.3 Reports.

The Debtors are required to comply with new Bankruptcy Rule 2015.3 ("Rule 2015.3"), which became effective immediately prior to the Petition Date. Pursuant to Rule 2015.3, the Debtors must file certain reports with the Bankruptcy Court, which provide additional financial reporting for non-Debtor entities in which the Debtors hold a "controlling or substantial" interest (the "2015.3 Reports"). As of the Petition Date, the Debtors wholly-owned 18 non-debtor entities and directly owned a non-majority equity interest in 8 non-debtor operating entities (the "Non-Majority Entities"). Because of the nature of the Debtors' interest in the Non-Majority Entities, the Debtors sought a determination that they do not have a "controlling or substantial" interest in those entities. Further, because of the commercial and competitive sensitivity of entity level financial information, the Debtors also sought a determination that "cause" existed to excuse entity level financial reporting for the Non-Majority Entities. Finally, due to the negotiations concerning a potential transaction involving the Chicago Cubs as well as the prohibition imposed by Major League Baseball on certain financial disclosures, the Debtors sought to exclude the Chicago Cubs and related assets from the requirements of Rule 2015.3. The Debtors filed a motion on January 12, 2009, seeking (i) additional time to file their initial 2015.3 Reports or (ii) a modification of such reporting requirements (the "2015.3 Motion"). On February 10, 2009, March 23, 2009, April 9, 2009, and August 17, 2009, the Debtors filed supplements to the 2015.3 Motion requesting authorization to comply in the manner set forth above. On July, 29, 2008, the Debtors filed 2015.3 Reports for each of Tribune's wholly-owned non-Debtor subsidiaries, with the exception of the Chicago Cubs-related entities. Subsequently, the Debtors reached agreement with the U.S. Trustee's office on a reporting protocol for the Non-Majority Entities and an agreed order was entered September 2, 2009. Rule 2015.3 Reports for these Non-Majority Entities were filed on October 6, 2009. On January 29, 2010, the Debtors filed their second set of Rule 2015.3 Reports for the wholly-owned non-Debtors and the Non-Majority Entities.

7.      Analysis of Potential Preferential Payments.

The Debtors and their advisors reviewed certain prepetition payments and transfers made by Tribune for potential avoidance as preferential payments under Chapter 5 of the Bankruptcy Code (the "Preference Review").[7] The Preference Review, the details of which were shared with the Creditors Committee, excluded disbursements made by Tribune on behalf of the Filed Subsidiary Debtors in accordance with the Debtors' consolidated cash management system, but otherwise included (i) all wire transfers from Tribune to third parties over $1 million during the 90 days prior to the Petition Date and (ii) other payments issued by Tribune during the 90 days prior to the Petition Date via check or ACH transfer that exceeded $1 million in the aggregate to any recipient. There were approximately $463 million in disbursements covered by the Preference Review, which disbursements generally fall into the following categories:

---

[7] Because the Plan provides for Holders of General Unsecured Claims against the Filed Subsidiary Debtors to be paid in full, the Preference Review focused primarily on evaluating payments made by Tribune.

- Senior Noteholder Principal and Interest ($186.1 million)
- Senior Lender Interest ($113.6 million)
- Purchasing Card Program ($79.1 million)
- Bridge Lender Interest ($34.6 million)
- Barclays Swap Payments ($15.9 million)
- Professional Fees and Retainers ($13.6 million)
- Lease and Claim Administrators ($10.6 million)
- PHONES Notes Redemptions ($6.0 million)
- Citibank Swap Payments ($2.6 million)
- Barclays DIP Facility Commitment Fee ($1.5 million)

The Debtors believe that pursuing recovery of the aforementioned payments would provide no material benefit to the Debtors' Estates because the vast majority of the aforementioned payments are (i) subject to one or more of the defenses set forth in Chapter 5 of the Bankruptcy Code, (ii) likely related to obligations of the Filed Subsidiary Debtors (e.g., a substantial portion of the Purchasing Card Program payments and the Lease and Claim Administrator payments), (iii) payments received by one or more professionals who have since reached a settlement with the United States Trustee regarding avoidance of potential preference payments as part of their retention (e.g., the majority of the Professional Fees and Retainers relate to payments made on behalf of the Filed Subsidiary Debtors), and/or (iv) payments that were issued to the Debtors' lenders and that are subject to resolution in connection with the Global Settlement.

In addition to reviewing the above third party-payments, the Debtors and their advisors also reviewed payments by Tribune to potential insiders, namely current and former officers and directors of Tribune, during the year prior to the Petition Date. There were approximately $87.0 million in payments, of which approximately $70.3 million relate to former officers and directors (comprised of approximately $17.8 million of payments related to restricted stock and options, approximately $39.0 million of severance, and approximately $13.5 million of salary, bonuses and other payments) and approximately $16.7 million relate to current officers and directors (comprised of approximately $5.6 million of payments related to restricted stock and options and $11.1 million of salary, bonuses and other payments). The majority of these payments were made under the terms of programs or contracts entered into more than one (1) year prior to the Petition Date and/or were paid in the ordinary course of business.[8]

After considering the costs of pursuing preference avoidance actions and the potential defenses of the parties, the Debtors currently believe that it is in the best interests of the Debtors' Estates to release preference causes of action. However, the Debtors will continue to discuss with the Creditors Committee and the Senior Lender Settlement Committee whether it would be cost efficient to commence any preference avoidance actions. If the Bridge Loan Claims in Class 1D vote to reject the Plan, a preference avoidance action may be one of the potential claims allowance issues that may need to be addressed in conjunction with the cramdown of Class 1D Claims. The Debtors will ensure that such preference avoidance actions, if any, will be commenced prior to the Confirmation Hearing.

## H.    Chicago Cubs Transaction.

During the pendency of the Chapter 11 Cases, the Tribune Entities pursued and consummated certain transactions pursuant to which the Chicago Cubs and related assets and liabilities, including the Company's 25.34% interest in CSN Chicago, were contributed to a newly formed limited liability company, Chicago Baseball Holdings, LLC and its subsidiaries (collectively, "New Cubs LLC"). Tribune first announced its intention to dispose of an interest in the Chicago Cubs and its attendant assets in April 2007, on the same day that Tribune announced the completion of its strategic review process and its decision to convert from a public

---

[8] These payments exclude the redemption of any stock through a transfer agent as part of the Leveraged ESOP Transactions.

company to a privately-held company. Thereafter, Tribune and Tribune CNLBC acted to identify parties that were both likely to have an interest in acquiring an interest in the Chicago Cubs and assets and the financial resources to complete such a transaction. In furtherance of those efforts, Tribune engaged J.P. Morgan Securities Inc. in July 2007 to aid in identifying suitable investors and to act as Tribune's financial advisor in connection with the proposed transaction.

From mid-2007 to early 2009, Tribune engaged in an intensive process to identify a transaction partner and ultimately reduced the number of interested parties from more than 100 to a single party. The prevailing party was a new entity formed by the Ricketts family ("Ricketts Acquisition LLC"). Following an extended period of negotiations, on August 21, 2009, Tribune and Ricketts Acquisition LLC, among other parties, entered an agreement (the "Cubs Formation Agreement") governing the contribution of certain assets and liabilities related to the businesses of the Chicago Cubs owned by Tribune and its subsidiaries to New Cubs LLC. The contributed assets included, but were not limited to, the Chicago Cubs Major League Baseball franchise, spring training and Dominican Republic baseball operations, Wrigley Field and certain other real estate used in the business, and a 25.34% interest in CSN Chicago, which operates a local sports programming network in the Chicago area (collectively, the "Cubs Business").

On August 24, 2009, the Debtors filed a motion with the Bankruptcy Court seeking authority to enter into the Cubs Formation Agreement and to perform all transactions necessary to effect the contribution of the Cubs Business to New Cubs LLC. On the same day, the Debtors announced that the principal entity holding the assets and liabilities of the Cubs Business, Tribune CNLBC, would commence a Chapter 11 case to implement the transactions contemplated by the Cubs Formation Agreement. The Debtors also sought approval for notice and other procedures relating to the transactions by filing a motion with the Bankruptcy Court on August 24, 2009. The Bankruptcy Court approved the Debtors' notice and other procedures for the transactions on August 31, 2009 and, on September 24, 2009, authorized the Debtors to perform the transactions under the Cubs Formation Agreement. On October 6, 2009, Major League Baseball announced unanimous approval of the transactions. Tribune CNLBC filed its voluntary Chapter 11 petition on October 12, 2009, and the Bankruptcy Court granted a motion to approve the transactions contemplated by the Cubs Formation Agreement as to Tribune CNLBC on October 14, 2009. The transactions contemplated by the Cubs Formation Agreement and the agreements related thereto closed on October 27, 2009.

In addition to the Cubs Formation Agreement, Tribune, Tribune CNLBC, and several of their affiliates entered into a number of ancillary agreements implementing various aspects of the Chicago Cubs-related transactions. Among those ancillary agreements are guarantees of collection by Tribune of the liabilities of New Cubs LLC under (i) certain senior indebtedness incurred in connection with the Chicago Cubs-related transactions, which consists of (a) a $25 million senior secured revolving credit facility, and (b) a $425 million senior secured term loan facility, and (ii) $248.75 million of subordinated indebtedness. Each of the guarantees is a guarantee of collection and not of payment. Tribune has no obligation to make any payment on such guarantees unless and until New Cubs LLC fails to make a payment on any of the above obligations when due, the relevant lender(s) exhaust all legal and equitable remedies against New Cubs LLC and other guarantors and the collateral posted by New Cubs LLC and other guarantors to secure the obligations (including foreclosure and similar remedies), and the lenders have failed to collect the full amount of the guaranteed obligations. Tribune's obligations under such guarantees are limited to the initial principal amount of the obligations reduced by principal payments made by New Cubs LLC or on its behalf, cash proceeds realized from the lenders' exercise of remedies, and any principal amounts that may be forgiven by the lenders plus any unpaid premium on, or unpaid interest accruing on such principal amount.

Pursuant to the Cubs Formation Agreement, Tribune and its contributing subsidiaries and affiliates received a special distribution from New Cubs LLC of approximately $705 million in cash and other consideration, which amount remains subject to final adjustments and is being held by Tribune CNLBC pending resolution of the Chapter 11 Cases, and a five percent (5%) membership interest in New Cubs LLC

valued at $21 million.[2]  Further, the majority of the liabilities of the Cubs Business were assumed by New Cubs LLC or one of its affiliates. The unsecured pre-bankruptcy guaranties entered into by Tribune CNLBC of Tribune's obligations under its pre-bankruptcy credit facilities and other exceptions set forth in the Cubs Formation Agreement were not assumed by New Cubs LLC or one of its affiliates and remain as obligations of Tribune CNLBC to be addressed under the Plan.

## I.    Morgan Stanley Swap Agreement

On December 19, 1994, Morgan Stanley Capital Services, Inc. ("MSCS") and Times Mirror entered into an interest rate swap in respect of a $100 million notional amount, which was memorialized in an ISDA Master Agreement, dated as of August 5, 1994, and a Confirmation to such agreement, dated as of December 19, 1994 (collectively, the "Swap Agreement"). Between 2006 and 2008, Morgan Stanley & Co., Inc. ("MS&Co.") purchased approximately $38.365 million in face amount of the Tribune 7.5% debentures, due July 1, 2023 (the "7.5% Debentures). During 2008 and 2009, MS&Co. transferred all of its interest in the 7.5% Indentures to MSCS.

Tribune asserts that in November 2008, Tribune engaged MS&Co. to provide advisory services.[10] Tribune understands that MS&Co. and MSCS deny that any agreements were reached. Shortly after November 20, 2008, Tribune and MS&Co. determined that it would be prudent for Tribune to retain a financial advisor that satisfied the disinterested person requirement, and for MS&Co. to continue to serve as financial advisor to provide for an efficient transition to the new advisor.  MS&Co. informed Tribune that, as a formal engagement agreement had not been reached, it required Tribune to execute an indemnification agreement in order for MS&Co. to assist Tribune during this transition period.  On November 30, 2008, Tribune and MS&Co. executed an indemnification agreement.[11]

Tribune's bankruptcy filing was an Event of Default under Section 5(a)(ii) of the Swap Agreement. MSCS designated December 9, 2008 as the Early Termination Date for the interest rate swap and, by letter dated December 18, 2008, informed Tribune that it had set off $38.365 million in principal amount of the 7.5% Debentures (plus accrued interest and expenses) against the $50,433,470.16 MSCS had determined, as the non-defaulting party under the Swap Agreement, it owed Tribune.  MSCS asserted that such setoff was permitted pursuant to the Bankruptcy Code's "safe harbors."

Tribune asserted that MSCS did not have such a right of setoff, and that even if such setoff right did exist, it was not protected.  By letter dated March 20, 2009, MSCS advised that the correct amount owing to Tribune under the Swap Agreement was $51,945,000 (the "Termination Amount") and that the prior figure was the result of a calculation error.  MSCS again informed Tribune that it had set off $38.365 million in principal amount of the 7.5% Debentures (plus accrued interest and expenses) against the Termination Amount.  The parties engaged in arm's-length negotiations to resolve their dispute with respect to the MSCS Claim, and on May 29, 2009, MSCS paid Tribune $9.5 million in partial satisfaction of the amount owing to Tribune under the

---

[9]  Tribune expects to recognize annual taxable income from its ownership interest in New Cubs LLC that will be taxable to Tribune as a C Corporation after its emergence from bankruptcy.  Those amounts are taken into account in Tribune's financial projections and models.

[10]  Tribune also asserts that during this time (i) Tribune and MS&Co. engaged in negotiations with respect to the terms of an engagement letter, and (ii) during these negotiations, MS&Co. agreed to transfer to a third party any financial instruments that could be materially adverse to the interests of Tribune, in order for MS&Co. to qualify as a "disinterested person" under the Bankruptcy Code and to serve as Tribune's financial advisor in the event Tribune determined to commence a chapter 11 proceeding.  MS&Co. could only serve as Tribune's financial advisor if MS&Co. qualified as a "disinterested person" under the Bankruptcy Code. In order to qualify as a "disinterested person" under the Bankruptcy Code, MS&Co. (and its affiliate, MSCS) could not hold financial instruments that could be materially adverse to the interests of the estate or of any claim of creditors or equity security holders.

[11]  At the December 1, 2008 meeting of Tribune's Board of Directors, the Board of Directors terminated MS&Co.'s engagement as financial advisor to Tribune.

Swap Agreement, without prejudice to the respective rights, claims, or defenses of the parties. The parties are continuing to engage in such negotiations to finally resolve the MSCS Claim.

## J. Appointment of an Examiner

On January 13, 2010, Wilmington Trust Company ("WTC"), as successor indenture trustee for the PHONES Notes, filed a motion seeking the appointment of an examiner pursuant to section 1104(c) of the Bankruptcy Code for the limited purpose of investigating the Leveraged ESOP Transactions and any potential claims related thereto (the "Examiner Motion"). The Debtors filed their opposition to the Examiner Motion on various grounds, including that such relief is not warranted and would be duplicative of the extensive investigations already being undertaken, with no correlative benefit to the Debtors' Estates.

The Examiner Motion was subsequently resolved by the parties consensually, resulting in the entry by the Bankruptcy Court on April 20, 2010 of an Agreed Order Directing the Appointment of an Examiner ("Examiner Order"). On April 30, 2010, the U.S. Trustee appointed Kenneth N. Klee to be the examiner (the "Examiner") and, on the same day, filed an application with the Bankruptcy Court requesting approval of such appointment. The U.S. Trustee's application was approved on May 10, 2010 and Kenneth N. Klee was appointed Examiner by order entered on the same date. On May 11, 2010, the Bankruptcy Court entered an order approving the Examiner's proposed work and expense plan and modifying the Examiner Order (the "Supplemental Order").

Pursuant to the Examiner Order and Supplemental Order, the Examiner's duties are to (i) evaluate the potential claims and causes of action held by the Debtors' estates that are asserted by the Parties (as defined in the Examiner Order) in connection with the Leveraged ESOP Transactions which may be asserted against any entity which may bear liability, including ,without limitation, the Debtors, the Debtors' former and/or present management, former and/or present members of Tribune's board of directors, the Debtors' lenders and the Debtors' advisors, and including without limitation, claims for fraudulent conveyance, breach of fiduciary duty, aiding and abetting breach of fiduciary duty and equitable subordination, and to evaluate the potential defenses asserted by the Parties to such potential claims and causes of action; (ii) evaluate whether WTC violated the automatic stay under 11 U.S.C. §362 by its filing, on March 3, 2010, of its Complaint for Equitable Subordination and Disallowance of Claims, Damages and Constructive Trust; (iii) evaluate the assertions and defenses made by certain of the Parties in connection with the Motion of JPMorgan Chase Bank N.A. for Sanctions Against Wilmington Trust Company for Improper Disclosure of Confidential Information in Violation of Court Order; and (v) otherwise performs the duties of an examiner set forth in 11 U.S.C. §§1106(a)(3) and (4) (as limited by the Examiner Order). The Examiner is required to prepare and file a report in respect of his investigation on or before July 12, 2010. Following such filing, parties may access the Examiner's completed report on the internet at the Debtors' website: http://chapter11.epiqsystems.com/tribune.

## VII. SETTLEMENT OF CLAIMS RELATING TO THE LEVERAGED ESOP TRANSACTIONS

The Plan provides for a Global Settlement of all potential LBO-Related Causes of Action among the Tribune Entities, the Debtors' Estates and the "Released Parties," as defined in the Plan. A significant portion of the value allocation under the Plan to the Holders of Other Parent Claims and General Unsecured Claims against Filed Subsidiary Debtors is attributable to the Global Settlement. Based on the Debtors' calculations, the Plan allocates (i) approximately 7.0% of total Distributable Value (substantially all of which the Senior Lenders and Bridge Lenders (the "LBO Lenders") would otherwise claim to be entitled to receive), to the Holders of Senior Notes Claims and Other Parent Claims and (ii) approximately 1.4% of total Distributable Value (substantially all of which Holders of Allowed Loan Guaranty Claims would otherwise claim entitlement to receive), to the Holders of General Unsecured Claims against Filed Subsidiary Debtors, resulting in the payment in full (without post-petition interest) of these General Unsecured Claims, assuming such Claims do not exceed $150 million. More specifically, the Global Settlement provides for the Senior Noteholders to receive a strip of the consideration that the LBO Lenders will receive under the Plan amounting to 7.4% of the

total Distributable Value and Holders of Other Parent Claims to receive a recovery of approximately thirty five percent (35)% on account of their Allowed Claims. The Debtors value the aggregate additional consideration to be provided to Holders of Senior Noteholder Claims, Other Parent Claims, and General Unsecured Claims against Filed Subsidiary Debtors pursuant to the Global Settlement at more than $510 million. The Global Settlement and the Plan have the support of a cross-section of the Debtors' creditor constituencies, including LBO Lenders (such as JPMorgan Chase Bank, N.A. and Angelo Gordon & Co. LP), the largest single Noteholder, Centerbridge (holding approximately thirty-seven percent (37%) of the Senior Notes), one of the indenture trustees for the Senior Noteholders, and Law Debenture (solely in its capacity as successor trustee for certain of the Senior Notes). In addition, prior to the Debtors' filing of the Disclosure Statement, the Creditors Committee has-had voted to support the settlement terms contained in the Settlement Term Sheet, attached hereto as Exhibit B. The Creditors' Committee has now also voted to endorse the Plan and the Global Settlement, and has prepared a letter, to be included on the Debtors' solicitation materials sent to creditors entitled to vote on the Plan, urging all unsecured creditors to vote in favor of the Plan.[12]

The Debtors believe the proposed Global Settlement is a fair, equitable and reasonable compromise and settlement of the potential LBO-Related Causes of Action and is in the best interest of the Debtors' Estates. The Global Settlement is the product of extensive arm's length negotiations and the Debtors believe it provides a recovery to the Senior Noteholders and Holders of General Unsecured Claims that is within the range of reasonably possible outcomes considering all relevant circumstances. The Global Settlement provides releases for all parties relating to almost all causes of action potentially existing at or before the Effective Date, including the LBO-Related Causes of Action, supported by related anti-suit injunctions. The releases are a central and important element of both the Global Settlement and the Plan because, among other things, they are necessary to provide the LBO Lenders with a full and final resolution of disputed claims against them, will enable the Debtors to exit bankruptcy sooner than otherwise would be possible and will allow the Reorganized Debtors upon emergence to devote their full time and attention to their businesses, without the distraction of litigation. The Global Settlement and Plan will also spare the Debtors' Estates and the Reorganized Debtors the expense and inconvenience of what could otherwise be very complex and costly litigation.

The following is the Debtors' discussion and analyses of the Leveraged ESOP Transactions and the LBO-Related Causes of Action. Pursuant to the Debtors' invitation, certain parties in interest have submitted their own disclosures in respect of the LBO-Related Causes of Action and Global Settlement, which are included in Exhibit D to the Disclosure Statement. Additionally, although the Examiner will not opine on or otherwise evaluate the Global Settlement, the Examiner's Report will set forth the results of his investigation, including in respect of the LBO-Related Causes of Action. A copy of the Examiner's Report should be available, from and after July 12, 2010, at the following website: http://www.chapter11.epiqsystems.com/tribune.

A.    **The Leveraged ESOP Transactions.**

As discussed in Article IV.A, on April 1, 2007, Tribune's then board of directors, based on the recommendation of a special committee of independent directors, approved the Leveraged ESOP Transactions with (i) the ESOP, a newly formed Tribune employee stock ownership plan, (ii) the Zell Entity, and (iii) Samuel Zell. The Leveraged ESOP Transactions proceeded in two principal steps. In step one, the ESOP purchased shares of Tribune common stock, and Tribune consummated a cash tender offer for nearly fifty percent (50%) of its outstanding common stock. In order to finance the tender offer, Tribune entered into the $8.028 billion Senior Credit-Loan Agreement. A number of Tribune's domestic subsidiaries, the Guarantor Subsidiaries, provided unsecured guarantees of Tribune's indebtedness under the Senior Credit-Loan Agreement.

---

[12] [The Creditors Committee's support is conditional upon the inclusion of such settlement terms in the Plan, Disclosure Statement, and related documentation that are satisfactory to the Creditors Committee, and the Creditors Committee reserves i-its right to, among other things, review, comment upon, and seek modifications to this Disclosure Statement, the Plan, and related documents in any manner not inconsistent with the settlement terms set forth in the Settlement Term Sheet. ]

In step two, which was completed on December 20, 2007, Tribune merged with the Merger Sub, a Delaware corporation wholly owned by the ESOP, with Tribune surviving the Merger. Upon the Merger, all issued and outstanding shares of Tribune's common stock, other than shares held by Tribune or the ESOP, were cancelled, and Tribune became wholly owned by the ESOP. Also on December 20, 2007, Tribune borrowed an additional $2.1 billion under the Senior ~~Credit~~Loan Agreement and entered into the Bridge Loan Agreement, pursuant to which Tribune borrowed approximately $1.6 billion. The proceeds of the additional borrowings under the Senior ~~Credit~~Loan Agreement and of the borrowings under the Bridge Loan Agreement were used for, among other things, the consummation of the merger. The Bridge Loan Agreement indebtedness is unsecured but is guaranteed, on a subordinated basis to the Senior ~~Credit~~Loan Agreement indebtedness, by the Guarantor Subsidiaries.

