# EXHIBIT A

**BROWN RUDNICK**

ROBERT J. STARK
direct dial:  (212) 209-4862
rstark@brownrudnick.com

Seven
Times
Square
New York
New York
10036
tel 212.209.4800
fax 212.209.4801

May 19, 2010

To The Creditors of Tribune Company, et al.

RE:  In re Tribune Company, et al., Chap. 11 Case No. 08-13141 (KJC)

Dear Creditors:

    This firm is counsel to Wilmington Trust Company, Successor Indenture Trustee for the Exchangeable Subordinated Debentures due 2029, generally referred to as the "PHONES."  As discussed in the enclosed Disclosure Statement, the PHONES are a form of debt security (aggregate initial principal amount of $1.2 billion) issued by Tribune Company in April 1999.  Tribune's Plan of Reorganization does not reserve any distributions to holders of the PHONES, and such creditors are not being offered an opportunity to vote on the Plan.  It, therefore, should come as no surprise that Wilmington Trust, as Trustee, does not support the Plan and intends to vigorously oppose its approval by the Bankruptcy Court.  In this letter, we offer our case perspective and ask that you carefully consider our views before casting your Plan vote.

    As indicated in the Disclosure Statement (and widely reported in the press), Tribune was the target of a massive leveraged-buyout (often referred to as an "LBO") concluding only about 11 months before the Company's bankruptcy filing.  An LBO is a transaction whereby the target (here, Tribune) borrows heavily (here, about $8 billion) to purchase its own stock from public stock-holders (thereby, "taking the company private"), and selling stock to an LBO "sponsor" (here, Sam Zell) who, for a relatively small amount (here, about $300 million), becomes the new principal owner.  In other words, the target itself largely pays for its own acquisition by the sponsor.  Should the LBO debt ultimately prove too much, prompting the target's bankruptcy filing, pre-LBO creditors (like the PHONES) have basis in the law to call foul.  In fact, there is considerable support in the law for a Bankruptcy Court to find that, under this fact-pattern: (1) the company did not receive any real value when it bought back its own stock (only the former stockholders and the sponsor benefited); (2) if the LBO left the target insolvent or with unreasonably small capital, the claims and lien-protections asserted by LBO lenders may be avoided as "fraudulent conveyances," and those lenders may lose all entitlement to receive anything from the bankruptcy estate; (3) those responsible for the LBO (management, the sponsor, and LBO lenders) may bear significant liability to the estates and the pre-LBO creditors; and (4) pre-bankruptcy fees and interest payments delivered to the LBO lenders must be disgorged to the bankruptcy estate (in fact, before even considering more complex disgorgement theories, the estates appear to have formulaic "preference" claims against Mr. Zell and the LBO Banks for more than $360 million).  Tribune's LBO and resulting causes of action are at the heart of this Chapter 11 case, and the inaptly-named "Global Settlement" embedded in the Plan.

    The "Global Settlement" contemplates, among other things, that: (i) the LBO Banks will become the principal owners of Tribune post-bankruptcy; (ii) unsecured Senior Noteholders will

brownrudnick.com

Brown Rudnick LLP   *an international law firm*   Boston | Dublin | Hartford | London | New York | Providence | Washington

8251000 v1



receive about $450 million in value, equating to about a 35% return on their $1.3 billion pre-LBO loan to Tribune; and (iii) those responsible for the LBO (management, Mr. Zell, and the LBO Banks) will not contribute any additional value to the estate or bear any further liability (to the estate or privately to creditors) in connection with the LBO.[1]  Wilmington Trust, as Trustee, firmly believes that the terms of the Global Settlement are inconsistent with the law and are patently unfair, and intends to fully litigate its objection to the Plan.

Further, Wilmington Trust, as Trustee, believes that the Global Settlement was not the product of arm's-length bargaining.  To be sure, Mr. Zell and various members of Tribune's Board and Senior Management have significant, personal interest in seeing all LBO-related litigation "swept under the rug," especially when the proposed settlement does not require them to pay any amounts and also shelters them from all further litigation exposure.  JPMorgan Chase Bank (a lead LBO Bank), negotiating on behalf of itself and purportedly for all the LBO Banks, shares that same goal; and, regardless, under the terms of the Global Settlement, the LBO Banks take Tribune, giving up only a relatively small amount to settle.  The Official Creditors' Committee, which also supports the Global Settlement, is co-Chaired by JPMorgan Chase, is comprised chiefly of creditors that have no real economic interest in this litigation (most Committee creditors are non-bond creditors that are being paid-off under the Plan), and are being lead by counsel that typically represents certain lead LBO Banks in bankruptcy matters (and, in fact, is presently <u>defending</u> certain of the LBO Banks in another, similar fraudulent conveyance case).  Finally, the 35% distribution to holders of Senior Notes was negotiated principally by the hedge-fund Centerbridge Credit Advisors.  Wilmington Trust, as Trustee, has reason to believe that Centerbridge bought its Seniors Notes post-bankruptcy, at an average cost basis that is lower than 35%.  Thus, the "Global Settlement" may lock-in extraordinary profits for Centerbridge, while still reflecting unfavorable settlement terms for all other Senior Noteholders.

