# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .    Chapter 11
                                .
MOTOR COACH INDUSTRIES          .    Case No. 08-12136(BLS)
INTERNATIONAL, INC., *et al.,*  .    (Jointly Administered)
                                .
                                .    December 17, 2008
                                .    11:30 a.m.
            Debtors.            .    (Wilmington)
                                .


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1              THE CLERK: All rise.

2              THE COURT: You may be seated.  Mr. Ziman, good

3    morning.

4              MR. ZIMAN: Still good morning, Your Honor.  How are

5    you?

6              THE COURT: I apologize for the delay.

7              MR. ZIMAN: Oh, not at all, not at all.  Thank you

8    for seeing us today.  For the record Ken Ziman of Simpson,

9    Thacher, & Bartlett, LLP on behalf of the Debtors, Motor

10   Coach Industries International, Inc. and it's subsidiary

11   Debtors, Your Honor.  Before I get started, I'd just like to

12   introduce some of the people from the company here today.  We

13   have Mr. Nalepka, our General Counsel.

14             MR. NALEPKA: Good morning, Your Honor.

15             THE COURT: Good morning.

16             MR. ZIMAN: And Carl Lane from Alix Partners, our

17   Chief Restructuring Officer.  Joining me at counsel table

18   today, I have my colleague Kathrine McLendon, who will be

19   dealing with the disclosure statement matters, as we get

20   into.  My partner Bryce Friedman and our colleagues from

21   Richards Layton, Mr. Madron.  Today's hearing, Your Honor,

22   was essentially both an omnibus hearing and our disclosure

23   statement hearing.  As we'll get into on the agenda, the

24   omnibus matters, the non-disclosure statement matters are

25   essentially adjourned or not contested at this point.

1          THE COURT: Okay.

2          MR. ZIMAN: As to, before we get into the disclosure

3   matters and go through the agenda, I just wanted to update

4   the Court with respect to certain matters relating to our DIP

5   financing, if I could?

6          THE COURT: Sure.

7          MR. ZIMAN: Your Honor might recall that we have two

8   DIP financings.  We have a senior DIP financing and junior

9   DIP financing.  They really have matching covenants.  That

10  was subject to much discussion at the hearing - -

11         THE COURT: I recall.

12         MR. ZIMAN:  - - on the 17th.  One of those covenants

13  is what I would recall a minimum receipts covenant relative

14  to a forecast on a budget.  Due to some timing issues with

15  one of our suppliers, we came up a little short in each of

16  the last couple of weeks on that budgeted amount, or the

17  covenant amount, I should say.  And over that time period,

18  we've been in discussions with our DIP lenders on these

19  issues, and I'm pleased to report that through some

20  negotiation, we were able to obtain amendments on those

21  matters that.  And for the most part, I would characterize as

22  non-material amendments with one exception.  Not

23  surprisingly, the lenders have insisted on some compensation

24  for the accommodations they're providing us.  We'll be

25  bringing on a motion at the end of the year.  We'll schedule

1   to have it heard on the January 21 omnibus date.

2          THE COURT: Okay.

3          MR. ZIMAN: With respect to the fee aspects of that.

4   And unless Your Honor has questions, I don't really need to

5   go, tend to go into more detail right now.

6          THE COURT: Mr. Stark, do you wish to be heard?

7          MR. STARK: Please.  Very briefly.  I apologize for

8   interceding.  Robert Stark from Brown Rudnick on behalf of

9   the Committee.  I just found out about this this morning, and

10  I'm thankful - -

11         THE COURT: Me too.

12         MR. STARK:  - - to Mr. Ziman to brining it, making

13  me as aware in real time as possible, and Your Honor as well.

14  I don't want my silence to be viewed as Committee assent.

15         THE COURT: It's not.

16         MR. STARK: Because I assure it is not going to be

17  greeted that way by my Committee.

18         THE COURT: And my agreement to schedule it doesn't

19  mean I'm signing the order.

20         MR. STARK: Understood.

21         MR. ZIMAN: If only - -

22         THE COURT: That's just fine.

23         MR. ZIMAN: If only it were so easy, Your Honor.  So

24  if we could just take a look, why don't we just walk through

25  the agenda, then, if you don't mind, Your Honor?

1             THE COURT: Sure.

2             MR. ZIMAN: Item No. 1 was a lift-stay motion filed

3    by an alleged personal injury claimant.  We filed a response.

4    That was at Docket No. 467, the original motion was at Docket

5    Nol. 391.  Upon filing a response, the parties essentially

6    entered into an agreement to adjourn the matter for 60 days.

7    We anticipate having an order to that effect in the next

8    couple of days, and we'll submit that under a certificate of

9    no objection.

10            THE COURT: Okay.

11            MR. ZIMAN: The next two matters, Items No. 2 and 3,

12   have essentially been adjourned.  Item No. 2 was what I'll

13   call the Committee's standing motion.  That was originally

14   filed at Docket No. 359.  When we were here, I guess it was

15   on the 21st of November, we set up a schedule to actually

16   litigate that matter today.  You know, we had some further

17   discovery and some discussions and I think, you know, we and

18   the Committee agreed, as well as the lenders, that it was

19   best to just put that off until a date after confirmation,

20   given that many of the matters raised therein would

21   essentially be dealt with through the confirmation process,

22   or not.  And we just, it was just a, basically a preservation

23   of resources adjournment, I think is a fair way to categorize

24   that.  Your Honor entered and order to that effect on

25   December 9th, so that matter is now put off to date to be

1    determined.  And we'll deal with that on a post-confirmation

2    basis to the extent we still need to.  Post-confirmation

3    hearing basis, to the extent we still need to.

4            MR. STARK: Just to make sure that everybody is

5    clear on this.  The adjournment of the challenge period

6    deadline to February 14th, the presumption is that the to-be-

7    determined date if confirmation does not go forward as

8    scheduled will be a date in advance of the deadline so that

9    we don't get clipped on that end.

10           THE COURT: Sure.  I understand.  Okay.

11           MR. ZIMAN: Item No. 3, Your Honor, was a motion for

12   503(b)(9) administrative claim filed by Bridgestone.

13   Bridgestone Firestone North America.  That matter has been

14   adjourned until the January 21 hearing as well.

15           THE COURT: Okay.

16           MR. ZIMAN: On consent of the parties.  So Your

17   Honor, that brings us to the, what I'll call the disclosure

18   matters, item no. 4 and 5.  Four is actually the disclosure

19   statement itself that was filed.  We've since filed an

20   amended version as of Monday.  We also, in between the filing

21   of the disclosure statement and today, we filed our motion to

22   approve the disclosure statement and related solicitation

23   procedures.  There have been just a, I'll, couple general

24   comments, then I'll turn the podium over to Ms. McLendon.  We

25   served 19 thousand parties, Your Honor.  We published in

1    three newspapers.  The *Wall Street Journal*, the *New York*

2    *Times*, and the *USA Today*, I believe was the third one.  All

3    national editions of each.  We did receive, I think as our

4    response indicated, four responses plus comments from our

5    second lien lenders.  So really five responses all together.

6    I think that was pretty good.  Five out of 19 thousand plus.

7    We received some informal comments, as I said, from the

8    second lien lenders, from the indentured trustee for the

9    notes, HSBC, and from the PBGC.  We think that those issues

10   have been dealt with.  Obviously those parties, to the extent

11   they're here, can stand up and tell us otherwise.  We think

12   those comments have been addressed.  We received two formal

13   objections, or three if you count the Committee's

14   supplemental objection.  But effectively SKF is a parts

15   supplier, and is a co-defendant in a, actually the Hurricane

16   Rita matter, which was heard, a lift-stay matter that was

17   actually adjourned.

18           THE COURT: I recall.

19           MR. ZIMAN: And they've essentially asked for some,

20   essentially some plan modifications, because they don't

21   believe the plan comports with their rights.  We think it

22   does, and we think, in any event, we've disclosed the issues

23   related to that, and it's a confirmation issue if anything.

24   I'm sure they'll have something to say, potentially.  And

25   then we have the Committee's objection, which effectively was

1    a preview of a confirmation objection.  And they're advising

2    the third lien lenders and Franklin Mutual that these

3    proceedings could get costly and protracted if they don't

4    resolve themselves otherwise.  So with that, I'll let Ms.

5    McLendon walk Your Honor through some of the changes that

6    have occurred since what was originally filed, and where we

7    stand more specifically with the parties.

8              THE COURT: Okay.  That would be great.

9              MS. McLENDON: Good afternoon, Your Honor.  Kathrine

10   McLendon from Simpson Thacher.  As Mr. Ziman mentioned, we

11   filed black lines of the plan and disclosure statement on

12   Monday.

13             THE COURT: I have reviewed them.

14             MS. McLENDON: Pardon?

15             THE COURT: I have reviewed them.

16             MS. McLENDON: Okay.  Thank you.  Is there any, did

17   Your Honor have any questions about those changes or anything

18   you'd like me to go through at this - -

19             THE COURT: No, but I think it would be appropriate

20   to walk through them.

21             MS. McLENDON: All right.

22             THE COURT: And you can avoid stylistic and

23   technical changes.

