# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
IN RE:                          )  Case No. 08-13141(KJC)
                                )  (JOINTLY ADMINISTERED)
TRIBUNE COMPANY, et al.,        )  Chapter 11
                                )
                                )  Courtroom 5
                                )  824 Market Street
                    Debtors.    )  Wilmington, Delaware 19801
                                )
                                )  May 20, 2010
                                )  10:14 A.M.
```

TRANSCRIPT OF **(1)** MOTION FOR ORDER EXTENDING DEBTORS'
EXCLUSIVITY PERIOD (DOCKET NO. 4211). **(2)** APPLICATION OF
EXAMINER FOR ORDER AUTHORIZING RETENTION OF KLEE, TUCHIN
BOGDANOFF & STERN AS COUNSEL TO EXAMINER NUNC PRO TUNC (DOCKET
NO. 4356). **(3)** APPLICATION OF EXAMINER FOR ORDER AUTHORIZING
RETENTION OF SAUL EWING, LLP AS DELAWARE COUNSEL NUNC PRO TUNC
(DOCKET NO. 4358). **(4)** APPLICATION OF EXAMINER FOR ORDER
AUTHORIZING LECG, LLC AS FINANCIAL ADVISOR TO EXAMINER NUNC PRO
TUNC (DOCKET NO. 4360). **(5)** EXAMINER'S MOTION FOR ORDER
AUTHORIZING EXAMINER TO DEMAND AND ISSUE SUBPOENAS COMPELLING
PRODUCTION OF DOCUMENTS AND ORAL EXAMINATION OF PERSONAS AND
ENTITIES (DOCKET NO. 4354). **(6)** DISCLOSURE STATEMENT FOR JOINT
PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS
SUBSIDIARIES (DOCKET NO. 4008). **(7)** MOTION TO AUTHORIZE (MOTION
OF THE DEBTORS FOR AN ORDER (I) ESTABLISHING PROCEDURES FOR
SOLICITATION AND TABULATION OF VOTES TO ACCEPT OR REJECT JOINT
PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS
SUBSIDIARIES; (II) ESTABLISHING DEADLINE FOR RETURN OF MEDIA
OWNERSHIP CERTIFICATIONS; (III) SCHEDULING CONFIRMATION
HEARING; (IV) ESTABLISHING NOTICE AND OBJECTION PROCEDURES IN
RESPECT OF CONFIRMATION OF JOINT PLAN OF REORGANIZATION; AND
(V) GRANTING RELATED RELIEF) (DOCKET NO. 4204).
BEFORE HONORABLE KEVIN J. CAREY
UNITED STATES CHIEF BANKRUPTCY JUDGE


```
ECRO:                    AL LUGANO
```

**TRANSCRIPTION SERVICE:**     **TRANSCRIPTS PLUS, INC.**
**435 Riverview Circle**
**New Hope, Pennsylvania 18938**
**Telephone: 215-862-1115**
**Facsimile: 215-862-6639**
**e-mail CourtTranscripts@aol.com**

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**APPEARANCES:**

| | |
|---|---|
| For the Debtors: | Cole Schotz Meisel, Forman<br>& Leonard, P.A.<br>By:  NORMAN PERNICK, ESQ.<br>1000 N. West Street, Suite 1200<br>Wilmington, Delaware 19801 |
| | Sidley Austin LLP<br>By:  JAMES CONLAN, esq.<br>    BRYAN KRAKAUER, ESQ.<br>    JANET HENDERSON, ESQ.<br>    KEN KANSA, ESQ.<br>One South Dearborn<br>Chicago, Illinois 60603 |
| For the Examiner,<br>Kenneth Klee: | Saul Ewing<br>By:  MARK MINUTI, ESQ.<br>222 Delaware Avenue, Suite 1200<br>P.O. Box 1266<br>Wilmington, Delaware 19899 |
| | Klee, Tuchin, Bogdanoff & Stern LLP<br>By:  MARTIN BARASH, ESQ.<br>1999 Avenue of the Stars<br>Thirty-Ninth Floor<br>Los Angeles, California 90067-5061 |
| The U.S. Trustee: | United States Department of Justice<br>Office of the U.S. Trustee<br>By:  JOSEPH J. McMAHON, JR., ESQ.<br>844 King Street<br>Wilmington, Delaware 19899 |
| For Wells Fargo: | Fox Rothschild LLP<br>By:  JEFFREY SCHLERF, ESQ.<br>Mellon Bank Center<br>919 North Market Street, Suite 1400<br>14th Floor<br>Wilmington, Delaware 19801-3046 |
| | White & Case<br>By:  THOMAS E. LAURIA, ESQ.<br>    SCOTT GREISSMAN, ESQ.<br>Wachovia Financial Center<br>200 South Biscayne Boulevard<br>Suite 4900<br>Miami, Florida |

**APPEARANCES:**
(Continued)


For Unsecured Creditors'     Landis Rath & Cobb
Committee:                   By:  ADAM LANDIS, ESQ.
                             919 Market Street, Suite 1800
                             P.O. Box 2087
                             Wilmington, DE 19801

                             Chadbourne & Park, LLP
                             By:  HOWARD SEIFE, ESQ.
                                  DOUGLAS E. DEUTSCH, ESQ.
                                  ROBERT GAYDA, ESQ.
                             30 Rockefeller Plaza
                             New York, New York 10112

                             Zuckerman Spaeder, LLP
                             By:  THOMAS MACAULEY, ESQ.
                             One Commerce Center
                             1201 Orange Street, Suite 650
                             Wilmington, Delaware 19801

For the Credit               Young Conaway Stargatt & Taylor, LLP
Agreement Lenders:           By:  BLAKE CLEARY, ESQ.
                             The Brandywine Building
                             1000 West Street, 17th Floor
                             Wilmington, Delaware 19899-0391

                             Hennigan, Bennett & Dorman, LLP
                             By:  BRUCE BENNETT, ESQ.
                             865 South Figueroa Street, Suite 2900
                             Los Angeles, California 90017

For Wilmington Trust:        Benesch Friedlander Coplan
                             & Aronoff LLP
                             By:  RAY LEMISH, ESQ.
                             222 Delaware Avenue, Suite 801
                             Wilmington, Delaware 19801-1611

                             Brown Rudnick LLP
                             By:  ROBERT J. STARK, ESQ.
                                  MARTIN SIEGEL, ESQ.
                             Seven Times Square
                             New York, New York 10036

**APPEARANCES:**
(Continued)


For Deutsche Bank:          McCarter & English, LLP
                            By:  DAVID J. ADLER, ESQ.
                            Renaissance Centre
                            405 N. King Street, 8th Floor
                            Wilmington, Delaware 19801

For Barclays:               Edwards Angell Palmer & Dodge LLP
                            By:  R. CRAIG MARTIN, ESQ.
                            919 North Market Street
                            Wilmington, Delaware 19801

                            Mayer Brown, LLP
                            By:  JEAN-MARIE ATAMIAN, ESQ.
                                 AMIT TREHAM, ESQ.
                            71 South Wacker Street
                            Chicago, Illinois 60606

For Bank of America:        Pepper Hamilton
                            By:  DAVID STRATTON, ESQ.
                            Hercules Plaza, 1313 Market Street
                            Suite 5100, P.O. Box 1709
                            Wilmington, Delaware 19899-1709

For Merrill Lynch:          Potter Anderson & Corroon, LLP
                            By:  LAURIE SELBER SILVERSTEIN, ESQ.
                            Hercules Plaza, P.O. Box 951
                            1313 N. Market Street
                            Wilmington, Delaware 19899-0951

                            Kaye Scholer, LLP
                            By:  MADLYN G. PRIMOFF, ESQ.
                                 RICHARD CHOIL, ESQ.
                            425 Park Avenue
                            New York, New York 10022-3598

For Law Debenture:          Bifferato Gentilotti
                            By:  GARVAN F. MCDANIEL, ESQ.
                            800 North King Street, Plaza Level
                            Wilmington, Delaware 19801

                            Kasowitz, Benson, Torres
                            & Friedman LLP
                            By:  ANDREW GLENN, ESQ.
                                 MATT STEIN, ESQ.
                            1633 Broadway
                            New York, New York 10019

**APPEARANCES:**
(Continued)

```
For Centerbridge Credit   Akin Gump Strauss Hauer & Feld LLP
                          By:  DANIEL H. GOLDEN
                               ALEXIS FREEMAN, ESQ.
                          One Bryant Park
                          New York, New York 10036

For JPMorgan Chase:       Richards Layton & Finger, PA
                          By:  MARK COLLINS, ESQ.
                          One Rodney Square, P.O. Box 551
                          Wilmington, Delaware 19899

                          Davis Polk & Wardwell LLP
                          By:  MICHAEL RURRAN, ESQ.
                               DAMIAN SCHAIBLE, ESQ.
                               DON BERNSTEIN, ESQ.
                          450 Lexington Avenue
                          New York, NY 10017

For GreatBanc:            Womble Carlyle Sandridge & Rice, PLLC
                          By:  TOM HORAN, ESQ.
                          222 Delaware Avenue, Suite 1501
                          Wilmington, Delaware 19801

                          K&L Gates
                          By:  JEFFREY RICH, ESQ.
                          599 Lexington Avenue
                          New York, New York 10022-6030
```

**TELEPHONIC APPEARANCES:**
**(As reflected on the Confirmed Telephonic Appearance Schedule)**

```
For Tribune Company:      Sidley Austin
                          By:  D'LISIA BERGERON, ESQ.

For Tribune Company:      Sidley Austin
                          By:  CANDICE KLINE, ESQ.

For Tribune Company:      Sidley Austin
                          By:  JILLIAN LUDWIG, ESQ.

For Tribune Company:      Sidley Austin
                          By:  DAVID MILES, ESQ.

For Morgan Stanley:       Weil Gotshal & Manges, LLP
                          By:  EVAN LEDERMAN, ESQ.
```

## TELEPHONIC APPEARANCES:
**(As reflected on the Confirmed Telephonic Appearance Schedule)**
(Continued)

```
For Tribune Company:        Tribune Company
                            By:  CHANDLER BIGELOW

For Tribune Company:        Tribune Company
                            By:  DON LIEBENTRITT

For Tribune Company:        Tribune Company
                            By:  DAVID ELDERSVELD

For Tribune Company:        Tribune Company
                            By:  GARY WEITMAN

For Tribune Company:        Tribune Company
                            By:  MICHAEL O'NEAL

For Perry Capital:          Perry Capital
                            By:  JAMES FREEMAN

For Arrowgrass Capital      Arrowgrass Capital Services UK
Services UK:                By:  ARIF GANGAT

For Wells Fargo:            White & Case
                            By:  SCOTT GREISSMAN, ESQ.

For Tribune Company:        Kramer Levin Naftalis & Frankel, LP
                            By:  KATHERINE CRUZ, ESQ.

For Tribune Company:        Kramer Levin Naftalis & Frankel, LP
                            By:  DAVID E. BLABEY, JR., ESQ.

For Miller Taback           Miller Taback Securities
Securities:                 By:  MATTHEW DUNDON

For Carlson Capital:        Vinson & Elkins
                            By:  STEVEN ABRAMOWITZ, ESQ.

For Tricadia Capital:       Tricadia Capital
                            By:  IMRAN AHMED

For Barclays:               Mayer Brown, LLP
                            By:  MICHAEL SIMES, ESQ.

For Barclays:               Mayer Brown, LLP
                            By:  WILLIAM DOLAN, ESQ.
```

**TELEPHONIC APPEARANCES:**
**(As reflected on the Confirmed Telephonic Appearance Schedule)**
(Continued)


For Barclays:              Mayer Brown, LLP
                           By:  JARED ELLIAS, ESQ.

For Barclays:              Mayer Brown, LLP
                           By:  JEAN-MARIE ATAMIAN, ESQ.

For Barclays:              Mayer Brown, LLP
                           By:  BRIAN TRUST, ESQ.

For Grey Wolf Capital:     Grey Wolf Capital
By:                        JEFF ARMSTRONG, ESQ.

For SuttonBrook Capital    SuttonBrook Capital Management, LP:
Management, LP:            By:  CAROL L. BALE

For Guggenheim Partners:   Guggenheim Partners
                           By:  JOSHUA BLOSENSKI

For Wilmington Trust:      Brown Rudnick, LLP
                           By:  KATHERINE BROMBERG, ESQ.

For Wilmington Trust:      Brown Rudnick, LLP
                           By:  ANDREW DASH, ESQ.

For Goldman Sachs & Co.:   Goldman Sachs & CO.
                           By:  SCOTT BYNUM

For Goldman Sachs & Co.:   Goldman Sachs & CO.
                           By:  LEXI FALLON

For the Unsecured          Chadbourne & Park, LLP
Creditors' Committee:      By:  DAVID LeMAY, ESQ.

For the Unsecured          Chadbourne & Park, LLP
Creditors' Committee:      By:  HOWARD SEIFE, ESQ.

For the Unsecured          Chadbourne & Park, LLP
Creditors' Committee:      By:  MARC ROITMAN, ESQ.

For Bank of America:       O'Melveny & Myers
                           By:  DANIEL CANTOR, ESQ.

**TELEPHONIC APPEARANCES:**
**(As reflected on the Confirmed Telephonic Appearance Schedule)**
(Continued)


For Roy Carlin:              Roy Carlin, P.C.
                             By:  ROY CARLIN

For Allen & Company:         Allen & Company
                             By:  MICHAEL CHING

For Bank of America:         Bank of America
                             By:  ESTER CHUNG

For RBS Greenwich            RBS Greenwich Capital
Capital:                     By:  JEFFREY FARKAS

For DW Investment            DW Investment Management
Management:                  By:  RAMAN GAMBHIR

For U.S. Department          U.S. Department of Labor
of Labor:                    By:  LEONARD GERSON, ESQ.

For Angelo, Gordon           Wilmer Cutler Pickering Hale & Dorr
& Co.:                       By:  ANDREW N. GOLDMAN, ESQ.

For Arrowhawk Capital:       Arrowhawk Capital
                             By:  ANDREW GU

For Tribune Company:         Alvarez & Marsal, Inc.
                             By:  THOMAS E. HILL

For DE Shaw:                 DE Shaw
                             By:  SARAH S. JOHNSON

For the Credit              Hennigan, Bennett & Dorman, LLP
Agreement Lenders:           By:  JAMES O. JOHNSTON, ESQ.

For JPMorgan Chase:          JPMorgan Chase
                             By:  KEVIN C. KELLEY

For JPMorgan Chase:          JPMorgan Chase Bank, N.A.
                             By:  SHACHAR MINKOVE

For JPMorgan Chase:          JPMorgan Proprietary
                             By:  SAQUIB R. MIRZA

**TELEPHONIC APPEARANCES:**
**(As reflected on the Confirmed Telephonic Appearance Schedule)**
(Continued)


For Anna Kalenchits:        Anna Kalenchits
                            By:  ANNA KALENCHITS

For Longacre Management     Longacre Management Fund
Fund:                       By:  STEVEN KALTER

For Blue Mountain           MICHAEL KASS, Pro Se
Capital:

For Oaktree Capital         Oaktree Capital Management
Management:                 By:  KENNETH C. LIANG

For Oaktree Capital         Oaktree Capital Management
Management:                 By:  EDGAR LEE

For Kevin Millen:           KEVIN MILLEN, Pro Se

For Dennis A. Prieto:       Aurelius Capital Management
                            By:  DENNIS A. PRIETO

For KS Capital:             KS Capital
                            By:  GIACOMO PICCO

For Royal Bank of           Orrick Herrington
Scotland:                   By:  COURTNEY ROGERS, ESQ.

For TPG Credit:             TPG Credit
                            By:  JONATHAN T. ROITER

For San Bernardino:         Romero Law Firm
                            By:  MARTHA E. ROMERO, ESQ.

For Archview Investment     Archview Investment Group
Group                       By:  AARON ROSEN

For Crabhouse of            Harwood Feffer, LP
Douglastown, Inc.:          By:  SAMUEL ROSEN, ESQ.

For Canyon Partners:        Canyon Partners
                            By:  CHANEY M. SHAFFIELD

For CitiGroup:              Paul Weiss Rifkind Wharton
                            By:  LAUREN SHUMEJDA, ESQ.

**TELEPHONIC APPEARANCES:**
**(As reflected on the Confirmed Telephonic Appearance Schedule)**
(Continued)


For Matthew Zloto:          MATTHEW ZLOTO, Pro Se

For Katten Muchin          Katten Muchin Rosenman
Rosenman:                  By:  JOHN SIEGER, ESQ.

For Seneca Capital:        Seneca Capital
                           By:  USMAN TAHIR

For Macquarie Capital:     Macquarie Capital
                           By:  RUSHABH VORA

1            THE COURT:  Good morning, everyone.

2            MR. PERNICK:  Good morning, Your Honor.  Norman

3 Pernick on behalf of the debtors, Your Honor, Tribune Company.

4            Your Honor, just a couple of preliminary matters on

5 the agenda:

6            With respect to Item Number 1, Your Honor was kind

7 enough to sign that.  That was the order with respect to the

8 solicitation extension.

9            Items Number 2 through 5, Your Honor signed orders.

10 But I believe on Item Number 5, Mr. Minuti has a revised order

11 for the Court's consideration.  So, we thought we'd handle that

12 right now.

13            THE COURT:  That's fine.

14            MR. BARASH:  Thank you, Your Honor.  Martin Barash,

15 Klee, Tuchin, Bogdanoff & Stern, for the examiner, Kenneth

16 Klee.

17            Your Honor, we received some informal input from one

18 party, and agreed to a change to the order that was filed with

19 the motion.  I have a redline and a clean copy, if I may be

20 permitted to hand it up, and then I could explain it to the

21 Court.

22            THE COURT:  Please.  Thank you.

23            MR. BARASH:  Your Honor, other than the docket

24 references, and the references to the order entered yesterday,

25 this order would supersede it.  There's a new Paragraph E which

1  describes the circumstances under which the examiner, if he

2  does find the need to use the subpoena power, would -- unless

3  he thought it would unduly interfere with the investigation --

4  file a notice regarding the subpoena and allow any party in

5  interest notice that that was being used so that they could, if

6  they chose to, seek any relief from this Court.

7          This paragraph is not intended to revisit the Court's

8  ruling of last week.  That the examiner's work is the

9  examiner's work.  And it's not intended to be a vehicle for

10 discovery for other parties.

11         But at the request of one party, we did agree that we

12 would give them notice that we were using this power, and they

13 would have the opportunity to assert whatever rights they

14 wanted to assert, subject to our, and any other parties',

15 rights to object.

16         THE COURT:  All right.  Does anyone else wish to be

17 heard with respect to the proposed amendment?

18                 (No audible response heard)

19         THE COURT:  Thank you.

20         MR. BARASH:  Your Honor, I would note for the record

21 that I did circulate this widely to the, capital P, Parties,

22 within the meaning of the examiner order.

23         THE COURT:  All right.  Thank you.

24         MR. BARASH:  Thank you, Your Honor.

25         THE COURT:  The order has been signed.

1           MR. PERNICK:  Thank you, Your Honor.

2           That takes us to Item Number 6, which is the

3    disclosure statement hearing.  Just, as quick housekeeping, we

4    did file -- which is at Docket Numbers 4472 and 73 -- yesterday

5    morning clean and blackline disclosure statement and plan.  And

6    I've handed up, and I believe the Court has on the bench, a

7    chart -- an updated chart and updated blacklines showing

8    changes that we've made since the redline you received

9    yesterday.

10          And with that, Mr. Conlan is going to handle the

11   hearing.

12          THE COURT:  All right.  Let me just add that I've

13   received those papers that you've just referred to, have not

14   had the opportunity to look at them, given the timing; just so

15   you know.

16          MR. PERNICK:  No, that's fine, Your Honor.  We're

17   going to walk you through those.

18          MR. CONLAN:  Good morning, Your Honor.  Jim Conlan on

19   behalf of the debtor.

20          Your Honor, this will be a tag team today between me

21   and several of my partners who are here with me today.

22          Broadly speaking, we think the best approach or

23   structure for the hearing today is as follows:

24          First, and quickly, we'll touch on what I'll describe

25   as timing issues.

1         And then we will move to the technical objections,

2  including those that we have resolved, and those that we think

3  are fairly easy to resolve here today on the record with tweaks

4  to the language.  And Janet Henderson, my partner, will walk

5  you through those.

6         Then we will turn to the three objectors whose

7  objections, frankly, cannot be consensually resolved, and who

8  just don't like the settlement, and who don't like the plan

9  treatment.  Often today we'll refer to them collectively as the

10  "Institutional Dissenters."  They are Wilmington Trust, on

11  behalf of the PHONES; the bridge lenders, represented by Mr.

12  Lauria here today in court; and third, the nonsupportive

13  faction of the senior loan claimants, now down to 2.3 billion,

14  as we understand it of the 8.7 in senior loan claims.

15         But, again, back to timing for a minute, and we want

16  to take this up at the very beginning.  There were a couple of

17  objections for a total of -- I believe there were a total of 13

18  pending objections right now, plus some informals.  But there

19  were three objections -- sorry, two objections that argue that

20  this hearing should be adjourned.

21         One argument in those two objections is that the

22  examiner's report should first be filed, incorporated in the

23  disclosure statement, and then go forward.

24         Frankly, we think that's been asked, answered, and a

25  deal was made; it's parallel, it's not sequential.

1          The examiner's report will be filed quite a bit

2   before the voting deadline.  And, frankly, we're prepared to go

3   forward and think it's important that we go forward now with

4   the approval of the disclosure statement on a parallel path

5   with the examiner's report.  And we thought we had agreement on

6   that.

7          The other issue raised by at least one of those two

8   objectors is that an adjournment is appropriate because FCC

9   approval will take a while anyway.

10          Your Honor, the reality is we're not going to have

11   FCC approval until after we have a confirmation order.  And so,

12   frankly, the idea of waiting until the FCC process matures more

13   is a red herring, it doesn't work that way.

14          At a minimum, the ownership structure needs to be in

15   sight, frankly, probably more likely that we need a

16   confirmation order.  But those are the two arguments, frankly,

17   that are raised about adjourning the hearing.  We want to

18   address that right at the beginning and give the parties who

19   raised those two points an opportunity to speak to the

20   adjournment issue only before we turn to the -- what I call the

21   technical objections.

22          THE COURT:  That's fine.

23          MR. STARK:  Good morning, Your Honor.  Robert Stark

24   from Brown Rudnick on behalf of Wilmington Trust, indenture

25   trustee for the PHONES.

1        You know, I kind of want to start -- I don't know if

2  Your Honor read all the responsive papers --

3        THE COURT:  I did --

4        MR. STARK: -- about how it's a bait and switch, and

5  we're playing games, this is gamesmanship, it's for hold up

6  value.  And actually it really isn't.

7        Really we are not objecting to the calendar.

8  Frankly, we're saying "preserve it."

9        The confirmation hearing shouldn't be disturbed, it's

10 August 16th.  28 days backwards is July 20th.  Mr. Klee's

11 report is July 12th.  That yields eight days in which, if Epiq

12 starts today, it can stuff all the envelopes.  Mr. Klee files

13 his report.  And then they can just put in either the new disk

14 or put in the report, and then send it out, and you're still

15 keeping along the same time line.

16       So, this isn't about hold up value or we're changing

17 things.  It's simply that the process that we have developed

18 here through discussion, before the Court and outside, already

19 had flexibility in the calendar, and I think we should use it

20 for the benefit of those who are voting members.

21       And I don't really think -- I mean, you know, we'll

22 get into the issues of disclosure.  But I do think it is a

23 disclosure issue, and I will focus now purely on the timing

24 issue, but it is wrapped up in the whole 1125 thing.

25       And it isn't strategy, and let me -- there's --

1  everything we do here is strategy, but it's not for hold up

2  value.  Let me tell you what the strategy is, if you want to

3  call what I'm doing here.  Let's say you approve the disclosure

4  statement today and, as we described in our papers, we

5  interpret their discussion of the LBO causes of action as sort

6  of a garish advertisement, that's how we read it.  It says, you

7  know, this lawsuit should be thrown out the window, this

8  settlement is fantastic, and you solicit with that.

9          And then after that package has been sitting on the

10  creditor's desk, it's a pretty thick package, it's been sitting

11  there for a couple of weeks, then Mr. Klee files, publishes his

12  examiner's report, and guess what?  There is a good fraudulent

13  conveyance claim here in that, you know, management did reach

14  fiduciary duties, and the lender claims really are subject to

15  attack, and they may not even be assertable in this case.

16          THE COURT:  Well, let me ask you this, Mr. Stark.

17          MR. STARK:  Sure, yes.

18          THE COURT:  More than one party here has alleged

19  there are good fraudulent conveyance claims.  So, what's the

20  difference when the examiner comes out and says, "They're

21  fraudulent conveyance claims?"

22          MR. STARK:  Well, you have to look carefully, I

23  think, in the verbiage that's now in the disclosure statement.

24  It's the debtors' belief that this settlement is fantastic

25  because they've evaluated these claims, and says that they're

1  not particularly -- that the settlement is an appropriate

2  accommodation to resolve the issues.  And if Mr. Klee comes out

3  and says something very, very different, you sort of have a

4  really interesting procedural nuance here.  You've now put this

5  big monstrosity of a pleading really on the desk of creditors

6  and said, "read this."

7              And the debtors' position is very well stated, "We

8  think this should be settled."  The examiner may very well

9  disagree with that.

10             THE COURT:  Well, not --

11             MR. STARK:  And the only way the creditors --

12             THE COURT:  Not directly.

13             MR. STARK:  Well, he may very well --

14             THE COURT:  Given the scope of his examination.

15             MR. STARK:  But he may very well disagree impliedly

16 that the settlement is a fair reflection of value allocation.

17             THE COURT:  I don't disagree that the findings may

18 implicate a conclusion.

19             MR. STARK:  But the mechanic that's been -- I didn't

20 mean to cut you off, Your Honor.

21             THE COURT:  No, I'm --

22             MR. STARK:  The mechanic that's been proposed is

23 we'll give them a hyperlink.  We'll say, "Look, you know,

24 there's an examiner's report that's going to show up.  After

25 you've made it through our 400 pages that we've dumped on your

1 lap three weeks ago, if you feel inclined, read the examiner's

2 report."  Okay?

3          THE COURT:  Well, my guess is they'll start with the

4 headlines.  And if those are interesting enough, they'll go to

5 the report.

6          MR. CONLAN:  Your Honor, I don't mean to interrupt

7 Mr. Stark, but can I just speak to the mechanics question for

8 just one moment?  And the mechanics are the examiner's report

9 is July 12th.  On July 15th, we'll have the plan supplement.

10 The voting deadline is July 30th.

11          As you'll hear later today, not only will the

12 disclosure statement refer to the examiner's report, and

13 perhaps a hyperlink, the ballots will also refer to the

14 examiner's report, and contain a reference.

15          So, we think the mechanics actually work pretty well

16 and are fairly comfortable.  I'm sorry, I didn't mean to

17 interrupt.

18          MR. STARK:  That's okay.

19          THE COURT:  All right.

20          MR. CONLAN:  I just wanted to make sure you knew the

21 dates.

22          MR. STARK:  That's fine.

23          THE COURT:  Thank you.

24          MR. STARK:  But to me, Your Honor, there's going to

25 be a plan objection predicated on the interest in question.  Is

1  a hyperlink, even if it's listed 12 times in a very lengthy

2  document, sufficient for purposes of letting a creditor know

3  that this "garish advertisement that this global settlement is

4  really fantastic, but go see somebody else's views on that if

5  you feel inclined" is sufficient disclosure?

6          I would posit to Your Honor that you can't sort of

7  highlight good attributes in the document and say go hyperlink

8  to the bad attributes if that's what it comes down to be.

9          THE COURT:  Well, I haven't read the debtors' most

10  recent chart giving the status of the various objections to the

11  disclosure statement.  But the first chart that I saw and that

12  was supplied with the binder was rife with the debtors'

13  indications it was going to add all sorts of information with

14  respect to the LBO transaction to satisfy the objectors, and

15  there were a number of them, as you know, who claimed the

16  debtor had not included sufficient information about that.

17          Now, whether people will ultimately agree that's

18  occurred or not, I don't know yet.  But if it -- either as a

19  result of what the debtor has done or what I might order today,

20  that that happens, again, it seems to me that assuming a

21  creditor is willing to read anything, that information would be

22  contained in the disclosure statement.

23          MR. STARK:  Well, Your Honor, if we're going to have

24  an examination of the actual facts and potential causes of

25  action, and it's possible -- in my view probable, but let's say

1 possible -- that he comes out and says there are really good

2 causes of action here, and this disclosure statement is, in my

3 view, not really like an SEC filing, it's really like a

4 pleading as to why --

5          THE COURT:  They're not intended to be like an SEC

6 filing.

7          MR. STARK:  Well, they're supposed to objectively

8 reflect to a creditor -- it's intended not to be "we think,

9 debtor, you really ought to vote in favor of our plan because

10 these causes of action really aren't that good."  And, you

11 know, there's an alternative for your view, hyperlink maybe.

12          THE COURT:  Well, the debtor is entitled to say that.

13 And, as I understand it, the debtor has agreed to incorporate

14 into the disclosure statement views to the contrary expressed

15 by others here.   Now, I don't -- again, I don't know whether

16 that's yet been accomplished.

17          MR. STARK:  Right.  Your Honor, I'm not going to

18 belabor the record.  I think you understand where I'm coming

19 from.

20          THE COURT:  I --

21          MR. STARK:  To me, it sees as though if the schedule

22 that we've laid out enables a better disclosure process,

23 enables a more balanced view based upon what a third party, who

24 has been brought in to opine about these matters, says about

25 it, and it's not disturbing the confirmation schedule, it's not

1  hold up value, it's not -- it's trying to get to a better

2  process boy including that report in there.  That's the only

3  point we're making.

4          THE COURT:  You know, I might agree with you, Mr.

5  Stark -- I'll say two things:

6          I might agree with you if we hadn't already had so

7  much process devoted to potential claims; and we have.

8          MR. STARK:  Um-hum.

9          THE COURT:  And, again, I assume that somehow we'll

10 address a fair presentation of the issues in the disclosure

11 statement before we're done today.

12          But secondly -- and I say this with hesitation, but I

13 think it's important for the parties to understand, and I don't

14 intend this as an invitation -- as things develop, if something

15 necessitates an adjustment of the process, someone will file a

16 motion asking me to make that adjustment, and offering reasons

17 in support of it.

18          MR. STARK:  I understand, Your Honor.

19          THE COURT:  Okay.

20          MR. STARK:  I think we've -- but let me touch upon

21 the FCC issue, if I may.

22          THE COURT:  Okay.

23          MR. STARK:  Okay.  And a lot of times what I think

24 we're doing here in these pleadings -- and I call this open

25 mike negotiations -- we're as much communicating with each

1  other as we are communicating with Your Honor.  But I think

2  it's important that you understand exactly what we're talking

3  about in these pleadings.  And I don't want to bring the FCC

4  stuff in here too much, but just touch upon them briefly and

5  understand why it is a timing issue.

6          There are FCC rules that were briefed.  One is a

7  foreign ownership rule.  That's a matter of national security,

8  foreign ownership into news media outlets in the United States

9  is pretty sacrosanct, a no-no, at least in certain levels.

10          Second is a diversity ownership rule which tries to

11  include in various different jurisdictional areas --

12  geographical areas divergent views.  And that's also considered

13  a pretty sacrosanct rule.

14          This plan violates those rules.  And the debtors

15  concede the point in the disclosure statement, these are

16  problems.  Okay, but they have work around ideas.  And the work

17  around ideas are really twofold:

18          One is they're going to issue a warrant to creditors

19  that are not supposed to be holding stock.  Okay?

20          And then the second is they're going to issue

21  nonvoting shares.  Now, there's an issue between the debtors

22  and we as to whether or not it's sort of quasi voting shares,

23  and whether or not that's good enough for 1123(b)(6) purposes

24  and, at the same time, being good enough for the FCC.

25          We don't think so.  We think the warrant idea is a

1 sham because we all know they're going to get the warrant, and

2 the moment that they get it, they're going to convert it into

3 stock as soon as they get the FCC sign off on it.

4       And we think the nonvoting stock issue either

5 violates the FCC rules or it violates 1123(b)(6), and you can't

6 really thread the needle in between.  And this raises issues

7 that, you know, we can raise at the confirmation hearing and,

8 frankly, it raises lots of issues about process, about the

9 debtors presenting these issues to the FCC the way they have,

10 but that's not for today.

11       What the debtors say is "we do this all the time,

12 we've done it in other deals, this works."  And the fact is, at

13 least as far as I'm aware, all of the deals that they've talked

14 about where this sort of process was utilized before the FCC or

15 before a Bankruptcy Court was a consensual deal, or at least

16 the objections that were filed were sort of thin objections

17 that weren't sophisticated.  And I think there is a rub about

18 timing that's really critical here.

19       June 14th is the date by which parties will file

20 objections to the FCC process.  If nobody files an objection,

21 to the FCC at the FCC level, then, as best I understand it, and

22 I don't pretend to be an FCC expert, but it usually marshals

23 through its process relatively quickly, and as sort of a large

24 form investigation doesn't really happen.

25       But if an objection is filed, and it's a

1  sophisticated objection, and these are issues that I think are

2  relatively sophisticated, then administrative jurisdiction gets

3  imposed and an investigation starts.  And those investigations

4  are not short generally, they can last a year, even longer.

5  And the point that is really critical is that unlike a court

6  process, when you file an objection, and if you settle that

7  issue along the way, you can withdraw the objection and you get

8  to a resolution relatively quickly.

9       What I am told about the FCC is once you file that

10 objection, the bell is rung, you can't unring it.  The process

11 then goes, and will continue to go.

12      And so strategies that may have worked in the past

13 get front end loaded if they're objected to, and it's hard to

14 unresolve those issues.

15      Now, what I -- here's my hope in this entire process.

16 On Monday, by the way, we're giving very big submissions to the

17 examiner.  Very large briefs, financial advisor type

18 presentations, that will be followed subsequently by second

19 rounds.  And then I'm sure Mr. Klee is going to have

20 assignments for us and ask us to resolve certain issues for

21 him, and he's going to do an investigation on his own.

22      But my hope was through the ferreting out of people's

23 positions, discussion will result.  There is no discussion now,

24 at least with us.  And the hope was if we get all this briefing

25 in, people will stop and talk because you really don't want to

1 go the next step if we can avoid it, hopefully we'll get to a

2 deal before July 12th.  I'm predicting people will want to talk

3 with us, and maybe that's a foolish prediction.

4         But once that objection is filed with the FCC, it

5 forecloses certain opportunities for people to have meaningful

6 dialogue.

7         So, it struck us as perhaps a good idea if the

8 calendar otherwise allowed for some extension period so that

9 people can actually talk to one another.  That would be a

10 useful thing.  Similar -- and especially if it lined up with

11 the argument that perhaps we can wait to get the disclosure

12 statement out with the examiner's report, and perhaps along the

13 way people can start talking to one another.  That might be

14 beneficial to the process, too.  You know, yes, I'm informing

15 you about all of this, but it was a suggestion to all of the

16 parties that perhaps that idea is helpful to all of you,

17 otherwise you're just assuming risk.

18         And the hope is that we're going to settle and you

19 can avoid that risk.  But if you can't unring the bell, then

20 you can't.

21         So, if you don't want to -- if you want to assume,

22 and I can't prevent you, but that was the basis by which we've

23 interposed that point.

24         THE COURT:  Look, it strikes me that the process on

25 more than one level is fraught with risk.  But I'm not

1   convinced that's a reason to delay it.

2            MR. STARK:  I understand.

3            THE COURT:  Understanding that it can always be

4   subject to adjustment.

5            MR. STARK:  I understand, Your Honor.

6            THE COURT:  Okay.  Did you have anything further?

7            MR. STARK:  I didn't.  Any questions for me?

8            THE COURT:  No, thank you.  All right.  Let me hear

9   from anyone else who wishes to be heard with respect to a

10  request for adjournment of this hearing.

11           MR. LAURIA:  Your Honor, Tom Lauria with White &

12  Case, we represent Wells Fargo Bank as the agent for the bridge

13  loans.

14           I guess I feel the need to address the issue,

15  although we approached the whole topic of the interplay between

16  the disclosure statement and the examiner report from a

17  different perspective than counsel was just describing.

18           Our view fundamentally, as we explain in our papers,

19  is that the debtors have an obligation to provide adequate

20  information in the disclosure statement.

21           Interestingly, the response to our objection filed by

22  the settlement supporters and the debtors suggests that any

23  concerns we have about adequate information about the LBO

24  causes of action, the claims, defenses, potential results and

25  consequences, outcomes, impacts on creditor recoveries can be

1  addressed by this so-called hyperlink to the examiner's report

2  after it's prepared and filed on July 12th.

3          And what I'm troubled with -- I mean we -- in the

4  first instance, we want the disclosure from the debtor.  We

5  think the debtor has the information we want.  We're not asking

6  the debtor to make arguments.  We're asking, as I'll make clear

7  when we get to the disclosure statement, for factual

8  information to be included in the disclosure that will allow

9  creditors to make an independent assessment of the

10  reasonableness of the settlement and whether or not it's in

11  their interests to vote for or against this plan.

12          And I think that the debtor can't evade that

13  requirement by pointing to an examiner report that's going to

14  be prepared in the future.  And actually if you think about it,

15  the argument that our concerns are solved by this examiner

16  report is a tacit admission that maybe the information in the

17  disclosure statement is not adequate information.

18          And what I'm troubled by is the notion that as much

19  as everybody thinks of Mr. Klee, that his report, which today

20  hasn't been written, could somehow be approved by this Court,

21  sight-unseen as adequate information under 1125.

22          In other words, we're going to see this report on

23  June 12th and somehow that -- the Court is being asked today to

24  say "that makes this disclosure okay."  It's a little bit

25  unusual and, quite frankly, I don't think -- I think it's

1   asking too much of the Court to reach such a conclusion.

2          THE COURT:  Look, the disclosure statement has to

3   stand on its own.

4          MR. LAURIA:  Agreed.

5          THE COURT:  The later availability of the examiner's

6   report presumably will contain additional information.  But the

7   disclosure statement, before it must be approved, has to be

8   having determined to contain adequate information, and not rely

9   on something yet to be provided.  But it doesn't mean that the

10  something yet to be provided can't act as supplemental

11  information.

12         And, you know, the other thing is -- and part has to

13  do with the timing issue.  Again, you know, I've been on the

14  bench and in the practice along enough to know it's hard to

15  predict sometimes with certainty what will happen.  But I have

16  a feeling one of the likely scenarios is the examiner's report

17  will come out, and if there are certain claims identified, the

18  plan proponents and supporters will say "it's all wrong."  And

19  it may be some of the parties who have claimed that there are

20  claims will say "it doesn't go far enough."  You know, and that

21  will be another round of back and forth.

22         So, on the one hand, while I don't deny that there

23  will be additional information contained in the examiner's

24  report, I don't know that it solves anybody's problem.

25         MR. LAURIA:  Well, Your Honor, I agree.  So, we only

1  raise the issue as an alternative argument that says, look, the

2  information that we think should be included in the disclosure

3  statement, which we'll get into, I'm sure, during the course of

4  the day here, is information that the debtor has, clearly, and

5  would be easy for the debtor to include.  But for whatever

6  reason, they've chosen so far not to include it.  And by all

7  accounts, based on responses, I have to confess, I, too,

8  haven't had an opportunity to read what was filed, or maybe not

9  filed, or just given to the Court.  I certainly haven't been

10 served with any new piece of paper this morning, so I don't

11 know what the new piece of paper says, I guess we'll hear about

12 that during the day.  I hope that I get a copy, you know,

13 before it's handed around and discussed on the record.

14         THE COURT:  Well, maybe what we'll do is take a short

15 break for the debtor to be able to distribute that to anyone

16 who hasn't yet received it.

17         MR. LAURIA:  All right. But what I'm concerned about

18 is if the debtor continues to refuse to provide information

19 that it has, that would allow creditors to make an informed

20 decision about the settlement, not just a bare conclusion.  You

21 know, Page 58 of the disclosure statement just says "We've

22 concluded that the settlement is within a range of reasonable

23 results to a couple of the constituencies and, therefore, it

24 should be approved."  But --

25         THE COURT:  Well, it's the same thing they'd say in a

1 9019 motion; you would expect that they would say that.

2        MR. LAURIA:  Well, we're going to get into all of

3 that as to whether or not this is a 9019 settlement even, and

4 that standard is the appropriate standard.  And, you know, I'll

5 save all the fun about that for later.

6        But for a disclosure statement, for the debtors to

7 say that it's within a range of reasonableness, obviously that

8 means there's a range.

9        What is the range?  How did they figure that range

10 out?  Let us -- you know, I think that's the kind of thing that

11 people need to understand.  The debtors have refused to

12 disclose that.  And all we've said is in the alternative, if

13 the debtor continues to refuse to put that information in the

14 document, then we should defer this until we get the examiner

15 report so that we do have access to that type of information

16 and can have reasonable disclosure of adequate information

17 while we're deciding how to vote on the plan.

18        THE COURT:  All right.  Thank you.

19        MR. LAURIA:  Thank you.

20        MR. McMAHON:  Your Honor, good morning.  Joseph

21 McMahon for the Acting the United States Trustee.  I'll be

22 brief.

23        We filed an objection and reservation of rights.  One

24 of the issues that we footnoted for the Court was the fact that

25 we were discussing a number of issues, including the disclosure

32

1  regarding the transition management incentive plan and the key

2  operators' bonus, which the debtors previously communicated to

3  the Court they intended to incorporate into the disclosure

4  statement and plan.

5          Yesterday afternoon, we were advised for the first

6  time that notwithstanding the debtors' promise to include

7  disclosure regarding such topics on a supplement that would be

8  filed with the Court, prior to this hearing, the debtors

9  indicated that they would be doing so in the plan supplement

10 which, by separate agreement with our office, will be filed no

11 later than July 15th.

12          So, Your Honor, that puts us approximately another

13 two months out, at least if the debtors' request is granted.

14          I rise only, Your Honor, to note that while Mr.

15 Conlan may describe my issues as a technical one, I assume that

16 I'm not one of the "institutional dissenters" that was referred

17 to.  At least I don't want to be one.

18          But putting that aside --

19          THE COURT:  That's right, who wants to be in an

20 institution, right?

21                  (Laughter)

22          THE COURT:  Okay.

23          MR. McMAHON:  Putting that aside, Your Honor, I'm

24 happy to address this in course, but I want to know for the

25 record that to the extent that delay in the solicitation is

33

1  occasioned by the debtors' reversal of course, I want to

2  reserve that argument.

3          THE COURT:  All right.  Thank you.

4          MR. McMAHON:  Thank you.

5          THE COURT:  Anyone else with respect to timing only?

6                  (No audible response heard)

7          THE COURT:  Okay.  Mr. Conlan, is it appropriate for

8  us to take a break now so that you can make sure that we're all

9  working from the same scorecard with respect to the debtors'

10 revised chart and the most recent plan and disclosure statement

11 blacklines?

12         MR. CONLAN:  Certainly.

13         THE COURT:  Okay.  How much time?

14         MR. CONLAN:  Ten minutes, five minutes?

15         THE COURT:  All right.  We'll take a 10-minute

16 recess.

17         MR. CONLAN:  Very good.

18            (Recess 10:44 A.M./Reconvene 10:55 A.M.)

19         MR. CONLAN:  Good morning again, Your Honor.  Jim

20 Conlan on behalf of the debtor.  Everyone now has what you

21 have.

22         Your Honor, do you --

23         THE COURT:  Are they taking medication for it, too,

24 or not?

25                  (Laughter)

34

1          MR. CONLAN:  Do you want me to say anything more on

2  the timing issue?

3          THE COURT:  No, we're going to proceed.

4          MR. CONLAN  Very good, Your Honor.  With that, I

5  would like to invite my partner, Janet Henderson, to take the

6  podium and begin walking you through the language that we

7  believe resolved some of the objection, should resolve others.

8  Janet?

9          MS. HENDERSON:  Good morning, Your Honor.  Janet

10 Henderson, Sidley Austin, on behalf of the debtors.

11         THE COURT:  Good morning.

12         MS. HENDERSON:   Your Honor, what we would like to do

13 is -- and this will be in a -- we will be following the form of

14 chart that we tendered to Your Honor this morning as opposed to

15 the one that was attached with our filing of the revised

16 disclosure statement a couple of days ago.

17         The order is different, but we think that this makes

18 more sense, in terms of the ease with which we can move through

19 these various objections.

20         I'd first like to address certain of the informal

21 objections that were made that are not reflected in any filing

22 that was made with the Court, as well as certain of the formal

23 objections that were in the form of letters and the like, and

24 not pleadings, and take Your Honor through how we have resolved

25 those.

1          THE COURT:  All right.

2          MS. HENDERSON:  We received an informal request for a

3 revision to the disclosure statement -- or actually it's to the

4 plan -- plan definition for Morgan Stanley.  They asked us to

5 clarify that the debtors' retention of the Morgan Stanley

6 claims, which is a defined term, that we clarify that the

7 debtors are not seeking to retain LBO related causes of action

8 against Morgan Stanley.

9          We have, in the plan itself, I believe at Page 13,

10 reflected that change.

11          We have, with respect to a claims trader, Longacre,

12 made a couple of changes in the disclosure statement and the

13 plan dealing with a request that we clarify the timing of

14 distributions.  And that there could be catch up distributions

15 from the general unsecured claim reserves prior to the final

16 payments in a fashion that would provide some regularity to

17 those payments.

18          We have modified -- pardon me, Your Honor -- Section

19 7.1 of the plan on Page 50, as well as 7.22(b) of the plan on

20 Page 50, as well as made corresponding revisions in the

21 disclosure statement at Page 99, and at Page 100, to clarify

22 the timing of distributions, as well as the ability to provide

23 interim so-called catch up payments from the reserve under

24 certain circumstances having to do with how much money

25 essentially is available relative to claims allowed at that

1  point in time.

2          Centerbridge also made an informal request that we

3  clarify Section 13.9 of the plan in a manner to reflect the way

4  that the consent rights as to modification of the plan were, in

5  essence, the way they apply to Centerbridge.  We did that, and

6  that is reflected in the plan at Page 73.

7          We then received several letters that largely go to

8  the claims reconciliation process, and are not plan objections

9  at all.  These -- however, they were filed.  This would be a

10  letter from a Virginia Thompson requesting payment of the

11  claim.  Obviously that will be dealt with in the claims

12  reconciliation process.

13          Similarly, a letter from Maureen Dombeck.  This was

14  actually -- the docket has already been corrected, we see, to

15  reflect that that was entered in error as an objection to the

16  disclosure statement.  It's since been docketed as a claims

17  objection.

18          We received a letter from a Mr. Kevin Millen, also

19  requesting administrative payment for damages arising out of an

20  alleged slander by the Tribune Company.  Again, this is really

21  not in the nature of a disclosure statement objection, and it

22  will be addressed through the claims reconciliation process.

23          Similarly, we received a letter from a Mr. Patel,

24  which simply states that he's the owner of a bond.  And that he

25  doesn't like the disclosure statement generally.  Again, that

1  will be dealt with in the claims reconciliation process.

2          With respect to filed objections -- there is one

3  other informal objection I should note now, Your Honor.  We

4  will come to it again in a moment, but we -- I should note that

5  we did receive, and we appreciated the courtesy from the United

6  States Trustee's office, a list of items that they wish to have

7  addressed in the disclosure statement.  We spent considerable

8  time with the Trustee's Office trying to resolve those.

9          And in light of that, the United States Trustee filed

10 a rather limited objection, which, in terms of the filed

11 objection, really goes to solicitation issues and will be

12 addressed by Mr. Kansa at the end of our presentation in terms

13 of the propriety of the opt out mechanism on the ballot.

14         However, we had another conversation with Mr. McMahon

15 yesterday.  And he is of the view that there are a couple of

16 items, one of which he has already previewed, that were not

17 sufficiently addressed in our disclosure statement changes.

18 And so we will be dealing with that as we go to the objections.

19 I'd note that that is one informal objection that we

20 nevertheless still have outstanding.

21         THE COURT:  All right.  Well, before we move on to

22 what you've characterized as formal objections, let me just ask

23 for the record with respect to any party whose objection has

24 been referred to informal or is in letter form, including

25 specifically Virginia Thompson, Maureen Dombeck, Kevin Millen,

1  Philip Patel, is anyone -- are any of them present or on the

2  telephone?  Or is anyone appearing on any of their behalf,

3  either in person or on the telephone?  If so, please identify

4  yourself now.

5                        (No audible response heard)

6            THE COURT:  I hear no response.  You may proceed.

7            MS. HENDERSON:  Thank you, Your Honor.

8            This brings us to an objection that was filed by the

9  Taxing Authority for the County of San Bernardino, California.

10 Your Honor, we've reviewed this objection, and we have spoken

11 on a number of occasions to the representative of the County.

12           Our take on the objection is confirmed by our

13 subsequent conversations is that it, frankly, goes more to

14 treatment and would like some rather specific indication of

15 precisely what the law in California says about tax claims;

16 we're not inclined to do that.

17           What we have done is we have made a revision to the

18 disclosure statement at Page 69, and also to the plan, which

19 clarifies the treatment of San Bernardino's claim in this

20 fashion:

21           We have modified the definition of other secured

22 claims.  And I should back up and say that perhaps the

23 confusion here is that San Bernardino County alleges that their

24 priority claim is also a secured claim, which is hardly

25 uncommon for a taxing authority.  And they are looking for some

1  further elaboration on the interest that would apply to that

2  claim.  For example, what we have done is we have been clear

3  that other secured claims in our plan will exclude priority tax

4  claims, and that priority tax claims, as a defined term, will

5  include secured or unsecured claims of the governmental unit

6  otherwise entitled to priority under 507(a)(8).  So that it's

7  clear that we are treating this claim as a priority tax claim,

8  which we believe we're permitted to do under 1129.

9        The other aspect of their objection went to their

10  entitlement to interest.  And we would note that the plan

11  currently provides that if they're entitled, holders of

12  priority tax claims will receive interest as determined under

13  Section 511 of the Bankruptcy Code.  So, we believe we've

14  actually addressed that portion of their objection.

15        As a side note, we have told them that to the extent

16  they have a secured claim that is not a priority claim, then

17  their secured claims are reinstated and, therefore, they'll be

18  entitled to whatever the interest they would otherwise be

19  entitled to is under applicable law in California.

20        So, we believe we've tried to counsel with them to

21  help them understand how the plan works in respect of their

22  claims.  And we believe that where there could be any

23  confusion, we have addressed it definitionally.

24        I don't know if they're present telephonically, Your

25  Honor.  We have not had any further conversations with them or

1  e-mail exchanges with them since yesterday.  They didn't seem

2  entirely satisfied because, as I say, I think they wanted some

3  resolution that related specifically to them by name in terms

4  of their treatment.  But we feel that we have addressed their

5  objection appropriately.

6          THE COURT:  Let me ask for the record if the County

7  of San Bernardino wishes to be heard?

8          MS. ROMERO:  I do, Your Honor.  This is Martha Romero

9  for secured creditor, San Bernardino County.

10         And I think hearing what counsel has said, there's

11 been a miscommunication.  We never asserted we were a priority

12 tax claim.  In fact, we've asserted that we're a secured tax

13 claim.

14         And hence the confusion is exacerbated by the fact

15 that the priority tax claim section, as counsel put it out,

16 specifically sets forth that they are allowed interest under 11

17 U.S.C. Section 511, which was added to the Reform Act in

18 October of 2005.

19         And all we're asking is that same language that they

20 refer to in the priority tax claim section, of which we are not

21 a priority tax claim, be parroted in the secured tax claim

22 section.

23         And that's -- it's really a limited objection.  We're

24 not specifically asking that we be named as a taxing authority.

25 We're not specifically referring to anything in California law.

1  Perhaps there's been miscommunication throughout the e-mail,

2  but all we're asking is that the same language that's parroted

3  in the priority tax claim sections with respect to interest

4  under 511 -- Section 511 be parroted under the secured claim

5  section.

6          And we were kind of puzzled as to why they wouldn't

7  parrot the same language.  We didn't get a reason why they

8  wouldn't, or any justification why they wouldn't.  And so we

9  were just at a standstill as of yesterday after the e-mails

10  went back and forth.

11          We tried to communicate the fact that we just wanted

12  that same sentence in the miscellaneous secured tax claim

13  sections, and that's actually the only thing that our objection

14  is all about.

15          THE COURT:  Any response?

16          MS. HENDERSON:  Your Honor, we think that the taxing

17  authority may be a little confused about the treatment of the

18  priority tax claim being the same treatment that you would get

19  as an other secured claim.

20          And we might add that we don't have an express

21  reference to 511 in context of other secured claims because 511

22  refers only to tax claims.

23          To the County's point, to the extent that they are a

24  priority tax claim, we have the option of treating them as such

25  under 1129.

1          To the extent that they are a secured claim, if they

2    are priority, we have the option of treating them under 1129,

3    as well.

4          If they are a secured claim and not a priority claim,

5    then they would be reinstated and entitled to interest under

6    applicable law, which I think is all that 511 says anyway.

7    It's just that that particular provision doesn't apply to

8    secured claims.

9          So, rather than bake something into the plan that

10   would be inaccurate and confusing, we think that the way we

11   have addressed it through reinstatement for secured claims, and

12   for the treatment of priority claims that we already have,

13   addresses the objection and is consistent with both disclosure

14   and applicable law.

15         THE COURT:  Well, I confess I have not had a 511

16   issue yet, but it sounds more to me as if there may be a

17   disagreement about how the claim is to be treated and is more

18   appropriate for the subject of confirmation objection.

19         It may be that between now and then, the parties can

20   make a resolution of exactly what the nature of the claim is

21   and how it should be treated.  But I hear disparate views over

22   how it should be treated, and that tells me it's more a

23   confirmation objection at this point.

24         So, I'm not inclined to require further changes to

25   the disclosure statement.

1          MS. HENDERSON:  Thank you, Your Honor.

2          MS. ROMERO:  Thank you, Your Honor.  I just wanted to

3   make one last comment.  And that is in the priority tax claim

4   Section 2.3 on Page 22, there's specific reference to -- a

5   four-line reference to interest, and a specific reference to

6   511.

7          So, hopefully we can resolve that prior to

8   confirmation.

9          I thank you for your time, Your Honor, and I'd like

10  to be excused.

11         THE COURT:  You may be.

12         MS. ROMERO:  Thank you, Your Honor.

13         MS. HENDERSON:  Your Honor, this takes us to the

14  objection we received from the Ace American Insurance Company.

15         This objection largely addressed our proposed

16  treatment of any and all insurance contracts that fall within

17  the Ace Insurance program, as they have defined it.  They were,

18  frankly, primarily concerned that their rights not be abridged

19  in some fashion.

20         We were able to work with them to come up with a

21  reservation of rights paragraph which, Your Honor, should be

22  set forth in the supplement -- the blackline pages to the

23  disclosure statement.  And they have agreed to this, and we

24  have resolved their objection on that basis.

25         THE COURT:  All right.  Let me ask for the record,

44

1    does Ace wish to be heard?

2                     (No audible response heard)

3                THE COURT:  I hear no response.

4                MS. HENDERSON:  The next objection, Your Honor, was,

5    I think, also in the form of a letter when it was filed and

6    docketed by the so-called Crabhouse plaintiffs.  These -- the

7    objection was made by the attorneys who represent the

8    plaintiffs, I assume, in the putative class action lawsuit

9    pending against one of the debtors, Hoy Publications.  And has

10   asked for additional disclosure concerning the alleged fraud

11   involved in the claim, specifically that we quote -- or that we

12   put in language that they would like from a non-prosecution

13   agreement that was entered into between these defendants and

14   the Government.

15              And further have asked that we indicate that those

16   claims aren't discharged in bankruptcy.  And they further

17   indicated, I think, we've misidentified Tribune, N.D. as the

18   defendant.

19              We have made additional disclosure at Page 45 of our

20   disclosure statement, which we think addresses their concerns.

21              They have disagreed.  They would like us to say that

22   their claims aren't discharged, and they would like us to say

23   that there was some acknowledgment of fraud in the non-

24   prosecution agreement that was entered into with the

25   Government.

1          Our view on this, Your Honor, is that we have

2    supplemented our disclosure appropriately by referencing the

3    non-prosecution agreement, and referencing what we believe to

4    be the central terms of that agreement at Page 45.

5          We do not see the reason to say anything about the

6    alleged non-dischargeability of a fraud claim, as we are not

7    dealing with an individual case here or corporate case.  So,

8    we've tried to explain that to them.

9          And we also have pointed out that Trib, N.D. is a

10   successor in interest to the defendant that was named, and

11   hence it's the appropriate entity to be referenced in our

12   disclosure statement.

13         So, we believe we have resolved their objection.  I

14   think they would probably still like more language.  We think,

15   however, that it's unnecessary at this juncture, and that we've

16   made more than adequate disclosure.

17         I should say that even before what we added to the

18   disclosure statement, the couple of paragraphs that we already

19   had on this litigation, which is ongoing, were consistent with,

20   and our public disclosures have been made previously with the

21   SEC.

22         THE COURT:  All right.  Let me ask, do the so-called

23   Crabhouse plaintiffs wish to be heard?

24              (No audible response heard)

25         THE COURT:  I hear no response.  Let's press on then.

1          MS. HENDERSON:  Your Honor, the next objection was

2   from Robert Henke.  He had a couple of points:

3          He wanted an estimate in the disclosure statement in

4   respect of litigation claims, which we have provided.  We have

5   supplemented the disclosure statement at Pages 44 and 45 with a

6   couple of paragraphs setting forth the notational amount of

7   litigation claims, both at the subsidiary level and at the

8   parent level.

9          And further indicating how those are reduced by way

10  of duplication, and indicating how those are reduced by way of

11  duplication and indicating that we believe there are other

12  bases for objection to these claims, many of which have already

13  been objected to, and then providing what we think is the

14  appropriate range.  So, we believe we've addressed that

15  objection.

16         They also wanted some language in the disclosure

17  statement about violating the intent of the bankruptcy law by

18  discounting penalties for negligence or malice; we declined to

19  make that change.  But we believe we have addressed the

20  substance of Mr. Henke's concerns.

21         THE COURT:  Let me ask for the record, does Mr.

22  Henke, or anyone on his behalf, wish to be heard?

23              (No audible response heard)

24         THE COURT:  I hear no response.  You may proceed.

25         MS. HENDERSON:  Thank you, Your Honor.  I think that

47

1  this takes us to the U.S. Trustee's objection.

2         As noted, the objection that was filed relates to the

3  ballot.  And so we have deferred that to the solicitation

4  procedures motion portion of our presentation this morning.

5         With respect to the other informal objections, as I

6  indicated, I believe we have resolved all of them, say for two

7  that Mr. McMahon would like to press today.  This would be

8  perhaps a good opportunity for -- one of them, I should say,

9  just by way of outset, is the -- what he already alluded to,

10 the disclosure or the failure to have included in the plan

11 supplemented the description of the so-called TMIP and KOB

12 incentive plans.

13         The other objection that Mr. McMahon still presses

14 has to do with the adequacy of disclosure relative to the tax

15 effects of the Chicago Cubs' disposition.  And I think he would

16 want to be heard on both of those, now is probably a good time

17 to do that.

18         So, perhaps we'll let him speak to the TMIP and KOB,

19 and we can address it.

20         THE COURT:  Very well.  Mr. McMahon?

21         MR. McMAHON:  Your Honor, good morning again.  Joseph

22 McMahon for the Acting United States Trustee.

23         Your Honor, at the time the debtors moved to dismiss

24 the bonus plan motion without prejudice, we discussed the

25 impact on the objectors, the union and our office at the time

1  and the fact that the debtors reserve the opportunity to

2  incorporate this into the disclosure statement and plan.

3         As I had noted, up until all points, through

4  yesterday afternoon, it was our understanding that the debtors

5  were going to be making some disclosure regarding their

6  intentions in the disclosure statement.  And then that got

7  delayed for approximately 60 days via the proposed text that

8  was submitted to us yesterday.

9         In order to advise the Acting United States Trustee

10 as to what position she would like to take in connection with

11 the debtors' proposal, I need to know what it is.  And, Your

12 Honor, I don't know what the facts are, but my guess is that

13 this is not simply going to be a cut and paste of what was in

14 the motion into the new proposal.

15        I have a concern that I'm dealing with a moving

16 target.  I have no idea, to the extent that supplemental

17 objections or discovery may be necessary, what it is I'm

18 responding to.

19        The debtors were the ones that promised to put this

20 information in the disclosure statement text.  They said they

21 would have it on file prior to today's hearing; they haven't

22 done so.

23        There is prejudice to my client's position,

24 especially in light of the fact of the history of dealing with

25 compensation issues in these cases.

1          I don't know what more I can say with respect to that

2    particular issue, other than we've got to have disclosure

3    sufficient to apprise the parties in interest, including the

4    objectors to the motion -- the previous motion what it is the

5    debtors' intentions are.  It's only fair, in light of the

6    procedural history of that particular issue in connection with

7    these cases.

8          Would you like me to address the second disclosure

9    issue, as well?  Your Honor, I raised a disclosure issue with

10   respect to the tax impact of the Cubs sale with the debtors.

11   By way of background, Your Honor, I'm not a tax lawyer, but the

12   debtors, in connection with the transactions in 2007, switched

13   their corporate status from a C Corp to an S Corp.  My

14   understanding of the tax implication of that change is that for

15   a period of 10 years thereafter, they owe corporate gains taxes

16   if they sell assets with building gains.

17          So, the issue, Your Honor, is the transaction --

18          THE COURT:  "They" meaning the corporate entities as

19   opposed to the shareholders?

20          MR. McMAHON:  Correct, Your Honor.  So, the bottom

21   line is the issue from a tax characterization is whether the

22   Cubs sale, as approved by this Court, is a sale versus, as we

23   would call it, a distribution from a leverage partnership, my

24   characterization.  But I think it fairly characterizes what the

25   debtors believe occurred earlier in these cases.

1          My understanding of the impact of that issue is that

2  it's a multi hundred million dollar issue.  Public reports that

3  I have read have put the number in the range of $300 million.

4          So, my point with respect to disclosure, Your Honor,

5  is, well, what if the IRS challenges this, the debtors'

6  position that is, and what if they're right?  Well, there will

7  be obviously an impact on cash flow.  It may impact the

8  availability of credit to the debtors.

9          It seems to me that there should be a disclosure

10 regarding the consequences of the taxing authorities being

11 correct if they so choose to challenge the debtors' position

12 with respect to this issue.

13         Those are my two disclosure points, Your Honor.

14         THE COURT:  All right.  Thank you.

15         MR. KRAKAUER:  Your Honor, Bryan Krakauer on behalf

16 of the debtors.

17         I'm going to address just the tax issue relating to

18 the Cubs transaction.  And then I believe Mr. Conlan is going

19 to address the TMIP.

20         First, just to correct something, pursuant to this

21 plan, the debtors would convert back from an S Corporation to a

22 C Corp and, therefore, as a C Corp it no longer has pass-

23 through taxation, it gets taxed.  It gets taxed normally, if I

24 can use that word, as a nontax attorney.

25         In the projections we've provided, it projects that

1  tax -- that taxes would be taxed as a C Corp.  And there are --

2  there are taxes that arise from the Cubs transaction.  And

3  basically over a period of time, the -- there are taxes that

4  the debtor anticipates paying as a result of the Cubs

5  transaction.

6          And also in the financial statements, the debtors

7  also have disclosed what's known as a "deferred tax liability."

8  Which includes taxes arising from the Cubs transaction.

9          So, it is not -- because we're not dealing with an S

10  Corp anymore, we're not dealing with not paying taxes.  It

11  becomes just the timing issue.

12          We have, in the disclosure statement, disclosed all

13  that.

14          THE COURT:  Show me where.

15          MR. KRAKAUER:  Okay.  It's in a couple of places,

16  Your Honor:

17          First, on the new -- what I'll refer to as the new

18  disclosure statement, the one that was distributed this

19  morning.

20          THE COURT:  Okay.  I have the blackline.

21          MR. KRAKAUER:  Yes, if you look at --

22          THE COURT:  It's not complete copy, just so you

23  understand.

24          MR. KRAKAUER:  I understand.

25          THE COURT:  Okay.

52

1          MR. KRAKAUER:  It has the blackline pages.  If you

2   look at Page 59, Footnote 9, there is a disclosure about the

3   fact that -- how the transaction was structured.  That the

4   Tribune received an opinion of counsel for its own benefit,

5   which obviously isn't binding on the IRS.  But that there isn't

6   a current taxable event associated with the transaction.

7          And that the Tribune does expect to recognize taxes

8   over time in connection with this transaction.  And, indeed,

9   that's been reflected in our financial projections that are in

10  Exhibit G to the disclosure statement.

11          And we also reflect the tax liability -- there's more

12  than just the Cubs transaction there, obviously you could tell

13  -- as you could tell by the number.  But it's in the financial

14  statements themselves.  So, it's all recorded as a liability.

15          There is also a risk factor disclosure in the

16  disclosure statement.  And the risk factor disclosure is not on

17  -- is on what was filed last week, or a couple -- a few days

18  ago in our disclosure statement.  But that basically is on Page

19  132 of our disclosure statement.  And I'm looking, I believe,

20  at the blackline one, and that's in Section 14(c), and Number

21  16.

22          THE COURT:  Bear with me --

23          MR. KRAKAUER:  Yes, of course.

24          THE COURT:  -- while I locate that in my binder.

25                         (Pause)

1          MR. KRAKAUER:  Actually on 132 of the clean version,

2 I believe.  On the blackline version, it's Page 144, depending

3 on which one you have.

4          THE COURT:  I'm sorry.  Give me the page number

5 again, please?

6          MR. KRAKAUER:  If you're looking at the blackline of

7 our disclosure statement, it's Page 144.  If you're looking at

8 the clean version, it's Page 132.

9                         (Pause)

10          MR. KRAKAUER:  Your Honor, if you want, I can hand up

11 a binder with the clean version?

12          THE COURT:  Would you do that?

13          MR. KRAKAUER:  Or blackline.

14          THE COURT:  Because I don't know why I can't locate

15 it at the moment in my hearing binder.

16                         (Pause)

17          THE COURT:  Thank you.

18          MR. KRAKAUER:  And that's -- if you're looking at

19 Number 16, it's a generalized statement dealing with tax

20 liabilities in general.  But it points out that's a risk factor

21 in connection with the debtors.

22          THE COURT:  Well, is the magnitude of the risk

23 coextensive with the figure that was stated in the footnote on

24 Page 59?

25          MR. KRAKAUER:  The footnote on Page 59 includes this

1 risk and other risks associated with it. So, it's -- so, yes,

2 it's included in what's Footnote 9 on Page 59 of the blackline

3 you have in front of you.

4          And I should point out, Your Honor, nobody has

5 challenged this transaction at this point.  And if there was a

6 challenge, you know, the issue would be what does it say, what

7 aspects are they challenging, and all that.  And so it's purely

8 hypothetical.

9          And this transaction was reviewed very carefully, not

10 just by the debtors, but all sorts of other tax attorneys with

11 our creditor constituencies.  And we feel very good that it is

12 an appropriate transaction.

13          THE COURT:  I'm not going to require any further

14 disclosure on that issue.

15          Let's address the incentive plan objection.

16          MR. KRAKAUER:  Thank you, Your Honor.

17          THE COURT:  So, before you begin, Mr. Conlan, let me

18 tell you I think the U.S. Trustee here is correct.  Tell me why

19 that information shouldn't, isn't, can't be included in the

20 disclosure statement?

21          MR. CONLAN:  Your Honor, we'd like to include it in

22 the disclosure statement, we don't have agreement yet with

23 certain of the settlement support agreement parties.  As soon

24 as we have agreement with them, and that obviously must occur

25 before July 15th, which is the plan supplement date, but as

1 | soon as we have it, we would include it; we'd like to include
2 | it.

3 |     We do think that if we file it as late as July 15th,
4 | that that will give people adequate time to look at it before
5 | the July 30 voting deadline, but I'm not going to quarrel with
6 | the point that it would be better to have it earlier.

7 |     THE COURT:  Well, it's not going to go out with the
8 | solicitation package, is it?

9 |     MR. CONLAN:  No.

10 |     THE COURT:  No.  So, how will people learn of it?

11 |     MR. CONLAN:  They will have to look at the plan
12 | supplement.

13 |     THE COURT:  I don't think that's enough.  I mean I
14 | just finished a confirmation hearing in which I found the
15 | incentive plan component was legitimate subject to confirmation
16 | objection, and it was on one of the grounds on which I denied
17 | confirmation.  It goes to good faith among, arguably, other
18 | things.  But if you're going to ask that it be approved as part
19 | of a plan to be confirmed -- well, I'll give you a choice.  You
20 | either have to put it in the plan, which means it goes in the
21 | disclosure statement, or you'll have to make it a subject of a
22 | separate motion.

23 |     MR. CONLAN:  Well, we want it in the plan.  So, can
24 | we pass this issue to the -- til later in the day and continue
25 | to work with those parties?

56

1            THE COURT:  This will be the first item in the

2  bucket.

3            MR. CONLAN:  Thank you, Your Honor.

4                      (Laughter)

5            MR. CONLAN:  And with that, Janet Henderson will

6  retake the podium.

7            THE COURT:  All right.

8            MS. HENDERSON:  Your Honor, this brings us to the

9  objection that was filed by the Deutsche Bank in their capacity

10  as indenture trustee under the 1992, 1995 and 1997 indentures.

11            Some aspects of their objection relate to the matters

12  that will be taken up shortly relative to the adequacy of the

13  description in the disclosure statement of the LBO related

14  causes of action and to the settlement.  So, I will defer that

15  portion of the objection so that Mr. Conlan can deal with it in

16  connection with the other objections that are similar.

17            With respect to the other aspects of Deutsche Bank's

18  objection, some of them are simply technical.  I don't mean to

19  demean them, but I think they are language fixes that we have

20  been able to achieve; they'll tell us if we're wrong.

21            They have asked for information -- essentially

22  relative to identity of the notes that they represent, QSIP

23  numbers and the like, that there are filed proofs of claim,

24  different from the amounts of the disclosure statement.

25            We have added language in the revised version of the

1  disclosure statement that Your Honor has at Page 32 that

2  identifies the indenture under which each senior note was

3  issued.  And which will provide the QSIP numbers for each of

4  those, as well.

5           THE COURT:  All right.  That's not in -- that's not

6  among the --

7           MS. HENDERSON:  I believe that might in your

8  supplement.

9           THE COURT:  Yes, it's not in the pages of the

10 blackline I was given.

11          MS. HENDERSON:  I think the portion of what we've

12 done here may be in the supplement.

13          FEMALE SPEAKER:  Page 32 --

14          MS. HENDERSON:  Pardon me?

15          FEMALE SPEAKER:  Page 32 at the bottom of that.

16          MS. HENDERSON:  Okay.

17          THE COURT:  Okay.

18          MS. HENDERSON:  So, it's not a supplement item, it's

19 a -- okay.

20          FEMALE SPEAKER:  That first --

21          MS. HENDERSON:  Okay.

22                              (Pause)

23          MS. HENDERSON:  Sir, and you'll see at Page 32 an

24 additional column added to a chart with the QSIP numbers listed

25 and --

1          THE COURT:  I see it.

2          MS. HENDERSON:  -- the various indentures.  We have

3  also provided that we -- on Page 31 of the disclosure

4  statement, that the amounts listed are principal amounts, and

5  do not include interest and fees, and don't purport to

6  represent the allowed amount of the senior noteholder claims.

7  And that would be found in the footnote -- it's hard to read in

8  the type -- but I believe it's at Footnote 30 or 36 at the

9  bottom of Page 32 of the revised disclosure statement in the

10  binder, Your Honor.

11          THE COURT:  I see it.

12          MS. HENDERSON:  Additionally, there were some points

13  that Deutsche Bank raised relative to the mechanics of making

14  payment under the plan, having to do with the record date, how

15  the -- whether the indentures would be canceled, and the like,

16  and what we determined was that some of this was really

17  semantic.  We were able to make changes to the plan and

18  disclosure statement that we believe addresses these issues.

19  They are really technical issues.  For example, the record date

20  issue -- they want a record date for distributions.  It turns

21  out that that is -- the way the disbursing agent will do this

22  doesn't tie, by their own internal procedures, with a record

23  date.  It is necessary that there be a cancellation of the

24  indenture that's treated as an exchange by them.  It's

25  literally a semantics issue.

1           We have addressed these matters in the plan at Page

2   54, and the disclosure statement at Page 102.  And we think

3   that we have the kinks ironed out, if you will, of these rather

4   mechanical technical matters relative to making distributions

5   and how those distributions are evidenced.  And that really is

6   a fair amount of the points that are raised in the Deutsche

7   Bank objection.

8           I'm actually looking through here, Your Honor.  I

9   believe that the objections that go to how distributions will

10  be made, the cancellation of the indentures, and discharge of

11  Deutsche Bank as trustee, the record date, which are sort of

12  the technical items I mentioned, I believe those have all been

13  resolved through drafting in the disclosure statement around

14  Pages 100, 102, and where appropriate, would follow through in

15  the plan.

16          Beyond that, Deutsche Bank has an additional

17  objection whereby they are arguing that the plan and disclosure

18  statement should address the disparate treatment of Class 1D

19  creditors, those would be the noteholders, from the treatment

20  of the lender fees, senior lender settlement fees, Creditors'

21  Committee member fees, and senior noteholder fees and expense

22  claims, their essential issue here is that their fees are not

23  being paid.  That is to say the trustee, pursuant to the plan

24  and settlement support agreement, I believe that Law

25  Debenture's fees are being paid.  And, therefore, they think

1  that this may create some disparate treatment within the class

2  that would cause the class to be -- the treatment to fail under

3  the plan confirmation provision, Section 1129.  We think this

4  is clearly a confirmation issue and can be raised at that time.

5          We have added, though, additional language setting

6  forth their position.  And I might add that -- I think I may

7  have missed a step when I was telling you of the disparate

8  treatment.  Their view is that they are entitled to a charging

9  lien under the indenture.  And that by application of that

10  charging lien, they will be taking recoveries out of the notes

11  that will reduce their noteholders' recoveries relative to

12  other noteholder recoveries.

13          We have added language in the -- notwithstanding that

14  we believe this is a plan issue.  We have added language in the

15  disclosure statement supplement that we've given you, and I

16  believe that is at Page 12, and it is reflected, Your Honor, as

17  Footnote 7 whereby we would set forth that Deutsche Bank does

18  claim a charging lien for fees and expenses and that they

19  assert that if they successfully prosecuted that charging lien,

20  it would lead to the disparate treatment that they would like

21  disclosed.

22          We also note that we do not take a position with

23  regard to any right that the may have to assert a charging lien

24  at this time.  And that we also don't think this is a cause of

25  disparate treatment within the class.

1          So, we think we've addressed that particular

2     objection through additional disclosure.  Deutsche Bank may

3     have a different view.

4          The final portion of their objection that does not

5     relate to the adequacy of the settlement and the LBO related

6     claims has to do with a request for additional exposure as to

7     the appointment of an examiner, and how the examiner's report

8     can be accessed.  We believe we have addressed that rather

9     specifically in the disclosure statement at Pages 60 and 61

10    where we have a discussion of the examiner and reference a link

11    to obtain the report, and talk about the scope of his duties.

12    As noted, it will also be on the ballot.

13          THE COURT:  Let me hear from Deutsche Bank.

14          MR. ADLER:  good morning, Your Honor.  David Adler

15    from McCarter & English on behalf of Deutsche Bank, Trust

16    Company of Americas.

17          The debtors are correct that many of the issues have

18    been worked out.  We really remain with two issues:

19          And the first issue is an issue of mechanics.

20    Deutsche Bank was somewhat surprised that a record date for

21    distributions was not being established in this case.  Instead,

22    the way the plan envisions this process working is that the

23    holder will essentially tender his or her notes back to DTC and

24    get an exchange of new notes, new common stock, and cash.

25          We had a long discussion with the debtors and with

1  Epiq a couple days ago.  Suffice it to say that we will work

2  through the process.  It is very mechanical, but it is

3  something that we are just not yet completely comfortable with,

4  especially if there are going to be more than one distribution

5  in this case.  You would normally establish a record date for

6  distribution, and then have a holder's list in thereafter

7  provide that consideration to the holders as of the record

8  date.

9       So, Your Honor, on that point, we will continue to

10  work with the debtors.

11      They are mechanical issues that are here, and I think

12  that to the extent we are not in agreement on an issue, we can

13  deal with it via a plan supplement.  I mean it doesn't alter

14  the -- you know, the consideration to be distributed in this

15  case.

16      The second point, Your Honor, is the point that

17  Deutsche Bank raised concerning disparate treatment.  And that,

18  Your Honor, we stated was a disclosure issue.  Because, as it

19  stands right now, Deutsche Bank is in the same class as -- or

20  the holders of the Deutsche Bank indentures are in the same

21  class as the Law Debenture holders, and the plan provides for

22  the payment of the fees and expenses of Law Debenture and its

23  counsel.  But does not provide for the payment of Deutsche

24  Bank's counsel and other fees and expenses.

25      So, under the indentures, the way that payments are

1   allocated is that Deutsche Bank will reimburse itself first for

2   its fees and expenses, and then distribute the funds to the

3   holders.  And in our view, that created -- or has the potential

4   to create disparate treatment of creditors within the same

5   class.

6         So, we recognize that that is an issue that would

7   come up at confirmation.  And yesterday, we did work through

8   some language to put in the disclosure statement, which Ms.

9   Henderson referenced in that footnote.  And given that, we

10  obviously reserve our rights with respect to the disparate

11  treatment on confirmation.  But for purposes of disclosure, I

12  think that that footnote does cover what our position was.

13        THE COURT:  All right.  So, except for the common

14  issue on further disclosure on the LBO transaction --

15        MR. ADLER:  Right.

16        THE COURT:  -- your objections have been addressed?

17        MR. ADLER:  Correct, Your Honor.  I mean with respect

18  to the LBO related transaction, many parties have requested the

19  same information with respect to the disclosure on the

20  appointment of the examiner, others have asked for that, as

21  well.  I've seen what those disclosures are.  I think Deutsche

22  Bank is satisfied with the examiner disclosure.

23        But with respect to the LBO related causes of action,

24  I have not seen what the final disclosure looks like.  And

25  obviously we reserve our rights if we think that that's

64

1  insufficient, as well, as we read through that today.

2           THE COURT:  Okay.

3           MR. ADLER:  Thank you, Your Honor.

4           MS. HENDERSON:  Thank you, Your Honor.  This brings

5  us to the objection by the Department of Labor.

6           Mr. Krakauer has been working on this matter with the

7  Department of Labor, and I will cede the podium to him.

8           THE COURT:  Okay.

9           MR. KRAKAUER:  Your Honor, again, for the record,

10 Bryan Krakauer on behalf of the debtors.

11          We've made a number of changes in response to the

12 Department of Labor's objection.  And a number of them,

13 frankly, go to the plan itself.  So, our changes are in the

14 plan which then get just incorporated in the disclosure

15 statement as a plan change.

16          First, the Department of Labor had a concern that it

17 be clear that any claims that they have against nondebtors are

18 not released.  And rather than just say that in the disclosure

19 statement, we've put it in the plan itself in 11.2.2.  And we

20 did that in the disclosure statement that was filed with the

21 Court two days ago, and they asked for an additional change

22 last night just deleting basically the language.  We referred

23 to them as nondebtor third parties.  They said, why not just

24 refer to them as nondebtors, and delete the third party

25 reference.  And we said, fine.  So, I think that -- that is

1 resolved.

2          Second, the Department of Labor has what I would

3 characterize as a plan dispute as to whether or not the ESOP

4 related ERISA claims that might be asserted by them are or are

5 not subordinated.  We have classified those claims as

6 securities related claims, and this is basically a version of

7 the Touch America issue, which this Court addressed previously.

8          THE COURT:  Which one?

9                    (Laughter)

10          MR. KRAKAUER:  Well, one of your Touch America

11 issues.

12          And we have put in the disclosure statement at the

13 Department of Labor's request that they disagree with that

14 characterization, and I think that resolves it.

15          In the new -- we put it in with regard to the parent

16 claims and what they filed -- what we filed a few days ago.

17 They said, well, shouldn't you also put it in with regard to

18 the claims they filed against subsidiaries.  We said, yes, we

19 should.

20          So, in Page 81 of the new disclosure statement that

21 you were given this morning, there is a specific reference that

22 the Department of Labor has informed us they don't agree with

23 the characterization.  If you want to take a look, that's

24 there.

25          THE COURT:  All right.  I see that.

1          MR. KRAKAUER:  Okay.  In connection with the

2   supplemental injunction, again, we addressed the -- they wanted

3   it addressed that basically the claims that were enjoined were

4   those that were being released in connection with what were in

5   our plan.  Actually their words were "pursuant to the plan."

6   Our words were "in connection with."  We actually changed the

7   plan itself to make clear that that's the extent of the

8   injunction, and we did that in the plan language that we gave

9   you -- handed up this morning and there will be similar

10  provision in the disclosure statement.

11          I think the only dispute there, as we said, in

12  connection with they wanted "pursuant to," we said "in

13  connection with" because the third party releases is really a

14  consensual issue.  Somebody is consenting to a third party

15  release.  I didn't know that "pursuant to" really captured it.

16  I'm not sure if that's still an issue, but we think we've

17  addressed that.

18          Next, they wanted clarified that in connection with

19  what I'll refer to as the Neal litigation, which has been

20  pending in the Northern District of Illinois, that if a

21  creditor consents and agrees to a third party release, pursuant

22  to the plan, that that creditor would be consenting to release

23  whatever claims it had in connection with the Neal litigation.

24          And we thought that it was appropriate to make that

25  clear, and we've done that in Page 108 of the new disclosure

1 statement, which says that very explicitly.  And I don't know

2 if you want to look at it, but it's in the blackline, so we've

3 addressed that point.

4       In connection with identifying persons, they've also

5 said that we should identify persons who would be subject to

6 the third party releases.  Our disclosure does include in Page

7 106 and 107 of the blackline disclosure statement a description

8 of the various claims that would be released, and the

9 categories of people.

10       They've also said that it should make clear that if

11 somebody executes third party releases, that people who are

12 basically defendants in the Neal litigation, like GreatBanc,

13 are released, and we think we've done that now by that same 108

14 provision -- Page 108 provision which basically says if you are

15 a plaintiff in the Neal litigation, you're releasing everybody

16 in connection with the Neal litigation.  So -- and, again,

17 that's the consensual creditor release.  So, I think we've

18 resolved that.

19       Next they said in connection with the indemnity

20 language, that we should address what claims we are aware of in

21 connection with that.

22       To the extent we're talking about the Neal

23 litigation, we have clarified on Page 112 of the disclosure

24 statement that there are not -- we're not aware -- and this is

25 on what we gave you this morning.  We're not aware of any

1 indemnification claims against the debtors arising from the

2 currently pending causes of action in the Neal litigation,

3 that's in terms of what's currently pending.  So, I think we've

4 addressed that.

5        To the extent we're talking about indemnity claims

6 otherwise, obviously our hope in connection with this plan is

7 it's going to get rid of as much litigation -- threatened

8 litigation as possible, and there's a global settlement.  But I

9 think otherwise, it's probably best to defer it to a discussion

10 of the global settlement that we'll have in connection with the

11 other parties.  It's a question on disclosure on that.

12        And I think the final issue they had was we have a

13 provision in the plan that refers to findings we might seek in

14 connection with the ESOP basically and our rejection of the

15 ESOP pursuant to the plan.  And they asked that we disclosed

16 exactly what findings we would seek.

17        We would acknowledge that whatever we seek is going

18 to have to be something that the Court finds is appropriate in

19 connection with confirmation.  We've put in also a provision in

20 the disclosure statement on Page 99 to make clear that to the

21 extent we're dealing with ERISA issues and the ESOP, we would

22 provide reasonable notice to the Department of Labor, and give

23 them an opportunity to respond on any such findings.

24        But as to predicting exactly what we would seek,

25 it's, frankly, tough to do so right now.  Part of the reason is

1  we don't know quite what the Department of Labor will say about

2  all that and what we'll have to respond to and seek to ask this

3  Court to deal with.

4        But we -- and we also don't view it, frankly, as a

5  voting issue in connection with solicitation.  We think we've

6  addressed that by saying if we're seeking a finding, we'll give

7  the Department of Labor notice.  We'll all have an opportunity

8  to address it before you, and you can decide what's appropriate

9  or not.

10       And I think that's the points.  I think we -- that

11 addresses everything.  I don't know if the Department of Labor

12 is here by phone or not.

13       THE COURT:  It looks like they're on the phone.  Let

14 me ask if the Department of Labor wishes to be heard?

15       MR. GERSON:  Yes, I do, Your Honor.  It's Leonard

16 Gerson for the Department of Labor.

17       THE COURT:  Go ahead.

18       MR. GERSON:  I have two points:

19       I'm not in the courtroom, so I haven't seen the

20 supplement that was distributed today.  So, I haven't seen the

21 language with respect to the indemnity that's being added or

22 that was discussed last night.

23       Could Mr. Krakauer please read it to me, because he

24 only referenced one sentence.

25       MR. KRAKAUER:  And that's the one sentence that's

1   been added.

2          MR. GERSON:  So, you've only added that one sentence

3   to the --

4          MR. KRAKAUER:  Relating to the Neal litigation,

5   that's correct.

6          MR. GERSON:  Because more was discussed last night,

7   and I thought agreed upon.

8          All right, we might as well start with that then.

9   One of the unusual parts of this plan is that they're assuming

10  indemnity obligations that they otherwise wouldn't have to

11  assume.  They could be extinguished pursuant to Section 502(e).

12  So, we want some disclosure as to why they're being assumed,

13  potential mount of indemnification, obligations that the

14  assumption's going to result in, and there's nothing there.

15         THE COURT:  And what's your other issue?

16         MR. GERSON:  With respect to the indemnity?

17         THE COURT:  No, you said there were two items you

18  wanted to talk about.  Or was that it?

19         MR. GERSON:  Well, there are actually now three:

20         The second one has to do with the supplemental

21  injunction that's on Page -- it's on Page 110 of the redline,

22  107 on the clean copy.

23         As the Department described its objection, even

24  though it was supposed to be a consensual release, the

25  supplemental injunction was enjoining claims, even if creditors

1 opted out of the release.

2        The debtors said they were fixing that in their

3 filing that was done yesterday, but it still wasn't fixed.

4 Claims that -- for which creditors had opted out of the release

5 were still being enjoined.

6        We discussed language last night, and have almost

7 reached a resolution, except for that difference in the phrase

8 "in connection with the plan" or "pursuant to the plan."

9        Our problem with "in connection with the plan" is we

10 don't -- we believe that consensual releases that are being

11 granted as part of the plan are still pursuant to the plan.

12 So, "pursuant to the plan" covers such consensual releases.

13 "In connection with the plan" language is not needed.  "In

14 connection with the plan" suggests to us that there's some kind

15 of other documents, ancillary documents that might be entered

16 into in connection with the plan that will somehow relate to

17 the releases.  And then you'll have an injunction in the plan

18 enjoining the prosecution of those claims, but we won't know

19 what it's about.

20        It's basic law that an injunction is supposed to be

21 clear on its face and clearly indicate what is or what isn't

22 being enjoined.  We shouldn't have to look further than the

23 plan to know what's being enjoined.

24        And if there are other documents that the debtor is

25 going to be entering into, other agreements that are going to

1  involve the injunction, they should identify them in the

2  disclosure statement.

3           So, that's our objection with respect to Section 11.4

4  of the plan and related disclosure statement issue.

5           THE COURT:  Anything else?

6           MR. GERSON:  Any -- by "anything else," do you mean

7  do we have any other objections with respect to the disclosure

8  statement?

9           THE COURT:  That's what I would mean.

10          MR. GERSON:  Yes.  With respect to Section 6.8 of the

11 plan, we understand why the debtors are seeking to reject the

12 ESOP and forgive the note.  But the additional relief that they

13 say they might be seeking, we wanted clarification on why they

14 might be seeking that relief.

15          And they haven't provided it.  We suspect that it

16 might be -- it might have something to do with limiting our

17 claims in the case, or the claims in the Neal litigation.

18          We also feel that by including in the plan, they

19 might somehow be bootstrapping their right to present it in

20 court in a way that would not otherwise be appropriate.  For

21 example, as just part of proposed findings in the confirmation

22 order.  If, in fact, there's some relief that the debtors want

23 -- we're not saying that they can't seek that relief.  But it

24 should be done in an appropriate way, not as part of the plan.

25 And that's our objection with respect to Section 6.8, Your

1 Honor.

2            THE COURT:  All right.  Anything further?

3            MR. GERSON:  No, Your Honor.

4            THE COURT:  Any response?

5            MR. KRAKAUER:  Yes.  First on the indemnity

6 provision, Your Honor.  As we've said, I think in a number of

7 context, our hope is this plan gets confirmed with the global

8 settlement and it's going to limit any claims that exist after

9 that.  And the indemnity, at that point, becomes very

10 speculative in terms of whether there would ever be any claims

11 brought against it.  But it's just -- you can't sit here and

12 predict exactly what might be.  And, you know, the fact is I

13 don't know what we could say right now on that issue, other

14 than what I've just said.

15            With regard to the -- and that issue, in terms of

16 the appropriateness of it all, obviously, comes up at

17 confirmation.

18            In terms of the supplemental injunction, you know, I

19 think he's arguing with the way he'd like the plan to read.

20 But what we're doing in connection with the supplemental

21 injunction is dealing with whatever releases are given -- being

22 given in connection with the plan.  There's not another

23 document out there, so it is what it is.  And I think, you

24 know, he's arguing with the plan language, not the disclosure.

25            And then on 6.8, you know, we've said in the

1  disclosure statement whatever we do, we're going to give him

2  notice and an opportunity to be heard.  And, you know, we would

3  acknowledge we're going to have to show to you that it's an

4  appropriate thing to do in connection with confirmation.  I

5  don't know what else we'd say there either.  I think it's --

6  he's really running into a plan issue, not a disclosure issue.

7         THE COURT:  All right.  I'm not going to require any

8  further disclosure beyond those changes that have been made

9  with respect to the Department of Labor's objection.  We're

10  setting aside, and not disposing now for the moment, the voting

11  procedures issues which the Department has raised.  So, those

12  are still open.

13         MR. KRAKAUER:  Thank you, Your Honor.

14         MR. STARK:  Your Honor, I have a question about that,

15  if I may?  I apologize.

16         The Department of Labor's point with respect to the

17  opt in, or now opt out, I don't know whether it is, and

18  release, and how that is impacted with respect to the

19  supplemental injunction.  Is that a part of what we're talking

20  about with procedures?  Because otherwise, I'd like to join and

21  be heard on that issue, as well.

22         THE COURT:  well, let's talk -- let's put it aside

23  for now.  Talk about the procedures.  And if that has to be

24  revisited, we will revisit it.

25         MR. STARK:  Understood.  Thank you, Your Honor.

1           MR. KRAKAUER:  Thank you, Your Honor.

2           MS. HENDERSON:  Your Honor, this brings us to the

3   last three or four objections, I believe.  Next on the list is

4   Wilmington Trust Company as the indenture trustee for the

5   PHONES.

6           With respect to -- I'm going to go through these and

7   advise Your Honor where specific language changes have been

8   made that we believe address disclosure issues that have been

9   brought up in the pleadings.

10          However, on a number of these, these will, I suspect,

11  bleed over into larger arguments about adequacy of disclosure

12  relative to the settlement.  And so when I am done pointing out

13  specific language changes, I will turn the podium over to Mr.

14  Conlan.

15          But to assist Your Honor in saying where we were able

16  to make specific language changes, I will go through each of

17  these now:

18          With regard to Wilmington Trust, Your Honor, we did

19  make some changes to supplement the disclosure statement, and I

20  am now looking at what should be on your chart, I believe, Item

21  5, disclosure statement should be supplemented to include the

22  following:

23          Information regard the value of subsidiary

24  nondebtors.  We did add language in the disclosure statement at

25  Page 125, specifically addressing that point.  And that is

1  found in what is a new Footnote 16 on Page 125 relative to the

2  value attributable to the guarantor nondebtors.

3       We also added some disclosure relative to the value

4  of Chapter 5 avoidance claims against Morgan Stanley.  This

5  could be found at Page 59 to 60 of the revised disclosure

6  statement.  And I believe there you will find that we have

7  added -- yes, on Page 59, it's most of the page, carrying over

8  to Page 60.  There is a discussion of the Morgan Stanley swap

9  agreement and the potential claims that arise out of that and

10 the status of that matter.

11      There was also a request for information concerning

12 Chapter 5 avoidance claims at the parent company level that are

13 to be released under the plan.  We have added some disclosure

14 at Page 59 relative to an analysis of potential claims at the

15 parent, Chapter 5 claims from 56 to Page 57.  It includes the

16 nature of that objection.

17      There was an objection requesting more information

18 concerning the meaning of restructuring transactions that are

19 to be approved under the plan.  We have added language at Pages

20 83 through 84 dealing with the restructuring transactions,

21 adding additional disclosure there.

22      Again, some of Wilmington Trust objections --

23 actually a number of them are actually in the nature of

24 solicitation objections, Your Honor, and will be taken up at

25 the end of the presentation.

1          With respect to the credit agreement lenders, we have

2     added disclosure regarding --

3          UNIDENTIFIED ATTORNEY:  Your Honor, am I supposed to

4     respond?

5          THE COURT:  Let's -- you know what --

6          MS. HENDERSON:  Oh, I'm sorry.

7          THE COURT:  -- I think it's probably most helpful to

8     deal with the objections that we have yet to reach together,

9     and then go back and hear you.  And I have some ideas that

10    might apply to all of them anyway, but let's go that way.

11         MR. CONLAN:  Just -- Your Honor, just one point to

12    clarify what Ms. Henderson is doing is going through the

13    language we added in an effort to resolve these objections.

14    These objections are not resolved.

15         THE COURT:  I understand that.

16         MR. CONLAN:  And then we're going to launch in,

17    either before lunch or after, into the others.

18         So, Janet, did you have anymore you wanted to --

19         MS. HENDERSON:  Your Honor, let me just checks and

20    see.  There may be a couple of other things.  It was really

21    just to address where we could point to some language that Your

22    Honor might want to review in the context of this overall

23    discussion.

24         Of note, Your Honor, with respect to the credit

25    agreement lenders' objections, there was objection to failure

1  to describe the nature of retiree claim settlements.  There is

2  now a rather fulsome discussion of that in the disclosure

3  statement at Page 94.

4          And I believe, Your Honor, most of the remaining

5  objections are going to be dealt with in the context of other

6  overlapping issues that Mr. Conlan is going to address, as well

7  as any determination that what we've done so far doesn't

8  address the discrete items I just raised with regard to these

9  particular objectors.

10          THE COURT:  Okay.

11          MR. CONLAN:  Jim Conlan on behalf of the debtor, Your

12  Honor.

13          Again, the objections of Wilmington Trust of the

14  bridge lenders and of the faction of senior loan claimants that

15  do not support the settlement are not resolved, and it's

16  probably going to take us a while to go through those

17  thematically.  You suggested that you had some thoughts, or do

18  you want me to just do a -- and I do mean a very brief summary?

19          THE COURT:  Well, let me just make an overall

20  comment.  To the extent that those who think there is not yet

21  enough information in the disclosure statement about the LBO

22  transaction, frankly, I am inclined to think about requiring

23  the addition of a letter, which would include a summary of that

24  which those parties think should be included should be

25  included.  You know, subject to my review, and those of others,

1  before I would approve it.

2        But I would not be inclined to permit individual

3  statements.  But because so many of the issues are common, a

4  group statement -- and I would, during a break, ask you to go

5  into a conference room and see what you could come up with now.

6  I wouldn't expect T's to be crossed and I's to be dotted over

7  lunch break, but if that would be a way of resolving overall

8  those objections, I would be willing to consider that or

9  something like it.

10        So, that would be my first comment with respect to

11  the substantive LBO issues.

12        MR. CONLAN:  Your Honor, one point on that.  As

13  you're aware, we -- and I believe these were filed with the

14  amended disclosure statement, we invited the various parties to

15  provide the debtor with a two-page submission that would be

16  included as part of an exhibit to the disclosure statement

17  setting forth their view with respect to the LBO related

18  issues.

19        We received a two- or three-page letter from the

20  Committee, a two- or three-page letter from the plan

21  supporters.

22        We did receive a two- or three-page letter from

23  Wilmington Trust who also filed it.

24        And we received a nine-page letter from the

25  nonsupporting faction of the senior loan claimants.  I'm just

1 going to refer to them as the Bennett group.  And they filed

2 that.

3            THE COURT:  I read it.

4            MR. CONLAN:  Your Honor, so we have endeavored

5 through the two- or three-page each approach to provide a

6 grouping, and the Committee has a letter, as is often the case,

7 it's the official committee.

8            So, I've just -- what you're suggesting is that those

9 be put together or --

10            THE COURT:  Well, put it this way.  The disclosure

11 statement is already a lengthy document.  And, you know, it's

12 like any disclosure statement, you know, I wonder to myself who

13 will ever read it cover-to-cover.  And I guess the other

14 thought that goes through my mind, and I don't know the numbers

15 for all the constituents in terms of numbers of voters, but it

16 seems to me so many of the votes are preordained in any event.

17            But putting those things aside, and addressing

18 arguably legitimate concerns of those who wish to express a

19 point of view, contrary to that of the debtor, I'd like to see

20 that presented in the most efficient way possible.  You know,

21 and my inclination would not be to have the seriatim

22 statements.

23            Now, if the parties can come to some agreement that

24 it's better to have a series of two-page letters than a common

25 grouping of a statement, I would be open to that.

1          But the resolution, I think, has to be somewhere in
2   that type of universe.

3          This is -- I would say it's been a long time since
4   I've crawled this far into the weeds on a disclosure statement.
5   It's not an efficient process.  That's all I can say, but it
6   may be necessary.

7          So, with that, you can address the overall concerns,
8   if you'd like, Mr. Conlan.

9          MR. CONLAN:  Yes, I think with respect to the first
10  point that it can be resolved either with a series of two-page
11  letters that are within the bounds of propriety, and we'll try
12  for a combination over the lunch break.

13         Broadly speaking, Your Honor, we think that all of
14  the objections that were not already addressed by Ms.
15  Henderson, in terms of language, incorporated our confirmation
16  objections, and that's what they are by any other name.
17  Whether they're complaints about releases, complaints from the
18  Bennett group that too much is being left behind, complaints
19  from the other end of the aisle that not enough's being left
20  behind, and we can walk through each of those.  But, frankly,
21  it probably makes more sense to simply say that we're not going
22  to resolve them today.  They're not going to agree.  We're just
23  -- and, frankly, they're not happy with the settlement
24  agreement.  They're not happy with the plan structure.  And
25  we're going to see what happens at the ballot box.  And we feel

1  pretty good about what will happen at the ballot box.

2        So, what I think makes the most sense, Your Honor, is

3  rather than me going through each of the things that they've

4  said that fall outside of what we've already addressed, that we

5  take the break that you've suggested, and come back with what

6  we have come up with in terms of that first issue, and then

7  we'll let them take the podium and explain to you their view of

8  what I think I just said.  And I think it will, frankly, fit

9  within what I just said, and then we'll respond.

10        THE COURT:  Would anyone care to be heard briefly

11 with respect to the process that has been suggested?  Process

12 only.

13        MR. ROSEN:  Your Honor, this is Samuel Rosen speaking

14 on behalf of the Crabhouse class action.  Unfortunately I got

15 on the call late because of a personal matter that tied me up,

16 and I don't know if it was discussed -- if we passed it

17 already.  But I'm not there.  I got an e-mail last night about

18 a change in the language.  I had problems with that and e-

19 mailed back and got a response saying "out of office."

20        So, if we can -- if we could be part of the process

21 exchanging communications and trying to resolve it, I don't

22 want to take up any of the Court's time.  But I'm not there.

23 So, if we could do it outside the Court over the next few days,

24 that would be acceptable to me if it's acceptable to the Court

25 and to everybody else.

1          THE COURT:  Well, we did discuss your objection.  And

2   when I called for a response, there was none.  Now, I hear what

3   you just told me.

4          What I'll do is give you time over the lunch break to

5   contact debtors' counsel and see if your concerns can be

6   resolved at that point.  If not, we'll address them after the

7   break.

8          MR. ROSEN:  Okay.  Thanks.

9          MR. BENNETT:  Actually, Your Honor, I think you could

10  benefit from a little bit of argument from the parties about

11  exactly what the problem is.  Because I think that would inform

12  the directions that would go to the group that would go out

13  into the hallway and to try to craft short statements.

14         THE COURT:  Well, let's just say I read all of your

15  pleadings, which I did.  So, I'd be willing to hear something

16  briefly now, but only insofar as it will inform the process

17  over the lunch break.

18         MR. BENNETT:  Okay.  Well, let me come to two

19  specific things, which are probably going to show that it's

20  never going to be possible to come up with a joint statement,

21  but might also get some direction to the rest of us as to what

22  should be in the individual statements.

23         THE COURT:  Fair enough.

24         MR. BENNETT:  Okay.  First of all, I direct your

25  attention to the statements submitted by the settling parties,

1 | which is, in your materials, it's in the compendium of exhibits
2 | behind Exhibit --

3 |          THE COURT:  I've read it.

4 |          MR. BENNETT:  And what's remarkable about that, Your
5 | Honor, is that there are -- I want to deal two specifics, and
6 | then I want to go to something more generally.  There are two
7 | numbers in it that are in bold, really interesting numbers.

8 |          One of the numbers that they decided to put in bold
9 | is they decided to talk about the size of the group that I
10 | represent and the fact that it's smaller today.  Well, the more
11 | interesting part is that they didn't say anywhere what the size
12 | of the credit agreement lenders that are in the supporting
13 | group are.  Their own numbers were managed to be left out.  Why
14 | did they leave them out?  It's because their group is smaller
15 | still.

16 |          And what you have, frankly, is the reality is that in
17 | the universe out there, there are two camps that are organized
18 | to a degree, and there are lots of people who are trying to
19 | figure out what to do.

20 |          So, it may well be unlike the usual circumstance that
21 | disclosure if the different sides is important.

22 |          I would say but that narrow issue, the -- it's about
23 | time that the settling parties not say how optimistic they are
24 | that they'll get the settlement, but if they want to point to
25 | what the numbers of the different groups are, they might as

1 | well talk about how much they are.

2 | The second number that they decided to put in bold in
3 | their statement was that there were 900 recipients of payments
4 | under the credit agreement between the time of the transactions
5 | and the time of the filing date.  And then they go on to
6 | explain why they wanted to put 900 in bold.  It was because
7 | they wanted to highlight the supposed difficulties of getting
8 | money from 900 people.

9 | Well, the impression I suppose they wanted to leave
10 | is that the 900 people -- that the money was distributed evenly
11 | among the 900 people.  And, in fact, if the world is the way I
12 | suspect it is, that the top 25 percent accounts for something
13 | like 75 percent of the dollars.  A little bit more disclosure
14 | might show that the disgorgement recovery process is actually
15 | not one destined to be hobbled by procedural complexity and
16 | unreasonable expense but, in fact, can be narrowly targeted if
17 | this case ever went in that direction.

18 | There are a number of ways to get additional
19 | information with respect to how meaningful that 900 number
20 | really is.  One is just to say break it up into four quartiles
21 | of 225 and say what percentage of the disgorgement payments
22 | went to the top 225, what percentage of disgorgement payments
23 | went to the second quartile, what percentage went to the third
24 | quartile, and what percentage went to the fourth quartile. And,
25 | of course, that's just an example.  You can also it by 20

1 percent slices, by 10 percent slices.

2          And better still, again, if they think it's relevant

3 who received the disgorgement amount in terms of giving a full

4 picture, they might say who the top 10 or 15 recipients are.

5 And then I think those things would not be misleading.

6          So, those are two specific things that came up in the

7 context of the disclosure.

8          The two bold numbers turned out to be less

9 informative when you actually look at them in comparison to the

10 context than they would really -- than they were held out to

11 be.

12          Your Honor, I think that it's --

13          THE COURT:  Well, that's a -- you know -- I don't

14 know, it's a version of the -- there are lies, damn lies, and

15 statistics.  People are using figures obviously to their own

16 benefit.

17          MR. BENNETT:  I think that -- Your Honor, that's

18 exactly what's going on.  And maybe that's what has to go on.

19 I mean this is the -- that's the part of the disclosure process

20 is supposed to be, I guess, after there's an approved

21 disclosure statement is that the different sides are allowed to

22 make their case.  That's, of course, what Century Glove is all

23 about.

24          And so -- and what I think the -- once the debtor

25 decided I'm not going to try to improve the disclosure to

1 | capture the factual detail that people wanted to see, and I

2 | want to -- I'll come back to that in a second.

3 |     THE COURT:  So --

4 |     MR. BENNETT:  Because that's a effectively the

5 | decision they made.

6 |     THE COURT:  So, this is the flow chart idea really?

7 |     MR. BENNETT:  It's possibly a flow chart idea.  I

8 | think what we decided to do when the debtors said, "okay, we're

9 | not going to supply detail, we're going to say here are our

10 | claims.  Fraudulent transfer claims, potential disgorgement

11 | claims, breach of fiduciary duty claims."  They just -- they

12 | kind of listed them the way you -- it is essentially a list.

13 |     And then they said "They're disputed, and there are a

14 | couple of facts that are relevant, and it's a big mess, and

15 | we've settled it, and our settlement is better than a fight."

16 | That's really what the disclosure is in the disclosure

17 | statement.  And we think, frankly, in the disclosure statement

18 | and in a Section 9019 motion, what I think is required is a

19 | discussion of facts.  Of course, facts are the most important

20 | part.  In a complaint, you have to have the facts, the legal

21 | labels aren't significant.

22 |     THE COURT:  I think you're getting a little bit far

23 | afield from our process discussion.

24 |     MR. BENNETT:  Well, what I'm saying is you said

25 | you've read our -- it's eight pages, but it sounds better if

1 they call it nine.  And nobody got into two.  So, there's --

2 the difference is between three and nine, and I'm not sure

3 there's any law I can appeal to to convince the Court which one

4 is right.

5          But no one had a substantive comment to our statement

6 except for Mr. Bernstein, who had two.  All the debtor has said

7 is "make it shorter."

8          We could make it shorter if the debtors included

9 facts.  What we did was supply facts and citation; not

10 repetitively.  We didn't have nine pages of "vote with us, vote

11 for us, vote with us, vote for us."

12          And so, frankly, it's the debtors' lack of discussion

13 of facts, which they then point to the examiner's report and

14 say "it will be there."  And I'm sure it will be.

15          But when they said -- when they abandoned the field

16 and said "you guys supply facts," I'm not sure they can also

17 say, "and, oh, by the way, only two pages."  Frankly, the

18 discussion should be more about we did come up with eight

19 pages, which part doesn't belong here?

20          And I'm prepared to have that discussion with anyone.

21 No one's been willing to have that discussion.

22          THE COURT:  Look, it's -- it's the --

23          MR. BENNETT:  They just say "make it shorter."

24          THE COURT:  Look, as far as I'm concerned, it's the

25 classic "how much do we put into the disclosure statement," and

1  "how much of the objector's point of view should be and to what

2  extent should it be included?"

3       And I don't think there's going to be agreement on

4  that.  So, it's going to have to end up in, I think, the

5  Court's hands to order something.  So, I think part of the

6  answer is to create a document or series of documents that is

7  fair enough in terms of giving the objectors here the

8  opportunity to have their say.

9       But it's not -- it doesn't involve a right to have

10  competing disclosure statements, you know?  Not while we're in

11  the exclusivity period.  And I know there are those who think

12  we shouldn't be there now, and I'm aware of that.

13       All right.  That's all I have to say on that.

14  Anything further from you?

15       MR. BENNETT:  There will be with respect to the

16  procedures aspect of this.

17       THE COURT:  And I do think we ought to also talk

18  about that briefly before we adjourn.  I don't want to go

19  through a full round, but I do have some comments on that

20  before we break that may be the subject of some discussion

21  among the parties during the break.

22       MR. STARK:  For the record, Robert Stark from Brown

23  Rudnick for Wilmington Trust.

24       Your Honor, we're okay with the letter writing

25  method.  You know, what we wanted was the ability to present an

1  alternative view than, again, what we would call the garish

2  advertisement, but we think it's a spin job.  We'll say it our

3  own way.  And I don't think -- I don't know, nine pages, eight

4  pages, I don't think three letters -- three pages is awfully

5  taxing on people.

6        I'm happy to go into a room and see if what we've

7  drafted up makes people uncomfortable.  I know that some people

8  don't like the way that we view the case, they prefer different

9  wordage to get there.

10        THE COURT:  I'd say that would be an understatement,

11  Mr. Stark.

12        MR. STARK:  But we'll go from there.

13                    (Laughter)

14        MR. STARK:  But we'll see if we can get -- you know,

15  I think that's a fine way of just putting the alternative --

16  but I will say one thing, and this is important, is that I

17  think the intent is, from Mr. Conlan's perspective, is to take

18  the document, get an exhibit all the way at the back of it, and

19  stick all the letters in there.  And even if it gets modified

20  to like on Page 67, they're going to put in some paragraphs or

21  that's where all the letters fall, to me, I think that's

22  problematic.  I think -- there's not going to be pieces of

23  paper, there's going to be a disk that's given, and people are

24  going to flip around in there.

25        I think if letters -- letters should be in there

1  giving alternative views.  They should be in the envelope as a

2  letter.  And that shouldn't be hidden as a needle in the

3  haystack in the back.

4           THE COURT:  Okay.

5           MR. LAURIA:  Your Honor, I guess I want to be clear

6  on where Wells Fargo is coming from.  The practical reality is,

7  yes, we don't like the plan.  We think there are huge problems

8  with the plan, but we're not here today to argue about

9  confirmation issues or --

10          THE COURT:  Well, despite my admonition that I have

11  us not do that, the pleadings have been, in part, taken a

12  different tact.  But nothing to be done about that now.

13          MR. LAURIA:  The point is, Your Honor, obviously if

14  my client and the bridge lenders were happy with the plan, they

15  probably wouldn't be here arguing about the disclosure

16  statement.

17          That said, we really are concerned that adequate

18  information be in the disclosure statement so that everybody

19  who's going to vote -- and it's effectively a vote on the

20  propriety of the settlement of the LBO claims as information

21  they need to form a view, not just to read the debtors'

22  conclusion that this settlement falls within a range of

23  reasonableness.  And that's really what we want to talk about

24  when we get around to to.

25          We don't -- we're not so concerned about including a

1  two-page statement.  We'd be glad to include a statement that

2  says, you know, here's how we think the world ought to turn,

3  and here's what the outcome ought to be.  But I think the most

4  important thing to us is getting this disclosure statement.

5  It's not a matter of, you know, making the pile go from an inch

6  to three inches.  I think it should go the opposite way.  I

7  think there's a lot of puff in here that doesn't help anybody

8  do anything with respect to becoming informed and making a

9  vote.

10        What I'm concerned about is there are a few things

11  that can probably be presented in a very compact fashion that

12  the debtor certainly has that it has chosen not to provide.

13  And that's really what I'm interested in focusing on.

14        THE COURT:  All right.  Thank you.

15        MR. LAURIA:  Thanks.

16        MR. BERNSTEIN:  Don Bernstein from Davis Polk &

17  Wardwell for JPMorgan.

18        Your Honor, I just wanted to say we support the

19  debtors' approach of short statements by each of the parties.

20  And I actually agree with Mr. Bennett, I don't think we're ever

21  going to reconcile the differences.  So, I think short

22  statements are appropriate.

23        We do believe they should be together, they should be

24  given equal prominence.  They shouldn't be floating around an

25  envelope, having four or five letters floating around an

1 envelope.

2          Your Honor, on factual matters, we think that people

3 should be essentially permitted to say what they want.  If

4 there are factual inaccuracies, and there were two that I

5 mentioned to Mr. Bennett, we think those should be changed.

6          One example actually goes to a point he made.  In his

7 statement, there is a reference to free releases being provided

8 to JPMorgan.  And, of course, JPMorgan is actually paying

9 approximately 10 percent of the settlement amount under the

10 settlement under the plan.

11          So, the releases are hardly free.  And we want to

12 have a discussion of that with Mr. Bennett after we break.

13          The other thing, Your Honor, though is these

14 statements could become confirmation briefs.  And one of the

15 reasons for forcing people into a two-page format is to prevent

16 that from happening.  To convey a position, and to convey the

17 differences of view with what the debtor has said is one thing.

18 But to put effectively all of your arguments that you're going

19 to make in opposition or support of confirmation just doesn't

20 seem appropriate.  And once you get to five, seven, 10 pages

21 single-spaced, you're beginning to get to look like a brief.

22 And we don't think that's appropriate, Your Honor.

23          THE COURT:  I don't disagree with that.

24          MR. BERNSTEIN:  Thank you.

25          THE COURT:  All right.  Let me deal with process for

1  a moment, and then we'll take our break.  And I want to start

2  with my recent decision in Spansion, which I think the debtor

3  has taken beyond that which I intended.  And I'm concerned --

4  well, if it didn't come through in the opinion, I'll state it

5  in another way now.  The U.S. Trustee's objection to the form

6  of ballot and voting procedure was not raised as an issue by

7  anyone at the time of the hearing on approval of voting

8  procedures.  And I was not about to make a ruling at the

9  confirmation stage when so many things were in dispute that

10 turned the process all around to start over again.

11           But I am of the view that it's not appropriate, and I

12 said it in the opinion, these things have to be raised at the

13 voting procedures and disclosure stage, that a creditor who

14 does not send in a ballot is bound by releases when the

15 creditor also hasn't sent in the piece of paper with the box

16 checked, you know, "I opt out of the releases."

17           People who vote affirmatively to accept a plan can be

18 bound by them, provided the ballot, I think, adequately and

19 appropriately informs that voter that's what's happening.

20           And I just wanted to avoid some of the argument that

21 I think would occur otherwise.  Because that view, I am not

22 going to change.

23           MR. CONLAN:  Fair enough.

24           THE COURT:  Okay.  And that was my main point on

25 process.

1              Any questions about that?

2              MR. CONLAN:  No, sir.

3              THE COURT:  Okay.  How much time would the parties

4  like?  My inclination would be to give you until 2 o'clock.

5              MR. CONLAN:  That's fine.

6              THE COURT:  Okay.  Now, I'll tell you what I also

7  anticipate.  I also anticipate that it may not be possible,

8  without more time for the parties to write and exchange letters

9  that would be included of whatever length that I'll ultimately

10 decide, to wind this up today.  So, it would be my intention,

11 and it seems to me most likely, that I will have to bring you

12 back with all of the revisions having been made after all of

13 the final rulings are made today.  But I will do that soon, and

14 we'll talk about dates later.  But it will be soon.

15             Any questions before we break?

16             MR. CONLAN:  No, Your Honor.

17             THE COURT:  Court will stand in recess until 2

18 o'clock.

19                 (Recess 12:34 P.M./Reconvene 2:01 P.M.)

20             THE COURT:  Good afternoon.

21             MR. CONLAN:  Good afternoon, Your Honor.  Jim Conlan

22 on behalf of the debtor.

23             Some good news.  We all agreed that the best way,

24 frankly, the only way is to have the various parties put

25 together a three-page submission each.  And everyone is working

1  on doing that.  Mr. Bennett agreed to shrink his, as well, from

2  eight or nine to three.  And I believe everybody else is within

3  the three pages, that's fair to state.

4          And what we will do is we will put them together -- I

5  mean it's going to be a CD, in any event.  But they will be

6  together in one place.

7          And then in the disclosure statement, where relevant,

8  including at the beginning and where we talk about the LBO

9  causes of action, we will reference them.  And we will

10  reference them as often as is prudent in order for people to be

11  able to find them, and then not to be hidden, and open and

12  notorious.

13          THE COURT:  Okay.

14          MR. CONLAN:  So, I think we have agreement on that.

15          THE COURT:  Okay.  And how are they -- how and when

16  are they to be circulated, and when will I see them?

17          MR. CONLAN:  I think -- and people will jump up if

18  I'm going too far here.  I think everybody, with the possible

19  exception of the bridge, thought they either already had them

20  in three-page forms, or that they would by now have them.  And

21  I bet Mr. Lauria could have his ready, too, but I'll let him

22  respond to that.

23          (Attorneys engaged in off-the-record colloquy)

24          MR. CONLAN:  I apologize.  The JP and Centerbridge,

25  the other settlement supporters, need to work on theirs, as

1  well, including doing a little more work to include the view of

2  Centerbridge, for example, which would probably be different on

3  the merits than the view of JPM because they are collectively

4  the settlement support agreement parties.  So, they're not

5  going to have theirs ready today either.  Sorry, Mr. Lauria, I

6  didn't mean to single you out.  They'll need a day or so?

7          UNIDENTIFIED ATTORNEY:  Yes.

8          MR. CONLAN:  One day.

9          THE COURT:  Okay.  So, when will I see them?

10          MR. CONLAN:  Uh --

11          THE COURT:  Well, actually, you know what, let's hold

12  that.  We'll talk about when I'll see, you know, the entire

13  revised new and improved package --

14          MR. CONLAN:  Okay.

15          THE COURT:  -- before the end of the hearing.  Okay.

16          MR. CONLAN:  Well, I'll tell you that component

17  should be done by tomorrow.

18          THE COURT:  All right.

19          MR. CONLAN:  The other items, we are making the

20  changes with respect to the voting procedures motion, which Mr.

21  Kansa will mention, once we actually come to the voting

22  procedures motion that Your Honor suggested.

23          The other thing that I will is that we sat down with

24  counsel to Wilmington Trust and, Mr. Stark, why don't you come

25  up here with me?  I think it's fair to say that we have

1  resolved -- I believe we've resolved all of Wilmington Trust's

2  issues with respect to the disclosure statement, as well as the

3  voting procedures motion.

4           A couple of caveats:

5           They're finalizing their letter, too.  And so they

6  want to make sure that any issues other parties had with the

7  prior form are okay.

8           MR. STARK:  Well -- excuse me, Your Honor.  Robert

9  Stark from Brown Rudnick on behalf of Wilmington Trust.

10           I think we've actually obviated all of the issues.

11  I've now run it past JPMorgan, and counsel to the Creditors'

12  Committee, and counsel to the debtors, and I think with some

13  tweaks that I've interlineated on the draft letter, I think

14  everyone's now in agreement with that form.  I'm happy to show

15  Your Honor the interlineated form, or we can put it in the

16  solicitation package.  We'll talk about it later, however you'd

17  like.

18           THE COURT:  I'd rather see it all at once.

19           MR. STARK:  Okay.  And then --

20           THE COURT:  Rather than piecemeal my pleasure.

21           MR. STARK:  Understood.  And Mr. Conlan is right,

22  we've worked through with some matters that need to be put on

23  the record now, all of our disclosure statement and our

24  procedures issues.

25           THE COURT:  Okay.  Wonderful.

1          MR. CONLAN:  Okay.  The second item -- you mentioned

2  putting it on the record.  Just to be clear, and we'll talk

3  about this, as well, in connection with the voting procedures

4  motion, I think, somewhat, and it's this:  Certain causes of

5  action are going to be released under the plan, that's the

6  design of it; estate causes of action.  Certain causes of

7  action that are not estate causes of action may be released,

8  depending on how the check the box/not check the box things

9  work on the voting procedures motion.

10         It is not our intent to enjoin the assertion of

11  claims that have not been released.  And to the extent we have

12  been unclear about that, we will be more clear about it.

13         MR. STARK:  And, in fact, Your Honor, that was a big

14  -- that's a significant point for us, both in terms of

15  disclosure because, as we read it, and there's been some

16  iterations of it.  So, it has actually matured to a point that

17  I think soon will be perfectly clear on that.  People were

18  checking boxes, or asked to check a box as to whether they were

19  or were not releasing.  And our understanding of that

20  supplemental injunction provision was it didn't matter.  It was

21  irrelevant because you were going to be enjoined in any event,

22  even if you opted out of the release.  And that -- I think the

23  Department of Labor raised that similar issue.  And so it

24  became a balloting issue, as well.

25         But now that it's clarified through discussion, and

1 soon language, that, in fact, you check the box, you are not

2 releasing, then you're not.  Then I think it's no longer a

3 disclosure procedure issue.

4           THE COURT:  Okay.

5           MR. CONLAN:  And the last item that we had with Mr.

6 Stark, which was also resolved, had to do with the voting

7 procedures motion.  And I can wait until Mr. Kansa gets up and

8 addresses that, if that works for Mr. Stark.

9           MR. STARK:  It does.

10           THE COURT:  Okay.  What remains then of what I'll

11 call the "substantive disclosure statement issues?"  Either

12 from those I've -- from whom I've not yet heard, or from those

13 who we touched on, but then passed along, if anyone?

14           MR. CONLAN:  Mr. Bennett will step up and speak for

15 himself.  But I believe we still have issues with the credit

16 agreement lender group, the Bennett Group.

17           I believe we still have issues with the bridge

18 lenders, represented by Mr. Lauria.

19           And I think that's it.  There might have been --

20 that's it.

21           Both of those parties have agreed to the three-page,

22 though.  I didn't mean to suggest otherwise.

23           That said, people have been clear that they want the

24 disclosure -- they're reserving the ability to argue now with

25 respect to what they think the disclosure statement ought to

1 say with respect to the debtor.

2          THE COURT:  And how about the Crabhouse plaintiffs?

3 Did you manage to touch base with counsel during the break?

4          MS. HENDERSON:  Your Honor, the parties conferred

5 over the lunch hour, resolved any open issues, and we're done.

6          THE COURT:  Very well.  Thank you.

7          MR. CONLAN:  One other item, Your Honor.  Mr. McMahon

8 just mentioned it to me, and I could say it now, I would have

9 said it later, as well.  But to be clear, we're going to file

10 the TMIP and KOB, it will be part of the disclosure statement.

11 We're going to need just a little bit of time, you'll tell us

12 what date we're coming back in order to work out remaining

13 issues.  But we've heard you loud and clear there, and it will

14 be appended to the disclosure statement.

15          THE COURT:  Okay.  Thank you.

16          MR. CONLAN:  So, with that, the remaining two, I

17 believe, are Mr. Bennett and Mr. Lauria.

18          THE COURT:  Okay.

19          MR. SCHAIBLE:  I'm sorry, Your Honor, one second.

20 Damian Schaible of Davis Polk on behalf of JPMorgan.

21          We just wanted to advise the Court that we're not

22 necessarily -- we -- Davis Polk, representing JPMorgan, and

23 Wilmer Hale representing Angelo Gordon, two of the settlement

24 supporters, are not necessarily in unison or agreement with the

25 debtors' last statement about including the TMIP or KOB in the

1 plan and disclosure statement.

2        We remain -- we continue to have open issues with

3 respect to a very small number of employees to be covered by

4 those plans.  We're supportive of the plans of -- we're

5 supportive of compensation to the employees of the company

6 generally for sure, and very much appreciate the hard work that

7 the employees of the debtors have been doing for a very long

8 time for, in some cases, very low pay.  But we do have issues

9 with respect to a certain small number of employee aspects of

10 those plans.  And we were hoping to have the time, frankly,

11 over the next few weeks to continue to work those out with the

12 debtors.

13        If we're not going to have that time because

14 potentially they would have to be included in the disclosure

15 statement, we might well argue to the debtors that it would be

16 more appropriate for them to do that by a separate motion.  So,

17 we'd just like to reserve our right with respect to that at

18 this time, Your Honor.

19        THE COURT:  Well, my offer still stands in terms of

20 whichever alternative the debtor is able to choose.

21        MR. SCHAIBLE:  Thank you, Your Honor.  And we, and

22 presumably the debtors, will come back in a minute.

23        THE COURT:  Okay.

24        MR. CONLAN:  We will, but we won't be choosing the

25 motion.

1          THE COURT:  All right.  Let me hear from the

2   remaining objectors with respect to disclosure.

3          MR. BENNETT:  Your Honor, I don't have a -- I only

4   have one issue with disclosure left and that's, frankly, the

5   point that we thought that the basic terms of the new senior

6   secured term loan ought to be in there, too.  Like the interest

7   rate, the principal pay down schedule, if there's going to be

8   one, other than a balloon at maturity, and a description of the

9   collateral.  The debtors have said they want to punt all of

10  that off into the plan supplement era.

11          Frankly, in terms of what creditors are going to get,

12  these numbers would seem to be even more important than the

13  influence of the MIP and the other employee programs on the

14  value of the debtor.

15          But even that basic information isn't in the

16  disclosure statement, it's all been punted to the plan

17  supplement.

18          THE COURT:  Well, there's a valuation contained in

19  the disclosure statement, is there not?

20          MR. BENNETT:  Of the debtor.

21          THE COURT:  Correct.

22          MR. BENNETT:  This isn't -- these are the notes that

23  they're proposing to distribute.

24          THE COURT:  Understood.

25          MR. BENNETT:  Okay.  Well, that is our only pure

1 disclosure statement point.

2          We definitely want to be heard concerning the opt out

3 process because -- partly motivated by your opinion in

4 Spansion, but also to make sure that we deal with it, even

5 though that's kind of a mixed disclosure/confirmation issue.

6 But I think that's next up, not now.

7          MR. CONLAN:  Correct.

8          THE COURT:  Okay.

9          MR. BENNETT:  Okay.

10          MR. KRAKAUER:  Your Honor, just on the note terms, we

11 do propose to disclose those in the plan supplement.  The

12 issue, which is a fairly straightforward one, is a view on some

13 of our creditors that the note terms and provisions ought to

14 reflect what's going on in the market, and that the closer we

15 could get between the market -- the issuance date and the

16 market, it's much better off.

17          THE COURT:  So, are you telling me the terms have not

18 yet been fixed?

19          MR. KRAKAUER:  Correct, in terms of interest rate and

20 such, that's correct.  And --

21          THE COURT:  Is it not possible to report it within a

22 range?

23          MR. KRAKAUER:  We can, if you let me confer with a

24 couple, we can probably do something or put some parameter

25 around that.  But, again, it's just trying to get to what the

1  market is.

2          THE COURT:  Understood.

3          MR. KRAKAUER:  Okay.  I'll see if we can do that.

4          THE COURT:  Okay.

5          MR. KRAKAUER:  Thanks.

6                    (Pause)

7          MR. STARK:  I apologize, Your Honor.  There was one

8  matter that Mr. Conlan didn't I mention when we were talking

9  before about how we've resolved everything.  And we did resolve

10 one last point, but on terms that I need to make sure the

11 record is clear on, and Your Honor is aware.

12         There are 18 subsidiaries that today are not debtors.

13 Those entities are referred to -- it's a little bit confusing

14 sometimes about are they guarantor, subsidiary, nondebtors, are

15 they non-guarantors.

16         Suffice it to say, there's 18 entities in the

17 conglomerate that today are not debtors, but the debtors

18 reserve the right, to the extent they need to, to bring them in

19 and do it as a prepackaged plan of reorganization.

20         We had indicated in our papers that we may have

21 aiding and abetting type claims against those entities.

22 Without belaboring the record, Your Honor, just so that you

23 understand, Citicorp was the indenture trustee to the PHONES at

24 the same time this LBO was organized, and Citicorp served the

25 company as an architect of the deal, as a financial advisor.

1 And we've contended in our complaint that that was a violation

2 of duties that were owed to the PHONES holders.

3         We've also asserted claims against others on a

4 knowing based aiding and abetting fiduciary duty theory.  Those

5 claims may very well be assertable against debtors.  We haven't

6 revisited the issue about whether or not there was sufficient

7 knowledge of the underlying information to be able to get

8 relief from the claims bar date order, that may be an issue for

9 another day, it may not be.

10         But for purposes of entities that today are not

11 covered by Your Honor's previous bar date order, there are tort

12 based claims that may be assertable by PHONES holders and

13 Wilmington Trust against those entities.

14         To the extent those entities become debtors, we have

15 disclosure issues pertaining to this disclosure statement being

16 used as a prefiling date solicitation vehicle.

17         We've asked for individualized information about the

18 value of those 18 entities.  Normally what you would get in a

19 disclosure statement is valuation on a debtor-by-debtor basis

20 that would help a reasonable person for 1129 purposes to be

21 able to understand what the value of those entities are.  Those

22 are not in this disclosure statement.  The information about

23 those 18 entities are not.

24         They responded to our request for information on that

25 with a footnote that said -- and I don't know the page number,

1 and I can find it for Your Honor, but it says, in sum and

2 substance, "We believe those 18 entities are worth $1.6

3 billion," period. Okay?

4        I'm not going to press the point further today, Your

5 Honor.  In part, because I think -- I don't think Mr. Conlan

6 and his team are prepared today to add all that extra

7 information.  And I heard Your Honor loud and clear before the

8 lunch break about where we're going today.

9        But I will say this for the record, and Mr. Conlan

10 has agreed with this, that our -- we have not resolved the

11 issue.  We're moving it to another day, which is the

12 confirmation hearing.  To the extent they file those entities,

13 and they seek prepackage plan relief for those entities, we

14 retain the right to raise 1129(a) arguments.  That they didn't

15 solicit properly, and they didn't put sufficient information

16 out there.  And that's just an issue reserved for another day.

17        THE COURT:  Yes, I viewed nothing in what I would be

18 asked to do today as impairing any such right.

19        MR. STARK:  Understood.  Thank you.

20        THE COURT:  Okay.  Anyone else wish to be heard?

21        MR. LAURIA:  Good afternoon, Your Honor.  Tom Lauria

22 for Wells Fargo, agent for the bridge lenders.

23        Your Honor, maybe I'm stating the obvious here, but I

24 guess you start with the obvious and work your way to the

25 details.

1          This restructuring case is not principally about the

2   debtors publishing, broadcasting, or other businesses.  They're

3   all performing at this point, and I understand generating

4   substantial cash flow.  It's my understanding the debtors are

5   sitting today on something on the order of $1.5 billion of

6   cash.

7          What the case is about -- and I don't think --

8          THE COURT:  Given the industry, most would view that

9   as a good thing.

10          MR. LAURIA:  It's a great thing.  Maybe if it were

11   about that, we wouldn't all be talking about what we're talking

12   about.

13          But what the case is really about, what the central

14   issues are is the resolution of the fraudulent transfer and

15   related claims arising from the 2007 LBO and the impact that

16   those claims or the resolution of those claims will have on

17   creditor recoveries generally.

18          And the underlying issue, or the foundational issue

19   for all of this is the question of the debtors' solvency at the

20   time of the transaction.

21          That said, of the 150 plus pages of disclosure, which

22   now has been supplemented with another 150 pages of SEC

23   filings, about six pages are devoted to a discussion of the LBO

24   claims and the reasonableness of the proposed resolution.  That

25   discussion is, I believe, on Page 60 through 66 of the

1  blackline disclosure statement that the debtors circulated this

2  morning.  It was on Pages 55 through 60 of the old disclosure

3  statement, which was the document that we had when we prepared

4  our objection.

5          Our problem is that when you parse through the six

6  pages, all you really have is a few very thin, bare,

7  unsubstantiated conclusions.  Indeed, I think it's probably

8  fair to say that the debtors have exerted little effort in even

9  attempting to provide creditors with the type of information

10 that they would need to be able to form an independent opinion

11 regarding the proposed settlement that drives recoveries under

12 the plan.

13         And I think that's what a disclosure statement is

14 supposed to so.  It's supposed to give creditors the

15 information that they need to be able to reach their own

16 conclusions about the plan proposal which, in this case, is

17 principally a settlement of the LBO causes of action.

18         Now, a number of responses have been submitted by the

19 settlement supporters and the debtor.  First and foremost, they

20 say we can't have any more delay in these cases.  They say

21 we're going to get a very excellent report from the examiner on

22 July 12th, and we'll get that available to people before they

23 have to vote.

24         They say, again, in a conclusory fashion, you know,

25 we believe the settlement is within a range of reasonableness.

1          They've offered, and now we've accepted, to have the

2 objecting parties make a disclosure of their own views.

3          And as I referenced before, they've now attached 150-

4 page SEC filing describing the LBO.

5          I don't believe that any of that cures the shortfall

6 under Section 1125.  The creditors need to be able to assess

7 the transaction in the proposed settlement and get to an

8 informed view.  And what they've been provided in all of these

9 materials doesn't permit that.

10          And I'd like to be specific in pointing to the types

11 of information that we think should be included in the

12 disclosure statement, not just included in more massive

13 documents that could be appended to the disclosure statement,

14 but presented in a reasonable fashion so that people can read

15 it and understand it.

16          Number one, there should be a sources and uses

17 statement at the closing of Step 1, and at the closing of Step

18 2.  We all know that billions of dollars flowed into the

19 company and flowed out of the company in connection with those

20 two transactions on the order of $12 billion.  It ought to be

21 very easy for the debtors to provide a very simple one-pager or

22 two-pager that simply shows where the money came from, and

23 where it went.

24          Second, Your Honor, the debtors ought to include some

25 information that informs the constituencies of what they

1  believe the benefits to the debtors were from Step 1 and Step

2  2.  It's out there, it's very -- we've had access to the data

3  room, which has about three million pages of documents in it.

4  We have found statements and information regarding those two

5  matters.  None of that information is included in the

6  disclosure statement.

7          The debtors have it.  It would be easy for them to

8  provide, it ought to be in there.

9          Number three, we believe that the debtors ought to

10  provide whatever contemporaneous indicia existed regarding the

11  solvency or insolvency of the debtors at Step 1 and at Step 2.

12  These are things like a contemporaneous balance sheet and cash

13  flow projections and assumptions.

14          Now, Your Honor, some of this information is actually

15  included in the 150-page SEC filing that the debtors now

16  propose to append to the disclosure statement.  But I don't

17  think that really gets to the spirit of 1125.  I don't think

18  the idea is to say, "here's a box of documents that's got the

19  information in there somewhere, you find, you know, what's

20  important and ferret it out yourself."

21          I think it's the debtors' job to present the

22  information in a way that the creditors in this case can review

23  in a reasonable fashion and form views.  It shouldn't be

24  hidden, it shouldn't be a matter of saying "your advisors have

25  access to the data room, that should solve your problems."

1  This is a disclosure statement that has to have adequate

2  information under 1125.

3         A fourth item.  The actual cash flows of the business

4  in 2008, we know those exist.  We know the debtors have them.

5  It would be easy to provide right next to the projections that

6  were relied upon at the time of the transaction in 2007 with

7  some explanation for the very material differences between the

8  projections that people were looking at when this transaction

9  was put together, and what actually happened.  Almost right on

10 top of the transaction.

11        2007 turned out to be materially different than the

12 projections that were being relied upon when this transaction

13 was done in May and in December of 2007.

14        THE COURT:  Well, from where I sit, a lot happened in

15 2007.

16        MR. LAURIA:  Clearly, Your Honor.  Clearly.  All we

17 need, though -- all I'm asking for is to take information that

18 clearly the debtors have and present it in a reasonable,

19 readable fashion.  You know, lay it out there for people.  Let

20 people have the information that they need to form a view as to

21 the reasonableness of the resolution that's been proposed.

22        The debtors should also provide some formulation,

23 rather than just a list, of the potential claims and causes of

24 action that arise from that fact pattern.  And in doing so,

25 Your Honor, I think that the debtors have to make some

1 distinction between the impact that those claims and causes of

2 actions have at the present level and at the guarantor

3 subsidiary level.  Why?

4         Well, the impact of the settlement is markedly

5 different at those two levels.  As I'm sure the Court is aware,

6 the settlement contemplates total settlement consideration of

7 about $510 million.  Of that amount, 430 million comes from the

8 parent level, and 80 million, round number, comes from the

9 subsidiary level.

10        That result implies materially different claim risk

11 at the parent as opposed to the subsidiary level.  We need some

12 explanation of that.  Some discussion of the range of outcomes

13 should be provided.

14        The debtors include a glib statement.  On Page 58 of

15 the old disclosure statement, and I think it's Page 64 of the

16 version that was circulated this morning, in Subsection F,

17 entitled the reasonableness of the proposed settlement, under

18 Heading Number 1, the Probabilities of Success in Litigation,

19 there the debtors state as follows, "The debtors believe that

20 the global settlement provides a recovery to the senior

21 noteholders and holders of general unsecured claims that is

22 within the range of reasonably possible outcomes, considering

23 all relevant circumstances."

24        Now, I've got a few issues with that:

25        Number one, I'm not sure -- that sounds a lot like

1  TMT Trailer Ferry language to me.  The language that we all see

2  in every 9019 settlement motion that gets filed in a bankruptcy

3  case.

4          I'm not sure that that's the right standard here.

5  That is a deferential standard that has been used in bankruptcy

6  cases on the premise that there is deference to the debtors'

7  business judgment in negotiating a settlement agreement.

8          Here, the debtor admits, on Page 6 of the disclosure

9  statement, that the settlement was negotiated between four

10 nondebtor constituencies, i.e., non-estate fiduciaries, and was

11 subsequently adopted by the debtor into the plan.

12         I'm not sure that that is a settlement that rises to

13 the level of one that gets the TMT Trailer Ferry standard when

14 the Court considers it.

15         Nevertheless, the debtors basically support the

16 settlement by quoting TMT Trailer Ferry, without any

17 substantiation, without any explanation, without anything but a

18 conclusion.

19         Now, I think at the very least, given the reliance on

20 these nondebtor stakeholders who negotiated this settlement,

21 that there should be disclosure of the interests of the

22 architects of this deal.  On the one side, you had JPMorgan

23 Chase and Angelo Gordon, on the other side you had Centerbridge

24 and Law Debenture.

25         If we're to build this plan on a settlement that

1  these parties negotiated, I think it's fair game that the

2  stakeholders should know what their interests were when they

3  negotiated the settlement so that we can all assess their

4  motivation.  Since they weren't estate and don't represent to

5  be estate fiduciaries.

6         I think we should note the claims that they held and

7  the payments that they received, either in connection with the

8  LBO or in respect of their LBO created rights.

9         Third issue I've got.  The debtors state that the

10 result is within the range of reasonably possible outcomes.

11 There must be a range.  What is the range?  The debtors must

12 have a view that there's a range.  What is the range?  What's

13 the top?  What's the bottom?  And how was that range

14 formulated?

15        I don't think we're asking for something that's

16 unfair, or that doesn't exist.  Because if there is no range,

17 then the statement should come out.  If there is a range, they

18 should tell us what it is, and how they develop the range.

19        And I want to point out, this is -- this shouldn't be

20 considered as the Court would think of a 9019 motion.  What's

21 contained in the motion here, the disclosure statement, is not

22 for the Court.  The debtor can't -- can't respond to this

23 criticism and say, "Well, don't worry, we'll put on evidence at

24 confirmation about the range.  We'll satisfy the standard

25 then."

1          The disclosure statement is to provide information
2   for the creditors to consider while they have the opportunity
3   to vote.  That opportunity to vote will have expired when the
4   confirmation hearing gets started.

5          So, what we ought to have is some specificity about
6   what the range or results is, and how that range was developed.

7          I'd like to just illustrate the point here, and how
8   material this can be.  The settlement, as I mentioned, is
9   heavily weighted in terms of responsibility for the fraudulent
10  transfer risk at the parent level.  430 million of the $510
11  million of settlement currency comes from the parent, only 80
12  from the subs.

13         But a reasonable analysis of the two steps could get
14  to a very different conclusion and result.

15         THE COURT:  And I'm certain that some have.

16         MR. LAURIA:  Well, I was just going to walk you
17  through an example, Your Honor, if you care to indulge me.  If
18  it wouldn't be helpful, I'll skip past it.

19         THE COURT:  If it won't take long, go right ahead.

20         MR. LAURIA:  All right.  Thanks, Your Honor.

21         I don't think there's any dispute that at the
22  subsidiary level, Step 1 provided no benefit to the guarantor
23  subsidiaries.  This all happened at the parent, the subs didn't
24  get any money.  There was now flow down of benefit to the
25  subsidiaries.

1          So, the issue of assessing fraudulent transfer risk

2  of Step 1 boils down to the issue of the solvency of the

3  subsidiaries.  Perhaps each subsidiary on a standalone basis.

4          Now, this disclosure statement doesn't even provide a

5  conclusion on that point.

6          THE COURT:  Well, let me ask this.  Are one or more

7  of the letters to be added going to state in conclusory

8  fashion, or otherwise, that they believed -- or that there is

9  evidence that the entities were insolvent at Step 1 or Step 2?

10  I mean isn't somebody going to be saying that?

11          MR. LAURIA:  Your Honor, I don't know.  We may say

12  that.  We're, you know, in the digesting stage.  We may say

13  that.

14          But I think it's incumbent on the debtor in its

15  disclosure statement, again, to -- if there's a -- if this is

16  within a range of reasonableness according to the debtor,

17  what's the range?  How did you formulate it?

18          The only thing I wanted to -- and I'm just trying to

19  dig down a little bit to demonstrate how important some of

20  these building block issues are in terms of the difference it

21  has on the outcome.  And I'm -- I think that it's troubling

22  that the debtors have amassed this document, and have amended

23  it, and amended it again, and we don't have what I would

24  consider to be very basic information that I'm sure is in the

25  debtors' possession.  And it's not for me, the creditor, to say

1  what I think.  The debtors got the duty under Section 1125 to

2  provide adequate information to help me, and all creditors, be

3  able to make an informed assessment of the propriety of the

4  plan.  And in this case, the proposed settlement of the LBO

5  claims.

6        Now, just to continue going down the path here.  So,

7  there's not even a conclusion.  They don't even just state the

8  bare conclusion, "We believe all the subsidiaries were solvent

9  at the time of Step 1."  Or "We believe they were insolvent."

10  Or "We don't know."  They could say any of those three things.

11  Even the conclusion isn't here.

12        Now, the issue, I guess, as we all know comes down to

13  the reasonableness of the debtors' capital at the time of the

14  transaction.  The test that courts have adopted is not just

15  what were the existing obligations of the debtor in determining

16  reasonableness of capital.  But what were the contemplated

17  obligations, as well.  Existing and contemplated obligations.

18        Now, I think it's impossible for anybody to say with

19  a straight face that when Step 1 was being done, that these

20  debtors didn't contemplate doing Step 2.  There may have been

21  conditions on whether or not Step 2 would get done, but they

22  contemplated doing it.  Every public statement that debtors

23  made at the time talked about the whole deal.  The Board

24  approval was of the whole deal.  The merger agreement had been

25  signed.  Fees had been paid for the Step 2 financing.  You

1  can't say they didn't contemplate the Step 2 obligations.

2          So, when you add the eight billion or so of

3  obligations under Step 1, and the 3.7 billion or so of

4  obligations contemplated under Step 2, we think there's a real

5  question, and the debtors ought to address it in some fashion

6  as best they can as to whether or not the subsidiaries were

7  solvent.

8          Now, if they weren't, and I might add, Your Honor,

9  just to gild the lily, under New York law, which presumably

10 would be applicable, the Step 2 creditors have the right to

11 attack the Step 1 claims.  Subsequent creditors can attack the

12 fraudulent transfer.  And if there was no benefit, those claims

13 go away at the subsidiaries.

14          So, now we're left with the Step 2 claims.  And you

15 say, well, geeze, if the Step 2 claims -- if the Step 1 claims

16 go away because of insolvency, surely the Step 2 claims do.

17          Well, there's a difference.  What's the difference?

18 The debtors' public statements, the analysis done in connection

19 with Step 2 says that there was $1.6 billion, round number, of

20 benefit from Step 2.  That was the step that caused the debtor

21 to be owned by the ESOP and created the tax shield, which the

22 debtors valued at $1.1 billion.  That was the step that

23 relieved the debtor of its cost to being a public company,

24 which the debtor said cost it $20 million a year.  That was the

25 step that relieved the debtors of their 401K funding

1  obligations, which they said cost it $80 million a  year. All

2  tolled, the benefits of Step 2 were estimated at $1.6 billion.

3         Now, I don't know if that number's right or wrong.

4  But I will tell you this, if the Step 2 claims survive to the

5  extent of the benefit $1.6 billion, and my clients get their

6  pro rata share of that surviving claim, 43 percent, they get a

7  $690 million money good claim, even subordinated to the billion

8  dollars.  Because I don't think anybody would dispute that the

9  subsidiaries have sufficient value to pay the full $1.6

10  billion.

11         Now, under the settlement, the bridge lenders get

12  zero from the subsidiaries.  And a grand total of $7 million,

13  .44 percent on their $1.6 billion under this plan in the

14  aggregate.  Seven million dollars.

15         Now, Your Honor, what I've said might be reasonable,

16  it might be unreasonable.  I think it's certainly colorable.

17  The debtors need to provide some framework for parties to

18  assess the settlement.  Because I'm not talking about a

19  rounding error, I'm talking about basically going from zero to

20  $700 million recovery for my clients.

21         The debtors picked zero.  Why?  Against this

22  backdrop, I think the debtors' responses to this point fall

23  short.  I don't think it's fair to say some of the information

24  that you're asking for is buried in the 150-page SEC filing

25  that we've now attached to the disclosure statement.

1          I don't think saying "We're just going to let the
2   objectors say whatever they want to say," and that cures it.

3          Again, it's the -- the debtors are the owners of this
4   information.  They're supposed to provide adequate information
5   for us to make an informed decision.  It's not my advocacy of
6   the views that my clients have, the views that would be most
7   advantageous to my clients that the creditors, in particular,
8   need in the first instance.

9          What they need is the debtors' view.  The debtors'
10  explanation for the material impact that this settlement is
11  going to have on people's recoveries.

12         Now, in that regard, the debtors have stated that
13  millions of dollars have been spent diligencing these issues,
14  both by the debtors' advisors and by the Committee's advisors.

15         Now is the time for the creditors to realize on that
16  investment.  Nobody argues that these debtors are solvent.  So,
17  it's the creditors who have paid for that diligence.  Let's get
18  it presented in a reasonable fashion and help us make our
19  decision about this plan.

20         I don't think that's cured.  I think the Court said,
21  by linking to a future examiner report, the disclosure
22  statement has to stand on its own.  And the limited new
23  amendments that the debtor has offered, they don't get us
24  there.

25         Now, I want to talk for a minute about timing.

1 JPMorgan is very anxious that this calendar go forward.  In

2 fact, I sometimes get a little confused as to who the debtor is

3 and who's calling the shots for this debtor.  I heard the

4 debtor say just a minute ago on the MIP we're doing it one way,

5 I head JPMorgan say, no, we're not committed to doing it that

6 way.

7            THE COURT:  Now you know when you say that, the

8 debtor is going to feel compelled to stand up and say it's

9 fully discharging its fiduciary obligations to the estate and

10 its constituents.  Why precipitate that remark?

11            MR. LAURIA:  All right.  I take it back.

12            THE COURT:  Thank you.

13                      (Laughter)

14            MR. LAURIA:  I understand the debtors' desire to get

15 out of bankruptcy as quickly as possible.  All debtors are

16 supposed to be so motivated.

17            I certainly understand, I think, the settling

18 parties' desire to get this bankruptcy over with as quickly as

19 possible.

20            However, the debtor isn't losing money at this point;

21 the debtor is building cash.

22            And the debtors offered no evidence in its disclosure

23 statement or otherwise of specific ongoing harm from the

24 bankruptcy case, as far as the business is concerned.  The

25 debtors are cash flowing positive and sitting on a mountain of

1 money that's growing.

2        One of the undercurrents seems to be the debtors'

3 concern about exclusivity.  Now, I understand that one, too.

4 Every debtor wants to get their plan done with exclusivity in

5 place.  And the amendments to the Code certainly provide a new

6 challenge in achieving that objective.

7        But that is not a basis standing alone for cutting

8 short parties' rights.

9        Moreover, as a practical matter, if confirmation were

10 held in September, or I dare say even October, the debtors will

11 still get their first shot.  Because if exclusivity terminates

12 and somebody files a plan in early or mid-August, they're not

13 going to be in a position to get that disclosure statement

14 heard, much less approved and solicitation accomplished, before

15 the debtor has a confirmation hearing as long as this Court is

16 satisfied with the progress the debtor is making.

17        As the Court alluded to earlier, as events unfold,

18 the time line could change.  But any event, as a practical

19 matter, pushing this time line out a little bit isn't going to

20 result in this case devolving into a multiple plan contest.

21 That is something that is still in the control of the Court at

22 least for a month or two after the expiry of exclusivity.

23        Now, one further point I want to raise, and

24 unfortunately I'm at a bit of a disadvantageous because we

25 haven't had a lot of time to study the new language.  But the

1  debtors modified the plan in a fashion that now makes the

2  bridge loans a separate class, which I'm not here to complaint

3  about.

4         But what I don't understand is the treatment.  The

5  treatment says -- it's kind of a deathtrap kind of concept --

6  that if you -- if the class accepts, and you accept, then you

7  get the same treatment you were going to get before, the 0.44.

8         But if you reject, and the class rejects, and I think

9  I've got that right.  It seems like there's kind of a double

10 trigger, or if you don't vote at all, then the treatment of

11 your claim, if your claim is ever allowed, and I'm shorthanding

12 here, is treatment that will, quote/unquote, "satisfy Section

13 1129(b)."  What is that?  I mean I've been doing this for a

14 long time, there are others who have been doing it longer, I'm

15 pretty sure.  But I've never seen a plan that says the

16 treatment you get is treatment that satisfies 1129(b). Not it's

17 a half a cent, a quarter cent, zero.  It's treatment that

18 satisfies 1129(b).

19        Now, earlier I heard debtors' counsel refer to trying

20 not to make things inaccurate or confusing.  Your Honor, if you

21 take a look at the proposed new treatment of Class 1D, I think

22 it defines inaccurate and confusing.

23        And so I'm -- this is not a confirmation objection.

24 I think they have to tell us what our treatment is.  We'll

25 argue later about whether it's appropriate.  But I think they

1 have to tell us more than "we'll just give you something that

2 satisfies 1129(b)."  Whatever that happens to be.

3          So, Your Honor, where I am is I think that the debtor

4 should be required to provide some limited, focused, easy to

5 read information that will allow the stakeholders to review and

6 assess the settlement in a meaningful fashion, not just a big

7 pile of paper with some unsubstantiated conclusions.

8          THE COURT:  Thank you.  Is there anyone from whom I

9 have not yet heard with respect to disclosure statement

10 objections?

11                    (No audible response heard)

12          THE COURT:  All right.  Does the debtor care to

13 respond?

14          MR. CONLAN:  Just briefly, and Mr. Krakauer and I

15 will do this together.  We won't belabor the point, Mr.

16 Krakauer has been dealing with Mr. Lauria, we'll address some

17 of the specific issues, the detail issues.

18          The answer to your question on whether a party or two

19 that submits a three-page letter will address the issues that

20 Mr. Lauria raised as "I feel comfortable saying yes."  Somebody

21 will, probably a couple will, in as much detail as they can fit

22 into a three-page letter.  Those issues have been analyzed ad

23 nauseam.

24          Mr. Lauria referenced the language on Page 64 "within

25 the range of reasonable and possible outcomes."  Of course, the

1  response is "read on."  There's more said about two of the core

2  issues.

3          Mr. Lauria's clients -- and Mr. Lauria is new to the

4  case.  I think his clients only recently bought their

5  positions.

6          Their claims against the subsidiaries are

7  subordinated to the bank's.  And I'm not sure anybody would say

8  there's more value there than is necessary to satisfy the

9  bank's.  So, it folds into the issues you've heard about.

10         Mr. Lauria is upset about how the price of settlement

11  is allocated because he's not subordinated at the parent level.

12  And we understand when it comes to confirmation Mr. Lauria is

13  going to want to argue about that.  What is the value of the

14  parent?  Why?  Because he'd like to get up, even if it's just a

15  little bit up, from that .44 distribution.  And it's all about

16  what the parent's worth; we get that.  It's a confirmation

17  issue.

18         As far as the debtor adopting what the parties to the

19  settlement support agreement envision and have agreed to

20  between themselves, we would have adopted it if weren't within

21  the range of outcomes that made sense, given our own analysis,

22  it did.

23         And in terms of us sitting back and not being

24  involved, that's not real life.  The reality was we were very

25  much in and around those conversations and did everything we

1  could to bring the parties together.  That's the reality.

2          So, it isn't the debtor adopting the settlement

3  support agreement parties' vision.  It is the debtor adopting

4  it because the debtor believes it is the right outcome, which

5  we say in the disclosure statement.

6          It is true that we have a voluminous SEC filing.

7          It is true that we go on for six pages.

8          It is also true -- I don't know what the math adds up

9  to, 15 pages or so, we'll have in very dense, and I'm sure

10  very, very well written pieces from each of the parties as to

11  all of the causes of action that could exist, and God knows we

12  have people going at each other from every direction in those

13  letters.  I feel comfortable in concluding that those parties

14  who read the disclosure statement, I don't know how many that

15  will be, will either know those issues cold, because they'll be

16  represented by one of these fellows in court here today.  Or

17  they will understand when they're done reading all that that

18  this is one big disagreement.

19          And I don't know that the debtor saying "and our view

20  is that it's 36 percent this, 57 percent this," not that we

21  could actually do that, that's not what settlements, if you

22  will, and, frankly, I'll address this, too.  That's not how

23  settlements in reality must be looked at.  It's more like

24  probable outcomes.

25          We need the senior loan claim class to accept here.

1 This plan is not going to work if the senior loan claim class

2 does not accept.

3         So, we do talk about 9019.  We may employ the 9019

4 standards with respect to classes that don't accept; we hope we

5 won't have those for in the money creditors.  But clearly with

6 respect to the senior loan claim class, we need class

7 acceptance or we're going to be stopped cold.

8         Mr. Krakauer has been dealing with Mr. Lauria, so the

9 information to which Mr. Lauria referred which he saw, and we

10 had, and ought to be in the plan, we're scratching our head

11 about it.

12         Mr. Krakauer?

13         MR. KRAKAUER:  Yeah, I -- Your Honor, I don't know

14 that it's necessary to address it point-by-point.  But I would

15 just make a couple of comments.

16         If you go to every -- each different constituency in

17 this case, they have their own idea of what's material to their

18 point of view, and what they would assert if there's

19 litigation.

20         THE COURT:  Well, and cases would tell you that to

21 the extent you have differences in the constituencies, there

22 may be different levels or types of information which must be

23 disclose, applicable to each different constituency.  You

24 wouldn't disagree with that, would you?

25         MR. KRAKAUER:  I don't disagree.  And we tried in our

1  disclosure statement to do that, to do something that gives a

2  balance view and fair view of the important facts.  You know,

3  everybody has their own little issue on points of view.  And

4  part of this letter --

5          THE COURT:  None of them sound so little to me

6  actually.

7          MR. KRAKAUER:  Well, I understand.  But everybody has

8  their own view of what facts that are pertinent, and what facts

9  should be focused on, and what facts make a decision.

10         What we've tried to do in our statement is to put in

11 the most important things, to put it in in a reasonable way.

12 And also to have a process which we've done very thoroughly in

13 this case of having people who want to delve into the weeds on

14 this have access to a document depository which has, you know,

15 three million pages, et cetera.

16         So, I don't think -- I think it would be very

17 counterproductive to start laying out specific facts that one

18 particular constituency wants because we're going to have all

19 these other constituencies asking for their own version, and

20 what about this, and what about that.  And I think it is -- you

21 go down that road, and it is very, very counterproductive.

22         THE COURT:  Well, let me ask you this.

23         MR. KRAKAUER:  Right.

24         THE COURT:  What would be -- it seems to me that a

25 good point is to be made as related to the LBO transaction that

1  sources and uses should be described for both steps of the

2  transaction.

3          That doesn't seem like an unreasonable request to me,

4  and it seems to me that's something everybody might be

5  interested in.

6          MR. KRAKAUER:  We can put a one-pager that has

7  sources and uses, if the Court thinks that's useful.

8          THE COURT:  Okay.  I don't think it's necessary that

9  the debtor take a position about solvency at the various steps.

10 But why wouldn't it be relevant, to the extent the information

11 already exists, to show what the actual cash flows were against

12 the projections, and to the extent the debtor wishes to make an

13 explanation, to make it?

14         MR. KRAKAUER:  Your Honor, on that, I think it would

15 be very counterproductive for a whole variety of reasons:

16         First, there's not one set of cash flows, and there

17 are a number of sets of cash flows the company does at all

18 various times.  And providing explanations of going through

19 each cash flow, each difference, and what the rationale might

20 be is also something that, you know, essentially it's -- you

21 either do it in a very superficial way, or you wind up with

22 very long discussions of things.  And I think at the end of the

23 day, you're not going to get anything out of it.  I think we

24 can put down, if you want, what the cash flows that were

25 projected at the time of the transaction that were used in the

1  solvency opinions, if you think that's useful.  But I would

2  leave it with that.  I would not get into the explanations

3  because I think that goes down the road of everybody arguing

4  about what's relevant and what's not.

5          THE COURT:  Well, it seems to me that a statement, to

6  the extent it's true, that, you know, actual cash flows

7  differed from projections would be pertinent.

8          MR. KRAKAUER:  We --

9          MR. CONLAN:  And they did.

10         MR. KRAKAUER:  Yeah, and they did.  And we could put

11 that in.

12         MR. CONLAN:  We could put that into the background

13 section.

14         MR. KRAKAUER:  Right.

15         THE COURT:  Well -- okay.  What about the treatment

16 of the class issue that Mr. Lauria raised at the end of his

17 discussion?

18         MR. KRAKAUER:  The treatment of the class is simply

19 that -- let me try and describe what it is.  Let me talk about

20 it, better to explain it.  But basically it says that if you

21 vote -- if the bridge votes against the class, they have a

22 claim against the parent.  And whatever value the parent has,

23 distributable value, and we've used for plan purposes $6.1

24 billion as the value of all the debtors and nondebtor entities

25 -- entities owned by the debtors basically.  And we've had --

1    there's a portion of that that's attributable to the parent.

2    And if they vote against the plan, then essentially they're

3    saying that they don't want to settle this particular class.

4                So, then there's two issues:

5                One, do they have a good claim or not?  Or is their

6    claim subject to dispute or avoidance?

7                And if it turns out that they don't a good claim, and

8    they don't receive a recovery.

9                If they do have a good claim, ultimately, then what

10   they're entitled to is a pro rata share of whatever the parent

11   value is, where their claim is.  And that's their recovery.

12               THE COURT:  Show me in the plan where it describes

13   the treatment of this class.

14               MR. KRAKAUER:  Let me get that, Your Honor.

15               MR. CONLAN:  While Mr. Krakauer does that, I'll just

16   give a summary from memory.  It provides now for the separately

17   classified bridge claimants at the parent, or Topco.  And that

18   if the class accepts the plan, they all, everybody in the

19   class, the people who voted yes, the people who voted no,

20   receive .44 cents, a little less than half a cent on the

21   dollar.  If the class rejects, then anybody who voted yes, even

22   though the class rejects, still gets that .44 cents.  And the

23   only people who get the release of the estate causes of action

24   are those people who receive the .44 cents.

25               The others, that is the people who voted no and/or

1  voted no in a -- in each of the two scenarios I've just

2  described, they will have their claim, and perhaps we could be

3  clearer about this in the disclosure statement.  The causes of

4  action against them will remain alive.  And their recovery on

5  those claims will, in our view, be somewhere between zero and

6  $74 million.

7        And if we haven't put the zero to 74 in that

8  circumstance in the disclosure statement, we can.  And I can

9  run through that summary -- Mr. Krakauer can go through the

10 specific language.

11       THE COURT:  I have both the blackline of the plan and

12 the blackline of the disclosure statement concerning treatment.

13       MR. KRAKAUER:  Your Honor, in terms of the plan, on

14 Page 20 -- the bottom of 26 running over to 27 is where it

15 deals with the bridge, the parent.

16       THE COURT:  I have it.  I've just read it.

17       MR. KRAKAUER:  Okay.

18       THE COURT:  Okay.  Well, yes, I think you have to put

19 the range in is the short answer.

20       MR. CONLAN:  We'll put it in.

21       MR. KRAKAUER:  We'll put it in.

22       THE COURT:  And at this point, that's all I'm

23 prepared to order.  And that's not to say that any of these

24 arguments can't and shouldn't be raised at confirmation.

25       There's just so much running through my head at the

1  moment, but I think it would best serve everyone if it just

2  stayed there for the moment.  That's all.

3          Have I now addressed all of the objections to the

4  disclosure statement?

5          MR. KRAKAUER:  Your Honor, can I turn back to one

6  before that Mr. Bennett raised on the interest rate and

7  amortization schedule on the notes?

8          THE COURT:  You may.

9          MR. KRAKAUER:  Because I've had a chance to confer a

10 little bit with my client.  And I have a slightly different

11 proposal on that.

12         In terms of what we have in our disclosure statement

13 and our projections, based upon what market is right now as

14 we're sitting here, we can estimate and we are estimating an

15 interest rate and an amortization.  Okay?  And we'll point that

16 out more clearly to people that what -- this is what we

17 estimate it would be as we're dealing with markets.

18         And then I think what we do is just caveat the fact

19 that markets change.  I mean, you know, if Greece does default,

20 and Spain does default, and all that happens, you know, it's

21 going to change interest rates.  If they don't, it doesn't.

22         But we're basically dealing with "here's what it is

23 under today's circumstances."  And what the uncertainty is is

24 just what happens in the market in the interim, but at least it

25 gives people a sense of what we're talking about.

1            And then come -- and we'll also point out if they

2    want to know for sure, they should read the plan supplement,

3    which is going to be filed in the middle of July.

4            THE COURT:  All right.

5            MR. KRAKAUER:  Okay.

6            THE COURT:  That seems like a reasonable proposal to

7    me.

8            Any comment?

9            UNIDENTIFIED ATTORNEY:  Your Honor, there is.  I

10   wonder if they would supplement it by saying that it's their

11   goal to create an instrument that was going to have an interest

12   rate so it's going to trade at par?

13           MR. KRAKAUER:  I don't --

14           UNIDENTIFIED ATTORNEY:  And that would -- then people

15   would say, "okay, this is what you think it is now," and they'd

16   understand what adjustment would be.

17           MR. KRAKAUER:  Your Honor, I wouldn't say it that

18   clear.  I think we'd just give an estimate of what we think the

19   rates would be right now.

20           THE COURT:  I think that's sufficient.

21           MR. KRAKAUER:  Okay.  Thanks.

22           THE COURT:  Okay.  So, with that, have I addressed

23   all of the objections to the disclosure statement?

24           MR. KRAKAUER:  I think I have.  And I'd just make one

25   other point.  We are -- on this interest rate issue and

1 amortization issue, the debtor really does have a view to get

2 this out, we would, frankly, wanted to spell it all out right

3 now and be done with it.  But we are differing to some of our

4 other constituencies who wanted to stick with market.

5            THE COURT:  Okay.

6            MR. KRAKAUER:  Thanks.

7            MR. CONLAN:  I think that's it.

8            THE COURT:  Okay.  If anyone disagrees, now is the

9 time to speak or hold your peace.  Okay.  Let's -- I'm sorry,

10 Mr. Lauria?

11            MR. LAURIA:  Your Honor, just a clarification is by

12 virtue of not raising the other issues that I raised, or I

13 guess four or five points that I was focusing on, the Court has

14 considered them or --

15            THE COURT:  I have.

16            MR. LAURIA:  Okay.

17            THE COURT:  And to the extent they're considered to

18 be objections, I overrule them.  But all points well made.

19            Okay.  Let's deal with voting procedures.

20            MR. CONLAN:  Your Honor, Mr. Kansa.

21            MR. KANSA:  Good afternoon, Your Honor.  Ken Kansa of

22 Sidley Austin on behalf of the debtors.

23            This brings us to our motion to approve the

24 solicitation procedures in the case.

25            We have received roughly five objections to the

1  solicitation procedures.  Three of which relate to what I would

2  call the opt in/opt out release mechanical on the ballot that

3  the Court raised before the break, and which I would propose to

4  address first.

5          The objection from the Bennett claimants also

6  touches, I think, more on the substance of the releases, but

7  I'll come to that in that piece, as well.

8          And then we have an objection from Wilmington Trust,

9  which I believe we've resolved with some language and a couple

10  of other accommodations.

11          And lastly, we have a technical comment on the voting

12  procedures that was filed by Bank of America last night, which

13  we have resolved through language that we would propose be

14  added to the form of solicitation order.

15          So, I'll just walk through those in order, if Your

16  Honor wishes.

17          THE COURT:  I do.

18          MR. KANSA:  With respect to the release mechanic,

19  Your Honor, we heard the Court loud and clear before the break.

20  And we have revised the documents since the filing of our

21  response earlier this week.

22          We had made a revision to the release mechanism in

23  the ballots and had actually advised at least the Department of

24  Labor and Mr. McMahon at the U.S. Trustee's Office last night

25  that we have changed that mechanic to an opt in to the

1  releases, rather than an opt out, for creditors who vote to

2  reject the plan.

3          So, with respect to a creditor that votes to accept

4  the plan, they are still deemed to grant the releases that are

5  set out in 11.2.2 of the plan.

6          If a creditor votes to reject the plan, they then

7  have an option to, by affirmatively ticking a box, opt in to

8  the Section 11.2.2 releases.  Or if they do not tick that box,

9  they will be deemed not to grant the releases in 11.2.2.

10          THE COURT:  What about a creditor who does not vote?

11          MR. KANSA:  We have revised the ballot, as well, Your

12  Honor, to state that a creditor who does note vote on the plan,

13  or we have revised the procedures, I should say, and the

14  appropriate section of the plan, to state that a creditor who

15  does not vote on the plan will not be deemed to grant those

16  releases.  We believe that's consistent with Your Honor's

17  comment to us before the break.

18          And like I say, we heard you loud and clear, Your

19  Honor.

20          THE COURT:  Okay.

21          MR. KANSA:  We believe that that revision to the

22  mechanic should resolve the -- what I would call the mechanical

23  issue concerning how the ballot works with respect to the

24  releases.

25          We still have what I think is a more substantive

1   issue, and I don't know whether this resolves that that was

2   raised by Mr. Bennett, which really goes to the classification

3   of claims resulting from the release in an 1123(a)(4) argument.

4   And I think our papers make fairly clear, Your Honor, that that

5   is really a confirmation objection.  If he has a class

6   treatment issue to raise on that point, the confirmation

7   hearing is the appropriate place to do that.

8          If it helps us to offer the confirmation that we read

9   the Court's comment in Spansion not to require anything about

10  the substantive releases be brought up at this hearing, we

11  don't read the comment in Spansion that way.  We don't think

12  this Court would read that comment this way.

13         We think that if the Court was saying if you had a

14  mechanical issue about the ballot, now is the time to bring it

15  up.  And we're appropriately addressing that here.  But

16  beyond --

17         THE COURT:  That's what I meant to say, and maybe I

18  didn't say it clearly enough.

19         MR. KANSA:  We have certainly taken it that way,

20  Your Honor.  And we think that should resolve matters.

21         I have not heard from the Department of Labor whether

22  we have addressed their issue by this mechanical change.

23         I do understand that the U.S. Trustee's Office still

24  has an open issue with respect to the release mechanism that

25  I've just mentioned to you.  And I have not spoken with Mr.

1  Bennett on the point either, so I don't know if we have

2  addressed their concerns.

3         But in any event, we believe those are appropriately

4  deferred to confirmation.  So, I'd let the objectors address

5  their points now --

6         THE COURT:  All right.

7         MR. KANSA:  -- on this score.

8         THE COURT:  Very well.  Mr. Bennett, would you like

9  to go first?

10        MR. BENNETT:  Yes, Your Honor.  First of all, I don't

11 want to argue the confirmation point today.  There is a

12 remaining problem with the opt out structure.  And I want to

13 explain what the problem is, and I want to make sure that if

14 it's going to be resolved today, we resolve it today.  But if

15 it's not going to be resolved today, then it's preserved in all

16 respects for purposes of the confirmation hearing.

17        THE COURT:  Okay.

18        MR. BENNETT:  And that is as follows:

19        We all know what this deal looks like, what the

20 proposed settlement is.  For the credit agreement lenders, the

21 whole class, they're basically suffering a distribution

22 reduction of some number between 425 and $435 million.  And

23 they're getting releases of what I think everybody agrees are

24 estate claims.  That's the core fraudulent transfer claims,

25 it's the -- whatever rights that the estate would have or

1 anyone else would have, quite frankly, to object to their

2 claims.  But those are being resolved in a settlement.

3          And so the distribution is -- the cash distribution,

4 and notes distribution, and stock distribution is reduced by a

5 number that's approximately -- we'll call it 430, and you get a

6 release from the estate.

7          Those are the estate causes of action releases, to

8 use the words that Mr. Conlan used in -- about his last

9 paragraph when he was standing up here.

10          And then there's this extra kind of release, which is

11 the releases of nondebtors.  And that is the subject of the

12 "check a box."

13          Here's the problem:  The way the plan is currently

14 now written, the way the ballot is currently now written, a

15 person who affirmatively opts out of the nondebtor releases

16 also loses the estate releases.

17          Now, I've actually never seen that before.  I have

18 certainly seen plans that said, okay, we're going to have an

19 opportunity to get nondebtor releases, and if you check the

20 box, you get nondebtor releases from everybody else who checks

21 the box, and you give nondebtor releases to everyone who checks

22 the box.

23          But I've never seen someone say,  well, you not only

24 -- if you don't check the box or don't even send back a ballot,

25 you not only don't participate in the exchange of nondebtor

1  releases, which people can make a decision to do or not do, but

2  you also lose a fundamental part of the bargain with the

3  estate.  You lose a piece of your distribution, you lose the

4  estate release.

5        Frankly, the doctrinal way to get at that, from our

6  perspective, is, of course, the confirmation standard that

7  requires everyone in a class get treated the same way, whether

8  they vote to accept, or reject, or do anything else.

9        So, if you are giving up your piece $430 million in

10  distribution in exchange for an estate release, you should get

11  the estate release, irrespective of whether you give a

12  nondebtor release.  And that's as confirmation issue.

13        But the formulation of the opt out, quite frankly, is

14  very coercive.  And so our first choice is today, Your Honor

15  should disapprove of this form of opt out.  Because the

16  consequence of the opt out is to change your treatment in

17  respect of your claim against the debtor.  Something that

18  didn't happen in any case that has been cited to you.

19        If Your Honor would prefer to deal with this as a

20  confirmation problem, that's okay with me, we'll deal with it

21  then, too.  The problem is you have to think about how are you

22  going to back yourself out of it.  So, you will come to

23  confirmation hearings with people who would have been scared.

24  They will vote no on the plan, but they'll check the opt out

25  box, and then they'll object to the plan, which is perfectly

1 their right to do.

2         And so what have you got then?  Is every single

3 person who affirmatively checked to opt in -- I'm sorry,

4 they've reversed it.  Everyone who checked to opt in going to

5 get another opportunity?  Are the debtors going to agree that

6 this is unlawful discrimination, every election is invalid, and

7 no one exchanges nondebtor releases.  So, I, quite frankly,

8 think the existence of the coercive element is illegal, and

9 should be disapproved today.

10         If the question is going to be reserved to

11 confirmation, everyone has to understand there's a back --

12 backing away from this problem, that if Your Honor finds that

13 the effect of this opt in structure is to create disparate

14 treatment of different creditors within the class with respect

15 to their claims against the estate, I do want plans to get done

16 here at a reasonable time.  How are we going to work our way

17 out of a flood process?  And I certainly need to make sure that

18 contrary to the current form, that whatever order Your Honor

19 enters approving solicitation procedures, because I'm assuming

20 you're going to enter some order approving solicitation

21 procedures, does not approve as a substantive matter this opt

22 out treatment.  Instead, it says, "the form looks okay, but the

23 substance is a confirmation issue."

24         So, one way or another, this has to be addressed.

25 And if Your Honor is inclined to address the disparate

1  treatment issue now, I'll discuss the disparate treatment
2  issue; it's fairly obvious.

3         THE COURT:  Well, it is actually.  And yet I do think
4  it's a confirmation objection by its nature.  So, it's reserved
5  for confirmation.

6         I'll say this -- and typically how I approach these
7  things, and I did it in the last contested confirmation hearing
8  I had, and that is to say, look, the debtor has its shot at
9  exclusivity.  But if it does not achieve a confirmed plan
10 within that time frame, my inclination is not to give it a
11 second chance, but to open up the field.

12        And, frankly, while I actually didn't do that in the
13 last case, it was because there were only three minor, what I
14 viewed as, easily correctable problems to get the debtor to
15 confirmation.  They were corrected, and I confirmed the plan.

16        But the issues here are so much -- I don't want to
17 say larger, but different.  And I'm not so sure, given how the
18 parties, at least initially, have staked out their respective
19 positions, that if I should deny confirmation here, that
20 there's anything that's so easily corrected.  And I'm not
21 making a ruling, I'm just responding so that you understand
22 with respect to the issue you've mentioned, and I guess the
23 others that are floating around, that's how I intend to
24 approach it.

25        I view it as a risk the debtor chooses to take, and

1  those who support the plan take.  And in the first instance,

2  with exclusivity, with their first proposed plan, I'm content

3  to let them take it.  Everyone's well advised on that side of

4  the room, as they are on your side.  And we'll see where the

5  process goes.

6          MR. BENNETT:  Thank you, Your Honor.

7          THE COURT:  All right.

8          MR. BENNETT:  We'll make sure the order doesn't

9  address this issue.

10          THE COURT:  Very well.  Thank you.  Mr. McMahon?

11          MR. McMAHON:  Your Honor, good afternoon again.

12          We filed a brief objection on this point.  And the

13  central theme of it, Your Honor, was that the same principles

14  that apply to the "yes" side of the ballot should apply to the

15  "no" side of the ballot.

16          Obviously when we're talking about consent, it would

17  be great if we could untie the vote from the release in all

18  instances such that parties could take one or the other.

19          So, to the extent that this Court is going to direct

20  that an affirmative vote in favor of the plan constitutes

21  acceptance of the release on the "yes" side, our point is the

22  same principle should apply on the "no."  A "no" vote should be

23  deemed a rejection of the release, and that should end it.

24          Now, in speaking with debtors' counsel during the

25  break, Your Honor, the point was made that, well, parties who

1 vote against the plan should be able to determine whether it's

2 economically in their benefit to participate in the third party

3 release, to give and get.  And I only have two points to make

4 in response to that, Your Honor:

5         First, it's interesting that the same logic doesn't

6 inform the debtors' position with respect to the affirmative

7 vote.  If that were the case, the debtors will provide an opt

8 out to a vote in favor of the plan on the release point if it

9 was that important for a part to independent consider the

10 economic benefits and burdens of the release.

11         The second point, Your Honor, is that the third party

12 release here, unlike those which we see in some cases, is

13 necessarily elastic by definition.  It seems to be a new trend

14 towards having the definition of "release parties" be more than

15 one people, depending on what they do.

16         So, therefore, Your Honor, at the time any entity

17 returns its ballot, it will not know what it is giving or

18 getting as a technical matter, depending on whether a party

19 believes it's truly potentially liable in connection with a

20 host of prepetition transactions relating to the debtors and

21 maybe getting more than what the debtors are asking for from

22 certain people who hold notes, just as a technical matter.

23         So, those are our points, Your Honor.  All we want is

24 consistency on both sides of the ballot.

25         THE COURT:  All right.  Thank you.

1          MR. McMAHON:  Thank you.

2          THE COURT:  I don't -- Mr. McMahon, I will tell you,

3  the way the debtors have designed the opt in for rejecting

4  creditors, I think, is okay.  I'm, frankly, a little curious to

5  see how it will work out, but that's not the reason I'm willing

6  to approve it.  It's just that it gives the creditors choices.

7  And usually the offending part of releases and ballots as

8  they're proposed, it limits choices.  And, in fact, that one

9  does not.

10         So, I'm willing to overrule those objections by the

11  U.S. Trustee and to permit the debtor to move forward on that

12  basis.

13         MR. McMAHON:  Thank you, Your Honor.

14         THE COURT:  But I thank you.  And I thank you also

15  for raising the objection that you did at the time you did,

16  it's most helpful to the Court.

17         MR. McMAHON:  I appreciate it, Your Honor.  Thank

18  you.

19         THE COURT:  But let me ask whether anyone else wishes

20  to be heard with respect to process?  Does the Department of

21  Labor wish to be heard?

22              (No audible response heard)

23         THE COURT:  I hear no response.

24         MR. GERSON:  I'm sorry, Your Honor, it was on mute.

25         THE COURT:  All right.  Go ahead.

1          MR. GERSON:  I believe you have addressed our

2     concerns.  And what we were most concerned about was preserving

3     our rights to object at confirmation with respect to adequate

4     consideration being provided for those giving releases.

5          THE COURT:  Very well.

6          MR. GERSON:  Thank you.

7          THE COURT:  Thank you.

8          MR. GERSON:  Thank you.

9          THE COURT:  Anyone else care to be heard?

10              (No audible response heard)

11         THE COURT:  I hear no further response.  Would you

12    like to address Bank of America?

13         MR. KANSA:  I would, Your Honor.  The Bank of

14    America's technical comment filed last night was to raise an

15    issue that they believed a master ballot may be necessary for

16    certain senior loan claims that they hold.  Although they may

17    hold them in what they refer to as "street name" for a nominee

18    beneath them.

19         Bank of America is still investigating whether this

20    issue applies to them.  We, and the senior loan agent,

21    conferred, and we are also looking into it, as well.

22         What we have proposed for this form of order, and

23    what Bank of America has agreed on this point is that we will

24    insert language that provides that if the debtors, the senior

25    loan agent, and Bank of America all agree that there is a

1  master ballot necessary to be provided to Bank of America to

2  vote certain of its senior loan claims, we will provide them

3  with a form of master ballot that is substantially similar to

4  the master ballot that we have prepared and have filed with the

5  Court for the noteholder claims, as well.

6          And that if, for whatever reason, we're not all able

7  to agree on this point, we will not oppose any parties'

8  requests to come back before this Court to be heard on the

9  issue.  And we would not oppose a request, if that were to be

10 done on an expedited basis, understanding we can't bind

11 obviously the Court on a scheduling point.

12         But we would -- we have agreed to that language.  We

13 have proposed it, and we will put that in the form of

14 solicitation order that we present to the Court.  And I believe

15 that resolves their issue, as well.

16         THE COURT:  All right.

17         MR. KANSA:  There are also a --

18         THE COURT:  Mr. Stratton?

19         MR. STRATTON:  Good afternoon, Your Honor.  David

20 Stratton for Bank of America.

21         That resolution is acceptable to my client.

22         THE COURT:  All right.  Thank you.  Anything?

23         MR. KANSA:  Your Honor, apologies.  One other point

24 that Mr. Stark has raised.  We did resolve the four discrete

25 objections he had raised to the solicitation motion.

1          One of them involves the provision of some language

2   that is -- we had proposed language in our response that

3   addressed his point on the Class A versus B share issue in the

4   Media Ownership Certification.  We have a slight modification

5   to that proposed language that we will put in the form of

6   solicitation order that we present to the Court.  But it's in

7   the nature of ensuring that Wilmington Trust's rights are

8   preserved on that issue.

9          MR. STARK:  Can I just be heard real quick?  I just

10  want to make sure the record is eminently clear.  The point --

11  it's an important point.  The motion asked for authority for

12  the debtor to be able to issue this Class B, what we've

13  referred to as the nonvoting classes in the case that FCC

14  regulations require it.

15         And our objection was is that that's not something to

16  be raised in a procedures motion.  That's for the confirmation

17  hearing.  And to the extent that the order was being utilized

18  in a way -- it could be utilized in a way to be presented to

19  the FCC, or anybody else, saying that Your Honor has given

20  imprimatur to this mechanism, it's premature at this stage.

21         The language that counsel has proposed is acceptable

22  to us because we understand it to mean, and I want the record

23  to -- the surrounding record to reflect it, is that Your Honor

24  isn't reaching that ruling today.  That's an issue for

25  confirmation to decide and, in fact, it's qualified.  The way

1  the language is written now is subject to whatever Your Honor

2  reaches -- decision Your Honor reaches at the confirmation

3  hearing is whether or not that issue is appropriate.

4         THE COURT:  So, what precisely am I being asked to

5  authorize?

6         MR. KANSA:  Your Honor, what you are being asked to

7  authorize is that we will set a deadline -- the deadline

8  proposed for the Media Ownership Certification is July 1st --

9  for parties to reach out to us and to work with us to become a

10  party to the FCC applications that are being presented in

11  connection with the debtors' hopeful emergence from Chapter 11.

12         The consequence of a party not complying with that

13  deadline, and not doing anything before July 11 is they may be

14  issued B shares or warrants under the plan.

15         The propriety of the B shares and warrants

16  themselves, and the propriety of them receiving that as their

17  plan consideration is an issue that is entirely preserved for

18  the confirmation hearing, and that is something we are not

19  seeking your approval for today.  We are simply looking for a

20  deadline to work with these folks.

21         THE COURT:  Okay.  All right.  Has anyone who wishes

22  to be heard been heard on voting procedures?

23             (No audible response heard)

24         THE COURT:  I hear no response.  Okay.  Shall we talk

25  about what happens next?

1          MR. CONLAN:  Your Honor, we just need a date, sooner

2    rather than later, to come back to you with the letters which

3    we expect to have by the end of tomorrow, and the amendments we

4    talked about with respect to the exit facility.  On those two

5    points what we expect will occur, the sources and uses point,

6    the cash flow projection, and the zero to 74 range relating to

7    bridge claimants who don't receive a distribution under the

8    plan.

9          And as soon as you can have us back, we'll take it.

10   I don't think it will take us any time at all to make those

11   changes.  We could be back before you on Monday afternoon,

12   Tuesday, whatever works for you.

13         THE COURT:  Bear with me.

14                    (Pause)

15         MR. CONLAN:  Mr. Stark reminded me that submissions

16   to the examiner are due Monday, although I think it's

17   probably --

18         THE COURT:  Well, here's what I was thinking.  That I

19   would bring you back on Friday, the 21st.  I'm sitting on

20   Monday, and Tuesday through Thursday are full.  I'm sorry, the

21   28th.

22         MR. CONLAN:  That works with our -- Ken?

23         MR. KANSA:  Your Honor, I would just raise the point,

24   based on that change, I don't think this is material, we had

25   put in our form of proposed order --

1          THE COURT:  June 1st, I know.

2          MR. KANSA:  -- that we would have June 1 for

3  solicitation packages in the mail, and we'll obviously move

4  that.

5          THE COURT:  It will have to be moved back, but we

6  have -- the good news is there is lots of room --

7          MR. KANSA:  Yes, indeed, Your Honor.  Thank you.

8          THE COURT:  -- within the time frame.  Now, so --

9          MR. CONLAN:  Okay.

10          THE COURT:  Let's firm up, though, a deadline for the

11  filing and service of all the changes.  Are you telling me

12  still by close of business Monday, or do you want to push it a

13  day because of the examiner's submissions?

14          MR. CONLAN:  No, we can do it Monday.  Do it Monday.

15  We'll have it by Monday.  It will go out Monday night.

16          THE COURT:  Okay.  Now, normally for a hearing on the

17  28th, the binders would be due at noon on the 26th.  But

18  obviously parties will need -- again, not an invitation -- but

19  under the circumstances, I want to give parties a chance to

20  respond if there's any remaining problem with what comes from

21  the changes.  I hope there isn't, I expect there will not be.

22  But I'm thinking -- we'll say objections by, if any, to be

23  filed by 4 o'clock on Wednesday, the 26th.  And binders here in

24  chambers by noon on the 27th.

25          MR. CONLAN:  Friday morning, were you thinking?

1          THE COURT:  10 o'clock.

2          MR. CONLAN:  10 o'clock, very good.

3          THE COURT:  Hopefully everyone will get an early

4 start on the weekend -- on the holiday weekend.

5          Okay.  Let me just say one more thing about timing.

6 We presently have scheduled the week of August 16th, five days

7 for confirmation.  Now, I don't know what will happen as the

8 process progresses, I guess the only thing I can expect is the

9 unexpected.

10          If it turns out that either because the debtor asks

11 for it, or because I order it, there's a change in the

12 confirmation time frame, I just caution you now that finding

13 another week between that date that's now set and sometime in

14 October will not be an easy -- for five days in a row, that

15 will not be an easy exercise, and even getting a couple of days

16 in a row may be problematic because we have -- we run up

17 against not only the -- I guess everyone's vacation schedule at

18 the end of August, but the Labor Day holiday, the Jewish

19 holidays are a little bit earlier this year.   And then I have

20 -- and in between all that, I have my own calendar for other

21 matters.  Yes, there are others.

22                         (Laughter)

23          THE COURT:  I give it to you just as a heads up.  I

24 tell you now that if you -- if by the time you come back to me

25 on Friday, there is any desire to push that back farther, and

1 I'm not inviting motions, I'm talking to the debtor as I speak

2 now, I would give you the week of August 30th.

3          And I'm not suggesting you should avail yourself or

4 that.  All I'm telling you is after that, it becomes

5 problematic for a period of time.  That's all.

6          MR. CONLAN:  We understand.  Thank you.

7          (Attorneys engaged in off-the-record colloquy)

8          MR. CONLAN:  Your Honor, just to help us along, we

9 expect everybody will give us their letters by close of

10 business tomorrow.  But if you could go ahead and direct that

11 everybody give them to us by the close of business tomorrow?

12          THE COURT:  Okay.  Does anyone have a problem with

13 that?

14               (No audible response heard)

15          THE COURT:  No?  So ordered.

16          MR. CONLAN:  Thank you.

17          (Attorneys engaged in off-the-record colloquy)

18          MR. LAURIA:  As a point of clarification, is

19 everybody reviewing everybody's letter?  How is that supposed

20 to work?

21          THE COURT:  Well, if it can be done before they're

22 filed, that's better.  If it can't, there will be the objection

23 period.

24          MR. CONLAN:  Your Honor, we don't mind circulating

25 everybody's letter to everybody else.  We'll do that.

1           THE COURT:  Okay.

2           MR. CONLAN:  As soon as we receive them tomorrow

3  night.

4           MR. LAURIA:  So, I guess by definition, what that

5  means then is if people have issues, they end up flowing into

6  this objection process next week instead of --

7           MR. CONLAN:  Either that or we'll try to work them

8  out over the weekend.

9           THE COURT:  That, I'd prefer.

10          MR. CONLAN:  Yeah.

11          THE COURT:  Obviously.

12          MR. LAURIA:  I was actually thinking maybe if that's

13 the goal, maybe we ought to push it to Monday on the letters so

14 that people have the weekend to try to, you know, work this out

15 and we don't have issues.  It's kind of a coin toss, but --

16          THE COURT:  What would the debtor prefer?

17          (Attorneys engaged in off-the-record colloquy)

18          MR. CONLAN:  We'd prefer to have everybody first cut

19 by close of business tomorrow, and that will give us the

20 weekend, Mr. Lauria, to see if we can make sure everybody

21 agrees with everybody -- let me rephrase.  People don't want to

22 object to what's in everybody else's letter.

23          THE COURT:  All right.

24          MR. CONLAN:  So, we'll stick with tomorrow night.

25          THE COURT:  Let's stay with that then.  Is there

1 | anything further for today?

2 |         MR. CONLAN:  No, Your Honor.

3 |         THE COURT:  Then I thank you all very much.  That

4 | concludes this hearing.  Court will stand adjourned.

5 |         MR. CONLAN:  Thank you.

6 |     (Whereupon, at 3:33 P.M., the hearing was adjourned.)

7 |

8 |                         CERTIFICATE

9 |

10 |     I certify that the foregoing is a correct transcript from

11 | the electronic sound recording of the proceedings in the

12 | above-entitled matter.

13 |

14 |

15 |  _/s/_ _Karen Hartmann____AAERT CET**D0475 Date: May 22, 2010

16 | TRANSCRIPTS PLUS, INC.

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

**$**

**$1.1–** 119:22
**$1.5–** 108:5
**$1.6–** 107:2
119:19 120:2,5,9,
13
**$12–** 110:20
**$20–** 119:24
**$300–** 50:3
**$430–** 142:9
**$435–** 140:22
**$510–** 113:7
116:10
**$6.1–** 131:23
**$690–** 120:7
**$7–** 120:12
**$700–** 120:20
**$74–** 133:6
**$80–** 120:1

**&**

**&–** 11:15 27:11
61:15 92:16

**/**

**/S/–** 157:15

**0**

**0.44–** 124:7

**1**

**1–** 11:6 110:17
111:1,11 113:18
116:22 117:2,9
118:9,19 119:3,
11,15 153:2
**10–** 49:15 86:1,4
93:9,20 154:1,2
**100–** 35:21 59:14
**102–** 59:2,14
**106–** 67:7
**107–** 67:7 70:22
**108–** 66:25 67:13,
14
**10:44–** 33:18
**10:55–** 33:18
**10-MINUTE–** 33:15
**11–** 40:16 151:11,
13
**11.2.2–** 64:19
138:5,8,9
**11.4–** 72:3
**110–** 70:21
**112–** 67:23
**1123A4–** 139:3

**1123B6–** 23:23
24:5
**1125–** 16:24
28:21 110:6
111:17 112:2
118:1
**1129–** 39:8 41:25
42:2 60:3 106:20
**1129A–** 107:14
**1129B–** 124:13,16,
18 125:2
**12–** 20:1 60:16
**125–** 75:25 76:1
**12:34–** 95:19
**12TH–** 16:11 19:9
26:2 28:2,23
109:22
**13–** 14:17 35:9
**13.9–** 36:3
**132–** 52:19 53:1,8
**144–** 53:2,7
**14C–** 52:20
**14TH–** 24:19
**15–** 86:4 127:9
**150–** 108:21,22
110:3
**150-PAGE–** 111:15
120:24
**15TH–** 19:9 32:11
54:25 55:3
**16–** 52:21 53:19
76:1
**16TH–** 16:10 154:6
**18–** 105:12,16
106:18,23 107:2
**1992–** 56:10
**1995–** 56:10
**1997–** 56:10
**1D–** 19:18 124:21
**1ST–** 151:8 153:1

**2**

**2–** 11:9 95:4,17
110:18 111:2,11
117:9 118:20,21,
25 119:1,4,10,14,
15,16,19,20
120:2,4
**2.3–** 14:13 43:4
**20–** 85:25 133:14
**2005–** 40:18
**2007–** 49:12
108:15 112:6,11,
13,15
**2008–** 112:4

**20TH–** 16:10
**21ST–** 152:19
**22–** 43:4 157:15
**225–** 85:21,22
**25–** 85:12
**26–** 133:14
**26TH–** 153:17,23
**27–** 133:14
**27TH–** 153:24
**28–** 16:10
**28TH–** 152:21
153:17
**2:01–** 95:19

**3**

**3.7–** 119:3
**30–** 55:5 58:8
**30TH–** 19:10 155:2
**31–** 58:3
**32–** 57:1,13,15,
23 58:9
**36–** 58:8 127:20
**3:33–** 157:6

**4**

**4–** 153:23
**400–** 18:25
**401K–** 119:25
**425–** 140:22
**43–** 120:6
**430–** 113:7
116:10 141:5
**44–** 46:5 120:13
126:15 132:20,22,
24
**4472–** 13:4
**45–** 44:19 45:4
46:5

**5**

**5–** 11:9,10 75:21
76:4,12,15
**50–** 35:19,20
**502E–** 70:11
**507A8–** 39:6
**511–** 39:13 40:17
41:4,21 42:6,15
43:6
**54–** 59:2
**55–** 109:2
**56–** 76:15
**57–** 76:15 127:20
**58–** 30:21 113:14
**59–** 52:2 53:24,
25 54:2 76:5,7,14

**6**

**6–** 13:2 114:8
**6.8–** 72:10,25
73:25
**60–** 48:7 61:9
76:5,8 108:25
109:2
**61–** 61:9
**64–** 113:15 125:24
**66–** 108:25
**67–** 90:20
**69–** 38:18

**7**

**7–** 60:17
**7.1–** 35:19
**7.22B–** 35:19
**73–** 13:4 36:6
**74–** 133:7 152:6
**75–** 85:13

**8**

**8.7–** 14:14
**80–** 113:8 116:11
**81–** 65:20
**83–** 76:20
**84–** 76:20

**9**

**9–** 52:2 54:2
**900–** 85:3,6,8,10,
11,19
**9019–** 31:1,3
87:18 114:2
115:20 128:3
**94–** 78:3
**99–** 35:21 68:20

**A**

**ABANDONED–** 88:15
**ABETTING–** 105:21
106:4
**ABILITY–** 35:22
89:25 100:24
**ABLE–** 30:15
43:20 56:20
58:17 75:15
96:11 102:20
106:7,21 109:10,
15 110:6 118:3
146:1 149:6
150:12
**ABRIDGED–** 43:18
**ACCEPT–** 94:17
124:6 127:25

128:2,4 138:3
142:8
**ACCEPTABLE-**
82:24 149:21
150:21
**ACCEPTANCE-**
128:7 145:21
**ACCEPTED-** 110:1
**ACCEPTS-** 124:6
132:18
**ACCESS-** 31:15
111:2,25 129:14
**ACCESSED-** 61:8
**ACCOMMODATION-**
18:2
**ACCOMMODATIONS-**
137:10
**ACCOMPLISHED-**
21:16 123:14
**ACCORDING-** 117:16
**ACCOUNTS-** 30:7
85:12
**ACE-** 43:14,17
44:1
**ACHIEVE-** 56:20
144:9
**ACHIEVING-** 123:6
**ACKNOWLEDGE-**
68:17 74:3
**ACKNOWLEDGMENT-**
44:23
**ACT-** 29:10 40:17
**ACTING-** 31:21
47:22 48:9
**ACTION-** 17:5
20:25 21:2,10
27:24 35:7 44:8
56:14 63:23 68:2
82:14 96:9 99:5,
6,7 109:17
112:24 127:11
132:23 133:4
141:7
**ACTIONS-** 113:2
**ACTUAL-** 20:24
112:3 130:11
131:6
**AD-** 125:22
**ADD-** 13:12 20:13
41:20 60:6 75:24
107:6 119:2,8
**ADDED-** 40:17
45:17 56:25
57:24 60:5,13,14
69:21 70:1,2
76:3,7,13,19

77:2,13 117:7
137:14
**ADDING-** 76:21
**ADDITION-** 78:23
**ADDITIONAL-** 29:6,
23 44:10,19
57:24 59:16 60:5
61:2,6 64:21
72:12 76:21 85:18
**ADDRESS-** 15:18
22:10 27:14
32:24 34:20
47:19 49:8 50:17,
19 54:15 59:18
67:20 69:8 75:8
77:21 78:6,8
81:7 83:6 119:5
125:16,19 127:22
128:14 137:4
140:4 143:25
145:9 148:12
**ADDRESSED-** 28:1
36:22 37:7,12,17
39:14,23 40:4
42:11 43:15
46:14,19 59:1
61:1,8 63:16
65:7 66:2,3,17
67:3 68:4 69:6
81:14 82:4 134:3
135:22 139:22
140:2 143:24
148:1 150:3
**ADDRESSES-** 42:13
44:20 58:18
69:11 100:8
**ADDRESSING-**
75:25 80:17
139:15
**ADDS-** 127:8
**ADEQUACY-** 47:14
56:12 61:5 75:11
**ADEQUATE-** 27:19,
23 28:17,21 29:8
31:16 45:16 55:4
91:17 112:1
118:2 121:4 148:3
**ADEQUATELY-** 94:18
**ADJOURN-** 89:18
**ADJOURNED-** 14:20
157:4,6
**ADJOURNING-** 15:17
**ADJOURNMENT-**
15:8,20 27:10
**ADJUSTMENT-**
22:15,16 27:4

135:16
**ADLER-** 61:14
63:15,17 64:3
**ADMINISTRATIVE-**
25:2 36:19
**ADMISSION-** 28:16
**ADMITS-** 114:8
**ADMONITION-** 91:10
**ADOPTED-** 114:11
118:14 126:20
**ADOPTING-** 126:18
127:2,3
**ADVANTAGEOUS-**
121:7
**ADVERTISEMENT-**
17:6 20:3 90:2
**ADVISE-** 48:9
75:7 101:21
**ADVISED-** 32:5
137:23 145:3
**ADVISOR-** 25:17
105:25
**ADVISORS-** 111:24
121:14
**ADVOCACY-** 121:5
**AFIELD-** 87:23
**AFTERNOON-** 32:5
48:4 95:20,21
107:21 136:21
145:11 149:19
152:11
**AGAINST-** 28:11
35:8 44:9 64:17
65:18 68:1 73:11
76:4 105:21
106:3,5,13
120:21 126:6
130:11 131:21,22
132:2 133:4
142:17 143:15
146:1 154:17
**AGENDA-** 11:5
**AGENT-** 27:12
58:21 107:22
148:20,25
**AGGREGATE-** 120:14
**AGREE-** 12:11
20:17 22:4,6
29:25 65:22
81:22 92:20
143:5 148:25
149:7
**AGREED-** 11:18
21:13 29:4 43:23
70:7 95:23 96:1
100:21 107:10

126:19 148:23
149:12
**AGREEMENT-** 15:5
32:10 44:13,24
45:3,4 54:22,23,
24 59:24 62:12
76:9 77:1,25
80:23 81:24
84:12 85:4 89:3
96:14 97:4 98:14
100:16 101:24
114:7 118:24
126:19 127:3
140:20
**AGREEMENTS-** 71:25
**AGREES-** 66:21
140:23 156:21
**AHEAD-** 69:17
116:19 147:25
155:10
**AIDING-** 105:21
106:4
**AISLE-** 81:19
**ALIVE-** 133:4
**ALLEGED-** 17:18
36:20 44:10 45:6
**ALLEGES-** 38:23
**ALLOCATED-** 63:1
126:11
**ALLOCATION-** 18:16
**ALLOW-** 12:4 28:8
30:19 125:5
**ALLOWED-** 26:8
35:25 40:16 58:6
86:21 124:11
**ALLUDED-** 47:9
123:17
**ALONE-** 123:7
**ALTER-** 62:13
**ALTERNATIVE-**
21:11 30:1 31:12
90:1,15 91:1
102:20
**AM/RECONVENE-**
33:18
**AMASSED-** 117:22
**AMENDED-** 79:14
117:22,23
**AMENDMENT-** 12:17
**AMENDMENTS-**
121:23 123:5
152:3
**AMERICA-** 65:7,10
137:12 148:12,19,
23,25 149:1,20
**AMERICA'S-** 148:14

**AMERICAN-** 43:14
**AMERICAS-** 61:16
**AMONG-** 55:17
57:6 85:11 89:21
**AMORTIZATION-**
134:7,15 136:1
**AMOUNT-** 46:6
58:6 59:6 86:3
93:9 113:7
**AMOUNTS-** 56:24
58:4
**ANALYSIS-** 76:14
116:13 119:18
126:21
**ANALYZED-** 125:22
**ANCILLARY-** 71:15
**AND/OR-** 132:25
**ANGELO-** 101:23
114:23
**ANSWER-** 89:6
125:18 133:19
**ANSWERED-** 14:24
**ANTICIPATE-** 95:7
**ANTICIPATES-** 51:4
**ANXIOUS-** 122:1
**ANYBODY'S-** 29:24
**ANYMORE-** 51:10
77:18
**ANYWAY-** 15:9
42:6 77:10
**ANYWHERE-** 84:11
**APOLOGIES-** 149:23
**APOLOGIZE-** 74:15
96:24 105:7
**APPEAL-** 88:3
**APPEARING-** 38:2
**APPEND-** 111:16
**APPENDED-** 101:14
110:13
**APPLICABLE-**
39:19 42:6,14
119:10 128:23
**APPLICATION-** 60:9
**APPLICATIONS-**
151:10
**APPLIES-** 148:20
**APPLY-** 36:5 39:1
42:7 77:10
145:14,22
**APPOINTMENT-**
61:7 63:20
**APPRECIATE-**
102:6 147:17
**APPRECIATED-** 37:5
**APPRISE-** 49:3

80:5 92:19 144:6,
24
**APPROACHED-** 27:15
**APPROPRIATE-**
15:8 18:1 31:4
33:7 42:18 45:11
46:14 54:12
59:14 66:24
68:18 69:8 72:20,
24 74:4 92:22
93:20,22 94:11
102:16 124:25
138:14 139:7
151:3
**APPROPRIATELY-**
40:5 45:2 94:19
139:15 140:3
**APPROPRIATENESS-**
73:16
**APPROVAL-** 15:4,9,
11 94:7 118:24
151:19
**APPROVE-** 17:3
79:1 136:23
143:21 147:6
**APPROVED-** 28:20
29:7 30:24 49:22
55:18 76:19
86:20 123:14
**APPROVING-**
143:19,20
**APPROXIMATELY-**
32:12 48:7 93:9
141:5
**ARCHITECT-** 105:25
**ARCHITECTS-**
114:22
**AREAS-** 23:11,12
**AREN'T-** 21:10
44:16,22 87:21
**ARGUABLY-** 55:17
80:18
**ARGUE-** 14:19
91:8 100:24
102:15 124:25
126:13 140:11
**ARGUES-** 121:16
**ARGUING-** 59:17
73:19,24 91:15
131:3
**ARGUMENT-** 14:21
26:11 28:15 30:1
33:2 83:10 94:20
139:3
**ARGUMENTS-** 15:16
28:6 75:11 93:18

107:14 133:24
**ARISE-** 51:2 76:9
112:24
**ARISING-** 36:19
51:8 68:1 108:15
**ASPECT-** 39:9
89:16
**ASPECTS-** 54:7
56:11,17 102:9
**ASSERT-** 12:13,14
60:19,23 128:18
**ASSERTABLE-**
17:15 106:5,12
**ASSERTED-** 40:11,
12 65:4 106:3
**ASSERTION-** 99:10
**ASSESS-** 110:6
115:3 120:18
125:6
**ASSESSING-** 117:1
**ASSESSMENT-** 28:9
118:3
**ASSETS-** 49:16
**ASSIGNMENTS-**
25:20
**ASSIST-** 75:15
**ASSOCIATED-** 52:6
54:1
**ASSUME-** 22:9
26:21 32:15 44:8
70:11
**ASSUMED-** 70:12
**ASSUMING-** 20:20
26:17 70:9 143:19
**ASSUMPTION'S-**
70:14
**ASSUMPTIONS-**
111:13
**ATTACHED-** 34:15
110:3 120:25
**ATTACK-** 17:15
119:11
**ATTEMPTING-** 109:9
**ATTENTION-** 83:25
**ATTORNEY-** 50:24
77:3 97:7 135:9,
14
**ATTORNEYS-** 44:7
54:10 96:23
155:7,17 156:17
**ATTRIBUTABLE-**
76:2 132:1
**ATTRIBUTES-** 20:7,
8
**AUGUST-** 16:10
154:6,18 155:2

**AUSTIN-** 34:10
136:22
**AUTHORITIES-**
50:10
**AUTHORITY-** 38:9,
25 40:24 41:17
150:11
**AUTHORIZE-** 151:5,
7
**AVAIL-** 155:3
**AVAILABILITY-**
29:5 50:8
**AVAILABLE-** 35:25
109:22
**AVOID-** 26:1,19
94:20
**AVOIDANCE-** 76:4,
12 132:6
**AWARE-** 24:13
67:20,24,25
79:13 89:12
105:11 113:5
**AWFULLY-** 90:4

———————————

B

**BACK-** 14:15
29:21 38:22
41:10 50:21
61:23 77:9 82:5,
19 87:2 90:18
91:3 95:12
101:12 102:22
122:11 126:23
134:5 141:24
142:22 143:11
149:8 152:2,9,11,
19 153:5 154:24,
25
**BACKDROP-** 120:22
**BACKGROUND-**
49:11 131:12
**BACKING-** 143:12
**BACKWARDS-** 16:10
**BAIT-** 16:4
**BAKE-** 42:9
**BALANCE-** 111:12
129:2
**BALANCED-** 21:23
**BALLOON-** 103:8
**BALLOT-** 37:13
47:3 61:12 81:25
82:1 94:6,14,18
137:2 138:11,23
139:14 141:14,24
145:14,15 146:17,
24 148:15 149:1,

3,4
**BALLOTING-** 99:24
**BALLOTS-** 19:13
137:23 147:7
**BANK-** 27:12 56:9
58:13 59:7,11,16
60:17 61:2,13,15,
20 62:17,19,20
63:1,22 137:12
148:12,13,19,23,
25 149:1,20
**BANK'S-** 56:17
62:24 126:7,9
**BANKRUPTCY-**
24:15 39:13
44:16 46:17
114:2,5 122:15,
18,24
**BAR-** 106:8,11
**BARASH-** 11:14,23
12:20,24
**BARE-** 30:20
109:6 118:8
**BARGAIN-** 142:2
**BASE-** 101:3
**BASED-** 21:23
30:7 106:4,12
134:13 152:24
**BASES-** 46:12
**BASIC-** 71:20
103:5,15 117:24
**BASIS-** 26:22
43:24 106:19
117:3 123:7
147:12 149:10
**BEAR-** 52:22
152:13
**BECAME-** 99:24
**BECOME-** 93:14
106:14 151:9
**BECOMES-** 51:11
73:9 155:4
**BECOMING-** 92:8
**BEGINNING-** 14:16
15:18 93:21 96:8
**BEHIND-** 81:18,20
84:2
**BELABOR-** 21:18
125:15
**BELABORING-**
105:22
**BELIEF-** 17:24
**BELIEVED-** 117:8
148:15
**BELIEVES-** 127:4
146:19

**BELL-** 25:10 26:19
**BELONG-** 88:19
**BENCH-** 13:6 29:14
**BENEATH-** 148:18
**BENEFICIAL-** 26:14
**BENEFIT-** 16:20
52:4 83:10 86:16
116:22,24 119:12,
20 120:5 146:2
**BENEFITS-** 111:1
120:2 146:10
**BENNETT-** 80:1
81:18 83:9,18,24
84:4 86:17 87:4,
7,24 88:23 89:15
92:20 93:5,12
96:1 100:14,16
101:17 103:3,20,
22,25 104:9
134:6 137:5
139:2 140:1,8,10,
18 145:6,8
**BERNARDINO-** 38:9,
23 40:7,9
**BERNARDINO'S-**
38:19
**BERNSTEIN-** 88:6
92:16 93:24
**BET-** 96:21
**BETWEEN-** 13:20
23:21 24:6 27:15
42:19 44:13 85:4
88:2 104:15
112:7 113:1
114:9 126:20
133:5 140:22
154:13,20
**BIG-** 18:5 25:16
87:14 99:13
125:6 127:18
**BILLION-** 14:13
107:3 108:5
110:20 119:2,3,
19,22 120:2,5,7,
10,13 131:24
**BILLIONS-** 110:18
**BIND-** 149:10
**BINDER-** 20:12
52:24 53:11,15
58:10
**BINDERS-** 153:17,
23
**BINDING-** 52:5
**BIT-** 15:1 28:24
83:10 85:13
87:22 101:11

105:13 117:19
123:19,24 126:15
134:10 154:19
**BLACKLINE-** 13:5
43:22 51:20 52:1,
20 53:2,6,13
54:2 57:10 67:2,
7 109:1 133:11,12
**BLACKLINES-** 13:7
33:11
**BLEED-** 75:11
**BLOCK-** 117:20
**BOARD-** 118:23
**BOGDANOFF-** 11:15
**BOILS-** 117:2
**BOLD-** 84:7,8
85:2,6 86:8
**BOND-** 36:24
**BONUS-** 32:2 47:24
**BOOTSTRAPPING-**
72:19
**BOTH-** 42:13 46:7
47:16 99:14
100:21 121:14
130:1 133:11
146:24
**BOTTOM-** 49:20
57:15 58:9
115:13 133:14
**BOUGHT-** 126:4
**BOUND-** 94:14,18
**BOUNDS-** 81:11
**BOX-** 81:25 82:1
94:15 99:8,18
100:1 111:18
138:7,8 141:12,
20,21,22,24
142:25
**BOX/NOT-** 99:8
**BOXES-** 99:18
**BOY-** 22:2
**BREACH-** 87:11
**BREAK-** 30:15
33:8 79:4,7
81:12 82:5 83:4,
7,17 85:20 89:20,
21 93:12 94:1
95:15 101:3
107:8 137:3,19
138:17 145:25
**BRIDGE-** 14:11
27:12 78:14
91:14 96:19
100:17 107:22
120:11 124:2
131:21 132:17

133:15 152:7
**BRIEF-** 31:22
78:18 93:21
145:12
**BRIEFED-** 23:6
**BRIEFING-** 25:24
**BRIEFS-** 25:17
93:14
**BRINGS-** 38:8
56:8 64:4 75:2
136:23
**BROADCASTING-**
108:2
**BROADLY-** 13:22
81:13
**BROUGHT-** 21:24
73:11 75:9 139:10
**BROWN-** 15:24
89:22 98:9
**BRYAN-** 50:15
64:10
**BUCKET-** 56:2
**BUILD-** 114:25
**BUILDING-** 49:16
117:20 122:21
**BURDENS-** 146:10
**BURIED-** 120:24
**BUSINESS-** 112:3
114:7 122:24
153:12 155:10,11
156:19
**BUSINESSES-** 108:2

--- C ---

**CALENDAR-** 16:7,
19 26:8 122:1
154:20
**CALIFORNIA-** 38:9,
15 39:19 40:25
**CALL-** 15:20 17:3
22:24 49:23
82:15 88:1 90:1
100:11 137:2
138:22 141:5
**CALLED-** 83:2
**CALLING-** 122:3
**CAMPS-** 84:17
**CAN-** 16:12,13
19:7 24:7 25:4,7
26:1,9,11,13,19
27:3,25 31:16
33:8 34:18 42:19
43:7 47:19 49:1
50:24 53:10
55:23 56:15 60:4
61:8 62:12 69:8

80:23 81:5,7,10, 20 82:20 83:5 85:16,25 88:3,16 90:14 92:11 94:17 98:15 100:7 104:23,24 105:3 107:1 110:14 111:22 115:3 116:8 119:6,11 125:21 130:6,24 133:8,9 134:5,14 142:1 150:9 152:9 153:14 154:8 155:21 156:20
**CAN'T-** 20:6 24:5 25:10 26:19,20, 22 28:12 29:10 53:14 54:19 72:23 73:11 109:20 115:22 119:1 133:24 149:10 155:22
**CANCELED-** 58:15
**CANCELLATION-** 58:23 59:10
**CANNOT-** 14:7
**CAPACITY-** 56:9
**CAPITAL-** 12:21 118:13,16
**CAPTURE-** 87:1
**CAPTURED-** 66:15
**CARE-** 82:10 116:17 125:12 148:9
**CAREFULLY-** 17:22 54:9
**CARRYING-** 76:7
**CASE-** 17:15 27:12 45:7 61:21 62:5,15 72:17 80:6 85:17 86:22 90:8 108:1,7,13 109:16 111:22 114:3 118:4 122:24 123:20 126:4 128:17 129:13 136:24 142:18 144:13 146:7 150:13
**CASES-** 48:25 49:7,25 102:8 109:20 114:6 128:20 146:12
**CASH-** 50:7 61:24 108:4,6 111:12

112:3 122:21,25 130:11,16,17,19, 24 131:6 141:3 152:6
**CATCH-** 35:14,23
**CATEGORIES-** 67:9
**CAUSE-** 60:2,24
**CAUSED-** 119:20
**CAUSES-** 17:5 20:24 21:2,10 27:24 35:7 56:14 63:23 68:2 96:9 99:4,6,7 109:17 112:23 113:1 127:11 132:23 133:3 141:7
**CAUTION-** 154:12
**CAVEAT-** 134:18
**CAVEATS-** 98:4
**CD-** 96:5
**CEDE-** 64:7
**CENT-** 124:17 132:20
**CENTERBRIDGE-** 36:2,5 96:24 97:2 114:23
**CENTRAL-** 45:4 108:13 145:13
**CENTS-** 132:20,22, 24
**CENTURY-** 86:22
**CERTAIN-** 23:9 25:20 26:5 29:17 34:20,22 35:24 54:23 99:4,6 102:9 116:15 146:22 148:16 149:2
**CERTAINLY-** 30:9 33:12 92:12 120:16 122:17 123:5 139:19 141:18 143:17
**CERTAINTY-** 29:15
**CERTIFICATE-** 157:8
**CERTIFICATION-** 150:4 151:8
**CERTIFY-** 157:10
**CETERA-** 129:15
**CHALLENGE-** 50:11 54:6 123:6
**CHALLENGED-** 54:5
**CHALLENGES-** 50:5
**CHALLENGING-** 54:7
**CHAMBERS-** 153:24

**CHANCE-** 134:9 144:11 153:19
**CHANGE-** 11:18 35:10 46:19 49:14 64:15,21 82:18 94:22 123:18 134:19,21 139:22 142:16 152:24 154:11
**CHANGED-** 66:6 93:5 137:25
**CHANGES-** 13:8 35:12 37:17 42:24 58:17 64:11,13 74:8 75:7,13,16,19 97:20 152:11 153:11,21
**CHANGING-** 16:16
**CHAPTER-** 76:4,12, 15 151:11
**CHARACTERIZATION-** 49:21,24 65:14, 23
**CHARACTERIZE-** 65:3
**CHARACTERIZED-** 37:22
**CHARACTERIZES-** 49:24
**CHARGING-** 60:8, 10,18,19,23
**CHART-** 13:7 20:10,11 33:10 34:14 57:24 75:20 87:6,7
**CHASE-** 114:23
**CHECK-** 99:8,18 100:1 141:12,19, 24 142:24
**CHECKED-** 94:16 143:3,4
**CHECKING-** 99:18
**CHECKS-** 77:19 141:20,21
**CHICAGO-** 47:15
**CHOICE-** 55:19 142:14
**CHOICES-** 147:6,8
**CHOOSE-** 50:11 102:20
**CHOOSES-** 144:25
**CHOOSING-** 102:24
**CHOSE-** 12:6
**CHOSEN-** 30:6 92:12

**CIRCULATE-** 12:21
**CIRCULATED-** 96:16 109:1 113:16
**CIRCULATING-** 155:24
**CIRCUMSTANCE-** 84:20 133:8
**CIRCUMSTANCES-** 12:1 35:24 113:23 134:23 153:19
**CITATION-** 88:9
**CITED-** 142:18
**CITICORP-** 105:23, 24
**CLAIM-** 17:13 35:15 36:11 38:19,24 39:2,7, 16 40:12,13,15, 20,21 41:3,4,12, 18,19,24 42:1,4, 17,20 43:3 44:11 45:6 56:23 60:18 78:1 113:10 120:6,7 124:11 127:25 128:1,6 131:22 132:5,6,7, 9,11 133:2 142:17
**CLAIMANTS-** 14:13 78:14 79:25 132:17 137:5 152:7
**CLAIMED-** 20:15 29:19
**CLAIMS-** 14:14 17:14,19,21,25 22:7 27:24 29:17, 20 35:6,11,25 36:8,11,16,22 37:1 38:15,22 39:3,4,5,12,17, 22 41:21,22 42:8, 11,12 44:16,22 46:4,7,12 58:6 59:22 61:6 64:17 65:4,5,6,16,18 66:3,23 67:8,20 68:1,5 70:25 71:4,18 72:17 73:8,10 76:4,9, 12,14,15 87:10, 11 91:20 99:11 105:21 106:3,5,8, 12 108:15,16,24 112:23 113:1,21

115:6 118:5
119:11,12,14,15,
16 120:4 126:6
133:5 139:3
140:24 141:2
143:15 148:16
149:2,5
**CLARIFICATION-**
72:13 136:11
155:18
**CLARIFIED-** 66:18
67:23 99:25
**CLARIFIES-** 38:19
**CLARIFY-** 35:5,6,
13,21 36:3 77:12
**CLASS-** 44:8
59:18 60:1,2,25
62:19,21 63:5
82:14 124:2,6,8,
21 127:25 128:1,
6 131:16,18,21
132:3,13,18,19,
21,22 139:5
140:21 142:7
143:14 150:3,12
**CLASSES-** 128:4
150:13
**CLASSIC-** 88:25
**CLASSIFICATION-**
139:2
**CLASSIFIED-** 65:5
132:17
**CLEAN-** 11:19
13:5 53:1,8,11
70:22
**CLEAR-** 28:6 39:2,
7 64:17 66:7,25
67:10 68:20
71:21 91:5 99:2,
12,17 100:23
101:9,13 105:11
107:7 135:18
137:19 138:18
139:4 150:10
**CLEARER-** 133:3
**CLEARLY-** 30:4
60:4 71:21
112:16,18 128:5
134:16 139:18
**CLIENT'S-** 48:23
**CLIENTS-** 120:5,
20 121:6,7 126:3,
4
**CLOSE-** 153:12
155:9,11 156:19
**CLOSER-** 104:14

**CLOSING-** 110:17
**CODE-** 39:13 123:5
**COERCIVE-** 142:14
143:8
**COEXTENSIVE-**
53:23
**COIN-** 156:15
**COLD-** 127:15
128:7
**COLLATERAL-** 103:9
**COLLECTIVELY-**
14:9 97:3
**COLLOQUY-** 96:23
155:7,17 156:17
**COLORABLE-** 120:16
**COLUMN-** 57:24
**COMBINATION-**
81:12
**COME-** 29:17 37:4
43:20 63:7 79:5
80:23 82:5,6
83:18,20 87:2
88:18 94:4 97:21,
24 102:22 115:17
135:1 137:7
142:22 149:8
152:2 154:24
**COMES-** 17:20
18:2 20:8 21:1
73:16 113:7,8
116:11 118:12
126:12 153:20
**COMFORTABLE-**
19:16 62:3
125:20 127:13
**COMING-** 21:18
91:6 101:12
**COMMENT-** 43:3
78:20 79:10 88:5
135:8 137:11
138:17 139:9,11,
12 148:14
**COMMENTS-** 89:19
128:15
**COMMITTED-** 122:5
**COMMITTEE-** 59:21
79:20 80:6,7
98:12
**COMMITTEE'S-**
121:14
**COMMON-** 61:24
63:13 79:3 80:24
**COMMUNICATE-**
41:11
**COMMUNICATED-**
32:2

**COMMUNICATING-**
22:25 23:1
**COMMUNICATIONS-**
82:21
**COMPACT-** 92:11
**COMPANY-** 11:3
36:20 43:14
61:16 75:4 76:12
102:5 105:25
110:19 119:23
130:17
**COMPARISON-** 86:9
**COMPELLED-** 122:8
**COMPENDIUM-** 84:1
**COMPENSATION-**
48:25 102:5
**COMPETING-** 89:10
**COMPLAINT-** 87:20
106:1 124:2
**COMPLAINTS-**
81:17,18
**COMPLETE-** 51:22
**COMPLETELY-** 62:3
**COMPLEXITY-** 85:15
**COMPLYING-** 151:12
**COMPONENT-** 55:15
97:16
**CONCEDE-** 23:15
**CONCEPT-** 124:5
**CONCERN-** 48:15
64:16 123:3
**CONCERNED-** 30:17
43:18 88:24
91:17,25 92:10
94:3 122:24 148:2
**CONCERNING-**
44:10 62:17
76:11,18 104:2
133:12 138:23
**CONCERNS-** 27:23
28:15 44:20
46:20 80:18 81:7
83:5 140:2 148:2
**CONCLUDED-** 30:22
**CONCLUDES-** 157:4
**CONCLUDING-**
127:13
**CONCLUSION-**
18:18 29:1 30:20
91:22 114:18
116:14 117:5
118:7,8,11
**CONCLUSIONS-**
109:7,16 125:7
**CONCLUSORY-**
109:24 117:7

**CONDITIONS-**
118:21
**CONFER-** 104:23
134:9
**CONFERENCE-** 79:5
**CONFERRED-** 101:4
148:21
**CONFESS-** 30:7
42:15
**CONFIRMATION-**
15:11,16 16:9
21:25 24:7 42:18,
23 43:8 55:14,15,
17 60:3,4 63:7,
11 68:19 72:21
73:17 74:4 81:15
91:9 93:14,19
94:9 107:12
115:24 116:4
123:9,15 124:23
126:12,16 133:24
139:5,6,8 140:4,
11,16 142:6,12,
20,23 143:11,23
144:4,5,7,15,19
148:3 150:16,25
151:2,18 154:7,12
**CONFIRMED-** 38:12
55:19 73:7 144:9,
15
**CONFUSED-** 41:17
122:2
**CONFUSING-** 42:10
105:13 124:20,22
**CONFUSION-** 38:23
39:23 40:14
**CONGLOMERATE-**
105:17
**CONLAN-** 13:10,18
19:6,20 32:15
33:7,12,14,17,19,
20 34:1,4 50:18
54:17,21 55:9,11,
23 56:3,5,15
75:14 77:11,16
78:6,11 79:12
80:4 81:8,9
94:23 95:2,5,16,
21 96:14,17,24
97:8,10,14,16,19
98:21 99:1 100:5,
14 101:7,16
102:24 104:7
105:8 107:5,9
125:14 131:9,12
132:15 133:20

136:7,20 141:8
152:1,15,22
153:9,14,25
154:2 155:6,8,16,
24 156:2,7,10,18,
24 157:2,5
**CONLAN'S-** 90:17
**CONNECTION-**
48:10 49:6,12
52:8 53:21 56:16
66:1,4,6,12,13,
18,23 67:4,16,19,
21 68:6,10,14,19
69:5 71:8,9,13,
14,16 73:20,22
74:4 99:3 110:19
115:7 119:18
146:19 151:11
**CONSENSUAL-**
24:15 66:14
67:17 70:24
71:10,12
**CONSENSUALLY-**
14:7
**CONSENT-** 36:4
145:16
**CONSENTING-**
66:14,22
**CONSENTS-** 66:21
**CONSEQUENCE-**
142:16 151:12
**CONSEQUENCES-**
27:25 50:10
**CONSIDER-** 79:8
116:2 117:24
146:9
**CONSIDERABLE-**
37:7
**CONSIDERATION-**
11:11 62:7,14
113:6 148:4
151:17
**CONSIDERED-**
23:12 115:20
136:14,17
**CONSIDERING-**
113:22
**CONSIDERS-** 114:14
**CONSISTENCY-**
146:24
**CONSISTENT-**
42:13 45:19
138:16
**CONSTITUENCIES-**
30:23 54:11
110:25 114:10

128:21 129:19
136:4
**CONSTITUENCY-**
128:16,23 129:18
**CONSTITUENTS-**
80:15 122:10
**CONSTITUTES-**
145:20
**CONTACT-** 83:5
**CONTAIN-** 19:14
29:6,8
**CONTAINED-** 20:22
29:23 103:18
115:21
**CONTEMPLATE-**
118:20 119:1
**CONTEMPLATED-**
118:16,17,22
119:4
**CONTEMPLATES-**
113:6
**CONTEMPORANEOUS-**
111:10,12
**CONTENDED-** 106:1
**CONTENT-** 145:2
**CONTEST-** 123:20
**CONTESTED-** 144:7
**CONTEXT-** 41:21
73:7 77:22 78:5
86:7,10
**CONTINUE-** 25:11
55:24 62:9 102:2,
11 118:6
**CONTINUES-** 30:18
31:13
**CONTRACTS-** 43:16
**CONTRARY-** 21:14
80:19 143:18
**CONTROL-** 123:21
**CONVERSATION-**
37:14
**CONVERSATIONS-**
38:13 39:25
126:25
**CONVERT-** 24:2
50:21
**CONVEY-** 93:16
**CONVEYANCE-**
17:13,19,21
**CONVINCE-** 88:3
**CONVINCED-** 27:1
**COPY-** 11:19
30:12 51:22 70:22
**CORE-** 126:1
140:24
**CORP-** 49:13

50:22 51:1,10
**CORPORATE-** 45:7
49:13,15,18
**CORPORATION-**
50:21
**CORRECT-** 49:20
50:11,20 54:18
61:17 63:17 70:5
103:21 104:7,19,
20 157:10
**CORRECTABLE-**
144:14
**CORRECTED-** 36:14
144:15,20
**CORRESPONDING-**
35:20
**COST-** 119:23,24
120:1
**COUNSEL-** 27:17
39:20 40:10,15
52:4 62:23,24
83:5 97:24 98:11,
12 101:3 124:19
145:24 150:21
**COUNTERPRODUCTIVE**
- 129:17,21
130:15
**COUNTY-** 38:9,11,
23 40:6,9
**COUNTY'S-** 41:23
**COUPLE-** 11:4
14:16 17:11
30:23 34:16
35:12 37:15
45:18 46:2,6
51:15 52:17 62:1
77:20 87:14 98:4
104:24 125:21
128:15 137:9
154:15
**COURSE-** 30:3
32:24 33:1 52:23
85:25 86:22
87:19 93:8
125:25 142:6
**COURT'S-** 11:11
12:7 82:22 89:5
139:9
**COURTESY-** 37:5
**COURTROOM-** 69:19
**COURTS-** 118:14
**COVER-** 63:12
80:13
**COVERED-** 102:3
106:11
**COVERS-** 71:12

**CRABHOUSE-** 44:6
45:23 82:14 101:2
**CRAFT-** 83:13
**CRAWLED-** 81:4
**CREATE-** 60:1
63:4 89:6 135:11
143:13
**CREATED-** 63:3
115:8 119:21
**CREDIT-** 50:8
77:1,24 84:12
85:4 100:15
140:20
**CREDITOR-** 20:2,
21 21:8 27:25
40:9 54:11 66:21,
22 67:17 94:13,
15 108:17 117:25
138:3,6,10,12,14
**CREDITOR'S-** 17:10
**CREDITORS-** 18:5,
11 23:18 28:9
30:19 59:19 63:4
70:25 71:4
103:11 104:13
109:9,14 110:6
111:22 116:2
118:2 119:10,11
121:7,15,17
128:5 138:1
143:14 147:4,6
**CREDITORS'-**
59:20 98:11
**CRITICAL-** 24:18
25:5
**CRITICISM-** 115:23
**CROSSED-** 79:6
**CUBS-** 49:10,22
50:18 51:2,4,8
52:12
**CUBS'-** 47:15
**CURED-** 121:20
**CURES-** 110:5
121:2
**CURIOUS-** 147:4
**CURRENCY-** 116:11
**CURRENT-** 52:6
143:18
**CURRENTLY-** 39:11
68:2,3 141:13,14
**CUT-** 18:20 48:13
156:18
**CUTTING-** 123:7

**D**

**DAMAGES-** 36:19
**DAMIAN-** 101:20
**DAMN-** 86:14
**DARE-** 123:10
**DATA-** 111:2,25
**DATE-** 24:19
54:25 58:14,19,
20,23 59:11
61:20 62:5,8
85:5 101:12
104:15 106:8,11,
16 152:1 154:13
157:15
**DATES-** 19:21
95:14
**DAVID-** 61:14
149:19
**DAVIS-** 92:16
101:20,22
**DAY-** 30:4,12
55:24 97:6,8
106:9 107:11,16
130:23 153:13
154:18
**DAYS-** 16:10,11
34:16 48:7 52:17
62:1 64:21 65:16
82:23 154:6,14,15
**DEADLINE-** 15:2
19:10 55:5 151:7,
13,20 153:10
**DEAL-** 14:25
24:15 26:2 56:15
62:13 69:3 77:8
84:5 93:25 104:4
105:25 114:22
118:23,24 136:19
140:19 142:19,20
**DEALING-** 35:13
37:18 45:7 48:15,
24 51:9,10 53:19
68:21 73:21
76:20 125:16
128:8 134:17,22
**DEALS-** 24:12,13
133:15
**DEALT-** 36:11
37:1 78:5
**DEATHTRAP-** 124:5
**DEBENTURE-** 62:21,
22 114:24
**DEBENTURE'S-**
59:25
**DEBTOR-** 13:19

20:16,19 21:9,12,
13 28:4,5,6,12
30:4,5,15,18
31:13 33:20 51:4
71:24 78:11
79:15 80:19
86:24 88:6 92:12
93:17 94:2 95:22
101:1 102:20
103:14,20 106:19
109:19 114:8,11
115:22 117:14,16
118:15
119:20,23,24
121:23 122:2,3,4,
8,20,21 123:4,15,
16 125:3,12
126:18 127:2,3,4,
19 130:9,12
136:1 142:17
144:8,14,25
147:11 150:12
154:10 155:1
156:16
**DEBTORS-** 11:3
23:14,21 24:9,11
27:19,22 31:6,11
32:2,8 34:10
35:7 44:9 47:23
48:1,4,19 49:10,
12,25 50:8,16,21
51:6 53:21 54:10
61:17,25 62:10
64:10 68:1 71:2
72:11,22 87:8
88:8 98:12 102:7,
12,15,22 103:9
105:12,17 106:5,
14 108:2,4 109:1,
8 110:21,24
111:1,7,9,11,15
112:4,18,22,25
113:14,19 114:15
115:9,11 117:22
118:1,20,22
119:5,22,25
120:17,21 121:3,
12,16 122:15,22,
25 123:10 124:1
131:24,25 136:22
143:5 146:7,20,
21 147:3 148:24
**DEBTORS'-** 17:24
18:7 20:9,12
32:6,13 33:1,9

35:5 48:11 49:5
50:5,11 83:5
88:12 91:21
92:19 101:25
108:19 111:21
114:6 117:25
118:13 119:18
120:22 121:9,14
122:14 123:2
124:19 145:24
146:6 151:11
**DECEMBER-** 112:13
**DECIDE-** 69:8
95:10 150:25
**DECIDED-** 84:8,9
85:2 86:25 87:8
**DECIDING-** 31:17
**DECISION-** 30:20
87:5 94:2 121:5,
19 129:9 142:1
151:2
**DECLINED-** 46:18
**DEEMED-** 138:4,9,
15 145:23
**DEFAULT-** 134:19,
20
**DEFENDANT-** 44:18
45:10
**DEFENDANTS-**
44:13 67:12
**DEFENSES-** 27:24
**DEFER-** 31:14
56:14 68:9
**DEFERENCE-** 114:6
**DEFERENTIAL-**
114:5
**DEFERRED-** 47:3
51:7 140:4
**DEFINED-** 35:6
39:4 43:17
**DEFINES-** 124:22
**DEFINITELY-** 104:2
**DEFINITION-** 35:4
38:21 146:13,14
156:4
**DEFINITIONALLY-**
39:23
**DEGREE-** 84:18
**DELAY-** 27:1
32:25 109:20
**DELAYED-** 48:7
**DELETE-** 64:24
**DELETING-** 64:22
**DELVE-** 129:13
**DEMEAN-** 56:19
**DEMONSTRATE-**

117:19
**DENIED-** 55:16
**DENSE-** 127:9
**DENY-** 29:22
144:19
**DEPARTMENT-** 64:5,
7,12,16 65:2,13,
22 68:22 69:1,7,
11,14,16 70:23
74:9,11,16 99:23
137:23 139:21
147:20
**DEPENDING-** 53:2
99:8 146:15,18
**DEPOSITORY-**
129:14
**DESCRIBE-** 13:24
32:15 78:1 131:19
**DESCRIBED-** 17:4
70:23 130:1 133:2
**DESCRIBES-** 12:1
132:12
**DESCRIBING-**
27:17 110:4
**DESCRIPTION-**
47:11 56:13 67:7
103:8
**DESIGN-** 99:6
**DESIGNED-** 147:3
**DESIRE-** 122:14,
18 154:25
**DESK-** 17:10 18:5
**DESPITE-** 91:10
**DESTINED-** 85:15
**DETAIL-** 87:1,9
125:17,21
**DETAILS-** 107:25
**DETERMINATION-**
78:7
**DETERMINE-** 146:1
**DETERMINED-** 29:8
39:12 58:16
**DETERMINING-**
118:15
**DEUTSCHE-** 56:9,
17 58:13 59:6,11,
16 60:17 61:2,13,
15,20 62:17,19,
20,23 63:1,21
**DEVELOP-** 22:14
115:18
**DEVELOPED-** 16:17
116:6
**DEVOLVING-** 123:20
**DEVOTED-** 22:7
108:23

DIALOGUE- 26:6
DIDN'T- 18:19
19:16 27:7 40:1
41:7 66:15 84:11
88:10 94:4 97:6
99:20 100:22
105:8 107:14,15
116:23 118:20
119:1 139:18
142:18 144:12
DIFFERED- 131:7
DIFFERENCE-
17:20 71:7 88:2
117:20 119:17
130:19
DIFFERENCES-
92:21 93:17
112:7 128:21
DIFFERENT- 18:3
23:11 27:17
34:17 56:24 61:3
84:21,25 86:21
90:8 91:12 97:2
112:11 113:5,10
116:14 128:16,22,
23 134:10 143:14
144:17
DIFFERING- 136:3
DIFFICULTIES-
85:7
DIG- 117:19
DIGESTING- 117:12
DILIGENCE- 121:17
DILIGENCING-
121:13
DIRECTION- 83:21
85:17 127:12
DIRECTIONS- 83:12
DIRECTLY- 18:12
DISADVANTAGEOUS-
123:24
DISAGREE- 18:9,
15,17 65:13
93:23 128:24,25
DISAGREED- 44:21
DISAGREEMENT-
42:17 127:18
DISAGREES- 136:8
DISAPPROVE-
142:15
DISAPPROVED-
143:9
DISBURSING- 58:21
DISCHARGE- 59:10
DISCHARGED-
44:16,22

DISCHARGING-
122:9
DISCLOSE- 31:12
104:11 128:23
DISCLOSED- 51:7,
12 60:21 68:15
DISCLOSURE- 13:3,
5 14:23 15:4
16:22,23 17:3,23
19:12 20:5,11,22
21:2,14,22 22:10
23:15 26:11
27:16,20 28:4,7,
8,17,24 29:2,7
30:2,21 31:6,16,
25 32:3,7 33:10
34:16 35:3,12,21
36:16,21,25 37:7,
17 38:18 42:13,
25 43:23 44:10,
19,20 45:2,12,16,
18 46:3,5,16
47:10,14 48:2,5,
6,20 49:2,8,9
50:4,9,13 51:12,
18 52:2,10,15,16,
18,19 53:7 54:14,
20,22 55:21
56:13,24 57:1
58:3,9,18 59:2,
13,17 60:15 61:2,
9 62:18 63:8,11,
14,19,22,24
64:14,18,20
65:12,20 66:10,
25 67:6,7,23
68:11,20 70:12
72:2,4,7 73:24
74:1,6,8 75:8,11,
19,21,24 76:3,5,
13,21 77:2 78:2,
21 79:14,16
80:10,12 81:4
84:21 85:13 86:7,
19,21,25 87:16,
17 88:25 89:10
91:15,18 92:4
94:13 96:7 98:2,
23 99:15 100:3,
11,24,25 101:10,
14 102:1,14
103:2,4,16,19
104:1 106:15,19,
22 108:21 109:1,
2,13 110:2,12,13
111:6,16 112:1

113:15 114:8,21
115:21 116:1
117:4,15 120:25
121:21 122:22
123:13 125:9
127:5,14 129:1
133:3,8,12 134:4,
12 135:23
DISCLOSURE/
CONFIRMATION-
104:5
DISCLOSURES-
45:20 63:21
DISCOUNTING-
46:18
DISCOVERY- 12:10
48:17
DISCRETE- 78:8
149:24
DISCRIMINATION-
143:6
DISCUSS- 83:1
144:1
DISCUSSED- 30:13
47:24 69:22 70:6
71:6 82:16
DISCUSSING- 31:25
DISCUSSION-
16:18 17:5 25:23
61:10,25 68:9
76:8 77:23 78:2
87:19,23 88:12,
18,20,21 89:20
93:12 99:25
108:23,25 113:12
131:17
DISCUSSIONS-
130:22
DISGORGEMENT-
85:14,21,22 86:3
87:10
DISK- 16:13 90:23
DISMISS- 47:23
DISPARATE- 42:21
59:18 60:1,7,20,
25 62:17 63:4,10
143:13,25 144:1
DISPOSING- 74:10
DISPOSITION-
47:15
DISPUTE- 65:3
66:11 94:9
116:21 120:8
132:6
DISPUTED- 87:13
DISSENTERS-

DISTINCTION-
113:1
DISTRIBUTABLE-
131:23
DISTRIBUTE-
30:15 63:2 103:23
DISTRIBUTED-
51:18 62:14
69:20 85:10
DISTRIBUTION-
49:23 62:4,6
126:15 140:21
141:3,4 142:3,10
152:7
DISTRIBUTIONS-
35:14,22 58:20
59:4,5,9 61:21
DISTRICT- 66:20
DISTURBED- 16:9
DISTURBING- 21:25
DIVERGENT- 23:12
DIVERSITY- 23:10
DOCKET- 11:23
13:4 36:14
DOCKETED- 36:16
44:6
DOCTRINAL- 142:5
DOCUMENT- 20:2,7
31:14 73:23
80:11 89:6 90:18
109:3 117:22
129:14
DOCUMENTS- 71:15,
24 89:6 110:13
111:3,18 137:20
DOESN'T- 15:13
24:24 29:9,20
36:25 42:7 58:22
62:13 78:7 88:19
89:9 92:7 93:19
110:9 115:16
117:4 130:3
134:21 145:8
146:5
DOLLAR- 50:2
132:21
DOLLARS- 85:13
110:18 120:8,14
121:13
DOMBECK- 36:13
37:25
DON- 92:16
DOTTED- 79:6
DOUBLE- 124:9
DRAFT- 98:13
DRAFTED- 90:7

**DRAFTING-** 59:13
**DRIVES-** 109:11
**DTC-** 61:23
**DUE-** 152:16
153:17
**DUMPED-** 18:25
**DUPLICATION-**
46:10,11
**DUTIES-** 17:14
61:11 106:2
**DUTY-** 87:11
106:4 118:1

E

**EACH-** 22:25 57:2,
3 75:16 80:5
81:20 82:3 92:19
95:25 117:3
127:10,12 128:16,
23 130:19 133:1
**EARLIER-** 49:25
55:6 123:17
124:19 137:21
154:19
**EARLY-** 123:12
154:3
**EASE-** 34:18
**EASILY-** 144:14,20
**EASY-** 14:3 30:5
110:21 111:7
112:5 125:4
154:14,15
**ECONOMIC-** 146:10
**ECONOMICALLY-**
146:2
**EFFECT-** 143:13
**EFFECTIVELY-**
87:4 91:19 93:18
**EFFECTS-** 47:15
**EFFICIENT-** 80:20
81:5
**EFFORT-** 77:13
109:8
**EIGHT-** 16:11
87:25 88:18 90:3
96:2 119:2
**ELABORATION-** 39:1
**ELASTIC-** 146:13
**ELECTION-** 143:6
**ELECTRONIC-**
157:11
**ELEMENT-** 143:8
**ELSE'S-** 20:4
156:22
**EMAIL-** 40:1 41:1
82:17

**EMAILS-** 41:9
**EMERGENCE-** 151:11
**EMINENTLY-** 150:10
**EMPLOY-** 128:3
**EMPLOYEE-** 102:9
103:13
**EMPLOYEES-** 102:3,
5,7
**ENABLES-** 21:22,23
**ENDEAVORED-** 80:4
**ENGAGED-** 96:23
155:7,17 156:17
**ENGLISH-** 61:15
**ENJOIN-** 99:10
**ENJOINED-** 66:3
71:5,22,23 99:21
**ENJOINING-** 70:25
71:18
**ENOUGH'S-** 81:19
**ENSURING-** 150:7
**ENTER-** 143:20
**ENTERED-** 11:24
36:15 44:13,24
71:15
**ENTERING-** 71:25
**ENTERS-** 143:19
**ENTIRE-** 25:15
97:12
**ENTIRELY-** 40:2
151:17
**ENTITIES-** 49:18
105:13,16,21
106:10,13,14,18,
21,23 107:2,12,
13 117:9 131:24,
25
**ENTITLED-** 21:12
39:6,11,18,19
42:5 60:8 113:17
132:10
**ENTITLEMENT-**
39:10
**ENTITY-** 45:11
146:16
**ENVELOPE-** 91:1
92:25 93:1
**ENVELOPES-** 16:12
**ENVISION-** 126:19
**ENVISIONS-** 61:22
**EPIQ-** 16:11 62:1
**EQUAL-** 92:24
**ERA-** 103:10
**ERISA-** 65:4 68:21
**ERROR-** 36:15
120:19

15,21 72:12
119:21
**ESPECIALLY-**
26:10 48:24 62:4
**ESSENCE-** 36:5
**ESSENTIAL-** 59:22
**ESSENTIALLY-**
35:25 56:21
61:23 87:12 93:3
130:20 132:2
**ESTABLISH-** 62:5
**ESTABLISHED-**
61:21
**ESTATE-** 99:6,7
115:4,5 122:9
132:23 140:24,25
141:6,7,16 142:3,
4,10,11 143:15
**ESTIMATE-** 46:3
134:14,17 135:18
**ESTIMATED-** 120:2
**ESTIMATING-**
134:14
**ET-** 129:15
**EVADE-** 28:12
**EVALUATED-** 17:25
**EVENLY-** 85:10
**EVENTS-** 123:17
**EVERYBODY-** 28:19
67:15 82:25
91:18 96:2,18
129:3,7 130:4
131:3 132:18
140:23 141:20
155:9,11,19,25
156:18,20,21,22
**EVERYBODY'S-**
155:19,25
**EVERYONE-** 11:1
33:20 95:25
134:1 141:21
142:7 143:4,11
154:3
**EVERYONE'S-**
98:14 145:3
154:17
**EVERYTHING-** 17:1
69:11 105:9
126:25
**EVIDENCE-** 115:23
117:9 122:22
**EVIDENCED-** 59:5
**EXACERBATED-**
40:14
**EXACTLY-** 23:2
42:20 68:16,24

73:12 83:11 86:18
**EXAMINATION-**
18:14 20:24
**EXAMINER-** 11:15
12:1,22 17:20
18:8 25:17 27:16
28:13,15 31:14
61:7,10 63:20,22
109:21 121:21
152:16
**EXAMINER'S-** 12:8,
9 14:22 15:1,5
17:12 18:24 19:1,
8,12,14 26:12
28:1 29:5,16,23
61:7 88:13 153:13
**EXAMPLE-** 39:2
58:19 72:21
85:25 93:6 97:2
116:17
**EXCELLENT-** 109:21
**EXCEPT-** 63:13
71:7 88:6
**EXCEPTION-** 96:19
**EXCHANGE-** 58:24
61:24 95:8
141:25 142:10
**EXCHANGES-** 40:1
143:7
**EXCHANGING-** 82:21
**EXCLUDE-** 39:3
**EXCLUSIVITY-**
89:11 123:3,4,11,
22 144:9 145:2
**EXCUSE-** 98:8
**EXCUSED-** 43:10
**EXECUTES-** 67:11
**EXERCISE-** 154:15
**EXERTED-** 109:8
**EXHIBIT-** 52:10
79:16 84:2 90:18
**EXHIBITS-** 84:1
**EXISTED-** 111:10
**EXISTENCE-** 143:8
**EXISTING-** 118:15,
17
**EXISTS-** 130:11
**EXIT-** 152:4
**EXPECT-** 31:1
52:7 79:6 152:3,
5 153:21 154:8
155:9
**EXPEDITED-** 149:10
**EXPENSE-** 59:21
85:16
**EXPENSES-** 60:18

62:22,24 63:2
**EXPERT-** 24:22
**EXPIRED-** 116:3
**EXPIRY-** 123:22
**EXPLAIN-** 11:20
27:18 45:8 82:7
85:6 131:20
140:13
**EXPLANATION-**
112:7 113:12
114:17 121:10
130:13
**EXPLANATIONS-**
130:18 131:2
**EXPLICITLY-** 67:1
**EXPOSURE-** 61:6
**EXPRESS-** 41:20
80:18
**EXPRESSED-** 21:14
**EXTENSION-** 11:8
26:8
**EXTENT-** 32:25
39:15 41:23 42:1
48:16 62:12 66:7
67:22 68:5,21
78:20 89:2 99:11
105:18 106:14
107:12 120:5
128:21 130:10,12
131:6 136:17
145:19 150:17
**EXTINGUISHED-**
70:11
**EXTRA-** 107:6
141:10

F
**FACE-** 71:21
118:19
**FACILITY-** 152:4
**FACTION-** 14:13
78:14 79:25
**FACTUAL-** 28:7
87:1 93:2,4
**FAIL-** 60:2
**FAILURE-** 47:10
77:25
**FAIR-** 18:16
22:10 49:5 59:6
83:23 89:7 94:23
96:3 97:25 109:8
115:1 120:23
129:2
**FAIRLY-** 14:3
19:16 49:24
104:12 139:4

144:2
**FAITH-** 55:17
**FALL-** 43:16 82:4
90:21 120:22
**FALLS-** 91:22
**FANTASTIC-** 17:8,
24 20:4
**FAR-** 24:13 29:20
30:6 78:7 81:4
87:22 88:24
96:18 122:24
126:18
**FARGO-** 27:12
91:6 107:22
**FARTHER-** 154:25
**FASHION-** 35:16
38:20 43:19
92:11 109:24
110:14 111:23
112:19 117:8
119:5 121:18
124:1 125:6
**FAVOR-** 21:9
145:20 146:8
**FCC-** 15:8,11,12
22:21 23:3,6,24
24:3,5,9,14,20,
21,22 25:9 26:4
150:13,19 151:10
**FEEL-** 19:1 20:5
27:14 40:4 54:11
72:18 81:25
122:8 125:20
127:13
**FEELING-** 29:16
**FEES-** 58:5 59:20,
21,22,25 60:18
62:22,24 63:2
118:25
**FELLOWS-** 127:16
**FEMALE-** 57:13,15,
20
**FERRET-** 111:20
**FERRETING-** 25:22
**FERRY-** 114:1,13,
16
**FIDUCIARIES-**
114:10 115:5
**FIDUCIARY-** 17:14
87:11 106:4 122:9
**FIELD-** 88:15
144:11
**FIGHT-** 87:15
**FIGURE-** 31:9
53:23 84:19
**FIGURES-** 86:15

**FILE-** 12:4 13:4
22:15 24:19 25:6,
9 48:21 55:3
101:9 107:12
**FILED-** 11:18
14:22 15:1 24:16,
25 26:4 27:21
28:2 30:8,9
31:23 32:8,10
36:9 37:2,9,10
38:8 44:5 47:2
52:17 56:9,23
64:20 65:16,18
79:13,23 80:1
114:2 135:3
137:12 145:12
148:14 149:4
153:23 155:22
**FILES-** 16:12
17:11 24:20
123:12
**FILING-** 21:3,6
34:15,21 71:3
85:5 110:4
111:15 120:24
127:6 137:20
153:11
**FILINGS-** 108:23
**FINAL-** 35:15
61:4 63:24 68:12
95:13
**FINALIZING-** 98:5
**FINANCIAL-** 25:17
51:6 52:9,13
105:25
**FINANCING-** 118:25
**FIND-** 12:2 76:6
96:11 107:1
111:19
**FINDING-** 69:6
154:12
**FINDINGS-** 18:17
68:13,16,23 72:21
**FINDS-** 68:18
143:12
**FINE-** 11:13
13:16 15:22
19:22 64:25
90:15 95:5
**FIRM-** 153:10
**FIRST-** 13:24
14:22 20:11 28:4
32:5 34:20 50:20
51:17 56:1 57:20
61:19 63:1 64:16
73:5 79:10 81:9

82:6 83:24
109:19 121:8
123:11 130:16
137:4 140:9,10
142:14 145:1,2
146:5 156:18
**FIVE-** 33:14
92:25 93:20
136:13,25 154:6,
14
**FIXED-** 71:3
104:18
**FIXES-** 56:19
**FIXING-** 71:2
**FLEXIBILITY-**
16:19
**FLIP-** 90:24
**FLOATING-** 92:24,
25 144:23
**FLOOD-** 143:17
**FLOW-** 50:7 87:6,
7 108:4 111:13
116:24 130:19
152:6
**FLOWED-** 110:18,19
**FLOWING-** 122:25
156:5
**FLOWS-** 112:3
130:11,16,17,24
131:6
**FOCUS-** 16:23
**FOCUSED-** 125:4
129:9
**FOCUSING-** 92:13
136:13
**FOLDS-** 126:9
**FOLKS-** 151:20
**FOLLOW-** 59:14
**FOLLOWED-** 25:18
**FOLLOWING-** 34:13
75:22
**FOLLOWS-** 13:23
113:19 140:18
**FOOLISH-** 26:3
**FOOTNOTE-** 52:2
53:23,25 54:2
58:7,8 60:17
63:9,12 76:1
106:25
**FOOTNOTED-** 31:24
**FORCING-** 93:15
**FORECLOSES-** 26:5
**FOREGOING-** 157:10
**FOREIGN-** 23:7,8
**FOREMOST-** 109:16
**FORGIVE-** 72:12

**FORM-** 24:24
34:13,23 37:24
44:5 91:21 94:5
98:7,14,15
109:10 111:23
112:20 137:14
142:15 143:18,22
148:22 149:3,13
150:5 152:25
**FORMAL-** 34:22
37:22
**FORMAT-** 93:15
**FORMS-** 96:20
**FORMULATE-** 117:17
**FORMULATED-**
115:14
**FORMULATION-**
112:22 142:13
**FORTH-** 29:21
40:16 41:10
43:22 46:6 60:6,
17 79:17
**FORWARD-** 14:23
15:3 122:1 147:11
**FOUND-** 55:14
58:7 76:1,5 111:4
**FOUNDATIONAL-**
108:18
**FOUR-** 75:3 85:20
92:25 114:9
136:13 149:24
**FOUR-LINE-** 43:5
**FOURTH-** 85:24
112:3
**FRAME-** 144:10
153:8 154:12
**FRAMEWORK-** 120:17
**FRANKLY-** 14:7,24
15:2,12,15,16
16:8 24:8 28:25
38:13 43:18
64:13 68:25 69:4
78:22 81:20,23
82:8 84:16 87:17
88:12,17 95:24
102:10 103:4,11
127:22 136:2
141:1 142:5,13
143:7 144:12
147:4
**FRAUD-** 44:10,23
45:6
**FRAUDULENT-**
17:12,19,21
87:10 108:14
116:9 117:1

119:12 140:24
**FRAUGHT-** 26:25
**FREE-** 93:7,11
**FRIDAY-** 152:19
153:25 154:25
**FRONT-** 25:13 54:3
**FULL-** 86:3 89:19
120:9 152:20
**FULLY-** 122:9
**FULSOME-** 78:2
**FUN-** 31:5
**FUNDAMENTAL-**
142:2
**FUNDAMENTALLY-**
27:18
**FUNDING-** 119:25
**FUNDS-** 63:2
**FURTHER-** 27:6
39:1,25 42:24
44:15,16 46:9
54:13 63:14
71:22 73:2 74:8
89:14 107:4
123:23 148:11
157:1
**FUTURE-** 28:14
121:21

---
G
---

**GAINS-** 49:15,16
**GAME-** 115:1
**GAMES-** 16:5
**GAMESMANSHIP-**
16:5
**GARISH-** 17:6
20:3 90:1
**GAVE-** 66:8 67:25
**GEEZE-** 119:15
**GENERAL-** 35:15
53:20 113:21
**GENERALIZED-**
53:19
**GENERALLY-** 25:4
36:25 84:6 102:6
108:17
**GENERATING-** 108:3
**GEOGRAPHICAL-**
23:12
**GERSON-** 69:15,16,
18 70:2,6,16,19
72:6,10 73:3
147:24 148:1,6,8
**GET-** 16:22 22:1
24:1,2,3 25:7,13,
24 26:1,11 28:7
30:3,12 31:2,14

41:7,18 61:24
64:14 68:7 83:21
84:24 85:18 90:9,
14,18 91:24
93:20,21 103:11
104:15,25 106:7,
18 109:21,22
110:7 116:13,24
118:21 120:5,6,
11 121:17,23
122:2,14,18
123:4,11,13
124:7,16 126:14,
16 130:23 131:2
132:14,23 136:1
141:5,19,20
142:5,7,10 143:5,
15 144:14 146:3
154:3
**GETS-** 25:2 50:23
73:7 90:19 100:7
111:17 114:2,13
116:4 132:22
**GILD-** 119:9
**GIVE-** 12:12
15:18 18:23 53:4
55:4,19 68:22
69:6 74:1 83:4
95:4 109:14
125:1 132:16
135:18 141:21
142:11 144:10
146:3 153:19
154:23 155:2,9,
11 156:19
**GIVEN-** 13:14
18:14 30:9 57:10
60:15 63:9 65:21
73:21,22 90:23
92:24 108:8
114:19 126:21
144:17 150:19
**GIVES-** 129:1
134:25 147:6
**GLAD-** 92:1
**GLIB-** 113:14
**GLOBAL-** 20:3
68:8,10 73:7
113:20
**GLOVE-** 86:22
**GO-** 14:23 15:2,3
19:4 20:4,7
25:11 26:1 29:20
36:7 37:18 55:7
59:9 64:13 69:17
75:6,16 77:9,10

78:16 79:4 83:12
84:6 85:5 86:18
89:18 90:6,12
92:5,6 116:19
119:13,16 122:1
127:7 128:16
129:21 133:9
140:9 147:25
153:15 155:10
**GOAL-** 135:11
156:13
**GOING-** 13:10,17
15:10 18:24
19:24 20:13,23
21:17 23:18,20
24:1,2 25:19,21
26:18 28:13,22
31:2 34:3 48:5,
13 50:17,18
54:13 55:5,7,18
62:4 68:7,17
70:14 71:25 73:8
74:1,3,7 75:6
77:12,16 78:5,6,
16 80:1 81:21,22,
25 82:3 83:19,20
86:18,25 87:9
89:3,4 90:20,22,
23,24 91:19
92:21 93:18
94:22 96:5,18
97:5 99:5,21
101:9,11 102:13
103:7,11 104:14
107:4,8 109:21
116:16 117:7,10
118:6 120:19
121:1,11 122:8
123:13,19 124:7
126:13 127:12
128:1,7 129:18
130:18,23 134:21
135:3,11,12
140:14,15 141:18
142:22 143:4,5,
10,16,20 145:19
**GOOD-** 11:1,2
13:18 15:23
17:12,19 20:7
21:1,10 23:23,24
26:7 31:20 33:17,
19 34:4,9,11
47:8,16,21 54:11
55:17 61:14 82:1
95:20,21,23
107:21 108:9

120:7 129:25
132:5,7,9 136:21
145:11 149:19
153:6 154:2
**GORDON-** 101:23
114:23
**GOT-** 48:6 49:2
82:14,17,19 88:1
111:18 113:24
115:9 118:1
124:9 143:2
**GOVERNMENT-**
44:14,25
**GOVERNMENTAL-**
39:5
**GRAND-** 120:12
**GRANT-** 138:4,9,15
**GRANTED-** 32:13
71:11
**GREATBANC-** 67:12
**GREECE-** 134:19
**GROUNDS-** 55:16
**GROUP-** 79:4 80:1
81:18 83:12 84:9,
13,14 100:16
**GROUPING-** 80:6,25
**GROUPS-** 84:25
**GROWING-** 123:1
**GUARANTOR-** 76:2
105:14 113:2
116:22
**GUESS-** 17:12
19:3 27:14 30:11
48:12 80:13
86:20 91:5
107:24 118:12
136:13 144:22
154:8,17 156:4
**GUYS-** 88:16

────── H ──────
**HADN'T-** 22:6
**HALE-** 101:23
**HALF-** 124:17
132:20
**HALLWAY-** 83:13
**HAND-** 11:20
29:22 53:10
**HANDED-** 13:6
30:13 66:9
**HANDLE-** 11:11
13:10
**HANDS-** 89:5
**HAPPEN-** 24:24
29:15 82:1
142:18 154:7

**HAPPENED-** 112:9,
14 116:23
**HAPPENING-** 93:16
94:19
**HAPPENS-** 20:20
81:25 125:2
134:20,24 151:25
**HAPPY-** 32:24
81:23,24 90:6
91:14 98:14
**HARD-** 25:13
29:14 58:7 102:6
**HARM-** 122:23
**HASN'T-** 28:20
30:16 94:15
**HAVEN'T-** 20:9
30:8,9 48:21
69:19,20 72:15
106:5 123:25
133:7
**HAYSTACK-** 91:3
**HE'D-** 73:19
126:14
**HE'S-** 25:21
36:24 73:19,24
74:6 126:11
**HEAD-** 122:5
128:10 133:25
**HEADING-** 113:18
**HEADLINES-** 19:4
**HEAR-** 19:11 27:8
30:11 38:6 42:21
44:3 45:25 46:24
61:13 77:9 83:2,
15 103:1 147:23
148:11 151:24
**HEARD-** 12:17,18
27:9 33:6 38:5
40:7 44:1,2
45:23,24 46:22,
23 47:16 69:14
74:2,21 82:10
100:12 101:13
104:2 107:7,20
122:3 123:14
124:19 125:9,11
126:9 137:19
138:18 139:21
147:20,21,22
148:9,10 149:8
150:9 151:22,23
155:14
**HEARING-** 13:3,11,
23 14:20 15:17
16:9 24:7 27:10
32:8 40:10 48:21

53:15 55:14 94:7
97:15 107:12
116:4 123:15
139:7,10 140:16
144:7 150:17
151:3,18 153:16
157:4,6
**HEARINGS-** 142:23
**HEAVILY-** 116:9
**HELD-** 86:10
115:6 123:10
**HELP-** 39:21 92:7
106:20 118:2
121:18 155:8
**HELPFUL-** 26:16
77:7 116:18
147:16
**HELPS-** 139:8
**HENCE-** 40:14
45:11
**HENDERSON-** 14:4
34:5,9,10,12
35:2 38:7 41:16
43:1,13 44:4
46:1,25 56:5,8
57:7,11,14,16,18,
21,23 58:2,12
63:9 64:4 75:2
77:6,12,19 81:15
101:4
**HENKE-** 46:2,22
**HENKE'S-** 46:20
**HERE'S-** 25:15
92:2,3 111:18
134:22 141:13
152:18
**HERRING-** 15:13
**HESITATION-** 22:12
**HIDDEN-** 91:2
96:11 111:24
**HIGHLIGHT-** 20:7
85:7
**HISTORY-** 48:24
49:6
**HOBBLED-** 85:15
**HOLD-** 16:5,16
17:1 22:1 97:11
136:9 146:22
148:16,17
**HOLDER-** 61:23
**HOLDER'S-** 62:6
**HOLDERS-** 39:11
62:7,20,21 63:3
106:2,12 113:21
**HOLDING-** 23:19
**HOLIDAY-** 154:4,18

**HOLIDAYS-** 154:19
**HONOR'S-** 106:11
138:16
**HOPE-** 25:15,22,
24 26:18 30:12
68:6 73:7 128:4
153:21
**HOPEFUL-** 151:11
**HOPEFULLY-** 26:1
43:7 154:3
**HOPING-** 102:10
**HOST-** 146:20
**HOUR-** 101:5
**HOUSEKEEPING-**
13:3
**HOY-** 44:9
**HUGE-** 91:7
**HUNDRED-** 50:2
**HYPERLINK-** 18:23
19:13 20:1,7
21:11 28:1
**HYPOTHETICAL-**
54:8

────── I ──────
**I'S-** 79:6
**IDEA-** 15:12
23:25 26:7,16
48:16 87:6,7
111:18 128:17
**IDEAS-** 23:16,17
77:9
**IDENTIFIED-** 29:17
**IDENTIFIES-** 57:2
**IDENTIFY-** 38:3
67:5 72:1
**IDENTIFYING-** 67:4
**IDENTITY-** 56:22
**IE-** 114:10
**ILLEGAL-** 143:8
**ILLINOIS-** 66:20
**ILLUSTRATE-** 116:7
**IMPACT-** 47:25
49:10 50:1,7
108:15 113:1,4
121:10
**IMPACTED-** 74:18
**IMPACTS-** 27:25
**IMPAIRING-** 107:18
**IMPLICATE-** 18:18
**IMPLICATION-**
49:14
**IMPLIEDLY-** 18:15
**IMPLIES-** 113:10
**IMPORTANT-** 15:3

87:19 90:16 92:4 103:12 111:20 117:19 129:2,11 146:9 150:11
**IMPOSED-** 25:3
**IMPOSSIBLE-** 118:18
**IMPRESSION-** 85:9
**IMPRIMATUR-** 150:20
**IMPROVE-** 86:25
**IMPROVED-** 97:13
**IN/OPT-** 137:2
**INACCURACIES-** 93:4
**INACCURATE-** 42:10 124:20,22
**INC-** 157:16
**INCENTIVE-** 32:1 47:12 54:15 55:15
**INCH-** 92:5
**INCHES-** 92:6
**INCLINATION-** 80:21 95:4 144:10
**INCLINED-** 19:1 20:5 38:16 42:24 78:22 79:2 143:25
**INCORPORATE-** 21:13 32:3 48:2
**INCORPORATED-** 14:22 64:14 81:15
**INCUMBENT-** 117:14
**INDEED-** 52:8 109:7 153:7
**INDEMNIFICATION-** 68:1 70:13
**INDEMNITY-** 67:19 68:5 69:21 70:10, 16 73:5,9
**INDENTURE-** 15:24 56:10 57:2 58:24 60:9 75:4 105:23
**INDENTURES-** 56:10 58:2,15 59:10 62:20,25
**INDEPENDENT-** 28:9 109:10 146:9
**INDICATED-** 32:9 44:17 47:6 105:20
**INDICATING-** 46:9, 10,11
**INDICATION-** 38:14
**INDICATIONS-** 20:13
**INDICIA-** 111:10
**INDIVIDUAL-** 45:7

79:2 83:22
**INDIVIDUALIZED-** 106:17
**INDULGE-** 116:17
**INDUSTRY-** 108:8
**INFLUENCE-** 103:13
**INFORM-** 83:11,16 146:6
**INFORMAL-** 11:17 34:20 35:2 36:2 37:3,19,24 47:5
**INFORMALS-** 14:18
**INFORMATION-** 20:13,16,21 27:20,23 28:5,8, 16,17,21 29:6,8, 11,23 30:2,4,18 31:13,15,16 48:20 54:19 56:21 63:19 75:23 76:11,17 78:21 85:19 91:18,20 103:15 106:7,17,22,24 107:7,15 109:9, 15 110:11,25 111:4,5,14,19,22 112:2,17,20 116:1 117:24 118:2 120:23 121:4 125:5 128:9,22 130:10
**INFORMATIVE-** 86:9
**INFORMED-** 30:19 65:22 92:8 110:8 118:3 121:5
**INFORMING-** 26:14
**INFORMS-** 94:19 110:25
**INITIALLY-** 144:18
**INJUNCTION-** 66:2, 8 70:21,25 71:17, 20 72:1 73:18,21 74:19 99:20
**INPUT-** 11:17
**INSERT-** 148:24
**INSOFAR-** 83:16
**INSOLVENCY-** 111:11 119:16
**INSOLVENT-** 117:9 118:9
**INSTANCE-** 28:4 121:8 145:1
**INSTANCES-** 145:18
**INSTEAD-** 61:21 143:22 156:6

**INSTITUTION-** 32:20
**INSTITUTIONAL-** 14:10 32:16
**INSTRUMENT-** 135:11
**INSUFFICIENT-** 64:1
**INSURANCE-** 43:14, 16,17
**INTEND-** 22:14 144:23
**INTENDED-** 12:7,9 21:5,8 32:3 94:3
**INTENT-** 46:17 90:17 99:10
**INTENTION-** 95:10
**INTENTIONS-** 48:6 49:5
**INTEREST-** 12:5 19:25 39:1,10,12, 18 40:16 41:3 42:5 43:5 45:10 49:3 58:5 103:6 104:19 134:6,15, 21 135:11,25
**INTERESTED-** 92:13 130:5
**INTERESTING-** 18:4 19:4 84:7, 11 146:5
**INTERESTINGLY-** 27:21
**INTERESTS-** 28:11 114:21 115:2
**INTERFERE-** 12:3
**INTERIM-** 35:23 134:24
**INTERLINEATED-** 98:13,15
**INTERNAL-** 58:22
**INTERPLAY-** 27:15
**INTERPOSED-** 26:23
**INTERPRET-** 17:5
**INTERRUPT-** 19:6, 17
**INVALID-** 143:6
**INVESTIGATING-** 148:19
**INVESTIGATION-** 12:3 24:24 25:3, 21
**INVESTIGATIONS-** 25:3
**INVESTMENT-** 121:16

**INVITATION-** 22:14 153:18
**INVITE-** 34:5
**INVITED-** 79:14
**INVITING-** 155:1
**INVOLVE-** 72:1 89:9
**INVOLVES-** 150:1
**IRONED-** 59:3
**IRRELEVANT-** 99:21
**IRRESPECTIVE-** 142:11
**IRS-** 50:5 52:5
**ISN'T-** 16:6,16, 25 52:5 54:19 71:21 103:15,22 117:10 118:11 122:20 123:19 127:2 150:24 153:21
**ISSUANCE-** 104:15
**ISSUE-** 15:7,20 16:23,24 22:21 23:5,18,20,21 24:4 25:7 27:14 29:13 30:1 34:2 42:16 49:2,6,9, 17,21 50:1,2,12, 17 51:11 54:6,14 55:24 58:20,25 59:22 60:4,14 61:19 62:12,18 63:6,14 65:7 66:14,16 68:12 69:5 70:15 72:4 73:13,15 74:6,21 82:6 84:22 94:6 99:23,24 100:3 103:4 104:5,12 106:6,8 107:11, 16 108:18 115:9 117:1,2 118:12 126:17 129:3 131:16 135:25 136:1 138:23 139:1,6,14,22,24 142:12 143:23 144:1,2,22 145:9 148:15,20 149:9, 15 150:3,8,12,24 151:3,17
**ISSUED-** 57:3 151:14
**ISSUES-** 13:25 16:22 18:2 22:10 24:6,8,9 25:1,14,

20 31:24,25
32:15 37:11
48:25 58:18,19
61:17,18 62:11
65:11 68:21
74:11 75:8 78:6
79:3,11,18 91:9
98:2,6,10,24
100:11,15,17
101:5,13 102:2,8
106:15 108:14
113:24 117:20
121:13 125:17,19,
22 126:2,9
127:15 132:4
136:12 144:16
156:5,15
**IT'S-** 12:9 14:25
15:3 16:4,5,9,17
17:1,10,24 20:1,
25 21:3,8,25
22:1,13 23:2,22
24:25 25:13 28:2,
10,24,25 29:14,
18 30:13,25 31:7
35:3 36:16 39:6
40:23 42:7,22
45:11,15 49:5
50:2 51:15,22
52:13,14 53:2,7,
8,19 54:1,2,7
55:7 57:9,18
58:7,8,24 67:2
68:7,9,11,25
69:15 70:21
71:19,20 73:8,11
74:3,5 76:7 77:7
78:15 80:7,11,24
81:3,5 82:24
83:19 84:1,10,14,
22 86:2,12,14
87:7,14,25 88:12,
22,24 89:4,9
90:2 91:19 92:5
94:11 96:5 97:25
99:4,25 100:2
103:16 104:16,25
105:13 108:4,10
109:7,14 111:2,
21 113:15 115:1
117:14,21,25
118:18 120:16,23
121:3,5,17 122:8
124:5,16,17,25
126:14,15,16
127:20,23 128:14

130:8,20 131:6
134:20 135:10,12
140:14,15,25
144:2,4 146:1,5,
19 147:6,16
150:6,11,20,25
152:16 156:15
**ITEM-** 11:6,10
13:2 56:1 57:18
75:20 99:1 100:5
101:7 112:3
**ITEMS-** 11:9 37:6,
16 59:12 70:17
78:8 97:19
**ITERATIONS-** 99:16

─────────
          J
─────────
**JANET-** 14:4 34:5,
8,9 56:5 77:18
**JEWISH-** 154:18
**JIM-** 13:18 33:19
78:11 95:21
**JOB-** 90:2 111:21
**JOIN-** 74:20
**JOINT-** 83:20
**JOSEPH-** 31:20
47:21
**JP-** 96:24
**JPM-** 97:3
**JPMORGAN-** 92:17
93:8 98:11
101:20,22 114:22
122:1,5
**JUDGMENT-** 114:7
**JULY-** 16:10,11
19:9,10 26:2
28:2 32:11 54:25
55:3,5 109:22
135:3 151:8,13
**JUMP-** 96:17
**JUNCTURE-** 45:15
**JUNE-** 24:19
28:23 153:1,2
**JURISDICTION-**
25:2
**JURISDICTIONAL-**
23:11
**JUSTIFICATION-**
41:8

─────────
          K
─────────
**KANSA-** 37:12
97:21 100:7
136:20,21 137:18
138:11,21 139:19
140:7 148:13

149:17,23 151:6
152:23 153:2,7
**KEEPING-** 16:15
**KEN-** 136:21
152:22
**KENNETH-** 11:15
**KEVIN-** 36:18
37:25
**KEY-** 32:1
**KINKS-** 59:3
**KLEE-** 11:15,16
16:12 17:11 18:2
25:19 28:19
**KLEE'S-** 16:10
**KNOWING-** 106:4
**KNOWLEDGE-** 106:7
**KNOWN-** 51:7
**KNOWS-** 127:11
**KOB-** 47:11,18
101:10,25
**KRAKAUER-** 50:15
51:15,21,24 52:1,
23 53:1,6,10,13,
18,25 54:16 64:6,
9,10 65:10 66:1
69:23,25 70:4
73:5 74:13 75:1
104:10,19,23
105:3,5 125:14,
16 128:8,12,13,
25 129:7,23
130:6,14 131:8,
10,14,18 132:14,
15 133:9,13,17,
21 134:5,9 135:5,
13,17,21,24 136:6

─────────
          L
─────────
**LABELS-** 87:21
**LABOR-** 64:5,7,16
65:2,22 68:22
69:1,7,11,14,16
99:23 137:24
139:21 147:21
154:18
**LABOR'S-** 64:12
65:13 74:9,16
**LACK-** 88:12
**LAID-** 21:22
**LANGUAGE-** 14:4
34:6 40:19 41:2,
7 44:12 45:14
46:16 56:19,25
60:5,13,14 63:8
64:22 66:8 67:20
69:21 71:6,13

73:24 75:7,13,16,
24 76:19 77:13,
21 81:15 82:18
100:1 114:1
123:25 125:24
133:10 137:9,13
148:24 149:12
150:1,2,5,21
151:1
**LAP-** 19:1
**LARGE-** 24:23
25:17
**LARGELY-** 36:7
43:15
**LARGER-** 75:11
144:17
**LASTLY-** 137:11
**LATE-** 55:3 82:15
**LATER-** 19:11
29:5 31:5 32:11
55:24 95:14
98:16 101:9
124:25 152:2
**LAUGHTER-** 32:21
33:25 56:4 65:9
90:13 122:13
154:22
**LAUNCH-** 77:16
**LAURIA-** 14:12
27:11 29:4,25
30:17 31:2,19
91:5,13 92:15
96:21 97:5
100:18 101:17
107:21 108:10
112:16 116:16,20
117:11 122:11,14
125:16,20,24
126:3,10,12
128:8,9 131:16
136:10,11,16
155:18 156:4,12,
20
**LAURIA'S-** 126:3
**LAWSUIT-** 17:7
44:8
**LAWYER-** 49:11
**LAYING-** 129:17
**LBO-** 17:5 20:14
27:23 35:7 56:13
61:5 63:14,18,23
78:21 79:11,17
91:20 96:8
105:24 108:15,23
109:17 110:4
115:8 118:4

129:25
**LEAD-** 60:20
**LEARN-** 55:10
**LEAVE-** 84:14
85:9 131:2
**LEFT-** 81:18,19
84:13 103:4
119:14
**LEGAL-** 87:20
**LEGITIMATE-**
55:15 80:18
**LENDER-** 17:14
59:20 100:16
**LENDERS-** 14:11
77:1 78:14 84:12
91:14 100:18
107:22 120:11
140:20
**LENDERS'-** 77:25
**LENGTH-** 95:9
**LENGTHY-** 20:1
80:11
**LEONARD-** 69:15
**LET'S-** 17:3
20:25 45:25
54:15 74:22 77:5,
10 83:14 97:11
121:17 136:9,19
153:10 156:25
**LETTER-** 36:10,13,
18,23 37:24 44:5
78:23 79:19,20,
22,24 80:6 89:24
91:2 98:5,13
125:19,22 129:4
155:19,25 156:22
**LETTERS-** 34:23
36:7 80:24 81:11
90:4,19,21,25
92:25 95:8 117:7
127:13 152:2
155:9 156:13
**LETTING-** 20:2
**LEVEL-** 24:21
26:25 46:7,8
76:12 113:2,3,8,
9,11 114:13
116:10,22 126:11
**LEVELS-** 23:9
113:5 128:22
**LEVERAGE-** 49:23
**LIABILITIES-**
53:20
**LIABILITY-** 51:7
52:11,14
**LIABLE-** 146:19

**LIEN-** 60:9,10,18,
19,23
**LIES-** 86:14
**LIGHT-** 37:9
48:24 49:5
**LILY-** 119:9
**LIMIT-** 73:8
**LIMITED-** 37:10
40:23 121:22
125:4
**LIMITING-** 72:16
**LIMITS-** 147:8
**LINE-** 16:15
49:21 123:18,19
**LINED-** 26:10
**LINK-** 61:10
**LINKING-** 121:21
**LIST-** 37:6 62:6
75:3 87:12 112:23
**LISTED-** 20:1
57:24 58:4 87:12
**LITERALLY-** 58:25
**LITIGATION-**
45:19 46:4,7
66:19,23 67:12,
15,16,23 68:2,7,
8 70:4 72:17
113:18 128:19
**LOADED-** 25:13
**LOAN-** 14:13,14
78:14 79:25
103:6 127:25
128:1,6 148:16,
20,25 149:2
**LOANS-** 27:13
**LOCATE-** 52:24
53:14
**LOGIC-** 146:5
**LONG-** 61:25 81:3
102:7 116:19
123:15 124:14
130:22
**LONGACRE-** 35:11
**LONGER-** 25:4
50:22 100:2
124:14
**LOOK-** 13:14
17:22 18:23
26:24 29:2 30:1
51:21 52:2 55:4,
11 65:23 67:2
71:22 86:9 88:22,
24 93:21 124:21
144:8
**LOOKED-** 127:23

**LOOKING-** 38:25
52:19 53:6,7,18
59:8 75:20 112:8
148:21 151:19
**LOSE-** 142:2,3
**LOSES-** 141:16
**LOSING-** 122:20
**LOT-** 22:23 92:7
112:14 113:25
123:25
**LOTS-** 24:8 84:18
153:6
**LOUD-** 101:13
107:7 137:19
138:18
**LOW-** 102:8
**LUNCH-** 77:17
79:7 81:12 83:4,
17 101:5 107:8

---

M

**MAGNITUDE-** 53:22
**MAIL-** 153:3
**MAILED-** 82:19
**MAIN-** 94:24
**MAKING-** 22:3
48:5 58:13 59:4
92:5,8 97:19
123:16 144:21
**MALICE-** 46:18
**MANAGE-** 101:3
**MANAGED-** 84:13
**MANAGEMENT-**
17:13 32:1
**MANNER-** 36:3
**MANY-** 46:12
61:17 63:18 79:3
80:16 94:9 127:14
**MARKEDLY-** 113:4
**MARKET-** 104:14,
15,16 105:1
134:13,24 136:4
**MARKETS-** 134:17,
19
**MARSHALS-** 24:22
**MARTHA-** 40:8
**MARTIN-** 11:14
**MASSIVE-** 110:12
**MASTER-** 148:15
149:1,3,4
**MATERIAL-** 112:7
116:8 121:10
128:17 152:24
**MATERIALLY-**
112:11 113:10
**MATERIALS-** 84:1

110:9
**MATH-** 127:8
**MATTER-** 23:7
64:6 76:10 82:15
92:5 99:20 105:8
111:24 123:9,19
143:21 146:18,22
157:12
**MATTERS-** 11:4
21:24 56:11 59:1,
4 93:2 98:22
111:5 139:20
154:21
**MATURED-** 99:16
**MATURES-** 15:12
**MATURITY-** 103:8
**MAUREEN-** 36:13
37:25
**MCCARTER-** 61:15
**MCMAHON-** 31:20,
21 32:23 33:4
37:14 47:7,13,20,
21,22 49:20
101:7 137:24
145:10,11 147:1,
2,13,17
**MEANINGFUL-** 26:5
85:19 125:6
**MEANS-** 31:8
55:20 156:5
**MEANT-** 139:17
**MECHANIC-** 18:19,
22 137:18,25
138:22
**MECHANICAL-** 59:4
62:2,11 137:2
138:22 139:14,22
**MECHANICS-** 19:7,
8,15 58:13 61:19
**MECHANISM-** 37:13
137:22 139:24
150:20
**MEDIA-** 23:8
150:4 151:8
**MEDICATION-** 33:23
**MEMBER-** 59:21
**MEMBERS-** 16:20
**MEMORY-** 132:16
**MERGER-** 118:24
**MERITS-** 97:3
**MESS-** 87:14
**METHOD-** 89:25
**MID-AUGUST-** 123:12
**MIKE-** 22:25
**MILLEN-** 36:18
37:25

MILLION- 50:2,3
111:3 113:7,8
116:10,11 119:24
120:1,7,12,14,20
129:15 133:6
140:22 142:9
MILLIONS- 121:13
MINIMUM- 15:14
MINOR- 144:13
MINUTI- 11:10
MIP- 103:13 122:4
MISCELLANEOUS-
41:12
MISCOMMUNICATION-
40:11 41:1
MISIDENTIFIED-
44:17
MISLEADING- 86:5
MISSED- 60:7
MIXED- 104:5
MODIFICATION-
36:4 150:4
MODIFIED- 35:18
38:21 90:19 124:1
MONDAY- 25:16
152:11,16,20
153:12,14,15
156:13
MONEY- 35:24
85:8,10 110:22
116:24 120:7
122:20 123:1
128:5
MONSTROSITY- 18:5
MONTH- 123:22
MONTHS- 32:13
MOREOVER- 123:9
MORGAN- 35:4,5,8
76:4,8
MORNING- 11:1,2
13:5,18 15:23
30:10 31:20
33:19 34:9,11,14
47:4,21 51:19
61:14 65:21 66:9
67:25 109:2
113:16 153:25
MOTION- 11:19
22:16 31:1 47:4,
24 48:14 49:4
55:22 87:18
97:20,22 98:3
99:4,9 100:7
102:16,25 114:2
115:20,21 136:23
149:25 150:11,16

MOTIONS- 155:1
MOTIVATED- 104:3
122:16
MOTIVATION- 115:4
MOUNT- 70:13
MOUNTAIN- 122:25
MOVE- 14:1 34:18
37:21 147:11
153:3
MOVED- 47:23
153:5
MOVING- 48:15
107:11
MUCH- 22:7,25
23:4 28:18 29:1
33:13 35:24 68:7
81:18 85:1 88:25
89:1 95:3 102:6
104:16 123:14
125:21 126:25
133:25 144:16
157:3
MULTI- 50:2
MULTIPLE- 123:20
MUTE- 147:24

N

NAMED- 40:24
45:10
NARROW- 84:22
NARROWLY- 85:16
NATIONAL- 23:7
NAUSEAM- 125:23
ND- 44:17 45:9
NEAL- 66:19,23
67:12,15,16,22
68:2 70:4 72:17
NECESSARILY-
101:22,24 146:13
NECESSARY- 48:17
58:23 81:6 126:8
128:14 130:8
148:15 149:1
NECESSITATES-
22:15
NEEDED- 71:13
NEEDLE- 24:6 91:2
NEGLIGENCE- 46:18
NEGOTIATED-
114:9,20 115:1,3
NEGOTIATING-
114:7
NEGOTIATIONS-
22:25
NEVER- 40:11
83:20 124:15

141:17,23
NEVERTHELESS-
37:20 114:15
NEW- 11:25 16:13
30:10,11 48:14
51:17 61:24
65:15,20 66:25
76:1 97:13 103:5
119:9 121:22
123:5,25 124:21
126:3 146:13
NEWS- 23:8 95:23
153:6
NIGHT- 64:22
69:22 70:6 71:6
82:17 137:12,24
148:14 153:15
156:3,24
NINE- 88:1,2,10
90:3 96:2
NINE-PAGE- 79:24
NOBODY- 24:20
54:4 88:1 121:16
NOMINEE- 148:17
NON- 44:23
NONDEBTOR- 64:23
114:10,20 131:24
141:15,19,20,21,
25 142:12 143:7
NONDEBTORS-
64:17,24 75:24
76:2 105:14
141:11
NONDISCHARGE-
ABILITY- 45:6
NON-ESTATE-
114:10
NON-GUARANTORS-
105:15
NO-NO- 23:9
NON-PROSECUTION-
44:12 45:3
NONSUPPORTING-
79:25
NONSUPPORTIVE-
14:12
NONTAX- 50:24
NONVOTING- 23:21
24:4 150:13
NOON- 153:17,24
NORMALLY- 50:23
62:5 106:18
153:16
NORMAN- 11:2
NORTHERN- 66:20
NOTATIONAL- 46:6

32:14 37:3,4,19
39:10,15 57:2
60:22 72:12
77:24 104:10,13
115:6 138:12
NOTED- 47:2 48:3
61:12
NOTEHOLDER- 58:6
59:21 60:12 149:5
NOTEHOLDERS-
59:19 113:21
NOTEHOLDERS'-
60:11
NOTES- 56:22
60:10 61:23,24
103:22 134:7
141:4 146:22
NOTICE- 12:4,5,
12 68:22 69:7
74:2
NOTION- 28:18
NOTORIOUS- 96:12
NOTWITHSTANDING-
32:6 60:13
NUANCE- 18:4
NUMBER'S- 120:3
NUMBERS- 13:4
56:23 57:3,24
80:14,15 84:7,8,
13,25 86:8 103:12

O

OBJECT- 12:15
141:1 142:25
148:3 156:22
OBJECTED- 25:13
46:13
OBJECTING- 16:7
110:2
OBJECTION- 19:25
24:20,25 25:1,6,
7,10 26:4 27:21
31:23 34:7 36:15,
17,21 37:3,10,11,
19,23 38:8,10,12
39:9,14 40:5,23
41:13 42:13,18,
23 43:14,15,24
44:4,7 45:13
46:1,12,15 47:1,
2,13 54:15 55:16
56:9,11,15,18
59:7,17 61:2,4
64:5,12 70:23
72:3,25 74:9
76:16,17 77:25

83:1 94:5 109:4 124:23 137:5,8 139:5 144:4 145:12 147:15 150:15 155:22 156:6
**OBJECTIONS-** 14:1, 7,17,18,19,21 15:21 20:10 24:16,20 34:19, 21,23 36:8 37:2, 18,22 47:5 48:17 56:16 59:9 63:16 72:7 75:3 76:22, 24 77:8,13,14,25 78:5,13 79:8 81:14,16 125:10 134:3 135:23 136:18,25 147:10 149:25 153:22
**OBJECTIVE-** 123:6
**OBJECTIVELY-** 21:7
**OBJECTOR'S-** 89:1
**OBJECTORS-** 14:6 15:8 20:14 47:25 49:4 78:9 89:7 103:2 121:2 140:4
**OBLIGATION-** 27:19
**OBLIGATIONS-** 70:10,13 118:15, 17 119:1,3,4 120:1 122:9
**OBTAIN-** 61:11
**OBVIATED-** 98:10
**OBVIOUS-** 107:23, 24 144:2
**OBVIOUSLY-** 31:7 36:11 50:7 52:5, 12 54:24 63:10, 25 68:6 73:16 86:15 91:13 145:16 149:11 153:3,18 156:11
**OCCASIONED-** 33:1
**OCCASIONS-** 38:11
**OCCUR-** 54:24 94:21 152:5
**OCCURRED-** 20:18 49:25
**OCTOBER-** 40:18 123:10 154:14
**OFFENDING-** 147:7
**OFFER-** 102:19 139:8
**OFFERED-** 110:1 121:23 122:22

**OFFERING-** 22:16
**OFFICE-** 32:10 37:6,8 47:25 82:19 137:24 139:23
**OFFICIAL-** 80:7
**OFTEN-** 14:9 80:6 96:10
**OLD-** 109:2 113:15
**ONE-** 11:17 12:11 14:21 15:7 17:18 19:8 23:6,18 26:9,13,25 29:16, 22 31:23 32:15, 16,17 34:15 37:2, 16,19 43:3 44:9 47:8 51:18 52:20 53:3 55:16 62:4 65:8,10 69:24,25 70:2,9,20 77:11 79:12 84:8 85:15, 20 88:3,5 90:16 93:6,14,17 96:6 97:8 101:7,19 103:4,8 104:12 105:7,10 110:16 113:25 114:13,22 117:6 122:4 123:2,3,23 127:16,18 129:17 130:16 132:5 134:5 135:24 143:7,24 145:18 146:15 147:8 149:23 150:1 154:5
**ONE'S-** 88:21
**ONE-PAGER-** 110:21 130:6
**ONES-** 48:19
**ONGOING-** 45:19 122:23
**OPEN-** 22:24 74:12 80:25 96:11 101:5 102:2 139:24 144:11
**OPERATORS'-** 32:2
**OPINE-** 21:24
**OPINION-** 52:4 94:4,12 104:3 109:10
**OPINIONS-** 131:1
**OPPORTUNITIES-** 26:5
**OPPORTUNITY-**

12:13 13:14 15:19 30:8 47:8 48:1 68:23 69:7 74:2 89:8 116:2, 3 141:19 143:5
**OPPOSE-** 149:7,9
**OPPOSED-** 34:14 49:19 113:11
**OPPOSITE-** 92:6
**OPPOSITION-** 93:19
**OPT-** 37:13 74:17 94:16 104:2 137:2,25 138:1,7 140:12 142:13,15, 16,24 143:3,4,13, 21 146:7 147:3
**OPTED-** 71:1,4 99:22
**OPTIMISTIC-** 84:23
**OPTION-** 41:24 42:2 138:7
**OPTS-** 141:15
**ORDER-** 11:7,10, 18,24,25 12:22, 25 15:11,16 20:19 34:17 48:9 72:22 89:5 96:10 101:12 106:8,11 108:5 110:20 133:23 137:14,15 143:18,20 145:8 148:22 149:14 150:6,17 152:25 154:11
**ORDERED-** 155:15
**ORDERS-** 11:9
**ORGANIZED-** 84:17 105:24
**OTHERWISE-** 26:8, 17 39:6,18 68:6, 9 70:10 72:20 74:20 94:21 100:22 117:8 122:23
**OUTCOME-** 92:3 117:21 127:4
**OUTCOMES-** 27:25 113:12,22 115:10 125:25 126:21 127:24
**OUTLETS-** 23:8
**OUTSET-** 47:9
**OUTSTANDING-** 37:20
**OVERALL-** 77:22 78:19 79:7 81:7

**OVERLAPPING-** 78:6
**OVERRULE-** 136:18 147:10
**OWE-** 49:15
**OWED-** 106:2
**OWN-** 25:21 29:3 52:4 58:22 84:13 86:15 90:3 109:15 110:2 121:22 126:21 128:17 129:3,8, 19 154:20
**OWNED-** 119:21 131:25
**OWNER-** 36:24
**OWNERS-** 121:3
**OWNERSHIP-** 15:14 23:7,8,10 150:4 151:8

P

**PACKAGE-** 17:9,10 55:8 97:13 98:16
**PACKAGES-** 153:3
**PAID-** 59:23,25 118:25 121:17
**PAPERS-** 13:13 16:2 17:4 27:18 105:20 139:4
**PAR-** 135:12
**PARALLEL-** 14:25 15:4
**PARAMETER-** 104:24
**PARENT-** 46:8 65:15 76:12,15 113:8,11 116:10, 11,23 126:11,14 131:22 132:1,10, 17 133:15
**PARENT'S-** 126:16
**PARROT-** 41:7
**PARROTED-** 40:21 41:2,4
**PARSE-** 109:5
**PARTICIPATE-** 141:25 146:2
**PARTICULAR-** 42:7 49:2,6 61:1 78:9 121:7 129:18 132:3
**PARTICULARLY-** 18:1
**PARTIES-** 12:10, 21 15:18 22:13 24:19 26:16 29:19 42:19 49:3

54:23 55:25
63:18 64:23
68:11 78:24
79:14 80:23
83:10,25 84:23
89:21 92:19 95:3,
8,24 97:4 98:6
100:21 101:4
110:2 115:1
120:17 126:18
127:1,10,13
144:18 145:18,25
146:14 151:9
153:18,19
**PARTIES'-** 12:14
122:18 123:8
127:3 149:7
**PARTNER-** 14:4
34:5
**PARTNERS-** 13:21
**PARTNERSHIP-**
49:23
**PARTS-** 70:9
**PARTY-** 11:18
12:4,11 17:18
21:23 37:23
64:24 66:13,14,
21 67:6,11
125:18 146:2,11,
18 151:10,12
**PASS-** 50:22 55:24
**PASSED-** 82:16
100:13
**PAST-** 25:12
98:11 116:18
**PASTE-** 48:13
**PATEL-** 36:23 38:1
**PATH-** 15:4 118:6
**PATTERN-** 112:24
**PAUSE-** 52:25
53:9,16 57:22
105:6 152:14
**PAY-** 102:8 103:7
120:9
**PAYING-** 51:4,10
93:8
**PAYMENT-** 36:10,
19 58:14 62:22,23
**PAYMENTS-** 35:16,
17,23 62:25 85:3,
21,22 115:7
**PEACE-** 136:9
**PENALTIES-** 46:18
**PENDING-** 14:18
44:9 66:20 68:2,3
**PEOPLE-** 20:17

25:25 26:2,5,9,
13 31:11 55:4,10
67:9,11 84:18
85:8,10,11 86:15
87:1 90:5,7,23
93:2,15 94:17
96:10,17 99:17
100:23 109:22
110:14 112:8,19,
20 127:12 129:13
132:19,23,24,25
134:16,25 135:14
142:1,23 146:15,
22 156:5,14,21
**PEOPLE'S-** 25:22
121:11
**PERCENT-** 85:12,
13 86:1 93:9
120:6,13 127:20
**PERCENTAGE-**
85:21,22,23,24
**PERFECTLY-** 99:17
142:25
**PERFORMING-** 108:3
**PERHAPS-** 19:13
26:7,11,12,16
38:22 41:1 47:8,
18 117:3 133:2
**PERIOD-** 26:8
49:15 51:3 89:11
107:3 155:5,23
**PERMIT-** 79:2
110:9 147:11
**PERMITTED-** 11:20
39:8 93:3
**PERNICK-** 11:2,3
13:1,16
**PERSON-** 38:3
106:20 141:15
143:3
**PERSONAL-** 82:15
**PERSONS-** 67:4,5
**PERSPECTIVE-**
27:17 90:17 142:6
**PERTAINING-**
106:15
**PERTINENT-** 129:8
131:7
**PHILIP-** 38:1
**PHONE-** 69:12,13
**PHONES-** 14:11
15:25 75:5
105:23 106:2,12
**PHRASE-** 71:7
**PICKED-** 120:21
**PICTURE-** 86:4

**PIECE-** 30:10,11
94:15 137:7
142:3,9
**PIECEMEAL-** 98:20
**PIECES-** 90:22
127:10
**PILE-** 92:5 125:7
**PLACE-** 96:6
123:5 139:7
**PLACES-** 51:15
**PLAINTIFF-** 67:15
**PLAINTIFFS-** 44:6,
8 45:23 101:2
**PLAN-** 13:5 14:8
19:9,25 21:9
23:14 28:11
29:18 31:17 32:1,
4,9 33:10 35:4,9,
13,19 36:3,4,6,8
38:18 39:3,10,21
42:9 47:10,24
48:2 50:21 54:15,
25 55:11,15,19,
20,23 58:14,17
59:1,15,17,23
60:3,14 61:22
62:13,21 64:13,
14,15,19 65:3
66:5,7,8,22 68:6,
13,15 70:9 71:8,
9,11,12,13,14,16,
17,23 72:4,11,18,
24 73:7,19,22,24
74:6 76:13,19
79:20 81:24 91:7,
8,14 93:10 94:17
99:5 102:1
103:10,16 104:11
105:19 107:13
109:12,16 114:11,
25 118:4 120:13
121:19 123:4,12,
20 124:1,15
128:1,10 131:23
132:2,12,18
133:11,13 135:2
138:2,4,5,6,12,
14,15 141:13
142:24,25 144:9,
15 145:1,2,20
146:1,8 151:14,
17 152:8
**PLANS-** 47:12
102:4,10 141:18
143:15
**PLAYING-** 16:5

**PLEADING-** 18:5
21:4
**PLEADINGS-** 22:24
23:3 34:24 75:9
83:15 91:11
**PLEASURE-** 98:20
**PM-** 95:19 157:6
**PM/RECONVENE-**
95:19
**PODIUM-** 34:6
56:6 64:7 75:13
82:7
**POINT-** 128:14
**POINTED-** 45:9
**POINTING-** 28:13
75:12 110:10
**POINTS-** 15:19
46:2 48:3 50:13
53:20 58:12 59:6
69:10,18 129:3
136:13,18 140:5
146:3,23 152:5
**POLK-** 92:16
101:20,22
**PORTION-** 39:14
47:4 56:15 57:11
61:4 132:1
**POSIT-** 20:6
**POSITION-** 18:7
48:10,23 50:6,11
60:6,22 63:12
93:16 123:13
130:9 146:6
**POSITIONS-** 25:23
126:5 144:19
**POSITIVE-** 122:25
**POSSESSION-**
117:25
**POTENTIAL-** 20:24
22:7 27:24 63:3
70:13 76:9,14
87:10 112:23
**POTENTIALLY-**
102:14 146:19
**POWER-** 12:2,12
**PRACTICAL-** 91:6
123:9,18
**PRACTICE-** 29:14
**PRECIPITATE-**
122:10
**PRECISELY-** 38:15
151:4
**PREDICATED-** 19:25
**PREDICT-** 29:15
73:12

**PREDICTING-** 26:2 68:24

**PREDICTION-** 26:3

**PREFER-** 90:8 142:19 156:9,16, 18

**PREFILING-** 106:16

**PREJUDICE-** 47:24 48:23

**PRELIMINARY-** 11:4

**PREMATURE-** 150:20

**PREMISE-** 114:6

**PREORDAINED-** 80:16

**PREPACKAGE-** 107:13

**PREPACKAGED-** 105:19

**PREPARED-** 15:2 28:2,14 88:20 107:6 109:3 133:23 149:4

**PREPETITION-** 146:20

**PRESENT-** 38:1 39:24 72:19 89:25 111:21 112:18 113:2 149:14 150:6

**PRESENTATION-** 22:10 37:12 47:4 76:25

**PRESENTATIONS-** 25:18

**PRESENTED-** 80:20 92:11 110:14 121:18 150:18 151:10

**PRESENTING-** 24:9

**PRESENTLY-** 154:6

**PRESERVE-** 16:8

**PRESERVED-** 140:15 150:8 151:17

**PRESERVING-** 148:2

**PRESS-** 45:25 47:7 107:4

**PRESSES-** 47:13

**PRESUMABLY-** 29:6 102:22 119:9

**PRETEND-** 24:22

**PREVENT-** 26:22 93:15

**PREVIEWED-** 37:16

**PREVIOUS-** 49:4 106:11

**PREVIOUSLY-** 32:2 45:20 65:7

**PRICE-** 126:10

**PRIMARILY-** 43:18

**PRINCIPAL-** 58:4 103:7

**PRINCIPALLY-** 108:1 109:17

**PRINCIPLE-** 145:22

**PRINCIPLES-** 145:13

**PRIOR-** 32:8 35:15 43:7 48:21 98:7

**PRIORITY-** 38:24 39:3,4,6,7,12,16 40:11,15,20,21 41:3,18,24 42:2, 4,12 43:3

**PRO-** 120:6 132:10

**PROBABILITIES-** 113:18

**PROBABLE-** 20:25 127:24

**PROBABLY-** 15:15 45:14 47:16 68:9 77:7 78:16 81:21 83:19 91:15 92:11 97:2 104:24 109:7 125:21 152:17

**PROBLEM-** 29:24 71:9 83:11 109:5 140:12,13 141:13 142:20,21 143:12 153:20 155:12

**PROBLEMATIC-** 90:22 154:16 155:5

**PROBLEMS-** 23:16 82:18 91:7 111:25 144:14

**PROCEDURAL-** 18:4 49:6 85:15

**PROCEDURE-** 94:6 100:3

**PROCEDURES-** 47:4 58:22 74:11,20, 23 89:16 94:8,13 97:20,22 98:3,24 99:3,9 100:7 136:19,24 137:1, 12 138:13 143:19, 21 150:16 151:22

**PROCEED-** 34:3 38:6 46:24

**PROCEEDINGS-** 157:11

**PROCESS-** 15:12 16:17 21:22 22:2, 7,15 24:8,14,20, 23 25:6,10,15 26:14,24 36:8,12, 22 37:1 61:22 62:2 81:5 82:11, 20 83:16 85:14 86:19 87:23 93:25 94:10,25 104:3 129:12 143:17 145:5 147:20 154:8 156:6

**PROGRAM-** 43:17

**PROGRAMS-** 103:13

**PROGRESS-** 123:16

**PROGRESSES-** 154:8

**PROJECTED-** 130:25

**PROJECTION-** 152:6

**PROJECTIONS-** 50:25 52:9 111:13 112:5,8, 12 130:12 131:7 134:13

**PROJECTS-** 50:25

**PROMINENCE-** 92:24

**PROMISE-** 32:6

**PROMISED-** 48:19

**PROOFS-** 56:23

**PROPERLY-** 107:15

**PROPONENTS-** 29:18

**PROPOSAL-** 48:11, 14 109:16 134:11 135:6

**PROPOSE-** 104:11 111:16 137:3,13

**PROPOSED-** 12:17 18:22 43:15 48:7 72:21 108:24 109:11 110:7 112:21 113:17 118:4 124:21 140:20 145:2 147:8 148:22 149:13 150:2,5, 21 151:8 152:25

**PROPOSING-** 103:23

**PROPRIETY-** 37:13 81:11 91:20 118:3 151:15,16

**PROSECUTED-** 60:19

**PROSECUTION-** 44:24 71:18

**PROVIDE-** 27:19 30:18 35:16,22 57:3 62:7,23 68:22 79:15 80:5 92:12 109:9 110:21 111:8,10 112:5,22 116:1 117:4 118:2 120:17 121:4 123:5 125:4 146:7 149:2

**PROVIDED-** 29:9, 10 46:4 50:25 58:3 72:15 93:7 94:18 110:8 113:13 116:22 148:4 149:1

**PROVIDES-** 39:11 62:21 113:20 132:16 148:24

**PROVIDING-** 46:13 130:18

**PROVISION-** 42:7 60:3 66:10 67:14 68:13,19 73:6 99:20 150:1

**PROVISIONS-** 104:13

**PRUDENT-** 96:10

**PUBLIC-** 45:20 50:2 118:22 119:18,23

**PUBLICATIONS-** 44:9

**PUBLISHES-** 17:11

**PUBLISHING-** 108:2

**PUFF-** 92:7

**PUNT-** 103:9

**PUNTED-** 103:16

**PURE-** 103:25

**PURELY-** 16:23 54:7

**PURPORT-** 58:5

**PURPOSES-** 20:2 23:23 63:11 106:10,20 131:23 140:16

**PURSUANT-** 50:20 59:23 66:5,12,15, 21 68:15 70:11 71:8,11,12

**PUSH-** 153:12 154:25 156:13

**PUSHING-** 123:19

**PUTATIVE-** 44:8

**PUTS-** 32:12

**PUTTING-** 32:18,
23 80:17 90:15
99:2
**PUZZLED-** 41:6

---
Q
---
**QSIP-** 56:22 57:3,
24
**QUALIFIED-** 150:25
**QUARREL-** 55:5
**QUARTER-** 124:17
**QUARTILE-** 85:23,
24
**QUARTILES-** 85:20
**QUASI-** 23:22
**QUESTIONS-** 27:7
95:1,15
**QUICK-** 13:3 150:9
**QUICKLY-** 13:24
24:23 25:8
122:15,18
**QUOTE-** 44:11
**QUOTE/UNQUOTE-**
124:12
**QUOTING-** 114:16

---
R
---
**RAISE-** 24:7 30:1
107:14 123:23
139:6 148:14
152:23
**RAISED-** 15:7,17,
19 49:9 58:13
59:6 60:4 62:17
74:11 78:8 94:6,
12 99:23 125:20
131:16 133:24
134:6 136:12
137:3 139:2
149:24,25 150:16
**RAISES-** 24:6,8
**RAISING-** 136:12
147:15
**RANGE-** 30:22
31:7,8,9 46:14
50:3 91:22
104:22 109:25
113:12,22 115:10,
11,12,13,16,17,
18,24 116:6
117:16,17 125:25
126:21 133:19
152:6
**RATA-** 120:6
132:10
**RATE-** 103:7

104:19 134:6,15
135:12,25
**RATES-** 134:21
135:19
**RATHER-** 37:10
38:14 42:9 59:3
61:8 64:18 78:2
82:3 98:18,20
112:23 138:1
152:2
**RATIONALE-** 130:19
**REACH-** 17:13
29:1 77:8 109:15
151:9
**REACHED-** 71:7
**REACHES-** 151:2
**REACHING-** 150:24
**READABLE-** 112:19
**READING-** 127:17
**READY-** 96:21 97:5
**REALITY-** 15:10
84:16 91:6
126:24 127:1,23
**REALIZE-** 121:15
**REASON-** 27:1
30:6 41:7 45:5
68:25 147:5 149:6
**REASONABLE-**
30:22 31:16
68:22 106:20
110:14 111:23
112:18 116:13
120:15 121:18
125:25 129:11
135:6 143:16
**REASONABLENESS-**
28:10 31:7 91:23
108:24 109:25
112:21 113:17
117:16 118:13,16
**REASONABLY-**
113:22 115:10
**REASONS-** 22:16
93:15 130:15
**RECEIVE-** 37:5
39:12 79:22
132:8,20,24
152:7 156:2
**RECEIVED-** 11:17
13:8,13 30:16
35:2 36:7,18,23
43:14 52:4 79:19,
24 86:3 115:7
136:25
**RECEIVING-** 151:16
**RECENT-** 20:10

33:10 94:2
**RECENTLY-** 126:4
**RECIPIENTS-** 85:3
86:4
**RECOGNIZE-** 52:7
63:6
**RECONCILE-** 92:21
**RECONCILIATION-**
36:8,12,22 37:1
**RECORDED-** 52:14
**RECORDING-** 157:11
**RECOVERIES-**
27:25 60:10,11,
12 108:17 109:11
121:11
**RECOVERY-** 85:14
113:20 120:20
132:8,11 133:4
**RED-** 15:13
**REDLINE-** 11:19
13:8 70:21
**REDUCE-** 60:11
**REDUCED-** 46:9,10
141:4
**REDUCTION-** 140:22
**REFERENCED-**
45:11 63:9 69:24
110:3 125:24
**REFERENCES-** 11:24
**REFERENCING-**
45:2,3
**REFERRED-** 13:13
32:16 37:24
64:22 105:13
128:9 150:13
**REFERRING-** 40:25
**REFERS-** 41:22
68:13
**REFLECT-** 21:8
36:3,15 52:11
104:14 150:23
**REFLECTED-** 34:21
35:10 36:6 52:9
60:16
**REFLECTION-** 18:16
**REFORM-** 40:17
**REFUSE-** 30:18
31:13
**REFUSED-** 31:11
**REGULARITY-** 35:16
**REGULATIONS-**
150:14
**REIMBURSE-** 63:1
**REINSTATED-**
39:17 42:5

42:11
**REJECT-** 72:11
124:8 138:2,6
142:8
**REJECTING-** 147:3
**REJECTION-** 68:14
145:23
**REJECTS-** 124:8
132:21,22
**RELATE-** 56:11
61:5 71:16 137:1
**RELATIVE-** 35:25
47:14 56:12,22
58:13 59:4 60:11
75:12 76:1,3,14
**RELATIVELY-**
24:23 25:2,8
**RELEASE-** 66:15,
21,22 67:17
70:24 71:1,4
74:18 99:22
132:23 137:2,18,
22 139:3,24
141:6,10 142:4,
10,11,12 145:17,
21,23 146:3,8,10,
12,14
**RELEASED-** 64:18
66:4 67:8,13
76:13 99:5,7,11
**RELEASES-** 66:13
67:6,11 71:10,12,
17 73:21 81:17
93:7,11 94:14,16
137:6 138:1,4,8,
9,16,24 139:10
140:23 141:7,11,
15,16,19,20,21
142:1 143:7
147:7 148:4
**RELEASING-** 67:15
99:19 100:2
**RELIANCE-** 114:19
**RELIED-** 112:6,12
**RELIEF-** 12:6
72:12,14,22,23
106:8 107:13
**RELIEVED-** 119:23,
25
**RELY-** 29:8
**REMAIN-** 61:18
102:2 133:4
**REMAINING-** 78:4
101:12,16 103:2
140:12 153:20
**REMAINS-** 100:10

**REMARKABLE-** 84:4
**REMINDED-** 152:15
**REORGANIZATION-** 105:19
**REPETITIVELY-** 88:10
**REPORT-** 14:22 15:1,5 16:11,13, 14 17:12 18:24 19:2,5,8,12,14 22:2 26:12 27:16 28:1,13,16,19,22 29:6,16,24 31:15 61:7,11 88:13 104:21 109:21 121:21
**REPORTS-** 50:2
**REPRESENTATIVE-** 38:11
**REPRESENTED-** 14:11 100:18 127:16
**REQUEST-** 12:11 27:10 32:13 35:2, 13 36:2 61:6 65:13 76:11 106:24 130:3 149:9
**REQUESTED-** 63:18
**REQUESTING-** 36:10,19 76:17
**REQUESTS-** 149:8
**REQUIRE-** 42:24 54:13 74:7 139:9 150:14
**REQUIRED-** 87:18 125:4
**REQUIREMENT-** 28:13
**REQUIRES-** 142:7
**REQUIRING-** 78:22
**RESERVATION-** 31:23 43:21
**RESERVE-** 33:2 35:23 48:1 63:10, 25 102:17 105:18
**RESERVES-** 35:15
**RESERVING-** 100:24
**RESOLUTION-** 25:8 40:3 42:20 71:7 81:1 108:14,16, 24 112:21 149:21
**RESOLVE-** 14:3 18:2 25:20 34:7 37:8 43:7 77:13 81:22 82:21

105:9 138:22 139:20 140:14 149:24
**RESOLVED-** 14:2,7 34:7,24 43:24 45:13 47:6 59:13 65:1 67:18 77:14 78:15 81:10 83:6 98:1 100:6 101:5 105:9 107:10 137:9,13 140:14, 15 141:2
**RESOLVES-** 65:14 139:1 149:15
**RESOLVING-** 79:7
**RESPECT-** 11:6,7 12:17 20:14 27:9 33:5,9 35:11 37:2,23 39:21 41:3 46:4 47:5 49:1,10 50:4,12 56:17 63:10,17, 19,23 69:21 70:16 72:3,7,10, 25 74:9,16,18 75:6 77:1,24 79:10,17 81:9 82:11 85:19 89:15 92:8 97:20 98:2 100:25 101:1 102:3,9,17 103:2 115:8 125:9 128:4,6 137:18 138:3,23 139:24 142:17 143:14 144:22 146:6 147:20 148:3 152:4
**RESPECTIVE-** 144:18
**RESPECTS-** 140:16
**RESPOND-** 68:23 69:2 77:4 82:9 96:22 115:22 125:13 153:20
**RESPONDED-** 106:24
**RESPONDING-** 48:18 144:21
**RESPONSE-** 12:18 27:21 33:6 38:5, 6 41:15 44:2,3 45:24,25 46:23, 24 64:11 73:4 82:19 83:2 125:11 126:1 137:21 146:4

147:22,23 148:10, 11 150:2 151:23, 24 155:14
**RESPONSES-** 30:7 109:18 120:22
**RESPONSIBILITY-** 116:9
**RESPONSIVE-** 16:2 76:18,20 108:1
**RESULT-** 20:19 25:23 51:4 70:14 113:10 115:10 116:14 123:20
**RESULTING-** 139:3
**RESULTS-** 27:24 30:23 116:6
**RETAIN-** 35:7 107:14
**RETAKE-** 56:6
**RETENTION-** 35:5
**RETIREE-** 78:1
**RETURNS-** 146:17
**REVERSAL-** 33:1
**REVERSED-** 143:4
**REVIEWED-** 38:10 54:9
**REVIEWING-** 155:19
**REVISED-** 11:10 33:10 34:15 56:25 58:9 76:5 97:13 137:20 138:11,13
**REVISION-** 35:3 38:17 137:22 138:21
**REVISIONS-** 35:20 95:12
**REVISIT-** 12:7 74:24
**REVISITED-** 74:24 106:6
**RID-** 68:7
**RIFE-** 20:12
**RIGHTS-** 12:13,15 31:23 36:4 43:18, 21 63:10,25 115:8 123:8 140:25 148:3 150:7
**RISE-** 32:14
**RISES-** 114:12
**RISK-** 26:17,19, 25 52:15,16 53:20,22 54:1 113:10 116:10

117:1 144:25
**RISKS-** 54:1
**ROAD-** 129:21 131:3
**ROBERT-** 15:23 46:2 89:22 98:8 43:2,12
**ROMERO-** 40:8 43:2,12
**ROOM-** 79:5 90:6 111:3,25 145:4 153:6
**ROSEN-** 82:13 83:8
**ROUND-** 29:21 89:19 113:8 119:19
**ROUNDING-** 120:19
**ROUNDS-** 25:19
**ROW-** 154:14,16
**RUB-** 24:17
**RUDNICK-** 15:24 89:23 98:9
**RULE-** 23:7,10,13 24:5
**RULES-** 23:6,14 24:5
**RULING-** 12:8 94:8 144:21 150:24
**RULINGS-** 95:13
**RUN-** 98:11 133:9 154:16
**RUNG-** 25:10
**RUNNING-** 74:6 133:14,25

S

**SACROSANCT-** 23:9, 13
**SALE-** 49:10,22
**SAMUEL-** 82:13
**SAN-** 38:9,19,23 40:7,9
**SAT-** 97:23
**SATISFIED-** 40:2 63:22 123:16
**SATISFIES-** 124:16,18 125:2
**SATISFY-** 20:14 115:24 124:12 126:8
**SAVE-** 31:5
**SAW-** 20:11 128:9
**SCARED-** 142:23
**SCENARIOS-** 29:16 133:1
**SCHAIBLE-** 101:19, 20 102:21

**SCHEDULE-** 21:21, 25 103:7 134:7 154:17
**SCHEDULED-** 154:6
**SCHEDULING-** 149:11
**SCOPE-** 18:14 61:11
**SCORE-** 140:7
**SCORECARD-** 33:9
**SCRATCHING-** 128:10
**SEC-** 21:3,5 45:21 108:22 110:4 111:15 120:24 127:6
**SECOND-** 23:10,20 25:18 49:8 62:16 65:2 70:20 85:2, 23 87:2 99:1 101:19 110:24 144:11 146:11
**SECONDLY-** 22:12
**SECTIONS-** 41:3,13
**SECURED-** 38:21, 24 39:3,5,16,17 40:9,12,21 41:4, 12,19,21 42:1,4, 8,11 103:6
**SECURITIES-** 65:6
**SECURITY-** 23:7
**SEE-** 20:4 28:22 36:14 45:5 57:23 58:1,11 65:25 77:20 79:5 80:19 81:25 83:5 87:1 90:6,14 96:16 97:9,12 98:18 105:3 114:1 145:4 146:12 147:5 156:20
**SEEK-** 12:6 68:13, 16,17,24 69:2 72:23 107:13
**SEEKING-** 35:7 69:6 72:11,13,14 151:19
**SEEN-** 63:21,24 69:19,20 124:15 141:17,18,23
**SEES-** 21:21
**SELL-** 49:16
**SEMANTIC-** 58:17
**SEMANTICS-** 58:25
**SENIOR-** 14:13,14 57:2 58:6 59:20,

21 78:14 79:25 103:5 113:20 127:25 128:1,6 148:16,20,24 149:2
**SENT-** 94:15
**SENTENCE-** 41:12 69:24,25 70:2
**SEPARATE-** 32:10 55:22 102:16 124:2
**SEPARATELY-** 132:16
**SEPTEMBER-** 123:10
**SEQUENTIAL-** 14:25
**SERIATIM-** 80:21
**SERIES-** 80:24 81:10 89:6
**SERVE-** 134:1
**SERVED-** 30:10 105:24
**SERVICE-** 153:11
**SET-** 43:22 60:17 130:16 138:5 151:7 154:13
**SETS-** 40:16 130:17
**SETTING-** 46:6 60:5 74:10 79:17
**SETTLE-** 25:6 26:18 132:3
**SETTLED-** 18:8 87:15
**SETTLEMENT-** 14:8 17:8,24 18:1,16 20:3 27:22 28:10 30:20,22 31:3 54:23 56:14 59:20,24 61:5 68:8,10 73:8 75:12 78:15 81:23 84:24 87:15 91:20,22 93:9,10 96:25 97:4 101:23 109:11,17,19,25 110:7 113:4,6,17, 20 114:2,7,9,12, 16,20,25 115:3 116:8,11 118:4 120:11,18 121:10 125:6 126:10,19 127:2 140:20 141:2
**SETTLEMENTS-** 78:1 127:21,23

**SETTLING-** 83:25 84:23 122:17
**SEVEN-** 93:20 120:14
**SEVERAL-** 13:21 36:7
**SHALL-** 151:24
**SHAM-** 24:1
**SHARE-** 120:6 132:10 150:3
**SHAREHOLDERS-** 49:19
**SHARES-** 23:21,22 151:14,15
**SHEET-** 111:12
**SHIELD-** 119:21
**SHORTER-** 88:7,8, 23
**SHORTFALL-** 110:5
**SHORTHANDING-** 124:11
**SHORTLY-** 56:12
**SHOT-** 123:11 144:8
**SHOTS-** 122:3
**SHOULDN'T-** 16:9 54:19 65:17 71:22 89:12 91:2 92:24 111:23,24 115:19 133:24
**SHOW-** 44:24 51:14 74:3 83:19 85:14 98:14 130:11 132:12
**SHOWING-** 13:7
**SHOWS-** 110:22
**SHRINK-** 96:1
**SIDE-** 39:15 114:22,23 145:3, 4,14,15,21
**SIDES-** 84:21 86:21 146:24
**SIDLEY-** 34:10 136:22
**SIGHT-** 15:15
**SIGHT-UNSEEN-** 28:21
**SIGN-** 11:7 24:3
**SIGNED-** 11:9 12:25 118:25
**SIGNIFICANT-** 87:21 99:14
**SIMILAR-** 26:10 56:16 66:9 99:23 149:3

23
**SIMPLE-** 110:21
**SIMPLY-** 16:17 36:24 48:13 56:18 81:21 110:22 131:18 151:19
**SINGLE-** 97:6 143:2
**SINGLE-SPACED-** 93:21
**SIT-** 73:11 112:14
**SITTING-** 17:9,10 108:5 122:25 126:23 134:14 152:19
**SIX-** 108:23 109:5 127:7
**SIZE-** 84:9,11
**SKIP-** 116:18
**SLANDER-** 36:20
**SLICES-** 86:1
**SLIGHT-** 150:4
**SLIGHTLY-** 134:10
**SMALL-** 102:3,9
**SMALLER-** 84:10,14
**CO-CALLED-** 28:1 35:23 44:6 45:22 47:11
**SOLICIT-** 17:8 107:15
**SOLICITATION-** 11:8 32:25 37:11 47:3 55:8 69:5 76:24 98:16 106:16 123:14 136:24 137:1,14 143:19,20 149:14, 25 150:6 153:3
**SOLVE-** 111:25
**SOLVED-** 28:15
**SOLVENCY-** 108:19 111:11 117:2 130:9 131:1
**SOLVENT-** 118:8 119:7 121:16
**SOLVES-** 29:24
**SOMEWHAT-** 61:20 99:4
**SOONER-** 152:1
**SOPHISTICATED-** 24:17 25:1,2
**SORTS-** 20:13 54:10
**SOUND-** 129:5 157:11

SOUNDS- 42:16
87:25 113:25
SOURCES- 110:16
130:1,7 152:5
SPAIN- 134:20
SPANSION- 94:2
104:4 139:9,11
SPEAKER- 57:13,
15,20
SPECIFIC- 38:14
43:4,5 65:21
75:7,13,16 83:19
86:6 110:10
122:23 125:17
129:17 133:10
SPECIFICALLY-
37:25 40:3,16,24,
25 44:11 61:9
75:25
SPECIFICITY-
116:5
SPECIFICS- 84:5
SPECULATIVE-
73:10
SPELL- 136:2
SPENT- 37:7
121:13
SPIN- 90:2
SPIRIT- 111:17
SPOKEN- 38:10
139:25
STAGE- 94:9,13
117:12 150:20
STAKED- 144:18
STAKEHOLDERS-
114:20 115:2
125:5
STAND- 29:3
95:17 121:22
122:8 157:4
STANDALONE- 117:3
STANDARD- 31:4
114:4,5,13
115:24 142:6
STANDARDS- 128:4
STANDING- 123:7
141:9
STANDS- 62:19
102:19
STANDSTILL- 41:9
STANLEY- 35:4,5,
8 76:4,8
STARK- 15:23
16:4 17:16,17,22
18:11,13,15,19,
22 19:7,18,22,24

20:23 21:7,17,21
22:5,8,18,20,23
27:2,5,7 74:14,
25 89:22 90:11,
12,14 97:24 98:8,
9,19,21 99:13
100:6,8,9 105:7
107:19 149:24
150:9 152:15
START- 16:1 19:3
26:13 70:8 94:1,
10 107:24 129:17
154:4
STARTED- 116:4
STARTS- 16:12
25:3
STATE- 94:4 96:3
113:19 115:9
117:7 118:7
138:12,14
STATEMENT- 13:3,
5 14:23 15:4
17:4,23 19:12
20:11,22 21:2,14
22:11 23:15
26:12 27:16,20
28:7,17 29:2,7
30:3,21 31:6
32:4 33:10 34:16
35:3,12,21 36:16,
21,25 37:7,17
38:18 42:25
43:23 44:20
45:12,18 46:3,5,
17 48:2,6,20
51:12,18 52:10,
16,18,19 53:7,19
54:20,22 55:21
56:13,24 57:1
58:4,9,18 59:2,
13,18 60:15 61:9
63:8 64:15,19,20
65:12,20 66:10
67:1,7,24 68:20
72:2,4,8 74:1
75:19,21,24 76:6
78:3,21 79:4,14,
16 80:11,12,25
81:4 83:20 85:3
86:21 87:17 88:5,
25 91:16,18 92:1,
4 93:7 96:7 98:2,
23 100:11,25
101:10,14,25
102:1,15 103:16,
19 104:1 106:15,

19,22 109:1,3,13
110:12,13,17
111:6,16 112:1
113:14,15 114:9
115:17,21 116:1
117:4,15 118:22
120:25 121:22
122:23 123:13
125:9 127:5,14
129:1,10 131:5
133:3,8,12 134:4,
12 135:23
STATEMENTS- 51:6
52:14 79:3 80:22
83:13,22,25
89:10 92:19,22
93:14 111:4
119:18
STATING- 107:23
STATISTICS- 86:15
STATUS- 20:10
49:13 76:10
STAY- 156:25
STAYED- 134:2
STEP- 26:1 60:7
100:14 110:17
111:1,11 116:22
117:2,9 118:9,19,
20,21,25 119:1,3,
4,10,11,14,15,16,
19,20,22,25
120:2,4
STEPS- 116:13
130:1,9
STERN- 11:15
STICK- 90:19
136:4 156:24
STOCK- 23:19
24:3,4 61:24
141:4
STOP- 25:25
STOPPED- 128:7
STRAIGHT- 118:19
STRAIGHTFORWARD-
104:12
STRATEGIES- 25:12
STRATEGY- 16:25
17:1,2
STRATTON- 149:18,
19,20
STREET- 148:17
STRIKES- 26:24
STRUCK- 26:7
STRUCTURE- 13:23
15:14 81:24
140:12 143:13

STRUCTURED- 52:3
STUDY- 123:25
SUBMISSION-
79:15 95:25
SUBMISSIONS-
25:16 152:15
153:13
SUBMITS- 125:19
SUBMITTED- 48:8
83:25 109:18
SUBORDINATED-
65:5 120:7 126:7,
11
SUBPOENA- 12:2,4
SUBS- 116:12,23
SUBSECTION-
113:16
SUBSEQUENT-
38:13 119:11
SUBSEQUENTLY-
25:18 114:11
SUBSIDIARIES-
65:18 105:12
116:23,25 117:3
118:8 119:6,13
120:9,12 126:6
SUBSIDIARY- 46:7
75:23 105:14
113:3,9,11
116:22 117:3
SUBSTANCE- 46:20
107:2 137:6
143:23
SUBSTANTIAL-
108:4
SUBSTANTIALLY-
149:3
SUBSTANTIATION-
114:17
SUBSTANTIVE-
79:11 88:5
100:11 138:25
139:10 143:21
SUCCESS- 113:18
SUCCESSFULLY-
60:19
SUCCESSOR- 45:10
SUFFERING- 140:21
SUFFICE- 62:1
105:16
SUFFICIENT- 20:2,
5,16 49:3 106:6
107:15 120:9
135:20
SUFFICIENTLY-
37:17

**SUGGESTED-** 78:17
82:5,11 97:22
**SUGGESTION-** 26:15
**SUGGESTS-** 27:22
71:14
**SUM-** 107:1
**SUMMARY-** 78:18,
23 132:16 133:9
**SUPERFICIAL-**
130:21
**SUPERSEDE-** 11:25
**SUPPLEMENT-** 19:9
32:7,9 43:22
54:25 55:12 57:8,
12,18 60:15
62:13 69:20
75:19 103:10,17
104:11 135:2,10
**SUPPLEMENTAL-**
29:10 48:16 66:2
70:20,25 73:18,
20 74:19 99:20
**SUPPLEMENTED-**
45:2 46:5 47:11
75:21 108:22
**SUPPLIED-** 20:12
**SUPPLY-** 87:9
88:9,16
**SUPPORT-** 22:17
54:23 59:24
78:15 92:18
93:19 97:4
114:15 126:19
127:3 145:1
**SUPPORTERS-**
27:22 29:18
79:21 96:25
101:24 109:19
**SUPPORTING-** 84:12
**SUPPORTIVE-**
102:4,5
**SUPPOSE-** 85:9
**SUPPOSED-** 21:7
23:19 70:24
71:20 77:3 85:7
86:20 109:14
121:4 122:16
155:19
**SURELY-** 119:16
**SURPRISED-** 61:20
**SURROUNDING-**
150:23
**SURVIVE-** 120:4
**SURVIVING-** 120:6
**SUSPECT-** 72:15
75:10 85:12

**SWAP-** 76:8
**SWITCH-** 16:4
**SWITCHED-** 49:12

---

**T**

**T'S-** 79:6
**TACIT-** 28:16
**TACT-** 91:12
**TAG-** 13:20
**TAKING-** 33:23
60:10
**TARGET-** 48:16
**TARGETED-** 85:16
**TAX-** 38:15 39:3,
4,7,12 40:12,15,
20,21 41:3,12,18,
22,24 43:3 47:14
49:10,11,14,21
50:17 51:1,7
52:11 53:19
54:10 119:21
**TAXABLE-** 52:6
**TAXATION-** 50:23
**TAXED-** 50:23 51:1
**TAXES-** 49:15
51:1,2,3,8,10
52:7
**TAXING-** 38:9,25
40:24 41:16
50:10 90:5
**TEAM-** 13:20 107:6
**TECHNICAL-** 14:1
15:21 32:15
56:18 58:19 59:4,
12 137:11 146:18,
22 148:14
**TELEPHONE-** 38:2,3
**TELEPHONICALLY-**
39:24
**TELLING-** 60:7
104:17 153:11
155:4
**TELLS-** 42:22
**TEN-** 33:14
**TENDER-** 61:23
**TENDERED-** 34:14
**TERM-** 35:6 39:4
103:6
**TERMINATES-**
123:11
**TERMS-** 34:18
37:10,12 40:3
45:4 68:3 73:10,
15,18 80:15
81:15 82:6 86:3
89:7 99:14

102:19 103:5,11
104:10,13,17,19
105:10 116:9
117:20 126:23
133:13 134:12
**TEST-** 118:14
**TEXT-** 48:7,20
**THANKS-** 83:8
92:15 105:5
116:20 135:21
136:6
**THEIRS-** 96:25
97:5
**THEMATICALLY-**
78:17
**THEME-** 145:13
**THEORY-** 106:4
**THEREFORE-** 30:23
39:17 50:22
59:25 146:16
**THEY'D-** 30:25
135:15
**THEY'LL-** 19:3,4
39:17 56:20
84:24 97:6
127:15 142:24,25
**THICK-** 17:10
**THIN-** 24:16 109:6
**THIRD-** 14:12
21:23 64:23,24
66:13,14,21 67:6,
11 85:23 115:9
146:2,11
**THOMPSON-** 36:10
37:25
**THOROUGHLY-**
129:12
**THREAD-** 24:6
**THREATENED-** 68:7
**THREE-** 14:6,19
19:1 70:19 75:3
88:2 90:4 92:6
96:2,3 111:3,9
118:10 129:15
137:1 144:13
**THREE-PAGE-**79:19,
20,22 80:5 95:25
96:20 100:21
125:19,22
**THROWN-** 17:7
**THURSDAY-** 152:20
**TICK-** 138:8
**TICKING-** 138:7
**TIE-** 58:22
**TIED-** 82:15
**TIL-** 55:24

**TIME-** 16:15
23:24 24:11 32:6
33:13 36:1 37:8
43:9 47:16,23,25
51:3 52:8 55:4
60:4,24 81:3
82:22 83:4 84:23
85:4,5 94:7 95:3,
8 101:11 102:8,
10,13,18 105:24
108:20 112:6
118:9,13,23
121:15 123:18,19,
25 124:14 130:25
136:9 139:14
143:16 144:10
146:16 147:15
152:10 153:8
154:12,24 155:5
**TIMES-** 20:1
22:23 130:18
**TIMING-** 13:14,25
14:15 16:23 23:5
24:18 29:13 33:5
34:2 35:13,22
51:11 121:25
154:5
**TMIP-** 47:11,18
50:19 101:10,25
**TMT-** 114:1,13,16
**TODAY-** 13:20,21,
23 14:3,9,12
16:12 17:4 19:11
20:19 22:11
24:10 28:19,23
47:7 64:1 69:20
81:22 84:10 91:8
95:10,13 97:5
105:12,17 106:10
107:4,6,8,18
108:5 127:16
140:11,14,15
142:14 143:9
150:24 151:19
157:1
**TODAY'S-** 48:21
134:23
**TOGETHER-** 77:8
80:9 92:23 95:25
96:4,6 112:9
125:15 127:1
**TOLLED-** 120:2
**TOM-** 27:11 107:21
**TOMORROW-** 97:17
152:3 155:10,11
156:2,19,24

**TOP-** 85:12,22
86:4 112:10
115:13
**TOPCO-** 132:17
**TOPIC-** 27:15
**TOPICS-** 32:7
**TORT-** 106:11
**TOSS-** 156:15
**TOTAL-** 14:17
113:6 120:12
**TOUCH-** 13:24
22:20 23:4 65:7,
10 101:3
**TOUCHED-** 100:13
**TOUCHES-** 137:6
**TOUGH-** 68:25
**TOWARDS-** 146:14
**TRADE-** 135:12
**TRADER-** 35:11
**TRAILER-** 114:1,
13,16
**TRANSACTION-**
20:14 49:17
50:18 51:2,5,8
52:3,6,8,12 54:5,
9,12 63:14,18
78:22 108:20
110:7 112:6,8,10,
12 118:14 129:25
130:2,25
**TRANSACTIONS-**
49:12 76:18,20
85:4 110:20
146:20
**TRANSCRIPT-**
157:10
**TRANSCRIPTS-**
157:16
**TRANSFER-** 87:10
108:14 116:10
117:1 119:12
140:24
**TRANSITION-** 32:1
**TREATED-** 42:17,
21,22 58:24 142:7
**TREATING-** 39:7
41:24 42:2
**TREATMENT-** 14:9
38:14,19 40:4
41:17,18 42:12
43:16 59:18,19
60:1,2,8,20,25
62:17 63:4,11
124:4,5,7,10,12,
16,17,21,24
131:15,18 132:13

133:12 139:6
142:16 143:14,22
144:1
**TREND-** 146:13
**TRIB-** 45:9
**TRIBUNE-** 11:3
36:20 44:17 52:4,
7
**TRIED-** 39:20
41:11 45:8
128:25 129:10
**TRIES-** 23:10
**TRIGGER-** 124:10
**TROUBLED-** 28:3,18
**TROUBLING-** 117:21
**TRULY-** 146:19
**TRUST-** 14:10
15:24 61:15 75:4,
18 76:22 78:13
79:23 89:23
97:24 98:9
106:13 137:8
**TRUST'S-** 98:1
150:7
**TRUSTEE-** 15:25
31:21 37:9 47:22
48:9 54:18 56:10
59:11,23 75:4
105:23 147:11
**TRUSTEE'S-** 37:6,
8 47:1 94:5
137:24 139:23
**TUCHIN-** 11:15
**TUESDAY-** 152:12,
20
**TURN-** 14:6 15:20
75:13 92:2 134:5
**TURNED-** 86:8
94:10 112:11
**TURNS-** 58:20
132:7 154:10
**TWEAKS-** 14:3
98:13
**TWO-** 14:19,21
15:7,16,19 22:5
32:13 47:6 50:13
61:18 64:21
69:18 70:17
79:19,20,22 80:5
83:18 84:5,6,17
86:6,8 88:1,6,17
93:4 101:16,23
110:20 111:4
113:5 116:13
123:22 125:18
126:1 132:4

133:1 146:3 152:4
**TWOFOLD-** 23:17
**TWO-PAGE-** 79:15
80:24 81:10 92:1
93:15
**TWO-PAGER-** 110:22
**TYPES-** 110:10
128:22
**TYPICALLY-** 144:6

———— U ————
**ULTIMATELY-**
20:17 95:9 132:9
**UNCERTAINTY-**
134:23
**UNCLEAR-** 99:12
**UNCOMFORTABLE-**
90:7
**UNCOMMON-** 38:25
**UNDERCURRENTS-**
123:2
**UNDERLYING-**
106:7 108:18
**UNDERSTANDING-**
27:3 48:4 49:14
50:1 99:19 108:4
149:10
**UNDERSTATEMENT-**
90:10
**UNDERSTOOD-**
74:25 98:21
103:24 105:2
107:19
**UNDULY-** 12:3
**UNEXPECTED-** 154:9
**UNFAIR-** 115:16
**UNFOLD-** 123:17
**UNFORTUNATELY-**
82:14 123:24
**UNIDENTIFIED-**
77:3 97:7 135:9,
14
**UNION-** 47:25
**UNISON-** 101:24
**UNIT-** 39:5
**UNITED-** 23:8
31:21 37:5,9
47:22 48:9
**UNIVERSE-** 81:2
84:17
**UNLAWFUL-** 143:6
**UNLESS-** 12:2
**UNLIKE-** 25:5
84:20 146:12
**UNNECESSARY-**
45:15

**UNREASONABLE-**
85:16 120:16
130:3
**UNRESOLVE-** 25:14
**UNRING-** 25:10
26:19
**UNSECURED-** 35:15
39:5 113:21
**UNSUBSTANTIATED-**
109:7 125:7
**UNTIE-** 145:17
**UNUSUAL-** 28:25
70:9
**UPDATED-** 13:7
**UPSET-** 126:10
**USC-** 40:17
**USED-** 12:5
106:16 114:5
130:25 131:23
141:8
**USEFUL-** 26:10
130:7 131:1
**USES-** 110:16
130:1,7 152:5
**USING-** 12:12
86:15
**UTILIZED-** 24:14
150:17,18

———— V ————
**VACATION-** 154:17
**VALUATION-**
103:18 106:19
**VALUE-** 16:6,16
17:2 18:16 22:1
75:23 76:2,3
103:14 106:18,21
120:9 126:8,13
131:22,23,24
132:11
**VALUED-** 119:22
**VARIETY-** 130:15
**VARIOUS-** 20:10
23:11 34:19 58:2
67:8 79:14 95:24
130:9,18
**VEHICLE-** 12:9
106:16
**VERBIAGE-** 17:23
**VERSION-** 53:1,2,
8,11 56:25 65:6
86:14 113:16
129:19
**VERSUS-** 49:22
150:3
**VIA-** 48:7 62:13

**VIEW-** 20:25 21:3,
11,23 27:18
37:15 45:1 60:8
61:3 63:3 69:4
79:17 80:19 82:7
89:1 90:1,8
91:21 93:17
94:11,21 97:1,3
104:12 108:8
110:8 112:20
115:12 121:9
127:19 128:18
129:2,3,8 133:5
136:1 144:25
**VIEWED-** 107:17
144:14
**VIEWS-** 20:4
21:14 23:12
42:21 91:1 110:2
111:23 121:6
**VIOLATES-** 23:14
24:5
**VIOLATING-** 46:17
**VIOLATION-** 106:1
**VIRGINIA-** 36:10
37:25
**VIRTUE-** 136:12
**VISION-** 127:3
**VOLUMINOUS-** 127:6
**VOTE-** 21:9 28:11
31:17 88:10,11
91:19 92:9 94:17
109:23 116:3
124:10 131:21
132:2 138:1,10,
12,15 142:8,24
145:17,20,22
146:1,7,8 149:2
**VOTED-** 132:19,21,
25 133:1
**VOTER-** 94:19
**VOTERS-** 80:15
**VOTES-** 80:16
131:21 138:3,6
**VOTING-** 15:2
16:20 19:10
23:22 55:5 69:5
74:10 94:6,7,13
97:20,21 98:3
99:3,9 100:6
136:19 137:11
151:22

---

W

**WAIT-** 26:11 100:7
**WAITING-** 15:12

**WALK-** 13:17 14:4
81:20 116:16
137:15
**WALKING-** 34:6
**WANTS-** 32:19
123:4 129:18
**WARDWELL-** 92:17
**WARRANT-** 23:18,
25 24:1
**WARRANTS-** 151:14,
15
**WASN'T-** 71:3
**WAYS-** 85:18
**WE'RE-** 13:16
15:2,10 16:5,8,
16 20:23 22:3,11,
24,25 23:2 25:16
26:18 28:5,6,22
31:2,17 33:8
34:3 38:16 39:8
40:12,19,23,25
41:2 51:9,10
56:20 67:22,24,
25 68:5,21 69:6
72:23 73:20 74:1,
3,9,19 77:16
81:21,22,25 87:8,
9 89:10,24 91:8,
25 92:20 101:5,9,
11,12,21 102:4,
13 107:8,11
108:11 109:21
114:25 115:15
117:12 119:14
121:1 122:4,5
128:7,10 129:18
134:14,17,22,25
139:15 141:18
145:16 149:6
**WEDNESDAY-** 153:23
**WEEDS-** 81:4
129:13
**WEEK-** 12:8 52:17
137:21 154:6,13
155:2 156:6
**WEEKEND-** 154:4
156:8,14,20
**WEEKS-** 17:11
19:1 102:11
**WEIGHTED-** 116:9
**WELLS-** 27:12
91:6 107:22
**WEREN'T-** 24:17
115:4 119:8
126:20
**WHEREBY-** 59:17

60:17
**WHEREUPON-** 157:6
**WHICHEVER-** 102:20
**WHITE-** 27:11
**WHO'S-** 91:19
122:3
**WHOLE-** 16:24
27:15 118:23,24
130:15 140:21
**WIDELY-** 12:21
**WILL-** 13:20 14:1,
4,6 15:1,9 16:23
19:11,13 20:17
22:15 24:19
25:11,18,23,25
26:2 28:8 29:6,
15,17,18,20,21,
23 32:10 34:13
36:11,22 37:1,4,
11,18 39:3,4,12
50:6 55:4,10,11
56:1,5,12,14
57:3 58:21 59:3,
9 60:10,11 61:12,
23 62:1,9 63:1
64:7 66:9 69:1
71:16 74:24
75:10,13,16 76:6,
24 80:13 82:1,8
83:16 88:14
89:15 90:16
95:11,13,14,17
96:4,5,9,16,17
97:9,21,23 99:12,
17 100:14 101:10,
13 102:22,24
107:9 108:16
116:3 120:4
123:10 124:12
125:5,15,19,21
127:15,17,22
133:2,4,5 138:9,
15 142:22,24
146:7,17 147:2,5
148:23 149:2,7,
13 150:5 151:7
152:5,10 153:5,
15,18,21 154:3,7,
14,15 155:9,22
156:19 157:4
**WILLING-** 20:21
79:8 83:15 88:21
147:5,10
**WILMER-** 101:23
**WILMINGTON-**
14:10 15:24 75:4,

18 76:22 78:13
79:23 89:23
97:24 98:1,9
106:13 137:8
150:7
**WIND-** 95:10
130:21
**WINDOW-** 17:7
**WISH-** 12:16 37:6
44:1 45:23 46:22
80:18 107:20
147:21
**WISHES-** 27:9
40:7 69:14
130:12 137:16
147:19 151:21
**WITHDRAW-** 25:7
**WON'T-** 71:18
102:24 116:19
125:15 128:5
**WONDERFUL-** 98:25
**WORD-** 50:24
**WORDAGE-** 90:9
**WORDS-** 28:22
66:5,6 141:8
**WORK-** 12:8,9
15:13 19:15
23:16 43:20
55:25 62:1,10
63:7 96:25 97:1
99:9 101:12
102:6,11 107:24
128:1 143:16
147:5 151:9,20
155:20 156:7,14
**WORKED-** 25:12
61:18 98:22
**WORKING-** 33:9
61:22 64:6 95:25
**WORKS-** 24:12
39:21 100:8
138:23 152:12,22
**WORLD-** 85:11 92:2
**WORRY-** 115:23
**WORTH-** 107:2
126:16
**WOULDN'T-** 41:6,8
70:10 79:6 91:15
108:11 116:18
128:24 130:10
135:17
**WRAPPED-** 16:24
**WRITE-** 95:8
**WRITING-** 89:24
**WRITTEN-** 28:20
127:10 141:14

151:1

**Y**

**YEAR-** 25:4
119:24 120:1
154:19
**YEARS-** 49:15
**YESTERDAY-** 11:24
13:4,9 32:5
37:15 40:1 41:9
48:4,8 63:7 71:3
**YIELDS-** 16:11
**YORK-** 119:9
**YOU'D-** 81:8 98:16
**YOU'LL-** 19:11
55:21 57:23
71:17 101:11
**YOU'RE-** 16:14
26:17 53:6,7,18
55:18 67:15
79:13 80:8 87:22
93:18,21 100:2
120:24 130:23
143:20
**YOU'VE-** 13:13
18:4,25 37:22
70:2 82:5 87:25
126:9 144:22