# EXHIBIT B

## ORIGINAL AND BLACKLINED WELLS FARGO SUBMISSIONS

> *Wells Fargo Bank, N.A., as successor administrative agent (the "Administrative Agent") under the Bridge Loan Agreement, Recommends that all Creditors Vote to <u>Reject</u> the Proposed Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries dated May 19, 2010 (the "Tribune Plan")[1]*

## OVERVIEW

The Tribune Plan is constructed around and largely implements a purported global settlement (the "Settlement") of fraudulent transfer claims and other causes of action (the "LBO Claims") arising from the leveraged buy-out of Tribune in 2007 (the "LBO").

Under the Settlement and the Tribune Plan:

(A) the Bridge Lenders will recover about $7 million on their $1.6 billion of loans, which is a recovery of less than 0.5%;[2]

(B) the other LBO lenders will recover about $5.5 billion on their remaining $8.7 billion of loan claims, which is a recovery of about 63%; and

(C) the pre-LBO Senior Notes and General Unsecured Claims are to receive approximately $500 million on their aggregate claims of about $1.4 billion, which is a recovery of about 35%.

Absent the Settlement and assuming that (a) none of the LBO Claims have merit, (b) the Company's total distributable value is $6.1 billion, and (c) all contractual subordination is enforced:

(A) the Bridge Lenders' recovery would be at least $74 million, which is a recovery of at least 4.6%;

(B) the other LBO lenders recovery would be about $5.9 billion, which is a recovery of approximately 68%; and

(C) the Senior Notes and General Unsecured Claims would receive about $65 million, which is a recovery of approximately 4.6%.

The Administrative Agent believes that the shifting of recoveries under the Settlement is unfair to the Bridge Lenders, provides improper and undisclosed windfall recoveries to numerous other parties, including the other LBO lenders and the Company's former shareholders, and does not produce a defensible resolution of the underlying issues.

Among other things, the Settlement and the Tribune Plan suffer from the following defects: (1) the Settlement was negotiated by parties who are not estate fiduciaries and who had no interest in protecting the interests of any party, other than their own; (2) the distributable value of the Debtors' business may have been materially understated; (3) distributable value may have been materially over-allocated to the guarantor-subsidiaries; (4) the financial contribution required to resolve the LBO Claims has been materially over-allocated to Tribune; and (5) the Settlement is not premised on a reasonable construct of how fraudulent transfer avoidance would work (a) at the Tribune and Subsidiary Guarantor levels, respectively; (b) with respect to Step 1 and Step 2 of the LBO (whether collapsed or addressed separately); or (c) in respect of payments made in connection with the LBO or post-closing LBO-related obligations.

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Tribune Plan.

[2] If the Bridge Lender class rejects the Tribune Plan, each Bridge Lender who voted against the Tribune Plan will receive "cram down" treatment in accordance with section 1129(b) of the Bankruptcy Code, which would entitle such lender to receive a distribution equal to at least 4.6% of its Allowed Claim, if any.

## DISCUSSION

*1.    The Disclosure Statement does not provide meaningful support for the Settlement and does not include information that would be needed for creditors to formulate an independent view.*

The Debtors have represented that their professionals and those of the Creditors' Committee have spent millions of dollars of estate funds investigating and analyzing the LBO Claims. Nevertheless, in the Disclosure Statement, the only support for the Settlement are (a) bare, unsubstantiated conclusions that the Settlement is fair and reasonable, and (b) admonitions that the LBO Claims are complex and the defendants will fight them vigorously, making any litigation protracted, time-consuming and expensive.

The Administrative Agent has made numerous requests that the Debtors include information (if it exists) that would tend to support or justify the Settlement and its disproportionate impact on certain creditor constituencies and that would permit creditors to form their own views on an informed basis. Such requests have been largely rejected, increasing the Administrative Agent's doubt that an appropriate justification for the Settlement exists and making it impossible for stakeholders to form an informed view.

Among other things, the following salient information is missing:

- Benefits realized at the Subsidiary Guarantor and Tribune levels from Step 1 and Step 2 of the LBO.

- Contemporaneous indicia of the solvency, including the reasonableness of capital (*i.e.*, balance sheets; cash flow projections; and an analysis of the variances of the actual financial performance in 2007 and 2008 against the projections) for the Subsidiary Guarantors and Tribune at Step 1 and Step 2 of the LBO.

- Payments made in connection with the LBO and in respect of obligations incurred thereunder, including (1) identity of each payee (shareholder; lender; advisor; director; management); (2) type of payment (equity; debt; fee; other); (3) amount of payment; and (4) date of payment.

