## EXHIBIT 1

## BLACK LINE DISCLOSURE STATEMENT

[Proposed May 24, 2010 Disclosure Statement to
the Proposed May 19, 2010 Disclosure Statement]

### *CHANGED PAGES ONLY*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| | Jointly Administered |
| Debtors. | |

## PROPOSED DISCLOSURE STATEMENT FOR PROPOSED AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Janet E. Henderson
Kevin T. Lantry
Kerriann S. Mills
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue; Suite 1410
Wilmington, Delaware 19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

May ~~19~~ 24, 2010
Counsel to the Debtors, Debtors in Possession, and Certain Non-Debtor Affiliates

THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS A SOLICITATION OF ACCEPTANCES OF THE PLAN. ACCEPTANCES OF THE PLAN MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE. THE DEBTORS MAY SUPPLEMENT OR AMEND THIS DISCLOSURE STATEMENT OR ANY EXHIBITS ATTACHED HERETO AT ANY TIME PRIOR TO THE HEARING TO

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS 1, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268).  The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

## TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................................ 1
    A.    OVERVIEW OF CHAPTER 11. ........................................................................... 3
    B.    PARTIES ENTITLED TO VOTE ON THE PLAN. ............................................. 4
    C.    SOLICITATION PACKAGE. ................................................................................. 4
    D.    VOTING PROCEDURES, BALLOTS, AND VOTING DEADLINE. .................. 5
    E.    CONFIRMATION HEARING AND DEADLINE FOR OBJECTIONS TO
           CONFIRMATION. ................................................................................................. 5̶6
II. OVERVIEW OF THE PLAN ....................................................................................... 6
    A.    GENERAL OVERVIEW. ....................................................................................... 6
    B.    PLAN TREATMENT ............................................................................................. 7
    C.    SUMMARY OF ALLOWED CLAIMS AGAINST AND INTERESTS IN
           EACH OF THE DEBTORS AND OF ESTIMATED RECOVERIES IN
           RESPECT THEREOF. ............................................................................................ 9
          1.    Summary of Estimated Unclassified Claims Against all Debtors and of
               Estimated Recoveries in Respect Thereof. ................................................. 1̶0̶11
          2.    Summary of Estimated Allowed Claims and Interests against Tribune
               and the Filed Subsidiary Debtors and of Estimated Recoveries in Respect
               Thereof. ..................................................................................................... 11
          3.    Summary of Estimated Allowed Claims Against and Interests for Each
               Guarantor Non-Debtor, if any, that becomes a Debtor and of Estimated
               Recoveries in Respect Thereof. .................................................................. 14
    D.    FCC APPROVAL. ................................................................................................... 15
          1.    Required FCC Consents. ........................................................................... 1̶5̶16
          2.    Information Required from Prospective Stockholders of Reorganized
               Tribune. ..................................................................................................... 16
III. GENERAL INFORMATION ...................................................................................... 18
    A.    THE DEBTORS' BUSINESSES AND PROPERTIES. ...................................... 18
          1.    Company Overview. ................................................................................... 18
          2.    The Debtors' Properties. ........................................................................... 1̶8̶19
    B.    OPERATIONS OF THE DEBTORS. ................................................................... 19
          1.    Publishing Segment. .................................................................................. 19
          2.    Broadcasting Segment. ............................................................................. 2̶3̶24
          3.    Additional Investments. ............................................................................ 25
    C.    RECENT OPERATIONS. ..................................................................................... 27
    D.    CURRENT MANAGEMENT OF THE DEBTORS. .......................................... 28
          1.    Board of Directors. .................................................................................... 28
          2.    Subcommittees of the Board of Directors. ................................................ 28
          3.    Compensation of Directors. ...................................................................... 28
          4.    Executive Officers. .................................................................................... 29
IV. SUMMARY OF CERTAIN PREPETITION LIABILITIES ....................................... 29
    A.    PREPETITION FUNDED DEBT AND CAPITAL STRUCTURE OF THE
           TRIBUNE ENTITIES. .......................................................................................... 29
          1.    Prepetition Capital Structure. .................................................................... 29
          2.    Prepetition Funded Debt Structure. ........................................................... 30
    B.    PREPETITION TRADE PAYABLES & OTHER OPERATING LIABILITIES. .. 34
    C.    PREPETITION COMPENSATION AND BENEFIT PROGRAMS. .................. 34
          1.    Compensation and Benefit Programs in Effect as of the Petition Date that
               will be continued Pursuant to the Plan. ..................................................... 35
          2.    Compensation and Benefit Programs in Effect as of the Petition Date that
               will not be continued Pursuant to the Plan. ............................................... 1̶2̶41

  D.  PENDING LITIGATION AND CERTAIN OTHER LEGAL MATTERS
     INVOLVING THE DEBTORS ............................................................. ~~44~~43
    1. *Newsday* and *Hoy* Circulation Misstatements. ........................... ~~45~~44
    2. ESOP Lawsuit. .............................................................................. ~~46~~45
    3. FCC Related Matters. ................................................................... ~~47~~46
    4. Miscellaneous Other Litigation. .................................................. ~~48~~47
V. EVENTS LEADING UP TO CHAPTER 11 ................................................. ~~48~~47
VI. EVENTS DURING THE CHAPTER 11 CASES ......................................... ~~49~~48
  A.  PROCEDURAL MOTIONS ..................................................... ~~49~~48
  B.  "FIRST-DAY" MOTIONS ....................................................... ~~49~~48
  C.  EMPLOYEE COMPENSATION AND BENEFITS. ................. ~~50~~49
  D.  CASH MANAGEMENT. ........................................................... ~~51~~50
  E.  POST-PETITION FINANCING. ................................................ ~~51~~50
  F.  PROFESSIONAL RETENTIONS. ........................................... ~~52~~51
    1. Retention of Professionals by the Debtors' Estates. .................. ~~52~~51
    2. The Creditors Committee and its Advisors. ................................ 52
  G.  CERTAIN ADMINISTRATIVE MATTERS AND OTHER MOTIONS. ...... ~~53~~52
    1. Disposition of Certain Executory Contracts and Unexpired Leases. ........ ~~53~~52
    2. Certain other Motions filed by the Debtors. ............................... ~~55~~54
    3. Fee Disgorgement Motion. ........................................................... ~~55~~54
    4. Schedules of Assets and Liabilities; Statements of Financial Affairs. ...... ~~56~~55
    5. Filed Claims and Bar Date. ........................................................... ~~56~~55
    6. Bankruptcy Rule 2015.3 Reports. ............................................... ~~56~~55
    7. Analysis of Potential Preferential Payments. ............................. ~~57~~56
  H.  CHICAGO CUBS TRANSACTION. ........................................ ~~58~~57
  I.  MORGAN STANLEY SWAP AGREEMENT .......................... ~~59~~58
  J.  APPOINTMENT OF AN EXAMINER ..................................... ~~60~~59
VII. SETTLEMENT OF CLAIMS RELATING TO THE LEVERAGED ESOP TRANSACTIONS ~~61~~60
  A.  THE LEVERAGED ESOP TRANSACTIONS. ........................ ~~62~~61
  B.  INVESTIGATION OF THE LBO-RELATED CAUSES OF ACTION. ........ ~~62~~64
  C.  PROCEEDINGS RELATED TO LEVERAGED ESOP TRANSACTIONS. .... ~~63~~65
  D.  LBO-RELATED CAUSES OF ACTION. .................................. ~~63~~65
  E.  EFFORTS TO SETTLE THE LBO-RELATED CAUSES OF ACTION. ....... ~~64~~66
  F.  THE REASONABLENESS OF THE PROPOSED SETTLEMENT. ........... ~~64~~66
VIII. EXCLUSIVITY PERIOD. ...................................................................... ~~66~~68
IX. THE PLAN OF REORGANIZATION ....................................................... ~~66~~68
  A.  CLASSIFICATION AND ALLOWANCE OF CLAIMS AND EQUITY
     INTERESTS GENERALLY. ..................................................... ~~67~~68
  B.  PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS,
     DIP FACILITY CLAIMS, AND PRIORITY TAX CLAIMS. ...... ~~67~~69
    1. DIP Facility Claims. ..................................................................... ~~67~~69
    2. Administrative Expense Claims. ................................................... ~~68~~69
    3. Priority Tax Claims. ...................................................................... ~~69~~70
  C.  TREATMENT OF CLAIMS AND EQUITY INTERESTS. ....... ~~69~~71
    1. The Debtors, Filed Subsidiary Debtors, and Guarantor Non-Debtors. ..... ~~69~~71
    2. Classification of Claims against the Debtors under the Plan. ..... ~~72~~74
  D.  PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS UNDER
     THE PLAN. ............................................................................... ~~73~~75
    1. Classification and Treatment of Claims Against Tribune (Debtor 1). ....... ~~73~~75
    2. Classification and Treatment of Claims Against and Interests in Filed
     Subsidiary Debtors (Debtors 2 through 111). ............................. ~~78~~80

iii

|  | 3. | Prepackaged Plans for and Treatment of Claims Against and Interests In Guarantor Non-Debtors, If Any, That Become Debtors. | 81 83 |
| E. | | MEANS FOR IMPLEMENTATION OF THE PLAN. | 82 84 |
|  | 1. | Restructuring Transactions. | 82 84 |
| F. | | CORPORATE GOVERNANCE, DIRECTORS, OFFICERS AND CORPORATE ACTION. | 83 85 |
|  | 1. | Certificate of Incorporation, By-Laws, Limited Liability Company Agreement; Limited Liability Partnership Agreement. | 83 85 |
|  | 2. | Directors and Officers of Reorganized Tribune. | 84 86 |
|  | 3. | Ownership and Management of Reorganized Debtors Other Than Reorganized Tribune. | 84 86 |
| G. | | ISSUANCE AND DISTRIBUTION OF NEW SECURITIES AND RELATED MATTERS. | 84 86 |
|  | 1. | Issuance of New Securities. | 84 86 |
|  | 2. | Distribution of New Common Stock and New Warrants. | 85 87 |
|  | 3. | New Senior Secured Term Loan Agreement. | 90 92 |
|  | 4. | Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors. | 91 92 |
|  | 5. | Cancellation of Loan Agreements, Loan Guaranty Agreements, the Pledge Agreement, Notes Issued Under the Loan Agreements, Senior Notes, Debentures, Instruments, Indentures, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock and Other Tribune Interests. | 91 93 |
|  | 6. | Cancellation of Liens and Guaranties. | 92 94 |
|  | 7. | Exit Facility. | 92 94 |
|  | 8. | Equity Incentive Plan. | 92 94 |
|  | 9. | Sources of Cash for Plan Distributions. | 93 94 |
|  | 10. | Additional Transactions Authorized Under the Plan. | 93 95 |
|  | 11. | Settlement of Claims and Controversies. | 93 95 |
|  | 12. | Preservation of Rights of Action and Settlement of Litigation Claims. | 95 97 |
|  | 13. | FCC Applications. | 95 97 |
| H. | | ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES. | 95 97 |
|  | 1. | Assumption, Rejection and Cure Obligations. | 95 97 |
|  | 2. | Cure of Defaults of Assumed Executory Contracts and Unexpired Leases. | 96 98 |
|  | 3. | Rejection of Executory Contracts and Unexpired Leases. | 97 99 |
|  | 4. | Rejection Damages Bar Date. | 97 99 |
|  | 5. | Compensation and Benefit Programs. | 97 99 |
|  | 6. | Collective Bargaining Agreements. | 97 100 |
|  | 7. | Post-Petition Contracts and Leases. | 97 100 |
|  | 8. | Termination of ESOP. | 98 100 |
| I. | | PROVISIONS GOVERNING DISTRIBUTIONS TO HOLDERS OF CERTAIN ALLOWED CLAIMS AND INTERESTS UNDER THE PLAN. | 98 101 |
|  | 1. | General. | 98 101 |
|  | 2. | Distributions for Certain Claims. | 98 101 |
|  | 3. | Distributions to Holders of General Unsecured Claims Against Filed Subsidiary Debtors. | 99 101 |
|  | 4. | Special Provisions Governing Distributions to Holders of Loan Claims and Loan Guaranty Claims. | 99 102 |
|  | 5. | Interest on Claims. | 100 102 |
|  | 6. | Distributions by Disbursing Agent. | 100 102 |

iv

|  | 7. | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 103 |
|  | 8. | Record Date for Distributions | 103 |
|  | 9. | Allocation of Plan Distributions Between Principal and Interest. | 104 |
|  | 10. | Means of Cash Payment. | 104 |
|  | 11. | Withholding and Reporting Requirements. | 104 |
|  | 12. | Setoffs. | 105 |
|  | 13. | Fractional Shares. | 105 |
|  | 14. | De Minimis Distributions. | 105 |
|  | 15. | Special Provision Regarding Unimpaired Claims. | 105 |
|  | 16. | Subordination. | 105 |
| J. | PROVISIONS FOR RESOLVING DISPUTED CLAIMS AND DISPUTED INTERESTS. | | 106 |
|  | 1. | Objections to and Estimation of Claims. | 106 |
|  | 2. | Payments and Distributions on Disputed, Contingent, and Unliquidated Claims and Interests and On Claims for Which Proofs of Claim are Filed. | 106 |
| K. | CONFIRMATION AND CONSUMMATION OF THE PLAN. | | 106 |
|  | 1. | Conditions to Effective Date of the Plan. | 106 |
|  | 2. | Waiver of Conditions. | 107 |
|  | 3. | Consequences if Confirmation Order is Vacated. | 107 |
| L. | INJUNCTIONS, RELEASES AND DISCHARGE. | | 107 |
|  | 1. | Discharge. | 107 |
|  | 2. | Releases | 108 |
|  | 3. | Bar Order. | 112 |
|  | 4. | Supplemental Injunction. | 113 |
|  | 5. | Disallowed Claims and Disallowed Interests. | 114 |
|  | 6. | Exculpation. | 114 |
|  | 7. | Corporate Indemnities. | 114 |
|  | 8. | Term of Bankruptcy Injunction or Stays. | 116 |
| M. | RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT. | | 116 |
| N. | CERTAIN ADDITIONAL PROVISIONS OF THE PLAN. | | 116 |
|  | 1. | Surrender of Instruments. | 116 |
|  | 2. | Creditors Committee. | 116 |
|  | 3. | Post-Confirmation Date Retention of Professionals | 116 |
|  | 4. | Effectuating Documents and Further Transactions. | 116 |
|  | 5. | Exemption from Transfer Taxes. | 117 |
|  | 6. | Paid-in Capital of Corporate Reorganized Debtors. | 117 |
|  | 7. | Payment of Statutory Fees. | 117 |
|  | 8. | Amendment or Modification of the Plan. | 117 |
|  | 9. | Certain Provisions Pertaining to Senior Lender Settlement Committee and Centerbridge. | 118 |
| X. VOTING PROCEDURES AND REQUIREMENTS | | | 118 |
| A. | VOTING DEADLINE. | | 118 |
| B. | HOLDERS OF CLAIMS ENTITLED TO VOTE | | 119 |
| C. | VOTE REQUIRED FOR ACCEPTANCE BY A CLASS | | 120 |
|  | 1. | Class of Claims. | 120 |
|  | 2. | Class of Interests. | 120 |
| D. | VOTING PROCEDURES | | 120 |
|  | 1. | Ballots. | 120 |
|  | 2. | Special Instructions for Beneficial Holders of Senior Noteholder Claims. | 121 |
|  | 3. | Special Instructions for Holders of General Unsecured Claims Against Tribune Concerning the Convenience Class Election. | 121 |

|  | | 4. | Withdrawal or Change of Votes on the Plan. | ~~118~~121 |
| XI. | CONFIRMATION OF THE PLAN | | | ~~118~~121 |
|  | A. | | CONFIRMATION HEARING | ~~118~~121 |
|  | B. | | STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN. | ~~119~~122 |
|  | | 1. | Acceptance. | ~~119~~122 |
|  | | 2. | Fair and Equitable Test. | ~~120~~123 |
|  | | 3. | Feasibility. | ~~121~~124 |
|  | | 4. | Best Interests Test and Liquidation Analysis. | ~~122~~125 |
| XII. | PROJECTED FINANCIAL INFORMATION AND REORGANIZATION VALUE | | | ~~123~~126 |
|  | A. | | PROJECTED FINANCIAL INFORMATION. | ~~123~~126 |
|  | B. | | REORGANIZATION VALUE. | ~~124~~127 |
|  | | 1. | Overview. | ~~124~~127 |
|  | | 2. | Valuation Methodology. | ~~126~~129 |
| XIII. | DESCRIPTION OF DEBT AND CAPITAL STRUCTURE OF REORGANIZED DEBTORS | | | ~~129~~132 |
|  | A. | | NEW SENIOR SECURED TERM LOAN AGREEMENT. | ~~129~~132 |
|  | B. | | DESCRIPTION OF EXIT FACILITY | ~~130~~133 |
|  | C. | | DESCRIPTION OF CAPITAL STOCK. | ~~130~~133 |
| XIV. | RISK FACTORS | | | ~~130~~133 |
|  | A. | | GENERAL BANKRUPTCY LAW CONSIDERATIONS AND RISKS RELATED TO THE PLAN. | ~~130~~134 |
|  | | 1. | Objections to the Classification of Claims May Change the Composition of the Classes and the Vote Required of Each Class for the Approval of the Plan. | ~~130~~134 |
|  | | 2. | Failure to Obtain Confirmation of the Plan May Result in Liquidation or Alternative Plan on Less Favorable Terms. | ~~131~~134 |
|  | | 3. | Undue Delay in Confirmation of the Plan May Disrupt the Debtors' Operations. | ~~131~~135 |
|  | | 4. | If the Effective Date Fails to Occur, the Debtors May Liquidate or Adopt an Alternative Plan with Less Favorable Terms. | ~~132~~135 |
|  | B. | | FCC-RELATED CONSIDERATIONS AND RISKS RESPECTING THE DEBTORS' BUSINESSES. | ~~132~~135 |
|  | | 1. | The FCC Must Approve the Debtors' FCC Applications before Emergence from Bankruptcy. | ~~132~~135 |
|  | | 2. | Inability to Obtain FCC Approval and Media Ownership Waivers Would Adversely Affect Ability to Consummate the Plan. | ~~134~~137 |
|  | C. | | RISKS RELATED TO THE DEBTORS' BUSINESSES. | ~~136~~139 |
|  | | 1. | The Debtors' Actual Financial Results May Vary Significantly From the Projections. | ~~136~~139 |
|  | | 2. | Failure to Attract and Maintain Employees May Adversely Affect the Debtors' Financial Results. | ~~137~~140 |
|  | | 3. | Adverse Publicity in Connection with the Chapter 11 Cases or Otherwise Could Negatively Affect Business. | ~~137~~140 |
|  | | 4. | Advertising Demand Will Continue to be Impacted by Changes in Economic Conditions and Fragmentation of the Media Landscape. | ~~137~~140 |
|  | | 5. | Circulation and Audience Share May Continue to Decline as Consumers Migrate to Other Media Alternatives. | ~~138~~141 |
|  | | 6. | Changes in the Regulatory Landscape Could Affect the Debtors' Business Operations and Asset Mix. | ~~139~~142 |
|  | | 7. | The Availability and Cost of Quality Network-Provided and Syndicated Programming May Impact the Debtors' Television Ratings. | ~~140~~143 |

8. Newsprint Prices May Continue to be Volatile and Difficult to Predict and Control. ........................................................................ ~~141~~144
9. The Debtors' Ability to Grow Depends on the Development of the Debtors' Interactive Businesses. ................................................. ~~141~~144
10. The Debtors' Success Will Depend on the Debtors' Ability to Adapt to Technological Change. ...................................................... ~~142~~145
11. Historical Financial Information Will Not be Comparable. ............ ~~142~~145
12. The Debtors May be Required to Write Down Goodwill or Other Intangible Assets Which May Adversely Affect Their Financial Position and Results of Operations. ........................................................ ~~142~~145
13. Events Beyond the Debtors' Control May Result in Unexpected Adverse Operating Results. ...................................................... ~~143~~146
14. Changes in Accounting Standards Can Significantly Impact the Debtors' Reported Earnings and Operating Results. ....................... ~~143~~146
15. Adverse Results from Litigation or Governmental Investigations can Impact the Debtors' Business Practices and Operating Results. ........ ~~143~~146
16. The Debtors Could be faced with Additional Tax Liabilities. ......... ~~143~~146
17. The Debtors' Company-Sponsored Pension Plans are Currently Underfunded, and Over Time the Debtors Will Likely be Required to Make Cash Contributions to the Plans, Reducing the Cash Available for Working Capital and Other Corporate Uses. ............................ ~~143~~146
18. Labor Strikes, Lock-Outs and Protracted Negotiations can Lead to Business Interruptions and Increased Operating Costs. ................. ~~144~~147
19. Acquisitions, Investments and Dispositions Pose Inherent Financial and Other Risks and Challenges. ................................................. ~~144~~147
20. The Reorganized Debtors May Continue to Have Substantial Indebtedness. .................................................................. ~~144~~147
D. RISKS TO CREDITORS WHO WILL RECEIVE SECURITIES ....... ~~145~~148
1. The Lack of an Established Market for the Securities May Adversely Affect the Liquidity of the New Common Stock and the New Warrants. ~~145~~148
2. Lack of Dividends May Adversely Affect Liquidity of the New Common Stock. ........................................................................ ~~146~~149
3. Future Sales or Issuances of Equity, Including Issuances in Respect of New Warrants to Purchase New Class A Common Stock, May Depress the Stock Price of the New Common Stock. ......................... ~~146~~149
4. The Limited Voting Rights of the New Class B Common Stock and the Lack of Voting Rights of the New Warrants Could Impact their Attractiveness to Investors and, as a Result, their Market Value. ...... ~~146~~149
5. Certain Holders May be Restricted in Their Ability to Transfer or Sell Their Securities. ................................................................ ~~147~~149
XV. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......... ~~147~~150
A. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS. ........ ~~148~~151
1. Termination of Subchapter S Corporation Status. ..................... ~~148~~151
2. Cancellation of Debt and Reduction of Tax Attributes. ............... ~~148~~151
B. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS. .......................................................... ~~149~~152
1. General. ...................................................................... ~~149~~152
2. Market Discount. .......................................................... ~~150~~153
3. U.S. Holders of Loan Claims and Loan Guaranty Claims (not including the Barclays Swap Claim). .............................................. ~~150~~153
4. U.S. Holders of Senior Noteholder Claims. ............................ ~~152~~154

|    |    |    |
|----|----|----|
| 5. | U.S. Holders of General Unsecured Claims (not including Claims arising from a Non-Qualified Former Employee Benefit Plan). | ~~152~~155 |
| 6. | U.S. Holders of Convenience Claims. | ~~152~~155 |
| 7. | U.S. Holders of Claims arising from a Non-Qualified Former Employee Benefit Plan. | ~~153~~155 |
| 8. | U.S. Holders of EGI-TRB LLC Notes Claims. | ~~153~~156 |
| 9. | U.S. Holders of PHONES Notes Claims. | ~~153~~156 |
| 10. | U.S. Holders of Securities Litigation Claims. | ~~153~~156 |
| 11. | U.S. Holders of Tribune Interests. | ~~154~~156 |
| 12. | Definition of "Security." | ~~154~~156 |
| 13. | Federal Income Tax Treatment of the New Senior Secured Term Loan. | ~~154~~157 |
| 14. | Non-United States Persons. | ~~155~~157 |
| 15. | Information Reporting and Backup Withholding. | ~~155~~157 |
| C. | FEDERAL INCOME TAX TREATMENT OF OTHER PARENT CLAIMS RESERVES AND SUBSIDIARY GUC RESERVES. | ~~155~~158 |
| D. | IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE. | ~~155~~158 |
| E. | RESERVATION OF RIGHTS. | ~~156~~159 |
| XVI. | CERTAIN FEDERAL, STATE AND FOREIGN SECURITIES LAW CONSIDERATIONS | ~~156~~159 |
| A. | FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS. | ~~156~~159 |
| B. | SUBSEQUENT TRANSFERS OF NEW SECURITIES. | ~~156~~159 |
| XVII. | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | ~~156~~160 |
| A. | CONTINUATION OF THE CHAPTER 11 CASES | ~~157~~160 |
| B. | LIQUIDATION UNDER CHAPTER 7 OR CHAPTER 11 | ~~157~~160 |
| XVIII. | CONCLUSION AND RECOMMENDATION | ~~157~~160 |

viii

## INDEX OF EXHIBITS

Exhibit A    -    Proposed Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries

Exhibit B    -    Settlement Term Sheet

Exhibit C    -    Corporate Organizational Chart

Exhibit D    -    ~~Submissions by Certain Interested Parties Regarding the Leveraged ESOP TransactionsExhibit E~~    -    Offer to Purchase, filed by Tribune April 27, 2007

Exhibit ~~F~~E    -    Collective Bargaining Agreements

Exhibit ~~G~~F    -    Financial Projections

Exhibit ~~H~~G    -    Liquidation Analysis

Exhibit ~~I~~H    -    Selected Historical Financial Information

# I. INTRODUCTION

On December 8, 2008 (the "Petition Date"), Tribune Company ("Tribune") and certain of its subsidiaries (collectively, the "Debtors")[2] filed voluntary petitions for relief (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). An additional Debtor, Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club, LLC) ("Tribune CNLBC"), Tribune's subsidiary that held the majority of the assets related to the business of the Chicago Cubs Major League Baseball franchise (the "Chicago Cubs"), commenced a Chapter 11 Case on October 12, 2009 as one of the steps necessary to complete a transaction involving the Chicago Cubs and certain related assets. In all, the Debtors now comprise 111 entities.

On April 12, 2010, the Debtors filed the Joint Plan of Reorganization for Tribune and Its Subsidiaries (as the same may be amended from time to time, the "Plan") with the Bankruptcy Court. A copy of the Plan is attached hereto as Exhibit A. The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan also constitutes a Prepackaged Plan for any Guarantor Non-Debtors for which the commencement of a chapter 11 case becomes necessary or appropriate to conclude the restructuring provided under the Plan. The Guarantor Non-Debtors are (i) Tribune (FN) Cable Ventures, Inc.; (ii) Tribune Interactive, Inc.; (iii) Tribune ND, Inc.; and (iv) Tribune National Marketing Company.[3]

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in each of the Debtors in connection with (i) the solicitation of acceptances of the Plan and (ii) the hearing to consider confirmation of the Plan scheduled for [●], 2010, commencing at [●].m. prevailing Eastern Time. The purpose of this Disclosure Statement is to describe the Plan and its provisions, provide certain information, as required under section 1125 of the Bankruptcy Code, to creditors who will have the right to vote on the Plan so that they can make an informed decision in doing so, and to urge such creditors to vote to accept the Plan. Creditors entitled to vote to accept or reject the Plan will receive a Ballot (as defined herein) together with this Disclosure Statement to enable them to vote on the Plan. **Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan; provided, however, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.**

This Disclosure Statement includes, among other things, information pertaining to the Debtors' prepetition business operations and financial history and the events leading to the filing of the above-captioned Chapter 11 Cases. This Disclosure Statement also contains information respecting significant events that have occurred during these Chapter 11 Cases. In addition, an overview of the Plan is included, which sets forth certain terms and provisions of the Plan, the effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. This Disclosure Statement also discusses the confirmation process and the procedures for voting, which must be followed by the Holders of Claims entitled to vote under the Plan for their votes to be counted.

A Ballot for the acceptance or rejection of the Plan is also enclosed with the Disclosure Statement transmitted to each Holder of a Claim entitled to vote on the Plan.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES, AND CONFIRMATION, OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS REGARDING THE PLAN OR THE

---

[2] The Debtors are set forth on the cover page of this Disclosure Statement.

[3] For a further discussion of the Guarantor Non-Debtors, please refer to Article II.C.3, Article IX.C.1, Article IX.D.3, Article XI.B.1, and Article XII.B.

CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

THE DEBTORS' MANAGEMENT, IN CONSULTATION WITH THEIR PROFESSIONAL ADVISORS, PREPARED THE FINANCIAL PROJECTIONS.  WHILE THE DEBTORS HAVE PRESENTED THESE FINANCIAL PROJECTIONS WITH NUMERICAL SPECIFICITY, THEY HAVE NECESSARILY BASED THE FINANCIAL PROJECTIONS ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE DEBTORS' AND THE REORGANIZED DEBTORS' CONTROL.  THE DEBTORS CAUTION THAT THEY DO NOT AND CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO THE DEBTORS' OR THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHERMORE, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES.  ALTERNATIVELY, ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE FINANCIAL PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

SUBJECT TO APPLICABLE THIRD CIRCUIT LAW, AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  SUBJECT TO APPLICABLE THIRD CIRCUIT LAW, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN EITHER THE DEBTORS OR THE REORGANIZED DEBTORS.

A.    **Overview of Chapter 11.**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders.  In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote the equality of treatment of similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor.  Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor.  Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from all debts that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

3

After a plan of reorganization has been filed in a chapter 11 case, certain holders of claims against or equity interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan. The Debtors are submitting this Disclosure Statement to Holders of Claims against and Interests in each Debtor in order to satisfy the requirements of section 1125 of the Bankruptcy Code.

**B.    Parties Entitled to Vote on the Plan.**

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan. Creditors or equity interest holders whose claims or interests are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote. Creditors or equity interest holders whose claims or interests are impaired by a plan, but who will receive no distribution under the plan, are also not entitled to vote because they are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code. For a discussion of these matters, see Article X, "Voting Procedures and Requirements" and Article XI, "Confirmation of the Plan."

For a detailed description of the Classes of Claims and Interests and their treatment under the Plan, see Article IX.A-D of this Disclosure Statement. In addition, the following summary chart sets forth the Classes that are entitled to vote on the Plan:

| Class | Description |
|---|---|
| 1C | Senior Loan Claims against Tribune |
| 1D | Bridge Loan Claims against Tribune |
| 1E | Senior Noteholder Claims against Tribune |
| 1F | Other Parent Claims against Tribune |
| 50C-111C | Senior Loan Guaranty Claims against relevant Guarantor Debtors |
| 2E-111E | General Unsecured Claims against relevant Filed Subsidiary Debtors |

* As further explained in Article IX.D of this Disclosure Statement, in respect of the Plan, the votes cast by Holders of Allowed Loan Guaranty Claims in Classes 50C through 111C will also be counted as votes cast on the Prepackaged Plan of the relevant Guarantor Non-Debtors that may become Debtors.

**C.    Solicitation Package.**

Accompanying this Disclosure Statement (which is provided on CD-ROM) is a package of hard copy materials called the "Solicitation Package." The Solicitation Package contains copies of, among other things:

- the Bankruptcy Court order approving the Disclosure Statement and procedures for soliciting and tabulating votes on the Plan (the "Solicitation Order") which, among other things, approves this Disclosure Statement as containing adequate information, schedules the Confirmation Hearing, sets the voting deadline, sets out the procedures for distributing Solicitation Packages to the Holders of Claims against the Debtors, establishes the procedures for tabulating Ballots used in voting on the Plan, and sets the deadline for objecting to confirmation of the Plan;
- the Notice of the Hearing to Consider Confirmation of the Plan; ~~and~~
- one or more Ballots and a postage-paid return envelope (Ballots are provided only to Holders of Claims that are entitled to vote on the Plan), which will be used by creditors and interest holders who are entitled to vote on the Plan; and
- a compendium containing submissions (collectively, the "Settlement Submissions") prepared by the following creditors or creditor representatives which set forth their respective views concerning the LBO-Related Causes of Action and the Global

4

Settlement; (i) the Creditors Committee; (ii) the Settlement Supporters (as defined in their submission); (iii) the Credit Agreement Lenders (as defined in their submission); (iv) Wells Fargo Bank, N.A. as successor administrative agent under the Bridge Loan Agreement; and (v) Wilmington Trust Company, as successor indenture trustee for the PHONES Notes. The Settlement Submissions were not prepared by the Debtors; they were solely prepared by and express the views of the parties who tendered the Settlement Submissions. The Debtors disagree with many of the factual and legal assertions contained in certain of the Settlement Submissions. The Debtors' views in respect of the Global Settlement may be found in Article VII herein.

**D.      Voting Procedures, Ballots, and Voting Deadline.**

After carefully reviewing the materials in the Solicitation Package and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan. Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

In order for your vote to be counted, you must complete and sign your original Ballot and return it in the envelope provided. Only original signatures will be accepted. Please return your completed Ballot to the Voting Agent, unless you are a beneficial holder of a Senior Noteholder Claim (as defined below) who receives a Ballot from a broker, bank, commercial bank, trust company, dealer, or other agent or nominee (each, a "Voting Nominee"), in which case you must return the Ballot to such Voting Nominee. Ballots should not be sent to the Debtors or to the indenture trustee(s) for the Senior Notes.

**If you are a beneficial holder of a Senior Noteholder Claim who receives a Ballot from a Voting Nominee, in order for your vote to be counted, your Ballot must be completed in accordance with the voting instructions on the Ballot and received by the Voting Nominee in enough time for the Voting Nominee to transmit a Master Ballot to the Voting Agent so that it is received no later than [●], 2010 at 4:00 p.m. (prevailing Eastern time) (the "Voting Deadline"). If you are the Holder of any other type of Claim, in order for your vote to be counted, your Ballot must be properly completed in accordance with the voting instructions on the Ballot and received by Epiq Bankruptcy Solutions, LLC (the "Voting Agent") no later than the Voting Deadline. Any Ballot received after the Voting Deadline shall be counted at the sole discretion of the Debtors. Do not return any debt instruments or equity securities with your Ballot.**

**Any executed Ballot that does not indicate either an acceptance or rejection of the Plan or indicates both an acceptance and rejection of the Plan will not be counted as a vote either to accept or reject the Plan.**

If you are a Holder of a Claim who is entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, please call the Voting Agent at (646) 282-2400 or toll-free at (800) 622-1125.

If you have any questions about the procedure for voting your Claim, the packet of materials that you have received, the amount of your Claim, or if you wish to obtain, at your own expense, an additional copy of this Disclosure Statement and its appendices and Exhibits, please contact the Voting Agent.

FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE <u>ARTICLE X</u>, "VOTING PROCEDURES AND REQUIREMENTS."

Before voting on the Plan, each Holder of Claims in Classes that are entitled to vote on the Plan should read, in its entirety, this Disclosure Statement, the Plan, the Solicitation Order, the notice of the

shall be fully binding and effective.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Global Settlement and the Bankruptcy Court's finding that the Global Settlement is in the best interests of the Debtors, the Reorganized Debtors, their respective Debtors' Estates, and the Holders of Claims and Interests and is fair, equitable, and reasonable.  By providing a complete resolution of the LBO-Related Causes of Action, the Global Settlement embodied in the Plan allows the Debtors to exit bankruptcy in a timely and efficient manner, unhampered by the enormous costs, distraction and likely damage to operations occasioned by years of litigation.  Please refer to Article VII herein for a more detailed discussion of the Global Settlement.

The following  Plan Treatment section provides an overview of the treatment of different classes of Claims and Interests under the Plan, and reflects the allocation, pursuant to the Global Settlement, of (i) approximately 7.0% of total Distributable Value (to which Holders of Allowed Loan Claims would otherwise claim entitlement) to the Holders of Senior Noteholder Claims and Other Parent Claims and (ii) approximately 1.4% of total Distributable Value (to which Holders of Allowed Loan Guaranty Claims would otherwise claim entitlement) to the Holders of General Unsecured Claims against Filed Subsidiary Debtors, resulting in the payment in full (without post-petition interest) of these General Unsecured Claims, assuming the Allowed amount of such Claims does not exceed $150 million.[34]  The Debtors value the aggregate additional consideration to be provided to Holders of Senior Noteholder Claims, Other Parent Claims, and General Unsecured Claims against Filed Subsidiary Debtors pursuant to the Global Settlement at more than $510 million.

## B.    **Plan Treatment**

Under the Plan generally, all Allowed Administrative Expense Claims, Allowed DIP Facility Claims, Allowed Priority Tax Claims, and Allowed Convenience Claims against Tribune will be paid in full. Convenience Claims, however, will not receive post-petition interest.  All Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, and Interests in the Filed Subsidiary Debtors will be Reinstated.  The Plan provides no recovery to the Holders of Securities Litigation Claims, Tribune Interests, PHONES Notes Claims, EGI-TRB LLC Notes Claims, and Bridge Loan Guaranty Claims and further provides that Intercompany Claims shall be deemed satisfied, discharged, and extinguished in full and shall be eliminated as of the Effective Date.

As more fully described in the Plan and Article II.D hereof, which sets forth the estimated recoveries on account of each Class of Claims against and Interests in the Debtors, the Plan provides the following:

- Holders of Allowed Senior Loan Claims (Class 1C) shall receive, subject to Section 5.4.2 of the Plan, a Pro Rata share, calculated together with the Holders of Claims in Class 1D that are Allowed pursuant to Section 3.2.4(i), of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation, and the Loan Claims Stock Allocation.  Loan Claims Loan Allocation means 8.8% of the New Senior Secured Term Loan minus (a) the amount of the New Senior Secured Term Loan to be distributed to Holders of Allowed Claims in Class 1E and (b) the portion of the Other Parent Claims Allocation that is New Senior Secured Term Loan.  Loan Claims Cash Allocation means 8.8% of the Distributable Cash minus (A) the amount of the Distributable Cash to be distributed to Holders of Allowed Claims in Class 1E, (B) the portion of the Other Parent Claims Allocation that is Distributable Cash and (C) the amount of Cash to be distributed to Holders of Allowed Claims in Class 1G.  Loan Claims Stock Allocation means 8.8% of the New Common Stock (subject to dilution by the Equity Incentive Plan) minus (A) the amount of the New Common Stock to be distributed to Holders of Allowed Senior Noteholder Claims and (B) the portion of the Other Parent Claims Allocation that is New Common Stock.

---

[34] Please refer to Article XII for a discussion of the term "Distributable Value."

- The following treatment shall apply to (i) all Holders of Bridge Loan Claims if Class 1D votes to accept the Plan, or (ii) each Holder of a Bridge Loan Claim that votes to accept the Plan if Class 1D votes to reject the Plan: Each such Holder of a Bridge Loan Claim shall (a) as of the Effective Date, have its Claim Allowed in an amount equal to the principal amount of such Claim plus accrued interest as of the Petition Date, and (b) on or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Bridge Loan Claim against Tribune, subject to Section 5.4.2 of the Plan, receive such Holder's Pro Rata share, calculated together with the Holders of Allowed Claims in Class 1C, of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation.

   If Class 1D votes to reject the Plan, the following treatment shall apply to each Holder of a Bridge Loan Claim that votes to reject the Plan or does not return a Ballot on the Plan: Each such Holder of a Bridge Loan Claim shall (a) have its Claim treated as a Disputed Claim unless and until Allowed by Final Order, and (b) in full satisfaction, settlement, release and discharge of and in exchange for such Bridge Loan Claim against Tribune, subject to Section 5.4.2 of the Plan, receive, if ultimately Allowed, such distribution and treatment as may be proposed by the Debtors that would satisfy the requirements of section 1129(b) of the Bankruptcy Code not to exceed an amount determined by application of the mid-point estimate of total "Distributable Value" as defined and set forth herein and the allocation of such "Distributable Value" underlying the recoveries of Holders of Claims against Tribune under the Plan if such Bridge Loan Claims becomes Allowed.

