## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |
| | **Objection Deadline: June 9, 2010 at 4:00 p.m. (ET)**<br>**Hearing Date: June 16, 2010 at 11:00 a.m. (ET)** |

## MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING THE DEBTORS TO IMPLEMENT A MANAGEMENT INCENTIVE PLAN FOR 2010

Tribune Company (the "Company") and most of its wholly-owned subsidiaries,

each of which is a debtor and debtor in possession herein (each a "Debtor" and collectively, the

"Debtors"), hereby move this Court (the "Motion") for entry of an order, in substantially the

form attached hereto as Exhibit A (the "Order"), authorizing, but not directing, the Debtors

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS 1, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

pursuant to Section 363(c) and, as applicable, Sections 363(b) and 503(c)[2] of Title 11 of the

United States Code (the "Bankruptcy Code"), to continue their self-funding annual cash

Management Incentive Plan ("MIP") as described in this Motion for 2010 for approximately 640

management employees, including the Debtors' top executives[3] ("Top Management"), with an

aggregate payout opportunity of approximately:

(a)     $30.8 million – representing a 50%-of-target payout to Top Management
        (approximately $2.2 million) and a 100%-of-target payout to the remaining MIP
        participants (approximately $28.6 million) – if the Company achieves "planned"
        performance equal to 100% of its planned 2010 consolidated operating cash flow
        ("OCF") goal included in the 2010 operating plan that was approved by the
        Company's Board of Directors in February 2010;

(b)     $38.1 million – representing a 100%-of-target payout to Top Management
        (approximately $4.4 million) and a 118%-of-target payout to the remaining MIP
        participants (approximately $33.7 million) – if the Company achieves "stretch"
        performance for 2010 equal to approximately 119% of its "planned" consolidated
        OCF goal; and

---

[2] The Debtors are filing the instant Motion with respect to the 2010 MIP out of an abundance of caution because some participants are statutory insiders, notwithstanding the Debtors' position that Section 363(c) authorizes the continuation of that program without the need for notice and a hearing.

[3] For 2010, Top Management includes the Debtors' Chief Executive Officer; Chief Operating Officer; Chief Financial Officer; Chief Legal Officer; Chief Investment Officer; President of Tribune Broadcasting; Publisher of the *Los Angeles Times*; Executive Vice President of Tribune Publishing; and President of Tribune Interactive (a non-Debtor executive). The Debtors' previous Chief Executive Officer was not included in Top Management. He did not participate in any 2009 incentive programs, including the MIP, and does not participate in any such programs for 2010. The current Chief Executive Officer was promoted to that position in 2009 from his then-position of Chief Operating Officer. He was a member of Top Management in this prior position and participated in the 2009 MIP. The current Chief Operating Officer was promoted to that position in 2009 from his then-position of Chief Administrative Officer. He was a member of Top Management in this prior position and participated in the 2009 MIP. In 2009, the then-President of Tribune Broadcasting participated in the 2009 MIP as a member of Top Management. Effective as of April 30, 2010, he transitioned to a different role outside of Top Management, and has a reduced MIP target for 2010. See Exhibit D hereto (Mercer Report), at 14. The then-Executive Vice President and Chief Operating Officer of Tribune Broadcasting during 2009 participated in the 2009 MIP as a member of Top Management. He was promoted to President of Tribune Broadcasting in 2010 and continues to participate in the 2010 MIP as a member of Top Management in that role.

(c)     $42.9 million – representing a 130%-of-target payout to Top Management
(approximately $5.7 million) and the remaining MIP participants (approximately
$37.2 million) – if the Company achieves "maximum" performance of nearly 150%
of "planned" consolidated OCF for 2010 in the case of Top Management, and 132%
of "planned" consolidated OCF in the case of the remaining MIP participants.[4]

## SUMMARY

The Debtors seek to continue in the ordinary course for 2010 the historical MIP

that has been a key component of their incentive-based compensation structure since at least

1997.  Like the 2008 and 2009 MIP programs that were approved by this Court, the 2010 MIP

has been reviewed and approved by the Compensation Committee of the Company's Board of

Directors (the "Compensation Committee"), and was developed with and analyzed by Mercer

(U.S.), Inc. ("Mercer"), an independent compensation consulting firm.  Mercer concluded that

the incentive opportunities provided under the 2010 MIP are well within reasonable market

ranges, and indeed result in total cash compensation ("TCC") that is competitive and total direct

compensation ("TDC") that is still materially below the market median (in each case, including

for Top Management).[5]  The Debtors have provided materials regarding the 2010 MIP to the

official committee of unsecured creditors (the "Creditors Committee"), the original Senior

Lender Settlement Committee signatories to the Settlement Support Agreement with the Debtors

(the "Settlement Committee Members"), and their respective financial advisors and attorneys,

and have reviewed and discussed the 2010 MIP with these creditor constituencies.  Based on

creditor constituency feedback received, the Debtors made revisions to the 2010 MIP where

---

[4] This Motion does not seek authority to implement any 2010 incentive programs beyond the annual cash MIP.

[5] A redacted copy of Mercer's May 26, 2010 report describing and analyzing the proposed 2010 MIP (the "Mercer Report") is attached as Exhibit D hereto.  As discussed in footnote 10 below, the Debtors are contemporaneously seeking leave to file an unredacted version of the Mercer Report with the Court under seal, in order to protect confidential and proprietary information therein.

appropriate, including the incorporation into the 2010 MIP of various enhanced performance requirements and payout restrictions that are more stringent and conservative than historical MIP programs.

       This Court has already authorized the Debtors to implement the 2009 MIP as an ordinary course program under Section 363(c) of the Bankruptcy Code. <u>See</u> Transcript of January 27, 2010 hearing on 2009 MIP ("<u>January 27, 2010 Hearing</u>") (excerpts attached as <u>Exhibit F</u> hereto), at 17-18 ("The plan that is proposed is similar enough to the 2008 and prior plans, with the evidence showed, appropriate adjustments to fit the change in the circumstances, that it meets the [Section] 363 Ordinary Course standard."). This Court also approved payments under the 2008 MIP and suggested that they too may have met the ordinary course standard, even though that standard technically did not apply because the 2008 payments largely involved pre-petition services. Transcript of May 12, 2009 hearing on 2008 MIP payments (the "<u>May 12, 2009 Hearing</u>") (excerpts attached as <u>Exhibit G</u> hereto), at 9 ("With respect to the motion at Number 5, to make payments according to prepetition incentive plans, it may be really – it may be the first time that it really is an ordinary course thing and doesn't fall under the 503(c)(3) standard.").

       In these rulings, the Court recognized that these MIP programs are important means of ensuring that the Debtors maintain proper incentives for their management team during the Chapter 11 process:

> The evidence from the debtors' witnesses, especially Chief Financial Officer Chandler Bigelow, demonstrated the need for incentives. Debtors' expert, John Dempsey [of Mercer], among other things said, "It's a basic principle of human resources management that incentives are a tool used to both motivate people and to align the interests of people with the company."

Transcript of January 27, 2010 Hearing (Ex. F hereto), at 13; see also Transcript of May 12, 2009 Hearing (Ex. G hereto), at 55 ("The record here amply supports the award of this relief, the grant of this relief. The plan is consistent with the company's historical practices. It's not unreasonable in any respect. Indeed, the record clearly indicates that it's below market. You look at the industry, and considering the debtors' place in the industry in which it's trying to survive and transform itself in what are truly extraordinary times, and you compare that to what's proposed to be paid in relation to its revenue.").

The need for appropriate incentives in 2010 remains strong. Implementation of the 2010 MIP as a continuing ordinary course program is eminently reasonable given the Debtors' demonstrated ability to stabilize the profitability of the Company during unprecedented challenging times. See Transcript of January 27, 2010 Hearing (Ex. F hereto), at 15 (the Court stating that "it's undisputed that the debtor operates in a troubled industry . . . . Here the evidence demonstrated that the debtor is performing well, relative to its competitors.").

Indeed, the considerations expressed by Mr. LeMay, counsel for the Creditors Committee, and echoed by the Court at the January 27, 2010 Hearing on the 2009 MIP, apply equally to the 2010 MIP. This Court stated:

> I will tell you – he's not here today, but on this topic I was struck by Mr. Lemay's closing argument, from which I'll quote, not too extensively. He said, "Business people in the for-profit world have an understanding about what motivates management, because all business people in the for-profit world are in that world themselves. And what motivates management is a number of things, including pride in a job well done, but the chance to make something for one's self and one's family. Our clients – my clients don't wish to find out what would happen if management didn't get these awards. The suggestion has been made that a company, because it's in Chapter 11, maybe shouldn't pay bonuses just because it's in Chapter 11, and that may be true when a company is in a life or death liquidity situation, where there's simply you either pay the bonuses or have to turn [out] the lights. That's really not the case here. Liquidity is obviously an issue, but it's not a life or death liquidity question.

