**EXHIBIT F**

**Excerpts of Transcript of January 27, 2010 Hearing**

```
                  IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE DISTRICT OF DELAWARE


                                      )
IN RE:                                ) Chapter 11
                                      )
TRIBUNE COMPANY, et al.,              ) Case No. 08-13141 (KJC)
                                      )
                                      ) Courtroom 5
                                      ) 824 Market Street
_____Debtors._____   ) Wilmington, Delaware

                                       January 27, 2010
                                       10:04 a.m.

                        EXCERPT FROM
                   TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE KEVIN J. CAREY
                 UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:


For Debtors:               Sidley Austin LLP
                           BY:  KEVIN P. LANTRY, ESQ.
                           BY:  JONATHAN LOTSOFF, ESQ.
                           One South Dearborn
                           Chicago, IL 60603
                           (213) 896-6022

                           Cole, Schotz, Meisel, Forman &
                           Leonard, PA
                           BY:  NORMAN PERNICK, ESQ.
                           1000 North West Street
                           Suite 1200
                           Wilmington, DE 19801
                           (302) 652-3131


ECRO:                      AL LUGANO

Transcription Service:     DIAZ DATA SERVICES
                           331 Schuylkill Street
                           Harrisburg, Pennsylvania 17110
                           (717) 233-6664


Proceedings recorded by electronic sound recording; transcript
produced by transcription service
```

APPEARANCES:
(Continued)

| | |
|---|---|
| For Washington Baltimore<br>Newspaper Guild: | Cross & Simon LLC<br>BY:  CHRISTOPHER P. SIMON, ESQ.<br>913 North Market Street<br>11th Floor<br>Wilmington, DE 19801<br>(302) 777-4200 |
| For The Creditors Committee: | Landis Rath & Cobb<br>BY:  ADAM LANDIS, ESQ.<br>919 Market Street Suite 1800<br>P.O. Box 2087<br>Wilmington, DE 19899<br>(302) 467-4400 |
| | Chadbourne & Park LLP<br>BY:  DOUGLAS DEUTSCH, ESQ.<br>30 Rockefeller Plaza<br>New York, NY 10112<br>(212) 408-5100 |
| For U.S. Trustee: | Office of the U.S. Trustee<br>BY:  JOSEPH J. MCMAHON, ESQ.<br>844 King Street, Suite 2207<br>Lockbox 35<br>Wilmington, DE 19801<br>(302) 573-6491 |
| For Great Banc: | Womble Carlyle Sandridge & Rice<br>BY:  THOMAS M. HORAN, ESQ.<br>222 Delaware Avenue<br>Wilmington, DE 19801<br>(302) 252-4320 |
| For JP Morgan Chase: | Richards Layton & Finger<br>BY:  DREW G. SLOAN, ESQ.<br>One Rodney King Square<br>920 North King Street<br>Wilmington, DE 19801<br>(302) 651-7612 |

1   submit an order that as well.

2           THE COURT:  Very well.  All right, let's address the

3   MIP Motion.  Give me a moment to pull myself together here.

4           (Pause in proceedings)

5           THE COURT:  All right.  At the conclusion of the

6   September 25th hearing, on the debtors' motion to -- for

7   authority to implement a three-part 2009 plan and to pay 2008

8   management incentive plan awards, I asked the debtor whether it

9   would be willing to have the Court consider the various parts

10  separately or whether it was the debtors' position it should

11  rise or fall together.

12          The debtor followed with a letter telling me that

13  they wanted to -- the Court to consider the whole and not to

14  rule on its various parts.  And as the Guild's attorney pointed

15  out in a September 29th letter, the debtors' letter that had

16  been sent to me, which is a September 28th letter, did indeed

17  inappropriately take the opportunity to order -- to offer

18  further argument.  But be that as it may, I took the debtor at

19  its word and took under advisement all three parts.

20          I have not ruled so far because I had intended to

21  write an opinion resolving the dispute, but due to the press of

22  business I have not yet been able to reach it.  Recently, as

23  the parties now know, the debtors changed their mind and said

24  the Court -- well, and asked the Court to consider the separate

25  components.  In the order that I entered setting the matter for

9

1    today, I indicated it was not necessary for parties to re-file

2    any objections to the -- what's called the transition MIP or

3    the KOB components of the 2009 Plan.

