**EXHIBIT G**

**Excerpts of Transcript of May 12, 2009 Hearing**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Case No. 08-13141(KJC) |
| | ) | (JOINTLY ADMINISTERED) |
| TRIBUNE COMPANY, _et al._, | ) | Chapter 11 |
| | ) | |
| | ) | Courtroom 5 |
| | ) | 824 Market Street |
| Debtors. | ) | Wilmington, Delaware 19801 |
| | ) | |
| | ) | May 12, 2009 |
| | ) | 10:03 A.M. |

EXCERPT FROM
TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE KEVIN J. CAREY
UNITED STATES CHIEF BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:            Cole Schotz Meisel, Forman
                            & Leonard, P.A.
                            By:  NORMAN PERNICK, ESQ.
                            1000 N. West Street, Suite 1200
                            Wilmington, Delaware 19801

                            Sidley Austin LLP
                            By:  JONATHAN LOTSOFF, ESQ.
                                 BRIAN GOLD, ESQ.
                                 KEVIN LANTRY, ESQ.
                            One South Dearborn
                            Chicago, Illinois 60603


ECRO:                       AL LUGANO

TRANSCRIPTION SERVICE:      TRANSCRIPTS PLUS, INC.
                            435 Riverview Circle
                            New Hope, Pennsylvania 18938
                            Telephone:  215-862-1115
                            Facsimile: 215-862-6639
                            e-mail CourtTranscripts@aol.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

APPEARANCES:
(Continued)

For Greatbanc:                      Womble Carlyle Sandridge & Rice, PLLC
                                    By: THOMAS M. HORAN, ESQ.
                                    222 Delaware Avenue, Suite 1501
                                    Wilmington, Delaware 19801

For Creditors'                      Landis Rath & Cobb LLP
Committee:                          By:  MATTHEW MCGUIRE, ESQ.
                                    919 Market Street, Suite 1800
                                    Wilmington, Delaware 19801

                                    Chadbourne & Parke LLP
                                    By:  DAVID LeMAY, ESQ.
                                    30 Rockefeller Plaza
                                    New York, New York 10112

The U.S. Trustee:                   United States Department of Justice
                                    Office of the U.S. Trustee
                                    By:  JOSEPH J. McMAHON, JR., ESQ.
                                    844 King Street
                                    Wilmington, Delaware 19899

For C.W.:                           Morris Nichols Arsht & Tunnell, LLP
                                    By:  DEREK ABBOTT, ESQ.
                                    1201 North Market Street
                                    P.O. Box 1347
                                    Wilmington, Delaware 19899-1347

                                    Glickfield, Fields & Jacobson LLP
                                    By:  LARRY JACOBSON, ESQ.
                                    9401 Wilshire Boulevard, Suite 525
                                    Beverly Hills, California 90212-4186

TELEPHONIC APPEARANCES:

For the Debtor:                     Sidley Austin, LLP
                                    By:  CANDICE KLINE, ESQ.

3

TELEPHONIC APPEARANCES:
(Continued)

For JPMorgan as                Davis Polk & Wardell
Administrative Agent:          By:  DAMIAN SCHAIBLE, ESQ

For Kramer Levin               Kramer Levin Naftalis & Frankel
Naftalis & Frankel:            By:  JENNIFER SHARRET, ESQ.

4

# I N D E X

| WITNESSES FOR THE DEBTORS: | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| CHANDLER BIGELOW | | | | | |
| By Mr. Lotsoff | 17 | | | | |
| By Mr. McMahon | | 30 | | | |
| | | | | | |
| CHANDLER BIGELOW | | | | | |
| By Mr. Lotsoff | 59 | | | | |

| EXHIBITS: | Marked | Received |
|---|---|---|
| A    2008 proposed payouts under the MIP | 20 | 21 |

9

1          THE COURT:  With respect to the motion at Number 5,

2   to make payments according to prepetition incentive plans, it

3   may be really -- it may be the first time that it really is an

4   ordinary course thing and doesn't fall under the 503(c)(3)

5   standard.

6          However, I am interested to see how the evidence

7   addresses the U.S. Trustee's objection about -- well, I'll just

8   leave it at that.

9          With respect to Number 7, the motion to authorize

10  severance pay, I will tell you I think the U.S. Trustee has

11  made a fair objection with respect to whether the necessity of

12  payment doctrine warrants these payments.

13         Now, with respect to the union workers, I guess some

14  argument could be made that because CBA hasn't been assumed to

15  reject it, that the debtor wishes to continue its performance.

16  I guess in addition to that argument, as a practical matter,

17  the number is negligible in terms of the company's overall

18  finances.

19         But with respect to the other employees, I look to

20  see whether the debtor can establish some causal connection

21  between having to make those payments and affect on present

22  employee morale.

23         I will tell you one thought I had about that, again,

24  subject to what the evidence shows.  It's that a better

25  approach might be to reserve those funds for payment under

1  know, keeping our key employees motivated.

2        MR. McMAHON:  Your Honor, I don't have any further

3  questions.

