# EXHIBIT H

## Excerpts of Transcript of September 25, 2009 Hearing

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy Action |
| TRIBUNE COMPANY, et al., | ) | |
| Debtors, | ) | Chapter 11<br>Wilmington, DE<br>September 25, 2009 |

EXCERPT FROM
TRANSCRIPT OF HEARING
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:

JONATHAN LOTSOFF, ESQUIRE
BRIAN GOLD, ESQUIRE
Sidley, Austin, LLP
One South Dearborn Street
Chicago, Illinois 60603

NORMAN PERNICK, ESQUIRE
Cole, Schotz, Meisel, Forman & Leonard, P.A.
500 Delaware Avenue
Wilmington, Delaware 19801

Audio Operator: Sherry Stiles

Transcribed by:

DIANA DOMAN TRANSCRIBING
P.O. Box 129
Gibbsboro, New Jersey 08026-129
PHONE: (856)435-7172
FAX: (856) 435-7124
Email: Dianadoman@comcast.ne

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

(Appearances Continued)

| | |
|---|---|
| For Creditors Committee: | DAVID LeMAY, ESQUIRE<br>Chadbourne & Parke, LLP<br>30 Rockefeller Plaza<br>New York, New York 10112 |
| For U.S. Trustee: | JOSEPH J. McMAHON, JR., ESQUIRE<br>Office of the U.S. Trustee<br>844 King Street<br>Wilmington, Delaware |
| For Guild: | CHRISTOPHER SIMON, ESQUIRE<br>MICHAEL JOYCE, ESQUIRE<br>Cross & Simon<br>913 North Market Street<br>Wilmington, Delaware 19801 |
| For Dow Jones: | JOEL FRIEDLANDER, ESQUIRE<br>Bouchard, Margules & Friedlander<br>222 Delaware Avenue<br>Wilmington, Delaware |

always included in the motions that come before the Court. And for that reason, it's hard to do a consistent analysis, and so we did not include -- we did not include them. And where it was disclosed, we did make an effort to separate out the short term incentive from the special compensation.

Q And so in some instances, is information regarding ordinary course programs even available?

A It isn't always available, that's correct.

Q Having gone through this process, and I'll ask you some more questions about specific aspects of your report in a moment, but having gone through this process, what were your overall conclusions with respect to the debtors' proposed incentive plan?

A My conclusion is that the program will offer a market competitive compensation, and that it does provide an incentive to generate strong operating cash flows in 2009. And that it's appropriate and in the circumstances for the company.

Q And there are various payout levels under these proposed plans. Did you reach any conclusions with respect to whether the proposed plan is or is not market at each of those various payout levels --

A Yes, I did.

Q -- depending on performance?

A Yes, I did.

Q And what was that conclusion?

A That it, in each case, in the aggregate, the programs are at or below the market median relative to the benchmarks.

Q And did you also reach a conclusion as to whether or not these plans, and in particular the TMIP and the KOB are appropriate plans for a company in Chapter 11?

A Yes, I did.

Q And what was your conclusion?

A That they are appropriate.

Q All of these plans use cash flow as a core performance metric. Is that a common performance metric in incentive plans in your experience?

A Yes, it is. The operating cash flow is another name for EBITDAR or Earnings Before Interest, Taxes, Depreciation, Amortization and Restructuring costs. And so that is the most common metric for incentive plans in this environment. And so absolutely.

Q Your report speaks of total direct compensation and total cash compensation. Can you briefly explain what those terms mean?

A So in the -- in a typical package you have a salary. Then you have the total -- then you have an annual incentive, the sum of the salary and the annual incentive is the total cash compensation. Then there's this long term incentive element, and then as we add the expected value of that to the cash compensation, we get what we call total direct compensation.

Q Mr. Bigelow testified that the company does not currently have any equity value to grant, as it historically has done. What does that mean in terms of the management team's total direct compensation without the proposed plan?

A Well, without any sort of equity compensation, the total direct compensation will be far below the market, the prevailing market or at levels.

Q And could you look at page 14 of your report.

A Okay.

Q And this page is entitled "impact on TDC at plan". Can you tell us what this page of your report shows?

A This page shows that the market competitiveness of the compensation for the top ten without -- with and without the CEO and also with other key executives who are the participants in the TMIP and KOB, compares in aggregate to the market.

Q So, taking for example the line, top ten without CEO, and because the CEO doesn't participate in this plan, I'll have you walk through that line, but could you take us just across that row and explain those figures and what they signify?

A Certainly. So you have the sum of the salaries for the top ten without the CEO, and then the column market index which shows 40 percent. That is their pay relative to total direct compensation if they receive only base salary. So, if there were no MIP, no TMIP, no KOB, we did nothing, people would be paid 40 cents on the dollar relative to the market median.

everything even harder during difficult economic times than they do in better times when you know, it's easier to have the earnings roll in.

And so, it's important to offer the carrot and keep people focused on the right things and moving forward. And so, I think that it's desirable that -- and a very good thing that Tribune is putting forward incentive plans for this year.

Q And if you look at the ten companies on the peer group that you used, are a majority of them still to your knowledge offering incentive plans for 2009 --

A Yes.

Q -- they have not thrown in the towel?

A That's correct.

Q For informational purposes, did you rerun your benchmarking using the actual figures that the Guild, and in particular, Mr. Phillips, suggested should have been used in his report for certain of the peer group companies?

A Yes, I did.

Q And did that rerunning of the benchmarking, using those figures proposed by the Guild, did that change the competitiveness of these programs at any payout level?

A The program --

MR. SIMON: Your Honor, I'm going to object to this. We haven't seen any supplemental report or calculation or anything from the debtors on this point. We've worked with the

MR. LOTSOFF: You know, with respect to some of the Guild's points, in considering your decision, its attacks on Mercer's methodology as flawed, I think the evidence shows that those attacks are off base, and that Mr. Phillips is not a compensation expert.

We believe that the Guild's claim that this plan is a retention plan is also simply wrong. All of the components of the plan are directly tied to a central performance metric which is the generation of operating cash flow, and the payment provision of this plan which again is intended to incentivize emergence, and you heard the benefits of that from Mr. Bigelow, was also --

THE COURT: Well, let me just put that one to rest.

Every bonus plan, virtually every bonus plan has some element of retention in it. I have routinely held that unless a plan is demonstrated to be primarily for the purpose of retention, it doesn't fit within the 503(c)(1) rubric. And I don't see the evidence here supporting that view either.

I mean, largely, as I understand the debtors' goal, it's to reward those who are most responsible for, to put it plainly, strapping the company on its back and pulling it through these times.

MR. LOTSOFF: We appreciate that, Your Honor.

The Guild also argues that the targets in the plan are lay-ups in essence because the debtors have had the good

CERTIFICATION

We, Josette M. Jones and Sandra Carbonaro, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

[signature]
JOSETTE M. JONES

[signature]
SANDRA CARBONARO

Doman Transcribing & Recording Svcs. 10/07/09
AGENCY DATE