# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) ) ) | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | ) ) ) | Case No. 08-13141 (KJC) |
|  | ) ) | Jointly Administered |
| Debtors. | ) ) ) ) ) | **Related to Docket No. 4632**<br>**Hearing Date:  May 28, 2010 at 10:00 a.m.** |

## WELLS FARGO BANK N.A.'S SUPPLEMENTAL OBJECTION TO THE DEBTORS' MODIFIED PROPOSED DISCLOSURE STATEMENT FOR PROPOSED AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268).  The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

Wells Fargo Bank, N.A., as successor administrative agent and not individually (in such capacity, the "Bridge Agent") under that certain $1.6 billion Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007, by and among Tribune Company ("Tribune" and, collectively with its affiliated debtors and debtors in possession, the "Debtors"), each lender from time to time party thereto (the "Bridge Lenders") and the other named parties thereto, hereby files this objection (the "Objection") to the latest modified Proposed Disclosure Statement for Proposed Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries dated May 27, 2010 (the "Current Disclosure Statement").  [Docket No. 4632]. Capitalized terms used herein but not defined shall have the meanings set forth in the Current Disclosure Statement.  The Bridge Agent respectfully represents as follows:

## PRELIMINARY STATEMENT

1. Notwithstanding painstaking discussions with Debtors' counsel that have been ongoing since Monday, May 24, 2010, when the Debtors' filed amended versions of their plan and disclosure statement, the parties have been unable to reach agreement regarding a threshold issue: the description of the treatment of the Bridge Lenders' Claims.  Based on a quick review of the most recently revised versions of the plan (the "Current Plan") and the Current Disclosure Statement, which were filed at about 4:00 p.m. today (Thursday, May 27, 2010), the Bridge Agent has a number of serious concerns about the discussion of the treatment of the Bridge Lenders' claims:

   (a) The treatment set forth in the Current Plan--whatever the Debtors determine to propose that meets the requirements of 1129(b)--is beyond ambiguous, it is essentially meaningless;

NEWYORK 7668273 (2K)
WM1A 954975v1 05/27/10

    (b)    The discussion of the treatment in the Current Disclosure Statement is inconsistent with the treatment set forth in the Current Plan, and by the Debtors' admission, is not binding on anyone; and

    (c)    The Current Plan and Disclosure Statement are misleading regarding the preservation of the Bridge Lenders' rights against non-Debtor third parties:

- On the one hand, both documents purport to say that rights and remedies against non-Debtors are only waived and released if a creditor affirmatively agrees to do so by checking the appropriate box on the Ballot.

- On the other hand, the Current Plan and Current Disclosure Statement both appear to provide that confirmation (regardless of which box the Bridge Lenders check) strips away the Bridge Lenders' rights vis à vis the Senior Lenders to (i) dispute the enforceability of the subordination provisions in the Subsidiary Guarantees, (ii) equitably subordinate the Senior Lenders claims under section 510(c) of the Bankruptcy Code, and (iii) pursue their state law rights and remedies to recover their deficiency against the Senior Lenders (and any other non-Debtor who may have liability).

    2.    Repeated requests to cure these defects and deficiencies have been ignored by the Debtors, necessitating the filing of this objection. Unless and until they are properly resolved, the Current Disclosure Statement should not be approved.

NEWYORK 7668273 (2K)
WM1A 954975v1 05/27/10

## BACKGROUND

3.     **The First Version of the Disclosure Statement and Plan.**  On April 12, 2010, the Debtors filed a Disclosure Statement (the "First Disclosure Statement") and a Joint Plan of Reorganization For Tribune Company and Its Subsidiaries (the "First Plan"). [Docket No. 4008]. The First Plan, among other things, classified the Bridge Lenders' claims with the Claims of the Senior Lenders, and provided the Bridge Lenders with 0.44% recovery on their allowed claims against Tribune.

