> *Wells Fargo Bank, N.A., as successor administrative agent for the Bridge Lenders and not in its individual capacity (in such capacity, the "Bridge Agent") under the Bridge Loan Agreement, Recommends that all Creditors Vote to Reject the Proposed Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries dated May 19, 2010 (the "Tribune Plan")*[1]

## OVERVIEW

The Tribune Plan is constructed around and largely implements a purported global settlement (the "Settlement") of fraudulent transfer claims and other causes of action (the "LBO Claims") arising from the leveraged buy-out of Tribune in 2007 (the "LBO").

Under the Settlement and the Tribune Plan:

(A) the Bridge Lenders will recover about $7 million on their $1.6 billion of loans, which is a recovery of less than 0.5%;[2]

(B) the other LBO lenders will recover about $5.5 billion on their remaining $8.7 billion of loan claims, which is a recovery of about 63% (not taking into account payment made prior to commencement of the chapter 11 cases); and

(C) the pre-LBO Senior Notes and General Unsecured Claims at Tribune are to receive approximately $500 million on their aggregate claims of about $1.4 billion, which is a recovery of about 35%.

Absent the Settlement and assuming that (a) none of the LBO Claims have merit, (b) the Company's total distributable value is $6.1 billion, and (c) all contractual subordination is enforced, the Bridge Agent believes that:

(A) the Bridge Lenders' recovery would be at least $74 million, which is a recovery of at least 4.6%;

(B) the other LBO lenders' recovery would be about $5.9 billion, which is a recovery of approximately 68%; and

(C) the Senior Notes and General Unsecured Claims would receive about $65 million, which is a recovery of approximately 4.6%.

The Bridge Agent believes that the shifting of recoveries under the Settlement is unfair to the Bridge Lenders, provides improper and undisclosed windfall recoveries to numerous other parties, including the other LBO lenders and the Company's former shareholders, and does not produce a defensible resolution of the underlying issues.

The Bridge Agent believes that, among other things, the Settlement and the Tribune Plan suffer from the following defects: (1) the Settlement Support Agreement was entered into by parties who are not estate fiduciaries and who had no interest in protecting the interests of any party, other than their own; (2) the distributable value of the Debtors' business may have been materially understated; (3) distributable value may have been materially over-allocated to the guarantor-subsidiaries; (4) the financial contribution required to resolve the LBO Claims has been materially over-allocated to Tribune; and (5) the Settlement is not premised on a reasonable construct of how fraudulent transfer avoidance would work (a) at the Tribune and Subsidiary Guarantor levels, respectively; (b) with respect to Step 1 and Step 2 of the LBO (whether collapsed or

---

[1]    Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Tribune Plan.
[2]    [Description of cram down treatment to be inserted once finalized in the plan and disclosure statement.]

addressed separately); or (c) in respect of payments made in connection with the LBO or post-closing LBO-related obligations.

## DISCUSSION

*1.     The Bridge Agent believes that the Disclosure Statement does not provide a meaningful basis to justify creditors' support for the Settlement.*

The Debtors have represented that their professionals and those of the Creditors' Committee have spent millions of dollars of estate funds investigating and analyzing the LBO Claims. Nevertheless, in the Disclosure Statement, the only support for the Settlement are (a) bare, unsubstantiated conclusions that the Settlement is fair and reasonable, and (b) admonitions that the LBO Claims are complex and the defendants will fight them vigorously, making any litigation protracted, time-consuming and expensive.

The Bridge Agent has made numerous requests that the Debtors include information (if it exists) that would tend to support or justify the Settlement and its disproportionate impact on certain creditor constituencies and that would permit creditors to form their own views on an informed basis.  At the May 20 hearing on the Disclosure Statement, the Bankruptcy Court directed the Debtors to include in the Disclosure Statement certain of the additional information requested by the Bridge Agent, and also allowed principal constituents to prepare supplements stating their respective positions on the LBO-Related Causes of Action and the Settlement (which is central to and incorporated into the Plan).

Despite the court-ordered modifications to the Disclosure Statement and the various supplements, the Bridge Agent continues to doubt that an appropriate justification for the Settlement exists, and believes that it is therefore impossible for stakeholders conclude that there is any basis for supporting the Settlement.  Among other things, the Bridge Agent believes the following salient information is missing:

- Benefits realized at the Subsidiary Guarantor and Tribune levels from Step 1 and Step 2 of the LBO.

- Contemporaneous indicia of the solvency, including the reasonableness of capital (i.e., balance sheets; cash flow projections; and a detailed analysis of the variances of the actual financial performance in 2007 and 2008 against the projections), for certain material Guarantor Subsidiaries at Step 1 and Step 2 of the LBO.

- Payments made in connection with the LBO and in respect of obligations incurred thereunder, including (1) identity of each payee (shareholder; lender; advisor; director; management); (2) type of payment (equity; debt; fee; other); (3) amount of payment; and (4) date of payment.

- A discussion of the various potential claims and causes of action that are being resolved in connection with the Settlement which, in the Bridge Agent's view, would provide sufficient basis for differentiation of fraudulent conveyance risk at the Tribune and Subsidiary Guarantor levels.

- A presentation of the range of potential creditor recoveries in connection with differing outcomes of the LBO Claims (including the impact of avoidance and disgorgement), including an explanation of how the range was formulated.

