**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| | Jointly Administered |
| Debtors. | |
| | **Related to Docket No. 4650** |

# WELLS FARGO BANK N.A.'S SECOND SUPPLEMENTAL OBJECTION TO (I) THE DEBTORS' FURTHER MODIFIED PROPOSED DISCLOSURE STATEMENT FOR PROPOSED AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES AND (II) THE DEBTORS' REVISED PROPOSED ORDER WITH RESPECT TO MOTION OF THE DEBTORS FOR AN ORDER ESTABLISHING PROCEDURES FOR SOLICITATION

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

1. Wells Fargo Bank, N.A., as successor administrative agent and not in its individual capacity (solely in such capacity, the "Bridge Agent") under that certain $1.6 billion Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007, by and among Tribune Company ("Tribune" and, collectively with its affiliated debtors and debtors in possession, the "Debtors"), each lender from time to time party thereto (the "Bridge Lenders") and the other named parties thereto, hereby files this objection (the "Objection") to the latest modified Proposed Disclosure Statement for Proposed Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries dated June 1, 2010 (the "Current Disclosure Statement"). [Docket No. 4650]. Capitalized terms used herein but not defined shall have the meanings set forth in the Current Disclosure Statement. The Bridge Agent respectfully represents as follows:

**PRELIMINARY STATEMENT**

2. With Tuesday's filing, the Debtors have engaged in yet another wholesale rewrite of the treatment of the Bridge Loan Claims under the fifth iteration of their Joint Plan of Reorganization For Tribune Company and Its Subsidiaries (the "Current Plan") and the discussion thereof in the Current Disclosure Statement. Nevertheless, the documents remain subject to many of the failings complained of by the Bridge Agent with respect to the prior versions – the Debtors continue to fail to clearly specify the Bridge Lenders' treatment under the Current Plan or to provide a cognizable description thereof (including the impact of the Current Plan of the Bridge Lenders' rights against non-Debtors) in the Current Disclosure Statement.

3. In the Current Plan and Current Disclosure Statement, key defined terms have been revised to become more ambiguous; the proposed treatment of the Bridge Loan Claims against Tribune continues to be subject to an unspecified 1129(b) carve-out and, to make matters worse, now includes a confusing and redundant formulation of Pro Rata share;

reservations of rights continue to be one-sided; and the treatment of the Bridge Loan Claims at the subsidiary guarantors continues to implement the sub silentio release of rights and remedies held by the Bridge Lenders vis à vis the Senior Lenders.

4. Putting aside the fact that these flaws raise significant issues regarding the confirmability of the Current Plan, more importantly for present purposes, they are not addressed in the Current Disclosure Statement in an acceptable fashion – one that would permit the Bridge Lenders (or anyone else) to understand the proposed treatment of the Bridge Lenders' Claims while they have the right to vote on the Current Plan. Simply stated, more words do not equate to more disclosure. Indeed, as is discussed below, the Bridge Agent believes that the Debtors could, with fewer words, actually provide materially superior disclosure.

## BACKGROUND

5. On May 28, 2010, the Court held a hearing (the "Supplemental Disclosure Statement Hearing") on the Debtors' fourth iteration of their disclosure statement and plan (the "Fourth Disclosure Statement" and "Fourth Plan", respectively), blacklined versions of which were filed at approximately 4:00 p.m. on May 27, 2010. [Docket No. 4632]. The Fourth Disclosure Statement and Fourth Plan included the latest iterations of the Debtors' proposed treatment of the Bridge Loan Claims which, for reasons the Bridge Agent does not understand, has been an elusive and moving target throughout this process.

6. The Bridge Agent filed on May 27, 2010 a supplemental objection (the "Supplemental Objection") to the Fourth Disclosure Statement arguing, among other things, that the Fourth Plan contained no specified treatment of the Bridge Lenders' Claims (the "Cram Down Treatment") in the event that the Bridge Lender Class votes to reject the Fourth Plan, and

that the discussion of the Cram Down Treatment in the Fourth Disclosure Statement was incomprehensible. [Docket No. 4642].

