## EXHIBIT 1

## BLACK LINE DISCLOSURE STATEMENT

[Changed Pages Since the Filing of the Proposed Disclosure Statement on June 1, 2010]

*CHANGED PAGES ONLY*

46429/0001-6788066v1

the TMIP and KOB.  Following a March 23, 2010 hearing on this motion, the Bankruptcy Court entered an order that day granting this motion.  At that hearing, the Court stated that "regardless of what my expressed words were at the [January 27, 2010] hearing, I didn't suggest that the part of the plan that was proposed and which I had under advisement should or could be the same plan that was under consideration or that I would approve it in the context of the confirmation."  The Court further stated that it was not providing "any inclination of whether in that context it should be approved or not."  The Court also stated that "whatever record was made [with respect to the TMIP and KOB, including at the September 25, 2009 hearing] would be included in whatever presumably confirmation hearing record was made if there were still objections to it."—. As further discussed in Article IX.H.5, the Plan authorizes and implements the TMIP and the KOB.  The Debtors expect that the Guild and the United States Trustee will maintain their objections to the 2009 TMIP and the KOB at the confirmation hearing on the Plan on the ground that both violate the Bankruptcy Code. The Debtors disagree with these objections and believe that the TMIP and KOB are valid programs.

The Debtors intend to continue the ordinary course annual MIP program in 2010 and subsequent years, including after the Effective Date of the Plan.  Any creditor wishing further detail can access the 2010 MIP Motion filed May 26, 2010 [Docket No. 4620] on the Bankruptcy Court's docket.

(d)    Local Bonus Programs.

The Debtors maintain a variety of commission and incentive bonus programs for certain sales and other personnel who generally do not participate in the MIP.  These programs are implemented locally and designed to incentivize and reward achievements of the Debtors' employees based upon specific metrics relevant to the respective employees' local or departmental line of work (the "Local Bonus Programs"). During 2009, approximately 2,500 of the Debtors' employees participated in the Local Bonus Programs. Generally, these programs are developed and implemented locally by individual newspapers, broadcast stations and corporate office departments.  The majority of these programs are based on performance factors such as revenue generation, increasing market share, expense targets, and some discretionary factors.  Payouts under most of the Local Bonus Programs are based upon year-end, quarter-end or month-end performance. The Debtors paid an aggregate of approximately $24.8 million, $22.2 million, and $20.7 million, respectively during 2007, 2008, and 2009 in connection with the Local Bonus Programs.[39]

(e)    Collective Bargaining Agreements.

As of December 31, 2009, approximately eleven percent (11%) of the Debtors' employees in the Publishing Segment and approximately thirty-four percent (34%) of the Debtors' employees in the Broadcasting Segment were represented by unions and covered under various collective bargaining agreements.  Specifically, the Tribune Entities in the Publishing Segment are party to ten collective bargaining agreements and the Tribune Entities in the Broadcasting Segment are party to 15 collective bargaining agreements.  The following table summarizes certain information concerning the union representation of the Tribune Entities' employees.[40]

| | | | Approximate Number of Employees | | | |
|---|---|---|---|---|---|---|
| | Department | Union/Local Name | Full-Time | Part-Time | Per Diems/ Seasonal | Expiration Date |
| Publishing | | | | | | |
| Baltimore Sun | Packagers | GCC-IBT/888 | 108 | 72 | 0 | 12/ 2008** |
| Baltimore Sun | Transportation | GCC-IBT/355 | 19 | 12 | 0 | 12/2010 |

[39] As further discussed in Article VI of this Disclosure Statement, on February 3, 2009 and May 12, 2009, the Bankruptcy Court entered orders authorizing the Debtors to pay prepetition amounts outstanding in connection with the Local Bonus Programs in an aggregate amount of up to $8.8 million and $1.1 million, respectively.

[40] A list of all Collective Bargaining Agreements, including full names of such agreements, is attached hereto as Exhibit E.

cram down recovery reflects an estimated recovery by Holders of Bridge Loan Claims if: (i) such Claims are determined by Final Order to be fully Allowed Claims not subject to avoidance, setoff, subordination, or other defenses; (ii) the portion of Distributable Value (as Distributable Value is estimated in Article XII.B.1 of this Disclosure Statement ) attributable to Tribune is determined to be $537 million, and (iii) the Bankruptcy Court does not determine that a cram down treatment different from a Pro Rata allocation of Tribune's distributable value is appropriate.

The following may be further noted regarding the recovery by Holders of Bridge Loan Claims in the event of cram down treatment:

(i)     The Bridge Loan Claims will be treated as Disputed Claims and therefore not be entitled to any distributions under the Plan until and unless they are Allowed after resolution of all objections to such Claims, including objections based upon avoidance, setoff, subordination and/ or other Claim defenses. Actions for avoidance, setoff, or subordination and assertion of other defenses shall be brought by adversary proceeding or by Claim objection as appropriate under the Bankruptcy Rules. The Bridge Loan Claims will be not treated as Allowed Claims until actions for avoidance, setoff, or subordination, and other defenses to such Claims are resolved by Final Order, which is likely to be substantially after the Effective Date of the Plan.   If the Bridge Loan Claims are not determined to be Allowed Claims, then no distribution will be made on account of Bridge Loan Claims. The issues raised in Claim objections to the Bridge Loan Claims may include, but not be limited to, the potential avoidance claims respecting the Bridge Loan Claims generally described in Article VII of this Disclosure Statement and in various submissions by creditors in the compendium accompanying this Disclosure Statement.  The Holders of the Bridge Loans Claims subject to cram down will not receive releases and any and all objections to such Claims, including objections based upon Claim avoidance, setoff, subordination and other Claim defenses, will be preserved.  Holders of Bridge Loan Claims subject to cram down also will not receive the indemnities set forth in Article 11 of the Plan.

