**<u>EXHIBIT 2</u>**

**BLACK LINE DISCLOSURE STATEMENT**

[Cumulative Black Line Comparing the June 4, 2010 Disclosure Statement
to the April 12, 2010 Disclosure Statement]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

## DISCLOSURE STATEMENT FOR AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Janet E. Henderson
Kevin T. Lantry
Kerriann S. Mills
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue; Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

~~April 12, 2010~~

Counsel to the Debtors, Debtors in Possession, and Certain Non-Debtor Affiliates

~~THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS A SOLICITATION OF ACCEPTANCES OF THE PLAN.~~

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

ACCEPTANCES OF THE PLAN MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE. THE DEBTORS MAY SUPPLEMENT OR AMEND THIS DISCLOSURE STATEMENT OR ANY EXHIBITS ATTACHED HERETO AT ANY TIME PRIOR TO THE HEARING TO APPROVE THE DISCLOSURE STATEMENT.

**Dated: June 4, 2010**

**IMPORTANT DATES**

- Date by which Ballots and Master Ballots must be received: [●] **July 30, 2010 at 4:00 p.m. (prevailing Eastern Time)**

- Date by which objections to Confirmation of the Plan must be filed and served: [●] **July 30, 2010 at 4:00 p.m. (prevailing Eastern Time)**

- Hearing on Confirmation of the Plan: [●] at [●].m. (Prevailing Eastern Time) **August 16, 2010 at 10:00 a.m. (prevailing Eastern Time)**

TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................................................... 1
    A.    OVERVIEW OF CHAPTER 11. ........................................................................... 3
    B.    PARTIES ENTITLED TO VOTE ON THE PLAN. ............................................. 4
    C.    SOLICITATION PACKAGE. ................................................................................ 4
    D.    VOTING PROCEDURES, BALLOTS, AND VOTING DEADLINE. ............... 4̶5
    E.    CONFIRMATION HEARING AND DEADLINE FOR OBJECTIONS TO
        CONFIRMATION. ............................................................................................. 5̶6
II. OVERVIEW OF THE PLAN ................................................................................................... 6
    A.    GENERAL OVERVIEW. .................................................................................... 6
    B.    PLAN TREATMENT ........................................................................................... 7
    C.    SUMMARY OF ALLOWED CLAIMS AGAINST AND INTERESTS IN EACH
        OF THE DEBTORS AND OF ESTIMATED RECOVERIES IN RESPECT
        THEREOF. ......................................................................................................... 8̶9
        1.    Summary of Estimated Unclassified Claims Against all Debtors and of
            Estimated Recoveries in Respect Thereof. ................................................ 1̶0̶11
        2.    Summary of Estimated Allowed Claims and Interests against Tribune and
            the Filed Subsidiary Debtors and of Estimated Recoveries in Respect
            Thereof. ..................................................................................................... 1̶0̶12
        3.    Summary of Estimated Allowed Claims Against and Interests for Each
            Guarantor Non-Debtor, if any, that becomes a Debtor and of Estimated
            Recoveries in Respect Thereof. ................................................................. 1̶2̶15
    D.    FCC APPROVAL. ............................................................................................. 1̶3̶16
        1.    Required FCC Consents. ............................................................................ 1̶3̶16
        2.    Information Required from Prospective Stockholders of Reorganized
            Tribune. ...................................................................................................... 1̶4̶17
III. GENERAL INFORMATION ............................................................................................... 1̶6̶19
    A.    THE DEBTORS' BUSINESSES AND PROPERTIES. .................................. 1̶6̶19
        1.    Company Overview. .................................................................................. 1̶6̶19
        2.    The Debtors' Properties. ............................................................................ 1̶7̶20
    B.    OPERATIONS OF THE DEBTORS. .............................................................. 1̶7̶20
        1.    Publishing Segment. ................................................................................. 1̶7̶20
        2.    Broadcasting Segment. ............................................................................. 2̶1̶24
        3.    Additional Investments. ............................................................................ 2̶3̶26
    C.    RECENT OPERATIONS. ................................................................................. 2̶5̶28
    D.    CURRENT MANAGEMENT OF THE DEBTORS. ...................................... 2̶6̶29
        1.    Board of Directors. ................................................................................... 2̶6̶29
        2.    Subcommittees of the Board of Directors. ............................................... 2̶6̶29
        3.    Compensation of Directors. ...................................................................... 2̶6̶29
        4.    Executive Officers. ................................................................................... 2̶7̶30
IV. SUMMARY OF CERTAIN PREPETITION LIABILITIES ............................................. 2̶7̶30
    A.    PREPETITION FUNDED DEBT AND CAPITAL STRUCTURE OF THE
        TRIBUNE ENTITIES. ...................................................................................... 2̶7̶30
        1.    Prepetition Capital Structure. ................................................................... 2̶7̶30
        2.    Prepetition Funded Debt Structure. .......................................................... 2̶8̶31
    B.    PREPETITION TRADE PAYABLES & OTHER OPERATING LIABILITIES. ....... 3̶2̶35
    C.    PREPETITION COMPENSATION AND BENEFIT PROGRAMS. ......................... 3̶2̶35
        1.    Compensation and Benefit Programs in Effect as of the Petition Date that
            will be continued Pursuant to the Plan. .................................................... 3̶3̶36

i

       2.     Compensation and Benefit Programs in Effect as of the Petition Date that will not be continued Pursuant to the Plan. ........................................ ~~40~~42

D.    PENDING LITIGATION AND CERTAIN OTHER LEGAL MATTERS INVOLVING THE DEBTORS ............................................................ ~~42~~45

    1.    *Newsday* and *Hoy* Circulation Misstatements. ............................... ~~42~~45

    2.    ESOP Lawsuit. ........................................................................ ~~43~~46

    3.    FCC Related Matters. ............................................................. ~~44~~47

    4.    Miscellaneous Other Litigation. ............................................ ~~45~~48

V. EVENTS LEADING UP TO CHAPTER 11 ................................................ ~~45~~49

VI. EVENTS DURING THE CHAPTER 11 CASES ........................................ ~~46~~49

A.    PROCEDURAL MOTIONS.......................................................... ~~46~~50

B.    "FIRST-DAY" MOTIONS. .......................................................... ~~46~~50

C.    EMPLOYEE COMPENSATION AND BENEFITS. ...................... ~~47~~50

D.    CASH MANAGEMENT. .............................................................. ~~48~~51

E.    POST-PETITION FINANCING. ................................................... ~~48~~52

F.    PROFESSIONAL RETENTIONS. ................................................ ~~49~~52

    1.    Retention of Professionals by the Debtors' Estates. .............. ~~49~~52

    2.    The Creditors Committee and its Advisors. ........................... ~~50~~53

G.    CERTAIN ADMINISTRATIVE MATTERS AND OTHER MOTIONS. .................. ~~50~~53

    1.    Disposition of Certain Executory Contracts and Unexpired Leases. ............... ~~50~~53

    2.    Certain other Motions filed by the Debtors. .......................... ~~52~~55

    3.    Fee Disgorgement Motion. ..................................................... ~~52~~55

    4.    Schedules of Assets and Liabilities; Statements of Financial Affairs. ............ ~~53~~56

    5.    Filed Claims and Bar Date. .................................................... ~~53~~56

    6.    Bankruptcy Rule 2015.3 Reports. .......................................... ~~53~~56

    7.    Analysis of Potential Preferential Payments. ........................ 57

H.    CHICAGO CUBS TRANSACTION. ............................................ ~~53~~58

I.    MORGAN STANLEY SWAP AGREEMENT ............................... 59

J.    APPOINTMENT OF AN EXAMINER ........................................ 60

VII. SETTLEMENT OF CLAIMS RELATING TO THE LEVERAGED ESOP TRANSACTIONS ... ~~55~~61

A.    THE LEVERAGED ESOP TRANSACTIONS. ............................. ~~56~~62

B.    INVESTIGATION OF THE LBO-RELATED CAUSES OF ACTION. ............. ~~56~~65

C.    PROCEEDINGS RELATED TO LEVERAGED ESOP TRANSACTIONS ........... ~~56~~66

D.    LBO-RELATED CAUSES OF ACTION. ..................................... ~~57~~66

E.    EFFORTS TO SETTLE THE LBO-RELATED CAUSES OF ACTION. ......... ~~58~~67

F.    THE REASONABLENESS OF THE PROPOSED SETTLEMENT. ......... ~~58~~67

VIII. EXCLUSIVITY PERIOD. ................................................................. ~~61~~69

IX. THE PLAN OF REORGANIZATION ...................................................... ~~61~~69

A.    CLASSIFICATION AND ALLOWANCE OF CLAIMS AND EQUITY INTERESTS GENERALLY. .............................................. ~~61~~69

B.    PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS, DIP FACILITY CLAIMS, AND PRIORITY TAX CLAIMS ............... ~~62~~70

    1.    DIP Facility Claims. .............................................................. ~~62~~70

    2.    Administrative Expense Claims. ............................................. ~~62~~70

    3.    Priority Tax Claims. ............................................................... ~~63~~71

C.    TREATMENT OF CLAIMS AND EQUITY INTERESTS. ............... ~~63~~72

    1.    The Debtors, Filed Subsidiary Debtors, and Guarantor Non-Debtors. .......... ~~63~~72

    2.    Classification of Claims against the Debtors under the Plan ............ ~~67~~75

D.    PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. ............................................................... ~~68~~76

    1.    Classification and Treatment of Claims Against Tribune (Debtor 1). ........... ~~68~~76

|   | 2. | Classification and Treatment of Claims Against and Interests in Filed Subsidiary Debtors (Debtors 2 through 111) | ~~71~~83 |
|---|---|---|---|
|   | 3. | Prepackaged Plans for and Treatment of Claims Against and Interests In Guarantor Non-Debtors, If Any, That Become Debtors. | ~~74~~86 |
| E. | | MEANS FOR IMPLEMENTATION OF THE PLAN. | ~~75~~87 |
|   | 1. | Restructuring Transactions. | ~~75~~87 |
| F. | | CORPORATE GOVERNANCE, DIRECTORS, OFFICERS AND CORPORATE ACTION. | ~~76~~88 |
|   | 1. | Certificate of Incorporation, By-Laws, Limited Liability Company Agreement; Limited Liability Partnership Agreement. | ~~76~~88 |
|   | 2. | Directors and Officers of Reorganized Tribune. | ~~76~~88 |
|   | 3. | Ownership and Management of Reorganized Debtors Other Than Reorganized Tribune. | ~~76~~89 |
| G. | | ISSUANCE AND DISTRIBUTION OF NEW SECURITIES AND RELATED MATTERS. | ~~77~~89 |
|   | 1. | Issuance of New Securities. | ~~77~~89 |
|   | 2. | Distribution of New Common Stock and New Warrants. | ~~77~~89 |
|   | 3. | New Senior Secured Term Loan Agreement. | ~~82~~95 |
|   | 4. | Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors. | ~~83~~95 |
|   | 5. | Cancellation of Loan Agreements, Loan Guaranty Agreements, the Pledge Agreement, Notes Issued Under the Loan Agreements, Senior Notes, Debentures, Instruments, Indentures, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock and Other Tribune Interests. | ~~83~~96 |
|   | 6. | Cancellation of Liens and Guaranties. | ~~84~~97 |
|   | 7. | Exit Facility. | ~~85~~97 |
|   | 8. | Equity Incentive Plan. | ~~85~~97 |
|   | 9. | Sources of Cash for Plan Distributions. | ~~85~~97 |
|   | 10. | Additional Transactions Authorized Under the Plan. | ~~85~~97 |
|   | 11. | Settlement of Claims and Controversies. | ~~85~~98 |
|   | 12. | Preservation of Rights of Action and Settlement of Litigation Claims. | ~~86~~100 |
|   | 13. | FCC Applications. | ~~86~~100 |
| H. | | ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES. | ~~87~~100 |
|   | 1. | Assumption, Rejection and Cure Obligations. | ~~87~~100 |
|   | 2. | Cure of Defaults of Assumed Executory Contracts and Unexpired Leases. | ~~87~~101 |
|   | 3. | Rejection of Executory Contracts and Unexpired Leases. | ~~88~~101 |
|   | 4. | Rejection Damages Bar Date. | ~~88~~102 |
|   | 5. | Compensation and Benefit Programs. | ~~88~~102 |
|   | 6. | Collective Bargaining Agreements. | ~~88~~103 |
|   | 7. | Post-Petition Contracts and Leases. | ~~88~~103 |
|   | 8. | Termination of ESOP. | ~~88~~104 |
| I. | | PROVISIONS GOVERNING DISTRIBUTIONS TO HOLDERS OF CERTAIN ALLOWED CLAIMS AND INTERESTS UNDER THE PLAN. | ~~89~~104 |
|   | 1. | General. | ~~89~~104 |
|   | 2. | Distributions for Certain Claims. | ~~89~~104 |
|   | 3. | Distributions to Holders of General Unsecured Claims Against Filed Subsidiary Debtors. | ~~89~~105 |
|   | 4. | Special Provisions Governing Distributions to Holders of Loan Claims and Loan Guaranty Claims. | ~~90~~105 |

|  | 5. | Interest on Claims. | ~~90~~105 |
|  | 6. | Distributions by Disbursing Agent. | ~~90~~106 |
|  | 7. | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | ~~91~~106 |
|  | 8. | Record Date for Distributions | ~~91~~107 |
|  | 9. | Allocation of Plan Distributions Between Principal and Interest. | ~~92~~107 |
|  | 10. | Means of Cash Payment. | ~~92~~107 |
|  | 11. | Withholding and Reporting Requirements. | ~~92~~108 |
|  | 12. | Setoffs. | ~~92~~108 |
|  | 13. | Fractional Shares. | ~~93~~108 |
|  | 14. | De Minimis Distributions. | ~~93~~108 |
|  | 15. | Special Provision Regarding Unimpaired Claims. | ~~93~~108 |
|  | 16. | Subordination. | ~~93~~109 |
| J. | | PROVISIONS FOR RESOLVING DISPUTED CLAIMS AND DISPUTED INTERESTS. | ~~93~~109 |
|  | 1. | Objections to and Estimation of Claims. | ~~93~~109 |
|  | 2. | Payments and Distributions on Disputed, Contingent, and Unliquidated Claims and Interests and On Claims for Which Proofs of Claim are Filed. | ~~94~~109 |
| K. | | CONFIRMATION AND CONSUMMATION OF THE PLAN. | ~~94~~109 |
|  | 1. | Conditions to Effective Date of the Plan. | ~~94~~109 |
|  | 2. | Waiver of Conditions. | ~~95~~110 |
|  | 3. | Consequences if Confirmation Order is Vacated. | ~~95~~110 |
| L. | | INJUNCTIONS, RELEASES AND DISCHARGE. | ~~95~~110 |
|  | 1. | Discharge. | ~~95~~110 |
|  | 2. | Releases. | ~~96~~111 |
|  | 3. | Bar Order. | ~~98~~115 |
|  | 4. | Supplemental Injunction. | ~~99~~116 |
|  | 5. | Disallowed Claims and Disallowed Interests. | ~~100~~117 |
|  | 6. | Exculpation. | ~~100~~117 |
|  | 7. | Corporate Indemnities. | ~~100~~117 |
|  | 8. | Term of Bankruptcy Injunction or Stays. | ~~101~~119 |
| M. | | RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT. | ~~101~~119 |
| N. | | CERTAIN ADDITIONAL PROVISIONS OF THE PLAN. | ~~102~~119 |
|  | 1. | Surrender of Instruments. | ~~102~~119 |
|  | 2. | Creditors Committee. | ~~102~~119 |
|  | 3. | Post-Confirmation Date Retention of Professionals | ~~102~~120 |
|  | 4. | Effectuating Documents and Further Transactions. | ~~102~~120 |
|  | 5. | Exemption from Transfer Taxes. | ~~102~~120 |
|  | 6. | Paid-in Capital of Corporate Reorganized Debtors. | ~~103~~120 |
|  | 7. | Payment of Statutory Fees. | ~~103~~120 |
|  | 8. | Amendment or Modification of the Plan. | ~~103~~120 |
|  | 9. | Certain Provisions Pertaining to Senior Lender Settlement Committee ~~103~~ and Centerbridge. | |
| X. VOTING PROCEDURES AND REQUIREMENTS | | | ~~104~~121 |
| A. | | VOTING DEADLINE. | ~~104~~121 |
| B. | | HOLDERS OF CLAIMS ENTITLED TO VOTE | ~~104~~122 |
| C. | | VOTE REQUIRED FOR ACCEPTANCE BY A CLASS | ~~105~~123 |
|  | 1. | Class of Claims. | ~~105~~123 |
|  | 2. | Class of Interests. | ~~105~~123 |
| D. | | VOTING PROCEDURES | ~~105~~123 |
|  | 1. | Ballots. | ~~105~~123 |
|  | 2. | Special Instructions for Beneficial Holders of Senior Noteholder Claims. | ~~106~~124 |

3.  Special Instructions for Holders of General Unsecured Claims Against
Tribune Concerning the Convenience Class Election.................................~~106~~124

4.  Special Instructions for ~~Media and Foreign Ownership Certifications.~~ ~~106~~Holders of Bridge Lc

5.  Withdrawal or Change of Votes on the Plan. .........................................~~107~~124

XI. CONFIRMATION OF THE PLAN ...............................................................................~~107~~125

  A.  CONFIRMATION HEARING ...........................................................................~~107~~125

  B.  STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN. ........~~108~~126

    1.  Acceptance. ...........................................................................................~~108~~126

    2.  Fair and Equitable Test. .......................................................................~~109~~127

    3.  Feasibility. ...........................................................................................~~110~~128

    4.  Best Interests Test and Liquidation Analysis. ......................................~~111~~128

XII. PROJECTED FINANCIAL INFORMATION AND REORGANIZATION VALUE...............~~112~~130

  A.  PROJECTED FINANCIAL INFORMATION. ......................................................~~112~~130

  B.  REORGANIZATION VALUE.............................................................................~~113~~130

    1.  Overview. .............................................................................................~~113~~130

    2.  Valuation Methodology. .......................................................................~~114~~132

XIII. DESCRIPTION OF DEBT AND CAPITAL STRUCTURE OF REORGANIZED DEBTORS~~118~~136

  A.  NEW SENIOR SECURED TERM LOAN AGREEMENT. ...................................~~118~~136

  B.  DESCRIPTION OF EXIT FACILITY. ................................................................~~119~~137

  C.  DESCRIPTION OF CAPITAL STOCK. .............................................................~~119~~137

XIV. RISK FACTORS.......................................................................................................~~119~~137

  A.  GENERAL BANKRUPTCY LAW CONSIDERATIONS AND RISKS
RELATED TO THE PLAN...............................................................................~~119~~137

    1.  Objections to the Classification of Claims May Change the Composition
of the Classes and the Vote Required of Each Class for the Approval of the
Plan. .....................................................................................................~~119~~137

    2.  Failure to Obtain Confirmation of the Plan May Result in Liquidation or
Alternative Plan on Less Favorable Terms. .........................................~~120~~138

    3.  Undue Delay in Confirmation of the Plan May Disrupt the Debtors'
Operations. ...........................................................................................~~120~~138

    4.  If the Effective Date Fails to Occur, the Debtors May Liquidate or Adopt
an Alternative Plan with Less Favorable Terms...................................~~120~~138

  B.  FCC-RELATED CONSIDERATIONS AND RISKS RESPECTING THE
DEBTORS' BUSINESSES. ...............................................................................~~121~~139

    1.  The FCC Must Approve the Debtors' FCC Applications before
Emergence from Bankruptcy................................................................~~121~~139

    2.  Inability to Obtain FCC Approval and Media Ownership Waivers Would
Adversely Affect Ability to Consummate the Plan. .............................~~123~~141

  C.  RISKS RELATED TO THE DEBTORS' BUSINESSES......................................~~125~~143

    1.  The Debtors' Actual Financial Results May Vary Significantly From the
Projections. ...........................................................................................~~125~~143

    2.  Failure to Attract and Maintain Employees May Adversely Affect the
Debtors' Financial Results. ...................................................................~~125~~143

    3.  Adverse Publicity in Connection with the Chapter 11 Cases or Otherwise
Could Negatively Affect Business........................................................~~126~~144

    4.  Advertising Demand Will Continue to be Impacted by Changes in
Economic Conditions and Fragmentation of the Media Landscape. ..........~~126~~144

    5.  Circulation and Audience Share May Continue to Decline as Consumers
Migrate to Other Media Alternatives. ..................................................~~127~~145

    6.  Changes in the Regulatory Landscape Could Affect the Debtors' Business
Operations and Asset Mix. ...................................................................~~127~~145

7.   The Availability and Cost of Quality Network-Provided and Syndicated Programming May Impact the Debtors' Television Ratings. ...................... ~~129~~147

8.   Newsprint Prices May Continue to be Volatile and Difficult to Predict and Control. ................................................................................................ ~~129~~147

9.   The Debtors' Ability to Grow Depends on the Development of the Debtors' Interactive Businesses. .......................................................... ~~129~~148

10.  The Debtors' Success Will Depend on the Debtors' Ability to Adapt to Technological Change. ................................................................... ~~130~~148

11.  Historical Financial Information Will Not be Comparable. ....................... ~~131~~149

12.  The Debtors May be Required to Write Down Goodwill or Other Intangible Assets Which May Adversely Affect Their Financial Position and Results of Operations. ........................................................... ~~131~~149

13.  Events Beyond the Debtors' Control May Result in Unexpected Adverse Operating Results. ................................................................. ~~131~~149

14.  Changes in Accounting Standards Can Significantly Impact the Debtors' Reported Earnings and Operating Results. ......................................... ~~131~~149

15.  Adverse Results from Litigation or Governmental Investigations can Impact the Debtors' Business Practices and Operating Results. ................. ~~131~~150

16.  The Debtors Could be faced with Additional Tax Liabilities. .................... ~~132~~150

17.  The Debtors' Company-Sponsored Pension Plans are Currently Underfunded, and Over Time the Debtors Will Likely be Required to Make Cash Contributions to the Plans, Reducing the Cash Available for Working Capital and Other Corporate Uses. ......................................... ~~132~~150

18.  Labor Strikes, Lock-Outs and Protracted Negotiations can Lead to Business Interruptions and Increased Operating Costs. ......................... ~~132~~151

19.  Acquisitions, Investments and Dispositions Pose Inherent Financial and Other Risks and Challenges. .......................................................... ~~133~~151

20.  The Reorganized Debtors May Continue to Have Substantial Indebtedness. ................................................................................. ~~133~~151

D.   RISKS TO CREDITORS WHO WILL RECEIVE SECURITIES .......................... ~~134~~152

1.   The Lack of an Established Market for the Securities May Adversely Affect the Liquidity of the New Common Stock and the New Warrants. ... ~~134~~152

2.   Lack of Dividends May Adversely Affect Liquidity of the New Common Stock. ........................................................................................ ~~134~~152

3.   Future Sales or Issuances of Equity, Including Issuances in Respect of New Warrants to Purchase New Class A Common Stock, May Depress the Stock Price of the New Common Stock. ............................................ ~~134~~152

4.   The Limited Voting Rights of the New Class B Common Stock and the Lack of Voting Rights of the New Warrants Could Impact their Attractiveness to Investors and, as a Result, their Market Value. ............... ~~135~~153

5.   Certain Holders May be Restricted in Their Ability to Transfer or Sell Their Securities. ............................................................................. ~~135~~153

XV. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .................... ~~136~~154

A.   FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS .................... ~~136~~154

1.   Termination of Subchapter S Corporation Status. ................................. ~~136~~154

2.   Cancellation of Debt and Reduction of Tax Attributes. ............................ ~~136~~155

B.   FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS. .............................................................................. ~~137~~155

1.   General. ...................................................................................... ~~138~~156

2.   Market Discount. .......................................................................... ~~138~~157

3.      U.S. Holders of Loan Claims and Loan Guaranty Claims (not including
        the Barclays Swap Claim)........................................................................139157
4.      U.S. Holders of Senior Noteholder Claims. ..........................................140158
5.      U.S. Holders of General Unsecured Claims (not including Claims arising
        from a Non-Qualified Former Employee Benefit Plan)............................140159
6.      U.S. Holders of Convenience Claims. ...................................................141159
7.      U.S. Holders of Claims arising from a Non-Qualified Former Employee
        Benefit Plan........................................................................................141159
8.      U.S. Holders of EGI-TRB LLC Notes Claims. .........................................141159
9.      U.S. Holders of PHONES Notes Claims. .................................................141160

10.     U.S. Holders of Securities Litigation Claims. .........................................141160
11.     U.S. Holders of Tribune Interests. .........................................................142160
12.     Definition of "Security.".......................................................................142160
13.     Federal Income Tax Treatment of the New Senior Secured Term Loan. ....142160
14.     Non-United States Persons. ...................................................................143161
15.     Information Reporting and Backup Withholding. .....................................143161
C.      FEDERAL INCOME TAX TREATMENT OF OTHER PARENT CLAIMS
        RESERVES AND SUBSIDIARY GUC RESERVES. ...................................143162
D.      IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE...........143162
E.      RESERVATION OF RIGHTS. .................................................................144162
XVI. CERTAIN FEDERAL, STATE AND FOREIGN SECURITIES LAW CONSIDERATIONS 144162
A.      FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS....................144162
B.      SUBSEQUENT TRANSFERS OF NEW SECURITIES.................................144162
XVII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.........145163
A.      CONTINUATION OF THE CHAPTER 11 CASES ........................................145163
B.      LIQUIDATION UNDER CHAPTER 7 OR CHAPTER 11...............................145164
XVIII. CONCLUSION AND RECOMMENDATION.................................................145164

## INDEX OF EXHIBITS

Exhibit A    -    Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries

Exhibit B    -    Settlement Term Sheet

Exhibit C    -    Corporate Organizational Chart

Exhibit D    -    Offer to Purchase, filed by Tribune April 27, 2007

Exhibit E    -    Collective Bargaining Agreements

Exhibit F    -    Financial Projections

Exhibit FG    -    Liquidation Analysis

Exhibit FH    -    Selected Historical Financial Information

# I. INTRODUCTION

On December 8, 2008 (the "Petition Date"), Tribune Company ("Tribune" or the "Company") and certain of its subsidiaries (collectively, the "Debtors")[2] filed voluntary petitions for relief (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). An additional Debtor, Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club, LLC) ("Tribune CNLBC"), Tribune's subsidiary that held the majority of the assets related to the business of the Chicago Cubs Major League Baseball franchise (the "Chicago Cubs"), commenced a Chapter 11 Case on October 12, 2009 as one of the steps necessary to complete a transaction involving the Chicago Cubs and certain related assets. In all, the Debtors now comprise 111 entities.

On April 12, 2010, the Debtors filed the Joint Plan of Reorganization for Tribune and Its Subsidiaries (as the same may be amended from time to time, the "Plan") with the Bankruptcy Court. A copy of the Plan is attached hereto as Exhibit A. The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan also constitutes a Prepackaged Plan for any Guarantor Non-Debtors for which the commencement of a chapter 11 case becomes necessary or appropriate to conclude the restructuring provided under the Plan. The Guarantor Non-Debtors are (i) Tribune (FN) Cable Ventures, Inc.; (ii) Tribune Interactive, Inc.; (iii) Tribune ND, Inc.; and (iv) Tribune National Marketing Company.[3]

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in each of the Debtors in connection with (i) the solicitation of acceptances of the Plan and (ii) the hearing to consider confirmation of the Plan scheduled for [●], August 16, 2010, commencing at [●]10 a.m. (prevailing Eastern Time). The purpose of this Disclosure Statement is to describe the Plan and its provisions, and to provide certain information, as required under section 1125 of the Bankruptcy Code, to creditors who will have the right to vote on the Plan so that they can make an informed decision in doing so, and to urge such creditors. **The Debtors urge all Holders of Claims entitled to vote on the Plan to vote to accept the Plan.** Creditors entitled to vote to accept or reject the Plan will receive a Ballot (as defined herein) together with this Disclosure Statement to enable them to vote on the Plan. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan; **provided, however, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.**

This Disclosure Statement includes, among other things, information pertaining to the Debtors' prepetition business operations and financial history and the events leading to the filing of the above-captioned Chapter 11 Cases. This Disclosure Statement also contains information respecting significant events that have occurred during these Chapter 11 Cases. In addition, an overview of the Plan is included, which sets forth certain terms and provisions of the Plan, the effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. This Disclosure Statement also discusses the confirmation process and the procedures for voting, which must be followed by the Holders of Claims entitled to vote under the Plan for their votes to be counted.

A Ballot for the acceptance or rejection of the Plan is also enclosed with the Disclosure Statement transmitted to each Holder of a Claim entitled to vote on the Plan.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES, AND CONFIRMATION, OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE. NO PERSON MAY GIVE ANY

---

[2] The Debtors are set forth on the cover page of this Disclosure Statement.

[3] For a further discussion of the Guarantor Non-Debtors, please refer to Article II.C.3, Article IX.C.1, Article IX.D.3, Article XI.B.1, and Article XII.B.

INFORMATION OR MAKE ANY REPRESENTATIONS REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND SCHEDULES ATTACHED TO THE PLAN, WHICH CONTROL IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW OR THE LAWS OF ANY FOREIGN JURISDICTION.

THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE OR FOREIGN SECURITIES REGULATOR, AND NEITHER THE SEC NOR ANY STATE OR FOREIGN SECURITIES REGULATOR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF OR CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. ACCEPTANCES OF THE PLAN MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

CERTAIN INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND FINANCIAL PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED IN SECTION XIII, "RISK FACTORS." IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. NONE OF THE DEBTORS, NOR ANY OF THE REORGANIZED DEBTORS, UNDERTAKE ANY OBLIGATION TO UPDATE PUBLICLY OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND IN ITS EXHIBITS HAS NOT BEEN AUDITED BY A

CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

THE DEBTORS' MANAGEMENT, IN CONSULTATION WITH THEIR PROFESSIONAL ADVISORS, PREPARED THE FINANCIAL PROJECTIONS. WHILE THE DEBTORS HAVE PRESENTED THESE FINANCIAL PROJECTIONS WITH NUMERICAL SPECIFICITY, THEY HAVE NECESSARILY BASED THE FINANCIAL PROJECTIONS ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE DEBTORS' AND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT THEY DO NOT AND CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO THE DEBTORS' OR THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHERMORE, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES. ALTERNATIVELY, ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE FINANCIAL PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

SUBJECT TO APPLICABLE THIRD CIRCUIT LAW, AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. SUBJECT TO APPLICABLE THIRD CIRCUIT LAW, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN EITHER THE DEBTORS OR THE REORGANIZED DEBTORS.

## A.    **Overview of Chapter 11.**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote the equality of treatment of similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from all debts that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

After a plan of reorganization has been filed in a chapter 11 case, certain holders of claims against or equity interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan. The Debtors are submitting this Disclosure Statement to Holders of Claims against and Interests in each Debtor in order to satisfy the requirements of section 1125 of the Bankruptcy Code.

**B.     Parties Entitled to Vote on the Plan.**

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan. Creditors or equity interest holders whose claims or interests are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote. Creditors or equity interest holders whose claims or interests are impaired by a plan, but who will receive no distribution under the plan, are also not entitled to vote because they are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code. For a discussion of these matters, see Article X, "Voting Procedures and Requirements" and Article XI, "Confirmation of the Plan."

For a detailed description of the Classes of Claims and Interests and their treatment under the Plan, see Article IX.A-D of this Disclosure Statement. In addition, the following summary chart sets forth the Classes that are entitled to vote on the Plan:

| Class | Description |
|-------|-------------|
| 1C | Senior Loan Claims against Tribune |
| 1D | Bridge Loan Claims against Tribune |
| 1DE | Senior Noteholder Claims against Tribune |
| 1EF | Other Parent Claims against Tribune |
| 50C-111C | Senior Loan Guaranty Claims against relevant Guarantor Debtors |
| 2E-111E | General Unsecured Claims against relevant Filed Subsidiary Debtors |

\* As further explained in Article IX.D of this Disclosure Statement, the votes cast in respect of the Plan, the votes cast by Holders of Allowed Loan Guaranty Claims in Classes 50C through 111C will also be counted as votes cast on the Prepackaged Plan of the relevant Guarantor Non-Debtors that may become Debtors.

**C.     Solicitation Package.**

Accompanying this Disclosure Statement (which is provided on CD-ROM) is a package of hard copy materials called the "Solicitation Package." The Solicitation Package contains copies of, among other things:

- the Bankruptcy Court order approving the Disclosure Statement and procedures for soliciting and tabulating votes on the Plan (the "Solicitation Order") which, among other things, approves this Disclosure Statement as containing adequate information, schedules the Confirmation Hearing, sets the voting deadline, sets out the procedures for distributing Solicitation Packages to the Holders of Claims against the Debtors, establishes the procedures for tabulating Ballots used in voting on the Plan, and sets the deadline for objecting to confirmation of the Plan;
- the Notice of the Hearing to Consider Confirmation of the Joint Plan of Reorganization for Tribune and Its Subsidiaries Plan;
- a Foreign Ownership Certification (as defined below) and, if applicable, a Media Ownership Certification (as defined below); and

4

- one or more Ballots and a postage-paid return envelope (Ballots are provided only to Holders of Claims that are entitled to vote on the Plan), which will be used by creditors and ~~interest~~equity holders who are entitled to vote on the Plan~~.~~; and

- a compendium containing submissions (collectively, the "Settlement Submissions") prepared by the following creditors or creditor representatives which set forth their respective views concerning the LBO-Related Causes of Action and the Global Settlement: (i) the Settlement Supporters (as defined in their Settlement Submission); (ii) the Credit Agreement Lenders (as defined in their Settlement Submission); (iii) Wells Fargo Bank, N.A. as successor administrative agent under the Bridge Loan Agreement; and (iv) Wilmington Trust Company, as successor indenture trustee for the PHONES Notes. The Settlement Submissions were not prepared by the Debtors; they were solely prepared by and express the views of the parties who tendered the Settlement Submissions. The Debtors disagree with many of the factual and legal assertions contained in certain of the Settlement Submissions. The Debtors' views in respect of the Global Settlement may be found in Article VII herein.

