## VIII. EXCLUSIVITY PERIOD.

On March 27, 2009, July 24, 2009, November 13, 2009, ~~and~~ February 1, 2010, and March 31, 2010, the Debtors filed motions requesting an extension of the Debtors' exclusive period within which to file a chapter 11 plan and/or solicit acceptances thereto. The Bankruptcy Court granted each of these motions and extended the Debtors' exclusive period to file a plan through and including ~~March 31,~~ April 30, 2010, and their exclusive period to solicit votes on such plan through and including May 31, 2010. On ~~March 31,~~ April 30, 2010, the Debtors filed an additional motion requesting an extension only of the Debtors' exclusive period within which to ~~file~~ solicit a chapter 11 plan through and including ~~April 30,~~ August 8, 2010. A hearing on the Debtors' exclusivity extension motion is scheduled for ~~April 13,~~ May 20, 2010.

Pursuant to section 1121(d)(2) of the Bankruptcy Code, the Debtors' exclusive period to file a chapter 11 plan and solicit acceptances thereto may not be extended beyond August 8, 2010.

## IX. THE PLAN OF REORGANIZATION

**THE FOLLOWING SECTIONS SUMMARIZE, AND IN SOME INSTANCES RESTATE VERBATIM, CERTAIN KEY INFORMATION CONTAINED IN THE PLAN AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS _EXHIBIT A_. THE TERMS OF THE PLAN WILL GOVERN IN THE EVENT ANY INCONSISTENCY ARISES BETWEEN THIS SUMMARY AND THE PLAN. THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN DO NOT YET BIND ANY PERSON OR ENTITY. IF THE BANKRUPTCY COURT DOES CONFIRM A PLAN, HOWEVER, IT WILL THEN BIND ALL CLAIM AND INTEREST HOLDERS. MOREOVER, THE DEBTORS RESERVE THE RIGHT TO MODIFY OR WITHDRAW THE PLAN IN ITS ENTIRETY OR IN PART, FOR ANY REASON. IN ADDITION, SHOULD THE PLAN, OR ANY INDIVIDUAL DEBTOR'S PLAN, FAIL TO BE ACCEPTED BY THE REQUISITE NUMBER AND AMOUNT OF CLAIMS AND INTERESTS VOTING, AS REQUIRED TO SATISFY SECTION 1129 OF THE BANKRUPTCY CODE, THE DEBTORS RESERVE THE RIGHT TO RECLASSIFY CLAIMS OR INTERESTS OR OTHERWISE AMEND, MODIFY OR WITHDRAW THE PLAN IN ITS ENTIRETY OR IN PART.**

The confirmation requirements of section 1129(a) of the Bankruptcy Code must be satisfied separately with respect to each Debtor. Therefore, notwithstanding the combination of the separate plans of reorganization of all Debtors in the Plan for purposes of, among other things, economy and efficiency, the Plan shall be deemed a separate chapter 11 plan for each such Debtor.

## A.    Classification and Allowance of Claims and Equity Interests Generally.

Section 1123 of the Bankruptcy Code provides that, except for certain exceptions such as administrative expense claims and priority tax claims, a plan of reorganization must categorize claims against and equity interests in a debtor into individual classes. Although the Bankruptcy Code gives a debtor significant flexibility in classifying claims and interests, section 1122 of the Bankruptcy Code dictates that a plan of reorganization may only place a claim or an equity interest into a class containing claims or equity interests that are substantially similar.

The Plan creates numerous "Classes" of Claims and Interests. These Classes take into account the differing nature and priority of Claims against and Interests in the Debtors. Administrative Expense Claims, DIP Facility Claims and Priority Tax Claims are not classified for purposes of voting or receiving distributions under the Plan, but are treated separately as unclassified Claims.

The Plan provides specific treatment for each Class of Claims and Interests. Only Holders of Allowed Claims and Allowed Interests are entitled to vote on and receive distributions under the Plan. For purposes of the Plan, the term "Allowed" means, with respect to a Claim or Interest, or any portion thereof, in any Class or category specified, a Claim or Interest (i) that is evidenced by a Proof of Claim or Interest and is not listed as disputed, contingent or unliquidated on the pertinent Debtor's schedules and as to which no objection or request for estimation has been filed on or before any objection deadline set by the Bankruptcy Court or the expiration of such other applicable period fixed by the Bankruptcy Court, (ii) that is listed on the pertinent Debtor's schedules but is not listed as disputed, contingent or unliquidated, that is not otherwise subject to an objection and as for which no contrary or superseding Proof of Claim or Interest has been filed, (iii) as to which any objection has been settled, waived, withdrawn or denied by a Final Order, or (iv) that is expressly allowed (a) by a Final Order, (b) pursuant to the terms of the Claims Settlement Order, (c) solely with respect to those Claims or Interests that are not required under applicable bankruptcy law to be allowed pursuant to an order of the court, by an agreement between the Holder of such Claim or Interest and the pertinent Debtors or Reorganized Debtors, or (d) pursuant to the terms of the Plan.

Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim or Interest under the Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim or Interest.

**B.**    **Provisions for Payment of Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims.**

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Facility Claims, Administrative Expense Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.    DIP Facility Claims.

DIP Facility Claims are all Claims held by the DIP Facility Agent and the DIP Facility Lenders pursuant to the DIP Facility Agreements and the Final DIP Order.

On or as soon as reasonably practicable after the Effective Date, in full satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, the Reorganized Debtors shall pay Allowed DIP Facility Claims in full in Cash. In addition, on the Effective Date, any unexpired letters of credit outstanding under the DIP Facility shall be, at Tribune's option, (i) returned to the issuer undrawn and marked canceled, (ii) collateralized with Cash in an amount equal to one hundred and five percent (105%) of the face amount of such outstanding letter of credit in form and substance acceptable to the issuer thereof, (iii) collateralized with back-to-back letters of credit issued under the Exit Facility in an amount equal to one hundred and five percent (105%) of the face amount of such outstanding letter of credit, in form and substance acceptable to the issuer thereof, or (iv) otherwise deemed to be subject to reimbursement pursuant to the terms and conditions of the Exit Facility.

2.    Administrative Expense Claims.

Administrative Expense Claims are Claims for costs and expenses of administration of the Chapter 11 Cases that are Allowed under sections 328, 330, 363, 364(c)(1), 365, 503(b), or 507(a)(2) of the Bankruptcy Code, including, without limitation, (i) any actual and necessary costs and expenses of preserving the Debtors' Estates and operating the businesses of the Debtors (such as wages, salaries and commissions for services and payments for inventory, leased equipment and premises) and Claims of governmental units for taxes (including tax audit Claims) related to tax years ending on or after the Petition Date or commencing after the Petition Date, but excluding Claims related to tax periods, or portions thereof, ending on or before the Petition Date; (ii) all compensation for legal, financial, advisory, accounting and other professional services and reimbursement of expenses incurred during the Chapter 11 Cases Allowed by the Bankruptcy Court; (iii) any indebtedness or obligation incurred or assumed by the Debtors during the Chapter 11 Cases pursuant to an agreement which was

approved or otherwise permitted by a Final Order of the Bankruptcy Court or is an ordinary course agreement; (iv) any payment to cure a default on an assumed executory contract or unexpired lease; (v) post-petition Claims against any of the Debtors held by a Debtor or a non-Debtor Affiliate; or (vi) any fees and charges assessed against the Debtors' Estates under section 1930, chapter 123, of title 28 of the United States Code.

The Bankruptcy Code does not require that administrative expense claims be classified under a Plan.  It does, however, require that allowed administrative expense claims be paid in full in cash in order for a plan of reorganization to be confirmed unless the holder of such claim consents to a different treatment.

Subject to the provisions of sections 328, 330, 331 and 503(b) of the Bankruptcy Code, in full satisfaction, settlement, release and discharge of and in exchange for each Allowed Administrative Expense Claim, except to the extent that any Holder of an Allowed Administrative Expense Claim agrees to different treatment, or as otherwise provided for in the Plan, each Holder of an Allowed Administrative Expense Claim shall receive payment in full, in Cash, on the later of: (i) the Effective Date if due on or before that date, (ii) the date upon which such Administrative Expense Claim becomes an Allowed Claim, (iii) with respect to Allowed Administrative Expense Claims not yet due on the Effective Date or that represent obligations incurred by the Debtors in the ordinary course of their business during these Chapter 11 Cases, or assumed by the Debtors during these Chapter 11 Cases, such time as such Allowed Administrative Expense Claims are due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations, or (iv) such other date as may be agreed upon between the Holder of such Allowed Administrative Expense Claim and the Debtors.

Notwithstanding the foregoing, all claims for compensation for legal, financial, advisory, accounting and other professional services and reimbursement of expenses which are sought to be Allowed by the Bankruptcy Court shall be submitted and, to the extent Allowed, paid pursuant to the provisions of Section 9.2 of the Plan or that certain Order Authorizing the Debtors to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business entered on January 15, 2009 [Docket No. 227].

3.      Priority Tax Claims.

Priority Tax Claims are secured or unsecured Claims of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

On December 10, 2008, the Bankruptcy Court authorized the Debtors to pay certain tax claims that constitute Priority Tax Claims.  As a result, many Priority Tax Claims have been resolved during the Chapter 11 Cases.  As set forth in the summary chart contained in Article II of this Disclosure Statement, the Debtors estimate that the amount of remaining Priority Tax Claims that may become Allowed is approximately $150-175 million.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive either, at the sole option of the Debtors or the Reorganized Debtors, (i) payment in full in Cash after such Priority Tax Claim becomes an Allowed Claim, (ii) except as otherwise determined by the Bankruptcy Court at the Confirmation Hearing, regular installment payments in Cash equal to the Allowed amount of such Claim over a period ending not later than the fifth anniversary of the Petition Date, together with interest compounded annually from the Effective Date on any outstanding balance calculated at a rate determined under section 511 of the Bankruptcy Code, which installment payments shall commence after such Priority Tax Claim becomes an Allowed Claim, or (iii) such other treatment as agreed to by the Holder of an Allowed Priority Tax Claim and the Debtors.

**C.      Treatment of Claims and Equity Interests.**

1.    The Debtors, Filed Subsidiary Debtors, and Guarantor Non-Debtors.

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor.  For purposes of brevity and convenience, the classification and treatment of Claims and Interests has been set forth in three groups: (i) Tribune (Debtor 1), (ii) Filed Subsidiary Debtors (Debtors 2 through 111) and (iii) any Guarantor Non-Debtors that become Debtors and participate in the Prepackaged Plan.  For purposes of classifying and treating Claims against and Interests in each Debtor, and for balloting purposes, each Debtor has been also assigned its own number.

(a)    Tribune Company (Debtor 1).

| | |
|---|---|
| **1.** | Tribune Company |

(b)    Filed Subsidiary Debtors – (Debtors 2-111).

i)    Non-Guarantor Debtors

| | |
|---|---|
| **2.** | 435 Production Company |
| 3. | Baltimore Newspaper Networks, Inc. |
| 4. | Candle Holdings Corporation |
| 5. | Channel 20, Inc. |
| 6. | Chicago Avenue Construction Company |
| 7. | Chicago River Production Company |
| 8. | Chicago Tribune Newspapers, Inc. |
| 9. | Chicago Tribune Press Service, Inc. |
| 10. | ChicagoLand Microwave Licensee, Inc. |
| 11. | Direct Mail Associates, Inc. |
| 12. | ForSaleByOwner.com Referral Services, LLC |
| 13. | Fortify Holdings Corporation |
| 14. | GreenCo, Inc. |
| 15. | Heart & Crown Advertising, Inc. |
| 16. | Hoy, LLC |
| 17. | InsertCo, Inc. |
| 18. | JuliusAir Company II, LLC |
| 19. | JuliusAir Company, LLC |
| 20. | Los Angeles Times International, Ltd. |
| 21. | Los Angeles Times Newspapers, Inc. |
| 22. | Magic T Music Publishing Company |
| 23. | NBBF, LLC |
| 24. | Neocomm, Inc. |
| 25. | Newscom Services, Inc. |
| 26. | Newspaper Readers Agency, Inc. |
| 27. | North Michigan Production Company |
| 28. | North Orange Avenue Properties, Inc. |
| 29. | Oak Brook Productions, Inc. |
| 30. | Publishers Forest Products Co. of Washington |
| 31. | Sentinel Communications News Ventures, Inc. |
| 32. | Shepard's Inc. |

| | |
|---|---|
| 33. | Signs of Distinction, Inc. |
| 34. | The Other Company LLC |
| 35. | Times Mirror Land and Timber Company |
| 36. | Times Mirror Payroll Processing Company, Inc. |
| 37. | Times Mirror Services Company, Inc. |
| 38. | Towering T Music Publishing Company |
| 39. | Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. |
| 40. | Tribune Entertainment Production Company |
| 41. | Tribune Finance Service Center, Inc. |
| 42. | Tribune License, Inc. |
| 43. | Tribune Network Holdings Company |
| 44. | Tribune Publishing Company |
| 45. | ValuMail, Inc. |
| 46. | Virginia Community Shoppers, LLC |
| 47. | WATL, LLC |
| 48. | WCWN LLC |
| 49. | WLVI Inc. |

ii)     Guarantor Debtors

| | |
|---|---|
| **50.** | 5800 Sunset Productions Inc. |
| 51. | California Community News Corporation |
| 52. | Channel 39, Inc. |
| 53. | Channel 40, Inc. |
| 54. | Chicago Tribune Company |
| 55. | Chicagoland Publishing Company |
| 56. | Chicagoland Television News, Inc. |
| 57. | Courant Specialty Products, Inc. |
| 58. | Distribution Systems of America, Inc. |
| 59. | Eagle New Media Investments, LLC |
| 60. | Eagle Publishing Investments, LLC |
| 61. | forsalebyowner.com corp. |
| 62. | Forum Publishing Group, Inc. |
| 63. | Gold Coast Publications, Inc. |
| 64. | Homeowners Realty, Inc. |
| 65. | Homestead Publishing Company |
| 66. | Hoy Publications, LLC |
| 67. | Internet Foreclosure Service, Inc. |
| 68. | KIAH Inc. |
| 69. | KPLR, Inc. |
| 70. | KSWB Inc. |
| 71. | KTLA Inc. |
| 72. | KWGN Inc. |
| 73. | Los Angeles Times Communications LLC |
| 74. | New Mass. Media, Inc. |
| 75. | Orlando Sentinel Communications Company |
| 76. | Patuxent Publishing Company |

| 77. | Southern Connecticut Newspapers, Inc. |
| 78. | Star Community Publishing Group, LLC |
| 79. | Stemweb, Inc. |
| 80. | Sun-Sentinel Company |
| 81. | The Baltimore Sun Company |
| 82. | The Daily Press, Inc. |
| 83. | The Hartford Courant Company |
| 84. | The Morning Call, Inc. |
| 85. | TMLH 2, Inc. |
| 86. | TMLS I, Inc. |
| 87. | TMS Entertainment Guides, Inc. |
| 88. | Tower Distribution Company |
| 89. | Tribune Broadcast Holdings, Inc. |
| 90. | Tribune Broadcasting Company |
| 91. | Tribune Broadcasting Holdco, LLC |
| 92. | Tribune California Properties, Inc. |
| 93. | Tribune CNLBC, LLC |
| 94. | Tribune Direct Marketing, Inc. |
| 95. | Tribune Entertainment Company |
| 96. | Tribune Finance LLC |
| 97. | Tribune Los Angeles, Inc. |
| 98. | Tribune Manhattan Newspaper Holdings, Inc. |
| 99. | Tribune Media Net, Inc. |
| 100. | Tribune Media Services, Inc. |
| 101. | Tribune New York Newspaper Holdings, LLC |
| 102. | Tribune NM, Inc. |
| 103. | Tribune Television Company |
| 104. | Tribune Television Holdings, Inc. |
| 105. | Tribune Television New Orleans, Inc. |
| 106. | Tribune Television Northwest, Inc. |
| 107. | Virginia Gazette Companies, LLC |
| 108. | WDCW Broadcasting, Inc. |
| 109. | WGN Continental Broadcasting Company |
| 110. | WPIX, Inc. |
| 111. | WTXX Inc. |

(c)     Subsidiary Non-Debtors.

i)     Non-Guarantor Non-Debtors

| |
| --- |
| Multimedia Insurance Company |
| Fairfax Media, Incorporated |
| Professional Education Publishers International (Africa) Pty. Ltd. |
| TMS Entertainment Guides Canada Corp. |
| Tribune DB, LLC |
| Tribune DQ, LLC |
| Tribune Employee Lease Company LLC |
| Tribune Hong Kong, Ltd. |
| Tribune Media Services, BV |
| Tribune Receivables, LLC |

| Tribune Sports Network Holdings, LLC |
| Tribune Technology LLC |
| Tribune WFPT, LLC |

ii)      Guarantor Non-Debtors

| |
| --- |
| Tribune (FN) Cable Ventures, Inc. |
| Tribune Interactive, Inc. |
| Tribune ~~N.D.~~ND, Inc. |
| Tribune National Marketing Company |

Tribune (FN) Cable Ventures, Inc. is a holding company owned by Tribune Broadcasting Company with a 31.3% interest in the Television Food Network general partnership. Tribune Interactive, Inc. is owned by Tribune (88.5%) and Chicago Tribune Company (11.5%) and manages the website operations for Tribune's publishing and broadcasting subsidiaries and assists in the management of Tribune's various online classified businesses. Tribune ND, Inc. is a holding company owned by Tribune with an approximate three percent (3%) interest in Newsday Holdings, LLC, which is the parent company of the entity that owns and operates *Newsday.* Tribune National Marketing Company is a holding company owned by Tribune with a 30.8% interest in Career Builder (the United States' largest online job web site) and a 13.9% interest in Classified Ventures (which operates automotive and real estate classified advertising websites).[20] See further discussion at Article III.B, titled "Additional Investments."

Additional financial reporting information for the Guarantor Non-Debtors may be found in the Periodic Reports of Debtors Pursuant to Bankruptcy Rule 2015.3 filed with the Bankruptcy Court on July 29, 2009 and January 29, 2010 [Docket Nos. 1863 and 3266, respectively]. Pursuant to Bankruptcy Rule 2015.3, these reports include, among other things, balance sheet, operating statement, and cash flow statement information relating to the Guarantor Non-Debtors. Copies of these reports may be obtained from the publicly-available docket located, free of charge, on the Debtors' website: http://chapter11.epiqsystems.com/tribune.

2.      Classification of Claims against the Debtors under the Plan.

As noted above, Claims against and Interests in each of the Debtors are further divided into lettered Classes. Not all of these Classes apply to every Debtor, and consequently not all of the below lettered Classes appear in the case of each Debtor. However, whenever such a Class of Claims or Interests is relevant to a particular Debtor, that Class of Claims or Interests will be grouped under the appropriate lettered Class from the following lists.

(a)      Tribune Company (Debtor 1).

The following list assigns a letter to each Class against Tribune (Debtor 1) for purposes of identifying each separate Class:

| CLASS | CLAIM OR INTEREST |
| :---: | :---: |
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Senior Loan Claims |

---

[20] Tribune also holds an interest in Classified Ventures. As noted in Article II.B.3 above, the Tribune Entities hold an aggregate 27.8% interest in Classified Ventures.

| | |
|---|---|
| ~~D~~ | **Bridge Loan Claims** |
| ~~D~~E | Senior Noteholder Claims |
| ~~E~~F | Other Parent Claims |
| ~~F~~G | Convenience Claims |
| I | EGI-TRB LLC Notes Claims |
| J | PHONES Notes Claims |
| K | Intercompany Claims |
| L | Securities Litigation Claims |
| M | Tribune Interests |

(b)    Subsidiary Debtors – (Debtors 2-111).

The following list assigns a letter to each Class against the Subsidiary Debtors (Debtor 2-111) for purposes of identifying each separate Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Senior Loan Guaranty Claims |
| ~~D~~ | **Bridge Loan Guaranty Claims** |
| E | General Unsecured Claims |
| K | Intercompany Claims |
| L | Securities Litigation Claims |
| M | Interests in Filed Subsidiary Debtors |

## D.    Provisions for Treatment of Claims and Interests under the Plan.

The classification and treatment of Claims against and interest in Tribune and the Filed Subsidiary Debtors under the Plan are set forth in detail in Article III of the Plan. A summary of that treatment is provided below.

1.    Classification and Treatment of Claims Against Tribune (Debtor 1).

(a)    Class 1A – Priority Non-Tax Claims.

Class 1A consists of all Priority Non-Tax Claims against Tribune. A Priority Non-Tax Claim is any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

Each Holder of an Allowed Priority Non-Tax Claim against Tribune shall have its Claim Reinstated.

Allowed Claims in Class 1A are Unimpaired, and the Holders of Class 1A Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1A Claims are not entitled to vote to accept or reject the Plan; provided, however, that all Class 1A Claims shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Plan, including, but not limited to, Section 8 of the Plan.

(b)     Class 1B – Other Secured Claims.

Class 1B consists of all Other Secured Claims against Tribune.  An Other Secured Claim is a Secured Claim, other than an Administrative Expense Claim, a DIP Facility Claim, a Priority Tax Claim, a Senior Loan Claim (other than a right to setoff) or a Senior Noteholder Claim (other than a right to setoff).

Each Holder of an Allowed Other Secured Claim against Tribune shall have its Claim Reinstated.

Allowed Claims in Class 1B are Unimpaired, and the Holders of Class 1B Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1B Claims are not entitled to vote to accept or reject the Plan; provided, however, that all Class 1B Claims shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Plan, including, but not limited to, Section 8 of the Plan.

(c)     Class 1C – Senior Loan Claims

Class 1C consists of all Loan Claims against Tribune.  Senior Loan Claims are Claims arising under the Senior Loan ~~Claims, the Bridge Loan Claims~~ Agreement, other than a Senior Lender Fee/Expense Claim, any Claim of the Senior Lenders or the Senior Loan Agent arising under the Pledge Agreement, and the Barclays Swap ~~Claims~~ Claim.  The Senior Loan Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable under the Senior Loan Agreement or the Pledge Agreement, other than the Senior Lender Fee/Expense Claims, including the full amount of principal, interest, and all other amounts due and owing under the Senior Loan Agreement and the Pledge Agreement as of the Petition Date.  ~~The Bridge Loan Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable under the Bridge Loan Agreement, including the full amount of principal, interest, and all other amounts due and owing under the Bridge Loan Agreement as of the Petition Date.  Neither the Senior Loan Claims nor the Bridge Loan Claims shall~~ and shall not be subject to reduction, disallowance, subordination, set off, or counterclaim.

On or as soon as practicable after the applicable Distribution Date, together with other distributions provided for in the Plan, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Senior Loan Claims against Tribune, subject to Section 5.4.2 of the Plan, each Holder of an Allowed Senior Loan Claim against Tribune shall receive a Pro Rata share ~~of: (i) 8.8% of the New Senior Secured Term Loan minus (a) the amount of the New Senior Secured Term Loan to be distributed to Holders of Allowed,~~ calculated together with the Holders of Claims in Class 1D ~~and (b) the portion of the Other Parent Claims Allocation that is New Senior Secured Term Loan; (ii) 8.8% of the Distributable Cash minus (a) the amount of the Distributable Cash to be distributed to Holders of Allowed Claims in Class 1D, (b) the portion of the Other Parent Claims Allocation that is Distributable Cash and (c) the amount of Cash to be distributed to Holders of Allowed Claims in Class 1F; and (iii) 8.8% of the New Common Stock (subject to dilution by the Equity Incentive Plan) minus (a) the amount of the New Common Stock to be distributed to Holders of Allowed Claims in Class 1D and (b) the portion of the Other Parent Claims Allocation that is New Common Stock~~ that are Allowed pursuant to Section 3.2.4(b)(i), of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation.  In addition, on the Effective Date, any unexpired letters of credit outstanding under the Senior Loan Agreement shall be either, at Tribune's option, (i) returned to the issuer undrawn and marked canceled, (ii) collateralized with Cash in an amount equal to 105% of the face amount of such outstanding letter of credit in form and substance acceptable to the issuer thereof, or (iii) collateralized with back-to-back letters of credit issued under the Exit Facility in an amount equal to 105% of the face amount of such outstanding letter of credit, in form and substance acceptable to the issuer thereof.

In addition, on the Effective Date, any unexpired letters of credit outstanding under the Senior Loan Agreement shall be either, at Tribune's option, (i) returned to the issuer undrawn and marked canceled, (ii) collateralized with Cash in an amount equal to one hundred and five percent (105%) of the face amount of such outstanding letter of credit in form and substance acceptable to the issuer thereof, or (iii) collateralized with back-to-back letters of credit issued under the Exit Facility in an amount equal to one hundred and five percent

(105%) of the face amount of such outstanding letter of credit, in form and substance acceptable to the issuer thereof.

Claims in Class 1C are Impaired, and Holders of Class 1C Claims are entitled to vote to accept or reject the Plan.

        (d)       Class 1D ~~Senior Noteholder~~ Bridge Loan Claims

Class 1D consists of all Bridge Loan Claims against Tribune.  Bridge Loan Claims are Claims arising under the Bridge Loan Agreement.

The following treatment shall apply to all Holders of Bridge Loan Claims if Class 1D votes to accept the Plan: Each Holder of a Bridge Loan Claim shall (i) as of the Effective Date, have its Claim Allowed in an amount equal to the principal amount of such Claim plus accrued interest as of the Petition Date, and (ii) on or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for each Allowed Bridge Loan Claim against Tribune, subject to Section 5.4.2 of the Plan, receive such Holder's Pro Rata share, calculated together with the Holders of Allowed Claims in Class 1C, of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation.

If Class 1D votes to reject the Plan, the treatment of Bridge Loan Claims is set forth in Section 3.2.4(b)(ii)(A) and 3.2.4(b)(ii)(B) of the Plan, which Holders of Bridge Loan Claim are urged to review.  In summary, such treatment is as follows:

If the Bridge Loan Class rejects the Plan, the Claims of any Holders who do not elect, and are not deemed to elect, to receive the treatment set forth in Section 3.2.4(b)(ii)(B) of the Plan will be subject to treatment as Disputed Claims, and the Bankruptcy Court will determine after confirmation of the Plan whether or not and the extent to which such Claims should be Allowed Claims not subject to avoidance, setoff, subordination, or other defenses.  Such Disputed Claims, to the extent ultimately determined by Final Order to be Allowed Claims, will receive cram down treatment pursuant to Section 1129(b) of the Bankruptcy Code, which may be (i) Cash in an amount equal to their Pro Rata share of Tribune's distributable value after taking into account all Allowed Claims against Tribune and Intercompany Claims against Tribune, or (ii) if the Bankruptcy Court determines that a different (including a lesser) treatment is appropriate under Section 1129(b) of the Bankruptcy Code, then such different treatment.  To the extent that the cram down treatment entitles the Holders of Allowed Bridge Loan Claims to Cash in an amount equal to a share of Tribune's distributable value, such distributable value, including any allocation of value on account of Intercompany Claims among Tribune and its direct and indirect subsidiaries, would be determined by the Bankruptcy Court in connection with confirmation of the Plan.

If the Bridge Loan Class rejects the Plan, the Plan also provides that a Holder of a Bridge Loan Claim may elect the treatment set forth in Section 3.2.4(b)(ii)(B) of the Plan and thereby receive for itself on account of its Bridge Loan Claim the same treatment such Holder would have received if the Class of Bridge Loan Claims had accepted the Plan.  This elected treatment is described specifically in Section 3.2.4(b)(ii)(B) of the Plan.  The election of such treatment must be made in a timely filed Ballot accompanying the Holder's vote in connection with the Plan.  To the extent a Holder does not make a timely election, then: (i) if such Holder voted in favor of the Plan in respect of its Bridge Loan Claim, such Holder shall be deemed to have elected treatment of its Bridge Loan Claim in accordance with Section 3.2.4(b)(ii)(B) of the Plan; and (ii) if such Holder voted to reject the Plan, or did not vote, in respect of its Bridge Loan Claim, such Holder shall be deemed to have elected not to have its Bridge Loan Claim treated in accordance with Section 3.2.4(b)(ii)(B) of the Plan.

To the extent that the Bridge Loan Class votes against the Plan and Holders of Bridge Loan Claims do not elect, and have not been deemed to elect, the treatment set forth in Section 3.2.4(b)(ii)(B) of the Plan, the Debtors estimate that the distribution to Holders of Bridge Loan Claims will be between 0% and 4.6% of their

Bridge Loan Claims (equivalent to an estimated aggregate dollar recovery of $0 to $74 million for the entire Class of Bridge Loan Claims if such Class rejects the Plan). The Debtors' high-end estimate of a 4.6% cram down recovery reflects an estimated recovery by Holders of Bridge Loan Claims if: (i) such Claims are determined by Final Order to be fully Allowed Claims not subject to avoidance, setoff, subordination, or other defenses; (ii) the portion of Distributable Value (as Distributable Value is estimated in Article XII.B.1 of this Disclosure Statement ) attributable to Tribune is determined to be $537 million, and (iii) the Bankruptcy Court does not determine that a cram down treatment different from a Pro Rata allocation of Tribune's distributable value is appropriate.

The following may be further noted regarding the recovery by Holders of Bridge Loan Claims in the event of cram down treatment:

(i)     The Bridge Loan Claims will be treated as Disputed Claims and therefore not be entitled to any distributions under the Plan until and unless they are Allowed after resolution of all objections to such Claims, including objections based upon avoidance, setoff, subordination and/ or other Claim defenses. Actions for avoidance, setoff, or subordination and assertion of other defenses shall be brought by adversary proceeding or by Claim objection as appropriate under the Bankruptcy Rules. The Bridge Loan Claims will be not treated as Allowed Claims until actions for avoidance, setoff, or subordination, and other defenses to such Claims are resolved by Final Order, which is likely to be substantially after the Effective Date of the Plan.   If the Bridge Loan Claims are not determined to be Allowed Claims, then no distribution will be made on account of Bridge Loan Claims. The issues raised in Claim objections to the Bridge Loan Claims may include, but not be limited to, the potential avoidance claims respecting the Bridge Loan Claims generally described in Article VII of this Disclosure Statement and in various submissions by creditors in the compendium accompanying this Disclosure Statement. The Holders of the Bridge Loans Claims subject to cram down will not receive releases and any and all objections to such Claims, including objections based upon Claim avoidance, setoff, subordination and other Claim defenses, will be preserved.  Holders of Bridge Loan Claims subject to cram down also will not receive the indemnities set forth in Article 11 of the Plan.

(ii)    The Debtors propose to take into account the Claims of the Senior Lenders in the full amount Allowed pursuant to the Plan in calculating the Bridge Lenders' Pro Rata share of Tribune's distributable value. The Debtors also propose to take into account the Allowed Claims of the Holders of PHONES Notes in calculating the allocation of Tribune's distributable value to the extent the Bridge Loan Claims, if Allowed, and the other senior debt Allowed Claims would receive a benefit on account of any PHONES subordination.  In addition, the Debtors propose to take into account Intercompany Claims against Tribune in determining Tribune's distributable value.  The manner in which Intercompany Claims are to be taken into account, including what amounts to attribute to settlement and resolution and any discounting of such Intercompany Claims against Tribune in determining Tribune's distributable value, is subject to Bankruptcy Court approval in connection with Plan confirmation.

The Bankruptcy Court's determination of Tribune's actual value available for distribution on account of Allowed Claims may be different from the distributable value of $537 million estimated in Article XII.B.1 of this Disclosure Statement.  To the extent the Bankruptcy Court determines Tribune's distributable value to be lower than $537 million, Holders of Allowed Bridge Loan Claims will likely recover less than 4.6% of Allowed Bridge Loan Claims.[21]

---

[21] The estimated Distributable Value attributable to Tribune of $537 million is net of approximately $333 million to be allocated to Tribune's direct and indirect subsidiaries based upon an estimated resolution of Intercompany Claims. The estimate of $537 million of Distributable Value attributable to Tribune includes (i) attributing to Tribune a recovery of approximately $368.8 million related to cash transferred to certain of Tribune's subsidiaries just prior to the Petition Date (see Article I.C and Article XII.B.1 of this Disclosure Statement), (ii) attributing to Tribune a recovery of approximately $264 million related to receivables from and equity interest in Tribune Receivables, LLC, a Subsidiary Non-Debtor (see Article VI.A.2 of this Disclosure Statement), and (iii) resolution of Claims between and among Tribune, on the one hand,

(iii)    The Plan provides that if the Bankruptcy Court determines that a different (including a lesser) treatment is appropriate for Allowed Bridge Loan Claims pursuant to 1129(b) of the Bankruptcy Code, then such different treatment shall apply to Allowed Bridge Loan Claims. The Bankruptcy Court may determine that the appropriate treatment of the Holders of Bridge Loan Claims subject to cram down under 1129(b) is different from the Pro Rata distribution of Tribune's distributable value. The Plan provides that it will become effective, without re-solicitation, in the event that the Bankruptcy Court determines that an alternative treatment of the Bridge Loan Claim is appropriate, provided the conditions to the Effective Date of the Plan are met or waived. The Debtors cannot predict what other cram down treatment the Bankruptcy Court may find is appropriate, and Bridge Loan Holders should take account of this risk in determining how to vote and what Plan treatment to elect.

(iv)    To the extent, in the event of cram down, the aggregate recovery on account of Allowed Bridge Loan Claims is determined to be materially greater than that anticipated by the Distributable Value estimated in this Disclosure Statement — i.e., materially greater than an aggregate recovery of 4.6% on account of Bridge Loan Claims — then the condition to the Plan Effective Date in Section 10.1.1(i) of the Plan would need to be waived for the Plan to become Effective.

Claims in Class 1D are Impaired, and Holders of Class 1D Claims are entitled to vote to accept or reject the Plan.

(e)    Class 1D E - Senior Noteholder Claims

Class 1E consists of all Senior Noteholder Claims against Tribune. Senior Noteholder Claims are all Claims arising under or evidenced by the Senior Notes Indentures and related documents and any Claim of the Senior Noteholders arising under the Pledge Agreement. The Senior Noteholder Claims shall together be deemed Allowed in the aggregate amount of $1,283,055,743.77. The Senior Noteholder Claims shall not be subject to reduction, disallowance, subordination, set off or counterclaim (other than the Senior Noteholder Claims of MSCS with respect to the Morgan Stanley Claims).

On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Senior Noteholder Claims against Tribune, subject to Section 5.4.2 of the Plan, each Holder of an Allowed Senior Noteholder Claim shall receive such Holder's Pro Rata share of 7.4% of the New Senior Secured Term Loan, 7.4% of the Distributable Cash, and 7.4% of the New Common Stock, subject to dilution by the Equity Incentive Plan.

Claims in Class 1D are Impaired, and Holders of Class 1D E Claims are entitled to vote to accept or reject the Plan.

(f)    (e) Class 1E F – Other Parent Claims

Class 1F consists of all Other Parent Claims against Tribune. Other Parent Claims are General Unsecured Claims against Tribune and for the avoidance of doubt includes all Claims against Tribune under Non-Qualified Former Employee Benefit Plans with the exception of Convenience Claims.

On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Other Parent Claims against Tribune, each Holder of an Allowed Other Parent Claim shall receive an amount of Distributable Cash equal to 35.18% of the aggregate amount in U.S. dollars of such Holder's Allowed Other Parent Claim.

---

and Tribune's direct and indirect subsidiaries, on the other hand, taking account the likely enforceability of such Claims. The Bankruptcy Court's determination of Tribune's distributable value in connection with confirmation of the Plan may reflect a value or attribution of these assets and a resolution of Intercompany Claims different from that used by the Debtors to estimate Distributable Value.

Claims in Class 1~~I~~F are Impaired, and Holders of Class 1~~I~~F Claims are entitled to vote to accept or reject the Plan.

       (g)       (f)~~Class 1~~I~~G – Convenience Class Claims.

Class 1~~I~~G consists of all Convenience Claims against Tribune.  A Convenience Claim is a Claim against Tribune that would otherwise be a General Unsecured Claim that is (i) in an amount equal to or less than $1,000 or (ii) in an amount that has been reduced to $1,000 pursuant to a Convenience Class Election made by the Holder of such Claim; provided, however, that where any portion(s) of a single Claim has been transferred on or after March 30, 2010, any transferred portion(s) shall continue to be treated together April 12, 2010, such Claim as a single Claim for purposes of the Convenience Class Election and determining whether such Claim qualifies as a Convenience Claim.

