**<u>EXHIBIT 3</u>**

**BLACK LINE AMENDED PLAN**

[Cumulative Black Line Comparing the June 4, 2010 Amended Plan
to the April 12, 2010 Plan]

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

## AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES

SIDLEY AUSTIN LLP
Bryan Krakauer
James F. Conlan
Janet E. Henderson
Kevin T. Lantry
Jessica C.K. Boelter
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

COLE, SCHOTZ, MEISEL, FORMAN &
LEONARD, P.A.
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

### COUNSEL FOR DEBTORS AND DEBTORS IN POSSESSION AND CERTAIN NON-DEBTOR AFFILIATES
DATED: ~~APRIL 12,~~ June 4, 2010

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

ARTICLE I : DEFINITIONS; RULES OF INTERPRETATION; EXHIBITS ............................................. 1

  1.1   DEFINITIONS ............................................................................................... 1
  1.2   RULES OF INTERPRETATION .......................................................................... 2021
  1.3   COMPUTATION OF TIME .............................................................................. 2122
  1.4   EXHIBITS AND PLAN SUPPLEMENT ................................................................ 2122
  1.5   DEEMED ACTS ........................................................................................... 2122

ARTICLE II : TREATMENT OF ADMINISTRATIVE AND PRIORITY TAX CLAIMS ...................... 2122

  2.1   DIP FACILITY CLAIMS ................................................................................ 22
  2.2   ADMINISTRATIVE EXPENSE CLAIMS ............................................................. 2223
  2.3   PRIORITY TAX CLAIMS ................................................................................ 2223

ARTICLE III : CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS .. 23

  3.1   SUMMARY OF CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ........................... 23
  3.2   CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND INTERESTS IN TRIBUNE COMPANY (DEBTOR 1). 2425
  3.3   CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND INTERESTS IN FILED SUBSIDIARY DEBTORS (DEBTORS 2 THROUGH 111) ................................................................................. 2830
  3.4   PREPACKAGED PLANS FOR AND TREATMENT OF CLAIMS AGAINST AND INTERESTS IN GUARANTOR NON-DEBTORS, IF ANY, THAT BECOME DEBTORS. .............................................................. 3234

ARTICLE IV : ACCEPTANCE OR REJECTION OF PLAN ................................................... 3335

  4.1   IMPAIRED CLASSES OF CLAIMS AND INTERESTS ENTITLED TO VOTE. ................. 3335
  4.2   ACCEPTANCE BY AN IMPAIRED CLASS OF CLAIMS. ......................................... 3335
  4.3   DEEMED ACCEPTANCE BY HOLDERS OF INTERCOMPANY CLAIMS. ..................... 3336
  4.4   PRESUMED ACCEPTANCES BY UNIMPAIRED CLASSES. ...................................... 3336
  4.5   PRESUMED REJECTION OF THE PLAN. ............................................................ 3336
  4.6   CONFIRMABILITY AND SEVERABILITY OF THIS PLAN. ..................................... 3336

ARTICLE V : MEANS FOR IMPLEMENTATION OF THE PLAN ........................................ 3437

  5.1   NON-SUBSTANTIVE CONSOLIDATION. ........................................................... 3437
  5.2   RESTRUCTURING TRANSACTIONS. ................................................................ 3437
  5.3   CORPORATE GOVERNANCE, DIRECTORS, OFFICERS AND CORPORATE ACTION ...... 3538
  5.4   ISSUANCE AND DISTRIBUTION OF NEW SECURITIES AND RELATED MATTERS. ....... 3739
  5.5   REPORTING REQUIREMENTS UNDER SECURITIES EXCHANGE ACT OF 1934 AND LISTING OF NEW CLASS A COMMON STOCK ON SECURITIES EXCHANGE OR QUOTATION SYSTEM. .................. 3942
  5.6   NEW SENIOR SECURED TERM LOAN AGREEMENT. .......................................... 4042
  5.7   CONTINUED CORPORATE EXISTENCE AND VESTING OF ASSETS IN THE REORGANIZED DEBTORS. ............ 4043
  5.8   CANCELLATION OF LOAN AGREEMENTS, LOAN GUARANTY AGREEMENTS, THE PLEDGE AGREEMENT, NOTES ISSUED UNDER THE LOAN AGREEMENTS, SENIOR NOTES, DEBENTURES, INSTRUMENTS, INDENTURES, EGI-TRB LLC NOTES, PHONES NOTES, OLD COMMON STOCK AND OTHER TRIBUNE INTERESTS .................. 4144
  5.9   CANCELLATION OF LIENS AND GUARANTIES. ................................................. 4245
  5.10  EXIT FACILITY. ......................................................................................... 4345
  5.11  EQUITY INCENTIVE PLAN. .......................................................................... 4345
  5.12  SOURCES OF CASH FOR PLAN DISTRIBUTIONS ............................................... 4346
  5.13  ADDITIONAL TRANSACTIONS AUTHORIZED UNDER THE PLAN. .......................... 4346
  5.14  SETTLEMENT OF CLAIMS AND CONTROVERSIES. ............................................ 4346
  5.15  PRESERVATION OF RIGHTS OF ACTION AND SETTLEMENT OF LITIGATION CLAIMS. .............. 4447
  5.16  FCC APPLICATIONS. ................................................................................... 4547

ARTICLE VI : TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............. 4548

6.1    ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.................................... 45 48
6.2    CURE OF DEFAULTS OF ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES.......................... 46 48
6.3    REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES. .................................... 46 49
6.4    REJECTION DAMAGES BAR DATE. ........................................................................ 46 49
6.5    COMPENSATION AND BENEFIT PROGRAMS. ................................................................ 46 49
6.6    COLLECTIVE BARGAINING AGREEMENTS. .................................................................. 47 49
6.7    POST-PETITION CONTRACTS AND LEASES. ................................................................ 47 50
6.8    TERMINATION OF ESOP. ................................................................................ 47 50

**ARTICLE VII : PROVISIONS GOVERNING DISTRIBUTIONS** ................................................ **47 50**

7.1    GENERAL. ................................................................................................ 47 50
7.2    DISTRIBUTIONS FOR CERTAIN CLAIMS. .................................................................. 48 50
7.3    SPECIAL PROVISIONS GOVERNING DISTRIBUTIONS TO HOLDERS OF LOAN CLAIMS AND LOAN GUARANTY
CLAIMS. ........................................................................................................ 49 52
7.4    INTEREST ON CLAIMS. .................................................................................. 49 52
7.5    DISTRIBUTIONS BY DISBURSING AGENT. ................................................................ 49 52
7.6    DELIVERY OF DISTRIBUTIONS AND UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS. ......................... 49 52
7.7    RECORD DATE FOR DISTRIBUTIONS. ..................................................................... 50 53
7.8    ALLOCATION OF PLAN DISTRIBUTIONS BETWEEN PRINCIPAL AND INTEREST. ................................ 51 54
7.9    MEANS OF CASH PAYMENT. .............................................................................. 51 54
7.10   WITHHOLDING AND REPORTING REQUIREMENTS. ........................................................... 51 55
7.11   SETOFFS. .............................................................................................. 52 55
7.12   FRACTIONAL SHARES. ................................................................................... 52 55
7.13   DE MINIMIS DISTRIBUTIONS. ........................................................................... 52 55
7.14   SPECIAL PROVISION REGARDING UNIMPAIRED CLAIMS. .................................................... 52 56
7.15   SUBORDINATION. ....................................................................................... 52 56

**ARTICLE VIII : PROVISIONS FOR RESOLVING DISPUTED CLAIMS AND DISPUTED INTERESTS**
........................................................................................................ **53 56**

8.1    OBJECTIONS TO AND ESTIMATION OF CLAIMS. ............................................................ 53 56
8.2    PAYMENTS AND DISTRIBUTIONS ON DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS AND INTERESTS
AND ON CLAIMS FOR WHICH PROOFS OF CLAIM ARE FILED. ...................................................... 53 56

**ARTICLE IX : PAYMENT AND FILING OF PROFESSIONAL FEE CLAIMS** ................................... **53 56**

9.1    PAYMENT OF CERTAIN FEE AND EXPENSE CLAIMS. ........................................................ 53 57
9.2    BAR DATE FOR PAYMENT OR REIMBURSEMENT OF PROFESSIONAL FEES AND EXPENSES AND CLAIMS FOR
SUBSTANTIAL CONTRIBUTION. .................................................................................. 55 58

**ARTICLE X : CONFIRMATION AND CONSUMMATION OF THE PLAN** ...................................... **56 59**

10.1   CONDITIONS TO EFFECTIVE DATE. ...................................................................... 56 59
10.2   WAIVER OF CONDITIONS. ............................................................................... 57 60
10.3   CONSEQUENCES IF CONFIRMATION ORDER IS VACATED. .................................................... 57 61

**ARTICLE XI : INJUNCTIONS, RELEASES AND DISCHARGE** .............................................. **57 61**

11.1   DISCHARGE. ............................................................................................ 58 61
11.2   RELEASES. ............................................................................................. 59 62
11.3   BAR ORDER. ............................................................................................ 61 65
11.4   SUPPLEMENTAL INJUNCTION. ............................................................................ 62 66
11.5   DISALLOWED CLAIMS AND DISALLOWED INTERESTS. ....................................................... 63 67
11.6   EXCULPATION. .......................................................................................... 64 67
11.7   CORPORATE INDEMNITIES. .............................................................................. 64 67
11.8   TERM OF BANKRUPTCY INJUNCTION OR STAYS. ........................................................... 65 69

**ARTICLE XII : RETENTION OF JURISDICTION** ....................................................... **65 69**

12.1   RETENTION OF JURISDICTION. .......................................................................... 65 69

**ARTICLE XIII : MISCELLANEOUS**.................................................................................6771

13.1    SURRENDER OF INSTRUMENTS. .............................................................................6771
13.2    CREDITORS COMMITTEE. ......................................................................................6871
13.3    POST-CONFIRMATION DATE RETENTION OF PROFESSIONALS. ................................6872
13.4    EFFECTUATING DOCUMENTS AND FURTHER TRANSACTIONS. ..................................6872
13.5    EXEMPTION FROM TRANSFER TAXES.......................................................................6872
13.6    PAID-IN CAPITAL OF CORPORATE REORGANIZED DEBTORS. ...................................6872
13.7    PAYMENT OF STATUTORY FEES. ............................................................................6973
13.8    AMENDMENT OR MODIFICATION OF THIS PLAN. .....................................................6973
13.9    CERTAIN PROVISIONS PERTAINING TO SENIOR LENDER SETTLEMENT COMMITTEE AND CENTERBRIDGE. 6973
13.10   SEVERABILITY OF PLAN PROVISIONS.......................................................................7073
13.11   SUCCESSORS AND ASSIGNS. ...................................................................................7074
13.12   REVOCATION, WITHDRAWAL OR NON-CONSUMMATION. ..........................................7074
13.13   NOTICE.................................................................................................................7074
13.14   GOVERNING LAW. .................................................................................................7175
13.15   TAX REPORTING AND COMPLIANCE. .......................................................................7175
13.16   EXHIBITS AND APPENDICES. ...................................................................................7175
13.17   RESERVATION OF RIGHTS. ......................................................................................7175

# APPENDICES AND EXHIBITS

Appendix A – Filed Subsidiary Debtors
Appendix B – Subsidiary Non-Debtors
Appendix C – Collective Bargaining Agreements

Exhibit ~~1.1.118~~1.1.124 – New Warrant Agreement
Exhibit 5.2 – Restructuring Transactions
Exhibit 5.3.1(1) – Certificate of Incorporation of Reorganized Tribune
Exhibit 5.3.1(2) – By-Laws of Reorganized Tribune
Exhibit 5.3.2 – Directors and Officers of Reorganized Tribune
Exhibit 5.3.3 – Directors and Managers of Reorganized Debtors Other Than Reorganized Tribune
Exhibit 5.6 – Terms of New Senior Secured Term Loan Agreement
Exhibit 5.10 – Terms of Exit Facility Credit Agreement
Exhibit 5.14.3 – Retiree Claimant Settlement Agreement
Exhibit 6.3 – Rejected Executory Contracts and Unexpired Leases
Exhibit 11.7.6 – Indemnification Claim Procedures

## INTRODUCTION

Tribune Company and the Filed Subsidiary Debtors[2] listed in <u>Appendix A</u> hereto, together with those Subsidiary Non-Debtors listed in <u>Appendix B</u> hereto as may file for protection under chapter 11 of the Bankruptcy Code subsequent to the date hereof and prior to the Confirmation Date, hereby propose the following joint plan of reorganization for the resolution of outstanding Claims against and Interests in all of the Debtors in their reorganization cases under chapter 11 of the Bankruptcy Code.

The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code, and the Guarantor Non-Debtors are participating in this Plan with the Debtors.  Reference is made to the Disclosure Statement, distributed contemporaneously herewith, for a discussion of the Debtors' history, businesses, properties and operations, projections for those operations, risk factors, a summary and analysis of this Plan, and certain related matters including, among other things, the indebtedness and securities to be issued under this Plan. Subject to certain restrictions and requirements set forth herein, including, without limitation <u>Section 13.9</u> of this Plan, and in 11 U.S.C. § 1127 and Fed. R. Bankr. P. 3019, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its substantial consummation in accordance with the terms hereof, the Confirmation Order, and the Bankruptcy Code.

## ARTICLE I: DEFINITIONS; RULES OF INTERPRETATION; EXHIBITS

1.1    <u>Definitions</u>.

As used herein, capitalized terms shall have the meanings set forth below.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.1.1    <u>2009 MIP Motion</u> means the Motion of the Debtors for an Order Authorizing the Debtors to Implement a 2009 Management Incentive Plan and To Pay Earned 2008 Management Incentive Plan Awards to Certain Executives filed on July 22, 2009 [D.I. 1800].

1.1.2    <u>Administrative Expense Claim</u> means a Claim for costs and expenses of administration of the Chapter 11 Cases that is Allowed under sections 328, 330, 363, 364(c)(1), 365, 503(b), or 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors' Estates and operating the businesses of the Debtors (such as wages, salaries and commissions for services and payments for inventory, leased equipment and premises) and Claims of governmental units for taxes (including tax audit Claims) related to tax years ending on or after the Petition Date or commencing after the Petition Date, but excluding Claims related to tax periods, or portions thereof, ending on or before the Petition Date; (b) all compensation for legal, financial, advisory, accounting and other

---

[2] Capitalized terms used in this Introduction shall have the meanings ascribed to such terms in <u>Article I</u> hereof and elsewhere in the Plan.

professional services and reimbursement of expenses incurred during the Chapter 11 Cases
Allowed by the Bankruptcy Court; (c) any indebtedness or obligation incurred or assumed by the
Debtors during the Chapter 11 Cases pursuant to an agreement which was approved or otherwise
permitted by a Final Order of the Bankruptcy Court or is an ordinary course agreement; (d) any
payment to cure a default on an assumed executory contract or unexpired lease; (e) post-petition
Claims against any of the Debtors held by a Debtor or a non-Debtor Affiliate; or (f) any fees and
charges assessed against the Debtors' Estates under section 1930, chapter 123, of title 28 of the
United States Code.

   1.1.3 <u>Affiliate</u> shall have the meaning ascribed to such term in section 101(2) of
the Bankruptcy Code, and when used with reference to any Debtor, shall include, but not be
limited to, each of the other Debtors.

   1.1.4 <u>Allowed</u> means, with respect to a Claim or Interest, or any portion thereof,
in any Class or category specified, a Claim or Interest (a) that is evidenced by a Proof of Claim or
Interest and is not listed as disputed, contingent or unliquidated on the pertinent Debtor's
schedules and as to which no objection or request for estimation has been filed on or before any
objection deadline set by the Bankruptcy Court or the expiration of such other applicable period
fixed by the Bankruptcy Court, (b) that is listed on the pertinent Debtor's schedules but is not
listed as disputed, contingent or unliquidated, that is not otherwise subject to an objection and as
for which no contrary or superseding Proof of Claim or Interest has been filed, (c) as to which any
objection has been settled, waived, withdrawn or overruled by a Final Order; or (d) that is
expressly allowed (i) by a Final Order, (ii) pursuant to the terms of the Claims Settlement Order,
(iii) solely with respect to those Claims that are not pre-petition Claims and are not required under
applicable bankruptcy law to be allowed pursuant to an order of the Bankruptcy Court, by an
agreement between the Holder of such Claim and the pertinent Debtor or Reorganized Debtor
pursuant to an agreement which was approved or otherwise permitted by a Final Order of the
Bankruptcy Court or is an ordinary course agreement that, unless *de minimis* in nature, has been
provided to and has not been objected to in writing by the Creditors' Committee, or (iv) pursuant
to the terms of this Plan. <u>For the avoidance of doubt, to the extent a Claim is not Allowed, such
Claim is still subject to objection based upon potentially applicable rights of avoidance, setoff,
subordination, and any other defenses.</u>

   1.1.5 <u>Angelo Gordon</u> means Angelo Gordon & Co LP and its Affiliates and
Related Persons of such entities.

   1.1.6 <u>Available Cash</u> means all bank Cash balances that are immediately
available for disbursement reduced by the value of (a) any funds held in accounts that are restricted
in their use, including, but not limited to, Cash held as collateral for issued letters of credit, Cash
held in escrow accounts, Cash held for collateral in respect of utility deposits, and Cash held by
Multimedia Insurance Company, a Non-Guarantor Non-Debtor and (b) up to $5,000,000 held in
bank accounts that are not part of the Debtors' centralized cash management system.

   1.1.7 <u>Average Distributable Cash</u> means the average of the Available Cash
balance of all of the Tribune Entities at the close of business on each of the four Fridays (or the
immediately preceding Business Day if any such Friday is not a Business Day) immediately
preceding the Effective Date.

1.1.8  Ballot means the document for accepting or rejecting the Plan in the form approved by the Bankruptcy Court.

1.1.9  Bankruptcy Code means title 11 of the United States Code, as in effect on the Petition Date, together with any and all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases.

1.1.10 Bankruptcy Court means the United States Bankruptcy Court for the District of Delaware.

1.1.11 Bankruptcy Rules means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any local rules of the Bankruptcy Court, as in effect on the Petition Date, together with any and all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases.

1.1.12 Barclays Swap Claim means any Claims asserted by Barclays Bank PLC under that certain 1992 ISDA Master Agreement, dated as of July 2, 2007, between Barclays Bank PLC and Tribune.

1.1.13 Bridge Lenders means the lenders from time to time party to the Bridge Loan Agreement as Lenders thereunder, including former lenders and any applicable assignees and participants thereof.

1.1.14 Bridge Loan Agent means ~~Merrill Lynch Capital Corporation~~Wells Fargo Bank, N.A. as administrative agent, and its Affiliates and Related Persons of such entities, and any successor administrative agent, under the Bridge Loan Agreement.

1.1.15 Bridge Loan Agreement means that certain Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007, among Tribune, the Bridge Lenders, the Former Bridge Loan Agent, JPMorgan Chase Bank, N.A., as syndication agent, and Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time.

1.1.16 Bridge Loan Arrangers means any Syndication Agent, Documentation Agent, Arranger, Bookrunner or other party serving a similar purpose under the Bridge Loan Agreement.

1.1.17 ~~1.1.16~~ Bridge Loan Claim means a Claim arising under the Bridge Loan Agreement.

1.1.18 ~~1.1.17~~ Bridge Loan Guaranty Agreement means the Guarantee Agreement, dated as of December 20, 2007, among Tribune, each of the subsidiaries of Tribune listed on Annex I thereto, and the Bridge Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.19 ~~1.1.18~~ Bridge Loan Guaranty Claim means a Claim arising under Bridge Loan Guaranty Agreement.

1.1.20 1.1.19 Business Day means any day other than a Saturday, a Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

1.1.21 1.1.20 By-Laws means the amended and restated by-laws of Reorganized Tribune, in substantially the form attached as Exhibit 5.3.1(2) to this Plan and filed with the Plan Supplement.

1.1.22 1.1.21 Cash means legal tender of the United States of America or equivalents thereof, including, without limitation, payment in such tender by check, wire transfer or any other customary payment method.

1.1.23 1.1.22 Centerbridge means Centerbridge Credit Advisors LLC and its Affiliates and Related Persons of such entities.

1.1.24 1.1.23 Certificate of Incorporation means the amended and restated certificate of incorporation of Reorganized Tribune, in substantially the form attached as Exhibit 5.3.1(1) to this Plan and filed with the Plan Supplement.

1.1.25 1.1.24 Chapter 11 Cases means the voluntary cases commenced on the Petition Date by the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and the voluntary cases, if any, commenced by any of the Subsidiary Non-Debtors under chapter 11 of the Bankruptcy Code.

1.1.26 1.1.25 Claim means a "claim," as defined in section 101(5) of the Bankruptcy Code.

1.1.27 1.1.26 Claims Settlement Order means the Order Granting Debtors (I) Limited Waiver of Requirements of Local Rule 3007-1(f) and (II) Authority to Settle Disputed Claims, as entered on November 25, 2009 [D.I. 2657], as the same may be amended, modified or supplemented from time to time.

1.1.28 1.1.27 Class means a category of Claims or Interests set forth in Article III of this Plan, as such term is used and described in section 1122 and section 1123(a)(1) of the Bankruptcy Code.

1.1.29 1.1.28 Collective Bargaining Agreement(s) means, individually or collectively, the collective bargaining agreements listed on Appendix C hereto.

1.1.30 1.1.29 Communications Act means the Communications Act of 1934, as amended, or any other successor federal statute, and the rules and regulations of the FCC promulgated thereunder.

1.1.31 1.1.30 Confirmation Date means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

1.1.32 1.1.31 Confirmation Hearing means the hearing held by the Bankruptcy Court on confirmation of this Plan, as such hearing may be continued from time to time.

1.1.33 1.1.32 Confirmation Order means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

1.1.34 1.1.33 Convenience Claim means a Claim against Tribune that would otherwise be a General Unsecured Claim that is (a) in an amount equal to or less than $1,000 or (b) in an amount that has been reduced to $1,000 pursuant to a Convenience Class Election made by the Holder of such Claim; provided, however, that where any portion(s) of a single Claim has been transferred on or after April 12, 2010, any transferred portion(s) shall continue to be treated together with such Claim as a single Claim for purposes of the Convenience Class Election and determining whether such Claim qualifies as a Convenience Claim.

1.1.35 1.1.34 Convenience Class Election means an irrevocable election made on the Ballot by the Holder of a Claim against Tribune that would otherwise be a General Unsecured Claim in an amount greater than $1,000 to reduce such Claim to $1,000.

1.1.36 1.1.35 Covered Claims has the meaning set forth in Section 11.7.2 of this Plan.

1.1.37 1.1.36 Creditors' Committee Member Fee/Expense Claims means amounts incurred by individual members of the Creditors' Committee that are not indenture trustees solely in their capacity as members of the Creditors' Committee on and after the Petition Date through and including the Effective Date for the reasonable and documented fees, costs and expenses of their individual outside legal and/or financial advisors.

1.1.38 1.1.37 Creditors' Committee means the official committee of unsecured creditors appointed by the U.S. Trustee pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases.

1.1.39 1.1.38 Customer Program means any of the Debtors' customer programs and practices as to which the Debtors were authorized, in their sole discretion and in the ordinary course of business, to honor and perform all obligations in respect thereof by the Order Authorizing, But Not Requiring, the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Prepetition Customer Programs and Practices in the Ordinary Course of Business, which was signed by the Bankruptcy Court on December 10, 2008 [D.I. 50].

1.1.40 1.1.39 Debtor(s) means, individually or collectively, the debtors and debtors in possession identified in footnote 1 hereto, and shall also include any Subsidiary Non-Debtor that files a chapter 11 petition for relief prior to the Confirmation Date.

1.1.41 1.1.40 Debtor Released Claims has the meaning set forth in Section 11.2.1 of this Plan.

1.1.42 1.1.41 Defined Benefit Plan means a single-employer plan within the meaning of section 4001(a)(15) of the Employee Retirement Income Security Act of 1974, as amended.

1.1.43 ~~1.1.42~~ DIP Facility means the financing facility and letter of credit facility entered into by the Debtors pursuant to the DIP Facility Agreements.

1.1.44 ~~1.1.43~~ DIP Facility Agent means Barclays Bank PLC, as administrative agent and letter of credit agent under the DIP Facility Agreements.

1.1.45 ~~1.1.44~~ DIP Facility Agreements means collectively, as each may be amended, supplemented or otherwise modified from time to time, (a) that certain Amended and Restated Receivables Loan Agreement among Tribune, Tribune Receivables, LLC, the DIP Facility Agent, and the DIP Facility Lenders, (b) that certain Amended and Restated Receivables Purchase Agreement among Tribune Receivables, LLC, Tribune and the other Originators (as defined therein), (c) that certain Amended and Restated Servicing Agreement among Tribune Receivables, LLC, Tribune and the other Originators (as defined therein), (d) that certain Amended and Restated Guaranty Security Agreement among Tribune, the other Debtors, and the DIP Facility Agent, (e) that certain Letter of Credit Agreement among the DIP Facility Agent, certain DIP Facility Lenders and the Debtors, and (f) that certain Payout and Termination Agreement, dated as of March 1, 2010, among Tribune Receivables, LLC, Tribune, certain subsidiaries of Tribune party thereto, and Barclays Bank PLC, as administrative agent.

1.1.46 ~~1.1.45~~ DIP Facility Claims means all Claims held by the DIP Facility Agent and the DIP Facility Lenders pursuant to the DIP Facility Agreements and the Final DIP Order.

