IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                          .   Chapter 11
                                .
TRIBUNE COMPANY, INC.,          .   Case No. 08-13141(KJC)
*et al.*,                       .   (Jointly Administered)
                                .   June 4, 2010(2:02 p.m.)
           Debtors.             .   (Wilmington)(Telephonic)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE

<u>Appearances</u>:

For the Debtors:        Bryan Krakauer, Esq.
                        Sidley Austin LLP

For Wells Fargo:        Thomas E. Lauria, Esq.
                        White & Case LLP

For JPMorgan:           Damian Schaible, Esq.
                        Davis Polk

Audio Operator:     Al Lugano
Transcriber:        Elaine M. Ryan
                    (302) 683-0221

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE CLERK: All rise.

2          THE COURT: Good afternoon, counsel.  This is Judge

3     Carey.  We're on the record in the Tribune Chapter 11

4     proceeding.  This is a followup to the disclosure hearing

5     recently held.  I've received the submissions of the parties,

6     and it seems to me there are three things we need to address

7     today: the remaining objections to the disclosure statement,

8     the - I'll characterize it as remaining objection to the

9     procedures order, and then three, just to nail down the final

10    submissions, were letter inclusions to be distributed with

11    the disclosure statement.  Let me begin by asking whether any

12    of the issues have been resolved or narrowed?

13          MR. KRAKAUER (TELEPHONIC): Your Honor, this is

14    Bryan Krakauer on behalf of the Tribune.  Mr. Lauria and I

15    have spent a considerable amount of time talking through the

16    issues, and I think we've at least come to the point where we

17    understand each other very well, and I think if I went

18    through a couple of things and got them on the record, it

19    will probably help greatly narrow this, if you would give me

20    the opportunity to do so.

21          THE COURT: Okay.  Well, let me ask this: I found

22    the way the debtors reply broke down Wells Fargo's response -

23    their response to the second supplemental objection to be

24    helpful, just in terms of an outline.  Are you able in your

25    presentation, Mr. Krakauer, to follow that?

1          MR. KRAKAUER (TELEPHONIC): I can, Your Honor.

2          THE COURT: Alright.

3          MR. KRAKAUER (TELEPHONIC): And I think, frankly,

4    our issues at this point principally revolve around the first

5    point.  So, maybe the rest of the points we might not have to

6    spend a lot of time with.

