UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

*In re*                                         :                    Chapter 11

                                                :

TRIBUNE COMPANY, *et al.*,[1]

                                                :                    Case Number 08-13141 (KJC)

Debtors.                                        :                    (Jointly Administered)

                                                :

**PRELIMINARY OBJECTION OF THE UNITED STATES TRUSTEE TO THE
MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING THE DEBTORS TO
IMPLEMENT A MANAGEMENT INCENTIVE PLAN FOR 2010, CROSS-MOTION TO
CONTINUE THE HEARING ON THE MOTION, AND OBJECTION TO THE
RELATED MOTION TO SEAL PART OF THE MERCER REPORT
(RELATED TO DOCKET ENTRY #s 4620, 4621)**

In support of her preliminary objection to the motion of the Debtors for an order authorizing

the Debtors to implement a management incentive plan for 2010 (the "Motion"), her cross-motion

to continue the hearing on the Motion, and her objection to the Debtors' related motion to seal part

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8655); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago National League Ball Club n/k/a Tribune CNLBC, LLC (0347); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo., Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH, Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); new River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Brook Productions, Inc. (2598); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

of the Mercer Report (the "Seal Motion"), Roberta A. DeAngelis, United States Trustee for Region 3 ("U.S. Trustee"), by and through her counsel, avers:

## SUMMARY

If this Court approves the Motion, the Debtors will have been authorized to pay more than $100 million in cash bonuses to their management during these cases. While the Debtors argue for "shared sacrifice" in addressing collective bargaining issues with their unions, the Debtors fail to understand what that concept means when it comes to compensating their management. The Debtors themselves have proposed a reorganization plan which promises nothing or next-to-nothing for various classes of Tribune creditors. Now is not the time for yet another round of bonuses.

Initially, the hearing on the Motion should be continued. The Debtors are prosecuting a plan of reorganization which (i) seeks to revive the transition management incentive plan ("TMIP") and key operators bonus plan ("KOB") which this Court previously took under advisement in connection with the Debtors' 2009 bonus plan motion and (ii) adds an equity component to management's proposed compensation. Given that the Debtors seek approval of part of management's post-emergence compensation in the Motion, this Court should consider the 2010 management incentive plan (the "2010 MIP") in connection with the TMIP, the KOB and the Equity Incentive Plan[2] at the hearing on confirmation of the Debtors' plan of reorganization to avoid addressing management compensation issues piecemeal. Alternatively, the Motion should be continued in order to afford the U.S. Trustee and other parties in interest ample opportunity to conduct discovery regarding the 2010 MIP, and the June 16 hearing should serve as a status conference on the Motion.

Second, as a preliminary matter, the 2010 MIP raises the same issues vis-a-vis 11 U.S.C. §

---

[2]

For purposes of this objection, this term has the same meaning given to it in the Debtors' plan.

503(c) that the U.S. Trustee previously identified in connection with the Debtors' 2009 bonus plan motion. In the Motion, the Debtors do not adequately address the issue of whether the 2010 MIP is a retention plan proscribed by 11 U.S.C. § 503(c)(1); the Debtors do not attempt to justify the operating cash flow ("OCF") metric as establishing real hurdles for management to achieve. Further, the Motion seeks approval of an out-of-the-ordinary-course bonus plan that is not justified at this juncture of the cases.

## **INTRODUCTION**

1.      Under (i) 28 U.S.C. § 1334, (ii) (an) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a) and (iii) 28 U.S.C. § 157(b)(2)(A), this Court has jurisdiction to hear and determine the Motion and the Seal Motion.

2.      Under 28 U.S.C. § 586, the U.S. Trustee has an overarching responsibility to enforce the laws as written by Congress and interpreted by the courts.    *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

3.      Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on the Motion, the Seal Motion and the issues raised in this objection.

## **GROUNDS/BASIS FOR RELIEF**

*Cross-Motion*

4.      The hearing on the Motion should be continued to the hearing set for confirmation

of the Debtors' plan.  In their proposed plan, the Debtors seek approval of the TMIP and KOB.

Disclosure Stmt. (Docket Entry # 4690) at 39-41.  The Debtors also seek to implement an Equity

Incentive Plan (Disclosure Stmt. at 93), the details of which have not been disclosed to date.

