# **<u>EXHIBIT B</u>**

*Settlement Term Sheet*

**SETTLEMENT TERM SHEET**

## Select Terms of Settlement[1]

Set forth below is a summary of the primary terms of a settlement of the LBO-Related Causes of Action. The terms of such a settlement shall be reflected in a plan of reorganization (the "**Settlement Plan**").

| Plan Classification | Senior Loan Claims and Bridge Loan Claims against Tribune shall be treated together in a single class (the "**Parent Loan Claims Class**"). |
|---|---|
| | Senior Noteholder Claims and other general unsecured claims against Tribune that are not in the Parent Loan Claims Class shall be treated together in a single class (the "**Other Parent Claims Class**"); provided, however, that with the consent of the Senior Lender Settlement Committee, Claims against Tribune arising under non-tax qualified pension plans or individual agreements providing for retirement compensation or deferred compensation arrangements ("**Non-Qualified Former Employee Benefit Claims**") of Tribune or one of the subsidiaries of Tribune that are chapter 11 debtors (the "**Subsidiary Debtors**" and together with Tribune, the "**Debtors**") and/or other general unsecured claims against Tribune that are not Senior Noteholder Claims may be placed in a separate class and receive separate treatment, as set forth below, and the Senior Lender Settlement Committee intends to discuss in good faith such separate classification and treatment with counsel to certain holders of such claims. |
| | Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims against a given Subsidiary Debtor shall be treated together (such classes with respect to all of the Subsidiary Debtors being collectively referred to herein as the "**Guaranty Claims Classes**" and, together with the Parent Loan Claims Class, the "**Loan Claims Classes**"). |
| **Allocation of Distributable Enterprise Value** | The Settlement Plan will provide that, on the effective date of the Settlement Plan (the "**Plan Effective Date**"), the distributable value of Tribune and its subsidiaries (the "**Distributable Enterprise Value**", which is comprised of the aggregate distributable value, as of the Plan Effective Date, of all of the Distributable Cash, New Debt and New Common Stock, each as hereinafter defined ) shall be allocated as follows:<br><br>(i) 8.8% of such Distributable Enterprise Value shall be allocated for distribution to holders of claims against Tribune as hereinafter set forth (for the avoidance of |

---

[1] Capitalized terms used but not defined herein shall have the meanings given to such terms in Schedule 1, Defined Terms.

| | |
|---|---|
| | doubt, the 8.8% of Distributable Enterprise value allocated to Tribune shall be distributed such that the Senior Noteholders receive 7.4% of such Distributable Enterprise Value on account of their Claims against Tribune as set forth below); and |
| | (ii) 91.2% of such Distributable Enterprise Value shall be allocated for distributions to holders of claims against the subsidiaries of Tribune that are guarantors of the obligations of Tribune under the Senior Loan Agreement and the Bridge Loan Agreement (the "**Guarantor Subsidiaries**"), as hereinafter set forth. |
| | This allocation of Distributable Enterprise Value of $6.1 billion shall be fixed for purposes of the Settlement Plan, and distributions to holders of claims against Tribune and against the Subsidiary Debtors shall be based on such allocation, as more fully set forth below. |
| **Treatment of Claims of Senior Noteholders and Other Parent General Unsecured Creditors** | Except to the extent set forth below, the holders of claims in the Other Parent Claims Class shall receive Distributable Cash (as defined below), new debt issued by reorganized Tribune (the "**New Debt**", as described below) and common stock of reorganized Tribune (the "**New Common Stock**")[2] such that when distributed pro rata among the Other Parent Claims Class, the Senior Noteholders shall receive, in the aggregate, 7.4% of the Distributable Enterprise Value (for the avoidance of doubt, such consideration shall be a "strip" of the consideration to be received by holders of allowed Claims in the Loan Claims Classes under the Settlement Plan (*i.e.* the same consideration in form, substance and relative pro ration) not taking into account any modification of such consideration pursuant to the Parent Creditor Cash Distribution).[3] Specifically, each Senior Noteholder shall receive such Senior Noteholder's pro rata share of: |
| | (i) 7.4% of the total cash remaining available for distribution to unsecured creditors of Tribune and the Subsidiary Debtors calculated after the payment only of administrative expenses, priority claims, cure costs paid by Tribune, cash posted to collateralize outstanding letters of credit, employee benefit claims for plans continuing with current employees, Noteholder fees and expenses, Senior Lender fees and expenses, fees and expenses |

---

[2] To the extent any specific holder that would receive a distribution of New Common Stock cannot receive New Common Stock for FCC compliance purposes, such holder will receive the economic equivalent thereof in warrants to purchase such stock.

