## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| TRIBUNE COMPANY, et al.,[1] | ) Case No. 08-13141 (KJC) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) |
| | ) Related to Docket Nos. 4852 and 4943 |
| | ) Hearing Date: July 14, 2010 at 1:30 p.m. |

**BRIDGE AGENT'S (I) RESPONSE TO OBJECTIONS TO THE MOTION FOR ENTRY OF ORDERS (A) ESTABLISHING PROCEDURES FOR ADJUDICATING DEBTORS' OBJECTIONS TO THE BRIDGE LOAN CLAIMS IN CONJUNCTION WITH PLAN CONFIRMATION PROCEEDINGS AND (B) ALLOWING SUCH CLAIMS IN FULL AND (II) OBJECTION TO THE DEBTORS' CROSS MOTION FOR ENTRY OF PRELIMINARY PRE-TRIAL SCHEDULING ORDER FOR THE PLAN CONFIRMATION HEARING**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

Wells Fargo Bank, N.A., solely as successor administrative agent and not individually (in such capacity, the "Bridge Agent") under that certain $1.6 billion Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007, by and among Tribune Company ("Tribune" and, collectively with its affiliated debtors and debtors in possession, the "Debtors"), each lender from time to time party thereto (the "Bridge Lenders") and the other named parties thereto, hereby files this response (the "Response") to objections to the Motion for Entry of Orders (A) Establishing Procedures for Adjudicating the Debtors' Objections to the Bridge Loan Claims in Conjunction with Plan Confirmation Proceedings and (B) Allowing Such Claims in Full (the "Motion") and this objection (the "Objection") to the Debtors' Cross Motion (the "Cross Motion") for Entry of Preliminary Pre-Trial Scheduling Order for the Plan Confirmation Hearing [Docket No. 4943]. In support of this Response and Objection, the Bridge Agent respectfully represents at follows:[2]

## PRELIMINARY STATEMENT

The Debtors and the other Objectors (as defined below) that support the so-called Global Settlement reveal in their respective objections to the Motion and in the Cross Motion that their goal in these proceedings is to limit scrutiny of the propriety of the ill conceived Global Settlement while pursuing a plan of reorganization that is designed to penalize the Bridge Lenders for refusing to provide the Global Settlement and Plan with their support. The Bridge Lenders made a straightforward request to have their claims treated at the same time as Tribune's other creditors' claims and to avoid a largely duplicative and prejudicial trial of the LBO-Related Causes of Action months after the Confirmation Proceedings. In response, the Debtors and the other Objectors essentially seek (i) a summary judgment-type ruling that the "lowest rung of

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion. [Docket No. 4852]

reasonableness" test is the standard by which the Global Settlement and the Plan should be measured, (ii) a pre-trial order with an unrealistically compressed schedule in light of the complex and serious issues presented by the Plan and (iii) in limine orders curtailing the type of fact and expert evidence that the parties objecting to the Plan may present at the confirmation hearing. All of this is sought on short notice and while the parties are still in the midst of fact discovery and prior to any of the noticed depositions having been taken. In the guise of promoting efficiency, the Debtors and the other parties who support the Global Settlement show that their primary interest is to limit in every way possible the Court's scrutiny of their flawed settlement and the Plan.

## RESPONSE AND OBJECTION

I. **The Objectors Gloss Over the Bridge Agent's Arguments**

    A. **The Objectors Fail to Address the Bases for the Motion**

1. No party really addresses the Bridge Agent's central position that adjudication of the allowance of the Bridge Loan Claims during the Confirmation Proceedings will preserve judicial resources, ensure procedural fairness and avoid undue prejudice. (Motion ¶ 13) Rather, the Debtors, the Official Committee of Unsecured Creditors,[3] and the Settlement Supporters[4] (collectively, the "Objectors") focus solely on how the requested relief might affect the Confirmation Proceedings and their chances of dragging the Global Settlement and the Plan across the confirmation finish line, which is apparently what matters to them. The Objectors ignore the overall efficiencies that would be achieved by the Court and other parties by avoiding a duplicative, post-confirmation hearing on the allowance of Bridge Loan Claims.

