IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| TRIBUNE COMPANY, et al., | ) Case No. 08-13141 (KJC) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) |
| | ) **RE: Docket No. 5116** |
| | ) |

## STATEMENT OF CREDIT AGREEMENT LENDERS REGARDING DEBTORS' MOTION TO AUTHORIZE DISCLOSURE OF THE EXAMINER'S REPORT

The Credit Agreement Lenders[1] have no objection to the relief requested in the

Debtors' *Motion to Authorize the Disclosure of the Examiner's Report, Exhibits Cited in Report,*

*and Professionally Transcribed, Sworn Transcripts of Witness Interviews to the Parties and*

*Interviewees Pursuant to the Terms of the Document Depository Order* [D.I. 5116] (the

"Motion").[2]  It is, of course, essential that the parties who will soon be litigating over

confirmation of the Debtors' Plan actually have access to the Examiner's full report.  The

Motion, however, does not go far enough.  As shown below, due to the Examiner's

determination to file a truncated *30-page summary* of what has been described as a *1,000 page*

*report* (which itself will have 1,000 or more exhibits), creditors voting on the Debtors' Plan will

not have access to the Examiner's full report until *after* the current deadline for voting on the

Plan.  This nullifies the primary purpose of the Examiner's report and dictates that the voting

deadline be extended to a reasonable time after the entirety of the report is made public.

1.      The Debtors' Plan proposes a "settlement" in which current holders of

Credit Agreement claims would give up $425 million or more to settle fraudulent conveyance

claims that the Debtors theoretically could assert against those creditors and numerous other

---

[1]    The Credit Agreement Lenders are the entities identified in the *Sixth Amended Joint Verified Statement of Representation of More Than One Creditor by Hennigan Bennett & Dorman LLP and Young Conaway Stargatt & Taylor LLP* [D.I. 4374].

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

parties. Under that settlement, a host of potentially-liable entities, including the investment banks that structured the challenged loans (particularly, JPMorgan, Citibank, Merrill Lynch and Bank of America), lenders that received payments under the supposedly voidable loans, and Sam Zell, are to receive free releases and indemnities in respect of claims arising from the very same facts on which the claims against current lenders are based.

2.      The settlement involves complex claims allegedly arising from complex transactions involving tens of billions of dollars. In order to aid creditors in assessing the claims and determining the reasonableness and appropriateness of the settlement, the Court appointed Kenneth Klee as Examiner to investigate and opine on the claims.

3.      At great cost to the estates (and indirectly to current holders of Credit Agreement claims, as the likely owners of all or a vast majority of the equity in the reorganized debtors), the Examiner has conducted an exhaustive examination of the fraudulent conveyance claims and the Debtors' other potential claims. The primary purpose of the Examiner's efforts is the creation of a report that may allow Credit Agreement lenders and other creditors to judge the viability of the fraudulent conveyance claims (including the likely amount of any recoveries on these claims) and thereby assess the reasonableness of the proposed settlement of those claims funded solely by current holders of Credit Agreement claims (and the reasonableness of the related provision of free releases and indemnities to the other potentially-liable parties).

4.      The Examiner has now prepared his report. The Examiner has informed parties that the report exceeds 1,000 pages, has 1,000 exhibits, and contains over 400 pages of legal analysis devoted to a detailed analysis of the viability of the fraudulent conveyance claims that the Debtors propose to settle with the Credit Agreement lenders' money pursuant to the Plan.

5.      When the Court created the initial schedule for delivery of the Examiner's report, creditors had a period of 18 days (from July 12 to July 30) to digest the Examiner's report and deliver their votes on the Plan. While the task was substantial, the length of time was manageable, if challenging.

6.      The magnitude and importance of the Examiner's task, however, ultimately dictated that the report could not be delivered on July 12. Accordingly, the report deadline was pushed back two weeks to July 26. At the hearing relating to that extension, the Credit Agreement Lenders asked for a parallel move in the time allowed for the casting of votes —an extension to August 13. Based on the specter that a competing plan might theoretically be filed on August 9 (even though the Credit Agreement Lenders committed not to file a competing plan until after August 13), the Plan proponents persuaded the Court that creditors would have enough time to digest the Examiner's report and vote if the voting deadline was continued by only a week—to August 6. Thus, on July 1, the Court determined that an 11-day period (from July 26 to August 6) would provide creditors sufficient time to digest the report and mail their votes.

7.      It is now clear that primary beneficiaries of the Plan have found a way to game even that truncated schedule. In his investigation, the Examiner has interviewed witnesses and reviewed documents from Citibank, Merrill Lynch and Bank of America (collectively, the "Banks"). Each of these entities are central beneficiaries of the Plan, receiving releases of estate claims and indemnities from third-party claims (including claims that have, at least in part, already been pleaded against them by Wilmington Trust).

8.      The Examiner has informed the Court that his report relies extensively on material that the Banks assert is confidential and therefore unable to be publicly revealed. The Examiner has further informed the Court that he believes that the Banks' assertion of confidentiality is untenable but that the Banks have stubbornly stood on their assertion despite substantial efforts by the Examiner to persuade them to stand down.

9.      As a result, the Examiner, out of an abundance of caution, has informed the Court that he cannot publicly file his report on July 26th. Moreover, due to the extensive and comprehensive nature of the Banks' confidentiality position, the Examiner does not believe that he can even file a *redacted* version of his report or deliver his report *to the parties to the existing protective order*. Instead, the Examiner proposes to publicly file only a brief *25-or 30-page*

summary of the *1,000 page report* and to deliver the full report only to the Court itself in an under-seal form.  Issues regarding unsealing the full report will not be addressed until a hearing scheduled for August 9, *after the balloting deadline*.

