# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

*In re:*             :   Chapter 11

TRIBUNE COMPANY, *et al.*,[1]    :   Case Number 08-13141 (KJC)
                                    (Jointly Administered)
           Debtors.    :

                                   :

## REPORT OF KENNETH N. KLEE, AS EXAMINER

### (VOLUME ONE)

### (SUMMARY OF PRINCIPAL CONCLUSIONS, OVERVIEW AND CONDUCT OF THE EXAMINATION, AND FACTUAL BACKGROUND)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8655); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago National League Ball Club n/k/a Tribune CNLBC, LLC (0347); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo., Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH, Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Brook Productions, Inc. (2598); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, Inc. (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA  90067
Telephone:                      (310) 407-4000
Facsimile:                      (310) 407-9090

Lee R. Bogdanoff
Martin R. Barash
David A. Fidler
Ronn S. Davids
Jennifer L. Dinkelman

*Counsel to Examiner*

LECG, LLC
201 South Main, Suite 450
Salt Lake City, UT  84111
Telephone:                      (801) 364-6233
Facsimile:                      (801) 364-6230

F. Wayne Elggren

*Financial Advisor to Examiner*

SAUL EWING LLP
2222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899
Telephone:                      (302) 421-6800
Facsimile:                      (302) 421-6813

Mark Minuti
Charles O. Monk, II
Nicholas J. Nastasi
Cathleen M. Devlin

*Delaware Counsel to Examiner*

**<u>TABLE OF CONTENTS</u>**

I. SUMMARY OF PRINCIPAL FINDINGS ............................................................... 1

    A.    Appointment of the Examiner and the Questions Presented in the
        Investigation.................................................................................................. 1

    B.    Organization of the Report............................................................................ 3

    C.    Summary of Principal Conclusions. .............................................................. 5

        1.    Question One. ................................................................................... 7

                a.    Alleged Wrongful Acts—Intentional Fraudulent Transfers,
                      Equitable Subordination, and Assorted Common Law
                      Claims and Defenses.......................................................... 7

                b.    Constructive Fraudulent Transfer Claims and Defenses. ............. 16

                c.    Potential Preference Claims and Defenses. .................................. 22

                 d.    Issues Relating to Remedies Resulting From Avoidance
                      Actions. ............................................................................ 23

        2.    Question Two..................................................................................... 25

        3.    Question Three................................................................................... 27

II. CONDUCT OF THE EXAMINATION ............................................................... 28

    A.    Meet and Confer Process and Establishment of the Examiner Work Plan........... 28

    B.    The Investigation. ........................................................................................ 30

    C.    The Standard Adopted in the Report. ............................................................ 39

    D.    Issues Pertaining to Confidentiality. ............................................................. 40

III. STATEMENT OF BASIC FACTS, TRANSACTIONS, AND AGREEMENTS. ............... 43

    A.    The Tribune Entities and Their Businesses. .................................................. 43

        1.    Corporate History and Organization.................................................. 43

        2.    Tribune's Operations. ........................................................................ 44

a.    Publishing Segment. ................................................................... 44

b.    Broadcasting Segment. ................................................................ 44

c.    Additional Investments. .............................................................. 45

3.    Tribune's Directors, Management, and Advisors...................................... 46

a.    Board of Directors of Tribune....................................................... 46

b.    Management of Tribune................................................................ 47

c.    Boards of Directors of the Guarantor Subsidiaries. ...................... 49

d.    Management of the Guarantor Subsidiaries................................... 49

e.    Financial Advisors. ..................................................................... 49

    (1)    MLPFS. .......................................................................... 49

    (2)    Morgan Stanley................................................................ 52

    (3)    CGMI. ............................................................................ 54

4.    Holdings of Directors, Executive Officers, and Major
Stockholders.............................................................................................. 56

B.    Tribune's Principal Funded Indebtedness Before the Leveraged ESOP
Transactions: Senior Notes, PHONES Notes, and the 2006 Bank Debt. ............ 57

1.    Senior Notes............................................................................................... 58

a.    1992 Indenture. ............................................................................ 58

b.    1995 Indenture. ............................................................................ 59

c.    1996 Indenture. ............................................................................ 60

d.    1997 Indenture. ............................................................................ 61

e.    Principal Amounts Owing on Senior Notes................................... 62

2.    PHONES Notes.......................................................................................... 63

3.    The 2006 Bank Debt. ................................................................................. 65

a.    Background to the 2006 Leveraged Recapitalization. ................... 65

b.    2006 Credit Agreement................................................................. 68

|   |   | c. | 2006 Bridge Credit Agreement. | 71 |

C.    Significant Events Leading Up to the Step One Transactions. ............ 73

     1.    Tribune Entities' Financial Performance Leading Up to April 1, 2007 and the Step One Financing Closing Date. ................... 73

         a.    Financial Performance from 2004 through 2006. ......... 73

         b.    Financial Performance in Late 2006 and Tribune's Development of the 2007 Operational Plan. ................ 78

         c.    Financial Performance in Early 2007. ......... 86

         d.    Financial Performance in April and May 2007 .......... 92

         e.    Revision of Tribune's Projections. ............... 95

     2.    Analyst Reports  Before Announcement of the Step One Transactions. ...................... 97

D.    The Step One Transactions. ................. 100

     1.    Tribune Board Deliberations. ................ 101

         a.    Creation of the Special Committee. .......... 101

         b.    The Broad/Yucaipa Proposal. .................. 105

         c.    The Carlyle Proposal. ................ 107

         d.    The Chandler Trusts Proposal. .................. 108

         e.    Continuation of the Sale Process. ............... 111

         f.    Special Committee Activities and Response to the EGI Proposal. ................ 113

         g.    Tribune Board Approval. ........... 133

     2.    Approval by Subsidiary Boards. .............. 136

     3.    Merger Agreement. ................ 138

         a.    Reasonable Best Efforts. ............ 139

         b.    Closing Conditions. .................. 139

         c.    Termination Rights. ................ 141

d.    Termination Fees. ...................................................................... 142

4.    EGI-TRB Purchase Agreement .......................................................... 143

    a.    Reasonable Best Efforts. ............................................................ 143

    b.    Closing Conditions. ................................................................... 144

    c.    Termination Rights. .................................................................. 145

    d.    Termination Fees. ...................................................................... 146

    e.    The Exchangeable EGI-TRB Note, the Initial EGI-TRB Note, and the Warrant. .................................................. 148

        (1)    Exchangeable EGI-TRB Note. ....................................... 148

        (2)    EGI-TRB Notes. ........................................................... 150

        (3)    Warrant. ......................................................................... 152

    f.    EGI-TRB Purchase Agreement First Closing. ........................... 152

5.    ESOP Transactions. ............................................................................ 153

    a.    ESOP Purchase Agreement. ........................................................ 153

    b.    ESOP Loan. ................................................................................ 153

    c.    Duff & Phelps Fairness Opinion. ................................................ 154

    d.    Closing of ESOP Transactions. ................................................... 156

6.    Investor Rights Agreement. ................................................................ 156

7.    Voting Agreement. .............................................................................. 157

8.    Registration Rights Agreements. ........................................................ 158

9.    The Step One and Step Two Commitment Letters. ............................ 159

    a.    The Step One Commitment Letter. .............................................. 159

    b.    The Step Two Commitment Letter. ............................................. 162

    c.    "Market Flex" Provisions of Step Two Financing. ..................... 165

10.    The Step One Financing. .................................................................... 167

    a.    Syndication of the Step One Financing. ..................................... 167

|  | b. | Terms of the Step One Financing. | 171 |
|  | c. | Solvency. | 179 |
|  | d. | The Credit Agreement Subsidiary Guarantee. | 182 |
|  | e. | The Stock Pledge and Priority of the Credit Agreement Debt. | 185 |
| 11. | Terms of the Incremental Credit Agreement Facility. |  | 186 |
| 12. | FinanceCo/Holdco Transactions. |  | 187 |
| 13. | LATI Intercompany Debt Repayment Transactions. |  | 191 |
| 14. | Tender Offer. |  | 194 |
|  | a. | Terms. | 194 |
|  | b. | Closing Conditions. | 195 |
|  | c. | *Garamella* Litigation. | 195 |
| 15. | Pre-Closing of the Step One Financing and Tender Offer. |  | 196 |
|  | a. | Rating Agency Ratings. | 196 |
|  | b. | Analyst Reports. | 203 |
| 16. | Closing of the Step One Financing and Expiration and Funding of the Tender Offer. |  | 205 |
| E. | Knowledge and Actions of Key Participants in the Step One Transactions. |  | 210 |
| 1. | Management's Knowledge of the Tribune Entities' Financial Performance Through the Step One Financing Closing Date. |  | 210 |
| 2. | Knowledge of the Tribune Board and the Special Committee of the Tribune Entities' Financial Performance Through the Step One Financing Closing Date. |  | 216 |
|  | a. | The Tribune Board. | 216 |
|  | b. | The Special Committee. | 220 |
| 3. | Knowledge and Actions of Participants in the Step One Solvency Opinion and the Examiner's Evaluation of the Step One Solvency Opinion. |  | 221 |

a.      Parties Approached for the Step One Solvency Opinion............. 221

b.      VRC at Step One....................................................................... 225

      (1)      The Engagement of VRC................................................. 225

            (i)      Modification of the Definition of Fair Value...... 225

            (ii)     Assessment of Management's Projections and Information.................................................. 226

      (2)      Management's Interactions with VRC. ........................... 232

      (3)      VRC's Analysis Prior to Issuance of the Step One Opinion. ......................................................................... 233

c.      VRC's Step One Opinion. .......................................................... 236

      (1)      Approaches to Valuing Tribune's Operating Assets. ...... 239

            (i)      Comparable Companies. ..................................... 239

            (ii)     Comparable Transactions.................................... 240

            (iii)    Discounted Cash Flow. ...................................... 241

            (iv)    Sum-of-the-Parts. ............................................... 242

      (2)      Approach to Valuing Tribune's Equity Investments....... 243

      (3)      Approach to Valuing PHONES Notes Tax Savings....... 244

      (4)      The Examiner's Assessment of the Reasonableness of VRC's Valuation Conclusions. ................................... 245

      (5)      The Examiner's Assessment of the Reasonableness of VRC's Cash Flow Tests. ............................................ 254

      (6)      VRC's May 24, 2007 Solvency Update. ........................ 256

4.      Knowledge and Actions of the Lead Banks and Financial Advisors in Connection with the Step One Transactions....................................... 258

a.      JPM Entities................................................................................ 258

      (1)      Activities. ....................................................................... 259

      (2)      Due Diligence and Evaluations Performed.................... 265

b.     Merrill Entities. ........................................................................ 268

       (1)     Activities. ....................................................................... 272

       (2)     Due Diligence and Evaluations Performed. .................... 290

c.     Citigroup Entities. ..................................................................... 291

       (1)     Activities. ....................................................................... 297

       (2)     Due Diligence Performed. ............................................. 313

d.     BofA. .......................................................................................... 314

       (1)     Activities. ....................................................................... 315

       (2)     Due Diligence and Evaluations Performed. .................... 323

e.     Morgan Stanley. ........................................................................ 326

       (1)     The Special Committee's Engagement of Morgan Stanley and the Related Fee Agreement. ........................ 327

       (2)     Morgan Stanley's Initial Advisory and Due Diligence Activities. ...................................................... 330

       (3)     Morgan Stanley's Views on the Third-Party Bids and the Self-Help Alternatives. ...................................... 334

             (i)     Morgan Stanley's Evaluation of Self-Help Alternatives. ....................................................... 336

