UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

*In re:*                                        :    Chapter 11

TRIBUNE COMPANY, *et al.*,[1]                   :    Case Number 08-13141 (KJC)
                                                     (Jointly Administered)
                      Debtors.                  :

                                                :

# REPORT OF KENNETH N. KLEE, AS EXAMINER

## (VOLUME TWO)

## (FINDINGS AND CONCLUSIONS CONCERNING QUESTION ONE)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8655); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago National League Ball Club n/k/a Tribune CNLBC, LLC (0347); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo., Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH, Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxnet Publishing Company (4223); Publishers Forest Brook Productions, Inc. (2598); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, Inc. (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Telephone:              (310) 407-4000
Facsimile:              (310) 407-9090

Lee R. Bogdanoff
Martin R. Barash
David A. Fidler
Ronn S. Davids
Jennifer L. Dinkelman

*Counsel to Examiner*

LECG, LLC
201 South Main, Suite 450
Salt Lake City, UT  84111
Telephone:              (801) 364-6233
Facsimile:              (801) 364-6230

F. Wayne Elggren

*Financial Advisor to Examiner*

SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899
Telephone:              (302) 421-6800
Facsimile:              (302) 421-6813

Mark Minuti
Charles O. Monk, II
Nicholas J. Nastasi
Cathleen M. Devlin

*Delaware Counsel to Examiner*

# TABLE OF CONTENTS

IV. PRINCIPAL FINDINGS AND CONCLUSIONS CONCERNING QUESTION ONE .......... 1

A.     Overview of the Kinds of Claims at Issue in Question One. ................................ 1

B.     Fraudulent Transfer Claims. ................................................... 6

     1.     The Transfers and Obligations Potentially Subject to Avoidance and/or Recovery. .................................................................... 6

     2.     What Is at Stake in the Fraudulent Transfer Disputes? ............................ 10

     3.     Examiner's Conclusions and Explanation Concerning Choice of Law Issues Presented by Fraudulent Transfer Claims. ............................ 12

     4.     Intentional Fraudulent Transfer Claims. .................................................... 15

         a.     The Legal Standard. ........................................................ 15

         b.     Examiner's Conclusions and Explanation Concerning Intentional Fraudulent Transfer Claims in the Step One Transactions. .................................................................. 22

         c.     Examiner's Conclusions and Explanation Concerning Intentional Fraudulent Transfer Claims in the Step Two Transactions. .................................................................. 32

            (1)     Solvency and Value Received. ......................................... 35

            (2)     The Refinancing Representation. ...................................... 36

                (i)     Attempting to Reconcile the Testimony. .............. 43

                (ii)     Assessing the Conflicting Testimony. .................. 47

                (iii)     Did These Events Make a Difference? ................ 50

            (3)     Information Concerning Out-Year Growth Rate Assumptions and Valuation Implications of Such Assumptions. .................................................... 54

            (4)     The October 2007 Forecast. ............................... 58

            (5)     The Tribune Board and Special Committee Deliberations. ................................................... 63

            (6)     Factors that Mitigate Against the Conclusion that Step Two Constituted an Intentional Fraudulent Transfer and Conclusion. .................................................... 74

i

5.    Constructive Fraudulent Transfer Claims. ................................................ 77

  a.    Examiner's General Conclusions. ................................................. 77

  b.    Examiner's Conclusions and Explanation Concerning
        Equivalence of Value Provided at Step One and Step
        Two—the Question of "Collapse." ................................................ 77

  c.    Equivalence of the Value Provided Regarding Specific
        Transfers and Obligations. ........................................................... 90

        (1)    Examiner's Conclusions and Explanation
               Concerning Obligations Incurred to the LBO
               Lenders to Pay Selling Stockholders at Step One
               and Step Two. ................................................................. 91

        (2)    Examiner's Conclusions and Explanation
               Concerning Obligations Incurred to Repay the 2006
               Bank Debt. ...................................................................... 92

        (3)    Examiner's Conclusions and Explanation
               Concerning Obligations Incurred in Connection
               with the Satisfaction of the LATI Intercompany
               Claims. ............................................................................ 93

        (4)    Examiner's Conclusions and Explanation
               Concerning Obligations Incurred on the Revolving
               Credit Facility, Delayed Draw Facility and under
               the Credit Agreement and Bridge Facility for
               Satisfaction of LBO Fees, and for Payment of LBO
               Fees. ............................................................................... 97

        (5)    Examiner's Conclusions and Explanation
               Concerning Payments Made on Account of Advisor
               Fees. ............................................................................... 107

        (6)    Examiner's Conclusions and Explanation
               Concerning Tax Savings, 401(k), and Private
               Company Status. ............................................................ 110

        (7)    Examiner's Conclusions and Explanation
               Concerning Post-Step One and Step Two Payments
               on Account of the Credit Agreement and Bridge
               Credit Agreement. .......................................................... 119

  d.    Framing the Solvency and Capital Adequacy Analysis. .............. 127

        (1)    Examiner's Conclusions and Explanation
               Concerning the Relevant Dates for Step One and

Step Two Solvency, Capital Adequacy, and
Intention to Pay Debts as They Come Due Analysis...... 128

(2)     Legal Standards Governing Solvency Analysis............. 129

(3)     Legal Standards Governing Capital Adequacy
Analysis................................................................. 136

(4)     Examiner's Conclusions and Explanation
Concerning Whether Solvency and Capital
Adequacy Are Measured on an Estate-by-Estate
Basis—the Impact of the Subsidiary Guarantees........... 143

        (i)     The Guarantor Subsidiaries................................ 144

        (ii)    Tribune.............................................................. 154

(5)     Examiner's Conclusions and Explanation
Concerning the Role of Intercompany Claims at the
Time of the Leveraged ESOP Transactions on
Solvency and Capital Adequacy Analysis. .................... 156

        (i)     Tribune and the Guarantor Subsidiaries. ............ 157

        (ii)    The Guarantor Subsidiaries................................ 157

        (iii)   Tribune............................................................. 159

(6)     Examiner's Conclusions and Explanation
Concerning the Question of Inclusion of Step Two
Debt with Step One Debt for Purposes of Analysis
of Solvency, Capital Adequacy, and Intention to
Incur Debts Beyond Reasonable Ability to Pay
Adequacy Analysis. ...................................................... 160

        (i)     Examiner's Conclusions and Explanation
                Concerning Inclusion of Step Two Debt in
                Solvency Analysis............................................. 160

        (ii)    Examiner's Conclusions and Explanation
                Concerning Inclusion of Step Two Debt in
                Capital Adequacy Analysis................................ 183

        (iii)   Examiner's Conclusions and Explanation
                Concerning Inclusion of Step Two Debt in
                Analysis of Intention to Incur Debts Beyond
                Reasonable Ability to Pay................................. 187

(7)     Examiner's Conclusions and Explanation
Concerning Solvency of Tribune at Step One. ............... 187

(i)     Step One:  No Collapse With Step Two. ............ 188

(A)     Market Indicia of Solvency................................. 188

(B)     Balance Sheet Solvency:  The Auction Process and Contemporaneous Valuations. ........ 195

(ii)     Step One:  Collapse—Inclusion of Step Two Debt at Step One. ................................................ 201

(8)     Examiner's Conclusions and Explanation Concerning Solvency of the Guarantor Subsidiaries at Step One. ...................................................................... 207

(9)     Examiner's Conclusions and Explanation Concerning Capital Adequacy of Tribune and the Guarantor Subsidiaries at Step One. ............................... 211

(10)     Examiner's Conclusions and Explanation Concerning Solvency of Tribune at Step Two................ 220

(11)     Examiner's Conclusions and Explanation Concerning Solvency of Guarantor Subsidiaries at Step Two. ........................................................................ 226

(12)     Examiner's Conclusions and Explanation Concerning Capital Adequacy of Tribune and the Guarantor Subsidiaries at Step Two. ............................. 229

6.     Intention to Incur or Belief that the Tribune Entities Would Incur Debts Beyond Their Reasonable Ability to Pay. ..................................... 238

a.     The Legal Standard. ................................................... 238

b.     Examiner's Conclusions and Explanation Concerning Application to Step One............................................... 239

c.     Examiner's Conclusions and Explanation Concerning Application to Step Two. ............................................. 240

7.     Asserted Defenses to Fraudulent Transfer Claims................................. 241

a.     Defenses Under Bankruptcy Code section 546(e). ..................... 241

(1)     Examiner's Conclusions and Explanation Concerning Section 546(e) Defenses............................ 241

(2)     Examiner's Conclusions and Explanation Concerning the Question of a Section 546(e) "Work-Around." ............................................................. 254

b.    Good Faith Defenses at Step One and Step Two. ........................ 255

    (1)    Bankruptcy Code Section 548—The Legal
          Standard. ................................................................. 255

    (2)    Examiner's Conclusions and Explanation
          Concerning Effect of Good Faith Determination
          Regarding Credit Agreement Agent and Bridge
          Agent on Obligations Incurred Under Those
          Agreements—Whose Good Faith Matters? ................... 260

    (3)    Examiner's Conclusions and Explanation
          Concerning Good Faith of JPMCB as Credit
          Agreement Agent at the Time Obligations Incurred
          at Step One and Step Two............................................... 264

    (4)    Examiner's Conclusions and Explanation
          Concerning Good Faith of JPM Entities as
          Transferee of LBO Fees at Step One and Step Two. ....... 278

    (5)    Examiner's Conclusions and Explanation
          Concerning Good Faith of MLCC as Bridge Credit
          Agreement Agent at the Time Obligations Incurred
          at Step Two. ................................................................... 278

    (6)    Examiner's Conclusions and Explanation
          Concerning Good Faith of Merrill Entities as
          Transferee of LBO Fees at Step One and Step Two. ....... 280

    (7)    Examiner's Conclusions and Explanation
          Concerning Good Faith of Citigroup Entities as
          Transferee of LBO Fees at Step One and Step Two. ....... 281

    (8)    Examiner's Conclusions and Explanation
          Concerning Good Faith of BofA Entities as
          Transferee of LBO Fees at Step One and Step Two. ....... 283

    (9)    Examiner's Conclusions and Explanation
          Concerning Good Faith of MLPFS and CGMI as
          Transferees of Advisor Fees at Step One and Step
          Two. ............................................................................... 284

8.    Legal Questions Concerning Remedies Available in Connection
    with Avoidance. ....................................................................... 288

    a.    Examiner's Conclusions and Explanation Concerning the
        Questions of "Standing" and Scope of Avoidance at
        Guarantor Subsidiary Levels....................................................... 288

    b.    Examiner's Conclusions and Explanation Concerning

Participation of Creditors Whose Claims, Payments, or Liens are Avoided in Creditor Distributions............................... 298

c.    Examiner's Conclusions and Explanation Concerning Effect of Avoidance on PHONES Subordination....................... 303

d.    Examiner's Conclusions and Explanation Concerning Effect of Avoidance on Subordinated Bridge Subsidiary Guarantee. ................................................................................ 307

e.    Examiner's Conclusions and Explanation Concerning Treatment of Intercompany Claims in Avoidance Scenarios. ................................................................................... 309

9.    Examiner's Conclusions and Explanation Concerning the Economic Effect of Potential Avoidance on Distributions.................... 310

C.    Potential Preference Actions............................................................................ 310

1.    Examiner's Conclusions and Explanation Concerning Satisfaction of Exchangeable EGI-TRB Note. ........................................................... 311

2.    Examiner's Conclusions and Explanation Concerning Payments on Account of Bridge Debt and Credit Agreement Debt............................. 319

3.    Examiner's Conclusions and Explanation Concerning Payments to Directors and Officers of Tribune Entities............................................... 321

4.    Examiner's Conclusions and Explanation Concerning Intercompany Payments.......................................................................... 322

D.    Equitable Subordination/Equitable Disallowance of Specified Claims.............. 323

1.    Generally............................................................................................ 323

a.    The Effect of Insider or Non-Insider Status................................ 324

2.    Equitable Disallowance. ...................................................................... 327

3.    Application of Legal Standards. ........................................................... 332

a.    Examiner's Conclusions and Explanation Concerning LBO Lender Debt. ......................................................................... 332

b.    Examiner's Conclusions and Explanation Concerning EGI-TRB Note Claims........................................................................ 338

4.    Examiner's Conclusions and Explanation Concerning Equitable Disallowance........................................................................................ 339

E.    Common Law Claims. ........................................................................ 339

    1.    Examiner's Conclusions and Explanation Concerning Choice of
        Law/Choice of Forum Issues Presented by Common Law Claims. ....... 339

        a.    Breach of Fiduciary Duty. .................................................. 340

        b.    Aiding and Abetting Breach of Fiduciary Duty. ......................... 340

        c.    Unjust Enrichment. ........................................................ 343

        d.    Illegal Corporate Distributions. ......................................... 345

        e.    Professional Malpractice Claims. ....................................... 345

    2.    Breach of Fiduciary Duty. ..................................................... 346

        a.    Legal Standard for Breach of Fiduciary Duty Claims. ............... 346

            (1)    The Business Judgment Rule and the Entire
                    Fairness Doctrine. ................................................ 347

            (2)    The Duty of Loyalty Under Delaware Law. ................... 351

            (3)    The Duty of Disclosure as Part of the Duty of
                    Loyalty Under Delaware Law. .................................. 355

            (4)    The Duty of Care Under Delaware Law. ....................... 356

            (5)    The Statutory Safe Harbor. ..................................... 358

        b.    Effect of Solvency or Insolvency on Breach of Duty
            Questions Under Delaware Law. ........................................ 360

        c.    Fiduciary Duties of Directors and Officers of Subsidiaries. ........ 365

        d.    Legal Analysis of Effect of Indemnification and
            Exculpation Rights of Directors and Officers on Breach of
            Duty Claims. .............................................................. 367

        e.    Examiner's Conclusions and Explanation Concerning
            Application of Legal Standards to Potential Defendants. ........... 373

            (1)    Tribune Directors and Officers at Step One. ................. 374

            (2)    Guarantor Subsidiary Directors at Step One. ................. 375

            (3)    Large Stockholders at Step One. ............................... 376

            (4)    Tribune Directors at Step Two. ................................. 379

(5)    Tribune Officers at Step Two. ........................................ 386

(6)    Guarantor Subsidiary Directors at Step Two. ................. 387

(7)    Large Stockholders at Step Two. .................................... 389

3.    Aiding and Abetting Breach of Fiduciary Duty...................................... 390

a.    Legal Standard for Aiding and Abetting Breach of
Fiduciary Duty. ........................................................................ 390

b.    Legal Standards Governing Potential In Pari Delicto
Defenses to Aiding and Abetting Claims.................................... 392

c.    Examiner's Conclusions and Explanation Concerning
Application of Legal Standards to Potential Defendants............ 395

(1)    Large Stockholders. ......................................... 396

(2)    Lead Banks. ....................................................... 396

(3)    Financial Advisors. ........................................... 396

(4)    Zell Group. ........................................................ 397

(5)    VRC. .................................................................. 397

4.    Unjust Enrichment. ................................................................................. 398

a.    Legal Standard for Unjust Enrichment. ...................................... 398

b.    Potential Preemption Issues. ....................................................... 400

c.    In Pari Delicto as a Defense to an Unjust Enrichment
Claim.......................................................................................... 403

d.    Examiner's Conclusions and Explanation Concerning
Application of Legal Standards to Potential Defendants............ 404

5.    Illegal Corporate Distributions. .............................................................. 406

a.    Legal Standard for Illegal Corporate Distributions Pursuant
to the DGCL................................................................................ 406

b.    Potential Preemption Issues. ....................................................... 411

c.    Examiner's Conclusions and Explanation Concerning
Application of Legal Standards to Potential Defendants............ 411

6.    Professional Malpractice Claims. ............................................................ 414

a.      Legal Standard for Professional Malpractice Claims. ................ 414

b.      Legal Standards Governing In Pari Delicto Defenses to
        Professional Malpractice Claims. ................................................. 416

c.      Effect of Indemnification Rights on Professional
        Malpractice Claims. .................................................................... 420

d.      Examiner's Conclusions and Explanation Concerning
        Application of Legal Standards to VRC. ..................................... 421


Annex A:     Discounted Cash Flow Analysis

Annex B:     Recovery Scenarios

Annex C:     Prepetition LBO Lender Payments

# TABLE OF AUTHORITIES

Page(s)

## UNITED STATES CONSTITUTION

U.S. Const. Article VI, cl. 2 ................................................................................400

## CASES

### FEDERAL CASES

*A.J. Heel Stone, L.L.C. v. Evisu Int'l, S.R.L.*,
2006 U.S. Dist. LEXIS 34152 (S.D.N.Y. May 25, 2006).......................................166

*Abele v. Modern Fin. Plans Servs., Inc. (In re Cohen)*,
300 F.3d 1097 (9th Cir. 2002) .............................................................................120

*Acequia, Inc. v. Clinton (In re Acequia, Inc.)*,
34 F.3d 800 (9th Cir. 1994) ..................................................................................295

*ACF-Brill Motors Co. v. Comm'r*,
189 F.2d 704 (3d Cir. 1951)....................................................................................88

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*,
365 B.R. 24 (Bankr. S.D.N.Y. 2007), *aff'd sub nom. Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008), *aff'd*, 2010 WL 2094028 (2d Cir. May 26, 2010) ..................................................................................................331, 332

*Adelphia Recovery Trust v. Bank of Am., N.A.*,
390 B.R. 80 (S.D.N.Y. 2008), *aff'd*, 2010 WL 2094028 (2d Cir. May 26, 2010) .........289, 332

*Adelphia Recovery Trust v. Bank of Am., N.A.*,
624 F. Supp. 2d 292 (S.D.N.Y. 2009)....................................................................290

*Allegheny Gen. Hosp. v. Philip Morris*,
228 F.3d 429 (3d Cir. 2000)..................................................................................400

*Altria Grp. v. Good*,
129 S. Ct. 538 (2008)......................................................................................400, 401

*Aluminum Mills Corp. v. Citicorp N. Am. Inc. (In re Aluminum Mills Corp.)*,
132 B.R. 869 (Bankr. N.D. Ill. 1991) ..............................................................passim

*Am. Classic Voyages, Co. v. JP Morgan Chase Bank (In re Am. Classic Voyages, Co.)*,
384 B.R. 62 (D. Del. 2008)....................................................................................134

*Amerada Hess Corp. v. Comm'r*,
517 F.2d 75 (3d Cir. 1975)....................................................................................204

*Ameriserv Fin. Bank v. Commercebank, N.A.*,
  2009 U.S. Dist. LEXIS 24559 (W.D. Pa. Mar. 26, 2009) ....................................256

*AmeriServe Food Distrib., Inc. v. Transmed Foods, Inc. (In re AmeriServe Food Distrib., Inc.)*,
  315 B.R. 24 (Bankr. D. Del. 2004) ...................................................................313

*Ansel Props., Inc. v. Nutri/System Assocs. (In re Nutri/Sys. Assocs.)*,
  178 B.R. 645 (E.D. Pa. 1995) ...........................................................................324

*Aphton Corp. v. Sonefi Pasteur (In re Aphton Corp.)*,
  423 B.R. 76 (Bankr. D. Del. 2010) ................................................................92, 94

*Argus Mgmt. Group v. GAB Robins, Inc. (In re CVOE Corp.)*,
  327 B.R. 210 (Bankr. D. Del. 2005) ...........................................................121, 126

*Arrow Elecs., Inc. v. Justus (In re Kaypro)*,
  230 B.R. 400 (B.A.P. 9th Cir. 1999)................................................................132

*ASARCO LLC v. Ams. Mining Corp.*,
  396 B.R. 278 (S.D. Tex. 2008) ..................................................16, 22, 31, 239

*Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ.*,
  944 F. Supp. 1169 (S.D.N.Y. 1996)................................................................286

*Astropower Liquidating Trust v. KPMG LLP*,
  2007 U.S. Dist. LEXIS 38222 (D. Del. May 25, 2007)......................................399

*Atl. Cleaners & Dyers, Inc. v. United States*,
  286 U.S. 427 (1932)........................................................................................250

*Atlanta Shipping Corp. v. Chem. Bank*,
  818 F.2d 240 (2d Cir. 1987)..........................................................81, 92, 94

*Balabar-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*,
  256 B.R. 664 (Bankr. S.D.N.Y. 2000)............................................................103

*Balaber-Strauss v. Murphy (In re Murphy)*,
  331 B.R. 107 (Bankr. S.D.N.Y. 2005)............................................................296

*Bank of Marin v. England*,
  385 U.S. 99 (1966).........................................................................................417

*Bank of N.Y. v. Epic Resorts-Palm Springs Marquis Villas (In re Epic Capital Corp.)*,
  290 B.R. 514 (Bankr. D. Del. 2003) ........................................................324, 325

*Barber v. Dunbar (In re Dunbar)*,
  313 B.R. 430 (Bankr. C.D. Ill. 2004)..............................................................247

*Barnhill v. Johnson,*
    503 U.S. 393 (1992).......................................................................................248

*Bay Plastics, Inc. v. BT Commercial Corp. (In re Bay Plastics, Inc.),*
    187 B.R. 315 (Bankr. C.D. Cal. 1995)............................................................84

*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Grp.,
    LLC),*
    396 B.R. 810 (Bankr. S.D.N.Y. 2008).............................................79, 256, 257

*Bear, Stearns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.),*
    397 B.R. 1 (S.D.N.Y. 2007)...........................................................................123

*Belfance v. Buonpane (In re Omega Door Co.),*
    399 B.R. 295 (B.A.P. 6th Cir. 2009).............................................................250

*Bessette v. Avco Fin. Servs., Inc.,*
    230 F.3d 439 (1st Cir. 2000).........................................................................402

*Big V Supermarkets v. Wakefern Food Corp. (In re Big V Holdings),*
    267 B.R. 71 (Bankr. D. Del. 2001) ..........................................................84, 167

*Bohm v. Golden Knitting Mills, Inc. (In re Forman Enters.),*
    293 B.R. 848 (Bankr. W.D. Pa. 2003) ...........................................................317

*Bonded Fin. Servs., Inc., v. European Am. Bank,*
    838 F.2d 890 (7th Cir. 1988) .....................................................120, 121, 122

*Boyer v. Crown Stock Distrib., Inc. (In re Crown Unlimited Mach., Inc.),*
    2006 Bankr. LEXIS 4651 (Bankr. N.D. Ind. Oct. 13, 2006) .......................111

*Boyer v. Crown Stock Distrib., Inc.,*
    587 F.3d 787 (7th Cir. 2009) ................................................................. passim

*Brandt v. B.A Capital Co. (In re Plassein Int'l Corp.),*
    366 B.R. 318 (Bankr. D. Del. 2006), *aff'd,* 388 B.R. 46 (D. Del. 2008), *aff'd on other
    grounds,* 590 F.3d 252 (3d Cir. 2009) ....................................................86, 87

*Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.),*
    388 B.R. 46 (D. Del. 2008), *aff'd on other grounds,* 590 F.3d 252 (3d Cir. 2009) ...........86, 87

*Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.),*
    590 F.3d 252 (3d Cir. 2009)...................................................................242, 411

*Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.)*
    208 B.R. 288 (Bankr. D. Mass. 1997) .....................................................360, 361

*Brandt v. Trivest II, Inc. (In re Plassein Int'l Corp.),*
    405 B.R. 402 (Bankr. D. Del. 2009), *aff'd,* 428 B.R. 64 (D. Del. 2010) .........83, 103

*Braniff Airways v. Exxon Co.,*
  814 F.2d 1030 (5th Cir. 1987) ........................................................................312

*Brewer v. Brewer,*
  2010 U.S. Dist. LEXIS 60863 (C.D. Cal. June 17, 2010) ....................372, 373, 383

*Brown v. Shell Can., Ltd. (In re Tenn. Chem. Co.),*
  143 B.R. 468 (Bankr. E.D. Tenn. 1992), *aff'd in part and rev'd in part on other*
  *grounds*, 112 F.3d 234 (6th Cir. 1997) ..............................................................165

*Brown v. Third Nat'l Bank (In re Sherman),*
  67 F.3d 1348 (8th Cir. 1995) ...................................................................... passim

*Brunell v. Fed. Nat'l Mortg. Ass'n (In re Brunell),*
  47 B.R. 830 (Bankr. E.D. Pa. 1985), *aff'd*, 76 B.R. 64 (E. D. Pa. 1985) ................82

*Buncher Co. v. Off. Comm. of Unsecured Creditors of GenFarm Ltd. P'ship. IV,*
  229 F.3d 245 (3d Cir. 2000)....................................................................296, 301

*Burch v. Stylish Move Sportswear Inc. (In re Factory 2-U Stores, Inc.),*
  2007 Bankr. LEXIS 3140 (Bankr. D. Del. Sept. 11, 2007) .................................121

*Bus. Commc'ns, Inc. v. Freeman,*
  1994 U.S. Dist. LEXIS 2304 (N.D. Ill. 1994) ....................................................414

*Caillouet v. First Bank & Trust (In re Entringer Bakeries Inc.),*
  548 F.3d 344 (5th Cir. 2008) ...........................................................................315

*Cain v. Mappa,*
  142 B.R. 677 (Bankr. D.N.J. 1992) ...................................................................312

*Carrieri v. Jobs.com Inc.,*
  393 F.3d 508 (5th Cir. 2004) ...........................................................................165

*Casa de Cambio Magapara, S.A. de C.V. v. Wachovia Bank, N.A. (In re Casa de Cambio*
  *Magapara),*
  390 B.R. 595 (Bankr. N.D. Ill. 2008) ...............................................................245

*Cent. Va. Cmty. College v. Katz,*
  546 U.S. 356 (2006)........................................................................................263

*Centre Ins. Co. v. SNTL Corp. (In re SNTL Corp.),*
  380 B.R. 204 (B.A.P. 9th Cir. 2007)..................................................................292

*Charan Trading Corp. v. Uni-Marts, LLC (In re Uni-Marts, LLC),*
  399 B.R. 400 (Bankr. D. Del. 2009) ..................................................................339

*Chatz v. Bearing Point Inc. (In re Nanovation Techs., Inc.),*
  364 B.R. 308 (Bankr. N.D. Ill. 2007) .........................................................415, 416

*Chi. Hous. Auth. v. Fed. Sec., Inc.*,
    161 F.3d 485 (7th Cir. 1998) ................................................................420

*Chorost v. Grand Rapids Factory Showrooms, Inc.*,
    77 F. Supp. 276 (D.N.J. 1948), *aff'd*, 172 F.2d 327 (3d Cir. 1949) ....................256

*Christy v. Alexander & Alexander Inc. (In re Finley, Kumble, Wagner, Heine,*
    *Underberg, Manley, Myerson & Casey)*,
    130 F.3d 52 (2d Cir. 1997)...............................................120, 122, 123

*Citibank, N.A. v. Smith Jones*,
    17 B.R. 128 (Bankr. D. Minn. 1982) ..............................................304

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
    160 F.3d 982 (3d Cir. 1998)...........................................................330

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
    323 F.3d 228 (3d Cir. 2003)...........................................................323

*Claybrook v. Morris (In re Scott Acquisition Corp.)*,
    344 B.R. 283 (Bankr. D. Del. 2006) ..............................................366

*Cohen v. KB Mezzanine Fund II, L.P. (In re SubMicron Sys. Corp.)*,
    291 B.R. 314 (D. Del. 2003)................................................95, 324

*Cohen v. KB Mezzanine Fund II LP (In re SubMicron Sys. Corp.)*,
    432 F.3d 448 (3d Cir. 2006).............................................................94

*Coleman v. Cmty. Trust Bank (In re Coleman)*,
    426 F.3d 719 (4th Cir. 2005) .............................................247, 263, 295

*Collins & Aikman Corp. v. Stockman*,
    2009 U.S. Dist. LEXIS 43472 (D. Del. May 20, 2009).........................370

*Comer v. U.S. Soc. Sec. Admin. (In re Comer)*,
    386 B.R. 607 (Bankr. W.D. Va. 2008) ...........................................312

*Comm. of Equity Sec. Holders of Fed.-Mogul Corp. v. Off. Comm. of Unsecured*
    *Creditors (In re Fed.-Mogul Global, Inc.)*,
    348 F.3d 390 (3d Cir. 2003)...........................................................250

*Compton v. Plain Mktg., LP (In re Tri-Union Dev. Corp.)*,
    349 B.R. 145 (Bankr. S.D. Tex. 2006) ...........................................316

*Congoleum Corp. v. Pergament (In re Congoleum Corp.)*,
    2007 Bankr. LEXIS 4357 (Bankr. D.N.J. Dec. 28, 2007) ...................330, 331

*Conn. Fire Ins. Co. v. Commercial Nat'l Bank*,
    87 F.2d 968 (5th Cir. 1937) ...............................................17, 261

*Consove v. Cohen (In re Roco Corp.),*
  21 B.R. 429 (B.A.P. 1st Cir. 1982), *aff'd*, 701 F.2d 978 (1st Cir. 1983) ................................92

*Continuing Creditors' Comm. of Star Telecommc'ns, Inc. v. Edgecomb,*
  385 F. Supp. 2d 449 (D. Del. 2004)............................................................................... passim

*Covey v. Commercial Nat'l Bank,*
  960 F.2d 657 (7th Cir. 1992) ...............................................................................248, 250

*Cox v. Zale Delaware, Inc.,*
  242 B.R. 444 (N.D. Ill. 1999) ..............................................................................402

*Credit Managers Assoc. v. Fed. Co.,*
  629 F. Supp. 175 (C.D. Cal. 1985) ...............................................137, 138, 139, 140

*Credit Suisse v. Off. Comm. of Unsecured Creditors (In re Yellowstone Mountain Club, LLC),*
  2009 Bankr. LEXIS 2047 (Bankr. D. Mont. May 13, 2009) ................................327

*Crowthers McCall Pattern, Inc. v. Lewis,*
  129 B.R. 992 (S.D.N.Y. 1991)...........................................................13, 408, 409

*Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.),*
  275 B.R. 641 (Bankr. M.D. Fla. 2002) ..............................................................257

*Daley v. Chang (In re Joy Recovery Tech. Corp.),*
  286 B.R. 54 (Bankr. N.D. Ill. 2002) ....................................................89, 136, 141

*Dallas v. Comm'r,*
  92 T.C.M. (CCH) 313 (T.C. 2006) .....................................................................27

*Dean v. Davis,*
  242 U.S. 438 (1917)...........................................................................................22

*Dev. Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.),*
  250 B.R. 776 (Bankr. S.D. Fla. 2000)...............................................................260

*Dewsnup v. Timm,*
  502 U.S. 410 (1992)..........................................................................................251

*Dobin v. Hill (In re Hill),*
  342 B.R. 183 (Bankr. D.N.J. 2006) ............................................................. passim

*Dobin v. Taiwan Mach. Trade Ctr. Corp. (In re Victor Int'l),*
  97 F. App'x 365 (3d Cir. 2004)...........................................................................21

*Durso Supermarkets v. D'Urso (In re Durso Supermarkets),*
  193 B.R. 682 (Bankr. S.D.N.Y. 1996).................................................................130

*EBS Litig. LLC v. Barclays Global Investors, N.A.,*
  304 F.3d 302 (3d Cir. 2002)................................................................409

*Elway Co. v. Miller (In re Elrod Holdings Corp.),*
  394 B.R. 760 (Bankr. D. Del. 2008) ...................................................242

*Elway Co. v. Miller (In re Elrod Holdings Corp.),*
  421 B.R. 700 (Bankr. D. Del. 2010) .....................................................16

*Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.),*
  340 B.R. 180 (Bankr. S.D.N.Y. 2006), *vacated on other grounds,* 379 B.R. 425
  (S.D.N.Y. 2007).................................................................................80

*Enron Corp. v. Bear, Stearns Int'l, Ltd.,*
  323 B.R. 857 (Bankr. S.D.N.Y 2005) ..........................................251, 403

*Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.),*
  379 B.R. 425 (S.D.N.Y. 2007).....................................................262, 324

*Equibank v. Dan-Ver Enterprises, Inc. (In re Dan-Ver Enterprises, Inc.),*
  86 B.R. 443 (Bankr. W.D. Pa. 1988) ...................................................329

*Estate of Adams v. Comm'r,*
  83 T.C.M. (CCH) 1421 (T.C. 2002) .......................................................27

*Estate of Heck v. Comm'r,*
  83 T.C.M. (CCH) 1181 (T.C. 2002) .......................................................27

*Evvtex Co. v. Hartley Cooper Assoc.,*
  102 F.3d 1327 (2d Cir. 1996)...............................................................261

*ExxonMobil Oil Corp. v. Amex Constr. Co.,*
  2010 U.S. Dist. LEXIS 26343 (N.D. Ill. Mar. 19, 2010).......................420

*Faitoute Iron & Steel Co. v. City of Asbury Park,*
  316 U.S. 502 (1942)...........................................................................249

*FCC v. NextWave Commc'ns (In re NextWave Pers. Commc'ns, Inc.),*
  200 F.3d 43 (2d Cir. 2000)..................................................................309

*FCC v. NextWave Pers. Commc'ns Inc.,*
  537 U.S. 293 (2003)...........................................................................163

*FDIC v. Barton,*
  1998 U.S. Dist. LEXIS 5203 (E.D. La. Apr. 8, 1998).........................347

*Feldman v. Chase Home Fin. (In re Image Masters, Inc.),*
  421 B.R. 164 (Bankr. E.D. Pa. 2009) ..................................................292

*Ferrari v. Barclay's (In re Morse Tools, Inc.)*,
  148 B.R. 97 (Bankr. D. Mass. 1992) .................................................................136, 141, 185

*Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*,
  18 F.3d 217 (3d Cir. 1994).....................................................................................................316

*Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.)*,
  340 B.R. 266 (Bankr. E.D. Pa. 2006), *aff'd*, 371 B.R. 708 (E. D. Pa. 2007) ...................passim

*First Commodity Traders, Inc. v. Heinold Commodities, Inc.*,
  766 F.2d 1007 (7th Cir. 1985) ............................................................................................398

*Fisher v. Sellis (In re Lake States Commodities, Inc.)*,
  253 B.R. 866 (Bankr. N.D. Ill. 2000) ....................................................................................16

*Fisher v. United States*,
  425 U.S. 391 (1976)................................................................................................................337

*Fitzpatrick v. Cent. Commc'ns & Elecs., Inc. (In re Tenn. Valley Steel Corp.)*,
  203 B.R. 949 (Bankr. E.D. Tenn. 1996)...............................................................................315

*Fleet Nat'l Bank v. Gray (In re Bankvest Capital Corp.)*,
  375 F.3d 51 (1st Cir. 2004).....................................................................................................296

*Foxmeyer Drug Co. v. GE Capital Corp. (In re Foxmeyer Corp.)*,
  286 B.R. 546 (Bankr. D. Del. 2002) ...............................................................................82, 166

*Freehling v. Nielson (In re F&C Servs.)*,
  44 B.R. 863 (Bankr. S.D. Fla. 1984).......................................................................................19

*Frymire v. PaineWebber, Inc.*,
  107 B.R. 506 (E.D. Pa. 1989) ...............................................................................................302

*Ganis Credit Corp. v. Anderson (In re Jan Weilert RV, Inc.)*,
  315 F.3d 1192 (9th Cir. 2003) ...............................................................................................316

*Geltzer v. Artists Mktg. Corp. (In re Cassandra Group)*,
  338 B.R. 583 (Bankr. S.D.N.Y. 2006).....................................................................................21

*Gen. Elec. Credit Corp. v. Murphy (In re Rodriguez)*,
  895 F.2d 725 (11th Cir. 1990) .................................................................................................82

*Gen. Eng'g Corp. v. Martin Marietta Alumina*,
  783 F.2d 352 (3d Cir. 1986).................................................................................................292

*Gil v. Maddalena (In re Maddalena)*,
  176 B.R. 551 (Bankr. C.D. Cal. 1995)....................................................................................79

*Glanz v. RFJ Int'l Corp. (In re Glanz)*,
  205 B.R. 750 (Bankr. D. Md. 1997) ...............................................................................263, 295

*Global Crossing Estate Representative v. Alta Partners Holdings LDC (In re Global Crossing, Ltd.)*,
    385 B.R. 52 (Bankr. S.D.N.Y. 2008) ...................................................................245

*Gouveia v. RDI Grp. (In re Globe Bldg. Materials, Inc.)*,
    484 F.3d 946 (7th Cir. 2007) .............................................................................318

*Grace v. Bank Leumi Trust Co.*,
    443 F.3d 180 (2d Cir. 2006)...............................................................................309

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund)*,
    359 B.R. 510 (Bankr. S.D.N.Y. 2007)...............................................................121

*Grede v. McGladrey & Pullen LLP*,
    421 B.R. 879 (N.D. Ill. 2009) ..........................................................417, 418, 419

*Grigsby v. Carmell (In re Apex Auto. Warehouse, L.P.)*,
    238 B.R. 758 (Bankr. N.D. Ill. 1999) ...............................................................322

*Gross v. Comm'r*,
    272 F.3d 333 (6th Cir. 2001) ...............................................................................27

*H & C P'ship v. Va. Serv. Merchandisers*,
    164 B.R. 527 (E.D. Va. 1994)............................................................................262

*Hall v. Quigley (In re Hall)*,
    131 B.R. 213 (Bankr. N.D. Fla. 1991) ..............................................................187

*Halper v. Halper*,
    164 F.3d 830 (3d Cir. 1999)..............................................................................292

*Harris v. Huff (In re Huff)*,
    160 B.R. 256 (Bankr. M.D. Ga. 1993)..............................................................297

*Hassett v. Goetzmann (In re CIS Corp.)*,
    195 B.R. 251 (Bankr. S.D.N.Y. 1996)...............................................................322

*HBE Leasing Corp. v. Frank*,
    48 F.3d 623 (2d Cir. 1995)...........................................................81, 84, 166, 257

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944).........................................................................................302

*Hefferman v. Bass*,
    467 F.3d 596 (7th Cir. 2006) ............................................................................342

*Hirsch v. Gersten (In re Centennial Textiles)*,
    220 B.R. 165 (Bankr. S.D.N.Y. 1998) ..............................................................119

*Hoffman v. Conn. Dep't of Income Maint.,*
   492 U.S. 96 (1989)................................................................................247

*Hoot Winc, LLC v. RSM McGladrey Fin. Process Outsourcing, LLC,*
   2010 U.S. Dist. LEXIS 57880 (S.D. Cal. 2010) ................................337

*HSBC Bank USA, N.A. v. Adelphia Commc'ns Corp.,*
   2009 U.S. Dist. LEXIS 10675 (W.D.N.Y. 2009) ...............................303

*HSBC Bank USA v. Branch (In re Bank of New Eng. Corp.),*
   364 F.3d 355 (1st Cir. 2004)..............................................................306

*HSH Nordbank AG New York Branch v. Swerdlow,*
   672 F. Supp. 2d 409 (S.D.N.Y. 2009)................................................293

*Huffman v. N.J. Steel Corp. (In re Valley Steel Corp.),*
   182 B.R. 728 (Bankr. W.D. Va. 1995) ...............................315, 317, 321

*Hutson v. E.I. du Pont de Nemours & Co. (In re Nat'l Gas Distribs., LLC),*
   556 F.3d 247 (4th Cir. 2009) ..............................................................245

*In re Ahlswede,*
   516 F.2d 784 (9th Cir. 1975) ..............................................................302

*In re Am. Classic Voyages Co. v. JP Morgan Chase Bank (In re Am. Classic Voyages Co.),*
   367 B.R. 500 (Bankr. D. Del. 2007) ...................................................130

*In re Anchorage Marina, Inc.,*
   93 B.R. 686 (Bankr. D.N.D. 1988) .......................................................17

*In re Arrow Air, Inc.,*
   940 F.2d 1463 (11th Cir. 1991) ..........................................................319

*In re Asia Global Crossing, Ltd.,*
   333 B.R. 199 (Bankr. S.D.N.Y. 2005)....................248, 250, 251, 299

*In re Bank of New Eng. Corp.,*
   404 B.R. 17 (Bankr. D. Mass. 2009), *aff'd sub nom. HSBC Bank USA v. Bank of N.Y. Trust Co. (In re Bank of New Eng. Corp.),* 426 B.R. 1 (D. Mass. 2010)...............................306

*In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.,*
   238 B.R. 25 (Bankr. S.D.N.Y. 1999) ..................................................296

*In re Brown,*
   244 B.R. 62 (Bankr. D.N.J. 2000) ......................................................402

*In re Century Elecs. Mfg. Inc.,*
   345 B.R. 33 (Bankr. D. Mass. 2006) ..................................................371

*In re Chodnicki,*
   2008 Bankr. LEXIS 250 (Bankr. D.N.J. Jan. 24, 2008) ................................................402, 403

*In re Classic Drywall, Inc.,*
   127 B.R. 874 (D. Kan. 1991) ................................................................................................295

*In re Columbia Ribbon Co.,*
   117 F.2d 999 (3d Cir. 1941)..................................................................................................302

*In re Consol. Capital Equities Corp.,*
   143 B.R. 80 (Bankr. N.D. Tex. 1992) ..................................................................................145

*In re Crowthers McCall Pattern,*
   120 B.R. 279 (Bankr. S.D.N.Y. 1990)..........................................................................296, 300

*In re Dowell,*
   1998 U.S. Dist. LEXIS 22029 (D.N.J. Aug. 26, 1998).......................................................163

*In re Finn,*
   909 F.2d 903 (6th Cir. 1990) ...............................................................................................316

*In re Forklift LP Corp.,*
   340 B.R. 735 (Bankr. D. Del. 2006) ....................................................................................316

*In re Garden Ridge,*
   323 B.R. 136 (Bankr. D. Del. 2005) ....................................................................................250

*In re Grigoli,*
   151 B.R. 314 (Bankr. E.D.N.Y. 1993)..................................................................................303

*In re H.H. Distribs., L.P.,*
   400 B.R. 44 (Bankr. E.D. Pa. 2009) ....................................................................................157

*In re Haugen Constr. Serv., Inc.,*
   104 B.R. 233 (Bankr. D.N.D. 1989) .....................................................................................254

*In re Hinderliter Indus.,*
   228 B.R. 848 (Bankr. E.D. Tex. 1999) ................................................................................304

*In re Hough,*
   4 B.R. 217 (Bankr. S.D. Cal. 1980) .....................................................................................299

*In re Kaiser Steel Corp.,*
   952 F.2d 1230 (10th Cir. 1991) ...........................................................................................242

*In re Keller Tool Corp.,*
   151 B.R. 912 (Bankr. E.D. Mo. 1993)..................................................................................316

*In re King Res. Co.,*
   528 F.2d 789 (10th Cir. 1976) .............................................................................................306

*In re Kors, Inc.*,
   64 B.R. 163 (D. Vt. 1986), *aff'd*, 819 F.2d 19 (2d Cir. 1987)..............................305

*In re Kors, Inc.*,
   819 F.2d 19 (2d Cir. 1987)..........................................................................305

*In re Lafayette Radio Elecs. Corp.*,
   7 B.R. 189 (Bankr. E.D.N.Y. 1980)..............................................................302

*In re Lehman Bros. Holdings, Inc.*,
   2010 Bankr. LEXIS 1260 (Bankr. S.D.N.Y.May 5, 2010)...........................245, 253

*In re Mid-Am. Waste Sys.*,
   284 B.R. 53 (Bankr. D. Del. 2002) ........................................................302, 324

*In re Morse Tool, Inc.*,
   108 B.R. 389 (Bankr. D. Mass. 1989) ............................................................24

*In re Newman*,
   875 F.2d 668 (8th Cir. 1989) .....................................................................296

*In re Owens Corning*,
   419 F.3d 195 (3d Cir. 2005)..............................................................29, 144, 291

*In re Pease*,
   195 B.R. 431 (Bankr. D. Neb. 1996) ......................................................270, 292

*In re Pinto Trucking Serv., Inc.*,
   93 B.R. 379 (Bankr. E.D. Pa. 1988) ..............................................................16

*In re Process-Manz Press, Inc.*,
   236 F. Supp. 333 (N.D. Ill. 1964) ................................................................20

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000)........................................................................302

*In re R.L. Kelly & Sons, Millers*,
   125 B.R. 945 (Bankr. D. Md. 1991) .............................................................148

*In re R-B-Co.*,
   59 B.R. 43 (Bankr. W.D. La. 1986) ..............................................................254

*In re Revco D.S., Inc.*,
   118 B.R. 468 (Bankr. N.D. Ohio 1990) .........................................................165

*In re Rowland*,
   275 B.R. 209 (Bankr. E.D. Pa. 2002) ...........................................................303

*In re S. Afr. Apartheid Litig.*,
   633 F. Supp. 2d. 117 (S.D.N.Y. 2009).........................................................262

*In re Sandy Ridge Dev. Corp.,*
    881 F.2d 1346 (5th Cir. 1989) ................................................................................292

*In re Santoro Excavating, Inc.,*
    32 B.R. 947 (Bankr. S.D.N.Y. 1983) ......................................................................312

*In re Sw. Equip. Rental, Inc.,*
    1992 WL 684872 (E.D. Tenn. July 9, 1992) .....................................................89, 166

*In re Taubman Realty Co.,*
    160 B.R. 964 (Bankr. S.D. Ohio 1993) ...........................................................238, 250

*In re Telesphere Commc'ns, Inc.,*
    179 B.R. 544 (Bankr. N.D. Ill. 1994) .....................................................................255

*In re Texaco Inc.,*
    254 B.R. 536 (Bankr. S.D.N.Y. 2000) ............................................................110, 163

*In re Time Sales Fin. Corp.,*
    491 F.2d 841 (3d Cir. 1974).....................................................................................307

*In re V. Savino Oil & Heating Co.,*
    91 B.R. 655 (Bankr. E.D.N.Y. 1988) .......................................................................254

*In re W.T. Grant Co.,*
    699 F.2d 599 (2d Cir. 1983).......................................................................................29

*In re Xonics Photochemical, Inc.,*
    841 F.2d 198 (7th Cir. 1988) ...........................................................................149, 150

*Interbulk, Ltd. v. Louis Drefus Corp. (In re Interbulk, Ltd.),*
    240 B.R. 195 (Bankr. S.D.N.Y. 1999)......................................................................245

*Intercont. Publ'ns, Inc. v. Perry (In re Intercont. Publ'ns, Inc.),*
    131 B.R. 544 (Bankr. D. Conn. 1991) .....................................................................322

*Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC),*
    373 B.R. 283 (Bankr. S.D.N.Y. 2007)................................................131, 134, 137, 138

*IRS v. Kaplan (In re Kaplan),*
    104 F.3d 589 (3d Cir. 1997).....................................................................................302

*Irving Trust Co. v. State Bankers' Fin. Corp.,*
    40 F.2d 88 (S.D.N.Y. 1930).....................................................................................262

*J.J. McCaskill Co. v. United States,*
    216 U.S. 504 (1910)....................................................................................................17

*Jacoway v. Anderson (In re Ozark Rest. Equip. Co.),*
    850 F.2d 342 (8th Cir. 1988) ...................................................................................111

*JELD-WEN, Inc. v. Van Brunt (In re Grossman's Inc.),*
  607 F.3d 114 (3d Cir. 2010) (en banc)................................................161, 163

*Jimmy Swaggert Ministries v. Hayes (In re Hannover Corp.),*
  310 F.3d 796 (5th Cir. 2002) .............................................80, 83, 111

*Jobin v. McKay (In re M&L Bus. Mach. Co.),*
  84 F.3d 1330 (10th Cir. 1996) .............................................256, 257

*Jobin v. Ripley (In re M&L Bus. Mach. Co.),*
  198 B.R. 800 (D. Colo. 1996), *aff'd,* 84 F.3d 1330 (10th Cir. 1996).....................260

*Jones v. Nat'l Bank (In re Greenbrook Carpet Co.),*
  722 F.2d 659 (11th Cir. 1984) .............................................84, 166

*Joshua Slocum, Ltd. v. Boyle (In re Joshua Slocum, Ltd.),*
  103 B.R. 610 (Bankr. E.D. Pa. 1989) ..................................133, 165

*Jumer's Castle Lodge, Inc. v. Jumer (In re Jumer's Castle Lodge, Inc.),*
  338 B.R. 344 (C.D. Ill. 2006) .............................................111

*Kapila v. Media Buying, Inc. (In re Ameri P.O.S., Inc.),*
  355 B.R. 876 (Bankr. S.D. Fla. 2006)..................................315, 321

*Kennedy v. Venrock Assocs.,*
  348 F.3d 584 (7th Cir. 2003) .............................................347

*Kilbarr Corp. v. Gen. Servs. Admin. (In re Remington Rand),*
  836 F.2d 825 (3d Cir. 1998)...............................................163

*Kingsley v. Wetzel (In re Kingsley),*
  518 F.3d 874 (11th Cir. 2008) ...........................................119

*Kipperman v. Onex Corp.,*
  411 B.R. 805 (N.D. Ga. 2009) .......................................112, 137

*Kleven v. Household Bank F.S.B.,*
  334 F.3d 638 (7th Cir. 2003) .............................................316

*Knippen v. Grochocinski,*
  2007 U.S. Dist. LEXIS 36790 (N.D. Ill. May 18, 2007) .........................129

*Knutson v. Tredinnick (In re Tredinnick),*
  264 B.R. 573 (B.A.P. 9th Cir. 2001).....................................163

*LaSala v. Bordier et Cie,*
  519 F.3d 121 (3d Cir. 2008)...............................................342

*LaSalle Nat'l Bank v. Perelman,*
  82 F. Supp. 2d 279 (D. Del. 2000)...................................399, 405

*Lawrence v. Bonadio, Insero & Co. (In re Interco Sys.),*
   202 B.R. 188 (Bankr. W.D.N.Y. 1996) ...................................................................104

*Le Café Crème v. Le Roux (In re Le Café Crème, Ltd.),*
   244 B.R. 221 (Bankr. S.D.N.Y. 2000) ...................................................................13

*Lenoir v. GE Capital Corp. (In re Lenoir),*
   231 B.R. 662 (Bankr. N.D. Ill. 1999) ...................................................................402

*Leonard v. First Commercial Mortg. Co. (In re First Alliance, Inc.),*
   228 B.R. 225 (Bankr. S.D.N.Y. 1983) ...................................................................122

*Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.),*
   281 B.R. 535 (Bankr. D. Del. 2002) .............................................................130, 132

*Liebersohn v. WTAE-TV (In re Pure Weight Loss, Inc.),*
   2009 Bankr. LEXIS 3956 (Bankr. E.D. Pa. Nov. 10, 2009).................................320

*Liquidating Trust of U.S. Wireless Corp. v. Wax (In re U.S. Wireless Corp.),*
   384 B.R. 713 (Bankr. D. Del. 2008) ...................................................................402

*Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.),*
   327 B.R. 537 (D. Del. 2005), *aff'd,* 278 F. App'x 125 (3d Cir. 2008) ........................... passim

*Liquidation Trust v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.),*
   278 F. App'x 125 (3d Cir. 2008) ...................................................................... passim

*Loranger Mfg. Co. v. PNC Bank (In re Loranger Mfg. Corp.),*
   324 B.R. 575 (Bankr. W.D. Pa. 2005) ..........................................................242, 402

*Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l Inc.),*
   181 F.3d 505 (3d Cir. 1999).................................................242, 243, 405, 411

*Lowrey v. Mfrs. Hanover Leasing Corp. (In re Robinson Bros. Drilling),*
   6 F.3d 701 (10th Cir. 1993) ...................................................................292

*LTV Steel Co. v. Shalala (In re Chateaugay Corp.),*
   53 F.3d 478 (2d Cir. 1995).................................................................163

*Magten Asset Mgmt. Corp v. Nw. Corp. Debenture Trust Co. (In re Nw. Corp.),*
   313 B.R. 595 (Bankr. D. Del. 2004) ...................................................................290

*Mallory v. Citizens Bank (In re First Sec. Mortg. Co.),*
   33 F.3d 42 (10th Cir. 1994) ...................................................................120

*Marshall v. Showalter,*
   375 F.2d 529 (10th Cir. 1967) ...................................................................129

*Martino v. Edison Worldwide Capital (In re Randy),*
    189 B.R. 425 (Bankr. N.D. Ill. 1995) ................................................................................104

*Matanuska Valley Bank v. Arnold,*
    223 F.2d 778 (9th Cir. 1955) ...........................................................................................261

*Max Sugarman Funeral Home, Inc. v. A.D.B. Investors,*
    926 F.2d 1248 (1st Cir. 1991)...........................................................................................21

*MC Asset Recovery, LLC v. S. Co.,*
    2006 U.S. Dist. LEXIS 97034 (N.D. Ga. Dec. 11, 2006)..........................................295, 366

*McNamara v. PFS (In re Pers. & Bus. Ins. Agency),*
    334 F.3d 239 (3d Cir. 2003)..............................................................................................17

*McNellis v. Raymond,*
    420 F.2d 51 (2d Cir. 1970)...............................................................................................129

*Md. Cas. Co. v. W.R. Grace & Co.,*
    218 F.3d 204 (2d Cir. 2000).............................................................................................155

*Mellon Bank, N.A. v. Metro Commc'ns, Inc. (In re Metro Commc'ns, Inc.),*
    95 B.R. 921 (Bankr. W.D. Pa. 1989), *aff'd in part and rev'd in part,* 135 B.R. 15
    (W.D. Pa.), *rev'd on other grounds,* 945 F.2d 635 (3d Cir. 1991).........................................321

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.,*
    945 F.2d 635 (3d Cir. 1991)....................................................................................... passim

*Mellon Bank, N.A. v. Off. Comm. of Unsecured Creditors (In re R.M.L., Inc.),*
    92 F.3d 139 (3d Cir. 1996)......................................................................................... passim

*Merrill v. Abbott (In re Indep. Clearing House Co.),*
    77 B.R. 843 (D. Utah 1987)...............................................................................................80

*Mervyn's, LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC),*
    426 B.R. 488 (Bankr. D. Del. 2010) ...................................................................85, 242, 243

*Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC),*
    426 B.R. 96 (Bankr. D. Del. 2010) ............................................................................ passim

*Mfrs. & Traders Trust Co. v. Goldman (In re Ollag Constr. Equip. Corp.),*
    578 F.2d 904 (2d Cir. 1978)........................................................................144, 145, 155

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.,*
    910 F. Supp. 913 (S.D.N.Y. 1995) ............................................................................ passim

*Miller v. Greenwich Capital Fin. Prods. (In re Am. Bus. Fin. Servs.),*
    384 B.R. 66 (Bankr. D. Del. Mar. 20, 2008) .......................................................................20

*Miller v. McCown De Leeuw & Co. (In re Brown Sch.),*
    386 B.R. 37 (Bankr. D. Del. 2008) ....................................................................103, 104, 390

*Miller v. Westfield Steel, Inc. (In re Elrod Holdings Corp.),*
    426 B.R. 106 (Bankr. D. Del. 2010) ...........................................................................314, 315

*Misty Mgmt. Corp. v. Lockwood,*
    539 F.2d 1205 (9th Cir. 1976) ...............................................................................................299

*Moglia v. Universal Auto., Inc. (In re First Nat'l Parts),*
    2000 U.S. Dist. LEXIS 10420 (N.D. Ill. July 12, 2000) ...................................................257

*Montgomery Ward, LLC v. OTC Int'l, LTD. (In re Montgomery Ward, LLC),*
    348 B.R. 662 (Bankr. D. Del. 2006) ...................................................................................320

*Moody v. Sec. Pac. Bus. Credit, Inc.*
    971 F.2d 1056 (3d Cir. 1992) ........................................................................................ passim

*Moody v. Sec. Pac. Bus. Credit, Inc.,*
    127 B.R. 958 (Bankr. W.D. Pa. 1991), *aff'd,* 971 F.2d 1056 (3d Cir. 1992) ...........21, 138, 140

*Moore, Owen, Thomas & Co. v. Coffey,*
    992 F.2d 1439 (6th Cir. 1993) ...............................................................................................292

*Moore v. Bay (In re Sassard & Kimball, Inc.),*
    284 U.S. 4 (1931) ..............................................................................................................5, 296

*Morin v. OYO Instruments, L.P. (In re Labelon Corp.),*
    2006 Bankr. LEXIS 2490 (Bankr. W.D.N.Y. 2006) .........................................................297

*Morris v. St. John Nat'l Bank (In re Haberman),*
    516 F.3d 1207 (10th Cir. 2008) ...........................................................................................305

*Morse Operations, Inv. C. v. Goodway Graphics of Va., Inc. (In re Lease-A-Fleet, Inc.),*
    155 B.R. 666 (Bankr. E.D. Pa. 1993) .................................................................................133

*Munroe v. Harriman,*
    85 F.2d 493 (2d Cir. 1936) ...................................................................................................261

*Murphy v. Meritor Savs. Bank (In re O'Day Corp.),*
    126 B.R. 370 (Bankr. D. Mass. 1991) ............................................................................. passim

*N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale,*
    567 F.3d 8 (1st Cir. 2009) ............................................................................................400, 406

*N.Y. Cent. & Hudson River R.R. Co. v. United States,*
    212 U.S. 481 (1909) .................................................................................................................18

*N.Y. City Shoes, Inc. v. Bentley Int'l, Inc. (In re N.Y. City Shoes, Inc.),*
    880 F.2d 679 (3d Cir. 1989) ........................................................................................318, 319

*Nasr v. Geary,*
    2003 U.S. Dist. LEXIS 13887 (C.D. Cal. June 9, 2003) .......................................140

*Nelmark v. Helms,*
    2003 U.S. Dist. LEXIS 3664 (N.D. Ill. March 12, 2003) ...................................126

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC,*
    537 F.3d 168 (2d Cir. 2008) ..........................................................................87

*NextWave Pers. Commc'ns, Inc. v. FCC (In re NextWave Pers. Commc'ns, Inc.),*
    235 B.R. 305 (Bankr. S.D.N.Y. 1999), *aff'd,* 241 B.R. 311 (S.D.N.Y. 1999), *rev'd.*
    200 F.3d 43 (2d Cir. 1999)............................................................................79

*NMI Sys. v. Pillard (In re NMI Sys., Inc.),*
    179 B.R. 357 (Bankr. D.D.C. 1995) ...............................................................322

*Nordberg v. Republic Nat'l Bank (In re Chase & Sanborn Corp.),*
    51 B.R. 739 (Bankr. S.D. Fla. 1985)................................................................17

*O'Melveny & Myers v. FDIC,*
    512 U.S. 79 (1994).......................................................................................417

*Off. Comm. of Asbestos Claimants of G-I Holdings, Inc. v. Bldg. Materials Corp. (In re*
    *G-I Holdings Inc.),*
    338 B.R. 232 (Bankr. D.N.J. 2006) ...............................................................119

*Off. Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.),*
    330 B.R. 67 (Bankr. D. Del. 2005)..................................................................15

*Off. Comm. of Unsecured Creditors of Allegheny Health, Educ. & Research Found. v.*
    *PricewaterhouseCoopers, LLP,*
    607 F.3d 346 (3d Cir. 2010).................................................................17, 393

*Off. Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Grp.,*
    *Inc. (In re Buckhead Am. Corp.),*
    178 B.R. 956 (D. Del. 1994)..............................................167, 408, 409

*Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v.*
    *Chinery,*
    330 F.3d 548 (3d Cir. 2003).........................................................................290

*Off. Comm. of Unsecured Creditors of Cybergenics Corp.ex rel. Cybergenics Corp. v.*
    *Chinery (In re Cybergenics Corp.),*
    226 B.R. 237 (3d Cir. 2000).........................................................................295

*Off. Comm. of Unsecured Creditors of Enron Corp. v. Martin (In re Enron Creditors*
    *Recovery Corp.),*
    376 B.R. 442 (Bankr. S.D.N.Y. 2007) ...................................................317, 322

*Off. Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*,
  405 B.R. 527 (Bankr. D. Del. 2009) ..............................................................390, 399

*Off. Comm. of Unsecured Creditors of Grand Eagle Cos. v. Asea Brown Boveri, Inc.*,
  313 B.R. 219 (N.D. Ohio 2004)...................................................................................89

*Off. Comm. of Unsecured Creditors of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.)*,
  274 B.R. 71 (D. Del. 2002) .............................................................................. passim

*Off. Comm. of Unsecured Creditors of IT Group, Inc. v. Acres of Diamonds, L.P. (In re IT Group, Inc.)*,
  359 B.R. 97 (Bankr. D. Del. 2006) .........................................................................242

*Off. Comm. of Unsecured Creditors of Midway Games, Inc. v. Nat'l Amusements Inc. (In re Midway Games, Inc.)*,
  2010 Bankr. LEXIS 337 (Bankr. D. Del. Jan. 29, 2010) .........................................166

*Off. Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*,
  344 B.R. 340 (W.D. Pa. 2006), *aff'd on other grounds*, 590 F.3d 252 (3d Cir. 2009) .... passim

*Off. Comm. of Unsecured Creditors of R.M.L., Inc. v. Conceria Sabrina, S.P.A. (In re R.M.L., Inc.)*,
  195 B.R. 602 (Bankr. M.D. Pa. 1996) ....................................................................318

*Off. Comm. of Unsecured Creditors of Sunbeam Corp v. Morgan Stanley & Co. Inc. (In re Sunbeam Corp.)*,
  284 B.R. 355 (Bankr. S.D.N.Y. 2002)..............................................81, 98, 103, 332

*Off. Comm. of Unsecured Creditors v. Charleston Forge, Inc. (In re Russell Cave Co.)*,
  259 B.R. 879 (Bankr. E.D. Ky. 2001)......................................................................315

*Off. Comm. of Unsecured Creditors v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. )*,
  280 B.R. 90 (D. Del. 2002)......................................................................................365

*Off. Comm. of Unsecured Creditors v. Guardian Ins. 401 (In re Parcel Consultants, Inc.)*,
  287 B.R. 41 (Bankr. D.N.J. 2002) ...................................................................121, 124

*Off. Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*,
  267 F.3d 340 (3d Cir. 2001)....................................................................................417

*Off. Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*,
  343 B.R. 444 (Bankr. S.D.N.Y. 2006)......................................................................367

*Off. Unsecured Creditors Comm. of Valley-Vulcan Mold Co. v. Microdot, Ins. (In re Valley-Vulcan Mold Co.)*,
  1994 Bankr. LEXIS 2347 (N.D. Ohio 1994) ...........................................................238

*OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.),*
    389 B.R. 357 (D. Del. 2008), *aff'd*, 356 F. App'x 622 (3d Cir. 2009) ...................392, 393, 394

*Ohio Corrugating Co. v DPAC, Inc. (In re Ohio Corrugating Co.),*
    91 B.R. 430 (Bankr. N.D. Ohio 1988)................................................................................140

*Orr v. Kinderhill Corp.,*
    991 F.2d 31 (2d Cir. 1993)..................................................................................166, 167

*Pa. Dep't of Pub. Welfare v. Davenport,*
    495 U.S. 552 (1990).............................................................................................163

*Pa. Emp. Benefit Trust Fund v. Zeneca,*
    2010 U.S. Dist. LEXIS 44413 (D. Del. May 6, 2010)..........................................342, 343, 344

*Pajaro Dunes Rental Agency v. Spitters (In re Pajaro Dunes Rental Agency),*
    174 B.R. 557 (Bankr. N.D. Cal. 1994) ..................................................................105, 120, 300

*Panos v. Sullivan (In re Sabine, Inc.),*
    2006 Bankr. LEXIS 381 (Bankr. D. Mass. Feb. 27, 2006)...................................................366

*Payne v. Clarendon Nat'l Ins. Co. (In re Sunset Sales),*
    220 B.R. 1005 (B.A.P. 10th Cir. 1998)..........................................................................316

*Peltz v. Hatten,*
    279 B.R. 710 (D. Del. 2002), *aff'd,* 60 F. App'x 401 (3d Cir. 2003) ................................. passim

*Pension Transfer Corp. v. Beneficiaries Under the Third Amend. to Fruehauf Trailer
Corp. Ret. Plan 003 (In re Fruehauf Trailer Corp.),*
    444 F.3d 203 (3d Cir. 2006)......................................................................................... passim

*Pepper v. Litton,*
    308 U.S. 295 (1939).............................................................................293, 327, 328, 329

*Pereira v. Dow Chem. Co. (In re Trace Int'l Holdings, Inc.),*
    287 B.R. 98 (Bankr. S.D.N.Y. 2002)............................................................................165, 407

*Pereira v. Grecogas Ltd. (In re Saba Enters., Inc.),*
    421 B.R. 626 (Bankr. S.D.N.Y. 2009).............................................................................16

*Pertuso v. Ford Motor Credit Co.,*
    233 F.3d 417 (6th Cir. 2000) .......................................................................................402

*Petrakopoulou v. DHR Int'l, Inc.,*
    660 F. Supp. 2d 935 (N.D. Ill. 2009) ..............................................................................399

*Phoenix Canada Oil Co. Ltd. v. Texaco Inc.,*
    560 F. Supp. 1372 (D. Del. 1983), *aff'd in relevant part, vacated in part on other
grounds,* 842 F.2d 1466 (3d Cir. 1988) ..........................................................................344

*PHP Liquidating, LLC v. Robbins,*
    291 B.R. 603 (D. Del. 2003), *aff'd sub nom. PHP Liquidating Trust, LLC v. Robbins*
    *(In re PHP Healthcare Corp.),* 128 F. App'x 839 (3d Cir. 2005)................242, 409, 410, 411

*Pioneer Home Builders, Inc. v. Int'l Bank of Commerce,*
    147 B.R. 889 (Bankr. W.D. Tex. 1992)..............................................................136

*Pioneer Tech., Inc. v. Eastwood (In re Pioneer Tech., Inc.),*
    107 B.R. 698 (B.A.P. 9th 1988)........................................................................315

*Plotkin v. Pomona Valley Imports (In re Cohen),*
    199 B.R. 709 (B.A.P. 9th Cir. 1996)....................................................................16

*Pro-Specialties, Inc. v. Thomas Funding Corp.,*
    812 F.2d 797 (2d Cir. 1987)..............................................................................293

*Pummill v. Greensfelder, Hemker & Gale, P.C. (In re Richards & Conover Steel, Co.),*
    267 B.R. 602 (B.A.P. 8th Cir. 2001)..................................................................108

*Pusey & Jones Co. v. Hanssen,*
    261 U.S. 491 (1923)..........................................................................................249

*R.I. Hosp. Trust Nat'l Bank v. Ohio Cas. Ins. Co.,*
    789 F.2d 74 (1st Cir. 1986)...............................................................................293

*Radnor Holdings Corp. v. Tennenbaum Capital Partners (In re Radnor Holdings Corp.),*
    353 B.R. 820 (Bankr. D. Del. 2006) ............................................................. passim

*Rake v. Wade,*
    508 U.S. 464 (1993)..........................................................................................247

*Rand Energy Co. v. Del Mar Drilling Co. (In re Rand Energy Co.),*
    2000 Bankr. LEXIS 1607 (Bankr. N.D. Tex. July 28, 2000) ...............................130

*Redmond v. Ellis County Abstract & Title Co. (In re Liberty Livestock Co.),*
    198 B.R. 365 (Bankr. D. Kan. 1996) ................................................................315

*Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings*
    *(Cayman), Inc.),*
    216 B.R. 371 (S.D.N.Y. 1998)..........................................................................296

*Responsible Person of Musicland Holding Corp. v. Best Buy Co. (In re Musicland*
    *Holding Corp.),*
    398 B.R. 761 (Bankr. S.D.N.Y. 2008) .................................................................16

*Ring v. Bergman (In re Bergman),*
    293 B.R. 580 (Bankr. W.D.N.Y. 2003) ..............................................................138

*Roberds, Inc. v. Broyhill Furniture (In re Roberds, Inc.),*
    315 B.R. 443 (Bankr. S.D. Ohio 2004)..............................................................316

*Robinson v. Wangemann,*
　　75 F.2d 756 (5th Cir. 1935) ...................................................................92

*Roeder v. Lockwood (In re Lockwood Auto Grp., Inc.),*
　　2010 Bankr. LEXIS 1377 (Bankr. W.D. Pa. May 14, 2010).........................256, 257

*Rosener v. Majestic Mgmt. (In re OODC, LLC),*
　　321 B.R. 128 (Bankr. D. Del. 2005) ............................................... passim

*Roth Steel Tube Co. v. Comm'r,*
　　800 F.2d 625 (6th Cir. 1986) .................................................................95

*RTC v. Best Prods. Co. (In re Best Prods. Co.),*
　　168 B.R. 35 (Bankr. S.D.N.Y. 1994), *aff'd on other grounds,* 68 F.3d 26 (2d Cir.
　　1995) ...............................................................................300, 304, 305, 308

*Rubin v. Mfrs. Hanover Trust Co.,*
　　661 F.2d 979 (2d Cir. 1981).........................................................16, 98, 111

*Salisbury v. Texas Commerce Bank, N.A. (In re WCC Holding Corp.),*
　　171 B.R. 972 (Bankr. N.D. Tex. 1994)....................................................138

*Satriale v. Key Bank USA (In re Burry),*
　　309 B.R. 130 (Bankr. E.D. Pa. 2004) .................................................81, 83, 111

*Scharffenberger v. United Creditors Alliance Corp. (In re Allegheny Health, Educ. &*
　　*Research Found.),*
　　292 B.R. 68 (Bankr. W.D. Pa. 2003), *aff'd sub nom. Risk Mgmt. Alts., Inc. v.*
　　*Scharffenberger (In re Allegheny Health Educ. & Research Found.),* 127 F. App'x 27
　　(3d Cir. 2005)....................................................................................298

*Schnelling v. Crawford (In re James River Coal Co.),*
　　360 B.R. 139 (Bankr. E.D. Va. 2007)........................................................17

*Schubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.),*
　　348 B.R. 234 (Bankr. D. Del. 2005), *aff'd,* 554 F.3d 382 (3d Cir. 2009) .....................323, 325

*Scripomatic Inc. v. United States,*
　　555 F.2d 364 (3d Cir. 1977).................................................................95

*Sec. Investor Prot. Corp. v. Rossi (In re Cambridge Capital, LLC),*
　　331 B.R. 47 (Bankr. E.D.N.Y. 2005)........................................................13

*SEC v. Haligiannis,*
　　608 F. Supp. 2d 444 (S.D.N.Y. 2009)........................................................20

*Seippel v. Jenkens & Gilchrist, P.C.,*
　　341 F. Supp. 2d 363 (S.D.N.Y. 2004)........................................................286

*Shapiro v. Wilgus*,
    287 U.S. 348 (1932)...................................................................................15

*Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*,
    403 F.3d 43 (2d Cir. 2005)......................................................................16

*Shearer v. Tepsic (In re Emergency Monitoring Techs., Inc.)*,
    366 B.R. 476 (Bankr. W.D. Pa. 2007) .................................................323

*Sheffield Steel Corp. v. HMK Enters., Inc. (In re Sheffield Steel Corp.)*,
    320 B.R. 423 (Bankr. N.D. Okla. 2004) ...................................407, 408, 409, 410

*Shubert v. Premier Paper Prods., LLC (In re Am. Tissue, Inc.)*,
    2007 Bankr. LEXIS 4004 (Bankr. D. Del. Nov. 20, 2007) .................................256

*Sierra Invs., LLC v. SHC, Inc. (In re SHC, Inc.)*,
    329 B.R. 438 (Bankr. D. Del. 2005) .....................................................325

*Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.)*,
    96 B.R. 275 (B.A.P. 9th Cir. 1989).......................................................132

*Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*,
    337 B.R. 791 (Bankr. S.D.N.Y. 2005) .................................................15, 16

*Slone v. Lassiter (In re Grove-Merritt)*,
    406 B.R. 778 (Bankr. S.D. Ohio 2009)...................................................81

*Smurfit Newsprint Corp. v. Se. Paper Mfg. Co.*,
    368 F.3d 944 (7th Cir. 2004) ......................................................162, 163

*Soule v. Allot (In re Tiger Petroleum Co.)*,
    319 B.R. 225 (Bankr. N.D. Okla. 2004) ...............................................112

*Speco Corp. v. Canton Drop Forge (In re Speco Corp.)*,
    218 B.R. 390 (Bankr. S.D. Ohio 1998)...........................................315, 321

*Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*,
    295 B.R. 593 (B.A.P. 8th Cir. 2003), *aff'd*, 376 F.3d 819 (8th Cir. 2004) ...........................295

*Stanley v. Brock (In re Kettle Fried Chicken of Am., Inc.)*,
    513 F.2d 807 (6th Cir. 1975) ....................................................409, 410

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris*,
    171 F.3d 912 (3d Cir. 1999)......................................................399, 406

*Stern v. Samuel, Son & Co., Ltd. (In re Longview Aluminum)*,
    2005 Bankr. LEXIS 1312 (Bankr. N.D. Ill. July 14, 2005)..................................138

*Stinnett's Pontiac Serv., Inc. v. Comm'r*,
    730 F.2d 634 (11th Cir. 1984) .............................................................95

*Tavenner v. Smoot (In re Smoot)*,
    265 B.R. 128, (Bankr. E.D. Va. 1999), *aff'd*, 257 F.3d 401 (4th Cir. 2001)............................80

*Telefest, Inc. v. VU-TV, Inc.*,
    591 F. Supp. 1368 (D.N.J. 1984) ............................................................................148

*Teleglobe Commc'ns Corp. v. BCE, Inc. (In re Teleglobe Commc'ns Corp.)*,
    493 F.3d 345 (3d Cir. 2007)............................................................340, 362, 363, 366

*Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*,
    392 B.R. 561 (Bankr. D. Del. 2008) ........................................................................362

*Threadgill v. Armstrong World Indus., Inc.*,
    928 F.2d 1366 (3d Cir. 1991)..................................................................................402

*Tolliver v. Christina Sch. Dist.*,
    564 F. Supp. 2d 312 (D. Del. 2008)..................................................................398, 399

*Towers v. U.S. Dep't of Treasury (In re Feiler)*,
    218 B.R. 957 (Bankr. N.D. Cal. 1998), *aff'd*, 218 F.3d 948 (9th Cir. 2000) ........................247

*Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*,
    180 B.R. 389 (Bankr. D. Del. 1994) ........................................................................132

*Travellers Int'l, AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*,
    134 F.3d 188 (3d Cir. 1998)..................................................................................129

*U.S. Tr. v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.)*,
    180 F.3d 504 (3d Cir. 1999)..................................................................................315

*Unencumbered Assets, Trust v. JP Morgan Chase Bank (In re Nat'l Century Fin. Enters.)*,
    617 F. Supp. 2d 700 (S.D. Ohio 2009) ....................................................................394

*Union Bank v. Wolas*,
    502 U.S. 151 (1991)..............................................................................................320

*United States ex rel. FCC v. GWI PCS 1, Inc. (In re GWI PCS 1, Inc.)*,
    230 F.3d. 788 (5th Cir. 2000) ..........................................................................78, 309

*United States v. Gleneagles Inv. Co.*,
    565 F. Supp. 556 (M.D. Pa. 1983), *aff'd in relevant part sub nom. United States v.*
    *Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986)............................................ passim

*United States v. Noland*,
    517 U.S. 535 (1996)..............................................................................................302

*United States v. Tabor Court Realty Corp.*,
    803 F.2d 1288 (3d Cir. 1986)................................................................................ passim

*URSA Minor Ltd. v. AON Fin. Prod.,*
 2000 U.S. Dist. LEXIS 10166 (S.D.N.Y. July 21, 2000) ....................................................292

*Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.),*
 100 B.R. 127 (Bankr. D. Mass. 1989) ...................................................................84, 112, 140

*Verco Indus. v. Spartan Plastics (In re Verco Indus.),*
 704 F.2d 1134 (9th Cir. 1983) ............................................................................................299

*VFB LLC v. Campbell Soup Co.,*
 482 F.3d 624 (3d Cir. 2007)........................................................................................ passim

*Vinarov v. Motorola, Inc.,*
 2008 U.S. Dist. LEXIS 25363 (N.D. Ill. Mar. 26, 2008)...........................................344, 399

*Vintero Corp. v. Corparacion Venezolana de Fomento ( In re Vintero Corp.),*
 735 F.2d 740 (2d Cir. 1984)................................................................................................166

*Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.,*
 919 F.2d 206 (3d Cir. 1990)...........................................................................16, 78, 84, 88

*W.E. Trucker Oil Co. v. First State Bank of Crossett (In re W.E. Tucker Oil Co.),*
 55 B.R. 78 (Bankr. W.D. Ark. 1985) ..................................................................................151

*Wahoski v. Am. & Efrid, Inc. (In re Pillowtex Corp.),*
 416 B.R. 123 (Bankr. D. Del. 2009) ...................................................................................318

*Wall v. Comm'r,*
 81 T.C.M. (CCH) 1425 (T.C. 2001) .....................................................................................27

*Warfield v. Byron,*
 436 F.3d 551 (5th Cir. 2006) ..............................................................................................104

*Warsco v. Household Bank F.S.B. (In re Various Cases),*
 272 B.R. 246 (Bankr. N.D. Ind. 2002)........................................................................316, 317

*Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.),*
 161 B.R. 107 (E.D. Pa. 1993), *aff'd,* 37 F.3d 1487 (3d Cir. 1994) ..............................324, 325

*Wasserman v. Bressman (In re Bressman),*
 327 F.3d 229 (3d Cir. 2003)........................................................................14, 255, 256

*Wieboldt Stores Inc. v. Schottenstein,*
 131 B.R. 655 (N.D. Ill. 1991) .............................................................................................404

*Weinman v. Fidelity Capital Appreciation Fund (In re Integra Realty Res., Inc.),*
 198 B.R. 352 (Bankr. D. Colo. 1996) .................................................................................409

*Wells Fargo Bank v. Desert View Bldg. Supplies, Inc.,*
 475 F. Supp. 693 (D. Nev. 1978) ........................................................................................140

*West v. Hsu (In re Advanced Modular Power Sys.),*
    413 B.R. 643 (Bankr. S.D. Tex. 2009) ................................................................300

*Wheeling Pittsburgh Steel v. Keystone Metals Trading (In re Wheeling Pittsburgh Steel),*
    360 B.R. 649 (Bankr. N.D. Ohio 2006) ..............................................................122

*Whiteford Plastics Co. v. Chase Nat'l Bank,*
    179 F.2d 582 (2d Cir. 1950) ...............................................................................296

*Wieboldt Stores, Inc. v. Schottenstein,*
    94 B.R. 488 (N.D. Ill. 1988) .....................................................................16, 17, 84

*Wilen v. Pamrapo Sav. Bank, S.L.A. (In re Bayonne Med. Ctr.),*
    429 B.R. 152 (Bankr. D.N.J. May 26, 2010) ......................................................315

*Williams v. Marla (In re Marla),*
    252 B.R. 743 (B.A.P. 8th Cir. 2000) ..................................................................111

*Wolkowitz v. FDIC (In re Imperial Credit Indus., Inc.),*
    527 F.3d 959 (9th Cir. 2008) ..............................................................................250

*Wright v. Union Cent. Life Ins. Co.,*
    304 U.S. 502 (1938) ............................................................................................249

*Wright v. Vinton Branch of Mountain Trust Bank,*
    300 U.S. 440 (1937) ............................................................................................249

*WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File (In re WRT Energy Corp.),*
    282 B.R. 343 (Bankr. W.D. La. 2001) ................................................................239

*Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.),*
    124 B.R. 984 (Bankr. S.D. Ohio 1990) ..............................................................239

*Youthland, Inc. v. Sunshine Girls (In re Youthland, Inc.),*
    160 B.R. 311 (Bankr. S.D. Ohio 1993) ..............................................................315

*Zilkha Energy Co. v. Leighton,*
    920 F.2d 1520 (10th Cir. 1990) ............................................................................12

## STATE CASES

*Aetna Cas. & Sur. Co. v. Certain Underwriters at Lloyd's, London,*
    176 Misc. 2d 605 (N.Y. Sup. Ct. 1998) ..............................................................337

*Allied Capital Corp. v. GC-Sun Holdings, L.P.,*
    910 A.2d 1020 (Del. Ch. 2006) ...........................................................................342

*Am. Int'l Grp. v. Greenberg (In re Am. Int'l. Grp. Consol. Deriv. Litig.),*
    976 A.2d 882 (Del. Ch. 2009) ......................................................392, 393, 394, 395

*Anadarko Petroleum Corp. v. Panhandle E. Corp.*,
    545 A.2d 1171 (Del. 1988) ..................................................................365

*Annan v. Wilmington Trust Co. Tr.*,
    559 A.2d 1289 (Del. 1989) ..................................................................261

*Arnold v. Soc'y for Sav. Bancorp, Inc.*,
    650 A.2d 1270 (Del. 1994) ..................................................................371

*Aronson v. Lewis*,
    473 A.2d 805 (Del. 1984) .............................................................. passim

*AYH Holdings, Inc. v. Avreco, Inc.*,
    826 N.E.2d 1111 (Ill. App. Ct. 2005) ..................................................415

*Beal Bank, SSB v. Sandpiper Resort Corp.*,
    251 A.D.2d 360 (N.Y. App. Div. 1998) ...............................................292

*Beltrone v. Gen. Schuyler & Co.*,
    645 N.Y.S.2d 914 (N.Y. App. Div. 1996) ............................................144

*Benihana of Tokyo, Inc. v. Benihana, Inc.*,
    891 A.2d 150 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006) .................... passim

*Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*,
    922 A.2d 1169 (Del. Ch. 2006).............................................................356

*Boyer v. Wilmington Materials, Inc.*,
    754 A.2d 881 (Del. Ch. 1999)...............................................................359

*Brehm v. Eisner (In re Walt Disney Co. Deriv. Litig.)*,
    906 A.2d 27 (Del. 2006) ................................................................ passim

*Brehm v. Eisner*,
    746 A.2d 244 (Del. 2000) ..............................................356, 357, 410

*Bull v. Bray*,
    26 P. 873 (Cal. 1891) ............................................................................19

*Carson v. Fed. Reserve Bank*,
    172 N.E. 475 (N.Y. 1930)....................................................................121

*Case Fin. v. Alden*,
    2009 Del. Ch. LEXIS 153 (Del. Ch. Aug. 21, 2009)............................367

*Cede & Co. v. Technicolor, Inc.*,
    634 A.2d 345 (Del. 1994) .............................................................. passim

*Childs v. Pinnacle Health Care, LLC*,
    926 N.E.2d 807 (Ill. App. Ct. 2010) ....................................................414

*Citibank, N.A. v. Chammah,*
    44 V.I. 85 (V.I. Terr. Ct. 2001)................................................................292

*Citron v. Fairchild Camera & Instrument Corp.,*
    569 A.2d 53 (Del. 1989) ........................................347, 348, 352, 357

*Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.,*
    636 N.E.2d 503 (Ill. 1994) ................................................................416

*Ctr. v. Hampton Affiliates, Inc.,*
    488 N.E.2d 828 (N.Y. 1985)................................................................261

*Ctr. for Athletic Med., Ltd. v. Indep. Med. Billers, Inc.,*
    889 N.E.2d 750 (Ill. App. Ct. 2008) ............................403, 404, 417

*Dalton v. Am. Inv. Co.,*
    1981 Del. Ch. LEXIS 647 (Del. Ch. June 4, 1981) ............................347

*Dorocke v. Farrington,*
    193 N.E.2d 593 (Ill. App. Ct. 1963) ..................................................16

*Douglass v. Wones,*
    458 N.E.2d 514 (Ill. App. Ct. 1983) ........................................344, 399

*Dubroff v. Wren Holdings LLC,*
    2009 Del. Ch. LEXIS 89 (Del. Ch. May 22, 2009) ....................378, 379

*Eckmar Corp. v. Malchin,*
    297 A.2d 446 (Del. Ch. 1972)................................................................342

*Edelist v. MBNA Am. Bank,*
    790 A.2d 1249 (Del. Super. Ct. 2001) ................................................346

*Emerald Partners v. Berlin,*
    787 A.2d 85 (Del. 2001) ....................................................................370

*Fireman's Fund Ins. Co. v. SEC Donohue, Inc.,*
    666 N.E.2d 881 (Ill. App. Ct. 1996) ..................................................416

*Flushing Sav. Bank v. Parr,*
    438 N.Y.S.2d 374 (N.Y. App. Div. 1981) ............................................15

*Francotyp-Postalia AG & Co. v. On Target Tech., Inc.,*
    1998 Del. Ch. LEXIS 234 (Del. Ch. Dec. 24, 1998) ..................362, 382

*Gantler v. Stephens,*
    965 A.2d 695 (Del. 2009) ..................................................................347

*Gesoff v. IIC Indus., Inc.,*
    902 A.2d 1130 (Del. Ch. 2006)................................................................372

*Gilbert v. El Paso Co.*,
    490 A.2d 1050 (Del. Ch. 1984)................................................................347

*Grace Bros., Ltd. v. UniHolding Corp.*,
    2000 Del. Ch. LEXIS 101 (Del. Ch. July 12, 2000) ..................................367

*Guth v. Loft, Inc.*,
    5 A.2d 503 (Del. 1939) .........................................................................351

*Hexion Specialty Chems., Inc. v. Huntsman Corp.*,
    965 A.2d 715 (Del. Ch. 2008)................................................................162

*HMG/Courtland Props., Inc. v. Gray*,
    749 A.2d 94 (Del. Ch. 1999).................................................................353

*Holland v. Arthur Andersen & Co.*,
    469 N.E.2d 419 (Ill. App. Ct. 1984) ......................................................419

*Hoover Indus., Inc. v. Chase*,
    1988 Del. Ch. LEXIS 98 (Del. Ch. July 13, 1988) ...................................355

*IDT Corp. v. Tyco Group S.A.R.L.*,
    918 N.E.2d 913 (N.Y. 2009).........................................................162, 163

*In re Am. Int'l Grp., Inc. Consol. Derivative Litig.*,
    976 A.2d 872 (Del. Ch. 2009)..........................342, 344, 392, 393, 403

*In re Cox Radio, Inc. S'holders Litig.*,
    2010 Del. Ch. LEXIS 102 (Del. Ch. May 6, 2010) ..................................349

*In re HealthSouth Corp. S'holders Litig.*,
    845 A.2d 1096 (Del. Ch. 2003), *aff'd*, 847 A.2d 1121 (Del. 2004) ...............393, 394

*In re PNB Holding Co. S'holders Litig.*,
    2006 Del. Ch. LEXIS 158 (Del. Ch. Aug. 18, 2006)..........................378, 379

*Chemical Bank v. First Trust (In re Southeast Banking Corp.)*,
    710 N.E.2d 1083 (N.Y. 1999)................................................................306

*In re Tele-Commc'ns, Inc. S'holders Litig.*,
    2005 Del. Ch. LEXIS 206 (Del. Ch. Dec. 21, 2005) .........................349, 355

*In re Topps Co. S'holders Litig.*,
    924 A.2d 951 (Del. Ch. 2007)...............................................................340

*In re Transkaryotic Therapies, Inc.*,
    954 A.2d 346 (Del. Ch. 2008)......................................................... 391, 392

*In re W. Nat'l Corp. S'holders Litig.*,
    2000 Del. Ch. LEXIS 82 (Del. Ch. May 22, 2000) ..................................347

*In re Walt Disney Co. Deriv. Litig.*,
    825 A.2d 275 (Del. Ch. 2003) *aff'd sub nom. Brehm v. Eisner (In re Walt Disney Co.
    Deriv. Litig.)*, 906 A.2d 27 (Del. 2006) ......................................................373

*Jackson Nat'l Life Ins. Co. v. Kennedy*,
    741 A.2d 377 (Del. Ch. 1999).........................................................344, 398

*Johnston v. Wolf*,
    487 A.2d 1132 (Del. 1985) .....................................................................408

*Jones v. Chi. HMO Ltd.*,
    730 N.E.2d 1119 (Ill. 2000).........................................................414, 415, 421

*Kahn v. Lynch Commc'ns. Sys., Inc.*,
    638 A.2d 1110 (Del. 1994) ........................................................347, 350

*Kaplan v. Centex Corp.*,
    284 A.2d 119 (Del. Ch. 1971)................................................................347

*Kenneke v. First Nat'l Bank*,
    382 N.E.2d 309 (Ill. App. Ct. 1978) .......................................................399

*King v. First Capital Fin. Servs. Corp.*,
    828 N.E.2d 1155 (Ill. 2005).....................................................................416

*Kinzinger v. Tull*,
    770 N.E.2d 246 (Ill. App. Ct. 2002) .......................................................415

*Klang v. Smith's Food & Drug Ctrs., Inc.*,
    702 A.2d 150 (Del. 1997) ................................................406, 407, 410, 413

*Kohls v. Duthie*,
    791 A.2d 772 (Del. Ch. 2000).................................................................407

*Kronenberg v. Katz*,
    872 A.2d 568 (Del. Ch. 2004).........................................................342, 344

*Landis v. Sci. Mgmt. Corp.*,
    1991 Del. Ch. LEXIS 19 (Del. Ch. Ct. Feb. 15, 1991).............................343

*Lozosky v. State*,
    2001 Ill. Ct. Cl. LEXIS 29 (Ill. Ct. Cl. 2001) ........................................416

*Lyondell Chem. Co. v. Ryan*,
    970 A.2d 235 (Del. 2009) ...........................................................372, 383

*Malone v. Brincat*,
    722 A.2d 5 (Del. 1998) ..........................................................................391

*Malpiede v. Townson,*
   780 A.2d 1075 (Del. 2001) ........................................................390, 391, 392

*MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC,*
   845 N.E.2d 22 (Ill. App. Ct. 2006) .......................................................414

*McDermott v. City of N.Y.,*
   406 N.E.2d 460 (N.Y. 1980) ................................................................144

*McMullin v. Beran,*
   765 A.2d 910 (Del. 2000) ............................................................... passim

*McPadden v. Sidhu,*
   964 A.2d 1262 (Del. Ch. 2008) ............................................................371

*McRaith v. BDO Seidman, LLP,*
   909 N.E.2d 310 (Ill. App. Ct. 2009) ..............................................417, 419

*MF Global, Inc. v. Morgan Fuel & Heating Co.,*
   71 A.D.3d 420 (N.Y. App. Div. 2010) ...................................................292

*Mfrs. Hanover Trust Co. v. Green,*
   95 A.D.2d 737 (N.Y. App. Div. 1983) ...................................................292

*Mills Acquisition Co. v. Macmillan, Inc.,*
   559 A.2d 1261 (Del. 1989) ............................................................ passim

*Moorman Mfg. Co. v. Nat'l Tank Co.,*
   435 N.E.2d 443 (Ill. 1982) ..........................................................415, 416

*Morris v. Standard Gas & Elec. Co.,*
   63 A.2d 577 (Del. Ch. 1949) ...............................................................407

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,*
   930 A.2d 92 (Del. 2007) ................................................................ passim

*Nemec v. Shrader,*
   991 A.2d 1120 (Del. 2010) ..................................................................399

*O'Reilly v. Transworld Healthcare, Inc.,*
   745 A.2d 902 (Del. Ch. 1999) .............................................................347

*Orman v. Cullman,*
   794 A.2d 5 (Del. Ch. 2002) ...........................................352, 353, 354, 355

*Perry v. Estate of Carpenter,*
   918 N.E.2d 1156 (Ill. App. Ct. 2009) ...................................................162

*Prod. Res. Group, L.L.C. v. NCT Group,*
   863 A.2d 772 (Del. Ch. 2004) ...........................................29, 362, 363, 382

*Propp v. Sadacca,*
    175 A.2d 33 (Del. Ch. 1961), *aff'd in relevant part and rev'd in part sub nom. Bennett v. Propp*, 187 A.2d 405 (Del. 1962) .............................................................................410

*Raven Elevator Corp. v. Finkelstein,*
    223 A.D.2d 378 (N.Y. App. Div. 1996) ...................................................................292

*Roe v. Catholic Charities of the Diocese of Springfield, Ill.,*
    588 N.E.2d 354 (Ill. App. Ct. 1992) ..............................................................414, 415

*Rosenblatt v. Getty Oil Co.,*
    493 A.2d 929 (Del. 1985) ..............................................................................350, 351

*S. Indus., Inc. v. Jeremias,*
    66 A.D.2d 178 (N.Y. App. Div. 1978) ....................................................................15

*Smith v. Van Gorkom,*
    488 A.2d 858 (Del. 1985) .......................................................................358, 359, 413

*Solomon v. Armstrong,*
    747 A.2d 1098 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000) ..........................347

*Stifel Fin. Corp. v. Cochran,*
    809 A.2d 555 (Del. 2002) ......................................................................................367

*Stone ex rel. AmSouth Bancorp. v. Ritter,*
    911 A.2d 362 (Del. 2006) .......................................................346, 349, 351, 383

*Territory of U.S. V.I. v. Goldman, Sachs & Co.,*
    937 A.2d 760 (Del. Ch. 2007), *aff'd*, 956 A.2d 32 (Del. 2008) ...........................405

*Travelers Indem. Co. v. Lake,*
    594 A.2d 38 (Del. 1991) ........................................................................................341

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,*
    906 A.2d 168 (Del. Ch. 2006), *aff'd sub. nom Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007) ...............................................................348, 365, 382

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,*
    906 A.2d 200 (Del. Ch. 2006) ............................................................................. 389

*Unitrin, Inc. v. Am. Gen. Corp.,*
    651 A.2d 1361 (Del. 1995) ....................................................................................348

*Valeant Pharms. Int'l v. Jerney,*
    921 A.2d 732 (Del. Ch. 2007), *appeal dismissed*, 2007 Del. LEXIS 245 (May 30, 2007) .....................................................................................................................359

*Vine St. Clinic v. HealthLink, Inc.,*
    856 N.E.2d 422 (Ill. 2006)....................................................................................417

*VonFeldt v. Stifel Fin. Corp.,*
    1999 Del. Ch. LEXIS 131 (Del. Ch. June 11, 1999) ...................................................369, 386

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,*
    872 A.2d 611 (Del. Ch. 2005)......................................................................................414

*Waters v. Reingold,*
    663 N.E.2d 126 (Ill. App. Ct. 1996) ...........................................................................416

*Weil v. Morgan Stanley DW Inc.,*
    877 A.2d 1024 (Del. Ch. 2005)....................................................................................345

*Weinberger v. UOP, Inc.,*
    457 A.2d 701 (Del. 1983) ..........................................................................349, 350, 370

*Whitmer v. William Whitmer & Sons, Inc.,*
    99 A. 428 (Del. Ch. 1916)...........................................................................................362

*Williamson v. Cox Commc'ns, Inc.,*
    2006 Del. Ch. LEXIS 111 (Del. Ch. June 5, 2006) .....................................................347, 378

## STATUTES

### FEDERAL

11 U.S.C. § 101 (2006) ..................................................................................................250

11 U.S.C. § 101(5) (2006) ..............................................................................................156

11 U.S.C. § 101(5)(A) (2006) .........................................................................................161

11 U.S.C. § 101(5)(A)(12) (2006) ..................................................................................161

11 U.S.C. § 101(5)(A)(32) (2006) ..................................................................................161

11 U.S.C. § 101(22) (2006) ............................................................................................244

11 U.S.C. § 101(22)(A) (2006) .......................................................................................244

11 U.S.C. § 101(31)(B) (2006) .........................................................................................23

11 U.S.C. § 101(31)(B)(i)-(ii) (2006) .............................................................................321

11 U.S.C. § 101(32)(A) (2006) .......................................................................................129

11 U.S.C. § 101(54) (2006) ....................................................................................... passim

11 U.S.C. § 101(54)(D) (2006) .......................................................................................244

11 U.S.C. § 323(a) (2006)...............................................................................................290

11 U.S.C. § 361 (2006) ................................................................................................249

11 U.S.C. § 363(f) (2006) .............................................................................................249

11 U.S.C. § 502(b)(1) (2006) ........................................................................................251

11 U.S.C. § 502(d) (2006) ..................................................................................... 298, 299

11 U.S.C. § 502(h) (2006) ......................................................................................296, 298

11 U.S.C. § 502(j) (2006) ..............................................................................................329

11 U.S.C. § 506(a)-(b) (2006) .......................................................................................251

11 U.S.C. § 506(d) (2006) .............................................................................................251

11 U.S.C. § 510 (2006) ..................................................................................................323

11 U.S.C. § 510(a) (2006) ......................................................................................304, 306

11 U.S.C. § 510(c) (2006) ......................................................................................... passim

11 U.S.C. § 510(c)(1) (2006) .............................................................................................5

11 U.S.C. § 510(c)(2) (2006) .............................................................................................5

11 U.S.C. § 541 (2006) ..................................................................................................405

11 U.S.C. § 541(a) (2006) ..............................................................................................403

11 U.S.C. § 541(a)(1) (2006) .............................................................................................5

11 U.S.C. § 544 (2006) .........................................................................5, 246, 247, 295, 402

11 U.S.C. § 544(a) (2006) .........................................................................................4, 5, 12

11 U.S.C. § 544(a)(1)-(3) (2006) .......................................................................................5

11 U.S.C. § 544(b) (2006) ......................................................................................... passim

11 U.S.C. § 544(b)(1) (2006) ...................................................................................247, 290

11 U.S.C. § 546(a) (2006) ..............................................................................................241

11 U.S.C. § 546(e) (2006) ......................................................................................... passim

11 U.S.C. § 546(f) (2006) ..............................................................................................246

11 U.S.C. § 547 (2006) ..................................................................................248, 253, 312

11 U.S.C. § 547(a)(2) (2006) ...................................................................................318, 319

11 U.S.C. § 547(b) (2006) ................................................................311, 313

11 U.S.C. § 547(b)(2) (2006) ....................................................................322

11 U.S.C. § 547(b)(4)(B) (2006) .........................................................313, 321

11 U.S.C. § 547(c)(2) (2006) .....................................................................314

11 U.S.C. § 547(c)(4) (2006) .....................................................................318

11 U.S.C. § 548 (2006) ..................................................................................4

11 U.S.C. § 548 (2006) ....................................................................... passim

11 U.S.C. § 548(a) (2006) .................................................................... passim

11 U.S.C. § 548(a)(1) (2006) ............................................................... passim

11 U.S.C. § 548(a)(1)(A) (2006) .......................................................... passim

11 U.S.C. § 548(a)(1)(B)(i) (2006) .......................................................78, 79

11 U.S.C. § 548(a)(1)(B)(ii)(I)-(III) (2006) ...............................................127

11 U.S.C. § 548(a)(1)(B)(ii)(I) (2006) .......................................................151

11 U.S.C. § 548(a)(1)(B)(ii)(II) (2006) ......................................................136

11 U.S.C. § 548(a)(1)(B)(ii)(III) (2006) .....................................................238

11 U.S.C. § 548(a)(1)(B)(ii)(IV) (2006) .....................................................127

11 U.S.C. § 548(a)(2) (2006) ..............................................................78, 81

11 U.S.C. § 548(a)(2)(B)(iii) (2006) ..........................................................187

11 U.S.C. § 548(c) (2006) .................................................................... passim

11 U.S.C. § 548(d)(2)(a) (2006) ........................................................... passim

11 U.S.C. § 550 (2006) .........................................................5, 120, 263, 295

11 U.S.C. § 550(a) (2006) .............................................79, 119, 247, 263, 295

11 U.S.C. § 550(a)(1) (2006) ...............................................................119, 120

11 U.S.C. § 550(a)(2) (2006) .....................................................................120

11 U.S.C. § 550(b)(1) (2006) .....................................................................255

11 U.S.C. § 550(d) (2006) .........................................................................263

11 U.S.C. § 551 (2006)......................................................................247

11 U.S.C. § 741(7) (2000)..................................................................245

11 U.S.C. § 741(7)(A) (2006).............................................................244

11 U.S.C. § 1109 (2006)....................................................................290

15 U.S.C. § 77nnn............................................................................118

BANKRUPTCY ABUSE PREVENTION AND CONSUMER PROTECTION ACT OF 2005
   § 907(A)(2), PUB. L. 109-8, 119 STAT. 173 (2005)..............................244

FINANCIAL NETTING IMPROVEMENTS ACT OF 2006
   PUB. L. NO. 109-390, 120 STAT. 2697 (DEC. 12, 2006)........................243

**STATE**

DEL. CODE ANN. title 8, § 102(b)(7) (2010) ........................................370

DEL. CODE ANN. title 8, § 102(b)(7) (2010) ...........................370, 371, 410

DEL. CODE ANN. title 8, § 107(b)(7)(iii) (2010) ...................................410

DEL. CODE ANN. title 8, § 141(a) (2010) .............................................346

DEL. CODE ANN. title 8, § 141(e) (2010) .............................358, 359, 410

DEL. CODE ANN. title 8, § 141(e) (2010) .............................................358

DEL. CODE ANN. title 8, § 144 (2010)..................................................353

DEL. CODE ANN. title 8, § 144(a) (2010) .............................................353

DEL. CODE ANN. title 8, § 144(a)(1)-(2) (2010)....................................353

DEL. CODE ANN. title 8, § 144(a)(3) (2010).........................................353

DEL. CODE ANN. title 8, § 145 (2010).................................................367

DEL. CODE ANN. title 8, § 145 (2010).................................................367

DEL. CODE ANN. title 8, § 145(a) (2010) .....................................367, 369

DEL. CODE ANN. title 8, § 145(b) (2010) ...............................367, 368, 369

DEL. CODE ANN. title 8, § 145(c) (2010) .............................................368

DEL. CODE ANN. title 8, § 145(d) (2010) .............................................368

DEL. CODE ANN. title 8, § 145(e) (2010) .............................................368

DEL. CODE ANN. title 8, § 145(f) (2010)......................................................................368

DEL. CODE ANN. title 8, § 145(j) (2010)......................................................................368

DEL. CODE ANN. title 8, § 160 (2010)..........................................................................406

DEL. CODE ANN. title 8, § 160 (2010)........................................................................ passim

DEL. CODE ANN. title 8, § 160 (2010)..........................................................411, 412, 413

DEL. CODE ANN. title 8, § 160(a)(1) (2010)..........................................................345, 406

DEL. CODE ANN. title 8, § 170(a) (2010) ....................................................................407

DEL. CODE ANN. title 8, § 172 (2010)..........................................................................410

DEL. CODE ANN. title 8, § 173 (2010)..........................................................................408

DEL. CODE ANN. title 8, § 173 (2010)..........................................................411, 412, 413

DEL. CODE ANN. title 8, § 174 (2010) ...................................................................... passim

DEL. CODE ANN. title 8, § 174(a) (2010) ....................................................................408

DEL. CODE ANN. title 8, § 174(c) (2010) ....................................................................409

DEL. CODE ANN. title 8, § 1304 (2010).........................................................................86

DEL. CODE ANN. title 8, § 1305 (2010).........................................................................86

N.Y. DEBT. & CRED. LAW § 272 (McKinney 2010) ......................................................13

## RULES

### FEDERAL

Fed. R. Bankr. P. 2014........................................................................................................1

## OTHER AUTHORITIES

### FEDERAL REGULATION

17 C.F.R. § 210.3-16 (2010)..............................................................................................31

26 C.F.R. § 1.1361-4(a)(2) (2010).....................................................................................31

26 C.F.R. § 1.332-2(b) (2010) ...........................................................................................31

### LEGISLATIVE HISTORY

152 CONG. REC. H7601 (daily ed. Sept. 27, 2006) ......................................................246

152 CONG. REC. H8651 (daily ed. Nov. 15, 2006)................................................246

H.R. Rep. No. 109-648 (2006)
    *reprinted in* 2006 U.S.C.C.A.N. 1585 ..............................................245, 246

H.R. Rep. No. 95-595 (1977)
    *reprinted in* 1978 U.S.C.C.A.N. 5787, 6331 ...................................263

SECONDARY MATERIALS

18B AM. JUR. 2D CORPORATIONS
    § 1680 (2003)................................................................................394

BLACK'S LAW DICTIONARY 1104 (8TH ED. 2004).........................................248

2 COLLIER ON BANKRUPTCY ¶ 101.05.........................................................163

5 COLLIER ON BANKRUPTCY ¶ 546.06.........................................................245

5 COLLIER ON BANKRUPTCY ¶ 548.01[1].....................................................295

5 COLLIER ON BANKRUPTCY ¶ 548.05...........................................................79

1 GERRARD GLENN, FRAUDULENT CONVEYANCES AND PREFERENCES,
    §§ 111, 113 (rev. ed. 1940)........................................................303

GARRARD GLENN, THE LAW OF FRAUDULENT CONVEYANCES (1931)................247, 249

RESTATEMENT (FIRST) OF RESTITUTION § 3 (1937)......................................399

RESTATEMENT (FIRST) OF RESTITUTION § 138 (1937)..................................400

RESTATEMENT (SECOND) OF CONFLICT OF LAWS, § 145 (1971)....................341

RESTATEMENT (SECOND) OF CONFLICT OF LAWS, § 187 (1971)....................292

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 221 (1971)......................343

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 306 (1971)......................340

WILLIAM L. NORTON, III & ROGER G. JONES, NORTON CREDITORS' RIGHTS HANDBOOK
    § 8:8 .........................................................................................262

1-8 DONALD J. WOLFE & MICHAEL A. PITTINGER, CORPORATE AND COMMERCIAL
    PRACTICE IN DELAWARE COURT OF CHANCERY
    § 8.11 (2005) ....................................................................363, 382

JOURNALS, PERIODICALS, AND WEB SITES

DAVID ACKERMAN AND SUSAN E. GOULD, *S Corporation ESOP Valuation Issues* in The Handbook of Business Valuation and Intellectual Property Analysis 141 (Robert F. Reilly and Robert P. Schweihs, eds., 2004) .............................................28, 113

EDWARD ALTMAN AND EDITH HOTCHKISS, *Corporate Financial Distress and Bankruptcy* (3d ed. 2006) ........................................................................................................ A-5

DENNIS K. BERMAN, *How Solvent is Tribune Co.?*, WSJ Blogs: Deal Journal, December 6, 2007, *available at* http://blogs.wsj.com/deals/2007/12/06/how-solvent-is-tribune-co/; Miles Weiss, *Zell's Tribune LBO Runs Into Funds Seeking a Default*, Bloomberg, June 7, 2007, *available at* http://www.bloomberg.com/apps/news?pid=newsarchive&refer=home &sid=aVxwowcOuoY4 ..............................................................................................1

PEG BRICKLEY, *Tribune Creditors Follow the Money To McCormick Foundation*, WSJ Blogs: Bankruptcy Beat, June 11, 2009, *available at* http://blogs.wsj.com/bankruptcy/2009/06/11/tribune-creditors-follow-the-money-to-mccormick-foundation/?KEYWORDS=tribune+co...........................................................1

MICHAEL J. DE LA MERCED & BRIAN STELTER, *Request Seeks Details of Tribune's Buyout*, The N.Y. Times, August 27, 2009...............................................................1

ASWATH DAMODARAN, *Investment Valuation* (2d ed. 2002)...................................... A-62

ROGER J. GRABOWSKI, *S Corporation Valuations in the Post-Gross World-Updated,* Business Valuation Review, Sept. 2004 ................................................................27

GEORGE B. HAWKINS & MICHAEL A. PASCHALL, *CCH Business Valuation Guide* ¶ 1523 (2007) ......................................................................................................27

KERMIT D. LARSON, *Fundamental Accounting Principles,* 806-08 (12th ed. 1990).................................................................................................155

BRUCE A. MARKELL, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital,* 21 Ind. L. Rev. 469, 497 (1988)...........................................136, 138, 139, 140, 183

RICHARD PÈREZ-PEÑA, *Sam Zell: A Tough Guy in a Mean Business,* The N.Y. Times, April 7, 2008, *available at* http://www.nytimes.com/2008/04/07/business/media/07zell.html?_r=1&scp=110 &sq=zell&st=nyt.........................................................................................................1

SHANNON R. PRATT, ET AL., *Valuing a Business* 343-61 (4th ed. 2000)......................................205

SHANNON P. PRATT & ROGER J. GRABOWSKI, *Cost of Capital* (3d ed. 2008).......................... A-63

SHANNON P. PRATT, ET AL., *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (4th ed. 2000) ............................................................... A-3

SHANNON P. PRATT AND ALINA V. NICULITA, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (5th ed. 2008) ........................................................... A-3

SHEPARD, NOTE, *Beyond Moody: A Re-Examination of Unreasonably Small Capital*, 57 Hastings L.J. 891, 892 (2006) ........................................................................................137

RICHARD RAZGAITIS, *Early Stage Technologies: Valuation and Pricing* (1999) ................... A-65

ROBERT J. STEARN, JR., *Proving Solvency: Defending Preference and Fraudulent Transfer Litigation*, 62 Bus. Lawyer 359, 388-89 (Feb. 2007) ......................................................................138, 140

JOHN E. SULLIVAN III, *Future Creditors and Fraudulent Transfers: When a Claimant Doesn't Have a Claim, When a Transfer Isn't a Transfer, When a Fraud Doesn't Stay Fraudulent, and Other Important Limits to Fraudulent Transfers Law for the Asset Protection Planner*, 22 Del. J. Corp. L. 955, 1010-12 (1997) ......................................................................143, 184

TOM R. WECHTER, *Selling Chicago Cubs Without Recognizing Any Taxable Gain: How Chicago Tribune Did It* (2009) ............................................................................................28

MILES WEISS, *Zell's Tribune LBO Runs Into Funds Seeking a Default*, Bloomberg, June 7, 2007, *available at* http://www.bloomberg.com/apps/news?pid=newsarchive&refer=home &sid=aVxwowcOuoY4 ........................................................................................................1

TALLY M. WIENER & NICHOLAS B. MALITO, *On the Nature of the Transferred Bankruptcy Claim*, 12 U. Pa. J. Bus. L. 35, 49-51 (2009) ......................................................262

# IV.

# PRINCIPAL FINDINGS AND CONCLUSIONS CONCERNING QUESTION ONE

### A.    Overview of the Kinds of Claims at Issue in Question One.

Both before[2] and after[3] the commencement of the Chapter 11 Cases, attention focused on

the Leveraged ESOP Transactions and whether the Tribune Entities could satisfy the substantial

amount of debt imposed on them in those transactions—matters that are at the heart of Question

One.  As discussed extensively in the Statement of Facts, the Leveraged ESOP Transactions

were implemented in two phases in June and December of 2007, referred to in the Report as

"Step One" and "Step Two," respectively.  These transactions gave rise to the vast majority of

the indebtedness asserted against these estates.  At the most elemental level, the disputes

underlying Question One pit those creditors whose claims arose out of the Leveraged ESOP

Transactions (the LBO Lenders) against the rest of the Tribune Entities' creditors (the Non-LBO

---

[2]     *See, e.g.,* Richard Pèrez-Peña, *Sam Zell: A Tough Guy in a Mean Business,* THE N.Y. TIMES, April 7, 2008, *available at* http://www.nytimes.com/2008/04/07/business/media/07zell.html?_r=1&scp=110 &sq=zell&st=nyt ("Of course, if this house is ablaze, Mr. Zell has supplied much of the kindling. Almost $8 billion of Tribune's debt came from the highly leveraged deal, which he engineered, that took the company private. That borrowing now looms as the biggest threat to the company . . . ."); Dennis K. Berman, *How Solvent is Tribune Co.?,* WSJ BLOGS: DEAL JOURNAL, December 6, 2007, *available at* http://blogs.wsj.com/deals/ 2007/12/06/how-solvent-is-tribune-co/; Miles Weiss, *Zell's Tribune LBO Runs Into Funds Seeking a Default,* BLOOMBERG, June 7, 2007, *available at* http://www.bloomberg.com/apps/news?pid=newsarchive&refer=home &sid=aVxwowcOuoY4 ("The leveraged buyout is making Tribune one of the riskiest newspaper companies, according to John Puchalla, a media analyst at Moody's Investors Service in New York.").

[3]     *See, e.g.,* Michael J. de la Merced & Brian Stelter, *Request Seeks Details of Tribune's Buyout,* THE N.Y. TIMES, August 27, 2009 ("[T]he firm is seeking documents related to the leveraged buyout to help prove that the 2007 deal was done despite knowing it could render the company insolvent"); Peg Brickley, *Tribune Creditors Follow the Money To McCormick Foundation,* WSJ BLOGS: BANKRUPTCY BEAT, June 11, 2009, *available at* http://blogs.wsj.com/bankruptcy/2009/06/11/tribune-creditors-follow-the-money-to-mccormick-foundation/?KEYWORDS=tribune+co ("Papers filed Wednesday in a Delaware bankruptcy court don't say exactly why creditors are probing the merger. However, highly technical portions of the Bankruptcy Code provide that anyone who comes near a company a year before it goes belly-up and walks away richer is going to get banged on like a dinner gong by creditors."); *see also Application of the Official Committee of Unsecured Creditors of Tribune Company, et al., Pursuant to 11 U.S.C. §§ 328 and 1103 and Fed. R. Bankr. P. 2014 for an Order Authorizing the Employment and Retention of Zuckerman Spaeder LLP as Special Counsel Nunc Pro Tunc to August 6, 2009* filed on August 12, 2009 at 3-4 [Docket No. 1953] ("From the inception of these cases, it has been apparent to all parties that a major issue in connection with any proposed plan of reorganization for the Debtors is the investigation and resolution of certain potential claims and causes of action in favor of the Debtors' estates arising from the series of transactions during calendar year 2007.").

Creditors). It has not been lost on anyone that this entire dispute arises, fundamentally, from the fact that, by all accounts, the Tribune Entities have insufficient value to pay in full all of their indebtedness.[4] Representatives of the Non-LBO Creditors would note that the Tribune Entities still have sufficient value to repay their Non-LBO Debt, and that it is no coincidence that inclusion of the incremental LBO Lender Debt incurred in the Leveraged ESOP Transactions is what tips the Tribune Entities into insolvency.

The LBO Lender Debt, aggregating approximately $10.19 billion as of the Petition Date, is comprised of the Credit Agreement Debt, totaling about $8.57 billion[5], and the Bridge Debt, totaling about $1.62 billion. About $7.015 billion of the Credit Agreement Debt was funded in Step One, whereas $2.105 billion of the Credit Agreement Debt (under the Incremental Credit Agreement Facility) and all of the Bridge Debt were funded in Step Two. The Credit Agreement Debt: (i) has recourse on an unsecured basis to Tribune as borrower; (ii) is secured by the Stock Pledge; and (iii) is jointly and severally guaranteed on an unsecured basis by the Guarantor

---

[4]    The Court-approved Disclosure Statement states as follows regarding the enterprise value of the Debtors:

> Based on these Projections and solely for purposes of the Plan, Lazard estimates that the Enterprise Value of the Reorganized Debtors falls within a range from approximately $2.6 to $3.1 billion, with an approximate mid-point estimate of $2.9 billion as of the Assumed Effective Date. Adding the estimated cash balance at the Assumed Effective Date of approximately $1.4 billion and the value of the Other Assets of approximately $1.5 to $2.0 billion (with an approximate mid point value of $1.8 billion) to the Enterprise Value range yields a range of Distributable Value for the Reorganized Debtors from $5.6 billion to $6.6 billion with a mid-point of $6.1 billion.

Disclosure Statement at 131.

None of the Parties challenged these assumptions in their submissions to the Examiner. Accordingly, the Examiner is relying on the foregoing in the analysis contained in Annex B to Volume Two (Recovery Scenarios).

[5]    This amount is net of principal reductions following the issuance of this indebtedness in the Leveraged ESOP Transactions, plus amounts advanced after the Leveraged ESOP Transactions under the Revolving Credit Facility and the Delayed Draw Facility. This amount also does not include approximately $150.948 million outstanding under the Swap Documents. Under the terms of the Credit Agreement, Tribune was required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Credit Agreement and other debt with respect to borrowed money. On July 2 and July 3, 2007, Tribune entered into the Swap Documents. The obligations of Tribune under the Swap Documents do not constitute Credit Agreement Debt, but are guaranteed by the Guarantor Subsidiaries pursuant to the Credit Agreement Subsidiary Guarantee.

Subsidiaries.  The Bridge Debt:  (i) has recourse on an unsecured basis to Tribune as borrower and (ii) is jointly and severally guaranteed on an unsecured basis by the Guarantor Subsidiaries (but, under the Subordinated Bridge Subsidiary Guarantee, the Guarantor Subsidiaries' obligations on the Bridge Debt are contractually subordinated to their obligations on the Credit Agreement Debt).  Although the LBO Lender Debt is pari passu with the other unsecured debt at the Tribune level (except for the PHONES Notes, described below), the LBO Lenders enjoy structural seniority over creditors with recourse only against Tribune because, as part of the Leveraged ESOP Transactions, the Guarantor Subsidiaries (comprising most of the value available from the estates) guaranteed the LBO Lender Debt.  This means that the LBO Lenders, along with the Guarantor Subsidiaries' other unsecured creditors, enjoy primary access to the lion's share of the value from the estates.  The Bridge Debt is inferiorly situated in comparison to the Credit Agreement Debt because the Guarantor Subsidiaries' obligations to repay the Bridge Debt are contractually subordinated to the Credit Agreement Debt under the terms of the guarantees.  As a result, at least on certain avoidance questions, the current holders of the Bridge Debt share more in common with the Non-LBO Creditors than they do with the Credit Agreement Agent and the lenders under that facility.

Poised against all of the LBO Lenders are the Non-LBO Creditors, holding aggregate claims against the Tribune Entities as of the Petition Date of approximately $2.156 billion.  At the Tribune level, this group comprises:  (i) approximately $759 million of indebtedness under the PHONES Notes; (ii) approximately $1.283 billion under the Senior Notes; and (iii) approximately $114 million of remaining indebtedness.[6]  The Senior Notes are contractually

---

[6]  This figure includes approximately $35 million in lease cure amounts.

EGI-TRB, an entity wholly owned by EGI, and 24 other entities, hold the EGI-TRB Notes in the approximate principal amount of $225 million, under which they assert claims of approximately $10 million in unpaid interest.  These amounts are not included in the $2.156 billion tally on Non-LBO Debt of Tribune for purposes

senior to the PHONES Notes and are secured by the Stock Pledge on a pari passu basis with the LBO Lender Debt. The PHONES Notes are contractually subordinated to all funded indebtedness at the Tribune level (in other words, all obligations represented by notes or indebtedness for borrowed money) and are not secured. Neither the PHONES Notes nor the Senior Notes have any recourse to the Guarantor Subsidiaries or their assets. Finally, Non-LBO Creditors assert approximately $120 million in indebtedness against the Guarantor Subsidiaries. These creditors share ratably with the LBO Lender Debt against those entities.

The lenders under the Credit Agreement and their agent seek to enforce their nonbankruptcy rights and priorities regarding the Tribune Entities (including their structurally senior position at the Guarantor Subsidiaries' level) that existed immediately before the commencement of the Chapter 11 Cases. In contrast, the Non-LBO Creditors want to adjust those rights and priorities through the successful prosecution, by or on behalf of the estates, of potential claims, causes of action, and remedies available under the Bankruptcy Code and nonbankruptcy law. The latter claims include actions against Tribune's current and former fiduciaries who approved and effectuated the Leveraged ESOP Transactions and third parties who assisted in the Leveraged ESOP Transactions or otherwise facilitated them.

When a bankruptcy occurs following a highly leveraged transaction—such as the Leveraged ESOP Transactions at issue here—stakeholders investigate and estate representatives often assert a cluster of claims and causes of action against various parties that fall into three broad categories: first, claims to avoid fraudulent transfers and obligations under Bankruptcy Code sections 548 and 544(b) and to recover amounts transferred under Bankruptcy Code

---

of this discussion. These notes are subordinate and junior in right of payment to all obligations, indebtedness, and other liabilities of Tribune other than those that, by their express terms, rank pari passu or junior to Tribune's obligations under the EGI-TRB Notes and trade payables incurred in the ordinary course of business.

section 550;[7] second, actions to subordinate certain claims to other claims and to cause any liens

securing such claims to be transferred to the estate, pursuant to Bankruptcy Code sections

510(c)(1) and (c)(2);[8] and third, a series of common law claims against parties who effectuated

or participated in the highly leveraged transaction, including claims for breach of fiduciary duty,

aiding and abetting breach of fiduciary duty, unjust enrichment, and recovery of illegal

dividends, pursuant to Bankruptcy Code section 541(a)(1).[9]

      These three categories of claims typically are asserted together, and common facts often

support more than one claim or applicable defense.[10]  Thus, as a general matter, many of the

same facts underlie the questions whether a debtor engaged in a transaction to defraud, hinder, or

delay creditors and whether the debtor's officers or directors breached their fiduciary duties.  By

the same token, and again as a generalization, common facts typically underlie the questions

whether a particular transferee or obligee of an alleged fraudulent transfer acted in good faith and

whether that recipient aided and abetted a debtor-insider's breach of a fiduciary duty.

Nevertheless, the three above-described kinds of claims are legally distinct.  It is conceivable, for

example, that a particular transfer made in conjunction with a highly leveraged transaction is

found to be neither actually nor constructively fraudulent under bankruptcy law, but the

---

[7]    11 U.S.C. §§ 544, 548 and 550 (2006).  A trustee or debtor in possession may use Bankruptcy Code section 544(a) to assert a fraudulent transfer action that would be available to any one of three kinds of hypothetical creditors under other applicable law.  11 U.S.C. § 544(a)(1)-(3) (2006).  Section 544(a), however, only confers on the estate representative the standing of a hypothetical creditor "as of the commencement of the case," *i.e.*, the estate representative may assert only the rights of a creditor who acquired its claim after the Leveraged ESOP Transactions.  Under Bankruptcy Code section 544(b), however, the estate representative can assert the rights of any Tribune creditor in the case, including creditors whose claims arose before the Leveraged ESOP Transaction, to avoid transfers.  11 U.S.C. § 544(b) (2006); *Moore v. Bay (In re Sassard & Kimball, Inc.)*, 284 U.S. 4 (1931).

[8]    11 U.S.C. §§ 510(c)(1) and (c)(2) (2006).

[9]    11 U.S.C. § 541(a)(1) (2006).

[10]    *See Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 327 B.R. 537, 542 (D. Del. 2005), *aff'd*, 278 F. App'x 125 (3d Cir. 2008); *Rosener v. Majestic Mgmt. (In re OODC, LLC)*, 321 B.R. 128, 134 (Bankr. D. Del. 2005); *Murphy v. Meritor Savs. Bank (In re O'Day Corp.)*, 126 B.R. 370, 372-73 (Bankr. D. Mass. 1991).

fiduciaries responsible for the overall transaction are found to have engaged in grossly imprudent or reckless behavior or self-dealing under applicable nonbankruptcy law governing, for example, breach of fiduciary duty.[11]  Likewise, a particular holder of indebtedness whose claim otherwise survives a fraudulent transfer challenge nevertheless may have engaged in the kind of improper actions meriting equitable subordination.  As a result, and in accordance with the Examiner Order, the Report addresses as independent matters all of the assorted claims (and the relevant defenses) to the extent asserted by the Parties.

**B.      Fraudulent Transfer Claims.**

      **1.      The Transfers and Obligations Potentially Subject to Avoidance and/or Recovery.**

*Redacted*

6

*Redacted*

*Redacted*

*Redacted*

*Redacted*

### 2.    **What Is at Stake in the Fraudulent Transfer Disputes?**

Because the LBO Lender Debt dwarfs the other claims against the Tribune Entities and,
owing to the Subsidiary Guarantees, occupies a structurally senior position, if this indebtedness
is not avoided, subordinated, or disallowed, the holders of those claims would recover most of
the value available from the Debtors' bankruptcy estates.  Avoidance of the LBO Lender Debt
affords the Non-LBO Creditors an opportunity to unravel its structural seniority at the Guarantor
Subsidiaries level, and thereby move to the head of the line.  Thus, among the above-listed
potential avoidances and recoveries underlying Question One, the actions to avoid the LBO
Lender Debt are the proverbial "main event."

One way to place the issues presented by the claims relating to the LBO Lender Debt into
perspective is to envision all of the creditors of these estates (both the LBO Lenders and the
Non-LBO Creditors) standing together at the entryway of a very long hallway.  Each creditor
brings to that gathering its own legal and contractual rights against the Tribune Entities and
against creditors and shareholders.  Not all the Non-LBO Creditors share the same rights.  Most
of those creditors do not have recourse to the asset-rich Guarantor Subsidiaries, but others do.
The PHONES Notes are contractually subordinated to all other funded indebtedness of Tribune,
but not to trade liabilities.  As among the LBO Lenders, the Bridge Debt and the Credit
Agreement Debt are not of equal rank at the Guarantor Subsidiaries level.  Thus, creditors arrive
at the gathering with a host of inter-creditor rights and arrangements, in addition to differing
rights against particular Tribune Entities.  At the far end of the hallway are the distributions
creditors will receive on their claims, either under a plan of reorganization in the Chapter 11

Cases or in distributions under chapter 7. As each creditor proceeds from entry to exit, each strives to maximize its own recovery from the distributions at the end, whether directly from a Debtor or pursuant to turnover rights under an inter-creditor agreement. One conclusion appears certain: the total consideration available from the Tribune Entities' businesses and assets is insufficient to enable all creditors to receive payment in full.

To enforce their contractual entitlements against the Tribune Entities and ultimately other creditors—and thereby maximize their overall recovery—the Credit Agreement lenders and their agent must successfully pass through the gauntlet of challenges arising under fraudulent transfer law. Under their worst-case scenario, if they fail to defeat these challenges, their claims would be avoided against each estate and/or subordinated to all of the Non-LBO Debt.[25] Various other outcomes are possible.[26] Avoidance, in turn, could affect enforcement of the contractual subordination of the PHONES Notes at the Tribune level and the Bridge Debt at the Guarantor Subsidiary level.[27] To stop the holders of the LBO Lender Debt from proceeding to the exit with their full bundle of legal and contractual rights against the Tribune Entities intact, the estate representatives not only must satisfy the elements necessary to prove avoidability, but also must overcome defenses that the LBO Lenders would raise.[28] Each element of avoidance, and each defense asserted, in turn, raises discrete issues of fact and law. The ultimate question is whether the Bankruptcy Code avoidance provisions will adjust the priorities and recoveries of creditors when distributions occur in these bankruptcy cases. Not surprisingly, the Parties' perspectives on

---

[25] The Bridge Facility Lenders and their agent face a more nuanced task: If all of the LBO Lender Debt survives intact, this would prove a largely Pyrrhic victory for the Bridge Facility Lenders because the subordination of their debt to the Credit Agreement Debt at the Guarantor Subsidiaries means that most of the value from the estates would go to satisfy the Credit Agreement Debt.

[26] *See* Annex B to Volume Two (Recovery Scenarios).

[27] *See id.*

[28] This is not to suggest that the estate representative will have the burden of proof on each defense, but rather to make the point that, to prevail, the estate representative essentially must win each battle.

the assorted legal and factual questions comprising Question One were driven by how the answers to these questions affect their respective recoveries. As the consequences to the various creditor groups differed widely depending on the answers given, the Examiner had the benefit of a wide divergence of advocacy from the Parties.

The Report turns to the Examiner's substantive analysis of the claims, causes of action, and defenses raised by the Parties in Question One.

### 3. Examiner's Conclusions and Explanation Concerning Choice of Law Issues Presented by Fraudulent Transfer Claims.

**Examiner's Conclusions**:

Because all of the transfers and obligations in Question One occurred within two years of the Petition Date, and because the avoidance provisions contained in Bankruptcy Code section 548 are at least as favorable to an estate representative as the provisions of the NY UFCA, the Examiner will only analyze applicable Bankruptcy Code avoidance and recovery provisions.

**Explanation of Examiner's Conclusions**:

The Bankruptcy Code affords an estate representative two potential bases upon which to avoid fraudulent transfers and obligations: actions enumerated in Bankruptcy Code section 548(a)(1) and state law fraudulent transfer actions, the latter of which are applicable in a bankruptcy case due to the trustee's status as a hypothetical lien creditor under Bankruptcy Code section 544(a),[29] and assertion of the rights of an actual unsecured creditor under section 544(b).[30] All of the transfers and obligations raised by the Parties in Question One occurred

---

[29]  11 U.S.C. §§ 544(a) and 548(a)(1) (2006); *see also Zilkha Energy Co. v. Leighton*, 920 F.2d 1520, 1522 n.7 (10th Cir. 1990). Because section 544(a) only confers the hypothetical rights of the specified creditors "as of the commencement of the case," it is only of utility to the trustee where a particular state law permits avoidance of a transfer or obligation by a future creditor.

[30]  11 U.S.C. § 544(b) (2006) (stating that a trustee may avoid "any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under [Bankruptcy Code section 502].").

within the two year reach-back under Bankruptcy Code section 548(a)(1).[31]  In an effort to focus

the Parties on issues that could affect the outcome, the Examiner notified the Parties that he was

only interested in their evaluation of choice of law issues that are outcome-determinative.  Two

possibilities were raised, only one of which is within the scope of the Investigation.

Certain Parties contended that, whether directly or by analogy, the estates could abandon

to individual creditors and/or vest in a creditor trust established under a plan of reorganization

the rights to pursue fraudulent transfer claims that might otherwise be insulated from recovery

under Bankruptcy Code section 546(e), and argued that choice of law could be outcome

determinative on this point.[32]  Relinquishment of the claims allegedly would enable individual

creditors to assert state law fraudulent transfer claims to which section 546(e) allegedly would

have no application.  As discussed in the Report,[33] the Examiner concludes that this contention is

outside the scope of the Investigation and thus the Report does not address this matter.

In addition, one Party argued that if the NY UFCA were to apply to avoidance actions

concerning the LBO Lender Debt, an estate representative could take advantage of the provisions

of that statute defining "fair consideration" to impose the additional requirement of good faith,

meaning that a transfer for approximate equivalent value still may be avoided when the

transferee lacks good faith.[34]  That Party provided a brief choice of law analysis supporting the

contention that the NY UFCA would apply here, and no other Party presented a contrary analysis

---

[31]    11 U.S.C. § 548(a)(1) (2006).

[32]    11 U.S.C. § 546(e) (2006).

[33]    *See* text accompanying footnote 676.

[34]    N.Y. DEBT. & CRED. LAW § 272 (McKinney 2010); *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992,
997 (S.D.N.Y. 1991) ("Under § 272 of the New York Debtor and Creditor Law, fair consideration for
conveyance of property or an obligation may be found only if 'a fair equivalent therefor' is received by the
transferor *and* such consideration is given by the transferee in good faith."); *Sec. Investor Prot. Corp. v. Rossi
(In re Cambridge Capital, LLC)*, 331 B.R. 47, 63 (Bankr. E.D.N.Y. 2005); *Le Café Crème v. Le Roux (In re Le
Café Crème, Ltd.)*, 244 B.R. 221, 241 (Bankr. S.D.N.Y. 2000).

or challenged this conclusion. The Examiner, however, does not believe that the possible

application of the NY UFCA is outcome-determinative for the following three reasons:

First, as discussed in another part of the Report,[35] even though the plain language of

Bankruptcy Code section 548(a)(1) (read in conjunction with section 548(c)) entirely defers the

question of transferee or obligee good faith to a defense, under the "totality of circumstances"

test articulated by the Third Circuit Court of Appeals, discussed below, transferee or obligee

good faith is considered in conjunction with the determination of reasonably equivalent value

under section 548(a). Thus, the Third Circuit's consideration of reasonably equivalent value is

functionally very similar to the question of fair consideration under the NY UFCA.

Second, based on the Examiner's analysis of applicable Third Circuit law under section

548,[36] the Examiner does not believe that a court applying that authority[37] (whether as part of a

"totality of circumstances" analysis or in conjunction with consideration of a section 548(c)

defense) would permit an obligee who conferred less than reasonably equivalent value in

exchange for an obligation and did not act in good faith in connection therewith to enforce any

portion of that obligation. Such a result is consistent with what would happen under the NY

UFCA.

Finally, the Third Circuit's Court of Appeals adoption of an "objective" test for good faith

under Bankruptcy Code avoidance is no less favorable to an estate representative than the test for

good faith under the NY UFCA.[38] As a result, it is difficult to envision a circumstance in which

---

[35]  *See* Report at § IV.B.5.b.

[36]  *Id.*

[37]  No Party argued that any of the fraudulent transfer claims addressed in the Report should or would be
commenced in any forum other than one in the Third Circuit. Consistent with the scope of the Investigation,
therefore, the Examiner has assumed that any such action would be brought in a forum within the Third Circuit.

[38]  *Compare Wasserman v. Bressman (In re Bressman)*, 327 F.3d 229, 236-37 (3d Cir. 2003) ("[S]ome facts
suggest the underlying presence of other facts. If a transferee possesses knowledge of facts that suggest a
transfer may be fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that

a transferee or obligee in these cases would be found to have acted in good faith under section 548 but not under the NY UFCA.

For these reasons (which may help explain why the Parties devoted so little attention to this issue), the Report does not further consider the application of the NY UFCA and instead solely focuses on avoidance under Bankruptcy Code section 548.

### 4.    Intentional Fraudulent Transfer Claims.

#### a.    The Legal Standard.

Under Bankruptcy Code section 548(a)(1), a transfer can be avoided if the transferor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted . . . ."[39] The three forms of intent that a transferor may demonstrate—hinder, delay, or defraud—are disjunctive such that satisfaction of any one is sufficient to render the transaction avoidable.[40]

Generally, an intentional fraudulent transfer requires that the transferor engage in wrongdoing,[41] which must relate to the transfer or obligation that the estate representative seeks

---

the property is recoverable, he cannot sit on his heels, thereby preventing a finding that he has knowledge. In such a situation, the transferee is held to have knowledge of the voidability of the transfer.") (quotations and citations omitted), *with S. Indus., Inc. v. Jeremias*, 411 N.Y.S.2d 945, 949 (N.Y. App. Div. 1978) ("[A] person seeking to set aside a conveyance upon the basis of lack of good faith must prove that one or more of the following factors is lacking: (1) an honest belief in the propriety of the activities in question; (2) no intent to take unconscionable advantage of others; and (3) no intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others.") (citation omitted). *See* Report at § IV.B.7.b.

[39]    11 U.S.C. § 548(a)(1)(A) (2006).

[40]    *See Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932) ("A conveyance is illegal if made with an intent to defraud the creditors of the grantor, but equally it is illegal if made with an intent to hinder and delay them."). Thus, the statute does not require a showing that the debtor placed assets outside of the reach of creditors to support a finding that an intentional fraudulent transfer has occurred. *Id.*; *see also Flushing Sav. Bank v. Parr*, 438 N.Y.S.2d 374 (N.Y. App. Div. 1981) (same).

[41]    *Off. Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.)*, 330 B.R. 67, 77 (Bankr. D. Del. 2005) ("[A] claim for actual fraud requires that there be conscious wrong-doing."); *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 810 (Bankr. S.D.N.Y. 2005) ("[I]ntentional fraudulent conveyance claims should be relegated to their proper sphere, *i.e.*, where there is a knowing intent on the part of the defendant to damage creditors.").

to avoid.[42] However, an intentional fraudulent transfer "could, in principle, occur without

genuine fraud."[43] For example, it is well recognized that "[a] general scheme or plan to strip the

debtor of its assets without regard to the needs of its creditors can support a finding of actual

intent [to defraud]."[44] A strong inference of fraudulent intent may be established either by

(i) facts demonstrating that the defendant had both the motive and the opportunity to commit

fraud, or (ii) facts that "constitute strong circumstantial evidence of conscious misbehavior or

recklessness."[45]

To avoid a transfer as intentionally fraudulent, the focus is on the intention and

knowledge of the transferor.[46] Although the actions of third parties may be considered, those

acts are not imputed to the transferor for purposes of this analysis. The transferee's knowledge

may be useful in confirming the transferor's intent: "Where the transferor and transferee have

knowledge of the claims of creditors and know that the creditors cannot be paid and where

---

[42]  *Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005)
(finding that repayment was not fraudulent transfer because "[t]he fraud alleged in the complaint relates to the
matter in which Sharp obtained new funding from the Noteholders, not Sharp's subsequent payment of part of
the proceeds to State Street"); *see also Actrade*, 337 B.R. at 810 ("The fact that Actrade misled its own
shareholders does not prove that Actrade intended to defraud Allou's creditors, let alone participated in such a
fraud.").

[43]  *Plotkin v. Pomona Valley Imports (In re Cohen)*, 199 B.R. 709, 716 (B.A.P. 9th Cir. 1996); *see also Fisher v.
Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 871 (Bankr. N.D. Ill. 2000) ("The focus in the
inquiry into actual intent is on the state of mind of the debtor. Neither malice nor insolvency are required.")
(citations omitted).

[44]  *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 213-14 (3d Cir. 1990); *see also
ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 370-71 (S.D. Tex. 2008) (interpreting Delaware's Uniform
Fraudulent Transfer Act); *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 504 (N.D. Ill. 1988) (construing
11 U.S.C. § 548); *Dorocke v. Farrington*, 193 N.E.2d 593, 596 (Ill. App. Ct. 1963) (interpreting fraudulent
transfer statute).

[45]  *Responsible Person of Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.)*, 398 B.R.
761, 774 (Bankr. S.D.N.Y. 2008); *see also Pereira v. Grecogas Ltd., (In re Saba Enters., Inc.)*, 421 B.R. 626,
642 (Bankr. S.D.N.Y. 2009).

[46]  *Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 995 (2d Cir. 1981); *Elway Co. v. Miller (In re Elrod Holdings
Corp.)*, 421 B.R. 700, 709 (Bankr. D. Del. 2010) ("[T]he central focus of § 548(a) is the debtor's intent . . . ."); 
*Dobin v. Hill (In re Hill)*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006); *Silverman v. Actrade Capital, Inc. (In re
Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005); *In re Pinto Trucking Serv., Inc.*, 93 B.R.
379, 385 (Bankr. E.D. Pa. 1988).

consideration is lacking for the transfer the Court may infer an intent to hinder, delay, or defraud creditors."[47]

In determining whether a corporation had the requisite knowledge and intention, courts look to the knowledge and intention of the corporation's directors, officers, and other agents who act for the corporation.[48] "[T]he fraud of an officer of a corporation is imputed to the corporation when the officer's fraudulent conduct was (1) in the course of his employment, and (2) for the benefit of the corporation. This is true even if the officer's conduct was unauthorized, effected for his own benefit but clothed with apparent authority of the corporation, or contrary to instructions."[49] In the fraudulent transfer context, as in other situations involving alleged fraud by a corporation, as a general matter, acts perpetrated by the corporations' agent are ascribed to the corporation.[50] A corporation is not ascribed the knowledge, intention, or acts of an agent who is acting contrary to the interests of the corporation. However, even the acts and knowledge of an agent acting adversely to the interests of the principal may be attributed to the principal where the principal receives the benefits of the agent's acts.[51]

---

[47] *United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556, 580 (M.D. Pa. 1983), *aff'd in relevant part sub nom. United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986); *see also Wieboldt Stores*, 94 B.R. at 504; *Aluminum Mills Corp. v. Citicorp N. Am. Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 887 (Bankr. N.D. Ill. 1991) (denying motion to dismiss intentional fraudulent transfer count and stating that "courts will look to whether LBO participants had knowledge of: (1) the true financial condition of the debtor at the time of the LBO; and (2) whether the corporate acquisition was to be accomplished via the leveraging of the debtor's assets"). This does not mean, however, that an intentional fraudulent transfer claim may be validly asserted based solely on the acts and knowledge of the transferee. The central focus is on the transferor. *See* footnote 46. The Examiner rejects the contrary contention asserted by certain Parties.

[48] *McNamara v. PFS (In re Pers. & Bus. Ins. Agency)*, 334 F.3d 239, 242-43 (3d Cir. 2003); *Schnelling v. Crawford (In re James River Coal Co.)*, 360 B.R. 139, 161 (Bankr. E.D. Va. 2007); *In re Anchorage Marina, Inc.*, 93 B.R. 686, 691 (Bankr. D.N.D. 1988); *Nordberg v. Republic Nat'l Bank (In re Chase & Sanborn Corp.)*, 51 B.R. 739, 740 (Bankr. S.D. Fla. 1985).

[49] *In re Personal & Bus. Ins. Agency*, 334 F.3d 239, 242-43 (3d Cir. 2003).

[50] *J.J. McCaskill Co. v. United States*, 216 U.S. 504, 514-15 (1910).

[51] *See Off. Comm. of Unsecured Creditors of Allegheny Health, Educ. & Research Found. v. Pricewaterhouse-Coopers, LLP*, 607 F.3d 346, 351-53 (3d Cir. 2010); *Conn. Fire Ins. Co. v. Commercial Nat'l Bank*, 87 F.2d 968, 969 (5th Cir. 1937) ("The transaction of the unfaithful agent may indeed be not binding on his principal in the sense that because of fraud the principal can repudiate or rescind it, but if he elects to retain its specific

*United States v. Gleneagles Investment Co.*[52] is the leading case addressing intentional

fraudulent transfer in the leveraged buyout context. In that case, Great American purchased

Raymond Group using the proceeds of a loan by IIT. At the time of the sale, Raymond Group

was "on the brink of insolvency," with multi-million dollar liabilities for federal income taxes,

trade accounts, pension fund contributions, strip mining obligations, back-filling obligations, and

municipal real estate taxes.[53] In connection with the sale, Raymond Group guaranteed the loan

to Great American and pledged its assets as security. Following the closing, Raymond Group

lacked the funds to pay its taxes and routine operating expenses. Within two months of the

transfer, Raymond Group was forced to begin shutting down its operations, and, within six

months, it ceased all operations and bankruptcy ensued.[54]

The District Court for the Middle District of Pennsylvania found that Raymond Group

had engaged in an intentional fraudulent transfer, holding that "[w]here the transferor and

transferee have knowledge of the claims of creditors and know that the creditors cannot be paid

and where consideration is lacking for the transfer the Court may infer an intent to hinder, delay,

or defraud creditors."[55] Even though it could not be directly shown that Raymond Group

---

results to the detriment of a third person justice requires that he take the transaction with its actual infirmities
. . . . When authority to do the act is present, every agent fully represents his principal in that act. And when
the act is done by an agent of any class and advantage is claimed under it there can be no question of the
authority to do it."); *cf. N.Y. Cent. & Hudson River R.R. Co. v. United States*, 212 U.S. 481, 494-95 (1909)
("[T]here is a large class of offenses . . . wherein the crime consists in purposely doing the things prohibited by
statute. In that class of crimes we see no good reason why corporations may not be held responsible for and
charged with the knowledge and purposes of their agents, acting within the authority conferred upon them. . . .
If it were not so, many offenses might go unpunished and acts be committed in violation of law, where, as in the
present case, the statute requires all persons, corporate or private, to refrain from certain practices forbidden in
the interest of public policy.") (internal citations omitted). *See* Report at § IV.B.7.b.(1).

[52]   *United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556 (M.D. Pa. 1983), *aff'd in relevant part sub nom. United
States v. Tabor Court Realty Corp.*, 803 F.2d 1228 (3d Cir. 1986).

[53]   *Id.* at 571, 581.

[54]   *Id.* at 572.

[55]   *Id.* at 581; *see also Aluminum Mills Corp. v. Citicorp N. Am. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 887
(Bankr. N.D. Ill. 1991).

18

intended to hinder or delay paying creditors, the court deduced a fraudulent intent: "If the parties could have foreseen the effect on creditors resulting from the assumption of the IIT obligation by the Raymond Group, a company in a serious financial condition, the parties must be deemed to have intended the same."[56]

On appeal, the Third Circuit Court of Appeals declined to approve the "could have foreseen" standard stated by the lower court, but instead endorsed the lower court's alternative finding that "a party is deemed to have intended the *natural consequences of his acts*." [57]  Other courts have similarly focused on the effect of a transfer as indicative of intent: "When the legal effect of a conveyance is to hinder or delay creditors, the intent [to defraud] will be presumed, regardless of the actual motives of the parties."[58]  In *Moody v. Security Pacific Business Credit*, a later Third Circuit case involving a failed leveraged buyout, the Court of Appeals ruled that because the transferor was "not on the brink of insolvency" at the time of the transfer, it did not necessarily follow that the leveraged buyout would hinder, delay, or defraud creditors and thus there was no fraudulent transfer.[59]

The "natural consequences" analysis represents an effort to determine the transferor's intent in the leveraged buyout context by focusing on the readily discernible consequences of

---

[56]  *Gleneagles*, 565 F. Supp. at 582.

[57]  *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1305 (3d Cir. 1986) (emphasis added); *see also Moody v. Sec. Pac. Bus. Credit*, 971 F.2d 1056, 1075 (3d Cir. 1992) ("In *Tabor Court Realty Corp.* we relied in part on the principle that 'a party is deemed to have intended the natural consequences of his acts' in upholding the district court's finding of intentional fraud."); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935-36 (S.D.N.Y. 1995) (rejecting argument that actual intent could be inferred if creditor could merely have foreseen the harmful effect of transfer, because such a standard "is incompatible with the concept of actual fraud"); *Bull v. Bray*, 26 P. 873, 876 (Cal. 1891) (ruling, in the context of finding the intent to avoid a fraudulent conveyance, "every man intends the usual and ordinary consequences of his voluntary acts") (internal citation omitted).

[58]  *Freehling v. Nielson (In re F&C Servs.)*, 44 B.R. 863, 869 (Bankr. S.D. Fla. 1984); *see also Rosener v. Majestic Mgmt. (In re OODC, LLC)*, 321 B.R. 128, 140 (Bankr. D. Del. 2005) (holding that complaint adequately alleged intentional fraudulent transfer where "Trustee alleges that the Defendants were aware of the creditors' claims and that the LBO would leave the Debtor with too much debt, making it unable to pay those claims").

[59]  971 F.2d 1056, 1075-76 (3d Cir. 1992).

such a transaction.  The standard, however, is not precise (indeed it is less a standard than a

characterization of the underlying facts and consequences), and the courts have not put a fine

pencil on the question of what, precisely, the transferor must know or suspect for a court to find

that hindering, delaying, or defrauding creditors is the "natural consequence" of a failed

leveraged buyout transaction.  The relatively straightforward case in favor of finding an

intentional fraudulent transfer in these circumstances arises when the debtor transfers property

when it is not paying its debts or is otherwise insolvent, and the evidence shows that the debtor

knows this to be the case:  the "natural consequence" of the transfer is that creditors are hindered,

delayed, or defrauded.[60]  A more difficult question may arise when the evidence shows that the

debtor was aware of red flags suggesting a *possibility* or *likelihood* of insolvency or inadequacy

of capital, but proceeded with the transaction in any event.  The estate representative plainly

must prove more than that insolvency or bankruptcy were foreseeable at the time of the

leveraged buyout, but it is not clear just how much more must be proven.[61]

---

[60]  *See SEC v. Haligiannis*, 608 F. Supp. 2d 444, 451 (S.D.N.Y. 2009) (avoiding mortgage because "[w]hen [transferor] executed the mortgage, he almost certainly was aware that he was insolvent (or on the verge of insolvency), and that his fraud was about to be revealed") (citations omitted); *In re Process-Manz Press, Inc.*, 236 F. Supp. 333, 347 (N.D. Ill. 1964) ("It is elementary that a party is held to intend the natural consequences of his acts. Armstrong's arranging for and causing the unwarranted withdrawal of $2,000,000 in working capital from Manz at a time when Manz was having difficulty paying its debts clearly and conclusively justifies the Referee's conclusion that the transaction of December 14, 1961 is voidable under § 67, sub. d(2)(d) of the Bankruptcy Act."), *rev'd on other grounds*, 369 F.2d 513 (7th Cir. 1966); *Miller v. Greenwich Capital Fin. Prods. (In re Am. Bus. Fin. Servs.)*, 384 B.R. 66, 75 (Bankr. D. Del. 2008); *see also Rosener v. Majestic Mgmt. (In re OODC, LLC)*, 321 B.R. 128, 140 (Bankr. D. Del. 2005) (noting the close relationship between the parties to the transaction, the fact that the LBO occurred outside the ordinary course of the parties' business, and the fact that the defendant was aware that the LBO would leave the debtor with too much debt; *Murphy v. Meritor Sav. Bank (In re O' Day Corp.)*, 126 B.R. 370, 411 (Bank. D. Mass 1991) ("At no time during the course of this case has the Trustee even suggested that the company was anything but healthy prior to the 1987 LBO.  This distinction alone provides a sufficient reason for this Court to reject an application of the ruling in *Gleneagles* to the facts of this case."); *Aluminum Mills Corp. v. Citicorp N. Am., Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 887 (Bankr. N.D. Ill. 1991) (explaining that the lender had direct knowledge that LBO would render debtor insolvent and agreed to withdraw demand for a solvency letter, an independent accountant's review and fairness letter).

[61]  "Because of the difficulty in proving intentional fraud, challenges to leveraged buyouts tend to be predicated on constructive fraud . . . ." *Moody*, 971 F.2d at 1064.

The problem of determining what a debtor knew and intended is hardly unique to failed leveraged buyouts.  Since the English Parliament enacted the Statute of Anne, courts have grappled with the question of how to apply intentional fraudulent transfer statutes.  Because "[d]irect evidence of fraudulent intent . . . is often unavailable and courts usually rely on circumstantial evidence, including the circumstances of the transaction, to infer fraudulent intent,"[62] in evaluating the transferor's actions, courts have looked to various "badges of fraud" that include:  (1) the relationship between the debtor and the transferee; (2) consideration for conveyance; (3) insolvency or indebtedness of the debtor; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor; and (6) secrecy or concealment of the transaction.[63]

Although a single badge of fraud is insufficient, it is not necessary for an estate representative to show all of these badges of fraud (or any one in particular) to prove fraudulent intent.[64]  "Depending on the context, badges of fraud will vary in significance, though the presence of multiple indicia will increase the strength of the inference."[65]  Thus, an intentional fraudulent transfer may occur even when the transferee allegedly imparted fair consideration or

---

[62]   *Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 327 B.R. 537, 550-51 (D. Del. 2005) (citing authorities), *aff'd*, 278 F. App'x 125 (3d Cir. 2008).

[63]   *Id.*; *see also Moody v. Sec. Pac. Bus. Credit, Inc.*, 127 B.R. 958, 990 (Bankr. W.D. Pa. 1991), *aff'd*, 971 F.2d 1056 (3d Cir. 1992).

[64]   *See Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1353-54 (8th Cir. 1995) ("The presence of a single badge of fraud is not sufficient to establish actual fraudulent intent; however, 'the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent significantly clear evidence of a legitimate supervening purpose.'") (internal quotations omitted); *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254-55 (1st Cir. 1991) ("The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent significantly clear evidence of a legitimate supervening purpose.") (citations and internal quotations omitted). *But see Geltzer v. Artists Mktg. Corp. (In re Cassandra Group)*, 338 B.R. 583, 598 (Bankr. S.D.N.Y. 2006) (upholding an actual fraud claim under the NY UFCA based on the presence of only one badge: inadequate consideration).

[65]   *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995); *see also Moody.*, 971 F.2d at 1064; *Dobin v. Taiwan Mach. Trade Ctr. Corp. (In re Victor Int'l)*, 97 F. App'x 365, 369 (3d Cir. 2004).

reasonably equivalent value on account of a transfer.[66]  In addition, some courts have looked to

other factors in addition to the traditional "badges of fraud" to determine whether a transaction is

intentionally fraudulent.[67]

Finally, it bears noting in this Section of the Report that the Examiner concludes that a

court is highly likely to "collapse" transactions for purposes of evaluating intentional fraudulent

transfer claims when the various factors supporting such a result in a constructive fraudulent

transfer context also are present in an intentional fraudulent transfer setting.[68]  Collapse in this

context affects questions of defenses available to the transferee or obligee of an intentional

fraudulent transfer under Bankruptcy Code section 548(c), discussed in another part of the

Report.[69]

> **b.    Examiner's Conclusions and Explanation Concerning Intentional Fraudulent Transfer Claims in the Step One Transactions.**

**Examiner's Conclusions**:

A court is reasonably unlikely to find that the Tribune Entities incurred the obligations

and made the transfers in the Step One Transactions with actual intent to hinder, delay, or

defraud any entity to which the Tribune Entities were or became, on and after the date that such

transfers were made or such obligations were incurred, indebted.[70]

---

[66]  *See, e.g., Dean v. Davis*, 242 U.S. 438, 444-45 (1917) (finding that a mortgage constituted an intentional fraudulent transfer, even where the debtor received the loan proceeds, because the debtor used the loan proceeds with intent to hinder, delay, or defraud creditors).

[67]  *See ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 370-71 (Bankr. S.D. Tex. 2008).

[68]  *See, e.g., United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302, 1304 (3d Cir. 1986) (collapsing transaction and approving lower court's finding of intent to hinder creditors); *id.* at 1297 n.3 ("Although a rational creditor might under certain circumstances consent to a risky but potentially beneficial leveraged buy-out of a nearly insolvent debtor, no reasonable creditor would consent to the intentionally fraudulent conveyance the district court found the transaction to be.  Thus, the application of fraudulent conveyance law to the instant transaction appears consistent even with Baird and Jackson's analysis.").  *See Report at § IV.B.5.b.*

[69]  11 U.S.C. § 548(c) (2006).  *See Report at §§ IV.B.5.b. and IV.B.7.b.(1).*

[70]  11 U.S.C. § 548(a)(1)(A) (2006).

**Explanation of Examiner's Conclusions**.

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

 

c.    **Examiner's Conclusions and Explanation Concerning Intentional Fraudulent Transfer Claims in the Step Two Transactions.**

**Examiner's Conclusions**:

A court is somewhat likely to find that the Tribune Entities incurred the obligations and made the transfers in the Step Two Transactions with actual intent to hinder, delay, or defraud creditors to which the Tribune Entities were or became liable, on and after the date that such transfers were made or such obligations were incurred.

**Explanation of Examiner's Conclusions**:

*Redacted*

32

*Redacted*

*Redacted*

Redacted

**(1)**     **Solvency and Value Received.**

Redacted

Redacted

**(2)**    **The Refinancing Representation.**

Redacted

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

Redacted

      **(i)**      **Attempting to Reconcile the Testimony.**

Redacted

---

139  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 75:17-76:6, 79:5-9; *see also* Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 201:18-20 (asserting that Morgan Stanley "communicated that it was reasonable for us to believe that we could refinance"); *Id.* at 199:5-6 (characterizing

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

Redacted

**(iii)    Did These Events Make a Difference?**

Redacted

*Redacted*

*Redacted*

*Redacted*

*Redacted*

(3)    **Information Concerning Out-Year Growth Rate Assumptions and Valuation Implications of Such Assumptions.**

*Redacted*

54

*Redacted*

*Redacted*

*Redacted*

**(4)**    **The October 2007 Forecast.**
*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

**(5)     The Tribune Board and Special Committee Deliberations.**

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

(6)    **Factors that Mitigate Against the Conclusion that Step Two Constituted an Intentional Fraudulent Transfer and Conclusion.**

*Redacted*

*Redacted*

*Redacted*

*Redacted*

5.      **Constructive Fraudulent Transfer Claims.**

a.      **Examiner's General Conclusions.**

Evaluation of whether the transfers and obligations comprising the Leveraged ESOP

Transactions may be avoided as constructive fraudulent transfers entails a component-by-

component evaluation, set forth below, of the elements of such claims and the defenses.

b.      **Examiner's Conclusions and Explanation Concerning
        Equivalence of Value Provided at Step One and Step Two—the
        Question of "Collapse."**

**Examiner's Conclusions:**

It is highly likely that a court would collapse all of the transactions within each of Step

One and Step Two for purposes of evaluating the equivalence of the consideration given and

received by the estates.  This conclusion does not necessarily mean that a court would collapse

Step One and Step Two together, or determine that Step Two Debt should be included in the

solvency, capital adequacy, or intention to incur debt analysis, which are discussed separately in

the Report.[250]

---

[250]  *See* Report at §§ IV.B.5.d.(6).(i)., IV.B.5.d.(6).(iii).

**Explanation of Examiner's Conclusions**:

To establish a constructive fraudulent transfer claim, an estate representative must prove that (i) the debtor transferred an interest in property or incurred an obligation in return for "less than a reasonably equivalent value," and (ii) the debtor was financially unsound at the time of or as a result of the transaction, meaning that the debtor (a) was "insolvent;" (b) had "unreasonably small capital" for any business in which the debtor was or was about to become engaged; or (c) "intended" to incur or "believed" that it would incur debts "beyond the debtor's ability to pay as such debts matured."[251]   The Third Circuit Court of Appeals has adopted a two-step inquiry to determine whether a debtor received reasonably equivalent value in exchange for a transfer or obligation:  First, did the debtor receive *any* value from the transfer?  If a court answers that question in the affirmative, the next inquiry is "whether the debtor got roughly the value that it gave."[252]   The value received and given need not be equal, but a meaningful shortfall in value received will result in a finding that the debtor received less than reasonably equivalent value.[253] Whether the debtor received reasonably equivalent value is measured from the perspective of creditors.[254]

By its terms, Bankruptcy Code section 548(a)(1)(B)(i) provides for avoidance of an obligation if the debtor received less than reasonably equivalent value in exchange.[255]   Notably,

---

[251]   *See* 11 U.S.C. § 548(a)(2) (2006).

[252]   *Pension Transfer Corp. v. Beneficiaries Under the Third Amend. to Fruehauf Trailer Corp. Ret. Plan 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 212-13 (3d Cir. 2006); *see also Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646-47 (3d Cir. 1991).

[253]   *See generally United States ex rel. FCC v. GWI PCS 1, Inc. (In re GWI PCS 1, Inc.)*, 230 F.3d 788, 806 (5th Cir. 2000); *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 213 (3d Cir. 1990).

[254]   *See Mellon Bank, N.A. v. Off. Comm. of Unsecured Creditors (In re R.M.L., Inc.)*, 92 F.3d 139, 152 (3d Cir. 1996); *see also In re Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.)*, 340 B.R. 266, 286 (Bankr. E.D. Pa. 2006) (Carey, J., sitting by designation), *aff'd*, 371 B.R. 708 (E. D. Pa. 2007); *Rosener v. Majestic Mgmt. (In re OODC, LLC)*, 321 B.R. 128, 135 (Bankr. D. Del. 2005).

[255]   11 U.S.C. § 548(a)(1)(B)(i) (2006).

unlike Bankruptcy Code sections 548(c) and 550(a),[256] the statute does not limit avoidance *to the extent* the debtor received less than reasonably equivalent value.  Rather, the statute provides for avoidance of the entire obligation *if* the debtor received less than reasonably equivalent value and the other statutory prerequisites are met.  Read in conjunction with Bankruptcy Code section 548(c),[257] section 548(a)(1) provides for avoidance of the entire transfer or obligation incurred, whereas section 548(c) affords the transferee a lien or the right to retain an obligation "to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation."[258]  Thus, section 548(c) offers a saving grace for the good faith initial transferee to the extent that party imparted value to the debtor.  Questions of good faith, in turn, should have no place in the threshold determination concerning the equivalence of the value received under section 548(a)(1) and should only be relevant "to the extent" of the value provided pursuant to section 548(c).[259]  Although reasonably equivalent value and good faith are measured as of the time of the transfer or the obligation in question,[260] the two inquiries are considered separately.

---

[256]  11 U.S.C. § 548(c) (2006) ("to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation"); 11 U.S.C. § 550(a) (2006) ("to the extent that a transfer is avoided . . . .").

[257]  11 U.S.C. § 548(c) (2006).

[258]  11 U.S.C. § 548(c) (2006); *see also Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Grp., LLC)*, 396 B.R. 810, 844 (Bankr. S.D.N.Y. 2008); *NextWave Pers. Commc'ns, Inc. v. FCC (In re NextWave Pers. Commc'ns, Inc.)*, 235 B.R. 305, 309 (Bankr. S.D.N.Y. 1999) ("[T]he appropriate remedy is avoidance of the entire obligation and reinstatement of the obligation to the extent of value given" in good faith), *aff'd*, 241 B.R. 311 (S.D.N.Y. 1999), *rev'd* 200 F.3d 43 (2d Cir. 1999); *Gil v. Maddalena (In re Maddalena)*, 176 B.R. 551, 553-55 (Bankr. C.D. Cal. 1995).

[259]  5 COLLIER ON BANKRUPTCY ¶ 548.05 (Alan A. Resnick & Henry J. Sommer eds., 16th ed.) ("This definition of value, while derived partly from Section 3 of the Uniform Fraudulent Conveyance Act, substantively revises and departs from the definition contained in former Section 67d(1)(e) of the Bankruptcy Act, which, like section 3 of the UFCA, defined 'fair consideration.'  In a significant change from the 'fair consideration' standard, 'reasonably equivalent value' does not contain a good faith component.") (footnote omitted).

[260]  Focusing on the avoidance of obligations, which figures prominently in the Report, section 548(a)(1) provides for avoidance of an obligation incurred for less than reasonably equivalent value "in exchange for such . . . obligation."  11 U.S.C. § 548(a)(1)(B)(i) (2006).  Section 548(c) permits an obligee of an avoided obligation that takes for value and in good faith to enforce any obligation incurred to the extent such "obligee gave value to the debtor in exchange for such . . . obligation."  *Id.* § 548(c) (2006).  The focus on the equivalency of the value and obligee good faith as at the time of the exchange, as recognized by many cases in the context of avoidance and good faith defenses asserted in connection with transfers.  *See Peltz v. Hatten*, 279 B.R. 710, 737 (D. Del. 2002) ("For purposes of considering reasonable equivalence, the critical date is the date of the transfer

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

### c.    Equivalence of the Value Provided Regarding Specific Transfers and Obligations.

This Section evaluates each component of the consideration given and received by the participants in Step One and Step Two for purposes of assessing reasonably equivalent value under Bankruptcy Code section 548(a)(1) and defenses under section 548(c).  Based on that analysis, taken together, and the significant disparity between the value the Tribune Entities received and the obligations incurred to the LBO Lenders in each of Step One and Step Two, the Examiner finds it is highly likely a court would conclude that, in the aggregate, the Tribune Entities received less than reasonably equivalent value in each of Step One and Step Two.[288]

---

[287]    A separate question arises concerning the consideration EGI-TRB paid in exchange for the Exchangeable EGI-TRB Note.  The Exchangeable EGI-TRB Note was issued to EGI-TRB on April 23, 2010, over a month before the Step One Financing Closing Date.  As discussed in another part of the Report, *see* Report at § IV.C.1., Tribune satisfied this note at Step Two when it issued to EGI-TRB the EGI-TRB Note.  Since the issuance of this note preceded the Step One Financing Closing Date by over a month, and the consideration paid for the note thereby was given before the Step One Financing Closing Date, a court might determine that collapse of the Step One Transactions would not extend to the consideration paid by EGI-TRB to Tribune.  On the other hand, because this note was issued as part of the Step One Transactions (a fact that was known to the participants in these transactions) and would not have been issued but for the Leveraged ESOP Transactions, and the consideration paid by EGI-TRB for this note enabled the transactions to proceed, a court might apply the collapse principle and treat this note as one of the transactions effectuated as part of the Step One Transactions for which Tribune received less than reasonably equivalent value.  To the extent the obligations incurred by Tribune on the Exchangeable EGI-Note are avoidable, Tribune's repayment of that obligation at Step Two might be recoverable.

[288]    This conclusion is drawn by comparing the components of reasonably equivalent value that the Debtors received from the LBO Lenders, in the aggregate, in Step One and Step Two, versus the obligations incurred to those creditors.  *See United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1299 (3d Cir. 1986).  At each of Step One and Step Two, the disparity is enormous.

This Section of the Report considers whether one or more of the Tribune Entities received reasonably equivalent value in exchange for certain specific transfers made at the time of the Leveraged ESOP Transactions or thereafter. The analysis in this Section assumes *arguendo* that the other prerequisites to avoidance (i.e. insolvency, inadequate capital, or intention to incur debts beyond ability to pay) are otherwise met. These questions are evaluated separately in the Report. Also, this Section does not consider the good faith of any particular transferee, which as noted previously is relevant under the "totality of circumstances" for determining reasonably equivalent value in the Third Circuit[289] and defenses under section 548(c). The Report considers questions of good faith in a separate Section of the Report, which also addresses what the Examiner's findings on good faith mean to questions of reasonably equivalent value and defenses under section 548(c).[290]

<div align="center">

**(1)    Examiner's Conclusions and Explanation Concerning Obligations Incurred to the LBO Lenders to Pay Selling Stockholders at Step One and Step Two.**

</div>

**Examiner's Conclusions:**

A court is highly likely to conclude that the LBO Lenders did not confer reasonably equivalent value on Tribune or the Guarantor Subsidiaries in the Step One Transactions or Step Two Transactions for those portions of their advances used to redeem the Selling Stockholders' Common Stock.

**Explanation of Examiner's Conclusions:**

Payments to stockholders to redeem stock are not transfers for which a debtor receives reasonably equivalent value because the debtor's stock is worthless to the debtor as a matter of

---

[289]    *See* Report at §§ IV.B.7.b.(1) and IV.B.5.b.

[290]    *See* Report at §§ IV.B.7.b.(1)-IV.B.7.b.(9).

<div align="center">

91

</div>

law.[291] Thus, no value was conferred on any Tribune Entity for obligations incurred to the LBO

Lenders to make these payments.

**(2)    Examiner's Conclusions and Explanation
Concerning Obligations Incurred to Repay the
2006 Bank Debt.**

**Examiner's Conclusions:**

A court is highly likely to conclude that the lenders under the Credit Agreement

conferred reasonably equivalent value to Tribune, but not to the Guarantor Subsidiaries, in Step

One for amounts borrowed to repay the 2006 Bank Debt.

**Explanation of Examiner's Conclusions:**

Payment of antecedent debt or advances to a debtor actually used by the company to pay

valid debt is for value.[292] Because the 2006 Bank Debt represented valid antecedent debt, the

repayment of that debt should constitute reasonably equivalent value to Tribune. Certain Parties

nevertheless argued that Tribune did not receive any "benefit" from the repayment of the 2006

Bank Debt because:  (i) the pre-existing holders of that debt were substantially the same as the

LBO Lenders; (ii) the LBO Lender Debt bore a higher interest rate than the 2006 Bank Debt; and

(iii) the 2006 Bank Debt was not guaranteed, whereas the LBO Lender Debt was.  The question,

however, is not whether repayment of the 2006 Bank Debt *improved* Tribune's position but

whether the repayment constitutes "value" for purposes of the applicable statutes, which it did.

---

[291]  *See Robinson v. Wangemann*, 75 F.2d 756, 757 (5th Cir. 1935) ("The corporation does not acquire anything of
value equivalent to the depletion of its assets, if the stock is held in the treasury, as in this case.  It is simply a
method of distributing a proportion of the assets to the stockholder."); *Consove v. Cohen (In re Roco Corp.)*, 21
B.R. 429, 434 (B.A.P. 1st Cir. 1982) ("Regardless of whether [a stockholder's] ownership interest had any
tangible or intangible value to him, the stock was worthless to the corporation."), *aff'd*, 701 F.2d 978 (1st Cir.
1983).

[292]  11 U.S.C. § 548(d)(2)(A) (2006); *see also Atlanta Shipping Corp. v. Chem. Bank*, 818 F.2d 240, 249 (2d Cir.
1987) ("In general, repayment of an antecedent debt constitutes fair consideration unless the transferee is an
officer, director, or major shareholder of the transferor."); *Aphton Corp. v. Sonefi Pasteur (In re Aphton Corp.)*,
423 B.R. 76, 89 (Bankr. D. Del. 2010) ("Courts have held that when a transfer is made to pay an antecedent
debt, the transfer may not be set aside as constructively fraudulent.") (footnote omitted).

As noted previously, no evidence was adduced suggesting that the 2006 Bank Debt was invalid. Accordingly (but subject to questions of good faith), the lenders under the Credit Agreement should be entitled to a claim against Tribune equal to the amount repaid. Because the Credit Agreement lenders advanced the funds to repay this debt, there would be no basis for the Bridge Facility Lenders to benefit from this repayment notwithstanding the contrary contention advanced by one Party.

Because the Guarantor Subsidiaries were not obligated on this debt, however, these entities did not receive reasonably equivalent value from advances that repaid the 2006 Bank debt.[293]

      (3)     **Examiner's Conclusions and Explanation Concerning Obligations Incurred in Connection with the Satisfaction of the LATI Intercompany Claims.**

**Examiner's Conclusions:**

A court is highly unlikely to conclude that the Credit Agreement lenders conferred any value on one or more Tribune Entities resulting from the LATI Note transactions effectuated at the Step One Financing Closing Date.

**Explanation of Examiner's Conclusions:**

One Party advocated the position to the Examiner that the satisfaction of the LATI Notes represented reasonably equivalent value to the Debtors. That Party acknowledged that even if the satisfaction of the LATI Notes could constitute reasonably equivalent value, at most this

---

[293] *See United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556, 576-77 (M.D. Pa. 1983), *aff'd in relevant part sub nom. United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986) ("Those guarantors of the ITT loans who were not borrowing companies were, in essence, only secondarily liable on the ITT notes and loans. Nonetheless, despite the contingent nature of their obligations, the guarantees are clearly 'obligations incurred' under the [Uniform Fraudulent Conveyances] Act, and the mortgages collateralizing the guarantees are clearly conveyances. . . . No consideration at all flowed to the guarantors who were not borrowing companies.") (internal citations omitted).

would only represent value to the twenty-one Subsidiary obligors on the LATI Notes, not to any of the other Debtors. This qualification, however, does not end up making a difference because this extinguishment conferred no value to the twenty-one Subsidiaries either. As noted previously,[294] the repayment of a valid antecedent debt constitutes reasonably equivalent value for loan obligations incurred,[295] but only if the debt claimed to have been repaid is, in fact, debt. In analyzing whether an instrument is debt or equity, the Third Circuit Court of Appeals has stated:[296]

> In defining the recharacterization inquiry, courts have adopted a variety of multi-factor tests borrowed from non-bankruptcy case law. While these tests undoubtedly include pertinent factors, they devolve to an overarching inquiry: the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else. That intent may be inferred from what the parties said in their contracts, from what they do through their actions and from the economic reality of the surrounding circumstances.

In the years preceding the Leveraged ESOP Transactions, apparently to minimize state income tax liabilities,[297] the LATI Notes were created pursuant to a series of intercompany transactions having no substantive economic effect on the Tribune Entities in general or the entities made parties to the LATI Notes in particular. Literally, capital flowed in an instant and in a circle from Tribune to LATI, then from LATI to twenty-one of Tribune's Subsidiaries, and

---

[294]  *See* Report at § IV.B.5.c.(2).

[295]  11 U.S.C. § 548(d)(2)(A) (2006) ("'Value' means . . . satisfaction . . . of a present or antecedent debt of the debtor . . . ."); *see also Atlanta Shipping Corp.*, 818 F.2d at 249 ("In general, repayment of an antecedent debt constitutes fair consideration unless the transferee is an officer, director, or major shareholder of the transferor."); *Aphton Corp. v. Sonefi Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 89 (Bankr. D. Del. 2010) ("Courts have held that when a transfer is made to pay an antecedent debt, the transfer may not be set aside as constructively fraudulent.") (footnote omitted).

[296]  *Cohen v. KB Mezzanine Fund II LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 455-56 (3d Cir. 2006); *see also Radnor Holdings Corp. v. Tennenbaum Capital Partners (In re Radnor Holdings Corp.)*, 353 B.R. 820, 838 (Bankr. D. Del. 2006) ("[T]he overarching inquiry in a recharacterization case is the intent of the parties at the time of the transaction, determined not by applying any specific factor, but through a *common sense* evaluation of the facts and circumstances surrounding a transaction . . . .").

[297]  *See* Report at § III.D.13.; Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 263:10-22.

finally from these Subsidiaries back to Tribune.[298] The fact that Tribune memorialized the intermediate step (i.e., the transfer from LATI to the twenty-one Subsidiaries) in the form of intercompany notes appears to be the only thing that distinguished that step from the others.[299] Payments (or journal entries) of interest and principal followed a reverse circular path, again having no significance other than to memorialize the periodic crediting of the note balances. The transactions effectuated on the Step One Financing Closing Date followed that same circular journey via a series of book entries. The only consequence of these transactions effectuated at Step One was to extinguish the LATI Notes—instruments that had no independent meaning in the first place.

Any tax motivations driving these transactions, moreover, do not bear on whether the LATI Notes actually represented indebtedness for fraudulent transfer analysis. For two reasons, "common sense"[300] leads to a contrary conclusion. First, from beginning to end, none of the dollar amounts circulated through the twenty-one Subsidiaries remained with those recipients.[301] As noted above, once capital passed from LATI to a Tribune Subsidiary, the Subsidiary immediately returned it to Tribune. The transactions bore no resemblance to events that ordinarily happen when parties act at arm's length.[302] Second, many if not most of the transactions relating to the LATI Notes (including the periodic repayment of principal and

---

[298] *See* Report at § III.D.13.

[299] *See Roth Steel Tube Co. v. Comm'r*, 800 F.2d 625, 630 (6th Cir. 1986) (applying a multi-factor test to determine the nature of a claim and considering the name given the instrument as a factor); *Stinnett's Pontiac Serv., Inc. v. Comm'r*, 730 F.2d 634, 638 (11th Cir. 1984) (same); *Cohen v. KB Mezzanine Fund II, L.P. (In re SubMicron Sys. Corp.)*, 291 B.R. 314, 323 (D. Del. 2003) (same).

[300] *Radnor Holdings Corp.*, 353 B.R. at 838.

[301] *See* Report at § III.D.13.

[302] *See Scripomatic Inc. v. United States*, 555 F.2d 364, 368 (3d Cir. 1977) ("The analysis . . . to the debt-equity question may be expressed in terms of two lines of inquiry: assuming the obligation is debt in form, (1) did the form result from an arms'-length relationship, and/or (2) would an outside investor have advanced funds on terms similar to those agreed to by the shareholder.") (citations omitted).

interest) were accomplished via accounting entries: no actual funds moved at all.[303]  More

importantly, the consistent course of dealing demonstrated that Tribune would furnish the

amounts necessary to "repay" interest and principal on the LATI Notes, with the money

immediately looped back to Tribune.[304]  This was not a case in which any obligor was ever

called on to pay so much as a penny from its own resources toward satisfaction of the LATI

Notes.[305]  This course of dealing simply does not manifest anything resembling a real economic

transaction.  Faced with similar circumstances, the bankruptcy court in *In re O'Day Corp.*[306]

concluded "that cancellation of the Intercompany Notes did not provide fair consideration . . . .

The Intercompany Notes appeared to have been created only for tax advantages conferred by the

mirror subsidiary structures."

        The conclusion does not change even if a court were to find that the LATI Notes

constituted "debt" the moment before they were extinguished.[307]  From inception to repayment,

the obligors on those notes never had to use their own financial wherewithal to repay the LATI

Notes.  The capital always came from Tribune to the Subsidiaries and then a like amount from

those entities to LATI and back to Tribune.  In other words, this was a "debt" that would always

be paid but never have any substance in the real world.  In contrast, the guarantee obligations

incurred by those Subsidiaries on the LBO Lender Debt and that replaced the LATI Notes were

---

[303]  *See* Report at § III.D.13.

[304]  *See id.*

[305]  Indeed, although the net effect of unwinding the LATI Notes at the Step One Financing Closing Date was to shift the LATI Note "liability" from the Subsidiaries to Tribune, to the best of the Examiner's knowledge no new intercompany note ever was issued to memorialize this "debt."

[306]  *Murphy v. Meritor Savs. Bank (In re O'Day Corp.)*, 126 B.R. 370, 394 (Bankr. D. Mass. 1991).

[307]  The Examiner emphasizes that his finding that the LATI Notes do not constitute debt is presented solely in the context of the question of "value" for fraudulent transfer analysis.  The Examiner expresses no opinion, and is not addressing, whether the LATI Notes constitute debt for other purposes.  No Party has raised whether the intercompany liability from Tribune to LATI constitutes debt, and the Examiner similarly expresses no view on that question.

96

debt in every sense of the word. There was and never could be any reasonable expectation that the LBO Lender Debt would lack substance; that the satisfaction of these obligations would be as simple as merely flipping an inter-company switch and running money back and forth among the Tribune Entities in a circle; or that the LBO Lenders would act in any manner other than on an arm's length basis to enforce their full rights of repayment. The Examiner concludes that it is highly unlikely that a court would find that replacing the LATI Notes with the LBO Lender Debt constitutes reasonably equivalent value.

> (4)    **Examiner's Conclusions and Explanation Concerning Obligations Incurred on the Revolving Credit Facility, Delayed Draw Facility and under the Credit Agreement and Bridge Facility for Satisfaction of LBO Fees, and for Payment of LBO Fees.**

**Examiner's Conclusions**:

A court is reasonably likely to conclude that the lenders under the Credit Agreement conferred reasonably equivalent value to Tribune and the Guarantor Subsidiaries in an amount equal to amounts drawn on the Revolving Credit Facility and to Tribune only in an amount equal to amounts drawn on the Delayed Draw Facility. A court is highly likely to find that the LBO Lenders conferred some value to Tribune and the Guarantor Subsidiaries for advances used to pay the LBO Fees. The amount of that value, however, is difficult to determine.

**Explanation of Examiner's Conclusions**:

Of the approximately $750 million made available under the Revolving Credit Facility at Step One, approximately $237 million was drawn in a lump sum shortly before the Petition Date for general corporate purposes for the Tribune Entities under Tribune's centralized cash management system; Tribune used another approximate $100 million in borrowings under that

facility to obtain letters of credit.[308] Consistent with the purpose of the Delayed Draw Facility, Tribune borrowed approximately $193 million to make payments on the Senior Notes maturing in February, October, and December 2008. Had Tribune borrowed these funds at the closing of Step One or Step Two, there would be little question that borrowings for these purposes would constitute reasonably equivalent value to Tribune.[309] However, because reasonably equivalent value is measured at the time an obligation is incurred,[310] the question arises whether the amount Tribune actually borrowed after the Leveraged ESOP Transactions "counts" toward reasonably equivalent value at the time of the transfer. In *Mellon Bank, N.A. v. Metro Communications, Inc.*,[311] the Third Circuit Court of Appeals recognized that "[t]he ability to borrow money has considerable value in the commercial world."[312] Thus, a lender confers *some value* to the debtor by making a credit facility available, even if the debtor does not immediately take advantage of that opportunity by borrowing the money.[313] Under Third Circuit authority, discussed below, however, because the value of any such "indirect benefit" must be measurable, a court will likely

---

[308] The Examiner understands that about $28 million of those letters of credit have been drawn since the Petition Date. Accordingly, for purposes of calculating Recovery Scenarios, the Examiner used the actual amount drawn on that Revolving Credit Facility, $265 million.

[309] *See Off. Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan (In re Sunbeam Corp.)*, 284 B.R. 355, 371-72 (Bankr. S.D.N.Y. 2002) (finding that when the loan proceeds were used to refinance existing indebtedness, those transfers were not fraudulent even if viewed as a single, integrated transaction).

[310] *See* text accompanying footnote 260 and Report § IV.B.7.b(1).

[311] 945 F.2d 635 (3d Cir. 1991).

[312] *Id.* at 647. The court went on to state: "To quantify that value, however, is difficult. Quantification depends on the business opportunities the additional credit makes available to the borrowing corporation and on other imponderables in the operation or expansion of its business." *Id.* at 645. *Accord Mellon Bank, N.A. v. Off. Comm. of Unsecured Creditors of R.M.L. (In re R.M.L., Inc.)*, 92 F.3d 139, 149 (3d Cir. 1996).

[313] The Third Circuit Court of Appeals therefore has implicitly rejected the approach suggested in *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 994 (2d Cir. 1981), that a determination whether a party imparted any value to the debtor is measured at the time each borrowing occurs. However, the Third Circuit does require that the amount of the value conferred be quantifiable. *See R.M.L.*, 92 F.3d at 149 (citing *Metro Commcn's*, 945 F.2d at 646). Contrary to the contention of one Party, the Examiner does not find Bankruptcy Code section 548(d)(2)(A), which says that value does "not include an unperformed promise to furnish support to the debtor or to a relative of the debtor," relevant to this question. 11 U.S.C. § 548(d)(2)(A) (2006). That Tribune did not borrow the funds at the closing of the Leveraged ESOP Transactions does not mean that the Credit Agreement lenders made an "unperformed promise." The closing of Step One and the creation of availability under the Credit Agreement constituted a performed promise.

consider the Tribune Entities' actual use of such funds in the months following the Leveraged ESOP Transactions to make that determination.  The Parties did not devote attention to the question of which of the Tribune Entities derived value from the borrowing under the Working Capital Facility shortly before the Petition Date.  Because the Examiner was required to address this question in developing the Recovery Scenarios, the Examiner prorated this value among Tribune and the Guarantor Subsidiaries based on the ascribed value of these entities at the time of the borrowing on the assumption that these funds were available to fund the Tribune Entities' operations under the centralized cash management system.  Regarding the Delayed Draw Facility, however, because only Tribune was liable on the Senior Notes, only Tribune received value from this borrowing to pay this valid antecedent debt of Tribune.

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

(5)    **Examiner's Conclusions and Explanation Concerning Payments Made on Account of Advisor Fees.**

**Examiner's Conclusions:**

The law in the Third Circuit is sufficiently unclear on the standard for determining the question of the reasonably equivalent value of the payments made on the Advisor Fees such that the Examiner is unable to assess how a court is likely to rule on these payments.  The Examiner leaves this question in equipoise.

**Explanation of Examiner's Conclusions:**

*Redacted*

*Redacted*

*Redacted*

*Redacted*

        **(6)**    **Examiner's Conclusions and Explanation Concerning Tax Savings, 401(k), and Private Company Status.**

**Examiner's Conclusions:**

A court is reasonably likely to conclude that, at Step Two, the Tribune Entities received some reasonably equivalent value based on the tax savings made possible from the S-Corporation/ESOP structure and avoidance of annual 401(k) plan contributions. It is highly likely that a court would prorate the value derived from tax and annual 401(k) savings among the Tribune Entities based on the relative value of such entities. Although the question of how this value might be allocated between the Credit Agreement Debt and the Bridge Debt presents interesting and difficult questions, in view of the magnitude of the value conferred, the question appears to be somewhat academic. It is highly unlikely that a court would find that, at Step Two, Tribune and the Guarantor Subsidiaries received reasonably equivalent value on account of avoidance of their annual public financial statement reporting requirements.

*Redacted*

**<u>Explanation of Examiner's Conclusions</u>:**

In applying Bankruptcy Code section 548, the Third Circuit Court of Appeals has recognized that a leveraged buyout or other complex corporate transaction may give rise to indirect benefits to the debtor that must be included in the calculation of reasonably equivalent value.[338]  As noted previously, however, to constitute reasonably equivalent value the benefit must be quantifiable.[339]  Moreover, value is to be determined from the perspective of creditors: "Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition."[340]  As Judge Carey noted:  "Because 'the purpose of fraudulent conveyance law is to protect creditors, the determination of value is looked at from the vantage point of the debtor's creditors.  Thus, the inquiry focuses on what did the debtor give up and what did it receive that could benefit creditors.'"[341]

---

[338] *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 648 (3d Cir. 1999) ("Because Metro did not receive the proceeds of the acquisition loan, it did not receive any direct benefits from extending the guaranty and security interest collateralizing that guaranty.  However, in evaluating whether reasonably equivalent value has been given the debtor under section 548, indirect benefits may also be evaluated.  If the consideration Metro received from the transaction, even though indirect, approximates the value it gave TCI, this can satisfy the terms of the statute."); *see also Mellon Bank, N.A. v. Off. Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 149-50 (3d Cir. 1996); *Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 993 (2d Cir. 1981); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 937 (S.D.N.Y. 1995); *Jumer's Castle Lodge, Inc. v. Jumer (In re Jumer's Castle Lodge, Inc.)*, 338 B.R. 344, 354-55 (C.D. Ill. 2006).  Although these cases arise in the context of the determination of reasonably equivalent value under Bankruptcy Code section 548(a)(1), the analysis would apply with equal force to a defense asserted under section 548(c).  *See, e.g.*, *Satriale v. Key Bank USA, N.A. (In re Burry)*, 309 B.R. 130, 135 (Bankr. E.D. Pa. 2004).

[339] *Pension Transfer Corp. v. Beneficiaries Under the Third Amend. To Fruehauf Trailer Corp. Ret. Plan 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 213 (3d Cir. 2006).

[340] *Williams v. Marla (In re Marla)*, 252 B.R. 743, 759-61 (B.A.P. 8th Cir. 2000) (citing 7A Uniform Laws Annotated, Uniform Fraudulent Transfer Act § 3, Comment (1999)), *aff'd*, 267 F.3d 749 (8th Cir. 2001); *see also Jacoway v. Anderson (In re Ozark Rest. Equip. Co.)*, 850 F.2d 342, 344-45 (8th Cir. 1988) ("The concept of reasonably equivalent value is a means of determining if the debtor received a fair exchange in the market place for the goods transferred.").

[341] *See Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.)*, 340 B.R. 266, 286 (Bankr. E.D. Pa. 2006) (citations omitted).  *Accord Jimmy Swaggert Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 802 (5th Cir. 2002); *R.M.L.*, 92 F.3d 139, 150 (3d Cir. 1996); *Mellon Bank*, 945 F.2d at 646 ("The purpose of the [fraudulent transfer law in Bankruptcy Code § 548] is estate preservation; thus, the question whether the debtor received reasonable value must be determined from the standpoint of the creditors."); *Boyer v. Crown Stock Distrib., Inc. (In re Crown Unlimited Mach., Inc.)*, 2006 Bankr. LEXIS 4651, at *19-20 (Bankr. N.D. Ind. Oct. 13, 2006) ("Furthermore, since fraudulent conveyance laws are intended to protect a debtor's creditors, the

Case law outside of the Third Circuit is mixed on the question whether tax savings may qualify as an indirect benefit.[342] Statements from other cases suggest that "indirect benefits may include the synergistic effects of new corporate relationships."[343] Although the Third Circuit has not addressed whether tax benefits can constitute value, the law in the Third Circuit does not support the contention advocated by certain Parties that any such value, even if quantifiable, cannot constitute value "given by" the LBO Lenders within the meaning of Bankruptcy Code section 548(c) or value exchanged by those entities within the meaning of section 548(a)(1).[344] By definition, an "indirect benefit" is conferred *indirectly* by the transferee.

Under Third Circuit law, moreover, the dispositive question is how (and how much) the alleged indirect benefits would translate into something having actual value from a creditor's viewpoint. At a superficial level, a creditor cannot levy on or sell a tax or pension savings derived by a debtor in its operations; hence, tax benefits and avoidance of pension costs arguably do not constitute value from the perspective of creditors. However, to the extent the Tribune Entities would reduce their tax bills[345] and avoid incurring 401(k) costs, those savings would

---

transaction is to be evaluated from their perspective, not that of the defendant/transferee."); *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.)*, 100 B.R. 127, 136 (Bankr. D. Mass. 1989) (evaluating "reasonably equivalent value" as used in Bankruptcy Code § 548(a)(2)(A), and making two inquiries: first, whether the debtor, not some third party, received the required value; and second, "unlike the doctrine of consideration in contract law, that value must pass a measurement test").

[342] *MFS/Sun Life*, 910 F. Supp. at 937-38 (noting that "[t]he tax benefits that a target receives as a consequence of an LBO also constitute an indirect benefit," but finding in that case that "[i]t would be sheer speculation to assume that the tax benefits and economic value of the loan could be reasonably equivalent to the $26.8 million shortfall in consideration"); *see also Kipperman v. Onex Corp.*, 411 B.R. 805, 838 (N.D. Ga. 2009) (stating that in analyzing an LBO, "courts must look beyond the actual money received to the indirect benefits to the debtor. Such benefits may include synergistic effects of new corporate relationships . . . tax benefits, [and] additional access to credit to facilitate new business opportunities ") (citations omitted). *But see Soule v. Allot (In re Tiger Petroleum Co.)*, 319 B.R. 225, 239 (Bankr. N.D. Okla. 2004) (finding that tax benefits resulting from a transaction are "granted by the tax laws and the taxing authorities" and not by the parties to the transaction).

[343] *MFS/Sun Life*, 910 F. Supp. at 937; *see also Mellon Bank*, 945 F.2d at 647.

[344] *See MFS/Sun Life*, 910 F. Supp. at 937; *see also Mellon Bank*, 945 F.2d at 646.

[345] The Examiner found no evidence that the Tribune Entities were parties to a written tax sharing agreement. Because Tribune would be the taxpayer for federal income tax purposes, an argument could be made that any benefit from the tax savings inured solely to Tribune's benefit. However, to the extent the tax savings actually

inure to the benefit of the creditors by leaving more money on the table to satisfy their claims. Although no specific case has been found to support this conclusion, the Examiner finds that, consistent with the principles articled by the Third Circuit Court of Appeals on the question of indirect benefits, the tax savings made possible from the S-Corporation/ESOP structure and the avoidance of annual 401(k) plan contributions may qualify as value at Step Two to the extent it can be shown that these savings would benefit creditors by enhancing the value of a Tribune Entity.

    The Examiner's financial advisor quantified the value of these benefits. The S-Corporation/ESOP tax benefits arise from the S-Corporation's attribute of "passing-through" corporate earnings directly and proportionally to the stockholders, combined with the fact that the ESOP does not pay taxes on the income it earns through the S-Corporation.[346] These circumstances occurred on the Merger at Step Two. The value of the tax avoidance benefit from the S-Corporation/ESOP structure may be estimated by determining the taxes that would have been paid by Tribune absent this structure, if Tribune remained a going concern. Even an insolvent company can continue to operate. Because the benefit of the structure is equal to the taxes avoided, all the factors that typically bear on the determination of tax liability are relevant to the determination of the value of the tax avoidance benefit. Of primary importance is Tribune's projected taxable income, including the projected income from Tribune's operations, the periodic interest expense associated with Tribune's capital structure, and the depreciation and tax deductible amortization that may be reasonably recognized for purposes of determining

---

resulted in more value remaining within the Tribune Entities for operating purposes and otherwise, it is appropriate to allocate the value attributable to these benefits among those entities proportionate to the value of the benefits conferred. The Examiner notes that this a general proposition, as a specific Debtor-entity that generated no income tax and had a high tax basis would not enjoy any benefit from these savings.

[346]  DAVID ACKERMAN AND SUSAN E. GOULD, *S Corporation ESOP Valuation Issues* in THE HANDBOOK OF BUSINESS VALUATION AND INTELLECTUAL PROPERTY ANALYSIS 141 (Robert F. Reilly and Robert P. Schweihs, eds., 2004).

taxable income. In addition, the treatment of certain income from Tribune's equity investments must be analyzed.[347]

Because the valuation involves income, as opposed to cash, the discount rate used to convert period benefits to present value is critical in determining the value of these benefits. Moreover, because EGI-TRB had the right to acquire a 40% ownership interest in Tribune through its exercise of the Warrant at any time after consummation of the Merger, an assumption regarding when, if ever, EGI-TRB would exercise the Warrant affects the value of the tax savings. This is because upon exercise of the Warrant, Tribune was required to sell to EGI-TRB a 40% interest in Tribune, which would reduce the tax avoidance benefit to Tribune from the ESOP ownership by a commensurate percentage. Finally, any tax benefit associated with Tribune's former capital structure or other situation-specific benefits that Tribune enjoyed before the Leveraged ESOP Transactions were consummated, but foregone as a result of the Step Two Closing, should be quantified and netted against the value of the S-Corporation/ESOP tax benefit.

Based on the projected EBITDA set forth in the DCF Valuation Analysis in Annex A to this Volume of the Report, the Examiner's financial advisor deducted net interest expense, as well as depreciation, and amortization, to determine taxable income.[348] In addition, VRC's corporate tax rate was applied in estimating the tax avoided by Tribune as a result of

---

[347] For purposes of valuing the S-Corporation/ESOP structure, the Examiner's financial advisor included forecasted equity income only for Tribune's investment in TV Food Network given that: (i) forecasts of taxable income associated with Tribune's other equity investments contained in Tribune's October 2007 projections are deemed highly uncertain and, on a consolidated basis through 2006 and pro forma 2007, had not generated, collectively, any taxable equity income (excluding Comcast SportsNet), and (ii) Comcast SportsNet was anticipated to be sold. If this projected income stream were included, the value associated with the S-Corporation/ESOP structure tax savings would increase to $884.4 million, holding all else constant, although the Examiner's financial advisor believes it would be appropriate to apply a further discount to that value to account for the risk of achieving the taxable equity income associated with these investments, as forecasted by Tribune.

[348] Certain other Tribune-specific tax adjustments, as projected by Tribune, were accepted at face value as reasonable (*e.g.*, Section 199 adjustments).

consummating the Step Two Transactions. The Examiner's financial advisor also adopted VRC's estimation of the interval before EGI-TRB would be expected to exercise the Warrant (15 years) as a model parameter, although this is only an assumption.[349] The discount rate used to convert estimated avoided cash tax expense to present value is 16%, which is the rate applied by VRC in making its determination of the value of the S-Corporation/ESOP tax benefit.[350] For purposes of estimating the terminal value of the S-Corporation/ESOP tax avoidance benefit, the Examiner's financial advisor accepted the terminal growth rate of 1% that VRC estimated at 2022.

Based on this analysis, the Examiner's financial advisor determined that a reasonable value for the S-Corporation/ESOP tax avoidance benefit is $482.5 million. This value is highly sensitive to changes in critical input parameters including, for example, the discount rate applied to estimated period tax (for example, application of a higher estimated required rate of equity return would reduce the value of the benefit), and, as noted, the estimated interval before exercise of the Warrant. Thus, this is only an estimate.

With respect to the value of the benefit derived from avoidance of Tribune's 401(k) expenses, the Examiner's financial advisor used VRC's estimate of $60 million per year in savings (an estimate that the Examiner's financial advisor does not have any basis to affirm or

---

[349]  If exercise of the Warrant is assumed to occur earlier, the value of the tax benefit to Tribune declines, in that Tribune would be entitled to only its proportional allocation of this benefit thereafter.

[350]  The Examiner's financial advisor believes that a 16% discount rate, which reflects a rate of return to equity (because the tax benefit determination is made based on the assumption that all debt holder periodic claims for interest are satisfied prior to, and in connection with, the determination of taxable income, and therefore before estimation of the cash flow benefits that result from the tax avoidance), is a very conservative estimation of the equity rate of return that may reasonably be applied in this circumstance. Selection of a 16% discount rate represents a conservative estimate due to the substantial amount of Tribune's post-Merger leverage. Redacted
*Redacted*

refute). The cost of the annual 401(k) contribution must be adjusted, however, for the related tax saving that Tribune previously enjoyed. Based on a 39% tax rate, the net cost of the avoided 401(k) expense is $36.6 million per year. The Examiner's financial advisor estimated the present value of this annual savings using a discount rate of 8%,[351] resulting in a present value benefit of $457.5 million.

Based on the preceding, the collective value of the S-Corporation/ESOP tax savings and the 401(k) savings is approximately $940.0 million. The value of these benefits, however, must then be netted against the benefits foregone by Tribune as a result of the Merger, namely certain cash tax saving attributes of the PHONES Notes that Tribune enjoyed prior to the closing of Step Two. The PHONES Notes tax benefits resulted from Tribune's ability to deduct interest expense for the purpose of determining taxes, but to defer the actual cash payment of a portion of the interest until the maturity of the PHONES Notes in 2029. On the maturity date of the PHONES Notes, the deferred portion of the interest obligation previously recognized for tax purposes would become due. The opportunity to defer cash interest payments until well into the future benefitted Tribune significantly. VRC calculated the structure and amount of this periodic benefit, as well as the final amounts due under the deferral strategy, in its valuation of the PHONES Notes tax deferral.[352] The Examiner's financial advisor adopted this analysis for this purpose. The discounted present value of this deferral of taxes has been estimated on the basis of the projected taxable income noted above, and the application of a discount rate of 10%[353]

---

[351] A discount rate of 8% is appropriate since the benefit of avoiding compensation expense is a benefit to the corporation as a whole. Therefore, pre-transaction, industry-based weighted average cost of capital is the proper rate to use to capitalize the annuity.

[352] *See* Report at § III.H.3.

[353] This rate is appropriate because the PHONES Notes benefit is determined after debtholders' return has been satisfied (post-interest cash tax savings). Therefore, the appropriate discount rate should reflect a pre-transaction, industry-based cost of equity.

(reflecting a cost of equity informing the weighted average cost of capital estimated by VRC).

The present value of the PHONES Notes tax deferral asset, as quantified, is $371.9 million.

When the $482.5 million of S-Corporation/ESOP tax savings is added to the 401(k)

savings of $457.5 million, and that sum is netted against the value of the PHONES Notes cash

deferral benefit of $371.9 million that was foregone as a result of the Step Two Transactions, the

net benefit to Tribune resulting from the S-Corporation/ESOP structure is approximately $568.1

million on a present value basis.

Disagreement existed among certain Parties concerning how this value would be

allocated between the Credit Agreement Debt and the Bridge Debt. There is no question but that

the value that was made available from these savings only occurred because Step Two happened.

Approximately $2.1 billion was advanced under the Incremental Credit Agreement Facility and

about $1.6 billion under the Bridge Credit Agreement at Step Two. Although it is also true that

Step Two could not have occurred absent Step One (from the advances made under the Credit

Agreement at Step One), the Credit Agreement lenders cannot have it both ways. It would be

inequitable for the same Step One lenders who argued so vociferously against collapse of Step

One and Step Two to be awarded credit for value that was generated solely at Step Two. Indeed,

if the Credit Agreement lenders were to be rewarded for all the "good things" that happened at

Step Two, equity would require that they take the bad with the good. Regardless of the equities,

because value under Bankruptcy Code section 548(c) is the counterbalance to avoidance under

section 548(a)(1), for reasons discussed in another part of the Report,[354] it is the value given *in*

*connection with* the avoided obligation (in this instance the Step Two LBO Lender Debt) that is

the object of a section 548(c) defense. Nevertheless, by operation of the Subordinated Bridge

---

[354] *See* text accompanying footnote 260 and Report at § IV.B.7.b.(1).

Subsidiary Guarantee, to the extent the Credit Agreement Debt is enforced at the Guarantor Subsidiary level and this value is allocated at that level, this value should be remitted to lenders under the Credit Agreement until payment in full of the Credit Agreement Debt (plus postpetition interest whether or not allowed in the Chapter 11 Cases) at the Guarantor Subsidiary level. To the extent this value is allocated at the Tribune level, it should be allocated between the $2.1 billion advanced under the Incremental Credit Agreement Facility at Step Two and the amounts advanced under the Bridge Agreement.

Finally, certain Parties also asserted that the Leveraged ESOP Transactions, which resulted in Tribune becoming a private company, permitted Tribune to avoid $20 million annually in public reporting costs (equal to a present value of $137 million, assuming a savings over a 10-year period). This argument does not withstand analysis. Although after the Merger, Tribune no longer had publicly traded stock, it continued to have publicly traded bonds, which subjected the Company to public reporting requirements.[355] Indeed, even after the Step Two Financing Closing Date, Tribune continued to file public reports at least until the Chapter 11 Cases were commenced.[356] Although Tribune conceivably could realize incremental savings by only having public bonds outstanding, no evidence was adduced to support that supposition.[357]

---

[355] Trust Indenture Act of 1939 § 314(a), 15 U.S.C. § 77nnn (2006) .

[356] *See* Ex. 942 (Tribune 10-Q, dated November 10, 2008); Ex. 854 (Tribune 8-K, dated December 11, 2008).

[357] *Redacted*

(7)    **Examiner's Conclusions and Explanation Concerning Post-Step One and Step Two Payments on Account of the Credit Agreement and Bridge Credit Agreement.**

**Examiner's Conclusions:**

A court is highly likely to conclude that, to the extent obligations incurred in the Leveraged ESOP Transactions lacked reasonably equivalent value, interest and principal payments made after those transactions but before the Petition Date on account of those obligations likewise were for less than reasonably equivalent value. It is unclear, however, how a court would rule on the question whether the Credit Agreement Agent or the Bridge Credit Agreement Agent is the initial transferee of the payments on account of the Credit Agreement Debt or Bridge Debt, respectively, for purposes of Bankruptcy Code section 550(a)(1).

**Explanation of Examiner's Conclusions:**

Although little case law addresses what is essentially a "fruit of the poisonous tree" analysis, there is no principled reason to treat the payments on account of obligations any differently from the underlying obligations for purposes of reasonably equivalent value. On the contrary, if an obligation is avoided as fraudulent transfer, then interest and principal payments made on account of that obligation do not satisfy any valid debt and such payments are not for reasonably equivalent value. Therefore, the payments can generally be avoided themselves as fraudulent transfers. What little case law exists is in accord.[358] It would be necessary, however,

---

[358] *See Kingsley v. Wetzel (In re Kingsley)*, 518 F.3d 874, 877 (11th Cir. 2008) (stating that section 550(a) is intended to "restore the estate to the financial condition it would have enjoyed if the transfer had not occurred"); *Off. Comm. of Asbestos Claimants of G-I Holdings, Inc. v. Bldg. Materials Corp. (In re G-I Holdings Inc.)*, 338 B.R. 232, 250 (Bankr. D.N.J. 2006) (same) (citations omitted); *Hirsch v. Gersten (In re Centennial Textiles)*, 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998) (same).

for a court to prorate the portion of the payment attributable to the underlying indebtedness for which Tribune received reasonably equivalent value.[359]

As a separate matter, certain Parties argued that the Credit Agreement Agent is the initial transferee of the post-Leveraged ESOP Transaction payments within the meaning of Bankruptcy Code section 550(a)(1), such that these payments may be recovered from that entity separate and apart from any potential recovery that could be obtained against the Credit Agreement lenders as immediate transferees under section 550(a)(2). Certain other Parties asserted the contrary view that the Credit Agreement Agent is not an initial transferee but rather just a stakeholder for the movement of funds from Tribune to the lenders.[360] Resolution of the issue is potentially important because it is practically much easier to seek and obtain recovery from two parties than from dozens or hundreds of individual lenders. If, however, the Credit Agreement Agent was not a transferee of such payments, then the lenders would be the initial transferees.[361] Because the Parties devoted their attention principally to the question whether the Credit Agreement Agent is the initial transferee, this Section of the Report focuses principally on that question.

---

[359] *See generally Pajaro Dunes Rental Agency v. Spitters (In re Pajaro Dunes Rental Agency)*, 174 B.R. 557, 599 (Bankr. N.D. Cal. 1994) (applying *quantum meruit* principles). Records reviewed by the Examiner's professionals indicate that all such payments came from Tribune concentration accounts. Thus, Tribune was the transferor for purposes of these payments. In theory, to the extent cash was swept from a Guarantor Subsidiary to these concentration accounts, such Guarantor Subsidiary should hold a corresponding intercompany claim against Tribune, which intercompany claim would be given effect in connection with the relevant Recovery Scenarios. Because, as discussed later in the Report, *see* Report at § IV.B.8.d., the Parties did not challenge the Debtors' analysis of the effect of intercompany claims in the Recovery Scenarios, the Examiner did not independently investigate this matter.

[360] *See Abele v. Modern Fin. Plans Servs., Inc. (In re Cohen)*, 300 F.3d 1097, 1106-07 (9th Cir. 2002) (finding debtor's husband was not an initial transferee of a cashier's check made payable to a creditor where the husband had possession of the check but could not legally negotiate the check); *Mallory v. Citizens Bank (In re First Sec. Mortg. Co.)*, 33 F.3d 42, 44 (10th Cir. 1994) (finding bank was not an initial transferee when it received money for deposit); *Bonded Fin. Servs., Inc., v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988) (finding bank was not an initial transferee where transferor sent bank a check payable to bank's order with note directing bank to deposit check into account of a third party transferor).

[361] *See Christy v. Alexander & Alexander Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 56 (2d Cir. 1997) ("Numerous courts have recognized the distinction between the initial recipient – that is, the first entity to touch the disputed funds – and the initial transferee under section 550."); *Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 96, 103 (Bankr. D. Del. 2010).

However, as noted at the end of this Section, because the relevant provisions of the Credit Agreement and Bridge Credit Agreement are substantially the same, so is the legal analysis and conclusion.

Bankruptcy law has long recognized that a party who receives money or property for the delivery to another should not be considered the transferee for avoidance purposes.[362] When the transfer in question involves the payment of money, an entity that has no ability "to put the money to [its] own purpose" is not an initial transferee.[363] In *Bonded Financial Services v. European American Bank,*[364] the Seventh Circuit Court of Appeals held that, unless the recipient of money or property has "dominion and control" over such property, the recipient is not a transferee. In that case, a currency exchange gave $200,000 to its principal, Michael Ryan, by sending the bank a check with a note to deposit the check into Ryan's account.[365] The Seventh Circuit affirmed the lower court's holding that the bank was not the initial transferee because it only acted as a financial intermediary:[366]

> [T]he minimum requirement of status as a "transferee" is dominion over the money or other asset, the right to put the money to one's own purposes. When A gives a check to B as agent for C, then C is the "initial transferee;" the agent may be disregarded.

---

[362] *See, e.g., Carson v. Fed. Reserve Bank*, 172 N.E. 475, 482 (N.Y. 1930) ("The person to be charged with liability, if he has parted before the bankruptcy with title and possession, must have been more than a mere custodian, an intermediary or conduit between the bankrupt and the creditor. Directly or indirectly he must have had a beneficial interest in the preference to be avoided, the thing to be reclaimed.").

[363] *See Off. Comm. of Unsecured Creditors v. Guardian Ins. 401 (In re Parcel Consultants, Inc.)*, 287 B.R. 41, 46-47 (Bankr. D.N.J. 2002) (holding administrator of debtor's 401(k) program was not an "initial transferee" when the administrator was "bound by the contract terms" and "distributed the funds in accordance with the contract"). *Accord Bonded Fin. Servs.*, 838 F.2d at 893 ("[T]he minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes."); *see also Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund)*, 359 B.R. 510, 519-20 (Bankr. S.D.N.Y. 2007) (citing courts adopting the *Bonded Financial* test); *Burch v. Stylish Move Sportswear Inc. (In re Factory 2-U Stores, Inc.)*, 2007 Bankr. LEXIS 3140, at *9-10 (Bankr. D. Del. Sept. 11, 2007) (Carey, J.) ("Bankruptcy courts in this district have relied upon the *Bonded Financial* test.") (citations omitted); *Argus Mgmt. Group v. GAB Robins, Inc. (In re CVOE Corp.)*, 327 B.R. 210, 216, 233 (Bankr. D. Del. 2005) (citing *Bonded Financial*).

[364] *Bonded Fin. Servs.*, 838 F.2d at 893.

[365] *Id.* at 891.

[366] *Id.* at 893.

The court elaborated that "an entity does not have legal dominion over the money until it is free to invest that money in lottery tickets or uranium stocks."[367] Examples of entities exercising no dominion over funds may include depository banks, escrow and title companies, and attorneys holding funds in trust in connection with settlements.[368] In contrast, a circumstance warranting a finding that an entity is a transferee arises when that entity has "'dominion over the money or other asset [and] the right to put the money to [its] own purposes.'"[369]

This test announced by the Seventh Circuit Court of Appeals has been widely-adopted, but sometimes altered. In *Christy v. Alexander & Alexander Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*,[370] the Second Circuit Court of Appeals, in approving and applying the *Bonded* test, formulated what it called the "mere conduit test." The Second Circuit held that an insurance broker that received policy premiums from the law firm and, within several days, issued checks in the same amounts to primary insurers and reinsurers was a "mere conduit" not an initial transferee, noting:[371]

> As Finley Kumble's agent—not American Home's—A&A had no discretion or authority to do anything else but transmit the money, which is just what it did. Moreover, it is uncontested that the transfer of premium funds is an ordinary and routine financial transaction for an agency in A&A's industry, and that the transfer itself was performed here by A&A in a regular and unexceptionable way. Despite the existence of a more complex relationship, there can be no question that at that point A&A was

---

[367] *Id.* at 894.

[368] *Leonard v. First Commercial Mortg. Co. (In re First Alliance, Inc.)*, 228 B.R. 225, 233 (Bankr. S.D.N.Y. 1983) ("Examples of them include banks, . . . real estate escrow and title companies, . . . securities or investment brokers, . . . and attorneys holding funds in trust in connection with settlements of disputes . . . .") (internal citations omitted).

[369] *Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 96, 103 (Bankr. D. Del 2010) (citing *Bonded Financial*, 838 F.2d at 893, and *Factory 2-U Stores*, 2007 Bankr. LEXIS 3140, at *9-10).

[370] *Christy v. Alexander & Alexander Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52 (2d Cir. 1997). *Accord Wheeling Pittsburgh Steel v. Keystone Metals Trading (In re Wheeling Pittsburgh Steel)*, 360 B.R. 649, 652 (Bankr. N.D. Ohio 2006) ("All indications are that Keystone was simply acting as a payment conduit between Wheeling and its services providers, having no legal right to put the money it received from Wheeling to its own use.").

[371] *Finley*, 130 F.3d at 59 (citations omitted).

acting only to channel the funds from the premium returns and
Finley Kumble to American Home.

In contrast to the "dominion and control" analysis, which focuses on the entity's control over specified funds, the Second Circuit's formulation of the "mere conduit" test focuses on whether the entity serves as an intermediary between the transferor and a third party.[372] "'Parties that act as conduits and simply facilitate the transfer of funds or property from the debtor to a third party generally are not deemed initial transferees . . . .'"[373] Thus, the Second Circuit shifted the focus from control over the money on deposit to the alleged transferee's role in moving value from one party to another.

Examining the relevant provisions of the Credit Agreement governing Borrower payments to the Credit Agreement Agent, the Credit Agreement unsurprisingly provides that payments are applied in a very specific way so as to ensure that the lenders who advanced the funds receive interest and principal owing and the borrower appropriately receives credit against the obligations it owes. Specifically, the Credit Agreement provides for Tribune to repay advances and make prepayments to the Credit Agreement Agent, which receives the payments "for the account" of a particular Credit Agreement lender.[374] Although the phrase "for the account" is not defined, read in context this means that the payments are credited to the amounts owing to a particular lender.

---

[372] See Bear, Stearns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.), 397 B.R. 1, 34 (S.D.N.Y. 2007) ("Rather than stating that a party is an initial transferee if it exercises 'dominion and control' over the funds, the Second Circuit's version of the test states that a party is *not* an initial transferee if it was a 'mere conduit' **of** the funds.") (emphasis added).

[373] *Finley*, 130 F.3d at 58 n.3 (quoting *Hooker Atlanta Corp. v. Hocker (In re Hooker Inv., Inc.)*, 155 B.R. 332, 337 (Bankr. S.D.N.Y. 1993)).

[374] Ex. 179 at §§ 2.05(a), 2.05(b), and 2.13(f) (Credit Agreement) (providing that each payment "shall be applied," "shall be allocated," or "shall be made" ratably based on the principal amount owing on a specific tranche of Credit Agreement Debt). The question concerning the Credit Agreement Agent's status as conduit or transferee would have been easy to answer if the Credit Agreement Agent were the sole holder of the Credit Agreement Debt and had participated its interests to third parties, but that is not how the document or the syndicated transaction was structured.

The Credit Agreement, however, falls short of requiring the Credit Agreement Agent to distribute the actual funds it receives to the Credit Agreement lenders. No escrow or specified account is established to hold those funds pending payment to the lenders. Rather, the Credit Agreement says that once the Credit Agreement Agent receives payments it "will promptly thereafter cause to be distributed *like* funds relating to the payment of principal or interest, fees or commissions fees [sic] ratably . . . to the Lenders . . . ."[375] The Credit Agreement further authorizes the Credit Agreement Agent to assume that Tribune has timely made payment, and based thereon, "to cause to be distributed to each lender on such due date *an amount equal to* the amount then due each Lender."[376] If this assumption proves wrong, the Credit Agreement lender must repay the Credit Agreement Agent the amount received plus interest "at the Federal Funds Rate" for each day until repayment is made.[377]

Thus, although the Credit Agreement specifies how payments are to be credited and what amounts the Credit Agreement Agent is required to remit to the Credit Agreement lenders following its receipt of those payments, the Credit Agreement does not limit the Credit Agreement Agent's rights with respect to the actual funds paid by Tribune.[378] Although the Credit Agreement Agent receives the funds in its capacity as agent of the lenders, the Credit

---

[375] *Id.* at § 2.13(a) (emphasis added).

[376] *Id.* at § 2.13(f).

[377] *Id.*

[378] *Off. Comm. of Unsecured Creditors v. Guardian Ins. 401 (In re Parcel Consultants, Inc.)*, 287 B.R. 41, 46-47 (Bankr. D.N.J. 2002) ("GIAC could not exert dominion and control over the funds because it was bound by the contract terms, which granted control to the individual employees participating in the plan. Moreover, GIAC was not capable of using the funds for its own purposes. It was obligated to deposit funds at the direction of the employee participants, and not at its own discretion."). *See also Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 96, 103 (Bankr. D. Del. 2010) ("[T]he Committee does not plead in the Second Amended Complaint how Bank of America acting as trustee had 'dominion and control' over the funds. Specifically, the Committee fails to plead how Bank of America has legal title to the Notional Rent funds as opposed to mere physical possession. Bank of America acted as a financial intermediary and trustee to the Trust. It received no benefit and under the law of contracts, Bank of America is bound by the terms of the Trust and is therefore no different from a courier or an intermediary on a wire transfer; it held the Notional Rent funds only for the purpose of fulfilling an instruction to make the funds available to a third party.").

Agreement imposes no limits on the Credit Agreement Agent's dominion over or use of the funds. Rather, the Credit Agreement only obligates the Credit Agreement Agent to pay an amount equal to (i.e., "like funds") the amount received to those lenders and authorizes the Credit Agreement Agent, in effect, to extend credit to those lenders premised on receipt of payment from Tribune.

The question, then, is whether the Credit Agreement Agent would be deemed a transferee when it was free to use the actual funds paid by Tribune as it saw fit, but was obligated to pay to the Credit Agreement lenders an amount equal to those funds. Application of *Bonded Financial* suggests that the Credit Agreement Agent has "dominion and control" over the actual amounts received from Tribune and therefore should be an initial transferee. Focusing on the actual funds, the Credit Agreement does not impose any restrictions on the Credit Agreement Agent's use of those funds. In theory and quite possibly in practice, once Tribune paid principal or interest to the Credit Agreement Agent, the Credit Agreement Agent was free to spend those amounts however it pleased. Its only duty was to pay a "like" amount to the lenders. Stated differently, suppose the Credit Agreement Agent became subject to a receivership proceeding the moment after the Credit Agreement Agent received payment from Tribune but before the Credit Agreement Agent paid a like amount to the lenders. In that posited scenario, there seems little doubt but that (i) as between the Credit Agreement Agent and the lenders, the former would be a debtor and the latter creditors and (ii) Tribune would not be obligated to pay the same amount twice if the lenders were unsuccessful in extracting payment from the Credit Agreement Agent in its receivership proceeding.

On the other hand, focusing on the role played by the Credit Agreement Agent under the "mere conduit" test articulated in *Finley Kumble*, the Credit Agreement plainly obligates the Credit Agreement Agent to pay over to the lenders the same amount it received from Tribune.

The Credit Agreement Agent serves as an intermediary between Tribune and the lenders, much as the insurance broker did between law firm and the insurance companies in *Finley Kumble*. In *Finley Kumble*, it was apparent that the broker wrote checks to the insurance companies on its own account. Yet, as a "mere conduit" the broker was not deemed a transferee in connection with the movement of money. In short, if standard adopted in *Finley Kumble* applies, the Credit Agreement Agent is almost certainly not a transferee, except to the extent it receives funds for its own account.

Although cases from lower courts within the Third Circuit have tended to focus on whether the alleged transferee exercised control over the actual funds transferred,[379] those courts have not addressed a circumstance similar to the one presented here. Because the Third Circuit Court of Appeals has not spoken on this question and the lower court cases have provided insufficient guidance, the Examiner leaves this question in equipoise. Although this question certainly is important to the Credit Agreement Agent (albeit the agent holds rights of indemnity) and, as an administrative matter, to a prospective estate representative, its outcome should not affect the Tribune Entities' recovery. If the LBO Lenders are the initial transferees, the amounts received could be identified and most could be tracked down,[380] and as initial transferees they would be subject to the same liability the Credit Agreement Agent would face if it instead were

---

[379] *See Nelmark v. Helms*, 2003 U.S. Dist. LEXIS 3664, at *12 (N.D. Ill. March 12, 2003) ("Although the facts here and in *Bonded* and *In re Circuit Alliance, Inc.* are arguably alike in these respects, appellants ignore other parts of the record which were not at issue in the cited cases and would readily distinguish them, for example, that they were the debtor's daughters, thus insiders, and they commingled the debtor's funds with their own funds."); *Mervyn's Holdings*, 426 B.R. at 103; *Argus Mgmt. Group v. GAB Robins, Inc. (In re CVOE Corp.)*, 327 B.R. 210, 217 (Bankr. D. Del. 2005) ("The question of the Defendant's power over the account raises a genuine issue of material fact. There is conflicting evidence concerning the extent of the Defendant's control over those funds.").

[380] The Credit Agreement Agent must maintain "a register for the recordation of the names and addresses of the Lenders and the Commitments of, and principal amount of the Advances owing to, each Lender from time to time." Ex. 179 at § 8.7(d) (Credit Agreement) (register includes "(iii) the amount of any principal or interest due and payable or to become due and payable from Borrower to each Lender hereunder and (iv) the amount of any sum received by the Agent for Borrower hereunder and each Lender's share thereof.").

126

the initial transferee.  Proceeding against each individual transferee, however, obviously would increase the costs of seeking recovery.

Although the Parties focused principally on the Credit Agreement and the Credit Agreement Agent, the issue of the Bridge Credit Agent's status as transferee or conduit was also raised.  As the Bridge Credit Agreement and Credit Agreement are structured similarly, the analysis presented above is no different.[381]

### d.    Framing the Solvency and Capital Adequacy Analysis.

Having analyzed questions concerning reasonably equivalent value, the Report turns next to questions concerning solvency, capital adequacy, and intention to pay debts as they come due.

Bankruptcy Code section 548(a) provides that the trustee or debtor in possession may avoid the transfer of an interest in property or any obligation incurred by the debtor made or incurred on or within 2 years of the petition date, if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation" *and* at least one of three disjunctive "insolvency" conditions is satisfied, such that the debtor:

- was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

- was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or]

- intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured. . . .[382]

---

[381]  *See* Ex. 175 at §§ 2.13(a), (e) (Bridge Credit Agreement).

[382]  11 U.S.C. § 548(a)(1)(B)(ii)(I)-(III) (2006).  Bankruptcy Code section 548(a)(1)(B)(ii)(IV), which is not excerpted in the text above, addresses transfers under employment contracts outside the ordinary course of business.  11 U.S.C. § 548(a)(1)(B)(ii)(IV) (2006).

127

These alternative insolvency-related requirements and the issues they raise in respect of

the Leveraged ESOP Transactions are addressed below.

> **(1)    Examiner's Conclusions and Explanation Concerning the Relevant Dates for Step One and Step Two Solvency, Capital Adequacy, and Intention to Pay Debts as They Come Due Analysis.**

**Examiner's Conclusions:**

A court is highly likely to conclude that the Step One Financing Closing Date and

Step Two Financing Closing Date are the relevant dates for conducting the solvency and

capital adequacy analyses of the Tribune Entities.

**Explanation of Examiner's Conclusions:**

The Examiner previously has concluded that the relevant provisions of Bankruptcy Code

section 548 require that reasonably equivalent value and good faith are measured at the same

time that obligations are incurred and value allegedly is delivered.[383]  By parity of reasoning,

Bankruptcy Code section 548(a)[384] strongly suggests that the Step One Financing Closing Date

and Step Two Financing Closing Date are the correct dates to measure solvency and capital

adequacy of the Tribune Entities because those are the dates on which the Tribune Entities

incurred obligations and made transfers in the form of payments.  Although Tribune executed

numerous agreements and undertook certain obligations both on April 1, 2007, when the Tribune

Board approved the Leveraged ESOP Transactions, and on May 17, 2007, when Tribune entered

into the Credit Agreement, conditions to closing Step One remained outstanding nevertheless, on

those dates.  Had these conditions not ultimately been satisfied, the Tribune Entities would not

---

[383]  *See* text accompanying footnote 260 and Report at § IV.B.7.b.(1).

[384]  11 U.S.C. § 548(a)(1) (2006) (The trustee may avoid any *transfer* . . . of an interest of the debtor in property, or any *obligation* . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition . . . .") (emphasis added).

have incurred the obligations and made the transfers that subsequently occurred on the Step One

Financing Closing Date and Step Two Financing Closing Date.[385]  Moreover, had the Tribune

Entities breached a contractual undertaking to proceed with Step One and/or Step Two, they

might have been subject to breach of contract claims, but they would not have incurred the

obligations under the Credit Agreement (and, later, the Bridge Credit Agreement) and made the

transfers effectuated when Step One and Step Two closed.  It is these obligations and transfers

that certain Parties have challenged as fraudulent obligations and transfers.[386]

>              **(2)    Legal Standards Governing Solvency Analysis.**

Under the Bankruptcy Code, an entity is "insolvent . . . [if] the sum of such entity's debts

is greater than all of such entity's property, at a fair valuation."[387]  This test is commonly referred

---

[385]  *See* Report at § IV.B.5.d.(6).(i).

[386]  *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 630 (3d Cir. 2007) ("In light of that conclusion, the court determined both that the spin was not a fraudulent transfer and that, because VFI had been solvent at the time of the spin, it owed no 'fiduciary duty to future creditors of VFI.'") (citation omitted); *McNellis v. Raymond*, 420 F.2d 51, 53 (2d Cir. 1970) ("He found that various essential elements of the trustee's fraudulent conveyance claim had been satisfied, e.g., Donald's insolvency *at the time of his payments to Raymond*.") (emphasis added); *Marshall v. Showalter*, 375 F.2d 529, 531-32 (10th Cir. 1967) ("The final issue to be resolved is whether the creditors must prove appellant's insolvency at the time of the transfer, or whether it is sufficient to prove that he was rendered insolvent by the transfer. A person is insolvent 'when the present fair salable value of his property is less than the amount required to pay his debts; * * * To come within the provisions of Section 67(d) (2) (a) the transfer is fraudulent if the debtor is insolvent at the time of the transfer, or if he is rendered insolvent as a result of the transfer. These are alternative provisions. They are unambiguous. The District Court correctly construed the law as not requiring a finding of insolvency at the date of the transfer. The facts and the law support the court's conclusion that appellant's transfer to his wife of all his right, title and interest in the promissory note of the face value of $285,000.00, was made without fair consideration, and that said transfer rendered appellant insolvent. The act of bankruptcy under [Bankruptcy Act] Section 3(a) (1) occurred upon the transfer within the meaning of [Bankruptcy Act] Section 67(d) (2) (a) on June 1, 1964, within one year prior to September 4, 1964, the date of the creditors' petition for involuntary bankruptcy of appellant.") (footnote omitted); *Knippen v. Grochocinski*, 2007 U.S. Dist. LEXIS 36790, at *14 (N.D. Ill. May 18, 2007) ("Insolvency is determined at the time of the allegedly fraudulent transfer.").

[387]  11 U.S.C. § 101(32)(A) (2006). The Bankruptcy Code definition of insolvency is similar to those in the UFCA or UFTA. *See* UFCA at § 2(1) ("A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."); UFTA at § 2(a). *See Moody v. Sec. Pac. Bus. Credit*, 971 F.2d 1056, 1068 (3d Cir. 1992). Although the term "fair valuation" does not expressly connote a hypothetical disposition of the debtor's property, courts have interpreted this term to posit either a going concern or liquidation disposition depending on whether the debtor is operating. *See, e.g., Travellers Int'l, AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 193 (3d Cir. 1998) ("The cases generally direct us to look at 'market value' rather than 'distress value,' but then also caution that the valuation must be analyzed 'in a realistic framework'

to as a "balance sheet test"—although this label is in some respects a misnomer. The manner in which it is applied does not necessarily depend on the values set forth on the debtor's balance sheet.[388] More broadly, the test requires that "[t]he debtor's assets and liabilities are tallied at fair valuation to determine whether the corporation's debts exceed its assets."[389] This requirement generally is understood to mean that the debtor's assets should be valued on a going concern basis, unless the company's failure was clearly imminent.[390] Unlike the "unreasonably small capital" test, discussed *infra*, the balance sheet test looks to the debtor's solvency (or insolvency) at a moment in time, as opposed to the debtor's solvency (or insolvency) at a point in the future.[391]

---

considering amounts that can be realized 'in a reasonable time' assuming a 'willing seller' and a 'willing buyer.'") (quoting *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994)); *Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535 541 (Bankr. D. Del. 2002) ("Therefore, assets should be valued at the sale price a willing and prudent seller would accept from a willing and prudent buyer if the assets were offered in a fair market for a reasonable period of time."); *Rand Energy Co. v. Del Mar Drilling Co. (In re Rand Energy Co.)*, 2000 Bankr. LEXIS 1607, at *5 (Bankr. N.D. Tex. July 28, 2000) ("For a debtor that is a 'going concern,' the court would 'determine the fair market price of the debtor's assets as if they had been sold as a unit, in a prudent manner, and within a reasonable time.' As a going concern, the debtor would not likely face a forced sale.") (quoting *In re DAK Indus., Inc.*, 170 F.3d 1197, 1200 n.3 (9th Cir. 1999)) (internal citation omitted); *Durso Supermarkets v. D'Urso (In re Durso Supermarkets)*, 193 B.R. 682, 701 (Bankr. S.D.N.Y. 1996). *See also* footnotes 87 and 568.

[388] *See Peltz v. Hatten*, 279 B.R. 710, 743 (D. Del. 2002) ("While the inquiry is labeled a 'balance sheet' test, the court's insolvency analysis is not literally limited to or constrained by the debtor's balance sheet."), *aff'd*, 60 F. App'x 401 (3d Cir. 2003).

[389] *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 648 (3d Cir. 1999).

[390] *See Moody*, 971 F.2d at 1068; *In re Am. Classic Voyages Co. v. JP Morgan Chase Bank (In re Am. Classic Voyages)*, 367 B.R. 500, 508 (Bankr. D. Del. 2007) ("'A business does not have to be thriving in order to receive a going concern valuation. Before the going concern valuation is to be abandoned, the business must be wholly inoperative, defunct, or dead on its feet.'") (quoting *Fryman v. Century Factors (In re Art Shirt Ltd., Inc.*) 93 B.R. 333, 341 (E.D. Pa. 1988)); *Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.)*, 340 B.R. 266, 288 (Bankr. E.D. Pa. 2006) ("[A] fair valuation of assets contemplates the conversion of assets into cash during a reasonable period of time.").

[391] *See, e.g. Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 794 (7th Cir. 2009) ("The difference between insolvency and 'unreasonably small' assets in the LBO context is the difference between being bankrupt on the day the LBO is consummated and having at that moment such meager assets that bankruptcy is a consequence both likely and foreseeable.") (citing *Moody*, 971 F.2d at 1069-70, 1072-73; *Kipperman v. Onex Corp.*, 411 B.R. 805, 836 (N.D. Ga. 2009)).

Traditionally, courts have looked to a variety of valuation methodologies to determine whether the value of a debtor's assets exceed its liabilities for purposes of the "balance sheet" test, including the following:[392]

- Actual Sale Price. The actual sale price methodology looks to the knowledge and due diligence performed by the acquirer of the debtor's assets, including appraisals, projections and the like, to determine whether the price at which the assets were actually sold or transferred is representative of the fair value of those assets.[393]

- Discounted Cash Flow. The discounted cash flow method of valuing a debtor "involves projections of future cash flows . . . and judgments about liquidity and the cost of capital."[394] This analysis looks to determine the value of the debtor based upon the discounted present value of the debtor's projected income. When the court is assessing the probative value of projections prepared at or around the time of the transaction, "the question the Court must decide is not whether [the] projection was correct, for clearly it was not, but whether it was reasonable and prudent when made."[395]

- Market Multiple Approach. "Under this methodology, net revenues and earnings are multiplied by an appropriate range of risk-adjusted multiples to determine the

---

[392] See *Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 344 (Bankr. S.D.N.Y. 2007) (listing traditional methodologies).

[393] See *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 939 (S.D.N.Y. 1995) ("MAST proceeded with the LBO with full information and without coercion. Furthermore, other bidders expressed interest in purchasing VDAS at prices similar to that ultimately paid."); *see also Moody*, 971 F.2d at 1067 (stating that although there may be other probative evidence, "purchase price may be highly probative of a company's value immediately after a leveraged buyout").

[394] *Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002), *aff'd*, 60 F. App'x 401 (3d Cir. 2003).

[395] *Iridium Operating LLC*, 373 B.R. 283 (Bankr. S.D.N.Y. 2007); *see also MFS/Sun Life*, 910 F. Supp. at 939 ("With the acuity that comes from hindsight, we know that the forecasts were inaccurate: VDAS failed to meet management's expectations. However, given the information that was available to VDAS at the time the Final LBO Projections were made, I find them to have been reasonable.").

131

company's total enterprise value."[396] These multiples may be selected, for instance, "by bench marking certain publicly traded companies, using quantitative and qualitative factors."[397]

- Comparable Transactions Approach. This methodology "examines recent transactions where companies have been bought and sold on the market."[398] This methodology may be appropriate to value a company for solvency purposes because "it is designed to yield the price the company would carry in the marketplace based on similar transactions."[399] In order to be effective, however, the sales used in the analysis must truly be comparable and the adjustments must be justified.[400]

- Adjusted Balance Sheet Approach. This approach starts with a debtor's balance sheet, typically prepared under GAAP, and makes adjustments necessary to reflect the fair value of the assets listed there. The GAAP value of assets is deemed relevant but is not determinative of their value.[401] The balance sheet is "only the starting point in the analysis" because, for example, "financial statements prepared in accordance with GAAP do not record assets at fair market value . . . 'property' may include assets not even listed on the balance sheet[, and d]ebts are recorded only to the extent they are known and quantifiable."[402]

---

[396] *Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, 543 (Bankr. D. Del. 2002) ("The Market Multiple Methodology is an acceptable technique for determining solvency.") (citing additional authorities).

[397] *See, e.g., Lids Corp*, 281 B.R. at 543.

[398] *Id.*

[399] *Id.*

[400] *See id.* (rejecting a comparable transaction analysis that compared a company that had never been profitable against profitable companies, and relied on outdated transactions that were no longer relevant).

[401] *See id.* at 542-43.

[402] *Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.)*, 180 B.R. 389, 405 n.22 (Bankr. D. Del. 1994); *see also Arrow Elecs., Inc. v. Justus (In re Kaypro)*, 230 B.R. 400, 413 (B.A.P. 9th Cir. 1999) ("There is no generally accepted accounting principle method for analyzing the insolvency of a company. . . . Although such principles are relevant, they are not controlling in insolvency determinations."); *Sierra Steel,*

In addition, a final approach looks to the markets for publicly traded securities to assess

the market value of the debtor as a going concern.  In a somewhat recent example of this

approach, the Third Circuit Court of Appeals, in *VFB LLC v. Campbell Soup Co.*,[403] affirmed a

district court decision that relied on the market capitalization of the debtor to determine that the

debtor had received reasonably equivalent value for its leveraged acquisition of assets from a

former parent entity.  The Court of Appeals rejected appellant's contention that the market for a

debtor's equity securities is an unreliable method of assessing value: [404]

> Equity markets allow participants to voluntarily take on or transfer
> among themselves the risk that their projections will be inaccurate;
> fraudulent transfer law cannot rationally be invoked to undermine
> that function.  True, earnings projections "must be tested by an
> objective standard anchored in [a] company's actual performance,"
> but such a test applies to information about a company's
> performance available "when [the projection is] made."  Market
> capitalization is a classic example of such an anchored projection,
> as it reflects all the information that is publicly available about a
> company at the relevant time of valuation.

Further, the Court of Appeals found that the district court had committed no clear error

by deferring to evidence of the debtor's market capitalization over the testimony of several expert

witnesses utilizing other methodologies.  As the court stated:  "Absent some reason to distrust it,

the market price is a more reliable measure of the stock's value than the subjective estimates of

one or two expert witnesses."[405]  Specifically, the court found that evidence of a $1.1 billion

---

*Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.)*, 96 B.R. 275, 278 (B.A.P. 9th Cir. 1989) (stating that
"although GAAP are relevant, they are not controlling in insolvency determinations"); *Morse Operations, Inv.
C. Goodway Graphics of Va., Inc. (In re Lease-A-Fleet, Inc.)*, 155 B.R. 666, 679 (Bankr. E.D. Pa. 1993)
("Courts are not required to rely upon GAAP standards when determining the issue of insolvency."); *Joshua
Slocum, Ltd. v. Boyle (In re Joshua Slocum, Ltd.)*, 103 B.R. 610, 623-24 (Bankr. E.D. Pa. 1989) ("While GAAP
principles do not control this court's determination of insolvency, we are inclined to accord weight to a
company's treatment of its assets and liabilities according to GAAP.").  This approach is derivative of the other
valuation approaches.

[403]  482 F.3d 624 (3d Cir. 2007).

[404]  *See id.* at 631-33 (citations omitted).

[405]  *Id.* at 633 (quoting *In re Prince*, 85 F.3d 314, 320 (7th Cir. 1996)) (citing additional authorities; *see also Peltz
v. Hatten*, 279 B.R. 710, 737-38 (D. Del. 2002) ("[I]n determining whether a value is objectively reasonable the
court gives significant deference to marketplace values.  When sophisticated parties make reasoned judgments

market capitalization of the debtor's equity—months after the acquisition and subsequent to the

public disclosure of facts that may have had a negative impact on the value of debtor—was

appropriate evidence that the debtor was solvent at the time of the transaction. Although not

central to its holding, the court also made several observations about the market for the debtor's

publicly traded debt securities.[406]

It should be noted that shortly after the Court of Appeals' decision in *VFB LLC*, the

District Court for the District of Delaware held that *VFB LLC* did *not* compel application of the

market capitalization approach in the case before it, even though the company's equity securities

were publicly traded.[407] In *American Classic Voyages, Co. v. JP Morgan Chase Bank (In re

American Classic Voyages, Co.)*, however, the court did not explain its reliance on traditional

forms of valuation, other than to note that the market information presented to the court actually

was consistent with evidence adduced using those other methods.[408]

Somewhat surprisingly, the Parties devoted relatively little attention addressing the

import of *VFB LLC* to the valuation issues presented in Question One, and even then, only

obliquely. One Party relied on *VFB LLC* to argue that the auction process that preceded

selection of the Zell Group is compelling evidence that the $34 per share Tender Offer price

---

about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight."), *aff'd*, 60 F. App'x 401 (3d Cir. 2003); *Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 293 (Bankr. S.D.N.Y. 2007) ("[T]he public trading market constitutes an impartial gauge of investor confidence and remains the best and most unbiased measure of fair market value and, when available to the Court, is the preferred standard of valuation.").

[406] *See VFB LLC*, 482 F.3d at 628 (noting that debtor successfully issued $200 million in debt to institutional investors "despite disclosing discouraging financial data for the first nine months of FY1999, declining sales, limited advertising and product innovation, and other worrisome news"); *id.* at 632-33 (noting that the below par trading price of unsecured debt in fiscal year 2000 demonstrated that debtor was insolvent at the time, although it did not prove that debtor was insolvent in fiscal year 1999).

[407] *See Am. Classic Voyages, Co. v. JP Morgan Chase Bank (In re Am. Classic Voyages, Co.)*, 384 B.R. 62, 65 (D. Del. 2008).

[408] *See id.* at 65.

supports the conclusion that Tribune was solvent at Step One.  This argument, however, confuses the market capitalization approach affirmed in *VFB LLC*—which looks to the capitalization of a debtor's equity as reflected in an active, public market for those securities—and the actual sale approach, which looks at the facts and circumstances of a particular transaction to determine if the sale price reached as a result of that process is a reliable indication of solvency.  To the extent the Tender Offer price supports a conclusion on Step One solvency, the use of this data would represent an actual sale approach to valuation.

Another Party cited *VFB LLC* to argue that the price of Tribune's debt securities before Step One and the price of its equity securities before Step Two demonstrate that Tribune was insolvent prior to each of those steps.  Not surprisingly, other Parties challenged the assumptions underlying these contentions, pointing to the trading value of Tribune's Common Stock at other times, the trading value of other debt issuances allegedly supporting a solvency conclusion, and the characteristics of yet other Tribune debt issuances (i.e. coupon, maturity) to explain why those instruments traded at levels above what would be expected if the market had judged Tribune to be insolvent.

Based on his review of the applicable law, the Examiner concludes that a court is reasonably likely to consider relevant evidence of the markets for Tribune's publicly traded securities at relevant times on the question of solvency.  The Examiner does not believe, however, that a court is reasonably likely to view such evidence as conclusively determining the solvency analysis; rather, a court is reasonably likely to consider other valuation metrics, *along with market data*, to reach a conclusion on valuation.  Significantly, despite wide disagreement over valuation issues, no Party advocated to the Examiner a contrary view.

The Report discusses application of the various valuation methodologies to the question of solvency in the Sections that follow.

(3)    **Legal Standards Governing Capital Adequacy Analysis.**

The Bankruptcy Code does not define the term "unreasonably small capital" used in

Bankruptcy Code section 548(a)(1)(B)(ii)(II).  Courts generally have described the term as a

financial condition "short of equitable insolvency,"[409] but which leaves the transferor "unable to

generate sufficient profits to sustain operations"[410] so that the transferor "is technically solvent

but doomed to fail."[411]  Thus, the unreasonably small capital test is designed to capture those

situations when a transaction may leave the debtor technically solvent, but with so few assets that

inability to pay debts in the future should have been "reasonably foreseeable."[412]

In *Moody*, the Third Circuit Court of Appeals adopted the approach of *Credit Managers*

*Association of Southern California v. Federal Co.*, and held that "the test for unreasonably small

capital is reasonable foreseeability . . . whether the parties' projections were reasonable."[413]  This

approach does not view the projections in hindsight, but instead determines whether they were

---

[409]  "[E]quitable insolvency" is defined as "the general inability of the corporate debtor to meet its pecuniary liabilities as they mature, by means of either available assets or an honest use of credit."  *VFB LLC*, 482 F.3d at 636; *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 943 (S.D.N.Y. 1995) ("A transfer may be set aside as fraudulent if the transferor, though its assets exceed its liabilities, is rendered unable to pay its debts as they come due.  This forward-looking standard is generally referred to as equitable insolvency.").

[410]  *See Moody v. Sec. Pac. Bus. Credit*, 971 F.2d 1056, 1070 (2d Cir. 1992); *Fidelity Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.)*, 340 B.R. 266, 294.

[411]  *See MFS/Sun Life*, 910 F. Supp. at 944 (citing *Moody*, 971 F.2d at 1070 & n.22); *see also Boyer*, 587 F.3d at 792 (finding corporation was left with unreasonably small capital when the transfer left it "with insufficient assets to have a reasonable chance of surviving indefinitely"); *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002) ("[U]nreasonably small capital means something more than insolvency or inability to pay debts as they come due.  Being left without adequate capital would mean that the transaction in issue put [the debtor] on the road to ruin."); *Pioneer Home Builders, Inc. v. Int'l Bank of Commerce*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992) ("Although short of technical insolvency, a debtor's unreasonably small capital structure is presumed to lead eventually to insolvency, which is why it serves as grounds for treating the transfer in question as fraudulent vis-à-vis other unsecured creditors."); *Ferrari v. Barclay's (In re Morse Tools, Inc.)*, 148 B.R. 97, 133 (Bankr. D. Mass. 1992) (finding unreasonably small capital where the buyout made it almost certain the company would fail).

[412]  *See* Bruce A. Markell, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital*, 21 IND. L. REV. 469, 497 (1988) (stating that unreasonably small capital exists when the non-payment of the plaintiff's claim was a reasonably foreseeable effect given, the amount of the transferor's assets and capital remaining, and reasonably foreseeable cash resources).

[413]  *Moody*, 971 F.2d at 1072-73 (citing *Credit Managers Assoc. v. Fed. Co.*, 629 F. Supp. 175 (C.D. Cal. 1985)).

reasonable and prudent at the time they were made.[414] In evaluating the reasonableness of the

projections, courts give considerable weight to projections developed by management when there

is "substantial evidence presented to show that the [b]usiness [p]lan was prepared in a reasonable

manner, using supportable assumptions and logically consistent computations."[415] Independent

analysis and vetting of management's projections by independent advisors is also an indicator of

reasonableness.[416]

　　　　Further, the reasonableness of the projections should be measured according to an

objective standard "anchored in the company's actual performance" and should look to data

including "cash flow, net sales, gross profit margins, and net profits and losses."[417] In addition to

this historical data, courts must "also account for difficulties that are likely to arise, including

interest rate fluctuations and general economic downturns, and otherwise incorporate some

margin for error."[418] The reasonable foreseeability test has been described as a "fact-based test

of whether the company's cash flow forecasts are reasonable and leave enough margin for error

to account for reasonably foreseeable difficulties" and a "cash flow cushion test."[419]

　　　　Finally, although a company must be adequately capitalized, it does not need resources

sufficient "to withstand any and all setbacks."[420] In *Moody*, although the court voiced concerns

---

[414]　*See, e.g., Credit Managers*, 629 F. Supp. at 186-87 (finding that "[w]ith 20-20 hindsight it is clear that
　　Crescent's cash flows did not work out as projected by GECC" but that the court's focus must not be on "what
　　happened to Crescent, but whether the GECC projections . . . were prudent").

[415]　*Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 348 (Bankr. S.D.N.Y. 2007)
　　(citing *In re Mirant Corp.*, 334 B.R. 800, 825 (Bankr. N.D. Tex. 2005)).

[416]　*Id.*

[417]　*Moody*, 971 F.2d at 1073 (citing *Credit Managers*, 629 F. Supp. at 184-86; *Kipperman v. Onex Corp.*, 411 B.R.
　　805, 836 (D. Ga. 2009).

[418]　*Moody*, 971 F.2d at 1073 (citations omitted).

[419]　*See* Shepard, Note, *Beyond Moody: A Re-Examination of Unreasonably Small Capital*, 57 HASTINGS L.J. 891,
　　892 (2006) (citations omitted).

[420]　*Credit Managers*, 629 F. Supp. at 187; *see also Iridium*, 373 B.R. at 345; *accord Peltz v. Hatten*, 279 B.R. 710,
　　747 (D. Del. 2002) ("It is clear that USN had its operating challenges, including dealing with its billing and

about the potential for abuse in leveraged buyout scenarios, the court again employed the

approach adopted in *Credit Managers* test, holding "participants in leveraged buyout responsible

. . . when it is reasonably foreseeable that an acquisition will fail, but at the same time takes into

account that businesses fail for all sorts of reasons, and that fraudulent conveyance laws are not a

panacea for all such failures."[421]

The determination of unreasonably small capital is conducted on a case-by-case basis and

is likely to rely on industry-specific financial information.[422]  Considerable weight often is given

to management's projections or decisions made to enter into transactions.[423]  Courts also consider

a variety of other factors, including the following:

- Historic performance.  Deviation from historical practice can support a finding of

  unreasonably small capital.[424]  In *In re O'Day Corp.*, the court looked at two sets

  of projections that were prepared in connection with the alleged fraudulent

---

collection problems and adjusting its planning and projections as it grew at a rapid rate.  But these challenges were associated with meeting its projected growth rate and the market's expectations, not with all out business failure."), *aff'd*, 60 F. App'x 401 (3d Cir. 2003).

[421] *Moody*, 971 F.2d at 1073; *see also* Markell, footnote 412, at 506 ("[B]usinesses fail for all sorts of reasons, and . . . fraudulent transfer laws are not a panacea for all such failures.").  Judge Markell's statement has been cited with approval not only in *Moody*, but also in *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 793 (7th Cir. 2009); *Ring v. Bergman (In re Bergman)*, 293 B.R. 580, 584 (Bankr. W.D.N.Y. 2003); and *Salisbury v. Texas Commerce Bank, N.A. (In re WCC Holding Corp.)*, 171 B.R. 972, 986 (Bankr. N.D. Tex. 1994).

[422] *See* Robert J. Stearn, Jr., *Proving Solvency: Defending Preference and Fraudulent Transfer Litigation*, 62 BUS. LAWYER 359, 388-89 (Feb. 2007) (stating that financial ratios should be evaluated and compared to similar companies) (citations omitted).

[423] *Iridium*, 373 B.R. at 345, 348; *Credit Managers*, 629 F. Supp. at 183; *see also Stern v. Samuel, Son & Co., Ltd. (In re Longview Aluminum)*, 2005 Bankr. LEXIS 1312, at *21 (Bankr. N.D. Ill. July 14, 2005) (giving weight to the decisions of the debtor's principals who had their own finances and time at stake and had access to substantial professional expertise).

Similarly, weight may be given to market valuations in determining reasonableness.  For example, in *Iridium*, the court discussed the market's optimistic predictions of present and future value for the debtor.  The court continued, "[t]he capital markets synthesized and distilled what all the smart people of the era knew or believed to be true about Iridium.  Given the overwhelming weight of that market evidence, it may be that the burden of proving . . . unreasonably small capital simply could not be met under any circumstances . . . ."  373 B.R. at 352.

[424] *See Moody v. Sec. Pac. Bus. Credit, Inc.*, 127 B.R. 958, 998 (W.D. Pa. 1991) (including the company's historical capital cushion among the more relevant considerations).

transfer.[425] Before the closing of the leveraged buyout transaction, management received quarterly financial information showing a decrease in gross profit margin and a decline in EBIT.[426] Because the projections were inconsistent and irreconcilable with the debtor's recent historical financial data as well as its recent financial trends, including worst-case projections that the company would greatly exceed its average performance in the reference period, the court found that they were not reasonable.[427] The court held that the resulting inability to pay creditors was foreseeable, notwithstanding evidence of several unpredictable intervening events that could have caused the failure, including a stock market crash.[428] By contrast, in *Moody*, the court rejected the argument that the projections had ignored the most recent historical data, which included a down-turn and a break-even year in the two years preceding the transaction at issue there.[429] Finding the incorrect projections to have been reasonable when made, even given this recent history, the court noted that the company had enjoyed a pre-tax profit and had a positive cash flow prior to the transaction.[430]

- <u>Availability of Funds</u>. In determining whether there is adequate capital, courts may also consider "all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from *operations*, or cash from secured or unsecured loans over the relevant time period."[431] Access to credit alone may be

---

[425] *Meritor v. Murphy Savs. Bank (In re O'Day Corp.)*, 126 B.R. 370, 404-05 (Bankr. D. Mass. 1991).

[426] *Id.* at 406.

[427] *Id.* at 405-07.

[428] *Id.* at 407.

[429] *Moody v. Sec. Pac. Bus. Credit*, 971 F.2d 1056, 1074 (3d Cir. 1992).

[430] *Id.; see also Credit Managers Assoc. v. Fed. Co.*, 629 F. Supp. 175, 185 (C.D. Cal. 1985) (finding projections reasonable even where assumptions regarding collectability of accounts receivable were higher than data for the year prior to the LBO).

[431] *Moody*, 971 F.2d at 1072 n.24 (citation omitted); *Peltz v. Hatten*, 279 B.R. 710, 726 (D. Del. 2002) (same), *aff'd*, 60 F. App'x 401 (3d Cir. 2003); *see also* Markell, footnote 412, at 501 (arguing that courts should focus on "a business' ability to generate sufficient cash from operations, or to issue debt or equity securities for cash").

sufficient to establish adequate capital.[432] Further, even if projections show that the debtor will not have sufficient cash to pay off principal balances on loans or notes when they come due, courts should take the possibility of refinancing into account (even for companies experiencing financial and operational difficulty).[433] Courts may even accept the possibility of asset sales as a means for a company to raise cash.[434] However, where no reasonable means of raising funds exists, the court will find that there was unreasonably small capital.[435]

- Causation. Although the statutes do not explicitly require that there be a causal connection between the transfer and failure to satisfy the creditor claims, courts generally require that such causation be shown. Clearly, the occurrence of a calamity, such as a fire or storm, could cause unforeseen difficulties,[436] but courts also look to other causes of interruption in business that are at least arguably more foreseeable.[437]

- Time Horizon. Another indication that the transfer did not cause the inadequate capitalization is evidence that the company survived for a period (often measured

---

[432]  *Moody*, 971 F.2d at 1072 (although the LBO left the debtor with a line of credit as the sole source of operating capital, the court held the debtor was adequately capitalized); *cf. Meritor v. Murphy Savs. Bank (In re O'Day Corp.)*, 126 B.R. 370, 408 (Bankr. D. Mass. 1991) (holding that the "ability to borrow is not a substitute for operating profits" and that sums available under a revolver, which allowed the company to stay afloat for 22 months after the LBO, did not establish adequate working capital).

[433]  *See* Steam, footnote 422, at 389 (citing *Peltz*, 279 B.R. at 747) (additional citations omitted).

[434]  *See Nasr v. Geary*, 2003 U.S. Dist. LEXIS 13887, at *64 (C.D. Cal. June 9, 2003) ("Unreasonably small assets signify an inability to generate enough cash flow from operations *and the sale of assets* to remain financially stable.") (emphasis added); *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.)*, 100 B.R. 127, 137 (Bankr. D. Mass. 1989).

[435]  *See, e.g., Wells Fargo Bank v. Desert View Bldg. Supplies, Inc.*, 475 F. Supp. 693, 697 (D. Nev. 1978) (finding unreasonably small capital where, after taking on a secured loan, the only hope that the company would be able to pay creditors rested on its ability to expand sales, which was rendered impossible by the additional debt service).

[436]  *See* Markell, footnote 412, at 504 n.254.

[437]  *See, e.g., Moody v. Sec. Pac. Bus. Credit, Inc.*, 127 B.R. 958, 977-78 (D. W.D. Pa. 1991) (recession and increased competition); *Credit Managers Assoc. v. Fed. Co.*, 629 F. Supp. 175, 184 (C.D. Cal. 1985) (loss of a major customer and labor strike); *Ohio Corrugating Co. v DPAC, Inc. (In re Ohio Corrugating Co.)*, 91 B.R. 430, 440 (Bankr. N.D. Ohio 1988) (industry-wide downturn).

in months) after the allegedly fraudulent transfer and was able to pay creditors during that time.[438] In *Boyer v. Crown Stock Distribution, Inc.,*[439] the Seventh Circuit Court of Appeals addressed this factor in further detail in the context of a leverage buyout in a manner that the Examiner believes is consistent with the object of the capital adequacy test, namely to test the debtor's wherewithal to pay its creditors. In *Boyer*, the court held that notwithstanding the transferor's survival for 3½ years after the LBO, the transaction was susceptible to attack:[440]

> Should the acquired company be doomed to go broke after and because of the LBO–if the burden of debt created by the transaction was so heavy that the corporation had no reasonable prospect of surviving–the payment to the shareholders by the buyer of the corporation is deemed a fraudulent conveyance because in exchange for the money the shareholders received they provided no value to the corporation but merely increased its debt and by doing so pushed it over the brink . . . .
>
> * * *
>
> [N]ew Crown started life almost with no assets at all, for all its physical assets were encumbered twice over, and the dividend plus new Crown's interest obligations drained the company of virtually all its cash.  It was naked to any financial storms that might assail it.  So the statutory condition for a fraudulent conveyance was satisfied–or so at least the bankruptcy judge could and did find without

---

[438] *See, e.g., Moody v. Sec. Pac. Bus. Credit, Inc.,* 971 F.2d 1056, 1074 (3d Cir. 1992) (finding not unreasonably small capital where creditors were paid for twelve months after transaction); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.,* 910 F. Supp. 913, 945 (S.D.N.Y. 1995) (stating that where "the company remained viable so long [*i.e.* for eight months] after the LBO strongly suggests that its ultimate failure cannot be attributed to inadequacy of capital as of the date of the buyout" and finding failure resulted from rapid emergence of competition, imposition of fees, loss of business, and failure to implement growth and cost-saving strategies); *Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.),* 340 B.R. 266, 299-300 (Bankr. E.D. Pa. 2006) (finding projections reasonable where debtor survived 14 months after LBO); *Daley v. Chang (In re Joy Recovery Tech. Corp.),* 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002) ("Courts will not find that a company had unreasonably small capital if [it] survives for an extended period after the subject transaction.").

[439] 587 F.3d 787 (7th Cir. 2009) (Posner, J.).

[440] *Id.* at 792-95; *see also Ferrari v. Barclays Bus. Credit, Inc., 148 B.R. 97, 133 (Bankr. D. Mass. 1992)* (holding projections unsound even when debtor stayed in business for two years because the failure was almost certain from the start); *Murphy v. Meritor Savs. Bank (In re O'Day Corp.),* 126 B.R. 370, 408 (Bankr. D. Mass. 1991) (holding that there was unreasonably small capital even when the company stayed in business for 22 months after transaction).

committing a clear error.

> The fact that mistakes by the buyer hastened the company's demise is not a defense. Whether a transfer was fraudulent when made depends on conditions that existed when it was made, not on what happened later to affect the timing of the company's collapse. . . . An inadequately capitalized company may be able to stagger along for quite some time, concealing its parlous state or persuading creditors to avoid forcing it into a bankruptcy proceeding in which perhaps only the lawyers will do well.

> The interval was longer than in previous cases, but the defendants are unable to sketch a plausible narrative in which new Crown could have survived indefinitely despite being cash starved as a result of the terms of the LBO that brought it into being. The fact that Smith made mistakes in running the company does not weigh as strongly as the defendants think. Everyone makes mistakes. That's one reason why businesses need adequate capital to have a good chance of surviving in the Darwinian jungle that we call the market.

- <u>Additional Factors</u>. Among the other factors that courts may consider in addition to those discussed above are: (1) nature of business; (2) stable or volatile income; (3) likelihood of future growth or contraction; (4) current secured and unsecured debts; (5) likelihood of collateral of secured debt to retain, gain, or lose value; (6) likelihood of incurring substantial consensual debt in the future;[441] (7) if transferor is a guarantor, likelihood that primary debtors will default; (8) spending and saving habits; (9) composition of asset portfolio; (10) track record of prior incidents and claims; (11) amount of insurance; (12) type of insurance coverage;

---

[441] *See United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556, 580 (M.D. Pa. 1983) ("We are also of the opinion that the delivery of the mortgages and guarantee mortgages to IIT occurred when the Raymond Group was engaged or about to engage in a 'business or transaction for which the property remaining in [its] hands after the conveyance is an unreasonably small capital.' 39 Pa. Cons. Stat. § 355. Both before the November 26, 1973 transaction as well as thereafter, the Raymond Group did not have the capital resources it needed to carry on its business. *Moreover, Durkin planned to continue selling the surplus lands of the Raymond Group and would therefore incur additional income tax liabilities to the United States.* The provisions of the Note Purchase and Loan Agreement were such that relatively little, if any, proceeds of the land sales would be available for general creditors. *Durkin also planned to continue the Raymond Group's coal mining operations and would therefore incur additional liabilities to trade creditors, the Anthracite Health and Welfare Fund, and the Commonwealth for backfilling obligations.*") (emphasis added), *aff'd in relevant part sub nom., United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986).

and (13) also whether the transferor reasonably discounted the likelihood that certain assets or liabilities would materialize.[442]

> **(4)     Examiner's Conclusions and Explanation Concerning Whether Solvency and Capital Adequacy Are Measured on an Estate-by-Estate Basis—the Impact of the Subsidiary Guarantees.**

**Examiner's Conclusions:**

A court is highly likely to measure the solvency and capital adequacy of the Tribune Entities on an estate-by-estate basis.  In conducting that analysis, however, it is highly likely that in considering these questions as applied to Tribune and the Guarantor Subsidiaries (either separately or collectively), a court would take into account offsetting assets in the form of rights of contribution, subrogation, and indemnity whether arising under contract or common law.  To the extent, however, that an individual Guarantor Subsidiary was insolvent before incurring the Step One Debt, such entity's estate should be entitled to avoid such obligations.  In the case of Tribune, because it was the ultimate parent of the Guarantor Subsidiaries, to the extent it discharges debt of Guarantor Subsidiaries, Tribune's value would be enhanced (vis-à-vis the increased net worth of the solvent Guarantor Subsidiaries) by the amount of any indebtedness satisfied.

**Explanation of Examiner's Conclusions:**

Absent a finding of veil piercing, alter ego, or substantive consolidation of the Tribune Entities' respective estates, each Debtor must be considered as a separate entity with separate

---

[442]   *See* John E. Sullivan III, *Future Creditors and Fraudulent Transfers:  When a Claimant Doesn't Have a Claim, When a Transfer Isn't a Transfer, When a Fraud Doesn't Stay Fraudulent, and Other Important Limits to Fraudulent Transfers Law for the Asset Protection Planner*, 22 DEL. J. CORP. L. 955, 1010-12 (1997).

assets and liabilities.[443] As shown below, however, proper evaluation of the solvency and capital adequacy of the Guarantor Subsidiaries and Tribune requires consideration of the rights of contribution, subrogation, and indemnity that, in effect, give rise to offsetting assets.

### (i)    The Guarantor Subsidiaries.

The Credit Agreement Subsidiary Guarantee and Subordinated Bridge Subsidiary Guarantee imposed joint and several liability on the Guarantor Subsidiaries for the LBO Lender Debt.[444] As a result, if called upon, any individual Guarantor Subsidiary would be required to satisfy the full LBO Lender Debt. The Credit Agreement Subsidiary Guarantee renders each Guarantor Subsidiary unconditionally and primarily liable for the full amount of the guaranteed indebtedness. Thus, the LBO Lenders could proceed in any manner against any Guarantor Subsidiary for the full amount of the guaranteed indebtedness. If, however, any individual Guarantor Subsidiary were required to apply all of its available assets to the satisfaction of this indebtedness, the paying Guarantor Subsidiary would hold contractual and common law rights of contribution, subrogation, and indemnity against Tribune and each other.[445] These rights, in turn,

---

[443] *See In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005) ("Substantive consolidation . . . 'treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities. . . . The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor.'") (citing *In re Genesis Health Ventures, Inc.*, 402 F.3d 416, 423 (3d Cir. 2005)).

[444] *See* Ex. 189 at § 1 (Credit Agreement Subsidiary Guarantee); Ex. 414 at § 1 (Subordinated Bridge Subsidiary Guarantee).

[445] Of note, each Guarantor Subsidiary's *contractual* contribution, subrogation, and indemnity rights against the other Guarantor Subsidiaries arose at the Step Two Financing Closing Date. *See* Ex. 7 at § 2 (Credit Agreement Subrogation Subordination Agreement; Ex. 12 at § 2 (Bridge Subrogation Subordination Agreement). In contrast, the Credit Agreement Subsidiary Guarantee, which was entered into on the Step One Financing Closing Date, only recognizes contribution, subrogation, and indemnity rights against Tribune. *See* Ex. 189 at § 7 (Credit Agreement Subsidiary Guarantee). Nonetheless, each Guarantor Subsidiary likely had common law contribution, subrogation, and indemnity rights against each other Guarantor Subsidiary at the Step One Financing Closing Date because of the joint and several nature of the obligations. *See Mfrs. & Traders Trust Co. v. Goldman (In re Ollag Constr. Equip. Corp.)*, 578 F.2d 904, 908 (2d Cir. 1978) (finding subrogation and contribution rights exist even in the absence of a contractual provision granting such rights); *Beltrone v. Gen. Schuyler & Co.*, 645 N.Y.S.2d 914, 915 (N.Y. App. Div. 1996) (holding under New York law, guarantor who pays more than proportionate share of amount of guarantee is entitled to contribution from co-guarantors); *McDermott v. City of N.Y.*, 406 N.E.2d 460, 462 (N.Y. 1980) ("[W]here payment by one person is compelled,

directly affect conclusions concerning the solvency and capital adequacy of each guarantor, even though each entity is liable for the full amount of the debt.

*In re Ollag Construction Equipment Corp.*[446] illustrates this principle. There, the Second Circuit Court of Appeals reversed the lower court's conclusion that a debtor was insolvent based on the lower court's failure to consider certain intangible assets of the debtor, namely, the debtor's rights of contribution and subrogation in connection with its guarantee of an affiliate's debt.[447] The court held that "contingent subrogation and contribution rights must be valued as assets in determining solvency."[448] The Third Circuit Court of Appeals adopted the same approach in *Mellon Bank, N.A. v. Metro Communications, Inc.*[449] Applied here, solvency and capital adequacy analysis of each Guarantor Subsidiary must similarly take into account each such entity's contribution, subrogation, and indemnity rights against Tribune and the other Guarantor Subsidiaries.

Viewed in this light, solvency and capital adequacy analysis of the Guarantor Subsidiaries produces the same result whether the Guarantor Subsidiaries are considered liable on the LBO Lender Debt individually or collectively as long as each Guarantor Subsidiary is solvent before the Leveraged ESOP Transactions. An example (actually adapted from one submission to the Examiner) drives home the point: Assume that three guarantors, each with an equity value of $150 (excluding the value of contribution rights from other guarantors), jointly,

---

which another should have made . . . a contract to reimburse or indemnify is implied by law.") (citing *Brown v. Rosenbaum*, 41 N.E.2d 77, 81 (N.Y. 1942)).

[446]  578 F.2d 904 (2d Cir. 1978).

[447]  *Id.* at 908.

[448]  *Id.* (citing *Syracuse Eng'g Co. v. Haight*, 97 F.2d 573, 576 (2d Cir. 1938)).

[449]  *See also Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 648 (3d Cir. 1991) ("In valuing the cost of Metro's guaranty, the right of contribution of co-guarantors needs to be balanced against the amount of debt for which Metro is liable."); *In re Consol. Capital Equities Corp.*, 143 B.R. 80, 88 (Bankr. N.D. Tex. 1992) (finding liability on a guarantee may be offset by value of rights of contribution).

severally, and unconditionally guarantee a $300 debt. In analyzing the solvency of each guarantor, the $300 liability does not render any guarantor insolvent because each guarantor has an asset in the form of its contribution rights equal to $200 (*i.e.*, $100 from each of the other two guarantors in the event the first guarantor were required to pay the entire $300 debt). On a stand-alone basis, each guarantor has $350 in assets ($150 of equity value plus $200 in contribution rights) versus $300 in liabilities (the debt) resulting in a solvency cushion of $50 for each guarantor. This result is identical if the three guarantors are valued collectively. In that case, the guarantors have $450 in combined assets (their collective equity value) versus $300 in collective liability, resulting in a $150 collective solvency cushion ($50 for each).

A different conclusion regarding individual guarantors might result, however, if the guarantors each have a different net worth, but each is liable pro rata on the guarantee. Suppose, for example, three subsidiaries give a joint and several upstream guarantee of $300. Pre-transaction, one subsidiary has $2 of net worth, one has $5 of net worth, and one has $300 of net worth. Collectively the subsidiaries are solvent post-transaction. But if the liability is equally apportioned because each entity is equally liable on the guarantee (in other words, $100 per entity), two of the entities would be rendered insolvent. The Credit Agreement Subrogation Subordination Agreement and Bridge Subrogation Subordination Agreement, entered into in conjunction with Step Two, addressed this issue by providing that to the extent a Guarantor Subsidiary is called on to make a payment on the LBO Lender Debt, the other Guarantor Subsidiaries "shall indemnify the Claiming Guarantor in an amount equal to such payment, in each case multiplied by a fraction of which the numerator shall be the net worth . . . of the Contributing Guarantor . . . and the denominator shall be the aggregate net worth . . . of all the

Guarantors."[450]  Applying this provision to the above example, the collective net worth of the three guarantors is $307.  The first guarantor would have to pay 2/307ths of $300 (which is $1.95, leaving that guarantor solvent by a nickel), the second one has to pay 5/307ths of $300 (which is $4.89, leaving it solvent by 11 cents), and the third one has to pay 300/307ths of $300 (which is slightly over $293, leaving it solvent by $14).  In each case, each subsidiary remains solvent.  If any one of the subsidiaries had a negative net worth pre-transaction, the provision would result in none of the remaining subsidiaries being rendered insolvent, provided that the collective net worth of the solvent subsidiaries exceeds the collective liability of those solvent subsidiaries.  In other words, the insolvency of any one subsidiary would not render the remaining entities insolvent if the aggregate net worth of the remaining entities exceeds the liability.

The Credit Agreement Subrogation Subordination Agreement did not exist at Step One, meaning that, in theory, if each Guarantor Subsidiary were required to honor its Subsidiary Guarantee of the Step One Debt on an equal basis (in other words in an amount equal to the Step One Debt divided by the aggregate number of Guarantor Subsidiaries) at the Step One Financing Closing Date, any one Guarantor Subsidiary could be rendered insolvent if the inclusion of its ratable share of Step One Debt, combined with such entity's other liabilities, exceeded its assets. But if the Guarantor Subsidiaries are solvent collectively based, for example, on a hypothetical sale of the Tribune Entities as a going concern, it would seem implausible that a court would ratably allocate the Step One Debt and thereby render individual Guarantor Subsidiaries insolvent.  In that scenario, a court is more likely to apportion the liability in a manner that mirrors what the Credit Agreement Subrogation Subordination Agreement and Bridge

---

[450]  *See* Ex. 711 at § 2 (Credit Agreement Subrogation Subordination Agreement); Ex.712 at § 2 (Bridge Subrogation Subordination Agreement).

Subrogation Subordination Agreement accomplished contractually at Step Two:  in other words, allocate the collective liability among the Guarantor Subsidiaries in an amount equal to the proportion of each entity's net worth to the net worth of all of the Guarantor Subsidiaries.  Such an approach would better represent the actual contribution of each Guarantor Subsidiary to the value derived from the hypothetical sale of the enterprise and generally would be more consistent with *Ollag* and *Mellon Bank,* which require that rights of contribution be "balanced" against the amount of debt for which each guarantor is liable.[451]

Certain Parties nevertheless argued to the Examiner that the contribution, subrogation, and indemnity rights considered in cases such as *Ollag* and *Mellon Bank* are inapposite here. Specifically, these Parties asserted that because these rights are contractually subordinated to the prior payment in full of the LBO Lender Debt, such rights cannot be considered assets of any Guarantor Subsidiary (and consequently included in a solvency or unreasonable capital analysis) until the LBO Lender Debt is first paid in full.  Although these rights indeed are subordinated to the LBO Lender Debt,[452] however, this should not change the outcome of solvency or capital adequacy analysis.  First, as noted, the Guarantor Subsidiaries should be valued collectively for purposes of a solvency and capital adequacy analysis.  Thus, if the Guarantor Subsidiaries are solvent as a group, then the inter-guarantor subordination provisions are of no effect and disappear on the satisfaction of the LBO Lender Debt.  This is another way of saying that this issue merges with the question whether the Guarantor Subsidiaries are solvent collectively.

---

[451]  *See also Mellon Bank*, 945 F.2d at 648.  Although not directly relevant, equitable principles of marshalling also would support such a result.  *See, e.g., Telefest, Inc. v. VU-TV, Inc.,* 591 F. Supp. 1368, 1382 (D.N.J. 1984) ("It has repeatedly been said that the equitable doctrine of the marshalling of assets rests upon the principle that a creditor having two funds to satisfy his debt may not, by his application of them to his demand, defeat another creditor who may resort to only one of the funds.") (citations omitted); *In re R.L. Kelly & Sons, Millers*, 125 B.R. 945, 954 (Bankr. D. Md. 1991) (applying marshalling doctrine by analogy to common fund issues).

[452]  *See* Ex. 711 at § 3 (Credit Agreement Subrogation Subordination Agreement); Ex. 712 at § 3 (Bridge Subrogation Subordination Agreement).

Second, the import of the argument that the Guarantor Subsidiaries' contribution, subrogation, and indemnity rights should not be considered due to the subordination of those rights is that each Guarantor Subsidiary's assets must be compared to a liability for the entire LBO Lender Debt, but because the LBO Lender Debt need only be satisfied once, it cannot be the case that each Guarantor Subsidiary will face $11 billion in liability on the LBO Lender Debt resulting in aggregate liabilities in excess of $500 billion. The aggregate liability is $11 billion, not a multiple of that amount. The fact that each Guarantor Subsidiary is liable for this debt must be taken into consideration in evaluating the solvency and capital adequacy of each individual Guarantor Subsidiary. A court should apply the analysis of *Ollag* and *Mellon Bank*, i.e., that the rights of contribution, subrogation, and indemnity of each Guarantor Subsidiary must be included in any solvency and capital adequacy analysis, notwithstanding the existence of subordination provisions in the guarantees.

On the other side of the coin, certain Parties cited in *In re Xonics Photochemical, Inc.*[453] and its progeny for the proposition that the Guarantor Subsidiaries hold *contingent* liabilities which must be "discounted" to take into account the probability that such Guarantor Subsidiary would be called upon to "make good" on its guaranty. *Xonics* is a famous bankruptcy case authored by a famous jurist. There, Judge Posner, writing for the Seventh Circuit Court of Appeals, observed that when a company guarantees an affiliate's obligations, the guarantor incurs only a contingent liability.[454] Recognizing that any contingency involves an assessment of probability, Judge Posner reasoned that liability on a guarantee must be valued based on the

---

[453] 841 F.2d 198 (7th Cir. 1988).

[454] *Id.* at 200.

149

likelihood of the contingency coming to pass and therefore discounted "by the probability that the contingency will occur and the liability become real."[455]

The *Xonics* analysis is not relevant to the question considered here. It is true that in *Xonics*, the court evaluated the debtor's guarantee obligations in assessing whether the debtor was solvent at the time of an allegedly preferential transfer to a creditor; and it is likewise true that this inquiry bears a resemblance to the question of solvency and capital adequacy presented here. But the specific inquiry in *Xonics* was whether the company was insolvent at the time of the transfer, *not whether the transfer itself rendered the company insolvent.* It is this second question that must be evaluated, namely, whether the Leveraged ESOP Transactions (and in particular the incurrence of the LBO Lender Debt) rendered Tribune *and* the Guarantor Subsidiaries, as obligors and guarantors on this same massive indebtedness, insolvent or inadequately capitalized. If this question is answered in the affirmative, absent a fresh capital contribution, there would be no reasonable likelihood that Tribune could meet its obligations on the LBO Lender Debt, and not a likelihood but a certainty that the guarantees would be called. The converse is true. In the circumstance presented here, applying *Ollag* and *Mellon Bank* to take into account rights of contribution, subrogation, and indemnity of the Guarantor Subsidiaries against one another and Tribune is all that is required.

In sum, for purposes of solvency and capital adequacy analysis, the liability of the Guarantor Subsidiaries on the LBO Lender Debt should be measured collectively, notwithstanding that each entity is fully liable on that debt, but without applying any "discount."

Nevertheless, if an individual Guarantor Subsidiary were insolvent before it incurred the Step One Debt (after giving effect to intercompany claims, discussed below), the estate

---

[455] *Id.*

representative of that particular Guarantor Subsidiary should be able to avoid that particular Subsidiary Guarantee of Step One Debt.[456] To determine whether any significant Guarantor Subsidiary was insolvent before the Step One Financing Closing Date, the Examiner analyzed the net worth of some of such entities before giving effect to the Step One Transactions. To perform this analysis, the Examiner's financial advisor isolated certain of the largest Guarantor Subsidiaries in the Publishing Segment and the Broadcasting Segment, according to the relative size of their recorded book values of assets:[457]

- Publishing Segment: Los Angeles Times, Chicago Tribune, Newsday, Eagle New Media, Orlando Sentinel, Sun Sentinel, and Baltimore Sun.

- Broadcasting Segment: KTLA, WPIX, and Tower Distribution.[458]

In assessing the pre-Step One solvency of these Guarantor Subsidiaries, the Examiner's financial advisor first compared the recorded book value of each Guarantor Subsidiary's assets to its recorded liabilities.[459] The chart below presents the results of this "book basis" comparison for each of these entities (excluding intercompany balances) based on data as of the end of May 2007, just before the Step One Financing Closing Date:

---

[456] *See* 11 U.S.C. § 548(a)(1)(B)(ii)(I) (2006) (stating that transfers and obligations are subject to avoidance where transferor "was insolvent on the date that such transfer was made or such obligation was incurred, *or* became insolvent as a result of such transfer or obligation") (emphasis added). *See generally W.E. Trucker Oil Co. v. First State Bank of Crossett (In re W.E. Tucker Oil Co.)*, 55 B.R. 78, 81 (Bankr. W.D. Ark. 1985) ("The trustee's evidence clearly and unmistakably establishes that the debtor was insolvent before and after the transfers and that after the transfers an unreasonably small amount of capital remained for the debtor to engage in its business.").

[457] Given the time constraints of the Investigation, the Examiner's financial advisor relied on asset book values to identify and prioritize for evaluation certain of the largest Guarantor Subsidiaries. Although significant differences may exist between the book value and market value of the assets of these selected Guarantor Subsidiaries, selecting Guarantor Subsidiaries based on market value size would have effectively required the individual fair market valuation of numerous Subsidiaries, an unrealistic expectation given the number of Tribune Subsidiaries. The Examiner's financial advisor selected Guarantor Subsidiaries based not only on size (*i.e.*, highest book value) but also on the availability of EBITDA information as discussed herein.

[458] In this analysis, Tower Distribution and WGN Continental Broadcasting are combined.

[459] The Examiner's financial advisor specifically identified the assets and liabilities associated with intercompany amounts separately.

| TRIBUNE LARGE SUBSIDIARIES w/o I/C - Period 5 (May), 2007 ($000) | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Publishing Segment | | | | | | | Broadcasting Segment | | |
| | Los Angeles Times | Chicago Tribune | Newsday | Eagle New Media Invest. | Orlando Sentinel | Sun Sentinel | Baltimore Sun | KTLA | WPIX | Tribune Distribution |
| **Assets** | | | | | | | | | | |
| Cash and Equivalents | $ 78 | $ (4,942) | $ 1,785 | $ 41,768 | $ 1,281 | $ 1,550 | $ 1,060 | $ 1,096 | $ 895 | $ - |
| Accounts Receivable | 93,300 | 77,303 | 42,056 | 1,532 | 22,696 | 32,391 | 29,218 | 27,306 | 41,742 | 7,113 |
| Inventory | 15,235 | 7,226 | 6,354 | 562 | 3,114 | 3,651 | 3,136 | - | - | - |
| Broadcast Rights | - | - | - | - | - | - | - | 58,969 | 68,841 | - |
| Investment in Subs | 903,283 | 17 | 589,664 | 1,451,638 | - | 857 | 386,060 | - | - | - |
| Other | 307,673 | 56,730 | 28,650 | 110 | 17,924 | 15,821 | 7,673 | (1,275) | 10,513 | 293 |
| Net Properties | 434,063 | 307,587 | 177,912 | 1,264 | 75,577 | 113,428 | 148,820 | 10,146 | 13,695 | 10,651 |
| Intangibles | 1,840,072 | 49,324 | 1,003,940 | 36,579 | 11,773 | 10,617 | 617,352 | 285,231 | - | 153,937 |
| Total | 3,593,724 | 493,245 | 1,850,361 | 1,533,453 | 132,365 | 178,315 | 1,193,319 | 381,473 | 135,686 | 171,994 |
| **Liabilities** | | | | | | | | | | |
| Broadcast Rights Payable | - | - | - | - | - | - | - | 78,473 | 96,652 | - |
| Long Term Debt | - | - | 2,500 | - | 1,631 | - | - | - | - | 11,130 |
| Accounts Payable | 18,978 | 15,245 | 3,988 | 193 | 4,885 | 7,234 | 4,571 | 1,637 | 2,429 | 166 |
| Deferred Taxes | 246,517 | 58,420 | 47,169 | 11,458 | 20,213 | 61,771 | 37,622 | 30,124 | 9,320 | 35,121 |
| Other Current | 46,817 | 35,509 | 28,823 | 360 | 14,097 | 14,049 | 15,269 | 3,027 | 16,679 | 1,060 |
| Other Long Term | 13,113 | 7,795 | 6,892 | 916 | 1,827 | 2,583 | 5,954 | 3,982 | 6,468 | 161 |
| Total | 325,425 | 116,969 | 89,372 | 12,927 | 42,653 | 85,637 | 63,416 | 117,243 | 131,548 | 47,638 |
| Equity | $ 3,268,299 | $ 376,276 | $ 1,760,989 | $ 1,520,526 | $ 89,712 | $ 92,678 | $ 1,129,903 | $ 264,230 | $ 4,138 | $ 124,356 |

As shown in the chart above, on a book basis, each selected Guarantor Subsidiary is "book basis" solvent before intercompany receivables and payables are considered. Book value solvency, of course, is not synonymous with solvency for purposes of fair valuation.[460] To assess whether a significant disparity exists between book value and fair value of the selected Guarantor Subsidiaries, the Examiner's financial advisor considered the implied values for each such Guarantor Subsidiary using a selected range of EBITDA multiples, which then were applied to each selected Guarantor Subsidiary's estimated EBITDA, based on data compiled by VRC.[461] In all circumstances, the implied value exceeded each Guarantor Subsidiary's interest-bearing

---

[460] The proper standard is fair value. *See* Report at IV.B.5.d.(2).

[461] *See* Ex. 1070 (LECG Comparison Analysis of Recently Updated Tribune Performance). For purposes of this analysis, an approximation of the lowest Step Two LTM EBITDA identified by VRC was used. This is extremely conservative because cohort multiples, as quantified by VRC, declined significantly between VRC's Step One and Step Two analyses.

debt, indicating that each of the above large Guarantor Subsidiaries was solvent before the Step

One closing:

| | Publishing Segment | | | | | | | Broadcasting Segment | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Los Angeles Times | Chicago Tribune | Newsday | Eagle New Media Invest. | Orlando Sentinel | Sun Sentinel | Baltimore Sun | KTLA | WPIX | Tribune Distribution |
| **Assets** | | | | | | | | | | |
| Cash and Equivalents | $ 78 | $ (4,942) | $ 1,785 | $ 41,768 | $ 1,281 | $ 1,550 | $ 1,060 | $ 1,096 | $ 895 | $ - |
| Accounts Receivable | 93,300 | 77,303 | 42,056 | 1,532 | 22,696 | 32,391 | 29,218 | 27,306 | 41,742 | 7,113 |
| Inventory | 15,235 | 7,226 | 6,354 | 562 | 3,114 | 3,651 | 3,136 | - | - | - |
| Broadcast Rights | - | - | - | - | - | - | - | 58,969 | 68,841 | - |
| Investment in Subs | 903,283 | 17 | 589,664 | 1,451,638 | - | 857 | 386,060 | - | - | - |
| Other | 307,673 | $6,730 | 28,650 | 110 | 17,924 | 15,821 | 7,673 | (1,275) | 10,513 | 293 |
| Net Properties | 434,083 | 307,587 | 177,912 | 1,264 | 75,577 | 113,428 | 148,820 | 10,146 | 13,695 | 10,651 |
| Intangibles | 1,840,072 | 49,324 | 1,003,940 | 36,579 | 11,773 | 10,617 | 617,352 | 285,231 | - | 153,937 |
| Total | 3,593,724 | 493,245 | 1,850,361 | 1,533,453 | 132,365 | 178,315 | 1,193,319 | 381,473 | 135,686 | 171,994 |
| **Liabilities** | | | | | | | | | | |
| Broadcast Rights Payable | - | - | - | - | - | - | - | 78,473 | 96,652 | - |
| Long Term Debt | - | - | 2,500 | - | 1,631 | - | - | - | - | 11,130 |
| Accounts Payable | 18,978 | 15,245 | 3,988 | 193 | 4,885 | 7,234 | 4,571 | 1,637 | 2,429 | 166 |
| Deferred Taxes | 246,517 | 58,420 | 47,169 | 11,458 | 20,213 | 61,771 | 37,622 | 30,124 | 9,320 | 35,121 |
| Other Current | 46,817 | 35,509 | 28,823 | 360 | 14,097 | 14,049 | 15,269 | 3,027 | 16,679 | 1,060 |
| Other Long Term | 13,113 | 7,795 | 6,892 | 916 | 1,827 | 2,583 | 5,954 | 3,982 | 6,468 | 161 |
| Total | 325,425 | 116,969 | 89,372 | 12,927 | 42,653 | 85,637 | 63,416 | 117,243 | 131,548 | 47,638 |
| Equity | $ 3,268,299 | $ 376,276 | $ 1,760,989 | $ 1,520,526 | $ 89,712 | $ 92,678 | $ 1,129,903 | $ 264,230 | $ 4,138 | $ 124,356 |
| 2007E EBITDA | $ 197,000 | $ 205,300 | $ 96,100 | $ 26,600 | $ 60,700 | $ 96,900 | $ 53,600 | $ 40,100 | $ 69,700 | $ 132,800 |
| Multiple | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 8 | 8 | 8 |
| Implied Value | $ 985,000 | $ 1,026,500 | $ 480,500 | $ 133,000 | $ 303,500 | $ 484,500 | $ 268,000 | $ 320,800 | $ 557,600 | $ 1,062,400 |

Intercompany payables and receivables were then summarized for each selected

Guarantor Subsidiary.  As would be expected, some Guarantor Subsidiaries were net obligors

and others net obligees,[462] but all reflect solvency on a book basis, net of intercompany balances:

---

[462] The existence of significant intercompany obligations and the collectability of intercompany receivables could affect individual Subsidiary solvency.  However, additional analysis of collectability as to an individual intercompany receivable and an evaluation of the substance of the transactions informing such balances would be necessary to ensure that "due from" and "due to" balances are properly characterized (e.g., that they reflect true obligations and recovery rights versus, for example, equity investments).  This evaluation would require additional investigation.  Regardless, as discussed in another part of the Report (see Report at § IV.B.5.d.(7).(ii)), on the Step One Financing Closing Date, both Tribune and the Guarantor Subsidiaries likely were solvent, even after taking into account the Step Two Debt (as contemplated as of that date).  Thus, intercompany balances are assumed to be collectible for purposes of this presentation, although additional investigation would be required to verify this assumption.

| TRIBUNE LARGE SUBSIDIARIES w/o I/C - Period 5 (May), 2007 ($000) | | | | | | | | | | |
| **Publishing Segment** | | | | | | | | **Broadcasting Segment** | | |
| | Los Angeles Times | Chicago Tribune | Newsday | Eagle New Media Invest. | Orlando Sentinel | Sun Sentinel | Baltimore Sun | KTLA | WPIX | Tribune Distribution |
|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | |
| Cash and Equivalents | $ 78 | $ (4,942) | $ 1,785 | $ 41,768 | $ 1,281 | $ 1,550 | $ 1,060 | $ 1,036 | $ 895 | - |
| Accounts Receivable | 93,300 | 77,303 | 42,056 | 1,532 | 22,696 | 32,991 | 29,218 | 27,306 | 41,742 | 7,113 |
| Inventory | 15,235 | 7,226 | 6,354 | 562 | 3,114 | 3,651 | 3,136 | | | |
| Broadcast Rights | - | - | - | - | - | - | - | 58,969 | 68,841 | - |
| Investment in Subs | 903,283 | 17 | 589,664 | 1,451,638 | - | - | 857 | 386,060 | | |
| Other | 307,673 | 56,730 | 28,650 | 110 | 17,924 | 15,821 | 7,673 | (1,275) | 10,513 | 293 |
| Net Properties | 434,083 | 307,587 | 177,912 | 1,264 | 75,577 | 113,428 | 148,820 | 10,146 | 13,695 | 10,651 |
| Intangibles | 1,840,072 | 49,324 | 1,003,940 | 36,579 | 11,773 | 10,447 | 617,352 | 285,231 | | 153,937 |
| Intercompany Receivable | 3,610,854 | 2,509,042 | 1,638,773 | 14,022 | 841,492 | 1,198,677 | 983,467 | 790,242 | 641,904 | 894,991 |
| Total | 7,204,578 | 3,002,287 | 3,489,134 | 1,549,475 | 973,857 | 1,376,992 | 2,176,786 | 1,171,715 | 777,590 | 1,066,985 |
| **Liabilities** | | | | | | | | | | |
| Broadcast Rights Payable | - | - | - | - | - | - | - | 78,473 | 96,652 | |
| Intercompany Payable | 4,972,144 | 2,310,364 | 3,043,499 | - | 777,100 | 1,150,786 | 1,597,265 | 396,020 | 543,170 | 886,186 |
| Long Term Debt | - | - | 2,500 | - | 1,631 | - | - | | | 11,130 |
| Accounts Payable | 18,978 | 15,245 | 3,988 | 193 | 4,885 | 7,234 | 4,571 | 1,637 | 2,429 | 166 |
| Deferred Taxes | 246,517 | 58,420 | 47,169 | 11,458 | 20,213 | 61,771 | 37,622 | 30,124 | 9,320 | 35,121 |
| Other Current | 46,817 | 35,509 | 28,823 | 360 | 14,097 | 14,049 | 15,269 | 3,027 | 16,679 | 1,060 |
| Other Long Term | 13,113 | 7,795 | 6,892 | 916 | 1,827 | 2,583 | 5,954 | 3,982 | 6,468 | 161 |
| Total | 5,297,569 | 2,427,333 | 3,132,871 | 12,927 | 819,753 | 1,236,423 | 1,660,681 | 513,263 | 674,718 | 933,824 |
| Equity | $ 1,907,009 | $ 374,954 | $ 356,263 | $ 1,536,548 | $ 154,104 | $ 140,569 | $ 516,105 | $ 658,452 | $ 102,872 | $ 133,161 |

### (ii)  Tribune.

As noted above, Tribune and the Guarantor Subsidiaries all are liable on the LBO Lender Debt. However, unlike the Subsidiary Guarantees, which give rise to guarantor contractual rights of contribution, subrogation, and indemnity against Tribune, nothing in these documents (or the Credit Agreement, Subrogation Subordination Agreement, or Bridge Subrogation Subordination Agreement) gives Tribune contractual rights of contribution, subrogation, or indemnity against the Guarantor Subsidiaries. Moreover, Tribune's liability on the LBO Lender Debt is not contingent (although under the Subsidiary Guarantees, the Subsidiary Guarantors also are primary obligors on the LBO Lender Debt). Nonetheless, for three reasons, it does not follow that Tribune's liability on the LBO Lender Debt must necessarily be considered on a standalone basis, as opposed to being considered collectively with the Guarantor Subsidiaries in connection with a solvency or capital adequacy analysis.

First, as noted, the Guarantor Subsidiaries are not just sureties. Each one serves as a "primary obligor" of the LBO Lender Debt.[463]  In this sense, the Guarantor Subsidiaries are no

---

[463]  *See* Ex. 189 at § 1 (Credit Agreement Subsidiary Guarantee);  Ex. 414 at § 1 (Subordinated Bridge Subsidiary Guarantee).

different from Tribune. Although Tribune is without contractual rights of contribution, subrogation, or indemnity against the Guarantor Subsidiaries, it may separately hold such rights under common law as a co-obligor.[464] As such, there is no basis to set Tribune apart from each of the Guarantor Subsidiaries regarding the LBO Lender Debt, and the bases for viewing the LBO Lender Debt as an obligation of the Guarantor Subsidiaries separately and collectively applies with equal force to Tribune.

Second, even if Tribune does not hold an asset in the form of a common law right of contribution, subrogation, and indemnity against the Guarantor Subsidiaries,[465] Tribune holds the analog of that very asset. To the extent Tribune was required to satisfy the LBO Lender Debt, this would reduce the liability of the Guarantor Subsidiaries on such debt, thus increasing solvent Guarantor Subsidiaries' net worth. Tribune, as the parent entity, would be the beneficiary of that difference.[466] As such, the mathematical example cited above would yield analogous results in considering Tribune's solvency notwithstanding the absence of any contribution, subrogation, or indemnity rights.[467]

---

[464] In this regard, there would be no basis to treat Tribune differently from the Guarantor Subsidiaries if they are all primary obligors on the LBO Lender Debt. *See, e.g., Md. Cas. Co. v. W.R. Grace & Co.*, 218 F.3d 204, 210 (2d Cir. 2000) ("It is also a well-settled principle in the law of contribution that when one party jointly liable on an obligation pays more than its pro rata share, it may compel the co-obligors to contribute their share of the amount paid.") (citing HENRY L. MCCLINTOCK, HANDBOOK OF THE PRINCIPLES OF EQUITY, 542 (2d ed. 1948)).

[465] *See Ollag Constr. Equip. Corp. v. Goldman (In re Ollag Constr. Equip. Corp.)*, 578 F.2d 904, 908 (2d Cir. 1978).

[466] When reporting separately, a parent that has significant control over a subsidiary will record as an asset its equity interest in a subsidiary. An increase in the equity of a solvent subsidiary then increases the assets of the parent company. Ex. 941 (KERMIT D. LARSON, FUNDAMENTAL ACCOUNTING PRINCIPLES, 806-08 (12th ed. 1990)).

[467] Here, assume that a parent and two wholly owned subsidiary guarantors, each with an equity value of $150 are jointly and severally liable on a $300 debt. If the parent paid $200 of this debt, the two subsidiary guarantors would be collectively liable for $100, and the residual net worth of the subsidiary guarantors after paying the remainder of the debt would be $200 collectively. The parent would thus have a $200 asset in the form of the residual net worth of the two subsidiary guarantors. If instead the parent paid $0 of this debt, the subsidiary guarantors would be collectively liable for $300 and the residual net worth of the subsidiary guarantors after paying off the debt would be $0. In this case, the parent would also have a $150 asset, this time in the form of its initial equity value. In both cases, the parent is solvent.

Finally, as noted, it cannot be the case that Tribune's and the Guarantor Subsidiaries' liability for the LBO Lender Debt, even if independent, should be viewed as comprising multiple $11 billion liabilities. The LBO Lender Debt need only be satisfied once. To the extent Tribune or a Guarantor Subsidiary partially or fully satisfied this debt, this would reduce the collective liabilities of all of the co-obligors.

The preceding discussion suggests that for purposes of measuring Tribune's and the Guarantor Subsidiaries' solvency and capital adequacy, it is appropriate to consider as offsetting assets the contributions that such entities could enforce, or would benefit from, if one such entity bore a disproportionate share of liability on the LBO Lender Debt.

            (5)       **Examiner's Conclusions and Explanation Concerning the Role of Intercompany Claims at the Time of the Leveraged ESOP Transactions on Solvency and Capital Adequacy Analysis.**

**Examiner's Conclusions:**

A court is highly likely to consider valid intercompany claims in a solvency and capital adequacy analysis of Tribune and the Guarantor Subsidiaries. Under the circumstances presented here, however, intercompany claims should not materially affect the results of such analysis.

**Explanation of Examiner's Conclusions:**

The Bankruptcy Code contains no mandate to treat intercompany claims differently from other claims asserted against a debtor.[468] As such, the Examiner finds no basis to exclude intercompany claims (to the extent valid) that existed at the time of Step One and Step Two from a solvency or capital adequacy analysis, and these claims should be included as liabilities of

---

[468] *See* 11 U.S.C. § 101(5) (2006).

Tribune and the Guarantor Subsidiaries to the extent they constituted liabilities. Nevertheless, for the reasons discussed below, the existence of valid intercompany claims should not affect the ultimate conclusions on solvency or capital adequacy of Tribune and the Guarantor Subsidiaries whether: (i) Tribune and the Guarantor Subsidiaries are considered on a consolidated basis; (ii) the Guarantor Subsidiaries are considered alone; or (iii) Tribune is considered alone.

### (i)      Tribune and the Guarantor Subsidiaries.

If the solvency and capital adequacy analysis of Tribune and the Guarantor Subsidiaries are considered on a consolidated basis, intercompany claims will have no effect on their collective solvency and capital adequacy. On a consolidated basis, the intercompany claims between and among Tribune and all of the Guarantor Subsidiaries cancel each other out. Not unexpectedly, Tribune did not account for intercompany claims in its public financial reporting undoubtedly for this reason.[469]

### (ii)     The Guarantor Subsidiaries.

The effect of intercompany claims on the solvency and capital adequacy of the Guarantor Subsidiaries is somewhat more complicated but yields the same conclusions. As explained in the preceding Section, for purposes of solvency and capital adequacy analysis, the liability of the Guarantor Subsidiaries on the LBO Lender Debt should be measured collectively.[470] This conclusion results from, among other things, the fact that each Guarantor Subsidiary held liable on the LBO Lender Debt would have corresponding rights of contribution, subrogation, and indemnity against both Tribune and each of the Guarantor Subsidiaries. Intercompany claims

---

[469] *See* Ex. 4 at 87. The same result applies when, for example, separate estates are substantively consolidated. *See In re H.H. Distribs., L.P.*, 400 B.R. 44, 53-54 (Bankr. E.D. Pa. 2009). Viewing them on a consolidated basis nets out the intercompany liabilities.

[470] *See* Report at § IV.B.5.d.(4).(i).

among the Guarantor Subsidiaries must first be taken into account to determine each such entity's net worth. That calculation in turn determines the relative amount each entity ultimately will be called on to pay on account of the LBO Lender Debt. The existence of intercompany claims serves only to determine the net worth of each Guarantor Subsidiary that must be applied to satisfy the LBO Lender Debt.

Viewed in this light, intercompany claims should have little effect, if any, on the ultimate solvency of the Guarantor Subsidiaries. An example similar to the one in the previous Section of the Report illustrates this point. Assume three guarantors, A, B, and C each with $200 cash, jointly, severally and unconditionally guarantee a $1,000 debt. Also assume that C owes A $100. On a standalone basis, A has $300 in assets ($200 *plus* $100 owed to it by C), B has $200, and C has $100 in assets ($200 of assets *minus* $100 owed to A). Clearly in this instance, A, B, and C are collectively insolvent (by $400); thus, the existence of an intercompany claim between A and C is not relevant to a solvency or capital adequacy analysis of the guarantors collectively. Similarly, if A, B, and C jointly, severally and unconditionally guaranteed a $250 debt, the guarantors would be collectively solvent because if any one of them paid this debt, the paying guarantor would nonetheless have sufficient assets in the form of contribution rights to be left solvent, even accounting for the intercompany claim C owed A. Applying this scenario to the above example, assuming A paid the entire debt, it would have contribution rights against both B and C in the amount of $83.33. C—the least solvent guarantor—would have nonetheless be left with sufficient assets to remain solvent ($100 - $83.33 = $16.67).[471]

---

[471] These examples assume that the Guarantor Subsidiaries have comparable net worth. As discussed in the preceding Section of the Report, however, even if the net worths of the individual Guarantor Subsidiaries differ dramatically, in the context of solvency analysis, a court is likely to apportion the collective liability among the

Next, assume A, B, and C jointly, severally and unconditionally guaranteed a $500 debt. Here, the guarantors would still be collectively solvent. In this instance, also factored in is the existence of the Credit Agreement Subrogation Subordination Agreement and Bridge Subrogation Subordination Agreement (or in the case of the Step One Debt, principles analogous to these provisions for the solvency determinations at Step One).[472] The result is that A, B, and C would each be liable on the $500 debt in proportion to their relative net worth *taking into account the intercompany claims*, i.e., A would be liable for $250 (A's $300 net worth is 50% of the group's $600 collective net worth), B would be liable for $166.67 (B's $200 net worth is 33.3% of the group's $600 collective net worth) and C would be liable for $83.33 (C's $100 net worth is 16.6% of the group's $600 collective net worth).

In sum, because the Guarantor Subsidiaries share joint and several liability on the LBO Lender Debt, it is appropriate to value them collectively. Valued collectively, intercompany claims between the Guarantor Subsidiaries have no effect on the conclusion concerning collective solvency or capital adequacy.

### (iii)    Tribune.

As explained in the previous Section, in evaluating Tribune's solvency and capital adequacy, it is appropriate to consider as offsetting assets of Tribune the contributions of the Guarantor Subsidiaries on the LBO Lender Debt. For these same reasons, the examples cited

---

Guarantor Subsidiaries on the LBO Lender Debt in an amount equal to the proportion of each entity's net worth to the net worth of all of the Guarantor Subsidiaries. If, however, a particular Guarantor Subsidiary had a negative net worth after consideration of intercompany claims but before consideration of the liability on the LBO Lender Debt, that entity's estate could avoid the LBO Lender Debt.

[472]   The Examiner has reached no conclusion whether the Credit Agreement Subrogation Subordination Agreement and Bridge Subrogation Subordination Agreement, or the implementation of marshalling, should be applied in the first two scenarios, because this additional factor does not affect the outcome in the first two scenarios.

directly above would apply equally to intercompany claims running between Tribune and the

Guarantor Subsidiaries as they do to intercompany claims running solely among the Guarantor

Subsidiaries, and should not affect a solvency and capital adequacy analysis of Tribune. In sum,

and for the reasons explained above and in the previous Section, because Tribune and the

Guarantor Subsidiaries share joint and several liability on the LBO Lender Debt, it is appropriate

to take into account their collective resources to satisfy the LBO Lender Debt. Intercompany

claims running by and against Tribune serve only to help allocate which entity contributes more

to satisfy the LBO Lender Debt. Viewed in this fashion, intercompany claims between and

among Tribune and the Guarantor Subsidiaries have no material effect on the conclusion

concerning collective solvency or capital adequacy.

<blockquote>

**(6)    Examiner's Conclusions and Explanation Concerning the Question of Inclusion of Step Two Debt with Step One Debt for Purposes of Analysis of Solvency, Capital Adequacy, and Intention to Incur Debts Beyond Reasonable Ability to Pay Adequacy Analysis.**

**(i)    Examiner's Conclusions and Explanation Concerning Inclusion of Step Two Debt in Solvency Analysis.**

</blockquote>

**Examiner's Conclusions**:

Although the question is close, the Examiner concludes that a court is somewhat unlikely

to include the Step Two Debt for purposes of determining solvency at Step One.

**Explanation of Examiner's Conclusions**:

This question contains two subparts: first, whether the Step Two Debt should be

considered a Step One liability for purposes of evaluating Step One solvency, and, if so, how

much should be included in the Step One solvency measurement; second, if the first inquiry is

answered in the negative, whether the above-discussed collapse doctrine[473] nevertheless should be applied not just to the transactions *within* Step One and Step Two, but *between* Step One and Step Two, to determine Step One solvency.[474]

The answer to the first inquiry is straightforward. The Bankruptcy Code defines (i) the term "insolvency" to mean a financial condition in which "the sum of [an] entity's debts is greater than all of such entity's property, at a fair valuation;" (ii) the term "debt" to mean "liability on a claim;" and (iii) the term "claim" to include a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[475] Thus, to the extent the Step Two Debt constituted a liability at the time of the Step One Financing Closing Date, that debt must be factored into the liability side of the equation for purposes of solvency.

Under the Merger Agreement executed before Step One closed, Tribune was obligated to exercise reasonable best efforts to effectuate the Merger.[476] In particular, the Merger Agreement specifically required Tribune to exercise reasonable best efforts to "enforce its rights under the Financing Commitments."[477]         Redacted

---

[473] *See* Report at § IV.B.5.b.

[474] In the course of advocating their respective positions, certain Parties chose to describe Step One and Step Two as "Phase One" and "Phase Two" or the "Recapitalization" and the "Merger." These labels were designed to drive home various contentions on the question of collapse. If the law governing collapse means anything, it is that labels mean nothing. The Examiner chose to use the defined terms "Step One" and "Step Two" because this is actually how the participants referred to them at the time of the Leveraged ESOP Transactions.

[475] *See* 11 U.S.C. § 101 (5)(A), (12), and (32) (2006) (emphasis added); *see also JELD-WEN, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 122 (3d Cir. 2010) (en banc).

[476] Ex. 151 at § 5.6(a) (Merger Agreement).

[477] *Id.* at § 5.11(a).

Redacted

Although the preceding discussion amply establishes that Tribune had the means to

borrow the money necessary to close Step Two if the other conditions precedent were satisfied,

and Tribune undoubtedly would have faced some liability had it breached those obligations,[480] it

does not follow that Tribune was contingently liable *to the Step Two Lenders* on the Step Two

Debt before Step Two closed.[481]  A simple example illustrates why this is so.  Suppose A agrees

with B that it will purchase B's automobile for $25,000 if A can borrow that amount from A's

bank.  A obtains a commitment from its bank to advance this sum to A if A so requests.  A files

Redacted

---

[479]  *See* Report at § III.D.9.b. for a discussion of the closing conditions under the Credit Agreement and the Step Two Commitment Letter.  For example, as discussed later in this Section, the definition of "Company Material Adverse [Event] or Event" was narrowly drawn.  Although Tribune was required to represent that it was "Solvent" (a term that was specifically defined in the Credit Agreement) after giving effect to Step Two, the Credit Agreement specified the manner in which that representation would be confirmed via the delivery of a certificate that relied on VRC's solvency opinion.  *See* Ex. 179 at § 2.17 (Credit Agreement); Ex. 187 (Form of Credit Agreement Solvency Certificate); Ex. 175 at § 3.01(b)(i) (Bridge Credit Agreement); Ex. 709 (Form of Bridge Credit Agreement Solvency Certificate).

[480]  *See Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 749 (Del. Ch. 2008) (finding that party's obligation under merger agreement to use "reasonable best efforts" to obtain financing obligated that party to take any act that "was both commercially reasonable and advisable to enhance the likelihood of consummation of the financing . . . . To the extent that Hexion deliberately chose not to act, but instead pursued another path to *avoid* the consummation of the Financing, Hexion knowingly and intentionally breached this covenant").  Both the Merger Agreement and the EGI-TRB Purchase Agreement contain Delaware choice of law provisions.

[481]  *See Smurfit Newsprint Corp. v. Se. Paper Mfg. Co.*, 368 F.3d 944, 951 (7th Cir. 2004) (stating that conditions precedent "must be literally met or exactly fulfilled or no liability can arise on the promise qualified by such conditions") (citations omitted); *IDT Corp. v. Tyco Group S.A.R.L.*, 918 N.E.2d 913, 916 (N.Y. 2009) ("Although there was a valid settlement agreement in this case, Tyco's obligation to furnish [value] never became enforceable because agreed-upon conditions [precedent] were not met."); *Perry v. Estate of Carpenter*, 918 N.E.2d 1156, 1161 (Ill. App. Ct. 2009) ("It is well settled that where a contract contains a condition precedent, the contract is neither enforceable nor effective until the condition is performed . . . .") (internal quotations and citations omitted).

bankruptcy after entering into its agreement with B and obtaining the bank commitment but

before exercising its right to borrow the funds from the bank. In this circumstance, there is little

question that at the time of A's bankruptcy B is a creditor of A, but the bank is not; the bank

only made a commitment to A which A might or might not have exercised, and until A did so,

the bank had no right to payment (conditional or otherwise) on account of the amounts A could

borrow. The bank holds no claim against A, and, similarly, A has no liability to the bank for

those amounts.[482]

This conclusion derives from the fact that "[t]he plain meaning of a 'right to payment' is

nothing more nor less than an enforceable obligation . . . ."[483] The Bankruptcy Code's definition

of "claim" is exceedingly broad,[484] and certainly encompasses contingent liabilities, but this does

not transform every future liability into a bankruptcy claim:[485]

---

[482] *See In re Dowell*, 1998 U.S. Dist. LEXIS 22029, at *16-17 (D.N.J. Aug. 26, 1998) ("The court will not infer an obligation to repay advances absent a contractual agreement, unless the surrounding circumstances require such an inference."); *see also Smurfit Newsprint*, 368 F.3d at 951; *IDT*, 13 N.Y.3d at 214.

[483] *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 559 (1990) (emphasis added); *see also LTV Steel Co. v. Shalala (In re Chateaugay Corp.)*,53 F.3d 478 (2d Cir. 1995) ("A claim will be deemed pre-petition when it arises out of a relationship recognized in, for example, the law of contracts or torts. A claim exists only if before the filing of the bankruptcy petition, the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation – 'a right to payment' – under the relevant nonbankruptcy law.") (citing and quoting *In re Nat'l Gypsum Co.*, 139 B.R. 397, 405 (N.D. Tex. 1992)) (internal quotations omitted).

[484] *See FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 302 (2003) ("We have said that 'claim' has 'the broadest available definition.'"); *JELD-WEN, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 121 (3d Cir. 2010) (en banc) (overruling the *Frenville* accrual test); *Kilbarr Corp. v. Gen. Servs. Admin. (In re Remington Rand)*, 836 F.2d 825-26, 829 (3d Cir. 1998) (finding that "Congress defined 'claim' in the broadest possible terms" and "unambiguously stated its intent to address all possible legal obligations in defining a bankruptcy claim") (citations omitted).

[485] 2 COLLIER ON BANKRUPTCY ¶ 101.05 (Alan A. Resnick & Henry J. Sommer eds., 16th ed.); *see also Knutson v. Tredinnick (In re Tredinnick)*, 264 B.R. 573, 577-76 (B.A.P. 9th Cir. 2001) ("[T]he broad definition of a claim, however, is not boundless. . . . A key phrase in § 101(5)(A) is 'right to payment' and here, Knutson's right, strictly speaking, arose postpetition, given that all the legal services performed by Knutson for the Tredinnicks occurred subsequent to their petition.") (internal citations omitted); *In re Texaco Inc.*, 254 B.R. 536, 559 (Bankr. S.D.N.Y. 2000) ("Simply stated, the basic rule is that claims arising after confirmation from a contractual relationship are not barred by a confirmation order. It is only where the liability asserted in a claim is based upon a breach of contract that occurred before confirmation that the claim must be filed in the bankruptcy.

> However, the broad definition of claim is not boundless. The fact that an entity may have a claim in the future does not mean that the entity has a claim on the date of the petition. A person who might be injured in the future due to a manufacturing defect in a product made before bankruptcy does not have a prepetition claim if the person did not have a prepetition relationship with the debtor or the product. A parent corporation's asserted interest in customer obligations it was to transfer under an operating agreement to its finance subsidiary, a chapter 11 debtor, was not a claim. . . . Retirement advances that may have to be repaid under certain contingencies have been found not to be "claims" where the obligation is dependent on the debtor's choice of future actions. A *sue* [sic] *sponte* monetary sanctions award that was ordered postpetition in a lawsuit that was filed prepetition, in a case in which no party could have fairly contemplated such an award when the bankruptcy petition was filed, has also been found not to be a prepetition "claim." Similarly, new or continuing postpetition acts in violation of a statute that the debtor had been violating before filing the petition can give rise to postpetition claims, separate from the prepetition claims based on prepetition violations.

Looking at the circumstances at the time of the closing of Step One, the Step Two Lenders had no claim against Tribune and Tribune had no liability to the Step Two Lenders until Tribune drew funds. The circumstance was no different in the case of the Guarantor Subsidiaries. Although the Credit Agreement Subsidiary Guarantee imposed liability on the Guarantor Subsidiaries for any indebtedness incurred by Tribune under the Credit Agreement, including the amounts that might be advanced in connection with Step Two, these entities did not incur any such additional liability until Tribune drew the additional funds under the Credit Agreement. In other words, insofar as the Step Two funding under the Incremental Credit Agreement Facility was concerned, the Guarantor Subsidiaries were in the same position as Tribune.[486] Because the Step Two Debt was not a contingent liability at the time of Step One, it

---

Potential claims for liabilities for breach of obligations which might occur after confirmation cannot be filed before confirmation even if they could be anticipated . . . .") ( citations omitted).

[486] This conclusion should not be confused with the Examiner's earlier conclusion that, under the law in the Third Circuit law, a lender can confer value on a debtor by making a commitment to advance funds even though the debtor does not borrow the money until later. *See* Report at § IV.B.5.c.(4). Thus, if a lender provides a funding commitment and, in exchange, receives a fee which an estate representative subsequently seeks to recover, the

is not necessary for the Examiner to evaluate whether a court would include the full amount of

that debt, or something less, for solvency purposes.  The same is true regarding the obligations

imposed under the Merger Agreement to pay the consideration to the Selling Stockholders on the

consummation of the Merger.[487]

The next inquiry is whether it is nevertheless appropriate to collapse Step One and Step

Two for solvency purposes and thereby include the Step Two Debt as a liability at Step One.  In

other words, even though the Step Two Debt was not a liability at Step One, should a court

disregard the two separate steps in favor of viewing them as one transaction for solvency

analysis?  The issue of collapsing Step One and Step Two requires application of the three

above-discussed considerations applied by courts in the Third Circuit:  whether the parties had

---

lender may assert a defense under Bankruptcy Code section 548(c) based on the value the lender imparted to the debtor when the commitment was made. *See id.* at §§ IV.B.5.c.4. and IV.B.5.c.6.

[487]   Because this consideration was only payable if the Merger occurred, *see* Ex. 151 at § 2.1 (Merger Agreement) ("At the Effective Time, by virtue of the Merger . . . ."), no enforceable right to payment in favor of a Selling Stockholder could exist until the Merger closed. *See Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 524 (5th Cir. 2004) ("The touchstone of any 'claim' is that there is an 'enforceable obligation' of the debtor or an enforceable 'right to payment' from the debtor."); *see also* Ex. 151 at § 8.10 (Merger Agreement) (third party beneficiary rights conferred as to § 2.1(a), which in turn is conditioned on the occurrence of the Effective Time).  There also is authority to support the further contention that even if the Merger had occurred, stockholders would have had no right to payment unless Tribune were solvent. *See Carrieri*, 393 F.3d at 522 ("[T]he rights of shareholders to redeem stock are equity interests because they are not guaranteed the right to payment, as claims are, but rather are dependent on the solvency of the corporation."); *Pereira v. Dow Chem. Co. (In re Trace Int'l Holdings, Inc.)*, 287 B.R. 98, 110 (Bankr. S.D.N.Y. 2002) ("Ordinarily, a stock redemption obligation that is conditioned on the issuer's solvency is not considered a liability in determining the issuer's solvency."); *Joshua Slocum, Ltd. v. Boyle (In re Joshua Slocum, Ltd.)*, 103 B.R. 610, 622-24 (Bankr. E.D. Pa. 1989) (finding stock redemption obligation not "debt" on the debtors' balance sheet for insolvency purposes because "[s]tate law prohibits the redemption of shareholder stock by a corporation that is insolvent"), *aff'd*, 121 B.R. 442 (E.D. Pa. 1989); *see also Brown v. Shell Can. (In re Tenn. Chem. Co.)*, 143 B.R. 468, 473 (Bankr. E.D. Tenn. 1992) ("The court will not count the redemption price as a debt."), *aff'd in part and rev'd in part on other grounds*, 112 F.3d 234 (6th Cir. 1997); *In re Revco D.S., Inc.*, 118 B.R. 468, 474 (Bankr. N.D. Ohio 1990) ("Generally, the rights of shareholders to redeem stock are not guaranteed but are dependent on the financial solvency of the corporation.  Accordingly, the mandatory redemption provision of convertible preferred stock is an interest and not a claim as New York Life asserts.").  Either or both of these principles answers any contention that Tribune's payments to the Selling Stockholders at Step Two constituted the satisfaction of preexisting obligations incurred when Tribune was solvent at the time it entered into the Merger Agreement.  Tribune had no obligation to make these payments unless and until the Merger conditions were satisfied; and if it is established that these transfers were made pursuant to an intentional fraudulent transfer, they may be avoided and recovered.

knowledge of the multiple transactions; whether each transaction would have occurred on its

own; and whether each transaction was dependent or conditioned on the other transaction.[488]

Although the collapse principle typically has been applied for purposes of testing

reasonably equivalent value,[489] there is no principled reason why the collapse principle could not

apply to the question of solvency consistent with the bankruptcy court's broad powers to look to

the substance and disregard the form of a transaction.[490]  Moreover, the fact that the closings of

Step One and Step Two were separated by considerable time should not, by itself, forestall

application of the collapse principle.[491]  It is not beyond the realm of possibility that a planned

interval between the beginning and end of an integrated transaction is just an effort to

camouflage what is in substance a single transaction, nor is a transaction removed per se from

the realm of collapse just because specified conditions must be met in order for a later step to

---

[488] *Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 96, 104 (Bankr. D. Del. 2010) (setting forth three-part test).

[489] *See Off. Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge)*, 344 B.R. 340, 347-48 (W.D. Pa. 2006) (stating that the integration or step transaction doctrine "has often been applied in the context of leveraged buyouts" and is typically invoked "for purposes of demonstrating that the insolvent target company did not, in the aggregate, receive fair consideration or reasonably equivalent value for the transfer in question"); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 937 (S.D.N.Y. 1995) (finding that "[i]t is the debtor who must have received value as a result of the transfer. In the context of an LBO, this issue is determined after 'collapsing' the transaction" in certain circumstances); *Foxmeyer Drug Co. v. GE Capital Corp. (In re Foxmeyer Corp.)*, 286 B.R. 546, 574 (Bankr. D. Del. 2002) ("Integration of the two transfers reveals that the debtor in a paradigmatic scheme [did] not receive reasonably equivalent value . . . ."); *see also Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 792, 795 (7th Cir. 2009); *United States v. Tabor Court Realty Corp.*, 803 F.2d 1296, 1302-03 (3d Cir. 1986); *HBE Leasing Corp. v. Frank*, 48 F.3d 623,659, 635-36 (2d Cir. 1995); *Jones v. Nat'l City Bank of Rome (In re Greenbrook Carpet Co.)*, 722 F.2d 659, 660-61 (11th Cir. 1984) (per curiam).

[490] *See In re Sw. Equip. Rental, Inc.*, 1992 WL 684872, at *14 (E.D. Tenn. July 9, 1992) (collapsing a series of transactions over a three week period "for purposes of determining whether [the debtor] received fair consideration *or was rendered insolvent*" by the transactions) (emphasis added); *see also Vintero Corp. v. Corparacion Venezolana de Fomento ( In re Vintero Corp.)*, 735 F.2d 740, 742 (2d Cir. 1984) ("A bankruptcy court has broad equitable powers which may be invoked to see 'that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.'") (quoting *Pepper v. Litton*, 308 U.S. 295, 304-05 (1939)); *Off. Comm. of Unsecured Creditors of Midway Games, Inc. v. Nat'l Amusements Inc. (In re Midway Games, Inc.)*, 2010 Bankr. LEXIS 337, at *41 (Bankr. D. Del. Jan. 29, 2010) (stating that the purpose of recharacterization is to elevate the substance of the transaction over form).

[491] *Orr v. Kinderhill Corp.*, 991 F.2d 31, 33, 35-36 (2d Cir. 1993) (collapsing multiple transactions notwithstanding passage of time between transactions); *A.J. Heel Stone, L.L.C. v. Evisu Int'l, S.R.L.*, 2006 U.S. Dist. LEXIS 34152, at *4, *12 (S.D.N.Y. May 25, 2006) (collapsing series of transactions over the course of several months in fraudulent transfer action).

happen. It is the substance and meaningfulness, not just the existence, of any such conditions that are dispositive.[492] One could posit any number of leveraged buyout transactions nominally structured to contain conditions that in fact lack substance. Consistent with the bankruptcy court's power to elevate substance over form, however, the question is whether a particular condition has substance.

Applying the first of the above noted three-part inquiry courts use to evaluate the appropriateness of collapse, it is undisputed that all relevant parties had knowledge of the multiple transactions. Thus, the first inquiry favors collapse. The second inquiry is more of a mixed bag but, on balance, also tends to favor collapse. On the one hand, Tribune originally considered undertaking a recapitalization that would have been quite similar in effect to the Step One transactions.[493] Indeed, Step One bore many similarities to the 2006 Leveraged Recapitalization effectuated only the year before. Thus, it is conceivable that Tribune would have proceeded with a transaction similar to Step One had the Leveraged ESOP Transactions not been proposed. Moreover, although in theory all of the transactions could have been held in abeyance pending satisfaction of all conditions to the Merger, by design that is not how the

---

[492]  *See generally Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 793 (7th Cir. 2009) ("Fraudulent conveyance doctrine . . . is a flexible principle that looks to substance rather than form . . . .") (internal citations and quotations omitted); *Kinderhall*, 991 F.2d at 35 ("[W]here a transfer is only a step in a general plan, the plan must be viewed as a whole with its composite implications."); *Off. Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Grp., Inc. (In re Buckhead Am. Corp.)*, 178 B.R. 956, 970 (D. Del. 1994) ("Courts which have previously addressed the application of [illegal dividend statutes] to LBO transactions have rejected arguments which concentrate on the form of the transaction rather than its substantive economic effect."); *Big V Supermarkets Inc. v. Wakefern Food Corp. (In re Big V Holding Corp.)*, 267 B.R. 71, 92 (Bankr. D. Del. 2001) ("[B]y linking together all interdependent steps with legal or business significance, rather than taking them in isolation, the result may be based on a realistic view of the entire transaction.") (internal quotation marks omitted).

[493]  *See* Report at § III.D.1. (discussion of the deliberations of the Tribune Board and the Special Committee leading up to Step One); *see also* Ex. 141 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Tribune Board, dated March 30, 2007).

transaction was structured.  By design, significant consideration flowed to the Selling

Stockholders at Step One.[494]

<div align="center" style="color:red"><em>Redacted</em></div>

---

[494] Examiner's Interview of Thomas Whayne, June 11, 2010 ("I think it would've been hard for us to recommend going down the path with Zell unless we had the up front distribution that was same level as the recap.  I'm comfortable that Chandlers & McCormicks wouldn't have supported it either.").
<div align="center" style="color:red"><em>Redacted</em></div>

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

(ii)    **Examiner's Conclusions and Explanation Concerning Inclusion of Step Two Debt in Capital Adequacy Analysis.**

<u>**Examiner's Conclusions**</u>:

The analysis in the preceding Section concerning collapse also applies to capital adequacy analysis. In measuring capital adequacy at the time of Step One, however, a court is highly likely to consider all obligations that were reasonably foreseeable at the time of Step One, including those caused by Step Two.

<u>**Explanation for Examiner's Conclusions**</u>:

There is no principled basis on which to distinguish the preceding Section's collapse analysis in considering the question of capital adequacy. Whereas the absence of a liability on account of the Step Two Debt is dispositive on the question of inclusion of Step Two Debt as a liability for solvency analysis, the answer is different for capital adequacy analysis. As reflected in the discussion earlier in the Report,[533] solvency and capital adequacy analyses are distinct. Unlike solvency, unreasonably small capital is not strictly limited to consideration of those liabilities that reside on the balance sheet on the date of measurement. At its core, "the test for unreasonably small capital is reasonable foreseeability . . . whether the parties' projections were reasonable."[534] By definition, this entails a forward-looking analysis. Solvency focuses on the debtor's liabilities at a given moment, whereas capital adequacy focuses on the debtor's ability to

---

[533] *See* Report at §§ IV.B.5.d.(2). and IV.B.5.d.(3).

[534] *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1072-73 (3d Cir. 1992); *see also* Markell, footnote 412, at 497 (stating that unreasonably small capital exists when non-payment of the plaintiff's claim was a reasonably foreseeable effect given the amount of the transferor's assets/capital remaining and reasonably foreseeable cash resources).

meet its obligations over time. In addressing capital adequacy, therefore, it is necessary to consider liabilities reasonably expected to be incurred over time: [535]

> We are also of the opinion that the delivery of the mortgages and guarantee mortgages to IIT occurred when the Raymond Group was engaged or about to engage in a "business or transaction for which the property remaining in [its] hands after the conveyance is an unreasonably small capital." 39 Pa. Cons. Stat. § 355. Both before the November 26, 1973 transaction as well as thereafter, the Raymond Group did not have the capital resources it needed to carry on its business. *Moreover, Durkin planned to continue selling the surplus lands of the Raymond Group and would therefore incur additional income tax liabilities to the United States.* The provisions of the Note Purchase and Loan Agreement were such that relatively little, if any, proceeds of the land sales would be available for general creditors. *Durkin also planned to continue the Raymond Group's coal mining operations and would therefore incur additional liabilities to trade creditors, the Anthracite Health and Welfare Fund, and the Commonwealth for backfilling obligations.*

Applied here, in view of the Examiner's conclusion that at the time of Step One, Step Two was highly likely to occur, it is necessary to consider the Tribune Entities' ability at the time of Step One to service and satisfy those Step Two liabilities when they were expected to arise. This analysis does not assume that all of the Step Two Debt became due and payable at the time of Step One; nor is the evaluation performed with the benefit of hindsight, but, rather, is conducted using an objective test at the time of Step One. In short, because incurrence of the Step Two Debt was probable at the time of Step One, the Step Two Debt must be considered to properly analyze the Tribune Entities' capital adequacy at Step One.

---

[535] *United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556, 580 (M.D. Pa. 1983) (emphasis added) (citations omitted), *aff'd in relevant part sub nom. United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986); *see also* Ex. 262 at 52:9-53:1 and 60:2-63:9 (Rule 2004 Examination of Bryan Browning, December 4, 2009); John E. Sullivan III, *Future Creditors and Fraudulent Transfers: When a Claimant Doesn't Have a Claim, When a Transfer Isn't a Transfer, When a Fraud Doesn't Stay Fraudulent, and Other Important Limits to Fraudulent Transfers Law for the Asset Protection Planner*, 22 DEL. J. CORP. L. 955, 1010-12 (1997) ("In assessing whether the transferor has reasonably calculated her future obligations . . . the fact finder . . . might include . . . [i]s the transferor likely to incur substantial consensual debt in the future . . . ."); Examiner's Interview of Rajesh Kapadia, June 25, 2010 ("I think the marketplace, the fundamental thing around this deal, in the syndication of Step 1, was $6 billion . . even though we're syndicating $6 billion was the market is looking at it is really $8 billion because it's the second step.").

One Party nevertheless contended to the Examiner that it is inappropriate to consider the Step Two Debt at the time of Step One in view of the requirements under (i) the Merger Agreement for a solvency opinion (which was a condition to the Merger) and (ii) the Credit Agreement for a Tribune solvency certificate and representation of "Solvency"[536] as broadly defined in the Credit Agreement (which was a condition to the Step Two Financing). This Party essentially argued that, at the time of Step One, creditors and the Tribune Entities knew that Tribune's solvency and capital adequacy would be separately tested as prerequisites to proceeding with Step Two and that, therefore, Step Two could not have occurred if that transaction would have rendered the Tribune Entities insolvent or left them with unreasonably small capital. Under this view, because Step Two could not happen if its occurrence would render the Tribune Entities inadequately capitalized, inclusion of that debt for purposes of analyzing Step One capital adequacy would be improper.[537]

The problem with this contention is that it conflates what the documents required, what Tribune might have represented under those agreements, and what opinion VRC or someone else might have given at the time of Step Two, with the applicable standard governing capital adequacy. The representations and opinions actually given to make Step Two happen might be based on a flawed definition of solvency or simply wrong as applied, looking at the circumstances then known at that time but applying an objective test, as the law requires.[538] As

---

[536] *See* Report at § III.D.10.c.

[537] This Party advanced a similar argument on the question of collapse of Step One with Step Two for solvency purposes. The Examiner finds this argument similarly untenable for the reasons discussed in text.

[538] *See generally Mellon Bank, N.A. v. Off. Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 156 (3d Cir. 1996) ("The bankruptcy court correctly determined that a debtor's creative accounting practices, which have the effect of grossly overstating its financial condition, cannot be the basis of a court's solvency analysis."); *Ferrari v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.)*, 148 B.R. 97, 133 (Bankr. D. Mass. 1992) ("Lambert's projections were unreasonable and imprudent; this was discernable from information available before the buyout; and both Lambert and Barclays had reason to be skeptical and to inquire into the assumptions that rendered the projections so unreasonable.").

to the former point, the Credit Agreement and the Bridge Credit Agreement defined "fair value" and "fair market value" for purposes of Step Two solvency as involving a willing seller and willing buyer "*in a transaction having a similar structure.*"[539] This is, in substance, the same flawed definition that VRC agreed to use in its original engagement letter and that governed VRC's Step Two opinion.[540]  Indeed, applying the argument advocated by the above-noted Party to fraudulent transfer analysis generally, if the representations concerning solvency or capital adequacy given by the participants as conditions precedent to the challenged transfer always were accepted after the fact as true, then in theory a transfer that would render a debtor insolvent or without reasonable capital could never occur; and in evaluating these questions a court would be obliged to assume that the transaction never happened.  Although it is possible to draw distinctions between the current situation and other circumstances before the slippery slope leads to such an absurd result, the Examiner finds the argument unavailing when applied here.  The Examiner finds that consistent with the objective nature of the capital adequacy test and that test's focus on the debtor's future prospects at the time of the relevant transfer, a court is reasonably likely to reject the contrary approach advocated by one Party.  Rather, a court is reasonably likely to conclude that because, at the Step One Financing Closing Date, the Tribune Entities were highly likely to incur the Step Two Debt, the Tribune Entities' wherewithal to satisfy that debt must be considered for capital adequacy purposes at Step One.

---

[539] *See* Ex. 179 at § 1.01 (Credit Agreement) (emphasis added); Ex. 175 at § 101 (Bridge Credit Agreement) (emphasis added).

[540] *See* Report at § III.E.3.b.(1).(i).

(iii)    **Examiner's Conclusions and Explanation Concerning Inclusion of Step Two Debt in Analysis of Intention to Incur Debts Beyond Reasonable Ability to Pay.**

**Examiner's Conclusions:**

The same analysis above concerning the question of collapse also applies to the question of intention to incur debts beyond reasonable ability to pay.  However, like capital adequacy analysis, it is necessary to consider the obligations that were reasonably foreseeable at Step One, including the Step Two Debt in conjunction with the closing of Step Two.

**Explanation of Examiner's Conclusions:**

The plain language of Bankruptcy Code section 548(a)(2)(B)(iii)[541] explicitly requires consideration of obligations that may be incurred in the future.[542]  In other words, unlike solvency but like capital adequacy, this test requires consideration of future liabilities.

(7)    **Examiner's Conclusions and Explanation Concerning Solvency of Tribune at Step One.**

**Examiner's Conclusions:**

The Examiner finds that a court is highly likely to find that Tribune was solvent as of, and after giving effect to, the Step One Transactions if the Step Two Debt is not included for purposes of that determination.  The Examiner finds that to the extent that the effects of Step Two (including the Step Two Debt) are considered in connection with Step One solvency, credible assertions could be made that Tribune was insolvent at Step One, but the Examiner

---

[541]  11 U.S.C. § 548(a)(2)(B)(iii) (2006).

[542]  *Id.* ("[i]ntended to incur, *or believed that the debtor would incur*, debts that would be beyond the debtor's ability to pay as such debts matured") (emphasis added); *Hall v. Quigley (In re Hall)*, 131 B.R. 213, 217 (Bankr. N.D. Fla. 1991) ("Provision (B)(iii) does not require that the debtor be insolvent to maintain a fraudulent transfer action.  If the transfer causes the debtor to be unable to meet all his debts at some point in the future it may be avoided pursuant to (B)(i) or (ii).").

concludes that it is somewhat likely (although a very close call) that a court nonetheless would

find that Tribune was solvent in that circumstance as well.

**Explanation of Examiner's Conclusions:**

As shown below, market indicia, the Tribune auction process leading to the Tribune

Board's approval of the Leveraged ESOP Transactions on April 1, 2007, and the magnitude of

solvency reflected in valuations performed in the period leading up to Step One, all support the

conclusion that Tribune was solvent at the Step One Financing Closing Date if the Step Two

Debt is not included in the determination of solvency.[543]

> (i)     **Step One:  No Collapse With Step Two.**
>
> (A)     **Market Indicia of Solvency.**

Before the approval and announcement of the Leveraged ESOP Transactions in April

2007 through the Step One Financing Closing Date, Tribune Common Stock traded publicly in a

liquid market.  Tribune reported its financial results in SEC filings and publicly disclosed other

information bearing on its financial performance (*e.g.*, press releases).  Because this information

informed the trading price of Tribune Common Stock, trading prices of that stock before the Step

One Financing Closing Date furnishes relevant market-based information on Step One solvency.

Before the announcement of the Leveraged ESOP Transactions on April 2, 2007, however, the

trading value of Tribune Common Stock was influenced by Tribune's previous announcement of

its evaluation of strategic alternatives for Tribune, thereby potentially biasing trading prices

upward.  Likewise, after the announcement of the Leveraged ESOP Transactions on April 2,

2007, the trading price of Tribune Common Stock was upwardly biased in comparison to how it

---

[543]    Although certain Parties advocated the inclusion of a contingent liability at Step One in the amount of the
"probability-of-closing" adjusted pro forma Step Two Debt, the Examiner has concluded, as discussed in
another part of the Report, that it would be improper to do so.  *See* Report at § IV.B.5.b.

otherwise would have traded.[544] That price (and corresponding equity value), however, would likely be "inflated" due to market expectations of a $34 per share Tender Offer price. Thus, it is necessary to grapple with the potential upward bias in the trading price of Tribune Common Stock before drawing any solvency conclusions using the market capitalization of Tribune Common Stock.

Recognizing that approximately $4.3 billion of the proceeds from the Step One Debt would be used to acquire only a portion of the then-outstanding Tribune Common Stock,[545] a substantial residual equity value remained after giving effect to the Step One Transactions post-closing based on the observed pre-Step One closing trading price of Tribune Common Stock.[546] Because only the equivalent of $17.61 in equity value was being replaced with debt at Step Two,[547] a comparison of that price to prevailing market prices pre-Step One establishes a substantial unadjusted residual equity value of $16.39 per share (*i.e.*, $34.00 - $17.61 = $16.39), or "solvency cushion," after giving effect to the Step One Transactions. The following chart compares both the Tender Offer price and the above-noted $16.39 figure to the prevailing prices of Tribune Common Stock before the Step One Financing Closing Date:

---

[544] The announcement of Tribune's plan to initiate the Tender Offer at $34 per share, when its stock was trading at a price below $34, would cause the price to increase based on at least some probability of completing such Tender Offer at a price higher than the prevailing price, adjusted for time value of money effects between the date of stock price observance and the expected closing date of the Tender Offer, all other things being equal. *See* Ex. 5 (Tender Offer).

[545] A portion of the Step One Debt (about $2.8 billion) was used to repay the 2006 Bank Debt. Therefore, only about $4.3 billion of the Step One Debt was available to purchase shares in connection with the Tender Offer. *See* Ex. 628 (Tribune Form 10-Q, filed August 9, 2007).

[546] Stated differently (and greatly simplified), at a trading price of $34 per share and with approximately 242.8 million shares outstanding, Tribune had an implied equity value of about $8.3 billion ($34 x 242.8 million shares). Therefore, essentially replacing $4.3 billion of equity value with debt would still leave substantial residual equity value of about $4.0 billion.

[547] The total number of shares of Tribune Common Stock purchased by Tribune, 125,738,955, divided by the number of shares of Tribune Common Stock outstanding, 242,833,053, times the $34 per share Tender Offer price, equals $17.61, which is the equity value per share of the Tribune Common Stock replaced with debt. *See* Ex. 1065 (Calculation of Implied Stock Price).



To address the above-noted possible effect of the upward bias in the trading price of Tribune Common Stock, the Examiner's financial advisor analyzed whether, even assuming that the market assumed a high probability that Step One would close,[548] the resulting probability-adjusted Tribune Common Stock price could credibly support a conclusion that Tribune was insolvent (*i.e.*, that Tribune's stock would have traded below $16.39 per share absent any "inflationary" effects of the Tender Offer price of $34 per share on the trading price of Tribune Common Stock).Because Step One contemplated exchanging indebtedness equal to approximately one-half the equity value implied by a $34 per share price, for Tribune to remain solvent on a market-based basis when approximately half of its stock was redeemed for debt at

---

[548] This is, in reality, a conservative assumption that would minimize the effects of any upward bias informing observed stock prices.

$34 per share, the minimum pre-Step One price of Tribune Common Stock would be approximately $16.39 per share (*i.e.*, as long as Tribune's stock was trading above $16.39 per share, Tribune would be solvent on a market capitalization basis even after adding $4.3 billion of incremental debt, as happened at Step One).[549]  Using $16.39 per share as a proxy for the pre-Step One solvency threshold price, the Examiner's financial advisor evaluated the probability that, absent any extraneous factors affecting the price of the Tribune Common Stock, the trading values would reasonably have declined below that price.  This analysis considered the trading price of Tribune Common Stock during periods unaffected by the potential upward bias caused by market expectations of Tribune pursuing strategic transactions.

For the three months before Tribune's announcement of its intent to pursue strategic alternatives on September 22, 2006[550] (a period unaffected by announcements relating to Tribune's consideration of potential stockholder value-enhancing activities which ultimately resulted in the Tender Offer), Tribune Common Stock traded between a low of $28.23 (on July 27, 2006) and a high of $32.04 per share (on July 11, 2006).[551]  Following Tribune's announcement of its intention to pursue strategic alternatives, Tribune's stock price appears to have reacted significantly:[552]

---

[549]  This is simply a variation of the calculation in footnote 546.  At a trading price of $16.39 per share and 242,833,053 shares outstanding, Tribune would have an implied equity value of approximately $4.0 billion. Therefore, if Tribune replaced this equity value with just under $4.0 billion of debt, Tribune would still be balance sheet solvent based on market indicia.

[550]  *See* Ex. 1042 (Tribune Form 8-K, filed September 22, 2006).

[551]  For purposes of this discussion, the Examiner's financial advisor considered the trading prices of Tribune Common Stock between June 21, 2006 and September 21, 2006 (a period of three months).  *See* Ex. 75 (Tribune Stock Prices).

[552]  Again, this is an inferential observation as opposed to an analytical result of, for example, a statistically significant events study.



If, for purposes of this analysis, the entire observed change in price that occurred on the announcement date is assumed to have resulted solely from that announcement (such that, absent the beneficial effects associated therewith, the price of the Tribune Common Stock would have remained at pre-announcement levels), it is possible to assess the likelihood that the price of the Tribune Common Stock would have declined between the announcement date and the Step One Financing Closing Date by an amount necessary to evidence a market-based condition of Tribune insolvency (*i.e.*, a stock price below $16.39). The relevant question, therefore, is whether, before the Step One Financing Closing Date, Tribune Common Stock would have traded to less than $16.39 per share absent the upward bias caused by Tribune's announcement of

192

its intent to pursue strategic alternatives in September 2006, followed by its April 2007 announcement of the Leveraged ESOP Transactions.

As shown in the table above, from its low point of $28.23 per share on July 27, 2006, Tribune's stock price would had to have declined by almost $12 per share to reach the above-noted insolvency threshold. A decline of this magnitude would represent a drop of more than 40% from Tribune Common Stock's lowest pre-announcement trading price during the three-month period before the September 2006 announcement. Tribune's post-announcement stock price did not exhibit this degree of volatility in response to disclosures concerning Tribune's financial performance, nor, perhaps more significantly, did the stock prices of cohort companies or benchmark indices reflect anywhere near this degree of decline:





Russell 2000 Value Radio & TV Broadcasters Index
June 21, 2006 through June 29, 2007

Based on the preceding analysis, which the Examiner acknowledges involves various simplifying assumptions, there is no credible basis to conclude that Tribune Common Stock would have traded below the above-noted solvency threshold, even accounting for the upward bias caused by Tribune's announcements of strategic alternatives.

Other market indicia directly support this conclusion.  Tribune's publicly-held bond prices showed little change in response to the announcement of the Leveraged ESOP Transactions on April 2, 2007, despite the fact that those prices should have been influenced by the anticipated closing of Step One (and the incremental senior debt obligations associated therewith) and the possibility that Step Two might also occur, thereby further increasing the amount of senior debt comprising Tribune's capital structure.  Further, by the time of the Step

One Financing Closing Date, rating agency commentary[553] revealed a downgrade of Tribune's corporate debt rating caused by the Merger announcement, a fact that should have placed additional downward pressure on Tribune's bond prices. In view of the negligible changes in Tribune's bond prices immediately after the April 2, 2007 announcement of the Leveraged ESOP Transactions through the Step One Financing Closing Date, and notwithstanding that bond prices were arguably further downwardly biased to account for the possibility of Step Two Closing (which, as noted, would result in even more debt senior to the bonds), market pricing data for the Tribune bonds corroborates a conclusion that Tribune was solvent at Step One.[554]

|     | **(B)** | **Balance Sheet Solvency: The Auction Process and Contemporaneous Valuations.** |
|-----|---------|---------|

Based on the evidence adduced in the Investigation, the Examiner finds that the auction process that led to the Leveraged ESOP Transactions[555] furnishes additional indicia of solvency at Step One without factoring in the Step Two Debt. First, as shown above, the $34 per share Tender Offer price represents a valuation substantially greater than the aggregate indebtedness of the Tribune Entities on the Step One Financing Closing Date (without including the Step Two Debt)                               Redacted

---

[553]  *See, e.g.*, Ex. 80 (Standard & Poor's Research Report, dated April 2, 2007); Ex. 216 (Standard & Poor's Recovery Report, dated April 19, 2007); Ex. 1060 (Standard & Poor's Ratings Direct, dated May 18, 2007).

[554]  Certain Parties have asserted that bond prices trading below par evidence insolvency. This assertion is erroneous because yield differences associated with interest rate changes and returns on comparable risk investments can explain such phenomena. Here, Tribune's equity prices belie insolvency assertions based solely on observed bond prices trading at discounts to par.

[555]  *See* Report at § III.D.1.

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

(ii)    **Step One:  Collapse—Inclusion of Step Two Debt at Step One.**[562]

The inclusion of the financial consequences of the Step Two Transactions to the solvency analysis at Step One requires, as threshold matters, a determination and assessment of the amount of incremental Step Two Debt that should be included in that analysis as well as the potential economic benefits derived from the consummation of the Merger.  Without doubt, including the Step Two Debt in this analysis, if legally appropriate,[563] increases the probability that Tribune was rendered insolvent at Step One.

Regarding the amount of debt that would be included in this scenario, the Examiner finds that it is appropriate to consider the approximately $4.2 billion of additional LBO Lender Debt that, at the time of the Step One Financing Closing Date, was expected to be incurred by Tribune in connection with the Step Two Transactions.  Although this exceeds the amount of debt that Tribune actually incurred at Step Two, using the higher expected amount is consistent with using the Step One Financing Closing Date as the date for valuation.  Using the actual amount incurred at the Step Two Financing Closing Date would violate the fundamental principle that valuation is

---

*Redacted*

[562]  As explained above, the Examiner has determined that the Step One Financing Closing Date and Step Two Financing Closing Date are the correct dates for assessing the solvency of the Tribune Entities.  *See* Report at § IV.B.5.d.(1).  However, this determination does not readily answer which of those two dates should be used for the solvency assessment in a collapse scenario.  The Examiner believes that, consistent with the underlying principles governing collapse discussed at length on other Sections of the Report, the correct date for assessing solvency in a collapse scenario would be the Step One Financing Closing Date (the date in which the Leveraged ESOP Transactions would be deemed to have occurred under a collapse scenario).

[563]  The Examiner has concluded that it is not legally appropriate to collapse the Step One Transactions and the Step Two Transactions.  *See* Report at § IV.B.5.b.

not a retroactive exercise, but rather, is based on information reasonably available at the relevant moment of valuation.  For the same reason, because the solvency determination is made as of the Step One Financing Closing Date, it is appropriate in this scenario to disregard Tribune's post-Step One financial performance.

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

(8)    **Examiner's Conclusions and Explanation Concerning Solvency of the Guarantor Subsidiaries at Step One.**

**Examiner's Conclusions:**

The Examiner finds that a court is highly likely to find that the Guarantor Subsidiaries were solvent as of, and after giving effect to, the Step One Transactions if the Step Two Debt is not included for purposes of that determination. The Examiner finds that to the extent that the effects of Step Two (including the Step Two Debt) are considered in connection with Step One solvency, a court is somewhat more likely to conclude that the Guarantor Subsidiaries nevertheless were solvent when that scenario is applied to Tribune.

**Explanation for the Examiner's Conclusions:**

Considering Tribune's capital structure, because it is highly likely that Tribune was solvent at Step One if the Step Two Debt is not included, it necessarily follows that the Guarantor Subsidiaries were, on a consolidated basis, also solvent at Step One if the Step Two Debt is not included. Stated simply, if Tribune had sufficient value to satisfy the claims of all its creditors, including the Step One Debt, then such creditors need not look specifically to the Guarantor Subsidiaries to satisfy their claims.

Additional analysis, however, is required if the $4.2 billion of Step Two Debt contemplated at the time of the Step One Financing Closing Date is considered. As discussed in another part of the Report, the Examiner has concluded that it is appropriate to value the Guarantor Subsidiaries collectively for purposes of the solvency analysis.[574] To determine the Guarantor Subsidiaries' collective solvency (given that, under a collapse scenario, a case might be made that Tribune was insolvent at Step One),[575] the Examiner first considered Tribune's

---

[574]  *See* Report at § IV.B.5.d.(4).

[575]  *See id.* at § IV.B.5.d.(7).

207

solvency, independent of the value of its equity in the Guarantor Subsidiaries and its co-liability under the LBO Lender Debt. If on a stand-alone basis, Tribune had liabilities independent of debts guaranteed by its Subsidiaries greater than the value of its own assets (*i.e.,* assets owned outright by Tribune, or valuable equity ownership interests in non-Guarantor Subsidiaries), then it is possible to isolate Tribune's individual solvency and thereby draw conclusions regarding the collective solvency of the Guarantor Subsidiaries.

Two examples illustrate this methodological approach. Assume Tribune is insolvent by $100 (after giving effect to the LBO Lender Debt and Tribune's equity in the Guarantor Subsidiaries). Assume further that Tribune holds assets, independent of its equity ownership interests in the Guarantor Subsidiaries, of $150, but also is obligated on $175 of Tribune-level only debt (in other words, debt having no recourse to the Guarantor Subsidiaries and thus excluding the LBO Lender Debt). In that case, the net Tribune-only deficit of $25 can be deducted from its concluded insolvency—$100—in order to determine collective insolvency at the Guarantor Subsidiary level, namely $75. Alternatively, if Tribune were insolvent by $100 (after giving effect to the LBO Lender Debt and Tribune's equity in the Guarantor Subsidiaries), but was insolvent by $50 taking into account solely Tribune-level assets and liabilities, this would mean that $50 of the $100 of Tribune insolvency, after giving effect to the LBO Lender Debt and Tribune's equity in the Guarantor Subsidiaries, translates into $50 of collective insolvency at the Guarantor Subsidiary level.

Applying these examples to Tribune's actual capital structure at the time of Step One, based on analysis prepared by his financial advisor, the Examiner determined that Tribune, independent of the value of its ownership interests in the Guarantor Subsidiaries, held assets

worth approximately $1.231 billion at, or proximate to, the Step One Financing Closing Date.[576]

These assets, and the values associated with each, are summarized in the table below:

| TRIBUNE ASSETS AT JUNE 2007 ($mm) | | |
|---|---|---|
| Assets | June 2007 | Notes |
| Cash and Equivalents | $ 109.0 | [1] |
| Chicago Cubs | $ 603.0 | [2] |
| Time Warner Shares | $ 345.0 | [3] |
| Real Estate - Baltimore/St. Louis | $ 41.0 | [4] |
| Investments - Classified Ventures | $ 113.0 | [5] |
| Investments - Legacy.com | $ 6.0 | [5] |
| Equity in Non-Guarantor Subsidiaries | $ 14.0 | [5] |
| | | |
| Total Assets | $ 1,231.0 | |

Notes:
[1] Balance sheet amounts as of month end as indicated.
[2] Ex. 900 (VRC Real Estate FMV Summary).
[3] Shares outstanding at $21.23 at June 2007.
[4] Ex. 899 (Tribune Company Cubs Sale Update).
[5] Value determined from review of valuation consultants' presentations.

---

[576] Certain data limitations precluded a precise determination of Tribune asset value on June 4, 2007. As such, proxies of value as alternative data for certain assets were considered a reliable estimate.

On the liability side, independent of the LBO Lender Debt, Tribune had Tribune-only indebtedness of approximately $2.372 billion as of the Step One Financing Date:

| TRIBUNE LIABILITIES AT JUNE 2007 ($mm) | | |
|---|---|---|
| **Liabilities** | **June 2007** | **Notes** |
| Medium - Term Notes | $ 262.6 | [1] |
| Property Financing Obligations | $ 46.2 | [1] |
| 2010 Notes | $ 449.5 | [1] |
| Debentures | $ 716.5 | [1] |
| Other Notes and Obligations | $ 34.1 | [1] |
| PHONES Notes | $ 663.0 | [1] |
| Exchangeable EGI-TRB Note | $ 200.0 | [1] |
| | | |
| **Total Liabilities** | **$ 2,371.9** | |

Notes:
[1] Ex. 4 (Tribune 2007 Form 10-K).

As a result, independent of the LBO Lender Debt and its interest in the Guarantor Subsidiaries, Tribune had liabilities exceeding the value of its assets by approximately $1.14 billion as of the Step One Financing Closing Date:

| TRIBUNE ESTIMATED DISTRIBUTABLE VALUE AT JUNE 2007 ($mm) | | |
|---|---|---|
| | **June 2007** | **Notes** |
| Assets | $ 1,231.0 | |
| Liabilities | $ 2,371.9 | |
| | | |
| Distributable Value (Deficiency) | ($ 1,140.9) | [1] |

Notes:
[1] Excludes the impact of intercompany accounts and LBO Lender Debt.

Taking into account the preceding analysis and the analysis set forth in the preceding Section of the Report (which, as noted, admittedly includes a series of simplifying

assumptions),[577] it is reasonable to infer that Tribune was solvent at Step One (without inclusion of the Step Two Debt) by an amount well in excess of $1.14 billion, if the value attributable to the Guarantor Subsidiaries, net of the LBO Lender Debt, is included. As a result, the above-calculated $1.14 billion Tribune-only deficiency should not be sufficient to render the Guarantor Subsidiaries (which represent the remainder of the value available, after giving effect to the Step One Debt) insolvent on a collective basis at Step One, if the Step Two Debt is not included in the mix.

As explained in the previous Section,[578] the Examiner found that even if $4.2 billion in (originally contemplated) Step Two Debt were included in the calculation of solvency at Step One, market-based indicia tend to support a conclusion that Tribune was solvent at Step One. The same conclusion applies to the Guarantor Subsidiaries. Indeed, by parity of reasoning based on the analysis presented above, because Tribune on a standalone basis likely *detracted* from the collective solvency of the Tribune Entities, but Tribune likely was solvent nonetheless in that scenario, the Guarantor Subsidiaries also likely would be solvent (more so) if the contemplated $4.2 billion of Step Two Debt were factored into the calculation of solvency at Step One.

<div align="right">

(9)    **Examiner's Conclusions and Explanation
Concerning Capital Adequacy of Tribune and
the Guarantor Subsidiaries at Step One.**

</div>

**<u>Examiner's Conclusions</u>:**

The Examiner finds that it is reasonably likely that a court would find that each of Tribune and the Guarantor Subsidiaries were left with adequate capital after giving effect to the Step One Transactions.

---

[577] *See* Report at § IV.B.5.d.(7).

[578] *See id.*

**Explanation of Examiner's Conclusions:**

In assessing Tribune's capital adequacy at Step One, the Examiner's financial advisor reviewed the May 17, 2007 cash flow projection model developed by VRC, which in turn was based on Tribune's projections.[579] This model appears to have served as the basis for VRC's opinions regarding Tribune's capital adequacy (as well as Tribune's reasonable ability to pay its debts) in VRC's "bring down" solvency opinion, dated May 24, 2007.[580] VRC's May 17, 2007 model included both a base case cash flow forecast (based on management's projections) and a stress case scenario designed to assess Tribune's ability to meet its cash requirements (both operational and, financing related) while maintaining compliance with covenants.[581]

Certain Parties contended that reliance on these projections was unreasonable in light of the negative variances between actual results for Tribune after February 2007 but before the Step One Financing Closing Date. For the first three months of 2007, Tribune's year-to-date actual results approximated the results anticipated in Tribune's February 2007 plan on a consolidated basis. Although April 2007 (the last month in which Brown Book financial performance data would have been available prior to June 4, 2007) showed negative variances to the 2007 operating plan,[582] in the Examiner's view these variances were not significant enough to justify revision to the 2007 operating plan, which includes a much longer horizon. Preparation of the

---

[579]  VRC did not include in its projections of cash flows certain cash savings anticipated by management that were incorporated into the projections provided to VRC. Specifically, although management forecasted operating cash flows that included the expectation of $20 million in annual "Other Expense Reductions" (apparently related to savings anticipated to be derived from taking Tribune private), VRC did not include these savings in "Adjusted EBITDA" in its May 17, 2007 model. Apart from this difference, all revenue and expense amounts can be reconciled between the VRC May 17, 2007 model and May 14, 2007 projections prepared by management. *Compare* Ex. 83 (ESOP Transaction Model, dated May 14, 2007) *with* Ex. 1104 (VRC Solvency Analysis, dated May 17, 2007).

[580]  *See* Ex. 269 (VRC Step One Solvency Opinion Bring-Down Letter, dated May 24, 2007).

[581]  Ex. 1104 (VRC Solvency Analysis, dated May 17, 2007).

[582]  *See* Report at § III.C.1. There is also some evidence that management believed that cost-cutting measures would help reverse negative variances on the revenue side of the business. *See* footnote 78.

Brown Book for May 2007 likely occurred after the closing of the Step One Transactions, although certain information bearing on May 2007 financial performance was probably known to Tribune management before closing.  For example, Tribune prepared and issued weekly "flash" reports reporting advertising revenue and circulation.[583]  Although the May "flash" reports would have shown at least some of the negative variance reflected in Tribune's May results, significantly, management's projected 2007 revenue and EBITDA generally was consistent with analyst expectations at the time (and, significantly, Tribune was not providing market guidance).[584]  In light of these considerations, applying an objective test to measure capital adequacy based on what was known and ascertainable at the time, the Examiner finds that a court would likely conclude that it would be inappropriate to revise the February 2007 projections based on declines in performance in April and May.

<div align="center">Redacted</div>

---

[583]   *See, e.g.*, Ex. 66 at 20:14-21:8 (Rule 2004 Examination of Harry Amsden, December 16, 2009).

[584]   *See* Report at § III.C.2.

<div align="center">Redacted</div>

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

    (10)    **Examiner's Conclusions and Explanation Concerning Solvency of Tribune at Step Two.**

**<u>Examiner's Conclusions</u>:**

The Examiner finds that a court is highly likely to conclude that the Step Two Transactions rendered Tribune insolvent.

**<u>Explanation of the Examiner's Conclusions</u>:**

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

(11)    **Examiner's Conclusions and Explanation Concerning Solvency of Guarantor Subsidiaries at Step Two.**

**Examiner's Conclusions:**

The Examiner finds that a court is reasonably likely to conclude that the Guarantor Subsidiaries were rendered insolvent on a collective basis as a result of the Step Two Transactions.

**Explanation of the Examiner's Conclusions:**

As discussed in connection with the Examiner's analysis of the solvency of the Guarantor Subsidiaries at Step One, Tribune's degree of insolvency can be used to calculate the degree of solvency or insolvency of the Guarantor Subsidiaries.[608] The following chart shows the Examiner's assessment of Tribune's assets as of the Step Two Financing Closing Date (excluding the value of its ownership interests in the Guarantor Subsidiaries) compared to the Tribune-only debt (*i.e.*, non-LBO Debt):

---

[608]  *See id.* at § IV.B.5.d.(8).

| TRIBUNE ESTIMATED DISTRIBUTABLE VALUE AT DECEMBER 2007 ($mm) | | |
|---|---|---|
| | December 2007 | Notes |
| Assets | $ 1,468.0 | |
| Liabilities | $ 2,256.4 | |
| Distributable Value (Deficiency) | ($ 788.4) | [1] |

Notes

[1] Excludes the impact of intercompany accounts and LBO Lender Debt.

The following chart details the value of certain of Tribune's assets as of the Step Two Financing Closing Date:

| Assets | December 2007 | Notes |
|---|---|---|
| TRIBUNE ASSETS AT DECEMBER 2007 ($mm) | | |
| Cash and Equivalents | $ 179.0 | [1] |
| Chicago Cubs | $ 850.0 | [2] |
| Time Warner Shares | $ 265.0 | [3] |
| Real Estate - Baltimore/St. Louis | $ 41.0 | [4] |
| Investments - Classified Ventures | $ 113.0 | [5] |
| Investments - Legacy.com | $ 6.0 | [5] |
| Equity in Non-Guarantor Subsidiaries | $ 14.0 | [5] |
| Total Assets | $ 1,468.0 | |

Notes

[1] Balance sheet amounts as of month end as indicated.

[2] Ex. 900 (VRC Real Estate FMV Summary).

[3] Shares outstanding at $16.36 at December 2007.

[4] Ex. 899 (Tribune Cubs Sale Update).

[5] Value determined from review of valuation consultants' presentations.

The following chart details the amount of Tribune's non-LBO Debt liabilities as of the

Step Two Financing Closing Date:

| TRIBUNE LIABILITIES AT DECEMBER 2007 ($mm) | | |
|---|---|---|
| Liabilities | December 2007 | Notes |
| Medium - Term Notes | $ 262.6 | [1] |
| Property Financing Obligations | $ 35.7 | [1] |
| 2010 Notes | $ 449.6 | [1] |
| Debentures | $ 717.0 | [1] |
| Interest Rate Swaps | $ 119.0 | [1] |
| Other Notes and Obligations | $ 15.1 | [1] |
| PHONES Notes | $ 597.0 | [1] |
| Exchangeable EGI-TRB Note | $ 0.0 | [1] |
| EGI-TRB Note | $ 60.3 | [1] |
| **Total Liabilities** | **$ 2,256.4** | |
| Notes | | |
| [1] Ex. 4 (Tribune 2007 Form 10-K). | | |

Because the magnitude of insolvency attributable to Tribune, based on the preceding

Tribune-only analysis (resulting in an approximate $788 million deficiency), is substantially less

than the Tribune's aggregate insolvency after giving effect to the LBO Lender Debt and the value

attributable to the Guarantor Subsidiaries ($1.965 billion), it follows that the Step Two

Transactions rendered the Guarantor Subsidiaries collectively insolvent as well.

Market-based considerations do not alter this conclusion.  Although Tribune's public

bonds traded at a significant discount to par before the Step Two Financing Closing Date, these

bonds still traded at values above zero, from which it is possible to infer a market-based belief

that the Guarantor Subsidiaries had some positive net value even taking into account the LBO

Lender Debt and were therefore solvent.[609]  However, as discussed in another part of the

---

[609]  It should be noted, however, that just prior to the Step Two Financing Closing Date, Tribune's had not yet reported fourth quarter 2007 results (although some, albeit much less comprehensive information, e.g., press releases regarding performance for October and November, had been issued).

Report,[610] other market indicia, such as the difference between the trading price of Tribune

Common Stock and the Tender Offer price and the fact that Tribune's Step One Debt traded at

discounts to par, lead to the opposite conclusion (although it is also possible that certain debt

traded at a discount based on unfavorable pricing factors).  In light of the equivocal inferences

that could be drawn from these various market-based indicia and the significant contrary

evidence that supports a conclusion that the Guarantor Subsidiaries were rendered insolvent at

Step Two, the Examiner finds that it is reasonably likely that the Step Two Transactions rendered

the Guarantor Subsidiaries insolvent on a collective basis.

> **(12)     Examiner's Conclusions and Explanation Concerning Capital Adequacy of Tribune and the Guarantor Subsidiaries at Step Two.**

**Examiner's Conclusions:**

The Examiner finds that:  (i) it is highly likely that a court would conclude that Tribune

was left without adequate capital after giving effect to the Step Two Transactions, and (ii) it is

reasonably likely that a court would conclude that the Guarantor Subsidiaries were left without

adequate capital after giving effect to the Step Two Transactions.

**Explanation of Examiner's Conclusions - Tribune:**

*Redacted*

229

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

**Explanation of Examiner's Conclusions – The Guarantor Subsidiaries:**

The Examiner 's financial advisor next assessed the capital adequacy of the Guarantor Subsidiaries after giving effect to the Step Two Transactions.  In structure, the capital adequacy model developed by the Examiner's financial advisor makes the same assumptions as the Tribune-level model, with the following significant difference:

*Redacted*

*Redacted*

**6.     Intention to Incur or Belief that the Tribune Entities Would Incur Debts Beyond Their Reasonable Ability to Pay.**

**a.     The Legal Standard.**

Bankruptcy Code section 548(a)(1)(B)(ii)(III) provides for the avoidance of a transfer or obligation when the debtor "intended to incur or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured."[631]  Although several courts have held that this provision requires proof of the debtor's subjective intent or belief that it would incur debts beyond its ability to pay,[632] other courts have inferred the requisite intent from the

---

[631]  11 U.S.C. § 548(a)(1)(B)(ii)(III) (2006).

[632]  *See Off. Unsecured Creditors Comm. of Valley-Vulcan Mold Co. v. Microdot, Ins. (In re Valley-Vulcan Mold Co.)*, 1994 Bankr. LEXIS 2347, at *13 (N.D. Ohio) (citing *Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.)*, 124 B.R. 984, 1001 (Bankr. S.D. Ohio 1990)); *In re Taubman Realty Co.*, 160 B.R. 964, 986

facts and circumstances regarding the transfer, essentially applying an objective or reasonable person standard.[633]

### b.    Examiner's Conclusions and Explanation Concerning Application to Step One.

**Examiner's Conclusions:**

If a court were to apply a subjective or objective test, a court would be reasonably unlikely to find that the Tribune Entities intended to incur or believed they would incur debts beyond their ability to pay as such debts matured at Step One.

**Explanation of Examiner's Conclusions:**

For many of the same reasons discussed in the Report's analysis of the question of intentional fraudulent transfer at Step One,[634] there is insufficient evidence to support a finding that the Tribune Entities entered into Step One subjectively intending not to pay their debts as they matured.  If a court were to apply an objective test, then for all practical purposes the question is whether the Tribune Entities had adequate capital and the answer to that question likely would be the same here.

---

(Bankr. S.D. Ohio 1993) ("This prong . . . requires the court to undergo a subjective, rather than objective inquiry into the party's intent.").

[633]  *See WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File (In re WRT Energy Corp.)*, 282 B.R. 343, 415 (Bankr. W.D. La. 2001) ("While the statute suggests a standard based on subjective intent, the courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured."); *Suburban Motorfreight*, 124 B.R. at 1001 (finding stockholders could not have reasonably believed company would have been able to pay debts as they matured).  *See also ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 399 (S.D. Tex. 2008) (applying Delaware fraudulent transfer law).

[634]  *See Report at § IV.B.4.b.*

c.    **Examiner's Conclusions and Explanation Concerning Application to Step Two.**

**Examiner's Conclusions**:

If a court were to apply a subjective test, a court would be somewhat likely to find that the evidence supports the conclusion that at Step Two the Tribune Entities intended to incur or believed they would incur debts beyond their ability to pay as such debts matured. If a court were to apply an objective test on this question, however, the same answer would be given to this question and the question of capital adequacy at Step Two.

**Explanation for Examiner's Conclusions**:

Applying a subjective test, if a court were to agree with the Examiner's conclusion concerning intentional fraudulent transfer at Step Two, it is somewhat likely that a court would also find that the Tribune Entities believed that they would incur debts beyond their ability to pay as such debts matured. Largely the same evidence on the question of intentional fraudulent transfer would point in the same direction on this question. If a court were to apply an objective test, then for all practical purposes the question is whether the Tribune Entities had adequate capital and the answer to that question furnished above likely would be the same here.

### 7.    Asserted Defenses to Fraudulent Transfer Claims.

The Report turns to issues concerning defenses that might be asserted to the above-discussed fraudulent transfer claims.

### a.    Defenses Under Bankruptcy Code section 546(e).

#### (1)    Examiner's Conclusions and Explanation Concerning Section 546(e) Defenses.

**Examiner's Conclusions:**

A court is highly likely to find that Bankruptcy Code section 546(e)[635] protects payments to the Selling Stockholders on account of their stockholder interests in Tribune under the Leveraged ESOP Transactions, except to the extent the transfers constitute intentional fraudulent transfer. Whether or not intentional fraudulent transfers are involved, a court is reasonably likely to find, however, that section 546(e) does not protect against avoidance of the obligations incurred under the Credit Agreement or the Stock Pledge, guarantees, or promissory notes given in connection therewith.[636]

**Explanation of Examiner's Conclusions:**

Absent an intentional fraudulent transfer under Bankruptcy Code section 548(a)(1)(A),[637] which is not superseded under section 546(e), the application of the 546(e) defense to the Selling Stockholders on account of payments made under the Leveraged ESOP Transactions is straightforward. Section 546(e) provides that a "trustee may not avoid a transfer" that is

---

[635]    11 U.S.C. § 546(a) (2006).

[636]    Because the scope of the Investigation is limited to claims and defenses asserted by the Parties, the Report does not address potential 546(e) defenses that might be asserted by other parties with respect to other payments made in the Leveraged ESOP Transactions. Absent further order of the Bankruptcy Court expanding the scope of the Investigation, the Examiner is not permitted to consider these matters.

[637]    *Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.)*, 274 B.R. 71, 75 (D. Del. 2002) ("[T]he Committee is correct that section 548(a)(1) claims for intentional fraudulent transfers . . . are exempted from . . . section 546(e). . . .").

"settlement payment" and which is "made by or to (or for the benefit of) commodity broker, forward contract merchant, stock broker, financial institution, financial participant, or securities clearing agency."[638] The Third Circuit Court of Appeals has held that section 546(e) bars recovery of payments made to selling stockholders in the context of a leveraged buyout transaction.[639] Courts have held that the term "settlement payment" means "the transfer of cash or securities made to complete a securities transaction" and that the term "made by or to . . . a financial institution" is satisfied by a wire transfer of payment from the debtor's bank account to the selling stockholder. [640] Courts have applied this defense to bar recovery of payments in a leveraged buyout even from significant selling stockholders, including insiders.[641]

The payments made to the Selling Stockholders in the Leveraged ESOP Transactions were effectuated by wire transfers through a financial institution, and, under applicable Third Circuit law, those transfers likely are insulated from avoidance or recovery absent the successful prosecution of a claim for intentional fraudulent transfer under Bankruptcy Code section 548(a)(1)(A). Although the court in *Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*[642] recently stated that "section 546(e) does not apply to 'collapsed' transactions," that statement would not support a different conclusion regarding the payments made to the Selling Stockholders. The *Mervyn's* case arose out of a scheme to strip the real

---

[638]  11 U.S.C. § 546(e) (2006).

[639]  *See Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.)*, 590 F.3d 252, 258-59 (3d Cir. 2009); *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l Inc.)*, 181 F.3d 505, 514-16 (3d Cir. 1999); *see also PHP Liquidating, LLC v. Robbins*, 291 B.R. 603, 606-07 (D. Del. 2003), *aff'd sub nom. PHP Liquidating Trust, LLC v. Robbins (In re PHP Healthcare Corp.)*, 128 F. App'x 839 (3d Cir. 2005). *Accord In re Kaiser Steel Corp.*, 952 F.2d 1230, 1240 (10th Cir. 1991).

[640]  *Resorts Int'l*, 181 F.3d at 515; *see also Off. Comm. of Unsecured Creditors of IT Group, Inc. v. Acres of Diamonds, L.P. (In re IT Group, Inc.)*, 359 B.R. 97, 99-102 (Bankr. D. Del. 2006).

[641]  *See Off. Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*, 344 B.R. 340, 367-70 (W.D. Pa. 2006) (suit against inside stockholders in LBO similar to this case); *Hechinger*, 274 B.R. at 87; *Elway Co. v. Miller (In re Elrod Holdings Corp.)*, 394 B.R. 760, 763-64 (Bankr. D. Del. 2008); *Loranger Mfg. Co. v. PNC Bank (In re Loranger Mfg. Corp.)*, 324 B.R. 575, 585-86 (Bankr. W.D. Pa. 2005).

[642]  426 B.R. 488, 500 (Bankr. D. Del. 2010).

estate assets out of the debtor, Mervyn's LLC, a wholly owned subsidiary of Target Corporation, and to sell those assets to a group of three private equity firms. In considering the section 546(e) defense, the bankruptcy court reasoned that the protection afforded by that statutory provision could not be extended to encompass steps not involving settlement payments that had actually inflicted the damage and had driven the debtor into bankruptcy.[643] In contrast to the facts of that case, any action to recover the payments made to the Selling Stockholders would not be based on an interim conveyance, but on the final and core transaction protected by Section 546(e)–*i.e.*, the payment of funds to stockholders in return for or on account of their securities. Regardless, the *Mervyn's* court's blanket suggestion that section 546(e) does not apply to collapsed transactions is at odds with the applicable law in the Third Circuit.[644] In sum, unless the transfers in question are avoided as intentional fraudulent transfers under Bankruptcy Code section 548(a)(1)(A), payments to Selling Stockholders cannot be avoided under the Bankruptcy Code's avoiding powers.

The possible application of section 546(e) to bar constructive fraudulent transfer avoidance of the obligations incurred under the Credit Agreement as well as the Stock Pledge requires a finer analyses. Because the obligations incurred and security interests granted to the LBO Lenders are not settlement or margin payments, the application of section 546(e) in this instance depends on the amendments to section 546(e) enacted in the Financial Nettings Improvement Act of 2006. Because of that Act, section 546(e) currently provides:[645]

---

[643] *Id.* ("Target's attempt to have this Court apply section 546(e) to a single conveyance within the entire transaction is not persuasive.").

[644] Section 546(e) has been applied on numerous occasions to protect payments to stockholders in LBO cases in which the various transactions might otherwise have been collapsed. *See In Resorts Int'l*, 181 F.3d at 515 & n.7; *Hechinger*, 274 B.R. at 83-89.

[645] 11 U.S.C. § 546(e) (2006) (changes in emphasis), adopted under Financial Netting Improvements Act of 2006 § 5(b), Pub. L. No. 109-390, 120 Stat. 2697 (Dec. 12, 2006).

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (*or for the benefit of*) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, *or that is a transfer made by or to (*or for the benefit of*) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract*, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

The case for application of expanded section 546(e) as a complete defense to a

constructive fraudulent transfer action to avoid the obligations under the Credit Agreement as

well as the Stock Pledge requires a demonstration of four elements: (1) the broad definition of

"transfer" under Bankruptcy Code section 101(54)(D), which encompasses "each mode, direct or

indirect, absolute or conditional, voluntary or involuntary, of disposing or parting with—(i)

property; or (ii) an interest in property,"[646] extends to the obligations incurred under the Credit

Agreement, the Stock Pledge, and the guarantees and promissory notes in connection therewith;

(2) the Credit Agreement Agent and the other lenders under the Credit Agreement are financial

institutions, financial participants and/or stockbrokers for purposes of section 546(e);[647] (3) either

or both of the Merger Agreement and the Credit Agreement constituted a "securities contract;"[648]

---

[646]   11 U.S.C. § 101(54)(D) (2006).

[647]   A "financial institution" includes, *inter alia*, "an entity that is a commercial or savings bank . . .; or an investment company registered under the Investment Company Act of 1940." *See* 11 U.S.C. § 101(22) (2006). The term "financial institution" also includes any "customer" of such an institution when the institution is acting as an "agent . . . in connection with a securities contract." *Id.* Similarly, a "financial participant" includes any entity with certain minimum levels of particular kinds of financial activity. *See* 11 U.S.C. § 101(22A) (2006).

[648]   Congress expanded the definition of "securities contract" when it enacted the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") § 907(a)(2), Pub. L. 109-8, 119 Stat. 173 (2005) to include, inter alia, "(i) a contract for the purchase, sale, or loan of a security; . . . (iv) any margin loan; . . . (v) any extension of credit for the clearance or settlement of securities transactions; . . . (vii) any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph . . . ; (xi) any . . . other credit enhancement related to any agreement referred to in this subparagraph, including any guarantee . . . ." 11 U.S.C. § 741(7)(A) (2006). Prior to enactment of BAPCPA, the definition of "securities contract" under section 741 was limited to a "contract for the purchase, sale, or loan of a security, including an option for the purchase

244

and (4) the obligations, the Stock Pledge, and the guarantees and promissory notes in connection therewith all were transfers made "in connection with" a "securities contract."[649]

No reported decision has interpreted revised section 546(e) in the context asserted here. The bankruptcy court in *Global Crossing Estate Representative v. Alta Partners Holdings LDC (In re Global Crossing, Ltd.)*,[650] made passing reference to the amendments, but nothing more. A similar acknowledgment in *Collier* that Congress broadened the scope of section 546(e) is equally unenlightening.[651] The fact that Congress expanded section 546(e) in certain respects does not answer whether those changes are relevant to the instant dispute. The legislative history to this amendment is limited and, despite the Parties' vigorous advocacy, does not illuminate the question posed.[652] Thus, ordinary tools of statutory construction must be deployed to address this question.

---

or sale of a security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any option entered into on a national securities exchange relating to foreign currencies, or the guarantee of any settlement of cash or securities by or to a securities clearing agency." 11 U.S.C. § 741(7) (2000). The House Report on the legislation enacting these changes furnishes little explanation regarding these changes. The discussion of clause (v) covering "extensions of credit" states the amendment was "intended to confirm that the definition encompasses credit extended for the execution, clearance and settlement of securities transactions, which provide important liquidity to the securities markets." *See* H.R. Rep. No. 109-648 (2006) *as reprinted in* 2006 U.S.C.C.A.N. 1585, 1589. Of course, this does not address whether the term was intended to cover a loan made to a borrower to redeem its own publicly held stock, and, on the contrary, the natural reading of the clause suggests a much more narrow construction.

[649] *Casa de Cambio Magapara, S.A. de C.V. v. Wachovia Bank, N.A. (In re Casa de Cambio Magapara)*, 390 B.R. 595, 597-99 (Bankr. N.D. Ill. 2008) (finding that "prejudgment attachments were obtained 'in connection with' swap agreement"); *Interbulk, Ltd. v. Louis Drefus Corp. (In re Interbulk, Ltd.)*, 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999) ("A natural reading of 'in connection with' suggests a broad meaning similar to 'related to.'") (citations omitted).

[650] 385 B.R. 52, 57 (Bankr. S.D.N.Y. 2008) ("[L]ater amendments to the Code—inapplicable to this transaction but instructive as to what Congress was thinking about—broaden that definition and section 546(e)'s safe harbor . . .").

[651] 5 COLLIER ON BANKRUPTCY ¶ 546.06, at n.14 (Alan A. Resnick & Henry J. Sommers eds., 16th ed.).

[652] The legislative history stated that this was a "technical and clarifying change[.]" H.R. Rep. No. 109-648, pt. 1, at 6-7 (2006), *as reprinted in* 2006 U.S.C.C.A.N. 1585, 1591-92. *See Hutson v. E.I. du Pont de Nemours & Co. (In re Nat'l Gas Distribs., LLC*, 556 F.3d 247, 257 (4th Cir. 2009) (noting that the revisions to the definitions as part of the Financial Netting Improvement Act of 2006 were "technical and clarifying changes."). *See also In re Lehman Bros. Holdings, Inc.*, 2010 Bankr. LEXIS 1260, *25-26 (Bankr. S.D.N.Y. May 5, 2010) (rejecting contention that 2006 amendments eliminated requirement of mutuality from the automatic stay exceptions found in Bankruptcy Code section 362(d) and stating that "[t]he legislative history of FNIA reveals that

For this defense to succeed, each component of the above-summarized argument (i.e., (1) - (4)) must hold up.  If any one does not, the defense fails.  The Examiner finds that the defense does not make it past its first element—that the obligations incurred under the Credit Agreement resulting from the advances of loans by the lenders thereunder constituted a "transfer" within the meaning of the Bankruptcy Code.  The plain language of Bankruptcy Code section 546(e) simply does not protect obligations that are avoidable under sections 544 and 548.  Moreover, although the Bankruptcy Code's definition of "transfer" is indisputably broad, the term does not encompass an "obligation," whether or not embodied in an instrument (e.g., promissory note or loan agreement) delivered to a "stockbroker, financial institution [or] financial participant."

The most cursory reading of the Bankruptcy Code shows that the term "transfer" and "obligation" are not one and the same.  Bankruptcy Code sections 544 and 548, for example, specify two distinct avoidance powers:  the avoidance of a transfer and the avoidance of an

---

Congress intended merely to make "technical changes to the netting and financial provisions" of the Bankruptcy Code to "update the language to reflect current market and regulatory practices" and that "[t]hese technical amendments cannot be read as authority for so fundamental a change in creditor rights") (internal citations omitted).  The general purpose of the 2006 amendments was described as follows:

> H.R. 5585 makes technical changes to the netting and financial contract provisions incorporated by the [2004 Amendments] to update the language to reflect current market and regulatory practices, and help reduce systemic risk in the financial markets by clarifying the treatment of certain financial products in cases of bankruptcy or insolvency.

H.R. Rep. No. 109-648 (2006) *as reprinted in* 2006 U.S.C.C.A.N. 1585, 1591-92.  The legislative history specific to section 546(e) stated that the language was amended to conform to section 546(f).

> Section 5(b) amends Sections 546(e) and 546(f) of the Bankruptcy Code, which protect margin payments and settlement payments, to also protect transfers made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, securities clearing agency, or repo participant, in connection with a securities contract, commodity contract, forward contract, or repurchase agreement.  This amendment conforms the language of Sections 546(e) and 546(f) to the language in 546(g), regarding the protection of transfers in connection with swap agreements.

*Id.* at 8.

Statements from the House floor are not particularly illuminating.  *See* 152 CONG. REC. H7601 (daily ed. Sept. 27, 2006) (statement of Rep. Schultz) ("The primary goal of our legislation is to minimize systemic risks in situations when the procedure for resolving a single insolvency could trigger other failures elsewhere in the market."); 152 CONG. REC. H8651 (daily ed. Nov. 15, 2006) (statement of Rep. Baker) ("[T]here is considerable market uncertainty as to how a bankruptcy . . . would affect market liquidity.  The unwinding of these obligations . . . go[es] to the broader financial marketplace.").

obligation.[653]  If an obligation always were a transfer, the separate references to an obligation in these sections alone would be a surplusage.[654]  "The fraudulent conveyance essentially has to do with the consummated effort of the debtor to pass the asset beyond the creditor's reach by means of creating an alien interest in it."[655]  In contrast, the incurring of an obligation for less than reasonably equivalent value increases the claims against property in the debtor's hands.  There is simply no transfer out.  Thus, Bankruptcy Code section 551 provides that an avoided transfer "is preserved for the benefit of the estate."[656]  There is no reason to "preserve" an avoided obligation because, by definition, avoidance of an obligation correspondingly reduces the debtor's liabilities proportionate to the commission of a constructive or actual fraud.[657]  Likewise, Bankruptcy Code section 550(a) provides that to the extent a transfer is avoided, the estate representative may recover "the property transferred, or if the court so orders, the value of such property . . . ."[658] There is nothing to "recover" when an obligation is avoided.

The cornerstone of a transfer, within the meaning of Bankruptcy Code section 101(54), is an interest in property, whether in the form of a lien, retention of title, a debtor's equity of redemption, or otherwise, which is then disposed of in some fashion.[659]  In contrast, an

---

[653]  11 U.S.C. §§ 544(b)(1) and 548(a)(1) (2006).

[654]  See *Rake v. Wade*, 508 U.S. 464, 471 (1993) ("To avoid deny[ing] effect to a part of a statute, we accord significance and effect . . . to every word.") (internal citations omitted); *Hoffman v. Conn. Dep't of Income Maint.*, 492 U.S. 96, 103 (1989) ("It is our duty to give effect, if possible, to every clause and word of a statute. . . .") (citations omitted).

[655]  GARRARD GLENN, THE LAW OF FRAUDULENT CONVEYANCES § 3, at 5 (1931).

[656]  11 U.S.C. § 551 (2006).

[657]  11 U.S.C. § 548(a), (c) (2006).

[658]  11 U.S.C. § 550(a) (2006); *see Coleman v. Cmty. Trust Bank (In re Coleman)*, 426 F.3d. 719, 726 (4th Cir. 2005) (noting the distinction in context of section 544).

[659]  11 U.S.C. §101(54) (2006); *see also Barber v. Dunbar (In re Dunbar)*, 313 B.R. 430, 435 (Bankr. C.D. Ill. 2004) ("The hallmark of a 'transfer' is a change in the rights of the transferor with respect to the property after the transaction.") (citations omitted); *Towers v. U.S. Dep't of Treasury (In re Feiler)*, 218 B.R. 957, 962 (Bankr. N.D. Cal. 1998) (treating debtor's election to carry forward NOL's as a transfer), *aff'd*, 218 F.3d 948 (9th Cir. 2000).

obligation is a duty imposed by contract, law, or the moral universe.[660] A right to payment starts

its life as an obligation to pay something to someone else; when that obligation is honored and

funds move from one party's hands to another, a transfer on account of the obligation occurs, but

the fact that an obligation may give rise to a transfer does not make an obligation a transfer. The

two are very different things. *Barnhill v. Johnson*[661] illustrates the distinction nicely. There, a

debtor delivered a check outside the 90-day preference period, but the drawee bank honored the

check during the preference period. To determine when the transfer occurred for purposes of

Bankruptcy Code section 547, the Court distinguished between a transfer and a right to payment

embodied in a chose in action:[662]

> We acknowledge that § 101(54) adopts an expansive definition of
> transfer, one that includes "every mode . . . absolute or conditional
> . . . of disposing of or parting with property or with an interest in
> property." *There is thus some force in petitioner's claim that he
> did, in fact, gain something when he received the check. But at
> most, what petitioner gained was a chose in action against the
> debtor. Such a right, however, cannot fairly be characterized as a
> conditional right to property," § 101(54), where the property in
> this case is the account maintained with the drawee bank.* For as
> noted above, until the moment of honor the debtor retains full
> control over disposition of the account and the account remains

---

[660] *See also Black's Law Dictionary* 1104 (8th ed. 2004) (defining obligation as "anything that a person is bound to do or forbear from doing, whether the duty is imposed by law, contract, promise, social relations, courtesy, kindness, or morality").

[661] 503 U.S. 393 (1992).

[662] *Id.* at 400-01 (emphasis added). The bankruptcy court in *In re Asia Global Crossing, Ltd.*, 333 B.R. 199 (Bankr. S.D.N.Y. 2005) fleshed out these principles. In that case, 360networks prepaid $100 million to GC Bandwidth for "telecommunications capacity"; the debtor, Asia Global, guaranteed GC Bandwidth's performance of its obligations. *Id.* at 201. 360networks never received the telecommunications capacity and, when Asia Global filed for bankruptcy, it filed a $100 million proof of claim. *Id.* Asia Global's trustee objected to the claim pursuant to Bankruptcy Code section 502(d), which disallows the claim of a transferee of an avoidable transfer but does not speak to the obligee of an avoidable obligation. The court held that section 502(d) was inapplicable:

> Like the check in *Barnhill*, the Guaranty gave 360networks a chose in action against Asia Global, conditioned on the default by GC Bandwidth. It did not grant 360networks any interest in or right to Asia Global's property. As such, it was an "obligation" rather than a "transfer" within the meaning of § 101(54).

*Id.* at 203; *see also Covey v. Commercial Nat'l Bank*, 960 F.2d 657, 661 (7th Cir. 1992) ("Although a note or guarantee is not a "transfer" for purposes of 11 U.S.C. § 101(54) . . . either is an obligation.") (internal citation omitted).

> subject to a variety of actions by third parties. To treat petitioner's nebulous right to bring suit as a "conditional transfer" of the property would accomplish a near-limitless explanation of the term "conditional." In the absence of any right against the bank or the account, we think the fairer description is that petitioner had received no interest in debtor's property, not that his interest was "conditional."

A contractual right is a species of an obligation. Its lineage and the protections to which a holder of such right is entitled under bankruptcy law are distinct from an interest in property of the debtor and the rights of a holder of an interest in property of the debtor:[663]

> An unsecured simple contract creditor has, in the absence of statute, no substantive right, legal or equitable, in or to the property of his debtor. This is true, whatever the nature of the property; and, although the debtor is a corporation and insolvent. The only substantive right of a simple contract creditor is to have his debt paid in due course. His adjective right is, ordinarily, at law. He has no right whatsoever in equity until he has exhausted his legal remedy. After execution upon a judgment recovered at law has been returned unsatisfied he may proceed in equity by a creditor's bill.

When a property interest is involved, in contrast, important constitutional considerations, not to mention substantive Bankruptcy Code protections, arise and must be addressed.[664] The object of a transfer is the disposition of a property interest, not an obligation. Indeed, the Bankruptcy Code does not even refer to the holder of an obligation as a "transferee" but rather an

---

[663] *Pusey & Jones Co. v. Hanssen*, 261 U.S. 491, 497 (1923); *see also Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502, 509-10 (1942) ("In effect, therefore, the practical value of an unsecured claim against the city is inseparable from reliance upon the effectiveness of the city's taxing power. The only remedy for the enforcement of such a claim is a mandamus to compel the levying of authorized taxes."); GLENN at footnote 655, § 9, at 15-16 ("The relation of debtor and creditor embodies nothing but the right to sue, and the right to defend on the merits. Until the creditor gets judgment, he has no right to touch or interfere with any of the debtor's assets.") (citations omitted). *See also* 11 U.S.C. §§ 361, 363(f) (2006).

[664] The limitations, however, are limited indeed. *See generally Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 518 (1938) ("Property rights do not gain any absolute inviolability in the bankruptcy court because created and protected by state law. Most property rights are so created and protected. But if Congress is acting within its bankruptcy power, it may authorize the bankruptcy court to affect these property rights, provided the limitations of the due process clause are observed."); *Wright v. Vinton Branch of Mountain Trust Bank*, 300 U.S. 440, 470 (1937). On the other hand, the substantive rights afforded under the Bankruptcy Code on account of interests in property are significant.

"obligee."[665]  To label the incurrence of an obligation a "transfer," therefore, is the equivalent of mixing an apple and an orange.

Sometimes, a principle is so basic to the fabric of bankruptcy law that it is difficult to find a case stating the obvious, but on the rare occasion when courts have paused to consider the point, they have recognized that an obligation and transfer are not the same thing.[666] Regrettably, two courts blurred the distinction between these concepts, although the references were passing and the opinions are unlikely to be followed in this context (or any other when the distinction between a transfer and an obligation actually would make a difference).[667]

Because section 546(e) itself contains no other definition of the term "transfer," the logical conclusion is that this term means the same in that section as it does elsewhere in the Bankruptcy Code. [668]  By its terms, therefore, section 546(e) only protects transfers, as defined in

---

[665]  11 U.S.C. § 548(c) (2006).

[666]  *Covey Commercial Nat'l Bank*, 960 F.2d 657, 661 (7th Cir. 1992) ("Although a note or guarantee is not a 'transfer' for purposes of 11 U.S.C. § 101(54), both note and guarantee are obligations (internal citations omitted); *Asia Global Crossing*, 333 B.R. at 204 (stating that a guaranty is a "chose in action" and incurrence of such liability does not constitute a "transfer" within the meaning of Bankruptcy Code section 101(54)); *In re Garden Ridge*, 323 B.R. 136, 141 (Bankr. D. Del. 2005) ("The code does not specifically define 'obligation,' however, the Third Circuit held that 'the most straightforward understanding of an obligation is something that one is legally required to perform under the terms of the lease and that such an obligation arises when one becomes legally obligated to perform.'") (citing *Centerpoint Props. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holdings Corp.)*, 268 F.3d 205, 209 (3d Cir. 2001)).  The distinction has been recognized under other federal statutes as well.  *See Wolkowitz v. FDIC (In re Imperial Credit Indus., Inc.)*, 527 F.3d 959, 971-73 (9th Cir. 2008) (applying 12 U.S.C. § 1828(u)(1) to resolve the question whether that statute applied to "obligations" and rejecting such contention).

[667]  *See Belfance v. Buonpane (In re Omega Door Co.)*, 399 B.R. 295, 304 (B.A.P. 6th Cir. 2009) (applying Ohio law and only analogizing to Bankruptcy Code); *In re Taubman*, 160 B.R. 964, 982 (Bankr. S.D. Ohio 1993) (finding that "false profits" payments made by debtor in Ponzi scheme constituted transfers of the debtor's property under the Bankruptcy Code, where by "checks, cashier's check, or by transfer of other property, including real estate conveyances as well as the incurrence of obligations pursuant to promissory notes and agreements").

[668]  *See Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932) ("[T]here is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning."); *Comm. of Equity Sec. Holders of Fed.-Mogul Corp. v. Off. Comm. of Unsecured Creditors (In re Fed. Mogul-Global, Inc.)*, 348 F.3d 390, 407 (3d Cir. 2003) ("It is well established that 'identical words used in different parts of the same act are intended to have the same meaning.'") (citations omitted).  Although no rule of construction, let alone this one, is dispositive, it would be illogical to assume that Congress intended a different meaning for the term "transfer" in section 546(e) without specifying a different definition of the term in that section. *See* 11 U.S.C. § 101 (2006) ("In this title the following definitions shall apply . . . .").

the Bankruptcy Code, from the avoidance actions enumerated in that provision. Moreover, there is no principled distinction between the delivery of the check in *Barnhill* and the delivery of promissory notes and guarantees here. There was no transfer at the time of delivery in *Barnhill* and thus there is no transfer at the time of delivery of the promissory notes and guarantees here. Because an obligation is not protected under the plain language of the statute, an action to avoid an obligation as a fraudulent transfer should remain viable notwithstanding section 546(e).

This analysis also addresses the status of the Stock Pledge, which of course is a "transfer" within the meaning of Bankruptcy Code section 101(54). A security interest, however, is only as valid as the obligation it secures, and a lien that secures no obligation is a nullity. Stated otherwise, an "avoided obligation is rendered unenforceable."[669] A claim unenforceable against the debtor and its property therefore cannot be an "allowed claim" or a "secured claim" within the meaning of the Bankruptcy Code.[670] The security has no remaining status in the bankruptcy case. Thus, although a lien is a form of transfer, as is a payment, the lien's continued validity depends on the validity of the obligation it secures. This is in contrast to a settlement payment, which is fully effectuated when made and, in any event, expressly protected under section 546(e). Unlike a lien securing an obligation or a promissory note evidencing one, a transfer constituting a payment is not rendered void if the obligations satisfied by such payment are avoided: the transfer itself must be avoided and then recovered.[671] The Stock Pledge here only existed to secure the obligations under the Credit Agreement and is meaningless except as

---

[669] *Asia Global Crossing*, 333 B.R. at 202.

[670] 11 U.S.C. § 502(b)(1) (2006) (a claim is not allowed if it "is unenforceable against the debtor and property of the debtor"); § 506(a)-(b) ("[t]o the extent that an *allowed secured claim* is secured by property, the value of which . . . .") (emphasis added); § 506(d) ("[t]o the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void . . . ."); *see also Dewsnup v. Timm*, 502 U.S. 410, 416 (1992).

[671] *See* 11 U.S.C. § 548(a)(1) (2006) (distinguishing between avoidance of obligations and transfers). *See also Enron Corp. v. Bear, Stearns Int'l, Ltd.*, 323 B.R. 857, 877 (Bankr. S.D.N.Y 2005) (finding section 546(e) settlement payment defense not available if underlying obligations are void, but distinguishing between a void and voidable obligation).

251

security for the Credit Agreement Debt. If the Credit Agreement Debt is avoided, the Stock

Pledge secures nothing. In sum, section 546(e) affords no protection for the Credit Agreement

Debt or any security, promissory notes, or guarantees given in connection therewith. A very

different conclusion would follow had section 546(e) been drafted to cover not just transfers but

obligations.

The preceding statutory construction nevertheless may be criticized for rendering the

2006 amendments to section 546(e) *per se* inoperative as applied to transfers in favor of lenders

"in connection with" a leveraged buyout transaction involving a securities transaction, thereby

allegedly violating the very rule of statutory construction used to unravel this defense in the first

place: namely, that every provision of a statute must be given effect.[672] So the criticism goes:

avoiding an obligation under section 548 would render the very transfer (*i.e.*, the liens securing

that obligation, and any promissory notes given) a nullity, notwithstanding the protection that

section 546(e) provides and the supremacy of that protection over the avoidance provisions

enumerated in that section. The Examiner emphatically disagrees with this critique. Assuming

for the sake of argument that section 546(e) applies to extensions of credit in leveraged buyout

transactions, the conclusion that the statute does not protect avoidable obligations incurred to

those lenders (or liens securing them) does not render the 2006 amendments superfluous.

Applying the plain language, section 546(e) protects a transfer notwithstanding the fact that such

transfer might otherwise be avoidable under the enumerated avoidance provisions, but it offers

no protection for the underlying obligation. What this means is that if a transfer that is protected

under section 546(e) is made on account of an *unavoidable* obligation, the transfer is sacrosanct.

If not, it is not.

---

[672]  *See* footnote 654.

The following illustration makes the point concretely:  Suppose "in connection with" a leveraged buyout and securities transaction, the lender advancing the funds to cash out existing stockholders successfully insists that the debtor secure both the new advances and the lender's unsecured preexisting debt.  The debtor files bankruptcy within 90 days of the transfer.  The transfer on account of the preexisting debt is avoidable as a preference under Bankruptcy Code section 547, but as long as the *obligation* that was secured is unavoidable—and again provided the other prerequisites to section 546(e) are satisfied—under its plain terms, section 546(e) protects the transfer against avoidance.  Section 546(e) takes primacy over avoidance under section 547, but if that transfer is on account of an avoidable obligation, section 546(e) affords no protection because the transfer is only as valid as the obligation it continues to secure:  if the obligation is avoided, the lien falls on its own accord by application of the avoidance statute, sections 502 and 506, and general nonbankruptcy law.  To the extent the obligations are avoided, therefore, section 546(e) offers no protection.[673]  As the language of section 546(e) is plain and the legislative history gives no reason to deviate from the statute's plain meaning,[674] there is no basis on which to deviate from these conclusions.

The Examiner concludes that it is reasonably unlikely that a court would find that section 546(e) affords the protection that certain of the LBO Lenders assert.  Because the Examiner finds

---

[673] A separate question arises whether, if the other predicates to application of section 546(e) are met here, payments made to certain LBO Lenders on LBO Fees at the time of the Leveraged ESOP Transactions would be recoverable if the underlying obligations and liens are subsequently avoided.  The Parties did not present, and therefore the Examiner expresses no opinion on, this question.  Instead, the Parties only presented the question whether section 546(e) protects the obligations incurred to the LBO Lenders.

[674] *In re Lehman Bros. Holdings, Inc.*, 2010 Bankr. LEXIS 1260, at *25-26 (Bankr. S.D.N.Y.  May 5, 2010) (noting the technical nature of the amendments implemented by the act).  The contention of certain Parties that the Congress' intent in the 2006 amendments was to avoid the "systemic risks" faced by financial institutions that make credit extensions for purposes of enabling borrowers to redeem stock, or for other transactions involving settlement payments, is rank speculation.

that element (1) of the above-noted argument is lacking, there is no need to consider the remaining components.

<div align="right">

(2)    **Examiner's Conclusions and Explanation Concerning the Question of a Section 546(e) "Work-Around."**

</div>

**Examiner's Conclusions:**

Questions concerning the viability of potential mechanisms whereby individual creditors or a creditor trust may assert causes of action otherwise insulated from recovery under Bankruptcy Code section 546(e) are outside the scope of the Investigation.

**Explanation of Examiner's Conclusions:**

Certain Parties contended that, whether directly or by analogy, the estates could abandon to individual creditors and/or vest in a creditor trust established under a plan of reorganization the rights to pursue fraudulent transfer claims that might otherwise be protected under Bankruptcy Code section 546(e).  Relinquishment of the claims allegedly would enable individual creditors to assert state law fraudulent transfer claims unburdened by section 546(e),[675] whereas establishment of a creditor trust under a plan would allow for a single representative to amalgamate and prosecute these claims.  Certain other Parties argued that these mechanisms could not be accomplished consistent with law.[676]  Because Question One solely encompasses "potential claims and causes of action held by the Debtors' estates" and does not

---

[675] *See generally In re Haugen Constr. Serv., Inc.*, 104 B.R. 233, 240 (Bankr. D.N.D. 1989) (stating that trustee has discretion to utilize remedies provided for in the Bankruptcy Code avoidance provisions and in determining whether to pursue such actions trustee must consider factors such as "the factual and legal merits of the prospective action; the probable value of the recovery to the estate; the probable cost of the action to the estate"); *In re V. Savino Oil & Heating Co.*, 91 B.R. 655, 656 (Bankr. E.D.N.Y. 1988) ("[A] trustee or debtor-in-possession has a substantial degree of prosecutorial discretion to sue or not to sue.").

[676] *See, e.g., In re R-B-Co.*, 59 B.R. 43, 45 (Bankr. W.D. La. 1986) ("The Court does not believe that abandonment can be used, as a means of effecting a transfer of title, even if placed in the Plan of Reorganization.  Under section 554, upon abandonment, the trustee or debtor-in-possession is simply divested of control of the property because it is no longer property of the estate.").

fairly include commenting on what might or might not be included in a plan of reorganization not yet on file, the Examiner refrains from opining on these matters.

### b.    Good Faith Defenses at Step One and Step Two.

##### (1)    Bankruptcy Code Section 548—The Legal Standard.

**Examiner's Conclusions:**

A court is highly likely to adopt an objective test for good faith under Bankruptcy Code section 548 and measure good faith at the time the Tribune Entities incurred the obligations subject to challenge.

**Explanation of Examiner's Conclusions:**

Whether considered in the "totality of circumstances," in the determination of reasonably equivalent value under Bankruptcy Code section 548(a)(1), or, more properly, in assessing a defense to avoidance under section 548(c),[677] the good faith of each transferee must be evaluated. Courts have adopted different tests and approaches to measure good faith.[678]  Although the Third Circuit Court of Appeals has not specifically addressed the standard in applying section 548, in *Wasserman v. Bressman (In re Bressman)*,[679] a case involving the closely-analogous consideration of good faith under Bankruptcy Code section 550(b)(1),[680] the court endorsed the

---

[677]  *See* Report at § IV.B.5.b.

[678]  *See In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 557 (Bankr. N.D. Ill. 1994) ("Moreover, the courts have varied widely in the general approach they have taken in deciding questions of good faith in the context of fraudulent conveyance law."); *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1355 (8th Cir. 1996) ("Good faith is not susceptible of a precise definition and is determined on a case-by-case basis.").

[679]  327 F.3d 229 (3d Cir. 2003).

[680]  11 U.S.C. § 550(b)(1) (2006) (defense for subsequent transferee "that takes for value . . . , in good faith, and without knowledge of the voidability of the transfer avoided.").

now widely-accepted standard adopted by the Eighth Circuit Court of Appeals under section

548(c):[681]

> No one supposes that knowledge of voidability means complete understanding of the facts and receipt of a lawyer's opinion that such a transfer is voidable; some lesser knowledge will do. Accordingly, we believe that a transferee has knowledge if he knew facts that would lead a reasonable person to believe that the property transferred was recoverable. In this vein, some facts suggest the underlying presence of other facts. If a transferee possesses knowledge of facts that suggest a transfer may be fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that the property is recoverable, he cannot sit on his heels, thereby preventing a finding that he has knowledge. In such a situation, the transferee is held to have knowledge of the voidability of the transfer.

Under the "objective" test for measuring good faith, the court determines "what the

transferee knew or should have known 'such that a transferee does not act in good faith when it

has sufficient knowledge to place it on inquiry notice of the voidability of the transfer.'"[682] "[A]

transferee cannot stick its head in the sand, clinging to its subjective belief while purporting to

---

[681] 327 F.3d at 236-37 (quoting *In re Sherman*, 76 F.3d 1348, 1357 (8th Cir. 1995)) (internal citations and quotations omitted). *See also Chorost v. Grand Rapids Factory Showrooms, Inc.*, 77 F. Supp. 276, 281 (D.N.J. 1948) (avoiding transfer because "the facts and circumstances of the transaction were sufficient to put the reasonably prudent person on inquiry"), *aff'd*, 172 F.2d 327 (3d Cir. 1949); *Shubert v. Premier Paper Prods., LLC (In re Am. Tissue, Inc.)*, 2007 Bankr. LEXIS 4004, at *25 (Bankr. D. Del. Nov. 20, 2007) (stating that the Third Circuit has established that the "[good faith] defense is not available if the transferee has knowledge of facts that would lead a reasonable person to believe that the property was recoverable by a debtor").

[682] *See Roeder v. Lockwood (In re Lockwood Auto Grp., Inc.)*, 2010 Bankr. LEXIS 1377, at *12-13 (Bankr. W.D. Pa. May 14, 2010) (stating that "good faith is determined according to an objective or 'reasonable person' standard"); *Ameriserv Fin. Bank v. Commercebank, N.A.*, 2009 U.S. Dist. LEXIS 24559, at *25-26 (W.D. Pa. Mar. 26, 2009); *Dobin v. Hill (In re Hill)*, 342 B.R. 183, 203 (Bankr. D.N.J. 2006) (quoting *In re Burry*, 309 B.R. 130, 136 (Bankr. E.D. Pa. 2004)); *see also Jobin v. McKay (In re M&L Bus. Mach. Co.)*, 84 F.3d 1330, 1334, 1335-36 (10th Cir. 1996) ("The presence of any circumstance placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith unless investigation actually disclosed no reason to suspect financial embarrassment."); *Bayou Accredited Fund, LLC v. Redwood Growth Partners (In re Bayou Grp., LLC)*, 396 B.R. 810, 844-45 (Bankr. S.D.N.Y. 2008) (concluding that federal courts have reached a consensus that "good faith" under the Bankruptcy Code provisions is determined according to an "objective" or "reasonable person" standard and not on the subjective knowledge or belief of the transferee, and that under this standard the courts look to what the transferee objectively 'knew or should have known'").

ignore signs of fraud or insolvency on the part of the transferor."[683] Thus, in *Brown v. Third National Bank (In re Sherman)*,[684] the court held that "a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency."

"The presence of any circumstance placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith unless investigation actually disclosed no reason to suspect financial embarrassment."[685] "The rule does not require that the 'red flag' be of such specificity as to put the recipient on 'inquiry notice' of the actual fraud, or embezzlement, or looting, or whatever ultimately proves to be the cause of loss. It is sufficient if the red flag puts the investor on notice of some potential infirmity in the investment such that a reasonable investor would recognize the need to conduct some investigation."[686] "In order to prove 'good faith,' that 'diligent investigation' must ameliorate the issues that placed the transferee on inquiry notice in the first place."[687]

---

[683] *Moglia v. Universal Auto., Inc. (In re Nat'l Parts)*, 2000 U.S. Dist. LEXIS 10420, at *19 (N.D. Ill. July 12, 2000); *see, also HBE Leasing Corp. v. Frank*, 48 F.3d 635, 637 (2d Cir. 1995) ("Under the circumstances, [transferee's] failure to inquire represented a conscious turning away from the subject.").

[684] *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1355 (8th Cir. 1995).

[685] *M & L Bus. Mach. Co.*, 84 F.3d at 1335 (quoting 4 COLLIER ON BANKRUPTCY ¶ 548.07[2] at 548-72 (Lawrence P. King ed., 15th ed. 1996)). The court in *Jobin* also noted that "a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency." *Id.* at 1336 (citing *Sherman*, 67 F.3d at 1355). Under the objective test, however, the actual knowledge of the transferee is not rendered irrelevant. *See In re First Nat'l Parts Exch., Inc.*, 2000 U.S. Dist. LEXIS 10420, at *19-25 (N.D. Ill. July 12, 2000) (stating that a good faith analysis should weigh both subjective good faith and the objective basis for that good faith); *Bayou Grp.*, 396 B.R. at 849 ("[T]o disregard objective evidence of the transferee's subjective good faith intent would fundamentally distort the concept of good faith.").

[686] *Bayou Grp.*, 396 B.R. at 848.

[687] *Id.* at 846; *see also Lockwood Auto Grp., Inc.*, 2010 Bankr. LEXIS at *12-13 ("[O]nce a transferee is on notice of suspicious circumstances regarding a transfer, it is obliged to conduct a diligent investigation which must 'ameliorate' the issues that placed it on inquiry notice in the first place."); *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 660 (Bankr. M.D. Fla. 2002).

As noted previously,[688] the good faith of a transferee or obligee is measured when the transfer is made or the obligation is incurred.  Thus, for example, as discussed in another part of the Report, the Tribune Entities incurred the Step One obligations under the Credit Agreement at the closing of Step One when the funds were advanced and the Step Two obligations under the Incremental Credit Agreement Facility and Bridge Facility at Step Two when those funds were advanced.[689]  These are the obligations that an estate representative would seek to avoid and as to which the respective LBO Lenders assert good faith defenses.

Redacted

---

[688]  *See* text accompanying footnote 260.

[689]  *See* Report at § IV.B.5.d.(6).(i).

Redacted

Redacted

Redacted

The Examiner applies the objective standard in evaluating good faith under Bankruptcy Code section 548.[696]

> **(2)** **Examiner's Conclusions and Explanation Concerning Effect of Good Faith Determination Regarding Credit Agreement Agent and Bridge Agent on Obligations Incurred Under Those Agreements—Whose Good Faith Matters?**

**Examiner's Conclusion**:

A court is highly likely to find that any lack of good faith by the Credit Agreement Agent or the Bridge Facility Agent at the time the respective obligations under these facilities were

---

[695] *Jobin v. Ripley (In re M&L Bus. Mach. Co.)*, 198 B.R. 800 (D. Colo. 1996), *aff'd*, 84 F.3d 1330 (10th Cir. 1996); *Dev. Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776 (Bankr. S.D. Fla. 2000).

[696] *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986), does not compel a different conclusion. There, in applying Pennsylvania's UFTA, the court noted that "knowledge of insolvency is a rational interpretation of the statutory language of lack of 'good faith.'" *Id.* at 1295. The court also approved consideration of other factors, including "1) honest belief in the propriety of the activities in question; 2) no intent to take unconscionable advantage of others; and 3) no intent to, or knowledge of the fact that the activities in question will, hinder, delay, or defraud others." *Id.* at 1296. The court approved the lower court's finding of lack of good faith, noting that the court "determined that IIT did not act in good faith because it was aware, first, that the exchange would render Raymond insolvent, and second, that no member of the Raymond Group would receive fair consideration." *Id.* As the lower court found that the lender there had actual knowledge of the debtor's insolvency, there was no reason for the appellate court to consider whether the lender acted in bad faith based upon an objective test. *Id.*

incurred will apply to all claims issued under such facilities, whether those claims are in the hands of original holders or their successors.

**Explanation of Examiner's Conclusion:**

The lenders under the Credit Agreement and the Bridge Facility each appointed their respective agent to take actions on their behalf.[697] To the extent those agents manifested a lack of good faith for fraudulent transfer purposes, the consequences for those actions do not just begin and end with them. "[K]nowledge acquired by an agent acting within the scope of the agency is imputed to his principal, and the latter is bound by such knowledge although the information is never actually communicated" to the principal.[698] The presumption underlying the imputation rule is that "an agent has discharged his duty to disclose to the principal all the material facts coming to [the agent's] knowledge with reference to the subject of his agency."[699] A principal, moreover, cannot disclaim the actions of its agent if all of the principal's benefits— the obligations and liens that they hold—are critically dependent on the very acts they would like to disclaim.[700]

---

[697] *See* Ex. 179 at § 7.01 (Credit Agreement); Ex. 175 at § 7.01 (Bridge Credit Agreement).

[698] *See Ctr. v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 829 (N.Y. 1985). Because all credit facilities are governed by New York law, New York agency law applies; *see Annan v. Wilmington Trust Co. Tr.*, 559 A.2d 1289, 1293 (Del. 1989) ("Delaware courts will recognize a choice of law provision if the jurisdiction selected bears some material relationship to the transaction.").

[699] *Hampton Affiliates*, 488 N.E.2d at 829; *see also Evvtex Co. v. Hartley Cooper Assocs.*, 102 F.3d 1327, 1332 (2d Cir. 1996) ("[A]n agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have . . . .") (internal quotation marks and citations omitted).

[700] *Matanuska Valley Bank v. Arnold*, 223 F.2d 778, 781 (9th Cir. 1955) ("But assuming that Maze was acting adversely to appellant, his principal, his knowledge should nevertheless be imputed to appellant under the sole actor doctrine."); *Conn. Fire Ins. Co. v. Commercial Nat'l Bank*, 87 F.2d 968, 969 (5th Cir. 1937) ("The transaction of the unfaithful agent may indeed be not binding on his principal in the sense that because of fraud the principal can repudiate or rescind it, but if he elects to retain its specific results to the detriment of a third person justice requires that he take the transaction with its actual infirmities. . . . When authority to do the act is present, every agent fully represents his principal in that act. And when the act is done by an agent of any class and advantage is claimed under it there can be no question of the authority to do it."); *Munroe v. Harriman*, 85 F.2d 493, 495 (2d Cir. 1936) ("The truth is that where an agent, though ostensibly acting in the business of the principal, is really committing a fraud, for his own benefit, he is acting outside of the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it."). But the injustice disappears if

261

The answer is the same whether the lender is an original holder or a transferee. Citing *Enron Corp. v. Springfield Associates, LLC (In re Enron Corp.)*,[701] one Party asserted that any lack of good faith of the Credit Agreement Agent cannot avoid or disallow the claim of a "good faith" transferee under the Credit Agreement, alleging that they acquired their claims through "purchase" of rights under the Credit Agreement and that lack of good faith is a "personal disability" of the Credit Agreement Agent. But even assuming the correctness of the *Enron* decision and its distinction between sales and assignments,[702] and even accepting that the relevant transactions were denominated as a "purchase and sale," *Enron* should have no applicability to avoidance of claims and liens as fraudulent obligations and transfers. *Enron* dealt with the court's ability to equitably subordinate a claim in the hands of a transferee whose transferor had been guilty of inequitable conduct. The *Enron* court concluded that equitable subordination was a "personal disability,"[703] affixed to the holder of a claim rather than to the claim itself. But fraudulent transfer (or preference) law is different and operates directly to avoid the underlying obligation or transfer regardless of who holds the claim:[704]

> [A]voidability is an attribute of the transfer rather than of the creditor. Since it is the transfer, not the [creditor], that is avoided,

---

the principal adopts the unauthorized act of his agent in order to retain a benefit for himself. *See In re S. Afr. Apartheid Litig.*, 633 F. Supp. 2d. 117, 121-22 (S.D.N.Y. 2009) ("The acts of an agent are imputed to the principal if the principal adopts the unauthorized act of his agent in order to retain a benefit for himself. Even mere acquiescence is sufficient to infer adoption of wrongdoing.") (internal quotations marks and citations omitted); *Irving Trust Co. v. State Bankers' Fin. Corp.*, 40 F.2d 88 (S.D.N.Y. 1930) ("Where an agent engages in a fraudulent transaction of which his principal receives the fruits, the principal, if he insists upon retaining the benefits of the transaction, is chargeable with the knowledge of his agent.").

[701]   379 B.R. 425 (S.D.N.Y. 2007).

[702]   The decision has been criticized. WILLIAM L. NORTON, III & ROGER G. JONES, NORTON CREDITORS' RIGHTS HANDBOOK § 8:8 ("The court never explains the difference between an assignment and a sale, and the case law does not bear out the distinction."); Tally M. Wiener & Nicholas B. Malito, *On the Nature of the Transferred Bankruptcy Claim*, 12 U. PA. J. BUS. L. 35, 49-51 (2009) (criticizing decision's distinction between sales and assignments). Moreover, no court has cited the opinion for this distinction or the holding that equitable subordination is a personal disability.

[703]   379 B.R. at 439-40.

[704]   *H & C P'ship v. Va. Serv. Merchandisers*, 164 B.R. 527, 530 n.4 (E.D. Va. 1994) (citing *Levit v. Ingersoll Rand Fin. Corp. (In re Deprizio)*, 874 F.2d 1186, 1195 (7th Cir. 1989)) (internal quotations and citations omitted).

the creditor's only relief from liability or "recoverability" is governed by § 550(a). Contrary to H & C's assertions, avoidability and recoverability are distinguished by the application of the *Deprizio* rule. Avoidability of the transfer is governed by § 547. Section 550, then, answers the question of from whom the trustee may recover.

As the Supreme Court recognized in the preference context: [705]

> The § 547 determination, standing alone, operates as a mere declaration of avoidance. That declaration may be all that the trustee wants; for example, if the State has a claim against the bankrupt estate, the avoidance determination operates to bar that claim until the preference is turned over. See § 502(d). In some cases, though, the trustee, in order to marshal the entirety of the debtor's estate, will need to recover the subject of the transfer pursuant to § 550(a). A court order mandating turnover of the property, although ancillary to and in furtherance of the court's in rem jurisdiction, might itself involve in personam process.

The fact that a party may be an assignee, "purchaser," or the like of a portion of bank debt may—as *Enron* suggests—affect questions of equitable subordination (depending on the manner in which that debt is transferred and other courts' willingness to adopt the *Enron* holding), but that should have no bearing on avoidance. That is not to say that good faith of transferees is irrelevant in the fraudulent transfer context. Far from it. When avoidance does not suffice under Bankruptcy Code section 548, section 550 comes into play, and issues such as good faith, acquisition for value, and lack of knowledge by the subsequent transferee of the transfer's voidability all are on the table. Those matters, however, never arise when the underlying transfer is avoided without resort to section 550. [706]

---

[705] *Cent. Va. Cmty. College v. Katz*, 546 U.S. 356, 371-72 (2006).

[706] *See Coleman v. Cmty. Trust Bank (In re Coleman)*, 426 F.3d 719, 726 (4th Cir. 2005) ("[N]o recovery [is] necessary; the avoidance itself [is] the meaningful event. . . . Thus, the recovery statute [§ 550] has no application here."); *Glanz v. RFJ Int'l Corp. (In re Glanz)*, 205 B.R. 750, 758 (Bankr. D. Md. 1997) (same); H.R. Rep. No. 95-595 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 6331 ("Section 550 prescribes the liability of a transferee of an avoided transfer, and enunciates the separation between the concepts of avoiding a transfer and recovering from the transferee."). Section 550, on the other hand, expressly addresses who are the proper defendants to a fraudulent transfer cause of action by specifically identifying three different potential types of defendants (initial transferees, beneficiaries, and subsequent [a/k/a mediate or immediate] transferees). *See* 11 U.S.C. §§ 550(a), (d) (2006).

**(3)      Examiner's Conclusions and Explanation Concerning Good Faith of JPMCB as Credit Agreement Agent at the Time Obligations Incurred at Step One and Step Two.**

**Examiner's Conclusions**:

A court is reasonably likely to conclude that JPMCB acted in good faith in connection with the obligations incurred and advances made in the Step One Transactions but did not act in good faith in connection with the obligations incurred and advances made in the Step Two Transactions.

**Explanation of Examiner's Conclusions**:

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

 

 

> **(4)    Examiner's Conclusions and Explanation Concerning Good Faith of JPM Entities as Transferee of LBO Fees at Step One and Step Two.**

The Examiner finds no basis to vary the conclusions reached above concerning JPMCB's actions as Credit Agreement Agent from the actions of the JPM Entities as recipients of LBO Fees at both steps. As a result, the Examiner finds that it is reasonably likely that the JPM Entities acted in good faith in Step One but not in Step Two, and that they should be entitled to the good faith defense as to some portion of the LBO Fees paid at Step One but not at Step Two.

> **(5)    Examiner's Conclusions and Explanation Concerning Good Faith of MLCC as Bridge Credit Agreement Agent at the Time Obligations Incurred at Step Two.**
> *Redacted*

*Redacted*

*Redacted*

    **(6)**    **Examiner's Conclusions and Explanation Concerning Good Faith of Merrill Entities as Transferee of LBO Fees at Step One and Step Two.**

*Redacted*

*Redacted*

**(7)**    **Examiner's Conclusions and Explanation Concerning Good Faith of Citigroup Entities as Transferee of LBO Fees at Step One and Step Two.**

*Redacted*

Redacted

*Redacted*

(8)    **Examiner's Conclusions and Explanation Concerning Good Faith of BofA Entities as Transferee of LBO Fees at Step One and Step Two.**

*Redacted*

*Redacted*

  **(9)**   **Examiner's Conclusions and Explanation Concerning Good Faith of MLPFS and CGMI as Transferees of Advisor Fees at Step One and Step Two.**

<u>**Examiner's Conclusions**</u>:

  A court is somewhat likely to conclude that both MLPFS and CGMI acted in good faith

in connection with the payments made to them as Advisor Fees in connection with the Leveraged

*Redacted*

ESOP Transactions, although the question is closer regarding payments made following the Step

Two Transactions to CGMI.

**Explanation of Examiner's Conclusions**:

*Redacted*

*Redacted*

*Redacted*

*Redacted*

8.    **Legal Questions Concerning Remedies Available in Connection with Avoidance.**

    a.    **Examiner's Conclusions and Explanation Concerning the Questions of "Standing" and Scope of Avoidance at Guarantor Subsidiary Levels.**

**<u>Examiner's Conclusions</u>**:

    The Examiner concludes that it is highly likely that a court will find that each Guarantor

Subsidiary that is a Debtor in the Chapter 11 Cases has standing to bring avoidance actions to

---

*Redacted*

avoid the obligations incurred to the LBO Lenders.  To the extent a Guarantor Subsidiary

unjustifiably fails to bring such action, a creditor or an official creditors' committee in such

entity's case would be eligible to seek leave and obtain authority to bring such action on behalf of

the estate.  The Examiner concludes that a court is reasonably likely to find that if the estate

representatives for Tribune *and* the Guarantor Subsidiaries were to successfully avoid the LBO

Lender Debt, the value available from avoidance at the Guarantor Subsidiary estates would not

be limited just to the satisfaction of the Non-LBO Debt at those levels.

### Explanation of Examiner's Conclusions:

The Parties presented extensive argument on the question of whether Tribune's creditors

would have "standing" to seek avoidance of the obligations incurred by the Guarantor

Subsidiaries to the LBO Lenders, much of it keying off of the district court's decision in

*Adelphia Recovery Trust v. Bank of America, N.A.*[794]  *Adelphia* involved claims for fraudulent

transfer that were asserted by a recovery trust created under a confirmed plan of reorganization.

The trust sought to avoid and recover liens and obligations of certain Adelphia subsidiaries; the

defendants argued that the trust could not bring claims because the creditors of the Adelphia

subsidiaries that made the transfers were paid in full under the plan of reorganization.[795]

Applying the principle that "a party does not have standing to sue where the party is not able to

allege an injury that is likely to be addressed by the relief sought,"[796] the *Adelphia* court held that

neither the former subsidiary's creditors nor the trust constituted an "injured party" for standing

purposes.  In the current case, there should be little question that Tribune's creditors are without

standing to avoid fraudulent transfers of the Guarantor Subsidiaries.  Absent substantive

---

[794]  *Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 80, 94 (S.D.N.Y. 2008), *aff'd*, 2010 WL 2094028 (2d Cir. May 26, 2010).

[795]  *Id.* at 92.

[796]  *Id.* at 95.

consolidation, alter ego, or piercing of the corporate veil of all the Guarantor Subsidiaries (none of which has been alleged, let alone shown here), Tribune's creditors have no such standing in the Guarantor Subsidiaries' cases.[797]

Ultimately, however, the question of standing to bring avoidance actions at the Guarantor Subsidiary levels is not substantial. As debtors in possession, the Guarantor Subsidiaries not only have the right but the exclusive standing to bring avoidance actions on behalf of their respective estates.[798] To the extent a Guarantor Subsidiary unjustifiably fails to commence such actions, any one of several candidates clearly having standing might seek leave to act as the representative of those estates. The UCC was appointed in each Chapter 11 Case and therefore is a party in interest in each case.[799] The Guarantor Subsidiaries also have their own Non-LBO Creditors. Finally, a creditor or creditor representative at Tribune might seek leave to be vested with authority to act as a representative of the Tribune estate with respect to its ownership interests in FinanceCo and Holdco for purposes of exercising Tribune's rights as stockholder of those entities, both to cause them and the Guarantor Subsidiaries to bring avoidance actions. In *Adelphia*, unlike here, because a plan of reorganization had been confirmed, none of these avenues was available.[800]

---

[797] *See, e.g., Magten Asset Mgmt. Corp v. Nw. Corp. Debenture Trust Co. (In re Nw. Corp.)*, 313 B.R. 595, 602 (Bankr. D. Del. 2004).

[798] *See, e.g.,* 11 U.S.C. §§ 323(a), 544(b)(1), and 548(a)(1) (2006).

[799] *See Notice of Appointment of Comm. of Unsecured Creditors* [Docket No. 101]; *see also* 11 U.S.C. § 1109 (2006); *Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 580 (3d Cir. 2003) (en banc) ("[B]ankruptcy courts can authorize creditors' committees to sue derivatively to avoid fraudulent transfers for the benefit of the estate.").

[800] The bankruptcy court in *Adelphia* previously granted standing to the creditors' committee to pursue avoidance actions at the subsidiary level. It was only after the confirmed plan resulted in the payment in full of the subsidiary debtors' creditors and the release of the avoidance claims in question that the court found a lack of standing. *Adelphia Recovery Trust v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 332-33 (S.D.N.Y. 2009) (contrasting surviving fraudulent conveyance claim with those dismissed for lack of standing as not subject to a release).

Separate from the question of who might have standing to bring avoidance actions at the Guarantor Subsidiary levels is the more consequential question whether, if fraudulent transfer actions were successfully prosecuted at the Guarantor Subsidiary level, avoidance would inure to the benefit of Tribune's creditors who have no recourse to those entities under nonbankruptcy law. This result could occur if the LBO Lender Debt were avoided under Bankruptcy Code section 548, thereby effectively rendering the Guarantor Subsidiaries solvent and Tribune's interests in these entities highly valuable, after satisfaction of the Non-LBO Creditor liabilities. Avoidance of the LBO Lender Debt at Tribune in turn could allow Tribune's Non-LBO Creditors to receive payment in full from that newly-solvent estate.

It is important to appreciate that this question arises only in a scenario in which avoidance occurs at the Guarantor Subsidiaries' estates. Absent piercing of the corporate veil, alter ego, or substantive consolidation,[801] avoidance at Tribune but not the Guarantor Subsidiary estate would leave the lion's share of the value from those estates for the LBO Lenders whose claims would remain valid and enforceable at the Guarantor Subsidiary levels; that value would never be available to Tribune's creditors. This result follows from the provisions of the Subsidiary Guarantees which, among other things, specify that the obligation to pay "shall not be subject to any defense . . . , setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise."[802] Under New York law (which the Guarantee Agreement selects as its governing

---

[801] *See, e.g., In re Owens Corning*, 419 F.3d 195, 215 n.27 (3d Cir. 2005) ("[S]ubstantive consolidation should be used defensively to remedy identifiable harms, not offensively to achieve . . . a "free pass" to spare Debtors or any other group from proving challenges, like fraudulent transfer claims, that are liberally brandished to scare yet are hard to show. If the Banks are so vulnerable to the fraudulent transfer challenges Debtors have teed up (but have not swung at for so long), then the game should be played to a finish in that arena. . . . If the bondholders have a valid claim, they need to prove it in the District Court and not use their allegations as a means to gerrymander consolidation of the estates.") (footnote omitted).

[802] *See* Report at §§ III.D.10.d. and III.G.3.d. Each Guarantor Subsidiary serves as "primary obligor and not merely as surety."

law),[803] the guarantees therefore are enforceable as independent obligations of the Guarantor

Subsidiaries even if the underlying loan obligations are not enforceable for any reason, including

the insolvency of the primary obligor.[804] This principle remains true and the guarantees remain

enforceable even if Tribune Company's obligations under the Credit Agreement are avoided as

fraudulent conveyances or otherwise.[805] Contrary to the contention of certain Parties, this

conclusion is not tantamount to permitting parties to "opt out" of the fraudulent transfer law.[806]

---

[803]   In the Third Circuit, a forum selection clause will be enforced unless (1) the clause is a result of fraud or
overreaching, (2) some strong local public policy would be violated if the clause is enforced, or (3) the
opponent to the enforcement of such a clause would be forced to litigate in a jurisdiction that would be so
seriously inconvenient to the opponent that it would be unreasonable. *Gen. Eng'g Corp. v. Martin Marietta
Alumina*, 783 F.2d 352, 358 (3d Cir. 1986); RESTATEMENT (SECOND) OF CONFLICTS OF LAW, § 187 (1971).
Thus, in *Citibank, N.A. v. Chammah*, 44 V.I. 85, 93 (V.I. Terr. Ct. 2001), the court applied New York law to
enforce a provision of a guarantee that provided "the obligations of Guarantor hereunder are direct,
unconditional and completely independent of the obligations of the Borrower."

[804]   *See MF Global, Inc. v. Morgan Fuel & Heating Co.*, 896 N.Y.S.2d 326, 327 (N.Y. App. Div. 2010) ("The
guaranties were unconditional and barred any defenses to the obligation they guarantied, so, although executed
as part of the same transaction, they were intended to entail completely separate obligations.") (internal citations
omitted); *Beal Bank, SSB v. Sandpiper Resort Corp.*, 674 N.Y.S.2d 83, 34 (N.Y. App. Div. 1998) ("[B]y the
unqualified language contained in the guarantees, the guarantees are enforceable even if the principal escapes
liability.") (citations omitted); *Raven Elevator Corp. v. Finkelstein*, 636 N.Y.S.2d 292, 293 (N.Y. App. Div.
1996) ("[L]iability of the guarantor may be broader than and exceed the scope of that of the principal where the
guarantee, which is a separate undertaking, is, by its unqualified language, enforceable against the guarantor.");
*Mfrs. Hanover Trust Co. v. Green*, 474 N.Y.S.2d 474, 475-76 (N.Y. App. Div. 1983) (holding that where
guarantee states that it is enforceable even if underlying obligation invalid, irregular or unenforceable, guarantee
is enforceable even if underlying obligation not enforceable against primary obligor); *see also Halper v. Halper*,
164 F.3d 830, 843 (3d Cir. 1999) (noting support for "proposition that unconditional guarantees that extend a
guarantor's responsibility beyond that of the primary obligor are enforceable").

[805]   *See Lowrey v. Mfrs. Hanover Leasing Corp. (In re Robinson Bros. Drilling)*, 6 F.3d 701, 704 (10th Cir. 1993)
("[C]ourts have recognized, without regard to any special guaranty language, that guarantors must make good
on their guaranties following avoidance of payments previously made by their principal debtors."); *Feldman v.
Chase Home Fin. (In re Image Masters, Inc.)*, 421 B.R. 164, 189 (Bankr. E.D. Pa. 2009) (citing *In re Coutee*,
984 F.2d 138, 141 (5th Cir. 1993), for the proposition that "avoidance of debtor's payment to bank on note did
not extinguish a third party's guaranty of the note and the guarantor was liable to the bank on the guaranty"); *see
also Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1449 (6th Cir. 1993) (finding that debtor's
discharge did not affect guarantor's obligation to creditor); *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1351
(5th Cir. 1989) (holding that discharge does not release non-debtor guarantors); *Centre Ins. Co. v. SNTL Corp.
(In re SNTL Corp.)*, 380 B.R. 204, 213 (B.A.P. 9th Cir. 2007) ("[T]he return of a preferential payment by a
creditor generally revives the liability of a guarantor."); *see also URSA Minor Ltd. v. AON Fin. Prod.*, 2000
U.S. Dist. LEXIS 10166, at *22-23 (S.D.N.Y. July 21, 2000) ("The Court finds that AFP has an obligation to
pay irrespective of the Bond's potential invalidity or unenforceability with respect to GSIS . . . . [E]ven if GSIS
could properly allege that the Bond was void ab initio, AFP's waiver would still apply.").

[806]   *In re Pease*, 195 B.R. 431, 435 (Bankr. D. Neb. 1996) ("I conclude that any attempt by a creditor in a private
pre-bankruptcy agreement to opt out of the collective consequences of a debtor's future bankruptcy filing is
generally unenforceable.").

Rather, it recognizes that fraudulent transfer law has its limitations.[807]  Moreover, contrary to the

contention of another Party, general principles governing exoneration of a surety when the

principal obligor is discharged have no bearing on the Subsidiary Guarantees, which remain

enforceable absent avoidance.[808]

Nevertheless, it is possible to consider a scenario in which estate representatives for each

and every Debtor successfully avoid the obligations incurred to the LBO Lenders in the

Leveraged ESOP Transactions (in other words, all of the LBO Lender Debt); and those lenders

manage to enforce only a portion of their obligations against each estate under the good faith

defense asserted under Bankruptcy Code section 548(c) (or in the context of the Court's

determination of reasonably equivalent value under section 548(a)(1)).  To be clear, based on the

Examiner's other findings in the Report, the Examiner does not believe that it is reasonably likely

that a court would find that the Step One Transactions are avoidable as intentional or

constructive fraudulent transfers.  Because the Examiner recognizes that a court might disagree

with these conclusions and the Parties have raised this issue, the Examiner considered whether, if

all of the estates avoided the LBO Lender Debt, avoidance at the Guarantor Subsidiary levels

would solely inure to the benefit of Non-LBO Creditors of the Guarantor Subsidiaries, with the

remainder of the consideration going to satisfy the LBO Lender Debt.

---

[807]  To a great degree, principles of equitable subordination were developed to reach just results where the formalities of fraudulent transfer law would yield injustice.  *See, e.g., Pepper v. Litton*, 308 U.S. 295 (1939).

[808]  *Pro-Specialties, Inc. v. Thomas Funding Corp.*, 812 F.2d 797, 799 (2d Cir. 1987), does not compel a different conclusion.  The court there held "on the facts before us, the district court could not have found a guarantee without first finding the principal debtor liable on the principal obligation."  812 F.2d at 799.  The court then noted that, "[e]xcept in situations not applicable here, the general rule is that the guarantor is not liable unless the principal is bound."  *Id.*  For the reasons discussed above, this situation is not applicable here.  Likewise, the court in *HSH Nordbank AG New York Branch v. Swerdlow*, 672 F. Supp. 2d 409, 418-19 (S.D.N.Y. 2009), actually enforced the guarantee there in the face of a contention that the underlying obligation had been discharged, noting that "advance consent provisions in a guaranty may render the guarantor liable even after a release of the principal borrower or modifications of the underlying loan."  *See also R.I. Hosp. Trust Nat'l Bank v. Ohio Cas. Ins. Co.*, 789 F.2d 74, 78 (1st Cir. 1986) ("If, however, Ohio Casualty's suretyship was unconditional, it would be liable regardless of its principal's liability, unless it could raise an equitable defense.").

The Leveraged ESOP Transactions did not just involve Tribune or its assets alone; by design, the balance sheets of all of the Tribune Entities were changed. Tribune and the Guarantor Subsidiaries incurred the LBO Lender Debt at the same time—Tribune as borrower and the Guarantor Subsidiaries as guarantors and all of them as primary obligors—on the same underlying obligations to the LBO Lenders. The value that had been available to Tribune's creditors in the form of equity in the Guarantor Subsidiaries before the Leveraged ESOP Transactions was diluted by the Stock Pledge and the joint and several guarantees given by the Guarantor Subsidiaries in those transactions. In a scenario in which avoidance occurs by every estate as a constructive fraudulent transfer, by definition the court would find that all of those entities were rendered insolvent or left with unreasonably small capital at the same moment in time as a result of incurrence of the same underlying debt incurred in the same transactions. As the factors supporting collapse of the transactions within Step One and Step Two are no different for Tribune than the Guarantor Subsidiaries, the court would issue the same rulings concerning the appropriateness of collapse for all the Tribune Entities. In a scenario in which the LBO Lender Debt is found to be avoidable as to every debtor, would a court turn on a dime and allow the LBO Lenders—on account of their avoided obligations —to mop up all of the value left over after payment of the Guarantor Subsidiary creditors but before that value could find its way to Tribune's creditors?

The Examiner submits that to posit such a scenario is to answer the question posed. In the Examiner's view, it would be implausible for a court to find that avoidance is required as to each and every Debtor, only to reverse that avoidance for a moment in time to allow the LBO Lenders to recover the value from Guarantor Subsidiaries on account of their avoided obligations. Nothing in the language of Bankruptcy Code section 548 would support such a result. The statute provides for the avoidance of an obligation that is found constructively

fraudulent.[809]  Avoidance renders that obligation unenforceable. [810]  Avoidance under section

548 is distinguished from an action to recover property transferred or its value under Bankruptcy

Code section 550(a), which, by its terms, only allows for recoveries "for the benefit of the

estate."[811]  No similar limitation is found in section 548 avoidance.  Indeed, there is even

authority under section 550 permitting recovery beyond that which is necessary to pay creditors

in full.[812]  It is true that the Third Circuit Court of Appeals endorsed the fundamental principal

that "[t]he use of [the avoidance power] for the benefit of creditors is at the heart of the

avoidance powers."[813]  Of similar import is the Court of Appeal's statement that "the purpose of

fraudulent conveyance law is to make available to creditors those assets of the debtor that are

---

[809]  11 U.S.C. § 548(a)(1) (2006).

[810]  *See Coleman v. Cmty. Trust Bank (In re Coleman)*, 426 F.3d. 719, 726 (4th Cir. 2005) ("Under the facts found by the bankruptcy court, the plain language of § 544 provides that Debtor 'may avoid' the deeds of trust . . . . The ruling of the bankruptcy court that the deeds of trust remain in effect as between Debtor and the Bank clearly infringes Debtor's right, unambiguously conferred by the Code, to nullify the grant of the deeds. We therefore hold that the bankruptcy court erred in limiting Debtor's ability to avoid the deeds of trust."); *Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*, 295 B.R. 593, 606 (B.A.P. 8th Cir. 2003) ("In enacting section 544(b), Congress expressly rejected limiting the estate's recovery to the amount of a particular creditor's claims."), *aff'd*, 376 F.3d 819 (8th Cir. 2004); *Glanz v. RJF Int'l. Corp. (In re Glanz)*, 205 B.R. 750, 757-58 (Bankr. D. Md. 1997) ("Section 548 imposes no requirement that an avoidance action be brought only under circumstances where the avoidance will result in a benefit to the bankruptcy estate.").

Although the court in *Coleman* viewed with suspicion the suggestion that the debtor in that case would benefit individually from avoidance, *Coleman*, 426 F.3d. at 726, the Fourth Circuit's construction of section 544 in that context is without ambiguity.

[811]  11 U.S.C. § 550(a) (2006).  *MC Asset Recovery, LLC v. S. Co.*, 2006 U.S. Dist. LEXIS 97034, at *20 (N.D. Ga. Dec. 11, 2006) ("[A] trustee who brings an action to avoid and recover a fraudulent transfer may avoid and recover it in its entirety, even when the value of the transfer exceeds the value of all allowed claims of unsecured creditors"); *see also* 5 COLLIER ON BANKRUPTCY ¶ 548.01[1] (Alan A. Resnick & Henry J. Sommer eds., 16th ed.) ("[I]f the transaction is fraudulent within the rule set forth in section 548, the trustee may avoid it in its entirety.").  *See also In re Coleman*, 426 F.3d at 726.

[812]  *See Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 797-98 (7th Cir. 2009); *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 811-12 (9th Cir. 1994); *In re Classic Drywall, Inc.*, 127 B.R. 874, 876 (D. Kan. 1991) ("[S]ection 550(a) . . . restore[s] the estate [as] if the transfer had not occurred."); *Glanz*, 205 B.R. at 758 ("Notwithstanding this fact, a debtor's power to avoid transfers pursuant to § 544(a) is not unrestricted, and equitable principles may be applied to bar a lien avoidance action where the avoidance does not accrue to the benefit of creditors but instead creates a windfall for the debtor.").

[813]  *Off. Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 244 (3d Cir. 2000).

rightfully a part of the bankruptcy estate, even if they have been transferred away."[814] But these statements are truisms with which few courts could disagree. The Third Circuit Court of Appeals has not addressed directly the question whether avoidance under section 548 is subject to a limitation on the scope of avoidance or that any such limitation would support limiting the effect of avoidance in these circumstances. The Examiner concludes that the statutory language largely answers the question posed and does not support the limitation advocated by certain Parties.

Admittedly, some courts have imposed such a limitation, principally, but not exclusively, when the avoidance would inure to the benefit of an equity holder or would extend beyond the damages suffered by creditors.[815] But Tribune's ownership interest in the Guarantor Subsidiaries is several steps removed from the interests of Tribune's current equity holders in Tribune. Allowing the value derived from avoidance to flow from the Guarantor Subsidiaries to the Tribune estate (and then to Tribune's creditors) is not of the same tenor as allowing acquiring

---

[814] *Buncher Co. v. Off. Comm. of Unsecured Creditors of GenFarm Ltd. P'ship. IV*, 229 F.3d 245, 250 (3d Cir. 2000). The court went on to state that "[w]hen recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer." 229 F.3d at 250. This latter statement is based on the plain language of section 544(b) codifying the Supreme Court's holding in *Moore v. Bay*, 284 U.S. 4 (1931).

[815] *See Balaber-Strauss v. Murphy (In re Murphy)*, 331 B.R. 107, 121 (Bankr. S.D.N.Y. 2005) (noting that avoidance under section 548 is limited to the extent necessary to satisfy allowed prepetition and administrative claims; *i.e.* those "*legally* harmed by a [transfer]"); *In re Crowthers McCall Pattern*, 120 B.R. 279, 288 (Bankr. S.D.N.Y. 1990) ("It is settled that even where the obligation is avoided, that avoidance would be only for the benefit of creditors and the obligation would still stand ahead of equity."). *Accord In re Newman*, 875 F.2d 668, 670-71 (8th Cir. 1989) (finding that no avoidance action may proceed with respect to the transfer of partnership property in the individual chapter 7 case of one of the partners); *Whiteford Plastics Co. v. Chase Nat'l Bank*, 179 F.2d 582, 584 (2d Cir. 1950); *Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.)*, 216 B.R. 371, 376 (S.D.N.Y. 1998).

One Party asserted that Bankruptcy Code section 502(h) embodies the "principle" that a creditor is entitled to enforce an obligation as against the estate, citing, *e.g.*, *Fleet Nat'l Bank v. Gray (In re Bankvest Capital Corp.)*, 375 F.3d 51, 62 (1st Cir. 2004) ("[W]hen grounds for avoidance are found, however, a creditor . . . becomes entitled to pursue whatever claim it may have had in the avoided sum against the debtor") and *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 238 B.R. 25, 55 (Bankr. S.D.N.Y. 1999) ("So strong is [the principle that avoidance powers can only be exercised for the benefit of creditors] that a transfer, avoidable as fraudulent by a creditor, is considered valid as between a grantor and grantee"). As discussed in another part of the Report, *see* Report at § IV.B.8.b., however, section 502(h) has no application to avoidance of obligations, and an obligee's right to enforce an obligation is governed exclusively by Bankruptcy Code section 548(c).

stockholders in a leveraged buyout transaction to benefit from avoidance of the very debt they procured to make the transaction possible. Although it is true that Tribune's creditors did not bargain as a matter of nonbankruptcy law for recourse to the Guarantor Subsidiaries, it is hard to fathom that a court would permit the lenders whose debt would be avoided to enforce their structural seniority in this avoidance scenario. The so-called "participant bar" cases—arguably standing for the proposition that a trustee cannot assert an avoidance action when recovery would only benefit creditors or other parties who *expressly consented* to or participated in the transaction in question[816]—have little to do with the circumstance presented here. In the posited scenario, the fact that the Leveraged ESOP Transactions involved all of the Tribune Entities and rendered them all insolvent or unreasonably capitalized at the same time would have consequences. The Examiner finds it reasonably unlikely that a court would allow the LBO Lenders to recover ahead of Tribune's creditors from the Guarantor Subsidiaries in the posited scenario.

---

[816] In *Morin v. OYO Instruments, L.P. (In re Labelon Corp.)*, 2006 Bankr. LEXIS 2490, at *10 (Bankr. W.D.N.Y. Aug. 28, 2006), the court stated that "on equitable grounds, this Court would not make a finding of avoidance and recovery, when the only entity that would benefit from that avoidance and recovery would be, [one] which specifically approved the . . . transaction in writing and benefited from the transaction . . . .". This statement was dictim at best, however, as the court also denied leave to amend the complaint in question (an inherently discretionary question) because the amendment would not relate back to the original complaint. *Id.* In *Harris v. Huff (In re Huff)*, 160 B.R. 256, 261 (Bankr. M.D. Ga. 1993), the court applied long-standing jurisprudence under Bankruptcy Code section 544(b):

> The general rule is that section 544(b) confers upon the trustee no greater rights of avoidance than the creditor himself would have if he were asserting invalidity on his own behalf. Consequently, if the creditor is deemed estopped to recover upon his claim, or is barred from recovery because of the running of a statute of limitations prior to the commencement of the case, the trustee is likewise rendered impotent."

The court observed also (not controversially) that: "A transaction that is voidable by a single, actual unsecured creditor may be avoided in its entirety, regardless of the size of the creditor's claim." *Id.*

b.    **Examiner's Conclusions and Explanation Concerning
Participation of Creditors Whose Claims, Payments, or Liens
are Avoided in Creditor Distributions.**

**Examiner's Conclusions**:

To the extent a transferee of an avoided transfer pays the amount avoided or turns over

such property, the transferee will be entitled to assert a claim against the estate to which the

funds are paid or returned equal to the non-constructively fraudulent claim.  To the extent,

however, an obligee's claim is avoided, a court is reasonably likely only to permit participation

of such a claim, if at all, in distributions from the estate to the extent the claim is supported by

reasonably equivalent value or Non-LBO Creditor claims are paid in full plus postpetition

interest.  It is reasonably likely that if Step Two Debt, but not Step One Debt, is avoided, absent

an otherwise applicable basis to subordinate or disallow the Step One Debt or assert rights of

unjust enrichment, the Step One Debt would participate in distributions from the estates in

accordance with applicable nonbankruptcy priorities, although a question exists whether the Step

One Debt would participate in any recoveries of payments made in connection with avoidance of

the Step Two Transactions.

**Explanation of Examiner's Conclusions**:

Bankruptcy Code section 502(d)[817] provides that a transferee may not participate as a

creditor unless and until such transferee pays the amount of or returns the avoidable transfer to

the estate.[818]  Case law teaches that, on satisfaction of this precondition, a transferee of an

avoided transfer "should be allowed to prove whatever claim it would have had in the absence of

---

[817]  11 U.S.C. § 502(d) (2006).

[818]  *Scharffenberger v. United Creditors Alliance Corp. (In re Allegheny Health, Educ. & Research Found.)*, 292
B.R. 68, 74 (Bankr. W.D. Pa. 2003), *aff'd sub nom., Risk Mgmt. Alts., Inc. v. Scharffenberger (In re Allegheny
Health Educ. & Research Found.)*, 127 F. App'x 27 (3d Cir. 2005).  Similarly, by its terms, this provision does
not allow a claim in favor of the holder of an avoided transfer but conditions any participation in distributions
from the estate on such payment or return.  *See* 11 U.S.C. § 502(h) (2006).

its fraudulent behavior."[819]  Applied here, to the extent the transferee of an avoidable transfer restores the estate on account of the constructively fraudulent transfer, the transferee may assert an allowed claim equal to the non-constructively fraudulent portion of its claim.[820]

Section 502(d) applies only to the avoidance of transfers, not obligations.[821]  An obligee's entitlement to enforce its claim against the estate is governed exclusively by Bankruptcy Code section 548(c).[822]  To the extent a claim cannot be enforced under section 548(c), there is no basis under any other applicable Bankruptcy Code provision to enforce that claim against the bankruptcy estate.[823]  It would be nonsensical, moreover, to apply section 548(c)—with the object of fixing the portion of the claim that may be enforced and the portion that may not—only to turn around and allow the constructively fraudulent portion of the avoided claim. Nevertheless, the bankruptcy court in *Best Products* suggested in dictum that there may be room to afford a lender that acted in good faith in a leveraged buyout transaction the right to participate in bankruptcy dividends beyond the amount of the obligation conferring reasonably equivalent value: "There is respectable commentary to the effect that LBO lenders should have a

---

[819]  *Misty Mgmt. Corp. v. Lockwood*, 539 F.2d 1205, 1214 (9th Cir. 1976) ("[A] transferee guilty of fraudulent behavior may nevertheless prove a claim against the bankrupt estate, once he returns the fraudulently conveyed property to the estate. A rule to the contrary would allow the estate to recover the voidable conveyance and to retain whatever consideration it had paid therefor. Such a result would clearly be inequitable.") (internal citations omitted); *accord Verco Indus. v. Spartan Plastics (In re Verco Indus.)*, 704 F.2d 1134, 1139 (9th Cir. 1983).

[820]  *See In re Hough*, 4 B.R. 217, 219 (Bankr. S.D. Cal. 1980) ("Thus, that Court held that the transferee should be allowed to prove whatever claim it would have had in the absence of its fraudulent behavior. [T]his Court has concluded that Claimant gave no consideration for the transfer by the bankrupt of the Full Moon liquor license to her. Therefore, she has no claim against the estate.").

[821]  *In re Asia Global Crossing, Ltd.*, 333 B.R. 199, 202 (Bankr. S.D.N.Y. 2005).  Likewise, section 502(h) is inapposite.

[822]  11 U.S.C. § 548(c) (2006).

[823]  *See Murphy v. Meritor Savs. Bank (In re O'Day Corp.)*, 126 B.R. 370, 411 (Bankr. D. Mass. 1991) ("In fact, Meritor contends that, should the Court sustain the Trustee's fraudulent conveyance action, it would remain as an unsecured creditor. Consequently, the Bank takes the position that, as a creditor of the estate with a proof of claim on file, it is entitled to its *pro rata* distribution of the estate's assets unless an objection to Meritor's proof of claim is filed and sustained by the Court or, alternatively, its claim is equitably subordinated under section 510 of the Bankruptcy Code. The Court disagrees. The language of the UFCA and the Bankruptcy Code supports the position taken by the Trustee.").

claim for all the consideration with which they have parted.  Invalidation seems particularly

draconian in a legitimate LBO because the creditors actually parted with value."[824]  The court

went on, however, to suggest that a contrary result might well be appropriate even as a matter of

equity jurisprudence—and that the most one could conclude from the case law was that a lender

holds an unsecured claim to the extent it gave reasonably equivalent value: [825]

> On the other hand, if the underlying fraudulent transfer statute
> (such as DCL § 273) provides for the avoidance as fraudulent of an
> obligation incurred, it could be argued fairly persuasively that so
> much of the obligation which the debtor incurred as was not
> supported by consideration *to the debtor,* ought to be avoidable. *Cf.*
> *McColley v. Rosenberg (In re Candor Diamond Corp.),* 76 B.R.
> 342 (Bankr. S.D.N.Y. 1987) (under section 548 of the Bankruptcy
> Code, where consideration for transfers which left debtor insolvent
> was paid to debtor's principal and his family, rather than to the
> debtor, the debtor's transfers were made for less than a reasonably
> equivalent value and were avoidable); *accord* 1 *Glenn* § 286 at
> 481.

The relatively few other courts to actually confront the question of the treatment of the

constructively fraudulent portion of a creditor's claim have suggested that equitable

subordination of the claim of the obligee on an avoided transfer to other creditor claims might be

an appropriate remedy as a means of enabling innocent creditors to be made whole from the

constructively fraudulent transfer.[826]

---

[824] *RTC v. Best Prods. Co. (In re Best Prods. Co.),* 168 B.R. 35, 59 (Bankr. S.D.N.Y. 1994) (citation omitted), *aff'd on other grounds,* 68 F.3d 26 (2d Cir. 1995). Thus, the court noted: "But this much is unassailable: to the extent that the lenders gave consideration to the debtor, such as here, in the form of working capital which the Banks gave to Best at the time of the merger, the lenders would have a claim which would be allowable so long as they satisfied the judgment arising out of the fraudulent transfer action." *Id.* at 58 (footnote omitted).

[825] *Id.*

[826] *See West v. Hsu (In re Advanced Modular Power Sys.),* 413 B.R. 643, 677 (Bankr. S.D. Tex. 2009) (concluding that a trustee could both avoid transfers to insiders and subordinate their resulting claims; "In sum, because all three prongs of the Fifth Circuit's [*Mobile Steel*] test are met, this Court will not allow the Defendants to benefit from their inequitable conduct at the expense of AMPS's creditors. Therefore, any claims the Defendants may have for monies recovered by the Trustee are subordinate to both the Trustee's claims and any other creditor's claim against the estate."); *Pajaro Dunes Rental Agency v. Spitters (In re Pajaro Dunes Rental Agency),* 174 B.R. 557, 598 (Bankr. N.D. Cal. 1994); *In re Crowthers McCall Pattern, Inc.,* 120 B.R. 279, 288 (Bankr. S.D.N.Y. 1990). *But see generally Boyer v. Crown Stock Distrib., Inc.,* 587 F.3d 787, 797 (7th Cir. 2009) ("But as far as we can tell, should all the unsecured creditors of new Crown be paid in full the only other potential claimants to any surplus money in its estate will be the original shareholders. The LBO was fraudulent only

300

The preceding discussion addresses what happens when a claim is avoided. Additional issues arise when a creditor holds one claim that is avoided and another claim that is not. A straightforward application of the relevant Bankruptcy Code provisions makes it abundantly clear that barring equitable subordination, disallowance, or principles of unjust enrichment, if the Step Two Debt but not the Step One Debt is unavoidable, the Step One Debt would be entitled to participate in distributions from the estates in accordance with their nonbankruptcy priorities. Contrary to the contention advanced by one Party to the Examiner, Bankruptcy Code sections 502(d) and (h) provide no basis to disallow Step One Debt based on avoidance of Step Two Debt. As noted, these Bankruptcy Code provisions do not apply to avoidance of claims.

An argument nevertheless may be advanced that a court should prohibit the holders of the Step One Debt from participating in any *recoveries* of payments made in connection with *avoidance* of the Step Two Transactions until the Non-LBO Creditors holding claims against the particular Debtor-entities are paid in full. These are the same creditors (or their successors) who indeed participated in, funded, and made possible the Step Two Transactions. Thus, so the argument goes, it would be inequitable for those entities to benefit from avoidance of payments made and obligations incurred in the Step Two Transactions while non-LBO Creditors holding claims against the same estates remain unpaid. Although this argument may be appealing as an equitable matter, it is generally understood that an estate representative may bring actions to avoid and recover transfers for the benefit of creditors who might not have any right to bring those actions on their own accord.[827] Absent a basis to equitably subordinate the Step One Debt

---

with respect to the unsecured creditors. If and when they are paid in full, the wrong committed by the shareholders will have been righted and there will be no reason to deny their claims to whatever money is left over.").

[827] *See Buncher Co. v. Off. Comm. of Unsecured Creditors of GenFarm Ltd. P'shp IV*, 229 F.3d 245, 250-51 (3d Cir. 2000) (applying Bankruptcy Code section 544(b); "When recovery is sought under section 544(b) of the

consistent with the standards governing equitable subordination discussed later in the Report,[828] it is difficult to find a doctrinal basis that would support barring that debt from participating in avoidance recoveries.[829]

The doctrine of equitable estoppel, however, may furnish such a basis, even if the standards governing equitable subordination are not otherwise met.[830] As one bankruptcy court noted: "[S]ince this Court inherently possesses the powers of equity, it may employ the equitable estoppel doctrine in a manner not inconsistent with the Code."[831] But, equitable estoppel is at best an imperfect fit, as that doctrine typically requires some form of representation from the party against whom estoppel is sought in favor of the party seeking estoppel, with some

---

Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer.").

[828] *See* Report at § IV.D.1. Although equitable subordination is not a static concept, affording courts flexibility to fashion remedies as new fact patterns emerge, *see United States v. Noland*, 517 U.S. 535, 540 (1996) ("[T]he adoption in § 510(c) of 'principles of equitable subordination' permits a court to make exceptions to a general rule when justified by particular facts, *cf. Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case."), the Examiner has not found any equitable subordination case that would support the result discussed in the Report. Moreover, "[e]quitable subordination is remedial not penal." *In re Mid-Am. Waste Sys.*, 284 B.R. 53, 72 (Bankr. D. Del. 2002). *See also In re Ahlswede*, 516 F.2d 784, 788 (9th Cir. 1975) ("A supposed inequity resulting when an innocent party in good faith asserts a legally valid claim will not [support disallowance or subordination of a claim].") (citation omitted); *In re Columbia Ribbon Co.*, 117 F.2d 999, 1002 (3d Cir. 1941) ("It does not hold that the court may set up a sub-classification of claims within a class given equal priority by the Bankruptcy Act and fix an order of priority for the sub-classes according to its theory of equity.").

[829] In *In re PWS Holding Corp.*, 228 F.3d 224, 240 (3d Cir. 2000), the Third Circuit Court of Appeals referenced an examiner's report issued in that case (under seal) in which the examiner opinioned that "there was some likelihood that the Banks and the subordinated noteholders, as participants in the leveraged recapitalization, would be estopped from recovering on the claims." The Third Circuit, however, did not expressly endorse the examiner's opinions.

[830] *See IRS v. Kaplan (In re Kaplan)*, 104 F.3d 589, 601 at n.27 (3d Cir. 1997) ("The traditional elements of equitable estoppel are: '(1) the party to be estopped must have known the facts; (2) the party to be estopped must intend that his conduct will be acted upon or must so act that the party asserting the estoppel has the right to believe it was so intended; (3) the party asserting estoppel must be ignorant of the true facts; and (4) the party asserting estoppel must rely on the other party's conduct to his injury.'") (citing *In re Jones*, 181 B.R. 538, 543 (D. Kan. 1995); *Penny v. Giuffrida*, 897 F.2d 1543, 1545-46 (10th Cir. 1990)).

[831] *In re Lafayette Radio Elecs. Corp.*, 7 B.R. 189, 193 (Bankr. E.D.N.Y. 1980) (citing *Pepper v. Litton*, 308 U.S. 295, (1939)); *see also Frymire v. PaineWebber, Inc.*, 107 B.R. 506, 511 (E.D. Pa. 1989) (stating that equitable estoppel "is a defense used to preclude a person from denying or asserting a claim") (citation and internal quotation marks omitted).

courts requiring a false representation.[832]  In the current case, the LBO Lenders did not make any

representations to the Non-LBO Creditors.[833]

Because the law is not clear, the Examiner leaves this question in equipoise.  The

Recovery Scenarios contained in Annex B to this Volume of the Report, however, illustrate in

one scenario (Case 8) the results if a court were to prohibit the Step One Debt from sharing in

recoveries from avoidance of the Step Two Debt.[834]  (That scenario also posits that the LBO

Lenders are not entitled to enforce any portion of the Step Two Debt.)

> ### c.    Examiner's Conclusions and Explanation Concerning Effect of Avoidance on PHONES Subordination.

**<u>Examiner's Conclusions</u>:**

To the extent the LBO Lender Debt is not avoided (or if avoided, to the extent enforced

under Bankruptcy Code section 548(c)), the LBO Lenders will be entitled to recover value at the

Guarantor Subsidiary level and enforce their rights under the PHONES Subordination at the

Tribune level with respect to distributions from the Tribune estate.  Although not entirely clear,

the Examiner concludes that a court is reasonably likely to hold that the PHONES Subordination

would not extend to LBO Lender Debt that is avoided at the Tribune level.

---

[832]  *See In re Rowland*, 275 B.R. 209, 217 (Bankr. E.D. Pa. 2002) (finding equitable estoppel requires "a representation of material fact was made to the party") (citation omitted); *In re Grigoli*, 151 B.R. 314, 321 (Bankr. E.D.N.Y. 1993) ("Equitable estoppel may be invoked only if the following elements are present: (1) conduct which amounts to a false representation, (2) reliance on the conduct of the party to be estopped, and (3) a detrimental change of position based on the conduct.").

[833]  The doctrine of ratification may provide an alternative source.  *See generally HSBC Bank USA, N.A. v. Adelphia Commc'ns Corp.*, 2009 U.S. Dist. LEXIS 10675, at *18 (W.D.N.Y. Feb. 12, 2009); 1 GERRARD GLENN, FRAUDULENT CONVEYANCES AND PREFERENCES, §§ 111, 113 (rev. ed. 1940) ("'Ratification results when a party to a voidable contract accepts benefits flowing from the contract, or remains silent, or acquiesces in contract for any considerable length of time after he has had opportunity to annul or void the contract.").  The Examiner, however, has not found cases applying this doctrine in the context considered here.

[834]  Arguments similar to the ones discussed in text can be advanced regarding any participation by the holders of the EGI-TRB Notes in any recoveries from avoidance actions.  The Examiner likewise leaves this question in equipoise.

**Explanation of Examiner's Conclusions:**

Bankruptcy Code section 510(a) provides that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable non-bankruptcy law."[835] To the extent the LBO Lender Debt is not avoided (or if avoided, to the extent enforced under Bankruptcy Code section 548(c)), the LBO Lenders will be entitled to recover value at the Guarantor Subsidiary level and enforce their rights under the PHONES Subordination at the Tribune level regarding distributions from the Tribune estate. By its terms, Bankruptcy Code section 548(c) permits enforcement of a claim to the extent the prerequisites of that section are satisfied. The PHONES Subordination would apply at the Tribune level to the extent the LBO Lender Debt remains valid against Tribune or a particular Guarantor Subsidiary estate.

The more difficult question is whether, to the extent the LBO Lender Debt is avoided at the Tribune level, the PHONES Subordination continues with respect to the avoided portions of the LBO Lender Debt. In other words, could the LBO Lenders turn around and recover on their avoided claims any distributions from the estate on the PHONES Notes?[836] No case law has been found answering this specific question in an analogous setting. The closest is *In re Best Products Co.*,[837] discussed previously, in which certain parties objected to a settlement that resolved and allowed the claim of a fraudulent transfer target; the bankruptcy court's approval of the settlement meant that the lender's claim was senior to the claim of the subordinated creditor

---

[835]    11 U.S.C. § 510(a) (2006); *see also In re Hinderliter Indus.*, 228 B.R. 848, 853 (Bankr. E.D. Tex. 1999) ("[J]unior creditors should be prevented from receiving funds where they have 'explicitly' agreed not to accept them.") (internal citations omitted); *Citibank, N.A. v. Smith Jones*, 17 B.R. 128, 131 (Bankr. D. Minn. 1982) (holding subordination agreement enforced postpetition in favor of holder of bank debt).

[836]    The Examiner is required to address this question because it was raised by Parties, and the answer affects the Recovery Scenarios set forth in Annex B to Volume Two.

[837]    168 B.R. 35, 39 (Bankr. S.D.N.Y. 1994), *aff'd on other grounds*, 68 F.3d 26 (2d Cir. 1995).

under the party's subordination agreement.  Faced with an objection to enforcement of the

subordination provision, the court noted that even if the settlement had not been approved, the

lender still would have held a substantial senior unsecured claim that would have survived

avoidance.[838]  Although the court intimated that, under the subordination provisions at issue, the

lender's claims would be senior notwithstanding avoidance (noting that the subordinated creditor

had presented no case for equitable subornation), it is not clear from the opinion what the

subordination provision actually said.  Moreover, because the specific question presented was

whether the lender's allowed claim under the settlement constituted senior indebtedness, and not

whether the lender would hold a senior claim if its claims were entirely avoided, at most the

court's comments concerning the operation of the subordination agreement were dicta.

It is well established that avoidance of an obligation does not empower the trustee to step

into the shoes of that creditor's seniority rights under a contractual subordination.[839]  Moreover,

notwithstanding avoidance of an obligation, "[t]he subordination agreement, which provided

underpinning for the Bank's loan, should be enforced in the distribution of the proceeds of the

trustee's sale according to the terms of the parties who made the agreement."[840]  Applying this

principle, a court might conclude that avoidance of the LBO Lender Debt at the Tribune level

simply has no bearing on the operation of the PHONES Subordination and that, accordingly, the

LBO Lenders may continue to enforce that subordination notwithstanding the avoidance of the

LBO Lender Debt by the Tribune estate.  The problem with this conclusion, however, is that it

---

[838]  *Id.* at 70.

[839]  *See Morris v. St. John Nat'l Bank (In re Haberman)*, 516 F.3d 1207, 1211-12 (10th Cir. 2008); *In re Kors, Inc.*, 819 F.2d 19, 23-24 (2d Cir. 1987) ("At the same time, the Bank's rights with respect to its unperfected security interest on Kors' collateral were separate and distinct from its rights under the subordination agreement among the lenders. Therefore, the trustee, acting under §§ 544(a)(1) and 551 obtained only those rights and powers derived from the unperfected security interest against Kors in the collateral and did not acquire the rights of the Bank under the subordination agreement. Consequently, the bankruptcy court should have enforced the subordination agreement according to the terms of the parties to that agreement.") (citation omitted).

[840]  *In re Kors, Inc.*, 64 B.R. 163, 170 (D. Vt. 1986), *aff'd*, 819 F.2d 19 (2d Cir. 1987).

*assumes* that the PHONES Subordination extends to the LBO Lender Debt even if that indebtedness is avoided, and does not consider what the PHONES Indenture actually says.

Subordination agreements are enforceable in bankruptcy only to the extent they are enforceable under "applicable nonbankruptcy law."[841]  Because the PHONES Indenture is governed by New York law, a court is likely to apply New York principles of contract interpretation to interpret the PHONES Indenture.  The definitions of "Indebtedness" and "Senior Indebtedness" in the PHONES Indenture do not by their terms expressly subordinate the PHONES Notes to debt that is avoided in a Tribune bankruptcy.  In fact, the PHONES Indenture's only reference to bankruptcy in the definition of Senior Indebtedness is the statement that postpetition interest is only included as Senior Indebtedness if and to the extent allowed by a bankruptcy court.[842]  Although the Examiner has found no authority directly addressing this question, the Examiner concludes that, based on the New York Court of Appeals decision on certification in *Chemical Bank v. First Trust (In re Southeast Banking Corp.),*[843] a New York court likely would require specific language in the PHONES Subordination to alert the holders that Senior Indebtedness includes debt that is avoided in a bankruptcy proceeding.[844]  That explicit language is missing from the PHONES Indenture, and, as a result, a court is reasonably likely to conclude that the PHONES Subordination does not extend to avoided debt.  This

---

[841]  11 U.S.C. § 510(a) (2006).

[842]  Ex. 49 at § 14.01 (PHONES Indenture).

[843]  710 N.E.2d 1083 (1999).

[844]  *Id.* at 1087; *see also In re King Res. Co.*, 528 F.2d 789, 791 (10th Cir. 1976); *In re Bank of New Eng. Corp.*, 404 B.R. 17, 39 (Bankr. D. Mass. 2009), *aff'd sub nom. HSBC Bank USA v. Bank of N.Y. Trust Co. (In re Bank of New Eng. Corp.)*, 426 B.R. 1 (D. Mass. 2010).  *But see HSBC Bank USA v. Branch (In re Bank of New Eng. Corp.)*, 364 F.3d 355, 365-67 (1st Cir. 2004) (disagreeing with the holding of *Chemical Bank v. First Trust (In re Southwest Banking Corp.)*, 710 N.E.2d 1083, 1084-88 (N.Y. 1999), and instead holding that New York law does not require specific language in a subordination agreement to alert the holders of subordinated debt that senior creditors will receive postpetition interest in a bankruptcy case before the holders of the junior debt receive principal).

construction is consistent with controlling precedent from the Third Circuit Court of Appeals

applying the "Rule of Explicitness,"[845] which presents an analogous issue.

### d.    Examiner's Conclusions and Explanation Concerning Effect of Avoidance on Subordinated Bridge Subsidiary Guarantee.

**Examiner's Conclusions**:

To the extent the Credit Agreement Debt and Bridge Debt are not avoided (or if avoided,

to the extent enforced under Bankruptcy Code section 548(c)) at the Guarantor Subsidiary levels,

the subordination provisions of the Subordinated Bridge Subsidiary Guarantee will remain in

effect and govern distributions from the Guarantor Subsidiary estates.  It is reasonably likely that

to the extent those obligations are avoided and are not enforced under section 548(c) at the

Guarantor Subsidiary levels and the Stock Pledge is avoided, such avoidance would avoid, and

thereby render inoperative the subordination provisions of the Subordinated Bridge Subsidiary

Guarantee, such that any value distributed by Tribune (including amounts available to Tribune as

a result of the remittance of value from the Guarantor Subsidiaries to Tribune resulting from

avoidance of the LBO Lender Debt) would be ratably distributed between the Credit Agreement

Debt and the Bridge Debt.  However, in connection with fashioning remedies resulting from

avoidance, a court is reasonably likely to adjust this result if Non-LBO Creditors are made

whole.

**Explanation of Examiner's Conclusions**:

There would be no basis to relieve the Bridge Facility Lenders of the subordination

provisions contained in the Subordinated Bridge Subsidiary Guarantee to the extent the Credit

---

[845] *In re Time Sales Fin. Corp.*, 491 F.2d 841, 844 (3d Cir. 1974).  Although additional potential bases were presented to the Examiner going to the question whether the PHONES Subordination remains enforceable based on actions by the LBO Lenders allegedly not taken in good faith (*see generally* PHONES Indenture § 14.09), these contentions are outside the purview of the Investigation because they involve inter-creditor contentions and claims and not estate actions.

Agreement Debt remains valid at the Guarantor Subsidiary levels.[846] To the extent the Credit

Agreement Debt and the Bridge Debt are avoided by the Guarantor Subsidiary estates, however,

a more complex question arises concerning the effect of such avoidance on the subordination

provisions of the Subordinated Bridge Subsidiary Guarantee.  Had the Credit Agreement Agent

and the Bridge Credit Agreement Agent entered into a contractual subordination agreement

dealing with this question and specifying that, as between the Credit Agreement Debt and the

Bridge Debt, the subordination provisions would survive avoidance and govern the distribution

of any value derived from the Guarantor Subsidiaries, such a contract undeniably would be

enforced,[847] but the Subordinated Bridge Subsidiary Guarantee entered into between each

Guarantor Subsidiary and the Bridge Credit Agreement solely governs the scope of that

subordination.  No contractual subordination agreement exists between the Bridge Credit

Agreement Agent and the Credit Agreement Agents, and, in fact, the Bridge Debt and Credit

Agreement Debt are pari passu at Tribune (although the Credit Agreement Debt is secured by the

Stock Pledge).  Although the Subordinated Guarantee provides that its terms survive nullification

of Tribune's obligations, nothing in the Subordinated Bridge Subsidiary Guarantee could

bulletproof those guarantees against avoidance by a Guarantor Subsidiary's bankruptcy estate.

As a result, if the LBO Lender Debt is avoided by a Guarantor Subsidiary—such that the Credit

Agreement Subsidiary Guarantee and the Subordinated Bridge Subsidiary Guarantee are no

longer enforceable against that entity and no distributions from that estate on account of those

guarantees will occur—the subordination contained in the Subordinated Bridge Subsidiary

---

[846]  *See In re Best Prods.*, 168 B.R. 35, 70 (Bankr. S.D.N.Y. 1994) ("[I]n the event the LBO were to be deemed
fraudulent, the Banks would be left with a substantial claim . . . . Thus, . . . a debt would still be due and owing
to the Banks under the most favorable litigation scenario from [the debtor]'s viewpoint, as a result of which the
claims of the [junior creditors] would be [and remain] subordinated to those of the Banks.").

[847]  *See* Report at § IV.B.8.c.

Guarantee likewise should fall away.[848] Stated differently, if the obligations of the Guarantor Subsidiaries under both of these guarantees are avoided, there would be nothing to which the subordination contained in the Subordinated Bridge Subsidiary Guarantee could extend.

The Examiner concludes, however, that notwithstanding the preceding discussion, in connection with fashioning remedies resulting from avoidance at the Guarantor Subsidiary levels when Non-LBO Creditors are made whole, a court is reasonably likely to adjust the distributions so that the relative pre-avoidance priorities between the Credit Agreement Debt and Bridge Debt are honored regarding that portion of the value available that is attributable to the Guarantor Subsidiaries. It would seem inequitable to allow the holders of the Bridge Debt to, in effect, benefit from avoidance of their own debt at the Guarantor Subsidiaries; thus, as between the Credit Agreement Debt and Bridge Debt, a court should enforce the prepetition arrangements to which those holders agreed once all *other* creditors are paid in full plus interest. The Examiner recognizes, however, that no case law addresses this question.

### e.    Examiner's Conclusions and Explanation Concerning Treatment of Intercompany Claims in Avoidance Scenarios.

The Examiner has reviewed the Parties' submissions regarding intercompany claims existing as of the Petition Date. Based on this review, the Examiner has determined that no Party has challenged the analysis prepared by the Debtors regarding the likely percentage range of

---

[848] *See generally Grace v. Bank Leumi Trust Co.*, 443 F.3d 180, 189 (2d Cir. 2006) ("The proper remedy in a fraudulent conveyance claim is to rescind, or set aside, the allegedly fraudulent transfer, and cause the transferee to return the transferred property to the transferor."). It is important to point out, however, that avoidance and rescission are not synonymous. *See, e.g., United States ex rel. FCC v. GWI PCS 1, Inc. (In re GWI PCS 1, Inc.)*, 230 F.3d 788, 796 n. 14 (5th Cir. 2000) ("Avoidance differs considerably from rescission. Rescission unwinds the transaction and restores the status quo ante, whereas avoidance allows a debtor to retain the benefit of its bargain while rewriting the debtor's obligations under that bargain."). *See also FCC v. NextWave Commc'ns (In re NextWave Pers. Commc'ns, Inc.)*, 200 F.3d 43, 49 n.6 (2d Cir. 2000). Bankruptcy Code section 548(c) provides the sole statutory basis for an obligee to enforce an obligation that otherwise would be avoided. 11 U.S.C. § 548(c) (2006). *See* Report at §§ IV.B.5.b., IV.B.5.c. In this fashion, section 548(c) affords an obligee or transferee to rescind the effect of avoidance subject to compliance with the limitations imposed under that section.

intercompany claims that would be allowed for purposes of determining recoveries to creditors in various avoidance scenarios.[849]  Because Question One is limited to claims and defenses asserted by the Parties, the Examiner has not independently analyzed the validity of such claims, which represent hundreds of thousands of individual transactions over the Debtors' history.[850] The Examiner uses the Debtors' analysis of intercompany claims supplied to the Examiner in the analysis of Recovery Scenarios contained in Annex B to this Volume of the Report.

> **9.    Examiner's Conclusions and Explanation Concerning the Economic Effect of Potential Avoidance on Distributions.**

With the assistance of his financial advisor, the Examiner has prepared the Recovery Scenarios in Annex B to this Volume of the Report.  Readers are directed to the notes accompanying that analysis for the underlying assumptions.

### C.    Potential Preference Actions.

Certain Parties contended that one or more of the Tribune Entities may recover as preferential transfers payments and other transfers made in connection with and following the Leveraged ESOP Transactions.  The potential preferential transfers identified by the Parties include (i) satisfaction of the Exchangeable EGI-TRB Note, (ii) payments made to the LBO Lenders within the ninety-day period before the Petition Date, (iii) payments made to directors and officers of the Tribune Entities within one year before the Petition Date, and (iv) transfers between and among Tribune and its subsidiaries within one year before the Petition Date.

The Parties devoted little analysis to these issues.  Indeed, no Party attempted to demonstrate that each of the substantive elements necessary to recover a preferential transfer

---

[849]  *See* Ex. 1071 (Debtors' Assumptions re Intercompany Claims); Ex. 1072 (Debtors' Analysis of Recovery Scenarios).

[850]  *See* Ex. 1071 (Debtors' Assumptions re Intercompany Claims).

could be satisfied with respect to the transactions.[851] The Examiner considers these matters below.

      **1.    Examiner's Conclusions and Explanation Concerning Satisfaction of Exchangeable EGI-TRB Note.**

**Examiner's Conclusions:**

      It is unclear whether satisfaction of the Exchangeable EGI-TRB Note constitutes a preferential transfer. Even if, however, satisfaction of the Exchangeable EGI-TRB Note qualifies as a preferential transfer, it is reasonably likely that a court would find that the transaction is subject to an ordinary course of business defense, but it is unclear whether a court would find that the transaction is subject to a new value defense.

**Explanation of Examiner's Conclusions:**

      The EGI-TRB Purchase Agreement provided for Tribune's issuance of two unsecured subordinated promissory notes: the Exchangeable EGI-TRB Note and the Initial EGI-TRB Note, which EGI-TRB agreed to purchase subject to the satisfaction of certain terms and conditions. On April 23, 2007, over one month before the Step One Financing Closing Date, EGI-TRB acquired the Exchangeable EGI-TRB Note for $200,000,000 in consideration as specified in the EGI-TRB Purchase Agreement. The Exchangeable EGI-TRB Note was an unsecured subordinated promissory note that was exchangeable into Tribune Common Stock and due and payable immediately prior to consummation of the Merger.

---

[851] Bankruptcy Code section 547(b) provides that a trustee or debtor in possession may avoid the transfer of an interest of the debtor in property (i) to or for the benefit of a creditor; (ii) for or on account of an antecedent debt owed by the debtor to the creditor before such transfer was made; (iii) made while the debtor was insolvent; (v) on or within ninety days before the date of the filing of the petition or between ninety days and one year before the date of the filing of the petition if made to an insider; and (vi) that enables the creditor to receive more than would be received as a distribution in a hypothetical Chapter 7 liquidation had the transfer not been made. *See* 11 U.S.C. § 547(b) (2006).

On December 20, 2007, in connection with consummation of the Merger, EGI-TRB

purchased the Initial EGI-TRB Note in a transaction under which the Exchangeable EGI-TRB

Note was satisfied and EGI-TRB advanced additional sums to Tribune.  In this subsequent

transaction, Tribune did not make cash transfers to EGI-TRB to satisfy the Exchangeable EGI-

TRB Note.  Rather, the outstanding amount of the Exchangeable EGI-TRB Note of

$206,418,859.46 was netted against the face amount of the Initial EGI-TRB Note of

$225,000,000, and additional sums owed between the parties[852] were similarly netted against

each other.[853]

It is possible for a court to analyze and treat the Exchangeable EGI-TRB Note and Initial

EGI-TRB Note in two distinct ways, each of which in turn affects whether the transaction may

have resulted in an avoidable preference.  First, a court might find that the Exchangeable EGI-

TRB Note and Initial EGI-TRB Note were substantively the same obligation created pursuant to

---

<div align="center"><span style="color:red">Redacted</span></div>

---

[853] The netting transactions may qualify as setoffs under Bankruptcy Code section 553.  If treated as setoffs, the transactions are not subject to recovery as preferential transfers but are instead governed by Bankruptcy Code section 553.  *See, e.g., Braniff Airways v. Exxon Co.*, 814 F.2d 1030, 1034 (5th Cir. 1987) ("When § 553 is determined to be applicable, § 547 cannot thereafter be utilized to undo its effect.  The enactment of § 553 was an expression of the Congressional intent sanctioning the exercise of setoff as a permissible preference under certain circumstances."); *Comer v. U.S. Soc. Sec. Admin. (In re Comer)*, 386 B.R. 607, 608-609 (Bankr. W.D. Va. 2008) ("In order for there to be a preferential transfer under 11 U.S.C. § 547(b), there is a requirement of a pre-petition 'transfer' of an interest of the debtor in property.  Transfer is a term of art which is defined in 11 U.S.C. § 101(54).  The term 'setoff' is omitted from the definition of transfer in 11 U.S.C. § 101(54).  The legislative history to 11 U.S.C. § 101(54) explains the omission in clear terms:  inclusion of 'setoff' is deleted.  The effect is that a 'setoff' is not subject to being set aside as a preferential 'transfer' but will be subject to special rules.'") (internal citations omitted); *Cain v. Mappa*, 142 B.R. 677, 686 (Bankr. D.N.J. 1992) ("When a setoff right is being asserted, § 553 rather than § 547 governs the creditor's rights.") (citing *Lee v. Schweiker*, 739 F.2d 870, 873 (3d Cir. 1984)); *In re Santoro Excavating, Inc.*, 32 B.R. 947, 950 (Bankr. S.D.N.Y. 1983) ("By equating setoff with secured claims, the Code recognizes that a permitted setoff is, an allowed preference.").  The Examiner evaluates whether satisfaction of the Exchangeable EGI-TRB Note was a preferential transfer in the event a court were to find that the netting transactions were not setoffs.  The Parties have not raised, and the Examiner has not analyzed, whether the netting transactions were recoupments, and if so, the possible impact on the preference analysis.

the transaction initiating and culminating in the Merger.  Under the EGI-TRB Purchase

Agreement, Tribune was obligated to repay the Exchangeable EGI-TRB Note and replace it with

the Initial EGI-TRB Note when the Merger occurred.  Once that condition was satisfied, the

Initial EGI-TRB Note functioned identically to an amended and restated version of the

Exchangeable EGI-TRB Note, albeit extending the maturity date and increasing the principal

amount by $25,000,000 (representing the additional consideration due from EGI-TRB).  Tribune

did not transfer any cash to EGI-TRB when the Exchangeable EGI-TRB Note was satisfied and

the Initial EGI-TRB Note was issued.  If a court were to view the Initial EGI-TRB Note as a de

facto amendment to the Exchangeable EGI-TRB Note under which EGI-TRB made a subsequent

advance of $25,000,000 pursuant to the EGI-TRB Purchase Agreement, it would follow that

issuance of the Initial EGI-TRB Note did not result in any transfer during the one-year reach-

back period applicable to transfers to insiders.[854]  Moreover, because the replacement of the

Exchangeable EGI-TRB Note with the Initial EGI-TRB Note did not deplete or diminish

Tribune's available assets, a court might view the transaction as not involving the transfer of an

interest of Tribune in property that could be subject to recovery as a preference.[855]

---

[854] *See* 11 U.S.C. § 547(b)(4)(B) (2006).  Certain Parties have assumed that EGI-TRB would qualify as an insider of Tribune.  The Warrant purchased by EGI-TRB would permit it to buy 43,478,261 shares of Tribune Common Stock (subject to anti-dilution adjustments), but EGI-TRB had not exercised the Warrant. *See* Ex. 157 at § 1(a) and (b) (Warrant).  However, Samuel Zell was appointed to the Tribune Board on May 9, 2007. *See* Ex. 4 at 46 (Tribune 2007 Form 10-K).

[855] Although the Bankruptcy Code does not expressly mention depletion of the estate as an element of a preferential transfer, some courts have read this requirement into the law. *See, e.g., AmeriServe Food Distrib., Inc. v. Transmed Foods, Inc. (In re AmeriServe Food Distrib., Inc.),* 315 B.R. 24, 29 (Bankr. D. Del. 2004) ("Section 547(b) requires, inter alia, that the property transferred by the debtor be an 'interest of the debtor in property.'  The Supreme Court has interpreted this to be 'property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings.'  In determining whether a transfer was 'an interest of the debtor in property,' courts apply the 'diminution of estate doctrine,' under which a transfer of an interest of the debtor occurs when a transfer 'diminishes directly or indirectly the fund to which creditors of the same class can legally resort for the payment of their debts, to such an extent that it is impossible for other creditors of the same class to obtain as great a percentage as the favored one.'") (internal citations omitted).

Second, a court might view the Initial EGI-TRB Note as a separate and distinct instrument from the Exchangeable EGI-TRB Note.  There is no question that Tribune issued separate promissory notes representing the Exchangeable EGI-TRB Note and, subsequently, the Initial EGI-TRB Note.  Although cash was not exchanged when Tribune satisfied the Exchangeable EGI-TRB Notes in connection with the Merger, the Exchangeable EGI-TRB Note did represent an obligation that Tribune was required to repay.  Had the Merger not occurred, the Exchangeable EGI-TRB Note would never have been replaced by the Initial EGI-TRB Note. Viewed in this manner, when Tribune satisfied the Exchangeable EGI-TRB Note during the one-year reach-back period applicable to transfers to insiders, a transfer occurred on account of an antecedent debt, thereby giving rise to a prima facie preferential transfer.

Nevertheless, even if a court were to view the satisfaction of the Exchangeable EGI-TRB Note as a preferential transfer, it is reasonably likely that even in this circumstance any such transfer would be protected from avoidance under the ordinary course of business defense.  The ordinary course of business defense permits a creditor to retain an otherwise avoidable preference if the transfer was made in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and creditor and the transfer was either (i) made in the ordinary course of business of the parties or (ii) made according to ordinary business terms.[856]  In evaluating whether the transfer was in payment of a debt incurred in the ordinary course of business of the debtor and creditor, courts typically consider the circumstances related to the debt, including whether it was incurred in a normal arms-length commercial transaction

---

[856] *See* 11 U.S.C. § 547(c)(2) (2006); *see also Miller v. Westfield Steel, Inc. (In re Elrod Holdings Corp.)*, 426 B.R. 106, 110 (Bankr. D. Del. 2010) ("Under 11 U.S.C. § 547(c)(2), the 'ordinary course of business exception' permits a creditor to retain transfers made by a debtor to a creditor during the ninety days before the petition date if: (1) such transfers were made for a debt incurred in the 'ordinary course of business' of the parties; and either (2) the transfers were made in the 'ordinary course of business' of the parties; or (3) the transfers were made in accordance with 'ordinary business terms.'").

conducted between the parties[857] or in the routine operation of the business of the debtor and

creditor.[858] To establish whether a transfer was made in the ordinary course of business of the

debtor and creditor, courts analyze the course of dealing between the parties and the

circumstances of the particular transfers to determine if they are consistent with prior

practices.[859] When the course of dealing between the debtor and creditor is limited, the court

---

[857] *See, e.g., Kapila v. Media Buying, Inc. (In re Ameri P.O.S., Inc.)*, 355 B.R. 876, 883 (Bankr. S.D. Fla. 2006) ("Typically, this inquiry requires the Court to determine whether there is anything unusual about the transactions underlying the preferential payment. Courts have examined the following factors in making this determination (i) was the debt typical and (ii) was it incurred at arms length in the marketplace.") (internal citation omitted); *Huffman v. N.J. Steel Corp. (In re Valley Steel Corp.)*, 182 B.R. 728, 735 (Bankr. W.D. Va. 1995) ("[C]ourts generally are interested in whether or not the debt was incurred in a typical, arms-length commercial transaction that occurred in the marketplace, or whether it was incurred as an insider arrangement with a closely-held entity."); *see also Caillouet v. First Bank & Trust (In re Entringer Bakeries Inc.)*, 548 F.3d 344, 352 (5th Cir. 2008) (affirming finding that loan was not made in ordinary course of business of lender when made on non-conforming basis and terms inconsistent with lending policies); *Speco Corp. v. Canton Drop Forge (In re Speco Corp.)*, 218 B.R. 390, 398 (Bankr. S.D. Ohio 1998) ("In contrast, a debt will be considered not incurred in the ordinary course of business if creation of the debt is atypical, fraudulent, or not consistent with an arms-length commercial transaction.").

[858] *See, e.g., Elrod Holdings*, 426 B.R. at 111 (analyzing businesses of debtor and creditor to determine whether debt incurred in ordinary course of business); *Wilen v. Pamrapo Sav. Bank, S.L.A. (In re Bayonne Med. Ctr.)*, 429 B.R. 152, 188 (Bankr. D.N.J. 2010) ("The preamble requirement of § 547(c)(2) focuses on the *debt* for which the challenged transfer was payment. In this case, the inquiry is whether the credit line loan was provided by the bank in the ordinary course of its business, and so undertaken by the [debtor]."); *Off. Comm. of Unsecured Creditors v. Charleston Forge, Inc. (In re Russell Cave Co.)*, 259 B.R. 879, 882 (Bankr. E.D. Ky. 2001) (establishing that transfer is in payment of debt incurred in ordinary course of business "is demonstrated relatively easily by a showing that each party was engaged in its usual business when the debt was incurred and the transfer took place"); *Youthland, Inc. v. Sunshine Girls (In re Youthland, Inc.)*, 160 B.R. 311, 314 (Bankr. S.D. Ohio 1993) ("The first element of § 547(c)(2) requires an examination of the debts incurred for which the transfers were payment for the normality of such incurrences in each party's business operations generally."); *Pioneer Tech., Inc. v. Eastwood (In re Pioneer Tech., Inc.)*, 107 B.R. 698, 702 (B.A.P. 9th 1988) ("Courts have consistently held that the section was intended to protect *ordinary trade credit* transactions, and not those outside the normal course of either the debtor's or creditor's business."). *But see Fitzpatrick v. Cent. Commc'ns & Elecs., Inc. (In re Tenn. Valley Steel Corp.)*, 203 B.R. 949, (Bankr. E.D. Tenn. 1996) ("This analysis . . . looks to whether the debt was incurred in the ordinary course of business between the parties, as opposed to a determination of whether the debt was incurred in the ordinary course of each party's business, as viewed separate from their dealings with one another. As such, this court will apply the approach that looks to whether the debt was incurred in the ordinary course of business *between* the parties."); *Redmond v. Ellis County Abstract & Title Co. (In re Liberty Livestock Co.)*, 198 B.R. 365, 373 (Bankr. D. Kan. 1996) ("It is a subjective test. Even if the creditor is not a traditional lender, if the transaction was ordinary as between this particular debtor and creditor, then it was in the ordinary course of their business.").

[859] *See, e.g., U.S. Tr. v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.)*, 180 F.3d 504, 512 (3d Cir. 1999) ("[T]he determination of what is 'in the ordinary course of business' is subjective, calling for the Court to consider whether the transfer was ordinary as between the debtor and the creditor. Factors such as timing, the amount and manner in which a transaction was paid are considered relevant."); *Elrod Holdings*, 426 B.R. at 111 ("To make this determination, courts consider factors such as: (1) the length of time the parties engaged in the type of dealing at issue; (2) whether the subject transfers were in an amount more than usually paid; (3) whether the payments at issue were tendered in a manner different from previous payments; (4) whether there appears to

315

may instead rely on the terms of the agreement to establish the ordinary course of business

between the parties.[860]  A transfer may be made on ordinary business terms when it is consistent

with the range of terms prevailing in the relevant industry of the debtor and creditor.[861]

Although the transaction giving rise to the repayment of the Exchangeable EGI-TRB

Note was a one-time event for both Tribune and EGI-TRB, this does not necessarily mean that it

was outside the ordinary course of business.[862]  Because the prior course of dealing between

---

have been an unusual action by the debtor or creditor to collect on or pay the debt; and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition.") (citing *In re Forklift LP Corp.*, 340 B.R. 735, 738-39 (Bankr. D. Del. 2006)).

[860]  *See, e.g., Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 643 (7th Cir. 2003) ("In some instances, and this is one, the ordinary course of business may be established by the terms of the parties' agreement, until that agreement is somehow or other modified by actual performance. In the absence of modifying behavior, we see no reason why we should not look to the terms of the parties' agreement in order to determine their ordinary course of business."); *Payne v. Clarendon Nat'l Ins. Co. (In re Sunset Sales)*, 220 B.R. 1005, 1021 (B.A.P. 10th Cir. 1998) ("In the absence of any prior transactions, courts typically look to see if the debtor complied with the payment terms of its contract."); *Warsco v. Household Bank F.S.B. (In re Various Cases)*, 272 B.R. 246, 251-252 (Bankr. N.D. Ind. 2002) ("Nonetheless, in the absence of such a history, there seems to be no good reason not to look to the terms of the parties' agreement in order to determine their ordinary course of business."); *In re Keller Tool Corp.*, 151 B.R. 912, 914 (Bankr. E.D. Mo. 1993) ("When, as here, the record has established that the Debtor and the Defendant had no business dealings prior to the transaction that is the subject of this proceeding, the Court may look to the parties' ordinary course of dealings in other business transactions. Initially, however, the Court must examine the course of business dealings between the Debtor and the Defendant as it may be established by the documents and other evidence that appear from the record.") (internal citation omitted).

[861]  *See, e.g., Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 224-26 (3d Cir. 1994); *Forklift*, 340 B.R. at 738-39 ("[T]he creditor is not required to prove rigorous definitions of either the industry or the credit standards within that industry. The creditor must establish, however, a 'range of terms' on which 'firms similar in some general way to the creditor' deal. The court, therefore, is directed to make three inquiries in this regard. First, the court must consider 'the range of terms on which firms comparable to [the creditor] on some level provide credit to firms comparable to the debtor on some level.' Second, the court must consider 'the length of the parties' relationship predating the debtor's insolvency to estimate the size of the customized window surrounding the industry norm which was established in the first step.' Finally, the court inquires 'whether the relationship remained relatively stable leading into and throughout the insolvency period.'") (quoting *Molded Acoustical Prods.*, 18 F.3d at 227-28) (internal citations omitted); *see also Ganis Credit Corp. v. Anderson (In re Jan Weilert RV, Inc.)*, 315 F.3d 1192, 1198 (9th Cir. 2003) ("Only a transaction that is so unusual or uncommon 'as to render it an aberration in the relevant industry,' falls outside the broad range of terms encompassed by the meaning of 'ordinary business terms.'") (internal citation omitted).  The Parties have not suggested that the transaction could qualify as a transfer made on ordinary business terms in the industry of Tribune and EGI-TRB.

[862]  *See, e.g., In re Finn*, 909 F.2d 903, 908 (6th Cir. 1990) ("Obviously every borrower who does something in the ordinary course of her affairs must, at some point, have done it for the first time. We hold that . . . a transaction can be in the ordinary course of financial affairs even if it is the first such transaction undertaken by the customer."); *Compton v. Plain Mktg., LP (In re Tri-Union Dev. Corp.)*, 349 B.R. 145, 150 (Bankr. S.D. Tex. 2006) ("[A] singular event may be ordinary for the purposes of § 547(c)(2)(B)."); *Roberds, Inc. v. Broyhill Furniture (In re Roberds, Inc.)*, 315 B.R. 443, 458 (Bankr. S.D. Ohio 2004) ("[A]n appropriate ordinary course

316

Tribune and EGI-TRB also was limited, the terms of the Exchangeable EGI-TRB Note are the

most relevant consideration when determining whether an ordinary course of business defense

may be asserted.[863]  Here, the Exchangeable EGI-TRB Note was due and payable immediately

before consummation of the Merger.  At the time of the transaction, Tribune and EGI-TRB

complied with the requirements of the Exchangeable EGI-TRB Note, and the obligation was

satisfied in accordance with its terms; moreover, there is no evidence that anything unusual

occurred between the parties in connection with the transaction.[864]  As a result, a court is

reasonably likely to find that these circumstances support a conclusion that any transfer made to

satisfy the Exchangeable EGI-TRB Note qualifies for an ordinary course of business defense.

Certain Parties have also suggested that EGI-TRB provided "new value" in connection

with the transaction that could shield any transfer from avoidance.  Under the new value defense,

---

analysis requires a recognition that a variety of events in the course of the parties' business history may be found
ordinary, even though these events never occurred in the parties' history."); *Bohm v. Golden Knitting Mills, Inc.
(In re Forman Enters.)*, 293 B.R. 848, 857 (Bankr. W.D. Pa. 2003) ("A first-time transaction between a debtor
and a creditor in certain circumstances may qualify as an ordinary course transaction . . . ."); *Huffman v. N.J.
Steel Corp. (In re Valley Steel Corp.)*, 182 B.R. 728, 735 (Bankr. W.D. Va. 1995) ("[A] first time transaction is
no less susceptible of qualifying for the ordinary course of business exception than a transaction that has
occurred frequently in the past."). *But see Off. Comm. of Unsecured Creditors of Enron Corp. v. Martin (In re
Enron Creditors Recovery Corp.)*, 376 B.R. 442, 462 (Bankr. S.D.N.Y. 2007) ("Therefore, it appears for a 'first
time' transfer to qualify for application of the defense, it should be a type that could have been a 'recurring,
customary trade transaction' had the parties continued their business relationship—not a single isolated
transaction that would never have been repeated in any case.").

[863] As noted below, although there is some authority for the proposition that debt arising from a leveraged buyout
is not incurred in the ordinary course of business, the Examiner believes it is appropriate to consider the
circumstances under which the debt was incurred and related criteria, including whether the transaction was
conducted at arms-length.  In this case, there is no evidence indicating that the transaction between Tribune and
EGI-TRB was conducted at less than arms-length.

[864] *See, e.g., Forman Enters.*, 293 B.R. at 858 (following suggestion of other courts that "we should examine the
conduct of the parties to determine whether either of them did anything unusual or extraordinary with respect to
the transfer made in payment of the underlying debt.  If nothing unusual or untoward occurred, there is no good
reason to conclude that the transfer was out of the ordinary."); *Warsco v. Household Bank F.S.B. (In re Various
Cases)*, 272 B.R. 246, 252 (Bankr. N.D. Ind. 2002) ("Each transaction at issue, including the first-time
transactions between [the creditor] and a particular debtor, was conducted strictly in accordance with the terms
of the parties' written agreement.  This included the timing and the manner in which [the creditor] applied the
funds from each debtors' account to the loan balance.  Consequently, the court concludes that even the first-time
transactions were ordinary as between the parties.").

transfers are not avoidable when a creditor extends new value[865] to or for the benefit of the

debtor after receiving the transfer, such new value is not secured by an unavoidable security

interest, and such new value has not been repaid with an otherwise unavoidable transfer.[866]

Applied here, when Tribune paid the Exchangeable EGI-TRB Note, EGI-TRB in turn advanced

to Tribune a greater amount under the Initial EGI-TRB Note that was never repaid,[867] thereby

potentially giving rise to a new value defense.[868]

A court, however, may well conclude that EGI-TRB did not advance new value to

Tribune because EGI-TRB already was contractually obligated to purchase the Initial EGI-TRB

Note months before the transaction,[869] and the simultaneous effect of the transaction did not

---

[865]   The term "new value" is defined to include "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation."  11 U.S.C. § 547(a)(2) (2006).

[866]   *See* 11 U.S.C. § 547(c)(4) (2006).  *See also N.Y. City Shoes, Inc. v. Bentley Int'l, Inc. (In re N.Y. City Shoes, Inc.)*, 880 F.2d 679, 680 (3d Cir. 1989) ("The three requirements of section 547(c)(4) are well established. First, the creditor must have received a transfer that is otherwise voidable as a preference under § 547(b). Second, *after* receiving the preferential transfer, the preferred creditor must advance 'new value' to the debtor on an unsecured basis.  Third, the debtor must not have fully compensated the creditor for the 'new value' as of the date that it filed its bankruptcy petition.").  The third element of the new value defense as stated by the Third Circuit Court of Appeals should not be interpreted broadly to preclude "full compensation" per se, but only to circumstances in which the new value has been repaid with an otherwise unavoidable transfer.  *See, e.g., Wahoski v. Am. & Efrid, Inc. (In re Pillowtex Corp.)*, 416 B.R. 123, 129 (Bankr. D. Del. 2009) ("A creditor who raises the § 547(c)(4) defense has the burden of proving that: '(1) new value was extended after the preferential payment sought to be avoided, (2) the new value is not secured with an otherwise unavoidable security interest and (3) the new value has not been repaid *with an otherwise unavoidable transfer.*'") (quoting *Laker v. Vallette (In re Toyota of Jefferson, Inc.)*, 14 F.3d 1088, 1093 n.2 (5th Cir. 1994)).

[867]   *See, e.g., Off. Comm. of Unsecured Creditors v. Tennenbaum Capital Partners (In re Radnor Holdings Corp.)*, 353 B.R. 820, 848 (Bankr. D. Del. 2006) ("A creditor provides new value when it makes a loan to the debtor.").

[868]   *See, e.g., Off. Comm. of Unsecured Creditors of R.M.L., Inc. v. Conceria Sabrina, S.P.A. (In re R.M.L., Inc.)*, 195 B.R. 602, 616 (Bankr. M.D. Pa. 1996) ("In order to calculate the amount of new value to be applied against preferential payments, most courts apply a 'subsequent advance' method of calculation.  The method 'looks at the 90-day preference period and calculates the difference between the total preferences and the total advances, provided that each advance is used to offset only prior (although not necessarily immediately prior) preferences.'") (quoting *In re Meredith Manor, Inc.*, 902 F.2d 257, 259 (4th Cir. 1990)).

[869]   *See, e.g., Gouveia v. RDI Grp. (In re Globe Bldg. Materials, Inc.)*, 484 F.3d 946, 950 (7th Cir. 2007) (holding that performance of existing contractual obligation does not constitute new value).

actually result in a *subsequent* advance of new value to Tribune.[870]  Under Bankruptcy Code

section 547(a)(2), "new value" includes "new credit," but does not include "an obligation

substituted for an existing obligation."[871]  Between these two views, the Examiner concludes that

a court is reasonably likely to find that new value was not advanced because EGI-TRB

performed its preexisting contractual obligation to purchase the Initial EGI-TRB Note and,

alternatively, largely substituted an obligation for an existing obligation.

>        2.    **Examiner's Conclusions and Explanation Concerning Payments on**
>              **Account of Bridge Debt and Credit Agreement Debt.**

**Examiner's Conclusions:**

To the extent that payments to the LBO Lenders on account of the Bridge Debt and

Credit Agreement Debt qualified as preferential transfers, it is reasonably likely that a court

would find that the payments could be subject to an ordinary course of business defense, except

to the extent that the underlying Bridge Debt and Credit Agreement Debt are avoided as

fraudulent transfers.

---

[870]  *See, e.g., N.Y. City Shoes, Inc.*, 880 F.2d at 680 (3d Cir. 1989) ("[*A*]*fter* receiving the preferential transfer, the preferred creditor must advance 'new value' to the debtor on an unsecured basis."). Viewed in this fashion, the transfer might instead be shielded from avoidance as a contemporaneous exchange of new value. "Under Bankruptcy Code Section 547(c)(1), a transfer is not a preference if it was '(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange.'" *Off. Comm. of Unsecured Creditors v. Tennenbaum Capital Partners (In re Radnor Holdings Corp.)*, 353 B.R. 820, 847-48 (Bankr. D. Del. 2006). In certain circumstances, the advance of credit may qualify as a contemporaneous exchange of new value. *See, e.g., In re Arrow Air, Inc.*, 940 F.2d 1463, 1466 (11th Cir. 1991) ("As we have indicated in the past, that a transfer from debtor to creditor is payment of a pre-existing debt does not automatically preclude the transfer from also being a contemporaneous exchange for new value. And, under appropriate circumstances, the new value exchanged for the transfer or payment may take the form of new credit. Therefore, it is not impossible, as a matter of law, that an extension of new credit by [a creditor] to [a debtor] could have constituted 'new value.'") (internal citations omitted); *Radnor Holdings Corp.*, 353 B.R. at 847-48 ("Even if some of the new value is used by a debtor to pay pre-existing debt, the transfer falls within the four corners of 11 U.S.C. § 547(c)(1) if the amount transferred to the debtor exceeds the amount repaid on pre-existing debt."). As noted, however, a court could conclude that EGI-TRB's performance of the preexisting contractual obligation to purchase the Initial EGI-TRB Note was not intended by the parties to be a contemporaneous exchange for new value and did not constitute new value.

[871]  11 U.S.C. § 547(a)(2) (2006).

**Explanation of Examiner's Conclusions**:

*Redacted*

*Redacted*

### 3.    Examiner's Conclusions and Explanation Concerning Payments to Directors and Officers of Tribune Entities.

Certain Parties noted that bonuses, deferred compensation, retention, severance, and

change in control payments made to directors and officers of the Tribune Entities during the one-

year period prior to the Petition Date[876] could potentially qualify as preferential transfers.

Depending on the circumstances, these payments may or may not qualify as preferences and

*Redacted*

---

[876] To the extent they weighed in on this question, the Parties have treated this group as "insiders" of the Tribune Entities. *See* 11 U.S.C. §§ 101(31)(B)(i)-(ii) and 547(b)(4)(B) (2006). The Examiner therefore did not investigate this question.

could also be subject to an ordinary course of business defense that would make them unavoidable.[877] These issues were only briefly mentioned and insufficiently developed by the Parties, and a thorough analysis would require a detailed review of multiple payments to more than two hundred individuals. The time period of the Investigation and available resources did not permit the Examiner an opportunity to examine and analyze these transfers and reach a definitive conclusion.

### 4.    Examiner's Conclusions and Explanation Concerning Intercompany Payments.

Another Party suggested that Tribune may hold preferential transfer claims against its subsidiaries arising from intercompany transactions, but did not submit any analysis or evidence to support the allegation. To properly analyze these issues and reach a conclusion regarding the viability of any such claims, including applicable defenses such as an ordinary course of business defense, would demand an examination of the many thousands of transactions occurring among Tribune and more than one hundred subsidiaries over a one-year period, and require substantial efforts and months to complete. Moreover, the Examiner would have to determine the nature of the intercompany obligations. Only if the intercompany obligations are debts will a preference action be implicated.[878] Payments on account of equity investments, such as capital infusions or contributions, may implicate fraudulent transfers but would not constitute potential preferential

---

[877]  *See, e.g., Off. Comm. of Unsecured Creditors of Enron Corp. v. Martin (In re Enron Creditors Recovery Corp.),* 376 B.R. 442, 462-63 (Bankr. S.D.N.Y. 2007) (holding that severance payments did not qualify for ordinary course of business defense); *Grigsby v. Carmell (In re Apex Auto. Warehouse, L.P.),* 238 B.R. 758, 775 (Bankr. N.D. Ill. 1999) (holding that bonus payments did not qualify for ordinary course of business defense and noting that "[a] bonus by its very nature is something out of the ordinary"); *Hassett v. Goetzmann (In re CIS Corp.),* 195 B.R. 251, 257 (Bankr. S.D.N.Y. 1996) (holding that bonus payments did not qualify for ordinary course of business defense); *Intercont. Publ'ns, Inc. v. Perry (In re Intercont. Publ'ns, Inc.),* 131 B.R. 544, 550 (Bankr. D. Conn. 1991) (holding that severance payments did not qualify for ordinary course of business defense). *But see NMI Sys. v. Pillard (In re NMI Sys., Inc.),* 179 B.R. 357, 372-74 (Bankr. D.D.C. 1995) (holding that bonus payments qualified for ordinary course of business defense).

[878]  *See* 11 U.S.C. § 547(b)(2) (2006) (preferential transfer must be "for or on account of an antecedent debt owed by the debtor before such transfer was made").

transfers.  The Examiner was unable to investigate these matters given the limited time in which to conduct the Investigation.

### D.    Equitable Subordination/Equitable Disallowance of Specified Claims.

### 1.    Generally.

Bankruptcy Code section 510(c) provides that a court may:[879]

> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate.

In *Benjamin v. Diamond (In re Mobile Steel Company)*, the Fifth Circuit Court of Appeals formulated a three-factor test that has been followed by courts across the country:  (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must be consistent with the provisions of the Bankruptcy Code.[880]  Equitable subordination permits claims to be equitably subordinated to other claims, and interests subordinated to other interests, but does not authorize the subordination of claims to interests.[881]  Moreover, although courts have not required that the inequitable conduct warranting subordination of a creditor's claim be related to the acquisition or

---

[879]  11 U.S.C. § 510(c) (2006).  *See Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 233 (3d Cir. 2003).

[880]  *See Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128, 145 (Bankr. D. Del. 2005) (citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977)).

[881]  *See, e.g., See Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.) (Shubert II)*, 554 F.3d 382, 390, 392, 414 (3d Cir. 2009); *Shearer v. Tepsic (In re Emergency Monitoring Techs., Inc.)*, 366 B.R. 476, 504 (Bankr. W.D. Pa. 2007) (concluding that section 510(c) only authorizes the subordination of claims to other claims or interests to other interests, but does not allow subordination of claims to interests) (citing *Acropolis Enters., Inc. v. CR Amusements, LLC (In re C.R. Amusements LLC)*, 259 B.R. 523, 529 (Bankr. D.R.I. 2001)).

It appears that no published cases address whether Bankruptcy Code section 510(c) can be used to override a contractual subordination agreement under section 510(a), but the text of the statute seems to suggest such a possibility.  The precise language of section 510(c) provides that *"[n]otwithstanding* subsections (a) and (b)" of section 510 of the statute, a court may equitably subordinate a claim. 11 U.S.C. § 510(c) (2006) (emphasis added).

assertion of that claim,[882] courts have cautioned that equitable subordination is an "extraordinary measure" which should not be lightly invoked.[883]

### a.    The Effect of Insider or Non-Insider Status.

In determining whether a claimant has engaged in "inequitable conduct" under the *Mobile Steel* formulation, a key preliminary inquiry is whether the claimant was an "insider" in relation to the debtor at the time of the conduct in question.[884] If the claimant is determined to be an insider, once the trustee initially demonstrates "material evidence of unfair conduct" by the claimant, the burden of proof shifts to the claimant to establish "the fairness of his transactions with the debtor;" if the claimant fails to carry that burden, its claim will be equitably subordinated.[885] Courts have recognized three categories of "unfair conduct" by insiders that may constitute "inequitable conduct" under the *Mobile Steel* test:  (i) fraud, illegality, or breach of fiduciary duties; (ii) undercapitalization; and (iii) a claimant's use of the debtor as a mere instrumentality or alter ego.[886] In assessing whether a creditor is an insider, courts examine

---

[882]  *See, e.g., In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 69 (Bankr. D. Del. 2002) (citing *Fabricators, Inc. v. Tech. Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1467 n.14 1991 (5th Cir. 1991)).  A separate question is whether a court may equitably subordinate a claim in the hands of a transferee when the transferee did not engage in wrong-doing.  *See Enron Corp. v. Springfield Assocs., LLC (In re Enron Corp.)*, 379 B.R. 425, 427-28 (S.D.N.Y. 2007).  The decision in *Enron* is discussed in another part of the Report in the context of avoidance.  *See* Report at § IV.B.7.b.(2).  It is unclear whether the holding will be followed in the equitable subordination context.  The Examiner draws no conclusions in this regard, and notes only that the equation is unsettled.

[883]  *See Bank of N.Y. v. Epic Resorts-Palm Springs Marquis Villas (In re Epic Capital Corp.)*, 290 B.R. 514, 525 (Bankr. D. Del. 2003) (citing *MB Ltd. P'ship v. Nutri/Sys. (In re Nutri/Sys., Inc.)*, 169 B.R. 854, 865 (Bankr. E.D. Pa. 1994)), *aff'd*, 178 B.R. 645 (E.D. Pa. 1995); *see also Cohen v. KB Mezzanine Fund II (In re SubMicron Sys. Corp.)*, 291 B.R. 314, 327, 329 (D. Del. 2003) (stating that equitable subordination is a "drastic" and "unusual" remedy), *aff'd*, 432 F.3d 448 (3d Cir. 2006).

[884]  *See In re Mid-Am. Waste Sys., Inc.*, 284 B.R. at 69-70 (citing *Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust)*, 968 F.2d 1332, 1360 (1st Cir. 1992)); *see also Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.)*, 161 B.R. 107, 118 (E.D. Pa. 1993) (observing that courts differentiate between insider and non-insider claims in applying equitable subordination principles), *aff'd*, 37 F.3d 1487 (3d Cir. 1994); *Epic Capital Corp.*, 290 B.R. at 524 (same).

[885]  *Ansel Props., Inc. v. Nutri/System Assocs. (In re Nutri/Sys. Assocs.)*, 178 B.R. 645, 657 (E.D. Pa. 1995) (citing *In re N & D Props., Inc.*, 799 F.2d 726, 731 (11th Cir. 1986)).

[886]  *M. Paolella & Sons*, 161 B.R. at 117-18; *Mid-Am. Waste*, 284 B.R. at 70.

whether the creditor: (i) had greater ability to assert control than other creditors; (ii) made

management decisions for the debtor; (iii) directed work performance; or (iv) directed payment

of the debtor's expenses.[887] In this regard, the courts look for day-to-day control rather than

monitoring activities or exertion of influence regarding financial transactions in which the

creditor has a direct stake.[888]

   If the claimant is not an insider or a fiduciary, the movant must demonstrate, with

particularity, "gross" or "egregious" conduct by the claimant that is tantamount to "fraud,

spoliation or overreaching" in order to satisfy the first prong of the *Mobile Steel* test.[889]  In *In re

Aluminum Mills Corp.*, for example, the court held that the allegation that a lender made a loan

that it knew would result in insolvency and then acted strategically to maximize its own benefits

was insufficient, without more, to demonstrate egregious misconduct on the part of the lender.[890]

Although courts have rarely subordinated non-insider claims, the annals of bankruptcy law

include instances in which courts have done so when presented with egregious creditor

---

[887] *Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.) (Shubert I)*, 348 B.R. 234, 279 (Bankr. D. Del. 2005) (citing *ABC Elec. Serv. Inc. v. Rondout Elec., Inc. (In re ABC Elec. Serv. Inc.)*, 190 B.R. 672, 675 (Bankr. M.D. Fla. 1995)), *aff'd in part, mod. in part*, 554 F.3d 382 (3d Cir. 2009); *see also M. Paolella & Sons*, 161 B.R. at 118-19 (concluding that creditor was not an insider because it did not participate in the debtor's management, determine its operating decisions, or have any presence on its board); *Aluminum Mills Corp. v. Citicorp N. Am., Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 895 (Bankr. N.D. Ill. 1991) (holding that lender was an insider when lender had a security interest in 85% of debtor's stock, controlled a variety of key business decisions, and used its control to keep the debtor in business while the debtor was insolvent).

[888] *Shubert I*, 348 B.R. at 279; *Off. Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.)*, 353 B.R. 820, 840-41 (Bankr. D. Del. 2006).

[889] *See Sierra Invs., LLC v. SHC, Inc. (In re SHC, Inc.)*, 329 B.R. 438, 448 (Bankr. D. Del. 2005) (finding that debtors had sufficiently alleged facts showing fraud where lender had collaborated in one of debtors' insolvency to enter into an assignment agreement without any consideration given to debtors); *Bank of N.Y. v. Epic Resorts-Palm Springs Marquis (In re Epic Capital Corp.)*, 290 B.R. 514, 524 (Bankr. D. Del. 2003).

[890] *Aluminum Mills*, 132 B.R. at 896 (citing *In re Dry Wall Supply, Inc.*, 111 B.R. 933, 938-39 (D. Colo. 1990) ("In this case, the trustee simply alleges that Chase's predecessor knew or should have known that the loan transaction would render Dry Wall Supply, Inc. insolvent and that it was made without adequate consideration. There simply is no allegation or evidence that Chase committed gross misconduct by financing the leveraged buy-out of Dry Wall Supply, Inc."). Nonetheless, the court still held that the lender's claim could be equitably subordinated because the lender: (1) assumed the position of a fiduciary; (2) acted strategically to protect itself to the detriment of the debtor and unsecured creditors; and (3) engaged in fraud and overreaching, which in turn led to breaches of fiduciary duties. *Id.* at 896. *See also Radnor Holdings Corp.*, 353 B.R. at 840-41.

misconduct. In *Rosener v. Majestic Management, Inc. (In re OODC, LLC)*, [891] for example, the bankruptcy court concluded that a trustee had alleged sufficient facts to support claims against non-insider banks for actual and constructive fraud and aiding and abetting breach of fiduciary duty. The trustee alleged that the banks:  (1) knowingly facilitated the removal of at least $40 million in assets of the debtor at a time when the debtor was insolvent; (2) knowingly and recklessly disregarded the debtor's insolvency; (3) knowingly and recklessly intended to hinder, delay, or defraud the debtor's creditors; (4) knowingly or recklessly disregarded the fact that a leveraged buyout would force the debtor into bankruptcy; and (5) knowingly and recklessly disregarded the cumulative impact of these transactions on the debtor's unsecured creditors.  The court explained that, if proven, these allegations would provide the basis for a finding of egregious misconduct, which could warrant equitable subordination of the banks' claims. [892]

In *Murphy v. Meritor Savings Bank (In re O'Day Corp.)*, [893] the court equitably subordinated a non-insider lender's claims arising out of a failed leveraged buyout when:  (1) the bank's financial projections were unreasonable; (2) the bank gave "little weight" to indications showing declines in company earnings leading up to the leveraged buyout; (3) the bank had full access to the debtor's records, facilities, and management; (4) there was a widely-recognized decline in the debtor's industry; (5) the bank proceeded with the loan even though the company did not own assets that comprised a significant portion of the collateral it sought; and (6) the bank engaged in egregious behavior after the transaction closed to improve its position at the expense of creditors.

---

[891]    321 B.R. 128 (Bankr. D. Del. 2005).

[892]    *Id.* at 146.

[893]    *Murphy v. Meritor Sav. Bank (In re O'Day Corp.)*, 126 B.R. 370, 376, 380-81, 405-06, 412 (Bankr. D. Mass. 1991).  Although the court characterized some of the trustee's allegations as "overstated," *id.* at 412, including directing the debtor to cease vendor payments, the court noted among other things that the bank's actions were "tantamount to overreaching." *Id.*

Finally, in *Credit Suisse v. Official Committee of Unsecured Creditors (In re Yellowstone Mountain Club, LLC),*[894] the court found that the secured lender had devised a "loan scheme whereby it encouraged developers of high-end residential resorts . . . to take unnecessary loans." It made loans to the debtor that were passed directly to a principal shareholder and subsidiaries for purposes outside the scope of the debtor's business. The court observed that despite various "red flags" concerning the debtor's financial condition, the lender granted the debtor a substantial loan because "it was driven by the fees it was extracting from the loans it was selling, and letting the chips fall where they may."[895] Having "lined its pockets on the backs of the unsecured creditors," the lender's conduct was so far overreaching and self-serving so as to shock the court's conscience.[896] Concluding that the lender "turned a blind eye" to the debtor's financial records and could not have believed that the debtor could service such an increased debt load in light of its historical financial performance, the court held that equitable subordination of the lender's claim was appropriate.[897]

This triad of cases is illustrative of the level of egregious behavior that would justify equitable subordination of non-insider claims. In short, the behavior must be genuinely egregious.

## 2.    Equitable Disallowance.

In *Pepper v. Litton,*[898] the Supreme Court embraced both equitable subordination and equitable disallowance as permissible remedies when the equities of a given case justify their

---

[894]  *Credit Suisse v. Off. Comm. of Unsecured Creditors (In re Yellowstone Mountain Club, LLC),* 2009 Bankr. LEXIS 2047, at *15-16 (Bankr. D. Mont. May 13, 2009).

[895]  *Id.* at *31.

[896]  *Id.*

[897]  *Id.* at *29, *32-*33.

[898]  308 U.S. 295 (1939).

invocation.[899]  The issue in *Pepper* was whether a bankruptcy court could disallow (either as a

secured or general unsecured claim) a judgment obtained by the dominant and controlling

stockholder of a bankrupt corporation.[900]  The defendant, the controlling stockholder of a "one-

man" corporation, caused his corporation to confess judgment in his favor for allegedly unpaid

salary at a time when that corporation faced financial difficulties.[901]  The shareholder executed

on his judgment and levied on property that he in turn sold to another corporation he

controlled.[902]  Thereafter, his corporation filed for bankruptcy.  In holding that the lower court

properly disallowed the shareholder's claim, the Court noted that, for many purposes, "courts of

bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in

equity."[903]  Among the powers granted to bankruptcy courts as courts of equity is the allowance

and disallowance of claims, and thus, "a bankruptcy court has full power to inquire into the

validity of any claim asserted against the estate and to disallow it if it is ascertained to be without

lawful existence."[904]  The Court explained that, particularly in cases when the claim sought to be

allowed accrues to the benefit of an officer, director, or stockholder, claims have been disallowed

or subordinated when the courts were satisfied that the allowance of the claims would not be fair

---

[899]  *Id.* at 305 ("[A] claim which has been allowed may be later 'rejected in whole or in part, according to the equities of the case . . . .'") (quotation omitted).

[900]  *Id.* at 298.

[901]  *Id.* at 297.

[902]  *Id.* at 297-98.

[903]  *Id.* at 304.

[904]  *Id.* at 305 & 307-08 ("In the exercise of its equitable jurisdiction, the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankruptcy estate.").

or equitable to creditors.[905] Because the shareholder had engaged in a "planned and fraudulent scheme," disallowance of the shareholder's claim was warranted.[906]

Although *Pepper* is venerable authority that a court's equity powers include the power to disallow a claim on equitable bases, the question presented under the Bankruptcy Code is whether equitable disallowance contravenes the provisions of Bankruptcy Code section 510(c), which, as noted, specifies that equitable subordination entails adjusting priorities *among* creditors, but not *between* creditors and shareholders.[907] In the years since *Pepper*, courts in the Third Circuit have addressed this question but have not answered it. In *Equibank v. Dan-Ver Enterprises, Inc. (In re Dan-Ver Enterprises, Inc.)*, a judgment creditor filed an adversary complaint, claiming that judgments held by several individuals should be equitably subordinated to its own claim under Bankruptcy Code section 510(c).[908] In determining whether equitable subordination was appropriate, the United States Bankruptcy Court for the Western District of Pennsylvania explained that certain loans granted by the individuals were made to the debtor's CEO and president, and not to the debtor's estate.[909] Rather than subordinating such claims, the bankruptcy court, relying on the principles set forth in *Pepper*, disallowed the claims in their entirety.[910]

More recently, in *Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims*, the Third Circuit Court of Appeals considered the question whether the

---

[905] *Id.* at 308-09.

[906] *Id.* at 301, 302 & 312-13.

[907] On the other hand, Bankruptcy Code section 502(j), like section 57(k) of the Bankruptcy Act, provides statutory authority to disallow a claim based on the "equities of the case." 11 U.S.C. § 502(j) (2006) ("A reconsidered claim may be allowed or disallowed according to the equities of the case.").

[908] 86 B.R. 443, 450 (Bankr. W.D. Pa. 1988).

[909] *Id.*

[910] *Id.* at 451-52.

claims of a creditor stemming from a leveraged buyout could be equitably subordinated in light of evidence that the creditor surreptitiously purchased outstanding notes before the plan confirmation date to obtain a "blocking position" in the proposed reorganization.[911] The court held that the creditor's claims could be equitably subordinated because the notes were purchased: (1) for the dual purpose of making a profit and influencing the reorganization in its own self-interest; (2) with the benefit of non-public information acquired as a fiduciary; and (3) without disclosure of the purchasing plans to the bankruptcy court, the debtor's board, the official committee of unsecured creditors, or the selling noteholders.[912] In so holding, the court noted the district court's view that it lacked authority to fashion a "disallowance remedy."[913] Commenting that it "d[id] not endorse that conclusion," the court explained that the rationale of *Pepper* suggests that under pre-Bankruptcy Code law, a bankruptcy court was authorized to disallow a portion of a fiduciary's claim when the disallowance would produce an equitable result.[914] The court found it unnecessary, however, to resolve whether equitable "disallowance" remains an available remedy under the Bankruptcy Code.[915]

Later, in *Congoleum Corp. v. Pergament (In re Congoleum Corp.)*, the issue of equitable disallowance was again raised when a debtor sought to avoid as preferential transfers and postpetition transfers liens and security interests granted to asbestos claimants.[916] On previous occasions, the debtor had entered into agreements to settle asbestos claims asserted against it by assigning to the claimants certain unidentified insurance proceeds or granting security interests in

---

[911]    160 F.3d 982, 985 (3d Cir. 1998).

[912]    *Id.* at 987.

[913]    *Id.* at 991 n.7.

[914]    *Id.*

[915]    *Id.*

[916]    2007 Bankr. LEXIS 4357, at *6 (Bankr. D.N.J. Dec. 28, 2007).

certain insurance policy collateral.[917] The debtor sought to equitably disallow the settled claims under Bankruptcy Code section 510(c), arguing that this provision allows for equitable disallowance of claims under principles of equitable subordination.[918] The New Jersey Bankruptcy Court disagreed, explaining that equitable subordination and equitable disallowance are "two distinct concepts," and section 510(c) deals solely with equitable subordination.[919] Indeed, "[w]hile equitable disallowance is a means by which a claim may be invalidated, equitable subordination focuses on altering the order of payment of a claim, which in turn presupposes that a valid claim already exists."[920] The court referred to the Third Circuit's discussion of equitable disallowance in *Citicorp Venture Capital Ltd.* and concluded that it remains unclear whether equitable disallowance may be raised under section 510(c).[921] The court addressed appropriate treatment of the asbestos claimants' claims under principles of equitable subordination.[922] Whether or not equitable disallowance is available within the Third

---

[917]  *Id.* at *3 & *4.

[918]  *Id.* at *32.

[919]  *Id.* at *32, *33 ("To allow equitable disallowance under the guise of equitable subordination would be contradictory.").

[920]  *Id.* at *32-33.

[921]  *Id.* at *33-34.

[922]  *Id.* at *33-34. The courts of the Second Circuit have also considered the viability of equitable disallowance as a remedy in bankruptcy proceedings. In *Adelphia Communications Corp.*, the bankruptcy court discussed equitable disallowance as a remedy, finding that disallowance "would be permissible in those extreme instances – perhaps very rare – where it is necessary as a remedy." *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 365 B.R. 24, 73 (Bankr. S.D.N.Y. 2007), *aff'd sub nom. Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008), *aff'd*, 2010 WL 2094028 (2d Cir. May 26, 2010). In *Adelphia Communications Corp.*, the creditors' committee and equity committee asserted claims against lenders and investment banks, seeking to equitably subordinate and/or disallow the lenders' claims because the lenders had aided and abetted management in breaching its fiduciary duties and allowing constructively fraudulent transfers. *Adelphia Commc'ns Corp.*, 365 B.R. at 73. The court reasoned that although Bankruptcy Code section 510(c) expressly authorizes equitable subordination but does not likewise authorize equitable disallowance, it was not in a position to conclude that Congress intended to foreclose the possibility of disallowance in light of *Pepper* and its progeny. *Id.* at 73. The court also emphasized that subordination and disallowance were linked by an "or" no less than five times in the *Pepper* decision, showing that the Court perceived the remedies to be separate, distinct, and uniquely available. *Id.* Thus, although disallowance was "plainly" a "more draconian" remedy, it would be appropriate in "just a few" situations, and might be proper only when it represents the "most measured means" to correct the claimed inequity. *Id.* The court agreed that equitable disallowance was

Circuit, this remedy requires creditor misbehavior at least as repugnant as that which would warrant equitable subordination

> 3.    **Application of Legal Standards.**
>
>> a.    **Examiner's Conclusions and Explanation Concerning LBO Lender Debt.**

**Examiner's Conclusions:**  Based on the evidence adduced in the Investigation, a court is somewhat unlikely to exercise its equitable discretion to subordinate the claims of the LBO Lenders in the Chapter 11 Cases pursuant to Bankruptcy Code section 510(c).  However, for the reasons discussed below, the Examiner believes that additional investigation is warranted.

**Explanation of Examiner's Conclusions**:

<center>*Redacted*</center>

<center>332</center>

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

### b.    Examiner's Conclusions and Explanation Concerning EGI-TRB Note Claims.

**Examiner's Conclusions:**  A court is reasonably unlikely to exercise its equitable discretion to subordinate the EGI claims in the Chapter 11 Cases pursuant to Bankruptcy Code section 510(c).

**Explanation of Examiner's Conclusions:**

The Examiner did not find any plausible basis in the record to justify equitable subordination of the EGI-TRB Notes, which is contractually subordinated to most indebtedness in any event.  The Zell Group proposed an aggressive, highly-leveraged transaction that failed and ended up in bankruptcy.  EGI lost a lot of money.  These are not grounds to equitably subordinate the EGI-TRB Notes beyond their already broad contractual subordination.

*Redacted*

4.    **Examiner's Conclusions and Explanation Concerning Equitable Disallowance.**

**Examiner's Conclusions:**                        *Redacted*

**Explanation of Examiner's Conclusions:**

The Examiner reaches these conclusions for the same reasons as his conclusions on the question of equitable subordination.

E.    **Common Law Claims.**

1.    **Examiner's Conclusions and Explanation Concerning Choice of Law/Choice of Forum Issues Presented by Common Law Claims.**

**Examiner's Conclusions:**

As a threshold matter in evaluating the various common law claims and defenses asserted by the Parties, the Examiner determined the law applicable to each claim. The Examiner applied the choice of law rules of the State of Delaware, as the forum state,[941] and also considered any choice of law arguments raised by the Parties. The Examiner's conclusions regarding the law applicable to each common law claim are set forth below.[942]

---

[941] *See Charan Trading Corp. v. Uni-Marts, LLC (In re Uni-Marts, LLC)*, 399 B.R. 400, 414 n.4 (Bankr. D. Del. 2009) (*citing Pickett v. Integrated Health Servs., Inc. (In re Integrated Health Servs., Inc.)*, 304 B.R. 101, 106 (Bankr. D. Del. 2004), *aff'd*, 233 F. App'x 115 (3d Cir. 2007)).

[942] No Party argued that any of the common law claims addressed in the Report should or would be commenced in a forum other than the Bankruptcy Court. Consistent with the scope of the Investigation, therefore, the Examiner assumes that any such claims would be brought in that court.

**Explanation of Examiner's Conclusions:**

### a.    Breach of Fiduciary Duty.

The Examiner concludes that a court is highly likely to apply Delaware law in evaluating any claim for breach of fiduciary duty.[943]  By incorporating in Delaware, an entity submits to the application of Delaware law for the governance of the corporation's internal affairs, including the nature and scope of the fiduciary duties owed by the corporation's directors and officers.[944]  Tribune is a Delaware corporation with its corporate headquarters located in Illinois.[945]  Delaware law, therefore, governs the fiduciary duties of the Company's officers, directors and controlling shareholders.[946]  Delaware law likewise governs the fiduciary duties of the officers and directors of those Subsidiary Guarantors incorporated in Delaware.[947]

### b.    Aiding and Abetting Breach of Fiduciary Duty.

In evaluating any claim for aiding and abetting breach of fiduciary duty, the Examiner concludes that a court is highly likely to apply Delaware law, with additional reference to the law

---

[943]  Certain Parties contended that breach of fiduciary duty claims can be asserted against the officers and directors of Tribune, the officers and directors of the Subsidiary Guarantors, the Large Stockholders, and the Zell Group. All Parties applied Delaware law in their analyses of breach of fiduciary duty claims without addressing whether another state's law could or should apply.

[944]  *See Teleglobe Commc'ns Corp. v. BCE, Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 386 (3d Cir. 2007) ("Under the internal affairs doctrine, anyone controlling a Delaware corporation is subject to Delaware law on fiduciary obligations to the corporation and other relevant stakeholders."); *In re Topps Co. S'holders Litig.*, 924 A.2d 951, 960 (Del. Ch. 2007) (Strine, V.C.) (explaining that the law of fiduciary obligations is one of the most important ways a state regulates a corporation's internal affairs); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 306 (1971).

[945]  Ex. 4 at 1 (Tribune 2007 Form 10-K).

[946]  *See Topps Co. S'holders Litig.*, 924 A.2d at 959-60 (describing Delaware's "compelling public policy interest" in regulating the internal affairs of Delaware corporations by establishing the parameters of the fiduciary duties of directors).

[947]  Although several Parties noted the possibility of claims for breach of fiduciary duty against officers and directors of Subsidiary Guarantors, the only director of a Subsidiary Guarantor actually identified as a potential target of such a claim was David Williams, who served as a director of TMS Entertainment Guides, Inc. and Tribune Media Services, Inc. at the closing of Step One and Step Two. *See* Ex. 967 (Subsidiary Board Member Chart). TMS Entertainment Guides, Inc. and Tribune Media Services, Inc. are both incorporated in Delaware.

of Illinois.[948] Delaware has adopted the "most significant relationship" test set forth in the

Restatement (Second) of Conflict of Laws for analyzing the law applicable to tort claims.[949] The

most significant relationship test provides that "[t]he rights and liabilities of the parties with

respect to an issue in tort are determined by the local law of the state which, with respect to that

issue, has the most significant relationship to the occurrence and the parties."[950] In making this

evaluation, a court must take into account:[951]

> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties; and
>
> (d) the place where the relationship, if any, between the parties is centered.

Here, the Tribune Board often convened in person in Chicago, Illinois, with the Financial

Advisors in attendance.[952] The Company's headquarters also are located in Illinois, and various

---

[948] The Parties argued that claims for aiding and abetting breach of fiduciary duty can be asserted against the Large Stockholders, the LBO Lenders, the Financial Advisors, the Zell Group, and the officers and directors of Tribune and the Subsidiary Guarantors. Most of the Parties applied Delaware law in their analyses of aiding and abetting breach of fiduciary duty claims without addressing whether another state's law could or should apply. Two Parties, in their reply briefs, cited to authorities in multiple jurisdictions but did not address choice of law.

[949] *See Travelers Indem. Co. v. Lake*, 594 A.2d 38, 46-47 (Del. 1991) (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 6, 145 (1971)). In adopting the Restatement, the *Travelers* court overruled the law of Delaware which, to that point, had utilized the *lex loci delicti* rule. *Travelers Indem. Co.*, 594 A.2d at 46-47.

[950] RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(1) (1971). When there is no statutory directive, the factors relevant to the choice of the applicable rule of law include: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability, and uniformity of result, and (g) ease in the determination and application of the law to be applied. *Id.* § 6(2).

[951] *Travelers Indem. Co.*, 594 A.2d at 47; *see* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971). These contacts are to be evaluated according to their relative importance with respect to the particular matter at issue.

[952] *See* Ex. 93 at TRB0434048 (Tribune Board Meeting Minutes, dated September 21, 2006) (reflecting meeting held at Tribune Tower); Ex. 94 at TRB0434065 (Tribune Board Meeting Minutes, dated October 18, 2006) (same); Ex. 246 at TRB0434077 (Tribune Board Meeting Minutes, dated December 12, 2006) (same); Ex. 67 at TRB0415614 (Tribune Board Meeting Minutes, dated February 13, 2007) (same); Ex. 643 at TRB0415663 (Tribune Board Meeting Minutes, October 17, 2007) (same); Ex. 727 at TRB0415676 (Tribune Board Meeting

events relating to the Leveraged ESOP Transactions transpired in Illinois.[953] On this basis, one

Party suggested that Illinois law should govern an aiding and abetting fiduciary duty claim. The

relevant contacts point to Delaware and Illinois, but do not weigh heavily in favor of applying

the law of either jurisdiction.[954] The Examiner need not decide this issue, however, because the

elements of aiding and abetting breach of fiduciary duty are substantially similar under Delaware

and Illinois law.[955] In these circumstances, when there is no actual conflict between the laws of

the different jurisdictions, a choice of law analysis under Delaware's most significant relationship

test is unnecessary.[956] Instead, the Examiner may apply the law of the forum state[957] or refer to

---

Minutes, dated December 4, 2007) (same); Ex. 11 at TRB0415683 (Tribune Board Meeting Minutes, dated December 18, 2007) (same).

[953]  *See* Ex. 4 at 1 (Tribune 2007 Form 10-K); *see also* Report at §§ III.A.1 and III.D.16.

[954]  *See LaSala v. Bordier et Cie*, 519 F.3d 121, 130-32 (3d Cir. 2008) (holding, under Delaware law, that a complaint sufficiently alleged harm to a Delaware corporation in Delaware arising from an alleged breach of the duty of loyalty by the corporation's directors that led to bankruptcy). No Party argued for the application of New York law to aiding and abetting breach of fiduciary duty claims, and, as such, the Examiner did not evaluate whether New York law should apply. *See In re Am. Int'l Grp., Inc. Consol. Derivative Litig.*, 976 A.2d 872, 882 & n.17 (Del. Ch. 2009) (applying Delaware law, as the law of the forum state, when the parties "tacitly concede[d] that Delaware law is applicable" by failing to brief the issue whether another state's law should apply).

[955]  *Compare Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1038-39 (Del. Ch. 2006) (observing that a plaintiff pleading an aiding and abetting breach of fiduciary duty claim must prove "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) knowing participation in that breach by the nonfiduciary") (citing *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 72 (Del. 1995)), *with Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (stating, in evaluating viability of aiding and abetting breach of fiduciary duty claim, that "[u]nder Illinois law, to state a claim for aiding and abetting, one must allege (1) the party whom the defendant aids performed a wrongful act causing an injury, (2) the defendant was aware of his role when he provided the assistance, and (3) the defendant knowingly and substantially assisted the violation") (*citing Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 767 (Ill. App. Ct. 2003)).

[956]  *See Kronenberg v. Katz*, 872 A.2d 568, 589 (Del. Ch. 2004) ("Where the choice of law would not influence the outcome, the court may avoid making a choice.") (footnote omitted); *see also Pa. Emp. Benefit Trust Fund v. Zeneca*, 2010 U.S. Dist. LEXIS 44413, at *12-14 (D. Del. May 6, 2010) (collecting cases concluding that if no actual conflict exists upon examination of competing laws proposed by the parties, there is a "false conflict" and no choice of law analysis is necessary).

[957]  *See Zeneca*, 2010 U.S. Dist. LEXIS 44413, at *46 n.9 (noting that defaulting to the law of the home forum in the event of a false conflict "is another way of stating that applying the law of the foreign jurisdiction is unnecessary as the substance of the law is consistent with the home forum"); *cf. Eckmar Corp. v. Malchin*, 297 A.2d 446, 449 (Del. Ch. 1972) (choosing to apply Delaware law, as the law of the forum, where defendant argued that New York law should apply but "made no record showing that New York law is any different than our own").

the laws of both states interchangeably in addressing the Parties' claims of aiding and abetting breach of fiduciary duty.[958]

### c.    Unjust Enrichment.

In evaluating any claim for unjust enrichment, the Examiner concludes that a court is highly like to apply Delaware law, with additional reference to the law of Illinois.[959] Delaware courts use the most significant relationship test to determine the law applicable to restitution claims.[960] In the context of such a claim, the courts evaluate contacts including (a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship; (b) the place where the benefit or enrichment was received; (c) the place where the act conferring the benefit or enrichment was done; (d) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (e) the place where a physical thing, such as land or chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.[961]

Certain Parties asserted that based upon this analysis, Illinois law should apply. As in the case of aiding and abetting claims, however, the relevant contacts point to the application of

---

[958] *See Zeneca*, 2010 U.S. Dist. LEXIS 44413, at *44-*46 (collecting cases holding that when a "false conflict" exists, the court is free to refer to the laws of the competing jurisdictions interchangeably).

[959] Certain Parties that addressed the choice of law issue with respect to an unjust enrichment claim argued that Illinois law should apply. Other Parties contended that a choice of law analysis was unnecessary because unjust enrichment claims are preempted.

[960] *See Landis v. Sci. Mgmt. Corp.*, 1991 Del. Ch. LEXIS 19, at *8 (Del. Ch. Ct. Feb. 15, 1991) ("The first step in the analysis of the unjust enrichment claim is to determine the appropriate choice of law. Delaware follows the 'most significant relationship' test of the Restatement (Second) of Conflict of Laws § 221 (1971) to determine the law applicable to unjust enrichment claims.") (citing *Hurst v. Gen. Dynamics Corp.*, 583 A.2d 1334, 1338 (Del. Ch. 1990)).

[961] RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 221 (1971). These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Delaware and Illinois law, with neither jurisdiction heavily favored.[962]  In any event, the

Examiner need not decide this issue because the elements of unjust enrichment are substantially

similar under Delaware and Illinois law.[963]  Because there is no actual conflict between the laws

of the different jurisdictions, a choice of law analysis under Delaware's most significant

relationship test is unnecessary.[964]  Instead, as with the aiding and abetting claims, the Examiner

concludes that a court is highly likely to apply Delaware law[965] or refer to the laws of Delaware

and Illinois interchangeably in considering the Parties' unjust enrichment claims.[966]

---

[962]  No Party proposed that New York law should apply to unjust enrichment claims.  The Examiner, therefore, did not evaluate the application of New York law.  *See In re Am. Int'l Group, Inc. Consol. Derivative Litig.*, 976 A.2d 872, 882 & n.17 (Del. Ch. 2009).

[963]  *Compare Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128, 145 (Bankr. D. Del. 2005) ("To support a claim for unjust enrichment, the plaintiff must establish that the defendant received a benefit, that the defendant was aware of the benefit, and that the benefit was accepted by the defendant under circumstances that would make the acceptance inequitable without payment for its value."), *and Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999) (stating that unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good conscience") (quotations & citations omitted), *with Vinarov v. Motorola, Inc.*, 2008 U.S. Dist. LEXIS 25363, at *39 (N.D. Ill. Mar. 26, 2008) ("The essential elements of a claim for unjust enrichment include plaintiff conferring a benefit on defendant, defendant accepting that benefit, and circumstances where defendant's retention of the benefit 'violates fundamental principles of justice, equity, and good conscience.'") (quoting *Johnson v. Gudmundsson*, 35 F.3d 1104, 1114 (7th Cir. 1994)), *and Douglass v. Wones*, 458 N.E.2d 514, 521 (Ill. App. Ct. 1983) (stating that unjust enrichment consists of the "unjust retention of a benefit . . . by one party to the detriment of another party, against the fundamental principles of justice, equity, and good conscience") (citation omitted).

[964]  Indeed, the one Party that argued that Illinois law should apply acknowledged that the relevant principles underlying the doctrine of unjust enrichment are the same under Delaware and Illinois law.  *See also Kronenberg*, 872 A.2d at 589; *see also Zeneca*, 2010 U.S. Dist. LEXIS 44413, at *12-14.  *Cf. Phoenix Canada Oil Co. Ltd. v. Texaco Inc.*, 560 F. Supp. 1372, 1379-83 (D. Del. 1983) (applying "most significant relationship" test to determine law applicable to unjust enrichment claim where actual conflict existed between the laws of New York and Ecuador), *aff'd in relevant part, vacated in part on other grounds*, 842 F.2d 1466, 1473 (3d Cir. 1988).

[965]  *See Zeneca*, 2010 U.S. Dist. LEXIS 44413, at *12-14.

[966]  *See id.* at *46 n.9.

#### d.     Illegal Corporate Distributions.

In evaluating any claim arising under the Delaware General Corporation Law, the Examiner concludes that it is highly likely (if not certain) that a court will, by definition, apply Delaware law.[967]

#### e.     Professional Malpractice Claims.

In evaluating a professional malpractice claim, the Examiner concludes that it is highly likely a court will apply the law of Illinois.[968]

Under Delaware choice of law principles, when parties have designated in their contract the law applicable to disputes under that contract, such a provision "must be respected as long as the law selected 'bears some material relationship to the transaction.'"[969] "When the fact of Delaware incorporation has no bearing on the parties' relationship, and they have agreed to a broad choice of law provision that logically governs the claims brought before a Delaware court and that selects another state's law to govern," a Delaware court must apply the law selected in the parties' agreement.[970]

The VRC engagement letter selected Illinois law as the governing law for "[t]his agreement and any claim related directly or indirectly to this agreement (including any claim concerning advice provided pursuant to this agreement) . . . ."[971] No Party argued that the fact of

---

[967] *See* DEL. CODE ANN. tit. 8, § 160(a)(1) (2010). Certain of the Parties raised statutory claims under the Delaware General Corporation Law challenging the legality of Tribune's purchase or redemption of its own stock or payment of dividends as illegal corporate distributions.

[968] According to one of the Parties, the Debtors have a strong claim against VRC under Illinois law for negligence or professional malpractice arising from VRC's work on its solvency opinions. Another Party briefly addressed the possibility of professional malpractice claims against VRC or other advisors to the Company, citing cases in the federal district courts of Texas and New York, but did not address the question of which state's law should apply.

[969] *Weil v. Morgan Stanley DW Inc.*, 877 A.2d 1024, 1032 (Del. Ch. 2005) (quoting *Annan v. Wilmington Trust Co.*, 559 A.2d 1289, 1293 (Del. 1989)).

[970] *Weil*, 877 A.2d at 1035.

[971] Ex. 267 at Ex. 1 (VRC Solvency Engagement Letter, dated April 11, 2007).

345

the Company's Delaware incorporation bears on the contractual relationship between Tribune and VRC. Likewise, no Party disputed the efficacy of the choice of law provision in the VRC engagement letter.[972] Moreover, the Examiner finds that the choice of law provision in the VRC engagement letter is framed in terms that are sufficiently broad to encompass a claim of professional malpractice against VRC.[973] Thus, the Examiner will apply Illinois law to evaluate potential professional malpractice claims against VRC.

### 2.    Breach of Fiduciary Duty.

#### a.    Legal Standard for Breach of Fiduciary Duty Claims.

It is a fundamental principle of Delaware law that the business and affairs of a corporation are managed by or under the direction of its board of directors.[974] With this power comes "certain fundamental fiduciary obligations to the corporation and its shareholders."[975] In their management of the corporation, "directors are charged with an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders."[976] The appropriate discharge of this obligation will "depend[] upon the specific context that gives occasion to the board's exercise of its business judgment."[977] The fiduciary duties of directors

---

[972] *See Edelist v. MBNA Am. Bank*, 790 A.2d 1249, 1255-56 (Del. Super. Ct. 2001) (analyzing "most significant relationship" factors when plaintiff disputed the effectiveness of a choice of law provision in defendant's credit card agreement, and concluding that choice of law clause was effective).

[973] Ex. 267 at Ex. 1 (VRC Solvency Engagement Letter, dated April 11, 2007).

[974] *See* DEL. CODE ANN. tit. 8, § 141(a) (2010) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation."); *see also Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 366 (Del. 2006); *McMullin v. Beran*, 765 A.2d 910, 916 (Del. 2000) (citations omitted).

[975] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (footnote omitted), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) [hereinafter, *Brehm I*].

[976] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1994); *see also N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) (stating that "fiduciary duties of the directors of a Delaware corporation are unremitting").

[977] *McMullin*, 765 A.2d at 918.

extend even after they resign from the board of directors,[978] and can compel them to oppose a

transaction, even when there is a slight conflict of interest.[979]

Officers of Delaware corporations owe fiduciary duties identical to those of directors.[980]

Moreover, fiduciary duties extend to any shareholder who exercises "a 'dominant' position and/or

actually 'controlled' the corporation's conduct."[981] Thus, a shareholder who owns a majority

interest in, or exercises control over the business and affairs of, the corporation owes fiduciary

duties to minority shareholders.[982]

### (1)    The Business Judgment Rule and the Entire Fairness Doctrine.

The business judgment rule embodies the "presumption that in making a business

decision the directors of a corporation acted on an informed basis, in good faith and in the honest

---

[978]  *FDIC v. Barton*, 1998 U.S. Dist. LEXIS 5203, at *19-22 (E.D. La. Apr. 8, 1998).

[979]  *Dalton v. Am. Inv. Co.*, 1981 Del. Ch. LEXIS 647, at *2-7 (Del. Ch. June 4, 1981).

[980]  *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009).

[981]  *See Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128, 142 (Bankr. D. Del. 2005). The concepts of "dominance" and "control" are given their "ordinary meaning," and, "at a minimum . . . imply (in actual exercise) a direction of corporate conduct in such a way as to comport with the wishes or interest of the corporation (or persons) doing the controlling." *Id.* (quotations & citation omitted).

[982]  *See Kahn v. Lynch Commc'ns. Sys., Inc.*, 638 A.2d 1110, 1113-14 (Del. 1994). Generally, a shareholder who owns less than 50% of a corporation's outstanding stock does not, without more, owe fiduciary duties. *See Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984) (citing *Osofsky v. J. Ray McDermott & Co.*, 725 F.2d 1057 (2d Cir. 1984)). Rather, "[f]or a dominating relationship to exist in the absence of controlling stock ownership, a plaintiff must allege domination by a minority shareholder through actual control of corporat[e] conduct." *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989); *see also Kahn*, 638 A.2d at 1114-15 (46% shareholder found to be controlling on the basis of several facts, including that shareholder designated directors to five of the eleven board seats); *Solomon v. Armstrong*, 747 A.2d 1098, 1117 n.61 (Del. Ch. 1999) (stating that domination requires "literal control of corporate conduct"), *aff'd*, 746 A.2d 277 (Del. 2000); *Kaplan v. Centex Corp.*, 284 A.2d 119, 122 (Del. Ch. 1971); *see also In re W. Nat'l Corp. S'holders Litig.*, 2000 Del. Ch. LEXIS 82, at *25 (Del. Ch. May 22, 2000) (finding a shareholder to be non-controlling on the basis of several factors, including that none of the shareholder's "managers, employees, agents, or even nominees sat on [the allegedly controlled entity's] board of directors"); *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 913 (Del. Ch. 1999) (finding a 49% shareholder to be a controlling shareholder on the basis of several facts, including that two of the four directors of the controlled entities had conflicts of interest in the challenged transaction). In this regard, courts have held that designation of directors to the board of directors or entering into business agreements with an investee is not sufficient shareholder conduct, without more, to trigger a finding of "controlling" status; it is likewise insufficient to allege that shareholders were part of a "controlling group" because they had "parallel interests." *See Williamson v. Cox Commc'ns, Inc.*, 2006 Del. Ch. LEXIS 111, at *23 (Del. Ch. June 5, 2006) (citing *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 550-51 (Del. Ch. 2003)); *see also Kennedy v. Venrock Assocs.*, 348 F.3d 584, 590-91 (7th Cir. 2003).

347

belief that the action taken was in the best interests of the company."[983]  This presumption

attaches to "a director-approved transaction within a board's conferred or apparent authority in

the absence of any evidence of 'fraud, bad faith, or self-dealing in the usual sense of personal

profit or betterment.'"[984]  The presumption strongly favors the actions taken by directors, such

that a court will not "substitute its judgment for that of the board if the [board's] decision can be

attributed to any rational business purpose."[985]  Instead, when the business judgment rule's

presumption applies, "a corporate officer or director is not legally responsible to the corporation

for losses that may be suffered as a result of a decision that an officer made or that directors

authorized in good faith."[986]  The rule thus achieves two salutary ends:  it avoids judicial

intervention "into a management role for which [the courts] were neither trained nor competent,"

and it shields entrepreneurial and even risky decisions, provided those decisions were made with

due care and in good faith.[987]

---

[983]  *McMullin*, 765 A.2d at 916 (quotations & citations omitted); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

[984]  *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1994) (citation omitted); *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 64 (Del. 1989) (citations omitted).

[985]  *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1373 (Del. 1995) (quoting *Unocal Corp. v. Mesa Petrol. Co.*, 493 A.2d 946, 954 (Del. 1985)); *see also Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 327 B.R. 537, 549 (D. Del. 2005) *aff'd*, 278 F. App'x 125 (3d Cir. 2008).  One way to show that a decision cannot "be attributed to any rational business purpose" is to establish waste.  *See Brehm v. Eisner (In re Walt Disney Co. Deriv. Litig.)*, 906 A.2d 27, 73-74 (Del. 2006) [hereinafter *Brehm II*].  Waste is rarely found in Delaware, however, as the standard imposes the heavy burden to demonstrate "the rare, unconscionable case where directors irrationally squander or give away corporate assets." *Id.* at 74 (quotations & citations omitted).  In these Chapter 11 Cases, no Party has alleged waste.

[986]  *See Continuing Creditors' Comm. of Star Telecommc'ns, Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 458 (D. Del. 2004) (quotations & citations omitted); *see also Cede & Co.*, 634 A.2d at 361 (noting that when business judgment rule attaches, "our courts will not second-guess these business judgments").

[987]  *See Edgecomb*, 385 F. Supp. 2d at 458; *see also Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 193 (Del. Ch. 2006) ("The business judgment rule exists precisely to ensure that directors and managers acting in good faith may pursue risky strategies that seem to promise great profit."), *aff'd sub. nom Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007); *McMullin*, 765 A.2d at 916 ("The business judgment rule . . . combines a judicial acknowledgement of the managerial prerogatives that are vested in the directors of a Delaware corporation by statute with a judicial recognition that the directors are acting as fiduciaries in discharging their statutory responsibilities to the corporation and its shareholders.") (citations omitted); *Cede & Co.*, 634 A.2d at 360 ("The rule operates to preclude a court from imposing itself unreasonably on the business and affairs of a corporation."); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) ("The business judgment rule is an acknowledgement of the managerial prerogatives of Delaware directors . . . .").

The presumption erected by the business judgment rule is rebuttable. The burden of rebuttal lies initially with the contesting plaintiff who must demonstrate that the directors, in reaching the decision under attack, "breached any one of the triads of their fiduciary duty – good faith, loyalty or due care."[988] If the contesting plaintiff is unable to carry this burden, "the business judgment rule attaches to protect corporate officers and directors and the decisions they make."[989] Conversely, if the plaintiff succeeds in carrying this burden, the business judgment rule presumption falls away[990] and "the burden shifts to the defendant directors, the proponents of the challenged transaction, to prove to the trier of fact the 'entire fairness' of the transaction to the shareholder plaintiff."[991]

"Entire fairness" is an "unflinching" inquiry[992] that requires the contested transaction to be a product of both fair dealing and fair price.[993] Fair dealing embraces "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and

---

[988] *Cede & Co.*, 634 A.2d at 361; *accord Brehm II*, 906 A.2d at 52; *McMullin v. Beran*, 765 A.2d 910, 917 (Del. 2000); *Aronson*, 473 A.2d at 812. Note, however, that the Supreme Court of Delaware has since instructed that the first component of this triad, the duty of good faith, is subsumed under the duty of loyalty. *See Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006). *See* Report at § IV.E.2.a.(2).

[989] *Cede & Co.*, 634 A.2d at 361; *see McMullin*, 765 A.2d at 917 (noting that if it attaches, the rule "operates to protect the individual director-defendants from personal liability for making the board decision at issue") (citation omitted).

[990] Successfully rebutting the business judgment rule presumption "does <u>not</u> create *per se* liability on the part of the directors." *McMullin*, 765 A.2d at 917 (emphasis added). It merely shifts the burden back to the directors to substantively defend their actions. *Id.*

[991] *Cede & Co.*, 634 A.2d at 361; *accord Brehm II*, 906 A.2d at 52; *McMullin*, 765 A.2d at 917. Note that the use of a special committee can operate to shift the burden of proving entire fairness back onto the plaintiff or accusing party. *See In re Tele-Commc'ns, Inc. S'holders Litig.*, 2005 Del. Ch. LEXIS 206, at *33 (Del. Ch. Dec. 21, 2005). The party accused of breaching a fiduciary duty must, however, show that the special committee "was truly independent, fully informed, and had the freedom to negotiate at arm's length." *Id.* at *33. *Accord In re Cox Radio, Inc. S'holders Litig.*, 2010 Del. Ch. LEXIS 102, at *43 (Del. Ch. May 6, 2010) (same). If this test cannot be met, then the burden will not shift and will remain with the party accused of breaching a fiduciary duty. *See In re Tele-Commc'ns., Inc. S'holders Litig.*, 2005 Del. Ch. LEXIS 206, at *33.

[992] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983).

[993] *Cede & Co.*, 634 A.2d at 361; *Weinberger*, 457 A.2d at 711; *Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 327 B.R. 537, 549 (D. Del. 2005) *aff'd*, 278 F. App'x 125 (3d Cir. 2008).

how the approvals of the directors and the stockholders were obtained."[994]  Fair price

encompasses "the economic and financial considerations of the proposed [transaction], including

all relevant factors:  assets, market value, earnings, future prospects, and any other elements that

affect the intrinsic or inherent value of a company's stock."[995]  Although implicating two

different concepts (fair dealing and fair price), the entire fairness inquiry is "not a bifurcated one"

but instead "[a]ll aspects of the issue must be examined as a whole since the question is one of

entire fairness."[996]  When the transaction at issue involves the sale of the corporation, the

directors must establish that "the price offered was the highest value reasonably available under

the circumstances,"[997] though there is "no single blueprint" for accomplishing that end.[998]

      The "entire fairness" standard also applies when examining the propriety of a transaction

involving a dominating or controlling shareholder.[999]  The initial burden of establishing entire

fairness rests upon the dominating or controlling shareholder who stands on both sides of the

transaction.[1000]  Approval of the transaction by an independent committee of directors or an

informed majority of minority shareholders, however, shifts the burden of proof on the issue of

fairness away from the dominating or controlling shareholder to the party challenging the

transaction.[1001]  Even when such a transaction receives the informed approval of a majority of

---

[994] *Weinberger*, 457 A.2d at 711.

[995] *Id.* (citations omitted).

[996] *Id.*

[997] *Cede & Co.*, 634 A.2d at 361; *see McMullin v. Beran*, 765 A.2d 910, 918 (Del. 2000) (describing the directors' fiduciary obligation "to *seek* the best value reasonably available to the stockholders when the *board* is engaged in the process of selling the corporation") (emphasis in original).

[998] *McMullin*, 765 A.2d at 918 (citations omitted).

[999] *Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1114 (Del. 1994) (citing *Weinberger*, 457 A.2d at 710-11); *see also Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 937 (Del. 1985).

[1000] *Kahn*, 638 A.2d at 1114.

[1001] *See Rosenblatt*, 493 A.2d at 937-38.

minority shareholders or an independent committee of disinterested directors, however, an entire fairness analysis is the only proper standard of judicial review.[1002]

### (2)    The Duty of Loyalty Under Delaware Law.

As noted above, Delaware law recognizes a "triad" of fiduciary duties: (1) good faith; (2) loyalty; and (3) care.[1003]  Only the second and third of these, however, may lead directly to liability if breached.  The duty of good faith is subsumed in the duty of loyalty, and a breach of good faith is ordinarily redressed as a violation of the fiduciary's duty of loyalty.[1004]  A breach of these fiduciary duties is pivotal in framing the proper evaluation of liability claims against a corporation's directors and officers because, as noted above, such a breach by a director or officer rebuts the presumption of the business judgment rule, thereby subjecting the challenged action to an entire fairness review.[1005]

The contours of and rationale underlying the duty of loyalty are articulated in the seminal case of *Guth v. Loft, Inc.*[1006] in an oft-quoted passage:[1007]

> Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. . . .  A public policy, existing through the years, and derived from a profound knowledge of human characteristics and

---

[1002] *See Rosenblatt*, 493 A.2d at 937-38.

[1003] *Cede & Co.*, 634 A.2d at 361 (citations omitted); *see also Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 327 B.R. 537, 549 (D. Del. 2005), *aff'd*, 278 F. App'x 125 (3d Cir. 2008).

[1004] *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006); *see also Continuing Creditors' Comm. of Star Telecommc'ns, Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 460 n.9 (D. Del. 2004) (holding that the duty of good faith and the duty of loyalty "are identical").  The Supreme Court of Delaware explained this composition: "although good faith may be described colloquially as part of a 'triad' of fiduciary duties that includes the duties of care and loyalty, the obligation to act in good faith does not establish an independent fiduciary duty that stands on the same footing as the duties of care and loyalty.  Only the latter two duties, where violated, may directly result in liability, whereas a failure to act in good faith may do so, but indirectly." *Stone*, 911 A.2d at 370 (citations omitted).

[1005] *See Cede & Co.*, 634 A.2d at 361 (citations omitted); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 173 n.138 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006).

[1006] 5 A.2d 503 (Del. 1939).

[1007] *Loft*, 5 A.2d at 510 (quoted in *Cede & Co.*, 634 A.2d at 361).

motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest.

In short, the duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[1008]

In determining whether the business judgment rule attaches, the Delaware courts may conduct two inquiries into directorial loyalty: testing whether the directors or officers were interested[1009] and testing whether they lacked independence.[1010] If interest or non-independence is present, that decision-maker's actions will not receive the presumption of the business judgment rule and are voidable.[1011]

A director is considered interested if he or she appears on both sides of the transaction or if he or she "expect[s] to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally."[1012] Absent self-dealing, however, a benefit received by a director that is not equally received by shareholders is not alone sufficient to establish that the director was interested.[1013] Rather, the

---

[1008] *Cede & Co*, 634 A.2d at 361 (citations omitted); *see also Continuing Creditors' Comm. of Star Telecommc'ns, Inc.*, 385 F. Supp. 2d at 460.

[1009] *See Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 64 (Del. 1989); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984); *see also Benihana of Tokyo, Inc.*, 891 A.2d at 174.

[1010] *See Aronson*, 473 A.2d at 812.

[1011] *See Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002).

[1012] *Aronson*, 473 A.2d at 812 (citations omitted); *see also Continuing Creditors' Comm. of Star Telecommc'ns, Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 460 (D. Del. 2004); *Hechinger*, 327 B.R. at 549; *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002) (citations omitted); *Cede & Co.*, 634 A.2d at 362.

[1013] *Orman*, 794 A.2d at 23.

benefit must be material to the particular challenged director.[1014]  A benefit is material if it "was

significant enough '*in the context of the director's economic circumstances*, as to have made it

improbable that the director could perform [his or her] fiduciary duties to the . . . shareholders

without being influenced by [his or her] overriding personal interest.'"[1015]

Even if a director or officer is interested, however, DGCL section 144(a) establishes a

statutory safe harbor.  This section provides that a corporation's contracts and transactions will

not be made void or voidable just because they were consummated with participation by an

interested director or officer, as long as:  (1) the material facts regarding the director's or officer's

interest or relationship are disclosed to or known by the board, and the board's actions are

ratified, in good faith, by a majority of the disinterested directors; or (2) the material facts

regarding the director's or officer's interest or relationship are disclosed to or known by the

shareholders who then ratify, in good faith, the board's actions.[1016]  A failure to meet either of the

prongs of the statutory safe harbor will render the transaction void or voidable, unless the

interested director or officer can show that the transaction was entirely fair.[1017]  Establishing that

a given transaction complies with DGCL section 144 "only means that the [transaction] is not

---

[1014] *Orman*, 794 A.2d at 23 (citing *Cede & Co.*, 634 A.2d at 363); *see also Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. )*, 327 B.R. 537, 549 (D. Del. 2005) *aff'd*, 278 F. App'x 125 (3d Cir. 2008).

[1015] *Orman*, 794 A.2d at 23 (citations omitted; emphasis in original).

[1016] DEL. CODE ANN. tit. 8, § 144(a)(1)-(2) (2010).

[1017] DEL. CODE ANN. tit. 8, § 144(a)(3) (2010) (providing that, in the absence of informed ratification by either disinterested directors or shareholders, the transaction is not void or voidable if it "is fair as to the corporation as of the time it is authorized, approved or ratified"); *see also Benihana of Tokyo, Inc.*, 891 A.2d at 173 (citations omitted); *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 114 (Del. Ch. 1999) (citing *Cede & Co.*, 634 A.2d at 366 n.34).