void or voidable *solely* because of the conflict of interest."[1018] Indeed, a director or officer might still be held liable for a breach of his or her fiduciary duties.[1019]

The second duty of loyalty inquiry—independence—contemplates that "a director's decision [must be] based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[1020] An extraneous consideration or influence is present when the challenged director is controlled by another person or corporation.[1021] To prove that a director is controlled, a party must assert "facts manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.'"[1022] This can be shown by proving "'that the directors are 'beholden' to [the controlling person] or so under their influence that their discretion would be sterilized.'"[1023] A necessary threshold prerequisite for any such showing is "that the supposedly dominating person actually is interested in the transaction in question."[1024]

---

[1018] *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 185 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006) (emphasis in original).

[1019] *Id.*

[1020] *Aronson*, 473 A.2d at 816 ("While directors may confer, debate, and resolve their differences through compromise, or by reasonable reliance upon the expertise of their colleagues and other qualified persons, the end result, nonetheless, must be that each director has brought his or her own informed business judgment to bear with specificity upon the corporate merits of the issues without regard for or succumbing to influences which convert an otherwise valid business decision into a faithless act."); *see also Orman*, 794 A.2d at 24 (citation omitted).

[1021] *Orman*, 794 A.2d at 24.

[1022] *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984) (citation omitted); *see also Orman*, 794 A.2d at 24 (citation omitted).

[1023] *Orman*, 794 A.2d at 24 (citations omitted).

[1024] *See Continuing Creditors' Comm. of Star Telecommc'ns, Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 462 (D. Del. 2004).

When analyzing an allegation that a director is either interested or lacks independence, the appropriate standard is that of a subjective actual person.[1025] Whether a director is interested or lacks independence must be viewed in light of each particular director's circumstances.[1026]

Notably, proving a breach of the duty of loyalty by one director is not sufficient. Rather, in order to overcome the business judgment rule in favor of an entire fairness review, a party asserting a breach must allege "facts which, if accepted as true, establish that the *board* was either interested in the outcome of the transaction or lacked the independence to consider objectively whether the transaction was in the best interest of its company and all of its shareholders."[1027] To prove that the board was interested or lacked independence, a challenging party "must allege facts as to the interest and lack of independence of the *individual members* of that board."[1028] The party asserting a breach of loyalty must show that a majority of the board of directors had a financial interest in the transaction or were dominated or controlled by a materially-interested director.[1029]

### (3)    The Duty of Disclosure as Part of the Duty of Loyalty Under Delaware Law.

Under certain circumstances, the duty of loyalty includes a duty of disclosure.[1030] This duty does not require disclosure of every known fact about a transaction in which the corporation

---

[1025] *See In re Tele-Commc'ns, Inc. S'holders Litig.*, 2005 Del. Ch. LEXIS 206, at *31 (citations omitted); *Orman*, 794 A.2d at 24 (citations omitted); *see also McMullin v. Beran*, 765 A.2d 910, 923 (Del. 2000) (citations omitted); *Cede & Co. v. Technicolor*, 634 A.2d 345, 364 n.31 (Del. 1993).

[1026] *Orman*, 794 A.2d at 24 (citations omitted).

[1027] *Id.* at 22 (citations omitted); *see also Edgecomb, Inc.*, 385 F. Supp. 2d at 460.

[1028] *Orman*, 794 A.2d at 22.

[1029] *Id.* Such a showing may not always be required. A breach of the duty of loyalty can be established by showing material interest on the part of less than a majority of directors if an interested director failed to disclose his or her interest to the board and, if they had been aware of such an interest, the other board members would have considered that interest a significant fact in evaluating the transaction. *Id.* at 22-23.

[1030] *Hoover Indus., Inc. v. Chase*, No. 9276, 1988 Del. Ch. LEXIS 98, at *6-*7 (Del. Ch. July 13, 1988).

is engaged, but rather involves situations in which the director is personally engaged in a transaction that is "harmful to the corporation, but beneficial to the director."[1031]  Moreover, for the duty to disclose to arise, the director must have "clear knowledge of the information at issue."[1032]  Indeed, in the context of a leveraged buyout transaction, to apply any standard less stringent would unnecessarily expose the participants in such a transaction, "where directors or officers of the seller often emerge as directors and officers of the surviving corporation, to subsequent litigation based on mere speculation that a defendant should have known of some transaction planned by the new company within a few years after the sale, and that the transaction would turn out badly."[1033]

### (4)    The Duty of Care Under Delaware Law.

Under Delaware law, the fiduciary duty of care requires officers and directors, when making business decisions, to consider "all material information reasonably available."[1034]  Failure to meet the duty of care can expose directors to resulting damages, subject to any exculpation the corporation has conferred on directors in its charter.[1035]  Such exculpation will not protect officers.[1036]

---

[1031] *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1184 (Del. Ch. 2006) (citation omitted), *overruled in part on other grounds by N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. 2007).

[1032] *Id.* at 1185 (citations omitted).

[1033] *Id.*

[1034] *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).  This does not impose upon the board the obligation to be informed of every fact.  Rather, it "is responsible for considering only *material* facts that are *reasonably available*, not those that are immaterial or out of the [b]oard's reasonable reach."  *Brehm I*, 746 A.2d at 259.

[1035] *See* Report at § IV.E.2.d.

[1036] *See id.*

Once informed, the officers and directors must act with requisite care in the discharge of their duties.[1037] This obligation that directors "act on an informed basis . . . forms the duty of care element of the business judgment rule."[1038] A court will not find a breach of the duty of care "unless the directors individually and the board collectively have failed to inform themselves fully and in a deliberate manner before voting as a board upon a transaction as significant as a proposed merger or sale of the company."[1039] Nor is the required "due care" of the substantive variety: "Courts do not measure, weigh or quantify directors' judgments. We do not even decide if they are reasonable in this context. Due care in the decision-making context is *process* due care only."[1040] Like the duty of loyalty, a party alleging a breach of the duty of care must show that a majority of the directors failed to exercise due care.[1041]

Negligence alone by the officers and directors will not suffice to prove a breach of the duty of care.[1042] Rather, the officers' and directors' processes must be grossly negligent.[1043] Under Delaware law, gross negligence is defined as "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of

---

[1037] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 367 (Del. 1994) (citation omitted); *Aronson*, 473 A.2d at 812.

[1038] *Cede & Co.*, 634 A.2d at 367.

[1039] *Id.* at 368 (citation omitted).

[1040] *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000) [hereinafter, Brehm I] (citations omitted). Notwithstanding the sweeping nature of this pronouncement, there is a glimpse of "substantive" due care at the far margins of sensibility. *Id.* ("Irrationality is the outer limit of the business judgment rule. Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule.").

[1041] *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 192 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006) (finding no duty of care violation where disinterested, independent directors met and discussed the challenged transaction, considered objections and alternatives, and only then, by a disinterested vote comprising a majority of the board, voted to approve the transaction).

[1042] *Brehm I*, 746 A.2d at 259.

[1043] *McMullin v. Beran*, 765 A.2d 910, 921 (Del. 2000); *Brehm I*, 746 A.2d at 259; *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 66 (Del. 1989); *Aronson v. Lewis*, 473 A.2d 805, 812-13 (Del. 1984); *see Benihana of Tokyo, Inc.*, 891 A.2d at 192 ("Because duty of care violations are actionable only if the directors acted with gross negligence . . . such violations are rarely found.").

reason."[1044]  Proof of grossly negligent conduct that breaches a fiduciary's duty of care would rebut the business judgment rule presumption,[1045] and compel an entire fairness review as described above.[1046]

### (5)    The Statutory Safe Harbor.

In endeavoring to discharge their duty of care, "directors are fully protected in relying in good faith on reports made by officers"[1047] and other experts.  Indeed, by statute, Delaware law provides directors with a safe harbor when relying on data presented to them:[1048]

> A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.

This statute does not, however, permit directors or members of committees designated by the directors to rely blindly on data presented.[1049]  Inherent in this statutory safe harbor is "the presumption that the information provided is both accurate and complete."[1050]  To ensure that presumption is warranted, the directors are bound to make a reasonable inquiry.[1051]  A failure to

---

[1044]  *Benihana of Tokyo, Inc.*, 891 A.2d at 192 (citation omitted).

[1045]  *See McMullin*, 765 A.2d at 921-22; *Benihana of Tokyo, Inc.*, 891 A.2d at 192.  Examples of grossly negligent conduct include, but are not limited to, a failure to ask questions to determine if an opinion was made on a sound basis, and when a board is rushed into decision making.  *See Smith v. Van Gorkom*, 488 A.2d 858, 877-78 (Del. 1985), *overruled on other grounds by Gantler v. Stephens*, 965 A.2d 695 (Del. 2009).

[1046]  *McMullin*, 765 A.2d at 917.

[1047]  *Van Gorkom*, 488 A.2d at 874-75 (citation omitted).

[1048]  DEL. CODE ANN. tit. 8, § 141(e) (2010).

[1049]  *See Van Gorkom*, 488 A.2d at 875 ("[F]or a report to enjoy the status conferred by § 141(e), it must be pertinent to the subject matter upon which a board is called to act, and otherwise be entitled to good faith, not blind, reliance.").

[1050]  *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283-84 (Del. 1989).

[1051]  *Van Gorkom*, 488 A.2d at 875; *see also Mills Acquisition Co.*, 559 A.2d at 1283-84 (Del. 1989) ("[D]ecisions of a board based upon [reliance on] data will not be disturbed when made in the proper exercise of business

do so will destroy any safe harbor available under this statute.[1052] This is particularly true when the board is interested in a challenged transaction:  DGCL section 141(e) does not provide an absolute defense to an interested-party transaction.[1053]

In *Valeant Pharmaceuticals International v. Jerney*, Valeant's former director and president was held liable for approving cash bonuses to the Valeant's former CEO and several other members of the board (including himself).[1054] Although the president admitted that he had an interest in the bonus transaction, he claimed good faith reliance on a compensation expert's report.[1055] The court found that the report was a *factor*, but was not determinative of the entire fairness inquiry.  The court noted the report was based on flawed assumptions and the expert was hand selected by management without appropriate inquiry by the board; thus, it was unreasonable for the board to rely on the report.[1056]

---

judgment.  However, when a board is deceived by those who will gain from such misconduct, the protections girding the decision itself vanish.").

[1052] *See Van Gorkom*, 488 A.2d at 877-78 ("Under § 141(e), the directors were entitled to rely upon their chairman's opinion of value and adequacy, provided that such opinion was reached on a sound basis.  Here, the issue is whether the directors informed themselves as to all information that was reasonably available to them.  Had they done so, they would have learned of the source and derivation of the . . . price and could not reasonably have relied thereupon in good faith. . . .  [T]he record compels the conclusion that . . . the Board lacked valuation information adequate to reach an informed business judgment. . . ."); *see also Mills Acquisition Co.*, 559 A.2d at 1284 ("Decisions made on [the basis of profit-motivated deception] are voidable at the behest of innocent parties to whom a fiduciary duty was owed and breached, and whose interests were thereby materially and adversely affected.").

[1053] *Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 751 (Del. Ch. 2007), *appeal dismissed*, 2007 Del. LEXIS 245 (May 30, 2007).

[1054] 921 A.2d 732 at 735-36.

[1055] *Id.* at 751.

[1056] *Id.*; *see also Boyer v. Wilmington Materials, Inc.*, 754 A.2d 881, 910-11 (Del. Ch. 1999) (holding that directors' reliance on the advice of an attorney Manning that transaction was fair cannot shield them from liability arising out of the unfairness of the transaction because "they had no reason to believe that his firm had been selected with reasonable care by or on behalf of the corporation.") (citing DEL. CODE ANN. tit. 8, § 141(e)).

### b. Effect of Solvency or Insolvency on Breach of Duty Questions Under Delaware Law.

In Delaware, "the general rule is that directors do not owe creditors duties beyond the relevant contractual terms" that define the specific debtor-creditor relationship.[1057]  Indeed, Delaware law recognizes no directorial fiduciary duty owed directly to the corporation's creditors, whether during solvency, a "zone of insolvency," or in insolvency.[1058]  Of course, creditors of an insolvent corporation retain the right — framed for the benefit of the corporation — to initiate and prosecute derivative claims against the corporation's directors for breaching their fiduciary duties.[1059]

At least one Party, relying on the Massachusetts bankruptcy court's opinion in *Brandt v. Hicks, Muse & Co. (In re Healthco International, Inc.)*,[1060] argued that a *direct* fiduciary duty to creditors should nonetheless be recognized when the directors' challenged conduct leaves the corporation with "unreasonably small capital" that is just short of insolvency.  The court in *Brandt* had indeed recognized such a duty, reasoning that: "A distribution to stockholders which renders the corporation insolvent, or leaves it with unreasonably small capital, threatens the very existence of the corporation.  This is prejudicial to all its constituencies, including creditors,

---

[1057] *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007) (internal citations and quotations omitted).

[1058] *Gheewalla*, 930 A.2d at 98-103; *id.* at 99 ("While shareholders rely on directors acting as fiduciaries to protect their interests, creditors are afforded protection through contractual agreements, fraud and fraudulent conveyance law, implied covenants of good faith and fair dealing, bankruptcy law, general commercial law and other sources of creditor rights."); *id.* at 100-01 ("[A]n otherwise solvent corporation operating in the zone of insolvency is one in most need of effective and proactive leadership – as well as the ability to negotiate in good faith with its creditors – goals which would likely be significantly undermined by the prospect of individual liability arising from the pursuit of direct claims by creditors.") (citation omitted).

[1059] *Id.* at 101-03.

[1060] 208 B.R. 288 (Bankr. D. Mass. 1997).

employees, and stockholders retaining an ownership interest."[1061]  Whatever merit the *Brandt*

opinion may possess, however, it does not comport with current Delaware law.

