**Exhibit 5.3.2 – Directors and Officers of Reorganized Tribune**

**EXHIBIT 5.3.2**

**Directors and Officers of Tribune[1]**

I.    **Initial Board of Directors**

The Debtors anticipate that the current directors of Tribune[2] will serve on Tribune's board of directors after the Confirmation Date until the Effective Date. Set forth below is a table that identifies the current directors of Tribune and the other affiliations of each such director. The Debtors shall supplement this Exhibit 5.3.2 with information concerning the identity of the proposed directors of Reorganized Tribune that shall serve on and after the Effective Date as that information becomes available.

| Name | Other Affiliations |
|---|---|
| Jeffrey S. Berg | Mr. Berg is Chairman and Chief Executive Officer of International Creative Management, Inc. ("ICM"), a talent and literary agency representing clients in the fields of publishing, motion pictures, television, music and theater. Mr. Berg was named President of ICM in 1980 and became Chairman in 1985 . Mr. Berg is also a director of Oracle Corporation (NASDAQ: ORCL). He is currently on the Board of Trustees of the Anderson School of Management at the University of California at Los Angeles. |
| Brian L. Greenspun | Mr. Greenspun is Chairman and Chief Executive Officer of The Greenspun Corporation, a privately owned firm based in Henderson, Nevada, with interests in media and commercial real estate development. He also is President and Editor of the Las Vegas Sun, the oldest family-owned newspaper in Nevada. |
| Betsy D. Holden | Ms. Holden has been a senior advisor to McKinsey & Company since April 2007. Ms. Holden served as President-Global Marketing and Category Development of Kraft Foods Inc. (NYSE: KFT), a food business unit of Altria Group Inc., from January 2004 through June 2005. Further, Ms. Holden was the Co-Chief Executive Officer of Kraft Foods Inc. from March 2001 until December 2003 and President and Chief Executive Officer of Kraft Foods North America from May 2000 until December 2003. Ms. Holden began her career at General Foods in 1982. Ms. Holden is also a director of Western Union Company (NYSE: WU), MediaBank LLC, and Diageo plc. |
| Randy Michaels | Mr. Michaels has been the Chief Executive Officer and a director of Tribune since December 2009. Previously, Mr. Michaels served as Executive Vice President and Chief Operating Officer of the Company from May 2008 until December 2009, and Executive Vice President and Chief Executive Officer of Tribune Interactive, Inc. and Tribune Broadcasting Company from December 2007 until May 2008. Mr. Michaels was the Chief Executive Officer of Local TV, LLC from early 2007 until December 2007. Mr. Michaels was the Chief Executive Officer of Clear Channel Radio from 1999 until 2002. Prior to 2009, Mr. Michaels was Chief Executive |

---

[1] Subject to Section 13.9 of the Plan, the Debtors reserve the right to supplement, modify or revise this Exhibit 5.3.2 at or prior to the Confirmation Hearing and may supplement Part I of this disclosure after the Confirmation Hearing and prior to the Effective Date if the Debtors become aware of any changes to the anticipated directors of Reorganized Tribune.

[2] Capitalized terms used in this Exhibit 5.3.2 but not defined herein shall have the meanings ascribed to such terms in the Plan.

| | |
|---|---|
| | Officer of Jacor Communications. After leaving Clear Channel, Mr. Michaels started several private broadcast firms, including RadioActive and Product 1st. Mr. Michaels then began working with Oak Hill Capital Partners in early 2005 on acquisition opportunities, culminating in the creation of Local TV, LLC in 2007. |
| William A. Osborn | Mr. Osborn was the Chairman of Northern Trust Corporation (NASDAQ: NTRS), a multibank holding company, and its principal subsidiary, The Northern Trust Company, from October 1995 until November 2009. From June 1995 through December 31, 2007, Mr. Osborn also held the position of Chief Executive Officer of Northern Trust Corporation. Mr. Osborn is also a director of Caterpillar Inc. (NYSE: CAT), Abbott Laboratories (NYSE: ABT) and General Dynamics Corporation (NYSE: GD), and was a director of Northern Trust Corporation and Nicor Inc. (NYSE: GAS) within the past five years. |
| William C. Pate | Mr. Pate is a Managing Director for Equity Group Investments, L.L.C. ("EGI"), a privately held investment company founded by Sam Zell. Mr. Pate has served in various capacities for EGI since 1994, and in his present position since 2000. He is also a director of Covanta Holding Corporation (NYSE: CVA), MiddleBrook Pharmaceuticals, Inc. (NASDAQ: MBRK) and Exterran Holdings, Inc. (NYSE: EXH). Formerly Mr. Pate was a director of Adams Respiratory Therapeutics, Inc. |
| Mark Shapiro | Mr. Shapiro was the President, Chief Executive Officer and a director of Six Flags, Inc. from December 2005 through May 2010. From September 2002 through October 2005 he served as the Executive Vice President and General Manager, Programming of ESPN, Inc. From October 2005 until December 2005, Mr. Shapiro served as Chief Executive Officer of Red Zone LLC. Since January 2010, Mr. Shapiro serves as a trustee of the board of Equity Residential (NYSE: EQR), and as a director of Live Nation Entertainment Inc. (NYSE: LYV), and Frontier Communications Corporation (NYSE: FTR). |
| Maggie Wilderotter | Mrs. Wilderotter is Chairman, President and Chief Executive Officer of Frontier Communications Corporation (NYSE: FTR), the leading provider of communications services to rural America. She joined as President and Chief Executive Officer in 2004. Mrs. Wilderotter previously held positions as Senior Vice President of Worldwide Public Sector at Microsoft, President and Chief Executive Officer of Wink Communications, Inc. and Executive Vice President of National Operations for AT&T's Wireless Service, Inc. She has been a member of the Board of Directors of Procter & Gamble since 2009 and a Director of Xerox Corporation since 2006. Mrs. Wilderotter was a Director of The McClatchy Company from 2001-2007 and a Director of Yahoo! Inc. from 2007-2009. |
| Frank Wood | Mr. Wood is President and Chief Executive Officer of Secret Communications, LLC, a Cincinnati-based venture capital firm and has held this position since 1994. He is also the co-founder and principal of The Darwin Group, a venture capital firm specializing in second-stage investments, and has held this position since 1998. He is a 33-year veteran of the radio broadcast industry. He has also served as Chairman of 8e6 Technologies Corporation. Mr. Wood is also a director of Chemed Corporation (NYSE: CHE). Previously, Mr. Wood was a director at Rewards Network, Inc. (NASDAQ: DINE) until 2007. |
| Samuel Zell | Mr. Zell has served as a director of Tribune Company since May 2007, as Chairman since December 2007 and was Chief Executive Officer from December 2007 to December 2009. Mr. Zell also serves as Chairman of Equity Group Investments, L.L.C., the private investment firm he founded more than 40 years ago. Mr. Zell was a Trustee and Chairman of the Board of Trustees of Equity Office Properties Trust, an equity real estate investment trust primarily focused on office buildings, from |

