**Exhibit 1.1.124 – New Warrant Agreement**

WARRANT AGREEMENT[1]

between

TRIBUNE COMPANY

and

[WARRANT AGENT],

as Warrant Agent

Warrants to Purchase Shares of

Class A Common Stock or Class B Common Stock

Dated as of [_____]

---

[1] Subject to Section 13.9 of the Plan, the Debtors reserve the right to supplement, modify or revise this Exhibit 1.1.124 at or prior to the Effective Date.

THIS WARRANT AGREEMENT (this "Warrant Agreement"), dated as of [_____],
is made by and between Tribune Company, a Delaware corporation (the "Company"), and
[**Warrant Agent**], a [**Jurisdiction/Entity**], as warrant agent (the "Warrant Agent").

## W I T N E S S E T H :

WHEREAS, the Company proposes to issue warrants (the "Warrants") to purchase Class
A Common Stock (as defined below) or Class B Common Stock (as defined below), at the
Warrant holders' election, pursuant to the Amended Joint Plan of Reorganization for Tribune
Company and its subsidiaries (the "Plan") under chapter 11 of title 11 of the United States Code,
as amended (the "Bankruptcy Code"), as confirmed pursuant to the order, dated [**Date of
Confirmation Order**], of the United States Bankruptcy Court for the District of Delaware, and
the terms and conditions of this Warrant Agreement;

WHEREAS, the initial Warrants are being issued in an offering in reliance on the
exemption afforded by section 1145 of the Bankruptcy Code from the registration requirements
of the Securities Act (as defined below) and of any applicable state securities or "blue sky" laws;
and

WHEREAS, the Company has requested the Warrant Agent to act on behalf of the
Company, and the Warrant Agent is willing so to act, in connection with the issuance, division,
transfer, exchange and exercise of Warrants pursuant to the terms and conditions of this Warrant
Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein
set forth, the parties hereto agree as follows:

1.    Definitions. As used in this Warrant Agreement, the following capitalized terms
have the respective meanings set forth below:

"Bankruptcy Code" shall have the meaning specified in the recitals hereto.

"Business Day" means any day that is not a Saturday or Sunday or a day on which banks
are required or permitted to be closed in the State of New York.

"Cashless Exercise" shall have the meaning set forth in Section 4.1.

"Cashless Exercise Ratio" shall have the meaning set forth in Section 4.1.

"Class A Common Stock" means the Class A Common Stock, par value $0.001 per
share, of the Company.

"Class B Common Stock" means the Class B Common Stock, par value $0.001 per share,
of the Company.

"Common Stock" means the Class A Common Stock and the Class B Common Stock.

"Communications Act" means the Communications Act of 1934, as amended.

"Company" shall have the meaning specified in the preamble hereof.

"Current Market Price" as of any date, with respect to a share of Class A Common Stock or Class B Common Stock, as applicable, shall be deemed to be the average of the closing prices for the ten consecutive trading days ending on the trading day immediately preceding such date on the principal national securities exchange on which the shares of Class A Common Stock or Class B Common Stock, as applicable, are listed or admitted to trading or, if not listed or admitted to trading on any national securities exchange, the average of the reported bid and asked prices during such ten trading day period in any over-the-counter quotation system selected by the Company or, if the shares of Class A Common Stock or Class B Common Stock, as applicable, are not then publicly traded, the Current Market Price shall be determined reasonably and in good faith by the Board of Directors of the Company.

"Definitive Warrant" means a Warrant represented by a Warrant Certificate, in definitive, fully registered form.

"DTC" means The Depository Trust Company.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Exercise Price" shall be equal to $0.001 per share of Common Stock, as such price may be adjusted pursuant to Section 6.

"Expiration Date" means the twentieth anniversary of the Effective Date.  After the Expiration Date, the Warrants will become void and of no value.

"FCC" means the Federal Communications Commission and any successor governmental agency.

"Federal Communications Laws" means any law administered or enforced by the FCC, including, without limitation, the Communications Act, and regulations thereunder, pertaining to the ownership and/or operation or regulating the business activities of (x) any television or radio station, daily newspaper, cable television system or other medium of mass communications or (y) any provider of programming content to any such medium.

"Officer" means the President, any Vice-President, the Treasurer, any Assistant Treasurer, the Secretary or any Assistant Secretary of the Company.

"Other Property" shall have the meaning set forth in Section 6.3.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, incorporated organization, association, corporation, limited liability company, limited liability partnership, institution, public benefit corporation, entity or government (whether federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

"Plan" shall have the meaning specified in the recitals hereto.

- 2 -

"regulations" means not only regulations but rules, published policies and published controlling interpretations by an administrative agency or body empowered to administer a statutory provision of the Federal Communications Laws.

"Securities Act" means the Securities Act of 1933, as amended.

"Trading Day" means (i) if the applicable security is listed on the New York Stock Exchange, a day on which trades may be made thereon or (ii) if the applicable security is listed or admitted for trading on the NYSE Amex LLC, the NASDAQ Global Select Market, the NASDAQ Global Market or other national securities exchange or market, a day on which the NYSE Amex LLC, the NASDAQ Global Select Market, the NASDAQ Global Market or such other national securities exchange or market, respectively, is open for business or (iii) if the applicable security is not so listed, admitted for trading or quoted, any Business Day.

"Transaction" shall have the meaning set forth in Section 6.3.

"Warrants" shall have the meaning specified in the recitals hereto, and shall include all Warrants issued upon registration of transfer, division or combination of, or in substitution for, any thereof.

"Warrant Agent" shall have the meaning specified in the preamble hereof and shall include any successor Warrant Agent hereunder.

"Warrant Agent's Principal Office" means the principal office of the Warrant Agent at [*Insert Address of Warrant Agent Principal Office*] (or such other office of the Warrant Agent or any successor thereto hereunder acceptable to the Company as set forth in a written notice provided to the Company and the holders of the Warrants).

"Warrant Agreement" shall have the meaning specified in the preamble hereof.

"Warrant Certificate" means any certificate representing Warrants, substantially in the form set forth in Exhibit A attached hereto.

"Warrant Price" means an amount equal to (i) the number of shares of Common Stock being purchased upon exercise of a Warrant pursuant to Section 4.1, multiplied by (ii) the Exercise Price.

"Warrant Register" shall have the meaning set forth in Section 3.2.

"Warrant Registrar" shall have the meaning set forth in Section 3.2.

Capitalized terms not defined herein have the meanings ascribed to them in the Plan.

2.    Appointment of Warrant Agent.  The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Warrant Agreement, and the Warrant Agent hereby accepts such appointment.

3.    Issuance; Registration; Form and Execution of Warrants.

3.1.    Issuance. Subject to the provisions of this Agreement and the Plan, (i) on the Effective Date, the Company shall issue, in book-entry form, Warrants to purchase an aggregate of [*Insert Aggregate Number of Warrants to be Issued*] shares of Common Stock to the parties set forth on Schedule A attached hereto and (ii) from and after the Effective Date and until 5:00 p.m., New York City time, on the Expiration Date, the Company may, pursuant to Section C of Article 5 of the Amended and Restated Certificate of Incorporation, issue such additional Warrants, in book-entry form, as may be reasonably necessary solely to comply with Federal Communications Laws. The number of Warrants issued pursuant to this Warrant Agreement, the number of shares of Common Stock issuable upon exercise of such Warrants and the Exercise Price are all subject to adjustment pursuant to Section 6.

3.2.    Book-Entry Form and Registration. Warrants will be issued in book-entry form only. Definitive Warrants will not be issued unless required by law or by the rules or procedures of any exchange, trading system, book-entry system or similar organization in which the Company may from time to time seek to have the Warrants included. A register of the Warrants and of their transfer shall be maintained at the Warrant Agent's Principal Office by the Warrant Agent (the "Warrant Register"). The Company hereby appoints the Warrant Agent to act as the registrar with respect to the Warrants (the "Warrant Registrar"). The Warrant Register shall show the names and address of the holders of Warrants and the number of Warrants owned by each holder. The Company and the Warrant Agent may deem and treat the person in whose name a Warrant or Warrants are registered in the Warrant Register as the absolute owner thereof for all purposes whatsoever, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary (other than notice of transfer in accordance with the terms hereof).

3.3.    Form of Warrant Certificate. Each Warrant Certificate shall be in substantially the form set forth in Exhibit A hereto and shall have such insertions as are appropriate or required by this Warrant Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, as the Company may deem appropriate and as are not inconsistent with the provisions of this Warrant Agreement, such as may be required to comply with this Warrant Agreement, any law or any rule of any securities exchange on which Warrants may be listed, and such as may be necessary to conform to customary usage. The terms and provisions contained in any Warrant Certificate shall constitute, and are hereby expressly made, a part of this Warrant Agreement. The Company and the Warrant Agent, by their execution and delivery of this Warrant Agreement, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Warrant Certificate conflicts with the express provisions of this Warrant Agreement, the provisions of this Warrant Agreement shall govern and be controlling. Each Warrant Certificate shall represent such of the outstanding Warrants as shall be specified therein and shall provide that it shall represent the number of outstanding Warrants from time to time endorsed thereon and that the number of outstanding Warrants represented thereby may from time to time be modified, as appropriate, to reflect exchanges and exercises.

3.4.    Execution of Warrant Certificates. An Officer shall sign the Warrant Certificates on behalf of the Company by manual or facsimile signature. If the Officer whose signature is on a Warrant Certificate no longer holds that office at the time a Warrant Certificate is countersigned, the Warrant Certificate shall nevertheless be valid. A Warrant Certificate shall

-4-

not be valid until countersigned by the manual signature of the Warrant Agent. The signature shall be conclusive evidence that a Warrant Certificate has been properly issued under this Warrant Agreement.

The Warrant Agent shall, upon a written order of the Company signed by an Officer, countersign Warrant Certificates for original issue up to the number stated in Section 3.1. The Warrant Agent may appoint an agent acceptable to the Company to countersign Warrant Certificates. Such an agent may countersign Warrant Certificates whenever the Warrant Agent may do so. Each reference in this Warrant Agreement to a countersignature by the Warrant Agent includes a countersignature by such agent. Such agent shall have the same rights as the Warrant Agent in dealing with the Company.

4.    Exercise of Warrants.

4.1    Manner of Exercise.

Subject to Section 4.5(c), from and after the Effective Date and until 5:00 p.m., New York City time, on the Expiration Date, a holder of Warrants may exercise such holder's right to purchase shares of Common Stock (i)(x) by delivering on any Business Day to the Warrant Agent at the Warrant Agent's Principal Office the Form of Election to Purchase attached as Exhibit B hereto duly completed and signed by such holder or holders thereof or by the duly appointed legal representative thereof or by a duly authorized attorney, such signature to be guaranteed by a bank or trust company, by a broker or dealer which is a member of FINRA or by a member of a national securities exchange and, in the case of Definitive Warrants, the holder thereof must surrender for exercise the Warrant Certificates representing such Definitive Warrants at the Warrant Agent's Principal Office or, (y) in the case of any Warrants held by any Warrant holder through a direct or indirect DTC participant, by effecting exercise pursuant to the applicable DTC rules for warrant exercises, and in each case (ii) paying the Exercise Price for each share of Common Stock as to which such Warrants are being exercised, which may be made, at the option of the holder, (A) in United States dollars by certified or official bank check to the order of the Warrant Agent for the account of the Company, (B) by a Cashless Exercise (as defined below) or (C) by any combination of (A) and (B), at the Warrant Agent's Principal Office. An exercising Warrant holder may elect at the time of exercise, by duly completing the Form of Election to Purchase, whether the shares of Common Stock for which such Warrant is being exercised for shares of Class A Common Stock, Class B Common Stock or a combination of Class A Common Stock and Class B Common Stock as set forth in the Form of Election to Purchase.

A "Cashless Exercise" shall mean an exercise of a Warrant in accordance with the immediately following two sentences. To effect a Cashless Exercise, the holder of a Warrant may exercise a Warrant or Warrants without payment of the Exercise Price in cash by surrendering such Warrant or Warrants and, in exchange therefor, receiving such number of shares of Common Stock equal to the product of (1) that number of shares of Common Stock for which such Warrants are exercisable and which would be issuable in the event of an exercise with payment in cash of the Exercise Price and (2) the Cashless Exercise Ratio (as defined below). The "Cashless Exercise Ratio" shall equal a fraction, the numerator of which is the excess of the Current Market Price per share of Class A Common Stock or Class B Common

Stock, as applicable, on the date of exercise over the Exercise Price per share of Common Stock as of the date of exercise and the denominator of which is the Current Market Price per share of Class A Common Stock or Class B Common Stock, as applicable, on the date of exercise.

Upon surrender of a Definitive Warrant representing more than one Warrant in connection with any exercise thereof, the holder of such Warrants must specify the number of Warrants for which such Definitive Warrant is to be exercised. All provisions of this Warrant Agreement shall be applicable with respect to the exercise of a Definitive Warrant of less than the full number of Warrants represented thereby. In the case that a holder of a Definitive Warrant shall exercise fewer than all Warrants evidenced thereby, a new Definitive Warrant evidencing the number of Warrants equivalent to the number of Warrants remaining unexercised shall be issued by the Warrant Agent to such holder of such Definitive Warrant or to his duly authorized successors or assigns following completion of the procedures set forth in this Section 4.1. Except as provided in Section 6, no payment or adjustment shall be made on account of any distributions or dividends on the Common Stock issued prior to the exercise of a Warrant.

4.2     Delivery of Common Stock. Upon satisfaction of the requirements set forth in Section 4.1, the Warrant Agent shall requisition from the Company's Common Stock transfer agent (the "Transfer Agent") for issuance and delivery to or upon the written order of the holder of such Warrant or Warrants and in such name or names as such holder may designate, the share or shares of Common Stock issuable upon the exercise of the Warrant or Warrants. Subject to Section 4.5 and Section 6, upon receipt thereof, the Company shall, as promptly as practicable, and in any event within three Business Days thereafter, cause to be issued to such holder the aggregate number of whole shares of Common Stock issuable upon such exercise and deliver to such holder written confirmation that such shares have been duly issued and recorded on the books of the Company as hereinafter provided. Shares of Common Stock will be issuable in book-entry form only unless at the time the Company is issuing shares of Common Stock in certificated form, in which case such holder shall have the right to obtain shares in certificated form. The shares of Common Stock so issued shall be registered in the name of the Warrant holder or such other name as shall be designated in the Form of Election to Purchase delivered by the Warrant holder. Subject to Section 4.5, such shares shall be deemed to have been issued and any person so designated to be named therein shall be deemed to have become the holder of record of such share or shares of Common Stock as of the Trading Day on which the requirements set forth in Section 4.1 are satisfied. Notwithstanding any other provision of this Agreement, the Company shall not be required to recognize the exercise of any Warrant acquired in violation of this Agreement or deliver shares of Common Stock to the holder of such Warrant upon such exercise.

The Warrants may be exercised in whole or in part, provided that any exercise in part shall be for a whole number of Warrants.

4.3     Payment of Taxes. The Company shall pay all expenses and costs in connection with the initial issuance of the Warrants. Each Warrant holder shall be responsible for any and all other taxes or other governmental charges imposed on such holder with respect to any subsequent issuance or delivery of Warrants or any transfer or exercise thereof.

4.4     Fractional Shares. The Company shall not issue fractional shares of Common Stock upon exercise of any Warrant. Whenever any distribution of Warrants exercisable into a fractional share of Common Stock would otherwise be called for, the actual distribution thereof shall be rounded as follows: (i) fractions of ½ or greater shall be rounded to the next higher whole number and (ii) fractions of less than ½ shall be rounded to the next lower whole number.

4.5     Restrictions on Exercise.

(a)     The Company may restrict the exercise by any Person of Warrants in the event the ownership or proposed ownership of shares of capital stock of the Company, either alone or in combination with other actual or proposed ownership of other shares of capital stock of the Company or shares of capital stock of any other Person, would (i) be inconsistent with, or in violation of, any provision of the Federal Communications Laws, (ii) materially limit or materially impair any existing business activity of the Company or any of its subsidiaries under the Federal Communications Laws, (iii) materially limit or materially impair under the Federal Communications Laws the acquisition of an attributable interest in a full-power television station, a full-power radio station or a daily newspaper (which, as used herein, shall mean "daily newspaper" within the meaning of the Federal Communications Laws) by the Company or any of its subsidiaries for which the Company or its subsidiary has entered into a definitive agreement with a third party or (iv) subject the Company or any of its subsidiaries to any regulation under the Federal Communications Laws having a material effect on the Company or any subsidiary of the Company to which the Company or any subsidiary of the Company would not be subject but for such ownership or proposed ownership.

(b)     If the Company believes that the proposed ownership of shares of capital stock of the Company by any exercising holder of Warrants, or by such other Person as such holder may designate pursuant to Section 4.2, that has complied with the procedures set forth in Section 4.1 may (i) result in any inconsistency with or violation of the Federal Communications Laws as set forth in Section 4.5(a), including, without limitation, any inconsistency with or violation of Section 310(b) of the Communications Act or Section 73.3555 of the FCC's regulations as set forth in 47 C.F.R. 73.3555, (ii) materially limit or materially impair any existing business activity of the Company or any of its subsidiaries under the Federal Communications Laws, (iii) materially limit or materially impair under the Federal Communications Laws the acquisition of an attributable interest in a full-power television station, a full-power radio station or a daily newspaper by the Company or any of its subsidiaries for which the Company or its subsidiary is considering entering into a definitive agreement with a third party, (iv) subject the Company or any of its subsidiaries to any regulation under the Federal Communications Laws having a material effect on the Company or any subsidiary of the Company to which the Company or any subsidiary of the Company would not be subject but for such proposed ownership or (v) be subject to FCC reporting requirements regarding such Person, such Person shall furnish promptly to the Company such information (including, without limitation, information with respect to its citizenship, ownership structure, and other ownership interests and affiliations) as the Company shall reasonably request.

(c)     If (i) any Person from whom information is requested pursuant to Section 4.5(b) does not provide all the information requested by the Company completely and

accurately in a timely manner or (ii) the Company shall conclude that the proposed ownership of a Warrant holder, or such other Person as such holder may designate, or that a stockholder's exercise of any rights of ownership with respect to, shares of Common Stock, either alone or in combination with other existing or proposed ownership of shares of capital stock of any other person, would result in (A) an inconsistency with or violation of the Federal Communications Laws, (B) a material limitation or material impairment of any existing business activity of the Company or any of its subsidiaries under the Federal Communications Laws, (C) a material limitation or material impairment under the Federal Communications Laws of the acquisition of an attributable interest in a full-power television station, a full-power radio station or a daily newspaper by the Company or any of its subsidiaries for which the Company or its subsidiary has entered into a definitive agreement with a third party or (D) subjecting the Company or any of its subsidiaries to any regulation under the Federal Communications Laws having a material effect on the Company or any subsidiary of the Company to which the Company or any subsidiary of the Company would not be subject but for such ownership or proposed ownership, then in the case of either clause (i) or any provision of clause (ii) of this Section 4.5(c), the Company may (1) refuse to permit the exercise of all or any of the Warrants of such holder, (2) suspend those rights of Warrant ownership the exercise of which causes or could cause any situation described in any provision of clause (ii) of this Section 4.5(c) to occur, (3) condition the acquisition of shares of Common Stock on the prior consent of the FCC, to the extent such consent is required, and/or (4) exercise any and all appropriate remedies, at law or in equity, in any court of competent jurisdiction, against any such holder, with a view towards obtaining such information or preventing or curing any situation described in clause (ii) of this Section 4.5(c) to occur which would cause an inconsistency with or violation of the Federal Communications Laws. Any such refusal to permit or suspension of rights with respect to the exercise of Warrants pursuant to clauses (1) and (2), respectively, of the immediately preceding sentence shall remain in effect until the earlier of the following to occur: (x) the requested information has been received and the Company has determined that such exercise will not result in an inconsistency with or violation of the Federal Communications Laws, (y) a binding determination that such exercise will not cause a violation of applicable law, including, without limitation, a declaratory ruling from the FCC under Section 1.2 of the rules of the FCC promulgated under the Communications Act (or any successor rule) has been obtained to the extent that the Company reasonably deems any such ruling to be necessary or (z)(A) the holder has provided an opinion in form and substance, and from counsel, reasonably satisfactory to the Company that such exercise will not result in an inconsistency with or violation of the Federal Communications Laws and, (B) if the Company requests, an agreement from the holder reasonably satisfactory to the Company indemnifying the Company against losses in the event the exercise of the Warrant results in a violation of the Federal Communications Laws.

5.    Transfer and Exchanges.

    5.1.    Transfer of Warrants.

        (a) Subject to paragraph (b) of this Section 5, on any Business Day any Warrant or Warrants may be transferred, entitling the new Warrant holder to purchase a like number of shares of Common Stock as such holder transferring such Warrant or Warrants is entitled to purchase. Any Warrant holder desiring to transfer any Warrant or Warrants shall make such request by written instruction of transfer, in form satisfactory to the Company and the Warrant

Agent, duly executed by the registered holder thereof or by his, her or its attorney, or, in the case of Warrants held by any Warrant holder through a direct or indirect participant in DTC, any transfer shall be effected through the applicable DTC rules for warrant transfers. Additionally, in the case of Definitive Warrants, a Warrant holder may transfer a Definitive Warrant only upon surrender of such Definitive Warrant for registration of transfer. Thereupon the Warrant Agent shall record such transfer in the Warrant Register.

(b) No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act, or state securities laws. The Company and/or the Warrant Agent may require, as a condition to any sale, exchange or transfer of a Warrant, that the Warrant holder deliver to the Company and the Warrant Agent an opinion of counsel, which opinion of counsel shall be reasonably satisfactory to the Company, to the effect that such sale, exchange or transfer is made in compliance with the Securities Act and all applicable state securities laws or pursuant to an exempt transaction under the Securities Act and state securities laws. The provisions of this paragraph (b) shall not apply to the exercise of any Warrant to the extent that the shares of Common Stock issued upon such exercise (and any unexercised portion of the Warrant so exercised) shall be issued to the same holder that exercised such Warrant.

(c) Each Warrant holder acknowledges that each Warrant Certificate will bear such legends as the Company believes, based upon advice of its counsel, are advisable in light of the securities laws applicable to the Warrant Certificates and transfers thereof.

5.2.    General Provisions Relating to Transfers and Exchanges.

(a)    To permit registrations of transfers and exchanges, the Company shall execute and the Warrant Agent shall countersign Warrant Certificates upon the Company's order or at the Warrant Registrar's request.

(b)    No service charge shall be made to a Warrant holder for any registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any transfer tax or governmental charge payable in connection therewith.

(c)    All Warrants issued upon any registration of transfer or exchange of Warrants shall be duly authorized, executed and issued Warrants for Common Stock, not subject to any preemptive rights, and entitled to the same benefits under this Warrant Agreement, as the Warrants surrendered upon such registration of transfer or exchange.

(d)    Prior to due presentment for the registration of a transfer of any Warrant, the Warrant Agent, and the Company may deem and treat the Person in whose name any Warrant is registered on the Warrant Register as the absolute owner of such Warrant for all purposes and neither the Warrant Agent nor the Company shall be affected by notice to the contrary.

(e)    The Warrant Agent shall countersign Definitive Warrants in accordance with the provisions of Section 3.4.

5.3.    <u>Facsimile Submissions to Warrant Agent</u>. All instructions required to be submitted to the Warrant Registrar pursuant to this <u>Section 5</u> to effect a registration of transfer or exchange may be submitted by facsimile or other electronic submission (such as email).

6.    <u>Adjustments</u>. The number of shares of Common Stock for which a Warrant is exercisable and the Exercise Price shall be subject to adjustment from time to time as set forth in this <u>Section 6</u>.

6.1.    <u>Stock Dividends, Subdivisions and Combinations</u>. If at any time the Company shall: (i) take a record of the holders of its Common Stock for the purpose of entitling them to receive a dividend payable in, or other distribution of, additional shares of Common Stock; (ii) subdivide its outstanding shares of Common Stock into a larger number of shares of Common Stock; or (iii) combine its outstanding shares of Common Stock into a smaller number of shares of Common Stock; then (a) the number of shares of Common Stock for which a Warrant is exercisable immediately after the occurrence of any such event shall be adjusted to equal the number of shares of Common Stock that a record holder of the same number of shares of Common Stock for which a Warrant is exercisable immediately prior to the occurrence of such event would own or be entitled to receive after the happening of such event and (b) the Exercise Price shall be adjusted to equal (1) the Exercise Price prior to such adjustment multiplied by the number of shares of Common Stock for which a Warrant is exercisable immediately prior to the adjustment divided by (2) the number of shares of Common Stock for which a Warrant is exercisable immediately after such adjustment.

6.2.    <u>Other Provisions Applicable to Adjustments under this Section</u>. The following provisions shall be applicable to the making of adjustments of the number of shares of Common Stock for which a Warrant is exercisable and the Exercise Price provided for in this <u>Section 6</u>:

(a)    <u>When Adjustments to Be Made</u>. The adjustments required by this <u>Section 6</u> shall be made whenever and as often as any specified event requiring an adjustment shall occur, except that any adjustment of the number of shares of Common Stock for which a Warrant is exercisable that otherwise would be required may be postponed (except in the case of a subdivision or combination of shares of Common Stock, as provided for in <u>Section 6.1</u>) up to, but not later than the date of exercise if such adjustment either by itself or with other adjustments not previously made would result in an increase or decrease, as the case may be, of less than 1% of the shares of Common Stock for which a Warrant is exercisable immediately prior to the making of such adjustment. Any adjustment representing a change of less than such minimum amount (except as aforesaid) which is postponed shall be carried forward and made as soon as such adjustment, together with other adjustments required by this <u>Section 6</u> and not previously made, would result in a minimum adjustment or on the date of exercise. For the purpose of any adjustment, any specified event shall be deemed to have occurred at the close of business on the date of its occurrence.

(b)    <u>Fractional Interests</u>. In computing adjustments pursuant to this <u>Section 6</u> (but subject to <u>Section 4.4</u>), fractional interests in Common Stock shall be taken into account to the nearest 1/1000th of a share.

6.3.    <u>Reorganization, Reclassification, Merger, Consolidation or Sale of Substantially all Assets of the Company</u>.  If the Company (or any other entity, the stock or other securities of which are at the time receivable on the exercise of the Warrants) shall reorganize its capital or reclassify its capital stock or consolidate or merge with or into another Person or there shall occur any sale or conveyance to a third party of all or substantially all of the Company's assets or any statutory share exchange (each such event hereinafter referred to as a "<u>Transaction</u>"), and pursuant to the terms of any such Transaction, the consideration to be paid or distributed to or otherwise received by the holders of Common Stock consists of shares of common stock of the surviving Person or resulting entity and/or any cash, shares of stock (not constituting common stock) or other securities or property of any nature whatsoever (including warrants or other subscription or purchase rights) (such non-common stock property hereinafter referred to as "<u>Other Property</u>"), then each holder of a Warrant shall have the right thereafter to receive, upon exercise of a Warrant, solely the number of shares of common stock of the surviving Person or resulting entity and/or such amount of Other Property receivable pursuant to such Transaction by a holder of the number of shares of Common Stock for which a Warrant is exercisable immediately prior to the effective time of such Transaction.  In the case of any Transaction of the type described in the preceding sentence, it shall be a condition precedent to consummation of the Transaction that (i) the surviving Person or resulting entity assume the due and punctual observance and performance of each and every covenant and condition of this Warrant Agreement and the Warrants to be performed and observed by the Company and all the obligations and liabilities hereunder, subject to such modifications as may be deemed appropriate (as determined by resolution of the Board of Directors of the Company) in order to provide for adjustments of shares of Common Stock for which a Warrant is exercisable shall be as nearly equivalent as practicable to the adjustments provided for in this <u>Section 6.3</u> and (ii) an Officer's Certificate and Opinion of Counsel, each stating that the Transaction complies with the provisions of this Warrant Agreement, have been delivered to the Warrant Agent.  For purposes of this <u>Section 6.3</u>, "common stock of the surviving Person or resulting entity" shall include stock, limited liability company interests or other ownership interests, of such Person or resulting entity of any class which does not have a preference as to dividends or assets over any other class of stock, limited liability company interests or other ownership interests, of such Person or resulting entity and which is not subject to redemption and shall also include any evidences of indebtedness, shares of stock, limited liability company interests or other ownership interests or other securities which are convertible into or exercisable or exchangeable for any such stock, limited liability company interests or other ownership interests, either immediately or after the lapse of any prescribed time period or the occurrence of a specified event, and any warrants or other rights to subscribe for or purchase any such stock, limited liability company interests or other ownership interests.  The foregoing provisions of this <u>Section 6.3</u> shall similarly apply to successive Transactions.

7.    <u>Distributions</u>.  The Company shall make a pro rata distribution, other than as provided in <u>Section 6</u>, to the holders of the Warrants concurrently with any distribution made to the holders of Common Stock in an amount equal to the aggregate number of shares of Common Stock issuable upon the exercise of Warrants outstanding multiplied by the aggregate amount of such distribution made to the holders of Common Stock and divided by the number of shares of Common Stock entitled to such distribution made to the holders of Common Stock, provided that no such distribution shall be made to holders of Warrants if (x) an FCC ruling, regulation or policy prohibits such distribution to holders of Warrants or (y) the Company's FCC Counsel

- 11 -

opines that such distribution is reasonably likely to cause (i) the Company to violate any applicable FCC rules or regulations or (ii) any such holder of Warrants to be deemed to hold an attributable interest in the Company.

