**Exhibit 5.6 – Terms of New Senior Secured Term Loan Agreement**

Exhibit 5.6 to the Amended Joint Plan of reorganization for Tribune Company and Its Subsidiaries (as amended, modified or supplemented, the "Plan")[1]

## REORGANIZED TRIBUNE

### Senior Secured Term Loan Facility

Summary of Certain Terms and Conditions

| | |
|---|---|
| **Borrower:** | Reorganized Tribune |
| **Lenders:** | Initially, holders of Senior Loan Claims, Senior Loan Guaranty Claims, Senior Noteholder Claims and Bridge Loan Claims to the extent provided for in the Plan (the "**Lenders**"). |
| **Administrative Agent:** | An agent or agents of national stature to be selected by the Debtors (the "**Administrative Agent**"). |
| **Collateral Agent:** | An agent or agents of national stature to be selected by the Debtors (the "**Collateral Agent**"). |
| **Term Loan Facility:** | Senior secured term loan facility (the "**Term Loan Facility**") comprising a single tranche of term loans (the "**Term Loans**") in an amount to be determined, in good faith, by the settlement committee of holders of Senior Loan Claims (the "**Senior Lender Settlement Committee**") and the Debtors, not to exceed the Term Loan Facility Cap distributed to the Lenders in accordance with the terms of the Plan. |
| **Term Loan Facility Cap:** | The lesser of (i) the product of (a) two (2) *multiplied by* (b) the Credit Parties' trailing twelve month OCF (to be defined in the Term Facility Documents) as of the end of the fiscal quarter most recently ended prior to the Effective Date before the equity investments and (ii) $1.2 billion. |
| **Effective Date:** | The effective date of the Plan. |
| **Documentation:** | Usual for facilities and transactions of this type and reasonably acceptable to the Borrower and the Lenders, to include, among others, a credit agreement, guarantees and appropriate pledge, security interest, mortgage, deposit account and other collateral documents (collectively, the "**Term Facility Documents**"). |

---

[1] Subject to section 13.9 of the Plan, the Debtors reserve the right to supplement, modify or revise this Exhibit 5.6 at any time prior to the Effective Date.

| | |
|---|---|
| **Guarantors:** | Each of the Borrower's wholly owned domestic subsidiaries (other than any entity that is otherwise excluded in the loan documentation as determined by the Senior Lender Settlement Committee and the Debtors acting in good faith) existing on the Effective Date or thereafter created (including through the Restructuring Transactions (as defined in the Plan (as defined below))) or acquired shall unconditionally guarantee, on a joint and several basis, all obligations of the Borrower under the Term Loan Facility, any interest rate protection or other hedging agreements relating to the Term Loan Facility and cash management obligations entered into with a Lender or an affiliate of a Lender (collectively, the "**Secured Obligations**"), up to the maximum amount possible without violating applicable fraudulent conveyance laws.<br><br>Each guarantor of the Term Loan Facility is herein referred to as a "**Guarantor**" and its guarantee is referred to herein as a "**Guarantee**." The Borrower and each Guarantor are herein referred to collectively as the "**Credit Parties**" and individually referred to as a "**Credit Party**." The Guarantors will also guarantee the New Working Capital Facility. |
| **Related Working Capital Facility:** | The Term Facility Documents will contemplate that the Borrower and/or certain of its wholly owned subsidiaries may incur on the Effective Date a separate asset-based loan facility (the "**New Working Capital Facility**") under arrangements reasonably satisfactory to the Lenders, in an aggregate principal amount of up to $300 million, with a letter of credit sub-facility of up to $100 million, all subject to availability. The New Working Capital Facility will be secured by (i) a first-priority security interest in certain accounts receivable and inventory of the Credit Parties (to the extent included in the borrowing base of the New Working Capital Facility) and cash proceeds thereof (the "**New Working Capital Facility Priority Collateral**") and (ii) a second priority security interest in the Term Facility Priority Collateral. |
| **Security:** | The Secured Obligations will be secured by all of the following of the Borrower and each Guarantor, whether owned on the closing date of the Term Loan Facility or thereafter created or acquired, on a first-priority basis (the "**Term Facility Priority Collateral**): (i) a lien on and security interest in, and pledge of, all of the capital stock (excluding direct equity interests in joint ventures ("**Joint Venture Interests**"), but including interests in any holding company holding such Joint Venture Interests) and intercompany notes owned by the Borrower and each other Credit Party, except that only 66% of the capital stock of |

