UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| *In re:* | : | Chapter 11 |
| TRIBUNE COMPANY, *et al.*,[1] | : | Case Number 08-13141 (KJC) |
| | | (Jointly Administered) |
| Debtors. | : | |
| | : | |

## REPORT OF KENNETH N. KLEE, AS EXAMINER

### (VOLUME ONE)

### (SUMMARY OF PRINCIPAL CONCLUSIONS, OVERVIEW AND CONDUCT OF THE EXAMINATION, AND FACTUAL BACKGROUND)

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8655); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago National League Ball Club n/k/a Tribune CNLBC, LLC (0347); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo., Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH, Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Brook Productions, Inc. (2598); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, Inc. (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA  90067
Telephone:              (310) 407-4000
Facsimile:              (310) 407-9090

Lee R. Bogdanoff
Martin R. Barash
David A. Fidler
Ronn S. Davids
Jennifer L. Dinkelman

*Counsel to Examiner*

LECG, LLC
201 South Main, Suite 450
Salt Lake City, UT  84111
Telephone:              (801) 364-6233
Facsimile:              (801) 364-6230

F. Wayne Elggren

*Financial Advisor to Examiner*

SAUL EWING LLP
2222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899
Telephone:              (302) 421-6800
Facsimile:              (302) 421-6813

Mark Minuti
Charles O. Monk, II
Nicholas J. Nastasi
Cathleen M. Devlin

*Delaware Counsel to Examiner*

## TABLE OF CONTENTS

I. SUMMARY OF PRINCIPAL FINDINGS ................................................................. 1

    A.     Appointment of the Examiner and the Questions Presented in the Investigation................................................................................................. 1

    B.     Organization of the Report.................................................................................. 3

    C.     Summary of Principal Conclusions. .................................................................. 5

          1.     Question One. ................................................................................. 7

               a.     Alleged Wrongful Acts—Intentional Fraudulent Transfers, Equitable Subordination, and Assorted Common Law Claims and Defenses.................................................. 7

               b.     Constructive Fraudulent Transfer Claims and Defenses. ............. 16

               c.     Potential Preference Claims and Defenses. ................................. 22

               d.     Issues Relating to Remedies Resulting From Avoidance Actions. ....................................................................................... 23

          2.     Question Two.................................................................................. 25

          3.     Question Three................................................................................ 27

II. CONDUCT OF THE EXAMINATION ................................................................. 28

    A.     Meet and Confer Process and Establishment of the Examiner Work Plan.......... 28

    B.     The Investigation. ............................................................................................ 30

    C.     The Standard Adopted in the Report. ............................................................... 39

    D.     Issues Pertaining to Confidentiality. ................................................................ 40

III. STATEMENT OF BASIC FACTS, TRANSACTIONS, AND AGREEMENTS. ................ 43

    A.     The Tribune Entities and Their Businesses. ...................................................... 43

          1.     Corporate History and Organization..................................................... 43

          2.     Tribune's Operations. ......................................................................... 44

a.     Publishing Segment. ................................................................. 44

b.     Broadcasting Segment. .............................................................. 44

c.     Additional Investments. ............................................................ 45

3.     Tribune's Directors, Management, and Advisors....................................... 46

a.     Board of Directors of Tribune....................................................... 46

b.     Management of Tribune............................................................... 47

c.     Boards of Directors of the Guarantor Subsidiaries. ...................... 49

d.     Management of the Guarantor Subsidiaries................................. 49

e.     Financial Advisors. ..................................................................... 49

(1)     MLPFS. ............................................................................ 49

(2)     Morgan Stanley................................................................. 52

(3)     CGMI. .............................................................................. 54

4.     Holdings of Directors, Executive Officers, and Major Stockholders............................................................................................. 56

B.     Tribune's Principal Funded Indebtedness Before the Leveraged ESOP Transactions:  Senior Notes, PHONES Notes, and the 2006 Bank Debt. ............ 57

1.     Senior Notes............................................................................................. 58

a.     1992 Indenture. ........................................................................... 58

b.     1995 Indenture. ........................................................................... 59

c.     1996 Indenture. ........................................................................... 60

d.     1997 Indenture. ........................................................................... 61

e.     Principal Amounts Owing on Senior Notes................................. 62

2.     PHONES Notes........................................................................................ 63

3.     The 2006 Bank Debt. ............................................................................... 65

a.     Background to the 2006 Leveraged Recapitalization. .................. 65

b.     2006 Credit Agreement............................................................... 68

|   |   | c. | 2006 Bridge Credit Agreement. | 71 |

C. Significant Events Leading Up to the Step One Transactions. .............................. 73

    1. Tribune Entities' Financial Performance Leading Up to April 1, 2007 and the Step One Financing Closing Date. .................................... 73

        a. Financial Performance from 2004 through 2006. ........................ 73

        b. Financial Performance in Late 2006 and Tribune's Development of the 2007 Operational Plan. ................................ 78

        c. Financial Performance in Early 2007. .......................... 86

        d. Financial Performance in April and May 2007 ........................... 92

        e. Revision of Tribune's Projections. ................................. 95

    2. Analyst Reports  Before Announcement of the Step One Transactions. ....................................................... 97

D. The Step One Transactions. ..................................................... 100

    1. Tribune Board Deliberations. ................................................. 101

        a. Creation of the Special Committee. ........................... 101

        b. The Broad/Yucaipa Proposal. .................................... 105

        c. The Carlyle Proposal. ................................................ 107

        d. The Chandler Trusts Proposal. ................................... 108

        e. Continuation of the Sale Process. ............................... 111

        f. Special Committee Activities and Response to the EGI Proposal. ..................................................... 113

        g. Tribune Board Approval. ........................................... 133

    2. Approval by Subsidiary Boards. ............................................. 136

    3. Merger Agreement. ............................................................. 138

        a. Reasonable Best Efforts. ........................................... 139

        b. Closing Conditions. ................................................... 139

        c. Termination Rights. ................................................... 141

d.    Termination Fees. ....................................................... 142

4.    EGI-TRB Purchase Agreement............................................ 143

a.    Reasonable Best Efforts....................................... 143

b.    Closing Conditions............................................... 144

c.    Termination Rights. .............................................. 145

d.    Termination Fees. ................................................ 146

e.    The Exchangeable EGI-TRB Note, the Initial EGI-TRB
Note, and the Warrant. ................................................ 148

(1)    Exchangeable EGI-TRB Note........................................ 148

(2)    EGI-TRB Notes. ............................................. 150

(3)    Warrant. ............................................. 152

f.    EGI-TRB Purchase Agreement First Closing............................ 152

5.    ESOP Transactions. ..................................................... 153

a.    ESOP Purchase Agreement.......................................... 153

b.    ESOP Loan........................................................ 153

c.    Duff & Phelps Fairness Opinion.................................. 154

d.    Closing of ESOP Transactions.................................... 156

6.    Investor Rights Agreement. .................................................... 156

7.    Voting Agreement................................................................ 157

8.    Registration Rights Agreements. .......................................... 158

9.    The Step One and Step Two Commitment Letters. ............................... 159

a.    The Step One Commitment Letter................................... 159

b.    The Step Two Commitment Letter. ............................... 162

c.    "Market Flex" Provisions of Step Two Financing. .................... 165

10.    The Step One Financing........................................................ 167

a.    Syndication of the Step One Financing. ..................... 167

iv

b.     Terms of the Step One Financing. ................................................ 171

c.     Solvency................................................................................. 179

d.     The Credit Agreement Subsidiary Guarantee. ............................ 182

e.     The Stock Pledge and Priority of the Credit Agreement Debt................................................................................... 185

11.     Terms of the Incremental Credit Agreement Facility. ............................ 186

12.     FinanceCo/Holdco Transactions............................................................ 187

13.     LATI Intercompany Debt Repayment Transactions............................... 191

14.     Tender Offer........................................................................................ 194

a.     Terms. ....................................................................................... 194

b.     Closing Conditions.................................................................... 195

c.     *Garamella* Litigation. ................................................................ 195

15.     Pre-Closing of the Step One Financing and Tender Offer..................... 196

a.     Rating Agency Ratings. ............................................................. 196

b.     Analyst Reports........................................................................ 203

16.     Closing of the Step One Financing and Expiration and Funding of the Tender Offer.................................................................... 205

E.     Knowledge and Actions of Key Participants in the Step One Transactions....... 210

1.     Management's Knowledge of the Tribune Entities' Financial Performance Through the Step One Financing Closing Date................. 210

2.     Knowledge of the Tribune Board and the Special Committee of the Tribune Entities' Financial Performance Through the Step One Financing Closing Date........................................................................ 216

a.     The Tribune Board.................................................................... 216

b.     The Special Committee............................................................. 220

3.     Knowledge and Actions of Participants in the Step One Solvency Opinion and the Examiner's Evaluation of the Step One Solvency Opinion. ............................................................................... 221

a.      Parties Approached for the Step One Solvency Opinion............ 221

b.      VRC at Step One........................................................................ 225

        (1)      The Engagement of VRC................................................ 225

                 (i)      Modification of the Definition of Fair Value...... 225

                 (ii)     Assessment of Management's Projections
                          and Information................................................. 226

        (2)      Management's Interactions with VRC. ........................... 232

        (3)      VRC's Analysis Prior to Issuance of the Step One
                 Opinion. ......................................................................... 233

c.      VRC's Step One Opinion. .......................................................... 236

        (1)      Approaches to Valuing Tribune's Operating Assets. ...... 239

                 (i)      Comparable Companies. ..................................... 239

                 (ii)     Comparable Transactions.................................... 240

                 (iii)    Discounted Cash Flow. ....................................... 241

                 (iv)     Sum-of-the-Parts. ............................................... 242

        (2)      Approach to Valuing Tribune's Equity Investments....... 243

        (3)      Approach to Valuing PHONES Notes Tax Savings....... 244

        (4)      The Examiner's Assessment of the Reasonableness
                 of VRC's Valuation Conclusions. ................................... 245

        (5)      The Examiner's Assessment of the Reasonableness
                 of VRC's Cash Flow Tests. ............................................ 254

        (6)      VRC's May 24, 2007 Solvency Update. ........................ 256

4.      Knowledge and Actions of the Lead Banks and Financial Advisors
        in Connection with the Step One Transactions...................................... 258

        a.      JPM Entities................................................................................ 258

                 (1)      Activities. ...................................................................... 259

                 (2)      Due Diligence and Evaluations Performed.................... 265

b.     Merrill Entities. ........................................................................ 268

     (1)    Activities. ................................................................. 272

     (2)    Due Diligence and Evaluations Performed. .................... 290

c.     Citigroup Entities. .................................................................... 291

     (1)    Activities. ................................................................. 297

     (2)    Due Diligence Performed. ........................................... 313

d.     BofA. ........................................................................................ 314

     (1)    Activities. ................................................................. 315

     (2)    Due Diligence and Evaluations Performed. .................... 323

e.     Morgan Stanley. ....................................................................... 326

     (1)    The Special Committee's Engagement of Morgan
            Stanley and the Related Fee Agreement. ...................... 327

     (2)    Morgan Stanley's Initial Advisory and Due
            Diligence Activities. .................................................. 330

     (3)    Morgan Stanley's Views on the Third-Party Bids
            and the Self-Help Alternatives. ................................... 334

            (i)    Morgan Stanley's Evaluation of Self-Help
                     Alternatives. ...................................... 336

            (ii)   Morgan Stanley's Evaluation of the
                     Third-Party Bids and Focus on the Chandler
                     Trusts Proposal. ................................... 339

     (4)    Morgan Stanley's Participation in the Selection of
            the EGI Proposal and Implementation of the Step
            One Transactions. ..................................................... 344

     (5)    Morgan Stanley's Desire to Participate as a Lender
            in the Step One Financing. ......................................... 359

5.     Knowledge and Actions of the Large Stockholders in Connection
     with the Step One Transactions. ........................................................ 366

a.     The Large Stockholders. ............................................................ 366

     (1)    The Chandler Trusts. .................................................. 366

(2) The McCormick Foundation................................... 367

b. The Activities of the Large Stockholders Before, During, and After The Step One Transactions......................................... 367

(1) The Auction Process...................................................... 367

6. Knowledge and Actions of the Zell Group In Connection With the Step One Transactions. ............................................................. 381

a. The Circumstances Giving Rise to the Initial EGI Proposal in February 2007......................................................... 382

b. Internal EGI Communications throughout the Process. ............. 387

(1) EGI's Due Diligence. ...................................................... 387

(2) Revisions to the EGI Proposal. ....................................... 389

(3) EGI's Involvement In Negotiations Regarding the Step One Financing......................................................... 395

c. Tribune's Selection of the EGI Proposal..................................... 397

d. The Extent, if any, to which Tribune Director and Officer Transaction-Based Compensation Played a role in the Selection of the EGI Proposal...................................................... 397

e. The Zell Group's Activities Leading Up to the Closing of the Step One Transactions. ......................................................... 399

F. Significant Events Leading Up to the Step Two Transactions. .......................... 401

1. Pre-Step Two Transactions Market Background..................................... 401

a. Analyst Reports........................................................................... 401

b. SEC Filings. ................................................................................ 407

2. The Tribune Entities' Financial Performance Following the Step One Financing Closing Date and Before the Step Two Financing Closing Date................................................................................. 408

a. 2007 Quarterly Performance Versus Prior Years. ...................... 409

b. 2007 Monthly Performance Versus The February 2007 Tribune Board-Approved Plan.................................................... 414

c. The October 2007 Revised Plan. ................................................ 419

|   |   | d. | Observations Regarding Market Awareness and Reactions. | 419 |

| | 3. | Disposition of Chandler Trusts Stock and Resignation of Tribune Board Members Affiliated with the Chandler Trusts. | 421 |

| | 4. | Asset Dispositions and Application of Proceeds. | 423 |

| | 5. | Stockholder Approval. | 424 |

| | 6. | Step Two Due Diligence/Revisions to Long Term Financial Assumptions | 425 |

| | 7. | Third-Party Approvals. | 427 |

| | | a. | FCC. | 427 |

| | | b. | Major League Baseball. | 427 |

| | 8. | Management Incentive and Severance Plans. | 427 |

| | | a. | Transitional Compensation Plan. | 427 |

| | | b. | Proposal of the Management Equity Incentive Plan. | 430 |

| | | c. | Board of Directors/Compensation Committee Approvals of Bonus and Incentive Awards and Management Equity Incentive Plan | 431 |

| | | d. | Terms of 2007 Management Equity Incentive Plan. | 433 |

| | | e. | Recipients | 435 |

G. | | The Step Two Transactions. | 438 |

| | 1. | Tribune Board Deliberations | 439 |

| | 2. | Subsidiary Boards Approval. | 442 |

| | 3. | The Step Two Financing. | 443 |

| | | a. | Syndication of the Step Two Financing. | 443 |

| | | b. | Terms of the Bridge Facility. | 445 |

| | | c. | Solvency | 450 |

| | | d. | The Subordinated Bridge Subsidiary Guarantee | 452 |

e.      The Credit Agreement Subrogation Subordination
        Agreement. .................................................................. 456

f.      The Bridge Subrogation Subordination Agreement. .................. 457

g.      Priority of Bridge Credit Agreement. ......................................... 457

4.      Closing of the Step Two Transactions. ................................................... 458

a.      Merger Agreement. .................................................................... 458

b.      Second Closing under the EGI-TRB Purchase Agreement. ....... 459

c.      Advance under the Incremental Credit Agreement Facility. ...... 459

d.      Funds Flow ................................................................................. 460

e.      Payments to Tribune Advisors .................................................. 462

f.      Rating Agency Ratings Leading Up to the Closing of the
        Step Two Transactions .............................................................. 462

H.      Knowledge and Actions of Key Participants in the Step Two Transactions. ..... 465

1.      Management's Knowledge of the Tribune Entities' Financial
        Performance Through the Step Two Financing Closing Date. .............. 465

a.      Tribune Entities' Actual Performance Against Plan. ................. 466

b.      Management's Revised October 2007 Projections ...................... 466

c.      Management Awareness of Market Conditions .......................... 470

2.      Knowledge of the Tribune Board and the Special Committee of the
        Tribune Entities' Financial Performance Between Step One and
        Step Two. ................................................................................................ 471

3.      Knowledge and Actions of Participants in Step Two Solvency
        Opinion and Examiner's Evaluation of Step Two Solvency
        Opinion. .................................................................................................. 487

a.      VRC's Analysis Prior to the Issuance of the Step Two
        Solvency Opinion and VRC's Interactions with
        Management ............................................................................... 487

b.      VRC's December 4, 2007 Solvency Presentation. ...................... 492

        (1)     Approaches to Valuing Tribune's Operating Assets. ...... 496

(i)      Comparable Companies. ...................................... 496

(ii)     Comparable Transactions.................................... 498

(iii)    Discounted Cash Flow. ....................................... 499

(iv)    Sum-of-the-Parts. ............................................... 500

(2)     Approach to Valuing Tribune's Equity Investments....... 501

(3)     Approach to Valuing S-Corporation/ESOP Tax Savings. .......................................................... 503

c.     Questions from the Lead Banks Regarding VRC's Preliminary Solvency Analyses and VRC's Responses. ............. 503

d.     VRC's December 18, 2007 Solvency Presentation. .................... 506

e.     VRC's Step Two Solvency Opinion........................................... 509

f.     The Examiner's Assessment of VRC's Step Two Solvency Opinion. ...................................................................... 512

(1)     VRC's Reliance on Management's October 2007 Projections was Unreasonable. ....................................... 514

(2)     VRC Unreasonably Ignored its Own Internal Critiques of the October 2007 Projections...................... 530

(3)     VRC's Step Two Solvency Analysis Contained Several Other Significant Errors. ..................................... 544

(4)     Public Market Data Readily Available to VRC did not Support VRC's Solvency Conclusions at Step Two. ............................................................... 552

g.     The VRC Refinancing Representation Letter. ............................ 558

(1)     VRC's November 30, 2007 Cash Flow Analysis. ........... 560

(2)     Events of December 1, 2007.......................................... 561

(3)     Tribune Management's December 2, 2007 Telephone Call with Morgan Stanley. ........................... 564

(4)     Tribune Management's December 2, 2007 Telephone Call with VRC............................................... 568

(5)   December 2, 2007 E-Mail Exchange Between Mr. Bigelow and Mr. Whayne, and Morgan Stanley's Precedent Transactions. ................................... 573

(6)   December 2, 2007 Draft VRC Refinancing Representation Letter. ....................................... 576

(7)   Tribune Management's December 3, 2007 Mark-Up of the Draft VRC Refinancing Representation Letter. ........................................................... 579

(8)   VRC's December 3, 2007 Cash Flow Analysis. ............. 580

(9)   Cash Flow Projections in VRC's December 4, 2007 Tribune Board Presentation. ........................................ 581

(10)   Lead Bank Questions Concerning Refinancing. ............. 583

(11)   VRC's December 18, 2007 Tribune Board Presentation. ................................................................. 587

(12)   Tribune Management's December 20, 2007 VRC Refinancing Representation Letter. ............................... 588

(13)   VRC's December 20, 2007 Solvency Opinion. .............. 589

(14)   The Examiner's Assessment of Tribune Management's VRC Refinancing Representation and VRC's Reliance on Tribune Management's Representation. ........................................................... 590

4.   Knowledge and Actions of the Lead Banks and Financial Advisors in Connection with the Step Two Transactions. ...................................... 593

    a.   Backdrop:  The Deteriorating Economics of the Tribune Transaction and the Lead Banks' Contractual Commitments. ........................................................... 593

        (1)   Contractual "Market Flex" and Consensual Modifications to the Step Two Financing. ...................... 597

        (2)   Centrality of the Solvency Closing Condition at Step Two. ............................................................... 601

    b.   Lead Banks at Step Two. ........................................... 605

        (1)   Joint Due Diligence. ...................................................... 606

        (2)   JPM's Due Diligence. .................................................... 621

(3)    Merrill's Due Diligence...................................................... 626

(4)    Citigroup's Due Diligence............................................... 630

(5)    BofA's Due Diligence. ...................................................... 633

c.    Financial Advisors at Step Two..................................................... 634

(1)    Tribune's Financial Advisors:  MLPFS and CGMI. ....... 634

(2)    The Special Committee's Financial Advisor:
Morgan Stanley. .............................................................. 638

(i)    Interactions with Management........................... 639

(ii)    Interactions with the Special Committee. ........... 643

5.    Knowledge and Actions of the Large Stockholders in Connection
with the Step Two Transactions............................................................. 650

a.    The Company Meeting. ................................................................ 651

b.    The Merger Approval Process. .................................................... 651

c.    The Merger Closing. .................................................................... 653

6.    Knowledge and Actions of the Zell Group in Connection with the
Step Two Transactions........................................................................... 653

a.    Internal Zell Group Communications Regarding the
Closing of the Step Two Transactions and Solvency Issues....... 654

b.    The Extent of the Zell Group's Communications with
Tribune Management Before the Closing of the Step Two
Transactions. .............................................................................. 659

(1)    Communications Between EGI and Tribune
Regarding Financial Information and Projections
Before the Closing of the Step Two Transactions. ......... 660

(2)    EGI's Attempts To Participate In Strategic
Decision-Making Before the Closing of the Step
Two Transactions.......................................................... 664

c.    EGI's Contact with the Financial Advisors and the Lead
Banks in Connection with the Step Two Financing.................... 667

I.       Events Leading Up to the Bankruptcy Filings...................................................... 670

        1.       Tribune Board Deliberations.................................................................. 670

        2.       Chapter 11 Filing. ................................................................................. 671

        Table 1         —        Boards of Directors of the Guarantor Subsidiaries

        Table 2         —        Officers of the Guarantor Subsidiaries

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*,
  327 B.R. 537 (D. Del. 2005), *aff'd*, 278 F. App'x 125 (3d Cir. 2008) ........................ 10

*United States v. Tabor Court Realty Corp.*,
  803 F.2d 1288 (3d Cir. 1986) ..................................................................... 13

*The T.J. Hooper*,
  60 F.2d 737 (2d Cir. 1932) ........................................................................ 38

*Max v. Republican Comm.*,
  587 F.3d 198 (3d Cir. 2009) ....................................................................... 39

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) .............................................................................. 39


FEDERAL STATUTES

11 U.S.C. § 362 (2006) ................................................................................ 25

11 U.S.C. § 548(c) (2006) ........................................................................ 24, 25

11 U.S.C. § 546(e) (2006) ........................................................................ 20, 21


STATE STATUTES

35 Ill. Comp. Stat 5/203(e)(2)(E) (2010) ......................................................... 192


FEDERAL REGULATIONS

26 C.F.R. § 1.1361-4(a)(2) .......................................................................... 194

26 C.F.R. § 1.332-2(b) .............................................................................. 194

**OTHER SECONDARY MATERIALS**

STEPHEN LABATON, *The Reckoning: Agency's '04 Rule Let Banks Pile up New Debt*, N.Y. TIMES, October 8, 2008, http://www.nytimes.com/2008/10/03/business/-03sec.htmlpagewanted=all; JOINT CENTER FOR HOUSING STUDIES OF HARVARD UNIVERSITY, THE STATE OF THE NATION'S HOUSING 2008 (2008); Ben S. Bernanke, Chairman, Fed. Reserve, Speech at the Fed. Reserve Bank of Chicago's 43rd Annual Conference on Bank Structure & Competition, (May 17, 2007).............. 38

SHANNON P. PRATT, ROBERT F. REILLY, AND ROBERT P. SCHWEIHS, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (4th ed. 2000)...................... 547

# I.

## SUMMARY OF PRINCIPAL FINDINGS[2]

### A.    Appointment of the Examiner and the Questions Presented in the Investigation.

On December 8, 2008, the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On December 10, 2008, the Bankruptcy Court entered an order providing for the joint administration of the Chapter 11 Cases.

On January 13, 2010, Wilmington Trust filed its *Motion for Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code* [Docket No. 3062].  On April 20, 2010, the Bankruptcy Court entered the Examiner Order, directing the United States Trustee to appoint an examiner in the Chapter 11 Cases pursuant to Bankruptcy Code § 1104(c)(1).

On April 30, 2010, the United States Trustee filed her *Notice of Appointment of Examiner* [Docket No. 4212] appointing Kenneth N. Klee, Esq. as the Examiner, subject to Bankruptcy Court approval.  Contemporaneously therewith, the United States Trustee filed the *Application of the United States Trustee for Order Approving Appointment of Examiner* [Docket No. 4213].

On May 7, 2010, the Examiner filed the Examiner Work Plan in connection with this matter [Docket No. 4261].

On May 11, 2010, the Bankruptcy Court entered the Examiner Approval Order [Docket No. 4320], approving the appointment of Professor Klee as the Examiner.  The Bankruptcy Court also entered the Supplemental Order [Docket No. 4312], approving the Examiner Work Plan and modifying the Examiner Order.

---

[2]    Unless otherwise indicated, the capitalized terms used in the Report are intended to have the meanings set forth in Volume Four of the Report, which comprises the Glossary of Defined Terms.

On May 19, 2010, the Bankruptcy Court entered orders granting the Examiner's applications to employ Klee, Tuchin, Bogdanoff & Stern LLP and Saul Ewing LLP as his counsel and LECG, LLC as his financial advisor *nunc pro tunc* to April 30, 2010 [Docket Nos. 4498, 4499, 4500].[3]  The Bankruptcy Court also entered an order, on May 20, 2010, authorizing the Examiner to issue subpoenas for oral examinations and production of documents [Docket No. 4523].

Pursuant to the Examiner Order, as modified by the Supplemental Order, the Examiner was directed to conduct the Investigation, responding to each of the following Questions:[4]

> Question One:  evaluate the potential claims and causes of action held by the Debtors' estates that are asserted by the Parties, in connection with the leveraged buy-out of Tribune that occurred in 2007 (the "LBO") which may be asserted against any entity which may bear liability, including, without limitation, the Debtors, the Debtors' former and/or present management, including former/present members of Tribune's Board, the Debtors' lenders and the Debtors' advisors, said potential claims and causes of action including, but not limited to, claims for fraudulent conveyance (including both avoidance of liability and disgorgement of payments), breach of fiduciary duty, aiding and abetting the same, and equitable subordination and the potential defenses asserted by the Parties to such potential claims and causes of action.

> Question Two:  evaluate whether Wilmington Trust Company violated the automatic stay under 11 U.S.C. § 362 by its filing, on March 3, 2010, of its Complaint for Equitable Subordination and Disallowance of Claims, Damages and Constructive Trust.

> Question Three:  evaluate the assertions and defenses made by certain of the Parties in connection with the Motion of JPMorgan Chase Bank, N.A., for Sanctions Against Wilmington Trust Company for Improper Disclosure of Confidential Information in Violation of Court Order  (D.I. 3714).

---

[3]     The Examiner is grateful to his professional advisors for their tireless efforts in conducting this massive Investigation and helping to craft the Report.

[4]     Ex. 1 at ¶ 2 (Examiner Order).

In addition, the Examiner Order specified that the Examiner would "otherwise perform the duties of an Examiner set forth in 11 U.S.C. § 1106(a)(3) and (4) (as limited by this Order)."[5] The Examiner Order directed the Examiner to prepare and file a report in respect of the Investigation on or before July 12, 2010, unless such time shall be extended by order of the Bankruptcy Court on application by the Examiner and notice to the Parties.

On June 16, 2010, the Examiner filed the *Supplement Re: Examiner's Work and Expense Plan of Court-Appointed Examiner, Kenneth N. Klee, Esq.* [Docket No. 4797], apprising the Bankruptcy Court of the progress of the Investigation and advising the Bankruptcy Court that the scope and breadth of the work required to complete the Investigation was substantially greater than anticipated when the Examiner's Work Plan was filed, prior to the commencement of the Investigation.

On June 23, 2010, the Examiner filed the *Motion of Court-Appointed Examiner, Kenneth N. Klee, Esq. for Extension of Report Deadline* [Docket No. 4858].  Pursuant to a duly-entered order shortening time, the Bankruptcy Court held a telephonic hearing on the motion on July 1, 2010.  By order of the Bankruptcy Court entered on July 1, 2010, the Bankruptcy Court extended the deadline for the Examiner to file the Report through and including July 26, 2010 at 11:59 p.m. prevailing Eastern time [Docket No. 4928].

B.       **Organization of the Report.**

The Report comprises four Volumes (including annexes and tables) and an Appendix. Volume One comprises Sections I, II and III.  Section I of the Report summarizes the Examiner's principal findings.  Section II discusses the manner in which the Investigation was conducted. Section III contains the Statement of Facts.

_____

[5]      *Id.*

Although the Statement of Facts generally is organized chronologically, the Leveraged ESOP Transactions involved activities by dozens of participants who often were engaged in activities simultaneously that touched different aspects of the transactions.  The Statement of Facts contains specific sections focusing on the activities of the key players in the Leveraged ESOP Transactions at different times.  By necessity, some of these discussions span a multi-month period, followed by a discussion covering the same time period but focusing on a different participant in the transactions.  Thus, although the Statement of Facts generally progresses chronologically from the period preceding Step One to the Step Two Financing Closing Date in December 2007, certain sections of the Statement of Facts cover overlapping time periods.  Although, as noted, the Statement of Facts contains a narrative discussion of the relevant participants, events, and documents, it also specifically addresses, and sets forth the Examiner's findings regarding, a host of e-mails and documents cited by the Parties in support of their respective contentions.

Volume Two comprises Section IV.  Section IV contains the Examiner's analyses and conclusions concerning the issues raised in Question One.  The Examiner has organized this portion of the Report (as well as Volume Three) to enable the reader to obtain, in a relatively quick fashion, the Examiner's "bottom line" regarding the issues presented.  To accomplish this objective, the Report sets forth the Examiner's conclusions regarding the principal issues addressed in each subsection at the outset of that subsection, followed immediately by the Examiner's factual and legal analysis.  Although Section IV contains citations to relevant documents and facts adduced in the Statement of Facts, these citations are not intended to represent all of the facts and documents supporting the Examiner's legal conclusions.  Readers are encouraged to review the legal issues addressed in Section IV in tandem with the

corresponding factual discussion set forth in Section III.  Volume Two is accompanied by

Annex A (DCF Valuation Analysis), Annex B (Recovery Scenarios), and Annex C (Tribune

Payments to LBO Lenders).

Volume Three comprises Sections V and VI.  Section V contains the Examiner's analysis

and conclusions regarding Question Two.  Section VI contains the Examiner's analysis and

conclusions regarding Question Three.

Volume Four contains all of the defined terms that are used in the Report.

Finally, the Appendix to the Report (which will be filed subsequent to the Report itself

following leave of the Bankruptcy Court) will contain the exhibits cited in the Report.

### C.      Summary of Principal Conclusions.

The four Volumes comprising the Report contain dozens of discrete factual and legal

findings.  Summarizing each and every one of them here would take many pages and would not

read very much like a summary.  Some of the issues discussed in the Report, moreover, are

difficult, nuanced, and not conducive to summary treatment.  Nevertheless, the Examiner

recognizes that not everyone has the time or the inclination to read the entire Report.  The

summary below, therefore, is intended to serve as a brief overview of the Examiner's principal

conclusions and give readers the big picture.  Even with that limited purpose, regrettably, the

summary below is lengthy.  Readers are encouraged to review this Section I with the Glossary of

Defined Terms, contained in Volume Four of the Report, which defines the capitalized terms

used in the Report.  The summary does not, in every instance, correspond to the chronological

order of the main volumes.

The Examiner did not reach definitive conclusions regarding certain of the issues

considered in the Report, because, as noted, certain issues presented are difficult and nuanced.

As a result, by necessity, the Examiner established a full range of potential conclusions from

highly likely to highly unlikely, with steps in between.  Specifically, the Examiner determined to frame his conclusions in the Report in a uniform fashion utilizing the following continuum: (1) highly likely, (2) reasonably likely, (3) somewhat likely, (4) equipoise, (5) somewhat unlikely, (6) reasonably unlikely, and (7) highly unlikely.  This summary uses these terms, as does the rest of the Report, in reference to the Examiner's conclusions.

The Examiner emphasizes that the conclusions summarized below (indeed, all of the conclusions reached in the Report) are based on the evidence adduced in the Investigation through July 25, 2010.  As summarized in the next section of the Report, the Examiner and his team worked nearly around the clock from the time of his appointment to the issuance of the Report to understand and, ultimately, evaluate what happened in the Leveraged ESOP Transactions.  Although the Examiner and his advisors considered and developed a massive amount of information, by Bankruptcy Court order the Examiner had an extremely limited period of time to conduct the Investigation.  Had the Examiner had more time, he would have interviewed (and probably re-interviewed) several more witnesses and certainly would have conducted further discovery.  When appropriate, the Report notes specific areas meriting further investigation.

Finally, as discussed in the next section of the Report, as a result of what the Examiner believes are largely unjustified assertions of confidentiality by certain Parties, the Examiner was left with no choice but to redact from the version of the Report filed with the Bankruptcy Court essentially everything but this summary, the portions of Volume Two containing discussions of legal principles, Volume Three (discussing Questions Two and Three), and the Glossary of Defined Terms contained in Volume Four.  During the Investigation, the Examiner repeatedly encouraged the Parties and other entities that previously produced documents and furnished

information on a confidential basis to refrain from needlessly continuing to assert confidentiality, which in turn could unjustifiably shield highly relevant information from the public.  Despite repeated efforts, certain Parties persisted in asserting confidentiality.  The Examiner has taken these assertions up with the Bankruptcy Court and is hopeful that the vast majority, if not the entirety, of the Report (and exhibits) will be made available to the public.  The Examiner notes that certain Parties (including the Debtors, who facilitated the Investigation and were responsive to the Examiner's many requests for documents and information) acted responsibly in their assertions of confidentiality.

### 1. Question One.

Question One encompasses a host of bankruptcy and nonbankruptcy claims, causes of action, and defenses asserted by the Parties with respect to the Leveraged ESOP Transactions.

### a. Alleged Wrongful Acts—Intentional Fraudulent Transfers, Equitable Subordination, and Assorted Common Law Claims and Defenses.

Turning first to the cluster of bankruptcy and nonbankruptcy claims, causes of action, and defenses raised by the Parties involving the broad category of alleged wrongful acts by various persons and entities in connection with the Leveraged ESOP Transactions, the Examiner finds that a court is reasonably likely to conclude that the Step One Transactions did not constitute an intentional fraudulent transfer.  Application of the traditional "badges of fraud" to the record adduced and the circumstances giving rise to the Step One Transactions weigh against the conclusion that the Step One Transactions were entered into to hinder, delay, or defraud creditors.  Although Step One was a highly-leveraged transaction, which, after giving effect to the Step Two Transactions consummated half a year later, turned out very badly for creditors, the Examiner did not find credible evidence that the Tribune Entities entered into the Step One Transactions to hinder, delay, or defraud creditors.

The Examiner reaches a different conclusion regarding the Step Two Transactions and finds that it is somewhat likely that a court would conclude that the Step Two Transactions constituted intentional fraudulent transfers and fraudulently incurred obligations.  The Tribune Entities did not incur the approximately $3.6 billion in additional Step Two Debt until Step Two closed on December 20, 2007.  It is the incurrence of this indebtedness, the approximately $4 billion in payments made to stockholders, and the substantial amounts in fees paid to the lenders and investment bankers at Step Two,[6] that are the object of the Step Two intentional fraudulent transfer inquiry.  Although, as noted, this section of the Report is just a summary, the Examiner believes that it is appropriate to furnish, consistent with the above-noted restrictions imposed by confidentiality, some measure of detail here regarding his findings on this question, as the underlying factual predicates bear on other conclusions reached in the Report.

The story of how Tribune ended up effectuating a transaction that the Examiner believes a court would be somewhat likely to find was an intentional fraudulent transfer has its genesis in what transpired at Step One, and what the participants in the Step One Transactions expected at that time would happen at Step Two.  In connection with the Step One Transactions consummated in June 2007, three highly-qualified outside advisors were actively engaged: MLPFS and CGMI on behalf of Tribune, and Morgan Stanley on behalf of the Special Committee (which was formed in the fall of 2006 to oversee Tribune's consideration of a possible strategic transaction).  In the period leading up to the closing of Step One, these advisors evaluated management's projections as well as the solvency work performed by the entity retained to issue a solvency opinion required for Step One to close, Valuation Research Corporation (VRC).  With the input of the outside advisors, the Tribune Board approved the

---

[6]    As a result of certain Parties' assertions of confidentiality, the Examiner believes that he is not at liberty to disclose the amount of fees paid.

Leveraged ESOP Transactions on April 1, 2007 and the Tribune Entities proceeded with the closing of the Step One Financing on June 4, 2007, having succeeded in obtaining commitments from the Lead Banks to advance the funds necessary to complete the Leveraged ESOP Transactions.

The record shows that, at the time of Step One, the Tribune Board, the Special Committee, and the Financial Advisors all were aware that the Tribune Entities would be incurring substantial additional indebtedness if Step Two closed. The underlying transaction documents, therefore, conditioned Tribune's effectuation of the Merger that would complete the Leveraged ESOP Transactions at Step Two, and the incurrence of the Step Two Debt necessary to complete those transactions, on Tribune's solvency (as specially defined in certain of these documents) after giving effect to the Step Two Transactions, and, specifically, on Tribune obtaining a third-party solvency opinion and furnishing to the LBO Lenders solvency certificates and representations concerning solvency. In other words—and this is critical for purposes of analyzing the intentional fraudulent transfer issues at Step Two—by design, a direct causal nexus existed between, on the one hand, the obligations incurred and transfers made at Step Two and, on the other hand, the procurement and issuance of the solvency opinion and solvency certificates and the making of solvency representations. The former could not occur without the latter.

As summarized below, the Examiner concludes that it is highly likely that Tribune, and reasonably likely that the Guarantor Subsidiaries, were rendered insolvent and without adequate capital as a result of the closing of the Step Two Transactions. Thus, unfortunately, what was supposed to never happen ended up happening. Although insolvency and gross disparity in the value given and received are most commonly associated with constructive fraudulent transfer

analysis, they also are "badges of fraud" for purposes of intentional fraudulent transfer analysis.

But, standing alone, they are not sufficient to render a transaction intentionally fraudulent.  In the

course of the Investigation, the Examiner found that these two factors do not stand alone.  In

particular, the Examiner focused his Investigation on three instances involving dishonesty by

Tribune in the period leading up to, and resulting in, the Step Two Closing.  It should be noted

that direct evidence that a transferor set about to hinder, delay, or defraud creditors rarely is

found, and that is why "courts usually rely on circumstantial evidence, including the

circumstances of the transaction, to infer fraudulent intent."[7]

First, the Examiner found evidence indicating that Tribune did not act forthrightly in

procuring the solvency opinion issued by VRC at Step Two.  Based on the record adduced, the

procurement of the solvency opinion was marred by dishonesty and lack of candor about the role

played by Morgan Stanley in connection with VRC's solvency opinion and on the question of

Tribune's solvency generally.  Second, the Examiner found evidence indicating that Tribune's

senior financial management failed to apprise the Tribune Board and Special Committee of

relevant information underlying management's October 2007 projections on which VRC relied in

giving its Step Two solvency opinion.  Although the Examiner found no direct evidence that this

information was purposely withheld from the Tribune Board or Special Committee in December

2007, the Examiner finds it implausible that the failure to apprise the Tribune Board and Special

Committee of this information relating to the Step Two solvency valuation, and to a

representation given by Tribune to VRC, was unintentional.  Third, the Examiner found evidence

that one important component of those projections went beyond the optimism that sometimes

characterizes management projections.  Although the Examiner found no direct evidence that

---

[7]     *See Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.),* 327 B.R.
        537, 550 (D. Del. 2005), *aff'd,* 278 F. App'x 125 (3d Cir. 2008) (citing authorities).

Tribune's management was deceitful in the preparation and issuance of this aspect of the October 2007 forecast, this component of the projections bears the earmarks of a conscious effort to counterbalance the decline in Tribune's 2007 financial performance and other negative trends in Tribune's business, in order to furnish a source of additional value to support a solvency conclusion.  The Examiner found that other aspects of management's projections, while aggressive, do not support the conclusion that the senior financial management at Tribune prepared them in bad faith.

Although not fitting neatly into one of the recognized "badges of fraud," the record also shows that fiduciaries charged with the responsibility for overseeing management's actions and determining whether the Step Two Transactions would render Tribune insolvent did not adequately discharge their duties.  After Step One closed, Tribune's financial performance deteriorated.  This circumstance, combined with the decline in the price of Tribune Common Stock, the amount of indebtedness Tribune would incur if Step Two closed, and broader market indicia, raised red flags signaling Tribune's insolvency if Step Two went forward.  Indeed, had anyone performed a relatively simple mathematical calculation before Step Two closed, it would have been readily apparent that VRC's proposed Step Two solvency opinion translated into an implied pre-Step Two mid-point per share value of about $39 per share, well above both the $34 Tender Offer price that had been locked-in during the spring of 2007 (under far superior market conditions) and the trading value of Tribune's stock in the late fall of 2007.  VRC's opinion was highly suspect.

In contrast to the active involvement by MLPFS, CGMI, and Morgan Stanley in the period preceding Step One, by the late fall of 2007 MLPFS and CGMI had ceased advising Tribune because of conflicts arising from the lending activities of their respective affiliates,

MLCC and Citicorp.  Unlike at Step One, neither of those advisors evaluated for the Tribune Board the reasonableness of management's projections or VRC's work.  Although the Special Committee's Financial Advisor, Morgan Stanley, reviewed VRC's presentation materials and made brief oral remarks to the Special Committee which convened on December 18, 2007 to consider VRC's Step Two solvency opinion, no minutes of that Special Committee meeting ever were duly approved and adopted.  Testimony provided in the course of the Investigation contradicted what is stated in portions of the draft minutes of that meeting attributed to Morgan Stanley, including that VRC's ultimate solvency opinion was conservative and was something on which directors could reasonably rely.  In the course of the Investigation, the Examiner found a pattern beginning in early December 2007 in which Tribune used Morgan Stanley's imprimatur to bolster VRC's solvency opinion and push Step Two over the goal line, without authorization from Morgan Stanley.

The record shows, moreover, that both the Special Committee and the Tribune Board approved VRC's solvency opinion, despite the fact that no third-party advisor ever evaluated the reasonableness of that opinion or the projections on which VRC relied.  This is true even though VRC's engagement letter required that VRC use a definition of "fair market value" and "fair saleable value" that was contrary to well-established principles of sound valuation, as discussed extensively in the Report.  In effect, VRC was required to add to the value derived from its analysis the value conferred on the Tribune Entities from the S-Corporation/ESOP structure as a result of the Merger, even though inclusion of this value in the determination of "fair market value" and "fair saleable value" was improper.  Even leaving this flaw aside, the solvency opinion was implausible.  Other facts and circumstances, discussed in the Report, strongly

suggest that the Tribune Board and the Special Committee failed appropriately to discharge their responsibilities at Step Two.

Based on the record adduced and applying the "natural consequences" formulation adopted by the Third Circuit Court of Appeals[8] to test whether an intentional fraudulent transfer occurred, the Examiner finds that a court is somewhat likely to conclude that the Tribune Entities incurred the obligations and made the transfers in Step Two with actual intent to hinder, delay, or defraud creditors.  When a debtor resorts to what appears to be dishonesty to close a transaction, when no third-party advisor critically evaluates management's projections or the solvency opinion necessary for that transaction to close, when the transaction under consideration renders the debtor insolvent based on facts and circumstances known or reasonably ascertainable at the time, and when that transaction results in the debtor receiving far less than reasonably equivalent value, the natural consequence is that creditors will be hindered, delayed, or defrauded.

As discussed in the Report, the Examiner considered three principal potential mitigating factors that weigh against a conclusion that the Tribune Entities perpetrated an intentional fraudulent transfer at Step Two.  First, although Tribune charged senior financial management with the responsibility for preparing projections and procuring the VRC solvency opinion and, therefore, any acts by management are ascribed to Tribune as a matter of law, nothing in the record suggests that the Tribune Board or the members of the Special Committee knowingly or intentionally committed any fraud or acts of dishonesty.  Second, by all appearances, through and including the closing of the Step Two Transactions, the Zell Group remained eager to close Step Two.  That the Zell Group still wanted to proceed with the transaction furnished some indicia to the Tribune Board and Special Committee that this significant and highly sophisticated

---

[8]    *United States v. Tabor Court Realty Corp.,* 803 F.2d 1288, 1305 (3d Cir. 1986).

participant in the Leveraged ESOP Transactions had not concluded that Tribune was about to be rendered insolvent if the Merger were consummated.  Third, despite posing questions to Tribune and making it known to Tribune that they had retained a third-party solvency expert, the LBO Lenders ultimately funded the Step Two Debt.  That the LBO Lenders were prepared to advance another $3.6 billion to the Tribune Entities (albeit heavily influenced by their preexisting contractual obligations made at Step One) supplied additional indicia that yet another sophisticated party was unwilling to stand in the way of the Step Two Closing.

The honesty of Tribune's outside directors, however, does not erase what appears to be the dishonesty found in the course of the Investigation.  Likewise, the Zell Group's eagerness to take control of Tribune and willingness to invest approximately $56 million on a net basis at Step Two (representing about 1.5% of the aggregate debt and equity funded to make Step Two happen), and the unwillingness of the LBO Lenders to force a showdown with Tribune over funding Step Two, do not excuse Tribune's directors from failing to perform their responsibilities and do not erase the other evidence supporting the conclusion that an intentional fraudulent transfer occurred at Step Two.  In sum, the Examiner does not believe that a court will likely find that the mitigating factors outweigh the contrary evidence.  Nevertheless, in light of the mitigating factors, the Examiner concludes that it is only somewhat likely that a court would find an intentional fraudulent transfer occurred at Step Two.

Continuing the broad category of alleged wrongful acts by various persons and entities, with respect to claims for breach of fiduciary duty, the Examiner concludes that although, for the reasons summarized above, Tribune's directors did not exercise reasonable care in evaluating whether the solvency condition to the Step Two Closing was satisfied, Delaware law governing breach of fiduciary duty probably would not support imposition of liability against them.  The

Examiner reaches this conclusion in view of the exculpatory provisions contained in Tribune's corporate charter and the relatively low threshold required under Delaware law to satisfy the requirement of good faith.  As a result, although the Examiner acknowledges that the question is relatively close, based on the record adduced, the Examiner concludes it is somewhat unlikely that a court would impose liability against them.  The Examiner, however, finds it reasonably likely that a court would conclude that one or more of Tribune's officers breached their fiduciary duties in connection with the Step Two Transactions.  The Examiner did not find any credible evidence to support the conclusion that various third parties (the Large Stockholders, the Lead Banks, the Financial Advisors, and the Zell Group) aided and abetted any breach of fiduciary duty in connection with the Leveraged ESOP Transactions (although the Examiner leaves in equipoise the question whether VRC aided and abetted a breach of fiduciary duty or committed professional malpractice).

Based on the Investigation conducted to date, the Examiner finds that it is somewhat unlikely that a court would equitably subordinate or equitably disallow all or any portion of the LBO Lender Debt.  Although the Examiner did find evidence suggesting that the Lead Banks suspected, and some may have even believed, that the Step Two Transactions would render Tribune insolvent or close to insolvent, the record adduced does not support a finding that the Lead Banks engaged in the type of egregious behavior required to support imposition of these remedies.  The Examiner finds that the actions of the Lead Banks in the fall of 2007 largely were driven by the contractual obligations they made in the spring of 2007 at Step One.  These contractual predicates help explain the actions of the Lead Banks between the closing of Step One and the closing of Step Two, and, the Examiner believes, serve as mitigating factors against the conclusion that equitable subordination or equitable disallowance is warranted.  As discussed

in the Report, however, the information adduced in the Investigation regarding certain actions by the Lead Banks in the fall of 2007 suggests that further investigation is warranted, among other things, on the question whether deliberations by the Lead Banks in the months preceding the Step Two Closing are protected from disclosure based on assertions of attorney-client privilege. The Examiner concludes that it is reasonably unlikely a court would conclude that any unjust enrichment claims are meritorious.  Finally, the Examiner concludes that a court is reasonably unlikely to find that a claim for illegal corporate distributions pursuant to the relevant provisions of the DGCL could be sustained against Tribune's directors, based on the Step One Transactions, and is somewhat unlikely to find that such a claim could be sustained against Tribune's directors based on the Step Two Transactions.

> **b.**     **Constructive Fraudulent Transfer Claims and Defenses.**

Turning to the questions presented by the Parties arising under the general topic of constructive fraudulent transfer claims, the Examiner considered two threshold questions under what is colloquially referred to as the "collapse principle."  First, the Examiner concludes that it is highly likely that a court would collapse all of the transactions *within* each of Step One and Step Two for purposes of evaluating the equivalence of the consideration given and received by the estates.  Second, although the question is relatively close, the Examiner concludes that a court is somewhat unlikely to collapse Step One and Step Two *together* and thereby include the Step Two Debt for purposes of assessing solvency at Step One.  On the latter question, applying the standards governing when collapse is warranted, the Examiner cannot reasonably conclude that satisfaction of all of the conditions to the Step Two Closing were a mere formality or that the Step Two Closing was assured from beginning to end.  Thus, the Examiner finds that it is somewhat unlikely that a court would collapse Step One and Step Two together for solvency purposes.  The Examiner also concludes that the Step Two Debt did not constitute a liability of

the Tribune Entities at Step One.  However—and this is an important distinction—the Examiner

concludes that in measuring capital adequacy at the time of Step One and in considering whether

the Tribune Entities intended to incur debts beyond their ability to repay, a court is highly likely

to consider all obligations that were reasonably foreseeable at the time of Step One, including

those caused by Step Two, as and when they were scheduled to require payment of interest or

principal.  Stated succinctly, whereas the Step Two Debt is not added to the balance sheet for

Step One solvency purposes, this prospective indebtedness must be taken into account for

purposes of measuring the Tribune Entities' capital adequacy and intention to incur debts beyond

their reasonable ability to pay.  Arguments presented by certain Parties to the contrary are not

supported by the law governing the measurement of capital adequacy and the plain language of

the Bankruptcy Code governing a debtor's intention to incur debts beyond its reasonable ability

to pay.

Turning to questions of solvency and capital adequacy, the Examiner reaches a series of

conclusions concerning the effect of the joint and several liability of all of Tribune and the

Guarantor Subsidiaries on the LBO Lender Debt and the intercompany claims among the various

Tribune Entities, on those questions.  In broad outline, the Examiner finds that although a court

would consider the solvency of each Tribune Entity separately, a court is reasonably likely, in

the first instance, to value those entities collectively for solvency purposes after giving effect to

intercompany claims and offsets and in consideration of the Tribune Entities' joint and several

liability on the LBO Lender Debt.[9]

Regarding solvency and capital adequacy at Step One, the Examiner concludes that it is

highly unlikely that the Tribune Entities were rendered insolvent at Step One if only the Step

---

[9]   This area of inquiry is dense and highly technical, and it is unlikely that anyone other than the Parties and their
professionals will make their way through those sections of the Report.  They were as difficult to write as they
undoubtedly will be to read.

One Debt is considered.  Among other things, market indicia and the Tribune auction process leading to the Tribune Board's approval of the Leveraged ESOP Transactions on April 1, 2007 support this conclusion.  The Examiner further concludes that if, contrary to the conclusion the Examiner reached, a court were to collapse Step One and Step Two together or treat the Step Two Debt as a liability for solvency purposes at Step One, it is somewhat unlikely (although an exceedingly close call) that a court would conclude that the Tribune Entities were rendered insolvent in that scenario.  The Examiner further concludes that a court is reasonably unlikely to find that the Step One Transactions left the Tribune Entities without adequate capital, even taking into account the effect of the Step Two Debt contemplated at the time of Step One.  One important premise underlying this conclusion is that Tribune management's projections developed in February 2007 (as thereafter revised, and ultimately relied on by VRC in its Step One solvency opinion) should be used for purposes of testing capital adequacy at Step One.  For the reasons discussed in the Report, based on what was known and reasonably ascertainable at the time of the Step One Financing Closing Date, the Examiner finds that the variances in Tribune's financial performance through the Step One Financing Closing Date were not sufficient to justify adjusting those projections for purposes of testing capital adequacy.  Finally, the Examiner finds that it is reasonably unlikely that a court would conclude that the Tribune Entities entered into the Step One Transactions intending to incur debts beyond their reasonable ability to pay.

Regarding solvency and capital adequacy at Step Two, the Examiner finds that (i) it is highly likely that a court would conclude that Tribune was rendered insolvent and left without adequate capital after giving effect to the Step Two Transactions, and (ii) it is reasonably likely that a court would conclude that the Guarantor Subsidiaries were left without adequate capital

after giving effect to the Step Two Transactions.  These are not particularly close questions.  The Examiner finds that, applying a subjective test, a court is somewhat likely to find that the Tribune Entities intended to incur or believed they would incur debts beyond their ability to pay as such debts matured.  If a court were to apply an objective test on this question, the answer to this question and the question of capital adequacy at Step Two would be the same.

Regarding the question whether the Tribune Entities received reasonably equivalent value in exchange for the obligations incurred and transfers made in the Leveraged ESOP Transactions if the other prerequisites to avoidance are met, as an overall matter the Examiner concludes that the Tribune Entities did not receive reasonably equivalent value in exchange for the obligations incurred on the LBO Lender Debt.  The Examiner reached a series of conclusions regarding whether certain of the LBO Lenders conferred direct or indirect value to one or more of the Tribune Entities in connection with the advances made in the Step One Transactions and the Step Two Transactions.  With respect to the Parties' contentions concerning value allegedly conferred by the LBO Lenders from specific components of the advances made by those creditors at Step One and Step Two, the Examiner finds that it is highly likely a court would conclude that none of the LBO Lenders conferred reasonably equivalent value on any Tribune Entity (i) for the payments made at Step One and Step Two to Selling Stockholders, (ii) for the satisfaction of the LATI Notes at Step One, and (iii) for Tribune's alleged "private company status" following the Step Two Transactions.  The Examiner finds that it is highly likely that a court would find that the lenders under the Credit Agreement conferred reasonably equivalent value on Tribune resulting from the repayment of the 2006 Bank Debt.  Finally, the Examiner finds that it is reasonably likely that certain of the LBO Lenders conferred, in varying degrees, reasonably equivalent value on certain of the Tribune Entities resulting from (i) at Step One and Step Two,

obligations incurred to pay portions of the LBO Fees, (ii) at Step One, the provision of the

Revolving Credit Facility and the Delayed Draw Facility, and (iii) at Step Two, various tax and

annual 401(k) savings.  The Examiner concludes that a court is highly likely to find that the

Financial Advisors conferred some value on the Tribune Entities on account of their services

rendered, but the Examiner is unable to conclude how much value a court would ascribe to those

services.

The Examiner concludes that, to the extent obligations incurred in the Leveraged ESOP

Transactions lacked reasonably equivalent value, then interest and principal payments made after

those transactions but before the Petition Date on account of those obligations likewise were for

less than reasonably equivalent value.  Based on the applicable case law (which is less than

clear), however, the Examiner leaves in equipoise the question whether the Credit Agreement

Agent and the Bridge Credit Agreement Agent are the initial transferees of the payments on

account of the indebtedness incurred under their respective credit agreements.

Turning to the various defenses asserted by certain Parties, the Examiner finds that a

court is highly likely to find that Bankruptcy Code section 546(e)[10] protects payments to the

Selling Stockholders on account of their equity interests in Tribune in connection with the

Leveraged ESOP Transactions, except to the extent the transfers constitute intentional fraudulent

transfers.  As a result of the Examiner's findings concerning lack of an intentional fraudulent

transfer at Step One, section 546(e) should provide a defense to avoidance or recovery of

payments made to the Selling Stockholders in the Step One Transactions.  The converse is true

with respect to the payments made to those parties (and obligations incurred to the LBO

Lenders) in the Step Two Transactions.  The Examiner further finds that a court is reasonably

---

[10]    11 U.S.C. § 546(e) (2006).

likely to find that section 546(e) does not protect against avoidance of the obligations incurred on account of the LBO Lender Debt or the Stock Pledge, guarantees, or promissory notes given in connection therewith.  For the reasons discussed extensively in the Report, the Examiner disagrees with the contention advanced by certain Parties that this conclusion would render certain amendments to section 546(e) adopted in 2006 superfluous.  The Report explains why that contention is flawed.

With respect to the various "good faith" defenses asserted by certain Parties as partial defenses to avoidance, the Examiner finds that a court is highly likely to find that any lack of good faith by the Credit Agreement Agent or the Bridge Credit Agreement Agent at the time the respective obligations under these facilities were incurred will apply to all claims against the Tribune Entities issued under such facilities, whether those claims are in the hands of original holders or their successors.  The Examiner finds that a court is highly likely to apply an "objective test" for determining good faith in evaluating defenses to avoidance.  Applying this standard and considering the actions of the Parties that asserted this defense, the Examiner finds as follows on the question of good faith regarding specified entities:

(1)       A court is reasonably likely to conclude that JPMCB acted in good faith in connection with the obligations incurred and advances made in the Step One Transactions, but not at Step Two.

(2)       The Examiner finds no basis to vary the conclusions reached above concerning JPMCB's actions as Credit Agreement Agent from the actions of the JPM Entities as recipients of LBO Fees at both steps.  As a result, the Examiner finds that it is reasonably likely that the JPM Entities acted in good faith in Step One, but not at Step Two.

21

(3)     For reasons similar to the Examiner's rationale for his conclusion concerning JPMCB as Credit Agreement Agent, the Examiner finds that it is reasonably likely that a court would conclude that MLCC did not act in good faith as Bridge Credit Agreement Agent in connection with the obligations incurred and advances made in the Step Two Transactions.

(4)     Regarding the LBO Fees paid to the Merrill Entities at Step One, for reasons similar to the Examiner's conclusions concerning the good faith of JPMCB and MLCC as agents at Step One, the Examiner finds that it is reasonably likely that a court would find that the Merrill Entities acted in good faith in their capacity as transferee of LBO Fees at Step One, but not at Step Two.

(5)     Regarding the LBO Fees paid to the Citigroup Entities at Step One, for reasons similar to the Examiner's conclusions generally regarding lender good faith at Step One, the Examiner finds that it is reasonably likely that a court would conclude that the Citigroup Entities acted in good faith in their capacity as transferee of LBO Fees at Step One, but not at Step Two.

(6)     Regarding the LBO Fees paid to the BofA Entities at Step One, for reasons similar to the Examiner's conclusions generally regarding other lender good faith at Step One, the Examiner finds that it is reasonably likely that a court would conclude that the BofA Entities acted in good faith in their capacity as transferee of LBO Fees at Step One, but not at Step Two.

(7)     The Examiner finds that a court is somewhat likely to conclude that both MLPFS and CGMI acted in good faith in connection with the payments made to them for Advisor Fees for financial advisory services in connection with the Leveraged ESOP Transactions, although the question is closer respecting payments made to CGMI shortly after the Step Two Closing.

### c.     Potential Preference Claims and Defenses.

The Examiner finds that it is unclear whether satisfaction of the Exchangeable EGI-TRB Note in connection with the Step Two Transactions constitutes a preferential transfer.  Even if,

however, satisfaction of the Exchangeable EGI-TRB Note qualifies as a preferential transfer, the Examiner finds that it is reasonably likely that a court would find that the transaction is subject to an ordinary course of business defense.  It is unclear, however, whether a court would find that the transaction is subject to a new value defense.

The Examiner further finds that to the extent that payments to the LBO Lenders on account of the Credit Agreement Debt and the Bridge Debt qualified as preferential transfers, it is reasonably likely that a court would find that the payments would be subject to an ordinary course of business defense, except to the extent that the underlying Credit Agreement Debt and Bridge Debt are avoided as fraudulent transfers.

The Examiner did not have a sufficient opportunity to evaluate potential preference claims and defenses relating to bonuses, deferred compensation, retention, severance, and change in control payments made to directors and officers of the Tribune Entities, and to payments on intercompany claims, during the one-year period prior to the Petition Date.  These issues were only briefly mentioned and insufficiently developed by the Parties, and a thorough analysis would require, in the case of the first category, scrutiny of multiple payments to more than two hundred individuals and, in the case of the second category, many thousands of transactions occurring over a one-year period.

<div style="text-align:center"><b>d.      Issues Relating to Remedies Resulting From Avoidance<br>Actions.</b></div>

The Examiner next considered two issues under the general category of "standing."  First, the Examiner concludes that it is highly likely that a court would find that each Guarantor Subsidiary that is a Debtor in the Chapter 11 Cases has standing to seek avoidance of the obligations incurred to the LBO Lenders.  Second, the Examiner concludes that a court is reasonably likely to find that *if* the estate representatives for Tribune and the Guarantor

<div style="text-align:center">23</div>

Subsidiaries were to successfully avoid the obligations incurred on account of the LBO Lender

Debt, then the value available from avoidance at the Guarantor Subsidiary estates would not be

limited solely to the satisfaction of the Non-LBO Debt at the Guarantor Subsidiary levels.  Based

on the Examiner's conclusions concerning both intentional and constructive fraudulent transfer

claims at Step One, however, the Examiner believes that the above finding would not likely

affect the outcome in these cases.

The Examiner also made a series of findings concerning the effect of avoidance on

certain creditor recoveries.

First, the Examiner concludes that to the extent a transferee of an avoided transfer pays

the amount or turns over such property, the transferee will be entitled to assert a claim against the

estate to which the funds are paid or returned equal to the non-constructively fraudulent claim.

The Examiner finds, however, that to the extent an obligee's claim is avoided, a court is

reasonably likely only to permit any participation of such a claim in distributions from the estate

to the extent the claim is supported by reasonably equivalent value or if Non-LBO Creditor

claims are paid in full with interest.  It is reasonably likely that if the Step Two Debt, but not the

Step One Debt, is avoided, absent an otherwise applicable basis to subordinate or disallow the

Step One Debt or assert rights of unjust enrichment, the Step One Debt would participate in

distributions from the estates in accordance with applicable non-bankruptcy priorities, but the

Examiner leaves in equipoise the question whether the Step One Debt would participate in

avoidance recoveries if the Step Two Transactions are avoided.

Second, the Examiner concludes that to the extent the LBO Lender Debt is not avoided

(or if avoided, to the extent enforced under Bankruptcy Code section 548(c)),[11] the LBO Lenders

---

[11]    11 U.S.C. § 548(c) (2006).

will be entitled to recover value at the Guarantor Subsidiary levels as well as enforce their rights under the PHONES Subordination at the Tribune level with respect to distributions from the Tribune estate.  The Examiner, however, concludes that a court is reasonably likely to hold that the PHONES Subordination would not extend to LBO Lender Debt avoided at the Tribune level.

Third, the Examiner concludes that, to the extent the Credit Agreement Debt and Bridge Debt are not avoided (or if avoided, to the extent enforced under Bankruptcy Code section 548(c)) at the Guarantor Subsidiary levels, the subordination provisions of the Subordinated Bridge Subsidiary Guarantee will remain in effect and govern distributions from the Guarantor Subsidiary estates.  It is reasonably likely that to the extent those obligations are avoided and are not enforced under section 548(c) at the Guarantor Subsidiary levels and the Stock Pledge is avoided and thereby rendered inoperative, however, such avoidance in turn would invalidate the subordination provisions of the Subordinated Bridge Subsidiary Guarantee, such that any value distributed by Tribune (including amounts available to Tribune as a result of the remittance of value from the Guarantor Subsidiaries to Tribune resulting from avoidance of the LBO Lender Debt) would be ratably distributed between the Credit Agreement Debt and the Bridge Debt.  The Examiner finds, however, that in connection with fashioning remedies resulting from avoidance, once all Non-LBO Creditors are paid in full plus post-petition interest, a court is reasonably likely to adjust this result.

## 2.    Question Two.

Question Two presents a relatively discrete inquiry regarding whether Wilmington Trust violated the automatic stay imposed under Bankruptcy Code section 362[12] when it filed the Complaint against the Lead Banks and certain other defendants.  On this matter, the Examiner

---

[12]    11 U.S.C. § 362 (2006).

concludes that a court is reasonably likely to find that Wilmington Trust did not violate the automatic stay by filing the Complaint.

Although the Complaint includes certain factual allegations that could underlie a fraudulent transfer claim, the Complaint does not actually allege a fraudulent transfer claim as a substantive cause of action, nor does it seek to recover property that may have been fraudulently transferred by the Debtors before the Chapter 11 Cases were commenced. The claims for relief alleged in the Complaint are limited to equitable subordination and disallowance of the defendants' claims, breach of fiduciary duty by the predecessor indenture trustee to the holders of the PHONES Notes and the defendants' aiding and abetting that breach of fiduciary duty, and the imposition of a constructive trust on distributions that would be received by the defendants. The use of factual allegations that may form the basis of an avoidance action does not convert these claims into fraudulent transfer claims.

Even if the claims for relief requesting equitable subordination and disallowance of the defendants' claims could be characterized as fraudulent transfer claims in substance, it is reasonably unlikely that avoidance actions themselves are rightfully considered property of the bankruptcy estate, the assertion of which could potentially violate the automatic stay. Property of the estate includes causes of action that the debtor could have asserted under nonbankruptcy law before the petition date. Before filing for bankruptcy, a debtor has no right under applicable nonbankruptcy law to prosecute an action for the recovery of property it has fraudulently transferred, and all such rights are vested exclusively in creditors. Because a debtor could not pursue a fraudulent transfer claim under applicable nonbankruptcy law before the petition date, a fraudulent transfer claim does not constitute property of the estate, although after a bankruptcy petition is filed the trustee or debtor in possession holds the exclusive right to pursue such claims

26

as representative of the estate, absent further order of the court.  For similar reasons, equitable

subordination claims and claim objections are not property of the estate, the assertion of which

would violate the automatic stay.

Finally, a court is highly likely to find that the breach of fiduciary duty, aiding and

abetting breach of fiduciary duty, and constructive trust claims for relief alleged in the Complaint

do not violate the automatic stay.  These claims are not property of the estate and do not seek to

obtain possession of property of the estate or exert control over any such property.  The breach of

fiduciary duty and aiding and abetting breach of fiduciary duty claims are premised on unique

and specific fiduciary duties allegedly owed by the predecessor indenture trustee to the holders

of the PHONES Notes and could not be asserted by the Tribune Entities.  The constructive trust

remedy also is limited to distributions from the estates that would otherwise be received by the

defendants, and does not seek to impose a constructive trust over property that is retained or held

by the Tribune Entities.

### 3.    Question Three.

Question Three requires the evaluation of assertions and defenses made by certain of the

Parties in connection with the motion filed by JPMCB for sanctions against Wilmington Trust

for alleged violations of the Depository Order.  The Examiner concludes that a court is

reasonably likely to find that Wilmington Trust, through its counsel, failed to comply with the

requirements of the Depository Order when it publicly filed the defectively redacted version of

the Complaint, but that this violation was not intentional or reckless.  The Examiner further

concludes that a court is reasonably likely to require Wilmington Trust to pay the reasonable

attorneys' fees and expenses incurred by JPMCB as a result of the violation of the Depository

Order.  Finally, the Examiner concludes it is reasonably unlikely that a court would find that

Wilmington Trust breached its fiduciary duties as a member of the UCC or violated the UCC's

bylaws.  The Examiner notes in this summary and in Volume Three that Wilmington Trust's

counsel exhibited candor and contrition in their discussions with the Examiner regarding this

matter and cooperated completely, while responding firmly to contentions of the Parties to which

they disagreed and advancing the interests of their client in this matter.

## II.

## CONDUCT OF THE EXAMINATION

### A.    Meet and Confer Process and Establishment of the Examiner Work Plan.

Pursuant to the Examiner Order, prior to commencing the Investigation, the Examiner

was required to meet and confer with the Parties and, no later than seven days after the filing of

the notice of appointment of Examiner, file a work and expenses plan, including a "good faith

estimate of the fees and expenses of the Examiner and the Examiner's proposed professionals for

conducting the Investigation (the 'Budget')."[13]

Beginning promptly after the Examiner's appointment by the United States Trustee, on

April 30, 2010, the Examiner and his proposed counsel held telephonic conferences with counsel

to the United States Trustee and the Parties to begin discussing the Investigation and arrange for

an in-person meet and confer of the Parties.  These telephonic conferences continued throughout

the weekend.  During this period, the Examiner and his proposed counsel began reviewing

various pleadings in these cases relating to the subject matter of the Investigation, as well as

pleadings relating to the examinations ordered in other large bankruptcy cases in recent years.

The Examiner determined to proceed immediately to convene all of the Parties to meet and

confer as rapidly as possible.  The Debtors and the other Parties agreed that a prompt meeting

was appropriate under the circumstances.

---

[13]    Ex. 1 at ¶ 4 (Examiner Order).

For two full days, beginning on Tuesday, May 4, 2010, the Examiner conducted in-person meetings with the Parties in New York City, to discuss with them his preliminary views—and in turn solicit the Parties' views—regarding the work plan for conducting the Investigation, the manner in which the Parties would cooperate and assist with the Investigation, the Examiner's preliminary cost estimates for the Investigation, the manner in which issues of confidentiality and privilege should be addressed, and the need for certain clarifications or modifications to the Examiner Order.  The Examiner also invited the Parties to share their views in writing on the preceding issues, as well as the merits of the factual and legal issues raised by the Investigation.  These meetings began with a plenary session of all Parties, during which the Examiner formally discharged his meet and confer obligations under the Examiner Order, followed by a series of meetings between the Examiner and particular Parties (or, in some cases, groups of Parties).

After these consultations and his review of publicly available pleadings, it became readily apparent to the Examiner that the tasks he was assigned were quite substantial, and the timeframe in which he had to perform those tasks was exceedingly limited.  The Investigation relates to a series of transactions involving billions of dollars, potential claims against numerous parties, intricate financial analyses and other factual matters as to which the Parties had substantial disagreements, and a lengthy list of wide-ranging legal claims, defenses, and issues under state and federal law.  The record adduced as of the time the Investigation commenced included over 3 million pages of documents that were collected in a document "depository," but were not topically indexed.[14]  Examinations of this magnitude have taken examiners appointed in other cases many months, if not years, to conduct.

---

[14]    The "Document Depository" created by the Parties is not a single, electronic database containing the documents produced to date, but rather a collection of over 150 compact discs containing documents produced by various

Faced with the preceding circumstances, the Examiner crafted an approach to the Investigation that was tailored to the circumstances presented and aimed at maximizing the possibility that the Examiner would timely generate a work product that would aid the Bankruptcy Court.  It became clear to the Examiner that the Parties had devoted substantial time, analysis, and research to the financial and legal issues presented by the Investigation.  The Examiner determined that the most sensible way to approach the Investigation in the limited time given was to capitalize on the work performed by the Parties, and, at least in the first instance, to look to the Parties in the adversarial process to flesh out the issues and facts in dispute and the relative strengths and weaknesses of the positions of the Parties.  These contributions were intended to supplement, rather than replace, the Examiner's independent Investigation.  The Examiner prepared and filed the Examiner Work Plan, which set forth this approach.  In the Examiner Work Plan, the Examiner readily conceded that he was unaware of any other examination that had proceeded in this fashion, but submitted that his approach was appropriate under the circumstances.  The Bankruptcy Court approved the Examiner Work Plan on May 10, 2010 in the Supplemental Order.

B.    **The Investigation.**

Immediately following the Bankruptcy Court's approval of the Examiner Work Plan, the Examiner dispatched a letter dated May 10, 2010 to the Parties, in which the Examiner established a comprehensive procedure for the Parties to present an agreed-upon (or substantially agreed-upon) statement of basic facts and to furnish comprehensive legal, financial, and factual analyses of the matters that were the subject of the Investigation. [15]  The Examiner also set

---

parties in connection with the Chapter 11 Cases, in a variety of electronic formats.  Unfortunately, it took the Examiner considerable time and expense to create a useable electronic database compiling these documents.

[15]    *See* Ex. 3 (Letter to Parties, dated May 10, 2010).

deadlines concerning the submission of analyses in the form of opening and reply briefs served

on all Parties, and the Examiner identified a host of legal and factual issues to which he

requested the Parties devote attention.[16]  In addition, the Examiner encouraged the Parties to

furnish any documents or analyses that might bear meaningfully on the factual or legal subject

matter of the Investigation, and to identify the names and contact information of any individuals

that the Parties believed the Examiner should interview, and any discovery that they believed the

Examiner should conduct in conjunction with the Investigation.  The Examiner's advisors often

posed follow-up questions and requested and obtained further analyses and documents from the

Parties' legal and financial advisors.

        The Examiner received, reviewed, and considered hundreds of pages of briefing and tens

of thousands of pages of documentation in connection with these submissions (principally, but

by no means exclusively, documents identified by the Parties to the Examiner as relevant to the

Investigation).  In retrospect, the provisions of the Examiner Order limiting the Investigation to

contentions "raised by the Parties" encouraged the Parties to raise just about every conceivable

claim or defense that could be imagined, lest the Examiner not consider it.  The Parties raised

dozens of claims and defenses, each with sub-issues and special complexities that required the

Examiner's careful evaluation.  Moreover, although the Parties took advantage of the opportunity

to annotate their submissions with documents allegedly supporting their positions, on close

inspection the Examiner determined that many of the documents did not support the contentions

for which they were provided; in many instances the Examiner and his advisors had to search for

and evaluate other documents to help develop a more complete picture.  The interviews

---

[16]    After sending the May 10, 2010 letter, the Examiner clarified that all Parties were invited to present briefs.

conducted by the Examiner and his advisors, discussed below, also raised issues that had not

been adequately fleshed out by the Parties.

Early on, the Examiner established his own electronic databases of documents and

information collected by his advisors.  These databases provided the Examiner with the ability to

review documents in a more organized fashion.  In conjunction with the submissions requested

under the above-noted May 10, 2010 letter, the Parties directly submitted evidence that they

contend supported their respective positions, which the Parties uploaded to a secure document

website established by the Examiner for that purpose.  During the Investigation, certain Parties

conducted documentary discovery, which was furnished to the Examiner.

The Examiner was surprised to learn at the outset of the investigation that—

notwithstanding the extensive legal and factual analyses prepared by the Parties and the wide-

ranging and factually-intensive allegations concerning, among other things, intentional

fraudulent transfer, bad faith, breach of fiduciary duty, and aiding and abetting fiduciary duty

breaches—only seven Rule 2004 examinations relating to the Leveraged ESOP Transactions had

been conducted.  The Examiner determined that it was necessary to identify and quickly arrange

and conduct interviews of key witnesses, not all of whom were physically located in the same

city.  Because of the short amount of time available to conduct the Investigation, by necessity the

Examiner attempted to narrow the list of interviewees to those persons that the Examiner

believed could meaningfully clarify or augment the factual record.  Had the Examiner had more

time to conduct the Investigation, he would have conducted more than the 38 interviews that he

held; and it is possible that someone who the Examiner did not interview would have provided

pertinent information.  Nevertheless, as the process unfolded, and new information was adduced

in the interviews and during the Investigation, it became apparent that the Examiner would need

at least another two weeks to complete the interviews necessary to prepare the Report.  Thus, the Examiner requested and obtained an extension of time to file the Report.  The last interview was conducted telephonically on July 16, 2010.

All told, the Examiner and his advisors conducted 38 interviews over 46 days in four cities.  Of these, the Examiner attended 33 in person (of which three were attended by video conference).  Of the five interviews not attended by the Examiner (principally because he was conducting another interview at the same time or traveling to attend a scheduled interview), the Examiner believes that he adequately apprised himself of what transpired.  Participating in most of the interviews enabled the Examiner to personally evaluate witness demeanor and credibility and actively participate in questioning.  All interviewees were represented by counsel.  In some instances, the Examiner did not record the interviews and did not request that witnesses take an oath (although witnesses were admonished at the outset, and were asked to and did confirm at the conclusion of the interview, that all answers were furnished with the same care as if the interviewee had been under oath).  In other instances, the Examiner determined that it was appropriate to conduct transcribed interviews of certain interviewees under oath.  In three instances, the Examiner re-interviewed a witness under oath.  In connection with each transcribed interview, each witness was advised that the interview was not a deposition and that all objections to questions were preserved.  Unlike a deposition (in which one party typically asks questions at any given time), the Examiner, as well as his counsel, posed questions; sometimes the witness' counsel posed clarifying questions and offered perspectives to the Examiner on the answers given by the witness.

The following are the persons interviewed, the dates of the interviews and the locations:

| Interviewee | Title & Company | Date of Interview | Location of Interview |
|---|---|---|---|
| Bromberg, Kate S. | Current Senior Associate with Brown Rudnick LLP, representing Wilmington Trust | 6/1/2010 | Brown Rudnick LLP Seven Times Square New York, NY 10036 |
| Dolan, William M. | Current Partner with Brown Rudnick LLP, representing Wilmington Trust | 6/2/2010 | Brown Rudnick LLP Seven Times Square New York, NY 10036 |
| Hoover, Jennifer | Current Associate with Benesch Friedlander Coplan & Aronoff LLP, local Delaware counsel to Wilmington Trust | 6/2/2010 | Brown Rudnick LLP Seven Times Square New York, NY 10036 |
| Siegel, Martin | Current Partner with Brown Rudnick LLP, lead litigator representing Wilmington Trust | 6/2/2010 | Brown Rudnick LLP Seven Times Square New York, NY 10036 |
| Stark, Robert J. | Current Partner with Brown Rudnick LLP, representing Wilmington Trust | 6/2/2010 | Brown Rudnick LLP Seven Times Square New York, NY 10036 |
| Sell, Jeffrey A. | Former Head of Special Credits Group in the Credit Risk Department of JPMCB | 6/3/2010 | Davis Polk 450 Lexington Avenue New York, NY 10017 |
| Costa, Michael R. | Former Managing Director of Mergers and Acquisitions - part of the investment banking division of MLPFS | 6/4/2010 | Kaye Scholer 425 Park Avenue New York, NY 10022 |
| Whayne, Thomas | Current Managing Director at Morgan Stanley | 6/11/2010 | Weil Gotshal & Manges 767 Fifth Avenue New York, NY 10153 |
| Zell, Samuel | Current Controlling Shareholder of EGI, LLC/ Director, Chairman of the Tribune Board | 6/14/2010 | Equity Group Investments 2 N. Riverside Plaza Chicago, IL 60606 |
| Hianik, Mark | Former Tribune Vice President, Assistant General Counsel and Assistant Secretary | 6/15/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |
| Larsen, Nils | Current Executive Vice President and CIO of Tribune | 6/15/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |

| Interviewee | Title & Company | Date of Interview | Location of Interview |
|---|---|---|---|
| Bartter, Brit | Current Vice Chairman of JPMCB's Investment Banking Group | 6/16/2010 | JPMorgan Chase Chase Tower 10 South Dearborn Street Chicago, IL, 60603 |
| Bigelow, Chandler | Current Tribune CFO/ Former Tribune Treasurer/ VP, Treasurer of one or more Guarantor Subsidiaries | 6/17/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |
| Kazan, Daniel G. | VP of Development prior to the Leveraged ESOP Transactions/Current Sr. VP Corporate Development at Tribune | 6/17/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |
| Williams, David D. | President and CEO of Tribune Media Services, Inc. | 6/18/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |
| Landon, Timothy J. | Former President of Tribune Interactive, Inc. | 6/22/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |
| Mulaney Jr., Charles W. | Current Partners with Skadden Arps, Counsel to the Tribune Special Committee | 6/24/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |
| Osborn, William A. | Chair of the Special Committee of the Tribune | 6/24/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |
| Dimon, Jamie | Current CEO of JPM | 6/25/2010 | JPMorgan Chase 270 Park Avenue New York, NY 10017 |
| FitzSimons, Dennis J. | Former Tribune CEO/ Chairman of the Tribune | 6/25/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |
| Grenesko, Donald C. | Former Sr. VP of Finance & Administration at Tribune | 6/25/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |
| Kapadia, Rajesh | Currently at JPMCB | 6/25/2010 | Davis Polk 450 Lexington Avenue New York, NY 10017 |
| Stinehart, Jr., William | Former Director of Tribune/ Trustee of the Chandler Trusts | 6/28/2010 | Klee, Tuchin, Bogdanoff & Stern LLP 1999 Avenue of the Stars 39th Floor Los Angeles, CA 90067 |

| Interviewee | Title & Company | Date of Interview | Location of Interview |
|---|---|---|---|
| Mohr, Christina | Currently at Citigroup in the M&A Group | 6/29/2010 | Paul, Weiss, Rifkind, Wharton & Garrison LLP 1285 Avenue of the Americas New York, NY 10019 |
| Browning, Bryan | Current Senior Vice President and Professional Services Manager with VRC | 6/30/2010 | Winston & Strawn 200 Park Avenue New York, NY 10166 |
| Rucker III, Mose (Chad) | Current Managing Director with VRC | 6/30/2010 | Winston & Strawn 200 Park Avenue New York, NY 10166 |
| Taubman, Paul | Currently with Morgan Stanley | 7/1/2010 | Morgan Stanley 1585 Broadway New York, NY 10036 |
| Amsden, Harry | Former Vice President of Finance of Tribune Publishing | 7/2/2010 | LECG 33 West Monroe Street Chicago, IL 60603 |
| Whayne, Thomas (Follow-Up Interview) | Current Managing Director at Morgan Stanley | 7/2/2010 | Weil Gotshal & Manges 767 Fifth Avenue New York, NY 10153 |
| Kurmaniak, Rosanne | Current Director of Citigroup/ Former Vice President of Citigroup | 7/7/2010 | Paul, Weiss, Rifkind, Wharton & Garrison LLP 1285 Avenue of the Americas New York, NY 10019 |
| Larsen, Nils (Follow-Up Interview) | Current Executive Vice President and CIO of Tribune | 7/7/2010 | Jenner & Block 353 North Clark Street Chicago, IL 60654 |
| Grenesko, Donald C. (Follow-Up Interview) | Former Senior VP of Finance & Administration at Tribune | 7/8/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |
| Kaplan, Todd | Current Senior Banker with Merrill | 7/8/2010 | Kaye Scholer 70 West Madison Street Suite 4100 Chicago, IL 60602 |
| Kenney, Crane | Former General Counsel of Tribune | 7/8/2010 | Sidley Austin LLP One South Dearborn Chicago, Illinois 60603 |
| Persily, Julie H. | Formerly with the Citigroup Leveraged Finance Department | 7/8/2010 | Paul, Weiss, Rifkind, Wharton & Garrison LLP 1285 Avenue of the Americas New York, NY 10019 |

| Interviewee | Title & Company | Date of Interview | Location of Interview |
|---|---|---|---|
| Petrik, Daniel | Currently with Bank of America | 7/8/2010 | LECG<br>33 West Monroe Street<br>Chicago, IL 60603 |
| Kenny, Thomas J. | Current Senior Vice President of Murray Devine | 7/9/2010 | Saul Ewing<br>1500 Market Street, 38th Fl.<br>Philadelphia, PA 19102 |
| Amsden, Harry (Follow-Up Interview) | Former Vice President of Finance of Tribune Publishing | 7/16/2010 | Telephone Conference |

The Examiner believes that, on balance, the interviews were extraordinarily helpful in assisting the Examiner to understand key facts necessary to render his findings.  The Examiner recognizes, however, that formal depositions (and the cross-examination that accompanies an adversarial process) might well produce information different from that which the Examiner was able to adduce in these interviews.  Also, the adversarial process allows rebuttal witnesses and documents that may impeach or contradict other testimony or documents.  Although the Examiner strongly believes that the information adduced in the Investigation materially advances an understanding of what transpired in the Leveraged ESOP Transactions, neither the Investigation nor the resulting Report are intended to serve as proxies for what an adjudicative process would produce.

The Examiner and his counsel evaluated numerous legal and factual questions in connection with the Investigation.  In addition, the Examiner's counsel worked closely with the Examiner's financial advisor, LECG, which developed a reasonably comprehensive financial analysis of the issues presented under the circumstances.  Among other things, LECG analyzed issues concerning solvency, unreasonable capital, the flow of funds, and matters pertaining to intercompany claims.  To a great extent, LECG utilized and built on analyses prepared by the various financial advisors for the Parties, although, as the Report amply illustrates, LECG

conducted its own independent investigation of the financial matters at issue on behalf of the Examiner.

The Examiner would be remiss if he did not at least take note that in the wake of the financial collapse in the fall of 2008 and the resulting "Great Recession," considerable commentary has suggested that the credit markets generally and underwriting practices in particular in the period preceding these events were widely imprudent and reckless.[17]  The Examiner shares some of the sentiments expressed in this regard.  Although standards of reasonableness and prudence may well transcend the temporary systemic lapses that sometimes characterize standards of care at any particular time,[18] as readers will observe, the Examiner hewed closely in the Report to the applicable legal standards governing the Questions.  As the legal analyses that follow reveal, these standards do not give the Examiner license to evaluate the Leveraged ESOP Transactions with the benefit of hindsight or the wisdom born from the hard lessons of the past few years, nor could the Examiner simply assume that a financial catastrophe of the magnitude our country has experienced since 2008 was reasonably foreseeable even a year before that.  Moreover, the Examiner was not charged with evaluating, and therefore mercifully keeps to himself his own views regarding, whether the Leveraged ESOP Transactions represented a prudent, sound, or socially-useful business transaction.

---

[17]   Stephen Labaton, *The Reckoning: Agency's '04 Rule Let Banks Pile up New Debt*, N.Y. TIMES, October 8, 2008, http://www.nytimes.com/2008/10/03/business/03sec.htmlpagewanted=all; JOINT CENTER FOR HOUSING STUDIES OF HARVARD UNIVERSITY, THE STATE OF THE NATION'S HOUSING 2008 (2008); Ben S. Bernanke, Chairman, Fed. Reserve, Speech at the Fed. Reserve Bank of Chicago's 43rd Annual Conference on Bank Structure & Competition, (May 17, 2007).

[18]   *See generally The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir. 1932) (L. Hand, J.) ("Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices.  It may never set its own tests, however persuasive be its usages.  Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.").

C.        **The Standard Adopted in the Report.**

In connection with the Examiner Work Plan, the Examiner proposed, and the Bankruptcy Court in its Supplemental Order agreed, that with respect to Question One, the Examiner should engage in a meaningful process of weighing the relative positions of the Parties, including an analysis of the potential remedies that may be available to the estate(s) if one or more transfers or obligations are avoided, and the effect of such remedies on distributions on account of prepetition claims.[19]  In addition, the Examiner understood that, when possible, he should attempt to draw conclusions with respect to the issues in dispute based on the factual record adduced and applicable law, rather than just determining whether a particular claim, cause of action, or defense could be sustained if the Parties' allegations were ultimately proven with sufficient evidence—akin to the standard governing a motion to dismiss a complaint.[20]  To the best of the Examiner's knowledge, it is unusual for an Examiner to be requested to go beyond opining whether a claim or defense could survive a motion to dismiss.  This required the Examiner to delve deeply into the factual record and conduct as thorough an investigation as time and resources permitted.  As noted in the previous section, the Examiner determined to frame his conclusions in a uniform fashion utilizing the following continuum: (1) highly likely, (2) reasonably likely, (3) somewhat likely, (4) equipoise, (5) somewhat unlikely, (6) reasonably unlikely, and (7) highly unlikely.

As mentioned at the outset of the Report, although the Examiner has endeavored to present meaningful analyses and conclusions using the preceding framework, as previewed in the

---

[19]    By their terms, Questions Two and Three require that the Examiner "evaluate" the matters posed.  In contrast, as originally formulated, Question One reasonably could be read to charge the Examiner simply with determining whether there are or are not potential claims, causes of action, and defenses that *might* be asserted.  *See* Examiner Work Plan at ¶ 21.  The Supplemental Order clarified this ambiguity as discussed above.

[20]    To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Max v. Republican Comm.*, 587 F.3d 198, 200 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)).

Examiner Work Plan, given the short period of time that the Examiner was afforded to complete

the Investigation, the Report identifies certain matters on which a complete investigation and

analysis was not feasible and as to which further investigation may be necessary, if the

Bankruptcy Court so directs.  In all instances, the conclusions contained in the Report are based

on the information reviewed and analyses conducted through July 25, 2010.  Further analyses

and investigation might change the conclusions reached.  When appropriate, the Report identifies

areas that might require additional investigation and analyses.

       **D.**       **Issues Pertaining to Confidentiality.**

From the very first hours of the meet and confer process, the Examiner learned that

nearly every document produced in the Chapter 11 Cases was marked "confidential" or "highly

confidential" and its contents could not be publicly disclosed.  The "confidential" or "highly

confidential" designations of some documents verged on the absurd, and included, among other

things, underlying credit agreements and even documents filed with the SEC.  Unfortunately, to

the best of the Examiner's knowledge, no Party had challenged the designation of as much as a

single document as "confidential" or "highly confidential."  Moreover, the Examiner Order

expressly provided that the Examiner was subject to any applicable orders of the Bankruptcy

Court governing confidentiality.[21]  On the other hand, it also was clear from the Examiner

Order,[22] and from the record of the Chapter 11 Cases, that the Bankruptcy Court expected the

Report to be publicly filed.

In an effort to reconcile this apparent conflict, as discussed in the Examiner Work Plan,[23]

the Examiner required that following the formal exchange of briefs and documents described

---

[21]    *See* Ex. 1 at ¶¶ 6 & 11 (Examiner Order).

[22]    *See* Ex. 1 at ¶ 13 (Examiner Order).

[23]    *See* Ex. 2 at ¶¶ 25-26 (Examiner Work Plan).

above, each Party identify to the Examiner those particular documents accompanying the briefs that the Party believed in good faith were entitled to protection from public disclosure under applicable law and that the Examiner should not publicly disclose in the Report. The Examiner made clear to the Parties, repeatedly, that the standard the Parties should apply to determine whether to designate documents for continued nondisclosure should not be whether the disclosure would be embarrassing to a particular Party, or even harmful to its position in existing or potential litigation, but whether there was a *bona fide* legal basis to prevent its public disclosure. The Examiner set June 14, 2010 as the deadline for Parties to identify any specific document that they maintained should be preserved as confidential. After the June 14, 2010 deadline, in a series of communications, the Examiner identified to the Parties, and other entities that had produced documents denominated as confidential, certain documents that were not submitted with the briefs but which the Examiner might determine to quote from or refer to in the Report. The Examiner set deadlines for each Party and other entities to identify which of those accompanying documents the Party believed in good faith were entitled to protection from public disclosure under applicable law and that the Examiner should not publicly disclose in the Report. The process was laborious and taxing, and the wanton practice of designating essentially every piece of paper "confidential" or "highly confidential" is unnecessary, wasteful, and expensive for all clients.

In response to the notifications provided by the Examiner, certain Parties designated certain documents that such Parties maintained should remain confidential. References to those items were so numerous and, in many instances, wide-ranging that, regrettably, the Examiner had no choice but to redact the entire factual narrative in this Volume One and the substantive

analysis contained in Volume Two from the version of the Report filed as matter of public record.  The Examiner has filed a motion with the Bankruptcy Court to address this matter.

# III.

## STATEMENT OF BASIC FACTS, TRANSACTIONS, AND AGREEMENTS.

### A.    The Tribune Entities and Their Businesses.[24]

#### 1.    Corporate History and Organization.

The Tribune Entities are a leading media and entertainment conglomerate reaching more than eighty percent (80%) of households in the United States through their newspapers, other publications and websites, their television and radio stations, Superstation WGN America, and their other news and entertainment offerings,[25] with their principal place of business in Chicago, Illinois.[26]

Tribune was founded in 1847 and incorporated in Illinois in 1861.[27]  In 1968, as a result of a corporate restructuring, Tribune became a holding company incorporated in Delaware.[28]  In 1983, Tribune became a public company.[29]  Throughout the 1980s and 1990s, the Tribune Entities grew rapidly through a series of acquisitions,[30] culminating in 2000 with Tribune's acquisition of Times Mirror.[31]

Tribune directly or indirectly owns all (or substantially all) of the equity in the 128 Tribune Entities, of which 110 are Debtors.[32]

---

[24]    The description of the Tribune Entities' businesses set forth in the Report primarily focuses on the activities of the Tribune Entities in 2007 and does not address changes to the Tribune Entities' businesses or holdings since the Petition Date.

[25]    Ex. 4 at 1 (Tribune 2007 Form 10-K); http://www.tribune.com/about/history.html.

[26]    Ex. 4 at cover page (Tribune 2007 Form 10-K) (listing address of principal executive offices as Chicago, IL).

[27]    *Id.* at 1.

[28]    *Id.*

[29]    *Id.*; http://www.tribune.com/about/history.html.

[30]    http://www.tribune.com/about/history.html.

[31]    Ex. 5 at 99 (Tender Offer); http://www.tribune.com/about/history.html.

[32]    Ex. 6 (Organization Chart).

### 2.    Tribune's Operations.

The Tribune Entities' operations are divided into two primary industry segments:  the Publishing Segment and the Broadcasting Segment.[33]  These segments operate primarily in the United States.[34]

### a.    Publishing Segment.

In 2007, the Publishing Segment, which accounted for seventy-two percent (72%) of the Tribune Entities' consolidated 2007 revenues, operated eight major-market daily newspapers, distributed preprinted insert advertisements, provided commercial printing and delivery services to third-parties, and distributed entertainment listings and syndicated content through its Tribune Media Services business unit.[35]  The Tribune Entities' primary daily newspapers in 2007 were the *Los Angeles Times, Chicago Tribune, Newsday, South Florida Sun-Sentinel, Orlando Sentinel, The Sun, Hartford Courant, The Morning Call* and *Daily Press.*[36]  In 2007, the Tribune Entities' newspapers collectively had paid circulation of approximately 2.7 million copies daily and 3.9 million copies on Sundays.[37]  The Publishing Segment also managed the websites of the Tribune Entities' daily newspapers, television stations, and other branded products that target specific areas of interest.[38]

### b.    Broadcasting Segment.

In 2007, the Broadcasting Segment, which accounted for twenty-eight percent (28%) of the Tribune Entities' 2007 consolidated operating revenues, included 23 television stations in 19

---

[33]    Ex. 4 at 8 (Tribune 2007 Form 10-K).

[34]    *Id.*

[35]    *Id.* at 9.

[36]    *Id.*

[37]    *Id.*

[38]    *Id.*

markets.[39]  The Tribune Entities' television stations compete for audience and advertising with

other television and radio stations, cable television, and other media serving the same markets.[40]

Selected data for the Tribune Entities' television stations in 2007 are shown in the following

table:[41]

| | Market | | | Major Over-the Air Stations in Market | Expiration of FCC License | Year Acquired |
|---|---|---|---|---|---|---|
| | National Rank | % of U.S. Households | Affiliation | | | |
| WPIX—New York, NY | 1 | 6.6 | CW | 7 | 2015 | 1948 |
| KTLA—Los Angeles, CA | 2 | 5.0 | CW | 8 | 2014 | 1985 |
| WGN—Chicago, IL | 3 | 3.1 | CW | 8 | 2013 | 1948 |
| WPHL—Philadelphia, PA | 4 | 2.6 | MNTV | 7 | 2015 | 1992 |
| KDAF—Dallas, TX | 5 | 2.2 | CW | 9 | 2014 | 1997 |
| WDCW—Washington, D.C. | 9 | 2.0 | CW | 7 | 2012 | 1999 |
| KHCW—Houston, TX | 10 | 1.8 | CW | 9 | 2014 | 1996 |
| KCPQ—Seattle, WA | 14 | 1.6 | FOX | 8 | 2015 | 1999 |
| KMYQ—Seattle, WA | 14 | — | MNTV | 8 | 2015 | 1998 |
| WSFL—Miami, FL | 16 | 1.4 | CW | 7 | 2013 | 1997 |
| KWGN—Denver, CO | 18 | 1.3 | CW | 7 | 2014 | 1966 |
| KTXL—Sacramento, CA | 20 | 1.2 | FOX | 7 | 2014 | 1997 |
| KPLR—St. Louis, MO | 21 | 1.1 | CW | 6 | 2014 | 2003 |
| KRCW—Portland, OR | 23 | 1.0 | CW | 7 | 2015 | 2003 |
| WTTV—Indianapolis, IN | 26 | 1.0 | CW | 7 | 2013 | 2002 |
| WXIN—Indianapolis, IN | 26 | — | FOX | 7 | 2013 | 1997 |
| KSWB—San Diego, CA | 27 | 0.9 | CW | 7 | 2014 | 1996 |
| WTIC—Hartford, CT | 29 | 0.9 | FOX | 7 | 2015 | 1997 |
| WTXX—Hartford, CT | 29 | — | CW | 7 | 2015 | 2001 |
| WXMI—Grand Rapids, MI | 39 | 0.7 | FOX | 7 | 2013 | 1998 |
| WPMT—Harrisburg, PA | 41 | 0.6 | FOX | 5 | 2015 | 1997 |
| WGNO—New Orleans, LA | 53 | 0.5 | ABC | 7 | 2013 | 1983 |
| WNOL—New Orleans, LA | 53 | — | CW | 7 | 2013 | 2000 |

c.    **Additional Investments.**

Tribune has investments in various private corporations, limited liability companies, and

partnerships.[42]  Significant equity investments as of 2007 included CareerBuilder (40.8%),

---

[39]    *Id.* at 8 and 15-16.

[40]    *Id.* at 16.

[41]    *Id.*

[42]    *Id.* at 18.

Classified Ventures (28%), TV Food Network (31%), Comcast SportsNet Chicago (25%),

ShopLocal, LLC (43%), Tropix.net (33.7%), and Metromix, LLC (50%).[43]

### 3.    Tribune's Directors, Management, and Advisors.

#### a.    Board of Directors of Tribune.

During the period that the Leveraged ESOP Transactions were discussed and approved,

Tribune's Board was comprised of eleven directors:[44]  Jeffrey Chandler, Dennis J. FitzSimons,

Roger Goodan, Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, William A.

Osborn, J. Christopher Reyes,[45] William Stinehart, Jr., Dudley S. Taft, and Miles D. White.[46]

Tribune retained and received financial advice from MLPFS and CGMI and legal advice from

Wachtell and Sidley Austin LLP and, for ESOP matters, McDermott Will & Emery LLP.[47]  As

discussed below, on September 21, 2006, the Tribune Board created a Special Committee to

explore strategic alternatives.[48]

Three members of the Tribune Board (Mr. Chandler, Mr. Goodan, and Mr. Stinehart)

were trustees of the Chandler Trusts.[49]  Mr. Chandler and Mr. Goodan also were beneficiaries of

the Chandler Trusts.[50]  The Chandler Trusts were the principal stockholders of Times Mirror

before the merger of Times Mirror into Tribune in 2000.[51]  In connection with the Tender Offer

---

[43]    *Id.* at 18 and 109.

[44]    Ex. 7 at 9-11 (2007 Tribune Proxy).

[45]    Mr. Reyes resigned from the Tribune Board effective at the conclusion of the July 18, 2007 Tribune Board
meeting.  Ex. 8 (Tribune Press Release, dated June 29, 2007).

[46]    Mr. White resigned from the Tribune Board on August 6, 2007.  Ex. 9 (Tribune Form 8-K, filed August 10,
2007).

[47]    Ex. 5 at 45 (Tender Offer).

[48]    *See* Report at § III.D.1.a.

[49]    Ex. 5 at 97 (Tender Offer).

[50]    *Id.*

[51]    *Id.*

discussed below,[52] the Chandler Trusts agreed to tender all shares held by them and to cause Mr.

Chandler, Mr. Goodan, and Mr. Stinehart to resign as directors of Tribune at the expiration of the

Tender Offer.[53]  These three individuals thereafter resigned from the Tribune Board effective

June 4, 2007.[54]

On May 9, 2007, before the consummation of the Step One Transactions discussed

below,[55] Samuel Zell was appointed to the Tribune Board.[56]  On December 20, 2007, following

consummation of the Merger, the members of the Tribune Board were Betsy D. Holden,

William A. Osborn, William C. Pate, Maggie Wilderotter, Samuel Zell, Jeff Berg, Brian

Greenspan, and Frank Wood.[57]  Mr. FitzSimons, Mr. Hernandez, Mr. Morrison, and Mr. Taft

ceased to be members of the Tribune Board on consummation of the Merger.[58]

### b.    Management of Tribune.

Unless otherwise indicated, each individual listed below was an officer of Tribune during

the period from February 17, 2006 through at least March 20, 2008:[59]

Chandler Bigelow, Vice President/Treasurer.[60]

---

[52]    *See* Report at § III.D.16.

[53]    Ex. 5 at 98 (Tender Offer).  The Tender Offer expired on May 24, 2007 and the shares tendered thereunder were repurchased by Tribune on June 4, 2007.

[54]    Ex. 10 at 2 (Tribune Form 8-K, filed June 5, 2007).

[55]    *See* Report at § III.D.

[56]    *See id.* at § III.D.5.f.

[57]    Ex. 11 (Tribune Board Meeting Minutes, dated December 18, 2007); Ex. 12 (Tribune Board Meeting Minutes, dated December 20, 2007).

[58]    Ex. 13 at 8 (Tribune Form 8-K, filed December 28, 2007).

[59]    Ex. 4 at 21 (Tribune 2007 Form 10-K); Ex. 14 at 19-20 (Tribune 2006 Form 10-K); Ex. 15 at 17-18 (Tribune 2005 Form 10-K).

[60]    Chandler Bigelow was appointed Chief Financial Officer of Tribune effective March 24, 2008.  From 2003 through March 23, 2008, Mr. Bigelow served as Tribune's Vice President/Treasurer with responsibility for Tribune's financing activities, cash management, short-term and retirement fund investments and risk-management programs.  Before that time, commencing in 1998, Mr. Bigelow served as Tribune's Assistant Treasurer, Director/Corporate Finance and Corporate Finance Manager.  Ex. 16 at 2 (Tribune Form 8-K, filed March 26, 2008).

Dennis J. FitzSimons, Chairman, Chief Executive Officer, and President.[61]

Donald C. Grenesko, Senior Vice President/Finance and Administration.[62]

Crane H. Kenney, Senior Vice President, General Counsel, and Secretary.

Luis E. Lewin, Senior Vice President/Human Resources.[63]

R. Mark Mallory, Vice President and Controller.[64]

Randy Michaels, Executive Vice President and Chief Executive Officer of Tribune Interactive, Inc. and Tribune Broadcasting Company.[65]

John E. Reardon, President of Tribune Broadcasting Company.[66]

Scott C. Smith, President of Tribune Publishing Company.[67]

Gerald A. Spector, Executive Vice President and Chief Administrative Officer.[68]

Ed Wilson, President of Tribune Broadcasting Company.[69]

Samuel Zell, Chairman and Chief Executive Officer.[70]

Of the members of Tribune's management, before the Merger closed, only

Mr. FitzSimons also sat on the Tribune Board.

---

[61]  Mr. FitzSimons resigned effective on consummation of the Merger.  *See* Ex. 13 at 8 (Tribune Form 8-K, filed December 28, 2007).

[62]  Mr. Grenesko retired effective March 21, 2008.  *See* Ex. 16 at 2 (Tribune Form 8-K, filed March 26, 2008).

[63]  Mr. Lewin resigned effective February 22, 2008.  *See* Ex. 17 at 2 (Tribune Form 8-K, filed February 27, 2008).

[64]  Mr. Mallory retired effective April 17, 2008.  *See* Ex. 18 at 2 (Tribune Form 8-K, filed April 22, 2008).

[65]  Mr. Michaels was named to these positions effective on consummation of the Merger.  *See* Ex. 13 at 7-8 (Tribune Form 8-K, filed December 28, 2007).

[66]  Mr. Reardon resigned effective February 4, 2008.  *See* Ex. 19 at 2 (Tribune 8-K, filed February 8, 2008).

[67]  Mr. Smith retired effective June 12, 2008.  *See* Ex. 20 at 2 (Tribune Form 8-K, filed June 18, 2008).

[68]  Mr. Spector was named to these positions effective on consummation of the Merger.  *See* Ex. 13 at 7-8 (Tribune Form 8-K, filed December 28, 2007).

[69]  Mr. Wilson was named to this position effective February 11, 2008.  *See* Ex. 19 at 2 (Tribune Form 8-K, filed February 8, 2008).

[70]  Mr. Zell was named Chief Executive Officer on December 20, 2007 and Chairman on December 20, 2007.  *See* Ex. 13 at 7-8 (Tribune Form 8-K, filed December 28, 2007).

c.        **Boards of Directors of the Guarantor Subsidiaries.**

The members of the Boards of Directors of the Guarantor Subsidiaries as of June 4, 2007

and December 20, 2007 are as set forth on Table 1 of Volume One of the Report.

d.        **Management of the Guarantor Subsidiaries.**

The officers of each of the Guarantor Subsidiaries during the period from May 2, 2006

through at least December 20, 2007 are set forth on Table 2 of Volume One of the Report.

e.        **Financial Advisors.**

(1)        **MLPFS.**

On October 17, 2005, Tribune and MLPFS, an affiliate of ML&Co., entered into two

letter agreements whereby Tribune engaged MLPFS to serve as financial advisor to Tribune.[71]

No other Tribune Entity was a party to these letter agreements.

Under the first MLPFS letter agreement, the scope of MLPFS' engagement included

providing Tribune with financial advisory and investment banking services in connection with a

"Strategic Transaction," which the first MLPFS letter agreement defined as "a transaction or

series of transactions in which one or more Purchasers acquire or propose to acquire directly or

indirectly a majority of the stock, assets, revenues, income or business of the Company or

otherwise gains control of the Company. . . ."[72]  MLPFS agreed to assist Tribune, at Tribune's

request, in identifying and contacting potential transaction partners, as well as in "analyzing,

structuring, negotiating and effecting a proposed Strategic Transaction."[73]  MLPFS also agreed

to provide an opinion, if requested by Tribune, "whether the consideration to be . . . paid in [a]

---

[71]    Ex. 23 (MLPFS Strategic Transaction Engagement Letter); Ex. 24 (MLPFS Recapitalization Engagement Letter).  Although both letter agreements were executed by Michael Costa on behalf of MLPFS, the text of both letters references the engagement of ML&Co.

[72]    *Id.* at 2.

[73]    *Id.* at 1.

proposed Strategic Transaction was fair from a financial point of view to the Company or the shareholders of the Company, . . . as applicable."[74]

Tribune agreed that MLPFS or any of its affiliates could provide financing or related services to one or more potential purchasers in connection with a "Strategic Transaction," and to permit the MLPFS financing team to attend Tribune's management presentations and conduct formal due diligence investigations.[75]  In the event that MLPFS participated in a purchaser's financing, MLPFS only would be required to deliver a fairness opinion if Tribune also obtained an additional fairness opinion from a third-party financial advisor that was not participating in the financing of the transaction.[76]

If a "Strategic Transaction" were consummated, or if Tribune entered into an agreement for a "Strategic Transaction" that was subsequently consummated during the engagement period or within 18 months thereafter, the first letter agreement provided that MLPFS would earn a success fee of $12.5 million, payable on the closing of any such transaction.[77]  If MLPFS earned fees in a financing in which it acted as a book-running manager, lead arranger, or a similar role, the success fee would be reduced by 25% of the net financing fees paid, up to an aggregate maximum reduction of $3.75 million.[78]

Under the second MLPFS letter agreement, the scope of MLPFS' engagement included assisting Tribune in analyzing, structuring, negotiating, and effecting (a) a leveraged

---

[74]   *Id.*

[75]   *Id.* at 4.

[76]   *Id.* at 2.

[77]   *Id.*

[78]   *Id.*

recapitalization of Tribune (on a non-exclusive basis) and (b) the restructuring of Tribune's ownership interests in the TMCT LLCs (on an exclusive basis).[79]

If Tribune determined to make a tender or exchange offer as part of a leveraged recapitalization of Tribune, Tribune agreed to offer to retain MLPFS as dealer-manager for such offer.[80]  If, in connection with a leveraged recapitalization, any Tribune Entity (or any of their respective Subsidiaries or affiliates) entered into a loan financing, public sale, or private placement of equity or debt securities, the proceeds of which were used in connection with a leveraged recapitalization, Tribune agreed to offer, or to cause the appropriate Subsidiary or affiliate to offer, to retain MLPFS as a book running lead manager and/or lead arranger (or similar role) under terms no less favorable than any other financing source.[81]

Under the second MLPFS letter agreement, MLPFS agreed to render an opinion on the fairness, from a financial point of view, to Tribune of the distribution involved in the restructuring of Tribune's ownership interests in the TMCT LLCs.[82]

The second MLPFS letter agreement entitled MLPFS to a fee of $2 million payable on the consummation of a leveraged recapitalization and $0.75 million payable on the consummation of a restructuring of Tribune's ownership interests in each of the TMCT LLCs.[83]

In connection with both MLPFS letter agreements, Tribune agreed to indemnify MLPFS and the indemnified parties thereunder against any and all losses, claims, damages, and liabilities to which any such party may have become subject in connection any transaction contemplated by

---

[79]    Ex. 24 at 1 (MLPFS Recapitalization Engagement Letter).

[80]    *Id.* at 2.

[81]    *Id.*

[82]    *Id.*

[83]    *Id.*

the letter agreements, other than resulting from MLPFS' bad faith or gross negligence.[84]  Also,

under both letter agreements, MLPFS and Tribune acknowledged that MLPFS was retained to

act as an independent contractor with duties solely to Tribune and that nothing in the letter

agreements should be deemed to create a fiduciary relationship between MLPFS and Tribune or

between MLPFS and Tribune's stockholders, creditors, or employees.[85]  MLPFS was entitled to

rely on the completeness and accuracy of information supplied by Tribune without any duty of

MLPFS to independently verify such information and to assume that projections furnished to

MLPFS by Tribune were reasonably prepared and reflected "the best then currently available

estimates and judgment" of Tribune's management.[86]  The letter agreements stated that MLPFS

and its affiliates could actively trade debt and equity securities of Tribune for its own and for its

customers' accounts.[87]

### (2)    Morgan Stanley.

On October 17, 2006, Tribune and Morgan Stanley entered into a letter agreement

whereby Tribune engaged Morgan Stanley to serve as financial advisor to the Special Committee

in connection with (a) a possible sale involving a change of control of Tribune and (b) a

recapitalization or restructuring plan for Tribune, including any potential spin-off or significant

asset sale.[88]  No other Tribune Entity was a party to this agreement.  In connection therewith,

Morgan Stanley's responsibilities included (w) reviewing the analyses and presentations of

---

[84]    Ex. 23 at 3 and Annex A (MLPFS Strategic Transaction Engagement Letter); Ex. 24 at 4 and Annex A (MLPFS Recapitalization Engagement Letter).

[85]    Ex. 23 at 3 (MLPFS Strategic Transaction Engagement Letter); Ex. 24 at 3 (MLPFS Recapitalization Engagement Letter).

[86]    Ex. 23 at 3 (MLPFS Strategic Transaction Engagement Letter); Ex. 24 at 3 (MLPFS Recapitalization Engagement Letter).

[87]    Ex. 23 at 5 (MLPFS Strategic Transaction Engagement Letter); Ex. 24 at 4 (MLPFS Recapitalization Engagement Letter).

[88]    Ex. 25 at 1 (Morgan Stanley Engagement Letter).

Tribune's financial advisors, (x) representing the Special Committee throughout the process, (y) making recommendations to the Special Committee with respect to the process, and (z) providing the Special Committee with a fairness opinion as to the consideration to be received in any transaction described in clauses (a) or (b) above.[89]

The Morgan Stanley engagement letter entitled Morgan Stanley to an advisory fee of $2.5 million, payable at the time of execution of the letter agreement.[90]  In addition, Morgan Stanley charged a transaction fee of $7.5 million, payable at the earlier of (a) the time that Morgan Stanley, at the request of the Special Committee, was prepared to deliver a financial opinion (regardless of the conclusion reached in such opinion), (b) the closing of a transaction described in clause (a) of the paragraph above for which a financial opinion was not requested by the Special Committee, and (c) the closing of a transaction described in clause (b) of the paragraph above for which a financial opinion was not requested, but in which Morgan Stanley, at the request of the Special Committee, played a substantive role.[91]  Tribune also agreed to discuss with Morgan Stanley at a later date whether the payment to Morgan Stanley of an additional discretionary fee would be appropriate.[92]  In connection with the letter agreement, due in part to the fact that Morgan Stanley was acting as an independent contractor with duties solely to Tribune, Tribune agreed to indemnify Morgan Stanley under certain circumstances.[93]

---

[89]  *Id.*

[90]  *Id.* at 1 (Morgan Stanley Engagement Letter).  This fee was paid on November 13, 2006.

[91]  *Id.*  Morgan Stanley received the $7.5 million transaction fee on May 9, 2007.  *See* Report at § III.E.4.e.(1).

[92]  Ex. 25 at 1-2 (Morgan Stanley Engagement Letter).  In December 2007, Morgan Stanley requested, but did not receive, any discretionary fees.  *See* Report at § III.E.4.e.(1).

[93]  *Id.* at Appendix 2.  Because the section of the Morgan Stanley engagement letter provided to the Examiner relating to Morgan Stanley's rights to indemnification was illegible, and as Tribune has informed the Examiner that it is unable to locate a legible version, the Examiner is unable to assess Morgan Stanley's rights to indemnification under its engagement letter.

Morgan Stanley was entitled to rely on the accuracy and completeness of information received by Morgan Stanley from Tribune without any requirement to verify such information.[94] Morgan Stanley assumed that projections it received reflected "the best available estimates of future financial performance."[95]

Pursuant to the terms of the letter agreement, Morgan Stanley agreed that it would "not provide financing to any bidder and [would] not participate in the transaction other than as an advisor to the [Special] Committee on a basis determined by the [Special] Committee."[96]

### (3)    CGMI.

On October 27, 2006, Tribune and CGMI entered into a letter agreement whereby Tribune engaged CGMI to serve as financial advisor to Tribune in connection with a transaction or series of transactions in which one or more purchasers acquired, or proposed to acquire, a majority of the stock, assets, revenues, income, or business of Tribune, or otherwise gain control of Tribune.[97]   No other Tribune Entity was a party to this agreement.  Pursuant to the terms of the CGMI letter agreement, CGMI agreed to provide advice on the structure, negotiation strategy, valuation analyses, and financial terms of potential transactions, and assistance in preparing a memorandum for distribution to potential investors, as requested by Tribune.[98]

In connection with the CGMI letter agreement, Tribune consented to CGMI or any of its affiliates acting as "book-running manager, lead manager, co-manager, placement agent, bank agent, underwriter, arranger or principal counterparty or other similar role on behalf of one or more potential bidders in connection with a [potential transaction], or otherwise assisting one or

---

[94]   *Id.* at 2 (Morgan Stanley Engagement Letter).

[95]   *Id.*

[96]   *Id.* at Appendix I.

[97]   Ex. 26 at 1 (CGMI Engagement Letter).

[98]   *Id.*

more potential bidders in obtaining funds. . . ."[99]  CGMI agreed that it would establish "teams" that would either represent Tribune or potential buyers.[100]  Tribune acknowledged that CGMI and its affiliates could hold or trade in, for its own and its clients' accounts, debt and equity securities of Tribune.[101]

Tribune agreed to pay CGMI a fee of $12.5 million on the consummation of a transaction.[102]  Any fees CGMI earned acting in a leadership capacity with respect to financing a potential buyer would reduce the transaction fee by the amount of $0.25 per dollar for each dollar earned, up to an aggregate maximum reduction of $3.75 million.[103]  Tribune agreed that CGMI's fee would at least equal MLPFS' fees before any credit for financing fees.[104]

Tribune acknowledged that CGMI was relying, without verification, on the accuracy and completeness of information provided by Tribune,[105] and that CGMI was acting as an independent contractor of Tribune, not as a fiduciary.[106]

Pursuant to a separate indemnification letter agreement that was incorporated by reference into the CGMI letter agreement,[107] Tribune agreed to indemnify CGMI and the indemnified parties thereunder from and against any and all losses, claims, damages, and liabilities to which any such party may have become subject in connection with any transaction

---

[99]   *Id.* at 2.

[100]  *Id.*

[101]  *Id.* at 4.

[102]  *Id.* at 3.

[103]  *Id.*

[104]  *Id.*

[105]  *Id.*

[106]  *Id.* at 4.

[107]  *Id.* at 5.

described in the letter agreement, other than any such loss, claim, damage, liability, or expense resulting from any such indemnified party's bad faith or gross negligence.[108]

4.    **Holdings of Directors, Executive Officers, and Major Stockholders.**

As of April 1, 2007, before the Tender Offer, the aggregate number and percentage of shares of Tribune Common Stock that were beneficially owned by then current directors, executive officers, and each person who owned 5% or more of the outstanding Tribune Common Stock were:[109]

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership[110] | Percentage of Shares[111] |
|---|---|---|
| **5% or Greater Stockholders:** | | |
| The Chandler Trusts | 48,753,788 | 20.25% |
| McCormick Foundation | 31,282,788 | 13.00% |
| T. Rowe Price Associates, Inc. | 17,655,120 | 7.34% |
| Ariel Capital Management, LLC | 15,337,568 | 6.38% |
| **Directors and Executive Officers:** | | |
| Jeffrey Chandler | 30,387 | * |
| Dennis J. FitzSimons | 2,059,855 | * |
| Roger Goodan | 62,446 | * |
| Donald C. Grenesko | 873,144 | * |
| Enrique Hernandez, Jr. | 26,530 | * |

---

[108]    Ex. 27 at 1 (CGMI Indemnification Letter).

[109]    Ex. 5 at 101-104 (Tender Offer).

[110]    This column includes (a) shares of Tribune Common Stock beneficially owned by executive officers under the Tribune Company 401(k) Savings and Profit Sharing Plan and (b) options exercisable within 60 days of April 1, 2007.

[111]    Asterisk (*) indicates that the percentage of shares was less than 1%.

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership[110] | Percentage of Shares[111] |
|---|---:|:---:|
| Betsy D. Holden | 15,861 | * |
| Crane H. Kenney | 536,732 | * |
| Timothy J. Landon | 412,997 | * |
| Thomas D. Leach | 293,149 | * |
| Luis E. Lewin | 415,020 | * |
| R. Mark Mallory | 321,979 | * |
| Robert S. Morrison | 24,348 | * |
| Ruthellyn Musil | 414,770 | * |
| William A. Osborn | 23,159 | * |
| John E. Reardon | 387,269 | * |
| J. Christopher Reyes | 14,969 | * |
| Scott C. Smith | 802,667 | * |
| William Stinehart, Jr. | 44,350 | * |
| Dudley S. Taft | 125,860 | * |
| Miles D. White | 6,419 | * |

B.      **Tribune's Principal Funded Indebtedness Before the Leveraged ESOP Transactions:  Senior Notes, PHONES Notes, and the 2006 Bank Debt.**

Between March 1992 and August 2005, Tribune and certain of its predecessors entered into a series of indentures and supplements thereto pursuant to which the Senior Notes were issued.  The Senior Notes are unsubordinated obligations of Tribune and are not guaranteed and, at the time of original issuance, were not secured.  The indentures contain similar covenants, including the requirement that any lien granted to secure other indebtedness of Tribune or its Subsidiaries also equally and ratably secure the Senior Notes.

1.      **Senior Notes.**

a.      **1992 Indenture.**

Tribune entered into the 1992 Indenture on March 1, 1992 with Continental Bank, National Association as trustee.[112]  Tribune is the issuer of the 6.25% Series D Medium-Term Notes due 2026 under the 1992 Indenture.[113]  The 6.25% Series D Medium-Term Notes due 2026 mature on November 10, 2026, but holders of the notes had a one-time right to request payment in full of such holder's notes on November 15, 2001.[114]  The securities issued under the 1992 Indenture are general unsecured obligations of Tribune ranking pari passu with all other unsecured and unsubordinated debt of Tribune.[115]

The 1992 Indenture prohibits Tribune and its Subsidiaries (other than Subsidiaries expressly excluded from this restriction by a resolution of the Tribune Board adopted before or within 120 days after the creation or acquisition of such Subsidiary) from creating, assuming, or guaranteeing any indebtedness secured by a lien on any assets of Tribune or such Subsidiaries unless the securities issued pursuant to the 1992 Indenture are equally and ratably secured by such assets.[116]  Although subject to the foregoing restriction on secured indebtedness, Tribune's Subsidiaries are not prohibited under the 1992 Indenture from issuing unsecured indebtedness.[117]

---

[112]   Ex. 28 (1992 Indenture).

[113]   Ex. 29 (Prospectus Supplement, dated May 8, 1996).

[114]   Ex. 30 (Pricing Supplement, dated November 12, 1996).

[115]   Ex. 29 at S-2 (Prospectus Supplement, dated May 8, 1996).

[116]   Ex. 28 at § 10.07 (1992 Indenture).

[117]   Ex. 29 at 4 (Prospectus Supplement, dated May 8, 1996).

### b.    1995 Indenture.

New TMC Inc., a Subsidiary of Times Mirror, entered into the 1995 Indenture on January 30, 1995 with First Interstate Bank of California, as trustee.[118]  Tribune assumed the obligations under the 1995 Indenture following its merger with Times Mirror in 2000.[119] Tribune, as successor to New TMC Inc., is the issuer of the 7.25% Senior Debentures due 2013[120] and the 7.5% Senior Debentures due 2023[121] under the 1995 Indenture.  The 7.25% Senior Debentures due 2013 mature on March 1, 2013 and are not redeemable before maturity.[122] The 7.5% Senior Debentures due 2023 mature on July 1, 2023 and are not redeemable before maturity.[123]  The securities issued pursuant to the 1995 Indenture are not subordinated in right of payment to any other indebtedness of Tribune.[124]

The 1995 Indenture prohibits Tribune and its Subsidiaries that own material manufacturing plants or facilities in the United States from issuing, assuming, or guaranteeing any indebtedness secured by a lien on any material manufacturing plants or facilities in the United States owned by Tribune or its Subsidiaries or the stock of any Subsidiaries that own or lease material manufacturing plants or facilities in the United States unless the securities issued pursuant to the 1995 Indenture are equally and ratably secured by such assets.[125]

---

[118]   Ex. 31 (1995 Indenture).

[119]   Ex. 32 at § 1 (First Supplemental Indenture, dated June 12, 2000).

[120]   Ex. 33 (Form of 7.25% Senior Debentures due 2013).

[121]   Ex. 34 (Form of 7.5% Senior Debentures due 2023).

[122]   Ex. 33 (Form of 7.25% Senior Debentures due 2013).

[123]   Ex. 34 (Form of 7.5% Senior Debentures due 2023).

[124]   Ex. 31 at § 301 (1995 Indenture).

[125]   *Id.* at § 1006.

### c. 1996 Indenture.

Times Mirror entered into the 1996 Indenture on March 19, 1996 with Citibank, N.A., as trustee.[126]  Tribune assumed the obligations under the 1996 Indenture following its merger with Times Mirror in 2000.[127]  Tribune, as successor to Times Mirror, is the issuer of the 6.61% Senior Debentures due 2027[128] and the 7.25% Senior Debentures due 2096[129] under the 1996 Indenture.  The 6.61% Senior Debentures due 2027 mature on September 15, 2027, but are redeemable at Tribune's option at any time after September 15, 2004, and the holders thereof had a one-time right to request payment of such holder's debentures on September 15, 2004.[130]  The 7.25% Senior Debentures due 2096 mature on November 15, 2096 and are not redeemable by Tribune before maturity.[131]  The securities issued under the 1996 Indenture are unsecured and unsubordinated obligations ranking equally and ratably with other unsecured and unsubordinated indebtedness of Tribune.[132]

Pursuant to the terms of the Prospectus Supplements filed with respect to the 6.61% Senior Debentures due 2027 and the 7.25% Senior Debentures due 2096, Tribune and its Subsidiaries are prohibited from granting a lien securing any securities issued under the 1995 Indenture unless the securities issued under the 1996 Indenture are equally and ratably secured.[133]

---

[126]  Ex. 35 (1996 Indenture).

[127]  Ex. 36 at § 4 (Second Supplemental Indenture, dated June 12, 2000).

[128]  Ex. 37 (Officers' Certificate, dated September 9, 1997).

[129]  Ex. 38 (Officers' Certificate, dated November 13, 1996).

[130]  Ex. 37 (Officers' Certificate, dated September 9, 1997).

[131]  Ex. 38 (Officers' Certificate, dated November 13, 1996).

[132]  Ex. 39 at 5 (Prospectus Supplement, dated July 8, 1997); Ex. 40 at 4 (Prospectus Supplement, dated November 7, 1996).

[133]  Ex. 39 at S-7 (Prospectus Supplement, dated July 8, 1997); Ex. 40 at S-3 (Prospectus Supplement, dated November 7, 1996).

### d.    1997 Indenture.

Tribune entered into the 1997 Indenture on January 1, 1997 with Bank of Montreal Trust Company, as trustee.[134]  Tribune is the issuer of the 4.875% Senior Notes due 2010,[135] the 5.25% Senior Notes due 2015,[136] the 5.50% Series E Medium-Term Notes due 2008,[137] the 5.67% Series E Medium-Term Notes due 2008,[138] and the 6.35% Series E Medium-Term Notes due 2008.[139]

The 4.875% Senior Notes due 2010 mature on August 15, 2010 and are redeemable at any time at Tribune's option.[140]  The 5.25% Senior Notes due 2015 mature on August 15, 2015 and are redeemable at any time at Tribune's option.[141]  The 5.50% Series E Medium-Term Notes due 2008 matured on October 6, 2008 and were not redeemable before maturity.[142]  The 5.67% Series E Medium-Term Notes due 2008 matured on December 8, 2008 and were not redeemable before maturity.[143]  The 6.35% Series E Medium-Term Notes due 2008 matured on February 1, 2008 and were not redeemable before maturity.[144]  The securities issued under the 1997

---

[134]  Ex. 41 (1997 Indenture).

[135]  Ex. 42 (Prospectus Supplement, dated August 10, 2005).

[136]  *Id.*

[137]  Ex. 43 (Prospectus Supplement, dated January 14, 1997); Ex. 44 (Pricing Supplement, dated October 2, 1998). The indebtedness under the 5.50% Series E Medium-Term Notes due 2008 was paid in full with the proceeds of a draw under the Delayed Draw Facility.

[138]  Ex. 43 (Prospectus Supplement, dated January 14, 1997); Ex. 45 (Pricing Supplement, dated December 4, 1998).

[139]  Ex. 43 (Prospectus Supplement, dated January 14, 1997); Ex. 46 (Pricing Supplement, dated January 29, 1998). The indebtedness under the 6.35% Series E Medium-Term Notes due 2008 was paid in full with the proceeds of a draw under the Delayed Draw Facility.

[140]  Ex. 47 (Form of 4.875% Senior Notes due 2010).

[141]  Ex. 48 (Form of 5.25% Senior Notes due 2015).

[142]  Ex. 44 (Pricing Supplement, dated October 2, 1998).

[143]  Ex. 45 (Pricing Supplement, dated December 4, 1998).

[144]  Ex. 46 (Pricing Supplement, dated January 29, 1998).

Indenture are general unsecured and unsubordinated obligations of Tribune ranking pari passu with all other unsecured and unsubordinated debt of Tribune.[145]

The 1997 Indenture prohibits Tribune and its Subsidiaries (other than Subsidiaries expressly excluded from this restriction by a resolution of the Tribune Board adopted before or within 120 days after the creation or acquisition of such Subsidiary) from creating, assuming, or guaranteeing any indebtedness secured by a lien on any assets of Tribune or such Subsidiaries unless the securities issued pursuant to the 1997 Indenture are equally and ratably secured by such assets.[146]  Although subject to the foregoing restriction on secured indebtedness, Tribune's Subsidiaries are not prohibited under the 1997 Indenture from issuing unsecured indebtedness.[147]

### e.    Principal Amounts Owing on Senior Notes.

According to Tribune's books and records, the approximate principal amounts owing on the Senior Notes as of the Step One Financing Closing Date, the Step Two Financing Closing Date and the Petition Date were as follows:

| Indenture | Interest Rate | Maturity Date | Amount Outstanding as of the Step One Financing Closing Date | Amount Outstanding as of the Step Two Financing Closing Date | Amount Outstanding as of the Petition Date |
|---|---|---|---|---|---|
| 1992 | 6.25% | November 10, 2026 | $0.120 million | $0.120 million | $0.120 million |
| 1995 | 7.25% | March 1, 2013 | $ 82.083 million | $ 82.083 million | $ 82.083 million |
| 1995 | 7.5% | July 1, 2023 | $ 98.750 million | $ 98.750 million | $ 98.750 million |
| 1996 | 6.61% | September 15, 2027 | $ 84.960 million | $ 84.960 million | $ 84.960 million |
| 1996 | 7.25% | November 15, 2096 | $148.000 million | $148.000 million | $148.000 million |
| 1997 | 4.875% | August 15, 2010 | $450.000 million | $450.000 million | $450.000 million |
| 1997 | 5.25% | August 15, 2015 | $330.000 million | $330.000 million | $330.000 million |
| 1997 | 5.67% | December 8, 2008 | $ 69.550 million | $ 69.550 million | $ 69.550 million |

---

[145]    Ex. 42 at S-7 (Prospectus Supplement, dated August 10, 2005); Ex. 43 at S-4 (Prospectus Supplement, dated January 14, 1997).

[146]    Ex. 41 at § 10.07 (1997 Indenture).

[147]    Ex. 43 at 4 (Prospectus Supplement, dated January 14, 1997).

| Indenture | Interest Rate | Maturity Date | Amount Outstanding as of the Step One Financing Closing Date | Amount Outstanding as of the Step Two Financing Closing Date | Amount Outstanding as of the Petition Date |
|---|---|---|---|---|---|
| 1997 | 6.35% | February 1, 2008 | $ 25.000 million | $ 25.000 million | $0 |
| 1997 | 5.50% | October 6, 2008 | $ 167.915 million | $ 167.915 million | $0 |
| **Total:** | | | **$ 1.456 billion** | **$ 1.456 billion** | **$1.263 billion** |

## 2.    PHONES Notes.

Tribune entered into the PHONES Indenture on April 1, 1999 with Bank of Montreal Trust Company, as trustee.[148]  Tribune is the issuer of the PHONES Notes under the PHONES Indenture.[149]  The PHONES Notes mature on May 15, 2029.[150]

The principal amount of one PHONES Note is related to the value of a Reference Share, originally one share of common stock of AOL outstanding as of the date of the issuance of the PHONES Note and subject to adjustment for any splits, combination, sub-division, exchange, conversion, liquidation, or other changes to the Reference Share.[151]  The PHONES Notes were issued with an original principal amount of $157.00 per PHONES Note, which represented the closing price of one Reference Share on April 7, 1999, and which would be reduced on payment of any dividends or other cash or property distributed to the holder of the Reference Shares with respect to the Reference Shares.[152]  On November 22, 1999, AOL's common stock split on a two-to-one basis,[153] changing the Reference Share to two shares of AOL's common stock for each PHONES Note.  On January 11, 2001, AOL and Time Warner merged to form AOL Time

---

[148]   Ex. 49 (PHONES Indenture).

[149]   Ex. 50 (Form of PHONES Notes).

[150]   *Id.*

[151]   Ex. 51 at S-1 (Prospectus Supplement, dated April 7, 1999).

[152]   *Id.*

[153]   Ex. 52 at Note 6 (AOL Form 10-Q, filed November 2, 1999).

Warner Inc., with the merged entity continuing to trade under the ticker symbol "AOL."[154]  On

October 16, 2003, AOL Time Warner Inc. changed its name to Time Warner and began trading

under the ticker symbol "TWX."[155]

As a result of the two-to-one stock split and subsequent merger of AOL and Time

Warner, two shares of TWX common stock represent the Reference Shares for each PHONES

Note.[156]  Tribune has the right under the PHONES Indenture to redeem the PHONES Notes at

any time for the higher of the principal value of the PHONES Notes or the then-current market

value of two shares of Time Warner common stock, as reduced by the amount of dividends and

other distributions made on account of the Reference Shares before such date or the then-current

market value of the Reference Shares, subject to certain adjustments.[157]  In addition, before the

Petition Date, holders of PHONES Notes were contractually entitled to exchange a PHONES

Note for an amount of cash equal to ninety-five percent (95%) (or one hundred percent (100%)

under certain circumstances) of the then-current market value of the Reference Shares, plus any

accrued and unpaid interest on the PHONES Notes and any dividends or other distributions that

a holder of the References Shares would be entitled to receive.[158]

The PHONES Indenture provides that the PHONES Notes are subordinate in right of

payment to all "Senior Indebtedness" of Tribune.[159]  "Indebtedness" is defined to include all

notes, bonds, indentures, indebtedness for borrowed money, capitalized leases, and guarantees of

Tribune, as of the date on which such Indebtedness is to be determined, and "Senior

---

[154]  Ex. 53 at 2 (Time Warner Form 8-K, filed January 12, 2001 (without exhibits)).

[155]  Ex. 54 at 2 (Time Warner Form 8-K, filed October 16, 2003).

[156]  Ex. 4 at 116 (Tribune 2007 Form 10-K).

[157]  Ex. 55 at 16 (Tribune 2007 Form 10-Q, dated May 9, 2007).

[158]  Ex. 4 at 116 (Tribune 2007 Form 10-K).

[159]  Ex. 49 at § 14.01 (PHONES Indenture).

Indebtedness" is defined as the principal, premium (if any), and interest (including interest accruing after a bankruptcy filing, but only if such interest is allowed) on, and other amounts due on or in connection with, any "Indebtedness" of Tribune, whether arising before or after the date of the PHONES Indenture, other than debt which by its terms is subordinated to or pari passu with the PHONES Notes, trade payables, debt of Tribune to its Subsidiaries, and the PHONES Notes themselves.[160]

### 3. The 2006 Bank Debt.

#### a. Background to the 2006 Leveraged Recapitalization.

In June 2000, Tribune acquired Times Mirror.  The principal stockholders of Times Mirror were the Chandler Trusts.[161]  As a result of that transaction, Tribune amended its By-Laws to grant the Chandler Trusts the right to nominate three directors to the Tribune Board, one for each class of Tribune Board members.[162]  Before Tribune's acquisition of Times Mirror, the Chandler Trusts and Times Mirror had entered into two transactions which, through the formation of two limited liability companies, the TMCT LLCs, enabled Times Mirror to retire shares for accounting purposes and the Chandler Trusts to diversify their assets without incurring tax liability, if certain restrictions were met.[163]  Following the acquisition of Times Mirror by Tribune, Tribune and the Chandler Trusts became co-owners of the TMCT LLCs.[164]

Beginning in February 2005, in connection with Tribune's periodic strategic review of its businesses, the Tribune Board began to consider strategic alternatives, with MLPFS acting as

---

[160]  *Id.*

[161]  Ex. 56 at 1-2 and 18-21 (Tribune 2000 Form 10-K); Ex. 5 at 97 (Tender Offer).

[162]  Ex. 5 at 98 (Tender Offer).

[163]  Examiner's Interview of William Stinehart, June 28, 2010.

[164]  Ex. 56 at 1-2 and 18-21 (Tribune 2000 Form 10-K); Ex. 5 at 97-99 (Tender Offer); Examiner's Interview of William Stinehart, June 28, 2010.

Tribune's financial advisor.[165]  These discussions continued in October 2005 and December

2005, and included the possible sale or other separation of the Broadcasting Segment, a possible

strategic combination with another media company, the acquisition of Tribune by financial

buyers through a leveraged buyout, and the need to restructure the TMCT LLCs in connection

with any such transaction.[166]

In January 2006, Tribune met with representatives of the Chandler Trusts, who expressed

their desire to combine any strategic alternatives pursued by Tribune with the restructuring of the

TMCT LLCs.[167]  The Chandler Trusts believed that a "fundamental transaction" was in the best

interests of Tribune, due to management's "failure to address fundamental strategic issues" and

that restructuring the TMCT LLCs was a necessary prerequisite to a private equity transaction or

an auction of Tribune.[168]

In early February 2006, the Chandler Trusts sent a letter to the Tribune Board reiterating

their desire to restructure the TMCT LLCs and proposing that such restructuring occur before a

possible spin-off of the Broadcasting Segment.[169]  The letter also stated that in the absence of

satisfactory progress on these alternatives, the Chandler Trusts would begin exploring with third

parties, including existing stockholders, the possibility of a "fundamental transaction" involving

Tribune.[170]

In early May 2006, the Tribune Board reviewed with management and MLPFS the status

of the negotiations with respect to the potential redemption of Tribune's interests in one of the

---

[165]  Ex. 5 at 15 (Tender Offer).

[166]  *Id.*

[167]  *Id.*

[168]  Ex. 57 at 2 and 10-11 (Chandler Trusts Letter, dated June 13, 2006); Examiner's Interview of William Stinehart, June 28, 2010.

[169]  Ex. 5 at 15 (Tender Offer).

[170]  *Id.* at 15-16.

TMCT LLCs, and progress toward a spin-off of the Broadcasting Segment.[171]  CGMI was

invited to this Tribune Board meeting to make a presentation regarding a possible

recapitalization and other alternatives, either alone or in combination with a spin-off or other

separation of the Broadcasting Segment.[172]  MLPFS and CGMI both separately advised the

Tribune Board to pursue a recapitalization.[173]  The directors nominated by the Chandler Trusts

were not supportive of a leveraged recapitalization, but the other members of the Tribune Board

determined that additional work should be done to evaluate the leveraged recapitalization

alternatives.[174]

At a meeting on May 26, 2006, the Tribune Board reviewed and authorized a leveraged

recapitalization transaction in the form of a repurchase of up to 75 million shares of Tribune

Common Stock at prices not to exceed $32.50 per share.[175]  Because the proposed transaction did

not unwind the TMCT LLCs, the three directors nominated by the Chandler Trusts voted against

the proposed transaction.[176]  On May 30, 2006, Tribune announced the leveraged recapitalization

transaction using a modified "Dutch Auction" tender offer.[177]

On June 13, 2006, the Chandler Trusts sent a second letter to the Tribune Board, and filed

the letter publicly, stating that the Chandler Trusts did not intend to tender any shares into the

---

[171]   Ex. 58 (Tribune Board Meeting Minutes, dated May 1, 2006).  In his interview with the Examiner, William
Stinehart noted that, for tax reasons, the TMCT LLCs could not be unwound at the same time; by May 2006,
the seven-year holding period to avoid capital gains had expired for one of the TMCT LLCs but not the other.
Examiner's Interview of William Stinehart, June 28, 2010.

[172]   Ex. 5 at 16 (Tender Offer).

[173]   Ex. 59 (Tribune Company Leveraged Recapitalization Summary, dated May 23, 2006).

[174]   Examiner's Interview of William Stinehart, June 28, 2010; Ex. 5 at 16 (Tender Offer).

[175]   Ex. 60 (Tribune Board Meeting Minutes, dated May 26, 2006).

[176]   *Id.*; Examiner's Interview of William Stinehart, June 28, 2010.

[177]   Ex. 5 at 16-17 (Tender Offer); Ex. 1022 (Tribune Press Release, dated May 30, 2006).

2006 Tender Offer.[178]  The letter stated that the Chandler Trusts believed that the process that had led to the 2006 Tender Offer was "hasty and ill-informed," that the 2006 Tender Offer failed to address the business issues facing Tribune, and that Tribune should promptly explore other strategic alternatives, including a possible leveraged buyout.[179]  The letter concluded that, if timely action were not taken, the Chandler Trusts intended to engage with other stockholders and third parties to pursue changes in Tribune's management and other transactions to enhance value.[180]

On June 30, 2006, Tribune announced that it had repurchased approximately 55 million shares of Tribune Common Stock at a price of $32.50 per share through the 2006 Tender Offer and a separate purchase agreement with the McCormick Foundation, one of Tribune's major stockholders.[181]  As a result of these transactions and the Chandler Trusts' decision not to tender any shares, the Chandler Trusts became Tribune's largest stockholders, increasing their percentage ownership of Tribune to approximately 15% of Tribune's outstanding common stock.[182]

To finance these transactions and refinance certain existing debt, on June 19, 2006, Tribune incurred the 2006 Bank Debt.

### b.    2006 Credit Agreement.

On June 19, 2006, Tribune entered into a credit agreement, which was amended and restated on June 27, 2006, by and among Tribune, as borrower, the lenders party thereto, Citicorp, as administrative agent, MLPFS, as syndication agent, JPMCB, Bank of America,

---

[178]  Ex. 57 at 1-2 (Chandler Trusts Letter, dated June 13, 2006).

[179]  *Id.*

[180]  Ex. 57 at 11 (Chandler Trusts Letter, dated June 13, 2006).

[181]  Ex. 61 at 2 (Tribune Amendment No. 8 to Schedule TO); Ex. 62 (Tribune Press Release, dated June 30, 2006).

[182]  Ex. 5 at 17 (Tender Offer).

Morgan Stanley Bank, and The Bank of Tokyo-Mitsubishi UFJ, Ltd., Chicago Branch, as co-documentation agents, and CGMI, MLPFS, and JPMorgan as joint lead arrangers and joint bookrunners.[183]   The 2006 Credit Agreement provided for a $1.5 billion unsecured term loan facility, of which $250 million was available for and used to refinance certain medium-term notes that matured on November 1, 2006, and a $750 million unsecured revolving facility.[184]

Tribune was the sole borrower under the 2006 Credit Agreement.[185]   The 2006 Credit Agreement was not guaranteed or secured.  Advances under the 2006 Credit Agreement bore interest at a rate based on either the "Base Rate" (the higher of Citibank's base rate and the overnight federal funds rate plus 0.5%) or the "Eurodollar Rate" (LIBOR) plus the relevant applicable margin.[186]   The applicable margin varied based on Tribune's Moody's and Standard & Poor's public debt ratings and ranged from 0% to .250% for "Base Rate" advances and from .350% to 1.250% for "Eurodollar Rate" advances.[187]   As of December 31, 2006, the interest rate under the 2006 Credit Agreement was 6.2%.[188]

The 2006 Credit Agreement had a maturity date of June 20, 2011.[189]   Tribune had the right to prepay the 2006 Credit Agreement at any time without penalty and was not required to make mandatory prepayments other than with respect to revolving credit advances in excess of the revolving credit commitment.[190]   There were no scheduled amortization payments under the

---

[183]   Ex. 63 (2006 Credit Agreement).  The 2006 Credit Agreement was governed by New York law (*see* § 8.09).  The Indebtedness under the 2006 Credit Agreement was paid in full on the Step One Financing Closing Date.  *See* Report at § III.D.16.

[184]   Ex. 14 at 2 (Tribune 2006 Form 10-K).

[185]   Ex. 63 at 1 (2006 Credit Agreement).

[186]   *Id.* at § 2.07.

[187]   *Id.* at § 1.01 (definition of "Applicable Margin").

[188]   Ex. 14 at 100 (Tribune 2006 Form 10-K).

[189]   Ex. 63 at § 2.06 (2006 Credit Agreement).

[190]   *Id.* at § 2.10.

2006 Credit Agreement.  The proceeds of the term loans under the 2006 Credit Agreement were to be used to finance a portion of Tribune's repurchases of Tribune Common Stock pursuant to the 2006 Tender Offer and to refinance existing indebtedness, and the proceeds of the revolving facility were to be used for working capital and general corporate purposes.[191]

Under the 2006 Credit Agreement, Tribune was not prohibited from incurring additional debt, but Tribune's ability to grant liens was limited,[192] and any additional debt incurred by Tribune or its Subsidiaries would factor into the calculation of Tribune's compliance with the leverage ratio covenant.[193]  Tribune's Subsidiaries were explicitly prohibited from incurring debt other than specified types or amounts of debt.[194]  The basket for debt (other than intercompany debt, debt assumed as part of an acquisition, or other categories of permitted debt) was capped at $100 million.[195]  "Debt" as defined in the 2006 Credit Agreement included guarantees.[196]  As a result of the foregoing covenants, payment in full of the indebtedness under the 2006 Credit Agreement was (or the consent of the lenders under the 2006 Credit Agreement would have been) required for Tribune to enter into the Step One Financing and the Step Two Financing (in particular the Stock Pledge, the Credit Agreement Subsidiary Guarantees, and the Subordinated Bridge Subsidiary Guarantees).

A change in control, defined as (a) any person or group of persons becoming the beneficial owner of more than 40% of the voting power of Tribune on a fully diluted basis or obtaining the power to elect a majority of the Tribune Board or (b) a majority of the Tribune

---

[191]  *Id.* at § 2.17.

[192]  *Id.* at § 5.02(a).

[193]  *Id.* at § 5.03(a).

[194]  *Id.* at § 5.02(c).

[195]  *Id.* at § 5.02(c)(v).

[196]  *Id.* at § 1.01 (definition of "Debt").

Board, during any period of 24 consecutive months, ceasing to be comprised of individuals who were members of the Tribune Board at the beginning of such period and/or individuals whose election or nomination to the Tribune Board was approved by a majority of the directors who were members of the Tribune Board at the beginning of such period (or likewise approved during such period),[197] was an event of default under the 2006 Credit Agreement.[198]  As a result of the foregoing event of default, payment in full of the indebtedness under the 2006 Credit Agreement was (or the consent of the lenders under the 2006 Credit Agreement would have been) required to consummate the Merger.

### c.    2006 Bridge Credit Agreement.

At the same time Tribune entered into the 2006 Credit Agreement, it also entered into a bridge credit agreement by and among Tribune, as borrower, the lenders party thereto, Citicorp, as administrative agent, MLPFS, as syndication agent, JPMCB, as documentation agent, and CGMI, MLPFS, and JPMorgan, as joint lead arrangers and joint bookrunners.[199]  The 2006 Bridge Credit Agreement provided for a $2.15 billion unsecured bridge facility.[200]

As with the 2006 Credit Agreement, Tribune was the sole borrower under the 2006 Bridge Credit Agreement.[201]  The 2006 Bridge Credit Agreement was not guaranteed or secured. Advances under the 2006 Bridge Credit Agreement bore interest at a rate based on either the "Base Rate" (the higher of Citibank's base rate and the overnight federal funds rate plus 0.5%) or

---

[197]  *Id.* at § 1.01 (definition of "Change in Control").

[198]  *Id.* at § 6.01(g).

[199]  Ex. 64 (2006 Bridge Credit Agreement).  The 2006 Bridge Credit Agreement was governed by New York law (*see* § 8.09).  The indebtedness under the 2006 Bridge Credit Agreement was paid in full on the Step One Financing Closing Date.  *See* Report at § III.D.16.

[200]  Ex. 14 at 2 (Tribune 2006 Form 10-K).

[201]  Ex. 64 at 1 (2006 Bridge Credit Agreement).

the "Eurodollar Rate" (LIBOR) plus the relevant applicable margin.[202]  The applicable margin

varied based on Tribune's Moody's and Standard & Poor's public debt ratings and ranged from

0% to .250% for "Base Rate" advances and from .350% to 1.250% for "Eurodollar Rate"

advances.[203]  As of December 31, 2006, the interest rate under the 2006 Bridge Credit

Agreement was 6.2%.[204]

The 2006 Bridge Credit Agreement matured on June 18, 2007.[205]  Tribune had the right

to prepay the 2006 Bridge Credit Agreement at any time without penalty.[206]  Tribune was

required to prepay the 2006 Bridge Credit Agreement with the proceeds of any debt for

borrowed money or capital stock issued following the closing under the 2006 Bridge Credit

Agreement.[207]  There were no scheduled amortization payments under the 2006 Credit

Agreement.  The proceeds of the term loans under the 2006 Credit Agreement were to be used to

finance a portion of Tribune's repurchases of Tribune Common Stock pursuant to the 2006

Tender Offer and to refinance existing indebtedness.[208]

As under the 2006 Credit Agreement, under the 2006 Bridge Credit Agreement Tribune

was not prohibited from incurring additional debt, but Tribune's ability to grant liens was

limited[209] and any additional debt incurred by Tribune or its Subsidiaries would factor into the

calculation of Tribune's compliance with the leverage ratio covenant.[210]  Tribune's Subsidiaries

---

[202]   *Id.* at § 2.06.

[203]   *Id.* at § 1.01 (definition of "Applicable Margin").

[204]   Ex. 14 at 100 (Tribune 2006 Form 10-K).

[205]   Ex. 64 at § 2.05 (2006 Bridge Credit Agreement).

[206]   *Id.* at § 2.09(a).

[207]   *Id.* at § 2.09(b).

[208]   *Id.* at § 2.16.

[209]   *Id.* at § 5.02(a).

[210]   *Id.* at § 5.03(a).

were explicitly prohibited from incurring debt other than specified types or amounts of debt.[211] The basket for debt (other than intercompany debt, debt assumed as part of an acquisition or other categories of permitted debt) was capped at $100 million.[212]  "Debt" as defined in the 2006 Bridge Credit Agreement included guarantees.[213]  As a result of the foregoing covenants, payment in full of the indebtedness under the 2006 Bridge Credit Agreement was (or the consent of the lenders under the 2006 Bridge Credit Agreement would have been) required for Tribune to enter into the Step One Financing and Step Two Financing (in particular the Stock Pledge, the Credit Agreement Subsidiary Guarantees, and the Subordinated Bridge Subsidiary Guarantees).

A change in control (the definition of which under the 2006 Bridge Credit Agreement is identical to the definition under the 2006 Credit Agreement[214]) was an event of default under the 2006 Bridge Credit Agreement.[215]  As a result of the foregoing event of default, payment in full of the indebtedness under the 2006 Bridge Credit Agreement was (or the consent of the lenders under the 2006 Bridge Credit Agreement would have been) required for Tribune to consummate the Merger.

**C.**      **Significant Events Leading Up to the Step One Transactions.**

      **1.**      **Tribune Entities' Financial Performance Leading Up to April 1, 2007 and the Step One Financing Closing Date.**

          **a.**      **Financial Performance from 2004 through 2006.**

To place the events of 2007 in an appropriate context from a financial perspective, the Examiner reviewed key financial data for the Tribune Entities, as reported in Tribune's various

---

[211]   *Id.* at § 5.02(c).

[212]   *Id.* at § 5.02(c)(v).

[213]   *Id.* at § 1.01 (definition of "Debt").

[214]   *Id.* at § 1.01 (definition of "Change in Control"); Ex. 63 at § 1.01 (definition of "Change in Control") (2006 Credit Agreement).

[215]   Ex. 64 at § 6.01(g) (2006 Bridge Credit Agreement).

filings with the SEC for the period 2004 through 2006.  These filings include quarterly

(Form 10-Q) and annual (Form 10-K) financial statements, as well as other periodic disclosures

(*e.g*., Form 8-K filings).  The following chart summarizes the SEC filings considered:[216]

| SUMMARY OF SELECT SEC FILINGS | | |
|---|---|---|
| **Tribune Form** | **Filing Date** | **Subject** |
| 8-K | 4/15/2004 | Q1 2004 Earnings Announcement. |
| 10-Q | 4/30/2004 | Q1 2004 Financial Statements and related disclosures. |
| 8-K | 7/15/2004 | Q2 2004 Earnings Announcement. |
| 10-Q | 7/30/2004 | Q2 2004 Financial Statements and related disclosures. |
| 8-K | 10/28/2004 | Q3 2004 Earnings Announcement. |
| 10-Q | 10/29/2004 | Q3 2004 Financial Statements and related disclosures. |
| 8-K | 1/28/2005 | Q4 2004 Earnings Announcement. |
| 10-K | 3/4/2005 | 2004 Annual Financial Statements and related disclosures. |
| 8-K | 4/15/2005 | Q1 2005 Earnings Announcement. |
| 10-Q | 4/29/2005 | Q1 2005 Financial Statements and related disclosures. |
| 8-K | 7/14/2005 | Q2 2005 Earnings Announcement. |
| 10-Q | 7/29/2005 | Q2 2005 Financial Statements and related disclosures. |
| 8-K | 10/13/2005 | Q3 2005 Earnings Announcement. |
| 10-Q | 10/27/2005 | Q3 2005 Financial Statements and related disclosures. |
| 8-K | 2/1/2006 | Q4 2005 Earnings Announcement. |
| 10-K | 2/28/2006 | 2005 Annual Financial Statements and related disclosures. |
| 8-K | 4/13/2006 | Q1 2006 Earnings Announcement. |
| 10-Q | 4/28/2006 | Q1 2006 Financial Statements and related disclosures. |
| 8-K | 7/13/2006 | Q2 2006 Earnings Announcement. |
| 10-Q | 7/28/2006 | Q2 2006 Financial Statements and related disclosures. |
| 8-K | 10/19/2006 | Q3 2006 Earnings Announcement. |
| 10-Q | 11/2/2006 | Q3 2006 Financial Statements and related disclosures. |
| 8-K | 2/8/2007 | Q4 2006 Earnings Announcement. |
| 10-K | 2/26/2007 | 2006 Annual Financial Statements and related disclosures. |

For the years 2004 through 2006,[217] as shown in the following table, the Tribune Entities

reported substantial revenues, operating profits as measured by earnings before interest and taxes

---

[216]  These filings represent the principal, but not the only, public disclosures that Tribune made during this period. In addition to SEC filings, Tribune periodically issued press releases containing disclosures regarding certain period-specific financial performance information, among other things (although such disclosures typically did not contain comprehensive presentation of GAAP basis financial statements).  *See, e.g.*, Ex. 65 (Tribune Press Release, dated February 23, 2007).  In addition, other SEC filings contained presentation of financial data, albeit generally in connection with other announcements.  *See, e.g.,* Ex. 5 (Tender Offer).

[217]  The Examiner did not analyze Tribune's financial performance for periods before 2004.

(EBIT), and positive operating cash flow as measured by earnings before interest, taxes, depreciation, and amortization (EBITDA), all on a consolidated basis, as normalized for discontinued operations.[218]

| CONSOLIDATED TRIBUNE ($000s) | | | |
|---|---|---|---|
| | 2004 | 2005 | 2006 (2) |
| Revenue | $ 5,631,431 | $ 5,511,283 | $ 5,517,708 |
| EBIT | $ 1,187,278 | $ 1,127,191 | $ 1,085,010 |
| EBITDA | $ 1,417,395 | $ 1,368,232 | $ 1,312,023 |

The consolidated results for the Tribune Entities for 2005 and 2006 show declining year-over-year EBIT contribution and EBITDA contribution, as a percentage of revenue, notwithstanding relative consistency in revenue during the period on a normalized basis:

| CONSOLIDATED TRIBUNE EBIT and EBITDA as % of NORMALIZED REVENUE | | | |
|---|---|---|---|
| | 2004 | 2005 | 2006 |
| EBIT | 21.08% | 20.45% | 19.66% |
| EBITDA | 25.17% | 24.83% | 23.78% |

Although the Form 10-Q and Form 10-K filings for this period do not contain consolidating financial data on an entity-by-entity basis, the filings do contain a breakdown of revenue and operating profit results for Tribune's two operating business segments, the Publishing Segment and the Broadcasting Segment, which provides additional insight into the

---

[218]  These data reflect adjustments on account of discontinued operations.  Making these adjustments (or "normalizing" the data) facilitates an "apples-to-apples" comparison of operating data that is not skewed by the effects of businesses sold during a subsequent year.  The 2006 results reflect 53 weeks of financial data, although the 2004 and 2005 results reflect 52 weeks.  *See* Ex. 14 at 8 (Tribune 2006 Form 10-K) (discussing effects of these differences).

Tribune Entities' financial condition at the relevant time.  Specifically, although comprising a smaller percentage of consolidated revenues for the entire enterprise, the Broadcasting Segment was significantly more profitable as a percentage of revenue than the Publishing Segment (although the rate of profitability of the Broadcasting Segment declined, year-over-year, from 2004 through 2006):

| TRIBUNE SEGMENT LEVEL REPORTING ($000s) | | | |
|---|---|---|---|
| | 2004 | 2005 | 2006 |
| **Publishing Segment** | | | |
| Revenue | $ 4,129,850 | $ 4,096,850 | $ 4,092,562 |
| Operating Profit | $ 726,207 | $ 759,713 | $ 749,189 |
| *Operating Profit Margin* | *17.58%* | *18.54%* | *18.31%* |
| | | | |
| **Broadcasting Segment** | | | |
| Revenue | $ 1,501,581 | $ 1,414,433 | $ 1,425,146 |
| Operating Profit | $ 513,289 | $ 416,891 | $ 391,533 |
| *Operating Profit Margin* | *34.18%* | *29.47%* | *27.47%* |
| | | | |
| **Consolidated Tribune** | | | |
| Revenue | $ 5,631,431 | $ 5,511,283 | $ 5,517,708 |
| Operating Profit | $ 1,239,496 | $ 1,176,604 | $ 1,140,722 |
| Corporate Expenses | ($ 52,218) | ($ 49,413) | ($ 55,712) |
| Net Consolidated Operating Profit (EBIT) | $ 1,187,278 | $ 1,127,191 | $ 1,085,010 |
| *Operating Profit Margin* | *21.08%* | *20.45%* | *19.66%* |

The Examiner also considered quarterly trends in financial performance, derived from information contained in Tribune's Form 10-Q filings.  These data indicate that Tribune and its subsidiaries—except for the fourth quarter of 2006—reported declines in comparable quarter revenues each year during this period.  Although the fourth quarter of 2006 showed improvement over revenues for the fourth quarter of 2004 and 2005, the results for 2006 included an additional week that was not included in the prior years.  When normalized to adjust for that discrepancy, the fourth quarter of 2006 shows a slight decline over the prior year's fourth quarter revenue:



In terms of profitability, the 2006 consolidated quarterly results show consistent quarter-over-comparable-quarter declines over the results in both 2004 and 2005, except for the fourth quarter which exceeded the fourth quarter results for 2005 on both an as-reported and a normalized basis:



### b.    Financial Performance in Late 2006 and Tribune's Development of the 2007 Operational Plan.

According to testimony provided by Harry Amsden at his Rule 2004 examination,[219] consistent with its past practice in connection with the development of operating plans prepared in prior years, Tribune likely began the development of its 2007 financial and operating plan (including a budget and projections in respect thereof) during late summer of the prior year (*i.e.,* July or early August of 2006), by gathering input from discrete business units.[220]  Among other things, the process culminated in the presentation of a formal plan approved by the Tribune

---

[219]    At the time of his deposition, Mr. Amsden was Senior Vice President of Financial Operations for Tribune. During 2006 and 2007, however, Mr. Amsden was Vice President of Finance for Tribune Publishing.  *See* Ex. 66 at 8:7-12:11 (Rule 2004 Examination of Harry Amsden, December 16, 2009).

[220]    *See id.* at 13:14-14:4.

Board at its February 13, 2007 meeting.[221]  The 2007 operating plan development, however,

differed from prior year undertakings in two respects.  First, in connection with the development

of the 2007 plan, Tribune developed financial expectations extending beyond the typical

one-year projection horizon developed in prior years.[222]  This longer projection horizon was

---

[221]  *See* Ex. 67 at TRB0415614-15 (Tribune Board Meeting Minutes, dated February 13, 2007).  The 2007 Tribune operating plan materials disseminated to the Tribune Board in advance of the meeting appear to have been comprised solely of 2007 consolidated and segment level income statement projections.  *See, e.g.*, Ex. 68 (Tribune Board Meeting Materials, dated February 13, 2007).  Minutes of the Special Committee meeting which occurred on February 12, 2007 (one day before the full Tribune Board meeting on February 13, 2007) reflect that "Mr. Grenesko then described the current environment for the Company's businesses and presented management's revised operating plan and projections.  Referring to distributed materials, he outlined the revised 2007 operating plan and its publishing and broadcasting components."  Ex. 69 at TRB-UR-G0007809 (Special Committee Meeting Minutes, dated February 12, 2007).  It is not clear from the Special Committee meeting minutes whether this discussion pertained to solely 2007 projections, or included a discussion of projected results for subsequent years as well.  Regardless, a subsequent section of the February 12, 2007 Special Committee meeting minutes reflect that Thomas Whayne (of Morgan Stanley) discussed with the Special Committee "three sets of projections for 2007-2011:  management, research and management downside" projections.  *Id.* at TRB-UR-G0007810.  The meeting minutes note that "revenue and EBITDA for the Company on a consolidated basis and for each of publishing and broadcasting under each set of projections were described and analyzed."  *Id.*  A review of the February 12, 2007 Morgan Stanley "Project Tower – Presentation to the Committee of Independent Directors of the Board of Directors of Tribune" confirms that the Special Committee was presented with materials reflecting management projections of revenue and EBITDA, by segment and on a consolidated basis, for 2007-2011.  *See* Ex. 70 (Presentation to the Committee of Independent Directors of the Board of Directors of Tribune, dated January 12, 2007).

Although the February 13, 2007 Tribune Board meeting minutes reflect that, on motion, "the 2007 operating plan was approved" by the Tribune Board, it is unclear whether this approval related solely to the plan and projections submitted to the Tribune Board in advance of the meeting (which contained only 2007 projections), or to the 2007 plan containing the longer-term forecasts as presented in the Morgan Stanley materials discussed above.  *See* Ex. 67 at TRB0414412 (Tribune Board Meeting Minutes, dated February 13, 2007).

The Examiner reviewed the detailed projection model setting forth specific projection assumptions underlying the 2007 single year budget approved by the Tribune Board.  *See* Ex. 71 (ESOP Transaction Model—Revised Operating Plan Case, dated February 8, 2007).  This projection model contained forecasts for 2007, as well as later years.  The Examiner notes that this model presented the 2007 forecast quarterly, and for subsequent years, on a full year basis without monthly detail.  The Examiner notes that monthly budgeted amounts for 2007 as reported in, for example, Brown Books, nonetheless sum to the quarterly and full year 2007 projected amounts, with minimum, and largely reconcilable, differences.

[222]  According to Mr. Amsden, Tribune had historically, as part of its ordinary course strategic planning process, developed certain multi-year "high level" projections during the spring of each year for discussion with the Tribune Board.  He testified as follows:

Q:  Are there any longer term financial planning documents that are created?  And now I am talking in the normal course of business.  We will get to what happened in 2006, 2007.

A:  There is another part of our process that we normally undertake.  It's also our strategic planning process.  Normally that starts up in the spring of the year.  And then that normally culminates with a presentation to the board of directors in October of the year.  During that we are going through various strategic plans.  You know, what people want to do obviously to

apparently developed in connection with the bidding and strategic review process then underway at Tribune.  Second, the projections that were being developed starting in the summer of 2006 for the 2007 calendar year were, according to Mr. Amsden, subjected to an additional "re-do," or re-evaluation in early 2007, in order to "make sure that we reflected [the business units'] best thinking" at the time.[223]

This description of the chronology of events giving rise to the 2007 operating plan is largely consistent with the Examiner's review of Special Committee and Tribune Board meeting minutes (and materials disseminated in connection with those meetings).[224]  As discussed elsewhere in the Report, financial expectations for 2007 and 2008 (developed by management *before* the January 2007 reevaluation) were apparently more bullish on both revenue and EBITDA than were the expectations of analysts following Tribune during late 2006 and 2007.[225] The 2007 revised operating plan projections developed in early 2007 (both as to the 2007 forecast component of that plan,[226] as well as the 2008 forecast component of the plan) more closely approximated analyst expectations at that time.[227]

---

grow the business, what opportunities they see.  Often as part of that process we may ask the business units for some high-level projections for both the current year and a couple years out, or we might have formulated it at the group level just to give the board an overall sense where things may be headed.  Usually that's done at a pretty high level.

Ex. 66 at 15:19–16:14 (Rule 2004 Examination of Harry Amsden, December 16, 2009).  The Examiner notes that the process described by Mr. Amsden as to the development of the 2007 operating plan is differentiable from that type of review.  *See, e.g.*, *id.* at 25:9-29:14.

[223]  *Id.* at 16:24–17:17.

[224]  *See also* Report at § III.D.1.

[225]  *See, e.g.*, Ex. 1076 at 7 (Merrill and Citigroup January 12, 2007 "Confidential Discussion Materials Prepared for:  Committee of Independent Directors of Tribune") (observing that:  "Current Tribune Management Projections generally more aggressive than Wall Street research," that management's projections were "[a]bove consensus for Revenues and EBITDA through 2008," and that "2008 considerably higher than even most aggressive Wall Street estimate").

[226]  The Examiner did note that the single year 2007 operating plan (included as a part of the Tribune Board book disseminated on February 6, 2007) was a multi-page document that contained a description of some of the significant assumptions underlying the 2007 projections, the basis for those assumptions, and a comparison of projected amounts to prior year (2005 and 2006) financial results.  The Examiner also noted that, in connection

As shown in the table below, the Tribune Board-approved 2007 plan contemplated both reduced revenue and profitability compared to the actual 2006 results:[228]

| CONSOLIDATED TRIBUNE ($000s) | | | |
|---|---|---|---|
| 2004 (1) | 2005 (2) | 2006 (1)(2) | 2007 Budget (3) |
| **Revenue** $ 5,631,431 | $ 5,511,283 | $ 5,517,708 | $ 5,386,000 |
| **EBIT** $ 1,187,278 | $ 1,127,191 | $ 1,085,010 | $ 1,023,000 |
| **EBITDA** $ 1,417,395 | $ 1,368,232 | $ 1,312,023 | $ 1,270,000 |

(1)  Ex. 14 (Tribune 2006 Form 10-K).  Results are normalized for discontinued operations.
(2)  Fiscal year 2006 encompassed 53 weeks, while fiscal years 2004 and 2005 each encompassed 52 weeks.
(3)  Ex. 71 (ESOP Transaction Model-Revised Operating Plan Case, dated February 8, 2007).

These assumptions were directionally consistent with the trends observable in prior years.

Tribune's segment-level projections for revenue and operating profit reflected the same trends:

---

with the Tender Offer, Tribune made reference to the longer term 2007 operating plan (inclusive of not only projected 2007 results but also a full five-year projection as well) as having been presented to the Tribune Board and Special Committee in February.  *See, e.g.*, Ex. 5 at 94 (Tender Offer).  As previously noted, however, the Examiner did not see evidence that the Tribune Board was provided the multi-year projections in advance of the meeting in which the 2007 single year budget was discussed and approved; those longer term projections were apparently presented to, and discussed with the Special Committee at the February meetings.  *See, e.g.*, Ex. 69 at TRB-UR-G0007811 (Special Committee Meeting Minutes, dated February 12, 2007); Ex. 66 at 33:2-33:8 (Rule 2004 Examination of Harry Amsden, dated December 19, 2009).

[227]  Analyst expectations typically were presented on a forward looking basis for no more than two years.  As such, this comparison is limited to a review of management's 2007 and 2008 revenue and EBITDA expectations, although the operating plan encompassed five years of projected results.

[228]  Approval of the 2007 operating plan, which occurred on February 13, 2007, pre-dated Tribune's 2006 Form 10-K, which was filed on February 26, 2007.  Results for the fourth quarter of 2006 were, however, available to management and the Tribune Board, as Tribune's Form 8-K was publicly filed on February 8, 2007. *See* Ex. 72 (Tribune Form 8-K, filed February 8, 2007).

| TRIBUNE SEGMENT LEVEL REPORTING ($000s) | | | | |
|---|---|---|---|---|
| | **2004 (1)** | **2005 (1)** | **2006 (1)** | **2007 Budget (2)** |
| **Publishing Segment** | | | | |
| Revenue | $ 4,129,850 | $ 4,096,850 | $ 4,092,562 | $ 3,985,000 |
| Operating Profit | $ 726,207 | $ 759,713 | $ 749,189 | $ 721,000 |
| *Operating Profit Margin* | *17.58%* | *18.54%* | *18.31%* | *18.09%* |
| | | | | |
| **Broadcasting Segment** | | | | |
| Revenue | $ 1,501,581 | $ 1,414,433 | $ 1,425,146 | $ 1,401,000 |
| Operating Profit | $ 513,289 | $ 416,891 | $ 391,533 | $ 364,000 |
| *Operating Profit Margin* | *34.18%* | *29.47%* | *27.47%* | *25.98%* |
| | | | | |
| **Consolidated Tribune Company** | | | | |
| Revenue | $ 5,631,431 | $ 5,511,283 | $ 5,517,708 | $ 5,386,000 |
| Operating Profit | $ 1,239,496 | $ 1,176,604 | $ 1,140,722 | $ 1,085,000 |
| Corporate Expenses | ($ 52,218) | ($ 49,213) | ($ 55,712) | ($ 62,000) |
| Net Consolidated Operating Profit (EBIT) | $ 1,187,278 | $ 1,127,391 | $ 1,085,010 | $ 1,023,000 |
| *Operating Profit Margin* | *21.08%* | *20.46%* | *19.66%* | *18.99%* |
| | | | | |
| EBITDA | $ 1,417,395 | $ 1,368,232 | $ 1,312,023 | $ 1,270,000 |
| *EBITDA Margin* | *25.17%* | *24.83%* | *23.78%* | *23.58%* |

(1)  Ex. 14 (Tribune 2006 Form 10-K).  Results are normalized for discontinued operations.
(2)  Ex. 71 (ESOP Transaction Model - Revised Operating Plan Case, dated February 8, 2007).

Management's expectations regarding the future financial performance of the Tribune

Entities, as reflected in the Tribune Board-approved operating plan for 2007,[229] had not been

publicly disclosed at the time the Tribune Board considered them.  Indeed, as a general matter,

unlike some publicly traded companies, Tribune did not provide formal "guidance" to market

analysts regarding Tribune's financial expectations, as some companies elect to do.[230]

---

[229]  Ex. 1109 (Tribune 2007 Operating Plan, dated February 2007).

[230]  "Guidance," in the context used herein, refers to a formal announcement by a company of expectations, or estimates, of forward-looking financial performance measures such as revenue, earnings, or profitability. Although the Tribune, for example, communicated certain discrete, forward-looking plan and performance expectations, Tribune apparently did not express opinions regarding consolidated performance expectations in its communications with analysts.  *See, e.g.,* Ex. 73 (Transcript of the Fourth Quarter 2006 Earnings Conference Call).  Tribune did, however, subsequently disclose the February 2007 operating plan in connection with Tribune's Form SC TO-I on April 25, 2007, as an exhibit to the Tender Offer.  *See* Ex. 5 at 94 (Tender Offer). In his interview with the Examiner, Donald Grenesko noted that, once the Leveraged ESOP Transactions were announced, Tribune stopped holding conference calls and meetings with Wall Street analysts.  Examiner's Sworn Interview of Donald Grenesko, June 25, 2010, at 29:9-14.  Mr. Grenesko stated that this was done on the advice of counsel "to make sure that we didn't make any mistakes since [the Leveraged ESOP Transactions were] pending."  Examiner's Sworn Interview of Donald Grenesko, June 25, 2010, at 30:8-18.

Numerous financial analysts nonetheless followed Tribune and its reported financial results and developed their own forward-looking performance expectations for the Tribune Entities.  In early 2007, approximately 17 analysts followed Tribune.[231]  After Tribune's release of fourth quarter and full year 2006 results,[232] and at a time temporally proximate to the Tribune Board's approval of the 2007 budget, analysts' expectations of selected Tribune performance metrics ranged as follows:[233]

| TRIBUNE IBES ESTIMATES ($mm) | | | | |
|---|---|---|---|---|
| Consensus Date | 2007 Estimates | | | |
| | Revenue | | EBITDA | |
| | IBES Median | IBES Mean | IBES Median | IBES Mean |
| 01/2007 | $ 5,495.8 | $ 5,465.6 | $ 1,287.7 | $ 1,277.3 |
| 02/2007 | $ 5,399.6 | $ 5,395.1 | $ 1,269.7 | $ 1,267.8 |
| 03/2007 | $ 5,367.8 | $ 5,369.0 | $ 1,277.6 | $ 1,255.1 |

The public markets offer additional information regarding Tribune's financial prospects during this period.  For example, during early 2007 (through the date of the issuance of fourth quarter and full year 2006 results in February 2007), Tribune Common Stock traded between approximately $30 and $31 per share notwithstanding public disclosure of Tribune's downward trends in annual revenue and profitability:[234]

---

[231]  Three of the analysts were restricted from rating Tribune because of involvement of their firms as advisors in the strategic review process.  *See* Ex. 68 at TRB0413550 (Tribune Board Meeting Materials, dated February 13, 2007).

[232]  *See* Ex. 72 (Tribune Form 8-K, filed February 8, 2007); Ex. 14 (Tribune 2006 Form 10-K).

[233]  The Institutional Brokers' Estimate System data reflecting analyst consensus was obtained from Tribune's financial advisor, Lazard.  *See* Ex. 74 (Tribune IBES Estimates).

[234]  Tribune stock price data was obtained from Bloomberg Finance, L.P., on the basis of a subscription to its searchable database.  Tribune stock prices were obtained through use of the equity search function, "TRB" symbol.  *See* Ex. 75 (Daily Tribune Stock Trading Price).



The graph above illustrates that prices for Tribune Common Stock showed little movement following the announcements of end-of year financial results for 2006, suggesting that those results may not have meaningfully altered the market's long-term expectations of Tribune's financial performance or the attendant risks.[235]  The following table sets forth the relevant data illustrated in the above graph:

---

[235]  The foregoing observations are inferential and have been drawn solely on the basis of observed changes in Tribune stock prices in periods immediately preceding and subsequent to public disclosure of actual financial results in Tribune's Form 10-Q for the fourth quarter of 2006.  No statistically significant conclusions can be drawn relative to excess returns (*i.e.,* changes in stock price that are not related to general changes in the market) without performing econometric-based event studies to regress observed stock price changes against market and/or cohort returns.  The Examiner did not perform this kind of econometric analysis due to time and budgetary constraints relating to the preparation of the Report.

| MOVEMENT OF TRIBUNE COMMON STOCK PRICES BEFORE AND AFTER EARNINGS ANNOUNCEMENTS (1) | | | |
|---|---|---|---|
|  | **Close** | **Open** | **Volume** |
| 2/5/2007 | $    30.53 | $    30.37 | 1,159,900 |
| 2/6/2007 | 30.77 | 30.53 | 1,246,600 |
| 2/7/2007 | 30.77 | 30.96 | 2,531,800 |
| **2/8/2007 (2)** | 30.74 | 30.82 | 1,730,200 |
| 2/9/2007 | 30.31 | 30.74 | 1,262,800 |
| 2/12/2007 | 30.11 | 30.27 | 741,622 |
| 2/13/2007 | 30.22 | 30.09 | 645,574 |
|  |  |  |  |
| 2/21/2007 | $    30.63 | $    30.67 | 915,000 |
| 2/22/2007 | 30.64 | 30.51 | 600,500 |
| 2/23/2007 | 30.70 | 30.62 | 598,500 |
| **2/26/2007 (3)** | 30.81 | 31.00 | 1,605,464 |
| 2/27/2007 | 29.94 | 30.74 | 1,396,400 |
| 2/28/2007 | 30.03 | 29.85 | 1,076,600 |
| 3/1/2007 | 30.14 | 29.75 | 885,397 |

(1) Source: Bloomberg Finance, L.P., subscription database, equity search function, "TRB"
(2) Date of Tribune Form 8-K Filing
(3) Date of Tribune 2006 Form 10-K Filing

Likewise, bond prices for Tribune's then-existing publicly traded debt varied somewhat following the announcements of year-end financial results for 2006, but did not show a dramatic (let alone consistent) variance following the news—in some instances tilting up slightly, remaining relatively constant, or going down slightly—but generally remained within an 80% to 100% of face value range:[236]

---

[236] These inferential observations are subject to the same caveat as in the previous footnote. Data presented in the chart reflecting changes in bond prices were obtained from Bloomberg Finance, L.P. An alternative source of bond pricing information, Advantage Data, was reviewed as well by the Examiner based on data provided by Lazard, Tribune's financial advisor. *See* Ex. 76 (Bond Trading History). Results obtained from those alternative data providers generally reflect consistency, although modest differences were noted. *See* Ex. 77 (Tribune Bond Pricing).



**c.    Financial Performance in Early 2007.**

Tribune's management monitored and evaluated the financial performance of the Tribune

Entities on a monthly basis.[237]  Each month, management prepared and circulated internally to

other members of management a packet of materials referred to at Tribune as the "Brown

Book."[238]  The Brown Book contained both consolidated performance metric comparisons of

budgeted to actual results (*e.g.,* revenue and profitability) and detailed analysis and commentary

regarding discrete business unit performance.[239]  According to Mr. Amsden, the Brown Books

typically were prepared two-and-a-half to three weeks after the end of each reporting period.[240]

---

[237]    Technically, Brown Books were issued for each "reporting period," which approximated monthly reporting (although slight differences may exist between a calendar month and a reporting period).  There is no evidence that the Brown Books were furnished to the Tribune Board.

[238]    *See, e.g.,* Ex. 78 at EGI-LAW00090375-90535 (Brown Book for Period 4, 2007).

[239]    *See, e.g., id.* at EGI-LAW00090375-90535.

[240]    *See* Ex. 66 at 18:2-18:19 (Rule 2004 Examination of Harry Amsden, December 16, 2009).

In conjunction with the preparation of the Brown Books, Tribune's management tracked Tribune's actual performance against management's plan.  The monthly performance comparisons contained in the Brown Books were based on a comparison of monthly budgeted to actual unaudited results compiled by management.[241]  As such, the Brown Books afforded management the opportunity to track and evaluate Tribune's monthly performance.  Although Tribune typically did not publicly disclose information regarding its profitability until it issued its quarterly Form 10-Q or issued a Form 8-K summarizing quarterly results, Tribune did issue press releases each month with revenue statistics for the month before, including revenue for each business segment and comparisons to corresponding periods in the prior year.[242]

During the first quarter of 2007, Tribune performed essentially consistent with plan expectations on a consolidated basis, although Tribune underperformed the more aggressive expectations held by some analysts:

---

[241]    Monthly budgeted amounts contained in the 2007 Brown Books, in the aggregate, approximate the Tribune Board-approved 2007 plan annual total for revenue and operating profit, with the exception of differences principally attributable to budget modifications corresponding to unanticipated asset sales occurring during the year, and certain year end budget adjustments accounting for Step Two closing costs incurred during December 2007.

[242]    *See, e.g.*, Ex. 79 (Tribune Press Release, dated May 14, 2007).

| TRIBUNE CONSOLIDATED ($000s) | | | | |
|---|---|---|---|---|
| | 01/2007 | 02/2007 | 03/2007 | Q1 YTD (1) |
| **Revenue** | | | | |
| Brown Book 2007 Plan | $ 447,888 | $ 391,911 | $ 407,940 | $ 1,238,917 |
| Brown Book 2007 Actual | $ 441,948 | $ 384,500 | $ 391,785 | $ 1,214,502 |
| *Variance* | *($ 5,940)* | *($ 7,411)* | *($ 16,155)* | *($ 24,415)* |
| *% of Variance* | *-1.33%* | *-1.89%* | *-3.96%* | *-1.97%* |
| | | | | |
| **Operating Profit (EBIT) (2)** | | | | |
| Brown Book 2007 Plan | $ 50,481 | $ 51,785 | $ 80,754 | $ 183,044 |
| Brown Book 2007 Actual | $ 52,467 | $ 50,739 | $ 78,843 | $ 181,462 |
| *Variance* | *$ 1,986* | *($ 1,046)* | *($ 1,911)* | *($ 1,582)* |
| *% of Variance* | *3.93%* | *-2.02%* | *-2.37%* | *-0.86%* |

(1) YTD Quarterly information does not equal the sum of the three months due to discontinued operations.
(2) Consolidated Operating Profit (EBIT) does not equal the combined operating profits of both the Publishing Segment and the Broadcasting Segment due to a deduction for corporate expenses.

At the business unit level, however, more significant variances to plan are observable, particularly regarding operating profit—favorable as to the Broadcasting Segment but unfavorable as to the Publishing Segment, with the two segments tending to partially offset one another on a consolidated presentation basis:

| TRIBUNE ($000s) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Publishing Segment | | | | Broadcasting Segment | | | |
| | 01/2007 | 02/2007 | 03/2007 | Q1 YTD (1) | 01/2007 | 02/2007 | 03/2007 | Q1 YTD (1) |
| **Revenue** | | | | | | | | |
| Brown Book 2007 Plan | $ 351,357 | $ 302,145 | $ 308,972 | $ 953,652 | $ 96,531 | $ 89,766 | $ 98,968 | $ 285,265 |
| Brown Book 2007 Actual | $ 345,182 | $ 294,232 | $ 295,811 | $ 931,494 | $ 96,766 | $ 90,268 | $ 95,974 | $ 283,008 |
| *Variance* | *($ 6,175)* | *($ 7,913)* | *($ 13,161)* | *($ 22,158)* | *$ 235* | *$ 502* | *($ 2,994)* | *($ 2,257)* |
| *% of Variance* | *-1.76%* | *-2.62%* | *-4.26%* | *-2.32%* | *0.24%* | *0.56%* | *-3.03%* | *-0.79%* |
| | | | | | | | | |
| **Operating Profit** | | | | | | | | |
| Brown Book 2007 Plan | $ 44,005 | $ 46,088 | $ 58,106 | $ 148,229 | $ 11,558 | $ 16,344 | $ 26,972 | $ 54,874 |
| Brown Book 2007 Actual | $ 42,733 | $ 42,557 | $ 54,793 | $ 139,721 | $ 14,359 | $ 19,746 | $ 27,277 | $ 61,382 |
| *Variance* | *($ 1,272)* | *($ 3,531)* | *($ 3,313)* | *($ 8,508)* | *$ 2,801* | *$ 3,402* | *$ 305* | *$ 6,508* |
| *% of Variance* | *-2.89%* | *-7.66%* | *-5.70%* | *-5.74%* | *24.23%* | *20.81%* | *1.13%* | *11.86%* |

(1) YTD Quarterly information does not equal the sum of the three months due to discontinued operations.

On April 19, 2007, Tribune issued a press release summarizing first quarter 2007 results in its earnings announcement.[243]  Subsequently, on May 9, 2007, Tribune issued its Form 10-Q

---

[243]    Ex. 1075 (Tribune Press Release, dated April 19, 2007).

for the quarter ended April 1, 2007 setting forth, among other things, results of operations for the period.[244]  The Form 10-Q reported results were consistent with actual results contained in the Brown Books for the first three months of 2007, both at the consolidated and business unit level of reporting:

| TRIBUNE CONSOLIDATED ($000s) | | |
| --- | --- | --- |
| | 2007 Q1 10-Q | 2007 Q1 Brown Book Actual |
| Revenue | $ 1,214,502 | $ 1,214,502 |
| EBIT (1) | $ 181,462 | $ 181,462 |
| EBITDA (1) | $ 238,494 | $ 238,494 |
| (1) Consolidated EBIT and EBITDA do not equal the combined EBIT and EBITDA of the Publishing Segment and Broadcasting Segment divisions due to a deduction for corporate expenses | | |

| TRIBUNE ($000s) | | | | |
| --- | --- | --- | --- | --- |
| | Publishing Segment | | Broadcasting Segment | |
| | 2007 Q1 10-Q | 2007 Q1 Brown Book Actual | 2007 Q1 10-Q | 2007 Q1 Brown Book Actual |
| Revenue | $ 931,494 | $ 931,494 | $ 283,008 | $ 283,008 |
| EBIT | $ 139,721 | $ 139,721 | $ 61,382 | $ 61,382 |
| EBITDA | $ 183,721 | $ 183,758 | $ 74,382 | $ 74,136 |

Once again, Tribune Common Stock moved little after these filings.

---

[244]   Ex. 55 (Tribune Form 10-Q, filed May 9, 2007).

| MOVEMENT OF TRIBUNE COMMON STOCK PRICES BEFORE AND AFTER EARNINGS ANNOUNCEMENTS (1) | | | | | |
|---|---|---|---|---|---|
| | Close | | Open | | Volume |
| 4/16/2010 | $ | 32.83 | $ | 32.81 | 1,386,800 |
| 4/17/2010 | | 32.83 | | 32.78 | 1,085,300 |
| 4/18/2010 | | 32.69 | | 32.83 | 2,003,956 |
| **4/19/2007 (2)** | | 32.48 | | 32.70 | 2,693,500 |
| 4/20/2010 | | 32.25 | | 32.61 | 1,594,300 |
| 4/23/2007 | | 32.49 | | 32.29 | 711,600 |
| 4/24/2007 | | 32.55 | | 32.57 | 924,420 |
| | | | | | |
| 5/4/2010 | $ | 32.83 | $ | 32.84 | 657,069 |
| 5/7/2007 | | 32.83 | | 32.83 | 1,106,310 |
| 5/8/2007 | | 32.86 | | 32.83 | 1,156,683 |
| **5/9/2007 (3)** | | 32.91 | | 32.82 | 3,161,300 |
| 5/10/2007 | | 32.94 | | 32.84 | 1,339,900 |
| 5/11/2007 | | 32.94 | | 32.93 | 1,114,400 |
| 5/14/2007 | | 32.93 | | 32.92 | 723,700 |

(1) Source: Bloomberg Finance, L.P., subscription database, equity search function, "TRB"
(2) Date of Tribune Form 8-K Filing
(3) Date of Tribune Form 10-Q Filing

In general, bond prices showed little reaction to the announcement of earnings on either April 19, 2007 (the date corresponding to Tribune's Form 8-K earnings announcement) or May 9, 2007 (the date of Tribune's first quarter 2007 10-Q filing):[245]

---

[245]   Bond prices did decline between the announcement of the Leveraged ESOP Transactions on April 2, 2007 and the closing of Step One on June 4, 2007.  *See* Ex. 77 (Tribune Bond Pricing).  This decline in price would be anticipated given the announcement of the Leveraged ESOP Transactions and associated rating agency commentary.



In response to the announcement of the transaction on April 2, 2007, Standard & Poor's issued a research update on that same date.[246]  In that report, Standard & Poor's downgraded Tribune's corporate debt rating from 'BB+' to 'BB-' and Tribune's credit rating remained on credit watch with negative implications.[247]  Standard & Poor's also indicated that, on stockholder approval of the transaction, Standard & Poor's would further reduce Tribune's corporate credit rating from 'BB-' to 'B' with a stable outlook.[248]

---

[246]    Ex. 80 (Standard & Poor's Research Report, dated April 2, 2007).

[247]    *Id.*

[248]    *Id.*

d.        **Financial Performance in April and May 2007.**

Although year-to-date actual results approximated the results anticipated in Tribune's February 2007 plan on a consolidated basis for the first three months of 2007, Tribune's consolidated financial performance for April 2007 deviated from projections.  As reflected in the Brown Book for April 2007 (which likely was issued within the first two to three weeks of May), Tribune fell short of its internal expectations, missing budgeted operating profit in April by more than $11 million against a budgeted monthly profit of approximately $73.6 million (a variance to plan of more than 15%), despite a modest negative revenue variance of 3%:[249]

| TRIBUNE CONSOLIDATED ($000s) | | |
|---|---|---|
| | **April 2007 (1)** | |
| | **Revenue** | **Operating Profit (2)** |
| Brown Book 2007 Plan | $ 412,408 | $ 73,591 |
| Brown Book 2007 Actual | $ 399,470 | $ 62,480 |
| *Variance* | *($ 12,938)* | *($ 11,111)* |
| *% of Variance* | *-3.14%* | *-15.10%* |

(1) Ex. 78 (Brown Book for Period 4, 2007).
(2) Consolidated operating profit does not equal the combined operating profits of the Publishing Segment and the Broadcasting Segment divisions due to a deduction for corporate expenses.

As shown in the table below, the Publishing Segment accounted for this negative variance:

---
[249]    Ex. 78 at EGI-LAN0090375-90535 (Brown Book for Period 4, 2007).

| | TRIBUNE ($000s) | | | |
|---|---|---|---|---|
| | April 2007 (1) | | | |
| | Publishing Segment | | Broadcasting Segment | |
| | Revenue | Operating Profit | Revenue | Operating Profit |
| Brown Book 2007 Plan | $ 293,230 | $ 48,244 | $ 119,178 | $ 29,726 |
| Brown Book 2007 Actual | $ 278,817 | $ 35,508 | $ 120,653 | $ 31,136 |
| *Variance* | *($ 14,413)* | *($ 12,736)* | *$ 1,475* | *$ 1,410* |
| *% of Variance* | *-4.92%* | *-26.40%* | *1.24%* | *4.74%* |

(1) Ex. 78 (Brown Book for Period 4, 2007).

In a press release dated May 14, 2007, Tribune publicly disclosed its revenues for April 2007, by business segment, as well as certain other information regarding the nature of revenue declines experienced during the period, relative to a comparable period in the prior year.[250]  The press release did not include information regarding Tribune's profitability for that month.

---

[250]    *See* Ex. 79 (Tribune Press Release, dated May 14, 2007).  The press release stated:

Tribune Company (NYSE: TRB) today reported its summary of revenues and newspaper advertising volume for period 4, ended April 29.  Consolidated revenues for the period were $399 million, down 3.6 percent from last year's $414 million.

Publishing revenues in April were $279 million compared with $305 million last year, down 8.6 percent.  Advertising revenues decreased 10.3 percent to $217 million, compared with $242 million in April 2006.

- Retail advertising revenues decreased 6.8 percent as weakness in the specialty merchandise, home furnishings and department store categories was partially offset by strength in hardware/home improvement.  Preprint revenues, which are principally included in retail, were down 8 percent. Retail revenues were adversely impacted by the shift of Easter advertising from period 4 in 2006 to period 3 in 2007.

- National advertising revenues declined 8.2 percent; weakness in the financial and auto categories was partially offset by strength in movies.

- Classified advertising revenues decreased 14.9 percent.  Real estate fell 20 percent with over half of the decline due to weakness in the Florida markets. . . .  Interactive revenues, which are primarily included in classified, were $21 million, up 20 percent, due to growth in all categories.

Circulation revenues were down 7.2 percent due to selective discounting in home delivery and lower single-copy sales.

Broadcasting and entertainment group revenues in April increased 10.2 percent to $121 million compared with $110 million last year primarily due to more Cubs home games.  Television revenues fell 1.1 percent; a significant decrease in political advertising as well as weakness in restaurant/fast food and retail was partially offset by strength in automotive and movies.

May 2007 performance against plan showed an exacerbation of the negative performance against budget observed during April 2007.  For May, the Brown Book reported a revenue short fall against plan of 8%, and a more pronounced operating profit short fall of 21% to plan on a consolidated basis:

| TRIBUNE CONSOLIDATED ($000s) | | | | |
|---|---|---|---|---|
| | April 2007 (1) | | May 2007 (2) | |
| | Revenue | Operating Profit (3) | Revenue | Operating Profit (3) |
| Brown Book 2007 Plan | $ 412,408 | $ 73,591 | $ 441,391 | $ 93,116 |
| Brown Book 2007 Actual | $ 399,470 | $ 62,480 | $ 405,965 | $ 73,515 |
| *Variance* | ($ 12,938) | ($ 11,111) | ($ 35,426) | ($ 19,601) |
| *% of Variance* | -3.14% | -15.10% | -8.03% | -21.05% |

(1) Ex. 78 (Brown Book for Period 4, 2007).
(2) Ex. 635 (Brown Book for Period 5, 2007).
(3) Consolidated Operating Profit does not equal the combined Operating Profits of the Publishing Segment and Broadcasting Segment due to a deduction for corporate expenses.

During May 2007, both the Publishing Segment and the Broadcasting Segment performed about equally unfavorably against plan, with unfavorable operating profit variance against plan of approximately 21% and 20%, respectively:[251]

| TRIBUNE ($000s) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | April 2007 (1) | | | | May 2007 (2) | | | |
| | Publishing | | Broadcasting | | Publishing | | Broadcasting | |
| | Revenue | Operating Profit | Revenue | Operating Profit | Revenue | Operating Profit | Revenue | Operating Profit |
| Brown Book 2007 Plan | $ 293,230 | $ 48,244 | $ 119,178 | $ 29,726 | $ 319,488 | $ 65,895 | $ 121,903 | $ 31,599 |
| Brown Book 2007 Actual | $ 278,817 | $ 35,508 | $ 120,653 | $ 31,136 | $ 291,910 | $ 52,241 | $ 114,055 | $ 25,249 |
| *Variance* | ($ 14,413) | ($ 12,736) | $ 1,475 | $ 1,410 | ($ 27,578) | ($ 13,654) | ($ 7,848) | ($ 6,350) |
| *% of Variance* | -4.92% | -26.40% | 1.24% | 4.74% | -8.63% | -20.72% | -6.44% | -20.10% |

(1) Ex. 78 (Brown Book for Period 4, 2007).
(2) Ex. 635 (Brown Book for Period 5, 2007).

---

[251]    Although the preparation of the Brown Book for May 2007 likely occurred after the closing of the Step One Transactions, certain information bearing on May 2007 financial performance was probably known to Tribune management before closing.  For example, Tribune prepared and issued weekly "flash" reports reporting advertising revenue and circulation.  *See, e.g.*, Ex. 66 at 20:14-21:8 (Rule 2004 Examination of Harry Amsden, December 16, 2009).

Tribune issued a press release setting forth revenue results for May 2007, which again did not disclose profitability during the period.[252]  This press release was issued after the Step One Financing Closing Date.

### e.        Revision of Tribune's Projections.

As previously noted, the financial projections underlying the Tribune Board-approved 2007 operational plan appear to be the same projections used to develop the original "ESOP Transaction Model" dated February 8, 2007, for use in connection with the transactions then being considered by Tribune.[253]  In addition to various sensitivity versions developed by management, the underlying base case projections comprising the ESOP Transaction Model were modified on several occasions.[254]  It appears that an updated base case projection model was developed in April 2007 to accommodate certain anticipated changes to transaction financing.[255]  As such, these changes did not alter management's prior expectations regarding revenue and EBITDA.  Hence, this version of the ESOP Transaction Model generally comported with the original set of projection parameters, with respect to Tribune's operations.  During May, Tribune's management prepared another revised base case ESOP Transaction Model projection, this time reflecting downward adjustments to both the original February and subsequently developed April projection model projection parameters for both revenues and EBITDA.[256] These downward adjustments to forecasted revenues and earnings, however, did not reflect an alteration of management's expectations of the revenue and EBITDA contributions of Tribune's

---

[252]    *See* Ex. 81 (Tribune Press Release, dated June 20, 2007).

[253]    *See* Ex. 66 at 73:18-81:5 (Rule 2004 Examination of Harry Amsden, December 16, 2009); Ex. 71 (ESOP Transaction Model-Revised Operating Plan Case, dated February 8, 2007).

[254]    For example, various "sensitivity" model scenarios were identified which quantified the effects of, for example, changing revenue growth assumptions on forecasted financial results.

[255]    *See* Ex. 82 (ESOP Transaction Model, dated April 25, 2007).

[256]    See Ex. 83 (ESOP Transaction Model, dated May 14, 2007).

businesses, but rather, as shown in the following table, represented adjustments to remove from the model the revenue and EBITDA contributions of newly identified assets anticipated to be sold in 2008.  Those included "TMS" (*i.e.,* Tribune Media Services) from the Publishing Segment and "Washington/St. Louis/Portland/San Diego" broadcasting stations from the Broadcasting Segment.  Additionally, the revised May model anticipated the avoidance of additional annual $22 million in "TMCT Lease Payments" as part of the Publishing Segment's cost projections.  In the earlier models, the revenue and EBITDA contributions for these assets were included in projected amounts.[257]

A comparison of key revenue, EBIT, and EBITDA projection parameters in each of the February, April, and May 2007 versions of the ESOP Transaction Model is set forth in the table below:

| CONSOLIDATED TRIBUNE ($000s) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| **Revenue** | | | | | | | | | | | |
| ESOP Transaction Model (February 2007) | | | | | | | | | | | |
| (Unadjusted – Basis for Tribune Board Approved 2007 Budget) | $5,386 | $5,487 | $5,523 | $5,594 | $5,623 | $5,651 | $5,681 | $5,709 | $5,739 | $5,769 | $5,799 |
| (Adjusted) (1) | $5,168 | $5,262 | $5,295 | $5,364 | $5,392 | $5,421 | $5,449 | $5,478 | $5,508 | $5,537 | $5,567 |
| ESOP Transaction Model (Adjusted - Dated April 25, 2007) (1) | $5,168 | $5,262 | $5,295 | $5,364 | $5,392 | $5,421 | $5,449 | $5,478 | $5,508 | $5,537 | $5,567 |
| ESOP Transaction Model (Adjusted - Dated May 14, 2007) (2) | $5,168 | $5,178 | $5,072 | $5,137 | $5,161 | $5,186 | $5,210 | $5,235 | $5,269 | $5,284 | $5,309 |
| | | | | | | | | | | | |
| **Operating Cash Flow (EBITDA) (3)** | | | | | | | | | | | |
| ESOP Transaction Model (February 2007) | | | | | | | | | | | |
| (Unadjusted – Basis for Tribune Board Approved 2007 Budget) | $1,271 | $1,339 | $1,367 | $1,393 | $1,389 | $1,453 | $1,398 | $1,401 | $1,407 | $1,411 | $1,415 |
| (Adjusted) (1) | $1,244 | $1,307 | $1,335 | $1,361 | $1,356 | $1,361 | $1,365 | $1,369 | $1,374 | $1,378 | $1,383 |
| ESOP Transaction Model (Adjusted - Dated April 25, 2007) (1) | $1,245 | $1,310 | $1,336 | $1,362 | $1,357 | $1,362 | $1,366 | $1,370 | $1,375 | $1,379 | $1,384 |
| ESOP Transaction Model (Adjusted - Dated May 14, 2007) (2) | $1,245 | $1,267 | $1,253 | $1,277 | $1,271 | $1,275 | $1,277 | $1,281 | $1,285 | $1,287 | $1,290 |
| | | | | | | | | | | | |
| **EBIT (1),(2), (3)** | | | | | | | | | | | |
| ESOP Transaction Model (February 2007) | | | | | | | | | | | |
| (Unadjusted – Basis for Tribune Board Approved 2007 Budget) | $1,023 | $1,096 | $1,120 | $1,146 | $1,142 | $1,202 | $1,143 | $1,142 | $1,144 | $1,144 | $1,143 |
| (Adjusted) (1) | $997 | $1,067 | $1,091 | $1,117 | $1,112 | $1,112 | $1,112 | $1,112 | $1,113 | $1,112 | $1,113 |
| ESOP Transaction Model (Adjusted - Dated April 25, 2007) (1) | $999 | $1,071 | $1,093 | $1,119 | $1,114 | $1,115 | $1,115 | $1,114 | $1,115 | $1,114 | $1,115 |
| ESOP Transaction Model (Adjusted - Dated May 14, 2007) (2) | $999 | $1,030 | $1,016 | $1,041 | $1,035 | $1,035 | $1,032 | $1,032 | $1,032 | $1,030 | $1,029 |

(1) Revenue and expense categories exclude assets intended to be sold for adjusted projections (SCNI, Hoy, New York and Cubs)
(2) Revenue and expense categories exclude assets intended to be sold for adjusted projections (SCNI, Hoy, New York, Cubs, TMS, Select Cities and TMCT lease payments obligation reduction)
(3) Operating cash flow (EBITDA) and EBIT includes stock based compensation

---

[257]  Given the rough parity between the various models and projections developed in February, March, April, and May 2007, they are often referred to collectively in the Report as the February 2007 projections or spring 2007 projections, unless the context requires precision.  Similarly, even though management's October 2007 models and projections were modified as late as November 21, 2007, *see infra* notes 2134 & 2142, they are generally referred to as the October 2007 projections or the fall 2007 projections.

## 2.    Analyst Reports Before Announcement of the Step One Transactions.[258]

On January 4, 2007, Bear Stearns issued an analyst report in which it rated the Tribune Common Stock as "Peer Perform" and the publishing sector as "Market Underweight," with a target stock price of $31.[259]  The analyst report followed the announcement by the McCormick Foundation that it had established an advisory committee to evaluate strategic options with respect to its ownership of Tribune Common Stock.  Bear Stearns stated that "this move signals a vote of no confidence in current Tribune management, and may also indicate that the auction process . . . may not be generating as much interest as anticipated."[260]  Bear Stearns concluded that the Tribune Common Stock was "an unattractive investment in our view at this time."[261]

On January 12, 2007, Morgan Stanley provided the Special Committee with a summary of selected research analyst reports from October 10, 2006, the day that Tribune reported its 2006 third quarter results,[262] through January 12, 2007:[263]

| Firm | Rating | Target Price |
|---|---|---|
| Morgan Stanley | Equal Weight | N/A |
| ML&Co. | Neutral | $32-33 |
| A.G. Edwards | Hold | N/A |

---

[258] Certain of the Parties cited to various newspaper articles in support of the contentions raised in such Parties' respective briefs, contending that such articles constitute proof regarding whether the Step One Transactions and the Step Two Transactions should be collapsed for the purposes of the Examiner's evaluation.  The Examiner has determined that such newspaper articles are not dispositive as they do not include legal analysis and, in most instances, reflect assumptions by reporters regarding the technical details of the transactions.  As such, the Examiner gives such newspaper articles no weight in rendering his conclusions in the Report.

[259] Ex. 84 at 1 and 3 (Bear Stearns Analyst Report, dated January 4, 2007).

[260] *Id.* at 1.

[261] *Id.*

[262] Ex. 85 (Tribune Press Release, dated October 10, 2006).

[263] Ex. 70 at 14 (Presentation to the Committee of Independent Directors of the Board of Directors of Tribune, dated January 12, 2007).

| Firm | Rating | Target Price |
|---|---|---|
| Prudential | Overweight | $38 |
| Barrington Research | Market Perform | N/A |
| Credit Suisse | Outperform | $37 |
| Lehman Brothers | Underweight | $21 |
| JPMorgan | Neutral | N/A |
| Wachovia | Market Perform | $30 |
| Deutsche Bank | Hold | $31 |
| Analyst Median | -- | $31.78 |

On February 23, 2007, JPMorgan issued a research report, rating the Tribune Common Stock as "Neutral,"[264] noting that Tribune had the "worst monthly publishing ad growth performance, among [companies tracked by JPMorgan], in recent years."[265]  However, JPMorgan concluded that it expected that "Tribune will realize EPS growth in 2007 in line with peers."[266]

On March 16, 2007, Lehman Brothers issued a Company Update, rating Tribune as "Underweight" and the sector as "Negative," with a $20 price target.[267]  Lehman recommended that Tribune stockholders "take advantage of the current stock price and sell shares which have been propped up . . . by the six month strategic review process."[268]  Lehman indicated that it was likely that Tribune "will not be sold at all,"[269] that it believed that Tribune's management "needs

---

[264] Ex. 86 at 1 (JPMorgan Research Report, dated February 23, 2007).

[265] *Id.*

[266] *Id.* at 2.

[267] Ex. 87 at 1 (Lehman Company Update, dated March 16, 2007).

[268] *Id.*

[269] *Id.* at 2.

to get back to running the company full-time,"[270] and that "putting this much debt on Tribune's newspapers and TV stations is way too risky and makes it very possible to put the company into bankruptcy somewhere down the road, especially if the economy slows, with or without the added tax savings from the ESOP financing."[271]  Arguing that the "Tribune makes a poor LBO candidate,"[272] Lehman concluded that "we cannot even calculate an IRR for a leveraged buyout (LBO) assuming just $300 million in equity as the <u>IRR is too large of a negative number</u> and will not calculate . . . .  [T]he net debt to EBITDA ratio is way too high. . . ."[273]

Wachovia Capital Markets issued a research report on March 30, 2007, rating Tribune as "Market Perform" and the newspaper sector as "Market Weight."[274]  Wachovia's report discussed the ESOP structure, noting that the tax advantages associated with the structure "could be one of the reasons that the company has been favoring the Zell bid, as the Chandlers, the McCormick Trust, and management could all potentially benefit from" such a structure.[275]  Wachovia concluded that its rating was "predicated on our belief that TRB is trading on a potential takeout value, rather than fundamentals, and we do not view the risk/reward as compelling."[276]

On April 1, 2007, Morgan Stanley provided the Special Committee with a summary of selected research analyst reports from February 8, 2007, the day that Tribune reported its 2006

---

[270]  *Id.*

[271]  *Id.* at 3.  Although the potential use of an ESOP in connection with EGI's offer had not been announced publicly by Tribune, on February 24, 2007, the Chicago Tribune reported that "Chicago real estate magnate Sam Zell is proposing to participate in a buyout of Tribune Co. in a deal structured around an employee stock ownership plan, several sources close to the situation said Friday."  Ex. 88 (Chicago Tribune Article, dated February 24, 2007).

[272]  Ex. 87 at 4 (Lehman Company Update, dated March 16, 2007).

[273]  *Id.* at 3.

[274]  Ex. 89 at 1 (Wachovia Research Report, dated March 30, 2007).

[275]  *Id.*

[276]  *Id.*

fourth quarter and full year results,[277] through April 1, 2007, the day before Tribune announced

that it had entered into the Leveraged ESOP Transactions:[278]

| Firm | Rating | Target Price |
|------|--------|--------------|
| Morgan Stanley | N/A | -- |
| UBS | Neutral | $34 |
| A.G. Edwards | Hold | N/A |
| Prudential | Underweight | $27 |
| Credit Suisse | Outperform | $34 |
| Lehman Brothers | Underweight | $19 |
| Wachovia | Market Weight | $30 |
| Citigroup | Hold | $33 |
| Benchmark | Market Weight | $34 |
| Bear Stearns | Peer Perform | $31 |
| Deutsche Bank | Hold | $31 |
| Analyst Median | -- | $31 |

## D.    The Step One Transactions.

This section is a chronological summary of the actions taken, and agreements entered

into, in connection with the Step One Transactions.  Section III.E. addresses the knowledge and

actions of the key participants with respect to the events culminating in the Step One

Transactions.

---

[277]   Ex. 90 (Tribune Press Release, dated February 8, 2007).

[278]   Ex. 91 at 9 (Presentation to the Committee of Independent Directors of the Board of Directors of Tribune, dated April 1, 2007).

1.    **Tribune Board Deliberations.**

a.    **Creation of the Special Committee.**

On September 21, 2006, the Tribune Board created a Special Committee consisting of all of the members of the Tribune Board, other than the Chief Executive Officer and the three directors nominated by the Chandler Trusts,[279] to oversee a formal process of exploring strategic alternatives.[280]  Morgan Stanley served as financial advisor and Skadden Arps served as legal counsel to advise the Special Committee.[281]  The Tribune Board was advised by MLPFS and CGMI, who served as financial advisors, and Wachtell (New York, NY office) and Sidley Austin LLP (Chicago, IL office) served as outside legal counsel.[282]  As part of this process, the Tribune Board authorized the Special Committee to seek third-party proposals for the acquisition of Tribune.[283]  The process, initiated in September 2006, was an active, fluid, and at times, unpredictable one entailing a series of proposals and counterproposals, with intense involvement

---

[279]  Notwithstanding a provision in Tribune's bylaws requiring that a Chandler Trust director serve on each committee of the Tribune Board, at the request of the other members of the Tribune Board, the Chandler Trusts agreed that no Chandler Trusts director would sit on the Special Committee, provided that the Chandler Trusts were "assured full and bona fide cooperation and regular communication between the [Special Committee] and its advisors and the Chandler Trusts and their advisors . . . in order that the views of the Chandler Trust may be considered by the [Special Committee] as it proceeds."  Ex. 92 at 3 (Chandler Trusts Letter, dated October 2, 2006).  William Stinehart, a Chandler Trusts trustee and a Tribune Board member, told the Examiner that the Chandler Trusts supported the formation of a special committee without any representatives of the Chandler Trusts or Tribune management because "[w]e needed to have an independent group making the decision, and it couldn't include us or management, because management didn't agree with us."  Examiner's Interview of William Stinehart, June 28, 2010.

[280]  Ex. 93 (Tribune Board Meeting Minutes, dated September 21, 2006).  At a meeting of the Tribune Board on October 18, 2006, the Tribune Board formally adopted resolutions establishing the Special Committee and authorizing it to engage legal counsel and financial advisors.  Ex. 94 at 1-3 (Tribune Board Meeting Minutes, dated October 18, 2006).

[281]  Ex. 5 at 18 and 45 (Tender Offer).  William Osborn, Chair of the Special Committee, told the Examiner that, throughout the auction process, MLPFS and/or CGMI typically first made presentations to the Special Committee, and then Morgan Stanley was asked to opine on what had been presented.  Examiner's Sworn Interview of William Osborn, June 24, 2010, at 18:19-19:2.  Mr. Whayne stated that Morgan Stanley's role was "to critique [CGMI's and MLPFS'] work both to them and the board."  Examiner's Interview of Thomas Whayne, June 11, 2010.

[282]  Ex. 5 at 45 (Tender Offer).  MLPFS was a longtime financial advisor to the Tribune Board.  Examiner's Sworn Interview of Crane Kenney, July 8, 2010, at 11:19-22.

[283]  Ex. 5 at 17-18 (Tender Offer); Ex. 892 at 1 (Special Committee Meeting Minutes, dated October 6, 2006).  *See also* Ex. 25 (Morgan Stanley Engagement Letter).

by financial and legal experts, the Large Stockholders, the Tribune Board, the Special

Committee, and Tribune's management.

At its meeting on September 21, 2006, the Tribune Board reviewed with management

and MLPFS the progress of negotiations on the restructuring of the TMCT LLCs, and reviewed

with MLPFS and CGMI their analyses of strategic alternatives.[284]  Following this meeting,

Tribune publicly announced the creation of the Special Committee to oversee the process of

evaluating strategic alternatives for Tribune.[285]  Tribune stated that it expected the process to

conclude by the end of 2006.[286]  In addition, Tribune publicly announced the restructuring of the

TMCT LLCs.[287]

Thereafter, the Special Committee directed MLPFS and CGMI to begin contacting

private equity firms and potential strategic buyers to invite them to indicate their interest in an

acquisition of Tribune, and Tribune entered into confidentiality agreements and began sharing

information about Tribune with interested parties.[288]  MLPFS and CGMI moved quickly to reach

out to over thirty-six parties to gauge their interest in a possible transaction involving all or part

of Tribune.[289]  Over the next several weeks, several of these parties conducted due diligence for

---

[284]  Ex. 5 at 17 (Tender Offer).

[285]  *Id.* at 18; Ex. 1021 (Tribune Press Release, dated September 21, 2006).  The Special Committee was comprised of Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, William A. Osborn, J. Christopher Reyes, Dudley S. Taft, and Miles D. White.

[286]  Ex. 5 at 18 (Tender Offer).

[287]  Ex. 93 (Tribune Board Meeting Minutes, dated September 21, 2006); Ex. 1021 (Tribune Press Release, dated September 21, 2006).

[288]  Ex. 5 at 18 (Tender Offer).  As described by Christina Mohr of CGMI in her interview with the Examiner, "[a]t the outset, it started off as a robust process—there was plenty of interest."  Examiner's Interview of Christina Mohr, June 29, 2010.

[289]  Ex. 95 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated January 20, 2007).

the purpose of determining whether to submit a preliminary bid for the acquisition of Tribune.[290]

MLPFS and CGMI requested preliminary bids from interested parties by October 27, 2006.[291]

On October 18, 2006, MLPFS briefed the Special Committee concerning discussions

with interested parties to date and the status of execution of confidentiality agreements with

those parties.[292] Afterward, Morgan Stanley presented the Special Committee with valuations of

Tribune as a whole and of its constituent parts.[293]

On October 31, 2006, the Special Committee reviewed the process to date with Tribune's

financial advisors and management as well as with the Special Committee's financial and legal

advisors.[294] The Special Committee also reviewed with Tribune's management and advisors the

possibility of asset sales as an enhancement to the process, as well as the possibility of a further

leveraged recapitalization of Tribune.[295] The Special Committee directed management and

Tribune's financial advisors to continue the process of seeking a buyer for the Tribune Entities

and to explore the sale of all of the Broadcasting Segment and certain individual assets.[296] Six

---

[290]   Ex. 5 at 18 (Tender Offer).

[291]   *Id.*

[292]   Ex. 96 at 1 (Special Committee Meeting Minutes, dated October 18, 2006). Approximately nine parties submitted some form of an initial proposal as part of the auction process, not including EGI. Ex. 95 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated January 20, 2007).

[293]   Ex. 96 at 2 (Special Committee Meeting Minutes, dated October 18, 2006).

[294]   Ex. 5 at 18 (Tender Offer). By October 31, 2006, Tribune had received preliminary indications of interest from five parties or groups with prices ranging from $30 to $34 per share, and seventeen private equity firms and potential strategic bidders had signed confidentiality agreements seeking to access to Tribune information to prepare a proposal. Ex. 97 at 1 (Special Committee Meeting Minutes, dated October 31, 2006); Ex. 5 at 18 (Tender Offer). By the end of the process, thirty-one entities had signed confidentiality agreements and nine had submitted initial proposals (not including the Zell Group). Ex. 5 at 18 (Tender Offer); Ex. 95 at 1-3 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Tribune, dated January 20, 2007).

[295]   Ex. 5 at 18 (Tender Offer). Mr. Osborn testified that although the advisors had solicited bids for all of Tribune, the proposals coming in were not "all about buying the company. . . . [S]ome of [them] involved spinning out broadcasting" or were merely for the acquisition of a discrete asset. Examiner's Sworn Interview of William Osborn, June 24, 2010, at 61:2-7.

[296]   Ex. 5 at 18 (Tender Offer).

parties continued in the process and conducted further due diligence, including data room access and management presentations.[297]

On November 17, 2006 and November 27, 2006 the Special Committee reviewed with Tribune's financial advisors the status of the process and the parties who remained interested in a potential acquisition of the Tribune Entities.[298]  Based on the recommendation of Tribune's financial advisors, in order to allow interested parties to complete due diligence and "be in a position to provide firm, quality bids," the Special Committee approved a timetable providing that final bids would not be due until January 2007.[299]  Thereafter, Tribune negotiated a confidentiality agreement with the Chandler Trusts,[300] which signed the agreement on December 1, 2006.[301]  By December 12, 2006, five entities remained interested in purchasing all of Tribune and five others, including the Chandler Trusts, were interested in purchasing only discrete assets.[302]  At the meeting held on December 12, 2006, the Special Committee established a January 12, 2007 deadline for delivery of final proposals from all interested bidders.[303]

---

[297]  Ex. 97 (Special Committee Meeting Minutes, dated October 31, 2006); Ex. 1046 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated October 31, 2006); Ex. 5 at 18 (Tender Offer).

[298]  Ex. 98 (Special Committee Meeting Minutes, dated November 17, 2006); Ex. 99 (Special Committee Meeting Minutes, dated November 27, 2006).

[299]  Ex. 98 at 1 (Special Committee Meeting Minutes, dated November 17, 2006).  MLPFS told the Special Committee that at least one bidder had already requested an extension.  Ex. 5 at 23 (Tender Offer). Mr. FitzSimons testified that the revised deadline was necessary because the Tribune Board was told by bidders that they "wouldn't be able to do their homework that quickly."  Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 25:10-16.

[300]  Ex. 100 at 1 (Special Committee Meeting Minutes, dated November 27, 2006).

[301]  Ex. 101 (Confidentiality Agreement between Tribune and the Chandler Trusts, dated December 1, 2006).

[302]  Ex. 981 at 1-2 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Tribune, dated December 12, 2006).

[303]  Ex. 5 at 19 (Tender Offer).  The Special Committee subsequently accepted proposals, however, submitted through January 17, 2007.  Ex. 102 (O'Brien E-Mail, dated January 14, 2007).

On January 12, 2007, the Special Committee reviewed with Tribune's financial advisors and Tribune's management the status of the bidding process, as well as the various strategic alternatives available to Tribune, including a sale of all of the Tribune Entities, a leveraged recapitalization of Tribune, the sale of the Broadcasting Segment, a spin-off of the Broadcasting Segment, and a split-off of the Publishing Segment.[304]

On January 20, 2007, the Special Committee met to review the proposals that had been submitted to Tribune pursuant to its process.[305]  The process had elicited three proposals.

### b.    The Broad/Yucaipa Proposal.

The Broad/Yucaipa Proposal offered a $13 billion sponsored recapitalization of Tribune funded through a combination of new debt from a consortium of lenders and a new preferred equity investment by Broad/Yucaipa, which would provide an immediate cash payment to stockholders of $27 per share.[306]  Broad/Yucaipa estimated the total stockholder value of the offer at $34.30 per share.[307]  MLPFS and CGMI valued it between $29.45 and $31.72.[308]

---

[304]    Ex. 103 (Special Committee Meeting Minutes, dated January 12, 2007); Ex. 104 (Presentation to the Committee of Independent Directors of the Board of Directors of Tribune, dated January 12, 2007).

[305]    Ex. 105 (Special Committee Meeting Minutes, dated January 20, 2007); Ex. 95 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated January 20, 2007).  MLPFS and CGMI presented valuations of Tribune in light of the unexpected decline in Tribune's operating results at the end of 2006 and beginning of January 2007, particularly in the Publishing Segment.  Ex. 95 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated January 20, 2007).  In its presentation, MLPFS and CGMI told the Special Committee that management's revenue projections were "generally more aggressive than Wall Street research."  Ex. 95 at 18 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated January 20, 2007).  Morgan Stanley, in its presentation, agreed that management's projections were "meaningfully above Research estimates," primarily due to management's projections for the Publishing Segment.  Ex. 104 at 9 and 10-11 (Presentation to the Committee of Independent Directors of the Board of Directors of Tribune.).

[306]    Ex. 106 at 1 (Broad/Yucaipa Proposal, dated January 17, 2007).

[307]    Id. at 10.

[308]    Ex. 95 at 28 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated January 20, 2007).  In January 2007, Tribune Treasurer Chandler Bigelow wrote to Donald Grenesko, Tribune's Senior Vice President of Finance and Administration, that JPM believed that the Broad/Yucaipa Proposal "has too much leverage and that a self help route would be more prudent."  Ex. 982 (Bigelow E-Mail, dated January 22, 2007).  Mr. Osborn testified that the Broad/Yucaipa Proposal "was considered to be not as valuable as other bids were."  Examiner's Sworn Interview of William Osborn, June 24,

Under the Broad/Yucaipa Proposal, Broad/Yucaipa would invest $500 million into a security that would convert to a 34% ownership of Tribune preferred stock.[309] The Tribune preferred stock would automatically be convertible to $125 million of Tribune Common Stock on stockholder and FCC approval, notwithstanding the fact that Broad/Yucaipa could put the preferred stock back to Tribune if not converted at the end of three years.[310] The Broad/Yucaipa Proposal also contemplated Series A Warrants to purchase 10% of the Tribune preferred stock at an exercise price of $7.00 per share and Series B Warrants to purchase 10% of the Tribune preferred stock at $9.00 per share, with full registration rights on shares and warrants.[311] Preferred stockholder approval rights were also included for some actions.[312]

The Broad/Yucaipa Proposal emphasized the "superior value" of its bid, stating that, "[b]y giving existing shareholders a continuing stake in the Company, they will gain a unique opportunity to participate in the growth and strategic rationalization opportunities driving returns that would otherwise be enjoyed only by a financial buyer."[313] The Broad/Yucaipa Proposal also emphasized the "high degree of certainty" that it would close, noting that no FCC approval was required, the "speed of execution" associated with the transaction, and "strong equity sponsorship" related to the deal.[314] The Broad/Yucaipa Proposal gave every indication that it was a serious bid, noting that "we are eager to proceed with this transaction. . . . Our proposal

---

2010, at 64:13-14. Mr. Whayne of Morgan Stanley told the Examiner that the concerns of Tribune's advisors about the Broad/Yucaipa Proposal were "in terms of ability to get it done." Examiner's Interview of Thomas Whayne, June 11, 2010.

[309] Ex. 106 at 10 (Broad/Yucaipa Proposal, dated January 17, 2007).

[310] Id. at 1; Ex. 95 at 13 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated January 20, 2007).

[311] Ex. 95 at 13 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated January 20, 2007).

[312] Id.

[313] Ex. 106 at 2 (Broad/Yucaipa Proposal, dated January 17, 2007).

[314] Id. at 2-3.

106

will remain open through 5:00 p.m. Eastern Time on January 24, 2007, unless the Company

earlier accepts or rejects our proposal, including by accepting or announcing an alternative

transaction."[315]

### c.    The Carlyle Proposal.

The Carlyle Proposal, dated January 17, 2007, was an offer to purchase all of the

outstanding capital stock and other equity interests of the Tribune Broadcasting Company,

including the Chicago Cubs, Comcast SportsNet and the Food Network, for $4.8 billion.[316]  The

Carlyle Proposal was to be fully financed with a combination of debt and equity with up to $4.5

billion committed debt financing, with Carlyle contributing no less than 15% of the equity.[317]

The purchase price of the Carlyle Proposal assumed that Carlyle would agree to a group of

transferred entities, including WPIX, and Tribune would pay for final transition, severance,

parachute, and related transaction payments.[318]  Carlyle anticipated a $16 per share cash dividend

to the holders of Tribune Common Stock.[319]  The deal could also be combined with a

recapitalization of the Publishing Segment.[320]  Tribune's advisors valued the Carlyle Proposal at

$24.81 to $28.49 per share.[321]

---

[315] *Id.*

[316] Ex. 107 at 1-2 (Carlyle Group Proposal, dated January 17, 2007).

[317] *Id.* at 2.

[318] *Id.*

[319] Ex. 108 at 1 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated January 27, 2007).

[320] *Id.*

[321] Ex. 95 at 28 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated January 20, 2007).

The Carlyle Proposal emphasized Carlyle's qualifications and its ability to close a transaction quickly and asserted that Carlyle's offer was consistent with Tribune's strategic objectives:[322]

> We believe that our proposal optimally addresses Tribune's objectives with respect to value, speed and assurance of closure. We are prepared to work with your team "around the clock" to consummate a transaction as soon as practicable. Carlyle has a reputation for closing transactions quickly due to our vast capital resources and extensive transactional experience. Furthermore, since we have no attributable interests in any media properties which would prevent or delay regulatory approvals, we believe that we are ideally positioned to obtain FCC approval and close this transaction expeditiously. . . .  We believe there is a significant opportunity to create value by repositioning the Business as a standalone entity in a private market setting. A committed, long-term investor such as Carlyle will be an important value-added partner for management.

Although the Carlyle Proposal was not a "binding agreement to enter into any transaction," it nonetheless evidenced a high level of commitment to finalizing a transaction: "Carlyle is prepared to move quickly to consummate this transaction with Tribune. With your cooperation, we believe we could be in a position to sign definitive documentation within a limited number of days."[323]

### d.    The Chandler Trusts Proposal.

The Chandler Trusts Proposal focused on an acquisition of Tribune's Publishing Segment, the Chicago Cubs, and Tribune's interest in Comcast SportsNet.[324]  Additionally, the

---

[322]   Ex. 107 at 1 (Carlyle Group Proposal, dated January 17, 2007).

[323]   *Id.* at 4.

[324]   Ex. 109 at 1 (Chandler Trusts Proposal, dated January 17, 2007).  Tribune's advisors first alerted the Special Committee that the Chandler Trusts were interested in joining the bidding process on November 27, 2006. Ex. 100 at 1 (Special Committee Meeting Minutes, dated November 27, 2006).  Chandler Trusts trustee and Tribune Board member William Stinehart said the Chandlers were interested because "we heard that the auction process wasn't going well."  Examiner's Interview of William Stinehart, June 28, 2010.  Mr. Stinehart said that, at the time, the Chandler Trusts just "wanted out."  Examiner's Interview of William Stinehart, June 28, 2010. Mr. Stinehart added that "[t]he goal in making an offer . . . was to put a floor in the auction process. . . .  [We] thought that if nothing goes, we'll take control of our own destiny."  Examiner's Interview of William Stinehart,

Chandler Trusts proposed a tax-free spinoff of the Broadcasting Segment and a recapitalization

of the remainder, with a $19.30 cash dividend to non-Chandler Trust stockholders.[325]  The

Chandler Trusts valued their offer at $31.70 per share,[326] although the Tribune's advisors valued

the offer at between $26 and $27 per share.[327]  The Chandler Trusts emphasized the following

benefits of their proposal:[328]

> The structure contemplated by our proposal provides unique
> advantages to Tribune stockholders as compared with other
> alternatives by:  (i) providing a premium valuation to both the
> unaffected trading price of Tribune stock and the value of the
> publishing business to be acquired, (ii) enabling Tribune's
> stockholders (other than the Chandler Trusts) to retain the full
> operating and strategic appreciation potential for the broadcasting
> business, (iii) enabling the separation of its publishing segment
> from its broadcasting and entertainment segment without the
> incurrence of tax, and (iv) eliminating the potential for significant
> regulatory delays as the result of the Federal Communication
> Commission's ("FCC") cross-ownership rules.

The Chandler Trusts Proposal was subject to the completion of due diligence and

negotiation of definitive agreements, noting that:[329]

---

June 28, 2010.  CGMI and MLPFS told the Special Committee that "the Chandler Trusts could potentially serve as a significant source of competition for the financial party bidders."  Ex. 100 at 1-2 (Special Committee Meeting Minutes, dated November 27, 2006) .  Mr. Whayne told the Examiner that he believed the Chandler Trusts Proposal would cause uncertainty among other bidders because the Trusts were proposing a structure that was so different from that proposed by other bidders.  At that time, Mr. Whayne said that Tribune's advisors were "focused on a sale of the entire company so financial sponsors knew what they were competing against, it was just a price for the company."  Examiner's Interview of Thomas Whayne, June 11, 2010.

[325]   Ex. 109 at 1 (Chandler Trusts Proposal, dated January 17, 2007).

[326]   Id.

[327]   Ex. 95 at 28 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated January 20, 2007).  Mr. Whayne told the Examiner that "[w]e had a strong view that it wasn't the path to go to maximize value, but they had a view I think in a real heartfelt view [that their proposal] was actually higher [than recapitalization]."  Examiner's Interview of Thomas Whayne, June 11, 2010.

[328]   Ex. 109 at 1 (Chandler Trusts Proposal, dated January 17, 2007).

[329]   Id. at 6.  By the January 27, 2007 Special Committee meeting, Tribune's advisors told the Special Committee that the Chandler Trusts Proposal would require an IRS ruling that would push closing out at least nine to twelve months.  Ex. 95 at 4 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated January 20, 2007).

> This proposal will remain open until 5:00 pm Eastern Time,
> Wednesday, January 31, 2007 and we believe it should be possible
> to complete and sign definitive agreements for the proposed
> transaction before that time. We look forward to working with you
> to complete the proposed Transaction.

Along with these proposals, the Special Committee considered "self-help" alternatives including a further recapitalization.[330]  Tribune's financial advisors indicated that they believed the recapitalization alternative created value in excess of $33 per share at the upper end of the potential valuation ranges.[331]

In addition, the Special Committee reviewed a letter submitted by the McCormick Foundation expressing the McCormick Foundation's preference that Tribune continue as a public company with its current capital structure unless a transaction could be obtained for all of the Tribune Entities at a substantial premium with minimal closing risk.[332]  Following review, presentations by certain of the bidders, and consultations with its financial and legal advisors, the Special Committee, having determined that none of the proposals was satisfactory, directed Tribune's financial advisors to seek improvements in the proposals.[333]  The Special Committee

---

[330]  Ex. 108 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated January 27, 2007).  Mr. FitzSimons testified that Tribune started considering a self-help recapitalization because "why let private equity get the subsequent premium after a takeout of the public shareholders. . . .  Can we do some of these same things ourselves?"  Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 22:11-14.

[331]  Ex. 108 at TRB0011455 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated January 27, 2007).  Tribune's financial advisors placed the highest value—approximately $33 per share—on a spin-off of the Broadcasting Segment followed by a recapitalization of the remaining Publishing Group.  *Id.*  This version of recapitalization became known as the "self-help option."  Examiner's Sworn Interview of Donald Grenesko, June 25, 2010, at 42:14-19.  Tribune also considered a full recapitalization with or without a sale of the Broadcasting Segment to the Carlyle Group or some other third party.  Ex. 108 at 5 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated January 27, 2007).

[332]  Ex. 110 (McCormick Foundation Letter, dated January 17, 2007).

[333]  Ex. 105 (Special Committee Meeting Minutes, dated January 20, 2007).

also directed Tribune's financial advisors to analyze alternatives that Tribune could implement on its own.[334]

### e.    Continuation of the Sale Process.

Following additional negotiations with MLPFS and CGMI, Broad/Yucaipa revised its proposal by offering to (a) remove all of the Series B Warrants and to increase the Series A Warrants by 5% (the Series A Warrants would thus give Broad/Yucaipa the right to purchase 15% of Tribune Common Stock on a fully diluted basis), (b) limit the maximum ownership on conversion of the preferred stock and the exercise of the Series A Warrants to 39.9% of the voting stock of Tribune, (c) remove all preferred stockholder approval rights, and (d) modify the put right.[335]

Carlyle revised its proposal by (a) removing the proposed purchase of the Food Network, resulting in an additional $315 million of value to Tribune, (b) increasing the purchase price of the remaining assets by $110 million, and (c) reducing the cash to fund a dividend to the holders of Tribune Common Stock from $16 per share to $14 per share.[336]

The Chandler Trusts submitted a revised proposal on January 26, 2007.[337]  The structure of the original Chandler Trusts Proposal remained unchanged, but increased the cash consideration to Tribune's non-Chandler Trusts stockholders by $5.25 to $24.55 per share.[338] MLPFS and CGMI valued the revised offer's total undiscounted value at $30.19 - $31.64 per share for non-Chandler Trusts stockholders and between $33.17 - $38.00 per share for the

---

[334]  *Id.* at 2-3.

[335]  Ex. 108 at TRB0011459-60 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated January 27, 2007).

[336]  Ex. 108 at TRB0011457-58 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated January 27, 2007).

[337]  Ex. 111 (Revised Chandler Trusts Proposal, dated January 26, 2007).

[338]  *Id.* at 1.

Chandler Trusts.[339] The Chandler Trusts also emphasized that the revised proposal resulted in a "higher level of risk sharing on the exchange ratio for Tribune's broadcasting business" and "a greater degree of certainty as to closing."[340]

On February 2, 2007, two weeks after the auction was to have closed, EGI submitted to Tribune a letter proposing a transaction in which a company ESOP would acquire Tribune at a price of $30 per share.[341]

The Special Committee received an update on the sale process at its meeting on February 3, 2007.[342] Morgan Stanley compared the Chandler Trusts Proposal and the Broad/Yucaipa Proposal to a leveraged recapitalization of Tribune that contemplated a cash dividend of $20 per share.[343] Following these reviews, the Special Committee directed management and Tribune's financial advisors to present a full comparison of the possible alternatives and recommendations to the Special Committee and the Tribune Board at their meetings scheduled for February 12 and 13, 2007.[344]

On February 6, 2007, EGI revised its initial proposal and submitted a summary term sheet proposing a single step, leveraged acquisition of Tribune by a company ESOP at $33 per

---

[339]   Ex. 112 at 1, 4 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated February 3, 2007).

[340]   Ex. 111 at 1 (Revised Chandler Trusts Proposal, dated January 26, 2007).

[341]   Ex. 113 (EGI Letter, dated February 2, 2007).  Apparently, few specific details of this proposal were provided to Tribune and its financial advisors at this point in the process.  *See* Report at § III.E.6. for additional background on the submission of the EGI proposal.

[342]   Ex. 114 (Special Committee Meeting Minutes, dated February 3, 2007).

[343]   *Id.*; Ex. 115 (Presentation to the Committee of Independent Directors of the Board of Directors of Tribune, dated February 3, 2007).  Mr. Stinehart stated that although the Chandler Trusts had a final proposal on the table in January 2007, by the time the Tribune Board and Special Committee held meetings in February 2007, "it was relatively clear that the offer would probably not be accepted."  Examiner's Interview of William Stinehart, June 28, 2010.

[344]   Ex. 114 at 2 (Special Committee Meeting Minutes, dated February 3, 2007).

share, with EGI investing $225 million in Tribune,[345] that would take, in the estimate of Tribune's advisors, nine to twelve months to close.[346]

### f.    Special Committee Activities and Response to the EGI Proposal.

The Special Committee met on February 12 and 13, 2007, to review presentations and recommendations with respect to the alternatives available to Tribune.[347]  In addition, management reviewed certain revisions to the Tribune Entities' financial outlook based on preliminary operating results in January 2007, revising downward the outlook for the Publishing Segment.[348]

The review included presentations by Tribune's management and by the advisors with respect to a proposed recapitalization and spin-off plan.[349]  As presented to the Special Committee by Morgan Stanley, the proposed recapitalization and spin-off plan would be comprised of four steps:[350]

(1)    Tribune would leverage itself up to 6.9x 2006 adjusted EBITDA, and use the proceeds to repurchase $4.2 billion of Tribune Common Stock (approximately 149 million shares at an assumed price of $30 per share, constituting approximately 60% of the Tribune Common Stock outstanding), resulting in the equivalent of an $18 per share dividend;

---

[345]    Ex. 116 (EGI Proposal, dated February 6, 2007); Ex. 5 at 21 (Tender Offer).

[346]    Examiner's Interview of Thomas Whayne, June 11, 2010 (under the initial EGI proposals, stockholders might not get cash for nine months).

[347]    Ex. 117 (Special Committee Meeting Minutes, dated February 12, 2007); Ex. 5 at 21 (Tender Offer).

[348]    Ex. 117 (Special Committee Meeting Minutes, dated February 12, 2007); Ex. 118 (Presentation to the Committee of Independent Directors of the Board of Directors of Tribune, dated February 12, 2007); Ex. 5 at 21 (Tender Offer).

[349]    Ex. 118 (Presentation to the Committee of Independent Directors of the Board of Directors of Tribune, dated February 12, 2007).

[350]    Id. at 4-5.

(2)     The Broadcasting Segment would borrow $2.5 billion (pre-spin) and use $1.8 billion to repay certain outstanding Tribune debt;

(3)     The Broadcasting Segment would be spun-off on a tax-free basis to all of Tribune's stockholders, with the remaining Broadcasting Segment debt proceeds being used to pay a dividend of $2 per share; and

(4)     The Publishing Segment would sell the Chicago Cubs, Comcast SportsNet, and certain other assets.

Following the recapitalization and spin-off, current stockholders of Tribune would own 100% of both businesses.  Tribune's management recommended proceeding with this plan.[351]

Management and Tribune's advisors also reported that the Chandler Trusts and the McCormick Foundation had been negotiating with respect to the purchase of shares of Tribune Common Stock by the McCormick Foundation from the Chandler Trusts in the context of the recapitalization and spin-off plan.[352]

In addition, the Special Committee was advised that, because of management's revised outlook for the Publishing Segment, Broad/Yucaipa had indicated that it would lower the initial cash consideration to be paid to Tribune's stockholders from $27 per share to $23 per share, but it would add a contingent value right tied to the proceeds, if any, of the Matthew Bender tax litigation.[353]

---

[351]   Ex. 5 at 21 (Tender Offer).

[352]   Ex. 117 at 3 (Special Committee Meeting Minutes, dated February 12, 2007).

[353]   *Id.* at 1; Examiner's Sworn Interview of William Osborn, June 24, 2010, at 64:14-20.  Mr. Osborn also testified in a Rule 2004 examination that "the January numbers that came out that were a little softer than what [Broad/Yucaipa] had in their plans.  And then as a result of that, and this communication with the bankers, they lowered their number from $27 to $23."  Ex. 983 at 45:15-21 (Rule 2004 Examination of William Osborn, May 16, 2007).

Following these reviews and presentations, the Special Committee determined to recommend to the Tribune Board that Tribune proceed with the recapitalization and spin-off plan and that Tribune not continue to pursue the Broad/Yucaipa Proposal or the Chandler Trusts Proposal.[354] The Special Committee did, however, direct management and Tribune's advisors to continue to develop the EGI proposal to determine its feasibility.[355] On February 13, 2007, Tribune issued a press release providing an update on the Tribune Board's review of strategic alternatives, indicating that the Tribune Board expected to "make a decision on a course of action and have an announcement before the end of the first quarter."[356]

Tribune's management and advisors then worked to complete the required documentation with respect to the recapitalization and spin-off plan, including the negotiation of registration rights agreements with the Chandler Trusts and the McCormick Foundation.[357] In addition, the Chandler Trusts and the McCormick Foundation negotiated with respect to the terms and pricing

---

[354] Ex. 5 at 21 (Tender Offer); Examiner's Interview of Thomas Whayne, June 11, 2010. Mr. Whayne stated that: "we were of a mode that likely we were heading to a recapitalization plan because we didn't think anyone would come forward with a value proposition to satisfy shareholders." Examiner's interview of Thomas Whayne, June 11, 2010.

[355] Ex. 119 at 2 (Special Committee Meeting Minutes, dated February 13, 2007). This was the first Special Committee meeting at which the EGI proposal was presented in detail. Ex. 117 at 2 (Special Committee Meeting Minutes, dated February 12, 2007); Ex. 987 at 15 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated February 12, 2007). Tribune's advisors first announced EGI's bid to the Special Committee at the February 3, 2007 meeting. Ex. 114 at 1 (Special Committee Meeting Minutes, dated February 3, 2007) ("Taubman and Whayne reported on a preliminary expression of interest from a new party since the last Committee meeting . . ."). At that time, EGI had only submitted a letter proposal and had not yet provided a term sheet with details of its proposed ESOP transaction. *Compare* Ex. 113 (EGI Letter, dated February 2, 2007) *with* Ex. 116 (EGI Proposal, dated February 6, 2007).

[356] Ex. 120 (Tribune Press Release, dated February 13, 2007). Mr. Stinehart said that the Chandler Trusts insisted on the March 31, 2007 deadline "to make things happen sooner rather than later." Examiner's Interview of William Stinehart, June 28, 2010. Mr. FitzSimons also said the deadline was intended "to try to create a sense of urgency among the bidders." Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 132:14-17.

[357] Ex. 5 at 21 (Tender Offer).

of a purchase of shares of Tribune Common Stock by the McCormick Foundation from the

Chandler Trusts in connection with the recapitalization and spin-off plan.[358]

At the same time, Tribune's management and financial advisors sought to develop

additional details with respect to the EGI proposal.[359]  Tribune engaged McDermott Will &

Emery LLP to advise it on ESOP matters and GreatBanc as trustee in connection with the

possible ESOP transaction.[360]  GreatBanc engaged Duff & Phelps as its financial advisor and

K&L Gates as its legal counsel.[361]

On February 19, 2007, EGI submitted a revised term sheet to Tribune with proposed

terms for the ESOP transaction.[362]  The term sheet contemplated a merger in which Tribune's

stockholders would receive $33 per share in cash, with EGI-TRB, an entity wholly-owned by

EGI and newly-formed for the purposes of the proposed transaction, investing $225 million, a

newly-formed ESOP investing $825 million, and the Tribune Entities incurring debt for the

remaining cash payments to stockholders.[363]  Following the merger, Tribune would elect to

become a subchapter S corporation for federal income tax purposes, with the result that Tribune

would no longer be subject to federal income taxes, subject to certain limitations.[364]  The term

---

[358]  *Id.*

[359]  *Id.* at 22.  Michael Costa of MLPFS also briefed the Special Committee on the EGI proposal for the first time in depth.  Ex. 117 (Special Committee Meeting Minutes, dated February 12, 2007).  At this time, Mr. Whayne told the Examiner that there was "[l]ots of skepticism because [the] ability of shareholders to get cash could be nine months away whereas people wanted cash now, particularly the Chandlers who wanted some return of capital."  Examiner's Interview of Thomas Whayne, June 11, 2010.  Mr. Wayne observed that another concern was that EGI's initial proposal required a fairness opinion before Step Two would close, which he said put an extra condition on the Merger that made it less favorable than the self-help option.  *Id.*  Ms. Mohr, of CGMI, said that the EGI proposal did not initially include enough details to "see the whole thing, soup to nuts, to make sure [Zell had] thought it out all the way to the end."  Examiner's Interview of Christina Mohr, June 29, 2010.

[360]  Ex. 5 at 22 and 45 (Tender Offer).

[361]  *Id.* at 22.

[362]  Ex. 121 (EGI Term Sheet, dated February 19, 2007).

[363]  *Id.*

[364]  *Id.*

sheet also contemplated a management incentive plan providing management with stock appreciation rights having the economic equivalent of 5% of the outstanding Tribune Common Stock.[365]  After preliminary conversations with Tribune's management and financial advisors, EGI submitted a revised term sheet on February 22, 2007, which included a description of the terms of proposed financing for the transaction.[366]

On February 24, 2007, the Special Committee reviewed with Tribune's management and advisors the status of the proposed recapitalization and spin-off plan, as well as an update with respect to the EGI proposal.[367]  Tribune's advisors reported that "significant progress had been made on the documentation and other steps necessary to implement the potential recapitalization."[368]  The advisors also described the steps involved in the proposed ESOP transaction and the anticipated timetable, noting that the EGI proposal contemplated voting agreements from the Chandler Trusts and the McCormick Foundation.[369]  Following these reviews, the Special Committee consulted separately with its financial and legal advisors.[370]  The Special Committee then directed Tribune's management and financial advisors to solicit the views of the Chandler Trusts and the McCormick Foundation with respect to the EGI proposal and to continue to pursue the proposal with a view to improving the economic terms and

---

[365]  *Id.*

[366]  Ex. 122 (EGI Term Sheet, dated February 22, 2007).

[367]  Ex. 123 (Special Committee Meeting Minutes, dated February 24, 2007).

[368]  *Id.* at TRIB-G0051832.  Ms. Mohr, of CGMI, commented that, by this point, "we had the recap transaction ready to go that was—could have been put in place."  Examiner's Interview Christina Mohr, June 29, 2010.

[369]  Ex. 5 at 22 (Tender Offer).  Thomas Whayne stated to the Examiner that Morgan Stanley expressed concern to the Special Committee that the EGI proposal had troublesome contingencies requiring the ESOP trustee to obtain a fairness opinion at the closing of the Merger, which could be six to nine months after the Tribune Board's approval of the deal.  Mr. Whayne believed that these conditions made the EGI proposal less attractive because of the financial risk associated with conditioning the deal on receipt of a fairness opinion far into the future.  Examiner's Interview of Thomas Whayne, June 11, 2010.

[370]  Ex. 5 at 22 (Tender Offer).

certainty.[371]  Tribune's financial advisors sent materials related to the EGI proposal to the Chandler Trusts and the McCormick Foundation, and, on February 25, 2007, Tribune's advisors had separate discussions with representatives of the Chandler Trusts and representatives of the McCormick Foundation with respect to the EGI proposal.[372]

The McCormick Foundation and the Chandler Trusts responded with separate letters expressing concerns regarding the delays and completion risk associated with EGI's proposal.[373]

The McCormick Foundation raised three concerns:[374]

•    Price.  The McCormick Foundation argued that, although EGI's proposal contemplated a price per share of $33, such price should be "evaluated in light of 'when' and 'if' it will ever be paid to Tribune stockholders" and that therefore a discount should be applied to the price for the purposes of evaluating the proposed transaction.

•    Timing.  The McCormick Foundation estimated that EGI's proposal would not close for nine to twelve months following FCC publication of notice of the proceeding (expected to be April 2007 at the earliest).  According to the McCormick Foundation, the resultant delay would "continue for a considerable period of time the unhealthy status quo for Tribune management and its Board of Directors."

•    Execution Risk.  The McCormick Foundation noted that the ESOP structure required delivery of a bring-down fairness opinion and that although such an opinion could normally be delivered within the three months between signing and closing, in this case delivery of the opinion would be delayed nine to twelve months until the FCC Order could be

---

[371]  Ex. 123 at TRIB-G0051834 (Special Committee Meeting Minutes, dated February 24, 2007); Ex. 5 at 22 (Tender Offer).

[372]  Ex. 5 at 22 (Tender Offer).

[373]  Ex. 124 (McCormick Foundation Letter, dated March 1, 2007); Ex. 125 (Chandler Trusts Letter, dated March 2, 2007).

[374]  Ex. 124 at 2 (McCormick Foundation Letter, dated March 1, 2007).

obtained.  The McCormick Foundation argued that such a delay was especially problematic "in an industry that is in transition and which may deteriorate between now and closing."  The McCormick Foundation also maintained that during the delay any material adverse change provisions in the proposed financing "could come into play if Tribune business results decline."

The Chandler Trusts also focused on the issue of the time that it would take to obtain the FCC Order and the related difficulty associated with obtaining the fairness opinion.[375]  The Chandler Trusts noted that Tribune's outside counsel had informed the Chandler Trusts that it would take nine to twelve months to obtain the FCC Order.[376]  William Stinehart, a trustee of the Chandler Trusts and a Tribune Board member, told the Examiner that the delay was particularly troubling because "there was serious concern that we might not get FCC approval."[377]  The Chandler Trusts were concerned about the impact that "the statutory requirement that the price paid by the ESOP not exceed fair market value at the time of the closing" would have if "the value of Tribune stock were to decline during the interim period" thereby making it "impossible to complete the transaction at the agreed valuation."[378]  Ultimately, Mr. Stinehart told the Examiner, "we got concerned that this was just another way to put us off for another nine months."[379]

---

[375]   Ex. 125 at 1 (Chandler Trusts Letter, dated March 2, 2007).  Mr. Whayne stated to the Examiner that Morgan Stanley also advised the Special Committee to reject any condition requiring a fairness opinion to close. Examiner's Interview of Thomas Whayne, June 11, 2010.  Mr. Whayne also said that he advised the Special Committee that this condition "make[s] their proposal not competitive with a recapitalization [regardless of the share price]. . . .  We're taking [a] huge risk that this financial firm could say later that the transaction is no longer fair."  *Id.*

[376]   Ex. 125 at 1 (Chandler Trusts Letter, dated March 2, 2007).  The letter from the McCormick Foundation had not indicated a source for this information.

[377]   Examiner's Interview of William Stinehart, June 28, 2010.

[378]   Ex. 125 at 1 (Chandler Trusts Letter, dated March 2, 2007).

[379]   Examiner's Interview of William Stinehart, June 28, 2010.

Both the McCormick Foundation and the Chandler Trusts concluded by indicating that, under the circumstances described in their respective letters, they were not willing to sign voting agreements in support of EGI's proposal, and they preferred that Tribune continue to work on a recapitalization and spin-off plan in which the Tribune Entities would increase the amount of their leverage to fund a stock repurchase and then spin off the Broadcasting Segment.[380]

In the face of the concerns expressed by several of Tribune's largest stockholders, including the McCormick Foundation and the Chandler Trusts, the Special Committee requested of EGI that any further proposal assume that Tribune would proceed first with a recapitalization that provided an upfront distribution to Tribune's stockholders.[381]

In response, on March 4, 2007, EGI provided Tribune with a revised term sheet that included an initial payment to Tribune's stockholders, followed by a later merger.[382]  In particular, the revised term sheet contemplated that Tribune would effect a first step tender offer at $33 per share in cash as a means of providing a portion of the cash consideration to Tribune's stockholders more quickly and with greater certainty.[383]  The revised term sheet also contemplated that stockholders would receive an 8% "ticking fee" on the merger consideration

---

[380]   Ex. 124 at 2-3 (McCormick Foundation Letter, dated March 1, 2007); Ex. 125 at 1 (Chandler Trusts Letter, dated March 2, 2007).

[381]   Ex. 126 at 22-24 (Deposition of Thomas Whayne, May 17, 2007).  At the time, Morgan Stanley was still "skeptical that the Zell proposal was the right step to go at this point in time" because of the condition of the fairness opinion and the time needed to close the proposed one-step transaction.  Examiner's Interview of Thomas Whayne, June 11, 2010.  Mr. Whayne told the Examiner that "Morgan Stanley really pushed very hard . . . that if we were going down a path with Zell he needed to provide upfront distribution we would have received in the recap so that those two options available to the company were on equal footing."  *Id.*  Nils Larsen of EGI also told the Examiner that his firm was "pushed to replicate the economics of [the self-help recapitalization] to the shareholders. . . .  There was some concern and reluctance at the Board level that time is valuable.  A deal at $30 that wasn't paid out for 15 months really should be looked at as something less than that and discounted to present value."  Examiner's Interview of Nils Larsen, June 15, 2010.

[382]   Ex. 127 (EGI Term Sheet, dated March 4, 2007).

[383]   *Id.*

running from six months following the execution of the merger agreement until closing of the merger.[384]

On March 6, 2007, EGI provided a further revised term sheet that for the first time proposed a two-step transaction, together with other improved economic terms, thereby enhancing the proposal.[385]  The revised term sheet contemplated that EGI-TRB would purchase $250 million of Tribune Common Stock at $33 per share as soon as practicable following execution of the merger agreement, and that the ESOP would purchase $250 million of Tribune Common Stock at market prices concurrently with executing the merger agreement.[386]  The revised term sheet also contemplated that EGI-TRB's initial investment would be satisfied in the merger, but that EGI-TRB would then purchase a $185 million subordinated note and pay an additional $40 million for a 20-year warrant to acquire 38% of the Tribune Common Stock for an aggregate exercise price of $351 million.[387]  In addition, the revised term sheet contemplated that stockholders would receive a 5% "ticking fee" on the merger consideration running from the date of the merger agreement until closing of the merger.[388]

On March 7, 2007, EGI's counsel provided Tribune with a revised draft of a merger agreement reflecting the revised structure of the proposed transaction.[389]  The revised merger agreement contemplated that Tribune would merge with an entity owned by the ESOP, with the ESOP initially owning 100% of the Tribune Common Stock following the merger.[390]  EGI's counsel also provided Tribune with drafts of a warrant agreement setting forth the terms of EGI's

---

[384] *Id.*

[385] Ex. 128 (EGI Term Sheet, dated March 6, 2007).

[386] *Id.*

[387] *Id.*

[388] *Id.*

[389] Ex. 129 (Draft Merger Agreement, dated March 7, 2007).

[390] *Id.*

proposed warrant and a voting agreement under which the Chandler Trusts and the McCormick Foundation would vote for the ESOP transaction.[391]  During the next few days, the parties exchanged drafts of various agreements and comments on those drafts.[392]

On March 10, 2007, Tribune informed EGI that Tribune was reconsidering its level of comfort with the proposed ESOP transaction, including the levels of leverage contemplated by the transaction, and was also reconsidering the possible recapitalization and spin-off plan at reduced levels of leverage.[393]  Nils Larsen of EGI suggested that this may have been a negotiating tactic by the Special Committee.[394]

March 11, 2007 e-mails written by Mr. Larsen stated that "the Company signaled to us that they had decided not to pursue either deal" because Tribune Chief Executive Officer Dennis FitzSimons was getting "cold feet on the leverage."[395]  Mr. FitzSimons then apparently conveyed some of these concerns to Samuel Zell at a March 13, 2007 breakfast meeting.[396] Mr. FitzSimons testified that he told Mr. Zell that the "complexity of the transaction was causing us some difficulty in wondering could the transaction be, you know, could it be completed."[397] A March 15, 2007 internal JPM e-mail described EGI's proposal as "dead" and indicated that

---

[391]   Ex. 130 (Draft Warrant, dated March 7, 2007); Ex. 131 (Draft Voting and Proxy Agreement, dated March 7, 2007).

[392]   Ex. 5 at 23 (Tender Offer).

[393]   *Id.*

[394]   Examiner's Interview of Nils Larsen, June 15, 2010.

[395]   Ex. 132 at JPM_00246317 (Larsen E-Mail, dated March 11, 2007).  In his sworn interview with the Examiner, Mr. FitzSimons denied that his initial negative reaction to EGI's proposal resulted from the degree of leverage associated with the proposal.  *See* Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 30:2-31:4.

[396]   Ex. 133 at JPM_00492786 (Cohen E-Mail, dated March 15, 2007).

[397]   Ex. 134 at 120:9-12 (Rule 2004 Examination of Dennis FitzSimons, May 14, 2007).  Mr. FitzSimons testified that his reconsideration of EGI's proposal in March 2007 was caused by two issues:  (a) the "conditionality" of the deal, by which he meant "the number of hurdles that we would have to get over to do the transaction," and (b) concerns raised by mergers and acquisitions lawyer Martin Lipton about the level of scrutiny the transaction would likely undergo due to the high-profile nature of Tribune.  Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 30:8-31:4, 34:15-17, and 36:18-37:3.

Tribune was focusing on pursuing a self-help alternative.[398]  Thomas Whayne of Morgan Stanley explained to the Examiner that, in the mid-March 2007 time frame, Tribune's management "went back and forth as to what they wanted to do.  Was it recap, was it Zell."[399]

Over the course of the following week, representatives of Tribune discussed with representatives of the Chandler Trusts and the McCormick Foundation the possibility of pursuing the recapitalization and spin-off plan with a dividend of $15 per share rather than $20 per share.[400]  The McCormick Foundation and the Chandler Trusts engaged in discussions with respect to restructuring their agreement on the purchase of shares by the McCormick Foundation from the Chandler Trusts in the context of a reduced dividend.[401]  Tribune's advisors and the Special Committee's financial and legal advisors also had discussions with respect to the advisability of pursuing a revised recapitalization and spin-off plan versus re-engaging on the ESOP transaction proposed by EGI.[402]  As a result of these discussions, the Special Committee scheduled a meeting for March 21, 2007, to consider the status of the two potential transactions.[403]

On or about March 15, 2007, William Osborn, Chair of the Special Committee, contacted Mr. Zell to attempt to revive the EGI proposal.[404]  Mr. FitzSimons testified that Mr. Osborn told

---

[398]  Ex. 133 at JPM_00492785 (Cohen E-Mail, dated March 15, 2007).

[399]  Examiner's Interview of Thomas Whayne, June 11, 2010.  Ms. Mohr, of CGMI, told the Examiner that the process involved "really a lot of soul searching.  People got up some mornings and were comfortable, and other mornings people said they were uncomfortable."  Examiner's Interview of Christina Mohr, June 29, 2010.  Ms. Mohr confirmed that Mr. FitzSimons, specifically, "went hot and cold on this deal. . . .  It reflects the fact that it was doable but a lot of debt."  *Id.*

[400]  Ex. 5 at 23 (Tender Offer).

[401]  *Id.*

[402]  *Id.*

[403]  *Id.*

[404]  Examiner's Interview of Samuel Zell, June 14, 2010.  Mr. Whayne explained that he believed that a shift toward the EGI proposal occurred around this time, because Tribune wanted a "complete solution" and many of the

him to reopen discussions with EGI because he wanted the Special Committee to "develop this deal fully so the committee has multiple options to consider."[405]  Mr. Zell stated to the Examiner that Mr. Osborn told him:  "we've gone over this thing and really think it might work, and I said fine.  And we then proceeded to go forward."[406]

At the March 21, 2007 Special Committee meeting, Tribune's management and advisors reviewed the terms of the proposed ESOP transaction with a first-step cash payment to stockholders equivalent to $17.50 per share, and compared it to a recapitalization and spin-off transaction with a $17.50 per share cash dividend.[407]  At this point, the ESOP transaction was described by the Special Committee's financial advisors as follows:[408]

Step One

- The Tribune Entities would raise $7.3 billion of new debt;

- EGI-TRB would purchase from Tribune approximately 7.6 million shares of Tribune Common Stock at $33 per share for a total of $250 million; and

- The ESOP would purchase $250 million of newly issued shares of Tribune Common Stock at the market price.

Step Two

- The Tribune Entities would raise an additional $4.3 billion of debt and redeem the remaining public and EGI-TRB common stock for $33 per share, plus interest;

---

impediments to the initial EGI proposal had been removed.  Examiner's Interview of Thomas Whayne, June 11, 2010.

[405]  Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 58:10-11.  An e-mail sent by Mr. Grenesko at the time indicated that he contacted EGI's William Pate to discuss the issues that had concerned management and that Mr. Pate said he "will talk to Sam [Zell]."  Ex. 984 (Grenesko E-Mail, dated March 15, 2007).

[406]  Examiner's Interview of Samuel Zell, June 14, 2010.

[407]  Ex. 5 at 24 (Tender Offer).

[408]  Ex. 135 at 2 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated March 21, 2007).

•     EGI-TRB would purchase $225 million of subordinated notes and a warrant to purchase 38% of the outstanding Tribune Common Stock for $350 million;

•     The ESOP would initially own 100% of the outstanding Tribune Common Stock (subject to dilution for a management incentive plan); and

•     The S-Corporation election would be made at the beginning of 2008 or 2009.

MLPFS and CGMI told the Special Committee that the ESOP transaction involved substantially more debt than a recapitalization and spin-off, but as a result of the tax advantages of the subchapter S-Corporation structure, as well as the elimination of Tribune's 401(k) cash contributions after creation of the ESOP and other cost savings, the cash flow available for debt repayment would be approximately equivalent in the two alternatives.[409]  Christina Mohr, of CGMI, explained to the Examiner that the cash flow analysis was the same under both plans because Tribune could immediately reduce the amount of leverage under EGI's proposal by selling assets that did not have a positive cash flow.[410]  This meant that the EGI could reduce the leverage through asset sales without reducing the cash flow necessary to service debt.[411]  Tribune's financial advisors noted, however, that they expected that the credit rating agencies would rate the Tribune Entities' debt in the proposed recapitalization and spin-off transaction one

---

[409]   Ex. 5 at 24 (Tender Offer).

[410]   Examiner's Interview of Christina Mohr, June 29, 2010.

[411]   *Id.  See also* Ex. 135 at 4 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated March 21, 2007).

level higher than they would rate the Tribune Entities' debt in the proposed ESOP transaction.[412]

Tribune's financial advisors also provided a comparative valuation of the two alternatives.[413]

In addition, MLPFS and CGMI noted that the details of the "Step One" of the ESOP

transaction were similar to the proposed recapitalization and spin-off transaction (other than with

respect to the participation of the ESOP and EGI-TRB's $250 million cash purchase price), and

that if "Step Two" did not close:[414]

> •  It would have the same financial impact on Tribune and its stockholders as
the proposed recapitalization and spin-off would have, except that EGI-TRB would have
invested $250 million in new money in Tribune;[415]

> •  The Tribune Entities' employees would have invested $250 million in
anticipated future cash benefits into Tribune;

> •  The spin-off of the Broadcasting Segment would have been delayed; and

> •  There would have been disruption to Tribune's stockholders and
employees as a result of the failed transaction.

The Special Committee also heard presentations from GreatBanc and Duff & Phelps

about their qualifications and the process they were following with respect to determining the

fairness of the transaction to the ESOP.[416]  Management reported on the Tribune Entities' recent

---

[412]  Ex. 135 at 4 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated March 21, 2007).

[413]  Ex. 136 (Special Committee Meeting Minutes, dated March 21, 2007); Ex. 135 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated March 21, 2007); Ex. 137 (Presentation to the Committee of Independent Directors of the Board of Directors of Tribune, dated March 21, 2007).

[414]  Ex. 135 at 2 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated March 21, 2007).

[415]  Mr. Whayne of Morgan Stanley told the Examiner:  "[B]y virtue of what we were asking Zell to do which was convert his upfront warrant into equity we were basically accomplishing getting him to be a long-term investor and serve as a catalyst for change in the company."  Examiner's Interview of Thomas Whayne, June 11, 2010.

[416]  Ex. 136 (Special Committee Meeting Minutes, dated March 21, 2007).

financial performance, and Tribune's legal advisors reported on the legal terms of the alternative transactions.[417]  Tribune's advisors also reviewed the financing arrangements contemplated by each transaction.[418]  The Special Committee consulted separately with its financial and legal advisors with respect to the two potential transactions.[419]  Following these reviews, the Special Committee directed Tribune's management and advisors to present two fully developed alternatives to the Special Committee at a meeting on March 30, 2007 for a final determination.[420]

There were differences of opinion among Tribune's advisors about which transaction was more favorable for Tribune's stockholders.  Ms. Mohr, of CGMI, suggested that she favored EGI's proposal and that, although she did not tell the Special Committee this directly, she made it clear that "we got comfortable at that time that the cash flow provided such that the Company would be [able] to satisfy these obligations, we absolutely thought this."[421]  However, Mr. Whayne noted that Morgan Stanley still favored the self-help plan because "we thought [the] recap plan could yield value potentially better than [the] Zell proposal at $33."[422]

Between March 21, 2007 and March 30, 2007, representatives of Tribune, EGI, and the ESOP, including the Special Committee's financial and legal advisors,[423] negotiated the terms of

---

[417]  Ex. 5 at 24 (Tender Offer).

[418]  *Id.*

[419]  *Id.*

[420]  Ex. 136 (Special Committee Meeting Minutes, dated March 21, 2007); Ex. 5 at 24 (Tender Offer).

[421]  Examiner's Interview of Christina Mohr, June 29, 2010.  Ms. Mohr told the Examiner that by this point EGI's proposal "gets better fleshed out—[specifically] while the nominal leverage is higher, when you peel back and look at the analysis, the way people got comfortable was the fact that the cash flows were effectively identical." *Id.*

[422]  Examiner's Interview of Thomas Whayne, June 11, 2010.  *See also* Ex. 599 (Pate E-Mail, dated March 23, 2007) ("[Whayne] said [O]sborn was mad . . . that Morgan Stanley institutionally didn't think the deal was best option for tower.").

[423]  Beginning on March 22, 2007, Morgan Stanley represented Tribune in negotiating the final terms of the transaction with EGI.  Mr. Osborn told Morgan Stanley that "while [MLPFS] and [CGMI] would stay engaged,

the various agreements relating to the potential ESOP transaction.[424]  In addition, representatives of Tribune and EGI negotiated with representatives of the Chandler Trusts with respect to the proposed voting agreement and registration rights agreement.[425]  The McCormick Foundation declined to negotiate with respect to a voting agreement.[426]  Tribune also sought to increase the certainty with respect to the transaction, to limit any breakup fees Tribune would have to pay, and to require a breakup fee from EGI in the event financing was not obtained for any reason other than a breach by Tribune or the ESOP.[427]  In addition, Tribune required that its obligation to consummate a tender offer and complete the merger would be conditioned on the receipt of a satisfactory solvency opinion at both steps of the transaction.[428]

---

the Committee was concerned about conflict of interest and felt having Morgan Stanley involved in the final details was most appropriate."  Ex. 598 (Kenney E-Mail, dated March 22, 2007).

[424]  Ex. 5 at 24 (Tender Offer).

[425]  *Id.*  Mr. Stinehart, a trustee for the Chandler Trusts, said the Chandler Trusts "gave the voting agreement in exchange for registration rights."  Examiner's Interview of William Stinehart, June 28, 2010.

[426]  Ex. 5 at 24 (Tender Offer).

[427]  *Id.*

[428]  *Id.*  Thomas Whayne of Morgan Stanley told the Examiner that "I'm fairly confident it was Steve Rosenblum at Wachtell.  Wachtell was an advisor to the company that thought it was important to have [a] solvency opinion as a mechanism to protect the board."  Examiner's Interview of Thomas Whayne, June 11, 2010.  In his interview with the Examiner, William Osborn, former Chair of the Special Committee, indicated that he did not believe that obtaining the solvency opinion constituted a major hurdle:

> Q:  Was there any concern about whether Tribune would be able to get the solvency opinion?
>
> A:  We discussed that.  I personally felt that there would not be a problem, and my rationale for that was around the value of the pieces of the company, number one, and number two, the fact that Mr. Zell had made an investment and wanted to proceed with this transaction.  While there had been deterioration of the business, the cash flows were still quite strong, and the structure of the transaction was one that would give them flexibility going forward under nearly any circumstance, and I felt that the company would be fine.
>
> Q:  Were others on the board of the special committee concerned about whether the company would be able to get its solvency opinion?
>
> A:  I don't recall that anyone had a specific concern.  It was just an issue that we knew had to be dealt with, and because of some of the deterioration in the business and some of the revised projections, we wanted to make certain it would be accomplished.  I mean, if you recall at the time, there had been some deterioration of the business throughout the year of the company, so when you -- when your baseline is lower going forward than it was earlier, you know, your flexibility does change, and therefore, we wanted to make certain and we felt comfortable that there was still sufficient cushion in this that it would work.

As a result of negotiations with Tribune and the ESOP, the initial investment by EGI-TRB was restructured so that EGI-TRB would purchase $50 million in Tribune Common Stock and $200 million in a subordinated exchangeable note that would be exchangeable into Tribune Common Stock at Tribune's election, or automatically if the Merger Agreement was terminated.[429]  The parties also negotiated the terms of the proposed financing.[430]

Tribune continued to seek improvements in the economic terms of the transaction, including an increase in the price to be paid to Tribune's stockholders and an increase in the investment to be made by EGI-TRB.[431]  Tribune and GreatBanc also negotiated the terms of the ESOP's investment, including the price to be paid by the ESOP for the shares of Tribune Common Stock to be purchased by the ESOP.

In addition, the Tribune Board received two letters from Broad/Yucaipa.  In the first letter, Broad/Yucaipa sought access to further information, and, thereafter, additional information was provided to them by Tribune and its advisors.[432]  In the second letter, Broad/Yucaipa expressed its interest in participating with a $500 million equity investment in an ESOP transaction in which Tribune's stockholders would receive $34 per share.[433]  This second single-page letter was not accompanied by any further documents or financing commitments.[434]

---

Examiner's Sworn Interview of William Osborn, June 24, 2010, at 41:12-42:20.

[429]  Ex. 5 at 24 (Tender Offer).

[430]  *Id.*

[431]  *Id.*

[432]  Ex. 138 (Broad/Burkle Letter, dated March 23, 2007); Ex. 5 at 24 (Tender Offer).  In the March 23, 2007 letter, Broad/Yucaipa suggested that it would make an offer superior to EGI's proposal if given additional information and time to form a competing proposal. Ex. 138 at 1 (Broad/Burkle Letter, dated March 23, 2007) ("How can the Board now be certain that another investor would not be willing to pursue a transaction using this ESOP structure at a higher price?").  Mr. FitzSimons testified that Mr. Osborn instructed management to "try to give [Broad/Yucaipa] as much as possible for them to work with to see if they would come up with a more advantageous offer."  Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 130:21-131:2.

[433]  Ex. 139 (Broad/Burkle Letter, dated March 29, 2007).

[434]  *Id.*

Thereafter, Tribune's financial advisors had further discussions with Broad/Yucaipa's financial advisors.[435]

Before the meeting of the Special Committee on March 30, 2007, EGI-TRB slightly revised its proposal to increase the stated per share consideration in the merger to $33.50, but with the "ticking fee" start date moved to January 1, 2008.[436]  At this point, Mr. Whayne told the Examiner: "you had management as well as [MLPFS] and [CGMI] acting as very strong advocates for going down [the] Zell path."[437]  Mr. Whayne told the Examiner that he believed that a shift toward the EGI proposal occurred around this time, because Tribune wanted a "complete solution" and because many of the impediments to the initial EGI proposal had been removed.[438]  In addition, Tribune's advisors told the Examiner that Tribune became more familiar with how the tax shield under ESOP worked,[439] and with the fact that the cash flow under both proposals would be the same.[440]

---

[435]   Ex. 5 at 24-25 (Tender Offer).  Mr. Whayne told the Examiner that Broad/Yucaipa was "given extraordinary guidance as to how to paper a competing proposal [to] Zell."  Examiner's Interview of Thomas Whayne, June 11, 2010.

[436]   Ex. 5 at 25 (Tender Offer).

[437]   Examiner's Interview of Thomas Whayne, June 11, 2010.

[438]   *Id.*  Among the key changes were the removal of the requirement of a fairness opinion after each step and the change to a two-step process.  *Id.*

[439]   Examiner's Interview of Michael Costa, June 4, 2010.  Mr. Costa further explained to the Examiner that three things changed concerning the Zell Group proposal:  "(1) From this early [March] until end, amount of cash flow or EBITDA that Zell and company thought possible went up because of synergies, amount of costs that management under Zell could take out, went up from [March] until late [March]; (2) [B]etter understanding and more certainty how tax shield worked for ESOP, always there, not sure that in early [March] that all analysis done; I look at tax shield as equity cushion. Because if company would have to pay taxes but government says you don't have to, all of us are supporting transaction; [and] (3) Terms of Zell equity improved, more of it in final transaction than at this point in [March], but do not recall how much more."  *Id.*

[440]   Examiner's Interview of Christina Mohr, June 29, 2010.  Ms. Mohr, of CGMI, told the Examiner that Tribune was already willing to do the self-help plan and, "the way people got comfortable was the fact that the cash flows [in EGI's proposal] were effectively identical to the transaction that they were willing to do [*i.e.* the self-help option]."  *Id.*

On March 30, 2007, the Special Committee and the Tribune Board met to review the alternative transactions.[441]  At the meeting, Mr. FitzSimons told the Special Committee that Tribune management was changing its recommendation and now supported the EGI's proposed ESOP transaction.[442]  Mr. FitzSimons testified that management supported the EGI's proposal because "allowing [Broad/Yucaipa] back in and at the risk of losing what had been an option that was worked out to the satisfaction of the advisors and the [Special Committee] was deemed to be very dangerous."[443]  Former Special Committee Chair William Osborn also told the Examiner that at the end of March 2007, the Broad/Yucaipa Proposal was "too conditional at the time relative to [EGI's proposal] that had the financing arranged and was ready to go."[444]

Based on its consideration and the recommendations of Tribune's advisors, the Special Committee directed Tribune's management and financial advisors, and the Special Committee's financial and legal advisors, to seek to complete negotiation of the proposed ESOP transaction and present the completed proposal to the Special Committee on Sunday morning, April 1, 2007, with a full meeting of the Tribune Board to immediately follow.[445]  The Special Committee determined that the Broad/Yucaipa Proposal required additional work and documentation, so the Special Committee directed its advisors to continue discussions with Broad/Yucaipa.[446]

---

[441]  Ex. 140 (Special Committee Meeting Minutes, dated March 30, 2007).

[442]  *Id.* at TRB 002649.  Mr. FitzSimons testified that the last minute bid caused "a high level of frustration." Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 131:20-21.  Mr. FitzSimons further testified, "[T]here was a real desire so value wasn't lost to say let's move on, let's get a resolution to this process.'"  *Id.* at 133:1-3.

[443]  *Id.* at 133:1-7.

[444]  Examiner's Sworn Interview of William Osborn, June 24, 2010, at 65:2-4.

[445]  Ex. 140 at TRIB 002649-50 (Special Committee Meeting Minutes, dated March 30, 2007). *See also* Ex. 141 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated March 30, 2007); Ex. 142 (Presentation to the Committee of Independent Directors of the Board of Directors of Tribune, dated March 30, 2007).

[446]  Ex. 140 at TRIB 002649 (Special Committee Meeting Minutes, dated March 30, 2007);  Ex. 5 at 25 (Tender Offer).

Over the following twenty-four hours, the representatives of Tribune, the ESOP, EGI, and the Chandler Trusts continued negotiation of the agreements with respect to the ESOP transaction.  In the course of these negotiations, EGI-TRB agreed to increase the price to be paid to Tribune's stockholders from $33.50 to $34 per share with an 8% "ticking fee" running from January 1, 2008 to the actual closing date of the merger if the merger did not close by January 1, 2008.[447]  EGI-TRB agreed that its initial $250 million investment in Tribune would be based on a $34 per share price, and that its investment would increase to $315 million in connection with the merger, consisting of a $225 million subordinated note and a $90 million purchase price for the warrant.[448]  The parties also agreed to a breakup fee of $25 million to be paid by (a) Tribune to EGI-TRB if Tribune accepted a superior proposal, and (b) by EGI-TRB to Tribune if financing was not obtained for any reason other than breach by Tribune or the ESOP.[449]  Tribune and the ESOP agreed to a $28 per share purchase price for the ESOP's purchase of shares of Tribune Common Stock.[450]  The Chandler Trusts agreed to the voting agreement and, in connection with the registration rights agreement, to tender their shares of Tribune Common Stock in the contemplated tender offer and to cause the directors nominated by the Chandler Trusts to resign on the closing of the tender offer (or under certain other circumstances).[451]

On the morning of April 1, 2007, the Special Committee received a report on the status of the proposed ESOP transaction and additional discussions over the previous few days with

---

[447]  Ex. 5 at 25 (Tender Offer).  Mr. Whayne explained that the request for a price increase "came in with some amount of equity, but frankly more leverage."  Examiner's Interview of Thomas Whayne, June 11, 2010.  Ms. Mohr, of CGMI, told the Examiner that the "final bump" to $34 per share was not material to CGMI's evaluation of whether Tribune could service the debt.  Examiner's Interview of Christina Mohr, June 29, 2010.

[448]  Ex. 5 at 25 (Tender Offer).

[449]  *Id.* at 24.

[450]  *Id.*

[451]  *Id.* at 25.

Broad/Yucaipa.[452]  Tribune's management and advisors reported that all major open issues had

been resolved with EGI, with the exception of the exercise price of the warrant.[453]  During the

course of the day, Tribune, the ESOP, and EGI reached agreement that the exercise price of the

warrant would increase by $10 million per year for the first ten years of the warrant, to a

maximum of $600 million, and that the term of the warrant would be reduced from 20 years to

15 years.[454]

#### g.    Tribune Board Approval.

The Special Committee and the Tribune Board convened on the evening of April 1, 2007,

and Tribune's management and advisors reported on the resolution of all open issues with EGI

relating to the Leveraged ESOP Transactions.[455]  In a separate meeting of the Special

Committee, Morgan Stanley rendered its oral opinion to the Special Committee, subsequently

confirmed in writing as of the same date, to the effect that, as of April 1, 2007, and based on the

factors and subject to the assumptions set forth in its written opinion, the consideration under the

Merger to be received by the holders of Tribune Common Stock (other than certain affiliated

entities) was fair from a financial point of view to such stockholders.[456]  The Special Committee

---

[452]  Ex. 143 (Special Committee Meeting Minutes, dated April 1, 2007).  During his interview with the Examiner, Mr. Osborn asserted that the auction process benefited from the interplay among EGI's proposal, the Broad/Yucaipa Proposal, and the recapitalization and spin-off plan.  For example, the Broad/Yucaipa Proposal was improved at the last minute, "basically offering to [sic] a similar transaction to the Zell transaction." Examiner's Sworn Interview of William Osborn, June 24, 2010, at 64:14-20.

[453]  Ex. 143 (Special Committee Meeting Minutes, dated April 1, 2007); Ex. 5 at 25 (Tender Offer).

[454]  Ex. 5 at 26 (Tender Offer).

[455]  Ex. 143 (Special Committee Meeting Minutes, dated April 1, 2007).  The evening meeting of the Special Committee was by telephone.  Ex. 146 at 1 (Tribune Board Meeting Minutes, dated April 1, 2007).

[456]  Ex. 143 (Special Committee Meeting Minutes, dated April 1, 2007); Ex. 144 (Presentation to the Committee of Independent Directors of the Tribune Board, dated April 1, 2007); Ex. 145 (Morgan Stanley Opinion Letter, dated April 1, 2007).

unanimously recommended that the Tribune Board approve the "Zell/ESOP transaction to acquire Tribune for $34 per share."[457]

At the full meeting of the Tribune Board, MLPFS gave its oral opinion, subsequently confirmed in writing as of the same date, on the fairness of the merger consideration from a financial point of view of the stockholders.[458]  Morgan Stanley delivered to the full Tribune Board the opinion it had previously given to the Special Committee.[459]

On April 1, 2007, the Tribune Board voted to approve the Leveraged ESOP Transactions, including the establishment of the ESOP, the Merger, the Tender Offer, the Step One Commitment Letter, the Step Two Commitment Letter, and the entry into and performance of agreements related to the foregoing.[460]  Representatives of the Chandler Trusts on the Tribune Board abstained from voting as directors; Dudley Taft was not present at the meeting and did not vote.[461]  After the Tribune Board meeting, certain of the Leveraged ESOP Transaction documents were executed,[462] and on April 2, 2007, the Leveraged ESOP Transactions were

---

[457] Ex. 143 at 3 (Special Committee Meeting Minutes, dated April 1, 2007).

[458] Ex. 146 at 2 (Tribune Board Meeting Minutes, dated April 1, 2007); Ex. 147 (MLPFS Opinion Letter, dated April 1, 2007).

[459] Ex. 146 (Tribune Board Meeting Minutes, dated April 1, 2007).

[460] *Id.*

[461] *Id.* at 1.  Mr. Stinehart, a Chandler Trusts trustee and Tribune Board member, said that the decision by all of the Chandler Trust trustees to abstain "was not coordinated, but the other two [Chandler] Trusts designees may have followed my lead in abstaining."  Examiner's Interview of William Stinehart, June 28, 2010.  Mr. Stinehart told the Examiner that he abstained from voting because (a) he viewed the Chandler Trusts as being part of the transaction because they entered Voting Rights and Registration Rights agreements, (b) he was "missing a huge amount of [information] that [the Special Committee] had but we didn't" because he was not on the Special Committee, (c) as trustee to the Chandler Trusts with individual beneficiaries, he held a fiduciary duty that the other Tribune Board members did not have, and (d) the Chandler Trusts still had an offer outstanding to purchase part of Tribune, which had never been rejected.  *Id.*

[462] Ex. 146 at Exhibit A (Tribune Board Meeting Minutes, dated April 1, 2007); Ex. 5 at 26 (Tender Offer).

publicly announced.[463]  The description of the Leveraged ESOP Transactions in the press release

included the following statements:[464]

> Shareholders will receive their consideration in a two-stage
> transaction.  Upon completion of the transaction, the [C]ompany
> will be privately held, with an Employee Stock Ownership Plan
> (ESOP) holding all of Tribune's then-outstanding common
> stock. . . .   The first stage of the transaction is a cash tender offer
> for approximately 126 million shares at $34 per share. . . .   The
> second stage is a merger expected to close in the fourth quarter of
> 2007 in which the remaining publicly-held shares will receive $34
> per share.

Tribune's SEC filings during the period before consummation of the Step One

Transactions disclosed certain risks associated with the Leveraged ESOP Transactions.  In

Tribune's Form 10-Q for the period ended April 1, 2007 (filed May 9, 2007), Tribune disclosed

three risk factors with respect to the Leveraged ESOP Transactions:[465]

•      "Our businesses may be adversely affected by the Leveraged ESOP

Transactions and the failure to consummate the pending Leveraged ESOP Transactions."[466]

According to Tribune, the considerations underlying this risk factor included the diversion of

management's attention away from day-to-day operations, transaction costs (which would be

payable by Tribune whether or not the Merger closed), the termination of the Merger Agreement,

the failure of the Tender Offer or the Merger to close, the failure to obtain necessary stockholder

and FCC approvals to the Merger, and the failure to obtain the financing arrangements outlined

in the Commitment Letters.[467]

---

[463]   Ex. 148 (Tribune Press Release, dated April 2, 2007).

[464]   *Id.*

[465]   Ex. 55 at 37-39 (Tribune Form 10-Q, filed May 9, 2007).

[466]   *Id.* at 37.

[467]   *Id.*

135

- "We currently have substantial debt and other financial obligations, and we expect to incur significant additional debt in connection with the Leveraged ESOP Transactions."[468]  According to Tribune, the considerations underlying this risk factor included the need to dedicate greater amounts of cash flow to the payment of the LBO Lender Debt, the failure of operations to generate sufficient cash flow to pay the LBO Lender Debt, and the ability of the Tribune Entities to refinance the LBO Lender Debt on or before maturity.[469]

- "Consummation of the Leveraged ESOP Transactions will require regulatory approval from the FCC."[470]  According to Tribune, the considerations underlying this risk factor included the timing of the FCC's review of the application and the need to obtain new cross-ownership waivers as a result of the change of control that would result from the Merger.[471]

On May 21, 2007, the Tribune Board (with Mr. Chandler, Mr. Goodan, and Mr. Stinehart abstaining) adopted resolutions approving, ratifying, and adopting in all respects the Credit Agreement entered into on May 17, 2007 and authorizing the officers of Tribune to take all actions "necessary, desirable, advisable, expedient, convenient or proper" to carry out the purposes of the resolutions adopted by the Tribune Board on April 1, 2007 and May 21, 2007.[472]

## 2. Approval by Subsidiary Boards.

The Guarantor Subsidiaries authorized the Credit Agreement Subsidiary Guarantee by unanimous written consent of the respective Subsidiary Boards (or sole or managing member, as

---

[468] *Id.* at 38.

[469] *Id.* at 38-39.

[470] *Id.* at 39.

[471] *Id.*

[472] Ex. 149 (Tribune Board Meeting Minutes, dated May 21, 2007).

applicable).[473]  The recitals in the unanimous written consents of the Subsidiary Boards

acknowledged Tribune's entry into the Credit Agreement, noted that the Guarantor Subsidiary's

entry into the Credit Agreement Subsidiary Guarantee was a condition to making advances under

the Credit Agreement, and referenced the form of Credit Agreement Subsidiary Guarantee

attached as an exhibit to the Credit Agreement.[474]  The resolution in the unanimous written

consents of the Subsidiary Boards authorized "each of the President, any Vice President, the

Treasurer, any Assistant Treasurer, the Secretary or any Assistant Treasurer" of such Guarantor

Subsidiary to execute and deliver to the Credit Agreement Agent, the Credit Agreement

Subsidiary Guarantee and "all other documents, instruments and agreements deemed necessary

or desirable by the [Credit Agreement Agent] in order to guarantee the obligations of [Tribune]

under the Credit Agreement."[475]  The resolutions also authorized such officers to "take from time

to time any actions deemed necessary or desirable by the Authorized Officers of the Company to

establish the [Credit Agreement Subsidiary Guarantee] and to evidence the [Credit Agreement

Subsidiary Guarantee] properly in accordance with the requirements of the Credit

Agreement."[476]  The unanimous written consents were dated as of June 4, 2007.[477]

---

[473]  Ex. 150 (Unanimous Written Consents of the Subsidiary Boards, dated June 4, 2007).  These unanimous written consents of the Subsidiary Boards are substantially similar in form and substance.  It appears that the directors of the Guarantor Subsidiaries did little to no diligence when asked to sign the Subsidiary Board written consents authorizing the execution, delivery, and performance of the Credit Agreement Subsidiary Guarantee, but instead simply signed the written consents at the request of Tribune's in-house counsel.  Examiner's Interview of David Williams, June 18, 2010; Examiner's Interview of Timothy Landon, June 22, 2010.  In his interview with the Examiner, former Tribune General Counsel Crane Kenney confirmed that he, David Eldersveld, or Mark Hianik (all in-house attorneys at Tribune) would likely have asked the directors of the Guarantor Subsidiaries to sign the written consents.  Examiner's Sworn Interview of Crane Kenney, July 8, 2010, at 92:6-93:6.

[474]  Ex. 150 (Unanimous Written Consents of the Subsidiary Boards, dated June 4, 2007).

[475]  *Id.*

[476]  *Id.*

[477]  *Id.*  The unanimous written consents of Homestead Publishing Company and Patuxent Publishing Company were dated as of June 6, 2007.  The form and substance of these unanimous written consents are substantially the same as the other unanimous written consents and do not purport to ratify an action that was taken before the execution of the unanimous written consents.

### 3.    Merger Agreement.

On April 1, 2007, Tribune entered into the Merger Agreement, by and among Tribune, GreatBanc (not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which formed a part of the ESOP), Merger Sub,[478] and, for limited purposes,[479] EGI-TRB.[480]   Under the Merger Agreement, at and conditioned on the Effective Time, Merger Sub would merge with and into Tribune, with Tribune surviving the Merger and becoming a wholly-owned Subsidiary of the ESOP and holders of Tribune Common Stock receiving $34.00 per share in consideration on consummation of the Merger.[481]

The Merger Agreement (a Step Two Transaction) provided that Tribune would commence a tender offer for up to 126 million shares of Tribune Common Stock at $34.00 per share (a Step One Transaction).[482]   The 126 million shares represented approximately 52% of the issued and outstanding Tribune Common Stock as of April 1, 2007.[483]   To the extent that the Tender Offer was not consummated, the Merger Agreement nevertheless would remain in full force and effect and the Merger was to be consummated in accordance with the terms thereof.[484]

---

[478]   Merger Sub was an entity newly-formed and wholly-owned by the ESOP for the purposes of the Merger.

[479]   EGI-TRB was a party to the Merger Agreement solely with respect to Section 8.12 thereof.  Section 8.12 provided that, without the consent of EGI-TRB, neither the ESOP nor Merger Sub could (a) waive or amend any provision of the Merger Agreement or (b) agree to terminate the Merger Agreement (i) by mutual written consent or, (ii) before receipt of the Company Shareholder Approval, as a result of the Tribune Board failing to recommend that Tribune's stockholders vote in favor of the Merger or otherwise changing its recommendation to Tribune's stockholders in a manner adverse to the ESOP.  Ex. 151 at § 8.12 (Merger Agreement).

[480]   Ex. 151 (Merger Agreement).  The Merger Agreement was governed by Delaware law (*see* § 8.4).  With respect to the Merger Agreement (a) the ESOP and Merger Sub were represented by the law firm of K & L Gates (Pittsburgh, PA office), (b) Tribune was represented by the law firms of Wachtell (New York, NY office), Sidley Austin LLP (Chicago, IL office), Skadden Arps (Chicago, IL office), and McDermott, Will & Emery LLP (Chicago, IL office), and (c) Tribune Acquisition was represented by the law firm of Jenner & Block LLP (Chicago, IL office).  *See* Ex. 151 at § 8.7 (Merger Agreement).

[481]   Ex. 151 at § 2.1(a) (Merger Agreement).

[482]   *Id.* at § 5.14(a).

[483]   Ex. 5 at 101 (Tender Offer).

[484]   *Id.* at § 5.14(c).

a.      **Reasonable Best Efforts.**

Pursuant to the terms of the Merger Agreement, each of Tribune, the ESOP, and Merger

Sub covenanted to use "reasonable best efforts" to "take promptly, or cause to be taken promptly,

all actions, . . . and to assist and cooperate with the other parties in doing, all things necessary,

proper or advisable . . . to consummate and make effective the Merger and the other transactions

contemplated" by the Merger Agreement.[485]  Among the obligations delineated, the parties

agreed to use reasonable best efforts to obtain all necessary governmental approvals and consents

(including the FCC Order),[486] and to obtain certain third-party consents (including the consent of

Major League Baseball).[487]  In addition, Tribune covenanted to use reasonable best efforts to

obtain financing for the Leveraged ESOP Transactions pursuant to the terms and conditions of

the Commitment Letters and to "enforce its rights under" the Commitment Letters.[488]  To the

extent that Tribune became aware of any circumstance that would make the financing unlikely to

occur in accordance with the terms of the Commitment Letters, Tribune agreed to use reasonable

best efforts to arrange financing from "alternative sources."[489]

b.      **Closing Conditions.**

Tribune's obligation to consummate the Merger was subject to the satisfaction or waiver

of certain of conditions, including the representations and warranties of the ESOP and Merger

Sub being true and correct when made and at and as of the closing date of the Merger, other than

breaches thereof as would not have an ESOP Material Adverse Effect,[490] the FCC Order not

---

[485]   *Id.* at § 5.6(a).

[486]   *Id.* at § 5.6(a)(i).

[487]   *Id.* at § 5.6(a)(ii).

[488]   *Id.* at § 5.11(a)(iv).

[489]   *Id.* at § 5.11(a).

[490]   *Id.* at § 6.2(a).  "ESOP Material Adverse Effect" was defined under the Merger Agreement as the occurrence of
an event that "would not, individually or in the aggregate, reasonably be expected to prevent or materially delay

imposing any condition on the ESOP or Tribune Entities that reasonably would be expected to have a material adverse effect on the Broadcasting Segment,[491] and receipt of an opinion from VRC, or another nationally recognized firm, as to the "solvency"[492] of Tribune after giving effect to the transactions contemplated by the Merger Agreement, including any financing and the closing of the EGI-TRB Purchase Agreement and the ESOP Purchase Agreement.[493]

The ESOP's and Merger Sub's respective obligations to consummate the Merger were subject to the satisfaction or waiver[494] of certain conditions, including the representations and warranties of Tribune under the Merger Agreement being true and correct when made and at and as of the closing date of the Merger, other than breaches thereof as would not have a Company Material Adverse Effect,[495] and Tribune having performed all of its obligations under the Merger Agreement in all material respects.[496]

The Merger Agreement also provided that the obligations of the parties to complete the Merger were subject to the satisfaction or waiver of certain mutual conditions, including, but not limited to, the following:

•    Receipt of stockholder approval;[497]

•    Issuance of the FCC Order granting the consents or approvals required under the Communications Act of 1934;[498]

---

or materially impair the ability of the ESOP or Merger Sub to consummate the Merger and the other agreements contemplated by [the Merger Agreement]."  *Id.* at § 4.1.

[491]   *Id.* at § 6.2(c).

[492]   "Solvency" was not defined in the Merger Agreement.

[493]   *Id.* at § 6.2(e).

[494]   Neither the ESOP nor Merger Sub were permitted to waive any condition to closing under the Merger Agreement without the consent of EGI-TRB.  *See id.* at § 6.3 and § 8.12.

[495]   *Id.* at § 6.3(a).

[496]   *Id.* at § 6.3(b).

[497]   *Id.* at § 6.1(a).

- The consent of Major League Baseball;[499]

- Satisfaction of all conditions to the EGI-TRB Purchase Agreement (other than the closing of the Merger);[500] and

- Receipt by Tribune of financing on the terms set forth in the Commitment Letters, or alternative financing on substantially similar terms.[501]

As Tribune noted in its Form 10-Q for the quarter ended April 1, 2007, completion of the Tender Offer was not a condition to the Merger.[502]

### c.    Termination Rights.

The Merger Agreement was subject to several termination provisions.[503]  The Merger Agreement was terminable by either party if, among other things, the Effective Time did not occur by May 31, 2008,[504] or if the Company Meeting concluded without obtaining Company Shareholder Approval.[505]  In addition, the Merger Agreement was terminable by Tribune if the EGI-TRB Purchase Agreement was not consummated by August 17, 2007,[506] and by the ESOP if, before obtaining Company Shareholder Approval, the Tribune Board changed its recommendation to Tribune's stockholders to approve the Merger.[507]

---

[498]  *Id.* at § 6.1(c).

[499]  *Id.* at § 6.1(d).

[500]  *Id.* at § 6.1(f).

[501]  *Id.* at § 6.1(g).

[502]  Ex. 55 at 19 (Tribune Form 10-Q, filed May 9, 2007).

[503]  Ex. 151 at § 7.1 (Merger Agreement).

[504]  *Id.* at § 7.1(b).

[505]  *Id.* at § 7.1(d).

[506]  *Id.* at § 7.1(i).

[507]  *Id.* at § 7.1(h).

In addition, although Tribune covenanted in the Merger Agreement that it would (a) "immediately cease any [ongoing] discussions or negotiations with any parties,"[508] and (b) not "initiate or knowingly facilitate or encourage any inquiry,"[509] in either case with respect to any alternative proposal to acquire Tribune, its assets or a material portion thereof, if Tribune did receive an unsolicited alternative proposal, the Merger Agreement was terminable by Tribune if the Tribune Board determined to accept a Superior Proposal.[510]  For the purposes of the Merger Agreement, a "Superior Proposal" meant a bona fide proposal made before the receipt of the Company Shareholder Approval on terms that the Tribune Board or the Special Committee "determines in good faith, after consultation with the Company's or the Special Committee's outside legal and financial advisors, . . . is more favorable to the Company and its shareholders" than the transactions contemplated by the Merger Agreement.[511]

As contemplated by the EGI-TRB Purchase Agreement,[512] if the Merger Agreement was terminated before consummation of the Merger, EGI-TRB and the ESOP were granted certain registration rights by Tribune with respect to their shares of Tribune Common Stock.[513]

### d.    Termination Fees.

Under certain circumstances,[514] termination of the Merger Agreement would result in the obligation of either EGI-TRB or Tribune, as applicable, to pay a termination fee in the amount of $25 million to the other party.

---

[508]    *Id.* at § 5.3(a).

[509]    *Id.*

[510]    *Id.* at § 7.1(g).

[511]    *Id.* at §§ 5.3(f) and (g).

[512]    Ex. 152 at Recitals (EGI-TRB Purchase Agreement).

[513]    *See* Report at § III.D.8.

### 4.    EGI-TRB Purchase Agreement.

On April 1, 2007, Tribune, EGI-TRB, and Samuel Zell entered into the EGI-TRB

Purchase Agreement,[515] with Mr. Zell a party to the agreement only as a guarantor of "each and

every representation, warranty, covenant and agreement of EGI-TRB and the full and timely

observance, payment, performance and discharge of its obligations" under the provisions of the

EGI-TRB Transaction Documents.[516]  Pursuant to the terms of the EGI-TRB Purchase

Agreement, Tribune agreed to sell to EGI-TRB, (a) at the EGI-TRB Purchase Agreement First

Closing, (1) 1,470,588 newly issued shares of Tribune Common Stock, for a purchase price of

$50 million,[517] and (2) the Exchangeable EGI-TRB Note, for a purchase price of $200 million,[518]

and (b) immediately following the consummation of the Merger, at the EGI-TRB Purchase

Agreement Second Closing, (1) the Initial EGI-TRB Note, for a purchase price of $225

million,[519] and (2) the Warrant, for a purchase price of $90 million.[520]

### a.    Reasonable Best Efforts.

Pursuant to the terms of the EGI-TRB Purchase Agreement, each of Tribune and EGI-

TRB covenanted to use "reasonable best efforts" to "take promptly, or cause to be taken

promptly, all actions, … and to assist and cooperate with the other parties in doing, all things

---

[514]   The payment of the termination fee under the Merger Agreement was governed by the terms of the EGI-TRB Purchase Agreement as discussed below.  *See* Ex. 151 at § 7.1 (Merger Agreement); Ex. 152 at § 8.20 (EGI-TRB Purchase Agreement).  *See also* Report at § III.D.4.d.

[515]   Ex. 152 (EGI-TRB Purchase Agreement).  The EGI-TRB Purchase Agreement was governed by Delaware law (*see* § 8.7).  With respect to the EGI-TRB Purchase Agreement, (a) EGI-TRB was represented by the law firm of Jenner & Block, LLP (Chicago, IL office), and (b) Tribune was represented by the law firms of Wachtell (New York, NY office), Sidley Austin LLP (Chicago, IL office), and Skadden Arps (Chicago, IL office).  *See id.* at § 8.10.

[516]   *Id.* at § 8.18(a).

[517]   *Id.* at § 1.1.

[518]   *Id.*; Ex. 153 (Exchangeable EGI-TRB Note).

[519]   Ex. 152 at § 1.2 (EGI-TRB Purchase Agreement).

[520]   *Id.*

necessary, proper or advisable … to consummate and make effective the Merger and the transactions contemplated" by the EGI-TRB Purchase Agreement.[521]  Among the obligations delineated, the parties agreed to use reasonable best efforts to obtain all necessary governmental approvals and consents (including the FCC Order),[522] and to obtain certain third-party consents (including the consent of Major League Baseball).[523]  In addition, Tribune covenanted to use reasonable best efforts to obtain financing for the Leveraged ESOP Transactions pursuant to the terms and conditions of the Commitment Letters.[524]

### b.    Closing Conditions.

The EGI-TRB Purchase Agreement provided that the obligation of the parties to close the EGI-TRB Purchase Agreement First Closing was subject to there being no restraining order, injunction, or other court order prohibiting the consummation of the transactions contemplated by the EGI-TRB Purchase Agreement First Closing.[525]  The obligation of Tribune to close the EGI-TRB Purchase Agreement First Closing was subject to EGI-TRB's and Mr. Zell's representations and warranties being true and correct and the fulfillment of their respective obligations under the EGI-TRB Purchase Agreement.[526]  The obligation of EGI-TRB to close the EGI-TRB Purchase Agreement First Closing was subject to the Tribune's representations and warranties under the EGI-TRB Purchase Agreement being true and correct and the fulfillment of the Tribune's obligations under the EGI-TRB Purchase Agreement, certain of the Tribune's

---

[521]  *Id.* at § 5.7(a).

[522]  *Id.* at § 5.7(a)(i).

[523]  *Id.* at § 5.7(a)(ii).

[524]  *Id.* at § 5.7(a)(v).

[525]  *Id.* at § 6.1(a).

[526]  *Id.* at §§ 6.2(a) and (b).

representations and warranties under the Merger Agreement being true and correct,[527] the Merger Agreement not having been terminated in accordance with any of its terms,[528] and the 1,470,588 newly issued shares of Tribune Common Stock and the Exchangeable EGI-TRB Note having been authorized for listing on the New York Stock Exchange.[529]

The EGI-TRB Purchase Agreement provided that the obligation of the parties to close the EGI-TRB Purchase Agreement Second Closing was subject to there being no restraining order, injunction, or other court order prohibiting the consummation of the transactions contemplated by the EGI-TRB Purchase Agreement Second Closing,[530] the Merger having been consummated,[531] and Mr. Zell having been elected Chairman of the Tribune Board.[532]

### c.    Termination Rights.

The EGI-TRB Purchase Agreement was terminable on the mutual written consent of the parties,[533] and by either party on the entry of a restraining order, injunction, or other court order prohibiting consummation of the Merger or the transactions contemplated by the EGI-TRB Purchase Agreement,[534] termination of the Merger Agreement in accordance with its terms,[535] or failure of the EGI-TRB Purchase Agreement First Closing to occur by August 17, 2007.[536]

The EGI-TRB Purchase Agreement was terminable by Tribune if EGI-TRB in any material respect breached a representation, warranty, or covenant under the EGI-TRB Purchase

---

[527] *Id.* at §§ 6.3(a) and (b).

[528] *Id.* at § 6.3(d).

[529] *Id.* at § 6.3(e).

[530] *Id.* at § 7.1(a).

[531] *Id.* at § 7.1(b).

[532] *Id.* at § 7.1(c).

[533] *Id.* at § 8.19(a).

[534] *Id.* at § 8.19(b).

[535] *Id.* at § 8.19(c).

[536] *Id.* at § 8.19(f).

Agreement,[537] and by EGI-TRB if (a) Tribune breached in any material respect a representation, warranty, or covenant under the EGI-TRB Purchase Agreement,[538] (b) the Merger failed to be consummated by May 31, 2008,[539] (c) before Company Shareholder Approval, the Tribune Board changed its recommendation,[540] (d) the Company Meeting was concluded and Company Shareholder Approval was not obtained,[541] or (e) the Tribune Board accepted a Superior Proposal.[542]

### d.    Termination Fees.

A termination fee in the amount of $25 million was payable by Tribune to EGI-TRB if Tribune materially breached any of its representations, warranties, or covenants in the EGI-TRB Purchase Agreement or the Merger Agreement, as applicable, and:

- EGI-TRB terminated the EGI-TRB Purchase Agreement as a result of such breach; or

- EGI-TRB terminated the EGI-TRB Purchase Agreement as a result of the termination of the Merger Agreement due to Tribune's breach of its representations, warranties, and covenants contained therein; or

- EGI-TRB terminated the EGI-TRB Purchase Agreement as a result of the Merger not having occurred by May 31, 2008.[543]

---

[537]  *Id.* at § 8.19(d).

[538]  *Id.* at § 8.19(e).

[539]  *Id.* at § 8.19(g).

[540]  *Id.* at § 8.19(h).

[541]  *Id.* at § 8.19(i).

[542]  *Id.* at § 8.19(j).

[543]  *Id.* at § 8.20(a).

A termination fee in the amount of $25 million also was payable by Tribune to EGI-TRB if either Tribune or EGI-TRB terminated the EGI-TRB Purchase Agreement as a result of termination of the Merger Agreement, and:

- The Merger Agreement was terminated in favor of a Superior Proposal or as a result of a change in the Tribune Board's recommendation; or

- EGI-TRB terminated the EGI-TRB Purchase Agreement as a result of the Tribune Board's acceptance of a Superior Proposal or a change in the Tribune Board's recommendation.[544]

Finally, a termination fee in the amount of $25 million was payable by Tribune to EGI-TRB if a Qualifying Transaction was disclosed before the Company Meeting and not permanently abandoned before the Company Meeting, and if Tribune then entered into such Qualifying Transaction within 12 months of termination resulting from:

- EGI-TRB or Tribune terminating the EGI-TRB Purchase Agreement as a result of termination of the Merger Agreement when the Merger Agreement was terminated due to the failure to obtain Company Shareholder Approval; or

- EGI-TRB terminating the EGI-TRB Purchase Agreement due to the failure to obtain Company Shareholder Approval.[545]

A termination fee in the amount of $25 million was payable by EGI-TRB to Tribune if EGI-TRB materially breached any of its representations, warranties, or covenants in the EGI-TRB Purchase Agreement, and:

- Tribune terminated the EGI-TRB Purchase Agreement as a result of such breach; or

---

[544] *Id.*

[545] *Id.*

• Tribune terminated the EGI-TRB Purchase Agreement as a result of termination of the Merger Agreement where the Merger Agreement had been terminated as a result of the Merger not having occurred by May 31, 2008.[546]

A termination fee in the amount of $25 million was also payable by EGI-TRB to Tribune if either EGI-TRB or Tribune terminated the EGI-TRB Purchase Agreement as a result of termination of Merger Agreement; and

• The primary factor in the termination of the Merger Agreement was failure to satisfy the financing condition thereof; and

• The failure to satisfy such financing condition was not as a result of a material breach by Tribune or the ESOP of their respective representations, warranties, or covenants under the EGI-TRB Purchase Agreement, the Merger Agreement, the Commitment Letters, or any other documents delivered in connection therewith.[547]

      **e.    The Exchangeable EGI-TRB Note, the Initial EGI-TRB Note, and the Warrant.**

      **(1)    Exchangeable EGI-TRB Note.**

The Exchangeable EGI-TRB Note was an unsecured subordinated exchangeable promissory note in the original principal amount of $200 million, which note was exchangeable at the option of Tribune, or automatically under certain circumstances, into 5,882,353 shares of Tribune Common Stock.[548]  The Exchangeable EGI-TRB Note was issued by Tribune on

---

[546]   *Id.* at § 8.20(b).

[547]   *Id.*

[548]   Ex. 153 (Exchangeable EGI-TRB Note).  The Exchangeable EGI-TRB Note was governed by Delaware law (*see* § 6(f)).

April 23, 2007 in favor of EGI-TRB pursuant to the terms of the EGI-TRB Purchase Agreement in connection with the EGI-TRB Purchase Agreement First Closing.[549]

Interest on unpaid principal on the Exchangeable EGI-TRB Note accrued at the rate of 4.81% per annum, payable in-kind on the last day of each calendar quarter beginning on June 30, 2007.[550]  Payment of all outstanding principal and interest under the Exchangeable EGI-TRB Note was to be made immediately before the consummation of the Merger.[551]  The Exchangeable EGI-TRB Note was subordinate and junior in right of payment to all obligations, indebtedness, and other liabilities of Tribune other than those that, by their express terms, ranked pari passu or junior to the obligations under the Exchangeable EGI-TRB Note.[552]  Unless and until such time as the obligations to extend credit to Tribune under such senior obligations were terminated and paid in full in cash, Tribune was prohibited from making any payment of principal, interest, or otherwise on the Exchangeable EGI-TRB Note.[553]

If Tribune failed to make any payment of principal or interest when due under the Exchangeable EGI-TRB Note, the aggregate outstanding principal balance and accrued interest would become due and payable immediately on notice from EGI-TRB.[554]  If Tribune made an assignment for the benefit of creditors, admitted in writing as to its inability to pay its debts generally as they became due, or became subject to an order adjudicating Tribune to be bankrupt,

---

[549]    Ex. 152 at § 1.1 (EGI-TRB Purchase Agreement).

[550]    Ex. 153 at § 1(a) (Exchangeable EGI-TRB Note).

[551]    *Id.* at § 1(b).

[552]    *Id.* at § 2(a).

[553]    *Id.* at § 2(a).

[554]    *Id.* at § 3(b)(i).

the aggregate outstanding principal balance and accrued interest would become immediately due and payable without notice from EGI-TRB.[555]

At the option of Tribune, all or any portion of the outstanding principal balance of the Exchangeable EGI-TRB Note was exchangeable at any time for such amount of Tribune Common Stock as was determined by dividing (a) the outstanding principal balance being exchanged by (b) $34 (subject to adjustment as described therein).[556]  In addition, immediately on termination of the Merger Agreement, all of the outstanding principal balance of the Exchangeable EGI-TRB Note was to be exchanged for such amount of Tribune Common Stock as was determined by dividing (a) the outstanding principal balance being exchanged by (b) $34 (subject to adjustment as described therein).[557]  Any such shares of Tribune Common Stock would then be subject to Tribune's obligation to register such shares in accordance with the terms of the Registration Rights Agreement.[558]

### (2)    EGI-TRB Notes.

The Initial EGI-TRB Note was issued originally by Tribune in favor of EGI-TRB on December 20, 2007 in connection with the EGI-TRB Purchase Agreement Second Closing.[559]  It

---

[555]  *Id.* at § 3(b)(ii).

[556]  *Id.* at § 4(a).

[557]  *Id.* at § 4(b).  On such exchange of the original principal balance of the Exchangeable EGI-TRB Note for Tribune Common Stock, 40% of all (a) then-accrued but unpaid interest and (b) paid-in-kind interest and accrued but unpaid interest on such paid-in-kind interest would be paid by Tribune in cash.  The remaining paid-in-kind interest would be deemed satisfied as a result of the foregoing payment, and 60% of the then-accrued but unpaid interest would be allocated as additional consideration for the exchange of the original principal balance of the Exchangeable EGI-TRB Note for Tribune Common Stock.  *Id.* at § 4.

[558]  *See* Ex. 154 at § 1 (definition of "Registrable Securities") (Registration Rights Agreement).

[559]  *See* Ex. 155 (Initial EGI-TRB Note); Ex. 152 at § 1.2 (EGI-TRB Purchase Agreement).  The EGI-TRB Notes are governed by Delaware law.  *See* Ex. 155 at § 4(f) (Initial EGI-TRB Note).

appears that Tribune thereafter issued 25 separate EGI-TRB Notes, dated December 20, 2007, in lieu of the Initial EGI-TRB Note, to EGI-TRB and various assignees of EGI-TRB.[560]

The EGI-TRB Notes are unsecured subordinated promissory notes in the aggregate original principal amount of $225 million.  Interest on unpaid principal on the EGI-TRB Notes accrues at the rate of 4.64% per annum, and is payable on the last day of each calendar quarter.[561]  To the extent that the payment of interest under the EGI-TRB Notes otherwise is prohibited, such interest is capitalized as outstanding principal under the EGI-TRB Notes.[562] Principal payments in the aggregate of $250,000 are also due on the last day of each calendar quarter, with the outstanding principal balance and all accrued but unpaid interest due on December 20, 2018.[563]

If Tribune fails to make any payment of principal or interest when due under the EGI-TRB Notes, and (a) such failure is not cured within five business days or (b) such payment is not otherwise prohibited by the EGI-TRB Subordination Agreement, the aggregate outstanding principal balance and accrued interest becomes due and payable immediately on notice from EGI-TRB.[564]  If Tribune makes an assignment for the benefit of creditors, admits in writing as to its inability to pay its debts generally as they become due, or becomes subject to an order adjudicating Tribune to be bankrupt, the aggregate outstanding principal balance and accrued interest, subject to the terms of the EGI-TRB Subordination Agreement, becomes immediately due and payable without notice from EGI-TRB.[565]

---

[560]  *See* Ex. 12 (Tribune Board Meeting Minutes, dated December 20, 2007).

[561]  *See, e.g.,* Ex. 155 at § 1(a) (Initial EGI-TRB Note).

[562]  *See, e.g., id.*

[563]  *See, e.g., id.* at § 1(b).

[564]  *See, e.g., id.* at § 3(b)(i).

[565]  *See, e.g., id.* at § 3(b)(ii).

Tribune's obligations under the EGI-TRB Notes are unsecured and subordinated pursuant to the terms of the EGI-TRB Subordination Agreement.[566]  The EGI-TRB Notes are subordinate and junior in right of payment to all obligations, indebtedness, and other liabilities of Tribune other than those that, by their express terms, rank pari passu or junior to Tribune's obligations under the EGI-TRB Notes and trade payables incurred in the ordinary course of business.[567]

### (3)    Warrant.

The Warrant is a 15-year warrant to purchase 43,478,261 shares of Tribune Common Stock (subject to anti-dilution adjustments), for a purchase price of $90 million.[568]  The Warrant had an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first ten years of the Warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment),[569] and is exercisable, in whole or in part, through December 20, 2022.[570]  The Warrant was purchased by EGI-TRB, pursuant to the terms of the EGI-TRB Purchase Agreement, for a purchase price of $90 million on December 20, 2007 in connection with the EGI-TRB Purchase Agreement Second Closing.[571]

### f.    EGI-TRB Purchase Agreement First Closing.

The EGI-TRB Purchase Agreement First Closing occurred on April 23, 2007.[572]  In connection therewith, EGI-TRB purchased (a) 1,470,588 shares of the Tribune Common Stock at $34 per share for a purchase price of approximately $50 million, and (b) the $200 million

---

[566]  *See, e.g., id.* at § 2; Ex. 156 (EGI-TRB Subordination Agreement).

[567]  Ex. 156 at § 2 (EGI-TRB Subordination Agreement).

[568]  Ex. 157 at § 1(a) and (b) (Warrant).  The Warrant is governed by Delaware law (*see* § 13).  With respect to the Warrant, Tribune was represented by Wachtell (New York, NY office), and EGI-TRB was represented by the law firm of Jenner & Block LLP (Chicago, IL office).  *See* Ex. 157 at § 16 (Warrant).

[569]  *Id.* at § 1(b).

[570]  *Id.* at § 2.

[571]  Ex. 152 at § 1.2 (EGI-TRB Purchase Agreement).

[572]  Ex. 4 at 46 (Tribune 2007 Form 10-K); Ex. 5 at 63 (Tender Offer).

Exchangeable EGI-TRB Note, for an aggregate purchase price of $250 million.  Notwithstanding

the provisions of the EGI-TRB Purchase Agreement which required Tribune to cause Mr. Zell to

be appointed to the Tribune Board effective as of the date of the EGI-TRB Purchase Agreement

First Closing,[573] Mr. Zell was appointed to the Tribune Board on May 9, 2007.[574]

> **5.    ESOP Transactions.**

> **a.    ESOP Purchase Agreement.**

On April 1, 2007, Tribune entered into the ESOP Purchase Agreement with GreatBanc

(on behalf of the ESOP).[575]  Pursuant to the terms of the ESOP Purchase Agreement, on April 1,

2007 Tribune sold 8,928,571 shares of Tribune Common Stock to the ESOP at a price of $28 per

share.[576]  GreatBanc also agreed not to tender shares in the Tender Offer.[577]  The ESOP paid for

the purchased shares with the ESOP Note, to be repaid by the ESOP over the 30-year life of the

loan through its use of annual contributions, either in cash or in the form of forgiveness, from

Tribune to the ESOP and/or through distributions paid on the shares of Tribune Common Stock

held by the ESOP.[578]

> **b.    ESOP Loan.**

On April 1, 2007, Tribune and GreatBanc (on behalf of the ESOP) entered into the ESOP

Loan Agreement.[579]  The ESOP Loan Agreement documented an extension of credit of $250

---

[573]   Ex. 152 at § 5.11 (EGI-TRB Purchase Agreement).

[574]   Ex. 4 at 46 (Tribune 2007 Form 10-K).

[575]   Ex. 158 (ESOP Purchase Agreement).  The ESOP Purchase Agreement was governed by Delaware law (*see* § 12(c)).  With respect to the ESOP Purchase Agreement, (a) Tribune was represented by the law firms of McDermott Will & Emory LLP (Chicago, IL office) and Wachtell (New York, NY office) and (b) the Trust was represented by K & L Gates (Pittsburgh, PA office).  *See* Ex. 158 at § 12(b) (ESOP Purchase Agreement).

[576]   *Id.* at § 2; Ex. 5 at 66 (Tender Offer).

[577]   Ex. 158 at 1 (ESOP Purchase Agreement).

[578]   *Id.* at § 2; Ex. 160 (ESOP Note).

[579]   Ex. 159 (ESOP Loan Agreement).  The ESOP Loan Agreement is governed by Illinois law (*see* § 7.4).  With respect to the ESOP Loan Agreement, (a) the ESOP was represented by the law firm of K & L Gates

million from Tribune to the ESOP, as evidenced by the ESOP Note, which was made to permit

the ESOP to purchase shares of Tribune Common Stock pursuant to the terms of the ESOP

Purchase Agreement.[580]  The ESOP Note was to be repaid by the ESOP to Tribune in 30 annual

installments commencing on December 31, 2007, with an annual interest rate of approximately

5%.[581]  GreatBanc (on behalf of the ESOP) also entered into the ESOP Pledge Agreement with

Tribune whereby the ESOP pledged the shares of Tribune Common Stock acquired by the ESOP

from Tribune as collateral for Tribune's extension of credit to the ESOP.[582]  The ESOP Pledge

Agreement provides that there is no recourse by Tribune with respect to the ESOP Pledge

Agreement or the ESOP Note against the ESOP, the ESOP Trust, or GreatBanc, except to the

extent of the assets of the ESOP Trust to which a creditor would properly have recourse under

Treasury Regulation Section 54.4975-7(b) (and any successor provision thereto).[583]

### c.    Duff & Phelps Fairness Opinion.

Tribune initially engaged Duff & Phelps to provide a solvency opinion to Tribune in

connection with either a spin-off of the Broadcasting Segment or the Leveraged ESOP

Transactions.[584]  Then, Tribune and the Special Committee engaged Duff & Phelps to explore

Tribune's adoption of an ESOP and such ESOP's potential participation in EGI's proposed ESOP

transaction.[585]  Shortly thereafter, GreatBanc engaged Duff & Phelps as financial advisor to the

---

(Pittsburgh, PA office), and (b) Tribune was represented by the law firm of McDermott, Will & Emery LLP (Chicago, IL office).  *See id.* at § 7.2.

[580]   Ex. 159 at §§ 2.2-2.4 (ESOP Loan Agreement).

[581]   Ex. 160 at 1 (ESOP Note).  The ESOP Note is governed by Illinois law.  Ex. 160 at 1 (ESOP Note).

[582]   Ex. 161 at § 1 (ESOP Pledge Agreement).  The ESOP Pledge Agreement is governed by Illinois law.  *Id.* at § 11.

[583]   *Id.* at § 9.

[584]   Ex. 162 (Engagement Letter between the Tribune Board and Duff & Phelps, dated February 13, 2007).

[585]   Ex. 163 (Engagement Letter among Tribune, the Special Committee, and Duff & Phelps, dated February 26, 2007).

ESOP.[586]  Tribune and the ESOP agreed that if a solvency opinion was required, Duff & Phelps

would render the solvency opinion directly to the ESOP, and the Tribune Board would be given

the right to rely on the opinion.[587]

On March 29, 2007, Duff & Phelps delivered a preliminary report to the ESOP

Committee of GreatBanc.[588]  During the course of the meeting, Duff & Phelps reviewed the

terms of the Leveraged ESOP Transactions, noting that "[i]n the event the Merger Agreement is

not consummated, the ESOP retains the ESOP Shares and the Company continues to be publicly-

traded."[589]  Reiterating that its views remained preliminary, Duff & Phelps indicated that "in its

opinion, on a post-transaction basis, taking into account the S corporation tax shield, the fair

salable value of the Company's assets is greater than its liabilities."[590]  Duff & Phelps cautioned

that it was "able to issue its financing opinion because of the anticipated benefits of the S

corporation tax shield.  If those tax benefits [were] not considered, [Duff & Phelps] would be

unable to render its opinion."[591]

The ESOP again revised the terms of Duff & Phelps' engagement, this time providing for

Duff & Phelps to deliver the ESOP with an opinion as to "the financial viability of the Company,

as a going concern, and on a going-forward basis," following the close of the Leveraged ESOP

Transactions.[592]  Duff & Phelps specifically disclaimed that it would be opining as to Tribune's

solvency.[593]

---

[586]  Ex. 164 (Engagement Letter between GreatBanc and Duff & Phelps, dated March 8, 2007).

[587]  *Id.*

[588]  Ex. 165 (ESOP Committee Meeting Minutes, dated March 29, 2007).

[589]  *Id.* at 2.

[590]  *Id.* at 9.

[591]  *Id.*

[592]  Ex. 166 at 1 (Engagement Letter between GreatBanc and Duff & Phelps, dated March 31, 2007).

[593]  *Id.*

As a condition to closing under the ESOP Purchase Agreement,[594] on April 1, 2007 the

ESOP received a fairness opinion from Duff & Phelps concluding that:[595]

> (i) the price of $28.00 per share, or an aggregate amount of $250
> million, to be paid by the ESOP for shares of the Company's
> common stock is not greater than fair market value (as such term is
> used in determining "adequate consideration" pursuant to
> Section 3(18) of the Employee Retirement Income Security Act of
> 1974, as amended); (ii) the interest rate of 5.01% per annum on the
> ESOP Note does not exceed a reasonable rate of interest; (iii) the
> financial terms of the ESOP Note are at least as favorable to the
> ESOP as would be the terms of a comparable loan resulting from
> negotiations between independent parties; and (iv) the terms and
> conditions of the [Leveraged ESOP Transactions] are fair and
> reasonable to the ESOP from a financial point of view.

### d.    Closing of ESOP Transactions.

On April 1, 2007, Tribune sold 8,928,571 shares of Tribune Common Stock to the ESOP

in exchange for the ESOP Note.[596]  On that date, Duff & Phelps delivered its fairness opinion to

GreatBanc, consistent with the provisions of the ESOP Purchase Agreement.[597]

### 6.    Investor Rights Agreement.

On April 1, 2007, Tribune entered into the Investor Rights Agreement with EGI-TRB and

GreatBanc (on behalf of the ESOP).[598]  Each stockholder that was a party to the Investor Rights

Agreement agreed to vote its shares following the Merger such that (a) the initial directors on the

Tribune Board following the Merger would serve until the third annual election following the

consummation of the Merger, (b) there would be two directors designated by EGI-TRB, and

---

[594]  Ex. 158 at § 5(g) (ESOP Purchase Agreement).

[595]  Although Duff & Phelps did review Tribune management's and EGI's financial projections in connection with
delivering its opinion, it did not opine as to Tribune's financial viability.  Ex. 167 at 7 (Duff & Phelps Opinion,
dated April 1, 2007).

[596]  Ex. 168 at 7-8 (Tribune Form 8-K, filed April 5, 2007 (without exhibits)).

[597]  Ex. 167 (Duff & Phelps Opinion, dated April 1, 2007); Ex. 158 at § 5(g) (ESOP Purchase Agreement).

[598]  Ex. 169 (Investor Rights Agreement).  The Investor Rights Agreement is governed by Delaware law.  *Id.* at
§ 10.13.

(c) there would be one director who would be the chief executive officer of Tribune, with the Tribune Board to be comprised of nine members.[599]  The Investor Rights Agreement also contains provisions governing the transfer of the shares of Tribune Common Stock held by EGI-TRB and the ESOP, preemptive rights granted to the EGI-TRB and the ESOP by Tribune, and specified actions requiring the approval of a majority of the entire Tribune Board, including a majority of the independent directors and one designee of EGI-TRB.[600]

### 7.    Voting Agreement.

On April 1, 2007, Tribune entered into the Voting Agreement with the Chandler Trusts, pursuant to which the Chandler Trusts committed to vote all of the shares of Tribune Common Stock they beneficially owned in favor of the Merger Agreement, whether or not recommended by the Tribune Board, and against any competing transaction, against any other agreement or action that was intended or would reasonably be expected to prevent, impede, or, in any material respect, interfere with, delay, postpone, or discourage the transactions contemplated by the Merger Agreement, and against any action, agreement, transaction, or proposal that would result in a breach of any representation, warranty, covenant, agreement, or other obligation of Tribune in the Merger Agreement, the ESOP Purchase Agreement, or the EGI-TRB Purchase Agreement.[601]  Because the Chandler Trusts had sold all of their shares of Tribune Common Stock in advance of the Company Meeting,[602] the Chandler Trusts ultimately did not vote on the Merger Agreement.

---

[599]   *Id.* at § 2.1.

[600]   *Id.* at §§ 3-10.

[601]   Ex. 170 at § 1.1 (Voting Agreement).  The Voting Agreement was governed by Delaware law.  *Id.* at § 6.10.

[602]   Ex. 171 at 9-10 (Chandler Trusts Schedule 13D).

### 8.    Registration Rights Agreements.

On April 1, 2007, Tribune entered into the Registration Rights Agreement with EGI-TRB and GreatBanc (on behalf of the ESOP), pursuant to which Tribune granted to EGI-TRB and the ESOP certain demand and piggyback registration rights for the registration and sale of shares of Tribune Common Stock held by EGI-TRB or the ESOP, respectively, in the event that the Merger Agreement was terminated before consummation of the Merger.[603]  The Registration Rights Agreement covered shares of Tribune Common Stock held by EGI-TRB and the ESOP pursuant to the EGI-TRB Purchase Agreement, the Exchangeable EGI-TRB Note, and the ESOP Purchase Agreement.[604]

On termination of the Merger Agreement before consummation of the Merger, each of EGI-TRB and the ESOP had the right, pursuant to the terms of the Registration Rights Agreement, to cause Tribune to register its shares of Tribune Common Stock for sale in the public markets three times.[605]  EGI-TRB was not permitted, however, to exercise this right until the third anniversary of the closing of the Step One Purchase Transaction, and the ESOP was not permitted to exercise this right until the first anniversary of the execution of the Registration Rights Agreement.[606]  In addition, following the third anniversary of the closing of the Step One Purchase Transaction, with respect EGI-TRB, and following the first anniversary of the execution of the Registration Rights Agreement, with respect to the ESOP, Tribune covenanted to use, on the request of EGI-TRB and the ESOP, respectively, reasonable best efforts to include the shares of Tribune Common Stock owned by such party in any registration statement (other

---

[603]    Ex. 154 (Registration Rights Agreement).  The Registration Rights Agreement was governed by Illinois law. *Id.* at § 12(f).

[604]    *Id.* at § 1 (definition of "Registrable Securities").

[605]    *Id.* at § 2(a).

[606]    *Id.*

than registrations on Form S-4 and Form S-8) filed by Tribune for the sale of Tribune Common Stock in the public markets.[607]

Under the Registration Rights Agreement, EGI-TRB covenanted not to transfer any of its shares of Tribune Common Stock or the Exchangeable EGI-TRB Note until the third anniversary of the closing of the Step One Purchase Transaction, other than to an affiliate of EGI-TRB, Mr. Zell, or Mr. Zell's family, in each instance provided that such transferee agreed to be bound by the terms of the Registration Rights Agreement.[608]  The Registration Rights Agreement terminated on consummation of the Merger.[609]

On April 1, 2007, Tribune entered into the Chandler Trusts Registration Rights Agreement with the Chandler Trusts pursuant to which Tribune granted to the Chandler Trusts certain shelf registration rights for the registration and sale of Tribune Common Stock that the Chandler Trusts then owned.[610]  On June 4, 2007, the Chandler Trusts exercised their rights under the Chandler Trusts Registration Rights Agreement to sell all of their remaining shares of Tribune Common Stock through a block trade underwritten by Goldman Sachs.[611]

## 9.    The Step One and Step Two Commitment Letters.

### a.    The Step One Commitment Letter.

On April 1, 2007, Tribune entered into a commitment letter, which was amended and restated on April 5, 2007, with JPMorgan, JPMCB, MLCC, CGMI (on behalf of the Citigroup

---

[607]  *Id.* at § 2(b).

[608]  *Id.* at § 2(e).

[609]  *Id.* at § 12(i).

[610]  Ex. 172 (Chandler Trusts Registration Rights Agreement).  The Chandler Trusts Registration Rights Agreement was governed by Delaware law (*see* § 9(g)).  With respect to the Chandler Trusts Registration Rights Agreement, (a) Tribune was represented by the law firms of Wachtell (New York, NY office) and Sidley Austin LLP (Chicago, IL office), and (b) the Chandler Trusts were represented by the law firm of Gibson, Dunn & Crutcher LLP (Los Angeles, CA office).  *See id.* at § 9(c).

[611]  Ex. 10 at Exhibit 1.1 (Tribune Form 8-K, filed June 5, 2007); Ex. 4 at 46 (Tribune 2007 Form 10-K).  *See* Report at § III.F.3.

Entities), Bank of America, and BAS for the Step One Financing.[612]  Pursuant to the Step One

Commitment Letter, each of JPMCB and MLCC, severally and not jointly, agreed to provide

30% of the Step One Financing; the Citigroup Entities, severally and not jointly, agreed to

provide 25% of the Step One Financing; and Bank of America, severally and not jointly, agreed

to provide 15% of the Step One Financing.[613]  The aggregate commitment for the Step One

Financing was $8.028 billion.[614]  The Step One Commitment Letter stated that the Step One

Financing would be used by Tribune in connection with the consummation of the Tender Offer,

to refinance certain existing indebtedness of Tribune, for general corporate purposes, and to pay

fees and expenses related to the Step One Transactions.[615]

The obligations of JPMCB, MLCC, the Citigroup Entities, and Bank of America under

the Step One Commitment Letter were conditioned on:

• The negotiation, execution, and delivery of definitive documents, in

customary form, reflecting the terms and conditions set forth in the Step One Commitment

Letter;[616]

• There having been no offerings or issuances of or discussions regarding

the offering or issuance of any indebtedness by the Tribune Entities (including any refinancing of

existing indebtedness) from the date of the Step One Commitment Letter through the successful

syndication of the Step One Financing, other than the indebtedness contemplated by the Step

---

[612]  Ex. 944 (Step One Commitment Letter).  The Step One Commitment Letter was governed by New York law (*see* § 11).  With respect to the Step One Commitment Letter, (a) Tribune was represented by the law firm of Sidley Austin LLP (Chicago, IL office) and (b) the Lead Banks were represented by the law firm of Cahill Gordon & Reindel LLP (New York office).  *See id.* at § 14 (Step One Commitment Letter).

[613]  *Id.* at 2-3.

[614]  *Id.* at 2.

[615]  *Id.* at 2.

[616]  *Id.* at 2 and 4.

One Commitment Letter and the Step Two Commitment Letter and amendments to extend the maturity of the 2006 Bridge Credit Agreement;[617]

> • The absence of any Company Material Adverse Effect, except as contemplated, required or permitted by the Merger Agreement, the EGI-TRB Purchase Agreement or the ESOP Purchase Agreement, during the period from December 31, 2006 through April 5, 2007;[618] and

> • The absence of any Company Material Adverse Effect during the period following April 5, 2007.[619]

The Step One Commitment Letter also listed certain conditions to the initial borrowing under the Step One Financing.[620]  Because the execution and delivery of the Credit Agreement on May 17, 2007 terminated the commitments under the Step One Commitment Letter,[621] the conditions to the initial borrowing under the Step One Financing as set forth in the Credit Agreement are discussed below.[622]

---

[617]  *Id.* at 4-5.

[618]  *Id.* at 5.  The definition of Company Material Adverse Effect carved out changes in general economic conditions or the industries in which Tribune and its Subsidiaries operated to the extent that such changed did not disproportionately affect Tribune and its Subsidiaries and changes resulting from the announcement and pendency of the Merger or the compliance with the terms of the Merger Agreement.

[619]  *Id.*

[620]  *Id.* at Annex II.

[621]  *Id.* at 9.

[622]  *See* Report at § III.D.10.b.  One of the conditions to the initial borrowing under the Step One Financing set forth on Annex II to the Step One Commitment Letter was the consummation of the transactions that occurred at the EGI-TRB Purchase Agreement First Closing, including the purchase of the Exchangeable EGI-TRB Note. Ex. 944 at Annex II (Step One Commitment Letter).  Because the EGI-TRB Purchase Agreement First Closing occurred on April 23, 2007, before the execution of the Credit Agreement on May 17, 2007, this condition to closing was not included in the Credit Agreement.

Completion of the syndication of the Step One Financing was not a condition to the commitments of JPMCB, MLCC, the Citigroup Entities, and Bank of America under the Step One Commitment Letter.[623]

### b.    The Step Two Commitment Letter.

On April 1, 2007, Tribune also entered into a second commitment letter, which was amended and restated on April 5, 2007, with JPMorgan, JPMCB, MLCC, CGMI (on behalf of the Citigroup Entities), Bank of America, Banc of America Bridge, and BAS for the Step Two Financing.[624]  Pursuant to the Step Two Commitment Letter, each of JPMCB and MLCC, severally and not jointly, agreed to provide 30% of the Step Two Financing; the Citigroup Entities, severally and not jointly, agreed to provide 25% of the Step Two Financing; Bank of America, severally and not jointly, agreed to provide 15% of the Incremental Credit Agreement Facility, and Banc of America Bridge, severally and not jointly, agreed to provide 15% of the Bridge Facility.[625]  The aggregate commitments for the Step Two Financing were $2.105 billion under the Incremental Credit Agreement Facility and $2.1 billion under the Bridge Facility.[626] The Step Two Commitment Letter stated that the Step Two Financing would be used by Tribune in connection with the consummation of the Merger and to pay fees and expenses related to the Step Two Transactions.[627]

---

[623]    Ex. 944 at 4 (Step One Commitment Letter).

[624]    Ex. 1010 (Step Two Commitment Letter).  The Step Two Commitment Letter was governed by New York law (*see* § 11).  Under the Step Two Commitment Letter, (a) Tribune was represented by the law firm of Sidley Austin LLP (Chicago, IL office) and (b) the Lead Banks were represented by the law firm of Cahill Cordon & Reindel LLP (New York, NY office).  *See id.* at § 14.

[625]    *Id.* at 3.

[626]    *Id.* at 2.  The amount of the Bridge Facility was later reduced to $1.6 billion.  *See* Ex. 175 at § 1.01 (definition of "Commitment") (Bridge Credit Agreement).

[627]    Ex. 1010 at 2 (Step Two Commitment Letter).

The obligations of JPMCB, MLCC, the Citigroup Entities, Bank of America, and Banc of America Bridge under the Step Two Commitment Letter were conditioned on:

•      The negotiation, execution, and delivery of definitive documents, in customary form, reflecting the terms and conditions set forth in the Step Two Commitment Letter;[628]

•      There having been no offerings or issuances of or discussions regarding the offering or issuance of any indebtedness by the Tribune Entities (including any refinancing of existing indebtedness) from the date of the Step Two Commitment Letter through the successful syndication of the Step Two Financing, other than the indebtedness contemplated by the Step Two Commitment Letter, the Exchangeable EGI-TRB Note, the EGI-TRB Notes, and any senior notes offered or sold in connection with the Step One Transactions or the Step Two Transactions;[629]

•      The absence of any Company Material Adverse Effect, except as contemplated, required or permitted by the Merger Agreement, the EGI-TRB Purchase Agreement, or the ESOP Purchase Agreement, during the period from December 31, 2006 through April 5, 2007;[630] and

•      The absence of any Company Material Adverse Effect during the period following April 5, 2007.[631]

---

[628]   *Id.* at 3 and 5.

[629]   *Id.* at 5.

[630]   *Id.*  The definition of Company Material Adverse Effect carved out changes in general economic conditions or the industries in which Tribune and its Subsidiaries operated to the extent that such change did not disproportionately affect Tribune and its Subsidiaries and changes resulting from the announcement and pendency of the Merger or the compliance with the terms of the Merger Agreement.

[631]   *Id.*

Completion of the syndication of the Step Two Financing was not a condition to the commitments of JPMCB, MLCC, the Citigroup Entities, Bank of America, and Banc of America Bridge under the Step Two Commitment Letter.[632]

The Step Two Commitment Letter also listed certain conditions to the initial borrowing under the Step Two Financing, including:

• The accuracy of the representations and warranties in the Merger Agreement that were material to the interests of the lenders of the Step Two Financing, to the extent that the Merger Sub had the right to terminate the Merger Agreement as a result of the breach thereof, and representations and warranties respecting corporate status, power, authority, due execution, enforceability, margin regulations, and the Investment Company Act;[633]

• Delivery of financial statements, including a balance sheet on a pro forma basis giving effect to the Step Two Transactions;[634]

• Delivery of opinions of counsel and customary closing certificates;[635]

• Consummation of the Merger;[636]

• Consummation of the Step One Transactions;[637]

• Compliance with the Total Guaranteed Leverage Ratio test on a pro forma basis giving effect to the Step Two Transactions;[638] and

---

[632] *Id.*

[633] *Id.* at 3.

[634] *Id.* at Annex II.

[635] *Id.* Delivery of a solvency certificate was not expressly required by Annex II to the Step Two Commitment Letter, but the term sheet for the Incremental Credit Agreement Facility attached as Exhibit A to the Step Two Commitment Letter listed delivery of a solvency certificate as a condition to effectiveness. *Id.* at A-1-2. *See* Report at §§ III.D.10.c. and III.G.3.c. for a discussion of the solvency representations and warranties in the Credit Agreement and the Bridge Credit Agreement.

[636] *Id.* at Annex II.

[637] *Id.*

[638] *Id.*

- The purchase of the Initial EGI-TRB Note and the Warrant.[639]

The Step Two Commitment Letter terminated on the earliest to occur of (a) May 31, 2008, if the Step Two Financing Documents had not been executed and delivered, (b) the date the Step Two Financing Documents were executed and delivered, (c) if earlier than the date of execution of the Step Two Financing Documents, the date of termination of the Merger Agreement, and (d) August 17, 2007, if the Credit Agreement had not been executed and delivered.[640]

### c.    "Market Flex" Provisions of Step Two Financing.

On April 1, 2007, Tribune entered into a fee letter regarding the Step Two Financing, which was amended and restated on April 5, 2007.  Pursuant to the terms of the Step Two Fee Letter, executed by MLCC, CGMI, JPMorgan, JPMCB, Bank of America, Banc of America Bridge, and BAS, as arrangers and initial lenders, and Tribune, the Lead Banks had the right to change certain terms of the Incremental Credit Agreement Facility and the Bridge Facility if the Lead Banks reasonably believed that the changes were necessary to achieve a successful syndication of such facilities.[641]  The Lead Banks could make the following "market flex" changes without the consent of, but in consultation with, Tribune:[642]

- Increase the applicable interest rate margins for the Incremental Credit Agreement Facility by up to 50 basis points (which may also have been achieved through an original issue discount or a combination of an increase in the interest rate margins and original issue discount).

---

[639]    *Id.*

[640]    *Id.* at 9.

[641]    Ex. 176 at § 3 (Step Two Fee Letter).

[642]    *Id.*

•     Reallocate up to $1.4 billion of the Incremental Credit Agreement Facility to the Bridge Facility (but any such reallocation would not increase the weighted average fee obligation of Tribune).

•     Provide that any senior notes that could have been issued in lieu of the Bridge Facility be secured on a second lien basis with the Credit Agreement Debt.

The Lead Banks' right to make the foregoing "market flex" changes survived the execution of the documents effecting the Incremental Credit Agreement Facility and the Bridge Facility until the earlier of (a) the date that the Lead Banks' exposure under the Incremental Credit Agreement Facility was $0 and (b) 45 days after the Step Two Financing Closing Date.[643]

As discussed below, the Lead Banks had difficulty syndicating the Step Two Financing, due in part to the interest rate.[644]  Tribune and the Lead Banks ultimately agreed to certain changes to the Step Two Financing, and, on November 21, 2007, Tribune and the Lead Banks entered into a side letter agreeing that, if Tribune borrowed no more than $1.6 billion under the Bridge Facility, (a) the Lead Banks would waive their right under the Step Two Fee Letter to reallocate up to $1.4 billion of the Incremental Credit Agreement Facility to the Bridge Facility and (b) cash interest on the Bridge Facility would be capped at 14.5% per annum with an additional 0.75% per annum of interest to be paid-in-kind or through original issue discount.[645]

---

[643]   *Id.*

[644]   *See* Report at § III.H.4.  The interest rate on the Bridge Facility, as contemplated by the Step Two Commitment Letter, would have been 9.85%.

[645]   Ex. 177 (Flex Side Letter).  The Bridge Credit Agreement provides for paid-in-kind interest, not original issue discount.  *See* Report at § III.G.3.b.

10.     **The Step One Financing.**

a.     **Syndication of the Step One Financing.**

The Step One Financing was syndicated by the Lead Banks pursuant to a confidential

information memorandum dated April 2007.[646]  The confidential information memorandum

described a transaction that would result in "the Company going private and Tribune

shareholders receiving $34 per share" with the transaction to be "completed in two stages."[647]

The confidential information memorandum described the two stages as follows:[648]

> The first stage . . . of the [Leveraged ESOP Transactions] is a cash
> tender offer for approximately 126 million shares at $34 per share.
> The tender offer will be funded by incremental borrowings and a
> $250 million investment from [EGI-TRB], which occurred on
> April 23, 2007.  The tender will settle concurrently with the
> funding of the [Step One Financing], which is currently expected
> to take place in late May.  The second stage . . . is a merger, which
> is currently expected to close in the fourth quarter of 2007, in
> which the remaining publicly-held shares will receive $34 per
> share. . . .  Zell will make an additional investment of $65 million
> in connection with the merger, bringing Zell's total investment in
> Tribune to $315 million.  The board of directors of Tribune, on the
> recommendation of the Special Committee, has approved the
> agreements and will recommend Tribune shareholder approval of
> the merger.  The Chandler Trusts, Tribune's largest shareholder,
> have agreed to vote in favor of the merger.

Additionally, the confidential information memorandum set forth "Shareholder and other

necessary approvals" required to consummate the Merger:[649]

> The Merger is subject to a number of conditions including
> shareholder, HSR, [FCC], and Major League Baseball . . .
> approvals, compliance with certain covenants, no material adverse
> change in Tribune's business, and the delivery of a solvency

---

[646]  Ex. 178 (Step One Confidential Information Memorandum).  Ultimately, under the Credit Agreement MLCC
was the Syndication Agent, and JPMorgan, MLPFS, CGMI, and BAS were the Joint Lead Arrangers and Joint
Bookrunners.  Ex. 179 at Preamble (Credit Agreement).

[647]  Ex. 178 at 19 (Step One Confidential Information Memorandum).

[648]  *Id.* at 45.

[649]  *Id.* at 47.

opinion.  On April 20, 2007, early termination of the HSR waiting
period was granted.  Shareholder approval is currently expected to
take place in the third quarter of 2007, while the FCC approval is
currently expected in late 2007.

As set forth in the confidential information memorandum, the Step One Financing

consisted of the Revolving Credit Facility, the Tranche B Facility (in the amount of $7.015

billion),[650] and the Delayed Draw Facility,[651] and the Step Two Financing consisted of the Bridge

Facility (in the amount of $2.1 billion[652]) and the Incremental Credit Agreement Facility.[653]  The

Step One Financing and the Step Two Financing were to be "marketed concurrently."[654]

The confidential information memorandum set forth the estimated sources and uses of

funds for, and the pro forma capitalization of Tribune following, Step One and Step Two.[655]  The

Lead Banks estimated that $4.288 billion of the Step One Debt would be used to pay for the

Tender Offer, $2.825 billion would be used to refinance existing debt, and $152 million would

be used to pay Step One transaction and financing fees.[656]  The Lead Banks estimated that

$4.261 billion of the Step Two Debt would be used to consummate the Merger, $200 million

would be used to redeem the EGI-TRB Exchangeable Note, $50 million would be used to

repurchase shares of Tribune Common Stock owned by EGI-TRB, and $120 million would be

used to pay Step Two financing and other fees.[657]

---

[650]  This amount was reduced to $5.515 billion in the Credit Agreement when the $1.5 billion Tranche X
Facility was added (Ex. 179 at § 1.01 (definition of "Tranche X Facility") (Credit Agreement)).

[651]  Ex. 178 at 27 (Step One Confidential Information Memorandum).

[652]  This was amount was reduced to $1.6 billion in the Bridge Facility.  *See* Ex. 175 at § 1.01 (Bridge Credit
Agreement) (definition of "Commitment").

[653]  Ex. 178 at 28 (Step One Confidential Information Memorandum).

[654]  *Id.*

[655]  *Id.* at 23 and 25.

[656]  *Id.* at 23.

[657]  *Id.* at 25.

On April 26, 2007, a syndication meeting was held at which Mr. Zell and Mr. FitzSimons, among others, addressed potential lenders and answered questions.[658]  At the meeting, Mr. Zell was quoted as saying that although the Leveraged ESOP Transactions appeared to be very highly leveraged:[659]

> [t]his is the only [leveraged transaction] I've ever seen where the value of the assets is measurably greater than the amount of leverage that we intend to put on it.  I believe that this company, if we were to "liquidate" it tomorrow morning, the gross assets in place are significantly greater than the amount of debt that we envision putting on it.

With respect to anticipated cost savings resulting from the Leveraged ESOP Transactions, Mr. Zell said that "[o]bviously a focus on costs is important, but I promise you it's not possible to grow this business by just cutting costs.  We have to generate revenue.  We have to make our product much more relevant. . . ."[660]

As for selling assets, Mr. Zell said that:[661]

> we've undertaken this investment with the assumption that we would sell the Cubs and that we would sell the Comcast Sports interest.  Other than those two assets in the media area, I don't think we have any plans to sell any of the other assets.  Keep in mind that that zero basis which in effect creates a huge tax liability today, ten years from now has no tax liability because we will step up the basis, so it's very, very much in our interests to keep all of these assets through that ten year period.  There's a real incentive to us to do so and that's our intention.

Mr. Zell also addressed the issue of the likelihood of the Step Two Transactions not closing, saying: "you know, shit happens, OK?  So anything is possible, but obviously you could get a delay at the FCC.  I think that frankly is probably the only scenario that could impact the

---

[658]  Ex. 180 (Transcript of Lenders Meeting, dated April 26, 2007); Ex. 181 (Lenders' Presentation, dated April 26, 2007).

[659]  Ex. 180 at 8 (Transcript of Lenders Meeting, dated April 26, 2007).

[660]  *Id.* at 11.

[661]  *Id.* at 63.

phase two part of this transaction."[662]  Addressing the rationale for the overall structure of the

Leveraged ESOP Transactions, Mr. Zell said that:[663]

> Obviously the goal, with reference to the first step, was to have the
> same impact as a leverage[d] recap while we're waiting for the
> FCC approval and that's frankly a way to reward our shareholders
> for suffering through the last seven or eight months of process and
> obviously to improve their overall yield on a present basis.

Mr. FitzSimons also addressed the leverage issue at the meeting.  He was quoted as

saying:  "[w]e've got strong free cash flow to pay down the debt which I know is important to

everyone in this room."[664]  As to anticipated cost savings, Mr. FitzSimons said, "[w]e also will

look to accelerate cost reductions in the business, reengineering our business processes, taking

advantage of our economies of scale, and this year we'll look to reduce total expenses by one

percent,"[665] noting that:[666]

> We've also added in the cash savings by eliminating the 401K
> contributions that was $60 million we projected for this year was
> actually $70 million last year, so we won't have that cash expense,
> and then from being a private company we'll be making further
> staffing reductions in our corporate [inaudible] staffs since we will
> be private and we won't have listing fees and that sort of thing.

Donald Grenesko, Tribune's Senior Vice President/Finance and Administration, also

addressed the issue of cost reductions:[667]

> [W]e're showing a three percent projected decline in 2007's
> consolidated operating cash flow to a billion two hundred seventy
> million, but that's still very strong cash flow numbers.
> Nevertheless, given the softness that we've seen through the first
> four months we've implemented contingency planning to offset

---

[662] *Id.* at 56.

[663] *Id.* at 74.

[664] *Id.* at 56.

[665] *Id.* at 18.

[666] *Id.* at 73.

[667] *Id.* at 34.

possible revenue declines.  We're looking at additional cost reductions, mostly staffing, that will save us another ten to 15 million dollars.  We're going to reduce our 401K contribution, which will save an additional 15 to 25 million dollars . . . [s]o, in total, we're looking at $35 million to $50 million in savings on top of the $150 million of cost reductions that we've already announced.

In response to a question from a participant at the meeting regarding Tribune Entities' first quarter results relative to projected 2007 EBITDA, Mr. FitzSimons said:[668]

Yes, in terms of the $1 billion 270 million of cash flow that we're projecting for 2007, as we've indicated, the first half of the year is really going to be a challenge for us and, you know, we recognize that from the start, but again we think that things should turn around in the second half of the year with the easier comps and some of the things that I had mentioned.  Also I had mentioned this contingency planning where we expect to have potential savings of $35 million to $50 million on top of everything else that we had announced up to this point in time, so that $50 million would help us to the extent of another one or two percent decline in publishing's advertising revenues.

As discussed below,[669] additional meetings were held on September 26, 2007 and October 1, 2007 during which time Tribune discussed updates to its projections and model.[670]

### b.  Terms of the Step One Financing.

On May 17, 2007, Tribune entered into an $8.028 billion senior secured credit agreement with JPMCB, as administrative agent, MLCC, as syndication agent, Citicorp, Bank of America and Barclays as co-documentation agents, and the initial lenders named therein.[671]  The Credit Agreement consists of the following facilities:  (a) a $1.5 billion Tranche X Facility, (b) a $5.515

---

[668]  *Id.* at 69-70.

[669]  *See* Report at § III.F.6.

[670]  Ex. 182 (Bank Due Diligence Teleconference Call Agenda and Schedules, dated September 26, 2007); Ex. 183 (Tribune Company Underwriters Due Diligence Agenda, dated October 1, 2007); Ex. 184 (Tribune Publishing Presentation); Ex. 185 (Tribune Broadcasting Presentation).

[671]  Ex. 179 (Credit Agreement).  The Credit Agreement is governed by New York law (*see* § 8.09).  With respect to the Credit Agreement, Tribune was represented by the law firm of Sidley Austin LLP (Chicago, IL office) (*see* § 8.02).

billion Tranche B Facility, (c) a $263 million Delayed Draw Facility, and (d) a $750 million

Revolving Credit Facility, which includes a letter of credit subfacility in an amount up to $250

million and a swing line facility in an amount up to $100 million.[672]  Once drawn, advances

under the Delayed Draw Facility became part of the Tranche B Facility and were accorded the

same treatment as the Tranche B Facility.[673]  The Credit Agreement also provided a commitment

for an additional $2.105 billion in new incremental term loans under the Incremental Credit

Agreement Facility.[674]  The terms of the Incremental Credit Agreement Facility are discussed

below.[675]

   Advances under the Credit Agreement bear interest at a rate based on either the "Base

Rate" (the higher of JPMCB's corporate base rate and the overnight federal funds rate plus 0.5%)

or the "Eurodollar Rate" (LIBOR) plus the applicable margin for the tranche of loan.[676]  The

applicable margins are set forth below:[677]

| Type of Loan | Before the Step Two Closing | | On and after the Step Two Closing | |
|---|---|---|---|---|
| | Eurodollar Advances | Base Rate Advances | Eurodollar Advances | Base Rate Advances |
| Tranche X Facility | 2.50% | 1.50% | 2.75% | 1.75% |
| Tranche B Facility | 3.00% | 2.00% | 3.00% | 2.00% |

---

[672]  *Id.* at § 2.01.

[673]  *Id.* at § 1.01 ("Tranche B Advance" definition).

[674]  *Id.* at § 2.17.

[675]  *See* Report at § III.D.11.

[676]  Ex. 179 at § 2.07 (Credit Agreement).

[677]  *Id.* at § 1.01 ("Applicable Margin" definition).

| | Before delivery of financial statements for the first full quarter commencing after the Step One Financing Closing Date | | Following delivery of financial statements for the first full quarter commencing after the Step One Financing Closing Date | |
|---|---|---|---|---|
| Revolving Credit Facility | 3.00% | 2.00% | 3.00%, 2.50% or 2.00%, based on the Total Guaranteed Leverage Ratio | 2.00%, 1.50% or 1.00%, based on the Total Guaranteed Leverage Ratio |

The applicable margins for the Tranche X Facility and the Tranche B Facility were subject to reduction by 25 basis points in the event that the Merger Agreement was terminated before consummation of the Merger and the corporate credit ratings for Tribune were B1 or better by Moody's and B+ or better by Standard & Poor's (in each case with a stable outlook).[678]  Interest under the 2006 Credit Agreement is similarly calculated as "Base Rate" or "Eurodollar Rate" plus an applicable margin, but the applicable margins under the Credit Agreement are significantly higher.[679]  As of December 30, 2007, the interest rate on the Tranche X Facility was 7.99% and the interest rate on the Tranche B Facility was 7.91%[680]

The Tranche X Facility had a maturity date of June 4, 2009,[681] the Tranche B Facility matures on June 4, 2014[682] and the Revolving Credit Facility matures on June 4, 2013.[683] Pursuant to the terms of the Credit Agreement, the proceeds of the Tranche X Facility and the initial draw under the Tranche B Facility were used to finance a portion of the Step One Transactions and to pay fees and expenses related thereto.[684]  The proceeds of the Delayed Draw Facility were to be used to repay the obligations under the 6.35% Series E Medium-Term Notes

---

[678]  *Id.*

[679]  *See* Report at § III.B.3.b.

[680]  Ex. 4 at 51 (Tribune 2007 Form 10-K).

[681]  Ex. 179 at § 2.06(d) (Credit Agreement).

[682]  *Id.* at § 2.06(b).

[683]  *Id.* at § 2.06(a).

[684]  *Id.* at § 5.01(j)(i).

due 2008, the 5.50% Series E Medium-Term Notes due 2008, and the 5.67% Series E Medium-Term Notes due 2008 as each matured.[685]  The proceeds of the Revolving Credit Facility are to be used for working capital and general corporate purposes.[686]

An amortization payment of $750 million on the Tranche X Facility was due on December 4, 2008.[687]  Quarterly amortization payments are required to be made on the Tranche B Facility in the amount of $13.7875 million ($14.445 million following the date on which the first advance was made under the Delayed Draw Facility) starting on September 30, 2007.[688]  In the event that Tribune or any of its Subsidiaries incurs any indebtedness for borrowed money (subject to certain exceptions), generates excess cash flow for any fiscal year, sells assets or issues equity with an aggregate fair market value in excess of $10 million (subject to certain exceptions), or receives insurance proceeds or condemnation awards in excess of $10 million, Tribune is obligated to prepay the Credit Agreement Debt in an amount equal to the net cash proceeds thereof or, in the case of excess cash flow, 50% or 25% of such excess cash flow (based on the Total Guaranteed Leverage Ratio at such time).[689]  Any mandatory prepayments under the Credit Agreement are applied first to the Tranche X Facility (in forward order of maturity), second to the Tranche B Facility (on a pro rata basis among the subsequent scheduled amortization payments, unless Tribune elects to apply such prepayments to the four

---

[685]   *Id.* at § 5.01(j)(ii).  The 6.35% Series E Medium-Term Notes due 2008 and the 5.50% Series E Medium-Term Notes due 2008 were paid in full with the proceeds of draws under the Delayed Draw Facility.

[686]   *Id.* at § 5.01(j)(iii).

[687]   *Id.* at § 2.06(d).

[688]   *Id.* at § 2.06(b).

[689]   *Id.* at § 2.10(b).

installment payments scheduled to occur after the date of the prepayment), and third to the Revolving Credit Facility.[690]

Each lender under the Credit Agreement has the right to request that Tribune execute a promissory note evidencing the advances made by such lender.[691]

The Credit Agreement contains various affirmative and negative covenants (in the case of negative covenants, Tribune is required to not cause or permit any of its Subsidiaries to violate such covenants)[692] and specifies various events of default, including:

• Tribune was obligated to qualify and elect to be treated as an S-Corporation under Subchapter S of the IRC effective as of January 1, 2008; provided, that the failure to timely make such election could be cured by the investment of $100 million (subject to certain reductions) of junior capital by Mr. Zell or EGI-TRB;[693]

• Tribune is prohibited from selling the equity interests associated with the PHONES Notes unless Tribune contemporaneously purchases call options or otherwise enters into a hedge agreement to ensure Tribune's ability to perform under the terms of the PHONES Notes;[694]

• Tribune is required to comply with financial covenants with respect to guaranteed leverage and interest coverage, which are tested on a rolling four fiscal quarter period

---

[690]   *Id.* at § 2.10(b)(iv).

[691]   *Id.* at § 2.16(a).  The Examiner found no evidence that any lender under the Credit Agreement requested Tribune to execute such a note.

[692]   *Id.* at § 5.02.

[693]   *Id.* at § 5.01(n).

[694]   *Id.* at § 5.02(e)(ii).

basis[695] (the applicable ratio to be complied with in any given test period was based on whether the Step Two Transactions had occurred);[696]

• Tribune and its Subsidiaries are limited in their ability to make or accrue capital expenditures (subject to certain carve-outs) in any given year—the cap was $210 million in 2007 and 2008 and $145 million thereafter – but unspent amounts can be rolled forward into the succeeding years;[697]

• Tribune and its Subsidiaries are prohibited from incurring any indebtedness other than certain specified indebtedness, including the Step Two Financing, the Exchangeable EGI-TRB Note, the EGI-TRB Notes, and up to $450 million under a receivables facility;[698]

• FinanceCo, an entity wholly-owned by Tribune, newly-formed in connection with the FinanceCo Transaction, as described below,[699] is prohibited from engaging in any material business, holding any material assets, or incurring any material obligations, other than incurring debt as the co-obligor or guarantor of the Credit Agreement Debt and the Bridge Debt, holding the Intercompany Junior Subordinated Notes, and activities incidental to the foregoing;[700] and

---

[695]   *Id.* at § 5.02(i).

[696]   *Id.*

[697]   *Id.* at § 5.02(i)(C).

[698]   *Id.* at § 5.02(c).

[699]   *See* Report at § III.D.12.

[700]   Ex. 179 at § 5.02(n) (Credit Agreement).

- A Change in Control is an event of default under the Credit Agreement[701] (but the consummation of the Step One Transactions and the Step Two Transactions was, by definition, not a Change in Control).[702]

The initial closing under the Credit Agreement was subject to the satisfaction of various conditions, including the following:

- Delivery of executed copies of the Credit Agreement and associated loan documents;[703]

- Delivery of a solvency certificate executed by the Chief Financial Officer of Tribune;[704]

- Delivery of opinions from outside counsel to the Borrower, the general counsel of the Borrower, special ESOP counsel to the Borrower and counsel to GreatBanc;[705]

- Delivery of financial statements, including a balance sheet as of April 1, 2007 on a pro forma basis giving effect to the Step One Transactions and on a pro forma basis giving effect to both the Step One Transactions and Step Two Transactions;[706]

- Delivery of financial projections for the five year period following the Step One Financing Closing Date on a pro forma basis giving effect to the Step One Transactions and on a pro forma basis giving effect to both the Step One Transactions and the Step Two Transactions;[707]

---

[701]  *Id.* at § 6.01(g).

[702]  *Id.* at § 1.01 ("Change in Control" definition).

[703]  *Id.* at § 3.01(a).

[704]  *Id.* at § 3.01(b)(i).  *See* Report at § III.D.10.c. for a discussion of the definition of solvency and the form of solvency certificate.

[705]  *Id.* at § 3.01(b)(ii).

[706]  *Id.* at § 3.01(b)(iii).

[707]  *Id.* at § 3.01(c).

•    Delivery of an opinion of Duff & Phelps that the purchase price paid by GreatBanc (on behalf of the ESOP) for the Tribune Common Stock purchased by it was not in excess of fair market value, the interest rate on the ESOP Note was not in excess of a reasonable rate of interest, the terms of the ESOP Loan Agreement were at least as favorable to the ESOP as an arm's length negotiation between independent parties would be, and the terms and conditions of the ESOP Purchase Agreement and the Merger Agreement were fair and reasonable to the ESOP from a financial point of view;[708]

•    The payoff of the indebtedness under the 2006 Credit Agreement and the Bridge Credit Agreement;[709]

•    The consummation of the FinanceCo Transaction and the Holdco Transaction;[710]

•    The execution and delivery of the Merger Agreement;[711]

•    EGI-TRB and the ESOP having not participated in the Tender Offer;[712]

•    The accuracy of representations and warranties;[713] and

•    No default having occurred and was continuing at the time of, or would result from, the making of an advance.[714]

---

[708]    *Id.* at § 3.01(l).

[709]    *Id.* at § 3.01(e).

[710]    *Id.* at § 3.01(m).  *See* Report at § III.D.12. for a discussion of these transactions.

[711]    Ex. 179 at § 3.01(h) (Credit Agreement).

[712]    *Id.* at § 3.01(i).

[713]    *Id.* at § 3.02(i).  *See* Report at § III.D.10.c. for a discussion of the solvency representations and warranties in the Credit Agreement.

[714]    Ex. 179 at § 3.02(ii) (Credit Agreement).

### c.    Solvency.

Section 4.01(l) of the Credit Agreement contains representations regarding the solvency of Tribune:[715]

> (i) As of the [Step One Financing] Closing Date, immediately after giving effect to the [Step One] Transactions, [Tribune] is Solvent.
>
> (ii) Upon and after consummation of the [Step Two] Transactions and as of the [Step Two Financing] Closing Date, immediately after giving effect to the [Step Two] Transactions, [Tribune] is Solvent.

"Solvent" is defined as:[716]

> 'Solvent' and 'Solvency' mean, with respect to [Tribune] on the [Step One Financing] Closing Date or the [Step Two Financing] Closing Date, as applicable, that on such date (a) the fair value and present fair saleable value of the aggregate assets (including goodwill) of [Tribune] exceeds its liabilities (including stated liabilities, identified contingent liabilities and the new financing), and such excess is in an amount that is not less than the capital of [Tribune] (as determined pursuant to Section 154 of the Delaware General Corporate Law), (b) [Tribune] will be able to pay its debts (including the stated liabilities, the identified contingent liabilities and the new financing), as such debts mature or otherwise become absolute or due and (c) [Tribune] does not have unreasonably small capital.  As used in this definition:
>
> 'fair value' means the amount at which the aggregate or total assets of [Tribune] (including goodwill) would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, neither being under any compulsion to act and, on the [Step Two Financing] Closing Date, in a transaction having a similar structure;
>
> 'present fair saleable value' means the amount that may be realized by a willing seller from a willing buyer if [Tribune's] aggregate or total assets (including goodwill) are sold with reasonable promptness and, on the [Step Two Financing] Closing Date, in a transaction having a similar structure;

---

[715]    *Id.* at § 4.01(l).

[716]    *Id.* at § 1.01 (definition of "Solvency").

'does not have unreasonably small capital' relates to the ability of [Tribune] to continue as a going concern and not lack sufficient capital for the business in which it is engaged, and will be engaged, as management has indicated such businesses are now conducted and are proposed to be conducted;

'stated liabilities' means recorded liabilities of [Tribune] as presented on the most recent balance sheet of [Tribune] provided to [JPMCB] prior to the [Step One Financing] Closing Date or [Step Two Financing] Closing Date, as the case may be;

'identified contingent liabilities' means the reasonably estimated contingent liabilities that may result from, without limitation, threatened or pending litigation, asserted claims and assessments, environmental conditions, guaranties, indemnities, contract obligations, uninsured risks, purchase obligations, taxes, and other contingent liabilities as determined by [Tribune];

'new financing' means (a) on the [Step One Financing] Closing Date, the indebtedness incurred, assumed or guaranteed by [Tribune] in connection with the [Step One] Transactions and (b) on the [Step Two Financing] Closing Date, the indebtedness incurred, assumed or guaranteed by [Tribune] in connection with the Transactions; and

'similar structure' means a structure similar to the structure contemplated in the Transactions (an S corporation (under Subchapter 5 of the [IRC]), owned entirely by an Employee Stock Ownership Plan, which receives favorable federal income tax treatment), or another structure resulting in equivalent favorable federal income tax treatment.

One of the conditions to closing under the Credit Agreement was the accuracy of the representations and warranties.[717] The accuracy of the representations and warranties also is a condition to any advances after the Step One Financing Closing Date under the Delayed Draw Facility and the Revolving Credit Facility.[718] Generally speaking, representations and warranties

---

[717] *Id.* at § 3.02(i). Note that, although the closing condition and the events of default section did not explicitly carve Section 4.01(l)(ii) out of the representations and warranties that were to be true as of the June 4, 2007 Step One Financing Closing Date, the language of that section ("Upon and after consummation of the [Step Two] Transactions . . . ") might be read to indicate that such representation and warranty was not intended to be operative unless and until the Step Two Transactions were consummated.

[718] *Id.* at § 3.02(i).

were to be accurate as of the date the advance was made, except that representations and warranties that by their terms were made as of a specific date were only required to be accurate as of that specific date.[719]  It is also an event of default under the Credit Agreement if any representations and warranties were not true as of the date made or deemed made.[720]  Because the solvency representations and warranties in the Credit Agreement were made as of the respective Step One Financing Closing Date and Step Two Financing Closing Date only, the failure of the solvency representation and warranty to be accurate as of any date other than the Step One Financing Closing Date or the Step Two Financing Closing Date would not, in and of itself (and assuming that the solvency representation and warranty was correct as of such dates), prohibit an advance under the Delayed Draw Facility or the Revolving Credit Facility or give rise to an event of default.

On June 4, 2007, as a condition to the occurrence of the Step One Financing Closing Date, Donald Grenesko, Senior Vice President/Finance and Administration of Tribune, delivered a solvency certificate to JPMCB stating, "As of the date hereof, immediately after giving effect to the [Step One] Transactions, [Tribune] is Solvent."[721]  The certificate noted that Mr. Grenesko reviewed and relied on the opinions of VRC dated as of May 9, 2007 and May 24, 2007 for purposes of the solvency certificate.[722]

---

[719]  *Id.*

[720]  *Id.* at § 6.01(b).

[721]  Ex. 186 (Step One Solvency Certificate).  Capitalized terms used but not defined in the solvency certificate had the meanings ascribed to such terms in the Credit Agreement.

[722]  *Id.*

The solvency certificate delivered in connection with the Credit Agreement on the Step One Financing Closing Date was consistent with the form of solvency certificate attached as Exhibit E to the Credit Agreement.[723]

In addition, on June 4, 2007, as a condition to the occurrence of the Step One Financing Closing Date, Chandler Bigelow, a Vice President and the Treasurer of Tribune, delivered a Responsible Officer's Certificate under the Credit Agreement stating, "The undersigned certifies in his capacity as Vice President of the Company, that, as of the date hereof . . . the representations and warranties contained in Section 4.01 of the Credit Agreement . . . are correct in all material respects. . . ."[724]  Section 4.01(l)(i) of the Credit Agreement states that, "As of the [Step One Financing Closing Date], immediately after giving effect to the [Step One] Transactions, [Tribune] is Solvent."[725]

### d.    The Credit Agreement Subsidiary Guarantee.

Tribune's obligations under the Credit Agreement are guaranteed by the Guarantor Subsidiaries pursuant to the Credit Agreement Subsidiary Guarantee.[726]  The Credit Agreement Subsidiary Guarantee, executed by the Guarantor Subsidiaries on the Step One Financing Closing Date, provides that each of the Guarantor Subsidiaries, "jointly with the other [Guarantor Subsidiaries] and severally, as a primary obligor and not merely as a surety," unconditionally guarantees the monetary and other obligations of Tribune under the Credit Agreement[727] and that

---

[723]   Ex. 187 (Form of Credit Agreement Solvency Certificate).

[724]   Ex. 188 at 1 (Credit Agreement Responsible Officer's Certificate, dated June 4, 2007).

[725]   Ex. 179 at § 4.01(l)(i) (Credit Agreement).  Notwithstanding the above, Mr. Bigelow informed the Examiner that he never had been required to deliver a solvency certificate.  *See* Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 109:22-110:2.

[726]   Ex. 189 (Credit Agreement Subsidiary Guarantee).  The Credit Agreement Subsidiary Guarantee is governed by New York law.  *See id.* at § 13 (Credit Agreement Subsidiary Guarantee).

[727]   *Id.* at § 1.  Under the terms of the Credit Agreement, Tribune was required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Credit Agreement and other debt with respect to borrowed money.  On July 2, 2007 and July 3, 2007, Tribune entered into the Swap Documents.  The

such guarantee is a guarantee of payment when due and not of collection.[728]  The Guarantor

Subsidiaries waived various defenses, including:

- Presentment to, demand of payment from, and protest to Tribune;[729]

- Notice of acceptance of the guarantee;[730]

- Notice of protest for nonpayment;[731]

- The failure of the secured parties to enforce against Tribune or any other

Guarantor Subsidiary;[732]

- Any amendment, modification, waiver or release of the Credit Agreement

Subsidiary Guarantees or any other loan document;[733]

- The failure to perfect, or the release of, any security interest;[734]

- Any act or omission that may operate as a discharge of any Guarantor

Subsidiary (other than the indefeasible payment of the obligations under the Credit Agreement in

full in cash);[735]

- The right to require that the secured parties resort to any security

interest;[736]

---

obligations of Tribune under the Swap Documents do not constitute Credit Agreement Debt, but such
obligations are guaranteed by the Guarantor Subsidiaries pursuant to the Credit Agreement Subsidiary
Guarantee.

[728]  *Id.* at § 4.

[729]  *Id.* at § 2.

[730]  *Id.*

[731]  *Id.*

[732]  *Id.*

[733]  *Id.*

[734]  *Id.*

[735]  *Id.*

[736]  *Id.* at § 4.

• The invalidity, illegality, or unenforceability of the obligations under the Credit Agreement;[737]

• Any defense based on or arising out of any defense of Tribune (other than payment in full of the obligations under the Credit Agreement);[738] and

• Any defense arising out of the election of remedies, even though such election impaired or extinguished any right of reimbursement or subrogation against Tribune or any other guarantor.[739]

The Guarantor Subsidiaries agreed that all rights of subrogation, contribution, indemnity, and the like against Tribune arising from payment by such Guarantor Subsidiary of the guaranteed obligations are in all respects subordinate and junior in right of payment to the prior payment in full in cash of the obligations under the Credit Agreement.[740] The Guarantor Subsidiaries further agreed that any indebtedness owed by Tribune to the Guarantor Subsidiaries is subordinated in right of payment to the prior payment in full in cash of the obligations under the Credit Agreement, except to the extent otherwise permitted under the Credit Agreement.[741]

Notably, although addressing (a) subordination of obligations and (b) subrogation, contribution, and indemnity rights as to Tribune, the Credit Agreement Subsidiary Guarantee does not address (a) subordination of obligations, and (b) subrogation, contribution, and indemnity rights among the Guarantor Subsidiaries. Moreover, the Credit Agreement Subsidiary

---

[737] *Id.* at § 5.

[738] *Id.* at § 6.

[739] *Id.*

[740] *Id.* at § 7.

[741] *Id.*

Guarantee does not include a traditional "fraudulent transfer savings clause." The only provision addressing unenforceability is as follows:[742]

> In the event any one or more of the provisions contained in [the Credit Agreement Subsidiary Guarantee] or in any other [Step One Financing] Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

The guarantee of the Credit Agreement Debt under the Credit Agreement Subsidiary Guarantee by its terms includes any indebtedness incurred under the Incremental Credit Agreement Facility on the Step Two Financing Closing Date.[743]

### e.    The Stock Pledge and Priority of the Credit Agreement Debt.

The indebtedness under the Credit Agreement is secured by a pledge of the equity interests of FinanceCo and Holdco, both of which are direct Subsidiaries of Tribune.[744]  The Pledge Agreement was entered into on the Step One Financing Closing Date.[745]  Pursuant to the Pledge Agreement, and consistent with the equal and ratable security provisions of the Senior Notes,[746] the Senior Notes are secured by the Stock Pledge on a pari passu basis with the indebtedness under the Credit Agreement.[747]  The Credit Agreement contains a representation

---

[742]  *Id.* at § 15(b).

[743]  *Id.* at § 1.  "Obligations" as defined in the Credit Agreement include advances under the Incremental Credit Agreement Facility.

[744]  Ex. 190 (Pledge Agreement).  The Pledge Agreement is governed by New York law (*see* § 19).

[745]  *Id.* at 1.

[746]  *See* Report at § III.B.1.

[747]  Ex. 190 at 1 (Pledge Agreement).

and warranty that the Stock Pledge is superior to all other liens on the equity interests of

FinanceCo and Holdco, subject to very limited exceptions.[748]

### 11.    Terms of the Incremental Credit Agreement Facility.

The Credit Agreement executed on May 17, 2007 provided Tribune with the right to

request advances under the Incremental Credit Agreement Facility on the Step Two Financing

Closing Date.[749]  The lenders under the Credit Agreement, other than the Step Two Lenders that

were parties to the Step Two Commitment Letter, had the right to participate in the Incremental

Credit Agreement Facility.[750]  The Step Two Commitment Letter obligated the Step Two

Lenders party thereto to participate in the Incremental Credit Agreement Facility.[751]

The funding of the Incremental Credit Agreement Facility was subject to the satisfaction

of the following conditions:

•       No default had occurred and was continuing at the time of, or would result from,

the borrowing under the Incremental Credit Agreement Facility;[752]

•       The accuracy of certain specified representations and warranties, including with

respect to Tribune's corporate status, the execution, delivery, performance, and enforceability of

the Credit Agreement and Step One Financing Documents, and solvency of Tribune as of the

Step Two Financing Closing Date;[753]

•       No material adverse effect having occurred (for purposes of this closing

condition, "material adverse effect" was defined as, except as disclosed in Tribune's SEC filings

---

[748]   Ex. 179 at § 4.01(r) (Credit Agreement).

[749]   *Id.* at § 2.17.

[750]   *Id.* at § 2.17.

[751]   Ex. 1010 at 3 (Step Two Commitment Letter).

[752]   Ex. 179 at § 2.17(b)(i) (Credit Agreement).

[753]   *Id.* at § 2.17(b)(ii)(A).

before April 1, 2007 or as disclosed in the schedules to the Merger Agreement, a Company

Material Adverse Effect); and[754]

- The consummation of the Merger, the issuance of the Bridge Debt, the issuance of

the Initial EGI-TRB Note, the repayment of the Exchangeable EGI-TRB Note, the purchase of

the Warrant, and pro forma compliance with the financial covenants.[755]

Advances under the Incremental Credit Agreement Facility have terms that are identical

to the Tranche B Facility, with the exception of the interest rate.[756]  The applicable margins with

respect to the Incremental Credit Agreement Facility were determined by Tribune and the

lenders under the Credit Agreement, and if the applicable margins for advances under the

Incremental Credit Agreement Facility were more than 25 basis points higher than the applicable

margins for advances under the Tranche B Facility, the applicable margins for the Tranche B

Facility would be increased to equal the applicable margins for the Incremental Credit

Agreement Facility, minus 25 basis points.[757]

## 12.    FinanceCo/Holdco Transactions.

On May 16, 2007, FinanceCo and Holdco were formed, with the sole member of each

company being Tribune.[758]

FinanceCo was created as a direct, wholly-owned Subsidiary of Tribune.[759]  On the Step

One Financing Closing Date, Tribune made a $3 billion capital contribution to FinanceCo,[760]

---

[754]  *Id.* at § 2.17(b)(ii)(B).

[755]  *Id.* at § 2.17(b)(iii).

[756]  *Id.* at § 2.17(c) (Credit Agreement).

[757]  Ex. 179 at § 2.17(c) (Credit Agreement).

[758]  Ex. 191 (Delaware Formation Information); Ex. 192 (FinanceCo Limited Liability Company Agreement); Ex. 193 (Holdco Limited Liability Company Agreement).  *See also* Ex. 194 (Tribune Finance LLC Transaction Summary).  Although evidence that FinanceCo and Holdco were formed was provided by Tribune to the Examiner, Tribune informed the Examiner that the Tribune Board did not explicitly authorize the formation of FinanceCo and Holdco.

[759]  Ex. 6 (Organization Chart).

which in turn loaned $3 billion to eight Publishing Segment Subsidiaries in return for the

Intercompany Junior Subordinated Note.[761]  The Subsidiaries that received the loans then made

dividend payments of $3 billion back to Tribune.[762]  The net effect of this transaction was the

creation of a $3 billion asset held by FinanceCo in the form of the Intercompany Junior

Subordinated Notes and $3 billion in corresponding liabilities owed by the eight Publishing

Segment Subsidiaries that received the loans.

Holdco was also created as a direct, wholly-owned Subsidiary of Tribune.[763]  On the Step

One Financing Closing Date, Tribune capitalized Holdco by contributing to Holdco the stock of

Tribune Broadcasting Company, an existing, wholly-owned Subsidiary of Tribune that directly

or indirectly owned all of the operating Subsidiaries in the Broadcasting Segment.[764]

The consummation of the FinanceCo/Holdco Transactions were conditions to closing

under the Credit Agreement.[765]  The Credit Agreement also required that the Credit Agreement

Debt be secured by the Stock Pledge and that FinanceCo and Holdco become guarantors of the

Credit Agreement Debt.[766]  Pursuant to the terms of Tribune's existing bond indentures, the

Senior Notes (other than the PHONES Notes) received the same security in FinanceCo and

Holdco (*i.e.,* the Stock Pledge) on a ratable and pari passu basis.[767]  Under the Credit Agreement,

---

[760]   Ex. 194 (Tribune Finance LLC Transaction Summary).  Each of the steps in the transactions described in this paragraph of the Report were accomplished via accounting entries, and no cash actually was transferred among the companies.  *Id.*

[761]   *Id.*; Ex. 195 (Intercompany Junior Subordinated Note).

[762]   Ex. 194 (Tribune Finance LLC Transaction Summary).

[763]   Ex. 6 (Organization Chart).

[764]   Ex. 196 (Equity Contribution Agreement).  The Equity Contribution Agreement was effective immediately before the execution and delivery by Tribune of the Pledge Agreement.

[765]   Ex. 179 at § 3.01(m) (Credit Agreement).

[766]   *Id.* at § 3.01(a), (g).

[767]   *See* Report at § III.B.1.

FinanceCo (but not Holdco) was generally restricted from holding any material properties, becoming liable for any material obligations, or conducting any business activities.[768]

The Examiner has reviewed numerous documents addressing Tribune's creation of FinanceCo and Holdco and the transactions these entities effectuated in connection with Tribune's entry into the Credit Agreement.  Based on this review, it appears that at least two considerations gave rise to the FinanceCo/Holdco Transactions.

First, JPMCB, MLPFS, CGMI, and possibly the other parties looking to syndicate the Step One Financing, desired to transform the Credit Agreement facility into a secured facility so that the loans could be marketed as partially secured obligations,[769] thereby expanding the universe of potential lenders, including collateralized debt obligation (CDO) managers and other lenders who may have been restricted from investing in unsecured obligations.  This consideration, although helpful in understanding why the Credit Agreement included a form of collateral to secure the Credit Agreement Debt, does not by itself explain why the specific structures comprising the FinanceCo/Holdco Transactions were adopted.

Second, although Tribune could have created a secured facility by pledging the stock of existing entities (*i.e.,* by pledging the stock of Tribune Broadcasting Company and the Publishing Segment Subsidiaries that received the intercompany loans), Tribune expressed concern that such an approach could have resulted in significant and burdensome additional public reporting requirements.[770]  This concern appears to have been justified.  Under federal securities laws, if the stock of an issuer's Subsidiary serves as a substantial portion of the collateral for any class of registered securities, the issuer is required to file audited financial

---

[768]    Ex. 179 at § 5.02(n) (Credit Agreement).

[769]    Ex. 197 (Sell E-Mail, dated March 28, 2007).  *See also* Ex. 178 at 25 (Step One Confidential Information Memorandum).

[770]    Ex. 198 at 1 (Description of Tribune Credit Facilities Obligor Structure).

statements for that Subsidiary.[771]  Therefore, if Tribune had pledged the stock of its many

existing Subsidiaries, absent a waiver of reporting requirements, it would have been required to

prepare audited financial statements for each of these entities.[772]  Tribune was not in the practice

of preparing financial statements by entity, but rather had historically reported by business

segment.[773]  In addition, Tribune appears to have been concerned that reporting on an entity-by-

entity basis would have required sensitive disclosures.[774]

By contrast, the preparation of separate financial statements for only FinanceCo and

Holdco did not pose as significant a burden, both because of the limited nature of the assets held

by FinanceCo and Holdco and the fact that only two additional entities (as opposed to all eight of

the Publishing Segment Subsidiaries that received the loans) would be required to deliver audited

financial statements.[775]  FinanceCo and Holdco appear to have been created, at least in part, to

address these securities law issues.[776]

JPMCB and JPMorgan generally acknowledged that the establishment of FinanceCo and

Holdco would not enhance the lenders' collateral position, which derived principally from the

Subsidiary Guarantees and the corresponding structural seniority of the Credit Agreement Debt

over the Tribune level indebtedness.[777]  It also appears that JPMCB actually preferred a direct

---

[771]  *See* SEC Regulation S-X, Rule 3-16, 17 C.F.R. § 210.3-16.

[772]  *See id.*

[773]  Ex. 197 (Sell E-Mail, dated March 28, 2007); Ex. 4 at 8-21 and 138-142 (Tribune 2007 Form 10-K).

[774]  Ex. 199 (Chen E-Mail, dated March 30, 2007).

[775]  Ex. 198 at 1-2 (Description of Tribune Credit Facilities Obligor Structure).

[776]  Ex. 200 (Kaplan E-Mail, dated March 21, 2007); Ex. 199 (Chen E-Mail, dated March 30, 2007).  Tribune's 2007 Form 10-K includes audited financial statements for both FinanceCo and Holdco.  Ex. 4 at 144-174 (Tribune 2007 Form 10-K).

[777]  At the syndication meeting held on April 26, 2007, Todd Kaplan of Merrill described the collateral package for the Credit Agreement as "the capital stock of [FinanceCo] and [Holdco].  That will be prorated with the existing senior note but that is essentially not the driver of prioritization.  It is the guarantee package with the senior guarantees from the subsidiaries beneath and publishing and operating driving our prioritization."  Ex. 180 at 50 (Transcript of Lenders Meeting, dated April 26, 2007).  *See also* Ex. 201 at (Jacobson E-Mail, dated May 24,

pledge of stock of Tribune's existing Subsidiaries to the FinanceCo and Holdco structures and thought Tribune's reluctance to provide direct stock pledges was not justified.[778]

### 13.     LATI Intercompany Debt Repayment Transactions.

At various times between 1997 and 2006, certain intercompany transactions occurred between LATI and twenty-one direct or indirect Subsidiaries of Tribune whereby liabilities were recorded from these entities to LATI.[779]  These liabilities were documented in twenty-four separate promissory notes issued by these Subsidiaries in favor of LATI.[780]  The original aggregate principal amount of the LATI Notes totaled approximately $6.12 billion.[781]  As of the Step One Financing Closing Date, the aggregate amount totaled approximately $3.98 billion, comprised of approximately $3.86 billion in principal and approximately $116 million in accrued interest for the period January 1, 2007 to June 4, 2007.[782]

---

2007); Ex. 197 (Sell E-Mail dated March 28, 2007); Ex. 198 at 1-2 (Description of Tribune Credit Facilities Obligor Structure).

[778] Jeffrey Sell, former Head of Special Credits Group, JPMCB, informed the Examiner that "I recall that I considered this baloney—that these guys gave this up for the weekend because some comptroller couldn't give the financial statements. . . .  I wanted the pledge of stock in the subsidiaries.  I probably asked for a lien on the assets and was told no so a pledge on the stock of the subsidiaries was second choice.  Pledge on holding companies was next."  Examiner's Interview of Jeffrey Sell, June 3, 2010.  *See also* Ex. 197 (Sell E-Mail, dated March 28, 2007).

[779] These Subsidiaries are:  (i) Tribune Television Company, (ii) The Daily Press, Inc., (iii) Tribune Broadcasting Company, (iv) KHCW Inc. (f/k/a KHTV Inc. and KHWB Inc.), (v) Tribune Television Northwest, Inc., (vi) Tribune Television New Orleans, Inc., (vii) WBDC Broadcasting, Inc., (viii) Newsday, Inc., (ix) The Baltimore Sun Company, (x) The Hartford Courant Company, (xi) The Morning Call, Inc., (xii) Southern Connecticut Newspaper, Inc. (xiii) Los Angeles Times Communications LLC, (xiv) Virginia Gazette Companies, LLC, (xv) WTXX, Inc., (xvi) Tower Distribution Company, (xvii) KPLR, Inc., (xviii) Tribune Broadcast Holdings, Inc., (xix) Tribune National Marketing Company, (xx) Tribune Media Services, Inc., and (xxi) Tribune Media Net.  Certain of the LATI Notes were originally issued to Tribune and Shortland Publications, Inc. (a former indirect Subsidiary of Tribune) and later assigned to LATI pursuant to a series of allonges.  Ex. 202 (LATI Promissory Notes).  WLVI, Inc. also issued two LATI Notes, which were repaid in 2006, before the Step One Financing Closing Date.  Therefore, the WLVI notes are excluded from this summary.

[780] Ex. 202 (LATI Promissory Notes).

[781] Ex. 203 (Schedule of Notes 2007).

[782] *Id.*

The LATI Notes were initially created in the years preceding the Leveraged ESOP Transactions pursuant to three-step intercompany transactions whereby (1) Tribune made a capital contribution to LATI, (2) LATI in turn advanced the contributed amounts to the Subsidiary and received a promissory note in return, and (3) the Subsidiary thereupon returned an amount equal to the loaned proceeds to Tribune.[783]  Principal and interest payments on the LATI Notes were accomplished pursuant to a reverse three-step transaction, whereby (1) Tribune made a capital contribution to the Subsidiary, (2) the Subsidiary paid a like amount of principal or interest to LATI, and (3) LATI thereupon remitted the same amount of capital to Tribune.[784] Thus, the transactions had a circular quality, with funds flowing from Tribune to LATI to the particular Subsidiary to create a liability from the Subsidiary to LATI and then back from LATI to Tribune; and then funds flowing from Tribune to the Subsidiary and then LATI to repay principal and interest and then back from LATI to Tribune.  It appears that between 1997 and 2005, Tribune actually funded the principal and interest payments in cash (and received cash from LATI at step 3), but starting in 2006 these transactions were accomplished via accounting entries.[785]  Although a fair inference from these otherwise circular transactions is that they were accomplished for state tax purposes,[786] the Examiner discovered limited testimonial evidence supporting that inference.[787]

---

[783]   Ex. 204 at 2 (Intercompany Notes from Various Business Units to LA Times International, Ltd.).

[784]   *Id.* at 3-4.

[785]   *Id.*

[786]   Although Tribune and its Subsidiaries filed a consolidated income tax return for federal income tax purposes, many states require or permit each member of a consolidated group of corporations to file a separate state income tax return.  *See* 35 ILL. COMP. STAT. 5/203(e)(2)(E) (2010).  Therefore, the LATI transactions may have been structured to minimize the state tax liability incurred by Tribune's operating Subsidiaries in states other than California.

[787]   The Examiner had the following exchange with Mr. Bigelow:

> Q:   Are you familiar with intercompany transactions with LATI?
>
> A:   Generally at a high level.

The Credit Agreement specified as a condition to closing satisfaction of the intercompany amounts shown on a schedule to the Credit Agreement as running in favor of LATI.[788]  Tribune's twenty-one Subsidiaries that issued the LATI Notes were Guarantor Subsidiaries under the Credit Agreement.[789]  LATI was not a guarantor.

The following transactions were effectuated on the Step One Financing Closing Date: (a) Tribune made capital contributions in the aggregate amount of $3.98 billion to the twenty-one Subsidiaries, (b) the Subsidiaries used the proceeds from their respective capital contributions to pay off the LATI Notes, and (c) LATI returned the proceeds from these loan repayments directly to Tribune.[790]  In this fashion, the transactions replicated the above-described interest and principal repayments, except in this instance the entirety of the obligations was extinguished.

---

Q:  What's your understanding at a high level of the transactions with LATI?

A:  At a high level, my understanding is that because of some state tax planning that the company was doing for I think many, many years, I don't recall when it started, that the LATI entity, you know, issued notes to certain other subsidiaries in the organization, and because of those notes and because of the interest related to those notes, there were some advantages with respect to state tax payments, and for a time there were some economic advantages to that, but those advantages stopped.  I don't recall exactly which states and why, but, you know, there was a period of time where there were some reasonable economic advantages.  Because, those stopped, there was really no real economic reason to retain them, and as a result, I don't -- I can't recall exactly who, but the company elected to have those notes repaid.

Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 263:5-264:4

[788]  Ex. 179 at § 3.01 (Credit Agreement) ("Conditions Precedent to Initial Borrowing. The obligation of each Lender to make an advance on the Closing Date . . . shall be subject to the occurrence and satisfaction or waiver of the following conditions precedent (other than clause (m), which shall be a simultaneous condition). . . . (m) Related Transactions.  The Tribune Finance LLC Transaction . . . shall be consummated substantially and simultaneously with the making of the Advances on the Closing Date.") "Tribune Finance LLC Transaction" is defined as "(a) the satisfaction of intercompany indebtedness owed by certain Subsidiaries and listed on Schedule 1.01(d) hereto . . .".  Id. at § 1.01 (definition of "Tribune Finance LLC Transaction").  Although it appears that the Tribune Board did not specifically authorize repayment of the LATI Notes at the April 1, 2007 meeting where it approved the Leveraged ESOP Transactions and entry into the Credit Agreement, the Tribune Board did authorize Tribune's officers to "take from time to time any actions deemed necessary or desirable . . . to establish the Credit Facilities . . . in accordance with the requirements of the Commitments and the Credit Facilities Documents contemplated thereby and any other requirements established by the Credit Facilities Agents and/or any of the other lenders."  Ex. 146 at 9 (Tribune Board Meeting Minutes, dated April 1, 2007).

[789]  Ex. 189 at Annex I (Credit Agreement Subsidiary Guarantee).

[790]  Ex. 204 at 5 (Intercompany Notes from Various Business Units to LA Times International, Ltd.); Ex. 150 (Unanimous Written Consents of the Subsidiary Boards, dated June 4, 2007).

Each of the above steps in these transactions was accomplished via accounting entry rather than the actual movement of cash.[791]

The net effect of the transactions was to shift the remaining outstanding balance of the LATI Notes from the twenty-one Subsidiaries to Tribune.[792]   Although the elimination of the intercompany amounts may have enhanced the ability of these Subsidiaries to make required tax elections in a non-taxable manner and thereby be treated as qualified Subsidiaries under the S-Corporation/ESOP structure, the Examiner has not seen any evidence directly supporting the inference that the transactions were accomplished for this purpose.[793]   The Examiner did not discover any documents that directly address the specific purpose behind the LATI-related transactions described in this section.

### 14.    Tender Offer.

#### a.    Terms.

Pursuant to the terms of the Merger Agreement,[794] on April 25, 2007, Tribune commenced the Tender Offer to repurchase up to 126 million shares of the Tribune Common Stock that were then outstanding at a price of $34.00 per share.[795]   In the press release announcing the commencement of the Tender Offer, Mr. FitzSimons was quoted as saying,

---

[791]   Ex. 205 (Step One Flow of Funds Memorandum).

[792]   Ex. 205 at 6 (Step One Flow of Funds Memorandum).  LATI is a direct wholly-owned Subsidiary of Tribune, is not a Guarantor Subsidiary, and does not appear to have any significant creditors.  See Ex. 6 (Organization Chart); Ex. 189 at Annex I (Credit Agreement Subsidiary Guarantee); Ex. 206 (LATI Schedules).  As a consequence, any "claim" that LATI might hold against Tribune, in effect, is an asset of Tribune, and ultimately would be available for the benefit of Tribune's creditors.

[793]   See 26 C.F.R. §§ 1.1361-4(a)(2) and 1.332-2(b).  The Examiner did not evaluate the merits of this contention as a tax matter.

[794]   Ex. 151 at § 5.14(a) (Merger Agreement).

[795]   Ex. 5 at cover page (Tender Offer).

"With Sam Zell's initial investment completed, and the tender offer launched, the first stage of our transaction that will result in [Tribune] going private is underway."[796]

### b.    Closing Conditions.

The Tender Offer was not conditioned on a minimum number of shares being tendered.[797] However, the Tender Offer was subject to the satisfaction of several other conditions:

•      Receipt by Tribune of the necessary financing for the Tender Offer as contemplated by the Step One Commitment Letter;[798]

•      Receipt by Tribune of an opinion from VRC or another nationally recognized valuation firm satisfactory to Tribune on the solvency of Tribune after giving effect to the Tender Offer;[799]

•      The agreements relating to the Leveraged ESOP Transactions remaining in full force and effect;[800] and

•      There being no restraining order, injunction, or other court order prohibiting the consummation of the Tender Offer or any of the other Leveraged ESOP Transactions.[801]

### c.    *Garamella* Litigation.

On November 17, 2006, a case captioned *Garamella v. FitzSimons, et al.*, was filed in the Superior Court of California, Los Angeles County, against Tribune's directors and Tribune as a nominal defendant, alleging direct and derivative claims on behalf of a purported class of

---

[796]  Ex. 207 (Tribune Press Release, dated April 25, 2007).

[797]  Ex. 5 at 73 (Tender Offer).

[798]  *Id.* at 83.

[799]  *Id.*

[800]  *Id.*

[801]  *Id.* at 83-84.

Tribune stockholders for breach of fiduciary duty in connection with Tribune's 2006 Leveraged

Recapitalization and the manner in which the Tribune Board was handling its exploration of

strategic alternatives.[802]   On April 4, 2007, before any responsive pleading was due, the plaintiff

amended its complaint to include claims alleging that Tribune's directors had breached their

fiduciary duties to stockholders in connection with the negotiation of the Leveraged ESOP

Transactions.   Among other claims, the plaintiff alleged that the Tribune Board breached its

fiduciary duties by failing to obtain a higher value for Tribune's stockholders and that the Tender

Offer was impermissibly "coercive" under Delaware law.[803]   On May 18, 2007, the plaintiff filed

a motion for preliminary injunction seeking to enjoin Tribune from completing the Tender Offer

until Tribune (a) took steps to maximize stockholder value, (b) removed the allegedly coercive

aspects of the Tender Offer, and (c) disclosed all material information about the Tender Offer to

Tribune's stockholders.   Following expedited discovery and a hearing held on May 22, 2007, the

court denied this motion.[804]

> ### 15.    Pre-Closing of the Step One Financing and Tender Offer.

> #### a.    Rating Agency Ratings.

On March 29, 2007, Standard & Poor's Rating Evaluation Service sent a letter to

Chandler Bigelow, then a Vice President and the Treasurer (and currently the Chief Financial

Officer) of Tribune, in response to Mr. Bigelow's request for feedback on the ratings impact of

---

[802]   Ex. 208 (Verified Shareholder Class and Derivative Complaint, *Garamella v. FitzSimons, et al.*, No. BC362110).

[803]   Ex. 209 at ¶ 8 (First Amended Verified Shareholder Class and Derivative Complaint, *Garamella v. FitzSimons et al.*, No. BC362110).

[804]   Ex. 210 (Briefing and Declarations (and exhibits thereto) filed in *Garamella*); Ex. 211 (Court Minute Order, dated May 22, 2007).

Tribune's contemplated leveraged buyout transaction.[805]  Standard & Poor's indicated that the existing ratings for Tribune and its debt were as follows:[806]

| Corporate Credit Rating | BB+/Watch Neg[807] |
|---|---|
| Senior Unsecured Debt | BB+/Watch Neg[808] |
| Subordinated Debt | BB-/Watch Neg[809] |
| Commercial Paper | B/Watch Neg[810] |

After reviewing the terms of the leveraged buyout scenario, Standard & Poor's reached the following hypothetical ratings conclusions, assuming the closing of *both* the Step One Transactions and the Step Two Transactions:[811]

---

[805]  Ex. 212 (Standard & Poor's Letter, dated March 29, 2007).

[806]  *Id.* at 1.

[807]  Under Standard & Poor's rating system, "an obligor rated 'BB' is less vulnerable in the near term than other lower-rated obligors.  However, it faces major ongoing uncertainties and exposure to adverse business, financial, or economic conditions which could lead to the obligor's inadequate capacity to meet its financial commitments."  *See* Ex. 213 at 10 (Standard & Poor's Ratings).  The addition of a plus (+) sign shows "relative standing within the major rating categories."  *See id.*  "Watch Neg" means that a rating "may be lowered."  *See id.* at 13.

[808]  Under Standard & Poor's rating system, "[a]n obligation rated 'BB' is less vulnerable to nonpayment than other speculative issues.  However, it faces major ongoing uncertainties or exposure to adverse business, financial, or economic conditions which could lead to the obligor's inadequate capacity to meet its financial commitment on the obligation."  *See id.* at 4.  The addition of a plus (+) sign shows "relative standing within the major rating categories."  *See id.* at 10.  "Watch Neg" means that a rating "may be lowered."  *See id.* at 13.

[809]  Under Standard & Poor's rating system, "[a]n obligation rated 'BB' is less vulnerable to nonpayment than other speculative issues.  However, it faces major ongoing uncertainties or exposure to adverse business, financial, or economic conditions which could lead to the obligor's inadequate capacity to meet its financial commitment on the obligation."  *See id.* at 4 (Standard & Poor's Ratings).  The addition of a minus (-) sign shows "relative standing within the major rating categories."  *See id.* at 10.  "Watch Neg" means that a rating "may be lowered."  *See id.* at 13.

[810]  Under Standard & Poor's rating system, "[a]n obligation rated 'B' is more vulnerable to nonpayment than obligations rated 'BB', but the obligor currently has the capacity to meet its financial commitment on the obligation.  Adverse business, financial, or economic conditions will likely impair the obligor's capacity or willingness to meets its financial commitment on the obligation."  *See id.* at 4.  "Watch Neg" means that a rating "may be lowered."  *See id.* at 13.

[811]  Ex. 212 at 2 (Standard & Poor's Letter, dated March 29, 2007).

| Corporate Credit Rating | B/Stable[812] |
|---|---|
| Existing Senior Unsecured Debt | CCC+[813] |
| Existing Subordinated Debt | CCC+[814] |
| Commercial Paper | Not Rated[815] |
| New Senior Secured Debt[816] | B[817] |
| New Subordinated Debt[818] | CCC+[819] |

Per Standard & Poor's, Tribune's corporate credit rating, as of the time of the letter,

reflected Tribune's "significant debt levels and its announcement in September 2006 that the

company would be considering various alternatives for 'creating additional value for

---

[812]    Under Standard & Poor's rating system, "[a]n obligor rated 'B' is more vulnerable than the obligors rated 'BB', but the obligor currently has the capacity to meet its financial commitments.  Adverse business, financial, or economic conditions will likely impair the obligor's capacity or willingness to meets its financial commitments."  *See* Ex. 213 at 10 (Standard & Poor's Ratings).  "Stable" means that a rating "is not likely to change."  *See id.* at 13.

[813]    Under Standard & Poor's rating system, "[a]n obligation rated 'CCC' is currently vulnerable to nonpayment, and is dependent upon favorable business, financial, and economic conditions for the obligor to meet its financial commitment on the obligation.  In the event of adverse business, financial, or economic conditions, the obligor is not likely to have the capacity to meet its financial commitment on the obligation."  *See id.* at 4.  The addition of a plus (+) sign shows "relative standing within the major rating categories."  *See id.* at 10.

[814]    Under Standard & Poor's rating system, "[a]n obligation rated 'CCC' is currently vulnerable to nonpayment, and is dependent upon favorable business, financial, and economic conditions for the obligor to meet its financial commitment on the obligation.  In the event of adverse business, financial, or economic conditions, the obligor is not likely to have the capacity to meet its financial commitment on the obligation."  *See id.* at 4.  The addition of a plus (+) sign shows "relative standing within the major rating categories."  *See id.* at 10.

[815]    As it was anticipated that all outstanding borrowings would be repaid, the rating for Tribune's commercial paper would be withdrawn.  *See* Ex. 212 at 2 (Standard & Poor's Letter, dated March 29, 2007).

[816]    This referred to the Credit Agreement Debt that would be issued in part at Step One and in part at Step Two.

[817]    Under Standard & Poor's rating system, "[a]n obligation rated 'B' is more vulnerable to nonpayment than obligations rated 'BB', but the obligor has the capacity to meet its financial commitment on the obligation.  Adverse business, financial, or economic conditions will likely impair the obligor's capacity or willingness to meet its financial condition on the obligation."  *See* Ex. 213 at 4 (Standard & Poor's Ratings).

[818]    This referred to the Bridge Debt that would be issued at Step Two.

[819]    Under Standard & Poor's rating system, "[a]n obligation rated 'CCC' is currently vulnerable to nonpayment, and is dependent upon favorable business, financial, and economic conditions for the obligor to meet its financial commitment on the obligation.  In the event of adverse business, financial, or economic conditions, the obligor is not likely to have the capacity to meet its financial commitment on the obligation."  *See id.* at 4.  The addition of a plus (+) sign shows "relative standing within the major rating categories."  *See id.* at 10.

shareholders.'"[820]  Tribune's new corporate credit rating, assuming the consummation of both the

Step One Transactions and the Step Two Transactions, reflected the "substantially greater pro

forma debt levels, resulting in sharply weaker credit measure and free operating cash flow

generation.  Both the company's newspaper and broadcasting operations [were] facing very

challenging revenue climates and competitive market conditions."[821]  Finally, Standard & Poor's

concluded that its:

> default scenario contemplates that the sector downturn is more
> prolonged and pronounced than the company's expectations and
> other recent downturns. . . .  Under our scenario, the company is
> expected to default in 2009 when its cash flow and revolving credit
> capacity are unable to cover its interest expense, capital
> expenditures, and working capital needs.[822]

On March 29, 2007, Moody's Investors Service also sent a letter to Mr. Bigelow, in

response to Mr. Bigelow's request for feedback on the ratings impact of Tribune 's contemplated

leveraged buyout transaction.[823]  Moody's informed Mr. Bigelow that the consummation of both

the Step One Transactions and the Step Two Transactions would result in a 'B2' Corporate

Family Rating with a stable rating outlook, indicating that "[h]igh leverage . . . after conclusion

of the transaction and the negligible amount of equity invested are key drivers of the B2 CFR

---

[820]  Ex. 212 at 2 (Standard & Poor's Letter, dated March 29, 2007).  Standard & Poor's had previously anticipated that Tribune would "focus on debt reduction following the completion of the [2006 Leveraged Recapitalization].  This was no longer the case with the September announcement."  *Id.* at 2.

[821]  *Id.* at 3.

[822]  *Id.* at 4-5.  Standard & Poor's default scenario assumed:  (a) publishing advertising revenues declining by 7% in 2007, 4% in 2008, and 4% in 2009, (b) circulation revenues decreasing by 5% in 2007, 5% in 2008, and 5% in 2009, (c) broadcast and entertainment revenues falling by 16% in 2007, increasing by 3% in 2008 (as a result of increased political advertising), and declining by 3% in 2009, (d) the Step Two Transactions closing by the end of 2007 and including borrowing the $2.13 billion in incremental term loans under the Tranche B Facility and $2.1 billion in Bridge Debt, (e) the divestitures of the Chicago Cubs and Comcast SportsNet closing by the end of 2007, with the net proceeds of $600 million being used to repay a portion of the Credit Agreement Debt, (f) drawing $260 million on the Delayed Draw Facility in 2008 and using the proceeds to repay the maturing $263 million of Senior Notes, (g) capital expenditures of $100 million in 2007, $90 million in 2008, and $90 million in 2009, (h) LIBOR rising by 150 basis points, (i) interest rates on the Credit Agreement Debt and the Bridge Debt increasing by 150 basis points to reflect the higher risk resulting from Tribune's simulated credit deterioration, and (j) a fully drawn Revolving Credit Facility at the time of default.  *Id.* at 5.

[823]  Ex. 214 (Moody's Letter, dated March 29, 2007).

and would weakly position the company at that rating level."[824]  Finally, Moody's indicated its

concern that the increased leverage was occurring at a time of "pressure on the company's

advertising revenue . . . and cyclical fluctuations in the U.S. economy . . . [that] will make it

difficult to materially reduce leverage over the intermediate term, even if the company devotes

the majority of its cash flow . . . to debt reduction."[825]  Moody's concluded by noting that it did

"not view an upgrade as likely over the intermediate term."[826]

Following the announcement that Tribune had entered into the Leveraged ESOP

Transactions, on April 2, 2007, Standard & Poor's Ratings Services, assuming solely the

consummation of the Step One Transactions, lowered Tribune's corporate credit rating to 'BB-'

from 'BB+'.[827]

On April 19, 2007 Standard & Poor's, assuming solely the consummation of the Step One

Transactions, assigned the Credit Agreement Debt a rating of BB-, with a recovery rating of 2

(indicating the expectation for 80%-100% recovery of principal in the event of a payment

---

[824]  *Id.* at 1.  A "Corporate Family Rating" is Moody's "opinion of a corporate family's ability to honor all of its financial obligations and is assigned to a family as if it had a single class of debt [and] a single consolidated legal entity structure."  Ex. 215 at 18 (Moody's Rating Symbols & Definitions).  Under Moody's rating system, "[o]bligations rated 'B' are considered speculative and are subject to high credit risk" and the modifier "2" indicates a "mid-tier" ranking within that generic rating category.  *Id.* at 8.

[825]  Ex. 214 at 1 (Moody's Letter, dated March 29, 2007).

[826]  *Id.* at 6.

[827]  Ex. 80 at 1 (Standard & Poor's Research Report, dated April 2, 2007).  Standard & Poor's determined that, on later stockholder approval of the Step Two Transactions, and "based on our analysis of the proposed capital structure, . . . we would lower [Tribune's post-Step Two] corporate credit rating to 'B' . . . [reflecting Tribune's post-Step Two] highly leveraged capital structure, weakened credit measures, and reduced cash flow-generating capability as a result of the LBO and associated heavy interest burden."  *Id.* at 1-2.  Under Standard & Poor's rating system, "an obligor rated 'BB' is less vulnerable in the near term than other lower-rated obligors. However, it faces major ongoing uncertainties and exposure to adverse business, financial, or economic conditions which could lead to the obligor's inadequate capacity to meet its financial commitments" and "[a]n obligor rated 'B' is more vulnerable than the obligors rated 'BB', but the obligor currently has the capacity to meet its financial commitments.  Adverse business, financial, or economic conditions will likely impair the obligor's capacity or willingness to meets its financial commitments."  *See* Ex. 213 at 10 (Standard & Poor's Ratings).  The addition of a plus (+) or minus (-) sign shows "relative standing within the major rating categories."  *See* Ex. 213 at 10 (Standard & Poor's Ratings).

default).[828]  Tribune's corporate credit rating was BB-/Watch Neg.[829]  Once again, Standard &

Poor's concluded that, under its default scenario, assuming the consummation of the Step One

Transactions and the Step Two Transactions, Tribune was expected to default in 2009.[830]

On April 23, 2007, Moody's Investor Service issued a Rating Action downgrading

Tribune's Corporate Family Rating, assuming solely the consummation of the Step One

Transactions, to 'Ba3' from 'Ba1', explaining that the downgrade reflected the "significant

increase in leverage that will result from Tribune's repurchase of . . . stock . . . and that the

---

[828]  Ex. 216 at 1 (Standard & Poor's Recovery Report, dated April 19, 2007).  Standard & Poor's determined that, on later stockholder approval of the Step Two Transactions, and "based on our analysis of the proposed capital structure, . . . we would lower [Tribune's post-Step Two] corporate credit rating to 'B' with a stable outlook. Under these circumstances, the bank loan rating would also be lowered to 'B'." *Id.* at 1.  "An obligor rated 'B' is more vulnerable than the obligors rated 'BB', but the obligor currently has the capacity to meet its financial commitments.  Adverse business, financial, or economic conditions will likely impair the obligor's capacity or willingness to meets its financial commitments."  *See* Ex. 213 at 10 (Standard & Poor's Ratings).  "An obligation rated 'B' is more vulnerable to nonpayment than obligations rated 'BB', but the obligor currently has the capacity to meet its financial commitment on the obligation.  Adverse business, financial, or economic conditions will likely impair the obligor's capacity or willingness to meets its financial commitment on the obligation."  *See id.* at 4.  "An obligation rated 'BB' is less vulnerable to nonpayment than other speculative issues.  However, it faces major ongoing uncertainties or exposure to adverse business, financial, or economic conditions which could lead to the obligor's inadequate capacity to meet its financial commitment on the obligation."  *See id.* at 4.  The addition of a minus (-) sign shows "relative standing within the major rating categories."  *See id.* at 10.

[829]  Ex. 216 at 1 (Standard & Poor's Recovery Report, dated April 19, 2007).  Under Standard & Poor's rating system, "an obligor rated 'BB' is less vulnerable in the near term than other lower-rated obligors.  However, it faces major ongoing uncertainties and exposure to adverse business, financial, or economic conditions which could lead to the obligor's inadequate capacity to meet its financial commitments."  *See* Ex. 213 at 10 (Standard & Poor's Ratings).  The addition of a minus (-) sign shows "relative standing within the major rating categories."  *See* Ex. 213 at 10 (Standard & Poor's Ratings).  "Watch Neg" means that a rating "may be lowered."  *See id.* at 13.

[830]  Ex. 216 at 3 (Standard & Poor's Recovery Report, dated April 19, 2007).  Standard & Poor's slightly modified default scenario assumed:  (a) publishing advertising revenues declining by 7% in 2007, 4% in 2008, and 4% in 2009, (b) circulation revenues decreasing by 5% in 2007, 5% in 2008, and 5% in 2009, (c) broadcast and entertainment revenues falling by 16% in 2007, increasing by 3% in 2008 (as a result of increased political advertising), and declining by 3% in 2009, (d) the Step Two Transactions closing by the end of 2007 and including borrowing the $2.105 billion in incremental term loans under the Tranche B Facility and $2.1 billion in Bridge Debt (or the issuance of $2.1 billion of senior unsecured notes), (e) the divestitures of the Chicago Cubs and Comcast SportsNet closing by the end of 2007, with the net proceeds being used to repay a portion of the Credit Agreement Debt, (f) drawing $263 million on the Delayed Draw Facility in 2008 and using the proceeds to repay the maturing $263 million of Senior Notes, (g) capital expenditures of $100 million in 2007, $90 million in 2008, and $90 million in 2009, (h) LIBOR rising by 150 basis points, (i) interest rates on the Credit Agreement Debt and the Bridge Debt increasing by 150 basis points to reflect the higher risk resulting from Tribune's simulated credit deterioration, and (j) a fully drawn Revolving Credit Facility at the time of default.  *Id.* at 3.

increase in leverage is occurring at a time of pressure on Tribune's advertising revenue and operating margins."[831]   The rating remained on review for further downgrade.[832]

On May 3, 2007, Fitch Ratings announced that, assuming solely the consummation of the Step One Transactions, it had assigned a 'BB' rating to the Credit Agreement Debt and downgraded the Tribune's Issuer Default Rating to 'B+' from 'BB-', with the rating remaining on Fitch's Rating Watch Negative.[833]   Fitch's announcement explained that its rating actions "reflect the significant debt burden the announced transaction places on the company's balance sheet while its revenue and cash flow have been declining.  Fitch believes that newspapers and broadcast affiliates . . . face meaningful secular headwinds that could lead to more cash flow volatility in the future."[834]   Fitch indicated that, following the closing of the Step Two Transactions, it expected to further downgrade Tribune's Issuer Default Rating from 'B+' to 'B-', albeit with a "Stable Outlook" rating, "predicated upon the view that Tribune's portfolio of assets

---

[831]   Ex. 217 (Moody's Rating Action, dated April 23, 2007).  A "Corporate Family Rating" is Moody's "opinion of a corporate family's ability to honor all of its financial obligations and is assigned to a family as if it had a single class of debt [and] a single consolidated legal entity structure." Ex. 215 at 18 (Moody's Rating Symbols & Definitions).  Under Moody's rating system, "[o]bligations rated 'Ba' are judged to have speculative elements and are subject to substantial credit risk."  *Id.* at 8.  The modifier "3" indicates a ranking in the "lower end" of that generic rating category and the modifier "1" indicates a ranking in the "higher end" of that generic rating category.  *Id.*

[832]   Ex. 217 (Moody's Rating Action, dated April 23, 2007).

[833]   Ex. 218 (Fitch Press Release, dated May 3, 2007).  An "Issuer Default Rating" is Fitch Rating's opinion "on an entity's relative vulnerability to default on financial obligations."  Ex. 219 at 8 (Fitch Ratings Definitions of Ratings).  Under Fitch's rating system, a 'BB' rating indicates an "elevated vulnerability to default risk, particularly in the event of adverse changes in business or economic conditions over time; however, business or financial flexibility exists which supports the servicing of financial commitments" and a 'B' rating indicates that "material default risk is present, but a limited margin of safety remains.  Financial commitments are currently being met; however, capacity for continued payment is vulnerable to deterioration in the business and economic environment."  *Id.*  The plus (+) sign and minus (-) sign modifiers denote relative status within the major rating categories.  *Id.* at 9.

[834]   Ex. 218 (Fitch Press Release, dated May 3, 2007).

affords it the flexibility to postpone and potentially avoid financial distress even if its core businesses underperform to a degree."[835]

On May 18, 2007 (the day after the signing of the Credit Agreement), Moody's reaffirmed that Tribune's 'Ba3' Corporate Family Rating remained on review for downgrade and indicated that it would likely downgrade Tribune's Corporate Family Rating to 'B2' with a stable rating outlook if "(1) [the Step Two Transactions are] completed in accordance with the transactions outlined in Tribune's April 1, 2007 Form 8-K and; (2) industry conditions, the company's cash flow generation and anticipated asset sale proceeds are in line with Moody's expectations."[836]  Such a downgrade would likely result in the "ratings for the proposed bank credit facilities . . . moving to B1 from Ba2."[837]

### b.    Analyst Reports.

Following Tribune's announcement of the Leveraged ESOP Transactions, a Bear Stearns analyst research report published on April 2, 2007, concluded that, "[a]fter an exhaustive six month review we believe this complicated and heavily levered transaction is another indication

---

[835]  Ex. 218 (Fitch Press Release, dated May 3, 2007).  An "Issuer Default Rating" is Fitch Rating's opinion "on an entity's relative vulnerability to default on financial obligations."  Ex. 219 at 8 (Fitch Ratings Definitions of Ratings).  Under Fitch's rating system, a 'B' rating indicates that "material default risk is present, but a limited margin of safety remains.  Financial commitments are currently being met; however, capacity for continued payment is vulnerable to deterioration in the business and economic environment."  Id.  The plus (+) sign and minus (-) sign modifiers denote relative status within the major rating categories.  Id. at 9.

[836]  Ex. 220 (Moody's Press Release, dated May 18, 2007).  A "Corporate Family Rating" is Moody's "opinion of a corporate family's ability to honor all of its financial obligations and is assigned to a family as if it had a single class of debt [and] a single consolidated legal entity structure."  Ex. 215 at 18 (Moody's Rating Symbols & Definitions).  Under Moody's rating system, "[o]bligations rated 'Ba' are judged to have speculative elements and are subject to substantial credit risk" (Id. at 8) and "[o]bligations rated 'B' are considered speculative and are subject to high credit risk."  Id.  The modifier "3" indicates a ranking in the "lower end" of that generic rating category and the modifier "2" indicates a "mid-tier" ranking within that generic rating category.  Id.

[837]  Ex. 220 (Moody's Press Release, dated May 18, 2007).  Under Moody's rating system, "[o]bligations rated 'B' are considered speculative and are subject to high credit risk" and "[o]bligations rated 'Ba' are judged to have speculative elements and are subject to substantial credit risk."  Ex. 215 at 8 (Moody's Rating Symbols & Definitions).  The modifier "1" indicates a ranking in the "higher end" of that generic rating category and the modifier "2" indicates a "mid-tier" ranking within that generic rating category.  Id.

of the waning interest in the newspaper business given the ongoing secular challenges that are weighing on the fundamental outlook."[838]

BMO Capital Markets issued an analyst report on April 2, 2007, rating the Tribune Common Stock as "Market Perform" and the industry as "Underperform" and increasing its target stock price to $34.[839]  BMO noted that the $25 million break-up fee was "low" and "leaves the door ajar for the Burkle/Broad camp, but after raising their bid once by all accounts we see a second raise as improbable."[840]  BMO concluded that Mr. Zell's offer was the "best available fair price . . . [at a] valuation [that] mirrors levels where comparable Newspaper and Broadcasting asset values now trade."[841]

Goldman Sachs issued a Company Update on April 3, 2007, rating the Tribune Common Stock as "Neutral" and the media industry as "Cautious."[842]  Goldman Sachs noted that the Leveraged ESOP Transaction left "little room for error, particularly in this challenging newspaper operating environment."[843]  Although acknowledging the need for stockholder and regulatory approval, Goldman Sachs indicated that it expected the Step One Transactions and the Step Two Transactions to close and issued a six month price target of $34, concluding that the "tax-advantaged nature of ESOP ownership has allowed a higher purchase price."[844]

Barrington Research issued a Progress Report on Tribune on April 3, 2007, rating Tribune as "Market Perform."[845]  With respect to the Tender Offer, Barrington Research

---

[838]   Ex. 221 at 3 (AFX News Limited, dated April 2, 2007).

[839]   Ex. 222 at 1 (BMO Analyst Report, dated April 2, 2007).

[840]   *Id.*

[841]   *Id.*

[842]   Ex. 223 at 1 (Goldman Sachs Company Update, dated April 3, 2007).

[843]   *Id.*

[844]   *Id.*

[845]   Ex. 224 at 1 (Barrington Research Progress Report, dated April 3, 2007).

recommended that investors tender "all shares, getting cash for the likely allocation of about half the shares and then selling the balance in the open market due to time value of money considerations."[846]  Although acknowledging that the transaction "does entail some risks related to the high degree of financial leverage in the context of stagnating core revenue and circulation trends,"[847] Barrington Research concluded that going private would "buy the company time to make the hard decisions required to transform the business model to one appropriate to the new realities of the information and Internet age."[848]

### 16.    Closing of the Step One Financing and Expiration and Funding of the Tender Offer.

On May 9, 2007, in satisfaction of one of the conditions to the completion of the Tender Offer, VRC delivered its opinion to the Tribune Board that, giving effect to the Step One Transactions, Tribune was solvent.[849]  VRC subsequently delivered a bring-down of its solvency opinion on May 24, 2007.[850]  Tribune filed VRC's May 9, 2007 and May 24, 2007 solvency opinions with the SEC as amendments to the Tender Offer Filing.[851]  The Tender Offer expired on May 24, 2007.  On May 31, 2007, Tribune announced that 218,132,108 shares of Tribune Common Stock had been tendered in the Tender Offer.[852]  Pursuant to the terms of the Tender Offer, Tribune repurchased the 126 million shares it had tendered for on a pro rata basis.[853]  The shares tendered in the Tender Offer represented approximately 90% of the outstanding Tribune

---

[846]  *Id.*

[847]  *Id.*

[848]  *Id.*

[849]  Ex. 268 (VRC Step One Solvency Opinion, dated May 9, 2007).  *See* Report at § III.E.3.c. for a discussion of the solvency opinions delivered by VRC at Step One.

[850]  Ex. 269 (VRC Step One Solvency Opinion Bring-Down Letter, dated May 24, 2007).

[851]  Ex. 936 (Tribune Form TO-I/A, filed May 11, 2007); Ex. 937 (Tribune Form TO-I/A, filed May 24, 2007).

[852]  Ex. 225 (Tribune Press Release, dated May 31, 2007).

[853]  Ex. 226 at 8 (Proxy Statement, dated July 13, 2007).

Common Stock, and, after proration, the shares that Tribune repurchased represented approximately 52% of its shares outstanding.[854]  Tribune subsequently retired the repurchased shares on June 4, 2007.[855]  In the press release announcing the results of the Tender Offer, Mr. FitzSimons was quoted as saying, "The first stage of our transaction that will result in [Tribune] going private is now complete.  We look forward to obtaining the necessary approvals for the next stage of the transaction and to completing the transition to a private company."[856]

As described below, Tribune utilized proceeds of the Credit Agreement to repurchase the shares tendered in the Tender Offer.[857]  Tribune deposited the aggregate purchase price for the shares with Computershare Trust Company, N.A., the depositary for the Tender Offer, which acted as agent for Tribune for the purpose of receiving payment from Tribune and transmitting payment to the tendering stockholders.[858]

On the Step One Financing Closing Date, JPMCB and MLCC made the following wire transfers to Tribune:

- $5.515 billion, in respect of the Tranche B Facility;[859] and

- $1.5 billion, in respect of the Tranche X Facility.[860]

On the Step One Financing Closing Date, Tribune thereafter disbursed $4.284 billion to Computershare Trust Company, N.A. to consummate the Tender Offer,[861] approximately $2.5 billion to Citicorp to satisfy the 2006 Bank Debt, and $1,459,391 to Cahill Gordon & Reindel

---

[854]   Ex. 225 (Tribune Press Release, dated May 31, 2007).

[855]   Ex. 4 at 46 (Tribune 2007 Form 10-K).

[856]   Ex. 225 (Tribune Press Release, dated May 31, 2007).

[857]   Ex. 4 at 46 (Tribune 2007 Form 10-K).

[858]   Ex. 5 at 82 (Tender Offer).

[859]   Ex. 205 at 1 (Step One Flow of Funds Memorandum).

[860]   *Id.*

[861]   *Id.* at 2.

LLP (as legal counsel to the Lead Banks).[862]  Based on the Examiner's review of Tribune's books

and records, Tribune also made the following disbursements on the Step One Financing Closing

Date:[863]

---

[862]  *Id.*

[863]  The record developed by the Examiner during the course of the Investigation does not resolve the question of whether these non-advisory fees were paid to or for the benefit of the investment banking entities (MLPFS, CGMI, JPMorgan, and BAS), which constituted the "Lead Arrangers" under the Credit Agreement and Bridge Credit Agreement, their lender-affiliates (MLCC, Citicorp, JPMCB, Bank of America, and Banc of America Bridge), which constituted "Initial Lenders" and held other titles under the Credit Agreement and Bridge Credit Agreement, or both.  The governing documents contain a number of conflicting provisions in this regard.  (This is not true of the fees separately paid for advisory services, as noted below).  For instance, the Step One Commitment Letter, Ex. 944 at 4, states in relevant part:

> Fees.  As consideration for the commitments of the Initial Lenders hereunder
> and the agreement of the Lead Arrangers to arrange, manage, structure and
> syndicate the Senior Secured Credit Facilities, you agree to pay to them when
> due the fees as set forth in the First Step Fee Letter.

The Step Two Commitment Letter contains similar language, referring to Step Two Fee Letter rather than the Step One Fee Letter as the source of information regarding calculation of the fees.  *See* Ex. 1010 at 5.  As a general matter, both Commitment Letters are signed by both the investment banking entities (*i.e.*, the Lead Arrangers), and lender affiliate entities (*i.e.*, the Initial Lenders).  (For reasons that are not readily apparent, MLCC signed these agreements, but MLPFS did not.  Further, CGMI signed on behalf of "Citigroup," comprising all of the Citigroup Entities).  Thus, it appears that the investment banker entities and lenders are both to receive fees, or joint fees.

The Step One Fee Letter and Step Two Fee Letter, however, refer only to payment of certain "Underwriting Fees" in consideration for the Initial Lender's (*i.e.,* the lender-affiliates) commitments to fund and arrange the Step One Financing and the Step Two Financing pursuant to each commitment letter.  *See* Ex. 542 at 1; Ex. 543 at 1.  In other words, these agreements do *not* provide for the payment of any fees to the Lead Arrangers (*i.e.*, the investment banking entities).

Conversely, the Credit Agreement and Bridge Credit Agreement do provide for the payment on closing of fees to the Lead Arrangers (*i.e.*, the investment banking entities), but do not expressly provide for any payment of fees to the Initial Lenders in their capacity as such.  The fees provision of the Credit Agreement reads in relevant part:

> (c)     Agent's fees; Lead Arrangers' Fees.  Borrower shall pay to (i) the Agent
> for its own account such fees as may from time to time be agreed between
> Borrower and Agent and (ii) the Lead Arrangers for their respective own
> accounts such fees as agreed to between Borrower and each such Lead Arranger.

Ex. 179 at § 2.04(c) (Credit Agreement).  The Bridge Credit Agreement contains a nearly identical provision:

> (c)     Agent's fees; Lead Arrangers' Fees.  Borrower shall pay to (i) the Agent
> for its own account such fees as may from time to time be agreed between
> Borrower and Agent and (ii) the Lead Arrangers for their respective own
> accounts such fees as agreed to between Borrower and each such Lead Arranger
> (including pursuant to the Second Step Fee Letter).

| Step One Financing Fees, Costs, and Expenses | |
|---|---|
| JPM | $35,042,750 |
| Merrill Entities | $34,992,750 |
| Citigroup Entities[864] | $32,529,375 |
| BofA | $18,002,625 |
| Barclays[865] | $3,375,000 |
| LaSalle Bank National Association[866] | $2,187,500 |
| Lehman Brothers[867] | $2,187,500 |
| Sumitomo Mitsui Banking Corporation[868] | $2,187,500 |
| Other Step One Financing Costs and Expenses[869] | $3,585,523 |
| **Total Step One Financing Fees, Costs, and Expenses** | **$134,090,523** |

---

Ex. 175 at § 2.04(c) (Bridge Credit Agreement).  Neither agreement provides for the payment of an "Underwriting Fee" to the Initial Lenders as expressly contemplated by the Step One Fee Letter and the Step Two Fee Letter.

The flow of funds memoranda and wire instructions prepared in connection with each closing are generally consistent with the Credit Agreement and Bridge Credit Agreement on this—but not entirely so—providing yet another ambiguity.  Consistent with the Credit Agreement and Bridge Credit Agreement, no "Underwriting Fee" fee is paid, but instead only fees payable to the Lead Arrangers pursuant to Section 2.04(c)(ii) of each of the Credit Agreement and Bridge Credit Agreement.  The memoranda further indicate that these fees are paid to the investment banking entities as Lead Arrangers, rather than their lender affiliates, with one exception—MLCC, which is the lender-affiliate of MLPFS, an investment banking firm and Lead Arranger.

Although the Examiner was able to confirm that these sums left Tribune's accounts, he was unable to confirm during the Investigation which entities actually received the funds and the manner, if any, in which the funds were shared among the entities.

[864] Of this amount, $3.25 million was the result of payments made via JPMorgan to all non-Lead Banks.

[865] Payments made via JPMorgan to all non-Lead Banks.

[866] Payments made via JPMorgan to all non-Lead Banks.

[867] Payments made via JPMorgan to all non-Lead Banks.

[868] Payments made via JPMorgan to all non-Lead Banks.

[869] Includes the payment of out-of-pocket expenses, legal fees, and various other financing-related costs in connection with Step One.

The wire transfers from JPMCB and MLCC were sent to Tribune's concentration account at JPMorgan Chase Bank in Chicago, Illinois.[870]

Based on the Examiner's review of Tribune's books and records, on the Step One Financing Closing Date, Tribune also made the following payments in connection with the consummation of the Tender Offer:

| Step One Tender Offer/Dealer Manager Fees[871] | |
|---|---:|
| Merrill Entities | $460,000 |
| Citigroup Entities | $450,000 |
| BofA | $225,000 |
| JPM | $374,976 |
| All Other Tender Offer Fees | $3,444,274 |
| **Total Step One Tender Offer/Dealer Manager Fees** | **$4,954,250** |

Based on the Examiner's review of Tribune's books and records, Tribune made the following payments of Advisor Fees and other fees, costs, and expenses related to the Step One Transactions:

| Step One Related Advisor Fees, Costs, and Expenses | |
|---|---:|
| Morgan Stanley[872] | $7,667,704 |
| **Total Step One Advisor Fees, Costs, and Expenses** | **$7,667,704** |

---

[870]    Ex. 205 at 1-2 (Step One Flow of Funds Memorandum).

[871]    Dealer Manager fees were paid in accordance with the terms of the Step One Engagement Letter.  Ex. 306 (Step One Engagement Letter).

[872]    The payment of these Morgan Stanley Advisor Fees was made on May 9, 2007.  In addition, the Morgan Stanley engagement agreement provided for an upfront fee of $2.5 million, which was paid on November 13, 2006.

| | |
|---|---|
| **All Other Step One Related Fees, Costs, and Expenses**[873] | **$14,173,727** |

### E.    Knowledge and Actions of Key Participants in the Step One Transactions.

The Report now addresses the knowledge and actions of the key participants with respect to the events culminating in the Step One Transactions.  Although the Statement of Facts generally is organized chronologically, this section is organized by participant, such that the subsections span substantially the same multi-month period, but each focuses on a different participant.

### 1.    Management's Knowledge of the Tribune Entities' Financial Performance Through the Step One Financing Closing Date.

As a general matter, Tribune's management, by definition, had virtually unlimited access to information pertaining to the Tribune Entities' operations and financial performance, in accordance with procedures and policies that management had instituted to gather and evaluate such data.[874]  Tribune management, among other things:  (a) planned and executed Tribune's financial strategy, (b) budgeted, monitored, and reported on Tribune's financial performance (both internally and publicly),[875] and, (c) as a part of Tribune's strategic review process culminating with the entry into the Leveraged ESOP Transactions and the closing of Step One,

---

[873]  "All Other Step One Related Fees, Costs, and Expenses" generally consists of all other amounts (in addition to those otherwise specifically categorized above) which are assumed to be related to Step One based on the fact that they were expensed in either Q1 or Q2 2007.  With the exception of the Wachtell portion of these fees ($600,000) which is known to have been part of a payment made to Wachtell on June 4, 2007, actual payment dates are generally unknown.

[874]  Management includes the executive officers of Tribune as well as functional area and operational leadership. Examples of key management personnel, include for example, participants in VRC and underwriter due diligence meetings.  *See, e.g.*, Ex. 228 at VRC0002821-824 (Tribune Company Valuation Research Corp. Due Diligence Agenda) (identifying the participants in the two-day VRC due diligence meeting held September 19-20, 2007); Ex. 229 at MD00380 (Underwriters Due Diligence Agenda) (identifying the presenters in the meeting with Tribune's underwriters held on October 1, 2007).

[875]  Including the filing with the SEC of required public disclosures.

was the principal source of information for parties advising and/or participating in that transaction. As such, management was aware of both Tribune's actual and projected financial performance (and the assumptions on which that projected performance was based).  Before the approval of the Leveraged ESOP Transactions on April 1, 2007, management also was aware of the financial performance of the Tribune Entities through at least February 2007.  Similarly, before the Step One Financing Closing Date, management was aware of Tribune's actual financial performance through at least March and April 2007.

As discussed elsewhere in the Report, management began developing its 2007 budget as a part of its normal course annual budgeting process.[876]  This process culminated in Tribune Board approval of the 2007 budget at the February 13, 2007 Tribune Board meeting. Management was aware that the 2007 budget and the operating plan contemplated reduced 2007 performance relative to actual 2006 results, and, in certain internal communications, expressed concerns about this reduced expected performance.[877]

Before the Tribune Board's approval of the Leveraged ESOP Transactions on April 1, 2007, management also was aware that adverse performance against the budget could affect the value of Tribune's assets and, correspondingly, Tribune's resulting equity value.  For example, on March 24, 2007, James King, a Tribune employee, e-mailed Tribune Treasurer Chandler Bigelow as follows:  "[I]f I am reading this right, we have a pretty narrow band for success under the ESOP—*i.e.,* if we are off plan by 2% we have no value in the ESOP for 5 years.  Are there other dynamics at work I don't understand?"  Mr. Bigelow responded: "Probably makes sense to

---

[876]    *See* Report at § III.C.1.b.

[877]    *See, e.g.,* Ex. 1052 at TRB0047811 (Kazan E-Mail, dated February 21, 2007) ("If I'm reading this correctly, our plan has us being $47 million below 2006 for the first half.  I don't know what the bankers will base their threshold number on, but it suggests we really need to get to the bottom of that.  Otherwise, we are already half-way towards not being able to meet that covenant (which enables us to do the spin)").

meet on Monday to discuss.  But yes, if we hit the down 2 case there is no equity value in the first 5yrs."[878]

As discussed elsewhere in the Report,[879] management also was aware of Tribune's monthly financial performance against monthly projections (based on monthly detail corresponding to 2007 operational plan) in periods leading up to board approval of the Leveraged ESOP Transactions and through the Step One Financing Closing Date.  Tribune's actual performance, and variance from the 2007 operational plan, were formally reported in Brown Books, which, as previously noted, were typically issued within two to three weeks after the closing of each reporting period (approximating one month of results).[880]  Hence, management was aware of results, as reported in the Brown Books, for the first two months of 2007 preceding the April 1, 2007 entry into the Leveraged ESOP Transactions and the first four months preceding the Step One Financing Closing Date.

As illustrated in the following table, the Tribune Entities' monthly operating profit for the first five months of 2007 deviated unfavorably at an increasing rate from the original February plan:

---

[878]    Ex. 230 at TRB0082812-13 (Bigelow E-Mail, dated March 24, 2007).  Mr. Bigelow's comments regarding pro forma "equity value" appear to be based on a sensitivity analysis performed by management assuming a multiple of 8 times projected annual EBITDA (based on an assumed 2%, year-over-year, compounding downward adjustment of publishing revenue estimates contained in the 2007 operating plan, as well as associated EBITDA reductions).  This analysis further assumes that estimated debt of approximately $12.5 billion is subtracted from the asset value calculated using this methodology.  *See, e.g.*, Ex. 231  at TRB0109124-203 (February 8, 2007 ESOP Transaction Model) (reflecting 2% compounding publishing revenue declines and $12.5 billion in debt deduction in determining zero equity value between 2008 and 2013). *See also* Ex. 232 (ESOP- Equity Value Projections).

In addition to being a relatively simplistic analysis of downwardly adjusted cash flow expectations, the model on which this analysis is based clearly anticipates the inclusion of Step Two Debt in calculating equity values. The Examiner notes that the model implicitly fails to account for any tax savings attributes that may be associated with the Step Two S-Corporation/ESOP structure, among other things.

[879]    *See* Report at § III.C.1.

[880]    Slight differences in a reporting period in relation to a given calendar month may exist, but those differences are considered immaterial for purposes of the discussions in the Report.

| TRIBUNE OPERATING PROFIT ($000s) | | | | | |
|---|---|---|---|---|---|
| | 01/2007 | 02/2007 | 03/2007 | 04/2007 | 05/2007 (1) |
| **Plan** | $ 50,481 | $ 51,785 | $ 80,754 | $ 73,591 | $ 93,116 |
| **Actual** | $ 52,467 | $ 50,739 | $ 78,843 | $ 62,480 | $ 73,515 |
| **Variance** | $ 1,986 | ($ 1,046) | ($ 1,911) | ($ 11,111) | ($ 19,601) |
| **% Variance to Plan** | 3.93% | -2.02% | -2.37% | -15.10% | -21.05% |

(1) May results are summarized, although such results would have been unavailable to management in Brown Book format prior to the Step One Financing Closing Date on June 4, 2007.

Again, management was aware of these developments and reported on them both internally and publicly.[881]  Indeed, management considered and discussed at various times,

---

[881]  Tribune issued its Form 10-K for year end 2006 on February 26, 2007. See Ex. 14 (Tribune 2006 Form 10-K). Tribune issued its Form 10-Q for the first quarter of 2007 on May 9, 2007.  *See* Ex. 55 (Tribune 2007 Form 10-Q, filed May 9, 2007).  In addition to its 10-K and 10-Q disclosures, Tribune issued press releases disclosing certain other information regarding monthly financial performance.  During early 2007, Tribune issued press releases including the following:

| EARLY 2007 TRIBUNE PRESS RELEASES | |
|---|---|
| Date of Press Release | Nature of Disclosure |
| February 23, 2007 | January 2007 Revenue Disclosure and Commentary |
| March 11, 2007 | February 2007 Revenue Disclosure and Commentary |
| April 19, 2007 | Quarter 1 2007 Financial Results Disclosure |
| May 14, 2007 | April 2007 Revenue Disclosure and Commentary |

*See* Ex. 65 (Tribune Press Release, dated February 23, 2007); Ex. 233 (Tribune Press Release, dated March 11, 2007); Ex. 234 (Tribune Press Release, dated April 19, 2007); Ex. 79 (Tribune Press Release, dated May 14, 2007).  Tribune management had access to additional information bearing on actual financial performance beyond data reported in the Brown Books or disclosed in press releases or filings with the SEC.  For example, as described in the Rule 2004 Examination of Mr. Amsden, Tribune issued periodic "flash reports," which according to Mr. Amsden were "early indicators" of period financial results (*i.e.*, precursors to the more formal, and finalized, Brown Books).  Typically, the flash reports were issued approximately one week after the end of each reporting period.  As such, management would have had at least some indication of performance for the period financial performance, before the issuance of each period's Brown Book.  *See* Ex. 66 at 19:5-20:8  (Rule 2004 Examination of Harry Amsden, December 16, 2009).  Also, as evidenced by the Tribune Board materials and other documents, management was reporting on then-current financial trends and performance metrics that it was observing contemporaneously *i.e.*, before the close of the then-current reporting period.  *See, e.g.*, Ex. 68 at TRB0413504 (Tribune Board Meeting Materials, dated February 13, 2007) (reporting that although January ad revenue finished down 3%, February was "pacing up 2%"); Ex. 65 (Tribune Press Release, dated February 23, 2007) (observing that "period 2 [February] ad revenue trends are better than period 1 in both publishing and broadcasting, particularly retail revenue in publishing").

internally and with others, whether the actual results required a modification to the Tribune

Board-approved 2007 budget (a source of projected financial performance provided to numerous

parties to the transaction and on which, among other things, VRC relied in developing its Step

One solvency opinion).  For example, one e-mail dated April 30, 2007 from Peter Knapp, the

publishing group controller, to Brian Litman and Mr. Bigelow stated:[882]

> Brian and Chandler:
>
> You guys need to help get with Don and Crane to figure out
> whether or not we are doing an updated projection next week
> knowing that if we do, we may end up with some consistency
> issues to the recent document disclosures.  Harry is insisting that
> we HAVE to and I told him I thought the 6th floor was thinking we
> weren't and he should get to Don and figure it out.
>
> Another stellar week in April. . . .
>
> Pete

Furthermore, an e-mail exchange (dated March 19, 2007 and March 20, 2007) reflects

that an EGI representative, Nils Larsen, expected to meet with Mr. Bigelow on March 20, 2007

to inquire regarding both the status of availability of the second period 2007 results as well as an

apparent earlier statement by Mr. Bigelow regarding the need to "refine their projections for

2007."[883]  In connection with a review of actual January and February 2007 performance against

---

[882]   *See* Ex. 235 at TRB0137005 (Knapp E-Mail, dated April 30, 2007).

[883]   One of the Parties cited an e-mail exchange between the Citigroup Entities and members of management as
evidence that management inquired whether there ought to be adjustments to Tribune's 2007 and 2008
projections (which management ultimately concluded not to make).  *See* Ex. 236 at TRB0057895-96 (Litman
E-Mail, dated March 5, 2007).  This discussion, however, appears to pertain only to adjustments relating to
expected distributions from unconsolidated equity ownership interests held by Tribune and not the forecasted
revenue and earnings from Tribune operations.  One of the Parties also cited an e-mail exchange in which
Mr. Bigelow states:  "I am working on whether our full year projection will change and let you know in the
morning, but I expect for full year we are about $25M lower than our original plan."  *See* Ex. 342 at
TRB0077179 (Bigelow E-Mail, dated March 21, 2007).  It is not clear, however, that this statement refers to a
reduction in earnings expectations for 2007 or contemplated levels of debt repayment assumed in the projection
model.  There is also another e-mail chain cited by one of the Parties as potential evidence of an alleged failure
of Tribune to properly modify its projections in light of less-than-expected operating results in early 2007.  *See*
Ex. 238 at TRB057899-900 (Kurmaniak E-Mail, dated March 5, 2007).  Rather than evidencing a failure of the
projections to reflect reasonable expectations, however, these e-mails relate to the magnitude of growth in

plan, on March 21, 2007, Daniel Kazan (Tribune) e-mailed Mr. Bigelow, observing that, in connection with an upcoming ratings agency presentation, "we should discuss with Don before putting in the deck or showing to Nils.  This is tricky because we've told Nils that we aren't changing our plan based on results from the first two periods.  If he sees this, it may raise issues. We may need to weigh that against showing this in the rating agency deck."[884]

Notwithstanding the various management discussions about possible revisions to Tribune's projections, in accordance with past practices,[885] Tribune did not modify its 2007 operating plan projections through the closing of the Step One Transactions on June 4, 2007.  In May 2007, however, management did incorporate the effects of management's revised expectation to sell additional assets during 2008, which simply was not contemplated in earlier models.[886]  Ostensibly, management was also aware of mixed public reaction to its April 2, 2007 announcement of the Leveraged ESOP Transactions.[887]

---

expected distribution amounts and an allocation of cash flow from equity investments between the Publishing Segment and the Broadcasting Segment.

[884]   *See* Ex. 602 at TRB0078233–35 (Kazan E-Mail, dated March 21, 2007).  "Don", referred to in the e-mail appears to refer to Donald Grenesko, Tribune's Senior Vice President Finance and Administration.  "Nils" refers to Nils Larsen, an EGI representative involved in the transaction.

As reflected in monthly Brown Books for period 1 and period 2, 2007, the differences between the January 2007 and February 2007 actual operating profit results and plan were favorable 3.93% and unfavorable 2.02% in January 2007 and February 2007, respectively.  *See* Ex. 240 (Tribune Brown Book for Period 1, 2007) and Ex. 241 (Tribune Brown Book for Period 2, 2007).  January 2007 and February 2007 actual results were contained in the ratings agency presentation, as were comparisons of those results to comparable periods in the prior year.  Comparison of actual January 2007 and February 2007 results to plan were not disclosed in those presentation materials.  *See* Ex. 242 (Rating Agency Presentation, dated March 2007).

[885]   *See* Ex. 66 at 25:18-26:32 (Rule 2004 Examination of Harry Amsden, December 16, 2009).

[886]   See Report at § III.C.1.e.

[887]   *See, e.g.,* Ex. 243 (Musil E-Mail, dated May 7, 2007)  Analyst commentary ranged from favorable to negative. *See, e.g*., Ex. 224 (Barrington Research Report, dated April 3, 2007) (observing "The ownership structure is one that should benefit employees, though it does entail some risks related to the high degree of financial leverage in the context of stagnating core revenue and circulation trends.  Favorably, the going private transaction will provide an opportunity for the Company to restructure its operations while remaining outside the public limelight."); Ex. 244 (Lehman Brothers Report, dated April 2, 2007) (which observed "With only a $315 equity contribution from Sam Zell, this leaves Tribune with debt-to-2007E-EBITDA of 10x which we believe is far too high for secularly declining businesses.").

2.    **Knowledge of the Tribune Board and the Special Committee of the Tribune Entities' Financial Performance Through the Step One Financing Closing Date.**

a.    **The Tribune Board.**

From late 2005 (when the Tribune Board, Tribune's management, and Tribune's financial advisor at the time, MLPFS,[888] met to discuss strategic alternatives for Tribune) through the time of the Tribune Board's agreement to create the Special Committee in September 2006, the Tribune Board considered and evaluated several strategic alternatives for Tribune, including the potential sale or spin-off of the Broadcasting Segment, the outright sale of Tribune to financial buyers, strategic business combinations, share repurchase programs, and leveraged recapitalizations, among other alternatives.[889]

Following the September 21, 2006 Tribune Board meeting, however, at least until approval of the Leveraged ESOP Transactions, the Tribune Board largely delegated responsibility for the oversight of the process of reviewing strategic alternatives for the Tribune Entities to the Special Committee.[890]  As such, the minutes of the Tribune Board meetings and Special Committee meetings during this period suggest that the full Tribune Board was not directly involved in much of the strategic review process after the Special Committee's creation, other than in connection with the ultimate approval of the Leveraged ESOP Transactions on April 1, 2007.[891]

---

[888]    Tribune subsequently also engaged CGMI to assist it in the strategic review process.

[889]    The Tribune Board's evaluation of these, among other, alternatives was disclosed in general terms, in the Tender Offer filing.  The Tender Offer contains a more comprehensive discussion of the Tribune Board's involvement in the strategic review process for periods preceding the establishment of the Special Committee.  *See* Ex. 5 at 15-18 (Tender Offer).

[890]    Before approval of the Leveraged ESOP Transactions, the Special Committee was comprised of members of the Tribune Board, excluding Mr. Chandler, Mr. FitzSimons, Mr. Goodan, and Mr. Stinehart.  As such, information available to the Special Committee was available to certain members of the Tribune Board.

[891]    In connection with that approval, Mr. Chandler, Mr. Goodan, and Mr. Stinehart abstained from voting.  Ex. 146 at TRB0415621 (Tribune Board Meeting Minutes, dated April 1, 2007).

Including the September 21, 2006 Tribune Board meeting (at which the Tribune Board discussed the creation of the Special Committee), through the Step One Financing Closing Date, the Tribune Board met on seven occasions: September 21, 2006,[892] October 18, 2006, December 12, 2006, February 13,  2007, April 1, 2007, May 9, 2007, and May 21, 2007.  All but two of the meetings preceded the Tribune Board's approval of the Leveraged ESOP Transactions on April 1, 2007.

As reflected in minutes of the Tribune Board meetings occurring on and after September 21, 2006 and through April 1, 2007 (and the "Tribune Board books" disseminated to Tribune Board members in advance of certain of those meetings), the Tribune Board was made aware of the consolidated and segment level financial performance of the Tribune Entities

---

[892]    The minutes of the September 21, 2006 Tribune Board meeting indicate that Mr. FitzSimons described the strategic review process undertaken after the Tribune Board's July 19, 2006 meeting and reviewed strategic analyses previously undertaken by Tribune and its financial advisors that began in 2005. Ex. 93 at TRB0434051 (Tribune Board Meeting Minutes, dated September 21, 2006).  According to the minutes of that meeting, he also described actions taken by Tribune to address the decline in operating performance throughout 2005 and 2006.  *Id.*

The minutes also indicate that Donald Grenesko reviewed a report, provided to the Tribune Board in advance of the meeting, regarding Tribune's analysis of strategic alternatives.  Ex. 93 at TRB0434051 (Tribune Board Meeting Minutes, dated September 21, 2006).  The Examiner did not review this report.  The minutes also refer to a review of projected operating performance for 2006 through 2010.  The materials provided to Tribune Board members in advance of the meeting, as reviewed by the Examiner, did not contain those projections, nor do the minutes shed additional light as to their content.  *Id.*  The minutes reflect that representatives of both MLPFS and CMGI discussed the content of materials provided to the Tribune Board in advance of the meeting.  *Id.*  The Examiner and his professionals located and reviewed only a MLPFS presentation package entitled "Confidential Discussion Materials Prepared For the Board of Directors of Tribune" dated September 21, 2006. Ex. 245 at TRB0042267-311 (Confidential Discussion Materials, dated September 21, 2006).  The CGMI materials, referenced in both the  meeting minutes and the letter transmitting materials to the Tribune Board members in advance of the meeting have not been located as part of the Examiner's review.  The September 21, 2006 meeting minutes further reflect that MLPFS described each of five strategic alternatives and potential value creation associated with each.  Ex. 93 at TRB0434051 (Tribune Board Meeting Minutes, dated September 21, 2006).  MLPFS also reviewed a listing of potential strategic acquirers, as well as private equity investor interest in Tribune.  *Id.*  MLPFS concluded that pursuing a business combination with a strategic or private equity buyer was likely to produce the greatest value to Tribune stockholders.  *Id.*

Although the Examiner and his professionals were unable to locate the CGMI materials, the Tribune Board minutes indicate that representatives of CGMI discussed those materials and concluded that a leveraged buyout would yield the greatest value to stockholders.  *Id.* at TRB0434051-52.  The minutes further reflect that CGMI representatives discussed, among other things, a comparison of Tribune's projections prepared both by the Boston Consulting Group and other analysts, as well as a  "valuation summary of Tribune's assets on a consolidated and unconsolidated basis."  *Id.* at TRB0434051.

through year end 2006 (as the audited financial statements had already been approved by the

Tribune Board for issuance) and information bearing on financial results for the first period, *i.e.*,

January 2007.[893]  As previously indicated, in February the Tribune Board had also approved the

2007 budget.[894]  The Examiner found no conclusive evidence that the Tribune Board was

---

[893] For example, the minutes of the October 18, 2006 Tribune Board meeting reflect that Mr. Grenesko reviewed third quarter 2006 results and commented on factors affecting those results.  Ex. 94 at TRB0434068 (Tribune Board Meeting Minutes, dated October 18, 2006).  According to the minutes, he also reviewed operating performance trends for Tribune as compared to its peers.  *Id.*  According to the minutes, Merrill's Michael Costa reviewed the state of the strategic review process.  *Id.* at TRB0434065.  The minutes also indicate that Mr. Landon discussed a written report, provided to board members before the meeting, regarding the status of online (interactive) initiatives.  *Id.* at TRB0434068.  The Examiner was unable to locate or review this report.

The minutes of the December 12, 2006 Tribune Board meeting reflect that Mr. Grenesko discussed the projected financial performance of the Tribune Entities for the fourth quarter 2006 and full fiscal year, both on a consolidated and line-of-business, or segment, basis.  Ex. 246 at TRB0434078 (Tribune Board Meeting Minutes, dated December 12, 2006).  Materials disseminated in advance of the meeting contained commentary regarding "business conditions and recent Company developments," observing, with respect to publishing and interactive, that "the ad environment remains challenging with continued softness in national advertising and lower spending….," and that "Interactives fourth quarter revenues are projected to increase 28% over 2005," among other things.  Ex. 247 at TRB-UR-0433799-800 (Tribune Board Meeting Materials, dated December 12, 2006).  Broadcasting Segment commentary recognized increased advertising revenues in October and November "due to strong political spending," although it was noted that "December is currently pricing down 8%."  *Id.* at TRB-UR-0433800.  The Tribune Board book materials also included a "Development Update."  *Id.*

The December 12, 2006 meeting minutes also reflect that MLPFS reviewed a report that analyzed a range of alternatives.  Ex. 246 at TRB0434084 (Tribune Board Meeting Minutes, dated December 12, 2006).  In connection with the review of the MLPFS report, the Tribune Board authorized Mr. FitzSimons to further consider a spin-off of the broadcasting group, and "pursue a workplan that would enable such a transaction."  *Id.*  The minutes also reflect that Mr. Landon and Mr. Ferguson presented a report on CareerBuilder and other Interactive business initiatives.  *Id.* at TRB0434080-83.

The minutes for the February 13, 2007 Tribune Board meeting reflect the Tribune Board's approval of Tribune's audited financial statements for the fiscal year ending December 31, 2006 for inclusion in the Tribune's Form 10-K filing with the SEC.  Ex. 67 at TRB0415616 (Tribune Board Meeting Minutes, dated February 13, 2007).  These minutes indicate that Mr. Grenesko "comment[ed] on results of the first period of 2007," that he presented the 2007 operating plan for approval by the Tribune Board, and after discussion, the Tribune Board approved the plan.  *Id.* at TRB0415615.  Previously disseminated Tribune Board books corresponding to the February 13 meeting contained qualitative commentary regarding "general business conditions and recent company developments" for each business segment, including observations regarding revenue performance in January, 2007.  Ex. 68 at TRB0413503 (Tribune Board Meeting Materials, dated February 13, 2007).  The Tribune Board book for this meeting also contained detailed analysis of 2006 quarter four and full year results, in relation to both 2006 plan and prior year results, among other things.  *Id.* at TRB0413506-32.  The materials contained several observations regarding financial performance, including a statement that "January advertising revenues were down 7% from last year as soft national trends and print advertising declines continued, especially in real estate and automotive."  *Id.* at TRB0413503.  Interactive fourth quarter revenues were reported as having increased 31% over the same period in the prior year and 29% for the full year.  *Id.* at TRB0413504.  The Broadcasting Segment performance was also reported, noting that, although January ad revenue finished down 3%, February was "pacing up 2%."  *Id.* at TRB0413504.

[894] Ex. 67 at TRB0415615 (Tribune Board Meeting Minutes, dated February 13, 2007).

specifically made aware of actual February (Period 2) or March (Period 3) 2007 financial results before approving the Leveraged ESOP Transactions on April 1, 2007.

The meeting minutes of the April 1, 2007 Tribune Board meeting reflect that the Tribune Board received fairness opinions prepared by MLPFS (on behalf of the Tribune Board) and Morgan Stanley (on behalf of the Special Committee),[895] and that MLPFS and CMGI presented to the Tribune Board analyses comparing the Leveraged ESOP Transactions to the proposed leveraged recapitalization (previously considered by the Tribune Board).[896] There is no evidence, however, that actual historical financial results for the Tribune Entities were part of such presentations or any related discussions.

After the Tribune Board's approval of the Leveraged ESOP Transactions on April 1, 2007,[897] through the Step One Financing Closing Date on June 4, 2007, the Tribune Board meeting minutes show that the Tribune Board was made aware of first quarter 2007 financial results.[898]

---

[895] Ex. 146 at TRB0415621 (Tribune Board Meeting Minutes, dated April 1, 2007). Certain presentation materials prepared by Morgan Stanley on behalf of the Special Committee before the Tribune Board's approval of the Leveraged ESOP Transactions on April 1, 2007 clearly reflect analysis of post-January 2007 financial results. Ex. 144 (Presentation to the Committee of Independent Directors of the Board of Directors of Tribune, dated April 1, 2007). It is unclear whether the full Tribune Board received those same materials. Mr. Marchetti reported that the trustee for the ESOP also had received a fairness opinion from its financial advisor, Duff & Phelps. Ex. 146 at TRB0415621 (Tribune Board Meeting Minutes, dated April 1, 2007).

[896] Ex. 146 at TRB0415621 (Tribune Board Meeting Minutes, dated April 1, 2007).

[897] The minutes of the April 1, 2007 Tribune Board meeting reflect the Tribune Board's approval of the Leveraged ESOP Transactions and the adoption of numerous related resolutions. Id. at TRB0415626-37.

[898] Ex. 248 at TRB0415648 (Tribune Board Meeting Minutes, dated May 9, 2007). These minutes reflect that "Mr. Grenesko next reviewed the first quarter results of each of the Company's lines of business and commented on the factors impacting the results." Id. These meeting minutes also reflect that Mr. Osborn reported that the Audit Committee of the Tribune Board had "reviewed first quarter 2007 financial results with management and PWC before the public release as well as a draft of the Company's first quarter 10-Q." Id. at TRB0415649. Tribune Board books provided to the Tribune Board in connection with the May 9, 2007 meeting observed that, "The newspaper industry is going through a very difficult first half. Difficult comparisons to record real estate spending last year (especially in Florida) and continued weakness in automotive spending caused first quarter ad revenues to be down 6%. The second quarter will also be difficult." Ex. 249 at TRB0533511 (Tribune Board Meeting Materials, dated May 9, 2007). Interactive revenues were reported as up 17% for the first quarter 2007 in relation to the prior year. Id. at TRB0533512. The Tribune Board book also contained detailed comparisons of first quarter results, both at the consolidated and segment level, against prior year results and the 2007 plan. Id. at TRB0533514-40. Notably, the 2007 plan comparisons were based on, and largely agreed with, the Tribune Board-approved 2007 plan and the Brown Books discussed previously.

Minutes of the May 9, 2007 and May 21, 2007 Tribune Board meetings, however, do not indicate whether the Tribune Board was aware, at that time, of actual Tribune financial results for periods subsequent to the periods covered by the first quarter Form 10-Q.[899]

### b.    The Special Committee.

In executing its responsibility to oversee the process of reviewing strategic alternatives for Tribune, the Special Committee engaged Morgan Stanley as its financial advisor.  From its inception in September 6, 2006, through June 4, 2007, the Special Committee met on 16 occasions, most of which included participation by its and/or Tribune's financial advisors.[900]

Meeting minutes (and corresponding materials provided to the Special Committee by Tribune management and/or the financial advisors) show that, before the approval of the Leveraged ESOP Transactions on April 1, 2007, the Special Committee was aware of and considered Tribune's projections and Tribune's financial performance through February 2007.[901] The Examiner found no evidence, however, that the Special Committee was aware of, or otherwise took into account, actual March 2007 Tribune financial results in performing its evaluations and making an ultimate recommendation to the Tribune Board to approve the

---

[899]    As noted, however, Tribune did issue a press release regarding certain aspects of April 2007 financial performance before June 4, 2007.  Ex. 79 (Tribune Press Release, dated May 14, 2007); Ex. 248 at TRB0415648 (Tribune Board Meeting Minutes, dated May 9, 2007); Ex. 149 (Tribune Board Meeting Minutes, dated May 21, 2007).  The May 9, 2007 Tribune Board meeting minutes indicate that Mr. Grenesko "provided projections for the second quarter and answered questions from the Board of Directors."  Ex. 248 at TRB0415648 (Tribune Board Meeting Minutes, dated May 9, 2007).  The Examiner was unable to locate those projections.  The May 9, 2007 Tribune Board meeting minutes also reflect that the Tribune Board was presented with VRC's Step One solvency opinion dated May 9, 2007.  *Id.*  Although VRC apparently considered information regarding the Tribune Entities' actual performance through April 1, 2007 in rendering its solvency opinion as of May 9, 2007, there is no evidence that VRC considered, or presented to the Tribune Board, any specific financial performance information for the Tribune Entities after that date in connection with the rendering of its opinion.  VRC did receive a representation from Tribune that it had not experienced a material adverse change in its assets or liabilities between April 1, 2007 and the date of the VRC Solvency Opinion, May 9, 2007.  Ex. 250 (Representation Letters, dated May 9, 2007).

[900]    From 2005 until September 2006, MLPFS was Tribune's sole financial advisor.  Subsequently, Tribune also engaged CGMI as an additional advisor, such that MLPFS and CGMI were co-advisors to Tribune.

[901]    *See, e.g.,* Ex. 251 (Special Committee Meeting Minutes, dated March 30, 2007); Ex. 136 at TRIB-G0008787 (Tribune Special Committee Meeting Minutes, dated March 21, 2007).

Leveraged ESOP Transactions.[902]  Moreover, the Special Committee did not receive a solvency or capital adequacy opinion before the April 1, 2007 approval of the Leveraged ESOP Transactions.

The Examiner also notes that the Special Committee apparently met only once after the approval of the Leveraged ESOP Transactions and before the Step One Financing Closing Date, and it did so only to approve the minutes of prior meetings of the Special Committee and to receive "a brief update [from Special Committee Chair William Osborn] regarding the status of the series of transactions comprising the Zell/ESOP transaction."[903]  The minutes of that meeting (which occurred on May 9, 2007) do not specifically reflect knowledge or consideration of the Tribune Entities' financial results beyond those previously considered by the Special Committee before April 1, 2007, although by the time of the May 9, 2007 meeting, Tribune had issued its Form 10-Q for the quarter ending April 1, 2007 (and as such the information contained therein would have been generally available to members of the Special Committee).[904]

> 3.     **Knowledge and Actions of Participants in the Step One Solvency Opinion and the Examiner's Evaluation of the Step One Solvency Opinion.**

> a.     **Parties Approached for the Step One Solvency Opinion.**

Tribune contacted three firms to potentially render a solvency opinion to the Tribune Board in connection with the Special Committee's evaluation of potential strategic alternatives for Tribune: Houlihan Lokey, Duff & Phelps, and VRC.

---

[902]   As previously indicated, the evaluation of actual financial results for period 3 (March 2007) in Brown Book presentation format was unavailable before the Tribune Board's approval of the Leveraged ESOP Transactions on April 1, 2007.

[903]   Ex. 252 (Minutes of Special Committee Meeting, dated May 9, 2007).  In making these observations, the Examiner relied on a Draft of the Minutes because the Examiner was unable to locate an approved final copy.

[904]   Ex. 55 (Tribune Form 10-Q, filed May 9, 2007).

In early February 2007, Tribune contacted Andy Stull of Houlihan Lokey concerning a potential engagement regarding the preparation of a solvency opinion for the Tribune Board.[905] Mr. Stull referred the matter to Ben Buettell of Houlihan Lokey's Chicago office.[906]  Mr. Stull and Mr. Buettell spoke by telephone with Chandler Bigelow (Treasurer of Tribune) on February 8, 2007[907] regarding the delivery of a solvency opinion in connection with a proposed "self-help" transaction.[908]  During the call, it was Houlihan Lokey's impression that Mr. Bigelow conveyed a "sense of urgency," seeking to receive a response from Houlihan Lokey by the following day.[909]  However, Mr. Stull and Mr. Buettell indicated that Houlihan Lokey would require more time to evaluate the matter.[910]  By the middle of the following week Houlihan Lokey learned that Tribune was close to hiring Duff & Phelps "on the basis of fees and the assurance from [Duff & Phelps] that they could deliver an opinion by [February 15, 2007], if necessary."[911]  Houlihan Lokey ceased pursing the engagement at that point.[912]

Roughly contemporaneously with Tribune's contact with Houlihan Lokey regarding a solvency opinion, Tribune, by letter agreement dated February 13, 2007, engaged Duff & Phelps to serve as independent financial advisor to the Tribune Board and to provide an opinion as to

---

[905]  Ex. 253 at 20:11-16 (Rule 2004 Examination of Ben Buettell, December 2, 2009).  The firm's first contact with Tribune concerning a potential role in what ultimately became the Step One Transactions and Step Two Transactions was in late 2006, when Paul Much of Houlihan Lokey contacted the Special Committee to inquire about a potential engagement on behalf of the Special Committee.  *Id.* at 17:3-13.  At the time, Houlihan Lokey was aware only that Tribune had formed the Special Committee to explore transactional alternatives.  *Id.* at 19:6-9.  William Osborn, the Chair of the Special Committee, informed Houlihan Lokey that the Special Committee was not currently in need of Houlihan Lokey's services, and Houlihan Lokey learned that the Special Committee had engaged other financial advisors.  *Id.* at 19:14-20:5.

[906]  *Id.* at 21:8-12.

[907]  *Id.* at 28:19-23.

[908]  *Id.* at 29:17-19.

[909]  *Id.* at 32:23-33:4.

[910]  *Id.* at 33:3-4.

[911]  Ex. 254 at HLHZ-Tribune 000251 (Buettell E-Mail, dated February 24, 2007).

[912]  Ex. 253 at 46:4-7 (Rule 2004 Examination of Ben Buettell, December 2, 2009).

the solvency and capitalization (a) of Tribune after giving effect to a special distribution to stockholders of approximately $5 billion, and (b) of Tribune and the Broadcasting Segment after giving effect to a spinoff of the Broadcasting Segment.[913]   Duff & Phelps also agreed to review and opine on Tribune's solvency based on a leveraged ESOP transaction, as a "potential alternative" to the special distribution.[914]   Ultimately Duff & Phelps did not render the solvency opinion described in the February 13, 2007 engagement letter, however, because the Tribune Board's original engagement of Duff & Phelps was superseded by the separate engagement of Duff & Phelps on March 8, 2007 to advise GreatBanc, the ESOP trustee.[915]

On March 26, 2007, Tribune again contacted Houlihan Lokey concerning a potential solvency opinion engagement.[916]   A confidentiality agreement was signed,[917] and Houlihan Lokey reviewed an overview of the structure and broad terms of the transaction.[918]   By March 29, 2007, Houlihan Lokey decided to decline the potential solvency opinion engagement,[919] at least in part because Houlihan Lokey anticipated that it could be "tough" to opine that Tribune would be solvent following what Houlihan Lokey perceived to be a highly

---

[913]   Ex. 162 at D&P_TR108564 (Engagement Letter between the Tribune Board and Duff & Phelps, dated February 13, 2007).  In early February, EGI had separately contacted Duff & Phelps regarding a potential ESOP transaction, but EGI did not engage Duff & Phelps.  Ex. 255 at 26:20-32:5 (Rule 2004 Examination of Elyse Bluth, December 17, 2007).

[914]   Ex. 162 at D&P_TR108564 (Engagement Letter between the Tribune Board and Duff & Phelps, dated February 13, 2007).

[915]   Ex. 1106 (Tribune Letter to Duff & Phelps, dated March 28, 2007);  Ex. 164 (Engagement Letter between GreatBanc and Duff & Phelps, dated March 8, 2007).

[916]   Ex. 256 at HLHZ-Tribune 000243 (Buettell E-Mail, dated March 26, 2007).

[917]   Ex. 947 (Confidentiality Agreement).

[918]   Ex. 258 at HLHZ-Tribune 000147 (Buettell E-Mail, dated March 28, 2007); Ex. 253 at 72:2-3 (Rule 2004 Examination of Ben Buettell, December 2, 2009) ("[T]his was preliminary information that we put together . . .").

[919]   Ex. 253 at 82:1-7 (Rule 2004 Examination of Ben Buettell, December 2, 2009).

leveraged transaction.[920]  That same day, Samuel Zell telephoned Houlihan Lokey.[921]  According

to the Houlihan Lokey executive with whom Mr. Zell spoke, "Sam was upset that [Houlihan

Lokey] was holding up his deal and asked [the Houlihan Lokey executive] for an explanation."[922]

When questioned about this incident during his interview with the Examiner, Mr. Zell responded

that although he did not remember that specific conversation, he was likely told by someone at

EGI that Houlihan Lokey was "supposed to be doing something and they are not doing it," which

would have prompted a telephone call from Mr. Zell.[923]

Faced with the engagement of Duff & Phelps by GreatBanc and the unwillingness of

Houlihan Lokey to accept the engagement, Mr. Bigelow, on behalf of Tribune, approached VRC

on March 29, 2007.[924]  VRC's initial reaction was that the proposed transaction was "[h]ighly

[u]nusual (because of S-Corp ESOP tax benefits) and highly leveraged,"[925] and that Tribune

consisted of "good, stable but deteriorating businesses."[926]  Perhaps foreshadowing the fact that

VRC ultimately charged the highest fee it had ever charged for a solvency opinion,[927]

$1.5 million,[928] VRC's discussions on the first day it was approached by Tribune included an

---

[920]   Ex. 258 at HLHZ-Tribune 000147 (Buettell E-Mail, dated March 28, 2007); Ex. 253 at 72:18-21 (Rule 2004
Examination of Ben Buettell, December 2, 2009) ("[I]f we were asked [whether] we think we can deliver a
solvency opinion, it may have been hard for us to say yes based on th[e] preliminary information we had."); *Id.*
at 73:18-22 ("[Y]ou have face value of debt being greater than the enterprise value, at least as calculated by us
in [our preliminary analysis], and that [seemed] a little challenging from my perspective at the time.").  *See also
id.* at 75:19-76:7 (noting Houlihan Lokey's internal discussions and potential differences of opinion about
whether anticipated S-Corporation/ESOP tax benefits should factor into the solvency analysis).

[921]   Ex. 259 at HLHZ-Tribune 000071 (Stull E-Mail, dated March 29, 2007).

[922]   *Id.*

[923]   Examiner's Interview of Samuel Zell, June 14, 2010.

[924]   Ex. 260 at VRC0173988-89 (Browning E-Mail, dated March 30, 2007).

[925]   *Id.* at VRC0173988.

[926]   Ex. 261 at VRC0177894 (Gruskin E-Mail, dated March 30, 2007).

[927]   Ex. 262 at 28:23-29:3 (Rule 2004 Examination of Bryan Browning, December 4, 2009).

[928]   Ex. 263 at 7 (VRC Solvency Engagement Letter, dated April 11, 2007).

analysis of the fee necessary to compensate VRC for the risk involved in providing a solvency opinion for a transaction with the leverage anticipated in the Tribune transaction.[929]

### b.    VRC at Step One.

### (1)    The Engagement of VRC.

On April 11, 2007 (ten days after the Special Committee approved the Leveraged ESOP Transactions), Tribune formally engaged VRC to provide the Tribune Board the solvency opinion required as a condition to both the Tender Offer and the Merger.[930]  Two portions of the engagement letter are particularly important in assessing VRC's subsequent analysis and performance:  (a) the modification of the definition of "fair value," and (b) the extent to which VRC would make its own assessment of the reasonableness of management's projections and the accuracy of management-provided information.

### (i)    Modification of the Definition of Fair Value.

VRC's engagement letter specifically required the use of a definition of "fair value" that differed from definitions of that phrase in typical solvency opinions:  VRC was required to measure fair value as the consideration that would change hands between a willing buyer and a willing seller "both having structures similar to the structure contemplated in the Transactions by the subject entity (an S-Corporation, owned entirely by an ESOP, which receives favorable federal income tax treatment), or another structure resulting in equivalent favorable federal income tax treatment."[931]  As a consequence of this built-in limitation on VRC's analysis, VRC ultimately offered no opinion whether Tribune would be solvent if it were to be acquired by an

---

[929]    Ex. 261 at VRC0177894 (Gruskin E-Mail, dated March 30, 2007).  One VRC executive wrote:  "This may be just acceptable risk levels, but we will need to be compensated.  My fee estimate would be $600-700k. . . ." *Id.* Another VRC executive responded:  "I would say at least $750[K] and maybe significantly more depending on levels and if they need bringdowns, etc." *Id.*

[930]    Ex. 263 (VRC Solvency Engagement Letter, dated April 11, 2007).

[931]    *Id.* at 3-4.

entity that did not receive the described favorable federal income tax treatment.[932]  Bryan

Browning, a managing director at VRC who has worked on 400 to 500 solvency opinions

(including the Tribune opinions),[933] testified that he did not believe he had ever worked on a

solvency opinion that modified the definition of fair value in that fashion.[934]  Although Mr.

Browning testified that he could not recall whether VRC or Tribune suggested the modification

to the definition of fair value,[935] the draft engagement letter VRC sent Tribune on April 2, 2007

includes this modified definition, which was not materially edited in Tribune's April 5, 2007

markup of the draft engagement letter.[936]

> **(ii)    Assessment of Management's Projections and Information.**

The draft engagement letter VRC sent Tribune on April 2, 2007 specified that Tribune

would "furnish VRC with all reasonably available information and data" requested by VRC,

warrant that such information (other than financial forecasts and projections) "will not contain

any untrue statement of a material fact or omit to state a material fact," and, with respect to

financial forecasts and projections, warrant that they "have been prepared in good faith" based on

reasonable assumptions.[937]  The draft engagement letter further provided that VRC would make

no "independent verification or independent appraisal" of Tribune's assets, would assume the

---

[932]   Ex. 262 at 48:5-49:3 (Rule 2004 Examination of Bryan Browning, December 4, 2009); Ex. 264 at 247:8-16 (Rule 2004 Examination of Mose Rucker, December 3, 2009) (agreeing that "VRC did not opine on the solvency of the company following step 2 transactions in the event that a buyer of the Tribune would be subject to federal income tax").  This limitation ultimately only affected VRC's Step Two solvency analysis because VRC's Step One solvency analysis ignored the effects of Step Two, at management's direction.  *See* Report at § III.E.3.b.(2).

[933]   Ex. 262 at 14:4-13 (Rule 2004 Examination of Bryan Browning, December 4, 2009).

[934]   *Id.* at 35:17-22.

[935]   *Id.* at 35:23-36:3.

[936]   Ex. 265 at VRC0059204 (Hughes E-Mail, dated April 2, 2007); Ex. 266 at VRC0075241 (Bigelow E-Mail, dated April 5, 2007).

[937]   Ex. 265 at VRC0059205 (Hughes E-Mail, dated April 2, 2007).

reasonableness and prudence of Tribune's financial forecasts, and would "not assume any responsibility for independently verifying" any information provided by Tribune.[938]

Tribune responded to VRC's draft with a mark-up on April 5, 2007.[939]  Among other changes, Tribune modified the portion of the letter specifying that VRC had no obligation to independently verify the accuracy of management's projection or other information by adding this sentence:  "VRC will advise, however, whether anything has come to its attention in the course of its engagement which has led it to believe that that any such financial forecasts and projections are unreasonable or that any such information or data is inaccurate in any material respect, or that it was unreasonable for VRC to utilize and rely upon such financial forecasts, projections, information and data. . . ."[940]  This language was further modified such that the final VRC engagement letter provides, in pertinent part:[941]

> In rendering the Opinions, VRC will conduct such reviews, analyses, and inquiries and will consider such information, data and other material deemed necessary and appropriate based on the facts and circumstances of the assignment.  In conducting its reviews and analyses, and as a basis for arriving at its conclusions, VRC will utilize methodology, procedures and considerations deemed relevant and customary under the circumstances.  VRC will also consider its assessment of general economic, industry, market, financial and other conditions, which may or may not prove to be accurate, as well as its experience as a financial advisor in general.
>
> The Company hereby agrees to furnish VRC with all reasonably available information and data concerning the Company and the Transactions (the "Information") that VRC deems appropriate and will, if requested, provide VRC with reasonable access to the

---

[938]  *Id.*

[939]  Ex. 266 (Bigelow E-Mail, dated April 5, 2007).  Mark Hianik, formerly an assistant general counsel at Tribune, whose name appears on certain of the e-mail correspondence concerning edits to VRC's engagement letter, stated to the Examiner that Tribune's April 5, 2007 edits to the VRC engagement letter were generally provided by outside counsel.  Examiner's Interview of Mark Hianik, June 15, 2010.

[940]  Ex. 266 at VRC0075243 (Bigelow E-Mail, dated April 5, 2007).

[941]  Ex. 267 at TRB0412757 (VRC Engagement Letter, dated April 11, 2007) (emphasis added).

Company's officers, directors, employees, independent accountants, legal counsel and other advisors.  The Company represents and warrants that all Information (other than financial forecasts and projections) made available to VRC by or on behalf of the Company, at all times during the period of VRC's engagement hereunder, will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in the light of the circumstances under which such statements are made.  The Company further represents and warrants that any financial forecasts and projections provided by it to VRC will have been prepared in good faith and will be based upon assumptions that, in light of the circumstances under which they are made, are reasonable.

In connection with the Opinions, the Company acknowledges and agrees that in rendering VRC's services hereunder, VRC will be using and relying on the Information and information available from public sources and other sources deemed reliable by VRC, in each cast, without independent verification or independent appraisal of any of the Company's assets.  The Company agrees to notify VRC promptly (i) if any such Information becomes inaccurate, incomplete or misleading in any material respect, (ii) if the Information needs to be updated to be accurate in all material respects and (iii) of any material adverse change, or development that could reasonably be expected to lead to any material adverse change, in its business, properties, operations, financial condition or prospects; and if any such Information needs to be so updated, the Company will do so promptly.  VRC will assume and rely upon, without independent verification or independent appraisal, the accuracy and completeness of all Information, and all other information data and other material (including, without limitation, financial forecasts and projections) furnished or otherwise made available to VRC, discussed with or reviewed by VRC, or publicly available, and VRC will not assume any responsibility for independently verifying such Information or other information, data or other material.  In addition, VRC will assume and rely upon, without independent verification, that the Company's financial forecasts and projections have been reasonably and prudently prepared and therefore reflect the best currently available estimates and judgments of management as to the expected future financial performance of the Company.  VRC will also assume, without independent verification, that the Company's determination of the favorable federal income tax treatment to be received as part of the Transactions is correct. *VRC will, however, advise, after discussion with management with respect thereto, and based on its inquiries and its experience in reviewing such*

> *liabilities, (i) whether anything has come to VRC's attention in the*
> *course of its engagement which has led it to believe that any such*
> *financial forecasts and projections are unreasonable or that any*
> *such information or data is inaccurate in any material respect, or*
> *(ii) whether VRC has reason to believe that it was unreasonable*
> *for VRC to utilize and rely upon such financial forecasts,*
> *projections, information and data, or that there has been any*
> *material adverse change with respect to the Company.*

The portion of VRC's engagement letter highlighted above is somewhat difficult to square with the language that precedes the emphasized text (which is perhaps to be expected, given the provenance and drafting history of this portion of the engagement letter). The most reasonable reading of the engagement letter as a whole, giving effect to all its terms, is that although VRC was obligated to consult with management if any particular projection or piece of information provided by management struck VRC as unreasonable, VRC was under no obligation to affirmatively investigate or skeptically evaluate anything management provided.

Consistent with this reading, although the record establishes that VRC personnel strived to *understand* Tribune's various projections and assumptions, there is no colorable evidence that VRC ever critically evaluated the *reasonableness* of those projections. For example, as discussed elsewhere in the Report, forecasts for growth in Tribune's interactive business were unjustifiably optimistic.[942] When asked about the reasonableness of management's growth expectations for the interactive business, the VRC representatives (Bryan Browning and Mose Rucker) testified that management was "pursuing a new strategy" that "hopefully . . . was going to be somewhat of a growth engine in the publishing sector":[943]

> A:    [I] do know we spent a lot of time talking to them about the
>       growth strategy of that interactive sector. And they thought
>       that given some of the secular trends that were going on in

---

[942]  *See* Report at § III.H.3.f.(1).

[943]  Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 95:19-97:2.

the newspaper industry, that they would be able to leverage their interactive piece to get some growth there.

Q:     And what did you think?  Did you agree with their optimism in that regard?

A:     I can't recall whether we—whether we discounted— discounted that management could achieve what they were anticipating that they could achieve.  We did know that they had had some pretty significant successes or things that they had invested in, like Auto Trader and a Career Builder, that they had—you know, they had some real successes there.  So I don't recall whether we said this is not attainable or anything like that.  I think ultimately we concluded that what management was telling us seemed to be reasonable, particularly given that they had a pretty successful track record in investing in some real winners in the online sector.

In this and other instances, VRC appears to have simply accepted Tribune's projections and assumptions at face value so long as they were even arguably colorable.  In their sworn interviews with the Examiner, however, Donald Grenesko (formerly Tribune's Senior Vice President/Finance and Administration) and William Osborn (former Chair of the Special Committee) testified that they had a different understanding—that VRC was undertaking a rigorous, independent evaluation of management's work.  Mr. Grenesko stated that "[VRC's] charge was to test all of those assumptions [provided by management] and use whatever outside resources that they wanted, whether it be other analyst reports or industry reports, to verify themselves . . . the reasonableness of the projections."[944]  Mr. Osborn's understanding of VRC's role was similarly expansive:[945]

---

[944]   Examiner's Sworn Interview of Donald Grenesko, June 25, 2010, at 50:8-15.  *See also id.* at 36:23-37:1 ("[I]f there's something that looks unreasonable in our projections [VRC] would bring that to our attention."). Similarly, when asked whether "VRC conducted any review of the projection process to determine whether or not [Tribune's] projections were reasonable," Harry Amsden of Tribune testified that VRC "asked . . . how the projections were developed, and obviously we gave them all the documents we had in connection with those projections."  Ex. 66 at 25:1-7 (Rule 2004 Examination of Harry Amsden, December 16, 2009).

[945]   Examiner's Sworn Interview of William Osborn, June 24, 2010, at 88:17-89:11.

Q:      As chair of the special committee, did you understand that
        VRC was engaging in significant testing of management's
        base case and downside cases?

A:      Yes.

Q:      And what did you understand that to mean?  What exactly
        was VRC testing?

A:      They were looking at the cash flow assumptions going
        forward and looking at whether the company could service
        its debt appropriately based on the assumptions that were in
        there and then the reasonableness of those assumptions.

Q:      And so were they to—did you understand VRC was
        responsible for questioning or critiquing the projections
        themselves, the cash flow projections?

A:      Yes.

The record, however, reflects virtually no instances in which VRC did not adopt a

management assumption.  The only significant exception (concerning the net present value of

anticipated S-Corporation/ESOP tax savings) occurred very late in VRC's engagement and only

in response to an inquiry from the Lead Banks questioning one of those assumptions.[946]  Finally,

neither Mr. Grenesko nor Mr. Browning could recall a single instance in which VRC brought to

Tribune's attention any aspect of management's projections that VRC viewed as unreasonable.[947]

The Examiner submits that the fair inference from this silence—in the face of the host of suspect

assumptions underlying management's forecasts, particularly as Step Two approached—is that

VRC did not critically evaluate the assumptions underlying management's forecasts.  In light of

---

[946]   *See* Report at § III.H.3.d.  *See also* Ex. 950 (Amsden E-Mail, dated September 27, 2007) ("We have done two
conference calls with the bankers so far this week.  The bankers have asked much more detailed financial
questions than VRC did.").

[947]   Examiner's Sworn Interview of Donald Grenesko, June 25, 2010, at 52:10-13; Ex. 262 at 50:12-17 (Rule 2004
Examination of Bryan Browning, December 4, 2009).  VRC's May 9, 2007 opinion noted that, although VRC
"assumed and relied upon, without independent verification, the accuracy and completeness of all information,
data and other material . . . furnished or otherwise made available by the Company to VRC," "nothing has come
to VRC's attention to lead VRC to believe that it was unreasonable for VRC to utilize and rely upon [Tribune's]
financial forecasts, projections, information and data."  Ex. 268 at TRB0149972 (VRC Step One Solvency
Opinion, dated May 9, 2007).

the record adduced in the Investigation, the Examiner did not find Mr. Osborn's or

Mr. Grenesko's testimony to the contrary credible.

<div align="center">

(2)      **Management's Interactions with VRC.**

</div>

Consistent with the terms of the VRC engagement letter, Tribune management supplied

VRC with the projections and representations on which VRC based its Step One solvency

opinion.[948]  Chandler Bigelow, at the time a Vice President and the Treasurer of Tribune,

primarily interacted with Mr. Browning and Mr. Rucker of VRC in this regard,[949] providing "a

great deal of information" and responding to VRC's requests for additional information.[950]

Tribune management also provided representation letters on which VRC relied in the preparation

of the Step One solvency opinion.[951]

VRC shared drafts of its Step One solvency analysis with Tribune management,[952] and

Tribune marked up VRC's draft May 9, 2007 Step One solvency opinion with Tribune's

"requested changes."[953]  The most significant change directed by management was that VRC

---

[948]  Ex. 264 at 248:4-7 (Rule 2004 Examination of Mose Rucker, December 3, 2009) ("We did test around management's base case, management's downside case.  But ultimately we relied upon management's projections and representations to us.").  Mr. Rucker explained to the Examiner that VRC "used [Tribune management's] 2007 projected period to 2013 projected period."  Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 19:3-5.  Mr. Rucker further explained that "[w]hen we do these opinions, because we rely so much upon management, we request several different [representation] letters.  And unless we have assurance . . . that we are going to get those [representation] letters, we will not typically move forward with the opinion."  *Id.* at 308:14-21.

[949]  Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 49:7-8.

[950]  *Id.* at 119:12-14.  Mr. Bigelow also told the Examiner, "I was helping facilitate the flow of information to VRC in the context of the work that they were performing with respect to evaluating the economics and the financials. . . ."  *Id.* at 120:22-121:3.  *See also* Ex. 268 at TRB0149969-72 (VRC Step One Solvency Opinion, dated May 9, 2007) and Ex. 269 at TRB0163154-57 (VRC Letter to Tribune Board, dated May 24, 2007) (extensive lists of materials reviewed and considered by VRC for purposes of its May 9, 2007 solvency opinion and May 24, 2007 bringdown letter).

[951]  Ex. 250 (Representation Letters, dated May 9, 2007).  VRC's May 9, 2007 opinion letter noted that in the course of preparing its opinion, VRC "[o]btained a [sic] written representations from responsible officers of the Company" concerning contingent liabilities, the absence of material adverse changes, and financial projections.  Ex. 268 at TRB0149970 (VRC Step One Solvency Opinion, dated May 9, 2007).

[952]  Ex. 270 (Rucker E-Mail, dated April 24, 2007); Ex. 271 (Mednik E-Mail, dated May 4, 2007).

[953]  Ex. 272 at TRB0129235 (Hianik E-Mail, dated April 22, 2007).

<div align="center">

232

</div>

exclude the consequences of Step Two (including the additional debt and expected tax savings) from the Step One opinion.[954]  Because the S-Corporation and ESOP-related qualifications would not be achieved unless Step Two occurred, management's instruction to VRC was correct. As discussed below,[955] the Examiner concludes that it is somewhat likely that a court would find that Tribune's instruction that VRC not include the Step Two Debt in determining balance-sheet solvency at Step One was correct, but that it is reasonably likely that the instruction not to consider the Step Two Debt for capital adequacy purposes was incorrect.  The Examiner, however, did not find credible evidence to support a contention that Tribune's instruction in this regard was improperly motivated, and, in any event, as discussed below, the Examiner concludes that it is reasonably likely that Tribune did not have unreasonably small capital at the conclusion of the Step One Transactions—even taking the Step Two Debt into account.[956]

### (3)    VRC's Analysis Prior to Issuance of the Step One Opinion.

After giving effect to the above-noted instructions from management, VRC's Step One analysis was designed to determine whether, following consummation of the Step One Transactions, (a) the "Fair Value and Present Fair Saleable Value" of Tribune's assets would exceed Tribune's liabilities, (b) Tribune would "be able to pay its debts [as they] mature or

---

[954]    *Id.* at TRB0129237 and TRB0129240-42.  The Examiner interviewed Mark Hianik, the Tribune attorney who instructed VRC to exclude the consequences of Step Two from the Step One opinion.  Although Mr. Hianik stated that he did not specifically recall the basis of or any details surrounding his instruction to VRC, Mr. Hianik surmised that this particular edit was made by or at the direction of Tribune's outside counsel. Examiner's Interview of Mark Hianik, June 15, 2010.  For purposes of its internal analysis, VRC nevertheless analyzed at Step One the solvency of Tribune on the assumption that Step Two closed on a pro forma basis. Ex. 262 at 58:13-60:17 and 62:7-12 (Rule 2004 Examination of Bryan Browning, December 4, 2009); Ex. 270 (VRC Preliminary Solvency Analysis, dated April 19, 2007).  Mr. Browning testified that VRC undertook this analysis "to make sure that in rendering the [Step One solvency] opinion, that there weren't any red flags for the [Step Two solvency opinion]."  Ex. 262 at 60:14-17 (Rule 2004 Examination of Bryan Browning, December 4, 2009).

[955]    *See* Report at § IV.B.5.d.(6).

[956]    *See id.* at § IV.B.5.d.(9).

otherwise become absolute or due," and (c) Tribune would be adequately capitalized.[957]  For

purposes of this inquiry, VRC valued Tribune's assets on the basis of what "would change hands

between a willing buyer and a willing seller, within a commercially reasonable period of time,

each having reasonable knowledge of the relevant facts, neither being under any compulsion to

act."[958]  VRC determined the adequacy of Tribune's capitalization by assessing Tribune's "ability

. . . to continue as a going concern and not lack sufficient capital for the businesses in which it is

engaged, and will be engaged, as management has indicated such businesses are now conducted

and are proposed to be conducted."[959]

      In preparing the Step One solvency opinion, VRC "assumed that the Company will be

able to refinance debts when they mature and that it will not make acquisitions or dispositions

other than those assumed during the forecast period based on the financial forecasts provided" by

management.[960]  VRC further assumed that the Step One Transactions would be consummated in

accordance with their terms, and that management had "reasonably and prudently prepared" the

financial forecasts on which VRC based its analysis.[961]  VRC also cautioned that its Step One

solvency opinion did not express any views on "the relative risks or merits of the Transactions or

any other business strategies or transaction alternatives that may be available to the Company" or

"the underlying business decisions of the Company to consummate the Transactions."[962]

---

[957]  Ex. 273 at VRC0060948 (Step One Solvency Opinion, dated May 9, 2007).

[958]  *Id.* at VRC0060943.

[959]  *Id.*

[960]  *Id.* at VRC0060946.  Unlike certain other assumptions VRC made, and unlike the handling of this same issue at Step Two, Tribune did not provide VRC with a written representation to this effect.  *See* Ex. 250 (Representation Letters, dated May 9, 2007).  The Step One representation letters do not address Tribune's ability to refinance.

[961]  Ex. 273 at VRC0060946 (Step One Solvency Opinion, dated May 9, 2007).  *See also* Ex. 250 (Representation Letters, dated May 9, 2007).  Tribune made a written representation to VRC that Tribune's financial forecasts "reflect Management's best estimates" and "are reasonable and obtainable," in management's view.  *Id.* at 3.

[962]  Ex. 273 at VRC0060946 (Step One Solvency Opinion, dated May 9, 2007).

VRC's analysis at Step One relied on management's projections and representations,[963] though VRC also developed a sensitivity case to test management's numbers in various alternative scenarios.[964]  VRC also determined to give equal weight in its final Step One solvency opinion to each of four valuation tests: comparable companies, comparable transactions, sum of individual assets, and discounted cash flow.[965]  This equal weighing was a change from VRC's earlier draft analyses, in which VRC had assigned 40% to the discounted cash flow method, 25% to each of the comparable companies and sum of individual assets methods, and 10% to the comparable transactions method.[966]  Mr. Rucker testified that VRC's decision to weigh the four tests equally was made by VRC's opinion committee, which "concluded that it was not appropriate to use weightings in a solvency opinion analysis."[967] According to Mr. Rucker, VRC's opinion committee viewed the assignment of different weights to different valuation methods as "more a traditional appraisal-type of valuation process . . . as opposed to the way that you should use indications of value in a solvency opinion."[968]  VRC's decision to give equal weight to each of the four valuation methods increased VRC's overall assessment of the value of Tribune's operating assets.

---

[963]  Ex. 264 at 248:4-7 (Rule 2004 Examination of Mose Rucker, December 3, 2009); Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 19:3-5 and 308:14-21.

[964]  Ex. 264 at 101:6-17 (Rule 2004 Examination of Mose Rucker, December 3, 2009); Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 81:6-13.  Certain Parties have asserted that Tribune's adverse performance against plan during March, April, and May 2007 made it unreasonable for VRC to rely on management's projections when rendering its May 9, 2007 Step One solvency opinion.  Although the Examiner has identified many potential problems with VRC's Step One analysis, this is not one of them.  By May 9, 2007, Tribune had reported its first quarter 2007 results with little stock price reaction, and the variance to plan observed in March represented only a modest deviation on a consolidated basis.  Tribune did not publicly report second quarter performance until after the Step One Financing Closing Date.

[965]  Ex. 273 at VRC0060928 (Step One Solvency Analysis, dated May 9, 2007); Ex. 264 at 148:20-49:20 (Rule 2004 Examination of Mose Rucker, December 3, 2009); Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 49:20-51:4.

[966]  Ex. 271 at VRC0051407 (Mednik E-Mail, dated May 4, 2007).

[967]  Ex. 264 at 149:16-20 (Rule 2004 Examination of Mose Rucker, December 3, 2009); *see also* Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 53:25-54:6.

[968]  Ex. 264 at 151:2-10 (Rule 2004 Examination of Mose Rucker, December 3, 2009).

### c.    VRC's Step One Opinion.

On May 9, 2007, VRC issued its first Step One solvency opinion, opining that:[969]

- Immediately before giving effect to the consummation of the Step One Transactions,[970] each of the Fair Value and Present Fair Saleable Value of the aggregate assets (including goodwill) of Tribune exceeds its liabilities (including Stated Liabilities and the Identified Contingent Liabilities);

---

[969]  Ex. 268 at TRB0149973-74 (VRC Step One Solvency Opinion, dated May 9, 2007).

[970]  The term "Transactions" was defined in the VRC Step One solvency opinion as follows:

Tribune will be taken private through a two-step process involving a newly formed Tribune employee stock ownership plan (the "ESOP") and investments by [EGI-TRB].

The first step will involve (i) the purchase by EGI-TRB of newly issued common stock (the "Common Stock") from the Company for $34.00 per share, for an aggregate purchase price of $50 million in cash, and an exchangeable note for a purchase price of $200 million in cash (collectively, the "Step One EGI-TRB Purchase"); (ii) the purchase by the ESOP of newly issued Common Stock from the Company for $28.00 per share, for an aggregate purchase price of $250 million, which will be paid for by a note to the Company (the "ESOP Purchase"); (iii) the borrowing by the Company of debt of approximately $7.0 billion (the "Step One Debt Financing"); (iv) the purchase by the Company from its stockholders of up to 126 million shares of Common Stock at $34.00 per share, equaling approximately $4.3 billion (the "Step One Common Stock Purchase"); (v) the refinancing of existing debt of approximately $2.8 billion ("the Step One Debt Refinancing"); (vi) the roll-over of certain existing debt of approximately $2.4 billion (the "Step One Debt Roll-Over") and (vii) the payment of financing and other transaction fees of approximately $152 million (the "Step One Fees").  The Step One EGI-TRB Purchase, the ESOP Purchase, the Step One Debt Financing, the Step One Common Stock Purchase, the Step One Debt Refinancing, the Step One Debt Roll-Over, and the Step One Fees are collectively referred to as the "Step One Transactions."

The second step will involve (i) the borrowing by the Company of additional debt of approximately $4.2 billion (the "Step Two Debt Financing"); (ii) the repayment by the Company of the exchangeable note acquired by EGI-TRB in the Step One EGI-TRB Purchase (the "Step Two Repayment"); (iii) the closing of the merger (the "Merger") in which all of the remaining Common Stock, other than shares held by the ESOP (but including shares held by EGI-TRB), will be converted into the right to receive $34 per share (plus 8% annualized accretion starting January 1, 2008, if the Merger has not closed by then), for an aggregate of approximately $4.3 billion; (iv) the purchase by EGI-TRB from the Company of a subordinated note for $225 million, and the purchase by EGI-TRB from the Company of a 15-year warrant, for a purchase price of $90 million, which gives EGI-TRB the right to acquire shares of Common Stock representing 40% of the economic interest in the equity of the Company at an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years to a maximum aggregate exercise price of $600 million (collectively, the "Step Two EGI-TRB Purchase"); (v) the roll-over of certain existing debt of approximately $9.1 billion (the "Step Two Debt Roll-Over"); (vi) the payment of cash distributions triggered by a change of control of approximately $104 million (the "Step Two COC Payments"); (vii) the payment of financing and other transaction fees of approximately $120 million (the "Step Two Fees"); (viii) the election of an S-Corporation status following the Merger (the "S-Corp Election") and (ix) the sale of the Chicago Cubs and interest in Comcast SportsNet Chicago, which may occur before or after the closing of the Merger (the "Cubs/Comcast Sale").  The Step Two Debt Financing, the Step Two Repayment, the Merger, the Step Two EGI-TRB Purchase, the Step Two Debt Roll-Over, the Step Two COC Payments, the Step Two Fees, the S-Corp Election and the Cubs/Comcast Sale are collectively referred to as the "Step Two Transactions."  The Step One Transactions and Step Two Transactions are collectively referred to as the "Transactions."

Id. at TRB0149968-69.

- Immediately after and giving effect to the consummation of the Step One Common Stock Purchase, each of the Fair Value and Present Fair Saleable Value of the aggregate assets (including goodwill) of Tribune will exceed its liabilities (including the Stated Liabilities, the Identified Contingent Liabilities and the New Financing), and such excess is in an amount that is not less than the capital of the Company (as determined pursuant to Section 154 of the DGCL);

- As of the date hereof, immediately after and giving effect to the consummation of the Step One Transactions, Tribune will be able to pay its debts (including the Stated Liabilities, the Identified Contingent Liabilities and the New Financing), as such debts mature or otherwise become absolute or due; and

- As of the date hereof, immediately after and giving effect to the consummation of the Step One Transactions, Tribune Does Not Have Unreasonably Small Capital.

In essence, VRC opined that Tribune was solvent both before and after giving effect to Step One, and that Tribune was adequately capitalized (and able to pay its debts) taking into account the Step One Debt. With the assistance of his professionals and the benefit of access to VRC's workpapers, the Examiner has been able to develop an understanding of VRC's Step One solvency opinion, dated May 9, 2007,[971] the discussion materials that VRC apparently presented to the Tribune Board on May 9, 2007,[972] and, as discussed below, VRC's updated Step One solvency opinion, dated May 24, 2007.[973]

VRC assessed Tribune's solvency after giving effect to the expected effects of the Step One Transactions. VRC did so by calculating a value of Tribune's assets, from which VRC subtracted a pro forma estimate of the interest-bearing debt that was anticipated to be incurred at

---

[971]  Ex. 268 (VRC Step One Solvency Opinion, dated May 9, 2007).

[972]  Ex. 274 (VRC Solvency Opinion Analysis, dated May 9, 2007).

[973]  Ex. 269 (VRC Step One Solvency Opinion Bring-Down Letter, dated May 24, 2007).

Step One.[974]  A page from the materials VRC presented at the May 9, 2007 Tribune Board

meeting is replicated,[975] in part, below reflecting the results of its analysis as described above:

| VRC SUMMARY MAY 9, 2007 (as Presented) | | | |
|---|---|---|---|
| | **Valuation Summary** | | |
| **Valuation Method** | **Low** | **Mid** | **High** |
| Comparable Companies | $ 11,335.8 | $ 12,414.8 | $ 13,493.8 |
| Comparable Transactions | $ 11,753.4 | $ 12,623.6 | $ 13,493.8 |
| Discounted Cash Flow | $ 9,830.7 | $ 10,546.7 | $ 11,262.6 |
| Sum of Business Segments | $ 11,487.3 | $ 12,729.7 | $ 13,972.1 |
| **Average Operating Enterprise Value** | **$ 11,101.8** | **$ 12,078.7** | **$ 13,055.6** |
| + Equity Investments | $ 2,412.0 | $ 2,686.0 | $ 2,961.0 |
| + NPV of PHONES Tax Savings | $ 382.7 | $ 382.7 | $ 382.7 |
| **Adjusted Enterprise Value** | **$ 13,896.5** | **$ 15,147.4** | **$ 16,399.2** |
| + Cash | $ 182.1 | $ 182.1 | $ 182.1 |
| - Debt | ($ 9,463.8) | ($ 9,463.8) | ($ 9,463.8) |
| - Identified Contingent Liabilities | ($ 97.1) | ($ 97.1) | ($ 97.1) |
| **Equity Value** | **$ 4,517.7** | **$ 5,768.5** | **$ 7,020.4** |
| % of Enterprise Value | 32.5% | 38.1% | 42.8% |
| Less: Par value of Capital Stock | $ 3.9 | $ 3.9 | $ 3.9 |
| **Excess Capital** | **$ 4,513.8** | **$ 5,764.6** | **$ 7,016.5** |

**Source:** TRB0149946 - 0149967 at TRB0149955.

---

[974]  Ex. 274 at TRB0149955 (VRC Solvency Opinion Analysis, dated May 9, 2007).  VRC also considered "excess cash" as an increase to the value of VRC's assets and the amount of identified "contingent liabilities" as a deduction.  *Id.*

[975]  Ex. 274 at TRB0149955 (VRC Solvency Opinion Analysis, dated May 9, 2007).  The order, or sequencing, of the presentation of results in the VRC table presented to the Tribune Board is slightly different from the presentation in the table presented here, in order to facilitate a logical discussion of VRC's analysis.  The data presented, however, is numerically identical.

As shown in the table above, VRC determined the value of Tribune's assets by first determining the value of Tribune's operating assets to which VRC added its determination of the value of Tribune's ownership interests in other assets (whose revenue and profitability results were generally not consolidated with Tribune's other operations for financial statement presentation purposes)[976] and VRC's determination of the net present value of the PHONES Notes tax savings attributes.[977]

> **(1)    Approaches to Valuing Tribune's Operating Assets.**

In making its determination of the value of Tribune's operating assets, VRC employed four valuation methods—a comparable company approach, a transaction multiples approach, a sum-of-the parts (SOP) methodology, and a discounted cash flow (DCF) analysis.  A discussion of each follows.  For purposes of its presentation to the Tribune Board, VRC gave equal weight to each of four methods for valuing Tribune's operating assets: comparable companies, comparable transactions, discounted cash flow, and sum-of-the-parts, each of which is discussed below.

> **(i)    Comparable Companies.**

In determining a range of values for Tribune's operating assets using the comparable company valuation approach, VRC workpapers reflect that VRC identified a group of publicly traded companies that VRC ostensibly determined were comparable to Tribune.[978]  VRC then

---

[976]  These ownership interests included Tribune's 100% ownership interest in the Chicago Cubs (which was consolidated for financial statement presentation purposes), as well as partial ownership of the equity in, among others, TV Food Network, CareerBuilder, and Comcast SportsNet (whose results were not consolidated).  Ex. 4 at 18 and 109 (Tribune 2007 Form 10-K); Ex. 271 at VRC0051428 (Mednik E-Mail, dated May 4, 2007).  *See also* Ex. 268 at TRB0149971 (VRC Step One Solvency Opinion, dated May 9, 2007) (reciting VRC's review of materials related to these equity investments).

[977]  The PHONES Notes had certain attributes allowing for deferral of certain cash tax liabilities, which VRC projected to the year 2029.  Ex. 271 at VRC0051432 (Mednik E-Mail, dated May 4, 2007).

[978]  VRC's work papers reflect consideration of The E.W. Scripps Co., McClatchy Company, New York Times Company, Belo Corp., and Media General, Inc. as comparable companies for purposes of VRC's analysis.  *Id.* at VRC0051422.

computed values for those firms on the basis of observed equity trading values and debt,

expressing such values as multiples of reported latest twelve month (LTM) revenues, EBITDA,

and free cash flow (FCF), as well as multiples of current year expectations (CFY) and

subsequent year expectations (NFY) of revenues, EBITDA, and FCF.[979]  On the basis of the

resultant multiples, VRC selected a range of (only) EBITDA multiples (LTM, CFY, and NFY

multiples), applying the range of selected multiples to Tribune LTM EBITDA, CFY EBITDA,

and NFY EBITDA statistics.[980]  Applying VRC's selected range of EBITDA multiples to

Tribune's EBITDA statistics, VRC computed values of Tribune's assets ranging between

$11.33 billion and $13.06 billion.[981]  It appears that in the days leading up to the May 9, 2007

Tribune Board meeting, VRC then further revised its computations by, among other things,

including an additional $60 million of annual EBITDA based on Tribune's expected 401(k) cost

savings under the ESOP structure.[982]  These revisions resulted in an increased "comparable

companies" asset valuation range for Tribune of $11.33 billion to $13.49 billion, which was the

range of values that VRC presented to the Tribune Board during its May 9, 2007 meeting.[983]

### (ii)    Comparable Transactions.

VRC work papers reflect that, in computing a value for Tribune's operating assets using

the transactions multiples approach, VRC identified 15 transactions involving the acquisition of

companies that VRC deemed relevant for purposes of conducting its analysis.[984]  On the basis of

---

[979]   *Id.*

[980]   The CFY EBITDA and NFY EBITDA estimates were derived from the 2007 operating plan expectations.
Although VRC computed revenue and FCF multiples in addition to EBITDA multiples, VRC's work papers
indicate that VRC did not compute values for Tribune on the basis of those statistics.  *Id.* at VRC0051407.  The
Examiner is unaware why VRC made, but ultimately ignored, its revenue and FCF multiple calculations.

[981]   *Id.*

[982]   Ex. 274 at TRB0149955 (VRC Solvency Opinion Analysis, dated May 9, 2007).

[983]   *Id.*

[984]   Ex. 271 at VRC0051425 (Mednik E-Mail, dated May 4, 2007).

its determination of the value conveyed in connection with each of these acquisitions, VRC

expressed those values as multiples of each acquired company's LTM revenue and EBITDA.[985]

Based on the observed ranges of LTM EBITDA and revenue multiples so computed, VRC

selected a range of (only) EBITDA multiples that it then applied to not only Tribune LTM, but

also CFY and NFY, EBITDA statistics in determining a range of Tribune operating asset values

implied by that calculation.[986]   VRC's resulting values under this analysis ranged from

$11.56 billion to $13.34 billion.[987]   As noted above, it appears that VRC thereafter revised its

EBITDA computations to, among other things, reflect an additional $60 million in Tribune's

expected 401(k) cost savings.[988]   These revisions resulted in an increased "comparable

transactions" asset valuation range for Tribune of $11.75 billion to $13.49 billion, which was the

range of values that VRC presented to the Tribune Board during its May 9, 2007 meeting.[989]

<div align="center">

(iii)    **Discounted Cash Flow.**

</div>

The May 9, 2007 Tribune Board presentation materials prepared by VRC reflect that

VRC concluded a range of Tribune operating asset values of between approximately

$9.83 billion and $11.26 billion from its application of the DCF methodology.[990]   Although VRC

did not present the underlying DCF model parameters (*e.g.,* cash flow projections, discount rates,

or terminal period multiples utilized) to the Tribune Board on May 9, 2007,[991] VRC's work

papers reflect reliance on management's February 2007 operating plan[992] as the basis for the

---

[985]   *Id.*

[986]   *Id.* at VRC0051424-25.

[987]   *Id.* at VRC0051407.

[988]   Ex. 274 at TRB0149955 (VRC Solvency Opinion Analysis, dated May 9, 2007).

[989]   *Id.*

[990]   *Id.*

[991]   Ex. 274 (VRC Solvency Opinion Analysis, dated May 9, 2007).

[992]   Ex. 71 (ESOP Transaction Model, dated February 8, 2007).

forecasted cash flows incorporated into VRC's DCF model (though VRC appears to have made certain adjustments to management's projections).[993]  VRC converted annual forecasted EBITDA over the five-year projection horizon set forth in the 2007 operating plan to cash flow by deducting an estimate of working capital investment, taxes and capital expenditures.[994]  VRC then calculated a terminal value range (on the basis of a range of exit multiples) and discounted to present value both the determined five-year interim period cash flows and the determined range of terminal values, at discount rates ranging between 7.5% and 8.5%.[995]  The resulting "matrix of values" in VRC's work papers reflected a range of operating asset enterprise values of between $9.38 billion and $10.75 billion,[996] which range was then upwardly revised to $9.83 billion and $11.26 billion in the May 9, 2007 board presentation, to account for VRC's adjustments to its EBITDA calculations.[997]

### (iv)    Sum-of-the-Parts.

In conducting its SOP analysis, VRC valued Tribune's two operating segments separately, utilizing market and transaction multiples, and DCF methodologies to estimate values for the Broadcasting Segment and the Publishing Segment.[998]  As such, VRC utilized the same basic methodologies used to value Tribune's assets on a consolidated basis, but did so separately for the business segments.[999]

---

[993]   Ex. 275 (VRC Model Supporting May 9, 2007 Solvency Opinion).

[994]   Ex. 271 at VRC0051430 (Mednik E-Mail, dated May 4, 2007).

[995]   *Id.*

[996]   *Id.* at VRC0051407.

[997]   Ex. 274 at TRB0149955 (VRC Solvency Opinion Analysis, dated May 9, 2007).

[998]   Ex. 271 at VRC0051427 (Mednik E-Mail, dated May 4, 2007).  VRC also valued certain of Tribune's certain radio assets separately, but the value VRC ascribed to these assets represented less than 1.5% of the value calculated as Tribune's total operating enterprise value.  *Id.*

[999]   VRC's concluded SOP value ranges were slightly different between their May 4, 2007 work papers ($11.4795 billion to $13.9627 billion) and the May 9, 2007 Tribune Board presentation ($11.4873 billion to $13.9721 billion).  The Examiner was unable to determine the basis for this discrepancy.

### (2)     Approach to Valuing Tribune's Equity Investments.

For purposes of valuing Tribune's equity investments, VRC estimated values for each discrete investment (with limited exceptions) using different valuation methodologies, including DCF and market based approaches, as well as, for certain publicly traded investments owned by Tribune (including AdStar and Time Warner shares), observed stock market prices as the basis for its valuation conclusions, as follows:[1000]

| | | VRC'S EQUITY INVESMENT VALUATION ($mm) | | | | | | | | | |
| | | Valuation Range | | | Ownership Adjusted Range | | | | | Valuation Approach | |
| | Tribune Ownership | Low | Mid | High | Low | Mid | High | Unknown | DCF | Transaction Comps | Trading Comps |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cubs | 100.0% | $600 | $675 | $750 | $377 | $422 | $467 | X | | | |
| TV Food Network | 31.3% | $3,370 | $3,743 | $4,115 | $1,055 | $1,171 | $1,288 | | X | X | |
| Career Builder | 42.5% | $1,428 | $1,615 | $1,801 | $607 | $686 | $766 | | X | | X |
| Classified Ventures | 27.8% | $243 | $272 | $302 | $67 | $76 | $84 | | X | | X |
| Comcast SportsNet Chicago | 25.3% | $886 | $961 | $1,036 | $142 | $154 | $165 | | X | X | |
| ShopLocal | 42.5% | $82 | $97 | $113 | $35 | $41 | $48 | | | X | X |
| Topix.net | 33.7% | $75 | $80 | $85 | $25 | $27 | $29 | | | X | X |
| Legacy.com | 40.0% | $10 | $13 | $16 | $4 | $5 | $7 | | X | X | X |
| Recycler | | $72 | $72 | $72 | $72 | $72 | $72 | X | | | |
| AdStar (3.4mm shares @ $2.25/share) | | $0 | $0 | $0 | $8 | $8 | $8 | | | | |
| TWX (publicly traded Time Warner shares) | | $0 | $0 | $0 | $6 | $6 | $6 | | | | |
| Consumer Networks | | $0 | $0 | $0 | $0 | $0 | $0 | X | | | |
| Quetzel / Chase | 3.0% | $42 | $42 | $42 | $1 | $1 | $1 | (1) | | | |
| Low Income Housing Credits | 100.0% | $12 | $17 | $21 | $12 | $17 | $21 | X | | | |
| **Total** | | $6,820 | $7,587 | $8,353 | $2,411 | $2,686 | $2,962 | | | | |

Notes:
(1)  Value based on September 30, 2006 balance sheet (book value since investment carried at fair value)

VRC did not detail the basis for the value it ascribed to Tribune's ownership of the Chicago Cubs ($422 million mid-point valuation), although it appears that valuation information was provided to VRC by Tribune management and was likely based on management expectations derived from previous discussions with third parties regarding a potential sale of the Chicago Cubs.  VRC determined values on a pre-tax basis, except for the values for the Chicago Cubs and Comcast SportsNet Chicago, which were presented net of estimated capital gains

---

[1000] *Id.* at VRC0051428; Ex. 276 at VRC0024002 (Excel Version of Equity Investment Analysis forwarded by VRC to Tribune on May 4, 2007).

taxes.[1001]  For certain smaller Tribune equity investments, the basis of VRC's valuation

determination is not apparent.

After determining the aggregate value of the enterprises comprising Tribune's individual

investments, VRC quantified an "ownership adjusted range" based on a calculation which

multiplied Tribune's percentage ownership interest in each investment by VRC's determined

aggregate equity value for each.[1002]  Using this approach, VRC determined the value of Tribune's

total equity investments ranged between $2.41 billion to $2.96 billion,[1003] which is consistent

with the values presented to the Tribune Board on May 9, 2007.[1004]

### (3)    Approach to Valuing PHONES Notes Tax Savings.

VRC valued the tax savings associated with the PHONES Notes by estimating the

economic benefit to Tribune of the deferral of cash tax payments afforded by the structure of the

PHONES Notes, which permitted interest deductions in excess of the actual cash interest paid,

thereby deferring the payment of substantial income tax until the maturity of the PHONES

Notes.[1005]  VRC netted the present value of the periodic cash tax savings against the present

value of the future cash tax obligation at maturity, yielding a net present value for the tax savings

of approximately $382.7 million,[1006] which is consistent with the values presented to the Tribune

Board on May 9, 2007.[1007]

---

[1001]   Such presentation implies that VRC assumed that Tribune had no intention to liquidate its ownership interests in its investments, other than the Chicago Cubs and Comcast SportsNet.

[1002]   Ex. 271 at VRC0051428 (Mednik E-Mail, dated May 4, 2007); Ex. 276 (Excel Version of Equity Investment Analysis forwarded by VRC to Tribune on May 4, 2007).

[1003]   Ex. 271 at VRC0051428 (Mednik E-Mail, dated May 4, 2007); Ex. 276 (Excel Version of Equity Investment Analysis forwarded by VRC to Tribune on May 4, 2007).

[1004]   Ex. 274 at TRB0149955 (VRC Solvency Opinion Analysis, dated May 9, 2007).

[1005]   Ex. 271 at VRC0051432 (Mednik E-Mail, dated May 4, 2007).

[1006]   *Id.*

[1007]   Ex. 274 at TRB0149955 (VRC Solvency Opinion Analysis, dated May 9, 2007).

(4)    **The Examiner's Assessment of the Reasonableness of VRC's Valuation Conclusions.**

With the assistance of his financial advisors, the Examiner evaluated the reasonableness of VRC's Step One solvency analysis from two perspectives. First, the Examiner compared the range of equity values determined by VRC, expressed as a per share value, to market indicia. Second, the Examiner evaluated the components of VRC's valuation analysis and the assumptions underlying those determinations.

VRC's Step One solvency analysis presented to the Tribune Board on May 9, 2007 computed a range of implied equity value as follows:

| IMPLIED POST-STEP ONE EQUITY VALUE ($mm) | | | |
|---|---|---|---|
| | **Low** | **Mid** | **High** |
| Operating Asset Values | $ 11,101.8 | $ 12,078.7 | $ 13,055.6 |
| Equity Investments | $ 2,412.0 | $ 2,686.0 | $ 2,961.0 |
| PHONES Tax Savings | $ 382.7 | $ 382.7 | $ 382.7 |
| Cash | $ 182.1 | $ 182.1 | $ 182.1 |
| **Asset Value** | **$ 14,078.6** | **$ 15,329.5** | **$ 16,581.4** |
| | | | |
| Step One Debt (Est.) | ($ 9,463.8) | ($ 9,463.8) | ($ 9,463.8) |
| Contingent Liabilities | ($ 97.1) | ($ 97.1) | ($ 97.1) |
| **Debt** | **($ 9,560.9)** | **($ 9,560.9)** | **($ 9,560.9)** |
| | | | |
| **Implied Post-Step One Equity Value** | **$ 4,517.7** | **$ 5,768.6** | **$ 7,020.5** |

**Source:** Ex. 274 at TRB0149955 (VRC Solvency Opinion Analysis, dated May 9, 2007).

Because VRC's computed range of equity values was established after taking into account the amount of anticipated Step One Debt (and therefore, by definition, after giving effect to the redemption of the shares contemplated to be tendered from the proceeds of advances giving rise to that debt), an implied equity value per share can be computed on the basis of post-Step One common stock outstanding as follows:

| IMPLIED POST-STEP ONE VALUE PER SHARE | | | |
|---|---|---|---|
| | Low | Mid | High |
| VRC Computed Equity Value | $ 4,518 | $ 5,769 | $ 7,021 |
| Post-Step One Shares Outstanding (millions) | 117.1 | 117.1 | 117.1 |
| **Implied Value Per Share** | **$ 38.58** | **$ 49.26** | **$ 59.96** |

**Source:** Ex. 274 at TRB0149961 (VRC Solvency Opinion Analysis, dated May 9, 2007).

The Examiner concludes that the values implied by VRC's Step One solvency analysis included or relied on a series of aggressive or unsupported underlying assumptions that were unreasonable in light of both valuations of alternatives considered by the Special Committee leading up to the approval of the LBO on April 1, 2007,[1008] as well as the observed trading values of Tribune Common Stock in periods leading up to and including Step One Financing Closing Date.[1009]  The following are the primary problems with VRC's Step One solvency opinion:[1010]

> • VRC's DCF model contained a methodological error whereby VRC

overstated the calculated tax liability (due to an error in its treatment of depreciation and

---

[1008]   The per share values implied by VRC's analysis are belied by analyses of value conducted by the Special Committee's and Tribune's financial advisors, which simply do not reflect values remotely close to those determined by VRC's mid-point valuation.  Ex. 141 at TRB0098650 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated March 30, 2007); Ex. 144 at MS64879-83 (Presentation to the Committee of Independent Directors of the Board of Directors of Tribune, dated April 1, 2007).

[1009]   At the mid-point of VRC's valuation range, a $49.26 implied per share value would represent a premium of almost 65% to the observed trading value (approximately $30 per share) of the Tribune Common Stock in periods leading up to the announcement of the Leveraged ESOP Transactions on April 2, 2007.  This overstatement is further magnified when the methodological errors embedded in VRC's DCF and multiples-based analyses are corrected (as discussed in detail below).

[1010]   The Examiner notes that VRC performed its Step One solvency analysis on an extremely compressed timetable, which may account for the certain of the errors described above and elsewhere in the Report.  By contrast, VRC had a substantial period of time to develop and issue its Step Two solvency opinion.

246

amortization), thereby understating expected future cash flow and under-quantifying Tribune's asset value under the DCF methodology.[1011]

  • VRC's DCF model failed to deduct the costs of the planned Tribune interactive business acquisition and the costs of internal development investments in determining cash flow, resulting, among other things, in a substantial overstatement in Tribune operating asset value (a $443.6 million overstatement of midpoint value).[1012]

  • VRC's DCF model improperly increased forecasted cash flow resulting from anticipated Step Two compensation cost savings as a result of ESOP ownership (a $455.3 million overstatement of midpoint value).[1013]

  • VRC improperly converted its calculated terminal value to present value by erroneously specifying the applicable discount period in its DCF model (a $301.0 million understatement of midpoint value).[1014]

  • VRC improperly calculated the trading the multiples of cohort companies by failing to adjust total asset value to remove, when appropriate, the fair market value of each company's equity investments from total enterprise value before computing the multiple.[1015]

---

[1011] Specifically, in estimating taxable income in its DCF computation, VRC added depreciation and amortization expense to EBITDA instead of deducting those amounts to determine taxable income (EBIT). VRC thus overstated taxes by twice the amount of depreciation and amortization in its model, resulting in an understatement of value that lowered VRC's mid-point DCF value to $10.5467 billion (instead of $11.4423 billion without the error). Ex. 277 (LECG Model Adjusting for VRC's Depreciation and Amortization Error).

[1012] Ex. 278 (LECG Model Adjusting for VRC's Costs of Interactive Business Acquisition Error).

[1013] Specifically, VRC assumed the recognition of $60 million in annual cash flow savings in its DCF analysis (as well as its forward looking multiples analysis), some if not all of which relates to expected 401(k) cost savings contemplated to be obtained only in connection with Step Two. Ex. 279 (LECG Model Adjusting for VRC's Compensation Cost Savings Error).

[1014] Ex. 280 (LECG Model Adjusting for VRC's Additional Discount Period Error).

[1015] Specifically, VRC erroneously adjusted the enterprise values for identified cohort companies by removing those investments on the basis of book values recorded on the cohort companies' balance sheets. As a result (assuming that the fair value of such ownership interests exceeded book value, which, on the basis of the asserted market values of Tribune's equity investments, is likely true), VRC inflated the cohort companies' operating asset values, and hence, earnings multiples. When those multiplies were applied to Tribune's

• VRC used discount rates in its DCF analysis that were arguably too low (resulting in an overstatement of value) given the uncertainty associated with Tribune's ability to achieve long term expected growth rates in the Publishing Segment, particularly given the significant growth contemplated in the interactive business component of management's projections. Specifically, VRC used discount rates ranging from 7.5% to 8.5%,[1016] which does not properly reflect the risk attendant to the projected financial results in VRC's DCF model— particularly given rapid, high-margin growth projected in Tribune's interactive business, which Tribune predicted[1017] would make up for revenue losses anticipated in its more traditional publishing businesses:

| INTERACTIVE AS A PERCENT OF PUBLISHING SEGMENT REVENUE | | | | | |
|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 |
| Interactive Revenues (1) | $ 273 | $ 322 | $ 376 | $ 435 | $ 500 |
| Total Publishing Revenue (2) | $ 3,946 | $ 3,969 | $ 3,998 | $ 4,025 | $ 4,054 |
| Interactive Percentage | 6.9% | 8.1% | 9.4% | 10.8% | 12.3% |

(1) Interactive revenues drawn from Ex. 242 (Ratings Agency Presentation, dated March 2007).
(2) Publishing Segment revenues drawn from Ex. 71 (ESOP Transaction Model - Revised Operating Plan Case, dated February 8, 2007).

---

historical and forward looking EBITDA (the only performance metrics used by VRC), the result erroneously attributed significant value related to Tribune's equity investments. This resulted in a significant potential "double count" of value because VRC added the separately determined value of Tribune's equity investments to the value determined for its operating cash flows, determined on the basis of inflated multiples.

[1016] Ex. 271 at VRC0051430 (Mednik E-Mail, dated May 4, 2007).

[1017] Ex. 242 at TRB0094578-79 (Rating Agency Presentation, dated March 2007). The risks attendant to revenue expectations from future business opportunities not yet even identified at the time the February projections were developed should have led VRC to use much higher discount rates. Indeed, Timothy Landon of Tribune told the Examiner that the discount rate would need to be double-digits. Examiner's Interview of Timothy Landon, June 28, 2010. Moreover, Samuel Zell told the Examiner that EGI placed very little value on Tribune's interactive business during EGI's due diligence because "they were working on a whole bunch of projects that were going to create revenue in 2016. They didn't know what they were doing. . . . [N]ow we're working on projects that produce revenue next week." Examiner's Interview of Samuel Zell, June 14, 2010.

- For purposes of computing a terminal value in its DCF analysis, VRC used exit multiples that imply long term growth rates exceeding reasonable expectations:[1018]

| IMPLIED GROWTH RATES per VRC | | | |
|---|---|---|---|
| | Multiples | | |
| WACC | 7.50 | 8.00 | 8.50 |
| 7.50% | 1.56% | 1.91% | 2.22% |
| 8.00% | 2.03% | 2.38% | 2.70% |
| 8.50% | 2.50% | 2.86% | 3.17% |

- These implied long-term growth rates were unreasonable in light of the general secular decline in the publishing business and decline in Tribune's profitability. Specifically, these implied growth rates were unjustified based on the year-over-year 2004 through 2006 declines in Tribune's profitability (discussed earlier in the Report), the expectation that this trend would continue for 2007 (as reflected in the February 2007 projections relied on by VRC), and the fact that those projections, although contemplating growth in 2008 and beyond, contemplated annual growth rates significantly lower than what VRC assumed (despite VRC's professed reliance on the projections as reasonable for purposes of its analysis). Stated differently, VRC explicitly used the February 2007 forecast, yet adopted an exit multiple approach to determining a terminal value that effectively assumed growth rates well beyond those even contemplated by management at the time. The table below shows the year-over-year revenue growth rates assumed by management in the February 2007 plan:

---

[1018] VRC's implied long-term growth rates are reflected in VRC's ranges of concluded terminal values (calculated by VRC using exit multiples ranges) and the ranges of discount rates used by VRC to convert forecasted future cash flows, including terminal values, to present value. By expressing the range of VRC's calculated terminal values as a function of VRC's assumed terminal period, or perpetuity cash flow, and the range of discount rates used by VRC in its DCF model, implied growth rates can be calculated as $TV = FCF \div (r\text{-}g)$, where "TV" means the range of terminal values calculated by VRC, "FCF" means VRC's assumed perpetuity cash flow as reflected in its model, "r" means VRC's selected range of discount rates, and "g" means the long-term growth rates inherently incorporated into VRC's analysis. This model, referred to as a "Gordon Growth Model," is well recognized and generally accepted in the valuation community.



(1) The revenue figures above include forecasted revenues excluding the Chicago Cubs and other discontinued operations (e.g., SCNI and Hoy, New York). Prior presentations of revenue forecasts inclusive of pro forma estimates of revenue for those businesses were necessary to facilitate a comparison of projected results to actual results, which include the Chicago Cubs and subsequently discontinued operations (SCNI and Hoy-New York) in reported amounts.

• VRC failed to use multiples other than EBITDA multiples (e.g., revenue multiples or FCF multiples) in its market comparables approach, which, had they been used, would have resulted in lower values.[1019]

---

[1019] When revenue and FCF multiples are included in the determination of VRC's range of indicated values from application of trading multiples to Tribune earnings and revenues, the calculated averages of indicated Tribune values reflect substantial downward adjustment. The following tables illustrate this point. For purposes of its comparable company trading multiples valuation analysis, VRC considered only EBITDA multiples, calculating such multiples for identified cohort companies and then applying a range of multiples to Tribune EBITDA statistics. The valuation conclusions are shown below. (The Examiner notes that the multiples ranges selected by VRC are in excess of the medium values calculated for the cohorts for two of the three multiples it selected and used. The Examiner also notes that VRC applied the EBITDA multiples to EBITDA contributions expected from Tribune's ownership in the Chicago Cubs, both its multiples based valuation conclusion, even while simultaneously including a value for the Chicago Cubs in connection with VRC's separately quantified value of equity investments):

• VRC selected multiples ranges for both the trading and transaction multiples analysis which failed to incorporate lower-end multiples observed from the data on which VRC ultimately selected its multiples ranges.[1020]

| COMPARABLE COMPANY TEV CALCULATION USED BY VRC | | | | | |
|---|---|---|---|---|---|
| | May 9, 2007 | | Multiple | | Enterprise Value |
| | Model | | Low | High | Low | High |
| VRC LTM EBITDA | $ 1,334 | (1) | 8.50 | 9.50 | $ 11,336 | $ 12,669 |
| VRC CFY EBITDA | $ 1,306 | | 9.00 | 10.00 | $ 11,753 | $ 13,059 |
| VRC NFY EBITDA | $ 1,420 | (2) | 8.50 | 9.50 | $ 12,073 | $ 13,494 |
| Minimum | | | | | $ 11,336 |
| Maximum | | | | | $ 13,494 |
| Average | | | | | $ 12,397 |
| Median | | | | | $ 12,371 |

(1) Although VRC used $1,333.60 for this EBITDA figure it appears the actual amount per the Tribune February 2007 projections should be $1,339.
(2) This amount includes $60 mm in 401(k) savings.

As evidenced by VRC's work papers, however, VRC also calculated revenue and FCF multiples for the identified cohort companies—but then ignored these multiples in conducting its analysis. Ex. 271 at VRC0051422 (Mednik E-Mail, dated May 4, 2007). Had VRC determined values based on these other multiples, the following valuation conclusions would have resulted:

| COMPARABLE COMPANY TEV CALCULATION IGNORED BY VRC | | | | |
|---|---|---|---|---|
| | May 9, 2007 | | | |
| | Model | | Multiple | Enterprise Value |
| VRC LTM Revenue | $ 5,433 | (1) | 1.9 | $ 10,323 |
| VRC CFY Revenue | $ 5,358 | (1) | 1.9 | $ 10,180 |
| VRC NFY Revenue | $ 5,262 | (1) | 1.9 | $ 9,998 |
| VRC LTM FCF | $ 680 | (2) | 10.8 | $ 7,349 |
| VRC CFY FCF | $ 699 | (2) | 12.3 | $ 8,593 |
| VRC NFY FCF | $ 763 | (2) | 9.8 | $ 7,473 |
| Minimum | | | | $ 7,349 |
| Maximum | | | | $ 10,323 |
| Average | | | | $ 8,986 |
| Median | | | | $ 9,295 |

(1) Revenue figures were derived from the Tribune February 2007 projections that correspond with the EBITDA figures utilized by VRC. They do not represent an "apples-to-apples" comparison.
(2) FCF is calculated as EBITDA (VRC's figures) less cash taxes (with an assumed tax rate of 39%) less capital expenditures plus change in working capital. As with revenues, the FCF values do not represent an "apples-to-apples" comparison as the values for NFY are adjusted for certain asset sales.

[1020] For example, VRC's work papers reflect that cohort company LTM EBITDA multiples ranged from 7.1x to 9.3x, whereas VRC applied a range of multiples of 8.5x to 9.5x for Tribune. VRC applied multiples well in excess of the highest observed multiple derived from its analysis of the cohort companies in its "high" range valuation, while simultaneously establishing the "low" range on the basis of a multiple exceeding the lowest

• VRC inappropriately used LTM multiples calculated in connection with VRC's transaction multiples approach by applying historical (LTM) multiples to forward-looking (CFY and NFY) Tribune EBITDA statistics.[1021]

• VRC used transaction multiples for transactions occurring during a period spanning May 2003 through March 2007, when values, particularly in publishing, had experienced secular declines.[1022]

---

multiple observed from the cohorts. *See, e.g.*, Ex. 275 at VRC0001015 (VRC Model Supporting May 9, 2007 Solvency Opinion); Ex. 271 at VRC0051422 (Mednik E-Mail, dated May 4, 2007).

[1021] It is important to ensure that multiples derived from a comparable company's economic performance over a given interval (e.g., latest twelve months) are applied to the target company's economic performance measured over the same relative measurement period. If an industry is in decline or, on the contrary experiencing substantial growth, mismatching a "backward looking" multiple with forward looking projections of the target company's EBITDA can produce unreliable values.

[1022] By incorporating into its valuation analysis multiples derived from transactions dating back to 2003, VRC "benchmarked" a Tribune valuation conclusion to "cohort" acquisitions occurring at a time when industry expectations were likely very different.



Although the implications of "sector-wide" valuation changes likely would have been incorporated into transaction multiples to some degree (due to declining actual or EBITDA expectations, for example), in the Examiner's opinion use of significantly antecedent multiples in a rapidly changing industry sector is nonetheless improper.

• VRC failed to apply any minority or marketability discounts in connection with its determination of the value of Tribune's equity investments, despite the fact that (with limited exceptions) Tribune held less than a 50% ownership interest in those investments and most of Tribune's investments were in non-public, closely-held businesses.[1023]

• VRC used discount rates (in conducting DCF analyses to determine the value of certain equity investments) that failed to incorporate any size premium into its cost of capital determinations (despite a justifiable need to have done so given the smaller size of the firms in which Tribune was invested).

• VRC relied on market-based valuation approaches informed by companies materially different than Tribune or its investments, relying for example on Monster Worldwide as comparable to CareerBuilder, despite the former reporting significantly higher EBITDA margins than the latter.

---

[1023]  In a memo titled, "Response to Questions From Lenders" from Bryan Browning (and other VRC employees) to Chandler Bigelow dated December 7, 2007 (as pertaining to VRC's Step Two solvency opinion, VRC responded to the following question:  "10) Discuss the following issues concerning equity investments: a. Considering the Company has minority ownership in many of its equity investments, how has the marketability of these equity investments been considered?".

Response:  "VRC reviewed and valued each of the Company's equity investments.  A relatively small number of the Company's principal equity investments comprise a substantial percentage of the aggregate value of Tribune's equity investments. . . .  VRC did not apply minority or marketability discounts to these equity investments because i) the principal equity investments are in attractive market segments that are growing, and VRC believes that there would be significant demand for the Company's minority interests in these investments; and ii) Tribune is generally able to elect board of director members for its principal equity investments. Microsoft's recent minority interest investment in Career[B]uilder supports VRC's valuation conclusion for Tribune's interest."  Ex. 281 at TRB0398559 (Memorandum from Mr. Browning and Mr. Rucker to Mr. Bigelow, dated December 7, 2007).

Despite VRC's response, it is nonetheless appropriate to recognize some level of discount in determining the value of Tribune's minority ownership interests in illiquid (*i.e.,* non-publicly traded) assets.  VRC's claim that Tribune's equity investments were in growing market segments would not modify the *nature* of Tribune's ownership interests, but rather would be reflected in (an enhancement to) the aggregate values ascribed to each enterprise already reflected in the value of the enterprise.  Even though Tribune had (in certain instances) the ability to elect board members, this would not negate the justifiable inclusion of discounts.  Rather, these considerations might be relevant in assessing the magnitude of discount to be applied but would not serve as a basis for eliminating them altogether.

• VRC ascribed equal weight to valuation results when results derived from Tribune specific cash flow estimates (DCF methodology) were materially lower than results obtained from "benchmarking" type methodologies (market and transaction multiple).[1024]

### (5) The Examiner's Assessment of the Reasonableness of VRC's Cash Flow Tests.

VRC undertook cash flow tests to evaluate Tribune's post-Step One ability to fund its operations while meeting interest payment and principal amortization requirements associated with the Step One Financing debt covenants.[1025] VRC forecasted Tribune cash availability

---

[1024] The following tables highlight the point:

| VRC SUMMARY MAY 9, 2007  (at original weighting) | | | |
|---|---|---|---|
| | Valuation Summary | | |
| Valuation Method | Low | Mid | High |
| Comparable Companies (25%) | $ 11,335.8 | $ 12,414.8 | $ 13,493.8 |
| Comparable Transactions (10%) | $ 11,753.4 | $ 12,623.6 | $ 13,493.8 |
| Discounted Cash Flow (40%) | $ 9,830.7 | $ 10,546.7 | $ 11,262.6 |
| Sum of Business Segments (25%) | $ 11,487.3 | $ 12,729.7 | $ 13,972.1 |
| | | | |
| Average Operating Enterprise Value | $ 10,813.4 | $ 11,767.2 | $ 12,720.9 |

Source:
Values from Ex. 274 at TRB0149966  (VRC Solvency Opinion Analysis, dated May 9, 2007).
Weighting from Ex. 1117 at VRC0038534  (Draft VRC Solvency Opinion Analysis, dated May 9, 2007).

| VRC SUMMARY MAY 9, 2007 (at revised weightings) | | | |
|---|---|---|---|
| | Valuation Summary | | |
| Valuation Method | Low | Mid | High |
| Comparable Companies (25%) | $ 11,335.8 | $ 12,414.8 | $ 13,493.8 |
| Comparable Transactions (25%) | $ 11,753.4 | $ 12,623.6 | $ 13,493.8 |
| Discounted Cash Flow (25%) | $ 9,830.7 | $ 10,546.7 | $ 11,262.6 |
| Sum of Business Segments (25%) | $ 11,487.3 | $ 12,729.7 | $ 13,972.1 |
| | | | |
| Average Operating Enterprise Value | $ 11,101.8 | $ 12,078.7 | $ 13,055.6 |

Source:
Values from Ex. 274 at TRB0149966 (VRC Solvency Analysis, dated May 9, 2007).

[1025] Ex. 274 at TRB0149950 (VRC Solvency Opinion Analysis, dated May 9, 2007).  VRC included in its analysis amounts available under Tribune's contemplated revolving credit facility, (*id.* at TRB0149957) and explicitly

through year-end 2013 on the basis of a base case (modeled on the 2007 plan) and a sensitivity

case (with downward adjustments to Tribune's ability to generate cash from operations and its

equity investments).[1026]  On the basis of modeling cash availability and EBITDA, VRC

evaluated Tribune's ability to maintain both positive cash balances over the projection horizon

and, simultaneously, compliance with debt covenants under both the base case and sensitivity

case scenarios.

　　　　With the assistance of his financial professionals, the Examiner has concluded that VRC

failed to model (a) the pro-forma effects of the inclusion of the anticipated Step Two Debt in

evaluating downside scenarios, and (b) the foreseeable effects of revenue reductions on

EBITDA, particularly regarding the Publishing Segment, as to which the Examiner's review of

antecedent margin performance in a declining revenue environment demonstrates that publishing

expenses are less variable in nature than VRC's downside model assumes.  As such, the VRC

model did not fully account for the reduction in EBITDA (cash flow) when modeling revenue

declines.[1027]

---

assumed Tribune's ability to refinance maturing obligations on comparable terms, Ex. 268 at TRB0149972 (VRC Step One Solvency Opinion, dated May 9, 2007).  In his sworn interview with the Examiner, Mose Rucker of VRC acknowledged that there was an error in their DCF analysis before Step One:  the cash taxes that were included in the analysis were too high, meaning that the DCF was lower than it should have been. Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 144:20-146:5.

[1026]　Ex. 274 at TRB0149957 and TRB0149963 (VRC Solvency Opinion Analysis, dated May 9, 2007).  The sensitivity case assumed (i) corporate discretionary acquisition expenditures would decline below base case expectations by $50 million annually from 2009-2013; (ii) publishing revenues would decline 3% in 2008, 3% in 2009, and 2% annually thereafter through 2013; (iii) EBITDA margins would be 22% in 2008, 21% in 2009, 22% in 2010, 24% in 2011, and 24.4% in both 2012 and 2013; Broadcasting Segment revenues would decline 5% in both 2008 and 2009, 3% in 2010, and 2% per year thereafter; (iv) annual EBITDA margins were modeled as 32% for 2008, 33% for 2009, 34% for 2010, 35% for 2011 and 35.8% each year thereafter. *Id.* at TRB0149962.  VRC work papers reflect forecasts through 2017.  Ex. 273 at VRC0060935 (Browning E-Mail, dated May 8, 2007).

[1027]　Indeed, comparing VRC's downside scenario projection of operating cash flows with downside cases prepared by other advisors consulting on or participating in the Leveraged ESOP Transaction reveals VRC's inappropriate inflation of cash operating margins.

(6)    **VRC's May 24, 2007 Solvency Update.**

On May 24, 2007, VRC issued a second Step One solvency opinion, concluding

(consistent with its May 9, 2007 Step One solvency opinion) that:[1028]

> •    Immediately before giving effect to the consummation of the Step One Transactions, each of the Fair Value and Present Fair Saleable Value of the aggregate assets (including goodwill) of Tribune exceeds its liabilities (including Stated Liabilities and the Identified Contingent Liabilities);

> •    Immediately after and giving effect to the consummation of the Step One Common Stock Purchase, each of the Fair Value and Present Fair Saleable Value of the aggregate assets (including goodwill) of Tribune will exceed its liabilities (including the Stated Liabilities, the Identified Contingent Liabilities, and the New Financing), and such excess is in an amount that is not less than the capital of the Company (as determined pursuant to Section 154 of the DGCL);

| TRIBUNE CONSOLIDATED STEP 1 STRESS CASES | | | | | |
|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 |
| **VRC Stress Case (1)** | | | | | |
| Revenue | $ 5,357.6 | $ 4,992.6 | $ 4,822.6 | $ 4,717.3 | $ 4,624.9 |
| Operating Margin | 24.1% | 23.9% | 24.2% | 25.9% | 26.5% |
| **S&P (2)** | | | | | |
| Revenue | $ 4,952.3 | $ 4,634.2 | $ 4,450.9 | n/a | n/a |
| Operating Margin | 25.9% | 25.2% | 23.9% | n/a | n/a |
| **Duff & Phelps (3)** | | | | | |
| Revenue | $ 5,299.0 | $ 5,023.5 | $ 4,938.1 | $ 4,864.0 | $ 4,791.0 |
| Operating Margin | 25.4% | 24.4% | 24.4% | 24.2% | 23.3% |
| **Blackstone (4)** | | | | | |
| Revenue | $ 5,338.0 | $ 5,338.0 | $ 5,268.6 | $ 5,237.0 | $ 5,168.9 |
| Operating Margin | 23.7% | 24.2% | 24.4% | 24.5% | 24.2% |
| **Morgan Stanley Downside A (5)** | | | | | |
| Revenue | $ 5,107.0 | $ 5,045.7 | $ 4,954.9 | $ 4,905.3 | $ 4,846.5 |
| Operating Margin | 24.3% | 23.8% | 23.3% | 22.6% | 21.6% |
| **Morgan Stanley Downside B (5)** | | | | | |
| Revenue | $ 5,066.0 | $ 4,949.5 | $ 4,840.6 | $ 4,738.9 | $ 4,639.4 |
| Operating Margin | 23.9% | 23.0% | 21.9% | 21.0% | 19.6% |
| | | | | | |
| Maximum | 25.9% | 25.2% | 24.4% | 24.5% | 24.2% |
| Minimum | 23.7% | 23.0% | 21.9% | 21.0% | 19.6% |
| Average | 24.6% | 24.1% | 23.6% | 23.1% | 22.2% |
| **Median** | **24.3%** | **24.2%** | **23.9%** | **23.4%** | **22.5%** |

(1) Ex. 283 (VRC Solvency Analysis, dated May 17, 2007).
(2) Ex. 212 (Standard & Poor's Letter, dated March 29, 2007).
(3) Ex. 1063 (Duff & Phelps ESOP Analysis Preliminary Draft, dated April 1, 2007).
(4) Ex. 1062 (Blackstone Presentation, dated May 23, 2007).
(5) Ex. 144 (Presentation to the Committee of Independent Directors of the Board of Directors of Tribune, dated April 1, 2007).

---

[1028] Ex. 269 at TRB0163159 (VRC Step One Solvency Opinion Bring-Down Letter, dated May 24, 2007).

- As of [May 24, 2007], immediately after and giving effect to the consummation of the Step One Transactions, Tribune will be able to pay its debts (including the Stated Liabilities, the Identified Contingent Liabilities, and the New Financing), as such debts mature or otherwise become absolute or due; and

- As of [May 24, 2007], immediately after and giving effect to the consummation of the Step One Transactions, Tribune Does Not Have Unreasonably Small Capital.

VRC apparently issued this updated solvency opinion, just 15 days after its initial May 9, 2007 opinion, to take into account, among other things, revised financing terms associated with the Leveraged ESOP Transaction and a May 2007 update to the original February 2007 projection model.[1029]  Although VRC did not prepare a formal board presentation package similar to what it presented on May 9, 2007, VRC did prepare a comparable document for its internal use.[1030]  Mose Rucker testified that although the revised projection model provided by Tribune showed reduced revenue and EBITDA expectations, such reductions were not anticipated to have a material affect on VRC's Step One opinion given the magnitude of the equity value "cushion" determined in connection with the May 9, 2007 solvency opinion.[1031]  In any event, because VRC used the same methodology in its May 24, 2007 bring-down letter that

---

[1029] Ex. 282 (Browning E-Mail, dated May 14, 2007).  Other information VRC considered includes (i) the Tribune Amendment to the Tender Offer filed with the SEC on May 10, 2007, (ii) Tribune's first quarter 2007 Form 10-K (which was not available to VRC on May 9, 2007, although VRC had reviewed comparable period unaudited financial statements through the first quarter previously), (iii) a Tribune Financing Update Memorandum that included a draft copy of the Tribune press release discussing April performance, and (iv) an updated copy of the February 2007 model.  Ex. 269 at TRB0163154-55 (VRC Step One Solvency Opinion Bring-Down Letter, dated May 24, 2007).

[1030] Ex. 283 (VRC Solvency Analysis, dated May 17, 2007).  The newly incorporated information only modestly reduced VRC's calculated equity values and cash flow forecasts.  The range of equity values presented to the Tribune Board on May 9, 2007 ($4.518 billion, $5.769 billion, and $7.020 billion for VRC's low, mid, and high values, respectively) were reduced to $4.350 billion, $5.648 billion, and $6.946 billion for the low, mid, and high equity values in the May 17, 2007 analysis.  As such, VRC's incorporation of the May 2007 model revisions did little to alter VRC's opinion regarding Step One solvency and capital adequacy.

[1031] Ex. 264 at 174:15-175:12 (Rule 2004 Examination of Mose Rucker, December 3, 2009); Ex. 1103 (Browning E-Mail, dated May 15, 2007).  VRC did, however, recognize that these modifications would potentially have an impact on the Step Two solvency analysis, and in May 2007 VRC conducted some preliminary analyses relating to Step Two solvency.  Ex. 283 (VRC Solvency Analysis, dated May 17, 2007); Ex. 1103 (Browning E-Mail, dated May 15, 2007).

it used in its May 9, 2007 Step One solvency opinion, both analyses contained the same errors and omissions discussed above.

### 4.     Knowledge and Actions of the Lead Banks and Financial Advisors in Connection with the Step One Transactions.

#### a.     JPM Entities.

The JPM Entities and their designated roles in the Step One Transactions are as follows: (a) JPMCB as a lender, administrative agent, documentation agent, and syndication agent and (b) JPMorgan as a lender, joint lead arranger and joint bookrunner.[1032]

The key personnel working on behalf of JPM typically are identified in correspondence by virtue of their department or working group, not by a particular corporate entity for which they purport to be acting.  Some of the key personnel include:[1033]

> **Client Credit Management**
> Jeffrey Sell, Senior Vice President
> John Kowalczuk, Vice President
> Jieun (Jayna) Choi, Analyst
> **Investment Banking Client Coverage**
> Brit Bartter, Vice Chairman
> **Technology, Media and Telecom Group**
> Peter Cohen, Managing Director
> **Syndicated and Leveraged Financing**
> Patricia Deans, Managing Director
> Rajesh Kapadia, Managing Director
> Yang Chen, Associate

---

[1032] Ex. 178 at 8-9 (Step One Confidential Information Memorandum); Ex. 944 (Step One Commitment Letter); Ex. 1010 (Step Two Commitment Letter); Ex. 175 (Bridge Credit Agreement); Ex. 179 (Credit Agreement). Unlike financial institutions that served simultaneously as lenders and as advisors to Tribune, the JPM Entities served only as lenders to Tribune and therefore neither of the JPM Entities were potentially conflicted, rendering the distinction between JPMCB and JPMorgan less important than the distinctions among, for example, the Merrill Entities.

[1033] Ex. 178 at 8-9 (Step One Confidential Information Memorandum).

### (1)    Activities.

On February 15, 2007, William Pate of EGI telephoned Brit Bartter of JPMCB to express Samuel Zell's potential interest in pursuing a transaction involving Tribune and to gauge JPMCB's interest in helping to finance such a transaction.[1034]  Mr. Bartter, who was the Zell client executive at JPMCB for non-real-estate transactions, recalls being surprised that Mr. Zell was interested in Tribune.[1035]  Mr. Bartter asked JPMCB's conflicts desk to determine whether JPM could finance EGI's proposal; the next morning, Mr. Bartter learned that the conflicts desk had cleared the engagement.[1036]  JPMCB assembled a team initially consisting of Peter Cohen, an investment banker who was the primary relationship contact for Tribune, and Rajesh Kapadia, who worked in JPMorgan's Syndicated and Leveraged Finance group, to evaluate EGI's proposal.[1037]  In addition to Mr. Cohen and Mr. Kapadia, the team ultimately included Natasha Klykova, Darryl Jacobson, Yang Chen, Mark Guterman, and Tesja Sommer from Syndicated and Leveraged Finance, Joachim Sonne, Tony Grimminck, and Gretchen Tonneson from Investment Banking Coverage, John Kowalczuk and Jieun (Jayna) Choi from Client Credit Management, and Jeffrey Sell, as Credit Executive.[1038]  Mr. Bartter's role consisted of arranging for Mr. Cohen and Mr. Kapadia to meet with Mr. Pate, and then acting as a liaison between JPM and EGI through the closing of the Step Two Transactions.[1039]

---

[1034]  Examiner's Interview of Brit Bartter, June 16, 2010.

[1035]  *Id.*

[1036]  Although JPM had initially worked with other potential bidders on a possible Tribune transaction, "those trees had died.  So this would be a new tree."  Examiner's Interview of Brit Bartter, June 16, 2010; Ex. 285 at 38:25-39:6 (Rule 2004 Examination of Rajesh Kapadia, January 22, 2010).

[1037]  Examiner's Interview of Brit Bartter, June 16, 2010; Ex. 285 at 23:3-12 (Rule 2004 Examination of Rajesh Kapadia, January 22, 2010).

[1038]  Ex. 21 at 1 (JPMorgan Transaction Proposal, dated May 29, 2007).

[1039]  Examiner's Interview of Brit Bartter, June 16, 2010.

EGI was a sophisticated client that already knew how it wanted to structure a Tribune deal when EGI first contacted JPMCB.[1040]  Indeed, EGI had already submitted a written proposal to Tribune almost two weeks before approaching JPMCB,[1041] and the Special Committee had directed its advisors to continue to develop the EGI proposal several days before EGI's initial contact with JPMCB.[1042]  Typically, JPMCB would next have simultaneously undertaken an internal review process to evaluate whether it was interested in financing the proposed transaction and also worked with its client to formulate or substantially refine a proposal in advance of presentation to the seller.  Given that EGI already had presented a term sheet to the Special Committee, however, in this instance JPMCB focused its efforts primarily on vetting the structure proposed by EGI in order to determine whether JPMCB was willing to finance the proposal.[1043]  In particular, JPMCB analyzed Tribune's enterprise value using, among other methods, public market comparables, private transaction comparables, sum-of-the-parts analysis, discounted cash flow methodologies, and the public market valuations of Tribune's non-consolidated investments.[1044]  On February 20, 2007 (five days after Mr. Pate's initial call), Mr. Bartter was able to inform EGI that "JPM is there for them on their big project."[1045]

In his interview with the Examiner, Mr. Bartter characterized JPM's five-day turnaround time responding to EGI as "heroic," and indicated that both EGI and JPMCB's James Lee were

---

[1040]  *Id.*

[1041]  Ex. 5 at 21 (Tender Offer).  *See also* Ex. 116 (EGI Proposal, dated February 6, 2007).  At this stage, EGI's proposal was for a one-step transaction.  Ex. 285 at 42:3-7 (Rule 2004 Examination of Rajesh Kapadia, January 22, 2010).

[1042]  Ex. 119 at 2 (Special Committee Meeting Minutes, dated February 13, 2007).

[1043]  Examiner's Interview of Brit Bartter, June 16, 2010.

[1044]  Ex. 286 (JPMorgan Project Tower Deal Package, dated February 2007).

[1045]  Ex. 287 (Lee E-Mail, dated February 20, 2007).

pleased with the process and the response.[1046]  Mr. Bartter stated to the Examiner that JPMCB's

swift turnaround was not due to a desire to curry favor with Mr. Zell, but was instead a function

of the sophistication of the JPMCB team and the advanced stage of the EGI proposal when

JPMCB was first contacted.[1047]  Similarly, regarding the substance (as opposed to timing) of

JPMCB's response, Mr. Bartter maintained that JPM's long-standing relationship with Mr. Zell

played no part in JPMCB's decision to approve the EGI proposal.[1048]  According to Mr. Bartter,

although JPM cared about developing and maintaining client relationships (and Mr. Zell is, in his

own words, "a giant capital consumer"[1049]), JPM would not have made a different credit decision

"just because it's Sam."[1050]  To emphasize this point, Mr. Bartter identified a recent occasion in

which he had been approached by EGI about a potential transaction that JPM ultimately declined

to finance.[1051]

Jeffrey Sell, the senior credit officer at JPMCB who approved JPMCB's financing of

EGI's proposed transaction with Tribune,[1052] corroborated Mr. Bartter's assertion that JPMCB

approved the EGI proposal on February 20, 2007 on the basis of the proposal's substantive

merits.  Mr. Sell is an experienced credit professional who had been affiliated with JPM for

approximately four decades before he retired in 2008.[1053]  Mr. Sell first became involved with

EGI's proposal on February 20, 2007, when Timothy Storms (another senior credit officer at

---

[1046]  Examiner's Interview of Brit Bartter, June 16, 2010.  *See also* Ex. 287 (Lee E-Mail, dated February 20, 2007).

[1047]  Examiner's Interview of Brit Bartter, June 16, 2010.

[1048]  *Id.*

[1049]  Examiner's Interview of Samuel Zell, June 14, 2010.

[1050]  Examiner's Interview of Brit Bartter, June 16, 2010.

[1051]  *Id.*

[1052]  Ex. 21 at JPM-00169467 (JPMorgan Transaction Proposal, dated May 29, 2007)

[1053]  Examiner's Interview of Jeffrey Sell, June 3, 2010.  Mr. Sell was one of approximately six credit officers with "C6" approval authority, the highest authority at JPMCB.  *Id.*

JPMCB) instructed Mr. Kapadia "to go straight to Jeff Sell for credit [approval]" because of conflicts precluding one or more other credit officers from reviewing the proposal.[1054]  Although Mr. Sell was concerned about the high leverage and the use of what was to him an unfamiliar ESOP structure, Mr. Sell credibly explained that he approved EGI's proposal on its merits, with no pressure from JPMCB's senior management.[1055]  Mr. Sell told the Examiner that he would not "incur a loss to further a business relationship,"[1056] and a contemporaneous e-mail from Mr. Sell to his supervisor, Brian Sankey, explains that even though the deal was "marginal" from a credit perspective, Mr. Sell "ultimately got comfortable because of the sponsor and the asset base."[1057]

The EGI proposal that Mr. Sell preliminarily approved on February 20, 2007 underwent two significant revisions relevant to JPMCB before the proposal ultimately was approved by the Special Committee and the Tribune Board on April 1, 2007:

First, at the Special Committee's request (made in response to concerns raised by several of Tribune's largest stockholders that the original EGI proposal involved too much delay and completion risk), on March 4, 2007, EGI modified its proposal to encompass two steps:  an immediate share repurchase followed by the ESOP acquisition.[1058]  Notwithstanding that adoption of this two-step structure necessarily prolonged the gap between execution of the Step Two Commitment Letter and the Step Two Financing Closing Date, JPMCB nevertheless analyzed the Leveraged ESOP Transactions as a whole, and never sought internal approval to

---

[1054] Ex. 288 (Kapadia E-Mail, dated February 20, 2007); Ex. 289 at 52:11-54:2 (Rule 2004 Examination of John Kowalczuk, January 22, 2010).

[1055] Examiner's Interview of Jeffrey Sell, June 3, 2010.

[1056] Id.

[1057] Ex. 286 at JPM-00233346 (JPMorgan Project Tower Deal Package, dated February 2007).  Mr. Sell explained that EGI's sponsorship was a factor because Mr. Zell would "bring a financial discipline that'd be helpful in managing the company in a leveraged environment," and that Tribune's asset base was important because there was both a core business and other assets (such as the Chicago Cubs) that could be sold off if necessary. Examiner's Interview of Jeffrey Sell, June 3, 2010.

[1058] See Report at § III.D.1.f.

provide the Step One Financing independent of the Step Two Financing.[1059]  The failure to seek internal approval of this modification to EGI's proposal is surprising given that JPMCB was aware before the Commitment Letters were signed that the Step Two Financing could present a challenge.  In a March 8, 2007 e-mail summarizing a conversation with Henry Higby of JPMCB's ratings advisory group, Yang Chen of JPMCB's Syndicated and Leveraged Finance group informed Mr. Kapadia and Ms. Klykova that "[w]e walked through the 2 step transaction, obviously recognizing Step 2 being the difficult part."[1060]  Similarly, Mr. Sell indicated in a March 28, 2007 e-mail that he was "not concerned in the short term [*i.e.*, the Step One Financing]," but rather, he had concerns with "the second stage a year down the road."[1061]

Second, rather than creating a secured facility by pledging the stock of Tribune's existing subsidiaries, Tribune instead agreed to pledge the stock of two newly created intermediate holding companies (FinanceCo and Holdco).[1062]  Mr. Sell expressed displeasure from a credit perspective when he learned of this change on March 27, 2007, writing to his supervisor (Brian Sankey) the following day that:[1063]

> the deal team informed me that over the weekend, the company, Merrill and Citi discovered that the existing debt indentures [require] separate financial statements . . . for each legal entity if we take the security envisioned in the original approval (pledge of the stock of the operating subs).  The company says they produce statements by line of business and can't produce legal entity statements.  Merrill and Citi served up a structure which they have already approved which would give up the pledge of the stock of the operating subsidiaries and replace that security with a pledge of

---

[1059]  Ex. 289 at 116:3-9 (Rule 2004 Examination of John Kowalczuk, January 22, 2010).  Mr. Sell did, however, request and review an analysis "showing just step 1, assuming step 2 never got done." Ex. 290 at JPM_00260070 (Tonnesen E-Mail, dated March 29, 2007).

[1060]  Ex. 291 (Chen E-Mail, dated March 8, 2007).

[1061]  Ex. 292 at JPM_003536 (Sell E-Mail, dated March 28, 2007).

[1062]  *See* Report at § III.D.12.

[1063]  Ex. 292 at JPM_00353676-77 (Sell E-Mail, dated March 28, 2007).

the stock of a new intermediate holding company for the
publishing assets which would hold a single asset, an inter-
company note in the amount . . . of $4.2B.  We would continue to
have guarantees of the operating subsidiaries which will provide us
with a superior claim vis a vis the existing debt.  The rub in the
new structure is that the value of the collateral offered is less than
the face value of the secured debt.

The new bank debt would be partially secured.  Under the
bankruptcy laws we would not be [entitled] to post petition interest
if we are only partially secured.  The repayment of our principal
would be assured via the guarantees of the operating subsidiaries
but interest post petition could not be claimed by secured debt
since by definition the face of note is less than face of debt. . . .

I'm comfortable the guarantees would give us assurance of
repayment of principal . . . it's the interest post petition.  I feel this
second bridge has a possibility of being hung if markets
tighten. . . .  I've told the team I'm not comfortable approving the
new structure for the reasons cited but would understand if [senior
management] wanted to do this to further the Zell [relationship].
It's a question of lost income and leverage in a bankruptcy
negotiation.

Although certain Parties have pointed to Mr. Sell's March 28, 2007 e-mail as evidence

that JPMCB thought that a Tribune bankruptcy was likely, the Examiner believes that Mr. Sell's

comments are those of a credit officer concerned with receiving the best possible security for the

funds JPMCB was considering lending.  Mr. Sell credibly described his concerns about the

security for the Credit Agreement Debt to the Examiner as principally related to the fact that this

particular modification had been agreed to over a weekend, without input from JPMCB, based on

a concern (the preparation of entity-level audited financial statements) that Mr. Sell thought was

"baloney."[1064]  Notwithstanding his concern about the collateral, Mr. Sell noted that the Credit

Agreement Debt would be structurally superior to other Tribune debt due to the Subsidiary

Guarantees.[1065]

---

[1064]  Examiner's Interview of Jeffrey Sell, June 3, 2010.

[1065]  Ex. 292 at JPM_00353676 (Sell E-Mail, dated March 28, 2007).

Finally, certain Parties referred the Examiner to several e-mails sent by Peter Cohen, the Tribune client executive at JPMCB, using terms such as "ka-ching!!" to express enthusiasm about fees due JPM in connection with the Leveraged ESOP Transactions.[1066]  Mr. Cohen's e-mails are crass and undoubtedly would have been highly embarrassing to JPMCB had they come to light even before Tribune became a debtor in bankruptcy.  They are particularly inappropriate in light of what subsequently transpired.  Nevertheless, the profit motive evidenced by these isolated, informal communications was not unique to JPM,[1067] nor is there any credible evidence that JPMCB was improperly motivated in its Tribune credit decisions.  Indeed, Mr. Sell (the JPMCB credit officer who gave final approval to JPM's participation in the Leveraged ESOP Transaction) noted at the outset of JPMCB's involvement that "we will probably have to spend [a] considerable amount of fees to de risk the high yield bridge,"[1068] and Mr. Cohen (the author of the fee-related e-mails) later wrote that the JPM Entities "have eaten away at the majority of our fees to get this deal over the finish line."[1069]

### (2)    Due Diligence and Evaluations Performed.

As part of its internal credit approval process and due diligence, JPM examined the value of Tribune's operating businesses using a public market sum-of-the-parts analysis,[1070] a private market sum-of-the-parts analysis,[1071] a discounted cash flow analysis,[1072] and a market

---

[1066]  Ex. 883 at JPM_00284643-44 (Cohen E-Mail, dated March 29, 2007); Ex. 884 at JPM_00492571 (Cohen E-Mail, dated April 2, 2007); Ex. 882 (Cohen E-Mail, dated April 4, 2007).

[1067]  Mr. Zell told the Examiner that EGI planned "to make a fortune with this deal" and that Tribune "was fat city." Examiner's Interview of Samuel Zell, June 14, 2010.

[1068]  Ex. 286 at JPM00233346 (Sell E-Mail, dated February 21, 2007).

[1069]  Ex. 296 at JPM00340188 (Cohen E-Mail, dated May 11, 2007).

[1070]  Ex. 21 at JPM00169503 (JPMorgan Transaction Proposal, dated May 29, 2007).

[1071]  *Id.*

[1072]  Ex. 297 at JPM00169569-76 (JPMorgan Credit Analysis, dated May 29, 2007).

capitalization analysis.[1073]  Each of these valuations—when combined with the value of

Tribune's non-consolidated assets (including the estimated value of the Chicago Cubs) and the

value of the benefits expected to be obtained from the Merger—exceeded the debt that Tribune

was expected to have on its books at the time the Merger closed.  JPMCB also analyzed

Tribune's future cash needs under management's base case projections and a downside that

assumed recession in the general economy in 2008 and continued weakness in 2009.[1074]  Under

these analyses, the combination of Tribune's cash flows, its access to the $750M Revolving

Credit Facility, and its ability to raise cash through asset sales would allow Tribune to meet its

obligations as they became due ten years into the future.[1075]  JPM also considered what would

happen if Step One closed but Step Two did not.[1076]

Certain Parties referred the Examiner to an e-mail written by Jieun (Jayna) Choi, an

analyst on the JPMCB deal team, to dispute JPMCB's assertion that its commitment to finance

the Leveraged ESOP Transactions was made in the good-faith belief that Tribune would repay its

debts (including its Non-LBO Debt) as they matured.  Ms. Choi wrote:[1077]

> There was a WSJ article today that talked about how TRB should
> be very very careful at executing any deals or doing any-a-thing
> from now on, as the company has no room for mistake no more.
> The article also talked about how there is a wide speculation that
> the company might have put so much debt that all of its assets
> aren't gonna cover the debt, in case of (knock knock) you-know-
> what.  Well that is actually basically what we (JK and me and the
> rest of the group) are saying too, but we're doing this 'cause it's
> enough to cover our bank debt.  So, lesson learned from this deal:
> our (here, I mean JPM's) business strategy for TRB, but probably
> not only limited to TRB, is "hit and run" - "we'll s_ck the sponsor's

---

[1073]  *Id.* at JPM00169569.

[1074]  Ex. 297 at JPM00169566 (JPMorgan Credit Analysis, dated May 29, 2007).

[1075]  *Id.*

[1076]  Ex. 290 at JPM00260070 (Tonnesen E-Mail, dated March 29, 2007).

[1077]  Ex. 298 at JPM00422681 (Choi E-Mail, dated April 5, 2007).

> a$$ as long as we can s_ck $$$ out of the (dying or dead?) client's
> pocket, and we really don't care as long as our a$$ is well-covered.
> Fxxk 2nd/private guys - they'll be swallowed by big a$$ banks like
> us, anyways".  See graph below (total debt, btw, is $14.639MM).

This text is followed by a draft of the chart that ultimately appears in the final Transaction Proposal approved by Mr. Sell and John Kowalczuk on May 29, 2007 in a portion of the document discussing loss given default (LGD).[1078]  LGD is a risk assessment tool under which creditors "imagine the circumstances that would cause default and the condition of the obligor after such default."[1079]  Critically, the LGD analysis is not concerned with the ***probability*** of a default, but rather is tool used to assess the magnitude of a loss if a default (however probable or improbable) were to occur.[1080]  As is clear from the analysis portion of the May 29, 2007 Transaction Proposal, JPMCB's LGD calculation was based on an assessment of the capital structure and collateral package of the transaction—not any prediction of the probability of a Tribune default.[1081]  In addition, the "total debt" figure set out in the text of Ms. Choi's e-mail ($14.639 billion) is incorrect because of two errors: (i) Ms. Choi included both the Delayed Draw Facility ($263 million) and the Senior Notes that the Delayed Draw Facility was to be used to pay down ($263 million) and (ii) Ms. Choi included the $750 million Revolving Credit Facility without accounting for the cash that would result from a draw on the Revolving Credit Facility.[1082]  On balance, the evidence reveals that Ms. Choi's e-mail reflects a misunderstanding

---

[1078] Ex. 21 at JPM00169497 (JPMorgan Transaction Proposal, dated May 29, 2007).

[1079] Ex. 299 at 4 (Moody's LGD Modeling Methodology).

[1080] Examiner's Interview of Jeffrey Sell, June 3, 2010.

[1081] Ex. 21 at JPM00169491-98 (JPMorgan Transaction Proposal, dated May 29, 2007).

[1082] Examiner's Interview of Jeffrey Sell, June 3, 2010.

by a junior analyst who failed to understand the nature and purpose of the analysis she was asked to perform and whose conclusion that "total debt . . . is \$14.639MM"[1083] was inaccurate.[1084]

### b.    Merrill Entities.

The principal Merrill Entities and their designated roles in the Step One Transactions were as follows:  (a) MLCC, as an initial lender[1085] and syndication agent,[1086] and (b) MLPFS, as an advisor,[1087] a dealer manager,[1088] and a joint lead arranger and joint bookrunner.[1089]  Although unclear, it also appears that ML&Co. may have been engaged as an advisor to Tribune.[1090]  Some

---

[1083]  Ex. 298 at JPM00422681 (Choi E-Mail, dated April 5, 2007).

[1084]  On May 21, 2010, counsel for the Examiner requested that counsel for JPMCB contact Ms. Choi to determine if she was willing to be interviewed.  Ex. 300 (Nastasi E-Mail, dated May 21, 2010).  On May 28, 2010, counsel for JPMCB indicated that Ms. Choi currently lives in South Korea, and declined to be interviewed by the Examiner.  Ex. 301 (Letter from Sharon Katz, dated May 28, 2010).  Counsel for JPMCB also provided contact information for Ms. Choi and indicated that it would provide counsel for Ms. Choi in the event she decided to be interviewed.  *Id.*  On June 3, 2010 at 8:39 pm EST, counsel for the Examiner informed counsel for JPMCB that the Examiner intended to contact Ms. Choi seeking to conduct an interview telephonically.  Ex. 302 (Nastasi E-Mail, dated June 3, 2010).  On June 3, 2010, at 9:31 pm EST, counsel for the Examiner spoke with Ms. Choi telephonically.  Ms. Choi indicated that she was represented by counsel for JPMCB, that she had just started a new job and had scheduling difficulties, and that she was not sure if she wanted to be interviewed.  Ms. Choi indicated that she would consider being interviewed and would inform counsel for the Examiner of her decision soon.  On June 3, 2010 at 9:52 pm EST, counsel for the Examiner contacted counsel for JPMCB and sought clarification as to whether it represented Ms. Choi.  *Id.*  Counsel for JPMCB subsequently responded that Ms. Choi must have decided that she wanted representation and would confirm this with Ms. Choi.  *Id.*  On June 8, 2010, counsel for JPMCB confirmed that Ms. Choi wanted representation and that counsel for JPMCB was in the process of obtaining separate counsel for Ms. Choi.  Ex. 303 (Katz E-Mail, dated June 8, 2010).  On June 9, 2010, counsel for JPMCB informed counsel for the Examiner that Ms. Choi is being represented by Susan Brune of Brune & Richard LLP.  Ex. 304 (Katz E-Mail, dated June 9, 2010).  On June 15, 2010, counsel for the Examiner spoke with Ms. Brune who confirmed that she represents Ms. Choi and that Ms. Choi declines to be interviewed by the Examiner.

[1085]  Ex. 179 at 1 (Credit Agreement); Ex. 305 at 1-3 (Project Tower—Amended and Restated First Step Commitment Letter, dated April 5, 2007).

[1086]  Ex. 179 at 1 (Credit Agreement).

[1087]  Ex. 23 at 6 (MLPFS Strategic Transaction Engagement Letter).

[1088]  Ex. 306 (Project Tower—Amended and Restated First Step Engagement Letter, dated April 5, 2007).  This role was in connection with facilitating the stock repurchase.

[1089]  Ex. 179 at 1 (Credit Agreement).

[1090]  Two October 17, 2005 engagement letter agreements specify ML&Co. as the entity that will provide advisory services to Tribune, but the letters are executed by Michael Costa on behalf of *MLPFS.  See* Ex. 23 at 6 (MLPFS Strategic Transaction Engagement Letter); Ex. 24 (MLPFS Recapitalization Engagement Letter).

of the key personnel working with Tribune on behalf of the Merrill Entities, and the department

or working group with which each was affiliated, were as follows:

> **Leveraged Finance**
> Todd Kaplan, Chairman, Global Leverage Finance[1091]
> David Tuvlin, Managing Director[1092]
> **Leveraged Finance Capital Markets**
> Carl Mayer, Managing Director[1093]
> Stephen Paras, Managing Director[1094]
> **Investment Banking**
> Michael Costa, Managing Director[1095]
> Michael O'Grady, Managing Director[1096]

Certain Parties contended that notwithstanding the existence of separate legal entities, all

of the Merrill Entities should be viewed as a single entity, for among other purposes, determining

whether the knowledge and acts of personnel employed by one entity may be attributed to the

other entity, and whether, as a consequence thereof, the other entity acted in good faith regarding

a particular transaction or transfer.  Proponents of this viewpoint cite as support for this position

that, as noted, the October 2005 Merrill retention letters contain inconsistent entity references,

---

[1091]  Ex. 307 at 10 (Step One Confidential Information Memorandum).  Todd Kaplan had a longstanding business relationship with the Zell Group.  In his sworn interview with the Examiner, Mr. Kaplan testified that when he started work at Merrill in 1986, one of his first projects was for the Zell Group.  Examiner's Sworn Interview of Todd Kaplan, July 8, 2010, at 64:22-65:4.  Indeed, the Zell Group offered Mr. Kaplan a job at EGI after the close of the Step Two Transactions, but he "ultimately decided not to [accept the job] and stayed at Merrill Lynch." *Id.* at 65:16-18.  *See also* Examiner's Interview of Samuel Zell, June 14, 2010 ("We made him an offer.  I think it was late '08. . . .  We wanted him to come work for us, he ultimately said he was going to do it, then he got hotboxed by the guys at Merrill and he decided not to.").

[1092]  Ex. 307 at 10 (Step One Confidential Information Memorandum).  David Tuvlin also is identified as a Vice President of ML&Co.  *See* Ex. 179 at TRB0520889 (Credit Agreement).

[1093]  Ex. 307 at 10 (Step One Confidential Information Memorandum).

[1094]  *Id.*

[1095]  Ex. 24 at 4 (MLPFS Recapitalization Engagement Letter); Ex. 23 at 6 (MLPFS Strategic Transaction Engagement Letter).  Michael Costa also has been identified as a Managing Director for "Mergers and Acquisitions" group.  *See* Ex. 308 at ML-TRIB0382494-0382495 (Costa E-Mail, dated February 14, 2007).

[1096]  Ex. 307 at 11 (Step One Confidential Information Memorandum).

that some personnel apparently held positions with more than one entity[1097] (or are described in various materials as being affiliated with more than one of the Merrill Entities),[1098] that personnel for the Merrill Entities sometimes used the generic "Merrill Lynch" trade name to describe their employer,[1099] and that Merrill personnel involved in different aspects of the Leveraged ESOP Transactions often shared information.

Todd Kaplan explained in his interview with the Examiner that ML&Co. was the parent holding company, and MLPFS was the primary broker dealer within ML&Co.[1100] Mr. Kaplan further stated that MLCC was the "unregulated entity that we conducted a lot of lending and other types of counter-party business out of."[1101]

Michael Costa stated to the Examiner that the Merrill Entities had established procedures—well before the Tribune transactions—to maintain the separateness of the various working groups and address potential conflicts of interest between and among those personnel who are advising a target company regarding its strategic options, those personnel offering pre-arranged financing to facilitate an investment or acquisition, and those personnel representing and/or financing potential bidders interested in an acquisition or investment.[1102] At one point in

---

[1097] *See, e.g.,* Ex. 309 at 1-3 (Project Tower—Amended and Restated Second Step Commitment Letter, dated April 5, 2007) (Stephen Para executing on behalf of MLCC); Ex. 310 (Project Tower—Amended and Restated Second Step Engagement Letter, dated April 5, 2007) (Stephen Para executing on behalf of MLPFS).

[1098] *See, e.g.,* Ex. 307 at 10 (Step One Confidential Information Memorandum) (listing David Tuvlin, and all other personnel of the Merrill Entities under "Merrill Lynch & Co."); Ex. 179 at TRB0520902 (Credit Agreement) (David Tuvlin executing the Credit Agreement on behalf, and as a Vice President of, MLCC).

[1099] *See, e.g.,* Ex. 311 (Lewicki E-Mail, dated June 20, 2007) (Lewicki signature block stating that he is an Investment Banking Analyst with "Merrill Lynch").

[1100] Examiner's Sworn Interview of Todd Kaplan, July 8, 2010, at 165:6-13.

[1101] *Id.* at 165:13-16.

[1102] *See* Examiner's Interview of Michael R. Costa, June 4, 2010.

the interview Mr. Costa described these procedures as a "wall," essentially precluding contact between the advisory and lending groups.[1103]

At another point Mr. Costa described these procedures more as a set of restrictions, *e.g.,* requiring investment bankers advising a company to provide the same level of information to the bankers in their affiliated lending group as they provide to bankers representing competing bidders who are putting together independent financing in connection with a proposed transaction to ensure a level playing field.  The "wall" described by Mr. Costa was permeable. The evidence indicates that personnel working both with the investment banking and the finance groups at the Merrill Entities frequently communicated with each other regarding (a) how to structure the financing of the Tribune transaction and (b) how MLCC could participate in such financing.[1104]

Throughout the process of exploring strategic alternatives for Tribune and advising on the Leveraged ESOP Transactions, Merrill was aware of the potential conflicts of interest or appearances of conflict that arose because certain Merrill Entities served as advisors both to Tribune and to lenders to the buyer.[1105]

Nevertheless, the evidence generally indicates that each group of Merrill professionals had a distinct role and function in connection with the Leveraged ESOP Transactions, whether to

---

[1103] *Id.*

[1104] *See, e.g.,* Ex. 312 at ML-TRIB-0445779 (Tuvlin E-Mail, dated December 6, 2007) (discussing downturn in publishing sector and being "anxious to see the VRC report"); Ex. 313 at ML-TRIB-0613213 (Kaplan E-Mail, dated November 7, 2007) (discussing inability of Tribune organization "to come to a decision" regarding whether to close transaction); Ex. 251 (Special Committee Meeting Minutes, dated March 30, 2007) (indicating both Michael Costa and Todd Kaplan were in attendance); Ex. 345 at ML-TRIB-0386225 (Tuvlin E-Mail, dated March 28, 2007) (reporting on call among banks and latest financing negotiation issues); Ex. 315 at ML-TRIB-0368506 (O'Grady E-Mail, dated July 27, 2006) (arranging joint meeting with Tribune to review outlook on newspaper and Internet operations); Ex. 316 at ML-TRIB-0367311 (Costa E-Mail, dated June 9, 2006).

[1105] For example, Mr. Costa wrote to Mr. Kaplan, a colleague on the leveraged finance side of the business, and encouraged:  "Why aren't one of you in zell [sic] discussion. Are they arguing conflict[?]"  Ex. 317 at ML-TRIB-0571282 (Costa E-Mail, dated February 21, 2007).

advise Tribune on its strategic options as investment banker, to underwrite and negotiate the financing for the transaction, or to market the debt securities resulting from that financing to other lenders and investors. Indeed, as discussed below, when it appeared between Step One and Step Two that there was a conflict of interest between MLFPS's role as advisor and MLCC's role as lender, MLFPS essentially ceased advising the Tribune Board.[1106] As discussed below, the Merrill lending team worked with the other Lead Banks in the fall of 2007 to address the various issues raised in connection with the Step Two Financing. On balance, although the record is mixed,[1107] the Examiner cannot conclude that the Merrill Entities should be viewed as one entity in connection with the Leveraged ESOP Transactions.

### (1)    Activities.

The relationship between Tribune and Merrill Entities predates the Step One Transactions. As detailed elsewhere in the Report,[1108] Mr. Costa, on behalf of MLPFS and ML&Co., and Dennis FitzSimons, on behalf of Tribune, signed two engagement letters dated October 17, 2005,[1109] one retaining MLPFS/ML&Co. to provide financial advisory and

---

[1106]  *See* Report at § III.H.4.c. During his interview with the Examiner, Mr. Costa explained as follows:

> [B]ecause of the potential conflict or appearance of conflict [in the EGI transaction], I effectively stepped back from advising the company . . . once there were conditions to financing that remained to be satisfied—one of which was solvency—to avoid the appearance that I might be advising the Board one way or another as to what to do and Merrill side might have a different view, and in light of the Independent Committee having its own advisor, I effectively stepped back.

Examiner's Interview of Michael Costa, June 4, 2010.

[1107]  One area in which the record conflicts is the manner in which various transaction documents describe the fees to be paid to the various entities, the labels given to those fees, and the specific entities to which the payments actually were made. Given the inconsistency between the governing documents, the record is unclear whether the fees paid to the Merrill Entities for their lending commitments and arranging services (but not for the advisory services provided to Tribune) were paid to or for the benefit of MLPFS, MLCC, or both. *See* Report at § III.E.4.

[1108]  *See* Report at § III.A.3.e.(1).

[1109]  Ex. 24 at 4 (MLPFS Recapitalization Engagement Letter); Ex. 23 at 6 (MLPFS Strategic Transaction Engagement Letter).

investment banking services to Tribune in connection with the contemplated recapitalization[1110] and the other retaining MLPFS/ML&Co. to provide financial advisory and investment banking services to Tribune in connection with a "Strategic Transaction."[1111]

Between October 2005 and June 2006, representatives of Merrill, led principally by Mr. Costa, Mr. Kaplan, and Michael O'Grady, together with representatives of Citigroup, led principally by Christina Mohr, Michael Schell, and Michael Canmann,[1112] met regularly with the Tribune Board as it considered strategic alternatives for restructuring Tribune to enhance stockholder value.[1113]  On July 19, 2006, the Tribune Board met with Mr. Costa, Ms. Mohr, and Mr. Schell concerning the status of the 2006 Leveraged Recapitalization, Tribune's performance subsequent to the 2006 Tender Offer, the imputed value to Tribune's stockholders, and the results of the bank syndication.[1114]  The Merrill Entities and the Citigroup Entities continued to analyze various strategies to maximize stockholder value for Tribune between July and September 2006.[1115]

On September 21, 2006, Mr. Costa and Ms. Mohr met with the Tribune Board and presented a review of their strategic analysis to date.[1116]  The Tribune Board minutes state that "Mr. Costa concluded that in Merrill Lynch's opinion, on a risk-adjusted basis, pursuing a business combination with a strategic or private equity buyer is likely to produce the greatest

---

[1110]  Ex. 24 (MLPFS Recapitalization Engagement Letter).

[1111]  Ex. 23 (MLPFS Strategic Transaction Engagement Letter).

[1112]  The discussion in the following section addresses in further detail the role of Citigroup.

[1113]  Ex. 319 (Tribune Board Meeting Minutes, dated May 1, 2006), Ex. 320 at TRB-UR-0434011-12 (Tribune Board Meeting Minutes, dated May 26, 2006); Ex. 321 at TRB-UR-0434051-52 (Tribune Board Meeting Minutes, dated September 21, 2006).

[1114]  Ex. 322 at TRB0434034 (Tribune Board Meeting Minutes, dated July 19, 2006).

[1115]  Ex. 323 at ML-TRIB0418279-81 (Kaplan E-Mail, dated September 15, 2006).

[1116]  Ex. 321 at TRB-UR0434051-52 (Tribune Board Meeting Minutes, dated September 21, 2006).

value to Tribune shareholders."[1117]  Ms. Mohr next presented an analysis of the five strategic

proposals then under consideration.[1118]  According to the Tribune Board minutes, "Ms. Mohr

concluded that in Citigroup's opinion, a leveraged buy-out of [Tribune] would yield the highest

value to the Company's shareholders."[1119]

Following Ms. Mohr's and Mr. Costa's presentations, the Tribune Board unanimously

approved the engagement of MLPFS and CGMI to lead a formal review of Tribune's strategic

alternatives and appointed an independent Special Committee to oversee the process.[1120]

Thereafter, Tribune proposed that Merrill and Citigroup jointly "staple finance"[1121] the

transaction in exchange for a $10 million advisory fee to each firm, with a 50% credit against

their respective advisory fees for any financing fees they each received, up to a maximum credit

of $5 million.[1122]

---

[1117]  *Id.* at TRB-UR-0434051.

[1118]  *Id.*

[1119]  *Id.* at TRB-UR-0434052.  Thomas Whayne of Morgan Stanley stated to the Examiner that MLPFS and CGMI did not fully explore a series of assets sales that, according to Mr. Whayne, would have created more value for Tribune's stockholders than pursuing a leveraged recapitalization.  Examiner's Interview of Thomas Whayne, June 11, 2010.  Mr. Whayne stated that Mr. Costa and Mr. Kaplan of Merrill were always strong advocates of the ESOP because under the EGI proposal they would make a lot of money.  *Id.*  Stated differently, Mr. Whayne said to the Examiner that Mr. Costa was in favor of the EGI proposal because more debt would result in more fees.

[1120]  Ex. 321 at TRB-UR-0434053 (Tribune Board Meeting Minutes, dated September 21, 2006).  It appears that the Special Committee was formally organized a month later.  Ex. 324 at TRB0434065-67 (Tribune Board Meeting Minutes, dated October 18, 2006).  *See* Report at § III.D.1.a.

[1121]  "Stapled Finance is a loan commitment that is 'stapled' onto an offering memorandum, by the investment bank advising the seller in an M&A transaction.  It is available to whoever wins the bidding contest for the asset or firm that is being put up for sale; but the winner is under no obligation to accept the loan offer.  Stapled finance is usually offered early in the bidding process, providing the potential buyers with an indication of how much they can borrow against the target's assets and cash flow if they win, and under what conditions (interest rate, maturity, covenants, etc.)."  *See* Paul Povel and Rajdeep Singh, *Staple Finance* (August 1, 2007), at http://finance.wharton.upenn.edu/department/Seminar/2007FALL/micro/paul-povel-micro092007.pdf.

[1122]  Ex. 325 (Costa E-Mail, dated September 27, 2006).  Mr. Costa reported Tribune's proposal to Mr. Kaplan, Mr. O'Grady, and other Merrill personnel:  "CFO and GC came back to me this morning. . . .  Apparently Bill became more convinced given size of advisory fees cleaner to have new bank come in for fairness opinion.  So they have proposed the following:  ML and Citi do staple jointly[,] $10MM advisory fee to each firm[,] 50 percent credit against advisory fee for any financing fees we receive up to max credit of $5MM. . . .  Greg—this modifies what you say to [Osborn].  Think you can say appreciate how he is thinking about this and we will come back to company constructively."  *Id.*

MLPFS and CGMI assisted Tribune in conducting the auction process that culminated in the Step One Transactions.[1123]  At the same time the auction process was proceeding, at the direction of the Special Committee, MLPFS and CGMI pursued and developed various self-help strategies to restructure Tribune.[1124]  In a November 4, 2006 e-mail, Mr. Kaplan suggested to Mr. O'Grady and Mr. Costa a "radical approach" involving an ESOP structure in which:[1125]

> [W]e create a buying group that is the McCormick Foundation plus employees through an ESOP. . . .  That base probably requires either significant asset sales and/or another partner, but we'd be most of the way there.

According to Mr. Kaplan, the level of leverage required for such a transaction would be "north of 8x . . . a complex topic—was thinking though, that there may be a desire for something of an option that centers around existing/long standing Tribune constituents."[1126]  Four days later, EGI signed a confidentiality agreement with Tribune.[1127]  Thereafter, the factual record reflects no further discussion of the ESOP concept or EGI until late January 2007.[1128]  In his interview with the Examiner, Mr. Kaplan testified that the idea of an ESOP "just popped up out of [his] memory."[1129]

MLPFS and CGMI continued the auction analysis and advisory process during December 2006, and circulated a draft Special Committee presentation internally on December 10,

---

[1123]  *See* Report at § III.D.1.

[1124]  *See id.* at § III.D.1.

[1125]  Ex. 326 at ML-TRIB-0598182 (Kaplan E-Mail, dated November 5, 2006).

[1126]  *Id.*

[1127]  Ex. 327 at 22 (Preliminary Proxy Statement, dated June 1, 2007).

[1128]  *See* Report at § III.D.1.

[1129]  Examiner's Sworn Interview of Todd Kaplan, July 8, 2010, at 171:2-4.  Mr. Kaplan further testified that the "intersection of an ESOP owning more than 50 percent of an S Corp. and the specific exemption in the tax code that essentially allows both the corporation and its ESOP shareholders to avoid current taxation was something I was unaware of and surprised to find out when the Zell Team made me aware of it."  *Id.* at 172:19-173:3.

2006.[1130]  After distributing the draft presentation, Mr. Costa and Mr. Kaplan discussed the appropriate amount of leverage for each of Tribune's lines of business as part of an e-mail exchange:[1131]

> Mr. Costa:  Can you take a look at leverage levels here again. . . . Are we a touch aggressive in light of loan to value?
>
> Mr. Kaplan: Generally speaking, business that stays with the parent company (in this case Publishing), can go as high as 8x due to cushion provided by the PHONEs . . . spinco (Broadcasting) can go to 7.75x[.]
>
> [C]onferred with Citi on both of these in light of other discussions, and they concurred—we're still not thinking about leveragability as different between the two, broadly speaking.
>
> One comment that I've made a few times . . . is to be mindful of min equity of 20% -- thus, on page 8, not enough equity in Publishing —on page 9, none of the Publishing numbers work (all too thin)[.]
>
> [W]hy is our EBITDA range so wide on Publishing (almost 2 turns) when B&E is only ½ a turn — seems like a curious distinction.

During the auction process, on January 21, 2007, Mr. Kaplan provided Mr. Costa, Mr. O'Grady, and others an extensive analysis of potential scenarios for a stand-alone financing alternative.[1132]  In his e-mail, Mr. Kaplan summarized the possible alternatives as follows:[1133]

> Seems as though we are trying to achieve the following broadly defined objectives
>
> - capitalize on today's debt market conditions
>
> - return cash to shareholders as quickly as possible

---

[1130]  Ex. 328 at ML-TRIB-0378110 (Kaplan E-Mail, dated December 10, 2006).

[1131]  *Id.*

[1132]  Ex. 329 (Kaplan E-Mail, dated January 21, 2007).

[1133]  *Id.* at CITI-TRIB-CC 00041113.

- create the ability to execute a tax-free spinoff of Broadcasting in the near-term. . . .

Alternative 1—Raise financing for the whole company as currently constituted—my proposal is to use our staple—$7 b funded term loan, $750 mm revolver, $2.5 b notes ($1.7 b senior, $800 mm sub)—roll $1.25 b of existing debt plus PHONEs—bank debt secured, as are rollover senior notes, new bank/bond financing receives upstream guarantees . . .

Citi/ML can review rates/flex/etc. in light of this design . . .

Seems to be about 8.15x '06 EBITDA with PHONEs on rating agency basis (net liability of $875 mm) and 7.95x with PHONEs stated as GAAP liability of around $550mm . . .

Alternative 2—Raise financing for the whole company as currently constituted—would reduce financing level from above by about $400 mm (or a little more than 1/4x EBITDA) . . . this should work for resultant parent financing where the PHONEs take an important layer of risk underneath the new financing.

Mr. Costa asked in a January 26, 2007 e-mail to Mr. Kaplan: "Can we get more forceful/formal expression of interest from Zell two ways to do: he signals to board members his interest level or pate can call or email me to outline their interest on Sam's behalf."[1134]  Mr. Kaplan responded: "Just talked to Sam 10 min ago.  He reiterated interest of $500 mm investment with $24 dividend. . . .  [L]et me know how you'd like to progress – I can have Bill Pate call too, but leaned toward Sam as he has been calling directly on this."[1135]  Mr.  Kaplan explained to the Examiner in his sworn interview that he did not think this e-mail exchange reflected a desire to get the Zell Group interested in proposing a transaction; rather, it was an effort to get the Zell Group to "clarify in a more . . . forceful fashion what [their] interest is."[1136]

---

[1134] Ex. 1059 at ML-TRIB-0381221 (Kaplan E-Mail, dated January 26, 2007).

[1135] Id.

[1136] Examiner's Sworn Interview of Todd Kaplan, July 8, 2010, at 176:22-177:7.

On February 3, 2007, the same day that the Special Committee met, Mr. Costa informed William Pate of EGI that:[1137]

> —there are self-help and minority proposals that are marginally attractive and [permit holders] to retain some ownership
>
> —our deal is marginal at this valuation since it is an offer for the whole company, and in light of that there is a value gap
>
> —would we consider a straight investment in the company as part of a recap without the ESOP structure (competitive structure to [Broad/Yucaipa])
>
> —disappointment that, in light of tax savings, we could not put together a materially higher bid.

On February 5, 2007, management sent Mr. Costa and Ms. Mohr its updated consolidated financial projections for 2007,[1138] and on the following day, EGI e-mailed a revised proposal incorporating management's updated projections to Mr. Costa and Ms. Mohr.[1139] On February 12, 2007, Mr. Costa and Ms. Mohr presented the competing proposals, including EGI's revised proposal, to the Special Committee.[1140] Mr. Costa observed that the proposals from the other third parties contained more leverage than the self-help proposal also being considered.[1141] Mr. Costa also outlined the possibility of a recapitalization through a special dividend to Tribune's stockholders.[1142] Ms. Mohr summarized Tribune management's and research estimates

---

[1137]  Ex. 330 (Havdala E-Mail, dated February 3, 2007).

[1138]  Ex. 331 (Grenesko E-Mail, dated February 5, 2007).

[1139]  Ex. 116 (Kenney E-Mail, dated February 6, 2007).

[1140]  Ex. 117 (Special Committee Meeting Minutes, dated February 12, 2007).  *See also* Ex. 332 at TRIB-G0002808-9 (Presentation Materials for the Meeting of Committee of Independent Directors of the Board of Directors of Tribune, dated February 12, 2007).

[1141]  Ex. 117 at TRIB-G0007810 (Special Committee Meeting Minutes, dated February 12, 2007).  *See also* Ex. 332 (Presentation Materials for the Meeting of Committee of Independent Directors of the Board of Directors of Tribune, dated February 12, 2007).

[1142]  Ex. 117 at TRIB-G0007810 (Special Committee Meeting Minutes, dated February 12, 2007).  *See also* Ex. 332 (Presentation Materials for the Meeting of Committee of Independent Directors of the Board of Directors of Tribune, dated February 12, 2007).

for revenue and EBITDA and discussed the various values for recapitalization.[1143]  The Special

Committee directed MLPFS and CGMI  to continue to develop both the EGI and self-help

proposals and to seek from Carlyle its highest and best offer.[1144]

Despite the apparent progress with the EGI proposal, Mr. Kaplan complained to

Mr. Costa that the transaction was "like wrestling an octopus."[1145]  Mr. Costa, acknowledging

Mr. FitzSimons' concerns that Tribune might be taking on too much debt with the self-help

proposal, replied in an e-mail:[1146]  "Which one of those 8 arms represents our CEO now saying

its too much debt.  Not kidding. He called this morning.  At least he is doing what board should

have done."  On February 19 and 22, 2007, EGI presented revised proposals to the Special

Committee.[1147]  In a February 23, 2007 e-mail, Mr. Costa questioned why the employees would

support the EGI proposal and why the recapitalization should not be announced within a

week.[1148]

During a February 24, 2007 Special Committee meeting, Mr. Costa and Ms. Mohr

presented an update on, and comparison of, the various proposals.[1149]  After a separate meeting

between the Special Committee and Morgan Stanley, the Special Committee instructed Tribune

management and the Financial Advisors to defer further action on the self-help alternative so that

the Special Committee could explore the EGI proposal further and gauge the support of the

[1143]  Ex. 117 at TRIB-G0007810 (Special Committee Meeting Minutes, dated February 12, 2007).  *See also* Ex. 332 (Presentation Materials for the Meeting of Committee of Independent Directors of the Board of Directors of Tribune, dated February 12, 2007).

[1144]  Ex. 119 at TRIB-G0007814 (Special Committee Meeting Minutes, dated February 13, 2007).

[1145]  Ex. 308 at ML-TRIB-0382494 (Costa E-Mail, dated February 14, 2007).

[1146]  *Id.*  Mr. Costa confirmed to the Examiner that this e-mail referred to the concerns of Tribune's Chief Executive Officer, Dennis FitzSimons.  Examiner's Interview of Michael Costa, June 4, 2007.

[1147]  Ex. 121 (EGI Term Sheet, dated February 19, 2007); Ex. 122 (EGI Term Sheet, dated February 22, 2007).

[1148]  Ex. 333 (Costa E-Mail, dated February 23, 2007).

[1149]  Ex. 123 at TRIB-G0051832-33 (Special Committee Meeting Minutes, dated February 24, 2007).

Chandler Trusts and the McCormick Foundation.[1150]  On the following day, Mr. Costa learned

that Morgan Stanley had proposed to be part of the financing package for the self-help

transaction.[1151]  In an e-mail to Tribune General Counsel Crane Kenney, Mr. Costa reacted to

this development:[1152]

> How does MS who is supposed to be independent get to come in at
> the last minute and underwrite financing without having spent 9
> [m]onths developing alternatives.  I assume if MS indicates to
> Board that it favors recap over Zell it will disclose fact that it has
> submitted a financing proposal with substantial economics to them
> that they would not receive under Zell proposal.  Is [C]hip aware
> of this?

On February 28, 2007, Thomas Whayne, Managing Director at Morgan Stanley, reported

to Paul Taubman, Head of Global Mergers & Acquisitions at Morgan Stanley, and Charles

Stewart, Managing Director at Morgan Stanley, that:[1153]

> ML/Citi said that they had communicated to Zell that value needs
> to be improved, and that they believe that they may have a way of
> removing the back-end risk inherent in the bring down, although
> they are not ready to provide specifics.  Requested time through
> the weekend to see if they can secure a better price and address
> conditionality concerns.

Merrill and Citigroup continued to express reservations about the economics of both the

EGI and self-help proposals.  On February 28, 2007, Julie Persily, Managing Director and Head

of North American Leveraged Finance for Citigroup, addressed her concerns with both the EGI

and the self-help proposals to her lending counterpart at Merrill, Mr. Kaplan:[1154]

> Perhaps I'm over reacting [sic] — and that reaction [r]eflects my
> discomfort with Zell deal to begin with.  I think that if we do

---

[1150]  *Id.* at TRIB-G0051833.

[1151]  Ex. 334 (Costa E-Mail, dated February 24, 2007).

[1152]  *Id.* at ML-TRIB-1075295.

[1153]  Ex. 335 (Whayne E-Mail, dated February 28, 2007).

[1154]  Ex. 336 at CITI-TRIB-CC 00067426 (Canmann E-Mail, dated March 1, 2007).

20/share up front it exposes company to excess pricing. And risk. MFN issues become more real and we are exposed to both market movements and operating performance issues at the company. I suppose we are exposed in the Zell deal anyway and perhaps should welcome a chance to place paper sooner. So I don't want to say its undoable. If we are going to have 2.1 bn of a 2nd lien at the end of the day — I believe that paper must have broader call protection than in the self help case. Perhaps even NC2 to look like the bond we intended and to broaden investor audience. We need big audience for [Z]ell deal.

In response, Mr. Kaplan observed:[1155]

I think that we have a philosophical issue to work through. . . . The 3 of us are working on financing for TRB— we both have separate trees doing the Zell ESOP financing . . . I think that we can run through this with Don and Chandler—I should suggest that to get from $15 to $20, we need to collapse the financing teams in some fashion—that not only requires TRB and Zell signoff, but also . . . means we need to work back through management and internal counsel at Citi and ML—btw, Zell group is asking to see what we're showing company re the 2 step.

Merrill and Citigroup continued their negotiations with EGI and Tribune, and on

March 6, 2007, after observing that the Morgan Stanley proposal was "now not so different"

from that of the Citigroup Entities, Ms. Persily noted to Tribune Treasurer Chandler Bigelow:[1156]

For the record . . . [o]ur proposal does not assume that we can get around the liens test in the existing bonds as indicated in the MS proposal discussion. . . . We believe that we effectively "subordinate" the existing bonds by denying them guarantees. The Company provides that all subs guarantee the new loan(s), so that the value of the stock collateral is only realized by the existing note holders after satisfaction of the guarantees. Is that clear? — The cap tables in our presentations to you should more accurately describe the loans as Secured/Guaranteed (not just secured as they currently show). We focus on the "new debt" ratios to capture this concept of guaranteed debt. NOTE: We believe that we can market this to the banks and funds and our counsel agrees with our analysis that guarantees provided to the lenders come ahead of unguaranteed existing debt.

---

[1155] *Id.* at CITI-TRIB-CC 00067425.

[1156] Ex. 337 at CITI-TRIB-CC 00067723 (Persily E-Mail, dated March 6, 2007).

By March 10, 2007, the EGI proposal appeared "dead," at least from the perspective of Mr. Costa, at Merrill.[1157]  Mr. Costa wrote:  "Short answer is in light of recent operating performance no comfort in putting the kind of leverage necessary for Zell proposal to work and have board get comfortable with employees owning the equity.  Also numerous issues in the Zell proposal we could not solve."[1158]  Mr. Costa believed that Tribune had concluded that it was not comfortable with the leverage in either the EGI proposal or the self-help proposal.[1159]

The EGI proposal was, however, not dead, and, in fact, staged a come-back.  The Special Committee directed the Financial Advisors and Tribune management to present two fully-developed alternatives to the Special Committee on March 30, 2007.[1160]  The Financial Advisors were further directed to pursue the EGI proposal, but to get "better economic terms and enhance the likelihood of closing."[1161]  The same day, an investment banker at MLPFS circulated a debt covenants analysis among her colleagues on the Merrill team.[1162]

Rosanne Kurmaniak, Ms. Mohr, Mr. Kaplan, and Mr. Costa thereafter worked together on the requested presentation.  On March 20, 2007, Mr. Costa wrote to Ms. Mohr in an e-mail:[1163]

> Think we should take 2 percent decline case out of valuation.  I worry that if you take midpoint of those two cases you are in 30 range and only 10 percent away from Zell.  Seems more powerful to stick with revised mgmt plan, remind board we were closer to low end—and stock has moved this way—so near 20 percent discount to zell.  Plus zell gives you recap plus at incremental cost of spin delay.

---

[1157]  Ex. 338 (Costa E-Mail, dated March 10, 2007).

[1158]  *Id.*

[1159]  Ex. 339 at FOUN0000002 (Wander E-Mail, dated March 10, 2007).

[1160]  Ex. 327 at 27 (Preliminary Proxy Statement, dated June 1, 2007).

[1161]  Ex. 136 at TRIB-G0008789 (Special Committee Meeting Minutes, dated March 21, 2007).

[1162]  Ex. 340 at ML-TRIB-0619109 (Kim E-Mail, dated March 21, 2007).

[1163]  Ex. 341 at CITI-TRIB-CC 150611 (Mohr E-Mail, dated March 20, 2007).

Throughout the ensuing week, the Merrill Entities' and the Citigroup Entities' personnel worked in conjunction with Tribune management to negotiate an improved deal with EGI that Merrill and Citigroup would in turn be able to sell and finance.[1164]  At the same time, the Merrill Entities and the Citigroup Entities worked to garner the Chandler Trusts' and the McCormick Foundation's support for the EGI proposal by providing them financial and other information related to the EGI proposal.[1165]  Although Citigroup remained skeptical about the likelihood of success of the deal, the Merrill Entities continued to press forward and promote the EGI proposal.  On March 23, 2007, Mr. Costa wrote to Mr. Whayne concerning "Zell Financing and Impact on Spin:"[1166]

> You asked yesterday whether the financing of the Zell transaction would have any incremental cost compared to stand alone recap if second step of Zell did not close and we sought to pursue spin. . . . Zell Financing could permit the spin but the spin is not specifically architected into it as it is in the recap. . . .  [G]iven some of the recent IRS developments in the debt for debt area, we would have a high degree of confidence in putting the following steps together if 2nd step of Zell deal doesn't come together
>
> - create a new loan that ML/Citi/JPM own
>
> - use proceeds of that loan to pay off existing debt
>
> - put spin-off together, and execute debt/debt exchange against this new loan.

Efforts to structure the transaction both from the buy and the sell sides of the equation continued to be discussed in the days immediately preceding the March 30, 2007 Special

---

[1164]  Ex. 342 at TRB0077179 (Bigelow E-Mail, dated March 21, 2007).

[1165]  Ex. 343 at FOUN0004711-FOUN0004715 (Greenthal E-Mail, dated March 23, 2007).

[1166]  Ex. 344 at MS_273560-61 (Whayne E-Mail, dated March 23, 2007).

Committee meeting.  On March 28, 2007, JPMorgan's Jeffrey Sell wrote an internal e-mail to

Brian Sankey:[1167]

> [D]eal team informed me that over the weekend, the company,
> Merrill and Citi discovered that the exiting [sic] debt indentures
> . . . require that separate financial statements are required for each
> legal entity. . . .  The Company . . . can't produce legal entity
> statements. . . .  Merrill and Citi served up a structure which they
> have already approved which would give up the pledge of the
> stock of the operating subsidiaries and replace that security with a
> pledge of the stock of a new intermediate holding company for the
> publishing assets which would hold a single asset, an inter-
> company note in the amount . . . of $4.2B.  We would continue to
> have guarantees of the operating subsidiaries which will provide us
> with a superior claim vis a vis the existing debt.  The rub of the
> new structure is that the value of the collateral offered is less than
> the face value of the secured debt.

In an e-mail to other Merrill personnel working on the Tribune matter, David Tuvlin

reported:[1168]

> Latest developments post ratings news from a call just concluded
> among the banks: . . . JPM uncomfy with collateral and wants to
> explore flex to a more standard stock of sub package (I explained
> the issues several times in detail but they are pretty adamant) . . .
> Citi said they need a condition in order to fund step 2 that ratings
> are no less than they are today!!!

On March 30, 2007, the Financial Advisors met with the Special Committee.[1169]

Immediately before the meeting, EGI increased the price per share set forth in its prior offer, and

Broad/Yucaipa informed the Tribune Board that its "$34 per share, $500 million investment and

40% warrant offer will work within the Company's ESOP recapitalization plan."[1170]  Mr. Costa,

Mr. Kaplan, and Ms. Mohr, reported these developments to the Special Committee and provided

a comprehensive evaluation of the EGI proposal, including their evaluation of the transaction

---

[1167]   Ex. 197 at JPM_00353676 (Sell E-Mail, dated March 28, 2007).

[1168]   Ex. 345 (Tuvlin E-Mail, dated March 28, 2007).

[1169]   Ex. 140 (Special Committee Meeting Minutes, dated March 30, 2007).

[1170]   Ex. 346 at TRB0100566 (Broad/Yucaipa Letter, dated March 29, 2007).

financing, conditions to closing under the Step One Transactions and the Step Two Transactions, industry comparables, and precedent industry transactions.[1171]  Mr. Kaplan advised the Special Committee that:[1172]

> There would have to be very substantial, and at this point highly unlikely, deterioration in the Company's operating results before the lenders would have grounds not to fund the closing.

In his interview during the Investigation, Mr. Kaplan testified regarding his statements at the Special Committee meeting:[1173]

> [I]n discussing the conditions, one principal condition that we did focus on was material adverse effect.  And that I was clear that the measurement of performance was performance – if I'm recalling the condition correctly – relative to a peer group as opposed to an absolute measure of performance of the company between signing and closing.

Mr. Costa stated to the Examiner that from Tribune's perspective, and from his perspective as an advisor to Tribune, it was better to have minimal "conditionality" or "optionality" so that lenders could not back out of a deal.[1174]

On March 31, 2007, Mr. Costa and other members of the Merrill team sent a memorandum to their internal Fairness Opinion Committee recommending that the Committee find the EGI proposal fair to Tribune's stockholders.  The memorandum outlined the proposed transaction and noted that it has an "offer value of $8.3 billion and implies an adjusted enterprise value of $11.9 billion."[1175]  The memorandum further disclosed that the advisory fees payable to the Merrill Entities were expected to be approximately $15 million, in addition to which they

---

[1171] Ex. 347 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated March 30, 2007).

[1172] Ex. 140 at TRIB-G0008792 (Special Committee Meeting Minutes, dated March 30, 2007).

[1173] Examiner's Sworn Interview of Todd Kaplan, July 8, 2010, at 179:17-180:2.

[1174] Examiner's Interview of Michael Costa, June 4, 2010.

[1175] Ex. 348 at ML-TRIB-0034924 (Merrill Interoffice Memorandum, dated March 31, 2007).

anticipated earning another $50 million related to its debt financing commitment of $4.1 billion.[1176]  Tribune later filed its Form SC TO-I, Tender Offer Schedule and Amendment, attaching MLPFS' fairness opinion.[1177]

Leading up to the approval of the EGI proposal, the Merrill personnel internally discussed the topic of fees.  In a March 11, 2007 e-mail exchange, Mr. Kaplan wrote that Merrill could expect $33-35 million in financing fees related to the Leveraged ESOP Transactions.[1178]  Mr. Costa pushed back and said that Merrill should be "more aggressive."[1179]  Mr. Kaplan questioned what Mr. Costa expected, and Mr. Costa replied, "More money."[1180]

In his interview, Mr. Costa told the Examiner that his comment in the e-mail reflected his disappointment at the significant difference between the expected and actual total fees that the Merrill entities would earn in connection with a Tribune transaction.[1181]  Mr. Costa further stated that Merrill had advised Tribune that it had certain expectations of what it would earn on a combined basis from both the advisory services and lending fees.[1182]  Under their agreement with Tribune, however, fees for the Leveraged ESOP Transactions would not be due unless and until the Step Two Transactions closed.[1183]  Accordingly, with the exception of the $2 million advisory fee payment in 2006, MLFPS would not have received any advisory fees from Tribune for seven years of advisory work had Step Two not closed.[1184]

---

[1176]  *Id.* at ML-TRIB-0034924-25.

[1177]  Ex. 5 (Tender Offer).

[1178]  Ex. 349 at ML-TRIB-0385025 (Costa E-Mail, dated March 11, 2007).

[1179]  *Id.* at ML-TRIB-0385024.

[1180]  *Id.*

[1181]  Examiner's Interview of Michael Costa, June 4, 2010.

[1182]  *Id.*

[1183]  *Id.*

[1184]  *Id.*

As noted, although MLPFS was providing investment banking services, MLCC also obtained for itself a role as an initial lender to Tribune and arranger of the debt that would be necessary to fund the Leveraged ESOP Transactions.  On April 5, 2007, MLCC executed the Commitment Letters.[1185]  At the closing of the Step One Financing, MLCC's lending commitments totaled $129 million or 17.2% of the Revolving Credit Facility, $2.7575 billion or 50% of the Tranche B Facility, and $750 million or 50% of the Tranche X Facility.[1186]  At the closing of the Step Two Financing, MLCC's lending commitments totaled $448.8 million or 28% of the Bridge Facility[1187] and $606 million or 28.79% of the Incremental Credit Agreement Facility.[1188]

Although the Merrill Entities continued to explore the possibility of providing financing for alternative bidder Broad/Yucaipa,[1189] Merrill also was looking for ways to market the ESOP structure that it had assisted in creating.  On April 2, 2007, Mr. Costa informed Mr. Kaplan that:[1190]

> Tribune will announce in the morning a $13B going private transaction sponsored by a newly created ESOP and Sam Zell. Transaction is largest leveraged ESOP ever, takes full advantage of very robust credit markets and has unique transaction design by Zell and further developed by Company and ML.  Structure may have applicability to high net worth individuals as well as some PE firms.  Todd an[d] I will work with Jeff Kaplan and Alan Hartman to make sure we are pushing this structure elsewhere.
>
> ML, Citi acting as advisor to TRB along with JPM providing the financing.  MS advised special committee.

---

[1185] Ex. 305 (Amended and Restated Step One Commitment Letter, dated April 5, 2007); Ex. 309 (Amended and Restated Step Two Commitment Letter, dated April 5, 2007).

[1186] *See* Ex. 350 at TRB0445276 (Schedule I to Credit Agreement).

[1187] *See* Ex. 175 at TRB517070 (Schedule I to Bridge Credit Agreement).

[1188] *See* Ex. 351 (Increase Joinders).

[1189] Ex. 352 at ML-TRIB-0388154 (Costa E-Mail, dated April 10, 2007).

[1190] Ex. 353 (Nesi E-Mail, dated April 2, 2007).

> Greg, Bill [Osborn] intensely involved in this, including in
> negotiations with Zell. . . .

On April 3, 2007, Mr. Costa and Ms. Mohr were congratulated for their success in

negotiating the deal involving the Leveraged ESOP Transactions,[1191] and Mr. Costa's colleagues

analyzed potential clients for which those transactions might serve as a template.[1192]  Discussing

the applicability of the transaction template to potential other business opportunities, a fellow

investment banker observed:[1193]

> Guys—truly amazing financing engineering.  Even more kudos
> after I'm reading this. . . .   In terms of applicability, my biggest
> question is can you (and would anyone really want to) do this
> where you don't have the following two Tribune attributes:
>
> A decent amount of investment grade debt that can serve as the
> "equity" here.  Total leverage is 9x, which is effectively the
> purchase price. . . .  Would any management team or Board really
> want to tighten the screws this much (FCF/Debt ratios are
> amazingly tight over the entire projection period) if they weren't
> effectively forced into it and had no other options.

Mr. Kaplan's response was guarded:[1194]

> Might merit discussion live, but I'd say
>
> —existing debt that can be subordinated is helpful, but not
> required—would suggest that with corp and shareholder tax
> eliminated, value is north of what Zell/ESOP group paid—
> Zell/ESOP group just needed to pay enough to beat other options
>
> —while FCF/Debt is tight, not any worse than some other deals
> we've seen recently . . . given the volume of calls I'm getting, I
> suspect that others will be interested
>
> As to Lev Fin—gating item was getting to B2/B corp ratings . . .

---

[1191]  Ex. 354 at ML-TRIB-0608439 (Price E-Mail, dated April 3, 2007).

[1192]  *See also* Ex. 352 (Costa E-Mail, dated April 9, 2007).

[1193]  Ex. 355 at ML-TRIB-0387938 (Kaplan E-Mail, dated April 6, 2007).

[1194]  *Id.* at ML-TRIB-0387938.

> [T]his was as challenging and complex a transaction as I've ever
> worked on.

Despite the sense of accomplishment in early April 2007, by May 2007, the market's lack of interest in the Step One Transactions was evident, and certain Merrill personnel expressed concern that syndication of the debt would be undersubscribed "on an allocable demand basis by a material amount."[1195]  Internal communications among Merrill personnel attributed the problem in sales to be a reflection of the market's uneasiness with the deal itself rather than with market conditions generally.[1196]

After the Credit Agreement was signed on May 17, 2007,[1197] Merrill addressed the issue of the hold and sell levels for their portion of the Step One Financing, as well as the debt covenants.[1198]  Nancy Meadows, of the Loan Execution & Management division, reported:[1199]

> Ultimately, the overall structure for step one changed slightly. . . .
> In terms of covenants, financial covenants include max leverage of
> 6.25X with stepdowns and interest coverage minimum of 1.75x
> with step-up to 2.0x next year.  Also has capex limitation of $210
> million. . . .
>
> The nice thing about this company is that the assets are divisible
> into saleable pieces — very good newspapers in Florida, big
> papers in LA, NY, and Chicago (not doing very well, it's true).  As
> Don said, it's a melting ice cube but not one that disappears right
> away.  I'm not saying we love the credit, and the leverage is high,
> but there is some asset value here.

Also in May 2007, Merrill's attention focused on the valuation opinion required as a condition precedent to closing Step One.  Chandler Bigelow forwarded VRC's draft preliminary

---

[1195]  Ex. 356 at ML-TRIB-0390796 (Kaplan E-Mail, dated May 10, 2007).

[1196]  *Id.* at ML-TRIB-0390795.

[1197]  Ex. 179 (Credit Agreement).

[1198]  Ex. 357 (Browning E-Mail, dated May 18, 2007).

[1199]  *Id.* at ML-TRIB-0893577.

solvency analysis to Daniel Kazan, who in turn forwarded the document to Michael O'Grady, on

behalf of the Merrill Entities, and to Rosanne Kurmaniak, on behalf of the Citigroup Entities.[1200]

> Only real question I would be interested in your view on is that
> they include a pv of tax savings on phones as a part of the entity
> value.  I can understand the math and the rationale but we've never
> really included that in our valuation. Doesn't swing the outcome,
> just curious.

A colleague responded: "We have included in the sense that it is included in the future

free cash calculations which would be lower but for the Phones tax shield."[1201]  VRC issued its

first solvency opinion on May 9, 2007, stating that Tribune was solvent on the completion of

Step One.[1202]

### (2)    Due Diligence and Evaluations Performed.

As described above, the Merrill Entities and the Citigroup Entities had considerable

access to the books and records of Tribune during the time leading up to the April 1, 2007

Tribune Board meeting.  Additionally, both Merrill and Citigroup personnel met with the Special

Committee on a near-weekly basis and the Tribune Board on a monthly basis.  During each of

these meetings, the parties reviewed Tribune's financials and analyzed the financing, structural,

and other issues related to the strategic alternatives being considered by the Tribune Board.  In

addition, both Merrill and Citigroup participated in direct discussions with parties participating

in the auction process.  Overall, Merrill had significant access to information that was relevant to

their roles.

There is some question, however, whether MLPFS had sufficient time to engage in

comprehensive due diligence of each strategic alternative, given the constantly shifting dynamics

---

[1200]  Ex. 358 at ML-TRIB-1052281 (Marcus E-Mail, dated May 7, 2007).

[1201]  *Id.*

[1202]  Ex. 268 (VRC Step One Solvency Opinion, dated May 9, 2007).  *See also* Report at § III.E.3.

of the various auction proposals, the continuing consideration of the self-help options, the

shifting positions of the Large Stockholders, and the relatively late entry of the EGI proposal,

among other factors.

As discussed above, MLPFS appeared to support the self-help recapitalization during

March 2007, but then appeared to shift quickly to support the EGI proposal.[1203]  Mr. Costa stated

to the Examiner that the change was attributable to, among other reasons, the higher amount of

cash flow or EBITDA under the EGI proposal as a result of synergies and cost cutting measures

and a better understanding by MLPFS of how the ESOP tax shield worked.[1204]  Mr. Costa

viewed the tax shield as an "equity cushion."  Mr. Costa stated to the Examiner that the new

company would save an additional $60 million a year by matching employee 401(k)

contributions with Tribune Common Stock instead of cash, which also increased his comfort

with the EGI proposal.[1205]

### c.    Citigroup Entities.

Because the investment banker-advisors from Citigroup and Merrill worked together for

most of the relevant period and performed similar roles, much of the story of Citigroup's

involvement in Tribune advisory matters is discussed in the preceding section regarding Merrill.

This section provides additional detail regarding Citigroup's involvement.

The Citigroup Entities and their designated roles in the Step One Transactions were as

follows:  (a) CGMI, as joint lead arranger and joint bookrunner,[1206] and advisor,[1207] and

---

[1203]  Ex. 338 (Costa E-Mail, dated March 10, 2007).

[1204]  Examiner's Interview of Michael Costa, June 4, 2010.

[1205]  *Id.*

[1206]  Ex. 179 at 1 (Credit Agreement).

[1207]  Ex. 360 (Citigroup Engagement Letter, dated October 27, 2006).

(b) Citicorp, as lender[1208] and co-documentation agent.[1209]  Additionally, CGMI executed the

Commitment Letters on behalf of "Citigroup."[1210]   Some of the key personnel working with

Tribune on behalf of the Citigroup Entities, and the department or working group with which

each was affiliated, included the following:

### Leveraged Finance

Julie Persily, Managing Director, Head of North America
Leveraged Finance[1211]

Mallika Singh, Associate

### Investment Banking

Michael Schell, Vice Chairman, Global Banking[1212]

Mark Simonian, Global Co-Head of TMT[1213]

Michael Canmann, Managing Director, Head of Chicago
Investment Banking[1214]

John Apostolides, Associate

Ruoxi Chen, Analyst

### Mergers and Acquisitions

Christina Mohr, Managing Director[1215]

---

[1208] Ex. 179 at 1 (Credit Agreement).

[1209] *Id.*

[1210] CGMI executed and entered into the Step One Commitment Letter and the Step Two Commitment Letter on behalf of "Citigroup," which was defined thereunder to mean: "CGMI, Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as may be appropriate to consummate the transactions contemplated herein."  *See* Ex. 305 at TRB-162128-29, 40 (Amended and Restated Step One Commitment Letter, dated April 5, 2007); Ex. 309 at (Amended and Restated Step Two Commitment Letter, dated April 5, 2007).  Ultimately, Citibank executed the Credit Agreement, the Bridge Credit Agreement, and the applicable Increase Joinder.  *See* Ex. 179 at TRB0520885 (Credit Agreement); Ex. 361 at S-1 (Bridge Credit Agreement); Ex. 351 at TRB0520680-86 (Increase Joinder – Citicorp North America, Inc.).

[1211] Ex. 178 at 12 (Step One Confidential Information Memorandum).  Notably, Ms. Persily executed the Credit Agreement on behalf of Citicorp, as Vice President and Managing Director.  *See* Ex. 179 at TRB 5020898 (Credit Agreement).  Ms. Persily is no longer employed by Citigroup.  *See* Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 19:20-22.

[1212] Ex. 363 at 9 (Citigroup Project Tower Approval Memorandum, dated October 12, 2006).

[1213] *Id.*

[1214] Ex. 178 at 13 (Step One Confidential Information Memorandum).

[1215] *See* Ex. 364 at CITI-TRIB-CC 00026403 (Leveraged Finance Final Approval Memorandum – Update).  Although part of the group called "Mergers and Acquisitions," Ms. Mohr also is referred to as part of the "investment banking team."  *See* Ex. 363 at 9 (Citigroup Project Tower Approval Memorandum, dated October 12, 2006).  Notably, Ms. Mohr signed the Citigroup engagement letter on behalf of CGMI.  Ex. 360 at CITI-TRIB-CC 00010128 (Citigroup Engagement Letter, dated October 27, 2006).

Rosanne Kurmaniak, Vice President[1216]

Tribune engaged CGMI on October 27, 2006 to serve as its financial advisor in connection with "a possible Transaction" involving Tribune.[1217]  Pursuant to Tribune's October 27, 2006 engagement letter with CGMI, the parties contemplated that the Citigroup Entities might provide Tribune with more than advisory services:[1218]

> The Company hereby consents to Citigroup or any of its affiliates to act as book-running manager, lead manager, co-manager, placement agent, bank agent, underwriter, arranger or principal counterparty or other similar role on behalf of one or more potential bidders in connection with a transaction, or otherwise assisting one or more potential bidders in connection with a Transaction, or otherwise assisting one or more potential bidders in obtaining funds, through debt or equity financing or the sale of debt or equity securities (the "Financing") in connection with a Transaction.

The engagement letter further stated that the Citigroup Entities would establish a "Financing Team" to conduct due diligence and obtain information from Tribune that it would share with Tribune and potential purchasers, and, possibly, one or more "Purchaser Teams" to obtain information from and represent potential purchasers in the process.  The engagement letter precludes the Citigroup advisory team from sharing non-public information with the Financing Team or any Purchaser Team without the consent of Tribune.

In her interview with the Examiner, Christina Mohr elaborated on the manner in which her Citigroup advisory team (including personnel from "Investment Banking" and "Mergers and Acquisitions") worked with the Citigroup lending team—and the distinct roles that each played in connection with Tribune.  According to Ms. Mohr, the advisory team worked closely with

---

[1216]  Examiner's Sworn Interview of Rosanne Kurmaniak, July 7, 2010, at 17:16-19.

[1217]  Ex. 360 at 1 (Citigroup Engagement Letter, dated October 27, 2006).

[1218]  *Id.* at CITI-TRIB-CC 00010124.

management[1219] and was principally responsible for advising Tribune on strategic alternatives for Tribune, conducting the "hardcore analytics" behind management, board and lender presentations, and gathering and organizing information "to provide a level playing field of information to all prospective Purchasers" and their financing sources.[1220]

Consistent with the documentary evidence,[1221] Ms. Mohr acknowledged that her advisory group communicated with and worked closely with the lending group, headed by Julie Persily.[1222]  Ms. Persily confirmed in her interview with the Examiner that she had interaction with Ms. Mohr's team, and explained that beginning in late 2006, Ms. Persily's lending group began developing "staple financing" to offer parties potentially interested in a Tribune transaction.[1223]  Because Ms. Persily's group was assessing the amount of debt Tribune could handle on various recapitalization and spinoff scenarios—which Ms. Mohr's advisory group was helping management consider—the advisory group was providing the lending group with its analyses to integrate into its own work.[1224]  Ms. Mohr described this as an "active dialogue"

---

[1219]  Examiner's Interview of Christina Mohr, June 29, 2010 ("from early in 2006, the relationship changed and we became more on the inside, an integral part of the thought process, we had better access to the numbers, we were working with management hand in glove").

[1220]  *Id.*

[1221]  *See, e.g.,* Ex. 365 (Susman E-Mail, dated April 10, 2007) (discussing Mr. Susman's "negotiation with Zell on our financing fee" and "certain requests from Zell that I think will be important to the future coverage of the Tribune and other Zell entities" and planning a group meeting re same); Ex. 366 (Persily E-Mail, dated March 28, 2007) (discussing recent ratings news) ("I'm trying to spin our position . . . we will do it even with a negative outlook.  But we cannot risk a further downgrade."); Ex. 384 (Singh E-Mail, dated March 24, 2007) (requesting the running of certain financial models relating to the "Zell deal" and commenting "We are still debating internally if we want to do this deal even with low ratings"); Ex. 885 (Persily E-Mail, dated March 22, 2007) (discussing results of Special Committee meeting attended by Ms. Mohr, and Ms. Persily's views regarding the EGI proposal) ("Having seen the book I am still extremely uncomfortable with Zell.  No matter the rating.  Deal creep brings debt high than the deal we approved for him which was 9.6bn new raise (7.1x thru the new money).  Declining EBITDA is scary."); Ex. 369 (Persily E-Mail, dated March 1, 2007) (invitation to discuss proposed "collapsing" the finance teams, per suggestion of Todd Kaplan, who observes "we are starting to structure the Zell financing for the Zell group"); Ex. 370 (Persily E-Mail, dated February 13, 2007) (discussing potential pricing of Tribune securities assuming 8.5x leverage).

[1222]  Examiner's Interview of Christina Mohr, June 29, 2010.

[1223]  Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 52:1-17 and 24:4-12.

[1224]  Examiner's Interview of Christina Mohr, June 29, 2010.

between the groups, which continued as Ms. Persily's team evolved from the staple finance team to the leveraged buyout team, developing the financing that facilitated the Leverage ESOP Transactions.[1225]  As Ms. Mohr put it, "They learn enough from us to provide information to us to advise the Company appropriately."[1226]

Ms. Mohr stated further that the information provided to the lending team was "limited" and did not include "information about other bidders."[1227]  As did Merrill's Michael Costa in his interview, Ms. Mohr referred to this limitation as a "wall," although by use of such term she did not mean an absolute information barrier:[1228]

> The way the wall works is the only information you give to the financing team is the type of information you would give to any bidder looking for financing — maybe a little more — its more a give and a take, but it is enough that they can provide competent advice when they do a parallel process — its not an integrated process at that point.

Likewise, Ms. Mohr indicated that she did not have visibility on all of the work of the lending team—which involved "market conditions and other realities that are not necessarily with the purview of the advisory team"[1229]—or any involvement with the decisions made by the "financing side of the house."[1230]

---

[1225] *Id.*

[1226] *Id.*

[1227] *Id.*

[1228] *Id.* Ms. Mohr elaborated as follows:

> We might know a whole range of things on the advisory side, but our job in working with the financing side on the staple was to help them understand the Company's assessment and projections and to help them reach a judgment about the capacity and the structure of the financing, but we were not in a position – we're not mandated with making them part of the advisory team per se.

> *Id.*

[1229] *Id.*

[1230] *Id.* ("I can say they're goofy or they're smart, but my ability to impact the credit chain is zero—[there are] different managements.").

Ms. Persily had a slightly different understanding of the wall.  She also described the wall as "intended to protect the company from confidential [information going] to people it doesn't want the information to go."[1231]  However, in her view, she was "on the Tribune side working with Christina [Mohr] to create a staple financing package that would benefit the company and give it to individual buyers.  So until a buyer was selected I didn't talk to any buyers. . . . I was on Christina's side of the wall."[1232]  This changed after the Tribune Board accepted the EGI offer.  "Once it became clear that Zell was the buyer I flipped and moved to Zell's side of the wall and I represented Zell and he was my interest."[1233]

Aside from their involvement with the Leveraged ESOP Transactions, certain Citigroup Entities also had been involved in *prior* transactions involving Tribune.  In particular, an affiliate of CGMI, Citibank, N.A., served as the indenture trustee for the PHONES Notes.[1234]  Citibank tried to remove itself as trustee, as evidenced by correspondence in January 2007 and March 2007 from Robert Kirchner of Citibank to Jack Rodden of Tribune stating that Citibank wanted to resign as trustee for the PHONES Notes.[1235]  Citibank ultimately did not resign from its role as trustee until 2008, after completion of the Leveraged ESOP Transactions.[1236]

As is the case with Merrill, the evidence generally indicates that each group of Citigroup personnel had a distinct role and function in connection with the Leveraged ESOP Transactions, whether to advise Tribune as investment banker on Tribune's strategic options, underwrite and

---

[1231]  Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 51:11-14.  *See also* Examiner's Sworn Interview of Rosanne Kurmaniak, July 7, 2010, at 126:11-127:5.

[1232]  Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 52:1-11.

[1233]  *Id.* at 52:14-17.

[1234]  Ex. 49 (PHONES Indenture).  Sometime after the date of this Indenture, Citibank, N.A. succeeded the Bank of Montreal Trust Company as indenture trustee.  *See* Ex. 978 at TRB0507448 (Tripartite Agreement, dated August 1, 2008).

[1235]  Ex. 372 (Rodden E-Mail, dated March 8, 2007).

[1236]  Ex. 978 (Tripartite Agreement, dated August 1, 2008).

negotiate the financing for the transaction, or market the debt securities resulting from that financing to other lenders and investors.[1237]  Indeed, following the closing of Step One, the CGMI advisory group ceased advising the Tribune Board—although it did provide discrete analytic tasks, as requested thereafter from time to time by management.  Further, the lender team at Citigroup worked with the other Lead Banks to address issues related to consummation of the Step Two Financing.[1238]  Although the record is not clear in some respects,[1239] on balance, the Examiner cannot conclude that the Citigroup Entities should be viewed as a single, solitary entity in connection with the Leveraged ESOP Transactions.

### (1)     Activities.

As discussed above, CGMI and MLPFS worked jointly in preparing and presenting strategic alternatives for Tribune, the Tribune Board, and the Special Committee.  The Citigroup Entities learned about the EGI proposal on or about January 30, 2007.[1240]  Ms. Persily queried Michael Canmann and Ruoxi Chen whether EGI had "a coverage person at Citi who should be involved" and later exclaimed that "I assume that we will want to finance him!"[1241]  Mr. Canmann responded, "Yes to all.  Waiting to hear from compliance."[1242]  Despite professed

---

[1237]  At times, these roles conflicted.  CGMI personnel from the Leveraged Finance Department advocated for a commitment condition requiring that Tribune's new debt receive at least a "B" rating from the rating agencies, while CGMI Mergers and Acquisition personnel opposed such a condition.  Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 117:20-118:5.

[1238]  *See* Report at § III.H.4.

[1239]  As noted in the preceding section regarding Merrill, one area in which the record conflicts is the manner in which various transaction documents describe the fees to be paid to the various entities, the labels given to those fees, and the specific entities to which the payments actually were made.  Given the inconsistency between the governing documents, the record is unclear whether the fees paid to the Citigroup Entities for their lending commitments and arranging services (but not for the advisory services provided to Tribune) were paid to or for the benefit of CGMI, Citicorp, or both.  *See* Report at § III.D.16.

[1240]  Ex. 373 (Canmann E-Mail, dated January 30, 2007).

[1241]  *Id.*

[1242]  *Id.*

excitement at the outset, CGMI quickly developed a skeptical view of the EGI proposal, as

reflected in an internal February 6, 2007 e-mail from Ms. Persily:[1243]

> I spoke to ML.  They are on board with this silly [ESOP] structure.
> Note:  the cap table isn't showing the [ESOP] debt correctly.  Its
> actually just more hy debt for a total of 3.425bn. . . .  I am
> unequivocally not on board.  Yet.  But ML explained why they
> think it works. . . .  ML is Sam's bank.  They'll do anything for
> him. (They would not do this for KKR.)
>
> We'll listen politely.  Perhaps make a few comments.  And then
> I've got to figure out if this is real. . . .
>
> Let's try not to show too much of an opinion unless we have to.
> (That opinion being less focused on debt level than on free equity
> option.)  Things change.  (Last week they wanted 7-9bn of debt!)
> ML tells me that Zell is not looking for papers yet; still trying to
> figure out if there's a deal here.

Ms. Persily testified in her interview with the Examiner that she wrote this e-mail shortly

after first learning about the EGI proposal.[1244]  Ms. Persily also stated that she "had never heard

of an ESOP" and "never heard of levering [an] ESOP.  It took a month or so for people to

educate me and get me comfortable. . . . But they did eventually."[1245]  Ms. Persily further

explained that her concern with the EGI proposal had more to do with anticipated marketing

challenges than the proposal itself.  Ms. Persily explained:[1246]

> You know, all along this was a very highly leverage[d] deal in a
> structure that the market is not familiar with.  So my discomfort
> was always surrounding how we'd be able to sell that which we
> weren't holding.  We were always going to hold a piece and I don't
> think I was uncomfortable with that in the beginning as much as I
> was uncomfortable with how we were going to market it.

---

[1243]  Ex. 374 (Persily E-Mail, dated February 7, 2007).

[1244]  Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 36:4-16.

[1245]  *Id.* at 37:9-13.

[1246]  *Id.* at 66:2-11.

On February 20, 2007, the day after Ms. Mohr received a revised proposal from EGI, Ms. Persily's skepticism apparently subsided, and she noted that she now believed "that this deal works . . . PHONES and existing notes act as equity cushion.  Zell is hot right now."[1247]  In her interview with the Examiner, Ms. Persily stated that she wrote favorably about the EGI proposal in this e-mail because it was directed to her boss, Chad Leat, and that when writing to her boss:[1248]

> I want to keep it positive because if I do decide I like the deal I
> want him to like it and he likes what I said.  I talk to Chad [Leat]
> many, many times a day.  Our communication isn't just via E-mail.
> I'm guessing for a week or so before this I had said I'm coming
> around.  I think it's going to work I think we'll get there.

Ms. Persily further testified that she viewed the PHONES Notes as "equity" because "one could layer as much debt as they want—the PHONES did not have protection in their document to prevent layering debt above them . . . [w]hich is unusual."[1249]  Ms. Persily also explained that in referring to "existing notes" she was referring to "senior notes that Tribune had issued . . . [and] in any liquidation scenario any debt that we placed on the company would be paid out before the senior notes.  So we always look at a worst case scenario . . . and a worst case scenario you protect yourself and so we were protected."[1250]  Ms. Persily added that it is her "nature to be very conservative" but that she ultimately got comfortable with the EGI proposal because "there was a lot of free cash flow."[1251]

---

[1247] Ex. 375 (Persily E-Mail, dated February 20, 2007).

[1248] Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 46:16-47:1.

[1249] *Id.* at 31:13-32:1.

[1250] *Id.* at 48:3-16.

[1251] *Id.* at 45:10 and 43:20-21.

Like Merrill and JPMorgan, the Citigroup Entities perceived the EGI proposal as a potential way to develop a relationship with Samuel Zell.  Paul Ingrassia, a Managing Director and Group Head North America Real Estate & Lodging, wrote to Ms. Mohr:[1252]

> Christina, If we end us [sic] helping sam, if appropriate, please let him know how important his relationship is to our ecm and real estate teams, and that we were consulted. . . .  We are trying to win a book position on his IPO of Equity International. . . .

In her interview with the Examiner, Ms. Persily explained that the Citigroup Entities did not have a relationship with Mr. Zell despite having tried "for many, many years" to develop one.[1253]  For her part, Ms. Persily stated that she was "skeptical" but "intrigued" by the possibility of doing business with Mr. Zell because she did not know Mr. Zell personally but knew of his reputation and was "in awe of him."[1254]

Certain Parties alleged that Citigroup was improperly motivated to support the EGI proposal because of its desire to develop a relationship with Mr. Zell.  The Examiner has not found credible evidence supporting this contention.  To the contrary, Ms. Mohr stated in her interview that Citigroup did "not have [the] best relationship" with Mr. Zell during the course of negotiating the EGI proposal and described the relationship as "scanty."[1255]  Ms. Mohr further stated that CGMI "didn't do the deal because of Sam Zell, we did the deal despite Sam Zell."[1256]  Indeed, Mr. Zell supported a reduction in Citigroup's fees in order to bring in BofA, an entity with which Mr. Zell had a longstanding relationship.[1257]

---

[1252] Ex. 376 (Ingrassia E-Mail, dated February 20, 2007).

[1253] Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 35:3-4.

[1254] *Id.* at 34:20-35:10.

[1255] Examiner's Interview of Christina Mohr, June 29, 2010.

[1256] *Id.*

[1257] *See* Report at § III.E.6.d.

Citigroup and Merrill continued to weigh self-help alternatives suggested by Tribune, causing Todd Kaplan of Merrill to suggest collapsing the financing teams, requiring Tribune and EGI approval.[1258]  Ms. Mohr subsequently advised other personnel at Citigroup that Tribune appeared yet again to be going in a different direction and moving away from the EGI proposal:[1259]

> The company wants to go the recap route and has told Zell that
> they are pencils down on his proposal.  The recap that they want to
> do is a 15 dividend which is 1.2 billion less debt than we had been
> discussing.

This move was recognized as potentially costing Citigroup "another 18mm of fees (gross)."[1260]  Ms. Persily testified in her interview with the Examiner that losing these fees was "not a significant number compared to the total.  That gets divided among four people and net it's even less.  So it's not that much [of a] difference."[1261]  Ms. Persily also stated that "I don't think the fee would be the driver in our satisfaction between the standalone [recap] and the Zell [proposal].  It was purely a matter of ease of marketing.  I've always said that the ESOP deal was going to be harder to market than a standalone deal."[1262]

Citigroup personnel also were aware of the market reaction to Tribune's self-help proposals.  On March 15, 2007, Kevin Russell, Global Head of Convertible Securities for Citigroup, wrote to Suvir Thadani, Vice President of Citigroup Equity Capital Markets:[1263]

> [L]ots of speculation in the market regarding both comcast, and trb
> even more so, potentially looking to retire zones/phones. . . . please
> try to get infront [sic] of the bank on these issues.

---

[1258]  Ex. 377 at CITI-TRIB-CC 00067425 (Canmann E-Mail, dated March 1, 2007).

[1259]  Ex. 378 (Chen E-Mail, dated March 10, 2007).

[1260]  Ex. 378 (Chen E-Mail, dated March 10, 2007).

[1261]  Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 86:19-22.

[1262]  *Id.* at 88:5-12.

[1263]  Ex. 379 (Mohr E-Mail, dated March 15, 2007).

On being asked her thoughts on the issue later that day, Ms. Mohr responded, "[a]re you guys nuts?  Call me."[1264]

A discrete function served by CGMI leading up to Step One involved revising various models related to Tribune's strategic alternatives.  Chandler Bigelow and Daniel Kazan of Tribune communicated extensively with various CGMI personnel and transmitted information related to different models to them.[1265]  Additionally, Mr. Bigelow transmitted information for review by CGMI personnel, such as sending Rosanne Kurmaniak of the Mergers & Acquisitions group and Michael Canmann a draft Duff & Phelps solvency analysis of the self-help proposal.[1266]

Mr. Bigelow testified to the Examiner that CGMI was the "keeper of the model," especially Ms. Kurmaniak.[1267]  Ms. Kurmaniak told the Examiner that CGMI transitioned the models to Mr. Bigelow in September, October, or November 2007.[1268]  Indeed, Ms. Kurmaniak considered her substantive work for Tribune completed in April or early June 2007.[1269]  Although the exact date of the transition of the models is unclear, the Examiner found

---

[1264] *Id.*

[1265] *See, e.g.,* Ex. 380 (Bigelow E-Mail, dated March 16, 2007); Ex. 381 (Kazan E-Mail, dated March 21, 2007).

[1266] Ex. 382 (Kurmaniak E-Mail, dated March 16, 2007).

[1267] Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 93:19-94:3.  Citigroup's role in keeping and maintaining the model used by Tribune was a vestige of CGMI's activities advising the Tribune Board at Step One:  "[After] this April, May, June time period . . . my role was effectively sort of done and we were running this model because it was an accommodation to the client and because . . . we had historically built it and we knew the functionality and all of that. . . .  [A]s we began to transition into the financing role [we considered] whether we should be continuing to do that for the clients [because] generally when companies provide numbers to their banks it should be done by [the company]. . . ."  Examiner's Sworn Interview of Rosanne Kurmaniak, July 7, 2010, at 113:10-114:3.

[1268] Examiner's Sworn Interview of Rosanne Kurmaniak, July 7, 2010, at 56:8-57:4, 86:21-87:12 ("[A]t a certain point [Citigroup] transitioned the model back to Chandler [Bigelow]. . . .  I don't remember if that was September, October or November, but at a certain point we kind of said why don't you run your own models and we gave it back to them.").

[1269] *Id.* at 60:12-61:20.

documentary evidence showing that CGMI performed modifications to the Tribune models as late as September 27, 2007.[1270]

Mr. Bigelow and Ms. Kurmaniak worked together on the terms of the EGI proposal, and on March 16, 2007, Mr. Bigelow told Ms. Kurmaniak that there were certain "important changes to the Zell model" which he summarized as:[1271]

> (3)  in the summary of change of control payments, we told them to increase this by $20M for possible transitional comp (now we are considering having the $37M for "management deal fees" rolling in the deal as phantom equity)
>
> (4)  the annual cost savings is $80M not $100M
>
> (5)  we told them to take 2007 capital expenditures to $175M and investments to $50M
>
> There is a question regarding how we model the deferred comp going forward and I will work on that one.

At times, Mr. Bigelow called on the Citigroup Entities' and the Merrill Entities' personnel to review Morgan Stanley's materials.  For example, Mr. Bigelow forwarded Morgan Stanley's March 6, 2007 discussion materials to Mr. Kaplan and Michael O'Grady at Merrill, and to Ms. Persily and Mr. Canmann at Citigroup.[1272]  Ms. Persily responded that she, Mr. Kaplan, and Mr. Bigelow should speak before Mr. Bigelow contacted Morgan Stanley, and she wrote "for the record:"[1273]

> [Citigroup's] proposal does not assume that we can get around the liens test in the existing bonds as indicated in the [Morgan Stanley] proposal discussion.

---

[1270]  Ex. 889 (Roth E-Mail, dated September 27, 2007).

[1271]  Ex. 380 (Bigelow E-Mail, dated March 16, 2007).

[1272]  Ex. 337 at CITI-TRIB-CC 00067724 (Persily E-Mail, dated March 6, 2007).

[1273]  *Id.* at CITI-TRIB-CC 00067723.  Ms. Persily testified in her interview with the Examiner that it was her belief that Morgan Stanley's proposal "showed [Tribune] a proposal that subordinated the existing debt and we didn't think that was possible by virtue of not granting liens."  Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 82:11-14.

> We believe that we effectively "subordinate" the existing bonds by
> denying them guarantees.  The Company provides that all subs
> guarantee the new loan(s), so that the value of the stock collateral
> is only realized by the existing note holders after satisfaction of the
> guarantees. . . .
>
> NOTE:  We believe that we can market this to the banks and funds
> and our counsel agrees with our analysis that guarantees provided
> to the lenders come ahead of unguaranteed existing debt.

Later e-mail communications between Ms. Persily and Ms. Mohr reflected continued

concerns regarding EGI's proposal:[1274]

> Having seen the book I am still extremely uncomfortable with Zell.
> No matter the rating.  Deal creep brings debt higher than the deal
> we approved for him which was 9.5bn new raise.  (7.1x thru the
> new money.).  Declining ebitda is scary.  Until yesterday I did not
> know that Q1 cash flow was down 20 from last year.  All I heard
> was that pub was 6mm off plan and broadcast was 5mm higher.
> I'm very concerned.

In her interview with the Examiner, Ms. Persily recalled that the proposal EGI gave to the

rating agencies included more debt than Citigroup had approved, but that ultimately the debt

level came back down to within the range that Citigroup had approved.[1275]

Ms. Persily followed up on her concerns and requested updated models incorporating a

lower-than-expected rating, which would result in higher interest expenses.  The models showed

that "[g]iven that the interest expense will be a lot higher, the Company may not be able to

handle this much debt."[1276]  The Leveraged Finance group was "still debating internally if we

---

[1274] Ex. 383 (Persily E-Mail, dated March 22, 2007).  In her interview with the Examiner, Ms. Persily explained that
"deal creep" meant that "you commit to something, you'll say you do something and then things keep changing
by a little bit."  Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 94:11-22.

[1275] *Id.*

[1276] Ex. 384 at CITI-TRIB-CC 00141612 (Apostolides E-Mail, dated March 24, 2007).

want to do this deal even with low ratings."[1277]  In the meantime, investment banker Michael

Canmann was reporting that  "[the] Board really wants us to push towards Zell."[1278]

In her interview with the Examiner, Ms. Mohr stated:[1279]

> [I]t wasn't as if we all looked at Zell and said let's do it, we thought
> about it, pushed back among financing teams [and] advisor teams,
> this was something that had not been done on this scale.  We talked
> about, does . . . this work, it's tight, is it acceptable, a lot of debate.

According to Ms. Mohr, there "was a lot of back and forth and tug of war. . . .  It wasn't

flip or decided in an hour—it was a lot of soul searching."[1280]  "People got up some mornings

and were comfortable, and other mornings people said that they were uncomfortable with the

risk.  It was reflected in the financing; people said it was skinny."[1281]  CGMI requested that its

obligation to underwrite Tribune debt be conditioned on Tribune's debt receiving at least a single

B rating.[1282]  However, after Tribune received a single B rating in late March 2007, Ms. Persily

wrote, "I am beside myself.  Just sick over this.  Don't know what to do."[1283]

In Ms. Mohr's view, the "debate" was not over the funding to be provided at Step One:[1284]

> Step One stood on its own and washed its own face. . . .  The first
> step transaction was clear. . . .  The real question was, do we take
> the incremental step to get in S corp. position and limit taxes to put
> us in a better position to monetize assets. . . .  [Before the EGI
> proposal] everyone was comfortable with $10 billion to do the
> [recapitalization].  The question became for the incremental $2
> billion [which was to come in at Step Two].

---

[1277] *Id.*

[1278] Ex. 385 (Canmann E-Mail, dated March 23, 2007).

[1279] Examiner's Interview of Christina Mohr, June 29, 2010.

[1280] *Id.*

[1281] *Id.*

[1282] Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 115:4-118:5.

[1283] Ex. 1107 (Persily E-Mail, dated March 28, 2007).

[1284] Examiner's Interview of Christina Mohr, June 29, 2010.

Ultimately, Ms. Mohr concluded that the completion of the Leveraged ESOP Transactions was "doable but tight."[1285]  Ms. Kurmaniak told the Examiner that she shared this view and considered the possibility of closing on the Leveraged ESOP Transactions  to be "tight," but that she had "comfort in the numbers."[1286]  Ms. Kurmaniak also noted that the cash flow for the Leveraged ESOP Transactions was "relatively the same" as the recapitalization plan.[1287]  Similarly, Ms. Persily stated in her interview with the Examiner that she concluded that the EGI proposal and the recapitalization were not that different.  As Ms. Persily explained:[1288]

> [Although] there was more leverage on the company [under the
> EGI proposal], . . . what I came to believe was that there wasn't
> more risk on the company because the leveraged ESOP structure
> meant that the company didn't have to pay taxes. So the extra cash
> flow they had from not paying taxes could be used to pay down
> debt.  So effectively if you looked at [the EGI proposal and the
> recapitalization] structures they had equal cash flow and that's how
> I got comfortable at the end of the day that there wasn't that much
> difference between them, but it was just another challenge to have
> to sell it to the market.

In preparation for the upcoming Tribune Board meeting, on March 29, 2007, Ruoxi Chen of the Investment Banking group forwarded Mr. Bigelow the most recent draft of the EGI proposal, and noted that "2008 Guaranteed Debt / Adj. EBITDA still breaks the covenant of 8.75x, but barely, at 8.76x."[1289]  Tribune suggested that the investment bankers change certain presentation slides and remove others:[1290]

---

[1285]  *Id.* ("[S]o what I got wrong was the lack of ability down the road to both monetize assets and withstand the cash shortfall.  Personally if the Company sold the Cubs when it could have and had moved more rapidly to monetize non-core assets, [things] could have been – maybe not entirely different, but significantly better.").

[1286]  Examiner's Sworn Interview of Rosanne Kurmaniak, July 7, 2010, at 51:8-52:1.

[1287]  *Id.* at 51:16-19.

[1288]  Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 88:22-89:11.

[1289]  Ex. 386 (Chen E-Mail, dated March 29, 2007).

[1290]  Ex. 387 (O'Grady E-Mail, dated March 28, 2007).

> On the covenant call today the company suggested a couple small
> changes to the "cushion" pages and then including them in the
> board book.  I think the changes are just:
>
> In both the mgt case and the downside cases
>
> —revise Adjusted EBITDA for sale of cubs/comcast
>
> —delete the Total Debt . . . ratio
>
> —add EBITDA Cushion in $

Ms. Mohr noted that the solvency requirement at Step Two was very important to the

Tribune Board.[1291]  Ms. Mohr described a "tension" between the Tribune Board's desire to

approve Step One, ensure that the lenders would not back out of Step Two, but only proceed

with Step Two if doing so would not hurt Tribune.  The solvency opinion addressed that

tension:[1292]

> Well there is the solvency opinion—the tension—the board was
> trying to make sure deal finally financed and that the banks cannot
> back out—make sure I have committed financing.  [They] had
> Wachtell Lipton so from board's perspective  the board is trying to
> make sure [the] banks cannot back out if they changed their mind,
> because board had committed to first step.
>
> [The] Board said we need to make sure that banks can't decide to
> back out, but at same time they didn't want to do second step if it
> put the Company in danger and they came up with the construct
> such that  we're not moving forward unless solvency—that was
> [an] other important condition.

Ms. Persily testified in her interview with the Examiner that the Lead Banks did not

require the issuance of a solvency opinion, but that Citigroup took "comfort" in the fact that a

---

[1291] Examiner's Interview of Christina Mohr, June 29, 2010.  According to Ms. Mohr, the requirement "came from
the board" was intended "to protect itself and the Company."  *Id.*

[1292] *Id.*

solvency opinion was being issued by a third party.[1293]  Ms. Persily considered VRC to be one of three firms that she would choose to perform such work.[1294]

Citigroup personnel continued to work with Mr. Bigelow leading up to the announcement of the Step One Transactions, including refinements to the Standard & Poor's analysis. Mr. Bigelow wrote to Ms. Kurmaniak:  "As I mentioned to Dave [Tuvlin] and Julie [Persily] there is a small chance we can get S&P to drop their negative outlook—it's small."[1295]  Citigroup personnel accordingly created a model entitled "S&P case," but Ms. Persily questioned it:[1296]

> Is this what they are looking for? 2008—down 10% from 2007 meaning 20% off Plan?
>
> This won't help them (or anyone) at all.  We cannot solve that with [covenant] tweaks.

Mr. Bigelow suggested:  "Looks like to me that if we widened the adj. ebitda cov by 25 bps in 2008 that we'd make it.  2009 would still be an issue, but I think they are less focused on that year."[1297]  Ms. Persily rejected the notion of widening the covenant and suggested other lesser modifications to the model that would not affect EBITDA.[1298]

Following the announcement of the Leveraged ESOP Transactions, the Citigroup Entities learned that EGI was pushing to reduce the Citigroup Entities' fees because Samuel Zell wanted

---

[1293]  Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 129:13-17, 126:2-6.

[1294]  *Id.* at 203:1-5 ("If somebody asked us who to hire to give a reasonable opinion VRC would have been — I told you there [were] three.  VRC would have been one; Houlihan Lokey and Murray Devine two and three.").

[1295]  Ex. 388 at CITI-TRIB-CC 00048053 (Persily E-Mail, dated March 29, 2007).

[1296]  *Id.*

[1297]  *Id.*

[1298]  *Id.*

to add BofA to the group of Lead Banks.[1299]  Ultimately, the Citigroup Entities' share of the commitments (and thus, fees) was reduced.[1300]

On April 5, 2007, CGMI executed and entered into the Step One Commitment Letter and the Step Two Commitment Letter on behalf of "Citigroup," which was defined thereunder to mean: "CGMI, Citibank, N.A., Citicorp USA, lnc., Citicorp North America, Inc. and/or any of their affiliates as may be appropriate to consummate the transactions contemplated herein."[1301] Ultimately, Citicorp executed the Credit Agreement (at Step One), and the Bridge Credit Agreement, and applicable Increase Joinder (at Step Two).[1302]  At the closing of the Step One Financing, Citicorp's Step One lending commitments totaled $117 million or 15.6% of the Revolving Credit Facility; Citicorp was not a lender under the Tranche B Facility or the Tranche X Facility.[1303]  At the closing of the Step Two Financing, Citicorp's Step Two lending commitments totaled $374 million, or 23.375%, of the Bridge Facility[1304] and $505 million, or 23.99%, of the Incremental Credit Agreement Facility.[1305]

After the Tribune Board approved the EGI proposal, Citigroup transitioned to due diligence activities—including providing feedback through its advisory group on VRC's solvency analysis.  Beginning in early May 2007, the advisory group actively reviewed and

---

[1299]  Ex. 389 (Canmann E-Mail, dated April 3, 2007); Ex. 1051 (Canmann E-Mail, dated April 3, 2007).

[1300]  Ex. 390 at 1 (Citigroup Relationship Memorandum, dated July 30, 2007).

[1301]  *See* Ex. 305 at TRB-162128-29, 40 (Amended and Restated Step One Commitment Letter, dated April 5, 2007); Ex. 309 at (Amended and Restated Step Two Commitment Letter, dated April 5, 2007).

[1302]  *See* Ex. 179 at TRB0520885 (Credit Agreement); Ex. 361 at S-1 (Bridge Credit Agreement); Ex. 351 at TRB0520680-86 (Increase Joinder – Citicorp North America, Inc.).

[1303]  *See* Ex. 350 at TRB0445276 (Schedule I to Credit Agreement).

[1304]  *See* Ex. 175 (Schedule I to Bridge Credit Agreement).

[1305]  *See* Ex. 351 (Increase Joinders).

questioned VRC's analysis.  Documents indicate, for instance, that Ms. Kurmaniak requested

backup information from Mr. Bigelow about VRC's numbers:[1306]

> Can VRC provide you with some backup for the EBITDA and
> EBITDA + Cash Flow From Equity Investments numbers on page
> 9?  I'm worried that they are mixing some numbers up. . . .  It
> appears that for LTM, we're not sure what they're doing, in 2007
> they are including Cubs/Comcast and 2008 excluding
> Cubs/Comcast.

Ms. Kurmaniak followed up with another point, as review of the VRC solvency analysis

continued:[1307]

> [O]ne observation—it appears that their Sensitivity Case falls
> somewhere in between the Mgmt. Case and the Down 2%
> Case. . . .  Not recommending that any action be taken on this, just
> wanted to give some perspective on where their case fell out
> relative to others.

Ms. Mohr's interview with the Examiner corroborated her involvement and that of Ms.

Kurmaniak with the VRC analysis:  "Before they were issued, our job was to look at what VRC

was doing and look on the Company's behalf, and give push back on the analysis."[1308]  "Rosie

put together a note for the Company with comments, and it was my understanding that the

Company was going to reflect those comments back to VRC."[1309]  "Our comments were

provided before the opinion was rendered and would have been reflected in what was finally

produced."[1310]  Ms. Kurmaniak further explained to the Examiner in her sworn interview that in

reviewing VRC's work, "my primary focus when I was looking through their report was

mechanically were they capturing the right numbers."[1311]

---

[1306]  Ex. 391 (Kurmaniak E-Mail, dated May 7, 2007).

[1307]  *Id.*

[1308]  Examiner's Interview of Christina Mohr, June 29, 2010.

[1309]  *Id.*

[1310]  *Id.*

[1311]  Examiner's Sworn Interview of Rosanne Kurmaniak, July 7, 2010, at 95:14-16.

Concurrently, Citigroup and Mr. Bigelow were working together on a model for Standard & Poor's.  After revising the model, Ms. Kurmaniak commented to Mr. Bigelow:[1312]

> Interestingly, we did a cumulative (2008-2017) impact to FCF analysis and the net change of all the changes was abt $350 mm of FCF over the 10 year period.  The $22mm of incremental lease expense, increase of 50bps in the TLB (the $5.5bn) and loss of EBITDA from asset sales largely offset the cash flow generated to pay down debt and resulting interest expense savings; but, I presume that S&P is focused on the near-term repayment of the Term Loan X (which is easily done with the asset/real estate proceeds).

Mr. Bigelow sought assurances that "the guaranteed debt to EBITDA ratio is markedly improved in the new scenario, correct?"[1313]  Ms. Kurmaniak replied: "It is improved but not as much as the full cash flow pick up given the loss of ebitda."[1314]

Citigroup personnel were keenly aware of the problems with syndicating the Step One Financing.  Michael Canmann wrote an internal e-mail on May 10, 2007: "[E]veryone should be aware that the bank syndication is struggling.  There is some talk of having to flex again."[1315] John Apostolides had previously circulated a Standard & Poor's news release that discussed how the Lead Banks "boosted price talk on the second stage of their financing for Tribune Co."[1316] Mr. Canmann commented: "Some talk of having to do this.  Didn't hear that company had agreed but they must have.  Understanding is a little push back in the market overall and on this we knew it was tight relative to its size.  Supposedly they actually got 350 of the bridge sold."[1317] Ultimately, however, the Step One Financing was syndicated because, as Ms. Persily explained

---

[1312]  Ex. 392 (Kurmaniak E-Mail, dated May 15, 2007).

[1313]  *Id.*

[1314]  *Id.*

[1315]  Ex. 393 at CITI-TRIB-CC 00024662 (Mohr E-Mail, dated May 14, 2007).

[1316]  Ex. 394 at CITI-TRIB-CC 00034991 (Apostolides E-Mail, dated May 8, 2007).

[1317]  Ex. 394 at CITI-TRIB-CC 00034991 (Apostolides E-Mail, dated May 8, 2007).

in her interview with the Examiner, "we were promised by Zell that there would be huge cost cutting and his track record in that is very, very good.  Hence our ability to sell all of the debt in step 1 which as you know I was very skeptical of."[1318]

As Citigroup continued to evaluate internally the Leveraged ESOP Transactions, a May 17, 2007 update to an earlier loan approval memo noted again that loan syndication was expected to be difficult due to the ESOP ownership structure, high leverage, and a lack of hard asset collateral for the bank debt.[1319]  Unlike the earlier analysis performed on March 28, 2007, the updated memo did not list any offsets for the loan syndication risks.[1320]  Similarly, Citigroup noted that bond syndication was expected to be difficult due to the ESOP ownership structure and the amount of bank debt ahead of bonds.[1321]   Again, the updated memo did not list any offsets to these risks.[1322]

As it prepared the update to the loan approval memo, CGMI considered whether to include asset sales in its modeling assumptions.[1323]  Ms. Kurmaniak approved the inclusion of the asset sales in the model but clarified that:[1324]

> [G]iven the addition of the Term Loan X, the increase in the TLB pricing and the need for the TLX to replace within 24 months, the Company suggested various alternatives and opportunities to generate cash and create the additional cash flow flexibility for the required near-term mandatory debt repayment inherent in the Term Loan X.  These opportunities are there to show the ability to repay the X, but aren't necessarily the new base case management plan.

[1318] Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 72:20-73:2.

[1319] Ex. 395 at 5 (Citi Leveraged Finance Final Approval Memorandum, dated May 17, 2007).

[1320] *Id.*; *cf.* Ex. 396 at 5 (Citi Leveraged Finance Final Approval Memorandum, dated March 28, 2007).

[1321] Ex. 395 at 5 (Citi Leveraged Finance Final Approval Memorandum, dated May 17, 2007).

[1322] *Id.*; *cf.* Ex. 396 at 5 (Citi Leveraged Finance Final Approval Memorandum, dated March 28, 2007).

[1323] Ex. 397 (Apostolides E-Mail, dated May 16, 2007).

[1324] *Id.*

<center>(2)    **Due Diligence Performed.**</center>

Citigroup had considerable access to Tribune's books and records during the time leading up to the April 1, 2007 Tribune Board meeting.  Additionally, both Citigroup and Merrill personnel jointly met with the Special Committee on a near-weekly basis, and with the Tribune Board on a monthly basis.  During each of these meetings the parties reviewed Tribune financials and analyzed the financing, structural, and other issues related to the strategic alternatives being considered by the Tribune Board.  In addition, both Merrill and Citigroup personnel participated in direct discussions with parties participating in the auction process.  The Citigroup Entities had significant access to information that was relevant to their roles.

In addition to the activities of Citigroup personnel discussed above, Citigroup personnel also reviewed VRC's Step One solvency analysis.  Citigroup requested backup information for EBITDA calculations, and they commented on the VRC draft report,[1325] which included questioning the basis of VRC's assumptions and noting where these conclusions lacked support.[1326]

Citigroup's internal deal approval memorandum in respect of financing the Leveraged ESOP Transactions identified several key risks of the EGI proposal, including softening industry trends, decreased ad spending, declining circulation, the availability and cost of quality syndicated programming, and the complex ESOP ownership structure.[1327]  The memorandum discusses the view of Citigroup personnel that loan syndication would be difficult due to the ESOP ownership structure, high leverage, and the lack of hard asset collateral for the bank

---

[1325]  Ex. 398 (Kurmaniak E-Mail, dated May 7, 2007).

[1326]  Ex. 399 at CITI-TRIB-CC 00103593-601 (Handwritten comments to VRC Preliminary Report).

[1327]  Ex. 400 at CITI-TRIB-CC 00019393 (Project Zoom/Tower Z and Project Tower Memorandum, dated March 28, 2007).

<center>313</center>

debt.[1328]  The memorandum also asserts that the loan risks were offset by senior unsecured

guarantees, strong market conditions, and sufficient flex,[1329] but that bond syndication would be

difficult because of the amount of bank debt senior to the bonds.[1330]

On the other hand, the memorandum reflects the view that the Tribune Entities'

significant scale in publishing and broadcasting, diversification across businesses and markets,

strong free cash flow generation, and the existence of many saleable assets (*e.g.,* the Chicago

Cubs and individual newspapers or stations) would help to mitigate these concerns.[1331]

### d.    BofA.

BofA was a relatively late arrival to the Step One Transactions, and consequently, its

activities during this stage of the transaction were limited.  The BofA Entities and their

designated roles in the Step One Transactions are as follows:  (a) BAS, as lender, joint lead

arranger, and joint bookrunner, and (b) Bank of America, as lender and co-documentation

agent.[1332]  Key BofA personnel included Raju Patel (Senior Vice President), Charles Hagel

(Senior Vice President, Credit Products Senior Manager), Daniel Petrik (Senior Vice President,

Senior Credit Products Officer), and William (Hutch) Pegler, Jr. (Vice President, Leveraged

Finance).  As was the case at JPM, members of various working groups at BofA worked together

on the Tribune matter.[1333]

---

[1328]  *Id.*

[1329]  *Id.*

[1330]  *Id.*

[1331]  *Id.*

[1332]  Ex. 179 at 1 (Credit Agreement).  Subsequently, Banc of America Bridge became a lender under the Bridge
Facility.  Ex. 175 at TRB0517063 (Bridge Credit Agreement).  As is true of the JPM Entities, the BofA Entities
served only as lenders to Tribune (not advisors) and therefore none of the BofA Entities were potentially
conflicted.  The distinction between Banc of America Bridge, Bank of America, and BAS is therefore less
important than the distinctions among, for example, the Merrill Entities.

[1333]  Ex. 179 (Credit Agreement); Ex. 544 at TRB0160944 (Larsen E-Mail, dated May 18, 2007); Ex. 309 at
TRB0112684 (Amended and Restated Second Step Commitment Letter, dated April 5, 2007); Ex. 534 at 11

### (1)    Activities.

BofA's introduction to the Tribune auction process started with EGI.  EGI initially

participated in a conference call with the BofA client team on March 2, 2007, in the midst of

Tribune's auction process, "to discuss the financing of their bid for the Tribune Company."[1334]

At that meeting, EGI "asked Bank of America to provide a verbal indication of interest in co-

underwriting a meaningful portion of the $11.35BN proposed financing" related to EGI's

proposal.[1335]  In response, the BofA client team informed its internal Leverage Finance

Screening Committee that it "would like to express an interest in co-underwriting up to 33% of

the proposed facilities in the event that EGI's offer prevails, providing us an opportunity to

unseat one of the current underwriters."[1336]  The ultimate goal of the client team was  "to co-

underwrite at least 25% of the proposed facilities and obtain 25% of the transaction

economics."[1337]

BofA's client team was interested in participating in the financing despite the fact that the

proposed financing was outside BofA's own underwriting guidelines in five of the ten different

respects considered by BofA, including, among others, that it bore a pro forma risk rating of 6-,

even though BofA's guidelines required a rating of 6 or better.[1338]  Daniel Petrik of BofA

testified to the Examiner that there were three factors that militated in favor of proceeding with

---

(Step Two Confidential Information Memorandum); Ex. 923 at 1-4 (Project Bear Working Group List, dated March 2007).  Daniel Petrik is listed in the contact list for BAS that is part of the Step Two Confidential Information Memorandum, but he also signed the Credit Agreement on behalf of Bank of America.  Mr. Rose signed the Step Two Commitment Letter on behalf of both BAS and Banc of America Bridge.  Raju Patel's signature block indicated that he is "Senior Vice President, Bank of America, Banc of America Securities."  The Project Bear working group list included employees with e-mail addresses for both Bank of America and BAS.

[1334]  Ex. 535 at 2 (Bank of America Deal Screen Memorandum, dated March 5, 2007); Ex. 536 at 2 (Project Bear Leveraged Finance Screening Memo, dated March 6, 2007).

[1335]  Ex. 535 at 2 (Bank of America Deal Screen Memorandum, dated March 5, 2007).

[1336]  *Id.*

[1337]  *Id.*

[1338]  *Id.*

the transaction – BofA's "track history . . . with Sam Zell," the "name of Tribune and all of its value as a name and all the newspapers behind it.  And, three, just looking at the overall return on the risk as we look at that on every deal is a risk return issue."[1339]  As to this last factor, Mr. Petrik testified that he meant both the fees the transaction would generate and the on-going relationship with Tribune.[1340]  BofA's client team explained to BofA's internal Leveraged Finance Screening Committee that "we expect an appropriate risk/reward trade off if we obtain 25% of the economics from the proposed transaction as our share of the fees are estimated to be at least $40MM."[1341]

BofA had established relationships with both EGI and Tribune before EGI invited it to participate in the financing of EGI's proposal.  BofA had a longstanding relationship with Tribune, and it "was awarded joint books roles in the Company's [previous] two bond offerings and was selected as dealer manager in a tender for certain of the Company's debt securities in 2004."[1342]  In March 2007, BofA was one of the top five lenders to Tribune.[1343]  BofA also had "an extensive relationship with Zell and EGI through Real Estate Banking, Private Banking, BABC, and Commercial Banking."[1344]  As of March 2007, "EGI's primary financial partners [were] Bank of America, Merrill Lynch, and JPM."[1345]

EGI preferred "not to engage Citigroup . . . to take part in the financing as EGI [had] historically not had a relationship with Citi."[1346]  Instead, due to "BAS' historical relationships

---

[1339]  Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 64:13-65:5.

[1340]  *Id.*

[1341]  Ex. 535 at 5 (Bank of America Deal Screen Memorandum, dated March 5, 2007).

[1342]  Ex. 536 at 2 (Project Bear Leveraged Finance Screening Memo, dated March 6, 2007).

[1343]  *Id.*

[1344]  *Id.*

[1345]  *Id.*

[1346]  Ex. 539 at 1 (Project Bear Leveraged Finance Screening Memo Update, dated March 25, 2007).

with both Tribune and [EGI, EGI invited] BAS to participate in underwriting one-third of the financing for one-third of the economics."[1347]  Ultimately, BofA underwrote 15% of the financing for a like percentage of the fee.[1348]

BofA presented the EGI proposal to its internal Leveraged Finance Screening Committee on March 7, 2007.  A memo to the Screening Committee summarized the engagement and the proposal from EGI.[1349]  This memo included financial projections based on a model provided by EGI that assumed the sale of three Tribune assets—the Chicago Cubs, Cablevision, and Recycler.[1350]  It also analyzed some of the "credit considerations" implicated by EGI's proposal, including "competition from alternative media," "declining newspaper circulation and ad revenue," "low equity capitalization / high leverage at close," and FCC approval.[1351]  Half the criteria were outside of BofA's guidelines,[1352] and one BofA senior vice president said that it was "the most highly levered deal I worked on in the cash flow group."[1353]

The "investment highlights" identified in the memo included "high-quality assets in major markets," "stable free cash flow generation," S-Corporation/ESOP tax benefits, and "substantial 'hidden value' in unconsolidated equity investments."[1354]  The Screening Committee "supported moving forward due to their confidence that the paper could be distributed even

---

[1347]  *Id.*

[1348]  Ex. 305 at 2 (Amended and Restated Step One Commitment Letter, dated April 5, 2007); Ex. 309 at 3 (Amended and Restated Step Two Commitment Letter, dated April 5, 2007); Ex. 542 at 1 (Amended and Restated Step One Fee Letter, dated April 5, 2007; Ex. 543 at 1-2 (Amended and Restated Step Two Fee Letter, dated April 5, 2007).

[1349]  Ex. 536 at 1-3 (Project Bear Leveraged Finance Screening Memo, dated March 6, 2007).

[1350]  *Id.* at 4

[1351]  *Id.* at 5.

[1352]  Ex. 535 at BOA-TRB-0001555 (Bank of America Deal Screen Memorandum, dated March 5, 2007).

[1353]  Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 62:18-19.

[1354]  Ex. 536 at 5 (Project Bear Leveraged Finance Screening Memo, dated March 6, 2007).

though this is a highly levered and complex transaction."[1355]  BofA considered its track history

with Samuel Zell, the reputation of Tribune and its newspapers, and the overall return on the risk

it was taking, both in terms of the fees it would make on the underwriting and the benefits from

building a relationship with Tribune.[1356]

Immediately after the Screening Committee meeting, on March 8, 2007, BofA's Raju

Patel had a conversation with Nils Larsen of EGI.[1357]  Mr. Patel e-mailed several Bank of

America employees regarding the conversation and stated that "EGI is seeking to integrate

[BofA] into the 'process' with Citi, ML, and JPM."[1358]  Mr. Patel identified the next steps for

BofA as (a) "Await decision to get us integrated into the process," and (b) "Continue data

room/credit due diligence with goal of possibly underwriting 25% of the transaction by

March 17th."[1359]

Mr. Patel had another conversation with Mr. Larsen the next day, again focusing on some

of the challenges facing the EGI proposal.[1360]  Mr. Patel learned that "Morgan Stanley is advising

the special committee and advocating that the self-help deal has more value than the ESOP

plan."[1361]  He also learned that EGI was concerned "that emotional deal will outweigh their view

of better economic ESOP deal."[1362]  Mr. Patel again e-mailed several Bank of America

employees regarding the conversation and summarized the "rough financial terms of the new

---

[1355] Ex. 537 at 2 (Petrik E-Mail, dated March 21, 2007).

[1356] Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 64:18-65:11.

[1357] Ex. 538 at 2 (Patel E-Mail, dated March 21, 2007).

[1358] *Id.*

[1359] *Id.*

[1360] *Id.*

[1361] *Id.*

[1362] *Id.*

two-step structure" and provided updates on projections.[1363]  Mr. Patel stated that BofA was "not

at much disadvantage to other underwriters.  EGI is looking for a way to get us inserted with

competitive terms as they believe Citi (my guess) is the weak link."[1364]  Later that same day,

apparently, "EGI informed BAS that negotiations between Tribune and [EGI] had stalled."[1365]

      By March 20, 2007, however, the EGI proposal was once again active.  An update memo

to the BofA Screening Committee noted "EGI informed the deal team that Tribune had reversed

its earlier decision and approached [EGI] to continue discussion of the ESOP leveraged buy-out

plan."[1366]  That same day, Daniel Petrik prepared a draft e-mail describing the key risks in the

EGI proposal and the factors that mitigated those risks.[1367]  The key risks identified were

(a) "[m]inimal cash equity contributed," (b) "[h]igh leverage coupled with declining newspaper

circulation," and (c) "[r]egulatory approval by the FCC."[1368]  According to Mr. Petrik's draft

e-mail, the "minimal cash equity" risk was mitigated by "the implied equity value of the ESOP

tax savings ($330MM) and cash expense savings ($100MM) of $430MM."[1369]  Moreover, he

noted that the "high leverage" risk was offset by consistent spending on newspaper advertising,

Tribune's "equity investments in online media," "[a]sset sales of approximately $538MM that

will assist in delevering the company [and the] [v]alue of other [e]quity investments such as The

Food Network," and "[no] integration risk."[1370]  The "regulatory approval" risk was mitigated by

Tribune "currently operating successfully under FCC jurisdiction" and the ESOP structure which

---

[1363]  *Id.*

[1364]  *Id.*

[1365]  Ex. 539 at 1 (Project Bear Leveraged Finance Screening Memorandum, dated March 25, 2007).

[1366]  *Id.*

[1367]  Ex. 537 at 2 (Petrik E-Mail, dated March 21, 2007).

[1368]  *Id.*

[1369]  *Id.*

[1370]  *Id.*

he expected "to minimize FCC's concern due to effectively no change of control."[1371]  Mr. Petrik

forwarded the March 20, 2007 draft e-mail to William Pegler the next day, stating that "the big

thing we need you to confirm is the implied equity assumption."[1372]  Mr. Petrik testified that he

could not recall what Mr. Pegler did in response to his request in this regard.[1373]

EGI and Tribune presented EGI's proposal to the rating agencies on March 22, 2007, and

provided a copy of the presentation, along with updated financial projections and structure

details, to BofA the next day.[1374]  EGI requested a "verbal commitment" from BofA to

participate in the underwriting by March 28, 2007, subject to completion of due diligence and a

"[r]ough idea of [their] terms."[1375]  Due to these events and the evolution of the EGI proposal

into a two-step process, BofA personnel provided an updated memo to the Screening Committee

on March 25, 2007.[1376]  On April 2, 2007, the Screening Committee approved underwriting

16.67% of the proposed financing for EGI's two step-proposal.[1377]

On March 28, 2007, BofA again met with EGI for a presentation on the financing of

EGI's proposal.  BofA provided a summary of proposed financing terms and conditions, subject

to "satisfactory completion of due diligence, necessary credit approval and such other terms and

conditions as determined by Bank of America, in its sole discretion."[1378]  Unlike Citigroup's

internal memorandum dated the same day—which indicated that loan syndication and bond

---

[1371] *Id.*

[1372] *Id.* at 1.

[1373] Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 100:12-14.

[1374] Ex. 539 at 1 and 5 (Project Bear Leveraged Finance Screening Memorandum, dated March 25, 2007).

[1375] *Id.* at 2 and 5.

[1376] Ex. 539 (Project Bear Leveraged Finance Screening Memorandum, dated March 25, 2007).

[1377] Ex. 540 at 1 (Project Bear Leveraged Finance Committee Approval Summary, dated April 3, 2007).

[1378] Ex. 541 at 10-12 (Bank of America Presentation to Equity Group Investments, LLC, Project Tower Discussion Materials, dated March 28, 2007).

syndication for EGI's proposal would be "difficult"—BofA expressed its belief that "the Tribune financing will be well received in the capital markets."[1379]  The presentation also included a financing discussion of comparable transactions.[1380]

On April 5, 2007, BofA executed the Step One Commitment Letter and the Step Two Commitment Letter.[1381]  At the closing of the Step One Financing, BofA's lending commitments totaled $105 million, or 14%, of the Revolving Credit Facility; BofA held no commitments under the Tranche B Facility or the Tranche X Facility.[1382]  At the closing of the Step Two Financing, BofA's lending commitments totaled $224.4 million, or 14.03%, of the Bridge Facility[1383] and $303 million, or 14.39%, of the Incremental Credit Agreement Facility.[1384]

On May 3, 2007, the BofA client team submitted a Credit Approval Report, seeking approval to "initially hold up to $67.5MM of the $750.0MM revolving credit facility. . . .  At this stage, we believe our Revolver commitment will be sold down to the $50.0MM—$67.5MM range in the primary syndication.  Post-syndication, we will evaluate the viability of selling down our Revolver exposure in an orderly manner in the secondary market to a target hold level of $35.0MM - $40.0MM."[1385]  Mr. Petrik testified to the Examiner that "right from Day 1" it had always been BofA's intent to sell down some portion of its share of the Revolving Credit Facility to that level.[1386]  According to the May 3, 2007 Credit Approval Report, the risk characteristics

---

[1379]  Ex. 541 at 13 (Bank of America Presentation to Equity Group Investments, LLC, Project Tower Discussion Materials, dated March 28, 2007).

[1380]  *Id.* at 15-17.

[1381]  Ex. 305 (Amended and Restated Step One Commitment Letter, dated April 5, 2007); Ex. 309 (Amended and Restated Step Two Commitment Letter, dated April 5, 2007).

[1382]  *See* Ex. 350 at TRB0445276 (Schedule I to Credit Agreement).

[1383]  *See* Ex. 175 (Schedule I to Bridge Credit Agreement).

[1384]  *See* Ex. 351 (Increase Joinders).

[1385]  Ex. 924 at 4 (Bank of America Credit Approval Report, dated May 3, 2007).

[1386]  Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 77:10-19 and 182:5-12.

of the transaction had deteriorated compared to those characteristics described in the March 5, 2007 Deal Screen Memorandum.[1387]  Specifically, although the latter document noted that the proposed financing warranted a 6- pro forma risk rating, and fell outside of BofA's underwriting guidelines in five of the ten categories under review, the May 3, 2007 Credit Approval Report reflected a 7 pro forma risk rating, and that the transaction fell outside BofA's underwriting guidelines in nine of the ten categories listed.[1388]  Mr. Petrik testified that these changes in BofA's analysis of the transaction were a combination of BofA "having more information given the fact we did more due diligence and the loan deteriorated."[1389]  He further testified that by the time of the May 3, 2007 Credit Approval Report, BofA had "a better understanding of the business and maybe one more month of historical information showing, again, another decline in revenue, in EBITDA, and, therefore, impacting a lot of these ratios like fixed charge and the airball repayment and some of these other total debt to EBITDA issues."[1390]

On May 17, 2007, Bank of America executed the Credit Agreement.[1391]  The next day, May 18, 2007, Raju Patel sent an e-mail to Mr. Larsen and Chandler Bigelow to inform them that "Bank of America will be looking to sell our current $105.0MM revolver exposure to around $70.0MM.  There was some discussion about revolver sell-down in coordination with the joint book-runners but, apparently a solution was not achievable."[1392]  Mr. Larsen responded that he was "not surprised to hear this" given "previous conversations and the information in the

---

[1387]  Ex. 535 at 5 (Bank of America Deal Screen Memorandum, dated March 5, 2007).

[1388]  *Id.*; Ex. 924 at 11 (Bank of America Credit Approval Report, dated May 3, 2007).

[1389]  Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 186:19-187:2.

[1390]  *Id.* at 187:7-17.

[1391]  Ex. 179 at TRB0520883 (Credit Agreement).

[1392]  Ex. 544 at TRB0160944 (Larsen E-Mail, dated May 18, 2007).

market."[1393]  He also stated that "it is hard to take this as a sign of confidence from BofA but I am willing to be persuaded otherwise."[1394]

### (2)    Due Diligence and Evaluations Performed.

Due to its late involvement in the process, BofA did not have substantial time to perform due diligence before confirming its initial interest in co-underwriting EGI's proposal.  In fact, at the March 2, 2007 meeting, EGI pushed BofA for a response before the March 10, 2007 Tribune Board meeting when EGI's proposal would be evaluated against Tribune's self-help alternatives.[1395]  Consequently, BofA began performing due diligence on co-underwriting EGI's proposal within days of the March 2, 2007 meeting.  This due diligence included review of an EGI-prepared financial model, SEC filings, and existing senior note indentures.[1396]  BofA identified several key credit risks and mitigating factors after that meeting.[1397]

A "Due Diligence Action Plan" was included as an addendum to the March 25, 2007 updated memo to BofA's Screening Committee.[1398]  The due diligence outlined in this plan included "review of updated strategic operating plan," "review of 3rd party diligence reports," "review of tax, ESOP structure and ERISA requirements with outside advisors," "understanding of potential litigation related to dissident shareholders or investors," "assessment of ability to divest unconsolidated assets in the event of financial distress," "confirmation of [EGI's] plan/rights in the event step 2 is not executed," and "refining views of downside scenario."[1399]

---

[1393]  *Id.*

[1394]  *Id.*

[1395]  Ex. 536 at 1 (Project Bear Leveraged Finance Screening Memo, dated March 6, 2007).

[1396]  *Id.*; Ex. 538 at 3 (Patel E-Mail, dated March 21, 2007).

[1397]  Ex. 535 at 10-11 (Bank of America Deal Screen Memorandum, dated March 5, 2007).

[1398]  Ex. 539 at Addendum, 1 (Project Bear Leveraged Finance Screening Memorandum, dated March 25, 2007).

[1399]  *Id.*

Mr. Petrik testified that he did not know whether all of the due diligence items on this Due Diligence Action Plan were completed by the time of the closing of the Step One Transactions, but that he knew that BofA had reviewed EGI's strategic operating plan and forecasts, and had discussed, in a general way, that EGI would be making changes to Tribune's personnel.[1400]  He also testified that BofA had analyzed the transaction structure impact on cross-ownership limitations.[1401]  Further, he recalled reviewing the accounting due diligence prepared by KPMG, and testified that BofA performed due diligence with respect to understanding the ESOP structure and the implications of the planned S-Corporation election.[1402] He explained that BofA also verified the timing of the planned asset sales and discussed with EGI the parties EGI believed would be interested in purchasing certain unconsolidated assets in the event of financial distress.[1403]

Mr. Petrik also testified that BofA had discussions with EGI regarding EGI's plans and rights in the event the Step Two Transactions did not close.[1404]  BofA also prepared its own analysis of a downside case, using as a starting point the projections prepared by EGI.[1405]  This downside modeling was in addition to other models and projections reviewed or prepared by BofA during the period leading up to the closing of the Step One Transactions.[1406]  In preparing its cash flow projection models, BofA started with the projections it received from EGI and then

---

[1400]  Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 161:18-163:13.

[1401]  *Id.* at 163:14-15.

[1402]  *Id.* at 88:13-89:5 and 163:15-16.

[1403]  *Id.* July 8, 2010, at 164:9-165:3.

[1404]  *Id.* at 88:13-89:5 and 161:18-167:21.

[1405]  Ex. 539 at Addendum 3 (Project Bear Leveraged Finance Screening Memorandum, dated March 25, 2007); Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 169:2-10.

[1406]  Ex. 547 (Project Bear Sponsor Case, dated April 3, 2007); Ex. 550 (Investment Analysis – Project Tower, dated March 1, 2007); Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 202:20-205:6, 208:2-211:16, and 213:17-215:9.

"sensitize[d] it" and took steps to reach a comfort level that EGI's projections were realistic.  As part of this process, BofA asked questions of EGI and requested additional data as needed.[1407]

In addition to performing its own analysis of the Leveraged ESOP Transactions,[1408] BofA had access to several such analyses from other lenders.[1409]  Moreover, once it gained access to the data room, BofA assigned personnel to review the available data in order to further its due diligence.[1410]  Mr. Petrik testified that in addition to doing its own due diligence, BofA also utilized the due diligence work product that it received from JPM, MLPFS, and Citigroup.[1411] BofA also planned to perform stress case testing before it provided a financing commitment.[1412]

BofA's verbal commitment to offer financing at its March 28, 2007 presentation to EGI was conditioned on "satisfactory completion of due diligence."[1413]  On April 2, 2007, William Pegler sent an e-mail to several Bank of America employees and the Leveraged Finance Committee seeking approval to underwrite one-sixth of the financing for the Leveraged ESOP Transactions.[1414]  Mr. Pegler noted that "[w]e will not have an opportunity to conduct additional business due diligence before signing letters, but will be relying on Cahill Gordon (underwriters' counsel) for satisfactory comfort on legal/structure/ESOP diligence issues.  We will seek to arrange a call with Cahill prior to signing."[1415]  Mr. Petrik testified that he reviewed the VRC

---

[1407]  Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 90:16-91:9.

[1408]  Ex. 547 (Project Bear Sponsor Case, dated April 3, 2007); Ex. 925 (Petrik E-Mail, dated March 26, 2007); Ex. 549 ("What If" Risk Rating Detail Reports, dated March 27, 2007).

[1409]  Ex. 550 (Investment Analysis – Project Tower, dated March 1, 2007); Ex. 551 (Investment Analysis – Project Tower, dated March 23, 2007).

[1410]  Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 213:2-11.

[1411]  Id. at 83:20-84:22.

[1412]  Ex. 535 at 10 (Bank of America Deal Screen Memorandum, dated March 5, 2007).

[1413]  Ex. 541 at 10 (Bank of America Presentation to Equity Group Investments, LLC, Project Tower Discussion Materials, dated March 28, 2007).

[1414]  Ex. 546 (Pegler E-Mail, dated April 2, 2007).

[1415]  Id.

Step One solvency opinion dated May 24, 2007 but that BofA did not perform its own solvency

analysis in connection with Step One.[1416]  Mr. Petrik also testified that in approximately May

2007, Tribune's senior management made a formal presentation to JPM, MLPFS, Citigroup and

BofA regarding all of the Tribune businesses.[1417]

### e.    Morgan Stanley.

Morgan Stanley's interactions with the Special Committee, Tribune, the Zell Group,

Merrill, and Citigroup are discussed in other sections of the Report.[1418]  This section focuses on

Morgan Stanley's internal communications, due diligence, and other activities in connection with

the Step One Transactions.  In particular, this section addresses:  (a) the Special Committee's

engagement of Morgan Stanley and the related fee agreement between the parties, (b) Morgan

Stanley's initial advisory and due diligence activities, (c) Morgan Stanley's internal views on the

third-party bids and the self-help alternatives, (d) Morgan Stanley's participation in the final

selection of the EGI proposal, Morgan Stanley's fairness opinion, and implementation of the Step

One Transactions, and (e) Morgan Stanley's desire to participate in the Step One Financing as a

lender.

Morgan Stanley's role evolved through the Step One Transactions from initially

"look[ing] over the shoulder" of MLPFS and CGMI, to making valuation presentations to the

Special Committee, to eventually negotiating the final terms of the EGI proposal with the Zell

Group on behalf of the Special Committee and issuing a fairness opinion to the Special

Committee opining on the fairness of the transaction to Tribune's stockholders.[1419]

---

[1416]  Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 117:20-119:21 and 124:2-6.

[1417]  *Id.* at 69:13-22.

[1418]  *See* Report at §§ III.D.1., III.E.4.b., III.E.4.c. and III.E.6.

[1419]  Examiner's Interview of Thomas Whayne, June 11, 2010; Ex. 145 at 3 (Morgan Stanley Opinion Letter, dated
April 1, 2007).

The key personnel working on behalf of Morgan Stanley were:

**Investment Banking**

Paul J. Taubman, Managing Director, Head of Global Mergers & Acquisitions[1420]

Thomas Whayne, Managing Director, Mergers & Acquisitions[1421]

Charles Stewart, Managing Director, Media & Communications[1422]

James D. Fincher, Associate, Media & Communications;[1423] Vice President[1424]

Steven D. Williams, Associate, Mergers & Acquisitions[1425]

Thomas Kvorning, Analyst, Media & Communications[1426]

**Global Capital Markets**

Ashok Nayyar, Managing Director and Co-Head, Leverage Finance[1427]

Kevin Sisson, Managing Director[1428]

William Graham, Executive Director[1429]

### (1)  The Special Committee's Engagement of Morgan Stanley and the Related Fee Agreement.

On October 6, 2006, the Special Committee appointed Morgan Stanley as the Special

Committee's financial advisor in connection with its independent review of Tribune's strategic

---

[1420] Ex. 401 at 4 (Tribune Special Committee Working Group List, updated November 3, 2006); Ex. 402 at 2 (Presentation to the Tribune Special Committee, dated September 29, 2006); Examiner's Sworn Interview of Paul Taubman, July 1, 2010, at 30:16-18.

[1421] Ex. 401 at 4 (Tribune Special Committee Working Group List, updated November 3, 2006); Ex. 402 at 2 (Presentation to the Tribune Special Committee, dated September 29, 2006).

[1422] Ex. 401 at 4 (Tribune Special Committee Working Group List, updated November 3, 2006); Ex. 402 at 2 (Presentation to the Tribune Special Committee, dated September 29, 2006).

[1423] Ex. 401 at 4 (Tribune Special Committee Working Group List, updated November 3, 2006); Ex. 402 at 2 (Presentation to the Tribune Special Committee, dated September 29, 2006).

[1424] *Compare* Ex. 403 at MS_263484 (Stefan E-Mail, dated December 20, 2006) *with* Ex. 404 at MS_262901 (Fincher E-Mail, dated December 20, 2006) (noting apparent change in position).

[1425] Ex. 401 at 4 (Tribune Special Committee Working Group List, updated November 3, 2006); Ex. 402 at 2 (Presentation to the Tribune Special Committee, dated September 29, 2006).

[1426] Ex. 401 at 4 (Tribune Special Committee Working Group List, updated November 3, 2006); Ex. 402 at 2 (Presentation to the Tribune Special Committee, dated September 29, 2006).

[1427] Ex. 402 at 2 (Presentation to the Tribune Special Committee, dated September 29, 2006).

[1428] Ex. 405 (Sisson E-Mail, dated November 9, 2006).

[1429] Ex. 406 at MS_286241 (Nayyar E-Mail, dated February 18, 2007).

alternatives,[1430] one week after Morgan Stanley made its pitch for the role to the Special

Committee.[1431]  Before official appointment, Morgan Stanley personnel began negotiating the

fee arrangement with the Special Committee.  Paul Taubman consulted with Ashok Nayyar on

the fee, noting that the fee proposal should reflect "the opportunity cost of not providing

financing."[1432]  Mr. Nayyar suggested that Morgan Stanley "push hard to be allowed to put a

staple for buyers," and queried whether Merrill and Citigroup were permitted to provide staple

financing.[1433]  Mr. Taubman explained:[1434]

> This is for the comm of [indpendent] directors. No chance there.
> As to citi and mer I don't know. But my first bit of advice to the
> comm will be to say they shouldn't be allowed to provide
> financing.  And if they do we need to get paid considerably more.

Mr. Nayyar was concerned: "When can we talk? This is a major problem for us—

$8 billion+ in financing.  League table and $40 million in fees potentially left on the table.  Need

your help big time."[1435]  Mr. Taubman relayed his and Mr. Nayyar's shared concerns to Skadden

Arps, the Special Committee's legal counsel, which by October 8, 2006 had become responsible

for negotiating Morgan Stanley's fees "due to a lack of progress" with Donald Grenesko,

Tribune's Senior Vice President/Finance and Administration.[1436]

---

[1430]  Ex. 407 (Special Committee Meeting Minutes, dated October 6, 2006).  Morgan Stanley's duties pursuant to the engagement letter are discussed above.  *See* Report at § III.A.3.e.(2).

[1431]  Ex. 402 (Presentation to the Tribune Special Committee, dated September 29, 2006).  The former Chair of the Special Committee, William Osborn, testified that a subgroup of the Special Committee chose Morgan Stanley. Examiner's Sworn Interview of William Osborn, June 24, 2010, at 13:4-12.

[1432]  Ex. 408 at MS_351312 (Nayyar E-Mail, dated October 3, 2006).

[1433]  *Id.*

[1434]  *Id.*

[1435]  *Id.*

[1436]  Ex. 409 at MS_350511-MS_350512 (Taubman E-Mail, dated October 8, 2006).

Morgan Stanley and the Special Committee reached agreement on Morgan Stanley's fees on October 10, 2006.[1437]  Under the fee agreement, Morgan Stanley was to receive $2.5 million as an upfront advisory fee.[1438]  An additional $7.5 million transaction fee became due and payable once Morgan Stanley rendered its fairness opinion.[1439]  Tribune ultimately paid Morgan Stanley the $7.5 million transaction fee, plus expenses of $167,703.91, on May 9, 2007.[1440]  Much later, Morgan Stanley unsuccessfully sought approval from the Special Committee for an additional discretionary fee.[1441]  Mr. Taubman testified that "the history here is we had had a vigorous bid ask on the original fee and what we ultimately agreed to do was in an effort to make sure that we got off on the right foot with the committee."[1442]  Mr. Taubman "ultimately acquiesced to their request that we take our fee down significantly" in exchange for the

---

[1437] Ex. 410 at MS_351314 (Taubman E-Mail, dated October 11, 2006); Ex. 411 at MS_199245-MS_199246 (Kvorning E-Mail, dated October 10, 2006).

[1438] Ex. 25 at MS 00211 (Morgan Stanley Engagement Letter); Examiner's Interview of Thomas Whayne, June 11, 2010.  See also Report at § III.A.3.e.(2). (discussing the terms of the fee agreement).

[1439] Ex. 25 at MS 00211 (Morgan Stanley Engagement Letter); Examiner's Interview of Thomas Whayne, June 11, 2010; Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 34:21-37:4.  See also Report at § III.A.3.e.(2). (discussing the terms of the fee agreement).  Morgan Stanley's fairness opinion ultimately was delivered on April 1, 2007.  Ex. 145 (Morgan Stanley Opinion Letter, dated April 1, 2007).  In contrast, former Special Committee Chair William Osborn testified that he thought Morgan Stanley was not entitled to the transaction fee after rendering its April 1, 2007 fairness opinion, because "from our perspective the transaction wasn't totally completed yet."  Examiner's Sworn Interview of William Osborn, June 24, 2010, at 20:21-21:1.  See also id. at 115:9-116:4.  The evidence available to the Examiner at the time of the Report suggests that Mr. Osborn is mistaken and Morgan Stanley was, in fact, paid its transaction fee in May 2007 prior to the closing of Step One.  See Ex. 412 (Stewart E-Mail, dated May 10, 2007); Examiner's Sworn Interview of Paul Taubman, July 1, 2010, at 24:19-27:2.

[1440] See Ex. 412 (Stewart E-Mail, dated May 10, 2007); Examiner's Sworn Interview of Paul Taubman, July 1, 2010, at 24:19-27:2.  See also Ex. 25 at MS 00212 (Morgan Stanley Engagement Letter).

[1441] Ex. 413 at 2 (Overview of Morgan Stanley's Role in the Tribune Special Committee Review Process, dated December 3, 2007); Examiner's Interview of Thomas Whayne, June 11, 2010.  See also Ex. 410 at MS_351314 (Taubman E-Mail, dated October 11, 2006).  On the other hand, Mr. Osborn testified to the Examiner that he believes that Morgan Stanley asked for the discretionary fee sometime after the closing of Step Two.  Examiner's Sworn Interview of William Osborn, June 24, 2010, at 17:12-14.  He declined Morgan Stanley's request for the discretionary fee for two reasons: first, that the fee was inappropriate "because of the financial condition of the company at that point in time, it being highly leveraged," and second, because "I personally felt that that would have been a stretch."  Id. at 16:20-17:10.

[1442] Examiner's Sworn Interview of Paul Taubman, July 1, 2010, at 101:6-10.

opportunity to pitch for the discretionary fee.[1443]  Thomas Whayne noted that the market rate for

its services in connection with the Step One Transactions "would probably be twice what we

got," but in view of the preexisting roles of MLPFS and CGMI, Morgan Stanley "agreed to do it

at less than market."[1444]

<div align="center">

(2)    **Morgan Stanley's Initial Advisory and Due Diligence
Activities.**

</div>

Mr. Whayne described Morgan Stanley's involvement through the fall of 2006 as "fairly

light touch, just looking over the shoulder of Merrill [and] Citi."[1445]  The documents the

Examiner reviewed, however, demonstrate that once the fee arrangement was in place, Morgan

Stanley delved immediately into the engagement, participated in several conference calls with

Tribune management and third-party bidders, and took part in meetings with the Special

Committee.

Morgan Stanley's due diligence activities commenced the same day that Morgan Stanley

learned it had been selected as the Special Committee's advisor.[1446]  Thomas Kvorning, a

Morgan Stanley analyst, worked with other Morgan Stanley personnel to begin building Morgan

Stanley's own "Tribune LBO Model."  The model was "based on [W]all [S]treet consensus" and

initially assumed leverage levels of 7.5x or 8.0x and a $35 per share purchase price.[1447]  Morgan

Stanley considered valuation of Tribune's unconsolidated assets as a key model element because

of a "large dispersion among brokers on the value of these and they could be worth up to

---

[1443]  *Id.* at 101:10-102:2.

[1444]  Examiner's Interview of Thomas Whayne, June 11, 2010.

[1445]  *Id.*

[1446]  *See* Ex. 408 at MS_351312 (Nayyar E-Mail, dated October 3, 2006); Ex. 415 at MS_198713 (Kvorning E-Mail,
dated October 2, 2006); Ex. 416 (Audette E-Mail, dated October 4, 2006); Ex. 417 (Kvorning E-Mail,
October 4, 2006); Ex. 418 (Stewart E-Mail, dated October 14, 2006) (agenda for October 14, 2007 conference
call).

[1447]  Ex. 415 at MS_198713 (Kvorning E-Mail, dated October 2, 2006) (listing several assumptions).

$2.0Bn."[1448]  A discounted cash flow analysis[1449] and sum-of-the-parts analysis were added

later.[1450]  Overall, Morgan Stanley's valuation model, which eventually would become a key part

of its fairness opinion, evolved as an ongoing iterative process.[1451]

Morgan Stanley undertook additional due diligence tasks, including:

•    An analysis of Tribune's stockholders following the 2006 Tender Offer,

"reflecting changes in economic/voting ownership for the Chandlers, the McCormick

Foundation, Ariel Capital, Nelson Peltz and Davidson Kempner."[1452]

•    An analysis of "four separation alternatives," comprising a "Broadcasting

Sponsored Spin," "Publishing Sponsored Spin," "Publishing Sponsored Split (Chandlers and

sponsor owning 100% of publishing)," and "LA Times Split (Chandlers owning 100% of LA

Times)."[1453]

•    Revisions of the valuation model to reflect updated broker consensus.[1454]

•    Consideration of "the regulatory risks associated with various bidding

groups."[1455]

In evaluating the due diligence data, Morgan Stanley's Investment Banking division

personnel often reached out to their colleagues in the Global Capital Markets division for

---

[1448]  Ex. 419 at MS_194831-194832 (Kvorning E-Mail, dated October 5, 2006).

[1449]  Ex. 420 (Williams E-Mail, dated October 30, 2006).  Mr. Williams raised a concern over the proper treatment
of investments with negative incremental rates of return as an element of discounted cash flow.  Ex. 420
(Williams E-Mail, dated October 30, 2006).

[1450]  Ex. 421 at MS_199768 (Kvorning E-Mail, dated October 11, 2006).

[1451]  Ex. 422 at MS_196674 (Baldi E-Mail, dated October 26, 2006); Ex. 423 (Whayne E-Mail, dated October 29,
2006).

[1452]  Ex. 424 (Whayne E-Mail, dated November 5, 2006).

[1453]  Ex. 425 (Stewart E-Mail, dated November 6, 2006).

[1454]  Ex. 426 at MS_170027-170028 (Baldi E-Mail, dated November 13, 2006).

[1455]  Ex. 427 (Stewart E-Mail, dated November 16, 2006).

insights and research assistance.[1456]  For example, on October 13, 2006, Charles Stewart

forwarded to Kevin Sisson an electronic copy of the staple financing package that MLPFS was

poised to distribute to interested parties, and invited Mr. Sisson to comment.[1457]  Mr. Sisson

observed:[1458]

> Its exactly where we thought it would be at 7.5x. I don't really
> think of the phones as leverage because of the stock collateralizing
> them. They have conveniently left out any reference to a minimum
> cash equity contribution. . . .  I think the total secured debt and
> total sr debt multiples may be .25 to .5x too high. Also think bank
> pricing is 25 to 50 bps too tight for the ratings assumptions and the
> size of the deal. . . .  Other than that it looks ok.

In response, Mr. Kvorning revised his leveraged buyout transaction model to attempt to

replicate MLPFS' and CGMI's staple financing package in accordance with Mr. Sisson's

observations,[1459] and added a "segment LBO of Publishing" as a potential alternative.[1460]  Later,

Steven Williams also sought Mr. Sisson's view on an early iteration of the self-help alternative,

or "standalone recap scenario:"[1461]

> As you know, the company currently has a committed staple
> (Merrill/Citi) on the LBO at 8.25x.
>
> We wanted to get a sense for few things related to a Tribune
> standalone recap scenario.  1) appropriate standalone leverage
> levels, 2) how the debt would tranche out bank v. bond, 3)
> treatment of PHONES, and 4) the cost/ratings on new issues etc.

---

[1456] *See e.g.*, Ex. 428 at MS_199055 (Wynne E-Mail, dated October 2, 2006); Ex. 429 at MS_280619 (Sisson E-Mail, dated October 13, 2006); Ex. 1038 at MS_173567 (Williams E-Mail, dated November 8, 2006).

[1457] Ex. 429 at MS_280619 (Sisson E-Mail, dated October 13, 2006).

[1458] *Id.*  Mr. Sisson had preliminarily estimated leverage at 7.5x, but noted that "if there is a particularly good story/turnaround plan (e.g. cost cutting, etc.), we could be higher on leverage."  Ex. 428 at MS_199055 (Wynne E-Mail, dated October 2, 2006).

[1459] Ex. 431 at MS_204407 (Kvorning E-Mail, dated October 15, 2006).

[1460] Ex. 432 at MS_203029 (Kvorning E-Mail, dated October 18, 2006).

[1461] Ex. 433 at MS_196111 (Williams E-Mail, dated October 27, 2006).

In concert with Subhalakshmi Ghosh from Morgan Stanley's Global Capital Markets division, Mr. Williams evaluated what had become known as the "Consolidated Tower Model."[1462]  Ms. Ghosh commented:[1463]

> Can we look at leverage excluding Phones. Phones is sub debt so it doesn't make sense to include it in the bank debt section. In the sources and uses we can show the phones rolling to it shows up as a source and use of cash. But the 6.5x leverage you are calculating should not include the phones.

Mr. Williams then updated the model and replied that "we are no longer including PHONES in the leverage calculation, but we are including them as both a source and use of cash."[1464]

On a number of occasions, Morgan Stanley personnel questioned the quality of MLPFS' and CGMI's analyses and recommendations to the Special Committee.  For example, Mr. Whayne disagreed with the accuracy of MLPFS' "Sum-of-the-Parts analysis."[1465]  Multiple e-mails reflected tension at various times between Morgan Stanley on the one hand and CGMI[1466] and MLPFS on the other.[1467]

By early December 2006, due diligence activity slowed ahead of the final deadline for third-party auction bids.  Mr. Williams noted that "[t]hings have been relatively quiet on the Tribune front."[1468]  James Fincher confirmed "Nothing big at this stage . . . spoke to Tom yesterday and no new developments."[1469]  On December 19, 2006, however, Mr. Kvorning noted

---

[1462] Ex. 1038 (Williams E-Mail, dated November 8, 2006).

[1463] *Id.* at MS_173567.

[1464] *Id.* at MS_173566.

[1465] Ex. 434 (Whayne E-Mail, dated October 29, 2006).

[1466] Ex. 435 at MS_278951 (Whayne E-Mail, dated November 10, 2006).

[1467] Ex. 436 at MS_332439-332440 (Taubman E-Mail, dated December 22, 2006).

[1468] Ex. 437 at MS_236660 (Fincher E-Mail, dated December 5, 2006).

[1469] *Id.*

an update to Tribune's 2006-2010 business plan in the data room.  Preparing to update Morgan

Stanley's model, he summarized the revisions for the Morgan Stanley team as follows:[1470]

>—Publishing revenues adjusted downwards to reflects weakness in
>national advertising and circulation revenues
>
>—TV/Broadcasting revenue adjusted upwards after stronger-than-
>expected performance
>
>—06E EBITDA increases by $4MM to $1,307MM and 07E
>EBITDA decreases by $5MM to $1,340MM. From '08-10E they
>forecasts incremental EBITDA of approx. $30MM (positive BCF
>adjustment for B&E outweighs negative from Publishing)
>
>—Various cost reductions (continued cost control in B&E, lower
>comp due to lower results, reduction of 401(k) contribution).

### (3)    Morgan Stanley's Views on the Third-Party Bids and the Self-Help Alternatives.

Morgan Stanley viewed the Tribune Board's and the Special Committee's focus on the

auction process and strategic alternatives involving third parties as a weakness in Tribune's

strategic evaluation process.  In his interview with the Examiner, Mr. Whayne stated that

Tribune's pursuit of a possible leveraged buyout transaction distracted it from consideration of

other alternatives that could produce more value to Tribune's stockholders.[1471]  For example, the

record reflects that early in the engagement, Mr. Whayne commented that he would have

considered whether a potential sale of the Los Angeles Times would offset the potential effects

of a failure to achieve management's announced $200 million in cost reductions:[1472]

---

[1470]  Ex. 438 at MS_237635-237636 (Kvorning E-Mail, dated December 19, 2006).

[1471]  Examiner's Interview of Thomas Whayne, June 11, 2010.  In contrast, Mr. Osborn testified, referring to the Special Committee's review of strategic options from September 2006 through April 2007, that in his view, "in terms of casting a wide net, we did a very thorough job."  Examiner's Sworn Interview of William Osborn, June 24, 2010, at 61:8-9.

[1472]  Ex. 439 (Whayne E-Mail, dated October 22, 2006).  In contrast, Ms. Mohr stated to the Examiner that "there was substantial reverse inquiry around certain core assets--for example the LA Times."  Examiner's Interview of Christina Mohr, June 29, 2010.

> Remember $185 million of the total $200 million of cost cuts is
> attributable to Publishing. . . .  These cost reductions might not be
> achievable in which case the company will grow at the rate of
> Street estimates, or even below. If you can sell LA for a big
> multiple you can substantially derisk the company's plan.

Mr. Whayne stated to the Examiner that "the one thing we thought they didn't fully explore was could we do better by doing a series of assets sales and actually create more value for shareholders rather than simply pursuing an LBO."[1473]  Mr. Whayne also noted that information flow was a recurring difficulty with the process, as Morgan Stanley's access to the "engine room" was limited.[1474]

In advance of their first Special Committee meeting on October 18, 2006,[1475] Mr. Taubman, Mr. Whayne, and Mr. Stewart shared several concerns regarding the short time frame imposed on the bidding process.[1476]  Mr. Taubman viewed the initial transaction timetable as "being way accelerated with no meaningful feedback and no asset sale alternative."[1477]  Mr. Whayne recognized that MLPFS' and CGMI's October 12, 2006 bid solicitation letter was geared toward achieving "an expedited process to sell the company."[1478]  Mr. Stewart suggested promptly advising Special Committee Chair William Osborn that "1. Their timeframe is likely unrealistic.  2.  Doesn't appear they have baked [sic] off staple sources. 3. Need to create

---

[1473]  Examiner's Interview of Thomas Whayne, June 11, 2010.  Ms. Mohr, on the other hand, stated to the Examiner that she thought that Tribune "should sell assets as rapidly as possible," and that she "push[ed] to get asset sales done."  Examiner's Interview of Christina Mohr, June 29, 2010.

[1474]  Examiner's Interview of Thomas Whayne, June 11, 2010.

[1475]  Ex. 96 (Special Committee Meeting Minutes, dated October 18, 2006).

[1476]  *See* Ex. 440 (Stewart E-Mail, dated October 12, 2006).

[1477]  Ex. 440 at MS_300032 (Stewart E-Mail, dated October 12, 2006).  *See also* Ex. 421 at MS_199768 (Kvorning E-Mail, dated October 11, 2006).

[1478]  Ex. 440 at MS_300031 (Stewart E-Mail, dated October 12, 2006).

actionable alternative. 4. Credibility of 2007 projections (where they show growth) will be critical as will gannett [sic] online partnership considerations."[1479]

### (i)    Morgan Stanley's Evaluation of Self-Help Alternatives.

In early January 2007, Morgan Stanley was preparing to evaluate the anticipated auction process bids.  In conjunction with this process, Morgan Stanley internally debated issues related to Tribune's valuation and investigated Tribune's current ownership profile.[1480]  Morgan Stanley revisited the treatment of the PHONES Notes in early January, first seeking clarification on MLPFS' accounting for the value of the PHONES Notes.[1481]  Internally, James Fincher asked for Mr. Stewart's view on the treatment of the PHONES Notes "from a valuation perspective.  We are currently assuming the market value (~$550MM) but the Citi/Merrill guys assume $1Bn (based on $1.3Bn accreted value in 2029, less the value of the TWX shares they own)."[1482]  At the same time, the pace of Morgan Stanley's due diligence activities increased as it prepared its "valuation/strategic alternatives presentation" for the January 12, 2007 Special Committee meeting, a presentation that included consideration of various self-help alternatives.[1483]  Steven Williams again sought Ms. Ghosh's view of the recapitalization scenario, accounting for Tribune management's figures as updated in December 2007.  In particular, Mr. Williams asked "whether

---

[1479] *Id.* at MS_300030.

[1480] An ongoing internal debate over which unconsolidated assets should be grouped together reflected the larger difficulty that the unconsolidated assets could be, and typically were, grouped together in a number of different combinations.  Ex. 441 (Williams E-Mail, dated January 3, 2007).  Mr. Kvorning asked his Global Capital Markets colleagues to provide him with an update on "Tribune ownership," "[h]edge fund ownership," and "[i]ndex ownership" in order to examine any changes since the fall of 2006.  Ex. 442 at MS_356704 (Thompson E-Mail, dated January 2, 2007).  It was also reported that the volume of Tribune shares being shorted per month had been increasing since August 2006.  Ex. 442 at MS_356702 (Thompson E-Mail, dated January 2, 2007).

[1481] Ex. 443 (Fincher E-Mail, dated January 6, 2007).

[1482] Ex. 444 (Fincher E-Mail, dated January 8, 2007).

[1483] Ex. 445 at MS_119574 (Baldi E-Mail, dated January 18, 2007).

we could possibly put more leverage on the business without an equity partner."[1484]  Ms. Ghosh

advised (in Mr. Williams' words) that "the business would support 1.25x below the ML/Citi

staple on a WholeCo. Recap. . . .  Tribune could support 6.25x PLUS PHONES.  *i.e.* the

WholeCo can support 6.25x plus another 0.75x including the PHONES at $1.0Bn for total

leverage of 7.0x (including PHONES)."[1485]  Ms. Ghosh suggested the following capital

structure:[1486]

> Total Leverage:  6.25-6.50x (pre PHONES); PHONES at $1Bn
> add ~0.75x to total leverage getting you to 7.0x to 7.25x tot lev
>
> PF Capital Structure:
>
> 1) TLB @ L + 225 if Ba3/BB-, L + 250 if B1/B+
>
> 2) Sr Sec Nts (including $1.255Bn rollover notes) - Total of
> TLB+Sec Notes should be 4.75 - 5.00x of tot lev
>
> 3) 0.75x Sr Unsec Nts @ 9 - 9.25%
>
> 4) 0.75x Sr Sub Nts @ 10.5%
>
> Our analysis assumes your views for valuation of the individual
> businesses has not changed.

As Todd Schwarzinger, also of Morgan Stanley's Investment Banking division,

summarized to Mr. Stewart on January 11, 2007:[1487]

> The short answer is that it seems each party has their own
> distinctive way of valuing the [PHONES Notes], with limited
> consistency between firms. In addition to valuing the security
> itself, there is also a bit of diversity in terms of valuing the
> potential $334MM tax liability resulting from the recent IRS
> proposal to capitalize the security's interest.

---

[1484]  Ex. 446 at MS_119373–119374 (Williams E-Mail, dated January 9, 2007).

[1485]  *Id.* at MS_119372.

[1486]  Ex. 447 at MS_252215-252216 (Williams E-Mail, dated January 9, 2007).

[1487]  Ex. 448 at MS_310738 (Schwarzinger E-Mail, dated January 11, 2007).

337

Mr. Fincher sought input from Robert Shepardson, a managing director and head of

Morgan Stanley's Media & Communications group,[1488] regarding an alternative "where Tribune's

broadcasting business would trade if publishing were separated.  As part of the separation,

broadcasting would be recapped at 6.5x leverage and would include three additional assets: the

Cubs and Tribune's stakes in Food Network and Comcast SportsNet (assumed value of these

assets is $1.3Bn)."[1489]

Mr. Whayne reported to Mr. Taubman a further development on "standalone recap

scenarios" in late January:[1490]

> Christina called after finishing a meeting with TRB management
> and ML. . . .  She said that their standalone recap base case
> provides for a $20 special dividend, which implies approximately
> 6.5x leverage (7.2x with the PHONES) -- basically the case that
> we showed the board a couple of weeks ago.  Want to pursue
> immediately, but will be structured to provide for a spin when
> audited financials are completed.  Have also decided that a Carlyle
> proposal which provides for the same after-tax economics will
> trump, given greater certainty.

Recent operating results from the fourth quarter of 2006 began to impact Morgan

Stanley's analysis.  From these results, which showed "publishing slightly behind budget and tv

slightly ahead," Mr. Stewart expected that the "same trends [would] probably characterize 1q 07

performance."[1491]  Mr. Stewart observed to Frank English, Morgan Stanley's Vice Chairman and

Managing Director, Midwest Region,[1492] that the bidding process could result in "some partner

trading at the finish line" as the final bid due date of January 17, 2007 approached, and that

---

[1488]  Ex. 402 at 2 (Presentation to the Tribune Special Committee, dated September 29, 2006).

[1489]  Ex. 449 at MS_251814 (Fincher E-Mail, dated January 8, 2007).

[1490]  Ex. 450 at MS_289103 (Taubman E-Mail, dated January 25, 2007).

[1491]  Ex. 451 at MS_310729 (Stewart E-Mail, dated January 10, 2007).

[1492]  Ex. 401 at 4 (Tribune Special Committee Working Group List, updated November 3, 2006); Ex. 402 at 2
(Presentation to the Tribune Special Committee, dated September 29, 2006).

"[s]elf help alternatives as we have advocated all along as plan b" remained viable in the face of anticipated weak bids.[1493]

> (ii)    **Morgan Stanley's Evaluation of the Third-Party Bids and Focus on the Chandler Trusts Proposal.**

Although the Special Committee's bidding process ultimately resulted in proposals from the Chandler Trusts, Broad/Yucaipa, and Carlyle, Morgan Stanley concentrated primarily on the Chandler Trusts Proposal as the most serious, and in some ways most problematic, of the three bids received by the Special Committee on January 17, 2007.

Morgan Stanley's initial discussions with the Chandler Trusts took place soon after Morgan Stanley's engagement as part of an October 24, 2006 call with Rustic Canyon, the Chandler Trusts' financial advisor, and Goldman Sachs to discuss the Chandler Trusts' view of the sale process, "with the basic message that the family wants liquidity and preservation of capital."[1494]  Mr. Whayne thought it "sounded like the dog caught the bus and doesn't know what to do now, except keep barking."[1495]

During the November 27, 2006 Special Committee meeting, Morgan Stanley suggested that "the Chandler Trusts could potentially serve as a significant source of competition for the financial party bidders."[1496]  In his interview with the Examiner, Mr. Whayne commented that Morgan Stanley became concerned that a Chandler Trusts bid would frustrate the auction process because "what they were proposing was very different from what others were proposing,"

---

[1493]  Ex. 451 at MS_310729 (Stewart E-Mail, dated January 10, 2007).

[1494]  Ex. 452 at MS_300500 (Whayne E-Mail, dated October 25, 2006).  Though the contact had been approved by Mr. Osborn, due to the tension with the other advisors, subsequent calls concerning the Chandler Trusts' views were coordinated with MLPFS and CGMI.  Ex. 453 at MS_300764-300765 (Whayne E-Mail, dated November 1, 2006).

[1495]  Ex. 454 at MS_299683 (Taubman E-Mail, dated October 24, 2006).

[1496]  Ex. 99 at TRIB-G0007796 (Special Committee Meeting Minutes, dated November 27, 2006).

thereby creating uncertainty for other bidders.[1497]  Mr. Whayne opined that "any good banker who had good in-house tax expertise and had been involved in unique structures could figure out what the Chandlers could deliver. . . ."[1498]  Nonetheless, Mr. Whayne viewed the Chandler Trusts Proposal as a genuine bid.[1499]

Morgan Stanley internally reviewed a revised Chandler Trusts Proposal on December 11, 2006.  James Fincher summarized the Chandler Trusts' valuation of Tribune: "Based on the identified differences in assumptions, it looks like their values should be approximately $3 per share higher than ours, so it appears that they could be (a) valuing unconsolidated investments lower, (b) valuing the Chandler Trust's shares more highly or (c) some combination of (a) and (b)."[1500]  Morgan Stanley proceeded to analyze the tax implications of the Chandler Trusts Proposal out of concern that the Chandler Trusts could receive a windfall on a subsequent sale of Tribune's assets.[1501]  Reviewing Morgan Stanley's analysis of the Chandler Trusts Proposal on January 3, 2007, Mr. Whayne suggested to Mr. Fincher:[1502]

> On the special cash dividend funding page, we should add a line for the cash to the Chandlers at the bottom of the page, and then figure out the per share dividend to [other] shareholders based on a share count reduced for the Chandler shares. I think this is a more accurate portrayal of what is happening and it forces us to get specific regarding [w]hat the Chandlers are getting.  We should also add a new page at the end of Chandler section that seeks to derive their package value. . . .  Probably a sensitivity based on their ownership and the valued accorded by the investor to Publishing.

---

[1497]  Examiner's Interview of Thomas Whayne, June 11, 2010.

[1498]  *Id.*

[1499]  *Id.*

[1500]  Ex. 455 at MS_285383 (Taubman E-Mail, dated December 12, 2006).

[1501]  Ex. 456 (Sperling E-Mail, dated December 12, 2006).

[1502]  Ex. 457 (Whayne E-Mail, dated January 3, 2007).

By January 9, 2007, Steven Williams noted that the Chandler Trusts Proposal relied on outdated financials, causing him to question whether Morgan Stanley should run "the New Tower financials through the 'Chandlers' leveraged Broadcasting spin scenario."[1503]  He debated whether to make the change, apparently, because although "we all agree that the Chandlers used old financials as the basis of their bid, . . . the flip side says they're old news and no longer relevant to a new leveraged spin analysis."[1504]

On January 12, 2007, Morgan Stanley formally presented to the Special Committee its preliminary valuation of Tribune and its views of the Chandler Trusts Proposal, auction process status, and "[s]elected [a]lternatives."[1505]  Morgan Stanley received positive feedback on the presentation, but Mr. Whayne continued to disagree with Ms. Mohr on matters of strategy.[1506] Internally, Mr. Whayne noted positive feedback from the client following the meeting and additional requested analysis:[1507]

> Board meeting went well. One of the lead directors remarked that ours was the best presentation that they had seen. All wanted to take home to review further, which is unusual.
>
> Three follow up items:
>
> 1. Basis analysis for the top 20 Tower shareholders
>
> 2. Compare Street and Management estimates vs Actual performance to get a sense of who has been more accurate. Can likely do on a quarterly basis for last 2 years, but likely need plans that go back to do 3-4 years of analysis
>
> 3. Update valuation perspectives of Food Network stake (Street, DCF, Trading Multiples, etc).

---

[1503]  Ex. 458 (Williams E-Mail, dated January 9, 2007).

[1504]  *Id.*

[1505]  Ex. 104 (Presentation to the Committee of Independent Directors of the Board of Directors of Tribune, dated January 12, 2007).

[1506]  Ex. 459 (Whayne E-Mail, dated January 15, 2007).

[1507]  Ex. 460 (Stewart E-Mail, dated January 12, 2007).

On January 16, 2007, Mr. Whayne reported to Mr. Taubman that according to Michael

Costa of Merrill:[1508]

> Chandlers are apparently scrambling to complete diligence and
> Michael had a conversation with Unterman signalling [sic] that
> they need to think about some sort of price protection tied to the
> trading price of B&E after separation, as well as assuming more of
> the unconsolidated assets than were in their original proposal.
> Unterman asked to speak to the [McCormick] Foundation re a
> voting agreement but Michael declined.

By January 18, 2007, Mr. Taubman wanted to avoid "legitimiz[ing] the chandler offer"

by "claim[ing] market share for the deal being tracked as of today."[1509]  Following the Chandler

Trusts' revised proposal of January 26, 2007, Mr. Williams observed that "it doesn't appear that

they've changed the value at all, just delivering more cash and putting some certainty around the

trading level of Broadcasting with the collar. . . . Bargaining and Negotiations 101 . . . offer

something different without actually increasing your value."[1510]  Mr. Fincher viewed the "[k]ey

change [a]s the inclusion of two contingent payment mechanisms - one depends on the trading

value of the broadcasting business post-spin, the other on the resolution of an outstanding tax

case."[1511]

In mid-to-late January 2007, internal Morgan Stanley communications reflected a theme

of "cleaning up merrill and citi's mess."[1512]  A Morgan Stanley analysis of the Chandler Trusts

Proposal "using Goldman assumptions" found that "the addition of $800MM in value for

CareerBuilder and Other Interactive Assets increases package value.  Neighborhood of

---

[1508]  Ex. 461 (Whayne E-Mail, dated January 16, 2007).

[1509]  Ex. 462 (Taubman E-Mail, dated January 18, 2007).

[1510]  Ex. 463 at MS_128240 (Williams E-Mail, dated January 27, 2007).

[1511]  Ex. 464 at MS_252208 (Fincher E-Mail, dated January 30, 2007).

[1512]  Ex. 465 at MS_338566 (Taubman E-Mail, dated January 19, 2007).

$3.30/share in the 7.8x Pub case."[1513]  Circulating an updated analysis of comparable

transactions to the Morgan Stanley team on January 23, 2007, Mr. Williams noted a difference in

Morgan Stanley's methodology from that of the other advisors:[1514]

> As a general rule, Citi/Merrill are using I/B/E/S consensus
> estimates pulled from Bloomberg for their EBITDA.  We do not
> use I/B/E/S consensus because each broker treats EBITDA
> differently.  We go through the process of hand-entering estimates
> from only the brokers that we have complete information for (*i.e.*
> we have the research report printed out and in front of us).  This
> means that our consensus EBITDA estimates will differ slightly
> from those used by Citi/Merrill, but I am more confident in our
> numbers as we have confirmation that they are calculated on an
> apples to apples basis - and if they're not, we know exactly why.

In late January, MLPFS circulated a draft presentation in advance of the January 27, 2007

Tribune Board meeting in which it summarized all of the bids.  Charles Stewart commented on

the presentation, noting that the "range of value on self-help alternatives (eg whole co recap -

$25-$33) seem[ed] very wide . . . needs more color on determinants of value, time vs. non-core

asset value vs mkt multiples on core businesses vs mgmt ability to meet plan numbers."[1515]

Mr. Taubman added:[1516]

> [O]n page 5 would kill first alternative, give carlyle a put up or
> shut up on second and then compare it to the third to choose
> one . . . then we need to flesh that out vis-à-vis chandler proposal
> as we try and strengthen it and try and keep burkle/broad warm . . .
> if we [lose] him so be it[.]

---

[1513]  Ex. 466 (Williams E-Mail, dated January 21, 2007).

[1514]  Ex. 467 at MS_121078-121079 (Williams E-Mail, dated January 23, 2007).

[1515]  Ex. 468 at MS_268370 (Whayne E-Mail, dated January 26, 2007).  Mr. Whayne concurred.  Ex. 468 at MS_268370 (Whayne E-Mail, dated January 26, 2007).

[1516]  Ex. 469 at MS_288216 (Taubman E-Mail, dated January 27, 2007).

**(4)    Morgan Stanley's Participation in the Selection of the EGI Proposal and Implementation of the Step One Transactions.**

Morgan Stanley first learned about the Zell Group's initial "expression . . . of interest in sponsored recap" from Mr. Costa on January 26, 2007.[1517]  Mr. Whayne expressed surprise at Samuel Zell's interest.[1518]  In response, Christina Mohr of CGMI noted that there was "[n]o number from him yet, he had already signed a [confidentiality agreement] months ago."[1519]  Mr. Whayne explained to the Examiner that when Mr. Whayne first heard about the EGI proposal he thought: "[W]hat was novel was that it was an S-corp ESOP.  That was the part that was truly unprecedented.  I'd never seen that done.  I subsequently became educated that it had been done for other private [companies].  But I'm still not aware it'd been done to other public companies."[1520]  Although it learned of EGI's interest on January 26, 2007, Morgan Stanley did not formally evaluate the EGI proposal for the Special Committee until March 21, 2007.[1521]

In the meantime, Morgan Stanley continued to evaluate the other third-party bids as well as develop the self-help recapitalization option.  Neither the Carlyle Proposal nor the Broad/Yucaipa Proposal were "fully baked," in Mr. Whayne's view.[1522]  Mr. Whayne expected the Chandler Trusts to submit a revised proposal, but Ms. Mohr was "[n]ot sure if they have the financing to be credible in a revision."[1523]  According to Mr. Whayne, when Broad/Yucaipa subsequently reduced their offer price, their bid lost any attractiveness it may have had.[1524]

---

[1517]  Ex. 470 at MS_290169-70 (Mohr E-Mail, dated January 26, 2007).

[1518]  *Id.* at MS_290169.

[1519]  *Id.* at MS_290168-69.

[1520]  Examiner's Interview of Thomas Whayne, June 11, 2010.

[1521]  Ex. 136 (Special Committee Meeting Minutes, dated March 21, 2007).

[1522]  Examiner's Interview of Thomas Whayne, June 11, 2010.

[1523]  Ex. 471 at MS_288560 (Mohr E-Mail, dated February 2, 2007).

[1524]  Examiner's Interview of Thomas Whayne, June 11, 2010.

Morgan Stanley was still considering a leveraged spinoff of the Broadcasting Segment as of February 5, 2007.[1525]  At the same time, Mr. Whayne reported to Mr. Taubman that he "[j]ust spoke to my contact at Zell.  He thinks that they will be able to get to 33 [from $30], subject to getting key employees on board.  Sam apparently has a call into Bill [Osborn]."[1526]  The next day, EGI submitted a revised proposal at $33 per share.[1527]

Self-help asset sales also remained under consideration, as Morgan Stanley looked into "modeling in bridge loans that will be tied to selected assets that may potentially be sold by Tribune."[1528]  In particular, Mr. Williams asked Ms. Ghosh whether "when thinking about loan / value ratios on bridge loans, is a good rule-of-thumb percentage around 75%?  Also, is the L/V ratio attached to the gross proceeds from the sale or net proceeds after tax?"[1529]  Ms. Ghosh replied that, "[i]f the tax liability is significant, and we have sufficient comfort around the sale price we can lend against it that keeps in mind the tax liability."[1530]  Mr. Williams' reply reflects the challenges Morgan Stanley faced in obtaining timely financial information from Tribune, MLPFS, and CGMI and incorporating that data into its modeling:[1531]

> We will incorporate this concept into our model, as we are currently running the L/V ratio off of net proceeds vs. gross.
>
> Just so you know, Tribune management is currently in the process of updating their financial package, and we are trying to get the new info from the other advisors.  The Company won't give the

---

[1525]  Ex. 472 (Fincher E-Mail, dated February 5, 2007).

[1526]  Ex. 473 at MS_287136 (Whayne E-Mail, dated February 5, 2007).  In his interview, Mr. Whayne acknowledged that William Pate of EGI is a "close personal friend . . . from college."  Examiner's Interview of Thomas Whayne, June 11, 2010.

[1527]  Ex. 474 at MS_265757 (Whayne E-Mail, dated February 6, 2007).

[1528]  Ex. 475 at MS_239580 (Ghosh E-Mail, dated February 7, 2007).

[1529]  *Id.*

[1530]  *Id.*

[1531]  *Id.* at MS_239578-79.

package directly to us b/c we are spec. committee advisor, not
Company advisor.

As you can see, part of the frustration on this engagement is that
we are essentially left out of the loop on many of the decisions that
are made with the other advisors, and we have to make many of
our judgments in the dark, without perfect information.

Morgan Stanley's frustrations aside, by the next day, Mr. Williams reported to James

Fincher that "re: the Tower recap/div model . . . we are very close to matching with

Citi/Merrill."[1532]

Efforts to model a revised structure involving an upfront share repurchase that was

planned to occur in late March 2007, followed by a Broadcasting Segment spin planned to occur

in September or October 2007, continued through mid-February.[1533]  In preparation for a

February 12, 2007 Special Committee meeting, Morgan Stanley focused on evaluating "(a) the

doability of the Merrill/Citi proposal . . . and (b) reasonableness of their proposed fees."[1534]

William Graham opined that "Structure & rates generally look ok to me.  The key to this is

seeing exactly what conditions and flex ML/Citi have around their financing commitments."[1535]

In advance of the presentation, Mr. Whayne and Mr. Taubman continued to disagree with CGMI

over the self-help recapitalization scenario.  Mr. Whayne reported to Mr. Taubman that Ms.

Mohr:[1536]

favors the tender because believes it more effectively addresses
chandler take-out relative to dividend, but I told her that I disagree
with her math, and think it is inelegant to not distribute up to 20 if
undersubscribed.  she does not see why we would pay 32.5 when

---

[1532]  Ex. 476 (Williams E-Mail, dated February 8, 2007).

[1533]  Ex. 477 at MS_238443 (Fincher E-Mail, dated February 11, 2007).

[1534]  Ex. 478 at MS_264051 (Fincher E-Mail, dated February 9, 2007).  MLPFS and CGMI were seeking
$146 million in fees on a proposed $9.5 billion in debt.  Ex. 479 at MS_252278 (Kvorning E-Mail, dated
February 9, 2007).

[1535]  Ex. 480 at MS_263991 (Fincher E-Mail, dated February 11, 2007).

[1536]  Ex. 481 (Whayne E-Mail, dated February 12, 2007).

we can pay 30, but she is focused primarily on the chandlers rather than broader signalling [sic] issues.

Mr. Taubman replied:  "Fine. Then let's do a self tender at 30 and suggest that others not tender."[1537]  Mr. Whayne commented: "Great message."[1538]  Mr. Whayne and Mr. Taubman calculated that a tender offer with only the Chandler Trusts participating would be 56% undersubscribed.[1539]

Following the Special Committee meeting on February 12, 2007, Mr. Whayne reported what appeared to be progress:[1540]

> No information on hoy.  Board has decided to pursue $20 distribution and spin.
>
> Will decide between dividend and tender this morning.  Turns out Peltz now has a greater than 5% stake in company, so a tender where he does not participate takes him up to around 15%.  Same issue with Ariel.  Also learned that a shareholder vote will be required to give [McCormick] Foundation a convertible preferred, which is what they have demanded to help with Chandler issues. Very messy.

Nevertheless, a number of challenges remained.  On February 15, 2007, Mr. Whayne suggested that Mr. Taubman report to Special Committee Chair William Osborn "that the [McCormick] Foundation and Chandlers are unhappy about dividend and that price discussions are testy.  Unterman is being unreasonable as she wants price set based on [volume weighted average price] post dividend announcement."[1541]  Mr. Taubman was dismissive.[1542]

---

[1537]  *Id.* at MS_287505.

[1538]  *Id.* at MS_287505.

[1539]  Ex. 482 at MS_285971 (Taubman E-Mail, dated February 12, 2007).

[1540]  Ex. 483 at MS_265773 (Whayne E-Mail, dated February 13, 2007).

[1541]  Ex. 484 at MS_287527 (Whayne E-Mail, dated February 15, 2007).

[1542]  *Id.* at MS_287525- 26.

Mr. Taubman spoke with Mr. Osborn on February 16, 2007, and reported to Mr. Whayne that he "[g]ave him the 25bp speech,"[1543] apparently taking an incremental approach to persuading Mr. Osborn of Morgan Stanley's views on financing.  Mr. Whayne replied that CGMI viewed Tribune management as "spending most of their time focusing on the ESOP."[1544]

By February 20, 2007, the EGI proposal began to cause friction with the McCormick Foundation, which supported the self-help recapitalization.[1545]  Mr. Whayne discussed the problem with Charles Mullaney, of Skadden Arps, and reported to Mr. Taubman that they:[1546]

> Discussed Zell proposal and he said that he is concerned by the high level of conditionality reflected in their term sheet.  Also agrees that we need to hear from management in the next day or so as to their plan to make this work and timeframe.  Also took the opportunity to ask him if he had seen our financing proposal. . . . He tried to avoid discussion but I said that I was surprised that we had not heard anything from the company regarding our proposal. . . .  [He] reiterated that it is strange that no one has reached out to us.

Morgan Stanley thereafter increased its efforts to get Tribune management to focus on its self-help financing alternative.  For example, Mr. Whayne offered to extend a proposed six-month bridge loan to seven years in response to Tribune Treasurer Chandler Bigelow's concern about the short repayment schedule.[1547]  The same day, Mr. Whayne reported to Mr. Taubman that "Dennis [FitzSimons] and Crane [Kenney] approached State Street about serving as trustee for the ESOP, but were turned down.  Are scrambling to find a trustee."[1548]  Given its

---

[1543] Ex. 485 at MS_287603 (Whayne E-Mail, dated February 16, 2007).

[1544] *Id.* at MS_287602.

[1545] Ex. 486 at MS_285992 (Taubman E-Mail, dated February 20, 2007).  Jill Greenthal, of Blackstone, felt Tribune management and Michael Costa had become unresponsive, and "[t]hreaten[ed] to put pencils down." *Id.* at MS_285992.

[1546] Ex. 487 (Whayne E-Mail, dated February 21, 2007).

[1547] Ex. 488 at MS_288184-288185 (Whayne E-Mail, dated February 22, 2007); Ex. 489 at MS_287690 (Stewart E-Mail, dated February 22, 2007).

[1548] Ex. 490 (Whayne E-Mail, dated February 22, 2007).

own pending financing plan, this development was likely welcome to Morgan Stanley.[1549]

Indeed, by February 24, 2007, Charles Stewart reported significant progress:[1550]

> We are providing views on the $9bn financing package for tribune self-help alternatives.  we are having some dialogues with the company and are starting to reveal that the Citi/ML proposal is way off market and reflects their taking advantage of a non-competitive process.  would like to update you in more detail, especially as Don starts to get increasingly involved. . . .
>
> also had a 3 hour special committee meeting this morning.  the process continues but we're down to the short strokes. it's a nearly fully baked self-help plan vs. a 3rd party acquiror at this point; should know more in the next few days.

A few days later, Mr. Whayne reported to Mr. Taubman that the Large Stockholders "do not believe the ESOP provides compelling value relative to the recap, particularly in light of the conditionality and the likely 9-12 month timeframe for regulatory approval, and that they would like efforts to revert to the prior recap effort."[1551]  Mr. Whayne also noted "a looming issue with the Chandlers regarding an inability to provide them with [registration] rights until May when audited financials will be ready."[1552]  Mr. Whayne commented to the Examiner that the reaction of the Large Stockholders' advisors to the conditionality in the EGI proposal was not illogical, considering he and Mr. Taubman shared the same view.[1553]  Conditionality was Mr. Whayne's focus, second only to valuation, and Mr. Whayne viewed the level of conditionality in the EGI proposal as wholly unacceptable compared to that of the self-help recapitalization.[1554]  Despite

---

[1549] *See* Report at § III.E.4.e.(5).

[1550] Ex. 491 (Stewart E-Mail, dated February 24, 2007).

[1551] Ex. 492 (Whayne E-Mail, dated February 28, 2007).

[1552] *Id.*

[1553] Examiner's Interview of Thomas Whayne, June 11, 2010.

[1554] *Id.*

the uncertainty, Morgan Stanley prepared its due diligence on reverse breakup fees in case the EGI proposal moved forward.[1555]

In his Examiner interview, Mr. Whayne recalled that Michael Costa and Todd Kaplan of Merrill strongly advocated for the ESOP, and stated that, in his view, this was because under the EGI proposal "they would make a lot of money."[1556]  Stated differently, Mr. Whayne said that Mr. Costa favored the EGI proposal because "more debt, more fees."[1557]  Mr. Whayne stated that "they were big architects of it throughout.  They'd have advocated for it even as a one step [deal] with all the conditionality in it."[1558]  Mr. Whayne explained that there were three main issues in the initial EGI proposal that Morgan Stanley viewed as unattractive:  (a) stock price, (b) level of conditionality on the bid, and (c) if the transaction were completed as a one-step merger, investors would not receive cash for a number of months.[1559]  Mr. Whayne explained that the first two issues were standard problems, "M&A 101."[1560]  The third issue was unique to the EGI proposal.[1561]  Mr. Whayne expounded that the issue of conditionality, specifically, the receipt of a fairness opinion before closing (which would be six to nine months after the announcement of the transaction), was something that Merrill would "always fight against in any M&A deal."[1562]

---

[1555]  Ex. 493 (Whayne E-Mail, dated March 2, 2007).

[1556]  Examiner's Interview of Thomas Whayne, June 11, 2010.

[1557]  *Id.*

[1558]  *Id.*

[1559]  *Id.*

[1560]  *Id.*

[1561]  *Id.*

[1562]  *Id.*

Concerns about conditionality notwithstanding, the impact of Tribune's weak operating results in periods one and two were being felt by March 5, 2007.  As Mr. Whayne reported to Mr. Taubman and Mr. Stewart, he:[1563]

> Spoke with Christina.  According to her, Dennis is becoming more nervous about the $20 recap given the weakness in the business (down 5% in February, and 9% in January), and is considering recommending a lower amount (and potentially much lower) to the board.  I asked her if they were going to modify their management plan for the second time in a month, and she said that they were not, but had less confidence in the plan at present.  Said that certain members of publishing management were concerned that they could have covenant issues later in the year if the current business trajectory continues (a strong argument for Ashok's covenant lite concept).
>
> I noted three credibility problems with an argument for a lower dividend: (1) the free cash flow coverage ratios are the same in the recap as in the ESOP alternative (as she pointed out in the last board meeting), and the only difference is that one scenario involves the public LBO of a C-corp, while the other one involves a private LBO of an S-corp; (2) unless the management plan changes significantly, it is awkward to argue for a lower amount at this time given (a) [McCormick] Foundation/Chandler agreement which is based on a $20 dividend and (b) the fact that MS has consistently based our $20 view on the Research Case, which is still lower than even the revised management plan; (3) timing of argument for a less aggressive recap is strange given management agenda to pursue ESOP.
>
> Per the Zell term sheet, there was minor progress in that Zell agreed to 8% interest on the purchase price if closing occurs later than 6 months, as well as an upfront $15 per share distribution executed via a tender.  The bring-down opinion still exists, although with some protection against Zell's upfront equity (still to be defined) if the D&P view of value declines between signing and closing.  Still no movement on price, regulatory and financing conditionality or reverse break-up fee.

---

[1563] Ex. 494 (Whayne E-Mail, dated March 5, 2007).  In his sworn interview with the Examiner, Mr. FitzSimons denied that his initial negative reaction to EGI's proposal resulted from the degree of leverage associated with the proposal.  *See* Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 30:2-31:4.  In her interview with the Examiner, Christina Mohr noted that Mr. FitzSimons "went hot and cold on this deal—this deal was alive, dead, dead, alive, it reflects that it was doable but a lot of debt."  Examiner's Interview of Christina Mohr, June 29, 2010.

Mr. Whayne explained in his interview that at this time Tribune management's interest in the EGI proposal increased because it provided a "complete solution" whereby stockholders would receive cash up-front and Tribune could take on greater leverage while operating in an uncertain business climate.[1564]  Nevertheless, as of March 6, 2007, Mr. Whayne remained of the view that the self-help recapitalization was the best option.[1565]  The next day, however, Mr. Whayne thought the "Zell proposal still has a ways to go, but has improved substantially."[1566] Mr. Whayne expected MLPFS and CGMI to "argue for a $17.50 recap."[1567]

A March 10, 2007 e-mail from Mr. Costa reported a significant shift in thinking concerning the EGI proposal:  "[s]hort answer is in light of recent operating performance no comfort in putting the kind of leverage necessary for Zell proposal to work and have board get comfortable with employees owning the equity.  Also numerous issues in Zell proposal we could not solve."[1568]  Following Mr. Costa's e-mail, Ashok Nayyar suggested to Mr. Whayne that "where the co ends with the div (15 to 20) [on a self-help recapitalization] should be a function of cash flows etc etc –including a covenant lite bank deal."[1569]

The next day, CGMI transmitted a self-help recapitalization analysis to Morgan Stanley, from which Mr. Stewart noted that it "[l]ooks like Z proposal is dead and is now moving in this

---

[1564] Examiner's Interview of Thomas Whayne, June 11, 2010.  Mr. Whayne also stated to the Examiner that to his knowledge, Mr. Zell did not offer incentives to Tribune management to influence their support for his proposal. Examiner's Interview of Thomas Whayne, June 11, 2010.

[1565] Ex. 495 (Whayne E-Mail, dated March 6, 2007).  Mr. Wayne stated to the Examiner, "We at MS were skeptical that the Zell proposal was the right step to go at this point in time. Our view was that it didn't compare favorably in comparison to recap.  We were talking about a $20 dividend.  Thought that was compelling up front value to shareholders compared to $30 share price."  Examiner's Interview of Thomas Whayne, June 11, 2010.

[1566] Ex. 496 at MS_295073 (Whayne E-Mail, dated March 7, 2007).

[1567] Ex. 496 at MS_295073 (Whayne E-Mail, dated March 7, 2007).  Morgan Stanley's diligence then turned to preparing valuations of Tribune at $20, $17.50, and $15 dividend levels, and updating the research case to reflect more recent broker estimates.  Ex. 497 at MS_140421-140424 (Fincher E-Mail, dated March 11, 2007).

[1568] Ex. 498 at MS_294981 (Stewart E-Mail, dated March 10, 2007).

[1569] *Id.*

direction. . . . We've asked for the financing commitment papers but you can get a sense of their

latest thinking . . . [N]ow is when we will have to make our push."[1570]  William Graham replied

that CGMI's proposal reverted to:[1571]

> an all 1st lien deal.  They have conveniently changed presentation
> format and taken off the secured debt ratios to not show the
> secured debt bust we pointed out in their last presentation.  And
> they are now getting the $33MM rebate in fees we have been
> stressing for the "bridge" financing.  They have not provided us
> detailed term sheets this time.  Pretty substantial cash savings we
> have provided them.

Morgan Stanley's sense was that not all of Tribune management disfavored the EGI

proposal.  Mr. Whayne clarified to the Examiner that "I think it was really FitzSimons who

wasn't in favor of Zell, it was not the rest of management as far as I know."[1572]  Mr. Whayne

further stated that he had heard that Mr. FitzSimons' concern "was really the result of a

conversation he had with Marty Lipton at Wachtell Lipton about the Zell proposal.  And Marty

expressed some concerns – making some profound observations."[1573]

Due diligence on the EGI proposal continued within a week of the "pause."[1574]  Mr.

Whayne prepared to address certain issues with the EGI proposal with Skadden Arps attorneys,

but expected to make little progress without a meeting of the Tribune Board "to air these

---

[1570]  Ex. 499 at MS_296522-23 (Graham E-Mail, dated March 11, 2007).

[1571]  *Id.* at MS_296522.

[1572]  Examiner's Interview of Thomas Whayne, June 11, 2010.

[1573]  *Id.*  Mr. FitzSimons confirmed in detail in his interview that his concerns about the EGI proposal had to do with the overall structure and conditionality of the transaction, not merely (or even primarily) the leverage involved. Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 30:2-42:5 and 53:4-19.

[1574]  Mr. FitzSimons attributed the pause in the process to "all the significant obstacles that existed.  It's not to suggest that leverage wasn't always a consideration, but the primary reason for the pause were the long odds of getting this done and keeping the company further paralyzed -- or paralyzed for a longer period of time." Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 53:14-19.  Mr. FitzSimons further stated: "Could leverage be a part of that? . . . I do not recall that being the primary reason for the pause that I initiated." *Id.* at 60:13-17.

issues."[1575]  Internally, Morgan Stanley prepared an analysis "to understand the day 1 ownership split between the ESOP, Zell and Management, as well as the fully diluted ownership once the warrant is exercised by Zell."[1576]  Premiums paid for large public-to-private transactions were also collected and examined.[1577]  Morgan Stanley convened an internal fairness committee meeting to begin its fairness opinion work in earnest, consider whether to modify prior valuation multiples,[1578] and brief the team on the status of the proposals so as to be prepared for a final decision in either direction.[1579]

By March 20, 2007, Morgan Stanley personnel expressed concerns that MLPFS and CGMI would receive excessive fees under the EGI proposal.  Mr. Whayne alerted Mr. Taubman to James Fincher's "profound insight" that "ML and Citi are receiving in excess of $400 million in fees to raise just over $200 million in outside equity."[1580]  This concern apparently did not persuade the Special Committee to select the self-help recapitalization over the EGI proposal.  On March 22, 2007, Mr. Whayne sent Tribune General Counsel Crane Kenney an e-mail to forward to the Zell Group:[1581]

> The Special Committee is focused on two principal elements with
> regard to your proposal:

---

[1575]  Ex. 500 (Whayne E-Mail, dated March 16, 2007).

[1576]  Ex. 501 at MS_254905 (Whayne E-Mail, dated March 17, 2007); Ex. 502 (Whayne E-Mail, dated March 21, 2007).

[1577]  Ex. 503 at MS_144298 (Dickinson E-Mail, dated March 19, 2007).

[1578]  Ex. 504 at MS_141557 (Fincher E-Mail, dated March 18, 2007).

[1579]  Ex. 505 (Fincher E-Mail, dated March 18, 2007).  One matter that Morgan Stanley apparently did not analyze at this point was VRC's solvency opinion.  According to Mr. Taubman, Morgan Stanley was not asked by the Special Committee to review VRC's solvency opinion, and the Examiner found no evidence that Morgan Stanley evaluated VRC's May 9, 2007 Step One solvency opinion or VRC's May 24, 2007 bringdown of its May 9, 2007 solvency opinion.  *See* Examiner's Sworn Interview of Paul Taubman, July 1, 2010, at 41:16-42:5.  Mr. Whayne testified that he never approved an undertaking to replicate VRC's Step One solvency analysis.  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 46:13-47:3.

[1580]  Ex. 506 at MS_149681 (Whayne E-Mail, dated March 20, 2007).

[1581]  Ex. 507 (Whayne E-Mail, dated March 22, 2007).

1.    Improved Economics

*    Price Increase: Our analysis shows that the recap
alternative can deliver between $31 to $35 per share, and the value
inherent in your transaction needs to be well above the midpoint

*    Ticking Fee Increase: Ticking fee increase to 11% would
reflect an appropriate risk-adjusted return for shareholders in the
period until closing.  Based on the current 5% ticking fee, we are
marking down your headline number by approximately $1 to $1.50

2.    Improved Commitment

*    Commitment to Close: Reverse break-up fee for failure to
obtain financing or achieve regulatory approval.  Propose $50
million, or 20% of your upfront investment, which represents
approximately 0.4% of the transaction value, compared to an
average reverse break-up fee of 2.4%

*    Commitment to the Company if Closing Not Achieved:
Maintain investment in the company and board seat for 3 years.

Special Committee Chair William Osborn related to Mr. Whayne and Mr. Taubman

that:[1582]

> I talked to Sam this morning and indicated the two of you, in
> coordination with Crane, would be in contact with Bill Pate(sp?) to
> resolve some of the economic terms of the deal and that we
> planned to meet next [Thursday] or Friday as a Board to make the
> final decision.  I explained that while Merrill and Citi would stay
> engaged, the Committee was concerned about conflict of interest
> and felt having Morgan Stanley involved in the final details was
> most appropriate.

Just as the economic terms were nearly resolved, however, a comment on Tribune's

declining performance led Mr. Whayne to seek an explanation from Donald Grenesko, Tribune's

Senior Vice President/Finance and Administration:[1583]

> We are going to need a bridge from the management plan to your
> revised view as stated to the Special Committee on Wednesday
> that EBITDA will be down by $45 million relative to plan.  Would

---

[1582]  Ex. 508 (Whayne E-Mail, dated March 22, 2007).

[1583]  Ex. 509 (Whayne E-Mail, dated March 24, 2007).

355

> be helpful to have a quarterly comparison of your revised view
> compared to plan that includes revenue, EBITDA, operating
> income for Publishing and Broadcasting.  Would also be helpful to
> understand timing of revised view given that during our diligence
> call the week before that you said that the plan had not been
> changed.

Discussing Morgan Stanley's valuations on March 25, 2007, Mr. Taubman summarized

that "research has never moved. . . . mgmt projections never move.  Its just mgmt projecting

above research and then moving down to research."[1584]  Mr. Whayne agreed, noting with respect

to Tribune's management that "[d]enial seems to be the tactic, as I have received no response e-

mail from Don. . . ."[1585]  Mr. Taubman suggested that Morgan Stanley should "get a pack out to

directors early this week which refutes most of this.  Something to speak to [Mr. Osborn]

about."[1586]

These internal communications indicate that Morgan Stanley had heard that, as of

March 25, 2007, Tribune's operating performance had fallen $45 million behind management's

plan for 2007.[1587]  Nevertheless, in its first of two presentations to the Special Committee on

March 30, 2007, Morgan Stanley observed that Tribune's "year-to-date financial performance is

on track with the Management Plan for 2007."[1588]  Following the meeting, Mr. Whayne reported

to Mr. Taubman that:[1589]

---

[1584] Ex. 510 at MS_295708 (Whayne E-Mail, dated March 25, 2007).

[1585] *Id.*

[1586] *Id.* at MS_295707.

[1587] The Examiner has reviewed Tribune's Brown Books for the periods in question and has determined that Tribune's operating performance had not fallen $45 million behind management's plan for 2007.  The March 2007 Brown Book indicated that for the year-to-date period from January 2007 through March 2007, Tribune's revenues were below plan by approximately $24 million and Tribune's operating profit was below plan by only $1.5 million.  The variance to plan in January 2007 and February 2007 was even smaller.  See Ex. 240 (Brown Book for Period 1, 2007); Ex. 241 (Brown Book for Period 2, 2007); Ex. 915 (Brown Book for Period 3, 2007).

[1588] Ex. 142 at MS 65068 (Presentation to the Committee of Independent Directors of the Board of Directors of Tribune, dated March 30, 2007).  *See also* Ex. 140 at 1 (Special Committee Meeting Minutes, dated March 30, 2007).

[1589] Ex. 511 (Whayne E-Mail, dated March 31, 2007).

> Sam called Bill and said that he thinks he can get to $34, and he will [contribute] $98 million of additional equity. Wants to leave ticking fee at 8% starting on 1/1/08. Said he needs more equity than 40%, and that there are rating agency issues that they are working through (I assume that relates to the $100 million ask if S-corp not in effect in calendar '08 because of '08 close). Will obviously require discussion with ESOP trustee. Asked that we not send docs to BB.

Sensing that the EGI proposal was on the verge of being approved, Mr. Whayne informed Ji-Yeun Lee, a managing director in the Morgan Stanley Investment Banking division, that:[1590]

> May approve tomorrow, although some uncertainty given Broad/Burkle and need for Zell to respond to ask we gave yesterday. Currently at $33.50, with ticking fee now at 8% but starting on 1/1/08, rather than 5% ticking from announcement. Revised proposal is economically equivalent to prior proposal, but the headline number is higher. We have asked for $34, with $75 mm more equity to bring to $300 mm. If we don't get, may put board in difficult position given Broad/Burkle to move forward tomorrow, although there is a strong bias to do so.

Morgan Stanley's second March 30, 2007 presentation to the Special Committee compared the Zell offer at $33 with the stand-alone leveraged recapitalization and Broadcasting Segment spin alternative.[1591] Morgan Stanley's April 1, 2007 presentation reflected its view of the basis for the last-minute negotiations that resulted in the final acceptance of the EGI proposal: "The Wall Street median target price is $31," even though "[t]he private market value of Tower, based on the analyst median, is approximately $34."[1592] The April 1, 2007 presentation also compared the EGI proposal at $34 with the same standalone leveraged recapitalization and Broadcasting Segment spin alternative.[1593] The same day, Morgan Stanley

---

[1590] Ex. 512 at MS_293739 (Lee E-Mail, dated March 31, 2007).

[1591] Ex. 513 at MS 64946-64950 (Presentation to the Committee of Independent Directors of the Board of Directors of Tribune, dated March 30, 2007); Ex. 141 at 1-2 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated March 30, 2007).

[1592] Ex. 144 at 9 (Presentation to the Committee of Independent Directors of the Board of Directors of Tribune, dated April 1, 2007).

[1593] Id. at 1-2.

rendered its fairness opinion reflecting the decision to move forward with the EGI proposal.[1594]

The assumptions Morgan Stanley made in rendering that opinion included that Tribune management's "financial projections . . . have been reasonably prepared on bases reflecting the best currently available estimates and judgments of the future financial performance of the Company."[1595]  The opinion stated that Morgan Stanley reviewed, among other things, "certain internal financial statements and other financial and operating data concerning the Company prepared by the management of the Company."[1596]  Consistent with Morgan Stanley's observation in its first March 30, 2007 presentation that "year-to-date financial performance is on track with the Management Plan for 2007,"[1597] the opinion did not specifically discuss the deteriorating performance seen in January and February 2007.  Instead, Morgan Stanley simply concluded that, based on its assumptions and the information Tribune management provided to Morgan Stanley, "the [$34 per share] to be received by the holders of shares of the Common Stock . . . is fair from a financial point of view to such holders."[1598]

---

[1594]  Ex. 145 (Morgan Stanley Opinion Letter, dated April 1, 2007).

[1595]  *Id.* at TRB0522242.  In his sworn testimony to the Examiner, Mr. Whayne explained that:

> [W]e reviewed . . . multiple projections, a base case, a downside case, even an outside case and we did a variety of valuation analyses . . ., and we also did some credit [and] debt servicing analysis as well both in step 1 as well as step 2 based on those projections. . . .  [We] spent much more time with management in step 1 because we were being asked to render an opinion in step 1 and in step 2 we spent less time because we'd spent time as part of step 1 and we were not being asked to render any opinion as part of step 2.  So we certainly . . . diligence[d] those plans, had discussions with management around the assumptions underlying them and compared them to other projections in the public domain.

Examiner's Sworn Interview of Thomas Wayne, July 2, 2010, at 18:10-17 and 19:11-20.

[1596]  Ex. 145 at TRB0522241-0522242 (Morgan Stanley Opinion Letter, dated April 1, 2007).

[1597]  Ex. 142 at MS 65068 (Presentation to the Committee of Independent Directors of the Board of Directors of Tribune, dated March 30, 2007).

[1598]  Ex. 145 at TRB0522243 (Morgan Stanley Opinion Letter, dated April 1, 2007).

After the EGI proposal was accepted, Mr. Taubman observed to a colleague that "we were right all along.  Told him 34 and more [equity] would get our support.  And that was before broad and burkle did just that."[1599]  Mr. Whayne stated to the Examiner that the Special Committee took the Broad/Yucaipa Proposal (including the increase to $34 per share a week before the EGI proposal was accepted) seriously, but viewed it as lacking in comparison to the EGI proposal.[1600]  Broad/Yucaipa was "given extraordinary guidance as to how to paper a competing proposal."[1601]  In Mr. Whayne's opinion, despite ultimately rejecting the Broad/Yucaipa Proposal, the Special Committee treated Broad/Yucaipa "more than fairly" in view of the fact that they never "[came] forward with mark ups to . . . agreements Zell had been actively developing over the course of the month."[1602]

### (5)    Morgan Stanley's Desire to Participate as a Lender in the Step One Financing.

A separate issue concerning Morgan Stanley's role in the Step One Transactions and the chronology of events summarized above was Morgan Stanley's desire to participate as a lender in the transaction, despite being prohibited from playing such a role under its engagement letter with the Special Committee.[1603]  Mr. Osborn stated to the Examiner that Mr. Taubman repeatedly requested before April 1, 2007 that Morgan Stanley be permitted to participate in the Step One Financing.[1604]  Although he acknowledged that Morgan Stanley's engagement letter barred Morgan Stanley from participating in the Step One Financing, Mr. Whayne stated during his interview with the Examiner that in February 2007, Mr. Osborn "asked us to give [the Special

---

[1599]  Ex. 514 at MS_329940 (Taubman E-Mail, dated April 2, 2007).

[1600]  Examiner's Interview of Thomas Whayne, June 11, 2010.

[1601]  *Id.*

[1602]  *Id.*

[1603]  *See* Report at § III.E.4.e.(1).

[1604]  Examiner's Sworn Interview of William Osborn, June 24, 2010, at 100:6-101:17.

Committee] a view as to what we would do if we had been asked to provide financing on a similar basis" to the financing proposed by MLPFS and CGMI.[1605]  According to Mr. Whayne, Mr. Osborn asked for "not a hypothetical thing but your best judgment as to if we asked you to provide financing what [Morgan Stanley] would be willing to do."[1606]  In contrast, Mr. Osborn testified to the Examiner that "a lot of times I was fending [Morgan Stanley] off because they wanted to do more, they wanted to do other things, so I was trying to keep them out of the henhouse a little bit."[1607]

Morgan Stanley's Investment Banking personnel kept its Global Capital Markets colleagues advised of Tribune's strategic alternatives process, apparently setting the stage for Morgan Stanley to present its own financing proposal when and if the opportunity arose.  For example, while attending a Special Committee meeting on February 13, 2007, Mr. Whayne asked for a rate on a "$1.8B PIK preferred rated CCC for TRB."[1608]  William Graham estimated the interest rate at 10.5-11.0%, although MLPFS placed it at 15% and CGMI at 12-13%.[1609]  Mr. Graham emphasized to Mr. Whayne that "1.8bn of PIK preferred is very large size in a format that the market does not see very often anymore."[1610]  Mr. Whayne requested additional due diligence to refine this estimate.[1611]  Mr. Whayne deferred to Mr. Taubman, however, on whether to seek the Special Committee's consent to formally propose financing terms.[1612]

---

[1605]  Examiner's Interview of Thomas Whayne, June 11, 2010.

[1606]  *Id.*

[1607]  Examiner's Sworn Interview of William Osborn, June 24, 2010, at 100:1-5.

[1608]  Ex. 515 at MS_264598 (Fincher E-Mail, dated February 13, 2007).

[1609]  *Id.* at MS_264596-97.

[1610]  *Id.*

[1611]  *Id.* at MS_264595.  Kevin Sisson inquired whether the change to employ PIK notes was "covenant driven or debt service/interest coverage driven."  Ex. 516 at MS_239535 (Whayne E-Mail, dated February 16, 2007).  Mr. Whayne explained that it was partly the latter and partly "just so cash is not trapped in an entity that is almost entirely own[ed] by our client."  *Id.*  Particularly, the PIK notes would address "a restructuring of a partnership

By February 16, 2007, Morgan Stanley viewed MLPFS' and CGMI's financing proposal as "meaningfully off-market," and Mr. Taubman expressed that view directly to Mr. Osborn.[1613] One day later, Morgan Stanley delivered a formal financing proposal to Mr. Osborn and was prepared to commit the financing within three to four days based on due diligence performed by Morgan Stanley up to that time.[1614]  Mr. Whayne viewed Mr. Osborn as Morgan Stanley's "best potential advocate," who could start a dialogue with Tribune management.[1615]  Mr. Whayne summarized Morgan Stanley's pitch:[1616]

> 1.    Morgan Stanley has identified significant cost saving opportunities and has developed a financing structure that improves Tribune's flexibility while reducing execution risk.
>
> 2.    Savings of approximately $40MM in financing fees
>
> > a.    The utilization of a bridge loan to effect the spin-off of B&E eliminates the need to raise the same debt twice and saves Tribune over $30MM in financing fees
> >
> > b.    Morgan Stanley's more aggressive, market-based underwriting fee proposal saves Tribune at least $10MM in fees.
>
> 3.    Potential savings of $20MM due to lower interest rates. Morgan Stanley's more favorable view of the market acceptance of Tribune's financing could lead to annual interest savings of $20MM.  Our market view is reflected in our proposal in the form of lower rates/caps and less flex.
>
> 4.    Morgan Stanley has also identified areas to improve Tribune's flexibility with minimal cost impact Covenant lite

---

where [Tribune] did not want cash trapped initially or on an ongoing basis as dividends are paid."  *Id.* at MS_239534.

[1612]   Ex. 517 (Whayne E-Mail, dated February 14, 2007).

[1613]   Ex. 406 at MS_286240 (Nayyar E-Mail, dated February 18, 2007).

[1614]   Ex. 406 (Nayyar E-Mail, dated February 18, 2007).

[1615]   Ex. 518 at MS_287531 (Stewart E-Mail, dated February 18, 2007).

[1616]   *Id.* at MS_287530.

term loan structure at both Publishing and B&E eliminates financial maintenance covenant requirements and is readily accepted in the leveraged markets.

5.  We are prepared to fully commit to and underwrite the structure and terms of our proposal

6.  By having Morgan Stanley act as an additional joint book-runner in the financing transactions, Tribune will get better execution and a significantly more flexible and less costly structure.

Charles Stewart concurred with Mr. Whayne's suggested approach and proposed ways to further finesse the discussion with Tribune management.[1617]  MLPFS and CGMI quickly learned of Morgan Stanley's proposal.[1618]  As Mr. Whayne reported to Mr. Taubman and Ashok Nayyar, "ML and Citi now know about our proposal.  Apparently ML is very upset and is fighting hard against us.  Citi is more philosophical.  Let the games begin."[1619]  Mr. Whayne reported positively to Ashok Nayyar that the Special Committee was currently "[biased] to recap which we will pursue unless two largest shareholders say they prefer other path, which they won't."[1620]

Morgan Stanley then presented its proposal to its internal Credit Commitment Committee in order to be in position to commit financing to Tribune "on time."[1621]  Thomas Kvorning rebuilt a cash flow model for the review, in which he noted that "Publishing goes cash flow negative in 2008 due to the $175MM real estate [investment] (as it does in Tower's mgmt plan), but the rest of the years are CF positive.  In 2009 both Publishing and Broadcasting EBITDA decreases sharply which makes the credit ratios look a bit strange in 2009."[1622]  On February 24,

---

[1617]  Ex. 518 at MS_287529 (Stewart E-Mail, dated February 18, 2007).

[1618]  Ex. 519 at MS_286296 (Whayne E-Mail, dated February 20, 2007).

[1619]  Id.

[1620]  Ex. 520 at MS_285968 (Nayyar E-Mail, dated February 24, 2007).

[1621]  Ex. 521 at MS_242836 (Williams E-Mail, dated February 23, 2007); Ex. 522 at MS_238901-238902 (Fincher E-Mail, dated February 24, 2007); Examiner's Interview of Thomas Whayne, June 11, 2010.

[1622]  Ex. 523 at MS_249364-249365 (Kvorning E-Mail, dated February 25, 2007).

2007, Mr. Whayne sent Tribune Treasurer Chandler Bigelow a "soft copy" of Morgan Stanley's financing proposal.[1623]

By February 25, 2007, Morgan Stanley received stronger signals that Tribune was not interested in pursuing the self-help plan, imperiling the Morgan Stanley financing proposal. Mr. Bigelow wrote to Mr. Stewart and Mr. Whayne that "before we went beyond just discussing ideas that you and Paul [Taubman] and Chip [Mullaney] would need to discuss with respect to independent advisory role with Special Committee."[1624] Mr. Whayne saw this as a real barrier: "I thought they would resort to this issue as a means of excluding us, notwithstanding superior [structure] and economics put together by Ashok and Bill.  At least they are providing an early warning, now that we are past the tax fabrications."[1625]  Additionally, the emergence of the EGI proposal caused Morgan Stanley to again focus on its advisory role:[1626]

> Now that we have started down this amorphous/undefined path of exploring the ESOP, not surprisingly the [McCormick] Foundation is underwhelmed, but the Chandlers are excited. The more time that is spent, the greater the risk to their prior deal -- to state the obvious.
>
> Seems that we should have a call to address the obvious issues that are going to matter to us, and that will obviously play into the likelihood that an ESOP will be acceptable to us.
>
> 1.  First is price -- assume that we need to say that it has to be higher
>
> 2.  Second, will need a reverse break fee if ESOP not completed. This will be hard as Zell will pay 20% at the most, if he will even do that. Employees obviously are not going to pay.  ML/Citi say this is virtually impossible given construct, which I agree with

---

[1623] Ex. 524 at TRB0051921 (Whayne E-Mail, dated February 24, 2007).  The proposal indicated that Morgan Stanley was "prepared to fully commit to and underwrite the structure and terms of [its] proposal."  *Id.* at TRB0051922.

[1624] Ex. 525 at MS_238712 (Fincher E-Mail, dated February 25, 2007).

[1625] *Id.* at MS_238711.

[1626] Ex. 526 (Whayne E-Mail, dated February 25, 2007).

practically. How do you think it impacts price, given the free
option created?

3.  Who should pay expenses of exploring ESOP? Path we are on
is that the company will pay, but there is an obvious asymmetry
with the way we have dealt with [the McCormick] Foundation and
Chandlers thus far.

Nonetheless, Morgan Stanley continued to press for a role as a lender.  On February 27,

2007, Mr. Stewart and Mr. Nayyar presented the Morgan Stanley proposal to Donald Grenesko

and Mr. Bigelow, and despite the feeling a few days prior, Mr. Stewart viewed the discussion as

positive for Morgan Stanley's chances:[1627]

Don didn't say much but I think they acknowledge the benefits of
our fee/rate/structure/covenant lite approach.  They are very
focused on certainty of being able to repurchase the 900mm for
purposes of the debt for debt xc. That issue outweighs their
concern about fees.  Think ashok has got them comfortable with
our structure/approach and gave them a number of alternative
approaches.

Think we continue to occupy the high ground behind a superior
proposal and now Don has heard it live.

Chandler continuing to press for an answer on us having a
conversation with/approval from Chip before he could consider
whether ask us to participate.

Mr. Stewart followed up with a call to Mr. Bigelow on February 28, 2007:[1628]

Me/ashok/team speaking to chandler bigelow again tomorrow
afternoon.  I had a good heart to heart with him today and we still
have some wood to chop.  He wants to believe us but is getting
views from bofa/jpm that seem to corroborate ml/citi perspective.
Think we can still get there but need to push hard on him/don.

By March 1, 2007, Mr. Nayyar and William Graham were preparing to propose an

"aggressive" plan for an all first-lien structure to Mr. Bigelow.[1629]  Two days later, however, the

---

[1627]  Ex. 527 at MS_307891 (Taubman E-Mail, dated February 27, 2007).

[1628]  Ex. 528 at MS_308428-308429 (Stewart E-Mail, dated February 28, 2007).  In his testimony to the Examiner,
Mr. Bigelow did not recall speaking with anyone in specific except Mr. Stewart, his contact at Morgan Stanley.
Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 50:13-54:2.

situation with Tribune management remained in flux.  Mr. Nayyar observed to Mr. Stewart that "[e]ven with better ideas and cost savings to Trib we are not getting anywhere. We have had to shake this up first with Paul and then me for them to pay any attention to what is a good structure for them. Clearly ML and C have a very strong relationship with them."[1630]  Comparisons to MLPFS' and CGMI's financing proposal continued, with Morgan Stanley working to shift Tribune management's focus away from fees and toward the benefits of a "covenant-lite" approach.[1631]

Ultimately, Morgan Stanley's financing proposal was never accepted.[1632]  In Mr. Whayne's view, the exercise nevertheless benefitted Tribune: "Reality is we were asked by Bill, we responded to Bill and as a result the financing got better."[1633]

Even after the Tribune Board finally rejected the self-help recapitalization option, Morgan Stanley considered whether it yet could participate in the Step One Financing.[1634]  John McCann, a managing director in the Global Capital Markets division of Morgan Stanley, reported to a number of colleagues in his division and in the Investment Banking division, including Mr. Whayne:[1635]

> Talked to JP.  They are having a bank meeting Thursday, with commitments due the end of the month.  All of the titles are gone, including the Senior Managing Agent titles.  They are looking for retail tickets.

---

[1629]  Ex. 529 at MS_318982 (Graham E-Mail, dated March 2, 2007).

[1630]  Ex. 530 at MS_294296 (Stewart E-Mail, dated March 3, 2007).

[1631]  Ex. 531 at MS_296386 (Graham E-Mail, dated March 5, 2007).

[1632]  Ms. Persily testified that in her view, Morgan Stanley's proposal "was kind of an arrow shot in at the last minute and it just didn't work."  Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 80:17-20.  The flaw in Morgan Stanley's proposal, according to Ms. Persily, was that it "subordinated [Tribune's] existing debt and we didn't think that was possible by virtue of not granting liens."  *Id.* at 82:11-14.

[1633]  Examiner's Interview of Thomas Whayne, June 11, 2010.

[1634]  Ex. 532 at MS_283831 (Radomski E-Mail, dated April 24, 2007).

[1635]  *Id.*

If this is important . . . to the company or to Zell, we can consider taking some of the term loan or revolver.  If we do term loan, we probably resell it right after closing and don't lose much money, but I wold [sic] bet that if they ask us, they'll ask us to take revolver.  If we do revolver, we'll most likely mark it at 95-97% of par day one, so we'll take a hit.

JPM had no idea what if anything the company or Zell wants us to do. They were very much aware that we were conflicted from participating in the agent rounds of the financing.  So if we are still conflicted, then that's the end of this.  If we are not I think someone is going to have to [ask] the Company/Zell what they want from us, and we can evaluate the ask.

**5.    Knowledge and Actions of the Large Stockholders in Connection with the Step One Transactions.**

   **a.    The Large Stockholders.**

      **(1)    The Chandler Trusts.**

The Chandler Trusts were the principal shareholders of Times Mirror from 1935 until its merger into Tribune on June 12, 2000.[1636]  From that time until the final disposition of all of their shares of Tribune Common Stock in 2007, each of the Chandler Trusts, known as Chandler Trust No. 1 and Chandler Trust No. 2, was managed by a board consisting of seven trustees, each of whom was a member of both boards.[1637]  In connection with the merger of Times Mirror into Tribune, the Chandler Trusts exchanged their Times Mirror common stock for Tribune Common Stock, representing approximately 10.6% of the total shares of Tribune Common Stock then outstanding, and four representatives of the Chandler Trusts were elected to the Tribune Board.[1638]  One representative of the Chandler Trusts resigned from the Tribune Board on

---

[1636] Ex. 1105 at 75 (Times Mirror 1999 Form 10-K/A); Ex. 552 at 7 (Tribune Schedule 13D, filed June 21, 2000).

[1637] Ex. 552 at 1-7 (Tribune Schedule 13D, filed June 21, 2000).  The trustees at the time of the Tribune - Times Mirror merger were Gwendolyn Garland Babcock, Jeffrey Chandler, William Stinehart, Jr., Camilla Chandler Frost, Douglas Goodan, Judy C. Webb, and Warren B. Williamson; before the final disposition of all of the Chandler Trusts' Tribune Common Stock, Gwendolyn Garland Babcock and Douglas Goodan were succeeded by Susan Babcock and Roger Goodan, respectively.

[1638] *Id.* at 7-9; Ex. 1108 at 1 (Tribune Press Release, dated June 12, 2000).

May 8, 2001, following completion of the integration of Times Mirror into Tribune.[1639]  The

Chandler Trusts continued to be represented on the Tribune Board by Jeffrey Chandler, Roger

Goodan, and William Stinehart, Jr., until their resignations on June 4, 2007.[1640]

### (2)     The McCormick Foundation.

The McCormick Foundation is a nonprofit organization that was established as a

charitable trust in 1955 as a result of the death of Colonel Robert R. McCormick, the longtime

editor and publisher of *The Chicago Tribune*.[1641]  The mission of the McCormick Foundation is

to help build a more active and engaged citizenry through six grant-making programs, Cantigny

Park, two museums, and a civic outreach program.[1642]  It is one of the nation's largest charities,

having more than $1 billion in assets.[1643]

### b.     The Activities of the Large Stockholders Before, During, and After The Step One Transactions.

### (1)     The Auction Process.

The Large Stockholders played an active role in the events leading up to the auction

process and the auction process itself.[1644]  Following the 2006 Leveraged Recapitalization, on

---

[1639]  Ex. 553 at 2-3 (Tribune Schedule 14A, filed March 27, 2001).

[1640]  Ex. 554 at TRB0166821 (Tribune Press Release, dated June 4, 2007).

[1641]  Ex. 555 (Last Will and Testament of Robert R. McCormick, dated December 18, 1954 and Codicil, dated January 4, 1955).  The Cantigny Foundation is a foundation that receives most of its funding from the McCormick Foundation.  Given the lack of publicly available information relating to the Cantigny Foundation, the fact that the McCormick Foundation and the Cantigny Foundation apparently share the same board members, all of whom are current and former Tribune executives as mandated by the McCormick Foundation's formation documents, and the fact that the Foundation's Advisory Committee apparently was comprised of the same two representatives from both the McCormick Foundation and the Cantigny Foundation, the Report refers to the McCormick Foundation and the Cantigny Foundation collectively as the McCormick Foundation.  The directors of the McCormick Foundation at the time of the closing of the Step One Transactions were James C. Dowdle, Dennis J. FitzSimons, David W. Hiller, John W. Madigan, and Scott C. Smith.

[1642]  Ex. 555 (Last Will and Testament of Robert R. McCormick, dated December 18, 1954 and Codicil, dated January 4, 1955).  *See also* http:/mccormickfoundation.org.

[1643]  Ex. 555 (Last Will and Testament of Robert R. McCormick, dated December 18, 1954 and Codicil, dated January 4, 1955).  *See also* http:/mccormickfoundation.org.

[1644]  *See* Report at § III.D.1. for a discussion of the activities of the Chandler Trusts during this period.

December 14, 2006, the McCormick Foundation established the Foundation's Advisory

Committee, consisting of two independent directors, to analyze and evaluate the course of action

that the McCormick Foundation should take with respect to its shares of Tribune Common

Stock.[1645]  The McCormick Foundation subsequently retained Katten to serve as special legal

counsel and to assist the Foundation's Advisory Committee and the Foundation's Board in their

respective analyses.[1646]  The McCormick Foundation also engaged The Blackstone Group L.P. as

its independent financial advisor and requested Quarles & Brady LLP, its regular outside general

counsel, and Brien O'Brien of Advisory Research, its long-time financial advisor, to assist the

Foundation's Advisory Committee in evaluating the alternatives available to the McCormick

Foundation with respect to the transactions under consideration by Tribune.[1647]  The

Foundation's Advisors also were tasked with providing advice to the Foundation's Advisory

Committee and the Foundation's Board regarding related tax, legal, financial, and investment

issues.[1648]

On January 4, 2007, the McCormick Foundation disclosed that it had formed the

Foundation's Advisory Committee and that it had signed a non-disclosure agreement with

Tribune to obtain access to Tribune confidential information.[1649]  The next day, the Foundation's

Advisory Committee informed the Special Committee by letter that it had studied a number of

potential options regarding the McCormick Foundation's investment in Tribune.[1650]  As a result

of this analysis, the Foundation's Advisory Committee proposed a tax-free "split-off" of the

---

[1645]  Ex. 1114 at 1 (Unanimous Written Consent of Directors of the McCormick Foundation Board, dated May 23, 2007).

[1646]  *Id.*

[1647]  *Id.*

[1648]  *Id.*

[1649]  Ex. 557 at 3 (McCormick Foundation Schedule 13D, filed January 4, 2007).

[1650]  Ex. 558 at 1 (Foundation's Advisory Committee Letter, dated January 5, 2007).

Broadcasting Segment combined with a leveraged recapitalization of the Publishing Segment,

conditioned on (a) the completion of satisfactory due diligence review, including review and

acceptance of tax and other contingent liabilities, (b) satisfaction with the final structure of the

proposed transaction, (c) partnership of the McCormick Foundation with one or more equity

investors on satisfactory financing terms in an aggregate amount sufficient to consummate the

proposed transaction, (d) receipt of all required governmental, regulatory, third-party, and

stockholder approvals, and (e) execution of definitive transaction documents.[1651]

On January 10, 2007, Katten reported to the Foundation's Advisory Committee that

counsel to the Special Committee was amenable to substantive discussions between the

Foundation's Advisory Committee and Tribune management, as part of the McCormick

Foundation's due diligence process, and that counsel to the Special Committee had been advised

that the Foundation's Advisory Committee intended to engage the Chandler Trusts directly in

discussions relating to its proposal.[1652]  Certain Parties contended that the cooperation and

communication between the Chandler Trusts and the McCormick Foundation that followed were

indicative of a collusive arrangement to control the outcome of Tribune's auction process.  For

example, Parties cited to internal e-mails between the Foundation's Advisory Committee and the

Foundation's Advisors suggesting that it would be "difficult to do a transaction unless the 30%

shareholders are reasonably comfortable."[1653]  A representative of Advisory Research agreed,

noting "how can the special committee proceed without knowing very specifically what the goals

and objectives of 33 percent of the owners and of what the goals, objectives and desires of

---

[1651]  *Id.*

[1652]  Ex. 559 at FOUN0007432 (O'Brien E-Mail, dated January 11, 2007).

[1653]  *Id.*

management are."[1654]  Accordingly, the e-mail suggested that "as distasteful as it is," the

McCormick Foundation and the Chandler Trusts should engage in discussions.[1655]  Apart from

this one e-mail that merely states the obvious point that participation and agreement of the Large

Stockholders would be crucial to any fundamental transaction involving Tribune, no Party cited

other evidence indicating collusive behavior on the part of the McCormick Foundation or the

Chandler Trusts.

      The Foundation's Advisory Committee delivered an outline of the McCormick

Foundation's proposal to the Special Committee on January 17, 2007, with a letter expressing the

McCormick Foundation's preference that Tribune continue as a public company with its current

capital structure, unless an acquisition of the entire company at a substantial premium with

minimal closing risk could be effected.[1656]  The letter also informed the Special Committee that

the Foundation's Advisory Committee was aware that consideration was being given to splitting

Tribune, on a pro-rata basis to all stockholders, into two separate entities—the Publishing

Segment and the Broadcasting Segment—and that the McCormick Foundation would consider

supporting such a transaction "so long as it diffuse[d] the current stockholder discontent and

antagonism."[1657]  The letter also expressed a willingness to work with the Special Committee and

Tribune management to develop the proposal for a tax-free "split-off" of the Broadcasting

Segment and leveraged recapitalization of the Publishing Segment that the McCormick

Foundation had made in its January 5, 2007 letter to the Special Committee.[1658]

---

[1654]  *Id.*

[1655]  *Id.*

[1656]  Ex. 110 at 1 (Foundation's Advisory Committee Letter, dated January 17, 2007).

[1657]  *Id.* at 2.

[1658]  *Id.*

On January 17, 2007, the Chandler Trusts also submitted a proposal to the Special

Committee.[1659]  The Chandler Trusts Proposal involved an acquisition of the Publishing

Segment, a tax-free spin-off of the Broadcasting Segment, and a recapitalization of the remainder

of Tribune, sponsored by the Chandler Trusts.[1660]  In his interview with the Examiner, Mr.

Stinehart indicated that:[1661]

> The goal in making an offer in January 2007 was to put a floor in
> the auction process.  If we could get control, then we would have
> gone through with our offer.  As it was, we had no control and
> were on a board that was hostile toward us.  We thought the
> secular trends were going to really hurt the newspaper and
> publishing business, and right or wrong, we wanted out.

On January 22, 2007, Katten advised the Foundation's Advisory Committee and the other

Foundation's Advisors that counsel to the Chandler Trusts believed it to be advisable for the

Chandler Trusts and the McCormick Foundation to conduct joint negotiations regarding

Tribune's future direction.[1662]  The Foundation's Advisory Committee subsequently had a

number of discussions and one meeting with the Chandler Trusts to determine if there was any

common ground among the Large Stockholders with respect to Tribune's restructuring

efforts.[1663]  The Foundation's Advisory Committee also maintained communication with the

Special Committee.[1664]

On January 26, 2007, the Chandler Trusts delivered a revised bid to the Special

Committee that essentially maintained the same proposed structure but resulted in higher

---

[1659]  Ex. 109 at 1 (Chandler Trusts Proposal, dated January 17, 2007).

[1660]  *Id.  See also* Report at § III.D.1.d.

[1661]  Examiner's Interview of William Stinehart, June 28, 2010.

[1662]  Ex. 560 at FOUN0007333 (Wander E-Mail, dated January 22, 2007).

[1663]  Ex. 561 at 1 (Foundation's Advisory Committee Letter, dated February 2, 2007).

[1664]  Ex. 114 at TRIB-G0007807 (Special Committee Meeting Minutes, dated February 3, 2007); Ex. 562 at TRIB
000023 (Special Committee Meeting Agenda, dated February 3, 2007).

stockholder values.[1665]  In his interview, Mr. Stinehart noted that Tribune had released its 2006

financial results at about this time and Tribune had "drastic[ly] missed projections."[1666]  As a

result, Mr. Stinehart stated that although the Chandler Trusts "had been thinking about improving

our floor bid, [we] decided not to and even dampened it a bit."[1667]

      The McCormick Foundation's contacts with the Special Committee generated some

pushback from the Special Committee's advisors.  In a January 30, 2007 exchange of e-mails

with Blackstone concerning a recapitalization proposal that allegedly had been presented on the

McCormick Foundation's behalf to Tribune earlier that day, MLPFS expressed concern about

whether communications between the McCormick Foundation and Tribune conformed to

Tribune's bidding protocol established in connection with the strategic review process.[1668]

Blackstone denied making a formal written proposal on behalf of the McCormick Foundation

and asserted that only "possible paths" were discussed, but in a reply, MLPFS cautioned the

McCormick Foundation to follow the established protocol in further contacts with Tribune.[1669]

Although Blackstone expressed its readiness to discuss the alleged proposal with MLPFS, and

neither the Chandler Trusts nor their advisors were involved at all in these e-mails,[1670] certain

Parties contended that Blackstone's actions are evidence that the Large Stockholders ignored

established protocols governing communications with Tribune, resulting in a formal reproach by

Tribune's financial advisors.  In actuality, MLPFS sent Blackstone only a cautionary e-mail

advising Blackstone that "[t]here are some fairly well defined rules in this process including

---

[1665]  Ex. 111 (Revised Chandler Trusts Proposal, dated January 26, 2007).

[1666]  Examiner's Interview of William Stinehart, June 28, 2010.

[1667]  *Id.*

[1668]  Ex. 563 at FOUN0014779-80 (Greenthal E-Mail, dated January 31, 2007).

[1669]  *Id.*

[1670]  *Id.*

contacts with the company.  Would appreciate you sticking to those as other potential bidders are."[1671]  Beyond this e-mail, no other breaches of the auction protocol were cited by the Parties. Moreover, in his interview with the Examiner, Mr. Stinehart stated that the Chandler Trusts had very little direct interaction with the Special Committee, observing that "[w]e knew, for all practical purposes, nothing of what was going on.  They were trying to keep the Special Committee process pristine."[1672]

At a February 3, 2007 Special Committee meeting, Morgan Stanley presented a comparison of the revised Chandler Trusts Proposal and the revised Broad/Yucaipa Proposal with the three self-help options, together with a new proposal submitted by EGI.[1673]  The EGI proposal required the Chandler Trusts and the McCormick Foundation to enter into voting agreements in which they would agree to vote their shares of Tribune Common Stock in favor of EGI's proposal.[1674]

On February 12, 2007, Rustic Canyon Partners and Goldman Sachs sent a letter to the Special Committee on behalf of the Chandler Trusts, acknowledging the delay in the Chandler Trusts' submission of a further revised proposal and stating that it would provide a revised proposal within ten days.[1675]  The letter outlined some the revisions that would be expected, the advantages of the same, and the anticipated conditions to closing.[1676]  On the same day, Rustic

---

[1671]  *Id.*

[1672]  Examiner's Interview of William Stinehart, June 28, 2010.

[1673]  Ex. 114 at TRIB-G0007806 (Special Committee Meeting Minutes, dated February 3, 2007).  *See also* Ex. 113 (EGI Letter, dated February 2, 1007); Report at § III.D.1.e.

[1674]  Ex. 116 at 2 (EGI Proposal, dated February 6, 2007).  *See also* Report at § III.D.1.f.

[1675]  Ex. 564 at 1-6 (Chandler Trusts Letter, dated February 12, 2007).

[1676]  Ex. 564 at 1-3, 5 (Chandler Trusts Letter to Tribune, dated February 12, 2007).

Canyon Partners and Goldman Sachs sent a letter to Blackstone summarizing its previous discussions with Blackstone regarding the Chandlers Trusts' revised proposal.[1677]

After further review of the various third-party proposals and the self-help options, on February 12 and 13, 2007, the Special Committee determined that (a) the Chandler Trusts Proposal and the Broad/Yucaipa Proposal were unattractive compared to a self-help proposal involving a leveraged recapitalization and spin-off of the Broadcasting Segment, (b) the self-help proposal should be further developed, and (c) discussions with EGI regarding its proposal should be continued.[1678]  In conjunction with the development of the self-help proposal, the McCormick Foundation initiated negotiations with the Chandler Trusts concerning the terms and pricing of a purchase of 25 million shares of Tribune Common Stock by the McCormick Foundation from the Chandler Trusts.[1679]

At a February 23, 2007 meeting of the Foundation's Advisory Committee, following presentations by the Foundation's Advisors regarding the specifics of the self-help proposal, the Foundation's Advisory Committee unanimously approved the self-help proposal, and decided to recommend that the Foundation's Board approve the self-help proposal.[1680]

That same day, the Foundation's Board also met.[1681]  At this meeting, the Foundation's Advisory Committee reported on its activities over the prior months, including (a) its discussions with Tribune management, (b) its review of alternative plans and structures, (c) press coverage of its activities, and (d) its contacts with the Office of the Attorney General of Illinois.[1682]

---

[1677]  Ex. 565 at 1-2 (Chandler Trusts Letter to Blackstone, February 12, 2007).

[1678]  Ex. 119 at 1 (Special Committee Meeting Minutes, dated February 13, 2007).

[1679]  Ex. 5 at 21 (Tender Offer).

[1680]  Ex. 1116 at 7 (Foundation's Advisory Committee Meeting Minutes, dated February 23, 2007).

[1681]  Ex. 1115 (McCormick Foundation Board Meeting Minutes, dated February 23, 2007).

[1682]  *Id.* at 1-3.

However, the Foundation's Advisory Committee did not make a formal recommendation to the

Foundation's Board to approve the self-help proposal at the meeting because Mr. FitzSimons

informed the Foundation's Board that Tribune was not planning to take immediate action to

approve the self-help proposal, and was continuing to consider EGI's proposal as an

alternative.[1683]

On February 24, 2007, the Special Committee reviewed the status of the self-help

proposal and the EGI proposal.[1684]  The Special Committee then directed Tribune's management

to solicit the views of the Chandler Trusts and the McCormick Foundation with respect to the

EGI proposal and to continue to pursue the EGI proposal with a view to improving its economic

terms and certainty.[1685]  Tribune's Financial Advisors sent materials related to the EGI proposal

to the Chandler Trusts and the McCormick Foundation.[1686]  On February 25, 2007, Tribune's

Financial Advisors had separate discussions with the representatives of the Chandler Trusts and

the McCormick Foundation with respect to the EGI proposal.[1687]  In his interview, Mr. Stinehart

said that they were "interested" in the EGI proposal, and the promised $33 per share in particular,

but that he "had concerns about red herrings being put out to delay the process."[1688]

On March 1, 2007, the Foundation's Advisory Committee responded by letter to the

Special Committee's request for its position on the EGI proposal.[1689]  The McCormick

Foundation expressed "important concerns regarding the ESOP Proposal and whether it should

be pursued for the reasons that follow, namely, Price, Timing and Execution Risk in comparison

---

[1683] *Id.* at 5.

[1684] Ex. 123 (Special Committee Meeting Minutes, dated February 24, 2007).

[1685] Ex. 5 at 22 (Tender Offer).

[1686] *Id.*

[1687] *Id.*

[1688] Examiner's Interview of William Stinehart, June 28, 2010.

[1689] Ex. 124 at 1-3 (McCormick Foundation Letter, dated March 1, 2007).

to the self-help proposal presently under consideration."  The letter then described these concerns in further detail:[1690]

> Based on this analysis, you should be aware that the [McCormick] Foundation is not willing to sign a voting agreement in favor of the Zell/ESOP transaction as we now understand it.  For the reasons described above, we believe the self-help proposal as presently negotiated should be pursued by the Special Committee and Board of Directors of the Tribune Company.

Similarly, on March 2, 2007, the Chandler Trusts notified the Special Committee that they (a) had identified "very significant problems" with the EGI proposal, including the execution risk posed by the probable lengthy governmental approval process and the related possibility that the proposed transaction could not be completed at the agreed valuation, (b) did not believe the proposal was in the best interests of any Tribune stockholders, and (c) were not prepared to enter into a voting agreement to support EGI's proposal.[1691]  The Chandler Trusts expressed a willingness to work collaboratively with Tribune and the McCormick Foundation to pursue the self-help proposal, subject to the filing by Tribune of a shelf registration statement that would permit the Chandler Trusts to sell all of their remaining shares of Tribune Common Stock on completion of the self-help proposal.[1692]

In response to the concerns of the Large Stockholders, among others, the Special Committee requested revisions to the EGI proposal to provide for a two-step transaction in which a first-step tender offer would provide a "significant distribution to shareholders as soon as possible."[1693]  EGI provided a revised term sheet that proposed a two-step transaction, to be followed by a second-step merger of Tribune into a special-purpose entity owned by the ESOP in

---

[1690] *Id.* at 2-3.  *See also* Report at § III.D.1.f.

[1691] Ex. 125 at 1 (Chandler Trusts Letter, dated March 2, 2007).  *See also* Report at § III.D.1.f.

[1692] Ex. 125 at 2 (Chandler Trusts Letter, dated March 2, 2007).

[1693] Ex. 126 at 22:18-23:4 (Deposition of Thomas Whayne, May 17, 2007).

which Tribune would be the surviving entity and would become a wholly-owned subsidiary of the ESOP.[1694]

Certain Parties contend that the Large Stockholders worked together to influence the structure and outcome of the Leveraged ESOP Transactions. Although the record indicates that the Large Stockholders reviewed and supported further enhancements to the EGI proposal, the Large Stockholders primarily worked together, albeit begrudgingly,[1695] to negotiate and promote the self-help option. In fact, the Foundation's Advisors exchanged a memorandum summarizing the final negotiated self-help option as late as March 26, 2007, just five days before the Leveraged ESOP Transactions were approved by the Tribune Board.[1696] Additionally, the Foundation's Advisory Committee explicitly deferred to the Special Committee on the ultimate decision regarding the EGI proposal. In its March 1, 2007 letter, the Foundation's Advisory Committee made it clear that it was "only providing [its] present observations on the [EGI] proposal [and that the Special Committee] should understand that the determination of what is best for Tribune Company and its stockholders rests solely with the Special Committee and the Board of Directors of Tribune Company and not with the [Foundation's Advisory Committee]."[1697]

On or about March 10, 2007, the Special Committee had become uncomfortable with the EGI proposal and engaged the Chandler Trusts and the McCormick Foundation in discussions

---

[1694] Ex. 127 at 1-3 (EGI Term Sheet, dated March 4, 2007). *See also* Report at § III.D.1.f.

[1695] In his interview, Mr. Stinehart confirmed the difficult nature of the relationship between the McCormick Foundation and the Chandler Trusts. Mr. Stinehart noted that Mr. FitzSimons served on the Foundation's Board and that, as a result, the Chandler Trusts viewed the McCormick Foundation as "basically part of management. There was no dialogue back and forth between us. Any conversations between the [Chandler]Trusts and the [McCormick Foundation] took place through advisors." Examiner's Interview of William Stinehart, June 28, 2010.

[1696] Ex. 567 at 1-3 (Katten Memorandum, dated March 26, 2007).

[1697] Ex. 124 (McCormick Foundation Letter, dated March 1, 2007).

concerning a revised self-help proposal with a reduced dividend to Tribune's stockholders.[1698]

The McCormick Foundation and the Chandler Trusts, in turn, engaged in discussions regarding

their agreement on the sale of Tribune Common Stock by the Chandler Trusts to the McCormick

Foundation in the context of a revised self-help proposal.[1699]   As these discussions were ongoing,

negotiations regarding the EGI proposal also continued, including discussions among

representatives of Tribune, EGI, and the Chandler Trusts on the proposed voting agreement.[1700]

        During this period, the McCormick Foundation reviewed the revised terms of the EGI

proposal that had been provided to Blackstone.[1701]   Negotiated documents were also sent to the

McCormick Foundation for review and comment.[1702]   The McCormick Foundation did not,

however, participate in any of the negotiations with EGI and only discussed the terms of the EGI

proposal with EGI's advisors.[1703]   In addition, although requests were made for the McCormick

Foundation to sign the proposed voting agreement,[1704] the McCormick Foundation declined to

---

[1698]   Ex. 5 at 23 (Tender Offer).

[1699]   *Id.*  In response to the Examiner's question as to why the Chandler Trusts were considering selling their Tribune Common Stock to the McCormick Foundation, Mr. Stinehart explained that:

> We looked out and saw a ski-slope.  Management looked at the ski slope as though it [were] a bunny hill and you can traverse across by cost-cutting and catch the Internet chair lift and go to the top, but what the [Chandler] Trusts saw was a four-star black-diamond run headed straight downhill. Cost-cutting gets you nowhere, and the chair lift's broken.  Essentially there were two different versions of where the world was going, and we wanted off the ski slope.  We originally wanted to get everybody off the mountain, but we saw the world differently, and we had a special constituency that wanted off.

Examiner's Interview of William Stinehart, June 28, 2010.

[1700]   Ex. 5 at 24 (Tender Offer).

[1701]   Ex. 568 at FOUN0004706-0004707 (Chomicz E-Mail, dated March 25, 2007).

[1702]   Ex. 569 (Smith E-Mail, dated March 28, 2007); Ex. 1000 (Smith E-Mail, dated March 27, 2007).

[1703]   Ex. 569 (Smith E-Mail, dated March 28, 2007); Ex. 1000 (Smith E-Mail, dated March 27, 2007).

[1704]   Ex. 569 (Smith E-Mail, dated March 28, 2007); Ex. 1000 (Smith E-Mail, dated March 27, 2007).

participate in negotiations concerning the proposed voting agreement,[1705] in part because of the added expense of the financial and legal analysis that would need to be undertaken.[1706]

On or about March 31, 2007, the Chandler Trusts agreed to support the EGI proposal due to an increase in price to $34 per share and other improvements in the proposal's financial terms.[1707] Certain Parties contend that the substantial tax benefits of the EGI proposal were particularly attractive to the Large Stockholders, particularly the Chandler Trusts, and Tribune management. There does not appear to be any dispute that the structure of the EGI proposal provided certain tax benefits to the Large Stockholders, in particular the ability to avoid capital gains tax.[1708]

After the Special Committee's April 1, 2007 recommendation to approve the EGI proposal, Mr. Stinehart advised the Tribune Board that the directors representing the Chandler Trusts would abstain from the Tribune Board's vote on the EGI proposal, but that the Chandler Trusts would vote their shares of Tribune Common Stock in favor of the proposal and would enter into a voting agreement with Tribune to memorialize that understanding.[1709] Thereafter, the Tribune Board, minus the Chandler Trusts' representatives but including the McCormick Foundation's representative, voted to approve the EGI proposal, the Voting Agreement, and the

---

[1705] Ex. 5 at 24 (Tender Offer).

[1706] Ex. 977 at FOUN0004655 (Greenthal E-Mail, dated March 29, 2007); Ex. 571 at 1 (Greenthal E-Mail, dated March 27, 2007).

[1707] Ex. 5 at 25 (Tender Offer). *See also* Report at § III.D.1.f.

[1708] Ex. 572 (Musil E-Mail, dated March 30, 2007); Ex. 573 at EGI-LAW 00021094 (Havdala E-Mail, dated February 3, 2007); Ex. 89 (Wachovia Equity Research Publication, dated March 30, 2007); Ex. 570 (Brown E-Mail, dated February 17, 2007). Following the Tender Offer, the Chandler Trusts sold their remaining Tribune Common Stock. *See* Report at § III.F.3. The tax benefits of the ESOP structure were thus moot as to the Chandler Trusts.

[1709] Ex. 146 at 2 (Tribune Board Meeting Minutes, dated April 1, 2007).

Chandler Trusts Registration Rights Agreement.[1710]  Tribune and the Chandler Trusts executed

the Voting Agreement and the Chandler Trusts Registration Rights Agreement on April 1,

2007.[1711]

On May 23, 2007, Blackstone gave the Foundation's Board an opinion that the tender

price was financially fair to the McCormick Foundation.[1712]  The Foundation's Advisory

Committee concluded that participation in the Tender Offer was in the best interest of the

McCormick Foundation and recommended that the McCormick Foundation tender its shares of

Tribune Common Stock.[1713]  On May 23, 2007, the Foundation's Board authorized the

McCormick Foundation's participation in the Tender Offer to the maximum permitted level.[1714]

In connection with the Tender Offer, and in accordance with the terms of the Voting

Agreement, the Chandler Trusts tendered all of the shares of Tribune Common Stock held by

them as of May 24, 2007.[1715]  Because the total number of shares tendered by all Tribune

stockholders exceeded the 126 million shares for which the Tender Offer was made, proration

---

[1710] *Id.* at 4.  In his interview, Mr. Stinehart described the reasons that the representatives of the Chandler Trusts ultimately abstained from voting on the EGI proposal:

> We abstained for four reasons.  First, we were a part of the transaction—we had the voting agreement and the registration rights agreement, so we had a conflict.  Second, we had not been a part of the Special Committee process, so we were missing a huge amount of info that they had but we didn't. Third, unlike any other director, we held in a fiduciary capacity a huge stake in the company for individual beneficiaries, which puts us in a unique position.  FitzSimons' foundation was a charitable organization, so it was different.  Fourth, we technically still had an offer on the table to buy the company.  This was not coordinated, but the other two Trusts designees may have followed my lead in abstaining.

Examiner's Interview of William Stinehart, June 28, 2010.

[1711] *See* Report at §§ III.D.7. and III.D.8.

[1712] Ex. 575 at 2 (McCormick Foundation Board Meeting Minutes, dated May 23, 2007).

[1713] *Id.*

[1714] *Id.*

[1715] Ex. 5 at 102 (Tender Offer).

was required, and accordingly, Tribune did not accept for repurchase all of the shares tendered by the Chandler Trusts or the McCormick Foundation.[1716]

As a result of the completion of the Tender Offer, the Chandler Trusts' holdings were reduced to approximately 20.4 million shares of Tribune Common Stock, representing approximately 17% of the total shares then outstanding.[1717]  The interest of the McCormick Foundation was reduced to approximately 11.8 million shares of Tribune Common Stock, representing approximately 10% of the total shares then outstanding.[1718]

Certain Parties argued that the participation of the Large Stockholders in the Tender Offer was representative of their efforts to cause Tribune to proceed with the EGI proposal.  As discussed above, however, the record amply reflects that the Large Stockholders had concerns about the EGI proposal and actively encouraged Tribune to pursue the self-help proposal.

### 6.    Knowledge and Actions of the Zell Group In Connection With the Step One Transactions.

The submission of, and modifications to, EGI's initial proposal, and the related negotiations and communications by and among EGI, the Special Committee, the Tribune Board, management, and their respective advisors, are discussed elsewhere in the Report.[1719]  This section focuses on the following matters relating to the Zell Group:  (a) the circumstances giving rise to EGI's initial proposal, (b) EGI's internal communications throughout the process, (c) Tribune's selection of the EGI proposal, (d) the extent, if any, to which Tribune director and officer transaction-based compensation played a role in the selection of the EGI proposal, and (e) the Zell Group's activities leading up to the closing of the Step One Transactions.

---

[1716]  Ex. 576 at 5 (Tribune Schedule 14A, filed May 25, 2007).

[1717]  Ex. 577 at 27 (Tribune Form 10-Q, filed May 8, 2008); Ex. 554 (Tribune Press Release, dated June 4, 2007).

[1718]  Ex. 578 at 2-3 (McCormick Foundation Schedule 13D, filed May 31, 2007).

[1719]  *See* Report at § III.D.1.

a.    **The Circumstances Giving Rise to the Initial EGI Proposal in February 2007.**

EGI first considered an investment in Tribune in the fall of 2006.[1720]  Nils Larsen,

managing director of EGI, told the Examiner that "Tribune['s] announce[ment that] it was

exploring strategic alternatives . . . made all the headlines," and he recalls that the "teaser"

material prepared by MLPFS and CGMI crossed his desk in November 2006.[1721]  Although

Mr. Larsen did not recall having signed a confidentiality agreement to allow EGI to gain access

to Tribune's due diligence materials, the record reflects that EGI signed a confidentiality

agreement with Tribune on November 8, 2006.[1722]  By November 17, 2006, however, EGI

decided it was not interested in investing in Tribune.[1723]  Mr. Zell explained to the Examiner that

EGI's lack of interest in Tribune was because it was a media deal, it was overpriced, and EGI

lacked a "competitive advantage."[1724]  From November 17, 2006 to mid-January 2007, EGI did

not participate in the auction process.

In late January 2007, however, the Special Committee asked MLPFS and CGMI to

contact EGI to see if it was interested in making an investment as part of the recapitalization self-

help option that the Special Committee was then considering as an alternative to a third-party

deal.[1725]  Mr. Zell confirmed to the Examiner that a telephone call from Merrill's Todd Kaplan

advising him that the auction process was floundering caused Mr. Zell to renew EGI's interest in

---

[1720]  Examiner's Interview of Samuel Zell, June 14, 2010.

[1721]  Examiner's Interview of Nils Larsen, June 15, 2010.

[1722]  *Id.*; Ex. 226 at 22 (Proxy Statement).

[1723]  Examiner's Interview of Samuel Zell, June 15, 2010, at 1; Examiner's Interview of Nils Larsen, June 15, 2010. The Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated November 17, 2006, also reflects that EGI had withdrawn from the bidding by that date.  Ex. 579 at ML-TRIB-0105692 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated November 17, 2006).

[1724]  Examiner's Interview of Samuel Zell, June 14, 2010; Examiner's Interview of Nils Larsen, June 15, 2010.

[1725]  Examiner's Interview of Thomas Whayne, June 11, 2010.

Tribune.[1726]  Mr. Larsen likewise told the Examiner that MLPFS encouraged EGI to re-engage in the bidding process.[1727]  After speaking with Mr. Kaplan, Mr. Zell asked William Pate to "take another look and see if there's another way of approaching this that makes sense."[1728]  Thomas Whayne of Morgan Stanley explained to the Examiner that the Special Committee approached EGI at this time because the Special Committee did not consider the other proposals then on the table sufficiently attractive.[1729]  By January 29, 2007, EGI reviewed the data in Tribune's electronic data room in order to submit an outline of a proposed transaction to Tribune "by the end of the week."[1730]

As EGI prepared its proposal, Mr. Larsen spoke to the Merrill Entities and the Citigroup Entities about potentially financing EGI's proposed transaction.  On January 30, 2007, Tami Kidd (Merrill Investment Banking) e-mailed Carl Mayer (Merrill Global Capital Markets) and informed Mr. Mayer that she was working directly with Mr. Zell on his potential bid for

---

[1726]  Mr. Zell stated to the Examiner that he received a call from Mr. Kaplan who said, "Sam, this deal is falling apart.  There isn't going to be a deal and I think, as opposed to when you said you had no interest, this situation has changed and you really ought to take a look at it and see if you can have some other way of approaching it that makes sense." Examiner's Interview of Samuel Zell, June 15, 2010.  There is some dispute regarding Morgan Stanley's role in persuading EGI to re-engage in the bidding process.  Although the documents and testimony from Mr. Zell and Mr. Larsen indicate that Mr. Kaplan of Merrill contacted Mr. Zell to ask him to reconsider his decision to withdraw from the process, Thomas Whayne of Morgan Stanley takes a different view.  In his May 17, 2007 deposition, Mr. Whayne testified that he called William Pate of EGI, a "close personal friend [of Mr. Whayne] from college" (Examiner's Interview of Thomas Whayne, June 11, 2010), in late January/early February 2007 to discuss whether EGI would be interested in participating as an equity investor in a recap transaction. Ex. 126 at 37:7-28:23 (Rule 2004 Examination of Thomas Whayne, May 17, 2007).  Mr. Whayne told the Examiner that Morgan Stanley approached EGI because Mr. Zell had already expressed an interest in Tribune and that "[f]rankly there was a view that by virtue of Zell's participation on the Board he might be a catalyst to shake up management which might also help investors."  Examiner's Interview of Thomas Whayne, June 11, 2010.  The Examiner has not found any support for Mr. Whayne's statements in either the Special Committee meeting minutes leading up to February 6, 2007, or in the documents reviewed.

[1727]  Mr. Larsen described to the Examiner that, "[i]n the middle of January, it started to become obvious that the process was not going as well as could be expected.  One of the advisors came back to EGI and said, 'You should take a second look at this.  It's probably not as a robust a process as might have been anticipated.'  We reluctantly said, 'Sure, we're taking a look.'"  Examiner's Interview of Nils Larsen, June 15, 2010.

[1728]  Examiner's Interview of Samuel Zell, June 14, 2010.

[1729]  Examiner's Interview of Thomas Whayne, June 11, 2010.

[1730]  Ex. 580 (Larsen E-Mail, dated January 29, 2007).

Tribune.[1731]  Ms. Kidd further reported that Mr. Zell had proposed two different types of debt structures to finance the transaction, and, in both cases, the "new debt is lower [versus] the staple."[1732]  Julie Persily of CGMI offered to set up a "unique team" at Citigroup to work with Mr. Kaplan's team at Merrill on the financing commitment for an EGI proposal.[1733]  Mr. Larsen agreed with this suggestion.[1734]

On February 2, 2007, EGI submitted to Tribune a letter proposing a transaction in which a company ESOP would acquire Tribune at a price of $30 per share.[1735]  The very next day, Michael Costa, of Merrill, called Mr. Pate, of EGI, and conveyed concern about the terms of EGI's initial proposal.[1736]  Mr. Pate reported to Mr. Larsen and other EGI colleagues both Mr. Costa's "disappointment that, in light of tax savings, [EGI] could not put together a materially higher bid," and Mr. Costa's request that EGI consider a "straight investment in the company as part of a recap without the esop structure."[1737]  Mr. Pate described his response to Mr. Costa as follows: "I told him that I would talk to [Sam] but I was opposed to a straight investment and that the tax structure is the only thing that made it financially attractive for us."[1738]

---

[1731]  Ex. 581 (Kidd E-Mail, dated January 30, 2007).

[1732]  *Id.*

[1733]  Ex. 582 at EGI-LAW-00000635 (Pate E-Mail, dated January 31, 2007).

[1734]  *Id.*

[1735]  Ex. 113 (Letter from Samuel Zell to Tribune Board, dated February 2, 2007).

[1736]  Ex. 573 at EGI-LAW-00021094 (Havdala E-Mail, dated February 3, 2007).

[1737]  *Id.*

[1738]  *Id.*

Instead of restructuring its proposal away from a leveraged ESOP transaction, EGI decided to increase its acquisition price to $33 per share, with EGI investing $225 million directly in Tribune.[1739]

On February 6, 2007, EGI revised its initial proposal and submitted a summary term sheet proposing a single step, leveraged acquisition of Tribune by a company ESOP at $33 per share, with EGI investing $225 million in Tribune,[1740] that would, in the estimate of Tribune's advisors, take nine to twelve months to close.[1741]

Unsurprisingly, Mr. Zell had a profit motive in pursuing the Tribune transaction. Mr. Zell stated to the Examiner that his analysis was shaped by his background in the real estate industry:[1742]

> We thought we were going to make a fortune with this deal. Can I tell you why? It is so simple. Think about it like a real estate guy. It starts with assets.

Mr. Zell explained his assessment of the valuation of Tribune's assets as follows:[1743]

- Los Angeles Times - $2 billion

- Chicago Tribune - $1 billion

- Newsday and the other newspapers - $1 billion

- Chicago Cubs - $1 billion+

- TV stations - $4 billion (conservative estimate)

---

[1739] Ex. 116 (EGI Proposal, dated February 6, 2007); Ex. 5 at 21 (Tender Offer).

[1740] Ex. 116 (EGI Proposal, dated February 6, 2007); Ex. 5 at 21 (Tender Offer).

[1741] Ex. 113 (EGI Letter, dated February 2, 2007); Ex. 116 (EGI Proposal, dated February 6, 2007); Examiner's Interview of Thomas Whayne, June 11, 2010 (under the initial EGI proposals, stockholders might not get cash for nine months).

[1742] Examiner's Interview of Samuel Zell, June 14, 2010. Zell explained that "[t]he true value that has come out of real estate have come from being long-term owners, and frankly benefiting from the fact that when you have some inflation, debt services [have] got a fixed payment. If you own something long enough you get a fixed payment. The key to that is financing." *Id.*

[1743] Examiner's Interview of Samuel Zell, June 14, 2010.

- Tribune's 40% interest in CareerBuilder—at least $2.4 billion (Mr. Zell stated that the only business comparable with CareerBuilder was Monster.com, which was trading at $6 billion, and CareerBuilder was bigger than Monster.com)

- Real estate assets - $1 billion

- Apartments.com, cars.com, "and a whole bunch of other stuff"

Mr. Zell said that "when it was all said and done there was approx[imately] $16 billion of assets, $12 billion of debt."[1744]  Mr. Zell explained that the remaining $4 billion in assets consisted of the deferred tax from the proposed ESOP structure.[1745]  Mr. Zell maintained that after a ten year holding period, a step-up in asset basis would allow him to sell assets without built-in gain.[1746]  "Did we think we bought a great company?  We thought we bought a great opportunity.  What allowed us to do it was the asset base."[1747]  Similarly, in his sworn interview with the Examiner, Mr. Larsen acknowledged that the tax structure was a "substantial contributor as to the attractiveness of making an investment in Tribune."[1748]  Mr. Larsen added:[1749]

> I would not say that the tax benefits in year ten and beyond were the sole reason to pursue the transaction. . . .  [W]e did substantial due diligence on the assets, the operations, the investments that the company had, and I think viewed holistically with the added benefit of the structure, we felt that this was a sound and attractive financial investment with the tax benefits as he indicated were an attractive and contributing factor.

---

[1744] *Id.*

[1745] *Id.*

[1746] *Id.*  Mr. Zell stated: "We've never been flip artists, we've held stuff forever . . .  I still own a building I bought in 1966."  *Id.*  Mr. Larsen corroborated Mr. Zell's characterization of the Tribune transaction as a long-term investment: "We were long-term investors. . . .  The expectation was that [EGI and Tribune] would be partners for at least ten years.  There were financial benefits with regard to the net built-in gain items.  It's not unusual for EGI to have that kind of relationship. . . .  It's just the type of firm that Sam is." Examiner's Interview of Nils Larsen, June 15, 2010.

[1747] Examiner's Interview of Samuel Zell, June 14, 2010.

[1748] Examiner's Sworn Interview of Nils Larsen, July 7, 2010, at 14:17-19.

[1749] *Id.* at 14:19-15:6.

Mr. Zell's stated optimism as he approached the Leveraged ESOP Transactions was corroborated by Brit Bartter, EGI's principal relationship contact at JPMCB.[1750]  Mr. Bartter told the Examiner that Mr. Zell was "pumped" to do the deal and got "more excited" as the closing approached.[1751]  Mr. Larsen of EGI stated that, going into the transaction, EGI had a "fair amount of cushion . . . mean[ing] the covenants in the bank coverages or our liquidity."[1752]

> **b.      Internal EGI Communications throughout the Process.**

From late January through March 2007, EGI conducted due diligence of Tribune, revised its proposal, and addressed the concerns raised by the Special Committee and Tribune management, while working with the Lead Banks to obtain financing.

> **(1)      EGI's Due Diligence.**

EGI retained a team of professionals including KPMG,[1753] several law firms,[1754] and Presidio Merchant Partners,[1755] who consulted regarding Tribune's publishing division.  Tribune gave EGI access to additional financial reports such as Brown Books,[1756] ad category reports,[1757] and flash reports, among others.[1758]  EGI analyzed this information and posed additional due diligence questions to Tribune.[1759]  As early as February 20, 2007, internal EGI e-mails reflect knowledge of the large interactive division revenues as compared to the decline in traditional

---

[1750]  Examiner's Interview of Brit Bartter, June 16, 2010.

[1751]  *Id.*

[1752]  Examiner's Interview of Nils Larsen, June 15, 2010.

[1753]  Ex. 583 (Engagement letter from KPMG to EGI, dated February 14, 2007); Ex. 584 (Hauser E-Mail, dated February 13, 2007).

[1754]  Ex. 584 (Hauser E-Mail, dated February 13, 2007); Ex. 585 (Hauser E-Mail, dated February 21, 2007).

[1755]  Ex. 586 (Hauser E-Mail, dated February 27, 2007).

[1756]  Ex. 587 (Sotir E-Mail, dated February 22, 2007).

[1757]  *Id.*

[1758]  Ex. 588 (Hochschild E-Mail, dated March 9, 2007).

[1759]  Ex. 589 (Larsen E-Mail, dated February 20, 2007).

print revenues.[1760]  EGI also worked to understand the impact of an ESOP structure on tax

payment obligations, hiring and firing/retiring employees, the ability to accomplish non-taxable

spin-offs, and the payment of cash dividends to Tribune's stockholders.[1761]

      Throughout February and March 2007, EGI continued to revise and update its

financial[1762] and publishing models.[1763]  EGI also considered additional financial information

provided by Tribune and revised its forecasts accordingly.[1764]  Mr. Larsen stated to the Examiner

that EGI "had a fairly detailed financial model that had quite a few iterations, we were updating

operating and changing capital assumptions and that sort of thing.  What changed over that time

– it got weaker."[1765]  During this process, EGI apparently expressed concern to Tribune

management about Tribune's declining revenues and the possible need to revise Tribune's

forecasts.  According to a March 9, 2007 e-mail from Mr. Sotir, such comments had caused

Tribune to "look at the trends some more and rethink their outlook.  We told them that if they

come back with a lower revenue number, we want to see some action plans on how they are

going to maintain the cashflow # in '07."[1766]

      On March 20, 2007, in preparation for a meeting with Chandler Bigelow to discuss the

latest version of the Tribune model and the ratings agency presentation, Mr. Larsen informed his

colleagues via e-mail about additional issues he planned to raise:[1767]

---

[1760]  *Id.* at EGI-LAW-00010786-87.

[1761]  Ex. 590 (Pate E-Mail, dated February 20, 2007).

[1762]  Ex. 591 (Larsen E-Mail, dated March 19, 2007).

[1763]  Ex. 592 (Hochschild E-Mail, dated March 2, 2007).

[1764]  Ex. 591 (Larsen E-Mail, dated March 19, 2007).

[1765]  Examiner's Interview of Nils Larsen, June 15, 2010.

[1766]  Ex. 588 (Hochschild E-Mail, dated March 9, 2007).

[1767]  Ex. 593 (Larsen E-Mail, dated March 20, 2007).

> Chandler indicated on the 9th that management needed to sit down
> and refine their projections for 2007.  I will inquire as to the status
> of this refinement and whether we can have a copy.  It will not be
> to the level of detail outlined by Mark below but will/should be the
> projections management is willing to vouch for to the board and
> the financing providers.

In this same e-mail, Mr. Larsen commented on an earlier e-mail sent by Mr. Sotir asking
for "a list of items that we'd want to get from the Company" such as Period 2 final results,
Period 3 Flash report, 2007 Reforecast and Interactive diligence.[1768]  The record is not clear
whether EGI attempted to obtain some or all of this information from Tribune.  In a summary of
the March 20, 2007 meeting with Nils Larsen, Daniel Kazan (of Tribune) reported that
Mr. Larsen was told that Tribune had not changed its 2007 projections.[1769]

### (2)    Revisions to the EGI Proposal.

On February 19, 2007, EGI submitted a term sheet to Tribune with proposed terms for
the ESOP transaction.[1770]  After preliminary conversations with Tribune's management and
Financial Advisors, EGI submitted a revised term sheet on February 22, 2007, that included a
description of the terms of the proposed financing for the transaction.[1771]  In response, the
Special Committee asked EGI to restructure its proposal to provide for a recapitalization that
would offer an upfront distribution to Tribune's stockholders.[1772]

A February 28, 2007 internal Morgan Stanley e-mail reflected that MLPFS
communicated Tribune's concerns with the EGI proposal to Mr. Zell, and that EGI was going to
work through the weekend to "secure a better price and address conditionality concerns."[1773]  A

---

[1768]   *Id.*

[1769]   Ex. 594 (Crane E-Mail, dated March 20, 2007).

[1770]   Ex. 121 (EGI Term Sheet, dated February 19, 2007).  *See* Report at § III.D.1.f.

[1771]   Ex. 122 (EGI Term Sheet, dated February 22, 2007).  *See* Report at § III.D.1.f.

[1772]   Ex. 126 at 22-24 (Deposition of Thomas Whayne, May 17, 2007).  *See* Report at § III.D.1.f.

[1773]   Ex. 335 (Whayne E-Mail, dated February 28, 2007).

March 2, 2007 internal e-mail from William Pate to Mr. Larsen indicated that EGI responded to the Special Committee's concerns by incorporating an upfront payment and a year-end closing into its model.[1774]  Mr. Pate noted:[1775]

> The change does not appear to have a material impact on returns; however, it seems to push our revolver draw at the opening to the limit.  We become very reliant on the Cubs transaction to ensure that we don't have liquidity problems at the outset.  While I think it is fine for now, we may want to ask the lenders to upsize the Sr. Notes in this scenario.

Mr. Larsen explained EGI's decision to structure a two-step transaction with an upfront distribution as being driven by the Special Committee to replicate the economics of the self-help proposal for Tribune's stockholders.[1776]  Mr. Larsen further stated that EGI was being "positioned" as "not the only game in town," and "not the preferred alternative."[1777]

On March 4-6, 2007, EGI provided Tribune with revised term sheets that included an initial payment to Tribune's stockholders, followed later by the Merger.[1778]  On March 7, 2007, EGI's counsel provided Tribune with a revised draft of a merger agreement reflecting the revised structure of the proposed transaction.[1779]  During the next few days, the parties exchanged drafts of various agreements and comments on those drafts.[1780]

On March 11, 2007, Mr. Larsen sent an e-mail to Brit Bartter, Rajesh Kapadia, and others at JPMCB informing them that "as of late Friday night Tribune signaled to us that they had decided not to pursue either deal.  The reasons given are a bit skimpy and I am not sure if this

---

[1774]  Ex. 595 (Pate E-Mail, dated March 2, 2007).

[1775]  *Id.*

[1776]  Examiner's Interview of Nils Larsen, June 15, 2010.

[1777]  *Id.*

[1778]  Ex. 127 (EGI Term Sheet, dated March 4, 2007); Ex. 128 (EGI Term Sheet, dated March 6, 2007).  *See* Report at § III.D.1.f.

[1779]  Ex. 129 (Draft Merger Agreement, dated March 7, 2007).

[1780]  Ex. 5 at 23 (Tender Offer).

will stick but for now we are in limbo."[1781]   After receiving JPMCB's response, which reflected

surprise at the turn of events, Mr. Larsen responded that "[s]upposedly Dennis spent three days

with the publishers and got cold feet on the leverage.  It sort of came out of the blue to the other

senior managers from what I understand. I don't know if he can convince the board though."[1782]

(At the same time, Tribune was reconsidering the possible recapitalization and spin-off plan at

reduced levels of leverage.)[1783]   On March 13, 2007, Mr. FitzSimons had breakfast with

Mr. Zell.[1784]  Mr. FitzSimons testified that he told Mr. Zell that the "complexity of the

transaction was causing us some difficulty in wondering could the transaction be, you know,

could it be completed."[1785]

E-mails from the Lead Banks, as well as the interviews of Mr. Whayne, Mr. Zell, and

Mr. Larsen, reveal the various perspectives of Tribune, its Financial Advisors, and EGI with

regard to the status of the EGI proposal at this time.  On March 10, 2007, Michael Costa wrote:

"Short answer is in light of recent operating performance no comfort in putting the kind of

leverage necessary for Zell proposal to work and have comfortable [sic] with employees owning

the equity.  Also numerous issues in the Zell proposal we could not solve."[1786]  A March 15,

2007 internal JPMCB e-mail described the Zell deal as "dead," and indicated that Tribune was

focusing on pursuing a self-help proposal.[1787]  Mr. Whayne explained to the Examiner that,

---

[1781]  Ex. 132 at JPM-00246318 (Bartter E-Mail, dated March 11, 2007).

[1782]  *Id.* at JPM-00246317.  In his sworn interview with the Examiner, Mr. FitzSimons denied that (a) his initial negative reaction to EGI's proposal and (b) the message delivered to EGI on March 9, 2007 that Tribune had decided not to pursue further EGI's proposal, resulted from the degree of leverage associated with EGI's proposal.  *See* Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 30:2-31:4 and 34:9-35:3.

[1783]  Ex. 5 at 23 (Tender Offer).  *See* Report at § III.D.1.f.

[1784]  Ex. 133 at 2 (Cohen E-Mail, dated March 15, 2007).

[1785]  Ex. 134 at 120 (Deposition of Dennis FitzSimons, May 14, 2007).

[1786]  Ex. 338 (Costa E-Mail, dated March 10, 2007).

[1787]  Ex. 133 at 1 (Cohen E-Mail, dated March 15, 2007).

during the mid-March 2007 time period, Tribune's management "went back and forth as to what they wanted to do. Was it recap, was it Zell."[1788]  Mr. FitzSimons acknowledged that at that time the "process was very fluid and we're trying to come out with the best answer and we're trying to be open with everybody . . . and [I] wanted to be straight with [Zell] telling him exactly what my concerns were."[1789]

According to Mr. Zell, during March 2007 he "really thought the deal was dead."[1790]  In fact, though, the tide quickly shifted back in favor of the EGI proposal.  Mr. Zell was in New York City on another matter when he received a call from his assistant telling him that William Osborn, Chair of the Special Committee, needed to talk to him.[1791]  Mr. Zell told the Examiner that Mr. Osborn said to him "we've gone over this thing and really think it might work, and I said fine.  And we then proceeded to go forward."[1792]  Mr. Larsen told the Examiner that Tribune may have been using this "cold feet" story as a negotiating tactic to give Tribune "time to catch up on the self-help deal."[1793]  Mr. Whayne explained that he believed the shift back toward EGI's proposal occurred because Tribune wanted a "complete solution" and because many of the impediments to the initial EGI proposal had been removed.[1794]

At a March 21, 2007 Special Committee meeting, Tribune management and the Financial Advisors reviewed EGI's proposal as well as the self-help proposal.[1795]  The Financial Advisors highlighted the benefits and risks of each, including the tax benefits of the ESOP, but also the

---

[1788]  Examiner's Interview of Thomas Whayne, June 11, 2010.

[1789]  Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 60:4-10.

[1790]  Examiner's Interview of Samuel Zell, June 14, 2010.

[1791]  *Id.*

[1792]  Examiner's Interview of Samuel Zell, June 14, 2010.

[1793]  Examiner's Interview of Nils Larsen, June 15, 2010.

[1794]  Examiner's Interview of Thomas Whayne, June 11, 2010.

[1795]  Ex. 136 (Special Committee Meeting Minutes, dated March 21, 2007).

leverage associated with the EGI proposal.  Following these reviews, the Special Committee directed Tribune's management and advisors to present two fully developed alternatives to the Special Committee at a meeting on March 30, 2007 for a final determination.[1796]

When asked during his interview what changed Tribune's view of the EGI proposal, Michael Costa of Merrill cited three factors:  (a) a better understanding of the ESOP tax shield, (b) improvements in the consideration that Tribune's stockholders would receive under the proposal, and (c) anticipated improvements in Tribune's cash flow due to synergies (*i.e.,* costs that would not be incurred as a private company that would be incurred as a public company) and other cost cutting measures that Mr. Zell would implement.[1797]

Tribune continued to seek improvements to the economic terms of the EGI proposal, including an increase in the price to be paid to Tribune's stockholders and an increase in the investment made by EGI.[1798]  On March 22, 2007, Mr. Osborn sent an e-mail to Morgan Stanley advising that he had spoken with Mr. Zell that morning and asking Mr. Whayne to call EGI to resolve some of the open economic terms of the deal before the following week's Tribune Board meeting.[1799]  After the call with Mr. Whayne, William Pate e-mailed Mr. Larsen and Mr. Zell and told them that Mr. Osborn had made "a highly equivocated assent to our counter," and that the EGI proposal as it stood would be presented to the Tribune Board at the following week's meeting.[1800]  Mr. Pate emphasized that, at this point, the share price remained at $33 and, among other things, there was no break-up fee.[1801]  Mr. Pate directed Mr. Larsen to call Tribune and

---

[1796]  Ex. 5 at 24 (Tender Offer).  *See* Report at § III.D.1.f.

[1797]  Examiner's Interview of Michael Costa, June 4, 2010.

[1798]  Ex. 5 at 24 (Tender Offer).

[1799]  Ex. 598 (Crane E-Mail, dated March 22, 2007).

[1800]  Ex. 599 (Pate E-Mail, dated March 23, 2007).

[1801]  *Id.*

inquire into the status of EGI's request for fee reimbursement and then "move quickly to put a fully wrapped deal before trb board."[1802]

During this period, Tribune also discussed the EGI proposal with the rating agencies.[1803] The record is not clear regarding the extent of EGI's involvement in the meetings with the rating agencies.  Internal EGI e-mails suggest that Mr. Larsen was concerned about Tribune's ability to handle the rating agency presentations and that he therefore wanted to attend the presentations, but at least one of the agencies was not comfortable with Mr. Larsen's presence.[1804]  In preparing for the rating agency meetings, Tribune management internally debated whether revised financials for Period 1 and Period 2 should be put "in the deck" or shown to Mr. Larsen.[1805] "This is tricky b/c we've told Nils that we aren't changing our plan based on the results from the first two periods.  If he sees this, it may raise issues.  We need to weigh that against showing this in the rating agency deck."[1806]

As EGI prepared for the March 30, 2007 Tribune Board meeting, Chandler Bigelow forwarded to Mr. Larsen Tribune's attorneys' notes regarding the status of the EGI and self-help proposals in advance of a conference call to discuss the proposals.[1807]  In so doing, Mr. Bigelow ignored counsel's stated advice not to distribute the e-mail any further.[1808]

Before the meeting of the Special Committee on March 30, 2007, EGI revised its proposal slightly to increase the stated per share consideration in the merger to $33.50, but with

---

[1802] *Id.*

[1803] *See* Report at § III.D.15.a.

[1804] Ex. 600 at EGI-LAW-00030300 (Bigelow E-Mail, dated March 21, 2007); Ex. 601 (Larsen E-Mail, dated March 21, 2007).

[1805] Ex. 602 at TRIB0078232 (Kazan E-Mail, dated March 21, 2007).

[1806] Ex. 602 (Kazan E-Mail, dated March 21, 2007).

[1807] Ex. 603 (Bigelow E-Mail, dated March 29, 2007).

[1808] *Id.* at EGI-LAW 00044410.

the "ticking fee" start date moved to January 1, 2008.[1809]  An internal EGI e-mail reported that

adding the increase in price to the fully-flexed scenario resulted in "pretty tight" covenant levels

in the first few years as well as "knocked down" returns.[1810]

### (3)    EGI's Involvement In Negotiations Regarding the Step One Financing.

At the beginning of February 2007, EGI worked with MLPFS and the Citigroup Entities

regarding financing.  JPMCB joined the team later in the month, providing EGI with capital

commitments and underwriting services, but not financial advisory/M&A services.[1811]  On

February 23, 2007, Mr. Larsen e-mailed EGI's latest financial model with regard to the proposed

transaction to EGI's contacts at Citigroup, MLPFS, and JPMCB.[1812]  Mr. Larsen stated that: "The

company has indicated that our proposal is made even stronger by the fact that we have added

another party [JPMorgan] to the mix and we need to capitalize on this."[1813]  Mr. Larsen

forwarded engagement, commitment, and fee letters to Tribune General Counsel Crane Kenney

on February 23, 2007.[1814]

On March 4, 2007, Todd Kaplan of Merrill e-mailed Mr. Bartter and Mr. Kapadia of

JPMCB stating that the Zell Group and Tribune had asked them to work together on a "2-step"

plan for financing the buyout, and referencing a proposed meeting with the "combined Zell/Trib

client group" to discuss the financing.[1815]  Mr. Kapadia subsequently e-mailed Mr. Larsen to

confirm that EGI did not have an issue with JPMCB merging its team working with Tribune on

---

[1809]  Ex. 5 at 25 (Tender Offer).

[1810]  Ex. 604 (Hochschild E-Mail, dated March 29, 2007).

[1811]  Examiner's Interview of Brit Bartter, June 16, 2010.

[1812]  Ex. 605 at JPM __ 00205153 (Kapadia E-Mail, dated February 23, 2007).

[1813]  *Id.*

[1814]  Ex. 606 (Larsen E-Mail, dated February 23, 2007).

[1815]  Ex. 607 at JPM __ 00450043-450044 (Bartter E-Mail, dated March 4, 2007).

the self-help proposal with the team that had been working with EGI on its proposal.[1816]

Mr. Kapadia noted that "[i]t appears that ML and Citi have already done so."[1817]  Mr. Larsen

confirmed that he had no issue with the merger of the JPMCB teams.[1818]

On March 27, 2007, Sidley Austin LLP circulated to EGI and Tribune the Lead Banks

comments to the Commitment Letters for the proposed EGI transaction.[1819]  The same day,

Mr. Bigelow forwarded to Mr. Larsen a list of open issues with respect to the Commitment

Letters.[1820]  Mr. Bigelow also reported to Mr. Larsen that there was "deafening silence" with

respect to his request for EGI's $1.5 million fee reimbursement.[1821]

On the eve of the March 30, 2007 meeting of the Tribune Board, JPMCB believed that

the EGI proposal was going to be approved and noted that there would be discussions with Mr.

Zell to give JPMCB a "lead left role on some/all of the financings."[1822]

EGI believed that the Lead Banks made their decision to provide the LBO Lender Debt

based on the merits of the financing, not on the fees to be earned or the prospect of future

business from the Zell Group.[1823]  Mr. Larsen told the Examiner that he believed JPMCB would

have "done the same deal" for someone other than Mr. Zell.[1824]  Mr. Larsen pointed to the fact

that EGI had asked JPMCB to work exclusively with EGI and not finance any competitors, and

---

[1816]  Ex. 608 (Larsen E-Mail, dated March 6, 2007).

[1817]  *Id.*

[1818]  *Id.*

[1819]  Ex. 609 (Varner E-Mail, dated March 27, 2007).

[1820]  Ex. 610 at EGI-LAW-00036117 (Bigelow E-Mail, dated March 27, 2007).

[1821]  *Id.*

[1822]  Ex. 611 (Dimon E-Mail, dated March 29, 2007).

[1823]  Examiner's Interview of Nils Larsen, June 15, 2010.  Mr. Larsen told the Examiner that he believed the Lead Banks "looked at the opportunity and structure and thought it was a prudent risk to run.  They thought they could syndicate the risk and be adequately paid for the risk, and that was something based on their own due diligence."  According to Mr. Larsen, EGI "had no coercion or other deals to offer them.  They all had to look at this as a reasonable financial risk and reward."  *Id.*

[1824]  *Id.*

JPMCB refused.[1825]  Regarding the fees earned by the Lead Banks, Mr. Larsen stated that the

Lead Banks "provided a capital commitment that was still $4.2 [billion] of exposure that was tied

to the Second Step.  JPMorgan was on the hook for 1/3; that's $1.2 billion exposure, I don't think

we paid $1.2 billion of fees.  Even if they syndicated the whole first step, if they were not

comfortable with the risk its really hard to say how do you get there with the fees."[1826]

> No absolutely not.  Credit didn't know Sam.  People approving the
> projections didn't know Sam.  Senior management isn't going to
> influence Credit. . . .  On the margin you care about your client
> relationships.  Of course.  But will never do something crazy just
> because it's Sam.

### c.    Tribune's Selection of the EGI Proposal.

The sequence of events culminating in the Special Committee's and the Tribune Board's

approvals of the Leveraged ESOP Transactions is discussed elsewhere in the Report.[1827]

Mr. Larsen stated to the Examiner that EGI was not sure how serious the Broad/Yucaipa

Proposal was, but that "it was a credible feeling that the Company was considering other

alternatives.  To engage with [Tribune] we had to increase the pricing and the timing."[1828] EGI

went from $33 to $34 per share as a matter of "negotiation," which was ultimately Mr. Zell's

decision.[1829]

### d.    The Extent, if any, to which Tribune Director and Officer Transaction-Based Compensation Played a role in the Selection of the EGI Proposal.

Certain Parties alleged that the Tribune Board supported the EGI proposal because it

included monetary incentives for the directors and officers of Tribune.  The most significant

---

[1825] *Id.*

[1826] *Id.*

[1827] *See* Report at § III.D.1.

[1828] Examiner's Interview of Nils Larsen, June 15, 2010.

[1829] *Id.*

monetary incentives received by these individuals as a result of the Leveraged ESOP

Transactions, however, were based on the Transitional Compensation Plan and accelerated

restricted stock and options already in place before the EGI proposal was considered.[1830]

Mr. Zell told the Examiner that he did not recall negotiating any management incentives and that

he thought Tribune formulated the 2007 Management Equity Incentive Plan.[1831]  Mr. Whayne

also told the Examiner that he was "not aware of anything Zell did to offer incentives to

management.  What I saw of Zell was that he was non-committal about who was going to stay or

go.  Didn't offer any assurances, certainly no guarantees to people."[1832]  Mr. Larsen was similarly

unequivocal in response to the Examiner's question as to whether management incentives played

a role in Tribune management's ultimate support of the EGI proposal:[1833]

> The conclusion is about as far off base as possible.  The company
> had 95 or 100 different employee benefit plans, most of which
> were focused on senior folks.  As we did our due diligence we
> found lots of plans.  The Board had put in place a success bonus in
> 2006, all pre-existed our involvement.  We focused on how much
> money would go out if people left and got those payments.  We
> found between $100-$140 million in payments. . . .  EGI never
> proposed to add more money to the cash bonus pool.

The record establishes, however, that EGI's February 19, 2007 term sheet contemplated

the adoption of a management incentive plan providing management the economic equivalent of

5% of the outstanding Tribune Common Stock.[1834]  Mr. Larsen acknowledged the equity

incentive plan in his interview with the Examiner, stating that: "We suggested the success bonus

---

[1830]  Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 59:17-60:13 and 63:18-64:3.

[1831]  Examiner's Interview of Samuel Zell, June 14, 2010.

[1832]  Examiner's Interview of Thomas Whayne, June 11, 2010.

[1833]  Examiner's Interview of Nils Larsen, June 15, 2010.  In his sworn interview with the Examiner, Mr. FitzSimons
concurred, stating "absolutely not" in response to the Examiner's question as to whether Mr. Zell or others had
"sweetened the deal by giving management incentives, compensation incentives connected to the transaction."
Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 127:1-12.

[1834]  Ex. 121 at 5 (EGI Term Sheet, dated February 19, 2007).

be exchanged for a payment of $37 million cost net benefit of $25 million to management.  We looked at what the cost was going to be.  We allocated 5% pool with longer vesting and 3% shortened vesting in exchange for management relinquishing cash bonuses at closing."[1835] Mr. Larsen also said that the 2007 Management Equity Incentive Plan was designed to incentivize management to make the new company a success, whereas all of the other bonuses called for management to be paid on completion of the Leveraged ESOP Transactions or a change of control.[1836]  Similarly, Chandler Bigelow testified that the incentive plan developed as part of the EGI proposal "actually delivered less benefits" than the then-existing incentive plan.[1837]

> e.  **The Zell Group's Activities Leading Up to the Closing of the Step One Transactions.**

From April 1, 2007 until June 4, 2007, EGI actively participated in finalizing the Step One Financing.[1838]  The day after the Tribune Board approved the Leveraged ESOP Transactions, EGI advised the Citigroup Entities of Mr. Zell's intention to bring in BofA as a Lead Bank.[1839]

---

[1835]  Examiner's Interview of Nils Larsen, June 15, 2010.

[1836]  *Id.*

[1837]  Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 72:1-15.

> Q. The plan – the plan ultimately approved by the board had less benefits?
>
> A. Just so – can I be very clear . . . there was a 5 percent plan which was a broad-based, 300, 400, people, you know.  Obviously it's a big company, right.  And then on top of it there was a plan that was a 3 percent of equity plan.  It's that 3 percent of equity plan that did not include a gross up, was equity, and essentially replaced what had been in my mind, again, and this is just my recollection, a cash-based plan with a gross up, and it's that 3 percent plan that I believe, again I don't have the numbers in front of me, it's my recollection that delivered less benefits than the original plan.

[1838]  During this timeframe, Tribune regularly sent EGI internal financial reports, such as Brown Books, updated 2007 plan schedules by business unit, advertising revenue category reports, and full projections by business unit.  *See* Ex. 612 (Hochschild E-Mail, dated April 12, 2007); Ex. 613 (Kazan E-Mail, dated April 16, 2007); Ex. 614 (Hochschild E-Mail, dated May 14, 2007); Ex. 615 (Hochschild E-Mail, dated May 21, 2007); Ex. 616 (Pate E-Mail, dated May 25, 2007).

[1839]  Ex. 617 (Perisly E-Mail, dated April 3, 2007).

Mr. Zell's initial plan was to reduce the Citigroup Entities' share of the financing by 50% and to give that portion to BofA.[1840]  The Citigroup Entities were displeased with EGI's plan, which reduced their share yet left the Merrill Entities' and JPM's respective shares untouched.[1841] Mr. Zell and Tribune responded to the Citigroup Entities' complaints and ultimately determined that participation would be as follows: 30% each for the Merrill Entities and JPM (reduced from 33.3%), 25% for the Citigroup Entities (increased from 16.6%), and 15% for BofA (reduced from 16.6%).[1842]

Mr. Larsen described the financing for this transaction as not "the easiest transaction," but claimed that he has worked on "more difficult ones."[1843]  According to Mr. Larsen, in mid-April of 2007 JPMCB began its effort to syndicate the Step One Financing at a bank meeting in New York.[1844]  Mr. Larsen recalled that he attended the meeting (likely along with William Pate) but did not speak.[1845]  Mr. Larsen described the meeting as "well attended, several hundred people in the room and a fairly substantial number on the phone."[1846]

By the end of April, discussions with potential lenders were progressing, albeit slowly. On April 24, 2007, Mr. Bigelow forwarded to Tribune management an e-mail from Mr. Larsen regarding first quarter results, and Mr. Bigelow advised management that "the banks are getting a lot of questions from prospective lenders about Zell's reaction to our first quarter" financial results.[1847]

---

[1840]  *Id.*

[1841]  *Id.*

[1842]  Ex. 618 (Kowalczuk E-Mail, dated April 5, 2007).

[1843]  Examiner's Interview of Nils Larsen, June 15, 2010.

[1844]  *Id.*

[1845]  *Id.*

[1846]  *Id.*

[1847]  Ex. 619 at TRB0131956 (Musil E-Mail, dated April 24, 2007).

By early May 2007, it was apparent that the Lead Banks were having difficulties syndicating the loans. A series of internal JPMCB e-mails discussed these dynamics.[1848] JPMCB began working with Mr. Zell and Tribune on a proposal for an asset sale bridge that would "slow deleveraging and help with technicals."[1849] Mr. Larsen admitted that there was a difference in the market from February to May of 2007, and that "[i]n May, this was a large deal and a fair amount of senior debt relative to the capital structure. It's essentially a market deal. A lot of lenders, a lot of conversations."[1850] As discussed in the Report, Tribune, the Zell Group, and the LBO Lenders came to terms on the Step One Financing and the Step Two Financing, and the Step One Financing closed on June 4, 2007.[1851]

F.      **Significant Events Leading Up to the Step Two Transactions.**

1.      **Pre-Step Two Transactions Market Background.**

a.      **Analyst Reports.**

On June 20, 2007, Deutsche Bank Securities Inc. reduced its projected target price for the Tribune Common Stock after Tribune announced disappointing May 2007 revenues, announcing that "[w]e lower our price target from $34 to $32 to reflect the offer price and the probability of the offer being lowered or the deal not closing."[1852] Deutsche Bank also raised concerns about the likelihood of Tribune obtaining the FCC Order, the primary lenders' ability to syndicate the Step Two Financing, rising interest rates, and widening high yield credit spreads.[1853]

---

[1848]   *See* Ex. 620 (Kaplan E-Mail, dated May 11, 2007); Ex. 621 (Cohen E-Mail, dated May 11, 2007); Ex. 622 (Sell E-Mail, dated May 12, 2007).

[1849]   Ex. 623 (Linneman E-Mail, dated May 11, 2007).

[1850]   Examiner's Interview of Nils Larsen, June 15, 2010.

[1851]   *See* Report at §§ III.D.10. and III.D.17.

[1852]   Ex. 624 (Deutsche Bank Securities Inc. Company Alert, dated June 20, 2007).

[1853]   *Id.*

On June 22, 2007, an analyst at Standard & Poor's Leveraged Commentary & Data reported that the bid price for the Tranche B Facility had fallen approximately one point below its initial offer price, "an indicator that the market's appetite for the deal is waning."[1854]

On July 1, 2007, Deutsche Bank issued a comprehensive ratings upgrade report on Tribune indicating that:[1855]

> [b]ased on our understanding of the merger and the credit agreements, and discussions with the company, investors and DB analysts . . . we believe that the Tribune going-private transaction will complete.  There may be some unhappy lenders in the end, but equity investors are more likely than not to get their $34 in the second tender.  We therefore raise our target to $34, and move our rating from Hold to Buy.

Deutsche Bank continued on to say that "Zell/ESOP have secured financing via commitment letter, which essentially locks in financing to complete the deal…."[1856]  Deutsche Bank noted that, notwithstanding that the financing is "locked in place," the Tribune Common Stock had dropped below $30, explaining that the equity market was concerned about the following:[1857]

> 1)    The merger agreement includes a clause that would allow Sam Zell to exit the deal if there is insufficient financing. Some investors believe that Zell is having second thoughts given very weak current advertising trends and the rising cost of debt that TRB will have to contend with as the credit market's view of the company and [its] business is increasingly lukewarm.  These investors believe Zell will try to use the clause (or some other means) to get out of the deal.
>
> 2)    The primary lenders for the deal (four of them, led by JP Morgan and Merrill Lynch), who have guaranteed financing via a bridge loan, may be unhappy with the bond

---

[1854]  Ex. 625 at C3 (Chicago Tribune, dated June 22, 2007).

[1855]  Ex. 626 at 1 (Deutsche Bank Rating Upgrade, dated July 1, 2007).

[1856]  *Id.*

[1857]  *Id.* at 2-3.

market's diminished appetite for highly leveraged credit
issues, particularly from a big market newspaper company.
They may be looking for a way out of the deal themselves.
The commitment letter for the bridge loan contains a
leverage ratio test that could give them an out if operating
trends get meaningfully worse for Tribune.

3)    The Chandler family sold the balance of their shares
      remaining after the first tender (20.4M shares) for about
      $31.19 per share to Goldman Sachs in early June.  We are
      not sure why the family sold at a price so substantially
      below the upcoming second tender, and the mystery
      surrounding that move has contributed to the spooking of
      the equity markets.  Goldman likely, in turn, sold some or
      all of that position, which could also have put downward
      pressure on the stock.

Having evaluated the response of the equity markets, Deutsche Bank continued on to

evaluate the debt markets:[1858]

While the equity market appears to believe there is a good chance
the deal will die or the terms of the deal will be materially altered,
the bond and credit default swap markets appear to think the deal is
highly likely to be completed.

Credit default swaps are "insurance" against default for current
Tribune debt, and thus rise the more it becomes likely that current
debt will be impacted by newer, more senior debt, due to the
increased risk of default for a more highly leveraged company.  If
the deal died completely, the CDS price would fall sharply.
Instead they have been rising fairly dramatically, suggesting that
the CDS market thinks the deal will be completed.  Prices for the 5
year senior TRB CDS have risen over 100 points over the last two
weeks….  Some of this rise is due to a jittery debt market, but we
believe that most of it reflects a view on the deal.

With respect to the likelihood of obtaining the requisite FCC Order, Deutsche Bank noted

that:[1859]

Under current FCC rules, a single company cannot own both a
daily newspaper and a broadcast outlet in the same market.

---

[1858] *Id.* at 13.

[1859] *Id.* at 13-14.

Several companies with cross-ownership markets were either grandfathered around the ban, or received a waiver that allowed them to own both a paper and a TV or radio station in the same market.  FCC rules provide that a transfer of control terminates any grandfather exemption or waiver, and would theoretically force a purchaser to divest one of the media assets in a cross-owned market.

Among Tribune's 11 daily newspapers, five operate in markets in which Tribune also owns a TV station (New York, Los Angeles, Chicago, Miami/Ft. Lauderdale and Hartford).  The going-private transaction is conditioned upon the FCC providing a cross-ownership waiver for each of the five stations.

Recent press reports indicated that Zell and Tribune have lobbied both the FCC and Congress for a quick ruling on Tribune's pending transfer of control application (filed May 1).  The press has also reported that several prominent Senate Democrats, including Majority Leader Harry Reid, Richard Durbin from Illinois, and Charles Schumer from New York, have written a letter to FCC Chairman Kevin Martin asking for "prompt consideration."  In "Washington-speak" this means "approve it."

Historically the Democrats have been more concerned than the Republicans regarding local media concentration and diversity of voice.  With top Democrats promoting completion of the Tribune deal, we expect the Republican majority in the FCC to comply with the "prompt consideration" request as there seems to be bi-partisan political will behind it.

Finally, although Deutsche Bank did conclude that it believed that the Leveraged ESOP

Transactions would close, it noted the following concerns:[1860]

While we believe that Tribune will exceed the minimum adjusted EBITDA threshold laid out in the merger and credit agreements, our primary concern is that none of the parties involved in this going-private transaction are highly motivated to see the deal through on its current terms.

•      Zell has no reason to want to keep the second tender at $34 per share.  He may even now have reason to want to exit the deal all together [sic].  At the very least he'd like to renegotiate the price of the second tender to a lower number.  The only reason we can

---

[1860] *Id.* at 14-15.

see that he would not seek to renegotiate the second stage tender
offer is to keep his good reputation.

•       The lenders for this deal don't want to get stuck not being
able to syndicate the debt from the bridge loan.  We believe they'd
probably like to be able to get out of their commitment if they
could do so without damaging their reputation (which seems very
difficult).

•       Management may have some incentive to keep the deal
intact "as is," as some of their compensation (via options and
shares) has been tied to the sales price.  But if management
remains in place following the going-private transaction, they
would also want less debt to ease the interest burden of the
company they will be running.

•       The only party that has a fiduciary duty to the shareholders
and does not have conflicting alliances is The Board of Directors.
The Board may potentially have to weigh the threat of shareholder
lawsuits versus accepting a lower price to get the deal completed,
if Zell and the lenders put up legal delays (if any such are possible
other than the MAC clause).

On August 14, 2007, Lehman Brothers issued a Change of Earnings Forecast, cutting its

estimate of Tribune's earnings per share in 2007 from $1.48 to $1.42 and in 2008 from $1.20 to

$1.00, on the assumption that the Step Two Transactions would not close, and rating Tribune as

"Underweight" and the sector as "Negative," with a $34 price target[1861] for the Tribune Common

Stock.[1862]  Lehman indicated that, in its opinion, "the likelihood [of the Step Two Transactions]

happening in the upcoming months is no better than 50%/50% at this stage due to the significant

pressure on revenue and EBITDA….  Tribune is significantly overlevered currently and should

not be adding more debt to its capital structure,"[1863]  concluding that "[s]hould the [Step Two

---

[1861] Lehman cautioned that $34 was based on the price per share that stockholders would receive following the
consummation of the Step Two Transactions.  However, if the Step Two Transactions were not consummated,
Lehman's estimated that the "fair value on the stock would be $3-$4 per share based on our detailed sum-of-the-
parts analysis" or $9-$10 per share if determined on the basis of estimated free cash flow.  *See* Ex. 627 at 20
(Lehman Change of Earnings Forecast, dated August 14, 2007).

[1862] *Id.* at 1.

[1863] *Id.* at 2.

Transactions close], the company will not be able to cover the estimated annual interest expense from operations let alone have excess free cash flow to pay down debt each year."[1864]

Lehman outlined several factors that made it less likely that the Step Two Transactions would be consummated:[1865]

- "The secularly declining revenue/EBITDA at Tribune;"

- "Much tighter fixed income markets over the past two to three months with no end seemingly in sight make syndicating the [Step Two Debt] very difficult;"

- Lehman's "belief that the commercial banks who have committed to financing [the Step Two Transactions] may be looking to exit this deal [as] $4.2 billion in debt could be sitting on their balance sheets if they cannot syndicate the loans out;"

- Lehman's view that the "potential realization . . . by the parties involved in the [Step Two Debt] that the proposed leverage . . . will be much too high; . . . we are talking about Sam Zell personally, the board of directors at Tribune, the company's own outside advisors, etc.;"

- Lehman's skepticism that Tribune would be able to obtain the requisite solvency opinion;

- Lehman's estimated one-third possibility that the "FCC demands that Tribune sell . . . newspaper or TV station[s]" in certain markets "would most likely cause a 'material adverse change' to the portfolio of media assets;"

- The fact that, if the Leveraged ESOP Transactions did not close by May 31, 2008, the "banks involved in the deal can walk away from the financing;" and

---

[1864] *Id.* at 2.

[1865] *Id.* at 3.

&bull;     The possible failure of Tribune to meet the "secured leverage ratio test" in the Step Two Commitment Letter.

### b.    SEC Filings.

Tribune's SEC filings during the period leading up to the Step Two Transactions disclosed certain risks associated with the Leveraged ESOP Transactions.  In Tribune's Form 10-Q for the period ended July 1, 2007 (filed August 9, 2007) Tribune disclosed three risk factors with respect to the Leveraged ESOP Transactions:[1866]

&bull;     "Our businesses may be adversely affected by the Leveraged ESOP Transactions and the failure to consummate the pending Leveraged ESOP Transactions."[1867] According to Tribune, the considerations underlying this risk factor included the diversion of management's attention away from day-to-day operations, transaction costs (which would be payable by Tribune whether or not the Merger closed), the termination of the Merger Agreement, the failure of the Merger to close, the failure to obtain necessary stockholder and FCC approvals to the Merger, and the failure to obtain the financing arrangements outlined in the Commitment Letters.[1868]

&bull;     "We currently have substantial debt and other financial obligations, and we expect to incur significant additional debt in connection with the Leveraged ESOP Transactions."[1869]  According to Tribune, the considerations underlying this risk factor included the need to dedicate greater amounts of cash flow to the payment of the LBO Lender Debt, the

---

[1866] Ex. 628 at 46-49 (Tribune Form 10-Q, filed August 9, 2007).

[1867] *Id.* at 46.

[1868] *Id.* at 46-47.

[1869] *Id.* at 47.

failure of operations to generate sufficient cash flow to pay the LBO Lender Debt, and the ability of Tribune to refinance the LBO Lender Debt on or before maturity.[1870]

• "Consummation of the Leveraged ESOP Transactions will require regulatory approval from the FCC."[1871]  According to Tribune, the considerations underlying this risk factor included the timing of the FCC's review of the application and the need to obtain new cross-ownership waivers as a result of the change of control that would result from the Merger.[1872]

Tribune's Form 10-Q for the period ended September 30, 2007 (filed November 2, 2007) identified the same risk factors as in the previous quarter's Form 10-Q.[1873]  In addition, in the Form 10-Q for the period ended September 30, 2007, Tribune cited the failure to close the Merger due to "the inability to receive a satisfactory solvency opinion" as an additional consideration underlying the first risk factor.[1874]

> **2.    The Tribune Entities' Financial Performance Following the Step One Financing Closing Date and Before the Step Two Financing Closing Date.**

Between the Step One Financing Closing Date and the Step Two Financing Closing Date, the Tribune Entities' financial performance deteriorated significantly, both in relation to comparable periods in prior years and in comparison to the Tribune Board-approved February 2007 plan.  Tribune Common Stock prices, despite being informed by at least some expectation of the closing of Step Two, traded as low as $25.41 during this period (a discount of more than 25% to the Tender Offer price), and Tribune's bond prices began declining in relation to par,

---

[1870] *Id.* at 47-48.

[1871] *Id.* at 48.

[1872] *Id.* at 48-49.

[1873] Ex. 629 at 51-54 (Tribune Form 10-Q, filed November 2, 2007).

[1874] *Id.* at 52.

slumping to as low as almost 50 cents on the dollar for certain tranches of Tribune's longer-term maturity bond debt.  Most of the adverse Tribune financial performance can be traced to declining absolute and relative performance of the Publishing Segment (consistent with observed declines in the equity values of other publicly traded newspaper companies identified by advisors as Tribune cohorts[1875] and evidencing a secular decline in the industry).

> a.      **2007 Quarterly Performance Versus Prior Years.**

Tribune announced its second quarter 2007 results in a Form 8-K filed on July 25, 2007.[1876]  Tribune reported second quarter 2007 consolidated revenues of $1.3 billion, down 7%

---

[1875] Indexed stock price changes between June 4, 2007 and December 20, 2007 for companies identified as potential Tribune Publishing Segment cohorts is presented below.  *See* Ex. 630 (Table of Tribune comparable company stock trading prices).



[1876] *See* Ex. 631 (Tribune Form 8-K, filed July 25, 2007).  Tribune filed its 2007 second quarter 10-Q on August 9, 2007, approximately two weeks later.  *See* Ex. 628 at 33 (Tribune Form 10-Q, filed August 9, 2007).  The management discussion of results set forth therein observed, among other things, as follows:

> Consolidated operating revenues for the 2007 second quarter fell 7% to $1.3 billion from $1.4 billion in 2006, and for the 2007 first half decreased 6% to $2.5 billion from $2.7 billion. These declines were primarily due to decreases in publishing revenues.

from the prior year, and a 36% comparable quarter operating profit decline of more than

$100 million (declining from more than $300 million in 2006 to less than $200 million in 2007):

| TRIBUNE CONSOLIDATED Q2 COMPARISON ($000s) | | | |
|---|---|---|---|
| | Q2 2007 (1) | Q2 2006 (1) | Difference |
| Revenue | $ 1,313,366 | $ 1,408,789 | ($ 95,423) |
| EBIT | $ 195,804 | $ 303,993 | ($ 108,189) |
| EBITDA | $ 254,060 | $ 358,640 | ($ 104,580) |
| (1) Ex. 628 (Tribune Form 10-Q, filed August 9, 2007). | | | |

In connection with the earnings announcement, Mr. FitzSimons observed to the

marketplace:[1877]

> Our second quarter results reflect the difficult advertising
> environment, although strong cost controls partially offset revenue
> declines.  Publishing was impacted by soft print advertising and
> comparisons to record real estate spending, particularly in Florida,
> in 2006.  However, second quarter interactive revenues increased
> 17 percent over the same period last year.  In television, the
> telecom and entertainment categories showed growth.  Demand
> was soft across other categories and there was little political
> spending versus last year.  As we look to Tribune's second half,
> year-over-year comparisons will ease and new revenue initiatives
> are expected to contribute to publishing results.  The launch of new
> CW and syndicated shows will positively impact our television
> group.

---

Consolidated operating profit decreased 36%, or $108 million, in the 2007 second quarter and
decreased 28%, or $144 million, in the 2007 first half.  Publishing operating profit decreased
51%, or $106 million, in the 2007 second quarter and 36%, or $135 million, in the 2007 first
half.  Publishing operating profit in the second quarter and first half of 2007 included charges
of $25 million and $26 million, respectively, for the elimination of approximately 440
positions and a charge of $24 million in both the second quarter and first half of 2007 for the
write-off of Los Angeles Times plant equipment related to the previously closed San
Fernando Valley facility.  Publishing operating profit in the 2006 first half included a
$20 million charge related to new Newsday union contracts.  Broadcasting and entertainment
operating profit was down 2%, or $2 million, in the 2007 second quarter and 5%, or
$9 million, in the 2007 first half due to a decline in television group operating profit, partially
offset by an increase in radio/entertainment profit.

[1877] Ex. 631 (Tribune Form 8-K, filed July 25, 2007).

Tribune's third quarter results were reported in a Form 8-K filed on October 24, 2007 and in a press release issued on the same day.  A little more than a week later, Tribune filed its Form 10-Q for the quarter.  Again, results were disappointing in comparison to the same period during the prior year, although third quarter results showed less disparity relative to the prior year in relation to the comparative decline in the second quarter.

| TRIBUNE CONSOLIDATED Q3 COMPARISON ($000s) | | | |
|---|---|---|---|
| | Q3 2007 (1) | Q3 2006 (1) | Difference |
| Revenue | $ 1,276,899 | $ 1,332,169 | ($ 55,270) |
| EBIT | $ 229,001 | $ 237,856 | ($ 8,855) |
| EBITDA | $ 285,083 | $ 294,617 | ($ 9,534) |

(1) Ex. 628 (Tribune Form 10-Q, filed August 9, 2007).

A discussion of third quarter results contained in the Form 10-Q noted:[1878]

> Consolidated operating revenues for the 2007 third quarter fell 4% to $1.28 billion from $1.33 billion in 2006, and for the first three quarters of 2007 decreased 5% to $3.79 billion from $4.00 billion. These declines were due to decreases in publishing revenues, partially offset by an increase in broadcasting and entertainment revenues.

The Form 10-Q also noted:[1879]

> Consolidated operating profit decreased 4%, or $9 million, in the 2007 third quarter and decreased 20%, or $153 million, in the first three quarters of 2007.  Publishing operating profit decreased 15%, or $21 million, in the 2007 third quarter and 30%, or $157 million, in the first three quarters of 2007.  Publishing operating profit in the third quarter of 2007 included a severance charge of $3 million. Publishing operating profit in the first three quarters of 2007 included a severance charge of $29 million and a charge of $24 million for the write-off of Los Angeles Time plant equipment related to the previously closed San Fernando Valley facility.

---

[1878] *See* Ex. 629 at 36 (Tribune Form 10-Q, filed November 2, 2007).

[1879] *See id.* at 36-37.

Publishing operating profit in the 2006 third quarter and the first three quarters of 2006 included $2 million of severance charges. Publishing operating profit in the first three quarters of 2006 included a $20 million charge related to new union contracts at Newsday and a $3 million gain on real property sales. Broadcasting and entertainment operating profit was up 9%, or $10 million, in the 2007 third quarter primarily due to higher cable copyright royalties, partially offset by a decrease in television advertising revenues. Broadcasting and entertainment operating profit was up $1 million in the first three quarters of 2007.

Although comprehensive financial results for the fourth quarter 2007 were not published publicly until early 2008,[1880] after the Step Two Financing Closing Date, Tribune continued to issue press releases during the fourth quarter, which shed light on the continuing decline in Tribune's performance, at least to some degree.[1881] For example, on November 27, 2007, Tribune issued a press release for period 10 (ending October 28, 2007), announcing that consolidated revenues had decline 9.3% in that period in relation to a comparable period for the prior year:[1882]

---

[1880] Tribune filed both its Form 8-K and Form 10-K on March 20, 2008. Although actual financial results were not disclosed publicly until after year end, approximately a full year of 2007 results likely were available to management before the Step Two Closing on December 20, 2007 (*e.g.*, based on the availability of the Brown Books for both October and November 2007). The following discussion addresses the fourth quarter results based on data obtained from Tribune's 10-K filing for the fiscal year ended December 30, 2007. *See* Ex. 4 (Tribune 2007 Form 10-K).

| TRIBUNE CONSOLIDATED Q4 COMPARISON ($000s) (1) | | | |
|---|---|---|---|
| | Q4 2007 | Q4 2006 | Difference |
| Revenue | $ 1,268,695 | $ 1,448,214 | ($ 179,519) |
| EBIT (2) | $ 156,742 | $ 324,717 | ($ 167,975) |
| EBITDA | $ 213,824 | $ 383,525 | ($ 169,701) |

(1) Ex. 4 (Tribune 2007 Form 10K) and Ex. 629 (Tribune Form 10-Q, filed November 2, 2007).
(2) Adjusted to exclude $130 million adjustment for writedown of intangible asset.

[1881] Tribune's monthly press releases typically did not contain profitability disclosures.

[1882] *See* Ex. 633 (Tribune Press Release, dated November 27, 2007). The press release stated:

On December 12, 2007, Tribune issued its final revenue-related press release of the year, observing that period 11 revenues were down 3.3% from the prior year, but noting that advertising revenues for period 11 in 2007 benefitted from a shift in the Thanksgiving week from period 12 in 2006 to period 11 in 2007 (thereby understating the actual extent of the decline).[1883]

---

Tribune Company (NYSE: TRB) today reported its summary of revenues and newspaper advertising volume for period 10, ended October 28, 2007. Consolidated revenues for the period were $383 million, down 9.3 percent from last year's $422 million.

Publishing revenues in October were $287 million compared with $311 million last year, down 7.9 percent. Advertising revenues decreased 10.6 percent to $222 million, compared with $249 million in October 2006.

- Retail advertising revenues decreased 7.8 percent with the largest decreases in the department stores, amusements and electronic categories, partially offset by an increase in health care category. Preprint revenues, which are principally included in retail, were down 5.7 percent for the period.

- National advertising revenues decreased 2.3 percent, with the largest decreases in the auto, transportation, and technology categories, partially offset by an increase in the movie category.

- Classified advertising revenues decreased 19.2 percent. Real estate fell 26.9 percent with the most significant declines in Florida markets, Los Angeles, and Chicago. Help wanted declined 21.7 percent and automotive decreased 4.9 percent. Interactive revenues, which are primarily included in classified, were $22 million, up 11.4 percent, due to growth in most categories.

Circulation revenues were down 6.3 percent due to single-copy declines and continued selective discounting in home delivery.

Broadcasting and entertainment group revenues in October were $96 million, down 13.3 percent, due to decreases in television group revenue and Chicago Cubs revenue. Television revenues fell 7.1 percent, due to declines in political, movies and retail, partially offset by strength in the food/packaged goods, telecom and restaurant/fast food categories. Radio/entertainment revenues declined primarily due to five fewer Cubs home games.

[1883] *See* Ex. 634 (Tribune Press Release, dated December 12, 2007). The press release stated:

Tribune Company (NYSE: TRB) today reported its summary of revenues and newspaper advertising volume for period 11, ended Nov. 25, 2007. Consolidated revenues for the period were $413 million, down 3.3 percent from last year's $428 million. Consolidated operating expenses were 5.0 percent lower than period 11 last year.

Publishing revenues in November were $309 million compared with $321 million last year, down 3.5 percent. Advertising revenues decreased 4.9 percent to $244 million, compared with $257 million in November 2006. Advertising revenues benefited from the shift in the Thanksgiving holiday week from period 12 in 2006 to period 11 this year.

- Retail advertising revenues increased 7.3 percent with the largest increase in the specialty merchandise, department stores, apparel/fashion and electronics categories. Preprint revenues, which are principally included in retail, were up 18.5 percent for the period.

### b.    2007 Monthly Performance Versus The February 2007 Tribune Board-Approved Plan.

Although not reported publicly, Tribune did track monthly profitability performance in its Brown Books.  In addition to providing management with insight into actual performance, the Brown Books compared actual performance to plan.[1884]  Analysis of information contained in the Brown Books reveals not only that was Tribune performing poorly in relation to comparable quarterly results in prior years as reported, for example, in the quarterly SEC filings discussed above, but also in comparison to its February 2007 plan.  Based on data contained in the Brown

---

- National advertising revenues increased 1.9 percent, with the largest increases in the movies, auto, financial and telecom/wireless categories, partially offset by a decrease in the transportation category.

- Classified advertising revenues decreased 26.2 percent.  Real estate fell 39.8 percent with the most significant declines in Chicago, the Florida markets, and Los Angeles.  Help wanted declined 28.4 percent and automotive decreased 7.6 percent.  Interactive revenues, which are primarily included in classified, were $21 million, up 7.8 percent, due to growth in most categories.

Circulation revenues were down 4.6 percent due to single-copy declines and continued selective discounting in home delivery.

Publishing operating expenses in November were down 5.2 percent primarily due to lower newsprint and ink, compensation, promotion and other cash expenses.

Broadcasting and entertainment group revenues in November were $104 million, down 2.6 percent, due to decreases in television group revenue, partially offset by increases in radio/entertainment revenues.  Television revenues fell 4.8 percent due to the absence of political advertising, partially offset by strength in several categories including retail, corporate, health, food/packaged goods, telecom and restaurant/fast food.

Broadcasting and entertainment group operating expenses in November declined by 2.7 percent primarily due to lower compensation and other cash expenses.

Consolidated equity income was $11 million in November, up from $8 million in the prior year period.

Tribune expects to complete its disposition of the Chicago Cubs, Wrigley Field and related real estate, and its interest in Comcast SportsNet Chicago in the first half of 2008.  It plans to use the proceeds to repay existing debt.

As stated previously, the company also expects its going-private transaction to close before the end of Tribune's 2007 fiscal year following satisfaction of the remaining closing conditions, including the receipt of a solvency opinion and completion of the committed financing.

[1884]  The Examiner concluded that the monthly budget amounts contained in the Brown Books, when aggregated, agree (with minor and reconcilable differences) with the February 2007 Tribune Board-approved plan.

Books, monthly variances to plan at the consolidated Tribune level of reporting for the periods

from May through December 2007[1885] are summarized below:[1886]

| TRIBUNE CONSOLIDATED REVENUE ($000s) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2007 | | | | | | | |
| Period | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| 2007 Actual | $ 405,965 | $ 507,931 | $ 466,707 | $ 391,163 | $ 419,029 | $ 382,810 | $ 413,447 | $ 472,438 |
| 2007 Plan | $ 441,391 | $ 541,920 | $ 497,934 | $ 414,056 | $ 420,587 | $ 417,883 | $ 437,745 | $ 512,525 |
| Variance | -8.03% | -6.27% | -6.27% | -5.53% | -0.37% | -8.39% | -5.55% | -7.82% |

| TRIBUNE CONSOLIDATED OPERATING PROFIT ($000s) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2007 | | | | | | | |
| Period | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| 2007 Actual | $ 73,515 | $ 59,809 | $ 82,419 | $ 63,218 | $ 83,364 | $ 73,148 | $ 95,113 | ($ 141,519) |
| 2007 Plan | $ 93,116 | $ 123,144 | $ 88,112 | $ 73,846 | $ 72,409 | $ 90,221 | $ 106,162 | $ 113,767 |
| Variance | -21.05% | -51.43% | -6.46% | -14.39% | 15.13% | -18.92% | -10.41% | -224.39% |

Most of the negative variance to plan resulted from the Publishing Segment as opposed to

the Broadcasting Segment.[1887]

---

[1885] *See* Ex. 635, Ex. 636, Ex. 637, Ex. 638, Ex. 639, Ex. 640, Ex. 641, Ex. 642 (Monthly Brown Books for the eight periods May - December 2007). May 2007 data are included in this section of the Report because these data were not available in Brown Book format before the Step One Financing Closing Date.

[1886] The Examiner notes that certain significant non-recurring charges were taken by Tribune that explain some of the observed variances to plan, particularly in December 2007 when Tribune wrote off $130 million in goodwill associated with the Newsday Masthead, among other things. Therefore, variances to plan as reflected in the comparative tables need to be considered in light of these circumstances. Other non-recurring charges amounting to approximately $113.3 million were recorded during the fourth quarter 2007 as well. These charges included approximately $20 million in severance costs and almost $64 million in change of control payments. *See* Ex. 640, Ex. 641, Ex. 642 (Monthly Brown Books for fourth quarter 2007).

[1887] Broadcasting Segment results are summarized below. Monthly operating profit for the consolidated Tribune Entities does not equal the sum of Publishing Segment and the Broadcasting Segment results due to the recognition of certain expenses only at the consolidated Tribune Entities level of reporting.

| BROADCASTING SEGMENT REVENUE ($000s) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2007 | | | | | | | |
| Period | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| 2007 Actual | $ 114,055 | $ 158,251 | $ 147,427 | $ 120,536 | $ 138,088 | $ 96,123 | $ 104,047 | $ 116,206 |
| 2007 Plan | $ 121,903 | $ 164,486 | $ 148,504 | $ 121,913 | $ 115,550 | $ 100,665 | $ 106,549 | $ 117,211 |
| Variance | -6.44% | -3.79% | -0.73% | -1.13% | 19.50% | -4.51% | -2.35% | -0.86% |

| PUBLISHING SEGMENT REVENUE ($000s) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2007 | | | | | | |
| Period | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| 2007 Actual | $ 291,910 | $ 349,680 | $ 319,280 | $ 270,627 | $ 280,941 | $ 286,687 | $ 309,400 | $ 356,232 |
| 2007 Plan | $ 319,488 | $ 377,434 | $ 349,430 | $ 292,143 | $ 305,037 | $ 317,218 | $ 331,196 | $ 395,314 |
| Variance | -8.63% | -7.35% | -8.63% | -7.36% | -7.90% | -9.62% | -6.58% | -9.89% |

| PUBLISHING SEGMENT OPERATING PROFIT ($000s) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2007 | | | | | | |
| Period | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| 2007 Actual | $ 52,241 | $ 14,253 | $ 43,097 | $ 35,031 | $ 44,415 | $ 50,231 | $ 67,065 | ($ 114,277) |
| 2007 Plan | $ 65,895 | $ 71,437 | $ 50,327 | $ 43,375 | $ 54,308 | $ 64,514 | $ 77,545 | $ 92,026 |
| Variance | -20.72% | -80.05% | -14.37% | -19.24% | -18.22% | -22.14% | -13.51% | -224.18% |

Viewed in the aggregate, Tribune was underperforming in relation to both plan and prior year 2006 results, with most of the underperformance attributable to the Publishing Segment throughout 2007:

| BROADCASTING SEGMENT OPERATING PROFIT ($000s) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2007 | | | | | | |
| Period | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| 2007 Actual | $ 25,249 | $ 51,349 | $ 43,748 | $ 31,545 | $ 42,494 | $ 26,578 | $ 31,150 | $ 12,710 |
| 2007 Plan | $ 31,599 | $ 57,178 | $ 43,254 | $ 34,831 | $ 22,439 | $ 29,994 | $ 32,903 | $ 27,106 |
| Variance | -20.10% | -10.19% | 1.14% | -9.43% | 89.38% | -11.39% | -5.33% | -53.11% |





Most of the adverse performance was attributable to the Publishing Segment:





### c.    The October 2007 Revised Plan.

In light of its deteriorating financial performance in relation to the February 2007 Tribune Board-approved plan, Tribune management revised its financial forecast, and, as memorialized in minutes of the October 17, 2007 Tribune Board meeting, presented a revised plan to the Tribune Board.[1888]  This revised plan is discussed further in connection with the Examiner's discussion of management's knowledge between the Step One and Step Two closings.[1889]

### d.    Observations Regarding Market Awareness and Reactions.

Between the Step One Financing Closing Date and the Step Two Financing Closing Date, analysts following Tribune began downwardly revising expectations for Tribune's prospective financial performance, both in response to Tribune's specific public disclosures (*e.g.,* Form 8-K and 10-Q filings) and in recognition of performance announcements for companies identified as Tribune cohorts (among other information that would have been deemed relevant by such analysts, including broad based economic factors, etc.).  As reflected in the table below, consensus estimates declined considerably during this time:[1890]

| TRIBUNE IBES ESTIMATES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2007 Estimates | | | | 2008 Estimates | | | |
| Consensus | Revenue | | EBITDA | | Revenue | | EBITDA | |
| Date | IBES Median | IBES Mean | IBES Median | IBES Mean | IBES Median | IBES Mean | IBES Median | IBES Mean |
| 01/2007 | $ 5,495.8 | $ 5,465.6 | $ 1,287.7 | $ 1,277.3 | $ 5,448.6 | $ 5,432.1 | $ 1,260.1 | $ 1,279.4 |
| 02/2007 | $ 5,399.6 | $ 5,395.1 | $ 1,269.7 | $ 1,267.8 | $ 5,473.4 | $ 5,452.2 | $ 1,260.9 | $ 1,264.7 |
| 03/2007 | $ 5,367.8 | $ 5,369.0 | $ 1,277.6 | $ 1,255.1 | $ 5,399.6 | $ 5,412.5 | $ 1,237.1 | $ 1,244.5 |
| 04/2007 | $ 5,323.0 | $ 5,318.1 | $ 1,211.8 | $ 1,214.1 | $ 5,288.1 | $ 5,327.2 | $ 1,239.6 | $ 1,214.4 |
| 05/2007 | $ 5,335.5 | $ 5,323.9 | $ 1,218.4 | $ 1,217.4 | $ 5,304.2 | $ 5,335.4 | $ 1,244.3 | $ 1,219.7 |
| 06/2007 | $ 5,248.5 | $ 5,250.4 | $ 1,179.5 | $ 1,180.2 | $ 5,257.6 | $ 5,217.7 | $ 1,164.2 | $ 1,170.5 |
| 07/2007 | $ 5,113.3 | $ 5,130.5 | $ 1,138.7 | $ 1,123.9 | $ 5,053.3 | $ 5,062.2 | $ 1,138.7 | $ 1,109.0 |
| 08/2007 | $ 5,084.3 | $ 5,088.9 | $ 1,124.8 | $ 1,106.2 | $ 5,015.1 | $ 4,982.1 | $ 1,110.9 | $ 1,081.7 |
| 09/2007 | $ 5,075.9 | $ 5,086.8 | $ 1,117.3 | $ 1,104.3 | $ 4,983.7 | $ 4,971.9 | $ 1,088.4 | $ 1,074.5 |
| 10/2007 | $ 5,102.3 | $ 5,118.7 | $ 1,171.2 | $ 1,153.1 | $ 5,014.2 | $ 4,993.1 | $ 1,140.3 | $ 1,096.7 |
| 11/2007 | $ 5,128.4 | $ 5,128.9 | $ 1,171.4 | $ 1,161.7 | $ 5,009.0 | $ 4,987.7 | $ 1,135.2 | $ 1,092.6 |

---

[1888]  *See* Ex. 643 at TRB0415666 (Tribune Board Meeting Minutes, October 17, 2007).

[1889]  *See* Report at § III.H.1.b.

[1890]  This Institutional Brokers' Estimate System data reflecting analyst consensus estimates were obtained from Tribune's financial advisor, Lazard.  *See* Ex. 74 (Tribune IBES Estimates).

Tribune Common Stock price eroded during the period, albeit increasing to near the Tender Offer price as the closing of Step Two approached.[1891]



Finally, prices of Tribune's publicly traded debt declined significantly between June 4, 2007 and December 20, 2007, despite showing little volatility in periods leading up to the closing of Step One.[1892]

---

[1891]  *See* Ex. 75 (Daily Tribune Stock Trading Price).

[1892]  *See* Ex. 77 (Tribune Bond Pricing).  Credit default swap pricing also increased substantially during this period.



**3.    Disposition of Chandler Trusts Stock and Resignation of Tribune Board Members Affiliated with the Chandler Trusts.**

The Chandler Trusts tendered into the Tender Offer all shares of Tribune Common Stock held by them as of the expiration of the Tender Offer.[1893]  Because the number of shares tendered into the Tender Offer, proration of the tendered shares was required by the terms of the Tender Offer,[1894] and not all shares tendered by the Chandler Trusts into the Tender Offer were accepted for payment by Tribune.  As a result, the Chandler Trusts sold 27,774,388 of Tribune Common Stock into the Tender Offer.[1895]  On June 4, 2007, in accordance with the terms of the Chandler Trusts Registration Rights Agreement, the Chandler Trusts entered into an underwriting agreement with Goldman Sachs and Tribune, pursuant to which the Chandler Trusts agreed to sell through a block trade underwritten by Goldman Sachs an aggregate of 20,351,954 shares of

---

[1893]  Ex. 171 at 9 (Chandler Trusts Schedule 13D).

[1894]  Ex. 5 at 73 (Tender Offer); Ex. 225 (Tribune Press Release, dated May 31, 2007).

[1895]  Ex. 171 at 9 (Chandler Trusts Schedule 13D).

Tribune Common Stock, which represented the remainder of the shares of Tribune Common Stock owned by the Chandler Trusts following the Tender Offer.[1896]  At the time the underwriting agreement was signed, a Blackstone team member sent an e-mail to some members of the Foundation's Advisory Committee and other Foundation's Advisors concerning the Goldman Sachs trade, noting:[1897]

> From what I heard, Goldman was way oversubscribed on the Chandler block . . . more then [sic] 2x . . . the stock has pretty consistently traded over $32/share, so the arbs all thought getting a chance to buy the stock at $31.50 was a way to make sure money . . . interesting logic . . . will be interesting to see where the stock trades as they all try to capture the spread – it sounds like Goldman bought the shares from the Chandlers at a price around $31 or $31.25/share and reoffered to the street at $31.50 . . . the fun never stops!

Following the closing of this transaction on June 7, 2007, the Chandler Trusts no longer owned any shares of Tribune Common Stock.[1898]  On June 4, 2007, the three Tribune Board

---

[1896] Ex. 10 at Exhibit 1.1 (Tribune Form 8-K, filed June 5, 2007); Ex. 4 at 46 (Tribune 2007 Form 10-K).  In response to the Examiner's question as to why the Chandler Trusts sold their Tribune Common Stock before the consummation of the Merger, William Stinehart explained that:

> Once the [Tender Offer] closed, we had an absolute fiduciary duty to get rid of [the Chandler Trusts'] stock -- a quarter of the [Chandler Trusts'] net worth was in this stock, and they had suspended paying dividends for six months.  Most trusts have to diversify their assets, and we had a legal opinion that we didn't have to diversify like other trusts, but that opinion hinged on the 3 members of the board that were designated by the Chandler Trusts.  Once they lost their board seats, our fiduciary duty says, "dump this."

Examiner's Interview of William Stinehart, June 28, 2010.

When asked by the Examiner why the Chandler Trusts were willing to accept a price for their shares of Tribune Common Stock lower than the consideration that they would have received in the Merger, Mr. Stinehart explained that:

> We had to diversify from this comprising 25% of our total assets, and the stock was not paying dividends for 6 months.  We have a duty to our income beneficiaries.  Also, there was no guarantee that the transaction would go through.  As a trustee, there was no doubt in my mind that we could not hold that stock.

*Id.*

[1897] Ex. 644 (Greenthal E-Mail, dated June 4, 2007).

[1898] Ex. 577 at 27 (Tribune Form 10-Q, filed May 8, 2008).

members nominated by the Chandler Trusts, Jeffrey Chandler, Roger Goodan, and William

Stinehart, Jr., resigned from the Tribune Board.[1899]

### 4.    Asset Dispositions and Application of Proceeds.

During 2007, before the Step Two Transactions, the Tribune Entities completed several

asset dispositions:  On February 12, 2007, Tribune announced an agreement to sell Hoy, New

York, the Tribune Entities' Spanish-language daily newspaper, to ImpreMedia, LLC.[1900]  The

Tribune Entities completed the sale of Hoy, New York on May 15, 2007,[1901] recording a pretax

gain on the sale of $2.5 million ($0.1 million after taxes).[1902]  On March 6, 2007, Tribune

announced an agreement to sell the Tribune Entities' southern Connecticut newspapers, The

Advocate (Stamford) and Greenwich Time, to Gannett Co., Inc.[1903]  However, an arbitrator ruled

that the Tribune Entities could not sell the newspapers unless the buyer agreed to assume an

existing collective bargaining agreement, and, when the potential buyer refused, Tribune

announced the termination of the transaction on May 25, 2007.[1904]  On October 25, 2007,

Tribune announced an agreement to sell the newspapers to Hearst Corporation for

$62.4 million.[1905] The sale closed on November 1, 2007,[1906] and Tribune recorded a pretax loss

of $19 million ($33 million after taxes) to write down the net assets of the newspapers to

estimated fair value, less costs of sale.[1907]  The proceeds from this and other asset sales required

---

[1899]  Ex. 554 (Tribune Press Release, dated June 4, 2007); Ex. 4 at 46 (Tribune 2007 Form 10-K).

[1900]  Ex. 645 (Tribune Press Release, dated February 12, 2007).

[1901]  Ex. 646 (Tribune Press Release, dated May 15, 2007).

[1902]  Ex. 4 at 6 (Tribune 2007 Form 10-K).

[1903]  Ex. 647 (Tribune Press Release, dated March 6, 2007); Ex. 4 at 6 (Tribune 2007 Form 10-K).

[1904]  Ex. 4 at 6 (Tribune 2007 Form 10-K); Ex. 648 (Tribune Press Release, dated May 25, 2007).

[1905]  Ex. 4 at 6 (Tribune 2007 Form 10-K); Ex. 649 (Tribune Press Release, dated October 25, 2007).

[1906]  Ex. 4 at 6 (Tribune 2007 Form 10-K); Ex. 650 (Tribune Press Release, dated November 1, 2007).

[1907]  Ex. 4 at 6 (Tribune 2007 Form 10-K).

mandatory prepayments under the Credit Agreement when cumulative net cash proceeds, not previously prepaid, exceed $50 million.[1908]  No proceeds from this sale were applied to the LBO Lender Debt as a prepayment.  In the third quarter of 2007, Tribune recorded a favorable $3 million after-tax adjustment to the loss on the sale.[1909]  In addition, during the third quarter of 2007, Tribune began actively pursuing the sale of the stock of one of its Subsidiaries, EZ Buy & EZ Sell Recycler Corporation, to Target Media Partners.  The stock sale closed on October 17, 2007.[1910]  Tribune recorded a pretax loss of $1 million on the sale of the stock.[1911]  No proceeds from this sale were applied to the LBO Lender Debt.

### 5.    Stockholder Approval.

On July 2, 2007, Tribune announced that the Company Meeting to consider the Merger would be held on August 21, 2007.[1912]  On July 13, 2007, Tribune sent proxy materials to its stockholders in connection with the Company Meeting.[1913]  At the Company Meeting, 82,631,710 shares of Tribune Common Stock were voted in favor of the Merger, representing 64.9% of the total shares outstanding and 97.4% of the shares that were voted, and the Merger was thereby approved.[1914]  In the press release announcing the results of the Company Meeting, Mr. FitzSimons was quoted as saying, "With financing fully committed, we anticipate closing the transaction in the fourth quarter, following FCC approval and satisfaction of the other closing conditions."[1915]

---

[1908]  Ex. 179 at 49 (Credit Agreement).

[1909]  Ex. 4 at 6-7 (Tribune 2007 Form 10-K).

[1910]  *Id.* at 7 (Tribune 2007 Form 10-K).

[1911]  *Id.*

[1912]  Ex. 651 at 2 (Tribune Schedule 14A, filed July 3, 2007).

[1913]  Ex. 226 (Proxy Statement).

[1914]  Ex. 652 at 4 (Tribune Schedule 13E-3).

[1915]  Ex. 653 (Tribune Press Release, dated August 21, 2007).

### 6. Step Two Due Diligence/Revisions to Long Term Financial Assumptions.

In August 2007, Tribune began to prepare an updated five-year model by business unit.[1916]  To that end, Tribune elicited revised revenue, expense, and operating cash flow forecasts from its various business units.[1917]

On September 19 and 20, 2007, Tribune held a series of meetings with VRC.[1918] Participants included senior management and executives from the Tribune Entities' major businesses.[1919]  Tribune provided VRC with current 2007 projections, a revised five-year forecast, and detailed presentations regarding the Publishing Segment and the Broadcasting Segment.[1920]

On September 26, 2007, Tribune held a session with certain of the lenders participating in the Step One Financing and the Step Two Financing.[1921]  Tribune provided information regarding 2007 third and fourth quarter projections, 2007 projected cash flow summary, projected Tranche X Facility repayment schedule, revised long term financial projections, a summary of real estate assets, an update on the Chicago Cubs transaction process, equity investments, and a legal update that included an update on the status of the efforts to obtain the necessary waivers from the FCC.[1922]  Tribune held another session on October 1, 2007, during

---

[1916]  Ex. 654 (E-Mail from Chandler Bigelow, dated August 2, 2007).

[1917]  *Id.*

[1918]  Ex. 655 (Tribune Company Valuation Research Corp. Due Diligence Agenda).

[1919]  *Id.*

[1920]  *Id.*; Ex. 656 (Tribune Company Corporate Finance Handouts, dated September 19, 2007).

[1921]  Ex. 182 (Bank Due Diligence Teleconference Call Agenda and Schedules, dated September 26, 2007).

[1922]  *Id.*

which it provided information regarding the updated model for the Publishing Segment and the Broadcasting Segment.[1923]

On October 17, 2007, the Tribune Board met to discuss, among other things, management's revised five-year forecast for the Tribune Entities.[1924]  Management's revised forecast included several different scenarios, including a "base case," a "downside case," and an "upside case."[1925]  In addition, management ran each of these three operating scenarios two ways:  (a) assuming that the Step Two Financing was incurred as planned; and (b) assuming that Tribune was "flexed" (*i.e.,* the terms of the loans were modified as permitted under the Step One Financing documents into more expensive financing because of the Lead Banks' inability to syndicate the Step Two Financing).[1926]  Management's "downside scenario" was based on the publishing revenue projections assumed by Craig Huber at Lehman Brothers, the most pessimistic sell-side analyst, which assumed that Tribune's publishing revenues would fall 3.3% per year for five consecutive years.[1927]  Management's analysis also noted the possibility of asset dispositions depending on the severity of the downturn.[1928]  According to management's analysis, even in a downside operating scenario in which financing was more expensive, Tribune would be in compliance with its financial covenants without the need for asset sales over the term of the Credit Agreement.[1929]  At this meeting, Morgan Stanley made a presentation regarding the

---

[1923]  Ex. 183 (Tribune Company Underwriters Due Diligence Agenda for October 1, 2007); Ex. 184 (Tribune Publishing Presentation); Ex. 185 (Tribune Broadcasting Presentation).

[1924]  Ex. 643 at 4 (Tribune Board Meeting Minutes, dated October 17, 2007).

[1925]  *Id.*; Ex. 657 (Tribune Five-Year Financial Outlook).

[1926]  Ex. 643 at 4 (Tribune Board Meeting Minutes, dated October 17, 2007); Ex. 657 (Tribune Five-Year Financial Outlook).

[1927]  Ex. 657 at 4 (Tribune Five-Year Financial Outlook).

[1928]  *Id.*

[1929]  *Id.*

leveraged finance market environment, a publishing and broadcasting sector update, Tribune's updated longer term financial projections, and Tribune's leverage profile.[1930]

### 7.    Third-Party Approvals.

#### a.    FCC.

On November 30, 2007, Tribune issued a press release announcing that the FCC had approved the transfer of its broadcasting licenses and the extension of its cross-ownership waivers in markets where the Tribune Entities owned both a television station and a newspaper, thereby satisfying a closing condition to the Merger.[1931]  In the press release announcing FCC approval, Mr. FitzSimons was quoted as saying, "We appreciate today's action by the FCC, which allows our transaction to move forward. . . .  We look forward to implementing the new ownership structure that will enable us to focus all of our energy and resources on Tribune's future."[1932]

#### b.    Major League Baseball.

On December 17, 2007, the Tribune Entities received the consent of the Office of the Commissioner of Major League Baseball to consummate the Merger, thereby satisfying a closing condition to the Merger.[1933]

### 8.    Management Incentive and Severance Plans.[1934]

#### a.    Transitional Compensation Plan.

On July 19, 2006, the Tribune Board adopted an amended and restated Transitional Compensation Plan.[1935]  Each employee covered by the Transitional Compensation Plan was

---

[1930]  Ex. 643 at 5 (Tribune Board Meeting Minutes, dated October 17, 2007).

[1931]  Ex. 658 (Tribune Form 8-K, filed December 3, 2007); Ex. 659 (FCC Order, dated November 30, 2007). Although the FCC Order was entered, two FCC Commissioners dissented.

[1932]  Ex. 660 (Tribune Press Release, dated November 30, 2007).

[1933]  Ex. 661 (Major League Baseball Letter, dated December 17, 2007).

[1934]  This section of the Report describes only a few of the Tribune Entities' incentive compensation programs.

entitled to benefits in the event that such employee's employment was terminated (a) on, or within a specified period of time following, a change in control of Tribune (defined as (i) the acquisition of 20% or more of the outstanding Tribune Common Stock or voting power by a person or group of persons other than the McCormick Foundation and any employee benefit plan or trust of Tribune or its Subsidiaries, (ii) the failure of individuals who were directors as of January 1, 2005 or whose election or nomination to the Tribune Board was approved by such individuals (or individuals so approved) to constitute a majority of the Tribune Board, (iii) a reorganization or merger of Tribune in which the stockholders of Tribune immediately before the consummation of the reorganization or merger did not own 50% or more of the voting power of the combined entity immediately thereafter, or (iv) a sale of all or substantially all of the assets of the Tribune Entities), (b) before a change in control at the request of a third party participating in or causing the change in control, or (c) otherwise in connection with a change in control.[1936]

Eligibility for, and the amount of a portion of the benefits received by, a participant in the Transitional Compensation Plan depended on the tier to which such employee was ascribed:[1937]

| Tier | Period of Time Following Change in Control for Termination of Employment to Trigger Benefits | Lump Sum Cash Payment | Period of Continuation of Insurance Coverage (unless earlier covered by comparable insurance from a new employer) |
|---|---|---|---|
| Tier I | 36 months | 3 multiplied by the sum of the highest annual base salary during the three year period before termination plus 200% of the target bonus payable for the year in which the change in control occurs | 36 months |
| Tier II | 24 months | 2 multiplied by the sum of the highest annual base salary during the three year period before termination plus 200% of the target bonus payable for the year in which the change in control occurs | 24 months |

---

[1935] *Ex.* 662 at 1 (Transitional Compensation Plan).

[1936] *Id.* at §§ 2 and 4.

[1937] *Id.* at §§ 3 and 5.

| Tier | Period of Time Following Change in Control for Termination of Employment to Trigger Benefits | Lump Sum Cash Payment | Period of Continuation of Insurance Coverage (unless earlier covered by comparable insurance from a new employer) |
|---|---|---|---|
| Tier III | 18 months | 1 multiplied by the sum of the highest annual base salary during the three year period before termination plus 100% of the target bonus payable for the year in which the change in control occurs | 12 months |

Participants would also receive outplacement services and a gross-up for excise taxes payable under the IRC.[1938]  Termination of employment due to the participant's death, disability, or voluntary resignation or termination for conduct involving dishonesty or willful misconduct significantly detrimental to Tribune and its Subsidiaries would not trigger benefits under the Transitional Compensation Plan.[1939]  Tribune was not required to set aside funds for the payments to be made under the Transitional Compensation Plan.[1940]  Tribune was prohibited from making any modifications to the Transitional Compensation Plan that would reduce the benefits available thereunder during the 36 month period following a change in control if the modifications were made (a) on the day of or subsequent to the change in control, (b) before the change in control but at the request of a third party participating in or causing the change in control, or (c) otherwise in connection with an actual or anticipated change in control.[1941]

Pursuant to the terms of the Merger Agreement, the individual participants in the Transitional Compensation Plan had the right to enforce the requirement in the Merger Agreement that the surviving corporation in the Merger (*i.e.,* post-Merger Tribune) "honor, fulfill and discharge the Company's obligations under the Transitional Compensation Plan,

---

[1938] *Id.* at §§ 5 and 7.

[1939] *Id.* at § 3(b).

[1940] *Id.* at § 8.

[1941] *Id.* at § 11 (Transitional Compensation Plan).

without any amendment or change that is adverse to any beneficiary of such Transitional

Compensation Plan."[1942]

Mr. FitzSimons received a payment of $15,966,121 (including tax gross-up) under the

Transitional Compensation Plan as a result of the termination of his employment in

December 2007 and John Reardon received a payment of $6,118,449 (including tax gross-up)

under the Transitional Compensation Plan as a result of the termination of his employment in

February 2008.[1943]

### b.    Proposal of the Management Equity Incentive Plan.

Before February 19, 2007, EGI apparently had not proposed a management incentive

plan in connection with the Leveraged ESOP Transactions.[1944]  On February 19, 2007, EGI

submitted a term sheet to Tribune that, in addition to proposed terms for the Merger,

contemplated the adoption of a management incentive plan providing management the economic

equivalent of 5% of the outstanding Tribune Common Stock.[1945]  After preliminary

conversations with Tribune's management and financial advisors, EGI submitted a revised term

sheet on February 22, 2007 that included a further description of a "Management Equity

Incentive Plan" providing that:[1946]

> participants in the [Management Equity Incentive Plan] shall be
> entitled to receive benefits upon the occurrence of specified events
> or upon a specified date, with the value of their benefits to be
> determined by reference to the value of [Tribune's] stock,
> determined on an enterprise value basis, with no discount for the
> lack of control or lack of marketability.

---

[1942]  Ex. 151 at § 5.5(b)(i) (Merger Agreement).

[1943]  Ex. 4 at 198 (Tribune 2007 Form 10-K).

[1944]  Ex. 116 (EGI Proposal, dated February 6, 2007).

[1945]  Ex. 121 at 5 (EGI Term Sheet, dated February 19, 2007).

[1946]  Ex. 122 at 7 (EGI Term Sheet, dated February 22, 2007).

c.    **Board of Directors/Compensation Committee Approvals of Bonus and Incentive Awards and Management Equity Incentive Plan.**

In connection with the Tribune Board's approval of the Leveraged ESOP Transactions, on April 1, 2007, the Compensation Committee met to consider management's proposal for Tribune to adopt "a special cash bonus pool and phantom stock plan . . . in connection with, and conditioned upon consummation of, [the Leveraged ESOP Transactions]."[1947]  Compensation Committee members Jeffrey Chandler, Enrique Hernandez, Jr., and Robert S. Morrison attended the meeting, with Tribune officers Dennis J. FitzSimons, Donald C. Grenesko, and Crane H. Kenney also participating.[1948]

At the meeting, the Compensation Committee approved a special cash bonus pool (totaling $6.5 million)[1949] to be awarded to the 32 managers and other key employees[1950] involved in the strategic review process leading up the Leveraged ESOP Transactions, the establishment of a 3% phantom stock pool in post-Merger Tribune to be awarded to the 17 members of senior management directly involved in the Leveraged ESOP Transactions, and the establishment of a 5% phantom stock pool in post-Merger Tribune to be awarded to approximately 200 members of management as a long term incentive.[1951]  No director of Tribune held any stock or options as of December 30, 2007.[1952]

---

[1947]  Ex. 663 (Compensation Committee Meeting Minutes, dated April 1, 2007).

[1948]  *Id.* at 1 (Compensation Committee Meeting Minutes, dated April 1, 2007).

[1949]  This amount was later reduced to $5.4 million.  Ex. 5 at 60 (Tender Offer).

[1950]  This number was later increased to 40 managers and other key employees.  Ex. 5 (Tender Offer).

[1951]  Ex. 663 at 1 (Compensation Committee Meeting Minutes, dated April 1, 2007).  Payment of the cash bonuses was conditioned on consummation of the Leveraged ESOP Transactions.  Ex. 4 at 184 (Tribune 2007 Form 10-K).  Although the recipients and precise amounts of the phantom equity awards changed slightly between April 2007 and December 2007, the pool sizes, originally established at 3% and 5% in April 2007, did not change on their approval in December 2007.  *Compare* Ex. 1110 (Exhibit A to Compensation Committee Meeting Minutes, dated April 1, 2007) *with* Ex. 1111 (Exhibits A and B to Tribune Board Meeting Minutes, dated December 20, 2007).  *See also* Ex. 4 at 130-31 (Tribune 2007 Form 10-K); Ex. 12 (Tribune Board

At the April 1, 2007 Tribune Board meeting at which the Tribune Board voted to approve the Leveraged ESOP Transactions, the Tribune Board also addressed the impact of the potential change of control associated with the Leveraged ESOP Transactions on various of Tribune's employee compensation plans, resolving that:[1953]

> [I]n the event that the Company divests a business unit during the period beginning on the date on which the Company announces a transaction that would constitute a Change in Control (within the meaning of the Company's Incentive Compensation Plan) and the date on which such Change in Control is consummated, the Company shall cause any Company restricted stock units and stock options held by any employee of such divested business unit to be fully vested;
>
> [I]n the event that the Company eliminates an employee's position during the period beginning on the date on which the Company announces a transaction that would constitute a Change in Control (within the meaning of the Company's Incentive Compensation Plan) and the date on which such Change in Control is consummated, the Company shall cause any Company restricted stock units and the stock options held by such employee to be fully vested effective as of the consummation of such Change in Control; [and]
>
> [I]n the event of a Change in Control (within the meaning of the Company's Incentive Compensation Plan), each participant in the Tribune Company 401(k) Savings and Profit Sharing Plan whose employment with the Company is terminated by the Company other than for cause or is constructively terminated within one year following such Change in Control shall be fully vested in all employer contributions held on such participant's behalf under such plan. . . .

On July 18, 2007, the Compensation Committee held a brief meeting to review an executive compensation update presented by Tribune's management, including expected 2007

---

Meeting Minutes, dated December 20, 2007); Examiner's Sworn Interview of Donald Grenesko, July 8, 2010, at 228:19-229:14.

[1952]  Ex. 4 at 199 (Tribune 2007 Form 10-K).

[1953]  Ex. 146 at 17 (Tribune Board Meeting Minutes, dated April 1, 2007).  "Change of control" is defined in Article XIII of Tribune's Incentive Compensation Plan.  Ex. 664 at Article XIII (Tribune Incentive Compensation Plan).

management incentive payouts based on year-to-date results and incentive awards previously approved by the Compensation Committee.[1954]

At the December 20, 2007 Tribune Board meeting held following consummation of the Merger, the Tribune Board approved the 2007 Management Equity Incentive Plan.[1955]  No member of the Tribune Board received any awards under the 2007 Management Equity Incentive Plan.[1956]

### d.    Terms of 2007 Management Equity Incentive Plan.

The 2007 Management Equity Incentive Plan was effective as of December 20, 2007.[1957] It provides for the grant of phantom stock awards to eligible employees.[1958]  Initial awards under the 2007 Management Equity Incentive Plan were made on December 20, 2007.[1959]  Awards under the 2007 Management Equity Incentive Plan are granted as either First Tranche Units or Second Tranche Units.[1960]  The aggregate economic value of the First Tranche Units available for grant is equal to 5% of the fully diluted outstanding Tribune Common Stock (calculated after giving effect to the Warrant and subject to typical anti-dilution adjustments).[1961]  First Tranche Units vest ratably over a three year period beginning on the date of grant and, subject to a re-deferral election by individual plan participants, are payable in cash ratably following the fourth, sixth, and eighth anniversaries of the grant date.[1962]

---

[1954]  Ex. 665 (Compensation Committee Meeting Minutes, dated July 18, 2007).

[1955]  Ex. 12 (Tribune Board of Directors Meeting Minutes, dated December 20, 2007).  Ms. Wilderotter was the only director not in attendance at the meeting.

[1956]  Ex. 4 at 199 (Tribune 2007 Form 10-K).

[1957]  Ex. 666 at § 8 (2007 Management Equity Incentive Plan).

[1958]  *Id.* at § 4.

[1959]  Ex. 4 at 178 (Tribune 2007 Form 10-K).

[1960]  Ex. 666 at § 4 (2007 Management Equity Incentive Plan).

[1961]  Ex. 13 at 9 (Tribune Form 8-K, filed December 28, 2007).

[1962]  Ex. 666 at § 5 (2007 Management Equity Incentive Plan).

The unvested portion of any First Tranche Units fully vest on a change in control of Tribune or termination of employment due to death, disability, or retirement from Tribune.[1963] On a change in control of Tribune or a 2007 Management Equity Incentive Plan participant's termination of employment due to death or disability, all of the First Tranche Units held by such participant become payable as soon as practicable following such event.[1964] On a 2007 Management Equity Incentive Plan participant's termination of employment for any reason other than death or disability, the participant is entitled to retain the then-vested portion of the First Tranche Units, but the unvested portion of the First Tranche Units is to be cancelled on such termination.[1965]

The aggregate economic value of the Second Tranche Units available for grant is equal to 3% of the fully diluted outstanding Tribune Common Stock (calculated after giving effect to the Warrant and subject to typical anti-dilution adjustments).[1966] Participants receiving Second Tranche Units are entitled to receive a gross-up for the payment of excise taxes, if any.[1967] Fifty percent of the Second Tranche Units granted to a participant fully vest on grant, and the remaining fifty percent of the Second Tranche Units vest on the one year anniversary of the grant date.[1968] On a change in control of Tribune or a 2007 Management Equity Incentive Plan participant's involuntary termination of employment or termination of employment due to death, or disability, all of the Second Tranche Units held by such participant are payable in cash as soon

---

[1963] *Id.*

[1964] *Id.*

[1965] *Id.*

[1966] Ex. 13 at 9 (Tribune Form 8-K, filed December 28, 2007).

[1967] Ex. 666 at § 5 (2007 Management Equity Incentive Plan).

[1968] *Id.*

as practicable following such event.[1969]  On a 2007 Management Equity Incentive Plan

participant's termination of employment for any reason other than involuntary termination, death,

or disability, the participant is entitled to retain the then-vested portion of the Second Tranche

Units, but the unvested portion of any of the Second Tranche Units on such termination is to be

cancelled.[1970]

### e.    Recipients.

The following table summarizes the value of (a) cash bonuses, (b) equity incentives, and

(c) accelerated restricted stock and options, received by certain executive officers and key

employees of the Tribune Entities in connection with the Leveraged ESOP Transactions:[1971]

| Name | Cash Bonus | Phantom Stock | Accelerated Options and/or Restricted Stock Units |
|------|-----------|---------------|---------------------------------------------------|
| Dennis J. FitzSimons | $0[1972] | 2,916,667 | 6,869,559 |
| John E. Reardon | $200,000 | 1,500,000 | 2,005,265 |
| Timothy J. Landon | $300,000 | 1,666,667 | 1,605,285 |
| Chandler Bigelow | $400,000 | 0 | 880,645 |
| Scott C. Smith | $0 | 2,083,333 | 2,665,784 |
| Donald C. Grenesko | $400,000 | 2,083,333 | 2,699,026 |
| Crane H. Kenney | $600,000 | 0 | 2,005,265 |
| Harry A. Amsden | $150,000 | 0 | 717,324 |
| Mark W. Hianik | $175,000 | 0 | 634,019 |

---

[1969]  *Id.*

[1970]  *Id.*

[1971]  In the interests of privacy, the Examiner has limited individualized disclosure of this information to persons whose compensation was publicly reported by Tribune and whose participation in the Leveraged ESOP Transactions is described in the Report.  Ex. 667 (Chart of Compensation Payments).

[1972]  Mr. FitzSimons elected not to accept a cash bonus in connection with the Leveraged ESOP Transactions, informing the Examiner that "we were going to have to do some very difficult things, and I didn't want to be standing up in front of a group of employees after just accepting a $600,000 bonus and tell them there were going to have to be layoffs."  Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 121:22-122:4.

| Name | Cash Bonus | Phantom Stock | Accelerated Options and/or Restricted Stock Units |
|---|---|---|---|
| Other Key Employees | $2,375,000 | 7,416,667 | 22,927,938 |

The following table summarizes cash amounts received for shares of Tribune Common Stock tendered by the Tribune Entities' officers and directors in connection with the Tender Offer:

| Name | Office | Shares | Price | Total |
|---|---|---|---|---|
| Dennis J. FitzSimons[1973] | Chairman, President, CEO | 266,073 | $34 | $9,046,482 |
| Donald C. Grenesko[1974] | Senior Vice President | 131,391 | $34 | $4,467,294 |
| Scott C. Smith[1975] | President, Tribune Publishing | 129,542 | $34 | $4,404,428 |
| R. Mark Mallory[1976] | Vice President, Controller | 62,510 | $34 | $2,125,340 |
| Dudley S. Taft[1977] | Director | 56,938 | $34 | $1,935,892 |
| John E. Reardon[1978] | President, Tribune Broadcasting | 36,822 | $34 | $1,251,948 |
| Ruthellyn Musil[1979] | Senior Vice President, Corporate Relations | 33,754 | $34 | $1,147,636 |
| Crane H. Kenney[1980] | Senior Vice President, General Counsel and Secretary | 29,763 | $34 | $1,011,942 |
| Thomas D. Leach[1981] | Senior Vice President, Development | 29,281 | $34 | $995,554 |
| Timothy J. Landon[1982] | President, Tribune Interactive | 26,535 | $34 | $902,190 |

[1973] Ex. 668 (FitzSimons Form 4, filed on June 1, 2007); Ex. 669 (FitzSimons Form 4/A, filed on June 4, 2007).

[1974] Ex. 670 (Grenesko Form 4, filed on June 1, 2007).

[1975] Ex. 671 (Smith Form 4, filed on June 1, 2007).

[1976] Ex. 672 (Mallory Form 4, filed on June 1, 2007).

[1977] Ex. 673 (Taft Form 4, filed on June 1, 2007).

[1978] Ex. 674 (Reardon Form 4, filed on June 1, 2007).

[1979] Ex. 675 (Musil Form 4, filed on June 1, 2007).

[1980] Ex. 676 (Kenney Form 4, filed on June 1, 2007).

[1981] Ex. 677 (Leach Form 4, filed on June 1, 2007).

[1982] Ex. 678 (Landon Form 4, filed on June 1, 2007).

| Name | Office | Shares | Price | Total |
|------|--------|--------|-------|-------|
| Luis E. Lewin[1983] | Senior Vice President | 12,726 | $34 | $432,684 |
| William A. Osborn[1984] | Director | 8,216 | $34 | $279,344 |
| Roger Goodan[1985] | Director | 7,575 | $34 | $257,550 |
| Christopher J. Reyes[1986] | Director | 7,078 | $34 | $240,652 |
| William Stinehart, Jr.[1987] | Director | 4,041 | $34 | $137,394 |
| Robert S. Morrison[1988] | Director | 2,308 | $34 | $78,472 |
| Enrique Hernandez, Jr.[1989] | Director | 808 | $34 | $27,472 |
| Betsy D. Holden[1990] | Director | 635 | $34 | $21,590 |

The following table summarizes cash amounts received by the Tribune Entities' officers and directors for their respective shares of Tribune Common Stock in connection with the consummation of the Merger:[1991]

| Name | Office | Shares | Price | Total |
|------|--------|--------|-------|-------|
| Dennis J. FitzSimons[1992] | Chairman, President, CEO | 389,335.98 | $34 | $13,237,423.32 |
| Donald C. Grenesko[1993] | Senior Vice President | 182,385.46 | $34 | $6,201,105.64 |
| Scott C. Smith[1994] | President, Tribune Publishing | 165,730.50 | $34 | $5,634,837.00 |
| R. Mark Mallory[1995] | Vice President, Controller | 67,545.38 | $34 | $2,296,542.92 |

---

[1983] Ex. 679 (Lewin Form 4, filed on June 1, 2007).

[1984] Ex. 680 (Osborn Form 4, filed on June 1, 2007).

[1985] Ex. 681 (Goodan Form 4, filed on June 1, 2007).

[1986] Ex. 682 (Reyes Form 4, filed on June 1, 2007).

[1987] Ex. 683 (Stinehart Form 4, filed on June 1, 2007).

[1988] Ex. 684 (Morrison Form 4, filed on June 1, 2007).

[1989] Ex. 685 (Hernandez Form 4, filed on June 1, 2007).

[1990] Ex. 686 (Holden Form 4, filed on June 1, 2007).

[1991] On consummation of the Merger, all Tribune Common Stock, other than shares owned by the ESOP, were converted into the right to receive cash; thus, no Tribune officer or director directly owned any shares of Tribune Common Stock following the Merger.

[1992] Ex. 687 (FitzSimons Form 4, filed on December 21, 2007).

[1993] Ex. 688  (Grenesko Form 4, filed on December 21, 2007).

[1994] Ex. 689 (Smith Form 4, filed on December 21, 2007).

| Name | Office | Shares | Price | Total |
|---|---|---|---|---|
| Dudley S. Taft[1996] | Director | 44,000.00 | $34 | $1,496,000.00 |
| John E. Reardon[1997] | President, Tribune Broadcasting | 80,293.52 | $34 | $2,729,979.68 |
| Crane H. Kenney[1998] | Senior Vice President, General Counsel and Secretary | 75,239.55 | $34 | $2,558,144.70 |
| Thomas D. Leach[1999] | Senior Vice President, Development | 71,459.86 | $34 | $2,429,635.24 |
| Timothy J. Landon[2000] | President, Tribune Interactive | 63,446.75 | $34 | $2,157,189.50 |
| Luis E. Lewin[2001] | Senior Vice President | 44,318.33 | $34 | $1,506,823.22 |
| William A. Osborn[2002] | Director | 6,021.00 | $34 | $204,714.00 |
| Robert S. Morrison[2003] | Director | 13,119.28 | $34 | $446,055.22 |
| Enrique Hernandez, Jr.[2004] | Director | 12,800.85 | $34 | $435,228.90 |
| Betsy D. Holden[2005] | Director | 10,304.70 | $34 | $350,359.80 |
| Samuel Zell[2006] | Director | 2,278.00 | $34 | $77,452.00 |

## G.     The Step Two Transactions.

This section is a chronological summary of the actions taken, and agreements entered

into, in connection with the Step Two Transactions.  Section III.H. addresses the knowledge and

---

[1995] Ex. 690 (Mallory Form 4, filed on December 21, 2007).

[1996] Ex. 691 (Taft Form 4, filed on December 21, 2007).

[1997] Ex. 692 (Reardon Form 4, filed on December 21, 2007).

[1998] Ex. 693 (Kenney Form 4, filed on December 21, 2007).

[1999] Ex. 694 (Leach Form 4, filed on December 21, 2007).

[2000] Ex. 695 (Landon Form 4, filed on December 21, 2007).

[2001] Ex. 696 (Lewin Form 4, filed on December 21, 2007).

[2002] Ex. 697 (Osborn Form 4, filed on December 21, 2007).

[2003] Ex. 698 (Morrison Form 4, filed on December 21, 2007).

[2004] Ex. 699 (Hernandez Form 4, filed on December 21, 2007).

[2005] Ex. 700 (Holden Form 4, filed on December 21, 2007).

[2006] Ex. 701 (Zell Form 4, filed December 21, 2007).  The information in the table regarding Mr. Zell does not include the Warrant held by EGI-TRB.

actions of the key participants with respect to the events culminating in the Step Two Transactions.

### 1.    Tribune Board Deliberations.

As noted above,[2007] the Tribune Board voted to approve the Step Two Transactions on the evening of April 1, 2007 in connection with the approval of the Leveraged ESOP Transactions.[2008]  Representatives of the Chandler Trusts on the Tribune Board abstained from voting as directors; Dudley Taft was not present at the April 1, 2007 meeting and did not vote.[2009]

On November 21, 2007, the Tribune Board approved certain modifications to the terms of the Step Two Financing.[2010]  The Tribune Board did not vote again to approve entry into the Step Two Transactions, but did discuss the Step Two Transactions on December 18, 2007.[2011] On December 18, 2007 the Tribune Board and the Special Committee held meetings to review, among other things, the status of the Step Two Transactions, discussions with lenders, and the status of VRC's analysis.[2012]  VRC provided a presentation regarding its solvency analysis.[2013] Following VRC's presentation, and after being advised that management stood ready to deliver the closing certificates contemplated by the Credit Agreement and the Bridge Credit Agreement as to solvency and that such certificates would be based on management's own analysis, as

---

[2007] *See* Report at § III.D.1.g.

[2008] Ex. 146 (Tribune Board Meeting Minutes, dated April 1, 2007).

[2009] *Id.* at 1.

[2010] Ex. 702 at TRB0415674 (Tribune Board Meeting Minutes, dated November 21, 2007).

[2011] The Certificate of the Assistant Secretary of Tribune delivered in connection with the closing of the Step Two Financing only attaches the minutes from the April 1, 2007 Tribune Board meeting when certifying as to Tribune Board approval of the Step Two Financing.  Ex. 703 (Certificate of the Assistant Secretary of Tribune, dated December 20, 2007), which to which Ex. 146 was attached as Exhibit C thereto.

[2012] Ex. 11 (Tribune Board Meeting Minutes, dated December 18, 2007); Ex. 704 (Special Committee Meeting Minutes, dated December 18, 2007).  *See* Report at § III.H.2. for a further discussion of these meetings.

[2013] Ex. 705 (Tribune Board Meeting Materials, dated December 18, 2007).

further supported by VRC's opinion and analysis, the Tribune Board recessed to permit the

Special Committee to meet with its counsel and financial advisors.[2014]

    According to the draft minutes of the Special Committee meeting, Mr. Osborn, the Chair

of the Special Committee, asked Morgan Stanley to comment on the VRC solvency opinion and

analysis:[2015]

> Mr. Whayne indicated that the analysis of VRC seemed thorough
> and appropriate.  He noted that VRC used earnings and termination
> value multiples for the publishing and broadcasting industries
> consistent (but not identical) with those used by Morgan Stanley as

---

[2014] Ex. 11 (Tribune Board Meeting Minutes, dated December 18, 2007).  The minutes of the December 18, 2007 Tribune Board meeting state that the Tribune Board meeting was called to order at 1:00 p.m.  Although the minutes do not indicate at what time the Tribune Board meeting recessed to permit the Special Committee to meet with its counsel and financial advisors, the draft minutes of the December 18, 2007 Special Committee meeting state (assuming the accuracy of such draft minutes; *see* below) that the Special Committee meeting was called to order at 2:45 p.m.  As the minutes of the Tribune Board meeting state that the Tribune Board meeting reconvened following the Special Committee meeting, the Tribune Board then met in executive session, and the Tribune Board meeting then adjourned at 3:00 p.m., it appears that the Special Committee meeting at which the Special Committee determined to make its recommendation to the Tribune Board that "it rely in good faith upon the solvency opinion of VRC" lasted no longer than fifteen minutes and that the Tribune Board then, in the Examiner's opinion in somewhat cavalier fashion, with little opportunity to discuss the Special Committee's recommendation further, determined that "it could rely in good faith on the VRC opinion."  *Id.*; Ex. 704 (Special Committee Meeting Minutes, dated December 18, 2007).  The Examiner has not located any evidence that the December 18, 2007 Special Committee meeting minutes were signed or approved by the Special Committee, or that the Special Committee met subsequent to December 18, 2007.

[2015] Ex. 704 (Special Committee Meeting Minutes, dated December 18, 2007).  In his interview with the Examiner, Mr. Taubman disputed the characterization of his remarks in the draft minutes of the Special Committee meeting:

> Q:  As you sit here today based on your best recollection did you at that meeting or any other time reiterate the conservative nature of VRC's analysis?

> A:  No.  What I did recall doing was that there was one specific aspect of their analysis where they could have been more aggressive and they were not and I recall pointing that out to the members of the committee.

Examiner's Sworn Interview of Paul Taubman, July 1, 2010, at 84:16-85:3.

Mr. Whayne likewise disputed the characterization of his remarks:

> Q:  Did you state to the special committee that you or Morgan Stanley had concluded that VRC's solvency analysis was conservative?

> A:  No.

> Q:  Did you state to the special committee that you or Morgan Stanley had concluded that VRC's opinion was something upon which a director could reasonably rely?

> A:  No.

Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 130:4-13.

well as Merrill Lynch and Citibank in previous advice to the Board of Directors.  Similarly, VRC's selection of precedent transactions and its discounted cash flow analysis used metrics very similar to that previously used by each of the investment banks.  He commented on VRC's analysis of the net present value of S Corp. – ESOP tax savings using a 16% discount rate (as VRC did today) as compared with a 10% discount rate (as VRC did in its preliminary presentation to the Board on December 4, 2007).  He suggested the higher discount rate, representing the cost of equity, and the lower discount rate, representing the cost of capital, set forth the book ends of an appropriate net present valuation.  Using either of these analyses, VRC found solvency after given effect to the merger.  He also commented on VRC's valuation of the PHONES debt and other assets and liabilities of the Company.  He concluded that VRC's solvency analysis was conservative and that VRC's opinion was something upon which a director could reasonably rely.

Mr. Taubman reiterated the conservative nature of VRC's analysis.  He stated that the Company has additional value not represented in the VRC presentation because the Company has a number of different assets and businesses that readily could be sold for fair value and that this additional financial flexible is of incremental value to a company.

The Special Committee then adopted the following resolution:

RESOLVED, that the Special Committee hereby recommends to the [Tribune Board] (1) that it rely in good faith upon the solvency opinion of VRC, (2) that it determines that said opinion is in form and substance satisfactory to the Company for purposes of the [Merger Agreement] and (3) that the [Tribune Board] direct management to take all necessary and appropriate actions to consummate promptly the merger provided for in such [Merger] Agreement.[2016]

The Tribune Board then reconvened, was advised of the Special Committee's recommendations, and determined (with Mr. Zell abstaining) that:[2017]

Based upon the presentations and discussions at the Tribune meeting (as well as presentations and discussions at prior meetings of the board, including on May 9, 2007 and December 4, 2007) and the recommendation of the Special Committee, the Tribune

---

[2016] Ex. 704 (Special Committee Meeting Minutes, dated December 18, 2007).

[2017] Ex. 11 at TRB0415685-86 (Tribune Board Meeting Minutes, dated December 18, 2007).

Board, with Mr. Zell abstaining, determined (i) that it could rely in good faith on the VRC opinion and (ii) that the opinion is in form and substance satisfactory to the Company for the purposes of Section 6.2(e) of the Merger Agreement.

This appears to have been the final Tribune Board meeting that occurred before the Step Two Financing Closing Date at which the Merger was discussed.

## 2. Subsidiary Boards Approval.

The Guarantor Subsidiaries authorized the Subordinated Bridge Subsidiary Guarantee by unanimous written consent of the respective Subsidiary Boards (or sole or managing member, as applicable).[2018]  The recitals in the unanimous written consents of the Subsidiary Boards acknowledged Tribune's entry into the Bridge Credit Agreement, noted that the Guarantor Subsidiary's entry into the Subordinated Bridge Subsidiary Guarantee was a condition to making advances under the Bridge Credit Agreement, and referenced the form of Subordinated Bridge Subsidiary Guarantee attached as an exhibit to the Bridge Credit Agreement.[2019]  The resolution in the unanimous written consents of the Subsidiary Boards authorized "each of the President, any Vice President, the Treasurer, any Assistant Treasurer, the Secretary or any Assistant Treasurer" of such Guarantor Subsidiary to execute and deliver to the Bridge Credit Agreement Agent, the Subordinated Bridge Subsidiary Guarantee and "all other documents, instruments and agreements deemed necessary or desirable by the [Bridge Credit Agreement Agent] in order to guarantee the obligations of [Tribune] under the [Bridge Credit Agreement]."[2020]  The resolutions also authorized such officers to "take from time to time any actions deemed necessary or

---

[2018]  Ex. 706 (Unanimous Written Consents of the Subsidiary Boards, dated December 20, 2007).  These unanimous written consents of the Subsidiary Boards are substantially similar in form and substance.  As with the June 4, 2007 written consents of the Subsidiary Boards with respect to Credit Agreement Subsidiary Guarantee, it appears that the directors of the Guarantor Subsidiaries did little to no diligence when asked to sign the Subsidiary Board written consents authorizing the execution, delivery, and performance of the Subordinated Bridge Subsidiary Guarantee.  *See* Report at § III.D.2.

[2019]  Ex. 706 (Unanimous Written Consents of the Subsidiary Boards, dated December 20, 2007).

[2020]  *Id.*

desirable by the Authorized Officers of the Company to establish the [Subordinated Bridge Subsidiary Guarantee] and to evidence the [Subordinated Bridge Subsidiary Guarantee] properly in accordance with the requirements of the [Bridge Credit Agreement]."[2021]  The unanimous written consents were dated as of December 20, 2007.[2022]

### 3.    The Step Two Financing.

### a.    Syndication of the Step Two Financing.

The Step Two Financing was syndicated by the Lead Banks pursuant to a confidential information memorandum dated April 2007.[2023]  The confidential information memorandum described a transaction which would result in "the Company going private and Tribune shareholders receiving $34 per share" with the transaction to be "completed in two stages."[2024] The confidential information memorandum described the two stages as follows:[2025]

> The first stage . . . of the [Leveraged ESOP Transactions] is a cash tender offer for approximately 126 million shares at $34 per share. The tender offer will be funded by incremental borrowings and a $250 million investment from [EGI-TRB], which occurred on April 23, 2007.  The tender will settle concurrently with the funding of the [Step One Financing], which is currently expected to take place in late May.  The second stage . . . is a merger, which is currently expected to close in the fourth quarter of 2007, in which the remaining publicly-held shares will receive $34 per share. . . .  Zell will make an additional investment of $65 million in connection with the merger, bringing Zell's total investment in Tribune to $315 million.  The board of directors of Tribune, on the recommendation of the Special Committee, has approved the

---

[2021]  *Id.*

[2022]  *Id.*  Certain Guarantor Subsidiaries were not signatories to the Credit Agreement Subsidiary Guarantee on June 4, 2007, but their execution and delivery of a joinder to the Credit Agreement Subsidiary Guarantee on the Step Two Financing Closing Date was authorized in the December 20, 2007 unanimous written consents of such Guarantor Subsidiaries.

[2023]  Ex. 707 (Step Two Confidential Information Memorandum).  Ultimately, under the Bridge Credit Agreement JPMCB was the Syndication Agent, and JPMorgan, ML&Co., MLPFS, CGMI and BAS were the Joint Lead Arrangers and Joint Bookrunners.  *See* Ex. 175 at preamble (Bridge Credit Agreement).

[2024]  Ex. 707 at 15 (Step Two Confidential Information Memorandum).

[2025]  *Id.* at 42.

agreements and will recommend Tribune shareholder approval of
the merger.  The Chandler Trusts, Tribune's largest shareholder,
have agreed to vote in favor of the merger.

Additionally, the confidential information memorandum set forth "Shareholder and other

necessary approvals" required to consummate the Merger:[2026]

> The Merger is subject to a number of conditions including
> shareholder, HSR, [FCC], and Major League Baseball . . .
> approvals, compliance with certain covenants, no material adverse
> change in Tribune's business, and the delivery of a solvency
> opinion.  On April 20, 2007, early termination of the HSR waiting
> period was granted.  Shareholder approval is currently expected to
> take place in [the] third quarter [of] 2007, while the FCC approval
> is currently expected in late 2007.

As set forth in the confidential information memorandum, the Step One Financing

consisted of the Revolving Credit Facility, the Tranche B Facility (in the amount of $7.015

billion),[2027] and the Delayed Draw Facility,[2028] and the Step Two Financing consisted of the

Bridge Facility (in the amount of $2.1 billion)[2029] and the Incremental Credit Agreement

Facility.[2030] The Step One Financing and the Step Two Financing were to be "marketed

concurrently."[2031]  The confidential information memorandum set forth the estimated sources and

uses of funds for, and the pro forma capitalization of Tribune following, Step One and Step

Two.[2032]  The Lead Banks estimated that $4.288 billion of the Step One Debt would be used to

pay for the Tender Offer, $2.825 billion would be used to refinance existing debt, and

---

[2026]  Ex. 707 at 44 (Step Two Confidential Information Memorandum).

[2027]  This was amount was reduced to $5.515 billion in the Credit Agreement when the $1.5 billion Tranche X
Facility was added.  *See* Ex. 179 at § 1.01 (definition of "Tranche X Facility") (Credit Agreement).

[2028]  Ex. 707 at 23 (Step Two Confidential Information Memorandum).

[2029]  This was amount was reduced to $1.6 billion in the Bridge Facility.  *See* Ex. 175 at § 1.01 (definition of
"Commitment") (Bridge Credit Agreement).

[2030]  Ex. 707 at 24 (Step Two Confidential Information Memorandum).

[2031]  *Id.*

[2032]  *Id.* at 19 and 21.

$152 million would be used to pay Step One transaction and financing fees.[2033]  The Lead Banks estimated that $4.261 billion of the Step Two Debt would be used to consummate the Merger, $200 million would be used to redeem the EGI-TRB Exchangeable Note, $50 million would be used to repurchase shares of Tribune Common Stock owned by EGI-TRB, and $120 million would be used to pay Step Two financing and other fees.[2034]

On April 26, 2007, a syndication meeting was held at which Mr. Zell and Mr. FitzSimons, among others, addressed potential lenders and answered questions.[2035]  As discussed above,[2036] additional syndication meetings were held on September 26, 2007 and October 1, 2007, during which time Tribune discussed updates to its projections and model.[2037]

### b.    Terms of the Bridge Facility.

On December 20, 2007, Tribune entered into a $1.6 billion senior unsecured interim credit agreement with MLCC, as administrative agent, JPMCB, as syndication agent, Citicorp and Bank of America as co-documentation agents, and the initial lenders named therein.[2038]  The Bridge Credit Agreement consists of a $1.6 billion Bridge Facility.[2039]

Advances under the Bridge Credit Agreement bear interest at a rate based on either the "Base Rate" (the higher of Citibank's corporate base rate and the overnight federal funds rate

---

[2033]  *Id.* at 19.

[2034]  *Id.* at 21.

[2035]  Ex. 180 (Transcript of Lenders Meeting, dated April 26, 2007); Ex. 181 (Lenders' Presentation, dated April 26, 2007).

[2036]  *See* Report at § III.F.6.

[2037]  Ex. 182 (Bank Due Diligence Teleconference Call Agenda and Schedules, dated September 26, 2007); Ex. 183 (Tribune Company Underwriters Due Diligence Agenda for October 1, 2007); Ex. 184 (Tribune Publishing Presentation); Ex. 185 (Tribune Broadcasting Presentation).

[2038]  Ex. 175 (Bridge Credit Agreement).  The Bridge Credit Agreement is governed by New York law (*see* § 8.09). With respect to the Bridge Credit Agreement, (a) Tribune was represented by the law firm of Sidley Austin LLP (Chicago, IL office) and (b) the agent was represented by the law firm of Cahill Gordon & Reindel LLP (New York, NY office) (*see* § 8.02).

[2039]  *Id.* at § 2.01.

plus 0.5%) or the "Eurodollar Rate" (LIBOR) plus the applicable margin for the tranche of loan.[2040]  The applicable margin for "Base Rate" loans was 3.50%, which amount increased by 0.50% each quarter following the Step Two Financing Closing Date.[2041]  The applicable margin for "Eurodollar Rate" loans was 4.50%, which amount increased by 0.50% each quarter following the Step Two Financing Closing Date.[2042]  The interest rate is capped at 15.25% and Tribune can elect to pay the portion of interest in excess of 14.5% in kind rather than in cash.[2043]  Interest under the 2006 Bridge Credit Agreement was similarly calculated as "Base Rate" or "Eurodollar Rate" plus an applicable margin, but the applicable margins under the Bridge Credit Agreement are significantly higher.[2044]  As of December 30, 2007, the interest rate on the Bridge Facility was 9.43%.[2045]

The Bridge Facility Lenders have the right to exchange any loans outstanding on December 20, 2008 for senior exchange notes that would be issued under an indenture.[2046]  The maturity date of any exchanged notes would be December 15, 2015[2047] and, if the Tribune Entities had not filed the Chapter 11 Cases on December 8, 2008, the maturity date of any loans remaining outstanding under the Bridge Facility on December 20, 2008 automatically would

---

[2040] *Id.* at § 2.07.

[2041] *Id.* at § 1.01 ("Applicable Margin" definition).

[2042] *Id.*

[2043] *Id.* at § 1.01 ("Applicable Margin" definition) and Schedule I-A.

[2044] *See* Report at § III.B.3.c.

[2045] Ex. 4 at 51 (Tribune 2007 Form 10-K).

[2046] Ex. 175 at § 2.17 (Bridge Credit Agreement).

[2047] *Id.* at Exhibit I.

have been extended to December 15, 2015.[2048]  The proceeds of the Bridge Facility were used to finance a portion of the Step Two Transactions and to pay fees and expenses related thereto.[2049]

There are no scheduled amortization payments on the Bridge Facility.  In the event that Tribune or any of its Subsidiaries incurs certain indebtedness for borrowed money or sells assets or issues equity with an aggregate fair market value in excess of $10 million (subject to certain exceptions) or receives insurance proceeds or condemnation awards in excess of $10 million, Tribune is obligated to prepay the Bridge Facility in an amount equal to the net cash proceeds thereof.[2050]  Any such mandatory prepayments are to be first applied to the payment of the Credit Agreement Debt and then to the payment of the Bridge Debt.[2051]  In addition to the foregoing, on the occurrence of a Change in Control, each Bridge Facility Lender has the right to require Tribune to prepay its loans under the Bridge Facility.[2052]

Each Bridge Facility Lender has the right to request that Tribune execute a promissory note evidencing the advances made by such lender.[2053]

The Bridge Credit Agreement contains various affirmative and negative covenants (in the case of negative covenants, Tribune is required to not cause or permit any of its Subsidiaries to violate such covenants)[2054] and specifies various events of default, including:

- •        Tribune was obligated to qualify and elect to be treated as an S-Corporation under Subchapter S of the IRC effective as of January 1, 2008; provided, that the

---

[2048]  *Id.* at §§ 2.06 and 3.02.

[2049]  *Id.* at § 5.01(j).

[2050]  *Id.* at § 2.10(b).

[2051]  *Id.* at § 2.10(b).

[2052]  *Id.* at § 2.10(b)(iv).

[2053]  *Id.* at § 2.16(a).

[2054]  *Id.* at § 5.02.

failure to timely make such election could be cured by the investment of $100 million (subject to certain reductions) of junior capital by Mr. Zell or EGI-TRB;[2055]

- Tribune is prohibited from selling the equity interests associated with the PHONES Notes unless Tribune contemporaneously purchases call options or otherwise enters into a hedge agreement to ensure Tribune's ability to perform under the terms of the PHONES Notes;[2056]

- Tribune and its Subsidiaries are prohibited from incurring any indebtedness other than certain specified indebtedness, including the Step One Financing, the Exchangeable EGI-TRB Note, the EGI-TRB Notes, and up to $450 million under a receivables facility;[2057]

- FinanceCo is prohibited from engaging in any material business, holding any material assets or incurring any material obligations, other than incurring debt as the co-obligor or guarantor of the Credit Agreement Debt and the Bridge Debt, holding the Intercompany Junior Subordinated Notes, and activities incidental to the foregoing;[2058] and

- A Change in Control is an event of default under the Credit Agreement[2059] (but the consummation of the Step One Transactions and the Step Two Transactions was, by definition, not a Change in Control).[2060]

The closing under the Bridge Credit Agreement was subject to the satisfaction of various conditions, including the following:

---

[2055] *Id.* at § 5.01(n).  However, by definition, the amount that Mr. Zell or EGI-TRB was required to invest as junior capital was equal to zero.  *See id.* at § 1.01 ("Zell Investment Amount" definition).

[2056] *Id.* at § 5.02(e)(ii).

[2057] *Id.* at § 5.02(c).

[2058] *Id.* at § 5.02(n).

[2059] *Id.* at § 6.01(g).

[2060] *Id.* at § 1.01 ("Change in Control" definition).

- Delivery of executed copies of the Bridge Credit Agreement and associated loan documents;[2061]

- Delivery of a solvency certificate executed by the Chief Financial Officer of Tribune;[2062]

- Delivery of opinions from outside counsel to the Borrower and the general counsel of the Borrower;[2063]

- Delivery of financial statements, including a balance sheet as of September 30, 2007 on a pro forma basis giving effect to both the Step One Transactions and Step Two Transactions;[2064]

- Delivery of financial projections for the five year period following the Step Two Financing Closing Date on a pro forma basis giving effect to both the Step One Transactions and the Step Two Transactions;[2065]

- The consummation of the Merger;[2066]

- Tribune's receipt of proceeds from the borrowing under the Incremental Credit Agreement Facility;[2067]

- The accuracy of representations and warranties;[2068] and

---

[2061] *Id.* at § 3.01(a).

[2062] *Id.* at § 3.01(b)(i).  *See* Report at § III.G.3.c. for a discussion of the definition of solvency and the form of solvency certificate.

[2063] Ex. 175 at § 3.01(b)(ii) (Bridge Credit Agreement).

[2064] *Id.* at § 3.01(b)(iii).

[2065] *Id.* at § 3.01(c).

[2066] *Id.* at § 3.01(h).

[2067] *Id.* at § 3.01(m).

[2068] *Id.* at § 3.01(b)(iv)(A).  *See* Report at § III.G.3.c. for a discussion of the solvency representation and warranty in the Bridge Credit Agreement.

- No default had occurred and was continuing at the time of, or would result from, the making of an advance.[2069]

### c.    Solvency.

Section 4.01(l)(ii) of the Bridge Credit Agreement contains a representation regarding the solvency of Tribune:  "As of the [Step Two] Financing Closing Date, immediately after giving effect to the [Step Two] Transactions, [Tribune] is Solvent."[2070]

The definition of "Solvent" in the Bridge Credit Agreement is substantially the same as the definition in the Credit Agreement:[2071]

> "Solvent" and "Solvency" mean, with respect to [Tribune] on the [Step Two Financing] Closing Date, that on such date (a) the fair value and present fair saleable value of the aggregate assets (including goodwill) of [Tribune] exceeds its liabilities (including stated liabilities, identified contingent liabilities and the new financing), and such excess is in an amount that is not less than the capital of [Tribune] (as determined pursuant to Section 154 of the Delaware General Corporate Law), (b) [Tribune] will be able to pay its debts (including the stated liabilities, the identified contingent liabilities and the new financing), as such debts mature or otherwise become absolute or due and (c) [Tribune] does not have unreasonably small capital.  As used in this definition:
>
> "fair value" means the amount at which the aggregate or total assets of [Tribune] (including goodwill) would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, neither being under any compulsion to act and, on the [Step Two Financing] Closing Date, in a transaction having a similar structure;
>
> "present fair saleable value" means the amount that may be realized by a willing seller from a willing buyer if [Tribune] aggregate or total assets (including goodwill) are sold with reasonable promptness and, on the [Step Two Financing] Closing Date, in a transaction having a similar structure;

---

[2069] Ex. 175 at § 3.01(b)(iv)(B) (Bridge Credit Agreement).

[2070] *Id.* at § 4.01(l)).

[2071] *Id.* at § 1.01 (definition of "Solvency").

"does not have unreasonably small capital" relates to the ability of [Tribune] to continue as a going concern and not lack sufficient capital for the business in which it is engaged, and will be engaged, as management has indicated such businesses are now conducted and are proposed to be conducted;

"stated liabilities" means recorded liabilities of [Tribune] as presented on the most recent balance sheet of [Tribune] provided to [MLCC] prior to the [Step Two Financing] Closing Date;

"identified contingent liabilities" means the reasonably estimated contingent liabilities that may result from, without limitation, threatened or pending litigation, asserted claims and assessments, environmental conditions, guaranties, indemnities, contract obligations, uninsured risks, purchase obligations, taxes, and other contingent liabilities as determined by [Tribune];

"new financing" means, on the [Step Two Financing] Closing Date, the indebtedness incurred, assumed or guaranteed by [Tribune] in connection with the Transactions; and

"similar structure" means a structure similar to the structure contemplated in the Transactions (an S corporation (under Subchapter 5 of the [IRC]), owned entirely by an Employee Stock Ownership Plan, which receives favorable federal income tax treatment), or another structure resulting in equivalent favorable federal income tax treatment.

One of the conditions to closing under the Bridge Credit Agreement was the accuracy of representations and warranties.[2072]  It is also an event of default under the Bridge Credit Agreement if any representation or warranty was not true as of the date made or deemed made.[2073]

On December 20, 2007, as a condition to the occurrence of the Step Two Financing Closing Date, Donald Grenesko, Senior Vice President/Finance and Administration of Tribune, delivered a solvency certificate to MLCC stating "As of the date hereof, immediately after giving

---

[2072] *Id.* at § 3.01(b)(iv)(A).

[2073] *Id.* at § 6.01(b).

effect to the [Step Two] Transactions, [Tribune] is Solvent."[2074]  The certificate noted that Mr.

Grenesko reviewed and relied on the opinion of VRC, dated as of December 20, 2007, for

purposes of the solvency certificate.[2075]  The solvency certificate delivered in connection with the

Bridge Credit Agreement on the Step Two Financing Closing Date was consistent with the form

of solvency certificate attached as Exhibit E to the Bridge Credit Agreement.[2076]

        In addition, on December 20, 2007, as a condition to the occurrence of the Step Two

Financing Closing Date, Chandler Bigelow, a Vice President and the Treasurer of Tribune,

delivered a Responsible Officer's Certificate under the Bridge Credit Agreement stating, "The

undersigned certifies in his capacity as Vice President of the Company, that, as of the date hereof

. . . the representations and warranties contained in Section 4.01 of the [Bridge] Credit

Agreement . . . are correct in all material respects. . . ."[2077]  Section 4.01(l) of the Bridge Credit

Agreement states that, "As of the [Second Two Financing] Closing Date, immediately after

giving effect to the Second Step Transactions, Borrower is Solvent."[2078]

### d.    The Subordinated Bridge Subsidiary Guarantee.

        Tribune's obligations under the Bridge Credit Agreement are guaranteed by the Guarantor

Subsidiaries pursuant to the Subordinated Bridge Subsidiary Guarantee.[2079]  The Subordinated

Bridge Subsidiary Guarantee, executed by the Guarantor Subsidiaries on the Step Two Financing

Closing Date, provides that each of the Guarantor Subsidiaries, "jointly and severally, as a

---

[2074]  Ex. 708 (Step Two Solvency Certificate).  Capitalized terms used but not defined in the solvency certificate had the meanings ascribed to such terms in the Bridge Credit Agreement.

[2075]  *Id.*

[2076]  Ex. 709 (Form of Bridge Credit Agreement Solvency Certificate).

[2077]  Ex. 710 at 1 (Bridge Credit Agreement Responsible Officer's Certificate, dated December 20, 2007).

[2078]  Ex. 175 at § 4.01(l) (Bridge Credit Agreement).  Notwithstanding the above, Mr. Bigelow informed the Examiner that he never had been required to deliver a solvency certificate.  *See* Examiner's Sworn Interview of Chandler Bigelow, June 3, 2010, at 109:22-110:2.

[2079]  Ex. 414 (Subordinated Bridge Subsidiary Guarantee).  The Subordinated Bridge Subsidiary Guarantee is governed by New York law (*see* § 13).

primary obligor and not merely as a surety," unconditionally guarantees the monetary and other

obligations of Tribune under the Bridge Credit Agreement[2080] and that such guarantee is a

guarantee of payment when due and not of collection.[2081]  The Guarantor Subsidiaries waived

various defenses, including:

- Presentment to, demand of payment from and protest to Tribune;[2082]

- Notice of acceptance of the guarantee;[2083]

- Notice of protest for nonpayment;[2084]

- The failure of the secured parties to enforce against Tribune or any other Guarantor Subsidiary;[2085]

- Any amendment, modification, waiver, or release of the Subordinated Bridge Subsidiary Guarantee or any other loan document;[2086]

- The failure to perfect or release of any security interest;[2087]

- Any act or omission that may have operated as a discharge of any Guarantor Subsidiary (other than the indefeasible payment of the obligations under the Bridge Credit Agreement in full in cash);[2088]

- The right to require that the secured parties resort to any security interest;[2089]

---

[2080] *Id.* at § 1.

[2081] *Id.* at § 4.

[2082] *Id.* at § 2.

[2083] *Id.*

[2084] *Id.*

[2085] *Id.*

[2086] *Id.*

[2087] *Id.*

[2088] *Id.*

- The invalidity, illegality or unenforceability of the obligations under the Bridge Credit Agreement;[2090]

- Any defense based on or arising out of any defense of Tribune (other than payment in full of the obligations under the Bridge Credit Agreement);[2091] and

- Any defense arising out of the election of remedies, even though such election operates to impair or extinguish any right of reimbursement or subrogation against Tribune or any other guarantor.[2092]

The Guarantor Subsidiaries agreed that all rights of subrogation, contribution, indemnity, and the like against Tribune arising from payment by such Guarantor Subsidiary of the guaranteed obligations are in all respects subordinate and junior in right of payment to the prior payment in full in cash of the obligations under the Bridge Credit Agreement.[2093]  The Guarantor Subsidiaries further agreed that any indebtedness owed by Tribune to the Guarantor Subsidiaries is subordinated in right of payment to the prior payment in full in cash of the obligations under the Bridge Credit Agreement, except to the extent otherwise permitted under the Bridge Credit Agreement.[2094]

The obligations of the Guarantor Subsidiaries under the Subordinated Bridge Subsidiary Guarantee are subordinated to the prior payment in full in cash of the obligations (including interest that accrues after the commencement of any bankruptcy proceeding, whether or not such interest is an allowed claim) of the Guarantor Subsidiaries under the Credit Agreement

---

[2089] *Id.* at § 4.

[2090] *Id.* at § 5.

[2091] *Id.* at § 6.

[2092] *Id.*

[2093] *Id.* at § 7.

[2094] *Id.*

Subsidiary Guarantee.[2095]  The Guarantor Subsidiaries are prohibited from making any payments under the Subordinated Bridge Subsidiary Guarantee on receipt of a notice of either a payment default or a default that permits the acceleration of the obligations under the Credit Agreement.[2096]  In the event of a payment default, the Guarantor Subsidiaries are prohibited from making any payments under the Subordinated Bridge Subsidiary Guarantee until the payment blockage is cured or waived.[2097]  In the event of a non-payment default, the blockage period is 180 days after the date of the notice.[2098]

Although addressing (a) subordination of obligations and (b) subrogation, contribution, and indemnity rights as to Tribune, the Subordinated Bridge Subsidiary Guarantee does not by its terms address (a) subordination of obligations and (b) subrogation, contribution, and indemnity rights among the Guarantor Subsidiaries.  It did, however, require the Guarantor Subsidiaries to enter into the Bridge Subrogation Subordination Agreement.[2099]

The Subordinated Bridge Subsidiary Guarantee does not include a traditional "fraudulent transfer savings clause."  The only provision addressing unenforceability is as follows:[2100]

> In the event any one or more of the provisions contained in [the Subordinated Bridge Subsidiary Guarantee] or any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with

---

[2095]  *Id.* at § 3.

[2096]  *Id.*

[2097]  *Id.*

[2098]  *Id.*

[2099]  *Id.* at § 7.

[2100]  *Id.* at § 15(b).

455

valid provisions the economic effect of which comes as close as
possible to that of the invalid, illegal or unenforceable provisions.

> **e.**     **The Credit Agreement Subrogation Subordination Agreement.**

On the Step Two Financing Closing Date, the Guarantor Subsidiaries executed the Credit

Agreement Subrogation Subordination Agreement in favor of the Credit Agreement Agent.[2101]

Pursuant to the Credit Agreement Subrogation Subordination Agreement, Tribune agreed to

indemnify the Guarantor Subsidiaries for any payment made by the Guarantor Subsidiaries under

the Credit Agreement Subsidiary Guarantees and for the value of any assets of the Guarantor

Subsidiaries (at the greater of book or fair market value) that are sold to satisfy a claim under the

Credit Agreement.[2102]   Each Guarantor Subsidiary agreed to indemnify each other Guarantor

Subsidiary for its pro rata share of any payment made by such other Guarantor Subsidiary under

the Credit Agreement Subsidiary Guarantees and its pro rata share of the value of any assets sold

to satisfy a claim under the Credit Agreement, in which case the Guarantor Subsidiary making

such contribution would be subrogated to such other Guarantor Subsidiary's rights of

indemnification against Tribune to the extent of such contribution.[2103]   All rights of the

Guarantor Subsidiaries under the Credit Agreement Subrogation Subordination Agreement are

subordinated to the prior payment in full in cash of the obligations under the Credit

Agreement.[2104]

---

[2101]   Ex. 711 (Credit Agreement Subrogation Subordination Agreement).  The Credit Agreement Subrogation
Subordination Agreement is governed by New York law.  *See id.* at § 5.

[2102]   *Id.* at § 1.

[2103]   *Id.* at § 2.

[2104]   *Id.* at § 3.

### f.        The Bridge Subrogation Subordination Agreement.

On the Step Two Financing Closing Date, the Guarantor Subsidiaries executed the Bridge

Subrogation Subordination Agreement in favor of the Bridge Credit Agreement Agent.[2105]

Pursuant to the Credit Agreement Subrogation Subordination Agreement, Tribune agreed to

indemnify the Guarantor Subsidiaries for any payment made by the Guarantor Subsidiaries under

the Subordinated Bridge Subsidiary Guarantees and for the value of any assets of the Guarantor

Subsidiaries (at the greater of book or fair market value) that are sold to satisfy a claim under the

Bridge Credit Agreement.[2106]  Each Guarantor Subsidiary agreed to indemnify each other

Guarantor Subsidiary for its pro rata share of any payment made by such other Guarantor

Subsidiary under the Subordinated Bridge Subsidiary Guarantees and its pro rata share of the

value of any assets sold to satisfy a claim under the Bridge Credit Agreement, in which case the

Guarantor Subsidiary making such contribution would be subrogated to such other Guarantor

Subsidiary's rights of indemnification against Tribune to the extent of such contribution.[2107]  All

rights of the Guarantor Subsidiaries under the Bridge Subrogation Subordination Agreement are

subordinated to the prior payment in full in cash of the obligations under the Bridge Credit

Agreement.[2108]

### g.        Priority of Bridge Credit Agreement.

The Bridge Debt is not by its terms subordinated to any other indebtedness of Tribune,

however, mandatory prepayments resulting from the incurrence of indebtedness or the sales of

---

[2105]  Ex. 712 (Bridge Subrogation Subordination Agreement).  The Bridge Subrogation Subordination Agreement is
governed by New York law.  *See id.* at § 5.

[2106]  *Id.* at § 1.

[2107]  *Id.* at § 2.

[2108]  *Id.* at § 3.

assets or equity are to be first applied to the Credit Agreement Debt.[2109]  The Subordinated

Bridge Subsidiary Guarantee is expressly subordinated to the Credit Agreement Subsidiary

Guarantee.[2110]  The Stock Pledge does not secure the Bridge Debt.[2111]

### 4.      Closing of the Step Two Transactions.

#### a.      Merger Agreement.

As required under the Merger Agreement, on December 20, 2007, VRC delivered its

opinion to the Tribune Board that, giving effect to the Step Two Transactions, Tribune was

solvent.[2112]  At 12:02 p.m. on December 20, 2007, Tribune consummated the Merger utilizing

proceeds of the Incremental Credit Agreement Facility and the Bridge Facility.[2113]  Pursuant to

the terms of the Merger Agreement, the certificate of incorporation and bylaws of Tribune were

amended to read in their entirety as the certificate of incorporation and bylaws of the Merger

Sub.[2114]  As a result of the ownership of Tribune solely by the ESOP, Tribune filed a Form 15

with the SEC providing notice of the termination of Tribune's registration under Section 12(g) of

the Exchange Act.[2115]  Tribune also requested that the Tribune Common Stock be suspended

from the New York Stock Exchange effective as of the close of market on December 20,

2007.[2116]

---

[2109]  Ex. 175 at § 2.10(b) (Bridge Credit Agreement).

[2110]  Ex. 414 at § 3 (Subordinated Bridge Subsidiary Guarantee).

[2111]  Ex. 190 (Pledge Agreement).

[2112]  Ex. 728 (VRC Step Two Solvency Opinion, dated December 20, 2007).  *See* Report at § III.H.3. for a discussion of the solvency opinion delivered by VRC at Step Two.  Unlike the solvency opinions delivered by VRC at Step One, the solvency opinion delivered by VRC at Step Two was not filed by Tribune with the SEC. According to a statement issued by Chandler Bigelow on January 16, 2009, Tribune did not publicly file VRC's Step Two solvency opinion with the SEC because Tribune was not required to do so under federal securities laws.  Ex. 940 (Tribune Press Release, dated January 16, 2009).

[2113]  Ex. 13 at 2 (Tribune Form 8-K, filed December 28, 2007).

[2114]  Ex. 151 at § 1.5 (Agreement and Plan of Merger).

[2115]  Ex. 227 (Tribune Form 15, filed December 20, 2007).

[2116]  Ex. 13 at 6 (Tribune Form 8-K, filed December 28, 2007).

### b.     Second Closing under the EGI-TRB Purchase Agreement.

The EGI-TRB Purchase Agreement Second Closing occurred on December 20, 2007, immediately following consummation of the Merger.[2117]  In connection therewith, EGI-TRB purchased (a) the $225 million Initial EGI-TRB Note and (b) the Warrant, for an aggregate purchase price of $315 million.[2118]  In addition, pursuant to the terms thereof, Tribune repaid the Exchangeable EGI-TRB Note in the amount of $206,418,859.46.[2119]

### c.     Advance under the Incremental Credit Agreement Facility.

On December 12, 2007, Tribune notified the Credit Agreement Agent of a request for borrowing under the Incremental Credit Agreement Facility.[2120]  Certain lenders executed Increase Joinders on December 20, 2007[2121] and the Incremental Credit Agreement Facility was funded on the Step Two Financing Closing Date.[2122]  As discussed above, advances under the Incremental Credit Agreement Facility are guaranteed by the Guarantor Subsidiaries pursuant to the Credit Agreement Subsidiary Guarantee.[2123]

On December 20, 2007, as a condition to the occurrence of the Step Two Financing Closing Date, Donald Grenesko, Senior Vice President/Finance and Administration of Tribune, delivered a solvency certificate to JPMCB stating, "As of the date hereof, immediately after giving effect to the [Step Two] Transactions, [Tribune] is Solvent."[2124]  The certificate noted that

---

[2117]  Ex. 4 at 47 (Tribune 2007 Form 10-K).

[2118]  Ex. 4 at 47 (Tribune 2007 Form 10-K).  Tribune and EGI-TRB netted the payments between them.  *See* Report at § III.G.4.d.

[2119]  Ex. 153 at § 1(b)(i) (Exchangeable EGI-TRB Note); Ex. 714 at 4 (Step Two Flow of Funds Memorandum).

[2120]  Ex. 713 (Notice of Increase).

[2121]  Ex. 351 (Increase Joinders).

[2122]  Ex. 714 at 1 (Step Two Flow of Funds Memorandum).

[2123]  *See* Report at § III.D.10.d.

[2124]  Ex. 715 (Incremental Credit Agreement Facility Solvency Certificate).  Capitalized terms used but not defined in the solvency certificate had the meanings ascribed to such terms in the Credit Agreement.

Mr. Grenesko reviewed and relied on the opinion of VRC dated as of December 20, 2007 for purposes of the solvency certificate.[2125]  The solvency certificate delivered in connection with the draw under the Incremental Credit Agreement Facility on the Step Two Financing Closing Date was consistent with the form of solvency certificate attached as Exhibit E to the Credit Agreement.[2126]

In addition, on December 20, 2007, as a condition to the occurrence of the Step Two Financing Closing Date, Chandler Bigelow, a Vice President and the Treasurer of Tribune, delivered a Responsible Officer's Certificate under the Credit Agreement stating, "The undersigned certifies in his capacity as Vice President of the Company that the representations of the Company . . . contained in [Section 4.01(l)(ii) of the Credit Agreement] . . . are true and correct in all material respects as of the date hereof. . . ."[2127]  Section 4.01(l)(ii) of the Credit Agreement states that, "Upon and after consummation of the Second Step Transactions and as of the Second Step Closing Date, immediately after giving effect to the Second Step Transactions, Borrower is Solvent."[2128]

### d.    Funds Flow.

On the Step Two Financing Closing Date, JPMCB wire transferred $2.105 billion to Tribune in respect of the Incremental Credit Agreement Facility[2129] and the Lead Banks wire transferred $1.6 billion to Tribune in respect of the Bridge Facility.[2130]

---

[2125]  *Id.  See* Ex. 714 (Step Two Flow of Funds Memorandum).

[2126]  Ex. 187 (Form of Credit Agreement Solvency Certificate).

[2127]  Ex. 716 at 1 (Credit Agreement Responsible Officer's Certificate, dated December 20, 2007).

[2128]  Ex. 179 at § 4.01(l)(ii) (Credit Agreement).   Notwithstanding the above, and as with respect to the Bridge Credit Agreement, Mr. Bigelow informed the Examiner that he never had been required to deliver a solvency certificate.  *See* Examiner's Sworn Interview of Chandler Bigelow, June 3, 2010 at 109:22-110:2; Report at § III.G.3.c.

[2129]  Ex. 714 at 1 (Step Two Flow of Funds Memorandum).

[2130]  *Id.* at 2-4.

On the Step Two Financing Closing Date, Tribune thereafter disbursed approximately

$4 billion to Computershare Trust Company, N.A., to consummate the Merger[2131] and

$1.355 million to Cahill Gordon & Reindel LLP (as legal counsel to the Lead Banks).[2132]  Based

on the Examiner's review of Tribune's books and records, Tribune also made the following

disbursements on the Step Two Financing Closing Date:[2133]

| Step Two Financing Fees, Costs, and Expenses | |
| --- | --- |
| JPM | $13,767,054 |
| Merrill Entities | $37,883,125 |
| BofA | $6,883,527 |
| Citigroup Entities | $11,472,545 |
| Other Step Two Financing Fees, Costs, and Expenses[2134] | $3,436,240 |
| **Total Step Two Financing Fees, Costs, and Expenses** | **$73,442,490** |

Tribune and EGI-TRB netted the payments due between them, such that EGI-TRB wire

transferred Tribune $56,081,148.54 in respect of:  (a) (i) the issuance by Tribune of the Initial

EGI-TRB Note ($225,000,000) and (ii) the purchase by EGI-TRB of the Warrant ($90,000,000),

less (b)(i) the repayment by Tribune of the Exchangeable EGI-TRB Note ($206,418,859.46),

(ii) the payment of the Merger Consideration to EGI-TRB on account of its ownership of

---

[2131]  *Id.* at 5.

[2132]  *Id.* at 10.

[2133]  As noted, the record developed by the Examiner during the course of the Investigation does not resolve the question of whether these fees were paid to or for the benefit of the investment banking entities (MLPFS, CGMI, JPMorgan, and BAS), which constituted the "Lead Arrangers" under the Credit Agreement and Bridge Credit Agreement, their lender-affiliates (MLCC, Citicorp, JPMCB, Bank of America and Banc of America Bridge), which constituted "Initial Lenders" and held other titles under the Credit Agreement and Bridge Credit Agreement, or both.  *See* footnote 863.

[2134]  Includes the payment of out-of-pocket expenses, legal fees, and various other financing-related costs paid in connection with Step Two.

Tribune Common Stock ($49,999,992), and (iii) reimbursement of expenses ($2,500,000)

incurred by EGI-TRB pursuant to the EGI-TRB Purchase Agreement.[2135]

### e.    Payments to Tribune Advisors.

Based on the Examiner's review of Tribune's books and records, Tribune also made the

following payments to advisors, consultants, counsel, and other service providers in connection

with the Step Two Transactions:

| Step Two Related Advisor Fees, Costs, and Expenses | |
|---|---|
| CGMI[2136] | $12,837,360 |
| MLPFS[2137] | $12,768,422 |
| **Total Step Two Advisor Fees, Costs, and Expenses** | **$25,605,782** |
| | |
| **Other Step Two Related Fees, Costs, and Expenses**[2138] | **$21,577,816** |

### f.    Rating Agency Ratings Leading Up to the Closing of the Step Two Transactions.

On August 20, 2007, assuming the consummation solely of the Step One Transactions,

and one day before the Company Meeting, Standard & Poor's Rating Services issued a research

update, lowering Tribune's corporate credit rating to 'B+' from 'BB-' and the Credit Agreement

rating from 'BB+' to 'BB'.[2139]  In addition, all ratings remained on CreditWatch "with negative

---

[2135]  Ex. 714 at 4 (Step Two Flow of Funds Memorandum).

[2136]  The payment of these CGMI Advisor Fees was made on January 15, 2008.

[2137]  The payment of these MLPFS Advisor Fees was made on January 15, 2008.

[2138]  "All Other Step Two Related Fees, Costs and Expenses" generally consists of all other amounts (in addition to those otherwise specifically categorized above) which are assumed to be related to Step Two based on the fact that they were expensed in either Q3 or Q4 2007.  With the exception of the Wachtell portion of these fees ($4,350,000) which is known to have been part of a payment made to Wachtell on December 20, 2007, actual payment dates are generally unknown.

[2139]  Ex. 717 at 2 (Standard & Poor's Research Update, dated August 20, 2007).  Under Standard & Poor's rating system, "an obligor rated 'BB' is less vulnerable in the near term than other lower-rated obligors.  However, it

implications until the close of the [Step Two Transactions]. . . ."[2140] Standard & Poor's explained that "the negative outlook at the 'B' corporate credit rating represents a revision in the expected outlook from stable, and reflects deterioration in expected operating performance and cash flow generation compared to previous expectations."[2141]

On November 29, 2007, Moody's Investor Service issued a Rating Action downgrading Tribune's Corporate Family Rating to 'B1' from 'Ba3'.[2142] The downgrade reflected Moody's:[2143]

> estimate that projected advertising revenue, EBITDA and cash flow generation will be lower than previously anticipated in 2008 and 2009 as a result of the ongoing challenges associated with a difficult revenue environment facing the newspaper industry. . . . [However, this] rating action is unrelated to Tribune's plan to go private in a transaction led by Sam Zell … and all ratings remain on review for downgrade due to the transaction.

Moody's also indicated that completion of the Step Two Transactions would result in a further downgrade of Tribune's Corporate Family Rating to 'B3' with a stable outlook rating, one

---

faces major ongoing uncertainties and exposure to adverse business, financial, or economic conditions which could lead to the obligor's inadequate capacity to meet its financial commitments" and "[a]n obligor rated 'B' is more vulnerable than the obligors rated 'BB', but the obligor currently has the capacity to meet its financial commitments. Adverse business, financial, or economic conditions will likely impair the obligor's capacity or willingness to meets its financial commitments." *See* Ex. 213 at 10 (Standard & Poor's Ratings). The addition of a plus (+) or minus (-) sign shows "relative standing within the major rating categories." *See id.*

[2140] Ex. 717 at 2 (Standard & Poor's Research Update, dated August 20, 2007). "CreditWatch" reflects Standard & Poor's opinion regarding the potential direction of a rating; "negative" means that a rating "may be lowered." *See* Ex. 213 at 13 (Standard & Poor's Ratings).

[2141] Ex. 717 at 2 (Standard & Poor's Research Update, dated August 20, 2007).

[2142] Ex. 718 (Moody's Rating Action, dated November 29, 2007). A "Corporate Family Rating" is Moody's "opinion of a corporate family's ability to honor all of its financial obligations and is assigned to a family as if it had a single class of debt [and] a single consolidated legal entity structure." Ex. 215 at 18 (Moody's Rating Symbols & Definitions). Under Moody's rating system, "[o]bligations rated 'B' are considered speculative and are subject to high credit risk" and "[o]bligations rated 'Ba' are judged to have speculative elements and are subject to substantial credit risk." *Id.* at 8. The modifier "1" indicates a ranking in the "higher end" of that generic rating category and the modifier "3" indicates a ranking in the "lower end" of that generic rating category. *Id.*

[2143] Ex. 718 (Moody's Rating Action, dated November 29, 2007).

level lower than Moody's earlier expectation, due to an anticipated "reduction in earnings through 2009. . . ."[2144]

In connection with Tribune's announcement of the closing of the Step Two Transactions, on December 20, 2007, Fitch Ratings announced that it had downgraded Tribune's Issuer Default Rating from 'B+' to 'B-'.[2145]  According to Fitch, the downgrade reflected the "significant debt burden the transaction places on the company's balance sheet while its revenue and cash flow have been declining … [leaving] … very little room to endure a cyclical downturn."[2146]  In addition, Fitch assigned Tribune a "negative outlook" as result of Fitch's "belief that there are significant secular pressures facing newspapers and broadcast affiliate industries. . . ."[2147]  However, Fitch did indicate that the fact that "the company's assets are separable from the company [provided] some capacity to potentially postpone financial distress."[2148]

In addition, on December 20, 2007, immediately following closing of the Step Two Transactions, Standard & Poor's issued a Ratings Action Update e-mail update in which it lowered Tribune's issuer credit rating to 'B-' from 'B+'.[2149]

---

[2144] *Id.*  A "Corporate Family Rating" is Moody's "opinion of a corporate family's ability to honor all of its financial obligations and is assigned to a family as if it had a single class of debt [and] a single consolidated legal entity structure." Ex. 215 at 18 (Moody's Rating Symbols & Definitions).  Under Moody's rating system, "[o]bligations rated 'B' are considered speculative and are subject to high credit risk" and the modifier "3" indicates a ranking in the "lower end" of that generic rating category.  *Id.* at 8.

[2145] Ex. 719 (Fitch Press Release, dated December 20, 2007).  An "Issuer Default Rating" is Fitch Rating's opinion "on an entity's relative vulnerability to default on financial obligations."  Ex. 219 at 8 (Fitch Ratings Definitions of Ratings).  Under Fitch's rating system, a 'B' rating indicates that "material default risk is present, but a limited margin of safety remains.  Financial commitments are currently being met; however, capacity for continued payment is vulnerable to deterioration in the business and economic environment."  *Id.*  The plus (+) sign and minus (-) sign modifiers denote relative status within major rating categories.  *Id.* at 9.

[2146] Ex. 719 (Fitch Press Release, dated December 20, 2007).

[2147] *Id.*

[2148] *Id.*

[2149] Ex. 720 (Standard & Poor's Rating Action Update, dated December 20, 2007).  Under Standard & Poor's rating system, "[a]n obligor rated 'B' is more vulnerable than the obligors rated 'BB', but the obligor currently has the capacity to meet its financial commitments.  Adverse business, financial, or economic conditions will likely impair the obligor's capacity or willingness to meets its financial commitments."  *See* Ex. 213 at 10 (Standard &

### H.    Knowledge and Actions of Key Participants in the Step Two Transactions.

The Report now addresses the knowledge and actions of the key participants with respect to the events culminating in the Step Two Transactions.  As with Section III.E., this section is organized by participant, such that the subsections span substantially the same multi-month period, but each focuses on a different participant.

### 1.    Management's Knowledge of the Tribune Entities' Financial Performance Through the Step Two Financing Closing Date.

Between the Step One Financing Closing Date and the Step Two Financing Closing Date, Tribune management continued to monitor Tribune Entities' financial performance and was acutely aware that, during this period, the Tribune Entities generally were not achieving the financial results contemplated in the February 2007 Tribune Board-approved plan.

As a consequence, and in order to provide, among others, the Lead Banks and VRC current information regarding expected future financial performance, during the fall of 2007, management developed revised financial forecasts, and presented those revised expectations to the Tribune Board in October 2007.[2150]  Further, during the period between June 4, 2007 and December 20, 2007, management was aware of Tribune's stock performance, analyst expectations for, and commentary regarding, Tribune, and the contraction of the credit markets.[2151]

---

Poor's Ratings).  The addition of a plus (+) or minus (-) sign shows "relative standing within the major rating categories."  *See id.*

[2150] *See* Ex. 643 at TRB0415666 (Tribune Board Meeting Minutes, October 17, 2007).

[2151] *See, e.g.* Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 68:8-69:15, 70:17-71:1, 73:7-73:13.

### a.    Tribune Entities' Actual Performance Against Plan.

As discussed elsewhere in the Report,[2152] management tracked the Tribune Entities'
actual financial performance in monthly Brown Books.  Thus, management closely tracked the
Tribune Entities' performance.

### b.    Management's Revised October 2007 Projections.

According to testimony provided by former Tribune Treasurer and current Chief
Financial Officer Chandler Bigelow,[2153] against the backdrop of Tribune's unfavorable 2007
performance against its February 2007 plan, management developed revised projections in the
fall of 2007, culminating in the development of new financial projections which, in part,[2154] were
presented to and discussed with the Tribune Board.[2155]  At the October 17, 2007 meeting,
management presented a revised five-year plan forecasting the Tribune Entities' financial results
for 2008 through 2012.[2156]  The updated October 2007 projections also were provided to the
Lead Banks, VRC and rating agencies.  The October 2007 forecast reflected less optimism

---

[2152]  *See* Report at § III.C.1.

[2153]  *See* Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 139:3-144:8.

[2154]  The detailed projection model underlying the revised five-year projection discussed with the Tribune Board in
October 2007 also contained projections through the year 2017.  *See* Ex. 721 (Tribune Company Model, dated
November 21, 2007).  This model comports with the five-year projection information provided to the Tribune
Board in October 2007.  As discussed herein, management presented the Tribune Board with five-year
projections, reflecting downwardly revised expectations relative to the February plan over that forecast horizon.
The underlying financial model, however, contained projections for the next ten years that reflected certain
increased expectations of financial performance in later years relative to the longer term expectations developed
in connection with the February 2007 plan.  These longer-term projections also are discussed in the Report in
the Examiner's review of VRC's Step Two opinion.  *See* Report at § III.H.3.

[2155]  *See* Ex. 643 at TRB0415666 (Tribune Board Meeting Minutes, dated October 17, 2007) and Ex. 722 at TRB-
UR-710-763 (Tribune Board Meeting Materials, dated October 17, 2007).

[2156]  The basis for assumptions regarding projected levels of revenue and other key operating performance metrics,
with respect to the five-year projection model, were described in the text of the document provided to the
Tribune Board.  The Examiner directs the reader to the October 2007 plan for a delineation of the assumptions
informing the five-year October 2007 plan. *See* Ex. 722 at TRB-UR-0414710-44 (Tribune Board Meeting
Materials, dated October 17, 2007).

regarding revenue growth and profitability relative to management's expectations held in February 2007, as reflected in the summaries below:[2157]





[2157] *See* Ex. 71 (February 2007 ESOP Model);  Ex. 722 at TRB-UR-0414710–63 (Tribune Board Meeting Materials, dated October 17, 2007) (Revised October Model).

Although reflecting less optimism than the February 2007 projections for the initial years of the projection horizon, the October 2007 projection model (which contained projected results through 2017) contemplated that revenue and profitability would grow in the later years at a rate well beyond the expectations reflected in the February 2007 model.

The October 2007 projection model forecasted significant long-term improvements in performance relative to the expectations held in February 2007 despite contrary historical performance from 2004 to 2007, including actual unfavorable performance against the February 2007 plan for both revenue and EBIT:



(1) Management's February 2007 projections (Ex. 71 (ESOP Transaction Model - Revised Operating Plan Case, dated February 8, 2007)) and Management's November 21, 2007 projections (Ex. 721 (Tribune Company Model, dated November 21, 2007), which corresponds to the October 2007 Five-Year Plan) exclude forecasted results for the Cubs, SCNI and Hoy, New York (because such businesses had been, or were contemplated to be sold). Management's November 21, 2007 projections were adjusted to account for the pro forma revenue contributions of the Cubs, SCNI, and Hoy, New York based on amounts forecasted in February, 2007 projections to facilitate and "apples-to-apples" comparison to historical results which included the revenue from those businesses.
(2) 2004, 2005, and 2006 actuals from Ex. 14 (Tribune 2006 Form 10-K). 2007 actual is from the Ex. 4 (Tribune 2007 Form 10-K). The 2007 Form 10-K revenue does not include revenues from discontinued operations (SCNI and Hoy, New York) whereas 2004-2006 results are inclusive of SCNI and Hoy, New York revenues. Normalized to exclude the effects of discontinued operations, revenues for 2004-2006 (as reported in Ex. 4 (Tribune 2007 Form 10-K)) were $5,543, $5,427, and $5,444 million respectively. The declining revenue trend is nonetheless apparent, particularly given that 2006 results include 53 weeks.



There is no question that Tribune's management was aware of these negative trends.

Indeed, this largely what prompted the reforecast in October 2007.[2158]  Furthermore, the revised

October 2007 projection, although downwardly revising near term expectations of revenue and

operating profitability relative to the pre-existing February 2007 model, nonetheless

contemplated that Tribune would significantly mitigate the effects of the secular declines then

affecting the traditional Publishing Segment (*i.e.,* newspapers and corresponding print

advertising), by substantially growing its interactive business.  In fact, the October 2007

---

[2158]  *See* Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 139:3-144:8.

projections contemplated that Tribune's interactive business would create significant value prospectively.[2159]

### c.    Management Awareness of Market Conditions.

As evidenced by, among other things, materials disseminated to the members of the Tribune Board in connection with 2007 Tribune Board meetings occurring after June 4, 2007, management monitored the price performance of the Tribune Common Stock in both an absolute and relative sense (*e.g.,* noting in Tribune Board book materials Tribune's stock returns in relation to "cohort company" returns).  Management further recognized that the market was, for certain periods between Step One and Step Two, reflecting concerns regarding the ability of Tribune to consummate the Merger.[2160]

---

[2159] The following table, derived from a review of detailed projection parameters embedded in the financial forecasting model serving as the basis for the consolidated October 2007 plan, reveals the significant reliance Tribune management was apparently placing on an expectation of substantial growth in revenue and profitability in Tribune's interactive business.  *See* Ex. 721 (Tribune Company Model, dated November 21, 2007).

| INTERACTIVE BUSINESS OCTOBER 2007 PROJECTIONS ($mm) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Actual (1) | | October Projections (2) | | | | |
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Revenue | $ 227.0 | $ 254.2 | $ 318.0 | $ 406.3 | $ 507.9 | $ 603.8 | $ 712.5 |
| *% Growth* | | *12.0%* | *25.1%* | *27.8%* | *25.0%* | *18.9%* | *18.0%* |
| Operating Cash Flow | $ 125.9 | $ 116.9 | $ 127.2 | $ 158.5 | $ 203.2 | $ 241.5 | $ 285.0 |
| *% Margin (3)* | *55.5%* | *46.0%* | *40.0%* | *39.0%* | *40.0%* | *40.0%* | *40.0%* |

(1) Actual figures derived from Ex. 642 (Brown Book for Period 12, 2007) unless otherwise noted.
(2) All Projections are derived from Ex. 1004 (Mednik e-mail, dated October 31, 2007) unless otherwise noted.
(3) Operating Margin derived from Ex. 956 (Interactive Segment Projections).  Margin is utilized to calculate operating cash flow.

Both the reasonableness of these expectations, as well as the impact of these expectations on valuation, as implicitly incorporated into VRC's Step Two analysis, are discussed later in the Report in connection with the Examiner's conclusions regarding Step Two solvency and capital adequacy.  *See* Report at §§ IV.B.5.d.(10). and IV.B.5.d.(12).

[2160] *See, e.g.,* Ex. 723 at TRB-UR-0414584.03-84.04 (Tribune Board Meeting Materials, dated July 18, 2007).

2.    **Knowledge of the Tribune Board and the Special Committee of the Tribune Entities' Financial Performance Between Step One and Step Two.**

The Tribune Board met on nine occasions between the approval of the Leveraged ESOP Transactions and the Step Two Financing Closing Date.  During that interval, the Special Committee met only twice (on May 9, 2007 and December 18, 2007).[2161]  The minutes for the Tribune Board and Special Committee meetings and materials disseminated in connection with those meetings reveal that the Tribune Board was generally aware of the ongoing deterioration in the Tribune Entities' financial performance during 2007 (relative to the February 2007 Tribune Board-approved plan) and certain of management's actions taken in response to that decline.

The minutes also show that the Tribune Board received information regarding:  (a) the financial performance of the Tribune Entities during the first through third quarters (as Tribune had issued its Form 10-Q filings for those periods), (b) management's October 2007 revision to the Tribune Entities' financial projections,[2162] and (c) certain additional information bearing on

---

[2161]    *See* Ex. 248 (Tribune Board Meeting Minutes, dated May 9, 2007); Ex. 149 (Tribune Board Meeting Minutes, dated May 21, 2007); Ex. 724 (Tribune Board Meeting Minutes, dated July 18, 2007); Ex. 725 (Tribune Board Meeting Minutes, dated September 28, 2007); Ex. 643 (Tribune Board Meeting Minutes, dated October 17, 2007); Ex. 726 (Tribune Board Meeting Minutes, dated November 5, 2007); Ex. 702 at TRB0415674 (Tribune Board Meeting Minutes, dated November 21, 2007); Ex. 727 (Tribune Board Meeting Minutes, dated December 4, 2007); Ex. 11 (Tribune Board Meeting Minutes, dated December 18, 2007); Ex. 252 (Special Committee Meeting Minutes, dated May 9, 2007); Ex. 704 (Special Committee Meeting Minutes, dated December 18, 2007).  Mr. FitzSimons testified to the Examiner that as Step Two approached and after the Chandler Trusts no longer had a Tribune Board representative, the membership of the Tribune Board and the Special Committee substantially overlapped (with the exception of Mr. FitzSimons and Mr. Zell).  Examiner's Sworn Interview of Dennis J. FitzSimons, June 25, 2010, at 86:1-87:3.

[2162]    A revised five-year projection (*i.e.,* for years 2008 through 2012) presented to the Tribune Board at the October 17, 2007 Tribune Board meeting was apparently based on a detailed projection model, which also contained projections for an additional five years (through 2017).  *See* Ex. 721 (Tribune Company Model, dated November 21, 2007).  Although the detailed projection model reviewed by the Examiner is referenced as being "last updated" on November 21, 2007, the data contained therein comport with the October 2007 five-year projection model discussed with the Tribune Board on October 17, 2007 for years 2008 through 2012.  It appears that VRC relied on these full ten-year projections in connection with the rendering of its Step Two solvency opinion, as reflected in VRC's December 18, 2007 presentation to the Tribune Board and the VRC Step Two solvency opinion, dated December 20, 2007.

The VRC December 20, 2007 opinion letter references reliance on a management projection model "model_negotiated_proposal_november21.xls."  Ex. 728 at TRB0294009 (VRC Step Two Solvency Opinion,

471

period specific results through November 2007.  Moreover, the Tribune Board minutes show that before the Step Two Financing Closing Date, the Tribune Board received information regarding management's pro forma financial expectations for the entirety of 2007 based on actual performance data available at the time.[2163]

The first Tribune Board meeting after the Step One Financing Closing Date occurred on July 18, 2007.  At that meeting, Donald Grenesko reviewed the Tribune Entities' second quarter results for each of the Publishing Segment and the Broadcasting Segment, Tribune's stock price performance, and Tribune's operating performance in relation to its identified peers.[2164]  In addition, Chandler Bigelow discussed "alternatives for completing the second step financing in the face of tighter market conditions and the Company's current operating results" and "presented several alternative financing strategies" that would allow Tribune to more quickly repay the Tranche X Facility, "and facilitate a successfully syndicated second step financing. . . ."[2165]

The Tribune Board book (disseminated to the Tribune Board members in advance of the July 18, 2007 meeting) sheds additional light on the Tribune Entities' declining financial performance and the difficult environment facing the Tribune Entities' business segments

---

dated December 20, 2007).  It appears that the "Tribune Company Model dated November 21, 2007" is the same document.  The Examiner, however, has not located evidence indicating whether the Tribune Board received a copy of that underlying model or a description of the assumptions in respect of growth rates for both the Publishing Segment and the Broadcasting Segment on which such outer-year projections were based.  Accordingly, it is unclear what the Tribune Board knew about the projections for those "outer" periods.  These outer-year financial projections are discussed further in connection with the Examiner's discussion of Management's Knowledge of Tribune's Financial Performance.  *See* Report at § III.H.1.

[2163]  In addition to Tribune Board meeting minutes (and any materials disseminated or presented to the Tribune Board in connection with such meetings), Tribune continued to issue monthly press releases disclosing certain information regarding the Tribune Entities' monthly performance.  Between June 4, 2007 and the closing of Step Two, Tribune issued seven such press releases.  *See* Ex. 81 (Tribune Press Release, dated June 20, 2007); Ex. 729 (Tribune Press Release, dated July 25, 2007); Ex. 730 (Tribune Press Release, dated August 24, 2007); Ex. 731 (Tribune Press Release, dated September 20, 2007); Ex. 732 (Tribune Press Release, dated October 24, 2007); Ex. 633 (Tribune Press Release, dated November 27, 2007); Ex. 634 (Tribune Press Release, dated December 12, 2007).

[2164]  Ex. 724 at TRB0415655 (Tribune Board Meeting Minutes, dated July 18, 2007).

[2165]  *Id.*

(particularly the Publishing Segment), as well as management's actions taken in response to the

Tribune Entities' deteriorating financial performance.[2166]  The Tribune Board book also

commented on the implications of the Tribune Entities' financial results on the contemplated

Step Two Financing.[2167]

---

[2166]  For example, the July 11, 2007 letter to Tribune Board members transmitting the Tribune Board book observed that, with respect to the Publishing Segment and interactive business:  "The newspaper industry continues to struggle through a very difficult revenue environment," that "[r]evenue declines accelerated during the second quarter. . ." and that during the quarter, the Tribune Entities reduced Publishing Segment staffing by approximately 3%, or approximately 450 full-time equivalents.  *See* Ex. 723 at TRB0414550 (Tribune Board Meeting Materials, dated July 18, 2007).  The July 11, 2007 letter also observed that in the Broadcasting Segment, "[s]econd quarter ad revenue for our television group was down 10%" and that advertising demand was "soft across all ad categories, with the exception of telecom and entertainment."  *Id.* at TRB014552.  Quarterly interactive revenues, however, were reported as up 17% in relation to a comparable period in the prior year.  *Id.* at TRB0414551.

[2167]  Tribune Board book materials corresponding to the July 18, 2007 Tribune Board meeting included a document entitled "Tribune Company Leveraged ESOP Transaction Update."  That document, in addition to discussing the status of the Bender tax matter (and an anticipated $290 million associated settlement) and other matters, contained the following statement:

> There has been increasing speculation in the market regarding the possibility that the merger will not be consummated on its current terms.  Following the release of our Period 5 results, several sell-side analysts expressed some concern as to whether the second step of the transaction will close due to uncertainties relating to the FCC approval process and our ability to finance the second step, as interest rates have begun to rise and credit spreads have widened. . . .

> The Company is preparing for the possibility that general market conditions may have an adverse effect on a successful syndication of our second step financing.  There are a record number of transactions in the market due to the large volume and size of recently announced leveraged buyouts, many of which have aggressive pricing and 'covenant-like' [sic] structures.

> These new issues have pressured the secondary trading market, including the trading of our existing Term Loan B and Term Loan X.  These tighter market conditions and our current operating results could limit our access to or increase the cost of the public bond financing.  If this were the case, we would draw on the bridge to close the merger and wait for conditions to improve. . . .

> In addition, we are working with Valuation Research on the second step solvency opinion.  The solvency analysis includes future downside scenarios which have become tougher tests given our weaker operating results.  Nevertheless, we still expect to receive the solvency opinion.

Ex. 723 at TRB-UR-0414584.03-84.04 (Tribune Board Meeting Materials, dated July 18, 2007).

Interviewees noted to the Examiner the significant tightening of the credit markets following the Step One Financing Closing Date.  *See, e.g.*, Examiner's Sworn Interview of Dennis J. FitzSimons, June 25, 2010, at 72:19-73:13; Examiner's Interview of Rajesh Kapadia, June 25, 2010 ("Just to take a step back, the credit markets and the capital markets did show cracks in the system in the July time frame.  And it was most evidenced by some of the hedge funds issues at Bear Stearns, beginning of August."); Examiner's Sworn Interview of William A. Osborn, June 24, 2010, at 34:11-12 ("[Y]ou could tell from the way that the transaction was being viewed that the markets were getting tighter.").

The next Tribune Board meeting occurred on September 28, 2007.[2168]  At the meeting,

Mr. Grenesko "provided an update on the Company's recent presentations to VRC in connection

with the solvency opinion to be rendered by VRC at the closing of the leveraged ESOP

transaction."[2169]  Mr. Grenesko also discussed planned meetings with Morgan Stanley to

"provide updated Company performance information and projections."[2170]  Regarding the Step

Two Financing, Mr. Bigelow reported on the current debt market and reported on transactions

that were being renegotiated as a result of market conditions.[2171]

On October 10, 2007, Mr. FitzSimons distributed the Tribune Board book in advance of

the next Tribune Board meeting scheduled for October 17, 2007.  In the letter transmitting those

materials, he commented on preliminary third quarter results, observing that, "On an EBIT basis,

[the Tribune Entities were] $30 million ahead of our last projection. . .", and that "[d]iluted EPS

of $0.38 was $0.15 higher than our projection. . . ."[2172]  The Tribune Board materials explain that

the Tribune Entities' third quarter performance resulted from "better revenues, strong expense

controls and several favorable one-time items."[2173]

---

[2168]  Ex. 725 (Tribune Board Minutes, dated September 28, 2007).  The Examiner has not located any Tribune Board books that may have been issued in connection with the September 28, 2007 meeting.

[2169]  *Id.*

[2170]  *Id.*

[2171]  *Id.*

[2172]  Ex. 734 at TRB0414678 (Tribune Board Meeting Materials, dated October 17, 2007).

[2173]  *Id.*  The Examiner notes that third quarter 2007 results derived from an aggregation of monthly Brown Book data evidence an unfavorable third quarter consolidated revenue variance to plan of $55.7 million and an unfavorable operating profit variance to plan of $5.4 million.  *See* Ex. 637 (Brown Book for Period 7, 2007); Ex. 638 (Brown Book for Period 8, 2007); Ex. 639 (Brown Book for Period 9, 2007).

Significantly, the Tribune Board book disseminated by Mr. FitzSimons contained a

revised financial projection for the Tribune Entities.  The document, titled "Tribune Five-Year

Financial Outlook," dated October 2007, included both a revised "base case" projection and

| Q3 2007 CONSOLIDATED ACTUAL V. PLAN | | | | |
|---|---|---|---|---|
| | **Jul** | **Aug** | **Sep** | **Q3** |
| **Revenue** | | | | |
| 2007 Actual | $ 466,707 | $ 391,163 | $ 419,029 | $ 1,276,899 |
| 2007 Plan | $ 497,934 | $ 414,056 | $ 420,587 | $ 1,332,577 |
| *Difference* | ($ 31,227) | ($ 22,893) | ($ 1,558) | ($ 55,678) |
| *% Variance* | **-6.27%** | **-5.53%** | **-0.37%** | **-4.18%** |
| **Operating Profit** | | | | |
| 2007 Actual | $ 82,419 | $ 63,218 | $ 83,364 | $ 229,001 |
| 2007 Plan | $ 88,112 | $ 73,846 | $ 72,409 | $ 234,367 |
| *Difference* | ($ 5,693) | ($ 10,628) | $ 10,955 | ($ 5,366) |
| *% Variance* | **-6.46%** | **-14.39%** | **15.13%** | **-2.29%** |

Although September 2007 monthly profitability performance, in isolation, indicates a favorable variance to plan at the operating profit level, September was the only month during 2007 showing a favorable variance to the February 2007 board-approved plan.

| 2007 CONSOLIDATED ACTUAL V. PLAN | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Jan** | **Feb** | **Mar** | **Apr** | **May** | **Jun** | **Jul** | **Aug** | **Sep** | **Oct** | **Nov** | **Dec** |
| **Revenue** | | | | | | | | | | | | |
| 2007 Actual | $ 441,948 | $ 384,500 | $ 391,785 | $ 399,470 | $ 405,965 | $ 507,931 | $ 466,707 | $ 391,163 | $ 419,029 | $ 382,810 | $ 413,447 | $ 472,438 |
| 2007 Plan | $ 447,888 | $ 391,911 | $ 407,940 | $ 412,408 | $ 441,391 | $ 541,920 | $ 497,934 | $ 414,056 | $ 420,587 | $ 417,883 | $ 437,745 | $ 512,525 |
| *Difference* | ($ 5,940) | ($ 7,411) | ($ 16,155) | ($ 12,938) | ($ 35,426) | ($ 33,989) | ($ 31,227) | ($ 22,893) | ($ 1,558) | ($ 35,073) | ($ 24,298) | ($ 40,087) |
| *% Variance* | **-1.33%** | **-1.89%** | **-3.96%** | **-3.14%** | **-8.03%** | **-6.27%** | **-6.27%** | **-5.53%** | **-0.37%** | **-8.39%** | **-5.55%** | **-7.82%** |
| **Operating Profit** | | | | | | | | | | | | |
| 2007 Actual | $ 52,467 | $ 50,739 | $ 78,843 | $ 62,480 | $ 73,515 | $ 59,809 | $ 82,419 | $ 63,218 | $ 83,364 | $ 73,148 | $ 95,113 | ($ 141,519) |
| 2007 Plan | $ 50,481 | $ 51,785 | $ 80,754 | $ 73,591 | $ 93,116 | $ 123,144 | $ 88,112 | $ 73,846 | $ 72,409 | $ 90,221 | $ 106,162 | $ 113,767 |
| *Difference* | $ 1,986 | ($ 1,046) | ($ 1,911) | ($ 11,111) | ($ 19,601) | ($ 63,335) | ($ 5,693) | ($ 10,628) | $ 10,955 | ($ 17,073) | ($ 11,049) | ($ 255,286) |
| *% Variance* | **3.93%** | **-2.02%** | **-2.37%** | **-15.10%** | **-21.05%** | **-51.43%** | **-6.46%** | **-14.39%** | **15.13%** | **-18.92%** | **-10.41%** | **-224.39%** |

Mr. FitzSimons' October 10, 2007 letter to the Tribune Board noted that revenue trends improved slightly in the Publishing Segment during the third quarter, although still evidencing significant declines in relation to a comparable period in the prior year (down 7%, as contrasted with a 9% comparable quarter decline during the second quarter).  Ex. 734 at TRB0414678 (Tribune Board Meeting Materials, dated October 17, 2007).  Although meeting managements' projections, operating cash flow was identified as down 10% from the prior year.  *Id.*  Broadcasting Segment advertising revenue showed some improvement in trends during the quarter, but only in the sense that the rate of decline slowed, *i.e.*, July ad revenue was down 7%, and August and September were down 4%.  *Id.* at TRB0414680.  Interactive revenues, however, increased 9% over the prior year for the third quarter.  *Id.* at TRB0414680.

The Tribune Board book materials also included a "Development Update," which discussed the Tribune Entities' launching of Metromix, a national entertainment channel, expected to be a source of incremental revenue and cash flow, after an initial $18 million investment in 2007 and 2008.  *Id.* at TRB 0414697.

475

several alternative scenarios – *e.g.*, an "upside case" and a "downside case."[2174]  In addition to presenting a forecast of financial results for a five-year projection horizon, the "Tribune Five-Year Financial Outlook" contained a comparison of the financial results contemplated in the original 2007 operating plan that was approved by the Tribune Board in February 2007[2175] against a projection of anticipated 2007 results that was based on year-to-date actual results.[2176] The comparison reveals substantially diminished expectations when compared to the Tribune Entities' original 2007 operational plan:

| COMPARISON BETWEEN FEBRUARY AND OCTOBER PLAN (1) | | | |
|---|---|---|---|
| | February | October | Difference |
| Publishing Segment Revenue | $ 3,923 | $ 3,693 | ($ 230) |
| Broadcasting Segment Revenue | $ 1,198 | $ 1,164 | ($ 34) |
| **Consolidated Revenue** | **$ 5,121** | **$ 4,857** | **($ 264)** |
| | | | |
| Operating Cash Flow - Publishing Segment | $ 931 | $ 818 | ($ 113) |
| Operating Cash Flow - Broadcasting Segment | $ 401 | $ 384 | ($ 17) |
| Corporate Cash Expenses | ($ 49) | ($ 42) | $ 7 |
| **Consolidated Operating Cash Flow** | **$ 1,283** | **$ 1,160** | **($ 123)** |

(1) Ex. 657 at TRB0252887 (Tribune Five-Year Financial Outlook).

The notes to the comparison explain the differences as being "due to the unexpected decline in operating results in the second quarter of 2007 which have run through our current 2007 and our longer term projections."[2177]  Although the revised October 2007 plan forecasted lower 2007 operating cash flow, it nevertheless assumed, among other things:  (a) that Tribune

---

[2174] *Id.* at TRB0414710-40.

[2175] *Id.* at TRB0414723.  As noted previously, it is not clear whether the Tribune Board received in advance of its February 13, 2007 meeting a copy of the five-year projection that management had prepared or only a one-year projection for 2007.  It does appear that the Special Committee may have received a set of five-year projections, in connection with its February 12, 2007 meeting, which correspond to the so-called "ESOP Transaction Model – 2/8/07 Revised Operating Plan Case," *i.e.,* Ex. 71 (ESOP Transaction Model—Revised Operating Plan Case, dated February 8, 2007).  *See* Report at § III.C.1.b.

[2176] Ex. 734 at TRB0414716 (Tribune Board Meeting Materials, dated October 17, 2007).

[2177] *Id.*

would receive $338 million in connection with resolution of the so-called Bender tax matter (which proceeds were received on October 1, 2007), and (b) that Tribune would receive $250 million more from the contemplated 2007 sales of the Chicago Cubs and Comcast SportsNet than originally anticipated.[2178]  Management advised the Tribune Board that when these proceeds and others came in,[2179] they could be used to reduce the borrowings under the Step Two Financing from $4.2 billion, as originally contemplated, to approximately $3.7 billion.[2180]

The following chart summarizes the key operating performance projection metrics in the five-year base case plan presented to the Tribune Board in October 2007:

| TRIBUNE CONSOLIDATED FIVE-YEAR FINANCIAL OUTLOOK (BASE CASE/NO FLEX) ($mm) (1) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2007PF | 2008 | 2009 | 2010 | 2011 | 2012 | '07-'12 CAGR |
| **Operating Revenues** | | | | | | | |
| Publishing Segment | $ 3,693 | $ 3,680 | $ 3,752 | $ 3,840 | $ 3,928 | $ 4,019 | 1.7% |
| Broadcasting Segment (excl. Cubs) | $ 1,164 | $ 1,257 | $ 1,264 | $ 1,307 | $ 1,317 | $ 1,352 | 3.0% |
| **Total Operating Revenues** | **$ 4,857** | **$ 4,936** | **$ 5,016** | **$ 5,147** | **$ 5,245** | **$ 5,371** | **2.0%** |
| | | | | | | | |
| **Operating Expenses** | | | | | | | |
| Publishing Segment | $ 2,875 | $ 2,894 | $ 2,938 | $ 2,996 | $ 3,053 | $ 3,113 | 1.6% |
| Broadcasting Segment (excl. Cubs) | $ 780 | $ 808 | $ 800 | $ 827 | $ 852 | $ 868 | 2.2% |
| Corporate | $ 42 | $ 41 | $ 41 | $ 41 | $ 41 | $ 41 | -0.2% |
| Less: Elimination of Bonus Plan | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | |
| Less: Salary Freeze | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | |
| **Total Operating Expenses** | **$ 3,697** | **$ 3,743** | **$ 3,780** | **$ 3,865** | **$ 3,946** | **$ 4,023** | **1.7%** |
| | | | | | | | |
| **Operating Cash Flow** | | | | | | | |
| Publishing Segment | $ 818 | $ 786 | $ 814 | $ 844 | $ 875 | $ 906 | 2.1% |
| Plus: Comm. Delivery and Infrastructure Savings | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Publishing Segment | $ 818 | $ 786 | $ 814 | $ 844 | $ 875 | $ 906 | 2.1% |
| Broadcasting Segment (excl. Cubs) | $ 384 | $ 448 | $ 464 | $ 479 | $ 465 | $ 484 | 4.7% |
| Corporate/Other | ($ 42) | ($ 41) | ($ 41) | ($ 41) | ($ 41) | ($ 41) | -0.2% |
| **Total Operating Cash Flow** | **$ 1,160** | **$ 1,193** | **$ 1,237** | **$ 1,282** | **$ 1,298** | **$ 1,349** | **3.1%** |
| Plus: Cash From Equity Investments | $ 68 | $ 99 | $ 115 | $ 140 | $ 163 | $ 181 | 21.5% |
| Plus: Cash Savings From 401(k) Contributions | $ 40 | $ 60 | $ 60 | $ 60 | $ 60 | $ 60 | 8.4% |
| Plus: Interest Income | $ 19 | $ 4 | $ 2 | $ 2 | $ 2 | $ 2 | -34.6% |
| Less: Severance Payments | $ 0 | ($ 10) | ($ 10) | ($ 10) | ($ 10) | ($ 10) | |
| **Adjusted EBITDA** | **$ 1,287** | **$ 1,346** | **$ 1,404** | **$ 1,474** | **$ 1,513** | **$ 1,582** | **4.2%** |

(1) Information presented as it appears in Ex. 657 at TRB0252894 (Tribune Five-Year Financial Outlook).

---

[2178]  *Id.*

[2179]  Other sources of incremental cash increases were included proceeds from the sale of the KTLA Studios ($125 million) not contemplated in the February operating plan and reduced levels of investments and capital expenditures ($193 million).  *Id.* at TRB0414716.

[2180]  *Id.*

When contrasted with the five-year revenue and profitability expectations developed by management in the February 2007 operating plan, which served as the basis for the 2007 plan approved by the Tribune Board,[2181] the revised October 2007 projections show diminished expectations throughout the five-year projection period for both revenue and profitability, on a consolidated basis.  The following three graphs illustrate these differences:



(1) Management's  February, 2007 model, Ex. 71 (ESOP Transaction Model, dated February 8, 2007) and Management's November 21, 2007 model, Ex. 721 (Tribune Company Model, dated November 21, 2007).

---

[2181]  For purposes of this comparison, the October 2007 plan forecasted results are compared to forecasts contained in the February 2007 ESOP Model.  Although the May 2007 revision to the ESOP plan forecast eliminated from forecasted revenues and earnings the revenue and profit associated with business units that management expected to sell during 2008, the October 2007 version plan did not contemplate those same business unit sales.  Thus, the February 2007 ESOP Model version of the projections used in order to ensure an "apples-to-apples" comparison.  The 2007 operating plan approved by the Tribune Board was a one year plan.  As noted, the projection model underlying the 2007 plan contained projections for additional years.





In addition to the five-year "base case" plan, the October 2007 Tribune Board book included the presentation of a downside case, based on "the most pessimistic sell-side analyst" expectations,[2182] as well as "flex" projection scenarios.[2183]  According to the summary contained at the beginning of the "Tribune Five-Year Financial Outlook," management already had reviewed these projections with Tribune's bankers and financial advisors:[2184]

> We [management] have reviewed these financial projections with
> our four lead underwriting banks (JP Morgan, Merrill Lynch,
> Citigroup and Bank of America), our solvency firm (Valuation
> Research Corporation), Morgan Stanley and Equity Group.  We
> plan to review these projections with Moody's and Standard &
> Poor's on October 25 and 26, respectively.  In addition, these

---

[2182]  The disseminated materials noted:

> [O]ur downside Publishing revenue projections are based on the most pessimistic sell-side analyst on the
> Street (Craig Huber at Lehman Brothers).  Huber assumes that Publishing revenues fall 3.3% per year for
> five consecutive years.  While we don't agree with Huber's assessment of our business prospects, we have
> used his assumptions to illustrate that even in the most pessimistic operating environment, we maintain
> compliance with our financial covenants.
>
> In our downside case, we mitigate Huber's revenue declines through significant cost reductions, including a
> possible salary freeze and the elimination of management bonus payments.  In addition, we have the option
> to defer cash interest payments on our PHONES for a five year period, which would save us about $25
> million in cash annually during the deferral period.  We would also reduce our capital expenditure and
> investment spending in this scenario.  Depending on the severity of the downturn, we could also consider
> selling assets which are shown on Chart 20 in the Appendix of this report.  It is important to note that we
> are already ahead of Huber's projections as our third quarter 2007 operating cash flow from continuing
> operations exceeded his estimate by about $35 million, or 15%.
>
> Section 5 shows our three operating scenarios assuming a "flexed" second step.  In 2008, the "flex" has
> little impact on interest expense since we would fund the merger with a twelve-month bridge loan at a rate
> similar to the non-flex scenario.  However, in 2009, the "flex" case adds about $100 million of additional
> interest expense because the bridge loan converts into 12.5% seven-year notes.  These notes would be held by
> our lead banks if we are unable to refinance the bridge through a public high-yield bond offering.
> Importantly, as Charts 2 and 3 on the following pages show, even in a downside operating scenario that is
> "flexed," we will be in compliance with the financial covenants contained in our credit agreement without
> having to sell any assets other than those already identified.
>
> In addition, in order to consummate the merger, the Company must meet these financial covenants on a pro
> forma basis, assuming that all of the debt issued in connection with steps one and two of the Leveraged
> ESOP transaction had been outstanding for twelve months.  Assuming the second step of the transaction
> closes in the fourth quarter, we will meet these tests and have approximately $250 million of operating cash
> flow cushion.

*Id.* at TRB0414713.

[2183]  *Id.* at TRB0414738-40.

[2184]  *Id.* at TRB0414713.

> financial projections will become the basis for the presentation
> materials we will use with prospective lenders in the second step
> financing.

The October 17, 2007 Tribune Board book also contained a section devoted to the

ongoing VRC evaluation of solvency in contemplation of the Step Two Transactions, noting as

follows:[2185]

> Valuation Research Corporation (VRC) has been conducting its
> due diligence as it prepares for the provision of a solvency opinion
> prior to closing the transaction.  VRC spent two days on-site in
> September meeting with a group of Publishers, television station
> General Managers and members of the corporate staff.  Their
> diligence focused on current operating performance, our five year
> projections under various operating scenarios, balance sheet
> implications, performance of equity investments, divestitures,
> litigation and contingencies and general risk assessment.  Their
> team is experienced and their diligence has been rigorous.

> Since our on-site diligence meetings, we have held a series of
> follow-up sessions with business unit leaders and corporate staff.
> We expect this will continue for the next several weeks as VRC
> performs their solvency analysis.  We expect their work to be
> completed by the end of October, and they have indicated a
> willingness to provide updates as to their conclusions as they
> approach completion.

The minutes of the October 17, 2007 meeting reflect that:  (a) the Tribune Board

discussed the foregoing materials,[2186] (b) CGMI gave a presentation regarding the debt market

and disclosed that CGMI might cease providing advisory services to Tribune because of

Citicorp's obligation to fund the Step Two Financing,[2187] and (c) Morgan Stanley gave a

---

[2185]  Ex. 722 at TRB-UR-0414764.02 (Tribune Board Meeting Materials, dated October 17, 2007).

[2186]  Ex. 643 at TRB041566 (Tribune Board Meeting Materials, dated October 17, 2007).

[2187]  *Id.* at TRB041567.  It appears that CGMI never terminated its employment as an advisor to Tribune before the closing of Step Two, in part because Tribune would not pay CGMI's advisory fee until the closing of Step Two. Examiner's Interview of Christina Mohr, June 27, 2010.

presentation that addressed Tribune's expected level of leverage associated with the Step Two

Financing and the status of the debt markets, among other things.[2188]

The Tribune Board next met on November 5, 2007.  Minutes from that meeting show that

management presented the Tribune Board a review of preliminary operating results for period 10

(October 2007) and that Chandler Bigelow described the status of VRC's ongoing work, noting

that "[V]RC has indicated preliminarily that it is in a position to issue a favorable solvency

opinion prior to closing of the second step merger."[2189]  Minutes of the next Tribune Board

meeting, held on November 21, 2007, contained a "Solvency Update" in which Mr. Bigelow

noted, in connection with his discussion of the status of VRC's ongoing work, that "VRC was

working through a list of supplemental due diligence questions submitted by the lenders,"

although it is not apparent whether the Tribune Board was provided any details regarding the

substance of these inquiries at that time.[2190]

On November 28, 2007, the Tribune Board members received the Tribune Board book

for the December 4, 2007 meeting.  In the accompanying transmittal letter, Mr. FitzSimons

observed, among other things, regarding the Tribune Entities' recent financial performance

that:[2191]

> Publishing and Interactive
>
> Current business conditions – Period 11 advertising revenues were
> 1% ahead of our projection, down 5% for the period. . . .

---

[2188] Ex. 643 at TRB041567 (Tribune Board Meeting Materials, dated October 17, 2007).  It is unclear whether any additional written materials were disseminated to the Tribune Board relating to these matters.

[2189] Ex. 726 at TRB0415669 (Tribune Board Meeting Minutes, dated November 5, 2007).

[2190] Ex. 702 at TRB0415674 (Tribune Board Meeting Minutes, dated November 21, 2007).  Subsequent meeting minutes (December 18, 2007) indicate that "Diligence questions that had been posed by the banks to VRC and management were previously made available to the Board."  Ex. 11 at TRB0415685 (Tribune Board Meeting Minutes, dated December 18, 2007).

[2191] Ex. 736 at TRB0414798-799 (Tribune Board Meeting Materials, dated December 4, 2007).

Interactive – Fourth quarter interactive revenues are projected to increase 9% over the same period last year. . . .

Broadcasting/Entertainment

First quarter 2008 is currently pacing 57% ahead of 2007.  It is still early, but we are encouraged by the strong start to 2008.  The national broadcast and cable network market for the first quarter is very tight and our stations should see some positive impact from this in their local markets.  Combined with political spending and our stronger prime time lineups, we should continue to see positive revenue numbers.

The Tribune Board book for the December 4, 2007 meeting apprised Tribune Board members about speculation in the marketplace about the likelihood that the Step Two Transactions would close.  The "Tribune Company Stock Performance Report," included in the Tribune Board book materials, observed as follows:[2192]

With the possible close of the ESOP/Zell transaction just three weeks away, there has been a lot of speculation in the marketplace regarding shares of TRB, which traded as low as $27.25 on Nov. 27.  The next day, however, shares of TRB rose more than 10% and closed at $30, following FCC Chairman Kevin Martin's announcement that he was circulating a proposal to grant Tribune the temporary waivers needed to close our transaction by the end of the year.

The minutes of the December 4, 2007 Tribune Board meeting indicate that Donald Grenesko reviewed projected fourth quarter results for both of Tribune's business segments and factors affecting such performance.[2193]  The minutes also reveal that VRC representatives Bryan Browning, William Hughes, and Mose Rucker "made a comprehensive presentation regarding VRC's solvency analysis and the solvency opinion required to close the merger":[2194]

Messrs. Browning, Hughes and Rucker referred to a written report provided in advance to the Board and described the seven month

---

[2192] *Id.* at TRB0414822.

[2193] Ex. 727 at TRB0415676 (Tribune Board Meeting Minutes, dated December 4, 2007).

[2194] *Id.* at TRB0415677.

process used by VRC to reach their preliminary conclusions regarding solvency.  The presentation showed the various tests used by VRC in its solvency analysis, comparable transactions, case comparisons and the assumptions VRC relied upon in reaching its solvency determination.  VRC also reviewed its qualifications and the process by which its preliminary solvency analysis would be reviewed for modification prior to VRC issuing a final solvency opinion.  A lengthy discussion followed the presentation and Messrs. Browning, Hughes and Rucker answered questions from the Board.  Messrs.  Browning, Hughes, Rosenblum, Rucker and Whayne then left the meeting.

It appears from the minutes of the December 4, 2007 Tribune Board meeting that the Tribune Board received a presentation entitled "Tribune Company – Draft Board of Directors Presentation:  Preliminary Solvency Analysis, December 4, 2007."[2195]  This presentation discussed the results of VRC's valuation analysis and compared those results with VRC's opinions in connection with Step One.  The following chart summarizes this comparison:

---

[2195] *See* Ex. 737 at TRB0272807-31 (VRC Preliminary Solvency Analysis, dated December 4, 2007).

| COMPARISON BETWEEN VRC MID-RANGE VALUATIONS at STEP 1 and STEP 2 (1) | | | |
|---|---|---|---|
| **Valuation Method** | **Step One** | **Step Two** | **Change** |
| Comparable Companies | $ 12,497.6 | $ 9,865.3 | ($ 2,632.3) |
| Comparable Transactions | $ 12,681.1 | $ 11,081.5 | ($ 1,599.6) |
| Discounted Cash Flow (2) | $ 9,918.6 | $ 9,084.2 | ($ 834.4) |
| Sum of Business Segments | $ 12,709.7 | $ 9,925.3 | ($ 2,784.4) |
| | | | |
| **Average Operating Enterprise Value** | **$ 11,951.8** | **$ 9,989.1** | **($ 1,962.7)** |
| | | | |
| + Equity Investments and Other Assets (3)(4) | $ 2,686.0 | $ 3,312.1 | $ 626.1 |
| + NPV of PHONES Tax Savings | $ 382.7 | $ 0.0 | ($ 382.7) |
| + NPV of S-Corp-ESOP Savings | $ 0.0 | $ 2,024.7 | $ 2,024.7 |
| | | | |
| **Adjusted Enterprise Value** | **$ 15,020.4** | **$ 15,325.9** | **$ 305.5** |
| | | | |
| + Cash | $ 188.0 | $ 197.7 | $ 9.7 |
| - Debt | ($ 9,463.8) | ($ 13,188.1) | ($ 3,724.3) |
| - Identified Contingent Liabilities | ($ 97.1) | ($ 86.8) | $ 10.3 |
| | | | |
| **Equity Value** | **$ 5,647.5** | **$ 2,248.7** | **($ 3,398.8)** |
| | | | |
| **% of Enterprise Value** | **37.6%** | **14.7%** | **-22.9%** |

(1) Ex. 737 at TRB0272814 (VRC Preliminary Solvency Analysis, dated December 4, 2007). VRC used values from its May 17, 2007 solvency analysis for purposes of its comparison.  *See*  Ex. 283 at 10 (VRC Solvency Analysis, dated May 17, 2007).
(2) Includes the value of radio.
(3) Includes Tribune's latest estimate of the net proceeds from the sale of the Cubs and Comcast.
(4) Includes after tax value of certain real estate that can either be sold or capitalized into value.

Although the Tribune Board meeting minutes show that a "lengthy discussion" followed VRC's presentation at the December 4, 2007 meeting and that VRC representatives answered questions posed by the Tribune Board,[2196] no additional details were provided regarding the nature of that discussion.

Each of the Special Committee and the Tribune Board met on December 18, 2007.  At the Tribune Board meeting, Mr. Bigelow and Mr. Grenesko first presented management's overview regarding VRC's solvency analysis.[2197]  VRC representatives Mr. Rucker and

---

[2196]  Ex. 727 at TRB0415677 (Tribune Board Meeting Minutes, dated December 4, 2007).

[2197]  Ex. 11 at TRB0415685 (Tribune Board Meeting Minutes, dated December 18, 2007).

Mr. Browning then reviewed VRC's solvency analysis with the Tribune Board.[2198]  The VRC presentation materials show VRC's reliance on four "key assumptions" in rendering its opinion in connection with the Step Two Transactions:

•       The Step Two analysis assumed that the buyer would have a structure similar to the structure contemplated in the Step Two Transactions (an S-Corporation, owned entirely by an ESOP, which receives federal income tax deferrals or another structure resulting in equivalent favorable federal income tax treatment to Tribune);[2199]

•       VRC relied on management's Base Case and Downside Case;[2200]

•       VRC assumed substantial tax savings from the S-Corporation/ESOP structure using the Base Case forecast;[2201] and

•       VRC assumed that the Tribune Entities could refinance guaranteed debt after the expiration of the credit agreements.[2202]

According to the December 18, 2007 Tribune Board meeting minutes, management "confirmed its belief that VRC's analysis and the underlying assumptions and projections are reasonable, if not conservative:"[2203]

---

[2198]  *Id.*

[2199]  This differs from the assumption underlying the Step One opinion, which defined "Fair Value" and "Present Fair Saleable Value" as follows:

> Fair Value – The amount at which the aggregate or total assets of the subject entity (including goodwill) would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, neither being under any compulsion to act.

> Present Fair Saleable Value – The amount that may be realized by a willing seller from a willing buyer if the subject entity's aggregate or total assets (including goodwill) are sold with reasonable promptness.  *See* Ex. 268 at TRB0149969 (VRC Step One Solvency Opinion, dated May 9, 2007).  This is unsurprising, in that VRC's Step One opinion did not give effect to the Step Two Financing or the Merger.

[2200]  These cases were based on management projections developed in the fall of 2007.

[2201]  As explained elsewhere in the Report, the Examiner has concluded that this assumption was not reasonable. *See* Report at § IV.B.5.d.(10).

[2202]  *See* Report at § III.3.g.

[2203]  Ex. 11 at TRB0415685 (Tribune Board Meeting Minutes, dated December 18, 2007).

Diligence questions that had been posed by the banks to VRC and to management were previously made available to the Board.  The Board (directly and through its counsel and financial advisors) posed its own questions to VRC and to management and received answers thereto.  Without limitation, (i) VRC confirmed that its opinion was the result of its independent, professional advice without improper influence of management, (ii) VRC confirmed that it engaged in a significant testing of both management's base case and downside cases, (iii) VRC confirmed that it had received all the information it had requested from the Company; (iv) VRC described its internal opinion review process as rigorous and confirmed that its fee would be the same whether it opined favorably or unfavorably as to solvency and (v) VRC explained the changes in its approach to PHONES valuation and that such change was not, in any event, outcome determinative.  After completion of VRC's review and presentation and all questions and answers, VRC rendered its opinion, and said that it would provide a written opinion brought down to closing.  Management then advised the Board that management stands ready to deliver the closing certificate contemplated by the Credit Agreement as to solvency and that such certificate will be based upon its own analysis, as further supported by the VRC opinion and analysis.

The December 18, 2007 Tribune Board and Special Committee meetings are discussed elsewhere in the Report.[2204]

> **3.      Knowledge and Actions of Participants in Step Two Solvency Opinion and Examiner's Evaluation of Step Two Solvency Opinion.**
>
> **a.      VRC's Analysis Prior to the Issuance of the Step Two Solvency Opinion and VRC's Interactions with Management.**

VRC first considered the implications of the closing of the Step Two Transactions on the question of solvency early in the Tribune engagement.[2205]  In fact, VRC developed valuation and cash flow forecasting models designed to preliminarily assess Step Two solvency and capital adequacy before it issued its May 9, 2007 and May 24, 2007 Step One solvency opinions.[2206]

---

[2204] *See* Report at § III.G.1.

[2205] Ex. 264 at 194:25-195:10 (Rule 2004 Examination of Mose Rucker, December 3, 2009); Ex. 262 at 118:10-16 (Rule 2004 Examination of Bryan Browning, December 4, 2009).

[2206] Ex. 264 at 54:25-55:2 (Rule 2004 Examination of Mose Rucker, December 3, 2009).

For example, on April 24, 2007, Mose Rucker at VRC circulated a draft solvency analysis to other VRC employees incorporating both the effects of the expected Step One Debt as well as the effects of the anticipated Step Two Debt (in addition to presenting an analysis incorporating only the Step One Debt).[2207]  This analysis was performed in connection with VRC rendering an opinion regarding Tribune's solvency and capital adequacy as of Step One, both on a stand-alone basis as well as on a pro forma basis, that incorporated the impact of the Step Two Debt as of the date of the initial Step One solvency opinion.[2208]

        After providing its May 9, 2007 and May 24, 2007 Step One solvency opinions, VRC continued its due diligence regarding Step Two.  As it did in connection with Step One, VRC received information from, and presented drafts of its solvency and capital adequacy analysis to, Tribune management in the months between the closing of the Step One Financing Transactions and the Step Two Transactions.[2209]  As with VRC's Step One solvency opinions, and consistent with the terms of VRC's engagement letter, Tribune's management supplied projections and financial information on which VRC, in significant part, based its Step Two solvency opinion.[2210]  In addition, as discussed more fully below, management made representations to

---

[2207]  Ex. 270 at VRC0048044 (Rucker E-Mail, dated April 24, 2007).

[2208]  Ex. 264 at 68:15-69:15 (Rule 2004 Examination of Mose Rucker, December 3, 2009).  Mr. Browning testified in his Rule 2004 examination that "we wanted to make sure that in rendering the first opinion,  that there weren't any red flags for the second opinion." Ex. 262 at 60:14-17 (Rule 2004 Examination of Bryan Browning, December 4, 2009).  He also stated that "it would make it very complicated if we render an opinion for first step and then can't render it in the second step."  *Id.* at 60:23-61:2.

[2209]  For example, VRC participated in a two day meeting with Tribune management on September 19 and 20, 2007. Ex. 655 (Tribune Company Valuation Research Corp. Due Diligence Agenda); Ex. 656 (Tribune Company Corporate Finance Handouts, dated September 19, 2007).  Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 44:2-14 ("Yes, we had extensive sessions, two all-day sessions with the heads of, I think, every major company, every major paper, division at the company.  And we went through and we discussed some of the initiatives that they were putting in place, that they thought would allow them to recapture those markets.  So we had very extensive due diligence meetings with almost every major head of divisions at the company.").  *See, e.g.*, Ex. 948 (Mednik E-Mail, dated June 13, 2007) (forwarding to Chandler Bigelow VRC's preliminary Step Two solvency analysis); Ex. 949 (Bigelow E-Mail, dated September 27, 2007) (forwarding historical financial information to VRC).

[2210]  Ex. 728 at TRB0294012 (VRC Step Two Solvency Opinion, dated December 20, 2007).

VRC on Tribune's behalf and served as an intermediary for several questions posed by the Lead Banks to VRC (some of which management found "much more detailed" than VRC's inquiries).[2211]

In undertaking its Step Two solvency analysis, VRC initially worked from management's February 2007 projection model as updated in April 2007 and May 2007 (incorporating certain anticipated changes to financing terms and asset sales).[2212]  According to an e-mail from Harry Amsden of Tribune dated August 2, 2007, Tribune's effort to update its projections for Step Two purposes began in early August 2007.[2213] Although Mr. Amsden's e-mail addresses efforts by Tribune managers in the Publishing Segment to update the "5-year (2007-2011) financial model" that the Publishing Segment had developed in early 2007 for Step One purposes, Mr. Bigelow indicated that the Broadcasting Segment "will be embarking on a similar project."[2214]

Notably, Mr. Amsden's e-mail discussed a significant change in the format and level of detail required for the Step Two projections.  Mr. Amsden prefaced his instruction to the Publishing Segment team by recalling that, at the time of the Step One Financing, "we were able to satisfy [VRC's] needs with only a group level model."  However, Mr. Amsden continued:[2215]

> This time [VRC] will also need additional detail for our 6 largest business units, and also [Tribune interactive] as a whole and [Tribune Media Services], as this round of work will be more comprehensive.  In addition, they will want to talk to each of you, likely here in Chicago, about the portion of the model that relates to your business unit.

---

[2211]  Ex. 950 (Amsden E-Mail, dated September 27, 2007) ("We have done two conference calls with the bankers so far this week.  The bankers have asked much more detailed financial questions than VRC did.").

[2212]  The content and development of management's February, April, and May 2007 models are described more fully elsewhere.  *See* Report at § III.C.1.

[2213]  Ex. 654 (Bigelow E-Mail, dated August 2, 2007).  The Amsden e-mail was forwarded by Chandler Bigelow to David Eldersveld, Naomi Sachs, and Heidi Fischer on August 2, 2007.

[2214]  *Id.*

[2215]  *Id.*

In the e-mail, Mr. Amsden established a schedule for the process.  According to Mr.

Amsden, in the near term his team was expecting to "develop overall group targets for

2008-2012," as well as to provide the business units "with the standard assumptions that we built

into the model from a group perspective so that [the business units] can understand the starting

point we [give] you and what we factored in."[2216]  At that point, each business unit was to

receive its section of the model in order to assess whether adjustments to the model would be

required.  By August 29, 2007, the units were expected to return the revised model with

commentary on any identified initiatives and required adjustments.

After allowing for a brief window for review and additional feedback, the plan was to

"turn the group model into corporate by just after Labor Day."[2217]  Next, according to Mr.

Amsden:[2218]

> Corporate will then consolidate the models into one and turn them
> over to VRC by September 10th or so. . . .  VRC will then need
> several weeks for their work. Likely your visit to Chicago to meet
> with them would be in the second half of September some time and
> would not require more than a day here.

In an e-mail dated August 28, 2007, Mr. Amsden updated the Publishing Segment team

regarding progress on efforts regarding the five-year model.[2219]  He noted that an additional set

of meetings was to be scheduled for late September 2007 with both VRC and "the 4 banks

involved in the financing for the final stage of the buyout," and that he hoped to use "as much of

the same materials/presentation as possible for both meetings," indicating a significant overlap in

---

[2216] *Id.*

[2217] *Id.*

[2218] *Id.*

[2219] Ex. 951 (Amsden E-Mail, dated August 28, 2007).  For purposes of the Step Two effort, the business units were asked to project performance "three years out" rather than five.  Ex. 66 at 204:5 (Rule 2004 Examination of Harry Amsden, December 16, 2009).  According to Mr. Amsden, his group office team then "worked on the last two [years] on an overall basis."  *Id.* at 204:6-7; Ex. 952 at TRB0468697 (Tribune Publishing 5-Year Model Preparation).

interest with respect to "2007 and 2008-2012 also."[2220]  Other information discussed in the

e-mail indicates that the effort being made on the five-year model appeared to be on schedule.[2221]

　　　In response to a query regarding Tribune's new projections, Mr. Bigelow updated Mose

Rucker of VRC in a September 4, 2007 e-mail regarding Tribune's progress on the projections,

and confirmed meetings with VRC on September 19 and 20, 2007.[2222]  On  September 17, 2007,

with the meetings between Tribune and VRC imminent, Mr. Bigelow (again in response to

Mr. Rucker's prompting), advised Mr. Rucker that Tribune continued to work on the "financial

model and handouts for the meeting," but that nothing would be available for VRC's review in

advance of the meeting.[2223]

　　　It appears that Tribune management met with VRC beginning on September 19, 2007 and

that a base case five-year financial model was discussed, but that certain other elements of

interest to VRC, including sensitivity cases and other additional information, were planned for

later delivery.[2224]  The meetings set in motion an effort by VRC to gather and assess information

in the weeks following the September 19 and 20, 2007 meetings.[2225]

　　　By September 30, 2007, Tribune had apparently finalized its projection model pertaining

to operating cash flows from its principle business units, since the first five years of projected

---

[2220]  Ex. 951 (Amsden E-Mail, dated August 28, 2007).

[2221]  *Id.*

[2222]  Ex. 893 (Bigelow E-Mail, dated September 4, 2007).

[2223]  Ex. 894 (Bigelow E-Mail, dated September 17, 2007).

[2224]  It appears that Tribune's five year model was not available in final form on the first day of the meeting based on an 8:11 a.m. e-mail sent by Chandler Bigelow to Mr. Rucker on the second day of meetings in which Mr. Bigelow promised to deliver a "PDF . . . of yesterday's handouts updated to synch with the attached five year model." Ex. 895 (Bigelow E-Mail, dated September 20, 2007).  Moreover, the financial model attached to the 8:11 AM e-mail apparently was flawed in some way since Mr. Bigelow followed up this e-mail with another to Mr. Rucker at 10:28 AM asking that Mr. Rucker "delete the previous email and attachment" and accept the "correct model" which was titled Tribune Financial Model Sept 20.xls.  Ex. 896 (Bigelow E-Mail, dated September 20, 2007).

[2225]  *See* Ex. 953 (Bigelow E-Mail, dated September 20, 2007); Ex. 897 (Bigelow E-Mail, dated September 21, 2007).

performance informing its September 30, 2007 model correspond with the five-year forecast that

was subsequently presented to the Tribune Board in October 2007, as well as with the ten years

of forecasted operating cash flows informing the November 21, 2007 set of Tribune projections

on which VRC ultimately relied in connection with its December 20, 2007 solvency opinion.

Management, in fact, presented this new five-year forecast, entitled "Tribune Five Year Financial

Outlook," to the Tribune Board at its October 17, 2007 meeting.[2226]  In addition to containing a

base case five-year forecast, the October 2007 forecast included "a number of scenarios off of

[Tribune's] base case," including a downside case built around the expectations of Craig Huber

of Lehman Brothers, reputedly the most pessimistic analyst covering Tribune at the time.[2227]

VRC used these revised numbers to complete its analysis.[2228]

> b.      VRC's December 4, 2007 Solvency Presentation.

On the basis of its due diligence, at the December 4, 2007 Tribune Board meeting

Mr. Browning, Mr. Rucker, and Mr. Hughes of VRC "made a comprehensive presentation

regarding VRC's solvency analysis and the solvency opinion required to close the [M]erger."[2229]

VRC's December 4, 2007 analysis used the same general approaches to calculating Tribune's

equity value and assessing Tribune's capital adequacy that VRC used at Step One.  However,

notably different from the comparable presentation made to the Tribune Board at Step One,

---

[2226]  Ex. 657 (Tribune Five-Year Financial Outlook, dated October 2007).  *See* Report at § III.H.2.

[2227]  Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 151:3-12; Ex. 657 at TRB0414726-32 (Tribune Five-Year Financial Outlook).  *See also* Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 153:17-21 ("Craig Huber was out there with a model, very pessimistic, and we thought, hey, one of the most effective ways to really stress test the business is let's take Craig's numbers.").

[2228]  Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 155:9-156:5; Ex. 1004 (Mednik E-Mail, dated October 31, 2007).

[2229]  Ex. 727 at TRB415677 (Tribune Board Meeting Minutes, dated December 4, 2007).  Although the Tribune Board book disseminated in advance of the December 4, 2007 Tribune Board meeting did not contain any VRC-prepared materials, a VRC presentation dated December 4, 2007 appears to correspond to the materials presented to and discussed with the Tribune Board on December 4, 2007.  *See* Ex. 737 (VRC Preliminary Solvency Analysis, dated December 4, 2007).

VRC's December 4, 2007 preliminary Step Two materials set out four predicate "key assumptions" on which VRC's analysis was based:[2230]

> The standards of [Fair Value and Present Fair Saleable Value] used for the solvency of the Step Two Transactions . . . [has] been modified [to] assum[e] that the buyer would have a structure similar to the structure contemplated in the Step Two Transactions (an S-Corporation, owned entirely by an ESOP, which receives federal income tax deferrals or another structure resulting in equivalent favorable federal income tax treatment to Tribune);

> VRC relied on Management's Base Case and Downside Case projections for its opinion;

> VRC relied upon achieving S-Corporation/ESOP tax savings for Tribune which are determined using the Base Case forecast; and

> [VRC] assumes that the Company can refinance guaranteed debt after the expiration of the credit agreements.

Using these assumptions to reach its valuation conclusion, VRC calculated a value of Tribune's assets from which VRC subtracted a pro forma estimate of the interest-bearing debt that was anticipated on the Step Two closing.  VRC preliminarily determined that, after giving effect to the Step Two Transactions, Tribune's residual equity value ranged between $1.159 billion (low case) and $3.338 billion (high case), and Tribune would be able to meet cash flow requirements in both VRC's base case and downside case while maintaining compliance with its debt covenants.[2231]  The following chart summarizes VRC's December 4, 2007 conclusions:[2232]

---

[2230] Ex. 737 at TRB0272811 (VRC Preliminary Solvency Analysis, dated December 4, 2007).

[2231] *Id.* at TRB0272813.

[2232] *Id.*

| VALUATION SUMMARY ($ mm) | | | |
|---|---|---|---|
| **Valuation Method** | **Low** | **Mid** | **High** |
| Comparable Companies | $ 9,248.1 | $ 9,865.3 | $ 10,482.5 |
| Comparable Transactions | $ 10,782.0 | $ 11,081 5 | $ 11,381.0 |
| Discounted Cash Flow | $ 8,398.6 | $ 9,084.2 | $ 9,769.8 |
| Sum of Business Segments | $ 9,317.2 | $ 9,925.3 | $ 10,533.3 |
| **Average Operating Asset Value** | **$ 9,436.5** | **$ 9,989.1** | **$ 10,541.6** |
| + Equity Investments and Other Assets | $ 3,066.4 | $ 3,312.1 | $ 3,557.1 |
| + NPV of S-Corp-ESOP Tax Savings | $ 1,733.3 | $ 2,024.7 | $ 2,316.2 |
| **Adjusted Enterprise Value** | **$ 14,236.2** | **$ 15,325.9** | **$ 16,414.9** |
| + Cash | $ 197.7 | $ 197.7 | $ 197.7 |
| - Debt | ($ 13,188.1) | ($ 13,188.1) | ($ 13,188.1) |
| - Identified Contingent Liabilities | ($ 86.8) | ($ 86.8) | ($ 86.8) |
| **Equity Value** | **$ 1,159.0** | **$ 2,248.7** | **$ 3,337.7** |

VRC also compared its preliminary Step Two conclusions with the conclusion it reached at Step One.[2233]  As summarized in the chart below, between the issuance of its Step One solvency opinions and December 4, 2007, VRC had, among other things, reduced the mid-point value ascribed to Tribune's operating assets by approximately 16.4%, increased the mid-point value ascribed to Tribune's non-operating assets by approximately 23.3%, introduced approximately $2 billion of net present value S-Corporation/ESOP tax savings, eliminated the value previously ascribed to the PHONES Notes tax savings (as no longer applicable given the S-Corporation/ESOP structure), accounted for the incremental Step Two Debt, and made minor adjustments to excess cash and contingent liabilities:[2234]

---

[2233]  *Id.* at TRB0272814.

[2234]  *Id.*

| COMPARISON BETWEEN VRC MID-RANGE VALUATIONS at STEP 1 and STEP 2 (1) | | | | |
|---|---|---|---|---|
| Valuation Method | Step One | Step Two | Change | Percentage Change |
| Comparable Companies | $ 12,497.6 | $ 9,865.3 | ($ 2,632.3) | -21.06% |
| Comparable Transactions | $ 12,681.1 | $ 11,081.5 | ($ 1,599.6) | -12.61% |
| Discounted Cash Flow (2) | $ 9,918.6 | $ 9,084.2 | ($ 834.4) | -8.41% |
| Sum of Business Segments | $ 12,709.7 | $ 9,925.3 | ($ 2,784.4) | -21.91% |
| | | | | |
| Average Operating Enterprise Value | $ 11,951.8 | $ 9,989.1 | ($ 1,962.7) | -16.42% |
| | | | | |
| + Equity Investments and Other Assets (3)(4) | $ 2,686.0 | $ 3,312.1 | $ 626.1 | 23.31% |
| + NPV of PHONES Tax Savings | $ 382.7 | $ 0.0 | ($ 382.7) | NR |
| + NPV of S-Corp-ESOP Savings | $ 0.0 | $ 2,024.7 | $ 2,024.7 | NR |
| | | | | |
| Adjusted Enterprise Value | $ 15,020.4 | $ 15,325.9 | $ 305.5 | 2.03% |
| | | | | |
| + Cash | $ 188.0 | $ 197.7 | $ 9.7 | 5.16% |
| - Debt | ($ 9,463.8) | ($ 13,188.1) | ($ 3,724.3) | NR |
| - Identified Contingent Liabilities | ($ 97.1) | ($ 86.8) | $ 10.3 | -10.61% |
| | | | | |
| Equity Value | $ 5,647.5 | $ 2,248.7 | ($ 3,398.8) | -60.18% |
| | | | | |
| % of Enterprise Value | 37.6% | 14.7% | -22.9% | NR |

(1) Ex. 737 at 8 (VRC Preliminary Solvency Analysis, dated December 4, 2007).  VRC used values from its May 17, 2007
solvency analysis for purposes of its comparison.  *See* Ex. 283 at 10 (VRC Solvency Analysis, dated May 17, 2007.
(2) Includes the value of radio.
(3) Includes Tribune's latest estimate of the net proceeds from the sale of the Cubs and Comcast.
(4) Includes after tax value of certain real estate that can either be sold or capitalized into value.

Consistent with the Examiner's evaluation of VRC's Step One solvency opinions, the
Examiner investigated the bases on which VRC determined the values for Tribune's assets as
reflected in the materials presented to the Tribune Board on December 4, 2007 (and then again
on December 18, 2007, when VRC updated its analysis).  A review of VRC's work papers
corresponding to, among other things, VRC's December 4, 2007 and December 18, 2007
presentations to the Tribune Board confirms that VRC used the same general approaches to
calculating Tribune's equity value and assessing its capital adequacy as those VRC utilized in its
Step One analysis.[2235]  In particular, as at Step One, VRC utilized four valuation methods—a

---

[2235] The Examiner also reviewed work papers corresponding to a VRC December 20, 2007 presentation which, as
discussed below, apparently was not presented to the Tribune Board, and contained only minor modifications to
VRC's determination of Tribune asset value.  Among other things, the December 20, 2007 materials increased
the estimated Step Two Debt from $12.593 billion to $12.899 billion, thus decreasing the calculated amount of
equity value by the same difference (approximately $306 million).  *See* Ex. 1045 at TRB0293989 (Step Two

comparable company approach, a transaction multiples approach, a DCF analysis, and an SOP valuation—to determine the value of Tribune's operating assets.[2236]  VRC also adopted the same general approaches to valuing Tribune's equity ownership interests at both steps.  Despite the similarities between VRC's Step One and Step Two approaches, as explained below, VRC derived significantly different valuations.

<div align="center">

**(1)**　　　**Approaches to Valuing Tribune's Operating Assets.**

**(i)**　　　**Comparable Companies.**

</div>

For purposes of estimating a value of Tribune's operating assets using the comparable companies methodology at Step One, VRC calculated LTM, CFY, and NFY EBITDA multiples for its identified comparable companies, and, on the basis of a range of multiples selected by VRC, applied its selected ranges of these multiples to Tribune consolidated LTM, CFY, and NFY EBITDA statistics to conclude a valuation range for Tribune's operating assets.  At Step Two, although applying the same basic methodology, VRC modified its analysis to discretely determine comparable companies (and associated multiples) for each of the Publishing Segment and the Broadcasting Segment, separately, in addition to identifying cohort companies that VRC determined to be comparable to Tribune on a consolidated basis.[2237]

---

Solvency Analysis, dated December 20, 2007).  The Examiner also reviewed work papers corresponding to earlier VRC analyses to the extent necessary to garner an understanding of the assumptions relied on by VRC in rendering its December 20, 2007 solvency opinion.

[2236]  Ex. 737 at TRB0272813 (VRC Preliminary Solvency Analysis, dated December 4, 2007).

[2237]  At Step One, VRC determined that E.W. Scripps Co., McClatchy Co. Holdings, New York Times Co., Belo Corp., and Media General, Inc. were comparable to Tribune on a consolidated basis, and calculated LTM, CFY, and NFY multiples for each.  On the basis of that data, VRC subjectively determined ranges of LTM, CFY, and NFY EBITDA multiples, which VRC then applied to Tribune LTM, CFY, and NFY EBITDA statistics to determine a range of values for Tribune's operating assets based on the comparable company valuation methodology.

At Step Two, VRC calculated not only multiples for companies deemed comparable to Tribune on a consolidated basis (which, for purposes of its Step Two analysis included only E.W. Scripps Co., Belo Corp., and Media General, Inc.), but also calculated multiples, for each of comparable publishing companies and broadcasting and entertainment companies selected by VRC.

Having calculated cohort, or comparable company, multiples selected by VRC for purposes of comparing Tribune's consolidated business (and each of the Publishing Segment and Broadcasting Segment), VRC then "weighted" the segment level multiples based on the relative EBITDA contributions of each,[2238] applying a 50% weighting to the results.  VRC then weighted the results of its multiples analysis of Tribune consolidated cohorts by 50% in order to reach conclusions regarding an applicable range of LTM, CFY, and NFY EBITDA multiples to apply to Tribune consolidated EBITDA statistics, based on Tribune's October 2007 model forecasts, and to arrive at a range of values for Tribune's operating assets.[2239]  Applying the ranges of EBITDA multiples selected by VRC to Tribune's EBITDA forecasts taken from the October 2007 model, VRC calculated a range of values for Tribune's operating assets of between $9.248 billion and $10.482 billion, as reflected in its December 4, 2007 presentation to the Tribune Board.[2240]  The following table compares the ranges of EBITDA multiples selected by VRC in conducting its Step One analysis[2241] to those multiples used in VRC's December 4, 2007 preliminary Step Two analysis:[2242]

---

For purposes of valuing the Publishing Segment, VRC calculated LTM, CFY, and NFY multiples for Gannet Company, Inc., The Washington Post, McClatchy Co. Holdings, New York Times Co., and Lee Enterprises. For purposes of valuing the Broadcasting Segment, VRC calculated LTM, CFY, and NFY multiples for Hearst Argyle Television, Sinclair Broadcasting Group CS, LinTV Corp, Gray Television, Inc., and Nextar Broadcasting Group, Inc.  *See* Ex. 740 at VRC0060993-95 (VRC Internal Review Document, Tribune Company Preliminary Solvency Analysis, dated December 3, 2007).

[2238]  The precise mechanics of these calculations are not discernable from a review of VRC's work papers, although it appears that VRC weighted the segment multiples by the respective EBITDA contribution of each of Tribune's business segments.  Regardless, it appears that VRC subjectively determined the range of multiples, taking into account the results of its analytical review as described above.

[2239]  The Examiner notes that, unlike VRC's Step One analysis, VRC did not calculate FCF multiples as a part of its Step Two evaluation.

[2240]  Ex. 737 at TRB0272813 (VRC Preliminary Solvency Analysis, dated December 4, 2007).

[2241]  Ex. 271 at VRC0051421 (Mednik E-Mail, dated May 4, 2007).

[2242]  Ex. 740 at VRC0060993 (VRC Internal Review Document, Tribune Company Preliminary Solvency Analysis, dated December 3, 2007).

| COMPARABLE COMPANIES MULTIPLES | | |
|---|---|---|
| | **May Step One** | **December Step Two** |
| **LTM Multiples Range Applied** | 8.5 - 9.5 | 8.25 - 8.75 |
| **CFY Multiples Range Applied** | 9.0 - 10.0 | 8.0 - 8.5 |
| **NFY Multiples Range Applied** | 8.5 - 9.5 | 7.75 - 8.25 |

<div align="center">

**(ii)     Comparable Transactions.**

</div>

Consistent with its approach at Step One, VRC computed both LTM revenue and EBITDA transaction multiples for several publicly disclosed acquisitions of companies that VRC determined to be comparable to Tribune.[2243]   In contrast to the analysis conducted in its Step One study, however, in its Step Two analysis VRC applied only an LTM EBITDA-based multiple range to Tribune's forecasted pro forma 2007 EBITDA to calculate a value for Tribune's operating assets at Step Two ranging from $10.782 billion to 11.381 billion.[2244]   The table below compares the transaction multiples used by VRC at Step One with those used by VRC at Step Two:

---

[2243] *Id.* at VRC0060993, 96-97.  VRC calculated revenue and EBITDA multiples using the same transactions evaluated as part of its Step One analysis, adjusted to exclude multiples observed for three transactions which closed in 2003 and 2004, and to add multiples derived from two newly identified transactions (one of which closed on August 8, 2007, the other of which was pending as of the time of VRC's analysis).  *Compare* Ex. 271 at VRC0051425 (Mednik E-Mail, dated May 4, 2007) *with* Ex. 740 at VRC0060996-97 (VRC Internal Review Document, Tribune Company Preliminary Solvency Analysis, dated December 3, 2007).  VRC thereby effectively updated its analysis to exclude multiples derived from the oldest transactions included as a part of its Step One analysis and to add information derived from transactions that occurred or became pending subsequent to the issuance of its Step One solvency opinion.  Although VRC's Step Two comparable transactions analysis breaks the representative transactions into two groups, the Publishing Segment and the Broadcasting Segment, it appears that this is largely a distinction without a difference, in that VRC's transaction multiples analysis applied its selected range of multiples only to Tribune's consolidated LTM EBITDA for purposes of calculating a value of Tribune's operating assets using this valuation methodology.

[2244] *Compare* Ex. 271 at VRC0051424 (Mednik E-Mail, dated May 4, 2007) *with* Ex. 740 at VRC0060993 (VRC Internal Review Document, Tribune Company Preliminary Solvency Analysis, dated December 3, 2007).

| COMPARABLE TRANSACTION MULTIPLES | | |
|---|---|---|
| | **May Step One** | **December Step Two** |
| **LTM Multiples Range Applied** | 9.0 - 10.0 | 9.0 - 9.5 |
| **CFY Multiples Range Applied** | 9.0 - 10.0 | Not Applied |
| **NFY Multiples Range Applied** | 8.5 - 9.5 | Not Applied |

### (iii)    Discounted Cash Flow.

Although methodologically similar, VRC's December 4, 2007 DCF analysis differed

from VRC's Step One analysis in two significant ways.  First, the projected cash flows were

based on the use of management's revised October 2007 forecast (in contrast to VRC's reliance

on management's earlier forecasts for purposes of its Step One evaluation).[2245]  Second, VRC

modified the period for which cash flows were incorporated into the DCF model before

calculating a residual terminal value.[2246]  The result was a DCF valuation of Tribune's operating

---

[2245]  *Compare* Ex. 271 at VRC0051430 (Mednik E-Mail, dated May 4, 2007) *with* Ex. 740 at VRC0060998 (VRC Internal Review Document, Tribune Company Preliminary Solvency Analysis, dated December 3, 2007).

[2246]  For purposes of its Step One analysis, VRC calculated enterprise cash flows for the first five years of the projection period, discounted the results to present value, and added to the present value of the discrete period cash flows the present value of the terminal period value (calculated on the basis of an exit multiple). Ex. 271 at VRC0051430 (Mednik E-Mail, dated May 4, 2007).  For purposes of its Step Two analysis, by contrast, VRC calculated enterprise cash flows for the first *ten* years of the projection period, discounted the results to present value, and added to the present value of the discrete period cash flows the present value of the terminal period value (calculated on the basis of an exit multiple). Ex. 740 at VRC0060998 (VRC Internal Review Document, Tribune Company Preliminary Solvency Analysis, dated December 3, 2007).  When questioned by the Examiner about its decision to introduce a ten-year projection period at Step Two, VRC was unable to cite a specific reason for this methodological change, other than to characterize it as a "natural evolution" of the process.  Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 148:4-21.  The change in DCF enterprise value that results from adding an incremental five years of discreet period cash flow to VRC's DCF Step Two model (in relation to VRC's Step One analysis in which only five years of discreet period cash flows were considered before adding a terminal value) can be approximated by comparing VRC's actual Step Two concluded value with the DCF value as it would have been calculated without the inclusion of the extra five years.  The Examiner notes that apparently as early as November 30, 2007, for purposes of its internal Step Two DCF valuation models, VRC added an incremental five years to its Step One five-year interim period model before computing a terminal period value.  However, in VRC's earliest identified iteration of its Step Two DCF model, dated October 29, 2007, VRC had added 2013 to its interim periods, essentially making its Step Two model a six-year interim period valuation model.  *See* Ex. 1004 at VRC0034721 (Mednik E-Mail, dated October 31, 2007).  In adding 2013 to the model, however, it simply grew total Publishing Segment revenues by the 2012 calculated consolidated Publishing Segment growth rate of 2.63% and Broadcasting Segment revenues by the 2012 growth rate of 2.33% for a consolidated rate of 2.41%.  The Examiner performed this comparison by calculating the DCF value at Step Two without the inclusion of years 2013 through 2017 as part of the interim period cash flow before computing a terminal value.  To calculate the terminal value for the alternative DCF, the Examiner used the implied terminal growth rate informing VRC's

499

assets ranging from $8.399 billion to $9.770 billion.[2247]  Of note, VRC discounted forecasted

cash flows to present value at discount rates ranging between 7.5% and 8.5% in both its May

2007 (Step One) and December 2007 (Step Two) DCF models, implying that VRC concluded

that the risks attendant to Tribune's anticipated future cash flow had not changed between those

dates.[2248]

<div align="center">

**(iv)    Sum-of-the-Parts.**

</div>

VRC's SOP analysis at Step Two was methodologically similar to its Step One analysis,

using the same basic market and transaction multiples approaches (as updated by VRC) and DCF

methodologies (as applied by VRC in separately valuing the Publishing Segment and the

Broadcasting Segment) and resulting in an SOP valuation range of $9.317 billion to

$10.533 billion.[2249]

---

actual Step Two terminal year value computation when estimating the new terminal value five years earlier (essentially the terminal value calculation after year ten in VRC's original model was simply moved up in time and applied after the fifth year of the projections).  For comparison purposes, the Examiner used the mid-point of the resulting DCF valuation calculations.  Based on the comparison of the five- and ten-year model valuations ($9.597 billion and $10.210 billion, at a mid-point valuation, respectively), the additional five years of interim period cash flows added approximately $613 million to the Step Two DCF value, all other things being equal.  *See* Ex. 898 (Tribune Base Case, Consolidated Discounted Cash Flow Method).

| COMPARISON OF DECEMBER DCF MODELS WITH AND WITHOUT YEARS 6 - 10 at Present Value and at Mid Range Value ($mm) | | | | |
|---|---|---|---|---|
| | Years 1 - 5 | Years 6 - 10 | Terminal Value | Total Enterprise Value |
| **VRC December Model** | $ 2,644.3 | $ 2,085.2 | $ 5,480.4 | $ 10,209.9 |
| *10-year Interim Period Plus Terminal Value* | | | | |
| **Alternative VRC December Model** | $ 2,644.3 | Included in Terminal Value | $ 6,953.0 | $ 9,597.3 |
| *5-year Interim Period Plus Terminal Value* | | | | |
| **Value Difference** | | | | $ 612.6 |

[2247]  Ex. 737 at TRB0272813 (VRC Preliminary Solvency Analysis, dated December 4, 2007).

[2248]  *Compare* Ex. 271 at VRC0051430 (Mednik E-Mail, dated May 4, 2007) *with* Ex. 740 at VRC0060998 (VRC Internal Review Document, Tribune Company Preliminary Solvency Analysis, dated December 3, 2007).

[2249]  Ex. 740 at VRC0060991 (VRC Internal Review Document, Tribune Company Preliminary Solvency Analysis, dated December 3, 2007); Ex. 737 at TRB0272813 (VRC Preliminary Solvency Analysis, dated December 4, 2007).

**(2)        Approach to Valuing Tribune's Equity Investments.**

VRC utilized the same basic approaches to valuing Tribune's non-operating asset equity

investments in its Step One and Step Two evaluations, although, as summarized above, the value

VRC ascribed to those investments increased substantially between May 2007 and December

2007 as shown in the chart below:

| VALUE  OF NON-OPERATING ASSETS ($mm) | | | |
|---|---|---|---|
| | **High** | **Mid** | **Low** |
| Value of Non-Operating Assets - May 9, 2007 | $ 2,961.0 | $ 2,686.0 | $ 2,412.0 |
| Value of Non-Operating Assets - December 4, 2007 | $ 3,557.1 | $ 3,312.1 | $ 3,066.4 |
| **Increase** | **$ 596.1** | **$ 626.1** | **$ 654.4** |
| *Percentage Increase* | *20.1%* | *23.3%* | *27.1%* |

Based on a reconciliation developed using valuation information derived from a variety

of sources (including several different VRC work papers), the substantial increase in the value of

Tribune's equity interests between Step One and Step Two (at the mid-point of VRC's valuation

range) can be traced principally to an increase in VRC's valuation of the Chicago Cubs and

Comcast SportsNet (a $273 million increase) and VRC's inclusion of other assets including

"excess real estate" not quantified at Step One ($319 million).  At the mid-point valuation, these

differences account for $592 million of the approximately $625 million increase in value that

VRC ascribed to Tribune's non-operating asset equity ownership interests between the Step One

and December 4, 2007 Step Two valuations, as shown in the chart below:[2250]

---

[2250] *Compare* Ex. 274 at TRB0149955 (VRC Solvency Opinion Analysis, dated May 9, 2007) with Ex. 740 at VRC0060991 and VRC0061008 (VRC Internal Review Document, Tribune Company Preliminary Solvency Analysis, dated December 3, 2007); Ex. 899 at VRC00013637 (Tribune Company Cubs Sale Update); Ex. 900 (Tribune Company Summary of Potential Real Estate Opportunities); Ex. 737 at TRB0272813 (VRC Preliminary Solvency Analysis, dated December 4, 2007).

| ANALYSIS OF VRC'S CHANGE IN EQUITY INVESTMENT VALUES BETWEEEN STEP ONE AND STEP TWO ($mm) | | | |
|---|---|---|---|
| | VRC Ownership Adjusted Mid Range Value | | |
| Investments | Step One | Step Two | Change |
| TVFN | $ 1,171 | $ 1,151 | ($ 20) |
| CareerBuilder | $ 686 | $ 743 | $ 57 |
| Classified Ventures | $ 76 | $ 85 | $ 9 |
| ShopLocal | $ 41 | $ 45 | $ 4 |
| Topix.net | $ 27 | $ 25 | ($ 2) |
| Legacy.com | $ 5 | $ 6 | $ 1 |
| Recycler | $ 72 | $ 66 | ($ 6) |
| AdStar | $ 8 | $ 2 | ($ 6) |
| TWX | $ 6 | $ 4 | ($ 2) |
| MetroMix | $ 0 | $ 6 | $ 6 |
| Quetzel | $ 1 | $ 0 | ($ 1) |
| Low Income Housing Credits | $ 17 | $ 10 | ($ 7) |
| Subtotal a | $ 2,110 | $ 2,143 | $ 33 |
| Cubs (after tax) | $ 422 | $ 849 | n/a |
| Comcast SportsNet (after tax) | $ 154 | | n/a |
| Subtotal b | $ 576 | $ 849 | $ 273 |
| SUBTOTAL (a + b) | $ 2,686 | $ 2,992 | $ 306 |
| Other Assets (including real estate) | $ 0 | $ 319 | $ 319 |
| Subtotal c | $ 0 | $ 319 | $ 319 |
| GRAND TOTAL (a + b + c) | $ 2,686 | $ 3,311 | $ 625 |

VRC justified the increased values of its equity investments with both representations from Tribune management regarding the increased value attributed to the Chicago Cubs and Comcast SportsNet[2251] and the consideration of other asset values that were not included in its Step One analyses (with regard to excess real estate).[2252]

---

[2251]  Ex. 899 at VRC00013637 (Tribune Company Cubs Sale Update).

[2252]  Ex. 900 (Tribune Company Summary of Potential Real Estate Opportunities).  The Examiner notes that, in connection with its Step One analysis, VRC was provided with a Tribune-prepared quantification of the PHONES Notes obligations based on a netting of the face value of PHONES Notes ($1.264 billion) and the market value of Tribune's holdings of Time Warner stock ($334 million, based on 16 million shares at $20.88 per share) or $930 million. VRC determined to present the PHONES Notes obligation net of the value of Tribune's interest in Time Warner common stock, but apparently reconciled its conclusion to Tribune's final net value of $930 million by grossing up the book carrying value of the PHONES Notes ($612.1 million) by an amount that would reconcile their result with Tribune's net PHONES Notes value.  At Step Two and as late as December 7, 2007, VRC continued to value the PHONES Notes liability at face value less the value of the Time Warner stock.  See Ex. 281 at TRB0398561 (Memorandum from Mr. Browning and Mr. Rucker to

### (3)    Approach to Valuing S-Corporation/ESOP Tax Savings.

VRC calculated the value it ascribed to the tax savings from Tribune's post-Step Two closing S-Corporation/ESOP ownership structure based on certain assumptions provided by Tribune management, as well as the level of pre-tax income forecasted in the October 2007 Tribune projection model relied on by VRC in conducting its Step Two DCF analysis.[2253] Because, as discussed elsewhere in the Report,[2254] the Examiner has concluded that any value derived from tax savings resulting from the post-Step Two S-Corporation/ESOP ownership structure would likely be excluded in determining Tribune's solvency at Step Two under a fair market value standard, the Examiner did not conduct any further detailed analysis of how VRC derived its particular value of this attribute.[2255]

### c.    Questions from the Lead Banks Regarding VRC's Preliminary Solvency Analyses and VRC's Responses.

In connection with VRC's solvency analysis of Tribune, the Lead Banks prepared a series of detailed questions for which management acted as an intermediary.[2256]  Although the questions covered several topics, two key areas of inquiry concerned VRC's valuation of the S-Corporation/ESOP tax savings and VRC's assumption that Tribune could refinance its borrowed

---

Mr. Bigelow, dated December 7, 2007).  As discussed below, however, shortly before rendering its Step Two solvency opinion, VRC later determined to split apart and present separately Tribune's liability related to its PHONES Notes obligations and the value of its interest in Time Warner stock.  As such, VRC's later presentations included the value of Time Warner stock as a separate Tribune asset.  *See* Ex. 705 at TRB0414949 (Tribune Board Meeting Materials, dated December 18, 2007); Ex. 1045 at TRB0293989 (VRC Solvency Analysis, dated December 20, 2007).

[2253]  Ex. 740 at VRC0061009 (VRC Internal Review Document, Tribune Company Preliminary Solvency Analysis, dated December 3, 2007).

[2254]  *See* Report at § IV.B.5.d.(10).

[2255]  The value of this attribute is, however, relevant for purposes of evaluating reasonably equivalent value and is relevant for purposes of assessing capital adequacy.  Those considerations are addressed elsewhere in the Report.  *See* Report at §§ IV.B.5.c.(6). and IV.B.5.d.

[2256]  *See, e.g.*, Ex. 754 (Bigelow E-Mail, dated December 7, 2007) (providing edits to VRC's draft responses to questions from the Lead Banks); Ex. 281 (Memorandum from Mr. Browning and Mr. Rucker to Mr. Bigelow, dated December 7, 2007).

indebtedness in the future.  The refinancing assumption is discussed in detail elsewhere in the

Report.[2257]  The S-Corporation/ESOP tax savings are discussed directly below.

The Lead Banks asked VRC, through Tribune, about VRC's assumptions regarding

expected tax savings from the S-Corporation/ESOP structure:  "How are taxes treated in the

analysis?  As the Company will not be a federal taxpayer as a result of the S Corp election, does

the discounted cash flow analysis take this into consideration, and if so, how?"[2258]  VRC

responded:[2259]

> As part of the valuation tests, VRC considered that as an S-Corp
> ESOP, Tribune will not pay federal income taxes. The Company
> has provided VRC with an estimate of the future tax savings for
> through 2017.  VRC has extrapolated these tax savings to 2022 by
> applying similar growth rates and margins that Tribune provided
> for 2017.  These tax savings were discounted to present value.
> VRC assumed that in year fifteen and beyond, that the Company
> would receive 60% of the project savings after EGI TRB, L.L.C.
> ("Zell Group") exercises its warrants to acquire 40% of Tribune's
> equity interest.  The net present value of the S-Corp ESOP tax
> savings are estimated to be $1.7 billion to $2.3 billion.  The
> operating enterprise valuation DCF analyses did not consider the
> S-Corp ESOP tax savings.

In response, the Lead Banks asked the following:[2260]

> [A]re there any relevant precedent transactions which VRC
> considered in determining to ascribe value to the S-Corp ESOP tax
> savings or in assuming it as the buy-side structure in its Fair Value
> and Present Fair Saleable analyses?
>
> [T]he equity discount rate used to value the S-Corp ESOP tax
> savings (9.0% to 11.0%) appears to be based upon the market
> capital structure approach as opposed to the actual Tribune capital
> structure.  Is this correct and, if so, did VRC consider the using the
> actual Tribune capital structure?

---

[2257] *See* Report at § III.H.3.g.

[2258] Ex. 281 at TRB0398558 (Memorandum from Mr. Browning and Mr. Rucker to Mr. Bigelow, dated December 7, 2007).

[2259] *Id.*

[2260] Ex. 755 at VRC0070618-19 (Rucker E-Mail, dated December 12, 2007) (attaching lender questions).

[I]n assuming the S-Corp ESOP tax structure as the buy-side structure in the Fair Value and Present Fair Saleable Value analyses, did VRC consider whether to discount that probability and its effect on the universe of potential buyers (*i.e.,* private equity looking at public exits and public companies) and the potential for changes in tax laws permitting the employment of this structure going forward?

[T]o what extent did the tax consequences of planned or possible asset sales (whether as part of the sensitivity analyses or otherwise) factor into the valuation of the S-Corp ESOP tax savings?

[P]lease note Tribune's previous valuation of the S-Corp ESOP tax benefits at $1 billion in materials delivered to prospective lenders in Step 1.  Please reconcile this with the present valuation and discuss its relevance to the solvency opinion exercise.

[P]lease confirm our understanding from VRC's answer to Question 12 in the Response that the ranges of equity cushions would unacceptable for opinion purposes but for the value ascribed to the S-Corp ESOP tax savings.  If that is the case, at what valuation of the S-Corp ESOP tax savings would VRC be unwilling to deliver a solvency opinion? . . .

[R]egarding the discount rates for DCF and S-Corp ESOP tax savings, has VRC considered the current capital structure (instead of the 40%/60% debt/equity structure) and market rates of debt, particularly in light of the unique character of the structure and the impact on leverage?  What is the Beta used in your CAPM/WACC calculation?  Aside from CAPM, were any other methodologies used or considered as a point of comparison to calculate the cost of equity?

Although VRC did not provide any further written responses to these questions,[2261] on December 15, 2007, VRC modified the discount rate used to convert Tribune's projected nominal tax savings to present value from 10% to 16%, reducing the net present value of the S-Corporation/ESOP savings by approximately $1.1 billion.[2262]

---

[2261] Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 277:18-281:9.  Mr. Rucker stated: "To the best of my knowledge, no, we did not provide any—any answers.  We definitely read the questions and actually took some of the things into consideration in our analysis, but I don't know if we specifically provided any additional [answers]."  Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 278:15-22.

[2262] Ex. 955 at VRC0109230 (Rucker E-Mail, dated December 15, 2007).

d.      VRC's December 18, 2007 Solvency Presentation.

As noted above, a series of extensive interactions occurred among VRC, Tribune

management and, subsequently, the Lead Banks, concerning the tax savings associated with

Tribune becoming an S-Corporation/ESOP, and Tribune's ability to refinance its indebtedness in

the future.  Apparently based, at least in part, on these interactions, between December 4, 2007

and December 18, 2007, VRC further adjusted its preliminary valuation conclusions by, among

other things, reducing the value ascribed to the S-Corporation/ESOP tax savings by more than $1

billion from approximately $2 billion in VRC's December 4, 2007 materials to between $815

million and $936 million in VRC's revised and updated presentation to the Tribune Board on

December 18, 2007.[2263]  This significant decrease resulted from VRC's decision to raise the

discount rate used to convert forecasted tax savings to present value from 10% to 16%,[2264]

ostensibly to recognize that any tax savings should be discounted at a cost of equity because the

savings were equity-based returns rather than debt-weighted returns.[2265]

Despite reducing the mid-point value ascribed to the S-Corporation/ESOP tax benefit by

approximately $1.15 billion, however, other changes in VRC's analysis between December 4,

2007 and December 18, 2007 resulted in Tribune's overall equity value declining by just

$165 million.  The chart below shows these other changes:

---

[2263]  Ex. 737 at TRB0272811 (VRC Preliminary Solvency Analysis, dated December 4, 2007); Ex. 705 at
TRB0414949 (Tribune Board Meeting Materials, dated December 18, 2007).  One of the Parties included in its
submission a slightly different version of VRC's December 18, 2007 presentation, which appears to have had only
minor differences from the document that was included in the December 18, 2007 Tribune Board presentation
materials, most notably a total debt number of $12.586 billion versus the $12.593 billion contained in the
December 18, 2007 Tribune Board presentation materials.  These differences do not alter any of the Examiner's
conclusions.

[2264]  See Ex. 705 at TRB0414952 (Tribune Board Meeting Materials, dated December 18, 2007); Ex. 1045 at
TRB0293992 (VRC Solvency Analysis, dated December 20, 2007).  VRC's December 18, 2007 and
December 20, 2007 presentations included a $876.0 million value for the NPV of S-Corporation/ESOP Tax
Savings, with the December 20, 2007 presentation stating that the figure was "[a]djusted due to an increase in
the discount rate to 16% from 10%."  Id.

[2265]  Ex. 955 at VRC0109230 (Rucker E-Mail, dated December 15, 2007).

| VRC MID-POINT VALUATION SUMMARIES ($ mm) | | | | |
|---|---|---|---|---|
| Valuation Method | December 4, 2007 Board Presentation | December 18, 2007 Board Presentation | Change | Percentage Change |
| Comparable Companies | $ 9,865.3 | $ 9,865.3 | $ 0.0 | 0.0% |
| Comparable Transactions | $ 11,081.5 | $ 11,081.5 | $ 0.0 | 0.0% |
| Discounted Cash Flow | $ 9,084.2 | $ 10,234.4 | $ 1,150.2 | 12.7% |
| SOP | $ 9,925.3 | $ 9,909.7 | ($ 15.6) | -0.2% |
| **Average Operating Asset Value** | **$ 9,989.1** | **$ 10,272.7** | **$ 283.6** | **2.8%** |
| + Equity Investments and Other Assets | $ 3,312.1 | $ 3,417.2 | $ 105.1 | 3.2% |
| + NPV of S-Corp-ESOP Tax Savings | $ 2,024.7 | $ 876.0 | ($ 1,148.7) | -56.7% |
| **Adjusted Enterprise Value** | **$ 15,325.9** | **$ 14,565.8** | **($ 760.1)** | **-5.0%** |
| + Cash | $ 197.7 | $ 197.7 | $ 0.0 | 0.0% |
| - Debt | ($ 13,188.1) | ($ 12,593.2) | ($ 594.9) | -4.5% |
| - Identified Contingent Liabilities | ($ 86.8) | ($ 86.8) | $ 0.0 | 0.0% |
| **Equity Value** | **$ 2,248.7** | **$ 2,083.5** | **($ 165.2)** | **-7.3%** |

The Examiner investigated both the bases for the significant valuation changes between December 4, 2007 and December 18, 2007 (a period of only two weeks) and the specific bases for the valuation conclusions contained in VRC's December 18, 2007 presentation to the Tribune Board. Based on this investigation, the Examiner determined that the most notable increase, an approximately $1.15 billion increase in the calculated DCF value of Tribune's operating assets, resulted principally from VRC's correction of a previously identified error in VRC's Step One analysis, in which VRC improperly added depreciation and amortization expense to forecasted EBITDA for purposes of computing EBIT.[2266] As a result of this error, VRC overstated Tribune's forecasted income, and therefore taxes, the effect of which was to understate cash flow and the resulting value derived from discounting that cash flow to present value. VRC apparently identified this modeling error between December 4, 2007 and December 18, 2007, corrected for it, and presented the revised DCF value in its December 18, 2007 Tribune Board presentation materials.[2267] This correction increased VRC's DCF value by $1.15 billion as

---

[2266]  Ex. 262 at 232:11-233:8 (Rule 2004 Examination of Bryan Browning, December 4, 2009).

[2267]  *Compare* Ex. 737 at TRB0272813 (VRC Preliminary Solvency Analysis, dated December 4, 2007) *with* Ex. 705 at TRB0414949 (Tribune Board Meeting Materials, dated December 18, 2007).

shown in the table above.[2268]  In addition, the nearly $595 million reduction in expected Step

Two Debt resulted from, among other things, VRC's determination to record the PHONES Notes

liability on the basis of the market value, as opposed to the face value, of that obligation.[2269]  The

remaining VRC valuation adjustments occurring between December 4, 2007 and December 18,

2007 were attributable mostly to an approximately $100 million net upward adjustment to the

value of Tribune's equity investments.[2270]

On December 18, 2007 VRC presented the following "ranged" valuation summary in its

final presentation to the Tribune Board, which corresponds to the previously discussed

comparative analysis between the December 4, 2007 and December 18, 2007 valuations

presented to the Tribune Board:

| VALUATION SUMMARY ($ mm) | | | |
|---|---|---|---|
| Valuation Method | Low | Mid | High |
| Comparable Companies | $ 9,248.1 | $ 9,865.3 | $ 10,482.5 |
| Comparable Transactions | $ 10,782.0 | $ 11,081 5 | $ 11,381.0 |
| Discounted Cash Flow | $ 9,525.6 | $ 10,234.4 | $ 10,943.2 |
| Sum of Business Segments | $ 9,316.8 | $ 9,909.7 | $ 10,502.5 |
| Average Operating Asset Value | $ 9,718.1 | $ 10,272.7 | $ 10,827.3 |
| + Equity Investments and Other Assets | $ 3,186.3 | $ 3,417.2 | $ 3,648.1 |
| + NPV of S-Corp-ESOP Tax Savings | $ 815.8 | $ 876.0 | $ 936.1 |
| Adjusted Enterprise Value | $ 13,720.2 | $ 14,565.9 | $ 15,411.5 |
| + Cash | $ 197.7 | $ 197.7 | $ 197.7 |
| - Debt | ($ 12,593.2) | ($ 12,593.2) | ($ 12,593.2) |
| - Identified Contingent Liabilities | ($ 86.8) | ($ 86.8) | ($ 86.8) |
| Equity Value | $ 1,238.0 | $ 2,083.6 | $ 2,929.2 |
| % of Enterprise Value | 9.0% | 14.3% | 19.0% |

---

[2268]  VRC explained the weighted effect of this change (*i.e.*, the $283.6 million weighted average increase in VRC's concluded operating asset value) as resulting from "an adjustment to the discounted cash flow valuation that lowered the tax rate to be consistent with the Company's and to include annual severance expense." Ex. 1045 at TRB0293992 (VRC Solvency Analysis, dated December 20, 2007).

[2269]  Ex. 705 at TRB0414952 (Tribune Board Meeting Materials, dated December 18, 2007).

[2270]  This approximately $100 million net increase relates to the value ascribed by VRC to Tribune's equity investments as well as the value of Time Warner stock that VRC separately considered as a part of its December 18, 2007 presentation to the Tribune Board. *Id.* As noted above, in prior presentations VRC had netted the value of this stock against the PHONES Notes liability.

Although VRC's final presentation to the Tribune Board occurred on December 18, 2007, and was accompanied by a written presentation discussing VRC's analysis,[2271] the Examiner identified a further revised VRC presentation dated December 20, 2007.[2272]  This later presentation reflects modest changes to the asset values set out in VRC's December 18, 2007 presentation, as well as an approximately $306 million increase in aggregate Step Two Debt (from $12.593 billion to $12.899 billion).[2273]  Correspondingly, the range of Tribune's consolidated equity values decreased by the same difference to a range of between $931.6 million and $2.623 billion.[2274]  The Examiner found no evidence that this revised analysis was presented to the Tribune Board.[2275]

### e.    VRC's Step Two Solvency Opinion.

On December 20, 2007, VRC issued its Step Two solvency opinion, concluding that:[2276]

> Immediately after and giving effect to the consummation of the Step Two Transactions,[2277] each of the Fair Value and Present Fair

---

[2271] *Id.*

[2272] Ex. 1045 (VRC Solvency Analysis, dated December 20, 2007).

[2273] *Compare* Ex. 705 at TRB0414949 (Tribune Board Meeting Materials, dated December 18, 2007) *with* Ex. 1045 at TRB0293989 (VRC Solvency Analysis, dated December 20, 2007).  This change resulted from an increase in the calculation of the PHONES Notes liability to record the obligation at "book value," where VRC's earlier analysis recorded the obligation on the basis of its discounted market price.  Although VRC used at least three different bases for estimating the value of Tribune's PHONES Notes obligations at different times (*i.e.*, face value, then market value, then, finally, book value), the Examiner believes that VRC's final conclusion with respect to valuing the PHONES Notes was correct.

[2274] Ex. 1045 at TRB0293989 (VRC Solvency Analysis, dated December 20, 2007).

[2275] The minutes of the Tribune December 20, 2007 Tribune Board meeting make no mention of a further VRC presentation or that any additional discussions occurred with respect to VRC or the closing of Step Two.  *See* Ex. 12 (Tribune Board Meeting Minutes, dated December 20, 2007).

[2276] Ex. 728 at TRB0294015 (VRC Step Two Solvency Opinion, dated December 20, 2007).

[2277] The Step Two Transactions were defined in VRC's December 20, 2007 solvency opinion as follows:

> The second step will involve (i) the borrowing by the Company of additional debt of approximately $3.7 billion (the "Step Two Debt Financing"); (ii) the use by the Company of approximately $500 million of existing cash; (iii) the repayment by the Company of the exchangeable note acquired by EGI-TRB in the Step One EGI-TRB Purchase (the "Step Two Repayment"); (iv) the closing of the merger (the "Merger") in which all of the remaining Common Stock, other than shares held by the ESOP (but including shares held by EGI-TRB), will be converted into the right to receive $34 per

Saleable Value[2278] of the aggregate assets (including goodwill) of Tribune will exceed its liabilities (including Stated Liabilities, the Identified Contingent Liabilities and the New Financing);

As of the date hereof, immediately after and giving effect to the consummation of the Step Two Transactions, Tribune will be able to pay its debts (including the Stated Liabilities, the Identified Contingent Liabilities and the New Financing), as such debts mature or otherwise become absolute or due; and

As of the date hereof, immediately after and giving effect to the consummation of the Step Two Transactions, Tribune Does Not Have Unreasonably Small Capital.

---

share (plus 8% annualized accretion starting January 1, 2008, if the Merger has not closed by then), for an aggregate of approximately $4.3 billion; (v) the purchase by EGI-TRB from the Company of a subordinated note for $225 million, and the purchase by EGI-TRB from the Company of a 15-year warrant, for a purchase price of $90 million, which gives EGI-TRB the right to acquire shares of Common Stock representing 40% of the economic interest in the equity of the Company at an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years to a maximum aggregate exercise price of $600 million (collectively, the "Step Two EGI-TRB Purchase"); (vi) the roll-over by the Company of certain existing debt of approximately $8.9 billion (the "Step Two Debt Roll-Over"); (vii) the payment by the Company of cash distributions triggered by a change of control of approximately $104 million (the "Step Two COC Payments"); (viii) the payment by the Company of financing and other transaction fees of approximately $120 million (the "Step Two Fees"); (ix) the election by the Company of an S-Corporation status following the Merger (the "S-Corp Election") and (x) the disposition by the Company of part or all of its interest in the Chicago Cubs and interest in Comcast SportsNet Chicago, which will occur after the closing of the Merger (the "Cubs/Comcast Sale"). The Step Two Debt Financing, the Step Two Repayment, the Merger, the Step Two EGI-TRB Purchase, the Step Two Debt Roll-over, the Step Two COC Payments, the Step Two Fees, the S-Corp Election and the Cubs-Comcast Sale are collectively referred to as the "Step Two Transactions" or "Transactions."

*Id.* at TRB0294007.

[2278] VRC's opinion letter defined "Fair Value" and "Present Fair Saleable Value" as follows:

Fair Value – The amount at which the aggregate or total assets of the subject entity (including goodwill) would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, neither being under any compulsion to act, and, both having structures similar to the structure contemplated in the Transactions by the subject entity (an S-Corporation, owned entirely by an ESOP, which receives favorable federal income tax treatment, or another structure resulting in equivalent favorable federal income tax treatment to the Company.

Present Fair Saleable Value – The amount that may be realized by a willing seller from a willing buyer if the subject entity aggregate or total assets (including goodwill) are sold with reasonable promptness with both having structures similar to the structure contemplated in the Transactions by the subject entity (an S-Corporation, owned entirely by an ESOP, which receives favorable federal income tax treatment), or another structure resulting in equivalent favorable federal income tax treatment to the Company.

*Id.* at TRB0294008.

These definitions are modified from the generally accepted definition of "fair market value," as discussed above.

VRC's Step Two solvency opinion explicitly relied on Tribune management's

representations identifying contingent liabilities and certifying the absence of a material adverse

change, as well as the following:[2279]

> The provided financial forecasts of Tribune, on a consolidated and pro-forma basis . . . reflect Management's best estimates of Tribune Base and Tribune Downside case forecasts. . . . While such forecasts are subject to many factors outside Management's control, in Management's view they are reasonable and attainable based on Management's involvement and understanding of the business operations, its markets, the strategic vision, the competitive landscape, and regulatory and economic trends.

> [I]n Management's view the Company's annual tax savings as an S-Corp ESOP as reflected in the Base Case Forecast, the Management Five-Year Extrapolation, and VRC Extrapolation are reasonable and attainable by the Company based on Management's understanding of the existing income tax laws governing S-Corp. ESOP's, the Company's current business operations, strategic vision and competitive and regulatory landscape, and the growth rates and underlying assumptions utilized (i) by Management in developing the Base Case Forecast and the Management Five-Year Extrapolation and (ii) by VRC in developing the VRC Extrapolation.

> Based upon Tribune's current understanding of the Delaware General Corporation Law, the Board of Director's fiduciary and corporate governance duties and responsibilities, and current income tax laws, Management believes that it is reasonable and appropriate for VRC to assume that Tribune will retain all of the forecasted income tax savings (set forth in Schedule A attached) even if the warrant under which the Zell Group may acquire approximately 40 percent of the economic interest of Tribune . . . is exercised before its expiration date in the year 2022. . . .

> Based upon (i) management's best understanding of the debt and loan capital markets and (ii) management's recent discussions with Morgan Stanley, management believes that it is reasonable and appropriate for VRC to assume that Tribune, in the downside forecast . . . delivered to VRC via email on November 21, 2007 ("Tribune Downside Forecast"), would be able to refinance (i) any outstanding balances of Term Loan B under the Credit Agreement dated May 17, 2007, as amended (the "Credit Agreement"), that

---

[2279] Ex. 739 (Representation Letters, dated December 20, 2007).

mature in 2014 and (ii) any outstanding balances under the Senior Unsecured Interim Loan Agreement to be dated as of the closing date (or any notes issued to refinance such facility) that mature in 2015, in each case, without the need for any asset sales other than those incorporated into the Tribune Downside Forecast.

The book value of the [PHONES Notes] as reported in the Company's Form 10-Q for the quarter ended September 30, 2007 is a reasonable estimate of the Company's liability associated with the PHONES as of [December 20, 2007].

The following statement attests to VRC's reliance on Tribune's representations:[2280]

In rendering the Opinion, VRC assumed and relied upon, without independent verification, the accuracy and completeness of all information, data and other materials (including, without limitation, the Base Forecast Model and the Downside Forecast Model) furnished or otherwise made available by the Company to VRC, discussed with or reviewed by VRC with the Company, or publicly available, and VRC did not assume any responsibility for independently verifying such information, data or other materials. In addition, VRC assumed and relied upon, without independent verification, that the Base Forecast Model and the Downside Forecast Model have been reasonably and prudently prepared and therefore reflect the best currently available estimates and judgments of management as to the expected future financial performance of the Company.  In connection with its review of the Based Forecast Model and Downside Forecast Model, VRC advised the Company, after discussion with management with respect thereto, that nothing has come to VRC's attention to lead VRC to believe that it was unreasonable for VRC to utilize and rely upon such financial forecasts, projections, information and data.

> **f.    The Examiner's Assessment of VRC's Step Two Solvency Opinion.**

The Examiner tested the reasonableness of VRC's Step Two solvency opinion by evaluating both the specific modeling and analysis conducted by VRC in arriving at its conclusions, as well as the consistency of VRC's conclusions with certain market-based indicia of Tribune's value as of the closing of the Step Two Transactions.  As context for the detailed

---

[2280]  Ex. 728 at TRB0294012 (VRC Step Two Solvency Opinion, dated December 20, 2007).

discussion that follows, the Examiner notes that, in connection with its December 20, 2007 analysis, VRC established a range of post-Step Two Financing Closing Date equity values for Tribune of between $931.6 million and $2.623 billion.

Because this range of equity values is adjusted for the pro-forma Step Two Debt, and after taking into account the value of S-Corporation/ESOP tax savings (as VRC quantified such benefits), VRC's determined equity values can be restated under an assumption that the Step Two Financing never occurred, such that VRC's range of equity values can be expressed as a per share value on the basis of shares outstanding immediately prior to the closing:

| EQUITY VALUE PER SHARE WITHOUT STEP 2 CLOSING (1) ($mm) | | | |
|---|---|---|---|
| | Low | Mid | High |
| Equity Value | $ 931.6 | $ 1,777.2 | $ 2,622.8 |
| Less: ESOP Tax Savings | ($ 815.8) | ($ 876.0) | ($ 936.1) |
| Plus: Incremental Step 2 Debt | $ 3,705.0 | $ 3,705.0 | $ 3,705.0 |
| Total Residual Equity Value Without Closing | $ 3,820.8 | $ 4,606.2 | $ 5,391.7 |
| Number of Shares | 117.1 | 117.1 | 117.1 |
| Value per Share | $ 32.6 | $ 39.3 | $ 46.0 |

(1) Ex. 1045 (VRC Solvency Analysis, dated December 20, 2007).

This analysis reveals that VRC, as of December 20, 2007, concluded that just prior to the closing of the Step Two Transactions, Tribune Common Stock would have ranged in value between $32.60 and $46.00 per share. The Examiner finds this implied value per share to be *per se* unreasonable and inconsistent with the observed trading value of Tribune Common Stock before the closing of the Step Two Transactions, as well as investor behavior between the closing of the Step One Transactions and the closing of the Step Two Transactions. VRC, in effect, concluded that Tribune Common Stock would be worth more at the mid-point, $39.30 per share,

than the $34 per share Tender Offer price, despite the secular declines in the value of identified

cohort companies throughout 2007.

Regarding VRC's analytical work, the Examiner considered, among other things, the

reasonableness of the financial projections on which certain of VRC's valuation and capital

adequacy conclusions were based, the integrity of certain assumptions identified as "key" to

VRC's rendering of its Step Two solvency opinion, and the validity of certain representations

relied on by VRC compared to the known and reasonably ascertainable facts.  With respect to

market-based indicia of Tribune value, the Examiner considered, among other things, the trading

value of Tribune Common Stock and Tribune's publicly traded debt during the period between the

closing of the Step One Transactions and the closing of the Step Two Transactions, the pricing of

credit default swaps, and the secondary market trading values of Tribune's debt.  In addition to

containing several of the same mistakes identified by the Examiner as in VRC's Step One

analysis,[2281] VRC's Step Two analysis, although remedying *some* of the previous mistakes,

contained several additional significant errors and/or omissions, discussed below.

### (1)    VRC's Reliance on Management's October 2007 Projections was Unreasonable.

Significantly, VRC's Step Two analysis relied on revised October 2007 projections that

did not, in the Examiner's view, reasonably represent Tribune's likely future financial

performance following the Merger.

The reasonableness of the October 2007 management projections relied on by VRC in

conducting its Step Two analysis is highly germane to the reasonableness of VRC's solvency and

capital adequacy conclusions at Step Two.  In particular, VRC's reliance on the EBITDA

estimates derived from those projections bears directly on VRC's valuation and capital adequacy

---

[2281] *See* Report at § III.E.3.c.

conclusions in three important ways.  First, forecasted cash flows based on the EBITDA estimates contained in the October 2007 projection model are discounted to present value and thereby comprise a significant component of VRC's DCF valuation conclusion.  Second, the EBITDA estimates also affect VRC's multiples-based valuation conclusions because the near term forecasts of Tribune EBITDA are the base values to which VRC applied certain cohort-derived multiples in its comparable company valuation methodology.[2282]  Third, because EBITDA estimates bear on cash flow expected to be available to fund operations and make interest and principal payments, these estimates in turn drive conclusions regarding Tribune's capital adequacy.[2283]

In light of the importance of Tribune management's October 2007 projections to VRC's conclusions, the Examiner evaluated the bases articulated by management for certain key assumptions underlying the projections and, among other things, compared the forecasted performance both with Tribune's prior actual financial results (including performance trends observable from that historical review) and analyst expectations during the period proximate to the date that VRC's issued its Step Two solvency opinion.[2284]  The Examiner also evaluated

---

[2282] For example, VRC utilized LTM, CFY, and NFY EBITDA multiples as part of its comparable company valuation study.  As such, NFY expectations of Tribune EBITDA informed VRC's valuation conclusions using the comparable company valuation methodology.

[2283] EBITDA forecasts have the potential to affect Tribune's ability to satisfy debt covenant compliance as well, in that EBITDA effects both "total guaranteed leverage ratio" and "interest coverage ratio" determinations under the terms of the financing agreements applicable to Tribune.

[2284] Although VRC's December 20, 2007 solvency opinion stated that VRC assumed and relied on, without independent verification, the accuracy and completeness of all information provided it by Tribune, according to Mr. Rucker and Mr. Browning, VRC conducted due diligence, at least regarding specific elements of the performance forecasted by Tribune.  For example, when asked about how VRC came to understand that "advertising would revert back and become stronger over time," Mr. Rucker testified:

> Yes, we had extensive sessions, two all day sessions with the heads of, I think every major company, every major paper, division at the company. And we went through and discussed some of the initiatives that they were putting in place, that they thought would allow them to recapture those markets. So we had very extensive due diligence meetings with almost every major head of divisions at the company.

Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 44:2-14.

management's October 2007 projections in light of the expectations embodied in the February 2007 projections.

As discussed elsewhere in the Report,[2285] between 2004 and 2006, Tribune reported year-over-year declining EBIT and EBITDA, both nominally and as a percentage of revenues. Expectations for 2007, as approved by the Tribune Board in February 2007, anticipated a continuation of that trend, and, as discussed earlier, Tribune performed unfavorably to that plan for most months during 2007 after the Tribune Board's approval of the Leveraged ESOP Transactions on April 1, 2007.

In accordance with these multi-year trends, Tribune's revised October 2007 projections assumed near term (*i.e.*, 2008 through 2011) downwardly revised expectations in comparison to the similar period in the February 2007 projections. The October 2007 projections nonetheless assumed that Tribune would mitigate certain of these anticipated declines by improved financial performance in specified areas. For example, the October 2007 projections included enhancements in the Publishing Segment's forecasted revenue and profitability derived from a newly executed agreement with Sun-Times Media Group (whereby Tribune would provide delivery of Sun-Times publications on a contract basis), and growth in Tribune's interactive business. Similarly, the October 2007 projections assumed that the Broadcasting Segment would enjoy improved profitability from, among other things, enhanced programming. The net result was an assumed stabilization in Tribune's financial performance, followed by a dramatic recovery, as shown in the tables below:

---

Based on VRC's work papers and e-mail correspondence, the record shows that VRC attempted to understand the assumptions underlying Tribune's projections, and challenged the reasonableness of certain of those assumptions, although, in the end, VRC relied on and adopted, without modification, management's forecasts for purposes of rendering its Step Two solvency opinion. As shown herein, certain of those assumptions were inconsistent with Tribune's performance trends and other information considered by the Examiner.

[2285] *See* Report at § III.C.1.a.



(1) Management's November 21, 2007 projections (Ex. 721 (Tribune Company Model, dated November 21, 2007), which corresponds to the October Five-Year Plan) exclude forecasted results for the Cubs, SCNI and Hoy, New York (because such businesses had been, or were contemplated to be sold). Management's November 21, 2007 projections were adjusted to account for the pro forma revenue contributions of the Cubs, SCNI and Hoy, New York based on amounts forecasted in February 2007 projections (Ex. 71 (ESOP Transaction Model - Revised Operating Plan Case, dated February 8, 2007)) to facilitate an "apples-to-apples" comparison to historical results which included the revenues from those businesses.

(2) 2004, 2005, and 2006 actuals from Ex. 14 (Tribune 2006 Form 10-K). 2007 actual is from Ex. 4 (Tribune 2007 Form 10-K). The 2007 Form 10-K revenue does not include revenues from discontinued operations (SCNI and Hoy, New York) whereas 2004-2006 results are inclusive of SCNI and Hoy, New York revenues. Normalized to exclude the effects of discontinued operations, revenues for 2004-2006 (as reported in Ex. 14 (Tribune 2007 10-K)) were $5,543, $5,427, and $5,444 million respectively. The declining revenue



(1) Management's November 21, 2007 projections (Ex. 721 (Tribune Company Model, dated November 21, 2007), which corresponds to the October Five-Year Plan) exclude forecasted results for the Cubs, SCNI and Hoy, New York (because such businesses had been, or were contemplated to be sold). Management's November 21, 2007 projections were adjusted to account for the pro forma EBIT contributions of the Cubs, SCNI, and Hoy, New York based on amounts forecasted in the February, 2007 projections (Ex. 71 (ESOP Transaction Model - Revised Operating Plan Case, dated February 8, 2007)) to facilitate an "apples-to-apples" comparison to historical results which included the EBIT contributions of those businesses.

(2) EBIT is calculated consistently with management projections (EBIT = Revenue - Operating Expenses - Stock-Based Compensation - Depreciation & Amortization).

(3) 2004, 2005, and 2006 actuals from Ex. 14 (Tribune 2006 Form 10-K). 2007 actual is from the 2007 Form 10-K. The 2007 Form 10-K EBIT does not include results from discontinued operations (SCNI and Hoy, New York) whereas 2004-2006 results are inclusive of SCNI and Hoy, New York EBIT. Normalized to exclude the EBIT effects of discontinued operations, EBIT for 2004-2006 (as reported in Ex. 4 (Tribune 2007 10-K)) were $1,190, $1,121, and $1,085 million respectively. The declining EBIT trend is nonetheless apparent, particularly given that 2006 results include 53 weeks.

(4) Non-operating adjustments added back to reported EBIT include severance, outplacement fees, phantom equity compensation, changes-in-control compensation and other items (including $130 mm goodwill write-off occuring in December), as detailed in the Period 12 Tribune Brown Book (page 5).

The Examiner also reviewed the specific forecasting assumptions underlying the above-described projected performance with respect to each of Tribune's two business segments. The forecasts for the Publishing Segment were based on certain key assumptions:[2286]

• The October 2007 plan forecasted a modest 0.35% decline in 2008 publishing revenues from 2007 pro forma results.[2287] Although anticipating ongoing declines in traditional print advertising and circulation revenues, the projections assumed that these declines would be significantly mitigated by enhanced growth in, for example, interactive revenues,[2288] and growth in revenues associated with contract delivery and print services (of the type negotiated with Sun-Times Media Services). Publishing revenues were forecasted to increase annually after 2008, at rates of 1.96%, 2.35%, 2.29%, and 2.32%, respectively, through 2012.[2289]

---

[2286] Because forecasts of financial results for periods subsequent to 2012 were the result of extrapolating prior period results on the basis of fixed growth rate assumptions, *see* Ex. 739 (Representation Letters, dated December 20, 2007), these observations are limited to a discussion of projection assumptions through only 2012. Growth rate expectations for later years projected results are discussed elsewhere in this section.

[2287] The October 2007 projections contained a "pro forma" estimate of 2007 actual results, based on a review of actual results to date and a forecast of the remainder of the year. *See* Ex. 657 (Tribune Five-Year Financial Outlook).

[2288] The October projections relied on by VRC in conducting its Step Two analysis contemplated significant growth in interactive revenues and profitability as summarized below:

| INTERACTIVE PROJECTIONS ($mm) | | | | | |
|---|---|---|---|---|---|
| | **2008** | **2009** | **2010** | **2011** | **2012** |
| Interactive Revenue (1) | $ 318.0 | $ 406.3 | $ 507.9 | $ 603.8 | $ 712.5 |
| Interactive Operating Cash Flow | $ 127.2 | $ 158.5 | $ 203.2 | $ 241.5 | $ 285.0 |
| **Operating Margin (2)** | **40%** | **39%** | **40%** | **40%** | **40%** |

(1) Interactive Revenues are derived from the Ex. 657 (Tribune Five-Year Financial Outlook) projections utilized by VRC in their Step Two Analysis
(2) Interactive Operating Margins derived from Ex. 956 (Interactive Segment Projections)

A detailed discussion of the valuation implications of management's projections of Tribune interactive financial performance is provided in connection with the Examiner's discussion of the reasonableness of VRC's Step Two conclusions.

[2289] These projected growth rates are inconsistent with the historical declines in Publishing Segment revenues in prior periods: negative 0.8% from 2004 to 2005, negative 0.1% from 2005 to 2006, and negative 9.8%, based on the 2007 pro forma estimate in relation to 2006. The noted 9.8% decline is partially the result of Tribune's

| TRIBUNE PUBLISHING SEGMENT REVENUE ($mm) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Publishing Segment | 2004 | 2005 | 2006 | 2007 PF | 2008 | 2009 | 2010 | 2011 | 2012 |
| Revenue | $ 4,130 | $ 4,097 | $ 4,093 | $ 3,693 | $ 3,680 | $ 3,752 | $ 3,840 | $ 3,928 | $ 4,019 |
| *Growth* | | *-0.8%* | *-0.1%* | *-9.8%* | *-0.4%* | *2.0%* | *2.3%* | *2.3%* | *2.3%* |

(1) Source: Ex. 14 (Tribune 2006 Form 10-K); Ex. 657 (Tribune Five-Year Financial Outlook).

• The October 2007 plan forecasted $786 million in operating cash flow for the Publishing Segment for 2008, reflecting a 3.91% decline from 2007 pro forma expectations. The October 2007 plan also assumed, however, that operating cash flow thereafter would increase 3.6% annually through 2012. Management explained that this latter increase was "due to higher [projected] interactive and targeted print revenue."[2290] Expressed as a percentage of forecasted publishing revenue, the October 2007 plan forecasted publishing operating cash flow to increase each year from 2008 through 2012 (21.36%, 21.70%, 21.98%, 22.28%, and 22.54% for 2008 through 2012, respectively).

The forecast for the Broadcasting Segment was based on the following:

disposition of certain publishing assets in 2007 and the fact that 2006 results were based on a 53 week year. Even when growth rates are analyzed on the basis of a presentation of historical results normalized for discontinued operations and to eliminate the effects of the extra week informing 2006 reported results, the forecasted Publishing Segment growth rates nonetheless still reflect significant growth antithetical to prior performance.

| TRIBUNE PUBLISHING REVENUE ($mm) (1) | | | | |
|---|---|---|---|---|
| **As Reported** | **2004** | **2005** | **2006** | **2007** |
| Revenue | 4041.014 | 4012.413 | 4018.418 | 3664.59 |
| *% Growth* | | *-0.71%* | *0.15%* | *-8.81%* |
| **As Adjusted** | **2004** | **2005** | **2006 (52 weeks)** | **2007** |
| Revenue | 4041.014 | 4012.413 | 3939.62549 | 3664.59 |
| *% Growth* | | *-0.71%* | *-1.81%* | *-6.98%* |

(1) Ex. 4 (Tribune 2007 Form 10-K). 2004 through 2007 results presented on a normalized basis to account for asset dispositions through 2007. 2006 results are also presented on the basis of a 52-week year calculated as 2006 actual revenues divided by 1.02 based on an approximation of the impact of the additional week as disclosed in Ex. 4 at 9 (Tribune 2007 Form 10-K).

[2290] *See* Ex. 657 at 11 (Tribune Five-Year Financial Outlook).

• The October 2007 projection model forecasted baseline advertising revenue growth of 2.3% in 2008, followed by 1.1% annual growth thereafter through 2012, although the projection model also anticipated and accounted for other material increases in non-baseline revenues associated with, among other things, political advertising in election years, such that total broadcasting and entertainment revenues were forecasted to increase at annual growth rates of 7.99%, 0.56%, 3.40%, 0.77%, and 2.66% for 2008 through 2012, respectively.

• The October 2007 projection model contemplated significant improvement in operating cash flow[2291] to be generated by the Broadcasting Segment, forecasting an increase of more than 16% above 2007 pro forma expectations for 2008, with annual growth rates thereafter through 2012 of 3.57%, 3.23%, (2.92%), and 4.09% respectively. Operating cash flow, expressed as a percentage of forecasted revenue, was forecasted as 35.64%, 36.71%, 36.65%, 35.31%, and 35.8% for the years 2008 through 2012, respectively. These percentages reflect management's expectation of significant performance improvement above historical levels, though recognizing that historical results included the Chicago Cubs that had contributed below average margins historically.[2292]

---

[2291] The Examiner notes that the October 2007 projections exclude the Chicago Cubs. Ex. 721 (Tribune Company Model, dated November 21, 2007).

[2292] When compared to historical 2004 through 2006 (and pro forma 2007) actual results, the forecasted Broadcasting Segment EBITDA as a percentage of forecasted revenues (as assumed in the October 2007 projections) contemplated significant improvement above recent historical margins.

| TRIBUNE BROADCASTING SEGMENT EBITDA AS A PERCENT of REVENUE ($mm) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Broadcasting Segment | 2004 | 2005 | 2006 | 2007 PF | 2008 | 2009 | 2010 | 2011 | 2012 |
| Revenue | $ 1,502 | $ 1,414 | $ 1,425 | $ 1,164 | $ 1,257 | $ 1,264 | $ 1,307 | $ 1,317 | $ 1,352 |
| *Growth* | | *-5.8%* | *0.8%* | *-18.3%* | *8.0%* | *0.6%* | *3.4%* | *0.8%* | *2.7%* |
| EBITDA | $ 563 | $ 465 | $ 443 | $ 384 | $ 448 | $ 464 | $ 479 | $ 465 | $ 484 |
| *Growth* | | *-17.3%* | *-4.8%* | *-13.3%* | *16.7%* | *3.6%* | *3.2%* | *-2.9%* | *4.1%* |
| **EBITDA Percentage of Revenue** | 37.5% | 32.9% | 31.1% | 33.0% | 35.6% | 36.7% | 36.6% | 35.3% | 35.8% |

(1) 2007 pro forma and 2008-2012 forecasts exclude the Cubs, 2004-2006 actual results include the Cubs

The Examiner contrasted the October 2007 forecast with expectations embodied in the February 2007 projections. By comparing projected results contained in ESOP projection models (which correspond to both the February 2007 and October 2007 materials discussed with the Tribune Board at the respective February 2007 and October 2007 meetings),[2293] the following is evident: despite reflecting downwardly revised expectations for the near term, the October 2007 projections assumed that Tribune, on a consolidated basis, would rapidly recover from this decline, and also that, over the longer term, Tribune would exceed the performance expectations embodied in the February 2007 projections. The Examiner finds these assumptions unsupportable. In his interview with the Examiner, Harry Amsden stated that the out-year projections (*i.e.*, years 2011 to 2016) developed in February 2007, despite being based on an "extrapolation" of growth rates observed from projected 2011 results in relation to 2010 results, represented Tribune management's best estimate at that time, and that, by October 2007, it was clear that those expectations were not being met.[2294] The Tribune Entities' negative financial performance on an overall basis following the closing of the Step One Transactions (a continuation of historical performance trends, as shown above) should have resulted in a downward adjustment of the out-year assumptions contained in the February 2007 projections,

---

[2293] The Examiner notes that, although the ESOP projection models corresponding to the February 2007 and October 2007 plans discussed with the Tribune Board contained projections for ten years, the materials discussed with, and presented to, the Tribune Board correspond to a shorter projection horizon. Ex. 657 at 11 (Tribune Five-Year Financial Outlook).

[2294] Examiner's Interview of Harry Amsden, July 2, 2010. In his interview Mr. Amsden also explained that projections in the shorter term were based on more detailed information, the out-year projections were more of an "extrapolation," and he believed that the banks did not rely on the out-year projections. *See also* Ex. 250 (Representation Letters, dated May 9, 2007). Both Mr. Browning and Mr. Rucker confirmed that Tribune management's February 2007 forecast of flat to slightly declining revenue growth for the Broadcast Segment for the years 2010 through 2017 were reasonable, according to Mr. Rucker "based upon management's representation and the conversations that we had," which, according to Mr. Browning, made them "comfortable with the forecast." Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 92:2-16.

holding all else constant.  A comparison of the February 2007 and October 2007 projections

shows that management made the opposite assumption without explanation or justification:



(1) Management's February 2007 projections (Ex. 71 (ESOP Transaction Model - Revised Operating Plan Case, dated February 8, 2007)) and Management's November 21, 2007 projections (Ex. 721 (Tribune Company Model, dated November 21, 2007)), which corresponds to the October 2007 Five-Year Plan) exclude forecasted results for the Cubs, SCNI and Hoy, New York (because such businesses had been, or were contemplated to be, sold). Management's November 21, 2007 projections were adjusted to account for the pro forma revenue contributions of the Cubs, SCNI, and Hoy, New York based on amounts forecasted in February, 2007 projections to facilitate and "apples-to-apples" comparison to historical results which included the revenue from those businesses.

(2) 2004, 2005, and 2006 actuals from Ex. 14 (Tribune 2006 Form 10-K). 2007 actual is from the Ex. 4 (Tribune 2007 Form 10-K).  The 2007 Form 10-K revenue does not include revenues from discontinued operations (SCNI and Hoy, New York) whereas 2004-2006 actuals are inclusive of SCNI and Hoy, New York revenues.  Normalized to exclude the effects of discontinued operations, revenues for 2004-2006 (as reported in Ex. 4 (Tribune 2007 Form 10-K)) were $5,543, $5,427, and $5,444 million respectively.  The declining revenue trend is nonetheless apparent, particularly given that 2006 results include 53 weeks.



Consolidated EBIT Comparison between Actuals, Management February and October Projections ($mm)

(1)  Management's February 2007 projections (Ex. 71  (ESOP Transaction Model - Revised Operating Plan Case, dated February 8, 2007)) and Management's November 21, 2007 projections (Ex. 721 (Tribune Company Model, dated November 21, 2007)), which corresponds to the October 2007 Five-Year Plan) exclude forecasted results for the Cubs, SCNI and Hoy, New York (because such businesses had been, or were contemplated to be, sold). Management's November 21, 2007 projections were adjusted to account for the pro forma EBIT contributions of the Cubs, SCNI, and Hoy, New York based on amounts forecasted in the February 2007 projections to facilitate and "apples-to-apples" comparison to historical results which included the EBIT contributions of the businesses.
(2) EBIT is calculated consistently with management projections (EBIT = Revenue - Operating Expenses - Stock-Based Compensation - Depreciation & Amortization).
(3) 2004, 2005, and 2006 actuals from Ex. 14 (Tribune 2006 Form 10-K).  2007 actual is from Ex. 4 (Tribune 2007 Form 10-K).  The 2007 Form 10-K EBIT does not include results from discontinued operations (SCNI and Hoy, New York) whereas 2004-2006 results are inclusive of SCNI and Hoy, New York EBIT.  Normalized to exclude the EBIT effects of discontinued operations, EBIT for 2004-2006 (as reported in Ex. 4 (Tribune 2007 Form 10-K)) were  $1,190, $1,121, and $1,085 million respectively.  The declining EBIT trend is nonetheless apparent, particularly given that 2006 resu ts include 53 weeks.
(4) Non-operating adjustments added back to reported 2007 EBIT include severance, outplacement fees, phantom equity compensation, changes-in-control compensation, and other  tems (including $130 mm goodwill write-off occuring in December), as detailed in Ex. 642 at 5 (Brown Book for Period 12, 2007).

Both the February 2007 and October 2007 models, which contained detailed annual forecasts of revenue and cash flow for the near term (2007 through 2011 in the February 2007 model and 2008 through 2012 in the October 2007 model), extrapolated business segment growth rates observed between the last two years of the detailed annual projections (*i.e.*, the growth rate between 2010 and 2011 in the February 2007 model, and the growth rate between 2011 and 2012 in the October 2007 model) for purposes of forecasting annual growth in subsequent years.[2295]  It appears that the approach was undertaken at the direction of Tribune

---

[2295]  Mr. Amsden indicated that the process for forecasting the final five years of the projections in both the February 2007 and October 2007 projections involved a straightforward extrapolation of performance based on the growth rates informing the last interim period of each projection.  Examiner's Interview of Harry Amsden, July 2, 2010; Ex. 739 (Representation Letters, dated December 20, 2007).  When similarly asked about the out-year projections, Mr. Grenesko testified that Tribune management was "assuming that modest economic growth and the inflation would be around 2 1/2 percent or so, and we used that to extrapolate both the revenues and the expenses for the two groups."  Examiner's Sworn Interview of Donald Grenesko, July 8, 2010, at 166:3-7.

Treasurer Chandler Bigelow, who in e-mails to Rosanne Kurmaniak of Citigroup (the individual responsible for maintaining Tribune's complex projection models), suggested "We probably ought to take down the assumed CAGRs in the post 2012 years" and followed up with "How about we make post 2012 revenue/OCF CAGRs the same as the growth assumed in 2012 for both Publishing/Broadcasting?"[2296]

---

This does not explain, however, the difference in the out-year growth assumptions between the February 2007 and October 2007 projections. The February 2007 projections assumed flat growth even though the prospect for GDP growth in February 2007 certainly was not higher than in October 2007.

Mr. Grenesko also pointed to the "bottoms up" evaluation and a "very thoughtful process that the publishing group went through to identify exactly why our revenues had fallen and whether it was divided into three buckets, basically what was secular, what was cyclical, and what was execution." Examiner's Sworn Interview of Donald Grenesko, July 8, 2010, at 165:16 and 168:6-11. Mr. Grenesko stated that in conjunction with that process the publishing group "came up with reasons for the issues that we were having in publishing and they also came up with both revenue ideas, new revenue streams that they thought that they could implement as well as reducing expenses going forward . . . [and that] the publishing group worked with an outside consultant to come up with a way to transform the publishing group and to change the culture of the publishing group, basically shifting it from more of a traditional newspaper company over to one that was less dependent on the traditional newspaper and to think of the company more as a content provider as opposed to a newspaper, and also much more heavily weighted towards than what it previously had been towards the Internet." *Id.* at 168:12-17, 169:2-12. For example, he noted that the five-year plan included increased funding for interactive personnel and the interactive business. *Id.* at 171:9-15. He also noted efforts to generate revenues from preprints, targeted publications, and delivery services. *Id.* at 170:9-171:4 and 172:16-173:2. In connection with these efforts, Mr. Grenesko directed the Examiner to Tribune's five-year business plan which he testified "laid things out very succinctly." *Id.* at 169:16-17

Mr. Grenesko's explanation of the assumptions underlying the five-year business plan, however, does not explain the growth assumption for the out-years 2013-2017. Regarding that specific assumption, Mr. Grenesko acknowledged that this was an extrapolation using the 2012 growth that "seemed reasonable based upon what I stated had previously about the inflation rate and the real GDP growth, so those seemed reasonable that—those growth rates seemed reasonable compare to the general macrotrends that we were assuming." *Id.* at 178:20-179:3. Mr. Grenesko further testified he did not "recall anything specific" about this assumption. *Id.* at 183:21-22.

Similarly, when VRC was asked what might explain the projected performance for the years 2013 through 2017 in the October projections, Mr. Rucker said, "What it appears to me is that they might have applied some type of growth rate after 2012." Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 118:3-5. Mr. Rucker stated that generally such growth rates are keyed off of Gross Domestic Product (GDP). *Id.* at 118:24 -120:7. However, later in the interview, Mr. Browning stated that he could not recall whether he was aware of any differences in the growth rates management used between Step One and Step Two. *Id.* at 135:12-17.

For the reasons discussed in this section of the Report, the Examiner has determined that the out-year growth assumptions posited in the October 2007 forecast were unreasonable and unjustifiable.

[2296] Ex. 889 (Roth E-Mail, September 27, 2007). When questioned about the latter e-mail during her sworn interview, Ms. Kurmaniak corroborated this point:

> Q:  Do you have any idea why he made that comment and statement to you? It's got a question
>     mark so he actually appears to be asking a question, but let's begin with did you treat it as a
>     question?

The long term growth rates implied by these extrapolations result in starkly different long term growth rates between the February 2007 and October 2007 models, as shown below:

---

A:  They had a company prepared plan for 2000 through 2012 and so somebody has to make a judgment as to what's going to happen post that period because nothing was officially endorsed or provided to us or by the company.  So someone had to make a judgment about what those revenue and operating cash flow growth rates were going to look like.  In this case it was Chandler.  That's who I talked to every day about all this and so I think he's just giving us guidance and it's a common practice to say okay, in the last, in the five-year why don't we just assume that the business grows at the same pace or performs at the same pace as it did in the last year that we've officially projected it.  So that's a common practice.  It's a common assumption that we use which is just to say we don't really know what it's going to be in five years, but our best guess would be that it's going to perform at the same as it did in the five, you know, in the last year that we actually did an official projection for.  And, look, from time to time Chandler would come to me and say, hey, does that sound reasonable?  And I'd say yes or no, it doesn't sound reasonable and so it looks like that's what this E-mail chain is.

Q:  All right.  And so what was your response?  Did you think it was reasonable to use that approach?

A:  Yes.

Examiner's Sworn Interview of Rosanne Kurmaniak, July 7, 2010, at 137:9-139:1.

Although Ms. Kurmaniak testified that she felt that extrapolating the growth from 2012 to later years was reasonable, she acknowledged that she did not focus on the fact that 2012 was an election year and possibly an outlier.  *Id.* at 139:6-14 and 140:1-4.  She suggested that if something other than an extrapolation from 2012 were used, adjustments in the out-year projections would have to be made based on the timing of elections and other anticipated occurrences in those years.  *Id.* at 142:20-143:13. Regardless, a justification of expected "out-year" growth rates on the basis of expected GDP growth would be contrary to Tribune's observed historical growth rates in relation to actual GDP growth historically.

| COMPARISON OF GDP GROWTH RATES TO TRIBUNE HISTORICAL REVENUE GROWTH RATES 2004 - 2007 ($mm) | | | | | | |
|---|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 | Notes |
| **Real GDP** | $ 11,840,700.0 | $ 12,263,800.0 | $ 12,638,400.0 | $ 12,976,200.0 | $ 13,254,100.0 | [A], [B] |
| *Real GDP Growth* | | 3.57% | 3.05% | 2.67% | 2.14% | |
| **Nominal GDP** | $ 11,142,100.0 | $ 11,867,800.0 | $ 12,638,400.0 | $ 13,398,900.0 | $ 14,077,600.0 | [A] |
| *Nominal GDP Growth* | | 6.51% | 6.49% | 6.02% | 5.07% | |
| **Nominal Revenue** | $ 5,440.8 | $ 5,542.6 | $ 5,426.8 | $ 5,443.6 | $ 5,063.0 | [C] |
| *Revenue Growth* | | 1.87% | -2.09% | 0.31% | -6.99% | |

Notes:

[A]  http://www.bea.gov/national/index.htm

[B]  Converted to 2005 base year.

[C]  Normalized Revenue from Ex. 4 (2007 Tribune Form 10-K).  Results reflect operations as normalized for discontinued operations.



(1) The revenue figures above include forecasted revenues excluding the Chicago Cubs and other discontinued operations (e.g., SCNI and Hoy, New York). Prior presentations of revenue forecasts inclusive of pro forma estimates of revenue for those businesses were necessary to facilitate a comparison of projected results to actual results, which include the Chicago Cubs and subsequently discontinued operations (SCNI and Hoy, New York) in reported amounts.



(1) The revenue figures above include forecasted revenues excluding the Chicago Cubs and other discontinued operations (e.g., SCNI and Hoy, New York). Prior presentations of revenue forecasts inclusive of pro forma estimates of revenue for those businesses were necessary to facilitate a comparison of projected results to actual results, which include the Chicago Cubs and subsequently discontinued operations (SCNI and Hoy, New York) in reported amounts.

Both the February 2007 and October 2007 models "benchmarked" future growth expectations from the growth rates implied by the final year of the detailed annual projection. In the February 2007 model, the final year was 2011. Thus, the model extrapolated the growth rate from 2010 to 2011 in determining the growth rate from 2012 to 2016, whereas the October 2007 model added another year (*i.e.*, 2012) and extrapolated the growth rate from 2011 to 2012 in determining the growth rate from 2013 to 2017. Although this simplified the modeling assumption, the application of these growth assumptions resulted in starkly different projected outcomes for Tribune's long term revenue and profitability. Because VRC adopted these assumptions without adjustment in its Step Two opinion, this significantly (and upwardly) affected VRC's Step Two valuation conclusions by approximately $613 million.[2297]

---

[2297] When the Examiner asked VRC why it went from using a five-year DCF analysis at Step One to a ten-year DCF analysis at Step Two, Mr. Browning replied:

> So I think this—I don't recall any—there was no discussion that I recall that said, hey, let's move this from five-year to a ten-year. I think it was probably a natural thought process as we went through it to say it makes more sense to look at it by ten-year. We did—we may have looked at it both ways, but I don't think the outcome would be material whether it was five-year or ten-year. I don't know for sure. But there was never an intention to say the five-year doesn't work, let's make it a ten-year.

Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 148:4-18.

Mr. Rucker then added:

> And if I might add, with a DCF, in your end year, you have a terminal growth rate or terminal multiple that's supplied. And so, you know, that's an important factor, you know, in your DCF, in your overall DCF value. So the mere fact that you switched from a five to a ten, with that terminal value, it doesn't necessarily mean you are going to get a substantially different -- different answer.

*Id.* at 148:22-149:10.

As noted earlier in this section of the Report, the change in DCF enterprise value that resulted from adding an incremental five years of discrete period cash flow to VRC's DCF Step Two analysis (in relation to VRC's Step One analysis where only five years of discrete period cash flows were considered before adding a terminal value) added approximately $613 million to the Step Two DCF value, all other things being equal.

Because 2012 represents a presidential election year, and Tribune's forecasting model specifically recognized that election year spending enhances Tribune financial performance, the growth rate between 2011 and 2012 reflects the periodic four-year effects of such increases.  By extrapolating growth rates obtained from a comparison of a non-election year financial performance to a presidential election year expectation, and applying that growth rate annually thereafter, Tribune's projection model effectively assumed compounding increases in each and every prospective forecast year.  The net result, in effect, was to assume that every year from 2012 to 2017 would be a presidential election year, and bigger than the last.  This explains why the out-year projections developed in the October 2007 model exceeded those used in the February 2007 model.  Although one could argue that the February 2007 model contained the opposite flaw (in effect assuming that no election would occur between 2012 and 2016), in fact the 2012 to 2016 forecast contained in the February 2007 model was consistent with Tribune's historical performance, as described above.  The Examiner finds it inexplicable that VRC used the 2013 to 2017 projections in developing its Step Two solvency opinion without making any adjustment in light of Tribune's historical performance trends, Tribune's performance after the

| COMPARISON OF DECEMBER DCF MODELS WITH AND WITHOUT YEARS 6 - 10 at Present Value and at Mid Range Value ($mm) | | | | |
|---|---|---|---|---|
| | Years 1 - 5 | Years 6 - 10 | Terminal Value | Total Enterprise Value |
| **VRC December Model** | $ 2,644.3 | $ 2,085.2 | $ 5,480.4 | $ 10,209.9 |
| *10-year Interim Period Plus Terminal Value* | | | | |
| **Alternative VRC December Model** | $ 2,644.3 | Included in Terminal Value | $ 6,953.0 | $ 9,597.3 |
| *5-year Interim Period Plus Terminal Value* | | | | |
| **Value Difference** | | | | $ 612.6 |

closing of the Step One Transactions, or the assumptions underlying the February 2007

projections or the out years.[2298]

---

[2298] It appears that as early as December 2, 2007, management was aware that VRC had substantially revised its analysis to include the extrapolated out-years (*i.e.*, years 2013-2017) in reaching its valuation conclusions for Tribune at Step Two.  On that date, Mose Rucker e-mailed Chandler Bigelow stating:

> Please find attached a draft of our internal review document.  This will not be shared with the Board.  We will send out the Board Presentation as soon as it is complete.

Ex. 888 (Bigelow E-Mail, dated December 2, 2007).  On that same date, Mr. Bigelow responded: "Thanks."  *Id.*

A review of VRC's work papers dated December 3, 2007 reflect that VRC had revised its DCF analysis to include a ten-year interim period through 2017.  Ex. 740 (VRC Internal Review Document - Tribune Company Preliminary Solvency Analysis, dated December 3, 2007).  It appears that VRC first changed its DCF analysis from a five-year interim period to a ten-year interim period between sometime between November 27, 2007 and November 30, 2007.  *Compare* Ex. 1003 at VRC0067889 (VRC Internal Review Document, Tribune Company Preliminary Solvency Analysis, dated November 27, 2007) *with* Ex. 742 at VRC0063401 (VRC Internal Review Document, Tribune Company Preliminary Solvency Analysis, dated November 30, 2007).

Tribune's representation letter sent to VRC at Step Two specifically referenced management's extrapolation of its projections through 2017 based on the expected growth rates from 2011 to 2012, stating as follows:

> The provided financial forecasts of Tribune, on a consolidated and pro-forma basis, (as represented in the Excel file entitled model_negotiated_proposal_november21_2007.xls) delivered to VRC via e-mail on November 21, 2007) reflect Management's best estimates of Tribune Base and Tribune Downside case forecasts.  This file includes projections based on Management's five-year financial outlook through 2012 (the "Five-Year Outlook") and the subsequent extrapolation by Management of these projections through 2017 applying the revenue and operating cash flow growth rates for the fifth year of the Five-Year Outlook and other underlying assumptions as used in developing the Five-Year Outlook.  While such forecasts are subject to many factors outside Management's control, in Management's view they are reasonable and attainable based on Management's involvement and understanding of the business operations, its markets, the strategic vision, the competitive landscape, and regulatory and economic trends.

Ex. 739 (Representation Letters, dated December 20, 2007).

By contrast, the analog management representation letter sent to VRC at Step One makes no mention of extrapolated projections or a longer projection period, generically stating:

> The provided financial forecasts of Tribune, on a consolidated and pro-forma basis, (as represented in the financial forecast model (ESOP Transaction Model dated April 4, 2007) provided to VRC reflect Management's best estimates, and, while such forecasts are subject to many factors outside Management's control, in Management's view they are reasonable and obtainable based on Management's involvement and understanding of the business operations, its markets, the strategic vision, the competitive landscape, and regulatory and economic trends.

Ex. 250 (Representation Letters, dated May 9, 2007).

The Examiner concludes that Tribune's management must have realized the significance of the added language in the Step Two representation letter and that VRC's valuations of Step Two would likely (if not certainly) have reflected these extrapolated projections.

It appears that the Tribune Board was never presented with the ten-year growth model (*i.e.*, with extrapolated years 2013 through 2017) that management knew VRC was utilizing to reach its valuation conclusions.  *See* Examiner's Sworn Interview of Donald Grenesko, July 8, 2010, at 175:16-21 and 186:13-18.  (In an errata sheet dated July 20, 2010, Mr. Grenesko changed the portions of his testimony bearing on this point.  When asked whether the model presented to the Tribune Board "included the extrapolated growth rates from 2013 to 2017 or

The Examiner also evaluated the near term expectations of the Tribune Entities' financial performance in the October 2007 plan in comparison to analyst expectations in the period preceding the closing of the Step Two Transactions.  The comparison reveals that Tribune management's expectations regarding Tribune's ability to generate EBITDA from gross revenues were more optimistic than expectations held by analysts.  Because EBITDA is a driver of value, any overstatement in EBITDA expectations informing the October 2007 plan would result in an overstatement of valuation results accordingly:

| 2008 IBES FORECAST v. OCTOBER PLAN | | | | |
|---|---|---|---|---|
| | Revenue | | EBITDA | |
| | Mean | Median | Mean | Median |
| August 2007 | $ 4,982.1 | $ 5,015.1 | $ 1,081.7 | $ 1,110.9 |
| September 2007 | $ 4,971.9 | $ 4,983.7 | $ 1,074.5 | $ 1,088.4 |
| October 2007 | $ 4,993.1 | $ 5,014.2 | $ 1,096.7 | $ 1,140.3 |
| November 2007 | $ 4,987.7 | $ 5,009.0 | $ 1,092.6 | $ 1,135.2 |
| Management October Plan | $ 4,936.0 | | $ 1,193.0 | |

As shown in the chart above, Tribune estimated that it could achieve $1.193 billion in EBITDA from $4.936 billion in revenue, which equated to approximately 10% higher EBITDA than analysts' estimates even though Tribune forecasted *lower* revenues than these analysts.

### (2)    VRC Unreasonably Ignored its Own Internal Critiques of the October 2007 Projections.

The Examiner also reviewed and assessed a detailed analysis prepared by VRC of the October 2007 projections.  Of particular note is a VRC internal assessment of the reasonableness of Tribune management's revenue and expense growth rate assumptions informing Tribune

---

was it only a five-year model," Mr. Grenesko originally responded:  "I believe that was just a five-year."  *Id.* at 175:16-21.  The errata sheet, which is appended to the transcript of Mr. Grenesko's sworn interview, changes the answer to:  "I believe that was just a five-year model in our plan, but I believe VRC's solvency report included projections beyond the initial five years."  Similarly, when asked whether the detailed numbers for years 2013 through 2017 "were [ever] provided to the board in a board meeting," Mr. Grenesko originally responded:  "I don't believe so."  *Id.* at 186:13-18.  The errata sheet changes the answer to:  "I believe VRC's solvency reports included projections beyond the original five years.")

projections that were provided to VRC in late September 2007.[2299]  This assessment was memorialized in several October 29, 2007 internal VRC memoranda that, according to Bryan Browning, were the result of a routine procedure whereby analysts assisting him on valuation projects memorialized their work.[2300]

The adjustments to Tribune's projection parameters recommended by the VRC analysts in these memoranda were the result of VRC's due diligence review and analyses then conducted to date.  The extent of the information gathered and processed by VRC in connection with its assessment can be gauged, to a significant degree, by the e-mails between VRC and Tribune management in which VRC requested (and management delivered) the data for VRC's analysis.[2301]  VRC's October 29, 2007 memoranda include observations based on discussions with Tribune's management, independent analysis of the Tribune Entities' historical performance, and outside analyst opinions reviewed by VRC as part of its analysis.

Changes to Tribune management's revenue and expense growth rate projections, as recommended by VRC analysts, were incorporated by VRC into a DCF valuation.[2302]  The

---

[2299]  Importantly, these projections, with respect to forecasted revenue and EBITDA, agreed with the projection model ultimately relied on by VRC in rendering its Step Two solvency opinion.

[2300]  *See* Ex. 1004 at VRC0034756-85 (Mednik E-Mail, dated October 31, 2007).  Mr. Browning was asked about the nature of the document at his Rule 2004 examination:

> Q.  Did you see memoranda like this prepared by Mr. Mednik in the October 2007 timeframe?
>
> A:  Yes, memorandum like this. I told all my analysts to put their assumptions to file, so it was a general kind of procedure.

Ex. 262 at 121:10-16 (Rule 2004 Examination of Bryan Browning, December 4, 2009).

[2301]  *See, e.g.*, Ex. 953 (Bigelow E-Mail, dated September 20, 2007); Ex. 897 (Bigelow E-Mail, dated September 21, 2007); Ex. 901 (Bigelow E-Mail, dated September 21, 2007); Ex. 902 (Bigelow E-Mail, dated September 21, 2007); Ex. 903 (Bigelow E-Mail, dated September 21, 2007); Ex. 904 (Bigelow E-Mail, dated September 21, 2007); Ex. 905 (Bigelow E-Mail, dated September 25, 2007); Ex. 906 (Litman E-Mail, dated September 26, 2007); Ex. 907 (Mednik E-Mail, dated September 27, 2007); Ex. 908 (Bigelow E-Mail, dated September 28, 2007); Ex. 909 (Bigelow E-Mail, dated September 30, 2007); Ex. 910 (Bigelow E-Mail, dated October 3, 2007); Ex. 911 (Bigelow E-Mail, dated October 3, 2007); Ex. 912 (Bigelow E-Mail, dated October 15, 2007).

[2302]  Ex. 1004 at VRC0034756-85 (Mednik E-Mail, dated October 31, 2007).  VRC analysts contributing to the October 29, 2007 memoranda included Leonid Mednik (Broadcasting Revenue Assumptions), Shakespeare

resulting valuation indications were included in VRC's internal analysis and contrasted sharply with valuation indications based on DCF valuation conclusions derived from Tribune's projections without adjustment. The difference at the estimated midpoint[2303] of the two DCF valuations approximated $1.240 billion (Tribune management-based DCF mid-point value of $10.1105 billion versus VRC's DCF mid-point value of $8.8705 billion).[2304]

The specific differences between Tribune management's revenue and EBITDA growth rates on a consolidated basis and the resulting nominal estimations related thereto, as well as VRC's growth rates and estimations, are presented below. The table also includes the growth rates and amounts adopted by VRC for purposes of its final valuation of Tribune's operating assets. Notably, despite the fact that several internal VRC memoranda suggested that it was appropriate to make different assumptions and reach different conclusions than those reached by

---

James (Broadcasting Expense Assumptions), and Mose Rucker (Publishing Assumptions, Classified Assumptions, Circulation Assumptions, and Interactive Assumptions).

[2303] Rather than actually calculating a mid-point of their range of discount rates and exit multiple combinations, VRC typically calculated a simple average of the extreme end-points of the value indications generated from their range of combinations for purposes of their presentation of ranged DCF values. The Examiner refers to this mid-point as the "estimated" mid-point, and refers to the mid-point based on application of the specified parameters yielding a mid-point valuation indication as the "actual" or "calculated" mid-point.

[2304] As is typical with shorter duration interim period DCF models, most of the DCF model value is situated in the terminal period rather than in the discreet interim period projections of both models. Of the $1.240 billion difference in mid-point value indication between the VRC and Tribune DCF indications, 70.5%, or $873 million, is explained by the difference in terminal period values of the two models. This concentration of value difference in the terminal period highlights the significance of the EBITDA parameters estimated for the last interim period—$1.383 billion in the case of Tribune's projections and $1.220 billion in the case of VRC's downwardly revised estimate—since VRC used an "exit multiple" of EBITDA to estimate terminal value. The difference of $163 million in the two terminal period EBITDA multiples is the result of VRC's application of lower growth and profitability rates during the interim projection period than those applied by Tribune management. The $163 million in ending EBITDA difference also explains the substantial difference in terminal values between the two models, since exactly the same exit multiples and discount rate combinations are applied to the two respective model's final period EBITDA to estimate the terminal values for each. When "capitalized" through application of the exit multiple and brought to present value, the $163 million terminal period EBITDA difference explains $873.4 million of the total $1.240 billion of total DCF difference. It should be noted that in this particular version of VRC's DCF model, six years of interim period projections (2008 through 2013) are forecast before a terminal period (perpetuity) value is calculated based on the application of exit multiples ranging from 8.0x to 9.0x.

Tribune management, as explained in more detail below, VRC nonetheless adopted management's numbers in its solvency analysis:

| CONSOLIDATED ASSUMPTION COMPARISON ($mm) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Revenue Assumptions - Base Case | FY 2007P | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E | FY 2013E |
| Tribune October 28, 2007 Analysis | $ 4,856.7 | $ 4,936.4 | $ 5,016.1 | $ 5,146.8 | $ 5,244.8 | $ 5,371.1 | $ 5,500.4 |
| *Growth Rate* | | 1.6% | 1.6% | 2.6% | 1.9% | 2.4% | 2.4% |
| VRC October 29, 2007 Analysis | $ 4,856.7 | $ 4,831.1 | $ 4,856.1 | $ 4,898.7 | $ 4,953.9 | $ 5,015.2 | $ 5,077.3 |
| *Growth Rate* | | -0.5% | 0.5% | 0.9% | 1.1% | 1.2% | 1.2% |
| VRC December 20, 2007 Analysis | $ 4,856.7 | $ 4,936.4 | $ 5,016.1 | $ 5,146.8 | $ 5,244.8 | $ 5,371.1 | $ 5,500.4 |
| *Growth Rate* | | 1.6% | 1.6% | 2.6% | 1.9% | 2.4% | 2.4% |
| Operating Cash Flow Assumptions - Base Case | FY 2007P | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E | FY 2013E |
| Tribune October 28, 2007 Analysis | $ 1,160.3 | $ 1,193.3 | $ 1,236.8 | $ 1,282.1 | $ 1,298.6 | $ 1,348.8 | $ 1,382.7 |
| *OCF Margin* | 23.9% | 24.2% | 24.7% | 24.9% | 24.8% | 25.1% | 25.1% |
| VRC October 29, 2007 Analysis | $ 1,160.3 | $ 1,106.4 | $ 1,131.5 | $ 1,152.6 | $ 1,172.7 | $ 1,202.8 | $ 1,219.7 |
| *OCF Margin* | 23.9% | 22.9% | 23.3% | 23.5% | 23.7% | 24.0% | 24.0% |
| VRC December 20, 2007 Analysis | $ 1,160.3 | $ 1,193.3 | $ 1,236.8 | $ 1,282.1 | $ 1,298.6 | $ 1,348.8 | $ 1,382.7 |
| *OCF Margin* | 23.9% | 24.2% | 24.7% | 24.9% | 24.8% | 25.1% | 25.1% |

The differences between Tribune management's revenue and EBITDA growth rates for the Publishing Segment (and the resulting nominal estimations related thereto) and the growth rates applied by VRC (and resulting estimations), are shown below:

| PUBLISHING SEGMENT PROJECTIONS COMPARISON ($mm) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Revenue - Base Case | FY 2007P | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E | FY 2013E |
| Tribune October 28, 2007 Analysis | $ 3,692.6 | $ 3,679.9 | $ 3,752.0 | $ 3,840.2 | $ 3,927.6 | $ 4,019.3 | $ 4,113.1 |
| *Growth Rate* | -6.6% | -0.3% | 2.0% | 2.4% | 2.3% | 2.3% | 2.3% |
| VRC October 29, 2007 Analysis | $ 3,692.6 | $ 3,599.4 | $ 3,596.7 | $ 3,611.0 | $ 3,637.3 | $ 3,668.9 | $ 3,700.7 |
| *Growth Rate* | -6.6% | -2.5% | -0.1% | 0.4% | 0.7% | 0.9% | 0.9% |
| VRC December 20, 2007 Analysis | $ 3,692.6 | $ 3,679.9 | $ 3,752.0 | $ 3,840.2 | $ 3,927.6 | $ 4,019.3 | $ 4,113.1 |
| *Growth Rate* | -6.6% | -0.3% | 2.0% | 2.4% | 2.3% | 2.3% | 2.3% |
| Operating Cash Flow - Base Case | FY 2007P | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E | FY 2013E |
| Tribune October 28, 2007 Analysis | $ 818.2 | $ 786.1 | $ 814.2 | $ 844.2 | $ 874.8 | $ 906.3 | $ 927.5 |
| *OCF Margin* | 22.2% | 21.4% | 21.7% | 22.0% | 22.3% | 22.5% | 22.5% |
| VRC October 29, 2007 Analysis | $ 818.2 | $ 744.9 | $ 754.7 | $ 766.4 | $ 786.1 | $ 803.8 | $ 810.8 |
| *OCF Margin* | 22.2% | 20.7% | 21.0% | 21.2% | 21.6% | 21.9% | 21.9% |
| VRC December 20, 2007 Analysis | $ 818.2 | $ 786.1 | $ 814.2 | $ 844.2 | $ 874.8 | $ 906.3 | $ 927.5 |
| *OCF Margin* | 22.2% | 21.4% | 21.7% | 22.0% | 22.3% | 22.5% | 22.5% |

A comparison of Tribune management's and VRC's Publishing Segment EBITDA projections indicates that the lower EBITDA projected by VRC is explained not only by

reductions in projected revenues but also by modest reductions in EBITDA margin, which appears to average approximately 60 to 80 basis points lower in VRC's estimates.[2305]

The following table similarly compares Tribune management's and VRC's rates and nominal estimates of revenue and EBITDA projections for the Broadcasting Segment:

| BROADCASTING SEGMENT PROJECTIONS COMPARISON ($mm) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Revenue  - Base Case | FY 2007P | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E | FY 2013E |
| Tribune October 28, 2007 Analysis | $ 1,164.1 | $ 1,256.5 | $ 1,264.1 | $ 1,306.6 | $ 1,317.2 | $ 1,351.8 | $ 1,387.4 |
| *Growth Rate* | -4.7% | 7.9% | 0.6% | 3.4% | 0.8% | 2.6% | 2.6% |
| VRC October 29, 2007 Analysis | $ 1,164.1 | $ 1,231.6 | $ 1,259.3 | $ 1,287.7 | $ 1,316.7 | $ 1,346.3 | $ 1,376.6 |
| *Growth Rate* | -4.7% | 5.8% | 2.2% | 2.3% | 2.3% | 2.2% | 2.3% |
| VRC December 20, 2007 Analysis | $ 1,164.1 | $ 1,256.5 | $ 1,264.1 | $ 1,306.6 | $ 1,317.2 | $ 1,351.8 | $ 1,387.4 |
| *Growth Rate* | -4.7% | 7.9% | 0.6% | 3.4% | 0.8% | 2.6% | 2.6% |
| Operating Cash Flow  - Base Case | FY 2007P | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E | FY 2013E |
| Tribune October 28, 2007 Analysis | $ 383.7 | $ 448.5 | $ 463.9 | $ 479.3 | $ 465.0 | $ 483.8 | $ 496.5 |
| *OCF Margin* | 33.0% | 35.7% | 36.7% | 36.7% | 35.3% | 35.8% | 35.8% |
| VRC October 29, 2007 Analysis | $ 383.7 | $ 402.7 | $ 418.1 | $ 427.5 | $ 427.9 | $ 440.2 | $ 450.1 |
| *OCF Margin* | 33.0% | 32.7% | 33.2% | 33.2% | 32.5% | 32.7% | 32.7% |
| VRC December 20, 2007 Analysis | $ 383.7 | $ 448.5 | $ 463.9 | $ 479.3 | $ 465.0 | $ 483.8 | $ 496.5 |
| *OCF Margin* | 33.0% | 35.7% | 36.7% | 36.7% | 35.3% | 35.8% | 35.8% |

Importantly, these tables compare Tribune's "base" case projections to VRC's "base" case, so there is no apparent basis to assert that the difference between VRC's and Tribune's projections is explained by comparing a "base" case on the one hand to a "downside" or more pessimistic case on the other.  In fact, VRC's internal memoranda, prepared for all of the businesses within each of the Publishing Segment[2306] and the Broadcasting Segment, explicitly

---

[2305] VRC's October 29, 2007 memoranda apparently do not discuss Publishing Segment expenses (and therefore margins) despite having a section devoted to projected Broadcasting Segment expense growth and despite clear evidence that VRC downwardly adjusted Tribune's Publishing Segment margins in establishing VRC's projected operating cash flows.  It is possible that VRC downwardly adjusted the Publishing Segment's overall EBITDA margin to account for VRC's lower estimate of Tribune interactive revenue.  A reduction in interactive revenue would result in a reduction in overall publishing EBITDA *margin* because of the elimination of interactive's EBITDA contribution at approximately 40% of its revenue, which is much higher than the EBITDA margin of the Publishing Segment's without the interactive unit.  *See* Ex. 1004 (Mednik E-Mail, dated October 31, 2007).

[2306] The segments addressed by VRC memoranda include print advertising segments "Retail," "National," and "Classified," as well as the Publishing Segment's "Circulation" and "Interactive" business units.  The only unit

discuss Tribune's projected growth rates in terms of "reasonableness" and are prepared for "base" case as well as "downside" case scenarios.[2307]  Moreover, the identified differences between Tribune's and VRC's growth rates are the result of VRC-proposed alternative growth rates based on VRC's independent assessment of Tribune data as well as third-party analyst benchmarks and expectations, among other sources of relevant information (including information obtained at a two-day meeting with Tribune management in September 2007).[2308]

It is clear from the comparison of Publishing Segment projected revenue and operating cash flow that the gap between Tribune's and VRC's projections grows over time based on the differences in growth rates applied.  These differences result in significant disparity in the present values of the interim cash flows as well as the respective present values of Tribune's terminal period value.  In fact, the difference in the final year (2013) of the interim period projections of Publishing Segment operating cash flow (approximately $116.7 million of the $163 million difference in consolidated EBITDA) explains the majority of the overall difference in present value between the DCF indications of terminal period value informed by Tribune's projections and those informed by VRC's projections.  Moreover, the difference in projected final year Publishing Segment EBITDA explains approximately $625.1 million of the $873.4 million difference (71.6%) between the two terminal period valuations at the mid-point and approximately 50% of the overall $1.240 billion difference.

---

not specifically addressed in materials reviewed to date is the Publishing Segment's "Other" unit, that includes disparate business units like contract delivery and printing, Tribune Media and Tribune's direct mail business, among others.  *See id.*

[2307] *Id.* at VRC0034756-85.

[2308] Moreover, VRC actually upwardly revised at least one Tribune growth rate projection, apparently because it believed management's projection to be too conservative. VRC projected a negative growth rate of 1.3% for 2009 national advertising revenue. *Id.* at VRC0034777.  By contrast, Tribune management's projected growth rate was negative 2.4%.

It also appears that the different assumptions applied to the interactive business by Tribune management and VRC accounts for a substantial portion of the difference in resulting enterprise values.  To generally gauge the impact that management's and VRC's differing treatment of the interactive business had on their respective valuations,[2309] the Examiner applied a 40% OCF margin to the difference in revenues of approximately $191.9 million projected by Tribune and VRC for the interactive business in 2012:

| INTERACTIVE ASSUMPTION COMPARISON ($mm) | | | | | | |
|---|---|---|---|---|---|---|
| Revenue Assumptions - Base Case | FY 2007P | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
| Tribune October 28, 2007 Analysis | $ 262.0 | $ 318.0 | $ 406.3 | $ 507.9 | $ 603.8 | $ 712.5 |
| *Growth Rate* | 15.9% | 21.4% | 27.8% | 25.0% | 18.9% | 18.0% |
| VRC October 29, 2007 Analysis | $ 262.0 | $ 308.9 | $ 358.0 | $ 407.7 | $ 460.7 | $ 520.6 |
| *Growth Rate* | 15.9% | 17.9% | 15.9% | 13.9% | 13.0% | 13.0% |
| VRC December 20, 2007 Analysis | $ 262.0 | $ 318.0 | $ 406.3 | $ 507.9 | $ 603.8 | $ 712.5 |
| *Growth Rate* | 15.9% | 21.4% | 27.8% | 25.0% | 18.9% | 18.0% |

From this comparison, the significance of the interactive business as an element of the Publishing Segment's value becomes apparent.  The interactive business' OCF contribution of $76.8 million explains approximately 75% of the total $102.5 million difference between the two projection models in 2012.  This difference is demonstrated in the chart below:

---

[2309] Unfortunately, because VRC stopped projecting revenues and margins for the specific units of the Publishing Segments at 2012, and forecasted aggregate Publishing Segment revenue and margin in 2013 based on a "blended" 2012 revenue growth rate and observed 2012 EBITDA margin, calculating the specific impact that the interactive business had on the terminal value is extremely difficult.  Neither management's projections nor the DCF models used by VRC contain sufficient detail within the computations to establish the interactive business' EBITDA margin.  However, based on profitability projections contained in a summary of projected Tribune's interactive business operating performance, the interactive business was forecast to contribute to operating cash flow at a substantial 40% OCF margin. Ex. 956 (Tribune Interactive 2006-2012 Projections).

| INTERACTIVE V. PUBLISHING EBITDA CONTRIBUTION ($ mm) | | | |
|---|---|---|---|
| | | Interactive | Publishing |
| | | *FY2012E* | *FY2012E* |
| **Revenues** | | | |
| Tribune October 28, 2007 Analysis (1) | | $ 712.5 | $ 4,019.3 |
| VRC October 29, 2007 Analysis (2) | | $ 520.6 | $ 3,668.9 |
| Difference | | **$ 191.9** | **$ 350.4** |
| | | | |
| **EBITDA** | | | |
| Tribune October 28, 2007 Analysis (1), (3) | @ 40% | $ 285.0 | $ 906.3 |
| VRC October 29, 2007 Analysis (2), (3) | @ 40% | $ 208.2 | $ 803.8 |
| Difference | | **$ 76.8** | **$ 102.5**     74.9% |

(1) Ex. 1004 at VRC0034787 (Mednik E-Mail, dated October 31, 2007).
(2) Ex. 1004 at VRC0034798 (Mednik E-Mail, dated October 31, 2007).
(3) EBITDA for Interactive under both Tribune and VRC analyses has been assumed to be a 40% EBITDA Margin. EBITDA Figures presented under Publishing for both Tribune and VRC are as seen in Ex. 1004 at VRC0034787 and VRC0034798 (Mednik E-Mail, dated October 31, 2007).

The differences between Tribune management's and VRC's forecasts of projected annual revenue for the interactive unit are substantial.  Included in VRC's October 29, 2007 memoranda is a write-up of "Interactive Assumptions" apparently authored by VRC's Mose Rucker.  In that document, Mr. Rucker makes a series of observations in arriving at his downward adjustment of the growth rates that management had applied to projected interactive revenue to forecast performance of the interactive unit over the period 2008—2012.[2310]  Negative factors considered by Mr. Rucker included the competitiveness of the interactive space, Oppenheimer's and Credit Suisse's estimated growth for the interactive business generally, and the specific decline in interactive growth experienced by Tribune in 2007.[2311]

---

[2310] Ex. 1004 at VRC0034784-85 (Mednik E-Mail, dated October 31, 2007).

[2311] *Id.* at VRC0034784.

On the other hand, Mr. Rucker acknowledged that the amount of Tribune's planned investment was a mitigating factor as was management's positive view of its new Metro Mix offering.[2312]  In the end, apparently based on the fact that Tribune management's projected growth rates greatly exceeded "industry anticipated growth rates," among other factors, Mr. Rucker downwardly revised management's projections.[2313]

The VRC October 29, 2007 memoranda also contain, among other things, several memoranda from Mr. Rucker memorializing observations and analysis of revenue forecasted for all units of Tribune's Publishing Segment with the exception, as mentioned earlier, of the "Other" category of the Publishing Segment's businesses.  Revenue projections for Tribune print advertising segments, "National," "Retail," and "Classified" are each addressed in separate memoranda, as are the "Circulation" and interactive business segments.[2314]  Each memorandum includes observations made by management, VRC summaries of analyst research, and the results of VRC's own analysis of Tribune's historical performance.[2315]  Each memorandum also contains VRC's conclusions as to adjustments to revenue growth rates used by Tribune's management to project base case, downside, and "most stringent" case revenue performance for the Publishing Segment.[2316]

The following tables show the disparities (and similarities) between Tribune management's revenue projections and VRC's adjusted forecasts for the Publishing Segment. The tables also provide the projected performance as contained in VRC's December 20, 2007 model:

---

[2312]  *Id.* at VRC0034785.

[2313]  *Id.*

[2314]  *Id.* at VRC0034772-85.

[2315]  *Id.*

[2316]  *Id.*

## NATIONAL PUBLISHING ASSUMPTION COMPARISON ($mm)

| Revenue Assumptions - Base Case | FY 2007P | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
|---|---|---|---|---|---|---|
| Tribune October 28, 2007 Analysis | $ 661.7 | $ 651.6 | $ 636.1 | $ 620.1 | $ 611.1 | $ 598.7 |
| *Growth Rate* | -5.0% | -1.5% | -2.4% | -2.5% | -1.4% | -2.0% |
| VRC October 29, 2007 Analysis | $ 661.7 | $ 648.4 | $ 639.7 | $ 623.6 | $ 614.6 | $ 602.1 |
| *Growth Rate* | -5.0% | -2.0% | -1.3% | -2.5% | -1.4% | -2.0% |
| VRC December 20, 2007 Analysis | $ 661.7 | $ 651.6 | $ 636.1 | $ 620.1 | $ 611.1 | $ 598.7 |
| *Growth Rate* | -5.0% | -1.5% | -2.4% | -2.5% | -1.4% | -2.0% |

## RETAIL PUBLISHING ASSUMPTION COMPARISON ($mm)

| Revenue Assumptions - Base Case | FY 2007P | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
|---|---|---|---|---|---|---|
| Tribune October 28, 2007 Analysis | $ 1,231.0 | $ 1,231.5 | $ 1,237.2 | $ 1,242.5 | $ 1,255.5 | $ 1,267.4 |
| *Growth Rate* | -3.9% | 0.0% | 0.5% | 0.4% | 1.0% | 0.9% |
| VRC October 29, 2007 Analysis | $ 1,231.0 | $ 1,214.4 | $ 1,202.3 | $ 1,199.3 | $ 1,196.3 | $ 1,193.3 |
| *Growth Rate* | -3.9% | -1.4% | -1.0% | -0.2% | -0.3% | -0.2% |
| VRC December 20, 2007 Analysis | $ 1,231.0 | $ 1,231.5 | $ 1,237.2 | $ 1,242.5 | $ 1,255.5 | $ 1,267.4 |
| *Growth Rate* | -3.9% | 0.0% | 0.5% | 0.4% | 1.0% | 0.9% |

## CLASSIFIED PUBLISHING ASSUMPTION COMPARISON ($mm)

| Revenue Assumptions - Base Case | FY 2007P | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
|---|---|---|---|---|---|---|
| Tribune October 28, 2007 Analysis | $ 739.3 | $ 650.5 | $ 637.2 | $ 625.1 | $ 604.5 | $ 579.8 |
| *Growth Rate* | -21.2% | -12.0% | -2.0% | -1.9% | -3.3% | -4.1% |
| VRC October 29, 2007 Analysis | $ 739.3 | $ 621.0 | $ 591.5 | $ 575.2 | $ 559.4 | $ 544.0 |
| *Growth Rate* | -21.2% | -16.0% | -4.7% | -2.8% | -2.7% | -2.8% |
| VRC December 20, 2007 Analysis | $ 739.3 | $ 650.5 | $ 637.2 | $ 625.1 | $ 604.5 | $ 579.8 |
| *Growth Rate* | -21.2% | -12.0% | -2.0% | -1.9% | -3.3% | -4.1% |

## CIRCULATION PUBLISHING ASSUMPTION COMPARISON ($mm)

| Revenue Assumptions - Base Case | FY 2007P | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
|---|---|---|---|---|---|---|
| Tribune October 28, 2007 Analysis | $ 528.1 | $ 511.1 | $ 495.4 | $ 479.9 | $ 464.6 | $ 449.8 |
| *Growth Rate* | -5.2% | -3.2% | -3.1% | -3.1% | -3.2% | -3.2% |
| VRC October 29, 2007 Analysis | $ 528.1 | $ 509.1 | $ 492.8 | $ 477.1 | $ 461.8 | $ 447.1 |
| *Growth Rate* | -5.2% | -3.6% | -3.2% | -3.2% | -3.2% | -3.2% |
| VRC December 20, 2007 Analysis | $ 528.1 | $ 511.1 | $ 495.4 | $ 479.9 | $ 464.6 | $ 449.8 |
| *Growth Rate* | -5.2% | -3.2% | -3.1% | -3.1% | -3.2% | -3.2% |

| OTHER PUBLISHING ASSUMPTION COMPARISON ($mm) | | | | | | |
|---|---|---|---|---|---|---|
| Revenue Assumptions - Base Case | FY 2007P | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
| Tribune October 28, 2007 Analysis | $ 270.6 | $ 317.1 | $ 339.7 | $ 364.7 | $ 388.1 | $ 411.2 |
| *Growth Rate* | 6.8% | 17.2% | 7.1% | 7.3% | 6.4% | 6.0% |
| VRC October 29, 2007 Analysis | $ 270.6 | $ 297.6 | $ 312.5 | $ 328.1 | $ 344.5 | $ 361.8 |
| *Growth Rate* | 6.8% | 10.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| VRC December 20, 2007 Analysis | $ 270.6 | $ 317.1 | $ 339.7 | $ 364.7 | $ 388.1 | $ 411.2 |
| *Growth Rate* | 6.8% | 17.2% | 7.1% | 7.3% | 6.4% | 6.0% |

There are also several VRC memoranda authored by Leonid Mednik critiquing Tribune management's projections of revenue under "base," "downside," and "recession" cases for the Broadcasting Segment.[2317]  The difference between management's and VRC's projected revenues for the Broadcasting Segment is partially obscured by the differing projection approaches taken by each.  For purposes of its projection of Broadcasting Segment revenues for the interim periods 2009 through 2012, VRC used a "smoothed" estimate of growth based on an average annual growth rate to approximate the results otherwise obtained through application of a "stair step" form of projection.[2318]  In contrast, the stair step projection approach used by Tribune management arguably better and more accurately captures the timing of expected cyclicality of revenue performance due to the alternating two year impact of presidential and midterm election years which boost expected revenue as a result of extra advertising spending associated with political campaigns.  Application of the smoothed projection rate, however, is not a fatal simplification of the stair step projection, since projections based on the uniform growth rate results in overestimation one year and underestimation the next, all other things being equal.

---

[2317] *Id.* at VRC0034756-64.

[2318] *Id.*

| BROADCASTING SEGMENT PROJECTIONS COMPARISON ($mm) | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Revenue Assumptions - Base Case** | **FY 2007P** | **FY 2008E** | **FY 2009E** | **FY 2010E** | **FY 2011E** | **FY 2012E** | **FY 2013E** |
| **Tribune October 28, 2007 Analysis** | $ 1,164.1 | $ 1,256.5 | $ 1,264.1 | $ 1,306.6 | $ 1,317.2 | $ 1,351.8 | $ 1,387.4 |
| *Growth Rate* | -4.7% | 7.9% | 0.6% | 3.4% | 0.8% | 2.6% | 2.6% |
| | | | | | | | |
| **VRC October 29, 2007 Analysis** | $ 1,164.1 | $ 1,231.6 | $ 1,259.3 | $ 1,287.7 | $ 1,316.7 | $ 1,346.3 | $ 1,376.6 |
| *Growth Rate* | -4.7% | 5.8% | 2.2% | 2.3% | 2.3% | 2.2% | 2.3% |
| | | | | | | | |
| **Difference** | $ 0.0 | ($ 24.9) | ($ 4.8) | ($ 18.9) | ($ 0.5) | ($ 5.5) | ($ 10.8) |
| *Nominal Margin Percentage Difference* | 0.0% | -2.1% | 1.6% | -1.1% | 1.4% | -0.4% | -0.4% |
| *% Difference* | 0.0% | -2.0% | -0.4% | -1.4% | 0.0% | -0.4% | -0.8% |
| **Operating Cash Flow  - Base Case** | **FY 2007P** | **FY 2008E** | **FY 2009E** | **FY 2010E** | **FY 2011E** | **FY 2012E** | **FY 2013E** |
| **Tribune October 28, 2007 Analysis** | $ 383.7 | $ 448.5 | $ 463.9 | $ 479.3 | $ 465.0 | $ 483.8 | $ 496.5 |
| *OCF Margin* | 33.0% | 35.7% | 36.7% | 36.7% | 35.3% | 35.8% | 35.8% |
| | | | | | | | |
| **VRC October 29, 2007 Analysis** | $ 383.7 | $ 402.7 | $ 418.1 | $ 427.5 | $ 427.9 | $ 440.2 | $ 450.1 |
| *OCF Margin* | 33.0% | 32.7% | 33.2% | 33.2% | 32.5% | 32.7% | 32.7% |
| | | | | | | | |
| **Difference** | $ 0.0 | ($ 45.8) | ($ 45.8) | ($ 51.8) | ($ 37.1) | ($ 43.6) | ($ 46.4) |
| *Nominal Margin Percentage Difference* | 0.0% | -3.0% | -3.5% | -3.5% | -2.8% | -3.1% | -3.1% |
| *% Difference* | 0.0% | -10.2% | -9.9% | -10.8% | -8.0% | -9.0% | -9.3% |

In the case of the Broadcasting Segment, VRC's significant departure from Tribune's EBITDA projections principally results not from differences in the respective projections of revenue, but rather from VRC's adjustments to operating expenses based on divergent assumptions about expense margins and the rate of growth of Broadcasting Segment expenses. The difference in operating cash flow margin ranges between 300 and 350 basis points.  Such differences in OCF margin result in nominal OCF differences ranging between approximately 8.0% and 10.8% and result, for example, in a year-end 2013 difference in projected OCF of approximately $46.4 million.

Also among VRC's October 29, 2007 internal memoranda is a write-up of "Tribune Base Case—Broadcasting Expense Assumptions" authored by VRC's Shakespeare James.[2319]  In one of his memoranda, Mr. James explicitly acknowledged planned cost savings (and related Broadcasting Segment EBITDA margin) associated with the sale of the low-margin Chicago Cubs and Tribune entertainment units as well as management's planned effort to reduce costs by

---

[2319] *Id.* at VRC0034765-68.

$200 million during 2007 and 2008.[2320]  As with other assumptions made by Tribune management, however, Mr. James appears to have considered Tribune's claims of improved performance within the context of Tribune's historical performance and other pertinent factors and determined that Tribune's projected margin improvements were unreasonable.  Mr. James concluded:[2321]

> VRC has assumed a margin at the midpoint of the base case and the historical 10 year average to conservatively reflect achieving only part of the planned $200 million dollars in cost savings that the Company hopes to achieve in 2007 and 2008. VRC has derived an expense ration of 65.2% for 2008, 64.7% for 2009, 63.7% for 2010, 65.4% for 2011 and 65.1% for 2012.

Most notably, as is discussed elsewhere herein, the revisions that VRC made to Tribune's operating cash flow projections, as memorialized in its internal October 29, 2007 memoranda, appear to be one of only two times that VRC adjusted Tribune's projections.[2322]  The projections underlying VRC's models both before and after this date adhere to the amounts presented as Tribune's projections in every other iteration of VRC's models.

The above-discussed memoranda demonstrate that VRC performed detailed analyses of management's October 2007 projections and made multiple (principally) downward adjustments. Yet, in the end, VRC inexplicably ignored *all* of the conclusions it reached in these memoranda and proceeded to use the October 2007 projections *without change* in its Step Two solvency opinion.[2323]  The critiques contained in the memoranda are difficult to reconcile with VRC's

---

[2320]  *Id.* at VRC0034765.

[2321]  *Id.* at VRC0034768.

[2322]  The other time was in connection with VRC's determination of an enterprise value in connection with its December 20, 2007 opinion in which VRC work papers reflect that VRC considered alternative revenue and profitability expectations.  Ex. 913 at VRC0019373-74 (VRC Draft Model, dated December 20, 2007). However, as with the October 29, 2007 revisions that VRC considered, VRC ignored these numbers as well.

[2323]  The Examiner did not have the opportunity to evaluate these memoranda before his interview with Mr. Rucker and Mr. Browning or senior Tribune financial management and, accordingly, this is an area that may warrant further investigation.

ultimate conclusion that management's projections were reasonable and should not be adjusted.[2324]  The Examiner finds it troubling that VRC performed comprehensive analyses of management's projections (much of which the Examiner finds astute), reached substantial downward valuation conclusions based on that analysis, and yet proceeded to use the October 2007 projections without adjustment, purporting to rely on Tribune's representation letter concerning the reasonableness of the October 2007 projections.

As a result, because both VRC's Step Two valuation analysis (in part),[2325] and its cash flow tests (in full) were ultimately predicated on management's October 2007 projections containing the flaws discussed above (many of which were identified but ultimately ignored by

---

[2324]  When interviewed by the Examiner, Mr. Browning testified as follows:

> Q:  At any time throughout your work for Tribune Company and given what you have learned about Tribune to date, do you have reason to believe that Tribune's projections that were provided to VRC in connection with VRC's work in issuing both solvency opinions were unreasonable at the time?

> A:  I believe at the time that—and, frankly, I still believe this now, is that management was giving us what they believed were their forecasts what they believed could be achieved.  I don't believe there was any attempt -- at least in my opinion—and, you know, we are paid to look at management or look at companies that give us that to discern whether or not these things are right or not.  And discern if somebody is telling us a story or not.  And at the time, I believe that they thought those forecasts were achievable and I do believe that they thought they were conservative.  But—and so—and so no I think they were reasonable.

Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 330:5-331:7.

Earlier in the interview, Mr. Rucker echoed similar sentiments:

> Q:  What do you recall, if anything, about the discussions you had with Tribune management in relation to the change in revenue growth from .5 percent at Step 1 to 2.4 percent at Step 2?

> A:  The general -- my general recollection was because things were in a slight decline now or they were declining now, that management would anticipate that in the outer years, that as the economy recovered and things recovered, that there would be higher growth rates.

> Q:  And did VRC believe that that was a reasonable assumption?

> A:  We concluded that it was reasonable.

*Id.* at 162:3-21.

[2325]  Although VRC relied on management's projections, it also developed its own cohort company multiples to which VRC then applied Tribune metrics (*e.g.,* EBITDA) in calculating operating asset values.

543

VRC), the Examiner concludes that VRC's valuation conclusions were improperly upwardly biased.[2326]

### (3)    VRC's Step Two Solvency Analysis Contained Several Other Significant Errors.

In addition to the preceding problems, VRC's Step Two solvency opinion suffers from numerous other problems.  In particular, the Examiner finds that:

- VRC used discount rates in its DCF analysis that did not properly reflect the risk of achieving forecasted future cash flows, particularly regarding assumptions for growth in Tribune's interactive business.[2327]

---

[2326] To compound matters, whereas VRC used years 2007 through 2012 from the February 2007 projections to determine Tribune's interim period value for its Step One solvency opinion (after which VRC added a terminal value based on the application of an exit multiple), VRC used year 2008 through 2017 projections (ten years) for purposes of determining Tribune's interim period value in its Step Two solvency opinion.  *See* Ex. 721 (Tribune Company Model, dated November 21, 2007).  The Examiner finds that this change in methodology was unreasonable because Tribune's growth projections during this ten-year time horizon were inconsistent with the reasonable expectations at the time.  By incorporating an additional five years of projected operating performance (for the period from 2013 through 2017) into its DCF valuation model, VRC adopted a consolidated Tribune growth rate of approximately 2.41% for five years, at which point it estimated a terminal value for Tribune, using perpetuity growth rates ranging from 0.38% to 2.13%.  As noted, according to VRC's December 20, 2007 Step Two solvency opinion, the projected cash flows for years 2013 through 2017 were extrapolated from the five-year projection (2008 through 2012) provided to VRC by Tribune management (and referred to by VRC as the "Base Case Forecast") by applying the "revenue and operating cash flow growth rates for the fifth year of the Base Case Forecast and underlying assumptions as used in developing the Base Case Forecast (the 'Management Five-Year Extrapolation')."  *See* Ex. 728 at TRB0294013 (VRC Step Two Solvency Opinion, dated December 20, 2007).  Had VRC simply calculated a terminal value after the first five years of projections and used the same implied mid-point perpetuity growth rate as it actually did in its December valuation, the value of Tribune based on a DCF approach would have been approximately $612.5 million less than the $10.210 billion it actually calculated (based on its mid-point terminal value estimate), as described previously.

[2327] The Examiner notes that VRC applied the same range of discount rates in performing its December 2007 evaluation as used in its May 2007 evaluations, despite the recognition that Tribune had performed unfavorably to plan for virtually every month in 2007, except September.  *See* Ex. 271 at VRC0051430 (Mednik E-Mail, dated May 4, 2007); Ex. 240 (Brown Book for Period 1, 2007); Ex. 241 (Brown Book for Period 2, 2007); Ex. 915 (Brown Book for Period 3, 2007); Ex. 78 (Brown Book for Period 4, 2007); Ex. 635 (Brown Book for Period 5, 2007); Ex. 636 (Brown Book for Period 6, 2007); Ex. 637 (Brown Book for Period 7, 2007); Ex. 638 (Brown Book for Period 8, 2007); Ex. 639 (Brown Book for Period 9, 2007); Ex. 640 (Brown Book for Period 10, 2007); Ex. 641 (Brown Book for Period 11, 2007); Ex. 642 (Brown Book for Period 12, 2007).  Based on an evaluation of historical and projected Tribune interactive revenue and operational performance, and as confirmed by Timothy Landon and Harry Amsden in their respective interviews with the Examiner, Tribune's interactive business was a higher growth, higher risk business than any of its counterpart businesses in the Publishing Segment and the Broadcasting Segment.  Examiner's Interview of Timothy Landon, June 22, 2010; Examiner's Interview of Harry Amsden, July 2, 2010.  Mr. Amsden indicated that the projected cash flow performance of the interactive business was informed by expectations regarding product development and

•      VRC improperly gave equal weighting to values derived using a

multiples-based approach and a DCF approach, because the DCF derived value is based on a

specific forecast of Tribune's cash flow generating characteristics and attributes (including, for

example, significant geographic concentration on Florida and California), and cohort companies

identified by VRC as comparable to Tribune can be differentiated from Tribune both

qualitatively and quantitatively.[2328]

---

acquisitions that had not, at the time of the projections, been undertaken or completed.  Examiner's Interview of Harry Amsden, July 2, 2010.  Mr. Landon indicated that an appropriate discount rate to apply to such projected cash flows would be "double digit."  Examiner's Interview of Timothy Landon, June 22, 2010.  Mr. Amsden also spoke of the projections related to internal development and acquisitions as "speculative."  Examiner's Interview of Harry Amsden, July 2, 2010.  Accordingly, the Examiner finds that the cash flow projections related to Tribune's interactive business require application of a discount rate considerably higher than the rate otherwise applicable to the non-Interactive portion of the legacy Publishing Segment and Tribune's Broadcasting Segment.

In developing its equity cost for purposes of determining an appropriate discount rate for its DCF, VRC observed capital structure information for selected Tribune cohorts.  In an effort to assess the extent to which the cohorts' betas might reflect risk associated with internet-based operations similar in nature to Tribune's interactive business, the Examiner reviewed available information for each company comprising the group VRC selected.  The group was comprised of E.W. Scripps Co., McClatchy Co. Holding, The New York Times Co., Belo Corp., and Media General, Inc.  Of the three companies for which interactive revenues could be ascertained, only E.W. Scripps Co. reported interactive revenues at a level commensurate with Tribune (E.W. Scripps Co. $271 million v. Tribune $265 million).  The other two companies, McClatchy Co. Holding and Media General Inc., reported modest revenues from interactive activity of approximately $47 million and $21 million respectively, (representing 2.8% and 2.2% of their total revenues, respectively).  The New York Times Co. appears to have considerable interactive business exposure but the revenues associated therewith were not ascertainable for 2006.  In its SEC filings, Belo Corp. indicates an interactive component to its business, but revenues associated therewith were likewise not ascertainable.

Of note is the fact that E.W. Scripps Co. and The New York Times Co., two cohorts apparently with substantial exposure to interactive, exhibited among the lowest betas observed by VRC (E.W. Scripps Co.—Raw:  .51 and Adjusted:  .70; New York Times Co.—Raw:  .81 and Adjusted:  .89).  Ex. 742 at VRC0063430 (VRC Preliminary Solvency Analysis, dated November 30, 2007).  It would appear unlikely therefore that the risk associated with the interactive businesses within these companies was driving their risk profiles in any significant manner.  This may be a result of the relative maturity of the interactive components of these companies, or differing expectations regarding growth and profitability within their respective businesses.

It is important to recall that the projections developed for Tribune's interactive business, although premised on the existing business, also based a substantial portion (approximately 40% by 2012) of projected future operating cash flows on the realization of then-nascent, potential start-up projects and unidentified acquisitions.  Ex. 956 at VRC0026119; Examiner's Interview of Harry Amsden, July 16, 2010.  In this way, Tribune's interactive business is distinguishable.

[2328]   For example, many "comparables" perform better than Tribune across important financial metrics such as growth rates and profitability margins or are qualitatively distinguishable on the basis of service and product offerings.

Based on the weighting used by VRC in a version of their valuation summary that was developed for and included in a May 9, 2007 *draft* presentation, the weighting of the approaches was as follows:

| VALUATION METHOD |
|---|
| Comparable Companies (25%) |
| Comparable Transactions (10%) |
| Discounted Cash Flow (40%) |
| Sum of Business Segments (25%) |

Ex. 1117 at VRC 0038534 (Draft of VRC Solvency Opinion Analysis, dated May 9, 2007).

When these "preliminary" weightings are applied to the valuation indications generated for VRC's December 20, 2007 solvency opinion, the average operating enterprise value is computed as follows:

| VRC SUMMARY DECEMBER 20, 2007 (at original weighting) | | | |
|---|---|---|---|
| | Valuation Summary | | |
| **Valuation Method** | **Low** | **Mid** | **High** |
| Comparable Companies (25%) | $ 9,248.1 | $ 9,865.3 | $ 10,482.5 |
| Comparable Transactions (10%) | $ 10,782.0 | $ 11,081.5 | $ 11,381.0 |
| Discounted Cash Flow (40%) | $ 9,525.6 | $ 10,234.4 | $ 10,943.2 |
| Sum of Business Segments (25%) | $ 9,316.8 | $ 9,909.7 | $ 10,502.5 |
| | | | |
| **Average Operating Enterprise Value** | **$ 9,529.7** | **$ 10,145.7** | **$ 10,761.6** |
| | | | |
| **VRC December 20 Value (Based on Equal Weighting)** | **$ 9,718.1** | **$ 10,272.7** | **$ 10,827.3** |

A comparison of the December 2007 average operating enterprise values derived under the original and actual December 2007 weightings indicates differences under each of the ranged categories, from low to high. Although the differences in average operating enterprise value are not large, the significance of the differences, when considered in the context of concluded *equity* value or solvency, become more apparent. *See* Ex. 917 (VRC Solvency Model):

| CHANGE IN CONCLUDED RANGE USING EQUAL v. ORIGINAL WEIGHTING | | | |
|---|---|---|---|
| | Valuation Summary | | |
| **Valuation Method** | **Low** | **Mid** | **High** |
| Average Operating Enterprise Value (Revised) | $ 9,718.1 | $ 10,272.7 | $ 10,827.3 |
| Average Operating Enterprise Value (Original) | $ 9,529.7 | $ 10,145.7 | $ 10,761.6 |
| **Difference Due to Changed Weighting** | **$ 188.4** | **$ 127.0** | **$ 65.7** |
| Concluded Equity Value (Original) | $ 743.2 | $ 1,650.2 | $ 2,557.1 |
| **Concluded Equity Value (Revised)** | **$ 931.6** | **$ 1,777.2** | **$ 2,622.8** |
| | | | |
| **% Increase in Concluded Equity Range** | **25.4%** | **7.7%** | **2.6%** |

When asked by the Examiner whether for purposes of solvency opinions he equally weighted or weighted differentially the value indications from his valuation methodologies, Mr. Browning indicated that he had "seen some that are weighted and some that are not. . . ."  Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 78:7-78:10.  But when asked whether one approach was more typical than the other, Mr. Browning answered that "it is more typical to average them, to look at them equally."  Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 78:17-78:19.  When asked the same question, Mr. Rucker said, "I don't think I've ever done a solvency opinion . . . where you haven't looked at all evaluation methodologies equally to determine a range of values."  Examiner's Sworn Interview of Mose

•      VRC appears to have failed to reasonably calculate comparable company

trading multiples by adjusting the comparable companies' total asset value, when appropriate, to

remove the fair market value of each comparable company's equity investments from its

---

Rucker and Bryan Browning, June 30, 2010, at 78:22-79:3.  The authors of a leading treatise on business valuation note:

> The final value opinion regarding the subject business enterprise or business interest should be derived from the analyst's reasoning and judgment of all the factors considered and from the impartial weighting of all the market-derived valuation evidence.

Shannon P. Pratt, Robert F. Reilly, and Robert P. Schweihs, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES at 444 (4th ed. 2000).

When asked during his December 4, 2009 Rule 2004 examination about the circumstances in which one valuation method might be weighed more heavily than others, Mr. Browning testified, "[G]enerally speaking, if you have more confidence in one approach than the other, you may weight it heavier." Ex. 262 at 70:14-17 (Rule 2004 Examination of Bryan Browning, December 4, 2009).  Later in his examination, Mr. Browning recalled the impetus for the change in weightings to the arithmetic averaging of results from the four valuation methods.  Speaking about a discussion with VRC's "opinion committee about the decision to weight the results equally," Mr. Browning testified:

> Q:   What do you remember about the discussion?
>
> A:    That this isn't an appraisal from the standpoint of where you—you weight and indication and that's the point indication.  It's really a range of values that you are looking at, so it's better to look at that range without putting any kind of constraints on or—if you will.

*Id.* at 100:10-18.

When Mr. Rucker was asked at his December 3, 2009 Rule 2004 examination why he thought it would be inappropriate to overweight the discounted cash flow indication of value in the case of Tribune's solvency, he responded:

> The way we have traditionally done our solvency opinions in the past and the way we do it now, we look at each indication of value and we treat each indication of value equally.  And I would say in general the industry as a whole looks at each indication of value equally.

Ex. 264 at 77:19-78:2 (Rule 2004 Examination of Mose Rucker, December 3, 2009).

With respect to "mechanical" weightings or averaging weightings applied to value indications, Dr. Pratt and his colleagues observe:

> Occasionally, an arithmetic average to arrive at a final value estimate is appropriate. Using the arithmetic average implies that *all of the valuation methods have equal validity and equal weight.* While this may occur in certain instances, this is usually not the case. When it is the case, it should be based on a conscience decision on the part of the analyst – and not on a naïve averaging of all value indications."

Shannon P. Pratt, Robert F. Reilly, and Robert P. Schweihs, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES at 444 (4th ed. 2000) (emphasis added).

observed total enterprise value before computing the multiple of earnings for the comparable

company.[2329]

> • VRC used an exit multiple for purposes of calculating a terminal value in

its DCF analysis that reflected an excessive implied terminal growth rate.[2330]

---

[2329] VRC apparently attempted to address this issue by reducing the observed total enterprise value of the cohorts by the book value of the cohorts' equity investments which would only partially mitigate the potential overvaluation problem.  As a consequence of using the potentially inflated total enterprise values when calculating the cohorts' multiples, the multiples were inflated.  When the inflated cohort multiples were applied to Tribune's performance metrics, the result was a valuation of Tribune which (impliedly and inappropriately) likely included significant value ostensibly related to Tribune's equity investments.  This resulted in a significant potential double counting of value when VRC added the separately determined value of Tribune's equity investments to the value determined for its operating cash flows.

The potential impact of the overstatement of calculated total enterprise value (TEV) on the multiple derived therefrom can be illustrated by calculating a multiple of earnings for Tribune in the same way VRC would have done had Tribune been one of the companies it included as a cohort for purposes of its market method valuation analysis.  Observed Tribune equity value of approximately $7.35 billion at December 31, 2006 (*See* Ex. 14 (Tribune 2006 Form 10-K)) is added to Tribune's net debt of $4.83 billion to estimate total enterprise value of $12.18 billion at December 31, 2006.  The EBITDA earnings multiple (for example) calculated based on Tribune's year end 2006 total enterprise value and its latest twelve months EBITDA ($1.28 billion) is 9.52 (12.18/1.28).  If Tribune held no equity investments, this multiple would capture Tribune's EBITDA multiple based on operating performance.  However, Tribune, like other cohorts, owns equity investments and other non-operating assets with substantial value.  In order to develop a multiple for estimating cohort enterprise value related to *operating* cash flow, exclusive of the value of Tribune's equity and other non-operating investments (which is consistent with the goal of the VRC analysis), the fair market value of Tribune's equity investments needs to be eliminated from Tribune's total enterprise value.  For purposes of its analysis, VRC estimated the fair market value of these investments based on the book carrying value of the investments.  Adjusting Tribune's TEV to eliminate the book value of Tribune's equity investments reduces TEV by approximately $500 million.  The resulting multiple of 9.13 (11.68/1.28) is lower than the multiple based on the unadjusted TEV.  This is essentially the multiple calculated by VRC and used to inform its market method valuations.  However, when the fair market value of Tribune's equity and other non-operating assets and investments ($3.4 billion, as quantified by VRC) is eliminated from TEV (for this example, the mid-point of VRC's range of estimated values for "equity investments and other assets" in its December 20, 2007 presentation is used), the resulting multiple of 6.86 ((12.18-3.4)/1.28) is considerably lower than the one developed by removing the book carrying value of these non-operating assets.

[2330] For example, as evidenced in its February 2007 projections, Tribune was, at that time, forecasting modest long-term growth.  In contrast, VRC adopted terminal period growth rates of up to more than 2% as part of the range of values it determined in its Step Two evaluation.

| IMPLIED GROWTH RATES per VRC at STEP TWO | | | |
|---|---|---|---|
| | Multiples | | |
| WACC | 7.25 | 7.75 | 8.25 |
| 7.50% | 0.38% | 0.81% | 1.19% |
| 8.00% | 0.84% | 1.28% | 1.66% |
| 8.50% | 1.31% | 1.75% | 2.13% |

• VRC failed to incorporate into its multiples-based valuations "lower-end" multiples observed from the cohort data on which it relied.[2331]

• Furthermore, in selecting a range of multiples to apply to Tribune LTM, CFY, and NFY EBITDA, VRC selected ranges of multiples that are inappropriately excessive compared to the cohort company multiples it analyzed. For example, in connection with the application of LTM multiples, VRC selected and applied a range of 8.25x to 8.75x. When this

---

[2331] The multiples informing VRC's value conclusions do not comport with either the average or median statistics presented in its own supporting analytical schedules. For example, VRC applied a range of pro forma LTM EBITDA multiples of 8.25x to 8.75x to Tribune LTM EBITDA despite the fact that the mean figure, per VRC, was 8.0x and the median figure was 7.7x. The table below shows the actual "Weighted Consolidated Multiples" computed by VRC in comparison to the mean and median values actually quantified by VRC. As noted in the tables below, VRC's failure to use the actual mean or median statistics flowing from its own analysis resulted in a potential over quantification of operating asset value ranging from approximately $356 million to $537 million:

| COMPARABLE COMPANIES<br>IMPACT OF VRC'S FAILURE TO USE ITS ACTUAL WEIGHTED MEAN OR MEDIAN | | | | | |
|---|---|---|---|---|---|
| COMPARABLE COMPANIES METHOD (per VRC) | | | | | |
| | Financial Metric | Multiples | | Enterprise Value | |
| Period | Adjusted EBITDA | Low | High | Low | High |
| PF LTM | $ 1,198.0 | 8.25 | 8.75 | $ 9,883.5 | $ 10,482.5 |
| 2007P | $ 1,191.4 | 8.00 | 8.50 | $ 9,531.6 | $ 10,127.3 |
| 2008P | $ 1,193.3 | 7.75 | 8.25 | $ 9,248.1 | $ 9,844.8 |
| Operating Enterprise Value Range | | | | $ 9,248.1 | $ 10,482.5 |
| COMPARABLE COMPANIES METHOD (adjusted by LECG) | | | | | |
| | Financial Metric | Multiples | | Enterprise Value | |
| Period | Adjusted EBITDA | Low (1) | High (2) | Low | High |
| PF LTM | $ 1,198.0 | 7.70 | 8.00 | $ 9,224.6 | $ 9,584.0 |
| 2007P | $ 1,191.4 | 8.10 | 8.50 | $ 9,650.3 | $ 10,126.9 |
| 2008P | $ 1,193.3 | 7.30 | 7.70 | $ 8,711.1 | $ 9,188.4 |
| Operating Enterprise Value Range | | | | $ 8,711.1 | $ 10,126.9 |
| | | | Difference | $ 537.0 | $ 355.6 |

Notes:
(1) Low figure represents the lower of the mean or median values as computed by VRC. Ex. 742 at VRC0063399 (VRC Draft Solvency Analysis, dated November 30, 2007).
(2) High figure represents the higher or the mean or median values as computed by VRC. Ex. 742 at VRC0063399 (VRC Draft Solvency Analysis, dated November 30, 2007).

VRC also inappropriately utilized a 2007 pro forma EBITDA which included the EBITDA contribution of the Chicago Cubs. *See* Ex. 721 at VRC 0012546 (Tribune Company Model, dated November 21, 2007), thus double counting the value of the Chicago Cubs in its analysis.

549

range is contrasted with the cohort multiples from which VRC's range was determined, the

multiples are demonstrably excessive.[2332]

•        VRC failed to apply any minority or marketability discounts in connection

with its determination of the value of Tribune's equity investments, despite the fact that, with

limited exceptions, Tribune held less than a 50% ownership interest in those investments, and

despite the fact that most of Tribune's investments were in non-public, closely-held businesses.

•        VRC used discount rates in conducting DCF analyses to determine the

value of certain equity investments that failed to incorporate any size premium into the cost of

---

[2332] As reflected in the table below, VRC identified cohort multiples for each of the Publishing Segment and the
Broadcasting Segment, as well as multiples ostensibly applicable to Tribune on a consolidated basis.  For 2007,
the Publishing Segment contributed almost 70% of total EBITDA.  Furthermore, in selecting publishing
comparables, VRC included The Washington Post metrics despite the fact that The Washington Post is
demonstrably not comparable to Tribune, as discussed below.  By selecting a range of multiples that exceeded
publishing cohort and consolidated company cohort multiples, VRC, in the Examiner's opinion, upwardly
biased its selected range of LTM EBITDA multiples.



capital determinations, despite a justifiable need to have done so given the smaller size of the firms in which Tribune was invested.

- VRC relied on market based valuation approaches that used companies materially different from Tribune or its investments.[2333]

- When conducting its cash flow stress test, VRC improperly "stressed" cash flows which contained the revenue and earnings performance of certain assets that Tribune had designated held for sale.[2334]  This mistake resulted in a projection of "stressed" Broadcasting Segment cash flows that actually are greater in amount than the cash flows without including the assets held for sale.[2335]

---

[2333] Several of the cohort firms identified and used by VRC for purposes of its trading multiples analysis appear insufficiently comparable to Tribune Co. to allow for meaningful valuation conclusions to be drawn.  For example, E.W. Scripps, a cohort relied on by VRC, generated over 42% of its 2006 revenues and nearly 75% of its 2006 income from continuing operations (before income taxes and minority interests) from its network investments, including HGTV, TV Food Network, DIY, Fine Living and GAC.  Ex. 918 (The E. W. Scripps Company 2006 Form 10-K).  In contrast, the vast majority (74%) of Tribune's 2006 revenues were associated with the Publishing Segment.  Ex. 14 (Tribune 2006 Form 10-K).  Removing E. W. Scripps from the VRC multiples analysis causes the resultant multiples to decline substantially.  Specifically, based on this single change, VRC's consolidated comparables mean LTM revenue multiple falls from 2.1 to 1.7 (a decline of approximately 19%) while the mean LTM EBITDA multiple falls from 8.1 to 7.6 (a decline of approximately 6%).  Similarly, The Washington Post, another VRC identified comparable firm, generated substantial revenue from its education business, Kaplan, Inc.  This segment of The Washington Post's business generated approximately 43% of the firm's 2006 operating revenues and 28% of the firm's 2006 operating income.  Ex. 919 (The Washington Post Company 2006 Form 10-K).  Further, this segment of The Washington Post's business grew 19% (as measured by year-over-year revenue growth from fiscal 2005 to fiscal 2006) representing the company's fastest growing segment in 2006.  *Id.*  In addition to its education segment, The Washington Post provided cable service (through its Cable One subsidiary) to over 690,000 subscribers, further differentiating its business from that of the Tribune Entities.  *Id.*

When Mr. Rucker was asked why The Washington Post was added to the group of comparable companies, he stated that he could not recall specifically why it was added.  Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 188:9-189:4.  Nor was Mr. Rucker able to recall how it was that he concluded that The Washington Post was in fact a comparable company.  Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 189:15-18.  If The Washington Post is removed from the multiples calculation performed by VRC, the mean LTM EBITDA publishing multiple falls from 6.7 (inclusive of The Washington Post) to 5.9 (exclusive of The Washington Post), representing a decline of approximately 12%.  *Notably, VRC did not identify The Washington Post as a cohort company in connection with its Step One solvency analysis.  See, e.g.,* Ex. 271 at VRC0051422 (Mednik E-Mail, dated May 4, 2007).  Indeed, Cristina Mohr stated to the Examiner that it was Citigroup's judgment that The Washington Post was not an appropriate comparable for purposes of valuing Tribune.  Examiner's Interview of Cristina Mohr, June 29, 2010.

[2334] Those assets included the Chicago Cubs, SCNI, and Hoy, New York.

[2335] The following tables show the impact of the mistake:

### (4)    Public Market Data Readily Available to VRC did not Support VRC's Solvency Conclusions at Step Two.

Finally, in evaluating the reasonableness of VRC's December 20, 2007 solvency opinion, the Examiner considered certain market information that should have been readily available to VRC and, in the Examiner's view, bears on reasonableness.  For example, during the period between the Step One Financing Closing Date and the Step Two Financing Closing Date, (a) the secondary market for the Step One Debt began reflecting modest discounts, (b) Tribune's publicly traded bonds began trading at steep discounts to par (particularly during the period immediately preceding the Step Two Closing),[2336] (c) the pricing on credit default securities increased significantly, and (d) Tribune Common Stock traded at values as low as $25.41 per

| VRC 12/20/2007 MODEL | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| Publishing Segment Revenue | $ 3,713 | $ 3,680 | $ 3,752 | $ 3,840 | $ 3,928 | $ 4,019 | $ 4,113 | $ 4,209 | $ 4,307 | $ 4,408 | $ 4,511 |
| Broadcasting Segment Revenue (incl Radio) | $ 1,383 | $ 1,257 | $ 1,264 | $ 1,307 | $ 1,317 | $ 1,352 | $ 1,387 | $ 1,424 | $ 1,461 | $ 1,500 | $ 1,539 |
| Total Revenue | $ 5,096 | $ 4,936 | $ 5,016 | $ 5,147 | $ 5,245 | $ 5,371 | $ 5,500 | $ 5,633 | $ 5,769 | $ 5,907 | $ 6,050 |
| | | | | | | | | | | | |
| Publishing Segment EBITDA | $ 818 | $ 786 | $ 814 | $ 844 | $ 875 | $ 906 | $ 927 | $ 949 | $ 971 | $ 994 | $ 1,017 |
| Broadcasting Segment EBITDA (incl Radio) | $ 415 | $ 448 | $ 464 | $ 479 | $ 465 | $ 484 | $ 497 | $ 510 | $ 523 | $ 537 | $ 551 |
| Corporate Expenses | ($ 42) | ($ 41) | ($ 41) | ($ 41) | ($ 41) | ($ 41) | ($ 41) | ($ 41) | ($ 41) | ($ 41) | ($ 41) |
| Total EBITDA | $ 1,191 | $ 1,193 | $ 1,237 | $ 1,282 | $ 1,299 | $ 1,349 | $ 1,383 | $ 1,417 | $ 1,453 | $ 1,489 | $ 1,527 |

| VRC 12/20/2007 SENSITIVITY CASE | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| Publishing Segment Revenue | $ 3,713 | $ 3,532 | $ 3,404 | $ 3,309 | $ 3,220 | $ 3,139 | $ 3,061 | $ 2,984 | $ 2,910 | $ 2,837 | $ 2,766 |
| Growth | | -4.9% | -3.6% | -2.8% | -2.7% | -2.5% | -2.5% | -2.5% | -2.5% | -2.5% | -2.5% |
| Broadcasting Segment Revenue (incl Radio) | $ 1,383 | $ 1,409 | $ 1,387 | $ 1,424 | $ 1,413 | $ 1,442 | $ 1,473 | $ 1,504 | $ 1,535 | $ 1,567 | $ 1,600 |
| Growth | | 1.9% | -1.6% | 2.7% | -0.8% | 2.1% | 2.1% | 2.1% | 2.1% | 2.1% | 2.1% |
| Total | $ 5,096 | $ 4,941 | $ 4,791 | $ 4,733 | $ 4,632 | $ 4,582 | $ 4,533 | $ 4,488 | $ 4,445 | $ 4,404 | $ 4,366 |
| | | | | | | | | | | | |
| Publishing Segment EBITDA | | $ 731 | $ 674 | $ 645 | $ 625 | $ 609 | $ 594 | $ 579 | $ 564 | $ 550 | $ 537 |
| Margin | | 20.7% | 19.8% | 19.5% | 19.4% | 19.4% | 19.4% | 19.4% | 19.4% | 19.4% | 19.4% |
| Broadcasting Segment EBITDA | | $ 459 | $ 462 | $ 484 | $ 442 | $ 453 | $ 462 | $ 472 | $ 482 | $ 492 | $ 502 |
| Margin | | 32.6% | 33.3% | 34.0% | 31.3% | 31.4% | 31.4% | 31.4% | 31.4% | 31.4% | 31.4% |
| Corporate Expenses | | -41.3 | -41.3 | -41.3 | -41.3 | -41.3 | -41.3 | -41.3 | -41.3 | -41.3 | -41.3 |
| Total | | $ 1,149 | $ 1,095 | $ 1,088 | $ 1,025 | $ 1,021 | $ 1,015 | $ 1,010 | $ 1,005 | $ 1,001 | $ 998 |

[2336]  Those bonds further declined in value after the closing of the Step Two Transactions, as additional information regarding Tribune's fourth quarter 2007 performance was disclosed in early 2008.  *See* Ex. 77 (Tribune Bond Pricing).  Although not publicly disclosed before the closing of Step Two, much of the financial performance data for the fourth quarter of 2007 was known to management prior to the closing of Step Two (*e.g.,* Brown Book data for periods 10 and 11 of 2007).

share.  These factors (none of which VRC appears to have considered explicitly) further undermine VRC's Step Two valuation conclusions.[2337]

As evidenced by a chart prepared by Morgan Stanley in connection with a November 21, 2007 presentation,[2338] Tribune's Tranche B Facility debt, despite having traded near par value in May 2007, declined to approximately 91% of par value as of mid-November 2007, reflecting a significant discount not only to the trading value of Tribune's Tranche X Facility debt (which as of November 2007 was trading at 97.5% of par value), but also a discount to the benchmark index selected by Morgan Stanley for comparative purposes.  Between the Step One Financing Closing Date and Step Two Financing Closing Date, Tribune's longer term debt traded at an almost 10% discount in the secondary market.

Similarly, as the chart below indicates, the price of Tribune's publicly traded debt eroded steadily between the Tribune Board's approval of the Leveraged ESOP Transactions on April 1, 2007 and the Step Two Financing Closing Date.  At the time of the closing of Step Two, Tribune's bonds were trading between approximately 50% and 75% of par value:

---

[2337] As explained elsewhere in the Report, significant market indicia did not support a conclusion that Tribune was solvent at Step Two.  *See* Report at § IV.B.5.d.(10).

[2338] Ex. 920 (Morgan Stanley Project Tower Discussion Materials, dated November 21, 2007).  These materials appear to correspond to materials presented to the Tribune Board at the November 21, 2007 Tribune Board meeting, based on a description of Morgan Stanley's presentation as contained in the meeting minutes.  *See* Ex. 702 (Tribune Board Meeting Minutes, dated November 21, 2007).



Moreover, and related to the market indicators above, the pricing of Tribune credit

default securities increased significantly during this period:[2339]

---

[2339] Ex. 921 (Tribune Company CDS Prices Chart).  The Examiner notes that VRC was, or should have been, aware of this fact in conducting its analysis.  *See, e.g.*, Ex. 922 (Edge E-Mail, dated July 22, 2007), referring to a Bloomberg article which observed:

> Tribune Co. has a 50-50 chance of missing interest payments on some of the $13 billion in debt it will have after real estate investor Sam Zell buys the company, trading in the company's credit-default swaps shows.

> Prices of the swaps, financial contracts used to speculate on a company's ability to repay debt, have jumped $331,000 since the first step in the sale was completed in May.  It costs $770,000 to protect $10 million of Tribune bonds for five years, according to CMA Datavision, indicating a more than 50 percent risk of default. . . .

> Tribune swaps prices imply investors consider the company the fourth-riskiest debt issuer among the almost 1,200 worldwide whose credit-default swaps were quoted this week by London-based CMA. Tribune is perceived as more likely to default on its bonds than Ford Motor Co., the Dearborn, Michigan-based automaker that reported a record $12.6 billion lost last year.  Ford credit-default swaps trade at $682,000, CMA prices show. . . .

> The company's sales are running behind even the most pessimistic scenario evaluated by its banker, New York-based Morgan Stanley.  Tribune would be worth as little as $14.21 a share if newspaper sales were to fall 3 percent a year and broadcasting cash flow declined 1 percent annually through 2011, Tribune said in the filing, citing a Morgan Stanley analysis.



And, when contrasted with other identified cohort company credit default pricing,

Tribune securities evidenced more significant pricing differentiation:[2340]

---

[2340] The consolidated Tribune credit default prices were calculated as the average of all credit default security prices on a given day across all of Tribune's bonds.  The credit default prices for Gannett, McClatchy, and LIN TV were also derived using this methodology.  Belo Corp., The New York Times, and Sinclair Broadcast Group only had data for one security, and as a result, only that security is illustrated in the graph.



Finally, between the closing of the Step One Transactions and the closing of the Step Two Transactions, Tribune Common Stock traded at times below $26 per share. Thus, the trading price of Tribune Common Stock could be construed to evidence insolvency, given that the Tribune Common Stock would be replaced with debt in an amount equivalent to $34 per share (and considering that the trading price of the Tribune Common Stock was likely upwardly biased due to the prospect of receiving $34 per share on the Step Two Financing Closing Date). This fact in isolation, however, does not conclusively demonstrate that Tribune would be insolvent on the consummation of the Merger.[2341] First, a price of $34 per share could reflect Tribune's value in the hands of a purchaser that could realize synergies that others could not. In such case, the differential between the $34 Tender Offer price and the observed trading price of a

---

[2341] *See* Report at § IV.B.5.d.(10).

share of Tribune Common Stock might represent a "control premium" associated with such synergies.[2342]  Second, a price of $34 per share could reflect a unique attribute of the buyer that adds value to the enterprise (and thereby permits the buyer to pay more than fair market value for the Tribune Entities' assets), such as the tax attributes of the proposed S-Corporation/ESOP structure that would only be available following consummation of the Merger.  This "added value" (the $8 per share premium Tender Offer price over the trading price) equates to approximately $935 million.[2343]  As discussed in the Report, however, the Examiner concludes that the value associated with these particular tax attributes cannot be included in a solvency determination under a fair market value standard because such attributes are unique to the particular buyer and transaction ownership structure in this case.[2344]  As a result, "synergistic" and "tax attribute" considerations would not refute the inference that the significant difference between the $26 per share trading price of Tribune Common Stock and the $34 per share Tender Offer price reflected insolvency at Step Two.

In sum, market-based information that was (or should have been) readily available to VRC contradicts VRC's Step Two opinion that Tribune was solvent as of December 20, 2007 when viewed from the perspective of the fair market value of the Tribune Entities' assets at that time.

---

[2342] Strategic purchasers often pay more for a company than financial buyers due to these synergies.  In this case, however, Tribune's auction process yielded bids from two competing buyers, neither of which could be considered a strategic buyer.  It would therefore be unlikely that the differential between the trading price of Tribune Common Stock and the Tender Offer price could be explained by the value associated with potential synergies.

[2343] The calculation assumes approximately 117 million shares of Tribune Common Stock were outstanding at such time.  Of note, this $935 million value is roughly equivalent to the $876 million S-Corporation/ESOP tax savings calculated by VRC in its December 18, 2007 solvency analysis (not taking into account other potential savings associated with the proposed S-Corporation/ESOP structure such as 401(k) savings).  Ex. 705 at TRB0414949 (Tribune Board Meeting Materials, dated December 18, 2007).

[2344] Such attributes do afford their owners value, unique to the particular owner, that is often referred to as "investment value."

g.        **The VRC Refinancing Representation Letter.**

Tribune's prospective ability to refinance in 2014 and 2015 approximately $8 billion of debt arising from the Leveraged ESOP Transactions was one of four "key assumptions" VRC listed in its December 18, 2007 presentation to the Tribune Board,[2345] and, as noted in the Report, was the subject of a representation letter delivered by Tribune's management and cited and relied on in VRC's Step Two solvency opinion.[2346]  The issue arose because of the large principal repayments Tribune was required to make on the Tranche B Facility and the Bridge Facility in 2014 and 2015.  Specifically, for the first six years following the Leveraged ESOP Transactions, Tribune was projected to have relatively manageable debt servicing obligations. Excluding repayment of the Tranche X Facility (to be accomplished in large part through the sale of the Chicago Cubs), Tribune's scheduled debt repayments were $110.7 million in 2008, $77.7 million in 2009, $527.6 million in 2010, $77.9 million in 2011, $78.8 million in 2012, and $160.8 million in 2013.[2347]  In 2014 and 2015, however, a large portion of the LBO Lender Debt was slated to come due, with a $6.325 billion repayment scheduled to be made on the Tranche B Facility in 2014 and a $1.695 billion repayment scheduled to be made on the Bridge Facility in 2015.[2348]  Neither Tribune's $750 million Revolving Credit Facility nor the cash Tribune was projected to have on hand and available for debt repayments in 2014 and 2015 was sufficient to make the scheduled debt repayments.[2349]  Nor, under the parameters of VRC's Step Two

---

[2345]  Ex. 738 at VRC0109242 (VRC Preliminary Solvency Analysis, dated December 18, 2007) ("Assumes that the Company can refinance guaranteed debt after the expiration of the credit agreements").

[2346]  Ex. 739 at 10 (Representation Letters, dated December 20, 2007); Ex. 728 at TRB0294013 (VRC Step Two Solvency Opinion, dated December 20, 2007).

[2347]  Ex. 740 at VRC0061018 (VRC Preliminary Solvency Analysis, dated December 3, 2007).

[2348]  *Id.*

[2349]  *Id.* at VRC0061017.  *See also* Ex. 628 at 47-48 (Tribune Form 10-Q, filed August 9, 2007) (cautioning that because Tribune "currently [has] substantial debt and other financial obligations [and expects] to incur significant additional debt in connection with the Leveraged ESOP Transactions," risk factors investors should consider include the ability of Tribune to refinance the LBO Lender Debt on or before maturity).

solvency analysis, were the proceeds of any additional asset sales (other than those incorporated in Tribune's downside projections) to be considered a source for satisfying debt in 2014 and 2015.[2350]

Tribune's ability to refinance its debt was more central to VRC's solvency analysis at Step Two than at Step One.  Although VRC assumed at Step One "that the Company will be able to refinance debt when they mature,"[2351] VRC's Step One solvency analysis did not project that Tribune would be unable to meet its maturing obligations with existing cash flow.[2352] Additionally, Tribune would be significantly more leveraged following Step Two than it was following Step One, and therefore would likely have more difficulty accessing the capital markets.[2353]  As Bryan Browning of VRC explained, Tribune's ability to refinance following its assumption of the Step Two Debt was essential "in order to continue to operate in a normal fashion."[2354]  It was against this backdrop that management and VRC approached the refinancing issue in November and December 2007.

---

[2350] See Ex. 728 at TRB0294013 (VRC Step Two Solvency Opinion, dated December 20, 2007) ("VRC . . . has assumed that the Company would be able to refinance . . . without the need for asset sales other than those incorporated into the Downside Case Forecast.").  As discussed more fully elsewhere in the Report, it was VRC's assumption of no additional asset sales that led one banker to consider VRC's analysis conservative.  See Report at § III.G.1.

[2351] Ex. 268 at TRB0149972 (VRC Step One Solvency Opinion, dated May 9, 2007).

[2352] Ex. 274 at TRB0149957 (VRC Solvency Opinion Analysis, dated May 9, 2007).

[2353] One JPM banker described this concern as follows, albeit with regard to bonds set to mature between 2008 and 2010: "[I]f we were to fund the second step commitments, one would then reasonably have to assume that the company would not have access to [the capital] markets to refinance these, except perhaps at extreme coupons, that would likely result in the company not be [sic] able to cover the interest.  Can we contact solvency firm to let them know they should not be assuming markets would be open to Trib to refi their maturities?"  Ex. 741 (Jacobson E-Mail, dated September 6, 2007).

[2354] Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 207:17-18.  See also id. at 207:21-208:22 (Mr. Rucker:  "[I]f you have debt outstanding, when it matures, you either have one or two options:  You either have to pay off the debt with existing cash proceeds, or you have to refinance it. . . . Based upon the projections that management gave us, . . . management anticipated that . . . it would have to be refinanced.").

### (1)    VRC's November 30, 2007 Cash Flow Analysis.

VRC's November 30, 2007 internal analysis revealed that although Tribune would have sufficient cash flow available for debt repayments in 2008 through 2013, scheduled repayments due in 2014 and 2015 would vastly exceed available cash—even under the more optimistic base case assumptions provided by management.[2355]  Specifically, under management's base case, only $605 million in cash would be available to cover more than $5 billion in debt repayments scheduled for 2014 and only $709 million in cash would be available to cover more than $2 billion in debt repayments scheduled for 2015.[2356]  The outlook under management's downside case showed that Tribune would have only $275 million in cash available for debt repayments in 2014 and only $307 million in cash available for debt repayments in 2015.[2357]

In its November 30, 2007 internal analysis, VRC addressed these significant cash shortfalls in 2014 and 2015 by noting that:  "Term Loan B and Bridge Note are assumed to be refinanced in 2014 and 2015, respectively."[2358]  The footnote supporting that assumption in the base case states that "VRC believes that this assumption is reasonable given that the Company was able to reduce [g]uaranteed debt to 4.25x in 2014 and 3.89x in 2015."[2359]  A similar footnote in the downside case reads: "VRC believes that this assumption is reasonable given that the Company was able to reduce guaranteed debt to 5.75x in 2014 and 5.68x in 2015 assuming the sale of the Company's interest in Career[B]uilder."[2360]  No mention is made in the November 30,

---

[2355]  Ex. 742 at VRC0063418 (VRC Preliminary Solvency Analysis, dated November 30, 2007).

[2356]  *Id.*

[2357]  *Id.* at VRC0063423.

[2358]  *Id.* at VRC0063418 and VRC0063423.

[2359]  *Id.* at VRC0063418.

[2360]  *Id.* at VRC0063423.

2007 VRC analysis of any representation from management or Tribune's financial advisors regarding refinancing.

### (2)    Events of December 1, 2007.

VRC discussed its refinancing assumption at an internal VRC opinion committee meeting on Saturday, December 1, 2007, just three days before a Tribune Board meeting at which VRC was scheduled to present its preliminary Step Two solvency analysis.[2361]  In the handwritten notes of Bryan Browning (who attended the opinion committee meeting), refinancing is the only topic mentioned by name:[2362]

> Met again to address outstanding issues with committee.
> Significant time was spent on the assumption of refinancing.  The committee asked for more data to look at and consider potential asset sales.

When asked about this opinion committee meeting during his interview with the Examiner, Mr. Browning testified that "typically it was three or four people that are involved in the committee other than those that are . . . completing the project."[2363]  Mr. Browning explained that "because of the size of the debt . . . [the opinion committee] wanted to make sure that we were satisfied that [refinancing was] a fair assumption."[2364]

Mose Rucker of VRC also was at the December 1, 2007 opinion committee meeting.[2365] After the meeting, Mr. Rucker telephoned Tribune Treasurer Chandler Bigelow.[2366]  Although neither Mr. Rucker nor Mr. Bigelow has a specific, independent recollection of their

---

[2361]  Ex. 743 (Handwritten Notes of Bryan Browning, dated December 1, 2007); Ex. 736 (Tribune Board Meeting Materials, dated December 4, 2007).

[2362]  Ex. 743 (Handwritten Notes of Bryan Browning, dated December 1, 2007).

[2363]  Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 226:4-10.

[2364]  *Id.* at 226:17-22.

[2365]  *Id.* at 227:16-19.

[2366]  Ex. 744 (Kenney E-Mail, dated December 2, 2007).

December 1, 2007 conversation,[2367] Mr. Bigelow sent an e-mail that evening to Donald

Grenesko, Tribune's Senior Vice President/Finance and Administration, copying Tribune

General Counsel Crane Kenney and Tribune Chief Executive Officer Dennis FitzSimons, which

reads in pertinent part:[2368]

> I just spoke to [Mr. Rucker].  VRC has three issues/concerns that
> we need to resolve prior to an internal VRC committee meeting
> scheduled for tomorrow at 1130 am Chicago time.
>
> VRC is concerned about refinancing risk with our new debt in
> 2014.  They want us to rep that it is reasonable to assume that we
> will be able to refinance the new debt in 2014 even in the
> downside.  They would like our rep to indicate that we have
> conferred with one of our financial advisors and that our advisor
> concurs with this assumption. . . .
>
> For the first point, I think we need Morgan Stanley.  But, to be
> clear, it is reasonable to assume we can refi in 2014. . . .
>
> I suggest we have a call tomorrow at 730 if possible.

During his interview with the Examiner, Mr. Rucker recalled asking Mr. Bigelow to

speak with Tribune's financial advisor and ask "the financial advisor to agree that it is reasonable

to assume that this debt could be refinanced."[2369]  Mr. Rucker does not believe he asked Mr.

Bigelow to determine whether the financial advisor "concurs" that the debt could be

refinanced.[2370]  Mr. Rucker explained that VRC sought to use this representation as one factor in

---

[2367] Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 180:1-181:20; Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 230:7-24.

[2368] Ex. 744 (Kenney E-Mail, dated December 2, 2007).

[2369] Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 237:7-18.

[2370] *Id.* at 237:7-23 ("Q.  Do you remember asking Chandler Bigelow or anybody else to get an indication that the financial advisor concurs with the refinancing assumption?  A.  Not those specific terms of concur.  I think that the way that I termed it or phrased it to Chandler Bigelow is we would want the financial advisor to agree that it is reasonable to assume that this debt could be refinanced.  I don't know about confers [sic]—I don't think I used the word 'confers' [sic].  I think more I would have used the term that it is reasonable to assume that it can be refinanced.").

VRC's ultimate determination that Tribune could refinance its debt and thereby maintain adequate cash flow:[2371]

> Q.    Mr. Rucker, how was VRC able to make this assumption [that Tribune could refinance its debts in the future]?
>
> A.    Well, there are two things . . . that we did in this process in determining whether or not it is reasonable to assume that management would be able to refinance the debt.  Number one, we looked at the debt levels in those outer years.  We also looked at the [covenants] and how much cushion was available on the [covenants] at that time.  One additional thing that we also did was we received a representation letter from management, that based upon management's assumptions and management's discussions with Morgan Stanley, if management would be able to refinance those debts when they matured, if they believed it was reasonable.

When asked why VRC "went beyond [a general management representation] in this case and asked that [management] also have discussions with Morgan Stanley," Mr. Browning explained that VRC requested that management confer with Morgan Stanley "[b]ecause [this] was a highly leveraged transaction, and we wanted to make sure that [the prospective ability to refinance] was a fair assumption.  So we took it very seriously.  It [was something that] the committee wanted to make sure . . . was looked at very closely."[2372]  Nonetheless, VRC apparently did not expect to receive written confirmation from Morgan Stanley that it believed Tribune could refinance its debt in the future:[2373]

---

[2371]  Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 208:23-209:20.  *See also id.*, at 216:10-14 (Mr. Browning: "[W]e insisted, as we always do, that the company provide us a rep that they believe they have the ability to refinance the debt when it becomes mature.").

[2372]  *Id.* at 216:15-217:7.

[2373]  *Id.* at 221:24-222:14.  *See also id.* at 242:13-243:5 ("Q.  [I]f it wasn't . . . an absolute requirement to get Morgan Stanley's involvement in some way, why did you ask for it?  A.  [W]e asked for it [as] a way of getting additional comfort to see if our assumptions . . . were reasonable.  So it was just a way of getting . . . additional comfort to ask for it.  Q.  But you knew you weren't likely to get that comfort, right?  A.  That doesn't mean you don't ask for it.").

> [K]nowing the way that the investment banks work with respect to
> solvency opinions and how they typically will not issue solvency
> opinions, I would say I would not be surprised if they would say
> we will not opine on that particular issue as far as giving a written
> opinion.  We might say that we think it can be refinanced, but we
> are not prepared to write a written opinion saying it can be
> refinanced, because that may be almost equivalent to a solvency
> opinion because we know they don't participate in that sector of the
> business.

### (3)    Tribune Management's December 2, 2007 Telephone Call with Morgan Stanley.

On the morning of Sunday, December 2, 2007, Mr. Bigelow sent an e-mail to Thomas Whayne and Charles Stewart of Morgan Stanley, asking, "Would you be available for a quick call this morning at 1015 NYC time?  Want to get you caught up with the VRC process and one question that they have asked about our ability to refinance in 2014."[2374]  Mr. Stewart circulated a dial-in number for a telephone call to Mr. Whayne, Mr. FitzSimons, Mr. Grenesko, and Mr. Bigelow of Tribune.[2375]  Mr. Whayne informed his boss, Paul Taubman, of the telephone call: "fyi—we have a call at 10:15 am this morning with Dennis, Don and Chandler to get an update on the VRC process.  No need for you to join, just wanted to let you know."[2376]

Mr. Whayne summarized the December 2, 2007 call in an e-mail to Mr. Taubman that afternoon:[2377]

> Charlie and I just finished a call with Dennis, Don and Chandler,
> who wanted to give us an update on the VRC process.  VRC is
> scheduled to present to the TRB board on Tuesday with regards to
> their solvency analysis, and are having their final internal
> committee meeting at noon today.  They called the company on

---

[2374] Ex. 745 at MS_97054 (Whayne E-Mail, dated December 2, 2007).

[2375] *Id.*

[2376] *Id.*

[2377] Ex. 746 (Whayne E-Mail, dated December 2, 2007).  The Friday call referred to in Mr. Whayne's e-mail may actually have taken place on Saturday, December 1, 2007, given that Mr. Browning's notes place the VRC opinion committee meeting on that date.  Ex. 743 (Handwritten Notes of Bryan Browning, dated December 1, 2007).

> Friday to discuss some committee pushback that they have
> received thus far.
>
> First, they requested a TRB management rep to the effect that it is
> reasonable to assume that the debt can be refinanced in 2014, and
> that the financial projections have been prepared by management
> in good faith.  VRC also asked management to discuss this issue
> with advisors.

After discussing an issue arising from the potential timing of EGI-TRB's exercise of the

Warrant[2378] and corroboration for a tax savings analysis,[2379] Mr. Whayne closed his e-mail with:

"As a result, all issues appear manageable with VRC."[2380]

During his sworn interview with the Examiner, Mr. Whayne's recollection of his

December 2, 2007 telephone call with Mr. FitzSimons, Mr. Grenesko, and Mr. Bigelow was:

(a) that he received "an update of what VRC . . . had requested," (b) "a fairly . . . open discussion

around . . . what Zell would do with exercising his option," (c) "having a discussion around the

fact that [the anticipated tax savings] was core to the way that rating agencies looked at

multiples," and (d) "being told that the management was being asked to make [the refinancing]

rep."[2381]  With regard to the refinancing representation, specifically, Mr. Whayne explained that

"on this call I just remember being told about the issue."[2382]  Although "there was discussion

around the [tax savings and Warrant exercise issues]," Mr. Whayne does not recall "much

discussion between ourselves and management regarding the refinancing rep, only that they were

---

[2378]  Ex. 746 (Whayne E-Mail, dated December 2, 2007) ("Second, someone on the VRC committee expressed nervousness that Zell could exercise his option early and force the company to pay his associated taxes, which would be economically irrational and that the board could prevent—so, it appears that this is a mere misunderstanding.").

[2379]  *Id.* ("Finally, VRC wants management to review their analysis of the PV of tax savings associated with being an S-corp, which they put at approximately $1 billion.  This is consistent with the company's analysis, and in fact, the company has this analysis included as part of their rating agency and bank presentations.").

[2380]  *Id.*

[2381]  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 62:17-63:20.

[2382]  *Id.* at 64:4-5.

being asked to do it."[2383]  Mr. Whayne interpreted his statement to Mr. Taubman that the issues

with VRC appeared "manageable" to mean that "management . . . will have a discussion with

[VRC] and educate them on the [Warrant] issue and . . . the tax saving issue,"[2384] *i.e.*, that

management would work with VRC to resolve these issues.[2385]

    The Examiner asked each of Mr. FitzSimons, Mr. Grenesko, and Mr. Bigelow for their

respective recollections of the December 2, 2007 telephone call with Mr. Whayne and Mr.

Stewart.  Mr. FitzSimons had no specific recollection of the telephone call.[2386]  Mr. Grenesko

remembered participating in such a telephone call "during the December 2nd and 3rd

timeframe," and recalled with respect to what Morgan Stanley said about Tribune's ability to

refinance:  "I thought they said that, yes, it would be reasonable to assume that the company

could refinance in 2014."[2387]  Although Mr. Bigelow did not tie his recollection to a specific

telephone call or date, when the Examiner questioned Mr. Bigelow about the statement "I think

---

[2383]  *Id.* at 64:6-16.  Mr. Whayne opined that the brevity of his reference to the refinancing representation in his
e-mail to Mr. Taubman indicated that the topic was not extensively discussed: "[T]his is an E-mail to Paul
Taubman who was and is my boss, and I tend to be fairly precise in what I wrote to Paul.  So there were three
issues that were laid out to us by management, and two, the last two . . . I remember a fairly active discussion
around those issues because obviously I shared with Paul that I had a point of view about those issues that I
shared with management that they ought to take that to VRC. . . ."  *Id.* at 65:2-16.

[2384]  *Id.* at 67:21-68:3.

[2385]  *Id.* at 68:8-10.

[2386]  *See* Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 91:15-92:19:

> Q:  Are you aware of any discussions [with Morgan Stanley] in or around December 2007 with
> respect to whether or not [Tribune] would have the ability to refinance its debt that it was
> assuming in this transaction in 2014?
>
> A:  In preparation for this examination, I was shown some e-mails and asked what my
> recollection was.  I was on so many conference calls during this whole process, during the
> auction process and beyond, I can't remember specifically, but seeing these e-mails, it made it
> clear that [Morgan Stanley was] asked about . . . refinancing in 2014. . . .
>
> Q:  And do you actually remember any of these events?
>
> A:  No, I wouldn't have remembered.  If somebody would have asked me that question without
> the e-mails, I would not have remembered.

[2387]  Examiner's Sworn Interview of Donald Grenesko, June 25, 2010, at 100:10-101:4.  Mr. Grenesko did not make
any notes of this conversation, nor did he prepare any confirmatory e-mail, letter, or memorandum, "because we
thought that they were in agreement."  *Id.* at 101:12-14, 102:15-19, and 103:3-5.

we need Morgan Stanley" in his December 1, 2007 e-mail, Mr. Bigelow appeared to be

describing the December 1, 2007 telephone call when he explained:[2388]

> Q. So what were you intending to use or rely upon from Morgan Stanley?
>
> A. I guess I was suggesting that Morgan Stanley be conferred with.
>
> Q. Did you do that?
>
> A. I—so I did ultimately speak to Morgan Stanley about that.
>
> Q. Who did you speak with?
>
> A. You know, my present recollection is that I spoke with Tom Whayne. If I had a document in front of me, we could probably talk about it if there is one, but I think it was Tom Whayne.
>
> Q. Well, before we start looking at more documents, tell me what you recall about a conversation with Tom Whayne.
>
> A. Again, my present recollection is that I spoke to Tom Whayne about this request.
>
> Q. And what—let me make sure that I'm understanding you. When you say "this request," what specific request are you talking about? What would you—
>
> A. Wanted to get—Tribune Company obviously wanted to get Morgan Stanley's view on the reasonableness that the company could refinance the new debt in 2014.
>
> Q. And you made that ask to Morgan Stanley?
>
> A. I think specifically what I did was spoke to them about that to see if they could provide me with some feedback about that request, some market color, some precedent, you know, comparables in the market, get their view.
>
> Q. Did you ask Morgan Stanley to give you a representation at that time that the company could refinance?
>
> A. I don't specifically recall. I may have.

---

[2388] Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 178:1-180:1.

567

Q.    Do you recall anything else about your conversation with Mr. Whayne, I think it was Mr. Whayne, at that time?

A.    My recollection is that I might have asked to see if they would give me a rep, and, you know, I think he said that he could not do that but that he could give me information based on their experience that would certainly lend support to saying it was reasonable that we could refinance our debt in 2014, and I believe that they did that.

Similarly, at a later point in his sworn interview with the Examiner, Mr. Bigelow characterized management's discussions with Morgan Stanley as having "left us with the impression that it would be reasonable to assume we could refinance."[2389]

### (4)    Tribune Management's December 2, 2007 Telephone Call with VRC.

Following the December 2, 2007 telephone call from Mr. FitzSimons, Mr. Grenesko, and Mr. Bigelow to Morgan Stanley, a subsequent telephone call was placed by Mr. Bigelow, Mr. Grenesko, and Mr. Kenney to Mr. Browning of VRC.[2390]  Mr. Browning made one set of notes during the telephone call,[2391] and then re-wrote those notes at a later point.[2392]  Mr. Browning's original notes appear below:[2393]

---

[2389]  *Id.* at 199:5-6.

[2390]  Ex. 747 (Original Handwritten Notes of Bryan Browning, dated December 2, 2007); Ex. 748 (Revised Handwritten Notes of Bryan Browning, dated December 2, 2007).

[2391]  Ex. 747 (Original Handwritten Notes of Bryan Browning, dated December 2, 2007).

[2392]  Ex. 748 (Revised Handwritten Notes of Bryan Browning, dated December 2, 2007).  *See* Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 255:4-256:4.

[2393]  Ex. 747 (Original Handwritten Notes of Bryan Browning, dated December 2, 2007).



Mr. Browning re-wrote his notes apparently shortly thereafter as follows:[2394]

> Discussions about the assumption that the Company can refinance the guaranteed debt in 2014 and 2015.
>
> 1.     Tribune talked to Morgan Stanley and they looked at the downside case provided to VRC.  MS said that they believe it would be refinanceable at the levels outlined in the downside case and that would be before any assets sales.
>
> 2.     They believed that the environment that we are currently in would refinance at those levels.

---

[2394] Ex. 748 (Revised Handwritten Notes of Bryan Browning, dated December 2, 2007).  Mr. Rucker believes that he participated in this telephone call, too, but he could not specifically recall.  Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 256:5-16.

3.        They said that all lenders when making these types of loans anticipate the loans being refinanced after the debt comes due.

Tribune also looked at the fact that 3 years after the guaranteed debt comes due [*illegible*].  The lenders will be most likely considering the S-Corp Structure and the significant benefit of waiting 3 more years to sell assets when they establish a new tax basis and no capital gains will be paid.

This will save the Company significant cash flow and will give lending some cushion to be repaid in a timely fashion.

4.        We asked Tribune (Chandler) to see if Morgan Stanley will provide documentation (leveraged comps) to support their statement.  They will get back to us.

5.        Management will provide a letter of representation that the refinancing is a reasonable assumption.

Mr. Browning explained during his sworn interview with the Examiner that it was his belief, based on his discussions with Tribune's management, that Morgan Stanley had told management that Tribune could refinance:[2395]

We had discussions with management about refinancing and where the sources of refinancing would be, generally speaking.  Then we also had, during those discussions, . . . I think management said, well, Morgan Stanley has told us that we can refinance at those levels even . . . under the downside scenario, they believed they still could refinance the debt. . . .

And then we asked how they knew that or why they thought that, and they said Morgan Stanley has data that would support them being able to do that.  And I think it was a number of comparables or a number of transactions that were out there.  And we asked if they could provide that information to us, which they did.  They provided a schedule of transactions that had high LBO debt.

---

[2395] Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 214:10-215:12.  *See also id.* ("[W]e felt that what management was telling us that Morgan Stanley said was, in fact, the case.").  When asked "who at the company did you speak with?" Mr. Browning replied: "I think it was a team of people.  Probably Chandler [Bigelow], maybe Don Grenesko, and maybe Crane Kenney . . . and others.  I'm not sure, but there was a team that we typically talked to when we had conference calls."  *Id.* at 215:21-216:8.

Mr. Rucker similarly stated that he understood from management "that Morgan Stanley also believed that the debt could be refinanced."[2396] Nevertheless, Mr. Browning and Mr. Rucker understood following the telephone call with management that Morgan Stanley was unwilling to provide a written representation to that effect.[2397]

Mr. Bigelow has no independent recollection of this December 2, 2007 telephone call with VRC,[2398] but when asked about Mr. Browning's notes during his sworn interview with the Examiner, Mr. Bigelow stated:[2399]

> A.    I believe that while I don't recall my phone conversation with Tom Whayne, which I just described, I think it's pretty clear from the notes that Bryan Browning wrote that I had had a call with Morgan Stanley and they had, you know, discussed with me and said they would get precedent comparables to help support what they told me, that it's reasonable and fair to assume that we could—that Tribune Company could refinance in the future. . . .
>
> Q.    Do you think Morgan Stanley ever told you that they believed the company could refinance?
>
> A.    I believe Morgan Stanley told me that.  I know they weren't willing to write a formal document to Valuation Research in a formal representation standpoint.  I believe that Morgan Stanley communicated to me and supported that communication with a document, which, I mean, we've got to be able to find.
>
> Q.    We have the comparable—
>
> A.    Okay.  And they communicated that it was reasonable for us to believe that we could refinance.

---

[2396] *Id.* at 211:16-18.

[2397] *Id.* at 272:8-273:17.

[2398] Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 185:4-8 ("Q.  [Do] you recall a call with VRC on Sunday [, December 1, 2007]?  A.  Again, it was a long time ago.  I [do not] recall a call, but clearly I was on a call.").

[2399] *Id.* at 200:7-201:20.  *See also id.* at 210:9-15 ("Q.  What I'm asking is, do you have any specific recollection of Morgan Stanley telling you that it would be reasonable to refinance?  A.  Again, I don't recall the conversation, but my present recollection as I sit here today and look at these materials is yes, they did that.").

Mr. Grenesko testified that he does not specifically recall the details of the December 2, 2007 telephone call either,[2400] but he told the Examiner that he believes management "told [VRC] about the conversation earlier with Morgan Stanley and that Morgan Stanley was in agreement that, yes, this could be refinanced in 2014."[2401]  Mr. Kenney has no independent recollection of the December 2, 2007 telephone call or anything pertaining to a refinancing representation or assumption.[2402]

The Examiner questioned Mr. Whayne about the statements Tribune management made to VRC concerning Morgan Stanley's views on Tribune's ability to refinance its debt, using Mr. Browning's notes of what management claimed that Morgan Stanley said:[2403]

> Q.    [L]ook at the paragraph labeled Number 1.  According to Mr. Browning's notes it says Tribune talked to Morgan Stanley and [Morgan Stanley] said that they believe it would be refinanceable at the levels outlined in the downside case and that would be before any asset sales. . . . Do you recall anyone from Morgan Stanley having any discussions at any time in that regard with Tribune?
>
> A.    No.  I remember discussions of the requests being made around this assumption, but I remember us saying that we are not going to . . . address that.
>
> Q.    Let's look at Number 2.  Number 2 says: They believe that the environment that we are currently in would refinance at those levels. . . .  Did Morgan Stanley ever make a statement to management in that regard at any time?
>
> A.    No.
>
> Q.    Let's look at Number 3.  Number 3 states: They said that all lenders when . . . making these types of . . . loans anticipate

---

[2400]  Examiner's Sworn Interview of Donald Grenesko, June 25, 2010, at 121:4-6 ("I believe there was a call, but I don't specifically remember the details of the call."); *id.* at 121:18-20 ("Q.  What do you recall was told to the VRC people on the telephone call?  A.  I don't recall.").

[2401]  *Id.* at 123:18-21.

[2402]  Examiner's Sworn Interview of Crane Kenney, July 8, 2010, at 36:7-44:16.

[2403]  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 84:13-87:21.

> . . . the loans being refinanced after the debt comes
> [due]. . . .  Did Morgan Stanley ever have any discussions
> to your knowledge with Tribune in that regard?

 A.  No. . . .

 Q.  Now just to be complete for the record, there is more to
    Paragraph 3 in [Mr. Browning's] notes on the backside of
    the page.  It then goes on to talk about Tribune.  If you
    could just briefly look at that and tell us, if anything, in the
    remainder of that Paragraph 3 changes your answer. . . .
    Does anything in there impact your answer that makes you
    want to add or change anything . . . [r]egarding what
    Morgan Stanley told Tribune [or] didn't tell Tribune?

 A.  No.

Mr. Whayne did, however, explain that he may have told Tribune management that

*management* (not Morgan Stanley) could make assumptions that sufficient debt would have been

paid down by 2014 "that you could refinance it, . . . with the emphasis on you [*i.e.*, management]

could make that assumption, but . . . I never would have said [Morgan Stanley] would make that

assumption."[2404]

    **(5)  December 2, 2007 E-Mail Exchange Between Mr.
      Bigelow and Mr. Whayne, and Morgan Stanley's
      Precedent Transactions.**

 After the telephone call between management and VRC, Mr. Bigelow sent the following

e-mail to Mr. Whayne:[2405]

> Heard back from VRC.  They have given us the green light.
> Probably will not see a draft of the presentation until late tonight.  I
> will send it to you when I get it.

---

[2404] Examiner's Sworn Interview of Thomas Whayne, July 2, 2010 at 75:17-76:6 and 79:5-9.  *See also* Examiner's
   Sworn Interview of Chandler Bigelow, June 17, 2010, at 201:18-20 (asserting that Morgan Stanley
   "communicated that it was reasonable for us to believe that we could refinance"); *id.* at 199:5-6 (characterizing
   management's discussions with Morgan Stanley as having "left us with the impression that it would be
   reasonable to assume we could refinance").

[2405] Ex. 749 (Whayne E-Mail, dated December 2, 2007); Examiner's Sworn Interview of Chandler Bigelow,
   June 17, 2010, at 195:5-7.

> VRC has asked that we get them precedent debt issuance
> transactions of companies with the level of senior secured leverage
> that we will have in 2014.  VRC's calc of this sr secured leverage is
> in the 6.5x level.  Do you think you can come up with some
> precedent transactions that show companies [issuing] debt at these
> levels?  VRC additional [sic] has asked if Morgan Stanley would
> rep to our ability to refi in 2014.  I said I would ask you, but that I
> doubted it.  In any event, the important deliverable is to get
> precedent transactions to them, ideally by tomorrow sometime.

Mr. Whayne interpreted Mr. Bigelow's e-mail to consist of two distinct requests: "[O]ne is just a request for us to give them data and one is a request for . . . us to give them a judgment. . . .  And we were always helpful in providing data, but related to solvency we were always unwilling to provide judgments."[2406]  Mr. Whayne responded to Mr. Bigelow's e-mail within the hour, writing: "We will look for precedents, although may be difficult to pull together today.  You were correct regarding our inability to rep."[2407]

Morgan Stanley did, in fact, forward "some [leveraged] loan and [high yield] issuance precedents for TV/Newspaper companies going back to mid-2006."[2408]  When asked by the Examiner why Morgan Stanley provided the precedent transactions requested by Mr. Bigelow, Mr. Whayne explained:[2409]

> A.    Because they asked us for precedent transactions and we
>       were always prepared to help provide them data regarding
>       other deals that had been done in the market or public
>       market debt trading levels or where public market
>       companies were trading.
>
> Q.    Did you have an understanding as to why they were asking
>       for these debt, for these precedent transactions? . . .

---

[2406]  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 91:4-10.

[2407]  Ex. 749 (Whayne E-Mail, dated December 2, 2007).

[2408]  Ex. 750 (Williams E-Mail, dated December 3, 2007).

[2409]  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 91:22-93:8.  During his informal interview with the Examiner, Mr. Whayne noted that it was his personal belief that a refinancing for Tribune's debt in 2014 and 2015 was not "an unreasonable assumption at the time" it was made, in December 2007.  Examiner's Interview of Thomas Whayne, June 11, 2010.

> A.    [I] believe they were . . . trying to . . . get a view as to . . .
> different points in time where different companies had
> issued loans or issued bonds . . . to the market to just get a
> historical perspective.
>
> Q.    Did you have discussions with management about how they
> might be able to use these transactions, these precedent
> transactions in any way?
>
> A.    Well, I'm sure we gave them . . . perspective as to where
> company A, B or C . . . financed at different points in the
> marketplace from a historical perspective.

VRC found the Morgan Stanley precedent transactions persuasive.  Mr. Rucker

explained:[2410]

> Q.    What did Morgan Stanley supply you with?
>
> A.    [T]hey supplied us with a list of deals that had been done
> and what leverage ratios for EBITDA.
>
> Q.    And what is the relevance of those deals and leverage ratios
> in 2007 to a refinancing of $6 billion of debt in 2014?
>
> A.    It gives you an indication of how much leverage in today's
> market you can put on a company.  So you would have to
> make an assumption that things would stay equivalent or
> some range in 2014.
>
> Q.    Is that a reasonable assumption?
>
> A.    Yes, because that's—truthfully, when you look at these
> things, typically, that's the only data that you have, is
> current data, because you are projecting out.

Mr. Browning concurred, stating that "comparables help us determine in a normal

market, is it reasonable to make that assumption. . . .  [Y]ou are trying to see what its normal

---

[2410] Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 246:8-247:6.  *See also* Examiner's Sworn Interview of Donald Grenesko, June 25, 2010, at 97:12-98:4 ("I remember we wanted to know whether or not there were precedents for this and what type of financings had been done during the last 18 months, 2 years, to see whether or not deals of this type, meaning with this type of leverage, could be completed, and I believe Charlie Stewart had mentioned several transactions sort of during our call that he had remembered, and I recall one being Univision, for example, that he had mentioned.  And so we had requested [that Morgan Stanley] provide us with a list of comparable transactions, and they ended up sending that to us early the next week, Monday I think after the weekend, and we had indicated to VRC that, yes, we felt that we could provide this type of representation.").

level of transaction multiples or multiples associated with debt. . . .  So that gives us—in a sense, it passed that sort of smell test, if you will."[2411]

Even though he agreed to provide the precedent transactions, and even though he personally believed that it was not "an unreasonable assumption at the time" for management to assume Tribune could refinance its debt in 2014 and 2015,[2412] Mr. Whayne testified that he was "crystal clear" that Morgan Stanley was not making or offering its own assessment that Tribune could refinance its debt, or agreeing with Tribune's assessment.[2413]  He recalls that Mr. Grenesko "was looking for us very actively to help him with the work underlying his solvency [certificate]," including "to do the analysis for him and actually to do the [calculations] . . . to prove that there was equity value."[2414]  Mr. Whayne refused, and explained to Mr. Grenesko that Morgan Stanley was willing to do no more than provide information such as "publicly available data around where high yield bond or leverage loans are trading . . . but what we will not do is go beyond that.  So we'll provide you facts, but not judgments."[2415]

### (6)    December 2, 2007 Draft VRC Refinancing Representation Letter.

The first draft of what would ultimately become the December 20, 2007 VRC refinancing representation letter from Mr. Grenesko to VRC appears to have been initially circulated on the

---

[2411]  Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 248:23-249:12.  *See also id.* at 285:10-18 ("[W]e [were] trying to put ourselves in what could be the scenario in 2014, . . . so [we] look[ed] at transactions—not just from 2007 [that were] in this industry, what the [debt] levels were, the multiples were.  And that's what [we were] relying on.").

[2412]  Examiner's Interview of Thomas Whayne, June 11, 2010.

[2413]  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 94:17-96:20.

[2414]  *Id.* at 95:3-14.

[2415]  *Id.* at 96:1-13.

evening of December 2, 2007 by Mr. Rucker of VRC.[2416]  The first paragraph of the

December 2, 2007 draft reads, in pertinent part:[2417]

> Based upon management's best understanding of the debt and loan
> capital markets and management's recent discussions with Morgan
> Stanley, it is reasonable and appropriate for VRC to assume that in
> the Tribune Downside Forecast dated November 21, 2007 that
> Tribune would be able to refinance any outstanding balances of
> Term Loan B that matures in 2014 and the Bridge Note that
> matures in 2015 without the need for any asset sales.

This first paragraph is followed by two paragraphs in which management appears to link

Tribune's ability to refinance its debt to the satisfaction of particular leverage tests in 2014 and

2015:[2418]

> Management believes that it is reasonable and appropriate for VRC
> to assume that in the Tribune Downside Forecast dated
> November 21, 2007 that Tribune will be able to refinance any
> Guaranteed Debt (as defined in the indenture) that matures in 2014
> *if* the Guaranteed Debt to Covenant EBITDA (as defined in the
> indenture) is 6.95 times and the Covenant EBITDA to Cash
> Interest Expenses (as defined in the indenture) is 1.3 times without
> the need for any asset sales.
>
> Management believes that it is reasonable and appropriate for VRC
> to assume that in the Tribune Downside Forecast dated
> November 21, 2007 that Tribune will be able to refinance any
> Guaranteed Debt (as defined in the indenture) that matures in 2015
> *if* the Guaranteed Debt to Covenant EBITDA (as defined in the
> indenture) is 6.77 times and the Covenant EBITDA to Cash
> Interest Expenses (as defined in the indenture) is 1.3 times without
> the need for any asset sales.

These final two paragraphs, as distinct from the first, make no reference to discussions

between management and Morgan Stanley.  Nor does the December 2, 2007 draft letter explain

---

[2416]  Ex. 751 (Hianik E-Mail, dated December 3, 2007).  Mr. Rucker stated in his sworn interview with the Examiner
that he believed "the crux of the letter, the core of the letter" came from Tribune.  Examiner's Sworn Interview
of Mose Rucker and Bryan Browning, June 30, 2010, at 270:10-25.  The earliest iteration of this particular
representation letter in the documentary record, however, appears to have been sent as part of Mr. Rucker's
December 2, 2007 e-mail.  Ex. 751 (Hianik E-Mail, dated December 3, 2007).

[2417]  Ex. 752 at VRC0056532 (Draft VRC Representation Letter, dated December 2, 2007).

[2418]  *Id.* (emphasis added).

the potential inconsistency underlying (a) the unconditional assumption made in the first paragraph (which states that it is reasonable and appropriate for VRC to assume that Tribune will be able to refinance the stated debt in 2014 and 2015) versus (b) the conditional assumptions made in the last two paragraphs (which state that it is reasonable and appropriate for VRC to assume that Tribune will be able to refinance the stated debt in 2014 and 2015 *if* the specified ratios are met in 2014 and 2015).  The multiple references to leverage ratios do imply, however, that management's assumption that Tribune would be able to refinance in the future was based, at least in part, on comparable transactions in which other companies meeting the specified leverage ratios successfully refinanced their debt.

There is no evidence that Morgan Stanley personnel were furnished drafts of the December 2, 2007 VRC refinancing representation letter.  In addition, in his interview with the Examiner, Mr. Whayne said that he had never seen the VRC refinancing representation letter or VRC's Step Two solvency opinion.[2419]  Based on the Examiner's review of the relevant e-mails and Mr. Whayne's testimony, neither Mr. Bigelow, Mr. FitzSimons, Mr. Grenesko, nor Mr. Kenney ever told Morgan Stanley that the VRC refinancing representation letter or VRC's opinion would refer to Morgan Stanley.  Mr. Whayne credibly testified during his interview with the Examiner that neither he nor Mr. Stewart told Mr. FitzSimons, Mr. Grenesko, or Mr. Bigelow that Morgan Stanley believed or concurred with any belief that Tribune could refinance indebtedness in the future,[2420] and that had Mr. Whayne seen the VRC refinancing representation letter or a draft of it, he would have said "take our name out.  You're not allowed to . . . rely on anything that we said for purposes of this relationship that you have with VRC."[2421]

---

[2419]  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 21:6-24:5 & 138:10-139:22.

[2420]  *Id.* at 75:7-80:14.

[2421]  *Id.* at 140:1-8.

(7)    **Tribune Management's December 3, 2007 Mark-Up of the Draft VRC Refinancing Representation Letter.**

On December 3, 2007, Mark Hianik of Tribune sent Mose Rucker and Bryan Browning of VRC (with a copy to Mr. Bigelow) a mark-up of the draft VRC management representation letters, including the letter regarding refinancing.[2422]  The VRC refinancing representation letter was revised to, among other changes, specifically state that "*management* believes that it is reasonable and appropriate" for VRC to assume refinancing (whereas the original draft read only that "it is reasonable and appropriate" for VRC to assume refinancing).[2423]  The revised first paragraph reads:[2424]

> Based upon (i) management's best understanding of the debt and loan capital markets and (ii) management's recent discussions with Morgan Stanley, management believes that it is reasonable and appropriate for VRC to assume that Tribune, in the downside forecast described in the Excel file . . . delivered to VRC via email on November 21, 2007 ("Tribune Downside Forecast"), would be able to refinance (i) any outstanding balances of Term Loan B under the Credit Agreement dated May 17, 2007, as amended (the "Credit Agreement"), that mature in 2014 and (ii) any outstanding balances under the Senior Unsecured Interim Loan Agreement to be dated as of the closing date (or any notes issued to refinance such facility) that mature in 2015, in each case, without the need for any asset sales other than those incorporated into the Tribune Downside Forecast.

Management's edits to the second and third paragraphs (discussing indebtedness ratios) appear to harmonize these paragraphs with the opening paragraph by making them explanatory:[2425]

---

[2422]  Ex. 751 (Hianik E-Mail, dated December 3, 2007).

[2423]  *Compare* Ex. 752 at VRC0056532 (Draft VRC Representation Letter, dated December 2, 2007) *with* Ex. 751 at VRC0179131 (Hianik E-Mail, dated December 3, 2007) (emphasis added).  *See also* Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010 at 201:18-20 (Morgan Stanley "communicated that it was reasonable for us to believe that we could refinance.").

[2424]  Ex. 751 at VRC0179131 (Hianik E-Mail, dated December 3, 2007).

[2425]  *Id.*

The Tribune Downside Forecast assumes that in 2014 (i) the Total Guaranteed Leverage Ratio (as defined in the Credit Agreement) will be approximately 7.0:1.0, (ii) the Interest Coverage Ratio (as defined in the Credit Agreement) will be approximately 1.3:l.0 and (iii) the ratio of total consolidated indebtedness (excluding the Zell Notes) to last twelve months EBITDA will be approximately 8.1:l.0.

The Tribune Downside Forecast assumes that in 2015 (i) the Total Guaranteed Leverage Ratio (as defined in the Credit Agreement) will be approximately 7.0:1.0, (ii) the Interest Coverage Ratio (as defined in the Credit Agreement) will be approximately 1.3:l.0 and (iii) the ratio of total consolidated indebtedness (excluding the Zell Notes) to last twelve months EBITDA will be approximately 7.9:1.0.

Unlike the final two paragraphs in the December 2, 2007 draft VRC refinancing representation letter, these revised paragraphs do not make any explicit representations concerning what VRC should or should not assume. Instead, they simply set out what the leverage ratios are expected to be in 2014 and 2015 under the referenced forecast.

### (8)    VRC's December 3, 2007 Cash Flow Analysis.

VRC updated its internal analysis on December 3, 2007, the day before the Tribune Board meeting.[2426] In the section analyzing cash flow under management's base case, the projections were less favorable than they were in VRC's November 30, 2007 internal analysis: only $597 million in cash would be available to cover more than $6.2 billion in debt repayments scheduled for 2014, and only $699 million in cash would be available to cover more than $2 billion in debt repayments scheduled for 2015.[2427] Projections in the section analyzing cash flow under management's downside case were worse, too, with only $180 million in cash

---

[2426] Ex. 740 (VRC Preliminary Solvency Analysis, dated December 3, 2007).

[2427] *Id.* at VRC0061017.

available to cover $6.3 billion in scheduled debt repayments in 2014 and only $197 million in cash available to cover more than $2 billion in debt repayments in 2015.[2428]

VRC's notation that "Term Loan B and Bridge Note are assumed to be refinanced in 2014 and 2015, respectively" remained the same on both the base case and downside case pages of VRC's December 3, 2007 analysis as it was on the corresponding pages of VRC's November 30, 2007 analysis.[2429]  However, the footnote supporting that assumption in the base case was revised to read that "VRC believes that this assumption is reasonable given that the Company was able to reduce [g]uaranteed debt to 4.31x in 2014 and 3.96x in 2015"[2430] (versus "4.25x in 2014 and 3.89x in 2015" in VRC's November 30, 2007 analysis[2431]).  The corresponding footnote in VRC's December 3, 2007 downside case was revised to read: "As a result of its delevering, the Company is able to reduce guaranteed debt to 6.37x in 2014 assuming the sale of the Company's interest in Career[B]uilder."[2432]  As with VRC's November 30, 2007 preliminary analysis, VRC's December 3, 2007 preliminary analysis makes no mention of any representation from management or Tribune's financial advisors regarding refinancing.

<div align="center">

(9)    **Cash Flow Projections in VRC's December 4, 2007 Tribune Board Presentation.**

</div>

VRC presented its preliminary Step Two solvency analysis to the Tribune Board on December 4, 2007.[2433]  Consistent with its internal analysis from the day before, VRC's presentation indicated that under the base case, only $597 million in cash would be available to

---

[2428]  *Id.* at VRC0061022.

[2429]  *Id.* at VRC0061017 and VRC0061022.

[2430]  *Id.* at VRC0061017.

[2431]  Ex. 742 at VRC0063418 (VRC Preliminary Solvency Analysis, dated November 30, 2007).

[2432]  Ex. 740 at VRC0061022 (VRC Preliminary Solvency Analysis, dated December 3, 2007).

[2433]  Ex. 727 at TRB415677 (Tribune Board Meeting Minutes, dated December 4, 2007); Ex. 737 (VRC Preliminary Solvency Analysis, dated December 4, 2007).

cover more than $6.2 billion in debt repayments scheduled for 2014, and only $699 million in

cash would be available to cover more than $2 billion in debt repayments scheduled for 2015;

and under the downside case (which was renamed the "Sensitivity Case"), only $180 million in

cash would be available to cover $6.325 billion in debt repayments scheduled for 2014 and only

$197 million in cash would be available to cover more than $2 billion in debt repayments

scheduled for 2015.[2434]

      Unlike VRC's December 3, 2007 internal analysis, VRC's December 4, 2007 presentation

to the Tribune Board did not explicitly state that the "Term Loan B and Bridge Note are assumed

to be refinanced in 2014 and 2015, respectively,"[2435] nor did the Tribune Board presentation

contain a corresponding footnote explaining the basis for VRC's refinancing assumption.

Instead, VRC inserted a slide at the beginning of the presentation with a list of "Key

Assumptions," including "that the Company can refinance guaranteed debt after the expiration of

the credit agreements."[2436]  The charts setting out cash flow projections under the base case and

downside case account for this refinancing as a credit on a line titled "Other Financing

Activities."[2437]

      Mr. Whayne of Morgan Stanley was present at the portion of the December 4, 2007

Tribune Board meeting at which VRC presented its preliminary solvency analysis,[2438] and he

also received advance copies of the VRC presentation the night before it was presented to the

---

[2434] Ex. 737 at TRB0272819 and TRB0272823 (VRC Preliminary Solvency Analysis, dated December 4, 2007).

[2435] Ex. 740 at VRC0061017 and VRC0061022 (VRC Preliminary Solvency Analysis, dated December 3, 2007).

[2436] Ex. 737 at TRB0272811 (Draft Preliminary Solvency Analysis, dated December 4, 2007).

[2437] Id. at TRB0272819 and TRB0272823.

[2438] Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 100:5-7; Ex. 727 at TRB415676-77 (Tribune Board Meeting Minutes, dated December 4, 2007).

Tribune Board.[2439]  During his interview with the Examiner, Mr. Whayne stated that he recalled

the VRC presentation and, in particular, the slide listing VRC's "Key Assumptions."[2440]  Mr.

Whayne stated that there was no mention during VRC's December 4, 2007 Tribune Board

presentation that Morgan Stanley had been involved in assisting management in giving a

representation that refinancing was a reasonable assumption,[2441] nor was there any discussion

between Mr. Whayne and anyone from VRC before or after this meeting concerning Morgan

Stanley's purported involvement in assisting management in giving a representation to VRC that

Tribune could refinance its debt.[2442]

### (10)    Lead Bank Questions Concerning Refinancing.

Following VRC's December 4, 2007 Tribune Board presentation, the Lead Banks sent

VRC (through Tribune management) several detailed questions concerning VRC's assumption

that Tribune could refinance its debt.  The Lead Banks asked VRC, "What is the assumption for

the Company's ability to refinance debts as they become due and how is the assumption

established?"[2443]  VRC responded on December 7, 2007:[2444]

> VRC has assumed that the Company will be able to refinance its
> debts as they become due.  This assumption is based upon a review
> of the forecasted total debt and guaranteed debt leverage ratios at

---

[2439]  Ex. 753 (Stewart E-Mail, dated December 3, 2007).

[2440]  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 100:5-101:12.

[2441]  *Id.* at 101:19-102:1.

[2442]  *Id.* at 102:13-19.

[2443]  Ex. 281 at TRB0398562 (Memorandum from Mr. Browning and Mr. Rucker to Mr. Bigelow, dated December 7, 2007).

[2444]  *Id.*  When VRC provided management with a draft of its responses to the Lead Banks' questions, Mr. Bigelow responded with a mark-up of proposed changes that included editing VRC's refinancing assumption response to read that "VRC has assumed that the Company will be able to *repay or* refinance its debts. . . ."  Ex. 754 at VRC0007121 (Bigelow E-Mail, dated December 7, 2007) (emphasis added).  VRC did not incorporate management's edit to this response, even though other edits in the markup were included.  *Compare* Ex. 754 (Bigelow E-Mail, dated December 7, 2007) (management's markup) *with* Ex. 281 (Memorandum from Mr. Browning and Mr. Rucker to Mr. Bigelow, dated December 7, 2007) (VRC's final memorandum, edited to reflect some, but not all, edits proposed by management).

602 of 726

> the time of the required refinancing, recent leveraged debt
> multiples, and representation from the Company which states that
> based upon recent discussions with Morgan Stanley, the Company
> would be able to refinance debt in its downside forecasts without
> the need for additional asset sales.

The Lead Banks responded to VRC's December 7, 2007 memorandum with additional questions on the refinancing representation:[2445]

> Reference is made to VRC's answer to Question 18 in the
> Response in which VRC indicates that it is relying, in part, on a
> representation from Tribune which states that based upon recent
> discussions with Morgan Stanley, the Company would be able to
> refinance debt in its downside forecasts without the need for
> additional assets sales.  Did VRC meet with someone from Morgan
> Stanley and does VRC know whether Morgan Stanley understands
> that Tribune is relying upon its view?  Did VRC discuss this
> assumption with other financial institutions?  To what extent did
> VRC consider current market conditions relevant to this analysis?

Mr. Bigelow forwarded the Lead Banks' follow-up questions to, among others, Mr. Whayne.[2446]  Mr. Whayne stated to the Examiner that although he does not recall receiving Mr. Bigelow's e-mail with the Lead Banks' follow-up questions, he does not doubt that he did, in fact, receive it.[2447]  Mr. Rucker stated that he does not believe VRC "provided specific answers on these or written answers or anything like that," although VRC "definitely read the questions and actually took some of the things into consideration in our analysis, but I don't know if we specifically provided any additional [answers]."[2448]

---

[2445] Ex. 755 at VRC0070618-19 (Rucker E-Mail, dated December 12, 2007).

[2446] Ex. 756 (Bigelow E-Mail, dated December 11, 2007).

[2447] Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 107:22-109:10.

[2448] Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 278:8-22.  *See also id.* at 281:5-9 (Mr. Browing: "I think what we did was . . . we had a call to discuss the issues and whether we felt that we considered these in our analysis.").

Mr. Bigelow stated the Lead Banks' follow-up questions were answered verbally, with no written response.[2449]  Verbal responses were apparently given during a December 17, 2007 conference call that included, among others, Thomas Kenny of Murray Devine, a firm hired by the Lead Banks to "educate" them on solvency matters,[2450] and Tony Grimminck of JPM, both of whom took notes during the meeting.[2451]  Mr. Kenny's handwritten notes appear to reference the Lead Banks' follow-up question concerning the refinancing representation:  "Co. has used Morgan Stanley as solvency [advisor].  Mgt. believes company is solvent & can service debt."[2452]  Mr. Grimminck's notes are similar.  Under the heading "VRC report and solvency analysis," Mr. Grimminck wrote: "VRC is independent & Morgan Stanley to review solvency."[2453]  Beneath that, he wrote "'Accurate & complete' - VRC report"; "'MS assumptions & recommendations fair & reasonable in light of fairness opinion'"; and "'corp, pub, bdcast senior mgmt believe company is solvent & can meet debt obligations going fwd.'"[2454]  On a subsequent page, Mr. Grimminck appears to indicate that Mr. Bigelow referred to a "conservative approach from VRC," and several lines below that he states:  "MS will be [at] board mtg to answer questions."[2455]  Finally, Merrill produced a copy of VRC's draft solvency

---

[2449] Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 241:4-10.  Mr. Grenesko did not recall the questions or whether any answers were given.  Examiner's Sworn Interview of Donald Grenesko, June 25, 2010, at 143:18-144:20.

[2450] Examiner's Interview of Rajesh Kapadia, June 25, 2010 (hiring and role of Murray Devine).

[2451] Ex. 757 (Handwritten Notes of Thomas Kenny, dated December 17, 2007) (notes from a conference call with Tribune management addressing the Lead Banks' follow-up questions); Ex. 758 (Handwritten Notes of Tony Grimminck, dated December 17, 2007).  Mr. Grimminck erroneously wrote the date on his notes as "Mon[day] 12/17/2006."  In fact, December 17, 2006, was a Sunday; Mr. Grimminck undoubtedly was referring to Monday, December 17, 2007.  At his interview with the Examiner, Mr. Kenny stated that he does not have an independent recollection of the statements from his notes quoted above.  Examiner's Sworn Interview of Thomas Kenny, July 9, 2010, at 50:14-51:10.

[2452] Ex. 757 at MD000550A (Handwritten Notes of Thomas Kenny, dated December 17, 2007).

[2453] Ex. 758 at JPM_00499993 (Handwritten Notes of Tony Grimminck, dated December 17, 2007).

[2454] Id.  Mr. Grimminck's internal quotation marks appear to indicate what was said by a speaker during the call.

[2455] Ex. 758 at JPM_00499996 (Handwritten Notes of Tony Grimminck, dated December 17, 2007).

analysis dated for the following day (which Mr. Bigelow circulated in advance of this conference call)[2456] with a handwritten notation at the top of the cover page stating: "Fair and reasonable\— MS believes this as well."[2457]

Given the references to Morgan Stanley in the above-referenced notes from the December 17, 2007 conference call, which the Examiner discovered late in the Investigation and after the completion of most witness interviews, the Examiner's counsel contacted Morgan Stanley's counsel and asked whether anyone from Morgan Stanley was invited to attend the December 17, 2007 conference call or any other call or meeting on or about that date, and whether Morgan Stanley had any comments regarding the notes prepared by JPMCB of that conference call.[2458]  Morgan Stanley's counsel responded as follows:[2459]

> I am writing on behalf of [Morgan Stanley] in response to your July 12, 2010 email inquiring as to (i) Morgan Stanley's knowledge of a December 17, 2007 conference call or meeting held between Tribune and the [Lead Banks] relating to VRC's solvency opinion, and (ii) Morgan Stanley's understanding of its role in or around December 2007 as it related to providing advice regarding Tribune's solvency.
>
> Mr. Whayne has no recollection of ever being invited to that conference call or meeting, nor was he aware at that time that such a conference call or meeting was going to take place.  As such, given that Mr. Whayne was not a participant at the meeting, he cannot confirm the accuracy or substance of the handwritten notes attached to your [e-mail].

---

[2456]  Ex. 886 at JPM_00450061 (Bigelow E-Mail, dated December 17, 2007) (forwarding to the Lead Banks VRC's draft December 18, 2007 solvency analysis for "discuss[ion] with you on our call this afternoon").

[2457]  Ex. 859 at ML-TRIB-0009950 (VRC Preliminary Solvency Analysis, dated December 18, 2007).

[2458]  Ex. 1043 (Nastasi E-Mail, dated July 12, 2010).

[2459]  Ex. 1044 (Letter from Jonathan Polkes, dated July 19, 2010).

### (11)    VRC's December 18, 2007 Tribune Board Presentation.

VRC presented a revised preliminary solvency analysis to the Tribune Board on December 18, 2007, with Mr. Whayne and Mr. Taubman of Morgan Stanley in attendance.[2460] As with VRC's December 4, 2007 presentation, VRC's December 18, 2007 presentation set forth four "Key Assumptions," including "that the Company can refinance guaranteed debt after the expiration of the credit agreements."[2461]  Mr. Whayne stated that "VRC walk[ed] through [these] assumptions," but there was no discussion of the basis for the refinancing assumption either during VRC's presentation or otherwise.[2462]

The portion of VRC's December 18, 2007 presentation addressing cash flow available for debt repayments in 2014 and 2015 under both the base case and downside case was essentially the same as what VRC had presented to the Tribune Board on December 4, 2007:  under the base case, only $596 million in cash would be available to cover more than $6.2 billion in debt repayments scheduled for 2014, and only $698 million in cash would be available to cover more than $2 billion in debt repayments scheduled for 2015; under the downside case, only $181 million in cash would be available to cover $6.3 billion in scheduled debt repayments scheduled for 2014 and only $199 million in cash would be available to cover more than $2 billion in debt repayments scheduled for 2015.[2463]  VRC's charts continued to account for

---

[2460]  Ex. 11 (Tribune Board Meeting Minutes, dated December 18, 2007); Ex. 738 (VRC Preliminary Solvency Analysis, dated December 18, 2007); Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 123:22-124:12.

[2461]  Ex. 738 at VRC0109242 (VRC Preliminary Solvency Analysis, dated December 18, 2007).

[2462]  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 125:13-126:9; Examiner's Sworn Interview of Paul Taubman, July 1, 2010, at 76:18-22.  Nor was it discussed when VRC gave its preliminary solvency presentation to the Tribune Board on December 4, 2007.  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 99:12-102:1.

[2463]  Ex. 738 at VRC0109247 and VRC0109251 (VRC Preliminary Solvency Analysis, dated December 18, 2007).

anticipated refinancing by including billions of dollars in credits on a line titled "Other Financing Activities."[2464]

The December 18, 2007 Tribune Board minutes reflect that after Mr. Browning and Mr. Rucker reviewed VRC's solvency analysis with the Tribune Board, "[m]anagement confirmed its belief that VRC's analysis and the underlying assumptions and projections [were] reasonable, if not conservative."[2465]  The minutes further recite that "[d]iligence questions that had been posed by the banks to VRC and to management were previously made available to the Board," and that "[t]he Board (directly and through its counsel and financial advisors) posed its own questions to VRC and to management and received answers thereto."[2466]

### (12)    Tribune Management's December 20, 2007 VRC Refinancing Representation Letter.

Mr. Grenesko signed on behalf of Tribune seven representation letters dated December 20, 2007 and addressed to VRC.[2467]  One of the seven letters provided as follows:[2468]

> Based upon (i) management's best understanding of the debt and loan capital markets and (ii) management's recent discussions with Morgan Stanley, management believes that it is reasonable and appropriate for VRC to assume that Tribune, in the downside forecast . . . delivered to VRC via email on November 21, 2007 ("Tribune Downside Forecast"), would be able to refinance (i) any outstanding balances of Term Loan B under the Credit Agreement dated May 17, 2007, as amended (the "Credit Agreement"), that mature in 2014 and (ii) any outstanding balances under the Senior Unsecured Interim Loan Agreement to be dated as of the closing date (or any notes issued to refinance such facility) that mature in 2015, in each case, without the need for any asset sales other than those incorporated into the Tribune Downside Forecast.

---

[2464]  *Id.* at VRC0109247 (base case, listing a $6.2 billion credit in 2014 and a $1.7 billion credit in 2015); *Id.* at VRC0109251  (downside case, listing a $6.3 billion credit in 2014 and a $1.7 billion credit in 2015).

[2465]  Ex. 11 at TRB0415685 (Tribune Board Meeting Minutes, dated December 18, 2007).

[2466]  *Id.*

[2467]  Ex. 739 (Representation Letters, dated December 20, 2007).

[2468]  *Id.*

The paragraph set forth above is identical to the draft VRC refinancing representation letter as edited by Tribune management on December 3, 2007. Unlike the December 3, 2007 draft, however, the final VRC refinancing representation letter signed by Mr. Grenesko did not contain the two paragraphs discussing leverage ratios. Those two paragraphs appear to have been deleted between December 18, 2007 and December 20, 2007.[2469] Morgan Stanley was not given a copy of Mr. Grenesko's refinancing representation letter referencing discussions with Morgan Stanley.[2470]

### (13)    VRC's December 20, 2007 Solvency Opinion.

VRC's December 20, 2007 Step Two solvency opinion summarizes Mr. Grenesko's refinancing representation and states as follows:[2471]

> A responsible officer of the Company has provided VRC with [a] representation letter that based upon (i) Management's best understanding of the debt and loan capital markets and (ii) Management's recent discussions with Morgan Stanley, Management believes that it is reasonable for VRC to assume that the Company would be able to refinance it debts when they come due in the Downside Case Forecast. VRC has relied upon this representation letter in concluding its Opinion and has assumed that the Company would be able to refinance the New Financing and any other existing indebtedness for borrowed money upon their scheduled maturities without the need for asset sales other than those incorporated into the Downside Case Forecast.

Mr. Grenesko's VRC refinancing representation letter is narrower in scope than the assumption made by VRC in its solvency opinion. Whereas Mr. Grenesko represented only that Tribune "would be able to refinance" outstanding balances due on the Tranche B Facility in 2014

---

[2469] Ex. 759 (Draft Letter from Donald Grenesko to VRC, dated December 20, 2007) (marked up copy changing the date of the letter from December 18, 2007 to December 20, 2007 and deleting the final two paragraphs). *See also* Ex. 760 (Draft Letter from Donald Grenesko to VRC, dated December 18, 2007) (marked up copy identical to management's December 3, 2007 mark-up, with "December 18, 2007" inserted in place of "December [  ], 2007").

[2470] Examiner's Sworn Interview of Paul Taubman, July 1, 2010, at 94:16-95:16; Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 138:3-139:22.

[2471] Ex. 728 at TRB0294013 (VRC Step Two Solvency Opinion, dated December 20, 2007).

and on the Bridge Facility in 2015, VRC assumed Tribune "would be able to refinance . . . *any other existing indebtedness of borrowed money upon [its] scheduled maturit[y]*," apparently without regard to whether the debt in question was due in 2014, 2015, or another year altogether.[2472]  VRC's Step Two solvency opinion was never provided to Morgan Stanley[2473] or filed with the SEC.[2474]

> (14)    **The Examiner's Assessment of Tribune Management's VRC Refinancing Representation and VRC's Reliance on Tribune Management's Representation.**

By assuming that Tribune could refinance all of its debts (rather than the subset of its contemplated post-Step Two obligations addressed in Mr. Grenesko's December 20, 2007 VRC refinancing representation letter), VRC accepted as true a proposition that was both untested and inconsistent with what management actually represented.  Given this incongruence, and taking into account the observed secondary market discounts to the Step One Debt,[2475] the increased indebtedness that Tribune would incur as a result of the Step Two Transactions, and the

---

[2472]  Ex. 728 at TRB0294013 (VRC Step Two Solvency Opinion, dated December 20, 2007) (emphasis added).

[2473]  Examiner's Interview of Thomas Whayne, June 11, 2010; Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 21:6-24:5; Examiner's Sworn Interview of Paul Taubman, July 1, 2010, at 89:2-90:22.

[2474]  At Tribune's Section 341 meeting held after the Petition Date, the U.S. Trustee's representative asked Mr. Bigelow whether the two VRC solvency opinions were publicly filed.  Mr. Bigelow replied that the first opinion was publicly filed, but the second was not, stating that "to the best of my knowledge we had no obligation to publicly file the second step of the solvency opinion."   Audio Recording of Section 341(a) Meeting of Creditors, January 16, 2009.  Because Step One involved the Tender Offer, Tribune included the first VRC solvency opinion in its public filings with the SEC apparently to meet the requirements of the SEC's Schedule TO and Schedule 13E-3.  Step Two did not involve a tender offer, and the Examiner's analysis is that there does not appear to be any law or regulation that required Tribune to file VRC's Step Two solvency opinion with the SEC.  Separate and apart from Tribune's SEC reporting obligations, the Examiner finds it difficult to reconcile why Tribune apparently never furnished the opinion to Morgan Stanley either before or after it was delivered.

[2475]  As part of a presentation made by Morgan Stanley on November 21, 2007 regarding Tribune management's effort to negotiate with its banks to "improve the Step 2 financing," the trading levels of Tribune's Tranche B Facility and Tranche X Facility were presented over the period from May 22, 2007 (approximately when the loans "broke for trading,") through November 14, 2007.  The chart indicates that both tranches traded at a discount from par, beginning in June of 2007, hitting a trough in August, after which they began trading within a range of 92 and nearly 100 percent of par.  Ex. 761 at TRB0266940 (Morgan Stanley Discussion Materials, dated November 21, 2007).

deterioration of the debt markets generally during the fall and winter of 2007,[2476] the Examiner concludes that VRC's assumption that Tribune would be able to refinance any existing indebtedness for borrowed money without the need for asset sales (other than those incorporated in the downside forecast) was not adequately supported.

The Examiner considered the precedent transaction information provided by Morgan Stanley in response to Mr. Bigelow's request.[2477]  Those materials, however, do not support a favorable determination concerning Tribune's prospective ability to refinance its debt.  It is an apples-to-oranges comparison to measure the leverage ratios of those *actual* transactions against a hypothetical projection of Tribune's *future* leverage ratios that depends on meeting (unrealistic) projections for the next seven years.[2478]  Moreover, before drawing any conclusions about the precedents supplied by Morgan Stanley, any number of factors would require careful consideration, including the comparability of the growth and earnings expectations for the precedent companies versus those of Tribune.  On this score, Mr. Whayne's testimony is instructive:[2479]

> Q.    The only thing that you supplied to management in this regard was comparable transactions after they requested that, is that right?
>
> A.    We provided comparable transactions and we updated the multiples that—we updated the publicly traded comparable

---

[2476] *See generally* William Bassett & Thomas King, Profits and Balance Sheet Developments at U.S. Commercial Banks in 2007, 94 Federal Reserve Bulletin (June 2008).

[2477] Ex. 750 (Williams E-Mail, dated December 3, 2007).

[2478] The conditional nature of this inquiry is clear from the original draft VRC refinancing representation letter, which specified that (a) "Management believes that it is reasonable and appropriate for VRC to assume that . . . Tribune will be able to refinance any Guaranteed Debt . . . that matures in 2014 if the Guaranteed Debt to Covenant EBITDA . . . is 6.95 times and the Covenant EBITDA to Cash Interest Expenses . . . . is 1.3 times," and (b) "Management believes that it is reasonable and appropriate for VRC to assume that . . . Tribune will be able to refinance any Guaranteed Debt . . . that matures in 2015 *if* the Guaranteed Debt to Covenant EBITDA . . . is 6.77 times and the Covenant EBITDA to Cash Interest Expenses . . .  is 1.3 times."  Ex. 752 at VRC0056532 (Draft VRC Refinancing Representation Letter, dated December 2, 2007) (emphasis added).

[2479] Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 82:4-83:7.

> multiples that we had used as part of our fairness opinion at
> their request.

> Q.    And by the time this transaction closed [on]
>        December [20], 2007, what would the validity have been of
>        using those comparable transactions with respect to
>        [refinanceability] of debt in December 2007?

> A.    Oh, I don't, I don't, I don't think they would have been valid
>        at all.

> Q.    Why?

> A.    Well, because those multiples would, would only have been
>        useful as one of a number of analyses to try to validate
>        whether or not the company was actually solvent at that
>        point in time.  That's—and that's a snapshot as of that date.
>        It doesn't have anything to do with whether the company
>        would have a liquidity profile going forward and being able
>        to pay off its debt X years down the road.

The more appropriate comparison is Tribune's pro forma leverage ratio at the time of the

Step Two Transactions.  Three different Tribune leverage ratios are pertinent.  The first ratio,

9.2:1, is based on Tribune's November 21, 2007 projections, which indicate pro forma 2007

adjusted EBITDA (EBITDA plus equity investment income plus anticipated 401(k) savings) of

approximately $1.29 billion and total debt of approximately $11.83 billion.  The second ratio,

9.7:1, is based on actual 2007 EBITDA of approximately $1.32 billion (including the addition of

approximately $100 million of 2007 equity income and $60 million of anticipated 401(k) savings

and the elimination of certain non-recurring items) and total debt of approximately

$12.84 billion.  The third ratio, 8.4:1, is based on projected 2008 adjusted EBITDA of

approximately $1.346 billion and total year end 2008 debt of approximately $11.37 billion.  With

the exception of the Univision comparison, every company on the list of precedent transactions

supplied by Morgan Stanley had a leverage ratio lower than any of these three actual Tribune

leverage ratios—and Univision was an outlier in every sense of the term.[2480]

> ### 4. Knowledge and Actions of the Lead Banks and Financial Advisors in Connection with the Step Two Transactions.

The knowledge and actions of the Lead Banks and Financial Advisors leading up to the

Step Two Transactions were informed by the deterioration in performance of the market

generally and Tribune in particular, and were largely driven by contractual commitments made in

mid-2007.  With this context, the discussion below turns to two categories of pertinent financial

institution activities at Step Two:  (a) the actions of the Lead Banks, and (b) the actions of the

Financial Advisors.

> ### a. Backdrop:  The Deteriorating Economics of the Tribune Transaction and the Lead Banks' Contractual Commitments.

Shortly after the June 4, 2007 closing of the Step One Financing, Tribune and the Lead

Banks observed substantial changes in the financial markets.  On July 17, 2007, Peter Cohen of

JPM suggested that Tribune Senior Vice President/Finance and Administration Donald Grenesko

and Tribune Treasurer Chandler Bigelow begin participating in weekly updates "on what is

happening in the leverage markets, given all the recent news, to give you some of our perspective

(being in the middle of it) and share some thoughts on how what is happening may or may not

[affect] the second step."[2481]  Two days later, JPM forwarded Mr. Grenesko and Mr. Bigelow a

"Tribune Market Update" noting, among other things, that "[t]he high yield market reversed

---

[2480] The Univision leveraged buyout is neither a reasonable transaction proxy for purposes of valuing Tribune's business nor evidence of the ability of Tribune to prospectively refinance its debt.  Among other differences, Univision (unlike Tribune) saturated the large and growing U.S. Hispanic market (it was, for example, ranked number one in prime time television among adults within this segment), and grew revenues at a compound annual rate of more than 17% (and operating income at more than 15%) from 2000 to 2005 (as compared to Tribune's compound annual revenue growth of approximately 2.2% and operating income growth of 1.8% over the same period).  *See* Ex. 762 at 9 and F-5 (Univision 2005 Form 10-K).  In addition, Univision, at the time of its leveraged buyout, generated a significant amount of its revenues from its music products and music publishing segment, and had no material traditional newspaper publishing operations.  *Id.* at 7-8 and F-5.

[2481] Ex. 1077 (Cohen E-Mail, dated July 17, 2007).

course dramatically over the past three weeks," with a "[s]evere secondary market sell-off" and

"severe market pushback" for "[d]eals that have challenged standards of maximum leverage and

minimum coverage."[2482]   A transaction update included in the Tribune Board materials for

July 18, 2007 reflects this negative sentiment and notes its possible effect on Tribune's ability to

close the Step Two Transactions:[2483]

> There has been increasing speculation in the market regarding the
> possibility that the merger will not be consummated on its current
> terms.  Following the release of our Period 5 results, several sell-
> side analysts expressed some concern as to whether the second step
> of the transaction will close due to uncertainties relating to the
> FCC approval process and our ability to finance the second step, as
> interest rates have begun to rise and credit spreads have
> widened. . . .
>
> The Company is preparing for the possibility that general market
> conditions may have an adverse effect on a successful syndication
> of our second step financing. . . .  [T]ighter market conditions and
> our current operating results could limit our access to or increase
> the cost of the public bond financing.

These market changes, coupled with Tribune's recent declining operating performance,

led one banker to report to JPM Vice Chairman James Lee in July 2007 that JPM was "totally

underwater on this underwrite [and] the deal is now underequitized and underpriced."[2484]

Bankers at other Lead Banks expressed similar concerns about the impact of market changes and

Tribune's performance:

---

[2482]   Ex. 992 at TRB185635-37 (Tribune Market Update, dated July 19, 2007).  *See also* Examiner's Sworn
Interview of Chandler Bigelow, June 17, 2010, at 168:16-21 ("[W]e were constantly talking to the banks.  We
were giving the banks our information.  We had monthly calls with the banks about our financial results.  Yeah,
we were in constant communication with the banks all the time.").

[2483]   Ex. 723 at TRB-UR-0414584.03-84.04 (Tribune Board Meeting Materials, dated July 18, 2007).

[2484]   Ex. 1078 at JPM_00269777 (Kapadia E-Mail, dated July 26, 2007).  This prompted Mr. Lee to meet with
Mr. Zell and convey "all the issues around selling the remainder of his acquisition debt . . . ie it couldnt [sic] be
done."  *Id.* at JPM_00269776.

•       At Merrill (where one banker had previously described Tribune as "a melting ice cube but not one that disappears right away"[2485]), a banker wrote in late June 2007 that it was "too difficult to really put a confidence level" on the likelihood of the Step Two Transactions closing, in part because "the company's fundamental performance likely needs to be better in the last half of the year than it has been in the first."[2486]

•       Citigroup's Julie Persily testified during her sworn interview with the Examiner that "[it] occurred to me that this company was in more trouble than we thought it was when we first signed the deal. We'd be stupid not to know that . . . we were not going to be able to sell the second step debt."[2487]

•       The day after a meeting between BAS, Tribune, and EGI to "discuss second quarter results, current business trends and the outlook for the remainder of 2007, as well as Step-2 transaction timing and process,"[2488] a BAS banker told his deal team that syndicating the Step Two Financing likely would require reducing BAS's fees to zero "[g]iven the volatility in the leveraged finance market."[2489]

Notwithstanding the challenges of a softening market and Tribune's operating performance, at Step Two Tribune was favorably positioned vis-à-vis the Lead Banks because Tribune had "fully committed second step financing from [its] four lead banks comprised of an additional $2.1 billion of Term Loan B . . . $2 billion of publicly issued high-yield bonds," and "[a] fully committed bridge facility is in place in the event that [it is] unable or elect[s] not to

---

[2485] Ex. 357 at ML-TRIB-0893576 (Browning E-Mail, dated May 18, 2007).

[2486] Ex. 926 at ML-TRIB-0580949 (O'Grady E-Mail, dated June 28, 2007).

[2487] Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 76:9-14.

[2488] Ex. 927 at 1 (BAS Leveraged Finance Committee Update Memo, dated August 3, 2007).

[2489] Ex. 928 at BOA-TRB-0012808 (Hagel E-Mail, dated July 26, 2007).

issue the public bonds."[2490]  In other words, subject only to satisfaction of the closing conditions,

the Lead Banks were contractually obligated to advance additional funds on the Step Two

Financing Closing Date.  When the Lead Banks ultimately funded on the Step Two Financing

Closing Date, at least some were well aware at the time that they were paying the equivalent of

one dollar "to get back 92 cents."[2491]

        To the extent the Lead Banks viewed this circumstance as a predicament, it was one of

their own making.  Once the Lead Banks signed the Step Two Commitment Letter in April 2007,

they were obligated (subject to the closing conditions) to lend specified amounts up to 13 months

later, without regard to intervening macroeconomic deterioration or the ability of the Lead Banks

to successfully syndicate the debt.[2492]  JPM Chief Executive Officer Jamie Dimon explained that

a lending institution's assumption of the risk of changed economic circumstances between initial

commitment and closing is part of the borrower's bargain when it obtains a funding commitment

rather than rely on accessing the capital markets when money is needed: "That's like asking if

---

[2490]  Ex. 723 at TRB-UR-0414584.03 (Tribune Board Meeting Materials, dated July 18, 2007).

[2491]  Examiner's Interview of Michael Costa, June 4, 2010.  *See also* Ex. 761 at TRB0266940 (Morgan Stanley Discussion Materials, dated November 21, 2007) (noting that Tranche B Facility bonds were trading at 91 cents on the dollar, and had previously been trading even lower).  JPM's Rajesh Kapadia similarly told the Examiner that it was "obvious" on the Step Two Financing Closing Date that it would have been better for the Lead Banks as an economic matter if they did not have to go through with the financing, as they were required to immediately mark the debt to market (and thereby incur a loss).  Examiner's Interview of Rajesh Kapadia, June 25, 2010.  *See also* Examiner's Sworn Interview of Todd Kaplan, July 8, 2010, at 85:13-15 ("I think it's fair to say it would have been better for us to not close economically, absolutely."); Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 76:8-16 (At the end of 2007, "we were not going to be able to sell the second step debt.  We were going to have to own it."); Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 141:15-142:8 ("[W]e knew we were obligated under certain circumstances given the commitment we signed, [but] it wasn't like we were looking forward to it. . . .  I know that I would have been . . . thankful [if Step 2 did not happen].").

[2492]  Ex. 1010 at 5 (Step Two Commitment Letter) (incorporating definition of "Company Material Adverse Effect" that carves out changes in general economic conditions or the industries in which Tribune operated from the definition of a "Company Material Adverse Effect" sufficient to terminate the Lead Banks' commitment, to the extent such economic or industry conditions did not disproportionately impact Tribune, and further providing that completion of the syndication of the Step Two Financing was not a condition to the commitments of the Lead Banks); Ex. 179 at § 1.01 (definition of "Material Adverse Effect") (Credit Agreement); Ex. 151 at § 3.1 (definition of "Company Material Adverse Effect") (Merger Agreement).

the weather was bad, yes by that time the weather was bad.  [But when] we sign the binding commitment, it's a binding commitment.  That's . . . why you have a bank."[2493]

Two aspects of the Step Two Financing are particularly important in assessing the Lead Banks' activities and due diligence prior to the Step Two Financing Closing Date: the market flex provisions in the Step Two Fee Letter (which allowed certain unilateral changes by the Lead Banks to the terms of the Step Two Financing) and the closing conditions (which had to be satisfied before the Lead Banks had any obligation to fund).  As discussed in turn below, the market flex provisions provided the backdrop against which the Lead Banks approached Tribune to discuss modifications to the Step Two Financing (with only partial success), and the closing conditions—most notably, the solvency requirement—drove their due diligence.

### (1)    Contractual "Market Flex" and Consensual Modifications to the Step Two Financing.

The Step Two Fee Letter gave the Lead Banks a unilateral right to make limited modifications to the Step Two Financing if necessary to achieve a successful syndication.[2494] These permissible changes included increasing certain interest rate margins up to 50 basis points, reallocating a portion of the Incremental Credit Agreement Facility to the Bridge Facility, and giving second-lien status to senior notes issued in lieu of the Bridge Facility.[2495]  After the closing of Step One, the Lead Banks did not view this flexibility as sufficient given the market's

---

[2493] Examiner's Interview of Jamie Dimon, June 25, 2010.  *See also* Ex. 957 at JPM_00051021 (Deutsche Bank Research Report, dated July 1, 2007) ("[W]e believe that the Tribune going-private transaction will complete. There may be some unhappy lenders in the end [but our] understanding is that Zell/ESOP have secured financing via commitment letter, which essentially locks in financing to complete the deal. . . . [O]ur impression is that the agreements are pretty 'tight.'"); Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 58:17-59:1 ("In this day and age [a seller] wouldn't agree to sell a company unless they knew the capital was there.  You couldn't sell the bonds in February for a deal that wasn't going to close for many, many months. You had to have a bank stand by it and say if the bonds don't sell we'll fund.  So we did that and then we sold that funding agreement to the bond market.").

[2494] *See* Report at § III.D.9.c.

[2495] Ex. 176 at § 3 (Step Two Fee Letter).

and Tribune's performance, and they approached Tribune in October and November 2007 to

discuss recalibrating the terms of the Step Two Financing to facilitate syndication.[2496]  JPM's

Rajesh Kapadia summarized some of those discussions in an e-mail to James Lee of JPM:[2497]

> [We] just left meeting with Tribune and Nils Larsen in Chicago to
> lay out the changes to the Tribune financing (summarized below)
> that we discussed with you Monday.  I know you said you may
> want to call Sam.
>
> Meeting went well, Tribune mgt is focused on how they convince
> their Board of the revised terms.  *We explained that we are still
> losing money and that the board should want a market clearing
> deal and not leave a levered company with its underwriters
> stuffed.* . . .
>
> As a reminder, the proposed changes are:  (a) reducing debt by
> $700 to $3.5BN from cash on hand and FCF; (b) commit to selling
> an additional $1.5bn in assets over next three years; (c) apply the
> increased rate to the bonds that would have resulted from
> exercising the flex to shift $1.4bn from loans to bonds
> (d) additional PIK rate of 300bps on $2.1bn bonds; (e) reduce bond
> maturity from 8 to 7 years.
>
> Separately we talked to Nils about Zell buying $500mm of the
> bonds/bridge (this did not come up in the Tribune meeting).

When asked why Tribune or Samuel Zell would consider modifications to the Step Two

Financing beyond the limited flex provisions to which the Lead Banks were contractually

entitled, Brit Bartter of JPM explained that it is very much in a borrower's interest to have this

type of debt in the hands of long-term institutional investors, rather than staying on the books of

the Lead Banks.[2498]

---

[2496]  Examiner's Interview of Brit Bartter, June 16, 2010; Ex. 844 (Kapadia E-Mail, dated October 18, 2007).

[2497]  Ex. 844 (Kapadia E-Mail, dated October 18, 2007) (emphasis added).

[2498]  Examiner's Interview of Brit Bartter, June 16, 2010.  Todd Kaplan of Merrill has a slightly different
recollection, suggesting during his sworn interview with the Examiner that *Tribune* first raised restructuring
because "they really did not want us to exercise [the flex] option."  Examiner's Sworn Interview of Todd
Kaplan, July 8, 2010 at 45:10-11.  *See also id.* at 45:16-21 ("Q.  [W]hy did the banks want to restructure the
debt at all?  A.  We didn't start with wanting to restructure the debt.  We were responding to a company request
not to exercise the contractual option we already had.").  Mr. Kaplan's recollection in this regard does not
appear to be consistent with the contemporaneous documentary record, including an e-mail Mr. Kaplan wrote in

Nonetheless, on November 5, 2007, after considering "the Company's and the Board's legal obligations under the merger agreement and the banks' legal obligations under the credit agreement," the Tribune Board rejected the restructuring proposal made by the Lead Banks.[2499] Todd Kaplan of Merrill reported the Tribune Board's decision in an internal e-mail:[2500]

> [O]ur proposed changes to the financing were reviewed by the board and rejected for reason I'd be happy to review live – I asked Chandler and Crane if there was a counterproposal – for today, there is not, but I've encouraged Chandler and Crane to go back and think about a redesign of the financing that, from their standpoint, would make sense. . . .

Michael Costa of Merrill responded:[2501]

> We are clearly dealing with an organization at all levels unable to come to a decision.  We should make an institutional judgment as to whether closing into existing papers and preserving flexibility to restructure when the new board is in place is in our interests.  We should also seek direct dialogue with board since mgmt seems incapable of driving a decision.

On November 14, 2007, Tribune offered a counterproposal for modifying certain of the financial terms of the Step Two Financing.  An internal BofA e-mail summarized the counterproposal:[2502]

1.  Reduce the amount of Bonds by $500MM for Step Two from $2.1BN to $1.6BN primarily due to IRS settlement proceeds of $350MM received in October.

2.  Waive the 20 day marketing period that the Underwriters have to market the TLB and Bridge/Bonds after receiving FCC approval.

---

August 2007 stating that he was "trying to conceptualize what we can ask for in terms of making the 2nd step better"; "[g]iven the challenge of the credit," Mr. Kaplan suggested a possible arrangement whereby the principal of the debt (not the interest) would increase in stress situations "to improve noteholders claim in a reorg type analysis."  Ex. 868 (Kaplan E-Mail, dated August 11, 2007).

[2499]  Ex. 726 at 1-2 (Tribune Board Meeting Minutes, dated November 5, 2007).

[2500]  Ex. 1054 at ML-TRIB-0613214 (Kaplan E-Mail, dated November 7, 2007).

[2501]  *Id.* at ML-TRIB-0613213.

[2502]  Ex. 930 at BOA-TRB-0007791 (Petrik E-Mail, dated November 14, 2007).

3.      Eliminate our ability to flex the $1.4BN to Bonds from the
        TLB.  Therefore, TLB would be $2.1BN and Bridge/Bonds
        at $1.6BN.

4.      Increase the cap on the Bonds from 12.5% to 14.5% (14%
        cash and 0.5% PIK).

On November 21, 2007, Tribune and the Lead Banks reached an agreement to modify the

Step Two Financing.  The terms were described in an internal Merrill e-mail:[2503]

[B]anks agree that upon the near-term receipt of the completed
offering memorandum (targeted for next few days), the
information requirement for the marketing period is satisfied. . . .

[C]ompany states intent to use $500 mm of excess cash flow +
settlement proceeds from tax case . . . to reduce funding in Step 2

[B]anks agree to forego structural flex of $1.4 b of B loan to bridge
loan/notes.

[T]he cap rate on the notes is increased to 15.25%, of which 14.5%
can be in cash (vs current cap of 12.5%).

Tribune and the Lead Banks memorialized their agreement to modify the Step Two

Financing via a side letter that effectively superseded the market flex provisions in the Step Two

Fee Letter with an agreement by Tribune to borrow less money at Step Two and to pay higher

interest rates on a portion of the Step Two Debt.[2504]  Mr. FitzSimons explained during his sworn

interview with the Examiner that Tribune agreed to borrow less money because it received an

unexpected tax settlement that reduced its financing needs.[2505]  Mr. Zell similarly characterized

Tribune's decision to borrow less money as a concession that would be cost-free to Tribune yet

nonetheless be of value to the Lead Banks.[2506]

---

[2503]  Ex. 988 at ML-TRIB-0405454 (Costa E-Mail, dated November 21, 2007).

[2504]  Ex. 177 (Flex Side Letter).

[2505]  Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 71:10-72:17.

[2506]  Examiner's Interview of Samuel Zell, June 14, 2010.

(2)    **Centrality of the Solvency Closing Condition at Step Two.**

The Lead Banks' obligation to fund Step Two was contingent on satisfaction of the contractual closing conditions under the Credit Agreement (with respect to the closing of the Incremental Credit Agreement Facility) and the Bridge Credit Agreement.  The Credit Agreement (with respect to the closing of the Incremental Credit Agreement Facility) and the Bridge Credit Agreement each required Tribune's Chief Financial Officer to certify that "as of the [Step Two Financing] Closing Date, immediately after giving effect to the [Step Two] Transactions, [Tribune] is Solvent."[2507]  In addition, both the Credit Agreement and the Bridge Credit Agreement contain representations and warranties of "Solvency," separate and apart from the Chief Financial Officer's certification.[2508]  Although the solvency *certificate* delivered on the Step Two Financing Closing Date[2509] was separate from the solvency *opinion* required under the Merger Agreement,[2510] the record is clear that Tribune's Chief Financial Officer would not have issued the former had VRC not issued the latter.[2511]  Accordingly, as a practical matter, a favorable solvency opinion from VRC or another independent firm effectively was a closing condition to the Step Two Financing.[2512]

---

[2507] Ex. 179 at §§ 2.17(b)(ii)(A) and 4.01(l)(ii) (Credit Agreement); Ex. 175 at § 3.01(b)(i) and (b)(iv)(A) (Bridge Credit Agreement).  Although the Step Two Commitment Letter did not expressly condition the Lead Banks' Step Two funding obligations under that letter on Tribune's solvency, those obligations were conditioned on the negotiation, execution, and delivery of definitive Step Two Financing Documents, in customary form, presumably meaning that the definitive Step Two Financing Documents would include a solvency requirement mirroring the solvency requirement embodied in the Credit Agreement entered into by the Lead Banks at Step One.  Ex. 1010 at 3 and 5 (Step Two Commitment Letter).

[2508] Ex. 179 at § 4.01(l)(ii) (Credit Agreement); Ex. 175 at § 3.01(b)(i) and (b)(iv)(A) (Bridge Credit Agreement).

[2509] Ex. 708 (Step Two Solvency Certificate)

[2510] Ex. 151 at § 6.2(e) (Merger Agreement).

[2511] Examiner's Sworn Interview of Donald Grenesko, June 25, 2010, at 33:3-34:11; Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 135:11-136:12.

[2512] Indeed, the form of Step One solvency certificate attached as an exhibit to the Credit Agreement specifically references the Chief Financial Officer's reliance on VRC's solvency opinion.  Ex. 187 (Form of Credit Agreement Solvency Certificate) ("I have reviewed such information as I have deemed relevant for purposes of

The definitions of "Solvent" and "Solvency" in the Credit Agreement and the Bridge

Credit Agreement are non-standard because they limit the "fair value" and "present fair saleable

value" components of the definition of "Solvency" at Step Two to an assessment made by

reference only to those transactions "having a similar structure" to the S-Corporation/ESOP

structure.[2513]  This same limitation is built into VRC's analysis of Tribune's solvency at Step

Two.[2514]  As discussed elsewhere in the Report,[2515] the Examiner concludes that this redefinition

of solvency is not appropriate for purposes of determining whether transfers made, and

obligations incurred, in connection the Leveraged ESOP Transactions may be avoided under the

Bankruptcy Code.  Accordingly, because of the restrictive definitions of "Solvent" and

"Solvency" in the Credit Agreement and Bridge Credit Agreement, Tribune could conceivably be

"Solvent" for purposes of the condition precedent to the Lead Banks' contractual obligations, but

nevertheless "insolvent" under the Bankruptcy Code.[2516]

---

this certification, including the opinion of Valuation Research Corporation . . ").  The solvency certificate
ultimately signed by Donald Grenesko on the Step Two Financing Closing Date noted that Mr. Grenesko
reviewed and relied on the opinion of VRC, dated as of December 20, 2007, for purposes of the solvency
certificate.  Ex. 708 (Step Two Solvency Certificate).

[2513] Ex. 179 at § 1.01 (definition of "Solvent" and "Solvency") (Credit Agreement); Ex. 175 at § 1.01 (definition of
"Solvent" and "Solvency") (Bridge Credit Agreement).

[2514] Ex. 728 at TRB0294008 (VRC Step Two Solvency Opinion, dated December 20, 2007) (defining "Fair Value"
and "Present Fair Saleable Value" by reference to acquiring entities "having structures similar to the structure
contemplated in the Transactions by the subject entity (an S-Corporation, owned entirely by an ESOP, which
receives favorable federal income tax treatment), or another structure resulting in equivalent favorable federal
income tax treatment to the Company").

[2515] *See* Report at § IV.B.5.d.(10).

[2516] At least certain of the Lead Banks appear to have considered this possibility.  *See* Examiner's Sworn Interview
of Daniel Petrik, July 8, 2010, at 122:4-20 ("Q:  What were the internal discussions about the propriety of
[VRC] including the discounted cash flow of the tax benefits [in its solvency assessment]?  A:  It was -- it is not
a traditional value that we would -- that I usually look at. . . . I don't do [a] solvency analysis when I am trying
to write an approval document to determine whether I want to [extend credit but] I do look at the cash flow
related to their ability to service debt.  I do know that the tax benefit . . . improve[s] their cash flow.  Whether
that net present value of that discounted cash flow should be included . . . in a solvency opinion was just a
question that we all tried to get our hands around. "); Ex. 931 (Tuvlin E-Mail, dated December 7, 2007) (Merrill
banker questioning whether it is "fair to modify the Fair Saleable Value to assume a buyer has a similar
structure as the S-Corp owned entirely by an ESOP"); Examiner's Sworn Interview of Julie Persily, July 8,
2010, at 195:1-11 ("Q: Were you concerned at the time that these tax savings were only available to this
company in this structure and that if you sold these assets to someone else or the company had to be broken up

Given the deteriorations in market conditions and Tribune's performance, and in light of the limiting language in the Credit Agreement's (with respect to the closing of the Incremental Credit Agreement Facility) and the Bridge Credit Agreement's material adverse effect clauses,[2517] the solvency requirement was the most logical point for the Lead Banks to "push" if they were trying to avoid closing the Step Two Transactions.  A draft JPM internal analysis from September 2007 illustrates why the solvency requirement was more prone to challenge than the requirement of no material adverse effect.[2518]  Under the heading "Material Adverse Effect," the analysis states:[2519]

> The definition of MAE contains "disproportionate" language, essentially dictating that a MAE could only be claimed if the Company significantly underperforms its industry and geographic peers.

> JPMorgan deal team's peer analysis indicates that although Tribune's publishing segment has underperformed its peers in the recent quarters, the entire industry is experiencing very difficult operating environment and deteriorating performance.

Under the heading "Solvency Opinion," by contrast, the analysis states: "JPMorgan deal team's DCF and sum-of-the-parts analysis based on revised July projection[s] indicate that the current valuation of Tribune is approximately $[10] to $[13] billion, potentially failing the solvency tests (*i.e.,* debt amount exceeds the value of Borrower)."[2520]  Although this document is

---

because it couldn't pay its debts that those tax savings weren't real value to some third party?  A: Yeah, I was concerned about that, but our M & A guys told me that they believed there were ways they could sell certain of the assets that would preserve the tax value.").

[2517] Both the Credit Agreement's definition of "Material Adverse Effect" and the Bridge Credit Agreement's definition of "Material Adverse Effect" cross-reference the definition of "Company Material Adverse Effect" in the Merger Agreement.  Ex. 179 at § 1.01 (definition of "Material Adverse Effect") (Credit Agreement); Ex. 175 at § 1.01 (definition of "Material Adverse Effect") (Bridge Credit Agreement); Ex. 151 at § 3.1 (definition of "Company Material Adverse Effect") (Merger Agreement).

[2518] Ex. 1036 (Tribune Company Financing Memo, dated September 10, 2007).

[2519] *Id.* at JPM_00504332.

[2520] *Id.*  An earlier draft of this same document, dated "September [   ], 2007," contains the same "$[10] to $[13] billion" bracketed value.  Ex. 958 (Tribune Company Financing Memo, dated September 2007).  What appears

a draft (the valuations are bracketed and thus apparently preliminary and subject to change), the same document's "Summary of Public Research" cites Lehman and Standard & Poor's reports (dated August 14, 2007 and August 22, 2007, respectively) that appear to buttress the JPM deal team's evident suspicion that insolvency was a possibility.[2521]

At least some members of Tribune's management recognized that the Lead Banks would focus very carefully on the solvency requirement.  Crane Kenney (Tribune's General Counsel at the time) explained during his sworn interview with the Examiner:[2522]

> [A]fter . . . we had signed up the deal with Zell and had obtained all the financing . . . from there until the end . . . it should have been just procedural . . . primarily the issue was getting the FCC's approval.  [O]nce you had the banks committed and locked up and Sam committed and locked up and the tender finished, from there to the finish line . . . it should have been procedural and would have been procedural I think until the banks started getting nervous about the commitments they had made. . . .

> The solvency opinion became this issue because the banks I think probably reviewed the credit agreement and said: "This thing's ironclad.  The only hope we have that we don't have to fund these loans that we no longer want to fund is that we can somehow [prevent the issuance of a solvency certificate]. . . ."

> I think they thought they'd take a shot at . . . solvency. . . .  I think they were trying to get out of their obligations by trying to squeeze the solvency certificate.

Solvency also was a logical focus because at least certain of the Lead Banks realized they could not fund the Step Two Transactions if doing so would render Tribune insolvent.

Citigroup's Julie Persily explained:[2523]

---

to be a portion of a more final document reaches the same conclusion without using specific numbers: "JPMorgan deal team's analysis indicates that the Company will potentially fail the solvency tests pro forma for Step 2."  Ex. 1034 (JPM Undated Discussion Points).

[2521] The Lehman report is summarized as warning that "Tribune is significantly over-levered after Step 1 and should not incur any additional debt."  Ex. 1036 at JPM_00504332 (Tribune Company Financing Memo, dated September 10, 2007).  The Standard & Poor's report is summarized as concluding that "Debt other than Credit Facilities have very low recovery of 0% to 10%."  Id.

[2522] Examiner's Sworn Interview of Crane Kenney, July 8, 2010, at 72:5-74:1.

604

> [T]here were two things going on here.  On the one hand the market had completely collaped and we knew that if we funded this we were going to lose money, but separately the company's performance was deteriorating and we didn't want to fund the second stage of a transaction and cause the company's insolvency by doing so.

BofA's Daniel Petrik concurred:[2524]

> Bank of America and the other underwriters were [asking about] the solvency of this company . . . to make sure that . . . we weren't doing something that was inappropriate based on our regulatory requirements [concerning] lending to insolvent companies. . . . There are definitely regulators that would criticize the banks for lending to an insolvent company.  And there are probably legal ramifications of lending to insolvent companies.  And I am supposed to be a fiduciary to my shareholders and not lend to insolvent companies.

A Merrill banker aptly summarized the situation as he welcomed a new member to the team in August 2007: "We will have a bit of work to do as the second-step financing for the Zell buyout moves closer to execution.  Lots of focus internally because we have a sizable [sic] commitment and the business is underperforming."[2525]

### b.    Lead Banks at Step Two.

The Lead Banks undertook solvency-related diligence jointly and individually in connection with Step Two.  Their joint activities included propounding due diligence questions to Tribune's management and consulting (through counsel) a solvency expert to assist in evaluating VRC's work.  These joint activities (that largely framed each individual institution's internal analyses of Tribune's solvency) are discussed below, followed by separate discussions of institution-specific analyses and due diligence.  Collectively, these analyses suggest that the Lead

---

[2523]  Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 166:14-21.

[2524]  Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 126:20-127:17.

[2525]  Ex. 932 (Harrison E-Mail, dated August 17, 2007).

Banks were aware of the significant possibility that Tribune would be rendered insolvent by the consummation of Step Two.

### (1)    Joint Due Diligence.

On August 23, 2007, the Lead Banks jointly sent Tribune a five-page due diligence outline.[2526]  In addition to operational information about Tribune's strategy, markets, and business lines, the Lead Banks sought detailed financial information including:[2527]

- "Overview of 5-year operating model—longer-term expectations,"

- "Quarterly projections through 2009, annually thereafter,"

- "Outline [of] significant differences between the new forecasts and forecasts provided in April 2007,"

- "Rationale for key corporate level operating assumptions and financial drivers, e.g., corporate G&A, etc.,"

- "Rationale for key Publishing segment assumptions for 2H 2007 and 5-year operating model,"

- "[M]arket-by-market . . . quarterly projections through 2009, annually thereafter," and

- "Rationale for key Digital/Interactive segment assumptions for 2H 2007 and 5-year operating model (including quarterly projections through 2009)."

On September 20, 2007, Tribune sent the Lead Banks a five-year consolidated model that included downside scenarios "prepared by Tribune solely in response to your requests."[2528]  Mr. Bigelow's cover e-mail noted that "[t]he downside scenarios in the model are not sensitivity cases endorsed or adopted by Tribune management" and "are not to be disclosed to any other

---

[2526]  Ex. 998 (Harrison E-Mail, dated August 23, 2007).

[2527]  *Id.* at ML-TRIB-0582684-88.

[2528]  Ex. 999 (Lewicki E-Mail, dated September 20, 2007).  *See also* Ex. 938 (Kurmaniak E-Mail, dated September 14, 2007) (forwarding Chandler Bigelow's e-mail in which he forwarded an earlier version to Citigroup's Rosanne Kurmaniak, who "offer[ed] to help [Tribune] with the preparation of our financial model").

person or otherwise used in connection with the syndication or marketing of the second step financing."[2529]  These downside scenarios included, among other things, "a sensitivity case [that] reflects the assumptions made by Craig Huber of Lehman Brothers in his research report dated August 14, 2007"[2530]—the same research report that JPM's internal memorandum summarized as warning that "Tribune is significantly over-levered after Step 1 and should not incur any additional debt."[2531]  Mr. Bigelow testified during his sworn interview with the Examiner that Tribune used Mr. Huber's projections in preparing a stress case because Mr. Huber was the most pessimistic of the analysts covering Tribune.[2532]

In late September 2007, the Lead Banks jointly decided to engage Murray Devine, a valuation advisory firm, to assist in the Lead Banks' due diligence concerning Tribune's solvency.[2533]  Arrangements were made through the Lead Banks' law firm, Cahill Gordon & Reindel LLP, for the express purpose of affording attorney-client and/or work product protection to the Lead Banks' interactions with Murray Devine.[2534]  The Lead Banks provided Murray Devine with VRC's Step One solvency analysis and Tribune's most recent financial model,[2535]

---

[2529]  Ex. 999 (Lewicki E-Mail, dated September 20, 2007).

[2530]  *Id.*

[2531]  Ex. 1036 at JPM_00504332 (Tribune Company Financing Memo, dated September 10, 2007).

[2532]  Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 153:17-21 ("Craig Huber was out there with a model, very pessimistic, and we thought, hey, one of the most effective ways to really stress test the business is let's take Craig's numbers.").

[2533]  Ex. 969 (Murray Devine Engagement Letter, dated October 1, 2007); Ex. 974 (Kenny E-Mail, dated October 2, 2007) ("Raj from JPM called and would like to have a call with us on Thursday or Friday morning with a smaller group.  He specifically wants our input on the VRC opinion and presentation and to educate them on valuation methods and how they apply in solvency opinions.  He mentioned discount rate calculations[,] the weightings of methods, etc.").

[2534]  Examiner's Interview of Rajesh Kapadia, June 25, 2010.

[2535]  Ex. 274 (VRC Solvency Opinion Analysis, dated May 9, 2007); Ex. 990 (Tribune Company Model, dated September 30, 2007).

and later, VRC's Step Two presentations to the Tribune Board.[2536]  Although Murray Devine

evaluated these materials and assisted the Lead Banks in formulating questions concerning

solvency, Murray Devine was not asked to (and did not) render an opinion as to whether Tribune

was solvent.  Instead, as set out in its engagement letter, Murray Devine was retained to provide

guidance "as to the methodologies and analyses which may be used by *another* firm in preparing

a solvency opinion . . . in connection with the Transaction."[2537]

        The Examiner asked representatives of each of the Lead Banks whether they asked

Murray Devine to assess Tribune's solvency.  All of the Lead Banks agreed that Murray Devine

was not asked to assess Tribune's solvency, but rather was retained to assist the Lead Banks in

understanding VRC's solvency analysis.  JPM's Rajesh Kapadia explained that the Lead Banks

"needed to get smarter and . . . educated around the solvency process," but did not want or need a

de novo assessment of Tribune's solvency because (according to Mr. Kapadia) the condition

precedent to the Lead Banks' obligations was the Chief Financial Officer's certification of

solvency—not the Lead Banks' own assessment of solvency.[2538]  Todd Kaplan of Merrill

testified that "Murray Devine was asked to give us background as to how . . . solvency opinions

were developed and rendered," not to actually render a solvency opinion itself.[2539]  Similarly,

when Citigroup's Julie Persily was asked whether Citigroup "ask[ed] Murray Devine to advise

---

[2536]  Ex. 1030 (Schaffzin E-Mail, dated December 7, 2007) (forwarding VRC's December 4, 2007 presentation); Ex. 738 (VRC Preliminary Solvency Analysis, dated December 18, 2007); Ex. 886 (Schaffzin E-Mail, dated December 17, 2007).

[2537]  Ex. 969 at 1 (Murray Devine Engagement Letter, dated October 1, 2007) (emphasis added).  *See also* Ex. 970 (Murray Devine Time Records) (reflecting the relatively narrow scope of work performed by Murray Devine).

[2538]  Examiner's Interview of Rajesh Kapadia, June 25, 2010.

[2539]  Examiner's Sworn Interview of Todd Kaplan, July 8, 2010, at 101:13-102:20.  *See also id.* at 97:17-21 ("Murray Devine was brought in as an expert in the field of delivering solvency opinions, and that expertise was our attempt to learn more about how solvency opinions were developed and rendered."); *id.* at 104:2-105:11 ("[I]f we as a lending group in the August, September, October time frame had decided gee, it would be nice to have a solvency opinion, that was too late [because] we didn't have any ability to garner access to the company for a solvency expert to render an opinion.").

you whether the second stage closing would render Tribune insolvent," she responded: "We didn't ask the question that way. . . . [W]e asked how do you develop a solvency opinion, what do you look at?"[2540]  Daniel Petrik of BofA explained "that [the Lead Banks] discussed this internally and viewed that we did not need another solvency opinion, but we wanted to . . . understand [VRC's] solvency opinion."[2541]

Tribune hosted a Lead Bank due diligence session on October 1, 2007.[2542]  The Lead Banks attended with Murray Devine, and also met as a group (without Tribune) to discuss the session.[2543]  Tribune's agenda for the session included modeling assumptions, operating plan sensitivities, and capital planning.[2544]  Fifty-eight attendees were expected, including Tribune's senior management, representatives from key Tribune business units, EGI, and the Lead Banks.[2545]  In connection with the diligence session, Tribune provided the Lead Banks with its finalized five-year projections, which included a management downside case, management base case, and management upside case.[2546]

The Lead Banks sent follow-up diligence questions on October 3, 2007 and November 1, 2007.[2547]  With a particular focus on Tribune's financial projections, the Lead Banks asked management to "[d]iscuss the process of preparing the projection models" and to provide

---

[2540]  Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 167:4-13.

[2541]  Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 146:15-18.  *See also id.* at 145:5-8 ("[T]he underwriters talked about whether we need someone to help us understand, someone that would be more of an expert to help us understand VRC's work.").

[2542]  Ex. 1079 (Chen E-Mail, dated September 28, 2007) (forwarding agenda for Underwriters Due Diligence meeting on October 1, 2007).

[2543]  Ex. 991 (Slovitt E-Mail, dated October 1, 2007).

[2544]  Ex. 1079 at TRB0223091-92 (Chen E-Mail, dated September 28, 2007).

[2545]  *Id.* at TRB0223093-94.

[2546]  Ex. 1025 (Five Year Projected Financial Information and Key Credit Statistics and Ratios, dated October 1, 2007).

[2547]  Ex. 1033 (Tribune Follow-Up Diligence Questions, dated October 3, 2007); Ex. 939 (Chen E-Mail, dated November 1, 2007).

"quarterly projections through 2009," "more details on classified revenue," "more details on interactive growth," and a "more detailed breakdown" of expenses.[2548]  For the interactive business projections, the Lead Banks wanted to know whether investments in the interactive business could be cut by 50% (as in the downside case) while still maintaining growth of 15% a year.[2549]  Perhaps prompted by a concern Citigroup articulated in October 2007 that Tribune's "cost cutting program [is] not fully baked" and Citigroup's "worrie[s] about newspaper projections,"[2550] the Lead Banks sought specific "case studies on results *already achieved* and impact on projections at selected Tribune newspapers for any new revenue enhancing and/or cash cost saving initiatives."[2551]  The Lead Banks also noted that, "[b]ased on the Chicago and Los Angeles market reports, Tribune's newspapers' share of net paid circulation is declining," and they asked: "What factors are driving this trend?  Who is gaining share in these markets: other newspapers?"[2552]

On November 8, 2007, the Lead Banks sent management a lengthy list of questions specifically directed at the solvency analysis being performed by VRC.[2553]  These questions appear to have been largely drafted by Murray Devine.[2554]  The questions pertaining to the net

---

[2548]  Ex. 1033 at MD002030A (Tribune Follow-Up Diligence Questions, dated October 3, 2007).

[2549]  *Id.*

[2550]  Ex. 933 (Tuvlin E-Mail, dated October 6, 2007) (Merrill banker describing Citigroup's concerns:  "Citi worried about leverage levels, though.  Concerned that cost cutting program not fully baked.  Also worried about newspaper projections.  They may be pulling back on all-in leverage, at least based on informal conversation I had with one of their lev fin guys. . . .").

[2551]  Ex. 939 at ML-TRIB-0586387 (Chen E-Mail, dated November 1, 2007) (second emphasis omitted).

[2552]  *Id.*

[2553]  Ex. 934 at ML-TRIB-0404767 (Kapadia E-Mail, dated November 8, 2007).

[2554]  *See, e.g.,* Ex. 1026 (Kenny E-Mail, dated October 19, 2007) (relaying request from JPM that Murray Devine "send questions for VRC on their analysis"); Ex. 1027 (VRC Step 2 Solvency Opinion Valuation Questions, dated October 22, 2007); Ex. 1028 (Draft Step Two Solvency Valuation Questions, dated October 23, 2007) (produced from Murray Devine's files); Ex. 1029 (Draft Step Two Solvency Valuation Questions, dated November 6, 2007) (produced from Murray Devine's files).

present value of the S-Corporation/ESOP tax benefits and the assumption that Tribune could refinance its debts in 2014 and 2015 are addressed above.[2555]  Other questions included:[2556]

- "Summarize preliminary conclusions, nature of due diligence investigation and scope of review";

- "Provide detail on the comparable transactions used in the analyses," including the underlying business and business mix of the target companies, whether the target companies were public or private, and the dates of the transactions;

- "What comparable public companies were used in the analyses?";

- "Explain the sum of individual assets method and underlying assumptions";

- "Explain the weighting given to the different valuation approaches, if any. Was any weighting different as between Step 1 and Step 2?"

- "Discuss the methods and assumptions used in the discounted cash flow analysis," including the discount rate used, whether the rate varied by year, information about the assumed capital structure, and the methodology and assumptions underlying the terminal year value;

- "Discuss whether methods and principles employed in solvency analysis are consistent between Step 1 and Step 2," including "any general changes in assumptions and outlook that were considered in the Step 2 analysis as compared with the Step 1 analysis";

- A series of inquiries concerning valuation of Tribune's equity investments;

- "Was the value of any excess real estate considered in the valuation?";

---

[2555] *See* Report at § III.H.3.

[2556] Ex. 934 at ML-TRIB-0404768-69 (Kapadia E-Mail, dated November 8, 2007).

- "What is considered the acceptable range of excess capital in the capitalization test [and what] is considered to be the acceptable range of equity cushion?";

- "Was a company specific or market capital structure used to calculate the levered cost of equity?";

- "What downside cases were considered[, what] were the relevant assumptions to the downside case and how did it affect overall analyses," including financial covenants and "revolver capacity to fund [Tribune's] operating capital needs?"; and

- "Discuss differences from recent research published by equity analysts and rating agency (Lehman, Deutsche Bank, Merrill, S&P)?  Were these reports relevant to the analysis?".

Tribune waited nearly a month to respond to the Lead Banks' solvency diligence questions.  On December 7, 2007, Mr. Bigelow sent VRC's answers (which had been edited by Tribune management) to the Lead Banks.[2557]  VRC's answers were formatted as a memorandum from Bryan Browning and Mose Rucker of VRC to Mr. Bigelow, with a disclaimer at the outset that VRC was making "no representation or warranty . . . as to the accuracy or completeness of any information provided in this memorandum [or] information received from Tribune" and that:[2558]

> This Memorandum is not intended to be a representation of Tribune's or any other company's solvency to [the Lead Banks] or any other person [and] VRC makes no representation or warranty regarding any actions the Company, [the Lead Banks,] or any other

---

[2557]  Ex. 281 (Memorandum from Mr. Browning and Mr. Rucker to Mr. Bigelow, dated December 7, 2007); Ex. 754 (Bigelow E-Mail, dated December 7, 2007) (providing edits to VRC's draft responses to Lead Bank questions). Earlier that day, Mr. Bigelow also had sent the Lead Banks a copy of the preliminary solvency presentation VRC delivered to the Tribune Board on December 4, 2007.  Ex. 1030 at MD002285A (Schaffzin E-Mail, dated December 7, 2007).

[2558]  Ex. 281 at TRB0398553-54 (Memorandum from Mr. Browning and Mr. Rucker to Mr. Bigelow, dated December 7, 2007).

person may take in reliance on or in reference to matters presented
in these responses.

In the substantive portion of the memorandum, VRC set out answers to each of the Lead

Banks' 18 questions, and attached schedules with additional information on comparable

companies and comparable transactions considered in VRC's analysis.

Five days later, the Lead Banks, with Murray Devine's assistance, sent an extensive set of

follow-up questions,[2559] prefaced as follows:[2560]

> The following are additional questions based upon a review of the
> Materials.  The Banks request an opportunity to receive written
> responses to these questions as soon as possible or to discuss the
> answers to the questions on a due diligence telephone call as soon
> as possible.  It is likely that the Banks will have further questions
> and a telephonic discussion will be necessary.  In addition, the
> Banks request a separate opportunity to discuss with management
> of Tribune the Materials and the certificate required of Tribune
> management concerning solvency that is a condition to the Banks'
> financing commitments.

Much of the focus of the Lead Banks' follow-up questions was VRC's valuation of the

anticipated S-Corporation/ESOP tax savings and VRC's assumption that Tribune could refinance

its debts in the future, which are addressed elsewhere in the Report.[2561]  Other questions

included:[2562]

> •      We note that the comparable transactions list is largely
> made up of transactions that preceded significant changes in the
> market for securities of comparable companies.  Why did this not
> merit giving lesser weight to the comparable transactions
> analyses? . . .

---

[2559]  Ex. 755 at VRC0070618-19 (Rucker E-Mail, dated December 12, 2007) (attaching Lender Questions); Ex. 1031 (Draft Step 2 Solvency Valuation Questions, dated December 10, 2007); Ex. 1032 (Draft Step 2 Solvency Valuation Questions, dated December 11, 2007).

[2560]  Ex. 755 at VRC0070618 (Rucker E-Mail, dated December 12, 2007) (attaching Lender Questions).  "Materials" was a defined term encompassing VRC's December 4, 2007 presentation to the Tribune Board and VRC's December 7, 2007 memorandum answering the Lead Banks' initial solvency questions.  *Id.*

[2561]  *See* Report at § III.H.3.

[2562]  Ex. 755 at VRC0070619 (Rucker E-Mail, dated December 12, 2007) (attaching Lender Questions).

- To what extent are the current trading values for Tribune's debt and credit default swaps relevant to the solvency analyses and the assumptions, capitalization and methodologies employed by VRC?  In particular, what would these trading levels imply about appropriate equity discount rates and refinancing risks? . . .

- It appears as though the DCF valuation increased between Step One and Step Two while the other valuation methods declined—can you highlight for us what you believe to be the main drivers behind this?

The volume and tenor of the Lead Banks' questions raised concerns among Tribune's management that the Lead Banks were attempting to "spook" VRC by asking it "to assume all sorts of things, some of which are reasonable and some of which we thought weren't, [such as] 'Do you think the world is going to end' and various other things."[2563]  Management rejected this approach:[2564]

> [W]e [were not] required to put our independent solvency experts up on a stage and let anybody they want just throw as many curve balls at them as they can. . . . [T]he solvency firm is required to give an independent analysis to the board.  They have to do their work, obviously in earnest and with diligence, but you don't have to subject them to a full on assault by anybody off the street.

Likely as a result of Tribune management's concerns, no written answers were ever provided to the Lead Banks' follow-up questions to VRC concerning solvency.[2565]  Instead, Tribune management, the Lead Banks, Murray Devine, and attorneys for both sides (including litigation counsel Tribune retained in preparation for a possible breach of contract lawsuit if the Lead Banks did not fund at Step Two[2566]) scheduled a telephone call for December 17, 2007 to

---

[2563] Examiner's Sworn Interview of Crane Kenney, July 8, 2010, at 22:14-22.  *See also id.* at 28:19-29:4 ("[I] n some ways we felt like they were . . . saying:  Well, let's see if we can just throw a mess of stuff at VRC that might get them so nervous they don't issue their opinion. So did you assume that the world might end tomorrow, did you assume this, that and the other.").

[2564] Examiner's Sworn Interview of Crane Kenney, July 8, 2010, at 24:4-12.

[2565] *See* Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 277:18-281:10.

[2566] Examiner's Sworn Interview of Crane Kenney, July 8, 2010, at 16:22-17:3 ("I remember telling my CEO I want to hire yet another law firm specifically to make sure if [the Lead Banks] breach our commitment we have

discuss the Lead Banks' questions.[2567]   Three days before that call, however, the Lead Banks had

their own internal call to discuss solvency.   BofA banker Daniel Petrik took the following notes

of the Lead Banks' December 14, 2007 conference call:[2568]

---

recourse.  That was Quinn [Emanuel].").  Mr. Kenney invited Michael Carlinsky of Quinn Emanuel to join the
December 17, 2007 call.  Ex. 1080 (Kenney E-Mail, dated December 17, 2007).

[2567]   Ex. 1080 (Kenney E-Mail, dated December 17, 2007).

[2568]   Ex. 959 at BOA-TRB-0001201A (Petrik Handwritten Notes, dated December 14, 2007).

Word Product
_____

12/14/07  UW call
- Need URC info today and discuss Monday
- If A slide - change notices to NYSE
                                    to Employees

Chris   - The Not 100% final but leaning
          Going ahead and funding
          Risk greater if do not fund

        MRC - Not 100% but leaning
              to Not fund -
              - Reasonable that not a solvent company
              - Not planning on being long wolf

Julie   Citi - Numerous & Not Significant to fund
               - More risk if end up in BK
               - Focus on understanding risk of not funding
               - Not get landed -

        BFd - Tose Biaggi   Bill Bower
              - Lyon S.      Don Kelly
              Roger, Dan P., Hetak

        If in good faith  - good defense

616

Mr. Petrik's notes appear to state as follows:[2569]

Word Product

12/14/07 - UW call

- Need VRC info today and discuss Monday

- If D date - change entries to NYS to Employees

Chris          JPM  - Not 100% final but leaning

Going ahead and funding

Risk greater if do not fund

MRL - Not 100% but leaning

to not fund

- Reasonable that not a solvent company

- Not planning on being lone wolf

Julie          Citi  - Numerous and not significant to not fund

- More risk if end up in bankruptcy

- Focus on understanding risk of not funding

- Not yet landed  -

BofA          - Tom Briggin          Bill Bower

- Lynn S.          Dan Kelly

Rajin, Dan P.,          [illegible]

If in good faith - good defense

---

[2569] *Id.*

The Examiner received Mr. Petrik's notes after all Lead Bank interviews had concluded, shortly before the deadline for filing the Report.  Accordingly, the Examiner was not able to question witnesses about the views expressed on the December 14, 2007 conference call.  It does appear, however, that after December 14, 2007 the focus of the Lead Banks' diligence shifted from the substance of VRC's solvency conclusions to the process by which VRC arrived at those conclusions.  For example, in contrast to the technical, multi-part questions the Lead Banks sent to Tribune on December 12, 2007,[2570] the final set of Lead Bank questions propounded on December 17, 2007 consisted of the following:[2571]

> 1.    Please confirm that the changes between the December 4 and December 18 draft solvency opinion arose from VRCs ongoing independent analysis and were not influenced by others, including the Company, its Board of Directors or their respective advisors.
>
> 2.    Please confirm that the form and format of the solvency opinion that is to be delivered on December 18 (including the qualifications, assumptions or exceptions thereto) will be in substantially the same form and format as the opinion delivered in connection with the first step transaction.
>
> 3.    Would VRC's opinion reach the same solvency conclusion if the PHONES liability was considered at face value instead of market value as described in the draft December 18th presentation?
>
> 4.    If VRC's opinion would reach the same solvency conclusion if the PHONES liability was considered at face value, would VRC's opinion reach the same solvency conclusion if the PHONES liability was considered at face value and the discount rate applied to the ESOP Tax Savings was changed to match EGI/Zell's implied IRR of approximately 41%?

Tribune General Counsel Crane Kenney responded the next day:[2572]

---

[2570] Ex. 755 at VRC0070619 (Rucker E-Mail, dated December 12, 2007) (attaching Lead Bank Questions).

[2571] Ex. 1037 (Kapadia E-Mail, dated December 17, 2007).

[2572] Ex. 1068 (Kapadia E-Mail, dated December 19, 2007).

The Board and its special counsel, Skadden, did not react well to your questions but at our urging were willing to provide an excerpt from the draft minutes of today's meeting. I believe this will address your concerns regarding their diligence and VRC's independence. We are still at work on the other three questions and hope to have some resolution tomorrow.

Mr. Kenney attached to his message a one-page document entitled "Excerpt from 12/18/07 minutes," which recited the following events that purportedly transpired at the meeting of the Tribune Board:[2573]

Representatives of VRC reviewed its solvency analysis with the board. Management confirmed its belief that VRC's analysis and the underlying assumptions and projections are reasonable, if not conservative. Diligence questions that had been posed by the banks to VRC and to management were previously made available to the board. The board (directly and through its counsel and financial advisors) posed its own questions to VRC and to management and received answers thereto. Without limitation, (i) VRC confirmed that its opinion was the result of its independent, professional advice without improper influence of management, (ii) VRC confirmed that it engaged in a significant testing of both management's base case and downside cases, (iii) VRC confirmed that it had received all the information it had requested from the Company; (iv) VRC described its internal opinion review process as rigorous and confirmed that its fee would be the same whether it opined favorably or unfavorably as to solvency, (v) VRC explained the changes in its approach to the PHONES valuation and that such change was not, in any event, outcome determinative and (vi) VRC confirmed it received and considered written questions submitted by the four lead banks to management related to the second step transaction and its solvency analysis reflects VRC's consideration of those questions.

The board then met with VRC in executive session, without management and continued its review of VRC's solvency analysis. Management then rejoined the meeting and after completion of VRC's review and presentation and all questions and answers, VRC rendered its opinion, and said that it would provide a written opinion brought down to closing. Management then advised the board that management stands ready to deliver the closing certificate contemplated by the Credit Agreement as to solvency

---

[2573] *Id.* at JPM_00475089.

and that such certificate will be based upon its own analysis, as further supported by the VRC opinion and analysis. Thereupon, the board recessed and the Special Committee met with its counsel and financial advisors. When the board reconvened, it was advised that the Special Committee recommended acceptance of the VRC opinion in satisfaction of the condition to closing set forth in the Merger Agreement.

Based upon the presentations and discussions at the meeting (as well as presentations and discussions at prior meetings of the board, including on May 9, 2007 and December 4, 2007) and the recommendation of the Special Committee, the board determined (i) that it could rely in good faith on the VRC opinion and (ii) that the opinion is in form and substance satisfactory to the Company for purposes of Section 6.2(e) of the Merger Agreement.

The final, signed document that purports to be the minutes of the Tribune Board's December 18, 2007 meeting differs in several respects from the excerpt Mr. Kenney circulated to the Lead Banks.[2574] In addition to certain typographical and stylistic changes that suggest the document signed by Mr. Kenney is a later version of the document Mr. Kenney sent to the Lead Banks,[2575] the two documents differ in the following respects:[2576]

• The document signed by Mr. Kenney omits the sixth item that VRC allegedly confirmed to the Tribune Board, that VRC "received and considered written questions submitted by the four lead banks to management related to the second step transaction and its solvency analysis reflects VRC's consideration of those questions";

---

[2574] Ex. 11 (Tribune Board Meeting Minutes, dated December 18, 2007).

[2575] For example, the document Mr. Kenney signed: (a) specifies the names of the VRC representatives (rather than referring to them as "Representatives of VRC"), (b) changes all references from "board" to "Board," consistent with other Tribune Board minutes (*see, e.g.*, Ex. 58 (Tribune Board Meeting Minutes, dated May 1, 2006)), and (c) removes a stray space before a closed parenthesis in the final paragraph.

[2576] *Compare* Ex. 1068 at JPM_00475089 (Kapadia E-Mail, dated December 19, 2007) *with* Ex. 11 at TRB0415685-86 (Tribune Board Meeting Minutes, dated December 18, 2007). Notably, certain Parties referred the Examiner to portions of Mr. Kenney's draft excerpt that were ultimately omitted from the final, duly adopted minutes, indicating that these Parties are unaware that the excerpt Mr. Kenney circulated to the Lead Banks was not the final document approved by the Tribune Board as the official minutes of the December 18, 2007 meeting.

      •     The document signed by Mr. Kenney omits the statement that "[t]he board then met with VRC in executive session, without management and continued its review of VRC's solvency opinion analysis"; and

      •     The document signed by Mr. Kenney adds a notation that Mr. Zell abstained from the Tribune Board's vote to accept and rely on the VRC opinion.

Notably, Mr. Kenney did not forward excerpts from the minutes of the Special Committee, even though the draft Special Committee minutes ultimately presented to the Examiner as reflecting the December 18, 2007 proceedings before the Special Committee purport to demonstrate additional diligence by the Special Committee (with representatives from Morgan Stanley) concerning the validity of VRC's Step Two solvency analysis.  The December 18, 2007 Special Committee meeting is discussed in more detail elsewhere in the Report.[2577]

### (2)    JPM's Due Diligence.

Although it is not clear when JPM started to generate its own valuation analyses, the Examiner located in the document depository at least eight drafts of such analyses with dates ranging from December 10, 2007 through December 18, 2007.  The latest of these, dated December 18, 2007, calculates Tribune's net equity value under a range of "stress," "low," "mid," and "high" valuations:[2578]

|  | Stress | Low | Mid | High |
|---|---|---|---|---|
| Excess Capital (post-Step Two) | ($1.225 billion) | $50 million | $1.505 billion | $3.209 billion |

---

[2577] See Report at § III.G.1.

[2578] The Examiner located four JPM documents dated December 18, 2007 titled "Tribune Valuation Update."  The documents appear to be substantially similar if not identical.  *See* Ex. 960 (Tribune Valuation Update, dated December 18, 2007); Ex. 961 (Tribune Valuation Update, dated December 18, 2007); Ex. 962 (Tribune Valuation Update, dated December 18, 2007); Ex. 963 (Tribune Valuation Update, dated December 18, 2007).

JPM's analysis suggested that Tribune would be insolvent only under a "stress" case, would be barely solvent under a "low" case, and would be substantially solvent under the "mid" and "high" cases.  In addition to the fact that JPM's calculations of the net present value of the anticipated S-Corporation/ESOP tax savings are substantially lower than VRC's final calculations,[2579] JPM's valuations of Tribune's equity value (like VRC's) appear to be upwardly biased due to high comparable transactions valuations.[2580]  To illustrate, if JPM's December 18, 2007 internal analysis were adjusted to eliminate the comparable transactions valuation methodology (thereby giving one-half equal weight to the comparable companies and discounted cash flow methodologies),[2581] and if the net present value of the anticipated S-Corporation/ESOP tax savings was excluded (as is appropriate for purposes of assessing solvency[2582]), the following stress, low, mid, and high cases would result:[2583]

| Analysis | Stress | Low | Mid | High |
|---|---|---|---|---|
| Excess Capital (post-Step Two) Excluding Comparable Transactions and NPV of Tax Savings | ($2.017 billion) | ($1.445 billion) | ($92 million) | $1.716 billion |

---

[2579]  JPM assigned $612 million, $648 million, and $687 million in value for the S-Corporation/ESOP tax savings in its low, mid, and high valuations, respectively, compared to VRC's $816 million, $876 million, and $936.1 million valuations.  *Compare* Ex. 960 at JPM_00156245 (Tribune Valuation Update, dated December 18, 2007) *with* Ex. 1045 at TRB0293989 (VRC Solvency Analysis, dated December 20, 2007).

[2580]  Ex. 960 at JPM_00156245 (Tribune Valuation Update, dated December 18, 2007) (giving one-third equal weight to "Transactions comps" valuation methodology that trends substantially higher than the "Trading Comps" and "DCF" valuation methodologies).  The proper weighting of the valuation methods is addressed elsewhere in the Report.  *See* Report at §§ III.E.3. and III.H.3.

[2581]  This is not to say that the comparable transactions methodology is impermissible, but rather to illustrate the potential distortion that can result if comparable transactions are not appropriately selected.  *Cf.* Ex. 931 (Tuvlin E-Mail, dated December 7, 2007) (internal Merrill e-mail critiquing VRC's analysis because "comparable transactions in the context of few to none in the past year [make it] a challenge to understand their value here").

[2582]  *See* Report at § IV.B.5.d.(10).

[2583]  The values reflected in the table are based on the values set forth in Ex. 960 at JPM_00156245 (Tribune Valuation Update, dated December 18, 2007).

It is also notable that JPM appears to have added a fourth case—the "stress" case—at precisely the point in time that its internal analyses began showing insolvency in the low case.[2584] The drafts prepared between December 10, 2007 and December 13, 2007 show how JPM's final equity valuation analysis evolved, including the addition of a stress case:

| Document | Stress | Low | Mid | High |
|---|---|---|---|---|
| JPM 12/10/07 Analysis[2585] | N/A | $146 million | $1.918 billion | $3.955 billion |
| JPM 12/12/07 Analysis I[2586] | N/A | $146 million | $1.918 billion | $3.955 billion |
| JPM 12/12/07 Analysis II[2587] | N/A | $246 million | $1.868 billion | $3.755 billion |
| JPM 12/13/07 Analysis I[2588] | N/A | $246 million | $1.868 billion | $3.755 billion |
| JPM 12/13/07 Analysis II[2589] | N/A | ($329 million) | $1.450 billion | $3.301 billion |
| JPM 12/13/07 Analysis III[2590] | N/A | ($504 million) | $1.202 billion | $2.974 billion |
| JPM 12/13/07 Analysis IV[2591] | ($546 million) | $50 million | $1.505 billion | $3.299 billion |

Although the Examiner is not able to determine the order in which each analysis bearing the same date was prepared, the overall trend of the analyses from December 10, 2007 to December 13, 2007 appears to suggest that projected insolvency in the low case led JPM to add a fourth case (the stress case) to reflect the insolvency scenario, with modifications to the low case such that it once again reflected solvency (albeit thin).

---

[2584] Ex. 964 at JPM_00156034 (Tribune Valuation Update, dated December 13, 2007).

[2585] Ex. 1014 at JPM_00108127 (Tribune Valuation Update, dated December 10, 2007).

[2586] Ex. 1015 at JPM_00108134 (Tribune Valuation Update, dated December 12, 2007).

[2587] Ex. 1016 at JPM_00108148 (Tribune Valuation Update, dated December 12, 2007).

[2588] Ex. 1017 at JPM_00108141 (Tribune Valuation Update, dated December 13, 2007).

[2589] Ex. 1018 at JPM_00156058 (Tribune Valuation Update, dated December 13, 2007).

[2590] Ex. 1019 at JPM_00156022 (Tribune Valuation Update, dated December 13, 2007).

[2591] Ex. 964 at JPM_00156034 (Tribune Valuation Update, dated December 13, 2007).

When questioned about these internal analyses during his interview with the Examiner, JPM's Rajesh Kapadia could not recall the intended audience for which they were prepared, but he believed the analyses were merely a continuation of JPM's Step Two solvency diligence.[2592] Mr. Kapadia stated that he did not believe JPM's diligence in the week prior to the closing of the Step Two Transactions was shared with senior JPM executives such as James Lee or Jamie Dimon, nor did Mr. Kapadia believe that JPM was using these internal solvency analyses to make a final decision whether to close.[2593]  To the contrary, and generally consistent with the view apparently expressed by JPM on the December 14, 2007 Lead Bank conference call that the "risk [was] greater if [the Lead Banks] do not fund,"[2594] albeit with a much different spin, Mr. Kapadia indicated that "in practice, people don't go up to the 11th hour and not close the deal.  This is not like we're . . . diligencing to get out of the deal."[2595]  Indeed, Mr. Kapadia could recall only one instance in his career in which a deal did not close because the closing conditions were not met, and in that case, everyone involved "knew seven to ten days before closing and we reconfigured the deal and took it to market six months later."[2596]

Certain Parties referred the Examiner to an e-mail James Lee sent to Jamie Dimon the day before the closing of the Step Two Transactions, in which Mr. Lee reports that he spoke to Samuel Zell that morning "to get his confirmation that [Tribune] was solvent and he was going to make good on his commitment to me to make this deal work,"[2597] which those Parties believe is an indication that JPM believed that Tribune was or would be insolvent upon the closing of

---

[2592]  Examiner's Interview of Rajesh Kapadia, June 25, 2010.

[2593]  *Id.*

[2594]  Ex. 959 at BOA-TRB-0001201A (Petrik Handwritten Notes, dated December 14, 2007).

[2595]  Examiner's Interview of Rajesh Kapadia, June 25, 2010.

[2596]  *Id.*

[2597]  Ex. 846 (Lee E-Mail, dated December 19, 2007).

Step Two.  When questioned about this e-mail during his interview with the Examiner,

Mr. Dimon characterized the communication as a personal entreaty from Mr. Lee to Mr. Zell, in

the face of Tribune's declining financial performance, to do the necessary work to improve

Tribune's financial performance *i.e.*, "this is just saying 'hey partner, we've got this far, we need

you now to give it everything you've got.'"[2598]  This explanation accords with Mr. Zell's

statement during his interview with the Examiner that by the time Mr. Lee made his telephone

call to Mr. Zell, "I knew he was going to fund:"[2599]

> I never heard the word "solvency" with him.  I've never had any
> conversations about this whole solvency issue other than in the
> parts of the board meetings.  This is Jimmy, and he truly believes
> as I do, that banking is personal.  He wanted to make sure that I
> was still there, and I was.

Shortly after Mr. Lee's call with Mr. Zell on December 19, 2007, William Pate of EGI

forwarded to Mr. Lee a speech Mr. Zell had given to Los Angeles Times employees, apparently

to emphasize Mr. Zell's commitment to making the transaction work.[2600]

Certain Parties have also referred the Examiner to an e-mail from Darryl Jacobson of

JPM to Mr. Dimon assessing whether JPM could assist Tribune in either a direct share

repurchase or a total return swap,[2601] which those Parties believe is another indication that JPM

anticipated a future Tribune bankruptcy.  In this e-mail, Mr. Jacobson cautioned that if JPM

participated in a total return swap, "[t]he Bank's credit exposure . . . could be equitably

subordinated in bankruptcy."[2602]  The share repurchase or swap transaction discussed in

Mr. Jacobson's e-mail arose when Mr. Zell contacted Mr. Dimon to suggest Tribune or JPM take

---

[2598]  Examiner's Interview of Jamie Dimon, June 25, 2010.

[2599]  Examiner's Interview of Samuel Zell, June 14, 2010.

[2600]  Ex. 1081 (Lee E-Mail, dated December 19, 2007).

[2601]  Ex. 839 (Jacobson E-Mail, dated August 24, 2007).

[2602]  *Id.*

advantage of the low share price in August 2007 (Tribune Common Stock was trading at less

than the Merger price) to essentially buy for $26 a share what the Lead Banks were contractually

committed to provide funding to buy four months later for $34 a share because it was "free

money" as far as Mr. Zell was concerned, but according to Mr. Zell, JPM declined to do so

because of "a technical issue."[2603]  Mr. Jacobson's e-mail reflects JPM's conclusion that

contractual and practical impediments (including "the potential for creating diverging economic

interests") prevented JPM from participating in the transaction proposed by Mr. Zell, and that if

JPM were to nonetheless do so, any claim in a hypothetical future reorganization proceeding

could be equitably subordinated.[2604]  Mr. Jacobson's concerns in this regard do not suggest to the

Examiner that JPM was anticipating a future Tribune bankruptcy.

### (3)    Merrill's Due Diligence.

Merrill began its Step Two valuation due diligence in August 2007, when Todd Kaplan

sent an internal e-mail suggesting that Merrill "should pull out the letters from Valuation

Research this spring and try to replicate the type of analysis they did," which the Merrill bankers

described as "a valuation exercise that focuses on comps" coupled with a "test [of] covenant

future compliance to determine if [Tribune] can pay debts when due."[2605]  From August 2007

through December 2007, Merrill prepared numerous draft financial analyses that reflected

Tribune's solvency (or lack thereof) following Step Two.  Much of Merrill's activity took place

in the three weeks before the closing of the Step Two Financing Transactions, and the final three

---

[2603]  Examiner's Interview of Samuel Zell, June 14, 2010.

[2604]  Ex. 839 (Jacobson E-Mail, dated August 24, 2007).

[2605]  Ex. 1055 at ML-TRIB-0395566 (Kaplan E-Mail, dated August 17, 2007).  Consistent with this description, what appears to be the first report Merrill produced on Tribune's valuation at Step Two was circulated three days later in an e-mail with the subject line "Valuation and Covenant Analysis—Tribune."  Ex. 1056 (Hwang E-Mail, dated August 21, 2007).

analyses considered by the Examiner are each dated December 16, 2007.[2606]  These analyses show varying degrees of insolvency (as reflected by equity value) in all three of the "low" and "mid" range valuations:

| Document | Low | Mid | High |
|---|---|---|---|
| Merrill 12/16/07 Analysis I[2607] | ($1.545 billion) | ($287 million) | $1.027 billion |
| Merrill 12/16/07 Analysis II[2608] | ($1.946 billion) | ($688 million) | $626 million |
| Merrill 12/16/07 Analysis III[2609] | ($1.946 billion) | ($487 million) | $1.027 billion |

Each of these analyses gives equal weight to comparable companies, sum-of-the-parts and discounted cash flow valuations to ascertain Tribune's net equity value, and each assumes (in all scenarios) $469 million in S-Corporation/ESOP tax savings.[2610]  Subtracting those anticipated tax savings (which, as the Examiner concludes elsewhere in the Report should not be included in assessing Tribune's solvency),[2611] substantially deepens the projected insolvency in all of Merrill's low and mid range valuations, and reduces the solvency cushion in one of Merrill's high range valuations to $157 million.

The difference in values reached across the three Merrill analyses is entirely due to differences in the comparable companies valuation, which comprises one-third of the average

---

[2606]  Ex. 1011 (Valuation Analysis of Tribune Company, dated December 16, 2007); Ex. 1012 (Valuation Analysis of Tribune Company, dated December 16, 2007); Ex. 1013 (Valuation Analysis of Tribune Company, dated December 16, 2007).

[2607]  Ex. 1011 at ML-TRIB-0009932 (Valuation Analysis of Tribune Company, dated December 16, 2007).  A version of what appears to be substantially the same document (also dated December 16, 2007) is attached to an e-mail from January 2008 that states: "This is final version with summarized sotp." Ex. 1057 (Harrison E-Mail, dated January 8, 2008).

[2608]  Ex. 1012 at ML-TRIB-0486749 (Valuation Analysis of Tribune Company, dated December 16, 2007).

[2609]  Ex. 1013 at ML-TRIB-0486789 (Valuation Analysis of Tribune Company, dated December 16, 2007).

[2610]  Ex. 1011 (Valuation Analysis of Tribune Company, dated December 16, 2007); Ex. 1012 (Valuation Analysis of Tribune Company, dated December 16, 2007); Ex. 1013 (Valuation Analysis of Tribune Company, dated December 16, 2007).

[2611]  *See* Report at § IV.B.5.d.(10).

operating enterprise value (the other two-thirds consisting of a DCF valuation and an SOP valuation).[2612]  The Merrill analyses showed solvency only when the comparable companies valuation used a blended 9.0x multiple of 2007 estimated operating EBITDA—a result that was not even contemplated on a model dated three days earlier that showed insolvency across the low, mid, and high ranges using an 8.0x multiple for the "high" range.[2613]  Indeed, to reach the blended 9.0x multiple that yielded solvency, Merrill had to assign a 7.0x multiple to Tribune's Publishing Segment,[2614] yet a contemporaneous internal Merrill e-mail faulted VRC's analysis for using a similar assumption: "how can they defend the publishing multiples of 7.4x when the public comps trade in the 6x range[?]"[2615]

The Examiner questioned Merrill banker Todd Kaplan about these internal models during his sworn interview.[2616]  Mr. Kaplan repeatedly disclaimed knowledge about the calculations and assumptions underlying these analyses, and testified that he would not consider any of them to be "a Merrill Lynch valuation analysis"[2617]—notwithstanding that each is printed on Merrill stationery and bears the title "Valuation Analysis of Tribune Company."  Rather, according to Mr. Kaplan, each document was "our attempt to understand how VRC was developing their

---

[2612]  Unlike VRC's solvency analysis, the Merrill analyses do not use a comparable transactions valuation method. An internal Merrill e-mail critiquing VRC's analysis notes that the author "would like to see the comparable transactions they are using . . . comparable transactions in the context of few to none in the past year [make it] a challenge to understand their value here."  Ex. 931 (Tuvlin E-Mail, dated December 7, 2007).

[2613]  Ex. 1058 at ML-TRIB-0486707 (Valuation Analysis of Tribune Company, dated December 13, 2007).

[2614]  Ex. 1011 at ML-TRIB-0009933-36 (Valuation Analysis of Tribune Company, dated December 16, 2007);
Ex. 1012 at ML-TRIB-0486750-53 (Valuation Analysis of Tribune Company, dated December 16, 2007);
Ex. 1013 at ML-TRIB-0486790-93 (Valuation Analysis of Tribune Company, dated December 16, 2007).

[2615]  Ex. 931 at ML-TRIB-0406176 (Tuvlin E-Mail, dated December 7, 2007).

[2616]  Examiner's Sworn Interview of Todd Kaplan, July 8, 2010, at 142:2-157:14.

[2617]  *Id.* at 155:2-3.

work."[2618]  Mr. Kaplan further testified that he could not recall whether he or any of the other

bankers working on the transaction had reservations about closing:[2619]

> Q:    Did you have any reservations at that time about closing
>        step two?
>
> A:    I don't recall.  My particular feelings were I do know that
>        we were working hard to ascertain whether or not the
>        transaction was going to close, but beyond that I don't
>        recall what my particular feelings were at that time.
>
> Q:    Were you having discussions at that time . . . with the other
>        lenders?
>
> A:    Yes.
>
> Q:    Did any of the other lenders express to you that they had
>        reservations about closing step two?
>
> A:    I don't recall.

Mr. Kaplan's lack of recollection aside, the documentary evidence reflects Merrill's

concern that Tribune would be rendered insolvent at Step Two.[2620]  Handwritten notes of the

Lead Bank call that took place six days before Step Two closed (at which point Merrill was

"[n]ot 100% but leaning not to fund")[2621] appear to reflect Merrill's belief that Tribune was "not a

solvent company," yet Merrill was "not planning on being [the] lone wolf" that did not close.[2622]

---

[2618] *Id.* at 155:5-6.

[2619] *Id.* at 40:15-41:7.

[2620] On July 16, 2010, the Examiner's counsel received from Merrill's counsel what purports to be a "corrected" transcript of Mr. Kaplan's July 8, 2010 sworn interview with the Examiner, containing numerous multi-paragraph additions to the sworn testimony Mr. Kaplan gave on July 8, 2010.  Ex. 976 (Letter from Jane W. Parver, dated July 16, 2010).  Beyond the fact that these extensive additions are different in kind from every other errata sheet submitted in connection with the Examiner's sworn interviews, and appear to contradict Mr. Kaplan's testimony that he had no recollection of key events, documents, and circumstances, the Examiner notes that Mr. Kaplan's "corrected" transcript was sent one day after the Examiner notified counsel to the Lead Banks that the Examiner was in possession of the handwritten notes described in the remainder of this paragraph.  Ex. 959 at BOA-TRB-0001201A (Petrik Handwritten Notes, dated December 14, 2007).  The Examiner makes the "corrected transcript" part of the record of the Investigation, but does not believe it is entitled to any weight.

[2621] Ex. 959 at BOA-TRB-0001201A (Petrik Handwritten Notes, dated December 14, 2007).

[2622] *Id.*

Additionally, in an e-mail dated October 17, 2007, Michael Costa (who was working on behalf of MLPFS, the Merrill Entity advising the Tribune Board) gave Mr. Kaplan a report on the Tribune Board meeting that occurred that day:  "Sense mgmt gave impression closing on target mid Nov early Dec. . . .  Not sure solvency issue got alot [sic] of focus."[2623]  The next line of Mr. Costa's e-mail asks, "Todd where are we in thinking thru solvency issue if company's advisor thinks solvent but we think otherwise?"[2624]  No written response apparently was given.

### (4)  Citigroup's Due Diligence.

In December 2007, Citigroup prepared an internal analysis assessing Tribune's solvency following consummation of Step Two.[2625]  At her sworn interview with the Examiner, Citigroup's Julie Persily stated that this December 2007 analysis represented a "bust case or a breaking case," and did not represent Citigroup's views on fair market value.[2626]  The analysis compared five values for both a comparable companies approach and a discounted cash flow approach:  (a) a "Citi Valuation using Citi Projections," (b) a "Citi Valuation using Management Projections," based on management's base case; (c) a "Citi Valuation using Management Projections," based on management's downside case, (d) the "mid" valuation presented by VRC to the Tribune Board on December 4, 2007, and (e) the "low" valuation presented by VRC to the Tribune Board on December 4, 2007:[2627]

---

[2623]  Ex. 1050 (Costa E-Mail, dated October 17, 2007).

[2624]  *Id.*

[2625]  Ex. 1020 at CITI-TRIB-CC 00023666 (Solvency Analysis, dated December 2007).  Although the Citigroup analysis bears no date, its reference to VRC's December 4, 2007 presentation to the Tribune Board suggests that it was prepared in December 2007.  *Id.*

[2626]  Examiner's Sworn Interview of Julie Persily, July 8, 2007, at 192:1-18 and 201:20-21.

[2627]  Ex. 1020 at CITI-TRIB-CC 00023666 (Solvency Analysis, dated December 2007).

| Approach | Citigroup Valuation Using Citigroup Projections | Citigroup Valuation w/Tribune Base Case | Citigroup Valuation w/Tribune Downside Case | VRC Valuation High Range | VRC Valuation Low Range |
|---|---|---|---|---|---|
| Comparable Companies | ($1.428 billion) | $215 million | ($1.064 billion) | $2.201 billion | $1.047 billion |
| Discounted Cash Flow | ($1.653 billion) | $2.130 billion | ($836 million) | $2.641 billion | $1.548 billion |

Citigroup's analysis showed insolvency using Tribune management's downside scenario if Citigroup's internal valuation parameters were applied. Those parameters were substantially more conservative than the parameters used by VRC:[2628]

| Parameters | WACC | Cost of Debt | Cost of Equity | DCF EBITDA Exit Multiples | Perpetuity Growth Rates |
|---|---|---|---|---|---|
| Citigroup | 8.3% | L+400bps to L+450bps | 11.7% | 6.5x | -0.5% to +1% |
| VRC | 6.5% to 8.5% | L+200bps | 9.7% to 10.6% | 5.7x to 10.5x | -1.3% to +1.9% (implied) |

Moreover, Citigroup's internal projections were substantially more negative than management's downside case projections for both the Publishing Segment and the Broadcasting Segment, resulting in the following differences in operating cash flow:[2629]

| Projections | 2007PF | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| Citigroup | $1.192 billion | $1.063 billion | $966 million | $934 million | $849 million | $858 million |
| Management Downside | $1.192 billion | $1.091 billion | $1.039 billion | $1.032 billion | $976 million | $968 million |

Citigroup banker Julie Persily was asked about the negative equity values reflected on this internal analysis at her sworn interview with the Examiner:[2630]

---

[2628] *Id.*

[2629] *Id.*

[2630] Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 196:7-197:11.

> Q:    If I read this correctly in the management downside case and in Citi's case the company is under water when it comes to total equity value on the first page?
>
> A:    Yeah, I want to be careful. I'm glad you chose those words because under water doesn't necessarily mean it's [not] solvent. . . .  [T]he equity would be, Zell's investment would be under water and perhaps the value of those PHONES as well.
>
> Q:    [W]hy do you draw a distinction between negative equity and not necessarily insolvent?
>
> A:    Because there are very many solvent companies that have negative equity and as we learned through this process there are a lot of ways to value solvency and one of them is ability to meet commitments when they become due in the near term one year, two years out and this company had a very big revolver and it had a lot of asset sales, assets which we knew there was third party interest in and so we believed that this company was going to have access to liquidity for quite some time.

Two days before the Lead Bank conference call on which Ms. Persily apparently expressed the view that it might be less problematic "to not fund" rather than risking a Tribune bankruptcy,[2631] Citicorp approached Houlihan Lokey about a possible solvency-related engagement that (to at least one individual at Houlihan Lokey) "smell[ed] like divorce work."[2632] Specifically, on December 12, 2007, Ben Buettell of Houlihan Lokey sent an e-mail stating that one of his colleagues received a telephone call from Citigroup's general counsel:[2633]

> She was calling to see if we could be helpful in assessing the solvency of Tribune Company. . . . The good news is that we would not be hired to deliver a solvency opinion, but if we end up where I think we all know we would end up with our analysis, we may be the ones to "kill the deal" so to speak and not certain we want to be involved in that mess.

---

[2631]  Ex. 959 at BOA-TRB-0001201A (Petrik Handwritten Notes, dated December 14, 2007).

[2632]  Ex. 1008 (Beiser E-Mail, dated December 12, 2007).

[2633]  Ex. 1006 (Buettell E-Mail, dated December 12, 2007).

Later that evening, Mr. Buettell sent an e-mail to Citigroup's general counsel:[2634]

> Had a brief call with a few of my senior partners.  A few questions:
> 1) what happens if we all conclude that the company is not solvent,
> what does the bank group do between now and December 20th?
> Are all of the terms and pricing set on the loan?  Do you have any
> sense about what the other three banks have been discussing with
> [Tribune]?

Ultimately Houlihan Lokey was not engaged by Citigroup.  Seven days later, when a

Wall Street Journal report indicated that VRC was going to issue its Step Two solvency opinion,

an analyst from Houlihan Lokey wrote: "According to this, it sounds like they got the second

stage solvency opinion," to which Mr. Buettell replied: "Imagine that, getting a solvency opinion

despite the changes with the company and the credit markets.  Hope they put in language about

selling the Cubs and Wrigley Field for billions in April to pay down debt."[2635]

### (5)    BofA's Due Diligence.

Other than internally evaluating and potentially contributing to the questions prepared by

Murray Devine,[2636] BofA does not appear to have performed an internal solvency analysis at

Step Two.  When asked whether BofA had done an internal analysis in the fall of 2007 "to

determine whether Tribune's assets exceeded its liabilities," Daniel Petrik (the credit products

officer on the transaction for BofA[2637]) responded: "I don't think so."[2638]  However, BofA's

Leveraged Finance Screening Committee received updates from the deal team on August 3, 2007

and December 13, 2007.[2639]  These memos listed an "enterprise value" for Tribune that was

---

[2634]  Ex. 1007 at HLHZ_Tribune001190-91 (Buettell E-Mail, dated December 13, 2007).

[2635]  Ex. 1009 (Buettell E-Mail, dated December 19, 2007).

[2636]  Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 130:7-131:4.

[2637]  *Id.* at 19:18-20:2.  *See also id.* at 23:8-11 ("I stayed very involved through closing of Step 2 [and] I am also now responsible for monitoring the revolving line of credit and the relative risk to our institution.").

[2638]  *Id.* at 146:19-22.  *See also id.* at 124:2-9.

[2639]  Ex. 927 (Leveraged Finance Committee Update Memo, dated August 3, 2007); Ex. 966 (Leveraged Finance Committee Update Memo, dated December 13, 2007).

apparently based on work done by BofA's Enterprise Valuation Group, and encompassed only Tribune's core business assets, not its investments in other businesses (like the Chicago Cubs).[2640]  The calculated enterprise values on August 3, 2007 and December 13, 2007 were $8.2 billion and $12.3 billion, respectively.[2641]  Total debt following Step Two was estimated on both dates to be $12.233 billion.[2642]  On its face, BofA's December 13, 2007 memo would appear to indicate a thin level of anticipated solvency following Step Two, but the Examiner is unable to ascertain the assumptions and calculations underlying the putative enterprise value.  Moreover, BofA was aware that its participation in the Leveraged ESOP Transactions "deviate[d] from [BofA's] Leveraged Lending underwriting guidelines"[2643] and apparently was told at one point by EGI that the likelihood of obtaining a clean solvency opinion at Step Two was less than 50%.[2644]

### c.    Financial Advisors at Step Two.

### (1)    Tribune's Financial Advisors:  MLPFS and CGMI.

Following the closing of the Step One Transactions, Tribune's advisors at each of MLPFS and CGMI substantially curtailed their involvement with Tribune.  Both Michael Costa (who worked for MLPFS) and Christina Mohr (who worked for CGMI) stated to the Examiner that after the closing of the Step One Transactions each of them and their respective advisory groups "stepped back" from advising Tribune, although neither firm formally resigned from their

---

[2640]  Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 103:8-105:1.

[2641]  Ex. 927 at BOA-TRB-0013163 (Leveraged Finance Committee Update Memo, dated August 3, 2007); Ex. 966 at BOA-TRB-0007609 (Leveraged Finance Committee Update Memo, dated December 13, 2007).

[2642]  Ex. 927 at BOA-TRB-0013164 (Leveraged Finance Committee Update Memo, dated August 3, 2007); Ex. 966 at BOA-TRB-0007611 (Leveraged Finance Committee Update Memo, dated December 13, 2007).

[2643]  Ex. 985 at BOA-TRB-0001261 (Hagel E-Mail, dated July 10, 2007).

[2644]  Ex. 986 (Hagel E-Mail, dated October 17, 2007) (referring to a prior EGI estimate: "EGI estimates the probability of a clean solvency opinion for Step 2 at 80% vs. their previous estimate of less than 50%.").

advisory engagements.[2645]  Nevertheless, there clearly was contact between each of them and Tribune's management following the closing of the Step One Transactions and before the closing of the Step Two Transactions, as discussed below.[2646]

When asked why this occurred, Mr. Costa explained that in or around the summer of 2007, Merrill was concerned about potential conflicts of interest or the appearance of conflicts of interest between the roles of the Merrill Entities as advisors and as lenders.  According to Mr. Costa, there were certain conditions to MLCC funding the Step Two Financing, including a solvency-related requirement, and if there were a difference of opinion between MLCC and Tribune regarding the satisfaction of any of those conditions, it was Merrill's view that it would not be appropriate to have an advisor from MLPFS advising Tribune.  Mr. Costa explained that the decision to "step back" was Merrill's decision, not a personal decision by Mr. Costa.[2647]

Mr. Costa acknowledged that he continued to confer with Tribune's management from time to time, although he states that he did not personally attend Tribune Board meetings or provide advice to Tribune.  In one e-mail from Mr. Costa to his counterpart on the Merrill lending side, Todd Kaplan, Mr. Costa relayed management's description of an October 17, 2007 Tribune Board meeting, in which it was reported to Mr. Costa that the Step Two Transactions were on course to close in mid-November or early December 2007.  Mr. Costa also noted to Mr. Kaplan:  "Not sure solvency issue got [a lot] of focus. . . .  Todd where are we in thinking thru solvency issue if company's advisor thinks solvent but we think otherwise?"[2648]  The

---

[2645]  Examiner's Interview of Michael Costa, June 4, 2010; Examiner's Interview of Christina Mohr, June 29, 2010.

[2646]  Examiner's Interview of Michael Costa, June 4, 2010; Examiner's Interview of Christina Mohr, June 29, 2010.

[2647]  Examiner's Interview of Michael Costa, June 4, 2010.

[2648]  Ex. 989 (Costa E-Mail, dated October 17, 2007).

Examiner did not identify evidence, however, indicating that Mr. Costa or his advisory group at Merrill provided advice to Tribune or the Tribune Board on the issue of solvency.

The level of involvement by CGMI's advisors with Tribune following the closing of the Step One Transactions and before the closing of the Step Two Transactions is similar in many respects.  According to Ms. Mohr, CGMI stopped advising the Tribune Board after the Step One Transactions closed.  She acknowledged, however, that her advisory group—particularly Rosanne Kurmaniak—continued to assist management during this period with some scenario analysis.[2649]  As noted, Ms. Kurmaniak and the CGMI advisory group were principally responsible for maintaining the financial projection models that had been used at various times to advise Tribune and develop information to provide to the Lead Banks (including Citigroup).  It also appears that members of CGMI's advisory group (and Citigroup's lending group) participated in at least one telephone call with management regarding Tribune's post-Step One financial performance in July 2007.[2650]

Ms. Mohr could not recall whether she attended a due diligence session held in Chicago in October 2007, but she did acknowledge that she and some of her colleagues made one presentation to the Tribune Board, at the request of management, on October 17, 2007.[2651]  Ms. Mohr indicated that CGMI had been asked by management to give a presentation to the Tribune Board regarding the financing markets.[2652]  During the week before that meeting, her colleague Michael Canmann reported that he had gone through his script with "Don," who had no problems

---

[2649]  Examiner's Interview of Christina Mohr, June 24, 2010.

[2650]  *See* Ex. 994 (Kurmaniak E-Mail, dated July 3, 2007).

[2651]  Examiner's Interview of Christina Mohr, June 24, 2010.

[2652]  *Id.*

with it.[2653]  Mr. Canmann also reported that he had made clear to "Don" that the presentation

would be in an advisory capacity, and that CGMI would take no position "should negotiations

take place."[2654]  Ms. Mohr noted that this was a concern, in the event "the other side of the

house," *i.e.,* Citigroup's lending group, had an "adversarial position."[2655]

The minutes for the October 17, 2007 meeting of the Tribune Board indicate that

Mr. Canmann gave a presentation, with Ms. Mohr and Michael Schell in attendance, as well as

Thomas Whayne and Paul Taubman of Morgan Stanley.[2656]  When presented with the minutes of

that meeting, Ms. Mohr advised the Examiner that she had not seen the minutes previously, and

she did not agree that the minutes accurately reflected what happened (for instance, noting that

Mr. Canmann "read a script"), characterizing them as someone's "spin" on what had occurred.[2657]

In particular, Ms. Mohr noted that Mr. Canmann indicated in his presentation that the

presentation was being given specifically at the request of the Tribune Board, and that the

Citigroup Entities had a potentially adverse position (*i.e.*, as lenders)—points that are not

reflected in the minutes.[2658]

---

[2653] Ex. 995 (Canmann E-Mail, dated October 12, 2007).  Although it is highly likely that Mr. Canmann's reference to "Don" was Donald Grenesko, Senior Vice President/Finance and Administration of Tribune, it is uncertain from the e-mail and from Ms. Mohr's statements.

[2654] Ex. 995 (Canmann E-Mail, dated October 12, 2007).

[2655] Examiner's Interview of Christina Mohr, June 24, 2010.

[2656] Ex. 643 at TRB041566-67 (Tribune Board Meeting Minutes, dated October 17, 2007).

[2657] Examiner's Interview of Christina Mohr, June 24, 2010.  The minutes themselves state, in pertinent part:

> Mr. Schell then discussed the presentation from Citigroup regarding the debt market and Citigroup's possible need to cease providing advisory services to Tribune given its obligations to finance the second step of the leveraged ESOP transaction.  Ms. Mohr and Mr. Whayne separately reviewed current equity and credit market conditions and an overview of the publishing and broadcasting sectors in the context of the Company's transaction.  Mr. Whayne also commented on the Company's current operating outlook and expected leverage profile following the second step merger.  Ms. Mohr and Mr. Whayne answered questions from the Board and following their reports, Mr. Zell departed due to a scheduling conflict and Messrs. Canmann and Schell and Ms. Mohr departed.

> Ex. 643 at TRB041566-67 (Tribune Board Meeting Minutes, dated October 17, 2007).

[2658] Examiner's Interview of Christina Mohr, June 24, 2010.

Ms. Mohr also acknowledged that following the closing of the Step One Transactions she and her team made several presentations to Samuel Zell and EGI in an effort to garner future business from them.[2659]  One of those presentations, on June 13, 2007, focused on Tribune's most recent results, the impact of those results, the possible impact on the Step Two Financing, and strategic alternatives, including asset sales.[2660]  Another presentation, on June 28, 2007, focused on alternatives for the disposition of the WGN Superstation and the "Renaissance Cluster" assets.[2661]  A third presentation, on July 28, 2007, discussed the condition of the leverage markets and strategic alternatives for Tribune.[2662]  The Examiner is not aware, however, of evidence indicating that Ms. Mohr or her advisory group at CGMI provided advice following the closing of the Step One Transactions to Tribune or the Tribune Board on the issue of solvency.

### (2)    The Special Committee's Financial Advisor:  Morgan Stanley.

With the decision by CGMI and MLPFS to "step back" from advisory roles in the face of potential conflicts between Tribune and the Lead Banks as the closing of the Step Two Transactions approached, only one financial advisor remained:  Morgan Stanley.  Indeed, in December 2007 Morgan Stanley asked the Special Committee for an additional, discretionary fee—beyond the $10 million provided for in Morgan Stanley's engagement letter,[2663] all of which had been paid by May 9, 2007[2664]—in part because Morgan Stanley was the "[s]ole advisor to the Special Committee and the Company during key negotiations with the [Lead] Banks as part of the Step 2 financing, following resignation of the Company's initial advisors

---

[2659]  *Id.*

[2660]  Ex. 996 (Tribune Discussion Materials prepared for EGI, dated June 13, 2007).

[2661]  Ex. 834 (Tribune Discussion Materials prepared for EGI, dated June 28, 2007).

[2662]  Ex. 997 (Tribune Discussion Materials prepared for EGI, dated July 25, 2007).

[2663]  Ex. 25 at MS_00211 (Morgan Stanley Engagement Letter).

[2664]  *See* Report at § III.E.4.e.(1).

(Merrill Lynch and Citi)."[2665]   The Special Committee denied Morgan Stanley's request for an additional fee, which essentially meant that Morgan Stanley received no compensation for work undertaken in connection with Step Two.[2666]

### (i)    Interactions with Management.

Notwithstanding Morgan Stanley's own description of having advised "the Company" and "the Company's Management" in negotiations with the Lead Banks in the fall of 2007, however, Morgan Stanley's sole client throughout its engagement was the Special Committee, not Tribune or Tribune's management.[2667]   As a consequence, Tribune and its senior management were effectively acting without engaged financial advisors during a critical time period in the transaction.  Tribune General Counsel Crane Kenney conveyed the challenge management faced in this regard when describing a late December 2007 conversation with Merrill's Todd Kaplan: "[A]t some point you don't know who is actually on your side.  I don't know whether Todd was trying to queer the deal [or] whether he was supportive of the deal."[2668]

---

[2665]   Ex. 1048 at MS_69131 (Overview of Morgan Stanley's Role in the Tribune Special Committee Review Process, dated December 3, 2007).  *See also* Ex. 1048 at 69133 (Overview of Morgan Stanley's Role in the Tribune Special Committee Review Process, dated December 3, 2007) ("During the Step 2 financing negotiations with the Banks, Morgan Stanley became sole advisor performing and presenting analyses to the Special Committee as well as the Company's Management, as the Company's financial advisors determined that they were no longer able to serve in an advisory capacity.").  As explained below, despite these references to Morgan Stanley's serving as an advisor to Tribune, the Examiner found no other credible evidence that Tribune, as opposed to the Special Committee, ever retained Morgan Stanley as a financial advisor.

[2666]   Examiner's Interview of Thomas Whayne, June 11, 2010.

[2667]   Ex. 25 at MS_00213 (Morgan Stanley Engagement Letter) ("Morgan Stanley will act under this letter agreement as an independent contractor with duties solely to the [Special] Committee."); Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 33:8-14 ("Q:  What's your understanding of who Morgan Stanley's client was?  A:  Our client was the special committee.  Q:  And that was your only client in this case?  A:  Yes."); Examiner's Sworn Interview of Paul Taubman, July 1, 2010, at 22:13-22 ("Q:  The special committee was [Morgan Stanley's] client, is that right?  A:  The special committee was the client.  Q:  [W]as Tribune Company the client?  A:  No.  Q:  And was the board in general the client?  A:  No.").  *See also* Examiner's Sworn Interview of Donald Grenesko, June 25, 2010, at 55:7-57:10.

[2668]   Examiner's Sworn Interview of Crane Kenney, July 8, 2010, at 23:10-13.  *See also* Ex. 959 at BOA-TRB-0001201A (Petrik Handwritten Notes, dated December 14, 2007) (reflecting the Lead Banks' internal deliberations, with Merrill "[n]ot 100%, but leaning to not fund" because Tribune may "not [be] a solvent company").

In December 2007, as "the [Lead Banks] were keeping their cards very close to the chest" and not "indicat[ing] to anyone that they were definitely going to fund,"[2669] Tribune management repeatedly attempted to turn to Morgan Stanley for advice.  When VRC sought management's representation "that it is reasonable to assume [Tribune] will be able to refinance the new debt in 2014," Tribune Treasurer Chandler Bigelow told Tribune Senior Vice President/Finance and Administration Donald Grenesko that "we need Morgan Stanley."[2670]  The next day, Thomas Whayne and Charles Stewart of Morgan Stanley participated in a telephone call concerning that issue and two others.[2671]  On December 3, 2007, Mr. Bigelow sent Mr. Whayne "the backup for the [VRC] report," asking Mr. Whayne to "[take] a look at the comparable transactions/companies especially the newspaper peer company multiples."[2672]  Similarly, on

---

[2669]  Examiner's Interview of Charles Mulaney, June 24, 2010.  According to Mr. Mulaney (outside counsel to the Special Committee), the Lead Banks "weren't making relationship speeches or sending out invitations to the closing dinner."  *Id.*

[2670]  Ex. 744 (Kenney E-Mail, dated December 2, 2007).  The events that transpired concerning the refinancing assumption are discussed in detail elsewhere in the Report.  *See* Report at § III.H.3.g.

[2671]  Ex. 746 (Whayne E-Mail, dated December 2, 2007).  Mr. Whayne reported to Mr. Taubman that Mr. Whayne and Mr. Stewart:

> just finished a call with Dennis [FitzSimons], Don [Grenesko] and Chandler [Bigelow], who wanted to give us an update on the VRC process.  VRC is scheduled to present to the [Tribune Board] on Tuesday with regards to their solvency analysis, and are having their final internal committee meeting at noon today.  They called the company on Friday to discuss some committee pushback that they have received thus far.
>
> First, they requested a [Tribune] management rep to the effect that it is reasonable to assume that the debt can be refinanced in 2014, and that the financial projections have been prepared by management in good faith.  VRC also asked management to discuss this issue with advisors.  Second, someone on the VRC committee expressed nervousness that Zell could exercise his option early and force the company to pay his associated taxes, which would be economically irrational and that the board could prevent—so, it appears that this is a mere misunderstanding.  Finally, VRC wants management to review their analysis of the PV of tax savings associated with being an S-corp, which they put at approximately $1 billion.  This is consistent with the company's analysis, and in fact, the company has this analysis included as part of their rating agency and bank presentations.

> *Id.*

[2672]  Ex. 1049 (Bigelow E-Mail, dated December 3, 2007).  In fact, the multiples VRC selected were heavily scrutinized by the Lead Banks days later when they reviewed VRC's December 4, 2007 preliminary solvency analysis.  *See* Ex. 931 at ML TRIB 0406176 (Tuvlin E-Mail, dated December 7, 2007) (questioning "how can they defend the publishing multiples of 7.4x when the public comps trade in the 6x range," and noting that "comparable transactions in the context of few to none in the past year [make it] a challenge to understand their value here").

December 13, 2007, Mr. Bigelow suggested that Tribune ask "Morgan Stanley to give us a view of our [weighted average cost of capital calculation]."[2673]

As discussed elsewhere in the Report,[2674] Morgan Stanley appears to have provided information by, for example, participating in telephone calls with management concerning VRC's requests and furnishing precedent transactions that management ultimately used as a basis on which to make the refinancing representation to VRC.[2675]  During his sworn interview with the Examiner, Mr. Whayne commented on those efforts as follows:[2676]

> We had been asked to work with the special committee and in this final phase with management because the banks that had been advising primarily management during the first step transaction were no longer willing to serve in that capacity.  So [from] the standpoint of actually helping them . . . make judgments [concerning] the capital markets [and] the right debt terms because they were in discussions with the creditors around . . . how to close the transaction on the debt documents, we were certainly helpful in that regard. . . .

On the other hand, as discussed previously, Mr. Whayne testified that he did not know whether the Special Committee or any of its members were aware of management's requests for Morgan Stanley's assistance or Morgan Stanley's responses,[2677] and a contemporaneous instant message communication appears to reflect Morgan Stanley's desire "to make this as little work as possible."[2678]  Mr. Whayne also stated during his sworn interview with the Examiner that he

---

[2673]  Ex. 1024 (Sachs E-Mail, dated December 13, 2007).

[2674]  *See* Report at § III.H.3.g.(5).

[2675]  Ex. 746 (Whayne E-Mail, dated December 2, 2007); Ex. 750 (Williams E-Mail, dated December 3, 2007); Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 91:22-93:8; Examiner's Sworn Interview of Donald Grenesko, June 25, 2010, at 97:12-98:4.

[2676]  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 25:6-18.

[2677]  *Id.* at 27:1-11.

[2678]  Ex. 1047 (Whayne Instant Message, dated December 14, 2007).

expressly declined Mr. Grenesko's requests for substantive assistance with the solvency matters

on which the Lead Banks were focused:[2679]

> [T]here were clearly conversations with Mr. Grenesko . . . where
> Don was looking for us very actively to help him with the work
> underlying his solvency for certificate. . . .  He wanted us to go as
> far as to do the analysis for him and actually to do the addition . . .
> to prove that there was equity value.  We categorically said no to
> that. . . .
>
> There were a number of very tense discussions . . . but what I did
> tell Don [Grenesko] is I said, look, Don, we can provide you data
> for you guys to do whatever work you need to do, but we can't do
> the work for you.  So if you want publicly available data around
> where high yield bond or leverage loans are trading, we can be
> helpful with providing that data in terms of precedent transactions.
> If you want us to update our work from our fairness opinion in
> terms of multiples, we'll provide that, but what we will not do is go
> beyond that.  So we'll provide you facts, but not judgments.

In short, the record reflects that at a critical point in the Step Two closing process

Tribune's management did not have a financial advisor to which to turn, and that members of

management, including Mr. Grenesko and Mr. Bigelow, reached out for guidance to Morgan

Stanley, the Special Committee's financial advisor.  Morgan Stanley, however, was not engaged

to provide financial advice to management, and offered relatively little assistance.  Management

was therefore largely unaided as the closing of the Step Two Financing Transactions approached

and the solvency diligence questions posed by the Lead Banks became more pointed.  It was in

this context that Tribune's management appears to have used Morgan Stanley's alleged

imprimatur to bolster conclusions and analyses that management and/or VRC reached in

connection with the refinancing assumption set forth in VRC's Step Two solvency opinion.[2680]

---

[2679]  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 95:4-96:13.

[2680]  *See* Report at § III.H.3.g.

**(ii)    Interactions with the Special Committee.**

Morgan Stanley's client—the Special Committee—met only one time after the Step One Financing Closing Date, on December 18, 2007.[2681]  Unlike the Tribune Board meeting held that same day,[2682] there are no final, duly adopted minutes memorializing the Special Committee's proceedings on December 18, 2007, because the Special Committee never met again and never approved the draft minutes prepared by counsel.[2683]  It appears that on that date, the Special Committee met for no more than fifteen minutes.  The minutes of the full Tribune Board meeting reflect that the Special Committee meeting took place while the full Tribune Board meeting was in recess prior to its 3:00 p.m. adjournment,[2684] and the draft minutes of the Special Committee state that it "convened at 2:45 p.m."[2685]

What transpired between 2:45  p.m. and 3:00  p.m. on December 18, 2007 is a matter to which the Examiner was required to devote attention in light of the evidence adduced in the Investigation.  The draft minutes prepared by the Special Committee's outside counsel (set forth in detail elsewhere in the Report)[2686] state that William Osborn, the Chair of the Special Committee, "requested that the representatives of Morgan Stanley comment on the solvency

---

[2681]  Morgan Stanley made presentations to the Tribune Board (the membership of which largely overlapped with the Special Committee) following the Step One Financing Closing Date.  *See, e.g.*, Ex. 643 (Tribune Board Meeting Minutes, dated October 17, 2007); Ex. 727 (Tribune Board Meeting Minutes, dated December 4, 2007); Ex. 726 (Tribune Board Meeting Minutes, dated November 5, 2007); Ex. 702 (Tribune Board Meeting Minutes, dated November 21, 2007).

[2682]  Ex. 11 (Tribune Board Meeting Minutes, dated December 18, 2007).

[2683]  Examiner's Interview of Charles Mulaney, June 24, 2010.  The draft minutes prepared by counsel are unsigned, as are the final, duly adopted minutes of prior Special Committee meetings.  Ex. 704 (Special Committee Meeting Minutes, dated December 18, 2007).  *See, e.g.*, Ex. 143 (Special Committee Meeting Minutes, dated April 1, 2007).

[2684]  Ex. 11 at TRB0415685-86 (Tribune Board Meeting Minutes, dated December 18, 2007).

[2685]  Ex. 704 at TRB0533007 (Special Committee Meeting Minutes, dated December 18, 2007).  The Special Committee meeting was likely even shorter, as the Tribune Board's minutes reflect that the full Tribune Board passed a resolution based on the Special Committee's recommendation and met in executive session for an undisclosed amount of time immediately prior to the Tribune Board's 3:00 p.m. adjournment.  Ex. 11 at TRB0415686 (Tribune Board Meeting Minutes, dated December 18, 2007).

[2686]  *See* Report at § III.G.1.

opinion and the analysis behind it that was just presented to the Board of Directors by VRC."[2687]

The draft minutes then purport to summarize remarks made by Mr. Whayne and Mr. Taubman of

Morgan Stanley, allegedly culminating in the conclusion that "VRC's solvency analysis was

conservative and that VRC's opinion was something upon which a director could reasonably

rely."[2688]  Specifically, Mr. Whayne was reported to have:[2689]

- "indicated that the analysis by VRC seemed thorough and appropriate,"

- "noted [that VRC's] earnings and termination value multiples for the publishing and broadcasting industries [were] consistent (but not identical) with those used by Morgan Stanley as well as Merrill Lynch and Citibank in previous advice to the Board of Directors,"

- observed that "VRC's selection of precedent transactions and its discounted cash flow analysis used metrics very similar to that previously used by each of the investment banks,"

- "commented on VRC's analysis of the net present value of [the anticipated S Corporation/ESOP] tax savings, [including the discount rate],"

- "commented on VRC's valuation of the PHONES debt and other assets and liabilities of the Company," and

- "concluded that VRC's solvency analysis was conservative and that VRC's opinion was something upon which a director could reasonably rely."

Mr. Taubman was reported to have "reiterated the conservative nature of VRC's

analysis," and to have "stated that the Company has additional value not represented in the VRC

presentation because the Company has a number of different assets and businesses that readily

---

[2687]  Ex. 704 at TRB0533007 (Special Committee Meeting Minutes, dated December 18, 2007).

[2688]  *Id.*

[2689]  *Id.*

could be sold for fair value and that this additional financial [flexibility] is of incremental value to a company."[2690]

Mr. Whayne described his and Mr. Taubman's December 18, 2007 remarks to the Special Committee during his interview with the Examiner.  According to Mr. Whayne: "We were asked questions about assumptions being reasonable.  We sort of observed they used same comps [and] analyses that we had seen, and that was as far as we would go."[2691]  Mr. Whayne stated that he and Mr. Taubman "[c]ompared multiples we'd used . . . back in March [and] April" to VRC's multiples, and also "compared projections [and] multiples they were using to the comps our comps were trading at to see if they were reasonable to that point in time," primarily using ratios of enterprise value to EBITDA.[2692]  Finally, with regard to the *process* by which VRC reached its conclusions, Mr. Whayne stated that he indicated to the Special Committee that VRC's work "seemed thorough and appropriate" and appeared to be something the Special Committee "could take [a] level of comfort in" in determining that Tribune had satisfied the Merger Agreement's condition precedent of an independent solvency opinion.[2693]  Similarly, Mr. Taubman stated that his use of the adjective "conservative" or "not aggressive" referred to "one specific aspect of [VRC's] analysis where they could have been more aggressive and they were not and I recall pointing that out to the members of the committee. . . .  [VRC] had not assumed that if need be individual assets could be sold piece by piece."[2694, 2695]

---

[2690] *Id.*

[2691] Examiner's Interview of Thomas Whayne, June 11, 2010.

[2692] *Id.*

[2693] *Id.*

[2694] Examiner's Sworn Interview of Paul Taubman, July 1, 2010, at 84:21-85:8.  *See also id.* at 111:7-11 ("I said that as it relates to this one dimension of the analysis they did—I either said on this one aspect they were not aggressive or on this one assumption there was a degree of conservatism.").

[2695] Examiner's Interview of Thomas Whayne, June 11, 2010.

During his interview with the Examiner, Mr. Whayne stated that neither he nor Mr. Taubman offered any opinion or conclusion concerning the substantive merits of VRC's solvency opinion, nor did he or Mr. Taubman tell the Special Committee they could reasonably rely on the fact that Tribune would be solvent after Step Two.[2696]  To the contrary, according to Mr. Whayne, the remarks made by him and Mr. Taubman went solely to whether the work done by VRC was in compliance with the solvency opinion condition precedent of the Merger Agreement:[2697]

> [W]e were not in any way shape or form speaking to the substance of the solvency opinion. . . .  The board completely understood that we weren't speaking to whether the company was solvent from a substance matter [nor] were we saying whether this opinion was right or wrong.  All we were staying was from a process stand point of fulfilling the condition the board could rely on the opinion for process not substance.

Mr. Whayne reiterated his earlier statements during his subsequent sworn interview with the Examiner:[2698]

> Q:     Do these minutes accurately reflect the statements that you made at the special committee meeting on December 18th, 2007?
>
> A:     From the standpoint of us making observations around their earnings and termination value multiples, yes.  From the statement about us, about the precedent transactions and a discount cash flow used metrics similar to what each of the investment banks had used in step 1, yes.  [T]hat they use the net present value of [the] tax savings the way that the banks had done and the rating agencies had done, I remember that.  Yeah, I mean the discount rates at the bookend, yes, I'm sure I said that. . . .  This line about using either of these analyses VRC found solvency after giving effect of the merger, I don't, I don't recall saying that. . . .  The notion that I commented on the fact that they, the way

---

[2696] *Id.*

[2697] *Id.*

[2698] Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 127:13-131:22.

they valued the phones debt and other assets and liability, yes, I made a comment on that.  And the conclusion that the solvency analysis was conservative, I absolutely did not say that.  And that the board could rely on it, [I] did not say that. . . .

Just to expound on one thing, . . . conservatism was the fact that there was no assumption that the company—there was no assumption as part of the analysis that the company was making any asset sales.  So I do remember that Paul made an observation that they could sell asset sales if there was— if they had liquidity issues and that was not part of VRC's analysis, but that addressed liquidity. . . .  I don't think Paul said that the nature of the analysis—he didn't say the analysis was conservative, but Paul did make the comment that there is additional value not represented in the presentation because the company has assets and business that it could sell if it got into duress . . . that the VRC analysis did not incorporate any analysis of potential asset sales as a way of dealing with potential liquidity issues and Paul did make the observation that that from the standpoint of viewing liquidity issues only was conservative.

With regard to the Special Committee's ability to rely on the process VRC undertook to as satisfying the Merger Agreement's independent solvency opinion condition precedent, Mr. Whayne testified:[2699]

Q:    The last time that we spoke you made [a] statement to the effect of you may not have used these words, but . . . your presentation may have given the special committee comfort that it could rely on the process that VRC followed. . . . Could you explain that again for us, please.

A:    [T]he line we tried to walk was to say that the analyses that they used are conventional.  The methodologies that they've used . . . are standard and that they were thorough from a standpoint of all the normal analyses that you would expect a bank to use and that we, Citi and Merrill had used as part of our fairness opinion, but going beyond that to say you can rely on this, I don't believe we said that. . . .

I think all the special committee members understood that

---

[2699] *Id.* at 134:16-137:8.

> we were not providing a solvency opinion or judgments
> around solvency. . . .  [T]hey would have understood that
> by the fact that we were, we were being asked to merely
> make comments on VRC's analysis and that they were
> fairly high level observations and that we had put no
> analysis in front of them.  I mean a reasonable special
> committee member given the fact that we had been in front
> of the many, many, many times with exhaustive analyses
> that underlie that fairness opinion and these are all expert—
> these are all board members that have served on many,
> many boards, they would have understood or they should
> reasonably have understood that by virtue of the fact that
> we had provided no analysis as part of this presentation that
> we were making absolutely no, you know, statements
> regarding, you know, solvency other than to make selective
> observations.

Mr. Taubman's testimony during his interview with the Examiner was similar:[2700]

> [W]e were invited to the meeting and . . . there was a general
> opportunity for us to give our impressions afterwards and that
> seems to be corroborated [by the statement in the draft Special
> Committee minutes] that they requested that we comment on what
> we just had heard along with them.  And I do recall albeit vaguely
> that Tom was trying to compare and contrast the cases and the
> discount rates that were being used by VRC with what others had
> come up with as operating cases of what other advisors had used
> for discount rates.  I have a general recollection of that.

Mr. Taubman testified that he does not recall Mr. Whayne commenting on the

reasonableness of VRC's solvency opinion at the Special Committee meeting, and Mr. Taubman

is "more than doubtful" that Mr. Whayne characterized VRC's solvency opinion as

"conservative."[2701]

In sum, although there appears to be no question that Mr. Whayne and Mr. Taubman

offered brief, oral observations at the December 18, 2007 Special Committee meeting concerning

---

[2700]  Examiner's Sworn Interview of Paul Taubman, July 1, 2010, at 82:11-22.

[2701]  *Id.* at 83:1-6.

the process by which VRC assessed Tribune's solvency at Step Two,[2702] both Mr. Whayne and Mr. Taubman emphatically dispute that they characterized VRC's ultimate opinion as "conservative."  Neither Mr. Whayne nor Mr. Taubman had ever seen the draft Special Committee minutes prior to being interviewed by the Examiner,[2703] and others interviewed by the Examiner who were present during the December 18, 2007 Special Committee meeting had no specific, independent recollection of the term "conservative" being used by Morgan Stanley (although several individuals stated that they had no reason to question the accuracy of the draft Special Committee meeting minutes).[2704]

Mr. Osborn described Morgan Stanley's role with respect to the VRC opinion as "mak[ing] certain that the solvency opinion was appropriate and made sense so that we would

---

[2702] Mr. Mulaney (outside counsel to the Special Committee) stated during his interview with the Examiner that Mr. Osborn merely wanted to ask Mr. Whayne and Mr. Taubman "if they had any comments" on VRC's solvency analysis, which prompted Mr. Mulaney to telephone Mr. Whayne several days before the meeting to tell him "that the Special Committee would like to hear Morgan Stanley's comments and views on VRC's solvency opinion and to the extent VRC has relied on different assumptions, I wanted them to highlight them and talk about them."  Examiner's Interview of Charles Mulaney, June 24, 2010.  *See* Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 137:19-21 and 148:11-13 ("[W]e were asked by Chip Mulaney to make oral observations about VRC's presentation and that is all we did. . . . It was fairly short discussion.  I can't imagine it went much beyond five'ish minutes.").  By contrast, Morgan Stanley's formal presentation to the Special Committee in connection with the fairness opinion at Step One "probably took well over an hour."  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 148:14-19.

[2703] Examiner's Interview of Thomas Whayne, June 11, 2010; Examiner's Sworn Interview of Paul Taubman, July 1, 2010, at 83:11-17.

[2704] Examiner's Sworn Interview of William Osborn, June 24, 2010, at 27:1-7 ("Q.  Now, when you say they used the word 'conservative,' do you remember them saying that to you, or do you just remember reading that in the minutes?  A.  I don't -- one, for me to sit here and say I remember them saying it, I can't remember that.  I did see it in the minutes."); Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 101:7-18 ("Q.  Do you have a specific recollection that [Morgan Stanley] approved VRC's solvency opinion as conservative and appropriate, or is that based on what you read[?]  A.  That's what I read [in the] board minutes, yes.  Q.  Aside from what you read in the board minutes, do you have any independent recollection that Morgan Stanley made that claim?  A.  No.").  The author of the draft minutes stated to the Examiner that he believed the word conservative was used, but he has no specific recollection and bases his belief "on how these minutes are prepared."  Examiner's Interview of Charles Mulaney, June 24, 2010.  There is no evidence that the draft Special Committee meeting minutes were prepared prior to the actual meeting (as may have been the case with at least one other set of Special Committee minutes), and the December 2007 time records of the Special Committee's outside counsel reflect some work by counsel on the minutes the day following the December 18, 2007 Special Committee meeting.

have the confidence that . . . we could move forward with the second step,"[2705] a characterization

with which Mr. Whayne agreed.[2706]  This type of evaluation is qualitatively different from the

type of evaluation VRC made with respect to Tribune's solvency and capital adequacy.

Moreover, Morgan Stanley was not asked to look at Tribune management's post-Step One

financial projections,[2707] the good faith and reasonableness of which are a foundation of VRC's

solvency analysis.[2708]  Whether or not Mr. Whayne or Mr. Taubman described VRC's Step Two

solvency opinion as "conservative" in their oral observations at the December 18, 2007 Special

Committee meeting, the record reflects, and the Examiner concludes, that Morgan Stanley was

not asked to, nor did it, undertake or present a comprehensive evaluation of VRC's Step Two

solvency opinion.

       **5.**       **Knowledge and Actions of the Large Stockholders in Connection with the Step Two Transactions.**

     Following the completion of the Step One Transactions, the activities of the Large

Stockholders[2709] were significantly more limited, particularly given the Chandler Trusts'

disposition of all of their remaining Tribune Common Stock by June 7, 2007.[2710]  Indeed, the

---

[2705]  Examiner's Sworn Interview of William A. Osborn, June 24, 2010, at 26:11-14.

[2706]  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 151:1-18.

[2707]  *Id.* at 151:19-22.

[2708]  *See* Ex. 267 at TRB0412757 (VRC Engagement Letter, dated April 11, 2007) (requiring that financial forecasts and projections provided to VRC must "have been prepared in good faith . . . based upon assumptions that, in light of the circumstances under which they are made, are reasonable").

[2709]  Although the Report refers to the Chandler Trusts and the McCormick Foundation collectively as the Large Stockholders, as described previously, following completion of the Step One Transactions, the Large Stockholders possessed significantly fewer shares of Tribune Common Stock because the Chandler Trusts had disposed of their entire holdings through a combination of the Tender Offer and their block trade underwritten by Goldman Sachs and the McCormick Foundation held 11.8 million shares of Tribune Common Stock, representing approximately 10% of the total shares of Tribune Common Stock outstanding.  *See* Report at § III.E.5.

[2710]  *See* Report at § III.F.3.

only notable activity by the Large Stockholders during the Step Two Transactions took place in connection with the Merger.

### a.    The Company Meeting.

On July 13, 2007, Tribune provided notice of the August 21, 2007 Company Meeting to approve the Merger.[2711]  Only the holders of record of Tribune Common Stock at the close of business on July 12, 2007, the record date for the Company Meeting, were entitled to notice and to vote at the meeting.[2712]

### b.    The Merger Approval Process.

The Foundation's Advisory Committee and the Foundation's Board each scheduled a special meeting on August 17, 2007, to discuss whether the McCormick Foundation should vote its shares of Tribune Common Stock in support of the Merger.[2713]

At the Foundation's Advisory Committee special meeting, Blackstone, Katten, and Q&B gave presentations on previously submitted reports and opinions with respect to various financial and legal aspects of the Merger.[2714]  First, Blackstone discussed the terms of the Merger Agreement, reviewed the share price of the Tribune Common Stock, and concluded that the Merger price of $34.00 per share was fair to the McCormick Foundation from a financial standpoint.[2715]  Second, Katten reviewed its memorandum to the Foundation's Advisory Committee describing benefits that would be granted to certain Tribune officers in the form of a cash bonus pool, the 2007 Management Equity Incentive Plan, indemnification and insurance,

---

[2711]  Ex. 226 at 2-3 (Proxy Statement, dated July 13, 2007).

[2712]  *Id.*

[2713]  Ex. 763 (Pitrof E-Mail, dated July 19, 2007).

[2714]  Ex. 1112 (Foundation's Advisory Committee Meeting Minutes, dated August 17, 2007).

[2715]  *Id.* at 2.

stock options, restricted stock, and transitional compensation plans.[2716]  Finally, Q&B provided a detailed review of its draft legal opinion in which it concluded that the proposed decision of the Foundation's Board to vote the McCormick Foundation's shares of Tribune Common Stock in favor of the Merger was in compliance with applicable law and approval for the Merger would not jeopardize the McCormick Foundation's tax exempt status.[2717]  Thereafter, the Foundation's Advisory Committee approved a recommendation to the Foundation's Board to authorize a vote of the Tribune Common Stock owned by the McCormick Foundation in favor of the Merger.[2718]

At its special meeting, the Foundation's Board, including Mr. FitzSimons, also heard reports and presentations by Blackstone, Katten, and Q&B on the Merger.[2719]  After the question and answer period, the Foundation's Advisory Committee submitted its report to the Foundation's Board and recommended that the McCormick Foundation vote the McCormick Foundation's shares of Tribune Common Stock in favor of the Merger.[2720]  The Foundation's Board subsequently unanimously approved, including Mr. FitzSimons, the vote of all of the Tribune Common Stock owned by the McCormick Foundation in favor of the Merger.[2721]

Certain Parties contend that the McCormick Foundation committed to support the Merger starting at the commencement of the Step One Transactions and therefore had already agreed to vote in favor of the Merger at the time it was announced.  As noted above, however, the record is

---

[2716]  *Id.*

[2717]  *Id.* at 3.

[2718]  *Id.*

[2719]  Ex. 768 at 19-21 (McCormick Foundation Board Meeting Minutes, dated August 17, 2007).

[2720]  *Id.* at 20-21.

[2721]  *Id.* at 21.

clear that the Foundation's Board did not determine to vote all of the Tribune Common Stock

owned by the McCormick Foundation in favor of the Merger until August 17, 2007.[2722]

The McCormick Foundation later concluded its Merger approval process by obtaining

certain investment opinions,[2723] including an opinion issued by Advisory Research, dated as of

August 17, 2007, stating that the terms of the Merger represented fair value to the McCormick

Foundation.[2724]

### c.        The Merger Closing.

After the Merger was approved at the Company Meeting, the McCormick Foundation's

activities were limited to monitoring media coverage related to Tribune and the McCormick

Foundation.[2725]  The McCormick Foundation was kept informed by Tribune's senior

management as to the continued expectation for the Merger to close by the end of the year.[2726]

With that in mind, on December 14, 2007, the McCormick Foundation cancelled its media

coverage subscription.[2727] On December 20, 2007, Tribune announced the consummation of the

Merger.[2728]

### 6.        Knowledge and Actions of the Zell Group in Connection with the Step Two Transactions.

This section focuses on the Zell Group and its communications and interactions:

(a) internally regarding the closing of the Step Two Transactions and related solvency issues,

---

[2722] *Id.*; Ex. 1113 at 4 (Unanimous Written Consent of Directors of the McCormick Foundation Board, dated August 17, 2007).

[2723] Ex. 772 (Chomicz E-Mail, dated September 11, 2007).

[2724] Ex. 1001 (Advisory Research Opinion Letter, dated August 17, 2007).

[2725] Ex. 775 (Maynes E-Mail, dated September 28, 2007 ); Ex. 776 (Maynes E-Mail, dated October 5, 2007); Ex. 777 (Maynes E-Mail, dated November 2, 2007); Ex. 778 (Maynes E-Mail, dated December 13, 2007).

[2726] Ex. 779 at 2 (McCormick Foundation Meeting Minutes, dated October 9, 2007); Ex. 780 at FOUN0009915 (McCormick Foundation Investment Committee Meeting Minutes, dated November 13, 2007).

[2727] Ex. 781 (Wander E-Mail, dated December 14, 2007).

[2728] Ex. 782 (Tribune Press Release, dated December 20, 2007).  *See* Report at § III.G.4.a.

(b) with Tribune management before the closing of the Step Two Transactions, and (c) with Tribune's investment bankers and the Lead Banks leading up to the closing of the Step Two Transactions.

### a.    Internal Zell Group Communications Regarding the Closing of the Step Two Transactions and Solvency Issues.

In late July 2007, William Pate directed Nils Larsen and Chris Hochschild to prepare an analysis of EGI's strategic options if Step Two failed to close, including a "full spin of broadcasting, spin of CB, and push[ing] debt to broadcasting."[2729]  Mr. Pate stated that "the spin scenario is the better course given the operational complexities of the business and the risk of overleveraging these assets."[2730]

Nevertheless, Mr. Larsen was pushing for the Step Two Transactions to close and suggested that EGI undertake a restructuring analysis to determine "what changes to the deal structure can be put in place that allow closing but address the capital structure," such as reducing the per share price or adding an incremental asset sale bridge for another $1.5 billion.[2731]  Mr. Larsen argued further:[2732]

> [T]he majority of our return is generated from the second phase. So while closing a bad deal is not the way to go, not closing the deal leaves us with a series of negatives that a cumbersome and time consuming spin/liquidation may not be the right way to proceed.

---

[2729]  Ex. 783 at EGI-LAW 00114068-00114072 (Pate E-Mail, dated July 25, 2007).  In his interview with the Examiner, Mr. Larsen repeatedly stated his belief that EGI did not have an unfettered right to terminate the Leveraged ESOP Transactions before the closing of the Step Two Transactions.  Examiner's Interview of Nils Larsen, June 15, 2010.  Mr. Pate, by contrast, seemed to believe that EGI had the option not to proceed with Step Two.  Internal EGI communications are equivocal on this issue.  In a July 25, 2007 e-mail from Mr. Larsen to Mr. Pate, Mr. Larsen stated: "The spin analysis along with a reconstituted transaction at a lower price will be ready for discussion at the end of the week or early next week.  It will not take a week, let alone two.  If we decide not to hit Phase II our FCC risk goes away and we can get moving ASAP."  Ex. 783 at EGI-LAW 00114068 (Pate E-Mail, dated July 25, 2007).

[2730]  Ex. 783 at EGI-LAW 00114068 (Pate E-Mail, dated July 25, 2007).

[2731]  *Id.* at EGI-LAW 00114072.

[2732]  *Id.*

In his interview with the Examiner, Mr. Larsen denied that he and Mr. Pate had divergent opinions about whether to close the Step Two Transactions.[2733]  Mr. Larsen stated that he did not think that either he or Mr. Pate "had made a determination of which was the way to go," but were just trying to analyze the trends so they were not "caught unaware."[2734]  Mr. Larsen told the Examiner:[2735]

> We didn't look at not doing step 2.  It wasn't really our decision.
> The majority of it—$250 million—had already been invested.  We
> had an obligation with limited conditions to make the balance of
> the investment.  Absent something we could have pointed to, we
> couldn't get out of the transaction.  If the deal hadn't closed we
> were going to be investors.

Conversely, in his interview with the Examiner, Samuel Zell expressed personal concerns over whether Step Two would close:[2736]

> [W]hen the first step closed, I thought the chances of getting the
> second stage closed were pretty high.  As the months [passed], my
> belief in it materially decreased.  One week, the stock was trading
> at 27, the next week . . . someone was taking 34.  I tried to get
> everyone to listen to me.  Here we are, it was indicative of where
> the markets were at the time, panic was in the air.

On August 1, 2007, Mr. Hochschild prepared a leveraged buyout transaction model with the spin analysis requested by Mr. Pate.  Mr. Hochschild made the following two assumptions as part of the spin analysis:  Step Two "does not take place" and "EGI pays the $25mm break-up fee."[2737]  Mr. Hochschild concluded that "the returns under this initial Spin scenario are significantly worse . . . than under the current [leveraged buyout transaction] scenario."[2738]  Mr.

---

[2733]  Examiner's Interview of Nils Larsen, June 15, 2010.

[2734]  *Id.*

[2735]  *Id.*

[2736]  Examiner's Interview of Sam Zell, June 14, 2010.

[2737]  Ex. 784 (Hochschild E-Mail, dated August 1, 2007).

[2738]  *Id.*

Hochschild pointed to Tribune's tax status as a cause of the lower returns on the spin scenario.[2739] One day later, Mr. Hochschild prepared a revised spin and asset sale model that refined the asset sale structure and certain tax assumptions.[2740]  Notwithstanding the revised analysis, Mr. Hochschild again concluded that the ten-year returns under the spin scenario were worse than under the leveraged buyout transaction scenario.[2741]

In a confidential memorandum to Mr. Zell, dated August 9, 2007, Mr. Pate warned that EGI must be "prepared to respond if the second step of the go-private transaction falters, due to market uncertainty or otherwise."[2742]  He further stated:  "I also think we should review our financial forecast with a very skeptical eye and consider whether we fully support the second step of the go-private transaction in light of recent financial shortcomings."[2743]

From Mr. Pate's perspective, the issue of Tribune's solvency was tied closely to the question of closing the Step Two Transactions.  Mr. Pate voiced concern regarding Tribune's solvency in his August 9, 2007 confidential memorandum to Mr. Zell, warning that Mr. FitzSimons did not appear to be taking the issue seriously: "We need to be absolutely sure the company is solvent before completing the transaction.  Dennis is not focused on the solvency of this deal, and that is one of the key reasons why we are making a mistake in not acting immediately to change management."[2744]

In his interview with the Examiner, Mr. Zell denied the existence of any such concern at the time:  "We weren't even concerned. . . .  [A] solvency opinion doesn't do shit for me. . . .

---

[2739]  *Id.*

[2740]  Ex. 785 (Hochschild E-Mail, dated August 2, 2007).

[2741]  *Id.*

[2742]  Ex. 786 at EGI-LAW 00178270 (Pate Memorandum, dated August 9, 2007).

[2743]  *Id.*

[2744]  *Id.*

Cash flow is all we care about."[2745]  Mr. Larsen echoed Mr. Zell's assertion that EGI would not

be focused on any "solvency test in a classical sense," but instead would be focused on

liquidity.[2746]  Additionally, Mr. Larsen denied any involvement in the VRC solvency analysis,

although he acknowledged that EGI tried to educate itself about the solvency process.[2747]  In his

interview with the Examiner, JPM's Brit Bartter confirmed that although there was a "concern"

about Tribune's solvency, "Zell wanted to do this deal – he's pumped to do this deal."[2748]

EGI was not directly involved in the VRC solvency analysis process.  On September 12,

2007, Chandler Bigelow forwarded to Mr. Larsen the schedule for upcoming due diligence

sessions with the Lead Banks and VRC.[2749]  In internal discussions of the proposed schedule, Mr.

Larsen recommended participating in the Lead Bank due diligence process, but not the VRC due

diligence process, as "duplicative and more remedial."[2750]  Nevertheless, EGI retained its own

advisor, CRA, to consult on solvency issues.[2751]

In his sworn interview with the Examiner, Mr. Larsen stated that EGI retained CRA

because EGI felt that it lacked in-house expertise on the solvency process "and with the second

---

[2745]  Examiner's Interview of Samuel Zell, June 14, 2010.

[2746]  Examiner's Interview of Nils Larsen, June 15, 2010.  In a subsequent interview, Mr. Larsen said that EGI continued to assess Tribune's solvency by "pay[ing] close attention to the interactions with management, receipt of monthly financials . . . and also to work with . . . independent parties to look at how . . . we might improve the operations and to execute on our overall investment thesis."  Examiner's Sworn Interview of Nils Larsen, July 7, 2010, at 28:16-29:2.

[2747]  Examiner's Interview of Nils Larsen, June 15, 2010.

[2748]  Examiner's Interview of Brit Bartter, June 16, 2010.

[2749]  Ex. 787 at EGI-LAW 00127421 (Larsen E-Mail, dated September 12, 2007).

[2750]  *Id.*

[2751]  *See, e.g.,* Ex. 788 (Hochschild E-Mail, dated September 24, 2007); Ex. 789 (Hochschild E-Mail, dated October 6, 2007) (Mr. Hochschild inquiring of CRA:  "As you guys go through the VRC model and make your changes.  Can you keep a list of the 'errors' in their model or any discrepancies that you have with their model."); Ex. 790 at EGI-LAW 00147146 (Frizzell E-Mail, dated October 18, 2007); Ex. 791 at EGI-LAW 00175782 (Mayer E-Mail, dated December 7, 2007) (Mr. Larsen updating CRA:  "We are making definitive progress on all fronts including solvency.  VRC presented their oral views of the second step to the Board earlier this week and did not raise any reasons for concern.").

step and VRC doing its work and the knowledge that the banks were looking at this issue, we felt

sort of under informed as to the process and, you know, we felt it was prudent to . . . increase our

knowledge as to the process so that we could understand it better and [it] added some level of

clarity."[2752]  Mr. Larsen further noted that EGI shared with CRA some of the VRC models and

preliminary detailed financial information on Tribune in order to "get CRA's informed opinion as

to . . . what possible diligence and questions that Murray Devine would be asking and also to try

to get a better understanding as to what the potential . . . view VRC may have and outcome."[2753]

Mr. Larsen said that CRA did not issue a formal solvency opinion, but furnished advice on

solvency issues:[2754]

> I would not likely characterize it as an opinion because I don't
> believe they actually did the work that would lead to an official
> opinion.  The sense that we got from the work was that . . . VRC
> would likely come back and indicate that the company would be
> solvent after the second step.

As noted, EGI was also aware that the Lead Banks had retained their own solvency

expert, Murray Devine, and there was some concern that the move was designed to provide the

Lead Banks with a potential "out" if the funding condition precedent of Tribune's solvency could

be called into question.  In his sworn interview with the Examiner, Mr. Larsen summarized these

concerns:[2755]

> Well certainly I'd say it was by hiring Murray Devine obviously
> that [the Lead Banks] were sensitive to that condition precedent
> and assessing it very closely. . . .  I don't know where they felt they
> were on the continuum of whether that condition was going to be
> met or not, but certainly, you know, the idea that retaining
> someone who specializes in that type of service, the logical

---

[2752] Examiner's Sworn Interview of Nils Larsen, July 7, 2010, at 33:4-11.

[2753] *Id.* at 45:16-21.

[2754] *Id.* at 48:5-12.

[2755] *Id.* at 23:19-24:6.

conclusion was drawn that they were focused on that condition precedent.

Starting in late November through early December 2007, the Lead Banks submitted their solvency-related questions to Tribune which forwarded the questions to VRC.[2756]  Although Mr. Larsen received a copy of the Lead Banks' initial due diligence questions, it does not appear from the documentary evidence that EGI participated in the VRC solvency due diligence process.[2757] In his interview with the Examiner, however, Mr. Larsen indicated that "we were certainly in contact with the company as to how the VRC process was going and whether there was any information that could be shared with regard to that process."[2758]  On November 27, 2007, Chris Hochschild sent an e-mail to Gerald Spector regarding the solvency opinion: "VRC has completed their work and is 'prepared to deliver an opinion' to the board. . . .  They have not said whether the opinion will be a positive one, but the fact that they completed the work quickly and have really given the company no signals of concern leads everyone to believe that we are fine on this front; but until the opinion actually comes, there is still a risk that we are not."[2759]

### b.    The Extent of the Zell Group's Communications with Tribune Management Before the Closing of the Step Two Transactions.

EGI began actively planning to assume control of Tribune on the closing of the Step Two Transactions shortly after the close of the Step One Transactions.  The reactions of Tribune's management to EGI's attempts to assert control varied.  Tribune's management was generally accommodating in response to EGI's requests relating to financial information and operating results, but was far less enthusiastic in response to EGI's attempts to participate in strategic decision-making before the closing of the Step Two Transactions.

---

[2756]  Examiner's Sworn Interview of Donald Grenesko, June 25, 2010, at 132:5-8.

[2757]  Ex. 792 (Kapadia E-Mail, dated November 8, 2007).

[2758]  Examiner's Sworn Interview of Nils Larsen, July 7, 2010, at 26:3-6.

[2759]  Ex. 793 (Hochschild E-Mail, dated November 27, 2007).

### (1)    Communications Between EGI and Tribune Regarding Financial Information and Projections Before the Closing of the Step Two Transactions.

After some initial hesitation about possible legal limitations on the ability to share information,[2760] Tribune routinely shared detailed financial and operational reports with EGI regarding both the Broadcasting Segment and the Publishing Segment, along with other financial records of the Tribune Entities.[2761]  It appears that EGI reviewed the financial reports and did not hesitate to question Tribune about concerns it noted, such as downward trends in revenue or cash flow.[2762]

Mr. Hochschild used Tribune's financial information to prepare an internal EGI financial model showing Tribune management's current revenue and operating cash flow projections for 2007, along with his own operating assumptions regarding growth and decline in the various

---

[2760]  Ex. 794 (Sotir E-Mail, dated June 8, 2007) ("Can you guys meet with the Trib finance team on Tuesday afternoon (June 12) to review Period 5 financials.  They may show us their revised forecast, but are still [discussing] with lawyers what level of detail they can discuss."); Ex. 795 at EGI-LAW 00113215 (Larsen E-Mail, dated July 18, 2007) ("Attached are selected pages from the period 6 brown book for publishing that I am comfortable forwarding to you.").

[2761]  The Publishing Segment provided EGI with financial reports on a regular basis such as Publishing Flash summaries, Brown Books for publishing by period, quarterly ad category reports, yearly capital and cost reduction plans.  The Broadcasting Segment provided EGI with weekly pacing and category reports with a brief summary of revenue trends and general business conditions.  EGI also received period and quarterly Flash reports from the interactive business, Brown Books, and press releases issued by Tribune reporting on revenues. *See, e.g.,* Ex. 796 (Hochschild E-Mail, dated June 4, 2007); Ex. 797 (Pate E-Mail, dated June 5, 2007); Ex. 798 (Hendricks E-Mail, dated July 16, 2007); Ex. 799 at EGI-LAW-00113453-00113454 (Larsen E-Mail, dated July 19, 2007); Ex. 795 (Larsen E-Mail, dated July 18, 2007); Ex. 800 at EGI-LAW 00106257 (Bigelow E-Mail, dated June 20, 2007); Ex. 801 (Hochschild E-Mail, dated August 20, 2007); Ex. 802 (Hendricks E-Mail, dated August 20, 2007); Ex. 803 (Sotir E-Mail, dated September 24, 2007); Ex. 804 (Pate E-Mail, dated October 10, 2007); Ex. 805 (Hendricks E-Mail, dated October 5, 2007); Ex. 806 (Hochschild E-Mail, dated October 8, 2007); Ex. 1039 (Hochschild E-Mail, dated November 12, 2007); Ex. 807 at EGI-LAW 00161133 (Hochschild E-Mail, dated November 15, 2007); Ex. 808 (Hendricks E-Mail, dated December 3, 2007); Ex. 1120 (Hochschild E-Mail, dated December 11, 2007).

[2762]  Ex. 799 at EGI-LAW 00113453 (Larsen E-Mail, dated July 19, 2007) (commenting on advertising category reports forwarded by Tribune: "We need to understand the national fall-off and the trib real estate fall.  There is plenty of grist for meetings with hiller and smith to push them on these particular items. Also, compare ad inches to revenues. There seems to be clear discounting taking place – maybe too much."); Ex. 795 at 00113215 (Larsen E-Mail, dated July 18, 2007); Ex. 803 (Sotir E-Mail, dated September 24, 2007) (commenting on Tribune forwarded Publishing Flash Summary from Period 9, Week 3:  "It seems that retail is slowing down. Any idea why that is?  I don't think we were anticipating it slowing down, right?"); Ex. 809 at EGI-LAW 00158927 (Hochschild E-Mail, dated November 13, 2007) ("Can you provide a little color to me on the broadcasting results for Period 10?  Both revenues and OCF were well off versus 2006 . . . and the 2007 Plan.").

publishing divisions.[2763]  Between August and December 2007, Mr. Hochschild regularly

compared EGI's projections to the then-current projections in Tribune's five-year model, updated

EGI's model, and sent internal EGI e-mails commenting when he thought one party or the other

had been more aggressive in its projections.[2764]  Mr. Larsen told the Examiner that he did not

agree with management's approach to the interactive business:[2765]

> [My] recollection is that they cast their net incredibly broadly and
> had many, many plans, opportunities, ideas that they were
> investing time and money into, and I think our view of the world
> was focusing on everything is focusing on nothing, and you really
> needed to create a business plan, a return on capital, to determine
> whether or not you're going to green light certain opportunities,
> and if you couldn't—if they didn't have a reasonable return on
> capital within a reasonable period of time, pursuing those was
> probably not time or money well spent. . . .  I think our view would
> be that working on 120 different projects at the same time was not
> the best use of people's time and effort.

Mr. Larsen testified that "it would have been overstepping to try to indicate to

management that we think their projections should be changed to reflect, you know, the way we

think the world would be."[2766]

---

[2763]  Ex. 810 at EGI-LAW 00119758-00119759 (Pate E-Mail, dated August 17, 2007).

[2764]  Ex. 811 (Hochschild E-Mail, dated August 29, 2007); Ex. 812 (Hochschild E-Mail, dated September 27, 2007); Ex. 813 (Hochschild E-Mail, dated October 8, 2007); Ex. 814 (Hochschild E-Mail, dated December 6, 2007).

[2765]  Examiner's Sworn Interview of Nils Larsen, July 7, 2010, at 56:14-57:10.  After Mr. Larsen's interview, his counsel sent an errata sheet that offered the following addition to the testimony quoted above:  "Initially, I recall that the projected Tribune interactive revenue associated with possible new investments was not very material to the overall analysis of Tribune's business."  The corresponds with Mr. Larsen's comments during his initial interview with the Examiner:

> It's helpful as you look at this, to consider the size of these interactive revenues compared to [the] overall picture and how significant they really are.  My recollection is interactive didn't become a meaningful contributor until 2015 and out.  I don't think they were over-aggressive on interactive. That didn't cause this problem.

Examiner's Interview of Nils Larsen, June 15, 2010.  Mr. Larsen also told the Examiner that he did not believe there was any "ball hiding" by Tribune with respect to Tribune's financial projections generally.  *Id.*

[2766]  Examiner's Sworn Interview of Nils Larsen, July 7, 2010, at 58:20-59:1.

In August 2007, Tribune was in the midst of updating its 2007 operating plan to deliver to VRC for preparation of VRC's Step Two solvency opinion.[2767]  The revised operating plan was to be based on the current 2007 projections and an updated five-year financial model.[2768] Mr. Bigelow solicited EGI's comments and input on Tribune's revised financial models and incorporated Mr. Larsen's comments into its updated five-year model.[2769]  E-mail exchanges between Mr. Bigelow and Mr. Larsen in the fall of 2007 reflected an ongoing dialogue on modeling the downside scenarios to Tribune's five-year consolidated model, that Tribune would provide to the Lead Banks.[2770]  Mr. Bigelow asked Mr. Larsen to review the sensitivities included in the model,[2771] and Mr. Larsen expressed his unhappiness with the inclusion of a downside sensitivity case based on the negative assumptions made in a Lehman Brothers report that Mr. Larsen described as "garbage."[2772]  Mr. Bigelow also kept EGI advised regarding rating agency activities.  For example, Mr. Bigelow forwarded a copy of Tribune's late-October 2007 rating agency presentation to Mr. Larsen,[2773] as well as copies of Moody's and Standard & Poor's draft press releases for comment.[2774]

---

[2767]  Ex. 654 (Bigelow E-Mail, dated August 2, 2007).

[2768]  *Id.*

[2769]  Ex. 815 (Hochschild E-Mail, dated September 25, 2007).  In his interview with the Examiner's counsel and financial advisor, Harry Amsden, Vice President Finance of Tribune Publishing Company indicated that he did not believe that the Zell Group had any involvement in the reforecasting process.  Examiner's Interview of Harry Amsden, July 2, 2010.

[2770]  *See* Ex. 816 (Larsen E-Mail, dated September 20, 2007); Ex. 817 (Larsen E-Mail, dated September 20, 2007); Ex. 818 (Larsen E-Mail, dated October 24, 2007).  Mr. Larsen did not recall speaking with Tribune management regarding the funding of projects that were proposed to be undertaken by the Tribune Entities' interactive group.  Examiner's Sworn Interview of Nils Larsen, July 7, 2010, at 57:11-58:2.  Donald Grenesko similarly did not recall specifically discussing plans for the Tribune Entities' interactive group with Zell Group personnel.  Examiner's Sworn Interview of Donald Grenesko, July 8, 2010, at 174:22-175:7.

[2771]  Ex. 816 (Larsen E-Mail, dated September 20, 2007).

[2772]  Ex. 817 (Larsen E-Mail, dated September 20, 2007).

[2773]  Ex. 818 at EGI-LAW 00153635 (Larsen E-Mail, dated October 24, 2007).

[2774]  Ex. 819 (Larsen E-Mail, dated November 29, 2007); Ex. 1040 at EGI-LAW 00189249 (Bigelow E-Mail, dated December 18, 2007).

On October 1, 2007, EGI participated in the underwriters' due diligence meeting attended by representatives from Tribune, the Lead Banks, and Murray Devine.  At this meeting, Tribune presented, among other things, its updated financial model and consolidated operating sensitivities.[2775]  Leading up to this meeting, EGI provided input into Tribune's financial model. For instance, Mr. Bigelow responded to Mr. Larsen's concerns about basing the downside case scenario on the figures used in the Lehman Brothers report by preparing an explanatory e-mail for the Lead Banks, and asked Mr. Larsen to review the e-mail.[2776]  The next day, Mr. Larsen told Mr. Bigelow that he had additional comments to Tribune's financial model.[2777] Additionally, William Pate e-mailed Tribune's Ken DePaola and Doug Thomas before the October 1, 2007 underwriters' meeting and complimented them on the presentation they had prepared for the meeting, which EGI had obviously been allowed to preview.[2778]  Mr. Pate also gave advice with regard to the questions that Tribune was likely to face from the Lead Banks.[2779]

Tribune consistently included EGI on its e-mails forwarding the latest versions of its financial model or other financial reports to the Lead Banks in preparation for the weekly due diligence conference calls.[2780]  Not only did EGI receive the final versions of these documents, but EGI also had the opportunity to review drafts of the models before they were provided to the Lead Banks.[2781]

---

[2775]  Ex. 820 (Jacobson E-Mail, dated September 29, 2007).

[2776]  Ex. 816 (Larsen E-Mail, dated September 20, 2007).

[2777]  Ex. 821 (Larsen E-Mail, dated September 21, 2007).

[2778]  Ex. 822 (Pate E-Mail, dated September 29, 2007).

[2779]  *Id.*

[2780]  Ex. 823 (Bigelow E-Mail, dated October 5, 2007); Ex. 1041 (Chen E-Mail, dated October 16, 2007).

[2781]  Ex. 824 (Sachs E-Mail, dated November 13, 3007).

(2)    **EGI's Attempts To Participate In Strategic Decision-Making Before the Closing of the Step Two Transactions.**

Following consummation of the Step One Transactions, EGI also attempted to assert some control over Tribune's strategic decision-making processes in the period leading up to the Step Two Transactions.  EGI's attempts in this regard were not well-received by Tribune management.

Shortly after the Step One Transactions closed, Mr. Pate traveled to Los Angeles to meet with managers of the Los Angeles Times to discuss operating results, new initiatives, and project development.[2782]  Mr. Zell then tasked Randy Michaels, Mr. Zell's choice for Chief Operating Officer of Tribune, to draft a "first 100 day" action plan.[2783]  Mr. Michaels also prepared a series of questions for managers of Tribune's various business units to assist him in evaluating both the business units and the managers.[2784]  Mr. Michaels advised the EGI team that they needed to have "allies" inside "the Tower" and asked Mr. Pate, Mr. Larsen, Mark Sotir, and Gerald Spector to identify Tribune employees whom they believed could help in this regard.[2785]  Mr. Larsen responded with a short list that included Mr. Bigelow.[2786]

Tribune management appears to have resisted EGI's efforts to participate actively in the strategic decision-making process at Tribune before the closing of the Step Two Transactions. The following exchanges are illustrative of this tension:

- Mr. FitzSimons told the Examiner that in the summer of 2007, Mr. Zell gave an "ambiguous answer at best" in response to a question from a group of Los Angeles

---

[2782]  Ex. 783 at EGI-LAW 00114067 (Pate E-Mail, dated July 25, 2007).

[2783]  Ex. 825 at EGI-LAW 00123664 (Pate E-Mail, dated August 29, 2007).

[2784]  Ex. 826 at EGI-LAW 00127531 (Larsen E-Mail, dated September 13, 2007).

[2785]  Ex. 827 (Larsen E-Mail, dated October 5, 2007).

[2786]  *Id.*

Times reporters related to the Leveraged ESOP Transactions and who would be part of Tribune management following consummation of the Leveraged ESOP Transactions.[2787]  Mr. FitzSimons further stated that "I told Sam in no uncertain terms that that wasn't acceptable because while I was running this company I was running this company and didn't need anybody undercutting me. It was a little bit more colorful than that."[2788]

•      On September 18, 2007, Mr. Larsen and John Vitanovec of Tribune exchanged e-mails regarding the Tribune Entities' plans to shut down the television syndication business without first marketing the business to potential purchasers.  Frustrated by the response he received, Mr. Larsen e-mailed Mr. Michaels and stated that EGI "[needed] to move quickly" before Tribune "take[s] apart a valuable asset."[2789]

•      On September 28, 2007, Mr. Larsen e-mailed Mr. Vitanovec after he read that premiere episodes of two of the CW Network's new primetime series were going to be streamed free-of-charge on Yahoo TV.[2790]  Mr. Larsen described this as a "disturbing and negative development," and asked Mr. Vitanovec if Tribune was involved in this decision.[2791] Again unhappy with the answers he received, Mr. Larsen responded:  "[M]y concern runs to the fact that much of this seems to be happening to us as opposed to being a part of a regular and evolving dialogue. . . .  At some point I would love to have an opportunity to get together and discuss this in more detail and spend time on the digital distribution experiments."[2792]

---

[2787]  Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 108:18-19.

[2788]  *Id.* at 108:19-109:2.

[2789]  Ex. 828 at EGI-LAW 00129322 (Larsen E-Mail, dated September 18, 2007).

[2790]  Ex. 829 at EGI-LAW 00138604 (Larsen E-Mail, dated September 28, 2007).

[2791]  *Id.*

[2792]  *Id.* at EGI-LAW 00138603.

•        When EGI was apprised of the Gannett-Metromix deal that was about to be publicly announced, Mr. Pate e-mailed Mr. Larsen and Mr. Michaels, stating: "We should discuss early tomorrow if we want to push back on the Gannett-Metromix deal.  They plan to announce next Wednesday.  Trib thinks it is a winner.  I have my doubts but would like your advice."[2793]

•        When Mr. Landon e-mailed EGI before the December 18, 2007 Tribune Board meeting with a list of subjects for discussion, Mr. Michaels immediately expressed his concerns:[2794]

> My input would be to slow down what you can.  For some reason, there is a great rush to get projects started before the change of control.  This is backwards. . . .  Finally, let's not let Tribune agree to ANYTHING that forecloses future options.  We can participate in experiments we can get out of, but make sure we don't commit to exclusives or non-competes.

Although it appears that Tribune management included EGI in certain management-level discussions and provided it with relevant documents,[2795] Mr. Zell told the Examiner that Tribune management was not "enthusiastic" about the deal, and that Mr. FitzSimons refused to give Mr. Zell any power until after Step Two closed.[2796]  For example, even though Mr. Zell was named to the Tribune Board in May 2007, Mr. Zell told the Examiner that his "instructions [from Mr. FitzSimons] were, you are on the Board, you sit on the Board.  You don't sit on any committees.  You don't have anything to do with it until it's a real deal."[2797]  Additionally, Mr. Zell said that "FitzSimons sat in my office in December and said I'm not doing anything, I'm

---

[2793]  Ex. 830 (Pate E-Mail, dated October 17, 2007).

[2794]  Ex. 831 at EGI-LAW 00172384 (Michaels E-Mail, dated December 1, 2007).

[2795]  Ex. 832 (Sotir E-Mail, dated October 27, 2007); Ex. 833 (FitzSimons E-Mail, dated December 6, 2007).

[2796]  Examiner's Interview of Samuel Zell, June 14, 2010.

[2797]  *Id.*

not giving you any power until it closes and I don't think it's going to close.  I'm not moving, because I'm not moving.  If it doesn't close then I'm still CEO."[2798]  Mr. FitzSimons, however, denied that he did anything to frustrate or disrupt Mr. Zell's ability to plan for the transition, or that he refused any of Mr. Zell's requests in this regard.[2799]  Mr. FitzSimons stated that his "recollection is that [he] tried to be again very helpful to Sam to let him know at all times the condition of the company, where there were issues, where we were doing well."[2800]

> ### c.    EGI's Contact with the Financial Advisors and the Lead Banks in Connection with the Step Two Financing.

In June and July of 2007, CGMI and EGI met to discuss various strategic options, including alternatives with respect to the WGN Superstation and a set of television stations referred to as the "Renaissance Cluster,"[2801] and overall plans for the remaining $4 billion in financing in light of the then-current market conditions.[2802]  Christina Mohr, a Managing Director of CGMI, told the Examiner that her message to the Zell Group in June 2007 was that "this Company should be selling assets to reduce risk around the transaction and to take [it] from achievable to prudent."[2803]

Following the closing of the Step One Transactions, EGI dealt with JPMCB as the spokesperson for the Lead Banks regarding possible changes to the terms of the Step Two Financing.  EGI was approached by JPMCB with concerns about the ability of the Lead Banks to syndicate the Step Two Debt.  Internal JPMCB e-mails expressed apprehension that JPMCB was

---

[2798] *Id.*

[2799] Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 108:1-8.

[2800] *Id.* at 109:20-110:1.

[2801] Ex. 834 at 1 and 27-29 (EGI Tribune Discussion Materials, dated June 28, 2007).

[2802] Ex. 835 (Canmann E-Mail, dated July 26, 2007).

[2803] Examiner's Interview of Christina Mohr, June 29, 2010.  Ms. Mohr further stated:  "Part of the pitch is you should buy yourself some insurance, has nothing to do with whether the business is solvent at the time."  *Id.*

"totally underwater on this underwrite"[2804] and that "this deal will fail without a lot more help

from Zell."[2805]  On July 26, 2007, James Lee of JPMCB met with Mr. Zell to discuss the status of

the financing.  On returning from this meeting, Mr. Lee sent an e-mail to colleagues at JPMCB

expressing his satisfaction with Mr. Zell's responsiveness to JPMCB's concerns:[2806]

> To his credit, he said he would do what was necessary to help us.
> We discussed him selling more assets, improving the yield, etc.
> etc.  I also raised it would probably be helpful for him to be
> involved in the operations of the company to the extent permitted
> given the softness in the space and our need to have a strong story
> to sell.  He couldn't have been more understanding of all the issues
> and willing to help.

Mr. Zell stated during his interview with the Examiner that, although he did not recall

that specific meeting, such a meeting would not have been uncommon.[2807]  Mr. Zell told the

Examiner that he was not willing to raise the interest rates, put in more money, or do anything

that would change the economics of the deal.[2808]  Mr. Larsen corroborated Mr. Zell's position

regarding EGI's unwillingness to modify the economics of the deal.[2809]

In anticipation of another meeting with Mr. Zell, on September 25, 2007, Yang Chen of

JPMCB prepared a presentation for JPMCB senior management in which he outlined "[p]otential

changes to deal terms."[2810]  These changes included a commitment from Mr. Zell to sell

additional assets and to contribute more equity, a "Most Favored Nation" clause for the Step Two

---

[2804]  Ex. 836 (Lee E-Mail, dated July 26, 2007).

[2805]  Ex. 837 (O'Brien E-Mail, dated July 26, 2007).

[2806]  Ex. 836 (Lee E-Mail, dated July 26, 2007).

[2807]  Examiner's Interview of Samuel Zell, June 14, 2010.

[2808]  *Id.*

[2809]  Examiner's Interview of Nils Larsen, June 15, 2010 ("If it changed the economics, we would not have been
supportive of that.  Because that is why we have a commitment letter.").

[2810]  Ex. 841 at JPM_00280816 and JPM_00280821 (Chen E-Mail, dated September 19, 2007).

Lenders, and more fees payable at regular intervals until the documents governing the Step Two Financing were executed.[2811]

On October 15, 2007, Rajesh Kapadia of JPMCB requested a meeting with Mr. Larsen and Chandler Bigelow to discuss Step Two Financing issues.[2812]  Immediately thereafter, Mr. Larsen forwarded this e-mail to William Pate, stating that he thought it would be hard to decline to participate.[2813]  Mr. Pate responded: "I'd just take the meeting. listen to their comments and go from there.  Sam has been expecting an ask from them since you met with them three weeks ago."[2814]  Although he agreed to a meeting, Mr. Larsen cautioned Mr. Kapadia that "I am working under the assumption that your thoughts represent some mutually beneficial suggestions and will be presented as such."[2815]

Mr. Kapadia subsequently summarized the discussions for Mr. Lee, stating that he explained to Tribune and Mr. Larsen that "we are still losing money" and the Tribune Board should want a "market clearing deal and not leave a levered company with its underwriters stuffed."[2816]  Additionally, Mr. Kapadia said that he discussed with EGI other proposed changes to the current financing terms, including conversations with Mr. Larsen about "Zell buying $500mm of the bonds/bridge."[2817]  In a follow-up call between Mr. Lee and Mr. Zell the next day, Mr. Zell advised Mr. Lee that he believed that JPMCB "asked for a lot with a lot of take and no give."[2818]  JPMCB anticipated receiving a counteroffer from Mr. Zell or Tribune after the next

---

[2811] *Id.*

[2812] Ex. 842 at EGI-LAW 00145139 (Pate E-Mail, dated October 15, 2007).

[2813] *Id.*

[2814] *Id.*

[2815] Ex. 843 at JPM_00333013-00333014 (Kapadia E-Mail, dated October 16, 2007).

[2816] Ex. 844 (Kapadia E-Mail, dated October 18, 2007).

[2817] *Id.*

[2818] Ex. 845 (Kapadia E-Mail, dated October 20, 2007).

Tribune Board meeting.[2819]  Ultimately, EGI and Tribune agreed to reduce the amount to be borrowed in the Step Two Financing, eliminate the "structural flex" available to the Lead Banks, and adjust the terms of the high yield notes.[2820] Mr. Zell told the Examiner that this was "a perfect example of something we thought we could live with and it would reduce the debt service requirements, we didn't think that changed our economics materially."[2821]

On the eve of the closing of the Step Two Transactions, Mr. Zell remained optimistic, telling JPM's James Lee, " You have no idea how many things we're going to do to make this work."[2822]  Indeed, according to JPM's Jamie Dimon even as Tribune approached bankruptcy, Mr. Zell still thought that the deal was going to work: "Sam until very late in the game thought he was going to make a lot of money on this."[2823]

## I.        Events Leading Up to the Bankruptcy Filings.

### 1.        Tribune Board Deliberations.

Faced with debt service and related payments in December 2008 of approximately $200 million (including $69.5 million on the 5.67% Series E Medium-Term Notes due 2008),[2824] and another $1.3 billion due in 2009, including $512 million of the Tranche X Facility debt maturing in June 2009,[2825] the Tribune Board held a series of meetings in November and December 2008, during which time the Tribune Board, together with its financial advisors (including Morgan Stanley, engaged on November 13, 2008 to advise the Tribune Board),[2826]

---

[2819] *Id.*

[2820] Ex. 702 at TRIB0415673 (Tribune Board Meeting Minutes, dated November 21, 2007).

[2821] Examiner's Interview of Samuel Zell, June 14, 2010.

[2822] Examiner's Interview of James Dimon, June 25, 2010.

[2823] *Id.*

[2824] Ex. 847 at ¶ 21 (Bigelow Affidavit).

[2825] *Id.* at ¶ 26.

[2826] Ex. 848 at 1 (Tribune Board Meeting Minutes, dated November 13, 2008).

reviewed Tribune's operating performance, liquidity, near-term debt maturities, and capital structure, and considered various alternatives, including a potential restructuring and a series of asset dispositions.[2827]

### 2. Chapter 11 Filing.

Following a Tribune Board meeting held on December 8, 2008,[2828] Tribune and certain of its Subsidiaries filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.[2829] Thereafter, the Debtors continued to operate their businesses as debtors in possession under the jurisdiction of the Bankruptcy Court.[2830]

---

[2827] Ex. 848 (Tribune Board Meeting Minutes, November 13, 2008); Ex. 849 (Tribune Board Meeting Minutes, dated December 1, 2008); and Ex. 850 (Tribune Board Meeting Minutes, dated December 7, 2008).

[2828] Ex. 851 (Tribune Board Meeting Minutes, dated December 8, 2008).

[2829] Ex. 852 (Bankruptcy Petition); Ex. 853 (Bankruptcy Notice); Ex. 854 at 2 (Tribune Form 8-K, filed December 11, 2008).

[2830] Ex. 854 at 2 (Tribune Form 8-K, filed December 11, 2008).

**Table 1**

**Boards of Directors of the Guarantor Subsidiaries**[2831]

| Guarantor Subsidiary | Directors as of June 4, 2007 | Directors as of December 20, 2007 |
|---|---|---|
| The Baltimore Sun Company | Crane H. Kenney<br>Robert Gremillion | Crane H. Kenney<br>Robert Gremillion<br>Scott C. Smith |
| Chicago Tribune Company | Dennis J. FitzSimons<br>Scott C. Smith | Dennis J. FitzSimons<br>Scott C. Smith<br>Crane H. Kenney |
| The Daily Press, Inc. | Crane H. Kenney<br>Scott C. Smith<br>Kathleen M. Waltz | Crane H. Kenney<br>Scott C. Smith<br>Kathleen M. Waltz |
| The Hartford Courant Company | Stephen D. Carver<br>Robert Gremillion<br>Crane H. Kenney | Stephen D. Carver<br>Robert Gremillion<br>Crane H. Kenney |
| Orlando Sentinel Communications Company | Dennis J. FitzSimons<br>Scott C. Smith<br>Kathleen M. Waltz | Dennis J. FitzSimons<br>Scott C. Smith<br>Kathleen M. Waltz |
| The Morning Call, Inc. | Scott C. Smith<br>Kathleen M. Waltz | Scott C. Smith<br>Kathleen M. Waltz |
| Sun-Sentinel Company | Dennis J. FitzSimons<br>Scott C. Smith<br>Robert Gremillion | Dennis J. FitzSimons<br>Scott C. Smith<br>Robert Gremillion |
| Tribune Interactive, Inc. | Timothy J. Landon<br>Crane H. Kenney | Timothy J. Landon<br>Crane H. Kenney |
| Tribune Los Angeles, Inc. | Crane H. Kenney | Crane H. Kenney |
| Tribune Media Services, Inc. | Scott C. Smith<br>Crane H. Kenney<br>David D. Williams | Scott C. Smith<br>Crane H. Kenney<br>David D. Williams |
| Tribune Broadcasting Company | Dennis J. FitzSimons<br>John E. Reardon | Dennis J. FitzSimons<br>John E. Reardon |
| KSWB Inc. | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec |
| KPLR, Inc. | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec |
| KTLA Inc. | Crane H. Kenney<br>John E. Reardon | Crane H. Kenney<br>John E. Reardon |

---

[2831]  Ex. 967 (Tribune Subsidiary Boards Chart).

| Guarantor Subsidiary | Directors as of June 4, 2007 | Directors as of December 20, 2007 |
|---|---|---|
| KWGN Inc. | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec |
| Tower Distribution Company | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec |
| Tribune Broadcast Holdings, Inc. | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec |
| Tribune Entertainment Company | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec |
| Tribune Television Company | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec |
| Channel 40, Inc. | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec |
| Channel 39, Inc. | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec |
| Tribune Television Holdings, Inc. | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec |
| Tribune Television New Orleans, Inc. | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec |
| Tribune Television Northwest, Inc. | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec |
| WDCW Broadcasting, Inc. | John E. Reardon<br>John J. Vitanovec | John E. Reardon<br>John J. Vitanovec |
| WGN Continental Broadcasting Company | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec |
| WPIX, Inc. | Crane H. Kenney<br>John E. Reardon | Crane H. Kenney<br>John E. Reardon |
| Tribune Finance, LLC | Sole Member[2832] | Sole Member[2833] |

---

[2832] Tribune is the sole member of Tribune Finance, LLC. *See* Ex. 150 (Unanimous Written Consents of the Subsidiary Boards, dated June 4, 2007).

[2833] Tribune is the sole member of Tribune Finance, LLC. *See* Ex. 150 (Unanimous Written Consents of the Subsidiary Boards, dated June 4, 2007).

| Guarantor Subsidiary | Directors as of June 4, 2007 | Directors as of December 20, 2007 |
|---|---|---|
| Homestead Publishing Company | Irving L. Quimby, Jr.<br>John D. Worthington, IV | Irving L. Quimby, Jr.<br>John D. Worthington, IV<br>Crane H. Kenney<br>Scott C. Smith |
| Patuxent Publishing Company | Irving L. Quimby, Jr.<br>John D. Worthington, IV | Irving L. Quimby, Jr.<br>John D. Worthington, IV<br>Scott C. Smith |
| Chicagoland Publishing Company | Scott C. Smith<br>Crane H. Kenney | Scott C. Smith<br>Crane H. Kenney |
| Tribune Direct Marketing, Inc. | Crane H. Kenney<br>Richard H. Malone | Crane H. Kenney<br>Scott C. Smith |
| Virginia Gazette Companies, LLC | Crane H. Kenney<br>Kathleen M. Waltz | Crane H. Kenney<br>Kathleen M. Waltz<br>Scott C. Smith |
| Forum Publishing Group, Inc. | Robert Gremillion<br>Crane H. Kenney<br>Scott C. Smith | Robert Gremillion<br>Crane H. Kenney<br>Scott C. Smith |
| Courant Specialty Products, Inc. | Stephen D. Carver<br>Robert Gremillion<br>Crane H. Kenney | Stephen D. Carver<br>Robert Gremillion<br>Crane H. Kenney |
| New Mass Media, Inc. | Stephen D. Carver<br>Robert Gremillion<br>Crane H. Kenney | Stephen D. Carver<br>Robert Gremillion<br>Crane H. Kenney |
| TMLH2, Inc. | Stephen D. Carver<br>Robert Gremillion<br>Crane H. Kenney | Stephen D. Carver<br>Robert Gremillion<br>Crane H. Kenney |
| Southern Connecticut Newspapers, Inc. | Crane H. Kenney<br>Timothy P. Knight<br>Durham J. Monsma | Crane H. Kenney<br>Timothy P. Knight<br>Mark W. Hianik |
| TMLS1, Inc. | Crane H. Kenney<br>Timothy P. Knight<br>Durham J. Monsma | Crane H. Kenney<br>Timothy P. Knight<br>Mark W. Hianik |
| Gold Coast Publications, Inc. | Robert Gremillion<br>Crane H. Kenney<br>Scott C. Smith | Robert Gremillion<br>Crane H. Kenney<br>Scott C. Smith |
| Distribution Systems of America, Inc. | Crane H. Kenney<br>Timothy P. Knight<br>Scott C. Smith | Crane H. Kenney<br>Timothy P. Knight<br>Scott C. Smith |
| Los Angeles Times Communications LLC | Dennis J. FitzSimons<br>Scott C. Smith<br>David D. Hiller | Dennis J. FitzSimons<br>Scott C. Smith<br>David D. Hiller |
| Tribune Manhattan Newspaper Holdings, Inc. | Crane H. Kenney | Crane H. Kenney |
| Tribune New York Newspaper Holdings, LLC | Crane H. Kenney<br>Timothy P. Knight | Crane H. Kenney<br>Timothy P. Knight |

| Guarantor Subsidiary | Directors as of June 4, 2007 | Directors as of December 20, 2007 |
|---|---|---|
| TMS Entertainment Guides, Inc. | Scott C. Smith<br>Crane H. Kenney<br>David D. Williams | Scott C. Smith<br>Crane H. Kenney<br>David D. Williams |
| Tribune Media Net, Inc. | Dennis J. FitzSimons<br>Scott C. Smith<br>Crane H. Kenney | Dennis J. FitzSimons<br>Scott C. Smith<br>Crane H. Kenney |
| Tribune National Marketing Company | Timothy J. Landon<br>Crane H. Kenney<br>Scott C. Smith | Timothy J. Landon<br>Crane H. Kenney<br>Scott C. Smith |
| Tribune Broadcasting Holdco, LLC | Sole Member[2834] | Sole Member[2835] |
| Chicagoland Television News, Inc. | Scott C. Smith<br>Crane H. Kenney<br>John E. Reardon | Scott C. Smith<br>Crane H. Kenney<br>John E. Reardon |
| 5800 Sunset Productions Inc. | Crane H. Kenney | Crane H. Kenney |
| Tribune (FN) Cable Ventures, Inc. | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec |
| WTXX Inc. | Crane H. Kenney<br>John E. Reardon | Crane H. Kenney<br>John E. Reardon |
| Tribune California Properties, Inc. | Crane H. Kenney<br>John E. Reardon | Crane H. Kenney<br>John E. Reardon |
| California Community News Corporation | Crane H. Kenney | Crane H. Kenney |
| Hoy Publications, LLC | Sole Member[2836] | Sole Member[2837] |
| Eagle New Media Investments, LLC | Sole Manager[2838] | Sole Manager[2839] |
| Stemweb, Inc. | Thomas S. Finke<br>Timothy J. Landon | Thomas S. Finke<br>Timothy J. Landon |
| ForSaleByOwner.com Corp. | Thomas S. Finke<br>Timothy J. Landon | Thomas S. Finke<br>Timothy J. Landon |

---

[2834]  Tribune is the sole member of Tribune Finance, LLC.  *See* Ex. 150 (Unanimous Written Consents of the Subsidiary Boards, dated June 4, 2007).

[2835]  Tribune is the sole member of Tribune Finance, LLC.  *See* Ex. 150 (Unanimous Written Consents of the Subsidiary Boards, dated June 4, 2007).

[2836]  Tribune is the sole member of Hoy Publications, LLC.  *See* Ex. 150 (Unanimous Written Consents of the Subsidiary Boards, dated June 4, 2007).

[2837]  Tribune is the sole member of Hoy Publications, LLC.  *See* Ex. 150 (Unanimous Written Consents of the Subsidiary Boards, dated June 4, 2007).

[2838]  Tribune is the sole manager of Eagle New Media Investments, LLC.  *See* Ex. 150 (Unanimous Written Consents of the Subsidiary Boards, dated June 4, 2007).

[2839]  Tribune is the sole manager of Eagle New Media Investments, LLC.  *See* Ex. 150 (Unanimous Written Consents of the Subsidiary Boards, dated June 4, 2007).

| Guarantor Subsidiary | Directors as of June 4, 2007 | Directors as of December 20, 2007 |
|---|---|---|
| Internet Foreclosure Service, Inc. | Thomas S. Finke<br>Timothy J. Landon | Thomas S. Finke<br>Timothy J. Landon |
| Eagle Publishing Investments, LLC | Sole Manager[2840] | Sole Manager[2841] |
| Star Community Publishing Group, LLC | Managing Member[2842] | Managing Member[2843] |
| KIAH Inc. (formerly known as KHCW Inc.) | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec | Crane H. Kenney<br>John E. Reardon<br>John J. Vitanovec |
| Tribune ND, Inc. (formerly known as Newsday, Inc.) | Crane H. Kenney<br>Timothy P. Knight<br>Scott C. Smith | Crane H. Kenney<br>Timothy P. Knight<br>Scott C. Smith |
| Tribune MD, Inc. (formerly known as Newport Media, Inc.) | Crane H. Kenney | Crane H. Kenney |
| Homeowners Realty, Inc. | Thomas S. Finke<br>Timothy J. Landon | Thomas S. Finke<br>Timothy J. Landon |
| Chicago National League Ball Club, Inc. | Dennis J. FitzSimons<br>Crane H. Kenney | Dennis J. FitzSimons<br>Crane H. Kenney |

---

[2840]   Tribune is the sole manager of Eagle Publishing Investments, LLC.  *See* Ex. 150 (Unanimous Written Consents of the Subsidiary Boards, dated June 4, 2007).

[2841]   Tribune is the sole manager of Eagle Publishing Investments, LLC.  *See* Ex. 150 (Unanimous Written Consents of the Subsidiary Boards, dated June 4, 2007).

[2842]   Distribution Systems of America is the managing member, and Newport Media, Inc. is also a member, of Star Community Publishing Group, LLC.  *See* Ex. 150 (Unanimous Written Consents of the Subsidiary Boards, dated June 4, 2007).

[2843]   Distribution Systems of America is the managing member, and Newport Media, Inc. is also a member, of Star Community Publishing Group, LLC.  *See* Ex. 150 (Unanimous Written Consents of the Subsidiary Boards, dated June 4, 2007).

**Table 2**

**Officers of the Guarantor Subsidiaries[2844]**

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| 5800 Sunset Productions, Inc. | John E. Reardon | President |
| | David Berson | Vice President and Assistant Secretary[2845] |
| | Richard E. Inouye | Vice President |
| | Gina Mazzaferri | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Charles J. Sennet | Assistant Secretary |
| | John F. Poelking | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| California Community News Corporation | Jeffrey M. Johnson | President[2846] |
| | David D. Hiller | President[2847] |
| | Tom Johnson | Publisher[2848] |
| | William H. Fleet | Publisher[2849] |
| | Robert E. Bellack | Vice President |
| | Mark H. Kurtich | Vice President |
| | David P. Murphy | Vice President |
| | Russ Newton | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Julie K. Xanders | Assistant Secretary |

---

[2844]  Ex. 1005 (Chart of Officers of the Guarantor Subsidiaries).  Unless otherwise indicated, the offices were held during the period from May 2, 2006 through at least December 20, 2007.

[2845]  Mr. Berson no longer held these positions as of May 9, 2007.

[2846]  Mr. Johnson no longer held this position as of October 5, 2006.

[2847]  Mr. Hiller was appointed to this position as of October 5, 2006.

[2848]  Mr. Johnson no longer held this position as of May 9, 2007.

[2849]  Mr. Fleet no longer held this position as of May 9, 2007.

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | Robert E. Bellack | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Gary Strong | Controller[2850] |
| | Sam De Froscia | Controller[2851] |
| Channel 39, Inc. | John E. Reardon | President |
| | Richard Engberg | Vice President |
| | Robert Gremillion | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | John F. Poelking | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Cam Trinh | Controller |
| Channel 40, Inc. | John E. Reardon | President |
| | Audrey L. Farrington | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | John F. Poelking | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Peter D. Filice | Controller |
| Tribune Broadcasting Holdco, LLC[2852] | Donald C. Grenesko | President |
| | Chandler Bigelow III | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |

---

[2850] Mr. Strong no longer held this position as of May 9, 2007.

[2851] Mr. De Froscia was appointed to this position as of May 9, 2007.

[2852] Each of the officers was appointed to his respective positions as of May 25, 2007.

TABLE 2—2

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | Chandler Bigelow III | Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Jack Rodden | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| Tribune California Properties, Inc. | John E. Reardon | President |
| | David Berson | Vice President and Assistant Secretary[2853] |
| | Richard E. Inouye | Vice President |
| | Gina Mazzaferri | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Charles J. Sennet | Assistant Secretary |
| | John F. Poelking | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| Tribune Direct Marketing, Inc. | Lou Tazioli | President and General Manager |
| | Scott G. Pompe | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Phil Doherty | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | Robert Delo | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| Tribune Entertainment Company | [Vacant] | President & C.E.O. |
| | Stephen J. Mulderrig | Executive Vice President |
| | L. Clark Morehouse III | Executive Vice President[2854] |
| | David Berson | Senior Vice President[2855] |

---

[2853] Mr. Berson no longer held these positions as of May 9, 2007.

[2854] Mr. Morehouse was appointed to this position on July 20, 2006.  Prior to July 20, 2006, Mr. Morehouse held the position of Senior Vice President.

[2855] Mr. Berson no longer held this position as of May 9, 2007.

TABLE 2—3

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | Donna Harrison | Senior Vice President |
| | Richard E. Inouye | Senior Vice President |
| | Cindy Donnelly | Vice President |
| | Taylor Fuller III | Vice President |
| | Lee Gonsalves | Vice President[2856] |
| | William J. Hamm | Vice President[2857] |
| | Jay Leon | Vice President[2858] |
| | George C. Nejame | Vice President |
| | John Krobot | Vice President[2859] |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Richard E. Inouye | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | John F. Poelking | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Stephen G. Santay | Controller |
| Tribune Finance, LLC | Donald C. Grenesko | President |
| | Chandler Bigelow III | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Chandler Bigelow III | Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Jack Rodden | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| Tribune Los Angeles, Inc. | Donald C. Grenesko | President |
| | Chandler Bigelow III | Vice President |
| | Jeffrey M. Johnson | Vice President[2860] |

---

[2856] Mr. Gonsalves no longer held this position as of May 9, 2007.

[2857] Mr. Hamm no longer held this position as of May 9, 2007.

[2858] Mr. Leon no longer held this position as of May 9, 2007.

[2859] Mr. Krobot was appointed to this position as of May 9, 2007.

TABLE 2—4

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | David P. Murphy | Vice President |
| | David D. Hiller | Vice President[2861] |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Julie K. Xanders | Assistant Secretary |
| | Chandler Bigelow III | Treasurer |
| | Robert E. Bellack | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Randy Sims | Controller[2862] |
| | Sam De Froscia | Controller[2863] |
| Tribune Manhattan Newspaper Holdings, Inc. | Donald C. Grenesko | President |
| | Timothy P. Knight | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Terry Jimenez | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| Tribune Media Net, Inc. | Kenneth DePaola | President & C.E.O. |
| | Dana C. Hayes, Jr. | Senior Vice President[2864] |
| | Doug Thomas | Senior Vice President |
| | Lee Jones | Senior Vice President[2865] |
| | Barry Haselden | Vice President[2866] |
| | John Wollney | Vice President[2867] |

[2860] Mr. Johnson no longer held this position as of May 9, 2007.

[2861] Mr. Hiller was appointed to this position as of May 9, 2007.

[2862] Mr. Sims no longer held this position as of May 9, 2007.

[2863] Mr. De Froscia was appointed to this position as of May 9, 2007.

[2864] Mr. Hayes no longer held this position as of May 9, 2007.

[2865] Mr. Jones was appointed to this position as of September 1, 2006.

[2866] Prior to May 9, 2007, Mr. Haselden also held the position of Managing Director.

[2867] Mr. Wollney was appointed to this position as of May 9, 2007.

TABLE 2—5

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| Tribune Media Services, Inc. | David D. Williams | President & C.E.O. |
| | Alexa A. Bazanos | Vice President |
| | Jay Fehnel | Vice President |
| | Michael Gart | Vice President |
| | Walter F. Mahoney | Vice President |
| | Steve Tippie | Vice President |
| | John Twohey | Vice President |
| | John E. Zelenka | Vice President[2868] |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Michael Gart | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Robin Mulvaney | Controller |
| Tribune New York Newspaper Holdings, LLC | Russel Pergament | C.E.O.[2869] |
| | Donald C. Grenesko | President |
| | Christopher Barnes | Publisher & General Manager[2870] |
| | Terry Jimenez | Publisher & General Manager[2871] |
| | Chandler Bigelow III | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |

---

[2868] Mr. Zelenka was appointed to this position as of May 9, 2007.

[2869] Mr. Pergament no longer held this position as of May 9, 2007.

[2870] Mr. Barnes held the position of Vice President from at least May 2, 2006 until August 31, 2006, when he was appointed Publisher and General Manager.  Mr. Barnes no longer held these positions as of July 16, 2007.

[2871] Mr. Jimenez was appointed to these positions as of July 16, 2007.

TABLE 2—6

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | Chandler Bigelow III | Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| Newport Media, Inc. (now known as Tribune MD, Inc.) | Timothy P. Knight | President |
| | Terry Jimenez | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Terry Jimenez | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Matthew Catania | Controller |
| Tribune Television Company | John E. Reardon | President |
| | Vince Giannini (GM, WPHL) | Vice President |
| | Richard J. Graziano (GM, WTIC) | Vice President |
| | Jerome P. Martin (GM, WXIN) | Vice President |
| | John A. Riggle (GM, WPMT) | Vice President |
| | John J. Vitanovec | Vice President |
| | Joseph A. Young (GM, KDAF) | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | John F. Poelking | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | John M. Fell, Jr. (WPHL) | Assistant Treasurer[2872] |
| | Carolyn S. Hudspeth (KDAF) | Assistant Treasurer |
| | Timothy Koller (WPMT) | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Daniel O'Sullivan (WXIN) | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Liz-Ann St. Onge (WTIC) | Assistant Treasurer[2873] |

---

[2872] Mr. Fell no longer held this position as of May 9, 2007.

TABLE 2—7

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | Jennifer DeKarz | Assistant Treasurer[2874] |
| Tribune Television Holdings, Inc. | John E. Reardon | President |
| | Patricia A. Kolb (GM, WXMI) | Vice President |
| | Pamela S. Pearson (GM, KTWB) | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | John F. Poelking | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | Bonnie Hunter (WXMI) | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Sharon A. Silverman (KMYA) | Assistant Treasurer[2875] |
| Tribune Television New Orleans, Inc. | John E. Reardon | President |
| | Lawrence Delia | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | John F. Poelking | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Patti Cazeaux | Controller |
| Tribune Television Northwest, Inc. | John E. Reardon | President |
| | Pamela S. Pearson | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | John F. Poelking | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |

---

[2873] Ms. St. Onge no longer held this position as of May 9, 2007.

[2874] Ms. DeKarz was appointed to this position as of May 9, 2007.

[2875] Ms. Silverman was appointed to this position as of May 9, 2007.  Prior to May 9, 2007, Ms. Silverman held the position of Assistant Treasurer (KTWB).

TABLE 2—8

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | Patrick M. Shanahan | Assistant Treasurer |
| | Sharon A. Silverman | Controller |
| Virginia Gazette Companies, LLC | Rondra J. Matthews | President[2876] |
| | Digby A. Solomon | President[2877] |
| | Ernie C. Gates | Vice President[2878] |
| | William C. O'Donovan | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Robyn L. Motley | Treasurer[2879] |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Donna R. Armory | Controller[2880] |
| | Eddie B. Mattison | Controller[2881] |
| | Ann B. Wilson | Treasurer[2882] |
| WDCW Broadcasting, Inc. | John E. Reardon | President |
| | Eric Meyrowitz | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | John F. Poelking | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Roger Williams | Controller |
| WGN Continental Broadcasting | John E. Reardon | President |

---

[2876] Ms. Matthews no longer held this position as of October 2, 2006.

[2877] Mr. Solomon was appointed to this position as of January 31, 2007.

[2878] Mr. Gates held the position of Interim President from October 2, 2006 until January 31, 2007.

[2879] Ms. Motley no longer held this position as of May 9, 2007.

[2880] Ms. Armory no longer held this position as of May 9, 2007.

[2881] Mr. Mattison was appointed to this position as of May 9, 2007.  Prior to May 9, 2007, Mr. Mattison held the position of Assistant Controller.

[2882] Ms. Wilson was appointed to this position as of May 9, 2007.

TABLE 2—9

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| Company | Steven D. Carver | Vice President[2883] |
| | Thomas E. Ehlmann | Vice President |
| | Thomas E. Langmyer | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | John F. Poelking | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Paul R. Kelly, Jr. | Assistant Controller |
| | Robert Salerno | Assistant Controller[2884] |
| | Sheau-Ming Ross | Assistant Controller[2885] |
| WPIX, Inc. | John E. Reardon | President |
| | Betty Ellen Berlamino | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | John F. Poelking | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Catherine A. Davis | Controller |
| WTXX Inc. | John E. Reardon | President |
| | Richard J. Graziano | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | John F. Poelking | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |

---

[2883] Mr. Carver no longer held this position as of May 9, 2007.

[2884] Mr. Salerno no longer held this position as of May 9, 2007.

[2885] Ms. Ross was appointed to this position as of May 9, 2007.

TABLE 2—10

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | Liz-Ann St. Onge | Assistant Treasurer[2886] |
| Tribune (FN) Cable Ventures | John E. Reardon | President |
| | Crane H. Kenney | Vice President |
| | Gina M. Mazzaferri | Vice President |
| | John F. Poelking | Vice President |
| | John E. Reardon | Vice President |
| | John J. Vitanovec | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | John F. Poelking | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| Tribune Interactive, Inc. | Timothy J. Landon | President |
| | Brigid E. Kenney | Senior Vice President |
| | Dana C. Hayes, Jr. | Senior Vice President[2887] |
| | Richard H. Malone | Senior Vice President[2888] |
| | Craig Besant | Vice President[2889] |
| | Julianna T. Cole | Vice President |
| | Thomas S. Finke | Vice President |
| | Daniel E. Hess | Vice President |
| | Christopher H. Cohn | Vice President[2890] |
| | William R. Razzino | Vice President and Treasurer[2891] |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | William R. Razzino | Treasurer |

[2886] Ms. St. Onge no longer held this position as of May 9, 2007.

[2887] Mr. Hayes was appointed to this position as of September 1, 2006.

[2888] Mr. Malone was appointed to this position as of October 1, 2006.

[2889] Mr. Besant no longer held this position as of May 9, 2007.

[2890] Mr. Cohn was appointed to this position as of June 8, 2006.

[2891] Prior to May 9, 2007, Mr. Razzino also held the position of Controller.

TABLE 2—11

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Suzanne Hall | Controller[2892] |
| Tribune National Marketing Company | Scott C. Smith | President |
| | Donald C. Grenesko | Vice President |
| | David D. Hiller | Vice President[2893] |
| | Timothy J. Landon | Vice President[2894] |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Harry A. Amsden | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| Newsday, Inc. (currently known as Tribune ND, Inc.) | Timothy P. Knight | Publisher, President & C.E.O. |
| | John P. Mancini | Executive Vice President |
| | Ray McCutcheon | Senior Vice President |
| | Frank E. Toner | Senior Vice President[2895] |
| | Katie Lawler | Senior Vice President[2896] |
| | Paul T. Barbetta | Vice President |
| | C. Paul Fleishman | Vice President |
| | Terry Jimenez | Vice President |
| | James Klurfeld | Vice President |
| | Robert A. Rosenthal | Vice President |
| | Michael Sacks | Vice President |
| | Crane H. Kenney | Secretary |

---

[2892] Ms. Hall was appointed to this position as of May 9, 2007.

[2893] Mr. Hiller no longer held this position as of May 9, 2007.

[2894] Mr. Landon was appointed to this position as of August 1, 2006.

[2895] Mr. Toner no longer held this position as of May 9, 2007.

[2896] Ms. Lawler was appointed to this position as of December 1, 2006.  Prior to December 1, 2006, Ms. Lawler held the position of Vice President.

TABLE 2—12

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | Roger C. Goodspeed | Assistant Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Matthew Catania | Controller |
| | Terry Jimenez | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Christopher Howard | Vice President |
| | Daniel Opat | Vice President |
| | Katie Lawler | Senior Vice President |
| Homeowners Realty, Inc. | Thomas S. Finke | C.E.O. |
| | Damon Giglio | President |
| | John Holbrook | Vice President |
| | William R. Razzino | Vice President |
| | Colby Sambrotto | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | William R. Razzino | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | William R. Razzino | Controller |
| Chicago National League Ball Club, Inc. | Andrew B. MacPhail | President & C.E.O.[2897] |
| | John F. McDonough | President & C.E.O.[2898] |
| | Mark E. McGuire | Executive Vice President |
| | John F. McDonough | Senior Vice President |
| | Michael R. Lufrano | Senior Vice President[2899] |

[2897] Mr. MacPhail no longer held this position as of May 9, 2007.

[2898] Mr. McDonough was appointed to these positions as of May 9, 2007. From October 1, 2006 through May 9, 2007, Mr. McDonough held the positions of Interim President and Chief Executive Officer.

[2899] Mr. Lufrano was appointed to this position as of May 9, 2007. Prior to May 9, 2007, Mr. Lufrano held the position of Vice President.

TABLE 2—13

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | James J. Hendry (General Manager) | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Mark E. McGuire | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | John F. Poelking | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Jodi L. Reischl | Controller |
| Chicago Tribune Company | David D. Hiller | President & C.E.O.[2900] |
| | Scott C. Smith | President, Publisher & C.E.O.[2901] |
| | Kenneth DePaola | Senior Vice President |
| | Ann Marie Lipinski | Senior Vice President |
| | Richard H. Malone | Senior Vice President |
| | Tony Hunter | Senior Vice President[2902] |
| | Owen Youngmen | Senior Vice President[2903] |
| | Deepak Agarwal | Vice President |
| | John Birmingham | Vice President |
| | Phil Doherty | Vice President & Treasurer |
| | Janice Jacobs | Vice President |
| | Timothy Ryan | Vice President[2904] |
| | Doug Thomas | Vice President[2905] |
| | Becky Brubaker | Vice President[2906] |

---

[2900] Mr. Hiller no longer held these positions as of October 5, 2006.

[2901] Mr. Smith was appointed to these positions as of May 9, 2007. From October 5, 2006 through May 9, 2007, Mr. Smith held the positions of Interim President, Publisher and Chief Executive Officer.

[2902] Mr. Hunter was appointed to this position as of May 9, 2007. Prior to May 9, 2007, Mr. Hunter held the position of Vice President.

[2903] Mr. Youngmen was appointed to this position as of May 9, 2007. Prior to May 9, 2007, Mr. Youngmen held the position of Vice President.

[2904] Mr. Ryan no longer held this position as of May 9, 2007.

[2905] Mr. Thomas no longer held this position as of May 9, 2007.

[2906] Ms. Brubaker was appointed to this position as of May 9, 2007.

TABLE 2—14

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | Jack Whisler | Vice President[2907] |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Henry M. Segal | Controller |
| Chicagoland Publishing Company | Theodore J. Biedron | President |
| | Randy Hano | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Phil Doherty | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| Chicagoland Television News, Inc. | David Underhill | President[2908] |
| | John E. Reardon | President[2909] |
| | Steve Farber | Vice President |
| | Judy Juds | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Judy Juds | Assistant Secretary and Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| Courant Specialty Products | Jack W. Davis, Jr. | President[2910] |
| | Steven D. Carver | President[2911] |

---

[2907] Mr. Whisler was appointed to this position as of May 9, 2007.

[2908] Mr. Underhill no longer held this position as of May 9, 2007.

[2909] Mr. Reardon was appointed to this position as of May 9, 2007.

[2910] Mr. Davis no longer held this position as of July 10, 2006.

[2911] Mr. Carver was appointed to this position as of July 10, 2006.

TABLE 2—15

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | Brian P. Toolan | Senior Vice President[2912] |
| | Thomas J. Anischik | Vice President |
| | David A. Bennet | Vice President |
| | Vivian Chow | Vice President[2913] |
| | Richard S. Feeney | Vice President |
| | Nancy A. Meyer | Vice President |
| | Christopher C. Morrill | Vice President |
| | David W. Rausch | Vice President |
| | Robert K. Schrepf | Vice President |
| | Clifford L. Teutsch | Vice President[2914] |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Julie K. Xanders | Assistant Secretary |
| | Richard S. Feeney | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Robert R. Rounce | Controller |
| Distribution Systems of America, Inc. | Timothy P. Knight | President |
| | Terry Jimenez | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Terry Jimenez | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| Eagle New Media Investments, LLC | Donald C. Grenesko | President |
| | Chandler Bigelow III | Vice President |
| | Crane H. Kenney | Secretary |

---

[2912]  Mr. Toolan no longer held this position as of May 9, 2007.

[2913]  Ms. Chow no longer held this position as of May 9, 2007.

[2914]  Mr. Teutsch was appointed to this position as of May 9, 2007.

TABLE 2—16

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | Mark W. Hianik | Assistant Secretary |
| | Julie K. Xanders | Assistant Secretary |
| | Chandler Bigelow III | Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Jack Rodden | Assistant Treasurer |
| | Naomi B. Sachs | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| Eagle Publishing Investments, LLC | Donald C. Grenesko | President |
| | Chandler Bigelow III | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Julie K. Xanders | Assistant Secretary |
| | Chandler Bigelow III | Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Jack Rodden | Assistant Treasurer |
| | Naomi B. Sachs | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| Forsalebyowner.com Corp. | Thomas S. Finke | C.E.O. |
| | Damon Giglio | President |
| | John Holbrook | Vice President |
| | William R. Razzino | Vice President |
| | Colby Sambrotto | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | William R. Razzino | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | William R. Razzino | Controller |
| Forum Publishing Group, Inc. | Ken Mitchell | President |
| | Howard Greenberg | Vice President |
| | Rey Justo | Vice President |

TABLE 2—17

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
|  | Laura L. Tarvainen | Vice President |
|  | Crane H. Kenney | Secretary |
|  | Mark W. Hianik | Assistant Secretary |
|  | Thomas C. Garris | Treasurer[2915] |
|  | Chandler Bigelow III | Assistant Treasurer |
|  | Robyn L. Motley | Treasurer[2916] |
|  | R. Mark Mallory | Assistant Treasurer |
|  | Patrick M. Shanahan | Assistant Treasurer |
|  | Laura L. Tarvainen | Assistant Treasurer |
|  | Darren Beevor | Controller[2917] |
| Gold Coast Publications, Inc. | Robert Gremillion | President[2918] |
|  | Howard Greenberg | President & C.E.O.[2919] |
|  | Ray Daley | Vice President |
|  | Ken Mitchell | Vice President |
|  | Crane H. Kenney | Secretary |
|  | Mark W. Hianik | Assistant Secretary |
|  | Thomas C. Garris | Treasurer[2920] |
|  | Robyn L. Motley | Treasurer[2921] |
|  | Chandler Bigelow III | Assistant Treasurer |
|  | R. Mark Mallory | Assistant Treasurer |
|  | Patrick M. Shanahan | Assistant Treasurer |
|  | Darren Beevor[2922] | Controller |
| Homestead Publishing Company | Denise E. Palmer | Chairman[2923] |

---

[2915] Mr. Garris no longer held this position as of May 9, 2007.

[2916] Ms. Motley was appointed to this position as of May 9, 2007.

[2917] Mr. Beevor no longer held this position as of May 9, 2007.

[2918] Mr. Gremillion no longer held this position as of May 9, 2007.

[2919] Mr. Greenberg was appointed to these positions as of May 9, 2007.  Prior to May 9, 2007, Mr. Greenberg held the position of Vice President.

[2920] Mr. Garris no longer held this position as of May 9, 2007.

[2921] Ms. Motley was appointed to this position as of May 9, 2007.

[2922] Mr. Beevor no longer held this position as of May 9, 2007.

[2923] Ms. Palmer no longer held this position as of October 2, 2006.

TABLE 2—18

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | Rondra J. Matthews | Chairman[2924] |
| | Timothy Ryan | Chairman[2925] |
| | Irving L. Quimby, Jr. | President |
| | John F. Patinella | Vice President[2926] |
| | John D. Worthington, IV | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | John S. Zabetakis | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | Richard L. Goldstein | Assistant Treasurer[2927] |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Erik A. Smist | Assistant Treasurer[2928] |
| Hoy Publications, LLC | Digby A. Solomon | President[2929] |
| | Javier J. Adalpe | Vice President |
| | Crane H. Kenney | Vice President |
| | Michael J. Malee | Vice President |
| | Michael Odegaard | Vice President[2930] |
| | Robert Palermini | Vice President[2931] |
| | Julian G. Posada | Vice President |
| | Jerry Symon | Vice President |
| | Anibal Torres | Vice President[2932] |
| | Gladys Arroyo | Vice President[2933] |

---

[2924] Ms. Matthews was appointed to this position as of October 2, 2006 and no longer held this position as of May 9, 2007.

[2925] Mr. Ryan was appointed to this position as of May 9, 2007.

[2926] Mr. Patinella no longer held this position as of May 9, 2007.

[2927] Mr. Goldstein no longer held this position as of May 9, 2007.

[2928] Mr. Smist was appointed to this position as of May 9, 2007.

[2929] Mr. Solomon no longer held this position as of May 9, 2007.

[2930] Mr. Odegaard no longer held this position as of May 9, 2007.

[2931] Mr. Palermini no longer held this position as of May 9, 2007.

[2932] Ms. Torres no longer held this position as of May 9, 2007.

TABLE 2—19

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
|  | Crane H. Kenney | Secretary |
|  | Mark W. Hianik | Assistant Secretary |
|  | Michael J. Malee | Treasurer |
|  | Chandler Bigelow III | Assistant Treasurer |
|  | R. Mark Mallory | Assistant Treasurer |
|  | Patrick M. Shanahan | Assistant Treasurer |
| Internet Foreclosure Service, Inc. | Thomas S. Finke | C.E.O. |
|  | Damon Giglio | President |
|  | John Holbrook | Vice President |
|  | William R. Razzino | Vice President |
|  | Colby Sambrotto | Vice President |
|  | Crane H. Kenney | Secretary |
|  | Mark W. Hianik | Assistant Secretary |
|  | William R. Razzino | Treasurer |
|  | Chandler Bigelow III | Assistant Treasurer |
|  | R. Mark Mallory | Assistant Treasurer |
|  | Patrick M. Shanahan | Assistant Treasurer |
|  | William R. Razzino | Controller |
| KHCW Inc. (currently known as KIAH Inc.) | John E. Reardon | President |
|  | Roger A. Bare | Vice President |
|  | Crane H. Kenney | Secretary |
|  | Mark W. Hianik | Assistant Secretary |
|  | John F. Poelking | Treasurer |
|  | Chandler Bigelow III | Assistant Treasurer |
|  | R. Mark Mallory | Assistant Treasurer |
|  | Patrick M. Shanahan | Assistant Treasurer |
|  | Feli M. Wong | Controller |
| KPLR, Inc. | John E. Reardon | President |
|  | William Lanesey | Vice President |
|  | Crane H. Kenney | Secretary |
|  | Mark W. Hianik | Assistant Secretary |

[2933] Ms. Arroyo was appointed to this position as of May 9, 2007.

TABLE 2—20

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | John F. Poelking | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Chris L. Fricke | Controller |
| KSWB Inc. | John E. Reardon | President |
| | Robert J. Ramsey | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | John F. Poelking | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Dan Mitrovich | Controller |
| KTLA Inc. | John E. Reardon | President |
| | Vincent A. Malcolm | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | John F. Poelking | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Michael E. Weiner | Controller |
| KWGN Inc. | John E. Reardon | President |
| | James Zerwekh | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | John F. Poelking | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Dennis G. O'Brien | Controller |

TABLE 2—21

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| Los Angeles Times Communications LLC | Jeffrey M. Johnson | President, Publisher & C.E.O.[2934] |
| | David D. Hiller | President, Publisher & C.E.O. & Director[2935] |
| | Dean P. Baquet (Editor) | Executive Vice President |
| | David P. Murphy (GM) | Executive Vice President |
| | James O'Shea | Executive Vice President & Editor[2936] |
| | Robert E. Bellack (CFO) | Senior Vice President |
| | Jack D. Klunder (Circulation) | Senior Vice President |
| | Mark H. Kurtich (Operations) | Senior Vice President |
| | John T. O'Loughlin (Marketing, Planning & Dev.) | Senior Vice President |
| | Amy Moyniham | Senior Vice President |
| | Robert J. Palermini (CTO) | Senior Vice President |
| | Julie K. Xanders (Legal) | Senior Vice President |
| | Karlene W. Goller (Legal) | Vice President |
| | Kim A. McCleary LaFrance (Planning) | Vice President |
| | Gwen P. Murkami (HR) | Vice President |
| | Russ Newton (Production) | Vice President |
| | David J. Walsh (Classified Advertising) | Vice President |
| | Lynne Segal | Vice President[2937] |
| | Javier J. Adalpe | Vice President[2938] |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Julie K. Xanders | Assistant Secretary |
| | Robert E. Bellack | Assistant Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |

[2934] Mr. Johnson no longer held these positions as of October 5, 2006.

[2935] Mr. Hiller was appointed to these positions as of October 5, 2006.

[2936] Mr. O'Shea was appointed to these positions as of November 13, 2006.

[2937] Ms. Segal was appointed to this position as of June 21, 2006.

[2938] Mr. Adalpe was appointed to this position as of February 12, 2007.

TABLE 2—22

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Randy Sims | Controller |
| New Mass Media, Inc. | Jack W. Davis, Jr. | President[2939] |
| | Steven D. Carver | President[2940] |
| | Thomas J. Anischik | Vice President |
| | Richard S. Feeney | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Julie K. Xanders | Assistant Secretary |
| | Richard S. Feeney | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Robert R. Rounce | Controller |
| Orlando Sentinel Communications Company | Kathleen M. Waltz | President & C.E.O. |
| | Avido Khahaifa | Senior Vice President |
| | Charlotte H. Hall | Senior Vice President[2941] |
| | F. Ashley Allen | Vice President |
| | Julie Andersen | Vice President |
| | Michael D. Asher | Vice President |
| | Kelly F. Benson | Vice President |
| | Jane E. Healy | Vice President |
| | Catherine M. Hertz | Vice President |
| | Debbie Irwin | Vice President[2942] |
| | Michael D. Slason | Vice President |
| | Louis J. Stancampiano | Vice President |

---

[2939] Mr. Davis no longer held this position as of July 10, 2006.

[2940] Mr. Carver was appointed to this position as of July 10, 2006.

[2941] Ms. Hall was appointed to this position as of May 9, 2007.  Prior to May 9, 2007, Ms. Hall held the position of Vice President.

[2942] Ms. Irwin no longer held this position as of May 9, 2007.

TABLE 2—23

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | Bert Ortiz | Vice President[2943] |
| | Linda Schaible | Vice President[2944] |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Michael D. Slason | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Vincent Garlati | Controller |
| Patuxent Publishing Company | Denise E. Palmer | Chairman[2945] |
| | Rondra J. Matthews | Chairman[2946] |
| | Irving L. Quimby, Jr. | President |
| | John F. Patinella | Vice President |
| | John D. Worthington, IV | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | John S. Zabetakis | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | Richard L. Goldstein | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Erik A. Smist | Assistant Treasurer[2947] |
| | Denise Carlisle | Controller |
| Southern Connecticut Newspapers, Inc. | Durham J. Monsma | President |
| | John M. Dunster | Senior Vice President[2948] |
| | Joseph Pisani | Senior Vice President |

[2943] Mr. Ortiz was appointed to this position as of May 9, 2007.

[2944] Ms. Schaible was appointed to this position as of May 9, 2007.

[2945] Ms. Palmer no longer held this position as of May 9, 2007.

[2946] Ms. Matthews was appointed to this position as of October 2, 2006 and no longer held this position as of May 9, 2007.

[2947] Mr. Smist was appointed to this position as of May 9, 2007.

[2948] Mr. Dunster no longer held this position as of May 9, 2007.

TABLE 2—24

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | Craig L. Allen | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Julie K. Xanders | Assistant Secretary |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Richard A. Del Monaco | Controller |
| Star Community Publishing Group, LLC | Timothy P. Knight | President |
| | David Kniffin | General Manager |
| | Michael Gates | Vice President |
| | Crane H. Kenney | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Terry Jimenez | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| Stemweb, Inc. | Thomas S. Finke | C.E.O. |
| | Damon Giglio | President |
| | John Holbrook | Vice President |
| | William R. Razzino | Vice President |
| | Colby Sambrotto | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | William R. Razzino | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | William R. Razzino | Controller |
| The Baltimore Sun Company | Denise E. Palmer | President[2949] |

---

[2949]  Ms. Palmer no longer held this position as of October 2, 2006.

TABLE 2—25

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | Rondra J. Matthews | President[2950] |
| | Timothy Ryan | President[2951] |
| | Timothy Franklin | Senior Vice President |
| | John F. Patinella | Senior Vice President[2952] |
| | Dianne Donovan | Vice President |
| | Richard L. Goldstein | Vice President and Treasurer[2953] |
| | Erik A. Smist | Vice President and Treasurer[2954] |
| | Mireille Grangenois | Vice President |
| | Linda Hutzler | Vice President |
| | Louis Maranto | Vice President |
| | Kevin Scanlon | Vice President |
| | Stephen G. Seidl | Vice President |
| | Timothy J. Thomas | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| The Daily Press, Inc. | Rondra J. Matthews | President & C.E.O.[2955] |
| | Digby A. Solomon | President & C.E.O.[2956] |
| | Lisa B. Bohnaker | Vice President |
| | Becky Brubaker | Vice President |
| | Sue Conway | Vice President |
| | Ernie Gates | Vice President |
| | Robyn L. Motley | Vice President and Treasurer[2957] |

---

[2950] Ms. Matthews no longer held this position as of May 9, 2007.

[2951] Mr. Ryan was appointed to this position as of May 9, 2007.

[2952] Mr. Patinella no longer held this position as of May 9, 2007.

[2953] Mr. Goldstein no longer held these positions as of May 9, 2007.

[2954] Mr. Smist was appointed to these positions as of May 9, 2007.  Prior to May 9, 2007, Mr. Smist held the position of Controller.

[2955] Ms. Matthews no longer held these positions as of January 31, 2007.

[2956] Mr. Solomon was appointed to these positions as of January 31, 2007.

TABLE 2—26

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | William C. O'Donovan | Vice President |
| | Gregory C. Pederson | Vice President |
| | Ann B. Wilson | Vice President and Treasurer[2958] |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Eddie B. Mattison | Controller |
| Hartford Courant Company | Jack W. Davis, Jr. | President[2959] |
| | Stephen D. Carver | President[2960] |
| | Brian P. Toolan | Senior Vice President[2961] |
| | Thomas J. Anischik | Vice President |
| | David A. Bennett | Vice President |
| | Vivian Chow | Vice President[2962] |
| | Richard S. Feeney | Vice President |
| | Christopher C. Morrill | Vice President |
| | David W. Rausch | Vice President |
| | Robert K. Schrepf | Vice President |
| | Nancy A. Meyer | Vice President[2963] |
| | Clifford L. Teutsch | Vice President[2964] |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Julie K. Xanders | Assistant Secretary |

[2957] Ms. Motley no longer held these positions as of May 9, 2007.

[2958] Ms. Wilson was appointed to these positions as of May 9, 2007.

[2959] Mr. Davis no longer held this position as of July 10, 2006.

[2960] Mr. Carver was appointed to this position as of July 10, 2006.

[2961] Mr. Toolan no longer held this position as of May 9, 2007.

[2962] Ms. Chow no longer held this position as of May 9, 2007.

[2963] Ms. Meyer was appointed to this position as of May 22, 2006.

[2964] Mr. Teutsch was appointed to this position as of May 9, 2007.

TABLE 2—27

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | Richard S. Feeney | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Robert R. Rounce | Controller |
| The Morning Call, Inc. | Timothy R. Kennedy | President |
| | John Acanfora | Vice President |
| | Laura Bader | Vice President[2965] |
| | Thomas F. Brown | Vice President |
| | Stephen M. Budihas | Vice President |
| | Michael C. Foux | Vice President |
| | Ardith Hilliard | Vice President |
| | Glenn G. Kranzley | Vice President |
| | Richard D. Molchany | Vice President |
| | James Feher | Vice President[2966] |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Thomas F. Brown | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Andrea M. Pudliner | Controller |
| TMLH2, Inc. | Jack W. Davis, Jr. | President[2967] |
| | Stephen D. Carver | President[2968] |
| | Thomas J. Anischik | Vice President |
| | Richard S. Feeney | Vice President |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |

---

[2965] Ms. Bader no longer held this position as of May 9, 2007.

[2966] Mr. Feher was appointed to this position as of December 20, 2006.

[2967] Mr. Davis no longer held this position as of July 10, 2006.

[2968] Mr. Carver was appointed to this position as of July 10, 2006.

TABLE 2—28

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | Julie K. Xanders | Assistant Secretary |
| | Richard S. Feeney | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Robert R. Rounce | Controller |
| TMS Entertainment Guides, Inc. | David D. Williams | President & C.E.O. |
| | Alexa A. Bazanos | Vice President |
| | Jay Fehnel | Vice President |
| | Michael Gart | Vice President and Treasurer |
| | Walter F. Mahoney | Vice President |
| | Steve Tippie | Vice President |
| | John Twohey | Vice President |
| | John E. Zelenka | Vice President[2969] |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | Robin Mulvaney | Controller |
| Tower Distribution Company | William P. Shaw | President |
| | Dennis K. Gillespie | Senior Vice President[2970] |
| | Kevin J. Connor | Vice President |
| | Nicola V. Guerra | Vice President[2971] |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | John F. Poelking | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | Kevin J. Connor | Assistant Treasurer |

---

[2969] Mr. Zelenka was appointed to this position as of May 9, 2007.

[2970] Mr. Gillespie no longer held this position as of May 9, 2007.

[2971] Mr. Guerra was appointed to this position as of June 19, 2006.

TABLE 2—29

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
|  | R. Mark Mallory | Assistant Treasurer |
|  | Patrick M. Shanahan | Assistant Treasurer |
| Tribune Broadcast Holdings, Inc. | John E. Reardon | President |
|  | John Manzi (GM, KWBP) | Vice President |
|  | Jerome P. Martin (GM, WTTV) | Vice President |
|  | Crane H. Kenney | Secretary |
|  | Mark W. Hianik | Assistant Secretary |
|  | John F. Poelking | Treasurer |
|  | Chandler Bigelow III | Assistant Treasurer |
|  | R. Mark Mallory | Assistant Treasurer |
|  | Daniel R. McDonnell (KWBP) | Assistant Treasurer |
|  | Daniel O'Sullivan (WTTV) | Assistant Treasurer |
|  | Patrick M. Shanahan | Assistant Treasurer |
|  | Sharon Ann Silverman (KRCW) | Assistant Treasurer[2972] |
| Tribune Broadcasting Company | John E. Reardon | President |
|  | John J. Vitanovec | Executive Vice President |
|  | Marc Schacher (Programming & Development) | Senior Vice President[2973] |
|  | Cynthia Baker (News Operations) | Vice President |
|  | Richard D. Felty (Creative Services) | Vice President |
|  | Ira Goldstone (Chief Technology Officer) | Vice President |
|  | John R. Hendricks (Sales) | Vice President |
|  | Gina Mazzaferri (Strategy and Development) | Vice President |
|  | John F. Poelking (Finance) | Vice President |
|  | Myrna Ramirez (Human Resources) | Vice President |
|  | Shaun Sheehan (Washington Affairs) | Vice President |

---

[2972] Ms. Silverman was appointed to this position as of May 9, 2007.

[2973] Mr. Schacher was appointed to this position as of July 20, 2006. Prior to July 20, 2006, Mr. Schacher held the position of Vice President (Programming).

TABLE 2—30

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | John F. Poelking | Treasurer |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |
| | John F. Poelking | Controller |
| Sun-Sentinel Company | Robert Gremillion | President & C.E.O.[2974] |
| | Howard Greenberg | President & C.E.O.[2975] |
| | Earl R. Maucker | Senior Vice President |
| | David A. Bucknor | Vice President |
| | Robert Christie | Vice President |
| | Ray Daley | Vice President |
| | Thomas C. Garris | Vice President and Treasurer[2976] |
| | Mark A. Jones | Vice President |
| | Jeffrey S. Levin | Vice President |
| | Kathy Trumbull | Vice President[2977] |
| | Robyn L. Motley | Vice President and Treasurer[2978] |
| | Tom Nork | Vice President[2979] |
| | Kathy H. Skipper | Vice President[2980] |
| | Crane H. Kenney | Secretary |
| | Mark W. Hianik | Assistant Secretary |
| | Chandler Bigelow III | Assistant Treasurer |
| | R. Mark Mallory | Assistant Treasurer |
| | Patrick M. Shanahan | Assistant Treasurer |

[2974] Mr. Gremillion no longer held these positions as of May 9, 2007.

[2975] Mr. Greenberg was appointed to these positions as of May 9, 2007.  Prior to May 9, 2007, Mr. Greenberg held the position of Senior Vice President.

[2976] Mr. Garris no longer held these positions as of May 9, 2007.

[2977] Ms. Trumbull no longer held this position as of May 9, 2007.

[2978] Ms. Motley was appointed to these positions as of May 9, 2007.

[2979] Mr. Nork was appointed to this position as of May 9, 2007.

[2980] Ms. Skipper was appointed to this position as of May 9, 2007.

TABLE 2—31

| Guarantor Subsidiary | Name | Position(s) |
|---|---|---|
| | Darren Beevor | Controller[2981] |

---

[2981] Mr. Beevor no longer held this position as of May 9, 2007.

TABLE 2—32