UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| *In re:* | : | Chapter 11 |
| TRIBUNE COMPANY, *et al.*,[1] | : | Case Number 08-13141 (KJC) |
| | | (Jointly Administered) |
| Debtors. | : | |
| | : | |

# REPORT OF KENNETH N. KLEE, AS EXAMINER

## (VOLUME THREE)

## (FINDINGS AND CONCLUSIONS CONCERNING QUESTIONS TWO AND THREE)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8655); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago National League Ball Club n/k/a Tribune CNLBC, LLC (0347); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo., Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH, Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Brook Productions, Inc. (2598); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, Inc. (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Telephone:          (310) 407-4000
Facsimile:          (310) 407-9090

Lee R. Bogdanoff
Martin R. Barash
David A. Fidler
Ronn S. Davids
Jennifer L. Dinkelman

*Counsel to Examiner*

LECG, LLC
201 South Main, Suite 450
Salt Lake City, UT  84111
Telephone:          (801) 364-6233
Facsimile:          (801) 364-6230

F. Wayne Elggren

*Financial Advisor to Examiner*

SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899
Telephone:          (302) 421-6800
Facsimile:          (302) 421-6813

Mark Minuti
Charles O. Monk, II
Nicholas J. Nastasi
Cathleen M. Devlin

*Delaware Counsel to Examiner*

# TABLE OF CONTENTS

Page

V.  PRINCIPAL FINDINGS AND CONCLUSIONS CONCERNING QUESTION
TWO ............................................................................................................................... 1

    A.  Question Two.................................................................................................... 1

    B.  Background. ...................................................................................................... 1

    C.  Legal Standards Governing Application of the Automatic Stay. ..................... 5

    D.  Examiner's Conclusion and Explanation Regarding Question Number
        Two. .................................................................................................................. 8

        1.  The Filing of the Complaint is Reasonably Unlikely to Have
            Violated the Automatic Stay. ....................................................... 9

            a.  The Complaint Does Not Allege a Fraudulent Transfer
                Cause of Action or Seek to Recover Fraudulently
                Transferred Property. ....................................................... 9

            b.  Fraudulent Transfer Claims Are Not Reasonably Likely
                Property of the Estate.................................................... 11

            c.  Equitable Subordination Claims Are Not Reasonably
                 Likely Property of the Estate. ....................................... 16

        2.  The Second Claim for Relief is Reasonably Unlikely to Violate the
            Automatic Stay............................................................................ 26

        3.  The Third, Fourth, and Fifth Claims for Relief are Highly Unlikely
            to Violate the Automatic Stay..................................................... 28

VI.  PRINCIPAL FINDINGS AND CONCLUSIONS CONCERNING QUESTION
THREE......................................................................................................................... 31

    A.  Question Three................................................................................................ 31

    B.  Background. .................................................................................................... 31

    C.  Assertions and Defenses of the Parties. ........................................................ 34

        1.  Summary of Contentions Regarding JPMCB's Motion for
            Sanctions Against Wilmington Trust and its Counsel. ............... 35

    a.  JPMCB's Contentions. ................................................... 35

    b.  Responses of Wilmington Trust to JPMCB's Contentions. .......... 37

  2.  Summary of Contentions Regarding Fiduciary Duties of Wilmington Trust as Member of the UCC. .............................. 38

    a.  UCC's Contentions...................................................... 38

    b.  Responses of Wilmington Trust to the UCC's Contentions.......... 40

  3.  Legal Standard Governing Enforcement of and Sanctions for Noncompliance with Discovery Orders................................... 41

  4.  Legal Standard Governing Fiduciary Duties of Members of Official Committee of Unsecured Creditors. ............................. 46

D.  Examiner's Conclusion and Explanation Regarding Question Number Three. ...................................................................... 47

  1.  JPMCB's Motion for Sanctions Against Wilmington Trust and its Counsel. .................................................................. 48

    a.  Wilmington Trust and its Counsel Reasonably Likely Failed to Comply With the Depository Order.............................. 48

    b.  The Failure to Comply with the Depository Order Was Reasonably Likely Inadvertent. ................................... 49

      (1)  Circumstances Related to the Filing of the Complaint........................................................ 49

      (2)  Findings Regarding the Filing of the Complaint and Failure to Comply with the Depository Order. ................. 54

    c.  Findings Regarding the Requested Sanctions.............................. 59

  2.  Fiduciary Duties of Wilmington Trust as Member of UCC. ................... 63

    a.  Circumstances Related to the Drafting and Preparation of the Complaint............................................................. 63

    b.  Findings Regarding Fiduciary Duties of Wilmington Trust as Member of UCC. .................................................... 65

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*AAMCO Transmissions, Inc. v. Baker,*
No. 06-5252, 2008 U.S. Dist. LEXIS 14084 (E.D. Pa. Feb. 25, 2008) .......................43, 62, 63

*ABF Capital Mgmt. v. Kidder Peabody & Co. (In re Granite Partners, L.P.),*
210 B.R. 508 (Bankr. S.D.N.Y. 1997) .....................................................................................18

*Algonquin Power Income Fund v. Ridgewood Heights, Inc. (In re Franklin Indus.*
*Complex, Inc.),*
No. 01-67459, 2007 Bankr. LEXIS 3004 (Bankr. N.D.N.Y. Aug. 30, 2007) .........................18

*Ali v. Sims,*
788 F.2d 954 (3d Cir. 1986).....................................................................................................44

*Allentown Ambassadors, Inc. v. Ne. Am. Baseball, LLC (In re Allentown Ambassadors,*
*Inc.),*
361 B.R. 422 (Bankr. E.D. Pa. 2007) ........................................................................................5

*Am. Cigar Co. v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.),*
85 B.R. 965 (Bankr. E.D. Pa. 1988) .......................................................................................18

*Am. Nat'l Bank v. MortgageAmerica Corp. (In re MortgageAmerica Corp.),*
714 F.2d 1266 (5th Cir. 1983) ............................................................................................7, 11

*Am. Spinning Mills, Inc. v. Kubicek (In re Am. Spinning Mills, Inc.),*
43 B.R. 365 (Bankr. E.D. Pa. 1984) .......................................................................................10

*BankAtlantic v. Blythe Eastman Paine Webber, Inc.,*
12 F.3d 1045 (11th Cir. 1994) ................................................................................................44

*Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,*
296 F.3d 164 (3d Cir. 2002).................................................................................5, 19, 20, 21

*Begier v. Price Waterhouse,*
81 B.R. 303 (E.D. Pa. 1987) ...................................................................................................25

*Bunch v. J.M. Capital Fin., Ltd. (In re Hoffinger Indus.),*
327 B.R. 389 (Bankr. E.D. Ark. 2005) ...................................................................................18

*Byrd v. Hoffman,*
417 B.R. 320 (D. Md. 2008) ...................................................................................................29

*Cadle Co. v. Mims (In re Moore),*
No. 09-10604, 2010 U.S. App. LEXIS 11118 (5th Cir. June 2, 2010)...................................15

*Cadleway Props., Inc. v. Andrews (In re Andrews)*,
    No. 94-21308, 2009 Bankr. LEXIS 1052 (Bankr. S.D. Tex. Apr. 2, 2009) ...........................18

*Caplin v. Marine Midland Grace Trust Co.*,
    406 U.S. 416 (1972).........................................................................................................19

*Carlucci v. Piper Aircraft Corp.*,
    775 F.2d 1440 (11th Cir. 1985) ......................................................................................42

*Carter v. Albert Einstein Med. Ctr.*,
    804 F.2d 805 (3d Cir. 1986)............................................................................................61

*CBS, Inc. v. Folks (In re Folks)*,
    211 B.R. 378 (B.A.P. 9th Cir. 1997)...........................................................................6, 20

*Chambers v. Nasco, Inc.*,
    501 U.S. 32 (1991)..........................................................................................................44

*Cine Forty-Second St. Theatre Corp. v. Allied Artists Picture Corp.*,
    602 F.2d 1062 (2d Cir. 1979).....................................................................................42, 63

*Citicorp Venture Capital v. Comm. of Creditors Holding Unsecured Claims*,
    160 F.3d 982 (3d Cir. 1998)............................................................................................17

*City of Farrell v. Sharon Steel Corp.*,
    41 F.3d 92 (3d Cir. 1994)................................................................................................30

*Civic Ctr. Square, Inc. v. Ford (In re Roxford Foods, Inc.)*,
    12 F.3d 875 (9th Cir. 1993) ............................................................................................10

*Claybrook v. Consol. Foods, Inc. (In re Bake-Line Grp., LLC)*,
    359 B.R. 566 (Bankr. D. Del. 2007) ..............................................................................29

*Clippard v. LWD, Inc. (In re LWD, Inc.)*,
    342 B.R. 514 (Bankr. W.D. Ky. 2006) ......................................................................17, 18

*Coleman v. Sears, Roebuck & Co.*,
    221 F.R.D. 433 (W.D. Pa. 2003) ....................................................................................43

*Comm. of Unsecured Creditors v. Commodity Credit Corp. (In re KF Dairies, Inc.)*,
    143 B.R. 734 (B.A.P. 9th Cir. 1992)...............................................................................28

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
    482 F.3d 1091 (9th Cir. 2007) ........................................................................................44

*Craig v. Kelchner*,
    No. 07-CV-1157, 2010 U.S. Dist. LEXIS 12064 (M.D. Pa. Feb. 11, 2010) ...........................43

*Crawford v. Franklin Credit Mgmt. Corp.*,
    261 F.R.D. 34 (S.D.N.Y. 2009) ...................................................61

*Di Gregorio v. First Rediscount Corp.*,
    506 F.2d 781 (3d Cir. 1974)....................................................41

*Elway Co., LLP v. Miller (In re Elrod Holdings Corp.)*,
    392 B.R. 110 (Bankr. D. Del. 2008) ...............................18, 26

*Energy Income Fund, L.P. v. Compression Solutions Co.*
    *(In re Magnolia Gas Co., L.L.C.)*,
    255 B.R. 900 (Bankr. W.D. Okla. 2000) ...........................28

*FDIC v. Hirsch (In re Colonial Realty Co.)*,
    980 F.2d 125 (2d Cir. 1992)....................................................6, 7

*Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*,
    57 F.3d 1215 (3d Cir. 1995)..................................................44, 45

*Gonzales v. IRS (In re Silver)*,
    303 B.R. 849 (B.A.P. 10th Cir. 2004)....................................8

*Gratton v. Great Am. Comm'cns*,
    178 F.3d 1373 (11th Cir. 1999) ...........................................42

*Halas v. Consumer Servs., Inc.*,
    16 F.3d 161 (7th Cir. 1994) ..................................................43

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
    530 U.S. 1 (2000)..................................................................17, 27

*Haskell v. PWS Holding Corp. (In re PWS Holding Corp.)*,
    303 F.3d 308 (3d Cir. 2002)..................................................15

*HBE Leasing Corp. v. Frank*,
    48 F.3d 623 (2d Cir. 1995)....................................................16

*Healy/Mellon-Stuart Co. v. Coastal Grp., Inc. (In re Coastal Grp., Inc.)*,
    100 B.R. 177 (Bankr. D. Del. 1989) ...................................10

*Highland Capital Mgmt. L.P. v. Chesapeake Energy Corp. (In re Seven Seas Petrol., Inc.)*,
    522 F.3d 575 (5th Cir. 2008) ......................................... passim

*In re ABC Auto. Prods. Corp.*,
    210 B.R. 437 (Bankr. E.D. Pa. 1997) .................................46

*In re Ambotiene*,
    316 B.R. 25 (Bankr. E.D.N.Y. 2004).................................................................41

*In re Barneys, Inc.*,
    197 B.R. 431 (Bankr. S.D.N.Y. 1996)...............................................................46

*In re Becker*,
    136 B.R. 113 (Bankr. D.N.J. 1992) ...................................................................15

*In re Beers*,
    No. 09-1666, 2009 U.S. Dist. LEXIS 111218 (D.N.J. Nov. 30, 2009) ..................46

*In re Conley*,
    159 B.R. 323 (Bankr. D. Idaho 1993).................................................................18

*In re Davey Roofing, Inc.*,
    167 B.R. 604 (Bankr. C.D. Cal. 1994)................................................................20

*In re Eagle Enters., Inc.*,
    265 B.R. 671 (E.D. Pa. 2001) .............................................................................6

*In re GenTek, Inc.*,
    328 B.R. 423 (Bankr. D. Del. 2005)...................................................................12

*In re Haskell-Dawes, Inc.*,
    188 B.R. 515 (Bankr. E.D. Pa. 1995) ............................................................46, 47

*In re Insilco Techs., Inc.*,
    480 F.3d 212 (3d Cir. 2007)...............................................................................17

*In re J.S. II, L.L.C.*,
    389 B.R. 570 (Bankr. N.D. Ill. 2008) ................................................................18

*In re Johns-Manville Corp.*,
    26 B.R. 919 (Bankr. S.D.N.Y. 1983)..................................................................47

*In re Nationwide Sports Distribs., Inc.*,
    227 B.R. 455 (Bankr. E.D. Pa. 1998) .................................................................46

*In re Poughkeepsie Hotel Assoc. Joint Venture*,
    132 B.R. 287 (Bankr. S.D.N.Y. 1991)................................................................16

*In re Prudential Ins. Co. Am. Sales Practice Litig. Action*s,
    278 F.3d 175 (3d Cir. 2002)...............................................................................46

*In re Refco, Inc.*,
    336 B.R. 187 (Bankr. S.D.N.Y. 2006)............................................................46, 47

*In re Saunders,*
    101 B.R. 303 (Bankr. N.D. Fla. 1989) ..............................................................6, 11

*In re Siciliano,*
    13 F.3d 748 (3d Cir. 1994) ...............................................................................10

*In re U.S. Mktg. Concepts, Inc.,*
    113 B.R. 487 (Bankr. N.D. Ind. 1990) ..................................................................6

*In re Vitreous Steel Prods. Co.,*
    911 F.2d 1223 (7th Cir. 1990) ..........................................................................18

*In re Zwirn,*
    362 B.R. 536 (Bankr. S.D. Fla. 2007) ................................................................15

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Ludwig Honold*
    *Mfg. Co. (In re Ludwig Honold Mfg. Co.),*
    30 B.R. 790 (Bankr. E.D. Pa. 1983) ..................................................................22

*JNA-1 Corp. v. Uni-Marts, LLC (In re Uni-Marts, LLC),*
    404 B.R. 767 (Bankr. D. Del. 2009) ..................................................................10

*Jones v. Cendant Mortg. Corp. (In re Jones),*
    396 B.R. 638 (Bankr. W.D. Pa. 2008) ...............................................................19

*Kalb, Voorhis & Co. v. Am. Fin. Corp.,*
    8 F.3d 130 (2d Cir. 1993) ...........................................................................19, 22

*Koch Ref. v. Farmers Union Cent. Exch., Inc.,*
    831 F.2d 1339 (7th Cir. 1987) ................................................................19, 23, 25

*Kowal v. Malkemus (In re Thompson),*
    965 F.2d 1136 (1st Cir. 1992) ..........................................................................27

*Krystal Cadillac Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp. (In re Krystal*
    *Cadillac Oldsmobile GMC Truck, Inc.),*
    142 F.3d 631 (3d Cir. 1998) ..............................................................................5

*Landon v. Hunt,*
    938 F.2d 450 (3d Cir. 1991) .............................................................................46

*Lawrence v. Steinford Holding B.V. (In re Dominelli),*
    820 F.2d 313 (9th Cir. 1987) ...........................................................................27

*Lehman Commercial Paper, Inc. v. Palmdale Hills Prop., LLC (In re Palmdale Hills*
    *Prop., LLC),*
    423 B.R. 655 (B.A.P. 9th Cir. 2009) .................................................................10

*Lighthouse Bluffs, Corp. v. Atreus Enters., Ltd. (In re Atreus Enters., Ltd.)*,
    120 B.R. 341 (Bankr. S.D.N.Y. 1990) ...................................................................10

*Litchfield Co. Ltd. P'ship v. Anchor Bank (In re Litchfield Co. Ltd. P'ship)*,
    135 B.R. 797 (W.D.N.C. 1992) .............................................................................6

*Long v. Steepro*,
    213 F.3d 983 (7th Cir. 2000) ...............................................................................43

*La. World Exposition v. Fed. Ins. Co.*,
    858 F.2d 233 (5th Cir. 1988) .................................................................................6

*Maritime Elec. Co., Inc. v. United Jersey Bank*,
    959 F.2d 1194 (3d Cir. 1991)...............................................................................10

*Marrocco v. Gen. Motors Corp.*,
    966 F.2d 220 (7th Cir. 1992) ...............................................................................44

*Martin v. Brown*,
    63 F.3d 1252 (3d Cir. 1995)..................................................................................45

*Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*,
    179 F.R.D. 77 (D. Conn. 1998)............................................................................43

*McGowan v. Ciccone (In re Ciccone)*,
    171 B.R. 4 (Bankr. D.R.I. 1994) ..........................................................................15

*Merch. Nat'l Bank v. Leemac Truck & Trailer Indus., Inc. (Leemac Truck & Trailer Indus., Inc.)*,
    No. 91-01761, 1992 Bankr. LEXIS 1213 (Bankr. N.D. Ill. July 13, 1992)............................58

*Minn. Corn Processors, Inc. v. Am. Sweeteners, Inc. (In re Am. Sweeteners, Inc.)*,
    248 B.R. 271 (Bankr. E.D. Pa. 2000) ...................................................................18

*Morley v. Ontos, Inc. (In re Ontos, Inc.)*,
    478 F.3d 427 (1st Cir. 2007)................................................................................15

*Moyer v. ABN AMRO Mortg. Corp. (In re Feringa)*,
    376 B.R. 614 (Bankr. W.D. Mich. 2007)..............................................................11

*Mullins v. Burtch (In re Paul J. Paradise & Assocs., Inc.)*,
    249 B.R. 360 (D. Del. 2000) ................................................................................30

*Nat'l Hockey League v. Metro. Hockey Club*,
    427 U.S. 639 (1976)..............................................................................................41

*Nat'l Tax Credit Partners L.P. v. Havlik*,
    20 F.3d 705 (7th Cir. 1994) ..................................................................................15

*O'Dowd v. Trueger (In re O'Dowd)*,
    233 F.3d 197 (3d Cir. 2000)................................................................................5

*Off. Comm. Unsecured Creditors v. Am. Sav. & Loan Ass'n (In re Gen. Homes Corp.)*,
    181 B.R. 870 (Bankr. S.D. Tex. 1994) ........................................................ passim

*Off. Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*,
    226 F.3d 237 (3d Cir. 2000)................................................................12, 13, 14, 15

*Off. Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*,
    330 F.3d 548 (3d Cir. 2003).............................................................................16

*Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*,
    562 F. Supp. 2d 606 (D. Del. 2008)..................................................................45

*PHP Liquidating, LLC v. Robbins*,
    291 B.R. 592 (D. Del. 2003)......................................................................19, 23

*PNC Bank v. Buzzelli (In re Buzzelli)*,
    246 B.R. 75 (Bankr. W.D. Pa. 2000) ...............................................................43

*Poliquin v. Garden Way Inc.*,
    154 F.R.D. 29 (D. Me. 1994)...........................................................................44

*Poulis v. State Farm Fire & Cas. Co.*,
    747 F.2d 863 (3d Cir. 1984)............................................................................44

*PW Enters., Inc. v. N. Dakota (In re Racing Servs., Inc.)*,
    363 B.R. 911 (B.A.P. 8th Cir. 2007).................................................................18

*R.W. Int'l Corp. v. Welch Foods, Inc.*,
    937 F.2d 11 (1st Cir. 1991).............................................................................42

*Reg'l Refuse Sys., Inc. v. Inland Reclamation Co.*,
    842 F.2d 150 (6th Cir. 1988) ..........................................................................44

*Republic of Phil. v. Westinghouse Elec. Corp.*,
    43 F.3d 65 (3d Cir. 1994)....................................................................45, 46, 61

*Rice v. City of Chicago*,
    333 F.3d 780 (7th Cir. 2003) ...........................................................................58

*Rice v. United States (In re Odom Antennas, Inc.)*,
    258 B.R. 376 (Bankr. E.D. Ark. 2001) .............................................................28

*Richardson v. Huntington Nat'l Bank (In re CyberCo Holdings, Inc.)*,
    382 B.R. 118 (Bankr. W.D. Mich. 2008)...........................................................11

*Rickel & Assocs. Inc. v. Smith (In re Rickel & Assocs.)*,
   272 B.R. 74 (Bankr. S.D.N.Y. 2002) ................................................................46, 47

*Robert Christopher Assoc. v. Franklin Realty Grp., Inc. (In re FRG, Inc.)*,
   121 B.R. 710 (Bankr. E.D. Pa. 1990) ...................................................................10

*Robison v. First Fin. Capital Mgmt. Corp. (In re Sweetwater)*,
   55 B.R. 724 (D. Utah 1985) ..................................................................................11

*Rubera v. Rubera (In re Rubera)*,
   289 B.R. 520 (Bankr. D. Conn. 2003) ...............................................................6, 11

*Salgado v. Gen. Motors Corp.*,
   150 F.3d 735 (7th Cir. 1998) ................................................................................42

*Schertz-Cibolo-Universal City Ind. Sch. Dist. v. Wright*
   *(In re Educators Grp. Health Trust)*,
   25 F.3d 1281 (5th Cir. 1994) ..............................................................................5, 20

*Sears, Roebuck & Co. v. Penney (In re Penney)*,
   76 B.R. 160 (Bankr. N.D. Cal. 1987) ...................................................................10

*Sender v. Simon*,
   84 F.3d 1299 (10th Cir. 1996) ..........................................................................16, 20

*Shapiro v. Plante & Moran, LLP (In re Connolly N. Am., LLC)*,
   376 B.R. 161 (Bankr. E.D. Mich. 2007) ...............................................................41

*Shubert v. Lucent Techs. Inc (In re Winstar Commc'ns, Inc.)*,
   554 F.3d 382 (3d Cir. 2009) ..................................................................................16

*Skilled Nursing Prof'l Servs. v. Sacred Heart Hosp. (In re Sacred Heart Hosp.)*,
   175 B.R. 543 (Bankr. E.D. Pa. 1994) ...................................................................29

*Sosne v. Reinert & Duree, P.C. (In re Just Brakes Corporate Sys.)*,
   108 F.3d 881 (8th Cir. 1997) ..................................................................................8

*Spartan Tube & Steel, Inc. v. Himmelspach (In re RCS Engineered Prods. Co.)*,
   102 F.3d 223 (6th Cir. 1996) ..................................................................................6

*Spear v. Comm'r*,
   41 F.3d 103 (3d Cir. 1994) ........................................................................42, 44, 61

*Steffen v. Gray, Harris & Robinson, P.A.*,
   283 F. Supp. 2d 1272 (M.D. Fla. 2003) ...............................................................11

*Steinberg v. Buczynski*,
   40 F.3d 890 (7th Cir. 1994) ..................................................................................21

*Steyr-Daimler-Puch of Am. Corp. v. Pappas*,
    852 F.2d 132 (4th Cir. 1988) ................................................................19

*Tamari v. Bache & Co. (Lebanon) S.A.L.*,
    729 F.2d 469 (7th Cir. 1984) ...............................................................43

