**Exhibit 4**

**COMPENDIUM OF SUBMISSIONS BY CERTAIN CREDITORS
OR CREDITOR REPRESENTATIVES RESPECTING THE LBO-RELATED
CAUSES OF ACTION AND THE GLOBAL SETTLEMENT**

Included herein are the Settlement Submissions respecting the LBO-Related Causes of Action and the Global Settlement from (i) the "Settlement Supporters" which include certain Senior Lenders, Senior Notes holder Centerbridge Partners, L.P. and Successor Senior Notes Indenture Trustee, Law Debenture Trust Company of New York; (ii) Wilmington Trust Company as Successor Indenture Trustee for the PHONES, (iii) the "Credit Agreement" Lenders who are certain holders of Credit Agreement Claims; and (iv) Wells Fargo Bank, N.A., as Successor Administrative Agent under the Bridge Loan Agreement.

These Settlement Submissions were <u>not</u> prepared by the Debtors; they were prepared solely by and express the views of the parties who tendered the Submissions. The Debtors disagree with many of the factual and legal assertions contained in certain of the Submissions. The Debtors' views in respect of the LBO-Related Causes of Action and the Global Settlement may be found in Article VII of the Disclosure Statement.

The Debtors urge you to vote <u>to accept</u> the Plan.

## STATEMENT OF SETTLEMENT SUPPORTERS RECOMMENDING THAT HOLDERS OF CLAIMS VOTE TO ACCEPT THE PLAN

The Settlement Supporters[1] comprise a cross section of the Debtors' creditors, including four of the five largest Senior Lenders and other Senior Lenders holding in the aggregate more than $3 billion in claims, the single largest holder of Senior Notes and the successor indenture trustee for certain of the Senior Notes. The LBO-Related Causes of Action seek recoveries from the Senior Lenders and others who participated in the Leveraged ESOP Transactions for the benefit of the Senior Notes and other general unsecured creditors of Tribune. Any ruling on such claims, whether for or against the Debtors' estates, would be adverse to some of the Settlement Supporters and favorable to others. It is therefore significant that, after months of investigations and difficult negotiations, the Settlement Supporters have agreed that the settlement of the LBO-Related Causes of Action (the "Settlement") under the Plan is fair and reasonable in light of the risks to all parties, including litigation-related expense and delay.

### A.   Investigations and Settlement

The Debtors, the Creditors' Committee (represented by special independent litigation counsel), several of the Settlement Supporters and numerous other parties have painstakingly investigated the LBO-Related Causes of Action. More than 4 million pages of documents have been produced and reviewed by various parties and several depositions were taken. Despite this exhaustive and costly review followed by many months of hard-fought negotiations, the Settlement Supporters continue to disagree regarding the merits of the LBO-Related Causes of Action. The Settlement Supporters do agree, however, that the issues are complex and highly dependent on factual and legal matters as to which the outcome at trial is uncertain. In light of each party's view of the litigation uncertainties and the substantial savings in terms of cost and time value of money that will be realized for the estates and ultimately their creditors through a prompt resolution of the issues, the Settlement Supporters have concluded that there is an overlap between what the Senior Lenders should be willing to pay and what the estates and their unsecured creditors should be willing to accept in settlement of the LBO-Related Causes of Action. The Settlement Supporters believe that a fair and reasonable settlement that avoids what could be years of protracted, prohibitively expensive and value destroying litigation is the best means of preserving and fairly allocating the value of Tribune and its subsidiaries to the parties in interest in these cases.

### B.   Certain Objections Relevant to Evaluation of the Settlement

To understand the Settlement Supporters' position regarding the Settlement, it is helpful to consider the diametrically opposed objections to the Settlement articulated by Wilmington Trust Company, indenture trustee for the PHONES ("WTC"), which believes the estate's recoveries under the Settlement are too low, and the so-called Credit Agreement Lenders, who believe the Settlement is too high.

*Wilmington Trust Company's Objections*: WTC asserts that the LBO-Related Causes of Action are more valuable than the recoveries under the Settlement and that the PHONES, despite their junior subordinated position, would receive recoveries if such claims were litigated to conclusion. The PHONES have little to lose and much to gain from attacking the Settlement, which, though substantial, is not sufficient to provide recoveries in respect of their junior claims. Because of this, the PHONES have every incentive to challenge the Settlement, rolling the dice at the risk of the Senior Notes to try to extract a recovery. Because the recoveries of Law Debenture, Centerbridge and other holders of Senior Notes *could be either greater or less than the value provided in the Settlement if litigation is pursued in lieu of the Settlement*, they are the appropriate parties to weigh the merits of the Settlement relative to litigating the claims. Law Debenture and Centerbridge's support for the Settlement suggests that the PHONES' opposition is unfounded and reflects nothing more than the natural hold-out bias of an out-of-the-money junior creditor class.

*Credit Agreement Lenders' Objections*: An ad hoc group of certain Senior Lenders argues that the Settlement is unfair because it is too costly for the Senior Lenders and also because there are parties that received prepetition payments on LBO-related debt that are not providing contributions to the Settlement.

---

[1] The Settlement Supporters include Senior Lenders Angelo Gordon & Co. LP, Bank of America, N.A., GoldenTree Asset Management, L.P., Viking Global Performance LLC and JPMorgan Chase Bank, N.A., Senior Notes holder Centerbridge Partners, L.P. and Successor Senior Notes Indenture Trustee Law Debenture Trust Company of New York.