Additional information concerning the Leveraged ESOP Transactions and events leading up to the Leveraged ESOP Transactions can be found in the "Offer to Purchase" filed by Tribune with the SEC on April 25, 2007, in connection with the Leveraged ESOP Transactions, a copy of which is attached hereto as Exhibit E.

**B.      Investigation of the LBO-Related Causes of Action.**

From the outset, it was apparent that a central issue in these Chapter 11 Cases would be the investigation and resolution of potential LBO-Related Causes of Action. Accordingly, the Creditors Committee began its investigation not long after the Debtors filed for bankruptcy, and retained Zuckerman Spaeder LLP as special litigation counsel for that purpose. During the course of that investigation, the Creditors' Committee undertook discovery from over 30 entities and persons involved in the Leveraged ESOP Transactions and obtained and reviewed over 3.7 million pages of discovered documents. The Creditors Committee also deposed numerous parties. The Debtors cooperated extensively with the professionals serving the Creditors Committee by providing them with informal discovery and access to information regarding the Leveraged ESOP Transactions to permit the Creditors Committee to conduct an investigation of potential LBO-Related Causes of Action. Law Debenture has also undertaken its own investigation of the Leveraged ESOP Transactions. In addition, the Debtors undertook their own substantial efforts to review and analyze the LBO-Related Causes of Action. The Debtors also took steps to permit other parties, including Law Debenture, access to the discovery material so that they could make their own evaluation of the LBO-Related Causes of Action. In December of 2009, the Debtors streamlined and further facilitated the review process by creating a centralized document depository to provide the relevant parties access to all of the documents and deposition transcripts that have been collected to date.

**C.      Proceedings Related to Leveraged ESOP Transactions.**

On January 13, 2010, ~~Wilmington Trust Company ("WTC"), as successor indenture trustee for the PHONES Notes, filed a motion seeking the appointment of an examiner pursuant to section 1104(c) of the Bankruptcy Code for the limited purpose of investigating the Leveraged ESOP Transactions and any potential claims related thereto (the "Examiner Motion"). The Debtors filed their opposition to the Examiner Motion on various grounds, including that such relief is not warranted and would be duplicative of the extensive investigations already being undertaken, with no correlative benefit to the Debtors' Estates. The Examiner Motion was originally scheduled to be heard by the Bankruptcy Court on February 18, 2010, but was continued by the Bankruptcy Court until April 13, 2010.~~ WTC filed the Examiner Motion. As discussed in greater detail in Article VI.I, the Examiner Motion was resolved by the parties consensually, resulting in the entry of an agreed order by the Bankruptcy Court on April 20, 2010 directing the appointment of an examiner. Please see Article VI.I for a more detailed discussion of the Examiner Motion and its resolution.

On February 1, 2010, the Creditors Committee filed a motion seeking authority to prosecute certain estate causes of action related to the Leveraged ESOP Transactions (the "Standing Motion"). The Debtors

opposed the relief requested in the Standing Motion on grounds that the requisite showing necessary to confer derivative standing on the Creditors Committee has not been made and such relief would not be in the best interests of the Debtors' Estates. The Standing Motion was also scheduled to be heard by the Bankruptcy Court on February 18, 2010, and has been continued by the Bankruptcy Court until April 13, 2010. To facilitate consideration of the Global Settlement embodied in the Plan, the Creditors Committee has agreed to adjourn *sine die* the Standing Motion and has advised it has no present intention of prosecuting the Standing Motion while consideration of the Global Settlement proceeds.

On March 4, 2010, WTC filed with the Bankruptcy Court a complaint (the "WTC Complaint") purporting to seek equitable subordination, disallowance of claims, damages and a constructive trust against certain of the Debtors' Senior Lenders, denominated in the WTC Complaint as the "Lead Banks." The relief sought is alleged to arise out of the Leveraged ESOP Transactions. The Debtors filed a motion on March 18, 2010 seeking a determination that the WTC Complaint violated the automatic stay imposed by section 362 of the Bankruptcy Code, requesting that WTC be required to demonstrate why it should not be held in contempt of court for filing the WTC Complaint, and seeking to halt all proceedings respecting the WTC Complaint. The Debtors' motion is based on the grounds that, *inter alia*, the WTC Complaint violates the automatic stay imposed by section 362 of the Bankruptcy Code and constitutes an attempt to exercise control of causes of action belonging to the Debtors' bankruptcy estates (the "Automatic Stay Motion"). On April 5, 2010, WTC filed a response to the Debtors' motion attaching a proposed amended complaint which adds additional defendants including Samuel Zell, the Zell Entity, and Sam Investment Trust. On April 7, 2010,[13] the Creditors Committee filed a statement supporting the Debtors' motion noting, among other things, that WTC's actions, through its attorneys, have disadvantaged the Creditors Committee and its constituency. The ~~Debtors' motion is scheduled to be heard on April 13, 2010.~~ Examiner Order provides for the Examiner to evaluate whether WTC violated the automatic stay by filing the WTC Complaint. The Automatic Stay Motion is currently adjourned to a date to be determined, and a further hearing date will be established following the issuance of the Examiner's report concerning the Automatic Stay Motion.

## D.    LBO-Related Causes of Action.

The Standing Motion and the WTC Complaint encompassed only certain of the potential LBO-Related Causes of Action. At their core, the LBO-Related Causes of Action are based on the assertion that the debt incurred as a part of the Leveraged ESOP Transactions rendered Tribune insolvent and/or left Tribune with ~~relatively~~unreasonably small capital to operate its businesses, harming all of the Debtors' creditors.

The potential claims encompassed by, the LBO-Related Causes of Action, include claims to: (i) avoid all of the guarantees provided by the Subsidiary Guarantors and avoid the obligations incurred and liens provided by Tribune in connection with the Leveraged ESOP Transaction as fraudulent transfers, (ii) avoid and recover for the benefit of the Debtors' Estates the amounts paid to certain third- parties in connection with the Leveraged ESOP Transactions as fraudulent transfers, (iii) avoid, recover and/or subordinate to all creditors, including Tribune's creditors, for the benefit of the Debtors' Estates the obligations incurred and collateral granted to certain lenders in connection with the Leveraged ESOP Transactions as fraudulent transfers, (iv) equitably and/or statutorily disallow all claims by certain third- parties, (v) recover for the benefit of the Debtors' Estates damages caused by breaches of fiduciary and other duties in engineering, facilitating and/or approving the Leveraged ESOP Transactions, (vi) recover for the benefit of the Debtors' Estates damages caused by certain third- parties having aided and abetted alleged breaches of fiduciary duties with respect to the Leveraged ESOP Transactions, (vii) recover for the benefit of the Debtors' Estates damages caused by the negligence of certain third- parties related to the Leveraged ESOP Transactions, (viii) recover for the benefit of the Debtors' Estates damages caused by the negligent misrepresentations of certain third- parties, and (ix) obtain declaratory judgment to disregard the corporate structures of certain Tribune subsidiaries on the basis of alter ego, veil piercing, substantive consolidation, or any other doctrine of law or equity.

---

[13] [Docket No. 3968].

E.      **Efforts to Settle the LBO-Related Causes of Action.**

The Debtors' objective in investigating and facilitating the exchange of information regarding the potential LBO-Related Causes of Action has been to reach a resolution, consensual so far as is feasible, pursuant to which all of the potential LBO-Related Causes of Action would be settled, thereby enabling the Debtors to emerge from bankruptcy without the distraction of costly and potentially time-consuming litigation. To that end, the Debtors and their advisers have expended considerable time and effort meeting with principal parties-in-interest in an effort to understand each party's perspective and to facilitate a dialogue that would be conducive to achieving such a resolution. These efforts commenced in the fall of 2009, at which time the Debtors met with the representatives of key creditor constituencies to discuss the nature of the potential LBO-Related Causes of Action and the key arguments that might be raised in connection therewith. These discussions, in turn, led to a series of meetings in January, February and March of 2010, in which certain of the principal parties discussed resolution of the LBO-Related Causes of Action. These meetings, certain of which were hosted by the Creditors Committee, were helpful in clarifying the parties' respective positions and eventually led to the Global Settlement that is embodied in the Plan.

F.      **The Reasonableness of the Proposed Settlement.**

The Debtors and their advisers have carefully assessed each of the potential LBO–Related Causes of Action. To that end, they have reviewed and analyzed documents from the Debtors' files relating to the Leveraged ESOP Transactions as well as documents produced by other parties, including Valuation Research Corporation, Houlihan Lokey, Duff & Phelps, JPMorgan Chase Bank, N.A., Merrill Lynch ~~Capital Corporation~~, Citicorp North America, Inc., the Zell Entity and Mr. Zell. The Debtors also have analyzed the various depositions taken by the Creditors Committee and Law Debenture, and have interviewed other key individuals. Further, they have researched and evaluated the law relating to each of the identified claims and corresponding defenses as well as the legal standards governing bankruptcy court approval of settlements. The Debtors also have analyzed the inter-company claims among the Debtors and their subsidiaries. In addition, the Debtors have had extensive discussions with all interested parties concerning the Debtors' analysis of the potential LBO-Related Causes of Action and have carefully considered the views and analyses of such other parties. Based on these analyses, the Debtors believe that the Global Settlement proposed in the Plan is fair, equitable, reasonable, and in the best interests of the Debtors' Estates, and that the Global Settlement should be approved by the Bankruptcy Court.

1.      The Probabilities of Success in Litigation.

The Debtors believe that the Global Settlement provides a recovery to the Senior Noteholders and Holders of General Unsecured Claims that is within the range of reasonably possible outcomes considering all relevant circumstances.

Starting with the LBO Lenders, the potential claims consist primarily of fraudulent conveyance and preference claims, although other claims potentially exist for equitable disallowance/ subordination, ~~,~~ aiding and abetting breaches of fiduciary duty and unjust enrichment. The Debtors have investigated each of these possible claims, the most significant of which are claims for constructive fraudulent conveyance. To prevail on such claims, it must be shown that the Leveraged ESOP Transactions rendered the Debtors insolvent and that reasonably equivalent value was not provided to the Debtors in good faith. The LBO Lenders are expected to vigorously contest each of these points and to raise other defenses as well. Two issues that will have a significant impact on the resolution of these claims and recoveries pursuant thereto are (i) whether the subsidiary guarantees can be successfully challenged and (ii) whether the debt     incurred in connection with the step two transactions should be taken into account in assessing solvency at the time of the step one transactions. The proposed settlement takes ~~each of~~ these two issues ˌ as well as all other issues that the Debtors believe may have a significant impact on the resolution of and recoveries on these claims into account and, in

64

the Debtors' view, constitutes a reasonable resolution of the LBO-Related Causes of Action against the LBO Lenders.

The proposed Global Settlement also takes into account the potential LBO-Related Causes of Action against other parties, including certain former major shareholders (i.e., the Chandler Trusts, the McCormick Foundation and the Cantigny Foundation), the directors and officers of Tribune and its subsidiaries, the Zell Entity and Mr. Zell, and Tribune's principal advisers. Like the LBO Lenders, each of these groups would be expected to vigorously oppose the LBO-Related Causes of Action. In that regard, they would likely put forward defenses similar to those asserted by the LBO Lenders as well as ones unique to their particular circumstances. For example, in addition to contesting the existence of a fraudulent conveyance, the major shareholders would almost certainly argue that the repurchases of their stock are shielded from disgorgement by section 546(e) of the Bankruptcy Code. Similarly, the directors and officers would assert that they fully satisfied their fiduciary duties and in support of that position raise various related defenses. For their part, the Zell Entity and Mr. Zell would point out, among other things, that they did not participate in Tribune's decisions to approve or move forward with the Leveraged ESOP Transactions but instead lost over $300 million. In addition, Tribune's principal advisers can be expected to argue that Tribune received reasonably equivalent value for the services that those advisers provided. In assessing the proposed settlement, each of these issues was taken into account and the settlement, in the Debtors' view, reasonably accounts for the LBO-Related Causes of Action against these parties.

2.      Complexity, Expense and Inconvenience of, and Delay From, Litigation.

The proposed Global Settlement takes into account the impact that litigation would be expected to have on the value of the Debtors' Estates. To date, the out-of-pocket cost of these Chapter 11 Cases has been staggering, with the billings for professional fees alone exceeding $100 million. Further, being in bankruptcy already has forced the Debtors to forego opportunities that clearly would have enhanced value. Extending the bankruptcy further in order to allow for litigation of the LBO-Related Causes of Action would result in further associated costs and further lost business opportunities. In addition, it would be more difficult to retain key personnel and to attract qualified new hires.

In addition, the costs of prosecuting the litigation itself would compound these difficulties. There would be the direct out-of-pocket expenses of litigation, such as legal and expert witness fees, as well as the indirect costs resulting from the inability of the Debtors' and the Reorganized Debtors' personnel to devote their full time to their businesses. Productivity and employee morale also would be adversely impacted.

The cost, complexity, expense, inconvenience and delay resulting from the initiation of litigation against any participant in the Leveraged ESOP Transactions would likely be further compounded by the rapid expansion of the litigation. For instance, there is a substantial likelihood that the defendants would assert third-party claims and cross claims in an effort to determine ultimate responsibility and liability. This likelihood indicates that the only real way to avoid the cost, complexity, expense, inconvenience and delay of litigation is through a global resolution.

3.      ~~Releases.~~

~~The releases described below are a central and important element of the Plan. The releases of parties other than the LBO Lenders are necessary to provide the LBO Lenders with a full and final resolution of all claims against them in return for their substantial financial contributions to the Global Settlement. Without such releases, the initiation of litigation against participants in the Leveraged ESOP Transactions other than the LBO Lenders undoubtedly would result in the LBO Lenders being drawn into the litigation by reason of the immediate assertion of claims by the other participant defendants against the LBO Lenders. In addition, by eliminating the need for further litigation, the releases will enable the Debtors to exit bankruptcy sooner than~~

otherwise would be possible and will allow the Reorganized Debtors to devote their full time and attention, without distraction from litigation, to their businesses.

(a)    Releases by Debtors.

In the Plan, the Debtors provide releases to a variety of identified Released Parties (including the LBO Lenders, the Debtors' present and former directors, officers, employees and shareholders, and the Debtor's agents and advisers) from almost all claims existing on or prior to the Effective Date, including with respect to the LBO-Related Causes of Action, which releases are supported by related anti-suit injunctions.  The Debtors believe that the releases are necessary, fair reasonable and in the best interests of the Debtors' Estates for a number of reasons.

As an initial matter, a suit against certain of the Released Parties would give rise to claims against the Debtors which could deplete the assets of the Debtors' Estates.  For example, litigation involving present and former directors, officers or employees of the Debtors likely would trigger statutory, contractual and/or common law claims for advancement, indemnification and/or contribution from the Debtors, as would litigation involving the advisers, Mr. Zell and the Zell Entity.

Substantial financial contributions to the reorganization also have been and will be made either directly by or indirectly on behalf of the Released Parties.  The LBO Lenders will contribute significant value to the Senior Noteholders and Holders of General Unsecured Claims in connection with the Global Settlement.  The directors, officers and employees of the Debtors also have made substantial non-financial contributions by designing and implementing the operational restructuring of the Debtors and participating in the informal discovery process relating to the LBO Related Causes of Action and in the negotiations relating to the Plan. The LBO Lenders, the advisers and others also have likewise made substantial non-financial contributions by participating in the informal discovery process and settlement negotiations.

In addition, the releases are essential to the reorganization in that they are an integral part of the agreement by the LBO Lenders to fund the Plan.  They also are necessary to the continued success of the Reorganized Debtors because they assure that the directors, officers and employees of the Debtors are not distracted by litigation of the LBO-Related Causes of Action.  They constitute a critical and essential condition to the Plan because they provide the necessary assurances that the Plan will result in the full and final resolution of all outstanding claims, and, in the absence of such releases, the LBO Lenders would likely be unwilling to provide the significant value to the Senior Noteholders and the Holders of General Unsecured Claims that is embodied in the Plan.

(b)    Releases by Non-Debtors.

The Plan also provides that each Holder of a Claim or Interest that has not returned a Ballot with the appropriate opt-out box checked shall be deemed to have released each and all of the Released Parties from almost all non-Estate Claims existing on or before the Effective Date.  Any Holder of a Claim or Interest that elects not to grant this release shall not receive the benefit of any other release under the Plan to which it might otherwise be entitled.  The Plan further provides that all Holders of Loan Guaranty Claims against Guarantor Non-Debtors shall be deemed on the Effective Date to have granted the Guarantor Non-Debtor Release and to have relieved the LBO Lenders and others from any liability on account of the Senior Loan Guaranty Claims or the Bridge Loan Guaranty Claims.4.    Paramount Interest of Creditors.

It is Debtors' judgment that the proposed Global Settlement furthers the paramount interest of all creditors by providing for a reasonable resolution of the LBO-Related Causes of Action and allowing the Debtors to emerge promptly from bankruptcy.  In reaching this judgment, the Debtors have considered and balanced all of the factors described above.  The Debtors' judgment is shared by a cross-section of the creditor constituencies of the Debtors, including LBO Lenders, Senior Noteholders, the Creditors Committee and creditors of the Subsidiary Debtors.

## VIII.  EXCLUSIVITY PERIOD.

On March 27, 2009, July 24, 2009, November 13, 2009, ~~and~~February 1, 2010, and March 31, 2010, the Debtors filed motions requesting an extension of the Debtors' exclusive period within which to file a chapter 11 plan and/or solicit acceptances thereto.  The Bankruptcy Court granted each of these motions and extended the Debtors' exclusive period to file a plan through and including ~~March 31,~~April 30, 2010, and their exclusive period to solicit votes on such plan through and including May 31, 2010.  On ~~March 31,~~April 30, 2010, the Debtors filed an additional motion requesting an extension only of the Debtors' exclusive period within which to ~~file~~solicit a chapter 11 plan through and including ~~April 30,~~August 8, 2010.  A hearing on the Debtors' exclusivity extension motion is scheduled for ~~April 13,~~May 20, 2010.

Pursuant to section 1121(d)(2) of the Bankruptcy Code, the Debtors' exclusive period to file a chapter 11 plan and solicit acceptances thereto may not be extended beyond August 8, 2010.

## IX.  THE PLAN OF REORGANIZATION

**THE FOLLOWING SECTIONS SUMMARIZE, AND IN SOME INSTANCES RESTATE VERBATIM, CERTAIN KEY INFORMATION CONTAINED IN THE PLAN AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT A.  THE TERMS OF THE PLAN WILL GOVERN IN THE EVENT ANY INCONSISTENCY ARISES BETWEEN THIS SUMMARY AND THE PLAN.  THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN DO NOT YET BIND ANY PERSON OR ENTITY.  IF THE BANKRUPTCY COURT DOES CONFIRM A PLAN, HOWEVER, IT WILL THEN BIND ALL CLAIM AND INTEREST HOLDERS.  MOREOVER, THE DEBTORS RESERVE THE RIGHT TO MODIFY OR WITHDRAW THE PLAN IN ITS ENTIRETY OR IN PART, FOR ANY REASON.  IN ADDITION, SHOULD THE PLAN, OR ANY INDIVIDUAL DEBTOR'S PLAN, FAIL TO BE ACCEPTED BY THE REQUISITE NUMBER AND AMOUNT OF CLAIMS AND INTERESTS VOTING, AS REQUIRED TO SATISFY SECTION 1129 OF THE BANKRUPTCY CODE, THE DEBTORS RESERVE THE RIGHT TO RECLASSIFY CLAIMS OR INTERESTS OR OTHERWISE AMEND, MODIFY OR WITHDRAW THE PLAN IN ITS ENTIRETY OR IN PART.**

The confirmation requirements of section 1129(a) of the Bankruptcy Code must be satisfied separately with respect to each Debtor.  Therefore, notwithstanding the combination of the separate plans of reorganization of all Debtors in the Plan for purposes of, among other things, economy and efficiency, the Plan shall be deemed a separate chapter 11 plan for each such Debtor.

**A.**     **Classification and Allowance of Claims and Equity Interests Generally.**

Section 1123 of the Bankruptcy Code provides that, except for certain exceptions such as administrative expense claims and priority tax claims, a plan of reorganization must categorize claims against and equity interests in a debtor into individual classes.  Although the Bankruptcy Code gives a debtor significant flexibility in classifying claims and interests, section 1122 of the Bankruptcy Code dictates that a plan of reorganization may only place a claim or an equity interest into a class containing claims or equity interests that are substantially similar.

The Plan creates numerous "Classes" of Claims and Interests.  These Classes take into account the differing nature and priority of Claims against and Interests in the Debtors.  Administrative Expense Claims, DIP Facility Claims and Priority Tax Claims are not classified for purposes of voting or receiving distributions under the Plan, but are treated separately as unclassified Claims.

The Plan provides specific treatment for each Class of Claims and Interests. Only Holders of Allowed Claims and Allowed Interests are entitled to vote on and receive distributions under the Plan. For purposes of the Plan, the term "Allowed" means, with respect to a Claim or Interest, or any portion thereof, in any Class or category specified, a Claim or Interest (i) that is evidenced by a Proof of Claim or Interest and is not listed as disputed, contingent or unliquidated on the pertinent Debtor's schedules and as to which no objection or request for estimation has been filed on or before any objection deadline set by the Bankruptcy Court or the expiration of such other applicable period fixed by the Bankruptcy Court, (ii) that is listed on the pertinent Debtor's schedules but is not listed as disputed, contingent or unliquidated, that is not otherwise subject to an objection and as for which no contrary or superseding Proof of Claim or Interest has been filed, (iii) as to which any objection has been settled, waived, withdrawn or denied by a Final Order; or (iv) that is expressly allowed (a) by a Final Order, (b) pursuant to the terms of the Claims Settlement Order, (c) solely with respect to those Claims or Interests that are not required under applicable bankruptcy law to be allowed pursuant to an order of the court, by an agreement between the Holder of such Claim or Interest and the pertinent Debtors or Reorganized Debtors, or (d) pursuant to the terms of the Plan.

Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim or Interest under the Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim or Interest.

**B.**      **Provisions for Payment of Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims.**

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Facility Claims, Administrative Expense Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.      DIP Facility Claims.

DIP Facility Claims are all Claims held by the DIP Facility Agent and the DIP Facility Lenders pursuant to the DIP Facility Agreements and the Final DIP Order.

On or as soon as reasonably practicable after the Effective Date, in full satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, the Reorganized Debtors shall pay Allowed DIP Facility Claims in full in Cash. In addition, on the Effective Date, any unexpired letters of credit outstanding under the DIP Facility shall be, at Tribune's option, (i) returned to the issuer undrawn and marked canceled, (ii) collateralized with Cash in an amount equal to one hundred and five percent (105%) of the face amount of such outstanding letter of credit in form and substance acceptable to the issuer thereof, (iii) collateralized with back-to-back letters of credit issued under the Exit Facility in an amount equal to one hundred and five percent (105%) of the face amount of such outstanding letter of credit, in form and substance acceptable to the issuer thereof, or (iv) otherwise deemed to be subject to reimbursement pursuant to the terms and conditions of the Exit Facility.