Your vote on the Plan bears a "risk/reward" profile, not unlike a decision to make an investment in the stock or bonds of a public company.  The Disclosure Statement is intended by law to reflect the "risk/reward" profile of your vote on the Plan, much like a public company's SEC filings are intended to help you gauge the "upside/downside" probabilities of an investment in a company's stock or bonds.  For Tribune's various creditor classes, the Plan and the Global Settlement reflect a "risk/reward" profile, which Wilmington Trust, as Trustee, gauges as follows:

- For holders of LBO Bank debt, the reward is high – you get virtually all estate value.  But, the risk is commensurately high.  The decision to prosecute this Plan (instead of negotiating a fully consensual plan of reorganization) will force litigation over the legal validity of your claims and liens.  If the Debtors (and JPMorgan Chase) are wrong, the consequences can be dire for you. <u>See</u> <u>In re Tousa</u>, 422 B.R. 783 (Bankr. S.D. Fla. 2009)

---

[1]    Some creditors are offered an opportunity on their ballot form to opt "not to release" private claims against these parties, but the Plan includes an injunction that bars the assertion of such "opt-out" lawsuits.  So, if the Debtors are successful, your release "opt-out" will have no legal impact whatsoever.  But, if you do choose to "opt-out" you will not receive a release, even if you are otherwise entitled to it (a "tails they win, heads you lose" proposition).



(lender claims avoided in full as fraudulent conveyances, and the holders of bank debt also compelled to disgorge over $400 million in interest and professional fee payments; this is the case in which lead counsel to Tribune's Official Creditors' Committee is <u>defending</u> certain of the LBO Banks).

- For holders of trade claims, the reward also is high – you will receive 100% cash payment. But, that too comes with high risk. This Plan will be the subject of lengthy, expensive and complex litigation. That litigation may last for a considerable period of time, and the results are now far from certain. Your affirmative Plan vote necessarily endorses this litigation and all the resulting cost and business stress/dislocation. A negative Plan vote may prompt the parties back to the negotiating table and, perhaps, a more efficient and business-rational case conclusion (likely with the same 100% cash payment reserved for you).

- For holders of Senior Notes, the "risk/reward" profile is less pronounced. Wilmington Trust, as Trustee, believes (and many public commentators seem to agree) that Tribune's LBO was one of the worst leveraged-buyout transactions in recent history, and that the resulting litigation claims against Mr. Zell, management, and the LBO Banks are strong. In light thereof, and considering that Centerbridge's investment in Senior Notes likely had an average cost basis lower than 35%, the Plan's proposed treatment for Senior Notes may not reflect a favorable "risk/reward" profile for you. In light of the Plan protections afforded to Mr. Zell and management, Wilmington Trust, as Trustee, believes it to be a very unfavorable settlement from your perspective.

Wilmington Trust's views as Trustee notwithstanding, you should be aware that, on May 10, 2010, the Bankruptcy Court approved the appointment of UCLA Law School Professor Kenneth Klee as Examiner in this case. Mr. Klee has been charged by the Bankruptcy Court with investigating Tribune's LBO and issuing a report discussing the viability of resulting causes of action. The Examiner has retained counsel and financial advisors, and is now hard at work discharging this assignment. His report is due July 12, 2010. Thus, you are receiving the Plan and Disclosure Statement well before Mr. Klee has concluded his examination and issued his report. Somewhere in the enclosures, you may be instructed as to how you might obtain a copy of Mr. Klee's report, but no promise has been made to you that you will automatically receive a copy in the mail. Nor have the Debtors suggested that you consider holding your vote (and keeping an open mind as to how you should vote) pending review of the Examiner's report.

For all of these reasons, Wilmington Trust, as Trustee, respectfully urges you to carefully consider your Plan vote, and all resulting case implications. At the very least, Wilmington Trust, as Trustee, respectfully urges you to consider holding your vote pending receipt of the Examiner's report. We thank you for patiently reading and reflecting on the case view reflected in this letter.

Very truly yours,

Robert J. Stark