24             MS. McLENDON: All right.

25             THE COURT: Just so that the record is complete.

1           MS. McLENDON: Okay.  Thank you, Your Honor.  In

2    response to the objection, informal objection received from

3    the Pension Benefit Guarantee Corporation, we have added a

4    section that addresses specifically amendment of the

5    company's pension plans.  In that regard I would note, Your

6    Honor, we had mentioned four in the definition of pension

7    plans, I'm sorry.  Three, and there is a fourth.  So there

8    are, there is an additional proposed amendment to add the

9    name of the fourth pension plan.  And we've added disclosure

10   corresponding to that.  The PBGC has approved both the plan

11   and disclosure statement revisions.  With respect to HSBC,

12   the indentured trustee for the subordinated notes indenture,

13   we have added disclosure reflecting the indentured trustee's

14   position that the subordinated notes are not contractually

15   subordinated to the Debtors' pre-petition credit agreements,

16   and the fact that the Debtors dispute that contention, as

17   well as a further dispute regarding the treatment of the

18   indentured trustee's fees, expenses, and disbursements.  With

19   respect to SKF, which is, was one of the two formal

20   objections, as Mr. Ziman mentioned, these comments really go

21   more to the plan than to the disclosure statement.  But in

22   response to the comments, we made modifications in Article

23   3(c) that address the treatment of insured claims.  And my

24   understanding is that those comments are acceptable to SKF.

25   The modifications.  We made a couple of modifications in

1    Article 9.1 relating to the discharge of the Debtors.  And my

2    understanding that there is still some dispute with respect

3    to what we have proposed here.  We do believe that to the

4    extent that there are any further issues, these are not

5    disclosure issues, but rather issues for plan confirmation,

6    potentially as to the scope of the discharge that might apply

7    to contingent claims, if any, that SKF may have.  Turning to

8    the Committee's objection, it was in essence a preview of the

9    confirmation objections.  We did add language, three general

10   areas pertaining to requested disclosure.  One would be with

11   respect to the Committee's standing motion, and the alleged

12   insider preference claims.  The second would be more

13   disclosure with respect to the critical vendor motion.  And

14   finally we added a complete risk factor in the risk factor

15   section that essentially language proposed by the Committee

16   that summarizes the objections they intend to raise to

17   confirmation of the plan.  There were also two other

18   objections raised that we have mooted by virtue of amendments

19   to the plan.  One was with respect to the substantive

20   consolidation of the Debtors' estates.  In the amended plan

21   that was filed on Monday, we have eliminated the, sorry, the

22   substantive consolidation.  There was also a question raised

23   regarding the retention of inter-company stock interest by

24   the Debtor entities.  We also have eliminated that provision

25   of the plan.  So - -

1          THE COURT: So will that stock, the inter-company

2    stock will be cancelled?

3          MS. McLENDON: Yes.

4          THE COURT: Or affiliated stock be cancelled?

5          MS. McLENDON: Yes, Your Honor.

6          THE COURT: Okay.

7          MS. McLENDON: Yes, it will be cancelled.  So those

8    two objections, although would have been more of a

9    confirmation objection as well, we have eliminated by

10   changing the provisions of the plan.  Since Monday, we have

11   had some additional comments from the second lien lenders,

12   and there were a handful of cleanup comments.  One I

13   mentioned to add the name of the additional pension plan.

14   Second, in §9.1, there was a carry over reference to the

15   retained equity interest of the affiliates.  And then we have

16   some proposed revised tax disclosure from our tax colleagues.

17   If I may approach, Your Honor, I've got the changed pages. .

18   .(microphone not recording).

19          THE COURT: Okay.

20          MS. McLENDON: And I believe we've shared these

21   changes with everyone in the courtroom.  But if anyone needs

22   a copy, we have additional copies of those.

23          THE COURT: This tax section is like reading the

24   dictionary.

25          MS. McLENDON: Well - - yeah.  We - -

1         THE COURT: Okay.

2         MS. McLENDON: Without, without being critical of

3    our tax colleagues, I did - -

4         THE COURT: We need them.

5         MS. McLENDON: Yeah.  We need them, but I did tell

6    them that I wasn't sure how many of us in the courtroom would

7    follow these changes.  And Your Honor, I think that that is a

8    very brief summary of the changes, unless the Court has any

9    questions.

10        THE COURT: Well, let me ask you a question, and I'm

11   sure I'll hear from Mr. Stark or from the Committee.  But the

12   Committee had a number of specific language proposals that

13   were included, and I heard you touch on or reference some of

14   them by topic.  But they were included in their supplemental

15   reply. Have the parties managed to work through editions of

16   those languages, of that language?  Are there points that are

17   still in controversy from their supplement?

18        MS. McLENDON: Your Honor, I believe their

19   supplemental reply was actually filed or circulated prior to

20   the time that Mr. Stark saw the revisions.  I believe that

21   was Friday.  And then the revisions went out over the

22   weekend.  So I, he will probably need to address whether

23   there are any specific language issues.  But we had

24   previously received the language that's attached to the

25   supplemental reply, and we attempted to incorporate it.  We

1    did not, however, for example, I think they asked for a

2    statement at the beginning of the disclosure statement

3    regarding the intended objections to confirmation.  We did

4    not put it in two places.  We put it, you know, in the risk

5    factors in the back, but not in the beginning of the

6    disclosure statement.

7            THE COURT: Okay.

8            MS. McLENDON: And we did add, actually, some

9    additional disclosure regarding the releases.

10           THE COURT: All right.

11           MS. McLENDON: Which was another point that was

12   raised.

13           THE COURT: And does the Debtor have a position

14   regarding the Committee's request to include a letter with

15   the solicitation package?

16           MS. McLENDON: Well Your Honor, we think that that

17   is inappropriate.  I'm not aware of any authority that

18   permits a Committee to put a, in a solicitation package a

19   letter addressed to a constituent, group of constituents whom

20   it does not represent.  It's our understanding that FMA

21   supports approval of the disclosure statement, and believes

22   that it includes adequate information.  Mr. Stark obviously

23   does not represent the group to whom the disclosure statement

24   is addressed.  And I would also note that I think his letter

25   essentially restates the risk factors that we have included

1   in the plan.  So we would object to inclusion of that in the

2   solicitation package.

3           THE COURT: Okay.  All right.

4           MS. McLENDON: Would Your Honor prefer me to wait to

5   go through the solicitation procedures?

6           THE COURT: Why don't we wait to go through the

7   solicitation, the mechanics of it - -

8           MS. McLENDON: Right.

9           THE COURT:  - - is the subject, I think, of a

10  separate discussion.

11          MS. McLENDON: All right.

12          THE COURT: Okay.  Before I hear from the Committee,

13  let me hear from SKF or any other objector - -

14          MS. McLENDON: Thank you.

15          THE COURT:  - - with discreet issues.  Mr. Jaffe.

16          MR. JAFFE: Good afternoon, Your Honor.

17          THE COURT: Good afternoon.

18          MR. JAFFE: Henry Jaffe of Pepper Hamilton.  I'm

19  here for SKF, Your Honor.  I think Ms. McLendon accurately

20  set forth that, that we have come to an agreement as to the

21  language in Article 3(c) of the plan regarding insured

22  claims.  We have also had a back and forth with respect to

23  Article 9.1, but we're not there yet.  And that's what I'd

24  like address.  Your Honor, by way of background, you don't

25  need to spend a long time with this plan to see and

1    understand that the Debtors propose to deal a very heavy blow

2    to unsecured creditors in this case.  A zero proposed

3    distribution.  Under circumstances like this, it is

4    absolutely critical, in our view, that the plan expressly

5    preserve rights that such creditors may have to pursue other

6    forms of recovery.  And under the Code and applicable case

7    law, those rights most specifically include rights under

8    §524(e) to pursue any other party that may have, be obligated

9    with respect to any liability of the Debtor, as well as any

10   property of any other party that may be deemed responsible or

11   liable with respect to such claim.  Similarly, with respect

12   to contingent claims that may arise - - and I want to be

13   careful when I say contingent claim.  Our view is that our

14   claim has not ripened yet.  The plaintiffs are still in the

15   point where they haven't gone to trial, and our view is our

16   claim would arise, if at all, at some later point.  But that,

17   of course, raises <u>Frenville</u> concerns.  And so without any

18   determination about where our claim may fall right now.

19   Obviously that's not a determination for today.  However, to

20   the extent you have such a claim, especially under these

21   circumstances, with this type of plan, it is critical that

22   those rights be expressly set forth and confirm the plan now.

23   We have gone back and forth.  I do have, I think, some more

24   clipped language that I think would preserve those rights.  I

25   think I disagree with counsel that this is not a disclosure

1    statement issue.  And I say that because I believe that the

2    law is fairly clear that in order for a disclosure statement

3    to be approved, you've got to have a plan that's going to be

4    confirmable.  And if there are key defects, or key omissions,

5    and we believe this to be such an omission, that should be

6    cured at the disclosure statement phase of the game.  And

7    that's where we think we are.  As far as whether the plan

8    protects it, I understand they've added some language that

9    provides that there will be a whole set of claims.  You know,

10   the long type of release language that you normally see, and

11   that the claims would be preserved to the extent otherwise

12   permitted by law.  Quite frankly, under the - - two issues.