- A discussion of the various potential claims and causes of action that are being resolved in connection with the Settlement, including any basis for differentiation at the Tribune and Subsidiary Guarantor levels.

- A presentation of the range of potential creditor recoveries in connection with differing outcomes of the LBO Claims (including the impact of avoidance and disgorgement), including an explanation of how the range was formulated.

Based on a review of the information made available in the Company database (but not included in the Disclosure Statement) regarding the foregoing matters, the Administrative Agent has been unable to generate a plausible fraudulent transfer scenario that would support a result even remotely similar to that produced by the Settlement. The Debtors appear to have relied upon the worst case scenarios for the Bridge Lenders with respect to every assumption in the Settlement and Tribune Plan. Based on available information, however, the Administrative Agent believes that **even worst case scenario assumptions would yield higher recoveries for the Bridge Lenders, and under all plausible scenarios, the Bridge Lenders' recoveries would be materially higher.**

*2.    The Settlement is the product of negotiations between parties who have material parochial interests at stake that are not aligned with the interests of the Debtors' estates.*

The principal parties to the Settlement and architects thereof are not the Debtors, but rather, include Senior Lenders, who are potential targets of the LBO Claims. Although not disclosed in the Disclosure Statement, these parties (JPMorgan and Angelo Gordon) are believed to have received substantial payments that, in the absence of the Settlement, may be subject to disgorgement as fraudulent transfers. In addition, they have senior claims at the Subsidiary Guarantor level that naturally motivate them to press for a resolution that would

primarily impact recoveries at the Tribune level. For unknown reasons, the Debtors have chosen not to disclose the competing interests of such parties which are furthered by the Settlement, or whether they considered or investigated this issue in adopting the Settlement in the Tribune Plan. These entities may have negotiated and agreed to the Settlement to obtain releases from the estates of such claims.

3.  *The unjustified structure of the Settlement wrongfully strips the Bridge Lenders of their recovery.*

The Tribune Plan allocates most of the Debtors' distributable value to the Subsidiary Guarantors, where the Bridge Lenders' guarantee claims are subordinated to the guarantee claims of the Senior Lenders, while nearly all of the Settlement consideration (approximately $510 million of value) is to be taken from distributions that would be made to creditors of Tribune. As such, the net effect of the Settlement is to strip from the Bridge Lenders almost their entire recovery in the Chapter 11 Cases (the Bridge Lenders receive a 0.44% recovery on their Bridge Loan Claims and no recovery on their Bridge Loan Guaranty Claims), while allowing the Senior Lenders to retain the vast majority of their recovery (the Senior Lenders receive a 0.44% recovery on their Senior Loan Claims and a 62.41% recovery on their Senior Loan Guaranty Claims).

The Administrative Agent believes this allocation scheme (which the Debtors do not explain or attempt to justify in the Disclosure Statement) is improper for, among other things, the following:

- The Settlement appears to be premised on the potential of an unprecedented partial avoidance of the integrated LBO transactions (*e.g.*, avoidance at the Tribune level with no risk of avoidance at the Subsidiary Guarantors), thereby dramatically over-allocating avoidance risk to creditors of Tribune.

- There is no evidence to suggest that the Subsidiary Guarantors were solvent and that transfers made by such entities would not be subject to potential avoidance in connection with the LBO Claims.

- Without explanation, the structure is inconsistent with the general rule that leveraged buy-out events will be collapsed for fraudulent transfer analysis purposes.

4.  *Most of the potential targets of the LBO Claims contribute no value to the Settlement, but nevertheless receive broad releases and/or recoup their legal fees and costs under the Tribune Plan.*

The Administrative Agent is not aware of any precedent for the proposition that lenders' claims can be eliminated through avoidance of a leveraged buy-out transaction without a concomitant right of the estate to recover from those who received the proceeds of or otherwise received payments in connection with such transaction. Accordingly, all creditors should "opt out" of these third-party releases by checking the appropriate box on the ballot you will receive.

5.  *The Tribune Plan is plagued by a number of valuation issues.*

As a threshold matter, the Tribune Plan is premised on an artificially depressed valuation analysis. Further, despite the fact that the Debtors are not seeking substantive consolidation, and that the allocation of value between Tribune, the Subsidiary Guarantors and the non-guarantor subsidiaries materially impacts creditor recoveries under the Tribune Plan, the Debtors have failed to provide (i) a separate valuation for each Debtor entity; and (ii) support for the allocation of value as between Tribune and its subsidiaries.