- Holders of Allowed Senior Noteholder Claims (Class 1E) shall receive, subject to section 5.4.2 of the Plan, a Pro Rata Share of (i) 7.4% of the New Senior Secured Term Loan; (ii) 7.4% of the Distributable Cash; and (iii) 7.4% of the New Common Stock, subject to dilution by the Equity Incentive Plan.

- Holders of Allowed Other Parent Claims (Class 1F) shall each receive an amount of Distributable Cash equal to 35.18% of the aggregate amount in U.S. dollars of such Holder's Allowed Other Parent Claim.

- Holders of Allowed Senior Loan Guaranty Claims (Classes 50C-111C) shall receive, subject to Section 5.4.2 of the Plan, a Pro Rata share of (i) 91.2% of the New Senior Secured Term Loan plus the portion of the Other Parent Claims Allocation that is New Senior Secured Term Loan; (ii) 91.2% of the Distributable Cash minus the amount of Distributable Cash to be distributed to Holders of Allowed General Unsecured Claims against the relevant Filed Subsidiary Debtors (Classes 2E-111EE) and the amount of Distributable Cash to be distributed to Holders of Allowed Other Parent Claims (Class 1E) in excess of the portion of the Other Parent Claims Allocation that is Distributable Cash; and (iii) 91.2% of the New Common Stock plus the portion of the Other Parent Claims Allocation that is New Common Stock, subject to dilution by the Equity Incentive Plan.

- Holders of Allowed General Unsecured Claims against the relevant Filed Subsidiary Debtors shall receive payment in full in Cash (paid out of the Distributable Cash), provided; however, that if the Debtors estimate, pursuant to the procedures set forth in Section 3.3.4 of the Plan, that the aggregate sum of Allowed General Unsecured Claims against the relevant Filed Subsidiary Debtors shall exceed $150 million and the Senior Lender Settlement Committee does not elect in writing after such estimate is filed with the Bankruptcy Court but prior to the conclusion of the Confirmation Hearing to provide

8

Subsidiary Debtor on October 12, 2009), and (iii) Tribune Interactive, Inc. (which is a Guarantor Non-Debtor). These transfers were done in order to implement certain business objectives, including the preservation of liquidity and the continued availability of funding for subsidiary operations. These intercompany transfers were appropriately accounted for on the books and records of Tribune and its subsidiaries. For purposes of calculating distributions to Holders of Allowed Claims against and Interests in the Debtors, the aforementioned $368.8 million is deemed to have been returned to Tribune.

- During the 12 months prior to the Petition Date, the Tribune Entities engaged in a series of third-party and intercompany real property transactions involving the "KTLA Studio Lot" owned by Tribune California Properties, Inc., a Guarantor Debtor; the "SCNI Property" owned by Southern Connecticut Newspapers, Inc., a Guarantor Debtor; and properties in Los Angeles, CA, St. Louis, MO, Baltimore, MD, Hartford, CT, Melville, NY, and Conklin, NY (collectively, the "TMCT Properties"), which were leased by Tribune from TMCT, LLC pursuant to an Amended and Restated Lease Agreement entered December 22, 2006 (the "Master Lease"). On January 30, 2008 and April 22, 2008, the KTLA Studio Lot and the SCNI Property were sold for approximately $119 million and $28 million, respectively, and the proceeds of each sale were placed into escrow.[5]

In January 2008, Tribune exercised its option to purchase the TMCT Properties for $175 million. Tribune closed the deal on April 28, 2008. This transaction was partially structured as a "like-kind exchange" for tax purposes and was funded with the escrowed proceeds from the KTLA Studio Lot and SCNI Property sales plus an additional approximately $28 million contributed by Tribune. At the conclusion of these transactions, Tribune owned the TMCT Properties and became both the landlord and tenant under the Master Lease. Most of the properties were then leased (pursuant to a series of sublease agreements that were in place prior to the acquisition) by Tribune to the various Tribune Entities which utilized the TMCT Properties in the operation of their businesses. Tribune initially explored various financing alternatives for the TMCT Properties; however, Tribune ultimately was not able to achieve such financing and thus determined to transfer certain of the properties to the respective Tribune Entity lessee which utilized the specific property. Accordingly, in November 2008, Tribune transferred title of certain TMCT Properties as follows: the Los Angeles, CA property (Times Mirror Square) was transferred from Tribune to Los Angeles Times Communication LLC, a Guarantor Debtor; the Hartford, CT property was transferred from Tribune to The Hartford Courant Company, a Guarantor Debtor; and the Melville, NY Properties were transferred to Tribune ND, Inc., a Non-Debtor.[6]

The economic result of these transactions is that certain of Tribune's subsidiaries collectively provided approximately $147 million of the funds for the acquisition of the TMCT Properties and collectively retain TMCT Properties to which $124.7 million of the purchase price was allocated, while Tribune provided approximately $28 million of the funds for the acquisition of the TMCT Properties and retains (or subsequently benefited from the proceeds of the sale of) properties to which $50.3 million of the purchase price was allocated.

- The Plan implements the Global Settlement and thereby effects a re-allocation of 7.0% of total Distributable Value for the benefit of Senior Noteholder Claims and Other Parent Claims as well as a re-allocation of 1.4% of total Distributable Value for the benefit of General Unsecured Claims against Filed Subsidiary Debtors, in each case representing value that would otherwise be claimed by the Holders of Loan Claims and Loan Guaranty Claims, respectively.[7]

The following charts summarize the projected distributions to Holders of Allowed Claims and Interests under the Plan. The projections of estimated recoveries are only an estimate. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries received. In addition, the ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain confirmation of the Plan and meet the conditions to confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement. Accordingly, the recoveries set forth below are projected recoveries only and may change based upon changes in the amount of Allowed Claims and Interests as well as other factors related to the Debtors' business operations and general economic conditions. Reference should be made to the entire Disclosure

---

[5] A portion of the KTLA Studio Lot was leased back to KTLA, Inc., a Guarantor Debtor.

[6] The Melville, NY properties are leased to Newsday LLC and that lease was assigned from Tribune to Tribune ND, Inc. contemporaneously with a transfer of the property from Tribune to Tribune ND, Inc. in 2008. The Conklin, NY property was sold to a third-party in October 2008. The St. Louis property was also sold to a third-party in June 2009, pursuant to an order of the Bankruptcy Court. The Baltimore properties continue to be owned by Tribune. *See* Tribune's Quarterly Report on Form 10-Q for the third quarter ending September 28, 2008 for additional information concerning the history of Tribune's relationship with TMCT, the resulting option to purchase the properties, and the monetization of an interest in the *Newsday* business.

[7] For a further discussion of the Global Settlement, please refer to Article VII herein for the Debtors' discussion and analyses of the Global Settlement. For the views of certain creditors or creditor representatives, please refer to the Settlement Submissions in the compendium accompanying this Disclosure Statement.

Statement and the Plan for a complete description of the classification and treatment of Allowed Claims against and Interests under the Plan.

1. Summary of Estimated Unclassified Claims Against all Debtors and of Estimated Recoveries in Respect Thereof.

| Description | Estimated Allowed Claims | Treatment | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| **DIP Facility Claims:** | $0 | **Unimpaired** | **100%** in the form of Cash.  See Article IX.B.1. |
| **Administrative Expense Claims:** | $100 to $150 million[8] | **Unimpaired** | **100%** in the form of Cash.  See Article IX.B.2. |
| **Priority Tax Claims:** | $150 to $175 million | **Unimpaired** | **100%** in the form of Cash in full or in installments over a period ending not later than the fifth anniversary of the Petition Date, together with interest compounded annually from the Effective Date on any outstanding balance.  See Article IX.B.3. |

2. Summary of Estimated Allowed Claims and Interests against Tribune and the Filed Subsidiary Debtors and of Estimated Recoveries in Respect Thereof.

| Class & Description | Estimated Allowed Claims | Treatment | Estimated Recovery to Holders of Allowed Claims and Interests |
|---|---|---|---|
| **Priority Non-Tax Claims (Class 1A):** | $0 to $1 million | **Unimpaired** | **100%** in the form of Reinstatement.  See Article IX.D.1.a. |
| **Other Secured Claims (Class 1B):** | Undetermined | **Unimpaired** | **100%** in the form of Reinstatement.  See Article IX.D.1.b. |
| **Senior Loan Claims (Class 1C):** | $8.722 billion | **Impaired** | **0.44%** in the form of a Pro Rata share, calculated together with the Holders of Claims in Class 1D that are Allowed pursuant to Section 3.2.4(b)(i), of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation.  See Article IX.D.1.c. |
| **Bridge Loan Claims (Class 1D)** | $1.619 billion | **Impaired** | **0.44%**, which ~~treatment~~ recovery percentage  shall apply to (i) all Holders of Bridge Loan Claims if Class 1D votes to accept the Plan, or (ii) each Holder of a Bridge Loan Claim that votes to accept the Plan if Class 1D votes to reject the Plan.  Each such Holder of a Bridge Loan Claim shall (a) as of the Effective Date, have its Claim Allowed in an amount equal to the principal amount of such Claim plus accrued interest as of the Petition Date, and (b) on or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Bridge Loan Claim against Tribune, subject to Section 5.4.2 of the Plan, receive such |

---

[8] This estimate does not include amounts outstanding for goods or services provided in the ordinary course of business and excludes Intercompany Claims that are also Administrative Expense Claims.  The Debtors intend to pay such amounts as they become due in the ordinary course of business.

| | | | Holder's Pro Rata share, calculated together with the Holders of Allowed Claims in Class 1C, of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation.<br><br>If Class 1D votes to reject the Plan, the following ~~treatment~~recovery percentage shall apply to each Holder of a Bridge Loan Claim that votes to reject the Plan ~~0% through a % recovery not to exceed an amount determined by~~ or does not return a Ballot on the Plan: **between 0% and 4.6%.** The Holders in such event may receive no recovery because in the event Class 1D votes to reject the Plan, the Claims of any rejecting or non-voting Holders shall be treated as "Disputed Claims" under the Plan. As Holders of Disputed Claims, such rejecting or non-voting Holders will not be entitled to receive any recovery on the Effective Date of the Plan and will likely be subject to protracted litigation commenced by a representative of the Estates seeking the disallowance of their Claims. If, however, ~~such Bridge Loan Claims~~ are ultimately Allowed in full, each Holder's recovery percentage on account of such claims could be as much as 4.6%, which is based upon application of the mid-point estimate of total "Distributable Value" as defined and set forth herein and the allocation of such "Distributable Value" underlying the recoveries of Holders of Claims against Tribune under the Plan ~~if such Bridge Loan Claims becomes Allowed~~. See Article IX.D.1.d. |
| **Senior Noteholder Claims (Class 1E):** | $1.283 billion | **Impaired** | **35.18%** in the form of each Holder of an Allowed Senior Noteholder Claim's Pro Rata share of 7.4% of the New Senior Secured Term Loan, 7.4% of the Distributable Cash, and 7.4% of the New Common Stock, subject to dilution by the Equity Incentive Plan. See Article IX.D.1.e.[9] |
| **Other Parent Claims (Class 1F):** | $100 to 125 million | **Impaired** | **35.18%** in the form of an amount of Distributable Cash equal to 35.18% of the aggregate amount in U.S. dollars of such Holder's Allowed Other Parent Claim. See Article IX.D.1.f. |
| **Convenience Claims (Class 1G):** | $0 to $1 million | **Unimpaired** | **100%** in the form of Cash; provided, however, that post-petition interest shall not be paid to any Holder on any Convenience Claim. A Convenience Claim is a Claim against Tribune that would otherwise be a General Unsecured Claim that is (i) in an amount equal to or less than $1,000 or (ii) in an amount that has been reduced to $1,000 pursuant to a Convenience Class Election. See Article IX.D.1.g. |
| **EGI-TRB LLC Notes Claims (Class 1I):** | $235 million | **Impaired** | **0%,** all EGI-TRB LLC Notes Claims shall be extinguished. See Article IX.D.1.h. |
| **PHONES Notes** | $761 million | **Impaired** | **0%,** all PHONES Notes Claims shall be extinguished. See Article |

[9] Deutsche Bank Trust Company of Americas ("DBTCA"), the successor indenture trustee for the Debtors' 1992, 1995 and 1997 Indentures, asserts that the Debtors should pay for the fees and expenses of DBTCA based on the following assertions: (i) Tribune is contractually obligated to pay such fees and expenses under each of the Indentures; (ii) the fees and expenses of DBTCA are entitled to be treated as an administrative claim; and (iii) the Debtors are paying the fees and expenses of various major constituencies (including the fees and expenses of the Indenture Trustee under the 1996 Indenture) as identified in Sections 9.1.1 through 9.1.4 of the Plan. DBTCA asserts that if the Debtors do not reimburse DBTCA for its fees and expenses. DBTCA is entitled under each of the applicable Indentures to assert a lien on all property held or collected by it for reimbursement of its fees and expenses. In the event DBTCA asserts such a charging lien, DBTCA has informed the Debtors that it will reimburse itself for fees and expenses prior to making any distributions to the Senior Noteholders. If DBTCA asserts a charging lien, DBTCA contends that the Holders of Senior Noteholder Claims under the 1992, 1995 and 1997 Indentures will receive a distribution that is less than that set forth in the chart above and less than that which will be received by the Holders of Senior Noteholder Claims under the 1996 Indenture. At this time, the Debtors do not take a position on whether DBTCA has the right to assert a charging lien under the applicable Indentures. However, the Debtors do not believe that DBTCA's assertion of a charging lien results in the disparate treatment of Class 1D Claims.

| Claims (Class 1J): | | | IX.D.1.i. |
|---|---|---|---|
| Intercompany Claims (Class 1K): | N/A | Impaired | N/A, all Intercompany Claims against Tribune shall be deemed satisfied, discharged, and extinguished in full.  See Article IX.D.1.j. |
| Securities Litigation Claims (Class 1L): | Undetermined | Impaired | 0%, all Securities Litigation Claims against Tribune shall be extinguished.  See Article IX.D.1.k. |
| Tribune Interests (Class 1M): | N/A | Impaired | 0%, all Tribune Interests in Tribune shall be extinguished.  See Article IX.D.1.l. |

| Class & Description | Estimated Allowed Claims | Treatment | Estimated Recovery to Holders of Allowed Claims and Interests |
|---|---|---|---|
| Priority Non-Tax Claims (Classes 2A – 111A): | $0 to $1 million | Unimpaired | 100% in the form of Reinstatement.  See Article IX.D.2.a. |
| Other Secured Claims (Classes 2B-111B): | Undetermined | Unimpaired | 100% in the form of Reinstatement.  See Article IX.D.2.b. |
| Senior Loan Guaranty Claims (Classes 50C - 111C): | $8.722 billion[10] | Impaired | 62.41% in the form of a Pro Rata share of (i) 91.2% of the New Senior Secured Term Loan plus the portion of the Other Parent Claims Allocation that is New Senior Secured Term Loan; (ii) 91.2% of the Distributable Cash minus the amount of Distributable Cash to be distributed to Holders of Allowed Claims in Classes 2E-111E and the amount of Distributable Cash to be distributed to Holders of Allowed Claims in Class 1E in excess of the portion of the Other Parent Claims Allocation that is Distributable Cash; and (iii) 91.2% of the New Common Stock plus the portion of the Other Parent Claims Allocation that is New Common Stock.  See Article IX.D.2.c. |
| Bridge Loan Guaranty Claims (Classes 50D-111D) | $1.619 billion[11] | Impaired | 0%, in order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions of (i) the New Senior Secured Term Loan, (ii) the Distributable Cash and (iii) the New Common Stock that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall instead be distributed to the Senior Loan Agent for distribution on account of Allowed Senior Loan Guaranty Claims.  Accordingly, on the Effective Date, all Bridge Loan Guaranty Claims against the Guarantor Debtors shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such Bridge Loan Guaranty Claims.  See Article IX.D.2.d. |
| General Unsecured Claims (Classes 2E-111E): | $85 to $150 million | Impaired | 100% in the form of Cash (paid out of the Distributable Cash); provided, however, that if the Debtors estimate, pursuant to Section 3.3.4 of the Plan, that the sum of Allowed Claims in Classes 2E-111E shall exceed $150 million in the aggregate and the Senior Lender Settlement Committee does not elect in writing after any such estimate is filed with the Bankruptcy Court but prior to the conclusion of the |

[10] This amount is asserted against each of the Guarantor Subsidiaries.  The estimated recovery set forth herein was calculated by taking the cumulative recovery from the Claims against each Guarantor Debtor and Guarantor Non-Debtor divided by this amount.

[11] This amount is asserted against each of the Guarantor Subsidiaries.

| | | | |
|---|---|---|---|
| | | | Confirmation Hearing to provide additional consideration to such Holders, each Holder of an Allowed Claim in Classes 2E-111E shall instead receive its Pro Rata share of $150 million in Cash; provided further, however, that post-petition interest shall not accrue or be paid to any Holder on any General Unsecured Claim. See Article IX.D.2.e. |
| **Intercompany Claims (Classes 2K-111K):** | N/A | **Impaired** | **N/A**, all Intercompany Claims against the Filed Subsidiary Debtors shall be deemed satisfied, discharged and extinguished in full. See Article IX.D.2.f. |
| **Securities Litigation Claims (Classes 2L-111L):** | Undetermined | **Impaired** | **0%**, all Securities Litigation Claims against the Filed Subsidiary Debtors shall be extinguished. See Article IX.D.2.g. |
| **Interests in the Filed Subsidiary Debtors (Classes 2M-111M):** | N/A | **Unimpaired** | **100%** in the form of Reinstatement. See Article IX.D.2.h. |

3.  Summary of Estimated Allowed Claims Against and Interests for Each Guarantor Non-Debtor, if any, that becomes a Debtor and of Estimated Recoveries in Respect Thereof.

The Plan also constitutes a Prepackaged Plan for the Guarantor Non-Debtors, if any, that commence cases under chapter 11 of the Bankruptcy Code. For any Guarantor Non-Debtor that commences a chapter 11 case, such Prepackaged Plan shall classify Allowed Claims and Interests in the same manner as set forth above for the Filed Subsidiary Debtors.

Except for Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims, each Holder of an Allowed Claim against or Interest in a Guarantor Non-Debtor that becomes a Debtor shall have its Claim or Interest Reinstated. In addition, except for Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims, Allowed Claims against and Interests in any Guarantor Non-Debtor that becomes a Debtor are Unimpaired, and the Holders of such Claims and Interests are conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of such Claims and Interests are not entitled to vote to accept or reject the Prepackaged Plan.

The treatment of Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims under the Prepackaged Plan is as follows:

| **Description** | **Estimated Allowed Claims** | **Treatment** | **Estimated Recovery to Holders of Allowed Claims** |
|---|---|---|---|
| **Senior Loan Guaranty Claims:** | $8.722 billion[12] | **Impaired** | **62.41%** in the form of the distributions provided to such Holder under Article IX.D.2.c of this Disclosure Statement. See Article IX.D.3.c.i. |
| **Bridge Loan Guaranty** | 1.619 | **Impaired** | **0%**, in order to comply with the contractual subordination provisions in the |

[12] This amount is asserted against each of the Guarantor Subsidiaries. The estimated recovery set forth herein was calculated by taking the cumulative recovery from the Claims against each Guarantor Debtor and Guarantor Non-Debtor divided by this amount.

14

| Claims: | billion[13] | | Loan Guaranty Agreements, all distributions of (i) the New Senior Secured Term Loan, (ii) the Distributable Cash and (iii) the New Common Stock that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall instead be distributed to the Senior Loan Agent for distribution on account of Allowed Senior Loan Guaranty Claims. Accordingly, on the Effective Date, all Bridge Loan Guaranty Claims against Guarantor Non-Debtors that become Debtors shall be extinguished and the Holders of such Claims shall not receive or retain any property under the relevant Prepackaged Plan on account of such Bridge Loan Guaranty Claims. See Article IX.D.3.c.ii. |
| Intercompany Claims: | Undetermined | Impaired | N/A, all Intercompany Claims against Guarantor Non-Debtors that become Debtors shall be deemed satisfied, discharged and extinguished in full. See Article IX.D.3.d. |
| Securities Litigation Claims: | Undetermined | Impaired | 0%, all Securities Litigation Claims against Guarantor Non-Debtors that become Debtors shall be extinguished. See Article IX.D.3.e. |

## D.    FCC Approval.

Certain of the Debtors' business operations are subject to regulation by the Federal Communications Commission (the "FCC"). Television and radio stations may not operate in the United States without the authorization of the FCC and FCC approval is required for the issuance, renewal, transfer and assignment of station operating licenses. The FCC also regulates the multiple and combined ownership of television and radio broadcast stations as well as the cross-ownership of broadcast stations and newspapers in the same market. Because the Debtors' operations include newspapers, television stations, and a radio station, the Plan must comply with certain FCC-related multiple and cross-ownership requirements and restrictions. The Plan also must comply with limitations on foreign ownership of broadcast licensees administered by the FCC. Consummation of the Plan will be subject to obtaining the requisite approvals and waivers from the FCC. On April 28, 2010, the Debtors filed with the FCC applications for the consents of the FCC necessary to implement the Plan and related requests for waiver of FCC multiple ownership rules.

There are specific FCC-related ownership restrictions and requirements for equity holders of entities that hold FCC broadcast licenses. Each Holder of an Allowed Claim that is entitled to receive a distribution of New Common Stock pursuant to the Plan will be required to demonstrate to the Debtors' satisfaction that the issuance of New Common Stock to such Holder would not impair the ability of the Reorganized Debtors to comply with FCC-related ownership requirements and restrictions.

THE FOLLOWING SUMMARY OF CERTAIN FCC RULES AND POLICIES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN ADVISORS AS TO FCC OWNERSHIP ISSUES AND OTHER CONSEQUENCES OF THE PLAN.

1.    Required FCC Consents.

Both the Debtors' commencement of the Chapter 11 Cases and their emergence from bankruptcy require the consent of the FCC. The FCC previously granted consent for the assignment of the Debtors' FCC licenses from the Debtors to the Debtors as "debtors-in-possession" under chapter 11 of the Bankruptcy Code. For the Reorganized Debtors to continue the operation of the Debtors' broadcast stations, the Debtors will be required to file applications with the FCC (the "FCC Applications") to obtain prior approval of the FCC for the assignment of the FCC licenses from the Debtors as "debtors-in-possession" to the Reorganized Debtors (the "FCC Approval"). Because consummation of the transactions proposed in the Plan requires FCC

---

[13] This amount is asserted against each of the Guarantor Subsidiaries.

of Tribune's 2008 fiscal year.  Tribune also elected to treat nearly all of its subsidiaries as qualified subchapter S subsidiaries.  Subject to certain limitations, Tribune and its qualified subchapter S subsidiaries are not currently subject to corporate level federal income tax.  Instead, the income of Tribune and such subsidiaries is required to be reported by its stockholders.  As of the date of this Disclosure Statement, the ESOP was the sole stockholder of Tribune and is not taxed on the income that is passed through to it because the ESOP is an employee benefit plan that qualifies for favorable tax treatment under Section 401(a) of the IRC.  Although most states in which Tribune and its subsidiaries operate recognize the subchapter S corporation status, some impose taxes at a reduced rate.

       2.      The Debtors' Properties.

The corporate headquarters of the Tribune Entities is located at 435 North Michigan Avenue, Chicago, Illinois 60611.  The Tribune Entities own an aggregate of approximately 7,710,000 square feet of office, production and other space in approximately 54 locations.  The Tribune Entities also lease parking lots, offices, and other space which aggregate to approximately 3,567,748 square feet in approximately 166 separate locations and also lease or own towers and transmitter space in approximately 84 locations.

**B.**      **Operations of the Debtors.**

The Tribune Entities' primary sources of revenue are from (i) the sale of advertising in newspapers and other publications and on websites owned by or affiliated with the Tribune Entities, (ii) the distribution of preprinted insert advertisements, (iii) the sale of newspapers and other publications to distributors and individual subscribers, (iv) the provision of commercial printing and delivery services to third parties, primarily other newspaper companies, (v) the sale of entertainment listings data and syndicated content, (vi) the sale of advertising on the Tribune Entities' television and radio stations, and on its "Superstation" WGN America, and (vii) the distribution of WGN America through cable, satellite, and other similar distribution methods.  The Tribune Entities' operations are divided into two primary industry segments: (a) publishing (the "Publishing Segment") and (b) broadcasting (the "Broadcasting Segment").[14]  These segments operate almost completely in the United States.[15]

       1.      Publishing Segment.

The Publishing Segment, which accounted for seventy percent (70%) of the Tribune Entities' consolidated revenues in 2009, currently operates eight major-market daily newspapers, distributes preprinted insert advertisements, provides commercial printing and delivery services to third parties, and distributes entertainment listings and syndicated content through its Tribune Media Services business unit.  The daily newspapers published by the Tribune Entities, which have collectively garnered 84 Pulitzer Prizes, include the following market leading papers: the *Los Angeles Times*, the *Chicago Tribune*, *The Baltimore Sun*, the *Orlando Sentinel*, the *South Florida Sun Sentinel*, the *Hartford Courant*, *The Morning Call,* and the *Daily Press*.

The Tribune Entities' newspapers collectively have paid circulation of approximately 2 million copies daily and 3.1 million copies on Sundays.  In addition, the Tribune Entities publish over 100 "niche" publications that target various geographic, ethnographic and demographic audiences and include the upscale *Chicago Magazine,* the Spanish language newspaper *Hoy*, which is published in Chicago and Los Angeles, and Chicago's *RedEye*, which targets a younger demographic.

---

[14] Certain administrative activities are not included in either segment and are instead considered as general corporate operations.

[15] These segments also reflect the way the Tribune Entities sell their products to the marketplace, manage operations, and make business decisions.

The table below sets forth information concerning the Tribune Entities' average paid circulation for the six months ended September 2009, as reported to the Audit Bureau of Circulations, for its daily newspapers (in thousands). Average daily circulation is based on a five-day (Monday-Friday) average.

|  | **Daily** | **Sunday** |
|---|---|---|
| *Los Angeles Times* | 657 | 984 |
| *Chicago Tribune* | 466 | 803 |
| *The Baltimore Sun* | 187 | 322 |
| *Orlando Sentinel* | 181 | 281 |
| *South Florida Sun Sentinel* | 154 | 239 |
| *Hartford Courant* | 144 | 210 |
| *Allentown Morning Call* | 101 | 124 |
| *Daily Press* (Newport News, VA) | 66 | 91 |
| **Total Net Paid Circulation** | **1,956** | **3,054** |

The Publishing Segment also manages the websites of the Tribune Entities' daily newspapers, television stations, and other branded products that target specific areas of interest. In 2009, those websites collectively averaged 49 million monthly unique visitors and over 510 million monthly page views. The Publishing Segment employed approximately 10,300 full-time equivalent employees in the fourth quarter of 2009. The primary businesses of the Publishing Segment are described below.

      (a)      Los Angeles Times Media Group

The Los Angeles Times Media Group is a leading provider of news and information in the Los Angeles metropolitan area. Its operations are principally comprised of the publication of the *Los Angeles Times* and its related businesses. The *Los Angeles Times* has been published continuously since 1881. The newspaper has won 39 Pulitzer Prizes and is the largest daily metropolitan newspaper in the United States in circulation. The Los Angeles market ranks second in the nation in terms of population. In its primary circulation areas of Los Angeles, Orange, Ventura, San Bernardino and Riverside Counties, the *Los Angeles Times* competes for advertising and circulation with 18 local daily newspapers and three national newspapers, with its largest local competitor having almost 243,000 in average daily circulation. The *Los Angeles Times* ranks fourth in the United States for average daily paid circulation and second on Sundays for paid circulation. Approximately seventy-eight percent (78%) and eighty-two percent (82%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2009, with the remainder primarily sold at newsstands and vending boxes.

The *Los Angeles Times* publishes two daily editions: the East edition and the West edition. Additional daily and semi-weekly community newspapers are either inserted into the paper in selected geographic areas or distributed to homes and through vending boxes to provide targeted local news coverage. The Los Angeles Times Media Group operates latimes.com, an online expanded version of the newspaper, providing local, national and international news along with features reporting, findlocal.latimes.com, covering entertainment, reviews and things to do in Southern California, and theenvelope.com, a comprehensive year-round entertainment awards website. In 2009, the Los Angeles Times Media Group's digital media reached an average of almost 9 million monthly unique visitors and averaged over 135 million monthly page views. The Los Angeles Times Media Group also operates several targeted publications and their related websites, including (i) the free Spanish language newspaper, *Hoy*, which provides local, national and international news and features of interest to the largest Hispanic market in the United States and (ii) *Brand X*, which focuses on lifestyle and entertainment features. In addition, the Los Angeles Times Media Group's production facility prints the local edition of *The Wall Street Journal*, and its outside carriers deliver the *Orange County Register*, *The Wall Street Journal*, *The New York Times* and numerous other local publications.

20

In 2009, television contributed ninety-seven percent (97%) of the Broadcasting Segment's operating revenues. Approximately eighty-one percent (81%) of these revenues were derived from advertising. The Tribune Entities' television stations compete for audience and advertising with other television and radio stations, cable television and other media serving the same markets. Competition for audience and advertising is based upon various interrelated factors including programming content, audience acceptance and price.

The television group also includes WGN America, a broad entertainment network distributed in over 71 million homes across America by cable, satellite, and telcos. Its programming emphasis is entertainment and consists of first-run programs, syndicated sit-coms, blockbuster movies, cable exclusives, and live sports.

(b)    Radio/Other

WGN-AM, Chicago, is a news and talk radio station. It operates on frequency 720-AM and is the flagship station of the Chicago Cubs (MLB) radio network and the Chicago Blackhawks (NHL) and also airs Northwestern University (NCAA) Men's basketball and football games. WGN-AM is the only radio station owned by the Tribune Entities. In 2009, radio/other operations contributed three percent (3%) of the Broadcasting Segment's operating revenues.

3.    Additional Investments.

Various Tribune Entities (including non-Debtors) have investments (typically minority equity interests) in private corporations, limited liability companies and partnerships that are not Debtors in these Chapter 11 Cases. The Tribune Entities' significant investments are as follows:

| Investment | Description | Tribune Entities' Ownership | Partners[1316] |
|---|---|---|---|
| Television Food Network | Lifestyle cable network and website with a focus on food and entertaining | 31.3% | Scripps Networks Interactive Inc. |
| CareerBuilder | Online recruitment company that connects job seekers and employers | 30.8% | Gannett Co., Inc.<br>The McClatchy Company<br>Microsoft Corporation |
| Classified Ventures | A network of automotive and real estate classified advertising websites, including cars.com, apartments.com and homegain.com | 27.8% | The McClatchy Company<br>Gannett Co., Inc.<br>The Washington Post Company<br>A.H. Belo Corporation |
| Homefinder | An online real estate company that connects home buyers, sellers and real estate professionals | 33.3% | The McClatchy Company<br>Gannett Co., Inc. |
| Topix | Provider of news and community information on the web, connecting people to the information and discussions that matter to them in every U.S. town and city | 33.7% | Gannett Co., Inc.<br>The McClatchy Company<br>Former and Current Management |
| quadrantONE | National premium advertising network of websites of the leading media companies in the U.S. | 25.0% | The New York Times Company<br>Hearst Corporation<br>Gannett Co., Inc. |

[1316] As used in this summary table, the term "Partners" refers to the parent company of each partner or in the case of an LLC, the parent company of each member. Actual legal partners or, in the case of LLCs, members, may be affiliates of such parent companies.

C.    **Recent Operations.**

The Tribune Entities' consolidated operating results for the fiscal years ended December 27, 2009 and December 28, 2008 are shown in the table below.[417]

| **TRIBUNE ENTITIES** | | |
|---|---|---|
| **CONSOLIDATED STATEMENTS OF OPERATIONS** | | |
| ($ in millions) | | |
| | **Year Ended** | |
| | **Dec. 27, 2009** | **Dec. 28, 2008** |
| **Revenues** | | |
| Publishing | $ 2,243.2 | $ 2,765.3 |
| Broadcasting | 939.4 | 1,165.0 |
| **Total Revenues** | $ 3,182.6 | $ 3,930.3 |
| | | |
| **Cash Operating Expenses** | | |
| Publishing | $ 1,915.8 | $ 2,303.2 |
| Broadcasting | 713.3 | 804.3 |
| Corporate | 60.0 | 36.7 |
| **Total Cash Operating Expenses** | $ 2,689.0 | $ 3,144.2 |
| | | |
| **Operating Cash Flow** | | |
| Publishing | $ 327.4 | $ 462.1 |
| Broadcasting | 226.2 | 360.6 |
| Corporate | (60.0) | (36.7) |
| **Total Operating Cash Flow** | $ 493.6 | $ 786.1 |
| **Income on Equity Investments, Net** | $ 123.0 | $ 85.0 |

At the end of 2009, the Tribune Entities' cash balance was approximately $1.5 billion, up from approximately $600 million at the end of 2008. The increase in cash reflects $701 million in proceeds from the Chicago Cubs transaction received in the fourth quarter of 2009 and net cash flow generated from operations.

During 2009, core operations produced approximately $596 million of cash. In addition, the Company received approximately $40 million from the operations of the Chicago Cubs and Comcast SportsNet and $89 million from TV Food Network in 2009. Offsetting these cash inflows was $112 million

[417] The Tribune Entities' results of operations are preliminary and unaudited and exclude discontinued operations (Chicago Cubs group and Newsday) and Comcast SportsNet Chicago. The Debtors use cash operating expenses and operating cash flow to evaluate internal performance. "Cash operating expenses" are defined as operating expenses before depreciation and amortization, write-downs of intangible assets and properties, stock-based compensation, ESOP expense, certain special items (including severance), non-operating items, and reorganization items. "Operating cash flow" is defined as earnings before interest income, interest expense, equity income and losses, depreciation and amortization, write-downs of intangible assets and properties, stock-based compensation, ESOP expense, certain special items (including severance), non-operating items, and reorganization items. Cash operating expenses and operating cash flow are not measures of financial performance under Generally Accepted Accounting Principles ("GAAP") and should not be considered as a substitute for measures of financial performance prepared in accordance with GAAP.

27

of capital expenditures, $91 million of capital gains and other tax payments, $225 million of repayments of the Tribune Entities' DIP Facility, $14 million to collateralize the Tribune Entities' letters of credit and $96 million of reorganization costs.

## D.    Current Management of the Debtors.

1.    Board of Directors.

In accordance with the Amended and Restated Bylaws of Tribune, the board of directors of Tribune (the "Board of Directors") currently consists of ten directors.  Set forth below are the directors of Tribune, as of the date of the filing of this Disclosure Statement.[18]

| Name | Title |
|------|-------|
| Samuel Zell | Chairman |
| Jeffrey S. Berg | Board Member |
| Brian L. Greenspun | Board Member |
| Betsy D. Holden | Board Member |
| Randy Michaels | Board Member[19] |
| William A. Osborn | Board Member |
| William C. Pate | Board Member |
| Mark Shapiro | Board Member |
| Mary Agnes Wilderotter | Board Member |
| Frank E. Wood | Board Member |

2.    Subcommittees of the Board of Directors.

The Board of Directors has a standing audit committee (the "Audit Committee") whose function includes reviewing and monitoring Tribune's financial reporting and accounting practices and internal controls.  Betsy D. Holden, William A. Osborn (chair) and Frank E. Wood currently serve on the Audit Committee.

The Board of Directors also has a standing compensation committee (the "Compensation Committee"), which has the responsibility to review annually and approve corporate goals and objectives relevant to the compensation of Tribune's principal executive officer, to evaluate Tribune's principal executive officer's performance in light of those goals and objectives and, based on that evaluation, to determine and approve the principal executive officer's compensation level.  The Compensation Committee also has the responsibility to review annually with the principal executive officer and approve the compensation for the other senior executive officers, including the three most highly-compensated executive officers other than the principal executive officer and principal financial officer.  Furthermore, the Compensation Committee has the responsibility to review and approve incentive and other compensation plans, if any, covering certain other management employees of the Debtors.  The current members of the Compensation Committee are Brian L. Greenspun, William C. Pate, and Mary Agnes Wilderotter (chair).

3.    Compensation of Directors.

Directors who are employees of the Tribune Entities receive no additional compensation for service as a director.  In 2010, the non-employee directors will receive cash compensation in the form of a $125,000 retainer and will be reimbursed for actual out-of-pocket expenses incurred in attending meetings.  In addition,

---

[18] This Disclosure Statement contains only information pertaining to Tribune's Board of Directors, which information does not apply in the case of each of Tribune's subsidiaries.

[19] Randy Michaels is also President and Chief Executive Officer of Tribune.

the chair of the Audit Committee will be paid an additional $15,000 cash retainer and each member of the Audit Committee, including the chair, will be paid an additional $6,000 cash retainer.

    4.      Executive Officers.

Set forth below are the members of the executive management team of the Tribune Entities as of the date of this Disclosure Statement and each member's position.

| Name | Position |
| --- | --- |
| Randy Michaels | President and Chief Executive Officer, Tribune |
| Gerald A. Spector | Chief Operating Officer, Tribune |
| Jerry Kersting | President, Tribune Broadcasting |
| Marc Chase | President, Tribune Interactive |
| Nils Larsen | Executive Vice President and Chief Investment Officer, Tribune |
| Donald J. Liebentritt | Executive Vice President and Chief Legal Officer, Tribune |
| Chandler Bigelow III | Executive Vice President and Chief Financial Officer, Tribune |

## IV. SUMMARY OF CERTAIN PREPETITION LIABILITIES

**A.**    **Prepetition Funded Debt and Capital Structure of the Tribune Entities.**

    1.      Prepetition Capital Structure.

As mentioned in Article III.A and further discussed in Article VII of this Disclosure Statement, Tribune returned to private ownership in 2007.[20] On April 1, 2007, Tribune entered into an Agreement and Plan of Merger (the "Merger Agreement") with GreatBanc Trust Company,[21] the Zell Entity,[22] and Tesop Corporation, a Delaware corporation wholly-owned by the ESOP (the "Merger Sub"). The Merger Agreement provided for a series of transactions that, if various conditions were satisfied, would ultimately culminate in the Merger Sub merging with and into Tribune, and following such merger, for Tribune to continue as the surviving corporation wholly-owned by the ESOP (the "Merger"). On April 1, 2007, pursuant to the terms of that certain ESOP Purchase Agreement, dated as of April 1, 2007, by and between Tribune and GreatBanc Trust Company, the ESOP purchased 8,928,571 shares of Tribune's common stock from Tribune at a price of $28 per share.[23] The ESOP paid for this purchase with a promissory note of the ESOP in favor of Tribune in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from Tribune to the ESOP and/or distributions paid on the shares of Tribune common stock held by the ESOP.