"So the question as a business matter then becomes, what's in the best interest of the business and its owners?  I'd like to submit that being in Chapter 11 doesn't change at all what management should be doing, it just changes who they're doing it for."

Transcript of January 27, 2010 Hearing (Ex. F hereto), at 16-17.

The Debtors respectfully submit that, like the 2009 MIP, the 2010 MIP also falls squarely within Section 363(c) of the Bankruptcy Code as an ordinary course program.  Its structure is similar in many respects to the 2009 MIP that this Court found to be an ordinary course program, and it continues in any event to be more conservative than the Debtors' longstanding ordinary course MIP programs from prior years.  For example:

- The Debtors' historical practice has been to offer an annual cash MIP program every year since at least 1997;

- The number of 2010 MIP participants (approximately 640) is lower than for prior years' programs;

- Individual participant target bonus opportunities generally are the same as they were for 2009, other than adjustments in connection with promotions or other increased responsibilities, internal or market equity, exceptional performance or contractual requirements;

- The OCF performance metric used in the 2010 MIP is the metric traditionally used in the MIP, including without limitation in 2008 and 2009;

- The aggregate payout opportunity at 100% of target (which, as stated, requires above-"planned" OCF performance for Top Management) is approximately $33 million, *less* than the target award opportunity under the 2009 MIP ($35 million) and also less than target payout opportunities under prior years' MIP programs; and

- The aggregate payout opportunity for "maximum" performance by all participants (which, as discussed below, requires Top Management to achieve a substantially higher

maximum consolidated OCF goal than other participants) is approximately $42.9 million, *less* than the maximum opportunity available under the 2009 MIP ($45.6 million).

Significantly, the 2010 MIP is even more conservative than prior years' MIP programs in several respects.  Indeed, the 2010 MIP again holds all participants to a high performance standard, including the requirement (as in the 2009 MIP) that the Debtors achieve at least "planned" consolidated OCF performance in order to generally fund an MIP pool in any amount.  Furthermore, in a sign of leadership and responsiveness to creditor input, the 2010 MIP holds Top Management in particular to an even *higher* performance standard than other MIP participants, providing Top Management with generally lower payout percentage opportunities and a higher maximum OCF target than other participants:

- *First*, an aggregate MIP bonus pool is funded only if the Debtors achieve at least *"planned"* OCF – there is no provision for an aggregate Company-wide bonus pool if the Company achieves any level of "threshold" performance below plan, even though all prior years' MIP programs before 2009 typically funded a partial pool at 40% of target if the Company achieved some minimum threshold of consolidated OCF below "plan."

- *Second*, achievement of 100% of "planned" 2010 consolidated OCF would result in a payout of only *50% of target* to Top Management, and 100% of target for other participants.  The 50%-of-target payout to Top Management for "planned" performance is consistent with the 2009 MIP structure.  The median award for all participants at "planned" performance is $29,255.  In years prior to 2009, achievement of 100% of "planned" OCF typically would fund a pro forma bonus pool at 100% of the target pool. For 2010, payout at 100% of target to Top Management requires achievement of a "stretch" goal – approximately 119% of "planned" OCF.

- *Third,* as under the 2009 MIP, "maximum" performance would fund a "maximum" aggregate pro forma bonus pool that is capped for all participants at 130% of the target pool.  This is significantly lower than the historical maximum opportunity under the MIP

– 200% of target – and also is substantially lower than the maximum annual cash incentive award opportunities offered by the Debtors' peers. See infra at 10-11.

- *Fourth*, the level of performance required to qualify for a maximum-level MIP pool is consistent with, and for Top Management is even higher than, the level of "maximum" performance required under historical MIP programs – traditionally 120% to 140% of "planned" OCF. For 2010, the Debtors must achieve consolidated OCF of approximately 132% of "planned" OCF to fund a maximum pool for MIP participants other than Top Management, and must achieve nearly 150% of "planned" OCF before Top Management qualifies for a maximum-level pool.

- *Fifth*, as with the 2009 MIP, the 2010 MIP is more conservative than historical MIP programs in that it limits the Debtors' discretion to make MIP awards when at least "planned" performance is not achieved. For 2010, if the Debtors do not reach at least "planned" consolidated OCF, no aggregate MIP pool is funded, no awards to Corporate division participants or to Publishing or Broadcasting segment group office participants (which collectively include eight of the members of Top Management) may be made, and individual business units that achieve at least "planned" performance will then be eligible only for substantially discounted partial awards. Furthermore, any discretion that is permitted will be exercised within the pay-for-performance framework of the 2010 MIP and with due regard for Company, business unit and individual performance results.

The Debtors have taken a thoughtful and conservative approach with the 2010 MIP to ensure proper incentives, to bring the participants' compensation closer to the market median relative to their peers, and to avoid the substantial undercompensation and dilution of incentives that otherwise would occur. As detailed below and as confirmed by Mercer:

- Without the 2010 MIP, TCC and TDC[6] on average would fall substantially below the market median for Top Management, for other key executives (the "Other Key

---

[6] TCC is comprised of base salary and short-term (e.g., annual) cash incentives. TDC is comprised of base salary, short-term (e.g., annual) cash incentives and long-term (e.g., equity-based) incentives, if any (i.e., TDC = TCC + long-term incentive compensation). See Ex. D (Mercer Report) at 11.

Executives"),[7] for the other participants included in the Mercer study ("<u>Other</u>
<u>Participants</u>"),[8] and for the total MIP participant population surveyed (the "<u>All</u>
<u>Participants</u>") (Ex. D, at 13):

|  | **Benchmarking <u>In the Absence</u> of the 2010 MIP** | | | |
|---|---|---|---|---|
|  | Top Management | Other Key Executives | Other Participants | All Participants |
| TCC as a % of Market Median | 56% | 74% | 82% | 75% |
| TDC as a % of Market Median | 28% | 42% | 62% | 49% |

- Approval of the ordinary course 2010 MIP will reduce this undercompensation somewhat but will not entirely close this gap due in part to the continuing lack of any equity incentive opportunity for 2010 (see infra note 15), as well as the conservative payout structure of the 2010 MIP:

  - At "planned" performance, resulting in a target-level pool for participants other than Top Management but only a 50%-of-target pool for Top Management, TCC on average will be approximately at market for all but Top Management (who will remain below market),[9] but TDC on average would remain materially below the market median for all participants (Ex. D, at 13-15):

---

[7] Other key executives, when referred to herein for purposes of compensation benchmarking, include 26 key MIP participants outside Top Management whose positions also are listed in the Mercer Report. See Ex. D, at 15.

[8] Mercer reviewed, and benchmarked on a position-by-position basis against media industry comparator positions, a representative sample of the 2010 MIP incentive-eligible population, covering 182 participants or approximately 29% of the incentive-eligible population. See Ex. D (Mercer Report) at 10.