4         The parties who I'll call the two remaining

5    objectors, that is the Washington Baltimore Newspaper Guild and

6    the U.S. Trustee filed supplemental papers indicating that they

7    still objected to authorization to pay bonuses under the --

8    just the MIP component of the 2009 incentive plan.  I will tell

9    you, and some may have surmised from the question I asked at

10   the conclusion of the September 25th hearing, I was prepared

11   then to approve the MIP component based upon the record that

12   had been made.  I guess it's a good thing for management that

13   the debtor has changed its mind.  And I frankly suggest, and

14   I'll read a more detailed ruling in a moment, that it consider

15   taking the remaining two components and incorporating them into

16   a Chapter 11 Plan.  And I'm assuming that the debtor is getting

17   closer to having arrived at one, but I don't know that.  In any

18   event, until advised otherwise, the other two components will

19   remain in the queue for ruling and I cannot tell you when that

20   ruling will be issued.

21        But before I continue, let me ask if anyone wishes

22   to be heard?  I hear no response.

23        Debtors filed a motion for authority to pay 2008 MIP

24   awards.  These were previously approved by prior order after

25   the hearing without objection.  The remaining request for

1    relief in the debtors' motion, which was heard on September

2    25th of last year, involved three components of a 2009

3    incentive plan.  The first component is what the debtor

4    characterizes as a continuation of self-funding -- of a self-

5    funding ordinary course annual MIP, which covers approximately

6    720 management employees, including the debtors' top 10

7    executives, with a payout of up to $44.6 million.

8         The second component is comprised of what the debtor

9    describes as a pay-for-performance bonus opportunity for 21

10   core management individuals, including the top 10 executives,

11   plus 50 others.  That's referred to as the transition MIP.  The

12   third -- and that allows for payment of up to 12 million --

13   about $12 million.

14        The third component is what the debtor characterizes

15   as a pay-for-performance bonus opportunity for 23 leaders of

16   key operations of the debtor or the KOB component.  The subject

17   of today's ruling, as I said previously, is only the MIP, not

18   the transition MIP and not the KOB.

19        I take a more detailed description of the proposed

20   MIP from the debtors' motion and I'll paraphrase, it consists

21   of several subparts.  First, it is proposed an aggregate MIP

22   bonus pool be funded if the company achieves what's called a

23   planned operating cash flow.  Second, if there's achievement of

24   100 percent of the planned 2009 consolidated operating cash

25   flow, it results in a payout of 50 percent of the target pool.

1   Payout of 100 percent of the target requires achievement of

2   what the debtor characterizes as a stretch goal, that is 142

3   percent of planned operating cash flow.  Third, there's a

4   maximum performance, 200 percent of planned operating cash

5   flow, which would fund a maximum aggregate pro-forma bonus pool

6   capped at 130 percent of the pool.

7          The debtor says in its motion that the number of

8   participants and the aggregate cost of the ordinary course MIP

9   at both planned and stretched performance levels, remain at or

10  below levels for MIPs in prior years.  And fifth, that 2009

11  management incentive plan limits the debtors' discretion to

12  make ordinary course MIP awards when goals are not achieved as

13  compared to prior years.

14         The Guild and the debtors did stipulate to certain

15  facts.  They're not extensive and I will paraphrase some of the

16  stipulated facts, which were attached to the joint pre-trial

17  memorandum which was submitted prior to the hearing -- the

18  September 25th hearing on the motion.

19         As of the filing of the petition, the debtors

20  employed approximately 15,000 employees.  They operate eight

21  major market daily newspapers and twenty-three television

22  stations.  As of November 30, 2008, approximately 10 percent of

23  the employees in the debtors' publishing segment and

24  approximately 32 percent of the employees in the debtors'

25  broadcasting and entertainment segment were represented by a

12

1  labor organization, hereafter union or unions, for the purposes

2  of collective bargaining and are covered by a collective

3  bargaining agreement.  As of September 1, 2009 approximately 11

4  percent of the employees in the debtors' publishing segment and

5  approximately 33 percent of the employees in the debtors'

6  broadcasting and entertaining segment are represented by unions

7  for the purposes of collective bargaining and are covered by a

8  collective bargaining agreement.