4        THE COURT:  Any redirect?

5        MR. LOTSOFF:  No, Your Honor.  Thank you.

6        THE COURT:  Thank you, sir.  You may step down.

7        MR. BIGELOW:  Thank you.

8        MR. LOTSOFF:  Your Honor, if I may, we have a short

9  proffer of testimony from a Mercer representative.  I estimate

10  it won't take more than five minutes.

11        THE COURT:  Go ahead.

12        MR. LOTSOFF:  If called as a witness, John Dempsey

13  would testify as follows:

14        Dempsey is a principal with Mercer U.S., Inc.  He has

15  been a principal with Mercer for the past nine years.

16        Mercer is a worldwide professional services firm that

17  provides clients with a broad range of human resources,

18  consulting, and outsourcing services.

19        One of Mercer's core service offerings is providing

20  compensation consulting, including the analysis, design and

21  implementation of a broad range of compensation and benefits

22  programs, including incentive compensation programs.

23        Mr. Dempsey has over 20 years of experience in this

24  field, including designing and analyzing incentive programs,

25  and other compensation, and benefits programs to determine

1  whether they are reasonable and competitively market based.

2          Mr. Dempsey also has substantial experience in

3  performing such services for companies undergoing Chapter 11

4  bankruptcy proceedings.

5          He's done so for approximately 10 companies over the

6  past eight years, as well as for other companies that were

7  preparing for possible bankruptcy filings.

8          Tribune Company, under the leadership of the

9  Compensation Committee of its Board of Directors retained

10 Mercer to provide an independent review and analysis of the

11 proposed 2008 MIP payouts that we're here for today.  Mr.

12 Dempsey led this analysis and review, and in doing so, Mercer

13 benchmarked the company's proposed payouts against practices,

14 both for peer companies in the media industry, and that would

15 be both publishing and broadcasting and entertainment, as well

16 as companies in Chapter 11 proceedings.

17         Mercer's analysis and conclusions are set forth in a

18 report dated April 17, 2009, which was submitted in support of

19 the company's motion.

20         On behalf of Mercer, Mr. Dempsey concluded that the

21 requested 2008 awards are within reasonable market ranges, and

22 are a common form of compensation, both for companies in the

23 company's industry, and for companies in Chapter 11 in order to

24 incentivize and motivate performance.

25         Mr. Dempsey also concluded that the proposed MIP

1  payments are reasonable in size.  As you've heard, the median

2  award is approximately $9,500.  84 percent of the individual

3  awards are under $30,000, and over 70 percent of the awards are

4  below $20,000.

5          Mr. Dempsey also determined, as you've heard, that

6  the participants will remain undercompensated relative to the

7  market, even with the requested payments.  But will be even

8  more profoundly undercompensated without them.  Specifically,

9  and this is at Page 8 of Mercer's report, "Due to the lack of

10 any long-term incentives, the participants' total compensation

11 will be 41 percent below the market median even with the

12 proposed payouts that we're seeking here today.  And absent

13 those payments, the total compensation of the participants

14 would fall 53 percent below the market median."

15         The proposed MIP payouts are also consistent with

16 industry practice of 2008.  As indicated on the last page of

17 Mercer's report, eight of nine media companies that had

18 released proxies as of mid-April paid bonuses to named

19 executive officers ranging from 20 percent to 100 percent of

20 target.  And it's typical that if bonuses are paid to named

21 executive officers, they are also paid to others further down

22 in the organization.

23         Since that time, a ninth media company, C.C. Media

24 Holdings, has also announced payments of cash incentive

25 bonuses.

43

1          Tribune Company's proposed payout percentage for the

2  2008 MIP payments is squarely within this reasonable market

3  range.

4          THE COURT:  Does anyone wish to examine Mr. Dempsey?

5                  (No audible response heard)

6          THE COURT:  I hear no response.  Does the debtor have

7  anything further in support of its motion under Number 5 of the

8  agenda?

9          MR. GOLD:  Your Honor, we have no further testimony

10 on Number 5.

11         In the interest of time, I didn't know if Your Honor

12 wanted to entertain any closing remarks with respect to that

13 issue, or move on to the severance, understanding your

14 calendar?

15         THE COURT:  How do you intend to address the

16 severance motion?

17         MR. GOLD:  I'm sorry, Your Honor?

18         THE COURT:  How do you intend to address the

19 severance motion from an evidentiary --

20         MR. GOLD:  Our intent was to present additional short

21 testimony of Mr. Bigelow, probably about 10 minutes, Your

22 Honor, that would be a guess, without adding whatever cross

23 examination may add to that.

24         THE COURT:  I'm going to ask you to come back at 2

25 o'clock for that motion.

52

1 | lights on/lights out issue.

2 | And I don't think that the debtors have met their

3 | burden insofar as demonstrating that these payments are

4 | essential, critical, necessary to keeping the Tribune operating

5 | in good performance.

6 | Thank you.

7 | THE COURT:  Thank you.  I'm prepared to make my

8 | ruling.  I'm going to grant the relief that's been requested,

9 | and I will explain why.