4.     On May 13, 2010, the Bridge Agent filed an objection to the First Disclosure Statement arguing, among other things, that the First Disclosure Statement lacked any meaningful information that would enable creditors to determine if the Settlement was reasonable. [Docket No. 4382]. The Bridge Agent also questioned whether there was a basis for classifying the Bridge Lenders' claims with the Claims of the Senior Lenders other than to gerrymander acceptance of a flawed plan.

5.     **The Second Version of the Disclosure Statement and Plan.**  On May 19, 2010, one day before the Disclosure Statement hearing scheduled for May 20, 2010 (the "Disclosure Statement Hearing"), the Debtors filed a new Disclosure Statement (the "Second Disclosure Statement") and an Amended Joint Plan of Reorganization For Tribune Company and Its Subsidiaries (the "Second Plan"). [Docket No. 4472]. Among other things, the Second Plan separately classified the Claims of the Bridge Lenders (Class 1D), and provided that Bridge Lenders that vote to accept the Second Plan would continue to receive the same 0.44% distribution at Tribune as under the First Plan. However, the Second Plan provided for different treatment (the "Cram Down Treatment") for any Claims held by Bridge Lenders who vote to

4

reject the Second Plan if the Bridge Lender Class votes to reject the Second Plan. Specifically, the Second Plan provided that:

> If Class 1D votes to reject the Plan, the following treatment shall apply to each Holder of a Bridge Loan Claim that votes to reject the Plan:
>
> Each such Holder of a Bridge Loan Claim shall (A) have its Claim treated as a Disputed Claim until Allowed by Final Order, and (B) in full satisfaction, settlement, release and discharge of and in exchange for such Bridge Loan Claim against Tribune, subject to Section 5.4.2 herein, receive, if ultimately Allowed, such distribution and treatment as may be proposed by the Debtors that would satisfy the requirements of section 1129(b) of the Bankruptcy Code not to exceed an amount determined by application of the mid-point estimate of total "Distributable Value" as defined and set forth in the Disclosure Statement and the allocation of such "Distributable Value" underlying the recoveries of Holders of Claims against Tribune under this Plan if such Bridge Loan Claims becomes Allowed. Second Plan at 27.

The Second Disclosure Statement provided the following description of the Cram Down Treatment:

> If Class 1D votes to reject the Plan, the following treatment shall apply to each Holder of a Bridge Loan Clam that votes to reject the Plan: 0% through a % recovery not to exceed an amount determined by application of the mid-point estimate of total "Distributable Value" as defined and set forth herein and the allocation of such "Distributable Value" underlying the recoveries of Holders of Claims against Tribune under the Plan if such Bridge Loan Claims becomes Allowed. Second Disclosure Statement at 12.

6. At the Disclosure Statement Hearing, the Bridge Agent complained that the Cram Down Treatment was incomprehensible as drafted in the Second Disclosure Statement and Second Plan. In response, the Debtors agreed to clarify the Cram Down Treatment in the next iteration of the Debtors' disclosure statement and plan.

7. **The Third Version of the Disclosure Statement and Plan.** On May 24, 2010, the Debtors filed a yet another iteration of the Disclosure Statement (the "Third Disclosure Statement") and of the Proposed Amended Joint Plan of Reorganization for Tribune Company

5

and Its Subsidiaries (the "Third Plan").  [Docket No. 4598].  Among other things, the Debtors again modified the proposed Cram Down Treatment, this time to provide as follows:

> If Class 1D votes to reject the Plan, the following treatment shall apply to each Holder of a Bridge Loan Claim that votes to reject the Plan or does not return a Ballot on the Plan:
>
> Each such Holder of a Bridge Loan Claim shall (A) have its Claim treated as a Disputed Claim unless and until Allowed by Final Order, and (B) in full satisfaction, settlement, release and discharge of and in exchange for such Bridge Loan Claim against Tribune, subject to Section 5.4.2 herein, receive, if ultimately Allowed, such distribution and treatment as may be proposed by the Debtors that would satisfy the requirements of section 1129(b) of the Bankruptcy Code not to exceed an amount determined by application of the mid-point estimate of total "Distributable Value" as defined and set forth in the Disclosure Statement and the allocation of such "Distributable Value" underlying to the recoveries of Holders of Allowed Claims against Tribune under this Plan if such Bridge Loan Claims becomes Allowed.  Second, other than Holders of Claims that are direct or indirect subsidiaries of Tribune, under the Plan.  Third Plan at 27.[2]