Based on a review of the information made available in the Company database (but not included in the Disclosure Statement) regarding the foregoing matters, the Bridge Agent has been unable to generate a plausible fraudulent transfer scenario that would support a result even remotely similar to that produced by the Settlement.  The Debtors appear to have relied upon the worst case scenarios for the Bridge Lenders with respect to every assumption in the Settlement and Tribune Plan. **Based on available information, however, the Bridge Agent believes that under all plausible scenarios, the recoveries of the Bridge Lenders, the**

**Senior Noteholders, the general unsecured creditors (at Tribune) and the Phones would all be materially higher.**

*2.    The Settlement is the product of negotiations between parties who have material parochial interests at stake that are not aligned with the interests of the Debtors' estates.*

The principal parties to the Settlement and architects thereof are not the Debtors, but rather, include Senior Lenders, who are potential targets of the LBO Claims. Although not disclosed in the Disclosure Statement, these parties are believed to have received substantial payments that, in the absence of the Settlement, may be subject to disgorgement as fraudulent transfers. In addition, they have senior claims at the Subsidiary Guarantor level that naturally motivate them to press for a resolution that would primarily impact recoveries at the Tribune level. For unknown reasons, the Debtors have chosen not to disclose the competing interests of such parties which are furthered by the Settlement, or whether they considered or investigated this issue in adopting the Settlement in the Tribune Plan. These entities may have negotiated and agreed to the Settlement to obtain releases from the estates of such claims.

*3.    The unjustified structure of the Settlement wrongfully strips the Bridge Lenders of their recovery.*

The Tribune Plan allocates most of the Debtors' distributable value to the Subsidiary Guarantors, where the Bridge Lenders' guarantee claims are subordinated to the guarantee claims of the Senior Lenders, while nearly all of the Settlement consideration (approximately $510 million of value) is to be taken from distributions that would be made to creditors of Tribune. As such, the net effect of the Settlement is to strip from the Bridge Lenders almost their entire recovery in the Chapter 11 Cases (the Bridge Lenders receive a 0.44% recovery on their Bridge Loan Claims and no recovery on their Bridge Loan Guaranty Claims), while allowing the Senior Lenders to retain the vast majority of their recovery (the Senior Lenders receive a 0.44% recovery on their Senior Loan Claims and a 62.41% recovery on their Senior Loan Guaranty Claims).

The Bridge Agent believes this allocation scheme (which the Debtors do not explain or attempt to justify in the Disclosure Statement) is improper for, among other things, the following:

- The Settlement appears to be premised on the potential of an unprecedented partial avoidance of the integrated LBO transactions (*e.g.*, avoidance at the Tribune level with no risk of avoidance at the Subsidiary Guarantors), thereby dramatically over-allocating avoidance risk to creditors of Tribune.

- There is no evidence to suggest that the Subsidiary Guarantors were solvent and that transfers made by such entities would not be subject to potential avoidance in connection with the LBO Claims.

- Without explanation, the structure is inconsistent with the general rule that leveraged buy-out events will be collapsed for fraudulent transfer analysis purposes.

*4.    Most of the potential targets of the LBO Claims contribute no value to the Settlement, but nevertheless receive broad releases and/or recoup their legal fees and costs under the Tribune Plan.*

The Bridge Agent is not aware of any precedent for the proposition that lenders' claims can be eliminated through avoidance of a leveraged buy-out transaction without a concomitant right of the estate to recover from those who received the proceeds of or otherwise received payments in connection with such transaction.

*5. It is unclear if the Tribune Plan is intended to limit the Bridge Lenders' Rights against Third Parties.*

The Bridge Agent believes that the Bridge Lenders have valuable rights, claims and remedies against non-Debtors. It is unclear, however, if the Current Plan is intended to or will have the effect of eviscerating such rights. These include (i) the right to challenge the enforceability of the subordination of the Bridge Lenders guarantees to the subsidiary guarantees of the Senior Lenders, (ii) the right to seek to equitably subordinate the

Claims of the Senior Lenders, and (iii) the right to assert state law rights and remedies against non-Debtor third parties who are not released under the Current Plan. To the extent the Bridge Agent is successful in prosecuting any of these rights or claims, the recovery of the Bridge Lenders would be materially increased. The Current Plan and Current Disclosure Statement are confusing and unclear on this topic. On the one hand, in numerous places the Debtors purport to say that non-Debtors are not released unless a creditor affirmatively elects to grant such a release. On the other hand, the treatment of Senior Lenders' Claims and the Bridge Lenders' Claims appears to implement a recovery scheme that is only viable if the Bridge Lenders' rights and remedies vis à vis the Senior Lenders are stripped away. This, opting out of the third party release may have no effect. This is another reason to reject the Plan.

*6. The Tribune Plan is plagued by a number of valuation issues.*

As a threshold matter, the Tribune Plan is premised on an artificially depressed valuation analysis. Further, despite the fact that the Debtors are not seeking substantive consolidation, and that the allocation of value between Tribune, the Subsidiary Guarantors and the non-guarantor subsidiaries materially impacts creditor recoveries under the Tribune Plan, the Debtors have failed to provide (i) a separate valuation for each Debtor entity; and (ii) support for the allocation of value as between Tribune and its subsidiaries.

> *For all of the Foregoing Reasons, the* Bridge *Agent*
> *Urges all Creditors to Vote to Reject the Tribune Plan*