7. The Bridge Agent also argued that the Fourth Disclosure Statement must disclose whether or not Bridge Lenders that do not "opt in" to the Fourth Plan's non-Debtor third party releases are releasing any of their claims against the Senior Lenders and/or other non-Debtor third parties, including, among other things, to challenge the existing contractual subordination of the subsidiary guarantees, or to equitably subordinate the Senior Lenders' Claims or to pursue other potential state law claims against other third parties. Finally, the Bridge Agent argued that the Fourth Disclosure Statement must disclose that all parties, in addition to the Debtors, reserve their rights to challenge, among other things, the Debtors' enterprise value, the allocation of value between Tribune and the guarantor subsidiaries and the claims pool at Tribune.

## CURRENT PLAN AND CURRENT DISCLOSURE STATEMENT

8. The Court at the Supplemental Disclosure Statement Hearing held that the Debtors were required to again (now for the fifth time) revise their disclosure statement and plan. Hr'g Tr. May 28, 2010, 8:5-7 (sidebar) (Judge Carey: "I need more clarity to the treatment of [the Bridge Lender] class and the plan provision needs to be consistent with the disclosure statement."). On June 1, 2010, the Debtors filed the Current Disclosure Statement and the Current Plan. [Docket No. 4650]. The Current Plan once again modifies the Cram Down Treatment, and now provides as follows:

> If Class 1D votes to reject the Plan, the following treatment shall apply:
>
> A. Subject to Section 3.2.4(b)(ii)(B) herein, each Holder of a Bridge Loan Claim shall (1) have its Claim treated as a Disputed Claim unless and until such Claim is Allowed~~ by Final Order, and without limitation, all rights of the Debtors and their Estates with respect to avoidance and setoff shall be preserved~~, if at all, including determined not to be subject to avoidance, setoff, subordination or other

> defense, by Final Order, and (2) in full satisfaction, settlement, release and discharge of and in exchange for such Bridge Loan Claim against Tribune, ~~subject to Section 5.4.2 herein,~~ receive, if ultimately Allowed by Final Order, ~~such distribution and treatment in Cash as may be proposed by the Debtors that would satisfy~~Cash equal to its Pro Rata share of the distributable value of Tribune as determined by the Bankruptcy Court in connection with confirmation of the Plan, taking into account all Allowed Claims against Tribune and also taking into account all Intercompany Claims against Tribune; provided, however, that if the Bankruptcy Court determines in connection with confirmation of the Plan that a different (including a lesser) treatment is appropriate under the requirements of section 1129(b) of the Bankruptcy Code, then such other treatment shall apply. All rights to object to such Bridge Loan Claims and to seek to subject such Claims to avoidance, setoff, subordination, and other defenses are preserved. Current Plan at 27.[2]

The Current Disclosure Statement now describes the Cram Down Treatment as follows:

> If Class 1D votes to reject the Plan, ~~subject to Section 3.2.4(b)(ii)(B) of the Plan,~~then the Claims of any Holders who do not elect~~and~~, or are not deemed to elect, to receive the treatment set forth in Section 3.2.4(b)(ii)(B) of the Plan shall be treated as "Disputed Claims~~" under the Plan.~~." As Holders of Disputed Claims, such rejecting or non-voting Holders will not be entitled to receive any recovery on the Effective Date of the Plan and will likely be subject to protracted litigation after the Effective Date commenced by a representative of the Estates ~~seeking the disallowance of their Claims. If~~respecting Allowance of their Claims, including litigation respecting whether or not such Claims should be subject to avoidance, setoff, subordination and/or other defenses. If and to the extent such Bridge Loan Claims are ultimately ~~Allowed, each Holder's recovery percentage on the Allowed amount of such Claim will be based upon a determination and application~~determined by a Final Order to be Allowed Claims, then each Holder shall receive Cash on account of its Allowed Claim in an amount equal to its Pro Rata share of the distributable value of Tribune ~~at Plan Confirmation and the allocation of such distributable value to the recoveries of Holders of Claims against Tribune under the Plan. The Debtors believe that the recoveries by Bridge Loan Claims determined by this method will not exceed~~after taking into account all other Allowed Claims and also Intercompany Claims against Tribune (such distributable value being determined by the Bankruptcy Court in connection with confirmation of the Plan); provided, however, that if the Bankruptcy Court determines that a different (including a lesser) treatment is appropriate under section 1129(b) of the Bankruptcy Code, then such other treatment shall apply. The Debtors estimate the recovery by a Holder of a Bridge Loan Claim in the event Class 1D votes to reject the Plan and such Holder does not elect, or is not deemed to elect, the treatment set forth in Section 3.2.4(b)(ii)(B) of the Plan will be between 0% and 4.6% of the amount of such ~~Allowed Claim (such 4.6% being determined by the application of the mid-point estimate of total "Distributable~~

[2] Blackline reflects changes from the Fourth Plan.