(ii)    The Debtors propose to take into account the Claims of the Senior Lenders in the full amount Allowed pursuant to the Plan in calculating the Bridge Lenders' Pro Rata share of Tribune's distributable value.  The Debtors also propose to take into account the Allowed Claims of the Holders of PHONES Notes in calculating the allocation of Tribune's distributable value to the extent the Bridge Loan Claims, if Allowed, and the other senior debt Allowed Claims would receive a benefit on account of any PHONES subordination.  In addition, the Debtors propose to take into account Intercompany Claims against Tribune in determining Tribune's distributable value.  The manner in which Intercompany Claims are to be taken into account, including what amounts to attribute to settlement and resolution and any discounting of such Intercompany Claims against Tribune in determining Tribune's distributable value, is subject to Bankruptcy Court approval in connection with Plan confirmation.

(ii)    The Bankruptcy Court's determination of Tribune's actual value available for distribution on account of Allowed Claims may be different from the distributable value of $537 million estimated in Article XII.B.1 of this Disclosure Statement.  To the extent the Bankruptcy Court determines

Tribune's distributable value to be lower than $537 million, Holders of Allowed Bridge Loan Claims will likely recover less than 4.6% of Allowed Bridge Loan Claims.[21]

(iii)   The Plan provides that if the Bankruptcy Court determines that a different (including a lesser) treatment is appropriate for Allowed Bridge Loan Claims pursuant to 1129(b) of the Bankruptcy Code, then such different treatment shall apply to Allowed Bridge Loan Claims. The Bankruptcy Court may determine that the appropriate treatment of the Holders of Bridge Loan Claims subject to cram down under 1129(b) is different from the Pro Rata distribution of Tribune's distributable value. The Plan provides that it will become effective, without re-solicitation, in the event that the Bankruptcy Court determines that an alternative treatment of the Bridge Loan Claim is appropriate, provided the conditions to the Effective Date of the Plan are met or waived. The Debtors cannot predict what other cram down treatment the Bankruptcy Court may find is appropriate, and Bridge Loan Holders should take account of this risk in determining how to vote and what Plan treatment to elect.

(iv)   To the extent, in the event of cram down, the aggregate recovery on account of Allowed Bridge Loan Claims is determined to be materially greater than that anticipated by the Distributable Value estimated in this Disclosure Statement — i.e., materially greater than an aggregate recovery of 4.6% on account of Bridge Loan Claims — then the condition to the Plan Effective Date in Section 10.1.1(i) of the Plan would need to be waived for the Plan to become Effective.

Claims in Class 1D are Impaired, and Holders of Class 1D Claims are entitled to vote to accept or reject the Plan.

(e)   Class 1E - Senior Noteholder Claims

Class 1E consists of all Senior Noteholder Claims against Tribune. Senior Noteholder Claims are all Claims arising under or evidenced by the Senior Notes Indentures and related documents and any Claim of the Senior Noteholders arising under the Pledge Agreement. The Senior Noteholder Claims shall together be deemed Allowed in the aggregate amount of $1,283,055,743.77. The Senior Noteholder Claims shall not be subject to reduction, disallowance, subordination, set off or counterclaim (other than the Senior Noteholder Claims of MSCS with respect to the Morgan Stanley Claims).

On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Senior Noteholder Claims against Tribune, subject to Section 5.4.2 of the Plan, each Holder of an Allowed Senior Noteholder Claim shall receive such Holder's Pro Rata share of 7.4% of the New Senior Secured Term Loan, 7.4% of the Distributable Cash, and 7.4% of the New Common Stock, subject to dilution by the Equity Incentive Plan.

Claims in Class 1D are Impaired, and Holders of Class 1E Claims are entitled to vote to accept or reject the Plan.

---

[21] The estimated Distributable Value attributable to Tribune of $537 million is net of approximately $333 million to be allocated to Tribune's direct and indirect subsidiaries based upon an estimated resolution of Intercompany Claims. The estimate of $537 million of Distributable Value attributable to Tribune includes (a) attributing to Tribune a recovery of approximately $368.8 million related to cash transferred to certain of Tribune's subsidiaries just prior to the Petition Date (see Article I.C and Article XII.B.1 of this Disclosure Statement), (b) attributing to Tribune a recovery of approximately $264 million related to receivables from and equity interest in Tribune Receivables, LLC, a Subsidiary Non-Debtor (see Article VI.A.2 of this Disclosure Statement), and (c) resolution of Claims between and among Tribune, on the one hand, and Tribune's direct and indirect subsidiaries, on the other hand, taking account the likely enforceability of such Claims. The Bankruptcy Court's determination of Tribune's distributable value in connection with confirmation of the Plan may reflect a value or attribution of these assets and a resolution of Intercompany Claims different from that used by the Debtors to estimate Distributable Value.