## D.    Voting Procedures, Ballots, and Voting Deadline.

After carefully reviewing the materials in the Solicitation Package and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan. Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

In order for your vote to be counted, you must complete and sign your original Ballot and return it in the envelope provided. Only original signatures will be accepted. Please return your completed Ballot to the Voting Agent, unless you are a beneficial holder of a Senior Noteholder Claim (as defined below) or a Senior Loan Claim (as defined below) who receives a Ballot from a broker, bank, commercial bank, trust company, dealer, or other agent or nominee (each, a "Voting Nominee"), in which case you must return the Ballot to such Voting Nominee. Ballots should not be sent to the Debtors or to the indenture trustee(s) for the Senior Notes.

**If you are a beneficial holder of a Senior Noteholder Claim or a Senior Loan Claim who receives a Ballot from a Voting Nominee, in order for your vote to be counted, your Ballot must be completed in accordance with the voting instructions on the Ballot and received by the Voting Nominee in enough time for the Voting Nominee to transmit a Master Ballot to the Voting Agent so that it is received no later than [●], July 30, 2010 at 4:00 p.m. (prevailing Eastern ~~time~~Time) (the "Voting Deadline"). If you are the Holder of any other type of Claim, in order for your vote to be counted, your Ballot must be properly completed in accordance with the voting instructions on the Ballot and received by Epiq Bankruptcy Solutions, LLC (the "Voting Agent") no later than the Voting Deadline. Any Ballot received after the Voting Deadline shall be counted at the sole discretion of the Debtors. Do not return any debt instruments or equity securities with your Ballot.**

**Any executed Ballot that does not indicate either an acceptance or rejection of the Plan or indicates both an acceptance and rejection of the Plan will not be counted as a vote either to accept or reject the Plan.**

If you are a Holder of a Claim who is entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, please call the Voting Agent at (646) 282-2400 or toll-free at (800) 622-1125.

If you have any questions about the procedure for voting your Claim, the packet of materials that you have received, the amount of your Claim, or if you wish to obtain, at your own expense, an additional copy of this Disclosure Statement and its appendices and Exhibits, please contact the Voting Agent.

FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE ARTICLE X, "VOTING PROCEDURES AND REQUIREMENTS."

Before voting on the Plan, each Holder of Claims in Classes that are entitled to vote on the Plan should read, in its entirety, this Disclosure Statement, the Plan, the Solicitation Order, the notice of the Confirmation Hearing, and the instructions accompanying the Ballots.  These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated.

**E.**    **Confirmation Hearing and Deadline for Objections to Confirmation.**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan.  The Confirmation Hearing pursuant to section 1128 of the Bankruptcy Code will be held on [●]August 16, 2010 at [●]10 a.m. (prevailing Eastern Time), before the Honorable Kevin J. Carey, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Fifth Floor, Courtroom No. 5, Wilmington, Delaware 19801.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.  Any objection to Confirmation of the Plan must be made in accordance with the requirements of section 1128(b) of the Bankruptcy Code, Bankruptcy Rule 9014, and the procedures set forth in Article XI.A of this Disclosure Statement.

## II. OVERVIEW OF THE PLAN

The following summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan.  For a more detailed description of the terms and provisions of the Plan, see Article IX, "The Plan of Reorganization."  The Debtors, moreover, reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

**A.**    **General Overview.**

The Plan described herein constitutes a separate plan of reorganization for each Debtor, and, to the extent they commence chapter 11 cases prior to the Confirmation Date, a prepackaged plan of reorganization for the Guarantor Non-Debtors.  The Plan, which incorporates a Global Settlement, is supported by certain key constituents in these Chapter 11 Cases who have entered into a Settlement Support Agreement, pursuant to which such parties agree to support a settlement of the LBO-Related Causes of Action in accordance with the term sheet (the ("Settlement Term Sheet") summarizing certain primary terms of such settlement.  The Settlement Support Agreement was filed with the Bankruptcy Court on April 12, 2010, and a copy of the Settlement Term Sheet is attached hereto as Exhibit B.  The Debtors are not a party to the Settlement Support Agreement; however, the Plan reflects and seeks to implement the terms of the Settlement Term Sheet.  The initial signatories to the Settlement Support Agreement are Angelo Gordon & Co LP; Centerbridge Credit Partners, L.P.; Centerbridge Credit Partners Master, L.P.; Centerbridge Special Credit Partners, L.P.; Law Debenture; and JPMorgan Chase Bank, N.A.  The Debtors believe that the Plan represents a good faith, fair, equitable and reasonable compromise that is in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests in these Chapter 11 Cases, and provides the greatest likelihood for achieving the Debtors' goal of a fair plan that will be accepted by the Impaired Classes of Claims entitled to distributions thereunder (i.e., the Holders of Loan Claims; the Holders of Senior Loan Guaranty Claims; the Holders of Senior Noteholder Claims; the Holders of Other Parent Claims; and the Holders of General Unsecured Claims). Certain parties to the Settlement Support Agreement have requested that the Settlement Support Agreement not be appended hereto due to confidentiality concerns; please refer to Exhibit B, however, for specific key terms thereof. The Creditors Committee supports the Plan and has prepared a letter ("Plan Support Letter") to all unsecured creditors urging them to vote in favor of the Plan.  A copy of the Plan Support Letter is included with the solicitation package that will be transmitted to creditors entitled to vote on the Plan.

The Plan sets forth the terms of the Debtors' reorganization and provides for the resolution of all Claims against and Interests in the Debtors. A central component of the Plan is the Global Settlement of all LBO-Related Causes of Action held by the Tribune entitiesEntities, the Debtors' Estates and any Person that is deemed to grant the Releases in Section 11.2.2 of the Plan. Any distributions to be made pursuant to the Plan shall be on account of and in consideration of the Global Settlement, which upon the Plan's Effective Date, shall be fully binding and effective. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Global Settlement and the Bankruptcy Court's finding that the Global Settlement is in the best interests of the Debtors, the Reorganized Debtors, their respective Debtors' Estates, and the Holders of Claims and Interests and is fair, equitable, and reasonable. By providing a complete resolution of the LBO-Related Causes of Action, the Global Settlement embodied in the Plan allows the Debtors to exit bankruptcy in a timely and efficient manner, unhampered by the enormous costs, distraction and likely damage to operations occasioned by years of litigation. Please refer to Article VII herein for a more detailed discussion of the Global Settlement.

The following Plan Treatment section provides an overview of the treatment of different classes of Claims and Interests under the Plan, and reflects the allocation, pursuant to the Global Settlement, of (i) approximately 7.0% of total Distributable Value (to which Holders of Allowed Loan Claims would otherwise claim entitlement) to the Holders of Senior Noteholder Claims and Other Parent Claims and (ii) approximately 1.4% of total Distributable Value (to which Holders of Allowed Loan Guaranty Claims would otherwise claim entitlement) to the Holders of General Unsecured Claims against Filed Subsidiary Debtors, resulting in the payment in full (without post-petition interest) of these General Unsecured Claims, assuming the Allowed amount of such Claims does not exceed $150 million.[4] The Debtors value the aggregate additional consideration to be provided to Holders of Senior Noteholder Claims, Other Parent Claims, and General Unsecured Claims against the Filed Subsidiary Debtors pursuant to the Global Settlement at more than $510 million.

**B.    Plan Treatment**

Under the Plan generally, all Allowed Administrative Expense Claims, Allowed DIP Facility Claims, Allowed Priority Tax Claims, and Allowed Convenience Claims against Tribune will be paid in full. Convenience Claims, however, will not receive post-petition interest. All Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, and Interests in the Filed Subsidiary Debtors will be Reinstated. The Plan provides no recovery to the Holders of Securities Litigation Claims, Tribune Interests, PHONES Notes Claims, orEGI-TRB LLC Notes Claims, and Bridge Loan Guaranty Claims and further provides that Intercompany Claims shall be deemed satisfied, discharged, and extinguished in full and shall be eliminated as of the Effective Date.

As more fully described in the Plan and Article II.D hereof, which sets forth the estimated recoveries on account of each Class of Claims against and Interests in the Debtors, the Plan provides the following:

- Holders of Allowed Senior Loan Claims (Class 1C) shall receive, subject to Section 5.4.2 of the Plan, a Pro Rata share of (i), calculated together with the Holders of Claims in Class 1D that are Allowed pursuant to Section 3.2.4(i) of the Plan, of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation, and the Loan Claims Stock Allocation. The Loan Claims Loan Allocation is 8.8% of the New Senior Secured Term Loan minus (ai) the amount of the New Senior Secured Term Loan to be distributed to the Holders of Allowed Senior Noteholder Claims (in Class 1D)E and (bii) the portion of the Other Parent Claims Allocation that is the New Senior Secured Term Loan; (ii). The Loan Claims Cash Allocation is 8.8% of the Distributable Cash minus (a) the amount of the Distributable Cash to be distributed to the Holders of Allowed Senior Noteholder Claims in Class 1E, (b) the portion of the Other Parent Claims Allocation that is Distributable Cash, and (c) the

---

[4] Please refer to Article XII for a discussion of the term "Distributable Value."

amount of Cash to be distributed to Holders of Allowed ~~Convenience~~Claims in Class 1G. The Loan Claims: and (iii) Stock Allocation is 8.8% of the New Common Stock (subject to dilution by the Equity Incentive Plan) minus (a) the amount of the New Common Stock to be distributed to the Holders of Allowed Senior Noteholder Claims and (b) the portion of the Other Parent Claims Allocation that is New Common Stock.

- The following treatment shall apply to all Holders of Bridge Loan Claims if Class 1D votes to accept the Plan: Each Holder of a Bridge Loan Claim shall (i) as of the Effective Date, have its Claim Allowed in an amount equal to the principal amount of such Claim plus accrued interest as of the Petition Date, and (ii) on or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for each Allowed Bridge Loan Claim against Tribune, subject to Section 5.4.2 of the Plan, receive such Holder's Pro Rata share, calculated together with the Holders of Allowed Claims in Class 1C, of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation.

  If Class 1D votes to reject the Plan, the following treatment shall apply:

  (i)     Subject to Section 3.2.4(b)(ii)(B) of the Plan, each Holder of a Bridge Loan Claim shall (i) have its Claim treated as a Disputed Claim unless and until such Claim is Allowed, if at all, including  determined not to be subject to avoidance, setoff, subordination or other defense, by Final Order, and (ii) in full satisfaction, settlement, release and discharge of and in exchange for such Bridge Loan Claim against Tribune, receive, if ultimately Allowed by Final Order, Cash equal to its Pro Rata share of the distributable value of Tribune as determined by the Bankruptcy Court in connection with confirmation of the Plan, taking into account all Allowed Claims against Tribune and also taking into account all Intercompany Claims against Tribune; provided, however, that if the Bankruptcy Court determines in connection with confirmation of the Plan that a different (including a lesser) treatment is appropriate under the requirements of section 1129(b) of the Bankruptcy Code, then such other treatment shall apply.  All rights to object to such Bridge Loan Claims and to seek to subject such Claims to avoidance, setoff, subordination, and other defenses are preserved.

  (ii)    Each Holder of a Bridge Loan Claim may, on such Holder's Ballot, elect the following treatment of its Bridge Loan Claim: (i) as of the Effective Date, have its Bridge Loan Claim Allowed in an amount equal to the principal amount of such Claim plus accrued interest as of the Petition Date, and (ii) on or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Bridge Loan Claim against Tribune, subject to Section 5.4.2 of the Plan, receive such Holder's Pro Rata share, calculated together with the Holders of Allowed Claims in Class 1C, of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation.  Each Holder of a Bridge Loan Claim who has voted in favor of the Plan shall be deemed to have elected the treatment set forth in Section 3.2.4(b)(ii)(B) of the Plan with respect to its Bridge Loan Claim unless, on such Holder's Ballot, such Holder elects not to receive the treatment set forth in Section 3.2.4(b)(ii)(B) of the Plan.

- Holders of Allowed Senior Noteholder Claims (Class 1~~D~~E) shall receive, subject to section 5.4.2 of the Plan, a Pro Rata Share of (i) 7.4% of the New Senior Secured Term Loan; (ii)

7.4% of the Distributable Cash; and (iii) 7.4% of the New Common Stock, subject to dilution by the Equity Incentive Plan.

- Holders of Allowed Other Parent Claims (Class 1E-F) shall each receive an amount of Distributable Cash equal to 35.18% of the aggregate amount in U.S. dollars of such Holder's Allowed Other Parent Claim.

- Holders of Allowed Senior Loan Guaranty Claims (Classes 50C-111C) shall receive, subject to Section 5.4.2 of the Plan, a Pro Rata share of (i) 91.2% of the New Senior Secured Term Loan plus the portion of the Other Parent Claims Allocation that is New Senior Secured Term Loan; (ii) 91.2% of the Distributable Cash minus the amount of Distributable Cash to be distributed to Holders of Allowed General Unsecured Claims against the relevant Filed Subsidiary Debtors (Classes 2E-111E) and the amount of Distributable Cash to be distributed to Holders of Allowed Other Parent Claims (Class 1E) in excess of the portion of the Other Parent Claims Allocation that is Distributable Cash; and (iii) 91.2% of the New Common Stock plus the portion of the Other Parent Claims Allocation that is New Common Stock, subject to dilution by the Equity Incentive Plan.

- Holders of Allowed General Unsecured Claims against the relevant Filed Subsidiary Debtors shall receive payment in full in Cash (paid out of the Distributable Cash); provided, however, that if the Debtors estimate, pursuant to the procedures set forth in Section 3.3.4 of the Plan, that the aggregate sum of Allowed General Unsecured Claims against the relevant Filed Subsidiary Debtors shall exceed $150 million and the Senior Lender Settlement Committee does not elect in writing after such estimate is filed with the Bankruptcy Court but prior to the conclusion of the Confirmation Hearing to provide additional consideration to such Holders, each Holder of an Allowed General Unsecured Claims against the relevant Filed Subsidiary Debtors shall instead receive its Pro Rata share of $150 million in Cash; provided further, however, that post-petition interest shall not accrue or be paid on any General Unsecured Claim.

In addition, the Plan constitutes a prepackaged plan for the Guarantor Non-Debtors, if any, that commence Chapter 11 Cases to effectuate the restructuring contemplated under the Plan. With the exception of Senior Loan Guaranty Claims, Bridge Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims, each Holder of an Allowed Claim against or Interest in a Guarantor Non-Debtor that becomes a Debtor shall have its Claim or Interest Reinstated. In addition, except for Senior Loan Guaranty Claims, Bridge Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims, Allowed Claims against and Interests in any Guarantor Non-Debtor that becomes a Debtor are Unimpaired and conclusively deemed to have accepted the Prepackaged Plan.

**C.    Summary of Allowed Claims Against and Interests in Each of the Debtors and of Estimated Recoveries in Respect Thereof.**

In order to determine the treatment of creditors of Tribune and each of its Subsidiary Debtors, management and its advisors reviewed the relationship between the value of each legal entity and third-party claims and intercompany claims at each such legal entity, including the Guarantor Non-Debtors. For purposes of this analysis, this relationship was modeled to calculate the value available for distribution to each legal entity's creditors and stockholders taking into account the flow of value between legal entities on account of Intercompany Claims. The treatment provided to the various Classes of Claims and Interests under the Plan is derived from estimates for Allowed Claims against Tribune, its Subsidiary Debtors, and each Non-Guarantor Debtor. Certain key assumptions utilized in formulating the aforementioned estimates are summarized below.

---

**KEY FACTORS AND ASSUMPTIONS**

- Guarantor Debtors. Claims against the Guarantor Debtors include, among others, Intercompany Claims, Senior Loan Guaranty

Claims, General Unsecured Claims, and Bridge Loan Guaranty Claims. The Bridge Loan Guaranty Claims are contractually subordinated to the Senior Loan Guaranty Claims and the Plan gives effect to such contractual subordination. These claims are otherwise *pari passu* in priority of payment against the Subsidiary Debtors.

- Tribune. Claims against Tribune include, among others, Loan Claims (which include Senior Loan Claims, and the Bridge Loan Claims, and the Barclays Swap Claims), EGI-TRB LLC Notes Claim, PHONES Notes Claims, and Senior Noteholder Claims. The PHONES Notes Claims and the EGI-TRB LLC Notes Claims are subordinated to the Senior Loan Claims, Bridge Loan Claims, Senior Noteholder Claims and Non-Qualified Former Employee Benefit Claims against Tribune. Additionally, based on the terms of the Senior Loan Guarantee Agreement, the right to recoveries on Intercompany Claims of any Guarantor Debtor or Guarantor Non-Debtor against Tribune are subordinated to the Senior Loan Guaranty Claims. The Plan gives effect to the foregoing subordination provisions.

- Intercompany Claims. The Debtors and their advisors have reviewed the Intercompany Claims as reflected in their books and records at the Petition Date in order to determine an appropriate estimate of Allowed Intercompany Claims. The Intercompany Claims are comprised of hundreds of thousands of individual transactions over the history of the Debtors. The review of these claims included a focus on (i) the most significant portion of these amounts which arose in the seven years preceding the Petition Date and (ii) amounts related to large, "one time" transactions. In addition, due to the prepetition debt structure which creates distinctions between Guarantor Debtors (and Guarantor Non-Debtors), Non-Guarantor Debtors, and Tribune, the review also focused on claims amongst these groups. The review resulted in the identification of certain categories of transactions, which were then assessed on both the legal and financial merits in terms of the transaction(s) likely creating Allowed Intercompany Claims. Based on this review and the assessment of strength of potential legal arguments, estimates were made of likely Allowed Intercompany Claims. Certain significant prepetition intercompany transactions assessed during this review include the following:

- Immediately prior to the Petition Date, Tribune transferred approximately $368.8 million in cash from its concentration and investment accounts at JPMorgan Chase Bank, N.A. and Bank of America, N.A. to new investment accounts at Fidelity Investments Institutional Services Company held by (i) Chicago Tribune Company and WGN Continental Broadcasting Company (which became Filed Subsidiary Debtors on December 8, 2008), (ii) Tribune CNLBC (which became a Filed Subsidiary Debtor on October 12, 2009), and (iii) Tribune Interactive, Inc. (which is a Guarantor Non-Debtor). These transfers were done in order to implement certain business objectives, including the preservation of liquidity and the continued availability of funding for subsidiary operations. These intercompany transfers were appropriately accounted for on the books and records of Tribune and its subsidiaries. For purposes of calculating distributions to Holders of Allowed Claims against and Interests in the Debtors, the aforementioned $368.8 million is deemed to have been returned to Tribune.

- During the 12 months prior to the Petition Date, the Tribune Entities engaged in a series of third-party and intercompany real property transactions involving the "KTLA Studio Lot" owned by Tribune California Properties, Inc., a Guarantor Debtor; the "SCNI Property" owned by Southern Connecticut Newspapers, Inc., a Guarantor Debtor; and properties in Los Angeles, CA, St. Louis, MO, Baltimore, MD, Hartford, CT, Melville, NY, and Conklin, NY (collectively, the "TMCT Properties"), which were leased by Tribune from TMCT, LLC pursuant to an Amended and Restated Lease Agreement entered December 2, 2006 (the "Master Lease"). On January 30, 2008 and April 22, 2008, the KTLA Studio Lot and the SCNI Property were sold for approximately $119 million and $28 million, respectively, and the proceeds of each sale were placed into escrow.[45]

In January 2008, Tribune exercised its option to purchase the TMCT Properties for $175 million. Tribune closed the deal on April 28, 2008. This transaction was partially structured as a "like-kind exchange" for tax purposes and was funded with the escrowed proceeds from the KTLA Studio Lot and SCNI Property sales plus an additional approximately $28 million contributed by Tribune. At the conclusion of these transactions, Tribune owned the TMCT Properties and became both the landlord and tenant under the Master Lease. Most of the properties were then leased (pursuant to a series of sublease agreements that were in place prior to the acquisition) by Tribune to the various Tribune Entities which utilized the TMCT Properties in the operation of their businesses. Tribune initially explored various financing alternatives for the TMCT Properties; however, Tribune ultimately was not able to achieve such financing and thus determined to transfer certain of the properties to the respective Tribune Entity lessee which utilized the specific property. Accordingly, in November 2008, Tribune transferred title of certain TMCT Properties as follows: the Los Angeles, CA property (Times Mirror Square) was transferred from Tribune to Los Angeles Times Communication LLC, a Guarantor Debtor; the Hartford, CT property was transferred from Tribune to The Hartford Courant Company, a Guarantor Debtor; and the Melville, NY Properties were transferred to Tribune ND, Inc., a Non-Debtor.[46]

---

[45] A portion of the KTLA Studio Lot was leased back to KTLA, Inc., a Guarantor Debtor.

[46] The Melville, NY properties are leased to Newsday LLC and that lease was assigned from Tribune to Tribune ND, Inc. contemporaneously with a transfer of the property from Tribune to Tribune ND, Inc. in 2008. The Conklin, NY property was sold to a third-party in October 2008. The St. Louis property was also sold to a third-party in June 2009, pursuant to an order of the Bankruptcy Court. The Baltimore properties continue to be owned by Tribune. *See* Tribune's Quarterly Report on Form 10-Q for the third quarter ending September 28, 2008 for additional information concerning the history of Tribune's relationship with TMCT, the resulting option to purchase the properties, and the monetization of an interest in

> The economic result of these transactions is that certain of Tribune's subsidiaries collectively provided approximately $147 million of the funds for the acquisition of the TMCT Properties and collectively retain TMCT Properties to which $124.7 million of the purchase price was allocated, while Tribune provided approximately $28 million of the funds for the acquisition of the TMCT Properties and retains (or subsequently benefited from the proceeds of the sale of) properties to which $50.3 million of the purchase price was allocated.
>
> · The Plan implements the Global Settlement and thereby effects a re-allocation of 7.0% of total Distributable Value for the benefit of Senior Noteholder Claims and Other Parent Claims as well as a re-allocation of 1.4% of total Distributable Value for the benefit of General Unsecured Claims against Filed Subsidiary Debtors, in each case representing value that would otherwise be claimed by the Holders of Loan Claims and Loan Guaranty Claims, respectively.[7]

The following charts summarize the projected distributions to Holders of Allowed Claims and Interests under the Plan. The projections of estimated recoveries are only an estimate. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries received. In addition, the ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain confirmation of the Plan and meet the conditions to confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement. Accordingly, the recoveries set forth below are projected recoveries only and may change based upon changes in the amount of Allowed Claims and Interests as well as other factors related to the Debtors' business operations and general economic conditions. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims against and Interests under the Plan.

    1.        Summary of Estimated Unclassified Claims Against all Debtors and of Estimated Recoveries in Respect Thereof.

| | | | |
|---|---|---|---|
| **(a)** | | | |
| **Description** | **Estimated Allowed Claims** | **Treatment** | **Estimated Recovery to Holders of Allowed Claims** |
| **DIP Facility Claims:** | $0 | **Unimpaired** | **100%** in the form of Cash. See Article IX.B.1. |
| **Administrative Expense Claims:** | $100 to $150 million[8] | **Unimpaired** | **100%** in the form of Cash. See Article IX.B.2. |
| **Priority Tax Claims:** | $150 to $175 million | **Unimpaired** | **100%** in the form of Cash in full or in installments over a period ending not later than the fifth anniversary of the Petition Date, together with interest compounded annually from the Effective Date on any outstanding balance. See Article IX.B.3. |

---

the *Newsday* business.

[7] For a further discussion of the Global Settlement, please refer to Article VII herein for the Debtors' discussion and analyses of the Global Settlement. For the views of certain creditors or creditor representatives, please refer to the Settlement Submissions in the compendium accompanying this Disclosure Statement.

[8] This estimate does not include amounts outstanding for goods or services provided in the ordinary course of business and excludes Intercompany Claims that are also Administrative Expense Claims. The Debtors intend to pay such amounts as they become due in the ordinary course of business.

2.    Summary of Estimated Allowed Claims and Interests against Tribune and the Filed Subsidiary Debtors and of Estimated Recoveries in Respect Thereof.

| (a) | Claims Against and Interests in Tribune (Debtor 1) | | |
|---|---|---|---|
| **Class & Description** | **Estimated Allowed Claims** | **Treatment** | **Estimated Recovery to Holders of Allowed Claims and Interests** |
| **Priority Non-Tax Claims (Class 1A):** | $0 to $1 million | **Unimpaired** | **100%** in the form of Reinstatement.  See Article IX.D.1.a. |
| **Other Secured Claims (Class 1B):** | Undetermined | **Unimpaired** | **100%** in the form of Reinstatement.  See Article IX.D.1.b. |
| **Senior Loan Claims (Class 1C):** | $8.722 billion | **Impaired** | **0.44%** in the form of a Pro Rata share, calculated together with the Holders of Claims in Class 1D that are Allowed pursuant to Section 3.2.4(b)(i), of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation.  See Article IX.D.1.c. |
| **Bridge Loan Claims (Class 1D)** | $1.619 billion | **Impaired** | **0.44%**, which recovery percentage shall apply to all Holders of Bridge Loan Claims if Class 1D votes to accept the Plan.  If Class 1D votes to accept the Plan, each Holder of a Bridge Loan Claim shall (a) as of the Effective Date, have its Claim Allowed in an amount equal to the principal amount of such Claim plus accrued interest as of the Petition Date, and (b) on or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for each Allowed Bridge Loan Claim against Tribune, subject to Section 5.4.2 of the Plan, receive such Holder's Pro Rata share, calculated together with the Holders of Allowed Claims in Class 1C, of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation.

If Class 1D votes to reject the Plan, then the Claims of any Holders who do not elect, or are not deemed to elect, to receive the treatment set forth in Section 3.2.4(b)(ii)(B) of the Plan shall be treated as "Disputed Claims."  As Holders of Disputed Claims, such rejecting or non-voting Holders will not be entitled to receive any recovery on the Effective Date of the Plan and will likely be subject to protracted litigation after the Effective Date commenced by a representative of the Estates respecting Allowance of their Claims, including litigation respecting whether or not such Claims should be subject to avoidance, setoff, subordination and/or other defenses.  If and to the extent such Bridge Loan Claims are ultimately determined by a Final Order to be Allowed Claims, then each Holder shall receive Cash on account of its Allowed Claim in an amount equal to its Pro Rata share of the distributable value of Tribune after taking into account all other Allowed Claims and also Intercompany Claims against Tribune (such distributable value being determined by the Bankruptcy Court in connection with confirmation of the Plan); provided, however, that if the Bankruptcy Court determines that a different (including a lesser) treatment is appropriate under section 1129(b) of the Bankruptcy Code, then such other treatment shall apply.  The Debtors estimate the recovery by a Holder of a Bridge Loan Claim in the event Class 1D votes to reject the Plan and such Holder does not elect, or is not deemed to elect, the treatment set forth in Section 3.2.4(b)(ii)(B) of the Plan will be between 0% and 4.6% of the amount of such Claim.  The aggregate recoveries by Bridge Loan Claims cannot materially exceed 4.6% of the amount of the Bridge Loan Claims unless |

| | | | |
|---|---|---|---|
| | | | the condition to the Plan Effective Date in Section 10.1.1.(i) of the Plan is waived.  The treatment of Bridge Loan Claims under the Plan is further discussed in Article IX.D.1.d herein. |
| **Senior Noteholder Claims (Class 1E):** | $1.283 billion | **Impaired** | **35.18%** in the form of each Holder of an Allowed Senior Noteholder Claim's Pro Rata share of 7.4% of the New Senior Secured Term Loan, 7.4% of the Distributable Cash, and 7.4% of the New Common Stock, subject to dilution by the Equity Incentive Plan.  See Article IX.D.1.e.[9] |
| **Other Parent Claims (Class 1F):** | $100 to 125 million | **Impaired** | **35.18%** in the form of an amount of Distributable Cash equal to 35.18% of the aggregate amount in U.S. dollars of such Holder's Allowed Other Parent Claim.  See Article IX.D.1.f. |
| **Convenience Claims (Class 1G):** | $0 to $1 million | **Unimpaired** | **100%** in the form of Cash; provided, however, that post-petition interest shall not be paid to any Holder on any Convenience Claim.  A Convenience Claim is a Claim against Tribune that would otherwise be a General Unsecured Claim that is (i) in an amount equal to or less than $1,000 or (ii) in an amount that has been reduced to $1,000 pursuant to a Convenience Class Election.  See Article IX.D.1.g. |
| **EGI-TRB LLC Notes Claims (Class 1D):** | $235 million | **Impaired** | **0%**, all EGI-TRB LLC Notes Claims shall be extinguished.  See Article IX.D.1.h. |
| **PHONES Notes Claims (Class 1J):** | $761 million | **Impaired** | **0%**, all PHONES Notes Claims shall be extinguished.  See Article IX.D.1.i. |
| **Intercompany Claims (Class 1K):** | N/A | **Impaired** | **N/A**, all Intercompany Claims against Tribune shall be deemed satisfied, discharged, and extinguished in full.  See Article IX.D.1.j. |
| **Securities Litigation Claims (Class 1L):** | Undetermined | **Impaired** | **0%**, all Securities Litigation Claims against Tribune shall be extinguished.  See Article IX.D.1.k. |
| **Tribune Interests (Class 1M):** | N/A | **Impaired** | **0%**, all Tribune Interests in Tribune shall be extinguished.  See Article IX.D.1.l. |

---

[9] Deutsche Bank Trust Company of Americas ("DBTCA"), the successor indenture trustee for the Debtors' 1992, 1995 and 1997 Indentures, asserts that the Debtors should pay for the fees and expenses of DBTCA based on the following assertions: (i) Tribune is contractually obligated to pay such fees and expenses under each of the Indentures; (ii) the fees and expenses of DBTCA are entitled to be treated as an administrative claim; and (iii) the Debtors are paying the fees and expenses of various major constituencies (including the fees and expenses of the Indenture Trustee under the 1996 Indenture) as identified in Sections 9.1.1 through 9.1.4 of the Plan.  DBTCA asserts that if the Debtors do not reimburse DBTCA for its fees and expenses, DBTCA is entitled under each of the applicable Indentures to assert a lien on all property held or collected by it for reimbursement of its fees and expenses.  In the event DBTCA asserts such a charging lien, DBTCA has informed the Debtors that it will reimburse itself for fees and expenses prior to making any distributions to the Senior Noteholders.  If DBTCA asserts a charging lien, DBTCA contends that the Holders of Senior Noteholder Claims under the 1992, 1995 and 1997 Indentures will receive a distribution that is less than that set forth in the chart above and less than that which will be received by the Holders of Senior Noteholder Claims under the 1996 Indenture.  At this time, the Debtors do not take a position on whether DBTCA has the right to assert a charging lien under the applicable Indentures.  However, the Debtors do not believe that DBTCA's assertion of a charging lien results in the disparate treatment of Class 1D Claims.