If you are the Holder of a General Unsecured Claim against Tribune, the Ballot included as part of the Solicitation Package that includes this Disclosure Statement provides for you to make the Convenience Class Election.  The Convenience Class Election is an irrevocable election made on the Ballot by the Holder of a Claim against Tribune that would otherwise be a General Unsecured Claim in an amount greater than $1,000 to reduce such Claim to $1,000.

In full satisfaction, settlement, release and discharge of and in exchange for Allowed Convenience Claims against Tribune, on or as soon as practicable after the applicable Distribution Date, each Holder of an Allowed Convenience Claim against Tribune shall receive payment in full in Cash on account of such Claim; provided, however, that, subject to section 7.4 of the Plan, post-petition interest shall not be paid to any Holder on any Convenience Claim without regard to whether such amount has accrued for federal income tax purposes.

Allowed Claims in Class 1~~I~~G are Unimpaired, and the Holders of Class 1~~I~~G Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1~~I~~G Claims are not entitled to vote to accept or reject the Plan; provided, however, that all Class 1~~I~~G Claims shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Plan, including, but not limited to, Section 8 of the Plan.

       (h)       (g)~~Class 1I – EGI-TRB LLC Notes Claims.

Class 1I consists of all EGI-TRB Notes LLC Claims against Tribune.  EGI-TRB LLC Notes Claims are all Claims held by the EGI-TRB LLC Noteholders pursuant to the EGI-TRB LLC Notes.

On the Effective Date, all EGI-TRB LLC Notes Claims against Tribune shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such EGI-TRB LLC Notes Claims.

Claims in Class 1I are Impaired, and Holders of Class 1I Claims are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

       (i)       (h)~~Class 1J – PHONES Notes Claims.

Class 1J consists of all PHONES Notes Claims against Tribune.  PHONES Notes Claims are Claims arising under or evidenced by the PHONES Notes Indenture and related documents.

On the Effective Date, all PHONES Notes Claims against Tribune shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such PHONES Notes Claims.

Claims  in Class 1J are Impaired, and Holders of Class 1J Claims are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

(j)    (i) Class 1K – Intercompany Claims.

Class 1K consists of all Intercompany Claims against Tribune.  Intercompany Claims are all prepetition Claims against any of the Debtors held by a Debtor or a non-Debtor Affiliate.

In full satisfaction, settlement, release and discharge of and in exchange for Intercompany Claims against Tribune, except as otherwise provided in the Plan, all Intercompany Claims against Tribune shall be deemed satisfied, discharged and extinguished in full and shall be eliminated as of the Effective Date.

Claims in Class 1K are Impaired; however, as set forth in Section 4.3 of the Plan, votes shall not be solicited from Holders of Claims in Class 1K.

(k)    (i) Class 1L – Securities Litigation Claims.

Class 1L consists of all Securities Litigation Claims against Tribune.  A Securities Litigation Claim is any Claim against any of the Debtors, except any Claim that survives confirmation and effectiveness of the Plan pursuant to Section 11.6 of the Plan.11.6, (i) arising from the rescission of a purchase or sale of shares, notes or any other securities of any of the Debtors or an Affiliate of any of the Debtors, (ii) for damages arising from the purchase or sale of any such security, (iii) for violations of the securities laws or the Employee Retirement Income Security Act of 1974 (unless there has been a judicial determination by Final Order that any such Claim is not subject to subordination under section 510(b) of the Bankruptcy Code) or for misrepresentations or any similar Claims related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, (iv) asserted by or on behalf of the ESOP and/or any present or former participants in the ESOP in their capacity as such, (v) for attorneys' fees, other charges or costs incurred on account of any of the foregoing Claims, and or (vi) for reimbursement, contribution or indemnification allowed under section 502 of the Bankruptcy Code on account of any of the foregoing Claims, including Claims based upon allegations that the Debtors made false and misleading statements or engaged in other deceptive acts in connection with the offer or sale of securities.

On the Effective Date, all Securities Litigation Claims against Tribune shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such Securities Litigation Claims.

Claims in Class 1L are Impaired.  Holders of Claims in Class 1L are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

While the Debtors believe that the aforementioned treatment is appropriate for each Securities Litigation Claim specified in the Plan, the DOL has informed the Debtors that the DOL disagrees with the Debtors' classification of Claims for violations of ERISA as Securities Litigation Claims and the subordination of such Claims to Interests in the Filed Subsidiary Debtors.  Consequently, it is possible that the DOL may choose to file an objection to Confirmation of the Plan in accordance with the procedures discussed in Article I.E of this Disclosure Statement.

(l)    (k) Class 1M – Tribune Interests.

Class 1M consists of all Tribune Interests in Tribune.  Tribune Interests are any shares of Old Common Stock, preferred stock or other instrument evidencing an ownership interest in Tribune, whether or not transferable, and any options, warrants (including, without limitation, the EGI-TRB LLC Warrants), calls, rights, puts, awards, commitments, repurchase rights, unvested or unexercised stock options, unvested common stock, unvested preferred stock or any other agreements of any character related to the Old Common Stock, but does not include the Securities Litigation Claims.

On the Effective Date, all Tribune Interests in Tribune shall be extinguished and Holders of such Interests shall not receive or retain any property under the Plan on account of such Tribune Interests.

Interests in Class 1M are Impaired.  Holders of Interests in Class 1M are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

2.    Classification and Treatment of Claims Against and Interests in Filed Subsidiary Debtors (Debtors 2 through 111).

(a)    Class 2A through 111A – Priority Non-Tax Claims.

Classes 2A through 111A consist of all Priority Non-Tax Claims against the relevant Filed Subsidiary Debtors.

Each Holder of an Allowed Priority Non-Tax Claim against a Filed Subsidiary Debtor shall have such Claim Reinstated.

Allowed Claims in Classes 2A through 111A are Unimpaired, and the Holders of Claims in such Classes are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 2A through 111A are not entitled to vote to accept or reject the Plan; provided, however, that all Claims in Classes 2A through 111A shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Plan, including, but not limited to, Section 8 of the Plan.

(b)    Classes 2B through 111B – Other Secured Claims

Classes 2B through 111B consist of all Other Secured Claims against the relevant Filed Subsidiary Debtors.

Each Holder of an Allowed Other Secured Claim against a Filed Subsidiary Debtor shall have such Claim Reinstated.

Allowed Claims in Classes 2B through 111B are Unimpaired, and the Holders of Claims in such Classes are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 2B through 111B are not entitled to vote to accept or reject the Plan; provided, however, that all Claims in Classes 2B through 111B shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Plan, including, but not limited to, Section 8 of the Plan.

(c)    Classes 50C through 111C – <u>Senior</u> Loan Guaranty Claims

Classes 50C through 111C consist of all <u>Senior</u> Loan Guaranty Claims against the relevant Guarantor Debtors.  <u>Senior</u> Loan Guaranty Claims are the<u>Claims arising under</u> Senior Loan Guaranty ~~Claims and the Bridge Loan Guaranty Claims~~<u>Agreement, including, without limitation, the guaranty of the Barclays Swap Claim</u>.  The Senior Loan Guaranty Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable under such Senior Loan Guaranty Agreement, including the full amount of principal, interest, and all other amounts due and owing under the Senior Loan Guaranty Agreement as of the Petition Date.  ~~The Bridge Loan Guaranty Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable thereunder, including the full amount of principal interest, and all other amounts due and owing under the Bridge Loan Guaranty Agreement as of the Petition Date.  Neither the Senior Loan Guaranty Claims nor the Bridge Loan Guaranty Claims shall~~ <u>and shall not</u> be subject to reduction, disallowance, subordination (other than with respect to the Bridge Loan Guaranty Claims as provided in the Loan Guaranty Agreements), set off, or counterclaim.

On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed <u>Senior</u> Loan Guaranty Claims against the Guarantor Debtors, subject to Section 5.4.2 of the Plan, each Holder of an Allowed <u>Senior</u> Loan Guaranty Claim against a Guarantor Debtor shall receive a Pro Rata share of: (i) 91.2% of the New Senior Secured Term Loan <u>plus</u> the

portion of the Other Parent Claims Allocation that is New Senior Secured Term Loan; (ii) 91.2% of the Distributable Cash <u>minus</u> the amount of Distributable Cash to be distributed to Holders of Allowed Claims in Classes 2E through 111E and the amount of Distributable Cash to be distributed to Holders of Allowed Claims in Class 1E in excess of the portion of the Other Parent Claims Allocation that is Distributable Cash; and (iii) 91.2% of the New Common Stock <u>plus</u> the portion of the Other Parent Claims Allocation that is New Common Stock, subject to dilution by the Equity Incentive Plan. ~~In accordance with Section 7.3 of the Plan, in order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions of (i) the New Senior Secured Term Loan, (ii) the Distributable Cash and (iii) the New Common Stock made on account of Allowed Bridge Loan Guaranty Claims shall be distributed to the Senior Loan Agent for distribution on account of Allowed Senior Loan Guaranty Claims, and no distribution shall be provided to Holders of Allowed Bridge Loan Guaranty Claims.~~

Claims in Classes 50C through 111C are Impaired, and Holders of Claims in Classes 50C through 111C are entitled to vote to accept or reject the Plan against the relevant Debtors.

<u>(d)        Classes 50D through 111D – Bridge Loan Guaranty Claims</u>

<u>Classes 50D through 111D consist of all Bridge Loan Guaranty Claims against the relevant Guarantor Debtors. Bridge Loan Guaranty Claim means Claims arising under the Bridge Loan Guaranty Agreement. If Class 1D votes to accept the Plan, the Bridge Loan Guaranty Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable under the Bridge Loan Guaranty Agreement, including the full amount of principal, interest, and all other amounts due and owing under the Bridge Loan Guaranty Agreement as of the Petition Date, and shall not be subject to reduction, disallowance, subordination (other than as provided in the Loan Guaranty Agreements), set off or counterclaim.</u>

<u>In accordance with Section 7.3 of the Plan, in order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions of (i) the New Senior Secured Term Loan, (ii) the Distributable Cash and (iii) the New Common Stock that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall instead be distributed to the Senior Loan Agent for distribution on account of Allowed Senior Loan Guaranty Claims. Accordingly, on the Effective Date, all Bridge Loan Guaranty Claims against the Guarantor Debtors shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such Bridge Loan Guaranty Claims.</u>

<u>Claims in Class 50D through 111D are Impaired, and Holders of Claims in Classes 50D through 111D are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.</u>

<u>(e)</u>        ~~(d)~~ Classes 2E through 111E – General Unsecured Claims.

Classes 2E through 111E consist of all General Unsecured Claims against the relevant Filed Subsidiary Debtors. A General Unsecured Claims is any Claim against the Debtors that is not an Administrative Expense Claim, a DIP Facility Claim, a Priority Tax Claim, a Priority Non-Tax Claim, an Other Secured Claim, a Senior Loan Claim, a Bridge Loan Claim, a Senior Noteholder Claim, a Convenience Claim, an EGI-TRB LLC Notes Claim, a PHONES Notes Claim, an Employee Benefit Claim, an Intercompany Claim, a Securities Litigation Claim, a Senior Loan Guaranty Claim or a Bridge Loan Guaranty Claim and shall not include Disallowed Claims or Claims that are released, whether by operation of law or pursuant to order of the Bankruptcy Court, written release or settlement, the provisions of the Plan or otherwise.

The Debtors have made a good faith, reasonable estimate of the amount to be paid to Classes 2E through 111E under the Plan, which estimate has been disclosed in Article II.C hereof and the Debtors shall supplement such estimate in a declaration filed with the Bankruptcy Court no later than ten calendar days prior to the deadline established for objecting to the Plan.

On or as soon as reasonably practicable after the applicable Distribution Date, each Holder of an Allowed General Unsecured Claim against a Filed Subsidiary Debtor shall receive payment in full in Cash (paid out of the Distributable Cash); provided, however, that if the Debtors estimate, pursuant to the immediately preceding paragraph, that the sum of Allowed Claims in Classes 2E through 111E shall exceed $150 million in the aggregate and the Senior Lender Settlement Committee does not elect in writing after such estimate is filed with the Bankruptcy Court but prior to the conclusion of the Confirmation Hearing to provide additional consideration to such Holders, each Holder of an Allowed Claim in Classes 2E through 111E shall instead receive its Pro Rata share of $150 million in Cash; provided further, however, that post-petition interest shall not accrue or be paid on any General Unsecured Claim.

Claims in Classes 2E through 111E are Impaired, and Holders of Claims in Classes 2E through 111E are entitled to vote to accept or reject the Plan against the relevant Debtors.

(f)    (e) Classes 2K through 111K – Intercompany Claims.

Classes 2K through 111K consist of all Intercompany Claims against the relevant Filed Subsidiary Debtors.

In full satisfaction, settlement, release and discharge of and in exchange for Intercompany Claims against Filed Subsidiary Debtors, except as otherwise provided in the Plan, all Intercompany Claims against Filed Subsidiary Debtors shall be deemed satisfied, discharged and extinguished in full and shall be eliminated as of the Effective Date.

Claims in Classes 2K through 111K are Impaired; however, as set forth in Section 4.3 of the Plan, votes on the Plan shall not be solicited from Holders of Claims in Classes 2K through 111K.

(g)    (f) Classes 2L through 111L – Securities Litigation Claims.

Classes 2L through 111L consist of all Securities Litigation Claims against the relevant Filed Subsidiary Debtors.

On the Effective Date, all Securities Litigation Claims against Filed Subsidiary Debtors shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such Securities Litigation Claims.

Claims in Classes 2L through 111L are Impaired. Holders of Claims in Classes 2L through 111L are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

While the Debtors believe that the aforementioned treatment is appropriate for each Securities Litigation Claim specified in the Plan, the DOL has informed the Debtors that the DOL disagrees with the Debtors' classification of Claims for violations of ERISA as Securities Litigation Claims and the subordination of such Claims to Interests in the Filed Subsidiary Debtors. Consequently, it is possible that the DOL may choose to file an objection to Confirmation of the Plan in accordance with the procedures discussed in Article I.E of this Disclosure Statement.

(h)    (g) Classes 2M through 111M – Interests in Filed Subsidiary Debtors.

Classes 2M through 111M consist of all Interests in the Filed Subsidiary Debtors.

Each Subject to Section 5.2 of the Plan, each Holder of an Allowed Interest in the Filed Subsidiary Debtors shall have its Interest Reinstated. Allowed Interests in each Filed Subsidiary Debtor shall be Reinstated for administrative convenience and (i) in the case of the Guarantor Debtors for the ultimate benefit of the Holders of Loan Guaranty Claims against such Guarantor Debtors and (ii) in the case of the Non-Guarantor

Debtors, in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain Cash distributions to the Holders of Allowed Claims against such Non-Guarantor Debtors.

Allowed Interests in Classes 2M through 111M are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Interests in Classes 2M through 111M are not entitled to vote to accept or reject the Plan.

3.    Prepackaged Plans for and Treatment of Claims Against and Interests In Guarantor Non-Debtors, If Any, That Become Debtors.

(a)    General.

The Plan constitutes a Prepackaged Plan for the Guarantor Non-Debtors, if any, that commence Chapter 11 Cases. For any Guarantor Non-Debtor that commences a Chapter 11 Case, such Prepackaged Plan shall classify Allowed Claims and Interests in the same manner as set forth in Section 3.3 of the Plan for the Filed Subsidiary Debtors.

(b)    Treatment of Unimpaired Claims and Interests.

Except for Loan Guaranty Claims, Intercompany Claims and Securities Litigation Claims, each Holder of an Allowed Claim against or Interest in a Guarantor Non-Debtor that becomes a Debtor shall have its Claim or Interest Reinstated. In addition, except for Loan Guaranty Claims, Intercompany Claims and Securities Litigation Claims, Allowed Claims against and Interests in any Guarantor Non-Debtor that becomes a Debtor are Unimpaired, and the Holders of such Claims and Interests are conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of such Claims and Interests are not entitled to vote to accept or reject the relevant Prepackaged Plan. All executory contracts and unexpired leases of the Guarantor Non-Debtors that become Debtors shall be assumed and shall be fully enforceable in accordance with their terms. Joint venture agreements, stockholder agreements, limited liability company agreements, limited liability partnership agreements, limited partnership agreements, general partnership agreements and any other agreements or arrangements related to the foregoing shall continue in accordance with their terms and shall remain in full force and effect and the parties' rights thereunder shall not be modified by the relevant Prepackaged Plan.

(c)    Treatment of Loan Guaranty Claims.

i.    Senior Loan Guaranty Claims.

In full satisfaction, settlement, release and discharge of and in exchange for Allowed Senior Loan Guaranty Claims against Guarantor Non-Debtors that become Debtors, each Holder of an Allowed Senior Loan Guaranty Claim against a Guarantor Non-Debtor that becomes a Debtor shall be entitled to receive the distributions provided to such Holder under Section 3.3.3 of the Plan and the guaranties described in Section 5.6 of the Plan and shall not be entitled to receive any other or further distributions or guaranties. Senior Loan Guaranty Claims are Impaired, and Holders of Senior Loan Guaranty Claims are entitled to vote to accept or reject the relevant Prepackaged Plan. Votes cast by Holders of Senior Loan Guaranty Claims in Classes 50C through 111C shall be counted as votes cast on the relevant Prepackaged Plan prepared on behalf of the relevant Guarantor Non-Debtors.

ii.    Bridge Loan Guaranty Claims.

In accordance with Section 7.3 of the Plan, in order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions of (i) the New Senior Secured Term Loan, (ii) the Distributable Cash and (iii) the New Common Stock that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall instead be distributed to the Senior Loan Agent for distribution on account

of Allowed Senior Loan Guaranty Claims. Accordingly, on the Effective Date, all Bridge Loan Guaranty Claims against Guarantor Non-Debtors that become Debtors shall be extinguished and the Holders of such Claims shall not receive or retain any property under the relevant Prepackaged Plan on account of such Bridge Loan Guaranty Claims. Bridge Loan Guaranty Claims are Impaired and Holders of such Claims are conclusively deemed to have rejected the relevant Prepackaged Plan and are not entitled to vote to accept or reject the relevant Prepackaged Plan

        (d)     Treatment of Intercompany Claims.

In full satisfaction, settlement, release and discharge of and in exchange for Allowed Intercompany Claims against Guarantor Non-Debtors that become Debtors, all Intercompany Claims against a Guarantor Non-Debtor that becomes a Debtor shall be deemed satisfied, discharged and extinguished in full and shall be eliminated as of the Effective Date. Intercompany Claims are Impaired; however, as set forth in Section 4.3 of the Plan, votes shall not be solicited from the Holders of such Claims.

        (e)     Securities Litigation Claims.

On the Effective Date, all Securities Litigation Claims against Guarantor Non-Debtors that become Debtors shall be extinguished and the Holders of such Claims shall not receive or retain any property under the relevant Prepackaged Plan on account of such Securities Litigation Claims. Securities Litigation Claims are Impaired and Holders of such Claims are conclusively deemed to have rejected the relevant Prepackaged Plan and are not entitled to vote to accept or reject the relevant Prepackaged Plan.

While the Debtors believe that the aforementioned treatment is appropriate for each Securities Litigation Claim specified in the Plan, the DOL has informed the Debtors that the DOL disagrees with the Debtors' classification of Claims for violations of ERISA as Securities Litigation Claims and the subordination of such Claims to Interests in the Filed Subsidiary Debtors. Consequently, it is possible that the DOL may choose to file an objection to Confirmation of the Plan in accordance with the procedures discussed in Article I.E of this Disclosure Statement.

**E.**    **Means for Implementation of the Plan.**

    1.    Restructuring Transactions.

On The Plan provides that on or prior to the Effective Date, any Debtor and, after the Effective Date, any Reorganized Debtor, may enter into or undertake any Restructuring Transactions and may take such actions as may be determined by such Debtor or Reorganized Debtor to be necessary or appropriate to effect such Restructuring Transactions. The actions to effect the Restructuring Transactions may include, without limitation: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, conversion, restructuring, recapitalization, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, disposition, or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, conversion or dissolution (or similar instrument) pursuant to applicable law; and (iv) all other actions which the applicable entities may determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions. The Restructuring Transactions may include one or more mergers, consolidations, conversions, restructurings, recapitalizations, dispositions, liquidations or dissolutions, as may be determined by the applicable Debtors or Reorganized Debtors to be necessary or appropriate to effect the purposes of such Restructuring Transactions for the benefit of the Reorganized Debtors, including, without limitation, the potential simplification of the organizational structure of the Reorganized Debtors. In

Over the past several months, the Debtors and their advisors have undertaken an analysis of the Debtors' corporate structure. These efforts have focused on, among other things, identifying modifications to the corporate structure that would reduce administrative inefficiencies and expenses, streamline post-emergence tax reporting and facilitate future strategic decision making. Consistent with the terms of Section 5.2 of the Plan, the Debtors anticipate proposing in the Plan Supplement a set of Restructuring Transactions to implement these initiatives. The Debtors anticipate that the Restructuring Transactions may include, among other transactions, (i) converting certain of the Reorganized Debtors into limited liability companies, or merging certain of the Reorganized Debtors into newly formed limited liability companies in jurisdictions where conversion is not available and (ii) consolidating and reallocating certain operations of the Reorganized Debtors within the organizational structure of Reorganized Tribune.

The Plan provides that in each case in which the surviving, resulting or acquiring person in any such Restructuring Transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring person will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring person, which may provide that another Reorganized Debtor will perform such obligations. Implementation of the Restructuring Transactions shall not affect any distributions, discharges, exculpations, releases or injunctions set forth in the Plan. Exhibit 5.2 to the Plan, to be filed with the Plan Supplement, shall set forth the Restructuring Transactions and a detailed description of the actions and steps required to implement each Restructuring Transaction. On or prior to, or as soon as practicable after, the Effective Date, the Debtors or the Reorganized Debtors may take such steps as they may deem necessary or appropriate to effectuate any Restructuring Transactions that satisfy the requirements set forth in Section 5.2 of the Plan. The Restructuring Transactions shall be authorized and approved by the Confirmation Order pursuant to, among other provisions, sections 1123 and 1141 of the Bankruptcy Code and section 303 of title 8 of the Delaware Code, if applicable, without any further notice, action, third-party consents, court order or process of any kind, except as otherwise set forth in the Plan or in the Confirmation Order. To the extent that any Restructuring Transaction may require the prior consent of the FCC to an assignment of FCC Licenses or a transfer of control of a holder of FCC Licenses, no such Restructuring Transaction shall be consummated until all necessary prior consents of the FCC shall have been obtained.

**F.    Corporate Governance, Directors, Officers and Corporate Action.**

    1.      Certificate of Incorporation, By-Laws, Limited Liability Company Agreement; Limited Liability Partnership Agreement.

On the Effective Date, the Certificate of Incorporation and By-Laws substantially in the forms attached as Exhibit 5.3.1(1) to the Plan and Exhibit 5.3.1(2) to the Plan, respectively, as will be filed with the Plan Supplement, shall go into effect. Consistent with, but only to the extent required by, section 1123(a)(6) of the Bankruptcy Code, the Certificate of Incorporation shall, among other things, prohibit the issuance of non-voting equity securities. Additionally, the Certificate of Incorporation shall contain director and officer liability exculpation and indemnity provisions to the fullest extent permitted under Delaware law. To the extent the summary description in the Plan conflicts with the terms of the Certificate of Incorporation or the By-Laws, the terms of such documents shall govern. The certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents, as applicable, of the other Debtors or Reorganized Debtors shall be amended as necessary to satisfy the provisions of the Plan (including, without limitation, Section 5.2 of the Plan) and the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents, as applicable, as permitted by applicable law.

    2.      Directors and Officers of Reorganized Tribune.

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the initial directors and officers of Reorganized Tribune shall be the persons identified in Exhibit 5.3.2 to the Plan, to be filed with the Plan Supplement. On the Effective Date, the board of directors of Reorganized Tribune shall have at least seven but not more than nine members, including the chief executive officer of Reorganized Tribune. All members of the initial board of directors of Reorganized Tribune will be in compliance with all applicable requirements of the Communications Act and the FCC's rules. As set forth in the Certificate of Incorporation, the initial board of directors of Reorganized Tribune shall serve for a one-year, non-staggered term and then shall be subject to re-election based on a shareholder vote pursuant to the terms of the Certificate of Incorporation and applicable law. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in Exhibit 5.3.2 to the Plan, to be filed with the Plan Supplement, the identity and affiliations of any person proposed to serve on the initial board of directors of Reorganized Tribune and to the extent such person is an insider (as defined in section 101(31) of the Bankruptcy Code) other than by virtue of being a director, the nature of any compensation for such person. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the Certificate of Incorporation and applicable law. Each member of the current board of directors of Tribune will be deemed to have resigned on the Effective Date unless identified in Exhibit 5.3.2 to the Plan as continuing on the board of directors of Reorganized Tribune.

      3.      Ownership and Management of Reorganized Debtors Other Than Reorganized Tribune.

Except as set forth in Exhibit 5.2 to the Plan, from and after the Effective Date, each Reorganized Debtor shall retain its equity interest in any other Reorganized Debtor. The initial boards of directors or managers of the Reorganized Debtors other than Reorganized Tribune shall be as set forth in Exhibit 5.3.3 to the Plan, to be filed with the Plan Supplement.

## G.     Issuance and Distribution of New Securities and Related Matters.

      1.      Issuance of New Securities.

On the Effective Date or a subsequent Distribution Date, as applicable, Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to the Plan without further act or action under applicable law, regulation, order or rule. Except as otherwise provided in the Plan, including as specifically provided in Section 5.4.2 of the Plan, each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to the Plan will be issued New Class A Common Stock, provided that any such Holder will be entitled to receive all or a portion of its shares of New Common Stock in the form of New Class B Common Stock if such Holder informs the Debtors of its desire to receive instead such New Class B Common Stock by the date announced by the Debtors in a filing with the Bankruptcy Court, with such date to be no earlier than the first day of the Confirmation Hearing. The Certificate of Incorporation, substantially in the form of Exhibit 5.3.1(1) to the Plan, sets forth the rights and preferences of the New Common Stock. The Certificate of Incorporation may contain customary provisions restricting the sale, transfer, assignment, conversion or other disposal of such shares of New Common Stock. To the extent the shares of New Class A Common Stock or New Class B Common Stock are certificated, such certificates may contain a legend restricting the sale, transfer, assignment, conversion or other disposal of such shares. The New Warrant Agreement substantially in the form of Exhibit ~~1.1.111~~1.1.124 to the Plan, which shall be filed with the Plan Supplement, sets forth the rights of the holders of the New Warrants. The issuance of the New Common Stock and the New Warrants and the distribution thereof under the Plan shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code. Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of the Plan, including, without limitation, the Exit Facility Credit Agreement (if any), the New Senior Secured Term Loan Agreement, and any other agreement entered into in connection with the foregoing, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto.

2.      Distribution of New Common Stock and New Warrants.

If the Effective Date occurs, on the Effective Date Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to the Plan without further act or action under applicable law, regulation, order or rule. The Plan authorizes the Debtors to issue two classes of New Common Stock: New Class A Common Stock and New Class B Common Stock. New Class A Common stock will have voting rights consistent with standard voting common stock. New Class B Common Stock will have more limited voting rights and is designed to be non-attributable under the FCC's rules.

Specifically, holders of New Class B Common Stock will be entitled to vote as a separate class on any amendment, repeal, or modification of any provision of the Restated Certificate of Incorporation for Reorganized Tribune that adversely affects the rights of the New Class B Common Stock in a manner different from the rights of the New Class A Common Stock. In addition, the holders of New Class B Common Stock will be entitled to vote together with holders of the New Class A Common Stock on the following non-ordinary course transactions to the extent that these matters are submitted to a vote of the holders of New Class A Common Stock: (i) any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking *pari passu* with or senior to the New Class A Common Stock or New Class B Common Stock as to dividends or liquidation preference, including with respect to an increase in the number of New Class A Common Stock or New Class B Common Stock; (ii) any amendment to the Restated Certificate of Incorporation or the Bylaws of Reorganized Tribune; (iii) any amendment to any stockholders or comparable agreement; (iv) any sale, lease or other disposition of all or substantially all of the assets of Reorganized Tribune through one or more transactions; (v) any recapitalization, reorganization, share exchange, consolidation or merger of Reorganized Tribune or its capital stock; (vi) any issuance or entry into an agreement for the issuance of capital stock (or any options or other securities convertible into capital stock) of Reorganized Tribune, including any stock option or stock incentive plan; (vii) any redemption, purchase or other acquisition by Reorganized Tribune of any of its capital stock (except for purchases from employees upon termination of employment); and (viii) any liquidation, dissolution, distribution of assets or winding-up of Reorganized Tribune.

The Debtors' business operations are subject to regulation by the FCC under the Communications Act. As a result, each Holder of a Claim that is entitled to receive a distribution of New Common Stock and/or New Warrants pursuant to the Plan will be required to demonstrate to the Debtors' satisfaction that the issuance of New Common Stock to such Holder would not impair the ability of the Reorganized Debtors to comply with FCC-related ownership requirements and restrictions, and would not impair the ability of the Reorganized Debtors to obtain the grant of the FCC Applications necessary to implement the Plan. Applicable FCC ownership requirements and restrictions, which are discussed in more detail below, include (i) FCC broadcast multiple ownership and cross-ownership restrictions, and (ii) restrictions in Section 310(b) of the Communications Act on the direct or indirect ownership or control of broadcast licensees by non-U.S. persons

(a)      FCC Media Ownership and Cross Ownership Rules.

Certain multiple ownership and cross-ownership rules promulgated by the FCC prohibit common ownership of "attributable interests" in certain combinations of broadcast and other media properties. The following is a summary of the FCC's principal policies on identifying and assessing "attributable interests" in media outlets. "Attributable interests" generally include the following interests in a media company: general partnership interests or managing membership interests in a limited liability company, non-insulated limited partnership or limited liability company interests, positions as an officer or director (or the right to appoint officers or directors), five percent (5%) or greater direct or indirect interests in the voting stock of a corporation, time brokerage agreements between same-market radio or television stations, joint sales agreements between same-market radio broadcast stations and certain significant investment interests coupled with some same-market media interests or significant programming arrangements.

Attribution traces through chains of ownership. In general, an individual or entity that has an attributable interest in another entity will also be deemed to hold each of that entity's attributable media interests. In addition, the FCC treats all partnership interests as attributable, except for those limited partnership interests that are "insulated" by the terms of the limited partnership agreement from "material involvement" in the media-related activities of the partnership. The FCC applies the same attribution and insulation standards to limited liability companies and other new business forms.

Currently, a minority stockholder in a media corporation with a single majority stockholder (i.e., a single holder of more than fifty percent (50%) of the outstanding voting power of the corporation) is not deemed to hold an attributable interest in that corporation or its media outlets based on the ownership of a minority voting stock interest of five percent (5%) or more. The FCC is considering whether or not to retain the single majority stockholder exemption in a pending rulemaking proceeding.

Combinations of direct and indirect equity and debt interests exceeding thirty-three percent (33%) of the total asset value (equity plus debt) of a media outlet may be deemed attributable if the holder has another attributable broadcast or daily newspaper interest in the same market or provides more than fifteen percent (15%) of the programming to the broadcast station in which the interest is held. Also, a person or entity that provides more than fifteen percent (15%) of the weekly programming for a television or radio station and has an attributable interest in another television or radio station in the same market is deemed to hold an attributable interest in the station to which it provides programming.

The FCC's broadcast multiple ownership and cross-ownership rules limit certain combinations of attributable interests in television broadcast stations and radio broadcast stations, and its cross-ownership rules restrict the ownership in the same market of attributable interests in (i) combinations of radio stations and television stations and (ii) combinations of radio or television broadcast stations with daily newspapers of general circulation. The FCC regards an entity with an "attributable interest" in a media outlet as an "owner" of that media outlet for purposes of applying these rules. Thus, prospective stockholders that may hold five percent (5%) or more of the New Class A Common Stock of Reorganized Tribune or persons who are officers or directors of Reorganized Tribune will need to assess (a) what attributable interests they may hold in daily newspapers of general circulation or other radio or television licensees and (b) whether the attributable media interests that they hold would conflict with their holding attributable interests in the daily newspapers or broadcast licensees of the Reorganized Debtors.

As explained in more detail below, the permissibility of particular combinations of attributable media interests may depend upon market size and other market characteristics. Generally, the FCC's media ownership rules place limits on (i) same-market ownership of broadcast stations and English-language daily newspapers of general circulation; (ii) local television station ownership; (iii) local radio station ownership; (iv) same-market ownership of television and radio stations; and (v) nationwide television station ownership. The FCC has pending proceedings to revise some of these rules and to adopt new rules, and the FCC's broadcast ownership rules are being challenged in the courts. No waivers will be sought and no special showings will be submitted to accommodate separate media interests of prospective stockholders independent of their interest in the Reorganized Debtors. Certain rules that could give rise to a prohibited combination for a prospective stockholder of Reorganized Tribune include the following:

- Newspaper/Broadcast Cross-Ownership Rule. The FCC generally prohibits the cross-ownership of a daily newspaper and either a television or radio broadcast station in the same market, absent a waiver. The 2008 Order adopted liberalized waiver standards; however, those changes are the subject of a pending appeal to the Third Circuit. In March 2010, the Third Circuit lifted the stay it had issued in September 2003 in connection with its review of the FCC's changes to its media ownership rules and allowed the 2008 Order to become effective. Under the 2008 Order, a daily newspaper is one that is published at least four days per week in the dominant language of the market and which is circulated generally in the community of publication. The revised waiver standards adopted in the 2008 Order presumptively allow the ownership of attributable interests in

a broadcast station and a daily newspaper of general circulation that is published in the market served by the broadcast station only when (i) the market at issue is one of the 20 largest "Designated Market Areas" or "DMAs" as determined by the Nielsen television ratings service; (ii) the combination involves only one daily newspaper and only one radio or television station; and (iii) if the combination involves a television station, (a) at least eight independently-owned and operating major newspapers and/or full-power television stations would remain in the DMA and (b) the television station is not among the top four ranked stations in the DMA. The FCC also presumptively permits cross-ownership if either the newspaper or the broadcast station is deemed "failed" or "failing" under FCC standards or if the proposed cross-ownership would result in a new source of local television news totaling at least seven hours per week. All other newspaper/broadcast combinations are presumed not to be in the public interest; however, that presumption can be overcome if the parties can demonstrate that, post-merger, the cross-owned entity would increase the diversity of independent news outlets and increase competition among independent news sources in the relevant market.

- <u>Local Television Station Ownership Rule (Duopoly Rule).</u> Under the local television ownership rule (often called the "duopoly rule"), a single entity may have attributable interests in two television stations in the same DMA if (i) the two stations do not have overlapping service areas, or (ii) notwithstanding the combination there are at least eight independently owned and operating full-power commercial and non-commercial television stations serving the DMA and at least one of the combining stations is not ranked among the top four stations in the DMA. In addition, if any entity with an attributable interest in a television station provides more than fifteen percent (15%) of the programming of another station in the same market pursuant to a time brokerage or local marketing agreement, then for purposes of applying this rule, the entity will be deemed to hold an attributable interest in the station to which it provides programming. In addition, the FCC has initiated a rule making proceeding to determine whether it should treat television joint sales agreements as attributable interests under its ownership rules and, if so, whether it should use a standard comparable to the one in effect for radio joint sales agreements, under which the FCC treats joint sales agreements as attributable if they cover fifteen percent (15%) or more of the brokered station's weekly commercial time. The FCC's duopoly rule and policies regarding ownership of television stations in the same market apply only to full-power television stations and not to television satellite stations, Class A or low power television stations, or television translator stations.

- <u>Local Radio Station Ownership Rule.</u> The FCC's local radio multiple ownership rule limits the number of radio stations in which one entity may hold an attributable interest in a local geographic market. In determining the size of a market, the rules consider both commercial and non-commercial stations and use a definition of a local radio market based on Arbitron "Metro" markets and, when there is no defined Arbitron market, a definition based upon the composite service contours of commonly owned stations with overlapping service areas. These limits are as follows: In a radio market with 45 or more radio stations, a party may hold an attributable interest in up to eight radio stations, not more than five of which are in the same broadcast service (AM or FM); in a radio market with between 30 and 44 radio stations, a party may hold an attributable interest in up to seven radio stations, not more than four of which are in the same broadcast service; in a radio market with between 15 and 29 radio stations, a party may hold an attributable interest in up to six radio stations, not more than four of which are in the same broadcast service; and in a radio market with 14 or fewer radio stations, a party may hold an attributable interest in up to five radio stations, not more than three of which are in the same broadcast service, except that a party may not hold an attributable interest in more than fifty percent (50%) of the stations in the market.