1.1.47 ~~1.1.46~~ DIP Facility Lenders means the lenders from time to time party to the DIP Facility Agreements, including any applicable assignees and participants thereof.

1.1.48 ~~1.1.47~~ Disallowed Claim means all or such part of a Claim that is disallowed by a Final Order.

1.1.49 ~~1.1.48~~ Disbursing Agent means any entity in its capacity as a disbursing agent under Section 7.5 hereof.

1.1.50 ~~1.1.49~~ Discharge Injunction means the injunction described in section 1141 of the Bankruptcy Code and contained in Section 11.1.2 of this Plan.

1.1.51 ~~1.1.50~~ Disclosure Statement means that certain disclosure statement relating to this Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.1.52 ~~1.1.51~~ Disputed Claim means any Claim, including any portion thereof, (a) that is neither an Allowed Claim nor a Disallowed Claim, (b) that is listed as disputed, contingent or unliquidated on the Debtors' schedules or that is otherwise subject to an objection, or (c) for which a Proof of Claim has been timely filed with the Bankruptcy Court or a written request for payment has been made, to the extent the Debtors have, or any party in interest entitled to do so has, interposed a timely objection or request for estimation, which objection or request for estimation has not been withdrawn or determined by a Final Order.

1.1.53 1.1.52 Distributable Cash means an amount in Cash equal to (a) the Distributable Cash Pool less (b) the sum of (i) $325 million and (ii) the amount of Cash estimated by the Debtors to be required to be distributed to Holders of Allowed Administrative Expense Claims (including fees paid pursuant to Section 9.1 of this Plan, any fees and expenses associated with the Exit Facility or any new indebtedness under Section 5.6 of this Plan, and cure costs required to be paid by the Debtors but excluding post-petition payables arising and paid in the ordinary course of business), Priority Tax Claims estimated to be payable at or in connection with the Effective Date, DIP Facility Claims, Priority Non-Tax Claims, Claims arising from Employee Benefit Plans continuing with current employees, and cash Cash required to be posted to cash collateralize outstanding letters of credit; provided, the Plan Supplement may also address an allocation for the Cash that may be required to be distributed to Holders of Class 1D Claims that do not elect or are deemed not to elect to receive the treatment in Section 3.2.4(b)(ii)(B).

1.1.54 1.1.53 Distributable Cash Pool means an amount in Cash equal to (i) if the Average Distributable Cash is more than $25 million greater than the Effective Date Cash, the Effective Date Cash plus $25 million, or (ii) if the Average Distributable Cash is more than $25 million less than the Effective Date Cash, the Effective Date Cash less $25 million, or (iii) if the Average Distributable Cash is within $25 million higher or lower than the Effective Date Cash, the Average Distributable Cash.

1.1.55 1.1.54 Distribution Date means any of the Initial Distribution Date, the Quarterly Distribution Date and the Final Distribution Date, but in no event a date prior to the Effective Date.

1.1.56 1.1.55 Distribution Record Date means the Confirmation Date or such other date as may be designated in the Confirmation Order.

1.1.57 1.1.56 DTC means The Depository Trust Company.

1.1.58 1.1.57 Effective Date means the first Business Day all of the conditions to the Effective Date specified in Section 10.1 of this Plan have been satisfied or waived in accordance with Section 10.2 of this Plan.

1.1.59 1.1.58 Effective Date Cash means an amount in Cash equal to the Available Cash balance of all of the Tribune Entities at the close of business on the Friday immediately preceding the Effective Date (or the immediately preceding Business Day if any such Friday is not a Business Day).

1.1.60 1.1.59 EGI-TRB LLC Noteholder means a Holder of EGI-TRB LLC Notes.

1.1.61 1.1.60 EGI-TRB LLC Notes means those certain promissory notes in the aggregate principal amount of $225 million issued by Tribune in favor of EGI-TRB, L.L.C. and certain direct and indirect assignees of EGI-TRB, L.L.C.

1.1.62 1.1.61 EGI-TRB LLC Notes Claim means all Claims held by the EGI-TRB LLC Noteholders pursuant to the EGI-TRB LLC Notes.

1.1.63 1.1.62 EGI-TRB LLC Warrant means those certain 15-year warrants issued to EGI-TRB, L.L.C. and certain assignees evidencing rights to purchase 43,478,261 shares in the aggregate (subject to adjustment) of Old Common Stock.

1.1.64 1.1.63 Employee Benefit Claim means any Claim arising under or in connection with an assumed Employee Benefit Plan.

1.1.65 1.1.64 Employee Benefit Plan means any employment, compensation, tax-qualified or non-tax qualified Pension Plan, Defined Benefit Plan, Multiemployer Plan, healthcare, bonus, incentive compensation, sick leave and other leave, vacation pay, expense reimbursement, dependent care, retirement, savings, workers compensation, life insurance, disability, dependent care, dependent healthcare, education, severance or other benefit plan or any individual contract or agreement that has not been rejected or terminated prior to the Confirmation Date for the benefit of the directors, officers or employees (whether salaried or hourly) of the applicable Debtor, or maintained by any Debtor for employees of non-Debtor direct or indirect subsidiaries of a Debtor, and any retiree benefit program of the applicable Debtor included in the protections of section 1114 of the Bankruptcy Code, in all cases that has been in existence and has accrued to a specific person before or on the Petition Date or has been approved or otherwise permitted by a Final Order of the Bankruptcy Court or is an ordinary course agreement, plan or program, provided that any of the foregoing involving any of the top twenty (20) executives of Tribune has been disclosed to the Creditors' Committee and the Senior Loan Agent; provided further, that the definition of "Employee Benefit Plan" excludes Non-Qualified Former Employee Benefit Plans and the ESOP.

1.1.66 1.1.65 Equity Incentive Plan means the equity incentive plan pertaining to the Reorganized Debtors described in Section 5.11 of this Plan.

1.1.67 1.1.66 Equity Incentive Pool means ~~an amount of New Common Stock, which shall be disclosed prior to the hearing to approve the Disclosure Statement, if available at that time, or otherwise in the Plan Supplement and shall in either case be subject to the consent of the Senior Lender Settlement Committee, such consent not to be unreasonably withheld~~up to five percent (5%) of the New Common Stock on a fully diluted basis as determined by the board of directors of Reorganized Tribune.

1.1.68 1.1.67 ESOP means, individually or collectively, the Tribune Employee Stock Ownership Plan and the Tribune Employee Stock Ownership Trust and any related documents and agreements, as the context implies.

1.1.69 1.1.68 Estate(s) means, individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.1.70 1.1.69 Exhibit means an exhibit annexed to this Plan.

1.1.71 1.1.70 Exit Facility Credit Agreement means the definitive agreement relating to the Exit Facility, the terms of which shall be filed as Exhibit 5.10 with the Plan Supplement.

1.1.72 1.1.71 Exit Facility means a new revolving credit facility, if any, as described in Exhibit 5.10 filed with the Plan Supplement, providing for loans and other extensions of credit in an aggregate amount up to $300 million, with a letter of credit sub-facility of up to $100 million, which may be entered into by Reorganized Tribune and certain of the other Reorganized Debtors and U.S. Subsidiary Non-Debtors on the Effective Date.

1.1.73 1.1.72 Face Amount means (a) when used in reference to a Disputed Claim, (i) the full stated amount claimed by the Holder of such Claim in any Proof of Claim timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicable bankruptcy law, (ii) the full stated amount listed on the pertinent Debtor's schedules as disputed, contingent or unliquidated if no contrary or superseding Proof of Claim or an objection to the Claim has been filed, or (iii) if no stated amount is included in the Proof of Claim or the pertinent Debtor's schedules with respect to a disputed, contingent or unliquidated claim, then an amount determined by the pertinent Debtor, and (b) when used in reference to an Allowed Claim, the Allowed amount of such Claim.

1.1.74 1.1.73 FCC means the Federal Communications Commission or any other federal agency succeeding to its jurisdiction.

1.1.75 1.1.74 FCC Applications means, collectively, each application to be filed with the FCC in connection with this Plan, including those filed in connection with the assignment and/or transfer of control of FCC Licenses from the Debtors to the Reorganized Debtors and any other FCC applications necessary to complete the Restructuring Transactions.

1.1.76 1.1.75 FCC Approval means an action or actions by the FCC (including any action or actions taken by the FCC's staff pursuant to delegated authority and regardless of whether any action or actions may be subject to further administrative or judicial review) on the FCC Applications granting any consent of the FCC necessary to consummate the assignment and/or transfer of control of FCC Licenses from the Debtors to the Reorganized Debtors and/or otherwise necessary to implement this Plan.

1.1.77 1.1.76 FCC Licenses means broadcasting and other licenses, authorizations, waivers and permits that are issued from time to time by the FCC.

1.1.78 1.1.77 Filed Subsidiary Debtors means, individually or collectively, the Debtors listed on Appendix A hereto.

1.1.79 1.1.78 Final DIP Order means the Final Order Pursuant to Sections 105, 362(d), 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), and 365 of the Bankruptcy Code (1) Authorizing the Debtors to Guarantee an Amended Securitization Facility and For Certain Debtors to Continue Selling Receivables and Related Rights Pursuant Thereto, (2) Authorizing the Debtors to Enter Into a Letter of Credit Facility, (3) Modifying the Automatic Stay and (4) Granting Other Related Relief, as entered on January 15, 2009 [D.I. 233], as the same has been and may be amended, modified or supplemented from time to time, together with any modifications and amendments thereto, including, without limitation, the Order Authorizing Debtors to Amend Letter of Credit Facility Pursuant to Sections 105, 362(d), 363(b)(1), 364(c)(1),

364(c)(2), 364(c)(3), 364(d), 364(e) and 365 of the Bankruptcy Code and Granting Other Related Relief, as entered on March 22, 2010 [D.I. 3808].

1.1.80 ~~1.1.79~~ Final Distribution Date means a date selected by the Reorganized Debtors that is no later than thirty (30) days after the date that all Disputed Claims in the applicable Class(es) shall have been Allowed or Disallowed.

1.1.81 ~~1.1.80~~ Final Order means an order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or on the docket of any other court of competent jurisdiction), which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for <u>certiorari</u> or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for <u>certiorari</u> or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of <u>certiorari</u>, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or <u>certiorari</u> shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for <u>certiorari</u> or move for a new trial, reargument or rehearing shall have expired; <u>provided</u>, <u>however</u>, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

1.1.82 ~~1.1.81~~ Foreign Ownership Certification means the certification of aggregate foreign voting interests and aggregate foreign equity interests that each Holder of a Claim, other than a Senior Noteholder Claim, that is eligible to receive New Common Stock under this Plan must provide and that Holders of Senior Noteholder Claims will be entitled to provide.

<u>1.1.83 Former Bridge Loan Agent means Merrill Lynch Capital Corporation as former administrative agent under the Bridge Loan Agreement and its Affiliates and Related Persons of such entities.</u>

1.1.84 ~~1.1.82~~ General Unsecured Claim means any Claim against the Debtors that is not an Administrative Expense Claim, a DIP Facility Claim, a Priority Tax Claim, a Priority Non-Tax Claim, an Other Secured Claim, a Senior Loan Claim, a Bridge Loan Claim, a Senior Noteholder Claim, a Convenience Claim, an EGI-TRB LLC Notes Claim, a PHONES Notes Claim, an Employee Benefit Claim, an Intercompany Claim, a Securities Litigation Claim, a Senior Loan Guaranty Claim or a Bridge Loan Guaranty Claim and shall not include Disallowed Claims or Claims that are released, whether by operation of law or pursuant to order of the Bankruptcy Court, written release or settlement, the provisions of this Plan or otherwise.

1.1.85 ~~1.1.83~~ Global Contract Motion means a motion seeking the assumption or rejection of unassumed or unrejected executory contracts and unexpired leases of the Debtors, which motion may be filed with the Bankruptcy Court and heard at the Confirmation Hearing.

1.1.86 ~~1.1.84~~ Global Settlement has the meaning set forth in <u>Section 5.14.2</u> hereto.

1.1.87 ~~1.1.85~~ Guarantor Debtors means those Debtors listed on <u>Appendix A</u> hereto as "Guarantor Debtors".

1.1.88 1.1.86 Guarantor Non-Debtor Release means the release by all Holders of Loan Guaranty Claims against the Guarantor Non-Debtors on the Effective Date (a) releasing the Guarantor Non-Debtors from any and all Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims and (b) releasing the Senior Loan Agent and Bridge Loan Agent, respectively, from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities of any nature whatsoever as a result of the release of the Guarantor Non-Debtors from any and all Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims.

1.1.89 1.1.87 Guarantor Non-Debtors means those non-Debtors listed on Appendix B hereto as "Guarantor Non-Debtors".

1.1.90 1.1.88 Holder means a Person holding a Claim or Interest.

1.1.91 1.1.89 Holder Released Claims has the meaning set forth in Section 11.2.2 of this Plan.

1.1.92 1.1.90 Impaired means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.1.93 1.1.91 Indemnified Creditor Parties has the meaning set forth in Section 11.7.2 of this Plan.

1.1.94 1.1.92 Indemnified Part(ies) has the meaning set forth in Section 11.7.2 of this Plan.

1.1.95 1.1.93 Indemnity, Subrogation and Contribution Agreements means (a) the Indemnity, Subrogation and Contribution Agreement, dated as of December 20, 2007, among Tribune, each of the subsidiaries of Tribune listed on Schedule I thereto, and the Bridge Loan Agent, as amended, restated, supplemented or otherwise modified from time to time, and (b) the Indemnity, Subrogation and Contribution Agreement, dated as of December 20, 2007, among Tribune, each of the subsidiaries of Tribune listed on Schedule I thereto, and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.96 1.1.94 Indentures means the Senior Notes Indentures and the PHONES Notes Indenture.

1.1.97 1.1.95 Indenture Trustees means the Senior Notes Indenture Trustees and the PHONES Notes Indenture Trustee.

1.1.98 1.1.96 Initial Distribution Date means a date selected by the Reorganized Debtors that is as soon as practicable following the Effective Date and is not later than thirty (30) days after the Effective Date.

1.1.99 1.1.97 Initial Report has the meaning set forth in Section 9.2 hereto.

1.1.100      1.1.98 Intercompany Claims means all prepetition Claims against any of the Debtors held by a Debtor or a non-Debtor Affiliate.

1.1.101    1.1.99 Interest means any share of common stock, preferred stock or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date, including, but not limited to, any Tribune Interest and Interest in a Subsidiary Debtor.

1.1.102    1.1.100 Law Debenture means Law Debenture Trust Company of New York, not personally but solely in its capacity as successor indenture trustee under that certain Indenture, dated as of March 19, 1996, as amended, restated or otherwise modified from time to time, between Tribune and Law Debenture Trust Company of New York.

1.1.103    1.1.101 LBO-Related Causes of Action means any and all claims, causes of action, avoidance powers or rights, and legal or equitable remedies against any Person arising from any transaction related to the leveraged buy-out of Tribune that occurred in 2007, including, without limitation, the purchase by Tribune of its common stock on or about June 4, 2007, the merger and related transactions involving Tribune on or about December 20, 2007, and any financing committed to, incurred or repaid in connection with any such transaction, regardless of whether such claims, causes of action, avoidance powers or rights, or legal or equitable remedies may be asserted pursuant to the Bankruptcy Code or any other applicable law.

1.1.104    1.1.102 Lien means, with respect to any interest in property, any mortgage, lien, pledge, charge, security interest, easement or encumbrance of any kind whatsoever affecting such interest in property.

1.1.105    1.1.103 Litigation Claims means the claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, including, without limitation, the Morgan Stanley Claims (unless settled on or prior to the Effective Date), that any Debtor or Estate may hold against any Person as of the Petition Date; provided, however, Litigation Claims shall not include (a) any claim, right of action, suit or proceeding that has been settled on or prior to the Effective Date, (b) the LBO-Related Causes of Action and (c) other claims, rights of action, suits or proceedings waived or released pursuant to Article XI of this Plan.

1.1.106    1.1.104 Loan Agents means the Senior Loan Agent and the Bridge Loan Agent.

1.1.107    1.1.105 Loan Agreements means the Senior Loan Agreement and the Bridge Loan Agreement.

1.1.108    1.1.106 Loan Claims means the Senior Loan Claims, the Bridge Loan Claims and the Barclays Swap Claims and the Bridge Loan Claims.

1.1.109 Loan Claims Cash Allocation means 8.8% of the Distributable Cash minus (A) the amount of the Distributable Cash to be distributed to Holders of Allowed Claims in Class 1E, (B) the portion of the Other Parent Claims Allocation that is Distributable Cash and (C) the amount of Cash to be distributed to Holders of Allowed Claims in Class 1G.

1.1.110 Loan Claims Loan Allocation means 8.8% of the New Senior Secured Term Loan minus (A) the amount of the New Senior Secured Term Loan to be distributed to

Holders of Allowed Claims in Class 1E and (B) the portion of the Other Parent Claims Allocation that is New Senior Secured Term Loan.

1.1.111 Loan Claims Stock Allocation means 8.8% of the New Common Stock (subject to dilution by the Equity Incentive Plan) minus (A) the amount of the New Common Stock to be distributed to Holders of Allowed Claims in Class 1E and (B) the portion of the Other Parent Claims Allocation that is New Common Stock.

1.1.112 ~~1.1.107~~ Loan Guaranty Agreements means the Senior Loan Guaranty Agreement, the Bridge Loan Guaranty Agreement and the Indemnity, Subrogation and Contribution Agreements.

1.1.113 ~~1.1.108~~ Loan Guaranty Claims means the Senior Loan Guaranty Claims and the Bridge Loan Guaranty Claims.

1.1.114 ~~1.1.109~~ Media Ownership Certification means the certification of other media investments and holdings, and any other information that the Debtors deem reasonably necessary for purposes of the FCC Applications and/or FCC Approval, including, without limitation, on FCC qualifications to hold an attributable interest in the Reorganized Debtors under FCC rules and policies that each Holder that is entitled to receive New Common Stock under this Plan may be required to provide.

1.1.115 ~~1.1.110~~ Morgan Stanley Claims means the claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, and including any and all rights, claims and actions (including avoidance actions arising under chapter 5 of the Bankruptcy Code) that Tribune or any of its Affiliates may have against MSCS arising from or related to (a) the acquisition, sale or disposition of any notes, bonds or other indebtedness held by MSCS ~~or~~, (b) the interest rate swap transaction executed pursuant to the ISDA Master Agreement dated as of August 5, 1994 (as subsequently amended and together with any schedules, exhibits and confirmations) between The Times Mirror Company and MSCS and any set-offs of claims arising from such interest rate swap transaction, or (c) any advisory engagement or potential advisory engagement of, and/or advice given by, MSCS between October 2008 and December 2008, including any claims related to or arising from the agreement between Tribune and MSCS dated as of November 30, 2008; provided, however, that the Morgan Stanley Claims do not include any LBO-Related Causes of Action.

1.1.116 ~~1.1.111~~ MSCS means Morgan Stanley Capital Services Inc. and its Affiliates and Related Persons of such entities.

1.1.117 ~~1.1.112~~ Multiemployer Plan means a plan (i) to which more than one employer is required to contribute, (ii) which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer, and (iii) which satisfies such other requirements contained in regulations promulgated by the United States Department of Labor.

1.1.118 Neil Litigation means the lawsuit captioned Neil v. Zell, Case No. 08-06833 (RRP) (N.D. Ill.).

1.1.119 ~~1.1.113~~ New Class A Common Stock means the Class A Common Stock to be issued by Reorganized Tribune in connection with the implementation of, and as authorized by, this Plan, which shall have the powers, preferences and rights and be subject to the limitations, qualifications and restrictions, in each case as set forth in the Certificate of Incorporation.

1.1.120 ~~1.1.114~~ New Class B Common Stock means the Class B Common Stock to be issued by Reorganized Tribune in connection with the implementation of, and as authorized by, this Plan, which shall have the powers, preferences and rights and be subject to the limitations, qualifications and restrictions, in each case as set forth in the Certificate of Incorporation.

1.1.121 ~~1.1.115~~ New Common Stock means, collectively, the New Class A Common Stock and the New Class B Common Stock; provided that, under the circumstances set forth in Section 5.4.2 of this Plan, certain Holders of Claims that would otherwise be entitled to receive New Class A Common Stock or New Class B Common Stock may instead receive New Warrants.

1.1.122 ~~1.1.116~~ New Senior Secured Term Loan means the new senior secured term loan in an aggregate principal amount of up to two times the Debtors' trailing twelve month EBITDA (as defined in the New Senior Secured Term Loan Agreement) as of the end of the fiscal quarter most recently ended prior to the Effective Date, which, subject to the terms of Section 5.6 of this Plan, may be issued on the Effective Date by Reorganized Tribune pursuant to the New Senior Secured Term Loan Agreement, or may be replaced in whole or in part with a distribution of Cash pursuant to and in accordance with Section 5.6.2 of this Plan.

1.1.123 ~~1.1.117~~ New Senior Secured Term Loan Agreement means the loan agreement among Reorganized Tribune, as borrower, the other Reorganized Debtors and U.S. Subsidiary Non-Debtors as provided in and subject to Section 5.6 of this Plan (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions), as guarantors, the administrative agent party thereto, and the Holders of Claims entitled to receive the New Senior Secured Term Loan under this Plan, which shall ~~be~~ contain terms substantially ~~in the form attached to this Plan~~ as set forth in Exhibit 5.6 and filed with the Plan Supplement.

1.1.124 ~~1.1.118~~ New Warrant Agreement means the warrant agreement in substantially the form attached as Exhibit ~~1.1.118~~1.1.124 to this Plan and filed with the Plan Supplement.

1.1.125 ~~1.1.119~~ New Warrants means the warrants to purchase New Class A Common Stock or New Class B Common Stock to be issued by Reorganized Tribune in connection with the implementation of, and as authorized by, this Plan.

1.1.126 ~~1.1.120~~ Non-Guarantor Debtors means those Debtors listed on Appendix A hereto as "Non-Guarantor Debtors".

1.1.127 ~~1.1.121~~ Non-Guarantor Non-Debtors means those non-Debtors listed on Appendix B hereto as "Non-Guarantor Non-Debtors".

1.1.128 1.1.122 Non-Qualified Former Employee Benefit Plan means any of the Debtors' non-tax qualified Pension Plans and individual agreements providing for retirement compensation, or deferred compensation arrangements of the applicable Debtor covering an individual who was not an employee, consultant or director of the applicable Debtor as of the Petition Date or who was identified to the Creditors Committee and the Senior Loan Agent.

1.1.129 1.1.123 Non-Released Parties means any Person (including, without limitation, any Holder of a Claim or Interest that has elected not to grant the releases contained in Section 11.2.2 of this Plan) other than (a) the Released Parties and (b) Persons who have otherwise been granted a release pursuant to the provisions of this Plan.

1.1.130 1.1.124 Old Common Stock means the issued and outstanding common stock of Tribune as of the Petition Date.

1.1.131 1.1.125 Other Parent Claims means General Unsecured Claims against Tribune and for the avoidance of doubt includes all Claims against Tribune under Non-Qualified Former Employee Benefit Plans with the exception of Convenience Claims.

1.1.132 1.1.126 Other Parent Claims Allocation means 35.18% of the aggregate amount in U.S. dollars of all Allowed Other Parent Claims, comprised of New Senior Secured Term Loan, Distributable Cash and New Common Stock in the same ratio as the distribution to Holders of Allowed Senior Noteholder Claims.

1.1.133 1.1.127 Other Parent Claims Reserve means one or more reserves of Cash established for the benefit of Allowed Other Parent Claims pursuant to Section 7.2.1(a) of this Plan.

1.1.134 1.1.128 Other Secured Claim means a Secured Claim, other than an Administrative Expense Claim, a DIP Facility Claim, a Priority Tax Claim, a Senior Loan Claim (other than a right to setoff) or a Senior Noteholder Claim (other than a right to setoff).

1.1.135 1.1.129 Pension Plan means an employee pension benefit plan within the meaning of section (2)(A) of the Employee Retirement Income Security Act of 1974, as amended, but excludes Multiemployer Plans.

1.1.136 1.1.130 Person means an individual, corporation, partnership, association, joint stock company, joint venture, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity, or any government, governmental agency or any subdivision, department or other instrumentality thereof.

1.1.137 1.1.131 Petition Date means (i) for Tribune and for all Debtors listed on Appendix A to this Plan other than Tribune CNLBC, LLC, December 8, 2008, the date on which such Debtors commenced their Chapter 11 Cases, (ii) for Tribune CNLBC, LLC, October 12, 2009, the date on which such Debtor commenced its Chapter 11 Case, and (iii) with respect to the Subsidiary Non-Debtors, the date on which any such Subsidiary Non-Debtor commences its Chapter 11 Case, if any.

1.1.138 1.1.132 PHONES Noteholder(s) means, individually or collectively, the Holder(s) of a PHONES Notes Claim(s).

1.1.139 1.1.133 PHONES Notes means the issued and outstanding notes under the PHONES Notes Indenture.

1.1.140 1.1.134 PHONES Notes Claim means a Claim arising under or evidenced by the PHONES Notes Indenture and related documents.

1.1.141 1.1.135 PHONES Notes Indenture means that certain Indenture, dated as of April 1, 1999, between Tribune and Wilmington Trust Company, as successor indenture trustee, as amended, restated or otherwise modified from time to time.

1.1.142 1.1.136 PHONES Notes Indenture Trustee means the indenture trustee under the PHONES Notes Indenture.