7          THE COURT: Okay.

8          MR. KRAKAUER (TELEPHONIC): So, should I go ahead?

9          THE COURT: You should.

10         MR. KRAKAUER (TELEPHONIC): Okay, thank you, Your

11   Honor.  First, in the event - What we've been talking about

12   with Mr. Lauria mostly and what the objections reflect

13   concern the treatment of the bridge in the event that they

14   vote against the plan and there's a cram-down.  The

15   disclosure statement itself reflects an estimated Tribune

16   distributable value of $573 million which after you take into

17   account other allowed claims and also take into account the

18   portion of the Tribune's value, which in our view should be

19   allocable to subsidiaries, because of intercompany claims,

20   provides for a recovery of $74 million or 4.6 percent to the

21   bridge if it were ultimately determined that the bridge

22   claims were allowed and not subject to voidance or setoff for

23   the full amount they assert.  What - and we do want to

24   clarify is that that number, the 573 distributable value and

25   the 74 million, the 4.6 percent recovery if the claims are

1    allowed in full, is what the debtors intend to go forward

2    with and present at confirmation.  We've caveated the plan to

3    provide for alternative treatment because, frankly, first the

4    Court may disagree with us and they say that it doesn't

5    believe what we've done is correct and needs to be modified,

6    in which case that allows us to modify the treatment and

7    provide something else and get the plan done.  Second, it may

8    be that along the way some lawyer or some other party in this

9    case points us to a material mistake in the analysis and

10   says, you know, you really have to change such and such, and

11   we want to reserve the right, if we believe they were

12   correct, to modify that.  But we're not intending to hide the

13   ball on this.  That is the amount - as we sit here today,

14   that 573 million in allocation is what we are intending to go

15   forward with.  That's the plan and confirmation and that's

16   what our disclosure statement, I think, reflects.  So, I

17   think that may be helpful to the Court and maybe helpful to

18   Mr. Lauria.  Second, with regard to the other points and the

19   rest, I think the language that we proposed and offered in

20   our response on Wednesday is helpful, and we would suggest

21   that it would be included in the disclosure statement.  And

22   then third, we do request that we get the disclosure

23   statement resolved today and support for the whole process

24   and we have, obviously, whole numbers of constituencies

25   we're dealing with as well as 13,000 employees and the rest

1   to move this process forward, and we would ask that we could

2   do whatever we can to get the disclosure statement resolved

3   today so we could move it forward and move the plan forward.

4   And then I'd be happy to address any of the other points, but

5   maybe it makes sense for me to hold for other parties to

6   respond, particularly Mr. Lauria, to see where we are and

7   then see what needs to be further discussed.

8        THE COURT: Well, really, Mr. Krakauer, as far as

9   I'm concerned the dispute has been narrowed to the debtor and

10  Wells Fargo here, so, I mean, unless there's some important

11  reason why I need to hear from others, that's where I'd like

12  to leave my main focus.

13       MR. KRAKAUER (TELEPHONIC): Okay.

14       THE COURT: Mr. Lauria?

15       MR. LAURIA (TELEPHONIC): Good afternoon, Your

16  Honor.  This is Tom Lauria with White & Case for Wells Fargo

17  Bank and as agent for the British loans.

18       THE COURT: Okay.  I ask that you not reargue what

19  you've argued in your papers.  I have read them, but just

20  focus in responding to what Mr. Krakauer has just said, if

21  you would.

22       MR. LAURIA (TELEPHONIC): Will do, Your Honor, thank

23  you.  Your Honor, I think that, you know, at a kind of a very

24  practical level, what Mr. Krakauer describes includes, with a

25  couple of caveats I'm going to mention, the certainty of

1   treatment that we've been looking for in the plan and

2   disclosure statement.  Namely, you know, what this comes down

3   to is a determination of the distributable value that is

4   available at Tribune Company, the claims that will be counted

5   to determine the denominator in a pro rata formulation and

6   then ultimately the allowed amount of the bridge lender

7   claim, and it is our understanding, based on what Mr.

8   Krakauer said, that the debtor is proposing that the

9   distributable value at Tribune would be 573 under the

10  settlement as proposed and that if the bridge loan claims

11  were allowed in the full amount of $1.6 billion, that based

12  on the debtors' view of the claims that should be counted,

13  the bridge loan claims would come out with $74 million of

14  recovery, which is a 4.6 percent recovery on the claim.  And,

15  you know, what we've been hoping for is language in the plan

16  and the disclosure statement to say that.  It seems to us to

17  be fairly simple and it's been disturbing and we really have

18  struggled with why we can't get information in the document

19  that just says that almost as clearly as we just said it

20  here.  We keep expanding the language but we don't seem to

21  get to a nice crisp understanding.  What I continue - a

22  couple of caveats that I want to make on top of that, I mean,

23  we want the debtor to be taking the position that Mr.

24  Krakauer just said.  We don't want to find ourselves in court

25  at confirmation and the debtor says, Well, you know, I've

1    changed my mind and instead the distributable value is two

2    cents, and so, their recovery is now zero.  And I think one

3    of the - what really troubles me is this caveat that they

4    continue to have in the treatment, that our treatment can be

5    changed to satisfy 1129(b).  What in part that feels like to

6    me is a wire around § 1127 of the Bankruptcy Code and

7    Bankruptcy Rule 3019, which specifically provide the

8    mechanics for modifying a plan after its been voted on and

9    what things the debtor has to do in connection with that

10   modification, who's bound and who's not bound.  What this

11   treatment, and it was really kind of clear in the way Mr.