Accordingly, it would be inappropriate to consider the 2010 MIP independent from the other parts

of the Debtors' proposed compensation to management.  Indeed, the interrelationships between the

incentive compensation proposals are key to evaluating the Debtors' contentions in the Motion.  For

example, the Debtors' argument that the 2009 plan was "ordinary course" was premised, in part,

upon the absence of a equity incentive element; the Debtors argued that their inability to compensate

management with equity justified a higher cash component.  In contrast, depending on what the

terms of the Equity Incentive Plan are, there may be equity awards in 2010.  Similarly, determining

whether the proposed cash awards are reasonable necessarily requires consideration of other forms

of compensation payable to management, including compensation in the form of equity.

5.      Additionally, the hearing on the Motion should be continued to permit a reasonable

opportunity for the U.S. Trustee to conduct discovery related to the Motion.  The contested 2009

bonus plan motion was addressed via a scheduling order which provided objecting parties with

ample opportunity to take discovery.  A similar procedure should be employed in connection with

the Motion.

6.      To the extent that the Debtors seek to oppose the requested continuance on grounds

that failure to pay the proposed bonuses by a date certain will have a negative impact on the Debtors

and their businesses, this Court can discount the Debtors' argument because it has proven to be
hollow.  At the conclusion of the hearing on the 2009 bonus plan motion, the Debtors were asked
by this Court whether the three plan elements (the 2009 cash awards tied to OCF, the TMIP and the
KOB) needed to be evaluated as an integrated whole or whether they could be considered as three
separate requests.  In a letter to this Court dated September 28, 2009, the Debtors responded by
stating that it was "critical that the Plan be judged and ruled upon as an integrated whole, not in
parts."  (Docket Entry # 2236).  The Debtors forecasted that "a decision to approve only certain
components of the Plan could do significant and lasting damage to the Debtors, to the motivation
and cohesiveness of their management team, to the Debtors' success and initiatives to date in an
incredibly challenging environment, and to the interests of the Debtors' constituencies and estates."
Today, approximately eighteen months after the Debtors initially drafted the 2009 bonus plan, the
TMIP and KOB have not been approved by this Court, and the forecasted negative results have not
occurred.

*Preliminary Objection*

7.    11 U.S.C. § 503(c) provides (in part):

> Notwithstanding subsection (b) [allowing the payment of
> administrative expenses in certain circumstances], there shall neither
> be allowed, nor paid –
>
> (1) a transfer made to, or an obligation incurred for the benefit of, an
> insider of the debtor for the purpose of inducing such person to
> remain with the debtor's business, absent a finding by the court based
> upon evidence in the record that –
>     (A)  the transfer or obligation is essential to retention of the
> person because the individual has a bona fide job offer from another
> business at the same or greater rate of compensation;
>     (B)  the services provided by the person are essential to the
> survival of the business; and
>     (C)  either

(i)  the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

(ii)  if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred; [or]

\*    \*    \*    \*    \*

(3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of filing of the petition.

8.      The Debtors propose to pay "insiders" pursuant to the 2010 MIP.  It is the Debtors' burden, therefore, to establish that the relief requested is not prohibited by 11 U.S.C. § 503(c)(1). Courts have interpreted 11 U.S.C. § 503(c)(1) as prohibiting incentive plans with performance "targets" set at levels where they do not truly serve as targets.  *See In re Dana Corp.*, 358 B.R. 567, (Bankr. S.D.N.Y. 2006) (court found that benchmarks for the debtors' long-term incentive plan "are difficult targets to reach and are clearly not 'lay-ups.'"); *In re Nobex Corp.*, No. 05-20050 (MFW), 2006 Bankr. LEXIS 417 (Bankr. D. Del. Jan. 19, 2006) (court approved incentive plan under 11 U.S.C. § 503(c) where payments were tied exclusively to improvement upon "stalking horse" bid; "stalking horse" bid, by itself, did not vest participants with right to payment).

9.      In 2005, Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 (Apr. 20, 2005) ("BAPCPA") in order to remedy

various abuses of the bankruptcy system.  Prior to enactment of the BAPCPA, retention payments

were frequently made in chapter 11 cases by means of KERPs.  Before 11 U.S.C. § 503(c) was

enacted, no specific provisions of the Bankruptcy Code addressed compensation to a debtor's

management.  Debtors-in-possession typically requested approval of employment compensation

under 11 U.S.C. §§ 363(b) and 365, and their requests for approval of management compensation

proposals, including KERPs, were evaluated by bankruptcy courts under the "sound business

purpose" test, which was essentially a "business judgment" rule.  *See, e.g., The Dai-Ichi Kangyo*

*Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R.

147, 153 (D. Del. 1999) (citing *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel*

*Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re EaglePicher Holdings, Inc.*, No. 05-12601, 2005

WL 4030132 at *6 (Bankr. S.D. Ohio Aug. 26, 2005).