[3] For example, at Distributable Enterprise Value of $6.1 billion, the value of the distribution to the Senior Noteholders would be approximately $451.4 million in the aggregate.

associated with exit financing or any other new indebtedness, and the reservation by Tribune of not more than $350 million of cash for operating purposes (the "**Distributable Cash**")

(ii) 7.4% of the New Debt and

(iii) 7.4% of the New Common Stock.

*provided, however*, that the New Common Stock to be received by all creditors entitled thereto under the Settlement Plan, including holders of claims in the Other Parent Claims Class, shall be subject to dilution as of the Plan Effective Date, pro rata, through the issuance pursuant to or as contemplated in the Settlement Plan of New Common Stock or options to purchase New Common Stock on account of management grants or for other purposes, including such grants as are contemplated in the Settlement Plan to be distributed over time as determined by the board of directors of reorganized Tribune, all as expressly provided for under the Settlement Plan with the consent of the Senior Lender Settlement Committee in its discretion and having an aggregate number of shares and/or value not to exceed 7.5% of the equity value of reorganized Tribune or such lower amount as may be determined by the Senior Lender Settlement Committee. Such issuances of New Common Stock or options to purchase New Common Stock shall be expressly provided for in the Settlement Plan and shall be subject to the consent of the Senior Lender Settlement Committee in its sole discretion.

Holders of allowed claims in the Other Parent Claims Class that are not Senior Noteholder Claims will receive distributions on their claims of Distributable Cash, New Debt and New Common Stock pari passu to those received by the Senior Noteholders as set forth above, which shall provide such holders with recoveries on their claims equal and ratable to the recoveries of the Senior Noteholders; *provided, however*, that, with the consent of the Senior Lender Settlement Committee, Non-Qualified Former Employee Benefit Claims against Tribune and/or other general unsecured claims against Tribune that are not Senior Noteholder Claims may be separately classified and receive their comparable distributions of equivalent value in cash alone, rather than in a combination of Distributable Cash, New Common Stock and New Debt (any such claims so classified the "**Separately Classified Parent Claims**"). If this modification of the distribution to such creditors (the "**Parent Creditor Cash Distribution**") occurs, the required additional cash that the Senior Lender Settlement Committee consents to have paid on account of the Separately Classified Parent Claims shall be reallocated from that portion of the Distributable Cash otherwise distributed to the Guaranty

| | |
|---|---|
| | Claims Classes as set forth below, and the New Common Stock and New Debt that otherwise would have been allocable to the Separately Classified Parent Claims shall be reallocated to the Guaranty Claims Classes. |
| **Treatment of Subsidiary General Unsecured Creditors** | General unsecured claims against the Subsidiary Debtors that are not in the Guaranty Claims Classes shall be paid in full in cash; provided, however, that post-petition interest shall not be allowed or paid on any such claims and the Debtors shall make a good-faith, reasonable estimate of the amount to be paid on account of such claims in the aggregate, which estimate they shall disclose in a Plan Supplement and which estimate shall be subject to review by the Parties. If the Debtors estimate that the sum of all such allowed claims will be greater than $150 million in the aggregate on the Plan Effective Date, the distributions to the holders of such claims shall be limited to their pro rata share of $150 million unless the Senior Lender Settlement Committee decides, in its sole discretion, to provide additional consideration to such creditors. |
| **Treatment of Loan Claims** | *Parent Loan Claims Class* – All of the Distributable Cash, New Debt and New Common Stock allocated for distribution to creditors of Tribune (as set forth above under "Allocation of Distributable Enterprise Value") remaining after the payment of the distributions to the Other Parent Claims Class and the Separately Classified Parent Claims, if any, shall be allocated to the Parent Loan Claims Class pro rata (treating claims under the Senior Loan Agreement and the Bridge Loan Agreement pari passu for such purpose).<br><br>*Guaranty Claims Classes* – Claims in these classes will receive all of the Distributable Cash, New Debt and New Common Stock allocated to Guarantor Subsidiaries (as set forth above under "Allocation of Distributable Enterprise Value") remaining after a portion of such Distributable Cash is used to pay general unsecured claims against the Subsidiary Debtors that are not in the Guaranty Claims Classes as described above, *minus* any cash paid pursuant to the Parent Creditor Cash Distribution, and *plus* any New Debt and New Common Stock reallocated to the Guaranty Claims Classes as a result of the Parent Creditor Cash Distribution<br><br>All of the Distributable Cash, New Debt and New Common Stock distributable to the Guaranty Claims Classes as set forth above shall be distributed solely to the holders of Senior Loan Guaranty Claims pursuant to enforcement of the applicable subordination and turn-over provisions for the benefit of Senior Lenders under the terms of the Bridge Loan Agreement and related guaranty agreement in accordance with Section 510 of the Bankruptcy |