---

[3] The Official Committee of Unsecured Creditors (the "Committee") filed an objection to the Motion. [Docket No. 4946]

[4] Certain Settlement Supporters filed an objection to the Motion and a joinder to the Cross Motion. [Docket No. 4949]

2. In fact, it is not even clear that there is a real dispute regarding the allowance of the Bridge Loan Claims. Although the underlying premise of the Debtors' objection to the Motion (the "Opposition") is that they intend to contest the allowance of the Bridge Loan Claims (Opposition and Cross Motion ¶¶ 2, 10, 11), the Plan provides that the Debtors need not do so. (Plan § 8.1) In fact, it seems unlikely that the Debtors could in good faith dispute the Bridge Loan Claims when (i) on the one hand, doing so would require the Debtors to pursue a fraudulent conveyance claim against the Bridge Lenders and (ii) on the other hand, the Debtors have already made very clear, in the Global Settlement and Plan, that they do not believe that the LBO transactions constituted fraudulent conveyances. The Debtors in the Plan and Global Settlement leave the Senior Lenders' subsidiary guarantee claims largely unscathed, and do not seek disgorgement of any fees paid to Merrill Lynch (the initial administrative agent for the Bridge Lenders) or JPMorgan Chase, nor any contribution from Mr. Zell or the other directors of the Debtors (nor have they accounted for such risk in the Global Settlement), notwithstanding that those parties structured the Bridge Loans and the LBO Transaction in the first instance.

3. If, however, the Debtors insist upon objecting to the allowance of the Bridge Loan Claims and the Court were to grant the Bridge Agent's Motion, any additional evidence required to adjudicate the allowance of Bridge Loan Claims during the Confirmation Proceedings would be merely incremental to the evidence the Court would otherwise consider. Although, as described below, the Bridge Agent disagrees with the Objectors' description of the legal standards for assessing the Global Settlement and the Plan, even the Objectors recognize that any evaluation of the reasonableness of the Global Settlement requires consideration of the probability of success of the LBO-Related Causes of Action. (Opposition and Cross Motion ¶ 6

(citing Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996) (noting that one of the factors is "the probability of success in the litigation"))). And the Debtors themselves (and by extension the other Plan proponents) have noted that objections to the allowance of the Bridge Loan Claims will relate to their potential avoidance under an LBO-Related Cause of Action. (Disclosure Statement at 78-79) Thus, by the Debtors' and the other proponents' own admissions, assessing the probability of success in the LBO-Related Causes of Action – multibillion dollar claims against dozens of potential defendants with different liabilities, positions and defenses – will require a significant evidentiary hearing concerning the merits of those claims.

4.      This is especially true where almost the entire burden of the Global Settlement is being foisted on Tribune and, hence, the Bridge Lenders.[5] At the very least, the Court will be required to assess in sufficient detail whether or not the Global Settlement is fair to the Bridge Lenders, or whether the settlement payment should be more fairly allocated across the Debtors' estates and contributions demanded of certain parties. All of this implicates directly the potential avoidability of the Bridge Loan Claims.

5.      It would therefore be inefficient, wasteful of the Court's time and resources, and prejudicial to the Bridge Lenders if the Bridge Agent and other parties in interest were required to relitigate the merits of the LBO-Related Causes of Action months after the Court will have considered the probability of success associated with such claims. The evidence presented at the Confirmation Proceedings will advance the ball well downfield on avoidance

---

[5] As discussed in various pleadings filed by the Bridge Agent with the Court, the claims of the Bridge Lenders against Tribune are pari passu with the claims of the Senior Lenders. Thus, the Bridge Loan Claims are eviscerated by the Global Settlement, which disproportionately burdens Tribune creditors for the benefit of the Senior Lenders' claims against the Subsidiary Guarantors, while the Senior Lenders' subsidiary guarantee claims are unaffected.

issues. The Bridge Agent and the Court should not be required to drive the ball the entire length of the field a second time.

6.  Further, any additional evidence required to adjudicate the Bridge Loan Claims at the Confirmation Proceedings would not cause any undue burden. Indeed, the same witnesses that will testify to show the probability of success of the LBO-Related Causes of Action will be required to testify in connection with adjudicating the Bridge Loan Claims. Moreover, the evidence adduced would be directly relevant to the reasonableness of the Global Settlement and would allow the Court to make a more informed decision on whether it should confirm the Plan – something the Debtors, the Settlement Supporters and other Plan proponents apparently hope to avoid.