10.    This is completely contrary to the Court's and the parties' expectations. As stated at the July 1 hearing, the Court "would not expect that the entire report would be filed under seal" and "would expect that the largest portion of it and certainly enough to be meaningful would be immediately publicly available."  Hr'g Tr. 22:12–15, July 1, 2010 (attached as Exhibit A).  This now is not the case.

11.    In fact, as it will only be a short summary of a 1,000 page document, the Examiner's public filing necessarily will contain only a small fraction of the full story to be laid out in his full report.  Even more troublingly, the Examiner has explained that his public summary will not be able to rely upon, let alone detail, the information contained in the documents and interviews as to which the Banks assert confidentiality.  Thus, the summary's analysis will not only be abbreviated, it will be fundamentally incomplete.

12.    Accordingly, unless the voting deadline is extended, creditors will not have even the minimally-manageable 11-day period the Court authorized on July 1st to digest a 1,000 page report and mail their votes—that report will not now be available until *after* the voting deadline.  Given the amounts at issue and the amounts expended to create the Examiner's report, the current schedule has now become both unmanageable and thoroughly unfair.

13.    The Banks, of course, see no problem here.  In their perfect world, they get releases under—and provide no contribution to—a Plan that is carried on the financial backs of current Credit Agreement lenders and that is voted upon without anyone having the opportunity to appreciate the Examiner's analysis of the Banks' exposure and the lack of any material exposure on the part of current Credit Agreement lenders.  One is therefore left to conclude that the Banks' untenable assertion of confidentiality is likely strategic, and not merely reflexive.  In any event, the timing problem created by the Banks' assertion of confidentiality

should not be allowed to deprive creditors of the opportunity to cast informed votes and otherwise have the benefit of the Examiner's exhaustive multimillion dollar effort.

14.    Eleven days is the absolute minimal time that creditors (particularly Credit Agreement lenders) should have to digest the Examiner's full report and mail their votes.

15.    Accordingly, the Credit Agreement lenders request that the Court direct that the voting deadline be extended to a date eleven days after the public filing of the Examiner's full report.

Dated: July 26, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ M. Blake Cleary
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19899
Telephone: (302) 571–6600
Telecopier: (302) 571–1253

- and -

HENNIGAN, BENNETT & DORMAN LLP
Bruce Bennett
James O. Johnston
Joshua D. Morse
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Telephone: (213) 694–1200
Telecopier: (213) 694–1234

*Counsel to the Credit Agreement Lenders*

068968.1001

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| TRIBUNE COMPANY, | . | Case No. 08-13141(KJC) |
| *et al.,* | . | (Jointly Administered) |
| | . | July 1, 2010(10:03 a.m.) |
| Debtors. | . | (Wilmington)(Telephonic) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE

Appearances:

| | |
|---|---|
| For the Debtors: | Bryan Krakauer, Esq. |
| | Sidley Austin LLP |
| | |
| For the Examiner: | Kenneth N. Klee, Esq. |
| | Martin R. Barash, Esq. |
| | Klee, Tuchin, Bogdanoff & Stern |
| | |
| For Certain Creditors: | James O. Johnston, Esq. |
| | Hennigan, Bennett & Dorman LLP |
| | Daniel H. Golden, Esq. |
| | Akin, Gump, Strauss, Hauer & Feld |
| | Robert Stark, Esq. |
| | Martin Siegel, Esq. |
| | Brown, Rudnick LLP |
| | Scott Greissman, Esq. |
| | White & Case LLP |
| | Norman L. Pernick, Esq. |
| | Cole, Schotz, Meisel, Forman |
| | |
| For the Committee: | Kevin LeMay, Esq. |
| | Chadbourne & Park, LLP |
| | |
| For the U.S. Trustee: | Joseph McMahon, Esq. |
| | U.S. Trustee's Office |
| | |
| For JPMorgan Chase: | Elliot Moskowitz, Esq. |
| | Davis, Polk & Wardell |

| | |
|---|---|
| Audio Operator: | Brandon McCarthy |
| Transcriber: | Elaine M. Ryan |
| | (302) 683-0221 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE COURT: All rise.

2          THE COURT: Good morning.   This is Judge Carey.

3    We're on the record in the Tribune, Chapter 11 proceeding to

4    consider the examiner's motion for an extension of the report

5    deadline.   As a related matter, the debtor in its reply has

6    suggested a revised, what I'll call confirmation schedule,

7    resulting from the relief, if granted, that the Examiner has

8    requested.   There is according to the written submissions

9    one sticking point concerning the fixing of a voting

10   deadline.   So, let me begin by asking whether the remaining

11   issue has been resolved or whether we need to have a

12   discussion this morning.   I'll turn it over to counsel.

13         MR. KRAKAUER (TELEPHONIC): Your Honor, Bryan

14   Krakauer on behalf of the debtors.   One of my colleagues did

15   speak to credit lenders counsel, Mr. Johnston, the day before

16   yesterday, and it's not resolved this morning.

17         THE COURT: Okay.   Well, I've given some thought to

18   it, and I understand, without determining whether the debtor

19   is correct or not in its assertion of the possible filing of

20   competing plans and whether that impacts the position taken

21   in the remaining objection, I won't decide, but I will say I

22   understand the concern the debtor has expressed and I'm

23   prepared to address it in the following manner, and that is

24   to leave the revised voting deadline where the debtor

25   proposes to leave it but twist the Examiner's arm to have the

1   report in by July 23rd.  So, let me turn -

2           MR. KLEE (TELEPHONIC): Your Honor, this is Kenneth

3   Klee, the Examiner.

4           THE COURT: Good morning, Mr. Klee.

5           MR. KLEE (TELEPHONIC): Good morning.  Your Honor,

6   that arm twisting, if we have to live with it, I guess we

7   have to live with it.  I want the Court to know that Judge

8   Gregg in Michigan has invited me to speak to his bar from

9   July 22nd to July 25th, and it will be difficult for me to file

10  a report on July 23rd, if I'm in Michigan, and we requested

11  the extension to the 27th, not just based on my travel

12  schedule but based on the volume of information that we have

13  to process, based on conflicting testimony in this case.