             (ii)     Morgan Stanley's Evaluation of the Third-Party Bids and Focus on the Chandler Trusts Proposal. ................................................... 339

       (4)     Morgan Stanley's Participation in the Selection of the EGI Proposal and Implementation of the Step One Transactions. ........................................................ 344

       (5)     Morgan Stanley's Desire to Participate as a Lender in the Step One Financing. ............................................. 359

5.     Knowledge and Actions of the Large Stockholders in Connection with the Step One Transactions. ............................................................. 366

a.     The Large Stockholders. ............................................................ 366

       (1)     The Chandler Trusts. ..................................................... 366

(2)  The McCormick Foundation............................................ 367

b.  The Activities of the Large Stockholders Before, During,
and After The Step One Transactions........................................ 367

(1)  The Auction Process. .................................................... 367

6.  Knowledge and Actions of the Zell Group In Connection With the
Step One Transactions. ................................................................ 381

a.  The Circumstances Giving Rise to the Initial EGI Proposal
in February 2007. ...................................................................... 382

b.  Internal EGI Communications throughout the Process. ............. 387

(1)  EGI's Due Diligence. .................................................... 387

(2)  Revisions to the EGI Proposal. ...................................... 389

(3)  EGI's Involvement In Negotiations Regarding the
Step One Financing....................................................... 395

c.  Tribune's Selection of the EGI Proposal.................................... 397

d.  The Extent, if any, to which Tribune Director and Officer
Transaction-Based Compensation Played a role in the
Selection of the EGI Proposal.................................................... 397

e.  The Zell Group's Activities Leading Up to the Closing of
the Step One Transactions. ........................................................ 399

F.  Significant Events Leading Up to the Step Two Transactions. .......................... 401

1.  Pre-Step Two Transactions Market Background..................................... 401

a.  Analyst Reports.......................................................................... 401

b.  SEC Filings. ............................................................................... 407

2.  The Tribune Entities' Financial Performance Following the Step
One Financing Closing Date and Before the Step Two Financing
Closing Date................................................................................................ 408

a.  2007 Quarterly Performance Versus Prior Years. ...................... 409

b.  2007 Monthly Performance Versus The February 2007
Tribune Board-Approved Plan.................................................... 414

c.  The October 2007 Revised Plan. ................................................ 419

d.      Observations Regarding Market Awareness and Reactions. ...... 419

3.      Disposition of Chandler Trusts Stock and Resignation of Tribune Board Members Affiliated with the Chandler Trusts. ........................... 421

4.      Asset Dispositions and Application of Proceeds. ................................... 423

5.      Stockholder Approval. .......................................................................... 424

6.      Step Two Due Diligence/Revisions to Long Term Financial Assumptions.......................................................................................... 425

7.      Third-Party Approvals. ......................................................................... 427

      a.      FCC. ........................................................................................ 427

      b.      Major League Baseball. ......................................................... 427

8.      Management Incentive and Severance Plans......................................... 427

      a.      Transitional Compensation Plan. ................................................. 427

      b.      Proposal of the Management Equity Incentive Plan.................. 430

      c.      Board of Directors/Compensation Committee Approvals of Bonus and Incentive Awards and Management Equity Incentive Plan.............................................................................. 431

      d.      Terms of 2007 Management Equity Incentive Plan. ................. 433

      e.      Recipients................................................................................ 435

G.      The Step Two Transactions. .......................................................................... 438

1.      Tribune Board Deliberations................................................................. 439

2.      Subsidiary Boards Approval. ................................................................ 442

3.      The Step Two Financing. ...................................................................... 443

      a.      Syndication of the Step Two Financing...................................... 443

      b.      Terms of the Bridge Facility. ...................................................... 445

      c.      Solvency................................................................................... 450

      d.      The Subordinated Bridge Subsidiary Guarantee........................ 452

e.     The Credit Agreement Subrogation Subordination Agreement. ................................................................ 456

f.     The Bridge Subrogation Subordination Agreement. ................. 457

g.     Priority of Bridge Credit Agreement. ......................................... 457

4.     Closing of the Step Two Transactions. .................................................. 458

a.     Merger Agreement. ..................................................................... 458

b.     Second Closing under the EGI-TRB Purchase Agreement. ....... 459

c.     Advance under the Incremental Credit Agreement Facility. ...... 459

d.     Funds Flow ................................................................................. 460

e.     Payments to Tribune Advisors. ................................................... 462

f.     Rating Agency Ratings Leading Up to the Closing of the Step Two Transactions. ............................................................. 462

H.     Knowledge and Actions of Key Participants in the Step Two Transactions. ..... 465

1.     Management's Knowledge of the Tribune Entities' Financial Performance Through the Step Two Financing Closing Date. ............... 465

a.     Tribune Entities' Actual Performance Against Plan. ................. 466

b.     Management's Revised October 2007 Projections. ..................... 466

c.     Management Awareness of Market Conditions. .......................... 470

2.     Knowledge of the Tribune Board and the Special Committee of the Tribune Entities' Financial Performance Between Step One and Step Two. .............................................................................................. 471

3.     Knowledge and Actions of Participants in Step Two Solvency Opinion and Examiner's Evaluation of Step Two Solvency Opinion. ................................................................................................ 487

a.     VRC's Analysis Prior to the Issuance of the Step Two Solvency Opinion and VRC's Interactions with Management. ............................................................................... 487

b.     VRC's December 4, 2007 Solvency Presentation. ..................... 492

(1)     Approaches to Valuing Tribune's Operating Assets. ...... 496

|  |  | (i) | Comparable Companies. | 496 |

(i) Comparable Companies. .......................................... 496

(ii) Comparable Transactions. .................................... 498

(iii) Discounted Cash Flow. ....................................... 499

(iv) Sum-of-the-Parts. ............................................... 500

(2) Approach to Valuing Tribune's Equity Investments. ....... 501

(3) Approach to Valuing S-Corporation/ESOP Tax Savings. .......................................................... 503

c. Questions from the Lead Banks Regarding VRC's Preliminary Solvency Analyses and VRC's Responses. ............. 503

d. VRC's December 18, 2007 Solvency Presentation. ................... 506

e. VRC's Step Two Solvency Opinion. ........................................... 509

f. The Examiner's Assessment of VRC's Step Two Solvency Opinion. ....................................................................... 512

(1) VRC's Reliance on Management's October 2007 Projections was Unreasonable. ........................................ 514

(2) VRC Unreasonably Ignored its Own Internal Critiques of the October 2007 Projections. .................... 530

(3) VRC's Step Two Solvency Analysis Contained Several Other Significant Errors. .................................... 544

(4) Public Market Data Readily Available to VRC did not Support VRC's Solvency Conclusions at Step Two. ............................................................................. 552

g. The VRC Refinancing Representation Letter. ........................... 558

(1) VRC's November 30, 2007 Cash Flow Analysis. ........... 560

(2) Events of December 1, 2007. ......................................... 561

(3) Tribune Management's December 2, 2007 Telephone Call with Morgan Stanley. ........................... 564

(4) Tribune Management's December 2, 2007 Telephone Call with VRC. ............................................. 568

(5) December 2, 2007 E-Mail Exchange Between Mr. Bigelow and Mr. Whayne, and Morgan Stanley's Precedent Transactions. ................................... 573

(6) December 2, 2007 Draft VRC Refinancing Representation Letter. .................................... 576

(7) Tribune Management's December 3, 2007 Mark-Up of the Draft VRC Refinancing Representation Letter. ........................................................... 579

(8) VRC's December 3, 2007 Cash Flow Analysis. ............ 580

(9) Cash Flow Projections in VRC's December 4, 2007 Tribune Board Presentation. ........................... 581

(10) Lead Bank Questions Concerning Refinancing. ............. 583

(11) VRC's December 18, 2007 Tribune Board Presentation. .................................................. 587

(12) Tribune Management's December 20, 2007 VRC Refinancing Representation Letter. ............................... 588

(13) VRC's December 20, 2007 Solvency Opinion. .............. 589

(14) The Examiner's Assessment of Tribune Management's VRC Refinancing Representation and VRC's Reliance on Tribune Management's Representation. ................................................. 590

4. Knowledge and Actions of the Lead Banks and Financial Advisors in Connection with the Step Two Transactions. ..................................... 593

a. Backdrop: The Deteriorating Economics of the Tribune Transaction and the Lead Banks' Contractual Commitments. .................................................. 593

(1) Contractual "Market Flex" and Consensual Modifications to the Step Two Financing. ..................... 597

(2) Centrality of the Solvency Closing Condition at Step Two. .................................................. 601

b. Lead Banks at Step Two. ......................................... 605

(1) Joint Due Diligence. ....................................... 606

(2) JPM's Due Diligence. ...................................... 621

|  |  | (3) | Merrill's Due Diligence...................................................... | 626 |

(4)      Citigroup's Due Diligence................................................ 630

(5)      BofA's Due Diligence. .................................................... 633

c.      Financial Advisors at Step Two.................................................. 634

(1)      Tribune's Financial Advisors:  MLPFS and CGMI. ....... 634

(2)      The Special Committee's Financial Advisor:
Morgan Stanley. .............................................................. 638

(i)      Interactions with Management............................ 639

(ii)      Interactions with the Special Committee. ........... 643

5.      Knowledge and Actions of the Large Stockholders in Connection
with the Step Two Transactions.............................................................. 650

a.      The Company Meeting. ............................................................. 651

b.      The Merger Approval Process. .................................................. 651

c.      The Merger Closing. ................................................................. 653

6.      Knowledge and Actions of the Zell Group in Connection with the
Step Two Transactions.......................................................................... 653

a.      Internal Zell Group Communications Regarding the
Closing of the Step Two Transactions and Solvency Issues....... 654

b.      The Extent of the Zell Group's Communications with
Tribune Management Before the Closing of the Step Two
Transactions. .......................................................................... 659

(1)      Communications Between EGI and Tribune
Regarding Financial Information and Projections
Before the Closing of the Step Two Transactions. ......... 660

(2)      EGI's Attempts To Participate In Strategic
Decision-Making Before the Closing of the Step
Two Transactions....................................................... 664

c.      EGI's Contact with the Financial Advisors and the Lead
Banks in Connection with the Step Two Financing.................... 667

I.      Events Leading Up to the Bankruptcy Filings.................................................... 670

    1.      Tribune Board Deliberations...................................................... 670

    2.      Chapter 11 Filing. ................................................................... 671

Table 1      —      Boards of Directors of the Guarantor Subsidiaries

Table 2      —      Officers of the Guarantor Subsidiaries

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.),*
    327 B.R. 537 (D. Del. 2005), *aff'd*, 278 F. App'x 125 (3d Cir. 2008) ......................... 10

*United States v. Tabor Court Realty Corp.,*
    803 F.2d 1288 (3d Cir. 1986) ....................................................... 13

*The T.J. Hooper,*
    60 F.2d 737 (2d Cir. 1932) ......................................................... 38

*Max v. Republican Comm.,*
    587 F.3d 198 (3d Cir. 2009) ....................................................... 39

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) ............................................................ 39


FEDERAL STATUTES

11 U.S.C. § 362 (2006) ................................................................. 25

11 U.S.C. § 548(c) (2006) ......................................................... 24, 25

11 U.S.C. § 546(e) (2006) ......................................................... 20, 21


STATE STATUTES

35 Ill. Comp. Stat 5/203(e)(2)(E) (2010) ............................................ 192


FEDERAL REGULATIONS

26 C.F.R. § 1.1361-4(a)(2) .......................................................... 194

26 C.F.R. § 1.332-2(b) ............................................................. 194

**OTHER SECONDARY MATERIALS**

STEPHEN LABATON, *The Reckoning: Agency's '04 Rule Let Banks Pile up New Debt*, N.Y. TIMES, October 8, 2008, http://www.nytimes.com/2008/10/03/business/-03sec.htmlpagewanted=all; JOINT CENTER FOR HOUSING STUDIES OF HARVARD UNIVERSITY, THE STATE OF THE NATION'S HOUSING 2008 (2008); Ben S. Bernanke, Chairman, Fed. Reserve, Speech at the Fed. Reserve Bank of Chicago's 43rd Annual Conference on Bank Structure & Competition, (May 17, 2007)............. 38

SHANNON P. PRATT, ROBERT F. REILLY, AND ROBERT P. SCHWEIHS, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (4th ed. 2000)...................... 547

# I.

## SUMMARY OF PRINCIPAL FINDINGS[2]

### A.    Appointment of the Examiner and the Questions Presented in the Investigation.

On December 8, 2008, the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On December 10, 2008, the Bankruptcy Court entered an order providing for the joint administration of the Chapter 11 Cases.