In *Brandt*, the target directors voted to approve a leveraged buyout that produced

significant revenue for shareholders but ultimately led to the corporation's bankruptcy by causing

severe cash shortfalls and loan defaults.[1062]  In bankruptcy, the trustee pursued breach of

fiduciary duty claims against the directors, arguing that the shareholder distributions in the LBO,

in which the voting directors participated, mortally imperiled the corporation in violation of the

directors' fiduciary duties.[1063]  The directors moved for summary judgment on the trustee's claim

against them, arguing that "their sole obligation in connection with the LBO was to attempt to

maximize the consideration passing to [the corporation's] shareholders," and as such, they

enjoyed protection under the business judgment rule.[1064]

In denying the directors' motion for summary judgment, the United States Bankruptcy

Court for the District of Massachusetts reasoned:[1065]

> Normally, what is good for a corporation's stockholders is good for
> the corporation.  But that was hardly true here if the Trustee
> establishes the LBO left [the corporation] insolvent or with
> unreasonably small capital.  When a transaction renders a
> corporation insolvent, or brings it to the brink of insolvency, the
> rights of creditors become paramount.

---

[1061]  *Id.* at 301.

[1062]  *Id.* at 298-99.

[1063]  *Id.* at 299-300.

[1064]  *Id.* at 300.

[1065]  *Id.* at 300 & 301.  The bankruptcy court acknowledged that the LBO may not have rendered the corporation "insolvent" under a strict bankruptcy law definition.  *Id.* at 302.  Nevertheless, the court reasoned that the creditors' fiduciary breach claim remained viable because saddling a corporation with "unreasonably small capital" was as actionable as leaving it facially insolvent: "[A] transaction leaves a company with unreasonably small capital when it creates an unreasonable risk of insolvency, not necessarily a likelihood of insolvency. This is similar to the concept of negligence, which is conduct that creates an unreasonable risk of harm to another's person or property."  *Id.*  The court explained that judging whether "unreasonably small capital" has resulted "typically depends upon the reasonableness of the parties' cash flow projections."  *Id.* (footnotes omitted).  "To be reasonable, the projections must leave some margin for error."  *Id.* (footnotes omitted).

* * *

Requiring directors to look out for the interests of creditors as well as stockholders involves no irreconcilable conflict . . . . It is merely an incident of the fiduciary obligations owed by directors to their corporation. A distribution to stockholders which renders the corporation insolvent, or leaves it with unreasonably small capital, threatens the very existence of the corporation. This is prejudicial to all its constituencies, including creditors, employees, and stockholders retaining an ownership interest. Surely it is not asking too much of directors that they honor their obligations of loyalty and care to avoid the corporation's destruction.

Under Delaware law, a corporation is insolvent if it has: "1) a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof, or 2) an inability to meet maturing obligations as they fall due in the ordinary course of business."[1066] Notably, balance sheet insolvency (the first of these two tests) ordinarily will not constitute legal "insolvency" under Delaware law if it appears that the company has a reasonable prospect of continuing its operations.[1067] As one court explained:[1068]

It is all too common, especially in the world of start-up companies . . ., for a Delaware corporation to operate with liabilities in excess of its assets for that condition to be the sole indicia of insolvency. Defining insolvency to be when a company's liabilities exceed its assets ignores the realities of the business world in which corporations incur significant debt in order to seize business opportunities.

---

[1066] *Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 782 (Del. Ch. 2004) (citations and quotation marks omitted); *see also Teleglobe Commc'ns Corp. v. BCE, Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 384 (3d Cir. 2007); *Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*, 392 B.R. 561, 599 (Bankr. D. Del. 2008) (justifying and following Third Circuit's arguably "narrow" formulation of the insolvency test based on *Prod. Res. Group. L.L.C.* case); *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 98 (Del. 2007) (citing solvency test articulated in *Prod. Res. Group, LLC* decision).

[1067] *See Whitmer v. William Whitmer & Sons, Inc.*, 99 A. 428, 430 (Del. Ch. 1916) ("An excess of liabilities over assets may constitute insolvency, unless it appear that there is a reasonable prospect that the business could be successfully continued notwithstanding the deficiency of assets."); *Francotyp-Postalia AG & Co. v. On Target Tech., Inc.*, 1998 Del. Ch. LEXIS 234, at *17 (Del. Ch. Dec. 24, 1998) (stating that the test "based on liabilities in excess of assets requires the additional element that there be no reasonable prospect that the business can be continued in the face of that condition, suggesting that liabilities in excess of assets, alone, does not constitute insolvency.").

[1068] *Francotyp-Postalia AG & Co.*, 1998 Del. Ch. LEXIS 234, at *16.

Conversely, "[a]t least when combined with other indicia of insolvency . . . a significant excess of liabilities over assets still will constitute evidence of insolvency."[1069]

The amorphous limits of a "zone of insolvency" in Delaware—and the scope of any purported fiduciary duties owed directly to creditors by directors of a corporation operating in it—have been the subject of extensive discourse by courts and commentators alike over the years.[1070] A decade after *Brandt* was decided, the Supreme Court of Delaware finally had occasion to consider whether creditors are owed fiduciary duties by a corporation's directors, either at the time the company is teetering precariously on the precipice of insolvency or, later, when incontestable insolvency arrives. In *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*,[1071] the court declared in no uncertain terms that direct fiduciary duties are not owed to creditors in either situation.[1072] Explicitly addressing the Court of Chancery's dictum that there could be a set of exceptional facts "in which the directors [of an actually insolvent corporation] display such a marked degree of animus towards a particular creditor with a proven entitlement to payment that they expose themselves to a direct fiduciary

---

[1069] *See* 1-8 Donald J. Wolfe & Michael A. Pittinger, CORPORATE AND COMMERCIAL PRACTICE IN DELAWARE COURT OF CHANCERY § 8.11 (2005); *see, e.g., Prod. Res. Grp., L.L.C.*, 863 A.2d at 782-84 (concluding that a creditor had alleged sufficient facts to support a reasonable inference of insolvency because, among other things, the corporation had liabilities that exceeded its assets by five times, had negative net tangible assets and a working capital deficit that exceeded the corporation's aggregate revenue for the prior five years, and had "consistently racked up huge annual operating losses.").

[1070] *Teleglobe Commc'ns Corp.*, 493 F.3d at 356 n.9, 384 (describing zone of insolvency as "amorphous," "ill-defined," and "hazy"); *Gheewalla*, 930 A.2d at 99 nn.27 & 28; *Prod. Res. Group, L.L.C.*, 863 A.2d at 789 n.56 (noting definitional challenges created by the "zone of insolvency" concept).

[1071] 930 A.2d 92 (Del. 2007).

[1072] *Id.* at 98-103. The Supreme Court in *Gheewalla* embraced many thoughts articulated by Vice Chancellor Strine in his opinion in *Production Resources Group, L.L.C. v. NCT Group, Inc.* There, Vice Chancellor Strine had explained his hesitation in engrafting a fiduciary duty in the so-called "zone of insolvency": "I doubt the wisdom of a judicial endeavor to second-guess good-faith director conduct in the so-called zone. Although it is easy to posit extreme hypotheticals involving directors putting cash in slot machines, the real world is more likely to generate situations when directors face a difficult choice between pursuit of a plausible, but risky, business strategy that might increase the firm's value to the level that equity holders will receive value, and another course guaranteeing no return for equity but preservation of value for creditors. Absent self-dealing or other evidence of bad faith, by what measure is a court fairly to critique the choice made through an award of damages?" *Prod. Res. Group, L.L.C.*, 863 A.2d at 790 n.57.

duty claim by that creditor,"[1073] the Delaware Supreme Court foreclosed that possibility: "We think not. While there may well be a basis for a direct claim arising out of contract or tort, our holding today precludes a direct claim arising out of a purported breach of a fiduciary duty owed to that creditor by the directors of an insolvent corporation."[1074]

Although *Gheewalla* addressed these issues as related to officers and directors,[1075] no Delaware court appears to have expressly considered whether creditors of an insolvent corporation may bring derivative actions for breach of fiduciary duty against controlling shareholders. In *Official Committee of Unsecured Creditors v. Fleet Retail Financial Group (In re Hechinger Investment Co.)*,[1076] however, the Delaware District Court noted in dictum, albeit pre-*Gheewalla*, that it is likely that such a cause of action would be recognized by Delaware law.[1077] The court began its analysis by noting that "[a]t the moment a corporation becomes insolvent . . . the insolvency triggers fiduciary duties for directors for the benefit of creditors."[1078] The court "assumed," therefore, that in insolvency, controlling shareholders owe the same fiduciary duties as directors,[1079] and declined to dismiss fiduciary duty claims against certain shareholders.[1080]

---

[1073] *Gheewalla*, 930 A.2d at 102 n.43 (quoting *Prod. Res. Group*, 863 A.2d at 798) (alteration in original).

[1074] *Id.*

[1075] *Id.* at 101.

[1076] 274 B.R. 71 (D. Del. 2002).

[1077] *Id.* at 89.

[1078] *Id.* at 89 (citing *Geyer v. Ingersoll Pubs. Co.*, 621 A.2d 784, 787 (Del Ch. 1992)). The court stated that this is because when a corporation enters the zone of insolvency, the creditors, and not just the shareholders, are residual risk bearers whose recovery is dependent upon business decisions of the directors. In other words, in an insolvency situation, the directors can be said to be "playing with the creditors money." *Id.*

[1079] *Id.* (citing *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613 (Del. Ch. Dec. 30, 1991)).

[1080] *Id.* at 91.

Thereafter, the court was asked to certify to the Supreme Court of Delaware the question whether controlling shareholders may be liable to creditors for breach of fiduciary duty.[1081]  The court again acknowledged that it was a "novel question" because "[a]lthough Delaware courts have held that directors of a corporation may owe fiduciary duties to creditors when the corporation is insolvent, no Delaware court has expressly extended that duty to controlling or majority shareholders."[1082]  The court declined to certify the question, however, because resolution of the question would not affect the course of the case as it then existed.[1083]  Thus, the courts have not squarely addressed whether controlling shareholders may be held liable to creditors for breach of fiduciary duty through a derivative action under Delaware law.

### c.    Fiduciary Duties of Directors and Officers of Subsidiaries.

Generally, "in a parent and wholly-owned subsidiary context, directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders."[1084]  Thus, when authorizing a transaction that has already been authorized at the parent level, a subsidiary's board has "no duty to replicate the deliberative process of [the parent's] board of directors."[1085, 1086]

> There is no sound basis to hold that the boards of wholly-owned subsidiaries must engage in their own parallel merger consideration processes, thereby . . . spreading the powerful procedural mandate of [*Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985)] and its progeny to every level of the corporate family.

---

[1081] *Off. Comm. of Unsecured Creditors v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. )*, 280 B.R. 90 (D. Del. 2002).

[1082] *Id.* at 94.

[1083] *Id.* ("No matter what the Delaware Supreme Court decides about whether these defendants may be liable under Count II, it is undisputed that they will remain in the case as potentially liable under the same set of facts as directors under Count I.").

[1084] *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988) (citations omitted); *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 200 (Del. Ch. 2006).

[1085] *Trenwick Am. Litig. Trust*, 906 A.2d at 201.

[1086] *Id.* (footnote omitted).

> Delaware law does not embrace the concept that a director of a
> wholly-owned subsidiary owes a duty to second-guess the business
> judgment of its parent corporation when following and supporting
> the parent's strategy would not violate any legal obligation the
> subsidiary owes to another.

This general rule is based on the assumption that a corporation's primary interest is in

maximizing its economic value, but the only interest of a wholly-owned subsidiary is in serving

its parent.[1087]

  The Third Circuit Court of Appeals and several of the lower courts in the Third Circuit

and elsewhere, however, have recognized that this general rule gives way when there is a

minority interest in the subsidiary or when the subsidiary is insolvent:[1088]

> If the subsidiary is not wholly owned, however, in the interest of
> protecting minority shareholders we revert to requiring that
> whoever controls the subsidiary seek to maximize its economic
> value with requisite care and loyalty. . . . Similarly, if the
> subsidiary is insolvent, we require the same in the interest of
> protecting the subsidiary's creditors.

"[U]pon insolvency directors of a wholly-owned subsidiary owe fiduciary duties to the

subsidiary and its creditors."[1089]  As a result, a lower court in the Third Circuit may hold a

director of a subsidiary liable for breach of fiduciary duties if the director did not exercise

business judgment in good faith or breached his or her duty of loyalty.  This is particularly

---

[1087] *Teleglobe Commc'ns Corp. v. BCE, Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 367 (3d Cir. 2007).

[1088] *Teleglobe Commc'ns*, 493 F.3d at 367 (citing *Trenwick Am. Litig. Trust*, 906 A.2d at 204 n.96 and *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007)).  *Accord VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 635 (3d Cir. 2007) (holding that, under New Jersey corporate law "[d]irectors normally owe no duty to corporate creditors, but when the corporation becomes insolvent the creditors' investment is at risk, and the directors should manage the corporation in their interests as well as that of the shareholders"); *MC Asset Recovery, LLC v. S. Co.*, 2006 U.S. Dist. LEXIS 97034, at *30-31 (N.D. Ga. Dec. 11, 2006) (refusing to dismiss complaint against parent corporation for aiding and abetting a breach of the fiduciary duty by subsidiary's directors); *Panos v. Sullivan (In re Sabine, Inc.)*, 2006 Bankr. LEXIS 381, at *24 (Bankr. D. Mass. Feb. 27, 2006) (refusing to dismiss a complaint alleging that director breached fiduciary duties by allowing subsidiary to engage in transactions that were harmful to the subsidiary); *Claybrook v. Morris (In re Scott Acquisition Corp.)*, 344 B.R. 283, 286 (Bankr. D. Del. 2006) ("In my view, Delaware law would recognize that the directors and officers of an insolvent wholly-owned subsidiary owe fiduciary duties to the subsidiary and its creditors.").