<table>
<tr><td></td><td>October 1996 until its acquisition in February 2007, its Chief Executive Officer from April 2002 to April 2003, and its President from April 2002 until November 2002. Mr. Zell has been Chairman of the Board of Covanta Holding Corporation (NYSE: CVA), a waste-to-energy and specialty insurance services company, since September 2005, served as its President, Chairman and Chief Executive Officer from July 2002 until December 2004, and was a director from 1999 until 2004. For more than the past five years, Mr. Zell has been Chairman of Equity Lifestyle Properties, Inc. (NYSE: ELS), an equity real estate investment trust primarily engaged in the ownership and operation of manufactured home resort communities; Chairman of the Board of Trustees of Equity Residential (NYSE: EQR), an equity real estate investment trust that owns and operates multi-family residential properties; and Chairman of Capital Trust, Inc. (NYSE: CT), a specialized finance company. Mr. Zell has been a director of Anixter International Inc. (NYSE: AXE) since 1984 and its Chairman since 1985. From 2002 until 2005 Mr. Zell was the Chairman of the board of Rewards Network, Inc. (NASDAQ: DINE).</td></tr>
</table>

## II.    Initial Officers

Set forth below is the identity, position and other affiliations for the individuals who will serve as officers of Reorganized Tribune. In addition, Section 1129(a)(5)(B) of the Bankruptcy Code provides that the Debtors should disclose the "nature of any compensation" of any insider to be employed by Reorganized Tribune. In addition to receiving base salary, the Debtors currently expect that the officers of Reorganized Tribune may participate in certain of the compensation and benefits programs described in Sections IV.C.1, IX.G.8 and IX.H.5 of the Disclosure Statement. Certain officers of Reorganized Tribune shall also participate in the Tribune Company Management Transition Plan, a form of which is attached hereto as Annex A.

| Name | Position | Other Affiliations |
|------|----------|--------------------|
| Randy Michaels | President and Chief Executive Officer | See above. |
| Gerald A. Spector | Chief Operating Officer | Mr. Spector has been the Chief Operating Officer of the Company since December 2009. Previously, Mr. Spector was an Executive Vice President and Chief Administrative Officer since 2007. Mr. Spector is currently the Vice Chairman and Trustee of Equity Residential (NYSE: EQR). Prior to joining the Company, Mr. Spector served as a Trustee and Executive Vice President of Equity Residential since 1993 and Chief Operating Officer since 1995. Mr. Spector was also the Executive Vice President and Chief Operating Officers of Equity Group Investments, Inc. from January 1991 through January 1994 and a Director of Manufactured Homes Communities, Inc. from December 1992 through May 1995. |
| Chandler Bigelow III | Executive Vice President | Mr. Bigelow has been the Chief Financial Officer for Tribune Company since March 2008. Previously he served as the Company's Vice President, and Treasurer since 2003. Mr. Bigelow joined Tribune |

| | | |
|---|---|---|
| | | Company in 1998. |
| Steve Gable | Executive Vice President | Mr. Gable has served as Tribune Company's Executive Vice President and Chief Technology Officer since May, 2009. Mr. Gable has been with the Company since March, 2008, previously as Senior Vice President/Chief Technology Officer. Prior to joining Tribune Company, Mr. Gable was employed by Clear Channel in various roles, most recently as Vice President of Technology from 2004 to 2008. |
| Nils E. Larsen | Executive Vice President | Mr. Larsen is the Executive Vice President – Chief Investment Officer at Tribune Company and a Managing Director of Equity Group Investments, LLC, a private investment group. Mr. Larsen joined Tribune in December 2008 as a member of the senior leadership team managing Tribune's restructuring process and leads Tribune's investment activities. Mr. Larsen was named Managing Director at EGI in 2001 and joined EGI in 1995. Previously, Mr. Larsen worked as a financial analyst with CS First Boston in the taxable fixed-income/derivatives group. Mr. Larsen serves on the Board of Directors of American Commercial Lines Inc. (NASDAQ: ACLI) as well as serving as Tribune's board representative for Chicago Baseball Holdings, LLC (parent entity of the Chicago Cubs), Television Food Network, G.P. (owner of the Food Network cable channel) and Newsday Holdings LLC (parent entity of Newsday). |
| Donald J. Liebentritt | Executive Vice President | Mr. Liebentritt joined Tribune as Executive Vice President and General Counsel in May 2008. Mr. Liebentritt is also a Senior Advisor with EGI, and was president of EGI from 2000 until 2005. Mr. Liebentritt is currently the Chairman of the board of directors of Rewards Network, Inc. (NASDAQ: DINE), and was a director of Adams Respiratory Therapeutics, Inc. from 2005 until 2008. Currently, Mr. Liebentritt is the President and a member of the board of managers of Chai Trust Company, LLC, an Illinois registered trust company, and a director of WRS Holding Company, an environmental remediation services company. |
| Don W. Meek | Executive Vice President | Mr. Meek is the Executive Vice president/Chief Revenue Officer for Tribune Company's interactive and publishing divisions. Previously, Mr. Meek was president/national media sales for Tribune's interactive and publishing divisions, as well as president/integrated media for The Los Angeles Times. Mr. Meek held sales and media posts at Sony Pictures Entertainment, iFilm Corp, Engine, |