8.    Notice to Warrant Holders.  Whenever the number of shares of Common Stock for which a Warrant is exercisable or whenever the Exercise Price shall be adjusted pursuant to Section 6, the Company shall forthwith prepare a certificate setting forth, in reasonable detail, the event requiring the adjustment and the method by which such adjustment was calculated, specifying the number of shares of Common Stock for which a Warrant is exercisable and describing the number and kind of any other shares of stock or Other Property for which a Warrant is exercisable, and any change in the Exercise Price, after giving effect to such adjustment or change.  The Company shall promptly cause a signed copy of such certificate to be delivered to the Warrant Agent in accordance with Section 15.2.  The Company shall keep at its office or agency designated by the Company pursuant to Section 13 copies of all such certificates and cause the same to be available for inspection at said office during normal business hours by any holder of Warrants or any prospective purchaser of a Warrant designated by a holder thereof.

9.    No Impairment.  The Company shall not by any action, including, without limitation, amending its certificate of incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant Agreement or any Warrant Certificate.  Without limiting the generality of the foregoing, the Company will (i) not increase the par value of any shares of Common Stock receivable upon the exercise of a Warrant above the amount payable therefor upon such exercise immediately prior to such increase in par value and (ii) take all such action as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock upon the exercise of any Warrant.

10.    Reservation and Authorization of Common Stock.  From and after the date hereof, the Company shall at all times reserve and keep available for issue upon the exercise of Warrants such number of its authorized but unissued shares of Common Stock as will be sufficient to permit the exercise in full of all outstanding Warrants.  All shares of Common Stock which shall be so issuable, when issued upon exercise of any Warrant and payment therefor in accordance with the terms of this Warrant Agreement and such Warrant, shall be duly and validly issued and fully paid and nonassessable, and not subject to preemptive rights.

11.    Stock and Warrant Transfer Books.  The Company will not at any time, except upon dissolution, liquidation or winding up of the Company, close its stock transfer books or Warrant transfer books so as to result in preventing or delaying the exercise or transfer of any Warrant.

12.    Loss or Mutilation.  Upon receipt by the Company and the Warrant Agent from any holder of Warrants of evidence reasonably satisfactory to them of the ownership of and the loss, theft, destruction or mutilation of such holder's Warrant Certificate and indemnity satisfactory to them, and in case of mutilation upon surrender and cancellation thereof, the Company will execute and the Warrant Agent will countersign and deliver in lieu thereof a new Warrant Certificate of like tenor and representing an equal number of Warrants to such holder;

- 12 -

provided, in the case of mutilation, no indemnity shall be required if such Warrant Certificate in identifiable form is surrendered to the Company or the Warrant Agent for cancellation.

13.    Office of Company. As long as any of the Warrants remain outstanding, the Company shall maintain an office or agency (which may be the principal executive offices of the Company) where the Warrants may be presented for exercise, registration of transfer, division or combination as provided in this Warrant Agreement. The Company shall initially maintain such an agency at the Warrant Agent's Principal Office.

14.    Warrant Agent.

14.1.    Merger or Consolidation or Change of Name of Warrant Agent. Any Person into which the Warrant Agent may be merged or with which it may be consolidated, or any Person resulting from any merger or consolidation to which the Warrant Agent shall be a party, or any Person succeeding to all or substantially all of the shareholder services business of the Warrant Agent, shall be the successor to the Warrant Agent hereunder without the execution or filing of any paper or any further act on the part of any of the parties hereto. If, at the time such successor by merger or consolidation to the Warrant Agent shall succeed to the agency created by this Warrant Agreement, any Warrant Certificate shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the predecessor Warrant Agent and deliver such Warrant Certificate so countersigned; and if at that time any Warrant Certificate shall not have been countersigned, any successor to the Warrant Agent may countersign such Warrant Certificate either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases Warrants shall have the full force provided in the Warrants and in this Warrant Agreement. If at any time the name of the Warrant Agent shall be changed and at such time any Warrant Certificate shall have been countersigned but not delivered, the Warrant Agent may adopt the countersignatures under its prior name and deliver such Warrant Certificate so countersigned; and if at that time any of the Warrant Certificate shall not have been countersigned as provided in Section 3.4, the Warrant Agent may countersign such Warrant Certificate either in its prior name or in its changed name; and in all such cases such Warrant Certificate shall have the full force provided in such Warrant Certificate and in this Warrant Agreement.

14.2.    Certain Terms and Conditions Concerning the Warrant Agent. The Warrant Agent undertakes the express (and not implied) duties and obligations imposed by this Warrant Agreement upon the following terms and conditions, by all of which the Company and the holders of Warrants, by their acceptance of Warrants, shall be bound:

(a)    Correctness of Statements. The statements contained herein and in the Warrants shall be taken as statements of the Company, and the Warrant Agent assumes no responsibility for the correctness of any of the same. The Warrant Agent assumes no responsibility with respect to the distribution of the Warrants except as herein expressly provided.

(b)    Breach of Covenants. The Warrant Agent shall not be responsible for any failure of the Company to comply with any of the covenants contained in this Warrant Agreement or in the Warrants to be complied with specifically by the Company.

(c)     Performance of Duties.  The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents (which shall not include its employees) and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(d)     Reliance on Counsel.  The Warrant Agent may consult at any time with legal counsel satisfactory to it, and the Warrant Agent shall incur no liability or responsibility to the Company or to any holder of Warrants in respect of any action taken, suffered or omitted by it hereunder in good faith and in accordance with the opinion or the advice of such counsel provided that such counsel shall have been selected with due care.

(e)     Compensation and Indemnification.  The Company agrees to pay to the Warrant Agent reasonable compensation for all services rendered by the Warrant Agent in the performance of this Warrant Agreement, to reimburse the Warrant Agent for all out-of-pocket expenses, actually and reasonably incurred by the Warrant Agent in the performance of this Warrant Agreement and to indemnify the Warrant Agent and save it harmless against any and all liabilities, including judgments, costs and reasonable attorney's fees, for anything done or omitted by the Warrant Agent in the performance of its duties and powers under this Warrant Agreement, except for such liabilities that arise as a result of the Warrant Agent's negligence, willful misconduct or bad faith.

(f)     Legal Proceedings.  The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or one or more holders of Warrants shall furnish the Warrant Agent with reasonable security and indemnity for any costs and expenses that may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper, whether with or without any such security or indemnity. All rights of action under this Warrant Agreement or under any of the Warrants may be enforced by the Warrant Agent without the possession of any of the Warrants or the production thereof at any trial or other proceeding relative thereto, and any such action, suit or proceeding instituted by the Warrant Agent shall be brought in its name as Warrant Agent, and any recovery of judgment shall be for the ratable benefit of the holders of Warrants, as their respective rights or interests may appear.

(g)     Other Transactions in Securities of the Company.  Except as prohibited by law, the Warrant Agent and any stockholder, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Warrant Agreement. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

(h)     Liability of Warrant Agent.  The Warrant Agent shall act hereunder solely as agent, and its duties shall be determined solely by the provisions hereof.  The Warrant Agent shall not be liable for anything that it may do or refrain from doing in connection with this Warrant Agreement except for its own negligence, willful misconduct or bad faith.

- 14 -

(i)    Reliance on Documents. The Warrant Agent will not incur any liability or responsibility to the Company or to any holder of Warrants for any action taken in reliance on any notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument reasonably believed by it to be genuine and to have been signed, sent or presented by the proper party or parties.

(j)    Validity of Agreements. The Warrant Agent shall not be under any responsibility in respect of the validity of this Warrant Agreement or the execution and delivery hereof (except the due execution and delivery hereof by the Warrant Agent) or in respect of the validity or execution of any Warrant (except its countersignature and delivery thereof); nor shall the Warrant Agent by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Common Stock (or other stock or other property) to be issued pursuant to this Warrant Agreement or any Warrant, or as to whether any Common Stock (or other stock or other property) will, when issued, be validly issued, fully paid and nonassessable, or as to the Warrant Price or the number or amount of Common Stock or other securities or other property issuable upon exercise of any Warrant.

(k)    Instructions from Company. The Warrant Agent is hereby authorized and directed to accept instructions with respect to the performance of its duties hereunder from an Officer, and to apply to such officers for advice or instructions in connection with its duties, and shall not be liable for, any action taken or suffered to be taken by it in good faith in accordance with instructions of any such officer or officers.

14.3.    Change of Warrant Agent. The Warrant Agent may resign and be discharged from its duties under this Warrant Agreement by giving to the Company 30 days' advance notice in writing. The Warrant Agent may be removed by like notice to the Warrant Agent from the Company. If the Warrant Agent shall resign or be removed or shall otherwise become incapable of acting, the Company shall appoint a successor to the Warrant Agent. If the Company shall fail to make such appointment within a period of 30 days after such removal or after it has been notified in writing of such resignation or incapacity by the resigning or incapacitated Warrant Agent, then any holder of Warrants, may apply to a court of competent jurisdiction for the appointment of a successor to the Warrant Agent. Pending the appointment of the successor warrant agent, the Company shall perform the duties of the Warrant Agent. After appointment, the successor warrant agent shall be vested with the same powers, rights, duties and responsibilities as if it had been originally named as Warrant Agent without further act or deed; provided, however, the former Warrant Agent shall be required to deliver and transfer to the successor warrant agent any property at the time held by it hereunder, and execute and deliver any further assurance, conveyance, act or deed necessary to facilitate succession. In the event of such resignation or removal, the successor warrant agent shall mail, first class, to each holder of Warrants, written notice of such removal or resignation and the name and address of such successor warrant agent. Failure to file any notice provided for in this Section 13.3, however, or any defect therein, shall not affect the legality or validity of the resignation or removal of the Warrant Agent or the appointment of the successor warrant agent, as the case may be.

14.4.    Disposition of Proceeds on Exercise of Warrants; Inspection of Records. The Warrant Agent shall account promptly to the Company with respect to Warrants exercised

and concurrently pay to the Company in immediately available funds all amounts received by the Warrant Agent for the purchase of shares of Common Stock through the exercise of such Warrants. The Warrant Agent shall, upon request of the Company from time to time, deliver to the Company such complete reports of registered ownership of the Warrants and such complete records of transactions with respect to the Warrants as the Company may request. The Warrant Agent shall also make available to the Company for inspection by the Company's agents or employees, from time to time as the Company may request, such original books of accounts and records maintained by the Warrant Agent in connection with the issuance and exercise of Warrants hereunder, such inspections to occur at the Warrant Agent's Principal Office. The Warrant Agent shall keep copies of this Warrant Agreement and any notices given or, received hereunder available for inspection by the Company or the holders of Warrants at the Warrant Agent's Principal Office. The Company shall supply the Warrant Agent from time to time with such numbers of copies of this Warrant Agreement as the Warrant Agent may request.

14.5.   Cancellation. The Warrant Agent shall cancel all Warrant Certificates properly surrendered for exercise, exchange, substitution, or transfer. The Warrant Agent shall destroy all cancelled Warrant Certificates and, if requested, deliver a certificate of such destruction to the Company.

14.6.   Survival. This Section 14 shall survive the resignation or removal of the Warrant Agent and the termination of this Warrant Agreement.

15.    Miscellaneous.

15.1.   Rights of Holders. Holders of unexercised Warrants are not entitled to (i) receive notice of or vote at any meeting of the stockholders, (ii) consent to any action of the stockholders, (iii) exercise any preemptive right, or (iv) exercise any other right granted to stockholders of the Company, other than those rights set forth in this Warrant Agreement or a Warrant Certificate.

15.2.   Notice Generally. Any notice, demand, request, consent, approval, declaration, delivery or other communication hereunder to be made pursuant to the provisions of this Warrant Agreement shall be sufficiently given or made if in writing and either delivered in person with receipt acknowledged or sent by registered or certified mail, return receipt requested, postage prepaid or by facsimile, addressed as follows:

If to any holder of a Warrant or holder of shares of Common Stock, at its last known address appearing on the Warrant Register of the Company maintained for such purpose.

If to the Company at:

Tribune Company
435 N. Michigan Avenue
Chicago, IL 60611
Attention: General Counsel
Telephone: (312) 222-9100
Fax: (312) 222-4206

- 16 -

If to the Warrant Agent at:

**[*Warrant Agent*]**
**[*Warrant Agent Address*]**
Attention: [_____]
Telephone: [_____]
Fax: [_____]

or at such other address as may be substituted by notice given as herein provided.  The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice.  Every notice, demand, request, consent, approval, declaration, delivery or other communication hereunder shall be deemed to have been duly given or served on the date on which personally delivered, the first Business Day after delivery by facsimile, receipt acknowledged, or the third Business Day after deposit in the United States mail, whichever is earliest.

15.3.   Successors and Assigns.  All covenants and provisions of this Warrant Agreement by or for the benefit of the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

15.4.   Supplements and Amendment.  This Warrant Agreement constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof and may not be amended, except in a writing signed by both of them.

The Company and the Warrant Agent may from time to time supplement or amend this Warrant Agreement (a) without the approval of any holders of Warrants in order to cure any ambiguity, manifest error or other mistake in this Warrant Agreement, or to correct or supplement any provision contained herein that may be defective or inconsistent with any other provision herein, or to make any other provisions in regard to matters or questions arising hereunder that the Company and the Warrant Agent may deem necessary or desirable (including any provision relating to legends or other notations the Company determines are required on any Warrant or Warrant Certificate and any provision necessary or desirable to comply with the policies or procedures of DTC) and that shall not materially and adversely affect, alter or change the legal rights of the holders of the Warrants or (b) with the prior written consent of holders of the Warrants exercisable for a majority of the Common Stock then issuable upon exercise of the Warrants then outstanding; provided, however, that each amendment or supplement that decreases the Warrant Agent's rights or increases its duties and responsibilities hereunder shall also require the prior written consent of the Warrant Agent.

15.5.   Third-Party Beneficiaries.  All covenants and provisions of this Warrant Agreement shall inure to the benefit of each holder of Warrants from time to time of Warrants.

15.6.   Severability.  Wherever possible, each provision of this Warrant Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Warrant Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without

- 17 -

invalidating the remainder of such provision or the remaining provisions of this Warrant Agreement.

      15.7.  <u>Headings</u>. The headings used in this Warrant Agreement are for the convenience of reference only and shall not, for any purpose, be deemed a part of this Warrant Agreement.

      15.8.  <u>Governing Law</u>. This Warrant Agreement and the Warrants shall be governed by the laws of the State of Delaware, without regard to the provisions thereof relating to conflict of laws.

      15.9.  <u>Counterparts</u>. This Warrant Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

- 18 -

IN WITNESS WHEREOF, each of the Company and the Warrant Agent has caused this Warrant Agreement to be executed by its duly authorized officers as of the date first above written.

TRIBUNE COMPANY

By: _____
       Name:
       Title:

**[*Warrant Agent*]**
As Warrant Agent

By: _____
       Name:
       Title:

Signature Page to Warrant Agreement

13059350.10

Schedule A

| Beneficial Owner | Aggregate Number of Warrants |
| --- | --- |

<u>Exhibit A</u>

[Form of Warrant Certificate]

WARRANT
TO PURCHASE CLASS A OR CLASS B COMMON STOCK
OF
TRIBUNE COMPANY

Certificate No.: _____                                        Number of Warrants:_____

   Exercisable from and after the date hereof until 5:00 p.m., New York City time on the twentieth anniversary of the Effective Date (as defined in the Warrant Agreement) (the "<u>Expiration Date</u>").

   [INSERT FORM OF LEGEND, IF ANY, AS DIRECTED BY
THE COMPANY FROM TIME TO TIME]

   **The sale, encumbrance or other disposition of the Warrants and any securities acquired upon exercise of the Warrants is subject to the provisions of the Warrant Agreement (as defined below), a copy of which may be available to any registered Holder or owner of a beneficial interest in a Warrant upon request to the Warrant Agent (or successor warrant agent) at the address provided in <u>Section 15.2</u> of the Warrant Agreement (as defined below) or obtained from the Company without charge.  No registration or transfer of the securities issuable pursuant to the Warrant will be recorded on the books of the Company until such provisions have been complied with.**

   This Warrant Certificate certifies that _____, or its registered assigns, is the registered holder ("<u>Holder</u>") of the number of Warrants set forth above expiring at 5:00 p.m., New York City time, on the Expiration Date (the "<u>Warrants</u>") to purchase Class A Common Stock or Class B Common Stock (collectively, the "<u>Common Stock</u>") of Tribune Company, a Delaware corporation (the "<u>Company</u>").  Each Warrant entitles the Holder, upon exercise thereof, to purchase from the Company at any time from and after the date hereof until 5:00 p.m., New York City time, on the Expiration Date, one (1) share of Common Stock at the Exercise Price of $0.001 per share subject to adjustment and the other terms and conditions set forth herein and in the Warrant Agreement dated as of *[**Insert Date of Warrant Agreement**]* (the "<u>Warrant Agreement</u>") by and between the Company and [***Warrant Agent**], a [**Jurisdiction/Entity**]*, as warrant agent (the "<u>Warrant Agent</u>").  Such purchase shall be payable in United States dollars by certified or official bank check to the order of the Warrant Agent for the account of the Company at the Warrant Agent's Principal Office (as defined in the Warrant Agreement), or by Cashless Exercise (as defined in the Warrant Agreement), subject to the conditions set forth herein and in the Warrant Agreement.  The number of shares of Common Stock for which each Warrant is exercisable, and the Exercise Price, are subject to adjustment upon the occurrence of certain events as set forth in the Warrant Agreement.  Whenever the number of shares of Common Stock for which a Warrant is exercisable, or the Exercise Price, is adjusted pursuant to the Warrant Agreement, the Company shall prepare a certificate setting forth, in reasonable detail the event requiring the adjustment and the method by which such adjustment was calculated.  The Company shall promptly cause a signed copy of such certificate to be delivered to the Warrant Agent.

The exercise of each Warrant is subject to the restrictions set forth in <u>Section 4.5</u> of the Warrant Agreement.

No Warrant may be exercised after 5:00 p.m., New York City time, on the Expiration Date, and to the extent not exercised by such time such Warrants shall be void.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse side hereof, and such further provisions shall for all purposes have the same effect as though fully set forth at this place.

This Warrant Certificate is not valid unless countersigned by the Warrant Agent.

Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Warrant Agreement.

THIS WARRANT CERTIFICATE SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO THE PROVISIONS THEREOF RELATING TO CONFLICT OF LAWS.

In witness whereof, the undersigned, duly authorized officer of the Company has caused this Warrant Certificate to be signed as of this ___ day of _____, ___.

TRIBUNE COMPANY

By: _____
      Name:
      Title:

COUNTERSIGNED:

**[*Warrant Agent*]**
as Warrant Agent

By: _____
      Name:
      Title:

[Form of Reverse of Warrant Certificate]

The Warrants evidenced by this Warrant Certificate are part of a duly authorized issue of Warrants expiring at 5:00 p.m., New York City time, on the Expiration Date, entitling the Holder, on exercise, to purchase shares of Common Stock of the Company, and are issued or to be issued pursuant to the Warrant Agreement, which Warrant Agreement is hereby incorporated by reference and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the holders of Warrants. A copy of the Warrant Agreement may be obtained by the Holder hereof upon written request to the Company or the Warrant Agent at the addresses set forth below.

Warrants may be exercised by surrendering this Warrant Certificate, with the Election to Purchase set forth hereon properly completed and executed, together with payment of the Exercise Price by certified or official bank check payable to the order of the Warrant Agent for the account of the Company or by Cashless Exercise as provided in the Warrant Agreement. In the event that the number of Warrants exercised shall be less than the total number of Warrants evidenced hereby, there shall be issued to the Holder hereof or his duly authorized successors or assigns a new Warrant Certificate evidencing the number of Warrants not exercised.

The Warrant Agreement provides that the number of shares of Common Stock for which each Warrant is exercisable, and the price at which such shares may be purchased upon exercise of each Warrant, are subject to adjustment upon the occurrence of certain events as set forth in the Warrant Agreement. The Company shall not issue fractional shares of Common Stock upon the exercise of any Warrant, and the Company shall round down to the nearest share of Common Stock as provided in the Warrant Agreement.

Warrant Certificates, when surrendered at the office of the Warrant Agent by the registered Holder thereof in person or by legal representative or attorney duly authorized in writing, may be exchanged, in the manner and subject to the limitations provided in the Warrant Agreement for another Warrant Certificate or Warrant Certificates of like tenor evidencing in the aggregate a like number of Warrants.

Upon due presentation for registration of transfer of this Warrant Certificate at the office of the Warrant Agent, a new Warrant Certificate or Warrant Certificates of like tenor and evidencing in the aggregate a like number of Warrants shall be issued to the transferee in exchange for this Warrant Certificate, subject to the limitations provided in the Warrant Agreement.

****

| COMPANY: | WARRANT AGENT: |
|---|---|
| Tribune Company | *[Warrant Agent]* |
| 435 N. Michigan Avenue | *[Insert Warrant Agent Address]* |
| Chicago, IL  60611 | *[Insert Warrant Agent Address]* |

****

Exhibit B

ELECTION TO PURCHASE

The undersigned hereby irrevocably elects to exercise ____ Warrants, to purchase _____ shares of Class A Common Stock of Tribune Company, a Delaware corporation (the "**Company**"), and _____ shares of Class B Common Stock and herewith makes payment therefor, all at the price and on the terms and conditions specified in that certain Warrant Agreement dated [ ], 2010 (the "**Warrant Agreement**") between the Company and [ ], as warrant agent and requests that certificates for the shares of Class A Common Stock and/or Class B Common Stock hereby purchased (and any securities or other property issuable upon such exercise) be issued in and delivered to the name and address specified below.

REQUEST FOR CASHLESS EXERCISE

☐    Please check if the undersigned, in lieu of tendering the cash payment, as aforesaid, hereby requests the delivery of a number of shares of Class A Common Stock and/or Class B Common Stock equal to the number of shares of Common Stock for which such Warrants are exercisable and which would be issuable in the event of an exercise with payment in cash multiplied by the Cashless Exercise Ratio within the meaning of Section 4.1 of the Warrant Agreement.

_____

Name

_____

Address

_____

Delivery Address (if different)

_____                    _____

*Social Security or Other*                    *Signature*
*Taxpayer Identification*
*Number of Holder*

(Name must conform in all respects to the name of the registered holder of the Warrant specified in the Warrant Register.)

Signature Guarantee:

_____

Signature must be guaranteed by a bank or trust company, by a broker or dealer which is a member of FINRA or by a member of a national securities exchange with membership or participation in an approved signature guarantee medallion program.

NOTE:  The exercise of any Warrants held by any holder of Warrants through a direct or indirect DTC participant shall be effected through the applicable DTC rules for warrant exercises.

Defined terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Warrant Agreement.

****

**Exhibit 5.14.3**
**Retiree Claimant Settlement Agreement**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

## STIPULATION BETWEEN DEBTORS AND RETIREE CLAIMANTS SETTLING AND ALLOWING CLAIMS

This stipulation (this "Stipulation") is entered into by and among Tribune

Company, a Delaware corporation, on behalf of itself and its affiliated debtors and debtors in

possession in the above-captioned jointly administered cases (collectively, the "Debtors"), and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

LA1 1788763

certain claimants holding retirement-related claims represented by Teitelbaum & Baskin, LLP (as identified collectively on Schedule A hereto, the "Retiree Claimants" and, together with the Debtors, the "Parties"), in each case by and through their respective counsel.

## RECITALS

A.     On December 8, 2008, the Debtors filed for protection under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").[2]

B.     On April 12, 2010, the Debtors filed the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries (the "Proposed Plan") and a supporting disclosure statement [Docket No. 4008].

C.     The Retiree Claimants have filed claims against various Debtors related to former employment with various of the Debtors or their predecessors (as identified collectively on Schedule A hereto, the "Retiree Claims"), the majority of which are non-qualified pension claims and deferred compensation claims.[3]

D.     The Debtors scheduled the Retiree Claims in an aggregate amount of approximately $82 million.  The Retiree Claimants asserted, through individual proofs of claim, an aggregate amount of approximately $113 million on account of the Retiree Claims.

E.     The Debtors and the Retiree Claimants have several disputes regarding the amount of the Retiree Claims, including: (i) the discount rates and mortality tables most appropriately applied to those Retiree Claims that are based in whole or in part on future annuity payments; (ii) whether Retiree Claims for deferred compensation are entitled to interest in the

[2] Debtor Tribune CNLBC, LLC (formerly known as Chicago National League Ball Club, LLC) filed a voluntary chapter 11 petition on October 12, 2009.

[3] The Retiree Claims do not include any rights of the Retiree Claimants under section 1114 of the Bankruptcy Code, which, under the Proposed Plan, are treated as Employee Benefit Claims.

LA1 1788763

amount of approximately $1.74 million, based upon a contract interest rate of 8.4% for the

prepetition period of the 2008 calendar year; and (iii) with respect to some of the Retiree Claims,

the factual basis for such claims, including whether the claimant was entitled to annuity or other

benefit payments, the type of annuity or other benefit, and the specific amounts owed.

       F.      Following good faith negotiations, the Parties have agreed to settle the

Retiree Claims on the terms and subject to the conditions set forth herein.

       NOW, THEREFORE, THE PARTIES STIPULATE AND AGREE AS

FOLLOWS:

## AGREEMENT

1.      The recitals set forth above are incorporated herein by reference.

2.      This Stipulation is subject to Bankruptcy Court approval pursuant to

Federal Rule of Bankruptcy Procedure 9019, to be granted in connection with confirmation of a

plan of reorganization in the Debtors' bankruptcy cases.

3.      Each of the Retiree Claims listed on Schedule A hereto will be allowed

under section 502 of the Bankruptcy Code in the amount listed thereon as the "Total Agreed

Amount" for such claim. To the extent any such claim is a claim for future annuity payments,

that component of the Total Agreed Amount has been calculated pursuant to a formula for

determining the present value of future annuity payments and applying certain mortality factors

(the "Formula"). Specifically, the Formula utilizes applicable interest rate and applicable

mortality table required to be used under § 417(e) of the Internal Revenue Code of 1986, as

amended, to calculate lump sum distributions from tax-qualified defined benefit plans for 2008

plan year payments, with (i) applicable interest rate for 2008 plan year payments determined as

of January 1, 2008 with a two-month lookback to the November 2007 segment rates of 4.60%,

4.82% and 4.91%, and (ii) the RP-2000 healthy mortality table (weighted 50% male and 50% female), using scale AA for (x) seven (7) years from the valuation date for annuitants and (y) fifteen (15) years from the valuation date for non-annuitants. In addition, a further amount equal to 5.165% of the present value of the future annuity payments (the "Litigation Adjustment") has been added to the present value calculation in computing the Total Agreed Amount for those Retiree Claims involving future annuity payments. The Litigation Adjustment represents the compromise, based on the potential cost and outcome of litigating the differences between the discount rates and mortality tables used by the Debtors and those used by the Retiree Claimants. To the extent any Retiree Claim listed on Schedule A is a claim for deferred compensation payments, that component of the Total Agreed Amount has been calculated to include interest at 4.2% for the aggregate amount of approximately $870,000 (or one half of the amount of interest asserted for the prepetition portion of the 2008 calendar year) ("Allowed 2008 Interest") that the Retiree Claimants argue accrued under the terms of the relevant plans and agreements. Each Total Agreed Amount listed on Schedule A shall constitute an allowed claim against the specific Debtor identified on the same row as such Total Agreed Amount on Schedule A.[4]

    4.  The Debtors and the Retiree Claimants reserve their rights to review and correct any arithmetic calculations; provided, however, that neither party shall be entitled to make any correction that will materially alter the aggregate allowed amount of the Retiree Claims.

---

[4] With respect to claims that are similar in nature to the Retiree Claims but not a part of this Stipulation ("Similar Claims"), the Debtors intend to liquidate such Similar Claims consistent with the formulas and principles applicable to the Retiree Claims under the Stipulation, using negotiations and claims objections.

5.    Any Retiree Claim listed on <u>Schedule A</u> as having a Total Agreed Amount of $0.00 is so listed because it duplicates another Retiree Claim with a Total Agreed Amount also listed on <u>Schedule A</u>.

6.    Each Retiree Claimant agrees that he or she will not: (i) object to the allowance or treatment of his or her Retiree Claim pursuant to the terms of this Stipulation, or (ii) absent the written consent of the Debtors, amend or attempt to amend his or her Retiree Claim or file any other claim that is inconsistent with the terms and conditions of this Stipulation.

7.    The Debtors agree that in consideration of the compromises set forth herein and upon the occurrence of the conditions for the effectiveness hereof, any and all claims of the Debtors and their estates, known or unknown, which may exist against any Retiree Claimant with respect to such claimant's Retiree Claim, including, without limitation, any claim for the avoidance and recovery of any pre-petition payment or transfer made on account of such Retiree Claim, shall be hereby released and waived.

8.    The agreed allowed amounts of the Retiree Claims pursuant to this Stipulation, the obligations described in Paragraph 6 of this Stipulation, and the release and waiver described in Paragraph 7 of this Stipulation, are conditioned upon confirmation of the Proposed Plan, as amended from time to time, or another plan of reorganization, in each case providing for the classification and treatment of the Retiree Claims consistent with their classification and treatment under the Proposed Plan as filed on April 12, 2010.