2

|  |  |
|---|---|
|  | "first-tier" non-U.S. subsidiaries shall be pledged and (ii) a lien on, and security interest in, all other tangible and intangible properties and assets (including, without limitation, all contract rights, inventory, certain real estate assets, intellectual property, trade names, equipment, licenses and proceeds of the foregoing, but excluding in any event (a) the New Working Capital Facility Priority Collateral, (b) FCC licenses, but only to the extent such security interest would violate applicable law (but not the proceeds thereof), (c) motor vehicles as to which a security interest and perfection thereof is required to be effected by recordings of certificates of title under applicable state law, (d) those properties and assets for which the costs of obtaining such security interest are excessive in relation to the value of the security to be afforded thereby in the good faith judgment of the Administrative Agent, and (e) other assets as agreed by the Lenders and as set forth in the loan documentation). |
|  | The Secured Obligations will also be secured by a second priority security interest in the New Working Capital Facility Priority Collateral. |
| **Ranking:** | The Term Loan Facility will be a senior obligation of the Borrower, secured by first priority liens on the Term Facility Priority Collateral of the Borrower and a second priority security interest in the New Working Capital Facility Priority Collateral of the Borrower. The Guarantees will be senior obligations of each Guarantor, secured by first priority liens on the Term Facility Priority Collateral of such Guarantor and a second priority security interest in the New Working Capital Facility Priority Collateral of such Guarantor. |
| **Final Maturity:** | Sixth anniversary of the Effective Date. |
| **Amortization:** | 1% of the initial principal amount of the Term Loans on an annualized basis payable in quarterly installments, beginning on the last day of the first full fiscal quarter following the Effective Date, with the balance payable on the final maturity date. |
| **Interest Rate and Periods:** | The Term Loans will bear interest, at the election of the Borrower, at a per annum rate equal to (i) the sum of Adjusted LIBOR in effect from time (subject to the LIBOR Floor referred to below) plus the Applicable Margin or (ii) the sum of the ABR in effect from time to time plus the Applicable Margin. |
|  | As used above: |

"**ABR**" means a rate per annum equal to the highest of (i) the rate of interest publicly announced by the Administrative Agent as its prime rate in effect at its principal office in New York City, (ii) the secondary market rate for three-month certificates of deposit (adjusted for statutory reserve requirements) *plus* 1.0%, (iii) the federal funds effective rate from time to time *plus* 0.5% and (iv) 4.00%.

"**Adjusted LIBOR**" means LIBOR, as adjusted for statutory reserve requirements for eurocurrency liabilities.

"**Applicable Margin**" means a separate basis point margin for Term Loans bearing interest based on Adjusted LIBOR and Term Loans bearing interest based on ABR, in each case to be determined by the Debtors and the Senior Lender Settlement Committee, in good faith, in consultation with each other and acting in the best interest of the company, and intended to make the Term Loans trade at par in light of market conditions as of the Effective Date.

"**LIBOR**" means the rate at which eurodollar deposits in the London interbank market for one, three or six months (as selected by the Borrower) are quoted on the Telerate screen.

"**LIBOR Floor**" means an interest rate floor consistent with market conditions for loan facilities of this type as determined by the Debtors and the Senior Lender Settlement Committee, in good faith, in consultation with each other and acting in the best interests of the company, and intended to make the Term Loans trade at par in light of market conditions as of the Effective Date.

The Borrower may elect interest periods, for Term Loans bearing interest based on LIBOR, of one, three or six months; *provided* that interest is payable not less frequently than quarterly.

**Default Rate:** During the continuance of an Event of Default under the Term Facility Documents, interest on the Term Loans and other obligations under the Term Loan Facility shall bear interest at the applicable interest rate (including the Applicable Margin) plus 2.0% per annum (i) automatically, if the Event of Default relates to a failure by the Borrower to pay principal or interest on the Term Loans (a "**Failure to Pay**") and (ii) at the direction of the Required Lenders, if the Event of Default relates to any event other than a