*Teerlink v. Lambert (In re Teerlink Ranch, Ltd.)*,
    886 F.2d 1233 (9th Cir. 1989) .............................................................10

*Teleglobe USA, Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*,
    392 B.R. 561 (Bankr. D. Del. 2008) ..............................................43, 44

*United Jersey Bank v. Morgan Guaranty Trust Co. (In re Prime Motor Inns, Inc.)*,
    135 B.R. 917 (Bankr. S.D. Fla. 1992) ...................................................28

*United States v. Inslaw*,
    932 F.2d 1467 (D.C. Cir. 1991) ..............................................................6

*United States v. State St. Bank & Trust Co. (In re Scott Cable Commc'ns, Inc.)*,
    No. 01-04605, 2002 Bankr. LEXIS 183 (Bankr. D. Del. Mar. 4, 2002) ................................22

*United Steelworkers v. Lampl (In re Mesta Mach. Co.)*,
    67 B.R. 151 (Bankr. W.D. Pa. 1986) ..............................................46, 47

*Variable-Parameter Future Dev. Corp. v. Comerica Bank-Cal. (In re Morpheus Lights, Inc.)*,
    228 B.R. 449 (Bankr. N.D. Cal. 1998) ...........................................18, 26

*Wagner v. Christiana Bank & Trust Co. (In re Wagner)*,
    353 B.R. 106 (Bankr. W.D. Pa. 2006) ...................................................11

*Westmoreland Human Opportunities, Inc. v. Walsh (In re Life Serv. Sys., Inc.)*,
    246 F.3d 233 (3d Cir. 2001).................................................................46

*Westmoreland Human Opportunities, Inc. v. Walsh (In re Life Serv. Sys., Inc.)*,
    327 B.R. 561 (W.D. Pa. 2005) .............................................................47

*XL/Datacomp, Inc. v. Wilson (In re Omegas Grp.)*,
    16 F.3d 1443 (6th Cir. 1994) ...............................................................29

## FEDERAL STATUTES

11 U.S.C. § 362(a)(1).............................................................................6, 7

11 U.S.C. § 362(a)(3).........................................................................5, 6, 7

11 U.S.C. § 362(a)(6)...............................................................................8

11 U.S.C. § 502(a) .................................................................................27

11 U.S.C. § 502(d) ................................................................................................27

11 U.S.C. § 510(c)(1) .............................................................................................17

11 U.S.C. § 510(c)(2) .............................................................................................17

11 U.S.C. § 541(a)(1) ...............................................................................................5

11 U.S.C. § 541(a)(3) ........................................................................................13, 30

11 U.S.C. § 541(a)(4) .............................................................................................30

11 U.S.C. § 544 ......................................................................................................13

11 U.S.C. § 545 ......................................................................................................13

11 U.S.C. § 547 ......................................................................................................13

11 U.S.C. § 548 ......................................................................................................13

11 U.S.C. § 550 ......................................................................................................13

**FEDERAL RULES**

Fed. R. Bankr. P. 1001 ...........................................................................................56

Fed. R. Bankr. P. 7019(a)(B)(ii) ............................................................................21

Fed. R. Bankr. P. 7037 ...........................................................................................41

Fed. R. Bankr. P. 9014(c) .......................................................................................41

Fed. R. Bankr. P. 9029(a)(1) ..................................................................................56

Fed. R. Bankr. P. 9029(a)(2) ..................................................................................56

Fed. R. Civ. P. 37 ...................................................................................................60

Fed. R. Civ. P. 37(b)(2)(A) ...............................................................................41, 42

Fed. R. Civ. P. 37(b)(2)(A)(i)-(vi) .........................................................................42

Fed. R. Civ. P. 37(b)(2)(C) ....................................................................................44

**LOCAL RULES**

Del. Bankr. L.R. 5005-4 ..........................................................................................50

LEGAL TREATISES

3 COLLIER ON BANKRUPTCY
¶ 362.03[8][c]....................................................................................................................8

5 COLLIER ON BANKRUPTCY
¶ 541.07..........................................................................................................................11

OTHER SECONDARY MATERIALS

Adam Liptak, *Prosecutors Can't Keep a Secret in Steroid Case*, N.Y. TIMES, June 23,
2006...............................................................................................................................36

Adobe Sys. Inc., *Redaction of Confidential Information in Electronic Documents: How to
Safely Remove Sensitive Information From Microsoft Word Documents and PDF
Documents Using Adobe Acrobat* (2006),
http://partners.adobe.com/public/developer/en/ acrobat/Redaction.pdf ...........................36, 58

Demian Bulwa, *Government Failed to Learn Basics of Keeping Secrets in Digital Age*,
S.F. CHRON., June 23, 2006 ...........................................................................................36

Douglas S. Malan, *A Major Redaction Gaffe—GE's Sensitive Information Easy to Access
Behind Black Veil*, CONN. LAW TRIB., May 26, 2008............................................................36

Spencer S. Hsu & Carrie Johnson, *TSA Accidentally Reveals Airport Security Secrets*,
WASH. POST, Dec. 9, 2009 ...........................................................................................36

## V.

## PRINCIPAL FINDINGS AND CONCLUSIONS CONCERNING QUESTION TWO

### A.    Question Two.

As part of the Investigation, the Examiner was directed to "evaluate whether Wilmington Trust Company violated the automatic stay under 11 U.S.C. § 362 by its filing, on March 3, 2010 of its Complaint for Equitable Subordination and Disallowance of Claims, Damages and Constructive Trust."[2]

### B.    Background.

On March 4, 2010, Wilmington Trust filed the Complaint with the Bankruptcy Court in its capacity as successor indenture trustee for the holders of the PHONES Notes,[3] naming as defendants most—if not all—of the advisors and lenders that participated or served a role in the Leveraged ESOP Transactions, including JPMCB (individually and as administrative agent), JPMorgan, MLCC (individually and as administrative agent), MLPFS, Citicorp (individually and as administrative agent), CGMI, Bank of America, BAS, Barclays Bank PLC, and Morgan Stanley,[4] as well as the prior trustee under the PHONES Indenture, Citibank, N.A.[5]

The Complaint is voluminous and contains hundreds of paragraphs of allegations, but its underpinning is that the Leveraged ESOP Transactions in which the defendants participated "rendered Tribune insolvent and, ultimately, bankrupt,"[6] causing harm to the Tribune Entities,

---

[2]    *See* Ex. 1 at ¶ 2 (Examiner Order).  Although the Examiner Order refers to March 3, 2010, the Complaint was actually filed on March 4, 2010.

[3]    *See* Ex. 880 at ¶ 11 (Complaint).  The redacted version of the Complaint has been included in the Appendix to the Report.

[4]    *Id.* at ¶¶ 12-16, 18-22.

[5]    *Id.* at ¶ 17.

[6]    *Id.* at ¶ 9; *see also id.* at ¶¶ 1, 3, 7.

the holders of the PHONES Notes, and similarly situated creditors.[7]  Based on the circumstances

described in the Complaint, Wilmington Trust alleges five separate causes of action against the

defendants.  In the first claim for relief, Wilmington Trust alleges that the defendants' claims

should be equitably subordinated to the claims of the holders of the PHONES Notes pursuant to

Bankruptcy Code section 510(c)(1) because of the defendants' misconduct in connection with the

Leveraged ESOP Transactions, and that any liens securing the defendants' claims should also be

transferred to the Tribune Entities' estates pursuant to Bankruptcy Code section 510(c)(1).[8]  In

the second claim for relief, Wilmington Trust alleges that the defendants' claims should be

disallowed because the defendants had received and retained transfers that are avoidable under

the Bankruptcy Code, and engaged in unconscionable and bad faith conduct that constituted

unclean hands, leading to the disallowance of their claims.[9]  In the third claim for relief,

Wilmington Trust alleges that Citibank, N.A. breached its fiduciary duty while serving as the

PHONES Indenture trustee during the Leveraged ESOP Transactions and was liable to the

holders of the PHONES Notes for damages arising from the breach of fiduciary duty.[10]  In the

fourth claim for relief, Wilmington Trust alleges that the other defendants aided and abetted

Citibank, N.A. in its purported breach of fiduciary duty as the PHONES Indenture trustee, that

the defendants were liable for damages caused to the holders of the PHONES Notes, and the

defendants' claims should be equitably subordinated to the claims of the holders of the PHONES

Notes as a result of aiding and abetting the breach of fiduciary duty committed by Citibank,

---

[7]   *See, e.g., id.* at ¶¶ 55, 89, 108, 116, 117, 120, 122, 136, 142.

[8]   *Id.* at ¶¶ 145-169.

[9]   *Id.* at ¶¶ 170-173.

[10]   *Id.* at ¶¶ 174-181.

N.A.[11]  In its fifth and final claim for relief, Wilmington Trust alleges that a constructive trust for the benefit of the holders of the PHONES Notes should be imposed on any distributions that the defendants would receive from the Tribune Entities' bankruptcy estates.[12]

On March 18, 2010, the Tribune Entities filed a motion asserting that Wilmington Trust willfully violated the automatic stay by filing the Complaint and asserting certain of the causes of action alleged therein.[13]  Specifically, the Tribune Entities contend that the first and the second claims for relief were, in substance, a usurpation of fraudulent transfer claims that constitute property of the estates which only the Tribune Entities had the right to pursue.[14]  The Tribune Entities characterize these claims for relief in the Complaint as alleging, and being premised on, general harm to the estates and creditors arising from consummation of the Leveraged ESOP Transactions, and further contend that the Complaint failed to allege any particularized harm to the holders of the PHONES Notes from the transactions that was not shared with similarly situated creditors.[15]  According to the Tribune Entities, because the first and second claims for relief were "disguised" fraudulent transfer claims that alleged only "general" harm, Wilmington Trust violated Bankruptcy Code section 362(a)(3) by asserting the claims and did not have standing to pursue them.[16]  The UCC also filed a statement supporting the relief sought by the Tribune Entities.[17]

---

[11]   *Id.* at ¶¶ 182-187.

[12]   *Id.* at ¶¶ 188-191.

[13]   *See Motion of the Debtors for an Order (I) Determining That Wilmington Trust Company Has Violated Automatic Stay, (II) Requiring Wilmington Trust Company to Show Cause Why It Should Not Be Held in Contempt of Court, and (III) Halting All Proceedings With Respect to the Complaint* [Docket No. 3759].

[14]   *Id.* at ¶¶ 8-11.

[15]   *Id.* at ¶¶ 16-19.

[16]   *Id.* at ¶¶ 15, 19.

[17]   *See Statement of the Official Committee of Unsecured Creditors in Connection With (A) Motion of JPMorgan Chase Bank, N.A. for Sanctions Against Wilmington Trust Company for Improper Disclosure of Confidential*

Wilmington Trust filed an objection to the motion conceding that the claims for relief were grounded in the same operative facts as fraudulent transfer and other causes of action that could be pursued by the Tribune Entities' estates, but maintaining that the Complaint alleged claims for direct and particular harm suffered by the holders of the PHONES Notes that could be separately brought on their behalf by Wilmington Trust as indenture trustee.[18]  Specifically, Wilmington Trust asserts that (i) individual creditors such as the holders of the PHONES Notes have standing to seek equitable subordination of the defendants' claims;[19] (ii) the Complaint sufficiently alleges particularized harm to the holders of the PHONES Notes that supports each of the claims for relief and provides standing to pursue them;[20] (iii) the right of the holders of the PHONES Notes to seek equitable subordination and other relief requested in the Complaint is not altered by alleging conduct that could also form the basis of an avoidance action;[21] (iv) the holders of the PHONES Notes have standing as parties in interest to object to the claims of other creditors;[22] and (v) the automatic stay cannot be violated when an action is commenced in the Bankruptcy Court.[23]

In response to the Examiner's request, the Tribune Entities and Wilmington Trust, and to a limited extent the UCC, submitted additional briefs to the Examiner setting forth their

---

*Information in Violation of Court Order, and (B) Motion of the Debtors for an Order (I) Determining That Wilmington Trust Company Has Violated Automatic Stay, (II) Requiring Wilmington Trust Company to Show Cause Why It Should Not Be Held in Contempt of Court, and (III) Halting All Proceedings With Respect to the Complaint* [Docket No. 3968] at 3-4.

[18]  *See Objection of Wilmington Trust Company to the Motion of the Debtors for an Order (I) Determining That Wilmington Trust Company Has Violated Automatic Stay, (II) Requiring Wilmington Trust Company to Show Cause Why It Should Not Be Held in Contempt of Court, and (III) Halting All Proceedings With Respect to the Complaint* [Docket No. 3942] at ¶¶ 3-5.

[19]  *Id.* at ¶¶ 19-28.

[20]  *Id.* at ¶¶ 29-44.

[21]  *Id.* at ¶¶ 45-48.

[22]  *Id.* at ¶¶ 50-56.

[23]  *Id.* at ¶¶ 62-65.

respective positions and arguments on Question Two issues.  During the Investigation, the Examiner also conducted five interviews with counsel for Wilmington Trust touching on certain aspects of Question Two.

### C.    Legal Standards Governing Application of the Automatic Stay.

As noted, the Tribune Entities contend that Wilmington Trust violated Bankruptcy Code section 362(a)(3) by filing the Complaint because it alleges only "general" harm to the estates and creditors and the first and second claims for relief assert "disguised" fraudulent transfer claims and equitable subordination claims that belong to the Tribune Entities' estates.

Bankruptcy Code section 362(a)(3) stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over any property of the estate."[24]  "By its plain text, the scope of § 362(a)(3) is dependent on the meaning of the terms 'property of the estate,' 'obtain possession' and 'exercise control.'"[25]  Bankruptcy Code section 541(a)(1) defines property of the bankruptcy estate to include all legal or equitable interests of the debtor in property as of the commencement of the case.[26]  Property of the estate includes causes of action that could have been brought by the debtor under applicable nonbankruptcy law prior to the petition date.[27]  Thus, to the extent that a claim or cause of action constitutes property of the

---

[24]    11 U.S.C. § 362(a)(3) (2006).

[25]    *Allentown Ambassadors, Inc. v. Ne. Am. Baseball, LLC (In re Allentown Ambassadors, Inc.)*, 361 B.R. 422, 436 (Bankr. E.D. Pa. 2007).

[26]    *See* 11 U.S.C. § 541(a)(1) (2006); *see also Krystal Cadillac Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp. (In re Krystal Cadillac Oldsmobile GMC Truck, Inc.)*, 142 F.3d 631, 635 (3d Cir. 1998) ("Generally, the property of an estate in bankruptcy is comprised of all legal or equitable interests of the debtor in property on the date of commencement of the bankruptcy proceeding.").

[27]    *See, e.g., Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 n.5 (3d Cir. 2002) (noting that property of the estate includes causes of action that could have been asserted by the debtor under nonbankruptcy law prior to the petition date); *O'Dowd v. Trueger (In re O'Dowd)*, 233 F.3d 197, 202 (3d Cir. 2000) ("While federal law defines what types of property comprise the estate, state law generally determines what interest, if any, a debtor has in property.") (citations omitted); *see also Schertz-Cibolo-Universal City Ind. Sch. Dist. v. Wright (In re Educators Grp. Health Trust)*, 25 F.3d 1281, 1284 (5th Cir. 1994)

estate, the assertion of that claim by a party other than the trustee or debtor in possession may

violate the automatic stay imposed under Bankruptcy Code section 362(a)(3) as an act to obtain

possession of, or exert control over, property of the estate.[28]

In addition to the preceding basis for violating the automatic stay, if the causes of action

alleged in the Complaint against the defendants are properly characterized as fraudulent transfer

claims, as posited by the Tribune Entities, the filing of the Complaint may have violated the

automatic stay for alternative reasons.[29]  Some courts hold that the commencement and

prosecution of a fraudulent transfer action by a third party violates the automatic stay imposed

under Bankruptcy Code section 362(a)(1).[30]  Bankruptcy Code section 362(a)(1) imposes a stay

---

("Whether a particular state cause of action belongs to the estate depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case."); *United States v. Inslaw*, 932 F.2d 1467, 1471 (D.C. Cir. 1991) ("It is undisputed that [property of the estate under Bankruptcy Code section 541(a)] encompasses causes of action that belong to the debtor . . . ."); *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 245 (5th Cir. 1988) ("Section 541(a)(1)'s reference to 'all legal or equitable interests of the debtor in property' includes causes of action belonging to the debtor at the time the case is commenced."); *CBS, Inc. v. Folks (In re Folks)*, 211 B.R. 378, 384 (B.A.P. 9th Cir. 1997) ("The scope of § 541 is broadly defined and includes causes of action." (citing *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.9 (1983))).

[28]  *See, e.g., In re Eagle Enters., Inc.*, 265 B.R. 671, 677-78 (E.D. Pa. 2001); *Off. Comm. Unsecured Creditors v. Am. Sav. & Loan Ass'n (In re Gen. Homes Corp.)*, 181 B.R. 870, 878-79 (Bankr. S.D. Tex. 1994) (holding that commencement of action by creditors' committee alleging fraudulent transfer and equitable subordination claims violated Bankruptcy Code section 362(a)(3) by asserting causes of action that constituted property of the estate); *Litchfield Co. Ltd. P'ship v. Anchor Bank (In re Litchfield Co. Ltd. P'ship)*, 135 B.R. 797, 802 (W.D.N.C. 1992) ("This is the law because 'property of the estate,' which is protected by Code § 362(a)(3), is defined by Code § 541(a) to include any cause of action that the [debtor] may be entitled to prosecute against third parties for the benefit of the estate and, ultimately, its creditors." (citing *Steyr-Daimler-Puch of Am. Corp. v. Pappas*, 852 F.2d 132, 136 (4th Cir. 1988))); *In re U.S. Mktg. Concepts, Inc.*, 113 B.R. 487, 490 (Bankr. N.D. Ind. 1990) ("[B]y protecting property of the estate, the automatic stay [imposed under Bankruptcy Code section 362(a)(3)] prevents the prosecution of certain claims against non-debtors where those claims are property of the estate.").  Conversely, the prosecution of a claim or cause of action that is not property of the estate generally does not violate the automatic stay.  *See, e.g., Spartan Tube & Steel, Inc. v. Himmelspach (In re RCS Engineered Prods. Co.)*, 102 F.3d 223, 227 (6th Cir. 1996) (holding that creditor's pursuit of alter ego claim that did not become property of estate did not violate Bankruptcy Code section 362(a)(3)).

[29]  The Tribune Entities did not assert that Wilmington Trust's filing of the Complaint violated the stay on these grounds.  However, the Examiner was specifically directed to determine whether the Complaint generally violated Bankruptcy Code section 362, which necessarily requires consideration of other provisions of the statute.  *See* Ex. 1 at ¶ 2 (Examiner Order).

[30]  *See, e.g., FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 126-27 (2d Cir. 1992); *Rubera v. Rubera (In re Rubera)*, 289 B.R. 520, 523 (Bankr. D. Conn. 2003); *In re Saunders*, 101 B.R. 303, 305 (Bankr. N.D. Fla. 1989).

on "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case . . . or to recover a claim against the debtor that arose before the commencement of the case . . . ."[31]  These courts reason that the commencement or continuation of an action by a third party to recover a fraudulent transfer contravenes Bankruptcy Code section 362(a)(1) because the right to pursue the claim arises from the third party's status as a creditor of the debtor and the action therefore effectively seeks to "recover on a claim against the debtor" that arose prior to the petition date.[32]

Other courts have determined that prosecution of a fraudulent transfer action by a third party may violate Bankruptcy Code section 362(a)(3), not as an assertion of a claim that is property of the estate, but because the estate retains a legal or equitable interest in the fraudulently conveyed property despite its transfer to another entity.[33]  The courts adopting this approach have determined that fraudulent transfer actions brought by third parties seek to recover property of the estate, which violates the stay imposed by Bankruptcy Code section 362(a)(3) against acts intended to obtain possession of, or exert control over, property of the estate.[34]

---

[31]  11 U.S.C. § 362(a)(1) (2006).

[32]  *See, e.g., Colonial Realty*, 980 F.2d at 131-32 ("Section 362(a)(1) provides that actions 'against the debtor' *or* 'to recover a claim against the debtor' are subject to the automatic stay.  The latter category must encompass cases in which the debtor is not a defendant; it would otherwise be totally duplicative of the former category and pure surplusage.  Upon analysis, a third-party action to recover fraudulently transferred property is properly regarded as undertaken 'to recover a claim against the debtor' and subject to the automatic stay pursuant to § 362(a)(1).").

[33]  *See, e.g., Am. Nat'l Bank v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266, 1275 (5th Cir. 1983) ("The transferee may have colorable title to the property, but the equitable interest—at least as far as the creditors (but not the debtor) are concerned—is considered to remain in the debtor so that creditors may attach or execute judgment upon it as though the debtor had never transferred it.").

[34]  *See, e.g., id* at 1275 ("[W]hen such a debtor is forced into bankruptcy, it makes the most sense to consider the debtor as continuing to have a 'legal or equitable interest' in the property fraudulently transferred within the meaning of section 541(a)(1) of the Bankruptcy Code . . . The automatic stay under section 362(a) thus applies

Yet other courts have concluded that the commencement and prosecution of a fraudulent transfer action by a third party may violate the automatic stay imposed under Bankruptcy Code section 362(a)(6), which stays "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case."[35]  The courts following this view have concluded that a fraudulent transfer action brought by a third party violates Bankruptcy Code section 362(a)(6) because it seeks to collect or recover on a claim against the debtor from property that could be recovered by the trustee or debtor in possession through a fraudulent transfer action brought on behalf of the estate.[36]

### D.    Examiner's Conclusions and Explanation Regarding Question Number Two.

**Examiner's Conclusions:**

The Examiner concludes that a court is reasonably unlikely to find that Wilmington Trust violated the automatic stay by filing the Complaint.

---

and prevents a creditor from continuing to pursue a cause of action under [state fraudulent transfer laws] after a petition for bankruptcy has been filed.") (internal citations and quotations omitted).

[35]    11 U.S.C. § 362(a)(6) (2006).

[36]    *See, e.g., Sosne v. Reinert & Duree, P.C. (In re Just Brakes Corporate Sys.)*, 108 F.3d 881, 884 (8th Cir. 1997); *Gonzales v. IRS (In re Silver)*, 303 B.R. 849, 864-65 (B.A.P. 10th Cir. 2004); *see also* 3 COLLIER ON BANKRUPTCY ¶ 362.03[8][c] (Alan A. Resnick & Henry J. Sommer eds., 16th ed.) ("The stay does apply, however, to an attempt to collect a prepetition claim out of property that was fraudulently transferred by the debtor before the commencement of the case.  Although the property itself is not property of the estate, because the debtor has no right to the property after it has been transferred, the bankruptcy trustee does have a right to avoid the transfer.  The fraudulent transfer action belongs to the estate, and a creditor's attempt to recover out of fraudulently conveyed property is stayed.").