The Settlement Supporters believe that the Settlement can be justified based on the benefits of avoiding the certain cost and delay of litigation and a fair assessment of the merits. JPMorgan and Angelo Gordon agreed to the Settlement in spite of their views as to the merits of the claims largely in order to preserve the enterprise value of Tribune and expedite their recoveries by avoiding what could be years of value destroying litigation. By maximizing the value of Tribune and expediting its emergence, which is the primary purpose of the Settlement, the Settlement redounds to the benefit of *all* Senior Lenders as the residual owners of Tribune, which is why the Settlement is funded equally by all Senior Lenders.

### C. Law Debenture's and Centerbridge's Views of the Merits of the LBO-Related Causes of Action

While the Supporting Senior Noteholders believe that the Settlement is fair and reasonable, if the Plan is not confirmed, the Supporting Senior Noteholders intend to cause the Debtors' estates to prosecute the LBO-Related Causes of Action for the benefit of Tribune and its creditors. The Supporting Senior Noteholders believe the litigation would succeed for the following reasons, among others:

- The LBO rendered Tribune insolvent and Tribune did not receive reasonably equivalent value. The LBO rendered the Debtors insolvent by more than tripling the Debtors' debt through the incurrence of over $11 billion in debt that provided no benefit to Tribune or its affiliates. Of the LBO proceeds, approximately $8.3 billion was used to cash out shareholders, $380 million was used to pay professional and other fees related to the LBO and $2.8 billion was used to refinance existing debt as to which Tribune's affiliates were not indebted. Neither the funds used for the share purchase nor the funds used for professional or other fees conferred any value to the Debtors as they were only incurred to facilitate the avoidable obligations and transfers pursuant to the LBO.
- The Two Phase LBO was one integrated transaction. Phase I and Phase II of the LBO are collapsible and the Debtors, Zell and the Senior Lenders understood that the LBO constituted one integrated transaction that closed in two Phases – a fact supported by the interconnectedness of the various agreements and indicated by key transactional documents. In addition, Tribune's Board approved the entire transaction at its April 1, 2007 Board meeting.
- The Credit Agreement guarantees are avoidable as constructively fraudulent transfers because, on an integrated basis, the Debtors did not receive reasonably equivalent value and the LBO rendered the Debtors insolvent. *Even on an individualized basis, Tribune's subsidiaries received no value in exchange for the incurrence of their newfound obligations. The LBO provided no direct value, nor did it provide any indirect value to these entities – not even synergistic benefits.*
- The LBO-Related transfers and obligations are avoidable as intentional fraudulent transfers based on, among other things, the Senior Lenders' knowledge that the LBO would render Tribune insolvent.
- Any claims against the Debtors retained by the Senior Lenders following litigation of the LBO-Related Causes of Action are subject to equitable subordination and, therefore, would not diminish the recoveries for the Senior Noteholders or any of the Debtors' other non-LBO related creditors.
- Upon the successful prosecution of the LBO-Related Causes of Action, the Senior Lenders will have their claims disallowed and will be required to return all monies paid by the Debtors or their affiliates, prepetition or postpetition, on account of the LBO-related debt.

### D. The Senior Lenders' Views of the Merits of the LBO-Related Causes of Action

The Senior Lender Settlement Supporters believe that the LBO-Related Causes of Action lack merit for a number of reasons, including:

- Contemporaneous financial analyses show that Tribune was solvent both at the time of the recapitalization and at the time of the merger, and solvency is a complete defense to constructive fraudulent conveyance challenge.
- The recapitalization and the subsequent merger were independent transactions and must be analyzed separately when determining solvency. Even if the Debtors were successful in avoiding the merger loans, the Senior Lenders would be entitled to receive substantially all of the equity of the Reorganized Debtors based on the recapitalization loans alone.
- Even if Tribune's obligations to the Senior Lenders could be avoided on the grounds that Tribune was insolvent at the time of the recapitalization and/or the merger, (i) the Senior Loan guaranties would be insulated from attack because Tribune's guarantor subsidiaries had more than $2 billion less debt than did

2

Tribune at the time and were therefore solvent throughout the relevant period and (ii) more than $3 billion of the Senior Loans were used to refinance existing debt and for other general corporate purposes and would thus be shielded from avoidance.
- The Senior Lenders acted in the good faith belief that Tribune was solvent after giving effect to the recapitalization and merger transactions, and this good faith is a complete defense to any fraudulent conveyance challenges in this case.
- Any litigation outcome that would yield any material recovery to other creditors would require (i) avoidance of both the recapitalization loans and the merger loans, (ii) avoidance of both Tribune's obligations *and* the subsidiary guarantees and (iii) application of unprecedented remedies, such as complete disallowance of the guarantee claims.

The Senior Lender Settlement Supporters and the so-called Credit Agreement Lenders agree that the LBO-Related Causes of Action lack merit, but they disagree as to the amount and sources of funding for the Settlement. The Credit Agreement Lenders believe that any settlement should be funded, at least in part, from disgorgement recoveries against lenders that received principal and interest debt payments from Tribune. The Settlement Supporters believe that any disgorgement claims would yield *de minimis* recoveries for the following reasons: (i) there are more than ***nine hundred*** recipients of prepetition payments on account of the Senior Credit Facility alone, several of which no longer exist or have undergone substantial restructuring, making the prospect of a material recovery extremely unlikely and any pursuit of disgorgement prohibitively expensive and complex, (ii) disgorgement defendants would have the same (if not more) defenses to disgorgement that current Senior Lenders have to claims avoidance but none of the incentive to settle to facilitate distributions from the estates and (iii) disgorgement defendants would assert revived claims against Tribune and the guarantors for each dollar, if any, disgorged, thus severely diluting recoveries of non-disgorging Senior Lenders. The potential benefit of disgorgement claims would thus be dwarfed by the costs of pursuing such claims.