2.      Administrative Expense Claims.

Administrative Expense Claims are Claims for costs and expenses of administration of the Chapter 11 Cases that are Allowed under sections 328, 330, 363, 364(c)(1), 365, 503(b), or 507(a)(2) of the Bankruptcy Code, including, without limitation, (i) any actual and necessary costs and expenses of preserving the Debtors' Estates and operating the businesses of the Debtors (such as wages, salaries and commissions for services and payments for inventory, leased equipment and premises) and Claims of governmental units for taxes (including tax audit Claims) related to tax years ending on or after the Petition Date or commencing after the Petition Date, but excluding Claims related to tax periods, or portions thereof, ending on or before the Petition Date; (ii) all compensation for legal, financial, advisory, accounting and other professional services and reimbursement of expenses incurred during the Chapter 11 Cases Allowed by the Bankruptcy Court; (iii) any indebtedness or

obligation incurred or assumed by the Debtors during the Chapter 11 Cases pursuant to an agreement which was approved or otherwise permitted by a Final Order of the Bankruptcy Court or is an ordinary course agreement; (iv) any payment to cure a default on an assumed executory contract or unexpired lease; (v) post-petition Claims against any of the Debtors held by a Debtor or a non-Debtor Affiliate; or (vi) any fees and charges assessed against the Debtors' Estates under section 1930, chapter 123, of title 28 of the United States Code.

The Bankruptcy Code does not require that administrative expense claims be classified under a Plan.  It does, however, require that allowed administrative expense claims be paid in full in cash in order for a plan of reorganization to be confirmed unless the holder of such claim consents to a different treatment.

Subject to the provisions of sections 328, 330, 331 and 503(b) of the Bankruptcy Code, in full satisfaction, settlement, release and discharge of and in exchange for each Allowed Administrative Expense Claim, except to the extent that any Holder of an Allowed Administrative Expense Claim agrees to different treatment, or as otherwise provided for in the Plan, each Holder of an Allowed Administrative Expense Claim shall receive payment in full, in Cash, on the later of: (i) the Effective Date if due on or before that date, (ii) the date upon which such Administrative Expense Claim becomes an Allowed Claim, (iii) with respect to Allowed Administrative Expense Claims not yet due on the Effective Date or that represent obligations incurred by the Debtors in the ordinary course of their business during these Chapter 11 Cases, or assumed by the Debtors during these Chapter 11 Cases, such time as such Allowed Administrative Expense Claims are due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations, or (iv) such other date as may be agreed upon between the Holder of such Allowed Administrative Expense Claim and the Debtors.

Notwithstanding the foregoing, all claims for compensation for legal, financial, advisory, accounting and other professional services and reimbursement of expenses which are sought to be Allowed by the Bankruptcy Court shall be submitted and, to the extent Allowed, paid pursuant to the provisions of Section 9.2 of the Plan or that certain Order Authorizing the Debtors to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business entered on January 15, 2009 [Docket No. 227].

3.    Priority Tax Claims.

Priority Tax Claims are secured or unsecured Claims of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

On December 10, 2008, the Bankruptcy Court authorized the Debtors to pay certain tax claims that constitute Priority Tax Claims.  As a result, many Priority Tax Claims have been resolved during the Chapter 11 Cases.  As set forth in the summary chart contained in Article II of this Disclosure Statement, the Debtors estimate that the amount of remaining Priority Tax Claims that may become Allowed is approximately $150-175 million.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive either, at the sole option of the Debtors or the Reorganized Debtors, (i) payment in full in Cash after such Priority Tax Claim becomes an Allowed Claim, (ii) except as otherwise determined by the Bankruptcy Court at the Confirmation Hearing, regular installment payments in Cash equal to the Allowed amount of such Claim over a period ending not later than the fifth anniversary of the Petition Date, together with interest compounded annually from the Effective Date on any outstanding balance calculated at a rate determined under section 511 of the Bankruptcy Code, which installment payments shall commence after such Priority Tax Claim becomes an Allowed Claim, or (iii) such other treatment as agreed to by the Holder of an Allowed Priority Tax Claim and the Debtors.

69

**C.**     **Treatment of Claims and Equity Interests.**

1.     The Debtors, Filed Subsidiary Debtors, and Guarantor Non-Debtors.

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor.  For purposes of brevity and convenience, the classification and treatment of Claims and Interests has been set forth in three groups: (i) Tribune (Debtor 1), (ii) Filed Subsidiary Debtors (Debtors 2 through 111) and (iii) any Guarantor Non-Debtors that become Debtors and participate in the Prepackaged Plan.  For purposes of classifying and treating Claims against and Interests in each Debtor, and for balloting purposes, each Debtor has been also assigned its own number.

(a)     Tribune Company (Debtor 1).

| | |
|---|---|
| **1.** | Tribune Company |

(b)     Filed Subsidiary Debtors – (Debtors 2-111).

i)     Non-Guarantor Debtors

| | |
|---|---|
| **2.** | 435 Production Company |
| 3. | Baltimore Newspaper Networks, Inc. |
| 4. | Candle Holdings Corporation |
| 5. | Channel 20, Inc. |
| 6. | Chicago Avenue Construction Company |
| 7. | Chicago River Production Company |
| 8. | Chicago Tribune Newspapers, Inc. |
| 9. | Chicago Tribune Press Service, Inc. |
| 10. | ChicagoLand Microwave Licensee, Inc. |
| 11. | Direct Mail Associates, Inc. |
| 12. | ForSaleByOwner.com Referral Services, LLC |
| 13. | Fortify Holdings Corporation |
| 14. | GreenCo, Inc. |
| 15. | Heart & Crown Advertising, Inc. |
| 16. | Hoy, LLC |
| 17. | InsertCo, Inc. |
| 18. | JuliusAir Company II, LLC |
| 19. | JuliusAir Company, LLC |
| 20. | Los Angeles Times International, Ltd. |
| 21. | Los Angeles Times Newspapers, Inc. |
| 22. | Magic T Music Publishing Company |
| 23. | NBBF, LLC |
| 24. | Neocomm, Inc. |
| 25. | Newscom Services, Inc. |
| 26. | Newspaper Readers Agency, Inc. |
| 27. | North Michigan Production Company |
| 28. | North Orange Avenue Properties, Inc. |
| 29. | Oak Brook Productions, Inc. |

| 30. | Publishers Forest Products Co. of Washington |
| 31. | Sentinel Communications News Ventures, Inc. |
| 32. | Shepard's Inc. |
| 33. | Signs of Distinction, Inc. |
| 34. | The Other Company LLC |
| 35. | Times Mirror Land and Timber Company |
| 36. | Times Mirror Payroll Processing Company, Inc. |
| 37. | Times Mirror Services Company, Inc. |
| 38. | Towering T Music Publishing Company |
| 39. | Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. |
| 40. | Tribune Entertainment Production Company |
| 41. | Tribune Finance Service Center, Inc. |
| 42. | Tribune License, Inc. |
| 43. | Tribune Network Holdings Company |
| 44. | Tribune Publishing Company |
| 45. | ValuMail, Inc. |
| 46. | Virginia Community Shoppers, LLC |
| 47. | WATL, LLC |
| 48. | WCWN LLC |
| 49. | WLVI Inc. |

ii)    Guarantor Debtors

| 50. | 5800 Sunset Productions Inc. |
| 51. | California Community News Corporation |
| 52. | Channel 39, Inc. |
| 53. | Channel 40, Inc. |
| 54. | Chicago Tribune Company |
| 55. | Chicagoland Publishing Company |
| 56. | Chicagoland Television News, Inc. |
| 57. | Courant Specialty Products, Inc. |
| 58. | Distribution Systems of America, Inc. |
| 59. | Eagle New Media Investments, LLC |
| 60. | Eagle Publishing Investments, LLC |
| 61. | forsalebyowner.com corp. |
| 62. | Forum Publishing Group, Inc. |
| 63. | Gold Coast Publications, Inc. |
| 64. | Homeowners Realty, Inc. |
| 65. | Homestead Publishing Company |
| 66. | Hoy Publications, LLC |
| 67. | Internet Foreclosure Service, Inc. |
| 68. | KIAH Inc. |
| 69. | KPLR, Inc. |
| 70. | KSWB Inc. |
| 71. | KTLA Inc. |
| 72. | KWGN Inc. |

| 73. | Los Angeles Times Communications LLC |
| 74. | New Mass. Media, Inc. |
| 75. | Orlando Sentinel Communications Company |
| 76. | Patuxent Publishing Company |
| 77. | Southern Connecticut Newspapers, Inc. |
| 78. | Star Community Publishing Group, LLC |
| 79. | Stemweb, Inc. |
| 80. | Sun-Sentinel Company |
| 81. | The Baltimore Sun Company |
| 82. | The Daily Press, Inc. |
| 83. | The Hartford Courant Company |
| 84. | The Morning Call, Inc. |
| 85. | TMLH 2, Inc. |
| 86. | TMLS I, Inc. |
| 87. | TMS Entertainment Guides, Inc. |
| 88. | Tower Distribution Company |
| 89. | Tribune Broadcast Holdings, Inc. |
| 90. | Tribune Broadcasting Company |
| 91. | Tribune Broadcasting Holdco, LLC |
| 92. | Tribune California Properties, Inc. |
| 93. | Tribune CNLBC, LLC |
| 94. | Tribune Direct Marketing, Inc. |
| 95. | Tribune Entertainment Company |
| 96. | Tribune Finance LLC |
| 97. | Tribune Los Angeles, Inc. |
| 98. | Tribune Manhattan Newspaper Holdings, Inc. |
| 99. | Tribune Media Net, Inc. |
| 100. | Tribune Media Services, Inc. |
| 101. | Tribune New York Newspaper Holdings, LLC |
| 102. | Tribune NM, Inc. |
| 103. | Tribune Television Company |
| 104. | Tribune Television Holdings, Inc. |
| 105. | Tribune Television New Orleans, Inc. |
| 106. | Tribune Television Northwest, Inc. |
| 107. | Virginia Gazette Companies, LLC |
| 108. | WDCW Broadcasting, Inc. |
| 109. | WGN Continental Broadcasting Company |
| 110. | WPIX, Inc. |
| 111. | WTXX Inc. |

(c)    Subsidiary Non-Debtors.

i)    Non-Guarantor Non-Debtors

| |
|---|
| Multimedia Insurance Company |
| Fairfax Media, Incorporated |
| Professional Education Publishers International (Africa) Pty. Ltd. |
| TMS Entertainment Guides Canada Corp. |
| Tribune DB, LLC |

| |
|---|
| Tribune DQ, LLC |
| Tribune Employee Lease Company LLC |
| Tribune Hong Kong, Ltd. |
| Tribune Media Services, BV |
| Tribune Receivables, LLC |
| Tribune Sports Network Holdings, LLC |
| Tribune Technology LLC |
| Tribune WFPT, LLC |

ii)    Guarantor Non-Debtors

| |
|---|
| Tribune (FN) Cable Ventures, Inc. |
| Tribune Interactive, Inc. |
| Tribune N.D., Inc. |
| Tribune National Marketing Company |

2.    Classification of Claims against the Debtors under the Plan.

As noted above, Claims against and Interests in each of the Debtors are further divided into lettered Classes.  Not all of these Classes apply to every Debtor, and consequently not all of the below lettered Classes appear in the case of each Debtor.  However, whenever such a Class of Claims or Interests is relevant to a particular Debtor, that Class of Claims or Interests will be grouped under the appropriate lettered Class from the following lists.

(a)    Tribune Company  (Debtor 1).

The following list assigns a letter to each Class against Tribune (Debtor 1) for purposes of identifying each separate Class:

| CLASS | CLAIM OR INTEREST |
|:---:|:---:|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Senior Loan Claims |
| D | Bridge Loan Claims |
| ~~D~~E | Senior Noteholder Claims |
| ~~E~~F | Other Parent Claims |
| ~~F~~G | Convenience Claims |
| I | EGI-TRB LLC Notes Claims |
| J | PHONES Notes Claims |
| K | Intercompany Claims |
| L | Securities Litigation Claims |
| M | Tribune Interests |

(b)    Subsidiary Debtors – (Debtors 2-111).

The following list assigns a letter to each Class against the Subsidiary Debtors (Debtor 2-111) for purposes of identifying each separate Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Senior Loan Guaranty Claims |
| D | Bridge Loan Guaranty Claims |
| E | General Unsecured Claims |
| K | Intercompany Claims |
| L | Securities Litigation Claims |
| M | Interests in Filed Subsidiary Debtors |

**D.    Provisions for Treatment of Claims and Interests under the Plan.**

The classification and treatment of Claims against and interest in Tribune and the Filed Subsidiary Debtors under the Plan are set forth in detail in Article III of the Plan. A summary of that treatment is provided below.

1.    Classification and Treatment of Claims Against Tribune (Debtor 1).

(a)    Class 1A – Priority Non-Tax Claims.

Class 1A consists of all Priority Non-Tax Claims against Tribune. A Priority Non-Tax Claim is any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

Each Holder of an Allowed Priority Non-Tax Claim against Tribune shall have its Claim Reinstated.

Allowed Claims in Class 1A are Unimpaired, and the Holders of Class 1A Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1A Claims are not entitled to vote to accept or reject the Plan; provided, however, that all Class 1A Claims shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Plan, including, but not limited to, Section 8 of the Plan.

(b)    Class 1B – Other Secured Claims.

Class 1B consists of all Other Secured Claims against Tribune. An Other Secured Claim is a Secured Claim, other than an Administrative Expense Claim, a DIP Facility Claim, a Senior Loan Claim (other than a right to setoff) or a Senior Noteholder Claim (other than a right to setoff).

Each Holder of an Allowed Other Secured Claim against Tribune shall have its Claim Reinstated.

Allowed Claims in Class 1B are Unimpaired, and the Holders of Class 1B Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1B Claims are not entitled to vote to accept or reject the Plan; provided, however, that all Class 1B Claims shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Plan, including, but not limited to, Section 8 of the Plan.

(c)     Class 1C – ~~Senior~~ Loan Claims

Class 1C consists of all Loan Claims against Tribune.  ~~Senior~~ Loan Claims are Claims arising under the Senior Loan ~~Claims, the Bridge Loan Claims,~~ Agreement, other than a Senior Lender Fee/Expense Claim, any Claim of the Senior Lenders or the Senior Loan Agent arising under the Pledge Agreement, and the Barclays Swap ~~Claims~~ Claim.  The Senior Loan Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable under the Senior Loan Agreement or the Pledge Agreement, other than the Senior Lender Fee/Expense Claims, including the full amount of principal, interest, and all other amounts due and owing under the Senior Loan Agreement and the Pledge Agreement as of the Petition Date.  ~~The Bridge Loan Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable under the Bridge Loan Agreement, including the full amount of principal, interest, and all other amounts due and owing under the Bridge Loan Agreement as of the Petition Date.~~  Neither the Senior Loan Claims ~~nor the Bridge Loan Claims shall~~ and shall not be subject to reduction, disallowance, subordination, set off, or counterclaim.

On or as soon as practicable after the applicable Distribution Date, together with other distributions provided for in the Plan, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Senior Loan Claims against Tribune, subject to Section 5.4.2 of the Plan, each Holder of an Allowed Senior Loan Claim against Tribune shall receive a Pro Rata share ~~of: (i) 8.8% of the New Senior Secured Term Loan minus (a) the amount of the New Senior Secured Term Loan to be distributed to Holders of Allowed~~, calculated together with the Holders of Claims in Class 1D ~~and (b) the portion of the Other Parent Claims Allocation that is New Senior Secured Term Loan; (ii) 8.8% of the Distributable Cash minus (a) the amount of the Distributable Cash to be distributed to Holders of Allowed Claims in Class 1D, (b) the portion of the Other Parent Claims Allocation that is Distributable Cash and (c) the amount of Cash to be distributed to Holders of Allowed Claims in Class 1F; and (iii) 8.8% of the New Common Stock (subject to dilution by the Equity Incentive Plan) minus (a) the amount of the New Common Stock to be distributed to Holders of Allowed Claims in Class 1D and (b) the portion of the Other Parent Claims Allocation that is New Common Stock.~~ that are Allowed pursuant to Section 3.2.4(b)(i), of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation.  In addition, on the Effective Date, any unexpired letters of credit outstanding under the Senior Loan Agreement shall be either, at Tribune's option, (i) returned to the issuer undrawn and marked canceled, (ii) collateralized with Cash in an amount equal to 105% of the face amount of such outstanding letter of credit in form and substance acceptable to the issuer thereof, or (iii) collateralized with back-to-back letters of credit issued under the Exit Facility in an amount equal to 105% of the face amount of such outstanding letter of credit, in form and substance acceptable to the issuer thereof.

In addition, on the Effective Date, any unexpired letters of credit outstanding under the Senior Loan Agreement shall be either, at Tribune's option, (i) returned to the issuer undrawn and marked canceled, (ii) collateralized with Cash in an amount equal to one hundred and five percent (105%) of the face amount of such outstanding letter of credit in form and substance acceptable to the issuer thereof, or (iii) collateralized with back-to-back letters of credit issued under the Exit Facility in an amount equal to one hundred and five percent (105%) of the face amount of such outstanding letter of credit, in form and substance acceptable to the issuer thereof.

Claims in Class 1C are Impaired, and Holders of Class 1C Claims are entitled to vote to accept or reject the Plan.

(d)     Class 1D – Bridge Loan Claims

Class 1D consists of all Bridge Loan Claims against Tribune.  Bridge Loan Claims are Claims arising under the Bridge Loan Agreement.

The following treatment shall apply to (i) all Holders of Bridge Loan Claims if Class 1D votes to accept the Plan, or (ii) each Holder of a Bridge Loan Claim that votes to accept the Plan if Class 1D votes to reject the Plan: Each such Holder of a Bridge Loan Claim shall (a) as of the Effective Date, have its Claim Allowed in an

amount equal to the principal amount of such Claim plus accrued interest as of the Petition Date, and (b) on or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Bridge Loan Claim against Tribune, subject to Section 5.4.2 of the Plan, receive such Holder's Pro Rata share, calculated together with the Holders of Allowed Claims in Class 1C, of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation.

If Class 1D votes to reject the Plan, the following treatment shall apply to each Holder of a Bridge Loan Claim that votes to reject the Plan: Each such Holder of a Bridge Loan Claim shall (a) have its Claim treated as a Disputed Claim until Allowed by Final Order, and (b) in full satisfaction, settlement, release and discharge of and in exchange for such Bridge Loan Claim against Tribune, subject to Section 5.4.2 of the Plan, receive, if ultimately Allowed, such distribution and treatment as may be proposed by the Debtors that would satisfy the requirements of section 1129(b) of the Bankruptcy Code not to exceed an amount determined by application of the mid-point estimate of total "Distributable Value" as defined and set forth herein and the allocation of such "Distributable Value" underlying the recoveries of Holders of Claims against Tribune under the Plan if such Bridge Loan Claims becomes Allowed.

Claims in Class 1D are Impaired, and Holders of Class 1D Claims are entitled to vote to accept or reject the Plan.

(e)    (d) Class 1D—E - Senior Noteholder Claims

Class 1DE consists of all Senior Noteholder Claims against Tribune. Senior Noteholder Claims are all Claims arising under or evidenced by the Senior Notes Indentures and related documents and any Claim of the Senior Noteholders arising under the Pledge Agreement. The Senior Noteholder Claims shall together be deemed Allowed in the aggregate amount of $1,283,055,743.77. The Senior Noteholder Claims shall not be subject to reduction, disallowance, subordination, set off or counterclaim (other than the Senior Noteholder Claims of MSCS with respect to the Morgan Stanley Claims).

On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Senior Noteholder Claims against Tribune, subject to Section 5.4.2 of the Plan, each Holder of an Allowed Senior Noteholder Claim shall receive such Holder's Pro Rata share of 7.4% of the New Senior Secured Term Loan, 7.4% of the Distributable Cash, and 7.4% of the New Common Stock, subject to dilution by the Equity Incentive Plan.

Claims in Class 1D are Impaired, and Holders of Class 1DE Claims are entitled to vote to accept or reject the Plan.

(f)    (e) Class 1EF – Other Parent Claims

Class 1EF consists of all Other Parent Claims against Tribune. Other Parent Claims are General Unsecured Claims against Tribune and for the avoidance of doubt includes all Claims against Tribune under Non-Qualified Former Employee Benefit Plans with the exception of Convenience Claims.

On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Other Parent Claims against Tribune, each Holder of an Allowed Other Parent Claim shall receive an amount of Distributable Cash equal to 35.18% of the aggregate amount in U.S. dollars of such Holder's Allowed Other Parent Claim.

Claims in Class 1EF are Impaired, and Holders of Class 1EF Claims are entitled to vote to accept or reject the Plan.

(g)    (f) Class 1FG – Convenience Class Claims.

Class 1F-G consists of all Convenience Claims against Tribune.  A Convenience Claim is a Claim against Tribune that would otherwise be a General Unsecured Claim that is (i) in an amount equal to or less than $1,000 or (ii) in an amount that has been reduced to $1,000 pursuant to a Convenience Class Election made by the Holder of such Claim; provided, however, that where any portion(s) of a single Claim has been transferred on or after March 30, 2010, any transferred portion(s) shall continue to be treated together April 12, 2010, such Claim as a single Claim for purposes of the Convenience Class Election and determining whether such Claim qualifies as a Convenience Claim.

If you are the Holder of a General Unsecured Claim against Tribune, the Ballot included as part of the Solicitation Package that includes this Disclosure Statement provides for you to make the Convenience Class Election.  The Convenience Class Election is an irrevocable election made on the Ballot by the Holder of a Claim against Tribune that would otherwise be a General Unsecured Claim in an amount greater than $1,000 to reduce such Claim to $1,000.

In full satisfaction, settlement, release and discharge of and in exchange for Allowed Convenience Claims against Tribune, on or as soon as practicable after the applicable Distribution Date, each Holder of an Allowed Convenience Claim against Tribune shall receive payment in full in Cash on account of such Claim; provided, however, that, subject to section 7.4 of the Plan, post-petition interest shall not be paid to any Holder on any Convenience Claim without regard to whether such amount has accrued for federal income tax purposes.

Allowed Claims in Class 1F-G are Unimpaired, and the Holders of Class 1F-G Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1F-G Claims are not entitled to vote to accept or reject the Plan; provided, however, that all Class 1F-G Claims shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Plan, including, but not limited to, Section 8 of the Plan.

(h)    (g) Class 1I – EGI-TRB LLC Notes Claims.

Class 1I consists of all EGI-TRB Notes LLC Claims against Tribune.  EGI-TRB LLC Notes Claims are all Claims held by the EGI-TRB LLC Noteholders pursuant to the EGI-TRB LLC Notes.

On the Effective Date, all EGI-TRB LLC Notes Claims against Tribune shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such EGI-TRB LLC Notes Claims.

Claims in Class 1I are Impaired, and Holders of Class 1I Claims are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

(i)    (h) Class 1J – PHONES Notes Claims.

Class 1J consists of all PHONES Notes Claims against Tribune.  PHONES Notes Claims are Claims arising under or evidenced by the PHONES Notes Indenture and related documents.

On the Effective Date, all PHONES Notes Claims against Tribune shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such PHONES Notes Claims.