13   Quite frankly, under the circumstances, given how unsecureds

14   are going to collect nothing, or very little most likely, I

15   don't think that's enough, number one.  Number two, there's

16   another specific concern which is, you know, what does it

17   mean to the fullest extent permitted by law?  And I say that,

18   because there's a specific problem that can arise.  As Your

19   Honor may be aware, there's certain case law out there that

20   says, you know, if you, if a plan gets confirmed, and it

21   turns out later that maybe certain parts of the plan exceeded

22   the bounds that are normally provided by the Code or

23   applicable law, that's binding on parties.  So I think under

24   those circumstances, you really need to carve out those

25   rights and preserve them.  And we would ask that the Court do

1    that.  Again, I understand if Your Honor views this to be

2    just a disclosure statement issue, we'll be back here at plan

3    confirmation saying the same thing.  If Your Honor is

4    inclined to grant, sustain our objection, I would have,

5    again, more clipped language than what was proposed in my

6    objection.

7              THE COURT: Okay.  Thank you

8              MR. JAFFE: Thank you, Your Honor.

9              THE COURT: All right.  Before I hear from the

10   Committee, does anyone else wish to be heard?  Okay.  Mr.

11   Stark?

12             MR. STARK: May I. . .(microphone not recording)?

13             THE COURT: Sure.

14             MR. STARK: That usually is a, bodes well, I guess.

15   Bodes poorly if I'm bringing water up.  Means I may be here

16   for a little while.  Robert Stark from Brown Rudnick on

17   behalf of the Committee.  I did, in fact, file the

18   supplemental on Friday, because I knew that Your Honor's

19   rules about 24 to 48 hours before a hearing if you wanted to

20   see it, and we did not have, in fact, time to talk with the

21   Debtors.

22             THE COURT: No, I, I'm - -

23             MR. STARK: So it wasn't - -

24             THE COURT: I under - -

25             MR. STARK:  - - intended to sort of preclude

1    discussions, and I don't that's what the Debtors' position

2    was.  We just wanted to get it on the record.

3            THE COURT: I don't think it does.  And I find it, I

4    understand how this process works.  I understand that, you

5    know, parties will actually come with a black line at this

6    hearing, and the language is changing during and after this

7    hearing.

8            MR. STARK: Right.

9            THE COURT: And that's, and that's fine.  So I

10   don't, I don't ascribe any significance to, that, my main

11   question to counsel was really I saw the black line and your

12   supplement as kind of ships passing in the night.  Some of it

13   addressed it, but obviously you proposed specific language,

14   and my expectation would be that you've had an opportunity in

15   the last few days to work through and raise any particular

16   language questions.

17           MR. STARK: We haven't negotiated, per say.

18           THE COURT: Okay.

19           MR. STARK: I wish we had the opportunity.  But time

20   was what it was.

21           THE COURT: Sure.

22           MR. STARK: The concepts were delivered, and they

23   were filed soon thereafter.

24           THE COURT: Okay.

25           MR. STARK: And I've seen the reply.  And so I think

1    we are, to a degree, still ships in the night, and we'll talk

2    about that.

3            THE COURT: Okay.

4            MR. STARK: But it wasn't for intending anything

5    untoward by filing it at the same time.

6            THE COURT: Sure.

7            MR. STARK: Just by way of introduction before my

8    presentation, I do want to acknowledge something that Mr.

9    Ziman alluded to, and Your Honor alluded to before.  Which is

10   from a certain vantage point, this is sort of absurd.  Why am

11   I standing up objecting to a disclosure statement, when the

12   only party voting is a secured lender, a third lien.  FMA is

13   locked up to the deal with 90% of the debt.  We may be

14   soliciting or stuffing envelopes for four people.  Okay?

15   It's a numerosity issue at best.  And in fact, for quite a

16   while, I said, you know what?  I'm not going to press the DOA

17   argument today.  We'll deal with all that at confirmation.

18   And there really isn't, this day can come and go without a

19   significant appearance by the Committee.  But I read their

20   motion, and I stopped and I thought about 1125 and the

21   standard.  What would a reasonable investor, what would a

22   reasonable non-FMA, Class IV creditor want to know that I

23   know today, because I've been involved in the process?  Mr.

24   Sherman has been involved in the process.  FMA has been

25   involved in the process.  They have not necessarily.  And

1    what would they want to know?  And is there anything that I

2    know that ought to be in the disclosure statement?  And to

3    me, there was an answer to that, which is yes.  Which

4    prompted me, in fact, to go ahead and file the objection and

5    to rise today.  And what is it that I'd want to know?  We are

6    about to embark, I think, in a pretty difficult period now in

7    this case.  I think Your Honor knows that.  I think the next

8    six weeks are going to be very laborious.  I think we're

9    going to see the incurrence of an extraordinary amount of

10   administrative expense.  Perhaps resulting business

11   dislocation as management gets enveloped in the litigation

12   process.  And a trial that I think is not going to be one

13   day.  It's going to be many days, perhaps weeks.  And we'll

14   talk about that in a minute.

15           THE COURT: Don't threaten me.

16           MR. STARK: Oh, no, no.  Your Honor, it will be an

17   enjoyable experience, I promise you.  I will be entertaining.

18           THE COURT: It will be a new year.

19           MR. STARK: But I certainly don't share the view

20   that confirmation is a surety.  Frankly, and I'm trying to be

21   objective, I really don't think that at all.  And what I

22   would want to appreciate, if I was a Class IV creditor who

23   wasn't enveloped in this process, I'd want to appreciate the

24   risk reward profile.  Because in fact, a vote in favor of the

25   plan is assent to moving forward on a very expensive,

1    difficult undertaking that is not, at least as I read the

2    disclosure statement, the steam roll ship out of bankruptcy

3    the way it's sort of, at least the tone, if not the verbiage,

4    is there.  The reward is certainly in the disclosure

5    statement.  It said again, and again, and again that you're

6    getting the company.  But the risk isn't.  The risk isn't.

7    And that's the point that I sat back and I said, as a

8    reasonably sophisticated guy about this kind of stuff, if I

9    was somebody who's holding this debt, I'd like to know it.

10   Okay.  So the Debtors did ask us, before we went and filed

11   our supplemental statement, to give us language, which we

12   did, and then we went ahead and filed it, to try to sort of

13   outline, with some degree of specificity, what, in our view,

14   would be the factors that this hypothetical Class IV creditor

15   would want to know in terms of risk reward profiling.  And I

16   think we need to spend a couple of minutes on it, Your Honor.

17   Not to belabor the record, and not to, as was suggested, pre-

18   try confirmation issues.  But for a couple of other reasons.

19   Disclosure is key, so you need to understand what the issues

20   are.  Also, we're going to be talking about scheduling in a

21   minute.  And so I think you need to have this background.

22   And perhaps most important of all, or perhaps less important,

23   but to me it's more important, as early as a couple of hours

24   ago, there were people sitting across the aisle from me that

25   were suggesting that they didn't really have a fair

1    appreciation of where we're thinking right now.  About this

2    case and where it's going.  I think I've been eminently

3    clear.  I think I've outlined it.  But if I haven't, if I've

4    erred, let me obviate it today for everyone's benefit.  Not

5    only the Court's.  There are five primary issues at

6    confirmation.  The first one is valuation.  If I were a

7    reasonably sophisticated Class IV creditor, I'd want to know

8    if the Debtors' valuation seems sustainable.  Or is it, as

9    Stark has said in hearings past, and in pleadings past, it

10    was a papering over a deal that was cut before the valuation

11    was done?  So for example, for example, let's be

12    hypothetical.  If the Debtors' financial advisor came forward

13    with a DCF analysis that shows unsecured creditors wildly in

14    the money, I'd want to know that.  And if, hypothetically

15    speaking at the same time, they're using comparable analytics

16    to weigh that down, to get just below us being in the money,

17    I'd want to know that.  If for nothing else, all I have to do

18    is look at my own IRA account to know that we are not in an

19    efficient marketplace scenario.  And comparable analytics are

20    predicated on an efficient marketplace hypothesis.  So if

21    those analytics are not particularly useful right now, the

22    DCF is much more, much more useful, and so you need to

23    understand these valuation theories.  And I'd want to know

24    that.  I'd want to know before we move into that particular,

25    that particular battle.  And that's even before we start

1    talking about whether or not an RV company, or if a

2    manufactured housing company is comparable to a bus company.