*For all of the Foregoing Reasons, the Administrative Agent
Urges all Creditors to Vote to Reject the Tribune Plan*

> *Wells Fargo Bank, N.A., as successor administrative agent (the "Administrative Agent") under the Bridge Loan Agreement, Recommends that all Creditors Vote to Reject the Proposed Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries dated May 19, 2010 (the "Tribune Plan")*[1]

## OVERVIEW

The Tribune Plan is constructed around and largely implements a purported global settlement (the "Settlement") of fraudulent transfer claims and other causes of action (the "LBO Claims") arising from the leveraged buy-out of Tribune in 2007 (the "LBO").

Under the Settlement and the Tribune Plan:

(A) the Bridge Lenders will recover about $7 million on their $1.6 billion of loans, which is a recovery of less than 0.5%;[2]

(B) the other LBO lenders will recover about $5.5 billion on their remaining $8.7 billion of loan claims, which is a recovery of about 63%; and

(C) the pre-LBO Senior Notes and General Unsecured Claims are to receive approximately $500 million on their aggregate claims of about $1.4 billion, which is a recovery of about 35%.

Absent the Settlement and assuming that (a) none of the LBO Claims have merit, (b) the Company's total distributable value is $6.1 billion, and (c) all contractual subordination is enforced:

(A) the Bridge Lenders' recovery could be at least $74 million, which is a recovery of at least 4.6%;

(B) the other LBO lenders recovery could be about $5.9 billion, which is a recovery of approximately 68%; and

(C) the Senior Notes and General Unsecured Claims could receive about $65 million, which is a recovery of approximately 4.6%.

The Administrative Agent believes that the shifting of recoveries under the Settlement is unfair to the Bridge Lenders, provides improper and undisclosed windfall recoveries to numerous other parties, including the other LBO lenders and the Company's former shareholders, and does not produce a defensible resolution of the underlying issues.

Among other things, the Settlement and the Tribune Plan suffer from the following defects: (1) the Settlement was negotiated among the Debtors, the Creditors Committee and parties who are not estate fiduciaries and who had no interest in protecting the interests of any party, other than their own; (2) the distributable value of the Debtors' business may have been materially understated; (3) distributable value may have been materially over-allocated to the guarantor-subsidiaries; (4) the financial contribution required to resolve the LBO Claims has been materially over-allocated to Tribune; and (5) the Settlement is not premised on a reasonable construct of how fraudulent transfer avoidance would work (a) at the Tribune and Subsidiary Guarantor levels, respectively; (b) with respect to Step 1 and Step 2 of the LBO (whether collapsed or addressed separately); or (c) in respect of payments made in connection with the LBO or post-closing LBO-related obligations.

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Tribune Plan.

[2] If the Bridge Lender class rejects the Tribune Plan, each Bridge Lender who voted against the Tribune Plan will receive "cram down" treatment in accordance with section 1129(b) of the Bankruptcy Code, which would entitle such lender, if and to the extent its claim is Allowed, to receive a distribution up to 4.6% of its Allowed Claim.

## DISCUSSION

*1.    The Disclosure Statement does not provide meaningful support for the Settlement.* The Debtors have represented that their professionals and those of the Creditors' Committee have spent millions of dollars of estate funds investigating and analyzing the LBO Claims. Nevertheless, in the Disclosure Statement, the only support for the Settlement are (a) bare, unsubstantiated conclusions that the Settlement is fair and reasonable, and (b) admonitions that the LBO Claims are complex and the defendants will fight them vigorously, making any litigation protracted, time-consuming and expensive.

> **Deleted:** *and does not include information that would be needed for creditors to formulate an independent view.* ¶
> ¶

The Administrative Agent has made numerous requests that the Debtors include information (if it exists) that would tend to support or justify the Settlement and its disproportionate impact on certain creditor constituencies and that would permit creditors to form their own views on an informed basis. Such requests have been largely rejected by the Debtors and by the Bankruptcy Court at the May 20 hearing on the Disclosure Statement, increasing the Administrative Agent's doubt that an appropriate justification for the Settlement exists.

> **Deleted:** and making it impossible for stakeholders to form an informed view

Among other things, the following information is missing:

> **Deleted:** salient

- Benefits realized at the Subsidiary Guarantor and Tribune levels from Step 1 and Step 2 of the LBO.

- Contemporaneous indicia of the solvency, including the reasonableness of capital (*i.e.*, balance sheets); for the Subsidiary Guarantors and Tribune at Step 1 and Step 2 of the LBO.

> **Deleted:** cash flow projections; and an analysis of the variances of the actual financial performance in 2007 and 2008 against the projections)

- Payments made in connection with the LBO and in respect of obligations incurred thereunder, including (1) identity of each payee (shareholder; lender; advisor; director; management); (2) type of payment (equity; debt; fee; other); (3) amount of payment; and (4) date of payment.