On April 23, 2007, pursuant to a purchase agreement dated April 1, 2007 (the "Zell Entity Purchase Agreement"), the Zell Entity made an initial investment of $250 million in Tribune in exchange for (i) the purchase of 1,470,588 shares of Tribune's common stock at a price of $34 per share and (ii) an unsecured subordinated exchangeable promissory note of Tribune in the principal amount of $200 million.

On April 25, 2007, Tribune commenced a tender offer to repurchase up to 126 million shares (approximately fifty percent (50%) of the then-outstanding shares) of Tribune's common stock that were then-outstanding at a price of $34 per share in cash. The tender offer expired on May 24, 2007 and 126

---

[20] The descriptions contained in this Disclosure Statement provide only a brief overview of the Leveraged ESOP Transactions. Additional details concerning the Leveraged ESOP Transactions are available in Tribune's Quarterly Report on Form 10-Q for the third quarter ending September 28, 2008.

[21] GreatBanc Trust Company was not party to the Merger Agreement in its individual or corporate capacity, but solely as trustee of Tribune Employee Stock Ownership Trust, a separate trust created under the ESOP.

[22] The Zell Entity was party to the Merger Agreement solely for the limited purpose provided therein.

[23] GreatBanc Trust Company was not a party to the ESOP Purchase Agreement in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust created under the ESOP.

million shares of Tribune's common stock were repurchased and subsequently retired on June 4, 2007 utilizing proceeds from the Senior Loan Agreement (as defined and discussed below).

On December 20, 2007, Tribune merged with Merger Sub, with Tribune surviving the Merger. Upon consummation of the Merger, the 8,928,571 shares of Tribune's common stock held by the ESOP were converted into 56,521,739 shares of common stock and represented the only outstanding shares of capital stock of Tribune after the Merger. Pursuant to the terms of the Merger Agreement, each share of common stock of Tribune, par value $0.01 per share, issued and outstanding immediately prior to the Merger, other than shares held by Tribune, the ESOP or Merger Sub immediately prior to the Merger (in each case, other than shares held on behalf of third parties) and shares held by stockholders, was cancelled and automatically converted into the right to receive $34, without interest and less any applicable withholding taxes, and Tribune became wholly-owned by the ESOP.

Pursuant to the Zell Entity Purchase Agreement, on December 20, 2007, the Zell Entity tendered the shares of Tribune common stock it had acquired pursuant to the Zell Entity Purchase Agreement. Tribune also retired the unsecured subordinated exchangeable promissory note held by the Zell Entity, including approximately $6 million of accrued interest. Following the consummation of the Merger, the Zell Entity purchased from Tribune, for an aggregate of $315 million, a $225 million subordinated promissory note and a 15-year warrant. As the $315 million investment was greater than the cash due from Tribune to the Zell Entity for the shares tendered and notes retired, accrued interest, and legal fees, the amounts were netted against each other and the balance of $56 million was paid by the Zell Entity to Tribune. The warrant entitles the Zell Entity to purchase 43,478,261 shares of Tribune's common stock (subject to adjustment), which represented approximately forty percent (40%) of the economic equity interest in Tribune following the Merger (on a fully-diluted basis). The initial aggregate exercise price for the warrant was $500 million (subject to adjustment), increasing by $10 million per year for the first ten years of the warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). Thereafter, the Zell Entity assigned minority interests in the subordinated promissory note and the warrant to certain permitted assignees.

The terms of the ESOP provide that common shares held by the ESOP are to be allocated on a noncontributory basis to eligible employees of Tribune. As of December 27, 2009, approximately 1.6 million of the common shares held by the ESOP have been allocated to eligible employees of Tribune. However, as discussed in Article IV.C hereof, no distributions will be made to eligible employees on account of such shares.

    2.       Prepetition Funded Debt Structure.

In connection with the Leveraged ESOP Transactions and in order to fund ongoing general corporate and working capital needs, Tribune entered into financing facilities in May 2007 and December 2007.[24] Tribune is also the obligor on (i) a series of outstanding note and debenture issuances and (ii) exchangeable subordinated debentures that predated the Merger, as well as a subordinated promissory note, which was issued immediately following the Merger. Additionally, Tribune (in its capacity as servicer) and Tribune Receivables LLC, a wholly-owned special purpose subsidiary which is not a Debtor, were parties to a trade receivables securitization facility for which Barclays Bank PLC ("Barclays") was the administrative agent and Tribune Receivables LLC was the borrower.[25] Accordingly, Tribune's prepetition debt structure was comprised of the following components: (a) a Senior Loan Agreement; (b) a Bridge Facility (as defined below); (c) various issuances of outstanding notes and debentures (the "Senior Notes"); (d) the EGI-TRB LLC Notes (as defined below); (e) exchangeable subordinated debentures (the "PHONES Notes"); and (f) a

---

[24] Please refer to Article VII for a further discussion of the financing facilities entered in connection with the Leveraged ESOP Transactions.

[25] The trade receivables securitization facility was amended and continued post-petition pursuant to orders entered by the Bankruptcy Court on January 15, 2009 and April 8, 2009. The trade receivables securitization facility was terminated on February 26, 2010.

Receivables Facility (as defined below). As of the Petition Date, Tribune's funded debt totaled approximately $12.706 billion in principal amount, as follows:

| Debt Instrument | Approximate Principal Amount Outstanding as of the Petition Date |
|---|---|
| Senior Credit Facility | $8.622 billion[26] |
| Bridge Facility | $1.600 billion |
| Senior Notes | $1.263 billion |
| EGI-TRB LLC Notes | $0.235 billion |
| PHONES | $0.759 billion |
| Receivables Facility | $0.225 billion |
| Total | $12.706 billion |

A brief overview of Tribune's debt facilities, outstanding note and debenture issuances, and any guarantees of such facilities and issuances by Tribune's subsidiaries is set forth below. All of the indebtedness described in subparagraphs (a) through (e) below – the Senior Loan Agreement indebtedness, the Bridge Facility indebtedness, the Senior Notes, the EGI-TRB LLC Notes, and the PHONES Notes – are obligations of the parent company, Tribune. This indebtedness is *pari passu* in payment priority at Tribune, except for the EGI-TRB LLC Notes and the PHONES. The EGI-TRB LLC Notes and the PHONES Notes are contractually subordinated to all funded indebtedness at Tribune. The Senior Loan Agreement indebtedness and the Senior Notes are secured, equally and ratably, by a stock pledge (the "Stock Pledge") of the equity in two subsidiaries. None of the Bridge Facility, the EGI-TRB LLC Notes, or the PHONES Notes are secured. Additionally, the indebtedness under the Senior Loan Agreement and the indebtedness under the Bridge Facility constitute unsecured obligations at those Tribune subsidiaries (the "Guarantor Subsidiaries"),[27] which have guaranteed (i) the Senior Loan Agreement indebtedness on a senior priority basis, and (ii) the Bridge Facility indebtedness on a subordinate basis to the Senior Loan Agreement indebtedness. None of the Senior Notes, PHONES Notes, or the EGI-TRB LLC Notes are guaranteed by, or constitute obligations of, any of Tribune's subsidiaries. Instead, they are liabilities solely of Tribune.

---

[26] The amount outstanding on account of the Senior Credit Facility includes the Barclays Swaps Claim (which is defined and described below).

[27] The Guarantor Subsidiaries are those subsidiaries deemed material under the Credit Agreement, and are comprised of the following: 5800 Sunset Productions Inc.; California Community News Corporation; Channel 39, Inc.; Channel 40, Inc.; Tribune CNLBC, LLC; Chicago Tribune Company; Chicagoland Publishing Company; Chicagoland Television News, Inc.; Courant Specialty Products, Inc.; Distribution Systems of America, Inc.; Eagle New Media Investments, LLC; Eagle Publishing Investments, LLC; Forsalebyowner.com corp.; Forum Publishing Group, Inc.; Gold Coast Publications, Inc.; Homeowners Realty, Inc.; Homestead Publishing Company; Hoy Publications, LLC; Internet Foreclosure Service, Inc.; KIAH Inc.; KPLR, Inc.; KSWB Inc.; KTLA Inc.; KWGN Inc.; Los Angeles Times Communications LLC; New Mass. Media, Inc.; Orlando Sentinel Communications Company; Patuxent Publishing Company; Southern Connecticut Newspapers, Inc.; Star Community Publishing Group, LLC; Stemweb, Inc.; Sun-Sentinel Company; The Baltimore Sun Company; The Daily Press, Inc.; TMLH 2, Inc.; TMLS I, Inc.; TMS Entertainment Guides, Inc.; Tower Distribution Company; Tribune (FN) Cable Ventures, Inc.; Tribune Broadcast Holdings, Inc.; Tribune Broadcasting Company; Tribune Broadcasting Holdco, LLC; Tribune California Properties, Inc.; Tribune Direct Marketing, Inc.; Tribune Entertainment Company; Tribune Finance LLC; Tribune Interactive, Inc.; Tribune Los Angeles, Inc.; Tribune Manhattan Newspaper Holdings, Inc.; Tribune Media Net, Inc.; Tribune Media Services, Inc.; Tribune National Marketing Company; Tribune ND, Inc.; Tribune New York Newspaper Holdings, LLC; Tribune NM, Inc.; Tribune Television Company; Tribune Television Holdings, Inc.; Tribune Television New Orleans, Inc.; Tribune Television Northwest, Inc.; Virginia Gazette Companies, LLC; WDCW Broadcasting, Inc.; WGN Continental Broadcasting Company; WPIX, Inc.; and WTXX Inc.

(a)     Senior Loan Agreement.

On May 17, 2007, Tribune entered into an $8.028 billion senior secured credit agreement (the "Senior Loan Agreement") with JPMorgan Chase Bank, N.A., as administrative agent and financial institutions from time to time party thereto.[28] The Senior Loan Agreement consists of the following loan facilities: (i) a $1.5 billion Senior Tranche X Term Facility (the "Tranche X Facility"), (ii) a $5.515 billion Senior Tranche B Term Facility (the "Tranche B Facility"), (iii) a $263 million Delayed Draw Senior Tranche B Term Facility (the "Delayed Draw Facility") and (iv) a $750 million Revolving Credit Facility (the "Revolving Credit Facility").[29] The Senior Loan Agreement also provided a commitment for an additional $2.105 billion in new incremental term loans under the Tranche B Facility (the "Incremental Facility"). On December 27, 2007, Tribune entered into a number of increase joinders pursuant to which the Incremental Facility became a part of the Tranche B Facility under the Senior Loan Agreement. On June 4, 2007, the Company used the proceeds from the Tranche X Facility and the Tranche B Facility in connection with the consummation of a tender offer to repurchase certain shares of the Company's common stock that were then outstanding and to, among other things, refinance the Company's former five-year credit agreement and former bridge credit agreement.

Under the terms of the Senior Loan Agreement, Tribune was required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Senior Loan Agreement and other debt with respect to borrowed money. On July 2, 2007, Tribune entered into an International Swap and Derivatives Association, Inc. ("ISDA") Master Agreement, a schedule to the 1992 ISDA Master Agreement and on July 3, 2007, entered into three interest rate swap confirmations (collectively, the "Swap Documents") with Barclays, which Swap Documents provide for (i) a two-year hedge with respect to $750 million in notional amount, (ii) a three-year hedge with respect to $1 billion in notional amount, and (iii) a five-year hedge with respect to $750 million in notional amount. The Swap Documents were terminated on the Petition Date. As of that date, Tribune's aggregate liability in connection with the Swap Documents was approximately $150.9 million, which liability is subject to the guarantee of the Senior Loan Agreement indebtedness by the Guarantor Subsidiaries on a *pari passu* basis with Tribune's Senior Loan Agreement indebtedness.[30]

As of the Petition Date, with the exception of the aforementioned liability in connection with the Swap Documents, the total principal amount outstanding under the Senior Loan Agreement was approximately $8.472 billion, including approximate outstanding balances on the Tranche X Facility, Tranche B Facility and the Revolving Credit Facility of $512 million, $7.723 billion[31] and $237 million, respectively.[32] The Senior Loan Agreement indebtedness is secured by a pledge of the equity interests of Tribune Finance, LLC and Tribune Broadcasting Holdco, LLC, both of which are Debtors, and is guaranteed, on a senior priority basis, by the Guarantor Subsidiaries.

(b)     Bridge Facility.

---

[28] The Senior Loan Agreement was subsequently amended on June 4, 2007, and all references thereto include the June 4, 2007 amendment.

[29] The Revolving Credit Facility includes a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million.

[30] Tribune was also party to an interest rate swap agreement with Morgan Stanley, which was terminated as of the Petition Date. Morgan Stanley, as the non-defaulting party under the swap agreement, calculated that approximately $52 million was owing to Tribune under that agreement as of the Petition Date. Approximately $9.5 million of this amount was paid to Tribune post-petition. While Tribune asserts a claim for the balance of approximately $42 million, Morgan Stanley has asserted a right to set-off approximately $38 million of this amount.

[31] The outstanding indebtedness under the Tranche B Facility includes amounts outstanding under the Incremental Facility and the Delayed Draw Facility.

[32] As of the Petition Date, Tribune had $99.8 million of letters of credit outstanding under the Revolving Credit Facility.

On December 20, 2007, Tribune entered into a $1.6 billion Senior Unsecured Interim Loan Agreement (the "Interim Credit Agreement") with Merrill Lynch as administrative agent, JPMorgan Chase Bank, N.A. as Syndication Agent, Citicorp North America, Inc. and Bank of America, N.A. as Co-Documentation Agents, and the Initial Lenders named therein. Pursuant to the Interim Credit Agreement, Tribune borrowed $1.6 billion under a 12 month bridge facility (the "Bridge Facility"). The total proceeds of $3.705 billion from the Bridge Facility and the Incremental Facility were used by Tribune, among other ways, in connection with the consummation of the Merger and for general corporate purposes. The Bridge Facility indebtedness is unsecured but is guaranteed, on a senior subordinated basis, by the Guarantor Subsidiaries. As of the Petition Date, the approximate outstanding balance of the Bridge Facility was $1.6 billion.

      (c)      The Senior Notes.

Pursuant to Indentures entered into between 1992 and 1997, Tribune is obligated on Senior Notes in the aggregate approximate amount of $1.263 billion. Each outstanding series and the approximate principal amounts owing as of the Petition Date are as follows:

| Indenture | Interest Rate | Maturity Date | Outstanding Amount[3033] | CUSIP # |
|---|---|---|---|---|
| 1992 | 6.25% | November 10, 2026 | $.120 million | 89605HBY9 |
| 1995 | 7.25% | March 1, 2013 | $ 82.083 million | 887364AA5 |
| 1995 | 7.5% | July 1, 2023 | $ 98.750 million | 887364AB3 |
| 1996 | 6.61% | September 15, 2027 | $ 84.960 million | 887364AF4 |
| 1996 | 7.25% | November 15, 2096 | $148.000 million | 887360AT2 |
| 1997 | 4.875% | August 15, 2010 | $450.000 million | 896047AE7 |
| 1997 | 5.25% | August 15, 2015 | $330.000 million | 896047AF4 |
| 1997 | 5.67% | December 8, 2008 | $ 69.550 million | 89604KAN8 |
| **Total** | | | **$1.263 billion** | |

The Senior Notes are not guaranteed. The Senior Notes are secured by the Stock Pledge on a *pari passu* basis with the indebtedness under the Senior Loan Agreement.

      (d)      The EGI-TRB LLC Notes.

On December 20, 2007, Tribune executed a $225 million subordinated promissory note in favor of the Zell Entity, which thereafter assigned minority interests in such notes to certain permitted assignees (collectively, the "EGI-TRB LLC Notes"). The notes are obligations solely of Tribune and are not guaranteed by Tribune's subsidiaries. As of the Petition Date, the aggregate outstanding principal balance of the EGI-TRB LLC Notes, including accrued payment-in-kind interest, totaled $235.3 million. The EGI-TRB LLC Notes mature in 2018.

      (e)      The PHONES Notes.

In April 1999, Tribune issued eight million Exchangeable Subordinated Debentures due 2029 (the "PHONES Notes") for an aggregate principal amount of $1.256 billion. At the time of issuance, the value of one PHONES Notes was related to the value of one "reference share" of America Online ("AOL") common stock, which was then trading at $157 per share. On November 22, 1999, AOL common stock split on a two-to-one basis, changing the reference to two shares of AOL for each PHONES Notes. On January 11, 2001, AOL and Time Warner Inc. merged to form AOL Time Warner Inc. with the merged entity continuing to trade under the ticker AOL. On October 16, 2003, AOL Time Warner Inc. changed its name to Time Warner Inc. and began trading as TWX. As a result of the split and subsequent merger, two shares of TWX common stock now represent the "reference shares" for each PHONES Notes. Tribune was eligible to redeem the

[3033] "The "Outstanding Amount" does not include accrued interest or fees as of the Petition Date. In addition, the "Outstanding Amount" does not purport to represent the Allowed amount of the Senior Noteholder Claims.

PHONES Notes at any time for the higher of the principal value of the PHONES Notes or the then-current market value of two shares of Time Warner common stock, subject to certain adjustments. In addition, prior to the Petition Date, Holders of PHONES Notes were contractually entitled to exchange a PHONES Notes for an amount of cash equal to ninety-five percent (95%) (or one hundred percent (100%) under certain circumstances) of the then-current market value of two shares of Time Warner stock. The approximate carrying value of PHONES Notes on the Petition Date was $759 million comprised of $703 million for PHONES Notes not submitted for exchange and a $56 million liability for PHONES Notes exchanged that were not settled in cash. The Debtors have been informed by the Trustee for the PHONES Notes that the Trustee and certain holders of the PHONES have disputed that the outstanding amount of the PHONES Notes that were submitted for redemption and not settled for cash has been reduced as a result of such submission. The PHONES Notes are obligations solely of Tribune and are not guaranteed by Tribune's subsidiaries.

<blockquote>(f)    The Receivables Facility.</blockquote>

Prior to the Petition Date, Tribune, Tribune Receivables, LLC, a non-Debtor special purpose subsidiary of Tribune (the "Receivables Subsidiary"), and certain other subsidiaries of Tribune entered into a $300 million trade receivables securitization facility (the "Receivables Facility") led by Barclays, as administrative agent. The Receivables Facility, entered into in July 2008, enabled certain of Tribune's subsidiaries (the "Operating Subsidiaries") to sell certain trade receivables and related assets (the "Receivables") to Tribune on a daily basis. Tribune, in turn, sold such Receivables to the Receivables Subsidiary, also on a daily basis. Receivables transferred to the Receivables Subsidiary are considered assets of the Receivables Subsidiary and not of Tribune or any of the Operating Subsidiaries.

As of the Petition Date, the total amount outstanding under the Receivables Facility was $225 million. As discussed in Article VI below, following the Petition Date, the Receivables Facility was amended, restated and incorporated into the Amended DIP Facility (defined below). On November 19, 2009, the outstanding term and revolving loan balances under the Amended DIP Facility were repaid. On February 25, 2010, the Debtors provided written notice to the Administrative Agent for the Amended DIP Facility terminating the Amended DIP Facility effective February 26, 2010.

## B.    Prepetition Trade Payables & Other Operating Liabilities.

In addition to the funded debt described above, Tribune and its Debtor subsidiaries had liabilities as of the Petition Date to various trade vendors. Such liabilities related to the purchase of broadcast rights, newsprint and ink, and other goods and services used in the Debtors' business operations. As of the Petition Date, the Debtors had approximately $115 million of trade payables, including accruals for goods or services received but not invoiced. These amounts remain subject to the claims reconciliation process, which is discussed further in Article VI.G.4 of this Disclosure Statement.

## C.    Prepetition Compensation and Benefit Programs.[34]

The Debtors employed approximately 11,929 full-time and 2,555 part-time employees as of December 31, 2009, and the Debtors' gross expenses for their employees' compensation and benefit programs were approximately $1.1 billion during calendar year 2009. In addition to standard wages, such costs include a number of programs which were implemented by the Debtors in the ordinary course of business and are designed to reward the Debtors' management and non-management employees for excellent service, incentivize future performance, and provide employees with a competitive compensation and benefit package.

Certain of these compensation and benefit programs are generally described below, with the exception of insured and self-insured programs (e.g., health plans), customary fringe benefit policies (e.g., vacation, sick leave), individual employment agreements and collectively bargained agreements (except for the information set forth in sections 1-2 below). The descriptions included below generally identify

---

[34] Unless otherwise specified, the Compensation and Benefit Programs discussed in this Section were implemented by the Debtors prior to the Petition Date.

compensation and benefit programs for current and former employees that, in addition to certain other employee compensation and benefit programs not specifically described herein, the Debtors intend to continue pursuant to the Plan. The descriptions also set forth those compensation and benefit programs that, though in effect as of the Petition Date, have either been suspended, have expired by their terms or are programs which the Debtors otherwise do not intend to continue following the Effective Date of the Plan.

As further described below, the Plan generally contemplates that the Tribune Company Pension Plan (defined below), the Debtors' other qualified defined benefit pension plans, the 401(k) Plans (defined below), the Management Incentive Plan (or the "MIP", as described below), Local Bonus Programs (defined below), collective bargaining agreements, and certain salary continuation programs will be continued following the Debtors' emergence from the Chapter 11 Cases. The Plan further contemplates that certain compensation and benefit programs in effect as of the Petition Date will not be continued following the Effective Date, including the Management Equity Incentive Plan (defined below), the Incentive Compensation Plan (defined below) (other than those provisions involving the MIP), the ESOP, the Transitional Compensation Plan (defined below), certain nonqualified retirement and deferred compensation programs, and certain individual letter agreements.

The descriptions set forth below are not, and are not intended to be, comprehensive and, as previously noted, do not include certain customary employee benefits provided by the Debtors. All such benefit programs and the Debtors' other compensation and benefit programs are governed by applicable program terms and conditions, as in effect or amended from time to time. In addition, the Debtors reserve the right to modify, amend or terminate any or all of their employee benefit and compensation programs in the ordinary course of business in their sole discretion, subject to applicable modification, amendment or termination provisions and/or applicable law. Moreover, nothing in this Disclosure Statement shall limit the Debtors' rights to implement or seek implementation of any compensation and benefit programs as may be appropriate.

1.    Compensation and Benefit Programs in Effect as of the Petition Date that will be continued Pursuant to the Plan.

(a)    Retirement Programs.

The Debtors provide retirement benefits to employees through numerous defined benefit pension plans and defined contribution 401(k) plans sponsored either by the Debtors or by unions. These benefits are generally described below.

i)    Single Employer Pension Plans

The Debtors currently maintain four qualified single-employer defined benefit pension plans.[235] A description of the Debtors' single-employer pension plans follows.

1.    Tribune Company Pension Plan

The Tribune Company Pension Plan is the Debtors' primary pension plan and is a tax-qualified, non-contributory, defined benefit pension plan for eligible employees.[236] Substantially all of the accrued benefits provided under the plan were earned by employees based on final average pay benefit formulas used in other defined benefit plans sponsored by the Debtors that were merged into the Tribune Company Pension Plan. Although the Tribune Company Pension Plan most recently provided benefits using a cash balance allocation, its assets and liabilities are almost entirely attributable to the benefits earned under prior plan formulas, the

---

[235] Two additional plans, the Major League Baseball Pension Plan for Non-Uniformed Personnel and the Minor League Players Pension Plan, were previously maintained by one of the Debtors. However, these plans were assumed and assigned as a part of the Chicago Cubs transaction.

[236] The formal name of the Tribune Company Pension Plan is the Tribune Company Cash Balance Pension Plan.

majority of which were frozen prior to January 1, 2006 and the last of which was frozen as of December 31, 2006.

As discussed above, from December 31, 2007 through December 31, 2009, the Tribune Company Pension Plan provided benefits in the form of an annual cash balance allocation to a hypothetical account established for each eligible employee participating in the plan in an amount equal to three percent (3%) of the employee's eligible compensation. In addition, each eligible employee's account was credited with interest quarterly to provide an annual effective rate equal to the ten-year, United States Treasury rate in effect on November 30th of the preceding year. Beginning in 2010, the Debtors discontinued the annual cash balance allocations; however, the Debtors continue to credit employees' accounts with the aforementioned interest. In place of the cash balance allocation, the Debtors currently provide retirement benefits through matching contributions to employees' accounts under the existing defined contribution 401(k) Plans, discussed below. These changes did not affect any benefits earned prior to 2010 under the Tribune Company Pension Plan.

The Debtors estimate that, as of January 1, 2009, there were approximately 13,057 active employees participating in the Tribune Company Pension Plan, as well as approximately 9,280 retirees receiving benefits from the Tribune Company Pension Plan. As of that date, there were also approximately 15,933 additional persons who were neither active employees of the Debtors nor currently receiving benefits under the Tribune Company Pension Plan, but that were eligible to receive benefits thereunder in the future.

The funding status of the Tribune Company Pension Plan is generally determined either in accordance with GAAP ("Accounting Funding") or in accordance with the Pension Protection Act ("Cash Funding"). On an Accounting Funding basis, the Tribune Company Pension Plan was approximately eighty-eight percent (88%) funded at the end of 2009. On a Cash Funding basis, the Tribune Company Pension Plan was between approximately ninety-five percent (95%) and one hundred percent (100%) funded at the end of 2009.[3437]

As of January 1, 2010, the Tribune Company Pension Plan maintained assets with a market value of approximately $1.3 billion. Based on current actuarial analyses, various assumptions, and the Debtors' business plans, the Debtors anticipate that there will not be any Cash Funding requirements for the plan in 2010-2011, but that such Cash Funding requirements will be approximately (in millions) $53 in 2012, $49 in 2013, and $43 in 2014. Actual funding requirements are highly dependent on assumptions and could vary considerably from these estimates.

2.    Other Single Employer Qualified Defined Benefit Pension Plans

In addition to the Tribune Company Pension Plan, the Debtors maintain the following three qualified defined benefit pension plans for eligible employees:

- *Baltimore Sun Company Employees Retirement Plan.* As of January 1, 2010, the Baltimore Sun Company Employees Retirement Plan maintained assets with a market value of approximately $46 million. Based on current actuarial analyses and the Debtors' business plans, the Debtors anticipate that the Cash Funding requirements for the Baltimore Sun Company Employees Retirement Plan will be approximately (in millions) $2 in 2010, $4 in 2011, $5 in 2012, $4 in 2013, and $4 in 2014. Actual Cash Funding requirements are highly dependent on assumptions and could vary considerably from these estimates.

---

[3437] The Cash Funding calculation yields a lower deficit than the Accounting Funding calculation for a number of reasons. For example, for purposes of the Cash Funding calculation, assets are "smoothed" by averaging the three most recent year-end asset values, with the benefit of averaging limited to one hundred and ten percent (110%) of the actual most recent year-end asset value. Under the Pension Protection Act rules, the Cash Funding calculation also applies a different discount rate to discount liabilities than the Accounting Funding method.

36

- *Tribune Company Hourly Pension Plan.* As of January 1, 2010, the Tribune Company Hourly Pension Plan maintained assets with a market value of approximately $17.6 million. Based on current actuarial analyses, various assumptions, and the Debtors' business plans, the Debtors anticipate that there will be no Cash Funding requirements for the Tribune Company Hourly Pension Plan in 2010-2014. Actual Cash Funding requirements are highly dependent on assumptions and could vary considerably from these estimates.
- *Baltimore Mailers Union Local No. 888 Plan.*[1538] As of January 1, 2010, the Baltimore Mailers Union Local No. 888 Plan maintained assets with a market value of approximately $8.1 million. Contributions, funded by concessions negotiated in collective bargaining, occur each pay period. Based on current actuarial analyses, various assumptions, and the Debtors' business plans, the Debtors anticipate that there will be no additional Cash Funding requirement for the Baltimore Mailers Union Local No. 888 Plan in 2010 and that additional Cash Funding of approximately $0.3 million will be required each year in 2011-2014. Actual funding requirements are highly dependent on assumptions and could vary considerably from these estimates. These estimates do not include routine contractual contributions that continue to be made each year.

As set forth in Section 6.5 of the Plan, the Debtors will continue performing their obligations under the above defined benefit pension plans on and after the Effective Date.

ii)    Multiemployer Pension Plans

The Debtors also participate in 16 multiemployer plans at various locations pursuant to certain of their collective bargaining agreements. These plans, which are summarized in the below table, generally require monthly contributions based on hours worked. On and after the Effective Date of the Plan, the Debtors intend to perform their obligations with respect to the multiemployer plans.

| Business Unit/Department | Union/Local | Plan Name | Estimated Number Current Employees of Debtors Covered | CBA Expiration Date | Estimated Total Number of Participants | Approximate Contribution[*] | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | 2007 | 2008 | 2009 |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) |
| (1) Chicago Tribune - Pressmen | GCC/#7 | GCIU-Employer Retirement Fund | 150 | 05/2012 | 56,367 | $ 464,118 | $ 467,830 | $ 451,612 |
| (2) Chicago Tribune - Drivers | IBT/#706 | Chicago Newspaper Publishers Drivers Union Pension Plan | 140 | 12/2010 | 1,039 | 1,813,473 | 1,696,538 | 1,661,276 |
| (3) Baltimore Sun - Pressroom | GCC/#31 | GCIU-Employer Retirement Fund | 80 | 04/2012 | 56,367 | 304,725 | 276,049 | 366,168 |
| (4) Chicago Tribune – Machinists | IAM/#126 | IAM National Pension Fund | 47 | 09/2008 | 227,988 | 226,741 | 207,952 | 204,588 |
| (5) KTLA – Newsroom | AFTRA | AFTRA Health and Retirement Plan | 40 | 08/2011 | 40,859 | 592,191 | 544,431 | 656,898 |
| (6) WPIX – Directors | DGA | Directors Guild of America Producers Pension Plan | 32 | 10/2008 | 17,141 | 74,445 | 80,391 | 80,487 |
| (7) WGN-TV – Newsroom | AFTRA | AFTRA Health and Retirement Plan | 30 | N/A[**] | 40,859 | 593,528 | 587,836 | 717,151 |
| (8) Baltimore Sun – Drivers | IBT/#355 | Truck Drivers and Helpers Local 355 Pension Fund | 25 | 12/2010 | 3,490 | 141,138 | 105,754 | 137,783 |
| (9) WPIX – Newsroom | AFTRA | AFTRA Health and Retirement Plan | 25 | 05/2009 | 40,859 | 489,995 | 508,626 | 478,933 |
| (10) WPIX – Stagehands | IATSE/#1 | IATSE Local #1 Pension Plan and Annuity Funds[**] | 14 | 03/2011 | 11,195 | 97,746 | 110,313 | 129,565 |
| (11) WGN-TV – Stagehands | IATSE/#2 | Stagehands Local #2 Pension Plan and Annuity Funds[***] | 10 | 05/2011 | 1,035 | 54,485 | 47,252 | 57,082 |
| (12) KLTA-TEC Electricians | IBEW/#40 | Motion Picture Association Pension Plan | 3 | 07/2010 | 328 | 46,276 | 28,336 | 29,141 |
| (13) WGN-TV 9 Op. Engs. | IUOE/#399 | IUOE Central Pension Fund | 3 | 05/2011 | 167,959 | 10,567 | 8,893 | 10,162 |
| (14) Baltimore Sun - Composers | CWA/ITU | CWA/ITU Negotiated Pension Fund | 1 | 12/2004 | 50,957 | 2,603 | 2,603 | 2,893 |
| TOTAL | | | 600 | | | $4,912,031 | $4,672,804 | $4,983,739 |

[*]   The Debtors' multiemployer pension plans generally require contributions based on the hours worked by participating employees, which may vary from year to year. Accordingly, the Debtors' contributions to such Plans may vary from year to year. Each contribution set forth in this summary chart is applicable only to the specific year noted.

[**]   The parties have entered into an open-ended contract extension that may be terminated by either party upon 30 days prior written notice.

[1538] The formal name of the Baltimore Mailers Union Local No. 888 Plan is the Baltimore Mailers Union Local No. 888 and the Baltimore Sun Company Retirement Plan.

37

cash compensation to certain of the Debtors' management employees to the extent that performance goals approved by the Compensation Committee are met. MIP participants typically consist of those management employees, other than those in sales positions, with target cash incentive award opportunities of at least fifteen percent (15%) of their base salary. Approximately 700670 of the Tribune Entities' employees participated in the MIP in 2009.

The Debtors have used a consistent methodology over the years in setting annual MIP targets and in subsequently determining MIP cash awards. During this time, each MIP participant had an annual target award opportunity expressed as a percentage of his or her base salary. The Debtors then used these individual bonus opportunities to determine target bonus pools for each business unit and segment, as well as a consolidated company-wide bonus pool. Within the Publishing Segment, each individual newspaper (combined with any subsidiaries) was measured as a separate business unit; within the Broadcasting Segment, each television and radio station (or station group in duopoly markets) was measured as a separate business unit; and certain other operations considered to be general corporate operations as well as certain group offices that oversee the entire Publishing Segment or Broadcasting Segment also constituted distinct business units. In the fourth quarter of each year, a budget and operating plan was developed by each business unit for the following year, as well as a consolidated budget and operating plan for the Tribune Entities as a whole. The operating cash flow goals established in the planning process for a given business unit served as the primary performance target for that year's MIP. Business units were generally eligible for bonus pools ranging from forty percent (40%) to two hundred percent (200%) of the applicable target pool based on performance ranging from threshold-level to maximum-level achievement of applicable MIP goals, respectively. Additionally, in accordance with the MIP, prior to the Petition Date, the Debtors historically made discretionary MIP cash awards to participants whose business units did not satisfy one or more of their stated goals (even at threshold levels), and otherwise adjusted pool amounts and individual awards, both positively and negatively, in their discretion even in cases where applicable goals were met in whole or in part. Any such adjustments were consistent with the MIP parameters discussed above.

By orders entered on May 12, 2009 and September 30, 2009, respectively, the Bankruptcy Court authorized the Debtors to pay awards for 2008 under the MIP totaling approximately $12.2 million to eligible employees other than certain executives and up to $3.1 million to such executives. In addition, as discussed in Article VI.C of this Disclosure Statement, on July 22, 2009 the Debtors filed a motion with the Bankruptcy Court seeking authority to implement a 2009 Management Incentive Plan consisting of a self-funding ordinary course MIP program consistent with the Debtors' historical MIP programs, but containing certain modifications relative to prior years (including, for example, reductions to payout percentages at various levels of goal achievement compared with historical levels), as well as a new self-funding Transition MIP ("TMIP") program and a self-funding Key Operators Bonus ("KOB") program for certain participants (the "2009 MIP Motion"). By order entered January 28, 2010, the Bankruptcy Court authorized the Debtors to implement the ordinary course MIP component of the 2009 Management Incentive Plan and to pay ordinary course MIP awards in an aggregate amount not to exceed $45.6 million. Payment of 2009 MIP bonuses totaling $42.1 million was made on February 26, 2010. As noted in Article IX.H.5 below. atAt a hearing held on January 27, 2010, the Bankruptcy Court suggested that the Debtors consider incorporating the TMIP and the KOB into a chapter 11 plan of reorganization. In the meantime, the Bankruptcy Court took under advisement, and did not rule with respect to, the TMIP and KOB programs. The Debtors followed the Bankruptcy Court's suggestion, and filed a motion on March 4, 2010, to voluntarily dismiss, without prejudice, their request in the 2009 MIP Motion for entry of an order authorizing the implementation of the TMIP and KOB. The Bankruptcy Court granted the Debtors' motion by order dated March 23, 2010. The Debtors will address the inclusion in the Plan ofAs further discussed in Article IX.H.5, the Plan authorizes and implements the TMIP and the KOB in the Plan Supplement.

The Debtors intend to continue the ordinary course annual MIP program (without any of the special limitations implemented for 2009) in 2010 and subsequent years, including after the Effective Date of the Plan.

(d)    Local Bonus Programs.

The Debtors maintain a variety of commission and incentive bonus programs for certain sales and other personnel who generally do not participate in the MIP. These programs are implemented locally and designed to incentivize and reward achievements of the Debtors' employees based upon specific metrics relevant to the respective employees' local or departmental line of work (the "Local Bonus Programs"). During 2009, approximately 2,500 of the Debtors' employees participated in the Local Bonus Programs. Generally, these programs are developed and implemented locally by individual newspapers, broadcast stations and corporate office departments. The majority of these programs are based on performance factors such as revenue generation, increasing market share, expense targets, and some discretionary factors. Payouts under most of the Local Bonus Programs are based upon year-end, quarter-end or month-end performance. The Debtors paid an aggregate of approximately $24.8 million, $22.2 million, and $20.7 million, respectively during 2007, 2008, and 2009 in connection with the Local Bonus Programs.[36,39]

(e)    Collective Bargaining Agreements.

As of December 31, 2009, approximately eleven percent (11%) of the Debtors' employees in the Publishing Segment and approximately thirty-four percent (34%) of the Debtors' employees in the Broadcasting Segment were represented by unions and covered under various collective bargaining agreements. Specifically, the Tribune Entities in the Publishing Segment are party to ten collective bargaining agreements and the Tribune Entities in the Broadcasting Segment are party to 15 collective bargaining agreements. The following table summarizes certain information concerning the union representation of the Tribune Entities' employees.[37,40]

| | Department | Union/Local Name | Full-Time | Part-Time | Per Diems/ Seasonal | Expiration Date |
|---|---|---|---|---|---|---|
| | | | **Approximate Number of Employees** | | | |
| **Publishing** | | | | | | |
| *Baltimore Sun* | Packagers | GCC-IBT/888 | 108 | 72 | 0 | 12/ 2008** |
| *Baltimore Sun* | Transportation | GCC-IBT/355 | 19 | 12 | 0 | 12/2010 |
| *Baltimore Sun* | Pressroom | GCC-IBT/31 | 81 | 0 | 0 | 4/2012 |
| *Baltimore Sun* | Various* | TNG/Baltimore-Washington | 209 | 11 | 0 | 6/2012 |
| *Baltimore Sun†* | Prepress | GCC-IBT/582 | 1 | 0 | 0 | 4/2012 |
| *Chicago Tribune* | Machinists | IAM/126 | 45 | 0 | 0 | 9/ 2008** |
| *Chicago Tribune* | Pressroom | GCC-IBT/7 | 138 | 3 | 0 | 5/2012 |
| *Chicago Tribune* | Drivers | IBT/706 | 138 | 6 | 0 | 12/2010 |
| *LA Times* | Pressroom | GCC-IBT | 185 | 1 | 0 | 5/2011 |
| *Morning Call* | Pressroom | GCC-IBT/160M | 20 | 0 | 0 | 6/ 2009** |
| *Subtotal* | | | *945* | *99* | *0* | |
| **Broadcasting and Entertainment** | | | | | | |
| KTLA (Los Angeles) | Newspersons | AFTRA | 22 | 0 | 15 | 8/2011 |
| WPIX (New York) | Directors | DGA | 8 | 1 | 21 | 10/ 2008** |
| WPIX (New York) | Newswriters | TNG/3 | 29 | 3 | 16 | 12/2012 |

[36,39] As further discussed in Article VI of this Disclosure Statement, on February 3, 2009 and May 12, 2009, the Bankruptcy Court entered orders authorizing the Debtors to pay prepetition amounts outstanding in connection with the Local Bonus Programs in an aggregate amount of up to $8.8 million and $1.1 million, respectively.