[9] As Mercer notes in its Report, competitive pay is generally defined as a range, not a point, due to inherent variations in market data. Therefore, Mercer typically considers total compensation to be competitive if it falls within 15% of the market median. Ex. D at 12. Mercer also states that it is typical for actual pay to vary from incumbent to incumbent, and in some cases to exceed the 15% range, based on multiple factors including pay required to initially attract the candidate to the organization, prior pay and individual performance potential. Id.

| | Benchmarking of 2010 MIP at <u>Planned</u> Performance | | | |
|---|---|---|---|---|
| | Top Management | Other Key Executives | Other Participants | All Participants |
| TCC as a % of Market Median | 82% | 113% | 111% | 106% |
| TDC as a % of Market Median | 40% | 64% | 85% | 69% |

- At "stretch" performance, resulting in a 118%-of-target-level pool for participants other than Top Management but only a 100%-of-target pool for Top Management, aggregate TCC on average will be at market (particularly given the above-plan performance delivered at the "stretch" level, which would warrant above-target compensation), but TDC on average would remain materially below the market median for all participants (Ex. D, at 13, 16-17):

| | Benchmarking of 2010 MIP at <u>Stretch</u> Performance | | | |
|---|---|---|---|---|
| | Top Management | Other Key Executives | Other Participants | All Participants |
| TCC as a % of Market Median | 107% | 120% | 116% | 115% |
| TDC as a % of Market Median | 53% | 68% | 89% | 75% |

- Even at "maximum" performance (132% of "planned" OCF for participants other than Top Management and nearly 150% of "planned" OCF for Top Management) and an authorized pool at 130% of the target pool for all participants, aggregate TCC is at market, and aggregate TDC would be significantly below the market median maximum – as one would expect given the absence of long-term incentive compensation and the fact that the 130%-of-target cap is well below the maximum payout opportunity of 200%-of-target most commonly offered by the Company's peers as well as under the Debtors' historical MIP programs. <u>See</u> Ex. D, at 13, 18-21;

id. at 28-29 (showing median maximum award opportunities for peer group Chief
Executive Officers and Named Executive Officers of 200%-of-target each, and
average maximum award opportunities of 196% and 173% of target, respectively, for
such peer group populations):

| | Benchmarking of 2010 MIP at __Maximum__ Performance | | | |
|---|---|---|---|---|
| | Top Management | Other Key Executives | Other Participants | All Participants |
| TCC as a % of Market Median Maximum | 87% | 97% | 102% | 97% |
| TDC as a % of Market Median Maximum | 35% | 45% | 67% | 52% |

- Notably, even if *maximum* payouts under the 2010 MIP were benchmarked using the
  *regular* (i.e., non-maximum) market median data, these maximum payouts would still
  be reasonable and market-based given the absence of long-term incentive
  opportunities and the conservative payout at "maximum" performance, bringing the
  participants' TDC on average to 60% of the (regular) market median for Top
  Management, 71% of the (regular) market median for Other Key Executives, 91% of
  the (regular) market median for Other Participants, and 79% of the (regular) market
  median for All Participants. See Ex. D, at 18-20.

    In sum, the Debtors believe in their business judgment that implementation of the
2010 MIP is essential to the success of both their ongoing operations and their restructuring
efforts. Additional facts and circumstances supporting this Motion are set forth below and are
verified in the Affidavit of Chandler Bigelow III, Executive Vice President and Chief Financial
Officer of Tribune Company, in support of the Motion (the "Bigelow Affidavit") and the
Affidavit of John Dempsey, Partner, Mercer (U.S.), Inc., in support of the Motion (the "Dempsey

Affidavit"). Copies of the Bigelow Affidavit and the Dempsey Affidavit are attached hereto as Exhibit B and Exhibit C, respectively. A redacted copy of the Mercer Report is designated as Exhibit D hereto.[10] In further support of this Motion, the Debtors respectfully represent as follows:

## STATUS OF THE CASE AND JURISDICTION

1.    On December 8, 2008 (the "Petition Date"), Tribune and certain of its subsidiaries each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. An additional Debtor, Tribune CNLBC, LLC,[11] filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 12, 2009. In all, the Debtors comprise 111 entities.

2.    The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee.

3.    The Creditors Committee was established on December 18, 2008.

4.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The Debtors submit that Section 363(c) of the Bankruptcy Code authorizes implementation of the 2010 MIP as an ordinary course program. 11

---

[10] Concurrently with this Motion, the Debtors are filing the Motion of the Debtors to File Under Seal an Exhibit to Motion Of The Debtors For An Order Authorizing The Debtors To Implement A 2010 Management Incentive Plan. Pursuant to Del. Bankr. L. R. 9018-1(b), an unredacted copy of Exhibit D, the Mercer Report, will be provided to the Judge's chambers in an envelope marked "Documents To Be Kept Under Seal." As stated, a redacted copy of the Mercer Report is attached to this Motion as Exhibit D.

[11] Tribune CNLBC, LLC was formerly known as Chicago National League Ball Club, LLC.

U.S.C. § 363(c).  The Debtors also submit that the 2010 MIP would comport with Sections

363(b) and 503(c) of the Bankruptcy Code even if those sections were applicable.  11 U.S.C. §§

363(b), 503(c); see supra note 2.

## BACKGROUND

### The Debtors' Principal Segments and Business Units

5.      The Company is America's largest employee-owned media and

entertainment company and is the ultimate parent company of each of the Debtors.  It reaches

more than 80% of U.S. households through its newspapers and other publications, its television

and radio broadcast stations and cable channels, and its other entertainment offerings.  The

Debtors' operations are conducted through two primary business segments:  (i) Publishing and

(ii) Broadcasting.

6.      The Publishing segment currently operates eight (8) major-market daily

newspapers, and distributes entertainment listings and syndicated content through its Tribune

Media Services business unit.  It also manages the websites of the Debtors' daily newspapers,

television stations, and other branded sites targeting specific communities of interests.  As of the

Petition Date, the Publishing segment employed approximately 12,000 full-time equivalent

employees.

7.      The Broadcasting segment includes 23 television stations in 19 markets,

including seven stations in the top 10 U.S. markets and the Chicago area's first and only 24-hour

cable news channel, CLTV.  It also operates the cable "Superstation" WGN America and

Chicago radio station WGN-AM.  As of the Petition Date, the Broadcasting segment employed

approximately 2,600 full-time equivalent employees.

8.      The Debtors also have a Corporate division that includes the senior management team as well as other corporate-level and centralized administrative personnel, including legal, finance, accounting, technology and human resources personnel.

**Overview of the MIP and the Debtors' Historical Compensation Practices**

9.      The Debtors have paid incentive compensation as a central component of employee compensation for many years.  As part of that practice, in 1997, they implemented the MIP as part of the Tribune Company Incentive Compensation Plan (the "Incentive Plan"), a copy of which is attached hereto as Exhibit E.  The Incentive Plan authorizes the Debtors to make incentive awards to eligible participants consisting of annual cash incentive awards through the MIP.  See Ex. E (Incentive Plan) Art. VI.  The Debtors have awarded cash incentive awards under the MIP each year since 1997.

10.     Historically, most management employees across the Company's and its affiliates' operations (other than those in sales positions) with target cash incentive award opportunities of at least 15% of their base salary have participated in the annual MIP.  There were a total of approximately 1,039 participants in the MIP for 2004, 1,040 for 2005, 1,010 for 2006, 953 for 2007, 720 for 2008, and 670 for 2009 (which was the approximate number of 2009 MIP participants when payouts were made in February 2010).

11.     The Debtors have used a consistent methodology over the years in setting annual cash incentive award targets and in subsequently determining such awards.  Each participant has an annual target award opportunity expressed as a percentage of his or her base salary.  For example, a participant with a base salary of $100,000 and a 20%-of-salary cash incentive award target percentage would be eligible for a target MIP award of $20,000.  The

Debtors then use these individual bonus opportunities to determine target bonus pools for each business unit and segment, as well as the consolidated Company-wide target pool.[12]

12.    Within the Publishing segment, each individual newspaper is its own business unit, as is Tribune Media Services.  Within the Broadcasting segment, each television and radio station is its own business unit.  The Corporate division, as well as certain group offices that oversee the entire Publishing segment and Broadcasting segment, respectively, also constitute distinct business units.

13.    Starting early in the fourth quarter of each year, a budget and operating plan is developed by each business unit for the following year.  These plans include forecasted income statements for each business unit, as well as other objectives such as, in the case of Broadcasting business units, market share goals.  Senior management then separately meets in person with representatives of each business unit to review and discuss that business unit's individual budget and plan, in some instances resulting in increases to applicable goals. Following that extensive process, individual business unit budgets and plans are aggregated into a consolidated budget and operating plan for the Company as a whole, taking into account the unique characteristics of each geographic market and business segment in which the Company's business units operate, as well as broader industry and macroeconomic factors.  In or about the end of the fourth quarter of such year, senior management and the Company's Board of Directors then review and assess these consolidated and individual budgets and operating plans for the

---

[12] As discussed below, the "target" annual cash incentive award opportunity of a given participant, expressed as a percentage-of-salary, is *different* in concept from the "target" level annual MIP *pool* as a whole.  While individual participants' percentage-of-salary cash incentive award targets historically have varied under the MIP, they typically have been *lower* than *aggregate* cash MIP pool payouts as a percentage of the target pool.  For example, even though "threshold" level Company performance typically resulted in a pro forma bonus pool equal to 40% of the target pool (see infra ¶ 14(a)), individual awards from that pool as a percentage of salary generally were significantly lower than 40%.

upcoming year and make any further refinements that may be appropriate.  Following this

iterative and deliberative process, the Company then submits these consolidated and business-

unit-specific budgets and operating plans to the Company's Board of Directors for final review

and approval during the first quarter of the applicable year.  The Board-approved budgets and

operating plans generally guide the Company and its business units for that year.