9        During the pendency of the petition a number of

10  union contracts have approached their expiration dates or have

11  expired.  In those instances, the debtors have engaged in

12  collective bargaining negotiations over the terms of a

13  successor collective bargaining agreement with respect to

14  negotiation of union contracts that have approached their

15  expiration dates or expired during the pendency of the

16  petition, economic contract proposals made by the debtors

17  during 2009 to these unions reflect a zero percent increase in

18  wages for calendar year 2009.

19        Except for employees of the debtors covered by an

20  individual employment agreement, the debtors, in February 2009,

21  implemented a salary freeze for all non-union employees.  Since

22  the filing of the petition, the debtors eliminated 887 non-

23  management, non-supervisory positions, 23 supervisors and 104

24  managerial positions.  The debtors severed almost 2,000

25  positions in 2008.

13

1            The evidence from the debtors' witnesses, especially

2    Chief Financial Officer Chandler Bigelow, demonstrated the need

3    for incentives.  Debtors' expert, John Dempsey (phonetic),

4    among other things said, "It's a basic principal of human

5    resources management that incentives are a tool used to both

6    motivate people and to align the interests of people with the

7    company."  All major constituents of the debtors supported all

8    three components of the plan.

9            The remaining objectors, the Washington Baltimore

10   Newspaper Guild, who employees -- who has 237 employees of the

11   debtor, and the U.S. Trustee objected, and the objections were

12   similar.  Among other things, the objectors argued that the

13   minimum bench marks had already been met.  I think I mentioned

14   at the time of the hearing, but I'll say again now, with

15   respect to timing, the way Chapter 11 cases, in my experience

16   have developed, especially in recent times, is there are other

17   matters which are properly, I think, of greater importance at

18   the beginning of a case, other than figuring out how to pay

19   bonuses to management employees.

20           The process here was the subject of a hearing in

21   May, again in September, the process was ongoing, it was

22   intensive, the evidence demonstrated that it involved all of

23   the major constituents of the debtor, and the fact that time

24   has passed, I don't think, should count against the debtor or

25   its -- the subjects of the proposed bonuses as a result of how

1  the 11 developed.  I'm not saying there would never be a time

2  when it would come to be too late, but under these

3  circumstances, I determined that it's not.  There was dispute

4  in the evidence about whether the debtors' expert looked at the

5  wrong peer groups, whether the sample that was discussed and

6  submitted was a representative sample of other industry

7  constituents, and of course a significant objection was that

8  the cash flow devoted -- or to be set aside for the proposed

9  bonuses -- was a much larger percentage of historic cash flow

10  from prior plans.

11          The debtor responded by arguing, in my words not

12  theirs, but that rarely is there an exact fit with respect to

13  peer groups or representative samples and that was the case

14  here.  With respect to the argument that performance levels for

15  bonuses had been met -- at least the minimums had been met at

16  the time of hearing, the debtor responded, I think, in a way

17  that does gain some purchase with me, and that is they weren't

18  achieved when they were first established.  And the debtor

19  argued, I think, persuasively that it would not be fair to move

20  the goal post in the middle of the performance period.

21          The expert offered by the Guild, while helpful in

22  some respects, was not a compensation expert.  I did

23  incorporate, and if I didn't I do so now, the hearing record

24  from the May 12, 2009 hearing.  Mr. Bigelow testified that

25  salaries are set historically low, relative to the market.  One

15

1    component of the proposed plan that was the subject of some

2    dispute was that the bonuses were to be paid in cash, as

3    opposed to cash and equity, which had historically been the

4    practice of the company, but it's plain from the evidence that

5    the equity has de minimis or no value and would not be an

6    appropriate component of a bonus program.

7            He testified that costs are fixed, the company is

8    under intense revenue pressure, and it's harder to do things in

9    a Chapter 11.  He testified that all eight newspapers owned by

10   the company are cash flow positive and that the program that's

11   proposed was approved by three independent directors.  I mean,

12   it's undisputed that the debtor operates in a troubled

13   industry.  An industry, in the Court's view anyway, that

14   besides shedding debt has yet to find the ultimate solution for

15   how to succeed in a changing market in the distressed economy.

16   This is the third large media -- well, this is one of three

17   large media cases that I have.  I had the first days on my most

18   recent filing just yesterday.  The industry continues to be

19   troubled.