10 | I do agree with the debtor, it doesn't matter what

11 | standard I apply, whether it's a business judgment standard,

12 | it's a 503(c)(3) standard, which is business judgment plus.  In

13 | my view, I don't believe this is subject to the doctrine of

14 | necessity.

15 | While it is a payment based upon prepetition

16 | performance, I don't view it as a payment of a prepetition

17 | debt.  It is a payment that the company has proposed to make

18 | now, yes, with respect to past performance, but to which it

19 | believes the covered employees are presently entitled.

20 | The record here amply supports the award of this

21 | relief, the grant of this relief.  The plan is consistent with

22 | the company's historical practices.  It's not unreasonable in

23 | any respect.  Indeed, the record clearly indicates that it's

24 | below market.  You look at the industry, and considering the

25 | debtors' place in the industry in which it's trying to survive

1  and transform itself in what are truly extraordinary times, and

2  you compare that to what's proposed to be paid in relation to

3  its revenue.   The major creditor constituencies are supportive,

4  others have not objected.

5          And when I say this, I'm careful to inform the U.S.

6  Trustee, and while nobody else said it, the fact that the only

7  objecting party has no economic skin in the game is not

8  relevant to me.   I appreciate the U.S. Trustee's role in this

9  and other matters.   But it doesn't mean it's not important that

10  the major creditor constituencies are supportive, and here they

11  are.

12          Mr. McMahon, I will tell you, and you appear enough

13  in front of me that you know I seldom editorialize from the

14  bench.   I find that as a judge it's generally an unwise thing

15  to do, but I'm going to do so now, and I'll explain why.

16          When Congress passed BAPCPA and included the new

17  provisions of 503, it was in response to what were perceived

18  abuses by debtors in possession in paying bonuses to managers,

19  particularly top managers.

20          Despite what others may say or think, courts,

21  including this one, have made every effort to be true to the

22  congressional intent in applying the new provision.   And as I

23  said before, I appreciate specifically the U.S. Trustee's role

24  and involvement in requests for relief for bonus and incentive

25  plans.   Because often when all of the other constituents come

54

1  into court holding hands, the U.S. Trustee is the only voice to
2  point out weaknesses or flaws in what's being requested.

3          But I have to tell you, unless the U.S. Trustee was
4  surprised by the record that was made here today, I have to
5  tell you I think your office made a very poor choice in
6  objecting to this plan.  Your cross examination, I think,
7  helped the debtor immeasurably.  And that's not a criticism of
8  the quality of the direct exam.

9          I just -- I'm really baffled, truly, at why the U.S.
10 Trustee would pick this plan to object to.  This is one of the
11 strongest records I've yet had in support of a bonus plan.

12         But maybe in some respect, it's not unlike any other
13 matter in the Bankruptcy Court.  Everyone is entitled to have
14 their say, and the Court is grateful that that's how the
15 process works usually.  I just ask that the U.S. Trustee
16 exercise better judgment in the future with respect to such
17 plans.  I just have this feeling that you find yourself in a
18 box and just keep looking at the same things and fail to
19 recognize the circumstances in which we now find ourselves in
20 the world today.

21         I've been reminded by your office that standards
22 don't change.  No, they don't, unless Congress tells us to
23 change them.  But circumstances change.

24         All right.  I'm finished.  At this point, we'll take
25 a recess.  I have other matters to take up.  We'll consider the

55

1  remaining motion at 2 o'clock today, or as close as we can get

2  to it based upon my calendar.

3          Court will stand in recess.  I'll consider a form of

4  order for this motion at that time.

5          (Recess 11:18 A.M./Reconvene 2:05 P.M.)

6          THE COURT:  Good afternoon.

7          MR. GOLD:  Good afternoon, Your Honor.  Brian Gold on

8  behalf of the debtors for Tribune.

9          Your Honor, first of all, thank you for accommodating

10 us on your schedule this afternoon.  I appreciate it very much.

11         Just to continue with the severance motion.  What I'd

12 first ask Your Honor is if we could hear from Mr. LeMay briefly

13 for a minute or two to express the creditor constituency

14 support of this motion.  And then we'll go right into direct

15 testimony again of Mr. Bigelow.

16         THE COURT:  Very well.

17         MR. GOLD:  Thank you.

18         MR. LeMAY:  Thank you, Your Honor.  David LeMay for

19 the Official Committee of Unsecured Creditors.

20         Much of the Committee's thinking behind the severance

21 motion is quite similar to the thinking that went into the

22 motion concerning the 2008 MIP.  And we can all agree that

23 perhaps some of the legal positions or principles are a little

24 bit different, and different issues come into play.

25         I wanted to talk a little bit about the Committee's

75

1        MULTIPLE SPEAKERS:   Thank you, Judge.

2        (Whereupon, at 2:35 P.M. the hearing was adjourned.)

3

4                        CERTIFICATE

5

6     I certify that the foregoing is a correct transcript from

7   the electronic sound recording of the proceedings in the

8   above-entitled matter.

9

10

11   /s/ Karen Hartmann    AAERT CET**D0475    Date:  May 13, 2009

12   TRANSCRIPTS PLUS, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25