The Third Disclosure Statement provided the following description of the Cram Down Treatment:

> If Class 1D votes to reject the Plan, the following treatment recovery percentage shall apply to each Holder of a Bridge Loan Clam Claim that votes to reject the Plan: 0% through a % recovery not to exceed an amount determined by or does not return a Ballot on the Plan: **between 0% and 4.6%**.  The Holder in such event may receive no recovery because in the event Class 1D votes to reject the Plan, the Claims of any rejecting or non-voting Holders shall be treated as "Disputed Claims" under the Plan.  As Holders of Disputed Claims, such rejecting or non-voting Holders will not be entitled to receive any recovery on the Effective Date of the Plan and will likely be subject to protracted litigation commenced by a representative of the Estates seeking the disallowance of their Claims.  If, however, such Bridge Loan Claims are ultimately Allowed in full, each Holder's recovery percentage on account of such claims could be as much as 4.6%, which is based upon application of the mid-point estimate of total "Distributable Value" as defined and set forth herein and the allocation of such "Distributable Value" underlying the recoveries of Holders of Claims against Tribune under the Plan if such Bridge Loan Claims becomes Allowed.  Second. Third Disclosure Statement at 12.[3]

---

[2] Blackline reflects changes from the Second Plan.
[3] Blackline reflects changes from the Second Disclosure Statement.

NEWYORK 7668273 (2K)
WM1A 954975v1 05/27/10

8. The Bridge Agent complained to the Debtors that the proposed revised Cram Down Treatment and description thereof in the Third Plan and Third Disclosure Statement was incomprehensible, and engaged in good faith discussion with the Debtors on consensual clarifying modifications.

9. **The Fourth Version of the Disclosure Statement and Plan.** The Debtors then filed, in the afternoon of May 27, 2010, the Current Disclosure Statement and a blackline showing changes in the fourth iteration of their plan. (There also were several iterations circulated between the filing of the third and fourth versions.) The Current Plan <u>once again</u> modifies the Cram Down Treatment, this time providing as follows:

> If Class 1D votes to reject the Plan, the following treatment shall apply ~~to each Holder of a Bridge Loan Claim that votes to reject the Plan or does not return a Ballot on the Plan~~:
>
> ~~Each such~~<u>A. Subject to Section 3.2.4(b)(ii)(B) herein, each</u> Holder of a Bridge Loan Claim shall (~~A~~<u>1</u>) have its Claim treated as a Disputed Claim unless and until Allowed by Final Order, and ~~(B~~<u>, without limitation, all rights of the Debtors and their Estates with respect to avoidance and setoff shall be preserved, and (2</u>) in full satisfaction, settlement, release and discharge of and in exchange for such Bridge Loan Claim against Tribune, subject to <u>Section 5.4.2</u> herein, receive, if ultimately Allowed, <u>such distribution and treatment in Cash as may be proposed by the Debtors</u> that would satisfy the requirements of section 1129(b) of the Bankruptcy Code ~~not to exceed an amount determined by application of the mid-point estimate of total "Distributable Value" as defined in the Disclosure Statement and the allocation of such Distributable Value to the recoveries of Holders of Allowed Claims against Tribune, other than Holders of Claims that are direct or indirect subsidiaries of Tribune, under the Plan.~~[4] Current Plan at 27 (emphasis added).[5]

The Current Disclosure Statement now describes the Cram Down Treatment as follows:

---

[4] Even if the Bridge Lender Class rejects the Current Plan, Bridge Lenders may elect to receive the consensual plan treatment which would have been provided to them had the Current Plan been accepted (0.44% of Distributable Value calculated as each Holder's Pro Rata share, calculated together with the Holders of Allowed Claims in Class 1C, of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation). Current Plan at 27.