> ~~Value" of Tribune as defined herein and the resulting allocation of such "Distributable Value" to the recoveries of Holders of Claims against Tribune under the Plan). The~~Claim. The aggregate recoveries by Bridge Loan Claims cannot materially exceed ~~such~~ 4.6% of the amount of ~~such Allowed~~the Bridge Loan Claims unless the condition to the Plan Effective Date in Section 10.1.1.(i) of the Plan is waived. Current Disclosure Statement at 12.[3]

A further and more detailed discussion of the mechanics of the Cram Down Treatment is found on pages 77-78 of the Current Disclosure Statement.

9. The Debtors have added or rearranged words in the Current Plan and Current Disclosure Statement, but have inexplicably failed, now for the fifth time, to cure the documents' principal defects vis à vis the Bridge Lenders' Claims.

## SECOND SUPPLEMENTAL OBJECTION

### A. The Current Plan Still Fails To Provide Specified Cram Down Treatment of the Bridge Lenders' Claims.

10. The Current Plan's new proposed Cram Down Treatment still lacks the necessary level of specificity because (like prior versions) it continues to provide for the possibility, set forth in Section 3.2.4(b)(ii)(A), that some alternative, undisclosed and unexplained treatment of the Bridge Lenders Claims is possible "if the Bankruptcy Court determines in connection with confirmation of the Plan that a different (including a lesser) treatment is appropriate under the requirements of section 1129(b) of the Bankruptcy Code." Current Plan at 27. On its face, this revised treatment seems to ignore this Court's directive for clarity at the Supplemental Disclosure Statement Hearing. Like the language in the Fourth Plan that the Court refused to accept, a mere reference to Bankruptcy Code 1129(b) is not a treatment. It is a mere recitation of the statutory standard, which could be satisfied in an almost infinite number of ways.

[3] Blackline reflects changes from the Fourth Disclosure Statement.



NEWYORK 7672971 (2K)

11. Moreover, the inclusion in the Current Plan of a new possible Cram Down Treatment is insufficient to cure this omission. Nothing in the Current Plan binds the Debtors to provide such treatment for the Bridge Loan Claims. It is, by the Debtors' own admission, just one possible alternative the Debtors might consider proposing in the event the Bridge Lender Class votes to reject the Current Plan. Again, the Current Plan must specify exactly what treatment Bridge Lenders that vote to reject the Current Plan should expect in the event their class does not accept the Current Plan. Otherwise, they have nothing to vote on.

**B. The Added Potential Cram Down Treatment is Itself Seriously Flawed**

12. Even if including hypothetical, non-binding potential Cram Down Treatment were sufficient, which it is not, such treatment proposed by the Debtors in the Current Plan is fatally deficient.

13. First, while the Bridge Agent understands that the Bridge Loan Claims may be disputed if the Bridge Lender Class rejects the Current Plan, the proposed potential treatment appears, without explanation, to exclude the Bridge Loan Claims from the existing claims allowance procedures set forth in the Current Plan for all other Claims. The Current Plan now provides at Clause (1) of Section 3.2.4(b)(ii)(A) that "each Holder of a Bridge Loan Claim shall . . . have its Claim treated as a Disputed Claim unless and until such Claim is Allowed, if at all, including determined not to be subject to avoidance, setoff, subordination or other defense, by Final Order." Current Plan at 27 (emphasis added). The definition of "Allowed" has also been revised, to add that "[f]or the avoidance of doubt, to the extent a Claim is not Allowed, such Claim is still subject to objection based upon potentially applicable rights of avoidance, setoff, subordination, and any other defenses."[4] Current Plan at 2. The Bridge Agent has no idea what

[4] "Allowed" is now defined in the Current Plan as follows:

the effect of the new language is intended to be or how a Claim could be "Allowed" but still be subject to objection. If the Debtors intend to use a Claims allowance procedure for the rejecting Bridge Lenders which is different from all other Claims, they should state what it is. Otherwise, they should use the defined term "Allowed" in this provision without modifications.