(a) ~~Claims Against and Interests in Tribune (Debtor 1)~~

| ~~Class & Description~~ | ~~Estimated Allowed Claims~~ | ~~Treatment~~ | ~~Estimated Recovery to Holders of Allowed Claims and Interests~~ |
|---|---|---|---|
| ~~Priority Non-Tax Claims (Class 1A):~~ | ~~$0 to $1 million~~ | ~~Unimpaired~~ | ~~100% in the form of Reinstatement. See Article IX.D.1.a.~~ |
| ~~Other Secured Claims (Class 1B):~~ | ~~Undetermined~~ | ~~Unimpaired~~ | ~~100% in the form of Reinstatement. See Article IX.D.1.b.~~ |
| ~~Loan Claims (Class 1C):~~ | ~~$10.342 billion~~ | ~~Impaired~~ | ~~0.44% in the form of a Pro Rata share of (i) 8.8% of the New Senior Secured Term Loan minus (a) the amount of the New Senior Secured Term Loan to be distributed to Holders of Allowed Claims in Class 1D and (b) the portion of the Other Parent Claims Allocation that is New Senior Secured Term Loans; (ii) 8.8% of the Distributable Cash minus (a) the amount of the Distributable Cash to be distributed to Holders of Allowed Claims in Class 1D, (b) the portion of the Other Parent Claims Allocation that is Distributable Cash, and (c) the amount of Cash to be distributed to Holders of Allowed Claims in Class 1F; and (iii) 8.8% of the New Common Stock (subject to dilution by the Equity Incentive Plan) minus (a) the amount of the New Common Stock to be distributed to Holders of Allowed Claims in Class 1D and (b) the portion of the Other Parent Claims Allocation that is the New Common Stock.[2] See Article IX.D.1.c.~~ |
| (b) | | | |
| ~~Senior Noteholder Claims (Class 1D):~~ | ~~$1.283 billion~~ | ~~Impaired~~ | ~~35.18% in the form of each Holder of an Allowed Senior Noteholder Claim's Pro Rata share of 7.4% of the New Senior Secured Term Loan, 7.4% of the Distributable Cash, and 7.4% of the New Common Stock, subject to dilution by the Equity Incentive Plan. See Article IX.D.1.d.~~ |
| ~~Other Parent Claims (Class 1E):~~ | ~~$100 to 125 million~~ | ~~Impaired~~ | ~~35.18% in the form of an amount of Distributable Cash equal to 35.18% of the aggregate amount in U.S. dollars of such Holder's Allowed Other Parent Claim. See Article IX.D.1.e.~~ |
| ~~Convenience Claims (Class 1F):~~ | ~~$0 to $1 million~~ | ~~Unimpaired~~ | ~~100% in the form of Cash; provided, however, that post-petition interest shall not be paid to any Holder on any Convenience Claim. A Convenience Claim is a Claim against Tribune that would otherwise be a General Unsecured Claim that is (i) in an amount equal to or less than $1,000 or (ii) in an amount that has been reduced to $1,000 pursuant to a Convenience Class Election. See Article IX.D.1.f.~~ |
| ~~EGI-TRB LLC Notes Claims (Class 1I):~~ | ~~$235 million~~ | ~~Impaired~~ | ~~0%, all EGI-TRB LLC Notes Claims shall be extinguished. See Article IX.D.1.g.~~ |
| ~~PHONES Notes Claims (Class 1J):~~ | ~~$761 million~~ | ~~Impaired~~ | ~~0%, all PHONES Notes Claims shall be extinguished. See Article IX.D.1.h.~~ |
| ~~Intercompany Claims (Class 1K):~~ | ~~N/A~~ | ~~Impaired~~ | ~~N/A, all Intercompany Claims against Tribune shall be deemed satisfied, discharged, and extinguished in full. See Article IX.D.1.i.~~ |

~~[2] The estimated recovery percentages for Holders of Loan Claims take into account the application of the contractual subordination PHONES Notes Claims and EGI-TRB LLC Notes Claims and any required turnover related thereto.~~

| | | | |
|---|---|---|---|
| ~~Securities Litigation Claims (Class 1L):~~ | ~~Undetermined~~ | ~~Impaired~~ | ~~0%, all Securities Litigation Claims against Tribune shall be extinguished. See Article IX.D.1.j.~~ |
| ~~Tribune Interests (Class 1M):~~ | ~~N/A~~ | ~~Impaired~~ | ~~0%, all Tribune Interests in Tribune shall be extinguished. See Article IX.D.1.k.~~ |
| **Class & Description** | **Estimated Allowed Claims** | **Treatment** | **Estimated Recovery to Holders of Allowed Claims and Interests** |
| **Priority Non-Tax Claims (Classes 2A – 111A):** | $0 to $1 million | **Unimpaired** | 100% in the form of Reinstatement. See Article IX.D.2.a. |
| **Other Secured Claims (Classes 2B-111B):** | Undetermined | **Unimpaired** | 100% in the form of Reinstatement. See Article IX.D.2.b. |
| **Senior Loan Guaranty Claims (Classes 50C -111C):** | $~~10.34~~28.722 billion[~~10~~] | **Impaired** | ~~52.64% (which represents a recovery of 62.41% with respect to Allowed Senior Loan Guaranty Claims and, in accordance with the contractual subordination provisions in the Loan Guaranty Agreements, zero percent (0%) with respect to Allowed Bridge Loan Guaranty Claims).~~62.41% in the form of a Pro Rata share of (i) 91.2% of the New Senior Secured Term Loan plus the portion of the Other Parent Claims Allocation that is New Senior Secured Term Loan; (ii) 91.2% of the Distributable Cash minus the amount of Distributable Cash to be distributed to Holders of Allowed Claims in Classes 2E-111E and the amount of Distributable Cash to be distributed to Holders of Allowed Claims in Class 1E in excess of the portion of the Other Parent Claims Allocation that is Distributable Cash; and (iii) 91.2% of the New Common Stock plus the portion of the Other Parent Claims Allocation that is New Common Stock. See Article IX.D.2.c. |
| **Bridge Loan Guaranty Claims (Classes 50D-111D)** | $1.619 billion[11] | **Impaired** | 0%, in order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions of (i) the New Senior Secured Term Loan, (ii) the Distributable Cash and (iii) the New Common Stock that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall instead be distributed to the Senior Loan Agent for distribution on account of Allowed Senior Loan Guaranty Claims. Accordingly, on the Effective Date, all Bridge Loan Guaranty Claims against the Guarantor Debtors shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such Bridge Loan Guaranty Claims. See Article IX.D.2.d. |
| **General Unsecured Claims (Classes 2E-111E):** | $85 to $150 million | **Impaired** | 100% in the form of Cash (paid out of the Distributable Cash); provided, however, that if the Debtors estimate, pursuant to Section 3.3.4 of the Plan, that the sum of Allowed Claims in Classes 2E-111E shall exceed $150 million in the aggregate and the Senior Lender Settlement Committee does not elect in writing after any such estimate is filed with the Bankruptcy Court but prior to the conclusion of the Confirmation |

[~~10~~] This amount is asserted against each of the Guarantor Subsidiaries. The estimated recovery set forth herein was calculated by taking the cumulative recovery from the Claims against each Guarantor Debtor and Guarantor Non-Debtor divided by this amount.

[11] This amount is asserted against each of the Guarantor Subsidiaries.

| | | | |
|---|---|---|---|
| | | | Hearing to provide additional consideration to such Holders, each Holder of an Allowed Claim in Classes 2E-111E shall instead receive its Pro Rata share of $150 million in Cash; provided further, however, that post-petition interest shall not accrue or be paid to any Holder on any General Unsecured Claim.  See Article IX.D.2.d~~g~~. |
| **Intercompany Claims (Classes 2K-111K):** | N/A | **Impaired** | **N/A**, all Intercompany Claims against the Filed Subsidiary Debtors shall be deemed satisfied, discharged and extinguished in full.  See Article IX.D.2.e~~f~~. |
| **Securities Litigation Claims (Classes 2L-111L):** | Undetermined | **Impaired** | **0%**, all Securities Litigation Claims against the Filed Subsidiary Debtors shall be extinguished.  See Article IX.D.2.f~~g~~. |
| **Interests in the Filed Subsidiary Debtors (Classes 2M-111M):** | N/A | **Unimpaired** | **100%** in the form of Reinstatement.  See Article IX.D.2.g~~h~~. |

3.    Summary of Estimated Allowed Claims Against and Interests for Each Guarantor Non-Debtor, if any, that becomes a Debtor and of Estimated Recoveries in Respect Thereof.

The Plan also constitutes a Prepackaged Plan for the Guarantor Non-Debtors, if any, that commence cases under chapter 11 of the Bankruptcy Code.  For any Guarantor Non-Debtor that commences a chapter 11 case, such Prepackaged Plan shall classify Allowed Claims and Interests in the same manner as set forth above for the Filed Subsidiary Debtors.

Except for Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims, each Holder of an Allowed Claim against or Interest in a Guarantor Non-Debtor that becomes a Debtor shall have its Claim or Interest Reinstated.  In addition, except for Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims, Allowed Claims against and Interests in any Guarantor Non-Debtor that becomes a Debtor are Unimpaired, and the Holders of such Claims and Interests are conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of such Claims and Interests are not entitled to vote to accept or reject the Prepackaged Plan.

The treatment of Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims under the Prepackaged Plan is as follows:

| (a) | | | |
|---|---|---|---|
| **Description** | **Estimated Allowed Claims** | **Treatment** | **Estimated Recovery to Holders of Allowed Claims** |
| **Senior Loan Guaranty Claims:** | $10.3~~1~~28.722 billion[~~12~~] | **Impaired** | ~~52.64% (which represents a recovery of 62.41% with respect to Allowed Senior Loan Guaranty Claims and, in accordance with the contractual subordination provisions in the Loan Guaranty Agreements, zero percent (0%) with respect to Allowed Bridge Loan Guaranty Claims)~~62.41% in the form of the distributions provided to such Holder under Article IX.D.2.c of this Disclosure Statement.  See Article IX.D.3.b~~c~~.i. |
| ~~Intercompany~~**Bridge Loan** | ~~Undetermined~~ 1.619 billion[13] | **Impaired** | ~~N/A, all Intercompany~~**0%, in order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions of (i) the New** |

---

[~~12~~] This amount is asserted against each of the Guarantor Subsidiaries.  The estimated recovery set forth herein was calculated by taking the cumulative recovery from the Claims against each Guarantor Debtor and Guarantor Non-Debtor divided by this amount.

| | | | |
|---|---|---|---|
| Guaranty Claims: | | | Senior Secured Term Loan, (ii) the Distributable Cash and (iii) the New Common Stock that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall instead be distributed to the Senior Loan Agent for distribution on account of Allowed Senior Loan Guaranty Claims. Accordingly, on the Effective Date, all Bridge Loan Guaranty Claims against Guarantor Non-Debtors that become Debtors shall be ~~deemed satisfied, discharged and extinguished in full~~extinguished and the Holders of such Claims shall not receive or retain any property under the relevant Prepackaged Plan on account of such Bridge Loan Guaranty Claims. See Article IX.D.3.c.ii. |
| ~~Securities Litigation~~Intercompany Claims: | Undetermined | Impaired | ~~0%~~N/A, all ~~Securities Litigation~~Intercompany Claims against Guarantor Non-Debtors that become Debtors shall be deemed satisfied, discharged and extinguished in full. See Article IX.D.3.d. |
| Securities Litigation Claims: | Undetermined | Impaired | 0%, all Securities Litigation Claims against Guarantor Non-Debtors that become Debtors shall be extinguished. See Article IX.D.3.e. |

## D.    FCC Approval.

Certain of the Debtors' business operations are subject to regulation by the Federal Communications Commission (the "FCC"). Television and radio stations may not operate in the United States without the authorization of the FCC and FCC approval is required for the issuance, renewal, transfer and assignment of station operating licenses. The FCC also regulates the multiple and combined ownership of television and radio broadcast stations as well as the cross-ownership of broadcast stations and newspapers in the same market. Because the Debtors' operations include newspapers, television stations, and a radio station, the Plan must comply with certain FCC-related multiple and cross-ownership requirements and restrictions. The Plan also must comply with limitations on foreign ownership of broadcast licensees administered by the FCC. Consummation of the Plan will be subject to obtaining the requisite approvals and waivers from the FCC. On April 28, 2010, the Debtors filed with the FCC applications for the consents of the FCC necessary to implement the Plan and related requests for waiver of FCC multiple ownership rules.

There are specific FCC-related ownership restrictions and requirements for equity holders of entities that hold FCC broadcast licenses. Each Holder of an Allowed Claim that is entitled to receive a distribution of New Common Stock pursuant to the Plan will be required to demonstrate to the Debtors' satisfaction that the issuance of New Common Stock to such Holder would not impair the ability of the Reorganized Debtors to comply with FCC-related ownership requirements and restrictions.

THE FOLLOWING SUMMARY OF CERTAIN FCC RULES AND POLICIES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN ADVISORS AS TO FCC OWNERSHIP ISSUES AND OTHER CONSEQUENCES OF THE PLAN.

1.    Required FCC Consents.

Both the Debtors' commencement of the Chapter 11 Cases and their emergence from bankruptcy require the consent of the FCC. The FCC previously granted consent for the assignment of the Debtors' FCC licenses from the Debtors to the Debtors as "debtors-in-possession" under chapter 11 of the Bankruptcy Code. For the Reorganized Debtors to continue the operation of the Debtors' broadcast stations, the Debtors will be required to file applications with the FCC (the "FCC Applications") to obtain prior approval of the FCC for the assignment of the FCC licenses from the Debtors as "debtors-in-possession" to the Reorganized Debtors (the "FCC Approval"). Because consummation of the transactions proposed in the Plan requires FCC Approval, the

---

[13] This amount is asserted against each of the Guarantor Subsidiaries.

FCC's favorable action on the Debtors' FCC Applications will affect when and whether those transactions may be consummated.

As part of the FCC Applications, the Debtors will be required to demonstrate compliance with a number of the FCC's rules and policies, including its broadcast multiple and cross-ownership rules and the foreign ownership limitations set forth in Section 310(b) of the Communications Act of 1934, 47 U.S.C. § 151 *et seq.*, as amended (the "Communications Act"). In addition, in order for certain combinations of the existing broadcasting and newspaper assets of the Debtors to continue to be held by Reorganized Tribune under the Plan, waivers of certain FCC broadcast multiple and cross-ownership rules must be obtained. Specifically, the Debtors will need to obtain waivers of the FCC's newspaper/broadcast cross-ownership rule and local television ownership or "duopoly" rule, including a waiver to continue to operate a television station in one market as a "satellite" station. The Debtors will not request any waivers, however, to accommodate separate media interests held by prospective stockholders independent of their interest in the Debtors. Instead, any prospective stockholders that might need independent waivers will receive New Class B Common Stock (or New Warrants) such that waivers are no longer necessary.

    2.      Information Required from Prospective Stockholders of Reorganized Tribune.

        (a)      Media Ownership Certifications

In processing the FCC Applications, the FCC will consider, among other things, whether the prospective licensees and those considered to be "parties" to the applications possess the legal, character, and other qualifications to hold an interest in a broadcast station. The FCC Applications require the Debtors to include information about the Reorganized Debtors and the "parties" to the applications – including certain of the proposed stockholders of the Reorganized Debtors – sufficient for the FCC to grant its consent to the transactions contemplated by the Plan. Prospective stockholders of the Reorganized Debtors, including those under common ownership or control, that would hold or control five percent (5%) or more of the New Class A Common Stock in Reorganized Tribune under the Plan will be parties to the FCC Applications and required to report certain information for FCC regulatory purposes. However, under certain circumstances, the Debtors may allocate such Holders as many shares of New Class B Common Stock as they deem necessary to ensure that the Holder will hold, in the aggregate, less than five percent (5%) of the shares of New Class A Common Stock upon the Effective Date. The New Class B Common Stock will have more limited voting rights than the New Class A Common Stock and has been designed to be non-cognizable (or "non-attributable") for purposes of determining the "parties" to the FCC Applications. Please refer to Article IX.G.2 for a further discussion of the rights of the New Class B Common Stock.

In order to be eligible to receive five percent (5%) or more of the New Class A Common Stock, a Claim Holder will be required to submit a Media Ownership Certification that provides information about the Holder and its affiliates to establish that the issuance of New Class A Common Stock to that Holder would not result in a violation of law, impair the qualifications of the Reorganized Debtors to hold FCC broadcast licenses, or impede the grant of any FCC Applications on behalf of the Reorganized Debtors. In general, the information provided in the Media Ownership Certifications will enable the Debtors to establish that prospective "parties" to the FCC Applications (i) have the requisite "character" qualifications required by the FCC and (ii) do not hold media interests that, together with their prospective interest in the Reorganized Debtors, would create an unlawful media combination under the FCC's rules. Specifically, to be eligible to receive five percent (5%) or more of New Class A Common Stock, each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to the Plan will be required to provide a Media Ownership Certification by the ~~Voting Deadline or such other~~ deadline established by the Bankruptcy Court, ~~which may be earlier than the Voting Deadline~~, in accordance with the instructions set forth in the Media Ownership Certification document that may be distributed to any such Holder. Such Holders will also be required to certify to and inform the Debtors of any changes in the information provided in their Media Ownership Certifications between the submission of the certification and the Effective Date by executing an amended Media Ownership Certification. Any such Holder that fails to provide the Media Ownership Certification by the ~~Voting Deadline or such other~~ deadline

established by the Bankruptcy Court, or that does not do so to the reasonable satisfaction of the Debtors, may be allocated New Class B Common Stock in lieu of New Class A Common Stock at the Debtors' discretion. Specifically, Reorganized Tribune in its discretion, may issue shares of New Class B Common Stock in lieu of shares of New Class A Common Stock if Reorganized Tribune determines, based on the Holder's Media Ownership Certification (or failure to provide the Media Ownership Certification or otherwise comply with applicable provisions of the Plan), that such Holder may have other media interests that could impair the ability of Reorganized Tribune to comply with the Communications Act or the FCC's rules if such Holder were issued the shares of New Class A Common Stock that it otherwise would be eligible to receive pursuant to the Plan. Except as otherwise provided in the Plan, each Holder of a Claim that is eligible to receive a distribution of New Common Stock will be issued New Class A Common Stock, provided that any such Holder will be entitled to receive all or a portion of its shares of New Common Stock in the form of New Class B Common Stock if such Holder informs the Debtors of its intent to receive such New Class B Common Stock by the date announced by the Debtors in a filing with the Bankruptcy Court and that will be no earlier than the first day of the Confirmation Hearing.

(b)    Foreign Ownership Certifications

The Communications Act generally prohibits alien (non-U.S.) persons or entities from having direct or indirect ownership or voting rights in the aggregate of more than twenty-five percent (25%) in a corporation that controls the licensee of a broadcast television or radio station. To ensure that Reorganized Tribune complies with this limitation, all prospective stockholders of the Reorganized Debtors (except the Holders of Senior Noteholder Claims), whether or not they will be "parties" to the FCC Applications, will be required to execute and submit a Foreign Ownership Certification that provides information about the extent of their direct and indirect ownership or control by non-U.S. persons or entities.

Each Holder of a Claim, with the exception of Senior Noteholder Claims, that is eligible to receive a distribution of New Common Stock pursuant to the Plan will be required (i) to provide the Foreign Ownership Certification by the deadline established by the Bankruptcy Court and (ii) to report any changes in foreign ownership percentages between the submission of the Foreign Ownership Certification and the Effective Date or such other deadline established by the Bankruptcy Court by providing an amended Foreign Ownership Certification and, upon request of the Debtors, confirm the absence of any changes. Any such Holder, other than a Holder of a Senior Noteholder Claim, that fails to provide the Foreign Ownership Certification by the deadline established by the Bankruptcy Court, that fails to provide an amended Foreign Ownership Certification if one is required, that does not provide a Foreign Ownership Certification that is reasonably satisfactory to the Debtors or that fails to provide a timely confirmation, if required, that its foreign ownership and voting rights percentages have not changed may be deemed to be an entity that is foreign-owned and controlled for purposes of determining the allocation of New Common Stock and New Warrants.

Each Holder of a Senior Noteholder Claim that is eligible to receive a distribution of New Common Stock pursuant to the Plan will have the option to submit a Foreign Ownership Certification and to tender its Senior Notes by the deadline established by the Bankruptcy Court. Any Holder of a Senior Noteholder Claim that does not submit a reasonably satisfactory Foreign Ownership Certification and tender its Senior Notes by such deadline will be deemed to be an entity that is foreign-owned and controlled for purposes of determining the allocation of New Common Stock and New Warrants.

Any Holder of a Claim that is eligible to receive New Common Stock under the Plan that, based on the Holder's Foreign Ownership Certification (or failure to provide the Foreign Ownership Certification or otherwise comply with the applicable provisions of the Plan), is or is deemed pursuant to the applicable provisions of the Plan to be, more than twenty-five percent (25%) foreign owned or controlled, on either a voting or an equity basis, as determined pursuant to section 310(b) of the Communications Act, shall receive New Warrants, New Common Stock, or a combination of New Warrants and New Common Stock based on an allocation mechanism that is to be determined. The allocation mechanism shall ensure, based on the aggregated

results of the Foreign Ownership Certifications, the compliance of Reorganized Tribune with section 310(b) of the Communications Act.

**HOLDERS OF CLAIMS ELIGIBLE TO RECEIVE NEW COMMON STOCK UNDER THE PLAN THAT ARE REQUIRED TO EXECUTE MEDIA OWNERSHIP CERTIFICATIONS MUST COMPLETE AND RETURN A MEDIA OWNERSHIP CERTIFICATION PRIOR TO THE ~~VOTING~~ DEADLINE ~~OR SUCH OTHER DATE AS MAY BE SET~~ESTABLISHED BY THE BANKRUPTCY COURT~~, WHICH MAY BE EARLIER THAN THE VOTING DEADLINE, AND TO~~ AND SUPPLEMENT SUCH CERTIFICATIONS AS AND WHEN REQUIRED. EXCEPT FOR THE SENIOR NOTEHOLDERS, ALL HOLDERS OF CLAIMS ELIGIBLE TO RECEIVE NEW COMMON STOCK UNDER THE PLAN MUST COMPLETE AND RETURN A FOREIGN OWNERSHIP CERTIFICATION BY THE ~~VOTING~~ DEADLINE ~~OR SUCH OTHER DATE THAT MAY BE SET~~ESTABLISHED BY THE BANKRUPTCY COURT AND SUPPLEMENT SUCH CERTIFICATIONS AS AND WHEN REQUIRED. ANY HOLDER OF A SENIOR NOTEHOLDER CLAIM ELIGIBLE TO RECEIVE NEW COMMON STOCK UNDER THE PLAN WILL HAVE THE OPTION TO RETURN A FOREIGN OWNERSHIP CERTIFICATION AND TENDER ITS SENIOR NOTES BY THE DEADLINE ESTABLISHED BY THE BANKRUPTCY COURT. ALL SUCH HOLDERS ARE ENCOURAGED TO CONSULT THEIR OWN ADVISORS CONCERNING THE COMPLETION OF THE MEDIA OWNERSHIP CERTIFICATION AND FOREIGN OWNERSHIP CERTIFICATION AND THEIR TREATMENT UNDER THE PLAN.**

## III.  GENERAL INFORMATION

A.    **The Debtors' Businesses and Properties.**

1.    Company Overview.

Tribune is a leading media and entertainment company reaching more than eighty percent (80%) of households in the United States through its newspapers, other publications and websites, its television and radio stations, its "Superstation" WGN America, and its other news and entertainment offerings. Tribune was founded in 1847 and incorporated in Illinois in 1861. In 1968, as a result of a corporate restructuring, Tribune became a holding company incorporated in Delaware. In 1983, after 136 years of private ownership, Tribune became a public company. Throughout the 1980s and 1990s, Tribune grew rapidly through a series of acquisitions. In 2000, Tribune acquired The Times Mirror Company ("Times Mirror").

Tribune returned to private ownership in 2007 when its board of directors, based on the recommendation of a special committee of the board comprised entirely of independent directors, approved a series of transactions (collectively, the "Leveraged ESOP Transactions") with a newly formed Tribune employee stock ownership plan (the "ESOP"), EGI-TRB, LLC (the "Zell Entity"), a Delaware limited liability company wholly-owned by Sam Investment Trust (a trust established for the benefit of Samuel Zell and his family), and Samuel Zell. On December 20, 2007, Tribune completed the Leveraged ESOP Transactions, culminating with the cancellation of all issued and outstanding shares of Tribune's common stock as of that date, other than shares held by the ESOP, and with Tribune becoming wholly-owned by the ESOP.

Tribune directly or indirectly owns all (or substantially all) of the equity in 128 subsidiaries (Tribune and its subsidiaries collectively, the "Tribune Entities"), of which 110 are Debtors. Tribune and certain of its subsidiaries also have equity interests, which are generally minority interests, in various businesses in which one or more third– parties are also holders of equity interests. These particular businesses are not Debtors as of the date of this Disclosure Statement. A corporate organizational chart detailing the ownership structure for Tribune and its majority and wholly-owned subsidiaries as of the date of this Disclosure Statement is attached as Exhibit C to this Disclosure Statement.

On March 13, 2008, Tribune filed an election to be treated as a subchapter S corporation under the Internal Revenue Code of 1986, as amended (the "IRC"), which election became effective as of the beginning of Tribune's 2008 fiscal year. Tribune also elected to treat nearly all of its subsidiaries as qualified subchapter S subsidiaries. Subject to certain limitations, Tribune and its qualified subchapter S subsidiaries are not currently subject to corporate level federal income tax. Instead, the income of Tribune and such subsidiaries is required to be reported by its stockholders. As of the date of this Disclosure Statement, the ESOP was the sole stockholder of Tribune and is not taxed on the income that is passed through to it because the ESOP is an employee benefit plan that qualifies for favorable tax treatment under Section 401(a) of the IRC. Although most states in which Tribune and its subsidiaries operate recognize the subchapter S corporation status, some impose taxes at a reduced rate.

2.      The Debtors' Properties.

The corporate headquarters of the Tribune Entities is located at 435 North Michigan Avenue, Chicago, Illinois 60611. The Tribune Entities own an aggregate of approximately 7,710,000 square feet of office, production and other space in approximately 54 locations. The Tribune Entities also lease parking lots, offices, and other space which aggregate to approximately 3,567,748 square feet in approximately 166 separate locations and also lease or own towers and transmitter space in approximately 84 locations.

## B.      Operations of the Debtors.

The Tribune Entities' primary sources of revenue are from (i) the sale of advertising in newspapers and other publications and on websites owned by or affiliated with the Tribune Entities, (ii) the distribution of preprinted insert advertisements, (iii) the sale of newspapers and other publications to distributors and individual subscribers, (iv) the provision of commercial printing and delivery services to third- parties, primarily other newspaper companies, (v) the sale of entertainment listings data and syndicated content, (vi) the sale of advertising on the Tribune Entities' television and radio stations, and on its "Superstation" WGN America, and (vii) the distribution of WGN America through cable, satellite, and other similar distribution methods. The Tribune Entities' operations are divided into two primary industry segments: (a) publishing (the "Publishing Segment") and (b) broadcasting (the "Broadcasting Segment").[14] These segments operate almost completely in the United States.[15]

1.      Publishing Segment.

The Publishing Segment, which accounted for seventy percent (70%) of the Tribune Entities' consolidated revenues in 2009, currently operates eight major-market daily newspapers, distributes preprinted insert advertisements, provides commercial printing and delivery services to third- parties, and distributes entertainment listings and syndicated content through its Tribune Media Services business unit. The daily newspapers published by the Tribune Entities, which have collectively garnered 84 Pulitzer Prizes, include the following market leading papers: the *Los Angeles Times*, the *Chicago Tribune*, *The Baltimore Sun*, the *Orlando Sentinel*, the *South Florida Sun Sentinel*, the *Hartford Courant*, *The Morning Call,* and the *Daily Press*.

The Tribune Entities' newspapers collectively have paid circulation of approximately 2 million copies daily and 3.1 million copies on Sundays. In addition, the Tribune Entities publish over 100 "niche" publications that target various geographic, ethnographic and demographic audiences and include the upscale *Chicago*

---

[14] Certain administrative activities are not included in either segment and are instead considered as general corporate operations.

[15] These segments also reflect the way the Tribune Entities sell their products to the marketplace, manage operations, and make business decisions.

*Magazine*, the Spanish language newspaper *Hoy*, which is published in Chicago and Los Angeles, and Chicago's *RedEye*, which targets a younger demographic.

The table below sets forth information concerning the Tribune Entities' average paid circulation for the six months ended September 2009, as reported to the Audit Bureau of Circulations, for its daily newspapers (in thousands). Average daily circulation is based on a five-day (Monday-Friday) average.

|  | **Daily** | **Sunday** |
|---|---|---|
| *Los Angeles Times* | 657 | 984 |
| *Chicago Tribune* | 466 | 803 |
| *The Baltimore Sun* | 187 | 322 |
| *Orlando Sentinel* | 181 | 281 |
| *South Florida Sun Sentinel* | 154 | 239 |
| *Hartford Courant* | 144 | 210 |
| *Allentown Morning Call* | 101 | 124 |
| *Daily Press* (Newport News, VA) | 66 | 91 |
| **Total Net Paid Circulation** | **1,956** | **3,054** |

The Publishing Segment also manages the websites of the Tribune Entities' daily newspapers, television stations, and other branded products that target specific areas of interest. In 2009, those websites collectively averaged 49 million monthly unique visitors and over 510 million monthly page views. The Publishing Segment employed approximately 10,300 full-time equivalent employees in the fourth quarter of 2009. The primary businesses of the Publishing Segment are described below.

       (a)      Los Angeles Times Media Group

The Los Angeles Times Media Group is a leading provider of news and information in the Los Angeles metropolitan area. Its operations are principally comprised of the publication of the *Los Angeles Times* and its related businesses. The *Los Angeles Times* has been published continuously since 1881. The newspaper has won 39 Pulitzer Prizes and is the largest daily metropolitan newspaper in the United States in circulation. The Los Angeles market ranks second in the nation in terms of population. In its primary circulation areas of Los Angeles, Orange, Ventura, San Bernardino and Riverside Counties, the *Los Angeles Times* competes for advertising and circulation with 18 local daily newspapers and three national newspapers, with its largest local competitor having almost 243,000 in average daily circulation. The *Los Angeles Times* ranks fourth in the United States for average daily paid circulation and second on Sundays for paid circulation. Approximately seventy-eight percent (78%) and eighty-two percent (82%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2009, with the remainder primarily sold at newsstands and vending boxes.

The *Los Angeles Times* publishes two daily editions: the East edition and the West edition. Additional daily and semi-weekly community newspapers are either inserted into the paper in selected geographic areas or distributed to homes and through vending boxes to provide targeted local news coverage. The Los Angeles Times Media Group operates latimes.com, an online expanded version of the newspaper, providing local, national and international news along with features reporting, findlocal.latimes.com, covering entertainment, reviews and things to do in Southern California, and theenvelope.com, a comprehensive year-round entertainment awards website. In 2009, the Los Angeles Times Media Group's digital media reached an

average of almost 9 million monthly unique visitors and averaged over 135 million monthly page views.  The Los Angeles Times Media Group also operates several targeted publications and their related websites, including (i) the free Spanish language newspaper, *Hoy*, which provides local, national and international news and features of interest to the largest Hispanic market in the United States and (ii) *Brand X*, which focuses on lifestyle and entertainment features.  In addition, the Los Angeles Times Media Group's production facility prints the local edition of *The Wall Street Journal*, and its outside carriers deliver the *Orange County Register*, *The Wall Street Journal*, *The New York Times* and numerous other local publications.

(b)      Chicago Tribune Media Group

The Chicago Tribune Media Group is a leading provider of news and information in Chicagoland.  Its operations are principally comprised of the publication of the *Chicago Tribune* and its related businesses.  Founded in 1847, the *Chicago Tribune* has won 25 Pulitzer Prizes and its print and online coverage attracts the largest news-seeking audience in the Midwest.  The Chicago market ranks third in the nation in terms of population.  The *Chicago Tribune* ranks eighth in the United States for average daily paid circulation and fourth on Sunday for paid circulation.  Approximately eighty-seven percent (87%) and seventy-eight percent (78%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2009, with the remainder primarily sold at newsstands and vending boxes.

The Chicago Tribune Media Group is a multi-product, multi-channel news and information source.  The Chicago Tribune Media Group operates chicagotribune.com, the web edition of the newspaper, and ChicagoNow.com, a local blog network.  In 2009, the Chicago Tribune Media Group's digital media reached an average of 4.5 million monthly unique visitors and averaged over 102 million monthly page views.  The Chicago Tribune Media Group also operates several targeted publications, including (i) *RedEye*, a free daily publication targeting young, urban commuters; (ii) *Hoy*, a free Spanish language newspaper; (iii) *Chicago Magazine*, an upscale monthly paid magazine; (iv) *TheMash*, a weekly newspaper for high school students; and (v) *Triblocal*, the largest community-driven weekly newspaper in Chicagoland.  Additionally, the Chicago Tribune Media Group provides an integrated and comprehensive direct mail service and is the leading distributor of third-party print publications in the Chicagoland area.  Its production facility prints the local edition of *The Wall Street Journal* and *The New York Times*, and its outside carriers deliver the *Chicago Sun-Times*, *The Wall Street Journal*, and *The New York Times* along with other national and local publications.

(c)      Baltimore Sun Media Group

The Baltimore Sun Media Group publishes *The Baltimore Sun*, Maryland's largest newspaper, which has won 15 Pulitzer Prizes since it began publishing a daily newspaper in 1837.  The Baltimore market ranks 20th in the nation in terms of population.  It competes with other Maryland and Washington, D.C. based daily and weekly newspapers as well as regional editions of national daily newspapers.  Approximately eighty-one percent (81%) and sixty-eight percent (68%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2009, with the remainder primarily sold at newsstands and vending boxes.

The Baltimore Sun Media Group's operations also include 18 community newspapers, the largest of which are *The Howard County Times, The Columbia Flier, The Towson Times* and *The Aegis*, along with *b*, a free daily publication targeting young adults, six magazines, and eight directories.  The Baltimore Sun Media Group also operates the market-leading website, baltimoresun.com, along with numerous niche online properties.  In 2009, the Baltimore Sun Media Group's digital media reached an average of more than 1.7 million monthly unique visitors and averaged over 36 million monthly page views.  It also has a custom media division that works with local companies to produce more than 40 specialized publications.

In addition, The Baltimore Sun Media Group prints the full circulation of the *Washington Times*, and also has printing contracts with the *New York Daily News* and *The Korea Daily*.  The Baltimore Sun Media Group has distribution and delivery agreements with 33 publications including *The Washington Post, USA Today*, the *New York Post*, and *The Wall Street Journal*.

      (d)     Florida Media Group

The Florida Media Group is a leading provider of news and information in Southern and Central Florida. Its operations are principally compromised of the publication of the *South Florida Sun Sentinel*, the *Orlando Sentinel*, and their related businesses. The Tribune Entities' Florida properties share significant resources in the areas of advertising sales, editorial coverage, and back office administration and have implemented significant regionalization and integration strategies.

The *Orlando Sentinel* primarily serves a six-county area in Central Florida. The newspaper is the only major daily newspaper in the Orlando market, although it competes with other Florida and national newspapers, as well as with other media. The *Orlando Sentinel* has been published since 1876 and has won three Pulitzer Prizes. The Orlando market ranks 26th in the nation in terms of population. Approximately eighty-six percent (86%) and eighty-one percent (81%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2009, with the remainder primarily sold at newsstands and vending boxes.

To serve the Central Florida market, the Florida Media Group also operates (i) orlandosentinel.com, a breaking news and information website; (ii) *Sentinel Express*, a free weekly publication used to distribute advertising and content to newspaper non-subscribers in Central Florida; (iii) *el Sentinel*, a weekly Spanish language newspaper, and its companion website, elsentinel.com; and (iv) *Everything Orlando*, a free niche product, and its companion website Everythingorlando.com. In 2009, the *Orlando Sentinel's* digital media reached an average of over 1.8 million monthly unique visitors and averaged over 43 million monthly page views. The Florida Media Group offers direct marketing and direct mail services through Tribune Direct/Orlando in addition to printing and distribution services for other publications.