- <u>Radio/Television Station Cross-Ownership Rule.</u> The FCC's radio/television cross-ownership rule permits the common attributable ownership of more than one full-power AM and/or FM radio station and up to two television stations in the same market. The total number of radio stations permitted to be under common attributable ownership is dependent on the number of independently-owned media voices in the local market as follows: (i) in markets with at least 20 independently owned media voices, a single entity may hold attributable interests in up to two

television stations and six radio stations. Alternatively, such an entity is permitted to hold an attributable interest in one television station and seven radio stations in the same market; (ii) in a market that includes at least ten independently-owned media voices, a single entity may hold attributable interests in up to two television stations and up to four radio stations; and (iii) regardless of the number of independently-owned media voices in a market, a single entity may hold an attributable interest in up to two television stations and one radio station in any market. Under all of these scenarios, the requirements of the local television and local radio ownership rules also must be met.

- <u>National Television Station Ownership Rule</u>. By statute, one party may hold attributable interests in television stations that reach, in the aggregate, no more than thirty-nine percent (39%) of all United States television households. The corresponding FCC rule on national television ownership limits provides that, when calculating a television station's nationwide aggregate audience, all UHF stations are considered to serve only fifty percent (50%) of the households in their DMA and all VHF stations are considered to serve all households in their DMA, including households that cannot naturally receive such a VHF station over the air. The FCC currently is considering whether to initiate a proceeding to modify or abolish this so-called UHF discount in light of the changes resulting from the transition to digital television broadcasting. If a broadcast licensee has an attributable interest in a second television station in a market, whether by virtue of ownership, a time brokerage agreement or a parent-satellite operation, the audience for that market will not be counted twice for purposes of determining compliance with the national cap.

    (b)    Issuance of New Class B Common Stock to Ensure Compliance with FCC Media Ownership and Cross-Ownership Rules

To ensure compliance with the FCC's broadcast multiple ownership and cross-ownership rules, each Holder of a Claim that could be eligible to receive a distribution of five percent (5%) or more of the New Class A Common Stock in Reorganized Tribune pursuant to the Plan will be required to provide a Media Ownership Certification by the ~~Voting Deadline or such other~~ deadline established by the Bankruptcy Court, ~~which may be earlier than the Voting Deadline,~~ in accordance with the instructions set forth in the Media Ownership Certification document that may be distributed to any such Holder. Any such Holder that fails to provide the Media Ownership Certification by the ~~Voting Deadline or such other~~ deadline established by the Bankruptcy Court or that does not do so to the reasonable satisfaction of the Debtors may be allocated New Class B Common Stock in lieu of New Class A Common Stock as set forth in Section 5.4.2 of the Plan at the Debtors' discretion.

Reorganized Tribune, in its discretion, may issue shares of New Class B Common Stock in lieu of shares of New Class A Common Stock to any Holder of a Claim that is eligible under the Plan to receive a distribution of New Common Stock to ensure that such Holder will hold, in the aggregate (including with entities under common ownership or control) less than five percent (5%) of the voting rights of Reorganized Tribune if Reorganized Tribune determines, based on the Holder's Media Ownership Certification (or failure to provide the Media Ownership Certification or otherwise comply with Section 5.4.2 of the Plan), that such Holder may have other media interests that could impair the ability of Reorganized Tribune to comply with the Communications Act or the FCC's rules if such Holder were issued the shares of New Class A Common Stock that it otherwise would be eligible to receive pursuant to the Plan.

Furthermore, if any Holder of a Claim is eligible under the Plan to receive New Class A Common Stock such that, upon the Effective Date, such Holder would receive five percent (5%) or more of the shares of New Class A Common Stock (for any reason, including, but not limited to, as a result of the distribution of New Warrants or the distribution of New Class B Common Stock), and such Holder has not provided the Media Ownership Certification in accordance with section 5.4.2(a) of the Plan or such ownership has not been disclosed in the FCC Applications and approved by the FCC, then Reorganized Tribune shall be entitled to issue to such Holder as many shares of New Class B Common Stock in lieu of shares of New Class A Common

Stock as Reorganized Tribune deems necessary to ensure compliance with the Communications Act or the FCC's rules and/or to avoid delay in FCC Approval.

        (c)      Limitations on Foreign Ownership or Control of Broadcast Licensees.

Section 310(b) of the Communications Act restricts, among other things, foreign ownership or control of FCC broadcast licenses. Foreign entities may not have direct or indirect ownership or voting rights of more than twenty-five percent (25%) in a corporation controlling the licensee of a broadcast station if the FCC finds that the public interest will be served by the refusal or revocation of such a license due to such foreign ownership or voting rights. The FCC has interpreted this provision to mean that the agency must make an affirmative public interest finding before it will permit the twenty-five percent (25%) foreign ownership cap to be exceeded. With very few exceptions, the FCC has not made such an affirmative finding in connection with the assignment of a broadcast license; the provision, therefore, generally serves as a prohibition on foreign ownership or voting interests exceeding twenty-five percent (25%). In assessing compliance with the twenty-five percent (25%) foreign ownership limitation, the FCC calculates the voting rights separately from the equity ownership percentage, and the twenty-five percent (25%) ceiling must be met for both. Warrants and other future interests typically are not counted by the FCC toward the foreign ownership ceiling unless and until converted. The FCC historically has treated partnerships with foreign partners as foreign controlled if any general partner is foreign, or if any foreign limited partner is not adequately insulated (using FCC criteria) from material involvement in the partnership's media activities and business. In a few specific circumstances, the FCC also has treated certain economic interests in a company other than direct equity interests as "ownership" for purposes of its foreign ownership determination. In addition, the FCC uses a "multiplier" to determine the ownership interest of each entity in the chain of ownership in cases of indirect ownership, such as a situation in which there are layers of investment short of control between the entity to be acquired and the licensee.

        (d)      Issuance of a Combination of New Common Stock and New Warrants To Ensure Compliance with Applicable Limitations on Foreign Ownership and Control of Broadcast Licensees.

Because direct and indirect ownership of New Common Stock by non-U.S. persons and entities will affect the level of foreign ownership and voting rights in the Reorganized Debtors permissible under the Communications Act, each prospective holder of New Common Stock will be required to provide information to the Debtors concerning its own foreign ownership and control. Based on an allocation mechanism that is to be determined, Reorganized Tribune shall issue New Warrants, New Common Stock, or a combination of New Warrants and New Common Stock to any Holder of a Claim that is eligible to receive New Common Stock under the Plan that, based on the Holder's Foreign Ownership Certification (or failure to provide the Foreign Ownership Certification or otherwise comply with section 5.4.2 of the Plan), is (or is deemed to be pursuant to Section 5.4.2 of the Plan) more than twenty five percent (25%) foreign owned or controlled, on either a voting or an equity basis, as determined pursuant to section 310(b) of the Communications Act. The allocation mechanism shall ensure, based on the aggregate results of the Foreign Ownership Certifications, the compliance of Reorganized Tribune with section 310(b) of the Communications Act.

        (e)      Reporting Requirements Under Securities Exchange Act of 1934 and Listing of New Class A Common Stock on Securities Exchange or Quotation System.

Reorganized Tribune shall use its reasonable best efforts to be a reporting company under section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as promptly as practicable after the Effective Date and shall maintain all necessary staff, operations and practices in order to be a public reporting company. In addition, Reorganized Tribune will use its reasonable best efforts to list, as promptly as practicable after the Effective Date, the New Class A Common Stock for trading on the New York Stock Exchange ("NYSE") or for quotation in the NASDAQ stock market but will have no liability if it is unable to do so. Persons receiving distributions of New Class A Common Stock, by accepting such distributions, will have agreed to cooperate with Reorganized Tribune's reasonable requests to assist Reorganized Tribune in its efforts

to list the New Class A Common Stock on the NYSE or for quotation in the NASDAQ stock market, including, without limitation, appointing or supporting the appointment of a sufficient number of directors to the board of directors of Reorganized Tribune who satisfy the independence and other requirements of the NYSE or for quotation in the NASDAQ stock market, as applicable.

      3.      New Senior Secured Term Loan Agreement.

Subject to the terms of Section 5.6 of the Plan, on the Effective Date, if the Debtors have not elected to replace the New Senior Secured Term Loan in its entirety with distributions of Cash, (i) Reorganized Tribune, as borrower, (ii) the other Reorganized Debtors and U.S. Subsidiary Non-Debtors as provided in Section 5.6 of the Plan (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions, but excluding any entities identified by the Debtors and consented to by the Senior Lender Settlement Committee), as guarantors, (iii) the administrative agent party thereto, and (iv) the Holders of Claims entitled to receive a distribution of the New Senior Secured Term Loan under the Plan shall become parties to the New Senior Secured Term Loan Agreement regardless of whether any party actually executes the New Senior Secured Term Loan Agreement.  If issued, the New Senior Secured Term Loan shall (a) be guaranteed by the U.S. subsidiaries of Reorganized Tribune (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions, but excluding any entities identified by the Debtors and consented to by the Senior Lender Settlement Committee), (b) be secured by certain assets of Reorganized Tribune and the guarantors thereof subject to specified exceptions and customary intercreditor arrangements, (c) have interest payable in Cash quarterly, (d) have principal payable in Cash quarterly, with the unpaid balance payable on the final maturity date thereof, (e) mature on the fifth anniversary of the Effective Date, (f) include usual and customary affirmative and negative covenants for term loan facilities of this type and (g) be repayable by Reorganized Tribune at any time prior to scheduled maturity without premium or penalty.  The New Senior Secured Term Loan Agreement shall ~~be in the form attached~~contain terms substantially as set forth in Exhibit 5.6 to the Plan ~~as Exhibit 5.6.~~, which shall be filed with the Plan Supplement.

To the extent that replacement financing is available on commercially reasonable terms, the Debtors shall at the reasonable direction, or may with the consent, of the Senior Lender Settlement Committee distribute Cash in the amount of all or part of the initial principal amount of the New Senior Secured Term Loan in lieu of all or such part of the New Senior Secured Term Loan to Holders of Allowed Claims that are entitled to receive the New Senior Secured Term Loan under the Plan.  If the Debtors so elect, the relevant Debtors or Reorganized Debtors, as applicable, are hereby authorized, without any requirement of further action by the security holders or directors of such Debtors or Reorganized Debtors, to make such repayment including through the issuance of new indebtedness; provided, however, that (i) any such Cash distribution shall be distributed Pro Rata to Holders of Allowed Claims that otherwise would have been entitled to receive the new Senior Secured Term Loan and (ii) the terms of any such indebtedness shall be subject to the consent of the Senior Lender Settlement Committee, such consent not to be unreasonably withheld.

      4.      Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors.

Subject to Section 5.2 of the Plan, after the Effective Date, the Reorganized Debtors shall continue to exist as separate entities in accordance with the applicable law in the respective jurisdictions in which they are organized and pursuant to their respective certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents in effect prior to the Effective Date, except to the extent such documents are to be amended pursuant to the terms of the Plan.  Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Debtors' Estates of the Debtors, including all claims, rights and causes of action and any property acquired by the Debtors or the Reorganized Debtors under or in connection with the Plan, shall vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, other encumbrances and Interests.  On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and compromise or settle any Claims without supervision of or approval by the Bankruptcy Court and

free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professionals' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

      5.     Cancellation of Loan Agreements, Loan Guaranty Agreements, the Pledge Agreement, Notes Issued Under the Loan Agreements, Senior Notes, Debentures, Instruments, Indentures, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock and Other Tribune Interests.

Except as otherwise provided for in the Plan, as of the Effective Date, all (i) Loan Agreements, Loan Guaranty Agreements, the Pledge Agreement, notes issued under the Loan Agreements, Senior Notes, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock, other Tribune Interests and any other notes, bonds (with the exception of surety bonds outstanding), indentures (including the Indentures), stockholders' agreements, registration rights agreements, repurchase agreements and repurchase arrangements, or other instruments or documents evidencing or creating any indebtedness or obligations of a Debtor that relate to Claims or Interests that are Impaired under the Plan shall be cancelled, and (ii) all amounts owed by and the obligations of the Debtors under any agreements, credit agreements, guaranty agreements, stockholders' agreements, registration rights agreements, repurchase agreements and repurchase arrangements, indentures (including the Indentures) or certificates of designation governing the Loan Claims, Loan Guaranty Claims, Senior Notes, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock, other Tribune Interests and any other notes, bonds, indentures, or other instruments or documents evidencing or creating any Claims against or Interests in a Debtor that are Impaired under the Plan shall be discharged.  In addition, as of the Effective Date, all Old Common Stock and other Tribune Interests that have been authorized to be issued but that have not been issued shall be deemed cancelled and extinguished without any further action of any party.  Notwithstanding anything to the contrary herein, the obligations of parties to the Loan Agreements and the Loan Guaranty Agreements that are not Reorganized Debtors or Subsidiary Non-Debtors shall not be discharged or limited in any way.

Notwithstanding the provisions of Section 5.8 of the Plan and anything contained elsewhere in the Plan, but subject to Section 5.8.1 of the Plan, (i) the Senior Notes Indentures shall continue in effect to the extent necessary to allow the Reorganized Debtors and the Senior Notes Indenture Trustees to make distributions pursuant to the Plan on account of the Senior Noteholder Claims under the respective Senior Notes Indentures and for the applicable Senior Notes Indenture Trustee to perform such other functions with respect thereto  and assert any rights preserved under subsection (z) of Section 5.8.2 of the Plan; (ii) the Loan Agreements (including, without limitation, the intercreditor provisions described in Section 7.3 of the Plan) shall continue in effect to the extent necessary to allow the Reorganized Debtors and administrative agents to make distributions pursuant to the Plan on account of the Loan Claims and Loan Guaranty Claims under the respective Loan Agreements and Loan Guaranty Agreements, for the applicable Loan Agent to perform such other functions with respect thereto as the applicable Loan Agent shall deem necessary or appropriate and with respect to all rights of the applicable Loan Agent with respect to any and all Persons other than the Reorganized Debtors or Subsidiary Non-Debtors; and (iii) nothing in the Plan shall waive, release, or impair any rights, claims or interests, if any, that a Senior Notes Indenture Trustee may have under the applicable Senior Notes Indenture or otherwise to the recovery and/or reimbursement of its fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder to the Holders of Senior Noteholder Claims, whether such rights, claims or interest are in the nature of a charging lien or otherwise, all of which rights, claims, and interests expressly are preserved.  Except as otherwise provided herein, upon cancellation of the applicable Indenture, the respective Indenture Trustee shall be relieved of any obligations as Indenture Trustee under such Indenture.  Except as expressly provided in the Plan, neither the Debtors nor the Reorganized Debtors shall have any obligations to any Indenture Trustee or Loan Agent for any fees, costs or expenses.

Notwithstanding any other provision of the Plan, the indemnification or guaranty obligations of the Debtors contained in (i) that certain Indemnity Agreement between CSC Holdings, Inc., NMG Holdings, Inc.

and Tribune dated July 29, 2008; (ii) that certain Guaranty of Collection entered into on October 27, 2009 made by Tribune to various parties with respect to the obligations of Chicago Baseball Holdings, LLC in respect of the Credit Agreement Loans (as defined therein) and the Private Placement Notes (as defined therein); and (iii) that certain Subordinated Guaranty of Collection entered into on October 27, 2009 made by Tribune to various parties with respect to the obligations of Chicago Baseball Holdings, LLC in respect of the Loans (as defined therein) shall continue in full force and effect.

6.      Cancellation of Liens and Guaranties.

Except as otherwise provided in the Plan, on the Effective Date, any Lien securing any Secured Claim (other than a Lien securing any Other Secured Claim that is Reinstated pursuant to the Plan) shall be deemed released and the Holder of such Secured Claim shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such Holder and to take such actions as may be requested by the Debtors (or the Reorganized Debtors, as the case may be) to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Debtors (or the Reorganized Debtors, as the case may be).  In addition, on the Effective Date, by voting in favor of the Plan, Classes comprised of the Senior Lenders and Bridge Lenders agree that the Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims against the Guarantor Non-Debtors shall be extinguished and cancelled; it beingit is a condition to the release, cancellation and extinguishment of the Senior Loan Guaranty Claims against the Guarantor Non-Debtors that all Bridge Loan Guaranty Claims shall be concurrently released, extinguished and cancelled.  The consummation of the Plan shall effect and constitute a full and final release, extinguishment and cancellation of any and all Senior Loan Guaranty Claims and any and all Bridge Loan Guaranty Claims against Guarantor Non-Debtors.

7.      Exit Facility.

On the Effective Date, without any requirement of further action by security holders or directors of the Debtors or Reorganized Debtors, the Debtors and Reorganized Debtors shall be authorized, but not directed, to enter into the Exit Facility Credit Agreement, if any, as well as any notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.

8.      Equity Incentive Plan.

The Equity Incentive Plan shall be used for the purpose of granting awards to directors, officers and employees of Reorganized Tribune and the other Reorganized Debtors.  The Equity Incentive Pool shall be reserved for issuance in the Equity Incentive Plan, and awards granted under the Equity Incentive Plan may consist of restricted stock, options, stock appreciation rights, warrants and/or other equity or equity-like incentives.  A portion of the Equity Incentive Pool shall be granted to the participants in the Equity Incentive Plan within 120 days after the Effective Date.  The terms and conditions of the Equity Incentive Plan, including participants in the Equity Incentive Plan, will be disclosed prior to the Disclosure Statement hearing or filed as part of the Plan Supplement, if applicableavailable at either time, and shall be acceptable to the Senior Lender Settlement Committee, unless not determined until after the Effective Date, in which case it shall be as determined by the compensation committee of the board of directors of Reorganized Tribune.

9.      Sources of Cash for Plan Distributions.

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Plan may be obtained from existing Cash balances, the operations of the Debtors or the Reorganized Debtors, sales of assets or the Exit Facility.  Subject to Section 5.1 of the Plan, the Reorganized Debtors may also make such payments using Cash received from their Affiliates through the Reorganized Debtors' consolidated cash management systems.

10.      Additional Transactions Authorized Under the Plan.

On or prior to the Effective Date, the Debtors shall be authorized to take any such actions as may be necessary or appropriate to have Claims or Interests Reinstated or render Claims or Interests Unimpaired to the extent provided in the Plan. On the Effective Date, the Agents are authorized and directed to take such actions as are necessary or appropriate to effect all transactions specified or referred to in or provided for under the Plan.

     11.     Settlement of Claims and Controversies.

     (a)     General.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims or controversies relating to the rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Interest, including, without limitation, the settlement of the Senior Loan Guaranty Claims and the Bridge Loan Guaranty Claims and the release of such Claims against the Guarantor Non-Debtors. The entry of the Confirmation Order constitutes the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims, Interests or controversies and the Bankruptcy Court's finding that all such compromises or settlements are in the best interests of (i) the Debtors, the Reorganized Debtors, the Subsidiary Non-Debtors and their respective Debtors' Estates and property, and (ii) Claim and Interest Holders, and are fair, equitable and reasonable on the dates and in the manner set forth in the Plan.

     (b)     Global Settlement Under the Plan.

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the Debtors believe that the provisions of the Plan constitute a good faith compromise and settlement, and the Plan constitutes a request to authorize and approve such compromise and settlement, to release all of the Related Claims, including without limitation the LBO-Related Causes of Action, belonging to the Tribune Entities, the Debtors' Estates, and any other Person that is deemed to have given a release pursuant to Section 11.2 of the Plan against all each and every and all Released Parties (the "Global Settlement").[22] Any distributions to be made pursuant to the Plan shall be made on account of and in consideration of the Global Settlement. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Global Settlement and the Bankruptcy Court's finding that the Global Settlement is in the best interests of the Debtors, the Reorganized Debtors, their respective Debtors' Estates, and the Holders of Claims and Interests, and is fair, equitable and reasonable.

     (c)     Implementation of Retiree Claimant Settlement.

The Plan will implement a settlement between the Debtors and approximately 200 individuals holding claims arising from Non-Qualified Former Employee Benefit Plans relating to their former employment with various of the Debtors or their predecessors (the "Retiree Claims"). The majority of the Retiree Claims arise from non-qualified pension claims and deferred compensation claims. The Debtors scheduled the Retiree Claims in an aggregate amount of approximately $82 million. The holders of the Retiree Claims (the "Retiree Claimants") asserted, through individual proofs of claim, an aggregate amount of approximately $113 million on account of the Retiree Claims. The proposed settlement establishes the Allowed amount of each Retiree Claim, with the total Allowed amount of all Retiree Claims being approximately $103 million. This settlement is embodied in the Stipulation Between Debtors and Retiree Claimants Settling and Allowing Claims (the "Retiree Claimant Settlement Agreement"), which is attached to the Plan as Exhibit 5.14.3. The Retiree

---

[22] For a further discussion of the Leveraged ESOP Transactions and Global Settlement, please refer to Article VII for the Debtors' discussion and analyses of the Leveraged ESOP Transactions and Global Settlement. For the views of certain creditors or creditor representatives, please refer to the Settlement Submissions in the compendium accompanying this Disclosure Statement.

Claimant Settlement Agreement resolves the disputes between the Debtors and the Retiree Claimants regarding: (i) the discount rates and mortality tables most appropriately applied to those Retiree Claims that are based on future annuity payments; (ii) whether the Retiree Claims for deferred compensation are entitled to interest for the prepetition period of the 2008 calendar year; and (iii) with respect to some of the Retiree Claims, the factual basis for such claims, including whether the claimant was entitled to annuity or other benefit payments, the type of annuity or other benefit, and the specific amounts owed.  The Debtors and counsel for the Retiree Claimants worked closely with the Creditors Committee and the Senior Lender Settlement Committee in negotiating the Retiree Claimant Settlement Agreement.

Pursuant to the Retiree Claimants Settlement Agreement, each of the Retiree Claims will be Allowed General Unsecured Claims in the "Total Agreed Amount" indicated on Schedule A to the Retiree Claimants Settlement Agreement.  To the extent a Retiree Claim is a claim for future annuity payments, that component of the Total Agreed Amount has been calculated pursuant to a formula for determining the present value of future annuity payments and the applicable mortality tables (the "Annuity Formula").  The Annuity Formula utilizes the United States Internal Revenue Code § 417(e) Lump Sum Rates for 2008 plan year payments, with (i) applicable interest rates for 2008 plan year payments determined as of January 1, 2008 with a two-month lookback to the November 2007 segment rates of 4.60%, 4.82% and 4.91%, and (ii) the RP-2000 Healthy mortality table (weighted 50% male and 50% female), using scale AA for (x) seven (7) years from the valuation date for annuitants and (y) fifteen (15) years from the valuation date for non-annuitants.  An additional 5.165% of the present value of the future annuity payments (the "Litigation Adjustment") has also been included in the Total Agreed Amounts for those Retiree Claims involving future annuity payments, to represent the compromise, based on the potential cost and outcome of litigating the differences between the discount rates and mortality tables used by the Debtors and those used by the Retiree Claimants.  To the extent any Retiree Claim listed on Schedule A to the Retiree Claimants Settlement Agreement is a claim for deferred compensation payments, that component of the Total Agreed Amount has been calculated to include one half of the amount of interest allocable to the prepetition portion of the 2008 calendar year ("Allowed 2008 Deferred Compensation Interest") that the Retiree Claimants argue accrued under the terms of the relevant plans and agreements.  Each Total Agreed Amount listed on Schedule A to the Retiree Claimants Settlement Agreement shall constitute an Allowed General Unsecured Claim against the specific Debtor identified on the same row as such Total Agreed Amount on Schedule A to the Retiree Claimants Settlement Agreement.

Under the Plan, (i) those Retiree Claims Allowed against Tribune will be classified as Claims in Class 1E and will receive a Cash distribution equal to 35.18% of the Allowed amount of their Retiree Claims, and (ii) those Retiree Claims allowed against Filed Subsidiary Debtors will be classified as Claims in Classes 2E through 111E, and will receive a Cash distribution equal to the full amount of their Allowed Retiree Claims, subject to the potential limitation set forth in Section 3.3.4(c) of the Plan.  Pursuant to the Retiree Claimants Settlement Agreement, the agreed Allowed amounts of the Retiree Claims are conditioned upon confirmation of the Plan, as amended from time to time, or another plan of reorganization, in each case providing for the classification and treatment of the Retiree Claims consistent with their classification and treatment under the Plan.

With respect to claims that are similar in nature to the Retiree Claims but not a part of the Retiree Claimants Settlement Agreement ("Similar Claims"), the Debtors intend to liquidate such Similar Claims consistent with the formulas and principles applicable to the Retiree Claims under the Retiree Claimants Settlement Agreement, including the Annuity Formula, the Allowed 2008 Deferred Compensation Interest, and the Litigation Adjustment.  In order to achieve this result, the Debtors will engage in negotiations with holders of Similar Claims and, as necessary, employ the procedures for objecting to claims described in this Disclosure Statement and the Plan.

Pursuant to Bankruptcy Rule 9019, the Plan implements and incorporates by reference the terms of the The Retiree Claimant Settlement Agreement, which will be filed with the Plan Supplement as is Exhibit 5.14.3 to the Plan, including, without limitation, the Allowance of the Claims of certain Retiree Claimants. Entry of the  Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of

the Plan, of the Retiree Claimant Settlement Agreement and the Bankruptcy Court's finding that the Retiree Claimant Settlement Agreement is in the best interests of the Debtors, the Reorganized Debtors, their respective Debtors' Estates, and the Holders of Claims and Interests, and is fair, equitable and reasonable.

12.    Preservation of Rights of Action and Settlement of Litigation Claims.

Except as otherwise provided in the Plan, the Confirmation Order, or in any document, instrument, release or other agreement entered into in connection with the Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the Debtors and their Debtors' Estates shall retain the Litigation Claims. The Reorganized Debtors, as the successors in interest to the Debtors and the Debtors' Estates, may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Litigation Claims or any other claims, rights of action, suits or proceedings that any Debtor or Estate may hold against any Person that are not otherwise released pursuant to the Plan.

13.    FCC Applications.

The FCC Applications shall be filed with the FCC as promptly as practicable after filing the Plan. The Debtors, the Senior Lenders and any other Holders of Claims that are eligible to receive New Common Stock shall use their best efforts to cooperate in diligently pursuing and in taking all reasonable steps necessary to obtain the requisite FCC Approvals and shall provide such additional documents or information as are reasonably requested by the Debtors or that the Debtors reasonably deem necessary for the FCC's review of such applications. Prior to the Effective Date, the Debtors shall cooperate with counsel for the Senior Loan Agent and the Creditors Committee regarding the FCC Approval, including but not limited to the filing and further prosecution of the FCC Applications, and shall keep such counsels apprised of the status and progress of the FCC Applications.

## H.    Assumption of Executory Contracts and Unexpired Leases.

1.    Assumption, Rejection and Cure Obligations.

Under section 365 of the Bankruptcy Code, the Debtors have the right, subject to Bankruptcy Court approval, to assume or reject executory contracts and unexpired leases to which the Debtors are a party. If a Debtor rejects an executory contract or unexpired lease that it entered into prior to the Petition Date, such contract or lease will be treated as if it were breached by the applicable Debtor(s) on the date immediately preceding the Petition Date, and the other party to the agreement may assert a claim for damages incurred as a result of the rejection, which will be treated as a prepetition unsecured claim pursuant to section 365(g) of the Bankruptcy Code. In the case of the rejection of unemployment agreements and real property leases, damages are subject to certain limitations imposed by sections 365 and 502 of the Bankruptcy Code.

On the Effective Date, all executory contracts or unexpired leases of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such executory contract or unexpired lease (i) was previously assumed or rejected by the Debtors, (ii) previously expired or terminated pursuant to its own terms, (iii) is an executory contract or unexpired lease that is included in the Global Contract Motion, (iv) is an executory contract or unexpired lease that is expressly excluded from the assumptions set forth in Section 6.5 of the Plan or is set forth on Exhibit 6.3 to the Plan, which shall be filed with the Plan Supplement, or (v) is an executory contract or unexpired lease that is included in a pending motion to reject such executory contract or unexpired lease. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed during the Chapter 11 Cases or pursuant to Section 7 of the Plan shall revest in and be fully enforceable by the applicable Reorganized Debtor, including any successor to such Reorganized Debtor after giving effect to the Restructuring Transactions, in accordance with its terms, except as modified by the provisions of the Plan, agreement of the parties thereto, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

Subject to the terms of Section 8 and Section 6.1.1 of the Plan and except for any Customer Program ~~included~~otherwise designated on Exhibit 6.3 to the Plan, ~~each Customer Program~~all refund, and subscriber credit programs, or similar obligations of the Debtors to subscribers or former subscribers to any of the Debtors' publications under the Customer Programs shall be deemed assumed effective ~~as of~~on the Effective Date and the proposed cure amount with respect to each shall be zero dollars. Nothing contained in Section 6.1.2 of the Plan shall constitute or be deemed to be a waiver of any claim or cause of action that the Debtors may hold against any Person. Except with respect to any Customer Programs included on Exhibit 6.3 to the Plan, as a result of the deemed assumption of the Debtors' refund, subscriber credit, and other obligations under the Customer Programs to subscribers and former subscribers pursuant to Section 6.1.2 of the Plan, all Proofs of Claim on account of or in respect of any ~~Customer Program~~such obligations shall be deemed withdrawn automatically and without any further notice to or action by the Bankruptcy Court and the Debtors' Claims Agent shall be authorized as of the Effective Date, to expunge such Proofs of Claim from the claims register.

The Debtors have not yet determined how to treat certain insurance policies issued by ACE American Insurance Company and/or its affiliates (collectively, "ACE") to or on behalf of the Debtors and any related agreements (hereinafter, the "ACE Policies and Agreements"), including whether or not such agreements are executory and whether they will be assumed. Subject to the Debtors' rights, if any, to assume or to reject such contracts, nothing contained in the Disclosure Statement, the Plan, the Confirmation Order, any exhibit to the Plan, any Plan Supplement or any other Plan document (including any provision that purports to be peremptory or supervening), shall in any way operate to, or have the effect of, waiving or impairing in any respect the legal, equitable or contractual rights or defenses of the parties to the ACE Policies and Agreements. For the avoidance of doubt, nothing herein or in the Plan shall be read to authorize the unilateral amendment by the Debtors of any of the terms of the ACE Policies and Agreements. In any event, ACE has reserved all of its rights and defenses under the ACE Policies and Agreements and applicable non-bankruptcy law with respect to the ACE Policies and Agreements.

 2. Cure of Defaults of Assumed Executory Contracts and Unexpired Leases.

The Bankruptcy Code provides for the calculation of "cure amounts" which may, in some instances, be payable by the Debtors to the non-Debtor party in connection with executory contracts or unexpired leases that are assumed by the Debtors. The proposed cure amount for any executory contract assumed pursuant to the Plan shall be zero dollars unless otherwise indicated in a schedule to be filed with the Bankruptcy Court. Any monetary amounts by which each executory contract and unexpired lease to be assumed is in default and not subsequently cured shall be satisfied, pursuant to section 365(b)(l) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree. In the event of a dispute regarding (i) the amount of any cure payments, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (iii) any other matter pertaining to assumption, the cure payments required by section 365(b)(l) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption. Pending the Bankruptcy Court's ruling on such motion, the executory contract or unexpired lease at issue shall be deemed assumed by the relevant Debtor unless otherwise ordered by the Bankruptcy Court.

 3. Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, each executory contract and unexpired lease that is listed on Exhibit 6.3 to the Plan, which shall be filed with the Plan Supplement, shall be rejected pursuant to Section 365 of the Bankruptcy Code. Each contract or lease listed on Exhibit 6.3 to the Plan shall be rejected only to the extent that any such contract or lease constitutes an executory contract or unexpired lease. The Debtors reserve their right to amend Exhibit 6.3 to the Plan to delete any unexpired lease or executory contract therefrom or add any unexpired lease or executory contract thereto. Listing a contract or lease on Exhibit 6.3 to the Plan shall not constitute an

admission by a Debtor nor a Reorganized Debtor that such contract or lease is an executory contract or unexpired lease or that such Debtor or Reorganized Debtor has any liability thereunder.

        4.       Rejection Damages Bar Date.

If the rejection by a Debtor, pursuant to the Plan, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor, or the properties of any of them, unless a Proof of Claim is filed and served upon counsel to the Debtors within 30 days after service of the notice that the executory contract or unexpired lease has been rejected.

        5.       Compensation and Benefit Programs.

Except as set forth in Article IV.C.2 herein and such other plans as may be disclosed in the Plan Supplement, the Reorganized Debtors shall continue to perform their obligations under all Employee Benefit Plans and all such Employee Benefit Plans shall be assumed by the applicable Reorganized Debtors; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, causes of action, or other rights with respect to the interpretation, application, or enforcement of any such Employee Benefit Plan or the payment of any Employee Benefit Claim, including the Reorganized Debtors' rights to amend, modify, or terminate any such Employee Benefit Plan either prior to or after the Effective Date.

The ~~Debtors will address the inclusion in the Plan of the TMIP and the KOB in a supplement that will be filed by the Debtors prior to the hearing on approval of the Disclosure Statement.~~ Plan incorporates and implements the TMIP and KOB programs set forth in the 2009 MIP Motion and exhibits thereto, subject to the modifications discussed herein. The following information is only a summary. The TMIP and the KOB are components of the 2009 Management Incentive Plan that the Debtors sought authority to implement in the 2009 MIP Motion, filed on July 22, 2009. At that time, the TMIP and KOB participants consisted of 38 key executives and managers who also participate in the MIP. The TMIP and KOB were intended to incentivize strong operational performance and to tie compensation to the operating performance of the Company, thereby achieving market-based compensation opportunities for the Debtors' key management team. The TMIP and KOB programs, including the performance targets and payout opportunities thereunder, were developed with and analyzed by Mercer, an independent compensation consulting firm retained by Tribune under the leadership of the Compensation Committee. Mercer concluded that the various incentive programs under the 2009 Management Incentive Plan are all within reasonable market ranges and are common forms of compensation for companies in chapter 11. The Guild and the United States Trustee disagree with Mercer's conclusions. The Compensation Committee specifically reviewed and approved the TMIP and KOB. The Creditors Committee supported the Debtors' request to implement the TMIP and KOB in the 2009 MIP Motion.

The Guild and the United States Trustee filed objections to the 2009 MIP Motion, which included the 2009 MIP, the TMIP and the KOB. These objections were litigated at an evidentiary hearing before the Bankruptcy Court on September 25, 2009. A complete transcript of the September 25, 2009 hearing is available upon written request to counsel for the Debtors. Upon the conclusion of the hearing, the Debtors asked the Bankruptcy Court to consider the MIP, TMIP and KOB as an integrated whole, not in parts. The Court then took under advisement, and did not immediately rule on, the 2009 MIP, TMIP and KOB programs.

At a hearing on January 27, 2010, in response to the Debtors' request that the 2009 MIP, TMIP and KOB now be considered separately, the Bankruptcy Court approved the 2009 MIP, and suggested that the Debtors consider incorporating the TMIP and KOB into a chapter 11 plan of reorganization. The Debtors followed the Bankruptcy Court's suggestion, and filed a motion to voluntarily dismiss, without prejudice, their request for entry of an order authorizing the implementation of the TMIP and KOB. Following a March 23, 2010 hearing on this motion, the Bankruptcy Court entered an order that day granting this motion. At that hearing, the Court stated that "regardless of what my expressed words were at the [January 27, 2010] hearing, I didn't suggest that the part of the plan that was proposed and which I had under advisement should or could be the same plan that was under consideration or that I would approve it in the context of the confirmation." The

Court further stated that it was not providing "any inclination of whether in that context it should be approved or not." The Court also stated that "whatever record was made [with respect to the TMIP and KOB, including at the September 25, 2009 hearing] would be included in whatever presumably confirmation hearing record was made if there were still objections to it."

The Debtors expect that the Guild and the United States Trustee will maintain their objections to the 2009 TMIP and the KOB at the confirmation hearing on the Plan on the ground that both violate the Bankruptcy Code. The Debtors disagree with these objections and believe that the TMIP and KOB are valid programs.