1.1.143 1.1.137 Plan means this chapter 11 plan of reorganization for the Debtors in the Chapter 11 Cases and the Non-Guarantor Non-Debtors, if any, that become Debtors and the Prepackaged Plan for the Guarantor Non-Debtors, if any, that become Debtors, including Exhibits and all supplements, appendices and schedules hereto, either in their present form or as the same may be altered, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.1.144 1.1.138 Plan Supplement means the supplement to this Plan filed with the Bankruptcy Court not later than tenfifteen (1015) calendar days prior to the deadline established for objecting to confirmation of this Plan.

1.1.145 1.1.139 Pledge Agreement means the Pledge Agreement, dated as of June 4, 2007, between Tribune and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.146 1.1.140 Prepackaged Plan means this Plan for the Guarantor Non-Debtors, if any, that become Debtors.

1.1.147 1.1.141 Priority Non-Tax Claims means any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.1.148 1.1.142 Priority Tax Claim means any secured or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.1.149 1.1.143 Proof of Claim or Proof of Interest means the proof of claim or proof of interest, respectively, that must be filed by a Holder of a Claim or Interest by the date(s) designated by the Bankruptcy Court as the last date(s) for filing proofs of claim or interests against the Debtors, or as is otherwise permitted to be filed against any of the Debtors pursuant to a Final Order of the Bankruptcy Court.

1.1.150 1.1.144 Pro Rata means that proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Interests in such Class except in cases where Pro Rata is used in reference to multiple Classes, in which case Pro Rata means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Interests in such multiple Classes, or in reference to a specific type of Claim, in which case Pro Rata means the proportion that an Allowed Claim of such type bears to the aggregate amount of all Allowed Claims of such type. Pro Rata shall also take into account Intercompany Claims against Tribune to the extent determined to be appropriate pursuant to Section 3.2.4(b)(ii)(A) of the Plan.

1.1.151 1.1.145 Quarterly Distribution Date means fifteen (15) calendar days after the conclusion of the calendar quarters ending in March, June, September and December.

1.1.152 1.1.146 Reinstated or Reinstatement means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest, or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default whether or not such default occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Interest (other than a Debtor or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim or Interest entitles the Holder of such Claim or Interest.

1.1.153 1.1.147 Related Person means, with respect to any Person, such Person's predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing their respective present and former Affiliates and each of their respective current and former members, partners, shareholders, equity-holders, officers, directors, employees, managers, trustees, trust beneficiaries, financial advisors, attorneys, accountants, investment bankers, consultants, agents and professionals, or other representatives, nominees or investment managers for beneficial owner(s) of the Senior Notes, each acting in such capacity, and any Person claiming by or through any of them (including their respective officers, directors, managers, trustees, trust beneficiaries, shareholders, partners, employees, members and professionals).

1.1.154 1.1.148 Released Claims means the Debtor Released Claims and the Holder Released Claims.

1.1.155 1.1.149 Released Parties means each of (a) the Debtors, their non-Debtor Affiliates including the Subsidiary Non-Debtors and the Reorganized Debtors, (b) the Creditors' Committee, in such capacity, and its present and former members, in their capacity as members of

the Creditors' Committee, (c) the Senior Lenders, the Senior Loan Agent, the Senior Lender Steering Committee, the Senior Lender Settlement Committee, the Bridge Lenders, the Bridge Loan Agent (subject to Section 4.6.3), the Bridge Loan Agent (subject to Section 4.6.3), the Former Bridge Loan Agent (subject to Section 4.6.3 if the Former Bridge Loan Agent or any of its Related Persons is a Bridge Lender or is otherwise entitled to vote on the Plan as of the voting record date) and the Holder of the Barclays Swap Claim, in each case in all of their respective capacities, (d) the EGI-TRB LLC Noteholders and the holders of the EGI-TRB LLC Warrant, in each case in all of their respective capacities, (e) Centerbridge, the Senior Noteholders, and the Senior Notes Indenture Trustees, in each case in all of their respective capacities, and (f) all of the respective Related Persons to each of the foregoing parties; provided, however, in each case only if the applicable party has not returned a Ballot opting out of the releases in Section 11.2.2 of the Plan and, if entitled to vote on the Plan, has voted to accept the Plan.

1.1.156 1.1.150 Reorganized Debtors means Reorganized Tribune and the other reorganized Debtors or any successors thereto by merger, consolidation or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with this Plan (including, without limitation, the Restructuring Transactions).

1.1.157 1.1.151 Reorganized Tribune means reorganized Tribune or any successors thereto by merger, consolidation or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with this Plan.

1.1.158 1.1.152 Restructuring Transactions means those transactions or other actions (including, without limitation, mergers, consolidations, conversions, joint ventures, restructurings, recapitalizations, dispositions, liquidations or dissolutions) that one or more of the applicable Debtors or Reorganized Debtors may enter into or undertake on, prior to, or after the Effective Date outside the ordinary course of business of such Debtors or Reorganized Debtors in accordance with Section 5.2 hereof and as shall be set forth in the Plan Supplement.

1.1.159 1.1.153 Retiree Claimants means those Holders of Claims under Non-Qualified Former Employee Benefit Plans that are parties to the Retiree Claimant Settlement Agreement.

1.1.160 1.1.154 Retiree Claimant Settlement Agreement means that certain settlement agreement by and among Tribune and certain Retiree Claimants attached hereto as Exhibit 5.14.3 and filed with the Plan Supplement.5.14.3.

1.1.161 1.1.155 Secured Claim means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral (i) as set forth in this Plan, (ii) as agreed to by the Holder of such Claim and the Debtors, which agreement is approved or otherwise permitted by a Final Order of the Bankruptcy Court or is an ordinary course agreement, or (iii) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (b) that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

1.1.162 1.1.156 Securities Litigation Claim means any Claim against any of the Debtors, except any Claim that survives confirmation and effectiveness of this Plan pursuant to

Section 11.6, (i) arising from the rescission of a purchase or sale of shares, notes or any other securities of any of the Debtors or an Affiliate of any of the Debtors, (ii) for damages arising from the purchase or sale of any such security, (iii) for violations of the securities laws or the Employee Retirement Income Security Act of 1974 <u>(unless there has been a judicial determination by Final Order that any such Claim is not subject to subordination under section 510(b) of the Bankruptcy Code)</u> or for misrepresentations or any similar Claims related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, (iv) asserted by or on behalf of the ESOP and/or any present or former participants in the ESOP in their capacity as such, (v) for attorneys' fees, other charges or costs incurred on account of any of the foregoing Claims, ~~and~~<u>or</u> (vi) for reimbursement, contribution or indemnification allowed under section 502 of the Bankruptcy Code on account of any of the foregoing Claims, including Claims based upon allegations that the Debtors made false and misleading statements or engaged in other deceptive acts in connection with the offer or sale of securities.

<u>1.1.163</u> ~~1.1.157~~ <u>Senior Lender Fee/Expense Claims</u> means all accrued and unpaid amounts for the reasonable and documented fees, costs and expenses of the Senior Lender Professionals incurred in connection with the Chapter 11 Cases.

<u>1.1.164</u> ~~1.1.158~~ <u>Senior Lender Professionals</u> means the professionals for the Senior Loan Agent and Angelo Gordon.

<u>1.1.165</u> ~~1.1.159~~ <u>Senior Lenders</u> means the lenders from time to time party to the Senior Loan Agreement as Lenders thereunder, including former lenders and any applicable assignees and participants thereof.

<u>1.1.166</u> ~~1.1.160~~ <u>Senior Lender Settlement Committee</u> means a committee comprised of Senior Lenders that become party to the Settlement Support Agreement prior to the commencement of the hearing to approve the Disclosure Statement.

<u>1.1.167</u> ~~1.1.161~~ <u>Senior Lender Settlement Fee/Expense Claims</u> means amounts incurred in connection with the Chapter 11 Cases on the Petition Date through and including the Effective Date for the reasonable and documented fees, costs and expenses of the legal advisors for the Senior Lenders that become party to the Settlement Support Agreement prior to the Disclosure Statement hearing.

<u>1.1.168</u> ~~1.1.162~~ <u>Senior Lender Steering Committee</u> means that certain informal steering committee of certain Senior Lenders selected by the Senior Loan Agent and each member and former member thereof.

<u>1.1.169</u> ~~1.1.163~~ <u>Senior Loan Agent</u> means JPMorgan Chase Bank, N.A. as administrative agent, and its Affiliates and Related Persons of such entities, and any successor administrative agent, under the Senior Loan Agreement.

<u>1.1.170</u> ~~1.1.164~~ <u>Senior Loan Agreement</u> means, collectively, (a) that certain Credit Agreement, dated as of May 17, 2007, among Tribune, the Senior Lenders, the Senior Loan Agent, Merrill Lynch Capital Corporation, as syndication agent, and Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time and (b) those certain increase joinders, dated as of December

20, 2007, among Tribune, certain of the Senior Lenders and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.171 Senior Loan Arrangers means any Syndication Agent, Documentation Agent, Arranger, Bookrunner or other party serving a similar purpose under the Senior Loan Agreement.

1.1.172 1.1.165 Senior Loan Claim means a Claim arising under the Senior Loan Agreement, other than a Senior Lender Fee/Expense Claim, and any Claim of the Senior Lenders or the Senior Loan Agent arising under the Pledge Agreement and the Barclays Swap Claim.

1.1.173 1.1.166 Senior Loan Guaranty Agreement means the Guarantee Agreement, dated as of June 4, 2007, among Tribune, each of the subsidiaries of Tribune listed on Annex I thereto, and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.174 1.1.167 Senior Loan Guaranty Claim means a Claim arising under the Senior Loan Guaranty Agreement, including, without limitation, the guaranty of the Barclays Swap Claim.

1.1.175 1.1.168 Senior Noteholder Claims means all Claims arising under or evidenced by the Senior Notes Indentures and related documents and any Claim of the Senior Noteholders arising under the Pledge Agreement.

1.1.176 1.1.169 Senior Noteholder Fee/Expense Claims means the reasonable and documented fees, costs and expenses of the legal and financial advisors for Law Debenture and Centerbridge incurred in connection with the Chapter 11 Cases.

1.1.177 1.1.170 Senior Noteholder(s) means, individually or collectively, the Holder(s) of a Senior Noteholder Claim(s).

1.1.178 1.1.171 Senior Notes means the eight series of notes issued and outstanding under the Senior Notes Indentures.

1.1.179 1.1.172 Senior Notes Indenture(s) means, individually or collectively:

(a)    that certain Indenture, dated as of January 1, 1997, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time;

(b)    that certain Indenture, dated as of March 19, 1996, between Tribune and Law Debenture Trust Company of New York, as successor indenture trustee, as amended, restated or otherwise modified from time to time;

(c)    that certain Indenture, dated as of January 30, 1995, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time; and

(d)     that certain Indenture, dated as of March 1, 1992, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time.

1.1.180 ~~1.1.173~~ Senior Notes Indenture Trustee(s) means, individually or collectively, the indenture trustees under the Senior Notes Indentures as of the Effective Date

1.1.181 ~~1.1.174~~ Settlement Support Agreement means that certain Settlement Support Agreement, dated as of April 8, 2010, by and among those parties listed on the signature pages thereto and any parties that may sign joinders thereto, as may be amended, supplemented and modified in accordance with the terms thereof.

1.1.182 ~~1.1.175~~ Subsidiary Debtors means, individually or collectively, the Filed Subsidiary Debtors, and such Subsidiary Non-Debtors, if any, that become Debtors prior to the Confirmation Date.

1.1.183 ~~1.1.176~~ Subsidiary GUC Reserve means one or more reserves, if any, of Cash that may be established for the benefit of Allowed General Unsecured Claims against the Filed Subsidiary Debtors pursuant to Section 7.2.2 of this Plan.

1.1.184 ~~1.1.177~~ Subsidiary Non-Debtors means those entities listed on Appendix B hereto.

1.1.185 ~~1.1.178~~ Tribune means Tribune Company, a Debtor in the Chapter 11 Cases.

1.1.186 ~~1.1.179~~ Tribune Entities means, collectively, the Debtors and the Subsidiary Non-Debtors.

1.1.187 ~~1.1.180~~ Tribune Interest means any shares of Old Common Stock, preferred stock or other instrument evidencing an ownership interest in Tribune, whether or not transferable, and any options, warrants (including, without limitation, the EGI-TRB LLC Warrants), calls, rights, puts, awards, commitments, repurchase rights, unvested or unexercised stock options, unvested common stock, unvested preferred stock or any other agreements of any character related to the Old Common Stock, but does not include the Securities Litigation Claims.

1.1.188 ~~1.1.181~~ Unimpaired means with respect to a Claim or Interest that such Claim or Interest is not Impaired including, without limitation, as a result of being Reinstated under this Plan.

1.1.189 ~~1.1.182~~ Voting Deadline means the deadline established by the Bankruptcy Court for returning Ballots.

1.2     Rules of Interpretation.

For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to

a contract, instrument, release, or other agreement or document attached as an Exhibit to this Plan being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document, schedule or Exhibit filed or to be filed means such document, schedule or Exhibit, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to a Person as a Holder of a Claim or Interest includes that Person's successors and assigns; (e) all references in this Plan to Sections, Articles and Appendices are references to Sections, Articles and Appendices of or to this Plan or the Plan Supplement, as the same may be amended, waived or modified from time to time; (f) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular Section, subsection or clause contained in this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to <u>Section 13.12</u> and the provisions of any contract, certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements, instruments, releases, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (j) the term "including" shall be construed to mean "including, but not limited to," "including, without limitation," or words of similar import.

    1.3    <u>Computation of Time</u>.

        In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.  In the event that any payment, distribution, act or deadline under this Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but if so made, performed or completed by such next succeeding Business Day shall be deemed to have been completed or to have occurred as of the required date.

    1.4    <u>Exhibits and Plan Supplement</u>.

        All Exhibits, as well as the Plan Supplement, are incorporated into and are a part of this Plan as if set forth in full herein, and, to the extent not annexed hereto, such Exhibits and Plan Supplement shall be timely filed in accordance with this Plan.  Holders of Claims and Interests may obtain a copy of the filed Exhibits and Plan Supplement upon written request to the Debtors.  Upon their filing, the Exhibits and Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours.  The documents contained in the Exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

    1.5    <u>Deemed Acts</u>.

        Whenever an act or event is expressed under this Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of this Plan and the Confirmation Order.

## ARTICLE II: TREATMENT OF ADMINISTRATIVE AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Facility Claims, Administrative Expense Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III.

### 2.1    DIP Facility Claims.

On or as soon as reasonably practicable after the Effective Date, in full satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, the Reorganized Debtors shall pay Allowed DIP Facility Claims in full in Cash.  In addition, on the Effective Date, any unexpired letters of credit outstanding under the DIP Facility shall be, at Tribune's option, (i) returned to the issuer undrawn and marked canceled, (ii) collateralized with Cash in an amount equal to 105% of the face amount of such outstanding letter of credit in form and substance acceptable to the issuer thereof, (iii) collateralized with back-to-back letters of credit issued under the Exit Facility in an amount equal to 105% of the face amount of such outstanding letter of credit, in form and substance acceptable to the issuer thereof, or (iv) otherwise deemed to be subject to reimbursement pursuant to the terms and conditions of the Exit Facility.

### 2.2    Administrative Expense Claims.

Subject to the provisions of sections 328, 330, 331 and 503(b) of the Bankruptcy Code, in full satisfaction, settlement, release and discharge of and in exchange for each Allowed Administrative Expense Claim, except to the extent that any Holder of an Allowed Administrative Expense Claim agrees to different treatment, or as otherwise provided for in the Plan, each Holder of an Allowed Administrative Expense Claim shall receive payment in full, in Cash, on the later of: (i) the Effective Date if due on or before that date, (ii) the date upon which such Administrative Expense Claim becomes an Allowed Claim, (iii) with respect to Allowed Administrative Expense Claims not yet due on the Effective Date or that represent obligations incurred by the Debtors in the ordinary course of their business during these Chapter 11 Cases, or assumed by the Debtors during these Chapter 11 Cases, such time as such Allowed Administrative Expense Claims are due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations, or (iv) such other date as may be agreed upon between the Holder of such Allowed Administrative Expense Claim and the Debtors.

### 2.3    Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive either, at the sole option of the Debtors or the Reorganized Debtors, (a) payment in full in Cash after such Priority Tax Claim becomes an Allowed Claim, (b) except as otherwise determined by the Bankruptcy Court at the Confirmation Hearing, regular installment payments in Cash equal to the Allowed amount of such Claim over a period ending not later than the fifth anniversary of the Petition Date, together with interest compounded annually from the Effective Date on any outstanding balance calculated at a rate determined under section 511 of the Bankruptcy Code, which installment payments shall commence after such Priority Tax Claim

becomes an Allowed Claim, or (c) such other treatment as agreed to by the Holder of an Allowed Priority Tax Claim and the Debtors.

## ARTICLE III: CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

3.1    <u>Summary of Classification and Treatment of Classified Claims and Interests</u>.

3.1.1  <u>General</u>.

(a)    Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for all purposes, including, without express or implied limitation, voting, confirmation and distribution pursuant to this Plan, as set forth herein.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.

(b)    This Plan constitutes a separate chapter 11 plan of reorganization for each Debtor.  For purposes of brevity and convenience, the classification and treatment of Claims and Interests has been set forth in three groups: (i) Tribune (Debtor 1), (ii) Filed Subsidiary Debtors (Debtors 2 through 111) and (iii) any Guarantor Non-Debtors that become Debtors and participate in the Prepackaged Plan.

3.1.2  <u>Identification of Classes Against Tribune (Debtor 1)</u>.  The following chart assigns a letter to each Class against Tribune for purposes of identifying each separate Class:

| <u>CLASS</u> | <u>CLAIM OR INTEREST</u> |
|:---:|:---:|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | <u>Senior</u> Loan Claims |
| <u>D</u> | <u>Bridge Loan Claims</u> |
| ~~D~~<u>E</u> | Senior Noteholder Claims |
| ~~E~~<u>F</u> | Other Parent Claims |
| ~~F~~<u>G</u> | Convenience Claims |
| I | EGI-TRB LLC Notes Claims |
| J | PHONES Notes Claims |

| | |
|---|---|
| K | Intercompany Claims |
| L | Securities Litigation Claims |
| M | Tribune Interests |

3.1.3   Identification of Classes Against Filed Subsidiary Debtors (Debtors 2 through 111).  The following chart assigns a letter to each Class against the Filed Subsidiary Debtors for purposes of identifying each separate Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Senior Loan Guaranty Claims |
| D | Bridge Loan Guaranty Claims |
| E | General Unsecured Claims |
| K | Intercompany Claims |
| L | Securities Litigation Claims |
| M | Interests in Filed Subsidiary Debtors |

3.2   Classification and Treatment of Claims Against and Interests in Tribune Company (Debtor 1).

3.2.1  Class 1A – Priority Non-Tax Claims.

(a)     Classification:  Class 1A consists of all Priority Non-Tax Claims against Tribune.

(b)     Treatment:  Each Holder of an Allowed Priority Non-Tax Claim against Tribune shall have its Claim Reinstated.

(c)     Voting:  Allowed Claims in Class 1A are Unimpaired, and the Holders of Class 1A Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1A Claims are not entitled to vote to accept or reject the Plan; provided, however, that all Class 1A Claims shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Plan, including, but not limited to, Article VIII.

3.2.2  <u>Class 1B – Other Secured Claims</u>.

(a)  Classification:  Class 1B consists of all Other Secured Claims against Tribune.

(b)  Treatment:  Each Holder of an Allowed Other Secured Claim against Tribune shall have its Claim Reinstated.

(c)  Voting:  Allowed Claims in Class 1B are Unimpaired, and the Holders of Class 1B Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1B Claims are not entitled to vote to accept or reject the Plan; <u>provided</u>, <u>however</u>, that all Class 1B Claims shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Plan, including, but not limited to, <u>Article VIII</u>.

3.2.3  <u>Class 1C – Senior Loan Claims</u>.

(a)  Classification:  Class 1C consists of all <u>Senior</u> Loan Claims against Tribune.

(b)  Allowance:  The Senior Loan Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable under the Senior Loan Agreement or the Pledge Agreement, other than the Senior Lender Fee/Expense Claims, including the full amount of principal, interest, and all other amounts due and owing under the Senior Loan Agreement and the Pledge Agreement as of the Petition Date.  ~~The Bridge Loan Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable under the Bridge Loan Agreement, including the full amount of principal, interest, and all other amounts due and owing under the Bridge Loan Agreement as of the Petition Date.  Neither the Senior Loan Claims nor the Bridge Loan Claims shall~~<u>, and shall not</u> be subject to reduction, disallowance, subordination, set off or counterclaim.

~~(c)    Treatment:  On or as soon as practicable after the applicable Distribution Date, together with other distributions provided for in this Plan, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Loan Claims against Tribune, subject to Section 5.4.2 herein, each Holder of an Allowed Loan Claim against Tribune shall receive a Pro Rata share of:~~

~~(i) 8.8% of the New Senior Secured Term Loan~~ ~~minus~~ ~~(A) the amount of the New Senior Secured Term Loan to be distributed to Holders of Allowed Claims in Class 1D and (B) the portion of the Other Parent Claims Allocation that is New Senior Secured Term Loan;~~

~~(ii) 8.8% of the Distributable Cash~~ ~~minus~~ ~~(A) the amount of the Distributable Cash to be distributed to Holders of Allowed Claims in Class 1D, (B) the portion of the Other Parent Claims Allocation that is Distributable Cash and (C) the amount of Cash to be distributed to Holders of Allowed Claims in Class 1F; and~~

(iii)8.8% of the New Common Stock (subject to dilution by the Equity Incentive Plan) minus (A) the amount of the New Common Stock to be distributed to Holders of Allowed Claims in Class 1D and (B) the portion of the Other Parent Claims Allocation that is New Common Stock.

(c)    Treatment: On or as soon as practicable after the applicable Distribution Date, together with other distributions provided for in this Plan, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Senior Loan Claims against Tribune, subject to Section 5.4.2 herein, each Holder of an Allowed Senior Loan Claim against Tribune shall receive a Pro Rata share, calculated together with the Holders of Claims in Class 1D that are Allowed pursuant to Section 3.2.4(b)(i), of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation. In addition, on the Effective Date, any unexpired letters of credit outstanding under the Senior Loan Agreement shall be either, at Tribune's option, (i) returned to the issuer undrawn and marked canceled, (ii) collateralized with Cash in an amount equal to 105% of the face amount of such outstanding letter of credit in form and substance acceptable to the issuer thereof, or (iii) collateralized with back-to-back letters of credit issued under the Exit Facility in an amount equal to 105% of the face amount of such outstanding letter of credit, in form and substance acceptable to the issuer thereof.

(d)    Voting:  Claims in Class 1C are Impaired, and Holders of Class 1C Claims are entitled to vote to accept or reject the Plan.

3.2.4  Class 1D – Bridge Loan Claims.

(a)    Classification:  Class 1D consists of all Bridge Loan Claims against Tribune.

(b)    Treatment:

(i)    The following treatment shall apply to all Holders of Bridge Loan Claims if Class 1D votes to accept the Plan:

Each Holder of a Bridge Loan Claim shall (A) as of the Effective Date, have its Claim Allowed in an amount equal to the principal amount of such Claim plus accrued interest as of the Petition Date, and (B) on or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for each Allowed Bridge Loan Claim against Tribune, subject to Section 5.4.2 herein, receive such Holder's Pro Rata share, calculated together with the Holders of Allowed Claims in Class 1C, of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation.

(ii)    If Class 1D votes to reject the Plan, the following treatment shall apply:

A.    Subject to Section 3.2.4(b)(ii)(B) herein, each Holder of a Bridge Loan Claim shall (1) have its Claim treated as a Disputed Claim unless and until such Claim is Allowed, if at all, including determined not to be subject to avoidance, setoff, subordination or other defense, by Final Order, and (2) in full satisfaction, settlement, release and discharge of and in exchange for such Bridge Loan Claim against Tribune, receive, if ultimately Allowed by Final Order, Cash equal to its Pro Rata share of the distributable value of Tribune as determined by the Bankruptcy Court in connection with confirmation of the Plan, taking into account all Allowed Claims against Tribune and also taking into account all Intercompany Claims against Tribune; provided, however, that if the Bankruptcy Court determines in connection with confirmation of the Plan that a different (including a lesser) treatment is appropriate under the requirements of section 1129(b) of the Bankruptcy Code, then such other treatment shall apply.  All rights to object to such Bridge Loan Claims and to seek to subject such Claims to avoidance, setoff, subordination, and other defenses are preserved.

B.    Each Holder of a Bridge Loan Claim may, on such Holder's Ballot, elect the following treatment of its Bridge Loan Claim: (1) as of the Effective Date, have its Bridge Loan Claim Allowed in an amount equal to the principal amount of such Claim plus accrued interest as of the Petition Date, and (2) on or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Bridge Loan Claim against Tribune, subject to Section 5.4.2 herein, receive such Holder's Pro Rata share, calculated together with the Holders of Allowed Claims in Class 1C, of the Loan Claims Loan Allocation, the Loan Claims Cash Allocation and the Loan Claims Stock Allocation.  Each Holder of a Bridge Loan Claim who has voted in favor of the Plan shall be deemed to have elected the treatment set forth in this Section 3.2.4(b)(ii)(B) with respect to its Bridge Loan Claim unless, on such Holder's Ballot, such Holder elects not to receive the treatment set forth in this Section 3.2.4(b)(ii)(B).