12   Krakauer described it on the phone, does, is relieve the

13   debtor of having to amend its plan if the Court determines

14   that some other treatment is appropriate for the bridge

15   lenders, and just to try to parse through this a bit, it's

16   not that the pro rata formula changes.  What the plan says

17   is, we get a pro rata share of distributable value, okay, and

18   paid in cash; okay?  So, there's no lock in there.  If the

19   debtor's going to advocate these numbers and if the Court

20   concludes that different numbers apply that still plugs into

21   the treatment.  Where the open end is, where you kind of gut

22   the thing is with this reference to 1129(b) because that

23   doesn't mean you changed the formula, you know, that it turns

24   out that the starting number is 690 or 290 or some other

25   number than the 573 or that the claims adjust such that the

1    amount that's available for the bridge lenders is some number

2    other than 74 million or that the percentage recovery is some

3    percentage other than 4.6.  That's all done within the

4    construct of the plan if it exists.  The 1129(b) reference is

5    so wide open, it basically says, If somebody convinces the

6    Court at confirmation that some other treatment satisfies the

7    requirement of 1129(b) that that other treatment could be

8    adopted.  It just seems to me that if you're going to make a

9    wholesale change of somebody's treatment at confirmation or

10   in anticipation of confirmation but after voting is

11   completed, 1127 of the Code and Bankruptcy Rule 3019 tell us

12   what the debtor is supposed to do to do that, and to just try

13   to put in the plan that we can just wholesale change their

14   treatment, as somebody may argue and the Court may decide is

15   all that's necessary to satisfy 1129(b), seems to just short-

16   circuit those provisions of the Code and Rules.  So, I

17   understand what Mr. Krakauer said and if the plan and

18   disclosure statement said that, I don't think we would have

19   to have any further conversation on the treatment issue.

20   There are two other points that I would like to quickly just

21   make also that came out of conversations that I had with Mr.

22   Krakauer, and maybe he can confirm these.  I think that Mr.

23   Krakauer has agreed that the disclosure statement will be

24   amended to include a statement that discloses the amount of

25   Tribune Company value that would get allocated to

1    subsidiaries in respect of intercompany subsidiary claims

2    against Tribune as part of the settlement to get to the 573

3    number, number one; and number two, I just want to say on the

4    record and make sure that Mr. Krakauer agrees that nothing

5    about the plan as constructed restricts or impairs the

6    ability of the bridge agent to put on evidence and argue for

7    a different enterprise value, to argue for a different

8    allocation of that value as between Tribune and its

9    subsidiaries, to argue that the treatment of the intercompany

10   claims of the subsidiaries is inappropriate, to argue and put

11   on evidence of course on all these points, that the

12   calculation of claims against Tribune, including in

13   particular the claims of the senior lender claims, should be

14   other than as contemplated in the settlement so that we can

15   freely work with all of the variables that would go to set

16   our pro rata share recovery at the end of the day, subject of

17   course, to the condition that they have in consummation of

18   the plan, that if our recovery turns out to be better than

19   4.6 percent the debtor has to waive it and I think . . .

20   (indiscernible) has to waive it all, so, we understand that.

21            THE COURT: Well, let me answer, myself, with

22   respect to the later point and that is, with respect to a

23   properly lodged confirmation objection and subject to all the

24   other normal relevance and evidentiary requirements and

25   restrictions, that's a decision that's not up to Mr.

 1   Krakauer, it's up to the Court, and I fully reserve all of

 2   the Court's rights and discretions with respect to that.  I

 3   think that answers that concern.  With respect to the first

 4   comment that you made, I'll turn to Mr. Krakauer and ask if

 5   he's willing to confirm that.

 6        MR. KRAKAUER (TELEPHONIC): Thank you, Your Honor.

 7   Let me, before I do that, just correct one thing.  I think I

 8   said 573 million as the distributable value.  It's actually

 9   537, just for the record, which is what's in our disclosure

10   statement.