        10.     Through the enactment of the BAPCPA, Congress responded to concerns that it was

inappropriate for corporate executives to be paid excessive amounts for continued service during

the bankruptcy case while labor, pensioners, trade vendors and other stakeholders shouldered the

"pain" associated with the bankruptcy process.  *See In re Nellson Neutraceutical, Inc.*, 369 B.R. 787,

801 (Bankr. D. Del. 2007) ("Although there is little in the way of legislative history, it is widely

acknowledged that [11 U.S.C. § 503(c)] was a response to perceived abuses of the bankruptcy

system by 'the executives of giant companies . . . who lined their own pockets, but left thousands

of employees and retirees out in the cold.'") (quoting statement of Senator Edward Kennedy, as cited

in *In re Dana Corp.*, 358 B.R. 567, 575 (Bankr. S.D.N.Y. 2006)).

        11.     Section 503(c)(1) significantly alters pre-BAPCPA, management compensation

practices by curtailing retention payments.  The relief requested by the Debtors implicates Code

section 503(c)(1), and "[i]t is axiomatic that statutory interpretation begins with the language of the statute itself." *Government of Virgin Islands v. Knight*, 989 F.2d 619, 633 (3d Cir. 1993). A statutory language analysis must precede any resort to legislative history or case law as "[t]here is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *United States v. American Trucking Ass'ns, Inc.*, 310 U.S. 534, 543 (1930). The statutory language is the best indicia of Congress' intent as "much less thought is spent on the future implications of committee reports and explanations on the floor than in choosing the words of a statute." *Paskel v. Heckler*, 768 F.2d 540, 543-44 (3d Cir. 1985).

12.      The plain meaning of the statutory phrase "for the purpose of inducing such person to remain with the debtor's business" unambiguously prohibits payments to insiders where the payment clearly serves a retentive purpose. Section 503(c)(1)'s text does not require that bankruptcy courts hierarchically order the bankrupt corporation's reasons for making proposed payments to insiders to discern the main or "primary" purpose. Rather, the statutory language directs the bankruptcy court to determine whether the proposed payment is being made to keep the employee in place. If the proposed payment has a retentive purpose, it may not be allowed or paid unless the Debtors can demonstrate that it meets the conditions in section 503(c)(1). *See In re Dana Corp.*, 351 B.R. 96, 102 (Bankr. S.D.N.Y. 2006) (rejecting debtors' request to pay bonuses to insiders upon debtors' emergence from chapter 11 and, in doing so, employing "a familiar fowl analogy" – "if it walks like a duck (KERP) and quacks like a duck (KERP), it's a duck (KERP).").

13.      "Words may be interpolated in a statute . . . 'only when the statutory language is equivocal or where literal interpretation leads to an absurdity' so gross as to shock general moral

or common sense." *See Hatfried, Inc. v. Commissioner of Internal Revenue*, 162 F.2d 628, 631 (3d Cir. 1947) (internal citation omitted).  Neither of those conditions is satisfied with respect to section 503(c)(1).  There is nothing equivocal about the express language of section 503(c)(1).  To the contrary, interpolation of the word "primary" as a modifier of the word "purpose" in section 503(c)(1) leads to equivocation: bankruptcy courts will be forced to divine from the record whether retention was the primary, secondary, or tertiary purpose of the proposed payments in determining whether section 503(c)(1) applies.

14.    Further, the BAPCPA was enacted, in part, to remedy the abusive effects of retention pay upon the bankruptcy system.  A remedial statute should be broadly construed to effectuate the remedial purpose. *See Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 202 (3d Cir. 1998); *In re Waters*, 384 B.R. 432, 441 (Bankr. N.D. W. Va. 2008) ("In construing the new provisions [of a new statute], courts should endeavor to give the statute a construction that defeats 'evasions employed to continue the mischief sought to be remedied by the statute.'") (internal citation omitted).  Interpolation of the word "primary" as a modifier of "purpose" in section 503(c)(1) limits the section's applicability and, by extension, hampers the effort to protect innocent creditors and equity security holders from management's enrichment and/or entrenchment efforts via "pay to stay" strategies.

15.    Finally, the text of the BAPCPA demonstrates that, when Congress wanted to use the words "primary" or "primarily" as modifiers, it expressly did so.  For example, "health care business" is defined as a public or private entity . . . that is *primarily* engaged in offering to the general public [certain] facilities and services . . . ."  BAPCPA § 1101(a)(2) (bracketed text and emphasis added).  The term "small business debtor" in the BAPCPA excludes "a person whose

*primary* activity is the business of owning or operating real property or activities incident thereto."