| | |
|---|---|
| | Code. |
| | All unreimbursed fees, costs and expenses of the legal and financial advisors for the Senior Loan Agent and Angelo Gordon shall be paid in full in cash on the Plan Effective Date. Senior Lenders that become party to the Agreement prior to the hearing to approve a Disclosure Statement for the Settlement Plan shall be entitled to reimbursement of reasonable and documented legal fees incurred in connection with the Bankruptcy Cases on the Plan Effective Date upon the receipt of reasonably detailed invoices, which shall include descriptions of services provided in summary form without individual time records; *provided, however,* that all such reimbursements to such Senior Lenders shall not exceed $5.0 million in the aggregate unless otherwise reasonably determined by the Senior Lender Settlement Committee, notice of which determination shall be provided to counsel to the Creditors' Committee. |
| **Reimbursement of Certain Fees of Other Parties to the Agreement** | On the Plan Effective Date, there shall be allowed and reimbursed to Centerbridge and Law Debenture (i) up to $5.25 million in the aggregate on account of reasonable and documented fees, costs and expenses of their legal and financial advisors and the reasonable and documented internal fees, costs and expenses of Law Debenture, in each case in connection with the Bankruptcy Cases incurred on or after the Petition Date and on or prior to the date of the Agreement and (ii) any additional reasonable and documented fees, costs and expenses of their legal and financial advisors incurred in connection with the Bankruptcy Cases on or after the date of the Agreement and on or prior to the Plan Effective Date in respect of actions taken that are not inconsistent with the Settlement or confirmation of the Settlement Plan, in each case upon the receipt of reasonably detailed invoices, which shall include descriptions of services provided in summary form without individual time records. |
| **Reimbursement of Certain Fees of Members of the Creditors' Committee** | On the Plan Effective Date, there shall be allowed and reimbursed to the members of the Creditors' Committee that are not indenture trustees up to $1.5 million in the aggregate on account of reasonable and documented fees, costs and expenses of their legal and financial advisors incurred by such members of the Creditors' Committee solely in their capacity as such during the pendency of the Bankruptcy Cases, upon the receipt of reasonably detailed invoices, which shall include descriptions of services provided in summary form without individual time records. Issues relating to the reimbursement of fees and expenses of members of the Creditors' Committee that are indenture trustees will be considered subsequently. |
| **Capital Structure** | On the Plan Effective Date, the debt capital structure for the |