7.  The Settlement Supporters' claim that granting the Motion would result in a more expensive confirmation proceeding is also flawed. Any additional expense would be merely incremental to the many months of analysis and millions of dollars the parties have already expended in investigating the viability of LBO-Related Causes of Action and briefing these matters to the Examiner. As this work has largely been completed, the additional expense at the Confirmation Proceedings is not likely to be significant in the grand scheme of these Chapter 11 Cases, and the total expense associated with proceeding in this fashion will be for less than in connection with the Debtors' propose which requires the parties to relitigate the same issues twice. In any event, all of that preliminary work was hardly worth the time and expense if the results of it cannot be shared with the Court at the Confirmation Proceedings and used to enable the Court to adjudicate all confirmation issues in the fairest way possible.

8.  In fact, the <u>only</u> potential downside for the Debtors and the Settlement Supporters in proceeding in this fashion is that the Court would potentially have a more

developed evidentiary basis to decide whether the Global Settlement and Plan are reasonable and confirmable. Indeed, the Debtors would have to justify, among other things, why the Global Settlement is borne almost entirely by Tribune creditors; treats the Senior Lenders and insiders who structured and approved the Bridge Loans and LBO Transaction more favorably than others; does not account for the risk that fees or interest payments paid to the Senior Lenders and their agents, and others, who structured the LBO Transaction or who received preferential payments, would be disgorged; and does not require any contribution from Mr. Zell, the chief architect of the LBO Transaction, who guided the Debtors into insolvency.

### B. The Debtors Misrepresent their Motive for Filing their Opposition and Cross Motion

9. The Debtors fail to identify what appears to be the true reason for opposing the Motion and adjudicating the allowance of the Bridge Loan Claims as many as 210 days after the Effective Date. The Debtors are attempting to keep from the Court's immediate consideration the inherently inconsistent positions that they have taken in their pursuit of the Global Settlement and the Plan. If the Debtors' objection to allowance of the Bridge Loan Claims is adjudicated at the Confirmation Proceedings, the Debtors would be in the precarious position of arguing that the Bridge Loan Claims were the product of fraudulent transfers while at the same time supporting a settlement of LBO-Related Causes of Action, which presumes almost no likelihood of avoidance of the Senior Lenders' guarantee claims and seeks no disgorgement of fees paid by the Debtors to third parties or the return of preferential payments. Indeed, the mere fact that the Debtors would seek to avoid the Bridge Loan Claims would demonstrate the serious flaws in the Global Settlement which was constructed to benefit insiders. Because these positions cannot be reconciled, the Debtors do not want to have to argue them at the same hearing.

10. If the Debtors decide to move forward with the Plan, they should be required to contest the allowance of the Bridge Loan Claims on the same schedule. The Debtors should be required to make a decision – either (i) they pursue confirmation of the Plan and approval for the Global Settlement which presumes a low probability of success on the merits of LBO-Related Causes of Action, or (ii) they contest the allowance of claims that arose in connection with the LBO-Related Causes of Actions. It is inherently contradictory for the Debtors to do both. Nevertheless, the Debtors seem prepared to do so in a lengthy and expensive process that penalizes the Bridge Lenders for the benefit of the Settlement Supporters.[6]

## II. The Debtors' Cross Motion Is Premature, Prejudicial and Unreasonable

11. The Debtors have cross moved the Court to enter a scheduling order that would specify the timing for opening and closing remarks, allocate time between the proponents and opponents of the Plan regarding the presentation of evidence, and clarify that expert reports and testimony pertaining to any potential LBO-Related Causes of Action shall only evaluate the reasonableness of the settlement as informed by the Texaco/Martin factors. (Opposition and Cross Motion ¶ 13) The Bridge Agent does have concern with the shortening of notice here. First, the caption of the Debtors' Expediting Motion was unclear when objections to the shortening of notice were due. Additionally, on substantive grounds, the Debtors failed to identify good cause or exigent circumstances that justify the immediate resolution of the Cross Motion on shortened notice. The Debtors provide no meaningful explanation of how they would be prejudiced if the Cross Motion were not granted on shortened notice. See In re Sandra

---

[6] In its objection, the Committee alleges that the Motion infringes upon the Debtors' rights to determine the contents of the Plan during the Debtors' exclusivity period. (Committee Objection ¶ 4) Although the Bridge Agent is objecting to the disputed claims process provided in the Plan, as addressed in the Motion (at pages 9-11), if the Bridge Agent waits to raise the issues until it files its confirmation objection, it may be too late for the Court to address the Bridge Agent's requested relief.