14  We've already taken 27 interviews, and we have been required

15  now to take many of the examinations under oath, and we're

16  going to have to revisit a few witnesses.  I anticipate an

17  additional 10 interviews are going to be required, and I have

18  been working diligently every week on the road and will not

19  be in a position to finish these interviews until July 9th at

20  the earliest.  So getting a report filed by July 23rd is

21  possible but extremely difficult.

22          THE COURT: Well, having heard what you just said,

23  Mr. Klee, if I give you the weekend until the 26th, does that

24  help?

25          MR. KLEE (TELEPHONIC): I think it would, Your

1   Honor.  I certainly could come in the office on the 26th, and

2   we could probably get something filed by midnight on the 26th,

3   11:59.

4         THE COURT: Alright, then I'm inclined to adjust the

5   deadline accordingly and still leave the voting deadline

6   where it is.  Now, I will give the parties, if anyone wishes

7   to be heard, a very brief opportunity to give a contrary view

8   if they have one.  I'll hear from others.

9         MR. JOHNSTON (TELEPHONIC):   Your Honor, Jim

10  Johnston of Hennigan, Bennett & Dorman on behalf of the

11  credit agreement lenders.  I would like to give you a short

12  contrary view and a plea for at least a slightly longer

13  review period for the examiner's report.  I think we've been

14  consistent, and you've heard us raise the point a number of

15  times before that we think creditors and particularly credit

16  agreement lenders who are being asked to give $425 million to

17  settle the claims that the Examiner's looking at should have

18  at least a modicum of opportunity to read, understand, digest

19  the Examiner's conclusions about those claims.  You heard us

20  at the hearing on the Examiner's appointment.  You heard us

21  at the hearing on the disclosure statement.  The point's

22  always been simply that the debtors should give creditor

23  access to the report, tell them how to get it, give them time

24  to get it and then give them a little bit of time to read it.

25  The original scheduling order accomplished that objective,

1    but frankly, just barely.  It gave creditors 18 days between

2    a July 12 deadline for filing of the report and a July 30

3    voting deadline.  In that time frame creditors would still

4    have to be vigilant.  They'd have to mark their calendars

5    knowing when the report's coming out, download it, and devote

6    immediate attention to it.  Under the debtors' current

7    proposal, even if the examiner report's filed a day earlier,

8    at midnight on the 26th, you're really giving creditors an

9    effective period of a week or less to get this report, read

10   it, and cast their ballot.  In that regard, I think it's

11   important to note that the voting deadline here is a deadline

12   for receipt.  It's not a deadline for mailing or postmarking.

13   So what you really have to look at, a creditor to be safe is

14   going to have to mail their ballot by August the 3rd, maybe

15   Wednesday, August the 4th, if they really want to push their

16   luck, and that then gives them 7 days to digest a report

17   that's surely going to be hundreds of pages if examiner

18   reports in any of the other big cases out there are any

19   indication, there may be a thousand pages or more, and we'd

20   submit that under the circumstances, that really would defeat

21   one of the fundamental purposes of having an Examiner here.

22   The issues to be covered by the examiner report are complex

23   as evidenced by the request for more time by Mr. Klee's

24   comments this morning.  I'd say if anything, that request

25   counsels in favor of a longer review period for creditors not

1   a shorter review period, and all that we're asking is simply

2   that the existing 18-, actually 17-day review period be

3   maintained and that the voting deadline be pushed back a week

4   till the 13th.   That's still more than 2 weeks before the

5   start of the confirmation hearing.   It's the same date that

6   objections to confirmation are now due, and it preserves all

7   the existing time periods that were set previously by Your

8   Honor.   No one previously objected to those time periods and

9   I think they're still reasonable now.   Just to briefly touch

10  on the argument that was made in the papers yesterday that we

11  heard for the first time yesterday that our concerns aren't

12  genuine and that this is all somehow a ruse so that we can

13  confuse people by filing a plan in the voting period, I'd

14  have to confess, I laughed out loud when I read it yesterday.

15  Your Honor knows that we care about the vote on this plan.

16  That's what the hearing was all about last time we were

17  before the Court discussing the creditor list to be provided

18  by JPMorgan.   That's what we're focused on, getting creditors

19  information about the plan that's now on the table, and the

20  fact is, when I got the email from the debtors late last

21  Friday afternoon proposing a different schedule, I didn't

22  hesitate.   I didn't think about ways that I could spin it to

23  our advantage.   I responded immediately, and I indicated that

24  the review period should be the same as that under the

25  existing order to give creditors the same period time to

1    review the report.  I didn't say anything about plan

2    exclusivity because the thought never crossed my mind.  We've

3    been focused from the start on insuring that the Examiner's

4    conclusions get into the hands of creditors before the voting

5    deadline.  That's what's at issue today.  And, I guess I'll

6    close by noting that if this really was a scheme to get our

7    plan out there before the voting deadline, it wouldn't be a

8    very effective one.  Exclusivity terminates over the weekend

9    of August 7 and 8.  If you assume that we file a plan first

10   thing Monday morning, August 9, and I don't know whether we

11   will or not, that's not going to have any impact on the votes

12   that would be due if Your Honor sets the voting deadline for

13   Friday the 13th.  Creditors would still need to mail their

14   ballots by Tuesday the 10th or Wednesday the 11th.  Having

15   another plan on file for a day or two just isn't going to

16   matter.  We couldn't solicit votes on it.  It wouldn't be

17   served on all creditors.  I'd venture to guess that most

18   creditors wouldn't even hear about it until well after the

19   voting deadline comes and goes.  Surely the debtors' plan is

20   not so fragile that it can't withstand the presence of

21   another plan for a day or two at the end of the balloting

22   deadline, and the bogeyman of chaos, confusion just doesn't

23   ring true, and so, I'd submit that what's really a remote

24   hypothetical possibility that some creditor somewhere might

25   be confused in a 2- or 3-day period after exclusivity ends

1   and before the voting deadline, it just doesn't justify

2   truncating what's already a very short review period for

3   creditors to consider this very important document that will

4   be filed.