On January 13, 2010, Wilmington Trust filed its *Motion for Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code* [Docket No. 3062].  On April 20, 2010, the Bankruptcy Court entered the Examiner Order, directing the United States Trustee to appoint an examiner in the Chapter 11 Cases pursuant to Bankruptcy Code § 1104(c)(1).

On April 30, 2010, the United States Trustee filed her *Notice of Appointment of Examiner* [Docket No. 4212] appointing Kenneth N. Klee, Esq. as the Examiner, subject to Bankruptcy Court approval.  Contemporaneously therewith, the United States Trustee filed the *Application of the United States Trustee for Order Approving Appointment of Examiner* [Docket No. 4213].

On May 7, 2010, the Examiner filed the Examiner Work Plan in connection with this matter [Docket No. 4261].

On May 11, 2010, the Bankruptcy Court entered the Examiner Approval Order [Docket No. 4320], approving the appointment of Professor Klee as the Examiner.  The Bankruptcy Court also entered the Supplemental Order [Docket No. 4312], approving the Examiner Work Plan and modifying the Examiner Order.

---

[2]    Unless otherwise indicated, the capitalized terms used in the Report are intended to have the meanings set forth in Volume Four of the Report, which comprises the Glossary of Defined Terms.

On May 19, 2010, the Bankruptcy Court entered orders granting the Examiner's applications to employ Klee, Tuchin, Bogdanoff & Stern LLP and Saul Ewing LLP as his counsel and LECG, LLC as his financial advisor *nunc pro tunc* to April 30, 2010 [Docket Nos. 4498, 4499, 4500].[3]  The Bankruptcy Court also entered an order, on May 20, 2010, authorizing the Examiner to issue subpoenas for oral examinations and production of documents [Docket No. 4523].

Pursuant to the Examiner Order, as modified by the Supplemental Order, the Examiner was directed to conduct the Investigation, responding to each of the following Questions:[4]

> Question One:  evaluate the potential claims and causes of action held by the Debtors' estates that are asserted by the Parties, in connection with the leveraged buy-out of Tribune that occurred in 2007 (the "LBO") which may be asserted against any entity which may bear liability, including, without limitation, the Debtors, the Debtors' former and/or present management, including former/present members of Tribune's Board, the Debtors' lenders and the Debtors' advisors, said potential claims and causes of action including, but not limited to, claims for fraudulent conveyance (including both avoidance of liability and disgorgement of payments), breach of fiduciary duty, aiding and abetting the same, and equitable subordination and the potential defenses asserted by the Parties to such potential claims and causes of action.

> Question Two:  evaluate whether Wilmington Trust Company violated the automatic stay under 11 U.S.C. § 362 by its filing, on March 3, 2010, of its Complaint for Equitable Subordination and Disallowance of Claims, Damages and Constructive Trust.

> Question Three:  evaluate the assertions and defenses made by certain of the Parties in connection with the Motion of JPMorgan Chase Bank, N.A., for Sanctions Against Wilmington Trust Company for Improper Disclosure of Confidential Information in Violation of Court Order  (D.I. 3714).

---

[3]  The Examiner is grateful to his professional advisors for their tireless efforts in conducting this massive Investigation and helping to craft the Report.

[4]  Ex. 1 at ¶ 2 (Examiner Order).

In addition, the Examiner Order specified that the Examiner would "otherwise perform the duties of an Examiner set forth in 11 U.S.C. § 1106(a)(3) and (4) (as limited by this Order)."[5] The Examiner Order directed the Examiner to prepare and file a report in respect of the Investigation on or before July 12, 2010, unless such time shall be extended by order of the Bankruptcy Court on application by the Examiner and notice to the Parties.

On June 16, 2010, the Examiner filed the *Supplement Re: Examiner's Work and Expense Plan of Court-Appointed Examiner, Kenneth N. Klee, Esq.* [Docket No. 4797], apprising the Bankruptcy Court of the progress of the Investigation and advising the Bankruptcy Court that the scope and breadth of the work required to complete the Investigation was substantially greater than anticipated when the Examiner's Work Plan was filed, prior to the commencement of the Investigation.

On June 23, 2010, the Examiner filed the *Motion of Court-Appointed Examiner, Kenneth N. Klee, Esq. for Extension of Report Deadline* [Docket No. 4858]. Pursuant to a duly-entered order shortening time, the Bankruptcy Court held a telephonic hearing on the motion on July 1, 2010. By order of the Bankruptcy Court entered on July 1, 2010, the Bankruptcy Court extended the deadline for the Examiner to file the Report through and including July 26, 2010 at 11:59 p.m. prevailing Eastern time [Docket No. 4928].

### B.      Organization of the Report.

The Report comprises four Volumes (including annexes and tables) and an Appendix. Volume One comprises Sections I, II and III. Section I of the Report summarizes the Examiner's principal findings. Section II discusses the manner in which the Investigation was conducted. Section III contains the Statement of Facts.

---

[5]      *Id.*

Although the Statement of Facts generally is organized chronologically, the Leveraged ESOP Transactions involved activities by dozens of participants who often were engaged in activities simultaneously that touched different aspects of the transactions. The Statement of Facts contains specific sections focusing on the activities of the key players in the Leveraged ESOP Transactions at different times. By necessity, some of these discussions span a multi-month period, followed by a discussion covering the same time period but focusing on a different participant in the transactions. Thus, although the Statement of Facts generally progresses chronologically from the period preceding Step One to the Step Two Financing Closing Date in December 2007, certain sections of the Statement of Facts cover overlapping time periods. Although, as noted, the Statement of Facts contains a narrative discussion of the relevant participants, events, and documents, it also specifically addresses, and sets forth the Examiner's findings regarding, a host of e-mails and documents cited by the Parties in support of their respective contentions.

Volume Two comprises Section IV. Section IV contains the Examiner's analyses and conclusions concerning the issues raised in Question One. The Examiner has organized this portion of the Report (as well as Volume Three) to enable the reader to obtain, in a relatively quick fashion, the Examiner's "bottom line" regarding the issues presented. To accomplish this objective, the Report sets forth the Examiner's conclusions regarding the principal issues addressed in each subsection at the outset of that subsection, followed immediately by the Examiner's factual and legal analysis. Although Section IV contains citations to relevant documents and facts adduced in the Statement of Facts, these citations are not intended to represent all of the facts and documents supporting the Examiner's legal conclusions. Readers are encouraged to review the legal issues addressed in Section IV in tandem with the

corresponding factual discussion set forth in Section III. Volume Two is accompanied by Annex A (DCF Valuation Analysis), Annex B (Recovery Scenarios), and Annex C (Tribune Payments to LBO Lenders).

Volume Three comprises Sections V and VI. Section V contains the Examiner's analysis and conclusions regarding Question Two. Section VI contains the Examiner's analysis and conclusions regarding Question Three.

Volume Four contains all of the defined terms that are used in the Report.

Finally, the Appendix to the Report (which will be filed subsequent to the Report itself following leave of the Bankruptcy Court) will contain the exhibits cited in the Report.

**C.     Summary of Principal Conclusions.**

The four Volumes comprising the Report contain dozens of discrete factual and legal findings. Summarizing each and every one of them here would take many pages and would not read very much like a summary. Some of the issues discussed in the Report, moreover, are difficult, nuanced, and not conducive to summary treatment. Nevertheless, the Examiner recognizes that not everyone has the time or the inclination to read the entire Report. The summary below, therefore, is intended to serve as a brief overview of the Examiner's principal conclusions and give readers the big picture. Even with that limited purpose, regrettably, the summary below is lengthy. Readers are encouraged to review this Section I with the Glossary of Defined Terms, contained in Volume Four of the Report, which defines the capitalized terms used in the Report. The summary does not, in every instance, correspond to the chronological order of the main volumes.

The Examiner did not reach definitive conclusions regarding certain of the issues considered in the Report, because, as noted, certain issues presented are difficult and nuanced. As a result, by necessity, the Examiner established a full range of potential conclusions from

highly likely to highly unlikely, with steps in between. Specifically, the Examiner determined to frame his conclusions in the Report in a uniform fashion utilizing the following continuum: (1) highly likely, (2) reasonably likely, (3) somewhat likely, (4) equipoise, (5) somewhat unlikely, (6) reasonably unlikely, and (7) highly unlikely. This summary uses these terms, as does the rest of the Report, in reference to the Examiner's conclusions.

The Examiner emphasizes that the conclusions summarized below (indeed, all of the conclusions reached in the Report) are based on the evidence adduced in the Investigation through July 25, 2010. As summarized in the next section of the Report, the Examiner and his team worked nearly around the clock from the time of his appointment to the issuance of the Report to understand and, ultimately, evaluate what happened in the Leveraged ESOP Transactions. Although the Examiner and his advisors considered and developed a massive amount of information, by Bankruptcy Court order the Examiner had an extremely limited period of time to conduct the Investigation. Had the Examiner had more time, he would have interviewed (and probably re-interviewed) several more witnesses and certainly would have conducted further discovery. When appropriate, the Report notes specific areas meriting further investigation.

Finally, as discussed in the next section of the Report, as a result of what the Examiner believes are largely unjustified assertions of confidentiality by certain Parties, the Examiner was left with no choice but to redact from the version of the Report filed with the Bankruptcy Court essentially everything but this summary, the portions of Volume Two containing discussions of legal principles, Volume Three (discussing Questions Two and Three), and the Glossary of Defined Terms contained in Volume Four. During the Investigation, the Examiner repeatedly encouraged the Parties and other entities that previously produced documents and furnished

information on a confidential basis to refrain from needlessly continuing to assert confidentiality, which in turn could unjustifiably shield highly relevant information from the public. Despite repeated efforts, certain Parties persisted in asserting confidentiality. The Examiner has taken these assertions up with the Bankruptcy Court and is hopeful that the vast majority, if not the entirety, of the Report (and exhibits) will be made available to the public. The Examiner notes that certain Parties (including the Debtors, who facilitated the Investigation and were responsive to the Examiner's many requests for documents and information) acted responsibly in their assertions of confidentiality.

### 1. Question One.

Question One encompasses a host of bankruptcy and nonbankruptcy claims, causes of action, and defenses asserted by the Parties with respect to the Leveraged ESOP Transactions.

### a. Alleged Wrongful Acts—Intentional Fraudulent Transfers, Equitable Subordination, and Assorted Common Law Claims and Defenses.