[1089] *Scott Acquisition Corp.*, 344 B.R. 283, 286 (Bankr. D. Del. 2006).

relevant if the director serves on the boards of both the parent company and the subsidiary and, at

a time the subsidiary was insolvent, approves a transaction that favors the parent at the expense

of the subsidiary.[1090]

### d.    Legal Analysis of Effect of Indemnification and Exculpation Rights of Directors and Officers on Breach of Duty Claims.

The Delaware legislature has enacted a tiered indemnification structure for its

corporations in DGCL section 145.[1091]  The structure "promote[s] the desirable end that

corporate officials will resist what they consider unjustified suits and claims" with the confidence

that the expenses incurred in that resistance will be indemnified by the corporation.[1092]  The

Supreme Court of Delaware has instructed that the corporate indemnification statute "should be

broadly interpreted to further the goals it was enacted to achieve," and that "an over literal

reading" of its provisions should be "eschew[ed]" when those goals would be disserved.[1093]

DGCL section 145 divides the corporate indemnification right into several categories.

First, Delaware corporations may grant indemnity against actions brought by third parties.[1094]

---

[1090] *Off. Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 473-74 (Bankr. S.D.N.Y. 2006) ("Any situation where a wholly-owned and controlled subsidiary enters the zone of insolvency obviously requires all responsible parties to act with the utmost care and responsibility."); *Case Fin. v. Alden*, 2009 Del. Ch. LEXIS 153, at *21 (Del. Ch. Aug. 21, 2009) ("Alden was an officer and director of Case Financial, a Delaware corporation. Thus, independent of Case Financial's status as a shareholder of Case Capital, Alden owed duties directly to Case Financial as a director and officer. In these specific circumstances, Case Financial has standing to sue Alden directly for those breaches of the fiduciary duties he owes directly to Case Financial arising out of his position at Case Financial. Thus, I do not find that Case Financial can sue directly on the basis that Case Financial, as a shareholder of Case Capital, can make out a direct claim against Alden, as a director or officer of Case Capital. Rather, I do so on the basis that Alden owed Case Financial duties as a director and officer of Case Financial.") (citation omitted); *Grace Bros., Ltd. v. UniHolding Corp.*, 2000 Del. Ch. LEXIS 101, at *40 (Del. Ch. July 12, 2000) ("To the extent that members of the parent board are on the subsidiary board or have knowledge of proposed action at the subsidiary level that is detrimental to the parent, they have a fiduciary duty, as part of their management responsibilities, to act in the best interests of the parent and its stockholders.").

[1091] DEL. CODE ANN. tit. 8, § 145 (2010).

[1092] *Stifel Fin. Corp. v. Cochran*, 809 A.2d 555, 561 (Del. 2002) (citation omitted).

[1093] *Id.* (citation omitted).

[1094] DEL. CODE ANN. tit. 8, § 145(a) & (b) (2010). This includes an "action, suit or proceeding" that is "civil, criminal, administrative or investigative," and whether "threatened, pending or completed." *Id.*

Such indemnification may be granted to current and former corporate directors, officers,

employees, or agents, and may encompass "expenses (including attorneys' fees), judgments, fines

and amounts paid in settlement actually and reasonably incurred" in the defense.[1095] Although

generally permissive, the right to an indemnification of "expenses" (including attorneys' fees) is

obligatory if the corporate director, officer, employee, or agent "has been successful on the

merits or otherwise."[1096]

Second, Delaware corporations may grant indemnity against actions brought by, or to

vindicate the rights of, the corporation itself.[1097] As in the first category, this indemnification

may be granted to present and former corporate directors, officers, employees, or agents, but

encompasses only "expenses" (including attorneys' fees).[1098] This indemnification also requires

that the indemnitee meet the same two requisites — that he or she "acted in good faith," and "in a

manner the person reasonably believed to be in or not opposed to the best interests of the

corporation."[1099] Likewise, indemnification of expenses is obligatory if the indemnitee prevails

in his or her defense.[1100] But unlike in the first category, a defeat in court categorically dooms

any access to indemnification, unless the forum tribunal or the Court of Chancery expressly rules

otherwise.[1101]

---

[1095] *Id.* § 145(j). Unless expressly provided otherwise, these indemnification rights persist even after the indemnitee leaves his or her position with the corporation, and "inure[s] to the benefit of the heirs, executors and administrators of such a person." *Id.* § 145(j).

[1096] *Id.* § 145(c). Even before an indemnitee learns whether he or she is victorious, the corporation may grant the indemnitee an advancement of the qualifying expenses (but only on the condition that the advanced expenses be reimbursed if it is later determined that indemnification was not appropriate). *Id.* § 145(e).

[1097] *Id.* § 145(b).

[1098] *Id.*

[1099] *Id.* § 145(b). As with the first category, these assessments must be made by express determination. *See id.* § 145(d).

[1100] *Id.* § 145(c).

[1101] *Id.* § 145(b) ("[N]o indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Court of

Third, Delaware corporations may provide for indemnity through non-statutory vehicles, such as by "bylaw, agreement, vote of stockholders or disinterested directors or otherwise . . . ."[1102] These non-statutory mechanisms do not, however, excuse the statutory prerequisites for corporate indemnification.[1103] Rather, when a corporation "undertakes to adopt a bylaw" that prospectively commits the corporation to indemnifying corporate personnel, "the good faith requirement survives."[1104] Indeed, Delaware corporations "lack the power to indemnify a party who did not act in good faith or in the best interests of the corporation."[1105] Nevertheless, there remains a meaningful benefit to the indemnitee who receives such a prospective commitment of indemnification — the burden of proving the statutory prerequisites (good faith and proceeding in the interests of the corporation) shifts to the corporation.[1106]

Tribune's Amended and Restated Certificate of Incorporation includes an indemnification provision drafted to provide the maximum support allowed by the DGCL:[1107]

> Each person who was or is made a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter, a "proceeding"), by reason of the fact that he or she or a person of whom he or she is the legal representative, is or was a director or officer of the corporation or is or was serving at the request of the corporation as a director or officer of another corporation or of a partnership, joint venture, trust or any other enterprise, including service with respect to employee benefit plans, whether the basis of such proceeding is alleged action in an official capacity as a director, or officer or in any other capacity while serving as a

---

Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all circumstances of the case, such person is fairly and reasonably entitled to immunity for such expenses of which the Court of Chancery or such other court shall deem proper.").

[1102] *Id.* § 145(f) (2010).

[1103] *VonFeldt v. Stifel Fin. Corp.*, No. 15688, 1999 Del. Ch. LEXIS 131, at *7 (Del. Ch. June 11, 1999).

[1104] *Id.* at *7 (citation omitted).

[1105] *Id.*

[1106] *Id.* at *10 ("[T]o overcome this self-imposed, mandatory obligation on [the corporation's] part, [the corporation] must demonstrate to this Court why it should not be required to indemnify [the officer or director].").

[1107] Ex. 968 at 5 (Amended and Restated Certificate of Incorporation of Tribune Company, dated June 12, 2000).

> director or officer, shall be indemnified and held harmless by the
> corporation to the fullest extent authorized by the Delaware
> General Corporation Law. . . . against all expense, liability and loss
> (including attorneys' fees, judgments, fines, ERISA excise taxes or
> penalties and amounts paid or to be paid in settlement) reasonably
> incurred or suffered by such person in connection therewith . . . .

The Delaware legislature additionally has provided a statutory template for exculpation

clauses protecting directors of Delaware corporations, codified at DGCL section 102(b)(7),

which "eliminate[] or limit[] the personal liability of a director to the corporation or its

stockholders for monetary damages for breach of fiduciary duty as a director . . . ."[1108] Such

provisions cannot, however, eliminate or limit the liability of a director:[1109]

> (i) For any breach of the director's duty of loyalty to the
> corporation or its stockholders; (ii) for acts or omissions not in
> good faith or which involve intentional misconduct or a knowing
> violation of the law; (iii) under § 174 of this title; or (iv) for any
> transaction from which the director derived an improper personal
> benefit.

Thus, although a section 102(b)(7) provision in a corporation's charter will exculpate

director defendants from paying monetary damages that are exclusively attributable to a violation

of the duty of care, Delaware law does not permit exculpation for breaches of the duty of loyalty,

including the duty of disclosure.[1110] The protection of a section 102(b)(7) exculpatory clause

may only be invoked by director defendants when "the factual basis for a claim *solely* implicates

a violation of the duty of care."[1111]

---

[1108] DEL. CODE ANN. tit. 8, § 102(b)(7) (2010). This provision is among the enumerated set of provisions that the statute allows (but does not require) a Delaware corporation to include in its certificate of incorporation. *See id.* § 102(b) (2010).

[1109] *Id.* § 102(b)(7) (2010).

[1110] *Emerald Partners v. Berlin*, 787 A.2d 85, 91-92, 96 (Del. 2001); *see Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) (recognizing that "[t]here is no 'safe harbor' for such divided loyalties in Delaware"); *see also Collins & Aikman Corp. v. Stockman*, No. 97-265, 2009 U.S. Dist. LEXIS 43472, at *63-*65 (D. Del. May 20, 2009).

[1111] *Collins & Aikman Corp.*, 2009 U.S. Dist. LEXIS 43472, at *64 (quoting *Emerald Partners v. Berlin*, 726 A.2d 1215, 1223-24 (Del. 1999)) (concluding that because "here, the Complaint alleges violations of the duty of loyalty as well as the duty of care, the duty of care claims against the individual director defendants may not be dismissed at this stage of the proceedings on the basis of [the company's] § 102(b)(7) exculpatory provision").

Tribune's Amended and Restated Certificate of Incorporation includes an exculpation provision drafted in accordance with the foregoing DGCL provisions:[1112]

> TWELFTH: No person who is or was a director of the corporation shall be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except that, unless otherwise permitted under applicable laws, this paragraph shall not eliminate or limit liability (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit.

DGCL 102(b)(7) and the exculpatory clauses it authorizes are subject to two limitations. First, by their explicit terms, DGCL section 102(b)(7) and the above-quoted exculpatory clause only allow exculpation of directors, not officers. When an officer is serving as a director, the exculpatory clause only applies to exempt monetary liability for acts as a director; liability for breaches of duty as an officer is not exculpated.[1113]

Second, the exculpatory clause does not exculpate a director's liability for acts not taken in good faith. The "good faith" referred to in DGCL section 102(b)(7) is the same as the fiduciary duty to act in good faith.[1114] According to the Delaware Supreme Court:[1115]

> The good faith required of a corporate fiduciary includes not simply the duties of care and loyalty, in the narrow sense that I have discussed them above, but all actions required by a true faithfulness and devotion to the interests of the corporation and its shareholders. A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation,

---

[1112] Ex. 968 at 5 (Amended and Restated Certificate of Incorporation of Tribune Company dated June 12, 2000).

[1113] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1288 (Del. 1994); *McPadden v. Sidhu*, 964 A.2d 1262, 1275-76 (Del. Ch. 2008); *accord In re Century Elecs. Mfg. Inc.*, 345 B.R. 33, 36 (Bankr. D. Mass. 2006) (holding that DGCL 102(b)(7) "does not shield officers who are also directors from breach of fiduciary duty claims arising from their acts taken as officers"). *But see Continuing Creditors Comm. of Star Telecommc'ns, Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 464 (D. Del. 2004) (holding that an exculpatory provision barred claims against directors and officers).

[1114] *Brehm v. Eisner (In re Walt Disney Co. Deriv. Litig.)*, 906 A.2d 27, 66 (Del. 2006).

[1115] *Eisner*, 906 A.2d at 67 (quoting *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005)).

> where the fiduciary acts with the intent to violate applicable
> positive law, or where the fiduciary intentionally fails to act in the
> face of a known duty to act, demonstrating a conscious disregard
> for his duties.

In a transaction context, an "extreme set of facts" is required to sustain a breach of good faith claim premised on the allegation that disinterested directors intentionally disregarded their duties.[1116] Only if officers and directors "knowingly and completely fail to undertake their responsibilities" do they breach the duty of good faith.[1117] Under this standard, the Delaware Supreme Court held that it was not a breach of the duty of good faith for a board to approve a $13 billion cash merger in one week, during which time the directors met for a total of only seven hours to consider the matter and did not seriously press the bidder for a better price or conduct a limited market check.[1118]

Courts applying the good faith standard have looked to whether directors took any intentional acts that are contrary to their known duties. Thus, courts have held that a plaintiff appropriately alleges breach of fiduciary duties when it alleges that directors favored one bidder over others.[1119] In *Gesoff v. IIC Industries, Inc.*, the Delaware Chancery court held that bad faith may be found when directors have "acted with conscious disregard or made decisions with knowledge that they lacked material information."[1120] Few Delaware cases attempt to define precisely what conduct reaches the level of actionable bad faith, but there is at least agreement that "adopting a 'we don't care about the risks' attitude concerning a material corporate decision"

---

[1116] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009).

[1117] *Id.* at 243-44.

[1118] *Id.* at 241.

[1119] *Brewer v. Brewer*, 2010 U.S. Dist. LEXIS 60863, at * 51-52 (C.D. Cal. June 17, 2010) (applying Delaware law); *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1281 (Del. 1989) ("When presumably well-intentioned outside directors remove themselves from the design and execution of an auction, then what occurred here, given the human temptations left unchecked, was virtually inevitable.").

[1120] *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1165 (Del. Ch. 2006).

constitutes bad faith.[1121]  Moreover, placing undue reliance on receiving information from a

party with an interest in the transaction can, in some circumstances, be bad faith.[1122]

e.  **Examiner's Conclusions and Explanation Concerning Application of Legal Standards to Potential Defendants.**

**Examiner's Conclusions:**

A court is reasonably unlikely to conclude that claims for breach of fiduciary duty could

be sustained against the Tribune Entities' officers and directors and/or the Large Stockholders in

connection with the Step One Transactions.  A court is somewhat unlikely to conclude that

claims for breach of fiduciary duty could be sustained against the Tribune Board at Step Two,

but is reasonably likely to conclude that claims for breach of fiduciary duty could be sustained

against one or more members of Tribune's senior financial management in connection with the

Step Two Transactions.  A court is reasonably unlikely to conclude that claims for breach of

fiduciary duty could be sustained against the Large Stockholders at Step Two.  The Examiner

leaves in equipoise whether the directors of the Guarantor Subsidiaries breached their fiduciary

duties at Step Two.