| | | and Fox Sports Net. |
|---|---|---|
| Lee Abrams | Senior Vice President | Mr. Abrams is The Tribune Company's Chief Innovation Officer. Prior to 2008, Abrams was XM's Senior Vice President and Chief Programming Officer. Abrams joined XM in June 1998. In 1989, Mr. Abrams joined ABC Radio Networks as an internal consultant. Mr. Abrams was a founding partner of Burkhart/Abrams (1972-1998), the Atlanta-based consulting giant. |
| Harry A. Amsden | Senior Vice President | Mr. Amsden has been with the Tribune Company organization for almost 24 years and has served as Senior Vice President of Financial Operations for Tribune Company since April 2008. He also currently serves as an officer of various subsidiaries of Tribune Company. Mr. Amsden was the Controller of Sentinel Communications Company in Orlando, Florida from January 1994 to December 1996, Assistant Controller of Sentinel Communications Company in Orlando, Florida from January 1988 to January 1994, Senior Operational Auditor for Tribune Company from August 1986 to January 1988. Prior to joining Tribune Company in August 1986, Mr. Amsden was an Experienced Senior Auditor in the Commercial Audit division of Arthur Andersen, LLP in Chicago. |
| Barbara Buchwald | Senior Vice President | Ms. Buchwald was named Senior Vice President of Human Resources for Tribune Corporate on June 1, 2010. Previous role was Senior Vice President of Human Resources for Local TV LLC, a role held since the company's inception on February 1, 2007. Previously, Ms. Buchwald worked for Jacor Communications, Inc. for 15 years serving as Director of Human Resources and Benefits for over 10 of those years. |
| David P. Eldersveld | Senior Vice President/ Corporate Secretary | Mr. Eldersveld has served as Senior Vice President/Deputy General Counsel and Corporate Secretary since May 2009. Mr. Eldersveld has been with the Company since 2005 also serving as Vice President/Deputy General Counsel and Corporate Secretary and as Senior Counsel/Mergers and Acquisitions. |
| Daniel G. Kazan | Senior Vice President | Mr. Kazan has served as Tribune Company's Senior Vice President, Investments (previously called Senior Vice President, Development), since May 2009, and prior to that, as the Company's Vice President, Development from July 2005 to May 2009, and various other roles, including Senior Counsel, Mergers & Acquisitions. Prior to joining the Tribune, Mr. Kazan was Vice President, Associate General Counsel and Assistant Secretary |

| | | for Metromail Corporation, a publicly-held provider of direct marketing, database marketing and reference products. |
|---|---|---|
| Naomi B. Sachs | Senior Vice President | Ms. Sachs has been Senior Vice President, Strategy for Tribune Company since May 2009. Ms. Sachs has been with the Company for five years in various roles, including Vice President, Strategy and Director of Investments. Prior to joining the Company, Ms. Sachs was a Director in the Investment Banking Group at Merrill Lynch & Co. |
| Gary Weitman | Senior Vice President | Mr. Weitman joined Tribune Company in October, 2000 as Vice President/Corporate Communications. He was promoted to Senior Vice President/Corporate Relations in May, 2008. Mr. Weitman served on the Board of Directors for Chicago Public Radio (WBEZ) from 1999 to 2008, on the Board of Directors for the Chicago Chapter of the Public Relations Society of America from 2001 to the present, and on the Board of the Juvenile Protective Agency from 2005 to the present. Prior to joining Tribune, Mr. Weitman was Executive Director of Corporate Communications for Allied Riser, a broadband services company from October 1999 to October 2000. Before that Mr. Weitman worked as SVP/Media Relations at Hill & Knowlton, a public relations agency from March 1997 to October 1999, at WBBM-TV as Managing Editor from November 1994 to March 1997, and WFLD – TV as an executive producer from May 1993 to November 1994. Mr. Weitman started his professional career at WBBM-TV and worked in a variety of positions in news and news management from 1984 to 1993. |
| Michael G. Bourgon | Vice President | Mr. Bourgon has served as Tribune Company's Vice President, Human Resources since February 2008. Mr. Bourgon has been with the Company for 11 years in various roles, including as Director, Human Resources, Director, Leadership Development and Director, Benefits. Prior to joining Tribune Company, Mr. Bourgon was employed by Sears, Roebuck and Co. from 1997 to 1999, and by PricewaterhouseCoopers LLP from 1987 to 1997. |
| Thomas G. Caputo | Vice President | Mr. Caputo was named vice president/auditing in February 2003. Previously, Mr. Caputo served as director/auditing since March 2000 and held a series of auditing and financial positions since joining Tribune in 1993. From 1997 to 2000, he was manager of planning and analysis for the Chicago Tribune's Circulation and Consumer Marketing department. Before that he worked in the corporate |

| | | |
|---|---|---|
| | | office as manager of auditing (1996-1997), supervisor of auditing (1994-1995) and senior auditor (1993-1994). Prior to Tribune, Mr. Caputo served as internal auditor at McMaster-Carr Supply Company, from 1989 to 1993, and senior auditor at Ernst & Young, from 1986 to 1989. |
| Christopher N. Hochschild | Vice President | Mr. Hochschild joined Tribune Company in 2007 as Vice President of Strategy and currently serves as Vice President of Investments. Previously, Mr. Hochschild was an associate at Equity Group Investments, LLC from 2005 to 2007, an analyst at UBS Investment Bank from 2004 to 2005 and an analyst at Bear, Stearns & Co. from 2003 to 2004. |
| Brian F. Litman | Vice President and Controller | Mr. Litman has served as Tribune Company's Vice President and Controller since 2008. Mr. Litman has been with the Company for approximately 13 years in various roles, including Assistant Controller and Director of Planning and Financial Reporting. Mr. Litman also currently serves as an officer of various subsidiaries of Tribune Company. Prior to joining Tribune Company, Mr. Litman was employed by Borg-Warner Automotive as Manager of Planning and Financial Reporting for approximately 2 years. Mr. Litman began his career at Deloitte & Touche LLP where he served in the audit practice for 6 years. |
| Jack Rodden | Vice President/Treasurer | Mr. Rodden has served as Tribune Company's Vice President/Treasurer since 2008. Mr. Rodden has been with the Company for 10 years in various roles, including Director of Treasury & Risk and Assistant Treasurer. Mr. Rodden also currently serves as an officer of various subsidiaries of Tribune Company. Prior to joining Tribune Company, Mr. Rodden was employed by Shell Oil Company from 1988 to 2000. |
| Patrick M. Shanahan | Vice President | Mr. Shanahan joined Tribune Company in August 2001 as Vice President/Tax. Mr. Shanahan also serves as an Assistant Treasurer for all the Tribune subsidiaries. Prior to joining Tribune Company, Mr. Shanahan was a partner with KPMG LLP from April 1999 to August 2001. From July 1991 to March 1999, Mr. Shanahan was employed by Waste Management, Inc. For most of his years with Waste Management, he served as director of federal taxes (a non officer position). From September 1982 to June 1991, Mr. Shanahan was employed with Arthur Andersen & Company. He was a tax manager when he left Arthur Andersen. |
| Shaun M. Sheehan | Vice President | Mr. Sheehan was named Vice President/Washington Affairs for Tribune Company in 1992. His |