9.    If the condition described in Paragraph 8 above does not occur or the Bankruptcy Court does not approve this Stipulation as part of its confirmation of the plan of reorganization that is ultimately confirmed, the Parties hereto fully reserve any and all of their rights, including, without limitation, (i) with respect to the Retiree Claimants, the right to assert

LA1 1788763

their respective Retiree Claims in their original asserted amounts, and (ii) with respect to the Debtors, the right to assert any and all objections or defenses to each Retiree Claim. Accordingly, nothing herein is or shall be deemed an admission of any kind.

10.    The undersigned persons represent and warrant that they have full authority to execute this Stipulation on behalf of the respective Parties and that the respective Parties have full knowledge of and have consented to this Stipulation.

11.    This Stipulation may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.    This stipulation shall be binding upon the Parties hereto and upon their affiliates, assigns and successors.

13.    It is acknowledged that each Party has participated in and jointly consented to the drafting of this Stipulation and that any claimed ambiguity shall not be construed for or against any Party on account of such drafting.

14.    The Bankruptcy Court shall retain jurisdiction over any and all disputes or other matters arising under or otherwise relating to this Stipulation.

15.    Each of the Debtors expressly reserves its right to object to any other claim of a Retiree Claimant other than the Retiree Claims listed on Schedule A hereto.

Dated: Wilmington, Delaware
      May _18_, 2010

TEITELBAUM & BASKIN, LLP          SIDLEY AUSTIN LLP

_____   _____
Jay Teitelbaum                        James F. Conlan
3 Barker Avenue, Third Floor        Bryan Krakauer
White Plains, New York 10601        Kevin T. Lantry
Telephone: (914) 437-7670          Ariella T. Simonds
Facsimile: (914) 437-7672          One South Dearborn Street
                              Chicago, Illinois 60603
COUNSEL TO THE RETIREE       Telephone: (312) 853-7000
CLAIMANTS, AS LISTED ON      Facsimile: (312) 853-7036
SCHEDULE A HERETO

                                - and -

                            COLE, SCHOTZ,
                            MEISEL, FORMAN & LEONARD, P.A.

                            Norman L. Pernick (No. 2290)
                            J. Kate Stickles (No. 2917)
                            Patrick J. Reilley (No. 4451)
                            500 Delaware Avenue, Suite 1410
                            Wilmington, Delaware 19801
                            Telephone: (302) 652-3131
                            Facsimile: (302) 652-3117

                            ATTORNEYS FOR DEBTORS AND
                            DEBTORS IN POSSESSION

7

LA1 1788763

# Schedule A

| Name | Claim Number | Debtor | Annuity Claims Claimed Amount* | Annuity Claims Agreed Amount | Deferred Compensation Claims Claimed Amount* | Deferred Compensation Claims Agreed Amount | Other Claims Claimed Amount* | Other Claims Agreed Amount | Total Claims Total Original Claim* | Total Claims Total Agreed Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| Abatemarco, Fred A. | 3968 | Tribune Company | $105,156.30 | $90,669.06 | | | | | $105,156.30 | $90,669.06 |
| Alcantar, Gerald J. | 3967 | Tribune Company | 11,811.29 | 12,985.77 | | | | | 11,811.29 | 12,985.77 |
| Alfano, Richard S. | 3966 | Tribune Company | 56,537.94 | 42,577.10 | | | | | 56,537.94 | 42,577.10 |
| Armstrong, Michael C. | 3961 | Tribune Company | - | - | 195,890.45 | 188,292.40 | | | 195,890.45 | 188,292.40 |
| Arnold, Gary M. | 3962 | Tribune Company | 51,322.02 | 46,621.75 | 52,407.99 | 50,375.23 | | | 103,730.01 | 96,996.98 |
| Arthur, John M. | 3963 | Tribune Company | 77,634.67 | 69,287.96 | | | 441.09 | 441.09 | 78,075.76 | 69,729.05 |
| Barlow, William H. | 3964 | Tribune Company | 30,213.16 | 28,029.63 | | | | | 30,213.16 | 28,029.63 |
| Barrett, David S. | 3965 | Tribune Company | 4,685.88 | 4,707.98 | | | | | 4,685.88 | 4,707.98 |
| Barwick, Bruce E. | 3932 | Tribune Company | 46,913.69 | 37,961.41 | | | | | 46,913.69 | 37,961.41 |
| Becker, Todd A. | 3933 | Tribune Company | 6,687.66 | 5,993.35 | 123,629.87 | 118,834.61 | | | 130,317.53 | 124,827.96 |
| Bell, George | 3934 | Tribune Company | 21,758.70 | 16,711.77 | | | | | 21,758.70 | 16,711.77 |
| Bell, Susan P. | 3935 | Tribune Company | 43,290.37 | 34,604.54 | | | | | 43,290.37 | 34,604.54 |
| Bergmann, Horst A. | 3936 | Tribune Company | 5,868,608.14 | 5,381,667.44 | | | | | 5,868,608.14 | 5,381,667.44 |
| Blood, Edward L. | 3937 | The Baltimore Sun Company | 85,974.55 | 83,396.90 | | | | | 85,974.55 | 83,396.90 |
| Bowen, Sharon M. | 3938 | Tribune Company | 7,879.34 | 6,987.13 | | | 49.32 | 49.32 | 7,928.66 | 7,036.45 |
| Bowen, Sharon M. | 3939 | Tribune Company | 548.59 | 533.23 | | | | | 548.59 | 533.23 |
| Bowlin, Gregory L. | 3940 | Tribune Company | 51,409.08 | 46,543.93 | | | | | 51,409.08 | 46,543.93 |
| Brandt, Robert F. | 3941 | Tribune Company | 27,545.56 | 25,048.20 | | | | | 27,545.56 | 25,048.20 |
| Brauer, Alan L. | 3942 | Tribune Company | 0 | - | 650,642.48 | 625,405.86 | | | 650,642.48 | 625,405.86 |
| Brennan, Leo | 3943 | Tribune Company | 0 | - | 79,868.36 | 76,770.49 | | | 79,868.36 | 76,770.49 |
| Brief, Kenneth H. | 3944 | Tribune Company | 55,918.19 | 38,370.50 | | | | | 55,918.19 | 38,370.50 |
| Brisco, Robert N. | 3945 | Tribune Company | - | - | 966,473.57 | 928,986.73 | | | 966,473.57 | 928,986.73 |
| Bryson, John E. | 3946 | Tribune Company | 102,312.38 | 78,321.63 | | | | | 102,312.38 | 78,321.63 |
| Campbell, Patricia | 3947 | Tribune Company | 703,514.32 | 624,456.10 | | | | | 703,514.32 | 624,456.10 |
| Carpenter, Dian S. | 3948 | Tribune Company | 355,310.50 | 327,120.99 | 1,168,318.11 | 1,123,002.28 | | | 1,523,628.61 | 1,450,123.27 |
| Carroll, John S. | 3949 | Tribune Company | 27,999.41 | - | 83,837.34 | 75,861.21 | | | 111,836.75 | 75,861.21 |
| Casey, Kathleen M. | 3950 | Tribune Company | 49,874.04 | 43,253.31 | | | | | 49,874.04 | 43,253.31 |
| Chandhok, Rajender K. | 3951 | Tribune Company | 1,089,878.63 | 963,537.50 | | | | | 1,089,878.63 | 963,537.50 |
| Chandler, Bettina W. | 3952 | Tribune Company | 53,190.66 | 38,420.98 | | | | | 53,190.66 | 38,420.98 |
| Charles, Randolph R. | 3953 | Tribune Company | 121,613.91 | 91,485.14 | | | 421.48 | 421.48 | 122,035.39 | 91,906.62 |
| Clayton, Janet T. | 3954 | Tribune Company | | | | | 15,217.72 | 15,217.72 | 15,217.72 | 15,217.72 |
| Clayton, Janet T. | 3955 | Los Angeles Times Communications LLC | | | | | | | | |
| Clifford, Patrick A. | 3956 | Tribune Company | 1,161,516.02 | 1,163,336.28 | | | | | 1,161,516.02 | 1,163,336.28 |
| Clurman, Andrew W. | 3957 | Tribune Company | 50,625.17 | 35,826.56 | | | | | 50,625.17 | 35,826.56 |
| Coffey, Shelby C. III | 3959 | Tribune Company | 239,849.60 | 217,121.56 | | | | | 239,849.60 | 217,121.56 |
| Colston, James Willard | 3960 | Los Angeles Times Communications LLC | 0 | | 341,112.31 | 327,881.51 | | | 341,112.31 | 327,881.51 |
| Colston, James Willard | 3909 | Tribune Company | 0 | | | | | | | |
| Coppers, Stuart K. | 3910 | Tribune Company | 22,713.20 | 23,309.90 | | | | | 22,713.20 | 23,309.90 |

# Schedule A

| Name | Claim Number | Debtor | Annuity Claims | | Deferred Compensation Claims | | Other Claims | | Total Claims | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Claimed Amount* | Agreed Amount | Claimed Amount* | Agreed Amount | Claimed Amount* | Agreed Amount | Total Original Claim* | Total Agreed Amount |
| Colliar, George J. | 3911 | Tribune Company | 239,050.32 | 218,744.25 | · | · | · | · | 239,050.32 | 218,744.25 |
| Crowder, Grace E. | 3912 | The Baltimore Sun Company | 325,521.64 | 284,766.84 | · | · | 3,461.67 | 3,461.67 | 328,983.31 | 288,228.51 |
| Crowder, Grace E. | 3913 | Tribune Company | · | · | · | · | · | · | · | · |
| Darnall, John | 3914 | Los Angeles Times Communications LLC | · | 14,454.09 | · | · | · | · | · | 14,454.09 |
| Darnall, John | 3915 | The Baltimore Sun Company | 12,067.23 | · | · | · | · | · | 12,067.23 | · |
| Davis, Kenneth | 3916 | The Baltimore Sun Company | 85,588.75 | 83,961.39 | · | · | · | · | 85,588.75 | 83,961.39 |
| Davis, Kenneth | 3917 | Tribune Company | · | · | · | · | · | · | · | · |
| Deyoung, Barbara | 3918 | Tribune Company | 8,170.79 | 4,286.53 | 131,973.55 | 126,854.66 | · | · | 140,144.34 | 131,141.19 |
| Dill, John F. | 3919 | Tribune Company | 109,100.04 | 104,001.88 | · | · | · | · | 109,100.04 | 104,001.88 |
| Dilworth, Ann E. | 3920 | Tribune Company | 184,998.00 | 157,922.07 | · | · | · | · | 184,998.00 | 157,922.07 |
| Downes, Mary | 3921 | The Hartford Courant Company | 107,609.85 | 93,239.19 | · | · | · | · | 107,609.85 | 93,239.19 |
| Downes, Mary | 3922 | Tribune Company | · | · | · | · | · | · | · | · |
| Downing, Kathryn M. | 3923 | Tribune Company | 1,350,233.65 | 1,061,201.09 | · | · | · | · | 1,350,233.65 | 1,061,201.09 |
| Dreher, Beverly A. | 3924 | Tribune Company | 58,882.23 | 52,776.00 | · | · | · | · | 58,882.23 | 52,776.00 |
| Drewry, Elizabeth | 3925 | Tribune Company | 159,351.22 | 123,201.85 | · | · | · | · | 159,351.22 | 123,201.85 |
| Dubester, Michael S. | 3926 | Tribune Company | 38,404.01 | 34,451.00 | · | · | · | · | 38,404.01 | 34,451.00 |
| Dyer, John | 3927 | Tribune Company | · | 0 | 592,605.17 | 569,619.65 | · | · | 592,605.17 | 569,619.65 |
| Egan, Paul H. | 3928 | Los Angeles Times Communications LLC | 23,494.71 | 23,419.08 | · | · | · | · | 23,494.71 | 23,419.08 |
| Egan, Paul H. | 3929 | Tribune Company | · | · | · | · | · | · | · | · |
| Erburu, Robert F. | 3930 | Tribune Company | 8,059,576.24 | 7,600,336.60 | 917,220.10 | 881,643.67 | · | · | 8,976,796.34 | 8,481,980.27 |
| Esgro, David A. | 3931 | Tribune Company | 32,602.00 | 22,528.45 | · | · | · | · | 32,602.00 | 22,528.45 |
| Estate Of Eugene L. Falk | 3892 | Tribune Company | · | · | · | · | 1,425.50 | 1,425.50 | 1,425.50 | 1,425.50 |
| Falk, Joanne K. | 3893 | Tribune Company | 133,983.00 | 117,546.08 | · | · | · | · | 133,983.00 | 117,546.08 |
| Fernald, Peter J. | 3894 | Tribune Company | 174,235.31 | 172,497.94 | · | · | · | · | 174,235.31 | 172,497.94 |
| Fitzgerald, James | 3895 | Tribune Company | 133,437.04 | 144,553.50 | · | · | · | · | 133,437.04 | 144,553.50 |
| Flick, John E. | 3896 | Tribune Company | 465,665.58 | 445,041.45 | · | · | · | · | 465,665.58 | 445,041.45 |
| Forgione, Michael | 3897 | Tribune Company | 44,838.32 | 45,249.34 | · | · | · | · | 44,838.32 | 45,249.34 |
| Forst, Donald | 3898 | Tribune Company | 115,977.12 | 107,948.72 | · | · | · | · | 115,977.12 | 107,948.72 |
| Fox, Douglas B. | 3899 | Tribune Company | 154,934.21 | 82,585.02 | · | · | · | · | 154,934.21 | 82,585.02 |
| Frost, Daniel F. | 3900 | Tribune Company | 247,414.15 | 239,907.66 | · | · | · | · | 247,414.15 | 239,907.66 |
| Gastler, Debra A. | 3901 | Tribune Company | 105,061.35 | 82,005.56 | · | · | · | · | 105,061.35 | 82,005.56 |
| Goldstein, Gary | 3902 | Tribune Company | 217,241.76 | 188,399.94 | · | · | · | · | 217,241.76 | 188,399.94 |
| Graham, Kenneth | 3903 | Tribune Company | 14,288.91 | 14,183.60 | · | · | · | · | 14,288.91 | 14,183.60 |
| Grant, Robert T. | 3904 | Tribune Company | 37,899.74 | 34,032.45 | · | · | · | · | 37,899.74 | 34,032.45 |
| Guerrero, Richard | 3905 | Tribune Company | · | 0 | 569,312.18 | 547,230.13 | · | · | 569,312.18 | 547,230.13 |
| Guittar, Lee | 3906 | Tribune Company | 126,217.54 | 122,595.05 | · | · | · | · | 126,217.54 | 122,595.05 |

# Schedule A

| Name | Claim Number | Debtor | Annuity Claims Claimed Amount* | Annuity Claims Agreed Amount | Deferred Compensation Claims Claimed Amount* | Deferred Compensation Claims Agreed Amount | Other Claims Claimed Amount* | Other Claims Agreed Amount | Total Claims Total Original Claim* | Total Claims Total Agreed Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| Guthrie, James F. | 3907 | Tribune Company | 577,807.24 | 527,425.61 | - | - | - | - | 577,807.24 | 527,425.61 |
| Guttry, Delynn | 3908 | Tribune Company | 70,638.34 | 62,864.48 | - | - | - | - | 70,638.34 | 62,864.48 |
| Halajian, Kenneth L. | 3869 | Tribune Company | 122,898.30 | 109,185.46 | 156,982.36 | 150,893.45 | - | - | 279,880.66 | 260,078.91 |
| Hall, Charlotte H. | 3870 | Tribune Company | 9,718.98 | - | 522,668.29 | 502,395.43 | - | - | 532,387.27 | 502,395.43 |
| Halle, Jean | 3871 | Tribune Company | 45,477.17 | 32,600.10 | - | - | - | - | 45,477.17 | 32,600.10 |
| Haugh, Michael J. | 3872 | Tribune Company | 173,043.24 | 159,359.68 | - | - | - | - | 173,043.24 | 159,359.68 |
| Heaphy, Janis | 3873 | Tribune Company | 114,943.32 | 100,316.89 | - | - | 1,097.85 | 1,097.85 | 116,041.17 | 101,414.74 |
| Helin, James D. | 3874 | Tribune Company | 34,404.38 | 31,982.78 | - | - | - | - | 34,404.38 | 31,982.78 |
| Henson, Pamela D. | 3875 | Tribune Company | 3,863.68 | 3,387.96 | - | - | - | - | 3,863.68 | 3,387.96 |
| Hessler, Curtis A. | 3876 | Tribune Company | 1,022,521.60 | 918,368.09 | - | - | - | - | 1,022,521.60 | 918,368.09 |
| Higby, James H. | 3877 | Tribune Company | 57,086.86 | 22,082.55 | - | - | - | - | 57,086.86 | 22,082.55 |
| Higby, Lawrence H. | 3878 | Tribune Company | 191,250.95 | 176,484.75 | - | - | - | - | 191,250.95 | 176,484.75 |
| Holton, Raymond | 3879 | Tribune Company | 0 | - | 86,402.16 | 83,050.86 | - | - | 86,402.16 | 83,050.86 |
| Horn, Karen | 3880 | Tribune Company | 0 | - | 329,826.52 | 317,033.46 | - | - | 329,826.52 | 317,033.46 |
| Howard, Leslie M. | 3881 | Tribune Company | 0 | - | 145,496.90 | 139,853.48 | - | - | 145,496.90 | 139,853.48 |
| Howe, Mark | 3882 | Tribune Company | 0 | - | 187,208.77 | 179,947.46 | - | - | 187,208.77 | 179,947.46 |
| Hughes, Joseph M. | 3883 | Tribune Company | 0 | - | 188,913.12 | 181,585.70 | - | - | 188,913.12 | 181,585.70 |
| Imbriaco, James | 3884 | Tribune Company | 63,028.95 | 49,306.61 | - | - | - | - | 63,028.95 | 49,306.61 |
| Isenberg, Steven L. | 3885 | Tribune Company | 457,012.70 | 422,845.33 | - | - | 120,605.56 | 120,605.56 | 577,618.26 | 543,450.89 |
| Isinger, William R. | 3886 | Tribune Company | 298,855.71 | 269,949.09 | - | - | - | - | 298,855.71 | 269,949.09 |
| Jansen, Raymond A. Jr. | 3887 | Tribune Company | 6,439,394.24 | 5,848,681.01 | - | - | - | - | 6,439,394.24 | 5,848,681.01 |
| Johnson, Edward E. | 3888 | Tribune Company | 1,183,611.96 | 1,085,440.57 | - | - | - | - | 1,183,611.96 | 1,085,440.57 |
| Johnson, Robert M. | 3889 | Tribune Company | 314,859.81 | 277,721.84 | - | - | - | - | 314,859.81 | 277,721.84 |
| Johnson, Wyatt T. Jr. | 3890 | Tribune Company | 2,091,151.24 | 1,895,905.16 | - | - | - | - | 2,091,151.24 | 1,895,905.16 |
| Junck, Mary E. | 3891 | Tribune Company | 687,471.28 | 589,640.17 | - | - | - | - | 687,471.28 | 589,640.17 |
| Kabak, Scott W. | 3848 | Tribune Company | 135,856.56 | 108,414.60 | - | - | - | - | 135,856.56 | 108,414.60 |
| Kallet, Judith S. | 3849 | Tribune Company | 86,874.62 | 76,514.90 | - | - | - | - | 86,874.62 | 76,514.90 |
| Keller, William | 3850 | Tribune Company | 43,819.77 | 44,521.60 | - | - | - | - | 43,819.77 | 44,521.60 |
| Kellermann, Donald | 3851 | Tribune Company | 202,942.77 | 186,608.98 | - | - | - | - | 202,942.77 | 186,608.98 |
| King, Victoria | 3852 | Tribune Company | 0 | - | 74,235.11 | 71,355.74 | - | - | 74,235.11 | 71,355.74 |
| Klein, Jason E. | 3853 | Tribune Company | 113,350.42 | 81,878.31 | - | - | - | - | 113,350.42 | 81,878.31 |
| Klein, Jeffrey S. | 3854 | Tribune Company | 214,771.81 | 175,155.46 | - | - | - | - | 214,771.81 | 175,155.46 |
| Kleiner, Arnold | 3855 | The Baltimore Sun Company | 2,428,807.91 | 2,252,043.70 | - | - | - | - | 2,428,807.91 | 2,252,043.70 |
| Kleiner, Arnold | 3856 | Tribune Company | - | - | - | - | - | - | - | - |
| Klutrick, Susan | 3857 | Tribune Company | 0 | - | 381,723.02 | 366,917.04 | - | - | 381,723.02 | 366,917.04 |
| Kopper, James L. | 3858 | Tribune Company | 353,362.22 | 284,239.96 | - | - | - | - | 353,362.22 | 284,239.96 |
| Kucera, Philip E. | 3859 | Tribune Company | 295,403.76 | 264,583.57 | - | - | - | - | 295,403.76 | 264,583.57 |
| Kuekes, Sally | 3860 | Tribune Company | 42,044.09 | 36,779.95 | - | - | 7,620.90 | 7,620.90 | 49,664.99 | 44,400.85 |
| Kurtich, Mark | 3861 | Tribune Company | 90,448.02 | 74,790.19 | - | - | - | - | 90,448.02 | 74,790.19 |

3 of 6

# Schedule A

| Name | Claim Number | Debtor | Annuity Claims Claimed Amount* | Annuity Claims Agreed Amount | Deferred Compensation Claims Claimed Amount* | Deferred Compensation Claims Agreed Amount | Other Claims Claimed Amount* | Other Claims Agreed Amount | Total Claims Total Original Claim* | Total Claims Total Agreed Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| Lafrance, Kimberly Mccleary | 3862 | Tribune Company | 43,852.05 | 34,197.55 | | | 154.59 | 154.59 | 44,006.64 | 34,352.14 |
| Lankey, Jeffrey W. | 3863 | Tribune Company | 8,600.23 | 7,178.56 | | | | | 8,600.23 | 7,178.56 |
| Laventhol, David | 3864 | Tribune Company | 3,598,937.76 | 3,286,446.21 | | | | | 3,598,937.76 | 3,286,446.21 |
| Lee Schneider; R. Marilyn | 3865 | Tribune Company | 63,947.25 | 53,342.84 | | | | | 63,947.25 | 53,342.84 |
| Levin, Martin P. | 3866 | Tribune Company | 103,195.50 | 106,292.37 | | | | | 103,195.50 | 106,292.37 |
| Levine, Jesse E. | 3867 | Tribune Company | 49,524.89 | 41,839.90 | | | | | 49,524.89 | 41,839.90 |
| Lindsay, John P. | 3868 | Tribune Company | 23,066.77 | 23,941.86 | | | | | 23,066.77 | 23,941.86 |
| Lobdell, Nancy | 3828 | Tribune Company | 115,583.28 | 102,225.64 | | | | | 115,583.28 | 102,225.64 |
| Magnuson, Robert G. | 3829 | Tribune Company | 230,074.32 | 192,525.57 | | | | | 230,074.32 | 192,525.57 |
| Marimow, William K. | 3830 | Tribune Company | 37,443.28 | 33,569.72 | | | | | 37,443.28 | 33,569.72 |
| Marro, Anthony J. | 3831 | Tribune Company | 324,038.35 | 293,750.03 | | | | | 324,038.35 | 293,750.03 |
| Maxwell, Donald S. | 3832 | Tribune Company | 375,385.65 | 376,098.43 | | | | | 375,385.65 | 376,098.43 |
| Mcguinness, Kathleen G. | 3833 | Tribune Company | 1,486,257.90 | 1,636,638.93 | 313,934.42 | 301,757.77 | | | 1,800,192.32 | 1,938,396.70 |
| Mckeon, John C. | 3834 | Tribune Company | 91,979.56 | 71,083.13 | | | | | 91,979.56 | 71,083.13 |
| Mckeon, John C. | 3835 | Tribune Media Net, Inc. | | | | | 4,949.00 | 4,949.00 | 4,949.00 | 4,949.00 |
| Meadows, Jack E. | 3836 | Tribune Company | 108,100.07 | 103,375.09 | | | | | 108,100.07 | 103,375.09 |
| Meier, Stephen C. | 3837 | Tribune Company | 232,480.68 | 198,913.29 | | | | | 232,480.68 | 198,913.29 |
| Molvar, Jane | 3838 | Tribune Company | 0 | | 843,787.40 | 811,059.22 | | | 843,787.40 | 811,059.22 |
| Molvar, Roger H. | 3839 | Tribune Company | 560,764.12 | 427,439.99 | | | | | 560,764.12 | 427,439.99 |
| Monsma, Durham J. | 3840 | Tribune Company The Baltimore Sun | 107,492.11 | 96,584.59 | | | | | 107,492.11 | 96,584.59 |
| Murphy, John R. | 3841 | Company | 1,259,218.77 | 1,202,804.47 | | | | | 1,259,218.77 | 1,202,804.47 |
| Murphy, John R. | 3842 | Tribune Company | | | | | | | | |
| Nash, John t. | 3843 | Tribune Company The Baltimore Sun | 0 | | 373,594.11 | 359,103.43 | | | 373,594.11 | 359,103.43 |
| Neely, Jack E. | 3844 | Company | 8,757.24 | | | | 200.00 | 200.00 | 8,957.24 | 9,907.23 |
| Neely, Jack E. | 3845 | Tribune Company | | 9,707.23 | | | | | | |
| Niese, William A. | 3846 | Tribune Company | 1,894,702.51 | 1,890,693.18 | | | | | 1,894,702.51 | 1,890,693.18 |
| Niles, Nicholas H. | 3847 | Tribune Company | 43,691.01 | 39,323.30 | | | | | 43,691.01 | 39,323.30 |
| Norris, James | 3814 | Tribune Company | 59,342.37 | 576.30 | 185,056.22 | 177,878.40 | | | 244,398.59 | 178,454.70 |
| Nuckols, James | 3815 | Tribune Company | 24,383.59 | 23,306.35 | 135,142.45 | 129,900.65 | | | 159,526.04 | 153,207.00 |
| Oglesby, Roger D | 3816 | Tribune Company | 47,034.01 | 41,451.84 | | | | | 47,034.01 | 41,451.84 |
| O'Neill, Nancy | 3817 | Tribune Company | 20,673.42 | 14,616.88 | 452,927.02 | 435,359.23 | | | 473,600.44 | 449,976.11 |
| O'Sullivan, Robert | 3818 | Tribune Company | 0 | | 317,971.62 | 305,638.38 | | | 317,971.62 | 305,638.38 |
| Parks, Michael | 3819 | Tribune Company | 618,849.54 | 555,923.22 | 1,341,094.27 | 1,289,076.93 | 3,240.09 | 3,240.09 | 1,963,183.90 | 1,848,240.24 |
| Paro, Jeffrey N. | 3820 | Tribune Company | 57,050.82 | 43,777.03 | | | | | 57,050.82 | 43,777.03 |
| Patinella, John F. | 3821 | Tribune Company | 150,001.24 | 132,683.53 | | | | | 150,001.24 | 132,683.53 |
| Payne, Janette O. | 3822 | Tribune Company | 35,393.07 | 24,310.98 | | | | | 35,393.07 | 24,310.98 |
| Peliza, Ellen | 3823 | Tribune Company | 67,546.24 | 51,339.45 | | | | | 67,546.24 | 51,339.45 |
| Perruso, Carol | 3824 | Tribune Company | 66,738.37 | 56,973.14 | | | 26,980.36 | 26,399.65 | 93,718.73 | 83,372.79 |