4

|  |  |
|---|---|
|  | Failure to Pay. The terms and applicability of default interest may be amended with the consent of the Required Lenders. |
| **Mandatory Prepayments:** | The Term Loans will be required to be prepaid with the following, provided that any of the following mandatory prepayment triggers may be removed or modified and new triggers may be added if the Debtors and the Senior Lender Settlement Committee determine, in good faith, in consultation with each other and acting in the best interests of the company, that such a change is advisable to make the Term Loans trade at par in light of market conditions as of the Effective Date: |

    (i)    100% of net cash proceeds of asset sales and other asset dispositions by any Credit Party or any of its respective subsidiaries (including insurance proceeds and condemnation awards), subject to customary leverage-based step-downs and exceptions to be determined including for asset swaps and ordinary course sales of inventory; *provided* that net cash proceeds of such sales or dispositions shall be subject to a reinvestment period for a business or other long-term asset used in the Borrower's business, which period shall consist of (i) an initial 12 months to either consummate such investment or enter into a binding agreement for such investment, and (ii) in the case of a binding agreement, (x) a further 6 months to close such investment and (y) an additional 3-month extension beyond such 6-month period if the sole unsatisfied closing condition is pending FCC or other regulatory approval; *provided* that during the reinvestment period, all net cash proceeds shall be deposited in a segregated deposit account and held for the benefit of the Lenders as Term Facility Priority Collateral;

    (ii)    100% of the net cash proceeds of the issuance or incurrence of *pari passu* funded debt by any Credit Party or any of its subsidiaries, subject to baskets and exceptions to be determined; and

    (iii)    50% of excess cash flow (definition to be determined), subject to a minimum cash threshold to be set consistent with the liquidity of the Borrower as of the Effective Date and customary leverage-based step-downs to be determined.

Mandatory prepayments will be applied to reduce, pro rata, all then remaining scheduled amortization payments (with

|  |  |
|---|---|
|  | final maturity also treated as a payment). |
| **Voluntary Prepayments:** | The Term Loans may be prepaid at any time in whole or in part at the option of the Borrower, in a minimum principal amount and in multiples to be determined, without premium or penalty (subject, in the case of LIBOR borrowings, to payment of LIBOR breakage costs arising from voluntary prepayments not made on the last day of the relevant interest period). |
|  | Voluntary prepayments will be applied to reduce, pro rata, all then remaining scheduled amortization payments (with final maturity also treated as a payment). |
| **Representations and Warranties:** | The Credit Parties will make representations and warranties customary for financings of this type, including, without limitation: (i) accuracy of disclosure and absence of undisclosed liabilities as of the Closing Date, (ii) corporate existence, (iii) compliance with law, (iv) corporate power and authority, (v) enforceability of Term Facility Documents, (vi) no conflict with law or contractual obligations, (vii) no material litigation, (viii) no default, (ix) ownership of property, (x) liens, (xi) intellectual property, (xii) no burdensome restrictions, (xiii) taxes, (xiv) Federal Reserve margin regulations, (xv) ERISA, (xvi) Investment Company Act, (xvii) subsidiaries, (xviii) collateral, (xix) environmental matters and (xx) labor matters. |
| **Affirmative Covenants:** | The Credit Parties will comply with affirmative covenants customary for financings of this type, including, without limitation: (i) compliance with laws and material contractual obligations, (ii) payment of taxes and other material obligations, (iii) maintenance of insurance, (iv) conduct of business; preservation of corporate existence, (v) keeping of books and records, (vi) maintenance of properties, (vii) transaction with affiliates, (viii), additional guarantors (ix) reporting requirements, (x) additional guarantors, (xi) ERISA, (xii) right of Lenders to inspect property and books and records, (xiii) notices of defaults, litigation and other material events, (xiv) compliance with environmental laws, (xv) further assurances and (xvi) interest rate hedging of floating rate debt (in an amount and for a period to be determined). |
| **Negative Covenants:** | The Credit Parties will comply with negative covenants customary for financings of this type (subject to reasonable exceptions, baskets and limits to be determined), including, without limitation: (i) liens (including, without limitation, a negative pledge on Joint Venture Interests and any other equity interests of any Credit Party or any of their subsidiaries not included in the Collateral), (ii) limitation on |