**Explanation of Examiner's Conclusions:**

1.    **The Filing of the Complaint is Reasonably Unlikely to Have Violated the Automatic Stay.**

   a.    **The Complaint Does Not Allege a Fraudulent Transfer Cause of Action or Seek to Recover Fraudulently Transferred Property.**

As an initial matter, the Complaint does not allege a fraudulent transfer claim as a substantive cause of action.[37]  The first claim for relief seeks to equitably subordinate the defendants' claims to the claims of the holders of the PHONES Notes, and the second claim for relief objects to the defendants' claims and seeks to have them disallowed.  Although the Complaint alleges certain facts in support of the first and second claims for relief that could also form the basis of a fraudulent transfer claim, it does not allege a cause of action for the avoidance and recovery of any property that the Tribune Entities may have fraudulently transferred to third parties.  Because the Complaint does not allege a fraudulent transfer claim as a substantive cause of action or seek the recovery of any fraudulently transferred property, a court is reasonably likely to conclude that the Complaint does not violate the automatic stay under any of the views adopted by the courts.

The cases holding that a creditor commencing or continuing a fraudulent transfer action may violate Bankruptcy Code section 362(a)(1) are based on the conclusion that such an action effectively seeks to "recover on a claim against the debtor" that arose prior to the petition date. However, the first and second claims for relief alleged in the Complaint seek only to equitably subordinate and disallow the defendants' claims and do not seek to recover on any claims against

---

[37]    *See, e.g., Highland Capital Mgmt. L.P. v. Chesapeake Energy Corp. (In re Seven Seas Petrol., Inc.)*, 522 F.3d 575, 583 (5th Cir. 2008) ("Whether a specific cause of action belongs to a bankruptcy estate is likewise a matter of law that we decide by reference to the facial allegations in the complaint.").

the Tribune Entities.  In addition, the Complaint was filed in the Bankruptcy Court instead of a

nonbankruptcy forum.  The majority of courts have concluded that when an action seeking to

recover on a claim against the debtor is commenced in the court in which the bankruptcy case is

pending, the filing of a complaint does not violate Bankruptcy Code section 362(a)(1) because it

is the functional equivalent of filing a proof of claim against the debtor or a request for relief

from stay.[38]  Although there is some authority to the contrary,[39] the Examiner believes that the

majority view is better reasoned.  The purposes of the automatic stay include giving the debtor in

possession a breathing spell and the opportunity to centralize litigation in the bankruptcy court

without being forced to litigate in numerous dispersed courts.[40]  Permitting a creditor to

commence litigation in the bankruptcy court exercising jurisdiction over the debtor gives all

parties the opportunity to centralize litigation and to address it in accordance with the needs of

the estate.

---

[38]    *See, e.g., Civic Ctr. Square, Inc. v. Ford (In re Roxford Foods, Inc.)*, 12 F.3d 875, 878 (9th Cir. 1993) ("[T]he automatic stay [is] inapplicable to a suit commenced in the same court where the bankruptcy was pending."); *Teerlink v. Lambert (In re Teerlink Ranch, Ltd.)*, 886 F.2d 1233, 1237 (9th Cir. 1989) ("The stay does not operate against the court with jurisdiction over the bankrupt."); *Lehman Commercial Paper, Inc. v. Palmdale Hills Prop., LLC (In re Palmdale Hills Prop., LLC)*, 423 B.R. 655, 663 (B.A.P. 9th Cir. 2009) ("Although the scope of the automatic stay is broad, it does not stay all proceedings.  Courts have recognized the automatic stay does not apply to actions against the debtor in the debtor's home bankruptcy court."); *JNA-1 Corp. v. Uni-Marts, LLC (In re Uni-Marts, LLC)*, 404 B.R. 767, 783 (Bankr. D. Del. 2009) ("[T]he filing of an adversary proceeding against a debtor in the home bankruptcy court is equivalent to the filing of a proof of claim in the Debtor's bankruptcy case and, therefore, does not violate the automatic stay."); *Robert Christopher Assoc. v. Franklin Realty Grp., Inc. (In re FRG, Inc.)*, 121 B.R. 710, 714 (Bankr. E.D. Pa. 1990); *Lighthouse Bluffs, Corp. v. Atreus Enters., Ltd. (In re Atreus Enters., Ltd.)*, 120 B.R. 341, 346 (Bankr. S.D.N.Y. 1990) ("Any action to recover property, to collect money, to enforce a lien, or to assert a prepetition claim against the debtor which would otherwise be enjoined by 11 U.S.C. § 362(a) if initiated in any other context, is not subject to the automatic stay if commenced in the bankruptcy court where the debtor's bankruptcy case is pending.") (citations omitted); *Am. Spinning Mills v. Kubicek (In re Am. Spinning Mills, Inc.)*, 43 B.R. 365, 367 (Bankr. E.D. Pa. 1984).

[39]    *See, e.g., Healy/Mellon-Stuart Co. v. Coastal Grp., Inc. (In re Coastal Grp., Inc.)*, 100 B.R. 177, 178-79 (Bankr. D. Del. 1989) (holding that creditor violated Bankruptcy Code section 362(a)(1) by commencing adversary proceeding in the bankruptcy court against the debtor seeking to recover on prepetition claims); *Sears, Roebuck & Co. v. Penney (In re Penney)*, 76 B.R. 160, 161 (Bankr. N.D. Cal. 1987) (same).

[40]    *See, e.g., In re Siciliano*, 13 F.3d 748, 750 (3d Cir. 1994); *Maritime Elec. Co., Inc. v. United Jersey Bank,* 959 F.2d 1194, 1204 (3d Cir. 1991).

Similarly, the cases holding that a creditor asserting fraudulent transfer claims may violate Bankruptcy Code sections 362(a)(3) or 326(a)(6) are based on an express finding that the creditor sought to recover fraudulently transferred property or to satisfy a claim against the debtor from fraudulently transferred property.[41]  That simply is not the case here because the first and second claims for relief alleged in the Complaint are limited to equitable subordination and disallowance of the defendants' claims.

> **b.    Fraudulent Transfer Claims Are Not Reasonably Likely Property of the Estate.**

Even if the first and second claims for relief alleged in the Complaint were properly characterized as "disguised" fraudulent transfer claims, as the Tribune Entities maintain, the Examiner does not believe that avoidance actions themselves are rightfully considered property of the bankruptcy estate, the assertion of which could potentially constitute an act to obtain possession of, or exercise control over, property of the estate.[42]  As noted above, in order for a

---

[41]    *See, e.g., Am. Nat'l Bank v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266, 1275-76 (5th Cir. 1983).

[42]    *See, e.g., Wagner v. Christiana Bank & Trust Co. (In re Wagner)*, 353 B.R. 106, 112 (Bankr. W.D. Pa. 2006) ("Here, based upon an examination of the plain language of Section 541, it is clear that a mere 'claim' held by the Chapter 7 Trustee for potential or prospective recovery pursuant to her strong-arm powers does *not* qualify as property of the Chapter 7 estate."); *see also Richardson v. Huntington Nat'l Bank (In re CyberCo Holdings, Inc.)*, 382 B.R. 118, 143 (Bankr. W.D. Mich. 2008) ("However, avoidance actions do not in and of themselves constitute property of the estate.  It is only that which is actually recovered under Section 550 on account of an avoided transfer that in fact becomes property of the estate."); *Moyer v. ABN AMRO Mortg. Corp. (In re Feringa)*, 376 B.R. 614, 624 (Bankr. W.D. Mich. 2007) ("[T]he avoidance action was not property of the estate to begin with."); *Steffen v. Gray, Harris & Robinson, P.A.*, 283 F. Supp. 2d 1272, 1284 n. 24 (M.D. Fla. 2003) ("This Court concludes that [a fraudulent transfer action] is not property of the estate because to construe Section 541(a)(1) in such a manner would render Section 541(a)(3) to be superfluous."), *aff'd*, 138 F. App'x 297 (11th Cir. 2005); *Rubera v. Rubera (In re Rubera)*, 289 B.R. 520, 523 (Bankr. D. Conn. 2003) ("[A]n estate's fraudulent conveyance cause of action does not qualify as property of the estate . . . ."); *In re Saunders*, 101 B.R. 303, 305 (Bankr. N.D. Fla. 1989) ("The fraudulent transfer cause of action itself is not considered property of the estate since the avoidance of such a transfer is not a cause of action assertable by the debtor.  It can only be asserted by a creditor . . . or by a trustee in bankruptcy."); *Robison v. First Fin. Capital Mgmt. Corp. (In re Sweetwater)*, 55 B.R. 724, 731 (D. Utah 1985) ("The avoiding powers are not 'property' but a statutorily created power to recover property."), *rev'd on other grounds*, 884 F.2d 1323 (10th Cir. 1989); 5 COLLIER ON BANKRUPTCY ¶ 541.07 n.1 (Alan A. Resnick & Henry J. Sommer eds., 16th ed.) ("The avoiding powers of a

cause of action to constitute property of the estate, the debtor must have had the right to assert

the claim under nonbankruptcy law prior to the petition date.[43]  Before filing for bankruptcy,

however, a debtor has no right under applicable nonbankruptcy law to prosecute an action for the

recovery of property it has fraudulently transferred, and all such rights are vested exclusively in

creditors.[44]  At most, the debtor may possess certain rights and other causes of action under

nonbankruptcy law to contest obligations and transactions.[45]

In contrast, after a bankruptcy petition is filed, the trustee or debtor in possession gains

the right to pursue fraudulent transfer claims as representatives of the estate, although such

claims may have belonged to creditors before the bankruptcy petition was filed.[46]  The right of

the trustee or debtor in possession to pursue fraudulent transfer and other avoidance actions is

---

debtor in possession granted in chapter 5 of the Code are not property of the estate but statutorily created powers to recover property.").

[43]    *See* Report at § V.C.

[44]    *See, e.g., Off. Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 242 (3d Cir. 2000) (stating that "outside of the context of bankruptcy, it is clear that a fraudulent transfer claim arising from [a debtor's] transfers and obligations belongs to [the debtor's] creditors, not to [the debtor]"); *see also In re GenTek, Inc.*, 328 B.R. 423, 429 (Bankr. D. Del. 2005) ("[T]he right to pursue fraudulent transfer claims shifts to the debtor in possession upon the filing of a chapter 11 petition notwithstanding that, outside of bankruptcy, such claims belong solely to the creditors.").

[45]    *See, e.g., Cybergenics*, 226 F.3d at 242 ("Other applicable nonbankruptcy laws may give [a debtor] various causes of action with which to challenge its own transactions and obligations, but a fraudulent transfer action is not among them.").

[46]    *See, e.g., id.* (finding that "the Bankruptcy Code empowers trustees as well as chapter 11 debtors in possession to avoid transfers as fraudulent using causes of action that state law provides to creditors," but "at least outside of the context of bankruptcy, it is clear that a fraudulent transfer claim arising from [a debtor's] transfers and obligations belongs to [the debtor's] creditors, not to [the debtor].").  Indeed, it seems illogical to suggest that, outside of the context of a bankruptcy case or similar proceeding, the debtor should have the ability to bring a cause of action to recover the property that it transferred to defraud creditors in the first instance.  The very purpose of fraudulent transfer statutes is to provide creditors with a remedy to recover fraudulently transferred assets in order to satisfy their claims, not enrich the party that transferred those assets in fraud of its creditors.  Once a bankruptcy case has been commenced, the trustee or debtor in possession has a fiduciary duty to maximize the value of the estate, and obtains the right to avoid and recover fraudulently transferred assets and avoid fraudulently incurred obligations for the benefit of all creditors.  *See id.* at 243 ("A paramount duty of a trustee or debtor in possession in a bankruptcy case is to act on behalf of the bankruptcy estate, that is, for the benefit of the creditors.  To fulfill this duty, trustees and debtors in possession have a variety of statutorily created powers, known as avoidance powers, which enable them to recover property on behalf of the bankruptcy estate.") (internal citation omitted).

derived solely from the provisions of the Bankruptcy Code.[47]  Because a debtor cannot pursue a fraudulent transfer claim under applicable nonbankruptcy law before the petition date, a fraudulent transfer cause of action cannot constitute property of the estate under Bankruptcy Code section 541(a).  Rather, such a pursuit is accomplished through exercise of a power vested in the representative of the estate.  Bankruptcy Code section 541(a)(3) makes clear that any recoveries from the exercise of such a power are property of the estate.[48]  The Examiner infers that the underlying power to recover the transferred property is not, itself, property of the estate.

The Third Circuit Court of Appeals addressed closely analogous circumstances in *Official Committee of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*.[49]  In *Cybergenics*, the debtor in possession had sold its assets to a third party during the course of its chapter 11 bankruptcy case.[50]  Following the asset sale, the committee of unsecured creditors sought to commence a fraudulent transfer action on behalf of the estate, and the intended defendants asserted that the litigation could not be maintained because any fraudulent claims had been previously sold as "assets" of the debtor.[51]  The district court dismissed the action on this ground, but on appeal the Third Circuit reversed the decision, holding that fraudulent transfer claims did not become "assets" of the debtor that it had a right to sell in the first place.[52]  As the court explained:[53]

---

[47]  *See, e.g.,* 11 U.S.C. §§ 544, 545, 547, 548, 550 (2006).

[48]  *See* 11 U.S.C. § 541(a)(3) (2006) (property of the estate includes "[a]ny interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title").

[49]  226 F.3d 237 (3d Cir. 2000).

[50]  *Id. at* 239.

[51]  *Id. at* 240.

[52]  *Id. at* 245.

[53]  *Id. at* 243-44 (internal citations omitted).

> The power to avoid the debtor's prepetition transfers and
> obligations to maximize the bankruptcy estate for the benefit of
> creditors has been called a "legal fiction" by one court.  It puts the
> debtor in possession "in the overshoes" of a creditor.  This attribute
> is no more an asset of Cybergenics as debtor in possession than it
> would be a personal asset of a trustee, had one been appointed in
> this case.  Much like a public official has certain powers upon
> taking office as a means to carry out the functions bestowed by
> virtue of the office or public trust, the debtor in possession is
> similarly endowed to bring certain claims on behalf of, and for the
> benefit of, all creditors.

As a result, the court concluded that the "avoidance powers neither shift ownership of the

fraudulent transfer action to the debtor in possession, nor are themselves a debtor's assets,"[54] and

"the fraudulent transfer claims . . . were never assets of [the debtor]"[55] that could have been sold

as "assets."

Although the Third Circuit Court of Appeals expressly declined to address whether

fraudulent transfer claims constitute property of the estate,[56] the court noted in dictum that:[57]

> Even if we agreed that an analysis of property of the estate was
> necessary to resolve this dispute, our outcome would not change
> due to the cause of action at issue here.  Subject to a few
> specifically enumerated exceptions, the bankruptcy estate contains
> only the interests of the debtor in property as of the time of the
> bankruptcy filing, "no more, no less."  As we already have
> explained, the fraudulent transfer action belonged to [the debtor's]
> creditors as of the time of the bankruptcy filing.

The holding and reasoning of *Cybergenics*, as well as its dicta, are persuasive and

instructive on this matter.  The Examiner acknowledges that although there is some authority in

---

[54]  *Id. at* 244.

[55]  *Id. at* 245.

[56]  *Id. at* 246-47.

[57]  *Id. at* 246 n.16 (internal citation omitted).

support of a contrary position,[58] the better view is that avoidance actions do not themselves

constitute property of the estate, in light of how property of the estate is defined under the

Bankruptcy Code.[59]   This conclusion is consistent with the holding and general principles

---

[58]   *See, e.g., In re Becker*, 136 B.R. 113, 116 (Bankr. D.N.J. 1992); *see also Cadle Co. v. Mims (In re Moore)*, No. 09-10604, 2010 U.S. App. LEXIS 11118, at *22 (5th Cir. June 2, 2010) (holding that trustee may sell state law fraudulent transfer claims that could be brought pursuant to Bankruptcy Code section 544(b) because such claims are, or become, property of the estate); *Morley v. Ontos, Inc. (In re Ontos, Inc.)*, 478 F.3d 427, 431 (1st Cir. 2007) (holding that trustee had standing to settle and release state law fraudulent transfer claims that could be brought pursuant to Bankruptcy Code section 544(b) because "a claim for fraudulent conveyance is included within [property of the estate]"); *Nat'l Tax Credit Partners L.P. v. Havlik*, 20 F.3d 705, 708-09 (7th Cir. 1994) (stating in dictum that "the right to recoup a fraudulent conveyance, which outside of bankruptcy may be invoked by a creditor, is property of the estate that only a trustee or debtor in possession may pursue once a bankruptcy is under way"); *In re Zwirn*, 362 B.R. 536, 539 (Bankr. S.D. Fla. 2007) ("Pursuant to 11 U.S.C. § 541 and its broad definition of property of the estate, fraudulent conveyance claims are property of the estate that with rare exception may *only* be prosecuted by the trustee."); *Off. Comm. of Unsecured Creditors v. Am. Sav. & Loan Ass'n (In re Gen. Homes Corp.)*, 181 B.R. 870, 878-79 (Bankr. S.D. Tex. 1994) (holding that equitable subordination and fraudulent transfer claims constitute property of the estate); *McGowan v. Ciccone (In re Ciccone)*, 171 B.R. 4, 5 (Bankr. D.R.I. 1994) (stating with respect to fraudulent transfer claim that "the *cause of action* itself constitutes an interest in property of the estate" that is subject to the automatic stay imposed by Bankruptcy Code section 362(a)(3)).  The holdings of these cases appear inconsistent with prevailing law in the Third Circuit.  As noted by the court in *Mims*, the conclusion that causes of action arising from the avoidance powers granted under the Bankruptcy Code are assets of the debtor and the estate that may be sold conflicts with the holding of *Cybergenics*.  *See Mims*, 2010 U.S. App. LEXIS 11118, at *18 n.13.  Similarly, the holding in *Ontos* that the trustee had standing to settle and release fraudulent transfer claims because they are property of the estate is inconsistent with the holding of *Haskell v. PWS Holding Corp. (In re PWS Holding Corp.)*, 303 F.3d 308 (3d Cir. 2002).  In *PWS Holding Corp.*, the Third Circuit Court of Appeals cited *Cybergenics* in holding that a debtor in possession could release and extinguish fraudulent transfer claims, including fraudulent transfer claims that could have otherwise been brought by a creditor under applicable nonbankruptcy law, in a confirmed plan of reorganization through the exercise of the avoiding powers granted under the Bankruptcy Code, even though such claims are not assets of the debtor in possession.  *PWS Holding Corp.*, 303 F.3d at 314-15.

[59]   The courts holding that avoidance actions are property of the estate appear to have generally, but understandably, confused the concept of standing to pursue or resolve fraudulent transfer claims with the determination whether those claims constitute property of the estate.  In many instances, courts seem to have assumed that, because the trustee or debtor in possession has exclusive standing to pursue or settle particular causes of action on behalf of the estate, the claims themselves—including avoidance actions—must therefore also constitute property of the estate.  *See, e.g., Ontos*, 478 F.3d at 431-32; *Zwirn*, 362 B.R. at 539.  Standing to pursue a particular cause of action, including an avoidance action, is a legally distinct determination and does not dictate that avoidance actions are themselves property of the estate.  Indeed, although the determination whether a cause of action constitutes property of the estate relies on Bankruptcy Code section 541(a) and applicable nonbankruptcy law, the right to pursue avoidance actions is granted under other specific sections of the Bankruptcy Code for purposes unique to the bankruptcy process.  The trustee or debtor in possession is empowered to litigate and resolve fraudulent transfer claims not because such claims are assets of the debtor or debtor in possession, but because the avoiding powers serve an integral function in bankruptcy that aids the trustee or debtor in possession in fulfilling his/her or its duties.  *See, e.g., PWS Holding Corp.*, 303 F.3d at 314-15; *Cybergenics*, 226 F.3d at 243 ("The fact that section 544(b) authorizes a debtor in possession, such as Cybergenics, to avoid a transfer using a creditor's fraudulent transfer action does not mean that the fraudulent transfer action is actually an asset of the debtor in possession, nor should it be confused with the separate authority of a trustee or debtor in possession to pursue the prepetition debtor's causes of action upon the filing of

articulated in *In re Cybergenics Corp.*[60]  Thus, even if the first and second claims for relief in the

Complaint may be characterized as "disguised" fraudulent transfer claims, such avoidance

actions do not constitute property of the Tribune Entities' estates.[61]  The Examiner accordingly

concludes that the assertion of any such claims by Wilmington Trust is not reasonably likely to

violate Bankruptcy Code section 362(a)(3) as an act to obtain possession of, or exercise control

over, a cause of action that is property of the estate.[62]

> **c.    Equitable Subordination Claims Are Not Reasonably Likely Property of the Estate.**

For comparable reasons, the Examiner reaches the same conclusion regarding the first

claim for relief alleged in the Complaint to the extent it is properly characterized as an equitable

subordination claim.  The ability to equitably subordinate claims is a unique power derived from

Bankruptcy Code section 510(c),[63] which itself was codified from decisions and judicially

crafted standards initially developed under the Bankruptcy Act.[64]  Bankruptcy Code section

510(c) permits the bankruptcy court to effectively reorder the priority of payment among

---

the bankruptcy petition.  Rather, it simply enables a debtor in possession to carry out its trustee-related duties.") (internal citation omitted).

[60]    226 F.3d 237.

[61]    *See, e.g., Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir. 1996) ("Causes of action commenced by a trustee on behalf of a debtor estate fall into two broad categories:  (1) actions brought by the trustee as successor to the debtor's interests included as property of the estate under 11 U.S.C. § 541, and (2) actions brought under one of the trustee's avoidance powers.").

[62]    Although avoidance actions may not themselves constitute property of the estate, this conclusion does not dictate that a third party has standing to bring such claims.  It is well established that only the trustee, debtor in possession, or a party granted derivative standing to pursue an avoidance action may bring fraudulent transfer claims on behalf of the estate.  *See, e.g., Cybergenics*, 330 F.3d at 568.

[63]    *See, e.g., HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995) ("Equitable subordination is distinctly a power of federal bankruptcy courts, as courts of equity, to subordinate the claims of one creditor to those of others."); *In re Poughkeepsie Hotel Assoc. Joint Venture*, 132 B.R. 287, 292 (Bankr. S.D.N.Y. 1991) ("The notion of equitable subordination, as embodied in Code § 510(c), is peculiar to bankruptcy law and an issue which can only be decided in a bankruptcy setting.").

[64]    *See, e.g., Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 411 (3d Cir. 2009) ("Section 510(c) simply 'codified' existing judge-made doctrine, and development of the substantive standards for equitable subordination has been left to the courts.").

creditors "under principles of equitable subordination" and "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."[65]  It further permits the bankruptcy court to "order that any lien securing such a subordinated claim be transferred to the estate."[66]

Like the right granted to the trustee or debtor in possession to pursue avoidance actions on behalf of the estate, the right to seek equitable subordination of claims is established under, and limited by, the Bankruptcy Code[67] as a method to alter the priority of distribution among claims administered in a bankruptcy case, and it does not arise under nonbankruptcy law (such that the debtor could have exercised those rights before the petition date).  For these reasons, an equitable subordination claim is not properly viewed as property of the bankruptcy estate.[68]  The Examiner therefore concludes that the assertion of an equitable subordination claim by Wilmington Trust is not reasonably likely to violate Bankruptcy Code section 362(a)(3) as an act to obtain possession of, or exercise control over, a cause of action that is property of the estate.

This conclusion is consistent with the plain language and prevailing interpretation of Bankruptcy Code section 510(c),[69] which does not limit the parties that may seek the equitable

---

[65]  11 U.S.C. § 510(c)(1) (2006).  *See also* Report at § IV.D.

[66]  11 U.S.C. § 510(c)(2) (2006).