### E. Reasons to Support the Settlement

While the Settlement Supporters differ strongly on the merits of the LBO-Related Causes of Action, each has come to the independent conclusion that the Settlement is the right compromise that allows the Debtors to emerge from bankruptcy and permit each to realize value sooner and without lengthy and value-destroying litigation. The Settlement Supporters are confident that through the Plan solicitation process, substantial majorities in each of their classes of creditors will express their agreement. By one month following the announcement of the Settlement and the filing of the Plan, Rule 2019 filings by counsel to the Credit Agreement Lenders disclosed that there were twenty-one fewer Senior Lenders (representing six different funds) in their group, and the amount of the claims held by the group dropped by approximately $1.3 billion. At the same time, four of the five largest Senior Lenders and other Senior Lenders holding in the aggregate more than $3 billion in claims have so far affirmatively expressed their support for the Settlement and the Plan This is a concrete indication that numerous Senior Lenders in addition to those who are officially supporting the Settlement agree that the Settlement appropriately resolves the LBO-Related Causes of Action. Law Debenture and Centerbridge believe that numerous senior noteholders also support the Settlement (as is evidenced by the absence of material objections to the disclosure statement by any senior noteholder) and will vote in favor of the Plan implementing the Settlement.

The Settlement pays all general unsecured creditors of Tribune's subsidiaries in cash in full. Senior Noteholders will receive approximately $427 million in excess of the amount to which the Debtors submit that they would be entitled in the absence of the LBO-Related Causes of Action. General unsecured creditors of Tribune Company will receive a fixed 35.18% recovery, also substantially in excess of the Debtors' view of their baseline entitlement. The cost to the Senior Lenders of the Settlement, while significant, represents a very small percentage of the Senior Lenders' recovery, and given the complexity of the issues involved, the expense and delay of litigation over the LBO-Related Causes of Action could entail significantly greater costs. Most importantly, the Settlement will allow the Debtors to emerge from bankruptcy protection quickly and stop the massive outlay of administrative expenses, thus maximizing the value of the Debtors' estates to the direct and substantial benefit of all creditors entitled to distributions on their claims.

For all of these reasons, the Settlement Supporters believe that the Settlement provides the best available resolution of these cases.

ROBERT J. STARK
direct dial: (212) 209-4862
rstark@brownrudnick.com



Seven
Times
Square
New York
New York
10036
tel 212.209.4800
fax 212.209.4801

May 24, 2010

To The Creditors of Tribune Company, et al.

RE:   In re Tribune Company, et al., Chap. 11 Case No. 08-13141 (KJC)

Dear Creditors:

      This firm is counsel to Wilmington Trust Company, Successor Indenture Trustee for the Exchangeable Subordinated Debentures due 2029, generally referred to as the "PHONES." As discussed in the enclosed Disclosure Statement, the PHONES are a form of debt security (aggregate initial principal amount of $1.2 billion) issued by Tribune Company in April 1999. Tribune's Plan of Reorganization does not reserve any distributions to holders of the PHONES, and such creditors are not being offered an opportunity to vote on the Plan. It, therefore, should come as no surprise that Wilmington Trust, as Trustee, does not support the Plan and intends to vigorously oppose its approval by the Bankruptcy Court. In this letter, we offer our case perspective and ask that you carefully consider our views before casting your Plan vote.

      As indicated in the Disclosure Statement (and widely reported in the press), Tribune was the target of a massive leveraged-buyout (often referred to as an "LBO") concluding only about 11 months before the Company's bankruptcy filing. An LBO is a transaction whereby the target (here, Tribune) borrows heavily (here, about $8 billion) to purchase its own stock from public stock-holders (thereby, "taking the company private"), and selling stock to an LBO "sponsor" (here, Sam Zell) who, for a relatively small amount (here, about $300 million), becomes the new principal owner. In other words, the target itself largely pays for its own acquisition by the sponsor. Should the LBO debt ultimately prove too much, prompting the target's bankruptcy filing, pre-LBO creditors (like the PHONES) have basis in the law to call foul. In fact, there is considerable support in the law for a Bankruptcy Court to find that, under this fact-pattern: (1) the company did not receive any real value when it bought back its own stock (only the former stockholders and the sponsor benefited); (2) if the LBO left the target insolvent or with unreasonably small capital, the claims and lien-protections asserted by LBO lenders may be avoided as "fraudulent conveyances," and those lenders may lose all entitlement to receive anything from the bankruptcy estate; (3) those responsible for the LBO (management, the sponsor, and LBO lenders) may bear significant liability to the estates and the pre-LBO creditors; and (4) pre-bankruptcy fees and interest payments delivered to the LBO lenders must be disgorged to the bankruptcy estate (in fact, before even considering more complex disgorgement theories, the estates appear to have formulaic "preference" claims against Mr. Zell and the LBO Banks for more than $360 million). Tribune's LBO and resulting causes of action are at the heart of this Chapter 11 case, and the inaptly-named "Global Settlement" embedded in the Plan.

brownrudnick.com

8251000 v1

LLP   an International law firm   Boston | Dublin | Hartford | London | New York | Providence | Washington



May 24, 2010
Page 2

The "Global Settlement" contemplates, among other things, that: (i) the LBO Banks will become the principal owners of Tribune post-bankruptcy; (ii) unsecured Senior Noteholders will receive about $450 million in value, equating to about a 35% return on their $1.3 billion pre-LBO loan to Tribune; and (iii) those responsible for the LBO (management, Mr. Zell, and the LBO Banks) will not contribute any additional value to the estate or bear any further liability (to the estate or privately to creditors) in connection with the LBO. Wilmington Trust, as Trustee, firmly believes that the terms of the Global Settlement are inconsistent with the law and are patently unfair, and intends to fully litigate its objection to the Plan.