Claims in Class 1J are Impaired, and Holders of Class 1J Claims are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

(j)    (i) Class 1K – Intercompany Claims.

Class 1K consists of all Intercompany Claims against Tribune. Intercompany Claims are all prepetition Claims against any of the Debtors held by a Debtor or a non-Debtor Affiliate.

In full satisfaction, settlement, release and discharge of and in exchange for Intercompany Claims against Tribune, except as otherwise provided in the Plan, all Intercompany Claims against Tribune shall be deemed satisfied, discharged and extinguished in full and shall be eliminated as of the Effective Date.

Claims in Class 1K are Impaired; however, as set forth in Section 4.3 of the Plan, votes shall not be solicited from Holders of Claims in Class 1K.

     (k)     (j) Class 1L – Securities Litigation Claims.

Class 1L consists of all Securities Litigation Claims against Tribune. A Securities Litigation Claim is any Claim against any of the Debtors, except any Claim that survives confirmation and effectiveness of the Plan pursuant to Section 11.6 of the Plan, 11.6, (i) arising from the rescission of a purchase or sale of shares, notes or any other securities of any of the Debtors or an Affiliate of any of the Debtors, (ii) for damages arising from the purchase or sale of any such security, (iii) for violations of the securities laws or the Employee Retirement Income Security Act of 1974 (unless there has been a judicial determination by Final Order that any such Claim is not subject to subordination under section 510(b) of the Bankruptcy Code) or for misrepresentations or any similar Claims related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, (iv) asserted by or on behalf of the ESOP and/or any present or former participants in the ESOP in their capacity as such, (v) for attorneys' fees, other charges or costs incurred on account of any of the foregoing Claims, and/or (vi) for reimbursement, contribution or indemnification allowed under section 502 of the Bankruptcy Code on account of any of the foregoing Claims, including Claims based upon allegations that the Debtors made false and misleading statements or engaged in other deceptive acts in connection with the offer or sale of securities.

On the Effective Date, all Securities Litigation Claims against Tribune shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such Securities Litigation Claims.

Claims in Class 1L are Impaired. Holders of Claims in Class 1L are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

     While the Debtors believe that the aforementioned treatment is appropriate for each Securities Litigation Claim specified in the Plan, the DOL has informed the Debtors that the DOL disagrees with the Debtors' classification of Claims for violations of ERISA as Securities Litigation Claims and the subordination of such Claims to Interests in the Filed Subsidiary Debtors. Consequently, it is possible that the DOL may choose to file an objection to Confirmation of the Plan in accordance with the procedures discussed in Article I.E.

     (l)     (k) Class 1M – Tribune Interests.

Class 1M consists of all Tribune Interests in Tribune. Tribune Interests are any shares of Old Common Stock, preferred stock or other instrument evidencing an ownership interest in Tribune, whether or not transferable, and any options, warrants (including, without limitation, the EGI-TRB LLC Warrants), calls, rights, puts, awards, commitments, repurchase rights, unvested or unexercised stock options, unvested common stock, unvested preferred stock or any other agreements of any character related to the Old Common Stock, but does not include the Securities Litigation Claims.

On the Effective Date, all Tribune Interests in Tribune shall be extinguished and Holders of such Interests shall not receive or retain any property under the Plan on account of such Tribune Interests.

Interests in Class 1M are Impaired.  Holders of Interests in Class 1M are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

 2. Classification and Treatment of Claims Against and Interests in Filed Subsidiary Debtors (Debtors 2 through 111).

 (a) Class 2A through 111A – Priority Non-Tax Claims.

Classes 2A through 111A consist of all Priority Non-Tax Claims against the relevant Filed Subsidiary Debtors.

Each Holder of an Allowed Priority Non-Tax Claim against a Filed Subsidiary Debtor shall have such Claim Reinstated.

Allowed Claims in Classes 2A through 111A are Unimpaired, and the Holders of Claims in such Classes are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 2A through 111A are not entitled to vote to accept or reject the Plan; provided, however, that all Claims in Classes 2A through 111A shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Plan, including, but not limited to, Section 8 of the Plan.

 (b) Classes 2B through 111B – Other Secured Claims

Classes 2B through 111B consist of all Other Secured Claims against the relevant Filed Subsidiary Debtors.

Each Holder of an Allowed Other Secured Claim against a Filed Subsidiary Debtor shall have such Claim Reinstated.

Allowed Claims in Classes 2B through 111B are Unimpaired, and the Holders of Claims in such Classes are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 2B through 111B are not entitled to vote to accept or reject the Plan; provided, however, that all Claims in Classes 2B through 111B shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Plan, including, but not limited to, Section 8 of the Plan.

 (c) Classes 50C through 111C – Senior Loan Guaranty Claims

Classes 50C through 111C consist of all Senior Loan Guaranty Claims against the relevant Guarantor Debtors.  Senior Loan Guaranty Claims are the ~~the~~ Claims arising under Senior Loan Guaranty ~~Claims and the Bridge Loan Guaranty Claims~~ Agreement, including, without limitation, the guaranty of the Barclays Swap Claim.  The Senior Loan Guaranty Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable under such Senior Loan Guaranty Agreement, including the full amount of principal, interest, and all other amounts due and owing under the Senior Loan Guaranty Agreement as of the Petition Date. ~~The Bridge Loan Guaranty Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable thereunder, including the full amount of principal interest, and all other amounts due and owing under the Bridge Loan Agreement as of the Petition Date.  Neither the Senior Loan Guaranty Claims nor the Bridge Loan Guaranty Claims shall~~ and shall not be subject to reduction, disallowance, subordination (other than with respect to the Bridge Loan Guaranty Claims as provided in the Loan Guaranty Agreements), set off, or counterclaim.

On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Senior Loan Guaranty Claims against the Guarantor Debtors, subject to Section 5.4.2 of the Plan, each Holder of an Allowed Senior Loan Guaranty Claim against a

Guarantor Debtor shall receive a Pro Rata share of: (i) 91.2% of the New Senior Secured Term Loan plus the portion of the Other Parent Claims Allocation that is New Senior Secured Term Loan; (ii) 91.2% of the Distributable Cash minus the amount of Distributable Cash to be distributed to Holders of Allowed Claims in Classes 2E through 111E and the amount of Distributable Cash to be distributed to Holders of Allowed Claims in Class 1E in excess of the portion of the Other Parent Claims Allocation that is Distributable Cash; and (iii) 91.2% of the New Common Stock plus the portion of the Other Parent Claims Allocation that is New Common Stock, subject to dilution by the Equity Incentive Plan. ~~In accordance with Section 7.3 of the Plan, in order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions of (i) the New Senior Secured Term Loan, (ii) the Distributable Cash and (iii) the New Common Stock made on account of Allowed Bridge Loan Guaranty Claims shall be distributed to the Senior Loan Agent for distribution on account of Allowed Senior Loan Guaranty Claims, and no distribution shall be provided to Holders of Allowed Bridge Loan Guaranty Claims.~~

Claims in Classes 50C through 111C are Impaired, and Holders of Claims in Classes 50C through 111C are entitled to vote to accept or reject the Plan against the relevant Debtors.

(d)    Classes 50D through 111D – Bridge Loan Guaranty Claims

Classes 50D through 111D consist of all Bridge Loan Guaranty Claims against the relevant Guarantor Debtors. Bridge Loan Guaranty Claim means Claims arising under the Bridge Loan Guaranty Agreement. If Class 1D votes to accept the Plan, the Bridge Loan Guaranty Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable under the Bridge Loan Guaranty Agreement, including the full amount of principal, interest, and all other amounts due and owing under the Bridge Loan Guaranty Agreement as of the Petition Date, and shall not be subject to reduction, disallowance, subordination (other than as provided in the Loan Guaranty Agreements), set off or counterclaim.

In accordance with Section 7.3 of the Plan, in order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions of (i) the New Senior Secured Term Loan, (ii) the Distributable Cash and (iii) the New Common Stock that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall instead be distributed to the Senior Loan Agent for distribution on account of Allowed Senior Loan Guaranty Claims. Accordingly, on the Effective Date, all Bridge Loan Guaranty Claims against the Guarantor Debtors shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such Bridge Loan Guaranty Claims.

Claims in Class 50D through 111D are Impaired, and Holders of Claims in Classes 50D through 111D are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

(e)    ~~(d)~~ Classes 2E through 111E – General Unsecured Claims.

Classes 2E through 111E consist of all General Unsecured Claims against the relevant Filed Subsidiary Debtors. A General Unsecured Claims is any Claim against the Debtors that is not an Administrative Expense Claim, a DIP Facility Claim, a Priority Tax Claim, a Priority Non-Tax Claim, an Other Secured Claim, a Senior Loan Claim, a Bridge Loan Claim, a Senior Noteholder Claim, a Convenience Claim, an EGI-TRB LLC Notes Claim, a PHONES Notes Claim, an Employee Benefit Claim, an Intercompany Claim, a Securities Litigation Claim, a Senior Loan Guaranty Claim or a Bridge Loan Guaranty Claim and shall not include Disallowed Claims or Claims that are released, whether by operation of law or pursuant to order of the Bankruptcy Court, written release or settlement, the provisions of the Plan or otherwise.

The Debtors have made a good faith, reasonable estimate of the amount to be paid to Classes 2E through 111E under the Plan, which estimate has been disclosed in Article II.C hereof and the Debtors shall supplement such estimate in a declaration filed with the Bankruptcy Court no later than ten calendar days prior to the deadline established for objecting to the Plan.

80

On or as soon as reasonably practicable after the applicable Distribution Date, each Holder of an Allowed General Unsecured Claim against a Filed Subsidiary Debtor shall receive payment in full in Cash (paid out of the Distributable Cash); provided, however, that if the Debtors estimate, pursuant to the immediately preceding paragraph, that the sum of Allowed Claims in Classes 2E through 111E shall exceed $150 million in the aggregate and the Senior Lender Settlement Committee does not elect in writing after such estimate is filed with the Bankruptcy Court but prior to the conclusion of the Confirmation Hearing to provide additional consideration to such Holders, each Holder of an Allowed Claim in Classes 2E through 111E shall instead receive its Pro Rata share of $150 million in Cash; provided further, however, that post-petition interest shall not accrue or be paid on any General Unsecured Claim.

Claims in Classes 2E through 111E are Impaired, and Holders of Claims in Classes 2E through 111E are entitled to vote to accept or reject the Plan against the relevant Debtors.

(f)        (e) Classes 2K through 111K – Intercompany Claims.

Classes 2K through 111K consist of all Intercompany Claims against the relevant Filed Subsidiary Debtors.

In full satisfaction, settlement, release and discharge of and in exchange for Intercompany Claims against Filed Subsidiary Debtors, except as otherwise provided in the Plan, all Intercompany Claims against Filed Subsidiary Debtors shall be deemed satisfied, discharged and extinguished in full and shall be eliminated as of the Effective Date.

Claims in Classes 2K through 111K are Impaired; however, as set forth in Section 4.3 of the Plan, votes on the Plan shall not be solicited from Holders of Claims in Classes 2K through 111K.

(g)        (f) Classes 2L through 111L – Securities Litigation Claims.

Classes 2L through 111L consist of all Securities Litigation Claims against the relevant Filed Subsidiary Debtors.

On the Effective Date, all Securities Litigation Claims against Filed Subsidiary Debtors shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such Securities Litigation Claims.

Claims in Classes 2L through 111L are Impaired.  Holders of Claims in Classes 2L through 111L are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

(h)        (g) Classes 2M through 111M – Interests in Filed Subsidiary Debtors.

Classes 2M through 111M consist of all Interests in the Filed Subsidiary Debtors.

Each Subject to Section 5.2 of the Plan, each Holder of an Allowed Interest in the Filed Subsidiary Debtors shall have its Interest Reinstated.  Allowed Interests in each Filed Subsidiary Debtor shall be Reinstated for administrative convenience and (i) in the case of the Guarantor Debtors for the ultimate benefit of the Holders of Loan Guaranty Claims against such Guarantor Debtors and (ii) in the case of the Non-Guarantor Debtors, in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain Cash distributions to the Holders of Allowed Claims against such Non-Guarantor Debtors.

Allowed Interests in Classes 2M through 111M are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Interests in Classes 2M through 111M are not entitled to vote to accept or reject the Plan.

3. Prepackaged Plans for and Treatment of Claims Against and Interests In Guarantor Non-Debtors, If Any, That Become Debtors.

 (a) General.

The Plan constitutes a Prepackaged Plan for the Guarantor Non-Debtors, if any, that commence Chapter 11 Cases.  For any Guarantor Non-Debtor that commences a Chapter 11 Case, such Prepackaged Plan shall classify Allowed Claims and Interests in the same manner as set forth in Section 3.3 of the Plan for the Filed Subsidiary Debtors.

 (b) Treatment of Unimpaired Claims and Interests.

Except for Loan Guaranty Claims, Intercompany Claims and Securities Litigation Claims, each Holder of an Allowed Claim against or Interest in a Guarantor Non-Debtor that becomes a Debtor shall have its Claim or Interest Reinstated.  In addition, except for Loan Guaranty Claims, Intercompany Claims and Securities Litigation Claims, Allowed Claims against and Interests in any Guarantor Non-Debtor that becomes a Debtor are Unimpaired, and the Holders of such Claims and Interests are conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of such Claims and Interests are not entitled to vote to accept or reject the relevant Prepackaged Plan.  All executory contracts and unexpired leases of the Guarantor Non-Debtors that become Debtors shall be assumed and shall be fully enforceable in accordance with their terms.  Joint venture agreements, stockholder agreements, limited liability company agreements, limited liability partnership agreements, limited partnership agreements, general partnership agreements and any other agreements or arrangements related to the foregoing shall continue in accordance with their terms and shall remain in full force and effect and the parties' rights thereunder shall not be modified by the relevant Prepackaged Plan.

 (c) Treatment of Loan Guaranty Claims.

 i. Senior Loan Guaranty Claims.

In full satisfaction, settlement, release and discharge of and in exchange for Allowed Senior Loan Guaranty Claims against Guarantor Non-Debtors that become Debtors, each Holder of an Allowed Senior Loan Guaranty Claim against a Guarantor Non-Debtor that becomes a Debtor shall be entitled to receive the distributions provided to such Holder under Section 3.3.3 of the Plan and the guaranties described in Section 5.6 of the Plan and shall not be entitled to receive any other or further distributions or guaranties.  Senior Loan Guaranty Claims are Impaired, and Holders of Senior Loan Guaranty Claims are entitled to vote to accept or reject the relevant Prepackaged Plan.  Votes cast by Holders of Senior Loan Guaranty Claims in Classes 50C through 111C shall be counted as votes cast on the relevant Prepackaged Plan prepared on behalf of the relevant Guarantor Non-Debtors.

 ii. Bridge Loan Guaranty Claims.

In accordance with Section 7.3 of the Plan, in order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions of (i) the New Senior Secured Term Loan, (ii) the Distributable Cash and (iii) the New Common Stock that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall instead be distributed to the Senior Loan Agent for distribution on account of Allowed Senior Loan Guaranty Claims.  Accordingly, on the Effective Date, all Bridge Loan Guaranty Claims against Guarantor Non-Debtors that become Debtors shall be extinguished and the Holders of such

82

Claims shall not receive or retain any property under the relevant Prepackaged Plan on account of such Bridge Loan Guaranty Claims. Bridge Loan Guaranty Claims are Impaired and Holders of such Claims are conclusively deemed to have rejected the relevant Prepackaged Plan and are not entitled to vote to accept or reject the relevant Prepackaged Plan

        (d)     Treatment of Intercompany Claims.

In full satisfaction, settlement, release and discharge of and in exchange for Allowed Intercompany Claims against Guarantor Non-Debtors that become Debtors, all Intercompany Claims against a Guarantor Non-Debtor that becomes a Debtor shall be deemed satisfied, discharged and extinguished in full and shall be eliminated as of the Effective Date. Intercompany Claims are Impaired; however, as set forth in Section 4.3 of the Plan, votes shall not be solicited from the Holders of such Claims.

        (e)     Securities Litigation Claims.

On the Effective Date, all Securities Litigation Claims against Guarantor Non-Debtors that become Debtors shall be extinguished and the Holders of such Claims shall not receive or retain any property under the relevant Prepackaged Plan on account of such Securities Litigation Claims. Securities Litigation Claims are Impaired and Holders of such Claims are conclusively deemed to have rejected the relevant Prepackaged Plan and are not entitled to vote to accept or reject the relevant Prepackaged Plan.

**E.**    **Means for Implementation of the Plan.**

    1.    Restructuring Transactions.

O̶n̶The Plan provides that on or prior to the Effective Date, any Debtor and, after the Effective Date, any Reorganized Debtor, may enter into or undertake any Restructuring Transactions and may take such actions as may be determined by such Debtor or Reorganized Debtor to be necessary or appropriate to effect such Restructuring Transactions. The actions to effect the Restructuring Transactions may include, without limitation: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, conversion, restructuring, recapitalization, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, disposition, or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, conversion or dissolution (or similar instrument) pursuant to applicable law; and (iv) all other actions which the applicable entities may determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions. The Restructuring Transactions may include one or more mergers, consolidations, conversions, restructurings, recapitalizations, dispositions, liquidations or dissolutions, as may be determined by the applicable Debtors or Reorganized Debtors to be necessary or appropriate to effect the purposes of such Restructuring Transactions for the benefit of the Reorganized Debtors, including, without limitation, the potential simplification of the organizational structure of the Reorganized Debtors. I̶n̶

Over the past several months, the Debtors and their advisors have undertaken an analysis of the Debtors' corporate structure. These efforts have focused on, among other things, identifying modifications to the corporate structure that would reduce administrative inefficiencies and expenses, streamline post-emergence tax reporting and facilitate future strategic decision making. Consistent with the terms of Section 5.2 of the Plan, the Debtors anticipate proposing in the Plan Supplement a set of Restructuring Transactions to implement these initiatives. The Debtors anticipate that the Restructuring Transactions may include, among other transactions, (i) converting certain of the Reorganized Debtors into limited liability

companies, or merging certain of the Reorganized Debtors into newly formed limited liability companies in jurisdictions where conversion is not available and (ii) consolidating and reallocating certain operations of the Reorganized Debtors within the organizational structure of Reorganized Tribune.

The Plan provides that in each case in which the surviving, resulting or acquiring person in any such Restructuring Transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring person will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring person, which may provide that another Reorganized Debtor will perform such obligations. Implementation of the Restructuring Transactions shall not affect any distributions, discharges, exculpations, releases or injunctions set forth in the Plan. Exhibit 5.2 to the Plan, to be filed with the Plan Supplement, shall set forth the Restructuring Transactions and a detailed description of the actions and steps required to implement each Restructuring Transaction. On or prior to, or as soon as practicable after, the Effective Date, the Debtors or the Reorganized Debtors may take such steps as they may deem necessary or appropriate to effectuate any Restructuring Transactions that satisfy the requirements set forth in Section 5.2 of the Plan. The Restructuring Transactions shall be authorized and approved by the Confirmation Order pursuant to, among other provisions, sections 1123 and 1141 of the Bankruptcy Code and section 303 of title 8 of the Delaware Code, if applicable, without any further notice, action, third-party consents, court order or process of any kind, except as otherwise set forth in the Plan or in the Confirmation Order. To the extent that any Restructuring Transaction may require the prior consent of the FCC to an assignment of FCC Licenses or a transfer of control of a holder of FCC Licenses, no such Restructuring Transaction shall be consummated until all necessary prior consents of the FCC shall have been obtained.

F.    **Corporate Governance, Directors, Officers and Corporate Action.**

1.    Certificate of Incorporation, By-Laws, Limited Liability Company Agreement; Limited Liability Partnership Agreement.

On the Effective Date, the Certificate of Incorporation and By-Laws substantially in the forms attached as Exhibit 5.3.1(1) to the Plan and Exhibit 5.3.1(2) to the Plan, respectively, as will be filed with the Plan Supplement, shall go into effect. Consistent with, but only to the extent required by, section 1123(a)(6) of the Bankruptcy Code, the Certificate of Incorporation shall, among other things, prohibit the issuance of non-voting equity securities. Additionally, the Certificate of Incorporation shall contain director and officer liability exculpation and indemnity provisions to the fullest extent permitted under Delaware law. To the extent the summary description in the Plan conflicts with the terms of the Certificate of Incorporation or the By-Laws, the terms of such documents shall govern. The certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents, as applicable, of the other Debtors or Reorganized Debtors shall be amended as necessary to satisfy the provisions of the Plan (including, without limitation, Section 5.2 of the Plan) and the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents, as applicable, as permitted by applicable law.

2.    Directors and Officers of Reorganized Tribune.

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the initial directors and officers of Reorganized Tribune shall be the persons identified in Exhibit 5.3.2 to the Plan, to be filed with the Plan Supplement. On the Effective Date, the board of directors of Reorganized Tribune shall have at least seven but not more than nine members, including the chief executive officer of Reorganized Tribune. All members of the initial board of directors of Reorganized Tribune will be in compliance with all applicable requirements of the Communications Act and

the FCC's rules.  As set forth in the Certificate of Incorporation, the initial board of directors of Reorganized Tribune shall serve for a one-year, non-staggered term and then shall be subject to re-election based on a shareholder vote pursuant to the terms of the Certificate of Incorporation and applicable law.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in Exhibit 5.3.2 to the Plan, to be filed with the Plan Supplement, the identity and affiliations of any person proposed to serve on the initial board of directors of Reorganized Tribune and to the extent such person is an insider (as defined in section 101(31) of the Bankruptcy Code) other than by virtue of being a director, the nature of any compensation for such person.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the Certificate of Incorporation and applicable law.  Each member of the current board of directors of Tribune will be deemed to have resigned on the Effective Date unless identified in Exhibit 5.3.2 to the Plan as continuing on the board of directors of Reorganized Tribune.

3.      Ownership and Management of Reorganized Debtors Other Than Reorganized Tribune.

Except as set forth in Exhibit 5.2 to the Plan, from and after the Effective Date, each Reorganized Debtor shall retain its equity interest in any other Reorganized Debtor.  The initial boards of directors or managers of the Reorganized Debtors other than Reorganized Tribune shall be as set forth in Exhibit 5.3.3 to the Plan, to be filed with the Plan Supplement.

**G.      Issuance and Distribution of New Securities and Related Matters.**

1.      Issuance of New Securities.

On the Effective Date or a subsequent Distribution Date, as applicable, Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to the Plan without further act or action under applicable law, regulation, order or rule.  Except as otherwise provided in the Plan, including as specifically provided in Section 5.4.2 of the Plan, each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to the Plan will be issued New Class A Common Stock, provided that any such Holder will be entitled to receive all or a portion of its shares of New Common Stock in the form of New Class B Common Stock if such Holder informs the Debtors of its desire to receive instead such New Class B Common Stock by the date announced by the Debtors in a filing with the Bankruptcy Court, with such date to be no earlier than the first day of the Confirmation Hearing.  The Certificate of Incorporation, substantially in the form of Exhibit 5.3.1(1) to the Plan, sets forth the rights and preferences of the New Common Stock.  The Certificate of Incorporation may contain customary provisions restricting the sale, transfer, assignment, conversion or other disposal of such shares of New Common Stock.  To the extent the shares of New Class A Common Stock or New Class B Common Stock are certificated, such certificates may contain a legend restricting the sale, transfer, assignment, conversion or other disposal of such shares.  The New Warrant Agreement substantially in the form of Exhibit ~~1.1.111~~1.1.123 to the Plan, which shall be filed with the Plan Supplement, sets forth the rights of the holders of the New Warrants.  The issuance of the New Common Stock and the New Warrants and the distribution thereof under the Plan shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.  Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of the Plan, including, without limitation, the Exit Facility Credit Agreement (if any), the New Senior Secured Term Loan Agreement, and any other agreement entered into in connection with the foregoing, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto.