3    But we'll deal with that another day.  But I will tell you

4    from a lot of experience doing valuation work, Your Honor,

5    discovery will be intensive, it will be expensive, and this

6    part of the trial will last probably days.  In fact, I think

7    you ought to pause and think about it.  This will be the

8    first case, and you will be the first judge, I think,

9    conducting a sophisticated valuation trial in what may soon

10   be declared the second depression in a hundred years.  A lot

11   of people will be watching what goes on here.  You're going

12   to need a lot of facts and a lot of evidence, and really

13   understand valuation theory, so we're going to be spending a

14   fair amount of time on that.  It certainly is not, in my

15   opinion, a surety that they're going to win this.  Second

16   issue, insider preference.  $200 million, give or take, of

17   cross border transfers, $200 million in cross border

18   transfers.  In the year preceding bankruptcy paying down

19   longstanding debt that the US Debtors owed Canadian

20   affiliates.  Perhaps hundreds of relevant transactions, I

21   think the number of actual cash transfers is below that, 70

22   or 80, but there is buses going back up north.  There's

23   administrative services that are being done by the US for the

24   benefit of Canada.  It's a complicated deal.  But the effect,

25   if successful, is that every, every transfer that is avoided

1    is unencumbered value, one segment of the TEV that is

2    unencumbered value for unsecured creditors.  That's the net

3    effect of the litigation.  It unencumbers the collateral.  So

4    if only one such transfer is an avoidable preference, the

5    plan fails.  Discovery is going to touch upon the extent and

6    the nature of these transfers, the internal accounting

7    systems at play here.  Solvency.  I think this is important.

8    We don't have just two solvency reports, two solvency time

9    periods with different kinds of reports, we have the here and

10   the now, and we have within the year proceeding.  And all

11   potential defenses.  And I'll remind everybody they're

12   affirmative defenses.  In my view on life, and we have some

13   disagreement in the papers, as the Debtors reply to my

14   disclosure statement objection, I think it's their burden.

15   Because of 1129 I think they carry all burdens, including

16   value allocation issues for purposes of best interest and

17   cram down.  So this lawsuit, I think, it's their burden to

18   prove that there's no such thing.  We'll see what their

19   evidence shows.

20            THE COURT: Okay.

21            MR. STARK: From experience I feel comfortable

22   predicting, on this issue, discovery will be intense and

23   expensive, and this part of the trial alone will last many

24   days.  Third point, unfair discrimination.  And this breaks

25   down to two parts.  One is fairly controversial, one is

1    factual.  The controversial part.  A very difficult legal

2    question raised.  Do you and the other Courts in this circuit

3    really have authority, under the doctrine of necessity, to

4    pay pre-petition, unsecured claims?  We do this at the trial

5    court level on a consensual basis all the time.  But there's

6    no appellate decisions on it.  And stated in the reverse, did

7    that very smart Judge Easterbrook in KMart get it dead wrong?

8    We don't have a consensual situation here.  We reserve - -

9           THE COURT: Judge Easterbrook in KMart, and I

10   haven't gone back and looked at it, but he actually didn't

11   say it couldn't be done, what he said was that the standard

12   was something that was perhaps very substantial.

13          MR. STARK: Accurate.  And I think we need to sort

14   of - -

15          THE COURT: And whether, and obviously the 7th

16   Circuit opinion isn't binding on this Court.

17          MR. STARK: Absolutely correct, Your Honor.  We have

18   a lot to parse through in Judge Easterbrook's decision.  Both

19   factually and legally.  Whether or not it can be done as a

20   flat out rule, or whether it can be on a very certain, very

21   strange and particularized circumstances that we may or may

22   not have here, a lot of evidentiary burden.  But let's go the

23   next step.  Let's presume, for the sake of discussion, that

24   in fact, you do have flat out authority to go ahead and allow

25   these payments that have already been made.  Okay?  Then you

1    have to go to the next level of analysis, which is what

2    happens when you make those payments?  What becomes of them?

3    Does the magic stick of bankruptcy touch them and convert

4    them from a pre-petition unsecured claim to an admin claim,

5    so the plan is irrelevant?  Or do they stay, as I think they

6    are, just advances on plan distributions?  That again, people

7    consented to over the course of a case.  Very difficult

8    question.  We go from there, what decision making did the

9    Debtor undertake?  What analyses did the Debtor undertake in

10   choosing who would be critical and who would not?  As I

11   understand it, it's something like 275 creditors, in number,

12   not dollar amounts, 80, 90% in percentage of the aggregate

13   trade pool, got paid off - -

14             THE COURT: You know - -

15             MR. STARK:  - - in part or in whole.

16             THE COURT:  - - let's, I want to take a step aside

17   - -

18             MR. STARK: Sure.

19             THE COURT:  - - for a moment.  And you're on your

20   third point and I want you to be able to get back.  I don't

21   want to - -

22             MR. STARK: I will.

23             THE COURT:  - - get you out of those.  But, and

24   this is, as a practical matter, this is an aside.  But I find

25   this, it's a very interesting discussion.  This issue of

1    critical trade vendors.  But also, your point is this

2    disparate treatment argument.

3              MR. STARK: Um-hum.

4              THE COURT: Unfair discrimination.  And I think I'd

5    hear from the Debtor, or from other parties involved, they'd

6    stand up and say, You know, no good deed goes unpunished.  We

7    have, we, the Debtor is going to say that they've made their

8    case.

9              MR. STARK: Um-hum.

10             THE COURT: And we can debate what that case is,

11   what that standard is.  But leaving that aside, that the

12   overwhelming majority of people who would have been your

13   constituents are satisfied.  Have been paid.

14             MR. STARK: Um-hum.

15             THE COURT: And it's, it's not intuitive that that's

16   actually a bad result.

17             MR. STARK: Um-hum.

18             THE COURT: But I agree with you that I don't think

19   that there's enough attention paid to this disconnect.  And

20   the reason that I raise it is that I've just been recently

21   involved in a handful of mediations in other, for some of my

22   colleagues, where there were similar circumstances.  And one

23   of the issues that was, that was brought to the fore, really

24   by both sides, from completely opposite perspectives, was

25   cases where there had been sales, and the overwhelming

1    majority of unsecured creditors were picked up by assumption

2    contracts being assumed.

3         MR. STARK: Um-hum.

4         THE COURT: And so the question was whether that was

5    disparate treatment or whether that was the Debtor doing

6    everything they could to actually maximize the benefit for

7    the largest number of creditors.  And I find it, I don't know

8    the answer.  You know?  But I think it's a, it is an

9    interesting philosophical discussion that brings into play

10   then the practicalities of a bankruptcy case, and what, you

11   know, what principle drives it.  Is it the greatest good for

12   the greatest number?  Is it absolute equitable treatment

13   among similarly situated creditors?  So on that point, I

14   guess I would say to you that, you know, you've raised all

15   these issues as being complex and substantial.  I find that

16   to be complex and substantial.

17        MR. STARK: I agree.  And in fact, I'm smiling as

18   you're saying all of that.  I'm going to leave the mediation

19   issue aside, and just talk about the here and the now, if

20   Your Honor will.  But I, we did a whole lot of soul searching

21   with the Committee.  We're in the, we're in the business of

22   making sure unsecured creditors get paid.  And so when the

23   Debtor came forward and said we'd like to pay them, we said,

24   All that's great.  We'd like to see you pay everybody in

25   full.  But I'll tell you today, Debtors, and we filed it and

1    we stood up in Court, that this has implications with respect

2    to the plan.  And what you must then do with respect to

3    everybody else.  And I'm not consenting, as I would if this

4    case was a free fall bankruptcy where we would be in there

5    for a year or two trying to figure out what's the benefit for

6    the greater good.  This case filed with a, a predetermined

7    plan to prefer some and harm the others.  It was 100 to zero

8    proposition.  If you're subjectively preferred, you got 100,

9    or something that they would negotiate with you, and if you

10   weren't, you got zero.  So the personal injury guys got

11   nothing, the bondholders got nothing, because they're just

12   funded debt, but the guy who supplied steel gets paid.  And

13   that, to me, is a very different case than lots of cases

14   where it's a free fall, and we have to figure these things

15   out as we go through that.  They knew, going in, exactly what

16   they were doing.  And it's Machiavellian.  And this develops

17   into a whole series of discovery and trial issues.  Who was

18   critical?  Why?  In fact, would the steel producer stop

19   shipping to you if you didn't pay their claim?  Would they,

20   in fact, go out of business, and could you not find somebody

21   else?  I mean, these are all issues that are enveloped in the

22   case law on unfair discrimination.  And we'll bring it out.

23   But a lot of discovery, a lot of time in trial.  I don't know

24   if I accurately - -

25            THE COURT: You did.

1          MR. STARK: - - addressed your - - but I agree with

2     you.  It's philosophically very interesting.

3          THE COURT: Yeah.

4          MR. STARK: There are a variety of other issues that

5     we alluded to in the papers.  Sub Con, I guess, has been

6     eliminated.  And they have done an interesting slight of hand

7     with respect to the inter-company stock ownership by saying

8     we're hereby not distributing stock inter-company-wise.  But

9     the interesting thing about it, Your Honor, is

10    notwithstanding the removal of that class treatment, per say,

11    the company still comes out of bankruptcy looking the same

12    way it did going in.  So you can remove some language, but

13    the effect is the same.  And I still think that's a really

14    fundamental <u>Armstrong</u> issue.  Because as I recall reading

15    <u>Armstrong</u>, and I think the 3rd Circuit was fairly emphatic

16    about this, you can't give stock on account of equity

17    interests.  You can't give a distribution on account of

18    equity interests when unsecured creditors aren't paid in

19    full.  And you can't hide behind the gifting milieu.  So the

20    fact that they took out some language and said, Oh, we're not

21    giving it a distribution, but it's a means for implementation

22    instead, is interesting.  I don't think it works for them.