- 

- A presentation of the range of potential creditor recoveries in connection with differing outcomes of the LBO Claims (including the impact of avoidance and disgorgement), including an explanation of how the range was formulated.

> **Deleted:** A discussion of the various potential claims and causes of action that are being resolved in connection with the Settlement, including any basis for differentiation at the Tribune and Subsidiary Guarantor levels.

Based on a review of the information made available in the Company database (but not included in the Disclosure Statement) regarding the foregoing matters, the Administrative Agent has been unable to generate a plausible fraudulent transfer scenario that would support a result even remotely similar to that produced by the Settlement. The Debtors appear to have relied upon the worst case scenarios for the Bridge Lenders with respect to every assumption in the Settlement and Tribune Plan. Based on available information, however, the Administrative Agent believes that **even worst case scenario assumptions would yield higher recoveries for the Bridge Lenders, and under all plausible scenarios, the Bridge Lenders' recoveries would be materially higher.**

*2.    The Settlement is the product of negotiations between parties who have material parochial interests at stake that are not aligned with the interests of the Debtors' estates.*

The principal parties to the Settlement and architects thereof are not the Debtors, but rather, include Senior Lenders, who are potential targets of the LBO Claims. Although not disclosed in the Disclosure Statement, these parties (JPMorgan and Angelo Gordon) are believed to have received substantial payments that, in the absence of the Settlement, may be subject to disgorgement as fraudulent transfers. In addition, they have senior claims at the Subsidiary Guarantor level that naturally motivate them to press for a resolution that would primarily impact recoveries at the Tribune level. For unknown reasons, the Debtors have chosen not to disclose the competing interests of such parties which are furthered by the Settlement, or whether they considered or

investigated this issue in adopting the Settlement in the Tribune Plan. These entities may have negotiated and agreed to the Settlement to obtain releases from the estates of such claims.

*3.    The unjustified structure of the Settlement wrongfully strips the Bridge Lenders of their recovery.*

The Tribune Plan allocates most of the Debtors' distributable value to the Subsidiary Guarantors, where the Bridge Lenders' guarantee claims are subordinated to the guarantee claims of the Senior Lenders, while nearly all of the Settlement consideration (approximately $510 million of value) is to be taken from distributions that would be made to creditors of Tribune. As such, the net effect of the Settlement is to strip from the Bridge Lenders almost their entire recovery in the Chapter 11 Cases (the Bridge Lenders receive a 0.44% recovery on their Bridge Loan Claims and no recovery on their Bridge Loan Guaranty Claims), while allowing the Senior Lenders to retain the vast majority of their recovery (the Senior Lenders receive a 0.44% recovery on their Senior Loan Claims and a 62.41% recovery on their Senior Loan Guaranty Claims).

The Administrative Agent believes this allocation scheme (which the Debtors do not explain or attempt to justify in the Disclosure Statement) is improper for, among other things, the following:

- The Settlement appears to be premised on the potential of an unprecedented partial avoidance of the integrated LBO transactions (*e.g.*, avoidance at the Tribune level with no risk of avoidance at the Subsidiary Guarantors), thereby dramatically over-allocating avoidance risk to creditors of Tribune.

- There is no evidence to suggest that the Subsidiary Guarantors were solvent and that transfers made by such entities would not be subject to potential avoidance in connection with the LBO Claims.

- Without explanation, the structure is inconsistent with the general rule that leveraged buy-out events will be collapsed for fraudulent transfer analysis purposes.

*4.    Most of the potential targets of the LBO Claims contribute no value to the Settlement, but nevertheless receive broad releases and/or recoup their legal fees and costs under the Tribune Plan.*

The Administrative Agent is not aware of any precedent for the proposition that lenders' claims can be eliminated through avoidance of a leveraged buy-out transaction without a concomitant right of the estate to recover from those who received the proceeds of or otherwise received payments in connection with such transaction. [opt out option no longer applies].

**Deleted:** Accordingly, all creditors should "opt out" of these third-party releases by checking the appropriate box on the ballot you will receive

*5.    The Tribune Plan is plagued by a number of valuation issues.*

As a threshold matter, the Tribune Plan is premised on an artificially depressed valuation analysis. Further, despite the fact that the Debtors are not seeking substantive consolidation, and that the allocation of value between Tribune, the Subsidiary Guarantors and the non-guarantor subsidiaries materially impacts creditor recoveries under the Tribune Plan, the Debtors have failed to provide (i) a separate valuation for each Debtor entity; and (ii) support for the allocation of value as between Tribune and its subsidiaries.

> *For all of the Foregoing Reasons, the Administrative Agent*
> *Urges all Creditors to Vote to **Reject** the Tribune Plan*