[37,40] A list of all Collective Bargaining Agreements, including full names of such agreements, is attached hereto as Exhibit I-E.

matters involving the Debtors and specifically exclude, among others, administrative actions, workers compensation actions and actions involving union grievances. In addition, the matters discussed below are included for disclosure purposes only and are not an admission, and are not intended to be an admission, of liability with respect to any claim or action.

The Debtors anticipate that, to the extent any of the litigation set forth below is not resolved prior to the Effective Date of the Plan or removed by the Debtors to federal court consistent with the Bankruptcy Code, and to the extent the plaintiffs timely filed proofs of claim, such litigation will continue after the Effective Date in the forum(s) in which it was initiated in order to liquidate the amount of the Claim. Any adverse judgment in any of these actions would constitute a Claim that will be treated in accordance with the provisions of the Plan, so long as such Claim was otherwise allowable because it complied with the applicable requirements of the Chapter 11 Cases and the Bankruptcy Code.

As of the date of this Disclosure Statement, the face-value of all litigation-related proofs of claim against the Tribune that have not already been disallowed by Bankruptcy Court order, including all unliquidated amounts, is approximately $67,000,000. That amount, however, assumes that all pending litigation-related proofs of claim against Tribune are not frivolous and will be successfully prosecuted for the full amount demanded. It also includes duplicate claims filed against Tribune. After accounting for duplicate claims, the face-value of claims arising from litigation pending against Tribune is approximately $36,000,000. The Debtors continue to review and defend the various litigation claims and the ultimate allowed amount is uncertain; however, based on the preceding information and the review to date, the Debtors believe the estimated range of Allowed Other Parent Claims of $100 million to $125 million is appropriate.

As of the date of this Disclosure Statement, the face-value of all litigation-related proofs of claim against the Filed Subsidiary Debtors that have not already been disallowed by Bankruptcy Court order, including all unliquidated amounts, is approximately $~~306,649,896~~ 306,000,000. That amount, however, assumes that all pending litigation-related proofs of claim against the Filed Subsidiary Debtors are not frivolous and will be successfully prosecuted for the full amount demanded. It also includes duplicate claims filed against the Subsidiary Debtors. After accounting for (i) duplicate claims, (ii) claims that are the subject of objections either pending before the Bankruptcy Court or to be filed with the Bankruptcy Court on May 17, 2010, and (iii) claims that have been settled in principle as of May 17, 2010, the face-value of claims arising from litigation pending against the Filed Subsidiary Debtors is approximately $~~44,505,987~~ 44,500,000. The Debtors continue to review and defend the various litigation claims and the ultimate allowed amount is uncertain; however, based on the preceding information and the review to date, the Debtors believe the estimated range of Allowed Subsidiary General Unsecured Claims of $85 million to $150 million is appropriate.

1.    *Newsday* and *Hoy* Circulation Misstatements.

In February 2004, a purported class action lawsuit was filed in New York federal court by certain advertisers in *Newsday* and an affiliate publication, *Hoy*, New York, alleging that they were overcharged for advertising as a result of inflated circulation numbers at these two publications (the "New York Circulation Action"). Plaintiffs in the New York Circulation Action also allege that certain entities that paid Distribution Systems of America, Inc., a *Newsday* subsidiary, to deliver advertising flyers were overcharged. Due to the commencement of these Chapter 11 Cases, the New York Circulation Action, captioned *Crabhouse of Douglaston Inc. d/b/a/ Douglaston Manor, et al., v. Newsday, Inc. et al.*, Case No. CV 04-558 (E.D.N.Y. Feb. 10, 2004), has been stayed with respect to the remaining Debtor defendants: Hoy, LLC (the publisher of *Hoy, New York*) and Distribution Systems of America, LLC. The litigation is ongoing with respect to Tribune ND, Inc., a Guarantor Non-Debtor, as successor to Newsday, Inc.

In addition to the New York Circulation Action, a stockholder derivative suit was filed against the Debtors and certain of their current and former directors and officers in the United States District Court for the Northern District of Illinois captioned *Hill v. Tribune Co.*, Case No. 05-2602 (WTH). The suit, which was

Prior to the Petition Date, the Debtors implemented and continue to implement aggressive strategic initiatives to enhance operating cash flow and mitigate the impact of the severe economic downturn. Strategic initiatives aimed at generating incremental cash flow through cost savings included improvements in operating efficiencies, reductions in workforce, web width (newspaper page size) reductions and newspaper redesigns. They also included revenue enhancement initiatives such as entering into arrangements to print and deliver other companies' newspapers, increasing the number of hours of television news programming, and improving the efficiency and effectiveness of the sales force. Additionally, in 2008 the Debtors implemented a strategy to monetize various assets including the July 2008 joint venture involving the Newsday operations, the April 2008 sale of real estate associated with the Debtors' former Southern Connecticut newspapers, the January 2008 sale of a studio production lot in Hollywood, California and the September 2008 sale of an equity stake in CareerBuilder LLC. Tribune also continued its efforts to select a winning bidder for the Chicago Cubs baseball operations and related assets, consistent with Tribune's announcement in April 2007 that it intended to pursue the disposition of an interest in that business. The consummation of certain transactions pursuant to which the Chicago Cubs and related assets and liabilities were contributed to a newly formed limited liability company, Chicago Baseball Holdings, LLC and its subsidiaries, is described in more detail in <u>Article VI.H</u> of this Disclosure Statement.

Notwithstanding the Debtors' aggressive efforts to enhance revenue, reduce expenses and monetize various assets, the impact of the unprecedented economic downturn left them with weak operating results and significant liquidity challenges. In December 2008 alone, the Debtors faced debt service and related payments of approximately $200 million, with another $1.3 billion due in 2009, including $512 million of the Tranche X debt maturing in June 2009.

Against a backdrop of declining revenues in a recession, uncertainty in the capital markets and substantial debt service requirements, the Debtors concluded that the most responsible course of action was to restructure their balance sheet in order to restore liquidity and return to financial health.

## VI. EVENTS DURING THE CHAPTER 11 CASES

On the Petition Date, the Debtors filed voluntary petitions for reorganization under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The Debtors' bankruptcy cases have been assigned to United States Bankruptcy Judge Kevin J. Carey. The following is a brief description of certain major events that have occurred during the Chapter 11 Cases. Because of the size of the Debtors' cases, not all events have been described below. For a complete overview of the proceedings in the Chapter 11 Cases, please refer to the publicly-available docket located, free of charge, on the Debtors' website: http://chapter11.epiqsystems.com/tribune.

### A.    Procedural Motions

On the Petition Date, the Debtors filed the Motion of the Debtors for an Order Directing Joint Administration of Related Chapter 11 Cases (the "<u>Joint Administration Motion</u>"), which requested procedural consolidation of these Chapter 11 Cases for ease of administration. The Bankruptcy Court approved the Joint Administration Motion on December 10, 2008. A supplemental joint administration order was entered by the Bankruptcy Court on October 14, 2009 jointly administering the Chapter 11 Cases of Tribune CNLBC with the Chapter 11 Cases of the other Debtors, and making certain "first day" orders and other orders previously entered in the Debtors' Chapter 11 Cases applicable to Tribune CNLBC.

### B.    "First-Day" Motions

On the Petition Date, the Debtors also filed several motions seeking typical "first day" relief in the Chapter 11 Cases. The purpose of such motions was to ensure that the Debtors were able to transition into the

$12.243 million, with respect to approximately 670 participants, and specifically excluded certain of the Debtors' executives.  The 2008 MIP Motion also sought authority to pay approximately $1.1 million in the aggregate under certain local bonus programs maintained by the Debtors.  The order granting the relief requested in the 2008 MIP Motion was granted on May 12, 2009.

Finally, on July 22, 2009, the Debtors filed the 2009 MIP Motion requesting authority to pay earned 2008 MIP awards to certain of the Debtors' executives and to implement a 2009 Management Incentive Plan (i) continuing the self-funding ordinary course MIP for 2009 for approximately 720 management employees, (ii) including a self-funding pay-for-performance TMIP bonus opportunity to incentivize 21 members of the Debtors' core management team to deliver strong operating results while performing substantial restructuring duties, and (iii) including a self-funding pay-for-performance bonus opportunity for 23 leaders of key operations (six of whom also participate in the TMIP) to incentivize such key leaders to achieve transformation of their respective operations by exceeding certain "stretch" operating cash flow goals.  On September 30, 2009, the Bankruptcy Court entered an order approving only the payment of earned but unpaid 2008 MIP awards to certain of the Debtors' executives.  On January 28, 2010, the Bankruptcy Court entered an order authorizing the payment of earned but unpaid 2009 MIP awards to all participants in the MIP in an aggregate amount not to exceed $45.6 million.  The Bankruptcy Court continues to take under advisement the TMIP and KOB programs.  On March 4, 2010, the Debtors filed a motion to voluntarily dismiss, without prejudice, their request in the 2009 MIP Motion for entry of an order authorizing the implementation of the TMIP and KOB programs.  The Bankruptcy Court granted the Debtors' motion by order dated March 23, 2010. ~~The Debtors will address the inclusion~~As further discussed in Article IX.H.5, the Plan ~~of~~authorizes and implements the TMIP and the KOB ~~in the Plan Supplement.~~

**D.    Cash Management.**

Prior to the Petition Date, the Debtors utilized a centralized cash management system (the "Cash Management System") to collect funds from their operations and to pay operating and administrative expenses in connection therewith.  In order to, among other things, avoid administrative inefficiencies, the Debtors moved the Bankruptcy Court for an order (i) approving the Cash Management System; (ii) authorizing the continued use of their existing, prepetition bank accounts and business forms; (iii) waiving the requirements of section 345(b) of the Bankruptcy Code on an interim basis; (iv) granting administrative priority status to intercompany claims between and among the Debtors and between and among the Debtors and their non-Debtor affiliates; and (v) authorizing use of cash collateral in their deposit accounts as of the Petition Date and providing adequate protection to the cash management banks for the Debtors use of the cash collateral (the "Cash Management Motion").  By order signed December 10, 2008, the Bankruptcy Court approved the Cash Management Motion and waived the requirements of section 345(b) on an interim basis (the "Interim Order").  The Interim Order granted administrative priority status to intercompany claims and transactions on an interim basis.  The final hearing on the Cash Management Motion was initially set for January 5, 2009, but was continued several times to April 30, 2009.  The order granting administrative superpriority status to post-petition intercompany claims and transactions was entered on April 30, 2009 (the "Final Order").  The Final Order granted relief under section 345(b) in regard to certain foreign accounts but continued the interim waiver of section 345(b) guidelines on an interim basis.  After entry of the Final Order, the Debtors and the U.S. Trustee resolved their remaining investment guidelines issues under section 345(b), and the Bankruptcy Court entered an order in respect of such issues on July 30, 2009.

**E.    Post-Petition Financing.**

As discussed in Article VI above, prior to the Petition Date, Tribune established the Receivables Facility.  After the Petition Date, the Debtors and Barclays amended the Receivables Facility to allow for it to be utilized as interim debtor-in-possession financing (the "Interim DIP Facility") and to provide liquidity for continued operations during the Chapter 11 Cases.  On December 8, 2008, the Debtors filed motions seeking Bankruptcy Court authorization for the (i) continued post-petition transfers of certain of the Debtors' receivables to the Receivables Subsidiary and (ii) Receivables Subsidiary to continue to obtain loans up to

a $425 million senior secured term loan facility, and (ii) $248.75 million of subordinated indebtedness. Each of the guarantees is a guarantee of collection and not of payment. Tribune has no obligation to make any payment on such guarantees unless and until New Cubs LLC fails to make a payment on any of the above obligations when due, the relevant lender(s) exhaust all legal and equitable remedies against New Cubs LLC and other guarantors and the collateral posted by New Cubs LLC and other guarantors to secure the obligations (including foreclosure and similar remedies), and the lenders have failed to collect the full amount of the guaranteed obligations. Tribune's obligations under such guarantees are limited to the initial principal amount of the obligations reduced by principal payments made by New Cubs LLC or on its behalf, cash proceeds realized from the lenders' exercise of remedies, and any principal amounts that may be forgiven by the lenders plus any unpaid premium on, or unpaid interest accruing on such principal amount.

Pursuant to the Cubs Formation Agreement, Tribune and its contributing subsidiaries and affiliates received a special distribution from New Cubs LLC of approximately $705 million in cash and other consideration, which amount remains subject to final adjustments and is being held by Tribune CNLBC pending resolution of the Chapter 11 Cases, and a five percent (5%) membership interest in New Cubs LLC valued at $21 million.[9] Further, the majority of the liabilities of the Cubs Business were assumed by New Cubs LLC or one of its affiliates. The unsecured pre-bankruptcy guaranties entered into by Tribune CNLBC of Tribune's obligations under its pre-bankruptcy credit facilities and other exceptions set forth in the Cubs Formation Agreement were not assumed by New Cubs LLC or one of its affiliates and remain as obligations of Tribune CNLBC to be addressed under the Plan.

## I.    Morgan Stanley Swap Agreement

On December 19, 1994, Morgan Stanley Capital Services, Inc. ("MSCS") and Times Mirror entered into an interest rate swap in respect of a $100 million notional amount, which was memorialized in an ISDA Master Agreement, dated as of August 5, 1994, and a Confirmation to such agreement, dated as of December 19, 1994 (collectively, the "Swap Agreement"). Between 2006 and 2008, Morgan Stanley & Co., Inc. ("MS&Co.") purchased approximately $38.365 million in face amount of the Tribune 7.5% debentures, due July 1, 2023 (the "7.5% Debentures). During 2008 and 2009, MS&Co. transferred all of its interest in the 7.5% Indentures to MSCS.

Tribune asserts that in November 2008, Tribune engaged MS&Co. to provide advisory services.[10] Tribune understands that MS&Co. and MSCS deny that any agreements were reached. Shortly after November 20, 2008, Tribune and MS&Co. determined that it would be prudent for Tribune to retain a financial advisor that satisfied the disinterested person requirement, and for MS&Co. to continue to serve as financial advisor to provide for an efficient transition to the new advisor. MS&Co. informed Tribune that, as a formal engagement agreement had not been reached, it required Tribune to execute an indemnification

---

[9] The Cubs transaction was consummated as the contribution of assets into a partnership formed with the Ricketts family. Tribune received an opinion of counsel solely for its own benefit which, although not binding on the IRS, opined that the receipt of cash attributable to partnership borrowings should not be taxable. Tribune has not reserved or set aside cash for taxes associated with the transaction. Tribune expects to recognize annual taxable income from its ownership interest in New Cubs LLC the partnership that will be taxable to Tribune as a C Corporation corporation after its emergence from bankruptcy. Those amounts are taken into account in Tribune's financial projections and models. Tribune's Projected Pro Forma Consolidated Balance Sheet included as Exhibit F reflects $1.03 billion of deferred income taxes, which includes deferred tax liabilities resulting from Tribune's contribution of assets to New Cubs LLC.

[10] Tribune also asserts that during this time (i) Tribune and MS&Co. engaged in negotiations with respect to the terms of an engagement letter, and (ii) during these negotiations, MS&Co. agreed to transfer to a third party any financial instruments that could be materially adverse to the interests of Tribune, in order for MS&Co. to qualify as a "disinterested person" under the Bankruptcy Code and to serve as Tribune's financial advisor in the event Tribune determined to commence a chapter 11 proceeding. MS&Co. could only serve as Tribune's financial advisor if MS&Co. qualified as a "disinterested person" under the Bankruptcy Code. In order to qualify as a "disinterested person" under the Bankruptcy Code, MS&Co. (and its affiliate, MSCS) could not hold financial instruments that could be materially adverse to the interests of the estate or of any claim of creditors or equity security holders.

The following is the Debtors' discussion and analyses of the Leveraged ESOP Transactions and the LBO-Related Causes of Action.  Pursuant to the Debtors' invitation, certain parties in interest have ~~submitted~~prepared the Settlement Submissions setting forth their ~~own disclosures~~views in respect of the LBO-Related Causes of Action and Global Settlement, which are included in ~~Exhibit D to~~ the compendium accompanying this Disclosure Statement.  Additionally, although the Examiner will not opine on or otherwise evaluate the Global Settlement, the Examiner's Report will set forth the results of his investigation, including in respect of the LBO-Related Causes of Action.  A copy of the Examiner's Report should be available, from and after July 12, 2010, at the following website: http://www.chapter11.epiqsystems.com/tribune.

## A.      The Leveraged ESOP Transactions.

As discussed in Article IV.A, on April 1, 2007, Tribune's then board of directors, based on the recommendation of a special committee of independent directors, approved the Leveraged ESOP Transactions with (i) the ESOP, a newly formed Tribune employee stock ownership plan, (ii) the Zell Entity, and (iii) Samuel Zell.   The Leveraged ESOP Transactions proceeded in two principal steps.

In step one, the ESOP purchased shares of Tribune common stock, and Tribune consummated a cash tender offer for nearly fifty percent (50%) of its outstanding common stock.  In order to finance the tender offer, Tribune entered into the $8.028 billion Senior Loan Agreement.  A number of Tribune's domestic subsidiaries, the Guarantor Subsidiaries, provided unsecured guarantees of Tribune's indebtedness under the Senior Loan Agreement.  The following charts illustrate the sources and uses of cash at step one of the Leveraged ESOP Transactions:

### Sources & Uses – Step I[13,14]
### ($ in millions)



| STEP I - SOURCES & USES | | |
|---|---|---|
| **Sources** | | **Amount** |
| A | Tranche B Term Loan | $5,515.0 |
| | Tranche X Term Loan | 1,500.0 |
| | Delayed Draw Tranche B Term Loan ($263 capacity) | 0.0 |
| | Revolving Credit Facility ($750 capacity) | 0.0 |
| B | EGI-TRB Equity Investment (1.47 million shares @ $34) | 50.0 |
| | Exchangeable EGI-TRB Note | 200.0 |
| | **Total Sources** | **$7,265.0** |
| **Uses** | | **Amount** |
| C | Repay Bridge Credit Agreement (a)(b) | $1,325.0 |
| | Repay Term Loan (b) | 1,500.0 |
| D | TRB repurchases 126 million shares @ $34 | 4,284.0 |
| | Bank Fees | 134.1 |
| | Other Fees | 21.9 |
| | **Total Uses** | **$7,265.0** |

In step two, which was completed on December 20, 2007, Tribune merged with the Merger Sub, a Delaware corporation wholly owned by the ESOP, with Tribune surviving the Merger. Upon the Merger, all issued and outstanding shares of Tribune's common stock, other than shares held by Tribune or the ESOP,

---

[13] Source: Company's public filings and books and records.
[14] Note:   ESOP's $250 million purchase of Tribune equity not shown as this transaction did not involve the actual transfer of any cash.
     Note:   Part B of the transaction was completed on April 23, 2007. Parts A, C and D were completed on June 4, 2007.
     (a)   Repayment of Amended and Restated Bridge Credit Agreement dated as of June 27, 2006 (as subsequently amended, the "Bridge Credit Agreement"). This repayment includes $300 million that was paid between April 23, 2007 and June 3, 2007.
     (b)   In addition to payment of principal, interest expense of $3.1 million and $6.3 million was paid on the Bridge Credit Agreement and Term Loan, respectively.

were cancelled, and Tribune became wholly owned by the ESOP.  Also on December 20, 2007, Tribune borrowed an additional $2.1 billion under the Senior Loan Agreement and entered into the Bridge Loan Agreement, pursuant to which Tribune borrowed approximately $1.6 billion.  The proceeds of the additional borrowings under the Senior Loan Agreement and of the borrowings under the Bridge Loan Agreement were used for, among other things, the consummation of the merger. ~~The Bridge Loan Agreement indebtedness is unsecured but is guaranteed, on a subordinated basis to the Senior Loan Agreement indebtedness, by the Guarantor Subsidiaries.[15]~~  The following charts illustrate the sources and uses of cash at step two of the Leveraged ESOP Transactions (in millions):

**<u>Sources & Uses – Step II</u>[16]**
**<u>($ in millions)</u>**

---

[15] The Bridge Loan Agreement indebtness is unsecured, but is guaranteed, on a subordinated basis to the Senior Loan Agreement indebtness, by the Guarantor Subsidiaries.

[16] Source: Company's public filings and books and records.

   Note:   Schedule details payments made on December 20, 2007, or shortly thereafter.

   (a)  Includes payments related to deferred compensation, non-qualified retirement and transitional compensation plans.



| STEP II - SOURCES & USES | |
|---|---|
| **Sources** | **Amount** |
| Cash from Balance Sheet | $582.9 |
| **E** Tranche B Term Loan | 2,105.0 |
| Bridge Facility | 1,600.0 |
| **F** EGI-TRB Net Cash Payment | 56.1 |
| **Total Sources** | **$4,344.0** |
| | |
| **Uses** | **Amount** |
| **G** Cash Settlement of Stock Based Awards | $134.9 |
| **H** TRB repurchases 117.1 million shares @ $34 | 3,981.9 |
| Cash Distribution triggered by Change of Control (a) | 104.0 |
| Bank Fees | 73.4 |
| Other Fees | 49.7 |
| **Total Uses** | **$4,344.0** |
| | |
| **MEMO: Details to Step F** | |
| Subordinated EGI-TRB Note Investment | $225.0 |
| EGI-TRB Warrant | 90.0 |
| Credit for TRB Shares | (50.0) |
| Credit for Exchangeable EGI-TRB Note | (200.0) |
| **Subtotal** | **65.0** |
| | |
| Credit for PIK Interest on Exchangeable EGI-TRB Note | (6.4) |
| Credit for Reimbursed Legal Fees | (2.5) |
| **Total Net Cash To Be Invested by EGI-TRB** | **$56.1** |

[17] Please refer to Article V for a discussion concerning the reasons underlying the variance between the projections prepared in February 2007 and October 2007 and actual 2007 and 2008 performance. ~~The following chart illustrates the financial projections prepared by the Company in February 2007 and October 2007.~~ The financial projections set forth below were included in the information utilized by the Company, the Board of Directors, a special committee of the Board of Directors and their respective financial and legal advisors in evaluating the Leveraged ESOP Transactions. The following chart also shows the Company's actual 2007 and 2008 performance.[17]

## Summary Projections
## ($ in millions)[18]

| | 2007PF | 2007A (a) | Var. ($) | Var. (%) | 2008P | 2008A (a) | Var. ($) | Var. (%) |
|---|---|---|---|---|---|---|---|---|
| **PROJECTIONS VS. ACTUALS** | | | | | | | | |
| **February Model** (b) | | | | | | | | |
| Revenue | $5,121.3 | $4,837.5 | ($283.7) | (5.5%) | $4,744.3 | $3,927.1 | ($817.2) | (17.2%) |
| Operating Cash Flow | 1,280.8 | 1,160.8 | (120.0) | (9.4%) | 1,263.9 | 779.0 | (484.8) | (38.4%) |
| | | | | | | | | |
| **October Model** (c) | | | | | | | | |
| Revenue | $4,856.7 | $4,837.5 | ($19.1) | (0.4%) | $4,442.0 | $3,927.1 | ($515.0) | (11.6%) |
| Operating Cash Flow | 1,160.1 | 1,160.8 | 0.6 | 0.1% | 1,095.0 | 779.0 | (316.0) | (28.9%) |

Additional information concerning the Leveraged ESOP Transactions and events leading up to the Leveraged ESOP Transactions can be found in the "Offer to Purchase" filed by Tribune with the SEC on April 25, 2007, in connection with the Leveraged ESOP Transactions, a copy of which is attached hereto as Exhibit F.D.

## B.    Investigation of the LBO-Related Causes of Action.

From the outset, it was apparent that a central issue in these Chapter 11 Cases would be the investigation and resolution of potential LBO-Related Causes of Action. Accordingly, the Creditors Committee began its investigation not long after the Debtors filed for bankruptcy, and retained Zuckerman Spaeder LLP as special litigation counsel for that purpose. During the course of that investigation, the Creditors Committee undertook discovery from over 30 entities and persons involved in the Leveraged ESOP Transactions and obtained and reviewed over 3.7 million pages of discovered documents. The Creditors Committee also deposed numerous parties. The Debtors cooperated extensively with the professionals serving the Creditors Committee by providing them with informal discovery and access to information regarding the Leveraged ESOP Transactions to permit the Creditors Committee to conduct an investigation of potential LBO-Related Causes of Action. Law Debenture has also undertaken its own investigation of the Leveraged ESOP Transactions. In addition, the Debtors undertook their own substantial efforts to review and analyze the LBO-Related Causes of Action. The Debtors also took steps to permit other parties, including Law Debenture, access to the discovery material so that they could make their own evaluation of the LBO-Related Causes of Action. In December of 2009, the Debtors streamlined and further facilitated the review process by creating a centralized document depository to provide the relevant parties access to all of the documents and deposition transcripts that have been collected to date.

## C.    Proceedings Related to Leveraged ESOP Transactions.

On January 13, 2010, WTC filed the Examiner Motion. As discussed in greater detail in Article VI.I, the Examiner Motion was resolved by the parties consensually, resulting in the entry of an agreed order by the Bankruptcy Court on April 20, 2010 directing the appointment of an examiner. Please see Article VI.I for a more detailed discussion of the Examiner Motion and its resolution.

Source:    February and October Models, 2007 Management Financial Report, 2008 Post-Audit Adjusted Management Financial Report, Company Disclosures.[1]
Note:    The Board approved the February Model on Feb. 13, 2007 and October Model on Oct. 17, 2007.[1]
Note:    All Operating Cash Flow figures are exclusive of Stock Based Compensation. See Exhibit F to the Disclosure Statement for additional information regarding Operating Cash Flow.[1]
(a).    Actual results are adjusted to exclude impact of Cubs and Tribune Entertainment, and exclude Newsday in 2008 only.[1]
(b).    Model adjusted to exclude Recycler, Tribune Entertainment, and Newsday in 2008.[1]
(c).    Model adjusted to exclude Newsday in 2008.[1]

| Tribune Hong Kong, Ltd. |
| Tribune Media Services, BV |
| Tribune Receivables, LLC |
| Tribune Sports Network Holdings, LLC |
| Tribune Technology LLC |
| Tribune WFPT, LLC |

ii)      Guarantor Non-Debtors

| |
| --- |
| Tribune (FN) Cable Ventures, Inc. |
| Tribune Interactive, Inc. |
| Tribune N-D ND, Inc. |
| Tribune National Marketing Company |

Tribune (FN) Cable Ventures, Inc. is a holding company owned by Tribune Broadcasting Company with a 31.3% interest in the Television Food Network general partnership. Tribune Interactive, Inc. is owned by Tribune (88.5%) and Chicago Tribune Company (11.5%) and manages the website operations for Tribune's publishing and broadcasting subsidiaries and assists in the management of Tribune's various online classified businesses. Tribune ND, Inc. is a holding company owned by Tribune with an approximate three percent (3%) interest in Newsday Holdings, LLC, which is the parent company of the entity that owns and operates *Newsday*. Tribune National Marketing Company is a holding company owned by Tribune with a 30.8% interest in Career Builder (the United States' largest online job web site) and a 13.9% interest in Classified Ventures (which operates automotive and real estate classified advertising websites).[20] See further discussion at Article III.B, titled "Additional Investments."

Additional financial reporting information for the Guarantor Non-Debtors may be found in the Periodic Reports of Debtors Pursuant to Bankruptcy Rule 2015.3 filed with the Bankruptcy Court on July 29, 2009 and January 29, 2010 [Docket Nos. 1863 and 3266, respectively]. Pursuant to Bankruptcy Rule 2015.3, these reports include, among other things, balance sheet, operating statement, and cash flow statement information relating to the Guarantor Non-Debtors. Copies of these reports may be obtained from the publicly-available docket located, free of charge, on the Debtors' website: http://chapter11.epiqsystems.com/tribune.

    2.      Classification of Claims against the Debtors under the Plan.

        As noted above, Claims against and Interests in each of the Debtors are further divided into lettered Classes. Not all of these Classes apply to every Debtor, and consequently not all of the below lettered Classes appear in the case of each Debtor. However, whenever such a Class of Claims or Interests is relevant to a particular Debtor, that Class of Claims or Interests will be grouped under the appropriate lettered Class from the following lists.

    (a)      Tribune Company  (Debtor 1).

        The following list assigns a letter to each Class against Tribune (Debtor 1) for purposes of identifying each separate Class:

| CLASS | CLAIM OR INTEREST |
| :---: | :---: |
| A | Priority Non-Tax Claims |

---

[20] Tribune also holds an interest in Classified Ventures. As noted in Article II.B.3 above, the Tribune Entities hold an aggregate 27.8% interest in Classified Ventures.

Class 1D consists of all Bridge Loan Claims against Tribune. Bridge Loan Claims are Claims arising under the Bridge Loan Agreement.

The following treatment shall apply to (i) all Holders of Bridge Loan Claims if Class 1D votes to accept the Plan, or (ii) each Holder of a Bridge Loan Claim that votes to accept the Plan if Class 1D votes to reject the Plan: Each such Holder of a Bridge Loan Claim shall (a) as of the Effective Date, have its Claim Allowed in an amount equal to the principal amount of such Claim plus accrued interest as of the Petition Date, and (b) on or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Bridge Loan Claim against Tribune, subject to Section 5.4.2 of the Plan, receive such Holder's Pro Rata share, calculated together with the Holders of Allowed Claims in Class 1C, of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation.

If Class 1D votes to reject the Plan, the following treatment shall apply to each Holder of a Bridge Loan Claim that votes to reject the Plan or does not return a Ballot on the Plan: Each such Holder of a Bridge Loan Claim shall (a) have its Claim treated as a Disputed Claim unless and until Allowed by Final Order, and (b) in full satisfaction, settlement, release and discharge of and in exchange for such Bridge Loan Claim against Tribune, subject to Section 5.4.2 of the Plan, receive, if ultimately Allowed, such distribution and treatment as may be proposed by the Debtors that would satisfy the requirements of section 1129(b) of the Bankruptcy Code not to exceed an amount determined by application of the mid-point estimate of total "Distributable Value" as defined and set forth herein and the allocation of such "Distributable Value" underlying the recoveries of Holders of Claims against Tribune under the Plan if such Bridge Loan Claims becomes Allowed.

Claims in Class 1D are Impaired, and Holders of Class 1D Claims are entitled to vote to accept or reject the Plan.

       (e)      Class 1E - Senior Noteholder Claims

Class 1E consists of all Senior Noteholder Claims against Tribune. Senior Noteholder Claims are all Claims arising under or evidenced by the Senior Notes Indentures and related documents and any Claim of the Senior Noteholders arising under the Pledge Agreement. The Senior Noteholder Claims shall together be deemed Allowed in the aggregate amount of $1,283,055,743.77. The Senior Noteholder Claims shall not be subject to reduction, disallowance, subordination, set off or counterclaim (other than the Senior Noteholder Claims of MSCS with respect to the Morgan Stanley Claims).

On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Senior Noteholder Claims against Tribune, subject to Section 5.4.2 of the Plan, each Holder of an Allowed Senior Noteholder Claim shall receive such Holder's Pro Rata share of 7.4% of the New Senior Secured Term Loan, 7.4% of the Distributable Cash, and 7.4% of the New Common Stock, subject to dilution by the Equity Incentive Plan.

Claims in Class 1D are Impaired, and Holders of Class 1E Claims are entitled to vote to accept or reject the Plan.

       (f)      Class 1F – Other Parent Claims

Class 1F consists of all Other Parent Claims against Tribune. Other Parent Claims are General Unsecured Claims against Tribune and for the avoidance of doubt includes all Claims against Tribune under Non-Qualified Former Employee Benefit Plans with the exception of Convenience Claims.

On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Other Parent Claims against Tribune, each Holder of an

On the Effective Date, all PHONES Notes Claims against Tribune shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such PHONES Notes Claims.

Claims in Class 1J are Impaired, and Holders of Class 1J Claims are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

> (j)    Class 1K – Intercompany Claims.

Class 1K consists of all Intercompany Claims against Tribune.  Intercompany Claims are all prepetition Claims against any of the Debtors held by a Debtor or a non-Debtor Affiliate.

In full satisfaction, settlement, release and discharge of and in exchange for Intercompany Claims against Tribune, except as otherwise provided in the Plan, all Intercompany Claims against Tribune shall be deemed satisfied, discharged and extinguished in full and shall be eliminated as of the Effective Date.

Claims in Class 1K are Impaired; however, as set forth in Section 4.3 of the Plan, votes shall not be solicited from Holders of Claims in Class 1K.

> (k)    Class 1L – Securities Litigation Claims.

Class 1L consists of all Securities Litigation Claims against Tribune.  A Securities Litigation Claim is any Claim against any of the Debtors, except any Claim that survives confirmation and effectiveness of the Plan pursuant to Section 11.6, (i) arising from the rescission of a purchase or sale of shares, notes or any other securities of any of the Debtors or an Affiliate of any of the Debtors, (ii) for damages arising from the purchase or sale of any such security, (iii) for violations of the securities laws or the Employee Retirement Income Security Act of 1974 (unless there has been a judicial determination by Final Order that any such Claim is not subject to subordination under section 510(b) of the Bankruptcy Code) or for misrepresentations or any similar Claims related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, (iv) asserted by or on behalf of the ESOP and/or any present or former participants in the ESOP in their capacity as such, (v) for attorneys' fees, other charges or costs incurred on account of any of the foregoing Claims, or (vi) for reimbursement, contribution or indemnification allowed under section 502 of the Bankruptcy Code on account of any of the foregoing Claims, including Claims based upon allegations that the Debtors made false and misleading statements or engaged in other deceptive acts in connection with the offer or sale of securities.

On the Effective Date, all Securities Litigation Claims against Tribune shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such Securities Litigation Claims.

Claims in Class 1L are Impaired.  Holders of Claims in Class 1L are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

While the Debtors believe that the aforementioned treatment is appropriate for each Securities Litigation Claim specified in the Plan, the DOL has informed the Debtors that the DOL disagrees with the Debtors' classification of Claims for violations of ERISA as Securities Litigation Claims and the subordination of such Claims to Interests in the Filed Subsidiary Debtors.  Consequently, it is possible that the DOL may choose to file an objection to Confirmation of the Plan in accordance with the procedures discussed in Article I.E of this Disclosure Statement.

> (l)    Class 1M – Tribune Interests.

Class 1M consists of all Tribune Interests in Tribune.  Tribune Interests are any shares of Old Common Stock, preferred stock or other instrument evidencing an ownership interest in Tribune, whether or not transferable,

On or as soon as reasonably practicable after the applicable Distribution Date, each Holder of an Allowed General Unsecured Claim against a Filed Subsidiary Debtor shall receive payment in full in Cash (paid out of the Distributable Cash); provided, however, that if the Debtors estimate, pursuant to the immediately preceding paragraph, that the sum of Allowed Claims in Classes 2E through 111E shall exceed $150 million in the aggregate and the Senior Lender Settlement Committee does not elect in writing after such estimate is filed with the Bankruptcy Court but prior to the conclusion of the Confirmation Hearing to provide additional consideration to such Holders, each Holder of an Allowed Claim in Classes 2E through 111E shall instead receive its Pro Rata share of $150 million in Cash; provided further, however, that post-petition interest shall not accrue or be paid on any General Unsecured Claim.

Claims in Classes 2E through 111E are Impaired, and Holders of Claims in Classes 2E through 111E are entitled to vote to accept or reject the Plan against the relevant Debtors.

(f)      Classes 2K through 111K – Intercompany Claims.

Classes 2K through 111K consist of all Intercompany Claims against the relevant Filed Subsidiary Debtors.

In full satisfaction, settlement, release and discharge of and in exchange for Intercompany Claims against Filed Subsidiary Debtors, except as otherwise provided in the Plan, all Intercompany Claims against Filed Subsidiary Debtors shall be deemed satisfied, discharged and extinguished in full and shall be eliminated as of the Effective Date.

Claims in Classes 2K through 111K are Impaired; however, as set forth in Section 4.3 of the Plan, votes on the Plan shall not be solicited from Holders of Claims in Classes 2K through 111K.

(g)      Classes 2L through 111L – Securities Litigation Claims.

Classes 2L through 111L consist of all Securities Litigation Claims against the relevant Filed Subsidiary Debtors.

On the Effective Date, all Securities Litigation Claims against Filed Subsidiary Debtors shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such Securities Litigation Claims.

Claims in Classes 2L through 111L are Impaired.  Holders of Claims in Classes 2L through 111L are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

While the Debtors believe that the aforementioned treatment is appropriate for each Securities Litigation Claim specified in the Plan, the DOL has informed the Debtors that the DOL disagrees with the Debtors' classification of Claims for violations of ERISA as Securities Litigation Claims and the subordination of such Claims to Interests in the Filed Subsidiary Debtors.  Consequently, it is possible that the DOL may choose to file an objection to Confirmation of the Plan in accordance with the procedures discussed in Article I.E of this Disclosure Statement.

(h)      Classes 2M through 111M – Interests in Filed Subsidiary Debtors.

Classes 2M through 111M consist of all Interests in the Filed Subsidiary Debtors.

Subject to Section 5.2 of the Plan, each Holder of an Allowed Interest in the Filed Subsidiary Debtors shall have its Interest Reinstated.  Allowed Interests in each Filed Subsidiary Debtor shall be Reinstated for administrative convenience and (i) in the case of the Guarantor Debtors for the ultimate benefit of the Holders

Bridge Loan Guaranty Claims shall instead be distributed to the Senior Loan Agent for distribution on account of Allowed Senior Loan Guaranty Claims. Accordingly, on the Effective Date, all Bridge Loan Guaranty Claims against Guarantor Non-Debtors that become Debtors shall be extinguished and the Holders of such Claims shall not receive or retain any property under the relevant Prepackaged Plan on account of such Bridge Loan Guaranty Claims. Bridge Loan Guaranty Claims are Impaired and Holders of such Claims are conclusively deemed to have rejected the relevant Prepackaged Plan and are not entitled to vote to accept or reject the relevant Prepackaged Plan

(d)     Treatment of Intercompany Claims.

In full satisfaction, settlement, release and discharge of and in exchange for Allowed Intercompany Claims against Guarantor Non-Debtors that become Debtors, all Intercompany Claims against a Guarantor Non-Debtor that becomes a Debtor shall be deemed satisfied, discharged and extinguished in full and shall be eliminated as of the Effective Date. Intercompany Claims are Impaired; however, as set forth in Section 4.3 of the Plan, votes shall not be solicited from the Holders of such Claims.

(e)     Securities Litigation Claims.

On the Effective Date, all Securities Litigation Claims against Guarantor Non-Debtors that become Debtors shall be extinguished and the Holders of such Claims shall not receive or retain any property under the relevant Prepackaged Plan on account of such Securities Litigation Claims. Securities Litigation Claims are Impaired and Holders of such Claims are conclusively deemed to have rejected the relevant Prepackaged Plan and are not entitled to vote to accept or reject the relevant Prepackaged Plan.