       14.    The OCF goals established in this extensive and thorough planning

process for the business units also historically served as the primary performance target for that

year's MIP, and set the MIP participants' performance and incentive goals and expectations for

that year:

       a.    <u>Publishing</u>:  Each Publishing segment business unit's OCF forecast

historically served as its annual cash incentive award performance target as well.  Under the

Debtors' practice:

- When a Publishing business unit achieved "threshold" performance – usually in the range of 75% to 85% of its forecasted OCF – a pro forma[13] annual cash incentive bonus pool was established for that business unit at 40% of the target pool.[14]

- Historically, if the business unit met its "planned" OCF goal, a pro forma bonus pool was established at 100% of target.  OCF between a minimum "threshold" and the "planned" goal historically would result in a linearly interpolated pro forma bonus pool achievement from 40% to 100% of target.

---

[13] This and other amounts are referred to as "pro forma" because, as discussed below, the Debtors have always reserved and exercised the discretion to adjust achieved pool and payout amounts.

[14] For example, assume that a Publishing business unit's OCF target was $10 million, its threshold performance target was 85% of that amount, and its aggregate bonus pool target was $1 million (at 100% achievement of forecasted OCF).  If this business unit generated OCF of $8.5 million (85% of target), it would achieve a pro forma bonus pool of $400,000 (40% of the $1 million target pool), subject to further adjustment in the Debtors' discretion. As discussed, payout at the threshold level of 40% of the target bonus pool did *not* result in a payout at 40% of each participant's base salary.  To the contrary, while individual participants' annual cash incentive bonus targets, expressed as a percentage of base salary, vary (<u>see supra</u> ¶ 11), aggregate annual cash incentive award payouts under past years' MIP programs as a percentage of base pay have been well below 40%.

- OCF in excess of a business unit's "planned" goal historically resulted in a proportionally increased pro forma achieved pool, up to 200% of the target pool for "maximum" performance in the range of 120% to 140% of "planned" OCF depending on the business unit.

b.    <u>Broadcasting</u>:  For Broadcasting segment business units, OCF and market share goals historically have determined a majority of their achieved annual cash incentive bonus pool opportunity, with a portion being determined based on discretionary factors.  A Broadcasting business unit's achievement of "threshold," "planned" or "maximum" performance on its goals typically resulted in a pro forma MIP pool opportunity equal to 40%, 100% or 200% of its target pool, respectively.

c.    <u>Publishing and Broadcasting Group Offices</u>:  For the Publishing group office and the Broadcasting group office, their annual cash incentive bonus pool achievement levels historically have been based, respectively, on a weighted average of the bonus achievement levels for the various individual business units within the Publishing segment and the Broadcasting segment.

d.    <u>Corporate Division</u>:  Historically, the Corporate division's annual cash incentive pool opportunity has been based on a blend of the Publishing segment's achievement, the Broadcasting segment's achievement, and individual goals including equity investment income achievement.

15.    Given the complexity and breadth of the Debtors' organization, the diversity of their business units, and the variety of markets in which they operate, the Debtors traditionally have exercised discretion in adjusting actual business unit and segment annual cash

incentive pool amounts, as well as individual awards, upwards or downwards relative to achieved pro forma amounts. This includes making discretionary awards, where deemed appropriate, to business units that did not meet their goals. The Incentive Plan expressly authorizes such exercises of discretion. See Ex. E (Incentive Plan) §§ 3.2, 10.6.

16.      In addition to their annual cash incentive awards, a majority of MIP participants historically have been eligible to receive equity-based awards to incentivize long-term performance. Prior to 2007, such equity-based awards were made as option or restricted stock unit grants under the Incentive Plan. Following the merger that returned the Company to private ownership at the end of 2007, the Company awarded phantom equity through a new Management Equity Incentive Plan (this plan is being discontinued under the Debtors' Plan of Reorganization).

17.      Under the Debtors' longstanding compensation philosophy, the TCC of key personnel (base salary and annual cash incentive award) purposefully was kept low relative to market. Equity-based compensation comprised a substantial component of their compensation to incentivize long-term performance, align managements' and the shareholders' interests, and bring the recipients' TDC (base salary, cash incentive award and long-term equity award) to market.

18.      However, the Debtors have been unable to provide equity compensation with any value to their key personnel, including Top Management, since 2007 due to prevailing adverse economic circumstances, including their Chapter 11 filing. As this Court stated at the January 27, 2010 Hearing, "it's plain from the evidence that the equity has de minimis or no value and would not be an appropriate component of a bonus program." Transcript of January

27, 2010 Hearing (Ex. F hereto), at 15. As a result, Top Management and other key personnel are significantly undercompensated relative to the market, as discussed above and further below.[15]

## REQUESTED RELIEF

### I.    Implementation of the 2010 Management Incentive Plan

19.    The Debtors seek approval to implement the 2010 MIP as described in this Motion, including in the Mercer Report (as stated, the Debtors have attached a redacted copy of the Mercer Report as Exhibit D hereto and are contemporaneously seeking leave to file the unredacted Mercer Report under seal). As demonstrated at the May 12, 2009 Hearing on certain 2008 MIP payments and the September 25, 2009 Hearing on the 2009 Management Incentive Plan ("September 25, 2009 Hearing") (excerpts attached as Exhibit H hereto), without an annual cash incentive bonus, the Company's management team would be severely undercompensated and would not have proper incentives to continue to transform the Company in the face of significant cyclical and secular pressure.

20.    Not having meaningful incentives would be detrimental at a time when the Company's challenges remain substantial and it needs to sustain the momentum that it achieved during 2009. As this Court stated in approving the 2009 MIP at the January 27, 2010 Hearing:

> [Mr. Bigelow] testified that costs are fixed, the company is under intense revenue pressure, and it's harder to do things in a Chapter 11. He testified that all eight newspapers owned by the company are cash flow positive and that the program that's proposed was approved by three independent directors. I mean, it's

---

[15] The Debtors' Plan of Reorganization authorizes the Compensation Committee of the reorganized Debtors' Board of Directors to implement a management equity plan upon emergence providing for the grant of up to 5% of the common equity of the reorganized Company. The timing of the Debtors' emergence is uncertain, particularly given the Federal Communications Commission approval process, and could conceivably occur after 2010. The Debtors' proposed Plan of Reorganization also currently does not specify any individual equity grants.

undisputed that the debtor operates in a troubled industry. An industry, in the Court's view anyway, that besides shedding debt has yet to find the ultimate solution for how to succeed in a changing market in the distressed economy. This is the third large media – well, this is one of three large media cases that I have. I had the first days on my most recent filing just yesterday. The industry continues to be troubled. Here the evidence demonstrated that the debtor is performing well, relative to its competitors.

Transcript of January 27, 2010 Hearing (Ex. F hereto), at 15.

21.    The Debtors therefore propose to continue their annual cash MIP opportunity for 2010, consistent with their historical MIP programs, for a slightly lower number of participants than in 2008 and 2009, as well as any newly hired or promoted employees, or any other employees at management's discretion, who in each case become eligible for the MIP.[16] See Ex. D, at 3. Applicable MIP performance levels, related payout percentages and aggregate pool amounts for the 2010 performance period are set forth in the following chart (percentages and pool amounts in between the stated reference points are determined by linear interpolation):

|  | Plan | Stretch | Maximum |
|---|---|---|---|
| Performance (approximate consolidated OCF, in $ millions) | All Participants: 100% of Planned Performance ($425) | All Participants: 119% of Planned Performance ($505) | Top Management: 149% of Planned Performance ($635)<br><br>Other Participants: 132% of Planned Performance ($560) |
| Payout as a % of target | Top Management: 50%<br><br>Other Participants: 100% | Top Management: 100%<br><br>Other Participants: 118% | Top Management: 130%<br><br>Other Participants: 130% |
| Aggregate Payout (approximate, in $ millions) | Top Management: $2.2<br><br>Other Participants: $28.6<br><br>Total: $30.8 | Top Management: $4.4<br><br>Other Participants: $33.7<br><br>Total: $38.1 | Top Management: $5.7<br><br>Other Participants: $37.2<br><br>Total: $42.9 |

---

[16] Any increases in the number of MIP participants will not increase the aggregate ordinary course MIP payout at any given performance level. Ex. D, at 3.