20           Here the evidence demonstrated that the debtor is

21   performing well, relative to its competitors.  So even though

22   there was some evidence that some in the industry retreated

23   with respect to their bonus programs, here I find that what's

24   been proposed is justified.  In looking at the legal standard

25   to be employed in determining whether the relief requested

1    should be granted, as I said earlier, I had intended to write

2    on this topic because I have not yet done so.  However, given

3    the passage of time and what I perceive as the need for a

4    ruling, at least on the component that I think is justified,

5    I'll rely at least in this case on the Dana Two (phonetic)

6    Factors.

7            And I conclude that here, the evidence shows there

8    is a reasonable relationship between the plan and its

9    objectives to enhance the company's chances of survival and

10   increased profitability.  The cost is reasonable as well.  The

11   scope is reasonable.  It covers the same management population

12   covered in previous plans, which is a critical core group.  The

13   plan was developed over time, as a result of extensive

14   negotiations by and among all of the major constituents of the

15   company and has the support of all the major constituents of

16   the company.

17           I will tell you -- he's not here today, but on this

18   topic I was struck by Mr. Lemay's closing argument, from which

19   I'll quote, not too extensively.  He said, "Business people in

20   the for-profit world have an understanding about what motivates

21   management, because all business people in the for-profit world

22   are in that world themselves.  And what motivates management is

23   a number of things, including pride in a job well done, but the

24   chance to make something for one's self and one's family.  Our

25   clients -- my clients don't wish to find out what would happen

1  if management didn't get these awards.  The suggestion has been

2  made that a company, because it's in Chapter 11, maybe

3  shouldn't pay bonuses just because it's in Chapter 11, and that

4  may be true when a company is in a life or death liquidity

5  situation, where there's simply you either pay the bonuses or

6  have to turn the lights.  That's really not the case here.

7  Liquidity is obviously an issue, but it's not a life or death

8  liquidity question.

9          So the question as a business matter then becomes,

10  what's in the best interest of the business and its owners?

11  I'd like to submit that being in Chapter 11 doesn't change at

12  all what management should be doing, it just changes who

13  they're doing it for.  Now ultimately they're going to be doing

14  it for the unsecured creditors.  It really just goes to the

15  question of who their ultimate constituents are in this case,

16  as in so many, it is almost inevitable.  Indeed, I would go so

17  far as to say inevitable that the equitable owners of the

18  business are now the creditors.  The creditors have an official

19  representative.  That representative is my client and that

20  client, which consists of a number of very canny business

21  people, has concluded that these incentives will ultimately put

22  more money in their pockets than the alternative."

23          The proposed plan was reviewed by an independent

24  committee of the board and validated, the evidence shows, by a

25  credible expert.  The plan that is proposed is similar enough

1  to the 2008 and prior plans, with the evidence showed,

2  appropriate adjustments to fit the change in the circumstances,

3  that it meets the 363 Ordinary Course standard.  Alternatively,

4  the evidence demonstrates that the debtor has also met the

5  503(c)(3) standard, a heightened business judgment standard,

6  and I conclude that the relief requested is justified by the

7  facts and circumstance of the case.  Neither 503(c)(1), which

8  relates to primarily retention-based bonus programs, or

9  503(c)(2) regarding severance, are applicable here.  The

10  objections are overruled and I'll ask the parties confer and

11  submit an order under certification.

12          Are there any questions?

13          MR. PERNICK:  No, Your Honor.

14          THE COURT:  Is there anything further for today?

15          MR. PERNICK:  No, Your Honor, not from the debtors.

16          THE COURT:  Thank you, all.  That concludes this

17  hearing.  Court will stand in recess.

18          MR. PERNICK:  Thank you, Your Honor.

19      (Whereupon at 10:30 a.m., the hearing was adjourned)

20

21

22

23

24

25

19

1                          CERTIFICATION

2          I   certify   that   the   foregoing   is   a   correct

3   transcript   from   the   electronic   sound   recording   of   the

4   proceedings in the above-entitled matter.

5

6

*Stephanie McMeel*

7   _____         February 1, 2010

8   Stephanie McMeel

9   AAERT Cert. No. 452

10  Certified Court Transcriptionist

11