[5] Blackline reflects changes from the Third Plan. Page references to the Current Disclosure Statement and Current Plan correspond to those in the Black Line Proposed Revisions to the Current Disclosure Statement and the Current Plan, filed with the Court. [Docket No. 4632].

7

>       If Class 1D votes to reject the Plan, ~~the following recovery percentage shall apply to each Holder of a Bridge Loan Claim that votes to reject the Plan or does not return a Ballot on the Plan: **between 0% and 4.6%**. The Holder in such event may receive no recovery because in the event Class 1D votes to reject~~ <u>subject to Section 3.2.4(b)(ii)(B) of</u> the Plan, the Claims of any ~~rejecting or non-voting~~ Holders <u>who do not elect and are not deemed to elect to receive the treatment set forth in Section 3.2.4(b)(ii)(B) of the Plan</u> shall be treated as "Disputed Claims" under the Plan. As Holders of Disputed Claims, such rejecting or non-voting Holders will not be entitled to receive any recovery on the Effective Date of the Plan and will likely be subject to protracted litigation commenced by a representative of the Estates seeking the disallowance of their Claims. If~~,~~ ~~however,~~ such Bridge Loan Claims are ultimately Allowed ~~in full~~, each Holder's recovery percentage on ~~account~~<u>the Allowed amount</u> of such ~~claims could be as much as 4.6%, which is~~<u>Claim will be</u> based upon <u>a determination and application of the distributable value of Tribune at Plan Confirmation and the allocation of such distributable value to the recoveries of Holders of Claims against Tribune under the Plan. The Debtors believe that the recoveries by Bridge Loan Claims determined by this method will not exceed 4.6% of the amount of such Allowed Claim (such 4.6% being determined by the</u> application of the mid-point estimate of total "Distributable Value" <u>of Tribune</u> as defined ~~and set forth~~ herein and the <u>resulting</u> allocation of such "Distributable Value" ~~underlying~~<u>to</u> the recoveries of Holders of Claims against Tribune under the Plan~~. Third~~<u>). The recoveries by Bridge Loan Claims cannot materially exceed such 4.6% of the amount of such Allowed Claims unless the condition to the Plan Effective Date in Section 10.1.1(i) of the Plan is waived.</u>Current Disclosure Statement at 12.[6]

A further and more detailed discussion of the mechanics of the Cram Down Treatment is found on pages 77-79 of the Current Disclosure Statement.

## SUPPLEMENTAL OBJECTION

       10.    The Debtors' proposed treatment of the Bridge Lenders' Claims has been a moving target throughout this process. The latest (fourth) version, changes the description of the Cram Down Treatment from the drafts previously provided, and was filed at approximately 4:00 p.m. on May 27, 2010. In the end, it is still impossible to determine from the Current Plan and Current Disclosure Statement exactly what the Cram Down Treatment will be.

       11.    The Current Plan merely provides that, if the Bridge Lender Class votes to reject the Current Plan, each Bridge Lender who votes to reject the Current Plan shall receive

---

[6] Blackline reflects changes from the Third Disclosure Statement.

"such distribution and treatment in Cash <u>as may be proposed by the Debtors</u> that would satisfy the requirements of section 1129(b) of the Bankruptcy Code."  Current Plan at 27 (emphasis added).  While the Current Disclosure Statement purports to provide more procedural and other detail regarding exactly how the value of the Bridge Lenders' recovery may be determined for purposes of cram down (see Current Disclosure Statement at 77-79), nowhere does it clearly say exactly what treatment the Debtors are actually proposing.  Nor is it binding on anyone; notably, there is nothing to prevent the Debtors (or any other party) from arguing at confirmation that, because no junior stakeholder is receiving a recovery, the requirement of section 1129(b)(2)(B) can be satisfied without making any distribution to the Bridge Lenders.