14. Similarly, the hypothetical potential Cram Down Treatment in Clause (2) of Section 3.2.4(b)(ii)(A) now provides that, to the extent the Bridge Loan Claims against Tribune are ultimately Allowed (whatever that now means), a Holder of such Claims will receive a Cash distribution "equal to its Pro Rata share of the distributable value of Tribune as determined by the Bankruptcy Court in connection with confirmation of the Plan, <u>taking into account all Allowed Claims against Tribune and also taking into account all Intercompany Claims against Tribune</u>." Current Plan at 27 (emphasis added).

15. Assuming that the term "Allowed" includes the Senior Lenders' Claims as they are to be allowed under the Current Plan (an assumption upon which no light is shed one

---

> [W]ith respect to a Claim or Interest, or any portion thereof, in any Class or category specified, a Claim or Interest (a) that is evidenced by a Proof of Claim or Interest and is not listed as disputed, contingent or unliquidated on the pertinent Debtor's schedules and as to which no objection or request for estimation has been filed on or before any objection deadline set by the Bankruptcy Court or the expiration of such other applicable period fixed by the Bankruptcy Court, (b) that is listed on the pertinent Debtor's schedules but is not listed as a disputed, contingent or unliquidated, that is not otherwise subject to an objection and as for which no contrary or superseding Proof of Claim or Interest has been filed, (c) as to which any objection has been settled, waived, withdrawn or overruled by a Final Order; or (d) that is expressly allowed (i) by a Final Order, (ii) pursuant to the terms of the Claims Settlement Order, (iii) solely with respect to those Claims that are not pre-petition Claims and are not required under applicable bankruptcy law to be allowed pursuant to an order of the Bankruptcy Court, by an agreement between the Holder of such Claim and the pertinent Debtor or Reorganized Debtor pursuant to an agreement which was approved or otherwise permitted by a Final Order of the Bankruptcy Court or is an ordinary course agreement that, unless *de minimis* in nature, has been provided to and has not been objected to in writing by the Creditors' Committee, or (iv) pursuant to the terms of this Plan. <u>For the avoidance of doubt, to the extent a Claim is not Allowed, such Claim is still subject to objection based upon potentially applicable rights of avoidance, setoff, subordination, and any other defenses</u>. Current Plan at 2 (emphasis added).

Notably, page 12 of the Current Disclosure Statement seems to contemplate that the "Allowance" provided would <u>include</u> "litigation respecting whether or not such Claims should be subject to avoidance, setoff, subordination and/or other defenses." Current Disclosure Statement at 12.

way or the other in the Current Disclosure Statement), it is unclear why such Claims should be included as allowed, rather than as otherwise allowable absent the Settlement. If the goal is to provide the Bridge Lenders with their fair share of any surplus value at Tribune, then there is no reason to include the Senior Lenders' Claims as artificially allowed.

16. In that same vein, the term "Allowed" is also broad enough to include claims (such as the PHONES Notes) that are subordinate to the Bridge Loan Claims. There is no clarification of this in the Current Disclosure Statement, nor is there any explanation of any basis for the inclusion of such Claims.

17. Adding to the confusion, the Current Plan also modifies the definition of "Pro Rata" by adding that "Pro Rata shall also take into account Intercompany Claims against Tribune to the extent determined to be appropriate pursuant to <u>Section 3.2.4(b)(ii)(A)</u> of the Plan."[4] Current Plan at 16. It is unclear why the Debtors would insist on calculating Tribune's distributable value taking into account Claims that are <u>not</u> Allowed, other than as part of an apparently ongoing, improper attempt to confuse and to preserve the ability to dilute the treatment of the Bridge Loan Claims if plan confirmation does not go as they would hope.[5]

---

[4] "Pro Rata" is now defined in the Current Plan as follows:

> "[T]hat proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Interests in such Class except in cases where Pro Rata is used in reference to multiple Classes, in which case Pro Rata means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Interests in such multiple Classes, or in reference to a specific type of Claim, in which case Pro Rata means the proportion that an Allowed Claim of such type bears to the aggregate amount of all Allowed Claims of such type. <u>Pro Rata shall also take into account Intercompany Claims against Tribune to the extent determined to be appropriate pursuant to Section 3.2.4(b)(ii)(A) of the Plan</u>." Current Plan at 16 (emphasis added).