The *South Florida Sun Sentinel* is the major daily newspaper serving the Broward/Palm Beach County market. The Miami/Fort Lauderdale/Miami Beach metropolitan area, which includes Broward and Palm Beach counties, ranks seventh in the nation in terms of population. Approximately eighty percent (80%) and seventy-five percent (75%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2009, with the remainder primarily sold at newsstands and vending boxes.

The Florida Media Group also serves the news and information needs of South Florida through (i) sunsentinel.com, a breaking news and information website; (ii) *el Sentinel*, a weekly Spanish language newspaper; (iii) *Teenlink*, a weekly newspaper distributed in Broward County high schools; (iv) several weekly community newspapers; and (v) other niche publications. In 2009, the *South Florida Sun Sentinel's* digital media reached an average of 1.3 million monthly unique visitors and averaged over 43 million monthly page views.

Other publications produced by the Florida Media Group in South Florida include: *City & Shore*, a bimonthly lifestyle magazine; *City Link*, an alternative weekly newspaper; *Home Source*, a comprehensive monthly guide to South Florida real estate and home improvement; *Jewish Journal*, a collection of weekly newspapers serving South Florida's Jewish community; and *South Florida Parenting*, a monthly magazine providing parenting information and resources for local families. The *South Florida Sun Sentinel* currently prints and transports all of the *Palm Beach Post's* circulation and its outside carriers deliver approximately eighty percent (80%) of the *Palm Beach Post's* single copy and approximately thirty percent (30%) of their home delivery copies. The *South Florida Sun Sentinel* also has printing contracts with *The New York Times* and *USA Today* for their daily papers and has distribution agreements with major dailies such as the *Miami Herald*, *The Wall Street Journal*, *USA Today*, *The New York Times*, and several other daily publications.

      (e)     CT1 Media

CT1 Media is a leading provider of news, information and entertainment in Connecticut. Its operations are principally comprised of the publication of the *Hartford Courant* and its related businesses. The *Hartford*

*Courant*, founded in 1764, is the oldest continuously published newspaper in the United States. It is the most widely circulated and read newspaper in Connecticut. Winner of two Pulitzer Prizes and twice named among the best-designed newspapers in the world, the *Hartford Courant* serves the state's northern and central regions. The *Hartford Courant's* primary market is the Hartford market, which ranks 45th in the nation in terms of population and includes Hartford, Tolland and Middlesex counties. Approximately ninety percent (90%) and seventy-eight percent (78%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2009, with the remainder primarily sold at newsstands and vending boxes. CT1 Media also operates courant.com, Connecticut's leading online news site, publishes three weekly alternative newspapers in Connecticut and operates a shared-mail company that distributes advertising supplements to more than one million households in Connecticut and Massachusetts. In 2009, the *Hartford Courant's* digital media reached an average of almost 900 thousand monthly unique visitors and averaged over 21 million monthly page views.

(f)     *The Morning Call*

*The Morning Call*, published since 1895, is the major regional newspaper for nine counties in eastern Pennsylvania and one county in western New Jersey. Its primary market, the Allentown-Bethlehem-Easton metropolitan area, is the 62nd largest market in the nation in terms of population. Approximately seventy-nine percent (79%) of the paper's daily and Sunday circulation was home delivered in 2009, with the remainder primarily sold at newsstands and vending boxes and to schools. *The Morning Call* also offers full service direct marketing and saturation preprint delivery through non-subscriber distribution and owns and operates the premier regional website, themorningcall.com. In 2009, *The Morning Call's* digital media reached an average of over 440,000 monthly unique visitors and averaged nearly 14 million page views.

(g)     *Daily Press*

Founded in 1896, the *Daily Press* serves the Virginia Peninsula market, which includes Newport News, Hampton, Williamsburg and eight other cities and counties. This market, together with Norfolk, Portsmouth, Virginia Beach and Chesapeake, is known as Virginia's Hampton Roads region and is the 35th largest market in the nation in terms of population. The *Daily Press* is the only major daily newspaper in its primary market, although it competes with other regional and national newspapers, as well as with other media. Approximately eighty-nine percent (89%) and eighty-four percent (84%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2009, with the remainder primarily sold at newsstands and vending boxes. The *Daily Press* also publishes *The Virginia Gazette*, a semi-weekly publication which primarily serves Williamsburg, Virginia, and the surrounding counties, the weekly *Tidewater Review*, published for the greater West Point, Virginia community, and several special interest publications. The *Daily Press* also distributes news, advertising and other information through various multimedia channels, including its online affiliates dailypress.com, hrtownsquare.com, hrvarsity.com and hrmilitary.com. In 2009, the *Daily Press'* digital media reached an average of over 360,000 monthly unique visitors and averaged over nine million monthly page views.

(h)     Tribune Media Services

Tribune Media Services ("TMS") is a leading provider of information and entertainment products for print, electronic and on-air media. Through its Entertainment Products division, TMS distributes television and movie listings and related editorial content under the TMS and Zap2it brands. This division also publishes monthly television listings magazines and offers direct marketing services for cable and satellite operators. TMS's News & Features division (i) syndicates comics, editorial cartoons, feature articles, opinion columns, games and puzzles; (ii) creates and distributes a variety of online information products; and (iii) licenses editorial content from national periodicals. TMS also markets news, features, information graphics and multimedia content to media clients around the world through McClatchy-Tribune Information Services. In 2009, TMS's Zap2it.com web site reached an average of 3.3 million monthly unique visitors and averaged over 33 million monthly page views.

2.     Broadcasting Segment.

The Broadcasting Segment, which accounted for thirty percent (30%) of the Tribune Entities' consolidated operating revenues in 2009, includes 23 television stations in 19 markets, of which seven stations are in the top ten markets in the United States. The Tribune Entities also own and operate the "Superstation" WGN America, which is seen in over 71 million homes, the Chicago radio station WGN-AM, which first went on the air in 1924, and CLTV, Chicago's first and only 24-hour cable news channel. Through its television stations and WGN America, the Broadcasting Segment reaches more than eighty percent (80%) of television households in the United States. The Broadcasting Segment employed approximately 2,750 full-time equivalent employees in the fourth quarter of 2009.

Thirteen of the Tribune Entities' television stations are affiliates of The CW Network. These stations are located in New York, Los Angeles, Chicago, Dallas, Washington, D.C., Houston, Miami, Denver, St. Louis, Portland, Indianapolis, Hartford and New Orleans. The Tribune Entities also have seven television stations affiliated with the FOX Network. These stations are located in Seattle, Sacramento, Indianapolis, Hartford, San Diego, Grand Rapids and Harrisburg. In addition, the Tribune Entities have an ABC Network television station affiliate in New Orleans and two independent stations in Philadelphia and Seattle.

Prior to the consummation of the transactions involving the Chicago Cubs' business, the Broadcasting Segment included Tribune's subsidiaries that operated the Chicago Cubs' business and held a twenty-five percent (25%) equity interest in regional sports network Comcast SportsNet Chicago, LLC. As discussed in Article V.H of this Disclosure Statement, in October 2009, the Tribune Entities contributed their interest in the Chicago Cubs' business and their twenty-five percent (25%) equity interest in Comcast SportsNet Chicago to Chicago Baseball Holdings, LLC. Results discussed herein for 2009 exclude results relating to the Chicago Cubs' business.

(a)     Television

The programming on the Tribune Entities' television stations consists of network-provided shows, syndicated series, news, local and regional sports coverage, feature films, and children's programs. These stations acquire most of their programming from outside sources, including The CW Network, the FOX Network, the ABC Network and major studios such as Warner Bros. A portion of the programming, including news and sports programming, is produced locally. Select information regarding the Tribune Entities' television stations is shown in the following summary table.

| | National Market Rank | % of U.S. Households | Channel | Major Over the Air Affiliation | Expiration of FCC License | Year Acquired |
|---|---|---|---|---|---|---|
| WPIX —New York, NY | 1 | 6.5 | 11 | CW | 2015 | 1948 |
| KTLA—Los Angeles, CA | 2 | 4.9 | 5 | CW | 2014 | 1985 |
| WGN—Chicago, IL | 3 | 3.0 | 9 | CW | 2013 | 1948 |
| WPHL—Philadelphia, PA | 4 | 2.6 | 17 | IND | 2015 | 1992 |
| KDAF—Dallas, TX | 5 | 2.2 | 33 | CW | 2014 | 1997 |
| WDCW—Washington, D.C. | 9 | 2.0 | 50 | CW | 2012 | 1999 |
| KIAH—Houston, TX | 10 | 1.8 | 39 | CW | 2014 | 1996 |
| KCPQ—Seattle, WA | 13 | 1.6 | 13 | FOX | 2015 | 1999 |
| KMYQ—Seattle, WA | 13 | 1.6 | 22 | IND | 2015 | 1998 |
| KWGN—Denver, CO* | 16 | 1.3 | 2 | CW | 2014 | 1966 |
| WSFL—Miami, FL | 17 | 1.4 | 39 | CW | 2013 | 1997 |
| KTXL—Sacramento, CA | 20 | 1.2 | 40 | FOX | 2014 | 1997 |
| KPLR—St. Louis, MO* | 21 | 1.1 | 11 | CW | 2014 | 2003 |
| KRCW—Portland, OR | 22 | 1.0 | 32 | CW | 2015 | 2003 |
| WTTV—Indianapolis, IN** | 25 | 1.0 | 4 | CW | 2013 | 2002 |
| WXIN—Indianapolis, IN | 25 | 1.0 | 59 | FOX | 2013 | 1997 |
| KSWB—San Diego, CA | 28 | 0.9 | 69 | FOX | 2014 | 1996 |
| WTIC—Hartford, CT | 30 | 0.9 | 61 | FOX | 2015 | 1997 |
| WTXX—Hartford, CT | 30 | 0.9 | 20 | CW | 2015 | 2001 |
| WPMT—Harrisburg, PA | 39 | 0.6 | 43 | FOX | 2015 | 1997 |
| WXMI—Grand Rapids, MI | 41 | 0.6 | 17 | FOX | 2013 | 1998 |
| WGNO—New Orleans, LA | 51 | 0.6 | 26 | ABC | 2013 | 1983 |

| | National Market Rank | % of U.S. Households | Channel | Major Over the Air Affiliation | Expiration of FCC License | Year Acquired |
|---|---|---|---|---|---|---|
| WNOL—New Orleans, LA | 51 | 0.6 | 38 | CW | 2013 | 2000 |

*This television station is party to a local marketing agreement with the FOX Network television station affiliate in the market owned by Local TV, LLC.

** WTTK (also in the Indianapolis market) is owned and operated as a satellite station, with a license expiration date in 2013.

In 2009, television contributed ninety-seven percent (97%) of the Broadcasting Segment's operating revenues. Approximately eighty-one percent (81%) of these revenues were derived from advertising. The Tribune Entities' television stations compete for audience and advertising with other television and radio stations, cable television and other media serving the same markets. Competition for audience and advertising is based upon various interrelated factors including programming content, audience acceptance and price.

The television group also includes WGN America, a broad entertainment network distributed in over 71 million homes across America by cable, satellite, and telcos. Its programming emphasis is entertainment and consists of first-run programs, syndicated sit-coms, blockbuster movies, cable exclusives, and live sports.

(b)     Radio/Other

WGN-AM, Chicago, is a news and talk radio station. It operates on frequency 720-AM and is the flagship station of the Chicago Cubs (MLB) radio network and the Chicago Blackhawks (NHL) and also airs Northwestern University (NCAA) Men's basketball and football games. WGN-AM is the only radio station owned by the Tribune Entities. In 2009, radio/other operations contributed three percent (3%) of the Broadcasting Segment's operating revenues.

3.     Additional Investments.

Various Tribune Entities (including non-Debtors) have investments (typically minority equity interests) in private corporations, limited liability companies and partnerships that are not Debtors in these Chapter 11 Cases. The Tribune Entities' significant investments are as follows:

| Investment | Description | Tribune Entities' Ownership | Partners[16] |
|---|---|---|---|
| Television Food Network | Lifestyle cable network and website with a focus on food and entertaining | 31.3% | Scripps Networks Interactive Inc. |
| CareerBuilder | Online recruitment company that connects job seekers and employers | 30.8% | Gannett Co., Inc. The McClatchy Company Microsoft Corporation |
| Classified Ventures | A network of automotive and real estate classified advertising websites, including cars.com, apartments.com and homegain.com | 27.8% | The McClatchy Company Gannett Co., Inc. The Washington Post Company A.H. Belo Corporation |
| Homefinder | An online real estate company that connects home buyers, sellers and real estate professionals | 33.3% | The McClatchy Company Gannett Co., Inc. |
| Topix | Provider of news and community information on the web, connecting people to the information and discussions that | 33.7% | Gannett Co., Inc. The McClatchy Company Former and Current Management |

---

[16] As used in this summary table, the term "Partners" refers to the parent company of each partner or in the case of an LLC, the parent company of each member. Actual legal partners, or, in the case of LLCs, members, may be affiliates of such parent companies.

| | matter to them in every U.S. town and city | | |
|---|---|---|---|
| quadrantONE | National premium advertising network of websites of the leading media companies in the U.S. | 25.0% | The New York Times Company<br>Hearst Corporation<br>Gannett Co., Inc. |
| Legacy.com | Provider of online obituaries | 49.1% | Individual Investors |
| Metromix | National network of local entertainment websites | 48.9% | Gannett Co., Inc. |
| Newsday Holdings LLC | Parent company of the entity that owns and operates *Newsday*, the leading daily newspaper in Long Island, and its related websites and other media properties | 2.8% | Cablevision Systems Corp. |
| Chicago Baseball Holdings, LLC | Owns and operates the Chicago Cubs Major League Baseball franchise and related businesses | 5.0% | Ricketts Acquisition LLC |

**C.    Recent Operations.**

The Tribune Entities' consolidated operating results for the fiscal years ended December 27, 2009 and December 28, 2008 are shown in the table below.[17]

| TRIBUNE ENTITIES CONSOLIDATED STATEMENTS OF OPERATIONS ($ in millions) | | |
|---|---|---|
| | Year Ended | |
| | Dec. 27, 2009 | Dec. 28, 2008 |
| **Revenues** | | |
| Publishing | $    2,243.2 | $    2,765.3 |
| Broadcasting | 939.4 | 1,165.0 |
| **Total Revenues** | $    3,182.6 | $    3,930.3 |
| **Cash Operating Expenses** | | |
| Publishing | $    1,915.8 | $    2,303.2 |
| Broadcasting | 713.3 | 804.3 |
| Corporate | 60.0 | 36.7 |
| **Total Cash Operating Expenses** | $    2,689.0 | $    3,144.2 |
| **Operating Cash Flow** | | |
| Publishing | $    327.4 | $    462.1 |
| Broadcasting | 226.2 | 360.6 |
| Corporate | (60.0) | (36.7) |
| **Total Operating Cash Flow** | $    493.6 | $    786.1 |
| **Income on Equity Investments, Net** | $    123.0 | $    85.0 |

At the end of 2009, the Tribune Entities' cash balance was approximately $1.5 billion, up from approximately $600 million at the end of 2008.  The increase in cash reflects $701 million in proceeds from the Chicago Cubs transaction received in the fourth quarter of 2009 and net cash flow generated from operations.

During 2009, core operations produced approximately $596 million of cash.  In addition, the Company received approximately $40 million from the operations of the Chicago Cubs and Comcast SportsNet and $89 million from TV Food Network in 2009.  Offsetting these cash inflows was $112 million of capital expenditures, $91 million of capital gains and other tax payments, $225 million of repayments of the Tribune

---

[17] The Tribune Entities' results of operations are preliminary and unaudited and exclude discontinued operations (Chicago Cubs group and Newsday) and Comcast SportsNet Chicago. The Debtors use cash operating expenses and operating cash flow to evaluate internal performance. "Cash operating expenses" are defined as operating expenses before depreciation and amortization, write-downs of intangible assets and properties, stock-based compensation, ESOP expense, certain special items (including severance), non-operating items, and reorganization items. "Operating cash flow" is defined as earnings before interest income, interest expense, equity income and losses, depreciation and amortization, write-downs of intangible assets and properties, stock-based compensation, ESOP expense, certain special items (including severance), non-operating items, and reorganization items. Cash operating expenses and operating cash flow are not measures of financial performance under Generally Accepted Accounting Principles ("GAAP") and should not be considered as a substitute for measures of financial performance prepared in accordance with GAAP.

Entities' DIP Facility, $14 million to collateralize the Tribune Entities' letters of credit and $96 million of reorganization costs.

**D.    Current Management of the Debtors.**

1.    Board of Directors.

In accordance with the Amended and Restated Bylaws of Tribune, the board of directors of Tribune (the "Board of Directors") currently consists of ten directors. Set forth below are the directors of Tribune, as of the date of the filing of this Disclosure Statement.[18]

| Name | Title |
| --- | --- |
| Samuel Zell | Chairman |
| Jeffrey S. Berg | Board Member |
| Brian L. Greenspun | Board Member |
| Betsy D. Holden | Board Member |
| Randy Michaels | Board Member[19] |
| William A. Osborn | Board Member |
| William C. Pate | Board Member |
| Mark Shapiro | Board Member |
| Mary Agnes Wilderotter | Board Member |
| Frank E. Wood | Board Member |

2.    Subcommittees of the Board of Directors.

The Board of Directors has a standing audit committee (the "Audit Committee") whose function includes reviewing and monitoring Tribune's financial reporting and accounting practices and internal controls. Betsy D. Holden, William A. Osborn (chair) and Frank E. Wood currently serve on the Audit Committee.

The Board of Directors also has a standing compensation committee (the "Compensation Committee"), which has the responsibility to review annually and approve corporate goals and objectives relevant to the compensation of Tribune's principal executive officer, to evaluate Tribune's principal executive officer's performance in light of those goals and objectives and, based on that evaluation, to determine and approve the principal executive officer's compensation level. The Compensation Committee also has the responsibility to review annually with the principal executive officer and approve the compensation for the other senior executive officers, including the three most highly-compensated executive officers other than the principal executive officer and principal financial officer. Furthermore, the Compensation Committee has the responsibility to review and approve incentive and other compensation plans, if any, covering certain other management employees of the Debtors. The current members of the Compensation Committee are Brian L. Greenspun, William C. Pate, and Mary Agnes Wilderotter (chair).

3.    Compensation of Directors.

Directors who are employees of the Tribune Entities receive no additional compensation for service as a director. In 2010, the non-employee directors will receive cash compensation in the form of a $125,000 retainer and will be reimbursed for actual out-of-pocket expenses incurred in attending meetings. In addition, the chair of the Audit Committee will be paid an additional $15,000 cash retainer and each member of the Audit Committee, including the chair, will be paid an additional $6,000 cash retainer.

---

[18] This Disclosure Statement contains only information pertaining to Tribune's Board of Directors, which information does not apply in the case of each of Tribune's subsidiaries.

[19] Randy Michaels is also President and Chief Executive Officer of Tribune.

4.    Executive Officers.

Set forth below are the members of the executive management team of the Tribune Entities as of the date of this Disclosure Statement and each member's position.

| Name | Position |
|---|---|
| Randy Michaels | President and Chief Executive Officer, Tribune |
| Gerald A. Spector | Chief Operating Officer, Tribune |
| ~~Ed Wilson~~ | ~~Chief Revenue Officer and Chief Sales Officer, Tribune; President, Tribune Broadcasting~~ |
| Jerry Kersting | ~~Executive Vice~~ President~~, Tribune; Chief Operating Officer~~, Tribune Broadcasting |
| Marc Chase | President, Tribune Interactive |
| Nils Larsen | Executive Vice President and Chief Investment Officer, Tribune |
| Donald J. Liebentritt | Executive Vice President and Chief Legal Officer, Tribune |
| Chandler Bigelow III | ~~Senior~~Executive Vice President and Chief Financial Officer, Tribune |

## IV. SUMMARY OF CERTAIN PREPETITION LIABILITIES

### A.    Prepetition Funded Debt and Capital Structure of the Tribune Entities.

1.    Prepetition Capital Structure.

As mentioned in Article III.A and further discussed in Article VII of this Disclosure Statement, Tribune returned to private ownership in 2007.[20] On April 1, 2007, Tribune entered into an Agreement and Plan of Merger (the "Merger Agreement") with GreatBanc Trust Company,[21] the Zell Entity,[22] and Tesop Corporation, a Delaware corporation wholly-owned by the ESOP (the "Merger Sub"). The Merger Agreement provided for a series of transactions that, if various conditions were satisfied, would ultimately culminate in the Merger Sub merging with and into Tribune, and following such merger, for Tribune to continue as the surviving corporation wholly-owned by the ESOP (the "Merger"). On April 1, 2007, pursuant to the terms of that certain ESOP Purchase Agreement, dated as of April 1, 2007, by and between Tribune and GreatBanc Trust Company, the ESOP purchased 8,928,571 shares of Tribune's common stock from Tribune at a price of $28 per share.[23] The ESOP paid for this purchase with a promissory note of the ESOP in favor of Tribune in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from Tribune to the ESOP and/or distributions paid on the shares of Tribune common stock held by the ESOP.

On April 23, 2007, pursuant to a purchase agreement dated April 1, 2007 (the "Zell Entity Purchase Agreement"), the Zell Entity made an initial investment of $250 million in Tribune in exchange for (i) the purchase of 1,470,588 shares of Tribune's common stock at a price of $34 per share and (ii) an unsecured subordinated exchangeable promissory note of Tribune in the principal amount of $200 million.

On April 25, 2007, Tribune commenced a tender offer to repurchase up to 126 million shares (approximately fifty percent (50%) of the then-outstanding shares) of Tribune's common stock that were then-outstanding at a price of $34 per share in cash. The tender offer expired on May 24, 2007 and 126 million

---

[20] The descriptions contained in this Disclosure Statement provide only a brief overview of the Leveraged ESOP Transactions. Additional details concerning the Leveraged ESOP Transactions are available in Tribune's Quarterly Report on Form 10-Q for the third quarter ending September 28, 2008.

[21] GreatBanc Trust Company was not party to the Merger Agreement in its individual or corporate capacity, but solely as trustee of Tribune Employee Stock Ownership Trust, a separate trust created under the ESOP.

[22] The Zell Entity was party to the Merger Agreement solely for the limited purpose provided therein.

[23] GreatBanc Trust Company was not a party to the ESOP Purchase Agreement in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust created under the ESOP.

shares of Tribune's common stock were repurchased and subsequently retired on June 4, 2007 utilizing proceeds from the Senior ~~Credit~~Loan Agreement (as defined and discussed below).

On December 20, 2007, Tribune merged with Merger Sub, with Tribune surviving the Merger. Upon consummation of the Merger, the 8,928,571 shares of Tribune's common stock held by the ESOP were converted into 56,521,739 shares of common stock and represented the only outstanding shares of capital stock of Tribune after the Merger. Pursuant to the terms of the Merger Agreement, each share of common stock of Tribune, par value $0.01 per share, issued and outstanding immediately prior to the Merger, other than shares held by Tribune, the ESOP or Merger Sub immediately prior to the Merger (in each case, other than shares held on behalf of third- parties) and shares held by stockholders, was cancelled and automatically converted into the right to receive $34, without interest and less any applicable withholding taxes, and Tribune became wholly-owned by the ESOP.

Pursuant to the Zell Entity Purchase Agreement, on December 20, 2007, the Zell Entity tendered the shares of Tribune common stock it had acquired pursuant to the Zell Entity Purchase Agreement. Tribune also retired the unsecured subordinated exchangeable promissory note held by the Zell Entity, including approximately $6 million of accrued interest. Following the consummation of the Merger, the Zell Entity purchased from Tribune, for an aggregate of $315 million, a $225 million subordinated promissory note and a 15-year warrant. As the $315 million investment was greater than the cash due from Tribune to the Zell Entity for the shares tendered and notes retired, accrued interest, and legal fees, the amounts were netted against each other and the balance of $56 million was paid by the Zell Entity to Tribune. The warrant entitles the Zell Entity to purchase 43,478,261 shares of Tribune's common stock (subject to adjustment), which represented approximately forty percent (40%) of the economic equity interest in Tribune following the Merger (on a fully-diluted basis). The initial aggregate exercise price for the warrant was $500 million (subject to adjustment), increasing by $10 million per year for the first ten years of the warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). Thereafter, the Zell Entity assigned minority interests in the subordinated promissory note and the warrant to certain permitted assignees.

The terms of the ESOP provide that common shares held by the ESOP are to be allocated on a noncontributory basis to eligible employees of Tribune. As of December 27, 2009, approximately 1.6 million of the common shares held by the ESOP have been allocated to eligible employees of Tribune. However, as discussed in Article IV.C hereof, no distributions will be made to eligible employees on account of such shares.

 2. Prepetition Funded Debt Structure.

In connection with the Leveraged ESOP Transactions and in order to fund ongoing general corporate and working capital needs, Tribune entered into financing facilities in May 2007 and December 2007.~~20~~[24] Tribune is also the obligor on (i) a series of outstanding note and debenture issuances and (ii) exchangeable subordinated debentures that predated the Merger, as well as a subordinated promissory note, which was issued immediately following the Merger. Additionally, Tribune (in its capacity as servicer) and Tribune Receivables LLC, a wholly-owned special purpose subsidiary which is not a Debtor, were parties to a trade receivables securitization facility for which Barclays Bank PLC ("Barclays") was the administrative agent and Tribune Receivables LLC was the borrower.~~21~~[25] Accordingly, Tribune's prepetition debt structure was comprised of the following components: (a) a Senior ~~Credit~~Loan Agreement; (b) a Bridge Facility (as defined below); (c) various issuances of outstanding notes and debentures (the "Senior Notes"); (d) the EGI-TRB LLC Notes (as defined below); (e) exchangeable subordinated debentures (the "PHONES Notes"); and (f) a Receivables Facility (as

---

~~20~~[24] Please refer to Article VII for a further discussion of the financing facilities entered in connection with the Leveraged ESOP Transactions.

~~21~~[25] The trade receivables securitization facility was amended and continued post-petition pursuant to orders entered by the Bankruptcy Court on January 15, 2009 and April 8, 2009. The trade receivables securitization facility was terminated on February 26, 2010.

defined below).  As of the Petition Date, Tribune's funded debt totaled approximately $12.706 billion in principal amount, as follows:

| Debt Instrument | Approximate Principal Amount Outstanding as of the Petition Date |
|---|---|
| Senior Credit Facility | $8.622 billion [20] |
| Bridge Facility | $1.600 billion |
| Senior Notes | $1.263 billion |
| EGI-TRB LLC Notes | $0.235 billion |
| PHONES | $0.759 billion |
| Receivables Facility | $0.225 billion |
| **Total** | **$12.706 billion** |

A brief overview of Tribune's debt facilities, outstanding note and debenture issuances, and any guarantees of such facilities and issuances by Tribune's subsidiaries is set forth below.  All of the indebtedness described in subparagraphs (a) through (e) below – the Senior ~~Credit~~Loan Agreement indebtedness, the Bridge Facility indebtedness, the Senior Notes, the EGI-TRB LLC Notes, and the PHONES Notes – are obligations of the parent company, Tribune.  This indebtedness is *pari passu* in payment priority at Tribune, except for the EGI-TRB LLC Notes and the PHONES.  The EGI-TRB LLC Notes and the PHONES Notes are contractually subordinated to all funded indebtedness at Tribune.  The Senior ~~Credit~~Loan Agreement indebtedness and the Senior Notes are secured, equally and ratably, by a stock pledge (the "Stock Pledge") of the equity in two subsidiaries.  None of the Bridge Facility, the EGI-TRB LLC Notes, or the PHONES Notes are secured.  Additionally, the indebtedness under the Senior ~~Credit~~Loan Agreement and the indebtedness under the Bridge Facility constitute unsecured obligations at those Tribune subsidiaries (the "Guarantor Subsidiaries"),[21] which have guaranteed (i) the Senior ~~Credit~~Loan Agreement indebtedness on a senior priority basis, and (ii) the Bridge Facility indebtedness on a subordinate basis to the Senior ~~Credit~~Loan Agreement indebtedness.  None of the Senior Notes, PHONES Notes, or the EGI-TRB LLC Notes are guaranteed by, or constitute obligations of, any of Tribune's subsidiaries.  Instead, they are liabilities solely of Tribune.

     (a)     Senior ~~Credit~~Loan Agreement.

On May 17, 2007, Tribune entered into an $8.028 billion senior secured credit agreement (the "Senior ~~Credit~~Loan Agreement") with JPMorgan Chase Bank, N.A., as administrative agent and financial institutions

---

[20] The amount outstanding on account of the Senior Credit Facility includes the Barclays Swaps Claim (which is defined and described below).

[21] The Guarantor Subsidiaries are those subsidiaries deemed material under the Credit Agreement, and are comprised of the following:  5800 Sunset Productions Inc.; California Community News Corporation; Channel 39, Inc.; Channel 40, Inc.; Tribune CNLBC, LLC; Chicago Tribune Company; Chicagoland Publishing Company; Chicagoland Television News, Inc.; Courant Specialty Products, Inc.; Distribution Systems of America, Inc.; Eagle New Media Investments, LLC; Eagle Publishing Investments, LLC; Forsalebyowner.com corp.; Forum Publishing Group, Inc.; Gold Coast Publications, Inc.; Homeowners Realty, Inc.; Homestead Publishing Company; Hoy Publications, LLC; Internet Foreclosure Service, Inc.; KIAH Inc.; KPLR, Inc.; KSWB Inc.; KTLA Inc.; KWGN Inc.; Los Angeles Times Communications LLC; New Mass. Media, Inc.; Orlando Sentinel Communications Company; Patuxent Publishing Company; Southern Connecticut Newspapers, Inc.; Star Community Publishing Group, LLC; Stemweb, Inc.; Sun-Sentinel Company; The Baltimore Sun Company; The Daily Press, Inc.; TMLH 2, Inc.; TMLS I, Inc.; TMS Entertainment Guides, Inc.; Tower Distribution Company; Tribune (FN) Cable Ventures, Inc.; Tribune Broadcast Holdings, Inc.; Tribune Broadcasting Company; Tribune Broadcasting Holdco, LLC; Tribune California Properties, Inc.; Tribune Direct Marketing, Inc.; Tribune Entertainment Company; Tribune Finance LLC; Tribune Interactive, Inc.; Tribune Los Angeles, Inc.; Tribune Manhattan Newspaper Holdings, Inc.; Tribune Media Net, Inc.; Tribune Media Services, Inc.; Tribune National Marketing Company; Tribune ND, Inc.; Tribune New York Newspaper Holdings, LLC; Tribune NM, Inc.; Tribune Television Company; Tribune Television Holdings, Inc.; Tribune Television New Orleans, Inc.; Tribune Television Northwest, Inc.; Virginia Gazette Companies, LLC; WDCW Broadcasting, Inc.; WGN Continental Broadcasting Company; WPIX, Inc.; and WTXX Inc.

from time to time party thereto.[24][28]  The Senior ~~Credit~~Loan Agreement consists of the following loan facilities: (i) a $1.5 billion Senior Tranche X Term Facility (the "Tranche X Facility"), (ii) a $5.515 billion Senior Tranche B Term Facility (the "Tranche B Facility"), (iii) a $263 million Delayed Draw Senior Tranche B Term Facility (the "Delayed Draw Facility") and (iv) a $750 million Revolving Credit Facility (the "Revolving Credit Facility").[25][29]  The Senior ~~Credit~~Loan Agreement also provided a commitment for an additional $2.105 billion in new incremental term loans under the Tranche B Facility (the "Incremental Facility").  On December 27, 2007, Tribune entered into a number of increase joinders pursuant to which the Incremental Facility became a part of the Tranche B Facility under the Senior ~~Credit Agreement.~~Loan Agreement.  On June 4, 2007, the Company used the proceeds from the Tranche X Facility and the Tranche B Facility in connection with the consummation of a tender offer to repurchase certain shares of the Company's common stock that were then outstanding and to, among other things, refinance the Company's former five-year credit agreement and former bridge credit agreement.

Under the terms of the Senior ~~Credit~~Loan Agreement, Tribune was required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Senior ~~Credit~~Loan Agreement and other debt with respect to borrowed money.  On July 2, 2007, Tribune entered into an International Swap and Derivatives Association, Inc. ("ISDA") Master Agreement, a schedule to the 1992 ISDA Master Agreement and on July 3, 2007, entered into three interest rate swap confirmations (collectively, the "Swap Documents") with Barclays, which Swap Documents provide for (i) a two-year hedge with respect to $750 million in notional amount, (ii) a three-year hedge with respect to $1 billion in notional amount, and (iii) a five-year hedge with respect to $750 million in notional amount.  The Swap Documents were terminated on the Petition Date.  As of that date, Tribune's aggregate liability in connection with the Swap Documents was approximately $150.9 million, which liability is subject to the guarantee of the Senior ~~Credit~~Loan Agreement indebtedness by the Guarantor Subsidiaries on a *pari passu* basis with Tribune's Senior ~~Credit~~Loan Agreement indebtedness.[26][30]

As of the Petition Date, with the exception of the aforementioned liability in connection with the Swap Documents, the total principal amount outstanding under the Senior ~~Credit~~Loan Agreement was approximately $8.472 billion, including approximate outstanding balances on the Tranche X Facility, Tranche B Facility and the Revolving Credit Facility of $512 million, $7.723 billion[27][31] and $237 million, respectively.[28][32]  The Senior ~~Credit~~Loan Agreement indebtedness is secured by a pledge of the equity interests of Tribune Finance, LLC and Tribune Broadcasting Holdco, LLC, both of which are Debtors, and is guaranteed, on a senior priority basis, by the Guarantor Subsidiaries.