The TMIP is a self-funding performance-based incentive compensation program that provides for payouts based on the Debtors' level of achievement of consolidated operating cash flow ("OCF") for 2009. TMIP participants consist of 20 management employees who hold key positions with top-level responsibility (including nine of the Debtors' Top 10 executives as defined in the 2009 MIP Motion) and who also are principally responsible for the Debtors' restructuring efforts. The then-President of Tribune Broadcasting, who was identified in the 2009 MIP Motion as a Top 10 participant in the TMIP and KOB, has assumed a different position with Tribune in 2010 and, by agreement, no longer will participate in the TMIP or the KOB. The TMIP also provides for a discretionary incentive pool from which the Debtors may make individual awards to up to 50 additional employees who, in the Debtors' judgment, made valuable contributions to the Debtors' restructuring efforts during 2009 (with no single award to exceed $65,000 at the "maximum" payout level). Based on the Debtors' level of consolidated OCF in 2009, payments under the TMIP will be made at the maximum levels specified for that program. Aggregate TMIP payments will total approximately $11.6 million (including the $1.3 million discretionary pool). Payouts will be made upon the Effective Date of the Plan.

The KOB is a self-funding performance-based incentive compensation plan that generally provides for payouts based on the level of incremental OCF achieved by individual business units above their "stretch" level OCF goals for 2009. In total, 21 key operating leaders (two fewer than originally proposed) who oversee the Debtors' primary operating business units participate in the KOB (five of whom also are eligible to participate in the TMIP). The aggregate payouts under the KOB will be approximately $4.6 million. As with the TMIP payouts, payouts under the KOB will be made upon the Effective Date of the Plan.

Due to certain participant reductions in the TMIP and KOB, the fact that two KOB participants did not achieve their KOB targets, and the fact that certain other KOB participants did not earn maximum-level KOB payouts per the terms of the KOB, the aggregate amount payable under the TMIP and KOB – approximately $16.2 million – is approximately $5 million less than the aggregate maximum payout proposed in the 2009 MIP Motion (approximately $21.2 million).

6.    Collective Bargaining Agreements.

Upon the Effective Date, any Collective Bargaining Agreement entered into by the Debtors that has not expired by its terms and is in effect as of the Effective Date shall be deemed to have been assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the survival, and/or the pertinent Debtor's assumption of the Collective Bargaining Agreements then in effect, except to the extent that such agreements have already been assumed prior to the entry of the Confirmation Order.

7.    Post-Petition Contracts and Leases.

All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors after the Petition Date shall be deemed assigned by such Debtors to the Reorganized Debtors, including any successor to any Reorganized Debtor after giving effect to the Restructuring Transactions, on the Effective Date.

8.    Termination of ESOP.

Upon the Effective Date, the ESOP shall be deemed terminated in accordance with its terms, and the amount of unpaid principal and interest remaining on the ESOP Note dated April 1, 2007 shall be forgiven pursuant to section 6.3 of the ESOP Loan Agreement by and between Tribune and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust dated April 1, 2007.  In connection with Tribune's forgiveness of the balance due under the ESOP Note, the Debtors will seek, in their sole discretion, (i) confirmation that Tribune has a right under the ESOP Plan and ESOP Note to forgive the ESOP's obligations; (ii) confirmation that Tribune's forgiveness of any post-petition payments due from the ESOP in connection with the ESOP Note, including, without limitation, the payment due on or about April 1, 2009, was in compliance with the ESOP Note and ESOP Plan and satisfied Tribune's obligations, if any, under the ESOP Plan to make a contribution to the ESOP during the relevant time period; (iii) a determination of the amount of the balance of the ESOP Note being forgiven, the value of any obligations of the ESOP owed to Tribune under the ESOP Note, and the legal effect of the forgiveness of the ESOP Note. Approval of the Plan is not conditioned upon these determinations, but these determinations may be sought in connection with the Plan. The Debtors intend to provide the DOL with reasonable notice and an opportunity to be heard with respect to any such filing.

**I.**     **Provisions Governing Distributions to Holders of Certain Allowed Claims and Interests Under the Plan.**

1.     General.

Unless the Holder of an Allowed Claim or Allowed Interest against any of the Debtors and the Debtors or the Reorganized Debtors agree to a different distribution date or except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, (i) distributions to be made on account of Claims or Interests that are Allowed as of the Effective Date shall be made on the Initial Distribution Date or as soon thereafter as is practicable and (ii) distributions to be made on account of Claims or Interests that become Allowed after the Effective Date shall be made on the succeeding Quarterly Distribution Date or as soon thereafter as is practicable. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

2.     Distributions for Certain Claims.

(a)     Distributions to Holders of Other Parent Claims.

i.     Other Parent Claim Reserve.

On or as soon as practicable after the Effective Date, Reorganized Tribune shall establish one or more Other Parent Claims Reserve(s) to make distributions to Holders of Disputed Claims that become Allowed Other Parent Claims after the Effective Date. The amount of Distributable Cash contributed to the Other Parent Claims Reserve(s) shall be equal to the amount of Distributable Cash necessary to satisfy the distributions required to be made pursuant to the Plan based upon the Face Amount of Disputed Other Parent Claims that may be entitled to receive a distribution of Distributable Cash if such Disputed Claims are subsequently Allowed Other Parent Claims.

ii.     Distributions On Account of Disputed Claims Once Allowed.

On each Quarterly Distribution Date, the Disbursing Agent shall make distributions of Distributable Cash, in accordance with the terms of the Plan, from the Other Parent Claims Reserve(s) to each Holder of a Disputed Claim that has become an Allowed Other Parent Claim during the preceding calendar quarter and that is entitled to receive such a distribution. On or as soon as practicable after the Final Distribution Date, after distributions are made to Holders of Disputed Claims that have become Allowed Other Parent Claims during the preceding calendar quarter, any Distributable Cash remaining in the Other Parent Claims Reserve(s) shall be distributed Pro Rata to the Holders of Allowed Loan Claims against Tribune entitled to receive a distribution under Section 3.2.3(c) and Section 3.2.4(b)(i) of the Plan.

3.    Distributions to Holders of General Unsecured Claims Against Filed Subsidiary Debtors.

(a)    Subsidiary GUC Reserve.

If pursuant to Section 3.3.4(b) of the Plan, Holders of Allowed Claims in Classes 2E through 111E shall receive their Pro Rata share of $150 million or any other amount, rather than receiving payment in Cash in full, on or as soon as practicable after the Effective Date, Reorganized Tribune shall establish one or more Subsidiary GUC Reserve(s) to make distributions to Holders of Disputed Claims that become Allowed General Unsecured Claims against a Filed Subsidiary Debtor after the Effective Date.  The amount of Cash contributed to the Subsidiary GUC Reserve(s) shall be equal to the amount of Cash necessary to satisfy the distributions required to be made pursuant to the Plan based upon the Face Amount of Disputed Claims that may be entitled to receive a distribution of Cash if such Disputed Claims are subsequently Allowed General Unsecured Claims against such Debtors.

(b)    Distributions On Account of Disputed Claims Once Allowed.

If one or more Subsidiary GUC Reserves are established, on each Quarterly Distribution Date, the Disbursing Agent shall make distributions of Cash, in accordance with the terms of the Plan, from the Subsidiary GUC Reserve(s) to each Holder of a Disputed Claim that has become an Allowed General Unsecured Claim against a Filed Subsidiary Debtor during the preceding calendar quarter and that is entitled to receive such a distribution. In addition, on the first and third Quarterly Distributions Dates of each calendar year, the Debtors shall make additional interim distributions from any excess Cash in the Subsidiary GUC Reserve(s) to Holders of Allowed General Unsecured Claims against the Filed Subsidiary Debtors if the Debtors determine, in their sole discretion, that (i) the amount of such excess Cash equals or exceeds ten percent (10%) of the aggregate Face Amount of such Allowed General Unsecured Claims against Filed Subsidiary Debtors and (ii) the aggregate amount of Cash held in the Subsidiary GUC Reserve(s) after such distribution will equal or exceed the maximum amount that the Debtors reasonably estimate is required to satisfy any remaining Disputed Claims that subsequently become Allowed General Unsecured Claims against such Filed Subsidiary Debtors after such Distribution Date.  On or as soon as practicable after the Final Distribution Date, after initial distributions are made to Holders of Disputed Claims that have become Allowed General Unsecured Claims against a Filed Subsidiary Debtor during the preceding calendar quarter, any Cash remaining in the Subsidiary GUC Reserve(s) shall be distributed Pro Rata to the Holders of Allowed General Unsecured Claims entitled to receive such distributions in accordance with the terms of the Plan; provided, however, that no Holder of an Allowed General Unsecured Claim shall receive more than payment in full of the principal amount of such Claim and no Holder of an Allowed General Unsecured Claim shall receive post-petition interest.

4.    Special Provisions Governing Distributions to Holders of Loan Claims and Loan Guaranty Claims.

Other than as specifically set forth in the Plan, distributions made on account of Loan Claims and Loan Guaranty Claims shall be made by the Disbursing Agent to the applicable Loan Agent for further distribution in accordance with the terms of the applicable Loan Agreement or Loan Guaranty Agreement.  In order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions that would otherwise be made on behalf of the Holdersaccount of Allowed Bridge Loan Guaranty Claims shall be distributed to the Senior Loan Agent, and no distribution shall be provided to Holders of Allowed Bridge Loan Guaranty Claims.

5.    Interest on Claims.

Except as otherwise specifically provided for in the Plan, the Confirmation Order or other order of the Bankruptcy Court (including, without limitation, the Final DIP Order), or required by applicable bankruptcy law, post-petition interest shall not be paid on any Claims, and no Holder of a Claim shall be entitled to be paid interest accruing on or after the Petition Date on any Claim without regard to whether such amount has accrued

for federal income tax purposes. Any post-petition interest that has been accrued for federal income tax purposes shall be cancelled as of the Effective Date.

      6.      Distributions by Disbursing Agent.

Other than as specifically set forth in the Plan, the Disbursing Agent shall make all distributions required to be made under the Plan. The Reorganized Debtors may act as Disbursing Agent or may employ or contract with other entities to act as the Disbursing Agent or to assist in or make the distributions required by the Plan. Law Debenture shall act as the Disbursing Agent for the Senior Noteholder Claims for which it is the Indenture Trustee. Other than as specifically set forth in the Plan, the distributions to be made on account of Senior Noteholder Claims shall be made in accordance with the terms of the particular Indenture or in accordance with the Plan where such Indenture is silent.

      7.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.

      (a)      Delivery of Distributions in General.

Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the Debtors' records unless such addresses are superseded by Proofs of Claim or transfers of claim filed pursuant to Bankruptcy Rule 3001.

      (b)      Undeliverable and Unclaimed Distributions.

      i.      General.

The Reorganized Debtors and the Disbursing Agent shall have no duty to make distributions to any Holder of an Allowed Claim with an undeliverable address as determined by any undeliverable or returned notice to the Debtors since the commencement of the Chapter 11 Cases unless and until the Reorganized Debtors or the Disbursing Agent are notified in writing of such Holder's then-current address prior to the Distribution Record Date. If the distribution to any Holder of an Allowed Claim or Interest is returned to the Reorganized Debtors or the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtors or the Disbursing Agent are notified in writing of such Holder's then-current address.

      ii.      Non-Negotiated Check Voucher Distributions.

Checks issued on account of Allowed Claims shall be null and void if not negotiated within 90 calendar days from and after the date of issuance thereof. Requests for reissuance of any check must be made directly and in writing to the Disbursing Agent by the Holder of the relevant Allowed Claim within the 90-calendar-day period. After such date, such Allowed Claim (and any Claim for reissuance of the original check) shall be automatically discharged and forever barred, and such funds shall revert to the Reorganized Debtors, notwithstanding any federal or state escheat laws to the contrary.

      iii.      Failure to Claim Undeliverable Distributions.

Except as otherwise expressly provided in the Plan, any Holder of an Allowed Claim or Interest that does not assert a claim pursuant to the Plan for an undeliverable or unclaimed distribution within one year after the Effective Date shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution against the Debtors or their Debtors' Estates or the Reorganized Debtors or their property. In such cases, any Cash for distribution on account of such claims for undeliverable or unclaimed distributions shall become the property of the Debtors' Estates and the Reorganized Debtors free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New Common Stock or New Warrants held for distribution on account of such Claim shall be canceled and of no further force or effect. Nothing

contained in the Plan shall require any Disbursing Agent, including, but not limited to, the Reorganized Debtors, to attempt to locate any Holder of an Allowed Claim or Interest.

8.      Record Date for Distributions

With the exception of Senior Noteholder Claims, the Reorganized Debtors and the Disbursing Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Claim or Interest that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes in the Plan to recognize and distribute only to those Holders of Allowed Claims or Interests (including Holders of Claims and Interests that become Allowed after the Distribution Record Date) that are Holders of such Claims or Interests, or participants therein, as of the close of business on the Distribution Record Date. With the exception of Senior Noteholder Claims, the Reorganized Debtors and the Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date.

Unless otherwise set forth in the Confirmation Order, the Debtors shall not establish a record date for distributions to Holders of Senior Noteholder Claims. Distributions to Holders of Senior Noteholder Claims held through the Depository Trust Company ("DTC") shall be made by means of book-entry exchange through the facilities of the Depository Trust Company ("DTC")DTC in accordance with the customary practices of DTC, as and to the extent practicable, and the Distribution Record Date shall not apply. In connection with such book-entry exchange, eachTribune will provide rate information to each Senior Notes Indenture Trustee, which such Senior Notes Indenture Trustee shall deliver instructions to DTC instructingconvey to DTC to effect distributions on a Pro Rata basis as provided under the Plan with respect to such Claims upon which such Senior Notes Indenture Trustee acts as trustee. Subject to Section 7.5.2 of the Plan, distributions of Cash to Holders of Allowed Senior Noteholder Claims shall be made to the applicable Senior Notes Indenture Trustees, which, in turn, shall make such distributions to the applicable Holders either through DTC or, in the case of Senior Noteholder Claims held directly by the Holder thereof, through the applicable Senior Notes Indenture Trustee subject to the respective rights, claims and interests, if any, that the Senior Notes Indenture Trustees may have under the applicable Senior Notes Indentures or otherwise to the recovery and/or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder to the Holders of Allowed Senior Noteholder Claims, whether such rights, claims or interests are in the nature of a charging lien or otherwise. Distributions of the New Senior Secured Term Loan and the New Common Stock to Holders of Senior Noteholder Claims shall be made by the Disbursing Agent either through DTC or, in the case of Senior Noteholder Claims held directly by the Holder thereof, through the Disbursing Agent upon surrender or deemed surrender of such Holder's Senior Notes except as otherwise provided in the Plan.

9.      Allocation of Plan Distributions Between Principal and Interest.

Except as otherwise expressly provided in the Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

10.     Means of Cash Payment.

Payments of Cash made pursuant to the Plan shall be made, at the option and in the sole discretion of the Reorganized Debtors, by (i) checks drawn on, (ii) automated clearing house transfer from, or (iii) wire transfer from a bank selected by the Reorganized Debtors. Cash payments to foreign creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

11.    Withholding and Reporting Requirements.

In connection with the Plan and all distributions hereunder, the Reorganized Debtors or the Disbursing Agent, as applicable, shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. All persons holding Claims or Interests shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan, (i) each Holder of an Allowed Claim that is to receive a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution and (ii) no distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations. Nothing in the preceding sentence shall affect distributions under the Plan to the Senior Loan Agent, the Bridge Loan Agent, the Senior Notes Indenture Trustees, or the Holders of Allowed Loan Claims or Senior Noteholder Claims.

12.    Setoffs.

The Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim (other than Allowed Claims in Classes 1C and 50C through 111C, which under no circumstances shall be subject to set off) the payments or other distributions to be made pursuant to the Plan in respect of such Claim, or claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Holder.

13.    Fractional Shares.

No fractional shares of New Common Stock or New Warrants shall be distributed. Where a fractional share would otherwise be called for, the actual issuance shall reflect a rounding up (in the case of more than 0.50) of such fraction to the nearest whole share of New Common Stock or New Warrant or a rounding down of such fraction (in the case of 0.50 or less than 0.50) to the nearest whole share of New Common Stock or New Warrant. The total number of shares of New Common Stock or New Warrants to be distributed pursuant to the Plan shall be adjusted as necessary to account for the rounding provided for in the Plan.

14.    De Minimis Distributions.

No distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.

15.    Special Provision Regarding Unimpaired Claims.

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

16.    Subordination.

The distributions and treatments provided to Claims and Interests under the Plan take into account and/or conform to the relative priority and rights of such Claims and Interests under any applicable

113

subordination and turnover provisions in any applicable contracts, including without limitation, the PHONES Notes Indenture and the EGI-TRB LLC Notes, and nothing in the Plan shall be deemed to impair, diminish, eliminate, or otherwise adversely affect the rights or remedies of beneficiaries (including, for the avoidance of doubt, their respective Senior Notes Indenture Trustees and Agents, as applicable) of any such contractual subordination and turnover provisions.

**J.**     **Provisions For Resolving Disputed Claims And Disputed Interests.**

     1.     Objections to and Estimation of Claims.

After the Effective Date, only the Reorganized Debtors may object to the allowance of any Claim or Administrative Expense Claim.  After the Effective Date, the Reorganized Debtors shall be accorded the power and authority to allow or settle and compromise any Claim without notice to any other party, or approval of, or notice to the Bankruptcy Court.  In addition, the Debtors or the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Reorganized Debtors have previously objected to such Claim.  Unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtors shall serve and file any objections to Claims and Interests as soon as practicable, but in no event later than (i) 210 days after the Effective Date or (ii) such later date as may be determined by the Bankruptcy Court upon a motion which may be made without further notice or hearing.

     2.     Payments and Distributions on Disputed, Contingent, and Unliquidated Claims and Interests and On Claims for Which Proofs of Claim are Filed.

No partial payments and no partial distributions will be made with respect to a disputed, contingent or unliquidated Claim or Interest, or with respect to any Claim for which a Proof of Claim has been filed, until the resolution of such disputes or estimation or liquidation of such claims by settlement or by Final Order.  On the next Distribution Date after a disputed, contingent or unliquidated Claim or Interest becomes an Allowed Claim or Interest in an amount certain, the Holder of such Allowed Claim or Interest will receive all payments and distributions to which such Holder is then entitled under the Plan.

**K.**     **Confirmation and Consummation of the Plan.**

     1.     Conditions to Effective Date of the Plan.

The Plan shall not become effective and the Effective Date shall not occur unless and until the following conditions shall have been satisfied or waived in accordance with Section 10.2 of the Plan:

     (a)     The Confirmation Order confirming the Plan, as the Plan may have been modified in accordance with the terms of the Plan, shall conform to the Plan in all respects and shall have been entered by the Bankruptcy Court in form and substance reasonably satisfactory to the Debtors, the Senior Lender Settlement Committee and the Creditors Committee.

     (b)     The Confirmation Order shall authorize and approve the Global Settlement.[23]

     (c)     The Certificate of Incorporation and By-Laws and any amended certificates or articles of incorporation, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents of the other Debtors, as necessary, shall have been adopted and filed with the applicable authorities of the relevant jurisdictions and shall become effective on the Effective Date in accordance with such jurisdictions' laws.

---

[23] For a further discussion of the Global Settlement, please refer to Article VII herein for the Debtors' discussion and analyses of the Global Settlement.  For the views of certain creditors or creditor representatives, please refer to the Settlement Submissions in the compendium accompanying this Disclosure Statement.

(d)    All authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement the Plan on the Effective Date shall have been obtained or shall have occurred unless failure to do so will not have a material adverse effect on the Reorganized Debtors.

(e)    At least seven members of the board of directors of Reorganized Tribune shall have been selected and shall have expressed a willingness to serve on the board of directors of Reorganized Tribune.

(f)    All other documents and agreements necessary to implement the Plan on the Effective Date shall have been executed and delivered and all other actions required to be taken in connection with the Effective Date shall have occurred.

(g)    All consents, approvals and waivers from the FCC that are necessary or that the Debtors deem appropriate to consummate the transactions contemplated in the Plan and to continue the operation of the Debtors' ownership structure shall have been obtained in form and substance reasonably satisfactory to the Debtors and the Senior Lender Settlement Committee.

(h)    The Confirmation Order shall include the language set forth in Section 11.3 and Section 11.4 of the Plan.

(i)    If Class 1D votes to reject the Plan, the class, in the aggregate, shall not be entitled to consideration materially in excess of that determined by (x) application of the mid-point estimate of total "Distributable Value" as defined and set forth in this Disclosure Statement and (y) the allocation of such "Distributable Value" underlying the recoveries of Holders of Claims against Tribune under the Plan.

2.    Waiver of Conditions.

Except for the condition set forth in Section 10.1.1(b) of the Plan (which may not be waived, modified or amended), each of the remaining conditions set forth in Section 10.1.1 of the Plan may be waived in whole or in part by the Debtors with the consent of the Senior Lender Settlement Committee, such consent not to be unreasonably withheld, without the need for notice or a hearing (except that notice shall be provided to the Creditors Committee); provided, however, that the Debtors may not waive any condition the waiver of which is proscribed by law; provided, further, however, that any waiver of the condition set forth in Section 10.1.1(i) shall also require the consent of Centerbridge, such consent not to be unreasonably withheld..

3.    Consequences if Confirmation Order is Vacated.

If the Confirmation Order is vacated, (i) the Plan shall be null and void in all respects; (ii) any settlement of Claims or Interests provided for in the Plan shall be null and void without further order of the Bankruptcy Court; and (iii) the time within which the Debtors may assume and assign or reject all executory contracts and unexpired leases of personal property shall be extended for a period of 120 days after the date the Confirmation Order is vacated.

L.    **Injunctions, Releases And Discharge.**

1.    Discharge.

(a)    Discharge of Claims and Termination of Interests.

As of the Effective Date, except as provided in the Plan, the distributions and rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be in exchange for, and in complete discharge of, all Claims against the Debtors, and in satisfaction of all Interests and the termination of Interests in Tribune.  In accordance with Section 7.4 of the Plan, as of the Effective Date any interest accrued on

Claims against the Debtors from and after the Petition Date shall be cancelled.  Accordingly, except as otherwise provided in the Plan or the Confirmation Order, confirmation of the Plan shall, as of the Effective Date, (i) discharge the Debtors from all Claims or other debts that arose before the Effective Date, and all debts of the kind specified in sections 502(g) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code (or is otherwise resolved), or (c) the Holder of a Claim based on such debt has accepted the Plan; and (ii) satisfy, terminate or cancel all Interests and other rights of equity security holders in the Debtors except as otherwise provided in the Plan.  In addition, confirmation of the Plan shall, as of the Effective Date, authorize the release of the Senior Loan Guaranty Claims and the Bridge Loan Guaranty Claims against the Guarantor Non-Debtors.

As of the Effective Date, except as provided in the Plan, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, or their respective successors or property, any other or further Claims, debts, rights, causes of action, liabilities or Interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Petition Date and from asserting against the Guarantor Non-Debtors any Senior Loan Guaranty Claims or Bridge Loan Guaranty Claims.  In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims and other debts and liabilities of the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent such judgment is related to a discharged Claim.

(b)      Discharge Injunction.

Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that hold, have held, or may hold a Claim or other debt or liability that is discharged, or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan, are permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims, debts or liabilities, or terminated Interests or rights: (i) commencing or continuing any action or other proceeding against the Debtors, the Reorganized Debtors or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Debtors, the Reorganized Debtors or their respective property; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Debtors, the Reorganized Debtors or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Debtors, the Reorganized Debtors or their respective property; and (v) commencing or continuing any judicial or administrative proceeding, in any forum, that does not comply with or is inconsistent with the provisions of the Plan.

2.      Releases

The Plan contemplates that certain releases will be provided to the following Released Parties: (i) the Debtors, their non-Debtor Affiliates including the Subsidiary Non-Debtors and the Reorganized Debtors, (ii) the Creditors Committee, in such capacity, and its present and former members, in their capacity as members of the Creditors Committee, (iii) the Senior Lenders, the Senior Loan Agent, the Senior Lender Steering Committee, the Senior Lender Settlement Committee, the Bridge Lenders (subject to section 4.6.3 of the Plan), the Bridge Loan Agent (subject to section 4.6.3 of the Plan), the Former Bridge Loan Agent (subject to section 4.6.3 of the Plan if the Former Bridge Loan Agent or any of its Related Persons is a Bridge Lender or is otherwise entitled to vote on the Plan as of the voting record date) and the Holder of the Barclays Swap Claim, in each case in all of their respective capacities, (iv) the EGI-TRB LLC Noteholders and the holders of the EGI-TRB LLC Warrant, in each case in all of their respective capacities, (v) Centerbridge, the Senior Noteholders, and the Senior Notes Indenture Trustees, in each case in all of their respective capacities, and (vi) all of the respective Related Persons to each of the foregoing parties.

The releases provided pursuant to the Plan to the Released Parties are a central and important element of the Plan.  The releases of parties other than the LBO Lenders are necessary to provide the LBO Lenders with a full and final resolution of all claims against them in return for their substantial financial contributions to the Global Settlement.[24]  Without such releases, the initiation of litigation against participants in the Leveraged ESOP Transactions other than the LBO Lenders undoubtedly would result in the LBO Lenders being drawn into the litigation by reason of the immediate assertion of claims by the other participant defendants against the LBO Lenders.  In addition, by eliminating the need for further litigation, the releases will enable the Debtors to exit bankruptcy sooner than otherwise would be possible and will allow the Reorganized Debtors to devote their full time and attention, without distraction from litigation, to their businesses.

        (a)      Releases by Debtors and Debtors' Estates.

In the Plan, the Debtors provide releases to the Released Parties from almost all claims existing on or prior to the Effective Date, including with respect to the LBO-Related Causes of Action, which releases are supported by related anti-suit injunctions.

~~Except~~Specifically, Section 11.2.1 of the Plan provides that, except for those Claims expressly preserved in Section 11.2.6 of the Plan ~~or the Confirmation Order~~, on the Effective Date and effective simultaneously with the effectiveness of the Plan, the Reorganized Debtors on their own behalf and as representatives of their respective estates, release unconditionally and hereby cause the Subsidiary Non-Debtors to release unconditionally, and are hereby deemed to release unconditionally, each and all of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claims), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Debtors' Estates, the Chapter 11 Cases or the Plan, the Disclosure Statement or the Restructuring Transactions (the "<u>Debtor Released Claims</u>"); <u>provided</u>, <u>however</u>, that, with the exception of LBO-Related Causes of Action, nothing in Section 11.2 of the Plan shall be construed to release any party from willful misconduct or gross negligence as determined by a Final Order.  The releases contained in Section 11.2 of the Plan shall not apply to or otherwise affect the Morgan Stanley Claims or the obligations of any of the Debtors' officers or directors to repay loans or advances of money or other property contractually owed to the Debtors or their ~~Debtors'~~ Estates with respect to loans or advances of money that the Debtors guaranteed on behalf of such officers or directors.  Furthermore, notwithstanding the foregoing, such release, waiver, and discharge shall not operate as a release, waiver, or discharge of any express contractual commercial obligations arising in the ordinary course of any Person to the Debtors not directly related to the LBO-Related Causes of Action.  On the Effective Date, each Guarantor Non-Debtor will provide each Holder of a Loan Guaranty Claim against the Guarantor Non-Debtors and the Senior Loan Agent and Bridge Loan Agent a release of such scope in consideration for the Guarantor Non-Debtor Release contemplated hereby.

The Debtors believe that the aforementioned releases by the Debtors and the Debtors' Estates are necessary, fair reasonable and in the best interests of the Debtors' Estates for a number of reasons.  As an initial matter, a suit against certain of the Released Parties would give rise to claims against the Debtors which could deplete the assets of the Debtors' Estates.  For example, litigation involving present and former directors, officers or employees of the Debtors likely would trigger statutory, contractual and/or common law claims for

---

[24] For a further discussion of the Global Settlement, please refer to Article VII herein for the Debtors' discussion and analyses of the Global Settlement.  For the views of certain creditors or creditor representatives, please refer to the Settlement Submissions in the compendium accompanying this Disclosure Statement.

advancement, indemnification and/or contribution from the Debtors, as would litigation involving the advisers, Mr. Zell and the Zell Entity.

Substantial financial contributions to the reorganization also have been and will be made either directly by or indirectly on behalf of the Released Parties. The LBO Lenders will contribute significant value to the Senior Noteholders and Holders of General Unsecured Claims in connection with the Global Settlement. The directors, officers and employees of the Debtors also have made substantial non-financial contributions by designing and implementing the operational restructuring of the Debtors and participating in the informal discovery process relating to the LBO-Related Causes of Action and in the negotiations relating to the Plan. The LBO Lenders, the advisers and others also have made substantial non-financial contributions by participating in the informal discovery process and settlement negotiations.

In addition, the releases are essential to the reorganization in that they are an integral part of the agreement by the LBO Lenders to fund the Plan. They also are necessary to the continued success of the Reorganized Debtors because they assure that the directors, officers and employees of the Debtors are not distracted by litigation of the LBO-Related Causes of Action. They constitute a critical and essential condition to the Plan because they provide the necessary assurances that the Plan will result in the full and final resolution of all outstanding claims, and, in the absence of such releases, the LBO Lenders would likely be unwilling to provide the significant value to the Senior Noteholders and the Holders of General Unsecured Claims that is embodied in the Plan.

      (b)     Releases by Holders of Claims and Interests.

Section 11.2.2 of the Plan also provides that each Holder of a Claim or Interest that has voted to accept the Plan or is deemed to have accepted the Plan, that has voted to reject the Plan but has opted to grant the releases in the Plan, or who otherwise agrees to grant the releases set forth in the Plan, shall be deemed to have released each and all of the Released Parties from almost all non-Estate Claims existing on or before the Effective Date, including Claims against any third parties alleging ERISA violations. Any creditor who is a plaintiff in the Neil litigation and who grants a third party release would be releasing his or her claims against the defendants in the Neil litigation. In addition, unless such Holder otherwise agrees to grant the releases provided in Section 11.2.2 of the Plan, each Holder of a Claim or Interest that is deemed to reject the Plan shall not be deemed to provide such releases.

Any Holder of a Claim or Interest that elects not to grant the release set forth in Section 11.2.2 of the Plan shall not receive the benefit of the releases of other Holders of Claims or Interests set forth in Section 11.2.2 of the Plan. The Plan further provides that all Holders of Loan Guaranty Claims against Guarantor Non-Debtors shall be deemed on the Effective Date to have granted the Guarantor Non-Debtor Release and to have relieved the LBO Lenders and others from any liability on account of the Senior Loan Guaranty Claims or the Bridge Loan Guaranty Claims.

ExceptSpecifically, section 11.2.2 of the Plan states that except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of the Plan, each Person (i) that has voted to accept the Plan or is deemed to have accepted the Plan, (ii) that has not voted to acceptreject the Plan but that has received a Ballot and that has nothas opted out ofto grant the releases in Section 11.2.2 of the Plan, or (iii) who otherwise agrees to provide the releases set forth in Section 11.2.2 of the Plan, shall be deemed to have unconditionally released each and all of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claim), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Effective Date that are in connection with the Debtors or

any of them, or their respective assets, property and ~~Debtors'~~ Estates, the Chapter 11 Cases or the Plan, Disclosure Statement or the Restructuring Transactions (the "Holder Released Claims" and together with the Debtor Released Claims the "Released Claims"); provided, however, that nothing in Section 11.2.2. of the Plan shall be construed as a release of any Claims against non-Debtors arising under ERISA held by the DOL; provided, further, that no agent or indenture trustee is, by virtue of giving its own release hereunder, releasing individual claims, if any, of lenders or noteholders for which it acts as agent or indenture trustee that are not themselves Released Parties. Furthermore, notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of, except as provided in Sections 11.2.5 of the Plan with respect to the Guarantor Non-Debtors, any express contractual obligation of any non-Debtor party due to any other non-Debtor party.

        (c)       Failure to Grant Release.

Any Holder of a Claim or Interest that has timely submitted to the Debtors or filed with the Court a Ballot opting not to grant the releases set forth in Section 11.2.2 shall not receive the benefit of the releases set forth in Section ~~11.2~~11.2.2 of the Plan (if otherwise entitled).

        (d)       Injunction Related to Releases.

Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that hold, have held, or may hold a Claim or other debt, right, cause of action or liability that is released pursuant to the provisions of the Plan are permanently enjoined from taking any of the following actions on account of or based upon such released Claims, debts, rights, causes of action or liabilities: (i) commencing or continuing any action or other proceeding against the Released Parties or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Released Parties or their respective property; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Released Parties or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Released Parties or against their respective property; and (v) commencing or continuing any judicial or administrative proceeding, in any forum, that does not comply with or is inconsistent with the provisions of the Plan.

        (e)       Release of Guarantor Non-Debtors from Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims.

All Holders of Loan Guaranty Claims against the Guarantor Non-Debtors shall be deemed on the Effective Date to have granted the Guarantor Non-Debtor Release and the Guarantor Non-Debtors shall be unconditionally relieved from any liability to the Senior Lenders or the Bridge Lenders on account of the Senior Loan Guaranty Claims or the Bridge Loan Guaranty Claims and the Senior Loan Agent and the Bridge Loan Agent, respectively, shall be unconditionally relieved from any liability of any nature whatsoever to such Holders as a result of the release of the Guarantor Non-Debtors from any and all Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims; provided that the Guarantor Non-Debtor Release is dependent upon and only effective upon (i) the execution by each of the Guarantor Non-Debtors of a guaranty of the New Senior Secured Term Loan pursuant to and to the extent provided in Section 5.6 of the Plan, (ii) the unconditional release by each of the Guarantor Non-Debtors, in form and substance acceptable to the Senior Lender Settlement Committee as of the Effective Date, of each of the Holders of Senior Loan Guaranty Claims and the Senior Loan Agents of and from any and all Debtor Released Claims, and (iii) the granting by the Guarantor Non-Debtors of Liens on certain property of the Guarantor Non-Debtors pursuant to and to the extent provided in Section 5.6 of the Plan. Pursuant to Bankruptcy Rule 9019, the Bankruptcy Court's entry of the Confirmation Order shall constitute its approval of this good faith settlement and compromise of the claims released by the Non-Debtor Guarantor Release and adequate factual findings that the Non-Debtor Guarantor Release is: (a) fair, equitable and reasonable; (b) necessary and essential to the Debtors' successful reorganization; (c) in exchange for good and valuable consideration provided by the Guarantor Non-Debtors

and the Agents; (d) warranted by the exceptional and unique circumstances of the Debtors' reorganization; and (e) consistent with public policy and due process principles.

        (f)      Release of Chapter 5 Causes of Action.

    InExcept as set forth in Section 3.2.4(b)(ii) of the Plan, in addition to the releases set forth in the Plan, the Debtors and the Reorganized Debtors shall not file, commence, or pursue any claim, right or cause of action under Chapter 5 of the Bankruptcy Code or seek to disallow any Claim to the extent it may be avoidable, except that the following claims are expressly preserved: (i) the Morgan Stanley Claims and (ii) any claims, rights or causes of action related to set-offs against amounts owing to the Debtors, provided that the Debtors shall not set-off against any distributions under the Plan to Holders of Allowed Claims in Classes 1C, 1D, and 50C through 111C (other than any distributions to MSCS with respect to the Morgan Stanley Claims).

        (g)      Non-Release of Certain Defined Benefit Plans.

    Notwithstanding anything to the contrary in the Plan, with respect to any Defined Benefit Plan that has not been terminated or does not terminate by its terms prior to the entry of the Confirmation Order, all Claims of, or with respect to, such a Defined Benefit Plan (including any based on fiduciary duties under the Employee Retirement Income Security Act of 1974, as amendedERISA) and all Claims of the Pension Benefit Guaranty Corporation, whether or not contingent, under 29 U.S.C. § 1362(b) for unfunded benefit liabilities, under 29 U.S.C. § 1306(a)(7) for termination premiums, and under 29 U.S.C. § 1362(c) for due and unpaid employer contributions shall not be discharged, released, exculpated or otherwise affected by the Plan (including Section 11.2 of the Plan), the entry of the Confirmation Order or the Chapter 11 Cases. Notwithstanding anything to the contrary in the Plan, in the event that a Defined Benefit Plan does not terminate prior to the entry of the Confirmation Order, obligations of the Debtors under the Defined Benefit Plan as of the Effective Date shall become obligations of the applicable Reorganized Debtors and, as required by the Internal Revenue Code of 1986, as amended, or the Employee Retirement Income Security Act of 1974, as amended or ERISA, the controlled group members.