(c)    Voting:  Claims in Class 1D are Impaired, and Holders of Class 1D Claims are entitled to vote to accept or reject the Plan.

3.2.5    3.2.4 Class 1DE – Senior Noteholder Claims.

(a)    Classification:  Class 1DE consists of all Senior Noteholder Claims against Tribune.

(b)    Allowance:  The Senior Noteholder Claims shall together be deemed Allowed in the aggregate amount of $1,283,055,743.77.  The Senior Noteholder Claims

shall not be subject to reduction, disallowance, subordination, set off or counterclaim (other than the Senior Noteholder Claims of MSCS with respect to the Morgan Stanley Claims).

(c)  Treatment:  On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Senior Noteholder Claims against Tribune, subject to Section 5.4.2 herein, each Holder of an Allowed Senior Noteholder Claim shall receive such Holder's Pro Rata share of 7.4% of the New Senior Secured Term Loan, 7.4% of the Distributable Cash, and 7.4% of the New Common Stock, subject to dilution by the Equity Incentive Plan.

(d)  Voting:  Claims in Class 1~~D~~E are Impaired, and Holders of Class 1~~D~~E Claims are entitled to vote to accept or reject the Plan

3.2.6  ~~3.2.5~~ Class 1~~E~~F – Other Parent Claims.

(a)  Classification:  Class 1~~E~~F consists of all Other Parent Claims against Tribune.

(b)  Treatment:  On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Other Parent Claims against Tribune, each Holder of an Allowed Other Parent Claim shall receive an amount of Distributable Cash equal to 35.18% of the aggregate amount in U.S. dollars of such Holder's Allowed Other Parent Claim.

(c)  Voting:  Claims in Class 1~~E~~F are Impaired, and Holders of Class 1~~E~~F Claims are entitled to vote to accept or reject the Plan.

3.2.7  ~~3.2.6~~ Class 1~~F~~G – Convenience Claims.

(a)  Classification:  Class 1~~F~~G consists of all Convenience Claims against Tribune.

(b)  Treatment:  In full satisfaction, settlement, release and discharge of and in exchange for Allowed Convenience Claims against Tribune, on or as soon as practicable after the applicable Distribution Date, each Holder of an Allowed Convenience Claim against Tribune shall receive payment in full in Cash on account of such Claim; provided, however, that, subject to Section 7.4 of this Plan, post-petition interest shall not be paid to any Holder on any Convenience Claim without regard to whether such amount has accrued for federal income tax purposes.

(c)  Voting:  Allowed Claims in Class 1~~F~~G are Unimpaired, and the Holders of Class 1~~F~~G Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1~~F~~G Claims are not entitled to vote to accept or reject the Plan; provided, however, that all Class 1~~F~~G Claims shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Plan, including, but not limited to, Article VIII.

3.2.8  ~~3.2.7~~ Class 1I – EGI-TRB LLC Notes Claims.

(a)    Classification:  Class 1I consists of all EGI-TRB LLC Notes Claims against Tribune.

(b)    Treatment:  On the Effective Date, all EGI-TRB LLC Notes Claims against Tribune shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such EGI-TRB LLC Notes Claims.

(c)    Voting:  Claims in Class 1I are Impaired, and Holders of Class 1I Claims are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

3.2.9    3.2.8 Class 1J – PHONES Notes Claims.

(a)    Classification:  Class 1J consists of all PHONES Notes Claims against Tribune.

(b)    Treatment:  On the Effective Date, all PHONES Notes Claims against Tribune shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such PHONES Notes Claims.

(c)    Voting:  Claims in Class 1J are Impaired, and Holders of Class 1J Claims are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

3.2.10 3.2.9 Class 1K – Intercompany Claims.

(a)    Classification:  Class 1K consists of all Intercompany Claims against Tribune.

(b)    Treatment:  In full satisfaction, settlement, release and discharge of and in exchange for Intercompany Claims against Tribune, except as otherwise provided herein, all Intercompany Claims against Tribune shall be deemed satisfied, discharged and extinguished in full and shall be eliminated as of the Effective Date.

(c)    Voting:  Claims in Class 1K are Impaired; however, as set forth in Section 4.3, votes shall not be solicited from Holders of Claims in Class 1K.

3.2.11 3.2.10 Class 1L – Securities Litigation Claims.

(a)    Classification:  Class 1L consists of all Securities Litigation Claims against Tribune.

(b)    Treatment:  On the Effective Date, all Securities Litigation Claims against Tribune shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such Securities Litigation Claims.

(c)     Voting:  Claims in Class 1L are Impaired.  Holders of Claims in Class 1L are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

3.2.12 3.2.11 Class 1M – Tribune Interests.

(a)     Classification:  Class 1M consists of all Tribune Interests in Tribune.

(b)     Treatment:  On the Effective Date, all Tribune Interests in Tribune shall be extinguished and Holders of such Interests shall not receive or retain any property under the Plan on account of such Tribune Interests.

(c)     Voting:  Interests in Class 1M are Impaired.  Holders of Interests in Class 1M are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

3.3     Classification and Treatment of Claims Against and Interests in Filed Subsidiary Debtors (Debtors 2 through 111).

3.3.1   Classes 2A through 111A – Priority Non-Tax Claims.

(a)     Classification:  Classes 2A through 111A consist of all Priority Non-Tax Claims against the relevant Filed Subsidiary Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)     Treatment:  Each Holder of an Allowed Priority Non-Tax Claim against a Filed Subsidiary Debtor shall have such Claim Reinstated.

(c)     Voting:  Allowed Claims in Classes 2A through 111A are Unimpaired, and the Holders of Claims in such Classes are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 2A through 111A are not entitled to vote to accept or reject this Plan; provided, however, that all Claims in Classes 2A through 111A shall be subject to allowance or disallowance in whole or in part under the applicable provisions of this Plan, including, but not limited to, Article VIII.

3.3.2   Classes 2B through 111B – Other Secured Claims.

(a)     Classification:  Classes 2B through 111B consist of all Other Secured Claims against the relevant Filed Subsidiary Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)     Treatment:  Each Holder of an Allowed Other Secured Claim against a Filed Subsidiary Debtor shall have such Claim Reinstated.

(c)     Voting:  Allowed Claims in Classes 2B through 111B are Unimpaired, and the Holders of Claims in such Classes are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in

Classes 2B through 111B are not entitled to vote to accept or reject this Plan; provided, however, that all Claims in Classes 2B through 111B shall be subject to allowance or disallowance in whole or in part under the applicable provisions of this Plan, including, but not limited to, Article VIII.

### 3.3.3  Classes 50C through 111C – Senior Loan Guaranty Claims.

(a)      Classification:  Classes 50C through 111C consist of all Senior Loan Guaranty Claims against the relevant Guarantor Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)      Allowance:  The Senior Loan Guaranty Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable under the Senior Loan Guaranty Agreement, including the full amount of principal, interest, and all other amounts due and owing under the Senior Loan Guaranty Agreement as of the Petition Date.  The Bridge Loan Guaranty Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable thereunder, including the full amount of principal, interest, and all other amounts due and owing under the Bridge Loan Agreement as of the Petition Date.  Neither the Senior Loan Guaranty Claims nor the Bridge Loan Guaranty Claims shall, and shall not be subject to reduction, disallowance, subordination (other than, with respect to the Bridge Loan Guaranty Claims, as provided in the Loan Guaranty Agreements), set off or counterclaim.

(c)      Treatment:  On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Senior Loan Guaranty Claims against the Guarantor Debtors, subject to Section 5.4.2, each Holder of an Allowed Senior Loan Guaranty Claim against a Guarantor Debtor shall receive a Pro Rata share of:

(i)      91.2% of the New Senior Secured Term Loan plus the portion of the Other Parent Claims Allocation that is New Senior Secured Term Loan;

(ii)      91.2% of the Distributable Cash minus (A) the amount of Distributable Cash to be distributed to Holders of Allowed Claims in Classes 2E through 111E and (B) the amount of Distributable Cash to be distributed to Holders of Allowed Claims in Class 1E in excess of the portion of the Other Parent Claims Allocation that is Distributable Cash; and

(iii)      91.2% of the New Common Stock plus the portion of the Other Parent Claims Allocation that is New Common Stock, subject to dilution by the Equity Incentive Plan.

In accordance with Section 7.3, in order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions of (i) the New Senior Secured Term Loan, (ii) the Distributable Cash and (iii) the New Common Stock made on account of Allowed Bridge Loan Guaranty Claims shall be distributed to the Senior Loan Agent for distribution on account of Allowed Senior Loan Guaranty Claims, and no distribution shall be provided to Holders of Allowed Bridge Loan Guaranty Claims.

(d)    Voting: Claims in Classes 50C through 111C are Impaired, and Holders of Claims in Classes 50C through 111C are entitled to vote to accept or reject the Plan against the relevant Debtors.

### 3.3.4  Classes 50D through 111D – Bridge Loan Guaranty Claims.

(a)    Classification: Classes 50D through 111D consist of all Bridge Loan Guaranty Claims against the relevant Guarantor Debtors. The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)    Allowance: If Class 1D votes to accept the Plan, the Bridge Loan Guaranty Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable under the Bridge Loan Guaranty Agreement, including the full amount of principal, interest, and all other amounts due and owing under the Bridge Loan Guaranty Agreement as of the Petition Date, and shall not be subject to reduction, disallowance, subordination (other than as provided in the Loan Guaranty Agreements), set off or counterclaim.

(c)    Treatment: In accordance with Section 7.3, in order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions of (i) the New Senior Secured Term Loan, (ii) the Distributable Cash and (iii) the New Common Stock that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall instead be distributed to the Senior Loan Agent for distribution on account of Allowed Senior Loan Guaranty Claims. Accordingly, on the Effective Date, all Bridge Loan Guaranty Claims against the Guarantor Debtors shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such Bridge Loan Guaranty Claims.

(d)    Voting: Claims in Class 50D through 111D are Impaired, and Holders of Claims in Classes 50D through 111D are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

### 3.3.5  ~~3.3.4~~ Classes 2E through 111E – General Unsecured Claims.

(a)    Classification: Classes 2E through 111E consist of all General Unsecured Claims against the relevant Filed Subsidiary Debtors. The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)    Amount: The Debtors have made a good faith, reasonable estimate of the amount to be paid to Classes 2E through 111E under this Plan, which estimate has been disclosed in the Disclosure Statement, and the Debtors shall supplement such estimate in a declaration filed with the Bankruptcy Court no later than ten (10) calendar days prior to the deadline established for objecting to this Plan.

(c)    Treatment: On or as soon as reasonably practicable after the applicable Distribution Date, each Holder of an Allowed General Unsecured Claim against a Filed Subsidiary Debtor shall receive payment in full in Cash (paid out of the Distributable Cash); provided, however, that if the Debtors estimate, pursuant to the immediately preceding paragraph, that the sum of Allowed Claims in Classes 2E through 111E shall exceed $150 million in the aggregate and the Senior Lender Settlement Committee does not elect in writing after such

estimate is filed with the Bankruptcy Court but prior to the conclusion of the Confirmation Hearing to provide additional consideration to such Holders, each Holder of an Allowed Claim in Classes 2E through 111E shall instead receive its Pro Rata share of $150 million in Cash; provided further, however, that post-petition interest shall not accrue or be paid on any General Unsecured Claim.

(d)     Voting:  Claims in Classes 2E through 111E are Impaired, and Holders of Claims in Classes 2E through 111E are entitled to vote to accept or reject the Plan against the relevant Debtors.

3.3.6    3.3.5 Classes 2K through 111K – Intercompany Claims.

(a)     Classification:  Classes 2K through 111K consist of all Intercompany Claims against the relevant Filed Subsidiary Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)     Treatment:  In full satisfaction, settlement, release and discharge of and in exchange for Intercompany Claims against Filed Subsidiary Debtors, except as otherwise provided herein, all Intercompany Claims against Filed Subsidiary Debtors shall be deemed satisfied, discharged and extinguished in full and shall be eliminated as of the Effective Date.

(c)     Voting:  Claims in Classes 2K through 111K are Impaired; however, as set forth in Section 4.3, votes on the Plan shall not be solicited from Holders of Claims in Classes 2K through 111K.

3.3.7    3.3.6 Classes 2L through 111L – Securities Litigation Claims.

(a)     Classification:  Classes 2L through 111L consist of all Securities Litigation Claims against the relevant Filed Subsidiary Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)     Treatment:  On the Effective Date, all Securities Litigation Claims against Filed Subsidiary Debtors shall be extinguished and Holders of such Claims shall not receive or retain any property under this Plan on account of such Securities Litigation Claims.

(c)     Voting:  Claims in Classes 2L through 111L are Impaired.  Holders of Claims in Classes 2L through 111L are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

3.3.8    3.3.7 Classes 2M through 111M – Interests in Filed Subsidiary Debtors.

(a)     Classification:  Classes 2M through 111M consist of all Interests in the Filed Subsidiary Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)     Treatment:  Each Subject to Section 5.2 of this Plan, each Holder of an Allowed Interest in the Filed Subsidiary Debtors shall have its Interest Reinstated.  Allowed Interests in each Filed Subsidiary Debtor shall be Reinstated for administrative convenience and (1) in the case of the Guarantor Debtors, for the ultimate benefit of the Holders of Loan Guaranty

Claims against such Guarantor Debtors and (2) in the case of the Non-Guarantor Debtors, in exchange for the Debtors' and Reorganized Debtors' agreement under this Plan to make certain Cash distributions to the Holders of Allowed Claims against such Non-Guarantor Debtors.

(c)    Voting: Allowed Interests in Classes 2M through 111M are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Interests in Classes 2M through 111M are not entitled to vote to accept or reject the Plan.

3.4    Prepackaged Plans for and Treatment of Claims Against and Interests in Guarantor Non-Debtors, if Any, That Become Debtors.

3.4.1    Prepackaged Plan. This Plan constitutes a Prepackaged Plan for the Guarantor Non-Debtors, if any, that commence Chapter 11 Cases. For any Guarantor Non-Debtor that commences a Chapter 11 Case, such Prepackaged Plan shall classify Allowed Claims and Interests in the same manner as set forth in Section 3.3 above for the Filed Subsidiary Debtors.

3.4.2    Unimpaired Claims and Interests. Except for Loan Guaranty Claims, Intercompany Claims and Securities Litigation Claims, each Holder of an Allowed Claim against or Interest in a Guarantor Non-Debtor that becomes a Debtor shall have its Claim or Interest Reinstated. In addition, except for Loan Guaranty Claims, Intercompany Claims and Securities Litigation Claims, Allowed Claims against and Interests in any Guarantor Non-Debtor that becomes a Debtor are Unimpaired, and the Holders of such Claims and Interests are conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of such Claims and Interests are not entitled to vote to accept or reject the relevant Prepackaged Plan. All executory contracts and unexpired leases of the Guarantor Non-Debtors that become Debtors shall be assumed and shall be fully enforceable in accordance with their terms. Joint venture agreements, stockholder agreements, limited liability company agreements, limited liability partnership agreements, limited partnership agreements, general partnership agreements and any other agreements or arrangements related to the foregoing shall continue in accordance with their terms and shall remain in full force and effect and the parties' rights thereunder shall not be modified by the relevant Prepackaged Plan.

3.4.3    Loan Guaranty Claims.

(a)    Senior Loan Guaranty Claims. In full satisfaction, settlement, release and discharge of and in exchange for Allowed Senior Loan Guaranty Claims against Guarantor Non-Debtors that become Debtors, each Holder of an Allowed Senior Loan Guaranty Claim against a Guarantor Non-Debtor that becomes a Debtor shall be entitled to receive the distributions provided to such Holder under Section 3.3.3 and the guaranties described in Section 5.6 and shall not be entitled to receive any other or further distributions or guaranties. Senior Loan Guaranty Claims are Impaired, and Holders of Senior Loan Guaranty Claims are entitled to vote to accept or reject the relevant Prepackaged Plan. Votes cast by Holders of Senior Loan Guaranty Claims in Classes 50C through 111C shall be counted as votes cast on the relevant Prepackaged Plan prepared on behalf of the relevant Guarantor Non-Debtors.

(b)    Bridge Loan Guaranty Claims.  In accordance with Section 7.3, in order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions of (i) the New Senior Secured Term Loan, (ii) the Distributable Cash and (iii) the New Common Stock that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall instead be distributed to the Senior Loan Agent for distribution on account of Allowed Senior Loan Guaranty Claims.  Accordingly, on the Effective Date, all Bridge Loan Guaranty Claims against Guarantor Non-Debtors that become Debtors shall be extinguished and the Holders of such Claims shall not receive or retain any property under the relevant Prepackaged Plan on account of such Bridge Loan Guaranty Claims.  Bridge Loan Guaranty Claims are Impaired and Holders of such Claims are conclusively deemed to have rejected the relevant Prepackaged Plan and are not entitled to vote to accept or reject the relevant Prepackaged Plan

3.4.4 _Intercompany Claims_.  In full satisfaction, settlement, release and discharge of and in exchange for Allowed Intercompany Claims against Guarantor Non-Debtors that become Debtors, all Intercompany Claims against a Guarantor Non-Debtor that becomes a Debtor shall be deemed satisfied, discharged and extinguished in full and shall be eliminated as of the Effective Date.  Intercompany Claims are Impaired; however, as set forth in _Section 4.3_, votes shall not be solicited from the Holders of such Claims.

3.4.5 _Securities Litigation Claims_.  On the Effective Date, all Securities Litigation Claims against Guarantor Non-Debtors that become Debtors shall be extinguished and the Holders of such Claims shall not receive or retain any property under the relevant Prepackaged Plan on account of such Securities Litigation Claims.  Securities Litigation Claims are Impaired and Holders of such Claims are conclusively deemed to have rejected the relevant Prepackaged Plan and are not entitled to vote to accept or reject the relevant Prepackaged Plan.

## ARTICLE IV: ACCEPTANCE OR REJECTION OF PLAN

4.1    Impaired Classes of Claims and Interests Entitled to Vote.

Holders of Claims or Interests in each Impaired Class of Claims or Interests that receive or retain property pursuant to this Plan shall be entitled to vote to accept or reject this Plan.

4.2    Acceptance by an Impaired Class of Claims.

Pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if, after excluding any Claims held by any Holder designated pursuant to section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept such Plan, and (b) more than one-half in number of such Allowed Claims actually voting in such Class have voted to accept the Plan.

4.3    Deemed Acceptance by Holders of Intercompany Claims.

As proponents of this Plan (or Affiliates thereof), Holders of Intercompany Claims are conclusively deemed to accept this Plan and votes shall not be solicited from the Holders of such Claims.

4.4     Presumed Acceptances by Unimpaired Classes.

        Classes of Claims or Interests designated as Unimpaired are conclusively presumed to have voted to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code, and the votes of the Holders of such Claims or Interests will not be solicited.

4.5     Presumed Rejection of the Plan.

        Impaired Classes of Claims or Interests that do not receive or retain property under the Plan are conclusively presumed to have voted to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, and the votes of Holders of such Claims or Interests will not be solicited.

4.6     Confirmability and Severability of this Plan.

        4.6.1   Consensual Confirmation.   The confirmation requirements of section 1129(a) of the Bankruptcy Code must be satisfied separately with respect to each Debtor. Therefore, notwithstanding the combination of the separate plans of reorganization of all Debtors in this joint plan of reorganization for purposes of, among other things, economy and efficiency, this Plan shall be deemed a separate chapter 11 plan for each such Debtor.

        4.6.2   Cramdown.   With respect to any Impaired Class of Claims or Interests that fails to accept the Plan in accordance with section 1129(a) of the Bankruptcy Code, including any Classes that may be created pursuant to amendments to this Plan, the Debtors request that the Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Classes, in which case or cases, the Plan shall constitute a motion for such relief.

        4.6.3   Reservation of Rights.   Subject to Section 13.9 of this Plan, the Debtors reserve the right to modify or withdraw this Plan, in its entirety or in part, for any reason, including, without limitation, in the event that the Plan as it applies to any particular Debtor is not confirmed. In addition, and also subject to Section 13.9 of this Plan, should this Plan fail to be accepted by the requisite number and amount of Claims and Interests voting, as required to satisfy section 1129 of the Bankruptcy Code, and notwithstanding any other provision of this Plan to the contrary, the Debtors reserve the right to reclassify Claims or Interests or otherwise amend, modify or withdraw this Plan in its entirety or in part. In addition, notwithstanding any other provision of the Plan to the contrary, if the Plan fails to be accepted by the requisite number and amount of Claims in Class 1D, any Holder of a Bridge Loan Claim that has not elected to receive the treatment specified in Section 3.2.4(b)(ii)(B) (and such Holder's Related Persons) shall not receive the benefit of the releases, indemnities and injunctions that would otherwise be provided under the Plan, and the scope of the releases, indemnities and injunctions shall instead be as proposed by the Debtors in connection with the cramdown of Class 1D Claims.

## ARTICLE V: MEANS FOR IMPLEMENTATION OF THE PLAN

5.1     Non-Substantive Consolidation.

        Although the Plan is presented as a joint plan of reorganization, this Plan does not provide for the substantive consolidation of the Debtors' estates, and on the Effective Date, the

Debtors' estates shall not be deemed to be substantively consolidated for any reason. Allowed Claims held against one Debtor will be satisfied solely from the Cash and assets of such Debtor and its Estate, provided that, to the extent of any insufficiency, funds may be advanced to the relevant Debtors by the Estate of Tribune or any of the Subsidiary Debtors at the option of the advancing Debtor, as applicable. Except as specifically set forth herein, nothing in this Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any one or all of the Debtors is subject to or liable for any Claims against any other Debtor. A Claim against multiple Debtors will be treated as a separate Claim against each Debtor's Estate for all purposes including, but not limited to, voting and distribution; provided, however, that no Claim will receive value in excess of 100% of the Allowed amount of such Claim. Notwithstanding anything to the contrary in this Plan, the Reinstated Claims and Interests and Impaired Claims and Interests of a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of this Plan, the Chapter 11 Cases, or otherwise.

    5.2    <u>Restructuring Transactions</u>.

        On or prior to the Effective Date, any Debtor and, after the Effective Date, any Reorganized Debtor, may enter into or undertake any Restructuring Transactions and may take such actions as may be determined by such Debtor or Reorganized Debtor to be necessary or appropriate to effect such Restructuring Transactions. The actions to effect the Restructuring Transactions may include, without limitation: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, conversion, restructuring, recapitalization, disposition, liquidation or dissolution containing terms that are consistent with the terms herein and that satisfy the requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, disposition, or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms herein and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, conversion or dissolution (or similar instrument) pursuant to applicable law; and (iv) all other actions which the applicable entities may determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions. The Restructuring Transactions may include one or more mergers, consolidations, conversions, restructurings, recapitalizations, dispositions, liquidations or dissolutions, as may be determined by the applicable Debtors or Reorganized Debtors to be necessary or appropriate to effect the purposes of such Restructuring Transactions for the benefit of the Reorganized Debtors, including, without limitation, the potential simplification of the organizational structure of the Reorganized Debtors. In each case in which the surviving, resulting or acquiring person in any such Restructuring Transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring person will perform the obligations of the applicable Reorganized Debtor pursuant to this Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring person, which may provide that another Reorganized Debtor will perform such obligations. Implementation of the Restructuring Transactions shall not affect any distributions, discharges, exculpations, releases or injunctions set forth in this Plan. <u>Exhibit 5.2</u>, to be filed with the Plan Supplement, shall set forth the Restructuring Transactions and a detailed description of the actions and steps required to

implement each Restructuring Transaction. On or prior to, or as soon as practicable after, the Effective Date, the Debtors or the Reorganized Debtors may take such steps as they may deem necessary or appropriate to effectuate any Restructuring Transactions that satisfy the requirements set forth in this <u>Section 5.2</u>. The Restructuring Transactions shall be authorized and approved by the Confirmation Order pursuant to, among other provisions, sections 1123 and 1141 of the Bankruptcy Code and section 303 of title 8 of the Delaware Code, if applicable, without any further notice, action, third-party consents, court order or process of any kind, except as otherwise set forth herein or in the Confirmation Order. To the extent that any Restructuring Transaction may require the prior consent of the FCC to an assignment of FCC Licenses or a transfer of control of a holder of FCC Licenses, no such Restructuring Transaction shall be consummated until all necessary prior consents of the FCC shall have been obtained.

     5.3    <u>Corporate Governance, Directors, Officers and Corporate Action</u>.

     5.3.1  <u>Certificate of Incorporation; By-Laws; Limited Liability Company Agreement; Limited Liability Partnership Agreement</u>. On the Effective Date, the Certificate of Incorporation and By-Laws substantially in the forms attached as <u>Exhibit 5.3.1(1)</u> hereto and <u>Exhibit 5.3.1(2)</u> hereto, respectively, and as filed with the Plan Supplement, shall go into effect. Consistent with, but only to the extent required by, section 1123(a)(6) of the Bankruptcy Code, the Certificate of Incorporation shall, among other things, prohibit the issuance of non-voting equity securities. Additionally, the Certificate of Incorporation shall contain director and officer liability exculpation and indemnity provisions to the fullest extent permitted under Delaware law. To the extent the summary description in this Plan conflicts with the terms of the Certificate of Incorporation or the By-Laws, the terms of such documents shall govern. The certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents, as applicable, of the other Debtors or Reorganized Debtors shall be amended as necessary to satisfy the provisions of this Plan (including, without limitation, <u>Section 5.2</u>) and the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents, as applicable, as permitted by applicable law.