11        THE COURT: Okay.

12        MR. KRAKAUER (TELEPHONIC): Second, in terms of - we

13   were not proposing to further modify our disclosure statement

14   but I could say this for the record, the treatment of

15   intercompany claims and the resolution or settlement of the

16   intercompany claims would be part of what we would present to

17   the Court at confirmation to determine the Tribune Company

18   value, and in arriving at the 537, that takes into account

19   that we had allocated a portion of the asset value of

20   Tribune to the subsidiaries based on what we currently think

21   is an appropriate resolution of how to deal with those

22   intercompany claims.  There is a - the number, I believe is,

23   about $333 million of value which we are allocating toward

24   the subsidiaries based on the intercompany claims that is

25   part of what we would present to you at confirmation for you

1   to consider, and you would have to determine whether that

2   settlement is reasonable and presumably Mr. Lauria will have

3   his say and you'll consider that too.  So, I think that

4   addresses that point.

5           MR. LAURIA (TELEPHONIC): Your Honor, if I just may

6   be heard.  It just seems like that 333 number ought to be in

7   the disclosure statement somewhere, that to get to the 537,

8   which is in the disclosure statement, the debtors have

9   determined that $333 million of value at Tribune should be

10  allocated down to its subsidiaries in respect of intercompany

11  claims of the subsidiaries.  It's very easy to disclose and

12  it just seems to me that number is a material number and it's

13  something that ought to be disclosed and just as short as I

14  said would be satisfactory.

15          THE COURT: Mr. Krakauer, that does not strike me as

16  an unreasonable request.

17          MR. KRAKAUER (TELEPHONIC): If Your Honor wants to

18  approve it on that basis, we absolutely could do that.

19          THE COURT: Okay.

20          MR. SCHAIBLE (TELEPHONIC): Your Honor, this is

21  Damian Schaible of Davis Polk representing JPMorgan.   Might

22  I be heard now at another time convenient -

23          THE COURT: Well, let me ask this: On what issue and

24  why?

25          MR. SCHAIBLE (TELEPHONIC): Your Honor, apologies

1   for taking up your time, I just wanted to make sure -

2            THE COURT: I'd gladly, sir, give my time to resolve

3   whatever dispute it is necessary to resolve.  What I do not

4   wish to do is reopen the disclosure hearing for additional

5   discussions from parties who have not filed papers.

6            MR. SCHAIBLE (TELEPHONIC): It is absolutely having

7   nothing to do with anything other than what we're discussing

8   today, Your Honor.

9            THE COURT: I know, but if you had a position to be

10  told with respect to that which has transpired after our last

11  disclosure hearing session why do I not have a paper from

12  you?

13           MR. SCHAIBLE (TELEPHONIC): Your Honor, it's only

14  because I wanted to make a clarification with respect to

15  discussions on the record today that haven't appeared in

16  anyone's papers.