*Id.* § 432(a) (emphasis added).  Similarly, in amending certain disclosure obligations respecting open

end credit plans, Congress provided in the BAPCPA that the disclosure obligations did not apply

to "any charge card account, the *primary* purpose of which is to require payment of charges in full

each month."  *Id.* § 1301(a) (emphasis added).  Accordingly, in light of the appearance of the word

"primary" in other sections of the BAPCPA, the absence of the word "primary" from section

503(c)(1) should not be construed as an accident.  *See Russello v. United States*, 464 U.S. 16, 23

(1983) ("[W]here Congress includes particular language in one section of a statute but omits it in

another section of the same Act, it is generally presumed that Congress acts purposefully in the

disparate inclusion or exclusion.").

16.    The Debtors' discussion of the OCF metric in the Motion is limited to one paragraph

of text that fails to explain how the metric is a true hurdle which does not run afoul of Bankruptcy

Code section 503(c)(1):

> The annual OCF metric used in the 2010 MIP is consistent with
> historical practice, including during 2008 and 2009, and motivates
> performance towards realistic goals for which participants have a
> clear "line of sight."  Indeed, MIP participants were involved in the
> rigorous budgeting and operating plan development process used to
> determine "planned" OCF for 2010, and the resulting consolidated
> and business-unit-specific OCF metrics were extensively analyzed by
> senior management and approved by the Company's Board of
> Directors.  MIP participants have been actively working towards
> these OCF goals throughout 2010, with the understanding that they
> also would determine their MIP award opportunities.

Mot. ¶ 22.  The Debtors' discussion of applicable law at the close of the Motion makes no mention

of Code section 503(c)(1).

17.    Code section 503(c)(3) applies only to transactions outside of the ordinary course of the Debtors' businesses.  The 2010 MIP is a transaction outside of the ordinary course of their business.  While the Debtors correctly cite to *In re Roth American, Inc.*, 975 F.2d 949 (3d Cir. 1992) for the appropriate standard to determine whether a particular transaction is an "ordinary course" transaction, the Debtors have not satisfied the standard.  Specifically, with respect to the "vertical dimension" test (whether the transaction subjects a creditor to an economic risk of a nature which he accepted when he decided to extend credit), there is nothing in the Motion which suggests that, in awarding bonuses historically, the Debtors paid the level of compensation proposed under the Incentive Plan for the so-called "performance" described therein.  *See In re Nellson Neutraceutical, Inc.*, 369 B.R. 787, 796-97 (Bankr. D. Del. 2007) (analyzing whether modifications to incentive plan satisfied *Roth American* standard).  To the contrary, the size of the 2010 MIP is inconsistent with the Debtors' historical practice of paying annual cash bonuses amounting to a relatively small percentage of their operating cash flow.

18.    The U.S. Trustee leaves the Debtors to their burden to demonstrate that implementation of the 2010 MIP is justified by the facts and circumstances of these cases and reserves the right to supplement this objection.

*Seal Motion*

19.    Finally, with regard to the Seal Motion, the U.S. Trustee is presently reviewing the part of the Mercer Report sought to be filed under seal.  The Debtors have the burden of demonstrating that the information contained in the part of the Mercer Report sought to be filed under seal is "confidential commercial information" for purposes of 11 U.S.C. § 107(b). "Confidential . . . commercial information" is not defined in the Bankruptcy Code, so the term must

"be interpreted as taking [its] ordinary, contemporary, common meaning." *See Perrin v. United States*, 444 U.S. 37, 42 (1979). "Commercial information has been defined as information that would cause 'an unfair advantage to competitors by providing them information as to the commercial operations of the debtor.'" *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24, 27 (2d Cir. 1994) (citation omitted). The U.S. Trustee reserves the right to supplement this objection.

<u>CONCLUSION</u>

WHEREFORE the U.S. Trustee requests that this Court issue an order (i) continuing the hearing on the Motion and establishing a discovery schedule with regards to the Motion or, alternatively, (ii) denying the Motion. The U.S. Trustee also requests that this Court issue an order addressing the Seal Motion consistent with this objection.

Respectfully submitted,

**ROBERTA A. DeANGELIS**
**UNITED STATES TRUSTEE**

**BY:**   /s/ Joseph J. McMahon, Jr.
     Joseph J. McMahon, Jr., Esquire (# 4819)
     Trial Attorney
     United States Department of Justice
     Office of the United States Trustee
     J. Caleb Boggs Federal Building
     844 King Street, Room 2207, Lockbox 35
     Wilmington, DE  19801
     (302) 573-6491
     (302) 573-6497 (Fax)

Date:  June 10, 2010