| | |
|---|---|
| of Reorganized Debtors and Affiliates | reorganized Debtors and their affiliates will be comprised of (i) a new revolving credit facility to fund working capital and letters of credit (exact size and other terms to be determined) and (ii) the New Debt in a principal amount to be determined by the Senior Lender Settlement Committee, but which principal amount shall in no event exceed two times TTM EBITDA, as determined at the time of the Plan Effective Date. The terms and conditions of such new revolving credit facility and the New Debt shall be satisfactory in form and substance to the Senior Lender Settlement Committee and shall be set forth in a supplement to the Settlement Plan. |
| **Distributions to Holders of PHONES Notes Claims and EGI-TRB LLC Notes Claims** | Based on the subordination thereof under their applicable terms, the holders of PHONES notes and EGI-TRB LLC notes will not receive any distributions under the Settlement Plan. |
| **Global Settlement** | Pursuant to Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided for thereunder, the Settlement (and the related provisions of and the distributions under the Settlement Plan) shall constitute a good faith compromise and settlement of all LBO-Related Causes of Action among Tribune and its affiliates, the Debtors' Estates, the parties to the Agreement, all other persons that are deemed to be bound thereto and all parties otherwise released under the Settlement Plan (including, without limitation, the Senior Loan Agent, the Senior Lenders, the Bridge Loan Agent and the Bridge Lenders, in each case in all of their respective capacities that could give rise to any LBO-Related Cause of Action, the Senior Noteholders, Centerbridge, Law Debenture, Deutsche Bank, the present and former members of the Creditors' Committee (in their capacity as members of the Creditors' Committee) and the present and former officers, directors, agents and advisors of the Debtors and each of the foregoing parties, in each case only if the applicable party is bound by the release sections of the Settlement Plan and, if entitled to vote on the Settlement Plan, has voted to accept the Settlement Plan, such released parties, together with such parties' respective present and former officers, directors, employees, members, managers and partners, being collectively referred to herein as the "**Released Parties**"). |
| **Releases and Exculpation** | The reorganized Debtors on their own behalf and as representatives of their respective estates shall release and shall cause the Subsidiary Non-Debtors to release unconditionally, and be deemed to release unconditionally the Released Parties of and from any and all claims, obligations, suits, judgments, damages, |

| | |
|---|---|
| | debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claims), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Plan Effective Date in connection with the Debtors or any of them, or their respective assets, property and estates, the Bankruptcy Cases or the Settlement Plan, the Disclosure Statement related to the Settlement Plan or any restructuring transactions consummated to effectuate the Settlement Plan (the "**Debtor Released Claims**"). |
| | Each of the Released Parties that is entitled to vote on the Settlement Plan and that has not opted out of the releases contained in the Settlement Plan, if such an option is provided in the Settlement Plan (and for the avoidance of doubt no Party shall exercise any such opt-out option) or who otherwise agrees to provide the releases set forth herein shall unconditionally release each other Released Party of and from the LBO-Related Causes of Action and any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Plan Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and estates, the Bankruptcy Cases or the Settlement Plan, the Disclosure Statement related to the Settlement Plan or any restructuring transactions consummated to effectuate the Settlement Plan; *provided* that no agent or indenture trustee is, by virtue of giving its own release hereunder, releasing individual claims, if any, of lenders or noteholders for which it acts as agent or indenture trustee that are not themselves Released Parties (the "**Holder Released Claims**" and together with the Debtor Released Claims the "**Released Claims**"). |
| | The Settlement Plan shall contain customary provisions exculpating the Released Parties and the present and former members of the Creditors' Committee (in their capacity as members of the Creditors' Committee) whether or not such members are otherwise Released Parties. |
| **Indemnities** | The reorganized Debtors shall jointly and severally indemnify and |

|   |   |
|---|---|
|   | hold harmless the Senior Loan Agent, the Senior Lenders, the Bridge Loan Agent, the Bridge Lenders (collectively, the "**Indemnified Creditor Parties**") and all of their respective related persons, in each case in all capacities related to the LBO, and any natural persons who are or were officers or directors of any of the Debtors (each an "**Indemnified Party**" and collectively, with the Indemnified Creditor Parties, the "**Indemnified Parties**"), on account of and with respect to any claim, cause of action, liability, judgment, settlement, cost or expense (including without limitation attorneys' fees) on account of claims or causes of action threatened or asserted by any person against such parties that seek damages, contribution, indemnity, equitable indemnity, or any similar claim, based upon or as the result of (x) the Released Claims, including without limitation any claims on account of and with respect to any LBO-Related Causes of Action; or (y) Barred Claims (defined below) or any similar claim based upon or as the result of the assertion of primary claims against any other person by any representative of the Debtors' Estates (the "**Covered Claims**"); *provided, however*, that in no event shall the aggregate liability of the reorganized Debtors to any individual Indemnified Creditor Party and all related persons of such Indemnified Creditor Party on account of such indemnity exceed the sum of (i) such Indemnified Creditor Party's pro rata share (calculated based on the proportion that the allowed Parent Loan Claims held by such Indemnified Creditor Party bears to the aggregate amount of all allowed Parent Loan Claims held by all Indemnified Creditor Parties) of $427,582,000, (ii) such Indemnified Creditor Party's pro rata share (calculated based on the proportion that the allowed Senior Loan Guaranty Claims held by such Indemnified Creditor Party bears to the aggregate amount of all allowed Senior Loan Guaranty Claims held by all Indemnified Creditor Parties) of $83,129,000 and (iii) all costs and/or expenses (including without limitation attorneys' fees) incurred in connection with any Covered Claims by such Indemnified Creditor Party and such related persons. |
|   | The reorganized Debtors shall further jointly and severally indemnify and hold harmless the present and former members of the Creditors' Committee and their related persons (in their capacity as members of the Creditors' Committee), on account of and with respect to any costs and/or expenses (including without limitation attorneys' fees) incurred in connection with any Covered Claims. |
| **Bar Order** | The confirmation order approving the Settlement Plan shall provide, among other things (and the inclusion of such language, or language substantially similar to the following, shall be a |