Cotton, Inc., 65 B.R. 153, 156 (W.D.N.Y. 1986) (administrative convenience does not justify granting relief on abbreviated notice). Indeed, as discussed below, the Cross Motion should be considered only at a later date closer to the Confirmation Proceedings when votes have been tallied, the Examiner's Report is issued, discovery has been completed and the precise confirmation issues become clearer. The Bankruptcy Rules provide that "when an act is required or allowed to be done at or within a specific time by these rules or by a notice given thereunder or by order of court, the court for cause shown may in its discretion with or without motion or notice order the period reduced." Fed. R. Bankr. P. 9006(c)(1) (emphasis added).

### A.   The Cross Motion Is Premature

12.   In addition to its procedural flaws, the Cross Motion should not be granted for substantive reasons. It is premature for the Debtors to propose a scheduling order almost two months before the commencement of the Confirmation Proceedings. There remains to be completed massive activity that will bear significantly on the appropriate schedule, allocation of hearing time and any limitations on the presentation of evidence. For example, the Plan voting deadline (August 6, 2010) has not yet passed, and the Examiner's Report detailing his assessment of the LBO-Related Causes of Action that are at the heart of the Global Settlement and Plan will not be filed until July 26, 2010. This report will impact the nature and extent of evidence that will be introduced at the Confirmation Proceedings. It would be premature to set a schedule for Confirmation Proceedings before the parties in interest have an opportunity to review the Examiner's Report.

13.   Also, the parties are in the midst of factual and expert discovery that will likely uncover additional issues that need to be explored at the Confirmation Hearings. Many deponents are resisting attending depositions prior to the release of the Examiner's Report. For example, although noticed for a deposition on June 28, 2010, Mr. Zell has refused to provide a

date to testify prior to August 17, 2010. Because the on-going discovery and deposition-taking may yet unearth critical facts and issues, entry of a scheduling order for the Confirmation Proceedings is premature at this time.[7]

### B. The Cross Motion Is Prejudicial

14.     The Bridge Agent is committed to prosecuting its objections to the Plan in an expeditious and efficient manner, but efficiency and expediency must not compromise the integrity of the process. At this point, entering an order that limits the length of the Confirmation Proceedings and allocates little time to the Bridge Agent and other Plan opponents to present evidence is highly prejudicial.

15.     First, it is unreasonable at this time to believe that the Confirmation Proceedings will last only five trial days. These Chapter 11 Cases are extremely complex and involve legal issues that affect many parties each of which has divergent interests. For example, the Plan is intimately bound to a determination of the merits of the LBO-Related Causes of Action. The Examiner has been working "diligently" since his appointment on April 30, 2010 to evaluate the LBO-Related Causes of Action; he and his team continue to review an enormous documentary record and conduct dozens of interviews and examinations of potential witnesses, some of which will be taken under oath. Given that the Examiner will have had almost three months to assess the LBO-Related Causes of Action and prepare his report, it seems implausible that the Bridge Agent and/or any other opponent of the Plan can effectively present evidence to confirm or refute the Examiner's findings in only two days at the Confirmation Proceedings.[8]

---

[7] Indeed, this Court's own procedures reflect that trial schedules can be set much later in the process. See Chambers Procedures for Honorable Kevin J. Carey (Bankr. D. Del. April 1, 2008); General Order Re: Pretrial Procedures in Adversary Proceedings Set for Trial Before Judge Kevin J. Carey (Bankr. D. Del. Feb. 21, 2007).

[8] The Settlement Supporters also suggest that the Examiner's Report will provide the Court with a sufficient record with which it can assess the Global Settlement; however, to the extent any party disagrees with the Examiner's Report, witnesses will need to testify and evidence will need to be presented that counters the Examiner's findings.