5       THE COURT: And if a second plan should be filed,

6   what is the Court required to do under these circumstances,

7   in your view?

8       MR. JOHNSTON (TELEPHONIC):   I don't think the

9   Court is required to do anything.  In the period between -

10  say a plan is filed on August 9 and a deadline for voting on

11  the existing plan is filed on August 13 there's nothing for

12  the Court to do.  The first step in respect of an alternative

13  plan would be consideration of a disclosure statement which

14  certainly wouldn't happen before the 13th.

15      MR. KRAKAUER (TELEPHONIC): Your Honor, can I

16  address those points?

17      THE COURT: Let me hear from others who wish to be

18  heard first then I'll go back to the debtor.  Anyone else

19  wish to be heard?

20      MR. LeMAY (TELEPHONIC): Your Honor, David LeMay

21  from Chadbourne & Park on behalf of the Official Committee of

22  Unsecured Creditors.  As you know from the paper that went

23  in, the Committee supports the debtors' position on this and

24  does believe that the voting deadline should take place

25  within the current exclusive period.  Notably absent from Mr.

1   Johnston's remarks was any offer to voluntarily agree to

2   delay or defer filing his plan until after the voting

3   deadline.  I think that speaks volumes because if it really

4   were not part of their calculus, then I think that would be

5   the easy way to get us off this rock.  Your Honor, consistent

6   with your request that remarks be kept brief, that's all I've

7   got for you, and I thank you for your time.

8            THE COURT: Thank you.  Anyone else wish to be

9   heard?

10            MR. MOSKOWITZ (TELEPHONIC): Your Honor, Elliot

11   Moskowitz of Davis, Polk representing JPMorgan Chase Bank.

12   May I be heard briefly?

13            THE COURT: Yes.

14            MR. MOSKOWITZ (TELEPHONIC): I just also want to

15   just supplement the remarks that were just made by counsel to

16   the Creditors Committee.  You know, just to respond very,

17   very briefly, I think that the notion that Mr. Johnston

18   paints a picture that when exclusivity runs out there'll be

19   just, you know, coming in the mail another plan that's been

20   filed and people are not going to really focus on it.  It's

21   just a total fantasy because the notion of filing a separate

22   plan, an alternative plan has been their game plan from the

23   very beginning and that's the reason why we were before Your

24   Honor a few weeks ago on the discovery request when they

25   requested all of the creditor information, they did that

1   because they want to tell people that this is coming.

2   They've been focused from the start.  It's no secret that

3   they want to file an alternative plan and when Mr. Johnston

4   says that he cares about the vote on this plan, I agree with

5   him.  He does care about the vote on this plan.  He wants it

6   to vote it down, and he wants everyone to vote it down, and

7   the proposal that he has put before the Court actually

8   enhances the possibility that that will happen, not on the

9   merits but because of the confusion that will ensue because

10  what's going to happen is, in just a few extra days the

11  parties are going to have, that he has requested, and that

12  separates his proposal from the debtors' proposal, it's just

13  a few extra days, but in those few extra days people are not

14  going to be sitting there just focusing on the examiner's

15  report, they going to also be sitting there focusing on the

16  examiner's report and his competing plan.  So, we submit that

17  actually the proposal that he is suggesting leads to much

18  more confusion and much less clouding of the process, and

19  that perfectly suits their objectives.  We think it's

20  inappropriate to use the Examiner's good faith request for

21  more time to do a complete end run around the debtors' right

22  of exclusivity and for those reasons, Your Honor, we

23  completely support the debtors' proposal and it should be

24  adopted in its entirety.

25          THE COURT: Is there anyone else who wishes to be

1  heard?

2          MR. KRAKAUER (TELEPHONIC): The debtor at the end,

3  Your Honor.

4          THE COURT: I won't forget you, Mr. Krakauer.

5          MR. KRAKAUER (TELEPHONIC): Thank you.

6          THE COURT: Alright.  I hear no additional response.

7  Mr. Krakauer?

8          MR. KRAKAUER (TELEPHONIC): Yes.  Your Honor, first,

9  in terms of the voting deadline, we would be okay with a

10  voting deadline that says that the 6th is the date that you

11  have to submit your ballots, which according to Mr. Johnston

12  would allow another 2 or 3 days, and then we would provide

13  that the ballots actually have to received by the 13th, and I

14  think that does give another couple of days in the process.

15          THE COURT: Well, when you say "submit" what

16  precisely do you mean?  Postmarks?

17          MR. KRAKAUER (TELEPHONIC): That people have to

18  postmark for mailing by the 6th, and then we have to actually

19  receive it by the 13th.

20          THE COURT: Okay.

21          MR. KRAKAUER (TELEPHONIC): I think that would work

22  in terms of somebody knowing that they could hold onto their

23  ballot through the 6th, review the examiner report for this

24  whole 11 or 12 days, and then they'd just have to postmark

25  their ballot by the 6th.   Then they should all be in by the

1    13th, and then we'd just extend the date for effect to

2    tabulate a week.  I think that would be fine with us, gives a

3    couple more days, which is what I think Your Honor was trying

4    to do.

5         THE COURT: Alright.  Does anyone have a comment

6    limited to the specific suggestion made by the debtor here?