Turning first to the cluster of bankruptcy and nonbankruptcy claims, causes of action, and defenses raised by the Parties involving the broad category of alleged wrongful acts by various persons and entities in connection with the Leveraged ESOP Transactions, the Examiner finds that a court is reasonably likely to conclude that the Step One Transactions did not constitute an intentional fraudulent transfer. Application of the traditional "badges of fraud" to the record adduced and the circumstances giving rise to the Step One Transactions weigh against the conclusion that the Step One Transactions were entered into to hinder, delay, or defraud creditors. Although Step One was a highly-leveraged transaction, which, after giving effect to the Step Two Transactions consummated half a year later, turned out very badly for creditors, the Examiner did not find credible evidence that the Tribune Entities entered into the Step One Transactions to hinder, delay, or defraud creditors.

The Examiner reaches a different conclusion regarding the Step Two Transactions and finds that it is somewhat likely that a court would conclude that the Step Two Transactions constituted intentional fraudulent transfers and fraudulently incurred obligations. The Tribune Entities did not incur the approximately $3.6 billion in additional Step Two Debt until Step Two closed on December 20, 2007. It is the incurrence of this indebtedness, the approximately $4 billion in payments made to stockholders, and the substantial amounts in fees paid to the lenders and investment bankers at Step Two,[6] that are the object of the Step Two intentional fraudulent transfer inquiry. Although, as noted, this section of the Report is just a summary, the Examiner believes that it is appropriate to furnish, consistent with the above-noted restrictions imposed by confidentiality, some measure of detail here regarding his findings on this question, as the underlying factual predicates bear on other conclusions reached in the Report.

The story of how Tribune ended up effectuating a transaction that the Examiner believes a court would be somewhat likely to find was an intentional fraudulent transfer has its genesis in what transpired at Step One, and what the participants in the Step One Transactions expected at that time would happen at Step Two. In connection with the Step One Transactions consummated in June 2007, three highly-qualified outside advisors were actively engaged: MLPFS and CGMI on behalf of Tribune, and Morgan Stanley on behalf of the Special Committee (which was formed in the fall of 2006 to oversee Tribune's consideration of a possible strategic transaction). In the period leading up to the closing of Step One, these advisors evaluated management's projections as well as the solvency work performed by the entity retained to issue a solvency opinion required for Step One to close, Valuation Research Corporation (VRC). With the input of the outside advisors, the Tribune Board approved the

_____

[6] As a result of certain Parties' assertions of confidentiality, the Examiner believes that he is not at liberty to disclose the amount of fees paid.

Leveraged ESOP Transactions on April 1, 2007 and the Tribune Entities proceeded with the closing of the Step One Financing on June 4, 2007, having succeeded in obtaining commitments from the Lead Banks to advance the funds necessary to complete the Leveraged ESOP Transactions.

The record shows that, at the time of Step One, the Tribune Board, the Special Committee, and the Financial Advisors all were aware that the Tribune Entities would be incurring substantial additional indebtedness if Step Two closed. The underlying transaction documents, therefore, conditioned Tribune's effectuation of the Merger that would complete the Leveraged ESOP Transactions at Step Two, and the incurrence of the Step Two Debt necessary to complete those transactions, on Tribune's solvency (as specially defined in certain of these documents) after giving effect to the Step Two Transactions, and, specifically, on Tribune obtaining a third-party solvency opinion and furnishing to the LBO Lenders solvency certificates and representations concerning solvency. In other words—and this is critical for purposes of analyzing the intentional fraudulent transfer issues at Step Two—by design, a direct causal nexus existed between, on the one hand, the obligations incurred and transfers made at Step Two and, on the other hand, the procurement and issuance of the solvency opinion and solvency certificates and the making of solvency representations. The former could not occur without the latter.

As summarized below, the Examiner concludes that it is highly likely that Tribune, and reasonably likely that the Guarantor Subsidiaries, were rendered insolvent and without adequate capital as a result of the closing of the Step Two Transactions. Thus, unfortunately, what was supposed to never happen ended up happening. Although insolvency and gross disparity in the value given and received are most commonly associated with constructive fraudulent transfer

analysis, they also are "badges of fraud" for purposes of intentional fraudulent transfer analysis. But, standing alone, they are not sufficient to render a transaction intentionally fraudulent. In the course of the Investigation, the Examiner found that these two factors do not stand alone. In particular, the Examiner focused his Investigation on three instances involving dishonesty by Tribune in the period leading up to, and resulting in, the Step Two Closing. It should be noted that direct evidence that a transferor set about to hinder, delay, or defraud creditors rarely is found, and that is why "courts usually rely on circumstantial evidence, including the circumstances of the transaction, to infer fraudulent intent."[7]

First, the Examiner found evidence indicating that Tribune did not act forthrightly in procuring the solvency opinion issued by VRC at Step Two. Based on the record adduced, the procurement of the solvency opinion was marred by dishonesty and lack of candor about the role played by Morgan Stanley in connection with VRC's solvency opinion and on the question of Tribune's solvency generally. Second, the Examiner found evidence indicating that Tribune's senior financial management failed to apprise the Tribune Board and Special Committee of relevant information underlying management's October 2007 projections on which VRC relied in giving its Step Two solvency opinion. Although the Examiner found no direct evidence that this information was purposely withheld from the Tribune Board or Special Committee in December 2007, the Examiner finds it implausible that the failure to apprise the Tribune Board and Special Committee of this information relating to the Step Two solvency valuation, and to a representation given by Tribune to VRC, was unintentional. Third, the Examiner found evidence that one important component of those projections went beyond the optimism that sometimes characterizes management projections. Although the Examiner found no direct evidence that

---

[7]     *See Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.),* 327 B.R. 537, 550 (D. Del. 2005), *aff'd,* 278 F. App'x 125 (3d Cir. 2008) (citing authorities).

Tribune's management was deceitful in the preparation and issuance of this aspect of the October 2007 forecast, this component of the projections bears the earmarks of a conscious effort to counterbalance the decline in Tribune's 2007 financial performance and other negative trends in Tribune's business, in order to furnish a source of additional value to support a solvency conclusion. The Examiner found that other aspects of management's projections, while aggressive, do not support the conclusion that the senior financial management at Tribune prepared them in bad faith.

Although not fitting neatly into one of the recognized "badges of fraud," the record also shows that fiduciaries charged with the responsibility for overseeing management's actions and determining whether the Step Two Transactions would render Tribune insolvent did not adequately discharge their duties. After Step One closed, Tribune's financial performance deteriorated. This circumstance, combined with the decline in the price of Tribune Common Stock, the amount of indebtedness Tribune would incur if Step Two closed, and broader market indicia, raised red flags signaling Tribune's insolvency if Step Two went forward. Indeed, had anyone performed a relatively simple mathematical calculation before Step Two closed, it would have been readily apparent that VRC's proposed Step Two solvency opinion translated into an implied pre-Step Two mid-point per share value of about $39 per share, well above both the $34 Tender Offer price that had been locked-in during the spring of 2007 (under far superior market conditions) and the trading value of Tribune's stock in the late fall of 2007. VRC's opinion was highly suspect.

In contrast to the active involvement by MLPFS, CGMI, and Morgan Stanley in the period preceding Step One, by the late fall of 2007 MLPFS and CGMI had ceased advising Tribune because of conflicts arising from the lending activities of their respective affiliates,

MLCC and Citicorp. Unlike at Step One, neither of those advisors evaluated for the Tribune Board the reasonableness of management's projections or VRC's work. Although the Special Committee's Financial Advisor, Morgan Stanley, reviewed VRC's presentation materials and made brief oral remarks to the Special Committee which convened on December 18, 2007 to consider VRC's Step Two solvency opinion, no minutes of that Special Committee meeting ever were duly approved and adopted. Testimony provided in the course of the Investigation contradicted what is stated in portions of the draft minutes of that meeting attributed to Morgan Stanley, including that VRC's ultimate solvency opinion was conservative and was something on which directors could reasonably rely. In the course of the Investigation, the Examiner found a pattern beginning in early December 2007 in which Tribune used Morgan Stanley's imprimatur to bolster VRC's solvency opinion and push Step Two over the goal line, without authorization from Morgan Stanley.

The record shows, moreover, that both the Special Committee and the Tribune Board approved VRC's solvency opinion, despite the fact that no third-party advisor ever evaluated the reasonableness of that opinion or the projections on which VRC relied. This is true even though VRC's engagement letter required that VRC use a definition of "fair market value" and "fair saleable value" that was contrary to well-established principles of sound valuation, as discussed extensively in the Report. In effect, VRC was required to add to the value derived from its analysis the value conferred on the Tribune Entities from the S-Corporation/ESOP structure as a result of the Merger, even though inclusion of this value in the determination of "fair market value" and "fair saleable value" was improper. Even leaving this flaw aside, the solvency opinion was implausible. Other facts and circumstances, discussed in the Report, strongly

suggest that the Tribune Board and the Special Committee failed appropriately to discharge their responsibilities at Step Two.

Based on the record adduced and applying the "natural consequences" formulation adopted by the Third Circuit Court of Appeals[8] to test whether an intentional fraudulent transfer occurred, the Examiner finds that a court is somewhat likely to conclude that the Tribune Entities incurred the obligations and made the transfers in Step Two with actual intent to hinder, delay, or defraud creditors.  When a debtor resorts to what appears to be dishonesty to close a transaction, when no third-party advisor critically evaluates management's projections or the solvency opinion necessary for that transaction to close, when the transaction under consideration renders the debtor insolvent based on facts and circumstances known or reasonably ascertainable at the time, and when that transaction results in the debtor receiving far less than reasonably equivalent value, the natural consequence is that creditors will be hindered, delayed, or defrauded.

As discussed in the Report, the Examiner considered three principal potential mitigating factors that weigh against a conclusion that the Tribune Entities perpetrated an intentional fraudulent transfer at Step Two.  First, although Tribune charged senior financial management with the responsibility for preparing projections and procuring the VRC solvency opinion and, therefore, any acts by management are ascribed to Tribune as a matter of law, nothing in the record suggests that the Tribune Board or the members of the Special Committee knowingly or intentionally committed any fraud or acts of dishonesty.  Second, by all appearances, through and including the closing of the Step Two Transactions, the Zell Group remained eager to close Step Two.  That the Zell Group still wanted to proceed with the transaction furnished some indicia to the Tribune Board and Special Committee that this significant and highly sophisticated

---

[8]    *United States v. Tabor Court Realty Corp.,* 803 F.2d 1288, 1305 (3d Cir. 1986).

participant in the Leveraged ESOP Transactions had not concluded that Tribune was about to be rendered insolvent if the Merger were consummated. Third, despite posing questions to Tribune and making it known to Tribune that they had retained a third-party solvency expert, the LBO Lenders ultimately funded the Step Two Debt. That the LBO Lenders were prepared to advance another $3.6 billion to the Tribune Entities (albeit heavily influenced by their preexisting contractual obligations made at Step One) supplied additional indicia that yet another sophisticated party was unwilling to stand in the way of the Step Two Closing.

The honesty of Tribune's outside directors, however, does not erase what appears to be the dishonesty found in the course of the Investigation. Likewise, the Zell Group's eagerness to take control of Tribune and willingness to invest approximately $56 million on a net basis at Step Two (representing about 1.5% of the aggregate debt and equity funded to make Step Two happen), and the unwillingness of the LBO Lenders to force a showdown with Tribune over funding Step Two, do not excuse Tribune's directors from failing to perform their responsibilities and do not erase the other evidence supporting the conclusion that an intentional fraudulent transfer occurred at Step Two. In sum, the Examiner does not believe that a court will likely find that the mitigating factors outweigh the contrary evidence. Nevertheless, in light of the mitigating factors, the Examiner concludes that it is only somewhat likely that a court would find an intentional fraudulent transfer occurred at Step Two.