---

[1121] *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003) (finding bad faith claim properly alleged where factual allegations, if true, implied that "the defendant directors knew that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss") (emphasis in original) *aff'd sub nom. Brehm v. Eisner (In re Walt Disney Co. Deriv. Litig.)*, 906 A.2d 27 (Del. 2006).

[1122] *See Brown v. Brewer*, 2010 U.S. Dist. LEXIS 60863, at *51-52 (C.D. Cal. June 17, 2010) (holding that board acted in bad faith by relying on self-interested CEO to get most of their information); *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1281 (Del. 1989) (finding that directors were not in good faith because "[w]hen presumably well-intentioned outside directors remove themselves from the design and execution of an auction, then what occurred here, given the human temptations left unchecked, was virtually inevitable.").

**<u>Explanation of Examiner's Conclusions</u>:**

        **(1)**     **Tribune Directors and Officers at Step One.**
             *Redacted*

*Redacted*

(2)    **Guarantor Subsidiary Directors at Step One.**

Based on the Examiner's conclusions regarding solvency at Step One, the Examiner does not find any credible basis to conclude that the Guarantor Subsidiary officers and directors breached their fiduciary duties in connection with the Step One Transactions.  If, however, a court were to disagree with the Examiner's conclusions regarding solvency at Step One, for the reasons discussed in the Examiner's consideration of whether the directors of the Guarantor

375

Subsidiaries breached their fiduciary duties at Step Two, a serious question exists whether those directors also breached their fiduciary duties at Step One.

    **(3)**  **Large Stockholders at Step One.**
      *Redacted*

*Redacted*

*Redacted*

*Redacted*

**(4)     Tribune Directors at Step Two.**
*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

*Redacted*

**(5)**     **Tribune Officers at Step Two.**
*Redacted*

*Redacted*

**(6)    Guarantor Subsidiary Directors at Step Two.**
   *Redacted*

*Redacted*

*Redacted*

(7)    **Large Stockholders at Step Two.**

*Redacted*

*Redacted*

3. **Aiding and Abetting Breach of Fiduciary Duty.**

   a. **Legal Standard for Aiding and Abetting Breach of Fiduciary Duty.**

Delaware law recognizes that third parties may be liable for aiding and abetting a corporate fiduciary's breach of duty to the corporation's shareholders.[1180]  To establish such a claim, the proponent must demonstrate four elements:  "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty . . ., (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."[1181]  Some courts have

Redacted

---

[1180] *See Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

[1181] *Malpiede*, 780 A.2d at 1096 (quotations & citations omitted); *see also Off. Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 543-44

further elaborated that, to be liable for aiding and abetting a breach of fiduciary duty, the defendant must give "substantial assistance or encouragement to the fiduciary's wrongful conduct."[1182]

The first two elements of this test set the obvious predicates for a cognizable aiding and abetting claim—without a fiduciary's breach of duty, there can of course be no claim for aiding and abetting such a breach.[1183] Typically, the primary, predicate violator of a duty will be a fiduciary and the aider and abettor will be a non-fiduciary, but this alignment is not essential in most jurisdictions. Rather, an actor who, though otherwise a fiduciary, possessed no obligation of trust extending to the specific wrongdoing at issue, may be liable for aiding and abetting another fiduciary whose obligations of trust were implicated and breached.[1184] Standing to assert an aiding and abetting claim is also required. A bankruptcy trustee possesses standing to assert a breach of fiduciary duty claim against its own officers and directors and the right to assert aiding and abetting claims against third parties for helping to facilitate those fiduciary breaches.[1185]

The third element of "knowing participation" in a breach of fiduciary duty compels that "the third party act with the knowledge that the conduct advocated or assisted" constitutes a fiduciary breach.[1186] The Delaware courts have recognized a broad spectrum of conduct as satisfying this standard. For example, the courts have held that "arm's-length negotiations are

---

(Bankr. D. Del. 2009); *Miller v. McCown De Leeuw & Co. (In re Brown Schs.)*, 386 B.R. 394, 402 (Bankr. D. Del. 2007); *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 370 (Del. Ch. 2008).

[1182] See *Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128, 144 (Bankr. D. Del. 2005) (citations omitted).

[1183] See *Malone v. Brincat*, 722 A.2d 5, 14-15 (Del. 1998) (citation omitted).

[1184] See *Brown Schs.*, 368 B.R. at 402-03.

[1185] See *OODC, LLC*, 321 B.R. at 143 (rejecting argument that "because a debtor cannot sue itself for breach of fiduciary duties . . . [it] should not be able to sue a third party for aiding and abetting a breach of fiduciary duty").

[1186] *Malpiede*, 780 A.2d at 1097 (citations omitted); see also *Transkaryotic Therapies, Inc.*, 954 A.2d at 371-72.

inconsistent with participation in a fiduciary breach,"[1187] but, a bidder may be liable for aiding and abetting by "attempt[ing] to create or exploit conflicts of interest in the board" or by "conspir[ing] in or agree[ing] to the fiduciary breach."[1188] Likewise, if a bidder "offer[s] [to the fiduciary [a] side deal in order to induce the fiduciary to breach or ignore his duty," aiding and abetting liability may be imposed.[1189]

The fourth element requires the proponent of an aiding and abetting claim to demonstrate damages that were proximately caused by "the concerted action of the fiduciary and the non-fiduciary."[1190]

> **b.    Legal Standards Governing Potential In Pari Delicto Defenses to Aiding and Abetting Claims.**

Delaware, like most American jurisdictions, recognizes the in pari delicto doctrine in the context of aiding and abetting claims.[1191]  Delaware construes the doctrine to mean that "'a party is barred from recovering damages if his losses are substantially caused by activities the law forbade him to engage in.'"[1192]  In applying in pari delicto, the Delaware courts reject a cramped, literal reading of this "equal fault" principle that would obligate the court to discern "which of the parties acted with the guiltiest mind;" instead, the doctrine "simply requires the court to determine that each party acted with scienter in the sense that it was a knowing and substantial

---

[1187] *Malpiede*, 780 A.2d at 1098 (citing Court of Chancery rationale) (citation omitted); *see also id.* at 1097 (holding that "a bidder's attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting"). *Accord Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.)*, 278 F. App'x 125, 130 (3d Cir. 2008).

[1188] *Malpiede*, 780 A.2d at 1097-98 (citations omitted).

[1189] *Transkaryotic Therapies, Inc.*, 954 A.2d at 372.

[1190] *Id.* at 373 (quotations & citations omitted).

[1191] *In re Am. Int'l Grp. Consol. Deriv. Litig.*, 976 A.2d 872, 882 (Del. Ch. 2009).

[1192] *Am. Int'l Grp.*, 976 A.2d at 883 (citation and quotation marks omitted); *see also OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*, 389 B.R. 357, 365 (D. Del. 2008) (stating that "a plaintiff's recovery may be barred by his own wrongful conduct") (quoting *Pinter v. Dahl*, 486 U.S. 622, 632 (1988)), *aff'd*, 356 F. App'x 622 (3d Cir. 2009).

participant in the wrongful scheme."[1193]  The in pari delicto defense may apply to estate

representatives that are asserting causes of action held by the bankruptcy corporation on the

petition date (as opposed to avoidance actions) because the estate representative "stand[s] in the

shoes" of a potentially-wrongdoing debtor.[1194]

In pari delicto is imported from equity jurisprudence and, as such, is subject to various

exceptions that preclude its application.[1195]  For example, the doctrine might not apply when the

illegal acts were the result of duress, when an illegal arrangement is "intrinsically unequal," or

when "important countervailing interests of public policy" so counsel.[1196]  Recently, the Third

Circuit Court of Appeals has held that, under Pennsylvania law, imputation under the in pari

delicto defense "is unavailable relative to an auditor which has not dealt materially in good faith

with the client-principal . . . ."[1197]  The two more familiar exceptions in Delaware are, however,

the "insider" exception and the "adverse interest" exception.[1198]

The "insider" exception permits claims against corporate insiders, notwithstanding the in

pari delicto doctrine.[1199]  It is based on the well-recognized principle that "[a]n exception to the

general rule that the knowledge of an officer or agent will be imputed to the corporation arises

---

[1193] *Am. Int'l Grp.*, 976 A.2d at 884; *see also id.* ("To go further and distinguish, for example, among willing foot soldiers, consiglieres, and the ultimate crime boss is to engage in precisely the type of summing up among co-conspirators that the doctrine of *in pari delicto* is intended to obviate.").

[1194] *Oakwood Homes*, 389 B.R. at 365.

[1195] *See Off. Comm. of Unsecured Creditors of Allegheny Health, Educ. & Research Found. v. PricewaterhouseCoopers, LLP ("Allegheny")*, 607 F.3d 346, 354 (3d Cir. 2010) (citations omitted).

[1196] *See Am. Int'l Grp.*, 976 A.2d at 883 (citations omitted); *In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1108 (Del. Ch. 2003), *aff'd*, 847 A.2d 1121 (Del. 2004).

[1197] *Allegheny*, 2010 U.S. App. LEXIS 10920, at *19-20 (citing *Off. Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PricewaterhouseCoopers, LLP*, 989 A.2d 313, 339 (Pa. 2010)).  The "good faith" limitation on the in pari delicto defense has not yet been applied outside the context of auditors and, by its terms, is only an application of Pennsylvania law.  However, other courts may analogize the decisions of the Third Circuit and the Pennsylvania Supreme Court to other contexts.

[1198] *Oakwood Homes*, 389 B.R. at 365; *Am. Int'l Grp.*, 976 A.2d at 891 (citations omitted).

[1199] *Oakwood Homes*, 389 B.R. at 365.

when an officer . . . is acting in a transaction in which he is personally or adversely interested or is engaged in the perpetration of an independent fraudulent transaction, where the knowledge relates to such transaction and it would be to his interest to conceal it."[1200]   It is well recognized that estate representatives can sue the debtor's insiders for their wrongful acts, notwithstanding that the debtor previously acted through those insiders.[1201]   However, the insider exception has been rarely (if ever) applied outside the context of officers, directors, or other agents of the corporation, and the Third Circuit Court of Appeals has rejected the argument that a bank could be an "insider" for purposes of the insider exception, even if it were an insider under the Bankruptcy Code.[1202]

The second, and more common, exception to the in pari delicto doctrine allows claims against parties with an "adverse interest" to the corporation.[1203]   This exception provides that "a corporation [may] sue its co-conspirators when the corporate agent responsible for the wrongdoing was acting solely to advance his own personal financial interest, rather than that of the corporation itself."[1204]   In such a circumstance, the law recognizes that the corporation is more victim than conspirator, notwithstanding that it may remain liable to innocent third parties.[1205]   For this exception to apply, it is not enough to show that the fiduciary was acting

---

[1200] 18B AM. JUR. 2D CORPORATIONS § 1680 (2003); *see also In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1107-08 (Del. Ch. 2003) ("The reality that HealthSouth itself might be liable to third-parties due to the failure of its managers (under Scrushy's supervision) to prepare materially accurate financial statements does not mean that HealthSouth has no right to seek recompense from those managers for the harm they caused it.") (citation omitted).

[1201] *Unencumbered Assets, Trust v. JP Morgan Chase Bank (In re Nat'l Century Fin. Enters.)*, 617 F. Supp. 2d 700, 712 (S.D. Ohio 2009) (collecting cases).

[1202] *OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*, 356 F. App'x 622, 628 (3d Cir. 2009).

[1203] *Am. Int'l Grp. v. Greenberg (In re Am. Int'l. Grp. Consol. Deriv. Litig.)*, 976 A.2d 882, 891 (Del. Ch. 2009) (citations omitted).

[1204] *Id.* at 891 (citations omitted).

[1205] *See id.*

with the third party for his or her benefit; instead, the fiduciary must be shown to have acted to harm the corporation.[1206]  Put another way, there must be a "total abandonment of the corporation's interests."[1207]

### c.    Examiner's Conclusions and Explanation Concerning Application of Legal Standards to Potential Defendants.

<u>Examiner's Conclusions</u>:

The existence of a breach of fiduciary duty is a fundamental prerequisite to any claim for aiding and abetting a fiduciary's breach.  As set forth elsewhere in the Report, the Examiner finds no credible basis to conclude that Tribune's officers or directors, the Guarantor Subsidiary officers or directors, or the Large Stockholders breached any fiduciary duties in conjunction with the Step One Transactions.[1208]  In view of these conclusions, a court is highly unlikely to conclude that any claims for aiding and abetting breach of fiduciary duty could be sustained based on the conduct of any potential defendants at Step One.  As such, the Examiner's discussion of potential aiding and abetting claims below focuses on Step Two.

As detailed below, the Examiner concludes that it is reasonably unlikely that a court would conclude that an aiding and abetting claim could be sustained against the Large Stockholders, the Leads Banks, the Financial Advisors, or the Zell Group arising from the Step Two Transactions.  (The Examiner's conclusion concerning regarding the Zell Group is subject to a caveat, described below.)  The Examiner leaves in equipoise the question whether a claim for aiding and abetting breach of fiduciary duty could be sustained against VRC.

---

[1206] *See id.*

[1207] *Id.*

[1208] *See* Report at § IV.E.2.e.