| | | responsibilities encompass government relations, media relations as it pertains to federal policy, and liaison with the broadcast and newspaper industry associations and other allied organizations. Mr. Sheehan joined Tribune Broadcasting in 1986 in a similar capacity. Prior to that, he spent eight years with the National Association of Broadcasters (NAB) as vice president and later senior vice president of the public affairs and communications department. Before joining NAB in 1978, Mr. Sheehan was vice president and group supervisor in the Washington office of Daniel J. Edelman Inc., an international public relations firm that he joined in 1974. Mr. Sheehan is a board member of the Media Institute, and served on the public relations committees of the American Advertising Federation, the American Society of Association Executives and the President's Committee on Employment of the Handicapped. |
| William C. Trimarco | Assistant Vice President | Mr. Trimarco joined Tribune Company in May 2008 as Assistant Vice President. Prior to joining the Company Mr. Trimarco worked as a business consultant for ten years and served as Senior Vice President for Equity Residential Properties from March 1996 to May 1998. Prior to that Mr. Trimarco was with Equity Group Investments, Inc. in a variety of roles for eighteen years. |
| Nick Chakiris | Assistant Controller | Mr. Chakiris joined Tribune Company in September 2008 as Assistant Controller. Prior to joining the Company, Mr. Chakiris worked at David M. Lewis Company, LLC as a consultant serving in finance and accounting management roles for various public companies, including Tribune Company and Option Care, Inc. In addition, Mr. Chakiris has held accounting management roles at various public and private companies, including Sun-Times Media Group, Inc. and Chart House Enterprises, Inc. |

# ANNEX A

## TRIBUNE COMPANY
## MANAGEMENT TRANSITION PLAN

        1.      <u>Purpose</u>. The purpose of the Tribune Company Management Transition Plan (the "<u>Transition Plan</u>") is to provide severance benefits to a group of employees of the Company and certain of its Affiliates that constitutes a "select group of management or highly compensated employees" within the meaning of Department of Labor Regulation § 2520.104-24. The Transition Plan is intended to secure the continued services and continued dedication of Employees following the Effective Date.

        2.      <u>Definitions</u>.

        "<u>Affiliate</u>" shall mean, with respect to any Person, any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, contract or otherwise.

        "<u>Bankruptcy Court</u>" shall mean the United States Bankruptcy Court for the District of Delaware.

        "<u>Bankruptcy Proceedings</u>" shall mean the bankruptcy proceedings in the United States Bankruptcy Court for the District of Delaware with respect to <u>In re: Tribune Company, et. al.</u>, Case No. 08-13141 (KJC).

        "<u>Base Salary</u>" shall mean an Employee's rate of annual base salary as in effect (i) immediately prior to his or her Termination Date or (ii) immediately prior to or on the Effective Date, in each case whichever is greater.

        "<u>Board</u>" shall mean the Board of Directors of the Company.

        "<u>Cause</u>" shall mean conduct involving dishonesty or willful misconduct that, in either case, is detrimental in a material way to the business of the Company or any of its Affiliates.

        "<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended.

        "<u>Committee</u>" shall mean the Compensation Committee of the Board consisting of three or more members of the Board, each of whom is (i) a "Non-Employee Director" within the meaning of Rule 16b-3 under the Exchange Act, (ii) an "outside director" within the meaning of section 162(m) of the Code and (iii) "independent" within the meaning of the rules of the principal national stock exchange on which the common stock of the Company is then traded.

        "<u>Company</u>" shall mean Tribune Company, a Delaware corporation, or any successor thereto.

        "<u>Corporate Transaction</u>" shall mean a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of the Company.

"Effective Date" shall mean the date as of which the Plan of Reorganization becomes effective.

"Employee" shall mean any individual identified on Exhibit A.

"Good Reason" shall mean, with respect to an Employee, any of the following:

> (i) a material reduction in the Employee's authority, duties or responsibilities;
>
> (ii) a reduction by the Company in the Employee's annual rate of base salary or target bonus (other than pursuant to any broad-based reduction or furlough policy);
>
> (iii) a change in the Employee's primary employment location to a location that is more than 50 miles from the primary location of the Employee's employment; or
>
> (iv) any attempt by the Company to change the Employee's inclusion as an Employee on Exhibit A to this Transition Plan, or to change his or her severance multiple or severance payment formula or eligibility for continuation of group medical benefits, as set forth in each case on Exhibit A, in a manner adverse to such Employee (which attempted change shall, in any such event, be null and void).

Notwithstanding the foregoing provisions of this definition, no act or omission shall constitute Good Reason (x) unless the Employee gives the Committee notice of the existence of a condition the Employee believes constitutes Good Reason within 90 days after the initial existence of the condition, and the Company fails to cure such act or omission within 30 days after receipt of such notice or (y) if the Employee consented in writing to such act or omission.

"Interest Rate" shall mean a rate equal to the prime rate, as published under "Money Rates" in *The Wall Street Journal* from time to time.