# Schedule A

| Name | Claim Number | Debtor | Annuity Claims | | Deferred Compensation Claims | | Other Claims | | Total Claims | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Claimed Amount* | Agreed Amount | Claimed Amount* | Agreed Amount | Claimed Amount* | Agreed Amount | Total Original Claim* | Total Agreed Amount |
| Perry, Victor A. | 3825 | Tribune Company | 32,377.21 | 26,273.37 | | | | | 32,377.21 | 26,273.37 |
| Peterson, Maureen G. | 3826 | Tribune Company | 594,751.05 | 526,784.10 | | | | | 594,751.05 | 526,784.10 |
| Petty, Martha A. | 3827 | Tribune Company | 149,885.51 | 116,930.86 | | | | | 149,885.51 | 116,930.86 |
| Plank, Jack L. | 3789 | Tribune Company | 316,088.85 | 318,622.61 | | | | | 316,088.85 | 318,622.61 |
| Redmond, Elizabeth | 3790 | Tribune Company | 838,434.21 | 738,639.00 | | | | | 838,434.21 | 738,639.00 |
| Rhoads, S. Keating | 3791 | Tribune Company | 98,744.57 | 101,081.44 | | | | | 98,744.57 | 101,081.44 |
| Riley, Michael | 3792 | Tribune Company | 123,950.91 | 104,569.77 | | | | | 123,950.91 | 104,569.77 |
| Rose, Michael G. | 3793 | Tribune Company | 1,210.64 | 1,117.80 | 351,346.96 | 337,719.18 | | | 352,557.60 | 338,836.98 |
| Rowe, William J. | 3794 | Tribune Company | 308,021.09 | 291,694.06 | | | | | 308,021.09 | 291,694.06 |
| Rubin, Jerome S. | 3795 | Tribune Company | 151,876.68 | 153,276.94 | | | | | 151,876.68 | 153,276.94 |
| Sann, Alexander | 3796 | Tribune Company | 349,680.25 | 311,823.69 | 1,106,331.93 | 1,063,420.37 | | | 1,456,012.18 | 1,375,244.06 |
| Scally, Geraldine | 3797 | Tribune Company | 23,692.38 | 21,720.78 | | | 4,741.00 | 4,933.38 | 28,433.38 | 26,654.16 |
| Schlosberg, Richard T. III | 3798 | Tribune Company | 2,760,068.72 | 2,483,650.26 | | | | | 2,760,068.72 | 2,483,650.26 |
| Schnall, Herbert K. | 3799 | Tribune Company | 601,401.39 | 569,956.44 | | | | | 601,401.39 | 569,956.44 |
| Schneider, Charles | 3800 | Tribune Company | 300,413.12 | 303,683.92 | | | | | 300,413.12 | 303,683.92 |
| Schneider, Hilary A. | 3801 | Tribune Company | 116,920.23 | 80,266.13 | | | | | 116,920.23 | 80,266.13 |
| Schneider, Howard | 3802 | Tribune Company | 111,725.93 | 102,524.31 | | | | | 111,725.93 | 102,524.31 |
| Sellstrom, Brian | 3803 | Tribune Company | 59,424.51 | 53,709.87 | | | | | 59,424.51 | 53,709.87 |
| Selter, Carolyn | 3804 | Los Angeles Times Communications LLC | 8,834.93 | 7,365.62 | | | | | 8,834.93 | 7,365.62 |
| Selter, Carolyn | 3805 | Tribune Company | | | | | | | | |
| Shaw, James D | 3806 | Tribune Company | 188,663.28 | 163,176.12 | | | | | 188,663.28 | 163,176.12 |
| Shirley, Dennis | 3807 | Tribune Company | 43,814.46 | 32,267.78 | 1,330,890.05 | 1,279,268.50 | | | 1,374,704.51 | 1,311,536.28 |
| Shorts, Gary K. | 3808 | Tribune Company | 169,089.46 | 143,245.25 | | | | | 169,089.46 | 143,245.25 |
| Simpson, James R. | 3809 | Tribune Company | 3,924,877.86 | 3,550,121.16 | | | | | 3,924,877.86 | 3,550,121.16 |
| Sito, Louis | 3810 | Tribune Company | 100,409.32 | 87,589.83 | | | | | 100,409.32 | 87,589.83 |
| Sweeney, Judith | 3811 | Tribune Company | 37,827.72 | 28,215.77 | | | | | 37,827.72 | 28,215.77 |
| Sweeney, Stender E. | 3812 | Tribune Company | 92,525.62 | 85,971.34 | | | | | 92,525.62 | 85,971.34 |
| Terpstra, James E. | 3813 | Tribune Company | 894.68 | 916.61 | | | 343.62 | 343.62 | 1,238.30 | 1,260.23 |
| Thomas, William | 3768 | Los Angeles Times Communications LLC | 395,688.06 | 400,498.68 | | | | | 395,688.06 | 400,498.68 |
| Thomas, William | 3769 | Tribune Company | | | | | | | | |
| Thorpe, Caroline | 3770 | Los Angeles Times Communications LLC | | | | | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 |
| Thorpe, Caroline | 3771 | Tribune Company | | | | | | | | |
| Toedtman, James | 3772 | Tribune Company The Baltimore Sun | 0 | | 7,503.51 | 7,212.47 | | 5,103.42 | 7,503.51 | 12,315.89 |
| Trainor, Robert E | 3773 | Company | 74,120.70 | 68,199.67 | | | 704.84 | 704.84 | 74,825.54 | 68,904.51 |
| Trainor, Robert E | 3774 | Tribune Company | | | | | | | | |
| Tunstall, Sharon S. | 3775 | Tribune Company | 8,684.60 | 8,319.92 | | | | | 8,684.60 | 8,319.92 |
| Udovic, Michael S. | 3776 | Tribune Company | 6,875.50 | 5,832.45 | | | | | 6,875.50 | 5,832.45 |

# Schedule A

| Name | Claim Number | Debtor | Annuity Claims Claimed Amount* | Annuity Claims Agreed Amount | Deferred Compensation Claims Claimed Amount* | Deferred Compensation Claims Agreed Amount | Other Claims Claimed Amount* | Other Claims Agreed Amount | Total Claims Total Original Claim* | Total Claims Total Agreed Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| Unterman, E. Thomas | 3777 | Tribune Company | 1,405,127.79 | 1,258,812.43 | - | - | - | - | 1,405,127.79 | 1,258,812.43 |
| Valenti, Michael | 3778 | Tribune Company | 0 | - | 1,228,403.25 | 1,180,756.88 | - | - | 1,228,403.25 | 1,180,756.88 |
| Vida, Herbert | 3779 | Los Angeles Times Communications LLC | 45,237.25 | 42,276.97 | - | - | 162.40 | 162.40 | 45,399.65 | 42,439.37 |
| Vida, Herbert | 3780 | Tribune Company | | | | | | | | |
| Wada, Karen | 3781 | Tribune Company | 277,091.87 | 197,504.08 | - | - | - | - | 277,091.87 | 197,504.08 |
| Wade, Claudia A. | 3782 | Tribune Company | 25,214.57 | 20,844.75 | - | - | - | - | 25,214.57 | 20,844.75 |
| Wallace, James W. | 3783 | Tribune Company | 319,337.67 | 302,287.33 | - | - | - | - | 319,337.67 | 302,287.33 |
| Waller, Michael E. | 3784 | Tribune Company | 1,856,802.57 | 1,663,437.92 | - | - | - | - | 1,856,802.57 | 1,663,437.92 |
| Wangberg, Larry | 3785 | Tribune Company | 359,536.67 | 329,739.60 | - | - | 43,665.13 | 43,665.13 | 403,201.80 | 373,404.73 |
| Weinstein, Howard** | 3786 | Tribune Company | 7,886.41 | 7,495.94 | - | - | 287.37 | 287.37 | 8,173.78 | 7,783.31 |
| Wiegand, William | 3787 | Tribune Company | 23,902.27 | 19,632.20 | 324,818.78 | 312,219.96 | - | - | 348,721.05 | 331,852.16 |
| Wild, Mary A. | 3788 | Tribune Company | 36,816.87 | 28,151.62 | - | - | - | - | 36,816.87 | 28,151.62 |
| Willes, Mark H. | 3767 | Tribune Company | 13,942,054.67 | 12,756,374.83 | 5,479,905.70 | 5,267,355.30 | 112,391.10 | 112,391.10 | 19,534,351.47 | 18,136,121.23 |
| Williams, Phillip L. | 3766 | Tribune Company | 572,842.71 | 580,288.90 | - | - | - | - | 572,842.71 | 580,288.90 |
| Wilson, Hazel E. | 3765 | Tribune Company | 26,114.05 | 24,341.49 | - | - | - | - | 26,114.05 | 24,341.49 |
| Wilson, Julia C. | 3764 | Tribune Company | 66,455.19 | 56,843.79 | 152,898.51 | 146,968.00 | - | - | 219,353.70 | 203,811.79 |
| Woldt, Harold F. Jr. | 3763 | Tribune Company | 35,533.16 | 31,909.16 | - | - | - | - | 35,533.16 | 31,909.16 |
| Wolinsky, Leo | 3762 | Tribune Company | 353,330.96 | 306,792.60 | 252,955.17 | 243,143.74 | 464.26 | 464.26 | 606,750.39 | 550,400.60 |
| Wright, Donald F. | 3761 | Tribune Company | 2,713,574.92 | 2,463,056.85 | - | - | - | - | 2,713,574.92 | 2,463,056.85 |
| Young, John W. | 3760 | Tribune Company | 73,452.93 | 59,164.78 | - | - | - | - | 73,452.93 | 59,164.78 |
| Zakarian, John J. | 3757 | Tribune Company | 0 | - | 295,629.56 | 284,162.91 | - | - | 295,629.56 | 284,162.91 |
| Zapanta, Norene | 3758 | Tribune Company | 0 | - | 11,482.47 | 11,037.10 | - | - | 11,482.47 | 11,037.10 |
| Zimbalist, Efren III | 3759 | Tribune Company | 2,206,657.73 | 1,904,183.74 | - | - | - | - | 2,206,657.73 | 1,904,183.74 |
| **Totals** | | | $ 89,516,909.25 | $ 81,537,918.70 | $ 22,452,421.13 | $ 21,576,829.47 | $ 408,624.85 | $ 413,339.94 | $ 112,377,955.23 | $ 103,528,088.11 |

* Claims which fully duplicate another are shown as zero

** The claim for Howard Weinstein also includes $337,850 related to a claim for severance which is not included in this settlement and remains in dispute.

**Exhibit 5.2 – Restructuring Transactions**

**EXHIBIT 5.2**

Restructuring Transactions

Pursuant to Section 5.2 of the Plan[1], but subject to the limitations herein, on or prior to the Effective Date, any Debtor and, after the Effective Date, any Reorganized Debtor may enter into or undertake any Restructuring Transactions and may take such actions as may be determined by such Debtor or Reorganized Debtor to be necessary or appropriate to effect such Restructuring Transactions. This Exhibit 5.2 contains a list of the Restructuring Transactions to be consummated by the Debtors and their successors pursuant to Section 5.2 of the Plan for each of Tribune's primary business groups: (i) Broadcasting; (ii) Publishing; and (iii) Corporate/ Investments. The transaction lists are accompanied by (i) the current organizational chart for each business group and (ii) an organizational chart that sets forth the organizational structure of each business group after giving effect to the Restructuring Transactions. Parties should refer to Section 5.2 of the Plan, Section IX.E.1 of the Disclosure Statement and the Confirmation Order for additional terms and conditions relating to the Restructuring Transactions.

As permitted under the Plan, the Debtors presently anticipate that most, if not all, of the Restructuring Transactions described in this Exhibit 5.2 shall occur (1) subsequent to the entry of the Confirmation Order and the requisite FCC Approval of the Plan and Restructuring Transactions but (2) prior to the Effective Date. The consummation of any Restructuring Transactions prior to the Effective Date shall be conditioned upon the following, any of which may be waived by the Debtors with the consent of the Senior Lender Settlement Committee:

A.     The Confirmation Order shall provide (i) that all converted Debtors and successors to the Debtors pursuant to the Restructuring Transactions shall be obligated with respect to any and all Claims against such predecessor Debtors, including any Loan Guaranty Claims, to the same extent as such predecessor Debtors, (ii) that all such converted Debtors and successors to the Debtors pursuant to the Restructuring Transactions shall be subject to any and all applicable Plan provisions respecting the relevant predecessor Debtors (including the discharge, release and injunction provisions), and (iii) for such other provisions as may be necessary in the Senior Lender Settlement Committee's view to preserve the status quo of Loan Guaranty Claims through the Effective Date of the Plan, which provisions (i) through (iii) shall be acceptable to the Senior Lender Settlement Committee;

B.     the Confirmation Order shall not have been stayed or reversed on appeal; and

C.     the Debtors must reasonably believe that the Effective Date shall occur within seven (7) calendar days from the date on which any such transactions are to

---

[1] Capitalized terms used in this Exhibit 5.2 but not defined herein shall have the meanings ascribed to such terms in the Plan.

become effective, provided that the formation of new shell entities shall not be subject to this subsection (C).

Subject to <u>Section 13.9</u> of the Plan, the Debtors reserve the right to supplement, modify or revise this <u>Exhibit 5.2</u> at any time prior to the conclusion of the Confirmation Hearing and may determine subsequent thereto not to pursue any or all of the Restructuring Transactions.

CHI 5385547v.7

## BROADCASTING TRANSACTIONS LIST

| Entity | Transaction |
|---|---|
| **Mergers** | |
| 1.  Tribune Broadcasting Holdco, LLC | Merge with and into Tribune Broadcasting Company |
| 2.  ChicagoLand Microwave Licensee, Inc | Merge with and into Chicagoland Television News, Inc. |
| 3.  Tribune Network Holdings Company | Merge with and into Tribune Broadcasting Company |
| 4.  WATL, LLC | Merge with and into Tribune Broadcasting Company |
| 5.  WCWN LLC | Merge with and into WLVI Inc. |
| 6.  WLVI Inc. | Merge with and into Tribune Broadcasting Company |
| 7.  Channel 20, Inc. | Merge with and into Tribune Television Company |
| 8.  North Michigan Production Company | Merge with and into Tribune Entertainment Production Company |
| 9.  435 Production Company | Merge with and into Tribune Entertainment Production Company |
| 10. Chicago River Production Company | Merge with and into Tribune Entertainment Production Company |
| 11. 5800 Sunset Productions Inc. | Merge with and into Tribune Entertainment Production Company |
| 12.  Tribune Entertainment Production Company | Merge with and into Tribune Entertainment Company |
| **Conversions to Limited Liability Companies** | |
| 1.  Tribune Broadcasting Company | Convert into limited liability company named Tribune Broadcasting Company, LLC |
| 2.  Chicagoland Television News, Inc. | Convert into limited liability company named Chicagoland Television News, LLC |
| 3.  Tribune Entertainment Company | Convert into limited liability company named Tribune Entertainment Company, LLC |
| 4.  Towering T Music Publishing Company | Convert into limited liability company named Towering T Music Publishing Company, LLC |
| 5.  Magic T Music Publishing Company | Convert into limited liability company named Magic T Music Publishing Company, LLC |
| 6.  Oak Brook Productions, Inc. | Convert into limited liability company named Oak Brook Productions, LLC |
| 7.  Tribune Washington Bureau Inc. | Convert into limited liability company named Tribune Washington Bureau, LLC |
| 8.  Tower Distribution Company | Convert into limited liability company named Tower Distribution Company, LLC |
| 9.  KWGN Inc. | Convert into limited liability company named KWGN, LLC |
| 10. KIAH Inc. | Convert into limited liability company named KIAH, LLC |
| 11. WGN Continental Broadcasting Company | Convert into limited liability company named WGN Continental Broadcasting Company, LLC |
| 12. Tribune Television New Orleans, Inc. | Convert into limited liability company named Tribune Broadcasting New Orleans, LLC |
| 13. WPIX, Inc. | Convert into limited liability company named WPIX, LLC |
| 14. Tribune Television Northwest, Inc. | Convert into limited liability company named KCPQ, LLC |
| 15. WCCT, Inc. (f/k/a WTXX Inc.) | Convert into limited liability company named WCCT, LLC |
| 16. WDCW Broadcasting, Inc. | Convert into limited liability company named WDCW, LLC |
| 17. Channel 39, Inc. | Convert into limited liability company named WSFL, LLC |

| Entity | Transaction |
|---|---|
| **Formation of New Entities** | |
| 1.   Tribune Broadcasting Company, LLC (f/k/a Tribune Broadcasting Company) | ➢ Form KTLA, LLC<br>➢ Form KSWB, LLC<br>➢ Form Tribune Broadcasting Hartford, LLC<br>➢ Form Tribune Broadcasting Indianapolis, LLC<br>➢ Form Tribune Broadcasting Seattle, LLC |
| 2.   Tribune Broadcast Holdings, Inc. | ➢ Form WTTV, LLC<br>➢ Form KRCW, LLC |
| 3.   Tribune Television Holdings, Inc. | ➢ Form KMYQ, LLC<br>➢ Form WXMI, LLC |
| 4.   Tribune Television Company | ➢ Form KDAF, LLC<br>➢ Form WPHL, LLC<br>➢ Form WPMT, LLC<br>➢ Form WTIC, LLC<br>➢ Form WXIN, LLC<br>➢ Form KTXL, LLC |
| **Merger of Entities in lieu of Conversion to a Limited Liability Company[1]** | |
| 1.   KTLA Inc. | Merge with and into KTLA, LLC |
| 2.   KSWB Inc. | Merge with and into KSWB, LLC |
| 3.   Channel 40, Inc. | Merge with and into KTXL, LLC |
| **Intercompany Conveyance of Assets and Liabilities in Businesses** | |
| 1.   Tribune Broadcast Holdings, Inc. | ➢ Convey assets and liabilities of the WTTV television station to WTTV, LLC<br>➢ Convey assets and liabilities of the KRCW television station to KRCW, LLC |
| 2.   Tribune Television Holdings, Inc. | ➢ Convey assets and liabilities of the WXMI television station to WXMI, LLC<br>➢ Convey assets and liabilities of the KMYQ television station to KMYQ, LLC |
| 3.   Tribune Television Company | ➢ Convey assets and liabilities of the WTIC television station to WTIC, LLC<br>➢ Convey assets and liabilities of the WXIN television station to WXIN, LLC<br>➢ Convey assets and liabilities of the KDAF television station to KDAF, LLC<br>➢ Convey assets and liabilities of the WPHL television station to WPHL, LLC<br>➢ Convey assets and liabilities of WPMT television station to WPMT, LLC |
| **Intercompany Conveyance of Equity Interests** | |
| 1.   Tribune Broadcasting Company, LLC | ➢ Convey equity interest in KCPQ, LLC (f/k/a Tribune Television Northwest, Inc.) to Tribune Broadcasting Seattle, LLC<br>➢ Convey equity interest in Tribune Washington Bureau, LLC to Tribune Publishing Company, LLC |

[1] The three entities listed are domiciled in jurisdictions that do not provide for conversion into a Delaware limited liability company.  Each of these entities will be merged with and into a newly formed Delaware limited liability company.

| Entity | Transaction |
|---|---|
| 2.  Tribune Broadcast Holdings, Inc. | Convey equity interest in WTTV, LLC to Tribune Broadcasting Indianapolis, LLC |
| 3.  Tribune Television Holdings, Inc. | Convey equity interest in KMYQ, LLC to Tribune Broadcasting Seattle, LLC |
| 4.  Tribune Television Company | ➢ Convey equity interest in WTIC, LLC to Tribune Broadcasting Hartford, LLC<br>➢ Convey equity interest in WCCT, LLC to Tribune Broadcasting Hartford, LLC<br>➢ Convey equity interest in WXIN, LLC to Tribune Broadcasting Indianapolis, LLC |
| **Mergers of Television Entities Following Conveyances** ||
| 1.  Tribune Broadcast Holdings, Inc. | Merge with and into Tribune Broadcasting Company, LLC |
| 2.  Tribune Television Holdings, Inc. | Merge with and into Tribune Broadcasting Company, LLC |
| 3.  Tribune Television Company | Merge with and into Tribune Broadcasting Company, LLC |



Tribune Broadcasting

Pre-Emergence



## Tribune Broadcasting
### Post-Emergence

## PUBLISHING TRANSACTIONS LIST

| Entity | Transaction |
|---|---|
| **Formation of New Entities to Receive Mastheads** | |
| 1.  Tribune Publishing Company | ➢ Form The Hartford Courant Company, LLC<br>➢ Form The Baltimore Sun Company, LLC<br>➢ Form The Morning Call, LLC |
| 2.  Los Angeles Times Communications, LLC | Form California Community News, LLC |
| **Intercompany Conveyance of Mastheads** | |
| 1.  Tribune License, Inc. | ➢ Distribute Los Angeles Times masthead to Los Angeles Times Communications LLC<br>➢ Convey Hartford Courant masthead to The Hartford Courant Company, LLC<br>➢ Convey Baltimore Sun masthead to The Baltimore Sun Company, LLC<br>➢ Convey Morning Call masthead to The Morning Call, LLC<br>➢ Convey California Community News masthead to California Community News, LLC |
| **Intercompany Conveyance of Chicago Magazine** | |
| 1.  Eagle New Media Investments, LLC | Convey assets and liabilities of Chicago Magazine to Chicagoland Publishing Company |
| **Mergers** | |
| 1.  Tribune License, Inc. | Merge with and into Tribune Publishing Company |
| 2.  Chicago Avenue Construction Company | Merge with and into Chicago Tribune Company |
| 3.  Chicago Tribune Newspapers, Inc. | Merge with and into Chicago Tribune Company |
| 4.  Newspaper Readers Agency, Inc. | Merge with and into Chicago Tribune Company |
| 5.  Chicago Tribune Press Service, Inc. | Merge with and into Chicago Tribune Company |
| 6.  Tribune Los Angeles, Inc. | Merge with and into Los Angeles Times Communications LLC |
| 7.  Los Angeles Times Newspapers, Inc. | Merge with and into Los Angeles Times Communications LLC |
| 8.  Sentinel Communications News Ventures, Inc. | Merge with and into Orlando Sentinel Communications Company |
| 9.  Neocomm, Inc. | Merge with and into Orlando Sentinel Communications Company |
| 10. North Orange Avenue Properties, Inc. | Merge with and into Orlando Sentinel Communications Company |
| 11. Gold Coast Publications, Inc. | Merge with and into Sun-Sentinel Company |
| 12. Forum Publishing Group, Inc. | Merge with and into Sun-Sentinel Company |
| 13. Signs of Distinction, Inc. | Merge with and into The Baltimore Sun Company |
| 14. Baltimore Newspaper Networks, Inc. | Merge with and into Patuxent Publishing Company |
| 15. Virginia Community Shoppers, LLC | Merge with and into The Daily Press, Inc. |
| 16. Tribune New York Newspaper Holdings, LLC | Merge with and into Tribune Manhattan Newspaper Holdings, Inc. |
| 17. Tribune Manhattan Newspaper Holdings, Inc. | Merge with and into Tribune ND, Inc. |
| 18. Hoy, LLC | Merge with and into Star Community Publishing Group, LLC |

| Entity | Transaction |
|---|---|
| 19. Star Community Publishing Group, LLC | Merge with and into Distribution Systems of America, Inc. |
| 20. Distribution Systems of America, Inc. | Merge with and into Tribune ND, Inc. |
| 21. Tribune NM, Inc. | Merge with and into Eagle New Media Investments, LLC |
| 22. ValuMail, Inc. | Merge with and into The Hartford Courant Company, LLC |
| 23. Direct Mail Associates, Inc. | Merge with and into The Morning Call, Inc. |
| 24. New Mass. Media, Inc. | Merge with and into Courant Specialty Products, Inc. |
| 25. Courant Specialty Products, Inc. | Merge with and into The Hartford Courant Company |
| 26. Heart & Crown Advertising, Inc. | Merge with and into The Hartford Courant Company |
| 27. TMLH 2, Inc. | Merge with and into The Hartford Courant Company |
| 28. TMLS I, Inc. | Merge with and into Southern Connecticut Newspapers, Inc. |
| 29. Southern Connecticut Newspapers, Inc. | Merge with and into Tribune Publishing Company |
| 30. InsertCo, Inc. | Merge with and into Tribune Media Net, Inc. |
| 31. Newscom Services, Inc. | Merge with and into Los Angeles Times International, Ltd. |
| 32. Los Angeles Times International, Ltd. | Merge with and into Tribune Publishing Company |
| 33. Homeowners Realty, Inc. | Merge with and into Stemweb, Inc. |
| 34. forsalebyowner.com corp. | Merge with and into Stemweb, Inc. |
| 35. Eagle New Media Investments, LLC | Merge with and into Tribune Publishing Company |
| **Conversions to Limited Liability Companies** | |
| 1. Chicagoland Publishing Company | Convert into limited liability company named Chicagoland Publishing Company, LLC |
| 2. Tribune Direct Marketing, Inc. | Convert into limited liability company named Tribune Direct Marketing, LLC |
| 3. Sun-Sentinel Company | Convert into limited liability company named Sun-Sentinel Company, LLC |
| 4. Orlando Sentinel Communications Company | Convert into limited liability company named Orlando Sentinel Communications Company, LLC |
| 5. The Daily Press, Inc. | Convert into limited liability company named The Daily Press, LLC |
| 6. Tribune Publishing Company | Convert into limited liability company named Tribune Publishing Company, LLC |
| 7. Tribune Media Net, Inc. | Convert into limited liability company named Tribune 365, LLC |
| 8. Tribune Media Services, Inc. | Convert into limited liability company named Tribune Media Services, LLC |
| 9. TMS Entertainment Guides, Inc. | Convert into limited liability company named TMS Entertainment Guides, LLC |
| 10. ForSaleByOwner.com Referral Services LLC | Convert into Delaware limited liability company named ForSaleByOwner.com Referral Services LLC |
| **Formation of New Entities** | |
| 1. Tribune Publishing Company, LLC | ➢ Form Chicago Tribune Company, LLC<br>➢ Form forsalebyowner.com, LLC |
| 2. The Baltimore Sun Company, LLC | Form Homestead Publishing Co., LLC |
| 3. Homestead Publishing Co., LLC | Form Patuxent Publishing Company, LLC |

| Entity | Transaction |
|---|---|
| 4.  forsalebyowner.com, LLC | Form Internet Foreclosure Service, LLC |
| **Merger of Entities in lieu of Conversion to a Limited Liability Company[2]** | |
| 1.  Chicago Tribune Company | Merge with and into Chicago Tribune Company, LLC |
| 2.  Patuxent Publishing Company | Merge with and into Patuxent Publishing Company, LLC |
| 3.  Homestead Publishing Co. | Merge with and into Homestead Publishing Co., LLC |
| 4.  The Baltimore Sun Company | Merge with and into The Baltimore Sun Company, LLC |
| 5.  The Morning Call, Inc. | Merge with and into The Morning Call, LLC |
| 6.  The Hartford Courant Company | Merge with and into The Hartford Courant Company, LLC |
| 7.  Stemweb, Inc. | Merge with and into forsalebyowner.com, LLC |
| 8.  Internet Foreclosure Service, Inc. | Merge with and into Internet Foreclosure Service, LLC |
| 9.  California Community News Corporation | Merge with and into California Community News, LLC |
| **Intercompany Conveyance of Equity Interests** | |
| 1.  Tribune Company | ➢ Convey equity interest in Hoy Publications, LLC to Tribune Publishing Company, LLC<br>➢ Convey equity interest in The Daily Press, LLC to Tribune Publishing Company, LLC<br>➢ Convey equity interest in Los Angeles Times Communications LLC to Tribune Publishing Company, LLC<br>➢ Convey equity interest in Orlando Sentinel Communications Company, LLC to Tribune Publishing Company, LLC<br>➢ Convey equity interest in Sun-Sentinel Company, LLC to Tribune Publishing Company, LLC<br>➢ Convey equity interest in Tribune Media Services, LLC to Tribune Publishing Company, LLC<br>➢ Convey equity interest in Tribune Hong Kong, Ltd. to Tribune Media Services, LLC<br>➢ Convey equity interest in NBBF, LLC to Tribune ND, LLC<br>➢ Convey equity interest in Tribune 365, LLC (f/k/a Tribune Media Net, Inc.) to Tribune Publishing Company, LLC |

---

[2] The nine entities listed are domiciled in jurisdictions that do not provide for conversion into a Delaware limited liability company. Each of these entities will be merged with and into a newly formed Delaware limited liability company.





## CORPORATE/INVESTMENTS TRANSACTIONS LIST

| Entity | Transaction |
|---|---|
| **Formation of New Entities** | |
| 1.  Tribune Company | Form Tribune Investments, LLC |
| **Mergers** | |
| 1.  Tribune California Properties, Inc. | Merge with and into Tribune Investments, LLC |
| 2.  Candle Holdings Corporation | Merge with and into Tribune Investments, LLC |
| 3.  Fortify Holdings Corporation | Merge with and into Tribune Investments, LLC |
| 4.  Shepard's Inc. | Merge with and into Tribune Investments, LLC |
| 5.  JuliusAir Company LLC | Merge with and into Tribune Investments, LLC |
| 6.  GreenCo, Inc. | Merge with and into Tribune Investments, LLC |
| 7.  JuliusAir Company II, LLC | Merge with and into Tribune Investments, LLC |
| 8.  Eagle Publishing Investments, LLC | Merge with and into Tribune Investments, LLC |
| 9.  Tribune Finance, LLC | Merge with and into Tribune Investments, LLC |
| 10. Tribune Finance Service Center, Inc. | Merge with and into Tribune Investments, LLC |
| 11. Times Mirror Services Company, Inc. | Merge with and into Tribune Investments, LLC |
| 12. Times Mirror Payroll Processing Company, Inc. | Merge with and into Tribune Investments, LLC |
| 13. Times Mirror Land and Timber Company | Merge with and into Tribune Investments, LLC |
| 14. Publishers Forest Products Co. of Washington | Merge with and into Tribune Investments, LLC |
| **Intercompany Conveyance of Equity Interests** | |
| 1.  Tribune Company | Convey equity interests in Tribune National Marketing Company, LLC to Tribune Investments, LLC |





*Tribune Corporate/Investments*

*Post-Emergence*

**Exhibit 5.3.1(1) – Certificate of Incorporation of Reorganized Tribune**

AMENDED AND RESTATED

CERTIFICATE OF INCORPORATION

OF

TRIBUNE COMPANY[1]

Tribune Company (the "Corporation"), a corporation organized and existing by virtue of the General Corporation Law of the State of Delaware (as amended from time to time, the "DGCL"), DOES HEREBY CERTIFY AS FOLLOWS:

The date of the filing of its original Certificate of Incorporation with the Secretary of State of the State of Delaware was March 19, 1968. This Amended and Restated Certificate of Incorporation was duly adopted in accordance with the provisions of Sections 242, 245 and 303 of the DGCL, and amends and restates, in their entirety, the provisions of the Corporation's Certificate of Incorporation. Provision for the making of this Amended and Restated Certificate of Incorporation is contained in the order of the United States Bankruptcy Court for the District of Delaware dated as of [_____], 2010 confirming the Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries filed pursuant to Section 1121(a) of chapter 11 of title 11 of the United States Code, as amended.

The Corporation's Certificate of Incorporation is hereby amended and restated so as to read in its entirety as follows:

1.    Name. The name of the corporation is Tribune Company (the "Corporation").

2.    Registered Office and Agent. The registered office of the Corporation in the State of Delaware is located at 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is Corporation Service Company.

3.    Nature of Business; Purpose. The nature of the business or purpose to be conducted or promoted by the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (as amended from time to time, the "DGCL").