|   |   |
|---|---|
|   | indebtedness, (iii) payment restrictions affecting subsidiaries, (iv) material changes in business, (v) no further negative pledge, (vi) ERISA, (vii) guarantee obligations, (viii) transactions with affiliates and (ix) changes in fiscal year. |
|   | For the avoidance of doubt, the Term Loan Facility will not contain any financial maintenance covenants, but will contain a debt incurrence test to be determined. |
|   | The foregoing negative covenants may be removed or modified and new covenants may be added if the Debtors and the Senior Lender Settlement Committee determine, in good faith, in consultation with each other and acting in the best interests of the company, that such change is advisable to make the Term Loans trade at par in light of market conditions as of the Effective Date. |
| **Events of Default:** | Customary Events of Default (subject to reasonable exceptions, materiality qualifications and notice periods to be determined and, where applicable 30 day cure and grace periods), including, without limitation: (i) nonpayment of principal when due and nonpayment of interest, fees or other amounts after a grace period of three (3) business days, (ii) material inaccuracy of representations or warranties, (iii) failure to perform or observe negative and certain affirmative covenants set forth in the Term Facility Documents, (iv) bankruptcy and insolvency defaults of any Credit Party or any of their subsidiaries, (v) change of control (the definition of which is to be determined), (vi) customary ERISA defaults and (vii) any Guarantee ceases to be in full force and effect. |
| **Assignments and Participations:** | Assignments shall be permitted subject (except to another Lender or to an affiliate of a Lender and, in the case of the Borrower, if an Event of Default shall be continuing) to the Administrative Agent's and the Borrower's consent (such consent not to be unreasonably withheld or delayed) in minimum amounts not less than $1.0 million (or, if less, the entire amount of the Lender's interest). Participations shall be permitted without restriction (other than customary voting restrictions). |
| **Required Lenders:** | Non-defaulting Lenders holding a majority of the Term Loans, subject to customary amendments of certain provisions of the Term Facility Documents requiring the consent of Lenders holding a super-majority (or all) of the Term Loans. |
|   | Holders of equity interests of Reorganized Tribune (and their affiliates) may hold and vote the Term Loans. |

| | |
|---|---|
| **Conditions to Closing:** | Conditions to closing will include: |

(i) Bankruptcy Court's confirmation of the Plan and satisfaction or waiver of all conditions to the effectiveness thereof;

(ii) accuracy in all material respects of representations and warranties, absence of default (including covenant default under the terms of the Term Facility Documents);

(iii) execution and delivery of the Term Facility Documents on terms and conditions reasonably satisfactory to the parties, together with customary collateral and other closing documentation (including, without limitation, creation and perfection of security arrangements opinions of counsel for the Credit Parties and local counsel) in form and substance satisfactory to the Senior Lender Settlement Committee; and

(iv) all governmental and third party consents and approvals required in the reasonable discretion of the Senior Lender Settlement Committee for consummation of the Term Loan Facility shall have been obtained and shall remain in effect without material adverse condition.

**Yield Protection:** The Term Facility Documents shall contain customary provisions (i) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes (subject to customary exclusions) and (ii) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, voluntary or mandatory prepayments.

**Expenses and Indemnification:** The Borrower shall pay (i) all reasonable expenses of the Administrative Agent associated with the preparation, execution, delivery and administration of the Term Facility Documents and any amendment or waiver with respect thereto (including, without limitation, the fees, disbursements and other charges of counsel) and (ii) all expenses of the Administrative Agent on behalf of the Lenders (including, without limitation, the fees, disbursements and other charges of counsel) in connection with the enforcement of the Term Facility Documents.

The Administrative Agent and the Lenders (and their affiliates and their respective officers, directors, employees,

8

|  |  |
|---|---|
|  | advisors and agents) will have no liability for, and will be indemnified and held harmless against, any loss, liability, cost or expense incurred in respect of the Term Loan Facility or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party and other customary exceptions). |
| **Governing Law and Forum:** | State of New York. |

**Exhibit 5.10 -- Terms of Exit Facility Credit Agreement**

**Exhibit 5.10 to the Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries (as amended, modified, or supplemented, the "Plan")[1]**

### SUMMARY OF TERMS AND CONDITIONS OF EXIT FACILITY

Pursuant to Section 5.10 of the Plan, on the Effective Date,[2] the Reorganized Debtors may enter into an Exit Facility and execute any notes, documents, or agreements in connection therewith, including an Exit Facility Credit Agreement. The Reorganized Debtors' entry into the Exit Facility is discretionary and is not a condition to confirmation or effectiveness of the Plan. If the Reorganized Debtors were to enter into an Exit Facility, the Debtors currently contemplate that the material terms of such facility would be substantially as set forth below; however, the actual terms of the Exit Facility and Exit Facility Credit Agreement may differ from those set forth below based upon, among other things, changes in market conditions for loan facilities of this type and the Debtors' or Reorganized Debtors' business and financial needs at emergence from chapter 11.