[67]  *See, e.g., Citicorp Venture Capital v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 990 (3d Cir. 1998) (holding that "a remedy of equitable subordination under § 510(c) must not be inconsistent with other provisions of the bankruptcy code"); *In re Insilco Techs., Inc.*, 480 F.3d 212, 219 (3d Cir. 2007) (stating that under Bankruptcy Code section 510(c) "the Bankruptcy Court is not empowered to punish inequitable conduct in the abstract; rather, it allows equitable concerns to modify its treatment *of claims*").

[68]  *See, e.g., Clippard v. LWD, Inc. (In re LWD, Inc.)*, 342 B.R. 514, 520 (Bankr. W.D. Ky. 2006) ("[E]quitable subordination claims [themselves] are not property of bankruptcy estates . . . ."); *but see Off. Comm. of Unsecured Creditors v. Am. Sav. & Loan Ass'n (In re Gen. Homes Corp.)*, 181 B.R. 870, 878-79 (Bankr. S.D. Tex. 1994) (holding that equitable subordination claim constituted property of the estate).

[69]  "Congress 'says in a statute what it means and means in a statute what it says there.'"  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)).  Therefore, "when the statute's language is plain, the sole function of the courts–at least where the disposition required by the text is not absurd–is to enforce it according to its terms."  *Id.* (quoting *United States* v. *Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)) (internal quotation marks omitted).

subordination of claims.[70]  Indeed, courts have generally recognized that creditors and other

parties in interest have the right to seek the equitable subordination of claims under Bankruptcy

Code section 510(b) independent of the estate.[71]

    The Examiner acknowledges that some courts appear to hold (or at least imply) that

equitable subordination claims alleging only "general" harm common to creditors that is

derivative of an injury suffered by the estate, rather than a "particularized" injury to the creditor,

may themselves constitute property of the estate,[72] while other courts have made no such

distinction or actually criticized the approach.[73]  Part of this apparent discord may have arisen

because certain courts have adopted a legal analysis developed for one purpose and applied it to

another circumstance that it was not necessarily designed to address, resulting in an imperfect fit.

    Courts developed the analytical framework for distinguishing between claims for direct

harm to the debtor and creditors "generally" and derivatively, which may be asserted only on

---

[70]  *See, e.g., Bunch v. J.M. Capital Fin., Ltd. (In re Hoffinger Indus.)*, 327 B.R. 389, 413 (Bankr. E.D. Ark. 2005) ("There is no specific provision in [Bankruptcy Code section 510(c)] that states that an equitable subordination claim must be brought by the trustee.  In fact, the statute is silent in this regard.  Utilizing the contextual features recognized by the Supreme Court, it is apparent that Congress intended for § 510(c) to be broadly available. Had the trustee been the only party with authority to use this section, Congress could have so stated, as it has in many instances."); *see also Minn. Corn Processors, Inc. v. Am. Sweeteners, Inc. (In re Am. Sweeteners, Inc.)*, 248 B.R. 271, 277 (Bankr. E.D. Pa. 2000) ("While the right to commence avoidance actions is statutorily limited to the trustee (or debtor-in-possession) . . . the right to commence an action for equitable subordination is not so constrained.") (internal citations omitted).

[71]  *See, e.g., In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1231 (7th Cir. 1990); *PW Enters., Inc. v. N.D. (In re Racing Servs., Inc.)*, 363 B.R. 911, 917 (B.A.P. 8th Cir. 2007), *rev'd in part on other grounds*, 540 F.3d 892 (8th Cir. 2008); *Cadleway Props., Inc. v. Andrews (In re Andrews)*, No. 94-21308, 2009 Bankr. LEXIS 1052, at *12 (Bankr. S.D. Tex. Apr. 2, 2009); *In re J.S. II, L.L.C.*, 389 B.R. 570, 581 (Bankr. N.D. Ill. 2008), *Algonquin Power Income Fund v. Ridgewood Heights, Inc. (In re Franklin Indus. Complex, Inc.)*, No. 01-67459, 2007 Bankr. LEXIS 3004, at *32-33 (Bankr. N.D.N.Y. Aug. 30, 2007); *Clippard*, 342 B.R. at 520; *Hoffinger Indus.*, 327 B.R. at 413-14; *ABF Capital Mgmt. v. Kidder Peabody & Co. (In re Granite Partners, L.P.)*, 210 B.R. 508, 514 (Bankr. S.D.N.Y. 1997); *In re Conley*, 159 B.R. 323, 325 (Bankr. D. Idaho 1993); *Am. Cigar Co. v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.)*, 85 B.R. 965, 973 (Bankr. E.D. Pa. 1988).

[72]  *See, e.g., Elway Co., LLP v. Miller (In re Elrod Holdings Corp.)*, 392 B.R. 110, 114-16 (Bankr. D. Del. 2008); *Variable-Parameter Future Dev. Corp. v. Comerica Bank-Cal. (In re Morpheus Lights, Inc.)*, 228 B.R. 449, 453 (Bankr. N.D. Cal. 1998).

[73]  *See, e.g., Vitreous Steel Prods.*, 911 F.2d at 1231; *J.S. II, L.L.C.*, 389 B.R. at 581; *Hoffinger Indus.*, 327 B.R. at 413-14  ("It is simply not logical to suggest that if many are harmed, then no more than one of the harmed may pursue the action.").

behalf of the estate, and claims for "particularized" harm to specific creditors, which may only be asserted by the injured creditors, primarily to address cases holding that a trustee lacked standing to assert causes of action that were "personal" to creditors under applicable nonbankruptcy law.[74] Consistent with this intended purpose, courts have employed the analysis to assess whether the debtor had the right to assert the claim under applicable nonbankruptcy law before the bankruptcy case was commenced because the harm was directly and primarily suffered by the debtor and "generally" and secondarily caused derivative injuries to creditors, typically addressing claims for breach of fiduciary duty, alter ego, and other state law causes of action.[75]

In essence, when the harm is suffered primarily by the debtor and only "generally" and derivatively injures creditors, it may give rise to a cause of action under applicable nonbankruptcy law that the debtor had standing to assert prior to filing for bankruptcy.  If the debtor had standing to assert the cause of action under applicable nonbankruptcy law prior to filing for bankruptcy, it follows that the claim becomes property of the estate and the trustee or debtor in possession has standing to assert the cause of action on behalf of the estate.[76]  In other words, in such cases the trustee or debtor in possession is not deprived of standing to pursue the

---

[74]  *See, e.g., Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 434 (1972).

[75]  *See, e.g., Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002) ("In order for the claim to be the 'legal or equitable interest of the debtor in property,' the claim must be a 'general one, with no particularized injury arising from it.'" (quoting *St. Paul Fire & Marine Ins. Co. v. Pepsico, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989))); *see also Highland Capital Mgmt. L.P. v. Chesapeake Energy Corp. (In re Seven Seas Petrol., Inc.)*, 522 F.3d 575, 584 (5th Cir. 2008); *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993); *Steyr-Daimler-Puch of Am. Corp. v. Pappas*, 852 F.2d 132, 135-36 (4th Cir. 1988); *Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1348 (7th Cir. 1987).  The courts have similarly employed the analysis to assess whether the trustee or debtor in possession has standing to assert claims under applicable nonbankruptcy law pursuant to Bankruptcy Code section 544(b), limiting the standing of the trustee or debtor in possession to "pursue general claims held by the debtor's creditors." *PHP Liquidating, LLC v. Robbins*, 291 B.R. 592, 599 (D. Del. 2003), *aff'd sub nom. In re PHP Healthcare Corp.*, 128 F. App'x 839 (3d Cir. 2005).

[76]  *See, e.g., Koch Ref.*, 831 F.2d at 1343-46; *see also Jones v. Cendant Mortg. Corp. (In re Jones)*, 396 B.R. 638, 647 (Bankr. W.D. Pa. 2008) ("A cause of action becomes property of a bankruptcy estate if: (1) the cause of action arose prior to the commencement of the bankruptcy case; and (2) the debtor could have asserted the cause of action prior [to] the commencement of the bankruptcy case." (citing *Bd. of Trs.*, 296 F.3d at 169 n.5)).

cause of action because it did not belong to creditors in the first instance.[77]  If, however, a cause

of action under applicable nonbankruptcy law is based on "particular" and direct harm to

creditors, the debtor would not have standing to assert the cause of action before filing for

bankruptcy, it would not become property of the estate, and the trustee or debtor in possession

therefore would equally lack standing to assert the claim.[78]

Although analyses of claims based on "general" and "particularized" harm are rooted in

concepts of standing, those considerations are not determinative whether claims constitute

property of the estate,[79] in particular with respect to rights that are derived exclusively under the

Bankruptcy Code and do not exist prior to the petition date, such as claims for equitable

subordination.  As noted, the analysis has been developed and is intended to assess the standing

of the trustee or debtor in possession to assert claims under applicable nonbankruptcy law, not

determine whether unique rights granted under the Bankruptcy Code constitute property of the

---

[77]  It often becomes necessary to distinguish between "general" harm and "particularized" injuries to creditors in instances when a specific cause of action could be potentially asserted by either the debtor or a creditor under applicable nonbankruptcy law, and the nature of the injury must examined in order to determine if the trustee or debtor in possession is asserting the claim to redress an injury suffered by the debtor itself that caused derivative harm to creditors or a "particularized" injury suffered by specific creditors.  For example, courts have found that under California law a corporation and a creditor may both assert an alter ego claim against a party that has improperly used the corporate entity.  *See, e.g., CBS, Inc. v. Folks (In re Folks)*, 211 B.R. 378, 384-87 (B.A.P. 9th Cir. 1997); *see also In re Davey Roofing, Inc.*, 167 B.R. 604, 608 (Bankr. C.D. Cal. 1994).

[78]  *See, e.g., Bd. of Trs.*, 296 F.3d at 170; *see also Seven Seas Petrol.*, 522 F.3d at 584 ("Whether a particular state-law claim belongs to the bankruptcy estate depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case.  As part of this inquiry, we look to the nature of the injury for which relief is sought and consider the relationship between the debtor and the injury.  If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate.  Conversely, if the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could have not been asserted by the debtor as of the commencement of the case, and thus is not property of the estate.") (internal citations and quotation marks omitted); *Sender v. Simon*, 84 F.3d 1299, 1305 (10th Cir. 1996) ("Importantly, to satisfy the requirements of § 541, the cause of action asserted by the trustee must belong to the debtor entity itself, not the debtor's creditors individually.").

[79]  *See, e.g., Schertz-Cibolo-Universal City Ind. Sch. Dist. v. Wright (In re Educators Grp. Health Trust)*, 25 F.3d 1281, 1285 (5th Cir. 1994) ("Stated differently, the fact that creditors in general are harmed does not determine whether a cause of action belongs to the bankruptcy estate; rather, general harm to creditors *necessarily follows* from the fact that the debtor has been injured.").

estate.  In addition, although the standing question often is closely related to determinations

whether causes of action are property of the estate, the conclusion that a claim only asserts

"general" harm also does not necessarily mean that the claim itself constitutes property of the

estate.  In each instance a court must determine whether the debtor had any right to assert the

claim under applicable nonbankruptcy law at the commencement of the case.[80]  To conclude

otherwise would mean that any conceivable claim constitutes property of the estate just because

it involves harm that is "general" to the debtor and its creditors—even when the debtor had no

right to assert the claim prior to the petition date and the power to pursue the claim is not

specifically granted under the Bankruptcy Code.[81]

    To be sure, prudential reasons may weigh in favor of limiting the standing of a creditor to

seek equitable subordination in certain circumstances.  For example, a defendant may demand

the addition of the debtor as a party to avoid potentially inconsistent rulings and obligations if the

underlying litigation involves factual or legal determinations that could also form the basis of

affirmative claims in favor of the estate.[82]  The result would be to force the estate to become

involved in the litigation on an involuntary basis.  Even if the estate avoids being joined to the

litigation involuntarily, the trustee or debtor in possession may be compelled to intervene to

protect, preserve, and maximize the estate for the benefit of stakeholders, in accordance with its

---

[80]  *See, e.g., Steinberg v. Buczynski*, 40 F.3d 890, 893 (7th Cir. 1994) ("The point is simply that the trustee is
confined to enforcing entitlements of the [debtor].  He has no right to enforce entitlements of a creditor.  He
represents the unsecured creditors of the [debtor]; and in that sense when he is suing on behalf of the [debtor] he
is really suing on behalf of the creditors of the [debtor].  But there is a difference between a creditor's interest in
the claims of the [debtor] against a third party, which are enforced by the trustee, and the creditor's own direct—
not derivative—claim against the third party, which only the creditor . . . can enforce.").

[81]  *See, e.g., Seven Seas Petrol.*, 522 F.3d at 588  ("[L]abeling certain claims of creditors personal—as opposed to
general—is not an illuminating usage.  These terms are perhaps best understood as descriptions to be applied
after a claim has been analyzed to determine whether it is properly assertable by the debtor or creditor, and not
as a substitute for the analysis itself.") (internal citations and quotation marks omitted).

[82]  *See, e.g.,* Fed. R. Bankr. P. 7019(a)(B)(ii).

21

or his/her fiduciary duties.[83]  Moreover, recognition of an unqualified right by creditors to assert

equitable subordination claims premised on allegations of "general" harm may greatly interfere

with the ability of the trustee or debtor in possession to resolve and settle other valuable causes

of action asserted on behalf of the estate.[84]  It is unlikely that a defendant facing claims relating

to the same underlying transactions and conduct will settle with the trustee or debtor in

possession when it will face litigation regarding the same matters by another competing plaintiff.

The potential for disruption in administering the estate may itself justify limiting the standing of

an individual creditor to seek equitable subordination, especially when the trustee or debtor in

possession (or other estate representative) is pursuing related and similar relief.[85]

However, these practical and pragmatic considerations—and the role of the trustee or

debtor in possession as a fiduciary with standing to bring claims that generally benefit the estate

and creditors—do not compel a conclusion that equitable subordination claims are property of

the estate.  An equitable subordination claim may "belong" to the estate in the sense that the

trustee or debtor in possession is the proper party to pursue the claim based on "general" harm to

the debtor and creditors, but that does not mean the claim itself constitutes property of the estate.

---

[83]    *See, e.g., United States v. State St. Bank & Trust Co. (In re Scott Cable Commc'ns, Inc.)*, No. 01-04605, 2002
Bankr. LEXIS 183, at *9 (Bankr. D. Del. Mar. 4, 2002) (granting motion of debtor to intervene in adversary
proceeding requesting equitable subordination and other relief and noting debtor had an "interest and fiduciary
duty, as debtor-in-possession, to ensure that the Estate's assets are distributed in accordance with the proper
legal and equitable priorities of the parties in interest" and that the "outcome of the proceeding has the potential
to disrupt [the] Debtor's current capital structure").

[84]    *See, e.g., Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) ("If a claim is a general one,
with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the
trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's
action.").

[85]    *See, e.g., Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Ludwig Honold Mfg. Co. (In re
Ludwig Honold Mfg. Co.)*, 30 B.R. 790, 791-92 (Bankr. E.D. Pa. 1983) (dismissing complaint filed by creditor
asserting preferential transfer and equitable subordination claims when chapter 11 trustee had commenced
similar action).

For the reasons explained above, the Examiner believes the better view is that equitable subordination claims are not property of the estate.

If, however, a court finds that an equitable subordination claim constitutes property of the estate when based on "general" harm to the debtor and creditors, the Examiner finds that a court is somewhat likely to view the harm described in the first claim for relief in the Complaint as essentially "general" in nature.[86]  The PHONES Notes were issued many years before the Leveraged ESOP Transactions were executed, let alone conceived, and the terms of the PHONES Indenture and its subordination provisions pre-date the Leveraged ESOP Transactions by nearly a decade.[87]  Although the Complaint contains some allegations that the holders of the PHONES Notes were the "particular target and victims" of the Leveraged ESOP Transactions,[88] the sum of the allegations, at most, describes a scenario in which the defendants recognized the capital structure of the Tribune Entities, the place of the PHONES Notes in that structure and the existence of the subordination provisions of the PHONES Indenture, and specifically designed the Leveraged ESOP Transactions to take advantage of—and even exploit—those factors.  These allegations, however, do not demonstrate that the *injury* allegedly caused by the Leveraged ESOP Transactions is "particularized" to the holders of the PHONES Notes, as opposed to being entirely derivative of the harm inflicted on the Tribune Entities; this is especially so given that

---

[86]  *See, e.g., Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 170 (3d Cir. 2002); *see also PHP Liquidating, LLC v. Robbins*, 291 B.R. 592, 599 (D. Del. 2003) ("Whether an action accrues to a creditor individually, such that a creditor has standing, or generally, such that a trustee has standing, requires the court to look 'to the injury for which relief is sought and consider whether it is peculiar and personal to the [creditor] or general and common to the . . . creditors.'" (quoting *Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1349 (7th Cir. 1987))), *aff'd sub nom. In re PHP Healthcare Corp.*, 128 F. App'x 839 (3d Cir. 2005).

[87]  *See* Ex. 880 at ¶ 2 (Complaint).

[88]  *Id.* at ¶ 3.

the most fundamental allegation of the Complaint is that the Leveraged ESOP Transactions in which the defendants participated "rendered *Tribune* insolvent and, ultimately, bankrupt."[89]

In fact, the Complaint is replete with allegations confirming that the estates suffered the initial harm caused by the Leveraged ESOP Transactions, and that the holders of the PHONES Notes—and similarly situated creditors—suffered the same harm derivatively.[90] The first claim for relief repeatedly alleges that the Tribune Entities failed to receive reasonably equivalent value in exchange for the obligations, liens, and guarantees granted in connection with, and were rendered insolvent as a result of, the Leveraged ESOP Transactions.[91] The holders of the PHONES Notes may have suffered disproportionately as a result of the subordination provision

---

[89] *Id.* at ¶ 9 (emphasis added); *see also id.* at ¶ 1 (stating that "[t]his action arises out of the 2007 failed leveraged buyout . . . of Tribune"), ¶ 3 (alleging that the Tribune Entities and the defendants engaged in a "scheme" to "structure and execute the LBO in a manner that both Tribune and the Lead Banks foresaw would render Tribune insolvent and, ultimately, drive it into bankruptcy"), ¶ 7 (alleging that "[t]he Lead Banks structured the LBO knowing that it would add a tremendous amount of debt to Tribune and render it insolvent").

[90] *See, e.g., id.* at ¶ 55 (alleging that the Leveraged ESOP Transactions allowed stockholders to "be cashed out at top-dollar at the expense of Tribune and the Pre-LBO creditors"), ¶ 89 (alleging that certain defendants "recognized both that the LBO could drive Tribune into bankruptcy and that, if bankruptcy occurred, it would be at the expense of the PHONES and the other Non-Bank Debt"), ¶ 108 (alleging that certain defendants "knew that the LBO, as structured, could only be completed at the expense of Tribune's solvency and would jeopardize the claims of the PHONES, and other Non-Bank Debt"), ¶ 116 (alleging that "the only way the Lead Banks were willing to arrange and finance the LBO was if they could effectively subordinate the Non-Bank Debt and maintain the contractual subordination of the PHONES to the LBO Debt"), ¶ 117 (alleging that "the Lead Banks intended to obtain priority to ensure that, in the event of bankruptcy, the first losses would fall disproportionately on the PHONES and other Non-Bank Debt"), ¶ 120 (alleging that "[t]he Lead Banks also took other steps that were intended to make it more difficult for the holders of the PHONES and other Non-Bank Debt to share equitably with the new LBO debt in the event of a bankruptcy"), ¶ 122 (alleging that components of the Leveraged ESOP Transactions were structured "in large part as a pretext to hinder the ability of holders of the PHONES and other Non-Bank Debt to challenge the guarantees as fraudulent in the event of a bankruptcy"), ¶ 136 (alleging that components of the Leveraged ESOP Transactions were structured "to divert additional value in the Guarantors away from PHONES and other Non-Bank Debt in the event of non-payment by Tribune of the debt incurred in the Step One and Step Two Financings and thereby to reduce the equity value of the Guarantors available to Tribune or the PHONES and other Non-Bank Debt"), ¶ 142 (alleging that the Leveraged ESOP Transactions were structured "to impose the first losses on the Non-Bank Debt").

[91] *See id.* at ¶¶ 147, 151, 152, 153, 157. As noted, the Complaint does not assert a fraudulent transfer claim as a distinct cause of action or seek to recover fraudulently transferred property, but the use of similar factual allegations supports the conclusion that the harm caused by the Leveraged ESOP Transactions is "general" to the Tribune Entities and creditors. *See, e.g., Highland Capital Mgmt. L.P. v. Chesapeake Energy Corp. (In re Seven Seas Petrol., Inc.)*, 522 F.3d 575, 589 n.9 (5th Cir. 2008) ("A typical fraudulent transfer claim is perhaps the paradigmatic example of a claim that is 'general' to all creditors . . . .").

of the PHONES Indenture, their place in the capital structure, and the method in which the

transactions were structured and implemented, but the injury arising from the Leveraged ESOP

Transactions is largely derivative of the injury to estates[92] and not unique to the holders of the

PHONES Notes.[93]  For these reasons, the allegations pleaded in the Complaint in support of the

first claim for relief are not likely to be construed by a court as describing a "particularized"

injury suffered by the holders of the PHONES Notes that stands apart from the "general" harm

suffered by the Tribune Entities and creditors derivatively.[94]

       Even if a court were to determine that the equitable subordination claim alleged in the

Complaint is based on "general" harm to the Tribune Entities and creditors, this still does not

---

[92]   The derivative nature of the injury is further highlighted by the allegation that the defendants' conduct "was inequitable and resulted in injury to the holders of the PHONES by depriving them of the equity in the Guarantors that existed prior to the LBO as a source of repayment for their debt."  *See* Ex. 880 at ¶ 168 (Complaint).  The payment obligation to the holders of the PHONES Notes was owed exclusively by Tribune, and to the extent any "equity in the Guarantors" could ever serve as "a source of repayment for their debt," it was only though value that Tribune could realize from the equity interests in its subsidiaries.  This "deprivation" of potential value arises only indirectly and derivatively through the payment obligations that are owed by Tribune to the holders of the PHONES Notes.

[93]   *See, e.g., Begier v. Price Waterhouse*, 81 B.R. 303, 305 (E.D. Pa. 1987) ("Where the injury alleged is primarily to the corporation, and is injury to the plaintiff creditor only insofar as it decreases the assets of the corporation to which he must look for satisfaction of his debt, then the suit is for a tort suffered by the corporation, and properly brought by the trustee; if there is a special damage to the creditor suing, not common to other creditors, then it is a personal creditor action which the trustee may not pursue." (quoting *Henderson v. Buchanan (In re W. World Funding, Inc.)*, 52 B.R. 743, 775 (Bankr. D. Nev. 1985), *aff'd in part and rev'd in part on other grounds*, 131 B.R. 859 (D. Nev. 1990), *rev'd*, 985 F.2d 1021 (9th Cir. 1993))); *see also Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1348 (7th Cir. 1987) ("A cause of action is 'personal' if the claimant himself is harmed and no other claimant or creditor has an interest in the cause.").  That other creditors may also have been harmed by the Leveraged ESOP Transactions does not necessarily preclude the holders of the PHONES Notes from alleging a "particularized" injury.  *See, e.g., Seven Seas Petrol.*, 522 F.3d at 588 ("We also wish to dispel any notion that a claim belongs to the estate or is otherwise only assertable by the trustee merely because it could be brought by a number of creditors, instead of just one.").  The Tribune Entities' estates and holders of the PHONES Notes theoretically also could hold separate claims arising out of the Leveraged ESOP Transactions.  *See id.* at 585 ("[I]t is entirely possible for a bankruptcy estate and a creditor to own separate claims against a third party arising out of the same general series of events and broad course of conduct.").  As noted, however, the allegations of the Complaint fundamentally describe "general" harm to the Tribune Entities caused by the Leveraged ESOP Transactions and resulting derivative injuries to creditors.