Further, Wilmington Trust, as Trustee, believes that the Global Settlement was not the product of arm's-length bargaining. To be sure, Mr. Zell and various members of Tribune's Board and Senior Management have significant, personal interest in seeing all LBO-related litigation "swept under the rug," especially when the proposed settlement does not require them to pay any amounts and also shelters them from all further litigation exposure. JPMorgan Chase Bank (a lead LBO Bank) shares that same goal; and, regardless, under the terms of the Global Settlement, the LBO Banks take Tribune, giving up only a relatively small amount to settle. The Official Creditors' Committee, which also supports the Global Settlement, is co-Chaired by JPMorgan Chase,[1] is comprised of creditors we believe have no real economic interest in this litigation (most Committee creditors are non-bond creditors that are being paid-off under the Plan), and are being lead by counsel that represents certain lead LBO Banks in other bankruptcy matters and/or other LBO transactions. Finally, the 35% distribution to holders of Senior Notes was negotiated principally by the hedge-fund Centerbridge Credit Advisors. Wilmington Trust, as Trustee, has reason to believe that Centerbridge bought its Seniors Notes post-bankruptcy, at an average cost basis that is lower than 35%. Thus, the "Global Settlement" may lock-in extraordinary profits for Centerbridge, while still reflecting unfavorable settlement terms for all other Senior Noteholders.

Your vote on the Plan bears a "risk/reward" profile, not unlike a decision to make an investment in the stock or bonds of a public company. The Disclosure Statement is intended by law to reflect the "risk/reward" profile of your vote on the Plan, much like a public company's SEC filings are intended to help you gauge the "upside/downside" probabilities of an investment in a company's stock or bonds. For Tribune's various creditor classes, the Plan and the Global Settlement reflect a "risk/reward" profile, which Wilmington Trust, as Trustee, gauges as follows:

- For holders of LBO Bank debt, the reward is high – you get virtually all estate value. But, the risk is commensurately high. The decision to prosecute this Plan (instead of negotiating a fully consensual plan of reorganization) will force litigation over the legal validity of your claims and liens. If the Debtors (and JPMorgan Chase) are wrong, the consequences can be dire for you. See In re Tousa, 422 B.R. 783 (Bankr. S.D. Fla. 2009) (on appeal) (lender claims avoided in full as fraudulent conveyances, and the holders of

---

[1] Wilmington Trust has been informed by counsel to the Official Creditors' Committee that JPMorgan Chase (like Wilmington Trust) did not participate in deliberations regarding the Global Settlement.



May 24, 2010
Page 3

bank debt also compelled to disgorge over $400 million in interest and professional fee payments).

- For holders of trade claims, the reward also is high – you will receive 100% cash payment. But, that too comes with high risk. This Plan will be the subject of lengthy, expensive and complex litigation. That litigation may last for a considerable period of time, and the results are now far from certain. Your affirmative Plan vote necessarily endorses this litigation and all the resulting cost and business stress/dislocation. A negative Plan vote may prompt the parties back to the negotiating table and, perhaps, a more efficient and business-rational case conclusion (likely with the same 100% cash payment reserved for you).

- For holders of Senior Notes, the "risk/reward" profile is less pronounced. Wilmington Trust, as Trustee, believes (and many public commentators seem to agree) that Tribune's LBO was one of the worst leveraged-buyout transactions in recent history, and that the resulting litigation claims against Mr. Zell, management, and the LBO Banks are strong. In light thereof, and considering that Centerbridge's investment in Senior Notes likely had an average cost basis lower than 35%, the Plan's proposed treatment for Senior Notes may not reflect a favorable "risk/reward" profile for you. In light of the Plan protections afforded to Mr. Zell and management, Wilmington Trust, as Trustee, believes it to be a very unfavorable settlement from your perspective.

Wilmington Trust's views as Trustee notwithstanding, you should be aware that, on May 10, 2010, the Bankruptcy Court approved the appointment of UCLA Law School Professor Kenneth Klee as Examiner in this case. Mr. Klee has been charged by the Bankruptcy Court with investigating Tribune's LBO and issuing a report discussing the viability of resulting causes of action. The Examiner has retained counsel and financial advisors, and is now hard at work discharging this assignment. His report is due July 12, 2010. Thus, you are receiving the Plan and Disclosure Statement well before Mr. Klee has concluded his examination and issued his report. In the Disclosure Statement, you are instructed as to how you can obtain a copy of Mr. Klee's report before the deadline for casting your Plan vote.

For all of these reasons, Wilmington Trust, as Trustee, respectfully urges you to carefully consider your Plan vote, and all resulting case implications. At the very least, Wilmington Trust, as Trustee, respectfully urges you to hold your vote, obtain a copy of the Examiner's report, and review that report carefully before casting your Plan vote. We thank you for patiently reading and reflecting on the case views reflected in this letter.

Very truly yours,

Robert J. Stark

To: All holders of "Senior Loan Claims" and "Senior Loan Guaranty Claims" as defined in the Tribune Plan (collectively, the "**Credit Agreement Claims**").