2.      Distribution of New Common Stock and New Warrants.

If the Effective Date occurs, on the Effective Date Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to the Plan without further act or action under applicable law, regulation, order or rule.  The

Plan authorizes the Debtors to issue two classes of New Common Stock: New Class A Common Stock and New Class B Common Stock. New Class A Common stock will have voting rights consistent with standard voting common stock. New Class B Common Stock will have more limited voting rights and is designed to be non-attributable under the FCC's rules.

Specifically, holders of New Class B Common Stock will be entitled to vote as a separate class on any amendment, repeal, or modification of any provision of the Restated Certificate of Incorporation for Reorganized Tribune that adversely affects the rights of the New Class B Common Stock in a manner different from the rights of the New Class A Common Stock. In addition, the holders of New Class B Common Stock will be entitled to vote together with holders of the New Class A Common Stock on the following non-ordinary course transactions to the extent that these matters are submitted to a vote of the holders of New Class A Common Stock: (i) any authorization of, or increase in the number of authorized shares, of any class of capital stock ranking *pari passu* with or senior to the New Class A Common Stock or New Class B Common Stock as to dividends or liquidation preference, including with respect to an increase in the number of New Class A Common Stock or New Class B Common Stock; (ii) any amendment to the Restated Certificate of Incorporation or the Bylaws of Reorganized Tribune; (iii) any amendment to any stockholders or comparable agreement; (iv) any sale, lease or other disposition of all or substantially all of the assets of Reorganized Tribune through one or more transactions; (v) any recapitalization, reorganization, share exchange, consolidation or merger of Reorganized Tribune or its capital stock; (vi) any issuance or entry into an agreement for the issuance of capital stock (or any options or other securities convertible into capital stock) of Reorganized Tribune, including any stock option or stock incentive plan; (vii) any redemption, purchase or other acquisition by Reorganized Tribune of any of its capital stock (except for purchases from employees upon termination of employment); and (viii) any liquidation, dissolution, distribution of assets or winding-up of Reorganized Tribune.

The Debtors' business operations are subject to regulation by the FCC under the Communications Act. As a result, each Holder of a Claim that is entitled to receive a distribution of New Common Stock and/or New Warrants pursuant to the Plan will be required to demonstrate to the Debtors' satisfaction that the issuance of New Common Stock to such Holder would not impair the ability of the Reorganized Debtors to comply with FCC-related ownership requirements and restrictions, and would not impair the ability of the Reorganized Debtors to obtain the grant of the FCC Applications necessary to implement the Plan. Applicable FCC ownership requirements and restrictions, which are discussed in more detail below, include (i) FCC broadcast multiple ownership and cross-ownership restrictions, and (ii) restrictions in Section 310(b) of the Communications Act on the direct or indirect ownership or control of broadcast licensees by non-U.S. persons

       (a)       FCC Media Ownership and Cross Ownership Rules.

Certain multiple ownership and cross-ownership rules promulgated by the FCC prohibit common ownership of "attributable interests" in certain combinations of broadcast and other media properties. The following is a summary of the FCC's principal policies on identifying and assessing "attributable interests" in media outlets. "Attributable interests" generally include the following interests in a media company: general partnership interests or managing membership interests in a limited liability company, non-insulated limited partnership or limited liability company interests, positions as an officer or director (or the right to appoint officers or directors), five percent (5%) or greater direct or indirect interests in the voting stock of a corporation, time brokerage agreements between same-market radio or television stations, joint sales agreements between same-market radio broadcast stations and certain significant investment interests coupled with some same-market media interests or significant programming arrangements.

Attribution traces through chains of ownership. In general, an individual or entity that has an attributable interest in another entity will also be deemed to hold each of that entity's attributable media interests. In addition, the FCC treats all partnership interests as attributable, except for those limited partnership interests that are "insulated" by the terms of the limited partnership agreement from "material involvement" in

the media-related activities of the partnership. The FCC applies the same attribution and insulation standards to limited liability companies and other new business forms.

Currently, a minority stockholder in a media corporation with a single majority stockholder (i.e., a single holder of more than fifty percent (50%) of the outstanding voting power of the corporation) is not deemed to hold an attributable interest in that corporation or its media outlets based on the ownership of a minority voting stock interest of five percent (5%) or more. The FCC is considering whether or not to retain the single majority stockholder exemption in a pending rulemaking proceeding.

Combinations of direct and indirect equity and debt interests exceeding thirty-three percent (33%) of the total asset value (equity plus debt) of a media outlet may be deemed attributable if the holder has another attributable broadcast or daily newspaper interest in the same market or provides more than fifteen percent (15%) of the programming to the broadcast station in which the interest is held. Also, a person or entity that provides more than fifteen percent (15%) of the weekly programming for a television or radio station and has an attributable interest in another television or radio station in the same market is deemed to hold an attributable interest in the station to which it provides programming.

The FCC's broadcast multiple ownership and cross-ownership rules limit certain combinations of attributable interests in television broadcast stations and radio broadcast stations, and its cross-ownership rules restrict the ownership in the same market of attributable interests in (i) combinations of radio stations and television stations and (ii) combinations of radio or television broadcast stations with daily newspapers of general circulation. The FCC regards an entity with an "attributable interest" in a media outlet as an "owner" of that media outlet for purposes of applying these rules. Thus, prospective stockholders that may hold five percent (5%) or more of the New Class A Common Stock of Reorganized Tribune or persons who are officers or directors of Reorganized Tribune will need to assess (a) what attributable interests they may hold in daily newspapers of general circulation or other radio or television licensees and (b) whether the attributable media interests that they hold would conflict with their holding attributable interests in the daily newspapers or broadcast licensees of the Reorganized Debtors.

As explained in more detail below, the permissibility of particular combinations of attributable media interests may depend upon market size and other market characteristics. Generally, the FCC's media ownership rules place limits on (i) same-market ownership of broadcast stations and English-language daily newspapers of general circulation; (ii) local television station ownership; (iii) local radio station ownership; (iv) same-market ownership of television and radio stations; and (v) nationwide television station ownership. The FCC has pending proceedings to revise some of these rules and to adopt new rules, and the FCC's broadcast ownership rules are being challenged in the courts. No waivers will be sought and no special showings will be submitted to accommodate separate media interests of prospective stockholders independent of their interest in the Reorganized Debtors. Certain rules that could give rise to a prohibited combination for a prospective stockholder of Reorganized Tribune include the following:

- Newspaper/Broadcast Cross-Ownership Rule. The FCC generally prohibits the cross-ownership of a daily newspaper and either a television or radio broadcast station in the same market, absent a waiver. The 2008 Order adopted liberalized waiver standards; however, those changes are the subject of a pending appeal to the Third Circuit. In March 2010, the Third Circuit lifted the stay it had issued in September 2003 in connection with its review of the FCC's changes to its media ownership rules and allowed the 2008 Order to become effective. Under the 2008 Order, a daily newspaper is one that is published at least four days per week in the dominant language of the market and which is circulated generally in the community of publication. The revised waiver standards adopted in the 2008 Order presumptively allow the ownership of attributable interests in a broadcast station and a daily newspaper of general circulation that is published in the market served by the broadcast station only when (i) the market at issue is one of the 20 largest "Designated Market Areas" or "DMAs" as determined by the Nielsen television ratings service; (ii)

the combination involves only one daily newspaper and only one radio or television station; and (iii) if the combination involves a television station, (a) at least eight independently-owned and operating major newspapers and/or full-power television stations would remain in the DMA and (b) the television station is not among the top four ranked stations in the DMA. The FCC also presumptively permits cross-ownership if either the newspaper or the broadcast station is deemed "failed" or "failing" under FCC standards or if the proposed cross-ownership would result in a new source of local television news totaling at least seven hours per week. All other newspaper/broadcast combinations are presumed not to be in the public interest; however, that presumption can be overcome if the parties can demonstrate that, post-merger, the cross-owned entity would increase the diversity of independent news outlets and increase competition among independent news sources in the relevant market.

- <u>Local Television Station Ownership Rule (Duopoly Rule)</u>. Under the local television ownership rule (often called the "duopoly rule"), a single entity may have attributable interests in two television stations in the same DMA if (i) the two stations do not have overlapping service areas, or (ii) notwithstanding the combination there are at least eight independently owned and operating full-power commercial and non-commercial television stations serving the DMA and at least one of the combining stations is not ranked among the top four stations in the DMA. In addition, if any entity with an attributable interest in a television station provides more than fifteen percent (15%) of the programming of another station in the same market pursuant to a time brokerage or local marketing agreement, then for purposes of applying this rule, the entity will be deemed to hold an attributable interest in the station to which it provides programming. In addition, the FCC has initiated a rule making proceeding to determine whether it should treat television joint sales agreements as attributable interests under its ownership rules and, if so, whether it should use a standard comparable to the one in effect for radio joint sales agreements, under which the FCC treats joint sales agreements as attributable if they cover fifteen percent (15%) or more of the brokered station's weekly commercial time. The FCC's duopoly rule and policies regarding ownership of television stations in the same market apply only to full-power television stations and not to television satellite stations, Class A or low power television stations, or television translator stations.

- <u>Local Radio Station Ownership Rule</u>. The FCC's local radio multiple ownership rule limits the number of radio stations in which one entity may hold an attributable interest in a local geographic market. In determining the size of a market, the rules consider both commercial and non-commercial stations and use a definition of a local radio market based on Arbitron "Metro" markets and, when there is no defined Arbitron market, a definition based upon the composite service contours of commonly owned stations with overlapping service areas. These limits are as follows: In a radio market with 45 or more radio stations, a party may hold an attributable interest in up to eight radio stations, not more than five of which are in the same broadcast service (AM or FM); in a radio market with between 30 and 44 radio stations, a party may hold an attributable interest in up to seven radio stations, not more than four of which are in the same broadcast service; in a radio market with between 15 and 29 radio stations, a party may hold an attributable interest in up to six radio stations, not more than four of which are in the same broadcast service; and in a radio market with 14 or fewer radio stations, a party may hold an attributable interest in up to five radio stations, not more than three of which are in the same broadcast service, except that a party may not hold an attributable interest in more than fifty percent (50%) of the stations in the market.

- <u>Radio/Television Station Cross-Ownership Rule</u>. The FCC's radio/television cross-ownership rule permits the common attributable ownership of more than one full-power AM and/or FM radio station and up to two television stations in the same market. The total number of radio stations permitted to be under common attributable ownership is dependent on the number of independently-owned media voices in the local market as follows: (i) in markets with at least 20 independently owned media voices, a single entity may hold attributable interests in up to two television stations and six radio stations. Alternatively, such an entity is permitted to hold an attributable interest in one television station and seven radio stations in the same market; (ii) in a

market that includes at least ten independently-owned media voices, a single entity may hold attributable interests in up to two television stations and up to four radio stations; and (iii) regardless of the number of independently-owned media voices in a market, a single entity may hold an attributable interest in up to two television stations and one radio station in any market. Under all of these scenarios, the requirements of the local television and local radio ownership rules also must be met.

- <u>National Television Station Ownership Rule.</u>  By statute, one party may hold attributable interests in television stations that reach, in the aggregate, no more than thirty-nine percent (39%) of all United States television households.  The corresponding FCC rule on national television ownership limits provides that, when calculating a television station's nationwide aggregate audience, all UHF stations are considered to serve only fifty percent (50%) of the households in their DMA and all VHF stations are considered to serve all households in their DMA, including households that cannot naturally receive such a VHF station over the air.  The FCC currently is considering whether to initiate a proceeding to modify or abolish this so-called UHF discount in light of the changes resulting from the transition to digital television broadcasting.  If a broadcast licensee has an attributable interest in a second television station in a market, whether by virtue of ownership, a time brokerage agreement or a parent-satellite operation, the audience for that market will not be counted twice for purposes of determining compliance with the national cap.

(b)     Issuance of New Class B Common Stock to Ensure Compliance with FCC Media Ownership and Cross-Ownership Rules

To ensure compliance with the FCC's broadcast multiple ownership and cross-ownership rules, each Holder of a Claim that could be eligible to receive a distribution of five percent (5%) or more of the New Class A Common Stock in Reorganized Tribune pursuant to the Plan will be required to provide a Media Ownership Certification by the ~~Voting Deadline or such other~~ deadline established by the Bankruptcy Court~~, which may be earlier than the Voting Deadline~~, in accordance with the instructions set forth in the Media Ownership Certification document that may be distributed to any such Holder.  Any such Holder that fails to provide the Media Ownership Certification by the ~~Voting Deadline or such other~~ deadline established by the Bankruptcy Court or that does not do so to the reasonable satisfaction of the Debtors may be allocated New Class B Common Stock in lieu of New Class A Common Stock as set forth in Section 5.4.2 of the Plan at the Debtors' discretion.

Reorganized Tribune, in its discretion, may issue shares of New Class B Common Stock in lieu of shares of New Class A Common Stock to any Holder of a Claim that is eligible under the Plan to receive a distribution of New Common Stock to ensure that such Holder will hold, in the aggregate (including with entities under common ownership or control) less than five percent (5%) of the voting rights of Reorganized Tribune if Reorganized Tribune determines, based on the Holder's Media Ownership Certification (or failure to provide the Media Ownership Certification or otherwise comply with Section 5.4.2 of the Plan), that such Holder may have other media interests that could impair the ability of Reorganized Tribune to comply with the Communications Act or the FCC's rules if such Holder were issued the shares of New Class A Common Stock that it otherwise would be eligible to receive pursuant to the Plan.

Furthermore, if any Holder of a Claim is eligible under the Plan to receive New Class A Common Stock such that, upon the Effective Date, such Holder would receive five percent (5%) or more of the shares of New Class A Common Stock (for any reason, including, but not limited to, as a result of the distribution of New Warrants or the distribution of New Class B Common Stock), and such Holder has not provided the Media Ownership Certification in accordance with section 5.4.2(a) of the Plan or such ownership has not been disclosed in the FCC Applications and approved by the FCC, then Reorganized Tribune shall be entitled to issue to such Holder as many shares of New Class B Common Stock in lieu of shares of New Class A Common Stock as Reorganized Tribune deems necessary to ensure compliance with the Communications Act or the FCC's rules and/or to avoid delay in FCC Approval.

89

(c)    Limitations on Foreign Ownership or Control of Broadcast Licensees.

Section 310(b) of the Communications Act restricts, among other things, foreign ownership or control of FCC broadcast licenses. Foreign entities may not have direct or indirect ownership or voting rights of more than twenty-five percent (25%) in a corporation controlling the licensee of a broadcast station if the FCC finds that the public interest will be served by the refusal or revocation of such a license due to such foreign ownership or voting rights. The FCC has interpreted this provision to mean that the agency must make an affirmative public interest finding before it will permit the twenty-five percent (25%) foreign ownership cap to be exceeded. With very few exceptions, the FCC has not made such an affirmative finding in connection with the assignment of a broadcast license; the provision, therefore, generally serves as a prohibition on foreign ownership or voting interests exceeding twenty-five percent (25%). In assessing compliance with the twenty-five percent (25%) foreign ownership limitation, the FCC calculates the voting rights separately from the equity ownership percentage, and the twenty-five percent (25%) ceiling must be met for both. Warrants and other future interests typically are not counted by the FCC toward the foreign ownership ceiling unless and until converted. The FCC historically has treated partnerships with foreign partners as foreign controlled if any general partner is foreign, or if any foreign limited partner is not adequately insulated (using FCC criteria) from material involvement in the partnership's media activities and business. In a few specific circumstances, the FCC also has treated certain economic interests in a company other than direct equity interests as "ownership" for purposes of its foreign ownership determination. In addition, the FCC uses a "multiplier" to determine the ownership interest of each entity in the chain of ownership in cases of indirect ownership, such as a situation in which there are layers of investment short of control between the entity to be acquired and the licensee.

(d)    Issuance of a Combination of New Common Stock and New Warrants To Ensure Compliance with Applicable Limitations on Foreign Ownership and Control of Broadcast Licensees.

Because direct and indirect ownership of New Common Stock by non-U.S. persons and entities will affect the level of foreign ownership and voting rights in the Reorganized Debtors permissible under the Communications Act, each prospective holder of New Common Stock will be required to provide information to the Debtors concerning its own foreign ownership and control. Based on an allocation mechanism that is to be determined, Reorganized Tribune shall issue New Warrants, New Common Stock, or a combination of New Warrants and New Common Stock to any Holder of a Claim that is eligible to receive New Common Stock under the Plan that, based on the Holder's Foreign Ownership Certification (or failure to provide the Foreign Ownership Certification or otherwise comply with section 5.4.2 of the Plan), is (or is deemed to be pursuant to Section 5.4.2 of the Plan) more than twenty five percent (25%) foreign owned or controlled, on either a voting or an equity basis, as determined pursuant to section 310(b) of the Communications Act. The allocation mechanism shall ensure, based on the aggregate results of the Foreign Ownership Certifications, the compliance of Reorganized Tribune with section 310(b) of the Communications Act.

(e)    Reporting Requirements Under Securities Exchange Act of 1934 and Listing of New Class A Common Stock on Securities Exchange or Quotation System.

Reorganized Tribune shall use its reasonable best efforts to be a reporting company under section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as promptly as practicable after the Effective Date and shall maintain all necessary staff, operations and practices in order to be a public reporting company. In addition, Reorganized Tribune will use its reasonable best efforts to list, as promptly as practicable after the Effective Date, the New Class A Common Stock for trading on the New York Stock Exchange ("NYSE") or for quotation in the NASDAQ stock market but will have no liability if it is unable to do so. Persons receiving distributions of New Class A Common Stock, by accepting such distributions, will have agreed to cooperate with Reorganized Tribune's reasonable requests to assist Reorganized Tribune in its efforts to list the New Class A Common Stock on the NYSE or for quotation in the NASDAQ stock market, including, without limitation, appointing or supporting the appointment of a sufficient number of directors to the board of

90

directors of Reorganized Tribune who satisfy the independence and other requirements of the NYSE or for quotation in the NASDAQ stock market, as applicable.

3.     New Senior Secured Term Loan Agreement.

Subject to the terms of Section 5.6 of the Plan, on the Effective Date, if the Debtors have not elected to replace the New Senior Secured Term Loan in its entirety with distributions of Cash, (i) Reorganized Tribune, as borrower, (ii) the other Reorganized Debtors and U.S. Subsidiary Non-Debtors as provided in Section 5.6 of the Plan (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions, but excluding any entities identified by the Debtors and consented to by the Senior Lender Settlement Committee), as guarantors, (iii) the administrative agent party thereto, and (iv) the Holders of Claims entitled to receive a distribution of the New Senior Secured Term Loan under the Plan shall become parties to the New Senior Secured Term Loan Agreement regardless of whether any party actually executes the New Senior Secured Term Loan Agreement. If issued, the New Senior Secured Term Loan shall (a) be guaranteed by the U.S. subsidiaries of Reorganized Tribune (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions, but excluding any entities identified by the Debtors and consented to by the Senior Lender Settlement Committee), (b) be secured by certain assets of Reorganized Tribune and the guarantors thereof subject to specified exceptions and customary intercreditor arrangements, (c) have interest payable in Cash quarterly, (d) have principal payable in Cash quarterly, with the unpaid balance payable on the final maturity date thereof, (e) mature on the fifth anniversary of the Effective Date, (f) include usual and customary affirmative and negative covenants for term loan facilities of this type and (g) be repayable by Reorganized Tribune at any time prior to scheduled maturity without premium or penalty. The New Senior Secured Term Loan Agreement shall be in the form attachedcontain terms substantially as set forth in Exhibit 5.6 to the Plan as Exhibit 5.6., which shall be filed with the Plan Supplement.

To the extent that replacement financing is available on commercially reasonable terms, the Debtors shall at the reasonable direction, or may with the consent, of the Senior Lender Settlement Committee distribute Cash in the amount of all or part of the initial principal amount of the New Senior Secured Term Loan in lieu of all or such part of the New Senior Secured Term Loan to Holders of Allowed Claims that are entitled to receive the New Senior Secured Term Loan under the Plan. If the Debtors so elect, the relevant Debtors or Reorganized Debtors, as applicable, are hereby authorized, without any requirement of further action by the security holders or directors of such Debtors or Reorganized Debtors, to make such repayment including through the issuance of new indebtedness; provided, however, that (i) any such Cash distribution shall be distributed Pro Rata to Holders of Allowed Claims that otherwise would have been entitled to receive the new Senior Secured Term Loan and (ii) the terms of any such indebtedness shall be subject to the consent of the Senior Lender Settlement Committee, such consent not to be unreasonably withheld.

4.     Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors.

Subject to Section 5.2 of the Plan, after the Effective Date, the Reorganized Debtors shall continue to exist as separate entities in accordance with the applicable law in the respective jurisdictions in which they are organized and pursuant to their respective certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents in effect prior to the Effective Date, except to the extent such documents are to be amended pursuant to the terms of the Plan. Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Debtors' Estates of the Debtors, including all claims, rights and causes of action and any property acquired by the Debtors or the Reorganized Debtors under or in connection with the Plan, shall vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, other encumbrances and Interests. On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and compromise or settle any Claims without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions

expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professionals' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

5.       Cancellation of Loan Agreements, Loan Guaranty Agreements, the Pledge Agreement, Notes Issued Under the Loan Agreements, Senior Notes, Debentures, Instruments, Indentures, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock and Other Tribune Interests.

Except as otherwise provided for in the Plan, as of the Effective Date, all (i) Loan Agreements, Loan Guaranty Agreements, the Pledge Agreement, notes issued under the Loan Agreements, Senior Notes, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock, other Tribune Interests and any other notes, bonds (with the exception of surety bonds outstanding), indentures (including the Indentures), stockholders' agreements, registration rights agreements, repurchase agreements and repurchase arrangements, or other instruments or documents evidencing or creating any indebtedness or obligations of a Debtor that relate to Claims or Interests that are Impaired under the Plan shall be cancelled, and (ii) all amounts owed by and the obligations of the Debtors under any agreements, credit agreements, guaranty agreements, stockholders' agreements, registration rights agreements, repurchase agreements and repurchase arrangements, indentures (including the Indentures) or certificates of designation governing the Loan Claims, Loan Guaranty Claims, Senior Notes, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock, other Tribune Interests and any other notes, bonds, indentures, or other instruments or documents evidencing or creating any Claims against or Interests in a Debtor that are Impaired under the Plan shall be discharged.  In addition, as of the Effective Date, all Old Common Stock and other Tribune Interests that have been authorized to be issued but that have not been issued shall be deemed cancelled and extinguished without any further action of any party.  Notwithstanding anything to the contrary herein, the obligations of parties to the Loan Agreements and the Loan Guaranty Agreements that are not Reorganized Debtors or Subsidiary Non-Debtors shall not be discharged or limited in any way.