23    But we'll deal with it in the days ahead.  And that issue,

24    amongst the releases, and all the other kind of stuff, will

25    be the subject of an extensive briefing, and extensive

1    evidentiary record, after an awful lot of discovery.  So all

2    in all, I think, let's get back to disclosure.  All in all, I

3    think I've now laid it all out for everybody, to those, to

4    the extent that people didn't otherwise know where my mind

5    was coming from.  All in all, on disclosure, I think there's

6    a risk reward profile that needs to accurately be reflected

7    to the people who are not invested the way that we all are in

8    the day to days of this case, so that they know for

9    themselves whether or not they want to subscribe to this

10   program.  Because again, it's going to be expensive, and it

11   is not a surety, at least from my - - I'm trying to be

12   objective, but from my vantage point, I certainly don't see

13   it as a surety.  So they're going to incur all this debt, and

14   they may lose.  And they ought to know that, and they ought

15   to be able to have a chance to think for themselves as to

16   whether or not they want to subscribe to the system and the

17   program.  The Debtors asked us to provide language, and I'd

18   like to go through it, Your Honor, because I think you'd

19   probably like me to move on and actually talk disclosure

20   particulars.  Our tombstone list of issues that we asked in

21   our supplemental.

22            THE COURT: I have it.

23            MR. STARK: To be put on page 4.  They did it.  They

24   did add it.  And I'm thankful for that.  All the way at the

25   end of the disclosure statement.  After 50 pages where they

1    have, you know, here and there interspersed some language

2    saying we think that there are, Stark's argument is

3    ridiculous, they stick it at the end.  It sort of reads to me

4    like a Bernie Madoff (phonetic) prospectus.  But we'll leave

5    that issue aside for the moment.  It strikes us, that if we

6    are going to be talking about and disclosing it appropriately

7    to people that what you are voting in favor of is an

8    expensive protracted fight, that may not enure to your

9    benefit, don't stick it on page 50.  Stick it on page 4.  And

10   let people understand it.  Or, alternatively, let me have my

11   letter.  And authority?  I can't give you cases, but I've

12   certainly done it in other cases.  Where I've been allowed to

13   put in a letter.  And I note that the Debtors have asked to

14   include in their solicitation package, in addition to the

15   disclosure statement, a letter of their own.  Saying, We urge

16   you do to it.  We think it's great.  That's an advocacy

17   piece.  I'm not saying that they should have the entitlement

18   to do that, but then an alternative view ought to be included

19   in it as well.

20          THE COURT: Okay.

21          MR. STARK: And if they choose to reject it - - I

22   think the one thing that we tried to do, Your Honor, in

23   articulating all of our different points, is to be very, we

24   tried not to be overly, overly litigious and take an

25   advocacy's tone.  We said, We believe the following.  And we

1    intend to have discovery and proof on it.  And Your Honor

2    will decide.  And we fully expect they're going to follow

3    that with a line saying, We think they're wrong.  But let

4    them do the analytics themselves.  Let them think about it.

5    Okay, we didn't put in purple prose or invective.  I'm going

6    to work off of, I guess I'll work side by side between this

7    Exhibit A to the reply.

8              THE COURT:  Actually I'm looking at your - -

9              MR. STARK:  Okay.

10             THE COURT:  Hang on.  Let me look at the reply as

11   well.  That probably would be helpful.  Okay.

12             MR. STARK:  Again, we talked about, looking again,

13   I'm going to look at the attachment to mine first.

14             THE COURT:  Okay.

15             MR. STARK:  And I'll use that as the base.  Page 4,

16   insert in your section (i)(b) about our response.  They did

17   include it at the end.  We would ask that it be put forward.

18   And/or give us the letter.  On page 6 we asked for additional

19   disclosure regarding the legal and factual bases for inter-

20   company claims, and interest being left unimpaired under the

21   plan.  I think it's, you know, self evident that we've got

22   lots of issues about inter-company claims, and also, at the

23   end of the day, about how the stock interests get, you know,

24   included in there as well.  I'm not saying they have to put

25   in case law, or advocate one way or the other as to whose

 1   position is right, but they ought to be able to sort of read

 2   it and say, I'd better call up my lawyer and figure out who's

 3   going to win this battle.  Critical vendors, let me see what

 4   they did here.  They did add some language, but they also

 5   added, at the end of it, a whole lot more of verbiage saying

 6   that the argument is ridiculous.  And again, that's me again,

 7   forgive the pop culture reference, but it sounds to me like a

 8   Bernie Madoff prospectus.  You know, just put it in

 9   objectively.  We say this, you disagree, move on.  Doctrine

10   of necessity, I believe they incorporated our paragraph.

11   Jeremy did they include that?  They did.  So that's a non-

12   issue.  Forgive me, Your Honor.  Substantive consolidation

13   has been obviated, because they removed it.  But again, I

14   think we have an <u>Armstrong</u> issue, and I somewhere think that

15   that ought to be included in there.  They did include the

16   insider preference stuff.  But again, it sort of feels a

17   little different to me.  But - -

18              THE COURT: Is this on, you're talking about the

19   language where you're looking for something on page 28-29 on

20   page 3 of your - -

21              MR. STARK: Yes.

22              THE COURT:  - - supplement?

23              MR. STARK: Did we, did they include this?

24              THE COURT: I got it.

25              MR. STARK: Forgive me, Your Honor.

1          THE COURT: Sure.

2          MR. STARK: Forgive me.  If I may, you know, reset

3     on that one.  Okay, they've obviated that issue, Your Honor.

4     Apologies.  Stuff's moving relatively quickly.  The, page 34,

5     the issue on the releases.  All they added was the disclosure

6     that the releases are to the extent otherwise consistent with

7     applicable law.  That to me is not really a disclosure,

8     that's simply saying that that's what we've done in the plan.

9     I think probably the applicable authority would suggest that

10    if you're going to get a third party release, you have had to

11    give something to the estate for that, and I'd like to know

12    what it is that they've given.  I think a reasonably prudent

13    Class IV creditor would want to know that.  But because

14    ultimately, if they haven't given anything, and they can't

15    otherwise disclose it, then maybe that issue fails.

16    Valuation on page 44.  This, I think, I feel really strongly

17    about this, Your Honor.  Because I do think that the way this

18    case was postured to you on day one, we have everything lined

19    up, it's going to be a *fait accompli*, let's get it all done.

20    Valuation is, I've got Rothschild, the valuation is a piece

21    of cake.  When you, you will learn soon enough, I think

22    you've already gotten a taste of it, that that's, there are

23    bases for significant disagreement on that issue.  And again,

24    I tend to think that people who own third lien debt are

25    reasonably sophisticated people on things like valuation.

1    Okay?  And they ought to know the DCF versus the comps, and

2    what the comps were, and what weighted average costs of

3    capital were used.  I'm not suggesting that they have to put

4    their expert report in here, but certainly a heck of a lot

5    more than, We think the plug number is $450 million of TEV,

6    and we'll see Stark in court.  They've added 48, so I don't

7    think that's an open issue anymore.  And I don't think we,

8    referring back to their schedule of open issues, because I

9    think we've exhausted mine, the last one that's referenced to

10   me, with good reason because it was in my objection, turned

11   on scheduling.  And I gather we'll be talking about that in a

12   moment.  But Mr. Friedman and I will probably address it.  I,

13   my understanding is my litigation partner, Mr. Siegel, has

14   been talking at length to Mr. Friedman, and my hope it, and I

15   have reason for optimism, that we will have a schedule worked

16   out, consensually.  We may need a scheduling order.  It

17   doesn't need to be in this order.  But I will note one thing,

18   which is while six weeks is generally, is generous in terms

19   of what I'm normally used to in terms of confirmation prep,

20   this is a very extraordinary case.  And so the hold date of

21   the 26th, I would view as a hold date for, if no other reason,

22   motions *in limine*, there's very little time for Your Honor to

23   decide them according to the schedule, and I do believe they

24   will be extraordinary in this case.  You will have some

25   significant motions *in limine*.  So on Daubert and other

1    grounds.  So, so we may need to sort of push that off, but at

2    least for the present purpose I'm not objecting to a 26th

3    date, just as long as the record is clear that I believe it's

4    a hold date.

5            THE COURT: I understand.

6            MR. STARK: Does Your Honor have any questions for

7    me?

8            THE COURT: No, I don't have any questions.

9            MR. STARK: Okay.

10            THE COURT: I'd like to hear from the Debtor.  I've

11    got a couple questions about the specific disclosure points

12    that the Committee has raised.  I've heard your response

13    regarding the letter.

14            MR. ZIMAN: Your Honor, may I interrupt for one

15    moment?

16            THE COURT: Sure.

17            MR. ZIMAN: I apologize.  In terms of the tag team

18    here, I apologize for the tag team in advance.  To the extent

19    you want, to hear on the SKF issue, Ms. McLendon would

20    address it, and then I would just address Mr. Stark's

21    comments.  So - -

22            THE COURT: Well, since you're up here, we'll come

23    back to SKF.