While the Debtors believe that the aforementioned treatment is appropriate for each Securities Litigation Claim specified in the Plan, the DOL has informed the Debtors that the DOL disagrees with the Debtors' classification of Claims for violations of ERISA as Securities Litigation Claims and the subordination of such Claims to Interests in the Filed Subsidiary Debtors. Consequently, it is possible that the DOL may choose to file an objection to Confirmation of the Plan in accordance with the procedures discussed in Article I.E of this Disclosure Statement.

**E.     Means for Implementation of the Plan.**

1.     Restructuring Transactions.

The Plan provides that on or prior to the Effective Date, any Debtor and, after the Effective Date, any Reorganized Debtor, may enter into or undertake any Restructuring Transactions and may take such actions as may be determined by such Debtor or Reorganized Debtor to be necessary or appropriate to effect such Restructuring Transactions. The actions to effect the Restructuring Transactions may include, without limitation: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, conversion, restructuring, recapitalization, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, disposition, or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, conversion or dissolution (or similar instrument) pursuant to applicable law; and (iv) all other actions which the applicable entities may determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions. The Restructuring Transactions may include one or more mergers, consolidations, conversions, restructurings, recapitalizations, dispositions, liquidations or dissolutions, as may be determined by the applicable Debtors or Reorganized Debtors to be necessary or appropriate to effect the purposes of such Restructuring Transactions for the

2.      Directors and Officers of Reorganized Tribune.

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the initial directors and officers of Reorganized Tribune shall be the persons identified in Exhibit 5.3.2 to the Plan, to be filed with the Plan Supplement.  On the Effective Date, the board of directors of Reorganized Tribune shall have at least seven but not more than nine members, including the chief executive officer of Reorganized Tribune.  All members of the initial board of directors of Reorganized Tribune will be in compliance with all applicable requirements of the Communications Act and the FCC's rules.  As set forth in the Certificate of Incorporation, the initial board of directors of Reorganized Tribune shall serve for a one-year, non-staggered term and then shall be subject to re-election based on a shareholder vote pursuant to the terms of the Certificate of Incorporation and applicable law.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in Exhibit 5.3.2 to the Plan, to be filed with the Plan Supplement, the identity and affiliations of any person proposed to serve on the initial board of directors of Reorganized Tribune and to the extent such person is an insider (as defined in section 101(31) of the Bankruptcy Code) other than by virtue of being a director, the nature of any compensation for such person.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the Certificate of Incorporation and applicable law.  Each member of the current board of directors of Tribune will be deemed to have resigned on the Effective Date unless identified in Exhibit 5.3.2 to the Plan as continuing on the board of directors of Reorganized Tribune.

3.      Ownership and Management of Reorganized Debtors Other Than Reorganized Tribune.

Except as set forth in Exhibit 5.2 to the Plan, from and after the Effective Date, each Reorganized Debtor shall retain its equity interest in any other Reorganized Debtor.  The initial boards of directors or managers of the Reorganized Debtors other than Reorganized Tribune shall be as set forth in Exhibit 5.3.3 to the Plan, to be filed with the Plan Supplement.

G.      **Issuance and Distribution of New Securities and Related Matters.**

1.      Issuance of New Securities.

On the Effective Date or a subsequent Distribution Date, as applicable, Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to the Plan without further act or action under applicable law, regulation, order or rule.  Except as otherwise provided in the Plan, including as specifically provided in Section 5.4.2 of the Plan, each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to the Plan will be issued New Class A Common Stock, provided that any such Holder will be entitled to receive all or a portion of its shares of New Common Stock in the form of New Class B Common Stock if such Holder informs the Debtors of its desire to receive instead such New Class B Common Stock by the date announced by the Debtors in a filing with the Bankruptcy Court, with such date to be no earlier than the first day of the Confirmation Hearing.  The Certificate of Incorporation, substantially in the form of Exhibit 5.3.1(1) to the Plan, sets forth the rights and preferences of the New Common Stock.  The Certificate of Incorporation may contain customary provisions restricting the sale, transfer, assignment, conversion or other disposal of such shares of New Common Stock.  To the extent the shares of New Class A Common Stock or New Class B Common Stock are certificated, such certificates may contain a legend restricting the sale, transfer, assignment, conversion or other disposal of such shares.  The New Warrant Agreement substantially in the form of Exhibit ~~1.1.123~~1.1.124 to the Plan, which shall be filed with the Plan Supplement, sets forth the rights of the holders of the New Warrants.  The issuance of the New Common Stock and the New Warrants and the distribution thereof under the Plan shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.  Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of the Plan, including, without limitation, the Exit Facility

the operations of the Debtors or the Reorganized Debtors, sales of assets or the Exit Facility. Subject to Section 5.1 of the Plan, the Reorganized Debtors may also make such payments using Cash received from their Affiliates through the Reorganized Debtors' consolidated cash management systems.

      10.     Additional Transactions Authorized Under the Plan.

      On or prior to the Effective Date, the Debtors shall be authorized to take any such actions as may be necessary or appropriate to have Claims or Interests Reinstated or render Claims or Interests Unimpaired to the extent provided in the Plan. On the Effective Date, the Agents are authorized and directed to take such actions as are necessary or appropriate to effect all transactions specified or referred to in or provided for under the Plan.

      11.     Settlement of Claims and Controversies.

      (a)     General.

      Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims or controversies relating to the rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Interest, including, without limitation, the settlement of the Senior Loan Guaranty Claims and the Bridge Loan Guaranty Claims and the release of such Claims against the Guarantor Non-Debtors. The entry of the Confirmation Order constitutes the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims, Interests or controversies and the Bankruptcy Court's finding that all such compromises or settlements are in the best interests of (i) the Debtors, the Reorganized Debtors, the Subsidiary Non-Debtors and their respective Debtors' Estates and property, and (ii) Claim and Interest Holders, and are fair, equitable and reasonable on the dates and in the manner set forth in the Plan.

      (b)     Global Settlement Under the Plan.

      Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the Debtors believe that the provisions of the Plan constitute a good faith compromise and settlement, and the Plan constitutes a request to authorize and approve such compromise and settlement, to release all of the Related Claims, including without limitation the LBO-Related Causes of Action, belonging to the Tribune Entities, the Debtors' Estates, and any other Person that is deemed to have given a release pursuant to Section 11.2 of the Plan against all each and every and all Released Parties (the "Global Settlement").[21] Any distributions to be made pursuant to the Plan shall be made on account of and in consideration of the Global Settlement. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Global Settlement and the Bankruptcy Court's finding that the Global Settlement is in the best interests of the Debtors, the Reorganized Debtors, their respective Debtors' Estates, and the Holders of Claims and Interests, and is fair, equitable and reasonable.

      (c)     Implementation of Retiree Claimant Settlement.

      The Plan will implement a settlement between the Debtors and approximately 200 individuals holding claims arising from Non-Qualified Former Employee Benefit Plans relating to their former employment with various of the Debtors or their predecessors (the "Retiree Claims"). The majority of the Retiree Claims arise

---

[21] For a further discussion of the Leveraged ESOP Transactions and Global Settlement, please refer to Article VII for the Debtors' discussion and analyses of the Leveraged ESOP Transactions and Global Settlement. For the views of certain creditors or creditor representatives, please refer to the Settlement Submissions in the compendium accompanying this Disclosure Statement.

pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed during the Chapter 11 Cases or pursuant to Section 7 of the Plan shall revest in and be fully enforceable by the applicable Reorganized Debtor, including any successor to such Reorganized Debtor after giving effect to the Restructuring Transactions, in accordance with its terms, except as modified by the provisions of the Plan, agreement of the parties thereto, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

Subject to the terms of Section 8 and Section 6.1.1 of the Plan and except for any Customer Program otherwise designated on Exhibit 6.3 to the Plan, all refund, and subscriber credit programs, or similar obligations of the Debtors to subscribers or former subscribers to any of the Debtors' publications under the Customer Programs shall be deemed assumed effective on the Effective Date and the proposed cure amount with respect to each shall be zero dollars. Nothing contained in Section 6.1.2 of the Plan shall constitute or be deemed to be a waiver of any claim or cause of action that the Debtors may hold against any Person. Except with respect to any Customer Programs included on Exhibit 6.3 to the Plan, as a result of the deemed assumption of the Debtors' refund, subscriber credit, and other obligations under the Customer Programs to subscribers and former subscribers pursuant to Section 6.1.2 of the Plan, all Proofs of Claim on account of or in respect of any such obligations shall be deemed withdrawn automatically and without any further notice to or action by the Bankruptcy Court and the Debtors' Claims Agent shall be authorized as of the Effective Date, to expunge such Proofs of Claim from the claims register.

The Debtors have not yet determined how to treat certain insurance policies issued by ACE American Insurance Company and/or its affiliates (collectively, "ACE") to or on behalf of the Debtors and any related agreements (hereinafter, the "ACE Policies and Agreements"), including whether or not such agreements are executory and whether they will be assumed. Subject to the Debtors' rights, if any, to assume or to reject such contracts, nothing contained in the Disclosure Statement, the Plan, the Confirmation Order, any exhibit to the Plan, any Plan Supplement or any other Plan document (including any provision that purports to be peremptory or supervening), shall in any way operate to, or have the effect of, waiving or impairing in any~~other~~ respect the legal, equitable or contractual rights or defenses of the parties to the ACE Policies and Agreements. For the avoidance of doubt, nothing herein or in the Plan shall be read to authorize the unilateral amendment by the Debtors of any of the terms of the ACE Policies and Agreements. In any event, ACE has reserved all of its rights and defenses under the ACE Policies and Agreements and applicable non-bankruptcy law with respect to the ACE Policies and Agreements.

2.       Cure of Defaults of Assumed Executory Contracts and Unexpired Leases.

The Bankruptcy Code provides for the calculation of "cure amounts" which may, in some instances, be payable by the Debtors to the non-Debtor party in connection with executory contracts or unexpired leases that are assumed by the Debtors. The proposed cure amount for any executory contract assumed pursuant to the Plan shall be zero dollars unless otherwise indicated in a schedule to be filed with the Bankruptcy Court. Any monetary amounts by which each executory contract and unexpired lease to be assumed is in default and not subsequently cured shall be satisfied, pursuant to section 365(b)(l) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree. In the event of a dispute regarding (i) the amount of any cure payments, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (iii) any other matter pertaining to assumption, the cure payments required by section 365(b)(l) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption. Pending the Bankruptcy Court's ruling on such motion, the executory contract or unexpired lease at issue shall be deemed assumed by the relevant Debtor unless otherwise ordered by the Bankruptcy Court.

3.       Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, each executory contract and unexpired lease that is listed on Exhibit 6.3 to the Plan, which shall be filed with the Plan Supplement, shall be rejected pursuant to Section 365 of the Bankruptcy Code. Each contract or lease listed on Exhibit 6.3 to the Plan shall be rejected only to the extent that any such contract or lease constitutes an executory contract or unexpired lease. The Debtors reserve their right to amend Exhibit 6.3 to the Plan to delete any unexpired lease or executory contract therefrom or add any unexpired lease or executory contract thereto. Listing a contract or lease on Exhibit 6.3 to the Plan shall not constitute an admission by a Debtor nor a Reorganized Debtor that such contract or lease is an executory contract or unexpired lease or that such Debtor or Reorganized Debtor has any liability thereunder.

4.       Rejection Damages Bar Date.

If the rejection by a Debtor, pursuant to the Plan, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor, or the properties of any of them, unless a Proof of Claim is filed and served upon counsel to the Debtors within 30 days after service of the notice that the executory contract or unexpired lease has been rejected.

5.       Compensation and Benefit Programs.

Except as set forth in Article IV.C.2 herein and such other plans as may be disclosed in the Plan Supplement, the Reorganized Debtors shall continue to perform their obligations under all Employee Benefit Plans and all such Employee Benefit Plans shall be assumed by the applicable Reorganized Debtors; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, causes of action, or other rights with respect to the interpretation, application, or enforcement of any such Employee Benefit Plan or the payment of any Employee Benefit Claim, including the Reorganized Debtors' rights to amend, modify, or terminate any such Employee Benefit Plan either prior to or after the Effective Date.

The ~~Debtors will address the inclusion in the Plan of the "Transition MIP" and the "Key Operators Bonus," each as defined in the 2009 MIP Motion, in the Plan Supplement.__ Plan incorporates and implements the TMIP and KOB programs set forth in the 2009 MIP Motion and exhibits thereto, subject to the modifications discussed herein. The following information is only a summary. The TMIP and the KOB are components of the 2009 Management Incentive Plan that the Debtors sought authority to implement in the 2009 MIP Motion, filed on July 22, 2009. At that time, the TMIP and KOB participants consisted of 38 key executives and managers who also participate in the MIP. The TMIP and KOB were intended to incentivize strong operational performance and to tie compensation to the operating performance of the Company, thereby achieving market-based compensation opportunities for the Debtors' key management team. The TMIP and KOB programs, including the performance targets and payout opportunities thereunder, were developed with and analyzed by Mercer, an independent compensation consulting firm retained by Tribune under the leadership of the Compensation Committee. Mercer concluded that the various incentive programs under the 2009 Management Incentive Plan are all within reasonable market ranges and are common forms of compensation for companies in chapter 11. The Compensation Committee specifically reviewed and approved the TMIP and KOB. The Creditors Committee supported the Debtors' request to implement the TMIP and KOB in the 2009 MIP Motion.

Following a hearing on September 25, 2009, the Bankruptcy Court took under advisement, and did not rule on, the TMIP and KOB programs. At a hearing on January 27, 2010, the Bankruptcy Court suggested that the Debtors consider incorporating the TMIP and KOB into a chapter 11 plan of reorganization. The Debtors followed the Bankruptcy Court's suggestion, and filed a motion on March 4, 2010 to voluntarily dismiss, without prejudice, their request for entry of an order authorizing the implementation of the TMIP and KOB. The Bankruptcy Court entered an order dated March 23, 2010 granting this motion.

The TMIP is a self-funding performance-based incentive compensation program that provides for payouts based on the Debtors' level of achievement of consolidated operating cash flow ("OCF") for 2009. TMIP participants consist of 20 management employees who hold key positions with top-level responsibility (including nine of the Debtors' Top 10 executives as defined in the 2009 MIP Motion) and who also are principally responsible for the Debtors' restructuring efforts. The then-President of Tribune Broadcasting, who was identified in the 2009 MIP Motion as a Top 10 participant in the TMIP and KOB, has assumed a different position with Tribune in 2010 and, by agreement, no longer will participate in the TMIP or the KOB. The TMIP also provides for a discretionary incentive pool from which the Debtors may make individual awards to up to 50 additional employees who, in the Debtors' judgment, made valuable contributions to the Debtors' restructuring efforts during 2009 (with no single award to exceed $65,000 at the "maximum" payout level). Based on the Debtors' level of consolidated OCF in 2009, payments under the TMIP will be made at the maximum levels specified for that program. Aggregate TMIP payments will total approximately $11.6 million (including the $1.3 million discretionary pool). Payouts will be made upon the Effective Date of the Plan.

The KOB is a self-funding performance-based incentive compensation plan that generally provides for payouts based on the level of incremental OCF achieved by individual business units above their "stretch" level OCF goals for 2009. In total, 21 key operating leaders (two fewer than originally proposed) who oversee the Debtors' primary operating business units participate in the KOB (five of whom also are eligible to participate in the TMIP). The aggregate payouts under the KOB will be approximately $4.6 million. As with the TMIP payouts, payouts under the KOB will be made upon the Effective Date of the Plan.

Due to certain participant reductions in the TMIP and KOB, the fact that two KOB participants did not achieve their KOB targets, and the fact that certain other KOB participants did not earn maximum-level KOB payouts per the terms of the KOB, the aggregate amount payable under the TMIP and KOB – approximately $16.2 million – is approximately $5 million less than the aggregate maximum payout proposed in the 2009 MIP Motion (approximately $21.2 million).

6.    Collective Bargaining Agreements.

Upon the Effective Date, any Collective Bargaining Agreement entered into by the Debtors that has not expired by its terms and is in effect as of the Effective Date shall be deemed to have been assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the survival, and/or the pertinent Debtor's assumption of the Collective Bargaining Agreements then in effect, except to the extent that such agreements have already been assumed prior to the entry of the Confirmation Order.

7.    Post-Petition Contracts and Leases.

All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors after the Petition Date shall be deemed assigned by such Debtors to the Reorganized Debtors, including any successor to any Reorganized Debtor after giving effect to the Restructuring Transactions, on the Effective Date.

8.    Termination of ESOP.

Upon the Effective Date, the ESOP shall be deemed terminated in accordance with its terms, and the amount of unpaid principal and interest remaining on the ESOP Note dated April 1, 2007 shall be forgiven pursuant to section 6.3 of the ESOP Loan Agreement by and between Tribune and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust dated April 1, 2007. In connection with Tribune's forgiveness of the balance due under the ESOP Note, the Debtors will seek, in their sole discretion, (i) confirmation that Tribune has a right under the ESOP Plan and ESOP Note to forgive the ESOP's obligations; (ii) confirmation that Tribune's forgiveness of any post-petition payments due from the ESOP in connection with the ESOP Note, including, without

limitation, the payment due on or about April 1, 2009, was in compliance with the ESOP Note and ESOP Plan and satisfied Tribune's obligations, if any, under the ESOP Plan to make a contribution to the ESOP during the relevant time period; (iii) a determination of the amount of the balance of the ESOP Note being forgiven, the value of any obligations of the ESOP owed to Tribune under the ESOP Note, and the legal effect of the forgiveness of the ESOP Note. Approval of the Plan is not conditioned upon these determinations, but these determinations may be sought in connection with the Plan. The Debtors intend to provide the DOL with reasonable notice and an opportunity to be heard with respect to any such filing.

I.    **Provisions Governing Distributions to Holders of Certain Allowed Claims and Interests Under the Plan.**

1.    General.

Unless the Holder of an Allowed Claim or Allowed Interest against any of the Debtors and the Debtors or the Reorganized Debtors agree to a different distribution date or except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, (i) distributions to be made on account of Claims or Interests that are Allowed as of the Effective Date shall be made on the Initial Distribution Date or as soon thereafter as is practicable and (ii) distributions to be made on account of Claims or Interests that become Allowed after the Effective Date shall be made on the succeeding Quarterly Distribution Date or as soon thereafter as is practicable. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

2.    Distributions for Certain Claims.

(a)    Distributions to Holders of Other Parent Claims.

i.    Other Parent Claim Reserve.

On or as soon as practicable after the Effective Date, Reorganized Tribune shall establish one or more Other Parent Claims Reserve(s) to make distributions to Holders of Disputed Claims that become Allowed Other Parent Claims after the Effective Date. The amount of Distributable Cash contributed to the Other Parent Claims Reserve(s) shall be equal to the amount of Distributable Cash necessary to satisfy the distributions required to be made pursuant to the Plan based upon the Face Amount of Disputed Other Parent Claims that may be entitled to receive a distribution of Distributable Cash if such Disputed Claims are subsequently Allowed Other Parent Claims.

ii.    Distributions On Account of Disputed Claims Once Allowed.

On each Quarterly Distribution Date, the Disbursing Agent shall make distributions of Distributable Cash, in accordance with the terms of the Plan, from the Other Parent Claims Reserve(s) to each Holder of a Disputed Claim that has become an Allowed Other Parent Claim during the preceding calendar quarter and that is entitled to receive such a distribution. On or as soon as practicable after the Final Distribution Date, after distributions are made to Holders of Disputed Claims that have become Allowed Other Parent Claims during the preceding calendar quarter, any Distributable Cash remaining in the Other Parent Claims Reserve(s) shall be distributed Pro Rata to the Holders of Allowed Loan Claims against Tribune entitled to receive a distribution under Section 3.2.3(c) and Section 3.2.4(b)(i) of the Plan.

3.    Distributions to Holders of General Unsecured Claims Against Filed Subsidiary Debtors.

(a)    Subsidiary GUC Reserve.

If pursuant to Section 3.3.4(b) of the Plan, Holders of Allowed Claims in Classes 2E through 111E shall receive their Pro Rata share of $150 million or any other amount, rather than receiving payment in Cash in full, on or as soon as practicable after the Effective Date, Reorganized Tribune shall establish one or more

With the exception of Senior Noteholder Claims, the Reorganized Debtors and the Disbursing Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Claim or Interest that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes in the Plan to recognize and distribute only to those Holders of Allowed Claims or Interests (including Holders of Claims and Interests that become Allowed after the Distribution Record Date) that are Holders of such Claims or Interests, or participants therein, as of the close of business on the Distribution Record Date. With the exception of Senior Noteholder Claims, the Reorganized Debtors and the Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date.

Unless otherwise set forth in the Confirmation Order, the Debtors shall not establish a record date for distributions to Holders of Senior Noteholder Claims. Distributions to Holders of Senior Noteholder Claims held through the Depository Trust Company ("DTC") shall be made by means of book-entry exchange through the facilities of ~~the~~ DTC in accordance with the customary practices of DTC, as and to the extent practicable, and the Distribution Record Date shall not apply. In connection with such book-entry exchange, ~~each~~Tribune will provide rate information to each Senior Notes Indenture Trustee, which such Senior Notes Indenture Trustee shall ~~deliver instructions to DTC instructing~~convey to DTC to effect distributions on a Pro Rata basis as provided under the Plan with respect to such Claims upon which such Senior Notes Indenture Trustee acts as trustee. ~~Distributions to Holders of Senior Noteholder Claims held directly by the Holder thereof shall be made by the Disbursing Agent upon surrender or deemed surrender of such Holder's Senior Notes except as otherwise provided in the Plan.~~ Subject to Section 7.5.2 of the Plan, distributions of Cash to Holders of Allowed Senior Noteholder Claims shall be made to the applicable Senior Notes Indenture Trustees, which, in turn, shall make such distributions to the applicable Holders either through DTC or, in the case of Senior Noteholder Claims held directly by the Holder thereof, through the applicable Senior Notes Indenture Trustee subject to the respective rights, claims and interests, if any, that the Senior Notes Indenture Trustees may have under the applicable Senior Notes Indentures or otherwise to the recovery and/or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder to the Holders of Allowed Senior Noteholder Claims, whether such rights, claims or interests are in the nature of a charging lien or otherwise. Distributions of the New Senior Secured Term Loan and the New Common Stock ~~to Holders of Senior Noteholder Claims shall be made by the Disbursing Agent~~ either through DTC or, in the case of Senior Noteholder Claims ~~held directly by the Holder thereof,~~ through the Disbursing Agent ~~upon surrender or deemed surrender of such Holder's Senior Notes except as otherwise provided in the Plan.~~

9.    Allocation of Plan Distributions Between Principal and Interest.

Except as otherwise expressly provided in the Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

10.    Means of Cash Payment.

Payments of Cash made pursuant to the Plan shall be made, at the option and in the sole discretion of the Reorganized Debtors, by (i) checks drawn on, (ii) automated clearing house transfer from, or (iii) wire transfer from a bank selected by the Reorganized Debtors. Cash payments to foreign creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

11.    Withholding and Reporting Requirements.

subordination and turnover provisions in any applicable contracts, including without limitation, the PHONES Notes Indenture and the EGI-TRB LLC Notes, and nothing in the Plan shall be deemed to impair, diminish, eliminate, or otherwise adversely affect the rights or remedies of beneficiaries (including, for the avoidance of doubt, their respective Senior Notes Indenture Trustees and Agents, as applicable) of any such contractual subordination and turnover provisions.

**J.        Provisions For Resolving Disputed Claims And Disputed Interests.**

     1.        Objections to and Estimation of Claims.

After the Effective Date, only the Reorganized Debtors may object to the allowance of any Claim or Administrative Expense Claim. After the Effective Date, the Reorganized Debtors shall be accorded the power and authority to allow or settle and compromise any Claim without notice to any other party, or approval of, or notice to the Bankruptcy Court. In addition, the Debtors or the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Reorganized Debtors have previously objected to such Claim. Unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtors shall serve and file any objections to Claims and Interests as soon as practicable, but in no event later than (i) 210 days after the Effective Date or (ii) such later date as may be determined by the Bankruptcy Court upon a motion which may be made without further notice or hearing.

     2.        Payments and Distributions on Disputed, Contingent, and Unliquidated Claims and Interests and On Claims for Which Proofs of Claim are Filed.

No partial payments and no partial distributions will be made with respect to a disputed, contingent or unliquidated Claim or Interest, or with respect to any Claim for which a Proof of Claim has been filed, until the resolution of such disputes or estimation or liquidation of such claims by settlement or by Final Order. On the next Distribution Date after a disputed, contingent or unliquidated Claim or Interest becomes an Allowed Claim or Interest in an amount certain, the Holder of such Allowed Claim or Interest will receive all payments and distributions to which such Holder is then entitled under the Plan.

**K.        Confirmation and Consummation of the Plan.**

     1.        Conditions to Effective Date of the Plan.

The Plan shall not become effective and the Effective Date shall not occur unless and until the following conditions shall have been satisfied or waived in accordance with Section 10.2 of the Plan:

         (a)        The Confirmation Order confirming the Plan, as the Plan may have been modified in accordance with the terms of the Plan, shall conform to the Plan in all respects and shall have been entered by the Bankruptcy Court in form and substance reasonably satisfactory to the Debtors, the Senior Lender Settlement Committee and the Creditors Committee.

         (b)        The Confirmation Order shall authorize and approve the Global Settlement.[22]

         (c)        The Certificate of Incorporation and By-Laws and any amended certificates or articles of incorporation, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents of the other Debtors, as necessary, shall have been adopted and filed with the applicable authorities of the relevant jurisdictions and shall become effective on the Effective Date in accordance with such jurisdictions' laws.

---

[22] For a further discussion of the Global Settlement, please refer to Article VII herein for the Debtors' discussion and analyses of the Global Settlement. For the views of certain creditors or creditor representatives, please refer to the Settlement Submissions in the compendium accompanying this Disclosure Statement.

resolved), or (c) the Holder of a Claim based on such debt has accepted the Plan; and (ii) satisfy, terminate or cancel all Interests and other rights of equity security holders in the Debtors except as otherwise provided in the Plan. In addition, confirmation of the Plan shall, as of the Effective Date, authorize the release of the Senior Loan Guaranty Claims and the Bridge Loan Guaranty Claims against the Guarantor Non-Debtors.

As of the Effective Date, except as provided in the Plan, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, or their respective successors or property, any other or further Claims, debts, rights, causes of action, liabilities or Interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Petition Date and from asserting against the Guarantor Non-Debtors any Senior Loan Guaranty Claims or Bridge Loan Guaranty Claims. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims and other debts and liabilities of the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent such judgment is related to a discharged Claim.

(b)    Discharge Injunction.

Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that hold, have held, or may hold a Claim or other debt or liability that is discharged, or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan, are permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims, debts or liabilities, or terminated Interests or rights: (i) commencing or continuing any action or other proceeding against the Debtors, the Reorganized Debtors or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Debtors, the Reorganized Debtors or their respective property; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Debtors, the Reorganized Debtors or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Debtors, the Reorganized Debtors or their respective property; and (v) commencing or continuing any judicial or administrative proceeding, in any forum, that does not comply with or is inconsistent with the provisions of the Plan.

2.    Releases

The Plan contemplates that certain releases will be provided to the following Released Parties: (a̶i) the Debtors, their non-Debtor Affiliates including the Subsidiary Non-Debtors and the Reorganized Debtors, (b̶ii) the Creditors Committee, in such capacity, and its present and former members, in their capacity as members of the Creditors Committee, (c̶iii) the Senior Lenders, the Senior Loan Agent, the Senior Lender Steering Committee, the Senior Lender Settlement Committee, the Bridge Lenders, the Bridge Loan Agent (subject to section 4.6.3 of the Plan), the Bridge Loan Agent (subject to section 4.6.3 of the Plan), the Former Bridge Loan Agent (subject to section 4.6.3 of the Plan if the Former Bridge Loan Agent or any of its Related Persons is a Bridge Lender or is otherwise entitled to vote on the Plan as of the voting record date) and the Holder of the Barclays Swap Claim, in each case in all of their respective capacities, (d̶iv) the EGI-TRB LLC Noteholders and the holders of the EGI-TRB LLC Warrant, in each case in all of their respective capacities, (e̶v) Centerbridge, the Senior Noteholders, and the Senior Notes Indenture Trustees, in each case in all of their respective capacities, and (f̶vi) all of the respective Related Persons to each of the foregoing parties; provided, however, in each case only if the applicable party has not returned a Ballot opting out of the releases in Section 11.2.2 of the Plan and, if entitled to vote on the Plan, has voted to accept the Plan.

The releases provided pursuant to the Plan to the Released Parties are a central and important element of the Plan. The releases of parties other than the LBO Lenders are necessary to provide the LBO Lenders with a full and final resolution of all claims against them in return for their substantial financial contributions

to the Global Settlement.[23] Without such releases, the initiation of litigation against participants in the Leveraged ESOP Transactions other than the LBO Lenders undoubtedly would result in the LBO Lenders being drawn into the litigation by reason of the immediate assertion of claims by the other participant defendants against the LBO Lenders. In addition, by eliminating the need for further litigation, the releases will enable the Debtors to exit bankruptcy sooner than otherwise would be possible and will allow the Reorganized Debtors to devote their full time and attention, without distraction from litigation, to their businesses.

        (a)     Releases by Debtors and Debtors' Estates.

In the Plan, the Debtors provide releases to the Released Parties from almost all claims existing on or prior to the Effective Date, including with respect to the LBO-Related Causes of Action, which releases are supported by related anti-suit injunctions.

Specifically, section 11.2.1 of the Plan provides that, except for those Claims expressly preserved in Section 11.2.6 of the Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of the Plan, the Reorganized Debtors on their own behalf and as representatives of their respective estates, release unconditionally and hereby cause the Subsidiary Non-Debtors to release unconditionally, and are hereby deemed to release unconditionally, each and all of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claims), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Debtors' Estates, the Chapter 11 Cases or the Plan, the Disclosure Statement or the Restructuring Transactions (the "Debtor Released Claims"); provided, however, that, with the exception of LBO-Related Causes of Action, nothing in Section 11.2 of the Plan shall be construed to release any party from willful misconduct or gross negligence as determined by a Final Order. The releases contained in Section 11.2 of the Plan shall not apply to or otherwise affect the Morgan Stanley Claims or the obligations of any of the Debtors' officers or directors to repay loans or advances of money or other property contractually owed to the Debtors or their Debtors' Estates or with respect to loans or advances of money that the Debtors guaranteed on behalf of such officers or directors. Furthermore, notwithstanding the foregoing, such release, waiver, and discharge shall not operate as a release, waiver, or discharge of any express contractual commercial obligations arising in the ordinary course of any Person to the Debtors not directly related to the LBO-Related Causes of Action. On the Effective Date, each Guarantor Non-Debtor will provide each Holder of a Loan Guaranty Claim against the Guarantor Non-Debtors and the Senior Loan Agent and Bridge Loan Agent a release of such scope in consideration for the Guarantor Non-Debtor Release contemplated hereby.

The Debtors believe that the aforementioned releases by the Debtors and the Debtors' Estates are necessary, fair reasonable and in the best interests of the Debtors' Estates for a number of reasons. As an initial matter, a suit against certain of the Released Parties would give rise to claims against the Debtors which could deplete the assets of the Debtors' Estates. For example, litigation involving present and former directors, officers or employees of the Debtors likely would trigger statutory, contractual and/or common law claims for advancement, indemnification and/or contribution from the Debtors, as would litigation involving the advisers, Mr. Zell and the Zell Entity.

Substantial financial contributions to the reorganization also have been and will be made either directly by or indirectly on behalf of the Released Parties. The LBO Lenders will contribute significant value

---

[23] For a further discussion of the Global Settlement, please refer to Article VII herein for the Debtors' discussion and analyses of the Global Settlement. For the views of certain creditors or creditor representatives, please refer to the Settlement Submissions in the compendium accompanying this Disclosure Statement. [1]

to the Senior Noteholders and Holders of General Unsecured Claims in connection with the Global Settlement. The directors, officers and employees of the Debtors also have made substantial non-financial contributions by designing and implementing the operational restructuring of the Debtors and participating in the informal discovery process relating to the LBO-Related Causes of Action and in the negotiations relating to the Plan. The LBO Lenders, the advisers and others also have likewise made substantial non-financial contributions by participating in the informal discovery process and settlement negotiations.

In addition, the releases are essential to the reorganization in that they are an integral part of the agreement by the LBO Lenders to fund the Plan. They also are necessary to the continued success of the Reorganized Debtors because they assure that the directors, officers and employees of the Debtors are not distracted by litigation of the LBO-Related Causes of Action. They constitute a critical and essential condition to the Plan because they provide the necessary assurances that the Plan will result in the full and final resolution of all outstanding claims, and, in the absence of such releases, the LBO Lenders would likely be unwilling to provide the significant value to the Senior Noteholders and the Holders of General Unsecured Claims that is embodied in the Plan.

(b)      Releases by Holders of Claims and Interests.

Section 11.2.2 of the Plan also provides that each Holder of a Claim or Interest that ~~is deemed to accept the Plan or that receives, but does not return a Ballot with the appropriate opt-out box checked~~has voted to accept the Plan or is deemed to have accepted the Plan, that has voted to reject the Plan but has opted to grant the releases in the Plan, or who otherwise agrees to grant the releases set forth in the Plan, shall be deemed to have released each and all of the Released Parties from almost all non-Estate Claims existing on or before the Effective Date, including Claims against any third parties alleging ERISA violations.[24] Any creditor who is a plaintiff in the Neil litigation and who grants a third party release would be releasing his or her claims against the defendants in the Neil litigation. In addition, unless such Holder otherwise agrees to grant the releases provided in Section 11.2.2 of the Plan, each Holder of a Claim or Interest that is deemed to reject the Plan shall not be deemed to provide such releases.

Any Holder of a Claim or Interest that elects not to grant ~~this~~the release set forth in Section 11.2.2 of the Plan shall not receive the benefit of ~~any other release under the Plan to which it might otherwise be entitled~~the releases of other Holders of Claims or Interests set forth in Section 11.2.2 of the Plan. The Plan further provides that all Holders of Loan Guaranty Claims against Guarantor Non-Debtors shall be deemed on the Effective Date to have granted the Guarantor Non-Debtor Release and to have relieved the LBO Lenders and others from any liability on account of the Senior Loan Guaranty Claims or the Bridge Loan Guaranty Claims.

Specifically, section 11.2.2 of the Plan states that except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of the Plan, each Person (i) that has voted to accept the Plan or is deemed to have accepted the Plan, (ii) that has ~~not~~ voted to ~~accept~~reject the Plan but ~~that has received a Ballot and that has not~~has opted ~~out of~~to grant the releases in Section 11.2.2 of the Plan, or (iii) who otherwise agrees to provide the releases set forth in Section 11.2.2 of the Plan, shall be deemed to have unconditionally released each and all of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claim), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and ~~Debtors'~~ Estates, the Chapter 11 Cases or the

---

[24] ~~Unless such Holder otherwise agrees to grant the releases provided in Section 11.2.2 of the Plan, each Holder of a Claim or Interest that is deemed to reject the Plan shall not be deemed to provide such releases.~~

Plan, Disclosure Statement or the Restructuring Transactions (the "Holder Released Claims" and together with the Debtor Released Claims the "Released Claims"); provided, however, that nothing in Section 11.2.2. of the Plan shall be construed as a release of any Claims against non-Debtor third partiesDebtors arising under ERISA held by the DOL; provided, further, that no agent or indenture trustee is, by virtue of giving its own release hereunder, releasing individual claims, if any, of lenders or noteholders for which it acts as agent or indenture trustee that are not themselves Released Parties.  Furthermore, notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of, except as provided in Sections 11.2.5 of the Plan with respect to the Guarantor Non-Debtors, any express contractual obligation of any non-Debtor party due to any other non-Debtor party.

(c)     Failure to Grant Release.

Any Holder of a Claim or Interest that has timely submitted to the Debtors or filed with the Court a Ballot opting not to grant the releases set forth in Section 11.2.2 shall not receive the benefit of the releases set forth in Section 11.211.2.2 of the Plan (if otherwise entitled).

(d)     Injunction Related to Releases.

Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that hold, have held, or may hold a Claim or other debt, right, cause of action or liability that is released pursuant to the provisions of the Plan are permanently enjoined from taking any of the following actions on account of or based upon such released Claims, debts, rights, causes of action or liabilities:  (i) commencing or continuing any action or other proceeding against the Released Parties or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Released Parties or their respective property; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Released Parties or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Released Parties or against their respective property; and (v) commencing or continuing any judicial or administrative proceeding, in any forum, that does not comply with or is inconsistent with the provisions of the Plan.

(e)     Release of Guarantor Non-Debtors from Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims.

All Holders of Loan Guaranty Claims against the Guarantor Non-Debtors shall be deemed on the Effective Date to have granted the Guarantor Non-Debtor Release and the Guarantor Non-Debtors shall be unconditionally relieved from any liability to the Senior Lenders or the Bridge Lenders on account of the Senior Loan Guaranty Claims or the Bridge Loan Guaranty Claims and the Senior Loan Agent and the Bridge Loan Agent, respectively, shall be unconditionally relieved from any liability of any nature whatsoever to such Holders as a result of the release of the Guarantor Non-Debtors from any and all Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims; provided that the Guarantor Non-Debtor Release is dependent upon and only effective upon (i) the execution by each of the Guarantor Non-Debtors of a guaranty of the New Senior Secured Term Loan pursuant to and to the extent provided in Section 5.6 of the Plan, (ii) the unconditional release by each of the Guarantor Non-Debtors, in form and substance acceptable to the Senior Lender Settlement Committee as of the Effective Date, of each of the Holders of Senior Loan Guaranty Claims and the Senior Loan Agents of and from any and all Debtor Released Claims, and (iii) the granting by the Guarantor Non-Debtors of Liens on certain property of the Guarantor Non-Debtors pursuant to and to the extent provided in Section 5.6 of the Plan.  Pursuant to Bankruptcy Rule 9019, the Bankruptcy Court's entry of the Confirmation Order shall constitute its approval of this good faith settlement and compromise of the claims released by the Non-Debtor Guarantor Release and adequate factual findings that the Non-Debtor Guarantor Release is: (a) fair, equitable and reasonable; (b) necessary and essential to the Debtors' successful reorganization; (c) in exchange for good and valuable consideration provided by the Guarantor Non-Debtors and the Agents; (d) warranted by the exceptional and unique circumstances of the Debtors' reorganization; and (e) consistent with public policy and due process principles.

      (f)     Release of Chapter 5 Causes of Action.