Ex. D, at 4-5. The aggregate MIP pool at 100%-of-target payout for all participants (which as

stated requires above-"plan" performance for Top Management) is $33 million. Id. at 4-6. To

determine actual performance for purposes of the MIP, OCF is calculated *net* of any applicable

incentive payouts, making the MIP self-funding.[17] Id. at 5.

22.    The annual OCF performance metric used in the 2010 MIP is consistent

with historical practice, including during 2008 and 2009, and motivates performance towards

realistic goals for which participants have a clear "line of sight." Indeed, MIP participants were

involved in the rigorous budgeting and operating plan development process used to determine

"planned" OCF for 2010, and the resulting consolidated and business-unit-specific OCF metrics

were extensively analyzed by senior management and approved by the Company's Board of

Directors. MIP participants have been actively working towards these OCF goals throughout

2010, with the understanding that they also would determine their MIP award opportunities.

23.    The 2010 MIP payout structure is similar to the 2009 MIP structure in

several respects and again is more conservative than historical MIP programs:

- The ordinary course MIP funds a Company-wide bonus pool if, and only if, the Company achieves at least "planned" OCF – there is no longer any partial payment opportunity for "threshold" (or other below-"plan") performance, as there has historically been in MIP programs.

---

[17] Actual consolidated OCF used to measure bonus achievement will reflect an appropriate level of MIP bonus expense, consistent with the Company's historical accounting practices. For example, achieving "planned" OCF for 2010 funds an ordinary course MIP pool of $30.8 million. In this case, the achievement of "planned" OCF would be determined net of a $30.8 million bonus expense (i.e., actual OCF before bonus expense must equal "planned" OCF plus $30.8 million). The MIP bonus expense, or "funding" for MIP bonuses, increases up to 130% of target as the Company's actual OCF increases up to the "maximum" target. To achieve a "maximum" MIP bonus pool of $42.9 million for all participants, actual OCF before bonus expense must equal "maximum" OCF plus $42.9 million.

- Performance at 100% of the Company's "planned" 2010 consolidated OCF goal would result in a pro forma MIP pool of only 50% of target for Top Management, instead of 100% of target as has been the Debtors' historical practice.

- Achievement in 2010 of 100% of the target bonus pool for Top Management would require "stretch" performance over and above the Debtors' forecasted financial performance – specifically, 119% of "planned" OCF.

- Furthermore, to fund a "maximum" aggregate MIP bonus pool, the Debtors must achieve nearly 150% of "planned" OCF for Top Management and 132% of "planned" OCF for other participants.  These maximum goals are consistent with and, for Top Management, in excess of the historical "maximum" performance requirement of 120% to 140% of "planned" performance.  Even then, the "maximum" bonus pool is capped at 130% of the target MIP opportunity for all MIP participants, the same level as under the 2009 MIP and well below the "maximum" 200%-of-target opportunity found in the Debtors' historical MIP programs and in the annual incentive plans of most of the Debtors' peers.

See Ex. D, at 4-6, 18-21, 28-29.

      24.     Both the 100%-of-target pool size payable at "stretch" performance for Top Management and at "planned" performance for other participants (approximately $33.0 million in total) and the participant level for 2010 (approximately 640) are *lower* than historical levels.  As stated, there were approximately 1,039 participants in the MIP for 2004, 1,040 for 2005, 1,010 for 2006, 953 for 2007, 720 for 2008 and 670 for 2009 (720 at the time the 2009 MIP initially was proposed).  Additionally, aggregate target pools over the past several years were $37.9 million for 2004, $39.3 million for 2005, $41.9 million for 2006, $39.8 million for 2007, $35.1 million for 2008, and $35.0 million for 2009.  The median 2010 award for all participants at "planned" performance is $29,255.

25.    Once funded, management will allocate the MIP pool to business units based on a formula that includes OCF, a blend of financial and operational metrics, and some discretion based on management assessment of individual business unit performance.  See Ex. D, at 7.  Specifically, 50% of the MIP pool for a given business unit will be allocated based on such business unit's OCF; 25% will be allocated based on business-unit-specific financial and operational goals; and the remaining 25% will be reserved for management discretion to recognize innovation, leadership, change management, and other measures of success and value creation (as with the MIP historically, management reserves the right to award a greater discretionary percentage to any business unit or participant on a case-by-case basis, but in doing so will not exceed the aggregate Company-wide bonus pool achieved based on consolidated OCF).  See Ex. D, at 7.

26.    In response to creditor constituency input, the Debtors also have incorporated limitations for 2010 on their historical discretion to make annual cash incentive awards in the event that goals are not achieved.  Specifically:

- If consolidated OCF does not reach the "planned" level, no Company-wide aggregate MIP pool will be funded for 2010, and participants in the Corporate division, the Publishing group office and the Broadcasting group office (which collectively include eight of the members of Top Management) will not receive any MIP award.  Ex. D at 4-6.

- Even if "planned" consolidated OCF *is* achieved, a given business unit that does not achieve at least "planned" OCF will not be allocated an MIP pool.  Ex. D, at 6, 8.  Such a business unit then will only be eligible for a partial discretionary MIP pool if that pool is paid out of one or more other business units' discretionary awards (thereby reducing those other discretionary awards), or out of "excess" aggregate MIP pool amounts that have funded (due to consolidated Company performance) but that the Company has elected not to award to other business units for performance or discretionary reasons.

23

27.     At the same time, the Debtors have taken care to ensure that continued

economic pressure and an inability to achieve *consolidated* operating goals do not dampen the

incentives of those individual business units that remain successful in achieving their goals.

Accordingly, in the event that "planned" performance is *not* achieved on a consolidated basis, an

individual business unit will remain eligible for an MIP pool if, and only if, it achieves its

individual OCF goal at least at the "planned" level. See Ex. D, at 8. Even then, however,

individual business unit pools would be reduced by *60%* relative to pro forma pool amounts that

potentially would have been available had consolidated performance goals been achieved.[18] Id.

28.     As with past practice, any MIP payouts earned for 2010 are payable within

the first two-and-a-half months of 2011. A participant generally must be employed on the date

of payment to receive an MIP award, except in cases of death, disability, retirement or

termination without cause, which would result in a pro-rated payment based on length of service

during the year.

## BASIS FOR RELIEF REQUESTED

29.     Section 363(c) of the Bankruptcy Code fully authorizes the continuation in

2010 of the Debtors' ordinary course MIP program. Moreover, the 2010 MIP would meet any

and all requirements of Sections 363(b) and 503(c) of the Bankruptcy Code even if those

sections were applicable (which they are not given that the 2010 MIP is an ordinary course

program).

---

[18] Thus, for example, if consolidated goals are not achieved but a business unit achieves "planned" performance, it would be eligible for an MIP pool of 40% (calculated as 40% x 100%) of target.

24

I.    **The 2010 MIP is an Ordinary Course Program Under Section 363(c).**

30.    Under Section 363(c)(1) of the Bankruptcy Code, "[i]f the business of the debtor is authorized to be operated under ... this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of the estate without notice or hearing." 11 U.S.C. § 363(c)(1).  A transaction is within the ordinary course of business if it is an ordinary transaction when looked at from the horizontal and vertical dimensions.  See In re: Roth American, Inc., 975 F.2d 949, 952 (3rd Cir. 1992).

A.    **The 2010 MIP Satisfies the Horizontal Ordinary Course Requirement.**

31.    From the horizontal dimension, a transaction is within the ordinary course of business if, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry.  Id. at 953.  The 2010 MIP clearly meets the horizontal standard.  As the Mercer Report reflects, and as the evidence at the May 12, 2009 Hearing and the September 25, 2009 Hearing demonstrated, it is commonplace for businesses within the Debtors' industry to provide ongoing short-term performance-based cash compensation such as the MIP, including during a Chapter 11 proceeding.  See Ex. D; Transcript of September 25, 2009 Hearing (Ex. H hereto), at 115-17, 131; Transcript of May 12, 2009 Hearing (Ex. G hereto), at 40-43, 52-53.  Numerous cases also demonstrate that short-term cash incentive programs are a common form of compensation, including for debtors in possession.  See, e.g., In re: Dana Corporation, 358 B.R. 567 (Bankr. S.D.N.Y. 2006) (approving annual cash incentive

program); In re: Propex, Inc., No. 08-10249 (Cook, J.) (Bankr. E.D. Tenn. Apr. 9, 2008)

(approving annual cash incentive program).