12.    To cure these problems, the Bridge Agent believes that the Current Plan should simply provide that the Bridge Lenders will receive as Cram Down Treatment on account of their Claims "their Pro Rata share of Tribune's Distributable Value, in Cash", and that the Current Disclosure Statement should then describe how that treatment will be implemented, what the material variables are and what their impact might be.  If some other treatment is contemplated, the Debtors should clearly state what it is.  Absent such modification, the Current Disclosure Statement does not provide adequate information and should not be approved in its most current form.

13.    The Bridge Agent also notes that it has requested that the Debtors insert in the Current Disclosure Statement and Current Plan a full reservation of the Bridge Lenders' rights and arguments in the event of a cram down dispute (<u>e.g.</u>, to contest valuation, allocation of value, etc.), in their description of the Bridge Lenders' Claims on pages 26-27 of the Current Plan (as the Debtors have done for themselves).  This request has been ignored.  Fairness dictates that such a reservation of rights should also be included in both the Current Plan and Current

9

Disclosure Statement, as the Debtors have provided for their own reservation of rights vis à vis the potential cram down of Bridge Lenders' claims.

14. Finally, the Bridge Agent believes that the Bridge Lenders have valuable rights, claims and remedies against non-Debtors. It is unclear, however, if the Current Plan is intended to or will have the effect of eviscerating such rights. These include (i) the right to challenge the enforceability of the subordination of the Bridge Lenders guarantees to the subsidiary guarantees of the Senior Lenders, (ii) the right to seek to equitably subordinate the Claims of the Senior Lenders, and (iii) the right to assert state law rights and remedies against non-Debtor third parties who are not released under the Current Plan. To the extent the Bridge Agent is successful in prosecuting any of these rights or claims, the recovery of the Bridge Lenders would be materially increased. The Current Plan and Current Disclosure Statement are confusing and unclear on this topic. On the one hand, the Debtors purport to say that non-Debtors are not released unless a creditor affirmatively elects to grant such a release. Current Plan at 62; Current Disclosure Statement at 111-112. On the other hand, the treatment of Senior Lenders' Claims and the Bridge Lenders' Claims appears to implement a recovery scheme that is only viable if the Bridge Lenders' rights and remedies vis à vis the Senior Lenders are stripped away. Current Plan at 34-35; Current Disclosure Statement at 14, 83. The Current Disclosure Statement should clearly disclose whether or not the Debtors intend the Current Plan to have such effect regardless of whether Bridge Lenders do not opt into the release.

## DISCLOSURE STATEMENT SUPPLEMENT

15. As discussed at the Disclosure Statement Hearing, the Bridge Agent has prepared a supplement to be distributed with whatever disclosure statement the Court ultimately approves. The form has been painstakingly negotiated in good faith with the Debtors over the

10

last week, and is now, we believe, largely acceptable to the Debtors, subject to a resolution of the proper description of the Cram Down Treatment and related conforming issues.  A copy of the draft supplement in its current form is attached as Exhibit A.

## **CONCLUSION**

16. The Bridge Agent has negotiated with the Debtors in good faith for minor modifications to the Current Disclosure Statement which addresses the foregoing concerns. The Bridge Agent respectfully requests that the Court direct modification of the Current Disclosure Statement and Current Plan to address the objections contained herein.

Dated: May 27, 2010
 Wilmington, Delaware

                              FOX ROTHSCHILD LLP

                              /s/ John H. Strock, Esquire
                              Jeffrey M. Schlerf (No. 3047)
                              Eric M. Sutty (No. 4007)
                              John H. Strock (No. 4965)
                              Citizens Bank Center
                              919 North Market Street, Suite 1600
                              Wilmington Delaware 19801
                              Telephone: (302) 654-7444

                              -and-

                              WHITE & CASE LLP
                              Thomas E Lauria
                              Gerard Uzzi
                              David Hille
                              Andrew Hammond
                              Scott Greissman
                              1155 Avenue of the Americas
                              New York, NY 10036
                              Telephone: (212) 819-8200
                              Facsimile: (212) 819-8113

                              Attorneys for the Bridge Agent