[5] Notably, the Bridge Agent in its originally filed objection [Docket No. 4382] (the "Original Objection"), complained that the Debtors' then current disclosure statement ignored that the Bridge Loan Guarantee Agreement provides for a subordination of Intercompany Claims owned by Tribune to the payment in full of the guarantees under the Bridge Loan Guarantee Agreement. Original Objection at 24, n.16. The Bridge Agent believes that if such subordination is properly taken into account, the distributable value of Tribune available to the Bridge Lenders whose Claims are Allowed would be <u>much higher</u> than the 4.6% mid-point recovery disclosed by the Debtors.

**C. The Current Disclosure Statement description of the Cram Down Treatment is Insufficient.**

18. The description of the Cram Down Treatment in the Current Disclosure Statement continues to be deficient. As stated above, the alternative treatment, "if the Bankruptcy Court determines that a different (including a lesser) treatment is appropriate under Section 1129(b) of the Bankruptcy Code," could be anything, or nothing. Current Disclosure Statement at 77. The Disclosure Statement provides no detail as to what "appropriate under Section 1129(b) of the Bankruptcy Code" means. This must be disclosed.

19. Moreover, the Current Disclosure Statement's description of the treatment of Intercompany Claims is internally inconsistent, as well as inconsistent with the corresponding (and confusing) language in the Current Plan. On the one hand, on page 8 the Current Disclosure Statement provides, consistent with the Current Plan, that each Holder of an Allowed Bridge Loan Claim shall receive "Cash equal to its Pro Rata share of the distributable value of Tribune as determined by the Bankruptcy Court in connection with confirmation of the Plan, taking into account all Allowed Claims against Tribune and also taking into account all Intercompany Claims against Tribune." Current Disclosure Statement at 8. On the other hand, the Current Disclosure Statement elsewhere provides that the value of Intercompany Claims shall be determined by the Bankruptcy Court. See Current Disclosure Statement at 77 ("distributable value, including any allocation of value on account of Intercompany Claims among Tribune and its direct and indirect subsidiaries, would be determined by the Bankruptcy Court in connection with confirmation of the Plan"); see also Current Disclosure Statement at 12 ("such distributable value being determined by the Bankruptcy Court in connection with confirmation of the Plan"). These inconsistent statements regarding treatment of Intercompany Claims must be remedied or explained.

20. Finally, as noted in parts A and B above, the Current Plan process creates massive confusion about the Claims allowance process and distribution calculation for the Bridge Lenders' Claims in the event of a cram down. To the extent the structure is allowed to stand, full disclosure is required.

## D. The Current Plan and Current Disclosure Statement Should Include a Fully Mutual Reservation of Rights, Or None At All.

21. The Debtors continue to ignore the Bridge Agent's repeated requests that the Debtors insert in their disclosure statement and plan a full reservation of the Bridge Lenders' rights and arguments in the event of a cram down dispute (e.g., to contest valuation, allocation of value, etc.), in their description of the Bridge Loan Claims on pages 26-28 of the Current Plan (as the Debtors have done for themselves). Fairness dictates that such a reservation of rights should also be included in both the Current Plan and Current Disclosure Statement, as the Debtors continue to provide for their own reservation of rights vis à vis the potential cram down of Bridge Lenders' Claims. Current Plan at 27; Current Disclosure Statement at 8.