> (b)    Bridge Facility.

On December 20, 2007, Tribune entered into a $1.6 billion Senior Unsecured Interim Loan Agreement (the "Interim Credit Agreement") with Merrill Lynch ~~Capital Corporation~~ as administrative agent, JPMorgan Chase Bank, N.A. as Syndication Agent, Citicorp North America, Inc. and Bank of America, N.A. as Co-Documentation Agents, and the Initial Lenders named therein.  Pursuant to the Interim Credit Agreement, Tribune borrowed $1.6 billion under a 12 month bridge facility (the "Bridge Facility").  The total proceeds of $3.705 billion from the Bridge Facility and the Incremental Facility were used by Tribune, among other ways,

---

[24][28] The Senior ~~Credit~~Loan Agreement was subsequently amended on June 4, 2007, and all references thereto include the June 4, 2007 amendment.

[25][29] The Revolving Credit Facility includes a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million.

[26][30] Tribune was also party to an interest rate swap agreement with Morgan Stanley, which was terminated as of the Petition Date.  Morgan Stanley, as the non-defaulting party under the swap agreement, calculated that approximately $52 million was owing to Tribune under that agreement as of the Petition Date.  Approximately $9.5 million of this amount was paid to Tribune post-petition.  While Tribune asserts a claim for the balance of approximately $42 million, Morgan Stanley has asserted a right to set-off approximately $38 million of this amount.

[27][31] The outstanding indebtedness under the Tranche B Facility includes amounts outstanding under the Incremental Facility and the Delayed Draw Facility.

[28][32] As of the Petition Date, Tribune had $99.8 million of letters of credit outstanding under the Revolving Credit Facility.

in connection with the consummation of the Merger and for general corporate purposes. The Bridge Facility indebtedness is unsecured but is guaranteed, on a senior subordinated basis, by the Guarantor Subsidiaries. As of the Petition Date, the approximate outstanding balance of the Bridge Facility was $1.6 billion.

(c)     The Senior Notes.

Pursuant to Indentures entered into between 1992 and 1997, Tribune is obligated on Senior Notes in the aggregate approximate amount of $1.263 billion. Each outstanding series and the approximate principal amounts owing as of the Petition Date are as follows:

| Indenture | Interest Rate | Maturity Date | Outstanding Amount[33] | CUSIP # |
|-----------|---------------|---------------|------------------------|---------|
| 1992 | 6.25% | November 10, 2026 | $.120 million | 89605HBY9 |
| 1995 | 7.25% | March 1, 2013 | $ 82.083 million | 887364AA5 |
| 1995 | 7.5% | July 1, 2023 | $ 98.750 million | 887364AB3 |
| 1996 | 6.61% | September 15, 2027 | $ 84.960 million | 887364AF4 |
| 1996 | 7.25% | November 15, 2096 | $148.000 million | 887360AT2 |
| 1997 | 4.875% | August 15, 2010 | $450.000 million | 896047AE7 |
| 1997 | 5.25% | August 15, 2015 | $330.000 million | 896047AF4 |
| 1997 | 5.67% | December 8, 2008 | $ 69.550 million | 89604KAN8 |
| Total |  |  | $1.263 billion |  |

The Senior Notes are not guaranteed. The Senior Notes are secured by the Stock Pledge on a *pari passu* basis with the indebtedness under the Senior ~~Credit~~Loan Agreement.

(d)     The EGI-TRB LLC Notes.

On December 20, 2007, Tribune executed a $225 million subordinated promissory note in favor of the Zell Entity, which thereafter assigned minority interests in such notes to certain permitted assignees (collectively, the "EGI-TRB LLC Notes"). The notes are obligations solely of Tribune and are not guaranteed by Tribune's subsidiaries. As of the Petition Date, the aggregate outstanding principal balance of the EGI-TRB LLC Notes, including accrued payment-in-kind interest, totaled $235.3 million. The EGI-TRB LLC Notes mature in 2018.

(e)     The PHONES Notes.

In April 1999, Tribune issued eight million Exchangeable Subordinated Debentures due 2029 (the "PHONES Notes") for an aggregate principal amount of $1.256 billion. At the time of issuance, the value of one PHONES Notes was related to the value of one "reference share" of America Online ("AOL") common stock, which was then trading at $157 per share. On November 22, 1999, AOL common stock split on a two-to-one basis, changing the reference to two shares of AOL for each PHONES Notes. On January 11, 2001, AOL and Time Warner Inc. merged to form AOL Time Warner Inc. with the merged entity continuing to trade under the ticker AOL. On October 16, 2003, AOL Time Warner Inc. changed its name to Time Warner Inc. and began trading as TWX. As a result of the split and subsequent merger, two shares of TWX common stock now represent the "reference shares" for each PHONES Notes. Tribune was eligible to redeem the PHONES Notes at any time for the higher of the principal value of the PHONES Notes or the then-current market value of two shares of Time Warner common stock, subject to certain adjustments. In addition, prior to the Petition Date, Holders of PHONES Notes were contractually entitled to exchange a PHONES Notes for an amount of cash equal to ninety-five percent (95%) (or one hundred percent (100%) under certain circumstances) of the then-current market value of two shares of Time Warner stock. The approximate carrying value of PHONES

---

[33] "The "Outstanding Amount" does not include accrued interest or fees as of the Petition Date. In addition, the "Outstanding Amount" does not purport to represent the Allowed amount of the Senior Noteholder Claims.

Notes on the Petition Date was $759 million comprised of $703 million for PHONES Notes not submitted for exchange and a $56 million liability for PHONES Notes exchanged that were not settled in cash. The Debtors have been informed by the Trustee for the PHONES Notes that the Trustee and certain holders of the PHONES have disputed that the outstanding amount of the PHONES Notes that were submitted for redemption and not settled for cash has been reduced as a result of such submission. The PHONES Notes are obligations solely of Tribune and are not guaranteed by Tribune's subsidiaries.

    (f)  The Receivables Facility.

    Prior to the Petition Date, Tribune, Tribune Receivables, LLC, a non-Debtor special purpose subsidiary of Tribune (the "Receivables Subsidiary"), and certain other subsidiaries of Tribune entered into a $300 million trade receivables securitization facility (the "Receivables Facility") led by Barclays, as administrative agent. The Receivables Facility, entered into in July 2008, enabled certain of Tribune's subsidiaries (the "Operating Subsidiaries") to sell certain trade receivables and related assets (the "Receivables") to Tribune on a daily basis. Tribune, in turn, sold such Receivables to the Receivables Subsidiary, also on a daily basis. Receivables transferred to the Receivables Subsidiary are considered assets of the Receivables Subsidiary and not of Tribune or any of the Operating Subsidiaries.

    As of the Petition Date, the total amount outstanding under the Receivables Facility was $225 million. As discussed in Article VI below, following the Petition Date, the Receivables Facility was amended, restated and incorporated into the Amended DIP Facility (defined below). On November 19, 2009, the outstanding term and revolving loan balances under the Amended DIP Facility were repaid. On February 25, 2010, the Debtors provided written notice to the Administrative Agent for the Amended DIP Facility terminating the Amended DIP Facility effective February 26, 2010.

**B.**  **Prepetition Trade Payables & Other Operating Liabilities.**

    In addition to the funded debt described above, Tribune and its Debtor subsidiaries had liabilities as of the Petition Date to various trade vendors. Such liabilities related to the purchase of broadcast rights, newsprint and ink, and other goods and services used in the Debtors' business operations. As of the Petition Date, the Debtors had approximately $115 million of trade payables, including accruals for goods or services received but not invoiced. These amounts remain subject to the claims reconciliation process, which is discussed further in Article VI.G.4 of this Disclosure Statement.

**C.**  **Prepetition Compensation and Benefit Programs.**[20][34]

    The Debtors employed approximately 11,929 full-time and 2,555 part-time employees as of December 31, 2009, and the Debtors' gross expenses for their employees' compensation and benefit programs were approximately $1.1 billion during calendar year 2009. In addition to standard wages, such costs include a number of programs which were implemented by the Debtors in the ordinary course of business and are designed to reward the Debtors' management and non-management employees for excellent service, incentivize future performance, and provide employees with a competitive compensation and benefit package.

    Certain of these compensation and benefit programs are generally described below, with the exception of insured and self-insured programs (e.g., health plans), customary fringe benefit policies (e.g., vacation, sick leave), individual employment agreements and collectively bargained agreements (except for the information set forth in sections 1-2 below). The descriptions included below generally identify compensation and benefit programs for current and former employees that, in addition to certain other employee compensation and benefit programs not specifically described herein, the Debtors intend to continue pursuant to the Plan. The descriptions also set forth those compensation and benefit programs that, though in effect as of the Petition

---

[20][34] Unless otherwise specified, the Compensation and Benefit Programs discussed in this Section were implemented by the Debtors prior to the Petition Date.

Date, have either been suspended, have expired by their terms or are programs which the Debtors otherwise do not intend to continue following the Effective Date of the Plan.

As further described below, the Plan generally contemplates that the Tribune Company Pension Plan (defined below), the Debtors' other qualified defined benefit pension plans, the 401(k) Plans (defined below), the Management Incentive Plan (or the "MIP", as described below), Local Bonus Programs (defined below), collective bargaining agreements, and certain salary continuation programs will be continued following the Debtors' emergence from the Chapter 11 Cases.  The Plan further contemplates that certain compensation and benefit programs in effect as of the Petition Date will not be continued following the Effective Date, including the Management Equity Incentive Plan (defined below), the Incentive Compensation Plan (defined below) (other than those provisions involving the MIP), the ESOP, the Transitional Compensation Plan (defined below), certain nonqualified retirement and deferred compensation programs, and certain individual letter agreements.

The descriptions set forth below are not, and are not intended to be, comprehensive and, as previously noted, do not include certain customary employee benefits provided by the Debtors.  All such benefit programs and the Debtors' other compensation and benefit programs are governed by applicable program terms and conditions, as in effect or amended from time to time.  In addition, the Debtors reserve the right to modify, amend or terminate any or all of their employee benefit and compensation programs in the ordinary course of business in their sole discretion, subject to applicable modification, amendment or termination provisions and/or applicable law.  Moreover, nothing in this Disclosure Statement shall limit the Debtors' rights to implement or seek implementation of any compensation and benefit programs as may be appropriate.

    1.      Compensation and Benefit Programs in Effect as of the Petition Date that will be continued Pursuant to the Plan.

        (a)      Retirement Programs.

The Debtors provide retirement benefits to employees through numerous defined benefit pension plans and defined contribution 401(k) plans sponsored either by the Debtors or by unions.  These benefits are generally described below.

          i)      Single Employer Pension Plans

The Debtors currently maintain four qualified single-employer defined benefit pension plans.[35]  A description of the Debtors' single-employer pension plans follows.

          1.      Tribune Company Pension Plan

The Tribune Company Pension Plan is the Debtors' primary pension plan and is a tax-qualified, non-contributory, defined benefit pension plan for eligible employees.[36]  Substantially all of the accrued benefits provided under the plan were earned by employees based on final average pay benefit formulas used in other defined benefit plans sponsored by the Debtors that were merged into the Tribune Company Pension Plan.  Although the Tribune Company Pension Plan most recently provided benefits using a cash balance allocation, its assets and liabilities are almost entirely attributable to the benefits earned under prior plan formulas, the majority of which were frozen prior to January 1, 2006 and the last of which was frozen as of December 31, 2006.

---

[35] Two additional plans, the Major League Baseball Pension Plan for Non-Uniformed Personnel and the Minor League Players Pension Plan, were previously maintained by one of the Debtors.  However, these plans were assumed and assigned as a part of the Chicago Cubs transaction.

[36] The formal name of the Tribune Company Pension Plan is the Tribune Company Cash Balance Pension Plan.

As discussed above, from December 31, 2007 through December 31, 2009, the Tribune Company Pension Plan provided benefits in the form of an annual cash balance allocation to a hypothetical account established for each eligible employee participating in the plan in an amount equal to three percent (3%) of the employee's eligible compensation. In addition, each eligible employee's account was credited with interest quarterly to provide an annual effective rate equal to the ten-year, United States Treasury rate in effect on November 30th of the preceding year. Beginning in 2010, the Debtors discontinued the annual cash balance allocations; however, the Debtors continue to credit employees' accounts with the aforementioned interest. In place of the cash balance allocation, the Debtors currently provide retirement benefits through matching contributions to employees' accounts under the existing defined contribution 401(k) Plans, discussed below. These changes did not affect any benefits earned prior to 2010 under the Tribune Company Pension Plan.

The Debtors estimate that, as of January 1, 2009, there were approximately 13,057 active employees participating in the Tribune Company Pension Plan, as well as approximately 9,280 retirees receiving benefits from the Tribune Company Pension Plan. As of that date, there were also approximately 15,933 additional persons who were neither active employees of the Debtors nor currently receiving benefits under the Tribune Company Pension Plan, but that were eligible to receive benefits thereunder in the future.

The funding status of the Tribune Company Pension Plan is generally determined either in accordance with GAAP ("Accounting Funding") or in accordance with the Pension Protection Act ("Cash Funding"). On an Accounting Funding basis, the Tribune Company Pension Plan was approximately eighty-eight percent (88%) funded at the end of 2009. On a Cash Funding basis, the Tribune Company Pension Plan was between approximately ninety-five percent (95%) and one hundred percent (100%) funded at the end of 2009.[37]

As of January 1, 2010, the Tribune Company Pension Plan maintained assets with a market value of approximately $1.3 billion. Based on current actuarial analyses, various assumptions, and the Debtors' business plans, the Debtors anticipate that there will not be any Cash Funding requirements for the plan in 2010-2011, but that such Cash Funding requirements will be approximately (in millions) $53 in 2012, $49 in 2013, and $43 in 2014. Actual funding requirements are highly dependent on assumptions and could vary considerably from these estimates.

### 2.    Other Single Employer Qualified Defined Benefit Pension Plans

In addition to the Tribune Company Pension Plan, the Debtors maintain the following three qualified defined benefit pension plans for eligible employees:

- *Baltimore Sun Company Employees Retirement Plan.* As of January 1, 2010, the Baltimore Sun Company Employees Retirement Plan maintained assets with a market value of approximately $46 million. Based on current actuarial analyses and the Debtors' business plans, the Debtors anticipate that the Cash Funding requirements for the Baltimore Sun Company Employees Retirement Plan will be approximately (in millions) $2 in 2010, $4 in 2011, $5 in 2012, $4 in 2013, and $4 in 2014. Actual Cash Funding requirements are highly dependent on assumptions and could vary considerably from these estimates.
- *Tribune Company Hourly Pension Plan.* As of January 1, 2010, the Tribune Company Hourly Pension Plan maintained assets with a market value of approximately $17.6 million. Based on current actuarial analyses, various assumptions, and the Debtors' business plans, the Debtors anticipate that there will be no Cash Funding requirements for the Tribune Company Hourly

---

[37] The Cash Funding calculation yields a lower deficit than the Accounting Funding calculation for a number of reasons. For example, for purposes of the Cash Funding calculation, assets are "smoothed" by averaging the three most recent year-end asset values, with the benefit of averaging limited to one hundred and ten percent (110%) of the actual most recent year-end asset value. Under the Pension Protection Act rules, the Cash Funding calculation also applies a different discount rate to discount liabilities than the Accounting Funding method.

Pension Plan in 2010-2014.  Actual Cash Funding requirements are highly dependent on assumptions and could vary considerably from these estimates.

- *Baltimore Mailers Union Local No. 888 Plan.*[138]  As of January 1, 2010, the Baltimore Mailers Union Local No. 888 Plan maintained assets with a market value of approximately $8.1 million.  Contributions, funded by concessions negotiated in collective bargaining, occur each pay period.  Based on current actuarial analyses, various assumptions, and the Debtors' business plans, the Debtors anticipate that there will be no additional Cash Funding requirement for the Baltimore Mailers Union Local No. 888 Plan in 2010 and that additional Cash Funding of approximately $0.3 million will be required each year in 2011-2014.   Actual funding requirements are highly dependent on assumptions and could vary considerably from these estimates.  These estimates do not include routine contractual contributions that continue to be made each year.

As set forth in Section 6.5 of the Plan, the Debtors will continue performing their obligations under the above defined benefit pension plans on and after the Effective Date.

ii)   Multiemployer Pension Plans

The Debtors also participate in 16 multiemployer plans at various locations pursuant to certain of their collective bargaining agreements.  These plans, which are summarized in the below table, generally require monthly contributions based on hours worked.  On and after the Effective Date of the Plan, the Debtors intend to perform their obligations with respect to the multiemployer plans.

| Business Unit/Department | Department Union/Local | Plan Name | Estimated Number Current Employees of Debtors Covered | CBA Expiration Date | Estimated Total Number of Participants | Approximate Contribution | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | 2007 | 2008 | 2009 |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) |
| (1)  Chicago Tribune - Pressmen | Pressmen GCC/#7 | GCIU-Employer Retirement Fund | 150 | 05/2012 | 56,367 | $ 464,118 | $ 467,830 | $ 451,612 |
| (2)  Chicago Tribune - Drivers | Drivers IBT/#706 | Chicago Newspaper Publishers Drivers Union Pension Plan | 140 | 12/2010 | 1,039 | 1,813,473 | 1,696,538 | 1,661,276 |
| (3)  Baltimore Sun - Pressroom | Pressroom GCC/#31 | GCIU-Employer Retirement Fund | 80 | 04/2012 | 56,367 | 304,725 | 276,049 | 366,168 |
| (4)  Chicago Tribune - Machinists | Machinist IAM/#126 | IAM National Pension Fund | 47 | 09/2008 | 227,988 | 226,741 | 207,952 | 204,588 |
| (5)  KTLA - Newsroom | Newsroom AFTRA | AFTRA Health and Retirement Plan | 40 | 08/2011 | 40,859 | 592,191 | 544,431 | 656,898 |
| (6)  WPIX - Directors | Directors DGA | Directors Guild of America Producers Pension Plan | 32 | 10/2008 | 17,141 | 74,445 | 80,391 | 80,487 |
| (7)  WGN-TV - Newsroom | Newsroom AFTRA | AFTRA Health and Retirement Plan | 30 | N/A** | 40,859 | 593,528 | 587,836 | 717,151 |
| (8)  Baltimore Sun - Drivers | Drivers IBT/#355 | Truck Drivers and Helpers Local 355 Pension Fund | 25 | 12/2010 | 3,490 | 141,138 | 105,754 | 137,783 |
| (9)  WPIX - Newsroom | Newsroom AFTRA | AFTRA Health and Retirement Plan | 25 | 05/2009 | 40,859 | 489,995 | 508,626 | 478,933 |
| (10)  WPIX - Stagehands | Stagehand s IATSE/#1 | IATSE Local #1 Pension Plan and Annuity Funds** | 14 | 03/2011 | 11,195 | 97,746 | 110,313 | 129,565 |
| (11)  WGN-TV - Stagehands | Stagehand s IATSE/#2 | Stagehands Local #2 Pension Plan and Annuity Funds *** | 10 | 05/2011 | ~~1035~~ 1,035 | 54,485 | 47,252 | 57,082 |
| KTLA (12)  KLTA-TEC Electricians | IEC Electricia ns | Motion Picture Association Pension Plan | 3 | 07/2010 | 328 | 46,276 | 28,336 | 29,141 |

---

[138] The formal name of the Baltimore Mailers Union Local No. 888 Plan is the Baltimore Mailers Union Local No. 888 and the Baltimore Sun Company Retirement Plan.

39

| | IBEW #40 | | | | | | | |
| (13) WGN-TV 9 Op. Engs. | Operation Engineers-) IUOE #399 | IUOE Central Pension Fund | 3 | 05/2011 | 167,959 | 10,567 | 8,893 | 10,162 |
| (14) Baltimore Sun - Composers | Composer of CWA-ITU | CWA/ITU Negotiated Pension Fund | 1 | 12/2004 | 50,957 | 2,601 | 2,601 | 2,893 |
| **TOTAL** | | | 600 | | | $4,912,031 | $4,672,804 | $4,983,739 |

\* The Debtors' multiemployer pension plans generally require contributions based on the hours worked by participating employees, which may vary from year to year. Accordingly, the Debtors' contributions to such Plans may vary from year to year. Each contribution set forth in this summary chart is applicable only to the specific year noted.

\*\* The parties have entered into an open-ended contract extension that may be terminated by either party upon 30 days prior written notice.

\*\*\* WPIX Stagehands and WGN-TV Stagehands each participate in two separate multiemployer pension plans: a local pension plan and a local annuity fund.

iii)    401(k) Plans.

The Debtors maintain various tax-qualified 401(k) retirement plans, which permit eligible employees to make voluntary contributions on a pre-tax basis and some of which also provide for contributions by the Debtors (the "401(k) Plans"). The 401(k) Plans allow participants to invest their account balances in various investments. As of January 1, 2008, the Debtors ceased contributions to the 401(k) Plans for non-union employees in conjunction with the introduction of the ESOP and the cash balance allocations under the Tribune Company Pension Plan.

As described above, the Debtors discontinued allocations under the Tribune Company Pension Plan as of January 1, 2010 and, as discussed in Article IV.C.2, intend to terminate the ESOP in connection with consummation of the Plan. Accordingly, the Debtors modified the 401(k) Plans for non-union employees effective January 1, 2010. The Debtors currently match each dollar an employee contributes up to two percent (2%) of such employee's eligible pay and match $0.50 for each dollar contributed between two percent (2%) and six percent (6%) of such employee's eligible pay. The Debtors also may make annual discretionary contributions based on the achievements of certain performance goals. The Debtors intend to continue performing such obligations on and after the Effective Date of the Plan.

iv)    Retiree Welfare Benefit Programs.

Historically, the Debtors maintained numerous medical, dental, prescription drug and life insurance programs for eligible retired union and non-union employees. Effective January 1, 2009, the Debtors consolidated the majority of these retiree welfare benefit programs, and they are now administered or insured by United Healthcare Services, Inc. These programs provide coverage to retirees at different levels based on which Debtor employed the individual, the retiree's year of retirement, collective bargaining agreement requirements and the retiree's eligibility for Medicare coverage.

As of January 1, 2010, the Debtors estimate that there were approximately 5,000 active employees who may be eligible for a retiree medical program, and 530 active employees who will be eligible for retiree life insurance upon retirement. As of January 1, 2010, the Debtors estimate that there were approximately 1,500 retirees covered by a retiree medical program and 2,185 retirees covered by retiree life insurance. As provided in Section 6.5 of the Plan, the Debtors will honor their obligations with respect to the retiree welfare benefits described in this Section on and after the Effective Date of the Plan.

(b)    Severance Programs.

Prior to the Petition Date and in the ordinary course of business, the Debtors customarily provided employees whose employment was terminated without cause (the "Terminated Employees") with severance payments (the "Severance Payments") equal to their base wages for specified periods of time that correlated with their number of years of employment (the "Severance Period"). Terminated Employees typically received

40

Severance Payments either (i) in a single, lump-sum Severance Payment (the "Lump-Sum Severance") or (ii) through salary continuation in the form of regular biweekly paychecks for the duration of the Severance Period (the "Salary Continuation Severance"). On February 4, 2009, the Bankruptcy Court entered an order authorizing the Debtors to implement a severance program for employees whose employment is terminated in certain circumstances after the Petition Date (the "Post-Petition Severance Program").

          (c)      Management Incentive Plan ("MIP").

The Debtors maintain a management incentive plan, also referred to as the "MIP," which historically has been part of the Incentive Compensation Plan (defined and discussed further below). The MIP provides cash compensation to certain of the Debtors' management employees to the extent that performance goals approved by the Compensation Committee are met. MIP participants typically consist of those management employees, other than those in sales positions, with target cash incentive award opportunities of at least fifteen percent (15%) of their base salary. Approximately ~~700~~670 of the Tribune Entities' employees participated in the MIP in 2009.

The Debtors have used a consistent methodology over the years in setting annual MIP targets and in subsequently determining MIP cash awards. During this time, each MIP participant had an annual target award opportunity expressed as a percentage of his or her base salary. The Debtors then used these individual bonus opportunities to determine target bonus pools for each business unit and segment, as well as a consolidated company-wide bonus pool. Within the Publishing Segment, each individual newspaper (combined with any subsidiaries) was measured as a separate business unit; within the Broadcasting Segment, each television and radio station (or station group in duopoly markets) was measured as a separate business unit; and certain other operations considered to be general corporate operations as well as certain group offices that oversee the entire Publishing Segment or Broadcasting Segment also constituted distinct business units. In the fourth quarter of each year, a budget and operating plan was developed by each business unit for the following year, as well as a consolidated budget and operating plan for the Tribune Entities as a whole. The operating cash flow goals established in the planning process for a given business unit served as the primary performance target for that year's MIP. Business units were generally eligible for bonus pools ranging from forty percent (40%) to two hundred percent (200%) of the applicable target pool based on performance ranging from threshold-level to maximum-level achievement of applicable MIP goals, respectively. Additionally, in accordance with the MIP, prior to the Petition Date, the Debtors historically made discretionary MIP cash awards to participants whose business units did not satisfy one or more of their stated goals (even at threshold levels), and otherwise adjusted pool amounts and individual awards, both positively and negatively, in their discretion even in cases where applicable goals were met in whole or in part. Any such adjustments were consistent with the MIP parameters discussed above.

By orders entered on May 12, 2009 and September 30, 2009, respectively, the Bankruptcy Court authorized the Debtors to pay awards for 2008 under the MIP totaling approximately $12.2 million to eligible employees other than certain executives and up to $3.1 million to such executives. In addition, as discussed in Article VI.C of this Disclosure Statement, on July 22, 2009 the Debtors filed a motion with the Bankruptcy Court seeking authority to implement a 2009 Management Incentive Plan consisting of a self-funding ordinary course MIP program consistent with the Debtors' historical MIP programs, but containing certain modifications relative to prior years (including, for example, reductions to payout percentages at various levels of goal achievement compared with historical levels), as well as a new self-funding Transition MIP ("TMIP") program and a self-funding Key Operators Bonus ("KOB") program for certain participants (the "2009 MIP Motion"). The Washington-Baltimore Newspaper Guild, Local 30235 of the Newspaper Guild-Communications Workers of America (the "Guild") and the United States Trustee filed objections to the 2009 MIP Motion, which included the 2009 MIP, the TMIP and the KOB. These objections were litigated at an evidentiary hearing before the Bankruptcy Court on September 25, 2009. A complete transcript of the September 25, 2009 hearing is available upon written request to counsel for the Debtors. Upon the conclusion of the hearing, the Debtors asked the Bankruptcy Court to consider the MIP, TMIP and KOB as an integrated whole, not in parts. The Court then took under advisement, and did not immediately rule on, the 2009 MIP, TMIP and KOB programs.

At a hearing on January 27, 2010, in response to the Debtors' request that the 2009 MIP, TMIP and KOB now be considered separately, the Bankruptcy Court approved the 2009 MIP, and suggested that the Debtors consider incorporating the TMIP and KOB into a chapter 11 plan of reorganization. By order entered January 28, 2010, the Bankruptcy Court authorized the Debtors to implement the ordinary course MIP component of the 2009 Management Incentive Plan and to pay ordinary course MIP awards in an aggregate amount not to exceed $45.6 million. Payment of 2009 MIP bonuses totaling $42.1 million was made on February 26, 2010. As noted in Article IX.H.5 below, at a hearing held on January 27, 2010, the Bankruptcy Court suggested that the Debtors consider incorporating the TMIP and the KOB into a chapter 11 plan of reorganization. In the meantime, the Bankruptcy Court took under advisement, and did not rule with respect to, the TMIP and KOB programs. The Debtors followed the Bankruptcy Court's suggestion, and filed a motion on March 4, 2010, to voluntarily dismiss, without prejudice, their request in the 2009 MIP Motion for entry of an order authorizing the implementation of the TMIP and KOB. The Bankruptcy Court granted the Debtors' motion by order dated March 23, 2010. The Debtors will address the inclusion in the Plan of the TMIP and the KOB in a supplement that will be filed by the Debtors prior to the hearing on approval of the Disclosure Statement. Following a March 23, 2010 hearing on this motion, the Bankruptcy Court entered an order that day granting this motion. At that hearing, the Court stated that "regardless of what my expressed words were at the [January 27, 2010] hearing, I didn't suggest that the part of the plan that was proposed and which I had under advisement should or could be the same plan that was under consideration or that I would approve it in the context of the confirmation." The Court further stated that it was not providing "any inclination of whether in that context it should be approved or not." The Court also stated that "whatever record was made [with respect to the TMIP and KOB, including at the September 25, 2009 hearing] would be included in whatever presumably confirmation hearing record was made if there were still objections to it." As further discussed in Article IX.H.5, the Plan authorizes and implements the TMIP and the KOB. The Debtors expect that the Guild and the United States Trustee will maintain their objections to the 2009 TMIP and the KOB at the confirmation hearing on the Plan on the ground that both violate the Bankruptcy Code. The Debtors disagree with these objections and believe that the TMIP and KOB are valid programs.

The Debtors intend to continue the ordinary course annual MIP program (without any of the special limitations implemented for 2009) in 2010 and subsequent years, including after the Effective Date of the Plan. Any creditor wishing further detail can access the 2010 MIP Motion filed May 26, 2010 [Docket No. 4620] on the Bankruptcy Court's docket.

> (d)    Local Bonus Programs.

The Debtors maintain a variety of commission and incentive bonus programs for certain sales and other personnel who generally do not participate in the MIP. These programs are implemented locally and designed to incentivize and reward achievements of the Debtors' employees based upon specific metrics relevant to the respective employees' local or departmental line of work (the "Local Bonus Programs"). During 2009, approximately 2,500 of the Debtors' employees participated in the Local Bonus Programs. Generally, these programs are developed and implemented locally by individual newspapers, broadcast stations and corporate office departments. The majority of these programs are based on performance factors such as revenue generation, increasing market share, expense targets, and some discretionary factors. Payouts under most of the Local Bonus Programs are based upon year-end, quarter-end or month-end performance. The Debtors paid an aggregate of approximately $24.8 million, $22.2 million, and $20.7 million, respectively during 2007, 2008, and 2009 in connection with the Local Bonus Programs.[39]

> (e)    Collective Bargaining Agreements.

---

[39] As further discussed in Article VI of this Disclosure Statement, on February 3, 2009 and May 12, 2009, the Bankruptcy Court entered orders authorizing the Debtors to pay prepetition amounts outstanding in connection with the Local Bonus Programs in an aggregate amount of up to $8.8 million and $1.1 million, respectively.

As of December 31, 2009, approximately eleven percent (11%) of the Debtors' employees in the Publishing Segment and approximately thirty-four percent (34%) of the Debtors' employees in the Broadcasting Segment were represented by unions and covered under various collective bargaining agreements. Specifically, the Tribune Entities in the Publishing Segment are party to ten collective bargaining agreements and the Tribune Entities in the Broadcasting Segment are party to 15 collective bargaining agreements. The following table summarizes certain information concerning the union representation of the Tribune Entities' employees. [40]

---

[40] A list of all Collective Bargaining Agreements, including full names of such agreements, is attached hereto as Exhibit E.

| | Department | Union/Local Name | Approximate Number of Employees | | | Expiration Date |
|---|---|---|---|---|---|---|
| | | | Full-Time | Part-Time | Per Diems/ Seasonal | |
| **_Publishing_** | | | | | | |
| _Baltimore Sun_ | Packagers | GCC-IBT/888 | 108 | 72 | 0 | 12/ 2008** |
| _Baltimore Sun_ | Transportation | GCC-IBT/355 | 19 | 12 | 0 | 12/2010 |
| _Baltimore Sun_ | Pressroom | GCC-IBT/31 | 81 | 0 | 0 | 4/2012 |
| _Baltimore Sun_ | Various* | TNG/Baltimore-Washington | 209 | 11 | 0 | 6/2012 |
| _Baltimore Sun†_ | Prepress | GCC-IBT/582 | 1 | 0 | 0 | 4/2012 |
| _Chicago Tribune_ | Machinists | IAM/126 | 45 | 0 | 0 | 9/ 2008** |
| _Chicago Tribune_ | Pressroom | GCC-IBT/7 | 138 | 3 | 0 | 5/2012 |
| _Chicago Tribune_ | Drivers | IBT/706 | 138 | 6 | 0 | 12/2010 |
| _LA Times_ | Pressroom | GCC-IBT | 185 | 1 | 0 | 5/2011 |
| _Morning Call_ | Pressroom | GCC-IBT/160M | 20 | 0 | 0 | 6/ 2009** |
| _Subtotal_ | | | _945_ | _99_ | _0_ | |
| **_Broadcasting and Entertainment_** | | | | | | |
| KTLA (Los Angeles) | Newspersons | AFTRA | 22 | 0 | 15 | 8/2011 |
| WPIX (New York) | Directors | DGA | 8 | 1 | 21 | 10/ 2008** |
| WPIX (New York) | Newswriters | TNG/3 | 29 | 3 | 16 | 12/2012 |
| WGN-TV (Chicago) | Newspersons | AFTRA | 27 | 5 | 13 | *** |
| WGN-AM (Chicago) | Engineers | IBEW/1220 | 2 | 1 | 6 | 3/ 2012 |
| WPIX (New York) | Newspersons | AFTRA | 16 | 1 | 9 | 5/ 2009** |
| WPIX (New York) | Engineers | IBEW/1212 | 73 | 1 | 102 | 6/ 2009** |
| WGN-TV (Chicago) | Engineers | IBEW/1220 | 80 | 1 | 107 | 3/ 2009** |
| WGN-TV (Chicago) | Newswriters | IBEW/1220 | 5 | 0 | 18 | 3/ 2009** |
| WPHL (Philadelphia) | Technicians | IBEW/98 | 10 | 2 | 3 | 12/ 2009 |
| KTLA (Los Angeles) | Technicians | IATSE | 72 | 2 | 369 | 7.2010 |
| KTLA (Los Angeles) | Electricians | IBEW/40 | 2 | 0 | 2 | 7/2010 |
| WPIX (New York) | Stagehands | IATSE/1 | 0 | 0 | 2 | 3/2011 |
| WGN-TV (Chicago) | Stagehands | IATSE/2 | 0 | 0 | 79 | 5/2011 |
| WGN-TV (Chicago) | Engineers | IUOE/399 | 3 | 0 | 0 | 5/2011 |
| _Subtotal_ | | | _356_ | _17_ | _780_ | |
| **TOTAL** | | | **1,301** | **116** | **780** | |

\*  Includes editorial, advertising, circulation, administrative and marketing employees.