        3.      Bar Order.

    The Confirmation Order shall provide, among other things (and the inclusion of such language, or language substantially similar to the following, and subject to Section 10.2 of the Plan, shall be a condition to the Effective Date):

    "ORDERED that all Persons, including without limitation (i) any Persons that are not Released Parties, (ii) Released Parties, and (iii) Persons who have voted for or against the Plan or who are presumed to have voted for or against the Plan under section 1126(f)-(g) of the Bankruptcy Code (collectively, the "Barred Persons"), are hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any claim for non-contractual indemnity or contribution against any Released Party (including any other non-contractual claim against the Released Parties, whether or not denominated as for contribution or indemnity, where the injury to the Person is the liability of the Person to the Barred Persons), arising out of or reasonably flowing from the claims or allegations in any of the Released Claims, whether arising under state, federal or foreign law as claims, cross-claims, counterclaims, or third-party claims (collectively, the "Barred Claims"), and with respect to the Barred Claims, the Barred Persons are also entitled to the judgment reduction provisions set forth in the Plan. This Order (the "Bar Order") is without prejudice to the position of any party as to the existence, in the absence of this Bar Order, of any Barred Claim; and it is further

    "ORDERED that no Person acting on behalf of the estate, including any successor to the Debtors, any committee appointed in the Bankruptcy Case, any chapter 7 trustee, any trustee of a litigation trust or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (any of the above, a

"Plaintiff"), may assert or bring a Released Claim.  In the event any such Plaintiff obtains a judgment or award (a "Judgment") against any Person with respect to one or more causes of action based upon, arising from, or related to the Released Claims or any transactions underlying any Released Claims then, with respect to any actual, potential or asserted liability of a Released Party to any Person for the Barred Claims in respect of such Judgment, the Plaintiff shall, prior to or in connection with the entry of such Judgment, provide notice of this Bar Order to the court or tribunal in which such Judgment was obtained, and the court or tribunal shall reduce such Judgment against such Person in an amount that is the greater of (i) the amount of the consideration provided pursuant to the Global Settlement by the Released Party or Parties against whom there would have been a Barred Claim in the absence of this Bar Order, or (ii) the amount equal to the Judgment against any such Person times the aggregate proportionate share of fault (expressed as a percentage) of the Released Party or Parties against whom there would have been a Barred Claim in the absence of this Bar Order.   In the event that Judgment shall be entered against any Person without a prior or concurrent determination as to the existence of a Barred Claim (and, in the event of a determination of the existence of a Barred Claim, without a reduction of such Judgment), such Judgment shall not, and shall be deemed not to, give rise to any Barred Claim; and it is further

"ORDERED that if any Plaintiff enters into a settlement with any Person with respect to one or more causes of action based upon, arising from, or related to the Released Claims or any transaction underlying any Released Claim, then such Plaintiff shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Barred Claims with respect to such settlement."

4.        Supplemental Injunction.

In order to supplement the settlements contemplated by and provided for in the Plan and the injunctive effect of the Discharge Injunction, and pursuant to sections 524 and 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following injunction to take effect as of the Effective Date.

*In order to preserve and promote the settlements contemplated by and provided for in the Plan, and to supplement, where necessary, the injunctive effect of the discharge as provided in sections 1141 and 524 of the Bankruptcy Code and as described in Section 11 of the Plan, except as otherwise provided in the Plan, all entities which have held or asserted, which hold or assert or which may hold or assert any claim, demand or cause of action against the Released Parties (or any of them) based upon, attributable to, or arising out of any Released Claim against or Interest in any of the Debtors that is released in connection with the Plan, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be permanently stayed, restrained and enjoined from taking any action against the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving payments or recovery with respect to any such claim, demand or cause of action arising prior to the Effective Date Released Claim, including, but not limited to:*

(a)        *commencing or continuing in any manner any action or other proceeding of any kind with respect to any such claim, demand or cause of action Released Claim against any of the Released Parties, or against the property of any Released Party;*

(b)        *enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or against the property of any Released Party with respect to any such claim, demand or cause of action Released Claim;*

(c)        *creating, perfecting or enforcing any Lien of any kind against any Released Party or the property of any Released Party with respect to any such claim, demand or cause of action Released Claim;*

(d)      *except as otherwise provided in the Plan, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due any Released Party or against the property of any Released Party with respect to any ~~such claim, demand or cause of action~~Released Claim; and*

(e)      *taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan relating to such ~~claim, demand or cause of action~~Released Claim.*

*The Debtors' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.*

*The injunction provided by section 11.4 of the Plan shall not enjoin any actions respecting claims not released or barred in connection with the Plan and, for the avoidance of doubt, shall only enjoin actions respecting Released Claims or Barred Claims.*

5.      Disallowed Claims and Disallowed Interests.

On and after the Effective Date, the Debtors and the Reorganized Debtors shall be fully and finally discharged of any and all liability or obligation on a Disallowed Claim or a disallowed Interest, and any Order disallowing a Claim or an Interest which is not a Final Order as of the Effective Date solely because of an entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided in the Plan, shall constitute an Order: (i) disallowing all Claims and Interests to the extent such Claims and Interests are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims and Interests, and Claims for unmatured interest and (ii) disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages or any other damages not constituting compensatory damages.

6.      Exculpation.

~~None~~To the fullest extent permitted under applicable law, none of the Released Parties and none of the present or former members of the Creditors' Committee (in their capacity as members of the Creditors' Committee), whether or not such members are otherwise Released Parties, shall have or incur any liability to any person or entity for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the negotiation of the Plan, pursuit of confirmation of the Plan, the administration, consummation and implementation of the Plan or the property to be distributed under the Plan, the Disclosure Statement, the Restructuring Transactions, the Plan Supplement, the releases and injunctions, or the management or operation of the Debtors (except for any liability that results from willful misconduct or gross negligence as determined by a Final Order). Any of the Released Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and the administration thereof.

7.      Corporate Indemnities.

(a)      Prepetition Indemnification and Reimbursement Obligations.

For purposes of the Plan, the respective obligations of Tribune and the other Debtors to indemnify and reimburse any Persons who are or were directors, officers or employees of the Debtors, against and for any obligations pursuant to certificates or articles of incorporation, certificates of formation, codes of regulation, bylaws, limited liability company agreements, partnership agreements, applicable state or non-bankruptcy law, or specific agreements or any combination of the foregoing, shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged under section 1141 of the Bankruptcy Code, irrespective of whether

122

indemnification or reimbursement is owed in connection with any event occurring before, on or after the Petition Date.  The Debtors are not aware of any indemnity claims against the Debtors arising from the currently-pending causes of action in the *Neil* litigation.

        (b)      Plan Indemnity.

In addition to the obligations set forth in Section 11.7.1 of the Plan and not by way of limitation thereof, subject to Section 4.6.3 of the Plan, the Reorganized Debtors shall jointly and severally indemnify and hold harmless the Senior Loan Agent, the Senior Loan Arrangers, the Senior Lenders, the Bridge Loan Agent, the Former Bridge Loan Agent, the Bridge Loan Arrangers and the Bridge Lenders (collectively, the "Indemnified Creditor Parties") and all of their respective Related Persons, in each case in all such capacities and all other non-fiduciary capacities related to the transactions underlying the LBO-Related Causes of Action, and any natural persons who are or were officers or directors of any of the Debtors (each an "Indemnified Party" and collectively, with the Indemnified Creditor Parties, the "Indemnified Parties"), on account of and with respect to any claim, cause of action, liability, judgment, settlement, cost or expense (including without limitation attorneys' fees but only if incurred after the Effective Date) on account of claims or causes of action threatened or asserted by any Person against such parties that seek damages, contribution, indemnity, equitable indemnity, or any similar claim, based upon or as the result of (ix) the Released Claims, including without limitation any claims on account of and with respect to any LBO-Related Causes of Action; or (iiy) Barred Claims or any similar claim based upon or as the result of the assertion of primary claims against any other person by any representative of the Debtors' Estates (the "Covered Claims"); provided, however, that in no event shall the aggregate liability of the Reorganized Debtors to any individual Indemnified Creditor Party and all Related Persons of such Indemnified Creditor Party on account of such indemnity exceed the sum of (ai) such Indemnified Creditor Party's pro rata share (calculated based on the proportion that the allowed Loan Claims against Tribune held by such Indemnified Creditor Party bears to the aggregate amount of all allowed Loan Claims against Tribune held by all Indemnified Creditor Parties) of $427,582,000, (bii) such Indemnified Creditor Party's pro rata share (calculated based on the proportion that the allowed Senior Loan Guaranty Claims held by such Indemnified Creditor Party bears to the aggregate amount of all allowed Senior Loan Guaranty Claims held by all Indemnified Creditor Parties) of $83,129,000 and (ciii) all costs and/or expenses (including without limitation attorneys' fees) incurred in connection with any Covered Claims by such Indemnified Creditor Party and such Related Persons.  For the avoidance of doubt, the provisions of Section 11.7.2 of the Plan are not intended to provide an indemnity for causes of action held by a non-Debtor against an Indemnified Person that exist independent of any Released Claim or Barred Claim, and Section 11.7.2 of the Plan is not intended to extend to any indemnification for any claims: (i) by the Holders of Claims in Class 1J against a trustee for such Class 1J Claims; and (ii) in connection with the claims asserted in the Neil Litigation.

        (c)      Indemnity for Members of the Creditors Committee.

The Reorganized Debtors shall jointly and severally indemnify and hold harmless the present and former members of the Creditors' Committee and their respective Related Persons (in their capacity as members of the Creditors Committee), on account of and with respect to any costs and/or expenses (including without limitation attorneys' fees) incurred in connection with any Covered Claims.

        (d)      Limitation on Indemnification.

Except as provided in the Plan with respect to the LBO-Related Causes of Action, the Reorganized Debtors shall not be obligated to indemnify and hold harmless any Person or entity for any claim, cause of action, liability, judgment, settlement, cost or expense that results from such Person's or entity's gross negligence or willful misconduct as determined by a Final Order.

        (e)      Director and Officer Liability Insurance and Fiduciary Liability Insurance.

The Debtors' director and officer liability insurance policies and fiduciary liability insurance policies shall provide coverage for claims made for any wrongful acts or other covered conduct, acts or omissions occurring on or prior to the Effective Date (such coverage also referred to as "tail" coverage) with coverage in scope and substance and on terms no less favorable to the current insureds than the Debtors' insurance policies existing as of the Confirmation Date, which insurance policies shall remain in full force and effect for a period of no less than six years following the Effective Date.

(f)     Indemnification Claim Procedures.

Claims made by beneficiaries of the indemnities contained in Section 11.7 of the Plan shall be submitted, resolved and reimbursed, if applicable, in accordance with the procedures set forth in Exhibit 11.7.6 to the Plan, to be filed with the Plan Supplement.

8.     Term of Bankruptcy Injunction or Stays.

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

## M.     Retention of Jurisdiction by the Bankruptcy Court.

The Plan provides that the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, and sets forth a non-exclusive list of numerous specific items over which the Bankruptcy Court will retain jurisdiction. In broad terms, those items include the determination of Allowed Claims and Interests, matters relating to executory contracts and unexpired leases, matters relating to distributions under the Plan, matters relating to modifications to the Plan, and adjudication of other causes of action by or on behalf of the Debtors or Reorganized Tribune.

## N.     Certain Additional Provisions of the Plan.

1.     Surrender of Instruments.

As a condition to participation under the Plan, the Holder of a note, debenture or other evidence of indebtedness of any of the Debtors that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture or other evidence of indebtedness shall surrender such note, debenture or other evidence of indebtedness to the Debtors, or their designee (unless such Holder's Claim will be Reinstated by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that if a claimant is a Holder of a note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by DTC or other securities depositary or custodian thereof, then the Debtors or the applicable Indenture Trustee for such note, debenture or other evidence of indebtedness may waive the requirement of surrender. Except as otherwise provided in Section 13.1 of the Plan, in the Debtors' sole discretion, if no surrender of a note, debenture or other evidence of indebtedness occurs and a claimant does not provide an affidavit and indemnification agreement (without any bond), in form and substance reasonably satisfactory to the Debtors, that such note, debenture or other evidence of indebtedness was lost, then no distribution may be made to any claimant whose Claim is based on such note, debenture or other evidence of indebtedness thereof.

2.     Creditors Committee.

The appointment of the Creditors Committee shall terminate on the Effective Date, except that the Creditors Committee shall continue in existence after the Effective Date for the sole purpose of preparing and prosecuting applications for the payment of fees and reimbursement of expenses.

3.        Post-Confirmation Date Retention of Professionals

Upon the Effective Date, any requirement that professionals employed by the Reorganized Debtors comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors will be authorized to employ and compensate professionals in the ordinary course of business and without the need for Bankruptcy Court approval.

4.        Effectuating Documents and Further Transactions.

Each of the Debtors and the Reorganized Debtors is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.

5.        Exemption from Transfer Taxes.

Pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance, transfer or exchange of notes, debentures or equity securities under the Plan; (ii) the creation of any mortgage, deed of trust, lien, pledge or other security interest; (iii) the making or assignment of any lease or sublease; or (iv) the making or delivery of any deed or other instrument of transfer under the Plan, including, without limitation, merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property, will not be subject to any stamp tax or other similar tax.

6.        Paid-in Capital of Corporate Reorganized Debtors.

On the Effective Date, after all other transactions necessary to effect the Plan have been consummated, the Paid-in Capital, as such term is defined in section 1.80(j) of the Illinois Business Corporation Act of 1983, 805 ILCS 5/1.01, *et seq.* (the "BCA"), of each corporate Reorganized Debtor shall, pursuant to Section 9.20(a)(2) of the BCA, be reduced to the following amounts (such reduced amounts to be referred to individually and collectively as the "Article XIII Paid-in Capital Amount" and "Article XIII Paid-in Capital Amounts," respectively): (i) in the case of Reorganized Tribune its Paid-in Capital shall be reduced to the aggregate par value, if any, of Reorganized Tribune's issued and outstanding shares of capital stock plus such amount as is recorded on Reorganized Tribune's financial statements as paid in capital or additional paid in capital under its fresh start accounting in accordance with Generally Accepted Accounting Principles, and (ii) in the case of each other corporate Reorganized Debtor its Paid-in Capital shall be reduced to the aggregate par value, if any, of each such other Reorganized Debtor's issued and outstanding shares of capital stock plus such amount as is recorded on each such other Reorganized Debtor's financial statements as paid in capital or additional paid in capital under its fresh start accounting in accordance with Generally Accepted Accounting Principles.  The amount required to reduce the Paid-in Capital of each corporate Reorganized Debtor to its Article XIII Paid-in Capital Amount shall be treated as a reduction in Paid-in Capital under Section 9.20(a)(2) of the BCA.  Any capital of each corporate Reorganized Debtor remaining in excess of its Article XIII Paid-in Capital Amount shall not be treated as Paid-in Capital for purposes of the BCA.  For purposes of Section 13.6 of the Plan, the term "corporate" refers to a corporation as defined in Sections 1.80(a) or (b) of the BCA.

7.        Payment of Statutory Fees.

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

8.        Amendment or Modification of the Plan.

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code and other applicable provisions of the Plan, including, without limitation, Section

13.9 of the Plan, the Debtors may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan. A Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

Subject to Section 13.9 of the Plan, the Debtors reserve the right to modify or withdraw the Plan, in its entirety or in part, for any reason, including, without limitation, in the event that the Plan as it applies to any particular Debtor is not confirmed. In addition, and also subject to Section 13.9 of the Plan, should the Plan fail to be accepted by the requisite number and amount of Claims and Interests voting, as required to satisfy section 1129 of the Bankruptcy Code, and notwithstanding any other provision of the Plan to the contrary, the Debtors reserve the right to reclassify Claims or Interests or otherwise amend, modify or withdraw the Plan in its entirety or in part. In addition, notwithstanding any other provision of the Plan to the contrary, if the Plan fails to be accepted by the requisite number and amount of Claims in Class 1D, any Holder of a Bridge Loan Claim that has not elected to receive the treatment specified in Section 3.2.4(b)(ii)(B)of the Plan (and such Holder's Related Persons) shall not receive the benefit of the releases, indemnities and injunctions that would otherwise be provided under the Plan, and the scope of the releases, indemnities, and injunctions shall instead be as proposed by the Debtors in connection with the cramdown of Class 1D Claims.

9.      Certain Provisions Pertaining to Senior Lender Settlement Committee and Centerbridge.

The Settlement Support Agreement is a binding legal obligation between the signatories thereto and requires such signatories to support a resolution of the Chapter 11 Cases on the terms provided in the Settlement Support Agreement. The Debtors are not parties to the Settlement Support Agreement and neither is the Creditors Committee. However, certain actions by the Debtors and the Creditors Committee are required to maintain the legal obligation of the signatories to the Settlement Support Agreement. One of those actions is that, no amendments shall be made to the Plan, and no supplements (including, without limitation, the Plan Supplement) shall be filed to the Plan, without the consent of the Senior Lender Settlement Committee, which consent shall not be unreasonably withheld. The aforementioned right of the Senior Lender Settlement Committee to reasonably consent to all amendments and supplements to the Plan shall extend to both the form and substance of any such amendment or supplement and any documents or information contained therein. Any alteration, amendment or modification to the Plan that is materially inconsistent with the terms of the "Settlement" (as defined in the term sheet attached to the Settlement Support Agreement and filed with the Bankruptcy Court) and that adversely and materially modifies the form or substance of affects the consideration to be provided to Class 1DE shall also be subject to the consent of Centerbridge, which consent is not to be unreasonably withheld. Prior to the Effective Date, the Debtors shall provide notice to the Creditors Committee of any alteration, amendment, modification, or supplement to the Plan. Because the Debtors believe that the best interests of the estate are maximized by resolution of these Chapter 11 Cases on the terms provided in the Plan, the Debtors (though not party to the Settlement Support Agreement) do not anticipate amending or supplementing the Plan without the reasonable consent of the Senior Lender Committee unless required to do so by the Bankruptcy Court.

## X. VOTING PROCEDURES AND REQUIREMENTS

The following section describes in summary fashion the procedures and requirements that have been established for voting on the Plan. If you are entitled to vote to accept or reject the Plan, you will receive a ballot for the purpose of voting on the Plan with the package accompanying this Disclosure Statement (the "Ballot"). If you hold Claims or Interests in more than one Class and you are entitled to vote such Claims or Interests in more than one Class, you will receive separate Ballots which must be used for each separate Class of Claims or Interests. If you are entitled to vote and did not receive a Ballot, received a damaged Ballot or lost your Ballot please call the Voting Agent, Epiq Bankruptcy Solutions, LLC, at (646) 282-2400 or toll-free at (800) 622-1125.

**A.    Voting Deadline.**

      TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS (INCLUDING THOSE BALLOTS TRANSMITTED BY VOTING NOMINEES) MUST BE **RECEIVED BY** THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE.  ONLY THOSE BALLOTS ACTUALLY RECEIVED BY THE VOTING AGENT BEFORE THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PLAN.  ALL BALLOTS MUST BE SENT TO THE FOLLOWING ADDRESS:

      **FOR FIRST CLASS MAIL:**

      Tribune Company Ballot Processing Center
      c/o Epiq Bankruptcy Solutions, LLC
      FDR Station, P.O. Box 5014
      New York, NY 10150-5014

      **FOR OVERNIGHT MAIL AND HAND DELIVERY:**

      Tribune Company Ballot Processing Center
      c/o Epiq Bankruptcy Solutions, LLC
      757 Third Avenue, Third Floor
      New York, NY 10017

      Ballots will only be counted if mailed to the above address.  Ballots <u>cannot</u> be transmitted orally, by facsimile or by electronic mail.  Accordingly, you are urged to return your signed and completed Ballot promptly.  Any executed Ballot received that does not indicate either an acceptance or rejection of the Plan or that indicates both an acceptance and rejection of the Plan shall not be counted.

**B.    Holders of Claims Entitled to Vote**

      In general, a holder of a claim may vote to accept or reject a plan of reorganization if (i) the holder's claim or interest is "allowed," (i.e., generally not disputed, contingent, or unliquidated), and (ii) such holder's claim or equity interest is "impaired" (as defined below) by the plan.  However, if a holder of an allowed and impaired claim will not receive any distribution under a plan, than such holder is deemed to have rejected the plan and is not entitled to vote.  In the same vein, a holder of an allowed and unimpaired claim will be presumed to have accepted the plan and will not be entitled to vote.

      Under the Bankruptcy Code, a class of claims or equity interests is presumed impaired unless a plan (i) does not alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder thereof; or (ii) regardless of any legal right to an accelerated payment of such claim or equity interest the plan (a) cures all existing defaults, except the defaults of a kind specified in section 365(b)(2) of the Bankruptcy Code, (b) reinstates the maturity of such claim or interest as it existed before the default, (c) compensates the holder of such claim for any damages incurred as a result of any such holder's reasonable reliance on such legal right to an accelerated payment, (d) if such claim arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the holder of such claim for any actual pecuniary loss incurred by such holder as a result of such failure, and (e) does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

      As detailed in <u>Article II</u> above, the Debtors are soliciting votes on the Plan from the Holders of Allowed Claims in Classes 1C, 1D, 1E, 1F, 50C-111C, and 2E-111E.  In addition, votes cast by Holders of Loan Guaranty Claims in Classes 50C through 111C shall be counted as votes cast on the Prepackaged Plan of the Guarantor Non-Debtors that may become Debtors.

Also as detailed in <u>Article II</u> above, with respect to the Impaired Classes of Claims and Interests that are deemed to reject the Plan (Classes 1I, 1J, 1L, 1M, <u>50D-111D,</u> and 2L-111L), and any other Class of Claims or Interests that vote to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm a Plan pursuant to section 1129(b) of the Bankruptcy Code.  In any such case or cases, the Plan constitutes a motion seeking such relief.

ANY VOTE NOT SOLICITED OR PROCURED IN GOOD FAITH OR IN ACCORDANCE WITH THE PROVISIONS OF THE BANKRUPTCY CODE WILL NOT BE COUNTED PURSUANT TO SECTION 1126(E) OF THE BANKRUPTCY CODE.

**C.**     <u>**Vote Required for Acceptance by a Class**</u>

1.     Class of Claims.

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (⅔) in amount and more than one-half (½) in number of the Allowed Claims in such Class that have voted on the Plan in accordance with the Solicitation Order.

2.     Class of Interests.

A Class of Interests shall have accepted the Plan if it is accepted by at least two-thirds (⅔) in amount of the Allowed Interests in such Class that have voted on the Plan in accordance with the Solicitation Order.

**D.**     <u>**Voting Procedures**</u>

1.     Ballots.

All votes to accept or reject the Plan with respect to any Class of Claims must be cast by properly submitting the duly completed and executed form of Ballot designated for such Class.  Each Ballot enclosed with this Disclosure Statement has been encoded with the Class into which the Claim has been placed under the Plan.  Holders of Impaired Claims voting on the Plan should complete and sign the Ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan."

ANY EXECUTED BALLOT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN WILL NOT BE COUNTED AS A VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

ANY BALLOT THAT IS RECEIVED BUT WHICH IS NOT SIGNED OR THAT OTHERWISE CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CLAIMANT WILL BE CONSIDERED AN INVALID BALLOT AND WILL NOT BE COUNTED FOR PURPOSES OF DETERRING ACCEPTANCE OR REJECTION OF THE PLAN.

In addition, each Holder of a Claim that (i) has voted to accept the Plan; (ii) <u>or</u> is deemed to have accepted the Plan; (iii<u>ii</u>) that has <del>not</del> voted to <del>accept</del><u>reject</u> the Plan but <del>that has received a Ballot and that has not</del><u>has</u> opted <del>out of</del><u>to grant</u> the releases in Section 11.2.2 of the Plan; or (iv<u>iii</u>) <u>who</u> otherwise agrees to provide the releases set forth in Section 11.2.2 of the Plan, shall be deemed to have unconditionally granted the releases provided in Section 11.2.2 of the Plan.  Please refer to <u>Article IX.L hereof</u> for a further discussion regarding the releases provided in Section 11.2.2 the Plan.

In order for a vote to be counted, a Holder must complete and sign an original Ballot and return it in the envelope provided (only original signatures will be accepted).  Each Ballot to be used in voting to accept or reject the Plan has been coded to reflect the Class of Claims it represents.  Accordingly, in voting to accept or reject the Plan, a Holder must use only the coded Ballot or Ballots sent with this Disclosure Statement.

All Ballots (including those Ballots transmitted by Voting Nominees) must be delivered to the Voting Agent, at its address set forth above, and received by the Voting Deadline. THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE VOTER.

**If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please contact the Voting Agent in the manner set forth in this Disclosure Statement.**

2.      Special Instructions for Beneficial Holders of Senior Noteholder Claims.

If you are a Holder of a Senior Noteholder Claim and hold the Claim in your own name, you can vote your Claim by completing and signing the enclosed Ballot and returning it directly to the Voting Agent using the enclosed preaddressed, postage prepaid envelope.

If you are a beneficial holder of a Senior Noteholder Claim or Senior Loan Claim and receive a Ballot from a Voting Nominee, in order for your vote to be counted, your Ballot must be completed in accordance with the voting instructions on the Ballot and received by the Voting Nominee in enough time for the Voting Nominee to transmit a Master Ballot to the Voting Agent so that it is received no later than the Voting Deadline. The Voting Nominee must then transmit your Ballot to the Voting Agent so that it is received no later than the Voting Deadline. Any Ballot received after the Voting Deadline shall be counted at the sole discretion of the Debtors. **Do not return any debt instruments or equity securities with your Ballot.**

3.      Special Instructions for Holders of General Unsecured Claims Against Tribune Concerning the Convenience Class Election.

If you are the Holder of a General Unsecured Claim against Tribune, the Ballot included as part of the Solicitation Package that includes this Disclosure Statement provides for you to make the Convenience Class Election. The Convenience Class Election is an irrevocable election by the Holder of a General Unsecured Claim against Tribune to reduce a General Unsecured Claim of greater than $1,000 to $1,000. As a result of the Convenience Class Election, the Holder of any such Claim will receive $1,000 in Cash under the Plan.

4.      Special Instructions for ~~Media and Foreign Ownership Certifications.~~ Holders of Bridge Loan Claims Against Tribune Concerning the Election Set Forth in Section 3.4.2(b)(ii)(B) of the Plan.

~~In order to be eligible to acquire five percent (5%) or more of the New Class A Common Stock upon the Effective Date, Claim Holders (including any Holders that acquire a Loan Claim, an Other Parent Claim, or a Loan Guaranty Claim after the Solicitation Packages have been mailed) will be required to submit an executed Media Ownership Certification on or prior to the Voting Deadline or such other Deadline as may be established by the Bankruptcy Court (which may be earlier than the Voting Deadline), certifying that prospective "parties" to the FCC Applications (i) have the requisite "character" qualifications (principally, the absence of adverse or unresolved character qualifications issues with the FCC and the absence of adverse final judgments in matters such as felonies, fraud on governmental agencies, media-related antitrust, employment discrimination, and denial of federal benefits for drug abuse), (ii) do not hold media interests that, together with their prospective interest in Reorganized Tribune, would create an unlawful media combination under the FCC's rules. Such Holders are also required to certify and inform the Debtors of any subsequent changes in the information provided in their Media Ownership Certifications between the submission of their Media Ownership Certification and the Effective Date by executing and submitting an amended Media Ownership Certification.~~

~~Holders of Loan Claims, Other Parent Claims, and Loan Guaranty Claims (i.e., those that are eligible to receive New Common Stock as part of their distribution under the Plan) as well as those that acquire such interests after the mailing of the Solicitation Package are required to execute and submit a Foreign Ownership Certification providing information about the extent of the relevant Holders' direct and indirect ownership or control by non-U.S. persons or entities. The deadline for submission of the Foreign Ownership Certification will be on the Voting Deadline or another date established by the Bankruptcy Court, and the relevant Claim~~

~~Holders are required to certify and inform the Debtors immediately of any subsequent changes in their percentage of foreign ownership prior to the Effective Date by executing and submitting an amended Foreign Ownership Certification. Finally, eligible Holders of Senior Noteholder Claims have the option to submit Foreign Ownership Certifications, by a deadline to be established by the Bankruptcy Court, when they tender their Senior Notes to the DTC.~~

Each Holder of a Bridge Loan Claim may, even if the Bridge Loan Claim Class fails to accept the Plan, elect for itself on account of its Bridge Loan Claim the Plan treatment offered by the Debtors to the Class of Holders of Bridge Loan Claims if such Class had accepted. Specifically, each Holder of a Bridge Loan Claim may, on such Holder's Ballot, elect the following treatment of its Bridge Loan Claim: (1) as of the Effective Date, have its Bridge Loan Claim Allowed in an amount equal to the principal amount of such Claim plus accrued interest as of the Petition Date, and (2) on or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Bridge Loan Claim against Tribune, subject to Section 5.4.2 of the Plan, receive such Holder's Pro Rata share, calculated together with the Holders of Allowed Claims in Class 1C, of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation. Each Holder of a Bridge Loan Claim who has voted in favor of the Plan shall be deemed to have elected the treatment set forth in Section 3.2.4(b)(ii)(B) of the Plan with respect to its Bridge Loan Claim unless, on such Holder's Ballot, such Holder elects not to receive the treatment set forth in Section 3.2.4(b)(ii)(B) of the Plan.

5.    Withdrawal or Change of Votes on the Plan.

After the Voting Deadline, no vote may be withdrawn without the prior consent of the Debtors, which consent shall be given in the Debtors' sole discretion.

Any Holder of a Claim or Interest who has submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. If more than one timely, properly completed Ballot is received with respect to the same Claim, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the Ballot that the Voting Agent determines was the last to be received.

# XI. CONFIRMATION OF THE PLAN

## A.    **Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. The Confirmation Hearing pursuant to section 1128 of the Bankruptcy Code will be held on [●] **August 16,** 2010 at [●] **10 a.m.,** **(prevailing Eastern Time)**, before the Honorable Kevin J. Carey, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Fifth Floor, Courtroom No. 5, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to Confirmation of the Plan must: (i) be made in writing; (ii) state the name and address of the objecting party and the nature of the claim or interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan; and (iv) be filed with the Court, together with proof of service, and served so that they are received **on or before** [●] **July 30,** 2010 at 4:00 p.m., **(prevailing Eastern Time)** by the following parties:

**Counsel to the Debtors**:

Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603

Cole Schotz Meisel Forman & Leonard, P.A.
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801

Facsimile: (312) 853-7036
Attn: ~~Kerriann S~~Jessica C. K. ~~Mills~~Boelter

Facsimile: (302) 652-3117
Attn: ~~J. Kate Stickles~~
Norman L. Pernick

**The U.S. Trustee:**

U.S. Trustee
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lock Box #35
Wilmington, Delaware 19899
Facsimile: (302) 573-6497
Attn: Joseph McMahon, Jr.

**Counsel to the Official Committee of Unsecured Creditors:**

Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, New York 10112
Fax (212) 541-5369
Attn: ~~David M. Le May~~Douglas A. Deutsch

Landis Rath & Cobb LLP
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Fax (302) 467-4450
Attn: Adam G. Landis

Objections to confirmation of the Plan are governed by Rule 9014 of the Bankruptcy Rules. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**B.      Statutory Requirements for Confirmation of the Plan.**

At the Confirmation Hearing, the Bankruptcy Court will confirm a plan only if it finds all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that a plan (i) is accepted by all impaired classes of claims and interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) is feasible, and (iii) is in the "best interests" of holders of claims and interests impaired under the plan.

    1.      Acceptance.

        (a)      Acceptance of the Plan.

The Claims and Interests in Classes 1C, 1D, 1E, 1F, 50C-111C, and 2E-111E are Impaired under the Plan (the "Impaired Classes of Claims") and are entitled to vote to accept or reject the Plan. As a condition to Confirmation of a plan, the Bankruptcy Code requires that each class of impaired claims or interests vote to accept the plan unless the plan satisfies the "fair and equitable test" (as described below) as applied to such nonaccepting impaired class.

Impaired Classes of Claims that are entitled to vote on the Plan will have accepted the Plan if the Plan is accepted by at least two-thirds (⅔) in dollar amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

The only Classes of Claims or Interests entitled to vote on the Plan are:

- Against Tribune (Debtor 1):  Classes 1C (Senior Loan Claims), 1D (Bridge Loan Claims) 1E (Senior Noteholder Claims), and 1EF (Other Parent Claims); and
- Against the Filed Subsidiary Debtors (Debtors 2 through 111):  Classes 50C-111C (Senior Loan Guaranty Claims) and 2E-111E (General Unsecured Claims).

As provided in the Bankruptcy Code, no other Classes of Claims and Interests are entitled to vote on the Plan.  Specifically, under the Plan, the Claims and Interests in Classes 1A, 1B, 1FG, 2A-111A, 2B-111B, and 2M-111M are Unimpaired.  The Holders of Allowed Claims and Interests in each of these Classes are conclusively presumed to have accepted the Plan.

Under the Plan, the Claims and Interests in Classes 1I, 1J, 1L, 1M, 50D-111D, and 2L-111L are Impaired and the Holders of such Claims and Interests will not receive or retain any property under the Plan. Accordingly, all such Classes are deemed not to have accepted the Plan and confirmation of the Plan will require application of the "fair and equitable test," described below.

      (b)      Acceptance of the Prepackaged Plan.

The Plan also constitutes a Prepackaged Plan for any Guarantor Non-Debtors that may commence Chapter 11 Cases and become Debtors.  The classification of Claims and Interests under any such Prepackaged Plan will be the same as the classifications of Claims and Interests for Filed Subsidiary Debtors (i.e., Debtors 2 through 111).

The only Classes of Claims and Interests entitled to vote on any of the Prepackaged Plans will be Classes of Loan Guaranty Claims (Class C).  All other Classes of Claims and Interests against or in any Guarantor Non-Debtors that become party to Prepackaged Plan will be Unimpaired, and hence presumed to accept the relevant Prepackaged Plan, with the exception of Intercompany Claims (Class K) and Securities Litigation Claims (Class L).  Intercompany Claims under any Prepackaged Plan will be Impaired and shall be deemed satisfied, discharged and extinguished in full and shall be eliminated as of the Effective Date, and the Holders of such Claims will not vote to accept or reject the Plan consistent with Section 4.5 of the Plan. Securities Litigation Claims will be Impaired and will not receive or retain any property under any Prepackaged Plan on account of such Claims and Interests, and will be conclusively deemed to reject such Prepackaged Plan.

      2.      Fair and Equitable Test.

The Debtors will seek to confirm the Plan notwithstanding the non-acceptance or deemed non-acceptance of a particular Plan by any Impaired Class of Claims or Interests.  To obtain such confirmation, it must be demonstrated that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting Impaired Class.  Generally, a plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner substantially equivalent with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its claims or interests.  The Debtors believe that the Plan satisfy these requirements.

The Bankruptcy Code establishes different "fair and equitable" tests for secured claims, unsecured claims and equity interests, as follows:

      (a)      Holders of Secured Claims.  Either (i) each holder of an impaired secured claim retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present

value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens attaching to the proceeds of the sale, and the treatment of such liens on proceeds is as provided in clauses (i) or (ii) above.

       (b)     <u>Unsecured Creditors.</u>  Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

       (c)     <u>Interest Holders.</u>  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the equity interest, or (ii) the holders of equity interests that are junior to the nonaccepting class will not receive or retain any property under the plan.

AS EXPLAINED ABOVE, THE BANKRUPTCY CODE CONTAINS PROVISIONS FOR CONFIRMATION OF A PLAN EVEN IF IT IS NOT ACCEPTED BY ALL CLASSES. THESE SO-CALLED "CRAMDOWN" PROVISIONS ARE SET FORTH IN SECTION 1129(B) OF THE BANKRUPTCY CODE, WHICH PROVIDES THAT A PLAN OF REORGANIZATION CAN BE CONFIRMED EVEN IF IT HAS NOT BEEN ACCEPTED BY ALL IMPAIRED CLASSES OF CLAIMS AND INTERESTS AS LONG AS AT LEAST ONE IMPAIRED CLASS OF NON-INSIDER CLAIMS HAS VOTED TO ACCEPT THE PLAN. **THE DEBTORS BELIEVE THAT THE PLAN MAY BE CONFIRMED ON A NONCONSENSUAL BASIS (PROVIDED AT LEAST ONE IMPAIRED CLASS OF CLAIMS VOTES TO ACCEPT THE PLAN). ACCORDINGLY, THE DEBTORS WILL DEMONSTRATE AT THE CONFIRMATION HEARING THAT THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ALL NON-ACCEPTING CLASSES.**

       3.     Feasibility.

Pursuant to section 1129(a)(11) of the Bankruptcy Code, the Bankruptcy Court must determine that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan. This condition is often referred to as the "feasibility" of the Plan. The Debtors believe that the Plan satisfies this requirement.