     5.3.2  <u>Directors and Officers of Reorganized Tribune</u>. Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the initial directors and officers of Reorganized Tribune shall be the persons identified in <u>Exhibit 5.3.2</u> hereto, to be filed with the Plan Supplement. On the Effective Date, the board of directors of Reorganized Tribune shall have at least seven (7) but not more than nine (9) members, including the chief executive officer of Reorganized Tribune. All members of the initial board of directors of Reorganized Tribune will be in compliance with all applicable requirements of the Communications Act and the FCC's rules. As set forth in the Certificate of Incorporation, the initial board of directors of Reorganized Tribune shall serve for a one-year, non-staggered term and then shall be subject to re-election based on a shareholder vote pursuant to the terms of the Certificate of Incorporation and applicable law. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in <u>Exhibit 5.3.2</u> hereto, to be filed with the Plan Supplement, the identity and affiliations of any person proposed to serve on the initial board of directors of Reorganized Tribune and to the extent such person is an insider (as defined in section 101(31) of the Bankruptcy Code) other than by virtue of being a director, the nature of any compensation for

such person.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the Certificate of Incorporation and applicable law.  Each member of the current board of directors of Tribune will be deemed to have resigned on the Effective Date unless identified in Exhibit 5.3.2 as continuing on the board of directors of Reorganized Tribune.

      5.3.3  Ownership and Management of Reorganized Debtors Other Than Reorganized Tribune.  Except as set forth in Exhibit 5.2, from and after the Effective Date, each Reorganized Debtor shall retain its equity interest in any other Reorganized Debtor.  The initial boards of directors or managers of the Reorganized Debtors other than Reorganized Tribune shall be as set forth in Exhibit 5.3.3 hereto, to be filed with the Plan Supplement.

      5.3.4  Corporate Action.  The adoption of the Certificate of Incorporation or similar constituent documents, the adoption of the By-Laws, the selection of directors and officers for Reorganized Tribune, and all other actions contemplated by this Plan shall be authorized and approved in all respects (subject to the provisions of this Plan) by the Confirmation Order.  All matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with this Plan, shall be deemed to have timely occurred in accordance with applicable law and shall be in effect, without any requirement of further action by the security holders or directors of the Debtors or the Reorganized Debtors.  On the Effective Date, as applicable, the appropriate officers of the Debtors and/or the Reorganized Debtors and members of the boards of directors or managers of the Debtors and/or Reorganized Debtors are authorized and directed to issue, execute and deliver, and cause the Reorganized Debtors to perform, the agreements, documents, securities and instruments contemplated by this Plan in the name of and on behalf of the Debtors and/or Reorganized Debtors.

    5.4     Issuance and Distribution of New Securities and Related Matters.

      5.4.1  Issuance of New Securities.  On the Effective Date or a subsequent Distribution Date, as applicable, Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to this Plan without further act or action under applicable law, regulation, order or rule.  Except as otherwise provided in this Plan, including as specifically provided in Section 5.4.2 hereof, each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to the Plan will be issued New Class A Common Stock, provided that any such Holder will be entitled to receive all or a portion of its shares of New Common Stock in the form of New Class B Common Stock if such Holder informs the Debtors of its desire to receive instead such New Class B Common Stock by the date announced by the Debtors in a filing with the Bankruptcy Court, with such date to be no earlier than the first day of the Confirmation Hearing.  The Certificate of Incorporation, substantially in the form of Exhibit 5.3.1(1) hereto, sets forth the rights and preferences of the New Common Stock.  The Certificate of Incorporation may contain customary provisions restricting the sale, transfer, assignment, conversion or other disposal of such shares of New Common Stock.  To the extent the shares of New Class A Common Stock or New Class B Common Stock are certificated, such certificates may contain a legend restricting the sale, transfer, assignment, conversion or other disposal of such shares.  The New Warrant Agreement substantially in the form of Exhibit 1.1.118 1.1.124 hereto, which shall be filed with the Plan Supplement, sets forth the rights of the holders of the New Warrants.  The

issuance of the New Common Stock and the New Warrants and the distribution thereof under this Plan shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code. Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of this Plan, including, without limitation, the Exit Facility Credit Agreement (if any), the New Senior Secured Term Loan Agreement (if any), and any other agreement entered into in connection with the foregoing, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto.

5.4.2   Distribution of New Common Stock and New Warrants.

(a)    Foreign Ownership Certification. Each Holder of a Claim, with the exception of Senior Noteholder Claims, that is eligible to receive a distribution of New Common Stock pursuant to this Plan will be required (1) to provide the Foreign Ownership Certification by the deadline established by the Bankruptcy Court and (2) to report any changes in foreign ownership percentages between the submission of the Foreign Ownership Certification and the Effective Date or such other deadline established by the Bankruptcy Court by providing an amended Foreign Ownership Certification and, upon request of the Debtors, confirm the absence of any changes. Notwithstanding anything else to the contrary in this Plan, any such Holder, other than a Holder of a Senior Noteholder Claim, that fails to provide (i) the Foreign Ownership Certification by the deadline established by the Bankruptcy Court, (ii) an amended Foreign Ownership Certification if one is required, (iii) a Foreign Ownership Certification that is reasonably satisfactory to the Debtors or (iv) a timely confirmation, if required, that its foreign ownership and voting rights percentages have not changed, may be deemed to be an entity that is foreign-owned and controlled for purposes of determining the allocation of New Common Stock and New Warrants as set forth in Section 5.4.2(c). Each Holder of a Senior Noteholder Claim that is eligible to receive a distribution of New Common Stock pursuant to this Plan will have the option to submit a Foreign Ownership Certification and to tender its Senior Notes by the deadline established by the Bankruptcy Court. Any Holder of a Senior Noteholder Claim that does not submit a reasonably satisfactory Foreign Ownership Certification and tender its Senior Notes by such deadline will be deemed to be an entity that is foreign-owned and controlled for purposes of determining the allocation of New Common Stock and New Warrants as set forth in Section 5.4.2(c).

(b)    Media Ownership Certification. Each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to this Plan may be required to provide a Media Ownership Certification by the ~~Voting Deadline or such other~~ deadline established by the Bankruptcy Court~~, which may be earlier than the Voting Deadline~~, in accordance with the instructions set forth in the Media Ownership Certification document that may be distributed to any such Holder. Any such Holder that fails to provide the Media Ownership Certification by the ~~Voting Deadline or such other~~ deadline established by the Bankruptcy Court or that does not do so to the reasonable satisfaction of the Debtors may be allocated New Class B Common Stock in lieu of New Class A Common Stock as set forth in Section 5.4.2(d) at the Debtors' discretion.

(c)    Foreign-Owned or Controlled Entities. Notwithstanding anything else to the contrary in this Plan, Reorganized Tribune shall issue (i) New Warrants in lieu of New

Common Stock, (ii) New Common Stock or (iii) a combination of New Warrants and New Common Stock (in lieu of only New Common Stock or only New Warrants), to any Holder of a Claim that is eligible to receive New Common Stock under this Plan and that, based on the Holder's Foreign Ownership Certification (or failure to provide the Foreign Ownership Certification or otherwise comply with Section 5.4.2(a) herein), is (or is deemed to be pursuant to Section 5.4.2(a)) more than twenty five percent (25%) foreign owned or controlled, on either a voting or an equity basis, as determined pursuant to section 310(b) of the Communications Act. Such issuance of New Warrants, New Common Stock, or a combination of New Warrants and New Common Stock to such Holders shall be pursuant to an allocation mechanism to be determined by Reorganized Tribune that, based on the aggregated results of the Foreign Ownership Certifications, ensures compliance with section 310(b) of the Communications Act.

(d)  Entities with Conflicting Media Interests. Reorganized Tribune, in its discretion, may issue shares of New Class B Common Stock in lieu of shares of New Class A Common Stock to any Holder of a Claim that is eligible under this Plan to receive a distribution of New Common Stock to ensure that such Holder will hold, in the aggregate (including with entities under common ownership or control) less than five percent (5%) of the voting rights of Reorganized Tribune, if Reorganized Tribune determines, based on the Holder's Media Ownership Certification (or failure to provide the Media Ownership Certification or otherwise comply with Section 5.4.2(b) herein), that such Holder has other media interests that could impair the ability of Reorganized Tribune to comply with the Communications Act or the FCC's rules if such Holder were issued the shares of New Class A Common Stock that it otherwise would be eligible to receive pursuant to this Plan.

(e)  Holders of Five Percent (5%) or More of New Class A Common Stock. If any Holder of a Claim is eligible under this Plan to receive New Class A Common Stock such that, upon the Effective Date or such other deadline established by the Bankruptcy Court, such Holder would receive five percent (5%) or more of the shares of New Class A Common Stock (for any reason, including, but not limited to, as a result of the distribution of New Warrants or the distribution of New Class B Common Stock in lieu of New Class A Common Stock in accordance with Sections 5.4.2(c) or 5.4.2(d)), and such Holder has not provided the Media Ownership Certification in accordance with Section 5.4.2(b) herein or such ownership has not been disclosed in the FCC Applications and approved by the FCC, then Reorganized Tribune shall be entitled to issue to such Holder as many shares of New Class B Common Stock in lieu of shares of New Class A Common Stock as Reorganized Tribune deems necessary to ensure compliance with the Communications Act or the FCC's rules and/or to avoid substantial delay in obtaining the FCC Approval.

(f)  Distributions. On or as soon as reasonably practicable after the applicable Distribution Date, all of the shares of the New Common Stock and New Warrants to which any Holder of a Claim shall become entitled pursuant to this Plan shall be transferred by delivery of one or more certificates representing such shares as described herein or issued in the name of such Holder or DTC or its nominee or nominees in accordance with DTC's book-entry exchange procedures, as contemplated by Section 7.7.2, subject to the terms and conditions of this Plan. In the period after the Effective Date and pending distribution of the New Common Stock to any Holder of an Allowed Claim entitled to receive such distribution, such Holder shall be entitled to exercise any voting rights and receive any dividends or other distributions payable in respect of

such Holder's New Common Stock (including receiving any proceeds of any permitted transfer of such New Common Stock), and to exercise all other rights in respect of the New Common Stock (so that such Holder shall be deemed for tax purposes to be the owner of the New Common Stock issued in the name of such Holder).

     5.5    Reporting Requirements Under Securities Exchange Act of 1934 and Listing of New Class A Common Stock on Securities Exchange or Quotation System.

     Reorganized Tribune shall use its reasonable best efforts to be a reporting company under section 12 of the Securities Exchange Act of 1934, as amended, as promptly as practicable after the Effective Date and shall maintain all necessary staff, operations and practices in order to be a public reporting company. In addition, Reorganized Tribune will use its reasonable best efforts to list, as promptly as practicable after the Effective Date, the New Class A Common Stock for trading on the New York Stock Exchange or for quotation in the NASDAQ stock market but will have no liability if it is unable to do so. Persons receiving distributions of New Class A Common Stock, by accepting such distributions, will have agreed to cooperate with Reorganized Tribune's reasonable requests to assist Reorganized Tribune in its efforts to list the New Class A Common Stock on the New York Stock Exchange or for quotation in the NASDAQ stock market, including, without limitation, appointing or supporting the appointment of a sufficient number of directors to the board of directors of Reorganized Tribune who satisfy the independence and other requirements of the New York Stock Exchange or for quotation in the NASDAQ stock market, as applicable.

     5.6    New Senior Secured Term Loan Agreement.

     5.6.1  Subject to the terms of this Section 5.6, on the Effective Date, if the Debtors have not elected to replace the New Senior Secured Term Loan in its entirety with distributions of Cash, (a) Reorganized Tribune, as borrower, (b) the other Reorganized Debtors and U.S. Subsidiary Non-Debtors (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions, but excluding any entities identified by the Debtors and consented to by the Senior Lender Settlement Committee), as guarantors, (c) the administrative agent party thereto, and (d) the Holders of Claims entitled to receive a distribution of the New Senior Secured Term Loan under this Plan shall become parties to the New Senior Secured Term Loan Agreement regardless of whether any party actually executes the New Senior Secured Term Loan Agreement. If issued, the New Senior Secured Term Loan shall (i) be guaranteed by the U.S. subsidiaries of Reorganized Tribune (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions, but excluding any entities identified by the Debtors and consented to by the Senior Lender Settlement Committee), (ii) be secured by certain assets of Reorganized Tribune and the guarantors thereof subject to specified exceptions and customary intercreditor arrangements, (iii) have interest payable in Cash quarterly, (iv) have principal payable in Cash quarterly, with the unpaid balance payable on the final maturity date thereof, (v) mature on the fifth anniversary of the Effective Date, (vi) include usual and customary affirmative and negative covenants for term loan facilities of this type and (vii) be repayable by Reorganized Tribune at any time prior to scheduled maturity without premium or penalty. The New Senior Secured Term Loan Agreement shall ~~be in the form attached hereto as~~<u>contain terms substantially as set forth in</u> Exhibit 5.6, which shall be filed with the Plan Supplement.

5.6.2  To the extent that replacement financing is available on commercially reasonable terms, the Debtors shall at the reasonable direction, or may with the consent, of the Senior Lender Settlement Committee, distribute Cash in the amount of all or part of the initial principal amount of the New Senior Secured Term Loan in lieu of all or such part of the New Senior Secured Term Loan to Holders of Allowed Claims that are entitled to receive the New Senior Secured Term Loan under this Plan.  If the Debtors so elect, the relevant Debtors or Reorganized Debtors, as applicable, are hereby authorized, without any requirement of further action by the security holders or directors of such Debtors or Reorganized Debtors, to make such repayment including through the issuance of new indebtedness; provided, however, that (i) any such Cash distribution shall be distributed Pro Rata to Holders of Allowed Claims that otherwise would have been entitled to receive the New Senior Secured Term Loan and (ii) the terms of any such indebtedness shall be subject to the consent of the Senior Lender Settlement Committee, such consent not to be unreasonably withheld.

5.7    Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors.

Subject to Section 5.2, after the Effective Date, the Reorganized Debtors shall continue to exist as separate entities in accordance with the applicable law in the respective jurisdictions in which they are organized and pursuant to their respective certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents in effect prior to the Effective Date, except to the extent such documents are to be amended pursuant to the terms of this Plan.  Except as otherwise provided in this Plan, on and after the Effective Date, all property of the Estates of the Debtors, including all claims, rights and causes of action and any property acquired by the Debtors or the Reorganized Debtors under or in connection with this Plan, shall vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, other encumbrances and Interests.  On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and compromise or settle any Claims without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by this Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professionals' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

5.8    Cancellation of Loan Agreements, Loan Guaranty Agreements, the Pledge Agreement, Notes Issued Under the Loan Agreements, Senior Notes, Debentures, Instruments, Indentures, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock and Other Tribune Interests.

5.8.1  Except as otherwise provided for herein, as of the Effective Date, all (a) Loan Agreements, Loan Guaranty Agreements, the Pledge Agreement, notes issued under the Loan Agreements, Senior Notes, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock, other Tribune Interests and any other notes, bonds (with the exception of surety bonds outstanding), indentures (including the Indentures), stockholders' agreements, registration rights agreements, repurchase agreements and repurchase arrangements, or other instruments or documents evidencing or creating any indebtedness or obligations of a Debtor that relate to Claims or Interests that are Impaired under this Plan shall be cancelled, and (b) all amounts owed by and

the obligations of the Debtors under any agreements, credit agreements, guaranty agreements, stockholders' agreements, registration rights agreements, repurchase agreements and repurchase arrangements, indentures (including the Indentures) or certificates of designation governing the Loan Claims, Loan Guaranty Claims, Senior Notes, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock, other Tribune Interests and any other notes, bonds, indentures, or other instruments or documents evidencing or creating any Claims against or Interests in a Debtor that are Impaired under the Plan shall be discharged.  In addition, as of the Effective Date, all Old Common Stock and other Tribune Interests that have been authorized to be issued but that have not been issued shall be deemed cancelled and extinguished without any further action of any party. Notwithstanding anything to the contrary herein, the obligations of parties to the Loan Agreements and the Loan Guaranty Agreements that are not Reorganized Debtors or Subsidiary Non-Debtors shall not be discharged or limited in any way.

 5.8.2  Notwithstanding the foregoing provisions of this <u>Section 5.8</u> and anything contained elsewhere in this Plan, but subject to <u>Section 5.8.1</u>, (x) the Senior Notes Indentures shall continue in effect to the extent necessary to allow the Reorganized Debtors and the Senior Notes Indenture Trustees to make distributions pursuant to the Plan on account of the Senior Noteholder Claims under the respective Senior Notes Indentures and for the applicable Senior Notes Indenture Trustee to perform such other functions with respect thereto and assert any rights preserved under subsection (z) of this <u>Section 5.8.2</u>; (y) the Loan Agreements (including, without limitation, the intercreditor provisions described in <u>Section 7.3</u> of this Plan) shall continue in effect to the extent necessary to allow the Reorganized Debtors and administrative agents to make distributions pursuant to the Plan on account of the Loan Claims and Loan Guaranty Claims under the respective Loan Agreements and Loan Guaranty Agreements, for the applicable Loan Agent to perform such other functions with respect thereto as the applicable Loan Agent shall deem necessary or appropriate and with respect to all rights of the applicable Loan Agent with respect to any and all Persons other than the Reorganized Debtors or Subsidiary Non-Debtors; and (z) nothing herein shall waive, release, or impair any rights, claims or interests, if any, that a Senior Notes Indenture Trustee may have under the applicable Senior Notes Indenture or otherwise to the recovery and/or reimbursement of its fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder to the Holders of Senior Noteholder Claims, whether such rights, claims or interests are in the nature of a charging lien or otherwise, all of which rights, claims and interests expressly are preserved.  <u>Except as otherwise provided herein, upon cancellation of the applicable Indenture, the respective Indenture Trustee shall be relieved of any obligations as Indenture Trustee under such Indenture.</u>  Except as expressly provided in this Plan, neither the Debtors nor the Reorganized Debtors shall have any obligations to any Indenture Trustee or Loan Agent for any fees, costs or expenses.

 5.8.3  Notwithstanding any other provision of this Plan, the indemnification or guaranty obligations of the Debtors contained in (A) that certain Indemnity Agreement between CSC Holdings, Inc., NMG Holdings, Inc. and Tribune dated July 29, 2008; (B) that certain Guaranty of Collection entered into on October 27, 2009 made by Tribune to various parties with respect to the obligations of Chicago Baseball Holdings, LLC in respect of the Credit Agreement Loans (as defined therein) and the Private Placement Notes (as defined therein); and (C) that certain Subordinated Guaranty of Collection entered into on October 27, 2009 made by Tribune to various parties with respect to the obligations of Chicago Baseball Holdings, LLC in respect of the Loans (as defined therein) shall continue in full force and effect.

5.9    Cancellation of Liens and Guaranties.

Except as otherwise provided in this Plan, on the Effective Date, any Lien securing any Secured Claim (other than a Lien securing any Other Secured Claim that is Reinstated pursuant to this Plan) shall be deemed released and the Holder of such Secured Claim shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such Holder and to take such actions as may be requested by the Debtors (or the Reorganized Debtors, as the case may be) to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Debtors (or the Reorganized Debtors, as the case may be). In addition, ~~on the Effective Date, by voting in favor of the Plan, Classes comprised of the Senior Lenders and Bridge Lenders agree that the Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims against the Guarantor Non-Debtors shall be extinguished and cancelled; it being~~it is a condition to the release, cancellation and extinguishment of the Senior Loan Guaranty Claims against the Guarantor Non-Debtors that all Bridge Loan Guaranty Claims shall be concurrently released, extinguished and cancelled. The consummation of this Plan shall effect and constitute a full and final release, extinguishment and cancellation of any and all Senior Loan Guaranty Claims and any and all Bridge Loan Guaranty Claims against Guarantor Non-Debtors.

5.10    Exit Facility.

On the Effective Date, without any requirement of further action by security holders or directors of the Debtors or Reorganized Debtors, the Debtors and Reorganized Debtors shall be authorized, but not directed, to enter into the Exit Facility Credit Agreement, if any, as well as any notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.

5.11    Equity Incentive Plan.

The Equity Incentive Plan shall be used for the purpose of granting awards to directors, officers and employees of Reorganized Tribune and the other Reorganized Debtors. The Equity Incentive Pool shall be reserved for issuance in the Equity Incentive Plan, and awards granted under the Equity Incentive Plan may consist of restricted stock, options, stock appreciation rights, warrants and/or other equity or equity-like incentives. A portion of the Equity Incentive Pool shall be granted to the participants in the Equity Incentive Plan within one hundred twenty (120) days after the Effective Date. The terms and conditions of the Equity Incentive Plan, including participants in the Equity Incentive Plan, will be disclosed prior to the Disclosure Statement hearing or filed as part of the Plan Supplement, if ~~applicable~~available at either time, and shall be acceptable to the Senior Lender Settlement Committee, unless not determined until after the Effective Date, in which case it shall be as determined by the compensation committee of the board of directors of Reorganized Tribune.

5.12    Sources of Cash for Plan Distributions.

Except as otherwise provided in this Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to this Plan may be obtained

from existing Cash balances, the operations of the Debtors or the Reorganized Debtors, sales of assets or the Exit Facility. Subject to <u>Section 5.1</u>, the Reorganized Debtors may also make such payments using Cash received from their Affiliates through the Reorganized Debtors' consolidated cash management systems.

    5.13    <u>Additional Transactions Authorized Under the Plan</u>.

    On or prior to the Effective Date, the Debtors shall be authorized to take any such actions as may be necessary or appropriate to have Claims or Interests Reinstated or render Claims or Interests Unimpaired to the extent provided herein.  On the Effective Date, the Agents are authorized and directed to take such actions as are necessary or appropriate to effect all transactions specified or referred to in or provided for under this Plan.

    5.14    <u>Settlement of Claims and Controversies</u>.

    5.14.1 <u>General</u>.  Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under this Plan, the provisions of this Plan constitute a good faith compromise and settlement of all Claims or controversies relating to the rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made pursuant to this Plan on account of any Allowed Claim or Allowed Interest, including, without limitation, the settlement of the Senior Loan Guaranty Claims and the Bridge Loan Guaranty Claims and the release of such Claims against the Guarantor Non-Debtors. The entry of the Confirmation Order constitutes the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims, Interests or controversies and the Bankruptcy Court's finding that all such compromises or settlements are in the best interests of (x) the Debtors, the Reorganized Debtors, the Subsidiary Non-Debtors and their respective Estates and property, and (y) Claim and Interest Holders, and are fair, equitable and reasonable on the dates and in the manner set forth herein.

    5.14.2 <u>Global Settlement Under the Plan</u>. Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement, and the Plan constitutes a request to authorize and approve such compromise and settlement, to release all of the Released Claims, including without limitation the LBO-Related Causes of Action, belonging to the Tribune Entities, the Debtors' Estates and any other Person that is deemed to have given a release pursuant to <u>Section 11.2</u> of this Plan against each and every and all Released Parties  (the "<u>Global Settlement</u>").  Any distributions to be made pursuant to the Plan shall be made on account of and in consideration of the Global Settlement.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Global Settlement and the Bankruptcy Court's finding that the Global Settlement is in the best interests of the Debtors, the Reorganized Debtors, their respective Estates, and the Holders of Claims and Interests, and is fair, equitable and reasonable.

    5.14.3 <u>Implementation of Retiree Claimant Settlement</u>.  Pursuant to Bankruptcy Rule 9019, the Plan implements and incorporates by reference the terms of the Retiree Claimant Settlement Agreement, which is attached hereto as <u>Exhibit</u> ~~5.14.3 and filed with the Plan Supplement,~~<u>5.14.3,</u> including, without limitation, the allowance of the Claims of certain Retiree

Claimants. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Retiree Claimant Settlement Agreement and the Bankruptcy Court's finding that the Retiree Claimant Settlement Agreement is in the best interests of the Debtors, the Reorganized Debtors, their respective Estates, and the Holders of Claims and Interests, and is fair, equitable and reasonable.

    5.15   Preservation of Rights of Action and Settlement of Litigation Claims.

        Except as otherwise provided in this Plan, the Confirmation Order, or in any document, instrument, release or other agreement entered into in connection with this Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the Debtors and their Estates shall retain the Litigation Claims. The Reorganized Debtors, as the successors in interest to the Debtors and the Estates, may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Litigation Claims or any other claims, rights of action, suits or proceedings that any Debtor or Estate may hold against any Person that are not otherwise released pursuant to this Plan.

    5.16   FCC Applications.

        The FCC Applications shall be filed with the FCC as promptly as practicable after filing this Plan. The Debtors, the Senior Lenders and any other Holders of Claims that are eligible to receive New Common Stock shall use their best efforts to cooperate in diligently pursuing and in taking all reasonable steps necessary to obtain the requisite FCC Approvals and shall provide such additional documents or information as are reasonably requested by the Debtors or that the Debtors reasonably deem necessary for the FCC's review of such applications. Prior to the Effective Date, the Debtors shall cooperate with counsel for the Senior Loan Agent and the Creditors Committee regarding the FCC Approval, including but not limited to the filing and further prosecution of the FCC Applications, and shall keep such counsels apprised of the status and progress of the FCC Applications.