17           THE COURT: Go ahead.

18           MR. SCHAIBLE (TELEPHONIC): I simply just wanted to

19  make sure that, you know, the language in the disclosure

20  statement and in the plan, as they appeared in the last

21  versions of the papers that people had distributed, had made

22  clear that it was not locked in stone if the bridge lenders,

23  if they vote against the settlement and vote against the

24  plan, would be entitled absolutely to their pro rata share of

25  the distributable value ultimately determined -

1      THE COURT: I'm not going to reopen that debate.

2  We've been over that.  I will hear no more on that topic.

3      MR. SCHAIBLE (TELEPHONIC): Sorry, Your Honor.

4      THE COURT:  Alright, I'm referring now and

5  following along with the debtors' reply to the Wells Fargo

6  second supplemental objection.  It's docket number 4666.  The

7  form of the reply characterizes in the debtors' words, the

8  bridge agent's contention and the debtors' response.  I will

9  order, Mr. Krakauer, that the debtor add from paragraph (1),

10  paragraph (2), paragraph (3), and paragraph (4) all of the

11  language that the debtor has indicated it will add along with

12  the allocation of subsidiary value that we just discussed

13  today on the record.  I agree as I did with the debtor, I

14  think, at the last disclosure hearing session with respect to

15  the contention in paragraph (5) that their objection's to be

16  left to confirmation.  With respect to paragraph (6), I did,

17  at the last session, I think, or the session before, I

18  forget, give the debtor the option of either putting the

19  incentive programs, building them into the plan, or doing it

20  by separate motion.  If I remember correctly, the debtor

21  said, with some assertiveness, that it intended to

22  incorporate that into the plan.  I take it, however, that

23  this has not happened and that a separate motion has been

24  filed.  I have reviewed the separate motion which is at

25  docket number 4620.  The bridge agent has contended that

1    there ought to be further description than what appears in

2    the disclosure statement of the 2010 program.  I agree with

3    the bridge agent on this and ask the debtor to add not a

4    fuller description but exactly the sentence that the debtor

5    has included in its reply and that is as follows, quote, "Any

6    creditor wishing further detail can access the 2010 MIP

7    motion filed May 26, 2010 (Docket No. 4620) on the Court's

8    docket."  I order that that be added to the disclosure

9    statement in the appropriate place.  Now, all other

10   objections remaining to the disclosure statement are

11   overruled.  The only question I will now ask is, before I

12   move onto the procedures order, did I miss an issue in any

13   party's view that was raised but that I did not resolve?

14   Okay.

15          MR. KRAKAUER (TELEPHONIC): Could I make a

16   clarification, Your Honor?

17          THE COURT: Yes, you may.  Go ahead.

18          MR. KRAKAUER (TELEPHONIC): Okay.  Two things: One

19   is in connection with the 2010 MIP motion, that is distinct

20   from the KOB and the TMIP, which is in the plan, and this is

21   the debtors' calendar year 2010 MIP which at one point when

22   we did the 2009 MIP, this is what we do each year, and it's

23   really separate from the issues that we talked about today.

24          THE COURT: I don't disagree with that, and I

25   recognize the distinction, but I think the reference should

1   be made.

2          MR. KRAKAUER (TELEPHONIC): Oh, we're perfectly

3   fine, I just was trying to clarify for the Court putting it

4   in that reference.

5          THE COURT: Okay.

6          MR. KRAKAUER (TELEPHONIC): And second, in terms of

7   the plan treatment, certainly in terms of what complies with

8   1129 would expect, not just Mr. Lauria but Mr. Schaible and

9   all other parties that have also the right to be heard as to

10  whether it's over- or under-compensated and what 1129

11  provides.  So, I think all rights are tentatively reserved on

12  that.

13         MR. LAURIA (TELEPHONIC): Your Honor, may I ask one

14  question about this?

15         THE COURT: Go ahead.

16         MR. LAURIA (TELEPHONIC): Because I'm still a little

17  unclear, and maybe I'm asking the Court just because I don't

18  think it's appropriate to address counsel on the record, but

19  if the Court thinks it an appropriate question, you can ask

20  that it be answered.

21         THE COURT: Go ahead.

22         MR. LAURIA (TELEPHONIC): Does the treatment then of

23  the bridge lenders really mean at the end of the day that the

24  treatment will be whatever is minimally - whatever the Court

25  determines minimally satisfies the required of 1129(b)?

1          THE COURT: Well, here's the final answer for today

2    on that, Mr. Lauria, and I put it in the context of how I

3    would normally resolve a confirmation dispute either from the

4    bench or in a later issued opinion.  All I need to do,

5    technically, is to confirm or to deny confirmation of the

6    plan.  What the parties usually like to have, however, is a

7    roadmap if in fact there are flaws that are correctable,

8    which they are, and that's usually my practice, but with

9    respect to changes actually made at the confirmation hearing,

10   they come up almost always in the context of a consensual

11   resolution, and issues about re-solicitation or whether it's

12   a better or worse treatment with respect to the effected

13   classes, normally are the subject of agreement.  Now, whether

14   that will happen here, I cannot say, and sitting here today,

15   I would not predict that it would happen, but to the extent

16   that there are plan modifications which fall subject to 1127

17   or to any other confirmation standard, they will have to be

18   met regardless of what the disclosure statement says.  The

19   Court is not bound by that, and that's the best I can do for

20   you at the moment.