condition to the Plan Effective Date):

"ORDERED that all Persons, including without limitation (i) any Persons that are not Released Parties, (ii) Released Parties and (iii) Persons who have voted for or against the Plan or who are presumed to have voted for or against the Plan under Section 1126(f)-(g) of the Bankruptcy Code (collectively, the "Barred Persons"), are hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any claim for non-contractual indemnity or contribution against any Released Party (including any other non-contractual claim against the Released Parties, whether or not denominated as for contribution or indemnity, where the injury to the Person is the liability of the Person to the plaintiffs), arising out of or reasonably flowing from the claims or allegations in any of the Released Claims, whether arising under state, federal or foreign law as claims, cross-claims, counterclaims, or third-party claims (collectively, the "Barred Claims"), and with respect to the Barred Claims, the Barred Persons are also entitled to the judgment reduction provisions set forth herein. This Order (the "Bar Order") is without prejudice to the position of any party as to the existence, in the absence of this Bar Order, of any Barred Claim; and it is further;

"ORDERED that no Person acting on behalf of the estate, including any successor to the Debtors, any committee appointed in the Bankruptcy Case, any chapter 7 trustee, any committee appointed in the Bankruptcy Case, any trustee of a litigation trust or any estate representative appointed or selected pursuant to Section 1123(b)(3) of the Bankruptcy Code (any of the above, a "**Plaintiff**"), may commence any cause of action or seek any judgment or award based upon, arising from, or related to the Released Claims. In the event any Plaintiff obtains a judgment or award (a "**Judgment**") against any Person with respect to one or more causes of action based upon, arising from, or related to the Released Claims or any transactions underlying any Released Claims then, with respect to any actual, potential or asserted liability of a Released Party to any Person for the Barred Claims in respect of such Judgment, the Plaintiff shall, prior to or in connection with the entry of such Judgment, provide notice of this Bar Order to the court or tribunal in which such Judgment was obtained, and the court or tribunal shall reduce such Judgment against such Person in an amount that is the greater of (i) the amount of the consideration provided pursuant to the Global Settlement by the Released Party or Parties against whom there

| | |
|---|---|
| | would have been a Barred Claim in the absence of this Bar Order, or (ii) the amount equal to the Judgment against any such Person times the aggregate proportionate share of fault (expressed as a percentage) of the Released Party or Parties against whom there would have been a Barred Claim in the absence of this Bar Order. In the event that Judgment shall be entered against any Person without a prior or concurrent determination as to the existence of a Barred Claim (and, in the event of a determination of the existence of a Barred Claim, without a reduction of such Judgment), such Judgment shall not, and shall be deemed not to, give rise to any Barred Claim; and it is further<br><br>"ORDERED that if any Plaintiff enters into a settlement with any Person with respect to one or more causes of action based upon, arising from, or related to the Released Claims or any transaction underlying any Released Claim, then such Plaintiff shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Barred Claims with respect to such settlement." |
| **Other Terms of Settlement Plan and Disclosure Statement** | The initial terms of the Disclosure Statement, the Settlement Plan and all supplements thereto other than those specified herein shall be satisfactory to the Senior Lender Settlement Committee in their good faith judgment, and no amendments to the Settlement Plan or any supplements thereto shall be made without the consent of the Senior Lender Settlement Committee, which consent shall not be unreasonably withheld; *provided, however*, that in no event shall any terms of the Settlement Plan be materially inconsistent with the terms of the Settlement. In addition to the provisions above, any descriptions of the LBO-Related Causes of Action or the Settlement set forth in the Disclosure Statement shall be reasonably acceptable to the Parties. |