16. Additionally, the scheduling order's proposed scope of expert and factual testimony and allocation of time are highly prejudicial to the Bridge Agent. Until discovery is completed, it is too early to know whether limiting the scope of testimony and expert reports pertaining to the LBO-Related Causes of Action to the reasonableness of the Global Settlement is appropriate. Also, the Bridge Agent may be prejudiced if Plan opponents and proponents are granted equal amounts of time to present evidence at the Confirmation Proceedings, given that most of the underlying information will likely be present through adverse direct examination.

17. Moreover, the Global Settlement is not the only aspect of the Plan to be contested in this multi-billion dollar reorganization. Among other things, the Debtors have allocated billions of dollars in value between its corporate entities, "resolved" billions of dollars of intercompany claims, proposed generous management incentive plans, and created complex distribution schemes, all of which must be assessed by the Court. A fair and reasonably expeditious trial on any of these issues could take several days. Not until the Court and all parties in interest have had the benefit of reviewing the pleadings filed in support of and in opposition to confirmation of the Plan can the Debtors fairly assess, and the Court determine, how time should be allocated at the Confirmation Proceedings.

C.  **The Cross Motion Effectively Seeks Summary Judgment on the Legal Standard to Be Applied to Review of the Global Settlement**

18. Perhaps the most troubling part of the Cross Motion is that the Debtors have essentially moved for summary judgment on the legal standard to be applied in the Court's review of the Global Settlement. As an initial matter, determination of the appropriate legal

---

In response, any party that supports the Examiner's Report may also present witnesses or testimony relied upon by the Examiner. (Hr'g Tr. May 20, 2010 29:15-21) (Judge Carey: "I have a feeling one of the likely scenarios is the examiner's report will come out, and if there are certain claims identified, the plan proponents and supporters will say 'it's all wrong.' And it may be some of the parties who have claimed that there are claims will say 'it doesn't go far enough.' You know, and that will be another round of back and forth.")

standard is not appropriate to include in the Cross Motion. The legal standard to be applied in the Court's review of the Global Settlement is wholly unrelated to the Bridge Agent's request that the Court adjudicate allowance of the Bridge Loan Claims at the Confirmation Proceedings.

19. The proposed scheduling order states that "[e]xpert and fact testimony and expert reports pertaining to any potential LBO Related Causes of Action (as defined in the Plan) shall be limited to the reasonableness of the settlement as informed by the Texaco/Martin factors." (Ex. A ¶ 4, Opposition and Cross Motion). This is yet another example of the Debtors' and other Plan proponents' Herculean efforts to avoid a careful scrutiny of the Global Settlement and Plan.

20. Because confirmation of the Plan is inextricably intertwined with approval of the Global Settlement, the legal standard used to assess the Settlement is likely to be hotly contested in the confirmation objections and responses. For example, the purported Global Settlement is, by the Debtors' admission, the very essence of the Plan. Therefore, using the low threshold of the Texaco/Martin factors as the standard for approval of the Global Settlement is not appropriate because it has the effect of eviscerating the plan confirmation requirements, as well as the protections afforded to nonconsenting creditors, set forth in Section 1129 of the Bankruptcy Code. In re Louise's, Inc., 211 B.R. 798, 802 (D. Del. 1997) ("The Settlement Agreement, presented here as a compromise of the Exclusivity Motion issue, is so tainted with provisions unrelated to the exclusivity issue that it cannot be fairly denoted a Rule 9019 compromise. In reality, the Settlement Agreement is a vehicle for Connecticut General to implement a plan of reorganization guaranteed to be more favorable to Connecticut General than all other interested parties.").

21. In addition, the Bridge Agent, and other constituents, will likely argue that Bankruptcy Rule 9019 is not the appropriate standard to apply to the "Global Settlement" because it is not a settlement at all in that certain parties to the LBO-Related Causes of Action (including the Bridge Lenders) are not parties to, and oppose, the settlement. Overton's, Inc. v. Interstate Fire & Cas. Ins. Co. (In re SportStuff, Inc.), No. 09-6030, 2010 WL 2196258, *9 (B.A.P. 8th Cir. June 3, 2010) ("A 'settlement' between only two parties to a multi-party lawsuit is not a settlement, and the procedure to approve a compromise under Fed. R. Bankr. P. 9019(a) cannot be used to impose an injunction on the non-settling parties.").