7         MR. GOLDEN (TELEPHONIC): Your Honor, it's Danny

8    Golden from Akin, Gump on behalf of Center Bridge.  Obviously

9    we just heard the suggestion, and we want to give people as

10   much time as they can between the filing of the examiner's

11   report and the voting deadline.  The problem with the

12   proposed extension is that I'm concerned that we are now

13   going to plunge these cases into a much more chaotic state.

14   You've already heard, I guess by reference, that the credit

15   agreement lenders may or may not, I would suggest may, but

16   may or may not be filing a competing plan on the moment of

17   the termination or the end of the current exclusivity period.

18   There may be other plans that will have to be filed in

19   respect of that and people won't know when or if they should

20   be filing competing plans because they want to see the

21   outcome of the result of the vote on this plan.  Given Mr.

22   Krakauer's suggestion to in effect extend the voting deadline

23   so that the votes are cast, postmarked, although most votes

24   aren't really postmarked because they're done through DPC.

25   People are not going to know for several more days what the

1   results of the vote are.  All of this potential chaos could

2   be avoided, I suggest to the Court, if the parties on this

3   call would agree to a relatively short standstill so that no

4   competing plans are filed until such time as the votes are

5   officially announced because if this plan is accepted, I

6   believe, can't confirm this, can't say it definitively, but I

7   believe that if this plan is accepted by the requisite

8   majority the likelihood of the filing of competing plans

9   becomes much more remote.  So I think we can solve all of

10  this and save probably a few hundred thousand trees if we get

11  the parties to agree to a stand-down or a standstill until

12  the announcement of the voting deadline so that nobody will

13  feel compelled in order to protect their particular interests

14  to rush in and file a competing plan.

15          THE COURT: Well, I think -

16          MR. KRAKAUER (TELEPHONIC): Your Honor, for the

17  debtors' standpoint, we would also endorse Mr. Golden's

18  suggestion.

19          THE COURT: Well, it's a wonderful suggestion that I

20  think would contribute to the efficient administration of

21  this phase of the Chapter 11, but there's at least one party

22  or group of parties that apparently, at least until the phone

23  call today, has refused to agree to that, and without a

24  motion or agreement in front of me, I can't order it, and I'm

25  unfortunately in that position.  I don't know how else to

1   address that comment.  It's a good suggestion, but one that

2   apparently at least one important constituent does not wish

3   to accept.  So, the consequence of that, of course, is that

4   the voting period will remain shorter than it would like,

5   but, you know, everyone here is well represented and

6   represents sophisticated parties and they make these

7   decisions understanding what the consequences are likely to

8   be.

9           MR. JOHNSTON (TELEPHONIC):   Your Honor, this is

10  Jim Johnston.  May I be heard on that point?

11          THE COURT: Briefly, yes.

12          MR. JOHNSTON (TELEPHONIC):   No one has asked us to

13  refrain from filing for a week voluntarily in exchange for

14  what I think the proposal would be a longer solicitation

15  period.  I heard Mr. LeMay say for the first time, I didn't

16  think it was fair to necessarily put my clients in that

17  choice and I certainly wasn't going to volunteer it, but if

18  Your Honor is posing the choice between having a voting

19  deadline whether it's postmarked or receipt of August 6th or

20  having a voting deadline of August 13 on the condition that

21  we agree not to file a plan, I'd ask you to give me the

22  chance to ask my clients about that and get back to the

23  debtors later today.  I understand the concerns, and I think

24  that that very well may be something that my clients would

25  want to do.

1    THE COURT: Well, let me say this: I will be

2  attending a funeral tomorrow, so will not be in the office.

3  I'd like to resolve this today one way or the other.  What I

4  would be willing to do is to adjourn this telephone hearing

5  to sometime later this afternoon.  Now, I have a telephone

6  conference scheduled for 5 o'clock today.  I'd like to

7  resolve this before then.  So, I would be willing to set you

8  for, you know, say, 3 o'clock in the afternoon, if you think

9  that gives you enough time.

10    MR. JOHNSTON (TELEPHONIC):   I have a commitment,

11  Your Honor, from 1 until 3 East Coast Time.  If we could do

12  it at 3:30, that would work for my schedule, and I will get

13  ahold of as many people as I can on my end.

14    MR. LeMAY (TELEPHONIC): Your Honor, David LeMay

15  again.  It occurs to me though that in order for this to work

16  it would not be just Mr. Johnston's client that we'd need to

17  know from but, you know, there are at least two other

18  constituencies who are vigorously opposing the plan, and I

19  gather, although I've not heard from them directly, that one

20  or more of them may have a plan up its own sleeve and so I

21  think in order to achieve the kind of stand-down that you're

22  talking about, we would need to put that question to, in

23  effect, everyone who is vigorously litigating against the

24  plan, unless I'm mistaken.  Thank you.

25    MR. JOHNSTON (TELEPHONIC):   Your Honor, I think we

1   need to step back a minute.  If he's referring to Wilmington

2   Trust, the phone's counsel, they're already deemed to reject

3   this plan.  So, there's no issue of a vote here, and I

4   thought the issue was confusion of creditors who are actually

5   voting on the plan.

6            MR. STARK (TELEPHONIC): Your Honor, it's Robert

7   Stark.  Maybe I can obviate the issue very quickly, if Your

8   Honor will hear me now?

9            THE COURT: Briefly.

10            MR. STARK (TELEPHONIC): I have no intention of

11   filing a plan.  So if a standstill is voluntarily needed by

12   me to give Mr. LeMay and others comfort, we'll agree to the

13   standstill.

14            THE COURT: Thank you, Mr. Stark.

15            MR. MOSKOWITZ (TELEPHONIC): Your Honor, Elliot

16   Moskowitz of Davis, Polk.  There's also the matter of the

17   bridge agent as well who may file a competing plan.