Continuing the broad category of alleged wrongful acts by various persons and entities, with respect to claims for breach of fiduciary duty, the Examiner concludes that although, for the reasons summarized above, Tribune's directors did not exercise reasonable care in evaluating whether the solvency condition to the Step Two Closing was satisfied, Delaware law governing breach of fiduciary duty probably would not support imposition of liability against them. The

Examiner reaches this conclusion in view of the exculpatory provisions contained in Tribune's corporate charter and the relatively low threshold required under Delaware law to satisfy the requirement of good faith. As a result, although the Examiner acknowledges that the question is relatively close, based on the record adduced, the Examiner concludes it is somewhat unlikely that a court would impose liability against them. The Examiner, however, finds it reasonably likely that a court would conclude that one or more of Tribune's officers breached their fiduciary duties in connection with the Step Two Transactions. The Examiner did not find any credible evidence to support the conclusion that various third parties (the Large Stockholders, the Lead Banks, the Financial Advisors, and the Zell Group) aided and abetted any breach of fiduciary duty in connection with the Leveraged ESOP Transactions (although the Examiner leaves in equipoise the question whether VRC aided and abetted a breach of fiduciary duty or committed professional malpractice).

Based on the Investigation conducted to date, the Examiner finds that it is somewhat unlikely that a court would equitably subordinate or equitably disallow all or any portion of the LBO Lender Debt. Although the Examiner did find evidence suggesting that the Lead Banks suspected, and some may have even believed, that the Step Two Transactions would render Tribune insolvent or close to insolvent, the record adduced does not support a finding that the Lead Banks engaged in the type of egregious behavior required to support imposition of these remedies. The Examiner finds that the actions of the Lead Banks in the fall of 2007 largely were driven by the contractual obligations they made in the spring of 2007 at Step One. These contractual predicates help explain the actions of the Lead Banks between the closing of Step One and the closing of Step Two, and, the Examiner believes, serve as mitigating factors against the conclusion that equitable subordination or equitable disallowance is warranted. As discussed

in the Report, however, the information adduced in the Investigation regarding certain actions by the Lead Banks in the fall of 2007 suggests that further investigation is warranted, among other things, on the question whether deliberations by the Lead Banks in the months preceding the Step Two Closing are protected from disclosure based on assertions of attorney-client privilege. The Examiner concludes that it is reasonably unlikely a court would conclude that any unjust enrichment claims are meritorious. Finally, the Examiner concludes that a court is reasonably unlikely to find that a claim for illegal corporate distributions pursuant to the relevant provisions of the DGCL could be sustained against Tribune's directors, based on the Step One Transactions, and is somewhat unlikely to find that such a claim could be sustained against Tribune's directors based on the Step Two Transactions.

### b. Constructive Fraudulent Transfer Claims and Defenses.

Turning to the questions presented by the Parties arising under the general topic of constructive fraudulent transfer claims, the Examiner considered two threshold questions under what is colloquially referred to as the "collapse principle." First, the Examiner concludes that it is highly likely that a court would collapse all of the transactions *within* each of Step One and Step Two for purposes of evaluating the equivalence of the consideration given and received by the estates. Second, although the question is relatively close, the Examiner concludes that a court is somewhat unlikely to collapse Step One and Step Two *together* and thereby include the Step Two Debt for purposes of assessing solvency at Step One. On the latter question, applying the standards governing when collapse is warranted, the Examiner cannot reasonably conclude that satisfaction of all of the conditions to the Step Two Closing were a mere formality or that the Step Two Closing was assured from beginning to end. Thus, the Examiner finds that it is somewhat unlikely that a court would collapse Step One and Step Two together for solvency purposes. The Examiner also concludes that the Step Two Debt did not constitute a liability of

the Tribune Entities at Step One. However—and this is an important distinction—the Examiner concludes that in measuring capital adequacy at the time of Step One and in considering whether the Tribune Entities intended to incur debts beyond their ability to repay, a court is highly likely to consider all obligations that were reasonably foreseeable at the time of Step One, including those caused by Step Two, as and when they were scheduled to require payment of interest or principal. Stated succinctly, whereas the Step Two Debt is not added to the balance sheet for Step One solvency purposes, this prospective indebtedness must be taken into account for purposes of measuring the Tribune Entities' capital adequacy and intention to incur debts beyond their reasonable ability to pay. Arguments presented by certain Parties to the contrary are not supported by the law governing the measurement of capital adequacy and the plain language of the Bankruptcy Code governing a debtor's intention to incur debts beyond its reasonable ability to pay.

Turning to questions of solvency and capital adequacy, the Examiner reaches a series of conclusions concerning the effect of the joint and several liability of all of Tribune and the Guarantor Subsidiaries on the LBO Lender Debt and the intercompany claims among the various Tribune Entities, on those questions. In broad outline, the Examiner finds that although a court would consider the solvency of each Tribune Entity separately, a court is reasonably likely, in the first instance, to value those entities collectively for solvency purposes after giving effect to intercompany claims and offsets and in consideration of the Tribune Entities' joint and several liability on the LBO Lender Debt.[9]

Regarding solvency and capital adequacy at Step One, the Examiner concludes that it is highly unlikely that the Tribune Entities were rendered insolvent at Step One if only the Step

---

[9] This area of inquiry is dense and highly technical, and it is unlikely that anyone other than the Parties and their professionals will make their way through those sections of the Report. They were as difficult to write as they undoubtedly will be to read.

One Debt is considered. Among other things, market indicia and the Tribune auction process leading to the Tribune Board's approval of the Leveraged ESOP Transactions on April 1, 2007 support this conclusion. The Examiner further concludes that if, contrary to the conclusion the Examiner reached, a court were to collapse Step One and Step Two together or treat the Step Two Debt as a liability for solvency purposes at Step One, it is somewhat unlikely (although an exceedingly close call) that a court would conclude that the Tribune Entities were rendered insolvent in that scenario. The Examiner further concludes that a court is reasonably unlikely to find that the Step One Transactions left the Tribune Entities without adequate capital, even taking into account the effect of the Step Two Debt contemplated at the time of Step One. One important premise underlying this conclusion is that Tribune management's projections developed in February 2007 (as thereafter revised, and ultimately relied on by VRC in its Step One solvency opinion) should be used for purposes of testing capital adequacy at Step One. For the reasons discussed in the Report, based on what was known and reasonably ascertainable at the time of the Step One Financing Closing Date, the Examiner finds that the variances in Tribune's financial performance through the Step One Financing Closing Date were not sufficient to justify adjusting those projections for purposes of testing capital adequacy. Finally, the Examiner finds that it is reasonably unlikely that a court would conclude that the Tribune Entities entered into the Step One Transactions intending to incur debts beyond their reasonable ability to pay.

Regarding solvency and capital adequacy at Step Two, the Examiner finds that (i) it is highly likely that a court would conclude that Tribune was rendered insolvent and left without adequate capital after giving effect to the Step Two Transactions, and (ii) it is reasonably likely that a court would conclude that the Guarantor Subsidiaries were left without adequate capital

after giving effect to the Step Two Transactions. These are not particularly close questions. The Examiner finds that, applying a subjective test, a court is somewhat likely to find that the Tribune Entities intended to incur or believed they would incur debts beyond their ability to pay as such debts matured. If a court were to apply an objective test on this question, the answer to this question and the question of capital adequacy at Step Two would be the same.

Regarding the question whether the Tribune Entities received reasonably equivalent value in exchange for the obligations incurred and transfers made in the Leveraged ESOP Transactions if the other prerequisites to avoidance are met, as an overall matter the Examiner concludes that the Tribune Entities did not receive reasonably equivalent value in exchange for the obligations incurred on the LBO Lender Debt. The Examiner reached a series of conclusions regarding whether certain of the LBO Lenders conferred direct or indirect value to one or more of the Tribune Entities in connection with the advances made in the Step One Transactions and the Step Two Transactions. With respect to the Parties' contentions concerning value allegedly conferred by the LBO Lenders from specific components of the advances made by those creditors at Step One and Step Two, the Examiner finds that it is highly likely a court would conclude that none of the LBO Lenders conferred reasonably equivalent value on any Tribune Entity (i) for the payments made at Step One and Step Two to Selling Stockholders, (ii) for the satisfaction of the LATI Notes at Step One, and (iii) for Tribune's alleged "private company status" following the Step Two Transactions. The Examiner finds that it is highly likely that a court would find that the lenders under the Credit Agreement conferred reasonably equivalent value on Tribune resulting from the repayment of the 2006 Bank Debt. Finally, the Examiner finds that it is reasonably likely that certain of the LBO Lenders conferred, in varying degrees, reasonably equivalent value on certain of the Tribune Entities resulting from (i) at Step One and Step Two,

obligations incurred to pay portions of the LBO Fees, (ii) at Step One, the provision of the Revolving Credit Facility and the Delayed Draw Facility, and (iii) at Step Two, various tax and annual 401(k) savings. The Examiner concludes that a court is highly likely to find that the Financial Advisors conferred some value on the Tribune Entities on account of their services rendered, but the Examiner is unable to conclude how much value a court would ascribe to those services.

The Examiner concludes that, to the extent obligations incurred in the Leveraged ESOP Transactions lacked reasonably equivalent value, then interest and principal payments made after those transactions but before the Petition Date on account of those obligations likewise were for less than reasonably equivalent value. Based on the applicable case law (which is less than clear), however, the Examiner leaves in equipoise the question whether the Credit Agreement Agent and the Bridge Credit Agreement Agent are the initial transferees of the payments on account of the indebtedness incurred under their respective credit agreements.

Turning to the various defenses asserted by certain Parties, the Examiner finds that a court is highly likely to find that Bankruptcy Code section 546(e)[10] protects payments to the Selling Stockholders on account of their equity interests in Tribune in connection with the Leveraged ESOP Transactions, except to the extent the transfers constitute intentional fraudulent transfers. As a result of the Examiner's findings concerning lack of an intentional fraudulent transfer at Step One, section 546(e) should provide a defense to avoidance or recovery of payments made to the Selling Stockholders in the Step One Transactions. The converse is true with respect to the payments made to those parties (and obligations incurred to the LBO Lenders) in the Step Two Transactions. The Examiner further finds that a court is reasonably

---

[10]    11 U.S.C. § 546(e) (2006).

likely to find that section 546(e) does not protect against avoidance of the obligations incurred on account of the LBO Lender Debt or the Stock Pledge, guarantees, or promissory notes given in connection therewith. For the reasons discussed extensively in the Report, the Examiner disagrees with the contention advanced by certain Parties that this conclusion would render certain amendments to section 546(e) adopted in 2006 superfluous. The Report explains why that contention is flawed.

With respect to the various "good faith" defenses asserted by certain Parties as partial defenses to avoidance, the Examiner finds that a court is highly likely to find that any lack of good faith by the Credit Agreement Agent or the Bridge Credit Agreement Agent at the time the respective obligations under these facilities were incurred will apply to all claims against the Tribune Entities issued under such facilities, whether those claims are in the hands of original holders or their successors. The Examiner finds that a court is highly likely to apply an "objective test" for determining good faith in evaluating defenses to avoidance. Applying this standard and considering the actions of the Parties that asserted this defense, the Examiner finds as follows on the question of good faith regarding specified entities:

(1)     A court is reasonably likely to conclude that JPMCB acted in good faith in connection with the obligations incurred and advances made in the Step One Transactions, but not at Step Two.