**<u>Explanation of Examiner's Conclusions</u>:**

      **(1)**    **Large Stockholders.**
           *Redacted*

      **(2)**    **Lead Banks.**
           *Redacted*

      **(3)**    **Financial Advisors.**
           *Redacted*

*Redacted*

**(4)    Zell Group.**

*Redacted*

**(5)    VRC.**

*Redacted*

*Redacted*

4.    **Unjust Enrichment.**

a.    **Legal Standard for Unjust Enrichment.**

Under Delaware law, unjust enrichment is the "unjust retention of a benefit to the loss of

another, or the retention of money or property of another against the fundamental principles of

justice or equity or good conscience."[1213]  A claim of unjust enrichment is a "quasi-contract

theory of recovery to remedy the absence of a formal contract."[1214]  The elements of unjust

enrichment are:  "1) an enrichment, 2) an impoverishment, 3) a relation between the enrichment

*Redacted*

---

[1213] *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999) (quotations and citations omitted); *see also Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128, 145 (Bankr. D. Del. 2005) ("To support a claim for unjust enrichment, the plaintiff must establish that the defendant received a benefit, that the defendant was aware of the benefit, and that the benefit was accepted by the defendant under circumstances that would make the acceptance inequitable without payment for its value.") (citations omitted).

[1214] *Tolliver v. Christina Sch. Dist.*, 564 F. Supp. 2d 312, 315 (D. Del. 2008) (citations omitted); *see also First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir. 1985) (*citing LaThrop v. Bell Fed. Savs. & Loan Ass'n*, 370 N.E.2d 188, 195 (Ill. 1977)).

and the impoverishment, 4) the absence of justification and 5) the absence of a remedy provided by law."[1215]

Unjust enrichment is typically invoked in a quasi-contractual setting, when a plaintiff seeks to recover from a defendant for a benefit conferred under an unconsummated or void contract or when the defendant is not lawfully entitled to retain a benefit which it has received.[1216]  In that context, "the existence of an express, enforceable contract that controls the parties' relationship will defeat unjust enrichment claims."[1217]  An unjust enrichment claim may be stated, however, "when the validity of the contract is in doubt or uncertain," when the express contract does not govern exclusively the obligations or rights of the parties, or when the subject matter of the unjust enrichment claim is distinct from the subject matter of the parties' contract.[1218]

An unjust enrichment claim also may be stated based on certain tortious conduct that benefits the tortfeasor.[1219]  For example, it is well recognized that "a fiduciary who has acquired

---

[1215] *LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279, 294-95 (D. Del. 2000) (citing *Jackson*, 741 A.2d at 393-94); *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010); *see also Vinarov v. Motorola, Inc.*, 2008 U.S. Dist. LEXIS 25363, at *39 (N.D. Ill. Mar. 26, 2008) *aff'd*, 323 F. App'x 472 (7th Cir. 2009) ; *Douglass v. Wones*, 458 N.E.2d 514, 521 (Ill. App. Ct. 1983); *Kenneke v. First Nat'l Bank*, 382 N.E.2d 309, 310-11 (Ill. App. Ct. 1978). With respect to the last element – the absence of a remedy at law – the Supreme Court of Delaware has held that there can be no cause of action for unjust enrichment unless without it "the plaintiffs will have no remedy to recover the benefit of which they were wrongfully deprived."  *Nemec*, 991 A.2d at 1130.

[1216] *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris*, 171 F.3d 912, 936 (3d Cir. 1999).

[1217] *Tolliver*, 564 F. Supp. 2d at 315; *see also Off. Comm. of Unsecured Creditors of Fedders N. Am. Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 552 (Bankr. D. Del. 2009) ("Whether asserted under the law of Delaware, New Jersey, or New York, the authorities are clear that a claim for unjust enrichment will be dismissed if the complaint alleges an express, enforceable contract that controls the parties' relationship."); *Astropower Liquidating Trust v. KPMG LLP*, 2007 U.S. Dist. LEXIS 38222, at *18-19 (D. Del. May 25, 2007) ("Claims for unjust enrichment must be dismissed when the complaint alleges that an express, enforceable contract controls the parties' relationship . . . .").

[1218] *Tolliver*, 564 F. Supp. 2d at 315-16; *Petrakopoulou v. DHR Int'l, Inc.*, 660 F. Supp. 2d 935, 940 (N.D. Ill. 2009).

[1219] *Steamfitters Local Union No. 420*, 171 F.3d at 936 ("In the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim (i.e., if defendant is permitted to keep the benefit of his tortious conduct, he will be unjustly enriched)."). RESTATEMENT (FIRST) OF RESTITUTION § 3 (1937).

a benefit by a breach of his duty as fiduciary is under a duty of restitution to the beneficiary"[1220]

and "[a] third person who has colluded with a fiduciary in committing a breach of duty, and who

obtained a benefit therefrom, is under a duty of restitution to the beneficiary."[1221]  However, a

defendant must prove all of the elements of the underlying tort to attack the benefits received

under a theory of unjust enrichment.[1222]  Moreover, not all torts give rise to an unjust enrichment

claim.

### b.    Potential Preemption Issues.

Even if a given set of facts supports an actionable unjust enrichment claim under

Delaware common law, it is conceivable that such a claim in the context of a bankruptcy

proceeding might be preempted by the "settlement payment" defense established by Bankruptcy

Code section 546(e).[1223]  Under the Supremacy Clause of the United States Constitution, state

laws that interfere with or are contrary to federal law are preempted and without effect.[1224]

When there is no statutory language that explicitly preempts state law, implied preemption may

be found under two circumstances:  conflict preemption and field preemption.[1225]

---

[1220] RESTATEMENT (FIRST) OF RESTITUTION § 138(1) (1937).

[1221] *Id.* § 138(2) (1937); *Rosener v. Majestic Mgmt. Inc. (In re OODC, LLC)*, 321 B.R. 128, 144-45 (Bankr. D. Del. 2005).

[1222] *Allegheny Gen. Hosp. v. Philip Morris*, 228 F.3d 429, 447 (3d Cir. 2000); *N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 15 n.3 (1st Cir. 2009).

[1223] 11 U.S.C. § 546(e) (2006). As detailed in another part of the Report, section 546(e) provides, in relevant part, that notwithstanding certain enumerated code sections, "the trustee may not avoid a transfer that is a . . . settlement payment . . . made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title." *Id.* Section 548(a)(1)(A) pertains to transfers within two years prior to filing the petition for bankruptcy. *See* 11 U.S.C. § 548(a)(1)(A); Report at § IV.B.7.a.

[1224] U.S. CONST. art. VI, cl. 2; *see Altria Grp. v. Good*, 129 S. Ct. 538, 543 (2008).

[1225] *See Off. Comm. of Unsecured Creditors v. Fleet Retail Fin. Grp. (In re Hechinger Invest. Co.)*, 274 B.R. 71, 96 (D. Del. 2002); *see also Altria Grp.*, 129 S. Ct. at 543 ("Pre-emptive intent may also be inferred if the scope of [a federal] statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law.").

In *Official Committee of Unsecured Creditors v. Fleet Retail Financial Group (In re Hechinger Investment Co.)*,[1226] the United States District Court for the District of Delaware examined whether an unsecured creditors' committee's unjust enrichment claim, in the context of a failed leveraged buyout, was preempted by Bankruptcy Code section 546(e) and concluded that the claim was preempted based on both conflict and field preemption. Conflict preemption occurs when federal and state law directly conflict and cannot coexist, either because compliance with both is a "physical impossibility" or there is an "inevitable collision" between the two regulatory schemes.[1227] Field preemption exists when a federal regulatory scheme is "sufficiently comprehensive" to allow a reasonable inference that Congress "left no room" for supplementary state regulation.[1228]

Evaluating conflict preemption first, the court in *Hechinger* noted that the remedies sought by the committee pursuant to its unjust enrichment and fraudulent transfer claims were the same—to avoid the transactions and recover payments made in exchange for the tender of Hechinger shares by Hechinger shareholders.[1229] Having already determined that Bankruptcy Code section 546(e) barred the committee from recovering payments made to shareholders based on a fraudulent transfer claim,[1230] the court concluded that allowing an unjust enrichment claim would enable the committee to circumvent section 546(e) and frustrate the purpose of the settlement payment defense.[1231] Thus, the court determined that "[b]ecause the Committee's

---

[1226] *Hechinger*, 274 B.R. at 95-97 (citation omitted).

[1227] *Id.*

[1228] *Id.* at 96 (*citing Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963)); *see also Altria Grp., Inc. v. Good*, 129 S. Ct. at 543.

[1229] *Hechinger*, 274 B.R. at 96.

[1230] *See id.* at 87-88.

[1231] *Id.* at 96.

401

unjust enrichment claim effectively acts as a section 544 fraudulent conveyance claim, it directly conflicts with the remedial exemption set forth in Code section 546(e)" and is preempted.[1232]

Next, analyzing field preemption, the court in *Hechinger* observed that the Bankruptcy Code, and section 544 in particular, provides an exclusive and comprehensive framework for addressing claims seeking to avoid transfers made more than one year[1233] before bankruptcy.  In this way, by "providing and circumscribing the remedies for the conduct alleged, Congress necessarily intended to displace inconsistent state law claims and remedies."[1234]  Thus, the court held that the Bankruptcy Code "preempts the field" and precludes an unjust enrichment claim as a supplemental state law remedy.[1235]  Accordingly, the court dismissed the committee's unjust enrichment claim.[1236]

In the Third Circuit, "the decision of a district court is not binding on a bankruptcy court . . . ."[1237]  Decisions by a district court judge, however, are entitled to substantial deference in the bankruptcy court, particularly when any appeal from the bankruptcy court would go to the

---

[1232] *Id.* at 96.  *But see Loranger Mfg. Corp. v. PNC Bank (In re Loranger Mfg. Corp.)*, 324 B.R. 575, 582 (Bankr. W.D. Pa. 2005) (finding that section 546(e) is applicable but refusing to dismiss claim for unjust enrichment.").

[1233] *Hechinger*, 274 B.R. at 97.  Bankruptcy Code Section 548(a)(1)(A) was amended in 2005, subsequent to the issuance of the *Hechinger* decision, to permit avoidance of transfers made two years prior to the filing of the bankruptcy petition.  *See* 11 U.S.C. § 548(a)(1)(A) (2006).

[1234] *Hechinger*, 274 B.R. at 97.

[1235] *Id.*

[1236] *Id.*  The First Circuit and Sixth Circuit Courts of Appeals, among other federal courts, have likewise applied field preemption to conclude that the Bankruptcy Code is sufficiently comprehensive as to preempt virtually all alternative mechanisms for remedying violations of the Code and all state law claims alleging misconduct in bankruptcy proceedings, including unjust enrichment claims.  *See Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 425-26 (6th Cir. 2000) (holding that state law unjust enrichment claims are preempted by the "pervasive nature of Congress' bankruptcy regulation" through the Bankruptcy Code); *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 447-48 (1st Cir. 2000) (affirming district court's holding that state law cause of action for unjust enrichment is preempted by the Bankruptcy Code); *see also Cox v. Zale Delaware, Inc.*, 242 B.R. 444, 449-50 (N.D. Ill. 1999) (rejecting plaintiff's unjust enrichment claim on basis that "the federal bankruptcy law occupies the field; there is simply no room for the state cause of action"); *Lenoir v. GE Capital Corp. (In re Lenoir)*, 231 B.R. 662, 675 (Bankr. N.D. Ill. 1999).

[1237] *Liquidating Trust of U.S. Wireless Corp. v. Wax (In re U.S. Wireless Corp.)*, 384 B.R. 713, 723 n.94 (Bankr. D. Del. 2008); *see also In re Chodnicki*, 2008 Bankr. LEXIS 250 at *11-12 (Bankr. D.N.J. Jan. 24, 2008); *In re Brown*, 244 B.R. 62, 64 (Bankr. D.N.J. 2000); *cf. Threadgill v. Armstrong World Indus., Inc.*, 928 F.2d 1366, 1371 (3d Cir. 1991) ("[T]here is no such thing as 'the law of the district.'").

district court.[1238] Notwithstanding this deference, under different factual circumstances, one

Delaware bankruptcy court concluded that an unjust enrichment claim is not preempted. In

*Rosener v. Majestic Management, Inc. (In re OODC, LLC),*[1239] the bankruptcy court refused to

dismiss well–pled, unjust enrichment claims because the settlement payment defense of section

546(e) did not apply, and thus, there was no conflict with federal law in allowing the unjust

enrichment claims to go forward.[1240] Although the holding in *In re OODC, LLC* is inconsistent

with a finding that the Bankruptcy Code field preempts a state law claim for unjust enrichment,

the decision did not address field preemption. In the Examiner's view, however, the bankruptcy

court's holding is consistent with the plain meaning of the Bankruptcy Code: Bankruptcy Code

section 546(e), by its terms, only limits avoiding powers, not choses in action that are property of

the estate under Bankruptcy Code section 541(a). Thus, the Examiner leaves the question of

preemption of unjust enrichment claims in equipoise.

    c.    **In Pari Delicto as a Defense to an Unjust Enrichment Claim.**

    A claim for unjust enrichment may also be barred when the plaintiff or its successor is in

pari delicto.[1241] As discussed in greater depth above, under this doctrine a party is foreclosed

from recovering damages if its losses are substantially caused by activities from which it was

legally forbidden to engage.[1242] Also as discussed above,[1243] however, there would be no in pari

---

[1238] *See Chodnicki,* 2008 Bankr. LEXIS 250 at *12.

[1239] 321 B.R. 128 (Bankr. D. Del. 2005).

[1240] *OODC,* 321 B.R. at 144-45; *accord, Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.),* 323 B.R. 857, 876 (Bankr. S.D.N.Y. 2005).

[1241] *See In re Am. Int'l Group, Inc. Consol. Deriv. Litig.,* 976 A.2d 873, 883 (Del. Ch. 2009).

[1242] The doctrine of in pari delicto is more commonly utilized as a defense to claims for aiding and abetting breach of fiduciary duty. That said, at least one court has concluded that a plaintiff's unjust enrichment claim was barred by in pari delicto when the plaintiff and defendant had entered into an illegal contract. *See Ctr. for Athletic Med., Ltd. v. Indep. Med. Billers, Inc.,* 889 N.E.2d 750, 759-60 (Ill. App. Ct. 2008). In reaching this conclusion, the court noted that "[t]he law will not aid either party to an illegal act, but will leave them without remedy as against each other, with the caveat that they are of equal knowledge, willfulness and wrongful intent,

delicto defense to an unjust enrichment claim against directors or officers of Tribune, if a court were to apply the "insider exception" to the in pari delicto defense.