"Nonqualifying Termination" shall mean the termination of an Employee's employment (i) by the Company or any of its Affiliates for Cause, (ii) by the Employee for any reason other than Good Reason, (iii) as a result of the Employee's death, (iv) by the Company or any of its Affiliates due to the Employee's inability to perform his or her duties with the Company on a full-time basis for at least 180 consecutive days as a result of the Employee's incapacity due to physical or mental illness, injury or condition (whether an Employee has such incapacity shall be determined by a physician selected by the Committee or the Company's insurers, which physician shall be reasonably acceptable to the Employee (or the Employee's legal representative)), or (v) in connection with a sale or other disposition of assets or equity by the Company or one of its Affiliates if the Employee is within a reasonable time following the transaction offered comparable employment by the purchaser or acquirer of such assets or equity or one of its Affiliates; *provided, however*, that employment shall not be deemed comparable if such purchaser or acquirer does not agree (i) to honor the terms of the Transition Plan with

2

respect to such Employee or (ii) to provide other severance benefits that, in the aggregate, are at least as favorable as those provided under the Transition Plan.

"Notice Period" shall have the meaning assigned to such term in Section 9(a).

"Person" shall mean any individual, group, firm, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, joint venture, association, trust, estate or other entity.

"Plan of Reorganization" shall mean the plan of reorganization approved, confirmed and made effective pursuant to the Bankruptcy Proceedings.

"Protection Period" shall mean the period commencing on the Effective Date and ending on the earlier to occur of (i) the date that is eighteen (18) months after the Effective Date and (ii) the Employee's death.

"Release Agreement" shall have the meaning assigned to such term in Section 3(a).

"Separation from Service" shall mean a "separation from service" as defined in Treasury Regulation § 1.409A-1(h).

"Target Bonus" shall mean the bonus an Employee would be entitled to receive under the Company's Management Incentive Plan (or any successor bonus plan) with respect to the year in which his or her Termination Date occurs, or, if greater, the most recent year in which the Employee was entitled to a bonus, assuming in each case that his or her bonus was earned thereunder at "target level" and the Employee remained employed by the Company on the bonus payment date.

"Termination Date" shall mean the date on which the Employee incurs a Separation from Service other than by reason of a Nonqualifying Termination.

3.    Payments and Benefits Upon Separation from Service.

(a)    Severance Benefits. If an Employee incurs a Separation from Service (other than by reason of a Nonqualifying Termination) during the Protection Period and the Employee (or the Employee's executor or other legal representative in the case of the Employee's death or disability following the Employee's Separation from Service) executes an agreement containing a general release of all claims in a form reasonably acceptable to the Committee (the "Release Agreement"), within sixty 60 days following the Termination Date and does not revoke the Release Agreement (to the extent a revocation option is provided therein), the Company shall provide to the Employee, as compensation for services rendered to the Company, and in consideration of the Release Agreement:

(i)    a lump sum cash payment (subject to any applicable payroll or other taxes required to be withheld pursuant to Section 5) in an amount equal to the severance amount determined in accordance with Exhibit A, and

3

(ii)     the opportunity to continue the Employee's group medical benefits for the period of time determined in accordance with Exhibit A upon the same terms and otherwise to the same extent as such coverage is provided to active employees of the Company or its Affiliates who have an employment position similar to the employment position held by the Employee on his or her Termination Date, and the Company and the Employee shall share the costs of the continuation of such coverage in the same proportion as such costs are shared between the Company and such active employees of the Company or its Affiliates; *provided, however*, that in the event that the Company is unable to provide the continuation coverage pursuant to this Section under the terms of the applicable group medical plan, practice, program or applicable law without adverse tax or other consequences to the Company or the Employee, the Company shall reimburse the Employee for the cost incurred by the Employee to obtain coverage comparable to the continuation coverage.

Subject to Section 20, the payment of lump sum severance benefits described in clause (i) above, to the extent payable hereunder, shall be paid on the seventieth (70th) day following the Termination Date.

(b)     In addition, if the employment of an Employee shall terminate for any reason, then the Employee shall be entitled to the following without regard to whether a Release Agreement is executed:  (i) a cash amount (subject to any applicable payroll or other taxes required to be withheld pursuant to Section 5) equal to the sum of the Employee's prorated annual base salary from the Company and its Affiliates for services performed through the Termination Date, and any accrued but unused vacation pay, in each case to the extent not theretofore paid, and (ii) subject to Section 8, the vested benefits and amounts, if any, provided under the terms of any employee benefit plan or compensation program in which the Employee participates at the time such benefits and amounts are permitted to be paid or distributed under the terms of such plan or program.

4.     Claims Procedure.  If any Employee or other Person believes he or she is entitled to benefits in an amount greater than those which he or she is receiving or has received, he or she may file a written claim with the president of the Company.  Such claim shall state the nature of the claim, the facts supporting the claim, the amount claimed, and the address of the claimant.  The president of the Company shall review the claim and shall, within 90 days after receipt of the claim, give written notice by registered or certified mail to the claimant of the president's decision with respect to the claim.  If special circumstances require an extension of time, the claimant shall be so advised in writing within the initial 90-day period and in no event shall such an extension exceed 90 days.  The notice of the Company's decision with respect to the claim shall be written in a manner designed to be understood by the claimant and, if the claim is wholly or partially denied, the notice shall set forth (i) the specific reasons for the denial, (ii) specific references to the pertinent Transition Plan provisions on which the denial is based, (iii) a description of any additional material or information necessary for the claimant to perfect the claim and an (iv) explanation of why such material or information is necessary, and an explanation of the claim review procedure under the Transition Plan.  The Company shall also advise the claimant that the claimant or his or her duly authorized representative may request a

4

review of the denial by the chair of the Committee by filing with the Company within 60 days after notice of the denial has been received by the claimant, a written request for such review. The claimant shall be informed that he or she may have reasonable access to pertinent documents and submit comments in writing to the chair of the Committee within the same 60-day period. If a request is so filed, review of the denial shall be made by the chair of the Committee within 60 days after receipt of such request unless special circumstances require an extension, and the claimant shall be given written notice of the chair of the Committee's final decision. If special circumstances require an extension of time, the claimant shall be so advised in writing within the initial 60-day period and in no event shall such an extension exceed 60 days. The notice of the Chair of the Committee's final decision shall include specific reasons for the decision and specific references to the pertinent Transition Plan provisions on which the decision is based and shall be written in a manner designed to be understood by the claimant.

5.    Withholding Taxes. The Company may withhold from all payments due under the Transition Plan to each Employee (or his or her beneficiary or estate) all taxes which, by applicable federal, state, local or other law, the Company determines are required to be withheld.