4.    Capital Stock. The total number of shares of capital stock which the Corporation shall have authority to issue is [_____] ([_____]) shares, consisting of: (a) [_____] ([_____]) shares of Class A Common Stock, par value $0.001 per share ("Class A Common Stock"); (b) [_____] ([_____]) shares of Class B Common Stock, par value $0.001 per share ("Class B Common Stock" and, together with the Class A Common Stock, the "Common Stock"); and (c) [_____] ([_____]) shares of preferred stock, par value $0.001 per share (the "Preferred Stock"),

---

[1] Subject to Section 13.9 of the Plan, the Debtors reserve the right to supplement, modify or revise this Exhibit 5.3.1(1) at or prior to the Effective Date.

1

issuable in one or more series as hereinafter provided. Pursuant to Section 1123(a)(6) of chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code"), the Corporation shall not issue any non-voting capital stock of any class, series or other designation; provided, however, that the provisions of this sentence shall (i) have no further force or effect beyond what is required by Section 1123(a)(6) of the Bankruptcy Code and (ii) only have such force and effect to the extent and for so long as Section 1123(a)(6) of the Bankruptcy Code is in effect and applies to the Corporation. Shares of Class A Common Stock and Class B Common Stock which have been redeemed, repurchased or otherwise acquired by the Corporation, or which are converted into or exchanged for (whether by the holder thereof or by the Corporation) shares of any other class or series of capital stock of the Corporation (or warrants to acquire shares of capital stock of the Corporation), shall have the status of authorized and unissued shares of Class A Common Stock or Class B Common Stock, respectively, and may be reissued as shares of Class A Common Stock or Class B Common Stock, as the case may be.

      A.    <u>Common Stock</u>.

         **i.**    **Class A Common Stock.**

           (a)    *Voting.* The holders of the Class A Common Stock are entitled to one vote for each share of Class A Common Stock held by such holder of record on the books of the Corporation for all matters on which stockholders of the Corporation are entitled to vote.

           (b)    *Conversion Rights for Class A Common Stock.* Subject to Section A(iii)(c) of this Article 4 and Article 5, each share of Class A Common Stock shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such share into one fully paid and nonassessable share of Class B Common Stock; provided, however, that such conversion shall not be permitted if, following and after giving effect to such conversion, no shares of Class A Common Stock would remain outstanding; provided, further, that any required approval from the Federal Communications Commission or any successor governmental agency ("FCC") shall have been received prior to any such conversion.

         **ii.**    **Class B Common Stock.**

           (a)    *Voting.* Except as otherwise required by law or expressly provided in this Section A(ii) of this Article 4, the holders of shares of Class B Common Stock shall not be entitled to vote on any matter submitted to a vote of the stockholders of the Corporation, except: (1) the holders of Class B Common Stock shall be entitled to one vote per share and to vote as a separate class on any amendment, repeal or modification of any provision of this Amended and Restated Certificate of Incorporation that adversely affects the powers, preferences or special rights of the Class B Common Stock in a manner different from the adverse effect on the powers, preferences or special rights of the Class A Common Stock; and (2) the holders of Class B Common Stock shall be entitled to one vote per share, voting together with the holders of the Class A Common Stock as a single class, on the following non-ordinary course transactions to the extent that any such transaction is submitted to a vote of the holders of Class A Common Stock: (A) any

2

authorization of, or increase in the number of authorized shares of, any class of capital stock ranking pari passu with or senior to the Class A Common Stock or Class B Common Stock as to dividends or liquidation preference, including additional shares of Class A Common Stock or Class B Common Stock; (B) any amendment to this Amended and Restated Certificate of Incorporation or the Bylaws of the Corporation; (C) any amendment to any stockholders or comparable agreement; (D) any sale, lease or other disposition of all or substantially all of the assets of the Corporation through one or more transactions; (E) any recapitalization, reorganization, share exchange, consolidation or merger of the Corporation or its capital stock; (F) any issuance or entry into an agreement for the issuance of capital stock (or any rights, options, warrants or other securities exercisable or exchangeable for or convertible into capital stock) of the Corporation, including any stock option or stock incentive plan; (G) any redemption, purchase or other acquisition by the Corporation of any of its capital stock (except for purchases from employees upon termination of employment); and (H) any liquidation, dissolution, distribution of all or substantially all of the assets or winding-up of the Corporation.

(b)     *Conversion Rights for Class B Common Stock.*  Subject to Section A(iii)(c) of this Article 4 and Article 5, each share of Class B Common Stock shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such share into one fully paid and nonassessable share of Class A Common Stock; provided, however, that any required approval of the FCC shall have been received prior to any such conversion.

### iii. Provisions Applicable to All Common Stock.

(a)     *General.*  Except as otherwise expressly provided in this Amended and Restated Certificate of Incorporation or as otherwise required by law, all shares of Common Stock shall have identical rights and privileges in each and every respect. Except as otherwise provided by (1) the DGCL, (2) this Article 4 or (3) resolutions, if any, of the Board of Directors of the Corporation (the "Board of Directors") fixing the relative powers, preferences and rights and the qualifications, limitations or restrictions of the Preferred Stock of any series, the entire voting power of the shares of the Corporation for the election of directors and for all other purposes shall be vested exclusively in the Common Stock. There shall be no cumulative voting.

(b)     *Dividends.*  Subject to the prior rights and preferences, if any, applicable to shares of Preferred Stock, and subject to Article 5, the holders of Class A Common Stock and the holders of Class B Common Stock shall be entitled to participate ratably, on a share-for-share basis as if all shares of Common Stock were of a single class, in such dividends, whether in cash, property, capital stock or otherwise, as may be declared by the Board of Directors from time to time out of assets or funds of the Corporation legally available therefor; provided, however, that any dividends payable in shares of Common Stock (or payable in rights to subscribe for or to purchase shares of Common Stock or securities or indebtedness convertible into or exchangeable for shares of Common Stock) shall be declared and paid at the same rate on each class of Common Stock and dividends payable in shares of Class A Common Stock (or rights to subscribe for or to purchase shares of Class A Common Stock or securities or indebtedness convertible into or exchangeable for shares of Class A Common Stock) shall only be paid to holders of Class A

3

Common Stock and dividends payable in shares of Class B Common Stock (or rights to subscribe for or to purchase shares of Class B Common Stock or securities or indebtedness convertible into or exchangeable for shares of Class B Common Stock) shall only be paid to holders of Class B Common Stock.

      (c)    *Conversion.* To effect a conversion of Common Stock permitted by this Article 4, a holder of Common Stock shall deliver to the transfer agent for the Class A Common Stock or the Class B Common Stock, as the case may be, the certificate or certificates representing the shares of Common Stock to be converted, duly endorsed in blank or accompanied by duly executed proper instruments of transfer, or, in the case of shares held in book-entry form, cause The Depository Trust Company or any successor depositary ("<u>DTC</u>") to transfer such shares to the account of the transfer agent for the Class A Common Stock or the Class B Common Stock, as the case may be, in accordance with DTC's procedures for such transfer, in each case together with written notice to such transfer agent, with a copy to the Secretary of the Corporation at its principal corporate office, stating that such holder elects to convert such shares and stating the names and addresses in which the shares of Common Stock issued upon such conversion are to be issued. Subject to Article 5, conversion shall be deemed to have been effected at the time and date when such delivery or book-entry transfer, as applicable, is made to such transfer agent of the shares to be converted, and the person exercising such voluntary conversion (or, if the notice specifies another person to whom shares are to be issued upon conversion, such other person) shall be deemed to be the holder of record of the number of shares of Common Stock issuable upon such conversion at such time; <u>provided</u>, <u>however</u>, that, if, as a result of such requested conversion, the holder seeking conversion or any other holder of Common Stock would acquire or be deemed to hold an interest subject to FCC media ownership and qualifications reporting requirements (including without limitation an "attributable interest" in the Corporation within the meaning of Section 73.3555 of the FCC's regulations as set forth in 47 C.F.R. § 73.3555 or any successor rules or regulations), the conversion shall not become effective until the Corporation shall have requested and received, pursuant to Section B of Article 5, information sufficient in the Corporation's reasonable judgment to determine whether to exercise its rights under Section C of Article 5 to deny, restrict, or condition the conversion and the Corporation in its reasonable judgment has determined not to exercise such rights. If a requested conversion would cause any holder other than the converting holder ("Other Holder") to acquire or be deemed to hold an attributable interest in the Corporation under the Federal Communications Laws (as defined in Section A of Article 5), the Corporation shall have the discretion to convert shares of Class A Common Stock held by such Other Holders to Class B Common Stock but only to the extent reasonably necessary to ensure that such Other Holders will remain non-attributable in the Corporation, <u>provided</u>, <u>however</u>, that (1) such Other Holders will be given prior written notice indicating the number of shares of their Class A Common Stock that the Corporation proposes to convert to Class B Common Stock, (2) each such Other Holder will be given a reasonable opportunity to make a showing that such Other Holder may hold an attributable interest in the Corporation consistent with the Federal Communications Laws, (3) at the request of any such Other Holder, the proposed conversion to Class B Common Stock shall not be made with respect to such Other Holder if the showing required in the preceding clause (2) is made to the reasonable satisfaction of the Corporation and (4) the Corporation shall have no other authority in the circumstances set forth in this subsection (c) to alter the Common Stock holdings of such Other

4

Holders without their prior written consent. As promptly as practicable following any holder's conversion of shares of Common Stock as aforesaid, the Corporation shall (1) in the case of conversions of certificated Class A Common Stock or Class B Common Stock, issue and deliver to the converting holder, or to such holder's transferee, as the case may be, one or more certificates (as such holder may request) evidencing the shares of Common Stock issuable upon such conversion and if the certificates surrendered by the converting holder evidence more shares of Common Stock than the holder has elected to convert, one or more certificates (as such holder may request) evidencing the shares of Common Stock which have not been converted and (2) in the case of conversions of book-entry Class A Common Stock or Class B Common Stock, cause the transfer agent to effect (directly or through DTC) a book-entry deposit of the shares of Common Stock issuable upon such conversion to the converting holder, or to such holder's transferee, as the case may be. Subject to Article 5, pending the issuance and delivery of such certificates, the certificate or certificates evidencing the shares of Common Stock that have been surrendered for conversion shall be deemed to evidence the shares of Common Stock issuable upon such conversion. Any dividends declared and not paid on shares of Common Stock prior to their conversion as provided above shall be paid, on the payment date, to the holder or holders entitled thereto on the record date for such dividend payment, notwithstanding such conversion and no holder of shares of Common Stock issued upon a conversion occurring after a record date for a declared and unpaid dividend shall be entitled to receive any payment of such dividend with respect to such shares of Common Stock. The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Class A Common Stock and Class B Common Stock, solely for the purpose of effecting the conversions provided for in this Article 4, such number of shares of Class A Common Stock and such number of shares of Class B Common Stock, respectively, as shall from time to time be sufficient to effect any conversion provided for in this Article 4 and shall take all such corporate action as may be necessary to assure that such shares of Class A Common Stock and such shares of Class B Common Stock shall be validly issued, fully paid and non-assessable upon such conversion.

          (d)     *Liquidation.* In the event of any voluntary or involuntary liquidation, dissolution, distribution of all or substantially all of the assets or winding-up of the Corporation, after all creditors of the Corporation shall have been paid in full and after payment of all sums, if any, payable in respect of Preferred Stock, if any, the holders of the Common Stock shall be entitled to share ratably, on a share-for-share basis as if all shares of Common Stock were of a single class, in all distributions of assets pursuant to such voluntary or involuntary liquidation, dissolution, distribution of all or substantially all of the assets or winding-up of the Corporation. For purposes of this Section A(iii)(d), neither the merger or the consolidation of the Corporation into or with another entity, the conversion of the Corporation into another entity, the merger or consolidation of any other entity into or with the Corporation nor the sale, transfer or other disposition of all or substantially all of the assets of the Corporation shall be deemed to be a voluntary or involuntary liquidation, dissolution, distribution of all or substantially all of the assets or winding-up of the Corporation.

          (e)     *Split, Subdivision or Combination.* If the Corporation shall in any manner split, subdivide or combine the outstanding shares of Class A Common Stock or Class B Common Stock, the outstanding shares of the other class of Common Stock shall be proportionally

split, subdivided or combined in the same manner and on the same basis as the outstanding shares of the class of Common Stock that has been so split, subdivided or combined.

      B.    Preferred Stock. The Preferred Stock may be issued from time to time in one or more series. The Board of Directors is hereby authorized to provide for the issuance of shares of Preferred Stock in such series and, by filing a certificate pursuant to the applicable law of the State of Delaware (each a "Preferred Stock Designation"), to fix from time to time the number of shares to be included in any such series and the designations, powers, preferences, and rights of the shares of each such series and the qualifications, limitations and restrictions thereof. The authority of the Board of Directors with respect to each such series shall include, without limiting the generality of the foregoing, the determination of any or all of the following: (i) the number of shares of such series and the designation to distinguish the shares of such series from the shares of all other series; (ii) the voting powers, if any, of the holders of shares of such series and whether such voting powers are full or limited; (iii) the redemption rights, if any, applicable to such series, including, without limitation, the redemption price or prices, if any, to be paid for the shares of such series; (iv) whether dividends on such series, if any, will be cumulative or noncumulative, the dividend rate of such series, and the dates and preferences of dividends on such series; (v) the rights of the holders of shares of such series upon the voluntary or involuntary liquidation, dissolution or winding up of the affairs of, or upon any distribution of the assets of, the Corporation; (vi) whether the shares of such series shall be convertible into or exchangeable for shares of any other class or series, or any other security, of the Corporation or any other entity, and, if so, the specification of such other class or series or such other security, the conversion or exchange price or prices or rate or rates, any adjustments thereof, the date or dates at which such shares shall be convertible or exchangeable and all other terms and conditions upon which such conversion or exchange may be made; (vii) the right, if any, of holders of shares of such series to subscribe for or to purchase any securities of the Corporation or any other entity; (viii) the terms and amount of any sinking fund, if any, applicable to such series; and (ix) any other preferences or relative, participating, optional or other special rights, qualifications, limitations or restrictions thereof. Shares of any series of Preferred Stock which have been redeemed (whether through the operation of a sinking fund or otherwise) or otherwise acquired by the Corporation, or which, if convertible or exchangeable, have been converted into or exchanged for shares of stock of any other class or classes or series shall have the status of authorized and unissued shares of Preferred Stock and may be reissued as a part of the series of which they were originally a part or may be reclassified and reissued as part of a new series of Preferred Stock to be issued from time to time as set forth above, all subject to the conditions or restrictions on issuance set forth in a Preferred Stock Designation providing for the issue of any series of Preferred Stock and to any filing required by law.

    5.    Stock Ownership and the Federal Communications Laws.

      A.    Restrictions on Stock Ownership or Transfer. As contemplated by this Article 5, the Corporation may restrict the ownership, conversion, or proposed ownership, of shares of capital stock of the Corporation by any person if such ownership, conversion or proposed ownership, either alone or in combination with other actual or proposed ownership (including due to

conversion) of shares of capital stock of any other person, would (i) be inconsistent with, or in violation of, any provision of the Federal Communications Laws (as hereinafter defined), (ii) materially limit or materially impair any existing business activity of the Corporation or any of its subsidiaries under the Federal Communications Laws, (iii) materially limit or materially impair under the Federal Communications Laws the acquisition of an attributable interest in a full-power television station, a full-power radio station or a daily newspaper (which, as used herein, shall mean "daily newspaper" within the meaning of the Federal Communications Laws) by the Corporation or any of its subsidiaries for which the Corporation or its subsidiary has entered into a definitive agreement with a third party or (iv) subject the Corporation or any of its subsidiaries to any regulation under the Federal Communications Laws having a material effect on the Corporation or any subsidiary of the Corporation to which the Corporation or any subsidiary of the Corporation would not be subject but for such ownership, conversion or proposed ownership. For purposes of this Article 5, the term "Federal Communications Laws" shall mean any law administered or enforced by the FCC, including, without limitation, the Communications Act of 1934, as amended (the "Communications Act"), and regulations thereunder pertaining to the ownership and/or operation or regulating the business activities of (a) any television or radio station, daily newspaper, cable television system or other medium of mass communications or (b) any provider of programming content to any such medium. The Corporation may, but is not required to, take any action permitted under this Article 5; and the grant of specific powers to the Corporation under this Article 5 shall not be deemed to restrict the Corporation from pursuing, alternatively or concurrently, any other remedy or alternative course of action available to the Corporation.

B.    Requests for Information.  If the Corporation believes that the ownership or proposed ownership of shares of capital stock of the Corporation by any person (whether by reason of a change in such person's ownership, a change in the number of shares outstanding overall or in any class, or for any other reason) may (i) result in any inconsistency with or violation of the Federal Communications Laws as set forth in Section A of this Article 5, including, without limitation, any inconsistency with or violation of Section 310(b) of the Communications Act or Section 73.3555 of the FCC's regulations as set forth in 47 C.F.R. 73.3555, (ii) materially limit or materially impair any existing business activity of the Corporation or any of its subsidiaries under the Federal Communications Laws, (iii) materially limit or materially impair under the Federal Communications Laws the acquisition of an attributable interest in a full-power television station, a full-power radio station or a daily newspaper by the Corporation or any of its subsidiaries for which the Corporation or its subsidiary is considering entering into a definitive agreement with a third party, (iv) subject the Corporation or any of its subsidiaries to any regulation under the Federal Communications Laws having a material effect on the Corporation or any subsidiary of the Corporation to which the Corporation or any subsidiary of the Corporation would not be subject but for such ownership or proposed ownership or (v) be subject to FCC reporting requirements regarding such person, such person shall furnish promptly to the Corporation such information (including, without limitation, information with respect to its citizenship, ownership structure, and other ownership interests and affiliations) as the Corporation shall reasonably request.

C.    Denial of Rights, Refusal to Transfer.  (i) If (a) any person from whom information is requested pursuant to Section B of this Article 5 does not provide all the information

7

requested by the Corporation completely and accurately in a timely manner or (b) the Corporation shall conclude that a stockholder's ownership, conversion, or proposed ownership of, or that a stockholder's exercise of any rights of ownership with respect to, shares of capital stock of the Corporation, either alone or in combination with other existing or proposed ownership of shares of capital stock of any other person, would result in (1) an inconsistency with or violation of the Federal Communications Laws, (2) a material limitation or material impairment of any existing business activity of the Corporation or any of its subsidiaries under the Federal Communications Laws, (3) a material limitation or material impairment under the Federal Communications Laws of the acquisition of an attributable interest in a full-power television station, a full-power radio station or a daily newspaper by the Corporation or any of its subsidiaries for which the Corporation or its subsidiary has entered into a definitive agreement with a third party or (4) subjecting the Corporation or any of its subsidiaries to any regulation under the Federal Communications Laws having a material effect on the Corporation or any subsidiary of the Corporation to which the Corporation or any subsidiary of the Corporation would not be subject but for such ownership or proposed ownership, then in the case of either clause (a) or any provision of clause (b) of this Section C(i), the Corporation may (A) refuse to permit the transfer to such proposed stockholder or conversion by such stockholder of shares of capital stock of the Corporation, (B) suspend those rights of stock ownership, the exercise of which causes or could cause any situation described in any provision of clause (b) of this Section C(i) to occur, (C) require the conversion of any or all shares of capital stock held by such stockholder into shares of any other class of capital stock in the Corporation with equivalent economic value (it being understood that for such purposes a share of Class A Common Stock and a share of Class B Common Stock are deemed to have an equivalent economic value), (D) require the exchange of any or all shares of capital stock held by such stockholder for warrants to acquire, at a nominal exercise price, the same number of shares of capital stock in the Corporation, (E) condition the acquisition (including due to conversion) of such shares of capital stock on the prior consent of the FCC, to the extent such consent is required, (F) to the extent that the remedies in the foregoing clauses (A) through (E) are not reasonably feasible, redeem any or all such shares of capital stock of the Corporation held by such stockholder in accordance with the terms and conditions set forth in Section C(ii) of this Article 5, and/or (G) exercise any and all appropriate remedies, at law or in equity, in any court of competent jurisdiction, against any such stockholder or proposed stockholder, with a view towards obtaining such information or preventing or curing any situation described in clause (a) or in any provision of clause (b) of this Section C(i); provided, however, that, to the extent reasonably feasible without materially adversely affecting the ability of the Corporation to prevent or cure the situation described in clause (a) and/or (b) of this Section C(i), the Corporation shall use its good faith efforts (y) to cause any of the remedies listed in the preceding clauses (A) through (G) to be imposed on similarly situated persons or stockholders in a substantially similar manner and (z) to minimize the impact of the exercise of any such remedy on the interests in the Corporation of the subject stockholders or subject persons or other stockholders of the Corporation or other persons with an interest in the Corporation, subject in all cases to the primary goal of preventing or curing any situation described in clause (a) or (b) of this Section C(i); provided, further, that in the circumstances set forth in Article 4(A)(iii)(c) the only remedy available to the Corporation with respect to Other Holders will be the remedy set forth therein.  Any such refusal of transfer or suspension of rights pursuant to clause (A) or (B) of the immediately preceding sentence shall

8

remain in effect until the requested information has been received and the Corporation has determined that such transfer, or the exercise of such suspended rights, as the case may be, will not result in any of the situations described in clause (a) or in any provision of clause (b) of this Section C(i).

(ii)    Without limiting the foregoing, the terms and conditions of redemption pursuant to Section C(i)(F) of this Article 5 shall be as follows:

(a) the redemption price of any shares of capital stock of the Corporation to be redeemed pursuant to Section C(i)(F) of this Article 5 shall be equal to the Fair Market Value of such shares;

(b) the redemption price of such shares will be paid in cash;

(c) if less than all such shares are to be redeemed, the shares to be redeemed shall be selected in such manner as shall be determined by the Board of Directors in good faith, which may include selection first of the most recently purchased shares thereof, selection by lot or selection in any other manner determined by the Board of Directors in good faith;

(d) at least 15 days' prior written notice of the Redemption Date (as hereinafter defined) shall be given to the record holders of the shares selected to be redeemed (unless waived in writing by any such holder); provided that the Redemption Date shall be the date on which written notice shall be given to record holders if the cash necessary to effect the redemption shall have been indefeasibly deposited in trust for the benefit of such record holders and is then subject to immediate withdrawal by them upon surrender of the stock certificates for their redeemed shares;

(e) from and after the Redemption Date, any and all rights of whatever nature in respect of the shares selected for redemption (including, without limitation, any rights to vote or participate in dividends declared on stock (including declared and unpaid dividends) of the same class or series as such shares), shall cease and terminate and the holders of such shares shall thenceforth be entitled only to receive the cash payable upon redemption; and

(f) such other terms and conditions as the Board of Directors shall determine in good faith.

(iii)    For purposes of this Section C:

(a) "Fair Market Value" shall mean, with respect to a share of the Corporation's capital stock of any class or series, the volume weighted average sales price for such a share on the stock exchange (if any) on which such capital stock is then listed during the 30 most recent days on which shares of stock of such class or series shall have been traded preceding the day on which notice of redemption shall be given pursuant to Section C(ii)(d) of this Article 5; provided, however, that if such shares of stock are not traded on any securities exchange, Fair Market Value shall mean the average of the reported bid and asked prices in any over-the-

counter quotation system selected by the Corporation during the 30 most recent days during which such shares were traded immediately preceding the day on which notice of redemption shall be given pursuant to Section C(ii)(d) of this Article 5, or if trading of such shares is not reported in any over-the-counter quotation system, Fair Market Value shall be determined by the Board of Directors in good faith; and provided, further, that "Fair Market Value" as to any stockholder who purchased his stock within 120 days of a Redemption Date need not (unless otherwise determined by the Board of Directors) exceed the purchase price paid by such stockholder.

(b) "person" shall mean not only natural persons but partnerships (limited or general), associations, corporations, limited liability companies, joint ventures, trusts and other legal entities.

(c) "Redemption Date" shall mean the date fixed by the Board of Directors for the redemption of any shares of stock of the Corporation pursuant to Section C(i)(F) of this Article 5 or the date specified in Section C(ii)(d) of this Article 5, as the case may be.

(d) "regulation" shall include not only regulations but rules, published policies and published controlling interpretations by an administrative agency or body empowered to administer a statutory provision of the Federal Communications Laws.

(iv)    The Corporation shall instruct the Corporation's transfer agent that the shares of capital stock of the Corporation are subject to the restrictions set forth in this Article 5 and such restrictions shall be noted conspicuously on the certificate or certificates representing such capital stock or, in the case of uncertificated securities, contained in the notice or notices sent as required by law or pursuant to the policies and procedures of DTC in the case of book-entry securities.

D.    Authority of Board of Directors.  In the case of an ambiguity in the application of any of the provisions of this Article 5, including any definition used herein, the Board of Directors shall have the power to determine the application of such provisions with respect to any situation based on its reasonable belief, understanding or knowledge of the circumstances.  In the event this Article 5 permits any action by the Corporation but fails to provide specific guidance with respect to such action, the Board of Directors shall have the power to determine whether to take any action and the action to be taken (if any) so long as such action is not contrary to the provisions of this Article 5.  All such actions, calculations, interpretations and determinations which are done or made by the Board of Directors in good faith shall be conclusive and binding on the Corporation and all other persons for all other purposes of this Article 5.  The Board of Directors may delegate all or any portion of its powers under this Article 5 to a committee of the Board of Directors as it deems necessary or advisable and, to the fullest extent permitted by law, may exercise the authority granted by this Article 5 through duly authorized officers or agents of the Corporation.  Nothing in this Article 5 shall be construed to limit or restrict the Board of Directors in the exercise of its fiduciary duties under applicable law.

E.    Reliance.  To the fullest extent permitted by law, the Corporation and the members of the Board of Directors shall be fully protected in relying in good faith upon any

10

information provided by any person pursuant to this Article 5 (including, without limitation, Section B of this Article 5) and the information, opinions, reports or statements of the chief executive officer, the chief financial officer or the principal accounting officer of the Corporation and the Corporation's legal counsel, independent auditors, transfer agent, investment bankers or other employees and agents in making any determinations and findings contemplated by this Article 5. The members of the Board of Directors shall not be responsible for any good faith errors made in connection therewith. For purposes of determining the existence and identity of, and the amount of any shares of capital stock of the Corporation owned by any stockholder, the Corporation is entitled to rely on the existence and absence of filings of Schedule 13D or 13G under the Securities Exchange Act of 1934, as amended (or similar filings), as of any date, subject to its actual knowledge of the ownership of shares of capital stock of the Corporation.

F.    Severability.  If any provision of this Article 5 or the application of any such provision to any person or under any circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision of this Article 5.

6.    Board of Directors.

A.    General.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

B.    Bylaws.  The Board of Directors shall have power to make, alter, amend or repeal any or all of the Bylaws of the Corporation.

C.    Written Ballot.  Election of directors need not be by written ballot unless the Bylaws of the Corporation so provide.

7.    Personal Liability.  To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.  If the DGCL is amended or any other law of the State of Delaware is adopted or amended after approval by the stockholders of this Article 7 to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL as so amended, or such other law of the State of Delaware.  Any repeal or modification of the foregoing provisions of this Article 7 by the stockholders of the Corporation or adoption of any provision of this Amended and Restated Certificate of Incorporation inconsistent with this Article 7 shall not adversely affect any right or protection of a director of the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director occurring prior to, such repeal, modification or adoption of any inconsistent provision.

8.    Right to Indemnification.

A.    Right to Indemnification of Directors and Officers.  The Corporation shall

11

indemnify and hold harmless, to the fullest extent permitted by law as it presently exists or may hereafter be amended, any person (an "Indemnified Person") who was or is a party or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that such person, or a person for whom such person is the legal representative, is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, trustee, manager, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust, enterprise, nonprofit entity or other entity of any type, including service with respect to any employee benefit plan, whether the basis of such Proceeding is alleged action in an official capacity as a director or officer or in any other capacity while serving, at the request of the Corporation, as a director, officer, employee or agent, against all liability and loss suffered and expenses (including attorneys' fees) actually and reasonably incurred by such Indemnified Person in such Proceeding. Notwithstanding the preceding sentence, except as otherwise provided in Section C of this Article 8, the Corporation shall be required to indemnify an Indemnified Person in connection with a Proceeding (or part thereof) commenced by or on behalf of such Indemnified Person only if the commencement of such Proceeding (or part thereof) by the Indemnified Person was authorized in advance by the Board of Directors.

B.    Prepayment of Expenses. The Corporation shall pay the expenses (including attorneys' fees) actually and reasonably incurred by an Indemnified Person in connection with any Proceeding in advance of its final disposition; provided, however, that, to the extent required by law, such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the Indemnified Person to repay all amounts advanced if it should be ultimately determined that the Indemnified Person is not entitled to be indemnified under this Article 8 or otherwise.

C.    Claims by Directors and Officers. If a claim for indemnification or advancement of expenses under this Article 8 is not paid in full within 30 days after a written claim therefor by the Indemnified Person has been received by the Corporation (and any undertaking required under Section B of this Article 8), the Indemnified Person may file suit to recover the unpaid amount of such claim. If successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses, the Indemnified Person shall be entitled to be paid the expense of prosecuting or defending such claim. In any such action the Corporation shall have the burden of proving that the Indemnified Person is not entitled to the requested indemnification or advancement of expenses under law.