| | |
|---|---|
| **BORROWER:** | Reorganized Tribune, a Delaware corporation (the "Borrower"). |
| **GUARANTORS:** | The Exit Facility will be guaranteed by all domestic direct and indirect subsidiaries of the Borrower other than Multimedia Insurance Company and such other entities specified in the loan documentation (collectively, the "Guarantors," together with the Borrower, the "Loan Parties"). All guarantees will be guarantees of payment and not of collection. The Guarantors will also guarantee the New Senior Secured Term Loan (or any replacement or alternative facility). |
| **ADMINISTRATIVE AND COLLATERAL AGENT:** | An agent or agents of national stature to be selected by the Debtors (the "Administrative Agent"). |
| **LENDERS:** | A syndicate of lenders to be determined (collectively, the "Lenders"). |
| **FACILITY TYPE AND AMOUNT:** | A new revolving credit facility providing for loans and other extensions of credit in an aggregate amount up to $300 million, with a letter of credit sub-facility of up to $100 million. |
| **CLOSING DATE:** | The execution of definitive loan documentation to occur concurrently with the effective date of the Plan (the "Closing Date"). |

---

[1] Subject to section 13.9 of the Plan, the Debtors reserve the right to supplement, modify or revise this Exhibit 5.10 at any time prior to the Effective Date.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

| | |
|---|---|
| **INTEREST AND FEES:** | Market rates and fees. |
| **MATURITY:** | Five (5) years from Closing Date. |
| **AVAILABILITY:** | The Exit Facility will be available for borrowings by the Borrower in U.S. dollars on a revolving basis during the period commencing on the Closing Date and ending on the termination date. |
| | Availability under the Exit Facility will be subject to a customary borrowing base. |
| **SECURITY:** | The obligations of each Loan Party in respect of the Exit Facility shall be secured, subject to customary exceptions, by (i) a perfected first priority security interest in all of its inventory and accounts receivable (to the extent included in the borrowing base) and (ii) a perfected second priority security interest in all of the assets in which the lenders under the New Senior Secured Term Loan (or any replacement or alternative facility) hold a first priority lien. |
| **DOCUMENTATION:** | Usual for facilities and transactions of this type and reasonably acceptable to Borrower, Administrative Agent, and Lenders. The documentation for the Exit Facility will include, among others, a credit agreement, guarantees and appropriate pledge, security interest, and other collateral documents. |
| **USE OF PROCEEDS:** | The proceeds of the Exit Facility shall be used to finance the working capital needs and general corporate purposes of the Borrower and its subsidiaries. |
| **REPRESENTATIONS, WARRANTIES, COVENANTS, EVENTS OF DEFAULT:** | Customary for facilities of this type, subject to customary exceptions, materiality qualifications, and, as applicable, grace periods. |
| **GOVERNING LAW:** | State of New York. |

2

**Exhibit 6.3 – Rejected Executory Contracts and Unexpired Leases**

# EXHIBIT 6.3

## (Rejected Executory Contracts and Unexpired Leases)

Pursuant to Section 6.3 of the Plan, each executory contract or unexpired lease listed on this Exhibit 6.3 shall be rejected pursuant to Section 365 of the Bankruptcy Code; provided that each contract or lease set forth below shall be rejected only to the extent that any such contract or lease constitutes an executory contract or unexpired lease. Any rejection of an executory contract or unexpired lease shall apply to any and all amendments, modifications, or supplements to the relevant executory contract or unexpired lease. The inclusion of a contract or lease on this Exhibit 6.3 shall not constitute an admission by a Debtor or a Reorganized Debtor that such contract or lease is an executory contract or unexpired lease or that such Debtor or Reorganized Debtor has any liability thereunder, and shall not entitle the non-Debtor party to said contract or lease to file a late claim for "rejection" damages if the applicable contract or lease is not executory or unexpired under applicable law. The Debtors expressly reserve the right, at any time prior to the Effective Date, to supplement, modify, or amend this Exhibit 6.3 to, among other things, add or remove any lease or contract.