[94]   In its submission to the Examiner, Wilmington Trust further contends that the subordination provision of the PHONES Indenture should not be enforced because it includes a qualification limiting subordination of the PHONES Notes to debt that is incurred in good faith.  *See* Ex. 49 at § 14.09 (PHONES Indenture).  The Complaint, however, does not include any allegations that would support such a claim, and the Examiner has concluded that a court is reasonably likely to find that the Step One Debt was incurred in good faith.  *See* Report at § IV.B.7.b.

mean that Wilmington Trust violated the automatic stay by asserting the claim. Rather, a court could instead conclude that Wilmington Trust lacks standing to pursue equitable subordination of the defendants' claims and that the Tribune Entities were the proper parties to seek that relief (which for the reasons set forth above is a result that the Examiner believes would be consistent with the proper interpretation of the law). Indeed, the courts that have found an equitable subordination claim brought by a creditor based on "general" harm to the debtor generally have opted to dismiss the claim for lack of standing rather than find that the creditor violated the automatic stay by asserting the claim.[95]

### 2. The Second Claim for Relief is Reasonably Unlikely to Violate the Automatic Stay.

The Examiner further concludes that the second claim for relief alleged in the Complaint, if properly characterized as an objection to the defendants' claims, also is reasonably unlikely to violate the automatic stay. As noted, the second claim for relief objects to the defendants' claims on the ground that the defendants "received transfers, including cash, liens and guarantees, which are avoidable under the Bankruptcy Code," and that their claims must be disallowed because "the defendants are transferees holding property recoverable to the estates, and they have received other avoidable transfers, which they have not paid or turned over."[96] The second claim for relief further alleges that "the defendants: (1) are guilty of conduct involving unconscionability and bad faith; (2) directly related to the Bank Claims and all other defendant claims asserted

---

[95] *See, e.g., Elway Co., L.L.P. v. Miller (In re Elrod Holdings Corp.)*, 392 B.R. 110, 116 (Bankr. D. Del. 2008); *In Variable-Parameter Future Dev. Corp. v. Comerica Bank (In re Morpheus Lights, Inc.)*, 228 B.R. 449, 454 (Bankr. N.D. Cal. 1998); *but see Off. Comm. of Unsecured Creditors v. Am. Sav. & Loan Ass'n (In re Gen. Homes Corp.)*, 181 B.R. 870, 878-79 (Bankr. S.D. Tex. 1994). Notably, in *General Homes* "the Committee admit[ted] that the suit asserted causes of action that belonged to the debtor" and it was "undisputed that 'control' or 'possession' of property of the estate (a cause of action) was at issue." 181 B.R. at 879. The Examiner does not conclude that such claims are likely to constitute property of the estate, and as a result finds the assumption of the parties in *General Homes* flawed and the holding of the case inapplicable.

[96] *See* Ex. 880 at ¶ 162 (Complaint).

against the Tribune Entities' estates; (3) that harmed holders of the PHONES; and (4) affect the balance of equities such that all of defendants' claims against any Debtor must be disallowed as a result of the defendants' 'unclean hands.'"[97]

The Examiner construes the second claim for relief as an objection to the defendants' claims under Bankruptcy Code section 502(a) and 502(d).  Bankruptcy Code section 502(a) provides that a claim "is deemed allowed, unless a party in interest, including a creditor or a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects."[98] Bankruptcy Code section 502(d) provides that "[n]otwithstanding [Bankruptcy Code sections 502(a) and (b)], the court shall disallow any claim of any entity from which property is recoverable under [Bankruptcy Code sections] 542, 543, 550, or 553 . . . or that is a transferee of a transfer avoidable under [Bankruptcy Code sections] 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) . . . unless such entity or transfer has paid the amount, or turned over any such property, for which such entity or transferee is liable under [Bankruptcy Code sections] 522(i), 542, 543, 550, or 553."[99]  The Examiner did not find authority addressing whether a claim objection asserted by a creditor under Bankruptcy Code section 502(a) and 502(d) may violate the automatic stay, and the statute does not set forth any explicit restrictions on the party that may assert an objection on such grounds.  However, the Examiner concludes it is not reasonably

---

[97]  *Id.* at ¶ 173.

[98]  11 U.S.C. § 502(a) (2006).  There is no express limitation in Bankruptcy Code section 502(a) on the right of a party in interest to object to a claim, but in chapter 7 cases, for policy reasons some courts have imposed certain restrictions on the ability of creditors to object to claims without leave of court.  *See, e.g., Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1147 (1st Cir. 1992) (stating that "[a]s a general rule, absent leave of court, the chapter 7 trustee alone may interpose objections to proofs of claim"); *Lawrence v. Steinford Holding B.V. (In re Dominelli)*, 820 F.2d 313, 317 (9th Cir. 1987) (same).  The courts have generally declined to impose similar limitations on the right of a party in interest to object to claims in a chapter 11 case, and there appears to be no dispute between the Tribune Entities and Wilmington Trust that a creditor may object to claims.  The Examiner concludes that this is the proper view in light of the plain language of Bankruptcy Code section 502(a) which does not impose any such restriction.  *See, e.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000).

[99]  11 U.S.C. § 502(d) (2006).

likely that asserting claim objections would violate the automatic stay, because for the reasons

set forth above, the right to contest claims is specifically created by and derived from the

Bankruptcy Code and is an integral part of the bankruptcy process.[100]

> **3.      The Third, Fourth, and Fifth Claims for Relief are Highly Unlikely to Violate the Automatic Stay.**

Finally, the Examiner concludes that it is highly unlikely that the third, fourth, and fifth

claims for relief alleged in the Complaint violate the automatic stay.  The third and fourth claims

for relief, which allege breach of fiduciary claims against Citibank, N.A. and aiding and abetting

breach of fiduciary duty claims against the other defendants, are based on fiduciary duties owed

by Citibank, N.A. as the trustee under the PHONES Indenture that are unique and specific to the

holders of the PHONES Notes (the constituents that Citibank, N.A. represented as indenture

trustee).  The breach of fiduciary duty cause of action is not property of the estate and alleges

direct and "particularized" harm to the holders of the PHONES Notes that is distinct from

general harm suffered by the Tribune Entities and creditors derivatively in connection with the

Leveraged ESOP Transactions.[101]  Because the aiding and breach of fiduciary duty claim is

---

[100]   Standing to assert a claim objection under Bankruptcy Code section 502(d) nonetheless may be limited.  In numerous instances, courts have found that parties in interest (other than the trustee or debtor in possession) lack standing to prosecute objections under Bankruptcy Code section 502(d) because the objecting party is essentially indirectly litigating an avoidance action.  *See, e.g., Rice v. United States (In re Odom Antennas, Inc.)*, 258 B.R. 376, 383 (Bankr. E.D. Ark. 2001) (holding that creditors lacked standing to prosecute claim objection under section 502(d) because "proceeding under the cover of § 502(d) would allow them to do indirectly what they cannot do directly"), *aff'd*, 340 F.3d 705 (8th Cir. 2003); *Energy Income Fund, L.P. v. Compression Solutions Co. (In re Magnolia Gas Co., L.L.C.)*, 255 B.R. 900, 924 (Bankr. W.D. Okla. 2000) (holding that creditor "as a non-trustee, non-debtor, and non-representative of the estate, does not have standing to object to . . . claims under § 502(d)"); *United Jersey Bank v. Morgan Guaranty Trust Co. (In re Prime Motor Inns, Inc.)*, 135 B.R. 917, 921 (Bankr. S.D. Fla. 1992) ("It is clear that the statutory language of § 547, which specifically vests standing to bring avoidance actions in a trustee, cannot be circumvented merely by asserting § 547 defensively" as a claim objection under Bankruptcy Code section 502(d)); *but see Comm. of Unsecured Creditors v. Commodity Credit Corp. (In re KF Dairies, Inc.)*, 143 B.R. 734, 737-38 (B.A.P. 9th Cir. 1992) (permitting creditors' committee to proceed with claim objection under Bankruptcy Code section 502(d)).

[101]   The Examiner makes no conclusions regarding whether any allegations in the Complaint are sufficient to state a claim on which relief may be granted under applicable law.

premised on the same relationship between Citibank, N.A. and the holders of the PHONES

Notes, the fourth claim for relief likewise is not property of the estate and alleges a direct and

"particularized" harm to the holders of the PHONES Notes.

The Examiner reaches a similar conclusion regarding the fifth claim for relief, which

seeks to impose a constructive trust.[102]  The Examiner views the constructive trust claim as a

remedy based on the third and fourth claims for relief rather than a distinct and separate

affirmative claim for relief.[103]  Although it is possible that "[i]nitiating a lawsuit seeking a

constructive trust against the property of a bankruptcy estate . . . qualifies as an 'act' in violation

of the automatic stay" under Bankruptcy Code section 362(a)(3),[104] a critical distinction here is

that the Complaint does not actually seek to impose a constructive trust on property of the

Tribune Entities' estates.  Rather, Wilmington Trust seeks to impose a constructive trust on

distributions from the estates that would otherwise be received by the defendants for the benefit

of holders of the PHONES Notes.[105]  Once that property been made available or delivered to the

defendants, it cannot be fairly characterized as property of the estate.

---

[102]  *See* Ex. 880 at ¶¶ 188-191 (Complaint).

[103]  *See, e.g., XL/Datacomp, Inc. v. Wilson (In re Omegas Grp.)*, 16 F.3d 1443, 1451 (6th Cir. 1994) (recognizing constructive trust as equitable remedy that under applicable nonbankruptcy law "does not exist until a plaintiff obtains a judicial decision finding him to be entitled to a judgment 'impressing' defendant's property or assets with a constructive trust"); *Claybrook v. Consol. Foods, Inc. (In re Bake-Line Grp., LLC)*, 359 B.R. 566, 571 (Bankr. D. Del. 2007) (recognizing constructive trust as equitable remedy that under applicable nonbankruptcy law arises at the time the circumstances leading to the creation of the trust occur); *Skilled Nursing Prof'l Servs. v. Sacred Heart Hosp. (In re Sacred Heart Hosp.)*, 175 B.R. 543, 555 (Bankr. E.D. Pa. 1994) (same).

[104]  *Byrd v. Hoffman*, 417 B.R. 320, 325 (D. Md. 2008) (citing *Amedisys, Inc. v. Nat'l Century Fin. Enters. (In re Nat'l Century Fin. Enters.)*, 423 F.3d 567 (6th Cir. 2005)), *aff'd*, 331 F. App'x 212 (4th Cir. 2009).  Notably, these cases involved the assertion and prosecution of constructive trust claims in forums other than the bankruptcy court in which the related bankruptcy case was pending.  As explained above, the commencement of such an action in the bankruptcy court presiding over the case of the debtor weighs against finding that the automatic stay was violated.

[105]  *See* Ex. 880 at ¶¶ 188-191 (Complaint).  Although the prayer for relief in the Complaint generally requests the "imposition of a constructive trust on all estate distributions for the benefit of the holders of the PHONES," the constructive trust claim for relief as pleaded is limited to imposing a constructive trust "over the claims, rights, or other legal interests in and to Tribune and/or any of its subsidiaries or property . . . ."  During interviews with the Examiner, Wilmington Trust's counsel confirmed that the constructive trust remedy is intended to cover

Thus, if any transfers made or obligations incurred in connection with the Leveraged

ESOP Transactions are avoided, any such property will be preserved and returned to the Tribune

Entities' estates,[106] and the constructive trust remedy sought by Wilmington Trust would apply

only to distributions from the estates to the defendants once such distributions actually became

available and the defendants were entitled to receive them, even if the allegations underlying this

claim relates to an earlier period of time under applicable nonbankruptcy law.  In this manner,

Wilmington Trust does not seek to obtain possession of property of the estate or exert control

over any such property, and instead seeks to impress a constructive trust over distributions that

would otherwise be the property of the defendants.  Moreover, even if the constructive trust

remedy did indirectly seek to recover property that may constitute property of the estate,

Wilmington Trust commenced the action in the Bankruptcy Court and it should be construed as

effectively requesting a determination that any such property is not property of the estate.[107]

These considerations make it highly unlikely that Wilmington Trust violated the automatic stay

by seeking the constructive trust remedy set forth in the Complaint.[108]

---

only distributions to the defendants, and not all distributions from the estates.  Examiner's Interview of William M. Dolan III, June 2, 2010.

[106]    *See* 11 U.S.C. § 541(a)(3) (property of the estate includes "[a]ny interest in property that the trustee recovers under . . . section 550 . . . ."); 541(a)(4) (2006) (property of the estate includes "[a]ny interest in property preserved for the benefit of or ordered transferred to the estate under section 510(c) or 551 . . . .").

[107]    *See, e.g., City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 99 (3d Cir. 1994) (finding that property held by the debtor in constructive trust is excluded from the bankruptcy estate); *Mullins v. Burtch (In re Paul J. Paradise & Assocs., Inc.)*, 249 B.R. 360, 366 (D. Del. 2000) (same).

[108]    The Examiner emphasizes that the scope of Question Two does not encompass whether these claims would survive confirmation of a plan of reorganization that distributes value to the defendants over which the holders of the PHONES Notes seek to impose a constructive trust.

# VI.

## PRINCIPAL FINDINGS AND CONCLUSIONS CONCERNING QUESTION THREE

### A.    Question Three.

The final question of the Investigation directs the Examiner to "evaluate the assertions and defenses made by certain of the Parties in connection with the Motion of JPMorgan Chase Bank, N.A., for Sanctions Against Wilmington Trust Company for Improper Disclosure of Confidential Information in Violation of Court Order (D.I. 3714)."[109]

### B.    Background.

On December 15, 2009, the Bankruptcy Court entered the Depository Order[110] to facilitate the creation of a document depository intended to assist in the production and protection of documents and other information sought in connection with the UCC's investigation of the Leveraged ESOP Transactions.  In order to gain access to the documents submitted to the depository under the Depository Order, a party had to be designated by the Debtors as a proper recipient and execute an acknowledgment form (on behalf of itself and any of its representatives) under which the party agreed it would not use any documents or information designated as "Financial Institution Highly Confidential Documents," "Highly Confidential - Attorneys Eyes Only," "Highly Confidential - Attorneys' Eyes Only" or "Confidential" in any filing with the Bankruptcy Court unless presented under seal.[111]

On January 11, 2010, Wilmington Trust became a party to the Depository Order when its counsel, through a partner at the Brown Rudnick firm, executed and delivered to the Debtors an

---

[109]    *See* Ex. 1 at ¶ 2 (Examiner Order).

[110]    *See Order (I) Authorizing the Debtors to Establish a Document Depository and Directing the Committee to Deliver Certain Documents to the Document Depository Pursuant to Federal Rule of Bankruptcy Procedure 2004 and (II) Establishing Settlement Negotiation Protections Pursuant to 11 U.S.C. § 105* [Docket No. 2858].

[111]    *See* Depository Order at ¶ f.

acknowledgement form on behalf of Wilmington Trust.[112]  By executing the acknowledgement

form, Wilmington Trust became bound by the terms of the Depository Order, as summarized

above.

On March 4, 2010, associates at the Brown Rudnick and Benesch firms filed the

Complaint on behalf of Wilmington Trust, which the Parties involved in this dispute concede

included confidential information subject to protection under the Depository Order.  In

accordance with the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware, the Complaint was electronically redacted and

filed through the electronic filing system of the Bankruptcy Court, making it available for public

review on the docket.  Shortly after the Complaint was filed, however, Wilmington Trust's

counsel was notified that the electronic redactions could be circumvented in a manner that

disclosed the underlying information.  After being notified of this issue, Wilmington Trust's

counsel took action to have the publicly-filed version of the Complaint removed from the docket,

so that it would no longer be publicly accessible.

On March 11, 2010, JPMCB filed a motion for sanctions against Wilmington Trust and

its counsel for violating the Depository Order.[113]  JPMCB alleged that, because the redactions to

the publicly-filed version of the Complaint were easily circumvented to reveal confidential

information, Wilmington Trust and its counsel violated their obligation under the Depository

Order to submit such information under seal.  JPMCB further alleged that the failure to securely

redact confidential information was intentional or reckless because the limitations in the

electronic redaction method employed by Wilmington Trust's counsel were well known, and

---

[112]  Examiner's Interview of William M. Dolan III, June 2, 2010.

[113]  *See Motion of JPMorgan Chase Bank, N.A. for Sanctions Against Wilmington Trust Company for Improper Disclosure of Confidential Information in Violation of Court Order* [Docket No. 3715].

attorneys at the Brown Rudnick firm recently had been involved in a similar incident in a different bankruptcy case.

JPMCB requested that the Bankruptcy Court issue wide ranging sanctions against Wilmington Trust and its counsel that, among other things, required the withdrawal of any Bankruptcy Court filings that referenced, described, or relied on confidential information under the Depository Order, enjoined any further use of confidential information under the Depository Order, and directed the payment of attorneys' fees and expenses incurred by JPMCB in connection with its sanctions motion.  MLCC and MLPFS joined in the motion and supported the relief sought by JPMCB.[114]

The UCC, for its own part, filed a statement supporting the relief sought by JPMCB[115] and raising additional allegations that Wilmington Trust violated the UCC Bylaws and breached certain fiduciary duties as a UCC member by filing the Complaint because it purportedly contained confidential information received by Wilmington Trust in its capacity as a member of the UCC.[116]

Following the appointment of the Examiner, in response to the Examiner's request, JPMCB, Wilmington Trust, the Debtors, and the UCC submitted additional opening and reply briefs to the Examiner setting forth their respective positions and arguments.  In addition, the Examiner and his advisors conducted interviews on June 1, 2010 and June 2, 2010 with

---

[114]    *See Joinder of Merrill Lynch Capital Corporation and Merrill Lynch, Pierce, Fenner & Smith Incorporated to J.P. Morgan Chase Bank, N.A.'s Motion for Sanctions Against Wilmington Trust Company for Improper Disclosure of Confidential Information in Violation of Court Order* [Docket No. 3724].

[115]    *See Statement of the Official Committee of Unsecured Creditors in Connection With (A) Motion of JPMorgan Chase Bank, N.A. for Sanctions Against Wilmington Trust Company for Improper Disclosure of Confidential Information in Violation of Court Order, and (B) Motion of the Debtors for an Order (I) Determining That Wilmington Trust Company Has Violated Automatic Stay, (II) Requiring Wilmington Trust Company to Show Cause Why It Should Not Be Held in Contempt of Court, and (III) Halting All Proceedings With Respect to the Complaint* [Docket No. 3968].

[116]    *See* Ex. 881 (UCC Bylaws).

William M. Dolan III, Martin S. Siegel, Robert J. Stark, and Kate S. Bromberg of the Brown

Rudnick firm, lead counsel to Wilmington Trust, and Jennifer R. Hoover of the Benesch firm,

local counsel to Wilmington Trust, to explore matters related to the contentions of the Parties in

connection with JPMCB's motion for sanctions.  The Examiner found each of these interviewees

to be sincere and credible.  The Examiner also reviewed and compared the numerous documents

that led to the disputes, as well as additional documents produced and submitted by the Parties in

connection with the Investigation that relate to the matter.

### C.        Assertions and Defenses of the Parties.

Given the directive of the Examiner Order, the scope of the Investigation on this matter

necessarily has been limited to evaluating the assertions and defenses actually made by the

relevant Parties in connection with JPMCB's motion for sanctions, which generally

include (i) the allegations by JPMCB that Wilmington Trust and its counsel intentionally or

recklessly violated the Depository Order because the redaction in the publicly-filed version of

the Complaint could be circumvented, and the defenses raised by Wilmington Trust to those

allegations, and (ii) the allegations by the UCC that Wilmington Trust violated the UCC Bylaws

and breached certain fiduciary duties by filing the Complaint, because it purportedly contains

confidential information received by Wilmington Trust in its capacity as a UCC member, and the

defenses raised by Wilmington Trust to those allegations.[117]

Certain predicate facts related to the Complaint and Depository Order are not in dispute,

namely (i) Wilmington Trust and its counsel were bound by the Depository Order; (ii) the

redacted version of the Complaint that was publicly filed included confidential information that

---

[117]    The Examiner's conclusions are similarly limited to matters arising from the assertions and defenses actually
made by the relevant Parties in connection with JPMCB's motion for sanctions at the time the Examiner Order
was entered by the Bankruptcy Court.

was required to be filed under seal pursuant to the terms of the Depository Order; (iii) the electronic redactions to the publicly-filed version of the Complaint could be circumvented; and (iv) the attempted method of redaction failed to fully protect confidential information from disclosure.

The relevant Parties vigorously dispute the remaining contentions, including whether Wilmington Trust and its counsel intentionally or recklessly violated the Depository Order or violated the UCC Bylaws or any fiduciary duties as a member of the UCC.

        **1.**        **Summary of Contentions Regarding JPMCB's Motion for Sanctions Against Wilmington Trust and its Counsel.**

        **a.**        **JPMCB's Contentions.**

JPMCB contends that the failure of Wilmington Trust and its counsel to securely redact confidential information in the Complaint violated the Depository Order, and that the failure to comply with the Depository Order was either intentional or reckless.  To support these assertions, JPMCB primarily advances two bases.[118]

First, JPMCB alleges that the electronic redaction technique employed by Wilmington Trust and its counsel (which involved converting the Complaint into an Adobe PDF document) is vulnerable to well-known technological limitations that make it relatively easy to circumvent the redactions and reveal the underlying information.  JPMCB cites numerous articles describing the vulnerability, including alerts issued by the publisher of the Adobe software, and asserts that these vulnerabilities permit any party that received the Adobe PDF version of the Complaint to reveal the underlying information simply by copying and pasting the otherwise seemingly

---

[118]   The UCC, MLCC, and MLPFS support the relief sought by JPMCB based on similar allegations.

redacted text into a new document.[119]  As a result, JPMCB contends that Wilmington Trust and its counsel either were aware or should have been aware that the electronic redactions to the publicly-filed version of the Complaint could be circumvented to reveal confidential information that was subject to the Depository Order.

Second, JPMCB stresses the involvement of Wilmington Trust's lead counsel, the Brown Rudnick firm, in a similar incident that occurred in the Lyondell Chemical Company bankruptcy case, approximately eight months prior to the filing of the Complaint.  In that case, the Brown Rudnick firm publicly filed a complaint with confidential information that had been electronically redacted, and the method of redaction could be circumvented to reveal the underlying information.  In particular, JPMCB heavily emphasizes that the partner from the Brown Rudnick firm that signed the Complaint and the acknowledgement form for the Depository Order on behalf of Wilmington Trust and the firm, William M. Dolan III, also was involved in the incident, and alleges that the Brown Rudnick firm failed to institute adequate safeguards following the incident to prevent similar occurrences.