---

*The Credit Agreement Lenders' Recommend That You Vote To Reject The Tribune Plan*

---

The Tribune Plan is premised upon a one-sided "settlement" of so-called LBO-Related Causes of Action. That settlement is objectionable for two primary reasons:

1. The settlement reduces the consideration distributable to holders of Credit Agreement Claims by more than *$425 million* (and potentially much more). This is substantially higher than any reasonable, probability-weighted assessment of the value of litigation that may be commenced in respect to the Credit Agreement Claims.

2. Holders of Credit Agreement Claims bear virtually the entire burden of the settlement, under which others alleged to be liable (including Sam Zell, JPMorgan (as a recipient of payments prior to the bankruptcy case) and others) are released and indemnified for free. The free indemnities are payable by the Reorganized Debtors and will devalue recoveries of holders of Credit Agreement Claims, who are to receive a substantial portion of the equity in the Reorganized Debtors.

---

*A $425 Million Settlement Payment By Holders Of Credit Agreement Claims Is Unwarranted*

---

The following is a table summarizing the impact of the proposed settlement and potential litigation outcomes assuming that Tribune Co. was insolvent but that its guarantors subsidiaries were solvent at the time of the challenged transactions:

| Defendant Group | Potential Outcome Of Litigation | Settlement |
| --- | --- | --- |
| Holders of Credit Agreement Claims | *Positive*: Receive approximately $25MM INCREASE in recovery due to avoidance of Bridge Claims – does not include potential benefits from disgorgement and damages claims | *Negative*: $425MM+ DECREASE in recovery + cost of indemnification |
| JPM and other Disgorgement Defendants | *Negative*: Payment of up to $2 Billion for principal, interest & fee payments received | *Positive*: Pay $0 and receive full indemnification plus up to 5% of equity for management |
| Directors and officers | *Negative*: Payment of up to hundreds of millions in potential damages | |
| Sam Zell and affiliates | *Negative*: Potential of up to hundreds of millions in potential damages and disgorgement claims | |

The primary claim to be "settled" under the Tribune Plan is an alleged claim for "constructive" fraudulent transfer. According to the Debtors, "to prevail on such claims, it must be shown that the Leveraged ESOP Transactions rendered the Debtors insolvent and that reasonably equivalent value was not provided to the Debtors in good faith." It will be extremely difficult for any representative of the bankruptcy estates to accomplish this, for at least the following reasons:

---

[1] The Credit Agreement Lenders are certain current holders of Credit Agreement Claims.

- **Inability to Avoid Credit Agreement Guarantees**

Tribune's Credit Agreement obligations are guaranteed by almost all of Tribune's debtor subsidiaries. In the aggregate Tribune's subsidiaries had $2.35 billion less debt than the parent entity. To prevail on a fraudulent conveyance claim, a plaintiff would have to establish that the value of the guarantors was less than the amount of the Credit Agreement obligations at the times of incurrence, without taking into account this $2.35 billion in preexisting parent debt. This is a highly unlikely result. Also, creditors of the Tribune parent entity (*i.e.*, bondholders agitating for the avoidance claims) have no standing to prosecute or the ability to benefit from avoidance actions commenced on behalf of the Tribune subsidiary estates, because the avoiding powers only exist for the benefit of creditors.

These are critical issues because, *under all realistic scenarios, avoidance of Credit Agreement claims against Tribune parent alone (keeping the subsidiary guarantees intact) would not materially improve the recoveries of Tribune parent creditors or materially diminish recoveries of holders of Credit Agreement claims.*

- **Inability to "Collapse" Tender Offer and ESOP Merger Transactions**

The Credit Agreement debt was incurred in connection with two separate and distinct transactions – a recapitalization in June 2007 (as to which the Debtors borrowed approximately $8 billion under the Credit Agreement) and the merger that closed in December 2007. These two transactions were not multiple "steps" of the same transaction, as the Disclosure Statement inaccurately implies. They were separate and independent. In particular, the closing of the merger was not certain and was highly conditional at the time the tender offer was completed. The $3.7 billion in debt incurred in December 2007 in connection with the merger cannot logically be considered in assessing Tribune's solvency six months earlier at the conclusion of the recapitalization. Because every estimate of the enterprise value of Tribune at the time of the tender offer vastly exceeds the debt of Tribune at that time, all of the Credit Agreement debt incurred in connection with the June 2007 recapitalization will remain valid.

Critically, because the Credit Agreement debt incurred in connection with the June 2007 recapitalization approximates the Debtors' current enterprise value, *holders of Credit Agreement Claims would be entitled to substantially all of the currently existing value of the bankruptcy estates even if the December 2007 merger debt was avoided.*

- **Tribune's Solvency is Established by the Market Value set by Zell's Bid**

The June 2007 recapitalization and December 2007 merger were the culmination of a year-long auction process, run by sophisticated investment banks and resulting in bids made by existing shareholders (the Chandler Trusts) and by a consortium of Eli Broad and Ronald Burkle. The results of this process are highly relevant to, if not dispositive of, the question of Tribune's solvency, because under governing law the results of a fairly-run auction establish value. Because the auction here resulted in a price that exceeds the amount of Tribune's liabilities following closing of the transactions, Tribune was, by definition, solvent, and the Credit Agreement debt cannot now subject to avoidance.

- **If Debt is Avoided, Credit Agreement Lenders Would Have Large Surviving Claims**

A substantial portion of the proceeds of Credit Agreement debt incurred in connection with the recapitalization was not used to tender for Tribune shares and instead was used to repay preexisting debt and for other corporate purposes. A lender provides reasonably equivalent value when extending credit to repay preexisting debt and satisfy other legitimate corporate expenditures. Accordingly, even if a plaintiff was able to establish that the portion of Credit Agreement debt used to fund share purchases (if any) is avoidable as a fraudulent transfer, holders of Credit Agreement Claims would nevertheless have a claim of well over $3 billion (perhaps much more).