Notwithstanding the provisions of Section 5.8 of the Plan and anything contained elsewhere in the Plan, but subject to Section 5.8.1 of the Plan, (i) the Senior Notes Indentures shall continue in effect to the extent necessary to allow the Reorganized Debtors and the Senior Notes Indenture Trustees to make distributions pursuant to the Plan on account of the Senior Noteholder Claims under the respective Senior Notes Indentures and for the applicable Senior Notes Indenture Trustee to perform such other functions with respect thereto  and assert any rights preserved under subsection (z) of Section 5.8.2 of the Plan; (ii) the Loan Agreements (including, without limitation, the intercreditor provisions described in Section 7.3 of the Plan) shall continue in effect to the extent necessary to allow the Reorganized Debtors and administrative agents to make distributions pursuant to the Plan on account of the Loan Claims and Loan Guaranty Claims under the respective Loan Agreements and Loan Guaranty Agreements, for the applicable Loan Agent to perform such other functions with respect thereto as the applicable Loan Agent shall deem necessary or appropriate and with respect to all rights of the applicable Loan Agent with respect to any and all Persons other than the Reorganized Debtors or Subsidiary Non-Debtors; and (iii) nothing in the Plan shall waive, release, or impair any rights, claims or interests, if any, that a Senior Notes Indenture Trustee may have under the applicable Senior Notes Indenture or otherwise to the recovery and/or reimbursement of its fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder to the Holders of Senior Noteholder Claims, whether such rights, claims or interest are in the nature of a charging lien or otherwise, all of which rights, claims, and interests expressly are preserved.  Except as otherwise provided herein, upon cancellation of the applicable Indenture, the respective Indenture Trustee shall be relieved of any obligations as Indenture Trustee under such Indenture.  Except as expressly provided in the Plan, neither the Debtors nor the Reorganized Debtors shall have any obligations to any Indenture Trustee or Loan Agent for any fees, costs or expenses.

Notwithstanding any other provision of the Plan, the indemnification or guaranty obligations of the Debtors contained in (i) that certain Indemnity Agreement between CSC Holdings, Inc., NMG Holdings, Inc.

92

and Tribune dated July 29, 2008; (ii) that certain Guaranty of Collection entered into on October 27, 2009 made by Tribune to various parties with respect to the obligations of Chicago Baseball Holdings, LLC in respect of the Credit Agreement Loans (as defined therein) and the Private Placement Notes (as defined therein); and (iii) that certain Subordinated Guaranty of Collection entered into on October 27, 2009 made by Tribune to various parties with respect to the obligations of Chicago Baseball Holdings, LLC in respect of the Loans (as defined therein) shall continue in full force and effect.

6.      Cancellation of Liens and Guaranties.

Except as otherwise provided in the Plan, on the Effective Date, any Lien securing any Secured Claim (other than a Lien securing any Other Secured Claim that is Reinstated pursuant to the Plan) shall be deemed released and the Holder of such Secured Claim shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such Holder and to take such actions as may be requested by the Debtors (or the Reorganized Debtors, as the case may be) to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Debtors (or the Reorganized Debtors, as the case may be).  In addition, ~~on the Effective Date, by voting in favor of the Plan, Classes comprised of the Senior Lenders and Bridge Lenders agree that the Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims against the Guarantor Non-Debtors shall be extinguished and cancelled; it being~~it is a condition to the release, cancellation and extinguishment of the Senior Loan Guaranty Claims against the Guarantor Non-Debtors that all Bridge Loan Guaranty Claims shall be concurrently released, extinguished and cancelled.  The consummation of the Plan shall effect and constitute a full and final release, extinguishment and cancellation of any and all Senior Loan Guaranty Claims and any and all Bridge Loan Guaranty Claims against Guarantor Non-Debtors.

7.      Exit Facility.

On the Effective Date, without any requirement of further action by security holders or directors of the Debtors or Reorganized Debtors, the Debtors and Reorganized Debtors shall be authorized, but not directed, to enter into the Exit Facility Credit Agreement, if any, as well as any notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.

8.      Equity Incentive Plan.

The Equity Incentive Plan shall be used for the purpose of granting awards to directors, officers and employees of Reorganized Tribune and the other Reorganized Debtors.  The Equity Incentive Pool shall be reserved for issuance in the Equity Incentive Plan, and awards granted under the Equity Incentive Plan may consist of restricted stock, options, stock appreciation rights, warrants and/or other equity or equity-like incentives.  A portion of the Equity Incentive Pool shall be granted to the participants in the Equity Incentive Plan within 120 days after the Effective Date.  The terms and conditions of the Equity Incentive Plan, including participants in the Equity Incentive Plan, will be disclosed prior to the Disclosure Statement hearing or filed as part of the Plan Supplement, if ~~applicable~~available at either time, and shall be acceptable to the Senior Lender Settlement Committee, unless not determined until after the Effective Date, in which case it shall be as determined by the compensation committee of the board of directors of Reorganized Tribune.

9.      Sources of Cash for Plan Distributions.

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Plan may be obtained from existing Cash balances, the operations of the Debtors or the Reorganized Debtors, sales of assets or the Exit Facility.  Subject to Section 5.1 of the Plan, the Reorganized Debtors may also make such payments using Cash received from their Affiliates through the Reorganized Debtors' consolidated cash management systems.

10.    Additional Transactions Authorized Under the Plan.

On or prior to the Effective Date, the Debtors shall be authorized to take any such actions as may be necessary or appropriate to have Claims or Interests Reinstated or render Claims or Interests Unimpaired to the extent provided in the Plan.  On the Effective Date, the Agents are authorized and directed to take such actions as are necessary or appropriate to effect all transactions specified or referred to in or provided for under the Plan.

11.    Settlement of Claims and Controversies.

(a)    General.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims or controversies relating to the rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Interest, including, without limitation, the settlement of the Senior Loan Guaranty Claims and the Bridge Loan Guaranty Claims and the release of such Claims against the Guarantor Non-Debtors.  The entry of the Confirmation Order constitutes the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims, Interests or controversies and the Bankruptcy Court's finding that all such compromises or settlements are in the best interests of (i) the Debtors, the Reorganized Debtors, the Subsidiary Non-Debtors and their respective Debtors' Estates and property, and (ii) Claim and Interest Holders, and are fair, equitable and reasonable on the dates and in the manner set forth in the Plan.

(b)    Global Settlement Under the Plan.

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the Debtors believe that the provisions of the Plan constitute a good faith compromise and settlement, and the Plan constitutes a request to authorize and approve such compromise and settlement, to release all of the Related Claims, including without limitation the LBO-Related Causes of Action, belonging to the Tribune Entities, the Debtors' Estates, and any other Person that is deemed to have given a release pursuant to Section 11.2 of the Plan against all each and every and all Released Parties (the "Global Settlement").  Any distributions to be made pursuant to the Plan shall be made on account of and in consideration of the Global Settlement.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Global Settlement and the Bankruptcy Court's finding that the Global Settlement is in the best interests of the Debtors, the Reorganized Debtors, their respective Debtors' Estates, and the Holders of Claims and Interests, and is fair, equitable and reasonable.

(c)    Implementation of Retiree Claimant Settlement.

The Plan will implement a settlement between the Debtors and approximately 200 individuals holding claims arising from Non-Qualified Former Employee Benefit Plans relating to their former employment with various of the Debtors or their predecessors (the "Retiree Claims").  The majority of the Retiree Claims arise from non-qualified pension claims and deferred compensation claims.  The Debtors scheduled the Retiree Claims in an aggregate amount of approximately $82 million.  The holders of the Retiree Claims (the "Retiree Claimants") asserted, through individual proofs of claim, an aggregate amount of approximately $113 million on account of the Retiree Claims.  The proposed settlement establishes the Allowed amount of each Retiree Claim, with the total Allowed amount of all Retiree Claims being approximately $103 million.  This settlement is embodied in the Stipulation Between Debtors and Retiree Claimants Settling and Allowing Claims (the "Retiree Claimant Settlement Agreement"), which is attached to the Plan as Exhibit 5.14.3.  The Retiree Claimant Settlement Agreement resolves the disputes between the Debtors and the Retiree Claimants

94

regarding: (i) the discount rates and mortality tables most appropriately applied to those Retiree Claims that are based on future annuity payments; (ii) whether the Retiree Claims for deferred compensation are entitled to interest for the prepetition period of the 2008 calendar year; and (iii) with respect to some of the Retiree Claims, the factual basis for such claims, including whether the claimant was entitled to annuity or other benefit payments, the type of annuity or other benefit, and the specific amounts owed. The Debtors and counsel for the Retiree Claimants worked closely with the Creditors Committee and the Senior Lender Settlement Committee in negotiating the Retiree Claimant Settlement Agreement.

Pursuant to the Retiree Claimants Settlement Agreement, each of the Retiree Claims will be Allowed General Unsecured Claims in the "Total Agreed Amount" indicated on Schedule A to the Retiree Claimants Settlement Agreement. To the extent a Retiree Claim is a claim for future annuity payments, that component of the Total Agreed Amount has been calculated pursuant to a formula for determining the present value of future annuity payments and the applicable mortality tables (the "Annuity Formula"). The Annuity Formula utilizes the United States Internal Revenue Code § 417(e) Lump Sum Rates for 2008 plan year payments, with (i) applicable interest rates for 2008 plan year payments determined as of January 1, 2008 with a two-month lookback to the November 2007 segment rates of 4.60%, 4.82% and 4.91%; and (ii) the RP-2000 Healthy mortality table (weighted 50% male and 50% female), using scale AA for (x) seven (7) years from the valuation date for annuitants and (y) fifteen (15) years from the valuation date for non-annuitants. An additional 5.165% of the present value of the future annuity payments (the "Litigation Adjustment") has also been included in the Total Agreed Amounts for those Retiree Claims involving future annuity payments, to represent the compromise, based on the potential cost and outcome of litigating the differences between the discount rates and mortality tables used by the Debtors and those used by the Retiree Claimants. To the extent any Retiree Claim listed on Schedule A to the Retiree Claimants Settlement Agreement is a claim for deferred compensation payments, that component of the Total Agreed Amount has been calculated to include one half of the amount of interest allocable to the prepetition portion of the 2008 calendar year ("Allowed 2008 Deferred Compensation Interest") that the Retiree Claimants argue accrued under the terms of the relevant plans and agreements. Each Total Agreed Amount listed on Schedule A to the Retiree Claimants Settlement Agreement shall constitute an Allowed General Unsecured Claim against the specific Debtor identified on the same row as such Total Agreed Amount on Schedule A to the Retiree Claimants Settlement Agreement.

Under the Plan, (i) those Retiree Claims Allowed against Tribune will be classified as Claims in Class 1E and will receive a Cash distribution equal to 35.18% of the Allowed amount of their Retiree Claims, and (ii) those Retiree Claims allowed against Filed Subsidiary Debtors will be classified as Claims in Classes 2E through 111E, and will receive a Cash distribution equal to the full amount of their Allowed Retiree Claims, subject to the potential limitation set forth in Section 3.3.4(c) of the Plan. Pursuant to the Retiree Claimants Settlement Agreement, the agreed Allowed amounts of the Retiree Claims are conditioned upon confirmation of the Plan, as amended from time to time, or another plan of reorganization, in each case providing for the classification and treatment of the Retiree Claims consistent with their classification and treatment under the Plan.

With respect to claims that are similar in nature to the Retiree Claims but not a part of the Retiree Claimants Settlement Agreement ("Similar Claims"), the Debtors intend to liquidate such Similar Claims consistent with the formulas and principles applicable to the Retiree Claims under the Retiree Claimants Settlement Agreement, including the Annuity Formula, the Allowed 2008 Deferred Compensation Interest, and the Litigation Adjustment. In order to achieve this result, the Debtors will engage in negotiations with holders of Similar Claims and, as necessary, employ the procedures for objecting to claims described in this Disclosure Statement and the Plan.

~~Pursuant to Bankruptcy Rule 9019, the Plan implements and incorporates by reference the terms of the~~The Retiree Claimant Settlement Agreement, ~~which will be filed with the Plan Supplement as~~ is Exhibit 5.14.3 to the Plan, ~~including, without limitation, the Allowance of the Claims of certain Retiree Claimants.~~ Entry of the  Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of

the Plan, of the Retiree Claimant Settlement Agreement and the Bankruptcy Court's finding that the Retiree Claimant Settlement Agreement is in the best interests of the Debtors, the Reorganized Debtors, their respective Debtors' Estates, and the Holders of Claims and Interests, and is fair, equitable and reasonable.

12.    Preservation of Rights of Action and Settlement of Litigation Claims.

Except as otherwise provided in the Plan, the Confirmation Order, or in any document, instrument, release or other agreement entered into in connection with the Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the Debtors and their Debtors' Estates shall retain the Litigation Claims. The Reorganized Debtors, as the successors in interest to the Debtors and the Debtors' Estates, may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Litigation Claims or any other claims, rights of action, suits or proceedings that any Debtor or Estate may hold against any Person that are not otherwise released pursuant to the Plan.

13.    FCC Applications.

The FCC Applications shall be filed with the FCC as promptly as practicable after filing the Plan. The Debtors, the Senior Lenders and any other Holders of Claims that are eligible to receive New Common Stock shall use their best efforts to cooperate in diligently pursuing and in taking all reasonable steps necessary to obtain the requisite FCC Approvals and shall provide such additional documents or information as are reasonably requested by the Debtors or that the Debtors reasonably deem necessary for the FCC's review of such applications. Prior to the Effective Date, the Debtors shall cooperate with counsel for the Senior Loan Agent and the Creditors Committee regarding the FCC Approval, including but not limited to the filing and further prosecution of the FCC Applications, and shall keep such counsels apprised of the status and progress of the FCC Applications.

## H.    Assumption of Executory Contracts and Unexpired Leases.

1.    Assumption, Rejection and Cure Obligations.

Under section 365 of the Bankruptcy Code, the Debtors have the right, subject to Bankruptcy Court approval, to assume or reject executory contracts and unexpired leases to which the Debtors are a party. If a Debtor rejects an executory contract or unexpired lease that it entered into prior to the Petition Date, such contract or lease will be treated as if it were breached by the applicable Debtor(s) on the date immediately preceding the Petition Date, and the other party to the agreement may assert a claim for damages incurred as a result of the rejection, which will be treated as a prepetition unsecured claim pursuant to section 365(g) of the Bankruptcy Code. In the case of the rejection of unemployment agreements and real property leases, damages are subject to certain limitations imposed by sections 365 and 502 of the Bankruptcy Code.

On the Effective Date, all executory contracts or unexpired leases of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such executory contract or unexpired lease (i) was previously assumed or rejected by the Debtors, (ii) previously expired or terminated pursuant to its own terms, (iii) is an executory contract or unexpired lease that is included in the Global Contract Motion, (iv) is an executory contract or unexpired lease that is expressly excluded from the assumptions set forth in Section 6.5 of the Plan or is set forth on Exhibit 6.3 to the Plan, which shall be filed with the Plan Supplement, or (v) is an executory contract or unexpired lease that is included in a pending motion to reject such executory contract or unexpired lease. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed during the Chapter 11 Cases or pursuant to Section 7 of the Plan shall revest in and be fully enforceable by the applicable Reorganized Debtor, including any successor to such Reorganized Debtor after giving effect to the Restructuring Transactions, in accordance with its terms, except as modified by the provisions of the Plan, agreement of the

96

parties thereto, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

Subject to the terms of Section 8 and Section 6.1.1 of the Plan and except for any Customer Program ~~included~~otherwise designated on Exhibit 6.3 to the Plan, ~~each Customer Program~~all refund, and subscriber credit programs, or similar obligations of the Debtors to subscribers or former subscribers to any of the Debtors' publications under the Customer Programs shall be deemed assumed effective ~~as of~~on the Effective Date and the proposed cure amount with respect to each shall be zero dollars. Nothing contained in Section 6.1.2 of the Plan shall constitute or be deemed to be a waiver of any claim or cause of action that the Debtors may hold against any Person. Except with respect to any Customer Programs included on Exhibit 6.3 to the Plan, as a result of the deemed assumption of the Debtors' refund, subscriber credit, and other obligations under the Customer Programs to subscribers and former subscribers pursuant to Section 6.1.2 of the Plan, all Proofs of Claim on account of or in respect of any ~~Customer Program~~such obligations shall be deemed withdrawn automatically and without any further notice to or action by the Bankruptcy Court and the Debtors' Claims Agent shall be authorized as of the Effective Date, to expunge such Proofs of Claim from the claims register.

The Debtors have not yet determined how to treat certain insurance policies issued by ACE American Insurance Company and/or its affiliates (collectively, "ACE") to or on behalf of the Debtors and any related agreements (hereinafter, the "ACE Policies and Agreements"), including whether or not such agreements are executory and whether they will be assumed. Subject to the Debtors' rights, if any, to assume or to reject such contracts, nothing contained in the Disclosure Statement, the Plan, the Confirmation Order, any exhibit to the Plan, any Plan Supplement or any other Plan document (including any provision that purports to be peremptory or supervening), shall in any way operate to, or have the effect of, waiving or impairing in any other respect the legal, equitable or contractual rights or defenses of the parties to the ACE Policies and Agreements. For the avoidance of doubt, nothing herein or in the Plan shall be read to authorize the unilateral amendment by the Debtors of any of the terms of the ACE Policies and Agreements. In any event, ACE has reserved all of its rights and defenses under the ACE Policies and Agreements and applicable non-bankruptcy law with respect to the ACE Policies and Agreements.

2.    Cure of Defaults of Assumed Executory Contracts and Unexpired Leases.

The Bankruptcy Code provides for the calculation of "cure amounts" which may, in some instances, be payable by the Debtors to the non-Debtor party in connection with executory contracts or unexpired leases that are assumed by the Debtors. The proposed cure amount for any executory contract assumed pursuant to the Plan shall be zero dollars unless otherwise indicated in a schedule to be filed with the Bankruptcy Court. Any monetary amounts by which each executory contract and unexpired lease to be assumed is in default and not subsequently cured shall be satisfied, pursuant to section 365(b)(l) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree. In the event of a dispute regarding (i) the amount of any cure payments, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (iii) any other matter pertaining to assumption, the cure payments required by section 365(b)(l) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption. Pending the Bankruptcy Court's ruling on such motion, the executory contract or unexpired lease at issue shall be deemed assumed by the relevant Debtor unless otherwise ordered by the Bankruptcy Court.

3.    Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, each executory contract and unexpired lease that is listed on Exhibit 6.3 to the Plan, which shall be filed with the Plan Supplement, shall be rejected pursuant to Section 365 of the Bankruptcy Code. Each contract or lease listed on Exhibit 6.3 to the Plan shall be rejected only to the extent that any such contract or lease constitutes an executory contract or unexpired lease. The Debtors reserve their right to amend

Exhibit 6.3 to the Plan to delete any unexpired lease or executory contract therefrom or add any unexpired lease or executory contract thereto.  Listing a contract or lease on Exhibit 6.3 to the Plan shall not constitute an admission by a Debtor nor a Reorganized Debtor that such contract or lease is an executory contract or unexpired lease or that such Debtor or Reorganized Debtor has any liability thereunder.

      4.      Rejection Damages Bar Date.

If the rejection by a Debtor, pursuant to the Plan, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor, or the properties of any of them, unless a Proof of Claim is filed and served upon counsel to the Debtors within 30 days after service of the notice that the executory contract or unexpired lease has been rejected.

      5.      Compensation and Benefit Programs.

Except as set forth in Article IV.C.2 herein and such other plans as may be disclosed in the Plan Supplement, the Reorganized Debtors shall continue to perform their obligations under all Employee Benefit Plans and all such Employee Benefit Plans shall be assumed by the applicable Reorganized Debtors; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, causes of action, or other rights with respect to the interpretation, application, or enforcement of any such Employee Benefit Plan or the payment of any Employee Benefit Claim, including the Reorganized Debtors' rights to amend, modify, or terminate any such Employee Benefit Plan either prior to or after the Effective Date.  The Debtors will address the inclusion in the Plan of the ~~TMIP~~"Transition MIP" and the ~~KOB in a supplement that will be filed by the Debtors prior to the hearing on approval of the Disclosure Statement~~"Key Operators Bonus," each as defined in the 2009 MIP Motion, in the Plan Supplement.

      6.      Collective Bargaining Agreements.

Upon the Effective Date, any Collective Bargaining Agreement entered into by the Debtors that has not expired by its terms and is in effect as of the Effective Date shall be deemed to have been assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the survival, and/or the pertinent Debtor's assumption of the Collective Bargaining Agreements then in effect, except to the extent that such agreements have already been assumed prior to the entry of the Confirmation Order.

      7.      Post-Petition Contracts and Leases.

All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors after the Petition Date shall be deemed assigned by such Debtors to the Reorganized Debtors, including any successor to any Reorganized Debtor after giving effect to the Restructuring Transactions, on the Effective Date.

      8.      Termination of ESOP.

Upon the Effective Date, the ESOP shall be deemed terminated in accordance with its terms, and the amount of unpaid principal and interest remaining on the ESOP Note dated April 1, 2007 shall be forgiven pursuant to section 6.3 of the ESOP Loan Agreement by and between Tribune and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust dated April 1, 2007.  In connection with Tribune's forgiveness of the balance due under the ESOP Note, the Debtors will seek, in their sole discretion, (i) confirmation that Tribune has a right under the ESOP Plan and ESOP Note to forgive the ESOP's obligations; (ii) confirmation that Tribune's forgiveness of any post-petition payments due from the ESOP in connection with the ESOP Note, including, without limitation, the payment due on or about April 1, 2009, was in compliance with the ESOP Note and ESOP Plan and satisfied Tribune's obligations, if any, under the ESOP Plan to make a contribution to the ESOP during the relevant time period;

(iii) a determination of the amount of the balance of the ESOP Note being forgiven, the value of any obligations of the ESOP owed to Tribune under the ESOP Note, and the legal effect of the forgiveness of the ESOP Note. Approval of the Plan is not conditioned upon these determinations, but these determinations may be sought in connection with the Plan.

**I.    Provisions Governing Distributions to Holders of Certain Allowed Claims and Interests Under the Plan.**

    1.    General.

Unless the Holder of an Allowed Claim or Allowed Interest against any of the Debtors and the Debtors or the Reorganized Debtors agree to a different distribution date or except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, (i) distributions to be made on account of Claims or Interests that are Allowed as of the Effective Date shall be made on the Initial Distribution Date or as soon thereafter as is practicable and (ii) distributions to be made on account of Claims or Interests that become Allowed after the Effective Date shall be made on the succeeding Quarterly Distribution Date or as soon thereafter as is practicable. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

    2.    Distributions for Certain Claims.

        (a)    Distributions to Holders of Other Parent Claims.

            i.    Other Parent Claim Reserve.