24            MR. ZIMAN: Okay.  There you go.

25            THE COURT: But on the, on Mr. Stark's point, it

1    seemed to me that - -

2              MR. ZIMAN: Could I just for the record, Your Honor?

3              THE COURT: Yeah.

4              MR. ZIMAN: If I could just, just make it clear.

5              THE COURT: Sure.

6              MR. ZIMAN: We disagree.  Okay, now we can move on.

7              THE COURT: I get it.

8              MR. ZIMAN: Yeah.  Thank you, Your Honor.  On the

9    merits, completely disagree with pretty much everything he

10   just said.  Now you can move on, Your Honor.  I apologize.  I

11   just had to say it, though.

12             THE COURT: Very helpful.

13             MR. ZIMAN: Thank you.

14             THE COURT: Okay.  All right.  It seems to me, and I

15   have not gone back and parsed through the black line, but if

16   I will we, if I have to, we will.  The threshold issue that's

17   raised or concern raised by the Committee is the adequacy or

18   accuracy of the Debtor proposed valuation.

19             MR. ZIMAN: Yes.

20             THE COURT: And so the Committee has asked for a

21   supplement in the disclosure regarding valuation

22   methodologies, and I think in your schedule - -

23             MR. ZIMAN: It's Exhibit D, I believe, Your Honor,

24   is the valuation analysis.

25             THE COURT: Yeah.  Where are we?  Is this going to

1   be in the black line of my disclosure statement?

2            MR. ZIMAN: Your Honor, and I - -

3            MS. McLENDON: Your Honor, excuse me.  I don't think

4   it is.  You, are you looking for the exhibit itself?  Or the

5   - -

6            THE COURT: Well, I'm looking for the - -

7            MR. ZIMAN: It was - -

8            THE COURT: If we're - -

9            MR. ZIMAN: It was the document that was filed.  And

10  I think I believe I left - -

11           THE COURT: All right.  If we're debating about the

12  content of the valuation analysis and its sufficiency under

13  §1125 - -

14           MS. McLENDON: Right.

15           THE COURT:  - - I think I need to see it.

16           MR. ZIMAN: I can hand you mine, Your Honor.

17           THE COURT: That would be great.

18           MR. ZIMAN: If you, can I approach?

19           THE COURT: Please.

20           MR. ZIMAN: (Microphone not recording.)

21           THE COURT: Okay.  Thanks.  Okay.  I understand.

22  Has the Debtor made additional disclosures regarding the

23  basis for the releases?

24           MR. ZIMAN: I'm sorry.  The basis for the valuation?

25           THE COURT: For, I'm sorry.  For the releases.  I've

1    moved past the valuation.

2            MR. ZIMAN: Okay.

3            THE COURT: I'll deal with that in the ruling.

4            MR. ZIMAN: No, Your Honor.  I don't believe we did.

5            THE COURT: Okay.

6            MR. ZIMAN: I mean, a little bit of the frustrating

7    part, Your Honor, is where the Committee provided us

8    language, I think it's pretty clear that we sort of took

9    their language and we put our contrary position in.  Where

10   they jut basically said, Do more work, we kind of said, No.

11   I mean, to be candid.

12           THE COURT: All right.

13           MR. ZIMAN: Your Honor, right, my colleague reminds

14   me that we did point out that the third party releases, to

15   the extent they are releases not by the Debtors, are

16   consensual releases only, Your Honor.

17           THE COURT: Okay.  All right.  Okay.  I'd like to

18   hear on the Debtors' response to the SKF objection.  Ms.

19   McLendon?

20           MR. ZIMAN: Just one more item, if I may, Your

21   Honor?

22           THE COURT: Yeah.  Sure.

23           MR. ZIMAN: Before I sit down.  Just to put this in

24   context.  There are no hypothetical third lien creditors.  We

25   have two third lien creditors.  They have multiple funds, but

1    essentially there are two managing entities here.  We have

2    Franklin Mutual Advisors, that's been a party to the case

3    from the get go, and we have Monarch Alternative Capital

4    Management, or Monarch Alternative Capital LP, which is

5    actually been a third lien lender from the inception in May

6    2004.  It's been a second lien lender from the inception,

7    since 2004.  It actually is the largest second lien lender.

8    Holds a 10% interest in the third lien debt, and is, you

9    know, a participant in the second lien and the junior DIP.

10    So there are no "hypothetical" creditors we're soliciting

11    here.

12             THE COURT: I understand.

13             MR. ZIMAN: We're soliciting actual, sophisticated

14    creditors.  And to the extent that they had specific

15    questions about the disclosure and wanted to raise issues, I

16    think they were more than capable given their participation

17    here.  I'll let Ms. McLendon address the SKF matters, Your

18    Honor.

19             MR. STARK: While I appreciate Mr. Ziman's

20    representation in that regard, unless he's prepared to state

21    today whether or not those entities in fact assigned them to

22    others, in a certain sense that's not otherwise reflected on

23    the docket or on a bank register, I'm not entirely sure that

24    he's positioned to actually know for, from that perspective.

25             THE COURT: I actually don't need a response on

1    that, because I don't think that that - - I understand the

2    Debtors' position in that regard.  But as a practical matter,

3    I don't think that's dispositive of the disclosure statement.

4    SKF?

5            MS. McLENDON: Your Honor, Mr. Jaffe seems to be

6    arguing from inconsistent positions with respect to rights of

7    creditors against third parties and what is preserved under

8    524(e).  At the same time saying that he doesn't think his

9    client has a claim today.  But in any event, the discharge

10   language that we have does not purport to limit rights that

11   his client, or other parties, might have against third

12   parties.  524(e) says what it says, and I don't think we need

13   to add language here to specifically recite what the

14   Bankruptcy Code says.  Moreover, to the extent that there's

15   an issue in the future regarding a claim that may exist now,

16   or it may exist later, that I think is an issue for the

17   future in terms of what the scope of the discharge is.  And

18   it's not appropriate for, or warranted, for the Debtors to

19   address what is, you know, potentially an unknown, but it's

20   potentially a known.  And the legal effect of what the

21   Frenville decision and subsequent decisions in this Circuit

22   provide in terms of what the treatment of an indemnification

23   and contribution claim might be.  I think what he was trying

24   to get to was some sort of pre-judgment of that issue in the

25   text of the discharge section.  And you know, as he said,

1    we've been back and forth on it, and we tried to put in some

2    language that does refer back to the agreed treatment on

3    insured claims.  Otherwise, we think that this is appropriate

4    language in terms of the discharge being the fullest extent

5    that it can be, by applicable law, and then if there is an

6    issue in terms of a treatment of a claim in the future, that

7    would be for the future.  And finally, circling back to a

8    point we discussed originally, I don't, I don't think that

9    this goes to the adequate information of the disclosure

10   statement for purposes of today.  Thank you.

11          THE COURT: I understand.  All right.  Does anyone

12   else wish to be heard regarding the disclosure statement?

13          MR. SHERMAN: Your Honor?

14          THE COURT: Yes sir.

15          MR. SHERMAN: (Microphone not recording.)

16          THE COURT: Sure.

17          MR. SHERMAN: (Microphone not recording). . .an

18   actual Class IV creditor?

19          THE COURT: Okay.

20          MR. SHERMAN: Because we, Mr. Stark has apparently

21   trying to assert our rights, which, and let me concur, and

22   I'm happy to elaborate with Mr. Ziman, we reject every, each

23   and every statement by Mr. Stark.  And to the extent he talks

24   to what the fourth lien creditors want, I am - - or the third

25   lien creditors, Class IV want, I am here today to tell you,

1   Your Honor, that what is in the disclosure statement is

2   sufficient to my client as a Class IV creditor.  I will make

3   it explicit.  So if, to the extent that Your Honor is

4   thinking about what the Class IV creditors want or don't

5   want, I'll make it explicit.  What's in this document is

6   acceptable.

7           THE COURT: I understand.  Okay.  Here's what we're

8   going to do.  Let me make an initial observation that this is

9   an anomalous situation.  I mean, I have a Committee that I

10  understand is opposed to confirmation of the plan, but as a

11  practical matter, your constituents aren't being given an

12  opportunity to vote on the plan.  So you've been accused of

13  arrogating to yourself the, the rights or interests of

14  parties that are actually going to vote on the plan, and I

15  hear from counsel that those folks are in favor of the plan.