Except as set forth in Section 3.2.4(b)(ii) of the Plan, in addition to the releases set forth in the Plan, the Debtors and the Reorganized Debtors shall not file, commence, or pursue any claim, right or cause of action under Chapter 5 of the Bankruptcy Code or seek to disallow any Claim to the extent it may be avoidable, except that the following claims are expressly preserved: (i) the Morgan Stanley Claims and (ii) any claims, rights or causes of action related to set-offs against amounts owing to the Debtors, provided that the Debtors shall not set-off against any distributions under the Plan to Holders of Allowed Claims in Classes 1C, 1D, and 50C through 111C (other than any distributions to MSCS with respect to the Morgan Stanley Claims).

      (g)     Non-Release of Certain Defined Benefit Plans.

Notwithstanding anything to the contrary in the Plan, with respect to any Defined Benefit Plan that has not been terminated or does not terminate by its terms prior to the entry of the Confirmation Order, all Claims of, or with respect to, such a Defined Benefit Plan (including any based on fiduciary duties under ERISA) and all Claims of the Pension Benefit Guaranty Corporation, whether or not contingent, under 29 U.S.C. § 1362(b) for unfunded benefit liabilities, under 29 U.S.C. § 1306(a)(7) for termination premiums, and under 29 U.S.C. § 1362(c) for due and unpaid employer contributions shall not be discharged, released, exculpated or otherwise affected by the Plan (including Section 11.2 of the Plan), the entry of the Confirmation Order or the Chapter 11 Cases. Notwithstanding anything to the contrary in the Plan, in the event that a Defined Benefit Plan does not terminate prior to the entry of the Confirmation Order, obligations of the Debtors under the Defined Benefit Plan as of the Effective Date shall become obligations of the applicable Reorganized Debtors and, as required by the Internal Revenue Code of 1986, as amended or ERISA, the controlled group members.

      3.     Bar Order.

The Confirmation Order shall provide, among other things (and the inclusion of such language, or language substantially similar to the following, and subject to Section 10.2 of the Plan, shall be a condition to the Effective Date):

"ORDERED that all Persons, including without limitation (i) any Persons that are not Released Parties, (ii) Released Parties, and (iii) Persons who have voted for or against the Plan or who are presumed to have voted for or against the Plan under section 1126(f)-(g) of the Bankruptcy Code (collectively, the "Barred Persons"), are hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any claim for non-contractual indemnity or contribution against any Released Party (including any other non-contractual claim against the Released Parties, whether or not denominated as for contribution or indemnity, where the injury to the Person is the liability of the Person to the Barred Persons), arising out of or reasonably flowing from the claims or allegations in any of the Released Claims, whether arising under state, federal or foreign law as claims, cross-claims, counterclaims, or third-party claims (collectively, the "Barred Claims"), and with respect to the Barred Claims, the Barred Persons are also entitled to the judgment reduction provisions set forth in the Plan. This Order (the "Bar Order") is without prejudice to the position of any party as to the existence, in the absence of this Bar Order, of any Barred Claim; and it is further

"ORDERED that no Person acting on behalf of the estate, including any successor to the Debtors, any committee appointed in the Bankruptcy Case, any chapter 7 trustee, any trustee of a litigation trust or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (any of the above, a "Plaintiff"), may assert or bring a Released Claim. In the event any such Plaintiff obtains a judgment or award (a "Judgment") against any Person with respect to one or more causes of action based upon, arising

from, or related to the Released Claims or any transactions underlying any Released Claims then, with respect to any actual, potential or asserted liability of a Released Party to any Person for the Barred Claims in respect of such Judgment, the Plaintiff shall, prior to or in connection with the entry of such Judgment, provide notice of this Bar Order to the court or tribunal in which such Judgment was obtained, and the court or tribunal shall reduce such Judgment against such Person in an amount that is the greater of (i) the amount of the consideration provided pursuant to the Global Settlement by the Released Party or Parties against whom there would have been a Barred Claim in the absence of this Bar Order, or (ii) the amount equal to the Judgment against any such Person times the aggregate proportionate share of fault (expressed as a percentage) of the Released Party or Parties against whom there would have been a Barred Claim in the absence of this Bar Order.   In the event that Judgment shall be entered against any Person without a prior or concurrent determination as to the existence of a Barred Claim (and, in the event of a determination of the existence of a Barred Claim, without a reduction of such Judgment), such Judgment shall not, and shall be deemed not to, give rise to any Barred Claim; and it is further

"ORDERED that if any Plaintiff enters into a settlement with any Person with respect to one or more causes of action based upon, arising from, or related to the Released Claims or any transaction underlying any Released Claim, then such Plaintiff shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Barred Claims with respect to such settlement."

4.      Supplemental Injunction.

In order to supplement the settlements contemplated by and provided for in the Plan and the injunctive effect of the Discharge Injunction, and pursuant to sections 524 and 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following injunction to take effect as of the Effective Date.

*In order to preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the discharge as provided in sections 1141 and 524 of the Bankruptcy Code and as described in Section 11 of the Plan, except as otherwise provided in the Plan, all entities which have held or asserted, which hold or assert or which may hold or assert any claim, demand or cause of action against the Released Parties (or any of them) based upon, attributable to, or arising out of any Released Claim that is released in connection with the Plan, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be permanently stayed, restrained and enjoined from taking any action against the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving payments or recovery with respect to any such Released Claim, including, but not limited to:*

    (a) *commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties, or against the property of any Released Party;*

    (b) *enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or against the property of any Released Party with respect to any Released Claim;*

    (c) *creating, perfecting or enforcing any Lien of any kind against any Released Party or the property of any Released Party with respect to any such Released Claim;*

    (d) *except as otherwise provided in the Plan, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against*

114

*any obligation due any Released Party or against the property of any Released Party with respect to any Released Claim; and*

        (e)     *taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan relating to such Released Claim.*

*The Debtors' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.*

*The injunction provided by section 11.4 of the Plan shall not enjoin any actions respecting claims not released or barred in connection with the Plan and, for the avoidance of doubt, shall only enjoin actions respecting Released Claims or Barred Claims.*

     5.     Disallowed Claims and Disallowed Interests.

On and after the Effective Date, the Debtors and the Reorganized Debtors shall be fully and finally discharged of any and all liability or obligation on a Disallowed Claim or a disallowed Interest, and any Order disallowing a Claim or an Interest which is not a Final Order as of the Effective Date solely because of an entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided in the Plan, shall constitute an Order: (i) disallowing all Claims and Interests to the extent such Claims and Interests are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims and Interests, and Claims for unmatured interest and (ii) disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages or any other damages not constituting compensatory damages.

     6.     Exculpation.

To the fullest extent permitted under applicable law, none of the Released Parties and none of the present or former members of the Creditors Committee (in their capacity as members of the Creditors Committee), whether or not such members are otherwise Released Parties, shall have or incur any liability to any person or entity for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the negotiation of the Plan, pursuit of confirmation of the Plan, the administration, consummation and implementation of the Plan or the property to be distributed under the Plan, the Disclosure Statement, the Restructuring Transactions, the Plan Supplement, the releases and injunctions, or the management or operation of the Debtors (except for any liability that results from willful misconduct or gross negligence as determined by a Final Order). Any of the Released Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and the administration thereof.

     7.     Corporate Indemnities.

        (a)     Prepetition Indemnification and Reimbursement Obligations.

For purposes of the Plan, the respective obligations of Tribune and the other Debtors to indemnify and reimburse any Persons who are or were directors, officers or employees of the Debtors, against and for any obligations pursuant to certificates or articles of incorporation, certificates of formation, codes of regulation, bylaws, limited liability company agreements, partnership agreements, applicable state or non-bankruptcy law, or specific agreements or any combination of the foregoing, shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged under section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on or after the Petition Date. The Debtors are not aware of any indemnity claims against the Debtors arising from the currently-pending causes of action in the *Neil* litigation.

115

(b)    Plan Indemnity.

In addition to the obligations set forth in Section 11.7.1 of the Plan and not by way of limitation thereof, subject to Section 4.6.3 of the Plan, the Reorganized Debtors shall jointly and severally indemnify and hold harmless the Senior Loan Agent, the Senior Loan Arrangers, the Senior Lenders, the Bridge Loan Agent, the Former Bridge Loan Agent, the Bridge Loan Arrangers and the Bridge Lenders (collectively, the "Indemnified Creditor Parties") and all of their respective Related Persons, in each case in all such capacities and all other non-fiduciary capacities related to the transactions underlying the LBO-Related Causes of Action, and any natural persons who are or were officers or directors of any of the Debtors (each an "Indemnified Party" and collectively, with the Indemnified Creditor Parties, the "Indemnified Parties"), on account of and with respect to any claim, cause of action, liability, judgment, settlement, cost or expense (including without limitation attorneys' fees but only if incurred after the Effective Date) on account of claims or causes of action threatened or asserted by any Person against such parties that seek damages, contribution, indemnity, equitable indemnity, or any similar claim, based upon or as the result of (x) the Released Claims, including without limitation any claims on account of and with respect to any LBO-Related Causes of Action; or (y) Barred Claims or any similar claim based upon or as the result of the assertion of primary claims against any other person by any representative of the Debtors' Estates (the "Covered Claims"); provided, however, that in no event shall the aggregate liability of the Reorganized Debtors to any individual Indemnified Creditor Party and all Related Persons of such Indemnified Creditor Party on account of such indemnity exceed the sum of (i) such Indemnified Creditor Party's pro rata share (calculated based on the proportion that the allowed Loan Claims against Tribune held by such Indemnified Creditor Party bears to the aggregate amount of all allowed Loan Claims against Tribune held by all Indemnified Creditor Parties) of $427,582,000, (ii) such Indemnified Creditor Party's pro rata share (calculated based on the proportion that the allowed Senior Loan Guaranty Claims held by such Indemnified Creditor Party bears to the aggregate amount of all allowed Senior Loan Guaranty Claims held by all Indemnified Creditor Parties) of $83,129,000 and (iii) all costs and/or expenses (including without limitation attorneys' fees) incurred in connection with any Covered Claims by such Indemnified Creditor Party and such Related Persons. For the avoidance of doubt, the provisions of Section 11.7.2 of the Plan are not intended to provide an indemnity for causes of action held by a non-Debtor against an Indemnified Person that exist independent of any Released Claim or Barred Claim, and Section 11.7.2 of the Plan is not intended to extend to any indemnification for any claims: (i) by the Holders of Claims in Class 1J against a trustee for such Class 1J Claims; and (ii) in connection with the claims asserted in the Neil Litigation.

(c)    Indemnity for Members of the Creditors Committee.

The Reorganized Debtors shall jointly and severally indemnify and hold harmless the present and former members of the Creditors Committee and their respective Related Persons (in their capacity as members of the Creditors Committee), on account of and with respect to any costs and/or expenses (including without limitation attorneys' fees) incurred in connection with any Covered Claims.

(d)    Limitation on Indemnification.

Except as provided in the Plan with respect to the LBO-Related Causes of Action, the Reorganized Debtors shall not be obligated to indemnify and hold harmless any Person or entity for any claim, cause of action, liability, judgment, settlement, cost or expense that results from such Person's or entity's gross negligence or willful misconduct as determined by a Final Order.

(e)    Director and Officer Liability Insurance and Fiduciary Liability Insurance.

The Debtors' director and officer liability insurance policies and fiduciary liability insurance policies shall provide coverage for claims made for any wrongful acts or other covered conduct, acts or omissions occurring on or prior to the Effective Date (such coverage also referred to as "tail" coverage) with coverage in

116

or after the Confirmation Date but prior to the substantial consummation of the Plan. A Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

Subject to Section 13.9 of the Plan, the Debtors reserve the right to modify or withdraw the Plan, in its entirety or in part, for any reason, including, without limitation, in the event that the Plan as it applies to any particular Debtor is not confirmed. In addition, and also subject to Section 13.9 of the Plan, should the Plan fail to be accepted by the requisite number and amount of Claims and Interests voting, as required to satisfy section 1129 of the Bankruptcy Code, and notwithstanding any other provision of the Plan to the contrary, the Debtors reserve the right to reclassify Claims or Interests or otherwise amend, modify or withdraw the Plan in its entirety or in part. In addition, notwithstanding any other provision of the Plan to the contrary, if the Plan fails to be accepted by the requisite number and amount of Claims in Class 1D, any Holder of a Bridge Loan Claim that has not voted to accept the Plan and be provided the treatment specified in Section 3.2.4(b)(ii) of the Plan (and such Holder's Related Persons) shall not receive the benefit of the releases, indemnities and injunctions that would otherwise be provided under the Plan, and the scope of the releases, indemnities, and injunctions shall instead be as proposed by the Debtors in connection with the cramdown of Class 1D Claims.

In the event Class 1D votes to reject the Plan, Estate causes of action shall not be released against Holders of Bridge Loan Claims that vote to reject the Plan or that do not vote on the Plan.

9.      Certain Provisions Pertaining to Senior Lender Settlement Committee and Centerbridge.

The Settlement Support Agreement is a binding legal obligation between the signatories thereto and requires such signatories to support a resolution of the Chapter 11 Cases on the terms provided in the Settlement Support Agreement. The Debtors are not parties to the Settlement Support Agreement and neither is the Creditors Committee. However, certain actions by the Debtors and the Creditors Committee are required to maintain the legal obligation of the signatories to the Settlement Support Agreement. One of those actions is that, no amendments shall be made to the Plan, and no supplements (including, without limitation, the Plan Supplement) shall be filed to the Plan, without the consent of the Senior Lender Settlement Committee, which consent shall not be unreasonably withheld. The aforementioned right of the Senior Lender Settlement Committee to reasonably consent to all amendments and supplements to the Plan shall extend to both the form and substance of any such amendment or supplement and any documents or information contained therein. Any alteration, amendment or modification to the Plan that is materially inconsistent with the terms of the "Settlement" (as defined in the term sheet attached to the Settlement Support Agreement and filed with the Bankruptcy Court) and that adversely affects the consideration to be provided to Class 1E shall also be subject to the consent of Centerbridge, which consent is not to be unreasonably withheld. Prior to the Effective Date, the Debtors shall provide notice to the Creditors Committee of any alteration, amendment, modification, or supplement to the Plan. Because the Debtors believe that the best interests of the estate are maximized by resolution of these Chapter 11 Cases on the terms provided in the Plan, the Debtors (though not party to the Settlement Support Agreement) do not anticipate amending or supplementing the Plan without the reasonable consent of the Senior Lender Committee unless required to do so by the Bankruptcy Court.

## X. VOTING PROCEDURES AND REQUIREMENTS

The following section describes in summary fashion the procedures and requirements that have been established for voting on the Plan. If you are entitled to vote to accept or reject the Plan, you will receive a ballot for the purpose of voting on the Plan with the package accompanying this Disclosure Statement (the "Ballot"). If you hold Claims or Interests in more than one Class and you are entitled to vote such Claims or Interests in more than one Class, you will receive separate Ballots which must be used for each separate Class of Claims or Interests. If you are entitled to vote and did not receive a Ballot, received a damaged Ballot or

As detailed in <u>Article II</u> above, the Debtors are soliciting votes on the Plan from the Holders of Allowed Claims in Classes 1C, 1D, 1E, 1F, 50C-111C, and 2E-111E. In addition, votes cast by Holders of Loan Guaranty Claims in Classes 50C through 111C shall be counted as votes cast on the Prepackaged Plan of the Guarantor Non-Debtors that may become Debtors.

Also as detailed in <u>Article II</u> above, with respect to the Impaired Classes of Claims and Interests that are deemed to reject the Plan (Classes 1I, 1J, 1L, 1M, 50D-111D, and 2L-111L), and any other Class of Claims or Interests that vote to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm a Plan pursuant to section 1129(b) of the Bankruptcy Code. In any such case or cases, the Plan constitutes a motion seeking such relief.

ANY VOTE NOT SOLICITED OR PROCURED IN GOOD FAITH OR IN ACCORDANCE WITH THE PROVISIONS OF THE BANKRUPTCY CODE WILL NOT BE COUNTED PURSUANT TO SECTION 1126(E) OF THE BANKRUPTCY CODE.

**C.    <u>Vote Required for Acceptance by a Class</u>**

1.    Class of Claims.

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (⅔) in amount and more than one-half (½) in number of the Allowed Claims in such Class that have voted on the Plan in accordance with the Solicitation Order.

2.    Class of Interests.

A Class of Interests shall have accepted the Plan if it is accepted by at least two-thirds (⅔) in amount of the Allowed Interests in such Class that have voted on the Plan in accordance with the Solicitation Order.

**D.    <u>Voting Procedures</u>**

1.    Ballots.

All votes to accept or reject the Plan with respect to any Class of Claims must be cast by properly submitting the duly completed and executed form of Ballot designated for such Class. Each Ballot enclosed with this Disclosure Statement has been encoded with the Class into which the Claim has been placed under the Plan. Holders of Impaired Claims voting on the Plan should complete and sign the Ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan."

ANY EXECUTED BALLOT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN WILL NOT BE COUNTED AS A VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

ANY BALLOT THAT IS RECEIVED BUT WHICH IS NOT SIGNED OR THAT OTHERWISE CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CLAIMANT WILL BE CONSIDERED AN INVALID BALLOT AND WILL NOT BE COUNTED FOR PURPOSES OF DETERRING ACCEPTANCE OR REJECTION OF THE PLAN.

In addition, each Holder of a Claim that (i) has voted to accept the Plan; ~~(ii)~~ or is deemed to have accepted the Plan; (~~iii~~ii) that has ~~not~~ voted to ~~accept~~reject the Plan but ~~that has received a Ballot and that has not~~has opted ~~out of~~to grant the releases in Section 11.2.2 of the Plan; or (~~iv~~iii) ~~who~~ otherwise agrees to provide the releases set forth in Section 11.2.2 of the Plan, shall be deemed to have unconditionally granted

the releases provided in Section 11.2.2 of the Plan.  Please refer to <u>Article IX.L hereof</u> for a further discussion regarding the releases provided in Section 11.2.2 the Plan.

In order for a vote to be counted, a Holder must complete and sign an original Ballot and return it in the envelope provided (only original signatures will be accepted).  Each Ballot to be used in voting to accept or reject the Plan has been coded to reflect the Class of Claims it represents.  Accordingly, in voting to accept or reject the Plan, a Holder must use only the coded Ballot or Ballots sent with this Disclosure Statement.

All Ballots (including those Ballots transmitted by Voting Nominees) must be delivered to the Voting Agent, at its address set forth above, and received by the Voting Deadline.  THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE VOTER.

**If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please contact the Voting Agent in the manner set forth in this Disclosure Statement.**

2.      Special Instructions for Beneficial Holders of Senior Noteholder Claims.

If you are a Holder of a Senior Noteholder Claim and hold the Claim in your own name, you can vote your Claim by completing and signing the enclosed Ballot and returning it directly to the Voting Agent using the enclosed preaddressed, postage prepaid envelope.

If you are a beneficial holder of a Senior Noteholder Claim and receive a Ballot from a Voting Nominee, in order for your vote to be counted, your Ballot must be completed in accordance with the voting instructions on the Ballot and received by the Voting Nominee in enough time for the Voting Nominee to transmit a Master Ballot to the Voting Agent so that it is received no later than the Voting Deadline.  The Voting Nominee must then transmit your Ballot to the Voting Agent so that it is received no later than the Voting Deadline.  Any Ballot received after the Voting Deadline shall be counted at the sole discretion of the Debtors.  **Do not return any debt instruments or equity securities with your Ballot.**

3.      Special Instructions for Holders of General Unsecured Claims Against Tribune Concerning the Convenience Class Election.

If you are the Holder of a General Unsecured Claim against Tribune, the Ballot included as part of the Solicitation Package that includes this Disclosure Statement provides for you to make the Convenience Class Election.  The Convenience Class Election is an irrevocable election by the Holder of a General Unsecured Claim against Tribune to reduce a General Unsecured Claim of greater than $1,000 to $1,000.  As a result of the Convenience Class Election, the Holder of any such Claim will receive $1,000 in Cash under the Plan.

4.      Withdrawal or Change of Votes on the Plan.

After the Voting Deadline, no vote may be withdrawn without the prior consent of the Debtors, which consent shall be given in the Debtors' sole discretion.

Any Holder of a Claim or Interest who has submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan.  If more than one timely, properly completed Ballot is received with respect to the same Claim, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the Ballot that the Voting Agent determines was the last to be received.

## XI. CONFIRMATION OF THE PLAN

A.      <u>Confirmation Hearing</u>

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. The Confirmation Hearing pursuant to section 1128 of the Bankruptcy Code will be held on [●], 2010 at [●]m., prevailing Eastern Time, before the Honorable Kevin J. Carey, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Fifth Floor, Courtroom No. 5, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to Confirmation of the Plan must: (i) be made in writing; (ii) state the name and address of the objecting party and the nature of the claim or interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan; and (iv) be filed with the Court, together with proof of service, and served so that they are received **on or before [●], 2010 at 4:00 p.m., prevailing Eastern Time** by the following parties:

**Counsel to the Debtors**:

| | |
|---|---|
| Sidley Austin LLP | Cole Schotz Meisel Forman & Leonard, P.A. |
| One South Dearborn Street | 500 Delaware Avenue, Suite 1410 |
| Chicago, Illinois 60603 | Wilmington, Delaware 19801 |
| Facsimile: (312) 853-7036 | Facsimile: (302) 652-3117 |
| Attn: ~~Kerriann S~~Jessica C.K. ~~Mills~~Boelter | Attn: ~~J. Kate Stickles~~ |
| | ~~Norman L. Pernick~~ |

**The U.S. Trustee**:

U.S. Trustee
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lock Box #35
Wilmington, Delaware 19899
Facsimile: (302) 573-6497
Attn: Joseph McMahon, Jr.

**Counsel to the Official Committee of Unsecured Creditors**:

| | |
|---|---|
| Chadbourne & Parke LLP | Landis Rath & Cobb LLP |
| 30 Rockefeller Plaza | 919 Market Street, Suite 1800 |
| New York, New York 10112 | Wilmington, Delaware 19801 |
| Fax (212) 541-5369 | Fax (302) 467-4450 |
| Attn: ~~David M. Le May~~Douglas A. Deutsch | Attn: Adam G. Landis |

Objections to confirmation of the Plan are governed by Rule 9014 of the Bankruptcy Rules. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**B.      Statutory Requirements for Confirmation of the Plan.**

At the Confirmation Hearing, the Bankruptcy Court will confirm a plan only if it finds all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that a plan (i) is accepted by all impaired classes of claims and interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) is feasible, and (iii) is in the "best interests" of holders of claims and interests impaired under the plan.

must be demonstrated that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting Impaired Class. Generally, a plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner substantially equivalent with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its claims or interests. The Debtors believe that the Plan satisfy these requirements.

The Bankruptcy Code establishes different "fair and equitable" tests for secured claims, unsecured claims and equity interests, as follows:

(a)    Holders of Secured Claims. Either (i) each holder of an impaired secured claim retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens attaching to the proceeds of the sale, and the treatment of such liens on proceeds is as provided in clauses (i) or (ii) above.

(b)    Unsecured Creditors. Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

(c)    Interest Holders. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the equity interest, or (ii) the holders of equity interests that are junior to the nonaccepting class will not receive or retain any property under the plan.

AS EXPLAINED ABOVE, THE BANKRUPTCY CODE CONTAINS PROVISIONS FOR CONFIRMATION OF A PLAN EVEN IF IT IS NOT ACCEPTED BY ALL CLASSES. THESE SO-CALLED "CRAMDOWN" PROVISIONS ARE SET FORTH IN SECTION 1129(B) OF THE BANKRUPTCY CODE, WHICH PROVIDES THAT A PLAN OF REORGANIZATION CAN BE CONFIRMED EVEN IF IT HAS NOT BEEN ACCEPTED BY ALL IMPAIRED CLASSES OF CLAIMS AND INTERESTS AS LONG AS AT LEAST ONE IMPAIRED CLASS OF NON-INSIDER CLAIMS HAS VOTED TO ACCEPT THE PLAN. **THE DEBTORS BELIEVE THAT THE PLAN MAY BE CONFIRMED ON A NONCONSENSUAL BASIS (PROVIDED AT LEAST ONE IMPAIRED CLASS OF CLAIMS VOTES TO ACCEPT THE PLAN). ACCORDINGLY, THE DEBTORS WILL DEMONSTRATE AT THE CONFIRMATION HEARING THAT THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ALL NON-ACCEPTING CLASSES.**

3.    Feasibility.

Pursuant to section 1129(a)(11) of the Bankruptcy Code, the Bankruptcy Court must determine that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan. This condition is often referred to as the "feasibility" of the Plan. The Debtors believe that the Plan satisfies this requirement.

For purposes of determining whether the Plan meets the feasibility requirement, the Debtors' financial advisors have analyzed the Debtors' ability to meet their obligations under the Plan. As part of that analysis, the Debtors have prepared consolidated projected financial results for each of the three fiscal years 2010, 2011 and 2012. These financial projections, and the assumptions on which they are based, are included in projections annexed hereto as Exhibit GF (the "Financial Projections").

125

A liquidation analysis (the "Liquidation Analysis") is attached as Exhibit HG to this Disclosure Statement. The analysis set forth in the Liquidation Analysis is based upon a number of estimates and assumptions that are inherently subject to significant uncertainties and contingencies, many of which would be beyond the Debtors' control. Accordingly, while the analyses contained in the Liquidation Analysis are necessarily presented with numerical specificity, the Debtors cannot provide assurance that the values assumed would be realized if the Debtors were in fact liquidated, nor can the Debtors cannot provide assurance that the Bankruptcy Court would accept this analysis or concur with these assumptions in making its determinations under section 1129(a) of the Bankruptcy Code. The Chapter 7 liquidation analysis has not been independently audited or verified. **ACTUAL LIQUIDATION PROCEEDS COULD BE MATERIALLY LOWER OR HIGHER THAN THE AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS. NO REPRESENTATION OR WARRANTY CAN BE OR IS BEING MADE WITH RESPECT TO THE ACTUAL PROCEEDS THAT COULD BE RECEIVED IN A CHAPTER 7 LIQUIDATION OF THE DEBTORS. THE LIQUIDATION ESTIMATES HAVE BEEN PREPARED SOLELY FOR PURPOSES OF ESTIMATING PROCEEDS AVAILABLE IN A CHAPTER 7 LIQUIDATION OF THE DEBTORS' ESTATES AND DO NOT REPRESENT VALUES THAT MAY BE APPROPRIATE FOR ANY OTHER PURPOSE. NOTHING CONTAINED IN THESE LIQUIDATION ESTIMATES IS INTENDED TO OR MAY BE ASSERTED TO CONSTITUTE A CONCESSION OR ADMISSION BY THE DEBTORS FOR ANY OTHER PURPOSE.**

The Liquidation Analysis is based upon the Debtors' balance sheets as of December 27, 2009, as adjusted for certain material transactions assumed to occur prior to the start of the liquidation, and assumes that the actual December 27, 2009 balance sheets are conservative proxies for the balance sheets that would exist at the time the Chapter 7 liquidation would commence.

Under section 704 of the Bankruptcy Code, a Chapter 7 trustee must, among other duties, collect and convert the property of a debtor's estate to cash and close the estate as expeditiously as is compatible with the best interests of the parties-in-interest. Consistent with these requirements, it is assumed for purposes of the Liquidation Analysis that a liquidation of the Debtors would commence under the direction of a Chapter 7 trustee appointed by the Bankruptcy Court and would continue for a period of six months, during which time all of the Debtors' major assets would either be sold or conveyed to their respective lien holders, and the Cash proceeds of such sales, net of liquidation-related costs, would then be distributed to the Debtors' creditors. Although the liquidation of some assets might not require six months to accomplish, other assets would be more difficult to collect or sell and hence would require a liquidation period substantially longer than six months.

As set forth in detail on the Liquidation Analysis, the Debtors believe that the Plan will produce a greater recovery for the holders of Claims and Interests than would be achieved in a Chapter 7 liquidation. Consequently, the Debtors believe that the Plan, which provides for the continuation of the Debtors' businesses, will provide a substantially greater ultimate return to the holders of Claims and Interests than would a Chapter 7 liquidation.

## XII. PROJECTED FINANCIAL INFORMATION AND REORGANIZATION VALUE

### A. Projected Financial Information.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources to operate their businesses. The Debtors, with the assistance of various professionals, including their financial advisors, prepared the Financial Projections attached as Exhibit GF for each of the three fiscal

years 2010, 2011 and 2012 (the "Financial Projection Period").

The Debtors do not, as a matter of course, publish their business plans, strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to Holders of Claims or other parties in interest after the Confirmation Date or otherwise make such information public.

The Financial Projections were prepared by the Debtors to present the anticipated impact of the Plan and assume that the Plan will be implemented in accordance with its stated terms. Further, the Financial Projections assume that the Effective Date will be September 27, 2010 (start of the Debtors' fourth quarter). Although the Debtors will seek to cause the Effective Date to occur as soon as practicable, there can be no assurance as to when or if the Effective Date will actually occur. It is also assumed that the Debtors will continue to conduct operations substantially similar to their businesses currently in operation.

The estimates and assumptions used in the Financial Projections, while considered reasonable by the Debtors and their financial advisors at the time of preparation, may not be realized and are inherently subject to uncertainties and contingencies. The Financial Projections are also based on factors such as industry performance, general business, economic, competitive, regulatory, market and financial conditions, all of which are difficult to predict and generally beyond the Debtors' control. Given the changes in the United States economy over the past 24 months and the difficult advertising environment created by general economic difficulties, it is anticipated that the Debtors' actual financial performance during the Financial Projection Period may differ materially from the Financial Projections.

**B.      Reorganization Value.**

The Debtors' investment banker and financial adviser, Lazard, has undertaken a valuation analysis to determine the value available for distribution to holders of Allowed Claims pursuant to the Plan and to analyze the relative recoveries to such holders thereunder.

1.      Overview.

Lazard has estimated the value of the Reorganized Debtors as of September 30, 2010. Lazard has undertaken this valuation analysis to determine the value available for distribution to holders of Allowed Claims pursuant to the Plan and to analyze the relative recoveries to such holders thereunder.[25] The estimated total value available for distribution to holders of Allowed Claims, exclusive of Allowed Claims held by Tribune and by direct or indirect subsidiaries of Tribune (the "Distributable Value") was derived based on (i) a sum-of-the-parts approach of the estimated value of the Reorganized Debtors' publishing, broadcasting and corporate operations on a going concern basis (the "Enterprise Value"), plus (ii) the estimated cash balance at the Assumed Effective Date, and (iii) the value of minority equity investments (the "Other Assets"). The valuation analysis assumes that the Effective Date is September 30, 2010 (the "Assumed Effective Date") and is based on projections developed and provided by the Debtors' management ("Projections") for 2010-2014 (the "Projection Period").

Based on these Projections and solely for purposes of the Plan, Lazard estimates that the Enterprise Value of the Reorganized Debtors falls within a range from approximately $2.6 to $3.1 billion, with an approximate mid-point estimate of $2.9 billion as of the Assumed Effective Date. Adding the estimated cash balance at the Assumed Effective Date of approximately $1.4 billion and the value of the Other Assets of approximately $1.5 to $2.0 billion (with an approximate mid-point value of $1.8 billion) to the Enterprise Value range yields a range of Distributable Value for the Reorganized Debtors from $5.6 billion to $6.6 billion with a mid-point of $6.1 billion. Approximately $537 million of the approximate mid-point estimate

---

[25] The estimated value of the Reorganized Debtors includes the value of the Debtors' wholly-owned subsidiaries as well as the value of minority equity interests held by the Debtors and their subsidiaries. The Debtors' minority equity interests are generally described in Section III.B.3 of this Disclosure Statement.

of Distributable Value is attributable to the value of Tribune, representing the Distributable Value to be allocated to Holders of Allowed Claims against Tribune exclusive of Allowed Claims held by direct or indirect subsidiaries of Tribune.[26] The approximate mid-point estimate of Distributable Value also includes approximately $1.6 billion attributable to the value of the Guarantor Non-Debtors.

Based on total estimated gross debt of approximately $0.9 billion projected as of the Assumed Effective Date, Lazard's mid-point estimate of Distributable Value reduced by $1.1 billion of cash distributions pursuant to the Plan of Reorganization implies a value for the new equity of the Reorganized Debtors (the "Equity Value") of approximately $4.1 billion.

THE ENTERPRISE VALUE RANGE, AS OF THE ASSUMED EFFECTIVE DATE, REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD AS OF THE DATE OF THIS DISCLOSURE STATEMENT. ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, NEITHER LAZARD NOR ANY OF THE DEBTORS HAS ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATES.

Lazard assumed that the Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. Lazard's estimated Enterprise Value range assumes the Reorganized Debtors will achieve their Projections in all material respects, including revenue, EBITDA margins, earnings and cash flow as projected. If the business performs at levels below those set forth in the Projections, such performance may have a materially negative impact on the Enterprise Value. Conversely, if the business performs at levels above those set forth in the Projections, such performance may have a materially positive impact on the Enterprise Value.

In estimating the range of Enterprise Value and the Equity Value of the Reorganized Debtors, Lazard: (i) reviewed certain historical financial information of the Debtors for recent years and interim periods; (ii) reviewed certain internal financial and operating data of the Debtors, which data were prepared and provided to Lazard by the Debtors' management and which relate to the Reorganized Debtors' business and its prospects; (iii) met with and discussed the Debtors' operations and future prospects with the senior management team; (iv) reviewed certain publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally comparable to the operating business of the Reorganized Debtors; (v) considered certain economic and industry information relevant to the operating business; and (vi) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. Although Lazard conducted a review and analysis of the Reorganized Debtors' business, operating assets and liabilities and the Reorganized Debtors' business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management as well as publicly available information.

In addition, Lazard did not independently verify the Projections in connection with preparing the estimated Enterprise Value range, and no independent valuations or appraisals of the Debtors were sought or obtained in connection herewith. The estimated Enterprise Value range was developed solely for purposes of the formulation and negotiation of the Plan and the analysis of implied relative recoveries to Holders of Allowed Claims thereunder.

Lazard has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated Enterprise Value range of the Reorganized Debtors set forth herein does not

---

[25] The mid-point estimate of Distributable Value includes approximately $1.6 billion attributable to the value of the Guarantor Non-Debtors.

[26] The estimate of Distributable Value attributable to Tribune includes the recovery by Tribune of approximately $368.8 million transferred to certain of Tribune's subsidiaries just prior to the Petition Date and the equity value of Tribune Receivables, LLC.

NOT READILY SUITABLE TO SUMMARY DESCRIPTION. IN PERFORMING THESE ANALYSES, LAZARD AND THE DEBTORS MADE NUMEROUS ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS. THE ANALYSES PERFORMED BY LAZARD ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

## XIII. DESCRIPTION OF DEBT AND CAPITAL STRUCTURE OF REORGANIZED DEBTORS

### A.    New Senior Secured Term Loan Agreement.

Section 5.6 of the Plan provides that on the Effective Date, if the Debtors have not elected to replace the New Senior Secured Term Loan in its entirety with distributions of Cash, (i) Reorganized Tribune, as borrower, (ii) the other material Reorganized Debtors and U.S. Subsidiary Non-Debtors (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions), but excluding any entities identified by the Debtors and consented to by the Senior Lender Settlement Committee, as guarantors, (iii) the administrative agent party thereto, and (iv) the Holders of Claims entitled to receive a distribution of the New Senior Secured Term Loan under the Plan shall become parties to the New Senior Secured Term Loan Agreement regardless of whether any party actually executes the New Senior Secured Term Loan Agreement. If issued, the New Senior Secured Term Loan shall be in an aggregate principal amount of up to two times the Debtors' trailing twelve month EBITDA (as defined in the New Senior Secured Term Loan Agreement) as of the end of the fiscal quarter most recently ended prior to the Effective Date. ~~The~~

For purposes of formulating the Financial Projections attached as Exhibit F, the Debtors have estimated the New Senior Secured Term Loan to be in an aggregate principal amount of $900 million, to be amortized at a rate of 1% per annum, and to have an effective interest rate of 6.25%, which represent the Debtors' estimates as to market terms as of the date hereof based on information the Debtors have received from potential financing sources. However, the actual terms of the New Senior Secured Term Loan Agreement may vary, in whole or in part, from the aforementioned terms, based upon, among other things, changes in market conditions for loan facilities of this type and the Debtors' business and financial needs at emergence from chapter 11. The principal terms of the New Senior Secured Term Loan shall be substantially in the form of New Senior Secured Term Loan that will be filed with the Plan Supplement as Exhibit 5.6 to the Plan.

### B.    Description of Exit Facility.

Section 5.10 of the Plan provides that on the Effective Date, without any requirement of further action by security holders or directors of the Debtors or Reorganized Debtors, the Debtors and Reorganized Debtors shall be authorized, but not directed, to enter into the Exit Facility Credit Agreement, if any, as well as any notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility. The Exit Facility shall be a revolving credit facility providing for loans and other extensions of credit in an aggregate amount up to $300 million, with a letter of credit sub-facility of up to $100 million. The Exit Facility shall be substantially in the form that will be filed with the Plan Supplement as Exhibit 5.10 to the Plan.

### C.    Description of Capital Stock.

The Plan provides that on the Effective Date or a subsequent Distribution Date, as applicable, Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to the Plan without further act or action under applicable law, regulation, order or rule. The powers, preferences and rights, as well as certain limitations, qualifications and restrictions associated with the New Common Stock shall be set forth in their

134

the Debtors treated or intend to treat significant amounts of income as not subject to tax because of the Debtors' status as an S corporation. Significant judgment is required in evaluating the Debtors' tax positions and in establishing appropriate reserves. The Debtors analyze their tax positions and reserves on an ongoing basis and make adjustments when warranted based on changes in facts and circumstances. The resolutions of the Debtors' tax positions are unpredictable and could result in tax liabilities and associated cash payments that are significantly higher or lower than that which has been provided for by the Debtors. In addition, a change in the tax laws of the United States and adjustments to tax positions as a result of audits could materially affect the consequences of the Plan to the Debtors and/or their stockholders.

17.    The Debtors' Company-Sponsored Pension Plans are Currently Underfunded, and Over Time the Debtors Will Likely be Required to Make Cash Contributions to the Plans, Reducing the Cash Available for Working Capital and Other Corporate Uses.

The Debtors provide pension benefits to eligible employees under certain company-sponsored defined benefits pension plans. In 2008, the market value of the Debtors' pension plan assets declined significantly due to negative investment returns. As a result, in accordance with GAAP (Accounting Standards Codification Topic 715, "Compensation Retirement Benefits"), the Debtors' recognized a net pension obligation for the underfunded status of its company-sponsored pension plans at the end of 2008. In 2009, the net pension obligation declined slightly due to an increase in pension assets resulting from investment returns but that increase was largely offset by higher liabilities due to a lower discount rate and other factors.

Cash Funding requirements are not driven directly by the GAAP underfunded position, but by the Pension Protection Act ("PPA"), which uses a different method to calculate the underfunded amount, as described in Article IV.C hereof. Using the PPA methodology and based on various assumptions, the Debtors project that significant cash contributions will be required in the future. Actual Cash Funding may be more or less than these projections. For example, if PPA discount rates remain low and/or investment returns are below expectations, then without legislative relief the projected contributions may be higher than currently anticipated. As a result, the Debtors may have less cash available for working capital and other corporate uses, which may have an adverse impact on the Debtors' operations, financial condition and liquidity.