**B.      The 2010 MIP Satisfies the Vertical Ordinary Course Requirement.**

32.      From the vertical dimension, a transaction is within the ordinary course of

business if, from the hypothetical creditor's perspective, the transaction does not subject the

creditor to economic risk of a nature different from those accepted when it decided to extend

credit.  See In re: Roth American, Inc., 975 F.2d at 952 (noting that primary focus is on the

debtor's pre-petition business practices and conduct).  Continuation of the Debtors' historical

MIP for 2010 also easily meets this standard.  As detailed above, the 2010 MIP is self-funding, is

reasonable in cost and participant levels relative to prior years' MIP programs, and is consistent

in its payout curve and structure with, if not more conservative than, the Debtors' historical MIP

practices.  It also provides for reasonable levels of incentive compensation that, while remedying

the Debtors' compensation gap to market somewhat, still leave the participants overall with

below-median TDC.  See Ex. D, at 13-21.

33.      This Court has already held that the 2009 MIP program constituted an

ordinary course program under Section 363 of the Bankruptcy Code.  See Transcript of January

27, 2010 Hearing (Ex. F hereto), at 17-18.  Similarly, the Court observed at the May 12, 2009

Hearing that the 2008 MIP program also may have met the Section 363(c) standard (even though

that issue technically was not before the Court).  See Transcript of May 12, 2009 Hearing (Ex. G

hereto), at 9 ("With respect to the motion at Number 5, to make payments according to

prepetition incentive plans, it may be really – it may be the first time that it really is an ordinary

course thing and doesn't fall under the 503(c)(3) standard.").

34.     The same is true of the 2010 MIP, which as detailed above is similar in several respects to the 2009 MIP.  See supra ¶¶ 23-24.  Indeed, in response to creditor constituency input, the Debtors have made various refinements to the 2010 MIP relative to prior years' MIP programs that make the 2010 MIP (like the 2009 MIP) more conservative than historical MIP programs.  These refinements include for example:

- Eliminating the historical "threshold" payout opportunity for below-"plan" performance, and instead requiring at least "planned" consolidated OCF performance in order to fund a Company-wide aggregate bonus pool or permit individual awards to any Corporate division or segment group office participants (which includes eight of the members of Top Management), all as under the 2009 MIP;

- Holding Top Management to an even higher performance standard than the already stringent standard applicable to other participants, including by restricting Top Management's payout opportunity for "planned" performance to 50% of target, requiring above-plan "stretch" performance for them to achieve a target-level MIP pool, and setting a higher "maximum" performance goal for them relative to other participants in order to fund a maximum-level pool;

- Capping the "maximum" aggregate bonus pool opportunity at 130% of the target pool as in the 2009 MIP, below the historical and typical peer group maximums of 200% of target;

- Allowing individual business units to qualify for MIP pools only at *reduced* levels if consolidated results are *not* achieved, provided the business units themselves achieve at least "planned" performance, to ensure that otherwise successful business units do not have their incentives diminished by an overall downturn; and

- Restricting the Debtors' discretion to allocate an MIP pool to a business unit that does not achieve at least "planned" OCF under its individual budget, unless that pool is paid out of one or more other business units' discretionary awards (thereby reducing those other discretionary awards), or out of "excess" aggregate MIP pool amounts that have funded

27

(due to consolidated Company performance) but that the Company has elected not to award to other business units for performance or discretionary reasons.

35.    The Debtors respectfully submit that the 2010 MIP, with its reasonable and carefully thought-out structure, provides critically important incentives to their key management personnel while appropriately recognizing the current circumstances that the Debtors face.  This Court has recognized that it is appropriate for a debtor, including the Company, to tailor its annual incentive plan to address the current circumstances that the debtor faces, and that the debtor may do so without necessarily affecting the ordinary course nature of the plan.  See Transcript of January 27, 2010 Hearing (Ex. F hereto), at 17-18 (this Court stating that the 2009 MIP "is similar enough to the 2008 and prior plans, with the evidence show, appropriate adjustments to fit the change in the circumstances, that it meets the 363 Ordinary Course standard."); cf. Transcript of May 12, 2009 Hearing (Ex. G hereto), at 54 (this Court observing that while legal standards may not change, "circumstances change," and that in considering the appropriateness of the Debtors' proposed 2008 MIP payouts, it is important "to recognize the circumstances in which we now find ourselves in the world today.").

36.    Like this Court, numerous other courts have approved historical incentive plans as ordinary course transactions even when they are modified to tailor the plans to current circumstances.  See, e.g., In re: Nellson Nutraceutical, Inc., 369 B.R. 787, 800-01 (Bankr. D. Del. 2007) (approving ordinary course modification of incentive plan targets where payment of the bonuses "'made good business sense' notwithstanding the failure to achieve the lowest threshold for payment of bonuses under the original plan."); In re: Dana Corporation, 358 B.R. 567 (Bankr. S.D.N.Y. 2006) (approving continuation of short-term incentive program, slightly refined from the prior year, as an ordinary course transaction); In re: Buffets Holdings, Inc., No.

08-10141 (Walrath, J.) (Bankr. D. Del. May 14, 2008) (approving continuation of prepetition

plan, modified due to changed circumstances, in the ordinary course of business).

37.     Accordingly, because the 2010 MIP is an ordinary course program under

Section 363(c) of the Bankruptcy Code, court approval technically is not required, but the

Debtors seek such approval because the 2010 MIP involves insiders, as noted.  See supra note 2.

The Debtors respectfully submit that such approval is warranted for reasons stated.

C.     **The 2010 MIP Satisfies the Business Judgment Requirement for Ordinary
        Course Programs.**

38.     Because continuation of the MIP program for 2010 thus falls squarely

within the scope of ordinary course transactions authorized by Section 363(c) of the Bankruptcy

Code, a court "will not entertain an objection to the transaction, provided that the conduct

involves a business judgment made in good faith upon a reasonable basis and within the scope of

authority under the Bankruptcy Code." Nellson, 369 B.R. at 799.  Meeting this standard for

ordinary course programs is a "relatively light evidentiary burden . . . . " Id. at 800.

39.     The 2010 MIP clearly meets this business judgment standard given its

sound objectives, its conservative cost and payout structure, and the Debtors' strong operating

performance relative to their peers in the face of adversity when management has proper

incentives. See Transcript of January 27, 2010 Hearing (Ex. F hereto), at 15 (the Court stating

that "it's undisputed that the debtor operates in a troubled industry . . . . The industry continues to

be troubled.  Here the evidence demonstrated that the debtor is performing well, relative to its

competitors.").

40.     Additionally, Mercer has independently validated that the Debtors' key management team members would be severely undercompensated relative to their competitors without annual cash incentive opportunities.  See infra at 9-11.  As stated, the Company (like its peers) remains under significant industry and macroeconomic pressures to transform its businesses.  See supra ¶ 39; Transcript of January 27, 2010 Hearing (Ex. F hereto), at 15.  Doing so requires a highly motivated executive and management team of the highest caliber, including the attraction of new talent where circumstances warrant, as well as the prevention of a loss of focus and drive among existing executive and management personnel due to below-market compensation and above-average daily performance demands.

41.     The Company cannot meet these challenges effectively if it cannot remain at least competitive with its peers in terms of compensation.  Without a 2010 MIP, Top Management's average TDC would fall at just 28% of the market median, that of Other Key Executives on average would fall at 42% of the market median, that of Other Participants (as noted, in the Mercer survey) on average would fall at 62% of the market median, and that of All Participants (in the Mercer survey) would fall at 49% of the market median.  Ex. D, at 13. Aggregate TCC also would be materially below the market median without a 2010 MIP.  Id. (Top Management:  56% of median; Other Key Executives:  74% of median; Other Participants: 82% of median; All Participants:  75% of median).

42.     Even with an ordinary course 2010 MIP award opportunity, at "planned" performance, key management members' TDC on average would remain below the market median given the absence of long-term incentives, and TCC would be at market for all participants other than Top Management due to the 50%-of-target cap on the MIP pool for Top Management.  See Ex. D, at 13-15 (Top Management:  40% of median TDC / 82% of median

TCC; <u>Other Key Executives</u>:  64% of median TDC / 113% of median TCC; <u>Other Participants</u>: 85% of median TDC / 111% of median TCC; <u>All Participants</u>:  69% of median TDC / 106% of median TCC).