## E. The Extent of the Non-Debtor Releases Should Be Clarified.

22. Finally, the Bridge Agent believes that the Bridge Lenders have valuable rights, claims and remedies against non-Debtors. The Bridge Agent argued in its Supplemental Objection and at the Supplemental Disclosure Statement Hearing that it was unclear if the Fourth Plan was intended to or would have the effect of eviscerating such rights. In the Current Plan the Debtors have done nothing to address these rights. These include (i) the right to challenge the enforceability of the subordination of the Bridge Lenders' guarantees to the subsidiary guarantees of the Senior Lenders, (ii) the right to seek to equitably subordinate the Claims of the Senior Lenders, and (iii) the right to assert state law rights and remedies against non-Debtor third parties who are not released under the Current Plan. To the extent the Bridge Agent is successful

in prosecuting any of these rights or claims, the recovery of the Bridge Lenders would be materially increased. The Current Plan and Current Disclosure Statement continue to be confusing and unclear on this topic. On the one hand, the Debtors apparently continue to say that non-Debtors are not released unless a creditor affirmatively elects to grant such a release. Current Plan at 62; Current Disclosure Statement at 111-12. On the other hand, the treatment of Senior Lenders' Claims and the Bridge Lenders' Claims continues to implement a recovery scheme that is only viable if the Bridge Lenders' rights and remedies vis à vis the Senior Lenders are stripped away. Current Plan at 34-35; Current Disclosure Statement at 14, 83. At the Original Disclosure Statement Hearing, the Court explicitly stated that non-Debtor third party releases may not be granted unless a creditor affirmatively opts for the release. Hr'g. Tr. May 20, 2010, 94:11-22. The Current Disclosure Statement should clearly disclose whether or not the Debtors intend the Current Plan to have such effect regardless of whether Bridge Lenders do not opt into the release.

**F. <u>The Disclosure Statement Should Include Disclosure About the 2010 MIP Motion.</u>**

23. On May 26, 2010, the Debtors filed a Motion For An Order Authorizing the Debtors To Implement a Management Incentive Plan for 2010 (the "2010 MIP Motion"). [Docket No. 4620]. If the 2010 MIP Motion is granted, certain of the Debtors' executives (who, on information and belief, are current equity holders of Tribune) will be paid up to $111.8 million in 2010 if certain benchmarks are reached. 2010 MIP Motion at 2-3. In contrast, the Current Disclosure Statement makes no disclosure of the 2010 MIP Motion and instead states only that "The Debtors intend to continue the ordinary course annual MIP program in 2010 and subsequent years, including after the Effective Date of the Plan." Current Disclosure Statement at 40.

24. In bankruptcy, form does not prevail over substance. The fact that the Debtors are distributing material value to management and current shareholders under a motion filed contemporaneously with the plan process, rather than doing it directly through the Current Plan, does not immunize the distribution from potential scrutiny under the applicable provisions of section 1129, including 1129(a)(4) (requiring court approval of compensation for services incident to, or in connection with, the case or the plan); 1129(a)(5) (requiring disclosure of compensation to insiders); and 1129(b) (the absolute priority rule, which will be applicable here if the Bridge Lender Class rejects the Current Plan).

25. As such, the Debtors should provide reasonable disclosure of the 2010 MIP Motion, the relief sought therein and the potential implications for plan confirmation.

**G. The Revised Solicitation Order.**

26. The Revised Solicitation Order adds the following language: "The Bridge Loan Agent shall prepare and provide to counsel to the Debtors within two (2) business days following entry of this Order an electronic file containing the names, addresses and principal amounts of the advances owing to each holder of a Bridge Loan Claim as of May 17, 2010." Revised Solicitation Order at 12. The Bridge Agent, as successor administrative agent, has a register of Bridge Loan Holders which was provided to it by its predecessor agent.

**CONCLUSION**

27. The Bridge Agent respectfully requests that the Court direct modification of the Current Disclosure Statement and the Current Plan to address the objections contained herein.

Dated: June 2, 2010
Wilmington, Delaware

FOX ROTHSCHILD LLP

By: ______________________________
Jeffrey M. Schlerf, Esq. (No. 3047)
Eric M. Sutty, Esq. (No. 4007)
Citizens Bank Center
919 North Market Street, Suite 1600
Wilmington Delaware 19801
Telephone: (302) 654-7444

-and-

WHITE & CASE LLP
Thomas E Lauria
Gerard Uzzi
David Hille
Andrew Hammond
Scott Greissman
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 819-8200
Facsimile: (212) 819-8113

Attorneys for the Bridge Agent