†  No employees are employed under this particular collective bargaining agreement.  However, approximately 10 former bargaining unit members with lifetime job guarantees continued to be employed at the Baltimore Sun in other capacities.

\*\*  In the case of each expired collective bargaining agreement included in this summary chart, the Debtors are currently in the process of negotiating the terms of a renewed collective bargaining agreement.  During such negotiations, the Debtors intend to continue performing their obligations under the collective bargaining agreement as required by applicable law.

\*\*\* The parties have entered into an open ended contract extension that may be terminated by either party upon 30-days written notice.

Section 6.5 of the Plan provides that any Collective Bargaining Agreement entered into by the Debtors that has not expired by its terms and that is in effect as of the Effective Date, shall be deemed to have been assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1113 of the Bankruptcy Code.

2.      Compensation and Benefit Programs in Effect as of the Petition Date that will not be continued Pursuant to the Plan.

(a)      Management Equity Incentive Program.

On December 20, 2007, Tribune's Board of Directors approved a management equity incentive plan (the "MEIP") pursuant to which certain of the Debtors' key employees were eligible to receive benefits. The MEIP provided for units that represented a right to receive cash equal to the fair market value of Tribune's common stock. MEIP awards were made to eligible members of the Debtors' management and other key employees at the discretion of the Board of Directors.

The Debtors do not intend to continue the MEIP described in this Section after the Effective Date of the Plan. Instead, the Plan provides for the implementation of a new equity incentive plan, the terms of which are generally described in Article IX.G.9.

(b)      Equity-Based Compensation Provisions of Incentive Compensation Plan.

In 1997, Tribune established the Tribune Company Incentive Compensation Plan (as amended and restated effective in 2004, the "Incentive Compensation Plan"). The Incentive Compensation Plan authorized grants of various forms of incentive compensation to management and other employees, as well as certain non-employee agents, of the Debtors. Historically, awards under the Incentive Compensation Plan were made to certain eligible members of the Debtors' management and other key employees at the discretion of the Board of Directors or, as applicable, of senior executives. As stated, the MIP program, providing for annual cash incentive awards, is one component of the Incentive Compensation Plan. The Incentive Compensation Plan also authorized other forms of incentive awards comprised of equity-based compensation grants, including grants of stock options, stock appreciation rights, restricted or unrestricted stock, or restricted stock units.

As discussed, the Debtors intend to continue the ordinary course annual MIP program (without any of the special limitations implemented for 2009) in 2010 and subsequent years, including after the Effective Date of the Plan. The Debtors do not intend to continue the equity-based compensation provisions of the Incentive Compensation Plan after the Effective Date of the Plan. Rather, as also stated above, the Plan provides for the implementation of a new management equity incentive plan.

(c)      Employee Stock Ownership Plan.

As discussed in Article IV.A.1 of this Disclosure Statement, on April 1, 2007, Tribune established the ESOP as an employee retirement benefit plan. Pursuant to the terms of the ESOP, each eligible employee received a pro rata allocation of stock for the 2008 plan year and will receive another for the 2009 plan year based upon such employee's relative eligible compensation, including base salary, wages and commissions, but excluding bonuses and overtime. ESOP participants were to receive a distribution of the value of the shares allocated to their accounts if during 2008 or 2009 such participants retired after age 65, became disabled or died. With respect to each such participant, the distribution was to be based on the value of the shares determined by the trustee of the ESOP as of December 31 of such participant's year of retirement, disability, or death, with the ESOP receiving the cash value of the shares from Tribune. As of both December 31, 2009 and December 31, 2008, the trustee of the ESOP determined the value of the shares to be $0; therefore, no distributions have been made under the ESOP. The Plan provides for the termination of the ESOP.

(d)      Transitional Compensation Plan

In 1985, the Debtors implemented a transitional compensation plan for executive employees (as amended and restated in 2006, the "Transitional Compensation Plan"). The Transitional Compensation Plan provided for benefits upon a qualifying event or circumstances occurring as a result of a "change in control" (as defined in the Transitional Compensation Plan) of Tribune. Generally, and subject to certain exceptions specified in the Transitional Compensation Plan, eligible employees received benefits for their termination of employment within a defined time period (length of period varies by individual) following a change in control, prior to a change in control if the termination was at the request of any third-party participating in or causing the change in control, or otherwise in anticipation of a change in control.

As of the date of this Disclosure Statement, no benefits were outstanding under the Transitional Compensation Plan. The Plan does not provide for continuation of the Transitional Compensation Plan.

(e)        Nonqualified Retirement / Deferred Compensation Plans.

i)        Noncontributory Plans.

The IRC limits the amount of annual earnings that may be considered when calculating benefits under qualified pension and 401(k) plans. As a result, Tribune and Times Mirror (prior to its merger with Tribune) established various supplemental retirement plans. These plans include the Tribune Company Supplemental Retirement Plan, Tribune Company Supplemental Defined Contribution Plan, and Times Mirror Excess Pension Plan. These were unfunded plans providing benefits substantially equal to the difference between the amount that would have been provided under the corresponding qualified plan in the absence of applicable IRC limits, and the amount actually provided under the qualified plan. In accordance with the provisions of the plans, in connection with the completion of the Merger, amounts accrued under the Tribune Company Supplemental Retirement Plan and Tribune Company Supplemental Defined Contribution Plan (with a few exceptions) were paid at the end of fiscal year 2007. Approximately $94,000 in accrued benefits remained in the Tribune Company Supplemental Defined Contribution Plan as of the Petition Date.

The Times Mirror Excess Pension Plan did not contain a provision for payouts upon a change in control; therefore, accrued amounts were not distributed at the time of the Merger and payments were suspended as of the commencement of the Chapter 11 Cases. As of the date the Chapter 11 Cases commenced, the estimated aggregate present value liability under the Times Mirror Excess Pension Plan was approximately $10.1 million.

In connection with Tribune's acquisition of Times Mirror, Tribune also assumed The Times Mirror Company Supplemental Retirement Plan for Certain Times Mirror Officers, and The Times Mirror Pension Plan for Directors. By December 2005, all accruals under these plans had ceased. The Times Mirror Company Supplemental Retirement Plan for Certain Times Mirror Officers provided additional retirement benefits for certain executives of Times Mirror. The Times Mirror Pension Plan for Directors provided benefits for a period following a director's service on the board of directors of Times Mirror, with such period based on the number of years during which the director served on such board. Payments under both of these plans were suspended as of the commencement of the Chapter 11 Cases. As of the date the Chapter 11 Cases commenced, the estimated aggregate present value liability under these plans was approximately $43.3 million.

Payments to former directors, officers or employees under the normal terms of these various noncontributory plans will not re-commence after the Effective Date of the Plan.

ii)        Contributory Plans.

Tribune sponsored The Times Mirror Deferred Compensation Plan for Executives and the Times Mirror Deferred Compensation Plan for Directors, which Tribune assumed in connection with the Times Mirror acquisition. A participant's benefit under these plans was based on his or her "account balance," which was based on the amount of a participant's compensation that was deferred under the plan, adjusted for hypothetical

earnings or losses based on investment benchmarks selected by the participant or credited interest designated under the plan, as applicable. Payments under each of these plans, as well as adjustments for hypothetical earnings and losses, were suspended as of the commencement of the Chapter 11 Cases. As of the date the Chapter 11 Cases commenced, the estimated aggregate present value liability under these plans was approximately $22.1 million.

Payments to former directors, officers or employees under the normal terms of these various contributory plans will not re-commence after the Effective Date of the Plan.

(f)    Certain Individual Letter Agreements.

In addition to the nonqualified deferred compensation plans described above, the Debtors are parties to individual agreements that entitle certain former employees to various retirement-related payments. The individual agreements vary with respect to benefit amounts, benefit formulas, and payment provisions. Payments under the individual agreements were suspended as of the commencement of the Chapter 11 Cases. As of the date the Chapter 11 Cases commenced, the estimated aggregate present value liability under these agreements was approximately $17.0 million. Payments to former directors, officers or employees under the normal terms of these individual letter agreements will not re-commence after the Effective Date of the Plan.

## D.    **Pending Litigation and Certain Other Legal Matters Involving the Debtors**

The Debtors are involved from time to time in a variety of litigation and legal matters that are incidental to their businesses. As a consequence of the Debtors' commencement of these Chapter 11 Cases, all pending claims and litigation against the Debtors in the United States have been automatically stayed pursuant to section 362 of the Bankruptcy Code. Certain pending litigation related to prepetition causes of action and certain other legal matters which may result in litigation following the Effective Date are described below. The descriptions below are not, and are not intended to be, a comprehensive list of all actions or matters involving the Debtors and specifically exclude, among others, administrative actions, workers compensation actions and actions involving union grievances. In addition, the matters discussed below are included for disclosure purposes only and are not an admission, and are not intended to be an admission, of liability with respect to any claim or action.

The Debtors anticipate that, to the extent any of the litigation set forth below is not resolved prior to the Effective Date of the Plan or removed by the Debtors to federal court consistent with the Bankruptcy Code, and to the extent the plaintiffs timely filed proofs of claim, such litigation will continue after the Effective Date in the forum(s) in which it was initiated in order to liquidate the amount of the Claim. Any adverse judgment in any of these actions would constitute a Claim that will be treated in accordance with the provisions of the Plan, so long as such Claim was otherwise allowable because it complied with the applicable requirements of the Chapter 11 Cases and the Bankruptcy Code.

As of the date of this Disclosure Statement, the face-value of all litigation-related proofs of claim against Tribune that have not already been disallowed by Bankruptcy Court order, including all unliquidated amounts, is approximately $67,000,000. That amount, however, assumes that all pending litigation-related proofs of claim against Tribune are not frivolous and will be successfully prosecuted for the full amount demanded. It also includes duplicate claims filed against Tribune. After accounting for duplicate claims, the face-value of claims arising from litigation pending against Tribune is approximately $36,000,000. The Debtors continue to review and defend the various litigation claims and the ultimate allowed amount is uncertain; however, based on the preceding information and the review to date, the Debtors believe the estimated range of Allowed Other Parent Claims of $100 million to $125 million is appropriate.

As of the date of this Disclosure Statement, the face-value of all litigation-related proofs of claim against the Filed Subsidiary Debtors that have not already been disallowed by Bankruptcy Court order, including all unliquidated amounts, is approximately $306,000,000. That amount, however, assumes that all pending litigation-related proofs of claim against the Filed Subsidiary Debtors are not frivolous and will be

successfully prosecuted for the full amount demanded.  It also includes duplicate claims filed against the Subsidiary Debtors.  After accounting for (i) duplicate claims, (ii) claims that are the subject of objections either pending before the Bankruptcy Court or to be filed with the Bankruptcy Court on May 17, 2010, and (iii) claims that have been settled in principle as of May 17, 2010, the face-value of claims arising from litigation pending against the Filed Subsidiary Debtors is approximately $44,500,000.  The Debtors continue to review and defend the various litigation claims and the ultimate allowed amount is uncertain; however, based on the preceding information and the review to date, the Debtors believe the estimated range of Allowed Subsidiary General Unsecured Claims of $85 million to $150 million is appropriate.

      1.     *Newsday* and *Hoy* Circulation Misstatements.

In February 2004, a purported class action lawsuit was filed in New York federal court by certain advertisers in *Newsday* and an affiliate publication, *Hoy*, New York, alleging that they were overcharged for advertising as a result of inflated circulation numbers at these two publications (the "New York Circulation Action").  Plaintiffs in the New York Circulation Action also allege that certain entities that paid Distribution Systems of America, Inc., a *Newsday* subsidiary, to deliver advertising flyers were overcharged.  Due to the commencement of these Chapter 11 Cases, the New York Circulation Action, captioned *Crabhouse of Douglaston Inc. d/b/a/ Douglaston Manor, et al., v. Newsday, Inc. et al.*, Case No. CV 04-558 (E.D.N.Y. Feb. 10, 2004), has been stayed with respect to the remaining Debtor defendants:  Hoy, LLC (the publisher of *Hoy,* New York) and Distribution Systems of America, LLC.  The litigation is ongoing with respect to Tribune ND, Inc., a Guarantor Non-Debtor, as successor to Newsday, Inc.

In addition to the New York Circulation Action, a stockholder derivative suit was filed against the Debtors and certain of their current and former directors and officers in the United States District Court for the Northern District of Illinois captioned *Hill v. Tribune Co.*, Case No. 05-2602 (WTH).  The suit, which was filed as a result of the circulation misstatements at *Newsday* and *Hoy,* alleged breaches of fiduciary duties and other managerial and director failings under Delaware law and the federal securities laws.  The consolidated securities class action lawsuit was dismissed with prejudice on September 29, 2006.  The dismissal was appealed to the United States Court of Appeals for the Seventh Circuit (the "Seventh Circuit").  On April 2, 2008, the Seventh Circuit issued an opinion affirming the dismissal of the securities class action lawsuit.  Plaintiffs in the securities class action lawsuit have filed a petition for a rehearing *en banc* by the Seventh Circuit.  Due to the commencement of the Chapter 11 Cases, this action is currently stayed.

On December 17, 2007, *Newsday* and *Hoy,* New York reached a non-prosecution agreement with the United States Attorneys' Office for the Eastern District of New York that ended a federal inquiry into the circulation practices of Newsday, Inc. and Hoy Publications LLC, as successor-in-interest to Hoy, LLC.  The agreement recognized (i) *Newsday's* and *Hoy,* New York's full cooperation with the investigation, (ii) the implementation of new practices and procedures to prevent fraudulent circulation practices, (iii) the payment as of December 2007 of approximately $83 million in restitution to advertisers, and (iv) a civil forfeiture payment of $15 million.

      2.     ESOP Lawsuit.

In September 2008, a lawsuit was filed in the United States District Court for the Central District of California (the "California District Court") by current and former employees of the *Los Angeles Times.*  The lawsuit named as defendants a former director and current directors of Tribune, the trustee of the ESOP, the Tribune Employee Benefits Committee, and certain current and former members, EGI-TRB, LLC, and, nominally, the ESOP.  The lawsuit alleged breaches by defendants of duties and obligations under the Employer Retirement Income Security Act of ~~1974~~1974, as amended ("ERISA") and state law.  On November 17, 2008, the California District Court transferred the case to the United States District Court for the Northern District of Illinois.  The lawsuit, captioned, *Neil v. Zell*, Case No. 08-6833 (RRP), seeks relief, including damages, for the benefit of the ESOP (the "Neil Litigation").  In an amended complaint filed on December 30, 2008, plaintiffs

added as defendants several current and former Tribune officers who had allegedly served on the Employee Benefits Committee.

On March 13, 2009, Tribune filed an adversary proceeding (the "Neil Adversary Proceeding") captioned *Tribune Company v. Dan Neil, et al.* (*In re Tribune Company*), Adv. Pro. No. 09-50445 (KJC) (Bankr. D. Del. Mar. 13, 2009), which sought declaratory and injunctive relief to stay all further prosecution of the Neil Litigation.  On May 20, 2009, Tribune withdrew its preliminary injunction motion without prejudice to its right to refile because the plaintiffs dropped Tribune as a defendant from the underlying lawsuit in an amended complaint filed December 30, 2008.  At a status conference held on June 25, 2009, Tribune advised the Bankruptcy Court that the parties had agreed that the underlying lawsuit would go forward solely with respect to briefing and decision on a motion to dismiss for failure to state a claim upon which relief could be granted (the "Motion to Dismiss").  In connection therewith, Tribune negotiated the terms under which its primary fiduciary liability insurance carrier agreed to advance the defense costs associated with the Motion to Dismiss to Tribune's directors and officers named in the suit.  Tribune filed a motion to authorize the payment and advancement of insurance proceeds on August 17, 2009, which was granted on September 2, 2009.  On November 16, 2009, upon agreement by the parties, the Bankruptcy Court stayed the Neil Adversary Proceeding pending resolution of the motion to dismiss filed in the Neil Litigation.

On December 17, 2009, the Illinois District Court granted in part and denied in part the Motion to Dismiss.  The court dismissed all claims against the directors and officers of Tribune, except that it denied the Motion to Dismiss as to certain claims against Tribune board member Samuel Zell.  The court also denied the Motion to Dismiss as to claims against the ESOP trustee and EGI-TRB.  On March 2, 2010, EGI-TRB and Zell filed an answer to the amended complaint.  On the same day, they filed a motion for judgment on the pleadings.  Also on March 2, 2010, GreatBanc Trust Company, the ESOP trustee, filed a motion for reconsideration of the Illinois District Court's December 17, 2009, ruling.

On March 5, 2010, Tribune filed in the Neil Adversary Proceeding a motion for preliminary injunction enjoining the Neil plaintiffs from seeking any equitable relief that would affect property of Tribune's bankruptcy estates (the "Preliminary Injunction Motion").  The parties in the Neil Adversary Proceeding stipulated to a briefing schedule that provides for briefing on the Preliminary Injunction Motion after the resolution of the motions for judgment on the pleadings and reconsideration filed in the Neil Litigation.

On March 18, 2010, the Illinois District Court requested briefing on certain issues regarding equitable relief raised in EGI-TRB's and Zell's motion for judgment on the pleadings and GreatBanc Trust Company's motion for reconsideration.

The ESOP has also been the subject of ongoing investigation by the United States Department of Labor ("DOL") and an audit by the Internal Revenue Service ("IRS").  On May 28, 2009, the DOL filed an unliquidated proof of claim against Tribune, and on June 10, 2009, the DOL filed a similar claim against 70 other Debtors.  The DOL's claims state that it is conducting an investigation of the ESOP for possible violations of ~~Title I of the Employee Retirement Income Security Act of 1974 ("ERISA")~~ERISA, including ERISA sections 404 and 406.  Pursuant to its investigation, the DOL has sought and obtained documents from the ESOP Trustee, GreatBanc Trust Company, and its financial advisor, Duff & Phelps, and the DOL has conducted interviews of personnel of both of those entities.  The IRS did not file a proof of claim relating to the ERISA issues being investigated by the DOL, but has conducted an interview of a representative of Duff & Phelps.

3.    FCC Related Matters.

Various aspects of the Debtors' operations are subject to regulation by governmental authorities in the United States.  The Debtors' television and radio broadcasting operations are subject to FCC jurisdiction under the Communications Act.  FCC rules govern, among other things, the term, renewal and transfer of radio and television broadcasting licenses and limit concentrations of broadcasting ownership that the FCC considers to

be inconsistent with the public interest. Federal law also regulates the rates charged for political advertising and the quantity of advertising within children's programs.

On November 30, 2007, the FCC issued an order (the "FCC Order") granting the Debtors' applications to transfer control of the Debtors from the existing stockholders to the ESOP in connection with the Leveraged ESOP Transactions. In the FCC Order, the FCC rejected the Debtors' request for "permanent" waivers of the newspaper/broadcast cross-ownership rule, which generally restricts the common ownership of a daily newspaper and a television station or radio station in the same local market, in order to permit continued common ownership of (i) WSFL-TV and the *South Florida Sun-Sentinel* in Miami, Florida; (ii) WTXX-TV/WTIC-TV and the *Hartford Courant in* Hartford, Connecticut; (iii) KTLA-TV and the *Los Angeles Times* in Los Angeles, California; and (iv) WPIX-TV and *Newsday* in New York, New York. The "permanent" waivers would have continued as long as the Debtors owned the properties; they would not have permitted subsequent sales of the properties intact. The FCC granted the Debtors "temporary" or time-limited waivers with respect to these cross-owned properties for a six-month period beginning January 1, 2008, and provided for extension of these waivers in three circumstances. First, the FCC ruled that if it were to adopt a revised newspaper/broadcast cross-ownership rule before January 1, 2008, it would grant applicants a two-year waiver of the rule, to among other things, allow parties an opportunity to make individualized waiver showings and the FCC to consider them. The date on which the two-year period is to commence is open to interpretation. On December 18, 2007, the FCC voted to adopt a revised rule (the "2008 Order"). Second, the FCC ordered that, if Tribune should challenge the denial of the requested "permanent" waivers in court, it would grant a waiver that would last either for two years or until six months after the conclusion of the litigation, whichever is longer, provided that the applicants did not abandon that litigation before a court decision was reached. Third, the FCC ordered that, in the event the applicants were not able to come into compliance with any revised cross-ownership rule during the two-year period because the revised rule was subject to a judicial stay, then the waiver would extend until six months after the expiration of any such stay. On December 3, 2007, the applicants appealed the FCC Order to the United States Court of Appeals for the District of Columbia Circuit (the "D.C. Circuit"), captioned *Tribune Co. v. FCC*, Case No. 07-1488. That appeal is pending, but the D.C. Circuit has held the appeal in abeyance pending the resolution of petitions for reconsideration of the FCC Order pending before the FCC. The terms of any waivers the FCC may grant in connection with the FCC Applications may affect the course of the pending appeal.

The FCC Order also granted the Debtors a "permanent" waiver of the newspaper/broadcast cross-ownership rule to permit continued common ownership of WGN-AM, WGN-TV and the *Chicago Tribune* in Chicago, Illinois; a "permanent" "failing station" waiver of the television duopoly rule to permit continued common ownership of WTIC-TV and WTXX-TV in Hartford, Connecticut; and continued satellite station status to WTTK-TV, licensed to Kokomo, Indiana, to permit continued common ownership with WTTV-TV in Bloomington, Indiana. Both WTTK-TV and WTTV-TV are in the Indianapolis market. Various parties have petitioned for reconsideration of the FCC Order with the FCC; the Debtors have filed an opposition to such filings with the FCC.

In the 2008 Order, the FCC announced new liberalized waiver standards for the newspaper/broadcast cross-ownership rule. Under the revised waiver standards, the Debtors would be entitled to a presumption in favor of common ownership in three of four of the Debtors' cross-ownership markets which are the subject of FCC temporary waivers (Los Angeles, CA; Miami, FL; and New York, NY). Various parties, including the Debtors, have sought reconsideration before the FCC or judicial review of the 2008 Order, and proceedings for such judicial review are pending in the United States Court of Appeals for the Third Circuit (the "Third Circuit"). On March 23, 2010, the Third Circuit lifted the stay that had been in effect and set a briefing schedule for the challenges to the 2008 Order, which ~~commences~~commenced on May 17, 2010 and ~~concludes~~will conclude approximately 44 days later.

4.    Miscellaneous Other Litigation.

As of the Petition Date, there were approximately 50 prepetition personal injury cases pending against the Debtors. There were also at least 45 prepetition cases pending against the Debtors involving media-related claims, such as defamation, slander and libel. In addition, the Debtors were subject to at least 15 employment–related cases (such as wrongful termination and breach of employment contract). Approximately two-thirds of the plaintiffs in these lawsuits filed a proof of claim prior to the Bar Date (defined below), and the Claims reflected therein will be evaluated during the claims reconciliation process (discussed in Article VI.G.4 below) and treated in accordance with the provisions of the Plan, provided that such Claims otherwise comply with the applicable requirements of the Bankruptcy Code and applicable orders of the Bankruptcy Court.

## V. EVENTS LEADING UP TO CHAPTER 11

In 2008, the newspaper publishing industry experienced an unprecedented decline which was exacerbated by the recent recession. While the Debtors' newspaper advertising revenue continued to be in line with, and in some cases superior to, other large metropolitan newspapers during that time, newspaper advertising revenue generally has been in significant decline, down industry-wide approximately fifteen to twenty percent (15-20%) in 2008 over the preceding year in major metropolitan markets, and down industry-wide nearly $2 billion, or eighteen percent (18%), in the third quarter of 2008 alone. Further, while the Debtors' television broadcasting stations outperformed the broader television broadcasting industry, the Debtors' 2008 broadcasting revenue nevertheless lagged behind their 2007 performance, again largely as a result of declining advertising revenue. Through November 2008, Tribune's consolidated revenue was down ten percent (10%) versus 2007, with publishing advertising revenues down eighteen percent (18%) and broadcasting and entertainment revenues down three percent (3%). On a consolidated basis, Tribune's operating cash flow (excluding equity compensation, one-time items and discontinued operations) was down thirty-three percent (33%) in 2008.

Prior to the Petition Date, the Debtors implemented and continue to implement aggressive strategic initiatives to enhance operating cash flow and mitigate the impact of the severe economic downturn. Strategic initiatives aimed at generating incremental cash flow through cost savings included improvements in operating efficiencies, reductions in workforce, web width (newspaper page size) reductions and newspaper redesigns. They also included revenue enhancement initiatives such as entering into arrangements to print and deliver other companies' newspapers, increasing the number of hours of television news programming, and improving the efficiency and effectiveness of the sales force. Additionally, in 2008 the Debtors implemented a strategy to monetize various assets including the July 2008 joint venture involving the Newsday operations, the April 2008 sale of real estate associated with the Debtors' former Southern Connecticut newspapers, the January 2008 sale of a studio production lot in Hollywood, California and the September 2008 sale of an equity stake in CareerBuilder LLC. Tribune also continued its efforts to select a winning bidder for the Chicago Cubs baseball operations and related assets, consistent with Tribune's announcement in April 2007 that it intended to pursue the disposition of an interest in that business. The consummation of certain transactions pursuant to which the Chicago Cubs and related assets and liabilities were contributed to a newly formed limited liability company, Chicago Baseball Holdings, LLC and its subsidiaries, is described in more detail in Article VI.H of this Disclosure Statement.

Notwithstanding the Debtors' aggressive efforts to enhance revenue, reduce expenses and monetize various assets, the impact of the unprecedented economic downturn left them with weak operating results and significant liquidity challenges. In December 2008 alone, the Debtors faced debt service and related payments of approximately $200 million, with another $1.3 billion due in 2009, including $512 million of the Tranche X debt maturing in June 2009.

Against a backdrop of declining revenues in a recession, uncertainty in the capital markets and substantial debt service requirements, the Debtors concluded that the most responsible course of action was to restructure their balance sheet in order to restore liquidity and return to financial health.

## VI.  EVENTS DURING THE CHAPTER 11 CASES

On the Petition Date, the Debtors filed voluntary petitions for reorganization under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  The Debtors' bankruptcy cases have been assigned to United States Bankruptcy Judge Kevin J. Carey.  The following is a brief description of certain major events that have occurred during the Chapter 11 Cases.  Because of the size of the Debtors' cases, not all events have been described below.  For a complete overview of the proceedings in the Chapter 11 Cases, please refer to the publicly-available docket located, free of charge, on the Debtors' website: http://chapter11.epiqsystems.com/tribune.

### A.    Procedural Motions

On the Petition Date, the Debtors filed the Motion of the Debtors for an Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Administration Motion"), which requested procedural consolidation of these Chapter 11 Cases for ease of administration.  The Bankruptcy Court approved the Joint Administration Motion on December 10, 2008.  A supplemental joint administration order was entered by the Bankruptcy Court on October 14, 2009 jointly administering the Chapter 11 Cases of Tribune CNLBC with the Chapter 11 Cases of the other Debtors, and making certain "first day" orders and other orders previously entered in the Debtors' Chapter 11 Cases applicable to Tribune CNLBC.

### B.    "First-Day" Motions

On the Petition Date, the Debtors also filed several motions seeking typical "first day" relief in the Chapter 11 Cases.  The purpose of such motions was to ensure that the Debtors were able to transition into the Chapter 11 process with as little disruption to their businesses as possible and to enable the Debtors' businesses to function smoothly while the Chapter 11 process was pending.

The "first day" motions filed by the Debtors sought authority to, among other things, (i) make tax payments to federal, state and local taxing authorities on an uninterrupted basis; (ii) continue prepetition insurance programs and pay premium installments outstanding in connection therewith; (iii) honor prepetition customer obligations and continue customer programs; (iv) pay prepetition wages and other benefits to the Debtors' employees; (v) continue use of the Debtors' existing cash management system, bank accounts and business forms; (vi) prevent utility companies from discontinuing, altering or refusing service; (vii) pay the prepetition commissions of the Debtors' brokers; (viii) pay certain prepetition claims of shippers, warehousemen and other lien claimants; (ix) make payments to certain prepetition creditors that are vital to the Debtors' uninterrupted operations; and (x) continue selling receivables and related rights and to obtain post-petition financing, among other similar relief.  All of the Debtors' first-day motions were ultimately granted by the Bankruptcy Court in substantially the manner requested by the Debtors.  A summary of certain material relief sought in connection with the "first-day" motions and other related relief is set forth below.

### C.    Employee Compensation and Benefits.

On the Petition Date, the Debtors filed a motion seeking court authority to continue, among other things, to pay employee wages, reimburse business expenses, and continue contributions to employee benefit plans (the "Employee Wage Motion").  Specifically, the Debtors requested (i) the ability to pay employee wages that were outstanding as of the Petition Date, (ii) satisfy obligations outstanding with respect to employee expense reports and various federal, state and local taxes withheld from the employees' wages, and (iii) pay amounts outstanding in connection with various benefit programs maintained by the Debtors for their employees, including employee health care programs, vacation, sick day and holiday benefits, employee savings plans, disability and other types of insurance, retiree medical programs and workers compensation.  By order entered on December 10, 2008, the Bankruptcy Court granted the relief requested in the Employee Wage Motion in substantially the manner requested by the Debtors.

In addition, on December 24, 2008, the Debtors moved the Bankruptcy Court for authority to pay certain prepetition contributions owed to certain union pension plans pursuant to collective bargaining agreements and to continue making contributions to those union pension plans post-petition in the ordinary course of business (the "Union Pension Motion"). Also on December 24, 2008, the Debtors filed a motion requesting authority to implement a retention plan for certain key, non-insider and non-management employees who were necessary for an effective and orderly transition of operations under a local marketing agreement in Denver and a shared services agreement in St. Louis (the "Incentive Plan Motion"). The Bankruptcy Court granted both the Union Pension Plan Motion and the Incentive Plan Motion on January 13, 2009.

On January 13, 2009, the Debtors moved the Bankruptcy Court to implement a severance policy for non-union employees and to continue severance for union employees (the "Severance Motion"), which asked for the authority to allow, but not require, the Debtors to pay severance based on time employed for non-union employees, and, in regard to union employees, to honor the severance provisions of the respective collective bargaining agreements. Also on January 13, 2009, the Debtors filed a motion to allow the payment of prepetition non-insider incentive programs in an amount not to exceed $8.8 million (the "Incentive Motion"). By order dated February 3, 2009, the Bankruptcy Court granted the Incentive Motion and authorized the Debtors to fund the non-insider incentive plan. The Bankruptcy Court granted the Severance Motion by order entered February 4, 2009.

On April 22, 2009, the Debtors moved the Court for the authority to make certain payments under the 2008 MIP and to comply with certain other local bonus obligations (the "2008 MIP Motion"). The MIP payments were analyzed by Mercer (U.S.), Inc. ("Mercer"), an independent compensation consultant engaged by the compensation committee of Tribune's Board of Directors. The MIP payments totaled approximately $12.243 million, with respect to approximately 670 participants, and specifically excluded certain of the Debtors' executives. The 2008 MIP Motion also sought authority to pay approximately $1.1 million in the aggregate under certain local bonus programs maintained by the Debtors. The order granting the relief requested in the 2008 MIP Motion was granted on May 12, 2009.

Finally, on July 22, 2009, the Debtors filed the 2009 MIP Motion requesting authority to pay earned 2008 MIP awards to the certain of the Debtors' executives and to implement a 2009 Management Incentive Plan (i) continuing the self-funding ordinary course MIP for 2009 for approximately 720 management employees, (ii) including a self-funding pay-for-performance TMIP bonus opportunity to incentivize 21 members of the Debtors' core management team to deliver strong operating results while performing substantial restructuring duties, and (iii) including a self-funding pay-for-performance bonus opportunity for 23 leaders of key operations (six of whom also participate in the TMIP) to incentivize such key leaders to achieve transformation of their respective operations by exceeding certain "stretch" operating cash flow goals. On September 30, 2009, the Bankruptcy Court entered an order approving only the payment of earned but unpaid 2008 MIP awards to certain of the Debtors' executives. On January 28, 2010, the Bankruptcy Court entered an order authorizing the payment of earned but unpaid 2009 MIP awards to all participants in the MIP in an aggregate amount not to exceed $45.6 million. The Bankruptcy Court continues continued to take under advisement the TMIP and KOB programs. On March 4, 2010, the Debtors filed a motion to voluntarily dismiss, without prejudice, their request in the 2009 MIP Motion for entry of an order authorizing the implementation of the MIP TMIP and KOB programs. The Bankruptcy Court granted the Debtors' motion by order dated March 23, 2010. The Debtors will address the inclusion in the Plan of As further discussed in Article IX.H.5, the Plan authorizes and implements the TMIP and the KOB in a supplement that will be filed by the Debtors prior to the hearing on approval of the Disclosure Statement. Please refer to Article IX.H.5 for a further discussion of the TMIP and the KOB.