For purposes of determining whether the Plan meets the feasibility requirement, the Debtors' financial advisors have analyzed the Debtors' ability to meet their obligations under the Plan. As part of that analysis, the Debtors have prepared consolidated projected financial results for each of the three fiscal years 2010, 2011 and 2012. These financial projections, and the assumptions on which they are based, are included in projections annexed hereto as <u>Exhibit DF</u> (the "<u>Financial Projections</u>").

The Debtors have prepared the Financial Projections based upon certain assumptions that they believe to be reasonable under the current circumstances. Those assumptions the Debtors considered to be significant are described in <u>Article XII</u> of this Disclosure Statement and the notes which are part of the Financial Projections. The Financial Projections have not been examined or compiled by independent accountants. Many of the assumptions on which the Financial Projections are based are subject to significant uncertainties. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the period covered by the Financial Projections may vary from the projected results, and the variations may be material. All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in evaluating the Plan.

       4.     Best Interests Test and Liquidation Analysis.

The "best interests" test under section 1129 of the Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each holder of an impaired claim or impaired interest receive property with a value not less than the amount such holder would receive in a chapter 7 liquidation. As indicated above, the Debtors believe that under the Plan, Holders of Impaired Claims and Impaired Interests will receive property with a value equal to or in excess of the value such Holders would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

To estimate potential returns to Holders of Claims and Interests in a chapter 7 liquidation, the Debtors determined, as might a Bankruptcy Court conducting such an analysis, the amount of liquidation proceeds that might be available for distribution (net of liquidation-related costs) and the allocation of such proceeds among the Classes of Claims and Interests based on their relative priority as set forth in the Bankruptcy Code. The Debtors considered many factors and data and have assumed that the liquidation of all assets would be conducted in an orderly manner. The liquidation proceeds available for distribution to holders of Claims against and Interests in the Debtors would consist of the net proceeds from the disposition of the Debtors' assets, augmented by any other Cash that the Debtors held and generated during the assumed holding period stated in the Plan and after deducting the incremental expenses of operating the business pending disposition.

In general, as to each debtor, liquidation proceeds would be allocated in the following priority:

- first, to the Claims of secured creditors to the extent of the value of their collateral;
- second, to the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtors' Chapter 7 cases, including tax liabilities;
- third, to unpaid Administrative Expense Claims;
- fourth, to Priority Tax Claims and other Claims entitled to priority in payment under the Bankruptcy Code;
- fifth, to Unsecured Claims; and
- sixth, to Interests.

The Debtors' liquidation costs in a chapter 7 case would include the compensation of a bankruptcy trustee, as well as compensation of counsel and other professionals retained by such trustee, asset disposition expenses, applicable taxes, litigation costs, Claims arising from the Debtors' operation during the pendency of the chapter 7 cases and all unpaid Administrative Expense Claims that are allowed in the chapter 7 case. The liquidation itself might trigger certain Priority Claims, such as Claims for severance pay, and would likely accelerate Claims or, in the case of taxes, make it likely that the IRS would assert all of its Claims as Priority Tax Claims rather than asserting them in due course as is expected to occur in the Chapter 11 Cases. These Priority Claims would be paid in full out of the net liquidation proceeds, after payment of secured Claims, chapter 7 costs of administration and other Administrative Expense Claims, and before the balance would be made available to pay Unsecured Claims or to make any distribution in respect of Interests.

A liquidation analysis (the "Liquidation Analysis") is attached as Exhibit EG to this Disclosure Statement. The analysis set forth in the Liquidation Analysis is based upon a number of estimates and assumptions that are inherently subject to significant uncertainties and contingencies, many of which would be beyond the Debtors' control. Accordingly, while the analyses contained in the Liquidation Analysis are necessarily presented with numerical specificity, the Debtors cannot provide assurance that the values assumed would be realized if the Debtors were in fact liquidated, nor can the Debtors cannot provide assurance that the Bankruptcy Court would accept this analysis or concur with these assumptions in making its determinations under section 1129(a) of the Bankruptcy Code. The Chapter 7 liquidation analysis has not been independently audited or verified. **ACTUAL LIQUIDATION PROCEEDS COULD BE MATERIALLY LOWER OR HIGHER THAN THE AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS. NO REPRESENTATION OR WARRANTY CAN BE OR IS BEING MADE WITH RESPECT TO THE ACTUAL PROCEEDS THAT COULD BE RECEIVED IN A CHAPTER 7 LIQUIDATION OF THE DEBTORS. THE LIQUIDATION ESTIMATES HAVE BEEN PREPARED SOLELY FOR PURPOSES OF ESTIMATING PROCEEDS AVAILABLE IN A CHAPTER 7 LIQUIDATION OF**

THE DEBTORS' ESTATES AND DO NOT REPRESENT VALUES THAT MAY BE APPROPRIATE FOR ANY OTHER PURPOSE. NOTHING CONTAINED IN THESE LIQUIDATION ESTIMATES IS INTENDED TO OR MAY BE ASSERTED TO CONSTITUTE A CONCESSION OR ADMISSION BY THE DEBTORS FOR ANY OTHER PURPOSE.

The Liquidation Analysis is based upon the Debtors' balance sheets as of December 27, 2009, as adjusted for certain material transactions assumed to occur prior to the start of the liquidation, and assumes that the actual December 27, 2009 balance sheets are conservative proxies for the balance sheets that would exist at the time the Chapter 7 liquidation would commence.

Under section 704 of the Bankruptcy Code, a Chapter 7 trustee must, among other duties, collect and convert the property of a debtor's estate to cash and close the estate as expeditiously as is compatible with the best interests of the parties-in-interest. Consistent with these requirements, it is assumed for purposes of the Liquidation Analysis that a liquidation of the Debtors would commence under the direction of a Chapter 7 trustee appointed by the Bankruptcy Court and would continue for a period of six months, during which time all of the Debtors' major assets would either be sold or conveyed to their respective lien holders, and the Cash proceeds of such sales, net of liquidation-related costs, would then be distributed to the Debtors' creditors. Although the liquidation of some assets might not require six months to accomplish, other assets would be more difficult to collect or sell and hence would require a liquidation period substantially longer than six months.

As set forth in detail on the Liquidation Analysis, the Debtors believe that the Plan will produce a greater recovery for the holders of Claims and Interests than would be achieved in a Chapter 7 liquidation. Consequently, the Debtors believe that the Plan, which provides for the continuation of the Debtors' businesses, will provide a substantially greater ultimate return to the holders of Claims and Interests than would a Chapter 7 liquidation.

## XII.  PROJECTED FINANCIAL INFORMATION AND REORGANIZATION VALUE

### A.  Projected Financial Information.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources to operate their businesses. The Debtors, with the assistance of various professionals, including their financial advisors, prepared the Financial Projections attached as Exhibit DF for each of the three fiscal years 2010, 2011 and 2012 (the "Financial Projection Period").

The Debtors do not, as a matter of course, publish their business plans, strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to Holders of Claims or other parties in interest after the Confirmation Date or otherwise make such information public.

The Financial Projections were prepared by the Debtors to present the anticipated impact of the Plan and assume that the Plan will be implemented in accordance with its stated terms. Further, the Financial Projections assume that the Effective Date will be September 27, 2010 (start of the Debtors' fourth quarter). Although the Debtors will seek to cause the Effective Date to occur as soon as practicable, there can be no assurance as to when or if the Effective Date will actually occur. It is also assumed that the Debtors will continue to conduct operations substantially similar to their businesses currently in operation.

The estimates and assumptions used in the Financial Projections, while considered reasonable by the Debtors and their financial advisors at the time of preparation, may not be realized and are inherently subject to uncertainties and contingencies. The Financial Projections are also based on factors such as industry

performance, general business, economic, competitive, regulatory, market and financial conditions, all of which are difficult to predict and generally beyond the Debtors' control. Given the changes in the United States economy over the past 24 months and the difficult advertising environment created by general economic difficulties, it is anticipated that the Debtors' actual financial performance during the Financial Projection Period may differ materially from the Financial Projections.

B.     **Reorganization Value.**

The Debtors' investment banker and financial adviser, Lazard, has undertaken a valuation analysis to determine the value available for distribution to holders of Allowed Claims pursuant to the Plan and to analyze the relative recoveries to such holders thereunder.

1.     Overview.

Lazard has estimated the value of the Reorganized Debtors as of September 30, 2010. Lazard has undertaken this valuation analysis to determine the value available for distribution to holders of Allowed Claims pursuant to the Plan and to analyze the relative recoveries to such holders thereunder.[25]  The estimated total value available for distribution to holders of Allowed Claims, exclusive of Allowed Claims held by Tribune and by direct or indirect subsidiaries of Tribune (the "Distributable Value") was derived based on (i) a sum-of-the-parts approach of the estimated value of the Reorganized Debtors' publishing, broadcasting and corporate operations on a going concern basis (the "Enterprise Value"), plus (ii) the estimated cash balance at the Assumed Effective Date, and (iii) the value of minority equity investments (the "Other Assets"). The valuation analysis assumes that the Effective Date is September 30, 2010 (the "Assumed Effective Date") and is based on projections developed and provided by the Debtors' management ("Projections") for 2010-2014 (the "Projection Period").

Based on these Projections and solely for purposes of the Plan, Lazard estimates that the Enterprise Value of the Reorganized Debtors falls within a range from approximately $2.6 to $3.1 billion, with an approximate mid-point estimate of $2.9 billion as of the Assumed Effective Date. Adding the estimated cash balance at the Assumed Effective Date of approximately $1.4 billion and the value of the Other Assets of approximately $1.5 to $2.0 billion (with an approximate mid-point value of $1.8 billion) to the Enterprise Value range yields a range of Distributable Value for the Reorganized Debtors from $5.6 billion to $6.6 billion with a mid-point of $6.1 billion.  Approximately $537 million of the approximate mid-point estimate of Distributable Value is attributable to the value of Tribune, representing the Distributable Value to be allocated to Holders of Allowed Claims against Tribune exclusive of Allowed Claims held by direct or indirect subsidiaries of Tribune.[26] The approximate mid-point estimate of Distributable Value also includes approximately $1.6 billion attributable to the value of the Guarantor Non-Debtors.

Based on total estimated gross debt of approximately $0.9 billion projected as of the Assumed Effective Date, Lazard's mid-point estimate of Distributable Value reduced by $1.1 billion of cash distributions pursuant to the Plan of Reorganization implies a value for the new equity of the Reorganized Debtors (the "Equity Value") of approximately $4.1 billion.

---

[25] The estimated value of the Reorganized Debtors includes the value of the Debtors' wholly-owned subsidiaries as well as the value of minority equity interests held by the Debtors and their subsidiaries. The Debtors' minority equity interests are generally described in Section III.B.3 of this Disclosure Statement.

[26] The estimate of Distributable Value attributable to Tribune includes the recovery by Tribune of approximately $368.8 million transferred to certain of Tribune's subsidiaries just prior to the Petition Date, the equity value of Tribune Receivables, LLC, and the value received by Tribune on account of its receivables from and equity interests in its subsidiaries.

THE ENTERPRISE VALUE RANGE, AS OF THE ASSUMED EFFECTIVE DATE, REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD AS OF THE DATE OF THIS DISCLOSURE STATEMENT. ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, NEITHER LAZARD NOR ANY OF THE DEBTORS HAS ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATES.

Lazard assumed that the Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. Lazard's estimated Enterprise Value range assumes the Reorganized Debtors will achieve their Projections in all material respects, including revenue, EBITDA margins, earnings and cash flow as projected. If the business performs at levels below those set forth in the Projections, such performance may have a materially negative impact on the Enterprise Value. Conversely, if the business performs at levels above those set forth in the Projections, such performance may have a materially positive impact on the Enterprise Value.

In estimating the range of Enterprise Value and the Equity Value of the Reorganized Debtors, Lazard: (i) reviewed certain historical financial information of the Debtors for recent years and interim periods; (ii) reviewed certain internal financial and operating data of the Debtors, which data were prepared and provided to Lazard by the Debtors' management and which relate to the Reorganized Debtors' business and its prospects; (iii) met with and discussed the Debtors' operations and future prospects with the senior management team; (iv) reviewed certain publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally comparable to the operating business of the Reorganized Debtors; (v) considered certain economic and industry information relevant to the operating business; and (vi) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. Although Lazard conducted a review and analysis of the Reorganized Debtors' business, operating assets and liabilities and the Reorganized Debtors' business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management as well as publicly available information.

In addition, Lazard did not independently verify the Projections in connection with preparing the estimated Enterprise Value range, and no independent valuations or appraisals of the Debtors were sought or obtained in connection herewith. The estimated Enterprise Value range was developed solely for purposes of the formulation and negotiation of the Plan and the analysis of implied relative recoveries to Holders of Allowed Claims thereunder.

Lazard has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated Enterprise Value range of the Reorganized Debtors set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

Lazard's estimate of Enterprise Value reflects the application of standard valuation techniques and does not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated Enterprise Value range of the Reorganized Debtors set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. None of the Debtors, Reorganized Debtors, Lazard, nor any other person assumes responsibility for any differences between the estimated Enterprise Value range and such actual outcomes. Actual market prices of such securities at issuance will depend upon, among other things, the operating performance of the Reorganized Debtors, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by Holders of Claims (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), developments in the Reorganized

137

Debtors' industry and economic conditions generally, and other factors which generally influence the prices of securities.

        2.      Valuation Methodology.

The following is a brief summary of certain financial analyses performed by Lazard to arrive at its range of estimated Distributable Value for the Reorganized Debtors. In performing the financial analyses described below and certain other relevant procedures, Lazard reviewed all significant assumptions with the Debtors' management. Lazard's valuation analysis must be considered as a whole. Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion as to Enterprise Value.

Under the sum-of-the-parts approach and the valuation methodologies summarized below, Lazard derived a range of estimated Distributable Value based on valuation estimates for each of the Reorganized Debtors' publishing operations (principally newspaper businesses plus Tribune Media Services), broadcasting operations (television, cable and radio businesses), corporate operations and Other Assets (principally minority equity investments in TV Food Network, CareerBuilder and Classified Ventures). As contemplated in the Plan, Lazard has assumed that the Reorganized Debtors will be subject to federal and state corporate income taxation.

        (a)      Comparable Company Analysis.

The comparable company valuation analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar operating and financial characteristics. Under this methodology, the enterprise value for each selected public company was determined by examining the trading prices for the equity securities of such company in the public markets and adding the aggregate amount of outstanding net debt for such company (at book value and at current market values), and subsequently adding minority interests, and subtracting unconsolidated investments. Those enterprise values are commonly expressed as multiples of various measures of operating statistics, most commonly sales and earnings before interest, taxes, depreciation and amortization ("EBITDA"). In addition, each of the selected public company's operating performance, operating margins, profitability, leverage and business trends were examined. Based on these analyses, financial multiples and ratios were calculated to apply to the Reorganized Debtors' actual and projected operating performance. Lazard focused primarily on EBITDA multiples of the selected comparable companies to value the Reorganized Debtors but also gave consideration to multiples derived by measuring enterprise value against revenue.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the Reorganized Debtors. Common criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar lines of business, business risks, growth prospects, maturity of business, location, market presence and size and scale of operations. Lazard selected comparable companies in both the publishing and broadcasting sectors. The selection of appropriate comparable companies is often difficult, a matter of judgment, and subject to limitations due to sample size and the availability of meaningful market-based information.

Lazard selected the following publicly traded publishing companies (the "Publishing Peer Group") on the basis of general comparability to the Reorganized Debtors in one or more of the factors described above: The New York Times Company, The McClatchy Company, Lee Enterprises Inc., A.H. Belo Corporation, Washington Post Co., Gannett Co., Inc., Media General, Inc., Journal Communications Inc., and The E.W. Scripps Company.

Lazard selected the following publicly traded broadcasting companies (the "Broadcasting Peer Group," and together with the Publishing Peer Group, the "Peer Group") on the basis of general comparability to the Reorganized Debtors in one or more of the factors described above: Nexstar Broadcasting Group Inc., Sinclair

Broadcast Group Inc., Gray Television Inc., Belo Corp., LIN TV Corp., Media General, Inc., The E.W. Scripps Company, Entravision Communications Corp., Discovery Communications, Inc., Scripps Networks Interactive, Inc., and Viacom, Inc.

Lazard calculated market multiples for the Peer Group by dividing the enterprise value of each comparable company by the actual 2009 EBITDA and the mean projected 2010 EBITDA as estimated by equity research analysts. For purposes of valuing the Debtors' television stations, Lazard calculated a blended 2009 / 2010 EBITDA multiple based on relevant television comparables. In determining the applicable EBITDA multiple ranges, Lazard considered a variety of factors, including both qualitative attributes and quantitative measures such as historical and projected revenue, EBITDA and capital expenditure amounts, historical enterprise value/EBITDA trading multiples, EBITDA margins, financial distress impacting trading values, size, growth and similarity in business lines. Based on this analysis, Lazard's implied EBITDA multiple ranges are set forth in the table below.

| | Enterprise Value / 2010E EBITDA | |
|---|---|---|
| Segment | Low | High |
| Publishing[27] | 5.4x | 6.0x |
| Broadcasting[28] | 8.9x | 10.0x |

(b)    Discounted Cash Flow Analysis.

The discounted cash flow ("DCF") analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated blended rate of return that would be required by debt and equity investors to invest in the business based on its capital structure. The enterprise value of the Reorganized Debtors' business is determined by calculating the present value of the Reorganized Debtors' unlevered after-tax free cash flows included in the Projections plus an estimate for the value of the business beyond the Projection Period known as the terminal value. The terminal value is derived by applying a multiple to the Reorganized Debtors' projected EBITDA in the final year of the Projection Period or capitalizing projected unlevered after-tax free cash flow in the same period using the Discount Rate and an assumed perpetual growth rate, discounted back to the assumed Effective Date using the Discount Rate.

To estimate the Discount Rate for the Publishing and Broadcasting segments, Lazard used the cost of equity and the after-tax cost of debt for the Reorganized Debtors, based on an assumed targeted debt-to-total capitalization ratio. Lazard calculated the cost of equity utilizing estimates derived from the Peer Group and the "Capital Asset Pricing Model," which assumes that the required equity return is a function of the risk-free cost of capital and the correlation of a publicly traded stock's performance to the return on the broader market. To estimate the cost of debt, Lazard evaluated current capital markets conditions and the spreads of companies with similar capital structures and operations and relied upon estimates for the Reorganized Debtors' debt financing cost as obtained by the Debtors from institutional lenders. In determining an EBITDA exit multiple, Lazard

---

[27] Does not include TMS or FSBO.
[28] Weighted average multiple for the station group, cable, and group allocations within the broadcasting segment. In the case of the station group, Enterprise Value is applied to a blended 2009/2010 EBITDA. In the case of cable and group allocation, Enterprise Value is applied to estimated 2010 EBITDA.

utilized a range reflecting current EBITDA multiples. Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtors, which in turn affect its cost of capital and terminal multiples. Lazard calculated its DCF valuation using the following assumptions:

| Publishing Segment | | Broadcasting Segment | |
|---|---|---|---|
| Discount Rate | Perpetual Growth Rate | Discount Rate | Terminal Multiple |
| 11.5% - 13.5% | (3.0)% - 3.0% | 9.5% - 11.5% | 7.75x – 8.75x |

In applying the above methodology, Lazard utilized management's detailed Projections for the period beginning September 30, 2010, and ending December 31, 2014, to derive unlevered after-tax free cash flows. Free cash flow includes sources and uses of cash not reflected in the income statement, such as changes in working capital and capital expenditures. For purposes of the DCF, the Reorganized Debtors are assumed to be full taxpayers (the effective tax rate is assumed to be 41%). These cash flows, along with the terminal value, are discounted back to the Assumed Effective Date using the range of Discount Rates described above to arrive at a range of Enterprise Value.

(c)     Precedent Transactions Analysis.

The precedent transactions valuation analysis is based on the enterprise values of companies involved in public merger and acquisition transactions that have operating and financial characteristics similar to the Reorganized Debtors. Under this methodology, the enterprise value of such companies is determined by an analysis of the consideration paid and the debt assumed in the merger or acquisition transaction. As in a comparable company valuation analysis, those enterprise values are commonly expressed as multiples of various measures of operating statistics, such as revenue, EBITDA, and earnings before interest and taxes ("EBIT"). Lazard reviewed industry-wide valuation multiples, considering prices paid as a multiple of the last 12 months ("LTM") EBITDA, for companies in similar lines of business to the Broadcasting segment of the Reorganized Debtors. The derived multiples were then applied to the Reorganized Debtors' operating statistics to determine the Enterprise Value or value to a potential strategic buyer. Similar to the comparable company analysis, Lazard focused mainly on EBITDA multiples in comparing the valuations of the Reorganized Debtors and the selected broadcasting companies involved in relevant precedent transactions.

Unlike the comparable company analysis, the enterprise valuation derived using this methodology reflects a "control" premium (i.e., a premium paid to purchase a majority or controlling position in the assets of a company). Thus, this methodology generally produces higher valuations than the comparable public company analysis. In addition, other factors not directly related to a company's business operations can affect a valuation based on precedent transactions, including: (i) the market environment is not identical for transactions occurring at different periods of time, and (ii) circumstances pertaining to the financial position of the company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

As with the comparable company analysis, because no precedent merger or acquisition used in any analysis will be identical to the target transaction, valuation conclusions cannot be based solely on quantitative results. The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations, and prospects of each target. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an

acquisition. The number of completed transactions for which public data is available also limits this analysis. Furthermore, the data available for all the precedent transactions may have discrepancies due to varying sources of information.

Lazard evaluated various merger and acquisition transactions that have occurred in the publishing and broadcasting industries over the last five years. Many of the publishing industry transactions in this sample were executed under drastically different fundamental, credit and other market conditions from those prevailing in the current marketplace, which factored into the determination of the relevance of this methodology and appropriate multiple range. As a result, Lazard did not give weight to the precedent transactions valuation methodology with respect to the Publishing Segment. With respect to the Broadcasting Segment, Lazard reviewed the implied premiums paid in comparable transactions relative to the then trading multiples and applied such premiums to the current trading multiples. The resulting enterprise value range implies a blended 2010E EBITDA multiple range of 10.7x to 11.8x (in the case of the station group, reflects a 2009/2010E blended multiple).

(d)    Other Assets and Corporate Operations Valuation.

Lazard estimated the value of Other Assets to be $1.8 billion. The material investments included in this category are minority interests in TV Food Network, CareerBuilder, LLC and Classified Ventures, LLC. Lazard utilized standard valuation methodologies to value the minority equity investments. In addition to these assets, Lazard included an estimated cash balance of $1.4 billion at the Assumed Effective Date to derive the estimated range for Distributable Value. This cash balance includes the proceeds from the recently completed transaction involving the Chicago Cubs and certain related assets.

Corporate activities (which represent a cost center) were valued by capitalizing an assumed run rate expense base by an assumed 11.1% blended Discount Rate. Additional calculations were performed to incorporate the present value of other cash outflows that are not reflected in corporate EBITDA. The estimated value of corporate activities was added to the cumulative segment enterprise value range to arrive at the estimated range for Enterprise Value.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY LAZARD. THE PREPARATION OF A VALUATION ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. IN PERFORMING THESE ANALYSES, LAZARD AND THE DEBTORS MADE NUMEROUS ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS. THE ANALYSES PERFORMED BY LAZARD ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

## XIII. DESCRIPTION OF DEBT AND CAPITAL STRUCTURE OF REORGANIZED DEBTORS

A.    **New Senior Secured Term Loan Agreement.**

Section 5.6 of the Plan provides that on the Effective Date, if the Debtors have not elected to replace the New Senior Secured Term Loan in its entirety with distributions of Cash, (i) Reorganized Tribune, as borrower, (ii) the other material Reorganized Debtors and U.S. Subsidiary Non-Debtors (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions), but excluding any entities identified by the Debtors and consented to by the Senior Lender Settlement Committee, as guarantors, (iii) the administrative agent party thereto, and (iv) the Holders of Claims entitled to receive a distribution of the New Senior Secured Term Loan under the Plan shall become parties to

the New Senior Secured Term Loan Agreement regardless of whether any party actually executes the New Senior Secured Term Loan Agreement.  If issued, the New Senior Secured Term Loan shall be in an aggregate principal amount of up to two times the Debtors' trailing twelve month EBITDA (as defined in the New Senior Secured Term Loan Agreement) as of the end of the fiscal quarter most recently ended prior to the Effective Date.  ~~The~~

~~For purposes of formulating the Financial Projections attached as Exhibit F, the Debtors have estimated the New Senior Secured Term Loan to be in an aggregate principal amount of $900 million, to be amortized at a rate of 1% per annum, and to have an effective interest rate of 6.25%, which represent the Debtors' estimates as to market terms as of the date hereof based on information the Debtors have received from potential financing sources.  However, the actual terms of the New Senior Secured Term Loan Agreement may vary, in whole or in part, from the aforementioned terms, based upon, among other things, changes in market conditions for loan facilities of this type and the Debtors' business and financial needs at emergence from chapter 11.  The principal terms of the~~ New Senior Secured Term Loan shall be substantially in the form ~~of New Senior Secured Term Loan~~ that will be filed with the Plan Supplement as Exhibit 5.6 to the Plan.

**B.     Description of Exit Facility**

Section 5.10 of the Plan provides that on the Effective Date, without any requirement of further action by security holders or directors of the Debtors or Reorganized Debtors, the Debtors and Reorganized Debtors shall be authorized, but not directed, to enter into the Exit Facility Credit Agreement, if any, as well as any notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.  The Exit Facility shall be a revolving credit facility providing for loans and other extensions of credit in an aggregate amount up to $300 million, with a letter of credit sub-facility of up to $100 million.  The Exit Facility shall be substantially in the form that will be filed with the Plan Supplement as Exhibit 5.10 to the Plan.

**C.     Description of Capital Stock.**

The Plan provides that on the Effective Date or a subsequent Distribution Date, as applicable, Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to the Plan without further act or action under applicable law, regulation, order or rule.  The powers, preferences and rights, as well as certain limitations, qualifications and restrictions associated with the New Common Stock shall be set forth in their entirety in the Certificate of Incorporation of Reorganized Tribune a form of which will be filed with the Plan Supplement as Exhibit 5.3.2(1) to the Plan.  The terms of the New Warrants shall be set forth in their entirety in the New Warrant Agreement, a form of which will be filed with the Plan Supplement as Exhibit 1.1.122 to the Plan.

## XIV.  RISK FACTORS

THE IMPLEMENTATION OF THE PLAN IS SUBJECT TO A NUMBER OF MATERIAL RISKS, INCLUDING THOSE ENUMERATED BELOW.

IN EVALUATING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AGAINST ANY OF THE DEBTORS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE IN THE PLAN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISK INVOLVED IN CONNECTION WITH THE PLAN AND THEIR IMPLEMENTATION, OR ALTERNATIVES TO THE PLAN.

**A.**    **General Bankruptcy Law Considerations and Risks Related to the Plan.**

    1.    Objections to the Classification of Claims May Change the Composition of the Classes and the Vote Required of Each Class for the Approval of the Plan.

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a class or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In such event, the Debtors intend, to the extent permitted by the Bankruptcy Court and the Plan, to make such reasonable modifications of the classifications under the Plan to permit Confirmation and to use the acceptances of the Plan received in response to this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member.  Any such reclassification could adversely affect the Class in which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

    2.    Failure to Obtain Confirmation of the Plan May Result in Liquidation or Alternative Plan on Less Favorable Terms.

Although the Debtors believe that the Plan will satisfy all requirements for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  ~~Moreover~~Certain parties do not agree with the Debtors' position that all aspects of the Plan will satisfy the requirements for confirmation under the Bankruptcy Code.  For example, contrary to the Debtors' belief, certain parties have alleged that the releases and related injunctive relief provided in Article XI of the Plan are not permissible.  Though the Debtors disagree with this contention, and, again, believe that the Plan will satisfy all requirements for confirmation under the Bankruptcy Code, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not be sufficiently material as to necessitate the resolicitation of votes in support of the Plan.

The Plan provides that the Debtors reserve the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by various Classes of Claims and Interests under the Plan.  In the event such Classes fail to accept the Plan in accordance with section 1126(c) and 1129(a)(8) of the Bankruptcy Code, the Debtors reserve the right: (a) to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code; and/or (b) to modify the Plan in accordance with Section 13 thereof.  While the Debtors believe that the Plan satisfies the requirements for non-consensual confirmation under section 1129(b) of the Bankruptcy Code because the Plan does not "discriminate unfairly" and are "fair and equitable" with respect to the Classes that reject or are deemed to reject the Plan, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  There can be no assurance that any such challenge to the requirements for non-consensual confirmation will not delay the Debtors' emergence from chapter 11 or prevent confirmation of the Plan.

If the Plan is not confirmed, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the holders of Claims against any of the Debtors as the terms of the Plan.  If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would substantially erode to the detriment of all stakeholders.

    3.    Undue Delay in Confirmation of the Plan May Disrupt the Debtors' Operations.

Although the Plan is designed to minimize the length of the Debtors' bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors  may spend in bankruptcy or to assure

parties-in-interest that the Plan will be confirmed. The continuation of the Chapter 11 Cases, particularly if the Plan is not approved or confirmed in the timeframe currently contemplated, could adversely affect operations and relationships with the Debtors' customers, vendors, employees, regulators and partners. If confirmation and consummation of the Plan does not occur expeditiously, the Chapter 11 Cases could result in, among other things, increased costs for professional fees and similar expenses.

    4.    If the Effective Date Fails to Occur, the Debtors May Liquidate or Adopt an Alternative Plan with Less Favorable Terms.

There can be no assurance with respect to timing of the Effective Date. The occurrence of the Effective Date is also subject to the conditions precedent described in Section 10 of the Plan. Failure to meet any of these conditions could result in the Plan not being consummated.

If the Effective Date of the Plan does not occur, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the holders of Claims against any of the Debtors as the terms of the Plan.

**B.**    **FCC-Related Considerations and Risks Respecting the Debtors' Businesses.**

    1.    The FCC Must Approve the Debtors' FCC Applications before Emergence from Bankruptcy.

The Debtors operate television broadcast stations, a radio station, and certain associated facilities under authority granted by the FCC. Under Section 310(d) of the Communications Act, the consent of the FCC is required for the assignment of FCC licenses or for the transfer of control of an entity that holds or controls FCC licenses. Except in the case of "involuntary" assignments, prior consent of the FCC is required before an assignment of FCC licenses or a transfer of control of FCC licensees may be consummated.

    (a)    "Involuntary" Transfers and Assignments.

For purposes of processing applications, the FCC classifies a licensee's change in status to a debtor in possession under chapter 11 of the Bankruptcy Code as an "involuntary" assignment, even though the chapter 11 filing is within the control of the licensee or its parent company. The FCC considers such involuntary assignments to be *pro forma* transactions and accordingly evaluates them under more abbreviated, or so-called "short-form," procedures than applications involving a substantial change in control, which are evaluated under "long-form" procedures. The FCC has granted the Debtors' applications for consent to such involuntary assignments of their broadcast licenses to the Debtors' licensees as debtors in possession. Reorganized Tribune's emergence from bankruptcy as a restructured company will require further consent of the FCC to effectuate an assignment of these broadcast licenses to the Reorganized Debtors.

Actions ordered by the Bankruptcy Court could require further consent of the FCC. For example, the appointment of a chapter 11 trustee by the Bankruptcy Court would require FCC consent. The FCC typically treats changes of this sort that are ordered by the Bankruptcy Court as involuntary assignments or transfers for which consent may be sought using *pro forma* procedures.

    (b)    FCC Consent Required for Emergence from Bankruptcy.

The FCC treats emergence from bankruptcy by a licensee or its parent company as a "voluntary" assignment of FCC licenses or a transfer of control of FCC licensees when control will be transferred to a post-bankruptcy holder. A "voluntary" assignment or transfer of control requires prior approval of the FCC. In the FCC's view, a debtor in possession is an interim controlling party. The FCC thus expects the outcome of the proceeding to be, among other things, a restructuring and that the restructuring will not be implemented until the

FCC has granted applications seeking approval of the new control structure and demonstrating the legal qualifications of any new parties that will have attributable ownership interests or positions in the new entity.

If the proposed resolution of a bankruptcy proceeding changes ultimate control of the FCC licensees (as, for example, when new parties will hold fifty percent (50%) or more of the stock of the restructured company), the transaction will be viewed as a substantial change in control, with consent sought on an FCC "long form" application, Form 314 (assignment) or Form 315 (transfer of control). The FCC treats a transaction as an "assignment" if the consummation of the transaction would change the identity of the entity holding the FCC license; changes in ownership or control in which the licensee entity remains unchanged typically are treated as "transfers of control." The application procedures for transfers and assignments are essentially the same. Even though a company may emerge from bankruptcy or receivership through a court order, the FCC will use the procedures applicable to a voluntary transfer or assignment when the consummation of the application would place the licenses in a new "permanent" holder. The company may not emerge from bankruptcy until the FCC has granted its consent.

      (c)    FCC Processing of Applications for Consent to Emerge from Bankruptcy.

~~Pursuant to the Plan, the Debtors will file the FCC Applications~~On April 28, 2010, the Debtors filed the FCC Applications, by which Debtors sought the consent of the FCC for each of the Debtors holding FCC licenses to assign its FCC licenses to that Debtor as reorganized pursuant to the Plan. The FCC Applications included requests for waivers of the FCC's newspaper/broadcast cross-ownership rule and local television multiple ownership rule, and for a "failing station" waiver. The Debtors filed 16 applications for consent to assignment of broadcast station licenses, together with applications seeking consent to assign ~~their FCC licenses from the Debtors to the Reorganized Debtors as promptly as practicable after the filing of the Plan with the Bankruptcy Court. The Debtors anticipate that the FCC will accept and process~~satellite earth station, private land mobile, private fixed microwave, and other categories of FCC licenses held by the Debtors.

On May 13, 2010, the FCC's Media Bureau issued a public notice announcing that the FCC has accepted all of the FCC Applications for filing upon initial review. Although the FCC is accepting and processing the FCC Applications while the Bankruptcy Court is considering the Plan, but~~the Debtors anticipate~~ that the FCC will not grant the FCC Applications until the Bankruptcy Court has confirmed the Plan and authorized the transactions proposed in the Plan.

~~Once the FCC accepts the filing of the FCC Applications, it will issue a public notice indicating that the applications are under consideration at the agency.~~ The FCC's public notice ~~typically is issued approximately one week after submission of an application, although such notices occasionally are not issued for a longer period. Under normal FCC procedures,~~of May 13, 2010, set a deadline of June 14, 2010, for interested ~~parties then have 30 days~~persons to file petitions to deny ~~or objections to an application, although the agency may extend this period. Applicants also must give local public notice of the filing of an application through broadcast announcements and notices in local newspapers serving their broadcast markets~~the FCC Applications. To the extent petitions to deny or objections to FCC applications are filed, they typically focus on the qualifications of the applicants and their attributable owners to hold or control FCC broadcast licenses. In this case, the FCC Applications ~~will~~ also include requests for waivers of the FCC's newspaper/broadcast cross-ownership and local television ownership or "duopoly" rules, including a "satellite" television waiver. These waiver requests are likely to be the subject of petitions to deny or objections. Amendments and/or separate pro forma or "short form" applications may also be filed with the FCC to implement any Restructuring Transactions requiring prior FCC approval.

Applicants also must give local public notice of the filing of an application through broadcast announcements and notices in local newspapers serving their broadcast markets. If petitions to deny or objections to an FCC application are filed, the applicant has an opportunity to file an opposition, and the petitioner(s) have an opportunity to reply. Absent extensions, the pleading cycle generally will be completed within 60 days. The FCC then will consider the application and any filings made by parties to the proceeding.