## ARTICLE VI: TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

    6.1   Assumption of Executory Contracts and Unexpired Leases.

        6.1.1  On the Effective Date, all executory contracts or unexpired leases of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such executory contract or unexpired lease (i) was previously assumed or rejected by the Debtors, (ii) previously expired or terminated pursuant to its own terms, (iii) is an executory contract or unexpired lease that is included in the Global Contract Motion, (iv) is an executory contract or unexpired lease that is expressly excluded from the assumptions set forth in Section 6.5 hereto or is set forth on Exhibit 6.3 hereto, which shall be filed with the Plan Supplement, or (v) is an executory contract or unexpired lease that is included in a pending motion to reject such executory contract or unexpired lease. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed during the Chapter 11 Cases or pursuant to this Article VI

shall revest in and be fully enforceable by the applicable Reorganized Debtor, including any successor to such Reorganized Debtor after giving effect to the Restructuring Transactions, in accordance with its terms, except as modified by the provisions of this Plan, agreement of the parties thereto, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

6.1.2  Subject to the terms of Article VII and Section 6.1.1 herein and except for any Customer Program ~~included~~otherwise designated on Exhibit 6.3 hereto, ~~each Customer Program~~all refund and subscriber credit programs or similar obligations of the Debtors to subscribers or former subscribers to any of the Debtors' publications under the Customer Programs shall be deemed assumed effective as of the Effective Date and the proposed cure amount with respect to each shall be zero dollars.  Nothing contained in this Section 6.1.2 shall constitute or be deemed to be a waiver of any claim or cause of action that the Debtors may hold against any Person.  Except with respect to any Customer Programs included on Exhibit 6.3 hereto, as a result of the deemed assumption of the Debtors' refund, subscriber credit and other obligations under the Customer Programs to subscribers and former subscribers pursuant to this Section 6.1.2, all Proofs of Claim on account of or in respect of any ~~Customer Programs~~such obligations shall be deemed withdrawn automatically and without any further notice to or action by the Bankruptcy Court, and the Debtors' Claims Agent shall be authorized as of the Effective Date, to expunge such Proofs of Claim from the claims register.

6.2    Cure of Defaults of Assumed Executory Contracts and Unexpired Leases.

The proposed cure amount for any executory contract or unexpired lease that is assumed pursuant to this Plan shall be zero dollars unless otherwise indicated in a schedule to be filed with the Bankruptcy Court.  Any monetary amounts by which each executory contract and unexpired lease to be assumed is in default and not subsequently cured shall be satisfied, pursuant to section 365(b)(l) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree.  In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(l) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.  Pending the Bankruptcy Court's ruling on such motion, the executory contract or unexpired lease at issue shall be deemed assumed by the relevant Debtor unless otherwise ordered by the Bankruptcy Court.

6.3    Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, each executory contract and unexpired lease that is listed on Exhibit 6.3 hereto, which shall be filed with the Plan Supplement, shall be rejected pursuant to Section 365 of the Bankruptcy Code.  Each contract or lease listed on Exhibit 6.3 hereto shall be rejected only to the extent that any such contract or lease constitutes an executory contract or unexpired lease.  The Debtors reserve their right to amend Exhibit 6.3 hereto to delete any unexpired lease or executory contract therefrom or add any unexpired lease or executory contract thereto.  Listing a contract or lease on Exhibit 6.3 hereto shall not constitute an admission by a

Debtor nor a Reorganized Debtor that such contract or lease is an executory contract or unexpired lease or that such Debtor or Reorganized Debtor has any liability thereunder.

6.4    Rejection Damages Bar Date.

If the rejection by a Debtor, pursuant to the Plan, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor, or the properties of any of them, unless a Proof of Claim is filed and served upon counsel to the Debtors within thirty (30) days after service of the notice that the executory contract or unexpired lease has been rejected.

6.5    Compensation and Benefit Programs.

Except as set forth in Article IV.C.2 of the Disclosure Statement and such other Employee Benefit Plans as may be disclosed in the Plan Supplement, the Reorganized Debtors shall continue to perform their obligations under all Employee Benefit Plans and all such Employee Benefit Plans shall be assumed by the applicable Reorganized Debtors; provided, however, that nothing in the Plan shall limit, diminish or otherwise alter the Reorganized Debtors' defenses, claims, causes of action, or other rights with respect to the interpretation, application or enforcement of any such Employee Benefit Plan or the payment of any Employee Benefit Claim, including the Reorganized Debtors' rights to amend, modify or terminate any such Employee Benefit Plan either prior to or after the Effective Date. ~~The Debtors will address the inclusion in~~ In addition, this Plan ~~of~~authorizes and implements the "Transition MIP" (or "TMIP") and the "Key Operators Bonus" (or "KOB"), each as defined in the 2009 MIP Motion~~, in a supplement that will be filed by the Debtors prior to the hearing on the approval of the Disclosure Statement~~.

6.6    Collective Bargaining Agreements.

Upon the Effective Date, any Collective Bargaining Agreement entered into by the Debtors that has not expired by its terms and is in effect as of the Effective Date shall be deemed to have been assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the survival, and/or the pertinent Debtor's assumption of the Collective Bargaining Agreements then in effect, except to the extent that such agreements have already been assumed prior to the entry of the Confirmation Order.

6.7    Post-Petition Contracts and Leases.

All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors after the Petition Date shall be deemed assigned by such Debtors to the Reorganized Debtors, including any successor to any Reorganized Debtor after giving effect to the Restructuring Transactions, on the Effective Date.

6.8    Termination of ESOP.

Upon the Effective Date, the ESOP shall be deemed terminated in accordance with its terms, and the amount of unpaid principal and interest remaining on the ESOP Note dated April 1, 2007 shall be forgiven pursuant to section 6.3 of the ESOP Loan Agreement by and between

Tribune and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust dated April 1, 2007. In connection with Tribune's forgiveness of the balance due under the ESOP Note, the Debtors will seek, in their sole discretion, (1) confirmation that Tribune has a right under the ESOP Plan and ESOP Note to forgive the ESOP's obligations; (2) confirmation that Tribune's forgiveness of any post-petition payments due from the ESOP in connection with the ESOP Note, including, without limitation, the payment due on or about April 1, 2009, was in compliance with the ESOP Note and ESOP Plan and satisfied Tribune's obligations, if any, under the ESOP Plan to make a contribution to the ESOP during the relevant time period; (3) a determination of the amount of the balance of the ESOP Note being forgiven, the value of any obligations of the ESOP owed to Tribune under the ESOP Note, and the legal effect of the forgiveness of the ESOP Note. Approval of this Plan is not conditioned upon these determinations, but these determinations may be sought in connection with this Plan.

## ARTICLE VII: PROVISIONS GOVERNING DISTRIBUTIONS

> 7.1    <u>General</u>.

Unless the Holder of an Allowed Claim or Allowed Interest against any of the Debtors and the Debtors or the Reorganized Debtors agree to a different distribution date or except as otherwise provided herein or as ordered by the Bankruptcy Court, <u>(1)</u> distributions to be made on account of Claims or Interests that are Allowed as of the Effective Date shall be made on the Initial <u>Distribution Date or as soon thereafter as is practicable and (2) distributions to be made on account of Claims or Interests that become Allowed after the Effective Date shall be made on the succeeding Quarterly</u> Distribution Date or as soon thereafter as is practicable. Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

> 7.2    <u>Distributions for Certain Claims</u>.

>> 7.2.1  <u>Distributions to Holders of Other Parent Claims</u>.

(a)    <u>Other Parent Claims Reserve</u>. On or as soon as practicable after the Effective Date, Reorganized Tribune shall establish one or more Other Parent Claims Reserve(s) to make distributions to Holders of Disputed Claims that become Allowed Other Parent Claims after the Effective Date. The amount of Distributable Cash contributed to the Other Parent Claims Reserve(s) shall be equal to the amount of Distributable Cash necessary to satisfy the distributions required to be made pursuant to this Plan based upon the Face Amount of Disputed Other Parent Claims that may be entitled to receive a distribution of Distributable Cash if such Disputed Claims are subsequently Allowed Other Parent Claims.

(b)    <u>Distributions On Account of Disputed Claims Once Allowed</u>. On each Quarterly Distribution Date, the Disbursing Agent shall make distributions of Distributable Cash, in accordance with the terms of the Plan, from the Other Parent Claims Reserve(s) to each Holder of a Disputed Claim that has become an Allowed Other Parent Claim during the preceding calendar quarter and that is entitled to receive such a distribution. On or as soon as practicable after the Final Distribution Date, after distributions are made to Holders of Disputed Claims that

have become Allowed Other Parent Claims during the preceding calendar quarter, any Distributable Cash remaining in the Other Parent Claims Reserve(s) shall be distributed Pro Rata to the Holders of Allowed Loan Claims against Tribune entitled to receive a distribution under Section 3.2.3(c) and Section 3.2.4(b)(i) of this Plan.

       7.2.2  Distributions to Holders of General Unsecured Claims Against Filed Subsidiary Debtors.

             (a)  Subsidiary GUC Reserve.  If pursuant to Section 3.3.4(c) of this Plan, Holders of Allowed Claims in Classes 2E through 111E shall receive their Pro Rata share of $150 million or any other amount, rather than receiving payment in full in Cash, on or as soon as practicable after the Effective Date, Reorganized Tribune shall establish one or more Subsidiary GUC Reserve(s) to make distributions to Holders of Disputed Claims that become Allowed General Unsecured Claims against a Filed Subsidiary Debtor after the Effective Date.  The amount of Cash contributed to the Subsidiary GUC Reserve(s) shall be equal to the amount of Cash necessary to satisfy the distributions required to be made pursuant to this Plan based upon the Face Amount of Disputed Claims that may be entitled to receive a distribution of Cash if such Disputed Claims are subsequently Allowed General Unsecured Claims against such Debtors.

             (b)  Distributions On Account of Disputed Claims Once Allowed.  If one or more Subsidiary GUC Reserves are established, on each Quarterly Distribution Date, the Disbursing Agent shall make distributions of Cash, in accordance with the terms of this Plan, from the Subsidiary GUC Reserve(s) to each Holder of a Disputed Claim that has become an Allowed General Unsecured Claim against a Filed Subsidiary Debtor during the preceding calendar quarter and that is entitled to receive such a distribution.  In addition, on the first and third Quarterly Distribution Dates of each calendar year, the Debtors shall make additional interim distributions from any excess Cash in the Subsidiary GUC Reserve(s) to Holders of Allowed General Unsecured Claims against the Filed Subsidiary Debtors if the Debtors determine, in their sole discretion, that (1) the amount of such excess Cash equals or exceeds ten percent of the aggregate Face Amount of such Allowed General Unsecured Claims against Filed Subsidiary Debtors and (2) the aggregate amount of Cash held in the Subsidiary GUC Reserve(s) after such distribution will equal or exceed the maximum amount that the Debtors reasonably estimate is required to satisfy any remaining Disputed Claims that subsequently become Allowed General Unsecured Claims against such Filed Subsidiary Debtors after such Distribution Date.  On or as soon as practicable after the Final Distribution Date, after initial distributions are made to Holders of Disputed Claims that have become Allowed General Unsecured Claims against a Filed Subsidiary Debtor during the preceding calendar quarter, any Cash remaining in the Subsidiary GUC Reserve(s) shall be distributed Pro Rata to the Holders of Allowed General Unsecured Claims entitled to receive such distributions in accordance with the terms of this Plan; provided, however, that no Holder of an Allowed General Unsecured Claim shall receive more than payment in full of the principal amount of such Claim and no Holder of an Allowed General Unsecured Claim shall receive post-petition interest.

       7.3  Special Provisions Governing Distributions to Holders of Loan Claims and Loan Guaranty Claims.

Other than as specifically set forth in this Plan, distributions made on account of Loan Claims and Loan Guaranty Claims shall be made by the Disbursing Agent to the applicable Loan Agent for further distribution in accordance with the terms of the applicable Loan Agreement or Loan Guaranty Agreement. In order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions that would otherwise be made on behalf of the Holders account of Allowed Bridge Loan Guaranty Claims shall be distributed to the Senior Loan Agent, and no distribution shall be provided to Holders of Allowed Bridge Loan Guaranty Claims.

7.4    Interest on Claims.

Except as otherwise specifically provided for in this Plan, the Confirmation Order or other order of the Bankruptcy Court (including, without limitation, the Final DIP Order), or required by applicable bankruptcy law, post-petition interest shall not be paid on any Claims, and no Holder of a Claim shall be entitled to be paid interest accruing on or after the Petition Date on any Claim without regard to whether such amount has accrued for federal income tax purposes. Any post-petition interest that has been accrued for federal income tax purposes shall be cancelled as of the Effective Date.

7.5    Distributions by Disbursing Agent.

7.5.1  Other than as specifically set forth in this Plan, the Disbursing Agent shall make all distributions required to be made under the Plan. The Reorganized Debtors may act as Disbursing Agent or may employ or contract with other entities to act as the Disbursing Agent or to assist in or make the distributions required by this Plan. Law Debenture shall act as the Disbursing Agent for the Senior Noteholder Claims for which it is the Indenture Trustee.

7.5.2  Other than as specifically set forth in this Plan, the distributions to be made on account of Senior Noteholder Claims shall be made in accordance with the terms of the particular Indenture or in accordance with this Plan where such Indenture is silent.

7.6    Delivery of Distributions and Undeliverable or Unclaimed Distributions.

7.6.1  Delivery of Distributions in General. Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the Debtors' records unless such addresses are superseded by Proofs of Claim or transfers of claim filed pursuant to Bankruptcy Rule 3001.

7.6.2  Undeliverable and Unclaimed Distributions.

(a)    General. The Reorganized Debtors and the Disbursing Agent shall have no duty to make distributions to any Holder of an Allowed Claim with an undeliverable address as determined by any undeliverable or returned notice to the Debtors since the commencement of the Chapter 11 Cases unless and until the Reorganized Debtors or the Disbursing Agent are notified in writing of such Holder's then-current address prior to the Distribution Record Date. If the distribution to any Holder of an Allowed Claim or Interest is returned to the Reorganized Debtors or the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtors or the Disbursing Agent are notified in writing of such Holder's then-current address.

(b)     Non-Negotiated Check Voucher Distributions. Checks issued on account of Allowed Claims shall be null and void if not negotiated within ninety (90) calendar days from and after the date of issuance thereof. Requests for reissuance of any check must be made directly and in writing to the Disbursing Agent by the Holder of the relevant Allowed Claim within the 90-calendar-day period. After such date, such Allowed Claim (and any Claim for reissuance of the original check) shall be automatically discharged and forever barred, and such funds shall revert to the Reorganized Debtors, notwithstanding any federal or state escheat laws to the contrary.

(c)     Failure to Claim Undeliverable Distributions. Except as otherwise expressly provided in this Plan, any Holder of an Allowed Claim or Interest that does not assert a claim pursuant to this Plan for an undeliverable or unclaimed distribution within one (1) year after the Effective Date shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution against the Debtors or their Estates or the Reorganized Debtors or their property. In such cases, any Cash for distribution on account of such claims for undeliverable or unclaimed distributions shall become the property of the Estates and the Reorganized Debtors free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New Common Stock or New Warrants held for distribution on account of such Claim shall be canceled and of no further force or effect. Nothing contained in this Plan shall require any Disbursing Agent, including, but not limited to, the Reorganized Debtors, to attempt to locate any Holder of an Allowed Claim or Interest.

7.7     Record Date for Distributions.

7.7.1  With the exception of Senior Noteholder Claims, the Reorganized Debtors and the Disbursing Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Claim or Interest that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims or Interests (including Holders of Claims and Interests that become Allowed after the Distribution Record Date) that are Holders of such Claims or Interests, or participants therein, as of the close of business on the Distribution Record Date. With the exception of the Senior Noteholder Claims, the Reorganized Debtors and the Disbursing Agent shall instead be entitled to recognize and deal for all purposes under this Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date.

7.7.2  Unless otherwise set forth in the Confirmation Order, the Debtors shall not establish a record date for distributions to Holders of Senior Noteholder Claims. Distributions to Holders of Senior Noteholder Claims held through DTC shall be made by means of book-entry exchange through the facilities of DTC in accordance with the customary practices of DTC, as and to the extent practicable, and the Distribution Record Date shall not apply. In connection with such book-entry exchange, Tribune will provide rate information to each Senior Notes Indenture Trustee, which such Senior Notes Indenture Trustee shall ~~deliver instructions to DTC instructing~~convey to DTC to effect distributions on a Pro Rata basis as provided under this Plan with respect to such Claims upon which such Senior Notes Indenture Trustee acts as trustee. Subject to Section 7.5.2 of this Plan, distributions of Cash to Holders of Allowed Senior

Noteholder Claims shall be made to the applicable Senior Notes Indenture Trustees, which, in turn, shall make such distributions to the applicable Holders either through DTC or, in the case of Senior Noteholder Claims held directly by the Holder thereof, through the applicable Senior Notes Indenture Trustee subject to the respective rights, claims and interests, if any, that the Senior Notes Indenture Trustees may have under the applicable Senior Notes Indentures or otherwise to the recovery and/or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder to the Holders of Allowed Senior Noteholder Claims, whether such rights, claims or interests are in the nature of a charging lien or otherwise.  Distributions of the New Senior Secured Term Loan and the New Common Stock to Holders of Senior Noteholder Claims shall be made by the Disbursing Agent either through DTC or, in the case of Senior Noteholder Claims held directly by the Holder thereof, through the Disbursing Agent upon surrender or deemed surrender of such Holder's Senior Notes except as otherwise provided in this Plan.

     7.8     Allocation of Plan Distributions Between Principal and Interest.

     Except as otherwise expressly provided in this Plan, to the extent that any Allowed Claim entitled to a distribution under this Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

     7.9     Means of Cash Payment.

     Payments of Cash made pursuant to this Plan shall be made, at the option and in the sole discretion of the Reorganized Debtors, by (a) checks drawn on, (b) automated clearing house transfer from, or (c) wire transfer from a bank selected by the Reorganized Debtors. Cash payments to foreign creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

     7.10     Withholding and Reporting Requirements.

     In connection with this Plan and all distributions hereunder, the Reorganized Debtors or the Disbursing Agent, as applicable, shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. All persons holding Claims or Interests shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of this Plan, (a) each Holder of an Allowed Claim that is to receive a distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution and (b) no distribution shall be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations. Nothing in the preceding sentence shall

affect distributions under this Plan to the Senior Loan Agent, the Bridge Loan Agent, the Senior Notes Indenture Trustees or the Holders of Allowed Loan Claims, Loan Guaranty Claims or Senior Noteholder Claims.

7.11    Setoffs.

The Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim (other than Allowed Claims in Classes 1C and 50C through 111C, which under no circumstances shall be subject to set off) the payments or other distributions to be made pursuant to this Plan in respect of such Claim, or claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Holder.

7.12    Fractional Shares.

No fractional shares of New Common Stock or New Warrants shall be distributed. Where a fractional share would otherwise be called for, the actual issuance shall reflect a rounding up (in the case of more than .50) of such fraction to the nearest whole share of New Common Stock or New Warrant or a rounding down of such fraction (in the case of .50 or less than .50) to the nearest whole share of New Common Stock or New Warrant.  The total number of shares of New Common Stock or New Warrants to be distributed pursuant to this Plan shall be adjusted as necessary to account for the rounding provided for herein.

7.13    De Minimis Distributions.

No distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.

7.14    Special Provision Regarding Unimpaired Claims.

Except as otherwise explicitly provided in this Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

7.15    Subordination.

The distributions and treatments provided to Claims and Interests under this Plan take into account and/or conform to the relative priority and rights of such Claims and Interests under any applicable subordination and turnover provisions in any applicable contracts, including, without limitation, the PHONES Notes Indenture and the EGI-TRB LLC Notes, and  nothing in this Plan shall be deemed to impair, diminish, eliminate or otherwise adversely affect the rights or remedies of beneficiaries (including, for the avoidance of doubt, their respective Senior Notes Indenture Trustees and Agents, as applicable) of any such contractual subordination and turnover provisions.

## ARTICLE VIII:  PROVISIONS FOR RESOLVING DISPUTED CLAIMS AND DISPUTED INTERESTS

8.1     Objections to and Estimation of Claims.

After the Effective Date, only the Reorganized Debtors may object to the allowance of any Claim or Administrative Expense Claim.  After the Effective Date, the Reorganized Debtors shall be accorded the power and authority to allow or settle and compromise any Claim without notice to any other party, or approval of, or notice to the Bankruptcy Court.  In addition, the Debtors or the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Reorganized Debtors have previously objected to such Claim.  Unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtors shall serve and file any objections to Claims and Interests as soon as practicable, but in no event later than (a) two hundred ten (210) days after the Effective Date or (b) such later date as may be determined by the Bankruptcy Court upon a motion which may be made without further notice or hearing.

8.2     Payments and Distributions on Disputed, Contingent and Unliquidated Claims and Interests and on Claims for Which Proofs of Claim are Filed.

No partial payments and no partial distributions will be made with respect to a disputed, contingent or unliquidated Claim or Interest, or with respect to any Claim for which a Proof of Claim has been filed, until the resolution of such disputes or estimation or liquidation of such claims by settlement or by Final Order.  On the next Distribution Date after a disputed, contingent or unliquidated Claim or Interest becomes an Allowed Claim or Interest in an amount certain, the Holder of such Allowed Claim or Interest will receive all payments and distributions to which such Holder is then entitled under this Plan.

## ARTICLE IX:  PAYMENT AND FILING OF PROFESSIONAL FEE CLAIMS

9.1     Payment of Certain Fee and Expense Claims.

9.1.1  Payment of Senior Lender Fee/Expense Claims.  Reorganized Tribune shall pay the Senior Lender Fee/Expense Claims in accordance with the procedures set forth in this Section 9.1.1.  No later than sixty (60) days after the Effective Date, the Senior Loan Agent and Angelo Gordon shall submit to Reorganized Tribune reasonably detailed statements of the Senior Lender Fee/Expense Claims, which statements shall include descriptions of services provided in summary form without individual time records.  Reasonable amounts due under such statements shall be paid by Reorganized Tribune within thirty (30) days of receipt of such statements.  If Reorganized Tribune disputes any amount due under any such statements, Reorganized Tribune and the Senior Loan Agent and/or Angelo Gordon, as applicable, will attempt in good faith to resolve any such dispute.  If Reorganized Tribune and the applicable party are unable to resolve the dispute, either party may seek relief from the Bankruptcy Court.  The Senior Loan Agent and Angelo Gordon shall provide the Debtors with estimates of the Senior Lender Fee/Expense Claims (which shall include the amount of actual accruals through a date that is no earlier than five (5) days prior to the date of such estimates) on each of the following dates: (a) seven (7) calendar days

prior to the filing of the Plan Supplement and (b) seven (7) calendar days prior to the anticipated Effective Date.

     9.1.2  <u>Payment of Senior Lender Settlement Fee/Expense Claims</u>.  Reorganized Tribune shall pay the Senior Lender Settlement Fee/Expense Claims up to an aggregate amount not to exceed $5 million unless otherwise reasonably determined by the Senior Lender Settlement Committee, notice of which determination shall be provided to counsel to the Creditors' Committee,  in accordance with the procedures set forth in this <u>Section 9.1.2</u>.  No later than sixty (60) days after the Effective Date, the applicable Senior Lenders shall submit to Reorganized Tribune reasonably detailed statements of the Senior Lender Settlement Fee/Expense Claims, which statements shall include descriptions of services provided in summary form without individual time records.  Reasonable amounts due under such statements up to the aggregate amount permitted by the first sentence of this <u>Section 9.1.2</u> shall be paid by Reorganized Tribune within thirty (30) days of receipt of such statements.  If Reorganized Tribune disputes any amount due under any such statements, Reorganized Tribune and the applicable Senior Lender will attempt in good faith to resolve any such dispute.  If the relevant parties are unable to resolve the dispute, either party may seek relief from the Bankruptcy Court.  The applicable Senior Lenders shall provide the Debtors with estimates of the Senior Lender Settlement Fee/Expense Claims (which shall include the amount of actual accruals through a date that is no earlier than five (5) days prior to the date of such estimates) on each of the following dates: (a) seven (7) calendar days prior to the filing of the Plan Supplement and (b) seven (7) calendar days prior to the anticipated Effective Date.

     9.1.3  <u>Payment of Creditors' Committee Member Fee/Expense Claims</u>. Reorganized Tribune shall pay the Creditors' Committee Member Fee/Expense Claims up to an aggregate amount not to exceed $1.5 million in accordance with the procedures set forth in this <u>Section 9.1.3</u>.  No later than sixty (60) days after the Effective Date, counsel to the Creditors' Committee shall submit to Reorganized Tribune reasonably detailed statements of the Creditors' Committee Member Fee/Expense Claims, which statements shall include descriptions of services provided in summary form without individual time records.  Reasonable amounts due under such statements up to the aggregate amount permitted by the first sentence of this <u>Section 9.1.3</u> shall be paid by Reorganized Tribune within thirty (30) days of receipt of such statements.  If Reorganized Tribune disputes any amount due under any such statements, Reorganized Tribune and counsel to the Creditors' Committee and/or the applicable member of the Creditors' Committee will attempt in good faith to resolve any such dispute.  If the relevant parties are unable to resolve the dispute, either party may seek relief from the Bankruptcy Court.  Counsel to the Creditors' Committee shall provide the Debtors with estimates of the Creditors' Committee Member Fee/Expense Claims (which shall include the amount of actual accruals through a date that is no earlier than five (5) days prior to the date of such estimates) on each of the following dates: (a) seven (7) calendar days prior to the filing of the Plan Supplement and (b) seven (7) calendar days prior to the anticipated Effective Date.