21          MR. LAURIA (TELEPHONIC): Thank you, Your Honor,

22   that's very helpful.

23          THE COURT: Okay.

24          MR. LAURIA (TELEPHONIC): Look, we've been through

25   this ad nauseam and I appreciate the Court's guidance.

1        THE COURT: Alright, thank you.  Let's turn to the

2    procedures order, and I guess I'll ask, first, Mr. Lauria,

3    both with respect to the - both of your submissions, you've

4    indicated in one that any order should take into account the

5    limited information available to the bridge agent and provide

6    appropriate confidentiality protections, and in another

7    submission you note - you don't ask for any relief, but note

8    that as the bridge agent, a successor administrative agent,

9    you have register of bridge loan holders which was provided

10   by your predecessor.  So, that I'm clear, tell me precisely

11   what if anything you are still requesting at this point with

12   respect to the procedures order.

13       MR. LAURIA (TELEPHONIC): Well, mainly I was

14   concerned that the order could be read to require Wells to

15   deliver something that it doesn't have, namely a complete

16   listing of all people who are entitled to vote on the plan

17   that are holders of bridge loan claims, and I just want to be

18   clear that we will cooperate and I think Mr. Krakauer and I

19   spoke earlier this morning about this, that we will cooperate

20   on this.  I just don't want to have Wells in a position where

21   it's been ordered - in effect, is in contempt of an order

22   because it's been ordered to do something that it can't do.

23   We do have a claims register that we received from Merrill.

24   We certainly are in no position to determine whether or not

25   it's true and complete and accurate, because obviously things

1    happen, you know, that were not on our watch, and we will

2    share that information with the debtor for purposes of

3    solicitation.  I do think that the information should be kept

4    confidential by the debtor and used only for solicitation.  I

5    understand that at the end of the day the parties who they

6    served will be disclosed, and that's fine, but if any other

7    parties want that information as we go up to confirmation,

8    you know, they should seek it through discovery and we should

9    have the right at that time to address whatever protective

10   orders or other relief would be appropriate.

11        THE COURT: Alright.  Mr. Krakauer, any response?

12        MR. KRAKAUER (TELEPHONIC): Your Honor, in terms of

13   that, first, I think Wells can give us whatever information

14   it has which I think Mr. Lauria is doing.  We already have a

15   list of the holders.  We don't have a contact person, some

16   names and addresses for a bunch of them, which we do need,

17   and we will have to file a list or it is normal process to

18   file a list of who we served . . . (indiscernible) Mr. Lauria

19   is not objecting to us doing.  So, I'm not sure there's any

20   remaining issues on -

21        THE COURT: Okay.  Let me ask specifically: Are

22   there any changes, Mr. Lauria, that at this point you're now

23   requesting in light of those statements to the procedures

24   order?

25        MR. LAURIA (TELEPHONIC): Your Honor, I hate to say,

1   with the big pile of paper I've got in front of me here, I

2   don't have the procedures order in front of me, but what I

3   would like to just be clear and if there's language that's

4   required, maybe Mr. Krakauer can tell me, but I'd like to be

5   clear that we will provide - the bridge agent will provide

6   the information it has.  We can't confirm its completeness,

7   accuracy, or even correctness, and we would ask that that

8   information be kept confidential by the debtor.  I guess

9   that's not in the order, so it would need to be added,

10  subject to the debtor making disclosure of service when it

11  determines it's appropriate to do so.

12        MR. KRAKAUER (TELEPHONIC): Subject to not being

13  information we already have.

14        THE COURT: I didn't hear that, Mr. Krakauer.

15        MR. KRAKAUER (TELEPHONIC): Oh, subject to be not

16  information we already have as far as confidentiality, that's

17  fine.

18        THE COURT: Okay, then, you'll make that

19  modification?