Schedule I
Defined Terms

1.1. <u>Agreement</u> means that certain Settlement Support Agreement, dated as of April 8, 2010, by and among those parties listed on the signature pages thereto and any parties that may sign joinders thereto, as may be amended, supplemented or modified in accordance with the terms thereof.

1.2. <u>Angelo Gordon</u> means Angelo Gordon & Co LP.

1.3. <u>Barclays Swap Claim</u> means any Claims asserted by Barclays Bank PLC under that certain 1992 ISDA Master Agreement, dated as of July 2, 2007, between Barclays Bank PLC and Tribune.

1.4. <u>Bankruptcy Court</u> means the United States Bankruptcy Court for the District of Delaware.

1.5. <u>Bankruptcy Cases</u> means the Debtors' chapter 11 cases that are being jointly administered as *In re Tribune Company, et al.,* Chapter 11 Case No. 08-13141 (KJC), together with the voluntary cases, if any, hereafter commenced by any of the Subsidiary Non-Debtors under chapter 11 of the Bankruptcy Code.

1.6. <u>Bankruptcy Code</u> means chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended.

1.7. <u>Bridge Lenders</u> means the lenders from time to time party to the Bridge Loan Agreement as Lenders thereunder, including former lenders and any applicable assignees and participants thereof.

1.8. <u>Bridge Loan Agent</u> means Merrill Lynch Capital Corporation as administrative agent, or any successor administrative agent, under the Bridge Loan Agreement.

1.9. <u>Bridge Loan Agreement</u> means that certain Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007, among Tribune, the Bridge Lenders, the Bridge Loan Agent, JPMorgan Chase Bank, N.A., as syndication agent, and Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time.

1.10. <u>Bridge Loan Claim</u> means a Claim arising under the Bridge Loan Agreement.

1.11. <u>Bridge Loan Guaranty Agreement</u> means the Guarantee Agreement, dated as of December 20, 2007, among Tribune, each of the subsidiaries of Tribune listed on Annex I thereto, and the Bridge Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.12. <u>Bridge Loan Guaranty Claim</u> means a Claim arising under Bridge Loan Guaranty Agreement, including, without limitation, any Claims thereunder that arise and/or become fixed and non-contingent upon or after the Plan Effective Date.

1.13. <u>Centerbridge</u> means Centerbridge Credit Advisors LLC.

1.14. <u>Claim</u> means a "claim," as defined in section 101(5) of the Bankruptcy Code.

1.15. <u>Creditors' Committee</u> means the official committee of unsecured creditors appointed by the U.S. Trustee pursuant to section 1102(a) of the Bankruptcy Code in the Bankruptcy Cases.

1.16. <u>Deutsche Bank</u> means Deutsche Bank Trust Company Americas, not personally but solely in its capacity as successor indenture trustee to the Senior Notes Indentures.

1.17. <u>Disclosure Statement</u> means a disclosure statement relating to the Settlement Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code.

1.18. <u>Estate(s)</u> means, individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.19. <u>JPMorgan</u> means JPMorgan Chase Bank, N.A.

1.20. <u>Law Debenture</u> means Law Debenture Trust Company of New York, not personally but solely in its capacity as successor indenture trustee under that certain Indenture, dated as of March 19, 1996, as amended, restated or otherwise modified from time to time, between Tribune and Law Debenture Trust Company of New York.

1.21. <u>LBO-Related Causes of Action</u> means any and all claims, causes of action, avoidance actions, powers or rights and legal or equitable remedies against any Person, whether or not a Party, or property of such Person, arising from or relating to any transaction related to the leveraged buy-out of Tribune that occurred in 2007 (the "<u>LBO</u>"), including, without limitation, the purchase by Tribune of its common stock on or about June 4, 2007, the merger and related transactions involving Tribune on or about December 20, 2007, and any financing committed to, incurred or repaid in connection with any such transaction, regardless of whether such claims, causes of action, avoidance actions, powers or rights, or legal or equitable remedies may be asserted pursuant to the Bankruptcy Code or any other applicable law.