22. Moreover, it is not at all clear that the Settlement actually settles or compromises any pending or contemplated litigation. "When considering the best interest of the estate [pursuant to Rule 9019], the Court must 'assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal.'" In re Spansion, Inc., No. 09-10690, 2009 WL 1531788, *4 (Bankr. D. Del. June 2, 2009) (quoting Martin, 91 F.3d at 393). Certainly, should the Debtors object to the Bridge Loan Claims they will not have avoided the cost and expense of litigating the LBO-Related Causes of Action that the Settlement purports to fully resolve. And the Plan requires the Debtors to indemnify the Settlement Supporters against litigation commenced or continued by other creditors who chose to "opt-out" of the releases under the Plan. Thus, while the Settlement Supporters achieve releases from some constituents and substantial indemnification from the Debtors, the Debtors' estate will continue to bear litigation expenses even if the Settlement is approved. This fact presents a strong basis to deny the Settlement under any standard, but also makes analysis solely under Rule 9019 inappropriate. See In re Nationwide Sports Distributors, Inc., 227 B.R. 455, 461 (Bankr. E.D. Pa. 1998) ("The litigation cost/benefit analysis which is

germane to Rule 9019(a) is not easily determined when, as here, there can only be speculation about whether the 'settled' litigation will be ended or merely resumed by other interested parties.").

23. In short, assessment of the applicability of Rule 9019 and the Texaco/Martin factors to the Global Settlement and Plan is highly complex. And, facts which may come out in discovery will certainly bear upon the parties' and the Court's analysis of the appropriate legal standard. Therefore, the Court should not address this issue until completion of discovery, and after reviewing the full legal briefing that will certainly appear in the parties' confirmation objections and responses. See, e.g., In re Louise's, Inc., 311 B.R. 798 (settlement that included de facto transfer of control of Debtor to settlement counterparty could not be considered or approved under Rule 9019); In re Nationwide Sports Distributors, Inc., 227 B.R. 455 (Rule 9019 not applicable to agreement where debtor may have entered into agreement to insulate debtors' insiders rather than to benefit estate and where 'settlement' encompassed issues unrelated to action for which compromise was purportedly sought); In re SportStuff, 2010 WL 2196258 (Rule 9019 not applicable to agreement between only two parties to multi-party litigation). Aspects of this Settlement and the benefits afforded to the Settlement Supporters raise "red flags" which warrant higher scrutiny than that required by Rule 9019. See In re Matco Electronics Group, Inc., 287 B.R. 68, 76 (Bankr. N.D.N.Y. 2002) (fact that settlement bound creditors committee to its terms even though committee was not a party to the settlement agreement, among other factors, raised red flags).[9]

---

[9] Notwithstanding the foregoing, the Bridge Agent reserves the right to make additional or alternative arguments regarding the proper standard to assess the Global Settlement in its confirmation objection and at the Confirmation Proceedings.

## NOTICE

24. Notice of this Response and Objection has been provided to: (i) counsel for the Debtors; (ii) the Office of the United States Trustee; (iii) counsel for the Creditors Committee; and (iv) all parties having requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Bridge Agent submits that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Bridge Agent respectfully requests that the Court (i) grant the Motion (and enter the Procedures Order in the form attached as Exhibit A thereto), (ii) establish procedures for adjudicating the Debtors' objections to the Bridge Loan Claims, (iii) ultimately enter an order allowing such claims in full, and (iv) deny the Cross Motion in its entirety.

Dated: July 12, 2010
      Wilmington, Delaware

FOX ROTHSCHILD LLP

By: _/s/ Jeffrey M. Schlerf_
Jeffrey M. Schlerf, Esq. (No. 3047)
Eric M. Sutty, Esq. (No. 4007)
John H. Strock, Esq. (No. 4965)
Citizens Bank Center
919 North Market Street, Suite 1600
Wilmington Delaware 19801
Telephone: (302) 654-7444

-and-

WHITE & CASE LLP
Thomas E Lauria
Gerard Uzzi
David Hille
Andrew Hammond
Scott Greissman
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 819-8200
Facsimile: (212) 819-8113

Attorneys for the Administrative Agent