18            MR. GREISSMAN (TELEPHONIC): This is Scott Greissman

19   from White & Case representing the bridge agent.  We've

20   agreed to a consensual resolution with the debtors on this

21   issue, and whatever agreement the parties reach, we don't

22   intend to upset.  So, we won't be filing a competing plan in

23   the 7-day grace period that everyone seems to be considering.

24            THE COURT: Okay.  So - Well, let me ask this: Have

25   we reached agreement or do parties still need time to consult

1    others and if so, what time this afternoon can we put on for

2    an adjourned call?

3            MR. JOHNSTON (TELEPHONIC):    Your Honor, Jim

4    Johnston again.  I definitely need to consult with my clients

5    about what I understand the choice to be here.   So, I would

6    like to reconvene this afternoon.  If 3:30 is convenient for

7    the Court, that would work on my end.

8            THE COURT: Alright, 3:30 is fine.  Anyone else have

9    an issue with that time?

10           MR. KLEE (TELEPHONIC): Your Honor, this is Ken

11   Klee, the Examiner.  This is not my issue and I have an

12   examination that's starting at 3:30 in New York that I

13   believe I need to be at, it's under oath.  So, I'm willing to

14   abide by whatever the Court orders on this, whether my

15   extension goes to the 26th or the 27th.  I'd prefer the 27th,

16   but I can live with the 26th if I have to.

17           THE COURT: Okay.  Then you're excused from the next

18   call, Mr. Klee, thank you.  Anyone else have any issues with

19   the timing?

20           MR. MOSKOWITZ (TELEPHONIC): Your Honor, Elliot

21   Moskowitz for JPMorgan.  I just ask for a clarification if

22   we're to be entirely clear about what we are going back to

23   and then resolving at 3:30.   The idea, Your Honor, if I may

24   clarify, the idea is that the ballots will have to be

25   postmarked by August 6th or the voting deadline will actually

1    be extended until August 13th?  I think there may not be

2    crystal clarification as to what the proposal is on the

3    table, and whatever that proposal is, I understand it to be

4    joined with the standstill that everyone now is going back to

5    confirm or at least the credit agreement lenders are going to

6    confirm, is acceptable to all their individual members.

7         UNIDENTIFIED SPEAKER (TELEPHONIC): The request is

8    that the voting deadline be moved to August 13 on the

9    condition that my clients not file a plan before that time,

10   as I understand it.

11        MR. KRAKAUER (TELEPHONIC): I think we want to put

12   in the order that no plan could be filed prior to the 13th,

13   prior to or on the 13th.

14        MR. MOSKOWITZ (TELEPHONIC): I guess no plan - Your

15   Honor, this is Elliot Moskowitz.  No plan - and I guess my

16   lingering concern is that while the parties who have been

17   most vociferous about their intent to file a plan are all

18   represented on this call, there could very well be other

19   parties out there among the creditors who could themselves

20   file a plan and the resolution that we're solving for on this

21   conference call or at the 3:30 p.m. conference call, even if

22   Mr. Johnston's client agrees, won't necessarily resolve that

23   issue.  There's still going to be right of somebody out there

24   filing a competing plan and plunging us into the chaos that

25   we've been expressing concerns about the entire time.

1          THE COURT: Well, that may be -

2          MR. MOSKOWITZ (TELEPHONIC): This whole mechanic is

3     absolutely necessary or if the proposal that was discussed at

4     the beginning of the conference call may still make more

5     sense upon reflection.

6          THE COURT: Well, let's do this: The answer is, that

7     problem is still out there, I think, but as I understand the

8     existing dynamics among the parties, those about whom the

9     debtor is most concerned, it sounds to me, have either signed

10    on or are willing to consult their clients in that respect.

11    To the extent the parties have other issues or want to have

12    further discussions, I would prefer they do that outside of

13    my presence.  We'll reconvene at a later time this afternoon.

14    To the extent agreement has not been reached among what the

15    group views as the necessary parties, I'll make a decision on

16    the motion before me and we'll go from there.

17         MR. PERNICK (TELEPHONIC): Your Honor, this is Norm

18    Pernick with a logistical issue, and I don't know if the

19    CourtCall operator's on.  Would it be possible to just use

20    the same dial-in information from CourtCall to make it easy

21    on everybody?

22         THE COURT: Let me ask.  Is the CourtCall operator

23    on the phone?

24         COURTCALL: I am here, Your Honor, and yes, it would

25    be fine to use the same.

1          MR. PERNICK (TELEPHONIC): Great, thank you.

2          THE COURT: Okay, and parties can sign up until the

3     time of hearing.

4          MR. KLEE (TELEPHONIC): Your Honor, this is Ken

5     Klee.  I have a related issue.  The Court has set a status

6     conference for July 14th on the issue of confidential

7     documents referenced in the examiner report.  Since the

8     examiner report will now not be filed until July 26th or 27th,

9     depending on what the Court's order is, can we set a status

10    conference continuance 2 days after the filing of the

11    examiner report?

12         THE COURT: No, because I will not be here.

13         MR. KLEE (TELEPHONIC): Okay.

14         THE COURT: Here's a thought that I do have though.

15    The next omnibus hearing - I'm sorry, it's not an omnibus

16    hearing.  The next hearing, it's set on the debtors' 2010 MIP

17    plan is scheduled for August 9th.  I don't think I scheduled

18    anything else for that day, but let me check that.

19         MR. PERNICK (TELEPHONIC): Right now what we have,

20    Your Honor, starts at 1 and we have 3 to 4 hours reserved.

21         THE COURT: Yeah.  I mean, I would be willing to add

22    that, Mr. Klee to that day and time.

23         MR. KLEE (TELEPHONIC): Thank you, Your Honor.

24         THE COURT: Okay.  Anything further before we

25    adjourn for now?