(2)     The Examiner finds no basis to vary the conclusions reached above concerning JPMCB's actions as Credit Agreement Agent from the actions of the JPM Entities as recipients of LBO Fees at both steps. As a result, the Examiner finds that it is reasonably likely that the JPM Entities acted in good faith in Step One, but not at Step Two.

(3)     For reasons similar to the Examiner's rationale for his conclusion concerning JPMCB as Credit Agreement Agent, the Examiner finds that it is reasonably likely that a court would conclude that MLCC did not act in good faith as Bridge Credit Agreement Agent in connection with the obligations incurred and advances made in the Step Two Transactions.

(4)     Regarding the LBO Fees paid to the Merrill Entities at Step One, for reasons similar to the Examiner's conclusions concerning the good faith of JPMCB and MLCC as agents at Step One, the Examiner finds that it is reasonably likely that a court would find that the Merrill Entities acted in good faith in their capacity as transferee of LBO Fees at Step One, but not at Step Two.

(5)     Regarding the LBO Fees paid to the Citigroup Entities at Step One, for reasons similar to the Examiner's conclusions generally regarding lender good faith at Step One, the Examiner finds that it is reasonably likely that a court would conclude that the Citigroup Entities acted in good faith in their capacity as transferee of LBO Fees at Step One, but not at Step Two.

(6)     Regarding the LBO Fees paid to the BofA Entities at Step One, for reasons similar to the Examiner's conclusions generally regarding other lender good faith at Step One, the Examiner finds that it is reasonably likely that a court would conclude that the BofA Entities acted in good faith in their capacity as transferee of LBO Fees at Step One, but not at Step Two.

(7)     The Examiner finds that a court is somewhat likely to conclude that both MLPFS and CGMI acted in good faith in connection with the payments made to them for Advisor Fees for financial advisory services in connection with the Leveraged ESOP Transactions, although the question is closer respecting payments made to CGMI shortly after the Step Two Closing.

### c.     Potential Preference Claims and Defenses.

The Examiner finds that it is unclear whether satisfaction of the Exchangeable EGI-TRB Note in connection with the Step Two Transactions constitutes a preferential transfer.  Even if,

however, satisfaction of the Exchangeable EGI-TRB Note qualifies as a preferential transfer, the Examiner finds that it is reasonably likely that a court would find that the transaction is subject to an ordinary course of business defense. It is unclear, however, whether a court would find that the transaction is subject to a new value defense.

The Examiner further finds that to the extent that payments to the LBO Lenders on account of the Credit Agreement Debt and the Bridge Debt qualified as preferential transfers, it is reasonably likely that a court would find that the payments would be subject to an ordinary course of business defense, except to the extent that the underlying Credit Agreement Debt and Bridge Debt are avoided as fraudulent transfers.

The Examiner did not have a sufficient opportunity to evaluate potential preference claims and defenses relating to bonuses, deferred compensation, retention, severance, and change in control payments made to directors and officers of the Tribune Entities, and to payments on intercompany claims, during the one-year period prior to the Petition Date. These issues were only briefly mentioned and insufficiently developed by the Parties, and a thorough analysis would require, in the case of the first category, scrutiny of multiple payments to more than two hundred individuals and, in the case of the second category, many thousands of transactions occurring over a one-year period.

### d. Issues Relating to Remedies Resulting From Avoidance Actions.

The Examiner next considered two issues under the general category of "standing." First, the Examiner concludes that it is highly likely that a court would find that each Guarantor Subsidiary that is a Debtor in the Chapter 11 Cases has standing to seek avoidance of the obligations incurred to the LBO Lenders. Second, the Examiner concludes that a court is reasonably likely to find that *if* the estate representatives for Tribune and the Guarantor

Subsidiaries were to successfully avoid the obligations incurred on account of the LBO Lender Debt, then the value available from avoidance at the Guarantor Subsidiary estates would not be limited solely to the satisfaction of the Non-LBO Debt at the Guarantor Subsidiary levels. Based on the Examiner's conclusions concerning both intentional and constructive fraudulent transfer claims at Step One, however, the Examiner believes that the above finding would not likely affect the outcome in these cases.

The Examiner also made a series of findings concerning the effect of avoidance on certain creditor recoveries.

First, the Examiner concludes that to the extent a transferee of an avoided transfer pays the amount or turns over such property, the transferee will be entitled to assert a claim against the estate to which the funds are paid or returned equal to the non-constructively fraudulent claim. The Examiner finds, however, that to the extent an obligee's claim is avoided, a court is reasonably likely only to permit any participation of such a claim in distributions from the estate to the extent the claim is supported by reasonably equivalent value or if Non-LBO Creditor claims are paid in full with interest. It is reasonably likely that if the Step Two Debt, but not the Step One Debt, is avoided, absent an otherwise applicable basis to subordinate or disallow the Step One Debt or assert rights of unjust enrichment, the Step One Debt would participate in distributions from the estates in accordance with applicable non-bankruptcy priorities, but the Examiner leaves in equipoise the question whether the Step One Debt would participate in avoidance recoveries if the Step Two Transactions are avoided.

Second, the Examiner concludes that to the extent the LBO Lender Debt is not avoided (or if avoided, to the extent enforced under Bankruptcy Code section 548(c)),[11] the LBO Lenders

_____

[11]    11 U.S.C. § 548(c) (2006).

will be entitled to recover value at the Guarantor Subsidiary levels as well as enforce their rights under the PHONES Subordination at the Tribune level with respect to distributions from the Tribune estate. The Examiner, however, concludes that a court is reasonably likely to hold that the PHONES Subordination would not extend to LBO Lender Debt avoided at the Tribune level.

Third, the Examiner concludes that, to the extent the Credit Agreement Debt and Bridge Debt are not avoided (or if avoided, to the extent enforced under Bankruptcy Code section 548(c)) at the Guarantor Subsidiary levels, the subordination provisions of the Subordinated Bridge Subsidiary Guarantee will remain in effect and govern distributions from the Guarantor Subsidiary estates. It is reasonably likely that to the extent those obligations are avoided and are not enforced under section 548(c) at the Guarantor Subsidiary levels and the Stock Pledge is avoided and thereby rendered inoperative, however, such avoidance in turn would invalidate the subordination provisions of the Subordinated Bridge Subsidiary Guarantee, such that any value distributed by Tribune (including amounts available to Tribune as a result of the remittance of value from the Guarantor Subsidiaries to Tribune resulting from avoidance of the LBO Lender Debt) would be ratably distributed between the Credit Agreement Debt and the Bridge Debt. The Examiner finds, however, that in connection with fashioning remedies resulting from avoidance, once all Non-LBO Creditors are paid in full plus post-petition interest, a court is reasonably likely to adjust this result.

### 2. Question Two.

Question Two presents a relatively discrete inquiry regarding whether Wilmington Trust violated the automatic stay imposed under Bankruptcy Code section 362[12] when it filed the Complaint against the Lead Banks and certain other defendants. On this matter, the Examiner

---

[12]   11 U.S.C. § 362 (2006).

concludes that a court is reasonably likely to find that Wilmington Trust did not violate the automatic stay by filing the Complaint.

Although the Complaint includes certain factual allegations that could underlie a fraudulent transfer claim, the Complaint does not actually allege a fraudulent transfer claim as a substantive cause of action, nor does it seek to recover property that may have been fraudulently transferred by the Debtors before the Chapter 11 Cases were commenced. The claims for relief alleged in the Complaint are limited to equitable subordination and disallowance of the defendants' claims, breach of fiduciary duty by the predecessor indenture trustee to the holders of the PHONES Notes and the defendants' aiding and abetting that breach of fiduciary duty, and the imposition of a constructive trust on distributions that would be received by the defendants. The use of factual allegations that may form the basis of an avoidance action does not convert these claims into fraudulent transfer claims.

Even if the claims for relief requesting equitable subordination and disallowance of the defendants' claims could be characterized as fraudulent transfer claims in substance, it is reasonably unlikely that avoidance actions themselves are rightfully considered property of the bankruptcy estate, the assertion of which could potentially violate the automatic stay. Property of the estate includes causes of action that the debtor could have asserted under nonbankruptcy law before the petition date. Before filing for bankruptcy, a debtor has no right under applicable nonbankruptcy law to prosecute an action for the recovery of property it has fraudulently transferred, and all such rights are vested exclusively in creditors. Because a debtor could not pursue a fraudulent transfer claim under applicable nonbankruptcy law before the petition date, a fraudulent transfer claim does not constitute property of the estate, although after a bankruptcy petition is filed the trustee or debtor in possession holds the exclusive right to pursue such claims

as representative of the estate, absent further order of the court. For similar reasons, equitable subordination claims and claim objections are not property of the estate, the assertion of which would violate the automatic stay.

Finally, a court is highly likely to find that the breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and constructive trust claims for relief alleged in the Complaint do not violate the automatic stay. These claims are not property of the estate and do not seek to obtain possession of property of the estate or exert control over any such property. The breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims are premised on unique and specific fiduciary duties allegedly owed by the predecessor indenture trustee to the holders of the PHONES Notes and could not be asserted by the Tribune Entities. The constructive trust remedy also is limited to distributions from the estates that would otherwise be received by the defendants, and does not seek to impose a constructive trust over property that is retained or held by the Tribune Entities.

### 3. Question Three.

Question Three requires the evaluation of assertions and defenses made by certain of the Parties in connection with the motion filed by JPMCB for sanctions against Wilmington Trust for alleged violations of the Depository Order. The Examiner concludes that a court is reasonably likely to find that Wilmington Trust, through its counsel, failed to comply with the requirements of the Depository Order when it publicly filed the defectively redacted version of the Complaint, but that this violation was not intentional or reckless. The Examiner further concludes that a court is reasonably likely to require Wilmington Trust to pay the reasonable attorneys' fees and expenses incurred by JPMCB as a result of the violation of the Depository Order. Finally, the Examiner concludes it is reasonably unlikely that a court would find that Wilmington Trust breached its fiduciary duties as a member of the UCC or violated the UCC's

bylaws. The Examiner notes in this summary and in Volume Three that Wilmington Trust's counsel exhibited candor and contrition in their discussions with the Examiner regarding this matter and cooperated completely, while responding firmly to contentions of the Parties to which they disagreed and advancing the interests of their client in this matter.

## II.

## CONDUCT OF THE EXAMINATION

### A.    Meet and Confer Process and Establishment of the Examiner Work Plan.

Pursuant to the Examiner Order, prior to commencing the Investigation, the Examiner was required to meet and confer with the Parties and, no later than seven days after the filing of the notice of appointment of Examiner, file a work and expenses plan, including a "good faith estimate of the fees and expenses of the Examiner and the Examiner's proposed professionals for conducting the Investigation (the 'Budget')."[13]

Beginning promptly after the Examiner's appointment by the United States Trustee, on April 30, 2010, the Examiner and his proposed counsel held telephonic conferences with counsel to the United States Trustee and the Parties to begin discussing the Investigation and arrange for an in-person meet and confer of the Parties. These telephonic conferences continued throughout the weekend. During this period, the Examiner and his proposed counsel began reviewing various pleadings in these cases relating to the subject matter of the Investigation, as well as pleadings relating to the examinations ordered in other large bankruptcy cases in recent years. The Examiner determined to proceed immediately to convene all of the Parties to meet and confer as rapidly as possible. The Debtors and the other Parties agreed that a prompt meeting was appropriate under the circumstances.

---

[13]    Ex. 1 at ¶ 4 (Examiner Order).