> **d.**    **Examiner's Conclusions and Explanation Concerning Application of Legal Standards to Potential Defendants.**

**Examiner's Conclusions:**

The Examiner concludes that, notwithstanding the deference accorded a Delaware district court opinion, [1244] it is unclear whether a Delaware bankruptcy court would follow *Hechinger* and hold that any such claims against the LBO Lenders and the Selling Shareholders are preempted by the Bankruptcy Code (including section 546(e) specifically, when applicable). [1245] Regardless, the Examiner concludes that it is reasonably unlikely a court would conclude that any such claims, even if not preempted, are meritorious.

**Explanation of Examiner's Conclusions:**

Although certain of the Parties argued that the court's ruling in *Hechinger* is determinative, one Party argued that under Illinois precedent, the settlement payment defense does not bar an unjust enrichment claim, citing *Wieboldt Stores v. Schottenstein.* [1246] The *Wieboldt* case examined section 546(e) and the legislative history thereof, and concluded that the defense was categorically inapplicable to payments to stockholders in a leveraged buyout. [1247] This conclusion was, however, specifically rejected by the Third Circuit Court of Appeals in

---

or *in pari delicto.*" *Ctr. for Athletic Med.,* 889 N.E.2d at 759-60 (citations and quotation marks omitted). *See* Report at § IV.E.3.b.

[1243]   *See* footnotes 1199-1201 and accompanying text.

[1244]   It is possible that, applying the plain meaning of the Bankruptcy Code, the Third Circuit Court of Appeals would eschew the *Hechinger* court's holding.

[1245]   Given the Examiner's conclusion that unjust enrichment claims are preempted, the potential application of the in pari delicto defense to the unjust enrichment claims raised by the Parties is not discussed further herein.

[1246]   131 B.R. 655, 663-65 (N.D. Ill. 1991).

[1247]   *Wieboldt,* 131 B.R. at 665.

*Lowenschuss v. Resorts International, Inc. (In re Resorts International, Inc.).*[1248] Nevertheless, the application of the 546(e) defense to a trustee's avoiding power says nothing about the trustee's pursuit of a chose in action under Bankruptcy Code section 541. Notwithstanding the Delaware district court's analysis in *Hechinger* that unjust enrichment claims based on potentially-voidable transfers or obligations are preempted by the Bankruptcy Code generally, and specifically by section 546(e), when applicable, a bankruptcy court in the District of Delaware has concluded otherwise on an unjust enrichment claim. Thus, the Examiner leaves the question of preemption in equipoise.

Leaving the question of preemption aside, although certain Parties suggested that Tribune holds unjust enrichment claims against the LBO Lenders and the Selling Stockholders, respectively, for the value conferred on those entities resulting from the LBO Lender Debt and the payments of principal and interest on the LBO Lender Debt, and the redemptions payments to the Selling Stockholders, those Parties cited little authority or substantiation for this contention. With respect to payments to Selling Stockholders, Delaware law appears to hold that dividends or redemptions may not be recovered under an unjust enrichment theory when the recipients did not engage in wrongdoing or otherwise tortious behavior.[1249] With respect to payments made and obligations incurred to the LBO Lenders, absent facts justifying avoidance of obligations or transfers or demonstrable wrongdoing such as tortious acts, it is difficult to envision how the fourth element of unjust enrichment, "the absence of justification," could be met, and a court following Third Circuit law is reasonably likely to hold that when the underlying behavior is not tortious.

---

[1248] 181 F.3d 505 (3d Cir. 1999).

[1249] *See LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279, 294-95 (D. Del. 2000); *Territory of U.S. V.I. v. Goldman, Sachs & Co.*, 937 A.2d 760, 796 (Del. Ch. 2007), *aff'd*, 956 A.2d 32 (Del. 2008).

Ultimately, as another Party pointed out, unjust enrichment is largely derivative of other causes of action. To the extent unjust enrichment is asserted against parties who allegedly breached their fiduciary duties to Tribune or aided and abetted the breach of fiduciary duties to Tribune, the analysis of the unjust enrichment claims would be very similar to the analysis of the underlying breach of fiduciary duty or aiding and abetting claims; only the remedy would differ.[1250] The factual difficulties in establishing breach of fiduciary duty or aiding and abetting breach of fiduciary duty would apply to an unjust enrichment claim based on the same facts. In sum, unjust enrichment does not add meaningfully to the analytical equation already extant under the rubric of aiding and abetting or breach of fiduciary duty.

### 5.    Illegal Corporate Distributions.

#### a.    Legal Standard for Illegal Corporate Distributions Pursuant to the DGCL.

Pursuant to the DGCL, a Delaware corporation may purchase, redeem, or otherwise acquire its own shares.[1251] This authority is limited, however, by DGCL section 160(a), which prohibits a corporation from purchasing or redeeming its own shares of stock "when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation . . . ."[1252] A stock purchase or redemption impairs capital "if the funds used in the repurchase exceed the amount of the corporation's 'surplus'. . . ."[1253]

---

[1250] *See Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris*, 171 F.3d 912, 936 (3d Cir. 1999); *N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 15 n.3 (1st Cir. 2009).

[1251] *See* DEL. CODE ANN. tit. 8, § 160 (2010).

[1252] DEL. CODE ANN. tit. 8, § 160(a)(1) (2010); *see Klang v. Smith's Food & Drug Ctrs., Inc.*, 702 A.2d 150, 153 (Del. 1997).

[1253] *Klang*, 702 A.2d at 153 (internal citation omitted). "Surplus" is defined by DGCL section 154 to mean the excess of net assets over the par value of the corporation's issued stock. *Klang*, 702 A.2d at 153 (citing DEL. CODE ANN. tit. 8, § 154).

Consequently, to conduct a lawful stock purchase or redemption, the net assets of the corporation must exceed its total liabilities.[1254]

In determining surplus, however, the corporation is not bound by its balance sheets.[1255] The DGCL recognizes that unrealized appreciation or depreciation, for example, may render a corporation's books misleading. Thus, in assessing conformity with section 160, courts permit a corporation "to revalue properly its assets and liabilities to show a surplus."[1256] Typically, courts defer to a board's determination of surplus, unless "a plaintiff can show that the directors 'failed to fulfill their duty to evaluate the assets on the basis of acceptable data and by standards which they are entitled to believe reasonably reflect present values.'"[1257] Thus, the few cases that have addressed this question have suggested that absent a showing of bad faith or fraud, the courts will defer to the judgment of the directors in determining the existence of a surplus and will not second guess them.[1258]

A Delaware corporation also is authorized, pursuant to DGCL section 170, to declare and pay dividends on shares of its capital stock out of its surplus, or, if there is no surplus, out of its net profits either for the fiscal year in which the dividend is declared or in the preceding year.[1259]

---

[1254] *See Kohls v. Duthie*, 791 A.2d 772, 784 (Del. Ch. 2000); *see also Pereira v. Dow Chem. Co. (In re Trace Int'l Holdings, Inc.)*, 287 B.R. 98, 107-08 (Bankr. S.D.N.Y. 2002), *vacated on other grounds*, 2009 U.S. Dist. LEXIS 55168 (S.D.N.Y. June 25, 2009).

[1255] *Klang*, 702 A.2d at 154.

[1256] *Id.*; *see also Sheffield Steel Corp. v. HMK Enters., Inc. (In re Sheffield Steel Corp.)*, 320 B.R. 423, 449-50 (Bankr. N.D. Okla. 2004) (quoting *Morris v. Standard Gas & Elec. Co.*, 63 A.2d 577, 582 (Del. Ch. 1949)). In *Sheffield Steel*, the record failed to establish that the board had acted with care by engaging qualified professionals to determine capital adequacy before declaring a dividend.

[1257] *Klang*, 702 A.2d at 155-56 (quoting *Morris*, 63 A.2d at 582).

[1258] *Id. at* 156; *Morris*, 63 A.2d at 585 (". . . I am persuaded that this court cannot substitute either plaintiff's or its own opinion of value for that reached by the directors where there is no charge of fraud or bad faith.").

[1259] DEL. CODE ANN. tit. 8, § 170(a) (2010). The statute provides, in relevant part:

(a) The directors of every corporation, subject to any restrictions contained in its certificate of incorporation, may declare and pay dividends upon the shares of its capital stock, or to its members if the corporation is a nonstock corporation, either (1) out of its surplus, as defined in and computed in accordance with §§ 154 and 244 of this title, or (2) in case there shall be no such

Any payment of dividends *except* out of surplus or net profits is prohibited specifically by DGCL section 173.[1260]

When a corporation has conducted an unlawful stock purchase or redemption or made an unlawful payment of dividends in contravention of the relevant DGCL provisions, the directors of the corporation may be subject to personal liability.[1261]  Specifically, DGCL section 174 prescribes that a director who willfully or negligently violates DGCL sections 160 or 173 "shall be jointly and severally liable . . . to the corporation, and to its creditors in the event of its dissolution or [insolvency]."[1262]  The purpose of section 174 is to protect those who relied upon the stated capital of the corporation in extending credit, because "when the corporation impairs that capital by an illegal redemption of stock, it depletes the creditors' 'trust fund' and seriously jeopardizes their means to recover their debts."[1263]

Courts have specifically recognized the viability of claims based on DGCL section 174 in the leveraged buyout context,[1264] and have concluded that elements of such transactions may constitute unlawful distributions subjecting a director to personal liability.[1265]

---

surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year.

[1260]  DEL. CODE ANN. tit. 8, § 173 (2010).  The fundamental premise underlying these DGCL sections is that capital constitutes, in essence, a trust fund available for payment of corporate debt, which has priority over the rights of equity holders. *See Sheffield Steel*, 320 B.R. at 448.

[1261]  DEL. CODE ANN. tit. 8, § 174(a) (2010).

[1262]  *Johnston v. Wolf*, 487 A.2d 1132, 1136 (Del. 1985) (citing Del. Code tit. 8, § 174(a)) (emphasis omitted). Section 174(a) allows a claim to be brought "at any time within 6 years after paying [an] unlawful dividend or after [an] unlawful stock purchase or redemption. . . ." DEL. CODE ANN. tit. 8, § 174(a) (2010).  Dissenting or absent directors may be absolved of liability if they caused their dissent to be entered on the corporate books and records at the proceeding or immediately thereafter. DEL. CODE ANN. tit. 8, § 174(a) (2010).

[1263]  *Johnston*, 487 A.2d at 1134-35 (internal citation omitted). *See generally Sheffield Steel*, 320 B.R. at 448.

[1264]  *See, e.g., Off. Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Group, Inc. (In re Buckhead Am. Corp.)*, 178 B.R. 956, 969-74 (D. Del. 1994) (denying directors' motion to dismiss illegal corporate distributions claim premised upon corporate subsidiary's financing of leveraged buyout); *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 1000-01 (S.D.N.Y. 1991) (denying motion to dismiss claim against directors based upon DGCL sections 160 or 173 in leveraged buyout context, noting that "the economic substance of the transactions in question brings them within the purview of the relevant sections of the [DGCL]").

Although section 174 does not expressly authorize a cause of action against stockholder recipients of allegedly illegal corporate distributions, courts in the Third Circuit and elsewhere have interpreted Delaware law to recognize a cause of action against stockholders to recover the distributions paid to them.[1266] For example, in *PHP Liquidating, LLC v. Robbins*,[1267] the United States District Court for the District of Delaware considered the viability of creditors' claims against stockholders arising from an allegedly unlawful stock distribution in violation of DGCL section 160.[1268] Noting that DGCL section 174(c) specifically entitles directors who are found liable for unlawful stock redemptions to be subrogated to the rights of the corporation against stockholders who received payments with knowledge of facts indicating that they were unlawful, the court in *PHP Liquidating, LLC* concluded that stockholders could be held liable under section 174 — but only if the stockholders acted in bad faith.[1269] Although other courts addressing similar claims alleged against shareholders likewise have recognized notice of the unlawful nature of the payment or bad faith as prerequisites, other courts have not imposed this requirement.[1270]

---

[1265] *See Buckhead Am.*, 178 B.R. at 969-74; *Crowthers*, 129 B.R. at 1000-01.

[1266] *PHP Liquidating, LLC v. Robbins*, 291 B.R. 603, 609 (D. Del. 2003) (recognizing that principle, but denying relief because claim was brought by assignee of individual creditors, and not the corporation, and because of failure to allege knowledge that stock redemption was unlawful or was received in bad faith), *aff'd*, 128 F. App'x 839 (3d Cir. 2005); *Sheffield Steel Corp. v. HMK Enters., Inc. (In re Sheffield Steel Corp.)*, 320 B.R. 405, 415 (Bankr. N.D. Okla. 2004) (applying Delaware law); *Weinman v. Fidelity Capital Appreciation Fund (In re Integra Realty Res., Inc.)*, 198 B.R. 352, 364-65 (Bankr. D. Colo. 1996) (applying Delaware law); *cf. Stanley v. Brock (In re Kettle Fried Chicken of Am., Inc.)*, 513 F.2d 807, 813 (6th Cir. 1975) (applying Delaware law).

[1267] 291 B.R. 603 (D. Del. 2003).

[1268] *PHP Liquidating*, 291 B.R. at 608.

[1269] *PHP Liquidating*, 291 B.R. at 608. In the absence of any allegation of bad faith, the court concluded that the stockholders had redeemed their stock in good faith and denied the creditors' claim. *Id.* at 609.