6.    Amendment. The Transition Plan may not be amended with respect to any Employee without the written consent of such Employee. The Transition Plan shall terminate only after all of the Company's obligations under the Transition Plan have been satisfied in their entirety.

7.    Reimbursement of Expenses; Interest on Late Payments.

(a)    If any contest or dispute shall arise under the Transition Plan involving termination of the Employee's employment with the Company or an Affiliate or involving the failure or refusal of the Company to perform fully in accordance with the terms hereof, the Company shall reimburse the Employee, on a current basis, for all legal fees and expenses, if any, incurred by the Employee in connection with such contest or dispute, together with interest thereon at a rate equal to the Interest Rate, but in no event higher than the maximum legal rate permissible under applicable law, such interest to accrue from the date the Company receives the Employee's written statement for such fees and expenses through the date of payment thereof; *provided, however*, that in the event the resolution of any such contest or dispute includes a finding completely denying the Employee's claims in such contest or dispute, the Employee shall be required to reimburse the Company, over a period of six (6) months from the date of such resolution, for all sums advanced to the Employee pursuant to this Section 7(a); *provided further*, that if the Employee fails to so reimburse the Company, the Company can withhold the amounts owed by the Employee from any payments owed by the Company or any of its Affiliates to the Employee, except as otherwise provided by law.

(b)    With respect to any and all payments that are required to be made by the Company to an Employee pursuant to the Transition Plan and that are not made within the time period specified herein, the Company shall pay to the Employee interest on such payments at the Interest Rate plus 300 basis points, but in no event higher than the maximum legal rate permissible under applicable law. Such interest shall accrue from the due date of the required payment through the date on which such payment is made to the Employee.

5

(c)     For the avoidance of doubt and to ensure compliance with section 409A of the Code, (i) reimbursements by the Company under this Section 7 or under Section 3(a)(ii) shall be made promptly, but in any event on or before the last day of the taxable year following the taxable year in which the relevant expense is incurred, (ii) the amount of expenses eligible for reimbursement during a taxable year may not affect the expenses eligible for reimbursement in any other taxable year, and (iii) this Section 7 shall be applicable only to expenses incurred during the lifetime of the Employee.

8.     Entire Agreement.  Subject to Section 9(a) and the terms of an arrangement, agreement or other contract, if any, that becomes effective with respect to an Employee after the Effective Date and that specifically provides for treatment other than that described in the first sentence of this Section 8, any amount paid pursuant to the Transition Plan shall be paid in lieu of, and the Employee shall be deemed to have waived his or her right to separate payment of, any other amount of severance relating to salary or bonus continuation, any other continuation of medical, dental or life insurance coverage (other than coverage required by the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended) or any outplacement services to be received by the Employee upon termination of employment of the Employee under any severance plan, policy or arrangement of the Company or any of its Affiliates or any agreement with the Company or any of its Affiliates.  Subject to the foregoing, the rights of, and benefits payable to, an Employee pursuant to the Transition Plan are in addition to any rights of, or benefits payable to, an Employee under any other employee benefit plan or compensation program of the Company.  All rights of an Employee under any such plan or program shall be determined in accordance with the provisions of such plan or program.

9.     Offset; Mitigation.

(a)     If the Company is obligated by law or a post-petition contract that was in effect prior to the Effective Date or a pre-petition contract that becomes fully binding on the "Reorganized Debtors" (as defined in the Plan of Reorganization) as a result of being assumed by the Company or an Affiliate under the Plan of Reorganization to pay severance pay, notice pay or other similar benefits, or if the Company is obligated by law or by an aforementioned contract to provide advance notice of separation ("Notice Period"), then any payments hereunder shall be reduced by the amount of any such severance pay, notice pay or other similar benefits, as applicable, and by the amount of any severance pay, notice pay or other similar benefits received during any Notice Period, to the extent permitted under section 409A of the Code.

(i)     If an Employee is entitled to severance pay under an arrangement (including an arrangement that provides for severance pay in different circumstances than those described in the Transition Plan) that is a post-petition contract that was in effect prior to the Effective Date or that is a pre-petition contract that becomes fully binding on the "Reorganized Debtors" (as defined in the Plan of Reorganization) as a result of being assumed by the Company or an Affiliate under the Plan of Reorganization (a "pre-existing severance arrangement"), and the aggregate amount of severance pay provided under such pre-existing severance arrangement is greater than the aggregate amount of severance pay provided under the Transition Plan, then, to the extent necessary to conform to the requirements of section 409A of the Code, the Employee shall receive his or her severance pay only under, and at the time and in the form of payment provided for

6

in, such pre-existing severance arrangement and not this Transition Plan. If the aggregate amount of severance pay provided under the Transition Plan is greater than the aggregate amount of severance pay provided under a pre-existing severance arrangement, then (A) an amount equal to the maximum aggregate amount payable under the pre-existing severance arrangement shall be paid to the Employee only under, and in the time and form of payment provided for in, such pre-existing severance arrangement and not this Transition Plan, and (B) the difference between the aggregate amount of severance pay provided under the Transition Plan and the maximum aggregate amount payable under the pre-existing severance arrangement shall be paid to the Employee only under, and in the time and form of payment provided for in, the Transition Plan and not the pre-existing severance arrangement. For purposes of this paragraph, the time value of money shall not be taken into account when comparing the aggregate amount of severance pay available under the Transition Plan and any pre-existing severance arrangement.

(ii)    In addition, to the extent any pre-existing severance arrangement provides for the continuation of group medical benefits (A) for a period of time that is longer than the duration of such benefits under the Transition Plan or (B) at a cost to the Employee that is lower than the cost described in the Transition Plan, then such continuation of group medical benefits shall be provided only pursuant to the terms of such pre-existing severance arrangement and not the Transition Plan to the extent such continuation would not result in a violation of any applicable law. In the event that such benefits are provided pursuant to the pre-existing severance arrangement on account of clause (B) and the Transition Plan provides continuation benefits for a longer period of time than such pre-existing severance arrangement, then the continuation of benefits following the end of the continuation period under the pre-existing severance arrangement shall be provided pursuant to the terms of the Transition Plan.