D.    Indemnification of Employees and Agents. The Corporation may indemnify and advance expenses to any person who was or is made or is threatened to be made or is otherwise involved in any Proceeding by reason of the fact that such person, or a person for whom such person is the legal representative, is or was an employee or agent of the Corporation or, while an employee or agent of the Corporation, is or was serving at the request of the Corporation as a director, officer, trustee, manager, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust, enterprise, nonprofit entity or other entity of any type, including service

12

with respect to any employee benefit plan, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such person in connection with such Proceeding. The ultimate determination of entitlement to indemnification of persons who are non-director or officer employees or agents shall be made in such manner as is determined by the Board of Directors in its sole discretion. Notwithstanding the foregoing sentence, the Corporation shall not be required to indemnify a person described therein in connection with a Proceeding initiated by or on behalf of such person if the Proceeding was not authorized in advance by the Board of Directors.

E.    Advancement of Expenses of Employees and Agents. The Corporation may pay the expenses (including attorneys' fees) actually and reasonably incurred by an employee or agent in defending any Proceeding in advance of its final disposition on such terms and conditions as may be determined by the Board of Directors.

F.    Non-Exclusivity of Rights. The rights conferred on any person by this Article 8 shall not be exclusive of any other rights which such person may have under the certificate of incorporation of the Corporation prior to the effectiveness of this Amended and Restated Certificate of Incorporation or have or hereafter acquire under any statute, provision of this Amended and Restated Certificate of Incorporation, bylaws, agreement, vote of stockholders or disinterested directors or otherwise.

G.    Other Indemnification. The Corporation's obligation, if any, to indemnify any person who was or is serving at its request as a director, officer, trustee, manager, employee or agent of another corporation, partnership, joint venture, limited liability company, trust, enterprise or nonprofit entity, including service with respect to any employee benefit plan, shall be reduced by any amount such person collects as indemnification from such other corporation, partnership, joint venture, limited liability company, trust, enterprise or nonprofit entity, including service with respect to any employee benefit plan.

H.    Insurance. The Board of Directors may, to the full extent permitted by law as it presently exists, or may hereafter be amended from time to time, authorize an appropriate officer or officers to purchase and maintain, at the Corporation's expense, insurance: (i) to indemnify the Corporation for any obligation which it incurs as a result of the indemnification of directors, officers, employees and agents under the provisions of this Article 8; and (ii) to indemnify or insure directors, officers, employees and agents against liability in instances in which they may not otherwise be indemnified by the Corporation under the provisions of this Article 8.

I.    Amendment or Repeal. Any repeal or modification of the foregoing provisions of this Article 8, or adoption of any provision of this Amended and Restated Certificate of Incorporation inconsistent with this Article 8, shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to the time of such repeal, modification or adoption of any inconsistent provision. The rights provided hereunder shall inure to the benefit of any Indemnified Person and such person's heirs, executors and administrators.

9.    Amendment of the Certificate of Incorporation. Subject to Article 7, Article 8 and

13

Article 10, the Corporation reserves the right at any time from time to time to amend, alter, change or repeal any provision contained in this Amended and Restated Certificate of Incorporation, and any other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted, in the manner now or hereafter prescribed by law. Subject to Article 7 and Article 8, all rights, preferences and privileges of whatsoever nature conferred upon stockholders, directors or any other persons whomsoever by and pursuant to this Amended and Restated Certificate of Incorporation in its present form or as hereafter amended are granted subject to the right reserved in this Article 9.

      10.    <u>DGCL Section 203</u>.  The Corporation hereby expressly elects not to be governed by Section 203 of the DGCL.

14

IN WITNESS WHEREOF, the Corporation has caused this Amended and Restated Certificate of Incorporation to be signed by _____, its _____, this _____ day of _____, 2010.

TRIBUNE COMPANY

By: _____

Name:

Title:

**Exhibit 5.3.1(2) – By-Laws of Reorganized Tribune**

AMENDED AND RESTATED

BYLAWS

OF

TRIBUNE COMPANY[1]

(a Delaware corporation)

(As amended and in effect as of [_____], 2010)

## Article I - Offices

Section 1.01. <u>Offices</u>.  Tribune Company, a Delaware corporation (the "<u>Corporation</u>"), may have offices at such places both within and without the State of Delaware as the Board of Directors of the Corporation (the "<u>Board of Directors</u>") may from time to time determine or the business of the Corporation may require.

## Article II - Meetings of Stockholders

Section 2.01. <u>Annual Meeting</u>.  Unless directors are elected by written consent in lieu of an annual meeting as permitted by the General Corporation Law of the State of Delaware (as amended from time to time, the "<u>DGCL</u>"), an annual meeting of the stockholders of the Corporation, for the election of directors and for the transaction of such other business as may properly come before the meeting, shall be held on such date, and at such time as the Board of Directors shall designate and as may be stated in the notice of the annual meeting.  Stockholders may, unless the Amended and Restated Certificate of Incorporation as it may be amended from time to time (the "<u>Amended and Restated Certificate of Incorporation</u>") otherwise provides, act by written consent to elect directors; provided, however, that if such consent is less than unanimous, such action by written consent may be in lieu of holding an annual meeting only if all of the directorships to which directors could be elected at an annual meeting held at the effective time of such action are vacant and are filled by such action.  The first annual meeting of stockholders following the date on which all conditions to the consummation of the Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries, including exhibits and all supplements, appendices and schedules thereto (the "<u>Plan</u>") filed pursuant to Section 1121(a) of chapter 11 of title 11 of the United States Code and confirmed by an order of the United States Bankruptcy Court for the District of Delaware dated as of [_____], 2010 have been satisfied or waived as provided in Article X of the Plan, and all acts, events, terms and conditions contemplated under the Plan to occur on the Effective Date as defined by the Plan have occurred (the "<u>Effective Date</u>"), shall be held no earlier than the first anniversary of the Effective Date.

---

[1] Subject to Section 13.9 of the Plan, the Debtors reserve the right to supplement, modify or revise this Exhibit 5.3.1(2) at or prior to the Effective Date.

Section 2.02.  Special Meeting.  Special meetings of the stockholders may be held upon call of a majority of the members of the Board of Directors or the Chairman of the Board and shall be called by the Secretary at the request in writing of holders of record of a majority of the outstanding shares of capital stock of the Corporation entitled to vote thereat.  The business transacted at a special meeting of the stockholders shall be limited to the purpose or purposes stated in the notice of the meeting.

Section 2.03.  Time and Place of Meetings.  Meetings of the stockholders shall be held at such place, either within or without the State of Delaware, as the Board of Directors shall determine (or the Chairman of the Board in the absence of a designation by the Board of Directors.)

Section 2.04.  Notice of Meetings, Adjournment.  Notice of the place, date, and time of all meetings of the stockholders shall be given in accordance with this Section 2.04 and Article V, not less than 10 nor more than 60 days before the date on which the meeting is to be held, to each stockholder entitled to vote at such meeting, except as otherwise required by law.

When a meeting is adjourned to another place, date or time, notice need not be given of the adjourned meeting if the place, date and time thereof are announced at the meeting at which the adjournment is taken; provided, however, that if the date of any adjourned meeting is more than 30 days after the date for which the meeting was originally noticed, or if a new record date is fixed for the adjourned meeting, written notice of the place, date, and time of the adjourned meeting shall be given in accordance with this Section 2.04 and Article V.  At any adjourned meeting, any business may be transacted which might have been transacted at the original meeting.

An affidavit of the mailing or other means of giving any notice of any stockholders' meeting, executed by the Secretary, Assistant Secretary or any transfer agent of the Corporation giving the notice, shall be *prima facie* evidence of the giving of such notice.

Section 2.05.  Quorum.  The holders of a majority of the votes entitled to be cast by the shares of outstanding capital stock of the Corporation entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business except as otherwise provided by law or by the Amended and Restated Certificate of Incorporation; provided that if a separate class vote is required with respect to any matter, the holders of a majority of the outstanding shares of such class, present in person or represented by proxy, shall constitute a quorum of such class, and, except as otherwise provided by law or the Amended and Restated Certificate of Incorporation, the affirmative vote of a majority of shares of such class so present shall be the act of such class. If, however, such quorum shall not be present or represented at any meeting of the stockholders, the chairman of the meeting or the stockholders entitled to cast a majority of the votes entitled to be cast thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented any business may be transacted which might have been transacted at the meeting as originally notified. If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

2

Section 2.06.  Action by Consent.  Unless otherwise provided in the Amended and Restated Certificate of Incorporation and subject to the proviso in the second sentence of Section 2.01, any action required to be taken at any annual or special meeting of stockholders, or any action which may be taken at any annual or special meeting of stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding shares of capital stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of stockholders to take the action were delivered to the Corporation as provided in this Section 2.06.

Every written consent shall bear the date of signature of each stockholder who signs the consent, and no written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the earliest dated consent delivered in the manner required by this Section 2.06 and the DGCL to the Corporation, written consents signed by a sufficient number of holders to take action are delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

Section 2.07.  Stockholders Entitled to Vote; Record Date.  In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall, unless otherwise required by law, not be more than 60 nor less than 10 days before the date of such meeting.  If the Board of Directors so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination.  If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance herewith at the adjourned meeting.

3

In order that the Corporation may determine the stockholders entitled to express consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than 10 days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. If no record date for determining stockholders entitled to express consent to corporate action in writing without a meeting is fixed by the Board of Directors, (i) when no prior action of the Board of Directors is required by law, the record date for such purpose shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation in accordance with applicable law, and (ii) if prior action by the Board of Directors is required by law, the record date for such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix a record date, which shall not be more than 60 days prior to such other action. If no such record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section 2.08.  <u>Order of Business at Annual Meetings</u>.  At any annual meeting, such business (including nominations for election of directors) shall be conducted only if brought before such annual meeting by or at the direction of the Board of Directors or by any stockholder who is a stockholder of record on the date of the giving of the notice provided for in this <u>Section 2.08</u> and on the record date for the determination of stockholders entitled to vote at such annual meeting, and who complies with the procedures set forth in this <u>Section 2.08</u>.

For business to be properly brought before an annual meeting by a stockholder, the business must be a proper subject for action by stockholders and the stockholder must give written notice to the Secretary in accordance with this <u>Section 2.08</u>. The stockholder's notice must be received by the Secretary at the principal executive offices of the Corporation not more than 120 days and not less than 90 days in advance of the anniversary date of the immediately preceding annual meeting; provided, however, that in the event that the annual meeting is called for a date that is not within 30 days before or after such anniversary date or in the case of the first annual meeting held following the Effective Date, notice by the stockholder in order to be timely must be so received not later than the close of business on the 10th day following the day on which notice of the date of the annual meeting was first mailed or public disclosure of the date of the annual meeting was first made, whichever first occurs.  To be in proper written form, a stockholder's notice to the Secretary shall set forth as to each matter the stockholder proposes to bring before the annual meeting the following: (i) a description of the business desired to be brought before the annual meeting, the reasons for conducting such business at the annual meeting and the complete text of any resolutions to be presented at the annual meeting; (ii) the name and address of the stockholder, as it appears on the Corporation's books, and of the beneficial owner, if any, on whose behalf the business is being brought; (iii) a representation that the stockholder is a holder of the Corporation's voting stock and the class or series and number of shares of stock of the Corporation which are owned beneficially or of record by the stockholder or beneficial owner; (iv) any material

4

interest of the stockholder or beneficial owner in such business; and (v) whether and the extent to which any hedging or other transaction or series of transactions has been entered into by or on behalf of, or any other agreement, arrangement or understanding (including any short position or any borrowing or lending of shares) has been made, the effect or intent of which is to mitigate loss to or manage risk or benefit of share price changes for, or to increase or decrease the voting power of, such stockholder or beneficial owner with respect to any share of stock of the Corporation (which information shall be updated by such stockholder and beneficial owner, if any, as of the record date of the annual meeting not later than 10 days after the record date of the annual meeting). In the case of nomination(s) for election as a director, the stockholder's notice must comply with the previous two sentences and shall also include (A) the name, age, business address and residence address of the nominee(s), (B) the principal occupation or employment of the nominee(s), (C) the class or series and number of shares of stock of the Corporation which are owned beneficially or of record by the nominee(s), (D) a description of all arrangements or understandings among the stockholder or such beneficial owner and the nominee(s), pursuant to which the nomination(s) are to be made by the stockholder or beneficial owner, (E) a representation that such stockholder intends to appear in person or by proxy at the annual meeting to nominate the nominee and (F) any other information relating to the nominee(s) that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 of the Securities Exchange Act of 1934, as amended. All notices of intent to make a nomination for election as a director shall be accompanied by the written consent of each nominee to serve as director of the Corporation if so elected. Notwithstanding the foregoing provisions of this Section 2.08, a stockholder shall also comply with all applicable requirements of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder and the rules and regulations of the stock exchange (if any) on which the Corporation's common stock is then listed with respect to all matters set forth in this Section 2.08. The chairman of the annual meeting shall, if the facts warrant, determine and declare that business (including any stockholder nominations for election as a director) not properly brought before the annual meeting in accordance with the provisions of this Section 2.08 shall not be transacted at the annual meeting.

At all meetings of the stockholders, the Chairman of the Board, or, in the Chairman of the Board's absence, the Chief Executive Officer, President, or, in the absence of all of the aforementioned officers, the most senior Vice President (in accordance with Section 6.08), shall act as chairman of the meeting. The chairman of the meeting shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts and things as are necessary or desirable for the proper conduct of the meeting, including, without limitation, the establishment of procedures for the dismissal of business that is not a proper matter for stockholder action or not properly presented, the maintenance of order and safety, limitations on the time allotted to questions or comments on the affairs of the Corporation, restrictions on entry to such meeting after the time prescribed for the commencement thereof, the opening and closing of the voting polls, the adjournment of the meeting and the appointment of one or more inspectors to act at the meeting.

Section 2.09. Proxies. Every stockholder may authorize another person or persons to act for such stockholder by proxy in all matters in which a stockholder is entitled to participate, including waiving any notice of any meeting, voting or participating at a meeting. No proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. A duly executed proxy

5

shall be irrevocable if it states that it is irrevocable, and if and only so long as it is coupled with an interest sufficient in law to support an irrevocable power.

Section 2.10.  <u>Voting by Fiduciaries and Pledgors</u>.  Persons holding stock in a fiduciary capacity shall be entitled to vote the shares so held, and persons whose stock is pledged shall be entitled to vote such shares, unless in the transfer by the pledgor on the books of the Corporation such pledgor has expressly empowered the pledgee to vote such shares, in which case only the pledgee or such pledgee's proxy may represent said stock and vote thereon.

Section 2.11.  <u>Method of Voting</u>.  The vote at any election or upon any question at any meeting of stockholders need not be by written ballot, except as required by law.  Notwithstanding the immediately preceding sentence, the Board of Directors, in its discretion, or the officer of the Corporation presiding at a meeting of stockholders, in such officer's discretion, may require that any votes cast at such meeting shall be cast by written ballot.  Except as otherwise provided by law, the Amended and Restated Certificate of Incorporation or these Bylaws, including the voting procedures set forth in <u>Section 2.05</u> with respect to a separate class vote, all matters shall be determined by a majority of the votes entitled to be cast by the shares of stock present in person or by proxy at the meeting and entitled to vote thereon.

Section 2.12.  <u>Stockholders List</u>.  A complete list of stockholders entitled to vote at any meeting of stockholders, for each class or series of stock and showing the address of each such stockholder and the number of shares registered in each such stockholder's name, shall be open to the examination of any such stockholder, for any purpose germane to the meeting, (i) on a reasonably accessible electronic network, provided that the information required to access such list is provided with the notice of meeting, or (ii) during ordinary business hours for a period of at least 10 days prior to the meeting, at the principal place of business of the Corporation.  The stockholders list shall also be kept at the place of the meeting during the whole time of the meeting and shall be open to the examination of any stockholder who is present and entitled to vote at such meeting.  This list shall presumptively determine the identity of the stockholders entitled to vote at the meeting and the number of shares held by each of them.

## Article III - DIRECTORS

Section 3.01.  <u>Management of Business; Qualifications of Directors</u>.  The business of the Corporation shall be managed by or under the direction of a Board of Directors.  Directors need not be stockholders or residents of the State of Delaware.  All directors of the Corporation will be in compliance with all applicable requirements of the Communications Act of 1934, as amended, and the rules and policies of the Federal Communications Commission.

Section 3.02.  <u>Powers</u>.  In addition to the powers and authority expressly conferred upon the Board of Directors by law, the Board of Directors may exercise all the powers of the Corporation and do all such lawful acts and things as may be done by the Corporation which are not in violation of law, or required to be exercised or done by the stockholders under applicable law, the Amended and Restated Certificate of Incorporation or these Bylaws.

Section 3.03.  <u>Number; Election; Tenure</u>.  The number of directors constituting the Board of Directors shall be not less than seven nor more than nine, and shall be fixed from time to time by resolution of the Board of Directors.  The directors shall be elected at each annual meeting of the stockholders, subject to, and except as provided in, <u>Sections 2.01</u> and <u>3.06</u>, and each director elected shall hold office until his or her successor is elected and qualified or until his or her earlier death, resignation or removal, provided that the directors serving as of the Effective Date shall serve until the second annual meeting following the Effective Date.  The vote required for election of a director by the stockholders of the Corporation shall, except in a contested election, be the affirmative vote of a majority of the votes cast in favor of or against the election of a nominee at a meeting of stockholders.  A majority of the votes cast in an election of directors shall mean that the number of shares voted "for" a director's election must exceed the number of votes cast "against" that director's election and, unless otherwise provided by law, shares not present, "broker nonvotes" and shares voting "abstain" or "abstentions" shall not be counted as a vote cast either "for" or "against" a director's election for purposes of determining whether a nominee for director has received a majority of the votes cast.  An election shall be considered contested if as of the record date there are more nominees for election than positions on the Board of Directors to be filled by election at the meeting.  In a contested election, directors shall be elected by a plurality of the votes cast at a meeting of stockholders by the holders of shares entitled to vote in the election.  In any non-contested election of directors, any incumbent director nominee who receives a greater number of votes cast against his or her election than in favor of his or her election shall immediately tender his or her resignation, and the Board of Directors, excluding the nominee in question, shall decide whether to accept the resignation at the regularly scheduled meeting of the Board of Directors following the annual meeting of stockholders.

Section 3.04.  <u>Nomination of Directors</u>.  Subject to any limitations stated in the Amended and Restated Certificate of Incorporation, and except as may otherwise be provided in the Amended and Restated Certificate of Incorporation with respect to the holders of preferred stock of the Corporation, if any, to nominate and elect a specified number of directors in certain circumstances, nominations for the election of directors may only be made by the Board of Directors or the applicable committee of the Board of Directors established in accordance with <u>Section 4.08</u>, as appropriate, or by any stockholder entitled to vote in the election of directors who complies with the notice procedures set forth in <u>Section 2.08</u>.

Section 3.05.  <u>Removal</u>.  Any director, or the entire Board of Directors, may be removed from office at any time, with or without cause, and only by the affirmative vote of the holders of a majority of the voting power of all of the outstanding capital stock of the Corporation entitled to vote in the election of directors of the Corporation generally, voting together as a single class, and the vacancies thus created may be filled in accordance with <u>Section 3.06</u>.

Section 3.06.  <u>Vacancies and Increases</u>.  Vacancies and newly created directorships resulting from any increase in the authorized number of directors shall be filled solely by a majority of the directors then in office, though less than a quorum, or by a sole remaining director.  Any director elected in accordance with the preceding sentence shall hold office for the remainder of the full term of the new directorship or the vacancy and until such director's successor shall have been elected and qualified or such director's earlier death, resignation or removal.  If there are no directors in office, then an election of directors may be held in accordance with the DGCL.  Unless otherwise provided in the Amended and

7

Restated Certificate of Incorporation, when one or more directors shall resign from the Board of Directors, effective at a future date, a majority of the directors then in office, including those who have so resigned, shall have the power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office as provided in the filling of other vacancies.

Section 3.07.  <u>Resignation</u>.  Any director may resign effective upon giving written notice to the Chairman of the Board, the Chief Executive Officer, the President, the Secretary or the Board of Directors, unless the notice specifies a later time for the resignation to become effective.  If the resignation of a director is effective at a future time, following receipt of notice of the resignation in accordance with this <u>Section 3.07</u>, the Board of Directors may, in accordance with <u>Section 3.06</u>, elect a successor to take office when the resignation becomes effective.

Section 3.08.  <u>Reliance upon Records</u>.  Every director, and every member of any committee of the Board of Directors, shall, in the performance of his or her duties, be fully protected in relying in good faith upon the records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors, or by any other person as to matters the director or member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation, including, but not limited to, such records, information, opinions, reports or statements as to the value and amount of the assets, liabilities and/or net profits of the Corporation, or any other facts pertinent to the existence and amount of surplus or other funds from which dividends might properly be declared and paid, or with which the Corporation's capital stock might properly be purchased or redeemed.

## Article IV - MEETINGS OF THE BOARD OF DIRECTORS

Section 4.01.  <u>Meeting of Newly Elected Board of Directors</u>.  The newly elected Board of Directors may meet at the place of the meeting at which such newly elected Board of Directors was elected, for the purpose of organization or otherwise, and no notice of such meeting to the newly elected directors shall be necessary in order to validly constitute the meeting, provided a quorum shall be present, or they may meet at such time and place as may be fixed by the consent in writing of all of the newly elected directors, or upon notice as provided in <u>Section 4.05</u>, or without notice as provided in <u>Section 5.02</u>.

Section 4.02.  <u>Meetings</u>.  Regular meetings of the Board of Directors may be held at such times as shall from time to time be determined by the Board of Directors by resolution or otherwise.  Special meetings shall be held only when called by the Chairman of the Board, Chief Executive Officer, President or any two directors.

Section 4.03.  <u>Place of Meetings</u>.  Except as otherwise provided in <u>Section 4.01</u>, meetings of the Board of Directors may be held at such place within or without the State of Delaware as shall be stated in the notice of meeting or waiver thereof.  Any member or members of the Board of Directors or of any committee may participate in a meeting of the Board of Directors, or any such committee, as the case may be, by means of a conference telephone or similar communications equipment by means of which

all persons participating in the meeting can hear each other and such participation shall constitute presence in person at such meeting.

Section 4.04. <u>Quorum</u>. At all meetings of the Board of Directors, a majority of the total number of directors shall constitute a quorum for the transaction of business, and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board of Directors, except as may be otherwise specifically provided by law or by the Amended and Restated Certificate of Incorporation. If a quorum shall not be present at any meeting of the Board of Directors, then a majority of the directors present may adjourn the meeting from time to time to another date, place or time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 4.05. <u>Board of Directors' Notices</u>. At least forty-eight hours' notice of each special meeting of the Board of Directors, stating the place, date and time for the meeting, shall be given to each director, by hand delivery to the recipient thereof, by depositing such notice in the mail, postage paid, by courier such as UPS, Federal Express or Airborne Express, by telegram, mailgram, telex, telecopy, facsimile transmission, electronic mail or other similar means of transmission or by personal communication either over the telephone or otherwise, except as otherwise provided in <u>Section 5.02</u>. Any such notice shall be addressed, where applicable, to such director at his or her last known address as the same appears on the books of the Corporation. Notice of a meeting of the Board of Directors need not state the purpose or purposes thereof and shall be deemed given (i) when received by the director in the case of hand delivery or personal communication over the telephone or otherwise, (ii) three business days after depositing such notice in the mail in the case of delivery by mail, (iii) one business day after depositing such notice with a courier such as UPS, Federal Express or Airborne Express (specifying next business day delivery) or (iv) when sent in the case of delivery by telegram, mailgram, telex, telecopy, facsimile transmission, electronic mail or other similar means of transmission. Notice need not be given of regular meetings of the Board of Directors held at times fixed by resolution of the Board of Directors.

Section 4.06. <u>Director Action Without a Meeting</u>. Unless otherwise restricted by the Amended and Restated Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board of Directors or committee, as the case may be, consent thereto in writing (which may be by facsimile, telecopy or other electronic transmission), and the writing or writings are filed with the minutes of proceedings of the Board of Directors or committee.

Section 4.07. <u>Compensation and Expenses</u>. Directors may receive such compensation and expenses, including such compensation and expenses for attendance at meetings of the Board of Directors or any committee established in accordance with <u>Section 4.08</u>, as may be determined from time to time by the Board of Directors, provided that nothing herein contained shall be construed to preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 4.08. <u>Committees</u>. The Corporation hereby elects to be governed by Section 141(c)(2) of the DGCL. The Board of Directors may designate one or more committees, each consisting of one or more directors. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent member at any meeting of the committee. In the absence or

9

disqualification of a member of the committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he, she or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in place of any such absent or disqualified members. Any such committee, to the extent permitted by law and to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it. Unless the Board of Directors or such committee shall provide, the regular and special meetings of any such committee shall be governed by the provisions of this <u>Article IV</u> applicable to meetings and actions of the Board of Directors.

## Article V - NOTICES

Section 5.01. <u>Manner of Notices</u>. Except as otherwise provided by law, the Amended and Restated Certificate of Incorporation or these Bylaws, whenever notice is required to be given to any stockholder, director or member of any committee of the Board of Directors, such notice may be given by (i) personal delivery, (ii) depositing it, in a sealed envelope, in the United States mails, first class, postage prepaid, addressed, (iii) delivering to a company for overnight or second day mail or delivery, (iv) delivering it to a telegraph company, charges prepaid, for transmission, or by transmitting it via telecopier or (v) any other reliable means permitted by applicable law (including, subject to this <u>Section 5.01</u>, electronic transmission) to such stockholder, director or member, either at the address of such stockholder, director or member as it appears on the records of the Corporation or, in the case of such a director or member, at his or her business address; and such notice shall be deemed to be given at the time when it is thus personally delivered, deposited, delivered or transmitted, as the case may be. Such requirement for notice shall also be deemed satisfied, except in the case of stockholder meetings, if actual notice is received orally or by other writing by the person entitled thereto as far in advance of the event with respect to which notice is being given as the minimum notice period required by law or these Bylaws.

Without limiting the foregoing, any notice to stockholders given by the Corporation pursuant to these Bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder to whom the notice is given. Any such consent shall be revocable by the stockholder by written notice to the Corporation and shall also be deemed revoked if (i) the Corporation is unable to deliver by electronic transmission two consecutive notices given by the Corporation in accordance with such consent and (ii) such inability becomes known to the Secretary of the Corporation, the transfer agent or other person responsible for the giving of notice; provided, however, that the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action. Notice given by a form of electronic transmission in accordance with these Bylaws shall be deemed given: (A) if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice; (B) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice; (C) if by a posting on an electronic network, together with separate notice to the stockholder of such specific posting, upon the later of such posting and the giving of such separate notice; or (D) if by another form of electronic transmission, when directed to the stockholder.

Section 5.02. <u>Waivers</u>. Whenever any notice is required to be given under applicable requirements of law or pursuant to the Amended and Restated Certificate of Incorporation or of these Bylaws, a waiver thereof in writing, signed by the person or persons entitled to said notice, whether before or after the time of the event for which notice is to be given, shall be deemed equivalent thereto. Neither the business nor the purpose of any meeting need be specified in such a waiver. Attendance by a director or stockholder at a meeting shall constitute a waiver of notice of such meeting except when the director or stockholder attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting has not been lawfully called or convened.

## Article VI - OFFICERS

Section 6.01. <u>General</u>. The officers of the Corporation shall be chosen by the Board of Directors and shall be a President, Secretary and Treasurer. The Board of Directors may elect a Chief Executive Officer, a Chief Operating Officer, a Chief Financial Officer, one or more Vice Presidents and one or more Assistant Secretaries and Assistant Treasurers. The Board of Directors at its first meeting and after each annual meeting of stockholders shall choose a President, a Secretary and a Treasurer and shall choose a Chairman of the Board. The Board of Directors may appoint such other officers and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Directors. Any number of offices may be held by the same person, unless the Amended and Restated Certificate of Incorporation or these Bylaws otherwise provide. The officers of the Corporation may sign certificates of shares for the Corporation as may be directed by the Board of Directors in accordance with <u>Section 7.01</u>. All officers of the Corporation will be in compliance with all applicable requirements of the Communications Act of 1934, as amended, and the rules and policies of the Federal Communications Commission.

Section 6.02. <u>Term; Removal; Vacancy</u>. Each officer of the Corporation shall hold office until such officer's successor is chosen and qualified or such officer's earlier death, resignation or removal. Any officer elected or appointed by the Board of Directors may be removed at any time by the affirmative vote of a majority of the Board of Directors with or without cause. Any vacancy occurring in any office of the Corporation may be filled by the Board of Directors.

Section 6.03. <u>The Chairman of the Board</u>. The Chairman of the Board, if there be a Chairman of the Board, shall preside at all meetings of the stockholders, of the Board of Directors and of the executive committee, if any, and shall have such other powers and duties as the Board of Directors may from time to time prescribe. The Chairman of the Board may execute contracts in the name of the Corporation and may sign any policies, deeds, mortgages, bonds, contracts, or other instruments which the Board of Directors have authorized to be executed except in cases where the signing and execution thereof shall be expressly delegated by the Board of Directors or by these Bylaws to some other officer or agent of the Corporation, or shall be required by law to be otherwise signed or executed.