1. Agreement of Resignation, Appointment, and Acceptance by and among Tribune Company, The Bank of New York, and Citibank, N.A., dated September 4, 2002;

2. Amendment No. 2 to Rights Agreement between Tribune Company and Computershare Trust Company, dated September 21, 2006;

3. Tribune Employee Stock Ownership Plan, as Amended, effective as of January 1, 2007;

4. ESOP Pledge Agreement between Tribune Company and GreatBanc Trust Company, dated April 1, 2007;

5. ESOP Loan Agreement between Tribune Company and GreatBanc Trust Company, dated April 1, 2007;

6. ESOP Note between Tribune Company and GreatBanc Trust Company, dated April 1, 2007;

7. Agreement and Plan of Merger, by and among GreatBanc Trust Company, Tribune Employee Stock Ownership Trust, TESOP Corporation, Tribune Company, and EGI-TRB, LLC, dated as of April 1, 2007;

8. First Step Fee Letter by and among Merrill Lynch Capital Corporation, Citigroup Global Markets, Inc., JPMorgan Chase Bank, N.A. and Tribune Company, dated as of April 1, 2007;

9. First Step Engagement Letter by and among Tribune Company, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and J.P. Morgan Securities Inc., dated as of April 1, 2007;

10. First Step Commitment Letter by and among Tribune Company, Merrill Lynch Capital Corporation, Citigroup Global Markets Inc., J.P. Morgan Securities Inc. and JPMorgan Chase Bank, N.A., dated as of April 1, 2007;

11. Registration Rights Agreement by and among Tribune Company, EGI-TRB, L.L.C. and GreatBanc Trust Company, dated as of April 1, 2007;

12. Registration Rights Agreement by and between the Chandler Trusts and Tribune Company, dated as of April 1, 2007;

13. Amendment No. 3 to Rights Agreement between Tribune Company and Computershare Trust Company, N.A., dated April 1, 2007;

14. Investor Rights Agreement by and among Tribune Company, EGI-TRB, L.L.C. and GreatBanc Trust Company, dated as of April 1, 2007;

15. Amended and Restated First Step Commitment Letter, dated as of April 5, 2007;

16. Second Step Fee Letter by and among Merrill Lynch Capital Corporation, Citigroup Global Markets, Inc., JPMorgan Chase Bank, N.A. and Tribune Company, dated as of April 1, 2007;

17. Second Step Engagement Letter by and among Tribune Company, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and J.P. Morgan Securities Inc., dated as of April 1, 2007;

18. Second Step Engagement Letter by and among Tribune Company, Merrill Lynch Capital Corporation, Citigroup Global Markets Inc. and J.P. Morgan Securities Inc. and JPMorgan Chase Bank, N.A., dated as of April 1, 2007;

19. Project Tower – Notes Commitment Letter, by and among, Merrill Lynch, Pierce, Fenner & Smith Incorporated, and Citigroup Global Markets Inc., on the one hand, and Tribune Company, on the other, dated February 2007;

20. Project Tower – Amended and Restated Second Step Commitment Letter dated April 5, 2007;

21. ESOP Purchase Agreement by and among Tribune Company and GreatBanc Trust Company, dated as of April 1, 2007;

22. Project Tower – Amended and Restated Second Step Engagement Letter between Merrill Lynch, Pierce, Fenner & Smith Incorporated, J.P. Morgan Securities Inc., Citigroup Global Markets Inc., and Banc of America Securities LLC, on the one hand, and Tribune Company, on the other, dated April 5, 2007;

23. Project Tower – Amended and Restated Second Step Fee Letter between J.P. Morgan Securities Inc. JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation, Citigroup Global Markets, Inc., and Banc of America Securities LLC Banc of America

Bridge LLC Bank of America, N.A., on the one hand, and Tribune Company, on the other, dated April 5, 2007;

24. Project Tower – Amended and Restated First Step Fee Letter between J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation, Citigroup Global Markets Inc., and Banc of America Securities LLC, Bank of America, N.A., on the one hand, and Tribune Company, on the other, dated April 5, 2007;

25. Project Tower – Amended and Restated First Step Engagement Letter between J.P. Morgan Securities Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc., and Bank of America Securities, on the one hand, and Tribune Company, on the other, dated April 5, 2007;