With these predicates, JPMCB asserts it is proper to infer that Wilmington Trust and its counsel either intentionally or recklessly violated the Depository Order and that any claim of an inadvertent or merely negligent failure to comply is not credible.  According to JPMCB, this conduct was motivated by an intent to disrupt then-ongoing plan settlement discussions and obtain negotiating leverage for strategic gain, and resulted in harm to JPMCB.  In particular,

---

[119]  *See, e.g.,* Adobe Sys. Inc., *Redaction of Confidential Information in Electronic Documents: How to Safely Remove Sensitive Information From Microsoft Word Documents and PDF Documents Using Adobe Acrobat* (2006), http://partners.adobe.com/public/developer/en/acrobat/Redaction.pdf; *see also* Spencer S. Hsu & Carrie Johnson, *TSA Accidentally Reveals Airport Security Secrets*, WASH. POST, Dec. 9, 2009; Douglas S. Malan, *A Major Redaction Gaffe—GE's Sensitive Information Easy to Access Behind Black Veil*, CONN. LAW TRIB., May 26, 2008; Demian Bulwa, *Government Failed to Learn Basics of Keeping Secrets in Digital Age*, S.F. CHRON., June 23, 2006; Adam Liptak, *Prosecutors Can't Keep a Secret in Steroid Case*, N.Y. TIMES, June 23, 2006.

JPMCB cites to (i) a provision set forth in the acknowledgement form to the Depository Order that presumes "irreparable damage" if it is violated[120] and (ii) the publication of at least one news article regarding the confidential information set forth in the Complaint.

####    b.    Responses of Wilmington Trust to JPMCB's Contentions.

Other than conceding that it was possible to circumvent the electronic redactions in the publicly-filed version of the Complaint, Wilmington Trust disputes JPMCB's remaining allegations.  Wilmington Trust contends that it endeavored to satisfy and substantially complied with the requirements of the Depository Order, and did not intentionally or recklessly violate the Depository Order.

Wilmington Trust maintains that, after the Complaint was reviewed by several partners at the Brown Rudnick firm, and before it was filed, an associate at the firm was directed to prepare a final version with all necessary redactions of confidential information.  To redact the Complaint, the associate highlighted the applicable confidential information in black in a Microsoft Word file and then converted the document into an Adobe PDF document, using the Adobe Acrobat Professional 7 computer program.  After this process was completed, Wilmington Trust contends that the associate, as well as another associate at the Benesch firm, further reviewed the Adobe PDF version of the Complaint in electronic and printed forms to confirm that all confidential information had been redacted.  On March 4, 2010, the associate at the Benesch firm proceeded to submit the Complaint with a motion for authorization to file it under seal, and filed the redacted version of the Complaint through the electronic case filing system of the Bankruptcy Court.  Upon filing, the Complaint became available on the federal court PACER system for review and/or downloading.  The filing also generated an electronic

---

[120]    *See* Depository Order, Ex. A at ¶ 16.

case filing notice that contained an electronic link through which the Complaint could be accessed.

Wilmington Trust states that counsel for JPMCB contacted the Brown Rudnick firm within less than one hour after the electronically redacted version of the Complaint was filed, and informed counsel that the redactions could be circumvented.  Wilmington Trust contends that it was only then that the Brown Rudnick firm learned that the redacted text in the Complaint filed with the Bankruptcy Court could be revealed with relative ease, by copying the relevant portions of the Adobe PDF file and pasting them into a blank document.  Wilmington Trust asserts that, after receiving this information, members of the Benesch firm immediately contacted and worked with Bankruptcy Court employees to replace the Complaint with a securely redacted version and sever the electronic links that made the prior version accessible through the docket and the electronic case filing notice.  Wilmington Trust contends that these objectives were accomplished within four hours after the Complaint was filed.

### 2.    Summary of Contentions Regarding Fiduciary Duties of Wilmington Trust as Member of the UCC.

#### a.    UCC's Contentions.

The UCC contends that Wilmington Trust breached its fiduciary duty as a member when it filed the Complaint and asserted the causes of actions alleged therein for three distinct reasons.

First, Wilmington Trust breached its fiduciary duty through the commencement and threatened prosecution of litigation that would have a substantial negative impact on creditors because the Complaint purportedly seeks the imposition of a constructive trust "on all estate distributions" for the benefit of the holders of the PHONES Notes, which would divert distributions from the estates to the holders of the PHONES Notes to the exclusion of other

creditors.  In essence, the UCC charges, Wilmington Trust has asserted for itself remedies that belong to all creditors.

Second, Wilmington Trust breached its fiduciary duty by misusing confidential information obtained in its capacity as a member of the UCC that is protected from disclosure under the UCC Bylaws.  The UCC asserts that the Complaint incorporates substantial and material portions of a draft complaint prepared by the UCC that was filed under seal and not available to the public, but was available to Wilmington Trust as a member of the UCC.[121]  The UCC maintains that, regardless of how Wilmington Trust obtained the draft complaint, the information remained confidential under the UCC Bylaws and could not be divulged.  The UCC asserts that Wilmington Trust's failure to securely redact confidential information in the Complaint violated the UCC Bylaws and thereby breached its duty as a member of the UCC.

Third, Wilmington breached its fiduciary duty by misappropriating confidential work product prepared by the UCC.  The UCC asserts that Wilmington Trust had access to virtually all of the UCC's work product concerning the Leveraged ESOP Transactions, and that the Complaint is nearly a verbatim copy of the UCC draft complaint, which Wilmington Trust could access only in its capacity as a member of the UCC.  By using the information in this manner, the UCC contends that Wilmington Trust abused its position as a member and misused the UCC's work product to advance its own narrow interests at the expense of creditors.

---

[121]    In its submission to the Examiner, the UCC also asserted for the first time that Wilmington Trust had copied portions of a second draft complaint prepared by the UCC that had not been filed and Wilmington Trust incorporated those allegations nearly verbatim in an amended version of the Complaint.  The Examiner also evaluated these allegations.

####     b.        Responses of Wilmington Trust to the UCC's Contentions.

In response to the UCC's first contention, Wilmington Trust contends that the Complaint alleges particularized injuries suffered by the holders of the PHONES Notes that Wilmington Trust has independent standing to pursue and does not assert any causes of actions held by the Tribune Entities' estates or that could be asserted on behalf of all creditors.

Wilmington Trust also contends that its membership on the UCC did not prevent or disqualify Wilmington Trust from aggressively pursuing its separate interests as indenture trustee of the PHONES Notes, and that it is entitled to assert its rights as an individual creditor and representative of the holders of the PHONES Notes, even if those actions may be adverse to the position of the UCC and other creditors.  Moreover, Wilmington Trust asserts, it has a fiduciary duty to the holders of the PHONES Notes that requires it to advocate a position in their best interests, which was necessarily adverse to the position of the UCC.  Thus, Wilmington Trust contends that filing the Complaint on behalf of holders of the PHONES Notes to protect their separate interests as creditors could not violate any fiduciary duty it possessed as a member of the UCC.

In response to the UCC's second and third contentions, Wilmington Trust states that the Complaint is not a verbatim copy of the complaint prepared by the UCC.  Wilmington Trust asserts that the draft complaint prepared by the UCC asserts only claims held by the Tribune Entities' estates, whereas the Complaint filed by Wilmington Trust asserts claims specific to the holders of the PHONES Notes and pleads unique and different facts and causes of action.  To the extent any similarities existed in the allegations, Wilmington Trust contends that the UCC does not possess or hold exclusive control over the facts relating to the Leveraged ESOP Transactions on which the equitable subordination and other claims alleged in the Complaint are based, and

that Wilmington Trust is not precluded from asserting those claims simply because the Tribune

Entities' estates may also hold causes of action arising from the same conduct.

Wilmington Trust further asserts that, because the UCC's draft complaint was accessible

by Wilmington Trust as a party to the Depository Order, it viewed the complaint in its capacity

as indenture trustee of the PHONES Notes and not as a member of the UCC.  Accordingly, even

if certain allegations of the Complaint were copied from the UCC's complaint, Wilmington Trust

contends that it accessed such information independent of its status as a UCC member, and that

publicly-filed complaints and the facts that are alleged in them are not protected from being

copied by third parties.  Subject to the requirements of the Depository Order, Wilmington Trust

maintains that there is no restriction, in the UCC Bylaws or otherwise, on its right to use

information in the UCC's complaint to support the claims alleged in the Complaint on behalf of

the holders of the PHONES Notes, because the factual allegations contained in the UCC's

complaint are a matter of public record.

### 3.     Legal Standard Governing Enforcement of and Sanctions for Noncompliance with Discovery Orders.

Federal Rule of Civil Procedure 37(b)(2)(A), which is made applicable to adversary

proceedings and contested matters in bankruptcy pursuant to Federal Rules of Bankruptcy

Procedure 7037 and 9014(c),[122] provides a bankruptcy court with broad discretion[123] to impose

---

[122]  *See, e.g., In re Ambotiene*, 316 B.R. 25, 34-35 (Bankr. E.D.N.Y. 2004) ("Bankruptcy Rules 7037 and 9014(c) invoke the requirements of Fed. R. Civ. P. 37 in adversary proceedings and contested matters and provide for cost-shifting in the context of discovery disputes.").

[123]  *See, e.g., Nat'l Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 642 (1976) (finding that determination of appropriate sanctions under Federal Rule of Civil Procedure 37 is within sound discretion of court); *see also Di Gregorio v. First Rediscount Corp.*, 506 F.2d 781, 788 (3d Cir. 1974) (same); *Shapiro v. Plante & Moran LLP (In re Connolly N. Am., LLC)*, 376 B.R. 161, 181-82 (Bankr. E.D. Mich. 2007) ("Fed. R. Civ. P. 37 authorizes the court to award sanctions for discovery misconduct.  The trial court has broad discretion in selecting a sanction that is proportionate to the particular discovery violations committed by a party." (citing *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067, 1073 (6th Cir. 1990))).

sanctions on parties that fail to comply with discovery orders,[124] setting forth a non-exclusive list

of available sanctions including:  (i) directing that designated facts be taken as established for

purposes of the action; (ii) prohibiting the disobedient party from supporting or opposing

designated claims or defenses or from introducing designated matters into evidence; (iii) striking

pleadings in whole or in part; (iv) staying proceedings until the order is obeyed; (v) dismissing

the action or proceeding in whole or in part; (vi) rendering a default judgment against the

disobedient party; and (vii) treating the failure to comply as contempt of court.[125]

　　　　The type and severity of sanctions imposed should be reasonable under the circumstances

and serve the general purposes of penalizing inappropriate conduct, deterring future violations of

court orders, and rectifying and compensating for any prejudice or economic harm caused by the

violation.[126]  In determining appropriate sanctions, courts may consider, among other factors, the

conduct and culpability of the disobedient party, any attempt by the disobedient party to comply

---

[124]  *See* Fed. R. Civ. P. 37(b)(2)(A); *see also R.W. Int'l Corp. v. Welch Foods, Inc.*, 937 F.2d 11, 15 (1st Cir. 1991) ("The rule's language clearly requires two things as conditions precedent to engaging the gears of the rule's sanction machinery:  a court order must be in effect, and then must be violated, before the enumerated sanctions can be imposed.").

[125]  *See* Fed. R. Civ. P. 37(b)(2)(A)(i)-(vii); *see also Cine Forty-Second St. Theatre Corp. v. Allied Artists Picture Corp.*, 602 F.2d 1062, 1066 (2d Cir. 1979) ("This rule provides a spectrum of sanctions.  The mildest is an order to reimburse the opposing party for expenses caused by the failure to cooperate.  More stringent are orders striking out portions of the pleadings, prohibiting the introduction of evidence on particular points and deeming disputed issues determined adversely to the position of the disobedient party.  Harshest of all are orders of dismissal and default judgment.").  Because no party contends that Wilmington Trust or its counsel should be held in contempt of court, the issue is outside the scope of the Investigation on this matter and the standards for such a determination are not discussed in the Report.

[126]  *See, e.g., Spear v. Comm'r*, 41 F.3d 103, 111 (3d Cir. 1994) ("We apply a sliding scale -- the harsher the sanction being imposed, the more the balance will have to get against the party being sanctioned to justify the sanction."); *see also Gratton v. Great Am. Comm'cns*, 178 F.3d 1373, 1374 (11th Cir. 1999) ("Rule 37 sanctions are intended to prevent unfair prejudice to the litigants and insure the integrity of the discovery process."); *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 740 (7th Cir. 1998) ("[T]he sanction selected must be one that a reasonable jurist, apprised of all the circumstances, would have chosen as proportionate to the infraction."); *Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1453 (11th Cir. 1985) ("The magnitude of sanctions awarded is bounded under Rule 37 only by that which is 'reasonable' in light of the circumstances.  Permissible purposes of sanction[s] include:  1) compensating the court and other parties for the added expense caused by the abusive conduct; 2) compelling discovery; 3) deterring others from engaging in similar conduct; and 4) penalizing the guilty party or attorney.") (internal citations omitted).

with the order, any efforts by the disobedient party to mitigate or remedy any violation of the

order and the existence of any prejudice caused by the failure to comply.[127]  Less severe

sanctions may be imposed when a party has merely failed to comply with a discovery order[128] or

in cases where violation of the order is due to negligence.[129]  In contrast, more severe sanctions

such as the dismissal of an action, entry of a default judgment, the exclusion of critical evidence,

or other measures that essentially dictate the outcome of the case typically require the movant to

prove bad faith,[130] willfulness,[131] or fault[132] of the disobedient party.[133]

---

[127]  *See, e.g., Craig v. Kelchner*, No. 07-CV-1157, 2010 U.S. Dist. LEXIS 12064, at *4-*5 (M.D. Pa. Feb. 11, 2010) ("In exercising this discretion, the Court is guided by the following standards.  Any sanction imposed should be just.  Further, the sanction must be specifically related to the particular claim or claims at issue in the order to provide discovery violated by the offending party.  Within the context of these principles, the Court is to assess the culpability of the offending party and the prejudice to the party seeking sanctions.") (internal citation omitted); *AAMCO Transmissions, Inc. v. Baker*, No. 06-5252, 2008 U.S. Dist. LEXIS 14084, at *20-21 (E.D. Pa. Feb. 25, 2008) (noting mitigation efforts of party when assessing appropriate sanctions); *Coleman v. Sears, Roebuck & Co.*, 221 F.R.D. 433, 436 (W.D. Pa. 2003) ("As case law demonstrates, before the court imposes sanctions under Rule 37 it must consider and balance the (1) willfulness and bad faith of the disobeying party; (2) prejudice to the moving party; and (3) effectiveness of lesser sanctions.  The court applies these factors in light of information provided to the court by both plaintiffs and defendants.") (internal citation omitted); *PNC Bank v. Buzzelli (In re Buzzelli)*, 246 B.R. 75, 102 n.6 (Bankr. W.D. Pa. 2000) ("In the Third Circuit, the propriety of a sanction order under Fed.R.Civ.P. 37(b)(2), provided that said order is not tantamount to a default judgment, is determined by balancing (a) the culpability of the party sanctioned, (b) prejudice that the party benefitting from the sanction has suffered at the hands of the sanctioned party, and (c) whether lesser sanctions would have been effective." (citing *Spear*, 41 F.3d at 111-16)).

[128]  *See, e.g., Tamari v. Bache & Co. (Lebanon) S.A.L.*, 729 F.2d 469, 473 (7th Cir. 1984) ("The Firm next contends that a court may not impose Rule 37(b) sanctions on a party unless that party violates a court order because of willfulness, bad faith, or fault.  The weight of authority, however, holds that the culpability of a party who fails to comply with a court order determines only which sanctions the court should impose and not whether any sanctions are appropriate at all."); *Halas v. Consumer Servs., Inc.*, 16 F.3d 161, 164-65 (7th Cir. 1994) (simple failure to comply with discovery order sufficient to warrant sanctions).

[129]  *See, e.g., Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 179 F.R.D. 77, 80 (D. Conn. 1998) ("While a showing of willful disobedience or gross negligence is required to impose a harsher sanction, a finding of willfulness or contumacious conduct is not necessary to support sanctions which are less severe than dismissal or entry of a default judgment.").

[130]  *See, e.g., Teleglobe USA, Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*, 392 B.R. 561, 582 (Bankr. D. Del. 2008) ("Bad faith is 'conduct which is either intentional or in reckless disregard of a party's obligations to comply with a court order.'" (quoting *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992))).

[131]  *See, e.g., id.* ("Willfulness is found where a party has engaged in a 'pattern of conduct' in 'flagrant disregard' of the rules of discovery and a specific court order.'" (quoting *DiGregrorio v. First Rediscount Corp.*, 506 F.2d 781, 788 (3d Cir. 1974))).

[132]  *See, e.g., Long v. Steepro*, 213 F.3d 983, 987 (7th Cir. 2000) ("Although willfulness and bad faith are associated with conduct that is intentional or reckless, the same is not true for 'fault.'  Fault [] is not a catch-all for any

Even if sanctions are not imposed, however, Federal Rule of Civil Procedure 37(b)(2)(C) requires the disobedient party and/or its counsel to pay the reasonable expenses, including attorneys' fees, that were caused by the violation of a discovery order unless the failure to comply was substantially justified or other circumstances make an award of expenses unjust.[134]

A bankruptcy court also has the discretion and inherent authority to impose sanctions in order to control the conduct of parties and protect the integrity and operation of the judicial process.[135]  The sanctions imposed under this inherent authority should be crafted to address the

---

minor blunder that a litigant or his counsel might make.  Fault, in this context, suggests objectively unreasonable behavior; it does not include conduct . . . classif[ied] as a mere mistake or slight error in judgment."); *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992) ("'Fault,' by contrast, doesn't speak to the noncomplying party's disposition at all, but rather only describes the reasonableness of the conduct -- or lack thereof -- which eventually culminated in the violation."); *see also Teleglobe Commc'ns Corp.*, 392 B.R. at 583 (same).

[133]  *See, e.g., Spear v. Comm'r*, 41 F.3d 103, 112 (3d Cir. 1994) ("Even with respect to the less extreme sanction of exclusion of evidence, we have held that with respect to *critical* evidence, 'the exclusion of critical evidence is an "extreme" sanction, not normally to be imposed absent a showing of willful deception or "flagrant disregard" of a court order by the proponent of the evidence.'" (quoting *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 905 (3d Cir. 1977))), *overruled on other grounds*, *Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985), *aff'd*, 482 U.S. 656 (1987); *Ali v. Sims*, 788 F.2d 954, 957-58 (3d Cir. 1986) (noting that the court has "established the strong presumption against sanctions that decide the issues of a case"); *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 868 (3d Cir. 1984) (factors to consider in imposing dismissal or default judgment sanction include "(1) the extent of the *party's* personal *responsibility*; (2) the *prejudice* to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was *willful* or in *bad faith*; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of *alternative sanctions*; and (6) the *meritoriousness* of the claim or defense"); *see also Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007) ("A terminating sanction, whether default judgment against a defendant or dismissal of a plaintiff's action, is very severe.  We review discovery sanctions for abuse of discretion.  Only 'willfulness, bad faith, and fault' justify terminating sanctions."); *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045, 1049 (11th Cir. 1994) (finding of bad faith or willfulness necessary to impose dismissal or default judgment sanction); *Reg'l Refuse Sys., Inc. v. Inland Reclamation Co.*, 842 F.2d 150, 153-54 (6th Cir. 1988) (dismissal sanction may be "imposed only if the court concludes that a party's failure to cooperate in discovery is due to willfulness, bad faith or fault") (internal citation omitted); *Teleglobe Commc'ns Corp.*, 392 B.R. at 579 ("[T]he courts agree that the sanctions of preclusion of evidence is a harsh punishment which should be imposed only in the most extreme circumstances.").

[134]  *See* Fed. R. Civ. P. 37(b)(2)(C); *see also Poliquin v. Garden Way Inc.*, 154 F.R.D. 29, 32 (D. Me. 1994) ("Once it is determined that a party has violated a discovery order, Rule 37(b) requires the disobedient party to show that its failure to comply is substantially justified or that other circumstances make an award of sanctions unjust.").

[135]  *See, e.g., Chambers v. Nasco, Inc.*, 501 U.S. 32, 48-49 (1991) (district courts have inherent power to issue sanctions for abuse of judicial process); *see also Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1224 (3d Cir. 1995) (bankruptcy courts have inherent authority to impose sanctions for conduct

specific circumstances presented.[136]  Therefore, in determining the appropriate sanction to

impose, it is proper to consider the conduct and culpability of the parties, the existence of any

harm or prejudice arising from the conduct and the presence of any mitigating factors.[137]  After

taking these factors into account, the court has broad discretion to impose sanctions that the court

views as appropriate under the circumstances.[138]  Although imposition of sanctions under the

inherent power of the court ordinarily requires a finding of bad faith,[139] particularly when

imposing severe sanctions, such a finding is not required in all cases.[140]

---

which abuses judicial process) (citing *Chambers*, 501 U.S. at 49); *Republic of Phil. v. Westinghouse Elec. Corp.*, 43 F.3d 65, 73 (3d Cir. 1994) ("[A] district court has *inherent* authority to impose sanctions upon those who would abuse the judicial process.") (internal citation omitted).

[136]  *See, e.g., Westinghouse Elec. Corp.*, 43 F.3d at 74 ("Thus, a district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers, and must also ensure that the sanction is tailored to address the harm identified.  In exercising its discretion under its inherent powers, the court should be guided by the same considerations that guide it in the imposition of sanctions under the Federal Rules.").

[137]  *See, e.g., id.* ("First, the court must consider the conduct at issue and explain why the conduct warrants sanction. If an attorney, rather than a client, is at fault, the sanction should ordinarily target the culpable attorney. Obviously, a pattern of wrongdoing may require a stiffer sanction than an isolated incident; a grave wrongdoing may compel a more severe sanction than might a minor infraction; and wrongdoing that actually prejudices the wrongdoer's opponent or hinders the administration of justice may demand a stronger response than wrongdoing that, through good fortune or diligence of court or counsel, fails to achieve its untoward object. Furthermore, there may be mitigating factors that must be accounted for in shaping the court's response.") (internal citations omitted); *see also Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 562 F. Supp. 2d 606, 611 (D. Del. 2008) ("When exercising discretion under its inherent sanction powers, a court is guided by the considerations set forth in the Federal Rules of Civil Procedure.  Factors to consider include:  1. The nature and quality of the conduct at issue; 2. Whether the attorney or the client is responsible for the culpable conduct;  3. Whether there was a pattern of wrongdoing requiring a stiffer sanction;  4. The sanctioned party's ability to pay;  5. Whether the wrongdoing actually prejudiced the wrongdoer's opponent or hindered the administration of justice; and,  6. The existence of mitigating factors.") (internal citation omitted) (citing *Westinghouse Elec. Corp.*, 43 F.3d at 74).

[138]  *See, e.g., Westinghouse Elec. Corp.*, 43 F.3d at 74 ("Second, having evaluated the conduct at issue, the district court must specifically consider the range of permissible sanctions and explain why less severe alternatives to the sanction imposed are inadequate or inappropriate.  Although the court need not 'exhaust all other sanctioning mechanisms prior to resorting to its inherent power,' the court must explain why it has chosen any particular sanction from the range of alternatives it has identified.") (internal citation omitted) (quoting *Landon v. Hunt*, 938 F.2d 450, 454 (3d Cir. 1991)).