This is a critical point. Even if the Credit Agreement lenders "lose" the fraudulent conveyance case, they will retain a multi-billion dollar claim against Tribune. Due to the potential for recovery of more than $2 billion in pre-bankruptcy payments made by Tribune (as described below), *under many scenarios holders of Credit Agreement Claims fare equally well, if not better, in the event that Credit Agreement claims against Tribune Company actually are avoided (due to the preservation of a $3 billion or greater claim and the increase in value of the bankruptcy estate caused by disgorgement of $2 billion in prepetition payments).* The settlement takes no account of this whatsoever.

> *Holders Of Credit Agreement Claims Unfairly Bear The Entire Cost Of Settlement*

The "global settlement" around which the Tribune Plan is structured provides for current holders of Credit Agreement Claims to fund the entirety of the settlement, through diversion of $425+ million or more in value to other Tribune creditors (primarily Tribune parent bondholders). At the same time, the Tribune Plan provides for a host of free releases and indemnities in favor of Sam Zell, Tribune insiders and other parties allegedly liable for LBO-Related Causes of Action who are contributing nothing to the settlement.

- **Those Subject to Disgorgement Claims are to be Released and Indemnified**

Before filing for bankruptcy, Tribune made *$2 billion* in payments under the Credit Agreement. If there is meaningful exposure with respect to avoidance of the Credit Agreement Claims (notwithstanding the serious hurdles and issues summarized above), that exposure logically extends to those who received the $2 billion of prepetition payments in respect of the allegedly-avoidable debt. If the debt is avoidable, prepetition payments on the debt obviously and inexorably are avoidable as well.

Yet, *under the proposed settlement, those potentially liable to disgorge the prepetition payments are to be released without providing consideration to the estates in respect of these distributions, and then indemnified against loss for any claims that might survive Plan confirmation.*

- **Zell, Other Insiders, Agents, Advisors and Trustees are to be Released and Indemnified**

Similarly, Sam Zell and Tribune's directors and officers and banks and investment banks that acted as agents, advisors and trustees all receive comprehensive releases and unlimited indemnities. *Zell and the directors and officers will not pay a penny for these protections* notwithstanding that the Debtors failed to undertake any independent examination (*i.e.*, one conducted without the influence of and control by Zell, the current Chairman and CEO of Tribune, and other insiders who are potential targets) of the claims and causes of action that could be asserted against them. The agents, advisors and trustees do not *give any additional value for their indemnities or for the releases of affirmative claims that can be asserted against them.*

To make matters worse, *the "settlement" makes holders of Credit Agreement Claims pay twice – once to fund the settlement and then again to fund the unlimited indemnities.* This risk of dilution is real. Zell and his controlled companies already are defendants in class action litigation, facing claims for breach of fiduciary duty and other causes of action arising in connection with the Tribune transactions. In addition, the defendants in the action filed by Wilmington Trust (indenture trustee for the PHONES) which asserts claims said to be owned by Wilmington and not by the Debtors, include Citicorp North America, Inc., JPMorgan, Merrill Lynch, Bank of America, Morgan Stanley, and Sam Zell. This obviously represents another material potential liability of the Reorganized Debtors and thus further serves to devalue the equity to be distributed to holders of Credit Agreement debt.

> *The Examiner's Report Will Be Important To Consideration Of The Settlement*

On May 11, 2010, the Bankruptcy Court entered an order appointing Kenneth N. Klee as Examiner to evaluate, among other things, the claims that are subject to the settlement. The Examiner's report is due on July 12, 2010. That report will be highly relevant to your consideration and analysis of the Tribune Plan and the proposed settlement. *The Credit Agreement Lenders urge you not to vote until you have had the chance to read and digest the Examiner's report.*

> *Your Vote Matters*

If holders of over one third of the amount of the Loan Claims, or holders of more than a majority of holders of Loan Claims, vote to reject the Tribune Plan, the Tribune Plan and proposed settlement embodied therein is not likely to be confirmed. The parties to the Settlement Term Sheet incorporated into the Tribune Plan do not hold Loan Claims in sufficient amounts to cause the class of Loan Claims to vote to accept the Tribune Plan. Accordingly, *your vote on the Tribune Plan is likely to be highly consequential in determining whether the Tribune Plan is accepted by creditors.*

> *Wells Fargo Bank, N.A., as successor administrative agent for the Bridge Lenders and not in its individual capacity (in such capacity, the "Bridge Agent") under the Bridge Loan Agreement, Recommends that all Creditors Vote to Reject the Proposed Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries dated June 4, 2010 (the "Tribune Plan")[1]*

## OVERVIEW

The Tribune Plan is constructed around and largely implements a purported global settlement (the "Settlement") of fraudulent transfer claims and other causes of action (the "LBO Claims") arising from the leveraged buy-out of Tribune in 2007 (the "LBO").

Under the Settlement and the Tribune Plan:

(A) the Bridge Lenders will recover about $7 million on their $1.6 billion of loans, which is a recovery of less than 0.5%;[2]

(B) the other LBO lenders will recover about $5.5 billion on their remaining $8.7 billion of loan claims, which is a recovery of about 63% (not taking into account payment made prior to commencement of the chapter 11 cases); and

(C) the pre-LBO Senior Notes and General Unsecured Claims at Tribune are to receive approximately $500 million on their aggregate claims of about $1.4 billion, which is a recovery of about 35%.