On or as soon as practicable after the Effective Date, Reorganized Tribune shall establish one or more Other Parent Claims Reserve(s) to make distributions to Holders of Disputed Claims that become Allowed Other Parent Claims after the Effective Date. The amount of Distributable Cash contributed to the Other Parent Claims Reserve(s) shall be equal to the amount of Distributable Cash necessary to satisfy the distributions required to be made pursuant to the Plan based upon the Face Amount of Disputed Other Parent Claims that may be entitled to receive a distribution of Distributable Cash if such Disputed Claims are subsequently Allowed Other Parent Claims.

            ii.    Distributions On Account of Disputed Claims Once Allowed.

On each Quarterly Distribution Date, the Disbursing Agent shall make distributions of Distributable Cash, in accordance with the terms of the Plan, from the Other Parent Claims Reserve(s) to each Holder of a Disputed Claim that has become an Allowed Other Parent Claim during the preceding calendar quarter and that is entitled to receive such a distribution. On or as soon as practicable after the Final Distribution Date, after distributions are made to Holders of Disputed Claims that have become Allowed Other Parent Claims during the preceding calendar quarter, any Distributable Cash remaining in the Other Parent Claims Reserve(s) shall be distributed Pro Rata to the Holders of Allowed Loan Claims against Tribune entitled to receive a distribution under Section 3.2.3(c) and Section 3.2.4(b)(i) of the Plan.

    3.    Distributions to Holders of General Unsecured Claims Against Filed Subsidiary Debtors.

        (a)    Subsidiary GUC Reserve.

If pursuant to Section 3.3.4(b) of the Plan, Holders of Allowed Claims in Classes 2E through 111E shall receive their Pro Rata share of $150 million or any other amount, rather than receiving payment in Cash in full, on or as soon as practicable after the Effective Date, Reorganized Tribune shall establish one or more Subsidiary GUC Reserve(s) to make distributions to Holders of Disputed Claims that become Allowed General Unsecured Claims against a Filed Subsidiary Debtor after the Effective Date. The amount of Cash contributed

to the Subsidiary GUC Reserve(s) shall be equal to the amount of Cash necessary to satisfy the distributions required to be made pursuant to the Plan based upon the Face Amount of Disputed Claims that may be entitled to receive a distribution of Cash if such Disputed Claims are subsequently Allowed General Unsecured Claims against such Debtors.

        (b)    Distributions On Account of Disputed Claims Once Allowed.

If one or more Subsidiary GUC Reserves are established, on each Quarterly Distribution Date, the Disbursing Agent shall make distributions of Cash, in accordance with the terms of the Plan, from the Subsidiary GUC Reserve(s) to each Holder of a Disputed Claim that has become an Allowed General Unsecured Claim against a Filed Subsidiary Debtor during the preceding calendar quarter and that is entitled to receive such a distribution. In addition, on the first and third Quarterly Distributions Dates of each calendar year, the Debtors shall make additional interim distributions from any excess Cash in the Subsidiary GUC Reserve(s) to Holders of Allowed General Unsecured Claims against the Filed Subsidiary Debtors if the Debtors determine, in their sole discretion, that (i) the amount of such excess Cash equals or exceeds ten percent (10%) of the aggregate Face Amount of such Allowed General Unsecured Claims against Filed Subsidiary Debtors and (ii) the aggregate amount of Cash held in the Subsidiary GUC Reserve(s) after such distribution will equal or exceed the maximum amount that the Debtors reasonably estimate is required to satisfy any remaining Disputed Claims that subsequently become Allowed General Unsecured Claims against such Filed Subsidiary Debtors after such Distribution Date. On or as soon as practicable after the Final Distribution Date, after initial distributions are made to Holders of Disputed Claims that have become Allowed General Unsecured Claims against a Filed Subsidiary Debtor during the preceding calendar quarter, any Cash remaining in the Subsidiary GUC Reserve(s) shall be distributed Pro Rata to the Holders of Allowed General Unsecured Claims entitled to receive such distributions in accordance with the terms of the Plan; provided, however, that no Holder of an Allowed General Unsecured Claim shall receive more than payment in full of the principal amount of such Claim and no Holder of an Allowed General Unsecured Claim shall receive post-petition interest.

        4.    Special Provisions Governing Distributions to Holders of Loan Claims and Loan Guaranty Claims.

Other than as specifically set forth in the Plan, distributions made on account of Loan Claims and Loan Guaranty Claims shall be made by the Disbursing Agent to the applicable Loan Agent for further distribution in accordance with the terms of the applicable Loan Agreement or Loan Guaranty Agreement. In order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions that would otherwise be made on behalf of the Holdersaccount of Allowed Bridge Loan Guaranty Claims shall be distributed to the Senior Loan Agent, and no distribution shall be provided to Holders of Allowed Bridge Loan Guaranty Claims.

        5.    Interest on Claims.

Except as otherwise specifically provided for in the Plan, the Confirmation Order or other order of the Bankruptcy Court (including, without limitation, the Final DIP Order), or required by applicable bankruptcy law, post-petition interest shall not be paid on any Claims, and no Holder of a Claim shall be entitled to be paid interest accruing on or after the Petition Date on any Claim without regard to whether such amount has accrued for federal income tax purposes. Any post-petition interest that has been accrued for federal income tax purposes shall be cancelled as of the Effective Date.

        6.    Distributions by Disbursing Agent.

Other than as specifically set forth in the Plan, the Disbursing Agent shall make all distributions required to be made under the Plan. The Reorganized Debtors may act as Disbursing Agent or may employ or contract with other entities to act as the Disbursing Agent or to assist in or make the distributions required by the Plan. Law Debenture shall act as the Disbursing Agent for the Senior Noteholder Claims for which it is the

Indenture Trustee. Other than as specifically set forth in the Plan, the distributions to be made on account of Senior Noteholder Claims shall be made in accordance with the terms of the particular Indenture or in accordance with the Plan where such Indenture is silent.

      7.     Delivery of Distributions and Undeliverable or Unclaimed Distributions.

      (a)     Delivery of Distributions in General.

Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the Debtors' records unless such addresses are superseded by Proofs of Claim or transfers of claim filed pursuant to Bankruptcy Rule 3001.

      (b)     Undeliverable and Unclaimed Distributions.

      i.     General.

The Reorganized Debtors and the Disbursing Agent shall have no duty to make distributions to any Holder of an Allowed Claim with an undeliverable address as determined by any undeliverable or returned notice to the Debtors since the commencement of the Chapter 11 Cases unless and until the Reorganized Debtors or the Disbursing Agent are notified in writing of such Holder's then-current address prior to the Distribution Record Date. If the distribution to any Holder of an Allowed Claim or Interest is returned to the Reorganized Debtors or the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtors or the Disbursing Agent are notified in writing of such Holder's then-current address.

      ii.     Non-Negotiated Check Voucher Distributions.

Checks issued on account of Allowed Claims shall be null and void if not negotiated within 90 calendar days from and after the date of issuance thereof. Requests for reissuance of any check must be made directly and in writing to the Disbursing Agent by the Holder of the relevant Allowed Claim within the 90-calendar-day period. After such date, such Allowed Claim (and any Claim for reissuance of the original check) shall be automatically discharged and forever barred, and such funds shall revert to the Reorganized Debtors, notwithstanding any federal or state escheat laws to the contrary.

      iii.     Failure to Claim Undeliverable Distributions.

Except as otherwise expressly provided in the Plan, any Holder of an Allowed Claim or Interest that does not assert a claim pursuant to the Plan for an undeliverable or unclaimed distribution within one year after the Effective Date shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution against the Debtors or their Debtors' Estates or the Reorganized Debtors or their property. In such cases, any Cash for distribution on account of such claims for undeliverable or unclaimed distributions shall become the property of the Debtors' Estates and the Reorganized Debtors free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New Common Stock or New Warrants held for distribution on account of such Claim shall be canceled and of no further force or effect. Nothing contained in the Plan shall require any Disbursing Agent, including, but not limited to, the Reorganized Debtors, to attempt to locate any Holder of an Allowed Claim or Interest.

      8.     Record Date for Distributions

With the exception of Senior Noteholder Claims, the Reorganized Debtors and the Disbursing Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Claim or Interest that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes in the

Plan to recognize and distribute only to those Holders of Allowed Claims or Interests (including Holders of Claims and Interests that become Allowed after the Distribution Record Date) that are Holders of such Claims or Interests, or participants therein, as of the close of business on the Distribution Record Date. With the exception of Senior Noteholder Claims, the Reorganized Debtors and the Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date.

Unless otherwise set forth in the Confirmation Order, the Debtors shall not establish a record date for distributions to Holders of Senior Noteholder Claims. Distributions to Holders of Senior Noteholder Claims held through the Depository Trust Company ("DTC") shall be made by means of book-entry exchange through the facilities of the Depository Trust Company ("DTC") in accordance with the customary practices of DTC, as and to the extent practicable, and the Distribution Record Date shall not apply. In connection with such book-entry exchange, each Indenture Trustee shall deliver instructions to DTC instructing DTC to effect distributions on a Pro Rata basis as provided under the Plan with respect to such Claims upon which such Indenture Trustee acts as trustee. Distributions to Holders of Senior Noteholder Claims held directly by the Holder thereof shall be made by the Disbursing Agent upon surrender or deemed surrender of such Holder's Senior Notes except as otherwise provided in the Plan. Subject to Section 7.5.2 of the Plan, distributions of Cash to Holders of Allowed Senior Noteholder Claims shall be made to the applicable Senior Notes Indenture Trustees, which, in turn, shall make such distributions to the applicable Holders subject to the respective rights, claims and interests, if any, that the Senior Notes Indenture Trustees may have under the applicable Senior Notes Indentures or otherwise to the recovery and/or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder to the Holders of Allowed Senior Noteholder Claims, whether such rights, claims or interests are in the nature of a charging lien or otherwise.

      9.     Allocation of Plan Distributions Between Principal and Interest.

Except as otherwise expressly provided in the Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

      10.     Means of Cash Payment.

Payments of Cash made pursuant to the Plan shall be made, at the option and in the sole discretion of the Reorganized Debtors, by (i) checks drawn on, (ii) automated clearing house transfer from, or (iii) wire transfer from a bank selected by the Reorganized Debtors. Cash payments to foreign creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

      11.     Withholding and Reporting Requirements.

In connection with the Plan and all distributions hereunder, the Reorganized Debtors or the Disbursing Agent, as applicable, shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. All persons holding Claims or Interests shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan, (i) each Holder of an Allowed Claim that is to receive a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income,

withholding and other tax obligations, on account of such distribution and (ii) no distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations. Nothing in the preceding sentence shall affect distributions under the Plan to the Senior Loan Agent, the Bridge Loan Agent, the Senior Notes Indenture Trustees, or the Holders of Allowed Loan Claims or Senior Noteholder Claims.

12.    Setoffs.

The Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim (other than Allowed Claims in Classes 1C and 50C through 111C, which under no circumstances shall be subject to set off) the payments or other distributions to be made pursuant to the Plan in respect of such Claim, or claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Holder.

13.    Fractional Shares.

No fractional shares of New Common Stock or New Warrants shall be distributed. Where a fractional share would otherwise be called for, the actual issuance shall reflect a rounding up (in the case of more than 0.50) of such fraction to the nearest whole share of New Common Stock or New Warrant or a rounding down of such fraction (in the case of 0.50 or less than 0.50) to the nearest whole share of New Common Stock or New Warrant. The total number of shares of New Common Stock or New Warrants to be distributed pursuant to the Plan shall be adjusted as necessary to account for the rounding provided for in the Plan.

14.    De Minimis Distributions.

No distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.

15.    Special Provision Regarding Unimpaired Claims.

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

16.    Subordination.

The distributions and treatments provided to Claims and Interests under the Plan take into account and/or conform to the relative priority and rights of such Claims and Interests under any applicable subordination and turnover provisions in any applicable contracts, including without limitation, the PHONES Notes Indenture and the EGI-TRB LLC Notes, and nothing in the Plan shall be deemed to impair, diminish, eliminate, or otherwise adversely affect the rights or remedies of beneficiaries (including, for the avoidance of doubt, their respective Senior Notes Indenture Trustees and Agents, as applicable) of any such contractual subordination and turnover provisions.

**J.    Provisions For Resolving Disputed Claims And Disputed Interests.**

1.    Objections to and Estimation of Claims.

After the Effective Date, only the Reorganized Debtors may object to the allowance of any Claim or Administrative Expense Claim.  After the Effective Date, the Reorganized Debtors shall be accorded the power and authority to allow or settle and compromise any Claim without notice to any other party, or approval of, or notice to the Bankruptcy Court.  In addition, the Debtors or the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Reorganized Debtors have previously objected to such Claim.  Unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtors shall serve and file any objections to Claims and Interests as soon as practicable, but in no event later than (i) 210 days after the Effective Date or (ii) such later date as may be determined by the Bankruptcy Court upon a motion which may be made without further notice or hearing.

      2.      Payments and Distributions on Disputed, Contingent, and Unliquidated Claims and Interests and On Claims for Which Proofs of Claim are Filed.

No partial payments and no partial distributions will be made with respect to a disputed, contingent or unliquidated Claim or Interest, or with respect to any Claim for which a Proof of Claim has been filed, until the resolution of such disputes or estimation or liquidation of such claims by settlement or by Final Order.  On the next Distribution Date after a disputed, contingent or unliquidated Claim or Interest becomes an Allowed Claim or Interest in an amount certain, the Holder of such Allowed Claim or Interest will receive all payments and distributions to which such Holder is then entitled under the Plan.

## K.    Confirmation and Consummation of the Plan.

      1.      Conditions to Effective Date of the Plan.

The Plan shall not become effective and the Effective Date shall not occur unless and until the following conditions shall have been satisfied or waived in accordance with Section 10.2 of the Plan:

      (a)      The Confirmation Order confirming the Plan, as the Plan may have been modified in accordance with the terms of the Plan, shall conform to the Plan in all respects and shall have been entered by the Bankruptcy Court in form and substance reasonably satisfactory to the Debtors, the Senior Lender Settlement Committee and the Creditors Committee.

      (b)      The Confirmation Order shall authorize and approve the Global Settlement.

      (c)      The Certificate of Incorporation and By-Laws and any amended certificates or articles of incorporation, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents of the other Debtors, as necessary, shall have been adopted and filed with the applicable authorities of the relevant jurisdictions and shall become effective on the Effective Date in accordance with such jurisdictions' laws.

      (d)      All authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement the Plan on the Effective Date shall have been obtained or shall have occurred unless failure to do so will not have a material adverse effect on the Reorganized Debtors.

      (e)      At least seven members of the board of directors of Reorganized Tribune shall have been selected and shall have expressed a willingness to serve on the board of directors of Reorganized Tribune.

      (f)      All other documents and agreements necessary to implement the Plan on the Effective Date shall have been executed and delivered and all other actions required to be taken in connection with the Effective Date shall have occurred.

(g)    All consents, approvals and waivers from the FCC that are necessary or that the Debtors deem appropriate to consummate the transactions contemplated in the Plan and to continue the operation of the Debtors' ownership structure shall have been obtained in form and substance reasonably satisfactory to the Debtors and the Senior Lender Settlement Committee.

(h)    The Confirmation Order shall include the language set forth in Section 11.3 and Section 11.4 of the Plan.

2.    Waiver of Conditions.

Except for the condition set forth in Section 10.1.1(b) of the Plan (which may not be waived, modified or amended), each of the remaining conditions set forth in Section 10.1.1 of the Plan may be waived in whole or in part by the Debtors with the consent of the Senior Lender Settlement Committee, such consent not to be unreasonably withheld, without the need for notice or a hearing (except that notice shall be provided to the Creditors Committee); provided, however, that the Debtors may not waive any condition the waiver of which is proscribed by law.

3.    Consequences if Confirmation Order is Vacated.

If the Confirmation Order is vacated, (i) the Plan shall be null and void in all respects; (ii) any settlement of Claims or Interests provided for in the Plan shall be null and void without further order of the Bankruptcy Court; and (iii) the time within which the Debtors may assume and assign or reject all executory contracts and unexpired leases of personal property shall be extended for a period of 120 days after the date the Confirmation Order is vacated.

**L.    Injunctions, Releases And Discharge.**

1.    Discharge.

(a)    Discharge of Claims and Termination of Interests.

As of the Effective Date, except as provided in the Plan, the distributions and rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be in exchange for, and in complete discharge of, all Claims against the Debtors, and in satisfaction of all Interests and the termination of Interests in Tribune. In accordance with Section 7.4 of the Plan, as of the Effective Date any interest accrued on Claims against the Debtors from and after the Petition Date shall be cancelled. Accordingly, except as otherwise provided in the Plan or the Confirmation Order, confirmation of the Plan shall, as of the Effective Date, (i) discharge the Debtors from all Claims or other debts that arose before the Effective Date, and all debts of the kind specified in sections 502(g) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code (or is otherwise resolved), or (c) the Holder of a Claim based on such debt has accepted the Plan; and (ii) satisfy, terminate or cancel all Interests and other rights of equity security holders in the Debtors except as otherwise provided in the Plan. In addition, confirmation of the Plan shall, as of the Effective Date, authorize the release of the Senior Loan Guaranty Claims and the Bridge Loan Guaranty Claims against the Guarantor Non-Debtors.

As of the Effective Date, except as provided in the Plan, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, or their respective successors or property, any other or further Claims, debts, rights, causes of action, liabilities or Interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Petition Date and from asserting against the Guarantor Non-Debtors any Senior Loan Guaranty Claims or Bridge Loan Guaranty Claims. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims and other

debts and liabilities of the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent such judgment is related to a discharged Claim.

(b)    Discharge Injunction.

Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that hold, have held, or may hold a Claim or other debt or liability that is discharged, or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan, are permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims, debts or liabilities, or terminated Interests or rights: (i) commencing or continuing any action or other proceeding against the Debtors, the Reorganized Debtors or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Debtors, the Reorganized Debtors or their respective property; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Debtors, the Reorganized Debtors or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Debtors, the Reorganized Debtors or their respective property; and (v) commencing or continuing any judicial or administrative proceeding, in any forum, that does not comply with or is inconsistent with the provisions of the Plan.

2.    Releases

The Plan contemplates that certain releases will be provided to the following Released Parties: (a) the Debtors, their non-Debtor Affiliates including the Subsidiary Non-Debtors and the Reorganized Debtors, (b) the Creditors Committee, in such capacity, and its present and former members, in their capacity as members of the Creditors Committee, (c) the Senior Lenders, the Senior Loan Agent, the Senior Lender Steering Committee, the Senior Lender Settlement Committee, the Bridge Lenders, the Bridge Loan Agent and the Holder of the Barclays Swap Claim, in each case in all of their respective capacities, (d) the EGI-TRB LLC Noteholders and the holders of the EGI-TRB LLC Warrant, in each case in all of their respective capacities, (e) Centerbridge, the Senior Noteholders, and the Senior Notes Indenture Trustees, in each case in all of their respective capacities, and (f) all of the respective Related Persons to each of the foregoing parties; provided, however, in each case only if the applicable party has not returned a Ballot opting out of the releases in Section 11.2.2 of the Plan and, if entitled to vote on the Plan, has voted to accept the Plan.

The releases provided pursuant to the Plan to the Released Parties are a central and important element of the Plan. The releases of parties other than the LBO Lenders are necessary to provide the LBO Lenders with a full and final resolution of all claims against them in return for their substantial financial contributions to the Global Settlement. Without such releases, the initiation of litigation against participants in the Leveraged ESOP Transactions other than the LBO Lenders undoubtedly would result in the LBO Lenders being drawn into the litigation by reason of the immediate assertion of claims by the other participant defendants against the LBO Lenders. In addition, by eliminating the need for further litigation, the releases will enable the Debtors to exit bankruptcy sooner than otherwise would be possible and will allow the Reorganized Debtors to devote their full time and attention, without distraction from litigation, to their businesses.

(a)    Releases by Debtors and Debtors' Estates.

In the Plan, the Debtors provide releases to the Released Parties from almost all claims existing on or prior to the Effective Date, including with respect to the LBO-Related Causes of Action, which releases are supported by related anti-suit injunctions.

~~Except~~Specifically, section 11.2.1 of the Plan provides that, except for those Claims expressly preserved in Section 11.2.6 of the Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of the Plan, the Reorganized Debtors on their own behalf and as

106

representatives of their respective estates, release unconditionally and hereby cause the Subsidiary Non-Debtors to release unconditionally, and are hereby deemed to release unconditionally, each and all of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claims), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Debtors' Estates, the Chapter 11 Cases or the Plan, the Disclosure Statement or the Restructuring Transactions (the "Debtor Released Claims"); provided, however, that, with the exception of LBO-Related Causes of Action, nothing in Section 11.2 of the Plan shall be construed to release any party from willful misconduct or gross negligence as determined by a Final Order. The releases contained in Section 11.2 of the Plan shall not apply to or otherwise affect the Morgan Stanley Claims or the obligations of any of the Debtors' officers or directors to repay loans or advances of money or other property contractually owed to the Debtors or their Debtors' Estates or with respect to loans or advances of money that the Debtors guaranteed on behalf of such officers or directors. Furthermore, notwithstanding the foregoing, such release, waiver, and discharge shall not operate as a release, waiver, or discharge of any express contractual commercial obligations arising in the ordinary course of any Person to the Debtors not directly related to the LBO-Related Causes of Action. On the Effective Date, each Guarantor Non-Debtor will provide each Holder of a Loan Guaranty Claim against the Guarantor Non-Debtors and the Senior Loan Agent and Bridge Loan Agent a release of such scope in consideration for the Guarantor Non-Debtor Release contemplated hereby.

The Debtors believe that the aforementioned releases by the Debtors and the Debtors' Estates are necessary, fair reasonable and in the best interests of the Debtors' Estates for a number of reasons. As an initial matter, a suit against certain of the Released Parties would give rise to claims against the Debtors which could deplete the assets of the Debtors' Estates. For example, litigation involving present and former directors, officers or employees of the Debtors likely would trigger statutory, contractual and/or common law claims for advancement, indemnification and/or contribution from the Debtors, as would litigation involving the advisers, Mr. Zell and the Zell Entity.

Substantial financial contributions to the reorganization also have been and will be made either directly by or indirectly on behalf of the Released Parties. The LBO Lenders will contribute significant value to the Senior Noteholders and Holders of General Unsecured Claims in connection with the Global Settlement. The directors, officers and employees of the Debtors also have made substantial non-financial contributions by designing and implementing the operational restructuring of the Debtors and participating in the informal discovery process relating to the LBO-Related Causes of Action and in the negotiations relating to the Plan. The LBO Lenders, the advisers and others also have likewise made substantial non-financial contributions by participating in the informal discovery process and settlement negotiations.

In addition, the releases are essential to the reorganization in that they are an integral part of the agreement by the LBO Lenders to fund the Plan. They also are necessary to the continued success of the Reorganized Debtors because they assure that the directors, officers and employees of the Debtors are not distracted by litigation of the LBO-Related Causes of Action. They constitute a critical and essential condition to the Plan because they provide the necessary assurances that the Plan will result in the full and final resolution of all outstanding claims, and, in the absence of such releases, the LBO Lenders would likely be unwilling to provide the significant value to the Senior Noteholders and the Holders of General Unsecured Claims that is embodied in the Plan.

       (b)        Releases by Holders of Claims and Interests.