16  I don't necessarily, the record that's before me, I accept

17  your representations, but the record before me still doesn't

18  relieve me of the obligation to make my determination under

19  §1125 and to allow the process to play out.  And I don't

20  think that there's anything under the Code that, that carves

21  the Committee out of this process for purposes of

22  articulating a position.  And I have to confess, I've never

23  seen a situation where a Committee was seeking to send a

24  letter to folks who are not their constituents.  But I'm

25  going to permit it.  And the reason is that I understand the

1    concerns that the Committee is raising and this may be a

2    circular exercise if indeed counsel's representations are

3    correct, then the effected creditors are fully aware of the

4    Committee's position and where they're going to go.  But

5    nevertheless, I think that the Code permits it, authorizes

6    it, and under the circumstances, I'm going to allow it.  That

7    also allows or avoids the dispute about exactly where the

8    Committee's opposition to the plan gets built into the plan.

9    I think it's certainly appropriate in a risk factor section,

10   but as a practical matter I don't have an issue with

11   inclusion of the letter substantially in the form that was

12   attached to the Debtor's proposal.  But again, I find it,

13   it's kind of anomalous.  I don't see a circumstance where

14   it's likely to change any result in the voting, but, but I

15   will, again, accept at face value the Committee's concerns

16   regarding the sufficiency of disclosure.  And as a practical

17   matter, the most significant thing going on in this case is

18   the Committee's opposition to the plan, and the Debtors' goal

19   to seek confirmation of the plan.  So in that regard, I think

20   the, the letter actually does serve a purpose by

21   communicating to anybody who looks at this case that this is

22   where this case is headed, and this is where the rubber meets

23   the road.  No pun intended.  With respect to the specific

24   objections, I'm going to roll through them fairly quickly,

25   but I will largely overrule the Committee's objections and

1    the Committee's request for additional disclosure.  First,

2    the request for additional disclosure regarding the

3    methodology and assumptions used in the valuation process.

4    In another case, I would probably require a more fulsome or a

5    more substantial disclosure.  I don't believe that there's a

6    need to do that here.  Again, because of at least a measure

7    of confidence that the affected creditors, and those

8    creditors to whom this disclosure is directed are

9    sufficiently sophisticated, and otherwise are on board with

10   the process.  In addition, I have no doubt that there will be

11   a full blown investigation and review into the valuation and

12   the content of the disclosure statement is really only the

13   very earliest starting point of that analysis.  So if you're

14   going to fight over disclosure, you're going to have an

15   expert report.  The language that's in the disclosure

16   statement is really of relatively little moment in that

17   dispute that I see coming down the pike anyway.  It, as I

18   understand it, the Committee's position on the doctrine of

19   necessity motions has been included in the disclosure

20   statement with a caveat that the Debtor disagrees with it.

21   Is that correct?

22            MR. ZIMAN: Yes, Your Honor.

23            MS. McLENDON: Yes, Your Honor.

24            THE COURT: Okay.  With respect to the, I believe

25   the Committee's comments that are included on page 4 of their

1    reply supplement about the Committee's opposition to the plan

2    and the cost and pain associated with the litigation of the

3    matter, I believe that that's, that's included, right?

4           MR. ZIMAN: Yes, Your Honor.  That is the risk

5    factor, Your Honor.

6           THE COURT: Okay.  The other elements that the

7    Committee seeks to have included or more substantial

8    disclosure, I don't believe I'm going to require.  And for

9    reasons largely consistent with my, my reaction to the, to

10   the valuation analysis.  And this goes, then, both to the

11   Committee issue, and the SKF issue regarding the scope of the

12   discharge and the sufficiency of disclosure on the releases.

13   It goes without saying that disclosure does not foreordain

14   confirmation, and that the Debtor has a burden to obtain

15   approval of the releases and approval of the discharge.  And

16   if the discharge is not consistent with applicable law, or

17   exceeds the, my authority under the Code, then presumably

18   those releases and that discharge will be scaled back.  My

19   rulings today with regard to the sufficiency of disclosure

20   are entirely without prejudice to the rights of SKF and the

21   Committee to address the confirmation issues on the merits.

22   But I'm not going to require additional disclosure on the

23   scope of the releases.  But again, I frankly expect from the

24   Committee's representations and from SKF's comments that

25   those, those issues are going to get vetted.  And again, as a

1    practical matter in the context of this case, the issue is

2    not sufficiency of disclosure for purposes of a hypothetical

3    investor, as a practical matter, it's whether or not the

4    matters will be fully presented to the Court for

5    consideration and for disposition in the context of

6    confirmation.  And again, I think we're going to talk about

7    scheduling, but the Committee has promised discovery and

8    litigation, so I'm pretty confident that these issues are

9    going to get vetted, and I don't think it's, what we're

10   talking about is not so much a voting exercise as a

11   confirmation exercise.  So under the circumstances of this

12   case, I'm not going to require modifications to the

13   disclosure that frankly, under other circumstances I probably

14   would require.  It's fairly rare, and I think Mr. Stark

15   started off by saying, We don't usually fight disclosure

16   statements.  It's the one hearing you can't lose as the

17   Debtor.  You just add it.  But I don't think that there's a

18   lot more to be gained by requiring parties to sit down,

19   hammer through additional language, because I think you know

20   where you're headed, and the disclosure statement's not going

21   to drive that analysis one way or the other.  So based upon

22   the record before me, I will overrule the SKF objection to

23   the extent that it remains extant, subject to SKF's rights

24   being fully preserved for purposes of plan confirmation.  And

25   likewise, to the extent that the Committee objections have

1  not been resolved by agreed language, or disposed of by the

2  authority to include a letter in the solicitation package,

3  those objections are overruled for purposes of disclosure.

4  And again, the issues are fully reserved for purposes of plan

5  confirmation.  Are there any questions?

6          MR. ZIMAN: Thank you, Your Honor.  Not, not, just

7  one in terms of, generally the letter is fine as written.

8  It's a regurgitation of the issues that were raised as we've

9  discussed.  I would say that, you know, we'll just take a

10  closer look at it.

11          THE COURT: Sure.

12          MR. ZIMAN: And I'm sure we'll work out with Mr.

13  Stark and you know, if there needs to be any changes.

14          THE COURT: Okay.  And let me make a point on that.

15  If there is an issue with respect to the text of the letter,

16  and I don't think that, I've read the letter - -

17          MR. ZIMAN: Your Honor, I can assure you there won't

18  be an issue with respect to the text of the letter.

19          THE COURT: Okay.  All right.  If you need me, get

20  me on the phone.  Okay.  Yes, sir.

21          MR. SHERMAN: Your Honor, maybe - -

22          THE COURT: Can you get to that podium, so we can

23  pick you up?

24          MR. SHERMAN: I'm sorry, Your Honor.

25          THE COURT: Sure.

1          MR. SHERMAN: Since the letter is directed at my

2     clients and Monarch, is there a way that we accept the letter

3     simply, I mean, I'm not sure why you have to print thousands

4     and thousands of pages from a cost/benefit analysis.  If it's

5     directed at my clients, that's fine.  We will accept it.

6          MR. ZIMAN: Your Honor, I think we can obviate Mr.

7     Sherman's concern about expense, because I think the way the

8     procedures work, and Ms. McLendon will go through this, that

9     we actually only send all the materials in printed form to

10     those who are voting.  And notice goes out to the entire

11     world.  And then there are materials available either to

12     request or on line.

13          THE COURT: Okay.  I think that probably disposes of

14     the issue.

15          MR. SHERMAN: Thank you, Your Honor.

16          THE COURT: Okay.

17          MR. ZIMAN: So with that, Your Honor, we then just

18     turn to the procedures.

19          THE COURT: Sure.

20          MR. ZIMAN: Thank you.

21          MS. McLENDON: Your Honor, with respect to the

22     procedures, we've actually covered a number of the points.

23     We've got a set of procedures that request approval of the

24     package that would go to now Classes IV(a) through IV(g).  We

25     will need to modify that ballot in that respect.  We'll

1    include the ballot, of course the plan, disclosure statement,

2    notification of the confirmation hearing, the two letters, as

3    well as the form of subscription agreement, and subscription

4    form for the rights offering that's being offered to the

5    holders of claims in Classes IV(a) through IV(g).  Otherwise,

6    the, there is a, there are attached forms of non-voting

7    status for the claimants who will not be voting, but they

8    will otherwise get the plan and disclosure statement

9    materials.  And Your Honor, in terms of the schedule as

10   proposed, the confirmation hearing date, the Court had

11   reserved January 26th.  Working back from that, we proposed a

12   voting deadline and plan objection deadline of January 16th.

13   Voting record date of today, if the order can be entered

14   today.  And then the packages would be mailed no later than

15   five business days after today, which would be December 24th.

16   I think, as Mr. Stark mentioned, I think the scheduling

17   issues with respect to discovery and motion related practice

18   would be, he and Mr. Friedman would address.  Otherwise,

19   there were no objections to the solicitation procedures, and

20   we would request that they be approved.

21        THE COURT: Okay.  Subject to the discovery and

22   litigation scheduling that we'll address, does anyone else

23   wish to be heard regarding solicitation?  Okay.

24        MS. McLENDON: Thank you.

25        THE COURT: I've reviewed the solicitation motion,

1    and I would be prepared to enter the order.

2             MS. McLENDON: Thank you.

3             THE COURT: Okay?  Mr. Friedman.

4             MR. FRIEDMAN: Good morning, Your Honor.  Bryce

5    Friedman from Simpson Thacher.  I apologize in advance for my

6    voice.