In addition, the Debtors participate in multiemployer pension plans on behalf of employees represented by certain unions. Contributions to these multiemployer pension plans could increase as a result of future collective bargaining, funding deficiencies or other factors. The Debtors' obligations to make contributions to their pension plans and multiemployer pension plans in which they participate would reduce the cash available for working capital and other corporate uses and may have a material adverse impact on the Debtors' operations, financial condition and liquidity.

18.    Labor Strikes, Lock-Outs and Protracted Negotiations can Lead to Business Interruptions and Increased Operating Costs.

As of December 31, 2009, union employees comprise about fifteen percent (15%) of the Debtors' workforce. The Debtors are required to negotiate collective bargaining agreements across their respective business units on an ongoing basis. Complications in labor negotiations can lead to work slowdowns or other business interruptions and greater overall employee costs.

19.    Acquisitions, Investments and Dispositions Pose Inherent Financial and Other Risks and Challenges.

The Debtors continuously evaluate their businesses and make strategic acquisitions, dispositions, and investments. These transactions involve challenges and risks in negotiation, execution, valuation and integration. There can be no assurance that any such transaction can be completed. Moreover, competition for certain types of acquisitions and investments is significant. Even if successfully negotiated, closed and

148

In certain circumstances, Reorganized Tribune may issue shares of New Class B Common Stock and/or New Warrants. The New Class A Common Stock and New Class B Common Stock generally provide identical economic rights, but holders of the New Class B Common Stock have limited voting rights, including that such holders have no right to vote in the election of directors. The holders of the New Warrants have no voting rights. The difference in voting rights of the New Class A Common Stock on the one hand, and New Class B Common Stock and New Warrants on the other hand, could diminish the value of the New Class B Common Stock and the New Warrants to the extent that investors or potential future purchasers of the New Class B Common Stock or the New Warrants ascribe value to the superior voting rights of the New Class A Common Stock. The Certificate of Incorporation of Reorganized Tribune, which will be filed with the Plan Supplement as Exhibit 5.3.2.1 to the Plan, contains more information about the rights and limitations associated with the New Class B Common Stock. In addition, the New Warrant Agreement, which will be filed with the Plan Supplement as Exhibit ~~1.1.123~~1.1.124 to the Plan, contains more information about the rights and limitations associated with the New Warrants.

     5.     Certain Holders May be Restricted in Their Ability to Transfer or Sell Their Securities.

To the extent that New Common Stock, New Warrants or any other securities are issued under the Plan and are covered by section 1145(a)(1) of the Bankruptcy Code, they may be resold by the holders thereof without registration unless the holder is an "underwriter" with respect to such securities. Resales by Persons who receive New Common Stock or New Warrants pursuant to the Plan that are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such Persons would be permitted to sell such New Common Stock or New Warrants without registration if they are able to comply with the provisions of rule 144 under the Securities Act.

Reorganized Tribune will use its reasonable best efforts to list, as promptly as practicable after the Effective Date, the New Class A Common Stock for trading on the NYSE or for quotation in the NASDAQ stock market but will have no liability if it is unable to do so. As noted above (see "Lack of an Established Market for the Securities May Adversely Affect the Liquidity of the New Common Stock and the New Warrants"), there can be no assurance that the listing or quotation of the New Class A Common Stock will be accepted or that an active or liquid trading market will develop for the New Class A Common Stock. Efforts to list the New Class A Common Stock, if successful, would include registering the New Class A Common Stock under the Exchange Act. Registration under the Exchange Act is a separate process from registration under the Securities Act and would not be sufficient to permit resales by persons who receive New Common Stock or New Warrants pursuant to the Plan and who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code. Reorganized Tribune has no current plans to list the New Class B Common Stock on the NYSE or for quotation on the NASDAQ Stock Market or to register the New Class B Common Stock or New Warrants under the Securities Act, the Exchange Act or under equivalent state securities laws such that the recipients of the New Class B Common Stock or New Warrants would be able to resell their securities pursuant to an effective registration statement.

The Certificate of Incorporation contains restrictions on stockholders' ability to transfer New Common Stock and New Warrants designed to ensure compliance with the FCC broadcast multiple ownership and cross-ownership rules and the limitations on foreign ownership or control of FCC broadcast licenses imposed by the Communications Act. Furthermore, certificates for shares of New Common Stock and certificates for New Warrants may bear a legend restricting the sale, transfer, assignment, conversion or other disposal of such securities.

## XV.CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax aspects of the Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax

Pursuant to the Plan, all Securities Litigation Claims will be extinguished, and U.S. Holders of Securities Litigation Claims will receive nothing in exchange for such Claims. As a result, each U.S. Holder of a Securities Litigation Claim generally will recognize a loss equal to the U.S. Holder's adjusted tax basis, if any, in such Claim, except to the extent that such U.S. Holder previously claimed a loss with respect to such Claim under its regular method of accounting.

      11.      U.S. Holders of Tribune Interests.

Pursuant to the Plan, all Tribune Interests will be extinguished, and U.S. Holders of Tribune Interests will receive nothing in exchange for such Tribune Interests. As a result, each U.S. Holder of Tribune Interests generally will recognize a loss equal to the U.S. Holder's adjusted tax basis in such Tribune Interests extinguished under the Plan, except to the extent that such U.S. Holder previously claimed a loss with respect to such Tribune Interests under its regular method of accounting.

      12.      Definition of "Security."

The term "security" is not defined in the IRC or in the Treasury Regulations. Whether an instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all of the facts and circumstances. Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument. These authorities have indicated that an initial term of less than five years is evidence that the instrument is generally not a security, whereas an initial term of ten years or more is evidence that it is a security. Treatment of an instrument with an initial term between five and ten years is generally unsettled. Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including, but not limited to, whether repayment is secured, the level of creditworthiness of the obligor, whether the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

      13.      Federal Income Tax Treatment of the New Senior Secured Term Loan.

If the New Senior Secured Term Loan is "publicly traded," its issue price is generally expected to equal its fair market value on the Effective Date. If the New Senior Secured Term Loan is not publicly traded, its issue price will depend on whether a substantial amount of the New Senior Secured Term Loan is exchanged for debt instruments that are publicly traded, in which case the issue price of the New Senior Secured Term Loan is generally expected to be determined by reference to the fair market value of the publicly traded debt for which a substantial amount of the New Senior Secured Term Loan has been exchanged. Otherwise, the issue price of the New Senior Secured Term Loan is generally expected to equal its stated redemption price at maturity. For these purposes, a debt instrument generally is treated as publicly traded if, at any time during the 60 day period ending 30 days after the issue date, (i) the debt is listed on a national securities exchange or quoted on an interdealer quotation system sponsored by a national securities association, (ii) it appears on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations (including rates, yields or other pricing information) of one or more identified brokers, dealers or traders or actual prices (including rates, yields or other pricing information) of recent sales transactions or (iii) if, in certain circumstances, price quotations are readily available from dealers, brokers or traders.

A U.S. Holder who receives the New Senior Secured Term Loan will generally be required to include stated interest on the New Senior Secured Term Loan in income in accordance with U.S. Holder's regular method of tax accounting. In addition, if the New Senior Secured Term Loan is treated as issued with original issue discount for U.S. federal income tax purposes, a U.S. Holder of the New Senior Secured Term Loan will be required to include in income as ~~additional~~ interest the amount of such original issue discount

over the term of the New Senior Secured Term Loan based on the constant yield method. In such a case, a U.S. Holder will also be required to include amounts in income before they are received. A U.S. Holder's tax basis in the New Senior Secured Term Loan will be increased by the amount of original issue discount included in income and reduced by the amount of Cash (other than payments of stated interest) received with respect to the New Senior Secured Term Loan.

14.    Non-United States Persons.

A holder of a Claim that is a Non-United States Person generally will not be subject to U.S. federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, or (ii) such holder is an individual and is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

15.    Information Reporting and Backup Withholding.

Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting by the payor (the relevant Debtor) to the IRS. Moreover, such reportable payments may be subject to backup withholding (currently at a rate of twenty-eight percent (28%)) under certain circumstances. Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) is notified by the IRS of a failure to report interest or dividends properly, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is correct and that the holder is a United States person that is not subject to backup withholding. Certain persons are exempt from backup withholding, including, under certain circumstances, corporations and financial institutions. Holders of Allowed Claims and Interests are urged to consult their own tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

Recent legislation generally imposes withholding of 30% on payments to certain foreign entities (including financial intermediaries), after December 31, 2012, of dividend payments on and the gross proceeds of dispositions of U.S. common stock and possibly warrants, unless various U.S. information reporting and due diligence requirements (that are in addition to, and potentially significantly more onerous than, the requirement to deliver an IRS Form W-8BEN) have been satisfied. Non-U.S. Holders should consult their tax advisers regarding the possible implications of this legislation for their receipt of interests in the New Common Stock and New Warrants.

C.    **Federal Income Tax Treatment of Other Parent Claims Reserves and Subsidiary GUC Reserves.**

Reorganized Tribune may establish one or more Other Parent Claims Reserves and Subsidiary GUC Reserves (together, "Reserves") to make distributions to Holders of Disputed Claims that become Allowed Claims after the Effective Date. Distributions from each such Reserve will be made to Holders of Disputed Claims when such Claims are subsequently Allowed, and to Holders of Allowed Claims (whether such Claims were Allowed on or after the Effective Date) when any Disputed Claims are subsequently disallowed.

Each Reserve may be structured in a manner intended to cause it to be taxable as a "qualified settlement fund" ("QSF"), separate and apart from Reorganized Tribune, subject to a separate entity-level tax

persons receiving such securities, if the offer to buy is made with a view to distribution, or (iv) is an "issuer" of the relevant security, as such term is used in Section 2(11) of the Securities Act. Under Section 2(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly through one or more intermediaries controlling, controlled by or under common control with the issuer.

To the extent that recipients of the New Common Stock or New Warrants under the Plan are deemed to be "underwriters," the resale of the shares of New Common Stock or New Warrants received by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable laws. Persons deemed to be underwriters may, however, be permitted to sell such New Common Stock or New Warrants without registration pursuant to the provisions of Rule 144 under the Securities Act. This rule permits the public resale of securities received by "underwriters" if current information regarding the issuer is publicly available and if certain volume limitations and other conditions are met.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER WITH RESPECT TO THE NEW COMMON STOCK OR THE NEW WARRANTS, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE SHARES OF NEW COMMON STOCK OR THE NEW WARRANTS ISSUED UNDER THE PLAN. THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS OR INTERESTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT REGISTRATION UNDER THE SECURITIES ACT.

## XVII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the alternatives include (i) continuation of the Chapter 11 Cases and formulation of an alternative plan or plans of reorganization or (ii) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. Each of these possibilities is discussed in turn below.

### A.    Continuation of The Chapter 11 Cases

If the Debtors remain in chapter 11, the Debtors could continue to operate their businesses and manage their properties as Debtors in Possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could continue as viable going concerns in protracted Chapter 11 Cases. If the Debtors remain in chapter 11 for a prolonged period of time, they could have difficulty operating with the high costs, operating financing and the eroding confidence of their employees, customers and trade vendors.

In addition, if the Debtors fail to settle outstanding Claims through the Plan, litigation over Claims may take years to resolve, be burdensome and expensive, prolong the Chapter 11 Cases, and have a detrimental impact on the Debtors' businesses and enterprise value.

### B.    Liquidation Under Chapter 7 or Chapter 11

If the Plan is not confirmed, the Debtors' Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code. In chapter 7, a trustee would be appointed to liquidate the assets of the Debtors. The Debtors believe that in a liquidation under chapter 7 additional administrative expenses involved in the appointment of a trustee and professionals to assist such trustee, along with expenses associated with an increase in the number of unsecured claims that would be expected, would cause a substantial diminution in the value of the estates. In addition, the Debtors believe that the Liquidation Analysis attached to this Disclosure Statement as Exhibit HG is speculative as it is necessarily premised upon

# EXHIBIT A

*Proposed Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries*

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TRIBUNE COMPANY, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 08-13141 (KJC)<br><br>Jointly Administered |

## PROPOSED AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES

SIDLEY AUSTIN LLP
Bryan Krakauer
James F. Conlan
Janet E. Henderson
Kevin T. Lantry
Jessica C.K. Boelter
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

COUNSEL FOR DEBTORS AND DEBTORS IN POSSESSION AND CERTAIN NON-DEBTOR AFFILIATES
DATED: May 19.24, 2010

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARTICLE I : DEFINITIONS; RULES OF INTERPRETATION; EXHIBITS .................. 1

1.1    DEFINITIONS. ............................................................................................................ 1
1.2    RULES OF INTERPRETATION. .................................................................................. 21
1.3    COMPUTATION OF TIME. ................................................................................... 2122
1.4    EXHIBITS AND PLAN SUPPLEMENT. ..................................................................... 22
1.5    DEEMED ACTS. ...................................................................................................... 22

ARTICLE II : TREATMENT OF ADMINISTRATIVE AND PRIORITY TAX CLAIMS ...... 22

2.1    DIP FACILITY CLAIMS. ......................................................................................... 22
2.2    ADMINISTRATIVE EXPENSE CLAIMS. ............................................................... 2223
2.3    PRIORITY TAX CLAIMS. ........................................................................................ 23

ARTICLE III : CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS   23

3.1    SUMMARY OF CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS. ................ 23
3.2    CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND INTERESTS IN TRIBUNE COMPANY (DEBTOR 1). ............... 25
3.3    CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND INTERESTS IN FILED SUBSIDIARY DEBTORS (DEBTORS 2
THROUGH 111). ................................................................................................................ 30
3.4    PREPACKAGED PLANS FOR AND TREATMENT OF CLAIMS AGAINST AND INTERESTS IN GUARANTOR NON-DEBTORS, IF ANY,
THAT BECOME DEBTORS. ................................................................................................ 33

ARTICLE IV : ACCEPTANCE OR REJECTION OF PLAN .................................... 35

4.1    IMPAIRED CLASSES OF CLAIMS AND INTERESTS ENTITLED TO VOTE. ......................... 35
4.2    ACCEPTANCE BY AN IMPAIRED CLASS OF CLAIMS. ........................................... 35
4.3    DEEMED ACCEPTANCE BY HOLDERS OF INTERCOMPANY CLAIMS. ....................... 35
4.4    PRESUMED ACCEPTANCES BY UNIMPAIRED CLASSES. ..................................... 35
4.5    PRESUMED REJECTION OF THE PLAN. ................................................................ 35
4.6    CONFIRMABILITY AND SEVERABILITY OF THIS PLAN. ....................................... 35

ARTICLE V : MEANS FOR IMPLEMENTATION OF THE PLAN ......................... 36

5.1    NON-SUBSTANTIVE CONSOLIDATION. .................................................................. 36
5.2    RESTRUCTURING TRANSACTIONS. ....................................................................... 36
5.3    CORPORATE GOVERNANCE, DIRECTORS, OFFICERS AND CORPORATE ACTION. ........ 37
5.4    ISSUANCE AND DISTRIBUTION OF NEW SECURITIES AND RELATED MATTERS. ........... 39
5.5    REPORTING REQUIREMENTS UNDER SECURITIES EXCHANGE ACT OF 1934 AND LISTING OF NEW CLASS A COMMON
STOCK ON SECURITIES EXCHANGE OR QUOTATION SYSTEM. ............................................ 41
5.6    NEW SENIOR SECURED TERM LOAN AGREEMENT. ......................................... 4142
5.7    CONTINUED CORPORATE EXISTENCE AND VESTING OF ASSETS IN THE REORGANIZED DEBTORS. .............. 42
5.8    CANCELLATION OF LOAN AGREEMENTS, LOAN GUARANTY AGREEMENTS, THE PLEDGE AGREEMENT, NOTES ISSUED
UNDER THE LOAN AGREEMENTS, SENIOR NOTES, DEBENTURES, INSTRUMENTS, INDENTURES, EGI-TRB LLC NOTES,
PHONES NOTES, OLD COMMON STOCK AND OTHER TRIBUNE INTERESTS. ........................... 43
5.9    CANCELLATION OF LIENS AND GUARANTIES. ..................................................... 44
5.10    EXIT FACILITY. ................................................................................................ 4445
5.11    EQUITY INCENTIVE PLAN. .............................................................................. 45
5.12    SOURCES OF CASH FOR PLAN DISTRIBUTIONS. ............................................. 45
5.13    ADDITIONAL TRANSACTIONS AUTHORIZED UNDER THE PLAN. ....................... 45
5.14    SETTLEMENT OF CLAIMS AND CONTROVERSIES. ........................................... 45
5.15    PRESERVATION OF RIGHTS OF ACTION AND SETTLEMENT OF LITIGATION CLAIMS. ........ 46
5.16    FCC APPLICATIONS. ...................................................................................... 46

ARTICLE VI : TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..... 47

6.1    ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES. ..................... 47

6.2    Cure of Defaults of Assumed Executory Contracts and Unexpired Leases. ...... 4748
6.3    Rejection of Executory Contracts and Unexpired Leases. ...... 48
6.4    Rejection Damages Bar Date. ...... 48
6.5    Compensation and Benefit Programs. ...... 48
6.6    Collective Bargaining Agreements. ...... 49
6.7    Post-Petition Contracts and Leases. ...... 49
6.8    Termination of ESOP. ...... 49

**ARTICLE VII : PROVISIONS GOVERNING DISTRIBUTIONS** ...... **49**

7.1    General. ...... 49
7.2    Distributions for Certain Claims. ...... 50
7.3    Special Provisions Governing Distributions to Holders of Loan Claims and Loan Guaranty Claims. ...... 51
7.4    Interest on Claims. ...... 51
7.5    Distributions by Disbursing Agent. ...... 5152
7.6    Delivery of Distributions and Undeliverable or Unclaimed Distributions. ...... 52
7.7    Record Date for Distributions. ...... 5253
7.8    Allocation of Plan Distributions Between Principal and Interest. ...... 53
7.9    Means of Cash Payment. ...... 5354
7.10    Withholding and Reporting Requirements. ...... 54
7.11    Setoffs. ...... 54
7.12    Fractional Shares. ...... 5455
7.13    De Minimis Distributions. ...... 5455
7.14    Special Provision Regarding Unimpaired Claims. ...... 55
7.15    Subordination. ...... 55

**ARTICLE VIII : PROVISIONS FOR RESOLVING DISPUTED CLAIMS AND DISPUTED INTERESTS**
**55**

8.1    Objections to and Estimation of Claims. ...... 55
8.2    Payments and Distributions on Disputed, Contingent and Unliquidated Claims and Interests and on Claims for Which Proofs of Claim are Filed. ...... 5556

**ARTICLE IX : PAYMENT AND FILING OF PROFESSIONAL FEE CLAIMS** ...... **56**

9.1    Payment of Certain Fee and Expense Claims. ...... 56
9.2    Bar Date for Payment or Reimbursement of Professional Fees and Expenses and Claims for Substantial Contribution. ...... 5758

**ARTICLE X : CONFIRMATION AND CONSUMMATION OF THE PLAN** ...... **5859**

10.1    Conditions to Effective Date. ...... 5859
10.2    Waiver of Conditions. ...... 5960
10.3    Consequences if Confirmation Order is Vacated. ...... 60

**ARTICLE XI : INJUNCTIONS, RELEASES AND DISCHARGE** ...... **60**

11.1    Discharge. ...... 60
11.2    Releases. ...... 61
11.3    Bar Order. ...... 64
11.4    Supplemental Injunction. ...... 65
11.5    Disallowed Claims And Disallowed Interests. ...... 66
11.6    Exculpation. ...... 66
11.7    Corporate Indemnities. ...... 6667
11.8    Term of Bankruptcy Injunction or Stays. ...... 68

**ARTICLE XII : RETENTION OF JURISDICTION** ...... **68**

12.1    Retention of Jurisdiction. ...... 68

**ARTICLE XIII : MISCELLANEOUS** ...... **70**

13.1    Surrender of Instruments. ........................................................................... 70
13.2    Creditors Committee. ................................................................................. 7071
13.3    Post-Confirmation Date Retention of Professionals. ................................. 7071
13.4    Effectuating Documents and Further Transactions. ................................... 71
13.5    Exemption from Transfer Taxes. ................................................................ 71
13.6    Paid-in Capital of Corporate Reorganized Debtors. ................................. 71
13.7    Payment of Statutory Fees. ........................................................................ 72
13.8    Amendment or Modification of this Plan. ................................................. 72
13.9    Certain Provisions Pertaining to Senior Lender Settlement Committee and Centerbridge. ...... 72
13.10   Severability of Plan Provisions. ................................................................. 7273
13.11   Successors and Assigns. ............................................................................. 73
13.12   Revocation, Withdrawal or Non-Consummation. ..................................... 73
13.13   Notice. ....................................................................................................... 73
13.14   Governing Law. .......................................................................................... 74
13.15   Tax Reporting and Compliance. ................................................................ 74
13.16   Exhibits and Appendices. ........................................................................... 74
13.17   Reservation of Rights. ................................................................................ 7475

iii

## APPENDICES AND EXHIBITS

Appendix A – Filed Subsidiary Debtors
Appendix B – Subsidiary Non-Debtors
Appendix C – Collective Bargaining Agreements

Exhibit ~~1.1.123~~1.1.124 – New Warrant Agreement
Exhibit 5.2 – Restructuring Transactions
Exhibit 5.3.1(1) – Certificate of Incorporation of Reorganized Tribune
Exhibit 5.3.1(2) – By-Laws of Reorganized Tribune
Exhibit 5.3.2 – Directors and Officers of Reorganized Tribune
Exhibit 5.3.3 – Directors and Managers of Reorganized Debtors Other Than Reorganized Tribune
Exhibit 5.6 – Terms of New Senior Secured Term Loan Agreement
Exhibit 5.10 – Terms of Exit Facility Credit Agreement
Exhibit 5.14.3 – Retiree Claimant Settlement Agreement
Exhibit 6.3 – Rejected Executory Contracts and Unexpired Leases
Exhibit 11.7.6 – Indemnification Claim Procedures

1.1.8  <u>Ballot</u> means the document for accepting or rejecting the Plan in the form approved by the Bankruptcy Court.

1.1.9  <u>Bankruptcy Code</u> means title 11 of the United States Code, as in effect on the Petition Date, together with any and all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases.

1.1.10 <u>Bankruptcy Court</u> means the United States Bankruptcy Court for the District of Delaware.

1.1.11 <u>Bankruptcy Rules</u> means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any local rules of the Bankruptcy Court, as in effect on the Petition Date, together with any and all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases.

1.1.12 <u>Barclays Swap Claim</u> means any Claims asserted by Barclays Bank PLC under that certain 1992 ISDA Master Agreement, dated as of July 2, 2007, between Barclays Bank PLC and Tribune.

1.1.13 <u>Bridge Lenders</u> means the lenders from time to time party to the Bridge Loan Agreement as Lenders thereunder, including former lenders and any applicable assignees and participants thereof.

1.1.14 <u>Bridge Loan Agent</u> means ~~Merrill Lynch Capital Corporation~~<u>Wells Fargo Bank, N.A.</u> as administrative agent, and its Affiliates and Related Persons of such entities, and any successor administrative agent, under the Bridge Loan Agreement.

1.1.15 <u>Bridge Loan Agreement</u> means that certain Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007, among Tribune, the Bridge Lenders, the <u>Former</u> Bridge Loan Agent, JPMorgan Chase Bank, N.A., as syndication agent, and Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time.

1.1.16 <u>Bridge Loan Arrangers</u> means any Syndication Agent, Documentation Agent, Arranger, Bookrunner or other party serving a similar purpose under the Bridge Loan Agreement.

1.1.17 <u>Bridge Loan Claim</u> means a Claim arising under the Bridge Loan Agreement.

1.1.18 <u>Bridge Loan Guaranty Agreement</u> means the Guarantee Agreement, dated as of December 20, 2007, among Tribune, each of the subsidiaries of Tribune listed on Annex I thereto, and the Bridge Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.81 <u>Final Order</u> means an order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or on the docket of any other court of competent jurisdiction), which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for <u>certiorari</u> or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for <u>certiorari</u> or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of <u>certiorari</u>, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or <u>certiorari</u> shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for <u>certiorari</u> or move for a new trial, reargument or rehearing shall have expired; <u>provided</u>, <u>however</u>, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

1.1.82 <u>Foreign Ownership Certification</u> means the certification of aggregate foreign voting interests and aggregate foreign equity interests that each Holder of a Claim, other than a Senior Noteholder Claim, that is eligible to receive New Common Stock under this Plan must provide and that Holders of Senior Noteholder Claims will be entitled to provide.

1.1.83 <u>Former Bridge Loan Agent means</u> Merrill Lynch Capital Corporation as former administrative agent under the Bridge Loan Agreement and its Affiliates and Related Persons of such entities.

1.1.84 1.1.83 <u>General Unsecured Claim</u> means any Claim against the Debtors that is not an Administrative Expense Claim, a DIP Facility Claim, a Priority Tax Claim, a Priority Non-Tax Claim, an Other Secured Claim, a Senior Loan Claim, a Bridge Loan Claim, a Senior Noteholder Claim, a Convenience Claim, an EGI-TRB LLC Notes Claim, a PHONES Notes Claim, an Employee Benefit Claim, an Intercompany Claim, a Securities Litigation Claim, a Senior Loan Guaranty Claim or a Bridge Loan Guaranty Claim and shall not include Disallowed Claims or Claims that are released, whether by operation of law or pursuant to order of the Bankruptcy Court, written release or settlement, the provisions of this Plan or otherwise.

1.1.85 1.1.84 <u>Global Contract Motion</u> means a motion seeking the assumption or rejection of unassumed or unrejected executory contracts and unexpired leases of the Debtors, which motion may be filed with the Bankruptcy Court and heard at the Confirmation Hearing.

1.1.86 1.1.85 <u>Global Settlement</u> has the meaning set forth in <u>Section 5.14.2</u> hereto.

1.1.87 1.1.86 <u>Guarantor Debtors</u> means those Debtors listed on <u>Appendix A</u> hereto as "Guarantor Debtors".

1.1.88 1.1.87 <u>Guarantor Non-Debtor Release</u> means the release by all Holders of Loan Guaranty Claims against the Guarantor Non-Debtors on the Effective Date (a) releasing the Guarantor Non-Debtors from any and all Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims and (b) releasing the Senior Loan Agent and Bridge Loan Agent, respectively,

10

from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities of any nature whatsoever as a result of the release of the Guarantor Non-Debtors from any and all Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims.

1.1.89 1.1.88 Guarantor Non-Debtors means those non-Debtors listed on Appendix B hereto as "Guarantor Non-Debtors".

1.1.90 1.1.89 Holder means a Person holding a Claim or Interest.

1.1.91 1.1.90 Holder Released Claims has the meaning set forth in Section 11.2.2 of this Plan.

1.1.92 1.1.91 Impaired means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.1.93 1.1.92 Indemnified Creditor Parties has the meaning set forth in Section 11.7.2 of this Plan.

1.1.94 1.1.93 Indemnified Part(ies) has the meaning set forth in Section 11.7.2 of this Plan.

1.1.95 1.1.94 Indemnity, Subrogation and Contribution Agreements means (a) the Indemnity, Subrogation and Contribution Agreement, dated as of December 20, 2007, among Tribune, each of the subsidiaries of Tribune listed on Schedule I thereto, and the Bridge Loan Agent, as amended, restated, supplemented or otherwise modified from time to time, and (b) the Indemnity, Subrogation and Contribution Agreement, dated as of December 20, 2007, among Tribune, each of the subsidiaries of Tribune listed on Schedule I thereto, and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.96 1.1.95 Indentures means the Senior Notes Indentures and the PHONES Notes Indenture.

1.1.97 1.1.96 Indenture Trustees means the Senior Notes Indenture Trustees and the PHONES Notes Indenture Trustee.

1.1.98 1.1.97 Initial Distribution Date means a date selected by the Reorganized Debtors that is as soon as practicable following the Effective Date and is not later than thirty (30) days after the Effective Date.

1.1.99 1.1.98 Initial Report has the meaning set forth in Section 9.2 hereto.

1.1.100    1.1.99 Intercompany Claims means all prepetition Claims against any of the Debtors held by a Debtor or a non-Debtor Affiliate.

1.1.101    1.1.100 Interest means any share of common stock, preferred stock or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such

11

interest in a Debtor that existed immediately prior to the Effective Date, including, but not limited to, any Tribune Interest and Interest in a Subsidiary Debtor.

1.1.102    ~~1.1.101~~ Law Debenture means Law Debenture Trust Company of New York, not personally but solely in its capacity as successor indenture trustee under that certain Indenture, dated as of March 19, 1996, as amended, restated or otherwise modified from time to time, between Tribune and Law Debenture Trust Company of New York.

1.1.103    ~~1.1.102~~ LBO-Related Causes of Action means any and all claims, causes of action, avoidance powers or rights, and legal or equitable remedies against any Person arising from any transaction related to the leveraged buy-out of Tribune that occurred in 2007, including, without limitation, the purchase by Tribune of its common stock on or about June 4, 2007, the merger and related transactions involving Tribune on or about December 20, 2007, and any financing committed to, incurred or repaid in connection with any such transaction, regardless of whether such claims, causes of action, avoidance powers or rights, or legal or equitable remedies may be asserted pursuant to the Bankruptcy Code or any other applicable law.

1.1.104    ~~1.1.103~~ Lien means, with respect to any interest in property, any mortgage, lien, pledge, charge, security interest, easement or encumbrance of any kind whatsoever affecting such interest in property.

1.1.105    ~~1.1.104~~ Litigation Claims means the claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, including, without limitation, the Morgan Stanley Claims (unless settled on or prior to the Effective Date), that any Debtor or Estate may hold against any Person as of the Petition Date; provided, however, Litigation Claims shall not include (a) any claim, right of action, suit or proceeding that has been settled on or prior to the Effective Date, (b) the LBO-Related Causes of Action and (c) other claims, rights of action, suits or proceedings waived or released pursuant to Article XI of this Plan.

1.1.106    ~~1.1.105~~ Loan Agents means the Senior Loan Agent and the Bridge Loan Agent.

1.1.107    ~~1.1.106~~ Loan Agreements means the Senior Loan Agreement and the Bridge Loan Agreement.

1.1.108    ~~1.1.107~~ Loan Claims means the Senior Loan Claims and the Bridge Loan Claims.

1.1.109    ~~1.1.108~~ Loan Claims Cash Allocation means 8.8% of the Distributable Cash minus (A) the amount of the Distributable Cash to be distributed to Holders of Allowed Claims in Class 1E, (B) the portion of the Other Parent Claims Allocation that is Distributable Cash and (C) the amount of Cash to be distributed to Holders of Allowed Claims in Class 1G.

1.1.110    ~~1.1.109~~ Loan Claims Loan Allocation means 8.8% of the New Senior Secured Term Loan minus (A) the amount of the New Senior Secured Term Loan to be

distributed to Holders of Allowed Claims in Class 1E and (B) the portion of the Other Parent Claims Allocation that is New Senior Secured Term Loan.

1.1.111  1.1.110 Loan Claims Stock Allocation means 8.8% of the New Common Stock (subject to dilution by the Equity Incentive Plan) minus (A) the amount of the New Common Stock to be distributed to Holders of Allowed Claims in Class 1E and (B) the portion of the Other Parent Claims Allocation that is New Common Stock.

1.1.112  1.1.111 Loan Guaranty Agreements means the Senior Loan Guaranty Agreement, the Bridge Loan Guaranty Agreement and the Indemnity, Subrogation and Contribution Agreements.

1.1.113  1.1.112 Loan Guaranty Claims means the Senior Loan Guaranty Claims and the Bridge Loan Guaranty Claims.

1.1.114    1.1.113 Media Ownership Certification means the certification of other media investments and holdings, and any other information that the Debtors deem reasonably necessary for purposes of the FCC Applications and/or FCC Approval, including, without limitation, on FCC qualifications to hold an attributable interest in the Reorganized Debtors under FCC rules and policies that each Holder that is entitled to receive New Common Stock under this Plan may be required to provide.

1.1.115  1.1.114 Morgan Stanley Claims means the claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, and including any and all rights, claims and actions (including avoidance actions arising under chapter 5 of the Bankruptcy Code) that Tribune or any of its Affiliates may have against MSCS arising from or related to (a) the acquisition, sale or disposition of any notes, bonds or other indebtedness held by MSCS, (b) the interest rate swap transaction executed pursuant to the ISDA Master Agreement dated as of August 5, 1994 (as subsequently amended and together with any schedules, exhibits and confirmations) between The Times Mirror Company and MSCS and any set-offs of claims arising from such interest rate swap transaction, or (c) any advisory engagement or potential advisory engagement of, and/or advice given by, MSCS between October 2008 and December 2008, including any claims related to or arising from the agreement between Tribune and MSCS dated as of November 30, 2008; provided, however, that the Morgan Stanley Claims do not include any LBO-Related Causes of Action.

1.1.116  1.1.115 MSCS means Morgan Stanley Capital Services Inc. and its Affiliates and Related Persons of such entities.

1.1.117  1.1.116 Multiemployer Plan means a plan (i) to which more than one employer is required to contribute, (ii) which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer, and (iii) which satisfies such other requirements contained in regulations promulgated by the United States Department of Labor.

1.1.118  1.1.117 Neil Litigation means the lawsuit captioned Neil v. Zell, Case No. 08-06833 (RRP) (N.D. Ill.).

13

1.1.119 ~~1.1.118~~ New Class A Common Stock means the Class A Common Stock to be issued by Reorganized Tribune in connection with the implementation of, and as authorized by, this Plan, which shall have the powers, preferences and rights and be subject to the limitations, qualifications and restrictions, in each case as set forth in the Certificate of Incorporation.

1.1.120 ~~1.1.119~~ New Class B Common Stock means the Class B Common Stock to be issued by Reorganized Tribune in connection with the implementation of, and as authorized by, this Plan, which shall have the powers, preferences and rights and be subject to the limitations, qualifications and restrictions, in each case as set forth in the Certificate of Incorporation.

1.1.121 ~~1.1.120~~ New Common Stock means, collectively, the New Class A Common Stock and the New Class B Common Stock; provided that, under the circumstances set forth in Section 5.4.2 of this Plan, certain Holders of Claims that would otherwise be entitled to receive New Class A Common Stock or New Class B Common Stock may instead receive New Warrants.

1.1.122 ~~1.1.121~~ New Senior Secured Term Loan means the new senior secured term loan in an aggregate principal amount of up to two times the Debtors' trailing twelve month EBITDA (as defined in the New Senior Secured Term Loan Agreement) as of the end of the fiscal quarter most recently ended prior to the Effective Date, which, subject to the terms of Section 5.6 of this Plan, may be issued on the Effective Date by Reorganized Tribune pursuant to the New Senior Secured Term Loan Agreement, or may be replaced in whole or in part with a distribution of Cash pursuant to and in accordance with Section 5.6.2 of this Plan.

1.1.123 ~~1.1.122~~ New Senior Secured Term Loan Agreement means the loan agreement among Reorganized Tribune, as borrower, the other Reorganized Debtors and U.S. Subsidiary Non-Debtors as provided in and subject to Section 5.6 of this Plan (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions), as guarantors, the administrative agent party thereto, and the Holders of Claims entitled to receive the New Senior Secured Term Loan under this Plan, which shall contain terms substantially as set forth in Exhibit 5.6 and filed with the Plan Supplement.

1.1.124 ~~1.1.123~~ New Warrant Agreement means the warrant agreement in substantially the form attached as Exhibit ~~1.1.123~~ 1.1.124 to this Plan and filed with the Plan Supplement.

1.1.125 ~~1.1.124~~ New Warrants means the warrants to purchase New Class A Common Stock or New Class B Common Stock to be issued by Reorganized Tribune in connection with the implementation of, and as authorized by, this Plan.

1.1.126 ~~1.1.125~~ Non-Guarantor Debtors means those Debtors listed on Appendix A hereto as "Non-Guarantor Debtors".

1.1.127 ~~1.1.126~~ Non-Guarantor Non-Debtors means those non-Debtors listed on Appendix B hereto as "Non-Guarantor Non-Debtors".

1.1.128 ~~1.1.127~~ Non-Qualified Former Employee Benefit Plan means any of the Debtors' non-tax qualified Pension Plans and individual agreements providing for retirement compensation, or deferred compensation arrangements of the applicable Debtor covering an individual who was not an employee, consultant or director of the applicable Debtor as of the Petition Date or who was identified to the Creditors Committee and the Senior Loan Agent.

1.1.129 ~~1.1.128~~ Non-Released Parties means any Person (including, without limitation, any Holder of a Claim or Interest that has elected not to grant the releases contained in Section 11.2.2 of this Plan) other than (a) the Released Parties and (b) Persons who have otherwise been granted a release pursuant to the provisions of this Plan.

1.1.130 ~~1.1.129~~ Old Common Stock means the issued and outstanding common stock of Tribune as of the Petition Date.

1.1.131 ~~1.1.130~~ Other Parent Claims means General Unsecured Claims against Tribune and for the avoidance of doubt includes all Claims against Tribune under Non-Qualified Former Employee Benefit Plans with the exception of Convenience Claims.

1.1.132 ~~1.1.131~~ Other Parent Claims Allocation means 35.18% of the aggregate amount in U.S. dollars of all Allowed Other Parent Claims, comprised of New Senior Secured Term Loan, Distributable Cash and New Common Stock in the same ratio as the distribution to Holders of Allowed Senior Noteholder Claims.

1.1.133 ~~1.1.132~~ Other Parent Claims Reserve means one or more reserves of Cash established for the benefit of Allowed Other Parent Claims pursuant to Section 7.2.1(a) of this Plan.

1.1.134 ~~1.1.133~~ Other Secured Claim means a Secured Claim, other than an Administrative Expense Claim, a DIP Facility Claim, a Priority Tax Claim, a Senior Loan Claim (other than a right to setoff) or a Senior Noteholder Claim (other than a right to setoff).

1.1.135 ~~1.1.134~~ Pension Plan means an employee pension benefit plan within the meaning of section (2)(A) of the Employee Retirement Income Security Act of 1974, as amended, but excludes Multiemployer Plans.

1.1.136 ~~1.1.135~~ Person means an individual, corporation, partnership, association, joint stock company, joint venture, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity, or any government, governmental agency or any subdivision, department or other instrumentality thereof.

1.1.137 ~~1.1.136~~ Petition Date means (i) for Tribune and for all Debtors listed on Appendix A to this Plan other than Tribune CNLBC, LLC, December 8, 2008, the date on which such Debtors commenced their Chapter 11 Cases, (ii) for Tribune CNLBC, LLC, October 12, 2009, the date on which such Debtor commenced its Chapter 11 Case, and (iii) with respect to

the Subsidiary Non-Debtors, the date on which any such Subsidiary Non-Debtor commences its Chapter 11 Case, if any.