43.    Likewise, at above-plan "stretch" performance, key management members' TDC on average would remain materially below the applicable market median, and TCC would be at market.[19]  <u>See</u> Ex. D, at 13, 16-17 (<u>Top Management</u>:  53% of median TDC / 107% of median TCC; <u>Other Key Executives</u>:  68% of median TDC / 120% of median TCC; <u>Other Participants</u>:  89% of median TDC / 116% of median TCC; <u>All Participants</u>:  75% of median TDC / 115% of median TCC).  This is particularly true given the fact that the market median assumes *target*-level performance, while a "stretch"-level payout under the 2010 MIP requires Company performance that is nearly *20% above target*.  Ex. D, at 13.  As Mercer confirms, *above-median* compensation would be appropriate for above-target performance under a typical pay-for-performance incentive structure.  <u>Id.</u>

44.    Finally, even at *maximum* payout levels for maximum performance, the MIP participants' TDC on average is well below the applicable market median for maximum awards, and TCC is at market.  <u>See</u> Ex. D, at 18-21 (<u>Top Management</u>:  35% of median maximum TDC / 87% of median maximum TCC; <u>Other Key Executives</u>:  45% of median maximum TDC / 97% of median maximum TCC; <u>Other Participants</u>:  67% of median maximum TDC / 102% of median maximum TCC; <u>All Participants</u>:  52% of median maximum TDC / 97% of median maximum TCC).  Indeed, given that the maximum award opportunity under the 2010

---

[19] As stated, competitive pay is generally defined as a range, not a point, due to inherent variations in market data, and Mercer typically considers compensation to be competitive if it falls within 15% of the market median.  <u>See</u> <u>supra</u> note 9; Ex. D, at 12.  Mercer also states that it is typical for actual pay to vary from incumbent to incumbent, and in some cases to exceed the 15% range, based on multiple factors including pay required to initially attract the candidate to the organization, prior pay and individual performance potential.  <u>See</u> <u>supra</u> note 9; Ex. D at 12.

MIP (130% of target) is significantly below the maximum opportunity under peer group plans (generally 200% of target), not to mention relative to the Debtors' historical practice, the MIP participants' TDC at maximum payouts on average remains below-market even when benchmarked using the *regular* (i.e., non-maximum) market median. See Ex. D, at 18-21 (Top Management:  60% of median TDC; Other Key Executives:  71% of median TDC; Other Participants:  91% of median TDC; All Participants:  79% of median TDC).

45.    Accordingly, the Debtors respectfully submit that the 2010 MIP easily meets the Section 363(c) ordinary course standard.  See supra ¶ 37; see also infra Section II (demonstrating that the 2010 MIP also would meet the six-factor Dana II standard for programs outside the ordinary course, which this Court referenced in its ruling on the 2009 MIP (Transcript of January 27, 2010 Hearing (Ex. F hereto), at 16)).

46.    The Debtors therefore respectfully request authorization to implement the 2010 MIP as an ordinary course program, as provided in the proposed Order attached hereto as Exhibit A.

## II.    Approval of the 2010 MIP Would be Warranted Under Sections 363(b) and 503(c) of the Bankruptcy Code Even if Those Sections Applied to the 2010 MIP.

47.    While the 2010 MIP constitutes an ordinary course transaction under Section 363(c) of the Bankruptcy Code, the Debtors submit out of an abundance of caution that it would also qualify as a valid exercise of the Debtors' business judgment under Sections 363(b) and 503(c)(3) for reasons stated above and herein, if those sections had been applicable.  See 11 U.S.C. §363(b)(1) ("The trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."); id. § 503(c)(3) (requiring that "transfers or obligations that are outside the ordinary course of business" and for which administrative

expense priority is sought be "justified by the facts and circumstances of the case"). By their express terms, neither Section 363(b) nor Section 503(c)(3) applies to payments made in the ordinary course of business (which includes the 2010 MIP). See In re: Nellson Nutraceutical, 369 B.R. at 803-04.

48.    In determining whether to authorize the use of property pursuant to Section 363(b), the debtor need only demonstrate that a sound business purpose justifies such use. In re: Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); see also In re: Delaware & Hudson Railway Co., 124 B.R. 169, 176 (D. Del. 1991). With respect to Section 503(c)(3), this Court has described the standard therein as a "heightened business judgment standard." Transcript of January 27, 2010 Hearing (Ex. F hereto), at 18; see also Transcript of May 12, 2009 Hearing (Ex. G hereto), at 52-53 (the Court characterizes the Section 503(c)(3) "justified by the facts and circumstances" standard as a "business judgment plus" standard).

49.    This Court already approved the 2008 MIP payments as transactions outside the ordinary course, and also held that the 2009 MIP program would meet a "heightened business judgment standard" under Section 503(c)(3) even if it had not been an ordinary course program. Transcript of May 12, 2009 Hearing (Ex. G hereto), at 52-55; Transcript of January 27, 2010 Hearing (Ex. F hereto), at 18. These same holdings and considerations would warrant implementation of the 2010 MIP as another valid exercise of the Debtors' business judgment even if it were not an ordinary course program (which it is), including without limitation under the six-factor Dana II framework cited by this Court in approving the 2009 MIP:

(1) Reasonable Relationship Between Plan and Business Objectives:  There is a clear relationship between the Debtors' OCF-based plan and their objective of enhancing their chances of survival and prosperity by increasing their profitability. The Debtors' ability

to stabilize the profitability of the Company is perhaps the best evidence that the incentives provided under the MIP program work.  See Transcript of January 27, 2010 Hearing (Ex. F hereto), at 15 (the Court stating that "Here the evidence demonstrated that the debtor is performing well, relative to its competitors.").

(2) <u>Reasonable Cost</u>:  The cost of the proposed self-funding 2010 MIP is reasonable in the context of the Debtors' assets, liabilities and earning potential, including their estimated 2010 revenues of approximately $3.0 billion.  These facts have been confirmed by Mercer and validated by the Compensation Committee.  Furthermore, the aggregate payout opportunity at 100% of target (which, as stated, requires above-"planned" OCF performance for Top Management) is *less* than the target award opportunities under both the 2009 MIP and prior years' MIP programs.  Similarly, the aggregate maximum payout opportunity is *less* than the maximum opportunity available under the 2009 MIP.  <u>See also</u> Transcript of May 12, 2009 Hearing (Ex. G hereto), at 55 (this Court stating, in approving the 2008 MIP payments: "The record here amply supports the award of this relief, the grant of this relief.  The plan is consistent with the company's historical practices.  It's not unreasonable in any respect.  Indeed, the record clearly indicates that it's below market.  You look at the industry, and considering the debtors' place in the industry in which it's trying to survive and transform itself in what are truly extraordinary times, and <u>you compare that to what's proposed to be paid in relation to its revenue</u>.") (emphasis added).

(3) <u>Reasonable Scope</u>:  The scope of the 2010 MIP is reasonable.  It covers the same management population that has historically participated in that program, though with an even lower number of total anticipated participants than in prior years due largely to attrition (approximately 640 participants for 2010 compared with 670 participants for 2009 as of year-end).

(4) <u>Consistent with Industry Standards</u>:  Mercer confirms, as does the other evidence presented at the hearings on the 2008 and 2009 MIP programs, that implementation of the 2010 MIP is consistent with industry standards, including for companies in Chapter 11, and the case law is in accord.  <u>See</u> <u>supra</u> ¶ 36 (cases); <u>infra</u> ¶ 51 (cases).

(5) <u>Due Diligence</u>:  The proposed plan has been subjected to due diligence over several months by a variety of different constituencies, including the Debtors' management, their Compensation Committee, the Creditors Committee and the Settlement Committee Members (all of whom were assisted by their professional financial advisors), and Mercer.  The Debtors have incorporated creditor constituency input where appropriate, including the incorporation into the 2010 MIP of the various enhanced performance requirements and payout restrictions described above, all of which are more stringent and conservative than historical MIP programs.

(6) <u>Independent Review</u>:  The Debtors received independent counsel in performing due diligence, and in creating and authorizing the 2010 MIP.  As stated, the Compensation Committee, whom the undisputed evidence has shown is a disinterested body, reviewed and approved the proposed plan and retained Mercer, an independent compensation consultant, to assist its consideration.  Mercer independently reviewed and validated the 2010 MIP as reasonable and market-based.