## D.    Cash Management.

Prior to the Petition Date, the Debtors utilized a centralized cash management system (the "Cash Management System") to collect funds from their operations and to pay operating and administrative expenses in connection therewith. In order to, among other things, avoid administrative inefficiencies, the Debtors

moved the Bankruptcy Court for an order (i) approving the Cash Management System; (ii) authorizing the continued use of their existing, prepetition bank accounts and business forms; (iii) waiving the requirements of section 345(b) of the Bankruptcy Code on an interim basis; (iv) granting administrative priority status to intercompany claims between and among the Debtors and between and among the Debtors and their non-Debtor affiliates; and (v) authorizing use of cash collateral in their deposit accounts as of the Petition Date and providing adequate protection to the cash management banks for the Debtors use of the cash collateral (the "Cash Management Motion"). By order signed December 10, 2008, the Bankruptcy Court approved the Cash Management Motion and waived the requirements of section 345(b) on an interim basis (the "Interim Order"). The Interim Order granted administrative priority status to intercompany claims and transactions on an interim basis. The final hearing on the Cash Management Motion was initially set for January 5, 2009, but was continued several times to April 30, 2009. The order granting administrative superpriority status to post-petition intercompany claims and transactions was entered on April 30, 2009 (the "Final Order"). The Final Order granted relief under section 345(b) in regard to certain foreign accounts but continued the interim waiver of section 345(b) guidelines on an interim basis. After entry of the Final Order, the Debtors and the U.S. Trustee resolved their remaining investment guidelines issues under section 345(b), and the Bankruptcy Court entered an order in respect of such issues on July 30, 2009.

E.    **Post-Petition Financing.**

As discussed in Article VI above, prior to the Petition Date, Tribune established the Receivables Facility. After the Petition Date, the Debtors and Barclays amended the Receivables Facility to allow for it to be utilized as interim debtor-in-possession financing (the "Interim DIP Facility") and to provide liquidity for continued operations during the Chapter 11 Cases. On December 8, 2008, the Debtors filed motions seeking Bankruptcy Court authorization for the (i) continued post-petition transfers of certain of the Debtors' receivables to the Receivables Subsidiary and (ii) Receivables Subsidiary to continue to obtain loans up to $300 million. The Debtors also sought Bankruptcy Court approval to permit the Debtors to (a) guarantee certain of the obligations of the Receivables Subsidiary and provide security in respect of such guaranty and (b) perform its reimbursement, cash collateral and other obligations under a new post-petition letter of credit facility (the "Letter of Credit Facility") to be provided by Barclays, as issuer and as administrative agent, and permitting the Debtors to obtain letters of credit in an aggregate amount up to $50 million. On December 11, 2008, the Bankruptcy Court granted interim approval of the Debtors' motions and, on January 15, 2009, the Bankruptcy Court granted final approval.

The Debtors and Barclays subsequently amended the Receivables Facility to allow its use as a more permanent asset-backed debtor-in-possession financing (the "Amended DIP Facility"). The Amended DIP Facility is comprised of a $75 million revolving line of credit, a $150 million term loan on terms similar to the Interim DIP Facility, and a letter of credit facility. The scheduled termination date of the Amended DIP Facility was amended to the earlier of April 10, 2010 or the Debtors' emergence from the Chapter 11 Cases. The Amended DIP Facility was approved by the Bankruptcy Court on April 8, 2009.

On November 19, 2009, the outstanding term and revolving loan balances under the Amended DIP Facility were repaid. On February 25, 2010, the Debtors provided written notice to the Administrative Agent for the Amended DIP Facility terminating the Amended DIP Facility effective February 26, 2010.

Although the Debtors have terminated the Amended DIP Facility, they recently amended and extended the Letter of Credit Facility. On March 2, 2010, the Debtors filed a motion with the Bankruptcy Court seeking authorization to enter into an amendment extending the term of the Letter of Credit Facility to the earlier to occur of (i) April 9, 2011 or (ii) certain contingencies specified in the proposed amendment, and permitting, among other things, the Debtors to obtain letters of credit in an aggregate amount up to $30 million.[1] The Bankruptcy Court approved the amendment to the Letter of Credit Facility by order entered March 22, 2010.

---

[1] See Motion of the Debtors for an Order Authorizing Debtors to Amend the Letter of Credit Facility Pursuant to Sections 105, 362(d), 363(b)(1), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e) and 365 of the Bankruptcy Code and Granting Other Related Relief [Docket No. 3666].

A letter of credit in the amount of $13 million has been issued and is outstanding under the Letter of Credit Facility.

**F.**     **Professional Retentions.**

1.     Retention of Professionals by the Debtors' Estates.

The Debtors applied for orders authorizing (i) the retention of Sidley Austin LLP ("Sidley") as its general reorganization and bankruptcy counsel and (ii) Cole, Schotz, Meisel, Forman & Leonard, P.A. ("Cole Schotz") as Delaware bankruptcy co-counsel under section 327(a) of the Bankruptcy Code on December 26, 2008.  The order approving Sidley's retention was entered on February 20, 2009, and the order approving Cole Schotz's was entered on February 3, 2009.

The Debtors also retained Alvarez & Marsal North America, LLC ("Alvarez") as restructuring advisor. The application to retain Alvarez was filed on December 26, 2008, and the order approving Alvarez's retention was entered on February 11, 2009.  In addition, the Debtors filed an application to retain Lazard Frères & Co., LLC ("Lazard") as their investment banker and financial advisor.  The application to retain Lazard was filed on December 26, 2008.  The order approving Lazard's retention was entered on March 13, 2009.  Finally, the Debtors filed an application to retain Deloitte & Touche LLP ("Deloitte") as their provider of certain financial, accounting, and advisory services on July 24, 2009.  The order approving Deloitte's retention was entered on August 11, 2009.

To further assist them in carrying out their duties as debtors in possession and to otherwise represent their interests in the Chapter 11 Cases, the Debtors also retained the following professionals with the Bankruptcy Court's approval:  (i) Daniel J. Edelman, Inc., as corporate communications and investor relations advisor; (ii) Dow Lohnes PLLC, as special counsel for certain regulatory matters; (iii) Ernst and Young LLP, to provide valuation, business modeling services, and market survey services to the Debtors; (iv) Jenner & Block LLP, as special counsel for certain litigation matters; (v) Jones Day, as special counsel for certain litigation matters; (vi) McDermott Will & Emery, LLP, as special counsel for general domestic legal matters; (vii) Mercer, as compensation consultant; (viii) Paul Hasting Janofsky & Walker LLP, as special counsel for general real estate and related matters; (ix) PricewaterhouseCoopers, LLP, as compensation and tax advisor and independent auditor; (x) Reed Smith LLP, as special counsel; and (xi) Seyfarth Shaw LLP, as special counsel for certain employment litigation matters.

In addition, the Debtors filed a motion seeking authorization to continue paying certain professionals utilized in the ordinary course of the Debtors' businesses (the "Ordinary Course Motion").  The Ordinary Course Motion was approved by order entered January 15, 2009.

2.     The Creditors Committee and its Advisors.

On December 18, 2008, the U.S. Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Creditors Committee") and subsequently amended that appointment on December 30, 2008 and May 26, 2009 to add and/or replace certain Creditors Committee members.  The Creditors Committee is currently comprised of the following parties: (i) JPMorgan Chase Bank, N.A.; (ii) Deutsche Bank Trust Company Americas; (iii) Warner Bros. Television; (iv) Buena Vista Television; (v) William Niese; (vi) Pension Benefit Guaranty Corporation; (vii) Wilmington Trust Company; and (viii) Washington-Baltimore Newspaper Guild, Local 32035.

On January 16, 2009, the Creditors Committee applied for an order authorizing the retention of (i) Chadbourne & Parke, LLP ("Chadbourne"), as counsel for the Creditors Committee and (ii) Landis, Rath & Cobb, LLP ("Landis"), as Delaware bankruptcy co-counsel.  The orders approving the retention of Chadbourne and Landis were entered on February 20, 2009.  Also on January 16, 2009, the Creditors Committee applied for an order to retain AlixPartners, LLP ("AlixPartners") as its financial advisor.  The order approving the retention of AlixPartners was entered on February 20, 2009.  On January 30, 2009, the Creditors Committee subsequently moved to allow them to retain Moelis & Company, LLC ("Moelis") as investment bankers.  The order

approving the retention of Moelis was signed on March 13, 2009. Finally, on August 13, 2009, the Creditors Committee requested authorization to retain Zuckerman Spaeder LLP ("Zuckerman") as special counsel. An order approving the retention of Zuckerman was entered on September 3, 2009.

## G.    Certain Administrative Matters and Other Motions.

1.    Disposition of Certain Executory Contracts and Unexpired Leases.

(a)    Unexpired Leases

In an effort to streamline business operations and reduce inefficiencies, the Debtors began the process of examining their real property leases in order to determine whether any of their operations could be consolidated. Since the Petition Date, the Debtors have obtained five orders from the Bankruptcy Court authorizing the rejection of over 70 real estate leases and subleases for certain office, operational, and studio properties that were no longer required for the Debtors' ongoing business operations.[2] On July 28, 2009, the Debtors also obtained authority from the Bankruptcy Court to abandon certain property and related obligations located at 2 Park Avenue, New York, New York.

The Debtors also sought and obtained authority to assume 226 real estate leases that are valuable assets and useful to the Debtors' ongoing businesses.[3] In addition, Debtor WGN Continental Broadcasting Company ("WGN") sought and obtained authority to assume two leases relating to the operation of WGN's digital transmitters located atop Chicago's Willis (Sears) Tower.[4] Los Angeles Times Communication LLC ("LATC") also sought and obtained authority to assume a lease pertaining to certain non-residential real property valuable to LATC's business operations.[5]

(b)    Motions to Assume Certain Executory Contracts.

The Debtors also sought authority to assume, assume and assign or reject various agreements, including the following:

- On July 8, 2009, Debtor Tribune Media Services, Inc. filed a motion seeking authority to assume certain prepetition local advertising sales agreements and to assign prepetition and post-petition local advertising sales agreements to Advantage Newspaper Consultants Inc., which was approved by order of the Bankruptcy Court on July 24, 2009. The Debtors also moved, on November 10, 2009, for an order to reject the service agreement between Tribune and Kenexa Brassring, Inc. (the "Kenexa Agreement"). The Bankruptcy Court entered an order authorizing the Debtors' to reject the Kenexa Agreement on November 25, 2009. Finally, the Debtors requested authority to assume a service agreement entered into between Debtor Tribune Publishing Company and Hewlett-Packard Company covering certain services to its advertisers (the "Hewlett-Packard Agreement"). The Debtors were granted authority to assume the Hewlett-Packard Agreement, as amended, on November 25, 2009.

---

[2] See Order Authorizing Debtors' First Omnibus Motion to Reject Certain Leases of Nonresidential Real Property, dated January 15, 2009; Order Authorizing Debtors' Second Omnibus Motion to Reject Certain Leases of Nonresidential Real Property, dated February 20, 2009; Order Authorizing Debtors' Third Omnibus Motion to Reject Certain Leases of Nonresidential Real Property, dated March 23, 2009; Order Authorizing Debtors' Fourth Omnibus Motion to Reject Certain Leases of Nonresidential Real Property, dated June 24, 2009 [Docket No. 1629]; Order Authorizing Debtors' Fifth Omnibus Motion to Reject Certain Leases of Nonresidential Real Property, dated September 2, 2009.
[3] See Order Authorizing Debtors to (I) Assume Certain Unexpired Leases of Nonresidential Real Property and (II) Set Cure Amounts with Respect Thereto, dated June 24, 2009 [Docket No. 1628].
[4] See Order Authorizing Debtor WGN Continental Broadcasting Company to (I) Assume Certain Unexpired Leases of Nonresidential Real Property and (II) Setting Cure Amount with Respect Thereto, dated September 2, 2009.
[5] See Order (I) Authorizing Debtor Los Angeles Times Communications LLC to Assume a Certain Unexpired Lease of Nonresidential Real Property Pursuant to Section 365 of the Bankruptcy Code and (II) Setting Cure Amount with Respect Thereto, dated December 14, 2009 [Docket No. 2834].

- On May 21, 2009, Tribune Broadcasting Company, WGN Continental Broadcasting Company, ChicagoLand Television, News, Inc., Tribune Entertainment Company, and certain Broadcast Subsidiaries (as defined in the Nielsen Assumption Motion, defined below) moved the Bankruptcy Court for an order authorizing the assumption of certain amended ratings services agreements and ancillary agreements with the Nielsen Company (US), LLC and the waiver and release of certain claims pursuant to a settlement and release agreement (the "Nielsen Assumption Motion"). The Nielsen Assumption Motion was approved by an order signed June 9, 2009.

- On June 26, 2009, certain of the Debtors filed a motion seeking the authority, pursuant to section 365 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure, to assume various syndicated program agreements entered into with King World Productions, Inc., and CBS Studios, Inc., and/or CBS Television Distribution and CBS Studios, Inc. (collectively, "CBS") and to compromise, waive, and release one-half of the prepetition amounts owed to CBS (the "CBS Motion"). An order approving the CBS Motion was signed July 14, 2009 (the "CBS Order"). Pursuant to the CBS Order, the Debtors were only required to pay one-half of the outstanding prepetition amounts owed to CBS under the various agreements in order to assume the agreements.

- On July 22, 2009, Tribune and Chicago Tribune Company ("CTC") filed a motion seeking authority (i) to assume the Metromix LLC limited liability agreement, as amended (the "Metromix Agreement"), (ii) compromise and release claims, and (iii) enter into new agreements (the "Metromix Motion"). The Metromix Motion sought the authority to assume the Metromix Agreement as amended to permit, but not require, Tribune to make additional capital contributions to the Metromix LLC joint venture, if required. In addition, the Metromix Motion sought the authority to enter into four new agreements resolving certain disputes, among other things. An order approving the Metromix Motion was entered by the Bankruptcy Court on August 10, 2009.

- On August 14, 2009, Tribune and the Publishing Debtors (as defined in the Classified Ventures Motion) filed a motion to approve the assumption by Tribune of the Limited Liability Company Agreement of Classified Ventures, LLC, and the assumption by the Publishing Debtors of their Affiliate Agreements with Classified Ventures, LLC (the "Classified Ventures Motion").[6] The Classified Ventures Motion sought authority for Tribune and the subsidiary Debtors which publish daily newspapers to assume certain agreements with Classified Ventures necessary to enable such Debtors to continue generating revenue from the sale of certain online classified advertising in their respective markets. The Classified Ventures Motion also requested authority to pay certain cure amounts related to the requested assumption. An order granting this relief was entered on September 2, 2009.

- On January 6, 2010, Tribune Broadcasting Company, WGN Continental Broadcasting Company, Tribune Television Company, Tribune Television Holdings, inc., Tribune Television Northwest, Inc., Tribune Television New Orleans, Inc., Channel 39, Inc., Channel 40, Inc., KSWB, Inc., KTLA Inc., WPIX, Inc., KIAH Inc. (f/k/a KHCW Inc.), WTXX Inc., and WDCW Broadcasting, Inc., sought approval to assume certain amended syndicated program agreements with Universal City Studios Productions LLP, a subsidiary of NBC Universal, Inc., and the compromise, waiver and release of certain claims (the "NBC Motion"). An order granting the relief requested in the NBC Motion was entered on January 25, 2010.

2.      Certain other Motions filed by the Debtors.

On April 29, 2009, the Debtors filed a motion seeking authorization to enter into a post-petition station affiliation agreement and related agreements with the CW Network (the "CW Motion"), pursuant to which the CW Network would provide programming for broadcast on certain of the Debtors' television stations. An order granting the CW Motion was entered by the Bankruptcy Court on May 12, 2009.

---

[6] As used in the Classified Ventures Motion, the term "Publishing Debtors" refers to Chicago Tribune Company, Los Angeles Times Communications LLC, The Hartford Courant Company, Orlando Sentinel Communications Company, Sun-Sentinel Company, The Daily Press, Inc., The Morning Call, Inc., and The Baltimore Sun Company.

On January 6, 2010, the Debtors filed a motion for authorization to compromise and settle a certain working capital account and related amounts with Hearst Danbury Holdings LLC, et al., in connection with a prepetition sale transaction involving Debtors Tribune and Southern Connecticut Newspapers, Inc. (the "SCNI Motion"). An order granting the SCNI Motion was entered by the Bankruptcy Court on January 26, 2010.

     3.     Fee Disgorgement Motion.

On March 26, 2010, the Bankruptcy Court heard oral arguments with respect to a motion filed by Law Debenture and joined by Centerbridge Credit Advisors LLC and Deutsche Bank Trust Company Americas seeking the disgorgement of fees and expenses paid by non-Debtor Tribune (FN) Cable Ventures, Inc. ("TCV") to certain professionals retained by the ~~Agent~~agent to the Senior Lenders under the Senior Loan Agreement and/or a former steering committee that was formed by the Debtors' Senior Lenders since the Petition Date (the "Fee Disgorgement Motion"). The Debtors, the Agent and the aforementioned steering committee opposed the Fee Disgorgement Motion on the grounds, among other things, that such payments were made by a non-Debtor on account of its own contractual obligations, were appropriately disclosed and vetted with the Creditors' Committee and the U.S. Trustee's office, and were made in furtherance of valid business considerations. The Bankruptcy Court did not rule on the Fee Disgorgement Motion at the March 26 hearing. However in connection with the Settlement Support Agreement, on April 9, 2010, a stipulation by and among JPMorgan Chase Bank, N.A., Law Debenture, and Centerbridge Credit Advisors LLC was filed with the Bankruptcy Court pursuant to which the Fee Disgorgement Motion was withdrawn without prejudice and the parties thereto agreed to the resumption of the fee reimbursements at issue in such motion. Also, on April 9, 2010, the Debtors filed a notice with the Bankruptcy Court indicating, in view of the stipulation, the intention of the Non-Debtor Guarantors and subsidiaries, including TCV, to recommence such fee reimbursements upon the expiration of five business days' notice. Such fee reimbursements were resumed following expiration of the aforementioned notice period. On April 29, 2010, the Debtors filed a notice with the Bankruptcy Court reflecting certain fees and expenses that were paid on or about April 22, 2010 and April 29, 2010 by TCV to certain professionals retained by the agent to the Senior Lenders under the Senior Loan Agreement and/or the former steering committee that was formed by the Senior Lenders.

     4.     Schedules of Assets and Liabilities; Statements of Financial Affairs.

On March 23, 2009, the Debtors filed their Schedules of Assets and Liabilities (the "Schedules") and Statements of Financial Affairs (the "Statements") with respect to each of the Debtors. Certain of the Schedules and Statements were amended on April 13, 2009, June 12, 2009, and March 2, 2010, and Schedules and Statements for Tribune CNLBC were filed with the Bankruptcy Court on October 12, 2009. Among other things, the Schedules contain information identifying the Debtors' executory contracts and unexpired leases, the creditors holding claims against the Debtors, and the nature of such claims. The Statements provide information including, among other things, payments or other transfers of property made by the Debtors to creditors on or within 90 days before the Petition Date or, in the case of "insiders", payments or other transfers of property made by the Debtors on or within one year before the Petition Date.

     5.     Filed Claims and Bar Date.

By order entered March 25, 2009, the Bankruptcy Court set June 12, 2009 at 4:00 p.m. (prevailing Eastern Time) (the "Bar Date") as the final date and time for filing certain proofs of claim in the Debtors' Chapter 11 Cases. As of the Bar Date, over 6,000 claims asserting approximately $606 billion in the aggregate were filed in the Chapter 11 Cases. The Debtors and their professionals have assembled specialized teams to review and reconcile the various categories of claims. While the claims reconciliation process is still ongoing, preliminary analysis suggests that the filed claims that are likely to be allowed may not vary substantially from the aggregate liabilities of approximately $13.7 billion reflected in the Schedules.

     6.     Bankruptcy Rule 2015.3 Reports.

The Debtors are required to comply with new Bankruptcy Rule 2015.3 ("Rule 2015.3"), which became effective immediately prior to the Petition Date. Pursuant to Rule 2015.3, the Debtors must file certain reports with the Bankruptcy Court, which provide additional financial reporting for non-Debtor entities in which the Debtors hold a "controlling or substantial" interest (the "2015.3 Reports"). As of the Petition Date, the Debtors wholly-owned 18 non-debtor entities and directly owned a non-majority equity interest in 8 non-debtor operating entities (the "Non-Majority Entities"). Because of the nature of the Debtors' interest in the Non-Majority Entities, the Debtors sought a determination that they do not have a "controlling or substantial" interest in those entities. Further, because of the commercial and competitive sensitivity of entity level financial information, the Debtors also sought a determination that "cause" existed to excuse entity level financial reporting for the Non-Majority Entities. Finally, due to the negotiations concerning a potential transaction involving the Chicago Cubs as well as the prohibition imposed by Major League Baseball on certain financial disclosures, the Debtors sought to exclude the Chicago Cubs and related assets from the requirements of Rule 2015.3. The Debtors filed a motion on January 12, 2009, seeking (i) additional time to file their initial 2015.3 Reports or (ii) a modification of such reporting requirements (the "2015.3 Motion"). On February 10, 2009, March 23, 2009, April 9, 2009, and August 17, 2009, the Debtors filed supplements to the 2015.3 Motion requesting authorization to comply in the manner set forth above. On July, 29, 2008, the Debtors filed 2015.3 Reports for each of Tribune's wholly-owned non-Debtor subsidiaries, with the exception of the Chicago Cubs-related entities. Subsequently, the Debtors reached agreement with the U.S. Trustee's office on a reporting protocol for the Non-Majority Entities and an agreed order was entered September 2, 2009. Rule 2015.3 Reports for these Non-Majority Entities were filed on October 6, 2009. On January 29, 2010, the Debtors filed their second set of Rule 2015.3 Reports for the wholly-owned non-Debtors and the Non-Majority Entities.

     7.      Analysis of Potential Preferential Payments.

The Debtors and their advisors reviewed certain prepetition payments and transfers made by Tribune for potential avoidance as preferential payments under Chapter 5 of the Bankruptcy Code (the "Preference Review").[7] The Preference Review, the details of which were shared with the Creditors Committee, excluded disbursements made by Tribune on behalf of the Filed Subsidiary Debtors in accordance with the Debtors' consolidated cash management system but otherwise included (i) all wire transfers from Tribune to third parties over $1 million during the 90 days prior to the Petition Date and (ii) other payments issued by Tribune during the 90 days prior to the Petition Date via check or ACH transfer that exceeded $1 million in the aggregate to any recipient. There were approximately $463 million in disbursements covered by the Preference Review, which disbursements generally fall into the following categories:

- Senior Noteholder Principal and Interest ($186.1 million)
- Senior Lender Interest ($113.6 million)
- Purchasing Card Program ($79.1 million)
- Bridge Lender Interest ($34.6 million)
- Barclays Swap Payments ($15.9 million)
- Professional Fees and Retainers ($13.6 million)
- Lease and Claim Administrators ($10.6 million)
- PHONES Notes Redemptions ($6.0 million)
- Citibank Swap Payments ($2.6 million)
- Barclays DIP Facility Commitment Fee ($1.5 million)

The Debtors believe that pursuing recovery of the aforementioned payments would provide no material benefit to the Debtors' Estates because the vast majority of the aforementioned payments are (i) subject to one or more of the defenses set forth in Chapter 5 of the Bankruptcy Code, (ii) likely related to obligations of the Filed Subsidiary Debtors (e.g., a substantial portion of the Purchasing Card Program payments and the

---

[7] Because the Plan provides for Holders of General Unsecured Claims against the Filed Subsidiary Debtors to be paid in full, the Preference Review focused primarily on evaluating payments made by Tribune.

Lease and Claim Administrator payments), (iii) payments received by one or more professionals who have since reached a settlement with the United States Trustee regarding avoidance of potential preference payments as part of their retention (e.g., the majority of the Professional Fees and Retainers relate to payments made on behalf of the Filed Subsidiary Debtors), and/or (iv) payments that were issued to the Debtors' lenders and that are subject to resolution in connection with the Global Settlement.

In addition to reviewing the above third party-payments, the Debtors and their advisors also reviewed payments by Tribune to potential insiders, namely current and former officers and directors of Tribune, during the year prior to the Petition Date.  There were approximately $87.0 million in payments, of which approximately $70.3 million relate to former officers and directors (comprised of approximately $17.8 million of payments related to restricted stock and options, approximately $39.0 million of severance, and approximately $13.5 million of salary, bonuses and other payments) and approximately $16.7 million relate to current officers and directors (comprised of approximately $5.6 million of payments related to restricted stock and options and $11.1 million of salary, bonuses and other payments).  The majority of these payments were made under the terms of programs or contracts entered into more than one year prior to the Petition Date and/or were paid in the ordinary course of business.[8]

After considering the costs of pursuing preference avoidance actions and the potential defenses of the parties, the Debtors currently believe that it is in the best interests of the Debtors' Estates to release preference causes of action.  However, the Debtors will continue to discuss with the Creditors Committee and the Senior Lender Settlement Committee whether it would be cost efficient to commence any preference avoidance actions.  If the Bridge Loan Claims in Class 1D vote to reject the Plan, a preference avoidance action may be one of the potential claims allowance issues that may need to be addressed in conjunction with the cramdown of Class 1D Claims.

## H.    **Chicago Cubs Transaction.**

During the pendency of the Chapter 11 Cases, the Tribune Entities pursued and consummated certain transactions pursuant to which the Chicago Cubs and related assets and liabilities, including the Company's 25.34% interest in CSN Chicago, were contributed to a newly formed limited liability company, Chicago Baseball Holdings, LLC and its subsidiaries (collectively, "New Cubs LLC").  Tribune first announced its intention to dispose of an interest in the Chicago Cubs and its attendant assets in April 2007, on the same day that Tribune announced the completion of its strategic review process and its decision to convert from a public company to a privately-held company.  Thereafter, Tribune and Tribune CNLBC acted to identify parties that were both likely to have an interest in acquiring an interest in the Chicago Cubs and assets and the financial resources to complete such a transaction.  In furtherance of those efforts, Tribune engaged J.P. Morgan Securities Inc. in July 2007 to aid in identifying suitable investors and to act as Tribune's financial advisor in connection with the proposed transaction.

From mid-2007 to early 2009, Tribune engaged in an intensive process to identify a transaction partner and ultimately reduced the number of interested parties from more than 100 to a single party.  The prevailing party was a new entity formed by the Ricketts family ("Ricketts Acquisition LLC").  Following an extended period of negotiations, on August 21, 2009, Tribune and Ricketts Acquisition LLC, among other parties, entered an agreement (the "Cubs Formation Agreement") governing the contribution of certain assets and liabilities related to the businesses of the Chicago Cubs owned by Tribune and its subsidiaries to New Cubs LLC.  The contributed assets included, but were not limited to, the Chicago Cubs Major League Baseball franchise, spring training and Dominican Republic baseball operations, Wrigley Field and certain other real estate used in the business, and a 25.34% interest in CSN Chicago, which operates a local sports programming network in the Chicago area (collectively, the "Cubs Business").

---

[8] These payments exclude the redemption of any stock through a transfer agent as part of the Leveraged ESOP Transactions.

On August 24, 2009, the Debtors filed a motion with the Bankruptcy Court seeking authority to enter into the Cubs Formation Agreement and to perform all transactions necessary to effect the contribution of the Cubs Business to New Cubs LLC. On the same day, the Debtors announced that the principal entity holding the assets and liabilities of the Cubs Business, Tribune CNLBC, would commence a Chapter 11 case to implement the transactions contemplated by the Cubs Formation Agreement. The Debtors also sought approval for notice and other procedures relating to the transactions by filing a motion with the Bankruptcy Court on August 24, 2009. The Bankruptcy Court approved the Debtors' notice and other procedures for the transactions on August 31, 2009 and, on September 24, 2009, authorized the Debtors to perform the transactions under the Cubs Formation Agreement. On October 6, 2009, Major League Baseball announced unanimous approval of the transactions. Tribune CNLBC filed its voluntary Chapter 11 petition on October 12, 2009, and the Bankruptcy Court granted a motion to approve the transactions contemplated by the Cubs Formation Agreement as to Tribune CNLBC on October 14, 2009. The transactions contemplated by the Cubs Formation Agreement and the agreements related thereto closed on October 27, 2009.

In addition to the Cubs Formation Agreement, Tribune, Tribune CNLBC, and several of their affiliates entered into a number of ancillary agreements implementing various aspects of the Chicago Cubs-related transactions. Among those ancillary agreements are guarantees of collection by Tribune of the liabilities of New Cubs LLC under (i) certain senior indebtedness incurred in connection with the Chicago Cubs-related transactions, which consists of (a) a $25 million senior secured revolving credit facility, and (b) a $425 million senior secured term loan facility, and (ii) $248.75 million of subordinated indebtedness. Each of the guarantees is a guarantee of collection and not of payment. Tribune has no obligation to make any payment on such guarantees unless and until New Cubs LLC fails to make a payment on any of the above obligations when due, the relevant lender(s) exhaust all legal and equitable remedies against New Cubs LLC and other guarantors and the collateral posted by New Cubs LLC and other guarantors to secure the obligations (including foreclosure and similar remedies), and the lenders have failed to collect the full amount of the guaranteed obligations. Tribune's obligations under such guarantees are limited to the initial principal amount of the obligations reduced by principal payments made by New Cubs LLC or on its behalf, cash proceeds realized from the lenders' exercise of remedies, and any principal amounts that may be forgiven by the lenders plus any unpaid premium on, or unpaid interest accruing on such principal amount.

Pursuant to the Cubs Formation Agreement, Tribune and its contributing subsidiaries and affiliates received a special distribution from New Cubs LLC of approximately $705 million in cash and other consideration, which amount remains subject to final adjustments and is being held by Tribune CNLBC pending resolution of the Chapter 11 Cases, and a five percent (5%) membership interest in New Cubs LLC valued at $21 million.[2] Further, the majority of the liabilities of the Cubs Business were assumed by New Cubs LLC or one of its affiliates. The unsecured pre-bankruptcy guaranties entered into by Tribune CNLBC of Tribune's obligations under its pre-bankruptcy credit facilities and other exceptions set forth in the Cubs Formation Agreement were not assumed by New Cubs LLC or one of its affiliates and remain as obligations of Tribune CNLBC to be addressed under the Plan.

## I.    Morgan Stanley Swap Agreement

On December 19, 1994, Morgan Stanley Capital Services, Inc. ("MSCS") and Times Mirror entered into an interest rate swap in respect of a $100 million notional amount, which was memorialized in an ISDA Master Agreement, dated as of August 5, 1994, and a Confirmation to such agreement, dated as of December

---

[9] The Cubs transaction was consummated as the contribution of assets into a partnership formed with the Ricketts family. Tribune received an opinion of counsel solely for its own benefit which, although not binding on the IRS, opined that the receipt of cash attributable to partnership borrowings should not be taxable. Tribune has not reserved or set aside cash for taxes associated with the transaction. Tribune expects to recognize annual taxable income from the partnership that will be taxable to Tribune as a C corporation after its emergence from bankruptcy. Those amounts are taken into account in Tribune's financial projections and models. Tribune's Projected Pro Forma Consolidated Balance Sheet included as Exhibit F reflects $1.03 billion of deferred income taxes, which includes deferred tax liabilities resulting from Tribune's contribution of assets to New Cubs LLC.

19, 1994 (collectively, the "Swap Agreement"). Between 2006 and 2008, Morgan Stanley & Co., Inc. ("MS&Co.") purchased approximately $38.365 million in face amount of the Tribune 7.5% debentures, due July 1, 2023 (the "7.5% Debentures). During 2008 and 2009, MS&Co. transferred all of its interest in the 7.5% Indentures to MSCS.

Tribune asserts that in November 2008, Tribune engaged MS&Co. to provide advisory services.[10] Tribune understands that MS&Co. and MSCS deny that any agreements were reached. Shortly after November 20, 2008, Tribune and MS&Co. determined that it would be prudent for Tribune to retain a financial advisor that satisfied the disinterested person requirement under the Bankruptcy Code, and for MS&Co. to continue to serve as financial advisor to provide for an efficient transition to the new advisor. MS&Co. informed Tribune that, as a formal engagement agreement had not been reached, it required Tribune to execute an indemnification agreement in order for MS&Co. to assist Tribune during this transition period. On November 30, 2008, Tribune and MS&Co. executed an indemnification agreement.[11]

Tribune's bankruptcy filing was an Event of Default under Section 5(a)(ii) of the Swap Agreement. MSCS designated December 9, 2008 as the Early Termination Date for the interest rate swap and, by letter dated December 18, 2008, informed Tribune that it had set off $38.365 million in principal amount of the 7.5% Debentures (plus accrued interest and expenses) against the $50,433,470.16 MSCS had determined, as the non-defaulting party under the Swap Agreement, it owed Tribune. MSCS asserted that such setoff was permitted pursuant to the Bankruptcy Code's "safe harbors."

Tribune asserted that MSCS did not have such a right of setoff, and that even if such setoff right did exist, it was not protected. By letter dated March 20, 2009, MSCS advised that the correct amount owing to Tribune under the Swap Agreement was $51,945,000 (the "Termination Amount") and that the prior figure was the result of a calculation error. MSCS again informed Tribune that it had set off $38.365 million in principal amount of the 7.5% Debentures (plus accrued interest and expenses) against the Termination Amount. The parties engaged in arm's-length negotiations to resolve their dispute with respect to the MSCS Claim, and on May 29, 2009, MSCS paid Tribune $9.5 million in partial satisfaction of the amount owing to Tribune under the Swap Agreement, without prejudice to the respective rights, claims, or defenses of the parties. The parties are continuing to engage in such negotiations to finally resolve the MSCS Claim.

## J.   Appointment of an Examiner

On January 13, 2010, Wilmington Trust Company ("WTC"), as successor indenture trustee for the PHONES Notes, filed a motion seeking the appointment of an examiner pursuant to section 1104(c) of the Bankruptcy Code for the limited purpose of investigating the Leveraged ESOP Transactions and any potential claims related thereto (the "Examiner Motion"). The Debtors filed their opposition to the Examiner Motion on various grounds, including that such relief is not warranted and would be duplicative of the extensive investigations already being undertaken, with no correlative benefit to the Debtors' Estates.