In addition to the consideration of any waiver requests, the FCC's review of an application will focus on whether the existing media interests (broadcast and daily newspaper holdings) of the parties to the application, when combined with other media interests held by parties to the application, will comply with the FCC's broadcast multiple ownership rules. The FCC also considers compliance with limitations on foreign ownership, other legal qualifications, the parties' prior records before the FCC, and certain categories of prior adverse determinations against parties to the application by courts and other administrative bodies.

If no petitions to deny or objections are filed and the FCC finds that the application is in compliance with its rules and policies and that the parties to the application are qualified, the FCC may grant the application shortly after the close of the public notice period. In some instances, the FCC may request that the applicants supply additional information through amendments to an application. There is no time limit on the FCC's consideration of assignment applications, whether or not such applications draw petitions to deny or objections. The FCC has a stated goal of processing all such applications within 180 days, although processing often exceeds this timeframe when petitions to deny or objections are filed.

In this case, the consummation of the Plan will not occur until the FCC has granted the FCC Applications and issued the necessary consents to implement the Plan as confirmed by the Bankruptcy Court. Once the FCC has granted the FCC Applications, it will issue a public notice of the grant. If the grant is made by the FCC *en banc*, parties may file petitions for reconsideration with the agency or an appeal with the D.C. Circuit within a period of 30 days after public notice of the grant. If the grant is made by the FCC's staff under delegated authority, an interested party may request the staff to reconsider its decision or the FCC to review the grant *en banc* within 30 days of public notice of the grant, and the FCC may reconsider the action on its own initiative for a period of 40 days following issuance of public notice of the grant. It is highly unusual for the FCC to rescind grant of consent to an assignment or transfer upon reconsideration or review. Parties are entitled to close upon the grant of FCC consent even if petitions for reconsideration, applications for review, or judicial appeals are filed and remain pending, but any such consummation is subject to any further order that the FCC or a court might issue.

2.    Inability to Obtain FCC Approval and Media Ownership Waivers Would Adversely Affect Ability to Consummate the Plan.

In the FCC Applications, the Debtors will be seeking waivers of several of the FCC's broadcast ownership rules. Grant of these waiver requests will be necessary in order to allow the assignment of combinations of media properties currently held by the Debtors in six markets in which the combinations currently operate under waivers of the FCC ownership rules. Absent continued waivers from the FCC, Reorganized Tribune will not be able to own and operate these combinations.

As a result of the FCC Order, the Debtors received seven waivers that allow them to hold clusters of media properties in six markets despite non-compliance with the FCC's rules. These waivers are as follows:

1)    A "temporary" waiver of the FCC's newspaper/broadcast cross-ownership rule to own WPIX-TV and *Newsday* in New York;

2)    A "temporary" waiver of the newspaper/broadcast cross-ownership rule to own KTLA-TV and the *Los Angeles Times* in Los Angeles;

3)    A "temporary" waiver of the newspaper/broadcast cross-ownership rule to own WSFL-TV and the Ft. Lauderdale-based *South Florida Sun-Sentinel* in Miami;

4)    A "permanent" waiver of the newspaper/broadcast cross-ownership rule to own WGN, WGN-TV and the *Chicago Tribune* in Chicago;

     5)     A "temporary" waiver of the newspaper/broadcast cross-ownership rule to own WTIC-TV, WTXX-TV and the *Hartford Courant* in Hartford;

     6)     A "permanent" "failing station" waiver of the FCC's television local ownership or "duopoly" rule to own WTIC-TV and WTXX-TV in Hartford; and

     7)     A "permanent" waiver of the FCC's "duopoly" rule to permit operation of WTTK-TV, a full-power television station licensed to Kokomo, Indiana, as a "satellite" rebroadcasting the programming of WTTV-TV, Bloomington, Indiana.

The "temporary" newspaper/broadcast cross-ownership rule waivers that the FCC issued are time limited. They extend until the latest of the following: (i) the expiration of a two-year period for the filing and evaluation of individualized waiver showings, the commencement of which is open to interpretation, (ii) six months following the conclusion of the litigation over the FCC Order pending in the D.C. Circuit, which the Debtors initiated on December 3, 2007, or (iii) six months after the expiration of any judicial stay to which the FCC's modified waiver standards for the cross-ownership rule as adopted in the 2008 Order may be subject. The "permanent" waivers continue as long as the Debtors own the properties, but the waivers do not permit assignments of the combinations intact, and waivers will be needed in order for the Reorganized Debtors to maintain their existing properties.

In the FCC Applications, the Debtors will seek extensions of the waivers covering these seven media combinations. In the case of the newspaper/broadcast cross-ownership rule waivers, the Debtors are requesting "permanent" relief that would allow them (i) to hold the ownership combinations or interests at least until the next "long form" assignment or transfer and (ii) upon such assignment or transfer to dispose of the interests in combination to a single purchaser. Alternatively, the Debtors are seeking a temporary waiver of the newspaper/broadcast cross-ownership rule that would extend until 18 months after the FCC completes its pending rulemaking review of that rule and the FCC's action becomes a final order no longer subject to judicial review. In the case of the Hartford television "duopoly" and the Indianapolis "satellite" waivers, the Debtors are seeking a continuation of those "permanent" waivers that would allow the combinations to be commonly held until the next "long-form" assignment or transfer.

In the requests for waivers filed as part of the FCC Applications, the Debtors intend to demonstrate that cross-ownership waiver relief is justified under the criteria announced in the 2008 Order, which took effect on March 23, 2010, with the Third Circuit's lifting of its stay, as well as the general "public interest" waiver test adopted with the newspaper/broadcast cross-ownership rule in 1975. In the cross-ownership markets, synergies and efficiencies attributable to cross-ownership allow the Debtors' combined media properties to deliver an exceptional level of local news – both quantitatively and qualitatively. The Debtors' combined properties have earned strong ratings and many journalistic awards as testament to their community service and success. Each cross-owned market is also remarkably diverse and competitive with respect to traditional media properties (broadcast, cable and print) and even more so when new technological offerings, particularly those available over the Internet and wireless services, are taken into account.

The waiver filings also will explain that any forced regulatory separation of the cross-owned properties would have adverse public interest effects. First, in today's challenging media marketplace, the assumption that an alternative purchaser would be willing and able to acquire any of the properties simply is not valid. Second, even assuming that such a purchaser could be found, it is unlikely that the new owners would have the resources and, absent efficiencies from cross-ownership, the ability to maintain the amount and caliber of local news, information, and community services currently offered by each cross-owned combination.

Under the standards set forth in the 2008 Order to analyze the waivers, cross-ownership relief is presumptive in New York, Los Angeles, and Miami, because (i) those markets are among the Top 20 largest DMAs, (ii) the Debtors own only one broadcast outlet in each market, (iii) the television station at issue does not rank among the top four rated television stations, and (iv) at least eight "major media voices" exist exclusive of the combination. In Chicago and Hartford, where the Debtors hold more than one broadcast property, the

Debtors are not entitled to a presumptive waiver, but their waiver requests will show that those combinations also are entitled to relief because (i) the stations have increased the amount of news provided to the market, (ii) the cross-owned properties exercise independent news judgment, (iii) the level of concentration in the DMA is not adversely affected, and (iv) the struggling financial condition of the Debtors justifies relief.

In the FCC Applications, the Debtors will show that continued waiver of the television "duopoly" rule for the Hartford properties is justified under either the FCC's "failed" or "failing station" standards. In the Indianapolis market, the Debtors will show that continued operation of WTTK-TV as a "satellite" is appropriate under FCC policies.

In each of the seven waiver requests, the Debtors will stress that grant of the waivers is required under the FCC's policies affording comity to the bankruptcy process. FCC precedent establishes that the agency is required to reconcile its policies with those underlying the bankruptcy laws. The FCC has previously taken comity into account in granting ownership waivers, and, in all seven instances involving the Debtors' properties; waivers would merely allow the Reorganized Debtors to maintain the existing combinations.

It is possible that the FCC will deny the Debtors' request for a "permanent waiver," or grant a temporary waiver of shorter duration than requested, with respect to one or more of the media combinations or interests for which the Debtors are seeking waivers. In the event that the FCC does not grant the requested waivers, the Debtors could be required to come into compliance with the applicable ownership rule by disposing of properties deemed non-conforming by a date set by the FCC, which date could be prior to the Debtors' emergence from bankruptcy. It is possible that the FCC will require the Debtors to place one or more properties deemed by the FCC to be non-compliant with its ownership rules into a divestiture trust prior to the Debtors' emergence from bankruptcy. If the present difficult financial climate for businesses overall and for media industries in particular persists, the Debtors could face difficulty locating buyers willing to purchase the non-conforming properties and could be forced to dispose of properties at prices that the Debtors otherwise would consider unacceptable.

In addition, it is possible that, in evaluating the FCC Applications, the FCC could determine that the Plan neither complies with nor ensures compliance with the FCC's broadcast multiple and/or cross-ownership rules and/or the twenty-five percent (25%) foreign ownership limit in Section 310(b) of the Communications Act. Specifically, the FCC may not agree with the Debtors and determine that the New Class B Common Stock should be considered attributable rather than non-attributable under its rules. Such a finding could cause the FCC to determine that certain prospective stockholders of the Reorganized Debtors would not be in compliance with the FCC's broadcast multiple and/or cross-ownership rules upon consummation of the currently proposed Plan. Further, the FCC could require the Debtors to amend the Plan and the FCC Applications, which could delay FCC Approval and consummation of the Plan. If petitions to deny or objections to the FCC Applications are filed, the preparation and submission of responsive pleadings and the FCC's consideration of those filings could cause a delay in FCC Approval and consummation of the Plan and could increase the cost to the Debtors of emerging from bankruptcy. It also is possible that the FCC would not accept the FCC Applications for filing until the Bankruptcy Court has confirmed the Plan, which could delay FCC Approval and consummation of the Plan.

## C.     Risks Related to the Debtors' Businesses.

1.     The Debtors' Actual Financial Results May Vary Significantly From the Projections.

The Projections were prepared by the Debtors' management in consultation with their professional advisors. The Projections have not been examined or compiled by independent accountants. While the Debtors have presented the Projections with numerical specificity, they have necessarily based the Projections on a variety of estimates and assumptions that may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market and financial uncertainties and contingencies, many of which will be beyond the Debtors and the Reorganized Debtors' control. The Debtors do not and cannot make any representations as to the accuracy of the Projections or to the Debtors or the Reorganized Debtors' ability to

achieve the projected results. Some assumptions inevitably will not materialize. Furthermore, events and circumstances occurring subsequent to the date on which the Projections were prepared may differ from any assumed facts and circumstances. Alternatively, any events and circumstances that come to pass may well have been unanticipated, and thus may affect financial results in a materially adverse or materially beneficial manner. The Projections, therefore, may not be relied upon as a guaranty or other assurance of the actual results that will occur. In addition, the price of the New Common Stock and the New Warrants may be adversely affected by the Debtors' failure to achieve operating results that meet or exceed the Projections.

2.    Failure to Attract and Maintain Employees May Adversely Affect the Debtors' Financial Results.

Among the Debtors' most valuable assets are their highly skilled employees, who have the ability to leave the Debtors and deprive the Debtors of valuable skills and knowledge that contribute substantially to their business operations. Although the Debtors have tried to maintain the confidence and dedication of their personnel through the pendency of the Chapter 11 Cases, the Debtors cannot be sure that they will ultimately be able to do so and, if not, that they will be able to replace such personnel with comparable personnel. In addition, the Debtors cannot be sure that such key personnel will not leave after consummation of the Plan and the Debtors emergence from the Chapter 11 Cases. Because the Debtors' success depends to a significant degree upon the continued contributions of its employees, further attrition may hinder the Debtors' ability to operate efficiently, which could have a material adverse effect on their results of operations and financial condition.

In addition, upon emergence from the Chapter 11 Cases, the Debtors may need to attract and retain new personnel, including key management, sales, marketing, and other personnel. Accomplishing this may be difficult due to many factors, including uncertainty created by the Debtors' Chapter 11 Cases. The failure to continue to attract and retain such individuals could materially adversely affect the Debtors' ability to compete.

3.    Adverse Publicity in Connection with the Chapter 11 Cases or Otherwise Could Negatively Affect Business.

Adverse publicity or news coverage relating to the Debtors, including, but not limited to, publicity or news coverage in connection with the Chapter 11 Cases, may negatively impact the Debtors' efforts to establish and promote name recognition and a positive image after emergence from the Chapter 11 Cases.

4.    Advertising Demand Will Continue to be Impacted by Changes in Economic Conditions and Fragmentation of the Media Landscape.

Advertising revenue is the primary source of revenue for the Debtors' publishing and broadcasting businesses. National and local economic conditions, particularly in major metropolitan markets, affect the levels of retail, national and classified newspaper advertising revenue, as well as television advertising revenue. Changes in gross domestic product, consumer spending, auto sales, housing sales, unemployment rates, job creation and circulation levels all impact demand for advertising. Consolidation across various industries, including large department stores and telecommunications companies, may also reduce the Debtors' overall advertising revenue. Retailers and other advertisers may also choose to reduce their overall advertising spending to reduce their operating costs, which could reduce the Debtors' advertising revenues. Deteriorations in national and local economic conditions increase the risk of financial distress and business failures among the Debtors' advertising customers, which may result in reduced advertising demand and decreased advertising revenue, and may also result in the Debtors being unable to fully collect upon advertising receivables.

Competition for newspaper advertising is based on reader demographics, price, service, advertiser results, and circulation and readership levels, and competition for television advertising is based on audience share and ratings information, audience engagement and price. Competition from other media, including other metropolitan, suburban and national newspapers, broadcasters, cable systems and networks, satellite television and radio, Internet sites, magazines, direct marketing and solo and shared mail programs, affects the Debtors'

ability to retain and attract advertising clients and may continue to negatively impact advertising rates. In recent years, the advertising industry generally has experienced a secular shift toward Internet advertising and away from traditional media. In particular, Internet sites devoted to recruitment, automobiles, real estate, and other classified advertising categories have become significant competitors of the Debtors' newspapers.

In broadcasting, the proliferation of cable and satellite channels, advances in mobile and wireless technology, the migration of television audiences to the Internet and the viewing public's increased control over the manner and timing of their media consumption through personal video recording devices have resulted in greater fragmentation of the television viewing audience and a more difficult sales environment. Other advances in technology, such as increasing use of local-cable advertising "interconnects," which allow for easier insertion of advertising on local cable systems, have also increased competition for television advertisers. In addition, video compression technologies permit greater numbers of channels to be carried within existing bandwidth on cable, satellite and other television distribution systems. These compression technologies, as well as other technological developments, are applicable to all video delivery systems, including digital over-the-air broadcasting, and have the potential to provide vastly expanded programming to highly targeted audiences. Reduction in the cost of creating and programming additional channel capacity could lower entry barriers for new channels and encourage the development of increasingly specialized niche programming on cable, satellite and other television distribution systems, which could further increase the competition for advertising revenue in the broadcasting industry.

Seasonal variations in consumer spending cause the Debtors' quarterly advertising revenues to fluctuate. Second and fourth quarter advertising revenues are typically higher than first and third quarter advertising revenues, reflecting slower economic activity in the winter and summer and the stronger fourth quarter holiday season. In addition, differences in annual political and biennial Olympic-related advertising can cause the Debtors' revenues to fluctuate from year to year, in particular with respect to broadcasting revenues.

All of these factors continue to contribute to a difficult sales environment and may further adversely impact the Debtors' ability to grow or maintain their revenues.

   5.    Circulation and Audience Share May Continue to Decline as Consumers Migrate to Other
         Media Alternatives.

Competition for newspaper circulation is based primarily upon the content of a newspaper, service, price, and to an increasing degree, upon the availability of alternative media sources. The Debtors' circulation revenues have declined, reflecting general trends in the newspaper industry, including declining newspaper buying by young people and the consumer migration toward the Internet and other available forms of media for news. The Debtors have attempted to take advantage of the growth of online media by operating local Internet sites in each of their daily newspaper markets, but face increasing competition from other online sources. In addition, in order to address declining circulation in certain markets, the Debtors may increase marketing designed to retain their existing subscriber base and continue to introduce niche publications targeted at commuters and young adults. The Debtors may also increase marketing efforts to drive traffic to their proprietary Internet sites. Any such increased marketing efforts would involve additional cost and expense. However, certain regulatory changes have made the Debtors' efforts at marketing more difficult. For example, the National Do Not Call Registry has impacted the way newspapers sell home-delivery circulation, particularly for the larger newspapers that historically have relied on telemarketing.

Competition for audience share is based primarily on the perceived quality of the original and syndicated programming offered on the Debtors' broadcast stations, and to an increasing degree on the availability of alternative media sources to view this programming. Technological innovation, and the resulting proliferation of alternative programming sources, such as cable, satellite television, telephone company fiber lines, satellite radio, video-on-demand, pay-per-view, the Internet, home video and entertainment systems, and portable entertainment systems, have fragmented television viewing audiences and subjected television broadcast stations to new types of competition. Over the past decade, the aggregate viewership of non-network

programming distributed via multi-channel, video program distributors such as cable television and satellite systems has increased, while the aggregate viewership of the major television networks has declined. Technologies that enable users to view content of their own choosing, in their own time, and to fast-forward or skip advertisements, such as digital video recorders, portable digital devices, and the Internet, may cause changes in consumer behavior or could hinder Nielsen's ability to accurately measure the Debtors' television audience, both of which could affect the attractiveness of the Debtors' offerings to advertisers. If these trends continue to occur, the Debtors' operating results could be adversely affected.

      6.     Changes in the Regulatory Landscape Could Affect the Debtors' Business Operations and Asset Mix.

Various aspects of the Debtors' operations are subject to regulation by governmental authorities in the United States. Changes in the current regulatory environment could result in increased operating costs or the need to divest one or more of the Debtors' properties.

The Debtors' television and radio broadcasting operations are subject to FCC jurisdiction under the Communications Act. A television or radio station may not operate in the United States without the authorization of the FCC. Accordingly, the Debtors' businesses depend upon the Debtors' ability to continue to hold television and radio broadcasting licenses from the FCC, which generally have a term of eight years.

The Communications Act empowers the FCC to regulate other aspects of the Debtors' businesses, in addition to imposing licensing requirements. For example, the FCC has the authority to:

- determine the frequencies, location and power of the Debtors' broadcast stations;
- regulate the equipment used by the Debtors' broadcast stations;
- adopt and implement regulations and policies concerning the ownership and operation of the Debtors' television stations; and
- impose penalties on the Debtors for violations of the Communications Act or FCC regulations.

Federal law also regulates the rates charged for political advertising and the quantity of advertising within children's programs. Broadcasters also are subject to a wide variety of other programming-related and technical regulations, including requirements to broadcast children's educational and informational programming and to provide for sponsorship identification and a prohibition on the broadcast of indecent programming during hours in which the viewing or listening audience is likely to include children.

The Debtors' failure to observe FCC rules and policies could result in the imposition by the FCC of various sanctions, including monetary forfeitures, reporting conditions, and short-term license renewals. In 2006 Congress substantially increased the financial penalties for the airing of indecent programming material outside of "safe harbor" hours. Accordingly, the inadvertent broadcasting of indecent programming may subject a broadcaster to substantial fines. Serious and repeated failures of a broadcast licensee to comply with applicable regulations may, in extreme cases, result in the revocation or non-renewal of a license. In addition, adverse adjudications relating to statutory "character" issues (such as felony or certain anti-trust convictions) and non-compliant media holdings of the Debtors' principals and the Debtors' investors in some instances could reflect adversely upon the Debtors' qualifications as a television and radio licensee.

Cable operators and direct broadcast satellite systems are generally required to carry the primary signal of local commercial television stations pursuant to the FCC's cable "must carry" or direct broadcast satellite "carry-one, carry-all" rules. These cable operators and direct broadcast satellite systems are prohibited from carrying a broadcast signal, however, without obtaining the station's consent. For each distributor, a local television broadcaster must make a choice once every three years whether to proceed under the "must carry" or "carry-one, carry-all" rules or to waive the right to mandatory but uncompensated carriage and negotiate a grant of retransmission consent to permit the cable system operator or satellite service provider to carry the station's signal, in most cases in exchange for some form of consideration from the system operator. If the Debtors'

retransmission consent agreements are terminated or not renewed, or if the Debtors' broadcast signal is distributed on less favorable terms, the Debtors' ability to distribute their programming could be adversely affected.

From time to time, the FCC revises existing regulations and policies in ways that could affect the Debtors' broadcasting operations. Revision of existing cable ownership rules and broadcast multiple ownership and cross-ownership rules and policies by the FCC and other changes in the FCC's rules and policies may continue to affect the competitive landscape in ways that could increase the competition the Debtors face, including competition from larger media, entertainment and telecommunications companies, which may have greater access to capital and resources.

In addition, Congress and the FCC may, in the future, adopt new laws, regulations and policies regarding a wide variety of matters (including technological changes or changes in spectrum assigned to specific services) that could, directly or indirectly, materially and adversely affect the operation and ownership of the Debtors' broadcast properties. For example, the National Broadband Plan, a report to Congress prepared by the FCC's staff and issued on March 16, 2010, contains several recommendations for legislative and regulatory action that could significantly affect television broadcasting, including (i) the reallocation of portions of the present television broadcasting spectrum for non-broadcast mobile and wireless services; (ii) incentive spectrum auctions to encourage current spectrum holders to relinquish all or a portion of their current holdings; (iii) the imposition of user fees on spectrum holders; and (iv) rule changes to permit and encourage spectrum sharing and innovative uses of spectrum. The Debtors cannot predict what regulations or legislation may be proposed, what regulations or legislation may be finally enacted, or what effect, if any, such regulations or legislation could have on the operation and ownership of the Debtors' broadcasting properties.

      7.      The Availability and Cost of Quality Network-Provided and Syndicated Programming May Impact the Debtors' Television Ratings.

The cost of syndicated programming represents a significant portion of television operating expenses. Programming emphasis at the Debtors' stations is placed on network-provided programming, syndicated series, feature motion pictures, local and regional sports coverage, locally produced news, and children's programs. Much of the Debtors' stations' programming is acquired from outside sources, including the broadcast networks with which the Debtors' stations are affiliated and major studios with whom the Debtors are not affiliated.

Syndicated programming costs are impacted largely by market factors, including demand from other stations within the market or cable channels. Availability of syndicated programming depends on the production of compelling programming and the willingness of studios to offer the programming to unaffiliated buyers. In addition, the Debtors usually acquire syndicated programming rights several years in advance of availability to telecast programs and those rights often require multi-year commitments, making it difficult to predict accurately how a program will perform.

In addition, as network affiliation agreements come up for renewal, the Debtors may not be able to negotiate terms comparable to or more favorable than the current agreements. Also, the impact of reverse network compensation payments made by the Debtors to networks pursuant to their affiliation agreements requiring compensation for network programming may have a negative effect on the Debtors' financial condition or results of operations.

The Debtors' inability to continue to acquire or produce affordable programming for their stations could adversely affect operating results or the Debtors' financial condition.

      8.      Newsprint Prices May Continue to be Volatile and Difficult to Predict and Control.

Newsprint is one of the largest expenses of the Debtors' publishing units. The price of newsprint has historically been volatile and the consolidation of North American newsprint mills over the years has reduced the number of suppliers. In addition, in an effort to support higher newsprint prices, newsprint mills often reduce their production of newsprint by shutting down mills or taking downtime in their production schedules. The Debtors have historically been able to realize favorable newsprint pricing by virtue of the Debtors' company-wide volume and a long-term contract with a significant supplier. However, the volatility of newsprint prices has increased over the last two years with significant price increases in 2008 followed by significant price reductions in 2009. Newsprint prices will continue to be impacted by many factors including the relative supply of and demand for newsprint, the exchange rate between U.S. and Canadian dollars and the level of energy prices, which is a significant factor in the cost structure of the newsprint mills. In addition, failure to maintain the Debtors' current consumption levels, further supplier consolidation or the inability to maintain the Debtors' existing relationships with their newsprint suppliers could adversely impact newsprint prices in the future.

     9.     The Debtors' Ability to Grow Depends on the Development of the Debtors' Interactive Businesses.

The Debtors' growth depends to a significant degree upon the development of their interactive businesses. The growth and success of the Debtors' interactive businesses over the long term depends on various factors, among other things:

- increasing online traffic and attracting and retaining a base of frequent visitors to the Debtors' Internet sites, which may be adversely affected by search engines (including Google, the primary search engine directing traffic to the Debtors' Internet sites) changing the algorithms responsible for directing search queries to Internet sites;
- attracting advertisers to the Debtors' Internet sites, which depends partly on the Debtors' ability to generate online traffic and partly on the rate at which users click through advertisements, which may be adversely affected by the development of new technologies to block the display of the Debtors' advertisements;
- maintaining or increasing the advertising rates of the inventory on the Debtors' Internet sites amid significant increases in inventory in the marketplace, which may depend on the market position of the Debtors' brands and the market position and growth of advertising networks and exchange-based advertising marketplaces;
- exploiting new and existing technologies to distinguish the Debtors' products and services from those of the Debtors' competitors and developing new content, products and services, which may move in unanticipated directions due to the development of competitive alternatives, rapid technological change, regulatory changes and shifting market preferences;
- investing funds and resources in online opportunities, in which some of the Debtors' existing competitors and possible additional entrants may have greater operational, financial and other resources than the Debtors or may be better positioned to compete for certain opportunities;
- maintaining and forming strategic relationships to attract more consumers, which will depend on the efforts of the Debtors' partners, fellow investors and licensees that may be beyond the Debtors' control;
- attracting and retaining talent for critical positions; and
- the impact that filing for chapter 11 bankruptcy may have had on the Debtors' public image, normal business operations, financial condition, liquidity or cash flow.

Even if the Debtors continue to develop their interactive businesses, the Debtors may not be successful in generating or increasing revenue from their interactive businesses due to increasing competition and current economic conditions. If the Debtors are not successful in maintaining or growing revenues from their interactive businesses to offset continued declines in revenues from their newspapers, their businesses, operating results or financial condition could be adversely affected.

The Debtors host Internet services that enable individuals to exchange information, generate content, comment on its content and engage in various online activities. The law relating to the liability of providers of these online services for activities of their users is currently unsettled both within the United States and internationally. While the Debtors monitor postings to such websites, claims may be brought against the Debtors for defamation, negligence, copyright or trademark infringement, unlawful activity, tort, including personal injury, fraud, or other theories based on the nature and content of information that may be posted online or generated by the Debtors' users. The Debtors' defense of such actions could be costly and involve significant time and attention of their management and other resources.

10.     The Debtors' Success Will Depend on the Debtors' Ability to Adapt to Technological Change.

The Debtors' businesses are subject to rapid technological change, evolving industry standards, and the emergence of new media technologies and services. In the past, innovations in communications technology, including the explosive growth of the Internet, the spread of satellite and cable television, and the expansion of alternative programming sources have affected many aspects of the Debtors' business. While the Debtors have made significant investments to address the opportunities and challenges presented by these technological changes, these efforts have not always been successful. In the future, the Debtors' ability to profitably grow their business will depend upon their ability to adapt to future technological innovation. No assurance can be given that the Debtors will be successful in this regard.

11.     Historical Financial Information Will Not be Comparable.

As a result of the consummation of the Plan and the transactions contemplated thereby, the Debtors will be operating their current businesses under a new capital structure and will be subject to the fresh start accounting rules. Accordingly, the Debtors' financial condition and results of operations from and after the Effective Date will not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

12.     The Debtors May be Required to Write Down Goodwill or Other Intangible Assets Which May Adversely Affect Their Financial Position and Results of Operations.

The Debtors review goodwill and other indefinite-lived intangible assets for impairment annually, or more frequently if events or changes in circumstances indicate that an asset may be impaired, in accordance with Accounting Standards Codification Topic 350, "Intangibles – Goodwill and Other."

To perform the annual impairment review, the Debtors estimate the fair values of their reporting units to which goodwill has been allocated using many critical factors, including projected future revenue, operating cash flows, and market growth, market multiples, discount rates and consideration of market valuations of comparable companies. The estimated fair values of other intangible assets subject to the annual impairment review, which include newspaper mastheads and FCC licenses, are generally calculated based on projected future discounted cash flow analyses. Adverse changes in expected results of operations and/or unfavorable changes in other economic factors used to estimate fair values, including market multiples and discount rates, could result in non-cash impairment charges in the future, which may have a material adverse effect on the consolidated statements of operations.

13.     Events Beyond the Debtors' Control May Result in Unexpected Adverse Operating Results.

The Debtors' results of operations could be affected in various ways by global or domestic events beyond the Debtors' control, such as wars, political unrest, acts of terrorism, and natural disasters. Such events can quickly result in significant declines in advertising revenues and significant increases in newsgathering costs. Coverage of the war in Iraq and Hurricane Katrina are two examples where newsgathering costs increased and, in the case of Hurricane Katrina, revenues dropped off significantly at the Debtors' two New Orleans television stations.

14.      Changes in Accounting Standards Can Significantly Impact the Debtors' Reported Earnings and Operating Results.

Generally accepted accounting principles and accompanying pronouncements and implementation guidelines (collectively, "GAAP") for many aspects of the Debtors' businesses, including those related to intangible assets, pensions, employee stock ownership plans, income taxes, derivatives, equity-based compensation and broadcast rights, are complex and involve significant judgments. Changes in these rules or their interpretation could significantly change the Debtors' reported earnings and operating results.

15.      Adverse Results from Litigation or Governmental Investigations can Impact the Debtors' Business Practices and Operating Results.

From time to time, the Debtors are parties to litigation and regulatory, environmental and other proceedings with governmental authorities and administrative agencies. Adverse outcomes in lawsuits or investigations could result in significant monetary damages, fines, penalties, or injunctive relief that could adversely affect the Debtors' operating results or financial condition as well as the Debtors' ability to conduct their businesses as they are presently being conducted.

16.      The Debtors Could be faced with Additional Tax Liabilities.

The Debtors are subject to federal and state income taxes and are regularly audited by federal and state taxing authorities. In the years currently under audit, or eligible for future audit, the Debtors consummated certain significant business transactions that they treated or intend to treat as not resulting in gain for income tax purposes but as resulting in gain or loss for financial accounting purposes. In addition, the Debtors treated or intend to treat significant amounts of income as not subject to tax because of the Debtors' status as an S corporation. Significant judgment is required in evaluating the Debtors' tax positions and in establishing appropriate reserves. The Debtors analyze their tax positions and reserves on an ongoing basis and make adjustments when warranted based on changes in facts and circumstances. The resolutions of the Debtors' tax positions are unpredictable and could result in tax liabilities and associated cash payments that are significantly higher or lower than that which has been provided for by the Debtors. In addition, a change in the tax laws of the United States and adjustments to tax positions as a result of audits could materially affect the consequences of the Plan to the Debtors and/or their stockholders.

17.      The Debtors' Company-Sponsored Pension Plans are Currently Underfunded, and Over Time the Debtors Will Likely be Required to Make Cash Contributions to the Plans, Reducing the Cash Available for Working Capital and Other Corporate Uses.

The Debtors provide pension benefits to eligible employees under certain company-sponsored defined benefits pension plans. In 2008, the market value of the Debtors' pension plan assets declined significantly due to negative investment returns. As a result, in accordance with GAAP (Accounting Standards Codification Topic 715, "Compensation Retirement Benefits"), the Debtors' recognized a net pension obligation for the underfunded status of its company-sponsored pension plans at the end of 2008. In 2009, the net pension obligation declined slightly due to an increase in pension assets resulting from investment returns but that increase was largely offset by higher liabilities due to a lower discount rate and other factors.

Cash Funding requirements are not driven directly by the GAAP underfunded position, but by the Pension Protection Act ("PPA"), which uses a different method to calculate the underfunded amount, as described in Article IV.C hereof. Using the PPA methodology and based on various assumptions, the Debtors project that significant cash contributions will be required in the future. Actual Cash Funding may be more or less than these projections. For example, if PPA discount rates remain low and/or investment returns are below expectations, then without legislative relief the projected contributions may be higher than currently anticipated. As a result, the Debtors may have less cash available for working capital and other corporate uses, which may have an adverse impact on the Debtors' operations, financial condition and liquidity.

155

In addition, the Debtors participate in multiemployer pension plans on behalf of employees represented by certain unions. Contributions to these multiemployer pension plans could increase as a result of future collective bargaining, funding deficiencies or other factors. The Debtors' obligations to make contributions to their pension plans and multiemployer pension plans in which they participate would reduce the cash available for working capital and other corporate uses and may have a material adverse impact on the Debtors' operations, financial condition and liquidity.

18.    Labor Strikes, Lock-Outs and Protracted Negotiations can Lead to Business Interruptions and Increased Operating Costs.

As of December 31, 2009, union employees comprise about fifteen percent (15%) of the Debtors' workforce. The Debtors are required to negotiate collective bargaining agreements across their respective business units on an ongoing basis. Complications in labor negotiations can lead to work slowdowns or other business interruptions and greater overall employee costs.

19.    Acquisitions, Investments and Dispositions Pose Inherent Financial and Other Risks and Challenges.

The Debtors continuously evaluate their businesses and make strategic acquisitions, dispositions, and investments. These transactions involve challenges and risks in negotiation, execution, valuation and integration. There can be no assurance that any such transaction can be completed. Moreover, competition for certain types of acquisitions and investments is significant. Even if successfully negotiated, closed and integrated, certain acquisitions or investments may prove not to advance the Debtors' businesses strategy and may fall short of expected return on investment targets. In certain of the Debtors' investments, the Debtors have taken or may take a minority position in a company with limited voting rights and an inability to exert absolute control over the entity.

20.    The Reorganized Debtors May Continue to Have Substantial Indebtedness.

The Reorganized Debtors may continue to have substantial indebtedness following the Effective Date, which may include a New Senior Secured Term Loan in an aggregate principal amount of up to two times the Debtors' trailing twelve month EBITDA (as defined in the New Senior Secured Term Loan Agreement) as of the end of the fiscal quarter most recently ended prior to the Effective Date. For purposes of the Financial Projections, the aggregate principal amount of the New Senior Secured Term Loan is assumed to be $900 million. While the Reorganized Debtors' management believes that future operating cash flow, together with financing arrangements, will be sufficient to finance operating requirements under the Reorganized Debtors' business plan, the Reorganized Debtors' leverage and debt service requirements could make it more vulnerable to economic downturns in the markets the Reorganized Debtors serve or in the economy generally.

The degree to which the Reorganized Debtors will be indebted could have important consequences because it may:

- require the Reorganized Debtors to dedicate a substantial portion of their cash flows to the payment of principal and interest on their debt which will reduce the funds available for other purposes;
- limit the Reorganized Debtors liquidity and operational flexibility and their ability to respond to the challenging general and industry-specific economic and business conditions that currently exist or that the Reorganized Debtors may face in the future;
- require the Reorganized Debtors in the future to defer planned capital expenditures, further reduce the size of the Reorganized Debtors' workforce, reduce discretionary spending, dispose of assets or forgo acquisitions or other strategic opportunities, any of which decisions may affect the Reorganized Debtors' revenues and place them at a competitive disadvantage compared to their competitors with less debt or with comparable debt at more favorable interest rates and who, as a

result, may be better positioned to withstand economic downturns or pursue key acquisitions or other strategic opportunities;

- limit the Reorganized Debtors' ability to obtain additional financing in the future;
- expose the Reorganized Debtors to increased interest rate risk because a substantial portion of the Reorganized Debtors' debt obligations may be at variable interest rates; and
- place the Reorganized Debtors at a competitive disadvantage because they may be more highly leveraged than some of their competitors.

In addition, any new financing facility that the Reorganized Debtors may enter into as of the Effective Date pursuant to the Plan will likely contain covenants that impose operating and financial restrictions on the Reorganized Debtors. These covenants could adversely affect the Reorganized Debtors' ability to finance future operations, potential acquisitions or capital needs or to engage in business activities that may be in their interest, including implementing the Reorganized Debtors' Plan.

## D.   **Risks to Creditors Who Will Receive Securities**

The ultimate recoveries under the Plan to Holders of Claims that receive shares of New Common Stock or New Warrants to purchase shares of New Common Stock pursuant to the Plan will depend on the realizable value of the shares of New Common Stock. Shares of New Common Stock are subject to a number of material risks, including, but not limited to, those specified below. Prior to voting on the Plan, each Holder of Claims that are to be satisfied in whole or part through a distribution of New Common Stock should carefully consider the risk factors specified or referred to below, as well as all of the information contained in the Plan.