     9.1.4  <u>Payment of Senior Noteholder Fee/Expense Claims</u>.  Reorganized Tribune shall pay (a) the Senior Noteholder Fee/Expense Claims and the reasonable and documented internal fees, costs and expenses of Law Debenture incurred in connection with the Chapter 11 Cases on or after the Petition Date through the date of the Settlement Support Agreement up to an aggregate amount not to exceed $5.25 million and (b) the Senior Noteholder Fee/Expense Claims

incurred in connection with the Chapter 11 Cases after the date of the Settlement Support Agreement through and including the Effective Date in respect of actions that are not inconsistent with the Settlement Support Agreement or confirmation of this Plan, in accordance with the procedures set forth in this <u>Section 9.1.4</u>.  No later than sixty (60) days after the Effective Date, Law Debenture and Centerbridge shall submit to Reorganized Tribune reasonably detailed statements of their respective Senior Noteholder Fee/Expense Claims, which statements shall include descriptions of services provided in summary form without individual time records.  Reasonable amounts due under such statements up to the amounts permitted by the first sentence of this <u>Section 9.1.4</u> shall be paid by Reorganized Tribune within thirty (30) days of receipt of such statements.  If Reorganized Tribune disputes any amount due under any such statements, Reorganized Tribune and Centerbridge and Law Debenture, as applicable, will attempt in good faith to resolve any such dispute.  If the relevant parties are unable to resolve the dispute, either party may seek relief from the Bankruptcy Court.  Centerbridge and Law Debenture shall provide the Debtors with estimates of their respective Senior Noteholder Fee/Expense Claims incurred from the date of the Settlement Support Agreement through and including the Effective Date (which shall include the amount of actual accruals through a date that is no earlier than five (5) days prior to the date of such estimates) on each of the following dates: (a) seven (7) calendar days prior to the filing of the Plan Supplement and (b) seven (7) calendar days prior to the anticipated Effective Date.

      9.2    <u>Bar Date for Payment or Reimbursement of Professional Fees and Expenses and Claims for Substantial Contribution</u>.

      All final requests for compensation or reimbursement of the fees of any professional employed pursuant to sections 327 or 1103 of the Bankruptcy Code or otherwise in the Chapter 11 Cases, including any Claims for making a substantial contribution under section 503(b)(4) of the Bankruptcy Code, must be filed and served on the Reorganized Debtors and their counsel, together with the Bankruptcy Court-appointed fee examiner, and the Office of the United States Trustee, not later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to applications of such professionals or other entities for compensation or reimbursement of expenses must be filed and served on the parties specified above in this <u>Section 9.2</u> and the requesting professional or other entity not later than twenty (20) days after the date on which the applicable application for compensation or reimbursement was served; <u>provided</u>, <u>however</u>, that the following protocol shall apply to the fee examiner previously appointed by the Bankruptcy Court in the Chapter 11 Cases in lieu of such twenty (20) day objection deadline:

      (i)    applicants shall submit all final requests for compensation or reimbursement of fees and expenses, and any responses provided for below, in the format required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of Practice and Procedure for the United States Bankruptcy Court for the District of Delaware, the Guidelines of the Office of the United States Trustee, and applicable orders of the Bankruptcy Court;

      (ii)    if the fee examiner has any questions for any applicant, the fee examiner may communicate such questions in writing to the applicant in an initial report (an "<u>Initial Report</u>") within thirty (30) days after the date on which the applicable application for compensation or reimbursement was served on the fee examiner;

(iii)    any applicant who receives such an Initial Report and wishes to respond thereto shall respond within twenty (20) days after the date of the Initial Report;

(iv)    within thirty (30) days after the date on which any response to an Initial Report is served on the fee examiner (or, if no such response is served, within thirty (30) days after the deadline for serving such Initial Report has passed), the fee examiner shall file with the Court a final report with respect to each such application for compensation or reimbursement; and

(v)    within fifteen (15) days after the date of the final report, the subject applicant may file with the Court a response to such final report.

Notwithstanding the foregoing, the fee examiner and a professional may agree to extend any of the time periods set forth in items (ii) through (v) above with respect to any application filed by such professional. In addition, notwithstanding the foregoing provisions of this Section 9.2, those professionals retained by the Debtors pursuant to that certain Order Authorizing the Debtors to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business entered by the Bankruptcy Court on January 15, 2009 [D.I. 227] shall continue to be compensated in accordance with the provisions of such Order, and shall not be subject to the final application procedures set forth in this Section 9.2.

## ARTICLE X: CONFIRMATION AND CONSUMMATION OF THE PLAN

10.1    Conditions to Effective Date.

10.1.1    This Plan shall not become effective and the Effective Date shall not occur unless and until the following conditions shall have been satisfied or waived in accordance with Section 10.2:

(a)    The Confirmation Order confirming this Plan, as this Plan may have been modified in accordance with the terms hereof, shall conform to this Plan in all respects and shall have been entered by the Bankruptcy Court in form and substance reasonably satisfactory to the Debtors, Senior Lender Settlement Committee and the Creditors' Committee.

(b)    The Confirmation Order shall authorize and approve the Global Settlement.

(c)    The Certificate of Incorporation and By-Laws and any amended certificates or articles of incorporation, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents of the other Debtors, as necessary, shall have been adopted and filed with the applicable authorities of the relevant jurisdictions and shall become effective on the Effective Date in accordance with such jurisdictions' laws.

(d)    All authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement this Plan on the Effective Date shall have been obtained or shall have occurred unless failure to do so will not have a material adverse effect on the Reorganized Debtors.

(e)     At least seven (7) members of the board of directors of Reorganized Tribune shall have been selected and shall have expressed a willingness to serve on the board of directors of Reorganized Tribune.

(f)     All other documents and agreements necessary to implement this Plan on the Effective Date shall have been executed and delivered and all other actions required to be taken in connection with the Effective Date shall have occurred.

(g)     All consents, approvals and waivers from the FCC that are necessary or that the Debtors deem appropriate to consummate the transactions contemplated herein and to continue the operation of the Debtors' ownership structure shall have been obtained in form and substance reasonably satisfactory to the Debtors and the Senior Lender Settlement Committee.

(h)     The Confirmation Order shall include the language set forth in Section 11.3 and Section 11.4 of this Plan.

(i)     If Class 1D votes to reject the Plan, the class, in the aggregate, shall not be entitled to consideration materially in excess of that determined by (x) application of the mid-point estimate of total "Distributable Value" as defined and set forth in the Disclosure Statement and (y) the allocation of such "Distributable Value" underlying the recoveries of Holders of Claims against Tribune under this Plan.

10.2    Waiver of Conditions.

Except for the condition set forth in Section 10.1.1(b) (which may not be waived, modified or amended), each of the remaining conditions set forth in Section 10.1.1 may be waived in whole or in part by the Debtors with the consent of the Senior Lender Settlement Committee, such consent not to be unreasonably withheld, without the need for notice or a hearing (except that notice shall be provided to the Creditors Committee); provided, however, that the Debtors may not waive any condition the waiver of which is proscribed by law; provided further, however, that any waiver of the condition set forth in Section 10.1.1(i) shall also require the consent of Centerbridge, such consent not to be unreasonably withheld.

10.3    Consequences if Confirmation Order is Vacated.

If the Confirmation Order is vacated, (a) this Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for herein shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtors may assume and assign or reject all executory contracts and unexpired leases of personal property shall be extended for a period of one hundred twenty (120) days after the date the Confirmation Order is vacated.

## ARTICLE XI: INJUNCTIONS, RELEASES AND DISCHARGE

11.1    Discharge.

11.1.1    Discharge of Claims and Termination of Interests.

(a)    As of the Effective Date, except as provided in this Plan, the distributions and rights afforded under this Plan and the treatment of Claims and Interests under this Plan shall be in exchange for, and in complete discharge of, all Claims against the Debtors, and in satisfaction of all Interests and the termination of Interests in Tribune. In accordance with Section 7.4, as of the Effective Date any interest accrued on Claims against the Debtors from and after the Petition Date shall be cancelled. Accordingly, except as otherwise provided in this Plan or the Confirmation Order, confirmation of the Plan shall, as of the Effective Date, (i) discharge the Debtors from all Claims or other debts that arose before the Effective Date, and all debts of the kind specified in sections 502(g) or 502(i) of the Bankruptcy Code, whether or not (x) a Proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (y) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code (or is otherwise resolved), or (z) the Holder of a Claim based on such debt has accepted the Plan; and (ii) satisfy, terminate or cancel all Interests and other rights of equity security holders in the Debtors except as otherwise provided in the Plan. In addition, confirmation of the Plan shall, as of the Effective Date, authorize the release of the Senior Loan Guaranty Claims and the Bridge Loan Guaranty Claims against the Guarantor Non-Debtors.

(b)    As of the Effective Date, except as provided in this Plan, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, or their respective successors or property, any other or further Claims, debts, rights, causes of action, liabilities or Interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Petition Date and from asserting against the Guarantor Non-Debtors any Senior Loan Guaranty Claims or Bridge Loan Guaranty Claims. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims and other debts and liabilities of the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent such judgment is related to a discharged Claim.

11.1.2    Discharge Injunction. Except as provided in this Plan or the Confirmation Order, as of the Effective Date, all Persons that hold, have held, or may hold a Claim or other debt or liability that is discharged, or an Interest or other right of an equity security holder that is terminated pursuant to the terms of this Plan, are permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims, debts or liabilities, or terminated Interests or rights: (i) commencing or continuing any action or other proceeding against the Debtors, the Reorganized Debtors or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Debtors, the Reorganized Debtors or their respective property; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Debtors, the Reorganized Debtors or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Debtors, the Reorganized Debtors or their respective property; and (v) commencing or continuing any judicial or administrative proceeding, in any forum, that does not comply with or is inconsistent with the provisions of this Plan.

11.2    <u>Releases</u>.

  11.2.1    <u>Releases by Debtors and Estates</u>.  Except for those Claims expressly preserved in <u>Section 11.2.6</u> of this Plan, on the Effective Date and effective simultaneously with the effectiveness of this Plan, the Reorganized Debtors on their own behalf and as representatives of their respective estates, release unconditionally and hereby cause the Subsidiary Non-Debtors to release unconditionally, and are hereby deemed to release unconditionally, each and all of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claims), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Effective Date that are  in connection with the Debtors or any of them, or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, the Disclosure Statement or the Restructuring Transactions (the "<u>Debtor Released Claims</u>"); <u>provided</u>, <u>however</u>, that, with the exception of LBO-Related Causes of Action, nothing in this Section shall be construed to release any party from willful misconduct or gross negligence as determined by a Final Order.  The releases contained in this Section shall not apply to or otherwise affect the Morgan Stanley Claims or the obligations of any of the Debtors' officers or directors to repay loans or advances of money or other property contractually owed to the Debtors or their Estates or with respect to loans or advances of money that the Debtors guaranteed on behalf of such officers or directors. <u>Furthermore, notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of any express contractual commercial obligations arising in the ordinary course of any Person to the Debtors not directly related to the LBO-Related Causes of Action.</u>  On the Effective Date, each Guarantor Non-Debtor will provide each Holder of a Loan Guaranty Claim against the Guarantor Non-Debtors and the Senior Loan Agent and Bridge Loan Agent a release of such scope in consideration for the Guarantor Non-Debtor Release contemplated hereby.

  11.2.2    <u>Releases by Holders of Claims and Interests</u>.  Except as otherwise expressly provided in this Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of this Plan, each Person (a) that has voted to accept the Plan or is deemed to have accepted the Plan, (b) that has ~~not~~ voted to ~~accept~~reject the Plan but ~~that has received a Ballot and that has not~~has opted ~~out of~~to grant the releases in this <u>Section 11.2.2</u>, or (c) who otherwise agrees to provide the releases set forth in this <u>Section 11.2.2</u>, shall be deemed to have unconditionally released each and all of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claim), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, Disclosure Statement or the Restructuring Transactions (the "<u>Holder Released Claims</u>" and together with the Debtor Released Claims the "<u>Released Claims</u>"); <u>provided</u>, <u>however, that nothing in this Section 11.2.2 shall be construed as a</u>

release of any Claims against non-Debtors arising under the Employee Retirement Income Security Act of 1974 held by the United States Department of Labor; provided further, that no agent or indenture trustee is, by virtue of giving its own release hereunder, releasing individual claims, if any, of lenders or noteholders for which it acts as agent or indenture trustee that are not themselves Released Parties.  Furthermore, notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of, except as provided in Section 11.2.5 hereof with respect to the Guarantor Non-Debtors, any express contractual obligation of any non-Debtor party due to any other non-Debtor party.

        11.2.3     Failure to Grant Release.  Any Holder of a Claim or Interest that has timely submitted to the Debtors or filed with the Court a Ballot opting not to grant the releases set forth in Section 11.2.2 shall not receive the benefit of the releases set forth in Section 11.211.2.2 (if otherwise entitled).

        11.2.4     Injunction Related to Releases.  Except as provided in this Plan or the Confirmation Order, as of the Effective Date, all Persons that hold, have held, or may hold a Claim or other debt, right, cause of action or liability that is released pursuant to the provisions of the Plan are permanently enjoined from taking any of the following actions on account of or based upon such released Claims, debts, rights, causes of action or liabilities:  (i) commencing or continuing any action or other proceeding against the Released Parties or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Released Parties or their respective property; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Released Parties or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Released Parties or against their respective property; and (v) commencing or continuing any judicial or administrative proceeding, in any forum, that does not comply with or is inconsistent with the provisions of this Plan.

        11.2.5     Release of Guarantor Non-Debtors from Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims.  All Holders of Loan Guaranty Claims against the Guarantor Non-Debtors shall be deemed on the Effective Date to have granted the Guarantor Non-Debtor Release and the Guarantor Non-Debtors shall be unconditionally relieved from any liability to the Senior Lenders or the Bridge Lenders on account of the Senior Loan Guaranty Claims or the Bridge Loan Guaranty Claims and the Senior Loan Agent and the Bridge Loan Agent, respectively, shall be unconditionally relieved from any liability of any nature whatsoever to such Holders as a result of the release of the Guarantor Non-Debtors from any and all Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims; provided that the Guarantor Non-Debtor Release is dependent upon and only effective upon (i) the execution by each of the Guarantor Non-Debtors of a guaranty of the New Senior Secured Term Loan pursuant to and to the extent provided in Section 5.6 of this Plan, (ii) the unconditional release by each of the Guarantor Non-Debtors, in form and substance acceptable to the Senior Lender Settlement Committee as of the Effective Date, of each of the Holders of Senior Loan Guaranty Claims and the Senior Loan Agents of and from any and all Debtor Released Claims, and (iii) the granting by the Guarantor Non-Debtors of Liens on certain property of the Guarantor Non-Debtors pursuant to and to the extent provided in Section 5.6 of this Plan.  Pursuant to Bankruptcy Rule 9019, the Bankruptcy Court's entry of the Confirmation Order shall constitute its approval of this good faith settlement and compromise of the claims released by the Guarantor Non-Debtor Guarantor Release and

adequate factual findings that the ~~Guarantor~~ Non-Debtor ~~Guarantor~~ Release is: (1) fair, equitable and reasonable; (2) necessary and essential to the Debtors' successful reorganization; (3) in exchange for good and valuable consideration provided by the Guarantor Non-Debtors and the Agents; (4) warranted by the exceptional and unique circumstances of the Debtors' reorganization; and (5) consistent with public policy and due process principles.

11.2.6    Release of Chapter 5 Causes of Action.  ~~In~~Except as set forth in Section 3.2.4(b)(ii) of this Plan, in addition to the releases set forth herein, the Debtors and the Reorganized Debtors shall not file, commence, or pursue any claim, right or cause of action under Chapter 5 of the Bankruptcy Code or seek to disallow any Claim to the extent it may be avoidable, except that the following claims are expressly preserved: (a) the Morgan Stanley Claims, and (b) any claims, rights or causes of action related to set-offs against amounts owing to the Debtors, provided that the Debtors shall not set-off against any distributions under this Plan to Holders of Allowed Claims in Classes 1C, 1D and 50C through 111C (other than any distributions to MSCS with respect to the Morgan Stanley Claims).

11.2.7    Non-release of Certain Defined Benefit Plans.  Notwithstanding anything to the contrary herein, with respect to any Defined Benefit Plan that has not been terminated or does not terminate by its terms prior to the entry of the Confirmation Order, all Claims of, or with respect to, such Defined Benefit Plan (including any based on fiduciary duties under the Employee Retirement Income Security Act of 1974, as amended) and all Claims of the Pension Benefit Guaranty Corporation, whether or not contingent, under 29 U.S.C. § 1362(b) for unfunded benefit liabilities, under 29 U.S.C. § 1306(a)(7) for termination premiums, and under 29 U.S.C. § 1362(c) for due and unpaid employer contributions shall not be discharged, released, exculpated or otherwise affected by the Plan (including Section 11.2), the entry of the Confirmation Order or the Chapter 11 Cases.  Notwithstanding anything to the contrary herein, in the event that a Defined Benefit Plan does not terminate prior to the entry of the Confirmation Order, obligations of the Debtors under the Defined Benefit Plan as of the Effective Date shall become obligations of the applicable Reorganized Debtors and, as required by the Internal Revenue Code of 1986, as amended, or the Employee Retirement Income Security Act of 1974, as amended, the controlled group members.

11.3    Bar Order.

The Confirmation Order shall provide, among other things (and the inclusion of such language, or language substantially similar to the following, and subject to Section 10.2 of this Plan, shall be a condition to the Effective Date):

"ORDERED that all Persons, including without limitation (i) any Persons that are not Released Parties, (ii) Released Parties, and (iii) Persons who have voted for or against the Plan or who are presumed to have voted for or against the Plan under Section 1126(f)-(g) of the Bankruptcy Code (collectively, the "Barred Persons"), are hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any claim for non-contractual indemnity or contribution against any Released Party (including any other non-contractual claim against the Released Parties, whether or not denominated as for contribution or indemnity, where the injury to the Person is the liability of

the Person to the Barred Persons), arising out of or reasonably flowing from the claims or allegations in any of the Released Claims, whether arising under state, federal or foreign law as claims, cross-claims, counterclaims, or third-party claims (collectively, the "Barred Claims"), and with respect to the Barred Claims, the Barred Persons are also entitled to the judgment reduction provisions set forth herein. This Order (the "Bar Order") is without prejudice to the position of any party as to the existence, in the absence of this Bar Order, of any Barred Claim; and it is further

"ORDERED that no Person acting on behalf of the estate, including any successor to the Debtors, any committee appointed in the Bankruptcy Case, any chapter 7 trustee, any trustee of a litigation trust or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (any of the above, a "Plaintiff"), may assert or bring a Released Claim. In the event any such Plaintiff obtains a judgment or award (a "Judgment") against any Person with respect to one or more causes of action based upon, arising from, or related to the Released Claims or any transactions underlying any Released Claims then, with respect to any actual, potential or asserted liability of a Released Party to any Person for the Barred Claims in respect of such Judgment, the Plaintiff shall, prior to or in connection with the entry of such Judgment, provide notice of this Bar Order to the court or tribunal in which such Judgment was obtained, and the court or tribunal shall reduce such Judgment against such Person in an amount that is the greater of (i) the amount of the consideration provided pursuant to the Global Settlement by the Released Party or Parties against whom there would have been a Barred Claim in the absence of this Bar Order, or (ii) the amount equal to the Judgment against any such Person times the aggregate proportionate share of fault (expressed as a percentage) of the Released Party or Parties against whom there would have been a Barred Claim in the absence of this Bar Order. In the event that Judgment shall be entered against any Person without a prior or concurrent determination as to the existence of a Barred Claim (and, in the event of a determination of the existence of a Barred Claim, without a reduction of such Judgment), such Judgment shall not, and shall be deemed not to, give rise to any Barred Claim; and it is further

"ORDERED that if any Plaintiff enters into a settlement with any Person with respect to one or more causes of action based upon, arising from, or related to the Released Claims or any transaction underlying any Released Claim, then such Plaintiff shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Barred Claims with respect to such settlement."

11.4    Supplemental Injunction.

In order to supplement the settlements contemplated by and provided for in this Plan and the injunctive effect of the Discharge Injunction, and pursuant to sections 524 and 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following injunction to take effect as of the Effective Date.

11.4.1 *Terms.* *In order to preserve and promote the settlements contemplated by and provided for in this Plan, and to supplement, where necessary, the injunctive effect of the discharge as provided in sections 1141 and 524 of the Bankruptcy Code and as described in this Article XI, except as otherwise provided in this Plan, all entities which have held or asserted, which hold or assert or which may hold or assert any claim, demand or cause of action against the Released Parties (or any of them) based upon, attributable to, or arising out of any Released*

*Claim against or Interest in any of the Debtorsthat is released in connection with the Plan, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be permanently stayed, restrained and enjoined from taking any action against the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving payments or recovery with respect to any such claim, demand or cause of action arising prior to the Effective DateReleased Claim, including, but not limited to:*

(a)     *commencing or continuing in any manner any action or other proceeding of any kind with respect to any such claim, demand or cause of actionReleased Claim against any of the Released Parties, or against the property of any Released Party;*

(b)     *enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or against the property of any Released Party with respect to any such claim, demand or cause of actionReleased Claim;*

(c)     *creating, perfecting or enforcing any Lien of any kind against any Released Party or the property of any Released Party with respect to any such claim, demand or cause of actionReleased Claim;*

(d)     *except as otherwise provided in this Plan, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due any Released Party or against the property of any Released Party with respect to any such claim, demand or cause of actionReleased Claim; and*

(e)     *taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Plan relating to such claim, demand or cause of actionReleased Claim.*

11.4.2 *Bankruptcy Rule 3016 Compliance.  The Debtors' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.*

11.4.3 *The injunction provided by this Section 11.4 shall not enjoin any actions respecting claims not released or barred in connection with this Plan and, for the avoidance of doubt, shall only enjoin actions respecting Released Claims or Barred Claims.*

11.5    Disallowed Claims And Disallowed Interests.

On and after the Effective Date, the Debtors and the Reorganized Debtors shall be fully and finally discharged of any and all liability or obligation on a Disallowed Claim or a disallowed Interest, and any Order disallowing a Claim or an Interest which is not a Final Order as of the Effective Date solely because of an entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.  The Confirmation Order, except as otherwise provided herein, shall constitute an Order: (a) disallowing all Claims and Interests to

the extent such Claims and Interests are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims and Interests, and Claims for unmatured interest and (b) disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages or any other damages not constituting compensatory damages.

11.6    Exculpation.

~~None~~To the fullest extent permitted under applicable law, none of the Released Parties and none of the present or former members of the Creditors' Committee (in their capacity as members of the Creditors' Committee), whether or not such members are otherwise Released Parties, shall have or incur any liability to any person or entity for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the negotiation of the Plan, pursuit of confirmation of the Plan, the administration, consummation and implementation of the Plan or the property to be distributed under the Plan, the Disclosure Statement, the Restructuring Transactions, the Plan Supplement, the releases and injunctions, or the management or operation of the Debtors (except for any liability that results from willful misconduct or gross negligence as determined by a Final Order). Any of the Released Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and the administration thereof.

11.7    Corporate Indemnities.

11.7.1    Prepetition Indemnification and Reimbursement Obligations. For purposes of this Plan, the respective obligations of Tribune and the other Debtors to indemnify and reimburse any Persons who are or were directors, officers or employees of the Debtors, against and for any obligations pursuant to certificates or articles of incorporation, certificates of formation, codes of regulation, bylaws, limited liability company agreements, partnership agreements, applicable state or non-bankruptcy law, or specific agreements or any combination of the foregoing, shall survive confirmation of this Plan, remain unaffected thereby, and not be discharged under section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on or after the Petition Date.

11.7.2    Plan Indemnity. In addition to the obligations set forth in Section 11.7.1 and not by way of limitation thereof, subject to Section 4.6.3 of this Plan, the Reorganized Debtors shall jointly and severally indemnify and hold harmless the Senior Loan Agent, the Senior Loan Arrangers, the Senior Lenders, the Bridge Loan Agent, the Former Bridge Loan Agent, the Bridge Loan Arrangers and the Bridge Lenders (collectively, the "Indemnified Creditor Parties") and all of their respective Related Persons, in each case in all such capacities and all other non-fiduciary capacities related to the transactions underlying the LBO-Related Causes of Action, and any natural persons who are or were officers or directors of any of the Debtors (each an "Indemnified Party" and collectively, with the Indemnified Creditor Parties, the "Indemnified Parties"), on account of and with respect to any claim, cause of action, liability, judgment, settlement, cost or expense (including without limitation attorneys' fees but only if incurred after the Effective Date) on account of claims or causes of action threatened or asserted by any Person against such parties that seek damages, contribution, indemnity, equitable indemnity, or any similar claim, based upon

or as the result of (x) the Released Claims, including without limitation any claims on account of and with respect to any LBO-Related Causes of Action; or (y) Barred Claims or any similar claim based upon or as the result of the assertion of primary claims against any other person by any representative of the Debtors' Estates (the "Covered Claims"); provided, however, that in no event shall the aggregate liability of the Reorganized Debtors to any individual Indemnified Creditor Party and all Related Persons of such Indemnified Creditor Party on account of such indemnity exceed the sum of (i) such Indemnified Creditor Party's pro rata share (calculated based on the proportion that the allowed Loan Claims against Tribune held by such Indemnified Creditor Party bears to the aggregate amount of all allowed Loan Claims against Tribune held by all Indemnified Creditor Parties) of $427,582,000, (ii) such Indemnified Creditor Party's pro rata share (calculated based on the proportion that the allowed Senior Loan Guaranty Claims held by such Indemnified Creditor Party bears to the aggregate amount of all allowed Senior Loan Guaranty Claims held by all Indemnified Creditor Parties) of $83,129,000 and (iii) all costs and/or expenses (including without limitation attorneys' fees) incurred in connection with any Covered Claims by such Indemnified Creditor Party and such Related Persons. For the avoidance of doubt, the provisions of this Section 11.7.2 are not intended to provide an indemnity for causes of action held by a non-Debtor against an indemnified Person that exist independent of any Released Claim or Barred Claim, and this Section 11.7.2 is not intended to extend to any indemnification for any claims: (i) by the Holders of Claims in Class 1J against a trustee for such Class 1J Claims; and (ii) in connection with the claims asserted in the Neil Litigation.