20        UNIDENTIFIED SPEAKER (TELEPHONIC): Yes.

21        THE COURT: Alright.  Any comments from anyone else

22  with respect to the proposed procedures order?  Alright.  I

23  have but one comment, and that is with respect to paragraph

24  (31), establishing the date for 3018 motions is July 14.  The

25  hearing time is 1:30, I think that should be added.  Alright,

1   Mr. Krakauer?

2           MR. KRAKAUER (TELEPHONIC): That's fine with us,

3   yes.

4           THE COURT: Okay.  Now, let's turn finally to the

5   packet that I received - put it this way, to the latest

6   packet I received today which included the notice of filing a

7   revised compendium of submissions, et cetera.  The notice

8   made that the Wells Fargo submissions still exceeds the 3-

9   page limit and that footnote 2 still has not been completed.

10  Have the parties resolved that remaining issue or no?

11          MR. LAURIA (TELEPHONIC): Well, Your Honor, with

12  respect to the footnote, I think, now that the plan and

13  disclosure statement are apparently settled, I think we can

14  quickly conform the footnote language, the language in the

15  footnote which is just a reference to the plan treatment.

16          THE COURT: To the cram-down treatment.

17          MR. LAURIA (TELEPHONIC): Yes.

18          THE COURT: Okay.

19          MR. LAURIA (TELEPHONIC): We're just holding that

20  open because, you know, it's been kept moving around a bit,

21  as the Court's aware from the papers.  With respect to the

22  length of the submission, you know, I don't think I've

23  discussed this with counsel, but we would ask that we be

24  permitted to submit our letter as drafted without having to

25  strike anything or to make the typeface smaller as some of

1   the others have done, but just to leave it as is, subject to

2   the revision of the footnote.

3        THE COURT: Is there any objection to that?

4        MR. KRAKAUER (TELEPHONIC): Your Honor, we leave

5   that to you.  To be fair, they probably ought to shrink the

6   font if they want to do it, just to be - consistent with

7   other parties, but I leave - we would not object strenuously.

8   Whatever you decide.

9        THE COURT: Does anyone else wish to be heard on

10  that issue?  Alright, in the absence of objection, I'll

11  permit Wells Fargo to leave it as it is with the footnote

12  change.  Now, is there anything that's been raised that I

13  have not yet resolved?  I think I hit everything, but I'll

14  give the parties one last chance to tell me.  Okay.  Mr.

15  Krakauer, when can I expect a revised complete package

16  showing me in the disclosure statement where the insertions

17  and corrections have been made and a revised procedures

18  order?

19       MR. KRAKAUER (TELEPHONIC): Your Honor, we'll turn

20  to it right away.  I would expect we could get it in a couple

21  of hours.

22       THE COURT: Okay.  Here's what I ask that you do. E-

23  file it as soon as you can.  Deliver a chambers copy to me of

24  the package, you know, at the opening of business Monday

25  morning, assuming that you have the papers e-filed and at

1  least e-circulated to those parties interested by the close

2  of business today.  What I will do is when I receive the

3  package Monday, I will hold it until noon Eastern Time.  I do

4  not expect that if the debtor is a faithful scribner, and I

5  expect that it will be, that there will be need for further

6  discussion.  I just filled in that cushion as a matter of

7  caution, but I intend to act upon it after 12 o'clock noon on

8  Monday, Eastern Time.  Are there any questions?  Is there

9  anything further for today?  Okay, thank you all very much.

10  That concludes this hearing.  Have a good weekend, everyone.

11  Court is adjourned.

12            ALL: Thank you, Your Honor.

13            (Whereupon at 2:37 p.m., the hearing in this matter

14  was concluded for this date.)

15

16

17

18            I, Elaine M. Ryan, approved transcriber for the

19  United States Courts, certify that the foregoing is a correct

20  transcript from the electronic sound recording of the

21  proceedings in the above-entitled matter.

22

23  /s/ Elaine M. Ryan_____June 5, 2010
    Elaine M. Ryan
    2801 Faulkland Road
    Wilmington, DE 19808
    (302) 683-0221