1.22. <u>Parent Loan Claims</u> means the Senior Loan Claims, the Bridge Loan Claims and the Barclays Swap Claims.

1.23. <u>Person</u> means an individual, corporation, partnership, association, joint stock company, joint venture, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity, or any government, governmental agency or any subdivision, department or other instrumentality thereof.

1.24. <u>Petition Date</u> means (i) for Tribune and for all Debtors other than Tribune CNLBC, LLC, December 8, 2008, the date on which such Debtors commenced their Bankruptcy Cases, (ii) for Tribune CNLBC, LLC, October 12, 2009, the date on which such Debtor

commenced its Bankruptcy Case, and (iii) with respect to the Subsidiary Non-Debtors, the date on which any such Subsidiary Non-Debtor commences its Bankruptcy Case, if any.

1.25. <u>Plan Supplement</u> means the supplement to the Settlement Plan to be filed with the Bankruptcy Court not later than ten (10) calendar days prior to the deadline established for objecting to confirmation of the Settlement Plan.

1.26. <u>Pledge Agreement</u> means that certain Pledge Agreement, dated as of June 4, 2007, between Tribune and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.27. <u>Senior Lender Settlement Committee</u> means a committee comprised of Senior Lenders that become party to the Agreement prior to the hearing to approve a Disclosure Statement for the Settlement Plan.

1.28. <u>Senior Lenders</u> means the lenders from time to time party to the Senior Loan Agreement as Lenders thereunder, including former lenders and any applicable assignees and participants thereof.

1.29. <u>Senior Loan Agent</u> means JPMorgan Chase Bank, N.A. as administrative agent, or any successor administrative agent, under the Senior Loan Agreement.

1.30. <u>Senior Loan Agreement</u> means, collectively, (a) that certain Credit Agreement, dated as of May 17, 2007, among Tribune, the Senior Lenders, the Senior Loan Agent, Merrill Lynch Capital Corporation, as syndication agent, and Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time and (b) those certain increase joinders, dated as of December 20, 2007, among Tribune, certain of the Senior Lenders and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.31. <u>Senior Loan Claim</u> means a Claim arising under the Senior Loan Agreement and any Claim of the Senior Lenders or the Senior Loan Agent arising under the Pledge Agreement.

1.32. <u>Senior Loan Guaranty Agreement</u> means the Guarantee Agreement, dated as of June 4, 2007, among Tribune, each of the subsidiaries of Tribune listed on Annex I thereto, and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.33. <u>Senior Loan Guaranty Claim</u> means a Claim arising under the Senior Loan Guaranty Agreement, including, without limitation, the guaranty of the Barclays Swap Claim.

1.34. <u>Senior Noteholder(s)</u> means, individually or collectively, the holder(s) of a Senior Noteholder Claim(s).

1.35. <u>Senior Noteholder Claims</u> means all Claims for principal or interest arising under or evidenced by the Senior Notes Indentures and related documents and any Claim of the Senior Noteholders arising under the Pledge Agreement.

1.36. <u>Senior Notes 1996 Indenture</u> means that certain Indenture, dated as of March 19, 1996, between Tribune and Law Debenture Trust Company of New York, as successor indenture trustee, as amended, restated or otherwise modified from time to time.

1.37. <u>Senior Notes Indenture(s)</u> means, individually or collectively (a) that certain Indenture, dated as of January 1, 1997, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time; (b) the Senior Notes 1996 Indenture; (c) that certain Indenture, dated as of January 30, 1995, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time; and (d) that certain Indenture, dated as of March 1, 1992, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time.

1.38. <u>Settlement</u> means the settlement contemplated hereby of all LBO Related Causes of Action, including, without limitation, the terms and conditions thereof referred to herein or included in the Settlement Plan.

1.39. <u>Subsidiary Non-Debtors</u> means those subsidiaries of Tribune that as of the date of the Agreement are not Debtors.

1.40. <u>Tribune</u> means Tribune Company.