1          MR. SIEGEL (TELEPHONIC): Your Honor, this is Martin

2     Siegel from Brown, Rudnick for Wilmington Trust.  We

3     currently still have a status conference scheduled for the

4     14th, and I don't know whether you want to discuss that,

5     keeping that date at least if there are any discovery or

6     other issues at this time or at the 3:30 conference call, but

7     we think the 14th should still be a status conference if there

8     are any disputes that the parties cannot resolve by

9     themselves.  We're hopeful of resolving all disputes, but

10    discovery is ongoing and in any large case like this, there

11    are always lingering issues attempting to get schedules,

12    particular with the Examiner still conducting examinations,

13    and we think it would be helpful to keep the 14th as a status

14    conference and that in fact may help the parties resolve any

15    lingering discovery issues.  I just wanted to make sure that

16    the request about the 14th doesn't include any open discovery

17    issues.

18          THE COURT: Mr. Klee?

19          MR. KLEE (TELEPHONIC): That's fine with me.

20          THE COURT: Alright.  That's okay with me too.  Any

21    other questions?

22          MR. McMAHON (TELEPHONIC): Your Honor, if I may jump

23    in.  Excuse me, Joseph McMahon for the United States Trustee.

24    I have a question related to the differential scheduling

25    versus the filing of the report versus the status conference.

1   Clearly the parties have been discussing an extended voting

2   period with an eye towards insuring that there's, I guess,

3   equal time for exposure of a publicly filed complete report.

4   To the extent that a sizeable portion or the entire report

5   was going to be filed under seal because of issues relating

6   to confidentiality and the like, I gather that now those

7   issues will be considered on the date scheduled for the MIP

8   hearing; is that correct?

9          THE COURT: Well, let's look at - The answer is, it

10  seems to me that that's the earliest time on our present

11  schedule that they should be considered, but I want to say

12  this, I would not expect that the entire report would be

13  filed under seal.  I would expect that the largest portion of

14  it and certainly enough to be meaningful would be immediately

15  publicly available, and regardless of where in the report -

16  it sometimes comes at the end, maybe usually, there's going

17  to be a place at which Mr. Klee says, Here are the claims

18  that may exist and against whom.  I would expect that that

19  would immediately be publicly available.  So, it seems to me,

20  Mr. McMahon, that if there are other issues to be determined

21  with respect to confidentiality, they would not and should

22  not include what I've just outlined, but if Mr. -

23         MR. McMAHON (TELEPHONIC): Your Honor, I appreciate

24  that clarification.

25         THE COURT: Okay.  And, Mr. Klee, if you take issue

1    with that, tell me now.

2           MR. KLEE (TELEPHONIC): I don't, Your Honor.  What

3    we'll have to do as we move toward the filing of the report

4    is to have an executive summary session and the fact session

5    that can be filed without having to file it under seal.  The

6    problem in the case, as I addressed before, is the large,

7    broad confidentiality order that has designated many

8    documents as confidential.  The parties have in good faith

9    limited the number of confidential documents, and we'll do

10   our best to live with that limited designation until we have

11   the hearing on the 9th.

12          THE COURT: Very well.  Alright, we will adjourn

13   until 3:30 this afternoon, Eastern Time.  The Court is now in

14   recess.

15          ALL (TELEPHONIC): Thank you, Your Honor.

16          (Whereupon at 10:36 a.m., a recess was taken in the

17   hearing in this matter.)

18          (Whereupon at 3:33 p.m., the hearing in this matter

19   reconvened and the following proceedings were had:)

20          THE CLERK: All rise.

21          THE COURT: Good afternoon.  This is Judge Carey.

22   We're back on the record again in the Tribune Company,

23   Chapter 11, proceeding to address at this point scheduling.

24   Let me ask debtors' counsel to report on where the parties

25   stand.

1          MR. KRAKAUER (TELEPHONIC): Your Honor, Bryan

2    Krakauer on behalf of the Tribune debtors.  First, with

3    regard to the suggestion that I made with regard to sending

4    in the ballots on the 6th rather than having to worry about

5    what Mr. Johnston said about having to send them in 2 days

6    prior.  We did confirm with Epiq, and we could live with

7    something that basically said something like the following:

8    The voting deadline is extended to August 6th at 4 p.m.

9    provided that any properly executed and completed ballot or

10   master ballot is placed in overnight mail on the 6th and

11   actually received by the voting agent no later than the 9th,

12   which is the following Monday at 4 p.m., would also be

13   counted, and I think that will at least make sure that if

14   somebody wanted to wait until the 6th in reviewing the report,

15   they could still send it in by overnight mail and it would be

16   okay.  So, I wanted to report on that first.  And then

17   second, one of my partners did talk to Mr. Johnston, he'll

18   speak for himself, obviously, but he indicated that he would

19   - that Oak Tree would be willing to bind themselves but that

20   it would take him another day to confer with the rest of his

21   clients and to see whether they would similarly bind

22   themselves.  I talked also to Mr. Greissman who is counsel

23   for the bridge, and he indicated that he only could bind the

24   bridge agent, would not have an opportunity to talk to all

25   the bridge holders at this time individually.  Our view, the

1    debtors' view is just - at this point it is too unwieldy and

2    too much uncertainty with regard to who else might file a

3    plan or whether a plan would be filed, and we do believe it

4    would create an enormous amount of confusion and be

5    inappropriate in terms of having a plan filed right before

6    the voting deadline.  So, we would ask the Court to go with

7    the 6th rather than the 13th with the proviso for people to

8    have the ability to put the ballot in overnight mail on the

9    6th if they wish.

10          THE COURT: Alright.  Does anyone else wish to be

11   heard briefly other than to repeat any argument that has been

12   made during the earlier phone call today?