For two full days, beginning on Tuesday, May 4, 2010, the Examiner conducted in-person meetings with the Parties in New York City, to discuss with them his preliminary views—and in turn solicit the Parties' views—regarding the work plan for conducting the Investigation, the manner in which the Parties would cooperate and assist with the Investigation, the Examiner's preliminary cost estimates for the Investigation, the manner in which issues of confidentiality and privilege should be addressed, and the need for certain clarifications or modifications to the Examiner Order. The Examiner also invited the Parties to share their views in writing on the preceding issues, as well as the merits of the factual and legal issues raised by the Investigation. These meetings began with a plenary session of all Parties, during which the Examiner formally discharged his meet and confer obligations under the Examiner Order, followed by a series of meetings between the Examiner and particular Parties (or, in some cases, groups of Parties).

After these consultations and his review of publicly available pleadings, it became readily apparent to the Examiner that the tasks he was assigned were quite substantial, and the timeframe in which he had to perform those tasks was exceedingly limited. The Investigation relates to a series of transactions involving billions of dollars, potential claims against numerous parties, intricate financial analyses and other factual matters as to which the Parties had substantial disagreements, and a lengthy list of wide-ranging legal claims, defenses, and issues under state and federal law. The record adduced as of the time the Investigation commenced included over 3 million pages of documents that were collected in a document "depository," but were not topically indexed.[14] Examinations of this magnitude have taken examiners appointed in other cases many months, if not years, to conduct.

---

[14] The "Document Depository" created by the Parties is not a single, electronic database containing the documents produced to date, but rather a collection of over 150 compact discs containing documents produced by various

Faced with the preceding circumstances, the Examiner crafted an approach to the Investigation that was tailored to the circumstances presented and aimed at maximizing the possibility that the Examiner would timely generate a work product that would aid the Bankruptcy Court. It became clear to the Examiner that the Parties had devoted substantial time, analysis, and research to the financial and legal issues presented by the Investigation. The Examiner determined that the most sensible way to approach the Investigation in the limited time given was to capitalize on the work performed by the Parties, and, at least in the first instance, to look to the Parties in the adversarial process to flesh out the issues and facts in dispute and the relative strengths and weaknesses of the positions of the Parties. These contributions were intended to supplement, rather than replace, the Examiner's independent Investigation. The Examiner prepared and filed the Examiner Work Plan, which set forth this approach. In the Examiner Work Plan, the Examiner readily conceded that he was unaware of any other examination that had proceeded in this fashion, but submitted that his approach was appropriate under the circumstances. The Bankruptcy Court approved the Examiner Work Plan on May 10, 2010 in the Supplemental Order.

### B. The Investigation.

Immediately following the Bankruptcy Court's approval of the Examiner Work Plan, the Examiner dispatched a letter dated May 10, 2010 to the Parties, in which the Examiner established a comprehensive procedure for the Parties to present an agreed-upon (or substantially agreed-upon) statement of basic facts and to furnish comprehensive legal, financial, and factual analyses of the matters that were the subject of the Investigation. [15] The Examiner also set

---

parties in connection with the Chapter 11 Cases, in a variety of electronic formats. Unfortunately, it took the Examiner considerable time and expense to create a useable electronic database compiling these documents.

[15] *See* Ex. 3 (Letter to Parties, dated May 10, 2010).

deadlines concerning the submission of analyses in the form of opening and reply briefs served on all Parties, and the Examiner identified a host of legal and factual issues to which he requested the Parties devote attention.[16] In addition, the Examiner encouraged the Parties to furnish any documents or analyses that might bear meaningfully on the factual or legal subject matter of the Investigation, and to identify the names and contact information of any individuals that the Parties believed the Examiner should interview, and any discovery that they believed the Examiner should conduct in conjunction with the Investigation. The Examiner's advisors often posed follow-up questions and requested and obtained further analyses and documents from the Parties' legal and financial advisors.

The Examiner received, reviewed, and considered hundreds of pages of briefing and tens of thousands of pages of documentation in connection with these submissions (principally, but by no means exclusively, documents identified by the Parties to the Examiner as relevant to the Investigation). In retrospect, the provisions of the Examiner Order limiting the Investigation to contentions "raised by the Parties" encouraged the Parties to raise just about every conceivable claim or defense that could be imagined, lest the Examiner not consider it. The Parties raised dozens of claims and defenses, each with sub-issues and special complexities that required the Examiner's careful evaluation. Moreover, although the Parties took advantage of the opportunity to annotate their submissions with documents allegedly supporting their positions, on close inspection the Examiner determined that many of the documents did not support the contentions for which they were provided; in many instances the Examiner and his advisors had to search for and evaluate other documents to help develop a more complete picture. The interviews

---

[16] After sending the May 10, 2010 letter, the Examiner clarified that all Parties were invited to present briefs.

conducted by the Examiner and his advisors, discussed below, also raised issues that had not been adequately fleshed out by the Parties.

Early on, the Examiner established his own electronic databases of documents and information collected by his advisors. These databases provided the Examiner with the ability to review documents in a more organized fashion. In conjunction with the submissions requested under the above-noted May 10, 2010 letter, the Parties directly submitted evidence that they contend supported their respective positions, which the Parties uploaded to a secure document website established by the Examiner for that purpose. During the Investigation, certain Parties conducted documentary discovery, which was furnished to the Examiner.

The Examiner was surprised to learn at the outset of the investigation that—notwithstanding the extensive legal and factual analyses prepared by the Parties and the wide-ranging and factually-intensive allegations concerning, among other things, intentional fraudulent transfer, bad faith, breach of fiduciary duty, and aiding and abetting fiduciary duty breaches—only seven Rule 2004 examinations relating to the Leveraged ESOP Transactions had been conducted. The Examiner determined that it was necessary to identify and quickly arrange and conduct interviews of key witnesses, not all of whom were physically located in the same city. Because of the short amount of time available to conduct the Investigation, by necessity the Examiner attempted to narrow the list of interviewees to those persons that the Examiner believed could meaningfully clarify or augment the factual record. Had the Examiner had more time to conduct the Investigation, he would have conducted more than the 38 interviews that he held; and it is possible that someone who the Examiner did not interview would have provided pertinent information. Nevertheless, as the process unfolded, and new information was adduced in the interviews and during the Investigation, it became apparent that the Examiner would need

at least another two weeks to complete the interviews necessary to prepare the Report. Thus, the Examiner requested and obtained an extension of time to file the Report. The last interview was conducted telephonically on July 16, 2010.

All told, the Examiner and his advisors conducted 38 interviews over 46 days in four cities. Of these, the Examiner attended 33 in person (of which three were attended by video conference). Of the five interviews not attended by the Examiner (principally because he was conducting another interview at the same time or traveling to attend a scheduled interview), the Examiner believes that he adequately apprised himself of what transpired. Participating in most of the interviews enabled the Examiner to personally evaluate witness demeanor and credibility and actively participate in questioning. All interviewees were represented by counsel. In some instances, the Examiner did not record the interviews and did not request that witnesses take an oath (although witnesses were admonished at the outset, and were asked to and did confirm at the conclusion of the interview, that all answers were furnished with the same care as if the interviewee had been under oath). In other instances, the Examiner determined that it was appropriate to conduct transcribed interviews of certain interviewees under oath. In three instances, the Examiner re-interviewed a witness under oath. In connection with each transcribed interview, each witness was advised that the interview was not a deposition and that all objections to questions were preserved. Unlike a deposition (in which one party typically asks questions at any given time), the Examiner, as well as his counsel, posed questions; sometimes the witness' counsel posed clarifying questions and offered perspectives to the Examiner on the answers given by the witness.

The following are the persons interviewed, the dates of the interviews and the locations:

| Interviewee | Title & Company | Date of Interview | Location of Interview |
|---|---|---|---|
| Bromberg, Kate S. | Current Senior Associate with Brown Rudnick LLP, representing Wilmington Trust | 6/1/2010 | Brown Rudnick LLP<br>Seven Times Square<br>New York, NY 10036 |
| Dolan, William M. | Current Partner with Brown Rudnick LLP, representing Wilmington Trust | 6/2/2010 | Brown Rudnick LLP<br>Seven Times Square<br>New York, NY 10036 |
| Hoover, Jennifer | Current Associate with Benesch Friedlander Coplan & Aronoff LLP, local Delaware counsel to Wilmington Trust | 6/2/2010 | Brown Rudnick LLP<br>Seven Times Square<br>New York, NY 10036 |
| Siegel, Martin | Current Partner with Brown Rudnick LLP, lead litigator representing Wilmington Trust | 6/2/2010 | Brown Rudnick LLP<br>Seven Times Square<br>New York, NY 10036 |
| Stark, Robert J. | Current Partner with Brown Rudnick LLP, representing Wilmington Trust | 6/2/2010 | Brown Rudnick LLP<br>Seven Times Square<br>New York, NY 10036 |
| Sell, Jeffrey A. | Former Head of Special Credits Group in the Credit Risk Department of JPMCB | 6/3/2010 | Davis Polk<br>450 Lexington Avenue<br>New York, NY 10017 |
| Costa, Michael R. | Former Managing Director of Mergers and Acquisitions - part of the investment banking division of MLPFS | 6/4/2010 | Kaye Scholer<br>425 Park Avenue<br>New York, NY 10022 |
| Whayne, Thomas | Current Managing Director at Morgan Stanley | 6/11/2010 | Weil Gotshal & Manges<br>767 Fifth Avenue<br>New York, NY 10153 |
| Zell, Samuel | Current Controlling Shareholder of EGI, LLC/ Director, Chairman of the Tribune Board | 6/14/2010 | Equity Group Investments<br>2 N. Riverside Plaza<br>Chicago, IL 60606 |
| Hianik, Mark | Former Tribune Vice President, Assistant General Counsel and Assistant Secretary | 6/15/2010 | Sidley Austin LLP<br>One South Dearborn<br>Chicago, Illinois 60603 |
| Larsen, Nils | Current Executive Vice President and CIO of Tribune | 6/15/2010 | Sidley Austin LLP<br>One South Dearborn<br>Chicago, Illinois 60603 |

| Interviewee | Title & Company | Date of Interview | Location of Interview |
|---|---|---|---|
| Bartter, Brit | Current Vice Chairman of JPMCB's Investment Banking Group | 6/16/2010 | JPMorgan Chase Chase Tower 10 South Dearborn Street Chicago, IL, 60603 |
| Bigelow, Chandler | Current Tribune CFO/ Former Tribune Treasurer/ VP, Treasurer of one or more Guarantor Subsidiaries | 6/17/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |
| Kazan, Daniel G. | VP of Development prior to the Leveraged ESOP Transactions/Current Sr. VP Corporate Development at Tribune | 6/17/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |
| Williams, David D. | President and CEO of Tribune Media Services, Inc. | 6/18/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |
| Landon, Timothy J. | Former President of Tribune Interactive, Inc. | 6/22/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |
| Mulaney Jr., Charles W. | Current Partners with Skadden Arps, Counsel to the Tribune Special Committee | 6/24/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |
| Osborn, William A. | Chair of the Special Committee of the Tribune | 6/24/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |
| Dimon, Jamie | Current CEO of JPM | 6/25/2010 | JPMorgan Chase 270 Park Avenue New York, NY 10017 |
| FitzSimons, Dennis J. | Former Tribune CEO/ Chairman of the Tribune | 6/25/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |
| Grenesko, Donald C. | Former Sr. VP of Finance & Administration at Tribune | 6/25/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |
| Kapadia, Rajesh | Currently at JPMCB | 6/25/2010 | Davis Polk 450 Lexington Avenue New York, NY 10017 |
| Stinehart, Jr., William | Former Director of Tribune/ Trustee of the Chandler Trusts | 6/28/2010 | Klee, Tuchin, Bogdanoff & Stern LLP 1999 Avenue of the Stars 39th Floor Los Angeles, CA 90067 |