[1270] *See, e.g., EBS Litig. LLC v. Barclays Global Investors, N.A.*, 304 F.3d 302, 307 (3d Cir. 2002) (noting that directors "could recover from the recipients of the dividend only if the recipients had been aware of the impropriety in issuing the dividend"); *Sheffield Steel*, 320 B.R. at 415 (noting that "[i]t is not clear to the Court whether bad faith is an element of the claim which must be alleged, or good faith is an affirmative defense, which need not be pleaded," but concluding that "the Court will assume that some element of knowledge of [the corporation's] financial condition, actual or imputed, on the part of a shareholder, is required to state a claim"); *Integra Realty*, 198 B.R. at 365 (recognizing implied cause of action against stockholders to recover illegal

It bears noting that conduct that exposes a director to potential liability pursuant to DGCL section 174 may also subject the director to liability for breach of fiduciary duty.[1271] For instance, a director may be charged with a breach of fiduciary duty for failing to appropriately discharge fiduciary duties in determining whether the corporation has a surplus.[1272] Directors are, however, entitled to the protection of a statutory safe harbor for reliance in good faith on valuation reports pursuant to section 172.[1273] Section 172 provides that:[1274]

> A member of the board of directors, or a member of any committee designated by the board of directors, shall be fully protected in relying in good faith upon . . . such information, opinions, reports or statements presented to the corporation by any of its officers or employees, or committees of the board of directors, or by any other person as to matters the director reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation, as to the value and amount of the assets, liabilities and/or net profits of the corporation or any other facts pertinent to the existence and amount of surplus or other funds from which dividends might properly be declared and paid, or with which the corporation's stock might properly be purchased or redeemed.

---

dividends paid, if stockholders had knowledge of illegality); *cf. Stanley v. Brock (In re Kettle Fried Chicken of Am., Inc.)*, 513 F.2d 807, 812 (6th Cir. 1975) (holding that DGCL section 160 affords a remedy for creditors against "innocent shareholders who have sold stock to the corporation in good faith and without knowledge that the capital of the corporate was impaired at the time of the sale," on basis that when "the corporate act is illegal, the shareholder's lack of knowledge of the illegality cannot be controlling"). Notably, the court in *PHP Liquidating* expressly rejected the court's recognition in *Kettle Fried Chicken* of an implied remedy against shareholders arising under DGCL section 160, as opposed to section 174, characterizing it as "unpersuasive" and "contrary to Delaware's statutory scheme." *See PHP Liquidating*, 291 B.R. at 609.

[1271] *See Brehm v. Eisner*, 746 A.2d 244, 264 (Del. 2000) (noting that failure to exercise "substantive due care" is "foreign to the business judgment rule"); *Propp v. Sadacca*, 175 A.2d 33, 38 (Del. Ch. 1961) (holding that chairman was not entitled to rely on business judgment rule in defending stock redemption made for the purpose of retaining control when corporation was in financial difficulty), *aff'd in relevant part and rev'd in part sub nom., Bennett v. Propp*, 187 A.2d 405 (Del. 1962).

[1272] *Klang*, 702 A.2d at 156-57.

[1273] *Id.* at 156 n.12. This safe harbor is analogous to that provided by DGCL section 141(e) in the context of a breach of fiduciary duty analysis, pursuant to which directors are entitled to rely on data provided to the board. *See* Report at § IV.E.2.a.(5).

[1274] DEL. CODE ANN. tit. 8, § 172 (2010); *see Klang*, 702 A.2d at 152 ("Directors have reasonable latitude to depart from the balance sheet to calculate surplus, so long as they evaluate assets and liabilities in good faith, on the basis of acceptable data, by methods that they reasonably believe reflect present values, and arrive at a determination of the surplus that is not so far off the mark as to constitute actual or constructive fraud."); *see also Sheffield Steel*, 320 B.R. at 449. Notably, exculpation of directors from section 174 liability by means of a charter provision is specifically prohibited by DGCL section 102(b)(7). DEL. CODE ANN. tit. 8, § 107(b)(7)(iii) (2010).

### b.    Potential Preemption Issues.

Illegal corporate distribution claims pursuant to the DGCL, like unjust enrichment claims

pursuant to Delaware common law,[1275] might be vulnerable to federal preemption in the

bankruptcy context.  As discussed above, courts of the Third Circuit have interpreted the

"settlement payment" defense set forth in Bankruptcy Code section 546(e) broadly, beyond the

scope of its plain meaning.[1276]  Consistent with this reading, at least one court has held that

section 546(e) acts to bar claims for illegal corporate distributions pursuant to DGCL sections

160 and 173.[1277]  For reasons discussed above, the Examiner leaves the question of preemption

in equipoise.

### c.    Examiner's Conclusions and Explanation Concerning Application of Legal Standards to Potential Defendants.

**Examiner's Conclusions:**  A court is reasonably unlikely to find that a claim for illegal

corporate distributions pursuant to the relevant provisions of the DGCL could be sustained

against Tribune's directors based on the Step One Transactions, and is somewhat unlikely to find

that such a claim could be sustained against Tribune's directors based on the Step Two

Transactions.

---

[1275] *See* Report at § IV.E.4.b.

[1276] *See, e.g., Brandt v. B.A. Capital Co., L.P. (In re Plassein Int'l Corp.)*, 590 F.3d 252, 258-59 (3d Cir. 2009) (following *Resorts International* in holding that transfer of acquisition proceeds paid for privately-traded shares in leveraged buyout transaction through financial institution was insulated under Bankruptcy Code section 546(e) as settlement payment); *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 514-16 (3d Cir. 1999) (concluding that transfer of stock sale proceeds in leveraged buyout transaction from transfer agent to broker for the account of the selling stockholder, without involvement of clearing agency, constituted "settlement payment").  *See* Report at § IV.E.4.b.

[1277] *Off. Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*, 344 B.R. 340, 351-68, 380-81 (W.D. Pa. 2006) (examining cases interpreting section 546(e), including *Resorts International* and *Hechinger*, in holding that settlement payment defense precluded prosecution of directors under DGCL sections 160 and 173 for unlawful distributions of payments that were settled though a financial institution, financial participant, or securities clearing agency).  *But see PHP Liquidating*, 291 B.R. at 607 (rejecting argument that Bankruptcy Code section 546(e) barred creditors' claims against stockholders based on DGCL section 160).

**Explanation of Examiner's Conclusions**:

Certain Parties argued that Tribune violated DGCL sections 160 and 173 by making payments to Selling Stockholders pursuant to the Tender Offer and Merger components of the Leveraged LBO Transactions, such that the Tribune Board, having authorized these payments, should be held jointly and severally liable to the corporation for willful or negligent violation of these provisions pursuant to DGCL section 174.

The Selling Stockholders received approximately $4.284 billion in connection with the Tender Offer at Step One.[1278]  As detailed in another part of the Report, the record adduced in this Investigation likely fails to establish that the Tender Offer occurred at a time when Tribune's capital was impaired, or that the Tender Offer caused an impairment of Tribune's capital.[1279]  Absent this prerequisite, a claim pursuant to DGCL sections 160 and 173 arise from Tribune's payments to the Selling Stockholders in connection with the Tender Offer.  Even if insolvency could be demonstrated in hindsight, a court would be reasonably likely to find that the Tribune Board is entitled to the protection of DGCL section 172.  As described above, this safe harbor provision shields the Tribune Board from exposure pursuant to DGCL section 174 to the extent that, in approving the Tender Offer, it relied in good faith on information, opinions, reports, or statements regarding Tribune's finances presented by officers, employees, committees, or any other persons, selected with reasonable care, concerning matters reasonably believed to be within the professional or expert competence of those persons.  The evidence in the record reflects that the Tribune Board relied in good faith on the information provided to it by the Special Committee and its Financial Advisors in deciding to authorize the Tender Offer.[1280]

---

[1278] *See* Report at § IV.B.1.

[1279] *See id.* at § IV.B.5.d.(8)-IV.B.5.d.(9).

[1280] *See id.* at § III.D.1 f. and III.D.1.g.

The Selling Stockholders also received approximately $3.982 billion in Merger Consideration in connection with Step Two.[1281]  As discussed in another part of the Report, the Examiner concludes that it is highly likely that Tribune and reasonably likely that the Guarantor Subsidiaries were rendered insolvent at Step Two.[1282]  As a result, a claim against Tribune's directors pursuant to DGCL sections 160 and 173 could potentially arise from Tribune's payment of the Merger Consideration at Step Two unless their good faith reliance on solvency analyses presented to them triggers the protection of the safe harbor provision of DGCL section 172.

As described elsewhere in the Report, the record adduced in this Investigation indicates that the Tribune Board failed to carefully scrutinize information presented by Tribune management and by VRC in order to evaluate the risk that closing on the Step Two Transactions would render Tribune insolvent.[1283]  If the Tribune Board relied blindly on flawed or inaccurate data or projections presented to it without making any reasonable inquiry into the soundness of this information, a question would arise as to whether the Tribune Board is protected from liability under DGCL section 174 by the safe harbor provision.[1284]  Here, however, as discussed previously, the record reflects at least some modicum of inquiry and evaluation by the Tribune Board, and probably falls short of supporting any finding of conscious abdication of responsibility or intentional wrongdoing in the Tribune Board's deliberations at Step Two.[1285]

---

[1281] *See id.* at § IV.B.1.

[1282] *See id.* at §§ IV.B.5.d.(10), IV.B.5.d.(11).

[1283] *See id.* at § IV.B.4.c.(5).

[1284] *See Klang*, 702 A.2d at 152; *see also Van Gorkom*, 488 A.2d at 875-88; *Mills Acquisition*, 559 A.2d at 1283-84.

[1285] *See Report* at §§ IV.E.2.e.(4), IV.E.2.e.(5).

6.    **Professional Malpractice Claims.**[1286]

a.    **Legal Standard for Professional Malpractice Claims.**

Illinois defines "malpractice" generally as "[a]n instance of negligence or incompetence on the part of a professional."[1287]  Under Illinois law, the elements of a cause of action for professional malpractice are the same as the elements necessary to establish a negligence case: "the existence of a relationship between the professional and client, a duty arising from that relationship, a breach of that duty, causation, and damages resulting from that breach."[1288]  In such cases, the duty coincides with the elevated position the law assigns to professionals: "In . . . a professional negligence case, the standard of care required of a defendant is to act as would an 'ordinarily careful professional.'  Pursuant to this standard of care, professionals are expected to use the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise under similar circumstances."[1289]  To establish a malpractice cause of action in Illinois, a plaintiff must use an expert witness to establish both "(1) the standard of care expected of the

---

[1286] The Parties only raised a potential professional malpractice claim against VRC for alleged negligence in its preparation of the solvency opinions. Somewhat surprisingly, no Party advocated any malpractice claims against other participants in the Leveraged ESOP Transactions. Thus, the Examiner did not evaluate the merits of any professional malpractice claims against any entities other than VRC.

[1287] *Childs v. Pinnacle Health Care, LLC*, 926 N.E.2d 807, 819-20 (Ill. App. Ct. 2010); *see also Roe v. Catholic Charities of the Diocese of Springfield, Ill.*, 588 N.E.2d 354, 363 (Ill. App. Ct. 1992) ("'Malpractice' is defined . . . as '[a]ny professional misconduct, unreasonable lack of skill or fidelity in professional or fiduciary duties, evil practice, or illegal or immoral conduct.'") (quoting BLACK'S LAW DICTIONARY 1111 (4th rev. ed. 1968)).

[1288] *Bus. Commc'ns, Inc. v. Freeman*, 1994 U.S. Dist. LEXIS 2304, at *10 (N.D. Ill. Mar. 2, 1994) (evaluating claim of malpractice in performance of accounting services under Illinois law); *see also MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC*, 845 N.E.2d 22, 30 (Ill. App. Ct. 2006) (same); *Catholic Charities of Springfield*, 588 N.E.2d at 363 (addressing claim of social worker malpractice under Illinois law); *cf. Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 630 (Del. Ch. 2005) (citing substantially identical elements for claim of professional malpractice under Delaware law), *aff'd in part and rev'd in part on other grounds*, 901 A.2d 106 (Del. 2006).

[1289] *Jones v. Chi. HMO Ltd.*, 730 N.E.2d 1119, 1130 (Ill. 2000) (citations omitted); *cf. Wal-Mart Stores*, 872 A.2d at 630 n.89 (stating that "'professionals' are held to a higher standard of care").

professional and (2) [that] the professional's deviation from the standard caused the plaintiff's injury."[1290]

Under Illinois law, the duty of care exists when the litigants "stand in such a relationship to one another that the law imposes upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff."[1291]  Whether such a duty is owed is a question of law.[1292]  In making that assessment, the court must examine the foreseeability, likelihood, and gravity of the harm or injury; the magnitude of the burden of guarding against the harm or injury and the consequences of imposing such a burden; and the utility of the challenged conduct.[1293]

In evaluating the viability of a professional malpractice claim under Illinois law when the parties' relationship is based on a contract, the court must consider Illinois' version of the economic loss doctrine, known as the "*Moorman* doctrine."[1294]  Under this doctrine, when a claimant's only incurred loss is economic,[1295] the claimant generally is limited to contract damages, "even if the defendant's alleged conduct [would otherwise have] constituted a tort as

---

[1290] *Kinzinger v. Tull*, 770 N.E.2d 246, 253 (Ill. App. Ct. 2002) (noting standard for "professional malpractice cases"); *see also Chi. HMO Ltd.*, 730 N.E.2d at 1130 (stating that "[t]he rationale for requiring expert testimony is that a lay juror is not skilled in the profession and thus is not equipped to determine what constitutes reasonable care in professional conduct without the help of expert testimony," although exceptions exist where the expert's behavior is "so grossly negligent" or the proper behavior "so common that a lay juror could readily appraise it").

[1291] *AYH Holdings, Inc. v. Avreco, Inc.*, 826 N.E.2d 1111, 1125 (Ill. App. Ct. 2005) (quotations and citations omitted).