(b)    If an Employee is entitled to rejection damages in respect of severance pay, notice pay, or other similar benefits pursuant to any contract, plan or other arrangement that was in effect prior to the Effective Date and that was rejected pursuant to the Bankruptcy Proceedings, then the amount of any payments hereunder shall be reduced by the amount of any such rejection damages. By accepting any payment or other benefit under this Transition Plan, an Employee shall be deemed to have waived his or her any right to any such rejection damages which could become payable after receiving such payments or other benefits under this Transition Plan.

(c)    In no event shall an Employee be obligated to seek other employment or to take other action by way of mitigation of the amounts payable and the benefits provided to such Employee under any of the provisions of the Transition Plan, and such amounts and benefits shall not be reduced whether or not such Employee obtains other employment.

10.    Unfunded Plan. The Transition Plan shall not be funded. No Employee entitled to benefits hereunder shall have any right to, or interest in, any specific assets of the Company, but an Employee shall have only the rights of a general creditor of the Company to receive benefits on the terms and subject to the conditions provided in the Transition Plan.

7

11.    Payments to Minors, Incompetents and Beneficiaries. Any benefit payable to or for the benefit of a minor, an incompetent individual or other individual incapable of giving a receipt therefor shall be deemed paid when paid to such individual's guardian or to the party providing or reasonably appearing to provide for the care of such individual, and such payment shall fully discharge the Company, the Committee and all other parties with respect thereto. If an Employee shall die while any amounts would be payable to the Employee under the Transition Plan had the Employee continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of the Transition Plan to such Person or Persons appointed in writing by the Employee to receive such amounts or, if no Person is so appointed, to the estate of the Employee.

12.    Non-Assignability. None of the payments, benefits or rights of any Employee shall be subject to any claim of any creditor, and, in particular, to the fullest extent permitted by law, all such payments, benefits and rights shall be free from attachment, garnishment, trustee's process or any other legal or equitable process available to any creditor of such Employee. Except as otherwise provided herein or by law, no right or interest of any Employee under the Transition Plan shall be assignable or transferable, in whole or in part, either directly or by operation of law or otherwise, including without limitation by execution, levy, garnishment, attachment or pledge; no attempted assignment or transfer thereof shall be effective; and no right or interest of any Employee under the Transition Plan shall be subject to any obligation or liability of such Employee.

13.    No Rights to Continued Employment. None of (i) the adoption of the Transition Plan, (ii) any amendment hereof, (iii) the creation of any fund, trust or account, (iv) the payment of any benefits or (v) participation in the Transition Plan, shall be construed as giving any Employee the right to be retained in the service of the Company, and all Employees shall remain subject to discharge to the same extent as if the Transition Plan had not been adopted. Except as otherwise provided in a written agreement signed by an authorized representative of the Company or one of its Affiliates, each Employee's employment with the Company is, and continues to be, "at-will," with either party having the right to terminate the employment relationship at any time, with or without cause or advance notice. By participating in the Transition Plan, each Employee acknowledges his or her at-will employment status and that such at-will status may be changed only by a written agreement signed by the Employee and an authorized representative of the Company or one of its Affiliates.

14.    Successors; Binding Agreement. The Transition Plan shall inure to the benefit of and be binding upon the beneficiaries, heirs, executors, administrators, successors and assigns of the parties, including each Employee, present and future, and any successor to the Company or one of its Affiliates. The Transition Plan shall not be terminated by any Corporate Transaction whereby the Company is or is not the surviving or resulting Person or as a result of any transfer of all or substantially all of the assets of the Company. In the event of any Corporate Transaction, the provisions of the Transition Plan shall be binding upon the surviving or resulting Person or the Person to which such assets are transferred. The Company agrees that concurrently with any Corporate Transaction referred to in this Section 14, the Company will cause any surviving or resulting Person or transferee unconditionally to assume all of the obligations of the Company hereunder. To the extent the Company sells or otherwise disposes of all or substantially all of the assets or equity of an Affiliate during the Protection Period, the

8

Company agrees that concurrently with such sale or disposition, the Company will cause the acquirer of such assets or equity to agree to honor the terms of the Transition Plan with respect to each Employee who had been employed by such Affiliate immediately before such sale or disposition.

15.    Headings. The headings and captions herein are provided for reference and convenience only, shall not be considered part of the Transition Plan and shall not be employed in the construction of the Transition Plan.

16.    Notices. Any notice or other communication required or permitted pursuant to the terms hereof shall have been duly given when delivered or mailed by United States mail, first class, postage prepaid, addressed to the intended recipient at his, her or its last known address.

17.    Effective Date. The Transition Plan shall be submitted to the Bankruptcy Court for approval in connection with the Plan of Reorganization and, if approved, shall become effective as of the Effective Date.

18.    Employment with Affiliates. For purposes of the Transition Plan, employment with the Company shall include employment with any Affiliate.

19.    Governing Law; Validity. The Transition Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Delaware (without regard to principles of conflicts of laws) to the extent not preempted by Federal law, which shall otherwise control. If any provision of the Transition Plan shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision hereof, and the Transition Plan shall be construed and enforced as if such provision had not been included.

20.    Compliance with section 409A of Code. The Transition Plan is intended to comply with the provisions of section 409A of the Code, and shall be interpreted and construed accordingly. Payments provided herein are intended to be exempt from section 409A of the Code to the maximum extent possible, under either the separation pay exemption pursuant to Treasury regulation § 1.409A-1(b)(9)(iii) or as short-term deferrals pursuant to Treasury regulation § 1.409A-1(b)(4). The Company shall have the discretion and authority to amend the Transition Plan at any time to satisfy any requirements of section 409A of the Code or rulings or other guidance published by the U.S. Treasury Department interpreting section 409A of the Code. Notwithstanding the foregoing, in no event shall the Company, any of its Affiliates, any of its agents, or any member of the Board have any liability for any taxes imposed in connection with a failure of the Transition Plan to comply with section 409A of the Code. Notwithstanding any other provision in this Transition Plan, if an Employee is a "specified employee," as defined in section 409A of the Code, as of the date he or she incurs a Separation from Service, then to the extent any amount payable under this Transition Plan constitutes the payment of nonqualified deferred compensation, within the meaning of section 409A of the Code and would be payable prior to the six-month anniversary of such Separation from Service, payment of such amount shall be delayed until the earlier to occur of (a) the six-month anniversary of such Separation from Service and (b) the date of the Employee's death.