Section 6.04. <u>The Chief Executive Officer</u>. The Chief Executive Officer of the Corporation shall direct the general affairs of the Corporation except as otherwise prescribed by the Board of Directors. In the absence of the Chairman of the Board, the Chief Executive Officer shall preside at all meetings of the stockholders, of the Board of Directors and of the executive committee, if any, and shall designate the

acting Secretary for such meetings to take the minutes thereof for delivery to the Secretary. The Chief Executive Officer may sign any policies, deeds, mortgages, bonds, contracts, or other instruments which the Board of Directors have authorized to be executed except in cases where the signing and execution thereof shall be expressly delegated by the Board of Directors or by these Bylaws to some other officer or agent of the Corporation, or shall be required by law to be otherwise signed or executed, appoint and discharge agents and employees of the Corporation, and in general, shall perform all duties incident to the office of Chief Executive Officer.

Section 6.05.  The Chief Operating Officer. The Chief Operating Officer, if any, shall exercise all the powers and perform the duties of the office of the chief operating officer and in general have overall supervision of the operations of the Corporation. The Chief Operating Officer shall, when requested, counsel with and advise the other officers of the Corporation and shall perform such other duties as the Board of Directors or the Chief Executive Officer or the President may from time to time determine.

Section 6.06.  The Chief Financial Officer. The Chief Financial Officer, if any, shall exercise all the powers and perform the duties of the office of the chief financial officer and in general have overall supervision of the financial operations of the Corporation. The Chief Financial Officer shall, when requested, counsel with and advise the other officers of the Corporation and shall perform such other duties as the Board of Directors or the Chief Executive Officer or the President may from time to time determine.

Section 6.07.  The President. The President along with the Chief Executive Officer of the Corporation shall direct the general affairs of the Corporation except as otherwise prescribed by the Board of Directors.  The President may sign any policies, deeds, mortgages, bonds, contracts, or other instruments which the Board of Directors have authorized to be executed except in cases where the signing and execution thereof shall be expressly delegated by the Board of Directors or by these Bylaws to some other officer or agent of the Corporation, or shall be required by law to be otherwise signed or executed, appoint and discharge agents and employees of the Corporation, and in general, shall perform all duties incident to the office of President.  In the absence of the Chief Executive Officer or in the event of such person's inability or refusal to act, the President, if there be any, shall perform the duties of the Chief Executive Officer, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Chief Executive Officer.

Section 6.08.  The Vice Presidents. In the absence of the Chief Executive Officer or President or in the event of such persons' inability or refusal to act, the Vice President, if there be any (or in the event there be more than one Vice President, the Vice Presidents in the order designated, or in the absence of any designation, then in the order of their election), shall perform the duties of the Chief Executive Officer or President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Chief Executive Officer or President. The Vice Presidents shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

Section 6.09.  The Secretary. The Secretary shall attend all meetings of the Board of Directors and all meetings of the stockholders and record all the proceedings of the meetings of the Corporation and of the Board of Directors in a book to be kept for that purpose and shall perform like duties for the standing committees when required. The Secretary shall give, or cause to be given, notice of all

meetings of the stockholders and special meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors, Chief Executive Officer or President, under whose supervision the Secretary shall be. The Secretary shall have custody of the corporate seal of the Corporation and the Secretary, or an Assistant Secretary, shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by the Secretary's signature or by the signature of such Assistant Secretary. The Board of Directors may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing by such officer's signature.

Section 6.10. The Assistant Secretary. The Assistant Secretary, or if there be more than one, the Assistant Secretaries in the order determined by the Board of Directors (or if there be no such determination, then in the order of their election) shall, in the absence of the Secretary or in the event the Secretary is not able or refuses to act, perform the duties and exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

Section 6.11. The Treasurer. The Treasurer shall have custody of the corporate funds and securities of the Corporation. The Treasurer shall deposit all monies and valuables in the name and to the credit of the Corporation with such depositories as may be designated by the Board of Directors or the Chief Financial Officer. The Treasurer shall disburse the funds of the Corporation as may be ordered by the Board of Directors, shall render to the Chief Executive Officer, the President, the Chief Financial Officer or the Board of Directors, whenever they request it, an account of all transactions and of the financial condition of the Corporation, and shall have such other powers and perform such other duties as may be prescribed by the Board of Directors, the Chief Executive Officer or the Chief Financial Officer.

Section 6.12. The Assistant Treasurer. The Assistant Treasurer, or if there shall be more than one, the Assistant Treasurers in the order determined by the Board of Directors (or if there be no such determination, then in the order of their election), shall, in the absence of the Treasurer or in the event the Treasurer is not able or refuses to act, perform the duties and exercise the powers of the Treasurer and shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

## Article VII - CERTIFICATES OF STOCK; UNCERTIFICATED SHARES

Section 7.01. Stock Certificates. The shares of stock of the Corporation may be represented by certificates; provided that the Board of Directors may provide by resolution or resolutions that some or all of any or all classes or series of the Corporation's stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation. The certificates for shares of stock shall be in such form as the Board of Directors may from time to time prescribe.

To the extent shares are represented by a certificate, the certificate of stock shall be signed by such officer or officers of the Corporation as may be permitted by law to sign (which signatures may be facsimiles), and shall be countersigned and registered in such manner, all as the Board of Directors may

by resolution prescribe. In case any officer or officers who shall have signed or whose facsimile signature or signatures has been placed on a certificate shall cease to be such officer or officers of the Corporation, whether because of death, resignation, removal or otherwise, before such certificate or certificates shall have been issued by the Corporation, such certificate or certificates may nevertheless be issued and delivered as though the person or persons who signed such certificate or certificates, or whose facsimile signature or signatures shall have been used thereon, had not ceased to be such officer or officers of the Corporation.

Section 7.02. <u>Book-Entry Shares</u>. Shares of the Corporation's stock may also be evidenced by registration in the holder's name in uncertificated, book-entry form on the books of the Corporation. Except as otherwise expressly provided by applicable law, the rights and obligations of the holders of shares represented by certificates and the rights and obligations of the holders of uncertificated shares of the same class and series shall be identical.

Section 7.03. <u>Transfer Agents; Registrars</u>. The Board of Directors may, in its discretion, appoint responsible banks or trust companies or other qualified institutions to act as transfer agents or registrars of the stock of the Corporation. Any such bank, trust company or other qualified institution appointed to act as transfer agent or registrar of the stock of the Corporation shall transfer stock of the Corporation in accordance with its customary transfer procedures and in accordance with applicable laws and regulations.

Section 7.04. <u>Lost Certificates</u>. No uncertificated shares or no certificate for shares of stock in the Corporation shall be issued in place of any certificate alleged to have been lost, stolen or destroyed, except upon production of such evidence of such loss, theft or destruction and upon delivery to the Corporation of a bond of indemnity in such amount, upon such terms and secured by such surety, as the Board of Directors in its discretion may require.

Section 7.05. <u>Additional Rules and Regulations</u>. The Board of Directors may make such additional rules and regulations as it may deem expedient, and not inconsistent with these Bylaws, concerning the issue, transfer and registration of certificated or uncertificated shares of stock of the Corporation. All references to stock or shares in these Bylaws shall refer to either stock or shares represented by certificates or uncertificated stock, and no such reference shall be construed to require certificated shares or to grant additional or different rights or obligations as between the holders of certificated and uncertificated stock of the Corporation.

## Article VIII - MISCELLANEOUS

Section 8.01. <u>Action with Respect to Securities of Other Corporations</u>. Unless otherwise directed by the Board of Directors, the Chairman of the Board, the Chief Executive Officer, the President, or any Vice President, or any other officer of the Corporation authorized by the Chairman of the Board, the Chief Executive Officer or the President, shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of stockholders or equity holders or with respect to any action of stockholders or equity holders of any other corporation, limited liability company, partnership or other entity in which the Corporation may hold securities, and otherwise to exercise any

and all rights and powers which the Corporation may possess by reason of its ownership of securities in such other corporation, limited liability company, partnership or entity, and to dispose of such securities.

Section 8.02.  Checks and Notes.  All checks and drafts on the Corporation's bank accounts and all bills of exchange and promissory notes, and all acceptances, obligations and other instruments for the payment of money, shall be signed by such officer or officers or agent or agents as shall be thereunto authorized from time to time by the Board of Directors.

Section 8.03.  Bank Deposits and Check Authorization.  The funds of the Corporation shall be deposited to its credit in such banks, trust companies or other financial institutions as may be determined from time to time by the Chairman of the Board, Chief Executive Officer or President or any Executive Vice President and the Secretary of the Corporation, evidenced by joint written action.  By such joint written action, filed with the minutes of the Board of Directors, the Chairman of the Board or President or any Executive Vice President together with the Secretary may authorize (i) the opening of one or more deposit accounts at any institution and (ii) the designation of, or a change in the designation of, the officers or employees upon whose signature checks may be written or funds withdrawn on any Corporation account at any such institution, provided that the signature of one person other than the Chairman of the Board, President or any Executive Vice President and Secretary shall be required therefor.  By the adoption of this Section 8.03, the Board of Directors adopts the form of any resolution or resolutions requested by or acceptable to any financial institution in connection with the foregoing actions, provided that the Secretary of the Corporation (A) believes that the adoption of such resolution or resolutions is necessary or advisable and (B) files such resolution or resolutions with the minutes of the Board of Directors.

Section 8.04.  Inspection of Books.  The Board of Directors shall cause to be kept a record containing the minutes of the proceedings of the meetings of the Board of Directors and of the stockholders, appropriate stock books and registers and such books of records and accounts as may be necessary for the proper conduct of the business of the Corporation.  The Board of Directors shall have power to keep the books, documents and accounts of the Corporation outside of the State of Delaware, except as otherwise expressly provided by law.

Section 8.05.  Corporate Seal.  The Board of Directors may provide a suitable seal, including duplicates thereof, containing the name of the Corporation.

Section 8.06.  Fiscal Year.  The fiscal year of the Corporation shall be as determined by the Board of Directors.  In the absence of such determination, the fiscal year of the Corporation shall begin on the first Monday after the last Sunday in December each year and end on the last Sunday in the following December.

Section 8.07.  Section Headings.  The headings of the Articles and Sections of these Bylaws are inserted for convenience or reference only and shall not be deemed to be a part thereof or used in the construction or interpretation thereof.

Article IX - AMENDMENTS

Section 9.01. These Bylaws may be amended, altered, or repealed and new bylaws adopted by the affirmative vote of the holders of at least a majority the voting power of the shares entitled to vote thereon at any annual or special meeting thereof, or at any meeting of the Board of Directors by a majority vote.

**Exhibit 5.3.1(3) – Registration Rights Agreement**

*[To Be Filed]*

**Exhibit 5.3.2 – Directors and Officers of Reorganized Tribune**

**EXHIBIT 5.3.2**

<u>**Directors and Officers of Tribune**[1]</u>

I.    <u>**Initial Board of Directors**</u>

The Debtors anticipate that the current directors of Tribune[2] will serve on Tribune's board of directors after the Confirmation Date until the Effective Date.  Set forth below is a table that identifies the current directors of Tribune and the other affiliations of each such director. The Debtors shall supplement this <u>Exhibit 5.3.2</u> with information concerning the identity of the proposed directors of Reorganized Tribune that shall serve on and after the Effective Date as that information becomes available.

| <u>Name</u> | <u>Other Affiliations</u> |
|---|---|
| Jeffrey S. Berg | Mr. Berg is Chairman and Chief Executive Officer of International Creative Management, Inc. ("ICM"), a talent and literary agency representing clients in the fields of publishing, motion pictures, television, music and theater.  Mr. Berg was named President of ICM in 1980 and became Chairman in 1985 .  Mr. Berg is also a director of Oracle Corporation (NASDAQ: ORCL).  He is currently on the Board of Trustees of the Anderson School of Management at the University of California at Los Angeles. |
| Brian L. Greenspun | Mr. Greenspun is Chairman and Chief Executive Officer of The Greenspun Corporation, a privately owned firm based in Henderson, Nevada, with interests in media and commercial real estate development.  He also is President and Editor of the Las Vegas Sun, the oldest family-owned newspaper in Nevada. |
| Betsy D. Holden | Ms. Holden has been a senior advisor to McKinsey & Company since April 2007. Ms. Holden served as President-Global Marketing and Category Development of Kraft Foods Inc. (NYSE: KFT), a food business unit of Altria Group Inc., from January 2004 through June 2005.  Further, Ms. Holden was the Co-Chief Executive Officer of Kraft Foods Inc. from March 2001 until December 2003 and President and Chief Executive Officer of Kraft Foods North America from May 2000 until December 2003.  Ms. Holden began her career at General Foods in 1982.  Ms. Holden is also a director of Western Union Company (NYSE: WU), MediaBank LLC, and Diageo plc. |
| Randy Michaels | Mr. Michaels has been the Chief Executive Officer and a director of Tribune since December 2009.  Previously, Mr. Michaels served as Executive Vice President and Chief Operating Officer of the Company from May 2008 until December 2009, and Executive Vice President and Chief Executive Officer of Tribune Interactive, Inc. and Tribune Broadcasting Company from December 2007 until May 2008.  Mr. Michaels was the Chief Executive Officer of Local TV, LLC from early 2007 until December 2007.  Mr. Michaels was the Chief Executive Officer of Clear Channel Radio from 1999 until 2002.  Prior to 2009, Mr. Michaels was Chief Executive |

---

[1] Subject to <u>Section 13.9</u> of the Plan, the Debtors reserve the right to supplement, modify or revise this <u>Exhibit 5.3.2</u> at or prior to the Confirmation Hearing and may supplement Part I of this disclosure after the Confirmation Hearing and prior to the Effective Date if the Debtors become aware of any changes to the anticipated directors of Reorganized Tribune.

[2] Capitalized terms used in this <u>Exhibit 5.3.2</u> but not defined herein shall have the meanings ascribed to such terms in the Plan.

1

| | |
|---|---|
| | Officer of Jacor Communications. After leaving Clear Channel, Mr. Michaels started several private broadcast firms, including RadioActive and Product 1st. Mr. Michaels then began working with Oak Hill Capital Partners in early 2005 on acquisition opportunities, culminating in the creation of Local TV, LLC in 2007. |
| William A. Osborn | Mr. Osborn was the Chairman of Northern Trust Corporation (NASDAQ: NTRS), a multibank holding company, and its principal subsidiary, The Northern Trust Company, from October 1995 until November 2009. From June 1995 through December 31, 2007, Mr. Osborn also held the position of Chief Executive Officer of Northern Trust Corporation. Mr. Osborn is also a director of Caterpillar Inc. (NYSE: CAT), Abbott Laboratories (NYSE: ABT) and General Dynamics Corporation (NYSE: GD), and was a director of Northern Trust Corporation and Nicor Inc. (NYSE: GAS) within the past five years. |
| William C. Pate | Mr. Pate is a Managing Director for Equity Group Investments, L.L.C. ("EGI"), a privately held investment company founded by Sam Zell. Mr. Pate has served in various capacities for EGI since 1994, and in his present position since 2000. He is also a director of Covanta Holding Corporation (NYSE: CVA), MiddleBrook Pharmaceuticals, Inc. (NASDAQ: MBRK) and Exterran Holdings, Inc. (NYSE: EXH). Formerly Mr. Pate was a director of Adams Respiratory Therapeutics, Inc. |
| Mark Shapiro | Mr. Shapiro was the President, Chief Executive Officer and a director of Six Flags, Inc. from December 2005 through May 2010. From September 2002 through October 2005 he served as the Executive Vice President and General Manager, Programming of ESPN, Inc. From October 2005 until December 2005, Mr. Shapiro served as Chief Executive Officer of Red Zone LLC. Since January 2010, Mr. Shapiro serves as a trustee of the board of Equity Residential (NYSE: EQR), and as a director of Live Nation Entertainment Inc. (NYSE: LYV), and Frontier Communications Corporation (NYSE: FTR). |
| Maggie Wilderotter | Mrs. Wilderotter is Chairman, President and Chief Executive Officer of Frontier Communications Corporation (NYSE: FTR), the leading provider of communications services to rural America. She joined as President and Chief Executive Officer in 2004. Mrs. Wilderotter previously held positions as Senior Vice President of Worldwide Public Sector at Microsoft, President and Chief Executive Officer of Wink Communications, Inc. and Executive Vice President of National Operations for AT&T's Wireless Service, Inc. She has been a member of the Board of Directors of Procter & Gamble since 2009 and a Director of Xerox Corporation since 2006. Mrs. Wilderotter was a Director of The McClatchy Company from 2001-2007 and a Director of Yahoo! Inc. from 2007-2009. |
| Frank Wood | Mr. Wood is President and Chief Executive Officer of Secret Communications, LLC, a Cincinnati-based venture capital firm and has held this position since 1994. He is also the co-founder and principal of The Darwin Group, a venture capital firm specializing in second-stage investments, and has held this position since 1998. He is a 33-year veteran of the radio broadcast industry. He has also served as Chairman of 8e6 Technologies Corporation. Mr. Wood is also a director of Chemed Corporation (NYSE: CHE). Previously, Mr. Wood was a director at Rewards Network, Inc. (NASDAQ: DINE) until 2007. |
| Samuel Zell | Mr. Zell has served as a director of Tribune Company since May 2007, as Chairman since December 2007 and was Chief Executive Officer from December 2007 to December 2009. Mr. Zell also serves as Chairman of Equity Group Investments, L.L.C., the private investment firm he founded more than 40 years ago. Mr. Zell was a Trustee and Chairman of the Board of Trustees of Equity Office Properties Trust, an equity real estate investment trust primarily focused on office buildings, from |

October 1996 until its acquisition in February 2007, its Chief Executive Officer from April 2002 to April 2003, and its President from April 2002 until November 2002. Mr. Zell has been Chairman of the Board of Covanta Holding Corporation (NYSE: CVA), a waste-to-energy and specialty insurance services company, since September 2005, served as its President, Chairman and Chief Executive Officer from July 2002 until December 2004, and was a director from 1999 until 2004. For more than the past five years, Mr. Zell has been Chairman of Equity Lifestyle Properties, Inc. (NYSE: ELS), an equity real estate investment trust primarily engaged in the ownership and operation of manufactured home resort communities; Chairman of the Board of Trustees of Equity Residential (NYSE: EQR), an equity real estate investment trust that owns and operates multi-family residential properties; and Chairman of Capital Trust, Inc. (NYSE: CT), a specialized finance company. Mr. Zell has been a director of Anixter International Inc. (NYSE: AXE) since 1984 and its Chairman since 1985. From 2002 until 2005 Mr. Zell was the Chairman of the board of Rewards Network, Inc. (NASDAQ: DINE).

## II.    Initial Officers

Set forth below is the identity, position and other affiliations for the individuals who will serve as officers of Reorganized Tribune. In addition, Section 1129(a)(5)(B) of the Bankruptcy Code provides that the Debtors should disclose the "nature of any compensation" of any insider to be employed by Reorganized Tribune. In addition to receiving base salary, the Debtors currently expect that the officers of Reorganized Tribune may participate in certain of the compensation and benefits programs described in Sections IV.C.1, IX.G.8 and IX.H.5 of the Disclosure Statement. Certain officers of Reorganized Tribune shall also participate in the Tribune Company Management Transition Plan, a form of which is attached hereto as Annex A.

| Name | Position | Other Affiliations |
|---|---|---|
| Randy Michaels | President and Chief Executive Officer | See above. |
| Gerald A. Spector | Chief Operating Officer | Mr. Spector has been the Chief Operating Officer of the Company since December 2009. Previously, Mr. Spector was an Executive Vice President and Chief Administrative Officer since 2007. Mr. Spector is currently the Vice Chairman and Trustee of Equity Residential (NYSE: EQR). Prior to joining the Company, Mr. Spector served as a Trustee and Executive Vice President of Equity Residential since 1993 and Chief Operating Officer since 1995. Mr. Spector was also the Executive Vice President and Chief Operating Officers of Equity Group Investments, Inc. from January 1991 through January 1994 and a Director of Manufactured Homes Communities, Inc. from December 1992 through May 1995. |
| Chandler Bigelow III | Executive Vice President | Mr. Bigelow has been the Chief Financial Officer for Tribune Company since March 2008. Previously he served as the Company's Vice President, and Treasurer since 2003. Mr. Bigelow joined Tribune |

3

| | | |
|---|---|---|
| | | Company in 1998. |
| Steve Gable | Executive Vice President | Mr. Gable has served as Tribune Company's Executive Vice President and Chief Technology Officer since May, 2009. Mr. Gable has been with the Company since March, 2008, previously as Senior Vice President/Chief Technology Officer. Prior to joining Tribune Company, Mr. Gable was employed by Clear Channel in various roles, most recently as Vice President of Technology from 2004 to 2008. |
| Nils E. Larsen | Executive Vice President | Mr. Larsen is the Executive Vice President – Chief Investment Officer at Tribune Company and a Managing Director of Equity Group Investments, LLC, a private investment group. Mr. Larsen joined Tribune in December 2008 as a member of the senior leadership team managing Tribune's restructuring process and leads Tribune's investment activities. Mr. Larsen was named Managing Director at EGI in 2001 and joined EGI in 1995. Previously, Mr. Larsen worked as a financial analyst with CS First Boston in the taxable fixed-income/derivatives group. Mr. Larsen serves on the Board of Directors of American Commercial Lines Inc. (NASDAQ: ACLI) as well as serving as Tribune's board representative for Chicago Baseball Holdings, LLC (parent entity of the Chicago Cubs), Television Food Network, G.P. (owner of the Food Network cable channel) and Newsday Holdings LLC (parent entity of Newsday). |
| Donald J. Liebentritt | Executive Vice President | Mr. Liebentritt joined Tribune as Executive Vice President and General Counsel in May 2008. Mr. Liebentritt is also a Senior Advisor with EGI, and was president of EGI from 2000 until 2005. Mr. Liebentritt is currently the Chairman of the board of directors of Rewards Network, Inc. (NASDAQ: DINE), and was a director of Adams Respiratory Therapeutics, Inc. from 2005 until 2008. Currently, Mr. Liebentritt is the President and a member of the board of managers of Chai Trust Company, LLC, an Illinois registered trust company, and a director of WRS Holding Company, an environmental remediation services company. |
| Don W. Meek | Executive Vice President | Mr. Meek is the Executive Vice president/Chief Revenue Officer for Tribune Company's interactive and publishing divisions. Previously, Mr. Meek was president/national media sales for Tribune's interactive and publishing divisions, as well as president/integrated media for The Los Angeles Times. Mr. Meek held sales and media posts at Sony Pictures Entertainment, iFilm Corp, Engine, |

4

| | | and Fox Sports Net. |
|---|---|---|
| Lee Abrams | Senior Vice President | Mr. Abrams is The Tribune Company's Chief Innovation Officer. Prior to 2008, Abrams was XM's Senior Vice President and Chief Programming Officer. Abrams joined XM in June 1998. In 1989, Mr. Abrams joined ABC Radio Networks as an internal consultant. Mr. Abrams was a founding partner of Burkhart/Abrams (1972-1998), the Atlanta-based consulting giant. |
| Harry A. Amsden | Senior Vice President | Mr. Amsden has been with the Tribune Company organization for almost 24 years and has served as Senior Vice President of Financial Operations for Tribune Company since April 2008. He also currently serves as an officer of various subsidiaries of Tribune Company. Mr. Amsden was the Controller of Sentinel Communications Company in Orlando, Florida from January 1994 to December 1996, Assistant Controller of Sentinel Communications Company in Orlando, Florida from January 1988 to January 1994, Senior Operational Auditor for Tribune Company from August 1986 to January 1988. Prior to joining Tribune Company in August 1986, Mr. Amsden was an Experienced Senior Auditor in the Commercial Audit division of Arthur Andersen, LLP in Chicago. |
| Barbara Buchwald | Senior Vice President | Ms. Buchwald was named Senior Vice President of Human Resources for Tribune Corporate on June 1, 2010. Previous role was Senior Vice President of Human Resources for Local TV LLC, a role held since the company's inception on February 1, 2007. Previously, Ms. Buchwald worked for Jacor Communications, Inc. for 15 years serving as Director of Human Resources and Benefits for over 10 of those years. |
| David P. Eldersveld | Senior Vice President/ Corporate Secretary | Mr. Eldersveld has served as Senior Vice President/Deputy General Counsel and Corporate Secretary since May 2009. Mr. Eldersveld has been with the Company since 2005 also serving as Vice President/Deputy General Counsel and Corporate Secretary and as Senior Counsel/Mergers and Acquisitions. |
| Daniel G. Kazan | Senior Vice President | Mr. Kazan has served as Tribune Company's Senior Vice President, Investments (previously called Senior Vice President, Development), since May 2009, and prior to that, as the Company's Vice President, Development from July 2005 to May 2009, and various other roles, including Senior Counsel, Mergers & Acquisitions. Prior to joining the Tribune, Mr. Kazan was Vice President, Associate General Counsel and Assistant Secretary |

| | | |
|---|---|---|
| | | for Metromail Corporation, a publicly-held provider of direct marketing, database marketing and reference products. |
| Naomi B. Sachs | Senior Vice President | Ms. Sachs has been Senior Vice President, Strategy for Tribune Company since May 2009. Ms. Sachs has been with the Company for five years in various roles, including Vice President, Strategy and Director of Investments. Prior to joining the Company, Ms. Sachs was a Director in the Investment Banking Group at Merrill Lynch & Co. |
| Gary Weitman | Senior Vice President | Mr. Weitman joined Tribune Company in October, 2000 as Vice President/Corporate Communications. He was promoted to Senior Vice President/Corporate Relations in May, 2008. Mr. Weitman served on the Board of Directors for Chicago Public Radio (WBEZ) from 1999 to 2008, on the Board of Directors for the Chicago Chapter of the Public Relations Society of America from 2001 to the present, and on the Board of the Juvenile Protective Agency from 2005 to the present. Prior to joining Tribune, Mr. Weitman was Executive Director of Corporate Communications for Allied Riser, a broadband services company from October 1999 to October 2000. Before that Mr. Weitman worked as SVP/Media Relations at Hill & Knowlton, a public relations agency from March 1997 to October 1999, at WBBM-TV as Managing Editor from November 1994 to March 1997, and WFLD – TV as an executive producer from May 1993 to November 1994. Mr. Weitman started his professional career at WBBM-TV and worked in a variety of positions in news and news management from 1984 to 1993. |
| Michael G. Bourgon | Vice President | Mr. Bourgon has served as Tribune Company's Vice President, Human Resources since February 2008. Mr. Bourgon has been with the Company for 11 years in various roles, including as Director, Human Resources, Director, Leadership Development and Director, Benefits. Prior to joining Tribune Company, Mr. Bourgon was employed by Sears, Roebuck and Co. from 1997 to 1999, and by PricewaterhouseCoopers LLP from 1987 to 1997. |
| Thomas G. Caputo | Vice President | Mr. Caputo was named vice president/auditing in February 2003. Previously, Mr. Caputo served as director/auditing since March 2000 and held a series of auditing and financial positions since joining Tribune in 1993. From 1997 to 2000, he was manager of planning and analysis for the Chicago Tribune's Circulation and Consumer Marketing department. Before that he worked in the corporate |

| | | |
|---|---|---|
| | | office as manager of auditing (1996-1997), supervisor of auditing (1994-1995) and senior auditor (1993-1994). Prior to Tribune, Mr. Caputo served as internal auditor at McMaster-Carr Supply Company, from 1989 to 1993, and senior auditor at Ernst & Young, from 1986 to 1989. |
| Christopher N. Hochschild | Vice President | Mr. Hochschild joined Tribune Company in 2007 as Vice President of Strategy and currently serves as Vice President of Investments. Previously, Mr. Hochschild was an associate at Equity Group Investments, LLC from 2005 to 2007, an analyst at UBS Investment Bank from 2004 to 2005 and an analyst at Bear, Stearns & Co. from 2003 to 2004. |
| Brian F. Litman | Vice President and Controller | Mr. Litman has served as Tribune Company's Vice President and Controller since 2008. Mr. Litman has been with the Company for approximately 13 years in various roles, including Assistant Controller and Director of Planning and Financial Reporting. Mr. Litman also currently serves as an officer of various subsidiaries of Tribune Company. Prior to joining Tribune Company, Mr. Litman was employed by Borg-Warner Automotive as Manager of Planning and Financial Reporting for approximately 2 years. Mr. Litman began his career at Deloitte & Touche LLP where he served in the audit practice for 6 years. |
| Jack Rodden | Vice President/Treasurer | Mr. Rodden has served as Tribune Company's Vice President/Treasurer since 2008. Mr. Rodden has been with the Company for 10 years in various roles, including Director of Treasury & Risk and Assistant Treasurer. Mr. Rodden also currently serves as an officer of various subsidiaries of Tribune Company. Prior to joining Tribune Company, Mr. Rodden was employed by Shell Oil Company from 1988 to 2000. |
| Patrick M. Shanahan | Vice President | Mr. Shanahan joined Tribune Company in August 2001 as Vice President/Tax. Mr. Shanahan also serves as an Assistant Treasurer for all the Tribune subsidiaries. Prior to joining Tribune Company, Mr. Shanahan was a partner with KPMG LLP from April 1999 to August 2001. From July 1991 to March 1999, Mr. Shanahan was employed by Waste Management, Inc. For most of his years with Waste Management, he served as director of federal taxes (a non officer position). From September 1982 to June 1991, Mr. Shanahan was employed with Arthur Andersen & Company. He was a tax manager when he left Arthur Andersen. |
| Shaun M. Sheehan | Vice President | Mr. Sheehan was named Vice President/Washington Affairs for Tribune Company in 1992. His |

| | | |
|---|---|---|
| | | responsibilities encompass government relations, media relations as it pertains to federal policy, and liaison with the broadcast and newspaper industry associations and other allied organizations. Mr. Sheehan joined Tribune Broadcasting in 1986 in a similar capacity. Prior to that, he spent eight years with the National Association of Broadcasters (NAB) as vice president and later senior vice president of the public affairs and communications department. Before joining NAB in 1978, Mr. Sheehan was vice president and group supervisor in the Washington office of Daniel J. Edelman Inc., an international public relations firm that he joined in 1974. Mr. Sheehan is a board member of the Media Institute, and served on the public relations committees of the American Advertising Federation, the American Society of Association Executives and the President's Committee on Employment of the Handicapped. |
| William C. Trimarco | Assistant Vice President | Mr. Trimarco joined Tribune Company in May 2008 as Assistant Vice President. Prior to joining the Company Mr. Trimarco worked as a business consultant for ten years and served as Senior Vice President for Equity Residential Properties from March 1996 to May 1998. Prior to that Mr. Trimarco was with Equity Group Investments, Inc. in a variety of roles for eighteen years. |
| Nick Chakiris | Assistant Controller | Mr. Chakiris joined Tribune Company in September 2008 as Assistant Controller. Prior to joining the Company, Mr. Chakiris worked at David M. Lewis Company, LLC as a consultant serving in finance and accounting management roles for various public companies, including Tribune Company and Option Care, Inc. In addition, Mr. Chakiris has held accounting management roles at various public and private companies, including Sun-Times Media Group, Inc. and Chart House Enterprises, Inc. |

# ANNEX A

## TRIBUNE COMPANY
## MANAGEMENT TRANSITION PLAN

1.      <u>Purpose</u>.  The purpose of the Tribune Company Management Transition
Plan (the "<u>Transition Plan</u>") is to provide severance benefits to a group of employees of the
Company and certain of its Affiliates that constitutes a "select group of management or highly
compensated employees" within the meaning of Department of Labor Regulation § 2520.104-24.
The Transition Plan is intended to secure the continued services and continued dedication of
Employees following the Effective Date.