26. Letter Agreement Revising Merger Agreement between Tribune Company and GreatBanc Trust Company, dated April 9, 2007;

27. Engagement Letter between Merrill Lynch and Tribune Company, dated October 17, 2005;

28. Engagement Letter between Morgan Stanley and Tribune Company, dated October 17, 2006;

29. Engagement Agreement between Valuation Research Corporation and Tribune Company, dated April 11, 2007;

30. Letter Agreement, dated April 23, 2007, among Tribune Company, EGI-TRB, L.L.C and Samuel Zell

31. Dealer Management Agreement by and among Tribune Company, Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc., J.P. Morgan Securities Inc. and Banc of America Securities LLC, dated as of April 25, 2007;

32. First Amendment of Tribune Employee Stock Ownership Plan, dated as of September 4, 2007;

33. Tribune Employee Stock Ownership Trust, effective as of February 7, 2007;

34. Trustee Engagement Agreement between GreatBanc Trust Company and Tribune Company, dated February 26, 2007;

35. Trustee Engagement Agreement between GreatBanc Trust Company and Tribune Company, dated December 20, 2007;

36. Depositary Agreement between Computershare Shareholder Services, Inc. and Computershare Trust Company, on the one hand, and Tribune Company, on the other, dated April 2007;

37. Agreement between Innisfree M&A Incorporated and Tribune Company dated April 18, 2007;

38. Letter Agreement by and among Tribune Company, Greatbanc Trust Company, TESOP Corporation and EGI-TRB, L.L.C., dated as of April 9, 2007, amending the form and Bylaws of TESOP Corporation;

39. Letter Agreement between Duff & Phelps, LLC, and Tribune Company dated February 13, 2007;

40. Letter Agreement between Citigroup Global Markets, Inc., and Tribune Company dated October 27, 2006;

41. Application for Moody's Rating Assessment Service between Moody's Investor Services, Inc. and Tribune Company dated March 22, 2007;

42. Letter Agreement between Navigant Consulting Inc. and Tribune Company dated July 17, 2007;

43. Letter Agreement between PricewaterhouseCoopers, LLP and Tribune Company dated July 21, 2008;

44. Agreement between Standard & Poor's and Tribune Company dated March 21, 2007;

45. Underwriting Agreement, dated as of June 4, 2007, by and among Tribune Company, Goldman, Sachs & Co. and the selling stockholders named therein;

46. Agreement between Principal Financial Group and Tribune Company dated February 21, 2007;

47. Any and all executory contracts between any Debtor and another party concerning the retention and possible indemnification by a Debtor of a professional, including retained or proposed to be retained in connection with the Leveraged ESOP Transactions (as described in the Disclosure Statement), including, without limitation, all such contracts not listed on this Exhibit 6.3; and

48. Any and all executory contracts between any Debtor and another party concerning the ESOP, including, without limitation, all such contracts not listed on this Exhibit 6.3.

**For the avoidance of doubt, no executory contract relating to the indemnification of a current or former officer or director of the Debtor is being rejected pursuant to this Exhibit 6.3.**

4

**Exhibit 11.7.6 – Indemnification Claim Procedures**

## Exhibit 11.7.6 – Indemnification Procedures

Claims made by beneficiaries of the indemnities contained in Section 11.7 of the Plan shall be submitted, resolved and reimbursed, if applicable, in accordance with the procedures set forth below.

1. The Indemnified Party shall give prompt notice in writing to the Reorganized Debtors (the "**Indemnifying Party**") of the assertion of any claim or the commencement of any suit, action or proceeding by any third party ("**Third Party Claim**") in respect of which indemnity may be sought under Section 11.7 of the Plan. Such notice shall set forth in reasonable detail such Third Party Claim and the basis for indemnification (taking into account the information then available to the Indemnified Party). The failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder, except to the extent such failure shall have materially and adversely prejudiced the Indemnifying Party.

2. The Indemnified Party shall be entitled to select one counsel in connection with defending the Third Party Claim, and shall provide the Indemnifying Party with prompt notice of such selection. Such counsel's fees and expenses shall be paid by the Indemnifying Party to the extent provided by Section 11.7 of the Plan.

3. Each party shall cooperate, and cause their respective affiliates to cooperate, in the defense or prosecution of any Third Party Claim and shall furnish or cause to be furnished such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials or appeals, as may be reasonably requested in connection therewith.

The Debtors reserve the right to supplement these procedures.

CH1 5397012v.1