[139]  *See, e.g., Martin v. Brown*, 63 F.3d 1252, 1265 (3d Cir. 1995) ("Usually, the inherent power that a district court retains to sanction attorneys also requires bad faith.  We have previously suggested care in the use of inherent powers to impose sanctions.  Generally, a court's inherent power should be reserved for those cases in which the conduct of a party or an attorney is egregious and no other basis for sanctions exists.") (internal citations omitted); *Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1227 (3d Cir. 1995) (suggesting that "a finding of bad faith is required to support a court's employment of its inherent sanction

### 4.    Legal Standard Governing Fiduciary Duties of Members of Official Committee of Unsecured Creditors.

An official committee of unsecured creditors is charged with representing and protecting the interests of the unsecured creditor class and maximizing the value of the estate for their benefit.[141]  To ensure the faithful pursuit of these objectives, a creditors' committee and its individual members are charged with fiduciary duties to unsecured creditors.[142]  These fiduciary duties require creditors' committee members to act with loyalty to the unsecured creditors and prohibit them from using their position on the creditors' committee to inappropriately advance their own personal interests at the expense of creditors.[143]  They also obligate the members of a

---

power"); *Landon*, 938 F.2d at 454 ("Thus, a prerequisite for the exercise of the district court's inherent power to sanction is a finding of bad faith conduct.").

[140]    *See, e.g., Westinghouse Elec. Corp.*, 43 F.3d at 74 n.11 ("[A] court need not always find bad faith before sanctioning under its inherent powers . . . ."); *see also In re Prudential Ins. Co. Am. Sales Practice Litig. Action*s, 278 F.3d 175, 181 (3d Cir. 2002) (same); *In re Beers*, No. 09-1666, 2009 U.S. Dist. LEXIS 111218, at *20-*21 (D.N.J. Nov. 30, 2009) ("While a finding of bad faith is 'generally' required, it is not mandated in every case.").

[141]    *See, e.g., In re Nationwide Sports Distribs., Inc.*, 227 B.R. 455, 463 (Bankr. E.D. Pa. 1998) ("In general, the purpose of such committees is to represent the interests of unsecured creditors and to strive to maximize the bankruptcy dividend paid to that class of creditors."); *In re Haskell-Dawes, Inc.*, 188 B.R. 515, 519 (Bankr. E.D. Pa. 1995) ("The creditors' committee is responsible for representing the interests of its constituents and maximizing their recovery.").

[142]    *See, e.g., Westmoreland Human Opportunities, Inc. v. Walsh (In re Life Serv. Sys., Inc.)*, 246 F.3d 233, 256 (3d Cir. 2001) ("[M]embers of a creditor's committee" hold a fiduciary duty "toward their constituent members."); *see also In re Refco, Inc.*, 336 B.R. 187, 195 (Bankr. S.D.N.Y. 2006) ("It is well recognized that, to fulfill these roles, the members of an official committee owe a fiduciary duty to their constituents -- in the case of an official creditors committee, to all of the debtor's unsecured creditors."); *Rickel & Assocs. Inc. v. Smith (In re Rickel & Assocs.)*, 272 B.R. 74, 99 (Bankr. S.D.N.Y. 2002) ("The Committee and its members owed a fiduciary duty to the class it represented, but not to the individual creditors within the class or to the estate."); *In re Barneys, Inc.*, 197 B.R. 431, 442 (Bankr. S.D.N.Y. 1996) ("An entity need not be disinterested to qualify for committee membership.  However, the committee and its members have a fiduciary duty to all creditors represented by the committee.") (internal citations omitted); *Haskell-Dawes*, 188 B.R. at 522 ("[T]he creditors appointed to the creditors' committee have a fiduciary obligation to act in the interests of the members whom they represent."); *United Steelworkers  v. Lampl (In re Mesta Mach. Co.)*, 67 B.R. 151, 156 (Bankr. W.D. Pa. 1986) ("It is well established law that members of all creditor committees in bankruptcy cases have a fiduciary responsibility to the creditors represented.").

[143]    *See, e.g., Westmoreland*, 246 F.3d at 256 ("A committee member violates its fiduciary duty by pursuing a course of action that furthers its self-interest to the potential detriment of fellow committee members."); *see also Rickel & Assocs.*, 272 B.R. at 99 (creditors' committee members are "required to be honest, loyal, trustworthy and without conflicts of interest"); *Nationwide Sports Distribs.*, 227 B.R. at 455 (creditors' committee members may not use position to pursue self-interest); *In re ABC Auto. Prods. Corp.*, 210 B.R. 437, 441 (Bankr. E.D. Pa. 1997) ("Creditors who serve on the committee owe a fiduciary duty to the constituents whom they represent.

creditors' committee to act with care and good faith and to preserve the confidentiality of information received in their capacity as members.[144]

Members of a creditors' committee, however, do not sacrifice their rights as creditors or the ability to protect and assert their financial interests.  Indeed, it is well established that creditors' committee members are free, to the extent consistent with their fiduciary duties, to independently pursue their own economic interests and even take positions contrary and adverse to the creditors' committee and other creditors, provided that they do not abuse their positions on the creditors' committee to do so.[145]

### D.    Examiner's Conclusion and Explanation Regarding Question Number Three.

### Examiner's Conclusions:

The Examiner concludes that a court is reasonably likely to find that Wilmington Trust and its counsel failed to satisfy the requirements of the Depository Order when it publicly filed

---

This duty obligates them to act with undivided loyalty for the benefit of all of the unsecured creditors.") (internal citation omitted); *Haskell-Dawes*, 188 B.R. at 522 ("This duty prohibits members of the creditors' committee from using their position to advance their own individual interests."); *see also Mesta Mach.*, 67 B.R. at 156 ("As fiduciaries, counsel and committee members have obligations of fidelity, undivided loyalty and impartial service in the interest of the creditors they represent."); *In re Johns-Manville Corp.*, 26 B.R. 919, 925 (Bankr. S.D.N.Y. 1983) ("[T]he individuals constituting a committee should be honest, loyal, trustworthy and without conflicting interests, and with undivided loyalty and allegiance to their constituents.").

[144]    *See, e.g., Refco*, 336 B.R. at 196-97 (noting obligation of members to maintain confidentiality of information received while serving on creditors' committee); *In re Gen. Homes Corp.*, 181 B.R. 870, 882 (Bankr. S.D. Tex. 1994) ("The fiduciary duty that exists between the members of the Unsecured Creditors Committee and the other unsecured creditors includes the duty to act in good faith and to insure to the greatest extent possible its actions are based on 'accurate and correct' information.").

[145]    *See, e.g., Westmoreland Human Opportunities, Inc. v. Walsh (In re Life Serv. Sys., Inc.)*, 327 B.R. 561, 573 (W.D. Pa. 2005) ("This is not to say that the members of a committee (and unsecured creditors in general) are somehow precluded from acting in their respective financial interests related to the bankruptcy estate or from continuing their own business, but being a member of the committee is not a position given to an unsecured creditor for the primary purpose of furthering its own financial interests." (citing *In re Enduro Stainless, Inc.*, 59 B.R. 603, 605 (Bankr. N.D. Ohio 1986))); *see also Rickel & Assocs.*, 272 B.R. at 100 ("Although Committee members owe fiduciary duties, they are hybrids who serve more than one master.  Every member of the Committee is, by definition, a creditor.  Thus, he is in competition with every other creditor for a piece of a shrinking pie.  He may assert his rights as a creditor to the detriment of the creditor body as a whole without running afoul of his fiduciary obligations." (citing *Krafsur v. UOP (In re El Paso Refinery, L.P.)*, 196 B.R. 58, 74 (Bankr. W.D. Tex. 1996))).

the electronically redacted version of the Complaint, but that these actions were inadvertent, rather than intentional or reckless.  A court is reasonably likely to require the Brown Rudnick firm to pay the reasonable attorneys' fees and expenses incurred by JPMCB as a result of the violation of the Depository Order.  Finally, it is reasonably unlikely that a court would find that Wilmington Trust breached its fiduciary duties as a member of the UCC or violated the UCC Bylaws.

### Explanation of Examiner's Conclusions:

1.    **JPMCB's Motion for Sanctions Against Wilmington Trust and its Counsel.**

   a.    **Wilmington Trust and its Counsel Reasonably Likely Failed to Comply With the Depository Order.**

Wilmington Trust and its counsel endeavored to comply with the requirements of the Depository Order by electronically redacting the publicly-filed version of the Complaint, but these efforts were not entirely successful.  Although the Complaint appeared on its face to redact confidential information, any party that obtained a copy of the Complaint could circumvent the attempted redactions with relative ease by copying and pasting the text into a different document to reveal the underlying confidential information.[146]  By publicly filing this version of the Complaint, the confidential information became subject to disclosure in the public domain, which is evidenced by at least one news article that described and quoted from confidential information contained in the Complaint, as if it were never redacted or filed under seal.[147]

---

[146]    Based on the descriptions provided by the parties, counsel for the Examiner was able to independently replicate and confirm that the redactions were subject to circumvention.

[147]    *See Tribune's Unredacted LBO Suit Details Quest for Solvency Opinion*, Standard & Poor's Leveraged Commentary & Data, Mar. 15, 2010.  There is no evidence directly linking this article to the defective redactions.  It is possible that Standard & Poor's could have received the unredacted information directly from a party other than Wilmington Trust.

48

Wilmington Trust and its counsel had the ability to fully comply with the obligations imposed under the Depository Order and attempted to do so, but did not securely protect confidential information from disclosure.  As a result, a court is reasonably likely to find that Wilmington Trust and its counsel failed to comply with the requirements of the Depository Order.

### b.    The Failure to Comply with the Depository Order Was Reasonably Likely Inadvertent.

The interviews conducted by the Examiner and the Examiner's review of contemporaneous documents and events reveal that the failure to securely redact confidential information in the Complaint was not intentional or reckless, although it was irresponsible.

### (1)    Circumstances Related to the Filing of the Complaint.

The Brown Rudnick firm was primarily responsible for preparing the electronically redacted version of the Complaint that was filed with the Bankruptcy Court.  Although several Brown Rudnick attorneys were involved in the process, partners Martin S. Siegel and Robert J. Stark and associate Kate S. Bromberg had principal roles.[148]  William M. Dolan III did not have any role in the final preparation of the Complaint for filing, although he had limited involvement in drafting the Complaint before it was filed and consulting on certain discrete issues and aspects of the Chapter 11 Cases.[149]

Mr. Siegel tasked Ms. Bromberg with the responsibility of ensuring that the version of the Complaint filed with the Bankruptcy Court was appropriately redacted to protect confidential information as required by the Depository Order, explaining that each and every allegation and

---

[148]  Examiner's Interview of Kate S. Bromberg, June 1, 2010; Examiner's Interview of Martin S. Siegel, June 2, 2010; Examiner's Interview of Robert J. Stark, June 2, 2010.

[149]  Examiner's Interview of William M. Dolan III, June 2, 2010.

its source should be reviewed and redacted if marked confidential under any category set forth in the Depository Order, without making any judgment regarding whether the material was actually confidential.[150]  On March 2, 2010 and March 3, 2010, Ms. Bromberg spent significant time reviewing the allegations of the Complaint to identify any potentially confidential information that was protected from disclosure under the Depository Order.[151]  During this period, Ms. Bromberg was assisted by several Brown Rudnick associates working under her supervision that checked each of the factual allegations in the Complaint in order to determine whether they were based on information available from public sources or contained non-public information that would need to be redacted under the Depository Order.[152]  To the extent the associates were unable to find a public source for information contained in a particular allegation, Ms. Bromberg conservatively redacted that information from the Complaint.[153]

After examining work performed by the associates at her direction, Ms. Bromberg first printed a hard copy of the Complaint and manually highlighted each of the allegations incorporating confidential information that should be redacted, erring on the side of redacting allegations, even when supported by information that arguably could be considered part of the public domain.[154]  Once this process was completed, Ms. Bromberg electronically marked and highlighted the confidential information in black in a Microsoft Word copy of the Complaint, which visually obscured the text, and carefully compared it to the physically marked copy of the

---

[150]  Examiner's Interview of Kate S. Bromberg, June 1, 2010; Examiner's Interview of Martin S. Siegel, June 2, 2010.

[151]  Examiner's Interview of Kate S. Bromberg, June 1, 2010.

[152]  *Id.*

[153]  *Id.*

[154]  *Id.*

Complaint to ensure that all identified confidential information had been covered.[155]  The redactions were subsequently reviewed and verified by another associate at Brown Rudnick and also checked by Mr. Stark and Mr. Siegel.[156]

Because the confidential information contained in the Microsoft Word version of the Complaint appeared to be fully redacted and unreadable, Ms. Bromberg proceeded to convert the document into an Adobe PDF file using the Adobe Professional 7 computer program.[157] Following conversion of the document into the Adobe PDF file format, Ms. Bromberg conducted a further review of the Complaint on her computer and in printed form, and confirmed that all appropriate redactions were in place.[158]  Ms. Bromberg believed that converting the Complaint from a Microsoft Word document to an Adobe PDF file effectively "locked down" the redactions and was not aware at the time that they were potentially vulnerable to circumvention.[159]  On the morning of March 4, 2010, Ms. Bromberg forwarded the electronically redacted Adobe PDF version of the Complaint to Jennifer R. Hoover of the Benesch firm, local counsel to Wilmington Trust.[160]

During the afternoon of March 4, 2010, Ms. Bromberg instructed Ms. Hoover to file the electronically redacted Adobe PDF version of the Complaint that had been forwarded to her.[161] Ms. Hoover engaged in her own independent review of the Complaint, determined that the

---

[155] *Id.*

[156] Examiner's Interview of Kate S. Bromberg, June 1, 2010; Examiner's Interview of Martin S. Siegel, June 2, 2010; Examiner's Interview of Robert J. Stark, June 2, 2010.

[157] Examiner's Interview of Kate S. Bromberg, June 1, 2010.

[158] *Id.*

[159] *Id.*

[160] Examiner's Interview of Kate S. Bromberg, June 1, 2010; Examiner's Interview of Jennifer R. Hoover, June 2, 2010.

[161] Examiner's Interview of Kate S. Bromberg, June 1, 2010; Examiner's Interview of Jennifer R. Hoover, June 2, 2010.

redactions appeared to be in place, and then instructed a paralegal with the Benesch firm to file

the Complaint with the Bankruptcy Court.[162]  At approximately 4:18 p.m. (ET), the Adobe PDF

version of the Complaint was filed, accompanied by a motion to authorize the filing of an

unredacted version of the Complaint under seal.[163]  Once filed, the Complaint became available

for review and downloading through the federal court PACER system, which generated an

electronic filing notice with a link pursuant to which the Complaint could be accessed.[164]

Soon after the Complaint was filed and accessible on the Bankruptcy Court docket, Mr.

Siegel received a telephone call from JPMCB's counsel that there was a problem with the

redacted version of the Complaint because the redacted information could be revealed by simply

copying and pasting the applicable text into another document.[165]  Mr. Stark was in a meeting at

the time, but received similar calls and voicemails from both JPMCB's counsel and counsel for

Law Debenture Company, a party to the Depository Order, notifying him of the matter, as well

as e-mails explaining the problem.[166]  After receiving a call from JPMCB's counsel, Mr. Siegel

promptly went to Ms. Bromberg's office to obtain clarification on the issue, and at approximately

4:55 p.m. (ET), she became aware of the issue for the first time.[167]  Mr. Siegel and Ms.

---

[162]  Examiner's Interview of Jennifer R. Hoover, June 2, 2010.

[163]  Examiner's Interview of Kate S. Bromberg, June 1, 2010; Examiner's Interview of Jennifer R. Hoover, June 2, 2010; *see also Motion of Wilmington Trust Company for Entry of an Order Authorizing Filing of Unredacted Complaint for Equitable Subordination and Disallowance of Claims, Damages, and Constructive Trust Under Seal* [Adv. Pro. No. 10-50732, Docket No. 3].

[164]  Examiner's Interview of Kate S. Bromberg, June 1, 2010; Examiner's Interview of Jennifer R. Hoover, June 2, 2010.

[165]  Examiner's Interview of Martin S. Siegel, June 2, 2010.

[166]  Examiner's Interview of Robert J. Stark, June 2, 2010.

[167]  Examiner's Interview of Kate S. Bromberg, June 1, 2010; Examiner's Interview of Martin S. Siegel, June 2, 2010.

Bromberg quickly called JPMCB's counsel in an attempt to determine the nature of the problem.[168]

By approximately 5:00 p.m. (ET), Ms. Bromberg had contacted Ms. Hoover to advise her of the issue, but when they viewed the Complaint on the federal court PACER system the redactions appeared to be in place.[169]  Following another call to JPMCB's counsel for a further explanation, Ms. Bromberg and Ms. Hoover were able to confirm the problem.[170]  Ms. Hoover immediately called the office of the clerk of the Bankruptcy Court, but found that it was closed.[171]  Ms. Hoover was able to locate contact information for the operations manager of the Bankruptcy Court, and called her to explain the situation and obtain assistance.[172]  Ms. Hoover also provided a manually scanned copy of the redacted Complaint to the operations manager and requested that it be filed immediately in place of the prior version of the Complaint.[173]

At approximately 6:20 p.m. (ET), Ms. Hoover was informed by Bankruptcy Court personnel that the prior version of the Complaint had been withdrawn from the PACER system and replaced with a securely redacted version.[174]  Believing that the problem had been fully resolved, Ms. Hoover contacted Ms. Bromberg and informed her that the prior version of the Complaint was no longer accessible on the Bankruptcy Court docket.[175]  After this was

---

[168]  Examiner's Interview of Kate S. Bromberg, June 1, 2010; Examiner's Interview of Martin S. Siegel, June 2, 2010.

[169]  Examiner's Interview of Kate S. Bromberg, June 1, 2010; Examiner's Interview of Jennifer R. Hoover, June 2, 2010.

[170]  Examiner's Interview of Kate S. Bromberg, June 1, 2010; Examiner's Interview of Jennifer R. Hoover, June 2, 2010.

[171]  Examiner's Interview of Jennifer R. Hoover, June 2, 2010.

[172]  *Id.*

[173]  *Id.*

[174]  *Id.*

[175]  *Id.*

accomplished, however, Ms. Bromberg was contacted by JPMCB's counsel and informed that it was still possible to access the prior version of the Complaint through the link in the electronic case filing notice, which prompted another series of calls between Ms. Hoover and the Bankruptcy Court operations manager for further assistance.[176]  Ms. Hoover explained this additional problem to the operations manager who took action and told Ms. Hoover at approximately 8:00 p.m. (ET) that the link in the electronic case filing notice had been severed and the prior version of the Complaint was no longer accessible by this alternative means.[177]

Thus, access to the Complaint through both the PACER system and electronic case filing notice was removed within approximately four hours, although during those four hours it was available for review and downloading by third parties.  Ms. Bromberg then contacted JPMCB's counsel and gave a status report.[178]  On March 5, 2010, Wilmington Trust transmitted a notice to all recipients of the original electronic case filing notice with an instruction that any copies of the prior version of the Complaint should be deleted.[179]

### (2)  Findings Regarding the Filing of the Complaint and Failure to Comply with the Depository Order.

The Examiner found the attorneys at the Brown Rudnick and Benesch firms to be candid, credible, and forthright in their explanations of what happened.  The Examiner does not believe

---

[176]  Examiner's Interview of Kate S. Bromberg, June 1, 2010; Examiner's Interview of Jennifer R. Hoover, June 2, 2010.

[177]  Examiner's Interview of Jennifer R. Hoover, June 2, 2010.

[178]  Examiner's Interview of Kate S. Bromberg, June 1, 2010.

[179]  Examiner's Interview of Kate S. Bromberg, June 2, 2010; Examiner's Interview of Jennifer R. Hoover, June 2, 2010.

that the Brown Rudnick firm or any of its attorneys intentionally or recklessly violated the Depository Order.[180]

First, as a general matter, it is implausible that any party wrongfully or maliciously intending to disclose confidential information would do so in the manner done here, when other, less traceable means could have been used, such as by leaking the information to the press or other.  It is reasonably unlikely that the Brown Rudnick firm would intentionally redact the Complaint in a manner that would allow parties to circumvent the redactions, particularly when it would be exceedingly simple to identify the firm as the source of the information.

Second, the Brown Rudnick firm earnestly attempted to redact confidential information from the Complaint and satisfy the requirements of the Depository Order.  As noted, these efforts included a team of attorneys reviewing the Complaint to identify and redact confidential information, including several rounds of review and checking of both the manually and electronically redacted versions of the Complaint by attorneys at both the Brown Rudnick and Benesch firms.[181]  Notably, no Party has contended that the attempted redactions failed to cover all potentially confidential information.

Third, the attorneys at both the Brown Rudnick and Benesch firms carefully reviewed the Complaint in both printed and Microsoft Word file formats to confirm that the redactions properly covered confidential information.[182]  Having taken these steps, it was not inappropriate or unreasonable for them to convert the Microsoft Word version of the redacted Complaint into an Adobe PDF file rather than manually scanning the document.  In fact, the Local Rules of

---

[180] The Examiner has focused this inquiry on the Brown Rudnick firm because it was primarily responsible for preparing and filing the Complaint, and JPMCB concentrated its allegations on the conduct of the Brown Rudnick firm and its attorneys.

[181] *See* Report at § VI.D.1.b.(1).

[182] *Id.*

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware generally require that documents submitted for filing be electronically converted to Adobe PDF files directly from word processing software, instead of manually scanned, when practicable.[183]  Although the redactions were not secure and could be circumvented, the attorneys at the Brown Rudnick and Benesch firms took reasonable precautions and sincerely attempted to protect confidential information from disclosure.

Fourth, the attorneys actually involved in the preparation and filing of the Complaint were not aware that the electronic redactions to the Complaint could potentially be circumvented to reveal confidential information.  It is true that Mr. Dolan and the Brown Rudnick firm were involved in a similar incident in the Lyondell Chemical Company bankruptcy case, that Mr. Dolan signed the Depository Order, and that he has been involved in Tribune's Chapter 11 Cases. However, Mr. Dolan had no role in the preparation or redaction of the Complaint for filing.[184] Mr. Dolan's involvement in the Chapter 11 Cases had been limited.[185]  He was not present when the Complaint was filed and did not even become aware of the problem until after it had been rectified.[186]

---

[183]  Examiner's Interview of Jennifer R. Hoover, June 2, 2010; *see also* Del. Bankr. L.R. 5005-4.  This requirement potentially conflicts with Bankruptcy Rules 1001 and 9029(a).  Bankruptcy Rule 1001 mandates that the Bankruptcy Rules be construed to secure the just, speedy, and inexpensive determination of every case and proceeding.  *See* Fed. R. Bankr. P. 1001.  Bankruptcy Rule 9029(a)(1) provides that district courts may develop local rules that do not conflict with the Bankruptcy Rules, *see* Fed. R. Bankr. P. 9029(a)(1), and Bankruptcy Rule 9029(a)(2) provides that local rules "imposing a requirement of form shall not be enforced in a manner that causes a party to lose rights because of a nonwillful failure to comply with the requirement."  Fed. R. Bankr. P. 9029(a)(2).  The Examiner respectfully suggests that modifications to the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware be considered to address this potential conflict.