Absent the Settlement and assuming that (a) none of the LBO Claims have merit, (b) the Company's total distributable value is $6.1 billion, and (c) all contractual subordination is enforced, the Bridge Agent believes that:

(A) the Bridge Lenders' recovery would be at least $74 million, which is a recovery of at least 4.6%;

(B) the other LBO lenders' recovery would be about $5.9 billion, which is a recovery of approximately 68%; and

(C) the Senior Notes and General Unsecured Claims would receive about $65 million, which is a recovery of approximately 4.6%.

The Bridge Agent believes that the shifting of recoveries under the Settlement is unfair to the Bridge Lenders, provides improper and undisclosed windfall recoveries to numerous other parties, including the other LBO

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Tribune Plan.

[2] If the Bridge Lender class rejects the Tribune Plan, individual Bridge Lenders can still elect to receive the less than 0.5% distribution outlined above. Otherwise, the claim of each Bridge Lender who voted against the Tribune Plan will be deemed disputed and not paid until Allowed. If such Bridge Loan Claims are ultimately Allowed, they will receive, unless the Court finds an alternative treatment is appropriate to satisfy Section 1129(b), a cash recovery, the amount of which will be dependant upon the amount of distributable value that is allocated to Tribune and the total amount of claims against Tribune. The Debtors believe that using this methodology would produce a recovery of 4.6% of the Bridge Loan Claims if all Bridge Loan Claims are ultimately Allowed in full. This percentage is based, among other things, on application of the Debtors' mid-point Distributable Value of $6.1 billion, the allocation of $537 million (after allocating $330 million of value to the subsidiaries on account of intercompany claims) of such value to Tribune, and the Debtors' view of the claims pool at Tribune. These amounts are reflected in the Settlement Agreement, which the Debtors have represented they support and intend to get approved in connection with confirmation. The Bridge Agent believes that the foregoing methodology will produce a higher recovery on the Bridge Loan Claims. It is the Debtors' intention that the distributable value of Tribune and the amount of that value, if any, that should be allocated to Subsidiaries in respect of intercompany claims will be determined at confirmation. The Tribune Plan also provides that if the recovery percentage materially exceeds 4.6%, then the Tribune Plan cannot be consummated without a waiver by the Debtors and the parties supporting the settlement.

lenders and the Company's former shareholders, and does not produce a defensible resolution of the underlying issues.

The Bridge Agent believes that, among other things, the Settlement and the Tribune Plan suffer from the following defects: (1) the Settlement Support Agreement was entered into by parties who are not estate fiduciaries and who had no interest in protecting the interests of any party, other than their own; (2) the distributable value of the Debtors' business may have been materially understated; (3) distributable value may have been materially over-allocated to the guarantor-subsidiaries; (4) the financial contribution required to resolve the LBO Claims has been materially over-allocated to Tribune; and (5) the Settlement is not premised on a reasonable construct of how fraudulent transfer avoidance would work (a) at the Tribune and Subsidiary Guarantor levels, respectively; (b) with respect to Step 1 and Step 2 of the LBO (whether collapsed or addressed separately); or (c) in respect of payments made in connection with the LBO or post-closing LBO-related obligations.

## DISCUSSION

*1.     The Bridge Agent believes that the Disclosure Statement does not provide a meaningful basis to justify creditors' support for the Settlement.*

The Debtors have represented that their professionals and those of the Creditors' Committee have spent millions of dollars of estate funds investigating and analyzing the LBO Claims. Nevertheless, in the Disclosure Statement, the only supports for the Settlement are (a) bare, unsubstantiated conclusions that the Settlement is fair and reasonable, and (b) admonitions that the LBO Claims are complex and the defendants will fight them vigorously, making any litigation protracted, time-consuming and expensive.

The Bridge Agent has made numerous requests that the Debtors include information (if it exists) that would tend to support or justify the Settlement and its disproportionate impact on certain creditor constituencies and that would permit creditors to form their own views on an informed basis. At the May 20 hearing on the Disclosure Statement, the Bankruptcy Court directed the Debtors to include in the Disclosure Statement certain of the additional information requested by the Bridge Agent, and also allowed principal constituents to prepare supplements stating their respective positions on the LBO-Related Causes of Action and the Settlement (which is central to and incorporated into the Plan).

Despite the court-ordered modifications to the Disclosure Statement and the various supplements, the Bridge Agent continues to doubt that an appropriate justification for the Settlement exists, and believes that it is therefore impossible for stakeholders conclude that there is any basis for supporting the Settlement. Among other things, the Bridge Agent believes the following salient information is missing:

- Benefits realized at the Subsidiary Guarantor and Tribune levels from Step 1 and Step 2 of the LBO.

- Contemporaneous indicia of the solvency, including the reasonableness of capital (i.e., balance sheets; cash flow projections; and a detailed analysis of the variances of the actual financial performance in 2007 and 2008 against the projections), for certain material Guarantor Subsidiaries at Step 1 and Step 2 of the LBO.

- Payments made in connection with the LBO and in respect of obligations incurred thereunder, including (1) identity of each payee (shareholder; lender; advisor; director; management); (2) type of payment (equity; debt; fee; other); (3) amount of payment; and (4) date of payment.

- A discussion of the various potential claims and causes of action that are being resolved in connection with the Settlement which, in the Bridge Agent's view, would provide sufficient basis for differentiation of fraudulent conveyance risk at the Tribune and Subsidiary Guarantor levels.