Section 11.2.2 of the Plan also provides that each Holder of a Claim or Interest that is deemed to accept the Plan or that receives, but does not return a Ballot with the appropriate opt-out box checked, shall be deemed to have released each and all of the Released Parties from almost all non-Estate Claims existing on or before the Effective Date, including Claims against any third parties alleging ERISA violations.[14] Any Holder of a Claim or Interest that elects not to grant this release shall not receive the benefit of any other release under the Plan to which it might otherwise be entitled. The Plan further provides that all Holders of Loan Guaranty Claims against Guarantor Non-Debtors shall be deemed on the Effective Date to have granted the Guarantor Non-Debtor Release and to have relieved the LBO Lenders and others from any liability on account of the Senior Loan Guaranty Claims or the Bridge Loan Guaranty Claims.

Except Specifically, section 11.2.2 of the Plan states that except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of the Plan, each Person (i) that has voted to accept the Plan or is deemed to have accepted the Plan, (ii) that has not voted to accept the Plan but that has received a Ballot and that has not opted out of the releases in Section 11.2.2 of the Plan, or (iii) who otherwise agrees to provide the releases set forth in Section 11.2.2 of the Plan, shall be deemed to have unconditionally released each and all of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claim), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Debtors' Estates, the Chapter 11 Cases or the Plan, Disclosure Statement or the Restructuring Transactions (the "Holder Released Claims" and together with the Debtor Released Claims the "Released Claims"); provided, however, that nothing in Section 11.2.2. of the Plan shall be construed as a release of any Claims against non-Debtor third parties arising under ERISA held by the DOL; provided, further, that no agent or indenture trustee is, by virtue of giving its own release hereunder, releasing individual claims, if any, of lenders or noteholders for which it acts as agent or indenture trustee that are not themselves Released Parties. Furthermore, notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of, except as provided in Sections 11.2.5 of the Plan with respect to the Guarantor Non-Debtors, any express contractual obligation of any non-Debtor party due to any other non-Debtor party.

      (c)     Failure to Grant Release.

Any Holder of a Claim or Interest that has timely submitted to the Debtors or filed with the Court a Ballot opting not to grant the releases set forth in Section 11.2.2 shall not receive the benefit of the releases set forth in Section 11.2 of the Plan (if otherwise entitled).

      (d)     Injunction Related to Releases.

Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that hold, have held, or may hold a Claim or other debt, right, cause of action or liability that is released pursuant to the provisions of the Plan are permanently enjoined from taking any of the following actions on account of or based upon such released Claims, debts, rights, causes of action or liabilities: (i) commencing or continuing any action or other proceeding against the Released Parties or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Released Parties or their respective property; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Released Parties or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Released Parties or against their respective property; and (v) commencing or

---

[14] Unless such Holder otherwise agrees to grant the releases provided in Section 11.2.2 of the Plan, each Holder of a Claim or Interest that is deemed to reject the Plan shall not be deemed to provide such releases.

continuing any judicial or administrative proceeding, in any forum, that does not comply with or is inconsistent with the provisions of the Plan.

(e)    Release of Guarantor Non-Debtors from Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims.

All Holders of Loan Guaranty Claims against the Guarantor Non-Debtors shall be deemed on the Effective Date to have granted the Guarantor Non-Debtor Release and the Guarantor Non-Debtors shall be unconditionally relieved from any liability to the Senior Lenders or the Bridge Lenders on account of the Senior Loan Guaranty Claims or the Bridge Loan Guaranty Claims and the Senior Loan Agent and the Bridge Loan Agent, respectively, shall be unconditionally relieved from any liability of any nature whatsoever to such Holders as a result of the release of the Guarantor Non-Debtors from any and all Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims; provided that the Guarantor Non-Debtor Release is dependent upon and only effective upon (i) the execution by each of the Guarantor Non-Debtors of a guaranty of the New Senior Secured Term Loan pursuant to and to the extent provided in Section 5.6 of the Plan, (ii) the unconditional release by each of the Guarantor Non-Debtors, in form and substance acceptable to the Senior Lender Settlement Committee as of the Effective Date, of each of the Holders of ~~Senior~~ Loan Guaranty Claims and the ~~Senior~~ Loan Agents of and from any and all Debtor Released Claims, and (iii) the granting by the Guarantor Non-Debtors of Liens on certain property of the Guarantor Non-Debtors pursuant to and to the extent provided in Section 5.6 of the Plan.  Pursuant to Bankruptcy Rule 9019, the Bankruptcy Court's entry of the Confirmation Order shall constitute its approval of this good faith settlement and compromise of the claims released by the Non-Debtor Guarantor Release and adequate factual findings that the Non-Debtor Guarantor Release is: (a) fair, equitable and reasonable; (b) necessary and essential to the Debtors' successful reorganization; (c) in exchange for good and valuable consideration provided by the Guarantor Non-Debtors and the Agents; (d) warranted by the exceptional and unique circumstances of the Debtors' reorganization; and (e) consistent with public policy and due process principles.

(f)    Release of Chapter 5 Causes of Action.

~~In~~Except as set forth in Section 3.2.4(b)(ii) of the Plan, in addition to the releases set forth in the Plan, the Debtors and the Reorganized Debtors shall not file, commence, or pursue any claim, right or cause of action under Chapter 5 of the Bankruptcy Code or seek to disallow any Claim to the extent it may be avoidable, except that the following claims are expressly preserved: (i) the Morgan Stanley Claims and (ii) any claims, rights or causes of action related to set-offs against amounts owing to the Debtors provided that the Debtors shall not set-off against any distributions under the Plan to Holders of Allowed Claims in Classes 1C, 1D, and 50C through 111C (other than any distributions to MSCS with respect to the Morgan Stanley Claims).

(g)    Non-Release of Certain Defined Benefit Plans.

Notwithstanding anything to the contrary in the Plan, with respect to any Defined Benefit Plan that has not been terminated or does not terminate by its terms prior to the entry of the Confirmation Order, all Claims of, or with respect to, such Defined Benefit Plan (including any based on fiduciary duties under ~~the Employee Retirement Income Security Act of 1974, as amended~~ERISA) and all Claims of the Pension Benefit Guaranty Corporation, whether or not contingent, under 29 U.S.C. § 1362(b) for unfunded benefit liabilities, under 29 U.S.C. § 1306(a)(7) for termination premiums, and under 29 U.S.C. § 1362(c) for due and unpaid employer contributions shall not be discharged, released, exculpated or otherwise affected by the Plan (including Section 11.2 of the Plan), the entry of the Confirmation Order or the Chapter 11 Cases.  Notwithstanding anything to the contrary in the Plan, in the event that a Defined Benefit Plan does not terminate prior to the entry of the Confirmation Order, obligations of the Debtors under the Defined Benefit Plan as of the Effective Date shall become obligations of the applicable Reorganized Debtors and, as required by the Internal Revenue Code of 1986, as amended~~, or the Employee Retirement Income Security Act of 1974, as amended~~ or ERISA, the controlled group members.

3.      Bar Order.

The Confirmation Order shall provide, among other things (and the inclusion of such language, or language substantially similar to the following, and subject to Section 10.2 of the Plan, shall be a condition to the Effective Date):

"ORDERED that all Persons, including without limitation (i) any Persons that are not Released Parties, (ii) Released Parties, and (iii) Persons who have voted for or against the Plan or who are presumed to have voted for or against the Plan under section 1126(f)-(g) of the Bankruptcy Code (collectively, the "Barred Persons"), are hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any claim for non-contractual indemnity or contribution against any Released Party (including any other non-contractual claim against the Released Parties, whether or not denominated as for contribution or indemnity, where the injury to the Person is the liability of the Person to the Barred Persons), arising out of or reasonably flowing from the claims or allegations in any of the Released Claims, whether arising under state, federal or foreign law as claims, cross-claims, counterclaims, or third-party claims (collectively, the "Barred Claims"), and with respect to the Barred Claims, the Barred Persons are also entitled to the judgment reduction provisions set forth in the Plan.  This Order (the "Bar Order") is without prejudice to the position of any party as to the existence, in the absence of this Bar Order, of any Barred Claim; and it is further

"ORDERED that no Person acting on behalf of the estate, including any successor to the Debtors, any committee appointed in the Bankruptcy Case, any chapter 7 trustee, any trustee of a litigation trust or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (any of the above, a "Plaintiff"), may assert or bring a Released Claim.  In the event any such Plaintiff obtains a judgment or award (a "Judgment") against any Person with respect to one or more causes of action based upon, arising from, or related to the Released Claims or any transactions underlying any Released Claims then, with respect to any actual, potential or asserted liability of a Released Party to any Person for the Barred Claims in respect of such Judgment, the Plaintiff shall, prior to or in connection with the entry of such Judgment, provide notice of this Bar Order to the court or tribunal in which such Judgment was obtained, and the court or tribunal shall reduce such Judgment against such Person in an amount that is the greater of (i) the amount of the consideration provided pursuant to the Global Settlement by the Released Party or Parties against whom there would have been a Barred Claim in the absence of this Bar Order, or (ii) the amount equal to the Judgment against any such Person times the aggregate proportionate share of fault (expressed as a percentage) of the Released Party or Parties against whom there would have been a Barred Claim in the absence of this Bar Order.  In the event that Judgment shall be entered against any Person without a prior or concurrent determination as to the existence of a Barred Claim (and, in the event of a determination of the existence of a Barred Claim, without a reduction of such Judgment), such Judgment shall not, and shall be deemed not to, give rise to any Barred Claim; and it is further

"ORDERED that if any Plaintiff enters into a settlement with any Person with respect to one or more causes of action based upon, arising from, or related to the Released Claims or any transaction underlying any Released Claim, then such Plaintiff shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Barred Claims with respect to such settlement."

4.      Supplemental Injunction.

In order to supplement the settlements contemplated by and provided for in the Plan and the injunctive effect of the Discharge Injunction, and pursuant to sections 524 and 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following injunction to take effect as of the Effective Date.

110

*In order to preserve and promote the settlements contemplated by and provided for in the Plan, and to supplement, where necessary, the injunctive effect of the discharge as provided in sections 1141 and 524 of the Bankruptcy Code and as described in Section 11 of the Plan, except as otherwise provided in the Plan, all entities which have held or asserted, which hold or assert or which may hold or assert any claim, demand or cause of action against the Released Parties (or any of them) based upon, attributable to, or arising out of any Released Claim* ~~against or Interest in any of the Debtors~~*, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be permanently stayed, restrained and enjoined from taking any action against the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving payments or recovery with respect to any such* ~~claim, demand or cause of action arising prior to the Effective Date~~*Released Claim, including, but not limited to:*

        (a)    *commencing or continuing in any manner any action or other proceeding of any kind with respect to any such* ~~claim, demand or cause of action~~*Released Claim against any of the Released Parties, or against the property of any Released Party;*

        (b)    *enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or against the property of any Released Party with respect to any* ~~such claim, demand or cause of action~~*Released Claim;*

        (c)    *creating, perfecting or enforcing any Lien of any kind against any Released Party or the property of any Released Party with respect to any such* ~~claim, demand or cause of action~~*Released Claim;*

        (d)    *except as otherwise provided in the Plan, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due any Released Party or against the property of any Released Party with respect to any* ~~such claim, demand or cause of action~~*Released Claim; and*

        (e)    *taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan relating to such* ~~claim, demand or cause of action~~*Released Claim.*

*The Debtors' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.*

    5.      Disallowed Claims and Disallowed Interests.

    On and after the Effective Date, the Debtors and the Reorganized Debtors shall be fully and finally discharged of any and all liability or obligation on a Disallowed Claim or a disallowed Interest, and any Order disallowing a Claim or an Interest which is not a Final Order as of the Effective Date solely because of an entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided in the Plan, shall constitute an Order: (i) disallowing all Claims and Interests to the extent such Claims and Interests are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims and Interests, and Claims for unmatured interest and (ii) disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages or any other damages not constituting compensatory damages.

    6.      Exculpation.

NoneTo the fullest extent permitted under applicable law, none of the Released Parties and none of the present or former members of the Creditors' Committee (in their capacity as members of the Creditors' Committee), whether or not such members are otherwise Released Parties, shall have or incur any liability to any person or entity for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the negotiation of the Plan, pursuit of confirmation of the Plan, the administration, consummation and implementation of the Plan or the property to be distributed under the Plan, the Disclosure Statement, the Restructuring Transactions, the Plan Supplement, the releases and injunctions, or the management or operation of the Debtors (except for any liability that results from willful misconduct or gross negligence as determined by a Final Order). Any of the Released Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and the administration thereof.

7.      Corporate Indemnities.

(a)      Prepetition Indemnification and Reimbursement Obligations.

For purposes of the Plan, the respective obligations of Tribune and the other Debtors to indemnify and reimburse any Persons who are or were directors, officers or employees of the Debtors, against and for any obligations pursuant to certificates or articles of incorporation, certificates of formation, codes of regulation, bylaws, limited liability company agreements, partnership agreements, applicable state or non-bankruptcy law, or specific agreements or any combination of the foregoing, shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged under section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on or after the Petition Date.

(b)      Plan Indemnity.

In addition to the obligations set forth in Section 11.7.1 of the Plan and not by way of limitation thereof, subject to Section 4.6.3 of the Plan, the Reorganized Debtors shall jointly and severally indemnify and hold harmless the Senior Loan Agent, the Senior Loan Arrangers, the Senior Lenders, the Bridge Loan Agent, the Bridge Loan Arrangers and the Bridge Lenders (collectively, the "Indemnified Creditor Parties") and all of their respective Related Persons, in each case in all such capacities and all other non-fiduciary capacities related to the transactions underlying the LBO-Related Causes of Action, and any natural persons who are or were officers or directors of any of the Debtors (each an "Indemnified Party" and collectively, with the Indemnified Creditor Parties, the "Indemnified Parties"), on account of and with respect to any claim, cause of action, liability, judgment, settlement, cost or expense (including without limitation attorneys' fees but only if incurred after the Effective Date) on account of claims or causes of action threatened or asserted by any Person against such parties that seek damages, contribution, indemnity, equitable indemnity, or any similar claim, based upon or as the result of (ix) the Released Claims, including without limitation any claims on account of and with respect to any LBO-Related Causes of Action; or (iiy) Barred Claims or any similar claim based upon or as the result of the assertion of primary claims against any other person by any representative of the Debtors' Estates (the "Covered Claims"); provided, however, that in no event shall the aggregate liability of the Reorganized Debtors to any individual Indemnified Creditor Party and all Related Persons of such Indemnified Creditor Party on account of such indemnity exceed the sum of (ai) such Indemnified Creditor Party's pro rata share (calculated based on the proportion that the allowed Loan Claims against Tribune held by such Indemnified Creditor Party bears to the aggregate amount of all allowed Loan Claims against Tribune held by all Indemnified Creditor Parties) of $427,582,000, (bii) such Indemnified Creditor Party's pro rata share (calculated based on the proportion that the allowed Senior Loan Guaranty Claims held by such Indemnified Creditor Party bears to the aggregate amount of all allowed Senior Loan Guaranty Claims held by all Indemnified Creditor Parties) of $83,129,000 and (eiii) all costs and/or expenses (including without limitation attorneys' fees) incurred in connection with any Covered Claims by such Indemnified Creditor Party and such Related Persons. For the avoidance of doubt, the provisions of Section 11.7.2 of the Plan are not intended to

provide an indemnity for causes of action held by a non-Debtor against an Indemnified Person that exist independent of any Released Claim or Barred Claim, and Section 11.7.2 of the Plan is not intended to extend to any indemnification for any claims: (i) by the Holders of Claims in Class 1J against a trustee for such Class 1J Claims; and (ii) in connection with the claims asserted in the Neil Litigation.

(c)    Indemnity for Members of the Creditors Committee.

The Reorganized Debtors shall jointly and severally indemnify and hold harmless the present and former members of the Creditors' Committee and their respective Related Persons (in their capacity as members of the Creditors Committee), on account of and with respect to any costs and/or expenses (including without limitation attorneys' fees) incurred in connection with any Covered Claims.

(d)    Limitation on Indemnification.

Except as provided in the Plan with respect to the LBO-Related Causes of Action, the Reorganized Debtors shall not be obligated to indemnify and hold harmless any Person or entity for any claim, cause of action, liability, judgment, settlement, cost or expense that results from such Person's or entity's gross negligence or willful misconduct as determined by a Final Order.

(e)    Director and Officer Liability Insurance and Fiduciary Liability Insurance.

The Debtors' director and officer liability insurance policies and fiduciary liability insurance policies shall provide coverage for claims made for any wrongful acts or other covered conduct, acts or omissions occurring on or prior to the Effective Date (such coverage also referred to as "tail" coverage) with coverage in scope and substance and on terms no less favorable to the current insureds than the Debtors' insurance policies existing as of the Confirmation Date, which insurance policies shall remain in full force and effect for a period of no less than six years following the Effective Date.

(f)    Indemnification Claim Procedures.

Claims made by beneficiaries of the indemnities contained in Section 11.7 of the Plan shall be submitted, resolved and reimbursed, if applicable, in accordance with the procedures set forth in Exhibit 11.7.6 to the Plan, to be filed with the Plan Supplement.

8.    Term of Bankruptcy Injunction or Stays.

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

## M.    Retention of Jurisdiction by the Bankruptcy Court.

The Plan provides that the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, and sets forth a non-exclusive list of numerous specific items over which the Bankruptcy Court will retain jurisdiction. In broad terms, those items include the determination of Allowed Claims and Interests, matters relating to executory contracts and unexpired leases, matters relating to distributions under the Plan, matters relating to modifications to the Plan, and adjudication of other causes of action by or on behalf of the Debtors or Reorganized Tribune.

## N.    Certain Additional Provisions of the Plan.

113

1.      Surrender of Instruments.

As a condition to participation under the Plan, the Holder of a note, debenture or other evidence of indebtedness of any of the Debtors that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture or other evidence of indebtedness shall surrender such note, debenture or other evidence of indebtedness to the Debtors, or their designee (unless such Holder's Claim will be Reinstated by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that if a claimant is a Holder of a note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by DTC or other securities depositary or custodian thereof, then the Debtors or the applicable Indenture Trustee for such note, debenture or other evidence of indebtedness may waive the requirement of surrender.  Except as otherwise provided in Section 13.1 of the Plan, in the Debtors' sole discretion, if no surrender of a note, debenture or other evidence of indebtedness occurs and a claimant does not provide an affidavit and indemnification agreement (without any bond), in form and substance reasonably satisfactory to the Debtors, that such note, debenture or other evidence of indebtedness was lost, then no distribution may be made to any claimant whose Claim is based on such note, debenture or other evidence of indebtedness thereof.

2.      Creditors Committee.

The appointment of the Creditors Committee shall terminate on the Effective Date, except that the Creditors Committee shall continue in existence after the Effective Date for the sole purpose of preparing and prosecuting applications for the payment of fees and reimbursement of expenses.

3.      Post-Confirmation Date Retention of Professionals

Upon the Effective Date, any requirement that professionals employed by the Reorganized Debtors comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors will be authorized to employ and compensate professionals in the ordinary course of business and without the need for Bankruptcy Court approval.

4.      Effectuating Documents and Further Transactions.

Each of the Debtors and the Reorganized Debtors is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.

5.      Exemption from Transfer Taxes.

Pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance, transfer or exchange of notes, debentures or equity securities under the Plan; (ii) the creation of any mortgage, deed of trust, lien, pledge or other security interest; (iii) the making or assignment of any lease or sublease; or (iv) the making or delivery of any deed or other instrument of transfer under the Plan, including, without limitation, merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property, will not be subject to any stamp tax or other similar tax.

6.      Paid-in Capital of Corporate Reorganized Debtors.

On the Effective Date, after all other transactions necessary to effect the Plan have been consummated, the Paid-in Capital, as such term is defined in section 1.80(j) of the Illinois Business Corporation Act of 1983, 805 ILCS 5/1.01, et seq.  (the "BCA"), of each corporate Reorganized Debtor shall, pursuant to Section

114

9.20(a)(2) of the BCA, be reduced to the following amounts (such reduced amounts to be referred to individually and collectively as the "Article XIII Paid-in Capital Amount" and "Article XIII Paid-in Capital Amounts," respectively): (i) in the case of Reorganized Tribune its Paid-in Capital shall be reduced to the aggregate par value, if any, of Reorganized Tribune's issued and outstanding shares of capital stock plus such amount as is recorded on Reorganized Tribune's financial statements as paid in capital or additional paid in capital under its fresh start accounting in accordance with Generally Accepted Accounting Principles, and (ii) in the case of each other corporate Reorganized Debtor its Paid-in Capital shall be reduced to the aggregate par value, if any, of each such other Reorganized Debtor's issued and outstanding shares of capital stock plus such amount as is recorded on each such other Reorganized Debtor's financial statements as paid in capital or additional paid in capital under its fresh start accounting in accordance with Generally Accepted Accounting Principles. The amount required to reduce the Paid-in Capital of each corporate Reorganized Debtor to its Article XIII Paid-in Capital Amount shall be treated as a reduction in Paid-in Capital under Section 9.20(a)(2) of the BCA. Any capital of each corporate Reorganized Debtor remaining in excess of its Article XIII Paid-in Capital Amount shall not be treated as Paid-in Capital for purposes of the BCA. For purposes of Section 13.6 of the Plan, the term "corporate" refers to a corporation as defined in Sections 1.80(a) or (b) of the BCA.

7.    Payment of Statutory Fees.

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

8.    Amendment or Modification of the Plan.

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code and other applicable provisions of the Plan, including, without limitation, Section 13.9 of the Plan, the Debtors may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan. A Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

9.    Certain Provisions Pertaining to Senior Lender Settlement Committee and Centerbridge.

The Settlement Support Agreement is a binding legal obligation between the signatories thereto and requires such signatories to support a resolution of the Chapter 11 Cases on the terms provided in the Settlement Support Agreement. The Debtors are not parties to the Settlement Support Agreement and neither is the Creditors Committee. However, certain actions by the Debtors and the Creditors Committee are required to maintain the legal obligation of the signatories to the Settlement Support Agreement. One of those actions is that, no amendments shall be made to the Plan, and no supplements (including, without limitation, the Plan Supplement) shall be filed to the Plan, without the consent of the Senior Lender Settlement Committee, which consent shall not be unreasonably withheld. The aforementioned right of the Senior Lender Settlement Committee to reasonably consent to all amendments and supplements to the Plan shall extend to both the form and substance of any such amendment or supplement and any documents or information contained therein. Any alteration, amendment or modification to the Plan that is materially inconsistent with the terms of the "Settlement" (as defined in the term sheet attached to the Settlement Support Agreement and filed with the Bankruptcy Court) and that adversely and materially modifies the form or substance of affects the consideration to be provided to Class 1DE shall also be subject to the consent of Centerbridge, which consent is not to be unreasonably withheld. Prior to the Effective Date, the Debtors shall provide notice to the Creditors Committee of any alteration, amendment, modification, or supplement to the Plan. Because the Debtors believe that the best interests of the estate are maximized by resolution of these Chapter 11 Cases on the terms provided in the Plan, the Debtors (though not party to the Settlement Support Agreement) do not anticipate amending or supplementing the Plan without the reasonable consent of the Senior Lender Committee unless required to do so by the Bankruptcy Court.