7             THE COURT: Everybody's sick.

8             MR. FRIEDMAN: I don't have much to add to what Mr.

9    Stark indicated, which is I've had multiple conferences with

10   his partner, Mr. Siegel.  We're trying to work out a

11   consensual discovery schedule given where we are and the time

12   of the year.  And we would propose to do that and submit

13   something under certification of counsel if we decide that

14   it's necessary to do so.  The only thing I would add,

15   perhaps, is we may have a slightly different view as to the

16   necessity for a lengthy confirmation hearing.  We have no

17   interest in cutting off anybody's rights, but we also don't

18   want to spend an inordinate amount of time having a hearing

19   we don't necessarily need to have, in our view.  We're

20   working through some issues on the scope of discovery, and

21   based on Your Honor's prior comments, our intent is, to the

22   extent we have any disagreements, to pick up the phone and

23   call.

24             THE COURT: Okay.  Mr. Stark?

25             MR. STARK: I agree with most of that, except for

1    the lengthy part.  I would note, however Your Honor, and just

2    by way of preview, I've been in valuation trials in the past

3    where I had some weeks to get prepared, and as discovery

4    processes wear themselves on, and you know, production sort

5    of takes some time to bates stamp and review, it's really

6    close towards the end that I actually get everything, and

7    it's a rush, rush, rush.  Well, everything in this case has

8    been a rush, rush, rush for me.  So I want to preview for

9    Your Honor and for everybody our intent that we have to work

10   very quickly and digest an awful lot of information, and so

11   that call to Your Honor about discovery disputes may come

12   sooner rather than later in the process if we can't otherwise

13   resolve these things.  We are going to be very rigorous in

14   terms of keeping along the time line, because we have to.

15            THE COURT: Well, let me make a comment that

16   probably is, I think, understood by all parties.  As you've

17   heard me in this or other cases, I generally don't encourage

18   motion practice as it relates to discovery.

19            MR. STARK: Um-hum.

20            THE COURT: Get me on the phone, and we can try to

21   sort some of this stuff out.  And while I don't want you to

22   believe in the process that you have the wind at your back,

23   the Debtor is moving this process forward.  It is on a fairly

24   expedited time frame.  The Debtor has done a lot of work to

25   do that.  But the Debtor wants the hearing date of the 26th,

1    so I'm, I'm expecting that the Debtor is prepared to, you

2    know, move promptly to deal with your discovery requests.

3    And I'm confident that that's been the subject of a

4    discussion between Mr. Friedman and Mr. Siegel.

5            MR. STARK: It has been.  However - -

6            THE COURT: So I don't think I, I don't think

7    there's much more that I can say about that.  And - -

8            MR. STARK: And I didn't intend to illicit a

9    response.  Only to dog ear the page - -

10            THE COURT: To poison the well.

11            MR. STARK: I actually saw it as bringing you up to

12    speed.

13            THE COURT: Okay.  Very diplomatic.  Okay.  And then

14    I think that the issue that's before me is simply a question

15    of timing for disclosure.  The Court has the matter on for

16    plan confirmation on the 26th.  I've been advised by the

17    Committee regarding their position on one, the timing, and

18    two, the significance of the hearing.  And that is what it

19    is.  And I will expect to be apprised by the parties as we

20    get closer to that date about what it is that I should

21    expect.  But otherwise, I'm happy to entertain an order under

22    certification that's an agreed scheduling order.  The parties

23    can be confident that any sort of scheduling arrangements

24    that you can agree to, you can be very confident that I will

25    be supportive of it.  And I think we'll go from there.  But

1    as I said, I am prepared to approve the disclosure statement,

2    and I think under Bankruptcy Rule 3017, I do need to enter

3    the disclosure order today.  Or we can deem it approved

4    today, if you wish.  But if you've got a disclosure statement

5    order I'm prepared to enter it.

6            MS. McLENDON: Your Honor, I - -

7            THE COURT: Yes ma'am.

8            MS. McLENDON: Excuse me.  I believe we need to make

9    just one modification to reflect the ruling with respect to

10   the letter.

11           THE COURT: Okay.

12           MS. McLENDON: And I understand we can upload

13   something this afternoon, and the final versions of the plan

14   and disclosure - -

15           THE COURT: Okay.

16           MS. McLENDON:  - - statement if that's acceptable?

17           MR. STARK: I feel confident in the record, Your

18   Honor.

19           THE COURT: Then we'll deem it approved today.  That

20   will be your record of date, and we'll go from there.  And

21   the solicitation order, do you have that, or are you going to

22   revise that as well?  I guess that has to - -

23           MS. McLENDON: That's, that's -  -

24           THE COURT:  - - reflect the letter as well.

25           MS. McLENDON:  - - that's actually - -

1          MR. STARK: Again, my only point was if I can rely

2    upon the record that it's going to be put in there, and, it

3    doesn't need to necessarily be in the order, because I think

4    Your Honor has so ruled on the record.  So if you have an

5    order, I don't want to stand in the way for procedural

6    purposes.

7          THE COURT: Okay.  Mr. Madron.

8          MR. MADRON: Good afternoon, Your Honor.  For the

9    record, Jason Madron of Richards, Layton & Finger.  We do

10   have a proposed form of order.  It's a combined order both

11   approving the disclosure statement as well as the

12   solicitation procedures.  Exhibit 9 is the Debtors' letter to

13   Class IV claimants urging support of the plan.  Based on the

14   record, we will, you know, also include Mr. Stark's letter.

15   In the actual distribution, but it's not attached hereto.

16         THE COURT: Okay.  That's fine.

17         MR. MADRON: If I may approach?

18         THE COURT: Sure.  Thank you.  All right.  Noting

19   that the Committee has been authorized to include their

20   letter, so that's the sole modification to the proposed

21   order.  And this is a combined procedures and disclosure

22   approval order.  I will enter the order.  We'll have it on

23   the docket this afternoon.

24         MR. STARK: I hate to be a stickler, Your Honor.  As

25   you're signing.

1          THE COURT: Yes, sir.

2          MR. STARK: We're going to need to give you an

3    electronic version of the letter to be added to that so it's

4    uploaded on the docket.

5          THE COURT: Why don't you just do a notice of filing

6    and supplement.

7          MR. STARK: We can do that.

8          THE COURT: And that way - -

9          MR. STARK: We'll do it that way.

10          THE COURT: Again, I just want to make sure that

11    this gets on the docket so the process starts rolling.  And I

12    think, I don't think anybody's under any uncertainty about

13    you're going to have a letter, you're going to finalize the

14    language, and it's going to get included in the package.  I

15    don't think we need to reflect that in the order.

16          MR. STARK: Okay.

17          THE COURT: But it would probably be a good idea for

18    you to have it on the docket separately, just so that it's

19    included.

20          MR. STARK: We're happy to do that.

21          THE COURT: Okay.  Mr. Ziman, do we have anything

22    else today?

23          MR. ZIMAN: I don't believe so, Your Honor.

24          THE COURT: Yes, sir?

25          MR. ZIMAN: I'm sorry.  Maybe we do.

1              THE COURT: I always ask.

2              MR. SHERMAN: Judge I just, Andrew Sherman, Sills

3    Cummis, for the record.

4              THE COURT: Sure.

5              MR. SHERMAN: Just so that the Court is not left

6    with a not, a correct impression of what's happening in the

7    background, is we've heard from Mr. Stark of this litigation

8    which may or may not be a *fait accompli*.  Mr. Stark and I had

9    engaged and will continue to engage in discussions,

10   negotiations, to try to make this process go more smoothly as

11   far as some type of global resolution.  But just so that Your

12   Honor is aware, there, this is not just a litigation foray,

13   and hopefully will not be.  And I understand Mr. Stark's

14   statements about expense.  We'll see what the benefit of

15   those expenses are later, but at this point, and as he said

16   in his papers, he has encouraged a settlement, we have been

17   productive and constructive in trying to get there, and we

18   will continue to get there.

19             THE COURT: I appreciate that.  I expect in most of

20   these, in most of these cases that there's a hopefully two

21   paths that the parties are proceeding along.  And if there's

22   anything that the Court can do to assist that dialog process,

23   we stand ready.

24             MR. SHERMAN: Thank you, Judge.

25             THE COURT: Okay?  Mr. Ziman, anything further?

1          MR. ZIMAN: Subject to being surprised yet again,

2    Your Honor, I believe, I believe we are done for the day.

3          THE COURT: Very well.

4          MR. ZIMAN: Thank you for your time.  I appreciate

5    it.

6          THE COURT: We'll stand in recess.  Thank you

7    counsel.

8          UNIDENTIFIED SPEAKER: Thank you, Your Honor.

9          UNIDENTIFIED SPEAKER: Thank you, Your Honor.

10        (Whereupon at 1:06 p.m. the hearing in this matter was

11   concluded for this date.)

12

13

14

15

16

17

18          I, Jennifer Ryan Enslen, approved transcriber for

19   the United States Courts, certify that the foregoing is a

20   correct transcript from the electronic sound recording of the

21   proceedings in the above entitled matter.

22

23    _/s/Jennifer Ryan Enslen_                    _January 6, 2009_
      Jennifer Ryan Enslen
24    43 Bay Boulevard
      Newark, DE 19702
25    (302)836-1905