1.1.138 1.1.137 PHONES Noteholder(s) means, individually or collectively, the Holder(s) of a PHONES Notes Claim(s).

1.1.139 1.1.138 PHONES Notes means the issued and outstanding notes under the PHONES Notes Indenture.

1.1.140 1.1.139 PHONES Notes Claim means a Claim arising under or evidenced by the PHONES Notes Indenture and related documents.

1.1.141 1.1.140 PHONES Notes Indenture means that certain Indenture, dated as of April 1, 1999, between Tribune and Wilmington Trust Company, as successor indenture trustee, as amended, restated or otherwise modified from time to time.

1.1.142 1.1.141 PHONES Notes Indenture Trustee means the indenture trustee under the PHONES Notes Indenture.

1.1.143 1.1.142 Plan means this chapter 11 plan of reorganization for the Debtors in the Chapter 11 Cases and the Non-Guarantor Non-Debtors, if any, that become Debtors and the Prepackaged Plan for the Guarantor Non-Debtors, if any, that become Debtors, including Exhibits and all supplements, appendices and schedules hereto, either in their present form or as the same may be altered, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.1.144 1.1.143 Plan Supplement means the supplement to this Plan filed with the Bankruptcy Court not later than fifteen (15) calendar days prior to the deadline established for objecting to confirmation of this Plan.

1.1.145 1.1.144 Pledge Agreement means the Pledge Agreement, dated as of June 4, 2007, between Tribune and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.146 1.1.145 Prepackaged Plan means this Plan for the Guarantor Non-Debtors, if any, that become Debtors.

1.1.147 1.1.146 Priority Non-Tax Claims means any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.1.148 1.1.147 Priority Tax Claim means any secured or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.1.149 1.1.148 Proof of Claim or Proof of Interest means the proof of claim or proof of interest, respectively, that must be filed by a Holder of a Claim or Interest by the date(s) designated by the Bankruptcy Court as the last date(s) for filing proofs of claim or interests

16

against the Debtors, or as is otherwise permitted to be filed against any of the Debtors pursuant to a Final Order of the Bankruptcy Court.

1.1.150 ~~1.1.149~~ Pro Rata means that proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Interests in such Class except in cases where Pro Rata is used in reference to multiple Classes, in which case Pro Rata means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Interests in such multiple Classes, or in reference to a specific type of Claim, in which case Pro Rata means the proportion that an Allowed Claim of such type bears to the aggregate amount of all Allowed Claims of such type.

1.1.151 ~~1.1.150~~ Quarterly Distribution Date means fifteen (15) calendar days after the conclusion of the calendar quarters ending in March, June, September and December.

1.1.152 ~~1.1.151~~ Reinstated or Reinstatement means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest, or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default whether or not such default occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Interest (other than a Debtor or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim or Interest entitles the Holder of such Claim or Interest.

1.1.153 ~~1.1.152~~ Related Person means, with respect to any Person, such Person's predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing their respective present and former Affiliates and each of their respective current and former members, partners, shareholders, equity-holders, officers, directors, employees, managers, trustees, trust beneficiaries, financial advisors, attorneys, accountants, investment bankers, consultants, agents and professionals, or other representatives, nominees or investment managers for beneficial owner(s) of the Senior Notes, each acting in such capacity, and any Person claiming by or through any of them (including their respective officers, directors, managers, trustees, trust beneficiaries, shareholders, partners, employees, members and professionals).

1.1.154 ~~1.1.153~~ Released Claims means the Debtor Released Claims and the Holder Released Claims.

17

1.1.155 ~~1.1.154~~ Released Parties means each of (a) the Debtors, their non-Debtor Affiliates including the Subsidiary Non-Debtors and the Reorganized Debtors, (b) the Creditors' Committee, in such capacity, and its present and former members, in their capacity as members of the Creditors' Committee, (c) the Senior Lenders, the Senior Loan Agent, the Senior Lender Steering Committee, the Senior Lender Settlement Committee, the Bridge Lenders (subject to Section 4.6.3), the Bridge Loan Agent (subject to Section 4.6.3), the Former Bridge Loan Agent (subject to Section 4.6.3 if the Former Bridge Loan Agent or any of its Related Persons is a Bridge Lender or is otherwise entitled to vote on the Plan as of the voting record date) and the Holder of the Barclays Swap Claim, in each case in all of their respective capacities, (d) the EGI-TRB LLC Noteholders and the holders of the EGI-TRB LLC Warrant, in each case in all of their respective capacities, (e) Centerbridge, the Senior Noteholders, and the Senior Notes Indenture Trustees, in each case in all of their respective capacities, and (f) all of the respective Related Persons to each of the foregoing parties~~; provided, however, in each case only if the applicable party has not returned a Ballot opting out of the releases in Section 11.2.2 of the Plan and, if entitled to vote on the Plan, has voted to accept the Plan~~.

1.1.156 ~~1.1.155~~ Reorganized Debtors means Reorganized Tribune and the other reorganized debtors or any successors thereto by merger, consolidation or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with this Plan (including, without limitation, the Restructuring Transactions).

1.1.157 ~~1.1.156~~ Reorganized Tribune means reorganized Tribune or any successors thereto by merger, consolidation or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with this Plan.

1.1.158 ~~1.1.157~~ Restructuring Transactions means those transactions or other actions (including, without limitation, mergers, consolidations, conversions, joint ventures, restructurings, recapitalizations, dispositions, liquidations or dissolutions) that one or more of the applicable Debtors or Reorganized Debtors may enter into or undertake on, prior to, or after the Effective Date outside the ordinary course of business of such Debtors or Reorganized Debtors in accordance with Section 5.2 hereof and as shall be set forth in the Plan Supplement.

1.1.159 ~~1.1.158~~ Retiree Claimants means those Holders of Claims under Non-Qualified Former Employee Benefit Plans that are parties to the Retiree Claimant Settlement Agreement.

1.1.160 ~~1.1.159~~ Retiree Claimant Settlement Agreement means that certain settlement agreement by and among Tribune and certain Retiree Claimants attached hereto as Exhibit 5.14.3.

1.1.161 ~~1.1.160~~ Secured Claim means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral (i) as set forth in this Plan, (ii) as agreed to by the Holder of such Claim and the Debtors, which agreement is approved or otherwise permitted by a Final Order of the Bankruptcy Court or is an ordinary course agreement, or (iii)

18

as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (b) that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

1.1.162 ~~1.1.161~~ Securities Litigation Claim means any Claim against any of the Debtors, except any Claim that survives confirmation and effectiveness of this Plan pursuant to Section 11.6, (i) arising from the rescission of a purchase or sale of shares, notes or any other securities of any of the Debtors or an Affiliate of any of the Debtors, (ii) for damages arising from the purchase or sale of any such security, (iii) for violations of the securities laws or the Employee Retirement Income Security Act of 1974 (unless there has been a judicial determination by Final Order that any such Claim is not subject to subordination under section 510(b) of the Bankruptcy Code) or for misrepresentations or any similar Claims related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, (iv) asserted by or on behalf of the ESOP and/or any present or former participants in the ESOP in their capacity as such, (v) for attorneys' fees, other charges or costs incurred on account of any of the foregoing Claims, or (vi) for reimbursement, contribution or indemnification allowed under section 502 of the Bankruptcy Code on account of any of the foregoing Claims, including Claims based upon allegations that the Debtors made false and misleading statements or engaged in other deceptive acts in connection with the offer or sale of securities.

1.1.163 ~~1.1.162~~ Senior Lender Fee/Expense Claims means all accrued and unpaid amounts for the reasonable and documented fees, costs and expenses of the Senior Lender Professionals incurred in connection with the Chapter 11 Cases.

1.1.164 ~~1.1.163~~ Senior Lender Professionals means the professionals for the Senior Loan Agent and Angelo Gordon.

1.1.165 ~~1.1.164~~ Senior Lenders means the lenders from time to time party to the Senior Loan Agreement as Lenders thereunder, including former lenders and any applicable assignees and participants thereof.

1.1.166 ~~1.1.165~~ Senior Lender Settlement Committee means a committee comprised of Senior Lenders that become party to the Settlement Support Agreement prior to the commencement of the hearing to approve the Disclosure Statement.

1.1.167 ~~1.1.166~~ Senior Lender Settlement Fee/Expense Claims means amounts incurred in connection with the Chapter 11 Cases on the Petition Date through and including the Effective Date for the reasonable and documented fees, costs and expenses of the legal advisors for the Senior Lenders that become party to the Settlement Support Agreement prior to the Disclosure Statement hearing.

1.1.168 ~~1.1.167~~ Senior Lender Steering Committee means that certain informal steering committee of certain Senior Lenders selected by the Senior Loan Agent and each member and former member thereof.

1.1.169 ~~1.1.168~~ Senior Loan Agent means JPMorgan Chase Bank, N.A. as administrative agent, and its Affiliates and Related Persons of such entities, and any successor administrative agent, under the Senior Loan Agreement.

19

1.1.170 ~~1.1.169~~ Senior Loan Agreement means, collectively, (a) that certain Credit Agreement, dated as of May 17, 2007, among Tribune, the Senior Lenders, the Senior Loan Agent, Merrill Lynch Capital Corporation, as syndication agent, and Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time and (b) those certain increase joinders, dated as of December 20, 2007, among Tribune, certain of the Senior Lenders and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.171 ~~1.1.170~~ Senior Loan Arrangers means any Syndication Agent, Documentation Agent, Arranger, Bookrunner or other party serving a similar purpose under the Senior Loan Agreement.

1.1.172 ~~1.1.171~~ Senior Loan Claim means a Claim arising under the Senior Loan Agreement, other than a Senior Lender Fee/Expense Claim, any Claim of the Senior Lenders or the Senior Loan Agent arising under the Pledge Agreement and the Barclays Swap Claim.

1.1.173 ~~1.1.172~~ Senior Loan Guaranty Agreement means the Guarantee Agreement, dated as of June 4, 2007, among Tribune, each of the subsidiaries of Tribune listed on Annex I thereto, and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.174 ~~1.1.173~~ Senior Loan Guaranty Claim means a Claim arising under the Senior Loan Guaranty Agreement, including, without limitation, the guaranty of the Barclays Swap Claim.

1.1.175 ~~1.1.174~~ Senior Noteholder Claims means all Claims arising under or evidenced by the Senior Notes Indentures and related documents and any Claim of the Senior Noteholders arising under the Pledge Agreement.

1.1.176 ~~1.1.175~~ Senior Noteholder Fee/Expense Claims means the reasonable and documented fees, costs and expenses of the legal and financial advisors for Law Debenture and Centerbridge incurred in connection with the Chapter 11 Cases.

1.1.177 ~~1.1.176~~ Senior Noteholder(s) means, individually or collectively, the Holder(s) of a Senior Noteholder Claim(s).

1.1.178 ~~1.1.177~~ Senior Notes means the eight series of notes issued and outstanding under the Senior Notes Indentures.

1.1.179 ~~1.1.178~~ Senior Notes Indenture(s) means, individually or collectively:

(a)  that certain Indenture, dated as of January 1, 1997, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time;

(b)     that certain Indenture, dated as of March 19, 1996, between Tribune and Law Debenture Trust Company of New York, as successor indenture trustee, as amended, restated or otherwise modified from time to time;

(c)     that certain Indenture, dated as of January 30, 1995, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time; and

(d)     that certain Indenture, dated as of March 1, 1992, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time.

1.1.180 1.1.179 Senior Notes Indenture Trustee(s) means, individually or collectively, the indenture trustees under the Senior Notes Indentures as of the Effective Date

1.1.181 1.1.180 Settlement Support Agreement means that certain Settlement Support Agreement, dated as of April 8, 2010, by and among those parties listed on the signature pages thereto and any parties that may sign joinders thereto, as may be amended, supplemented and modified in accordance with the terms thereof.

1.1.182 1.1.181 Subsidiary Debtors means, individually or collectively, the Filed Subsidiary Debtors, and such Subsidiary Non-Debtors, if any, that become Debtors prior to the Confirmation Date.

1.1.183 1.1.182 Subsidiary GUC Reserve means one or more reserves, if any, of Cash that may be established for the benefit of Allowed General Unsecured Claims against the Filed Subsidiary Debtors pursuant to Section 7.2.2 of this Plan.

1.1.184 1.1.183 Subsidiary Non-Debtors means those entities listed on Appendix B hereto.

1.1.185 1.1.184 Tribune means Tribune Company, a Debtor in the Chapter 11 Cases.

1.1.186 1.1.185 Tribune Entities means, collectively, the Debtors and the Subsidiary Non-Debtors.

1.1.187 1.1.186 Tribune Interest means any shares of Old Common Stock, preferred stock or other instrument evidencing an ownership interest in Tribune, whether or not transferable, and any options, warrants (including, without limitation, the EGI-TRB LLC Warrants), calls, rights, puts, awards, commitments, repurchase rights, unvested or unexercised stock options, unvested common stock, unvested preferred stock or any other agreements of any character related to the Old Common Stock, but does not include the Securities Litigation Claims.

1.1.188 ~~1.1.187~~ Unimpaired means with respect to a Claim or Interest that such Claim or Interest is not Impaired including, without limitation, as a result of being Reinstated under this Plan.

1.1.189 ~~1.1.188~~ Voting Deadline means the deadline established by the Bankruptcy Court for returning Ballots.

1.2    Rules of Interpretation.

For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document attached as an Exhibit to this Plan being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document, schedule or Exhibit filed or to be filed means such document, schedule or Exhibit, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to a Person as a Holder of a Claim or Interest includes that Person's successors, whether or assigns; (e) all references in this Plan to Sections, Articles and Appendices are references to Sections, Articles and Appendices of or to this Plan or the Plan Supplement, as the same may be amended, waived or modified from time to time; (f) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular Section, subsection or clause contained in this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to Section 13.12 and the provisions of any contract, certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements, instruments, releases, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (j) the term "including" shall be construed to mean "including, but not limited to," "including, without limitation," or words of similar import.

1.3    Computation of Time.

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.  In the event that any payment, distribution, act or deadline under this Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but if so made, performed or completed by such next succeeding Business Day shall be deemed to have been completed or to have occurred as of the required date.

1.4    Exhibits and Plan Supplement.

Tribune, subject to Section 5.4.2 herein, each Holder of an Allowed Senior Loan Claim against Tribune shall receive a Pro Rata share, calculated together with the Holders of Claims in Class 1D that are Allowed pursuant to Section 3.2.4(b)(i), of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation.  In addition, on the Effective Date, any unexpired letters of credit outstanding under the Senior Loan Agreement shall be either, at Tribune's option, (i) returned to the issuer undrawn and marked canceled, (ii) collateralized with Cash in an amount equal to 105% of the face amount of such outstanding letter of credit in form and substance acceptable to the issuer thereof, or (iii) collateralized with back-to-back letters of credit issued under the Exit Facility in an amount equal to 105% of the face amount of such outstanding letter of credit, in form and substance acceptable to the issuer thereof.

       (d)     Voting:  Claims in Class 1C are Impaired, and Holders of Class 1C Claims are entitled to vote to accept or reject the Plan.

       3.2.4  Class 1D – Bridge Loan Claims.

       (a)     Classification:  Class 1D consists of all Bridge Loan Claims against Tribune.

       (b)     Treatment:

       (i)     The following treatment shall apply to (1) all Holders of Bridge Loan Claims if Class 1D votes to accept the Plan, or (2) each Holder of a Bridge Loan Claim that votes to accept the Plan if Class 1D votes to reject the Plan:

Each such Holder of a Bridge Loan Claim shall (1) as of the Effective Date, have its Claim Allowed in an amount equal to the principal amount of such Claim plus accrued interest as of the Petition Date, and (B) on or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Bridge Loan Claim against Tribune, subject to Section 5.4.2 herein, receive such Holder's Pro Rata share, calculated together with the Holders of Allowed Claims in Class 1C, of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation.

       (ii)     If Class 1D votes to reject the Plan, the following treatment shall apply to each Holder of a Bridge Loan Claim that votes to reject the Plan or does not return a Ballot on the Plan:

Each such Holder of a Bridge Loan Claim shall (A) have its Claim treated as a Disputed Claim unless and until Allowed by Final Order, and (B) in full satisfaction, settlement, release and discharge of and in exchange for such Bridge Loan Claim against

27

Tribune, subject to Section 5.4.2 herein, receive, if ultimately Allowed, such distribution and treatment as may be proposed by the Debtors that would satisfy the requirements of section 1129(b) of the Bankruptcy Code not to exceed an amount determined by application of the mid-point estimate of total "Distributable Value" as defined and set forth in the Disclosure Statement and the allocation of such "Distributable Value" underlying to the recoveries of Holders of Allowed Claims against Tribune under this Plan if such Bridge Loan Claims becomes Allowed, other than Holders of Claims that are direct or indirect subsidiaries of Tribune, under the Plan.

(c)    Voting: Claims in Class 1D are Impaired, and Holders of Class 1D Claims are entitled to vote to accept or reject the Plan.

### 3.2.5    Class 1E – Senior Noteholder Claims.

(a)    Classification: Class 1E consists of all Senior Noteholder Claims against Tribune.

(b)    Allowance: The Senior Noteholder Claims shall together be deemed Allowed in the aggregate amount of $1,283,055,743.77. The Senior Noteholder Claims shall not be subject to reduction, disallowance, subordination, set off or counterclaim (other than the Senior Noteholder Claims of MSCS with respect to the Morgan Stanley Claims).

(c)    Treatment: On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Senior Noteholder Claims against Tribune, subject to Section 5.4.2 herein, each Holder of an Allowed Senior Noteholder Claim shall receive such Holder's Pro Rata share of 7.4% of the New Senior Secured Term Cash, 7.4% of the Distributable Cash, and 7.4% of the New Common Stock, subject to dilution by the Equity Incentive Plan.

(d)    Voting: Claims in Class 1E are Impaired, and Holders of Class 1E Claims are entitled to vote to accept or reject the Plan

### 3.2.6    Class 1F – Other Parent Claims.

(a)    Classification: Class 1F consists of all Other Parent Claims against Tribune.

(b)    Treatment: On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Other Parent Claims against Tribune, each Holder of an Allowed Other Parent Claim shall receive an amount of Distributable Cash equal to 35.18% of the aggregate amount in U.S. dollars of such Holder's Allowed Other Parent Claim.

28

4.6.2 <u>Cramdown</u>.   With respect to any Impaired Class of Claims or Interests that fails to accept the Plan in accordance with section 1129(a) of the Bankruptcy Code, including any Classes that may be created pursuant to amendments to this Plan, the Debtors request that the Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Classes, in which case or cases, the Plan shall constitute a motion for such relief.

4.6.3 <u>Reservation of Rights</u>.   Subject to <u>Section 13.9</u> of this Plan, the Debtors reserve the right to modify or withdraw this Plan, in its entirety or in part, for any reason, including, without limitation, in the event that the Plan as it applies to any particular Debtor is not confirmed.   In addition, and also subject to <u>Section 13.9</u> of this Plan, should this Plan fail to be accepted by the requisite number and amount of Claims and Interests voting, as required to satisfy section 1129 of the Bankruptcy Code, and notwithstanding any other provision of this Plan to the contrary, the Debtors reserve the right to reclassify Claims or Interests or otherwise amend, modify or withdraw this Plan in its entirety or in part.   In addition, notwithstanding any other provision of the Plan to the contrary, if the Plan fails to be accepted by the requisite number and amount of Claims in Class 1D, <u>any Holder of a Bridge Loan Claim that has not voted to accept the Plan and be provided the treatment specified in Section 3.2.4(b)(ii) (and such Holder's Related Persons) shall not receive the benefit of</u> the releases, indemnities and injunctions that would otherwise be provided <s>to the Holders of Claims in Classes 1D and 50D through 111D</s><u>under the Plan, and the scope of the releases, indemnities and injunctions</u> shall instead be as proposed by the Debtors in connection with the cramdown of Class 1D Claims.

## ARTICLE V: MEANS FOR IMPLEMENTATION OF THE PLAN

5.1    <u>Non-Substantive Consolidation</u>.

Although the Plan is presented as a joint plan of reorganization, this Plan does not provide for the substantive consolidation of the Debtors' estates, and on the Effective Date, the Debtors' estates shall not be deemed to be substantively consolidated for any reason.   Allowed Claims held against one Debtor will be satisfied solely from the Cash and assets of such Debtor and its Estate, <u>provided that</u>, to the extent of any insufficiency, funds may be advanced to the relevant Debtors by the Estate of Tribune or any of the Subsidiary Debtors at the option of the advancing Debtor, as applicable.   Except as specifically set forth herein, nothing in this Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any one or all of the Debtors is subject to or liable for any Claims against any other Debtor.   A Claim against multiple Debtors will be treated as a separate Claim against each Debtor's Estate for all purposes including, but not limited to, voting and distribution; <u>provided</u>, <u>however</u>, that no Claim will receive value in excess of 100% of the Allowed amount of such Claim.   Notwithstanding anything to the contrary in this Plan, the Reinstated Claims and Interests and Impaired Claims and Interests of a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of this Plan, the Chapter 11 Cases, or otherwise.

boards of directors or managers of the Reorganized Debtors other than Reorganized Tribune shall be as set forth in Exhibit 5.3.3 hereto, to be filed with the Plan Supplement.

5.3.4  Corporate Action.  The adoption of the Certificate of Incorporation or similar constituent documents, the adoption of the By-Laws, the selection of directors and officers for Reorganized Tribune, and all other actions contemplated by this Plan shall be authorized and approved in all respects (subject to the provisions of this Plan) by the Confirmation Order.  All matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with this Plan, shall be deemed to have timely occurred in accordance with applicable law and shall be in effect, without any requirement of further action by the security holders or directors of the Debtors or the Reorganized Debtors.  On the Effective Date, as applicable, the appropriate officers of the Debtors and/or the Reorganized Debtors and members of the boards of directors or managers of the Debtors and/or Reorganized Debtors are authorized and directed to issue, execute and deliver, and cause the Reorganized Debtors to perform, the agreements, documents, securities and instruments contemplated by this Plan in the name of and on behalf of the Debtors and/or Reorganized Debtors.

5.4    Issuance and Distribution of New Securities and Related Matters.

5.4.1  Issuance of New Securities.  On the Effective Date or a subsequent Distribution Date, as applicable, Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to this Plan without further act or action under applicable law, regulation, order or rule.  Except as otherwise provided in this Plan, including as specifically provided in Section 5.4.2 hereof, each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to the Plan will be issued New Class A Common Stock, provided that any such Holder will be entitled to receive all or a portion of its shares of New Common Stock in the form of New Class B Common Stock if such Holder informs the Debtors of its desire to receive instead such New Class B Common Stock by the date announced by the Debtors in a filing with the Bankruptcy Court, with such date to be no earlier than the first day of the Confirmation Hearing.  The Certificate of Incorporation, substantially in the form of Exhibit 5.3.1(1) hereto, sets forth the rights and preferences of the New Common Stock.  The Certificate of Incorporation may contain customary provisions restricting the sale, transfer, assignment, conversion or other disposal of such shares of New Common Stock.  To the extent the shares of New Class A Common Stock or New Class B Common Stock are certificated, such certificates may contain a legend restricting the sale, transfer, assignment, conversion or other disposal of such shares.  The New Warrant Agreement substantially in the form of Exhibit 1.1.1231.1.124 hereto, which shall be filed with the Plan Supplement, sets forth the rights of the holders of the New Warrants.  The issuance of the New Common Stock and the New Warrants and the distribution thereof under this Plan shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.  Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of this Plan, including, without limitation, the Exit Facility Credit Agreement (if any), the New Senior Secured Term Loan Agreement (if any), and any other agreement entered into in connection with the foregoing, shall

If the rejection by a Debtor, pursuant to the Plan, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor, or the properties of any of them, unless a Proof of Claim is filed and served upon counsel to the Debtors within thirty (30) days after service of the notice that the executory contract or unexpired lease has been rejected.

6.5    Compensation and Benefit Programs.

Except as set forth in Article IV.C.2 of the Disclosure Statement and such other Employee Benefit Plans as may be disclosed in the Plan Supplement, the Reorganized Debtors shall continue to perform their obligations under all Employee Benefit Plans and all such Employee Benefit Plans shall be assumed by the applicable Reorganized Debtors; provided, however, that nothing in the Plan shall limit, diminish or otherwise alter the Reorganized Debtors' defenses, claims, causes of action, or other rights with respect to the interpretation, application or enforcement of any such Employee Benefit Plan or the payment of any Employee Benefit Claim, including the Reorganized Debtors' rights to amend, modify or terminate any such Employee Benefit Plan either prior to or after the Effective Date. ~~The Debtors will address the inclusion in~~In addition, this Plan ~~of~~authorizes and implements the "Transition MIP" (or "TMIP") and the "Key Operators Bonus" (or "KOB"), each as defined in the 2009 MIP Motion~~, in the Plan Supplement~~.

6.6    Collective Bargaining Agreements.

Upon the Effective Date, any Collective Bargaining Agreement entered into by the Debtors that has not expired by its terms and is in effect as of the Effective Date shall be deemed to have been assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the survival, and/or the pertinent Debtor's assumption of the Collective Bargaining Agreements then in effect, except to the extent that such agreements have already been assumed prior to the entry of the Confirmation Order.

6.7    Post-Petition Contracts and Leases.

All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors after the Petition Date shall be deemed assigned by such Debtors to the Reorganized Debtors, including any successor to any Reorganized Debtor after giving effect to the Restructuring Transactions, on the Effective Date.

6.8    Termination of ESOP.

Upon the Effective Date, the ESOP shall be deemed terminated in accordance with its terms, and the amount of unpaid principal and interest remaining on the ESOP Note dated April 1, 2007 shall be forgiven pursuant to section 6.3 of the ESOP Loan Agreement by and between Tribune and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust dated April 1, 2007. In connection with Tribune's forgiveness of the balance due under the ESOP Note, the Debtors will seek, in their sole discretion, (1) confirmation that Tribune has a right under the ESOP Plan and ESOP Note to forgive the ESOP's obligations; (2) confirmation that Tribune's forgiveness of

Claim within the 90-calendar-day period. After such date, such Allowed Claim (and any Claim for reissuance of the original check) shall be automatically discharged and forever barred, and such funds shall revert to the Reorganized Debtors, notwithstanding any federal or state escheat laws to the contrary.

(c)    <u>Failure to Claim Undeliverable Distributions</u>. Except as otherwise expressly provided in this Plan, any Holder of an Allowed Claim or Interest that does not assert a claim pursuant to this Plan for an undeliverable or unclaimed distribution within one (1) year after the Effective Date shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution against the Debtors or their Estates or the Reorganized Debtors or their property. In such cases, any Cash for distribution on account of such claims for undeliverable or unclaimed distributions shall become the property of the Estates and the Reorganized Debtors free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New Common Stock or New Warrants held for distribution on account of such Claim shall be canceled and of no further force or effect. Nothing contained in this Plan shall require any Disbursing Agent, including, but not limited to, the Reorganized Debtors, to attempt to locate any Holder of an Allowed Claim or Interest.

7.7    <u>Record Date for Distributions</u>.

7.7.1  With the exception of Senior Noteholder Claims, the Reorganized Debtors and the Disbursing Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Claim or Interest that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims or Interests (including Holders of Claims and Interests that become Allowed after the Distribution Record Date) that are Holders of such Claims or Interests, or participants therein, as of the close of business on the Distribution Record Date. With the exception of the Senior Noteholder Claims, the Reorganized Debtors and the Disbursing Agent shall instead be entitled to recognize and deal for all purposes under this Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date.

7.7.2  Unless otherwise set forth in the Confirmation Order, the Debtors shall not establish a record date for distributions to Holders of Senior Noteholder Claims. Distributions to Holders of Senior Noteholder Claims held through DTC shall be made by means of book-entry exchange through the facilities of DTC in accordance with the customary practices of DTC, as and to the extent practicable, and the Distribution Record Date shall not apply. In connection with such book-entry exchange, <u>Tribune will provide rate information to</u> each Senior Notes Indenture Trustee<u>, which such Senior Notes Indenture Trustee</u> shall ~~deliver instructions to DTC instructing~~<u>convey to</u> DTC to effect distributions on a Pro Rata basis as provided under this Plan with respect to such Claims upon which such Senior Notes Indenture Trustee acts as trustee.~~Distributions to Holders of Senior Noteholder Claims held directly by the Holder thereof shall be made by the Disbursing Agent upon surrender or deemed surrender of such Holder's Senior Notes except as otherwise provided in this Plan.~~ Subject to <u>Section 7.5.2</u> of this Plan, distributions of Cash to Holders of Allowed Senior Noteholder Claims shall be made to the applicable Senior Notes Indenture Trustees, which, in turn, shall make such distributions to the

applicable Holders either through DTC or, in the case of Senior Noteholder Claims held directly by the Holder thereof, through the applicable Senior Notes Indenture Trustee subject to the respective rights, claims and interests, if any, that the Senior Notes Indenture Trustees may have under the applicable Senior Notes Indentures or otherwise to the recovery and/or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder to the Holders of Allowed Senior Noteholder Claims, whether such rights, claims or interests are in the nature of a charging lien or otherwise. Distributions of the New Senior Secured Term Loan and the New Common Stock to Holders of Senior Noteholder Claims shall be made by the Disbursing Agent either through DTC or, in the case of Senior Noteholder Claims held directly by the Holder thereof, through the Disbursing Agent upon surrender or deemed surrender of such Holder's Senior Notes except as otherwise provided in this Plan.

7.8    Allocation of Plan Distributions Between Principal and Interest.

Except as otherwise expressly provided in this Plan, to the extent that any Allowed Claim entitled to a distribution under this Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

7.9    Means of Cash Payment.

Payments of Cash made pursuant to this Plan shall be made, at the option and in the sole discretion of the Reorganized Debtors, by (a) checks drawn on, (b) automated clearing house transfer from, or (c) wire transfer from a bank selected by the Reorganized Debtors. Cash payments to foreign creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

7.10    Withholding and Reporting Requirements.

In connection with this Plan and all distributions hereunder, the Reorganized Debtors or the Disbursing Agent, as applicable, shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. All persons holding Claims or Interests shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of this Plan, (a) each Holder of an Allowed Claim that is to receive a distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution and (b) no distribution shall be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations. Nothing in the preceding sentence shall affect distributions under this Plan to the Senior Loan Agent, the Bridge

Plan.

11.2  Releases.

11.2.1  Releases by Debtors and Estates. Except for those Claims expressly preserved in Section 11.2.6 of this Plan, on the Effective Date and effective simultaneously with the effectiveness of this Plan, the Reorganized Debtors on their own behalf and as representatives of their respective estates, release unconditionally and hereby cause the Subsidiary Non-Debtors to release unconditionally, and are hereby deemed to release unconditionally, each and all of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claims), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Effective Date that are  in connection with the Debtors or any of them, or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, the Disclosure Statement or the Restructuring Transactions (the "Debtor Released Claims"); provided, however, that, with the exception of LBO-Related Causes of Action, nothing in this Section shall be construed to release any party from willful misconduct or gross negligence as determined by a Final Order.  The releases contained in this Section shall not apply to or otherwise affect the Morgan Stanley Claims or the obligations of any of the Debtors' officers or directors to repay loans or advances of money or other property contractually owed to the Debtors or their Estates or with respect to loans or advances of money that the Debtors guaranteed on behalf of such officers or directors. Furthermore, notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of any express contractual commercial obligations arising in the ordinary course of any Person to the Debtors not directly related to the LBO-Related Causes of Action. On the Effective Date, each Guarantor Non-Debtor will provide each Holder of a Loan Guaranty Claim against the Guarantor Non-Debtors and the Senior Loan Agent and Bridge Loan Agent a release of such scope in consideration for the Guarantor Non-Debtor Release contemplated hereby.

11.2.2  Releases by Holders of Claims and Interests. Except as otherwise expressly provided in this Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of this Plan, each Person (a) that has voted to accept the Plan or is deemed to have accepted the Plan, (b) that has ~~not~~ voted to ~~accept~~reject the Plan but ~~that has received a Ballot and that has not~~has opted ~~out of~~to grant the releases in this Section 11.2.2, or (c) who otherwise agrees to provide the releases set forth in this Section 11.2.2, shall be deemed to have unconditionally released each and all of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claim), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Effective Date that are in connection with the Debtors or any of them,

63

or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, Disclosure Statement or the Restructuring Transactions (the "Holder Released Claims" and together with the Debtor Released Claims the "Released Claims"); provided, however, that nothing in this Section 11.2.2 shall be construed as a release of any Claims against non-~~Debtor third parties~~Debtors arising under the Employee Retirement Income Security Act of 1974 held by the United States Department of Labor; provided further, that no agent or indenture trustee is, by virtue of giving its own release hereunder, releasing individual claims, if any, of lenders or noteholders for which it acts as agent or indenture trustee that are not themselves Released Parties. Furthermore, notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of, except as provided in Section 11.2.5 hereof with respect to the Guarantor Non-Debtors, any express contractual obligation of any non-Debtor party due to any other non-Debtor party.

      11.2.3    Failure to Grant Release. Any Holder of a Claim or Interest that has timely submitted to the Debtors or filed with the Court a Ballot opting not to grant the releases set forth in Section 11.2.2 shall not receive the benefit of the releases set forth in Section ~~11.2~~11.2.2 (if otherwise entitled).

      11.2.4    Injunction Related to Releases. Except as provided in this Plan or the Confirmation Order, as of the Effective Date, all Persons that hold, have held, or may hold a Claim or other debt, right, cause of action or liability that is released pursuant to the provisions of the Plan are permanently enjoined from taking any of the following actions on account of or based upon such released Claims, debts, rights, causes of action or liabilities: (i) commencing or continuing any action or other proceeding against the Released Parties or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Released Parties or their respective property; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Released Parties or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Released Parties or against their respective property; and (v) commencing or continuing any judicial or administrative proceeding, in any forum, that does not comply with or is inconsistent with the provisions of this Plan.

      11.2.5    Release of Guarantor Non-Debtors from Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims. All Holders of Loan Guaranty Claims against the Guarantor Non-Debtors shall be deemed on the Effective Date to have granted the Guarantor Non-Debtor Release and the Guarantor Non-Debtors shall be unconditionally relieved from any liability to the Senior Lenders or the Bridge Lenders on account of the Senior Loan Guaranty Claims or the Bridge Loan Guaranty Claims and the Senior Loan Agent and the Bridge Loan Agent, respectively, shall be unconditionally relieved from any liability of any nature whatsoever to such Holders as a result of the release of the Guarantor Non-Debtors from any and all Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims; provided that the Guarantor Non-Debtor Release is dependent upon and only effective upon (i) the execution by each of the Guarantor Non-Debtors of a guaranty of the New Senior Secured Term Loan pursuant to and to the extent provided in Section 5.6 of this Plan, (ii) the unconditional release by each of the Guarantor Non-Debtors, in form and substance acceptable to the Senior Lender Settlement Committee as of the Effective Date, of each of the Holders of Senior Loan Guaranty Claims and the Senior Loan Agents of and from any and all Debtor Released Claims, and (iii) the granting

11.4.1 *Terms.  In order to preserve and promote the settlements contemplated by and provided for in this Plan, and to supplement, where necessary, the injunctive effect of the discharge as provided in sections 1141 and 524 of the Bankruptcy Code and as described in this Article XI, except as otherwise provided in this Plan, all entities which have held or asserted, which hold or assert or which may hold or assert any claim, demand or cause of action against the Released Parties (or any of them) based upon, attributable to, or arising out of any Released Claim that is released in connection with the Plan, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be permanently stayed, restrained and enjoined from taking any action against the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving payments or recovery with respect to any such Released Claim, including, but not limited to:*

(a)    *commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties, or against the property of any Released Party;*

(b)    *enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or against the property of any Released Party with respect to any such Released Claim;*

(c)    *creating, perfecting or enforcing any Lien of any kind against any Released Party or the property of any Released Party with respect to any such Released Claim;*

(d)    *except as otherwise provided in this Plan, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due any Released Party or against the property of any Released Party with respect to any such Released Claim; and*

(e)    *taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Plan relating to such Released Claim.*

11.4.2 *Bankruptcy Rule 3016 Compliance.  The Debtors' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.*

11.4.3 *The injunction provided by this Section 11.4 shall not enjoin any actions respecting claims not released or barred in connection with this Plan and, for the avoidance of doubt, shall only enjoin actions respecting Released Claims or Barred Claims.*

11.5    Disallowed Claims And Disallowed Interests.

On and after the Effective Date, the Debtors and the Reorganized Debtors shall be fully and finally discharged of any and all liability or obligation on a Disallowed Claim or a disallowed Interest, and any Order disallowing a Claim or an Interest which is not a Final Order as of the Effective Date solely because of an entity's right to move for reconsideration of such

order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided herein, shall constitute an Order: (a) disallowing all Claims and Interests to the extent such Claims and Interests are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims and Interests, and Claims for unmatured interest and (b) disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages or any other damages not constituting compensatory damages.

11.6    Exculpation.

        To the fullest extent permitted under applicable law, none of the Released Parties and none of the present or former members of the Creditors' Committee (in their capacity as members of the Creditors' Committee), whether or not such members are otherwise Released Parties, shall have or incur any liability to any person or entity for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the negotiation of the Plan, pursuit of confirmation of the Plan, the administration, consummation and implementation of the Plan or the property to be distributed under the Plan, the Disclosure Statement, the Restructuring Transactions, the Plan Supplement, the releases and injunctions, or the management or operation of the Debtors (except for any liability that results from willful misconduct or gross negligence as determined by a Final Order). Any of the Released Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and the administration thereof.

11.7    Corporate Indemnities.

        11.7.1    Prepetition Indemnification and Reimbursement Obligations. For purposes of this Plan, the respective obligations of Tribune and the other Debtors to indemnify and reimburse any Persons who are or were directors, officers or employees of the Debtors, against and for any obligations pursuant to certificates or articles of incorporation, certificates of formation, codes of regulation, bylaws, limited liability company agreements, partnership agreements, applicable state or non-bankruptcy law, or specific agreements or any combination of the foregoing, shall survive confirmation of this Plan, remain unaffected thereby, and not be discharged under section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on or after the Petition Date.

        11.7.2    Plan Indemnity. In addition to the obligations set forth in Section 11.7.1 and not by way of limitation thereof, subject to Section 4.6.3 of this Plan, the Reorganized Debtors shall jointly and severally indemnify and hold harmless the Senior Loan Agent, the Senior Loan Arrangers, the Senior Lenders, the Bridge Loan Agent, the Former Bridge Loan Agent, the Bridge Loan Arrangers and the Bridge Lenders (collectively, the "Indemnified Creditor Parties") and all of their respective Related Persons, in each case in all such capacities and all other non-fiduciary capacities related to the transactions underlying the LBO-Related Causes of Action, and any natural persons who are or were officers or directors of any of the Debtors (each an "Indemnified Party" and collectively, with the Indemnified Creditor Parties, the "Indemnified Parties"), on account of and with respect to any claim, cause of action, liability,