<u>In re Dana Corp.</u> ("<u>Dana II</u>"), 358 B.R. 567, 576-77 (Bkrtcy. S.D.N.Y. 2006); <u>see id.</u> at 581 n.20 (noting in context of analyzing incentive plan that "Under applicable case law, in this and other circuits, courts should authorize business transactions outside the ordinary course of business if the Debtors have exercised sound business judgment."); <u>see also</u> <u>Global Home Products</u>, LLC, 369 B.R. at 786 (affirming plan approved by compensation committee, even though company did not retain independent counsel to review the plan).

50.    As the Court acknowledged at the January 27, 2010 Hearing on the 2009 MIP, the MIP participants' challenges and demands are by no means over.  <u>See</u> Transcript of January 27, 2010 Hearing (Ex. F hereto), at 15 ("[I]t's undisputed that the debtor operates in a troubled industry.  An industry, in the Court's view anyway, that besides shedding debt has yet to find the ultimate solution for how to succeed in a changing market in the distressed economy.").  It remains critically important to ensure that the Debtors have the necessary tools to

appropriately compensate and attract top-tier executive and management talent, and to preserve meaningful incentives for all participants.

51.    Consistent with the foregoing, since the amendments to the Bankruptcy Code went into effect in October 2005, numerous courts in addition to this Court have approved employee compensation programs outside the ordinary course of business.  See e.g., In re Global Home Products, 369 B.R. 778, 784 (Bankr. D. Del. 2007) ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment.") (internal citation omitted); In re: Nobex Corp., No. 05-20050, 2006 WL 4063024 (Bankr. Del. Jan. 19, 2006) (approving an incentive plan based on the gross purchase price of the sale of the company's assets); In re: Movie Gallery, Inc., No. 07-33849 (Tice, J.) (Bankr. E.D. Va. Feb. 29, 2008) (approving a key employee incentive plan based on earnings achieved); In re: Dana Corporation, 358 B.R. 567 (Bankr. S.D.N.Y. 2006) (approving a long-term incentive plan based on EBITDAR targets); In re: Sharper Image, No. 08-10322 (Gross, J.) (Bankr. Del. Jun. 25, 2008) (approving an incentive plan based on successful wind down of the business); In re: Semcrude, L.P., No. 08-11525 (Shannon, J.) (Bankr. Del. Jan. 13, 2009) (approving bonus plan based on EBITDA and substantial sale of the business units).

52.    For reasons detailed above, the requested relief falls directly within the Debtors' valid business judgment, is amply "justified by the facts and circumstances," and would comport with Sections 363(b) and 503(c)(3) of the Bankruptcy Code even if those Sections had been applicable.[20]

---

[20] Furthermore, the 2010 MIP does not involve "severance" or "retention" payments (whether or not to insiders), and thus Sections 503(c)(1) and (2) of the Bankruptcy Code are inapplicable. See 11 U.S.C. § 503(c)(1), (2).  This Court has already held that Sections 503(c)(1) and (2) are inapplicable to the 2009 MIP program.  See Transcript of September 25, 2009 Hearing (Ex. H hereto), at 212 ("Every bonus plan, virtually every bonus plan has some

53.     The Debtors therefore respectfully request authorization to implement the

2010 MIP, as provided in the proposed Order attached hereto as <u>Exhibit A</u>.

## CONCLUSION

54.     For the foregoing reasons, the Debtors respectfully submit that the 2010

Management Incentive Plan is an ordinary course program (and in any event would satisfy any

applicable Bankruptcy Code requirements for transactions outside the ordinary course), and that

granting the relief requested herein is well within the Court's authority, is a valid exercise of the

Debtors' business judgment, and thus is clearly in the best interests of the Debtors' estates and

creditors.  Accordingly, the Debtors respectfully request that the Court grant the relief requested

herein and enter the proposed Order attached as <u>Exhibit A</u> hereto authorizing, but not directing,

them to implement the 2010 Management Incentive Plan.

## NOTICE

55.     Notice of this Motion has been provided to: (i) the Office of the United

States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the

United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v)

element of retention in it.  I have routinely held that unless a plan is demonstrated to be primarily for the purpose of retention, it doesn't fit within the 503(c)(1) rubric.  And I don't see the evidence here supporting that view either [with respect to the 2009 MIP]."); Transcript of January 27, 2010 Hearing (Ex. F hereto), at 18 ("Neither 503(c)(1), which relates to primarily retention-based bonus programs, or 503(c)(2) regarding severance, are applicable here.").  As the foregoing quoted statements by the Court confirm, it is well-settled that Section 503(c)(1) only prohibits the allowance or payment of administrative expense amounts that have the "primary purpose" of retaining insiders.  <u>See</u> Transcript of September 25, 2009 Hearing (Ex. H hereto), at 212; Transcript of January 27, 2010 Hearing (Ex. F hereto), at 18; <u>see also</u> In re: Nellson Nutraceutical, Inc., 369 B.R. 787, 802 (Bankr. D. Del. 2007); Global Home Products, LLC, 369 B.R. 778, 785 (Bankr. D. Del. 2007); In re: Dana Corporation, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006).  If an incentive award or other payment or program is sought "for the primary purpose of motivating employees … the limitations of 503(c)(1) are not applicable," even if the payment or program would have some incidental retentive effect.  In re: Nellson Nutraceutical, Inc., 369 B.R. at 802; Global Home Products, 369 B.R. at 785; In re: Dana Corporation, 358 B.R. at 576; Transcript of September 25, 2009 Hearing (Ex. H hereto), at 212; Transcript of January 27, 2010 Hearing (Ex. F hereto), at 18.  The relief sought clearly passes muster under these standards.  Like the 2008 and 2009 MIP programs, the 2010 MIP is a bona fide incentive program with incentive opportunities based on real performance targets that are intended to motivate superior performance.

counsel for the Creditors Committee; (vi) counsel to the Senior Lender Settlement Committee; (vii) counsel to the administrative agent for the Debtors' postpetition financing facility; and (viii) all parties having requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## **NO PRIOR REQUEST**

56.    The Debtors have not previously sought the relief requested herein from this or any other Court.

WHEREFORE, for the foregoing reasons, the Debtors respectfully seek entry of an Order in substantially the form of the proposed Order attached hereto as <u>Exhibit A</u>:

(1)    authorizing, but not directing, the Debtors pursuant to Section 363(c) and, as applicable, Sections 363(b) and 503(c) of the Bankruptcy Code, to implement an ordinary course Management Incentive Plan for 2010 as described in this Motion for approximately 640 management employees, including the Debtors' Top Management, with an aggregate payout opportunity of approximately:

(a) $30.8 million – representing a 50%-of-target payout to Top Management (approximately $2.2 million) and a 100%-of-target payout to the remaining MIP participants (approximately $28.6 million) – if the Company achieves "planned" performance equal to 100% of its planned 2010 consolidated OCF goal included in the 2010 operating plan that was approved by the Company's Board of Directors in February 2010;

(b) $38.1 million – representing a 100%-of-target payout to Top Management (approximately $4.4 million) and a 118%-of-target payout to the remaining MIP participants (approximately $33.7 million) – if the Company achieves "stretch" performance for 2010 equal to approximately 119% of its "planned" consolidated OCF goal; and

(c) $42.9 million – representing a 130%-of-target payout to Top Management (approximately $5.7 million) and the remaining MIP participants (approximately $37.2 million) – if the Company achieves "maximum" performance of 149% of "planned" consolidated OCF for 2010 in the case of Top Management, and 132% of "planned" consolidated OCF in the case of the remaining MIP participants; and

(2)    granting such other and further relief as the Court may deem just and proper.


Dated:    Wilmington, Delaware
          May 26, 2010

          Respectfully submitted,

          SIDLEY AUSTIN LLP
          Bryan Krakauer
          Kevin T. Lantry
          Brian J. Gold
          Jonathan D. Lotsoff
          One South Dearborn Street
          Chicago, Illinois  60603
          Telephone:  (312) 853-7000
          Facsimile:  (312) 853-7036

                    -and-

          COLE, SCHOTZ, MEISEL,
          FORMAN & LEONARD, P.A.

          By: _____
          Norman L. Pernick (No. 2290)
          J. Kate Stickles (No. 2917)
          500 Delaware Avenue, Suite 1410
          Wilmington, Delaware  19801
          Telephone:  (302) 652-3131
          Facsimile:  (302) 652-3117

          ATTORNEYS FOR DEBTORS
          AND DEBTORS IN POSSESSION