The Examiner Motion was subsequently resolved by the parties consensually, resulting in the entry by the Bankruptcy Court on April 20, 2010 of an Agreed Order Directing the Appointment of an Examiner ("Examiner Order"). On April 30, 2010, the U.S. Trustee appointed Kenneth N. Klee to be the examiner (the

---

[10] Tribune also asserts that during this time (i) Tribune and MS&Co. engaged in negotiations with respect to the terms of an engagement letter, and (ii) during these negotiations, MS&Co. agreed to transfer to a third party any financial instruments that could be materially adverse to the interests of Tribune, in order for MS&Co. to qualify as a "disinterested person" under the Bankruptcy Code and to serve as Tribune's financial advisor in the event Tribune determined to commence a chapter 11 proceeding. MS&Co. could only serve as Tribune's financial advisor if MS&Co. qualified as a "disinterested person" under the Bankruptcy Code. In order to qualify as a "disinterested person" under the Bankruptcy Code, MS&Co. (and its affiliate, MSCS) could not hold financial instruments that could be materially adverse to the interests of the estate or of any claim of creditors or equity security holders.
[11] At the December 1, 2008 meeting of Tribune's Board of Directors, the Board of Directors terminated MS&Co.'s engagement as financial advisor to Tribune.

"Examiner") and, on the same day, filed an application with the Bankruptcy Court requesting approval of such appointment. The U.S. Trustee's application was approved on May 10, 2010 and Kenneth N. Klee was appointed Examiner by order entered on the same date. On May 11, 2010, the Bankruptcy Court entered an order approving the Examiner's proposed work and expense plan and modifying the Examiner Order (the "Supplemental Order").

Pursuant to the Examiner Order and Supplemental Order, the Examiner's duties are to (i) evaluate the potential claims and causes of action held by the Debtors' estates that are asserted by the Parties (as defined in the Examiner Order) in connection with the Leveraged ESOP Transactions which may be asserted against any entity which may bear liability, including ,without limitation, the Debtors, the Debtors' former and/or present management, former and/or present members of Tribune's board of directors, the Debtors' lenders and the Debtors' advisors, and including without limitation, claims for fraudulent conveyance, breach of fiduciary duty, aiding and abetting breach of fiduciary duty and equitable subordination, and to evaluate the potential defenses asserted by the Parties to such potential claims and causes of action; (ii) evaluate whether WTC violated the automatic stay under 11 U.S.C. §362 by its filing, on March 3, 2010, of its Complaint for Equitable Subordination and Disallowance of Claims, Damages and Constructive Trust; (iii) evaluate the assertions and defenses made by certain of the Parties in connection with the Motion of JPMorgan Chase Bank N.A. for Sanctions Against Wilmington Trust Company for Improper Disclosure of Confidential Information in Violation of Court Order; and (v) otherwise performs the duties of an examiner set forth in 11 U.S.C. §§1106(a)(3) and (4) (as limited by the Examiner Order). The Examiner is required to prepare and file a report in respect of his investigation on or before July 12, 2010. Following such filing, parties may access the Examiner's completed report on the internet at the Debtors' website: http://chapter11.epiqsystems.com/tribune.

## VII. SETTLEMENT OF CLAIMS RELATING TO THE LEVERAGED ESOP TRANSACTIONS

The Plan provides for a Global Settlement of all potential LBO-Related Causes of Action among the Tribune Entities, the Debtors' Estates and the "Released Parties," as defined in the Plan. A significant portion of the value allocation under the Plan to the Holders of Other Parent Claims and General Unsecured Claims against Filed Subsidiary Debtors is attributable to the Global Settlement. Based on the Debtors' calculations, the Plan allocates (i) approximately 7.0% of total Distributable Value (substantially all of which the Senior Lenders and Bridge Lenders (the "LBO Lenders") would otherwise claim to be entitled to receive), to the Holders of Senior Notes Claims and Other Parent Claims and (ii) approximately 1.4% of total Distributable Value (substantially all of which Holders of Allowed Loan Guaranty Claims would otherwise claim entitlement to receive), to the Holders of General Unsecured Claims against Filed Subsidiary Debtors, resulting in the payment in full (without post-petition interest) of these General Unsecured Claims, assuming such Claims do not exceed $150 million. More specifically, the Global Settlement provides for the Senior Noteholders to receive a strip of the consideration that the LBO Lenders will receive under the Plan amounting to 7.4% of the total Distributable Value and Holders of Other Parent Claims to receive a recovery of approximately thirty five percent (35)% on account of their Allowed Claims. The Debtors value the aggregate additional consideration to be provided to Holders of Senior Noteholder Claims, Other Parent Claims, and General Unsecured Claims against Filed Subsidiary Debtors pursuant to the Global Settlement at more than $510 million. The Global Settlement and the Plan have the support of a cross-section of the Debtors' creditor constituencies, including LBO Lenders (such as JPMorgan Chase Bank, N.A. and Angelo Gordon & Co. LP), the largest single Noteholder, Centerbridge (holding approximately thirty-seven percent (37%) of the Senior Notes), one of the indenture trustees for the Senior Noteholders, and Law Debenture (solely in its capacity as successor trustee for certain of the Senior Notes). In addition, prior to the Debtors' filing of the Disclosure Statement, the Creditors Committee has~~had~~ voted to support the settlement terms contained in the Settlement Term Sheet, attached hereto as Exhibit B.[42]   The Creditors' Committee has now also voted to endorse the Plan and the Global

---

[42] ~~The Creditors' Committee's support is conditional upon the inclusion of such settlement terms in the Plan, Disclosure Statement, and related documentation that are satisfactory to the Creditors' Committee, and the Creditors' Committee reserves is right to, among other things, review, comment upon, and seek modifications to this Disclosure Statement, the Plan, and related documents in any manner not inconsistent with the settlement terms set forth in the Settlement Term~~

Settlement, and has prepared a letter, to be included on the Debtors' solicitation materials sent to creditors entitled to vote on the Plan, urging all unsecured creditors to vote in favor of the Plan.

The Debtors believe the proposed Global Settlement is a fair, equitable and reasonable compromise and settlement of the potential LBO-Related Causes of Action and is in the best interest of the Debtors' Estates. The Global Settlement is the product of extensive arm's length negotiations and the Debtors believe it provides a recovery to the Senior Noteholders and Holders of General Unsecured Claims that is within the range of reasonably possible outcomes considering all relevant circumstances. The Global Settlement provides releases for all parties relating to almost all causes of action potentially existing at or before the Effective Date, including the LBO-Related Causes of Action, supported by related anti-suit injunctions. The releases are a central and important element of both the Global Settlement and the Plan because, among other things, they are necessary to provide the LBO Lenders with a full and final resolution of disputed claims against them, will enable the Debtors to exit bankruptcy sooner than otherwise would be possible and will allow the Reorganized Debtors upon emergence to devote their full time and attention to their businesses, without the distraction of litigation. The Global Settlement and Plan will also spare the Debtors' Estates and the Reorganized Debtors the expense and inconvenience of what could otherwise be very complex and costly litigation.

The following is the Debtors' discussion and analyses of the Leveraged ESOP Transactions and the LBO-Related Causes of Action. Pursuant to the Debtors' invitation, certain parties in interest have prepared the Settlement Submissions setting forth their views in respect of the LBO-Related Causes of Action and Global Settlement, which are included in the compendium accompanying this Disclosure Statement. Additionally, although the Examiner will not opine on or otherwise evaluate the Global Settlement, the Examiner's Report will set forth the results of his investigation, including in respect of the LBO-Related Causes of Action. A copy of the Examiner's Report should be available, from and after July 12, 2010, at the following website: http://www.chapter11.epiqsystems.com/tribune.

## A.     The Leveraged ESOP Transactions.

As discussed in Article IV.A, on April 1, 2007, Tribune's then board of directors, based on the recommendation of a special committee of independent directors, approved the Leveraged ESOP Transactions with (i) the ESOP, a newly formed Tribune employee stock ownership plan, (ii) the Zell Entity, and (iii) Samuel Zell. The Leveraged ESOP Transactions proceeded in two principal steps.

In step one, the ESOP purchased shares of Tribune common stock, and Tribune consummated a cash tender offer for nearly fifty percent (50%) of its outstanding common stock. In order to finance the tender offer, Tribune entered into the $8.028 billion Senior CreditLoan Agreement. A number of Tribune's domestic subsidiaries, the Guarantor Subsidiaries, provided unsecured guarantees of Tribune's indebtedness under the Senior Credit Agreement.Loan Agreement. The following charts illustrate the sources and uses of cash at step one of the Leveraged ESOP Transactions:



### Sources & Uses – Step I[13,14]
### ($ in millions)

| STEP I - SOURCES & USES | |
|---|---|
| **Sources** | **Amount** |
| A  Tranche B Term Loan | $5,515.0 |
| Tranche X Term Loan | 1,500.0 |
| Delayed Draw Tranche B Term Loan ($263 capacity) | 0.0 |
| Revolving Credit Facility ($750 capacity) | 0.0 |
| B  EGI-TRB Equity Investment (1.47 million shares @ $34) | 50.0 |
| Exchangeable EGI-TRB Note | 200.0 |
| **Total Sources** | **$7,265.0** |
| **Uses** | **Amount** |
| C  Repay Bridge Credit Agreement (a)(b) | $1,325.0 |
| Repay Term Loan (b) | 1,500.0 |
| D  TRB repurchases 126 million shares @ $34 | 4,284.0 |
| Bank Fees | 134.1 |
| Other Fees | 21.9 |
| **Total Uses** | **$7,265.0** |

In step two, which was completed on December 20, 2007, Tribune merged with the Merger Sub, a Delaware corporation wholly owned by the ESOP, with Tribune surviving the Merger. Upon the Merger, all issued and outstanding shares of Tribune's common stock, other than shares held by Tribune or the ESOP, were

---

[13] Source: Company's public filings and books and records.

[14] Note:     ESOP's $250 million purchase of Tribune equity not shown as this transaction did not involve the actual transfer of any cash.

Note:     Part B of the transaction was completed on April 23, 2007. Parts A, C and D were completed on June 4, 2007.

Note:     On June 4, 2007, simultaneously with the funding of the Credit Agreement loans, Tribune made capital contributions in the aggregate amount of $3.98 billion, directly or indirectly, to twenty-one subsidiary guarantors with outstanding promissory note balances owed to Los Angeles Times International, Ltd. ("LATI"), a solvent, non-Debtor, non-guarantor direct subsidiary of Tribune. The subsidiaries in turn used the proceeds from their respective capital contributions to repay their outstanding balances owed on the LATI notes. These transactions were required to occur as a simultaneous condition to the initial borrowing. (See Section 3.01(m) of the Credit Agreement.) The Credit Agreement also required that the proceeds of the Tranche X and Tranche B loans be used solely for purposes that included the transactions described above. In addition, pursuant to Sections 3.01(m) and 5.01(m) of the Credit Agreement, in May 2007, TFLLC, a guarantor, was formed, with the sole member being Tribune. Upon the closing of the Credit Agreement in June 2007, the following transactions occurred: (i) Tribune made a capital contribution of $3.0 billion to TFLLC; (ii) TFLLC loaned to eight guarantor publishing subsidiaries a total of $3.0 billion in exchange for intercompany promissory notes; and (iii) the publishing subsidiaries who received the loans from TFLLC made dividend payments in an aggregate amount totaling $3.0 billion to Tribune. In each of the above-transactions, the capital contributions, loans or loan repayments, and dividends were accomplished via book entry rather than the actual movement of cash.

(a)     Repayment of Amended and Restated Bridge Credit Agreement dated as of June 27, 2006 (as subsequently amended, the "Bridge Credit Agreement"). This repayment includes $300 million that was paid between April 23, 2007 and June 3, 2007.

(b)     In addition to payment of principal, interest expense of $3.1 million and $6.3 million was paid on the Bridge Credit Agreement and Term Loan, respectively.

cancelled, and Tribune became wholly owned by the ESOP.  Also on December 20, 2007, Tribune borrowed an additional $2.1 billion under the Senior ~~Credit~~Loan Agreement and entered into the Bridge Loan Agreement, pursuant to which Tribune borrowed approximately $1.6 billion.  The proceeds of the additional borrowings under the Senior ~~Credit~~Loan Agreement and of the borrowings under the Bridge Loan Agreement were used for, among other things, the consummation of the merger. ~~The Bridge Loan Agreement indebtedness is unsecured but is guaranteed, on a subordinated basis to the Senior Credit Agreement indebtedness, by the Guarantor Subsidiaries[15].~~  The following charts illustrate the sources and uses of cash at step two of the Leveraged ESOP Transactions (in millions):

**Sources & Uses – Step II[16]**
**($ in millions)**

---

[15]  The Bridge Loan Agreement indebtness is unsecured, but is guaranteed, on a subordinated basis to the Senior Loan Agreement indebtness, by the Guarantor Subsidiaries.
[16]  Source:   Company's public filings and books and records.
   Note:    Schedule details payments made on December 20, 2007, or shortly thereafter.
   (a)    Includes payments related to deferred compensation, non-qualified retirement and transitional compensation plans.



| STEP II - SOURCES & USES | |
|---|---|
| **Sources** | **Amount** |
| Cash from Balance Sheet | $582.9 |
| E  Tranche B Term Loan | 2,105.0 |
| Bridge Facility | 1,600.0 |
| F  EGI-TRB Net Cash Payment | 56.1 |
| **Total Sources** | **$4,344.0** |
| | |
| **Uses** | **Amount** |
| G  Cash Settlement of Stock Based Awards | $134.9 |
| H  TRB repurchases 117.1 million shares @ $34 | 3,981.9 |
| Cash Distribution triggered by Change of Control (a) | 104.0 |
| Bank Fees | 73.4 |
| Other Fees | 49.7 |
| **Total Uses** | **$4,344.0** |
| | |
| **MEMO: Details to Step F** | |
| Subordinated EGI-TRB Note Investment | $225.0 |
| EGI-TRB Warrant | 90.0 |
| Credit for TRB Shares | (50.0) |
| Credit for Exchangeable EGI-TRB Note | (200.0) |
| **Subtotal** | **65.0** |
| | |
| Credit for PIK Interest on Exchangeable EGI-TRB Note | (6.4) |
| Credit for Reimbursed Legal Fees | (2.5) |
| **Total Net Cash To Be Invested by EGI-TRB** | **$56.1** |

The following chart shows the financial projections prepared by the Company in February 2007 and October 2007. The financial projections set forth below were included in the information utilized by the Company, the Board of Directors, a special committee of the Board of Directors and their respective financial and legal advisors in evaluating the Leveraged ESOP Transactions. The following chart also shows the Company's actual 2007 and 2008 performance.[17]

**Summary Projections**
**($ in millions)[18]**

---

[17] Please refer to Article V for a discussion concerning the reasons underlying the variance between the projections prepared in February 2007 and October 2007 and actual 2007 and 2008 performance.
Source:  February and October Models, 2007 Management Financial Report, 2008 Post-Audit Adjusted Management Financial Report, Company Disclosures.
Note:  The Board approved the February Model on Feb. 13, 2007 and October Model on Oct. 17, 2007.
Note:  All Operating Cash Flow figures are exclusive of Stock Based Compensation. See Exhibit F to the Disclosure

| PROJECTIONS VS. ACTUALS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2007PF | 2007A (a) | Var. ($) | Var. (%) | 2008P | 2008A (a) | Var. ($) | Var. (%) |
| **February Model** (b) | | | | | | | | |
| Revenue | $5,121.3 | $4,837.5 | ($283.7) | (5.5%) | $4,744.3 | $3,927.1 | ($817.2) | (17.2%) |
| Operating Cash Flow | 1,280.8 | 1,160.8 | (120.0) | (9.4%) | 1,263.9 | 779.0 | (484.8) | (38.4%) |
| | | | | | | | | |
| **October Model** (c) | | | | | | | | |
| Revenue | $4,856.7 | $4,837.5 | ($19.1) | (0.4%) | $4,442.0 | $3,927.1 | ($515.0) | (11.6%) |
| Operating Cash Flow | 1,160.1 | 1,160.8 | 0.6 | 0.1% | 1,095.0 | 779.0 | (316.0) | (28.9%) |

Additional information concerning the Leveraged ESOP Transactions and events leading up to the Leveraged ESOP Transactions can be found in the "Offer to Purchase" filed by Tribune with the SEC on April 25, 2007, in connection with the Leveraged ESOP Transactions, a copy of which is attached hereto as Exhibit D.

**B.     Investigation of the LBO-Related Causes of Action.**

From the outset, it was apparent that a central issue in these Chapter 11 Cases would be the investigation and resolution of potential LBO-Related Causes of Action.  Accordingly, the Creditors Committee began its investigation not long after the Debtors filed for bankruptcy, and retained Zuckerman Spaeder LLP as special litigation counsel for that purpose.  During the course of that investigation, the Creditors' Committee undertook discovery from over 30 entities and persons involved in the Leveraged ESOP Transactions and obtained and reviewed over 3.7 million pages of discovered documents.  The Creditors Committee also deposed numerous parties.  The Debtors cooperated extensively with the professionals serving the Creditors Committee by providing them with informal discovery and access to information regarding the Leveraged ESOP Transactions to permit the Creditors Committee to conduct an investigation of potential LBO-Related Causes of Action.  Law Debenture has also undertaken its own investigation of the Leveraged ESOP Transactions.  In addition, the Debtors undertook their own substantial efforts to review and analyze the LBO-Related Causes of Action.  The Debtors also took steps to permit other parties, including Law Debenture, access to the discovery material so that they could make their own evaluation of the LBO-Related Causes of Action.  In December of 2009, the Debtors streamlined and further facilitated the review process by creating a centralized document depository to provide the relevant parties access to all of the documents and deposition transcripts that have been collected to date.

**C.     Proceedings Related to Leveraged ESOP Transactions.**

On January 13, 2010, ~~Wilmington Trust Company ("WTC"), as successor indenture trustee for the PHONES Notes, filed a motion seeking the appointment of an examiner pursuant to section 1104(c) of the Bankruptcy Code for the limited purpose of investigating the Leveraged ESOP Transactions and any potential claims related thereto (the "Examiner Motion").  The Debtors filed their opposition to the Examiner Motion on various grounds, including that such relief is not warranted and would be duplicative of the extensive investigations already being undertaken, with no correlative benefit to the Debtors' Estates.  The Examiner Motion was originally scheduled to be heard by the Bankruptcy Court on February 18, 2010, but was continued by the Bankruptcy Court until April 13, 2010.~~  WTC filed the Examiner Motion.  As discussed in greater detail in Article VI.I, the Examiner Motion was resolved by the parties consensually, resulting in the entry of an

---

| | Statement for additional information regarding Operating Cash Flow. |
|---|---|
| (a) | Actual results are adjusted to exclude impact of Cubs and Tribune Entertainment, and exclude Newsday in 2008 only. |
| (b) | Model adjusted to exclude Recycler, Tribune Entertainment, and Newsday in 2008. |
| (c) | Model adjusted to exclude Newsday in 2008. |

agreed order by the Bankruptcy Court on April 20, 2010 directing the appointment of an examiner.  Please see Article VI.I for a more detailed discussion of the Examiner Motion and its resolution.

On February 1, 2010, the Creditors Committee filed a motion seeking authority to prosecute certain estate causes of action related to the Leveraged ESOP Transactions (the "Standing Motion").  The Debtors opposed the relief requested in the Standing Motion on grounds that the requisite showing necessary to confer derivative standing on the Creditors Committee has not been made and such relief would not be in the best interests of the Debtors' Estates.  The Standing Motion was also scheduled to be heard by the Bankruptcy Court on February 18, 2010, and has been continued by the Bankruptcy Court until April 13, 2010.   To facilitate consideration of the Global Settlement embodied in the Plan, the Creditors Committee has agreed to adjourn *sine die* the Standing Motion and has advised it has no present intention of prosecuting the Standing Motion while consideration of the Global Settlement proceeds.

On March 4, 2010, WTC filed with the Bankruptcy Court a complaint (the "WTC Complaint") purporting to seek equitable subordination, disallowance of claims, damages and a constructive trust against certain of the Debtors' Senior Lenders, denominated in the WTC Complaint as the "Lead Banks."  The relief sought is alleged to arise out of the Leveraged ESOP Transactions.  The Debtors filed a motion on March 18, 2010 seeking a determination that the WTC Complaint violated the automatic stay imposed by section 362 of the Bankruptcy Code, requesting that WTC be required to demonstrate why it should not be held in contempt of court for filing the WTC Complaint, and seeking to halt all proceedings respecting the WTC Complaint.  The Debtors' motion is based on the grounds that, *inter alia*, the WTC Complaint violates the automatic stay imposed by section 362 of the Bankruptcy Code and constitutes an attempt to exercise control of causes of action belonging to the Debtors' bankruptcy estates (the "Automatic Stay Motion").  On April 5, 2010, WTC filed a response to the Debtors' motion attaching a proposed amended complaint which adds additional defendants including Samuel Zell, the Zell Entity, and Sam Investment Trust.  On April 7, 2010,[19] the Creditors Committee filed a statement supporting the Debtors' motion noting, among other things, that WTC's actions, through its attorneys, have disadvantaged the Creditors Committee and its constituency.  The ~~Debtors' motion is scheduled to be heard on April 13, 2010.~~Examiner Order provides for the Examiner to evaluate whether WTC violated the automatic stay by filing the WTC Complaint.  The Automatic Stay Motion is currently adjourned to a date to-be-determined, and a further hearing date will be established following the issuance of the Examiner's report concerning the Automatic Stay Motion.

## D.    LBO-Related Causes of Action.

The Standing Motion and the WTC Complaint encompassed only certain of the potential LBO-Related Causes of Action.  At their core, the LBO-Related Causes of Action are based on the assertion that the debt incurred as a part of the Leveraged ESOP Transactions rendered Tribune insolvent and/or left Tribune with ~~relatively~~unreasonably small capital to operate its businesses, harming all of the Debtors' creditors.

The potential claims encompassed by, the LBO-Related Causes of Action, include claims to: (i) avoid all of the guarantees provided by the Subsidiary Guarantors and avoid the obligations incurred and liens provided by Tribune in connection with the Leveraged ESOP Transaction as fraudulent transfers, (ii) avoid and recover for the benefit of the Debtors' Estates the amounts paid to certain third- parties in connection with the Leveraged ESOP Transactions as fraudulent transfers, (iii) avoid, recover and/or subordinate to all creditors, including Tribune's creditors, for the benefit of the Debtors' Estates the obligations incurred and collateral granted to certain lenders in connection with the Leveraged ESOP Transactions as fraudulent transfers, (iv) equitably and/or statutorily disallow all claims by certain third- parties, (v) recover for the benefit of the Debtors' Estates damages caused by breaches of fiduciary and other duties in engineering, facilitating and/or approving the Leveraged ESOP Transactions, (vi) recover for the benefit of the Debtors' Estates damages caused by certain third- parties having aided and abetted  alleged breaches of fiduciary duties with respect to the Leveraged ESOP Transactions, (vii) recover for the benefit of the Debtors' Estates damages caused by the

---

[19] [Docket No. 3968].

negligence of certain third- parties related to the Leveraged ESOP Transactions, (viii) recover for the benefit of the Debtors' Estates damages caused by the negligent misrepresentations of certain third- parties, and (ix) obtain declaratory judgment to disregard the corporate structures of certain Tribune subsidiaries on the basis of alter ego, veil piercing, substantive consolidation, or any other doctrine of law or equity.

**E.**     **Efforts to Settle the LBO-Related Causes of Action.**

The Debtors' objective in investigating and facilitating the exchange of information regarding the potential LBO-Related Causes of Action has been to reach a resolution, consensual so far as is feasible, pursuant to which all of the potential LBO-Related Causes of Action would be settled, thereby enabling the Debtors to emerge from bankruptcy without the distraction of costly and potentially time-consuming litigation. To that end, the Debtors and their advisers have expended considerable time and effort meeting with principal parties-in-interest in an effort to understand each party's perspective and to facilitate a dialogue that would be conducive to achieving such a resolution. These efforts commenced in the fall of 2009, at which time the Debtors met with the representatives of key creditor constituencies to discuss the nature of the potential LBO-Related Causes of Action and the key arguments that might be raised in connection therewith. These discussions, in turn, led to a series of meetings in January, February and March of 2010, in which certain of the principal parties discussed resolution of the LBO-Related Causes of Action. These meetings, certain of which were hosted by the Creditors Committee, were helpful in clarifying the parties' respective positions and eventually led to the Global Settlement that is embodied in the Plan.

**F.**     **The Reasonableness of the Proposed Settlement.**

The Debtors and their advisers have carefully assessed each of the potential LBO–Related Causes of Action. To that end, they have reviewed and analyzed documents from the Debtors' files relating to the Leveraged ESOP Transactions as well as documents produced by other parties, including Valuation Research Corporation, Houlihan Lokey, Duff & Phelps, JPMorgan Chase Bank, N.A., Merrill Lynch ~~Capital Corporation~~, Citicorp North America, Inc., the Zell Entity and Mr. Zell. The Debtors also have analyzed the various depositions taken by the Creditors Committee and Law Debenture, and have interviewed other key individuals. Further, they have researched and evaluated the law relating to each of the identified claims and corresponding defenses as well as the legal standards governing bankruptcy court approval of settlements. The Debtors also have analyzed the inter-company claims among the Debtors and their subsidiaries. In addition, the Debtors have had extensive discussions with all interested parties concerning the Debtors' analysis of the potential LBO-Related Causes of Action and have carefully considered the views and analyses of such other parties. Based on these analyses, the Debtors believe that the Global Settlement proposed in the Plan is fair, equitable, reasonable, and in the best interests of the Debtors' Estates, and that the Global Settlement should be approved by the Bankruptcy Court.

1.     The Probabilities of Success in Litigation.

The Debtors believe that the Global Settlement provides a recovery to the Senior Noteholders and Holders of General Unsecured Claims that is within the range of reasonably possible outcomes considering all relevant circumstances.

Starting with the LBO Lenders, the potential claims consist primarily of fraudulent conveyance and preference claims, although other claims potentially exist for equitable disallowance / subordination,- , aiding and abetting breaches of fiduciary duty and unjust enrichment. The Debtors have investigated each of these possible claims, the most significant of which are claims for constructive fraudulent conveyance. To prevail on such claims, it must be shown that the Leveraged ESOP Transactions rendered the Debtors insolvent and that reasonably equivalent value was not provided to the Debtors in good faith. The LBO Lenders are expected to vigorously contest each of these points and to raise other defenses as well. Two issues that will have a significant impact on the resolution of these claims and recoveries pursuant thereto are (i) whether the subsidiary guarantees can be successfully challenged and (ii) whether the debt      incurred in connection with

the step two transactions should be taken into account in assessing solvency at the time of the step one transactions. The proposed settlement takes ~~each of~~ these two issues , as well as all other issues that the Debtors believe may have a significant impact on the resolution of and recoveries on these claims into account and, in the Debtors' view, constitutes a reasonable resolution of the LBO-Related Causes of Action against the LBO Lenders.

The proposed Global Settlement also takes into account the potential LBO-Related Causes of Action against other parties, including certain former major shareholders (i.e., the Chandler Trusts, the McCormick Foundation and the Cantigny Foundation), the directors and officers of Tribune and its subsidiaries, the Zell Entity and Mr. Zell, and Tribune's principal advisers. Like the LBO Lenders, each of these groups would be expected to vigorously oppose the LBO-Related Causes of Action. In that regard, they would likely put forward defenses similar to those asserted by the LBO Lenders as well as ones unique to their particular circumstances. For example, in addition to contesting the existence of a fraudulent conveyance, the major shareholders would almost certainly argue that the repurchases of their stock are shielded from disgorgement by section 546(e) of the Bankruptcy Code. Similarly, the directors and officers would assert that they fully satisfied their fiduciary duties and in support of that position raise various related defenses. For their part, the Zell Entity and Mr. Zell would point out, among other things, that they did not participate in Tribune's decisions to approve or move forward with the Leveraged ESOP Transactions but instead lost over $300 million. In addition, Tribune's principal advisers can be expected to argue that Tribune received reasonably equivalent value for the services that those advisers provided. In assessing the proposed settlement, each of these issues was taken into account and the settlement, in the Debtors' view, reasonably accounts for the LBO-Related Causes of Action against these parties.

2.    Complexity, Expense and Inconvenience of, and Delay From, Litigation.

The proposed Global Settlement takes into account the impact that litigation would be expected to have on the value of the Debtors' Estates. To date, the out-of-pocket cost of these Chapter 11 Cases has been staggering, with the billings for professional fees alone exceeding $100 million. Further, being in bankruptcy already has forced the Debtors to forego opportunities that clearly would have enhanced value. Extending the bankruptcy further in order to allow for litigation of the LBO-Related Causes of Action would result in further associated costs and further lost business opportunities. In addition, it would be more difficult to retain key personnel and to attract qualified new hires.

In addition, the costs of prosecuting the litigation itself would compound these difficulties. There would be the direct out-of-pocket expenses of litigation, such as legal and expert witness fees, as well as the indirect costs resulting from the inability of the Debtors' and the Reorganized Debtors' personnel to devote their full time to their businesses. Productivity and employee morale also would be adversely impacted.

The cost, complexity, expense, inconvenience and delay resulting from the initiation of litigation against any participant in the Leveraged ESOP Transactions would likely be further compounded by the rapid expansion of the litigation. For instance, there is a substantial likelihood that the defendants would assert third-party claims and cross claims in an effort to determine ultimate responsibility and liability. This likelihood indicates that the only real way to avoid the cost, complexity, expense, inconvenience and delay of litigation is through a global resolution.

3.    ~~Releases.~~

~~The releases described below are a central and important element of the Plan. The releases of parties other than the LBO Lenders are necessary to provide the LBO Lenders with a full and final resolution of all claims against them in return for their substantial financial contributions to the Global Settlement. Without such releases, the initiation of litigation against participants in the Leveraged ESOP Transactions other than the LBO Lenders undoubtedly would result in the LBO Lenders being drawn into the litigation by reason of the immediate assertion of claims by the other participant defendants against the LBO Lenders. In addition, by~~

eliminating the need for further litigation, the releases will enable the Debtors to exit bankruptcy sooner than otherwise would be possible and will allow the Reorganized Debtors to devote their full time and attention, without distraction from litigation, to their businesses.

(a)    Releases by Debtors.

In the Plan, the Debtors provide releases to a variety of identified Released Parties (including the LBO Lenders, the Debtors' present and former directors, officers, employees and shareholders, and the Debtor's agents and advisers) from almost all claims existing on or prior to the Effective Date, including with respect to the LBO Related Causes of Action, which releases are supported by related anti-suit injunctions.  The Debtors believe that the releases are necessary, fair, reasonable and in the best interests of the Debtors' Estates for a number of reasons.

As an initial matter, a suit against certain of the Released Parties would give rise to claims against the Debtors which could deplete the assets of the Debtors' Estates.  For example, litigation involving present and former directors, officers or employees of the Debtors likely would trigger statutory, contractual and/or common law claims for advancement, indemnification and/or contribution from the Debtors, as would litigation involving the advisers, Mr. Zell and the Zell Entity.

Substantial financial contributions to the reorganization also have been and will be made either directly by or indirectly on behalf of the Released Parties.  The LBO Lenders will contribute significant value to the Senior Noteholders and Holders of General Unsecured Claims in connection with the Global Settlement.  The directors, officers and employees of the Debtors also have made substantial non-financial contributions by designing and implementing the operational restructuring of the Debtors and participating in the informal discovery process relating to the LBO Related Causes of Action and in the negotiations relating to the Plan.  The LBO Lenders, the advisers and others have likewise made substantial non-financial contributions by participating in the informal discovery process and settlement negotiations.

In addition, the releases are essential to the reorganization in that they are an integral part of the agreement by the LBO Lenders to fund the Plan.  They also are necessary to the continued success of the Reorganized Debtors because they assure that the directors, officers and employees of the Debtors are not distracted by litigation of the LBO Related Causes of Action.  They constitute a critical and essential condition to the Plan because they provide the necessary assurances that the Plan will result in the full and final resolution of all outstanding claims; and, in the absence of such releases, the LBO Lenders would likely be unwilling to provide the significant value to the Senior Noteholders and the Holders of General Unsecured Claims that is embodied in the Plan.

(b)    Releases by Non-Debtors.

The Plan also provides that each Holder of a Claim or Interest that has not returned a Ballot with the appropriate opt-out box checked shall be deemed to have released each and all of the Released Parties from almost all non-Estate Claims existing on or before the Effective Date.  Any Holder of a Claim or Interest that elects not to grant this release shall not receive the benefit of any other release under the Plan to which it might otherwise be entitled.  The Plan further provides that all Holders of Loan Guaranty Claims against Guarantor Non-Debtors shall be deemed on the Effective Date to have granted the Guarantor Non-Debtor Release and to have relieved the LBO Lenders and others from any liability on account of the Senior Loan Guaranty Claims or the Bridge Loan Guaranty Claims.4.    Paramount Interest of Creditors.

It is Debtors' judgment that the proposed Global Settlement furthers the paramount interest of all creditors by providing for a reasonable resolution of the LBO-Related Causes of Action and allowing the Debtors to emerge promptly from bankruptcy.  In reaching this judgment, the Debtors have considered and balanced all of the factors described above.  The Debtors' judgment is shared by a cross-section of the creditor constituencies of the Debtors, including LBO Lenders, Senior Noteholders, the Creditors Committee and creditors of the Subsidiary Debtors.