1.     The Lack of an Established Market for the Securities May Adversely Affect the Liquidity of the New Common Stock and the New Warrants.

No established market exists for the New Common Stock or New Warrants and there can be no assurance that an active market for the shares of the New Common Stock or New Warrants will develop, nor can any assurance be given as to the prices at which such securities might be traded. Although Reorganized Tribune will use its reasonable best efforts to list, as promptly as practicable after the Effective Date, the New Class A Common Stock for trading on the NYSE or for quotation in the NASDAQ stock market, there can be no assurance that the listing or quotation of the New Class A Common Stock will be accepted or that an active or liquid trading market will develop for the New Class A Common Stock. If a trading market does not develop or is not maintained, holders of shares of the New Common Stock and New Warrants may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such market were to exist, such securities could trade at prices higher or lower than the value attributed to such securities in connection with their distribution under the Plan, depending upon many factors, including, without limitation, markets for similar securities, industry conditions, the Reorganized Debtors' performance and investor expectations thereof. In addition, some persons who receive shares of the New Common Stock and/or the New Warrants may prefer to liquidate their investment in the near term rather than hold such securities on a long-term basis. Accordingly, any market for such securities may be volatile, at least for an initial period following the Effective Date, and may be depressed until the market has had time to absorb any such sales and to observe the Reorganized Debtors' performance.

2.     Lack of Dividends May Adversely Affect Liquidity of the New Common Stock.

The Debtors do not anticipate that cash dividends or other distributions will be made with respect to the New Common Stock in the foreseeable future. In addition, covenants in certain debt instruments to which the Reorganized Debtors will be a party may restrict their ability to pay dividends and make certain other payments. Further, such restrictions on dividends may have an adverse impact on the market demand for the New Common Stock as certain institutional investors may invest only in dividend-paying equity securities or may operate under other restrictions that may prohibit or limit their ability to invest in the securities issued pursuant to the Plan.

3.      Future Sales or Issuances of Equity, Including Issuances in Respect of New Warrants to Purchase New Class A Common Stock, May Depress the Stock Price of the New Common Stock.

If holders of New Common Stock sell substantial amounts of New Common Stock or Reorganized Tribune issues substantial additional amounts of its equity securities, or there is a belief that such sales or issuances could occur, the market price of the New Common Stock could decline significantly. Reorganized Tribune may issue New Warrants to purchase shares of New Class A Common Stock in certain circumstances. If Holders who receive New Warrants in connection with the implementation of the Plan exercise such warrants and purchase a significant number of shares of New Class A Common Stock, the market price of the New Class A Common Stock may be adversely affected. In addition, any new issuances of equity securities by Reorganized Tribune including as a result of warrant exercises, may be dilutive to existing stockholders of Reorganized Tribune.

4.      The Limited Voting Rights of the New Class B Common Stock and the Lack of Voting Rights of the New Warrants Could Impact their Attractiveness to Investors and, as a Result, their Market Value.

In certain circumstances, Reorganized Tribune may issue shares of New Class B Common Stock and/or New Warrants. The New Class A Common Stock and New Class B Common Stock generally provide identical economic rights, but holders of the New Class B Common Stock have limited voting rights, including that such holders have no right to vote in the election of directors. The holders of the New Warrants have no voting rights. The difference in voting rights of the New Class A Common Stock on the one hand, and New Class B Common Stock and New Warrants on the other hand, could diminish the value of the New Class B Common Stock and the New Warrants to the extent that investors or potential future purchasers of the New Class B Common Stock or the New Warrants ascribe value to the superior voting rights of the New Class A Common Stock. The Certificate of Incorporation of Reorganized Tribune, which will be filed with the Plan Supplement as Exhibit 5.3.2.1 to the Plan, contains more information about the rights and limitations associated with the New Class B Common Stock. In addition, the New Warrant Agreement, which will be filed with the Plan Supplement as Exhibit +.+.123 1.1.124 to the Plan, contains more information about the rights and limitations associated with the New Warrants.

5.      Certain Holders May be Restricted in Their Ability to Transfer or Sell Their Securities.

To the extent that New Common Stock, New Warrants or any other securities are issued under the Plan and are covered by section 1145(a)(1) of the Bankruptcy Code, they may be resold by the holders thereof without registration unless the holder is an "underwriter" with respect to such securities. Resales by Persons who receive New Common Stock or New Warrants pursuant to the Plan that are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such Persons would be permitted to sell such New Common Stock or New Warrants without registration if they are able to comply with the provisions of rule 144 under the Securities Act.

Reorganized Tribune will use its reasonable best efforts to list, as promptly as practicable after the Effective Date, the New Class A Common Stock for trading on the NYSE or for quotation in the NASDAQ stock market but will have no liability if it is unable to do so. As noted above (see "Lack of an Established Market for the Securities May Adversely Affect the Liquidity of the New Common Stock and the New Warrants"), there can be no assurance that the listing or quotation of the New Class A Common Stock will be accepted or that an active or liquid trading market will develop for the New Class A Common Stock. Efforts to list the New Class A Common Stock, if successful, would include registering the New Class A Common Stock under the Exchange Act. Registration under the Exchange Act is a separate process from registration under the

Securities Act and would not be sufficient to permit resales by persons who receive New Common Stock or New Warrants pursuant to the Plan and who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code. Reorganized Tribune has no current plans to ~~register~~list the New Class B Common Stock on the NYSE or for quotation on the NASDAQ Stock Market or to register the New Class B Common Stock or New Warrants under the Securities Act, the Exchange Act or under equivalent state securities laws such that the recipients of the New Class B Common Stock or New Warrants would be able to resell their securities pursuant to an effective registration statement.

The Certificate of Incorporation contains restrictions on stockholders' ability to transfer New Common Stock and New Warrants designed to ensure compliance with the FCC broadcast multiple ownership and cross-ownership rules and the limitations on foreign ownership or control of FCC broadcast licenses imposed by the Communications Act. Furthermore, certificates for shares of New Common Stock and certificates for New Warrants may bear a legend restricting the sale, transfer, assignment, conversion or other disposal of such securities.

## XV.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax aspects of the Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim or Interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences of the Plan. No representations or assurances are being made to the Holders of Claims or Interests with respect to the U.S. federal income tax consequences described in the Plan.

*      *      *      *

Any discussion of U.S. federal tax issues set forth in this Disclosure Statement was written solely in connection with the confirmation of the Plan to which the transactions described in this Disclosure Statement are ancillary. Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any U.S. federal tax penalties that may be imposed on such person. Each holder of a Claim or Interest should seek advice based on its particular circumstances from an independent tax advisor.

*      *      *      *

A.    **Federal Income Tax Consequences to the Debtors.**

1.      Termination of Subchapter S Corporation Status.

On March 13, 2008, Tribune filed an election to be treated as a subchapter S corporation under the IRC, which election became effective as of the beginning of its 2008 fiscal year. Tribune also elected to treat nearly all of its subsidiaries as qualified subchapter S subsidiaries. Subject to certain limitations (such as the built-in gains tax applicable to Tribune's net unrealized gains as of the beginning of the 2008 fiscal year that are recognized in the subsequent ten taxable years), Tribune and its qualified subchapter S subsidiaries are not currently subject to corporate level federal income tax. Instead, the income of Tribune and such subsidiaries is required to be reported by its stockholders. The ESOP, which, as of the Petition Date, was the sole stockholder of Tribune, does not pay taxes on the income that is passed through to it because the ESOP is an employee

benefit plan that qualifies for favorable tax treatment under Section 401(a) of the IRC. Although most states in which Tribune and its subsidiaries operate recognize the subchapter S corporation status, some impose taxes at a reduced rate.

As a result of the implementation of the Plan, Tribune will no longer be eligible to be treated as a subchapter S corporation beginning on the Effective Date. Accordingly, Reorganized Tribune and its subsidiaries will be subject to entity-level tax on all of their income and gains beginning on the Effective Date at corporate income tax rates. As described below, Reorganized Tribune is expected to have limited tax attributes available to offset such income and gains.

      2.        Cancellation of Debt and Reduction of Tax Attributes.

A debtor generally must recognize income from the cancellation of debt ("COD Income") to the extent that its debt is discharged for consideration less than the amount of such debt. For these purposes, consideration includes the amount of cash and the fair market value of property, including stock of the debtor. COD Income is not required to be included in taxable income, however, if the debtor is in bankruptcy (the "Bankruptcy Exception"). Instead, the debtor is required to reduce certain of its tax attributes by the amount of excluded COD Income, generally in the following order: net operating losses ("NOLs"), general business credit carryforwards, minimum tax credit carryforwards, capital loss carryforwards, the tax basis of the debtor's assets, passive activity loss or credit carryovers, and, finally, foreign tax credit tax carryforwards (collectively, "Tax Attributes"). Generally, the reduction in the tax basis of assets cannot exceed the excess of the total bases of the debtor's property held immediately after the debt discharge over the total liabilities of the debtor immediately after the discharge (the "Liability Floor Rule").

The Debtors expect to realize substantial COD Income as a result of the implementation of the Plan. The precise amount of COD Income will depend on, among other things, the fair market value of the New Common Stock and New Warrants, which cannot be known with certainty until after the Effective Date. Pursuant to the Bankruptcy Exception, this COD Income will not be included in the Debtors' taxable income, but they will have to reduce their Tax Attributes after calculating the tax for the taxable year of discharge.

As a subchapter S corporation, Tribune does not currently have any NOLs or other significant Tax Attributes other than tax basis in assets. Although the projected COD Income is expected to exceed the Debtors' aggregate tax basis in assets, under the Liability Floor Rule the Debtors' will not be required to reduce such basis below their total liabilities after the discharge.

**B.**      **Federal Income Tax Consequences to Holders of Claims and Interests.**

The U.S. federal income tax consequences of the transactions contemplated by the Plan to Holders of Claims and Interests that are United States Persons will depend upon a number of factors. For purposes of the following discussion, a "United States Person" is any individual who is a citizen or resident of the United States, or any entity (i) that is a corporation (or entity treated as a corporation) created or organized in or under the laws of the United States or any state thereof, (ii) that is an estate, the income of which is subject to U.S. federal income taxation regardless of its source or (iii) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control; or (b) that has elected to continue to be treated as a United States Person for U.S. federal income tax purposes. In the case of a partnership, the U.S. federal income tax treatment of its partners will depend on the status of the partner and the activities of the partnership. A "Non-United States Person" is any person or entity (other than a partnership) that is not a United States Person. For purposes of the following discussion and unless otherwise noted below, the term "U.S. Holder" means a beneficial owner of a Claim or Interest that is a United States Person. The general U.S. federal income tax consequences to Holders of Claims or Interests that are Non-United States Persons are discussed below under Article XVIXV.B.14 of this Disclosure Statement.

The U.S. federal income tax consequences to U.S. Holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things, (i) the manner in which a U.S. Holder acquired a Claim; (ii) the length of time the Claim has been held; (iii) whether the Claim was acquired at a discount; (iv) whether the U.S. Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (v) whether the U.S. Holder has previously included in income accrued but unpaid interest with respect to the Claim; (vi) the method of tax accounting of the U.S. Holder; (vii) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (viii) whether the Claim is a capital asset in the hands of the U.S. Holder. Certain holders of Claims or Interests (such as foreign persons, subchapter S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers and tax-exempt organizations) may be subject to special rules not addressed in this summary. In addition, this summary does not discuss consequences to holders of the Barclays Swap Claim. There also may be state, local, and/or non-U.S. income or other tax considerations or U.S. federal estate and gift tax considerations applicable to holders of Claims or Interests that are not addressed in this discussion.

EACH U.S. HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISORS REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

1.      General.

A U.S. Holder of a Claim may recognize ordinary income or loss with respect to any portion of its Claim attributable to accrued but unpaid interest. A U.S. Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as a payment of interest, regardless of whether such U.S. Holder realizes an overall gain or loss as a result of surrendering its Claim. In general, a U.S. Holder that previously included in its income accrued but unpaid interest attributable to its Claim will recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such U.S. Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim. Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the Debtors intend to allocate for U.S. federal income tax purposes the consideration paid pursuant to the Plan with respect to a Claim first to the principal amount of such Claim as determined for U.S. federal income tax purposes and then to accrued interest, if any, with respect to such Claim. Accordingly, in cases where a U.S. Holder receives consideration in an amount that is less than the principal amount of its Claim, the Debtors intend to allocate the full amount of consideration transferred to such U.S. Holder to the principal amount of such obligation and to take the position that no amount of the consideration to be received by such U.S. Holder is attributable to accrued interest. There is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

A U.S. Holder that receives New Common Stock or New Warrants in exchange for its Claim will be required to treat gain recognized on a subsequent sale or other taxable disposition of such New Common Stock or New Warrants as ordinary income to the extent of (i) any bad debt deductions taken with respect to the Claim and any ordinary loss deductions incurred upon satisfaction of the Claim, less any income (other than interest income) recognized by the U.S. Holder upon satisfaction of its Claim, and (ii) any amounts which would have been included in the U.S. Holder's gross income if the U.S. Holder's Claim had been satisfied in full, but which were not included in income because of the application of the cash method of accounting.

Subject to the foregoing rules relating to accrued interest, gain or loss recognized for U.S. federal income tax purposes as a result of the consummation of the Plan by U.S. Holders of Claims or Interests that hold their Claims or Interests as capital assets generally will be treated as a gain or loss from the sale or exchange of such capital asset. Capital gain or loss will be long-term if the Claim or Interest was held by the U.S. Holder for more than one year and otherwise will be short-term. Any capital losses realized generally may be used by a

corporate U.S. Holder only to offset capital gains, and by an individual U.S. Holder only to the extent of capital gains plus $3,000 of other income.

2.        Market Discount.

The market discount provisions of the IRC may apply to holders of certain Claims.  In general, a debt obligation that is acquired by a holder in the secondary market is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its revised issue price) exceeds, by more than a statutory de minimis amount, the tax basis of the debt obligation in the holder's hands immediately after its acquisition (any such excess, "market discount").  In general, a market discount obligation is treated as having accrued market discount as of any date equal to the total market discount multiplied by a fraction, the numerator of which is the number of days the holder has owned the market discount obligation and the denominator of which is the total number of days that remained until maturity at the time the holder acquired the market discount obligation.  If a U.S. Holder has Claims with accrued market discount and such U.S. Holder realizes gain upon the exchange of its Claims for property pursuant to the Plan, such U.S. Holder may be required to include as ordinary income the amount of such accrued market discount to the extent of such realized gain.  U.S. Holders who have Claims with accrued market discount should consult their tax advisors as to the application of the market discount rules to them in view of their particular circumstances.  In particular, U.S. Holders of Claims that are "securities" for U.S. federal income tax purposes and that are exchanged for New Common Stock and, if applicable, New Warrants should consult their tax advisors regarding recognition of ordinary income upon a subsequent disposition of such New Common Stock or New Warrants.  See "Definition of Security" below.

3.        U.S. Holders of Loan Claims and Loan Guaranty Claims (not including the Barclays Swap Claim).

U.S. Holders of Allowed Loan Claims and Loan Guaranty Claims will receive New Common Stock (and in certain caseswhere applicable, New Warrants) and Cash, and may receive the New Senior Secured Term Loan, in exchange for their Claims.  Each such U.S. Holder will realize gain or loss equal to the difference between the adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the New Common Stock and any New Warrants received, (ii) the Cash received, and (iii) the "issue price" of the New Senior Secured Term Loan, if received.  See "Federal Income Tax Treatment of the New Senior Secured Term Loan," below, for a discussion related to the determination of the issue price of the New Senior Secured Term Loan.

The tax consequences to a U.S. Holder of an Allowed Loan Claim and Loan Guaranty Claim depend on whether its Claim is a "security" for U.S. federal income tax purposes.  TheAlthough not free from doubt, the New Senior Secured Term Loan will likely not constitute a security for U.S. federal income tax purposes.  See "Definition of 'Security'" below.  U.S. Holders are encouraged to consult with their tax advisors in connection with the determination of whether the New Senior Secured Term Loan constitutes a security for U.S. federal income tax purposes.  The remainder of this discussion assumes that the New Senior Secured Term Loan will not constitute a security for U.S. federal income tax purposes.

If the Claim does not constitute a security for U.S. federal income tax purposes, the exchange of the Claim for New Common Stock (and in certain caseswhere applicable, New Warrants), Cash and the New Senior Secured Term Loan, if received, will be a taxable transaction, and the U.S. Holder of such Claim will be required to recognize gain or loss equal to the full amount of its gain or loss realized on the exchange.  In such a case, a U.S. Holder's tax basis in the New Common Stock and any New Warrants received in the exchange will equal the fair market value of the New Common Stock and New Warrants on the date received.  A U.S. Holder's tax basis in the New Senior Secured Term Loan, if received, will equal the issue price of the New Senior Secured Term Loan.  A U.S. Holder's holding period in such assets will commence on the day after the date received.  See "Federal Income Tax Treatment of the New Senior Secured Term Loan," below, for a discussion related to the determination of the issue price of the New Senior Secured Term Loan.

If the Claim constitutes a security for U.S. federal income tax purposes, the exchange of such Claim will be treated as a recapitalization for U.S. federal income tax purposes. In such a case, a U.S. Holder of such Claim who realizes a loss on the exchange will not be permitted to recognize such loss, except to the extent of any loss attributable to accrued but unpaid interest with respect to such Claim. A U.S. Holder of such Claim who realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized on the exchange and (ii) the sum of the issue price of the New Senior Secured Term Loan, if received, and the amount of Cash received as part of the exchange. A U.S. Holder's tax basis in the New Common Stock and any New Warrants received in exchange for its Claim will equal its adjusted tax basis in its Claim, increased by the amount of gain recognized on the exchange, if any, and reduced by the sum of (i) the fair market value of the New Senior Secured Term Loan, if received, and (ii) the amount of Cash received as part of the exchange. If a U.S. Holder receives both New Common Stock and New Warrants in exchange for its Claim, such basis will be allocated between the New Common Stock and the New Warrants in proportion to their relative fair market values on the date received. A U.S. Holder's holding period in the New Common Stock and any New Warrants will include the holding period in its Claim surrendered. A U.S. Holder's tax basis in the New Senior Secured Term Loan, if received, will equal the issue price of the New Senior Secured Term Loan. A U.S. Holder's holding period in the New Senior Secured Term Loan, if received, will commence on the day after the date received.

Because a U.S. Holder's ultimate share of consideration based on its Allowed Loan Claim may not be determinable on the Effective Date due to the existence of Disputed Claims, such U.S. Holder should realize additional or offsetting gain due to the disallowance of a Disputed Claim if, and to the extent that, the aggregate amount of consideration ultimately received by a U.S. Holder is greater than the amount used in initially determining such U.S. Holder's gain or loss in accordance with the procedures described in the preceding paragraphs.

See "Federal Income Tax Treatment of New Senior Secured Term Loan," below, for a discussion related to the tax considerations of holding the New Senior Secured Term Loan.

4.    U.S. Holders of Senior Noteholder Claims.

U.S. Holders of Allowed Senior Noteholder Claims will receive New Common Stock (and ~~in certain cases,~~ where applicable, New Warrants) and Cash, and may receive the New Senior Secured Term Loan, in exchange for their Claims. Each such U.S. Holder will realize gain or loss equal to the difference between the adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the New Common Stock and New Warrants received, (ii) any Cash received, and (iii) the issue price of the New Senior Secured Term Loan, if received. See "Federal Income Tax Treatment of the New Senior Secured Term Loan," below, for a discussion related to the determination of the issue price of the New Senior Secured Term Loan.

The exchange of such Claim will likely be treated as a recapitalization for U.S. federal income tax purposes. In such a case, a U.S. Holder of such Claim who realizes a loss on the exchange will not be permitted to recognize such loss, except to the extent of any loss attributable to accrued but unpaid interest with respect to such Claim. A U.S. Holder of such Claim who realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized on the exchange and (ii) the sum of the issue price of the New Senior Secured Term Loan, if received, and the amount of Cash received as part of the exchange. A U.S. Holder's tax basis in the New Common Stock and any New Warrants received in exchange for its Claim will equal its adjusted tax basis in its Claim, increased by the amount of gain recognized on the exchange, if any, and reduced by the sum of (i) the fair market value of the New Senior Secured Term Loan, if received, and (ii) the amount of Cash received as part of the exchange. If a U.S. Holder receives both New Common Stock and New Warrants in exchange for its Claim, such basis will be allocated between the New Common Stock and the New Warrants in proportion to their relative fair market values on the date received. A U.S. Holder's holding period in the New Common Stock and any New Warrants will include the holding period in its Claim surrendered. A U.S. Holder's tax basis in the New Senior Secured Term Loan, if received, will equal the issue price of the New

Senior Secured Term Loan. A U.S. Holder's holding period in the New Senior Secured Term Loan, if received, will commence on the day after the date received.

See "Federal Income Tax Treatment of New Senior Secured Term Loan," below, for a discussion related to the tax considerations of holding the New Senior Secured Term Loan.

5.      U.S. Holders of General Unsecured Claims (not including Claims arising from a Non-Qualified Former Employee Benefit Plan).

U.S. Holders of Allowed General Unsecured Claims will receive Cash in exchange for their Claims. Each U.S. Holder of an Allowed General Unsecured Claim will recognize gain or loss equal to the difference between (i) the adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the amount of Cash received as part of the exchange.

Because a U.S. Holder's ultimate share of consideration based on its General Unsecured Claim against the Filed Subsidiary Debtors may not be determinable on the Effective Date due to the existence of Disputed Claims, such U.S. Holder should recognize additional or offsetting gain due to the disallowance of a Disputed Claim if, and to the extent that, the aggregate amount of consideration ultimately received by a U.S. Holder is greater than the amount used in initially determining such U.S. Holder's gain or loss in accordance with the procedures described in the preceding paragraphs.

6.      U.S. Holders of Convenience Claims.

U.S. Holders of Allowed Convenience Claims will receive Cash in exchange for their Claims. Each U.S. Holder of a Convenience Claim will recognize gain or loss equal to the difference between (i) the adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the amount of Cash received as part of the exchange.

7.      U.S. Holders of Claims arising from a Non-Qualified Former Employee Benefit Plan.

U.S. Holders of Allowed Claims arising from a Non-Qualified Former Employee Benefit Plan will receive Cash in exchange for their Claims. The amount of Cash received as part of the exchange will likely be treated as compensation income to a U.S. Holder of a Claim arising from a Non-Qualified Former Employee Benefit Plan to the extent not previously included in income by such U.S. Holder. Under Treasury Regulations promulgated under Section 409A of the IRC, such a payment may be treated as an acceleration of deferred compensation, and, if so, would be subject to an additional twenty percent (20%) tax, and interest would be due at the federal underpayment rate plus one percent (1%) on the underpayments of income tax on the amount of such deferred compensation had it been included in income in the first year it was no longer subject to a substantial risk of forfeiture.[79]

Because a U.S. Holder's ultimate share of consideration based on its Claim against the Filed Subsidiary Debtors may not be determinable on the Effective Date due to the existence of Disputed Claims, such U.S. Holder would likely recognize additional compensation income due to the disallowance of a Disputed Claim if, and to the extent that, the aggregate amount of consideration ultimately received by a U.S. Holder is greater than the amount used in initially determining such U.S. Holder's compensation income in accordance with the procedures described in the preceding paragraphs. Such additional payments may also be subject to the additional twenty percent (20%) tax and interest imposed on deferred compensation that does not satisfy the requirements of Section 409A of the IRC.

8.      U.S. Holders of EGI-TRB LLC Notes Claims.

Pursuant to the Plan, all EGI-TRB LLC Notes Claims will be extinguished, and U.S. Holders of EGI-TRB LLC Notes Claims will receive nothing in exchange for such Claims.  As a result, each U.S. Holder of an EGI-TRB LLC Notes Claim generally will recognize a loss equal to the U.S. Holder's adjusted tax basis in such Claim extinguished under the Plan, except to the extent that such U.S. Holder previously claimed a loss with respect to such Claim under its regular method of accounting.

9.      U.S. Holders of PHONES Notes Claims.

Pursuant to the Plan, all PHONES Notes Claims will be extinguished, and U.S. Holders of PHONES Notes Claims will receive nothing in exchange for such Claims.  As a result, each U.S. Holder of a PHONES Notes Claim generally will recognize a loss equal to the U.S. Holder's adjusted tax basis in such Claim extinguished under the Plan, except to the extent that such U.S. Holder previously claimed a loss with respect to such Claim under its regular method of accounting.  U.S. Holders of PHONES Notes Claims should consult their tax advisors with respect to the character of their loss.

10.      U.S. Holders of Securities Litigation Claims.

Pursuant to the Plan, all Securities Litigation Claims will be extinguished, and U.S. Holders of Securities Litigation Claims will receive nothing in exchange for such Claims. As a result, each U.S. Holder of a Securities Litigation Claim generally will recognize a loss equal to the U.S. Holder's adjusted tax basis, if any, in such Claim, except to the extent that such U.S. Holder previously claimed a loss with respect to such Claim under its regular method of accounting.

11.      U.S. Holders of Tribune Interests.

Pursuant to the Plan, all Tribune Interests will be extinguished, and U.S. Holders of Tribune Interests will receive nothing in exchange for such Tribune Interests.  As a result, each U.S. Holder of Tribune Interests generally will recognize a loss equal to the U.S. Holder's adjusted tax basis in such Tribune Interests extinguished under the Plan, except to the extent that such U.S. Holder previously claimed a loss with respect to such Tribune Interests under its regular method of accounting.

12.      Definition of "Security."

The term "security" is not defined in the IRC or in the Treasury Regulations. Whether an instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all of the facts and circumstances.  Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument.  These authorities have indicated that an initial term of less than five years is evidence that the instrument is generally not a security, whereas an initial term of ten years or more is evidence that it is a security.  Treatment of an instrument with an initial term between five and ten years is generally unsettled. Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including, but not limited to, whether repayment is secured, the level of creditworthiness of the obligor, whether the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

13.      Federal Income Tax Treatment of the New Senior Secured Term Loan.

If the New Senior Secured Term Loan is "publicly traded," its issue price is generally expected to equal its fair market value on the Effective Date.  If the New Senior Secured Term Loan is not publicly traded, its issue price will depend on whether a substantial amount of the New Senior Secured Term Loan is exchanged for debt instruments that are publicly traded, in which case the issue price of the New Senior Secured Term Loan is generally expected to be determined by reference to the fair market value of the publicly traded debt for which a substantial amount of the New Senior Secured Term Loan has been exchanged.  Otherwise, the issue price of

the New Senior Secured Term Loan is generally expected to equal its stated redemption price at maturity. For these purposes, a debt instrument generally is treated as publicly traded if, at any time during the 60 day period ending 30 days after the issue date, (i) the debt is listed on a national securities exchange or quoted on an interdealer quotation system sponsored by a national securities association, (ii) it appears on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations (including rates, yields or other pricing information) of one or more identified brokers, dealers or traders or actual prices (including rates, yields or other pricing information) of recent sales transactions or (iii) if, in certain circumstances, price quotations are readily available from dealers, brokers or traders.

A U.S. Holder who receives the New Senior Secured Term Loan will generally be required to include stated interest on the New Senior Secured Term Loan in income in accordance with U.S. Holder's regular method of tax accounting. In addition, if the New Senior Secured Term Loan is treated as issued with original issue discount for U.S. federal income tax purposes, a U.S. Holder of the New Senior Secured Term Loan will be required to include in income as interest the amount of such original issue discount over the term of the New Senior Secured Term Loan based on the constant yield method. In such a case, a U.S. Holder will also be required to include amounts in income before they are received. A U.S. Holder's tax basis in the New Senior Secured Term Loan will be increased by the amount of original issue discount included in income and reduced by the amount of Cash (other than payments of stated interest) received with respect to the New Senior Secured Term Loan.

14.    Non-United States Persons.

A holder of a Claim that is a Non-United States Person generally will not be subject to U.S. federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, or (ii) such holder is an individual and is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

15.    Information Reporting and Backup Withholding.

Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting by the payor (the relevant Debtor) to the IRS. Moreover, such reportable payments may be subject to backup withholding (currently at a rate of twenty-eight percent (28%)) under certain circumstances. Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) is notified by the IRS of a failure to report interest or dividends properly, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is correct and that the holder is a United States person that is not subject to backup withholding. Certain persons are exempt from backup withholding, including, under certain circumstances, corporations and financial institutions. Holders of Allowed Claims and Interests are urged to consult their own tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

Recent legislation generally imposes withholding of 30% on payments to certain foreign entities (including financial intermediaries), after December 31, 2012, of dividend payments on and the gross proceeds of dispositions of U.S. common stock and possibly warrants, unless various U.S. information reporting and due diligence requirements (that are in addition to, and potentially significantly more onerous than, the requirement to deliver an IRS Form W-8BEN) have been satisfied. Non-U.S. Holders should consult their tax advisers

regarding the possible implications of this legislation for their receipt of interests in the New Common Stock and New Warrants.

### C.    Federal Income Tax Treatment of Other Parent Claims Reserves and Subsidiary GUC Reserves.

Reorganized Tribune may establish one or more Other Parent Claims Reserves and Subsidiary GUC Reserves (together, "Reserves") to make distributions to Holders of Disputed Claims that become Allowed Claims after the Effective Date. Distributions from each such Reserve will be made to Holders of Disputed Claims when such Claims are subsequently Allowed, and to Holders of Allowed Claims (whether such Claims were Allowed on or after the Effective Date) when any Disputed Claims are subsequently disallowed.

~~Reorganized Tribune may elect to treat each Reserve as a grantor trust for U.S. federal income tax purposes. As a grantor trust, the assets of such Reserve would be treated as directly owned by Reorganized Tribune.~~

~~To the extent a valid grantor trust election is not made with respect to a Reserve, such Reserve will likely~~Each Reserve may be structured in a manner intended to cause it to be taxable as a "qualified settlement fund" ("QSF"), separate and apart from Reorganized Tribune, subject to a separate entity-level tax on its income at the highest rate applicable for trusts and estates upon any amounts earned by such reserve. Therefore, distributions from each such Reserve may be reduced to satisfy any taxes payable by the QSF.

Holders of Claims should note the tax treatment of such Reserves is unclear and should consult their own tax advisors.

### D.    Importance of Obtaining Professional Tax Assistance.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE AND LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

### E.    Reservation of Rights.

This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan. The Debtors and their advisors reserve the right to further modify, revise or supplement this Article ~~XVI~~XV and the other tax related sections of the Plan up to ten days prior to the date by which objections to Confirmation of the Plan must be filed and served.

## XVI.  CERTAIN FEDERAL, STATE AND FOREIGN SECURITIES LAW CONSIDERATIONS

### A.    Federal and State Securities Law Considerations.

Upon consummation of the Plan, the Debtors will rely on section 1145 of the Bankruptcy Code to exempt the issuance of the shares of New Common Stock and the New Warrants from the registration requirements of the Securities Act and of any state securities or "blue sky" laws. Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of the debtor or a successor to a debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administrative expense in a case concerning, the debtor or a successor to the debtor under the plan. The Debtors believe that Reorganized Tribune is a successor to Tribune under the Plan for purposes of section 1145 of the Bankruptcy Code and that the offer and sale of the shares of New Common Stock and the

New Warrants under the Plan satisfies the requirements of section 1145 and is therefore exempt from the registration requirements of the Securities Act and state laws.

**B.      Subsequent Transfers of New Securities.**

In general, recipients of the New Common Stock and the New Warrants will be able to resell their shares of New Common Stock or New Warrants without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the Holder of such stock or warrant is an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code.  In addition, the New Common Stock and the New Warrants generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. However, recipients of the New Common Stock and the New Warrants issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (i) purchases a claim with a view to distribution of any security to be received in exchange for such claim, (ii) offers to sell securities issued under a plan for the Holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (iv) is an "issuer" of the relevant security, as such term is used in Section 2(11) of the Securities Act.  Under Section 2(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly through one or more intermediaries controlling, controlled by or under common control with the issuer.

To the extent that recipients of the New Common Stock or New Warrants under the Plan are deemed to be "underwriters," the resale of the shares of New Common Stock or New Warrants received by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable laws.  Persons deemed to be underwriters may, however, be permitted to sell such New Common Stock or New Warrants without registration pursuant to the provisions of Rule 144 under the Securities Act.  This rule permits the public resale of securities received by "underwriters" if current information regarding the issuer is publicly available and if certain volume limitations and other conditions are met.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER WITH RESPECT TO THE NEW COMMON STOCK OR THE NEW WARRANTS, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE SHARES OF NEW COMMON STOCK OR THE NEW WARRANTS ISSUED UNDER THE PLAN.  THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS OR INTERESTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT REGISTRATION UNDER THE SECURITIES ACT.

## XVII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the alternatives include (i) continuation of the Chapter 11 Cases and formulation of an alternative plan or plans of reorganization or (ii) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.  Each of these possibilities is discussed in turn below.

**A.      Continuation of The Chapter 11 Cases**

If the Debtors remain in chapter 11, the Debtors could continue to operate their businesses and manage their properties as Debtors in Possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code.  It is not clear whether the Debtors could continue as viable going concerns in protracted Chapter 11 Cases.  If the Debtors remain in chapter 11 for a prolonged period of time, they could have difficulty

operating with the high costs, operating financing and the eroding confidence of their employees, customers and trade vendors.

In addition, if the Debtors fail to settle outstanding Claims through the Plan, litigation over Claims may take years to resolve, be burdensome and expensive, prolong the Chapter 11 Cases, and have a detrimental impact on the Debtors' businesses and enterprise value.

## B.    Liquidation Under Chapter 7 or Chapter 11

If the Plan is not confirmed, the Debtors' Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code.  In chapter 7, a trustee would be appointed to liquidate the assets of the Debtors.  The Debtors believe that in a liquidation under chapter 7 additional administrative expenses involved in the appointment of a trustee and professionals to assist such trustee, along with expenses associated with an increase in the number of unsecured claims that would be expected, would cause a substantial diminution in the value of the estates.  In addition, the Debtors believe that the Liquidation Analysis attached to this Disclosure Statement as Exhibit FG is speculative as it is necessarily premised upon assumptions and estimates.  As such, the Liquidation Analysis can give no assurance as to the value which would be realized in a chapter 7 liquidation.

The Debtors could also be liquidated under a chapter 11 plan of reorganization.  In a chapter 11 liquidation, the Debtors' assets could be sold in a more orderly fashion over a longer period of time than in a liquidation under chapter 7 and a trustee would not be required.  Thus, chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation; however, the delay in distributions could result in lower present values being received and higher administrative costs.

## XVIII.  CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation of the Plan is preferable to the alternatives described above because it provides the greatest distributions and opportunity for distributions to Holders of Claims against and Interests in any of the Debtors.  In addition, any alternative to confirmation of the Plan could result in extensive delays and increased administrative expenses.

**Accordingly, the Debtors urge all Holders of Claims and Interests entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they are received no later than [●]4:00 p.m.; ( prevailing Eastern Time;) on [●]July 30, 2010.**

Dated: ~~April 12,~~ June 4, 2010

Respectfully submitted,

TRIBUNE COMPANY (for itself and on behalf of
the Affiliate Debtors, as Debtors and Debtors in
Possession)

By:  /s/ Chandler Bigelow III

Chandler Bigelow III
~~Senior~~  Executive Vice President and Chief Financial
Officer

| | |
|---|---|
| SIDLEY AUSTIN LLP | COLE, SCHOTZ, MEISEL, |
| James F. Conlan | FORMAN & LEONARD, P.A. |
| Bryan Krakauer | Norman L. Pernick (No. 2290) |
| Janet E. Henderson | J. Kate Stickles (No. 2917) |
| Kevin T. Lantry | Patrick J. Reilley (No. 4451) |
| Kerriann S. Mills | 500 Delaware Avenue |
| One South Dearborn Street | Suite 1410 |
| Chicago, Illinois 60603 | Wilmington, Delaware 19801 |
| Telephone: (312) 853-7000 | Telephone: (302) 652-3131 |
| Facsimile: (312) 853-7036 | Facsimile: (302) 652-3117 |

Counsel to the Debtors, Debtors-in-Possession, and Certain Non-Debtor Affiliates