11.7.3    Indemnity for Members of the Creditors' Committee. The Reorganized Debtors shall jointly and severally indemnify and hold harmless the present and former members of the Creditors' Committee and their respective Related Persons (in their capacity as members of the Creditors' Committee), on account of and with respect to any costs and/or expenses (including without limitation attorneys' fees) incurred in connection with any Covered Claims.

11.7.4    Limitation on Indemnification. Except as provided herein with respect to the LBO-Related Causes of Action, the Reorganized Debtors shall not be obligated to indemnify and hold harmless any Person or entity for any claim, cause of action, liability, judgment, settlement, cost or expense that results from such Person's or entity's gross negligence or willful misconduct as determined by a Final Order.

11.7.5    Director and Officer Liability Insurance and Fiduciary Liability Insurance. The Debtors' director and officer liability insurance policies and fiduciary liability insurance policies shall provide coverage for claims made for any wrongful acts or other covered conduct, acts or omissions occurring on or prior to the Effective Date (such coverage also referred to as "tail" coverage) with coverage in scope and substance and on terms no less favorable to the current insureds than the Debtors' insurance policies existing as of the Confirmation Date, which insurance policies shall remain in full force and effect for a period of no less than six (6) years following the Effective Date.

11.7.6    Indemnification Claim Procedures. Claims made by beneficiaries of the indemnities contained in this Section 11.7 shall be submitted, resolved and reimbursed, if applicable, in accordance with the procedures set forth in Exhibit 11.7.6 hereto, to be filed with the Plan Supplement.

11.8    Term of Bankruptcy Injunction or Stays.

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

## ARTICLE XII:  RETENTION OF JURISDICTION

12.1    Retention of Jurisdiction.

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

12.1.1    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim or Priority Tax Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

12.1.2    resolve any matters related to the rejection, assumption or assumption and assignment of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

12.1.3    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

12.1.4    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

12.1.5    enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases and other agreements or documents created in connection with this Plan, the Disclosure Statement or the Confirmation Order;

12.1.6    resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or any contract, instrument, release or other agreement or document that is executed or created pursuant to this Plan, or any entity's rights arising from or obligations incurred in connection with this Plan or such documents;

12.1.7    approve any modification of this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan or the Confirmation Order, or remedy any defect or omission or reconcile any

inconsistency in any Bankruptcy Court order, this Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan or the Confirmation Order, or enter any order in aid of Confirmation pursuant to section 1142 of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate this Plan;

12.1.8    hear and determine all applications for compensation and reimbursement of expenses of professionals under this Plan or under sections 330, 331, 363, 503(b), 1103 and 1129(c)(9) of the Bankruptcy Code, which shall be payable by the Debtors only upon allowance thereof pursuant to the order of the Bankruptcy Court; provided, however, that the professional fees and expenses of the Reorganized Debtors, incurred after the Effective Date, including counsel fees, may be paid by the Reorganized Debtors in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

12.1.9    hear and determine any dispute concerning the compromise by and between the Holders of Loan Guaranty Claims against the Guarantor Non-Debtors, the Loan Agents and the Guarantor Non-Debtors, and the Loan Agents' release of all Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims against the Guarantor Non-Debtors;

12.1.10    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of this Plan or the Confirmation Order;

12.1.11    hear and determine causes of action by or on behalf of the Debtors or the Reorganized Debtors;

12.1.12    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

12.1.13    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if distributions pursuant to this Plan are enjoined or stayed;

12.1.14    determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement, or document created in connection with this Plan, the Disclosure Statement or the Confirmation Order;

12.1.15    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

12.1.16    hear and determine all matters related to (i) the property of the Estates from and after the Confirmation Date and (ii) the activities of the Reorganized Debtors;

12.1.17    hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code; and

12.1.18    enter an order closing the Chapter 11 Cases.

## ARTICLE XIII: MISCELLANEOUS

13.1    <u>Surrender of Instruments</u>.

As a condition to participation under this Plan, the Holder of a note, debenture or other evidence of indebtedness of any of the Debtors that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture or other evidence of indebtedness shall surrender such note, debenture or other evidence of indebtedness to the Debtors, or their designee (unless such Holder's Claim will be Reinstated by this Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate this Plan; <u>provided, however,</u> that if a claimant is a Holder of a note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by DTC or other securities depositary or custodian thereof, then the Debtors or the applicable Indenture Trustee for such note, debenture or other evidence of indebtedness may waive the requirement of surrender. Except as otherwise provided in this <u>Section 13.1</u>, in the Debtors' sole discretion, if no surrender of a note, debenture or other evidence of indebtedness occurs and a claimant does not provide an affidavit and indemnification agreement (without any bond), in form and substance reasonably satisfactory to the Debtors, that such note, debenture or other evidence of indebtedness was lost, then no distribution may be made to any claimant whose Claim is based on such note, debenture or other evidence of indebtedness thereof.

13.2    <u>Creditors Committee</u>.

The appointment of the Creditors Committee shall terminate on the Effective Date, <u>except that the Creditors Committee shall continue in existence after the Effective Date for the sole purpose of preparing and prosecuting applications for the payment of fees and reimbursement of expenses.</u>

13.3    <u>Post-Confirmation Date Retention of Professionals</u>.

Upon the Effective Date, any requirement that professionals employed by the Reorganized Debtors comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors will be authorized to employ and compensate professionals in the ordinary course of business and without the need for Bankruptcy Court approval.

13.4    <u>Effectuating Documents and Further Transactions</u>.

Each of the Debtors and the Reorganized Debtors is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of this Plan and any notes or securities issued pursuant to this Plan.

13.5    <u>Exemption from Transfer Taxes</u>.

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of notes, debentures or equity securities under this Plan; (b) the creation of any

mortgage, deed of trust, lien, pledge or other security interest; (c) the making or assignment of any lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under this Plan, including, without limitation, merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property, will not be subject to any stamp tax or other similar tax.

        13.6    <u>Paid-in Capital of Corporate Reorganized Debtors</u>.

        On the Effective Date, after all other transactions necessary to effect this Plan have been consummated, the Paid-in Capital, as such term is defined in section 1.80(j) of the Illinois Business Corporation Act of 1983, 805 ILCS 5/1.01, *et seq.* (the "<u>BCA</u>"), of each corporate Reorganized Debtor shall, pursuant to Section 9.20(a)(2) of the BCA, be reduced to the following amounts (such reduced amounts to be referred to individually and collectively as the "Article XIII Paid-in Capital Amount" and "Article XIII Paid-in Capital Amounts," respectively): (i) in the case of Reorganized Tribune its Paid-in Capital shall be reduced to the aggregate par value, if any, of Reorganized Tribune's issued and outstanding shares of capital stock plus such amount as is recorded on Reorganized Tribune's financial statements as paid in capital or additional paid in capital under its fresh start accounting in accordance with Generally Accepted Accounting Principles, and (ii) in the case of each other corporate Reorganized Debtor its Paid-in Capital shall be reduced to the aggregate par value, if any, of each such other Reorganized Debtor's issued and outstanding shares of capital stock plus such amount as is recorded on each such other Reorganized Debtor's financial statements as paid in capital or additional paid in capital under its fresh start accounting in accordance with Generally Accepted Accounting Principles.  The amount required to reduce the Paid-in Capital of each corporate Reorganized Debtor to its Article XIII Paid-in Capital Amount shall be treated as a reduction in Paid-in Capital under Section 9.20(a)(2) of the BCA.  Any capital of each corporate Reorganized Debtor remaining in excess of its Article XIII Paid-in Capital Amount shall not be treated as Paid-in Capital for purposes of the BCA.  For purposes of this <u>Section 13.6</u>, the term "corporate" refers to a corporation as defined in Sections 1.80(a) or (b) of the BCA.

        13.7    <u>Payment of Statutory Fees</u>.

        All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

        13.8    <u>Amendment or Modification of this Plan</u>.

        Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code and other applicable provisions of this Plan, including, without limitation, <u>Section 13.9</u> of this Plan, the Debtors may alter, amend or modify this Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of this Plan.  A Holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

13.9    Certain Provisions Pertaining to Senior Lender Settlement Committee and Centerbridge.

No amendments shall be made to the Plan, and no supplements (including, without limitation, the Plan Supplement) shall be filed to the Plan, without the consent of the Senior Lender Settlement Committee, which consent shall not be unreasonably withheld.  For the avoidance of doubt, the aforementioned right of the Senior Lender Settlement Committee to reasonably consent to all amendments and supplements to the Plan shall extend to both the form and substance of any such amendment or supplement and any documents or information contained therein.  Any alteration, amendment or modification to the Plan that is materially inconsistent with the terms of the "Settlement" (as defined in the term sheet attached to the Settlement Support Agreement and filed with the Bankruptcy Court) and that adversely ~~and materially modifies the form or substance of~~ affects the consideration to be provided to Class 1~~D~~E shall also be subject to the consent of Centerbridge, which consent is not to be unreasonably withheld.  Prior to the Effective Date, the Debtors shall provide notice to the Creditors Committee of any alteration, amendment, modification or supplement to this Plan.

13.10    Severability of Plan Provisions.

If any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted; provided, however, that any substantive alteration of such term or provision shall be subject to the reasonable consent of the Senior Lender Settlement Committee.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.        .

13.11    Successors and Assigns.

This Plan shall be binding upon and inure to the benefit of the Debtors and their respective successors and assigns, including, without limitation, the Reorganized Debtors.  The rights, benefits and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

13.12    Revocation, Withdrawal or Non-Consummation.

The Debtors reserve the right to revoke or withdraw this Plan as to any or all of the Debtors prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw this Plan as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors, (a)

the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission of any sort by the Debtors or any other Person. If the Plan is revoked or withdrawn prior to the Effective Date, all parties' rights are hereby reserved with regard to the LBO-Related Causes of Action, provided that no such revocation or withdrawal shall have any effect on the obligations of the parties to the Settlement Support Agreement thereunder.

13.13    Notice.

To be effective, all notices, requests and demands to or upon the Debtors or the Reorganized Debtors shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile or electronic transmission, when received and telephonically confirmed, addressed as follows:

**Debtors:**
Tribune Company
435 Michigan Avenue
Chicago, Illinois 60611
Facsimile: (312) 222-4206
Attn:  Chief Legal Officer

*With a copy to:*

**Counsel to the Debtors:**

Sidley Austin LLP                                  Cole Schotz Meisel Forman & Leonard, P.A.
One South Dearborn Street                   500 Delaware Avenue, Suite 1410
Chicago, Illinois 60603                          Wilmington, Delaware 19801
Facsimile: (312) 853-7036                      Facsimile:  (302) 652-3117
Attn:  Jessica C.K. Boelter                      Attn:  J. Kate Stickles

*And, if prior to the Effective Date:*

**Counsel to the Official Committee of Unsecured Creditors:**

Chadbourne & Parke LLP                      Landis Rath & Cobb LLP
30 Rockefeller Plaza                               919 Market Street, Suite 1800
New York, New York 10112                    Wilmington, Delaware 19801
Fax (212) 541-5369                                 Fax (302) 467-4450
Attn: David M. Le May                           Attn: Adam G. Landis

13.14    Governing Law.

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other Federal law is applicable, or to the extent that an exhibit or schedule to this Plan or the relevant document provide otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

13.15    Tax Reporting and Compliance.

The Reorganized Debtors are hereby authorized, on behalf of each of the Debtors, to request an expedited determination under section 505 of the Bankruptcy Code of the tax liability of any of the Debtors for all taxable periods ending after the Petition Date through, and including, the Effective Date.

13.16    Exhibits and Appendices.

All Exhibits and appendices to this Plan are incorporated and are a part of this Plan as if set forth in full herein.

13.17    Reservation of Rights.

Except as expressly set forth herein, this Plan shall have no force and effect unless the Bankruptcy Court has entered the Confirmation Order.  The filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by the Debtors in furtherance of seeking confirmation of this Plan shall not be and shall not be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims and Interests.

Dated: ~~April 12,~~ June 4, 2010

TRIBUNE COMPANY (for itself and on behalf of
the other Debtors, as Debtors and Debtors in
Possession, and the Guarantor Non-Debtors and
Non-Guarantor Non-Debtors)

By: /s/ Donald J. Liebentritt~~————~~ _____
Name: Donald J. Liebentritt
Title:  Executive Vice President – Chief Legal
Officer, Tribune

**Appendix A**
**Filed Subsidiary Debtors**

## I.    Non-Guarantor Debtors

| Debtor Number | Debtor Name |
|---|---|
| 2. | 435 Production Company |
| 3. | Baltimore Newspaper Networks, Inc. |
| 4. | Candle Holdings Corporation |
| 5. | Channel 20, Inc. |
| 6. | Chicago Avenue Construction Company |
| 7. | Chicago River Production Company |
| 8. | Chicago Tribune Newspapers, Inc. |
| 9. | Chicago Tribune Press Service, Inc. |
| 10. | ChicagoLand Microwave Licensee, Inc. |
| 11. | Direct Mail Associates, Inc. |
| 12. | ForSaleByOwner.com Referral Services LLC |
| 13. | Fortify Holdings Corporation |
| 14. | GreenCo, Inc. |
| 15. | Heart & Crown Advertising, Inc. |
| 16. | Hoy, LLC |
| 17. | InsertCo, Inc. |
| 18. | JuliusAir Company II, LLC |
| 19. | JuliusAir Company LLC |
| 20. | Los Angeles Times International, Ltd. |
| 21. | Los Angeles Times Newspapers, Inc. |
| 22. | Magic T Music Publishing Company |
| 23. | NBBF, LLC |
| 24. | Neocomm, Inc. |
| 25. | Newscom Services, Inc. |
| 26. | Newspaper Readers Agency, Inc. |
| 27. | North Michigan Production Company |
| 28. | North Orange Avenue Properties, Inc. |
| 29. | Oak Brook Productions, Inc. |
| 30. | Publishers Forest Products Co. of Washington |
| 31. | Sentinel Communications News Ventures, Inc. |
| 32. | Shepard's Inc. |
| 33. | Signs of Distinction, Inc. |
| 34. | The Other Company LLC |
| 35. | Times Mirror Land and Timber Company |
| 36. | Times Mirror Payroll Processing Company, Inc. |
| 37. | Times Mirror Services Company, Inc. |
| 38. | Towering T Music Publishing Company |
| 39. | Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington |

| Debtor Number | Debtor Name |
|---|---|
| | Bureau Inc. |
| 40. | Tribune Entertainment Production Company |
| 41. | Tribune Finance Service Center, Inc. |
| 42. | Tribune License, Inc. |
| 43. | Tribune Network Holdings Company |
| 44. | Tribune Publishing Company |
| 45. | ValuMail, Inc. |
| 46. | Virginia Community Shoppers, LLC |
| 47. | WATL, LLC |
| 48. | WCWN LLC |
| 49. | WLVI Inc. |

## II.    Guarantor Debtors

| Debtor Number | Debtor Name |
|---|---|
| **50.** | 5800 Sunset Productions Inc. |
| 51. | California Community News Corporation |
| 52. | Channel 39, Inc. |
| 53. | Channel 40, Inc. |
| 54. | Chicago Tribune Company |
| 55. | Chicagoland Publishing Company |
| 56. | Chicagoland Television News, Inc. |
| 57. | Courant Specialty Products, Inc. |
| 58. | Distribution Systems of America, Inc. |
| 59. | Eagle New Media Investments, LLC |
| 60. | Eagle Publishing Investments, LLC |
| 61. | forsalebyowner.com corp. |
| 62. | Forum Publishing Group, Inc. |
| 63. | Gold Coast Publications, Inc. |
| 64. | Homeowners Realty, Inc. |
| 65. | Homestead Publishing Co. |
| 66. | Hoy Publications, LLC |
| 67. | Internet Foreclosure Service, Inc. |
| 68. | KIAH Inc. |
| 69. | KPLR, Inc. |
| 70. | KSWB Inc. |
| 71. | KTLA Inc. |
| 72. | KWGN Inc. |
| 73. | Los Angeles Times Communications LLC |
| 74. | New Mass. Media, Inc. |
| 75. | Orlando Sentinel Communications Company |

| 76. | Patuxent Publishing Company |
| 77. | Southern Connecticut Newspapers, Inc. |
| 78. | Star Community Publishing Group, LLC |
| 79. | Stemweb, Inc. |
| 80. | Sun-Sentinel Company |
| 81. | The Baltimore Sun Company |
| 82. | The Daily Press, Inc. |
| 83. | The Hartford Courant Company |
| 84. | The Morning Call, Inc. |
| 85. | TMLH 2, Inc. |
| 86. | TMLS I, Inc. |
| 87. | TMS Entertainment Guides, Inc. |
| 88. | Tower Distribution Company |
| 89. | Tribune Broadcast Holdings, Inc. |
| 90. | Tribune Broadcasting Company |
| 91. | Tribune Broadcasting Holdco, LLC |
| 92. | Tribune California Properties, Inc. |
| 93. | Tribune CNLBC, LLC |
| 94. | Tribune Direct Marketing, Inc. |
| 95. | Tribune Entertainment Company |
| 96. | Tribune Finance LLC |
| 97. | Tribune Los Angeles, Inc. |
| 98. | Tribune Manhattan Newspaper Holdings, Inc. |
| 99. | Tribune Media Net, Inc. |
| 100. | Tribune Media Services, Inc. |
| 101. | Tribune New York Newspaper Holdings, LLC |
| 102. | Tribune NM, Inc. |
| 103. | Tribune Television Company |
| 104. | Tribune Television Holdings, Inc. |
| 105. | Tribune Television New Orleans, Inc. |
| 106. | Tribune Television Northwest, Inc. |
| 107. | Virginia Gazette Companies, LLC |
| 108. | WDCW Broadcasting, Inc. |
| 109. | WGN Continental Broadcasting Company |
| 110. | WPIX, Inc. |
| 111. | WTXX Inc. |

4

**Appendix B**
**Subsidiary Non-Debtors**

## I.    Non-Guarantor Non-Debtors

| Entity Name |
| --- |
| Multimedia Insurance Company |
| Fairfax Media, Incorporated |
| Professional Education Publishers International (Africa) Pty. Ltd. |
| TMS Entertainment Guides Canada Corp. |
| Tribune DB, LLC |
| Tribune DQ, LLC |
| Tribune Employee Lease Company LLC |
| Tribune Hong Kong, Ltd. |
| Tribune Media Services, BV |
| Tribune Receivables, LLC |
| Tribune Sports Network Holdings, LLC |
| Tribune Technology, LLC |
| Tribune WFPT, LLC |

## II.    Guarantor Non-Debtors

| Entity Name |
| --- |
| Tribune (FN) Cable Ventures, Inc. |
| Tribune Interactive, Inc. |
| Tribune ND, Inc. |
| Tribune National Marketing Company |

**Appendix C**
**Collective Bargaining Agreements**

**The Baltimore Sun Company**

    1.    Agreement, dated as of July 21, 2008, between The Baltimore Sun Company and the Washington-Baltimore Newspaper Guild

    2.    Agreement, dated as of January 1, 2005, between The Baltimore Sun Company and the Baltimore Mailers' Union Local No. 888, Baltimore, Maryland, affiliated with the International Brotherhood of Teamsters

    3.    Agreement, dated as of April 21, 2006, by and between The Baltimore Sun Company and the Graphics Communications Conference of the International Brotherhood of Teamsters Local No. 582

    4.    Contract, dated as of May 1, 2006, between The Baltimore Sun Company and the Baltimore Newspaper Graphic Communications Union Local No. 31, a subordinate Union to the Graphics Communications Conference of the International Brotherhood of Teamsters

    5.    Agreement, dated as of January 1, 2008, between The Baltimore Sun Company and Truck Drivers, Helpers, Taxicab Drivers and Garage Employees and Airport Employees Local Union No. 355 Baltimore, Maryland affiliated with the International Brotherhood of Teamsters

**Chicago Tribune Company**

    1.    Agreement, dated as of October 1, 2005, between the Chicago Tribune Company and Progressive Lodge No. 126 of the International  Association of Machinists, AFL-CIO

    2.    Agreement, dated as of November, 2009, by and between the Chicago Tribune Company and the Chicago Web Printing Pressmen's Union No. 7, a subordinate union of the Graphics Communications International Union

    3.    Agreement, dated as of September 18, 2008, between Chicago Tribune Company and Newspaper, Magazine, Periodical Salesmen, Drivers, Pressmen, Division Men, District Managers, Checkers, Vendors, Handlers, and Electronic Media Workers Union Local No. 706 affiliated with I.B. of T., C., W. and H. of A.

**KTLA, Inc.**

    1.    Agreement, dated as of August 1, 2007, between KTLA, Inc. and International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada

    2.    Agreement, dated as of September 1, 2008, between American Federation of Television and Radio Artists Los Angeles Local (AFTRA) and Television Station KTLA

3.      Agreement, dated as of August 1, 2004 between the Alliance of Motion Picture and Television Producers, Inc. and International Brotherhood of Electrical Workers Local Union 40

**Los Angeles Times Communications LLC**

1.      Agreement, dated as of December 11, 2008, between Los Angeles Times Communications, LLC and Graphics Communications Conference, a subordinate of the International Brotherhood of Teamsters

**The Morning Call, Inc.**

1.      Agreement, dated as of May 29, 2007, between The Morning Call and the Graphic Communications Conference of the International Brotherhood of Teamsters, Local 4C

**WGN Continental Broadcasting Company**

1.      Agreement, dated as of April 1, 2009, between Radio Station WGN and Radio and Television Broadcast Engineers Local Union Number 1220 of the International Brotherhood of Electrical Workers

2.      Agreement, dated as of July 1, 2008, between WGN Television and Radio and Television Broadcast Engineers Local Union Number 1220 of the International Brotherhood of Electrical Workers

2.      Agreement, dated as of July 1, 2008, between WGN Television and Newswriters Local Union Number 1220 of the International Brotherhood of Electrical Workers

4.      Agreement, dated as of April 1, 2009, by and between the American Federation of Television and Radio Artists ("AFTRA") and WGN-TV

5.      Agreement, dated as of June 1, 2008, between Television Station WGN and Theatrical Stage Employees Union, Local No. 2 of International Alliance of Theatrical Stage Employees and Moving Picture Technicians, Artists and Allied Crafts of the United States and Canada

6.      Agreement, dated as of June 2, 2008, between WGN-TV and the International Union of Operating Engineers, Local 399, affiliated with A.F. of L. - C.I.O. and C.F. of L.

**Tribune Television Company**

1.      Agreement, dated as of January 1, 2010 by and between WPHL and Local Union #98 of the International Brotherhood of Electrical Workers, AFL-CIO

**WPIX, Inc.**

1.      Agreement, dated as of October 21, 2005, between the Directors Guild of America, Inc. and WPIX, Inc.

2.      Agreement, dated as of April 1, 2008, between WPIX, Inc. and Theatrical Protective Union No. One, and the International Alliance of Theatrical Stage Employees and Moving Picture Technicians, Artists and Allied Crafts of the United States, its Territories and Canada

3.      Agreement, dated as of November 2005, between WPIX, Inc. and Local Union 1212 of the International Brotherhood of Electrical Workers, AFL-CIO

4.      Agreement, dated as of October 2005, between the American Federation of Television and Radio Artists and WPIX, Inc.

5.      Agreement, dated as of July 23, 2009, between the Newspaper Guild of New York, a local (No. 31003) of The Newspaper Guild/C.W.A., (AFL-CIO) and WPIX, Inc.

**Exhibit ~~1.1.118~~<u>1.1.123</u>**
**New Warrant Agreement**
**(To be filed with Plan Supplement)**

**Exhibit 5.2**
**Restructuring Transactions**
**(To be filed with Plan Supplement)**

**Exhibit 5.3.1(1)**
**Certificate of Incorporation of Reorganized Tribune**
**(To be filed with Plan Supplement)**

**Exhibit 5.3.1(2)**
**By-Laws of Reorganized Tribune**
**(To be filed with Plan Supplement)**

**Exhibit 5.3.2**
**Directors and Officers of Reorganized Tribune**
**(To be filed with Plan Supplement)**

**Exhibit 5.3.3**
**Directors and Managers of Reorganized Debtors Other Than Reorganized**
**Tribune**
**(To be filed with Plan Supplement)**

**Exhibit 5.6**
**New Senior Secured Term Loan Agreement**
**(To be filed with Plan Supplement)**

**Exhibit 5.10**
**Terms of Exit Facility Credit Agreement**
**(To be filed with Plan Supplement)**

**Exhibit 5.14.3**
**Retiree Claimant Settlement Agreement**
~~**(To be filed with Plan Supplement)**~~

**Exhibit 6.3**
**Rejected Executory Contracts and Unexpired Leases**
**(To be filed with Plan Supplement)**

**Exhibit 11.7.6**
**Indemnification Claim Procedures**
**(To be filed with Plan Supplement)**