13          MR. JOHNSTON (TELEPHONIC): Your Honor, Jim Johnston

14   of Hennigan, Bennett & Dorman on behalf of the credit

15   agreement lenders.  I would.  I have to say I'm completely

16   flabbergasted by this turn of events.  I spoke to the debtors

17   - well, first, I spoke to the largest of my clients which is

18   Oak Tree.  Oak Tree is the one that was designated as a

19   negotiating party, has access to all the confidential

20   information and the like, and I did get the commitment that

21   they would refrain from filing a plan through August 13th if

22   the voting deadline was extended until August 13th.  I told

23   them that my 16 remaining clients, I was virtually certain

24   that I could get that commitment, and I could get it by

25   tomorrow morning by sending out an email after this hearing,

1   and that should have addressed the concerns that you heard

2   this morning that there would be confusion and chaos because

3   of a filing by my clients of a plan during the voting period.

4   Suddenly we hear that that's not good enough and they're

5   concerned about the bridge facility, which is a class to

6   receive a distribution of less than 1 percent on their claims

7   and is guaranteed to reject the plan.  I think that that

8   shows the concerns you heard this morning about confusion and

9   chaos just don't ring true and what's going on here for

10  whatever reason is that the settlement supporters want to do

11  everything they can to insure that the examiner's report has

12  the most minimal impact possible.  They don't want credit

13  agreement lenders, the class that's voting on this plan and

14  that will have the most impact on the vote, to hear what the

15  Examiner has to say.  I think for all the reasons discussed

16  this morning, it's perfectly appropriate to set the plan

17  voting deadline at August 13th.  An August 6th deadline

18  enforcing people to put their ballots by FedEx on August 6th

19  is simply not meaningful.  The creditors will not have the

20  ability to read and understand the examiner's report and it's

21  not appropriate.

22          THE COURT: Does anyone else wish to be heard?

23          MR. MOSKOWITZ (TELEPHONIC): Yes, Your Honor.

24  Elliot Moskowitz of Davis, Polk represent JPMorgan.  Can I

25  just be heard for about 1 minute?

1          THE COURT: Go ahead.

2          MR. MOSKOWITZ (TELEPHONIC): I just want – I'm sorry

3    that Mr. Johnston is flabbergasted, but I would remind

4    everyone that, of course, on the call this morning, we

5    certainly did talk about the concern that we're not only

6    concerned about his clients filing an alternative plan, but

7    of course anybody could file an alternative plan, and now we

8    also know that the bridge agent can only bind the agent and

9    is not even going to speak to the various holders.  So

10   there's a risk there as well, and even for purposes of this

11   call, Mr. Johnston can't even deliver anyone beyond Oak Tree.

12   I think we have a solution that works.  We have a solution

13   that makes sense, and it's also a solution that speaks

14   directly to the concern that Mr. Johnston referred to on the

15   call this morning when he pointed out to the Court that

16   parties really wouldn't have until August 6th.  They would

17   have only until a couple of days before because things had to

18   be received by August 6th.  That concern has now been totally

19   resolved, and so, for those reasons, Your Honor, and for all

20   the reasons that were discussed this morning, I think the

21   debtors' proposal, which I think is supported by everyone and

22   addresses the concerns that were raised earlier, should be

23   adopted.

24          THE COURT: Well, there's a lot I'd like to say, but

25   I'm not going to at this point.  I will, however, ask that

1    the debtor provide to me one form of order that grants the

2    Examiner's motion to extend the deadline from July 12th, 2010

3    to July 26th, 2010 at 11:59 p.m., Eastern Time, and to provide

4    in the same form of order what the debtor provided in its

5    proposed order attached to its reply but with one change, and

6    that is extending the voting deadline to August 6, 2010 and

7    requiring only that ballots be postmarked by that day and

8    time.  Are there any questions?

9         MR. KRAKAUER (TELEPHONIC): Your Honor, could I just

10   suggest one point on that?

11        THE COURT: Only if it's a question.

12        MR. KRAKAUER (TELEPHONIC): Okay.  Would there be a

13   date that the ballots actually have to be received by Epiq

14   because they were insistent that that would have be worked in

15   order for them to be an appropriate certification?

16        THE COURT: I'm not going to require that, given the

17   time frame within which creditors have to vote, that they

18   have to send overnight mail, and Epiq and everyone else will

19   just have to deal with the consequences of it.  The parties

20   have put the Court in an uncomfortable situation and that's

21   how I intend and will address it.  Now, if you get a form of

22   order to me today, within the next hour, it will be acted on

23   and docketed by the end of the day.  Otherwise, I won't see

24   it till Monday.  I leave the choice to you.  Are there any

25   other questions?

1          MR. BARASH (TELEPHONIC): Yes, Your Honor, I have a

2     question.  This is Martin Barash, Klee, Tuchin, Bogdanoff &

3     Stern, for the Examiner.  We had attached to the motion a

4     very simple form of order.  I understand the Court would like

5     one form of order.  I would kindly request that any form of

6     order relating to the relief requested by the Examiner, which

7     should be very simple, be copied on my office so that we can

8     quickly look at it and sign off.

9          THE COURT: It's going to say the same thing that

10    your form of order says with respect to that language with

11    respect to your motion except for the change in the date and

12    time.  I prefer to get an order entered today, and I will

13    review myself whether the order that's presented has been

14    faithfully memorialized.

15         MR. BARASH (TELEPHONIC): Thank you, Your Honor.

16         THE COURT: Are there any other questions?  Alright,

17    thank you.  That concludes this hearing.  Court will stand

18    adjourned.

19         (Whereupon at 3:44 p.m., the hearing in this matter

20    was concluded for this date.)

           I, Elaine M. Ryan, approved transcriber for the
United States Courts, certify that the foregoing is a correct
transcript from the electronic sound recording of the
proceedings in the above-entitled matter.

/s/ Elaine M. Ryan_____July 2, 2010
Elaine M. Ryan
2801 Faulkland Road
Wilmington, DE 19808
(302) 683-0221