| Interviewee | Title & Company | Date of Interview | Location of Interview |
|---|---|---|---|
| Mohr, Christina | Currently at Citigroup in the M&A Group | 6/29/2010 | Paul, Weiss, Rifkind, Wharton & Garrison LLP 1285 Avenue of the Americas New York, NY 10019 |
| Browning, Bryan | Current Senior Vice President and Professional Services Manager with VRC | 6/30/2010 | Winston & Strawn 200 Park Avenue New York, NY 10166 |
| Rucker III, Mose (Chad) | Current Managing Director with VRC | 6/30/2010 | Winston & Strawn 200 Park Avenue New York, NY 10166 |
| Taubman, Paul | Currently with Morgan Stanley | 7/1/2010 | Morgan Stanley 1585 Broadway New York, NY 10036 |
| Amsden, Harry | Former Vice President of Finance of Tribune Publishing | 7/2/2010 | LECG 33 West Monroe Street Chicago, IL 60603 |
| Whayne, Thomas (Follow-Up Interview) | Current Managing Director at Morgan Stanley | 7/2/2010 | Weil Gotshal & Manges 767 Fifth Avenue New York, NY 10153 |
| Kurmaniak, Rosanne | Current Director of Citigroup/ Former Vice President of Citigroup | 7/7/2010 | Paul, Weiss, Rifkind, Wharton & Garrison LLP 1285 Avenue of the Americas New York, NY 10019 |
| Larsen, Nils (Follow-Up Interview) | Current Executive Vice President and CIO of Tribune | 7/7/2010 | Jenner & Block 353 North Clark Street Chicago, IL 60654 |
| Grenesko, Donald C. (Follow-Up Interview) | Former Senior VP of Finance & Administration at Tribune | 7/8/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |
| Kaplan, Todd | Current Senior Banker with Merrill | 7/8/2010 | Kaye Scholer 70 West Madison Street Suite 4100 Chicago, IL 60602 |
| Kenney, Crane | Former General Counsel of Tribune | 7/8/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |
| Persily, Julie H. | Formerly with the Citigroup Leveraged Finance Department | 7/8/2010 | Paul, Weiss, Rifkind, Wharton & Garrison LLP 1285 Avenue of the Americas New York, NY 10019 |

| Interviewee | Title & Company | Date of Interview | Location of Interview |
|---|---|---|---|
| Petrik, Daniel | Currently with Bank of America | 7/8/2010 | LECG<br>33 West Monroe Street<br>Chicago, IL 60603 |
| Kenny, Thomas J. | Current Senior Vice President of Murray Devine | 7/9/2010 | Saul Ewing<br>1500 Market Street, 38th Fl.<br>Philadelphia, PA 19102 |
| Amsden, Harry<br>(Follow-Up Interview) | Former Vice President of Finance of Tribune Publishing | 7/16/2010 | Telephone Conference |

The Examiner believes that, on balance, the interviews were extraordinarily helpful in assisting the Examiner to understand key facts necessary to render his findings. The Examiner recognizes, however, that formal depositions (and the cross-examination that accompanies an adversarial process) might well produce information different from that which the Examiner was able to adduce in these interviews. Also, the adversarial process allows rebuttal witnesses and documents that may impeach or contradict other testimony or documents. Although the Examiner strongly believes that the information adduced in the Investigation materially advances an understanding of what transpired in the Leveraged ESOP Transactions, neither the Investigation nor the resulting Report are intended to serve as proxies for what an adjudicative process would produce.

The Examiner and his counsel evaluated numerous legal and factual questions in connection with the Investigation. In addition, the Examiner's counsel worked closely with the Examiner's financial advisor, LECG, which developed a reasonably comprehensive financial analysis of the issues presented under the circumstances. Among other things, LECG analyzed issues concerning solvency, unreasonable capital, the flow of funds, and matters pertaining to intercompany claims. To a great extent, LECG utilized and built on analyses prepared by the various financial advisors for the Parties, although, as the Report amply illustrates, LECG

conducted its own independent investigation of the financial matters at issue on behalf of the Examiner.

The Examiner would be remiss if he did not at least take note that in the wake of the financial collapse in the fall of 2008 and the resulting "Great Recession," considerable commentary has suggested that the credit markets generally and underwriting practices in particular in the period preceding these events were widely imprudent and reckless.[17]  The Examiner shares some of the sentiments expressed in this regard.  Although standards of reasonableness and prudence may well transcend the temporary systemic lapses that sometimes characterize standards of care at any particular time,[18] as readers will observe, the Examiner hewed closely in the Report to the applicable legal standards governing the Questions.  As the legal analyses that follow reveal, these standards do not give the Examiner license to evaluate the Leveraged ESOP Transactions with the benefit of hindsight or the wisdom born from the hard lessons of the past few years, nor could the Examiner simply assume that a financial catastrophe of the magnitude our country has experienced since 2008 was reasonably foreseeable even a year before that.  Moreover, the Examiner was not charged with evaluating, and therefore mercifully keeps to himself his own views regarding, whether the Leveraged ESOP Transactions represented a prudent, sound, or socially-useful business transaction.

---

[17]   Stephen Labaton, *The Reckoning: Agency's '04 Rule Let Banks Pile up New Debt*, N.Y. TIMES, October 8, 2008, http://www.nytimes.com/2008/10/03/business/03sec.htmlpagewanted=all; JOINT CENTER FOR HOUSING STUDIES OF HARVARD UNIVERSITY, THE STATE OF THE NATION'S HOUSING 2008 (2008); Ben S. Bernanke, Chairman, Fed. Reserve, Speech at the Fed. Reserve Bank of Chicago's 43rd Annual Conference on Bank Structure & Competition, (May 17, 2007).

[18]   *See generally The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir. 1932) (L. Hand, J.) ("Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices.  It may never set its own tests, however persuasive be its usages.  Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.").

### C.    The Standard Adopted in the Report.

In connection with the Examiner Work Plan, the Examiner proposed, and the Bankruptcy Court in its Supplemental Order agreed, that with respect to Question One, the Examiner should engage in a meaningful process of weighing the relative positions of the Parties, including an analysis of the potential remedies that may be available to the estate(s) if one or more transfers or obligations are avoided, and the effect of such remedies on distributions on account of prepetition claims.[19]  In addition, the Examiner understood that, when possible, he should attempt to draw conclusions with respect to the issues in dispute based on the factual record adduced and applicable law, rather than just determining whether a particular claim, cause of action, or defense could be sustained if the Parties' allegations were ultimately proven with sufficient evidence—akin to the standard governing a motion to dismiss a complaint.[20]  To the best of the Examiner's knowledge, it is unusual for an Examiner to be requested to go beyond opining whether a claim or defense could survive a motion to dismiss.  This required the Examiner to delve deeply into the factual record and conduct as thorough an investigation as time and resources permitted.  As noted in the previous section, the Examiner determined to frame his conclusions in a uniform fashion utilizing the following continuum: (1) highly likely, (2) reasonably likely, (3) somewhat likely, (4) equipoise, (5) somewhat unlikely, (6) reasonably unlikely, and (7) highly unlikely.

As mentioned at the outset of the Report, although the Examiner has endeavored to present meaningful analyses and conclusions using the preceding framework, as previewed in the

---

[19]    By their terms, Questions Two and Three require that the Examiner "evaluate" the matters posed.  In contrast, as originally formulated, Question One reasonably could be read to charge the Examiner simply with determining whether there are or are not potential claims, causes of action, and defenses that *might* be asserted.  *See* Examiner Work Plan at ¶ 21.  The Supplemental Order clarified this ambiguity as discussed above.

[20]    To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Max v. Republican Comm.*, 587 F.3d 198, 200 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)).

Examiner Work Plan, given the short period of time that the Examiner was afforded to complete

the Investigation, the Report identifies certain matters on which a complete investigation and

analysis was not feasible and as to which further investigation may be necessary, if the

Bankruptcy Court so directs.  In all instances, the conclusions contained in the Report are based

on the information reviewed and analyses conducted through July 25, 2010.  Further analyses

and investigation might change the conclusions reached.  When appropriate, the Report identifies

areas that might require additional investigation and analyses.

     **D.**     **Issues Pertaining to Confidentiality.**

     From the very first hours of the meet and confer process, the Examiner learned that

nearly every document produced in the Chapter 11 Cases was marked "confidential" or "highly

confidential" and its contents could not be publicly disclosed.  The "confidential" or "highly

confidential" designations of some documents verged on the absurd, and included, among other

things, underlying credit agreements and even documents filed with the SEC.  Unfortunately, to

the best of the Examiner's knowledge, no Party had challenged the designation of as much as a

single document as "confidential" or "highly confidential."  Moreover, the Examiner Order

expressly provided that the Examiner was subject to any applicable orders of the Bankruptcy

Court governing confidentiality.[21]  On the other hand, it also was clear from the Examiner

Order,[22] and from the record of the Chapter 11 Cases, that the Bankruptcy Court expected the

Report to be publicly filed.

     In an effort to reconcile this apparent conflict, as discussed in the Examiner Work Plan,[23]

the Examiner required that following the formal exchange of briefs and documents described

---

[21]    *See* Ex. 1 at ¶¶ 6 & 11 (Examiner Order).

[22]    *See* Ex. 1 at ¶ 13 (Examiner Order).

[23]    *See* Ex. 2 at ¶¶ 25-26 (Examiner Work Plan).

above, each Party identify to the Examiner those particular documents accompanying the briefs that the Party believed in good faith were entitled to protection from public disclosure under applicable law and that the Examiner should not publicly disclose in the Report. The Examiner made clear to the Parties, repeatedly, that the standard the Parties should apply to determine whether to designate documents for continued nondisclosure should not be whether the disclosure would be embarrassing to a particular Party, or even harmful to its position in existing or potential litigation, but whether there was a *bona fide* legal basis to prevent its public disclosure. The Examiner set June 14, 2010 as the deadline for Parties to identify any specific document that they maintained should be preserved as confidential. After the June 14, 2010 deadline, in a series of communications, the Examiner identified to the Parties, and other entities that had produced documents denominated as confidential, certain documents that were not submitted with the briefs but which the Examiner might determine to quote from or refer to in the Report. The Examiner set deadlines for each Party and other entities to identify which of those accompanying documents the Party believed in good faith were entitled to protection from public disclosure under applicable law and that the Examiner should not publicly disclose in the Report. The process was laborious and taxing, and the wanton practice of designating essentially every piece of paper "confidential" or "highly confidential" is unnecessary, wasteful, and expensive for all clients.

In response to the notifications provided by the Examiner, certain Parties designated certain documents that such Parties maintained should remain confidential. References to those items were so numerous and, in many instances, wide-ranging that, regrettably, the Examiner had no choice but to redact the entire factual narrative in this Volume One and the substantive

analysis contained in Volume Two from the version of the Report filed as matter of public record.  The Examiner has filed a motion with the Bankruptcy Court to address this matter.

# III.

## STATEMENT OF BASIC FACTS, TRANSACTIONS, AND AGREEMENTS

*Section III is redacted in its entirety.*

**Table 1**

**Boards of Directors of the Guarantor Subsidiaries**

*Table 1 is redacted in its entirety.*

TABLE 1—1

**Table 2**

**Officers of the Guarantor Subsidiaries**

*Table 2 is redacted in its entirety.*

TABLE 2—1