[1292] *See Chi. HMO Ltd.*, 730 N.E.2d at 1134 ("Whether a duty exists is a question of law to be determined by the court.") (citation omitted); *AYH Holdings, Inc.*, 826 N.E.2d at 1125 (same effect); *Catholic Charities of Springfield*, 225 Ill. App. 3d at 533, 588 N.E.2d at 363 (same effect).

[1293] *See AYH Holdings*, 826 N.E.2d at 1125-26 (citations omitted); *Catholic Charities of Springfield*, 588 N.E.2d at 363 (citation omitted); *see also Chi. HMO Ltd.*, 730 N.E.2d at 1134 (listing factors in context of medical malpractice against health maintenance organization).

[1294] *Chatz v. Bearing Point Inc. (In re Nanovation Techs., Inc.)*, 364 B.R. 308, 343 (Bankr. N.D. Ill. 2007) (discussing *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443 (1982)).

[1295] The Illinois Supreme Court defined "economic loss" to encompass "'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits – without any claim of personal injury or damage to other property . . .' as well as 'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.'" *Moorman*, 435 N.E.2d at 449 (citations omitted).

well as a breach of contract."[1296] Nevertheless, the *Moorman* doctrine does not apply to prevent recovery in tort when the defendant has either made (1) intentionally false representations, or (2) negligent misrepresentations and "is in the business of supplying information for the guidance of others in their business transactions."[1297] This latter exception, known as the "business professional exception" to the *Moorman* doctrine, removes the economic loss bar from professional malpractice actions against attorneys, accountants, and business consultants.[1298] As such, a professional malpractice claim against such professionals may, under Illinois law, "be couched in either contract or tort law."[1299]

**b.    Legal Standards Governing In Pari Delicto Defenses to Professional Malpractice Claims.**

Illinois law recognizes the doctrine of in pari delicto.[1300] As applied in Illinois, in pari delicto dictates that, when opposing litigants are "of equal knowledge, willfulness and wrongful intent" as respects an illegal act, "the law will not aid either party" but will instead "leave them

---

[1296] *Nanovation Techs.*, 364 B.R. at 343. In *Moorman*, the Illinois Supreme Court had reasoned that "[w]hen the defect is of a qualitative nature and the harm relates to the consumer's expectation that a product is of a particular quality so that it is fit for ordinary use, contract, rather than tort, law provides the appropriate set of rules for recovery." *Moorman*, 435 N.E.2d at 451.

[1297] *Nanovation Techs.*, 364 B.R. at 343; *Moorman*, 435 N.E.2d at 452.

[1298] *Nanovation Techs.*, 364 B.R. at 343-44 (finding the "business professional exception" to the *Moorman* doctrine applicable to permit professional negligence claim against KPMG for performance of stock valuation services) (citations omitted); *see also Congregation of the Passion*, 636 N.E.2d 503, 512-15 (Ill. 1994) (in assessing whether the economic loss doctrine bars tort recovery against accountants, "[w]e find that it does not"); *Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 666 N.E.2d 881, 885 (Ill. App. Ct. 1996) ("[T]he *Moorman* doctrine does not bar recovery for economic losses for professional malpractice actions against accountants."); *Waters v. Reingold*, 663 N.E.2d 126, 135 (Ill. App. Ct. 1996) (same), *overruled on other grounds by Niccum v. Botti, Marinaccio, DeSalvo & Tameling, Ltd.*, 694 N.E.2d 562 (Ill. 1998); *Lozosky v. State*, 2001 Ill. Ct. Cl. LEXIS 29, at *14 n.2 (Ill. Ct. Cl. July 19, 2001) (observing that Illinois Supreme Court "has seen fit to continue a piecemeal approach to applying the *Moorman* doctrine to professional malpractice of architects and . . . engineers but not to attorneys or accountants'") (citation omitted).

[1299] *Waters*, 663 N.E.2d at 135.

[1300] *King v. First Capital Fin. Servs. Corp.*, 828 N.E.2d 1155, 1173 (Ill. 2005).

416

without remedy as against each other."[1301]  In identifying an entity's status for purposes of in pari

delicto, the doctrine borrows the familiar tenet that "[s]ince corporations act through their

officers, the actions of the officers are . . . imputed to the corporation."[1302]  Thus, when a

corporate officer commits a fraud, for example, that fraud is imputed back to the officer's

corporation — provided the fraud was committed in the course of employment and for the

corporation's benefit.[1303]  If so imputed, the officer's wrongful conduct triggers in pari delicto

and, in turn, defeats any claim by the corporation against defendants complicit in the

wrongdoing.[1304]  If that corporation has entered bankruptcy, the trustee steps into the

corporation's shoes, and normally succeeds to the rights of (and becomes exposed to the defenses

against) the corporation.[1305]

Two recent decisions have examined the in pari delicto doctrine under Illinois law in

circumstances instructive on the doctrine's application here.[1306]  Both cases confronted the

doctrine in a professional malpractice context asserted against a corporation's auditors and

---

[1301] *Vine St. Clinic v. HealthLink, Inc.*, 856 N.E.2d 422, 436 (Ill. 2006) (citations omitted); *Ctr. for Athletic Med., Ltd. v. Indep. Med. Billers, Inc.*, 889 N.E.2d 750, 759-60 (Ill. App. Ct. 2008).

[1302] *Grede v. McGladrey & Pullen LLP*, 421 B.R. 879, 885 (N.D. Ill. 2009); *see also McRaith v. BDO Seidman, LLP*, 909 N.E.2d 310, 331 (Ill. App. Ct. 2009) ("Generally, the knowledge and conduct of agents are imputed to their principals.").

[1303] *See Off. Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 358 (3d Cir. 2001).

[1304] *See R.F. Lafferty & Co.*, 267 F.3d at 355 ("If wrongdoing is imputed, then the *in pari delicto* doctrine comes into play and bars a suit.").

[1305] *See Bank of Marin v. England*, 385 U.S. 99, 101 (1966) ("The trustee succeeds only to such rights as the bankrupt possessed; and the trustee is subject to all claims and defenses which might have been asserted against the bankrupt but for the filing of the petition."); *Grede*, 421 B.R. at 885 ("The essential principle of bankruptcy law is that the trustee stands in the exact place of the debtor.").

[1306] Illinois law would govern the application of the *in pari delicto* defense, because the cause of action for malpractice would be under Illinois law. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 90 (1994) (Stevens, J., concurring) ("Because state law provides the basis for respondent FDIC's claim, that law also governs both the elements of the cause of action and its defenses.").

considered whether the alleged fraud of corporate officers must be imputed against, respectively, a bankruptcy trustee and the liquidator of insolvent insurance companies.[1307]

In *Grede v. McGladrey & Pullen LLP*, the United States District Court for the Northern District of Illinois found "a clear consensus" in the case law that bankruptcy trustees are not insulated from the assertion of the in pari delicto defense and do not possess a sort of "innocent successor" antidote to the doctrine's effect.[1308] Nevertheless, although lacking a broad categorical insulation from the doctrine, the court observed that bankruptcy trustees still retain the ability to defeat in pari delicto if the corporate officers' fraud "was not perpetrated for the benefit of the debtor corporation, but rather only for the benefit of the wrongdoers . . . ."[1309] The court emphasized, however, that this "adverse interest exception" applies only "when the corporate officers act entirely for their own interests and the actions do not benefit the corporation."[1310]

The court explained the narrow scope of the exception as follows:[1311]

> The reason one must carefully examine what benefit accrued to the corporation is that corporate officers, even in the most upright enterprises, can always be said, in some meaningful sense, to act for their own interests, particularly when those officers own all or a very large piece of the business and control it. The adverse interest exception swallows the rule if all that is required to invoke it is a secondary, or indirect benefit of keeping the enterprise alive to preserve their jobs or increase the paper value of their ownership shares.

Having established these governing principles, the court still denied the auditors' motion to dismiss the trustee's malpractice claim on in pari delicto grounds, citing the uncertainty on the

---

[1307] *Grede*, 421 B.R. at 884 (assessing doctrine's applicability against bankruptcy trustee); *McRaith*, 909 N.E.2d at 331 (assessing doctrine's applicability against liquidator of insolvent insurers).

[1308] *Id.* at 885 (collecting cases).

[1309] *Id.* at 885-86.

[1310] *Id.* at 886.

[1311] *Id.*

undeveloped record whether the benefits alleged to have befallen the corporate debtor were truly "meaningful" or merely "illusory."[1312]

The in pari delicto defense met with even less success before the Appellate Court of Illinois in *McRaith v. BDO Seidman, LLP*.[1313]  In that case, the director of the Illinois Division of Insurance, as liquidator of an insolvent insurance company, sued BDO Siedman for malpractice in its audit of the insurance company and BDO Seidman asserted in the in pari delicto defense based on the fraud of the insurance company's principal.[1314]  The director asserted that in pari delicto should not apply to him as liquidator of the insurance company and that, in any event, the adverse interest exception would apply.[1315]  As in *Grede*, the court recognized the existence of the adverse interest exception and found that the director has alleged facts that would trigger the exception.[1316]  However, the court further held:[1317]

> In the instant case, the *in pari delicto* doctrine cannot apply because the Liquidator, by statutory definition, is not the wrongdoer; rather, he serves to protect the insurance industry and the public interest by ensuring the victims of the misconduct can recover monies entitled to them.  To equate the Liquidator with Engle under *in pari delicto* is illogical and unavailing. . . . [¶] Accordingly, we find as a matter of first impression that the

---

[1312] *Id.* at 888-89.  That said, the court was not especially bullish on the trustee's chances of ultimately defeating in pari delicto as the record matured.  *See id.* at 888 ("I would rate [the trustee's] potential success to be less than certain.").  Indeed, the court noted the apparent soundness of the complaint's allegations of benefits to the corporation from the claimed fraud: "Its apparent success attracted clients and capital, reduced debt, increased income from investments and increased trading gains allowed to [the corporation's] own account. . . . [T]he benefit was of limited duration.  *But that is enough.*"  *Id.* at 886 (emphasis added).

[1313] 909 N.E.2d 310 (Ill. App. Ct. 2009).

[1314] *Id.* at 314.

[1315] *Id.* at 329.

[1316] *Id.* at 331 ("An exception to this [officer-action-imputed-to-corporation] rule exists where the agent's interests are adverse to the principal."); *see also id.* at 332 ("'[W]hen a corporate officer or agent engages in fraudulent conduct for the distinctly private purpose of lining his own pockets at his corporation's expense, it is unlawful, as well as illogical, to impute the agent's guilty knowledge or disloyal, predatory conduct to his corporate principal.'" (quoting *Reider v. Arthur Andersen, LLP*, 784 A.2d 464, 470 (Conn. Super. Ct. 2001)).

[1317] 909 N.E.2d 310, 336 (Ill. App. Ct. 2009).  *But see Holland v. Arthur Andersen & Co.*, 469 N.E.2d 419, 424 (Ill. App. Ct. 1984) (holding that *in pari delicto* barred action because "liquidation trustee may only pursue those claims which belong to the estate of the debtor corporation").

imputation defense is inapplicable against the Liquidator.

       **c.**    **Effect of Indemnification Rights on Professional Malpractice Claims.**

Under Illinois law, an indemnity contract that is clear, explicit, and unambiguous must be enforced as written.[1318] A contract that agrees to indemnify a negligent actor from its own negligence falls within this general rule and, under Illinois law, must be enforced.[1319] In fact, enforcement of an indemnification against willful misconduct is not always foreclosed.[1320] Likewise, when an agreement includes a clause imposing a limitation on damages, such a clause is enforceable under Illinois law as long as the limitation is expressly stated and no public policy bar exists.[1321]

In connection with Tribune's engagement of VRC to prepare the solvency opinions, Tribune executed an Indemnification Agreement in favor of VRC.[1322] In the Indemnification Agreement, Tribune agreed that:[1323]

> [N]o Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or the Company's equity holders or creditors related to, arising out of or in connection with VRC's engagement except to the extent that any loss, claim, damage or liability is found . . . to have resulted primarily from such Indemnified Person's bad faith, willful misconduct or gross negligence.

The Indemnification Agreement also included a limitation on damages, stating that:[1324]

---

[1318] *See Chi. Hous. Auth. v. Fed. Sec., Inc.*, 161 F.3d 485, 487-88 (7th Cir. 1998).

[1319] *See id.* at 487-88 (noting that such indemnification need not be accomplished by "specific reference," if an indemnity against negligence is a "fair and reasonable interpretation based upon a consideration of all of its language and provisions") (citations omitted).

[1320] *See id.* at 488, 489 (although such indemnification is "as a general rule" against public policy, "[w]e see nothing in the general Illinois rule against contracts to indemnify someone for the consequences of its intentional or negligent acts that would preclude enforcement of a contract requiring the primary wrongdoer to bear the financial burden of its actions.") (citations omitted).

[1321] *See ExxonMobil Oil Corp. v. Amex Constr. Co.*, 2010 U.S. Dist. LEXIS 26343, at *71-72 (N.D. Ill. Mar. 19, 2010).

[1322] *See* Ex. 263 (Solvency Engagement Letter with attached Indemnification Agreement between the Company and VRC, dated April 11, 2007).

[1323] *Id.* (Indemnification Agreement).

The Company agrees that in the event of any claim brought by the Company against VRC relating to the Engagement Letter, VRC's liability to the Company shall be limited to the total amount of fees paid by the Company to VRC under the Engagement Letter. This limitation of liability shall not apply to any damages determined to have resulted from VRC's bad faith, gross negligence or willful misconduct.

       **d.**      **Examiner's Conclusions and Explanation Concerning Application of Legal Standards to VRC.**

**Examiner's Conclusions:**  The Examiner leaves in equipoise the question whether a professional malpractice claim could be sustained against VRC.

**Explanation of Examiner's Conclusions:**

*Redacted*

421

*Redacted*

# ANNEX A

*Annex A is redacted in its entirety.*

# ANNEX B

*Annex B is redacted in its entirety.*

# ANNEX C

*Annex C is redacted in its entirety.*