IN WITNESS WHEREOF, the Company has caused the Transition Plan to be adopted as of the ____ of _____, _____.

TRIBUNE COMPANY

By: _____

Title: _____

## EXHIBIT A -- EMPLOYEES

Each individual described on the following page shall be an Employee under the Transition Plan, and shall be eligible for the lump sum cash severance payment described on the following page pursuant to the terms of the Transition Plan. The job titles listed on the following page apply only to the specific individuals who hold such respective titles as of the date of filing of the "Plan Supplement" (as defined in the Plan of Reorganization). Except as described below, a change in any such individual's title prior to, on or after the Effective Date shall not adversely affect such individual's status as an Employee in this Transition Plan or the payments or benefits for which he or she is eligible as specified in this Transition Plan. "Base Salary" and "Target Bonus" as used herein shall have the meanings set forth in the Transition Plan. For purposes of determining the benefits to which an Employee is entitled pursuant to Section 3(a)(ii) of the Transition Plan, the individuals identified as being "Group A Employees" (the "Group A Employees") on the following page shall be eligible to continue to receive group medical benefits for twenty-four (24) months as set forth in 3(a)(ii) of the Transition Plan, and the individuals identified as being "Group B Employees" ("Group B Employees") on the following page shall be eligible to continue to receive group medical benefits for eighteen (18) months as set forth in Section 3(a)(ii) of the Transition Plan. Notwithstanding the foregoing, at any time prior to the Effective Date, the Company may, after giving the signatories to the "Settlement Support Agreement" and to the "Creditors' Committee" (each as defined in the Plan of Reorganization) reasonable notice and an opportunity to object, add or remove any individual (without such individual's consent) from the list of individuals on the following page that are identified as Group A Employees or Group B Employees. To the extent an individual is so added, the Transition Plan shall be interpreted as though such individual was identified as a Group A Employee or Group B Employee, as applicable, as of the date of filing of the "Plan Supplement" (as defined in the Plan of Reorganization). To the extent an individual is so removed, he or she shall have no rights under this Transition Plan, notwithstanding the immediately preceding sentence of this Exhibit A, the second and third sentences of this Exhibit A or Section 6 of this Transition Plan.

| | Group A Initial Employees | | Severance |
|---|---|---|---|
| | **Job Title** | **Company** | **Multiple of Sum of Base Salary + Target Bonus** |
| 1 | Chief Executive Officer | Tribune Company | 2.50 |
| 2 | Chief Operating Officer | Tribune Company | 2.25 |
| 3 | Publisher & CEO/LA Times | Los Angeles Times | 1.75 |
| 4 | EVP/Chief Legal Officer | Tribune Company | 1.75 |
| 5 | EVP/Tribune Publishing | Tribune Publishing | 1.75 |
| 6 | President/Tribune Interactive | Tribune Company | 1.75 |
| 7 | President/Tribune Broadcasting | Tribune Company | 1.75 |
| 8 | EVP/Chief Financial Officer | Tribune Company | 1.75 |
| 9 | President, Publisher & CEO | Chicago Tribune | 1.75 |
| 10 | EVP/Chief Investment Officer | Tribune Company | 1.75 |
| 11 | EVP/Chief Technology Officer | Tribune Company | 1.75 |

| | Group B Initial Employees | | Severance |
|---|---|---|---|
| | | | **Multiple of Base** |
| | **Job Title** | **Company** | |
| 1 | VP/General Manager, KTLA-TV | KTLA-TV | 1.50 |
| 2 | EVP/Int & Broadcast Sales | Tribune Broadcasting | 1.50 |
| 3 | EVP/Sales & Distribution | WGN America | 1.50 |
| 4 | President/Tribune365 | Tribune365 | 1.50 |
| 5 | EVP | KSWB-TV | 1.50 |
| 6 | VP/General Manager, WGN-TV | WGN-TV | 1.50 |
| 7 | President & CEO/Sun-Sentinel | Sun Sentinel | 1.50 |
| 8 | SVP/Chief Innovation Officer | Corporate Office | 1.50 |
| 9 | CEO, President & Publisher | The Hartford Courant | 1.50 |
| 10 | Publisher & CEO/ Baltimore Sun | The Baltimore Sun | 1.50 |
| 11 | SVP/Programming & Development | Tribune Broadcasting | 1.50 |
| 12 | SVP/News & News Operations | Tribune Broadcasting | 1.50 |
| 13 | VP/General Manager, KDAF-TV | KDAF-TV | 1.50 |
| 14 | SVP/Deputy Gnl Csl & Corp Secy | Corporate Office | 1.50 |
| 15 | SVP/GM, KCPQ/KMYQ/KRCW | KCPQ-TV | 1.50 |
| 16 | VP/General Manager, WGN-AM | WGN-AM | 1.50 |
| 17 | President & CEO/TMS | Tribune Media Services | 1.50 |
| 18 | VP/General Manager, WXIN-TV | WXIN-TV | 1.50 |
| 19 | SVP/CFO | Tribune Interactive | 1.50 |
| 20 | VP/General Manager, WPHL-TV | WPHL-TV | 1.50 |
| 21 | VP/General Manager, WXMI | WXMI-TV | 1.50 |
| 22 | SVP/Human Resources | Corporate Office | 1.50 |
| 23 | SVP/Financial Operations | Corporate Office | 1.50 |
| 24 | SVP/Administration & CFO | Tribune Broadcasting | 1.50 |
| 25 | VP/General Manager, WDCW-TV | WDCW - TV | 1.50 |
| 26 | EVP/TRG | Tribune Interactive | 1.50 |
| 27 | VP/General Manager, WPMT-TV | WPMT-TV | 1.50 |
| 28 | President & CEO/Daily Press | The Daily Press | 1.50 |
| 29 | VP/General Manager, KIAH-TV | KIAH - TV | 1.50 |
| 30 | VP/General Manager, WGNO/WNOL | WGNO-TV | 1.50 |
| 31 | SVP/Engineering | Tribune Broadcasting | 1.50 |
| 32 | SVP/Coporate Relations | Corporate Office | 1.50 |