2.      <u>Definitions</u>.

"<u>Affiliate</u>" shall mean, with respect to any Person, any other Person controlling,
controlled by or under common control with such particular Person, where "control" means the
possession, directly or indirectly, of the power to direct the management and policies of a Person
whether through the ownership of voting securities, contract or otherwise.

"<u>Bankruptcy Court</u>" shall mean the United States Bankruptcy Court for the
District of Delaware.

"<u>Bankruptcy Proceedings</u>" shall mean the bankruptcy proceedings in the United
States Bankruptcy Court for the District of Delaware with respect to <u>In re:  Tribune Company, et.
al.</u>, Case No. 08-13141 (KJC).

"<u>Base Salary</u>" shall mean an Employee's rate of annual base salary as in effect (i)
immediately prior to his or her Termination Date or (ii) immediately prior to or on the Effective
Date, in each case whichever is greater.

"<u>Board</u>" shall mean the Board of Directors of the Company.

"<u>Cause</u>" shall mean conduct involving dishonesty or willful misconduct that, in
either case, is detrimental in a material way to the business of the Company or any of its
Affiliates.

"<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended.

"<u>Committee</u>" shall mean the Compensation Committee of the Board consisting of
three or more members of the Board, each of whom is (i) a "Non-Employee Director" within the
meaning of Rule 16b-3 under the Exchange Act, (ii) an "outside director" within the meaning of
section 162(m) of the Code and (iii) "independent" within the meaning of the rules of the
principal national stock exchange on which the common stock of the Company is then traded.

"<u>Company</u>" shall mean Tribune Company, a Delaware corporation, or any
successor thereto.

"<u>Corporate Transaction</u>" shall mean a reorganization, merger or consolidation or
sale or other disposition of all or substantially all of the assets of the Company.

"Effective Date" shall mean the date as of which the Plan of Reorganization becomes effective.

"Employee" shall mean any individual identified on Exhibit A.

"Good Reason" shall mean, with respect to an Employee, any of the following:

>    (i)    a material reduction in the Employee's authority, duties or responsibilities;

>    (ii)    a reduction by the Company in the Employee's annual rate of base salary or target bonus (other than pursuant to any broad-based reduction or furlough policy);

>    (iii)    a change in the Employee's primary employment location to a location that is more than 50 miles from the primary location of the Employee's employment; or

>    (iv)    any attempt by the Company to change the Employee's inclusion as an Employee on Exhibit A to this Transition Plan, or to change his or her severance multiple or severance payment formula or eligibility for continuation of group medical benefits, as set forth in each case on Exhibit A, in a manner adverse to such Employee (which attempted change shall, in any such event, be null and void).

Notwithstanding the foregoing provisions of this definition, no act or omission shall constitute Good Reason (x) unless the Employee gives the Committee notice of the existence of a condition the Employee believes constitutes Good Reason within 90 days after the initial existence of the condition, and the Company fails to cure such act or omission within 30 days after receipt of such notice or (y) if the Employee consented in writing to such act or omission.

"Interest Rate" shall mean a rate equal to the prime rate, as published under "Money Rates" in *The Wall Street Journal* from time to time.

"Nonqualifying Termination" shall mean the termination of an Employee's employment (i) by the Company or any of its Affiliates for Cause, (ii) by the Employee for any reason other than Good Reason, (iii) as a result of the Employee's death, (iv) by the Company or any of its Affiliates due to the Employee's inability to perform his or her duties with the Company on a full-time basis for at least 180 consecutive days as a result of the Employee's incapacity due to physical or mental illness, injury or condition (whether an Employee has such incapacity shall be determined by a physician selected by the Committee or the Company's insurers, which physician shall be reasonably acceptable to the Employee (or the Employee's legal representative)), or (v) in connection with a sale or other disposition of assets or equity by the Company or one of its Affiliates if the Employee is within a reasonable time following the transaction offered comparable employment by the purchaser or acquirer of such assets or equity or one of its Affiliates; *provided, however*, that employment shall not be deemed comparable if such purchaser or acquirer does not agree (i) to honor the terms of the Transition Plan with

respect to such Employee or (ii) to provide other severance benefits that, in the aggregate, are at least as favorable as those provided under the Transition Plan.

"Notice Period" shall have the meaning assigned to such term in Section 9(a).

"Person" shall mean any individual, group, firm, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, joint venture, association, trust, estate or other entity.

"Plan of Reorganization" shall mean the plan of reorganization approved, confirmed and made effective pursuant to the Bankruptcy Proceedings.

"Protection Period" shall mean the period commencing on the Effective Date and ending on the earlier to occur of (i) the date that is eighteen (18) months after the Effective Date and (ii) the Employee's death.

"Release Agreement" shall have the meaning assigned to such term in Section 3(a).

"Separation from Service" shall mean a "separation from service" as defined in Treasury Regulation § 1.409A-1(h).

"Target Bonus" shall mean the bonus an Employee would be entitled to receive under the Company's Management Incentive Plan (or any successor bonus plan) with respect to the year in which his or her Termination Date occurs, or, if greater, the most recent year in which the Employee was entitled to a bonus, assuming in each case that his or her bonus was earned thereunder at "target level" and the Employee remained employed by the Company on the bonus payment date.

"Termination Date" shall mean the date on which the Employee incurs a Separation from Service other than by reason of a Nonqualifying Termination.

3.    Payments and Benefits Upon Separation from Service.

(a)    Severance Benefits. If an Employee incurs a Separation from Service (other than by reason of a Nonqualifying Termination) during the Protection Period and the Employee (or the Employee's executor or other legal representative in the case of the Employee's death or disability following the Employee's Separation from Service) executes an agreement containing a general release of all claims in a form reasonably acceptable to the Committee (the "Release Agreement"), within sixty 60 days following the Termination Date and does not revoke the Release Agreement (to the extent a revocation option is provided therein), the Company shall provide to the Employee, as compensation for services rendered to the Company, and in consideration of the Release Agreement:

(i)    a lump sum cash payment (subject to any applicable payroll or other taxes required to be withheld pursuant to Section 5) in an amount equal to the severance amount determined in accordance with Exhibit A, and

3

(ii)      the opportunity to continue the Employee's group medical benefits for the period of time determined in accordance with Exhibit A upon the same terms and otherwise to the same extent as such coverage is provided to active employees of the Company or its Affiliates who have an employment position similar to the employment position held by the Employee on his or her Termination Date, and the Company and the Employee shall share the costs of the continuation of such coverage in the same proportion as such costs are shared between the Company and such active employees of the Company or its Affiliates; *provided, however,* that in the event that the Company is unable to provide the continuation coverage pursuant to this Section under the terms of the applicable group medical plan, practice, program or applicable law without adverse tax or other consequences to the Company or the Employee, the Company shall reimburse the Employee for the cost incurred by the Employee to obtain coverage comparable to the continuation coverage.

Subject to Section 20, the payment of lump sum severance benefits described in clause (i) above, to the extent payable hereunder, shall be paid on the seventieth (70th) day following the Termination Date.

      (b)      In addition, if the employment of an Employee shall terminate for any reason, then the Employee shall be entitled to the following without regard to whether a Release Agreement is executed:  (i) a cash amount (subject to any applicable payroll or other taxes required to be withheld pursuant to Section 5) equal to the sum of the Employee's prorated annual base salary from the Company and its Affiliates for services performed through the Termination Date, and any accrued but unused vacation pay, in each case to the extent not theretofore paid, and (ii) subject to Section 8, the vested benefits and amounts, if any, provided under the terms of any employee benefit plan or compensation program in which the Employee participates at the time such benefits and amounts are permitted to be paid or distributed under the terms of such plan or program.

      4.      Claims Procedure.  If any Employee or other Person believes he or she is entitled to benefits in an amount greater than those which he or she is receiving or has received, he or she may file a written claim with the president of the Company.  Such claim shall state the nature of the claim, the facts supporting the claim, the amount claimed, and the address of the claimant.  The president of the Company shall review the claim and shall, within 90 days after receipt of the claim, give written notice by registered or certified mail to the claimant of the president's decision with respect to the claim.  If special circumstances require an extension of time, the claimant shall be so advised in writing within the initial 90-day period and in no event shall such an extension exceed 90 days.  The notice of the Company's decision with respect to the claim shall be written in a manner designed to be understood by the claimant and, if the claim is wholly or partially denied, the notice shall set forth (i) the specific reasons for the denial, (ii) specific references to the pertinent Transition Plan provisions on which the denial is based, (iii) a description of any additional material or information necessary for the claimant to perfect the claim and an (iv) explanation of why such material or information is necessary, and an explanation of the claim review procedure under the Transition Plan.  The Company shall also advise the claimant that the claimant or his or her duly authorized representative may request a

review of the denial by the chair of the Committee by filing with the Company within 60 days after notice of the denial has been received by the claimant, a written request for such review. The claimant shall be informed that he or she may have reasonable access to pertinent documents and submit comments in writing to the chair of the Committee within the same 60-day period. If a request is so filed, review of the denial shall be made by the chair of the Committee within 60 days after receipt of such request unless special circumstances require an extension, and the claimant shall be given written notice of the chair of the Committee's final decision. If special circumstances require an extension of time, the claimant shall be so advised in writing within the initial 60-day period and in no event shall such an extension exceed 60 days. The notice of the Chair of the Committee's final decision shall include specific reasons for the decision and specific references to the pertinent Transition Plan provisions on which the decision is based and shall be written in a manner designed to be understood by the claimant.

        5.    <u>Withholding Taxes</u>. The Company may withhold from all payments due under the Transition Plan to each Employee (or his or her beneficiary or estate) all taxes which, by applicable federal, state, local or other law, the Company determines are required to be withheld.

        6.    <u>Amendment</u>. The Transition Plan may not be amended with respect to any Employee without the written consent of such Employee. The Transition Plan shall terminate only after all of the Company's obligations under the Transition Plan have been satisfied in their entirety.

        7.    <u>Reimbursement of Expenses; Interest on Late Payments</u>.

        (a)    If any contest or dispute shall arise under the Transition Plan involving termination of the Employee's employment with the Company or an Affiliate or involving the failure or refusal of the Company to perform fully in accordance with the terms hereof, the Company shall reimburse the Employee, on a current basis, for all legal fees and expenses, if any, incurred by the Employee in connection with such contest or dispute, together with interest thereon at a rate equal to the Interest Rate, but in no event higher than the maximum legal rate permissible under applicable law, such interest to accrue from the date the Company receives the Employee's written statement for such fees and expenses through the date of payment thereof; *provided, however*, that in the event the resolution of any such contest or dispute includes a finding completely denying the Employee's claims in such contest or dispute, the Employee shall be required to reimburse the Company, over a period of six (6) months from the date of such resolution, for all sums advanced to the Employee pursuant to this Section 7(a); *provided further*, that if the Employee fails to so reimburse the Company, the Company can withhold the amounts owed by the Employee from any payments owed by the Company or any of its Affiliates to the Employee, except as otherwise provided by law.

        (b)    With respect to any and all payments that are required to be made by the Company to an Employee pursuant to the Transition Plan and that are not made within the time period specified herein, the Company shall pay to the Employee interest on such payments at the Interest Rate plus 300 basis points, but in no event higher than the maximum legal rate permissible under applicable law. Such interest shall accrue from the due date of the required payment through the date on which such payment is made to the Employee.

(c)    For the avoidance of doubt and to ensure compliance with section 409A of the Code, (i) reimbursements by the Company under this Section 7 or under Section 3(a)(ii) shall be made promptly, but in any event on or before the last day of the taxable year following the taxable year in which the relevant expense is incurred, (ii) the amount of expenses eligible for reimbursement during a taxable year may not affect the expenses eligible for reimbursement in any other taxable year, and (iii) this Section 7 shall be applicable only to expenses incurred during the lifetime of the Employee.

8.    Entire Agreement.  Subject to Section 9(a) and the terms of an arrangement, agreement or other contract, if any, that becomes effective with respect to an Employee after the Effective Date and that specifically provides for treatment other than that described in the first sentence of this Section 8, any amount paid pursuant to the Transition Plan shall be paid in lieu of, and the Employee shall be deemed to have waived his or her right to separate payment of, any other amount of severance relating to salary or bonus continuation, any other continuation of medical, dental or life insurance coverage (other than coverage required by the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended) or any outplacement services to be received by the Employee upon termination of employment of the Employee under any severance plan, policy or arrangement of the Company or any of its Affiliates or any agreement with the Company or any of its Affiliates. Subject to the foregoing, the rights of, and benefits payable to, an Employee pursuant to the Transition Plan are in addition to any rights of, or benefits payable to, an Employee under any other employee benefit plan or compensation program of the Company. All rights of an Employee under any such plan or program shall be determined in accordance with the provisions of such plan or program.

9.    Offset; Mitigation.

(a)    If the Company is obligated by law or a post-petition contract that was in effect prior to the Effective Date or a pre-petition contract that becomes fully binding on the "Reorganized Debtors" (as defined in the Plan of Reorganization) as a result of being assumed by the Company or an Affiliate under the Plan of Reorganization to pay severance pay, notice pay or other similar benefits, or if the Company is obligated by law or by an aforementioned contract to provide advance notice of separation ("Notice Period"), then any payments hereunder shall be reduced by the amount of any such severance pay, notice pay or other similar benefits, as applicable, and by the amount of any severance pay, notice pay or other similar benefits received during any Notice Period, to the extent permitted under section 409A of the Code.

(i)    If an Employee is entitled to severance pay under an arrangement (including an arrangement that provides for severance pay in different circumstances than those described in the Transition Plan) that is a post-petition contract that was in effect prior to the Effective Date or that is a pre-petition contract that becomes fully binding on the "Reorganized Debtors" (as defined in the Plan of Reorganization) as a result of being assumed by the Company or an Affiliate under the Plan of Reorganization (a "pre-existing severance arrangement"), and the aggregate amount of severance pay provided under such pre-existing severance arrangement is greater than the aggregate amount of severance pay provided under the Transition Plan, then, to the extent necessary to conform to the requirements of section 409A of the Code, the Employee shall receive his or her severance pay only under, and at the time and in the form of payment provided for

6

in, such pre-existing severance arrangement and not this Transition Plan. If the aggregate amount of severance pay provided under the Transition Plan is greater than the aggregate amount of severance pay provided under a pre-existing severance arrangement, then (A) an amount equal to the maximum aggregate amount payable under the pre-existing severance arrangement shall be paid to the Employee only under, and in the time and form of payment provided for in, such pre-existing severance arrangement and not this Transition Plan, and (B) the difference between the aggregate amount of severance pay provided under the Transition Plan and the maximum aggregate amount payable under the pre-existing severance arrangement shall be paid to the Employee only under, and in the time and form of payment provided for in, the Transition Plan and not the pre-existing severance arrangement. For purposes of this paragraph, the time value of money shall not be taken into account when comparing the aggregate amount of severance pay available under the Transition Plan and any pre-existing severance arrangement.

(ii) In addition, to the extent any pre-existing severance arrangement provides for the continuation of group medical benefits (A) for a period of time that is longer than the duration of such benefits under the Transition Plan or (B) at a cost to the Employee that is lower than the cost described in the Transition Plan, then such continuation of group medical benefits shall be provided only pursuant to the terms of such pre-existing severance arrangement and not the Transition Plan to the extent such continuation would not result in a violation of any applicable law. In the event that such benefits are provided pursuant to the pre-existing severance arrangement on account of clause (B) and the Transition Plan provides continuation benefits for a longer period of time than such pre-existing severance arrangement, then the continuation of benefits following the end of the continuation period under the pre-existing severance arrangement shall be provided pursuant to the terms of the Transition Plan.

(b) If an Employee is entitled to rejection damages in respect of severance pay, notice pay, or other similar benefits pursuant to any contract, plan or other arrangement that was in effect prior to the Effective Date and that was rejected pursuant to the Bankruptcy Proceedings, then the amount of any payments hereunder shall be reduced by the amount of any such rejection damages. By accepting any payment or other benefit under this Transition Plan, an Employee shall be deemed to have waived his or her any right to any such rejection damages which could become payable after receiving such payments or other benefits under this Transition Plan.

(c) In no event shall an Employee be obligated to seek other employment or to take other action by way of mitigation of the amounts payable and the benefits provided to such Employee under any of the provisions of the Transition Plan, and such amounts and benefits shall not be reduced whether or not such Employee obtains other employment.

10. Unfunded Plan. The Transition Plan shall not be funded. No Employee entitled to benefits hereunder shall have any right to, or interest in, any specific assets of the Company, but an Employee shall have only the rights of a general creditor of the Company to receive benefits on the terms and subject to the conditions provided in the Transition Plan.

11.    Payments to Minors, Incompetents and Beneficiaries.  Any benefit payable to or for the benefit of a minor, an incompetent individual or other individual incapable of giving a receipt therefor shall be deemed paid when paid to such individual's guardian or to the party providing or reasonably appearing to provide for the care of such individual, and such payment shall fully discharge the Company, the Committee and all other parties with respect thereto.  If an Employee shall die while any amounts would be payable to the Employee under the Transition Plan had the Employee continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of the Transition Plan to such Person or Persons appointed in writing by the Employee to receive such amounts or, if no Person is so appointed, to the estate of the Employee.

12.    Non-Assignability.  None of the payments, benefits or rights of any Employee shall be subject to any claim of any creditor, and, in particular, to the fullest extent permitted by law, all such payments, benefits and rights shall be free from attachment, garnishment, trustee's process or any other legal or equitable process available to any creditor of such Employee.  Except as otherwise provided herein or by law, no right or interest of any Employee under the Transition Plan shall be assignable or transferable, in whole or in part, either directly or by operation of law or otherwise, including without limitation by execution, levy, garnishment, attachment or pledge; no attempted assignment or transfer thereof shall be effective; and no right or interest of any Employee under the Transition Plan shall be subject to any obligation or liability of such Employee.

13.    No Rights to Continued Employment.  None of (i) the adoption of the Transition Plan, (ii) any amendment hereof, (iii) the creation of any fund, trust or account, (iv) the payment of any benefits or (v) participation in the Transition Plan, shall be construed as giving any Employee the right to be retained in the service of the Company, and all Employees shall remain subject to discharge to the same extent as if the Transition Plan had not been adopted.  Except as otherwise provided in a written agreement signed by an authorized representative of the Company or one of its Affiliates, each Employee's employment with the Company is, and continues to be, "at-will," with either party having the right to terminate the employment relationship at any time, with or without cause or advance notice.  By participating in the Transition Plan, each Employee acknowledges his or her at-will employment status and that such at-will status may be changed only by a written agreement signed by the Employee and an authorized representative of the Company or one of its Affiliates.

14.    Successors; Binding Agreement.  The Transition Plan shall inure to the benefit of and be binding upon the beneficiaries, heirs, executors, administrators, successors and assigns of the parties, including each Employee, present and future, and any successor to the Company or one of its Affiliates.  The Transition Plan shall not be terminated by any Corporate Transaction whereby the Company is or is not the surviving or resulting Person or as a result of any transfer of all or substantially all of the assets of the Company.  In the event of any Corporate Transaction, the provisions of the Transition Plan shall be binding upon the surviving or resulting Person or the Person to which such assets are transferred.  The Company agrees that concurrently with any Corporate Transaction referred to in this Section 14, the Company will cause any surviving or resulting Person or transferee unconditionally to assume all of the obligations of the Company hereunder.  To the extent the Company sells or otherwise disposes of all or substantially all of the assets or equity of an Affiliate during the Protection Period, the

8

Company agrees that concurrently with such sale or disposition, the Company will cause the acquirer of such assets or equity to agree to honor the terms of the Transition Plan with respect to each Employee who had been employed by such Affiliate immediately before such sale or disposition.

15.    Headings.  The headings and captions herein are provided for reference and convenience only, shall not be considered part of the Transition Plan and shall not be employed in the construction of the Transition Plan.

16.    Notices.  Any notice or other communication required or permitted pursuant to the terms hereof shall have been duly given when delivered or mailed by United States mail, first class, postage prepaid, addressed to the intended recipient at his, her or its last known address.

17.    Effective Date.  The Transition Plan shall be submitted to the Bankruptcy Court for approval in connection with the Plan of Reorganization and, if approved, shall become effective as of the Effective Date.

18.    Employment with Affiliates.  For purposes of the Transition Plan, employment with the Company shall include employment with any Affiliate.

19.    Governing Law; Validity.  The Transition Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Delaware (without regard to principles of conflicts of laws) to the extent not preempted by Federal law, which shall otherwise control.  If any provision of the Transition Plan shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision hereof, and the Transition Plan shall be construed and enforced as if such provision had not been included.

20.    Compliance with section 409A of Code.  The Transition Plan is intended to comply with the provisions of section 409A of the Code, and shall be interpreted and construed accordingly.  Payments provided herein are intended to be exempt from section 409A of the Code to the maximum extent possible, under either the separation pay exemption pursuant to Treasury regulation § 1.409A-1(b)(9)(iii) or as short-term deferrals pursuant to Treasury regulation § 1.409A-1(b)(4).  The Company shall have the discretion and authority to amend the Transition Plan at any time to satisfy any requirements of section 409A of the Code or rulings or other guidance published by the U.S. Treasury Department interpreting section 409A of the Code.  Notwithstanding the foregoing, in no event shall the Company, any of its Affiliates, any of its agents, or any member of the Board have any liability for any taxes imposed in connection with a failure of the Transition Plan to comply with section 409A of the Code.  Notwithstanding any other provision in this Transition Plan, if an Employee is a "specified employee," as defined in section 409A of the Code, as of the date he or she incurs a Separation from Service, then to the extent any amount payable under this Transition Plan constitutes the payment of nonqualified deferred compensation, within the meaning of section 409A of the Code and would be payable prior to the six-month anniversary of such Separation from Service, payment of such amount shall be delayed until the earlier to occur of (a) the six-month anniversary of such Separation from Service and (b) the date of the Employee's death.

IN WITNESS WHEREOF, the Company has caused the Transition Plan to be adopted as of the _____ of _____, _____.

TRIBUNE COMPANY

By: _____

Title: _____

## EXHIBIT A -- EMPLOYEES

Each individual described on the following page shall be an Employee under the Transition Plan, and shall be eligible for the lump sum cash severance payment described on the following page pursuant to the terms of the Transition Plan. The job titles listed on the following page apply only to the specific individuals who hold such respective titles as of the date of filing of the "Plan Supplement" (as defined in the Plan of Reorganization). Except as described below, a change in any such individual's title prior to, on or after the Effective Date shall not adversely affect such individual's status as an Employee in this Transition Plan or the payments or benefits for which he or she is eligible as specified in this Transition Plan. "Base Salary" and "Target Bonus" as used herein shall have the meanings set forth in the Transition Plan. For purposes of determining the benefits to which an Employee is entitled pursuant to Section 3(a)(ii) of the Transition Plan, the individuals identified as being "Group A Employees" (the "Group A Employees") on the following page shall be eligible to continue to receive group medical benefits for twenty-four (24) months as set forth in 3(a)(ii) of the Transition Plan, and the individuals identified as being "Group B Employees" ("Group B Employees") on the following page shall be eligible to continue to receive group medical benefits for eighteen (18) months as set forth in Section 3(a)(ii) of the Transition Plan. Notwithstanding the foregoing, at any time prior to the Effective Date, the Company may, after giving the signatories to the "Settlement Support Agreement" and to the "Creditors' Committee" (each as defined in the Plan of Reorganization) reasonable notice and an opportunity to object, add or remove any individual (without such individual's consent) from the list of individuals on the following page that are identified as Group A Employees or Group B Employees. To the extent an individual is so added, the Transition Plan shall be interpreted as though such individual was identified as a Group A Employee or Group B Employee, as applicable, as of the date of filing of the "Plan Supplement" (as defined in the Plan of Reorganization). To the extent an individual is so removed, he or she shall have no rights under this Transition Plan, notwithstanding the immediately preceding sentence of this Exhibit A, the second and third sentences of this Exhibit A or Section 6 of this Transition Plan.

| | Group A Initial Employees | | Severance |
|---|---|---|---|
| | | | Multiple of Sum of Base |
| | Job Title | Company | Salary + Target Bonus |
| 1 | Chief Executive Officer | Tribune Company | 2.50 |
| 2 | Chief Operating Officer | Tribune Company | 2.25 |
| 3 | Publisher & CEO/LA Times | Los Angeles Times | 1.75 |
| 4 | EVP/Chief Legal Officer | Tribune Company | 1.75 |
| 5 | EVP/Tribune Publishing | Tribune Publishing | 1.75 |
| 6 | President/Tribune Interactive | Tribune Company | 1.75 |
| 7 | President/Tribune Broadcasting | Tribune Company | 1.75 |
| 8 | EVP/Chief Financial Officer | Tribune Company | 1.75 |
| 9 | President, Publisher & CEO | Chicago Tribune | 1.75 |
| 10 | EVP/Chief Investment Officer | Tribune Company | 1.75 |
| 11 | EVP/Chief Technology Officer | Tribune Company | 1.75 |

| | Group B Initial Employees | | Severance |
|---|---|---|---|
| | | | Multiple of Base |
| | Job Title | Company | |
| 1 | VP/General Manager, KTLA-TV | KTLA-TV | 1.50 |
| 2 | EVP/Int & Broadcast Sales | Tribune Broadcasting | 1.50 |
| 3 | EVP/Sales & Distribution | WGN America | 1.50 |
| 4 | President/Tribune365 | Tribune365 | 1.50 |
| 5 | EVP | KSWB-TV | 1.50 |
| 6 | VP/General Manager, WGN-TV | WGN-TV | 1.50 |
| 7 | President & CEO/Sun-Sentinel | Sun Sentinel | 1.50 |
| 8 | SVP/Chief Innovation Officer | Corporate Office | 1.50 |
| 9 | CEO, President & Publisher | The Hartford Courant | 1.50 |
| 10 | Publisher & CEO/ Baltimore Sun | The Baltimore Sun | 1.50 |
| 11 | SVP/Programming & Development | Tribune Broadcasting | 1.50 |
| 12 | SVP/News & News Operations | Tribune Broadcasting | 1.50 |
| 13 | VP/General Manager, KDAF-TV | KDAF-TV | 1.50 |
| 14 | SVP/Deputy Gnl Csl & Corp Secy | Corporate Office | 1.50 |
| 15 | SVP/GM, KCPQ/KMYQ/KRCW | KCPQ-TV | 1.50 |
| 16 | VP/General Manager, WGN-AM | WGN-AM | 1.50 |
| 17 | President & CEO/TMS | Tribune Media Services | 1.50 |
| 18 | VP/General Manager, WXIN-TV | WXIN-TV | 1.50 |
| 19 | SVP/CFO | Tribune Interactive | 1.50 |
| 20 | VP/General Manager, WPHL-TV | WPHL-TV | 1.50 |
| 21 | VP/General Manager, WXMI | WXMI | 1.50 |
| 22 | SVP/Human Resources | Corporate Office | 1.50 |
| 23 | SVP/Financial Operations | Corporate Office | 1.50 |
| 24 | SVP/Administration & CFO | Tribune Broadcasting | 1.50 |
| 25 | VP/General Manager, WDCW-TV | WDCW - TV | 1.50 |
| 26 | EVP/TRG | Tribune Interactive | 1.50 |
| 27 | VP/General Manager, WPMT-TV | WPMT-TV | 1.50 |
| 28 | President & CEO/Daily Press | The Daily Press | 1.50 |
| 29 | VP/General Manager, KIAH-TV | KIAH - TV | 1.50 |
| 30 | VP/General Manager, WGNO/WNOL | WGNO-TV | 1.50 |
| 31 | SVP/Engineering | Tribune Broadcasting | 1.50 |
| 32 | SVP/Coporate Relations | Corporate Office | 1.50 |