[184]  Examiner's Interview of William M. Dolan III, June 2, 2010.

[185]  *Id.*

[186]  *Id.*

These matters were handled in large part by Ms. Bromberg and other associates working at her direction, with the oversight, assistance, and input of Mr. Siegel, Mr. Stark, and Ms. Hoover.[187]  Ms. Bromberg did not join Brown Rudnick until six months after the incident in the Lyondell Chemical Company bankruptcy case, and she was not aware of the vulnerability presented by the redaction method that was employed.[188]  Similarly, Mr. Stark was not involved in the incident in the Lyondell Chemical Company bankruptcy case while at Brown Rudnick, nor was Ms. Hoover, who is employed by the Benesch firm.[189]  Like Ms. Bromberg, neither Mr. Stark nor Ms. Hoover were aware of any flaws in the redaction method prior to the filing of the Complaint.[190]  Although Mr. Siegel had general knowledge that an incident occurred in the Lyondell Chemical Company bankruptcy case involving redacted documents, he did not have specific awareness of the vulnerability or the method in which electronic redactions could potentially be circumvented.[191]  Thus, the attorneys actually involved in the final preparation of the Complaint—which did not include Mr. Dolan—were not actually aware that the electronic redactions could be bypassed to reveal confidential information.  This lack of knowledge, and the other circumstances described above, support an inference that the Brown Rudnick firm did not intentionally violate the Depository Order.

Even if not indicative of an intent to violate the Depository Order, JPMCB avers in the alternative that the failure of the Brown Rudnick firm to institute preventive measures after the

---

[187]  Examiner's Interview of Kate S. Bromberg, June 1, 2010; Examiner's Interview of Martin S. Siegel, June 2, 2010; Examiner's Interview of Robert J. Stark, June 2, 2010; Examiner's Interview of Jennifer R. Hoover, June 2, 2010.

[188]  Examiner's Interview of Kate S. Bromberg, June 1, 2010.

[189]  Examiner's Interview of Robert J. Stark, June 2, 2010; Examiner's Interview of Jennifer R. Hoover, June 2, 2010.

[190]  Examiner's Interview of Robert J. Stark, June 2, 2010; Examiner's Interview of Jennifer R. Hoover, June 2, 2010.

[191]  Examiner's Interview of Martin S. Siegel, June 2, 2010.

incident in the Lyondell Chemical Company bankruptcy case to avoid a similar occurrence supports a finding of bad faith and reckless disregard of the obligation to comply with the Depository Order.  Mr. Dolan explained that, following the incident in the Lyondell Chemical Company bankruptcy case, the attorneys working on the matter were immediately advised of the problem, and the issue also was discussed at a litigation department meeting.[192]  After the incident in the Tribune Chapter 11 Cases, the Brown Rudnick firm issued a firm-wide notification regarding the issue and took additional corrective and preventive actions.[193]  Without question, in light of the first incident and available information concerning the issue,[194] the Brown Rudnick firm responsibly should have issued its notification and instituted controls on a firm-wide basis before the second event occurred, and the failure to do so did not meet the standard of care that one would expect from such a nationally prominent law firm.  The Examiner, however, cannot conclude under the circumstances that the Brown Rudnick firm's previous failure to take such prompt corrective firm-wide action demonstrates bad faith or reckless disregard of the obligations imposed by the Depository Order.[195]

---

[192]  Examiner's Interview of William M. Dolan III, June 2, 2010.

[193]  *Id.*  On March 17, 2010, the Brown Rudnick firm transmitted an e-mail to all attorneys and paralegals notifying them of the potential vulnerabilities of electronically redacted documents and introducing policies requiring any employees involved in redacting documents to confirm that they reviewed a training module that ensured the integrity of redacted files.  *Id.*  The recipients of the e-mail were required to confirm that they received and reviewed the information.  *Id.*  On March 19, 2010, the Brown Rudnick firm again forwarded the e-mail with a further request that any remaining recipients that had not previously confirmed receipt and review of the information do so promptly.  *Id.*  By March 23, 2010, the Brown Rudnick firm had also implemented and installed software with secure redaction capabilities.  *Id.*  It is clear that the Brown Rudnick firm took no such firm-wide efforts before these actions.

[194]  *See, e.g.,* Adobe Sys. Inc., *Redaction of Confidential Information in Electronic Documents:  How to Safely Remove Sensitive Information from Microsoft Word Documents and PDF Documents using Adobe Acrobat* (2006), http://partners.adobe.com/public/developer/en/ acrobat/Redaction.pdf.

[195]  The courts have found a party to have recklessly disregarded its obligations to comply with a court order in circumstances in which the party has extended no meaningful effort to satisfy those obligations.  *See, e.g., Merch. Nat'l Bank v. Leemac Truck & Trailer Indus., Inc. (Leemac Truck & Trailer Indus., Inc.),* No. 91-01761, 1992 Bankr. LEXIS 1213, at * 10-*12 (Bankr. N.D. Ill. July 13, 1992) (holding that parties' failure to attempt to comply with pretrial order "exhibits willfulness or reckless disregard" and warranted dismissal of action without prejudice); *see also Rice v. City of Chicago,* 333 F.3d 780, 785 (7th Cir. 2003) (reversing dismissal of action as

Fifth, once the attorneys at the Brown Rudnick firm were notified of the issue in the Chapter 11 Cases, they immediately sought to have the electronically redacted version of the Complaint withdrawn from the docket. As detailed above, within minutes after having learned that the redactions could be circumvented, the Brown Rudnick and Benesch firms engaged in substantial efforts to remedy the problem, and access to the Complaint was removed within approximately four hours after it was filed.[196] The extent and expediency of these actions further support the notion that there was no intent to violate the Depository Order.

Finally, in their dealings with the Examiner on this matter, the attorneys at the Brown Rudnick firm were genuinely contrite, apologetic, and even remorseful. The tenor and level of candor displayed during the interviews are not consistent with the contention that the Brown Rudnick firm engaged in intentional wrongdoing. Nevertheless, the failure of the Brown Rudnick firm to put in place an alternate safeguard after its ineffective redaction in the Lyondell Chemical Company bankruptcy case is not satisfactorily justified.

In light of the foregoing, the Examiner concludes that the Brown Rudnick firm's failure to comply with the Depository Order was inadvertent and represented a failure to exercise ordinary care, but was not intentional or reckless.

### c.    Findings Regarding the Requested Sanctions.

JPMCB requested that the Bankruptcy Court issue sanctions that (i) remove Wilmington Trust and its counsel as parties under the Depository Order that are permitted to access documents and information included in the document depository; (ii) require Wilmington Trust

---

sanction for failure to comply with court order and stating "[o]n the two occasions [plaintiff] failed to comply with court ordered deadlines, there is nothing in the record that would justify classifying the plaintiff's attorney as 'recklessly' disregarding his obligation to comply with a court order, as he filed an appropriate motion or the necessary papers within one week").

[196]    *See* Report at § VI.D.1.b.(1).

and its counsel to delete, remove, and otherwise destroy any copies of information protected from disclosure under the Depository Order; (iii) enjoin Wilmington Trust and its counsel from further using any information protected from disclosure under the Depository Order; (iv) require Wilmington Trust and its counsel to withdraw any filings with the Bankruptcy Court that quote, paraphrase, reference, describe, or rely upon any information protected from disclosure under the Depository Order; and (v) direct Wilmington Trust and its counsel to pay the attorneys' fees and expenses incurred by JPMCB in connection with the motion.

Several factors militate against the majority of sanctions requested by JPMCB. As an initial matter, most of the requested sanctions are sweeping, overbroad, and not specifically crafted to remedy any purported harm caused by the violation of the Depository Order. For example, the information encompassed by the sanctions is not limited to confidential information that was actually included in the Complaint, much less provided by JPMCB. Similarly, the requested injunction prohibiting any further use of confidential information by Wilmington Trust broadly applies to any action, including subsequent litigation in which the information could be independently obtained through discovery. In essence, Wilmington Trust would forever be barred from using information designated as confidential under the Depository Order to support any claim in any action.

In addition, when considered in the aggregate, the requested sanctions would be tantamount to dismissing the Complaint with prejudice and permanently barring Wilmington Trust from presenting critical evidence. Sanctions remotely approaching this severity would require a finding of bad faith, willfulness, or intentional misconduct by Wilmington Trust or its counsel, whether imposed under Federal Rule of Civil Procedure 37 or the inherent sanction

power of the court.[197]  As explained above,[198] the Examiner does not believe that the evidence

supports any such conclusion.  Moreover, given the nature of the violation committed here by

counsel, it would be inappropriate to, in effect, penalize Wilmington Trust and the holders of the

PHONES Notes.[199]

     In addition, no credible evidence supports a conclusion that JPMCB suffered actual harm

or prejudice arising from a violation of the Depository Order that would justify the severity of

the sanctions.[200]  JPMCB primarily relies on the above-referenced provision in the

acknowledgement form to the Depository Order that refers to "irreparable damage" if the terms

of the Depository Order are breached.  However, the purpose of that provision is to establish the

*presumption* of a right to "equitable relief, including [an] injunction and specific performance" to

prevent continuing violations of the Depository Order.  This provision standing alone does not

demonstrate that JPMCB actually suffered any harm or prejudice—or even that it would be

entitled to equitable relief.  JPMCB further cites one news article that described confidential

information set forth in the Complaint, and claims that it is "impossible" to know the extent of

---

[197]  *See* Report at § VI.C.3.

[198]  *See* Report at § VI.D.1.b.(2).

[199]  *See, e.g., Republic of Phil. v. Westinghouse Elec. Corp.*, 43 F.3d 65, 74 (3d Cir. 1994) ("If an attorney, rather than a client, is at fault, the sanction should ordinarily target the culpable attorney."); *Carter v. Albert Einstein Med. Ctr.*, 804 F.2d 805, 807 (3d Cir. 1986) (noting that the court has "increasingly emphasized visiting sanctions on the delinquent lawyer, rather than on a client who is not actually at fault"); *Crawford v. Franklin Credit Mgmt. Corp.*, 261 F.R.D. 34, 43 (S.D.N.Y. 2009) ("An order precluding the Defendants from offering any evidence or striking the answer, which is the relief [plaintiff] seeks, obviously would be an extreme sanction.  While I would not hesitate to impose such a sanction in an appropriate case, the fault here seems to lie largely with the Defendants' counsel rather than with his clients.  The sanctions sought by [plaintiff] therefore strikes me as overkill.") (internal citation omitted).

[200]  *See, e.g., Spear v. Comm'r*, 41 F.3d 103, 115 (3d Cir. 1994) ("And so we conclude that the imposition of any sanction that affects the likely outcome of a trial requires that the party sanctioned to have gained some advantage from his or her disobedience of a court order.  In other words, the party that gains from the sanction must have been at least arguably prejudiced by the misconduct of the other side.").

any harm because parties could have downloaded the Complaint, but JPMCB does not verify or describe any actual harm.

The Examiner cannot independently identify any specific harm or prejudice suffered by JPMCB.  The confidential information included in the Complaint does not disclose any business plans, trade secrets, economically sensitive data, or confidential research, development, or commercial information.  Although the information could create negative perceptions and inferences concerning JPMCB, it is equally clear that the Complaint is a form of advocacy and has been alleged in a manner to state Wilmington Trust's best case.  The Examiner is mindful that no party desires to be shown in a bad light resulting from violation of a court order on confidentiality, and it is regrettable that Wilmington Trust improperly allowed confidential information to be publicly accessible.  No evidence, however, has been presented to substantiate that JPMCB suffered any damages.

The bulk of the sanctions proposed by JPMCB are disproportionate and unnecessary under the circumstances to ensure compliance with the Depository Order or deter future violations.  The failure to comply with the Depository Order in this case was a singular, discrete, and unintentional event that was mitigated through the efforts of the Brown Rudnick firm within hours after it occurred by having the prior version of the Complaint removed from the docket and replaced with a securely redacted version.[201]  Given the nature of the violation, and the Brown

---

[201] *See, e.g. AAMCO Transmissions, Inc. v. Baker*, No. 06-5252, 2008 U.S. Dist. LEXIS 14084, at *20-21 (E.D. Pa. Feb. 25, 2008) (noting in determining appropriate sanction that counsel "promptly corrected the mistake by having an appropriately redacted document filed in substitution of the document containing the personal identifiers").

Rudnick firm's institution of corrective policies (albeit belated), much less severe sanctions are warranted.[202]

A distinction must be made, however, regarding JPMCB's request for attorneys' fees and expenses.  As previously concluded, the Brown Rudnick firm's experience in the Lyondell Chemical Company bankruptcy case should have informed it of the importance and need to have firm-wide policies and guidelines in place concerning best practices for securely redacting documents, which could have avoided the problem in the Chapter 11 Cases entirely.  Although the Brown Rudnick firm attempted in good faith to satisfy the requirements of the Depository Order, its failure to comply with the terms of that order was not substantially justified.  Consequently, the Examiner concludes it is reasonably likely that a court would determine that the Brown Rudnick firm should pay the *reasonable* attorneys fees and expenses incurred by JPMCB in connection with its motion for sanctions and the violation of the Depository Order.[203]

### 2. Fiduciary Duties of Wilmington Trust as Member of UCC.

#### a. Circumstances Related to the Drafting and Preparation of the Complaint.

During the first week of January 2010, the Brown Rudnick firm commenced the work that ultimately led to the filing of the Complaint.[204]  The initial stages of this process involved Mr. Stark, Mr. Siegel, and a team of associates at the Brown Rudnick firm analyzing and

---

[202]  *See, e.g., Cine Forty-Second St. Theatre Corp. v. Allied Artists Picture Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979) ("Considerations of fair play may dictate that courts eschew the harshest sanctions provided by Rule 37 where failure to comply is due to a mere oversight of counsel amounting to no more than simple negligence.").

[203]  *See, e.g., AAMCO Transmissions*, 2008 U.S. Dist. LEXIS 14084, at *23 (concluding in case involving negligent failure to redact personal information "that an appropriate remedy would be to impose upon [plaintiff's] counsel the responsibility of having to pay a reasonable counsel fee associated with having the matter made right"); Examiner's Interview of William M. Dolan III, June 2, 2010.

[204]  Examiner's Interview of Martin S. Siegel, June 2, 2010.  In addition to conducting interviews, the Examiner reviewed attorney time records produced by the Brown Rudnick firm which confirmed these activities and sequence of events and supported the testimony of the interviewees.  The time records reviewed by the Examiner will not be included in the Appendix to the Report.

researching potential causes of action arising out of the Leveraged ESOP Transactions, which was prompted by the review of publicly available documents in connection with preparation of Wilmington Trust's motion for an examiner and the information revealed during that process.[205] Once it was determined that Wilmington Trust could itself potentially assert causes of action on behalf of the holders of the PHONES Notes, the Brown Rudnick firm began to independently and extensively investigate the circumstances related to the Leveraged ESOP Transactions and prepared an outline of the types of claims that could be alleged.[206]

By the end of January 2010, between twenty and thirty associates at the Brown Rudnick firm were deployed to develop the underlying facts and review all documents that could support the claims, including documents in the depository established under the Depository Order, a process that took between two and three weeks to complete.[207]  Contemporaneous with these activities, the Brown Rudnick firm began drafting the Complaint, with Ms. Bromberg, once she had joined the firm, acting as the primary draftsperson under the supervision of Mr. Siegel and Mr. Stark.[208]

The associates reviewed and identified the documents, and provided them to Ms. Bromberg for analysis of the primary source material and potential attribution and description in the allegations of the Complaint.[209]  While Ms. Bromberg was drafting the Complaint, she also supervised and directed a team of five to ten associates that provided additional assistance, including legal and factual research and further investigation tasks in support of the allegations

---

[205]  Examiner's Interview of Martin S. Siegel, June 2, 2010; Examiner's Interview of Robert J. Stark, June 2, 2010.

[206]  Examiner's Interview of Martin S. Siegel, June 2, 2010.

[207]  Examiner's Interview of Kate S. Bromberg, June 1, 2010; Examiner's Interview of Martin S. Siegel, June 2, 2010; Examiner's Interview of Robert J. Stark, June 2, 2010.

[208]  Examiner's Interview of Kate S. Bromberg, June 1, 2010; Examiner's Interview of Martin S. Siegel, June 2, 2010; Examiner's Interview of Robert J. Stark, June 2, 2010.

[209]  Examiner's Interview of Kate S. Bromberg, June 1, 2010.

of the Complaint.[210]  When Ms. Bromberg produced and revised drafts of the Complaint, they were forwarded to Messrs. Stark, Siegel, and Dolan for review and comment.[211]

The drafting of the Complaint and analysis of documents and factual and legal issues continued through February 2010, demanding significant time and attention from numerous attorneys at the Brown Rudnick firm.[212]  As the Complaint reached its final stages, Mr. Stark and Mr. Siegel continued to provide input to Ms. Bromberg, and when it was in substantially advanced form, Mr. Dolan also reviewed and provided additional input on the allegations of the Complaint.[213]  This process culminated with the final version of the Complaint that was filed on March 4, 2010.

### b.    Findings Regarding Fiduciary Duties of Wilmington Trust as Member of UCC.

Wilmington Trust clearly acted aggressively in filing the Complaint, incorporating verbatim certain factual allegations from the complaint submitted by the UCC to the document depository.  Wilmington Trust, however, did not breach its fiduciary duties as a member of the UCC.

First, Wilmington Trust did not improperly assert estate claims for its exclusive benefit. Equitable subordination claims do not belong exclusively to the bankruptcy estate, and creditors may assert and prosecute such claims, as Wilmington Trust has done in the Chapter 11 Cases.[214]

---

[210]  *Id.*

[211]  Examiner's Interview of Kate S. Bromberg, June 1, 2010; Examiner's Interview of Martin S. Siegel, June 2, 2010; Examiner's Interview of Robert J. Stark, June 2, 2010; Examiner's Interview of William M. Dolan III, June 2, 2010.

[212]  Examiner's Interview of Kate S. Bromberg, June 1, 2010; Examiner's Interview of Martin S. Siegel, June 2, 2010; Examiner's Interview of Robert J. Stark, June 2, 2010.

[213]  Examiner's Interview of Kate S. Bromberg, June 1, 2010; Examiner's Interview of William M. Dolan III, June 2, 2010; Examiner's Interview of Robert J. Stark, June 2, 2010.

[214]  *See* Report at § V.D.1.c.

In addition, the constructive trust remedy sought by Wilmington Trust would not take away property of the estate that is otherwise available for distribution to creditors.  Rather, the constructive trust would attach exclusively to distributions that the defendants receive from the estates.[215]

Second, even as a member of the UCC, Wilmington Trust is entitled to take actions that advance its individual economic interests.[216]  Wilmington Trust did not forfeit its rights as a creditor when it joined the UCC, and as long as it does not abuse its position as a UCC member in the process, it is free to pursue and protect those rights.  Indeed, the UCC Bylaws specifically acknowledge that members may enforce or protect their rights as individual creditors as they may deem appropriate, and hold positions that diverge from the official position taken by the UCC.[217]  The exercise of such rights by Wilmington Trust is not an abuse of its position on the UCC or a breach of its fiduciary duties as a member.

Third, Wilmington Trust did not misuse confidential information obtained in its capacity as a UCC member or misappropriate confidential work product prepared by the UCC.  As noted above, Wilmington Trust devoted significant resources to independently review documents and construct the factual allegations set forth in the Complaint.[218]  In fact, Wilmington Trust began researching and developing the legal theories in support of the claims alleged in the Complaint

---

[215]  *Id.* at § V.D.3.

[216]  *Id.* at § VI.C.4.

[217]  *See* Ex. 881 at § VII.B. (UCC Bylaws) ("While all Committee Members acknowledge that as members of the Committee they are acting as fiduciaries in their capacity as such, nothing contained in these bylaws shall, subject to confidentiality and related issues, prevent any Member from exercising (or omitting to exercise) or seeking (or omitting to seek) to enforce or protect any of its rights as an individual creditor other party-in-interest in these cases as it may deem appropriate.  Each Member of the Committee retains the right to appear in the chapter 11 cases of the Debtors in respect of its own interests and to take a position different from that of the Committee; provided, however, that no Member shall purport to represent or speak for the Committee in connection therewith.").

[218]  *See* Report at § VI.D.2.a.

before it even had an opportunity to review the first draft of the UCC's complaint.[219]  Although

Wilmington Trust regrettably copied portions of certain allegations in the UCC's complaint, a

comparison between the Complaint and the UCC's complaint reveals significant differences

between the allegations and no real similarity in the legal theories or causes of action they

respectively assert.  The Complaint has many specific and detailed allegations that are not

reflected in the UCC's complaint, and the differences between the allegations in the Complaint

and the UCC's complaint are greater than the similarities.

    Fourth, to the extent there is overlap in the factual allegations in the Complaint and the

UCC's complaint, it appears to have resulted in many instances from quoting the same source

documents and information, and the allegations of both documents having arisen from the same

operative facts.  There are a limited number of ways in which the facts related to the Leveraged

ESOP Transactions may be averred, and many of the descriptions of the Leveraged ESOP

Transactions are based on publicly available documents or documents available in the depository

established under the Depository Order.  Wilmington Trust performed its own review and

analysis of the underlying documents and facts and had a basis to make the allegations in the

Complaint that was independent from the allegations in the UCC's complaint, even if the

phrasing of portions of certain allegations in the documents is identical.[220]

    Fifth, Wilmington Trust was entitled to access the UCC's draft complaint, which was

deposited into the document depository before the Complaint was finalized and filed, in its

capacity as a party to the Depository Order.  The UCC Bylaws restrict UCC members from

revealing information distributed to them by or through the UCC that is not generally available

---

[219]    *Id.*

[220]    *Id.*

to the public, but this restriction expressly does not apply to information that is separately received by the member outside of its capacity as a member of the UCC.[221]  As a party to the Depository Order, however, Wilmington Trust had the right to access the UCC's complaint any time after it was submitted to the document depository.[222]

Finally, Wilmington Trust did not use its position on the UCC as a conduit for information or as a means to accomplish its own agenda.  Rather, Wilmington Trust independently reviewed and analyzed documents and information, developed distinct factual allegations and legal theories, and drafted and prepared the Complaint, requiring substantial efforts from its counsel over several months.[223]  The Complaint represents independent work product derived from these efforts.

For these reasons, the Examiner concludes that a court is reasonably likely to find that Wilmington Trust did not breach its fiduciary duties as a member of the UCC.

---

[221]  *See* Ex. 881 at § VIII.B. (UCC Bylaws) ("confidential information shall not include information . . . (ii) that is separately received by a Member outside of that Member's capacity as a Committee Member . . . .").

[222]  The UCC asserts that the UCC Bylaws would still classify the information as confidential because it was subject to the Depository Order, but this contention fails to recognize that the confidentiality provision is written in the disjunctive and this requirement does not apply to information received by members outside their capacity as a member of the UCC.  *See* Ex. 881 at § VII.B. (UCC Bylaws) ("confidential information shall not include information . . . (ii) that is separately received by a Member outside of that Member's capacity as a Committee Member . . . *or* (iv) that becomes independently available to a Member by a means other than service on or in connection with its membership on the Committee so long as the Member's receipt of such information is not governed by any other confidential provisions or agreements . . . .") (emphasis added).

[223]  *See* Report at § VI.D.2.a.