- A presentation of the range of potential creditor recoveries in connection with differing outcomes of the LBO Claims (including the impact of avoidance and disgorgement), including an explanation of how the range was formulated.

Based on a review of the information made available in the Company database (but not included in the Disclosure Statement) regarding the foregoing matters, the Bridge Agent has been unable to generate a plausible fraudulent transfer scenario that would support a result even remotely similar to that produced by the Settlement. The Debtors appear to have relied upon the worst case scenarios for the Bridge Lenders with respect to every assumption in the Settlement and Tribune Plan. **Based on available information, however, the Bridge Agent believes that under all plausible scenarios, the recoveries of the Bridge Lenders, the Senior Noteholders, the general unsecured creditors (at Tribune) and the Phones would all be materially higher.**

*2.     The Settlement is the product of negotiations between parties who have material parochial interests at stake that are not aligned with the interests of the Debtors' estates.*

The principal parties to the Settlement and architects thereof are not the Debtors, but rather, include Senior Lenders, who are potential targets of the LBO Claims. Although not disclosed in the Disclosure Statement, these parties are believed to have received substantial payments that, in the absence of the Settlement, may be subject to disgorgement as fraudulent transfers. In addition, they have senior claims at the Subsidiary Guarantor level that naturally motivate them to press for a resolution that would primarily impact recoveries at the Tribune level. For unknown reasons, the Debtors have chosen not to disclose the competing interests of such parties which are furthered by the Settlement, or whether they considered or investigated this issue in adopting the Settlement in the Tribune Plan. These entities may have negotiated and agreed to the Settlement to obtain releases from the estates of such claims.

*3.     The unjustified structure of the Settlement wrongfully strips the Bridge Lenders of their recovery.*

The Tribune Plan allocates most of the Debtors' distributable value to the Subsidiary Guarantors, where the Bridge Lenders' guarantee claims are subordinated to the guarantee claims of the Senior Lenders, while nearly all of the Settlement consideration (approximately $510 million of value) is to be taken from distributions that would be made to creditors of Tribune. As such, the net effect of the Settlement is to strip from the Bridge Lenders almost their entire recovery in the Chapter 11 Cases (the Bridge Lenders receive a 0.44% recovery on their Bridge Loan Claims and no recovery on their Bridge Loan Guaranty Claims), while allowing the Senior Lenders to retain the vast majority of their recovery (the Senior Lenders receive a 0.44% recovery on their Senior Loan Claims and a 62.41% recovery on their Senior Loan Guaranty Claims).

The Bridge Agent believes this allocation scheme (which the Debtors do not explain or attempt to justify in the Disclosure Statement) is improper for, among other things, the following:

- The Settlement appears to be premised on the potential of an unprecedented partial avoidance of the integrated LBO transactions (*e.g.*, avoidance at the Tribune level with no risk of avoidance at the Subsidiary Guarantors), thereby dramatically over-allocating avoidance risk to creditors of Tribune.

- There is no evidence to suggest that the Subsidiary Guarantors were solvent and that transfers made by such entities would not be subject to potential avoidance in connection with the LBO Claims.

- Without explanation, the structure is inconsistent with the general rule that leveraged buy-out events will be collapsed for fraudulent transfer analysis purposes.

*4.     Most of the potential targets of the LBO Claims contribute no value to the Settlement, but nevertheless receive broad releases and/or recoup their legal fees and costs under the Tribune Plan.*

The Bridge Agent is not aware of any precedent for the proposition that lenders' claims can be eliminated through avoidance of a leveraged buy-out transaction without a concomitant right of the estate to recover from those who received the proceeds of or otherwise received payments in connection with such transaction.

*5. It is unclear if the Tribune Plan is intended to limit the Bridge Lenders' Rights against Third Parties.*

The Bridge Agent believes that the Bridge Lenders have valuable rights, claims and remedies against non-Debtors. It is unclear, however, if the Current Plan is intended to or will have the effect of eviscerating such rights. These include (i) the right to challenge the enforceability of the subordination of the Bridge Lenders guarantees to the subsidiary guarantees of the Senior Lenders, (ii) the right to seek to equitably subordinate the Claims of the Senior Lenders, and (iii) the right to assert state law rights and remedies against non-Debtor third parties who are not released under the Current Plan. To the extent the Bridge Agent is successful in prosecuting any of these rights or claims, the recovery of the Bridge Lenders would be materially increased. The Current Plan and Current Disclosure Statement are confusing and unclear on this topic. On the one hand, in numerous places the Debtors purport to say that non-Debtors are not released unless a creditor affirmatively elects to grant such a release. On the other hand, the treatment of Senior Lenders' Claims and the Bridge Lenders' Claims appears to implement a recovery scheme that is only viable if the Bridge Lenders' rights and remedies vis à vis the Senior Lenders are stripped away. Thus, opting out of the third party release may have no effect. This is another reason to reject the Plan.

*6. The Tribune Plan is plagued by a number of valuation issues.*

As a threshold matter, the Tribune Plan is premised on an artificially depressed valuation analysis. Further, despite the fact that the Debtors are not seeking substantive consolidation, and that the allocation of value between Tribune, the Subsidiary Guarantors and the non-guarantor subsidiaries materially impacts creditor recoveries under the Tribune Plan, the Debtors have failed to provide (i) a separate valuation for each Debtor entity; and (ii) support for the allocation of value as between Tribune and its subsidiaries.

*For all of the Foregoing Reasons, the Bridge Agent*
*Urges all Creditors to Vote to <u>Reject</u> the Tribune Plan*

Case 08-13141-BLS    Doc 5372-4    Filed 08/12/10    Page 17 of 17