10-K 1 a08-2334_110k.htm 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 30, 2007**

**Commission file number 1-8572**

# TRIBUNE COMPANY
(Exact name of registrant as specified in its charter)

**Delaware**
(State or other jurisdiction of
incorporation or organization)

**36-1880355**
(I.R.S. Employer Identification No.)

**435 North Michigan Avenue
Chicago, Illinois**
(Address of principal executive offices)

**60611**
(Zip Code)

Registrant's telephone number, including area code: **(312) 222-9100**
Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| 2% Exchangeable Subordinated Debentures Due 2029 | New York Stock Exchange |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes o No x

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes o No x

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes x No o

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. x

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (check one):

Large Accelerated Filer "  Accelerated Filer o  Non-Accelerated Filer x  Smaller Reporting Company o

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2).
Yes o No x

Aggregate market value of the Company's voting and non-voting common equity held by non-affiliates on June 29, 2007, based upon the closing price of the Company's Common Stock as reported on the New York Stock Exchange Composite Transactions list for such date: approximately $3,480,700,000.

On December 20, 2007, each share of the Company's common equity held by non-affiliates as of that date was cancelled and converted into the right to receive $34.00 per share in cash.  The Company's Common Stock was also suspended from trading on the New York Stock Exchange on that date.

At March 20, 2008, there were 56,521,739 shares of the Company's Common Stock ($.01 par value per share) outstanding, each of which were held by the Tribune Employee Stock Ownership Plan.

# INDEX TO TRIBUNE COMPANY
## 2007 FORM 10-K

Item No.

### PART I

| | | Page |
|---|---|---|
| 1. | Business | |
| | Significant Events | 1 |
| | Business Segments | 1 |
| | Publishing | 8 |
| | Broadcasting and Entertainment | 9 |
| | Investments | 15 |
| | Non-Operating Items | 18 |
| | Governmental Regulation | 19 |
| | Employees | 19 |
| | Executive Officers of the Company | 20 |
| | Available Information | 21 |
| 1A. | Risk Factors | 22 |
| 1B. | Unresolved Staff Comments | 23 |
| 2. | Properties | 29 |
| 3. | Legal Proceedings | 30 |
| 4. | Submission of Matters to a Vote of Security Holders | 32 |
| | | 36 |

### PART II

| | | Page |
|---|---|---|
| 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 37 |
| 6. | Selected Financial Data | 37 |
| 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 38 |
| 7A. | Quantitative and Qualitative Disclosures About Market Risk | 74 |
| 8. | Financial Statements and Supplementary Data | 78 |
| | Report of Independent Registered Public Accounting Firm | 79 |
| | Consolidated Statements of Income for each of the three fiscal years in the period ended Dec. 30, 2007 | 81 |
| | Consolidated Balance Sheets at Dec. 30, 2007 and Dec. 31, 2006 | 82 |
| | Consolidated Statements of Shareholders' Equity (Deficit) for each of the three fiscal years in the period ended Dec. 30, 2007 | 84 |
| | Consolidated Statements of Cash Flows for each of the three fiscal years in the period ended Dec. 30, 2007 | 86 |
| | Notes to Consolidated Financial Statements | 87 |
| | Note 1: Summary of Significant Accounting Policies | 94 |
| | Note 2: Changes in Operations and Non-Operating Items | 98 |
| | Note 3: Leveraged ESOP Transactions | 100 |
| | Note 4: Discontinued Operations and Assets Held for Sale | 102 |
| | Note 5: *Newsday* and *Hoy*, New York Charge | 103 |
| | Note 6: Inventories | 104 |
| | Note 7: Goodwill and Other Intangible Assets | 106 |
| | Note 8: TMCT and TMCT II | 108 |
| | Note 9: Investments | 110 |
| | Note 10: Debt | 117 |
| | Note 11: Contracts Payable for Broadcast Rights | |

Item No.

| | | Page |
|---|---|---|
| | Note 12: Fair Value of Financial Instruments | 117 |
| | Note 13: Commitments and Contingencies | 117 |
| | Note 14: Income Taxes | 118 |
| | Note 15: Pension and Other Postretirement Benefits | 123 |
| | Note 16: Capital Stock | 127 |
| | Note 17: Incentive Compensation and Stock Plans | 129 |
| | Note 18: Comprehensive Income | 135 |
| | Note 19: Business Segments | 136 |
| | 2007 Quarterly Results (Unaudited) | 139 |
| | 2006 Quarterly Results (Unaudited) | 140 |
| | Five Year Financial Summary | 141 |
| | Financial Statement Schedule for each of the three fiscal years in the period ended Dec. 30, 2007 | |
| | Schedule II Valuation and Qualifying Accounts and Reserves | 143 |
| | Consolidated Financial Statements of Tribune Broadcasting Holdco, LLC and Subsidiaries | 144 |
| | Financial Statements of Tribune Finance, LLC | 167 |
| 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 175 |
| 9A. | Controls and Procedures | 175 |
| 9B. | Other Information | 175 |

**PART III**

| | | |
|---|---|---|
| 10. | Directors, Executive Officers and Corporate Governance | 175 |
| 11. | Executive Compensation | 178 |
| 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 201 |
| 13. | Certain Relationships and Related Transactions, and Director Independence | 203 |
| 14. | Principal Accountant Fees and Services | 206 |

**PART IV**

| | | |
|---|---|---|
| 15. | Exhibits and Financial Statement Schedules | 207 |

* * * * *

| | |
|---|---|
| Signatures | 208 |
| Exhibit Index | 209 |
| Consent of Independent Registered Public Accounting Firm | 213 |
| Certifications of Chief Executive Officer and Chief Financial Officer | 214 |

# PART I

## ITEM 1. BUSINESS.

Tribune Company ("Tribune" or the "Company") is a media and entertainment company. Through its subsidiaries, the Company is engaged in newspaper publishing, television and radio broadcasting and entertainment. The Company was founded in 1847 and incorporated in Illinois in 1861. As a result of a corporate restructuring in 1968, the Company became a holding company incorporated in Delaware. References in this report to "the Company" include Tribune Company and its subsidiaries, unless the context otherwise indicates. The information in this Item 1 should be read in conjunction with the information contained in Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the Company's consolidated financial statements and related notes thereto included in Item 8. Certain prior year amounts have been reclassified to conform with the 2007 presentation. These reclassifications had no impact on reported prior year total revenues, operating profit or net income.

This Annual Report on Form 10-K ("Form 10-K") contains certain forward-looking statements that are based largely on the Company's current expectations. Forward-looking statements are subject to certain risks, trends and uncertainties that could cause actual results and achievements to differ materially from those expressed in the forward-looking statements including, but not limited to, the items discussed in Item 1A, "Risk Factors." Such risks, trends and uncertainties, which in some instances are beyond the Company's control, include: our ability to generate sufficient cash to service the significant debt levels and other financial obligations as a result of the Leveraged ESOP Transactions (as defined below); potential impacts to operations and liquidity as a result of restrictive covenants under our senior credit facilities; our dependency on dividends and distributions from our subsidiaries to make payments on our indebtedness; increased interest rate risk due to variable rate indebtedness; our ability to maintain subchapter S corporation status; changes in advertising demand, circulation levels and audience shares; regulatory and judicial rulings; availability and cost of broadcast rights; competition and other economic conditions; changes in newsprint prices; changes in accounting standards; adverse results from litigation, governmental investigations or tax related proceedings or audits; the effect of labor strikes, lock-outs and negotiations; the effect of acquisitions, investments and divestitures; the Company's reliance on third-party vendors for various services; and other events beyond the Company's control that may result in unexpected adverse operating results.

The words "believe," "expect," "anticipate," "estimate," "could," "should," "intend" and similar expressions generally identify forward-looking statements. Readers are cautioned not to place undue reliance on such forward-looking statements, which are being made as of the date of this filing. The Company undertakes no obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise.

## Significant Events

**Leveraged ESOP Transactions**—On April 1, 2007, the Company's board of directors (the "Board"), based on the recommendation of a special committee of the Board comprised entirely of independent directors, approved a series of transactions (collectively, the "Leveraged ESOP Transactions") with a newly formed Tribune Employee Stock Ownership Plan (the "ESOP"), EGI-TRB, L.L.C., a Delaware limited liability company (the "Zell Entity") wholly owned by Sam Investment Trust (a trust established for the benefit of Samuel Zell and his family), and Samuel Zell. On Dec. 20, 2007, the Company completed the Leveraged ESOP Transactions which culminated in the cancellation of all issued and outstanding shares of the Company's common stock as of that date, other than shares held by the Company or the ESOP, and the Company becoming wholly owned by the ESOP.

1

The Leveraged ESOP Transactions consisted of a series of transactions that included the following:

· On April 1, 2007, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust which forms a part of the ESOP, Tesop Corporation, a Delaware corporation wholly owned by the ESOP ("Merger Sub"), and the Zell Entity (solely for the limited purposes specified therein) providing for Merger Sub to be merged with and into the Company, and following such merger, the Company to continue as the surviving corporation wholly owned by the ESOP (the "Merger").

· On April 1, 2007, the ESOP purchased 8,928,571 shares of the Company's common stock from the Company at a price of $28.00 per share. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from the Company to the ESOP and/or distributions paid on the shares of the Company's common stock held by the ESOP. Upon consummation of the Merger (as described below), the 8,928,571 shares of the Company's common stock held by the ESOP were converted into 56,521,739 shares of common stock and represent the only outstanding shares of capital stock of the Company after the Merger. None of the shares held by the ESOP had been committed for release or allocated to employees at Dec. 30, 2007.

· On April 23, 2007, pursuant to a purchase agreement dated April 1, 2007 (the "Zell Entity Purchase Agreement"), the Zell Entity made an initial investment of $250 million in the Company in exchange for (1) 1,470,588 shares of the Company's common stock at a price of $34.00 per share and (2) an unsecured subordinated exchangeable promissory note of the Company in the principal amount of $200 million, which the Company repaid immediately prior to the Merger (as described below).  Pursuant to the Zell Entity Purchase Agreement, on May 9, 2007, Mr. Zell was appointed as a member of the Board.

· On April 25, 2007, the Company commenced a tender offer to repurchase up to 126 million shares of the Company's common stock that were then outstanding at a price of $34.00 per share in cash (the "Share Repurchase"). The tender offer expired on May 24, 2007 and 126 million shares of the Company's common stock were repurchased and subsequently retired on June 4, 2007 utilizing proceeds from the Credit Agreement (as defined in the "New Credit Agreements" section below).

· The Company granted registration rights to Chandler Trust No. 1 and Chandler Trust No. 2 (together, the "Chandler Trusts"), which were significant shareholders of the Company prior to the Company's entry into the Leveraged ESOP Transactions. On April 25, 2007, the Company filed a shelf registration statement in connection with the registration rights granted to the Chandler Trusts.

· On June 4, 2007, the Chandler Trusts entered into an underwriting agreement with Goldman, Sachs & Co. ("Goldman Sachs") and the Company, pursuant to which the Chandler Trusts agreed to sell an aggregate of 20,351,954 shares of the Company's common stock, which represented the remainder of the shares of the Company's common stock owned by them following the Share Repurchase, through a block trade underwritten by Goldman Sachs. The shares were offered pursuant to the shelf registration statement filed by the Company on April 25, 2007. Following the closing of this transaction, the Chandler Trusts no longer owned any shares of the Company's common stock. On June 4, 2007, Jeffrey Chandler, Roger Goodan and William Stinehart, Jr. resigned as members of the Board. Messrs. Chandler, Goodan and Stinehart served on the Board as representatives of the Chandler Trusts, which agreed to cause the resignations of Messrs. Chandler, Goodan and Stinehart effective upon the consummation of the Share Repurchase.

2

http://www.sec.gov/Archives/edgar/data/726513/00011046590801 8845/...

On Dec. 20, 2007, the Company completed its merger with Merger Sub, with the Company surviving the Merger. Pursuant to the terms of the Merger Agreement, each share of common stock of the Company, par value $0.01 per share, issued and outstanding immediately prior to the Merger, other than shares held by the Company, the ESOP or Merger Sub immediately prior to the Merger (in each case, other than shares held on behalf of third parties) and shares held by shareholders who validly exercised appraisal rights, was cancelled and automatically converted into the right to receive $34.00, without interest and less any applicable withholding taxes, and the Company became wholly owned by the ESOP.

In the Merger, the Zell Entity received cash for the shares of the Company's common stock it had acquired pursuant to the Zell Entity Purchase Agreement and the Company repaid the exchangeable promissory note held by the Zell Entity including approximately $6 million of accrued interest. In addition, the Company paid to the Zell Entity a total of $5 million in legal fee reimbursements, of which $2.5 million was previously paid following the Share Repurchase described above. Following the consummation of the Merger, the Zell Entity purchased from the Company, for an aggregate of $315 million, a $225 million subordinated promissory note and a 15-year warrant. For accounting purposes, the subordinated promissory note and 15-year warrant were recorded at fair value based on the relative fair value method. The warrant entitles the Zell Entity to purchase 43,478,261 shares of the Company's common stock (subject to adjustment), which represents approximately 40% of the economic equity interest in the Company following the Merger (on a fully-diluted basis, including after giving effect to share equivalents granted under a new management equity incentive plan which is described in Note 17 to the consolidated financial statements in Item 8). The warrant has an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years of the warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). Thereafter, the Zell Entity assigned minority interests in the subordinated promissory note and the warrant to certain permitted assignees. See Part III, Items 12 and 13, hereof for further information on the assignment of the minority interests in the subordinated promissory note and the warrant.

On Dec. 20, 2007, the Company notified the New York Stock Exchange (the "NYSE") that the Merger was consummated. The Company requested that the Company's common stock (and associated Series A junior participating preferred stock purchase rights) be suspended from the NYSE, effective as of the close of the market on Dec. 20, 2007, and that the NYSE file with the Securities and Exchange Commission an application on Form 25 to report that the shares of the Company's common stock and associated Series A junior participating preferred stock purchase rights are no longer listed on the NYSE.

The Company currently intends to dispose of an interest in the Chicago Cubs and the Company's 25% equity interest in Comcast SportsNet Chicago. The Company currently expects that proceeds from such dispositions will be used to pay down Company debt. The disposition of an interest in the Cubs is subject to the approval of Major League Baseball.

**New Credit Agreements**—On May 17, 2007, the Company entered into a $8.028 billion senior secured credit agreement, as amended on June 4, 2007 (collectively, the "Credit Agreement"). The Credit Agreement consists of the following facilities: (a) a $1.50 billion Senior Tranche X Term Loan Facility (the "Tranche X Facility"), (b) a $5.515 billion Senior Tranche B Term Loan Facility (the "Tranche B Facility"), (c) a $263 million Delayed Draw Senior Tranche B Term Loan Facility (the "Delayed Draw Facility") and (d) a $750 million Revolving Credit Facility (the "Revolving Credit Facility"). The Credit Agreement also provided a commitment for an additional $2.105 billion in new incremental term loans under the Tranche B Facility (the "Incremental Facility"). Accordingly, the aggregate amount of the facilities under the Credit Agreement equals $10.133 billion.

3

5/20/2010 9:00 PM

http://www.sec.gov/Archives/edgar/data/726513/000110465908018845/...

On June 4, 2007, proceeds from the Tranche X Facility and the Tranche B Facility were used by the Company in connection with the consummation of the Share Repurchase (as defined in "Leveraged ESOP Transactions" above) and to refinance the Company's former five-year credit agreement and former bridge credit agreement.

The Revolving Credit Facility includes a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million. Borrowings under the Revolving Credit Facility may be used for working capital and general corporate purposes. The Company intends to use the Delayed Draw Facility to refinance approximately $263 million of its medium-term notes as they mature during 2008. In February 2008, the Company refinanced $25 million of such medium-term notes with borrowings under the Delayed Draw Facility.

On Dec. 20, 2007, the Company entered into (i) a $1.6 billion senior unsecured interim loan agreement (the "Interim Credit Agreement") and (ii) a number of increase joinders pursuant to which the Incremental Facility became a part of the Tranche B Facility under the Credit Agreement (the Incremental Facility and Tranche B Facility are hereinafter referred to collectively as the Tranche B Facility). The Interim Credit Agreement contains a $1.6 billion twelve-month bridge facility (the "Bridge Facility"). The total proceeds of $3.705 billion from the Bridge Facility and the Incremental Facility were used by the Company, among other ways, in connection with the consummation of the Merger, and for general corporate purposes.

Prior to the consummation of the Merger, the Tranche X Facility bore interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 150 basis points or LIBOR plus a margin of 250 basis points. Pursuant to the terms of the Credit Agreement, following the closing of the Merger (as defined above in the description of the Leveraged ESOP Transactions), the margins applicable to the Tranche X Facility increased to 175 basis points and 275 basis points, respectively.

The Tranche B Facility, Delayed Draw Facility and Revolving Credit Facility bear interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 200 basis points or LIBOR plus a margin of 300 basis points. All undrawn amounts under the Delayed Draw Facility and the Revolving Credit Facility accrue commitment fees at a per annum rate of 75 basis points and 50 basis points, respectively. With respect to the Revolving Credit Facility only, the margin applicable to base rate advances, the margin applicable to LIBOR advances and the commitment fee applicable to undrawn amounts are subject to decreases based on a leverage-based grid.

On June 29, 2007, the Company repaid $100 million of the $1.5 billion of borrowings under the Tranche X Facility. The remaining principal balance of the Tranche X Facility must be repaid in an aggregate amount of $650 million on Dec. 4, 2008, which amount may be adjusted to reflect additional prepayments or other mandatory prepayments (described below) applied thereto, and the remaining outstanding amount of the Tranche X Facility, if any, must be repaid on June 4, 2009.

The Tranche B Facility is a seven-year facility which matures on June 4, 2014 and amortizes at a rate of 1.0% per annum (payable quarterly). The Delayed Draw Facility automatically becomes part of the Tranche B Facility as amounts are borrowed and amortizes based upon the Tranche B Facility amortization schedule. The Revolving Facility is a six-year facility and matures on June 4, 2013.

Prior to June 4, 2008, optional prepayments on the Tranche X Facility and the Tranche B Facility with the proceeds of a substantially concurrent issuance of loans under any senior secured credit facilities pursuant to the Credit Agreement must be accompanied by a prepayment fee equal to 1.0% of the aggregate amount of such prepayments if the interest rate spread applicable to such new loans is less than the interest rate applicable to the Tranche X Facility or the Tranche B Facility. Except as described in the immediately preceding sentence,

4

borrowings under the Credit Agreement are prepayable at any time prior to maturity without penalty, and the unutilized portion of the commitments under the Revolving Credit Facility or the Delayed Draw Facility may be reduced at the option of the Company without penalty.

The Bridge Facility bears interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 350 basis points or LIBOR plus a margin of 450 basis points; provided that such margins will increase by 50 basis points per annum each quarter beginning on March 20, 2008, subject to specified caps, a portion of which interest may be payable through an interest payable-in-kind feature. Subject to certain prepayment restrictions contained in the Credit Agreement, the Bridge Facility is prepayable at any time prior to maturity without penalty, including in connection with the issuance of up to $1.6 billion of high-yield notes.

If any loans under the Bridge Facility remain outstanding on Dec. 20, 2008, the lenders thereunder will have the option, subject to the terms of the Interim Credit Agreement, at any time and from time to time to exchange such initial loans for senior exchange notes that the Company will issue under a senior indenture, and the maturity date of any initial loans that are not exchanged for senior exchange notes will, unless a bankruptcy event of default has occurred and is continuing on such date, automatically be extended to Dec. 20, 2015 (the "Final Interim Credit Agreement Maturity Date"). The senior exchange notes will also mature on the Final Interim Credit Agreement Maturity Date. Holders of the senior exchange notes will have registration rights.

Loans under the Tranche X Facility, Tranche B Facility and Revolving Loan Facility are required to be repaid with the following proceeds, subject to certain exceptions and exclusions set forth in the Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of debt for borrowed money by the Company or any subsidiary (other than debt permitted to be incurred under the negative covenants contained in the Credit Agreement (with certain exclusions)), (b) certain specified percentages of excess cash flow proceeds based on a leverage-based grid ranging from 50% to 0%, and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company's subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Credit Agreement.

Loans under the Bridge Facility are required be required to be repaid with the following proceeds, in each case after the obligations under the Credit Agreement have been repaid, either as required by the Credit Agreement or repaid at the election of the Company, subject to certain exceptions and exclusions set forth in the Interim Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of certain debt for borrowed money by the Company or any subsidiary, (b) 100% of the net cash proceeds of any equity issuance consummated by the Company and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company's subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Interim Credit Agreement.

Borrowings under the Credit Agreement are guaranteed on a senior basis by certain of the Company's direct and indirect U.S. subsidiaries and secured by a pledge of the equity interests of Tribune Broadcasting Holdco, LLC and Tribune Finance, LLC, two subsidiaries of the Company. Audited financial statements of these two subsidiaries are included in Part II, Item 8, hereof. The Company's other senior notes and senior debentures are secured on an equal and ratable basis with the borrowings under the Credit Agreement as required by the terms of the indentures governing such notes and debentures. Borrowings under the Interim Credit Agreement are unsecured, but are guaranteed on a senior subordinated basis by certain of the Company's direct and indirect U.S. subsidiaries.

The Credit Agreement and the Interim Credit Agreement contain representations and warranties, affirmative and negative covenants, including restrictions on capital expenditures, and events of default, in each case subject to customary and negotiated exceptions and limitations, as applicable. If an event of default occurs,

5

the lenders under the Credit Agreement and the Interim Credit Agreement will be entitled to take certain actions, including acceleration of all amounts due under the facilities.

Further, pursuant to the Credit Agreement, the Company is required to comply, on a quarterly basis, with a maximum total guaranteed leverage ratio and a minimum interest coverage ratio. For the twelve-month period ending Dec. 30, 2007, the maximum permitted "Total Guaranteed Leverage Ratio" and the minimum permitted "Interest Coverage Ratio" (each as defined in the Credit Agreement) were 9.00 to 1.0 and 1.10 to 1.0, respectively. Both financial covenant ratios are measured on a rolling four-quarter basis and become more restrictive on an annual basis as set forth in the Credit Agreement. At Dec. 30, 2007, the Company was in compliance with these financial covenants. The Company's ability to remain in compliance with these financial covenants will be impacted by a number of factors, including the Company's ability to continue to generate sufficient revenues and cash flows, changes in interest rates, the impact of future purchase, sale, joint venture or similar transactions involving the Company or its business units and the other risks and uncertainties set forth in Part I, Item 1A, "Risk Factors."

The Company filed an election to be treated as a subchapter S corporation under the Internal Revenue Code on March 13, 2008, which election is effective as of the beginning of the Company's 2008 fiscal year. The Credit Agreement and the Interim Credit Agreement contain affirmative covenants which required the Company to make such election and that the election be effective for fiscal 2008. The Credit Agreement and Interim Credit Agreement further provide that if the Company fails to maintain the S corporation election for any year beginning with 2009, the Company will be required in each such year to obtain an investment in the Company in the form of common stock or subordinated debt in an amount of up to $100 million. There can be no assurance that the Company will be able to obtain such an investment and the failure to obtain such an investment in those circumstances could result in a default under the Credit Agreement and Interim Credit Agreement.

Under the terms of the Credit Agreement, the Company is required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Credit Agreement and other debt with respect to borrowed money. On July 2, 2007, the Company entered into an International Swap and Derivatives Association, Inc. ("ISDA") Master Agreement, a schedule to the 1992 ISDA Master Agreement and, on July 3, 2007, entered into three interest rate swap confirmations (collectively, the "Swap Documents") with Barclays Bank, which Swap Documents provide for (i) a two-year hedge with respect to $750 million in notional amount, (ii) a three-year hedge with respect to $1 billion in notional amount and (iii) a five-year hedge with respect to $750 million in notional amount. The Swap Documents effectively converted a portion of the variable rate borrowings under the Tranche B Facility in the Credit Agreement to a weighted average fixed rate of 5.31% plus a margin of 300 basis points.

**Sales of *Hoy*, New York, SCNI and Recycler**—On Feb. 12, 2007, the Company announced an agreement to sell the New York edition of *Hoy*, the Company's Spanish-language daily newspaper ("*Hoy*, New York"), to ImpreMedia, LLC. The Company completed the sale of *Hoy*, New York on May 15, 2007 and recorded a pretax gain on the sale of $2.5 million ($.1 million after taxes) in the second quarter of 2007. On March 6, 2007, the Company announced an agreement to sell its Southern Connecticut Newspapers—*The Advocate* (Stamford) and *Greenwich Time* (collectively "SCNI") to Gannett Co., Inc. On May 25, 2007, the Company announced the termination of this agreement following an arbitrator's ruling that the Company could not sell SCNI unless Gannett Co., Inc. assumed an existing collective bargaining contract as a condition of the sale, which Gannett Co., Inc. declined to do. The Company simultaneously announced that it would immediately begin the process of soliciting offers for SCNI with the intention of completing a sale as soon as possible. On Oct. 25, 2007, the Company announced an agreement to sell SCNI to Hearst Corporation for $62.4 million. The sale of SCNI closed on Nov. 1, 2007, and excluded the SCNI real estate in Stamford and Greenwich, Connecticut, which the Company plans to sell separately. In the first quarter of 2007, the Company recorded a pretax loss of $19 million ($33 million after taxes) to write down the net assets of SCNI to estimated fair value, less costs to sell. In the

6

third quarter of 2007, the Company recorded a favorable $3 million after-tax adjustment to the loss on the sale of SCNI. During the third quarter of 2007, the Company began actively pursuing the sale of the stock of one of its subsidiaries, EZ Buy & EZ Sell Recycler Corporation ("Recycler"), to Target Media Partners. Recycler publishes a collection of free classified newspapers in Southern California. The sale of Recycler closed on Oct. 17, 2007. The Company recorded a pretax loss on the sale of the stock of Recycler of $1 million in the third quarter of 2007. Due to the Company's high tax basis in the Recycler stock, the sale generated a significantly higher capital loss for income tax purposes. As a result, the Company recorded a $65 million income tax benefit in the third quarter of 2007, resulting in an after-tax gain of $64 million.

These businesses were considered components of the Company's publishing segment as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company. The operations and cash flows of these businesses have been eliminated from the ongoing operations as a result of the sales, and the Company will not have any significant continuing involvement in their operations. Accordingly, the results of operations for each of these businesses are reported as discontinued operations in the consolidated statements of income. Prior year consolidated statements of income have been reclassified to conform to the current year presentation of discontinued operations.

**Matthew Bender and Mosby Tax Liability**—During 1998, Times Mirror, which was acquired by the Company in 2000, disposed of its Matthew Bender and Mosby subsidiaries in separate transactions, which were structured to qualify as tax-free reorganizations under the Internal Revenue Code. The Company believes these transactions were completed on a tax-free basis. However, the Internal Revenue Service ("IRS") audited the transactions and disagreed with the position taken by Times Mirror. In the fourth quarter of 2001, the Company received an IRS adjustment to increase Times Mirror's 1998 taxable income by approximately $1.6 billion. The Company filed a petition in the United States Tax Court in November 2002 to contest the IRS position, and in December 2004, the Company presented its position in Tax Court.

On Sept. 27, 2005, the Tax Court issued an opinion contrary to the Company's position and determined that the Matthew Bender transaction was a taxable sale. In January 2006, the Tax Court extended its opinion in the Matthew Bender case to the Mosby transaction given the similarity of the two transactions. Taxes and related interest for both the Matthew Bender and Mosby transactions totaled approximately $1 billion. Over time, deductions for state taxes and interest were expected to reduce the net cash outlay to approximately $840 million.

The Company appealed the Tax Court ruling to the United States Court of Appeals for the Seventh Circuit. On June 1, 2007, the Company announced that an offer of settlement was pending in its appeal. The Company finalized the settlement during the third quarter of 2007. As a result of the settlement, the Company received refunds of federal income taxes and interest of $4 million on Sept. 26, 2007 and $340 million on Oct. 1, 2007. After consideration of income taxes on the interest received, the net cash proceeds totaled approximately $286 million. These refunds, together with related state income tax benefits of $29 million, were accounted for as a $91 million reduction in 2007 income tax expense and a $224 million reduction in goodwill recorded on the Company's consolidated balance sheet.

7

**Business Segments**

The Company's operations are divided into two industry segments: publishing and broadcasting and entertainment. These segments operate primarily in the United States. Certain administrative activities are not included in either segment, but are reported as corporate expenses. These segments reflect the way the Company sells its products to the marketplace, manages operations and makes business decisions.

The Company's fiscal year ends on the last Sunday in December. Fiscal years 2007 and 2005 encompassed a 52-week period. Fiscal year 2006 encompassed 53 weeks. For 2006 compared to 2005, the additional week increased consolidated operating revenues and operating expenses by approximately 1.5% and consolidated operating profit by approximately 2%. The following table sets forth operating revenues and operating profit information for each segment of the Company for 2007, 2006 and 2005 (in thousands):

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Operating revenues: | | | |
| Publishing | $ 3,664,590 | $ 4,018,418 | $ 4,012,413 |
| Broadcasting and entertainment | 1,398,394 | 1,425,146 | 1,414,433 |
| Total operating revenues | $ 5,062,984 | $ 5,443,564 | $ 5,426,846 |
| Operating profit (loss)(1): | | | |
| Publishing | $ 368,193 | $ 748,940 | $ 753,781 |
| Broadcasting and entertainment | 357,341 | 391,533 | 416,891 |
| Corporate expenses | (91,617) | (55,712) | (49,413) |
| Total operating profit | $ 633,917 | $ 1,084,761 | $ 1,121,259 |

(1) Operating profit for each segment excludes interest and dividend income, interest expense, equity income and loss, non-operating items and income taxes.

The following table sets forth asset information for each industry segment (in thousands):

|  | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| Assets: | | |
| Publishing(1) | $ 8,131,591 | $ 8,512,512 |
| Broadcasting and entertainment(2) | 4,017,255 | 3,987,449 |
| Corporate(3) | 1,000,873 | 900,811 |
| Total assets | $ 13,149,719 | $ 13,400,772 |

(1) Publishing assets at Dec. 30, 2007 and Dec. 31, 2006 included $10 million and $9 million of assets held for sale, respectively, and at Dec. 31, 2006, $26 million of idled assets (See Note 4 to the Company's consolidated financial statements in Item 8).

(2) Broadcasting and entertainment assets at Dec. 30, 2007 included $23 million of assets held for sale. (See Note 4 to the Company's consolidated financial statements in Item 8).

(3) Corporate assets include cash and cash equivalents, marketable securities and other investments.

The Company's results of operations, when examined on a quarterly basis, reflect the seasonality of the Company's revenues. Second and fourth quarter advertising revenues are typically higher than first and third quarter revenues. Results for the second quarter reflect spring advertising revenues, while the fourth quarter includes advertising revenues related to the holiday season.

8

**Publishing**

The publishing segment represented 72% of the Company's consolidated operating revenues in 2007. For the six months ended September 2007, total average paid circulation for Tribune's nine metro newspapers averaged 2.7 million copies daily (Mon.-Fri.) and 3.9 million copies Sunday, a decline of 2.7% and 3.9%, respectively, from 2006. The Company's primary daily newspapers are the *Los Angeles Times, Chicago Tribune, Newsday, South Florida Sun-Sentinel, Orlando Sentinel, The Sun, Hartford Courant, The Morning Call* and *Daily Press*. The Company's publishing segment manages the websites of the Company's daily newspapers and television stations, as well as other branded sites targeting specific communities of interest. The Company also owns entertainment listings, a newspaper syndication and media marketing company, a Chicago-area cable television news channel and other publishing-related businesses.

For 2006 compared to 2005, the additional week increased publishing advertising revenues, circulation revenues, and operating profit by approximately 2% and increased operating expenses by approximately 1.5%. Operating revenues for the Company's three largest newspapers, including their related businesses, for the last three years were as follows (in thousands):

| | 2007 | | 2006 | | 2005 |
|---|---|---|---|---|---|
| Operating revenues: | | | | | |
| Los Angeles Times(1) | $ 999,311 | $ | 1,095,622 | $ | 1,078,919 |
| Chicago Tribune(1) | 828,480 | | 882,182 | | 892,270 |
| Newsday(1) | 498,677 | | 541,074 | | 574,864 |
| Other newspapers and businesses | 1,338,122 | | 1,499,540 | | 1,466,360 |
| Total publishing revenues | $ 3,664,590 | $ | 4,018,418 | $ | 4,012,413 |

(1)  Includes the daily newspaper and other related businesses.

The following table provides a breakdown of operating revenues for the publishing segment for the last three years (in thousands):

| | 2007 | | 2006 | | 2005 |
|---|---|---|---|---|---|
| Advertising: | | | | | |
| Retail | $ 1,247,755 | $ | 1,327,095 | $ | 1,306,528 |
| National | 686,549 | | 730,038 | | 767,295 |
| Classified | 926,715 | | 1,137,835 | | 1,097,953 |
| Total advertising | 2,861,019 | | 3,194,968 | | 3,171,776 |
| Circulation | 526,529 | | 567,326 | | 585,093 |
| Other(1) | 277,042 | | 256,124 | | 255,544 |
| Total | $ 3,664,590 | $ | 4,018,418 | $ | 4,012,413 |

(1)  Primarily includes revenues from advertising placement services; the syndication of columns, features, information and comics to newspapers; commercial printing operations; delivery of other publications; direct mail operations; cable television news programming; distribution of entertainment listings; and other publishing-related activities.

9

The following table sets forth information concerning the Company's advertising volume for its daily newspapers for the last three years (in thousands):

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| Advertising inches | | | |
| Full run: | | | |
| Retail | | | |
| National | 5,263 | 5,466 | 5,380 |
| Classified | 2,798 | 3,132 | 3,461 |
| Total full run | 7,874 | 9,437 | 9,236 |
| Part run | 15,935 | 18,035 | 18,077 |
| Total advertising inches | 18,134 | 21,217 | 20,113 |
| Preprint pieces | 34,069 | 39,252 | 38,190 |
| | 14,500,271 | 14,814,093 | 14,818,375 |

The following table sets forth information concerning the Company's circulation for its primary daily newspapers (in thousands):

| | Average Paid Circulation For the Six Months Ended September(1) | | | | | |
|---|---|---|---|---|---|---|
| | Daily(2) | | | Sunday | | |
| | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 |
| Los Angeles Times | 780 | 776 | 843 | 1,112 | 1,172 | 1,248 |
| Chicago Tribune | 559 | 576 | 586 | 918 | 938 | 951 |
| Newsday (Long Island) | 388 | 411 | 432 | 454 | 475 | 496 |
| South Florida Sun-Sentinel | 202 | 222 | 227 | 286 | 305 | 322 |
| Orlando Sentinel | 213 | 214 | 220 | 318 | 317 | 331 |
| The Sun (Baltimore) | 233 | 236 | 247 | 365 | 381 | 419 |
| Other daily newspapers(3) | 357 | 374 | 386 | 495 | 521 | 531 |
| Total Net Paid Circulation(4) | 2,732 | 2,809 | 2,941 | 3,948 | 4,109 | 4,298 |
| Total Individually Paid Circulation(4) | 2,635 | 2,693 | 2,727 | 3,882 | 4,031 | 4,133 |

(1) Circulation data is based on internal records, is subject to audit by the Audit Bureau of Circulations ("ABC") and may be updated in subsequent filings.

(2) Average daily circulation is based on a five-day (Mon.-Fri.) average.

(3) Other daily newspapers include *Hartford Courant, The Morning Call* and *Daily Press.*

(4) Individually paid circulation includes home delivery and single copy sales. This circulation is more highly valued by advertisers and represented 96% of total daily circulation and 98% of total Sunday circulation for the six months ended September 2007. Total net paid circulation includes both individually paid and other paid (education, sponsored, hotels) copies.

Each of the Company's newspapers operates independently to most effectively meet the needs of the community it serves. Local management establishes editorial policies. The Company coordinates certain aspects of operations and resources in order to provide greater operating efficiency and economies of scale.

The Company's newspapers compete for readership and advertising with other metropolitan, suburban and national newspapers, and also with television, radio, Internet services and other media. Competition for newspaper advertising is based upon circulation levels, readership demographics, price, service and advertiser results, while competition for circulation is based upon the content of the newspaper, service and price.

The *Los Angeles Times, Chicago Tribune, South Florida Sun-Sentinel, Orlando Sentinel, Daily Press* and *The Morning Call* are printed in Company-owned production facilities. *Newsday, The Sun* and *Hartford Courant* are printed on Company-owned presses in production facilities leased from an affiliate (see Note 8 to the

10

http://www.sec.gov/Archives/edgar/data/726513/000110465908018845/...

Company's consolidated financial statements in Item 8). The principal raw material is newsprint. In 2007, the Company's newspapers consumed approximately 614,000 metric tons of standard newsprint, 45.0 gram basis weight. Average newsprint prices decreased 9% in 2007 from 2006 reflecting lower market prices. Average newsprint prices increased 10% in 2006 and 12% in 2005.

The Company is party to an agreement with AbitibiBowater Inc., expiring in 2009, to supply newsprint. Under the current agreement, the Company purchased approximately 360,000 metric tons of newsprint in 2007, representing 58% of the Company's newsprint purchases and has agreed to purchase 369,000 metric tons in 2008 and 2009, subject to certain limitations, based on market prices at the time of purchase.

### Los Angeles Times and Related Businesses

The *Los Angeles Times* has been published continuously since 1881. The newspaper has won 38 Pulitzer Prizes and is the largest daily metropolitan newspaper in the United States in circulation. The Los Angeles market ranks second in the nation in terms of households. In its primary circulation areas of Los Angeles, Orange, Ventura, San Bernardino and Riverside counties, the *Los Angeles Times* competes for advertising and circulation with 18 local daily newspapers and three daily national newspapers, with its largest local competitor having almost 280,000 in average daily circulation. For the six-month period ended September 2007, the *Los Angeles Times* ranked fourth and second in the country for average daily and Sunday circulation, respectively, according to ABC. Approximately 79% and 81% of the paper's daily and Sunday circulation, respectively, was home delivered in 2007, with the remainder primarily sold at newsstands and vending boxes.

In addition to the daily edition covering the Los Angeles metropolitan area, the *Los Angeles Times* publishes Orange County, San Fernando Valley, Inland Empire and Ventura County editions. Daily and semi-weekly community newspapers are either inserted into the paper in selected geographic areas or distributed to homes and through vending boxes to provide targeted local news coverage. The company operates latimes.com, an online expanded version of the newspaper, providing local, national and international news, calendarlive.com, covering entertainment, reviews and things to do in Southern California, and theenvelope.com, a comprehensive year-round entertainment awards website. In conjunction with MediaNews Group, Inc., the company owns 50% of California Independent Postal Systems ("CIPS"), which provides alternative distribution services for advertising preprints. MediaNews Group, Inc. owns the other 50% of CIPS. The company also operates a free Spanish-language newspaper, *Hoy*, which provides local, national and international news and features of interest to the largest Hispanic market in the U.S.

### Chicago Tribune and Related Businesses

Founded in 1847, the *Chicago Tribune* is the flagship publication of the Chicago Tribune Company. The newspaper has won 24 Pulitzer Prizes and is the largest circulation paper in the Midwest. It ranks eighth among U.S. daily newspapers with an average daily paid circulation of approximately 559,000; and third among U.S. Sunday newspapers with an average Sunday paid circulation of approximately 918,000. Approximately 86% of its weekday newspapers and 76% of its Sunday newspapers are home delivered with the remainder primarily sold at newsstands and vending boxes. Considered an industry leader in journalism and innovation, Chicago Tribune Company has grown into a multi-product, multi-channel news and information source. It also operates chicagotribune.com, the web edition of the newspaper and *RedEye*, a free daily newspaper in Chicago targeting young, urban commuters.

Other businesses owned by Chicago Tribune Company include Tribune Direct, which provides integrated and comprehensive direct mail services, and Chicagoland Publishing Company, which publishes a number of free guides in the real estate, automotive and help wanted categories and the monthly magazine *Chicago*. Chicago Tribune Company also operates CLTV, a local 24-hour cable news channel serving Chicagoland. CLTV was launched in January 1993 and currently is available to more than 1.5 million cable households in the Chicago market. Chicago Tribune Company also operates a free Spanish-language newspaper, *Hoy*, which provides local, national and international news and features of interest to the fourth largest Hispanic market in the U.S.

11

5/20/2010 9:00 PM

### *Newsday and Related Businesses*

*Newsday* is published daily and circulated primarily in Nassau and Suffolk counties on Long Island, New York, and in the borough of Queens in New York City. The paper has been published since 1940 and has won 19 Pulitzer Prizes. The New York metropolitan area ranks first among U.S. markets in terms of households. *Newsday* competes with two major metropolitan newspapers, daily regional editions of several national newspapers and numerous daily, weekly and semiweekly local newspapers and free distribution newspapers. Approximately 70% of the paper's daily and 66% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes. See Note 5 to the Company's consolidated financial statements in Item 8 for a discussion of charges recorded related to the settlement with advertisers regarding misstated circulation at *Newsday*.

Newsday, Inc., publisher of *Newsday*, also publishes *Distinction*, a magazine serving Long Island's households, issued 10 times per year; *Parents & Children*, a magazine for Long Island families, issued 12 times per year; *Long Island Weddings*, a magazine for brides-to-be, published three times per year; and *Wellness*, a magazine serving Long Island's 40+ health and fitness market, published eight times per year. Newsday, Inc.'s subsidiary, Star Community Publishing Group, LLC, publishes 181 pennysaver editions in Nassau and Suffolk counties on Long Island, New York, and in the boroughs of Queens, Brooklyn and Staten Island in New York City. Newsday, Inc. also publishes *amNew York*, a free daily newspaper in New York City targeting young, urban commuters. In addition, Newsday, Inc. operates several websites including newsday.com and amny.com, which are online versions of the newspapers.

### *Other Newspapers*

The Company's other primary daily newspapers are *South Florida Sun-Sentinel, Orlando Sentinel, The Sun, Hartford Courant, Daily Press,* and *The Morning Call.*

The *South Florida Sun-Sentinel* is the major daily newspaper serving the Broward/Palm Beach County market, leading in both circulation and readership. The Miami/Fort Lauderdale/Miami Beach metropolitan area, which includes Broward and Palm Beach counties, ranks seventh in the nation in terms of households. Approximately 80% of the paper's daily and 76% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes.

Sun-Sentinel Company, publisher of the *South Florida Sun-Sentinel*, also serves the news and information needs of South Florida through sun-sentinel.com, its breaking news and information website; *El Sentinel*, a weekly Spanish language newspaper; *Teenlink*, a weekly newspaper distributed in Broward County high schools; weekly community newspapers; niche publications; and television and radio partnerships, including its close working relationship with Tribune Broadcasting's WSFL-TV, Miami, The CW Network affiliate serving South Florida.

Other publications produced by Sun-Sentinel Company include: *City & Shore*, a bimonthly lifestyle magazine; *City Link*, an alternative weekly newspaper; *Florida New Homes & Condo Guide*, a comprehensive bimonthly guide to South Florida real estate; *Jewish Journal*, a collection of weekly newspapers serving South Florida's Jewish community; and *South Florida Parenting*, a monthly magazine providing parenting information and resources for local families.

The *Orlando Sentinel* primarily serves a six-county area in central Florida. The newspaper is the only major daily newspaper in the Orlando market, although it competes with other Florida and national newspapers, as well as with other media. The *Orlando Sentinel* has been published since 1876 and has won 3 Pulitzer Prizes. The Orlando market ranks 26th among U.S. markets in terms of households. Approximately 79% of the paper's daily and 74% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes.

Orlando Sentinel Communications Company, publisher of the *Orlando Sentinel* and orlandosentinel.com, also publishes *ShopLocal*, a free weekly publication used to distribute advertising and content to newspaper non-subscribers. The company publishes the weekly, Spanish-language newspaper, *El Sentinel*, and its companion website, elsentinel.com, as well as six weekly Forum community newspapers. The company's multimedia portfolio also includes free-distribution, niche products in the central Florida market including *Job Xtra* and *AutoFinder* magazines. Orlando Sentinel Communications offers direct marketing/direct mail services through Tribune Direct/Orlando in addition to distribution services for other publications.

*The Sun,* Maryland's largest newspaper, has won 15 Pulitzer Prizes since it began publishing a daily newspaper in 1837. The Baltimore market ranks 20th in the United States in number of households. For the six-month period ending Sept. 25, 2006, *The Sun* was ranked the 25th largest newspaper in the country by Sunday circulation according to ABC. *The Sun* competes with *Baltimore Examiner* as well as *The Washington Post* in Anne Arundel and Howard counties, with *The Annapolis Capital* in Anne Arundel County and with *The Carroll County Times* in Carroll County. It also competes with regional editions of national daily newspapers, as well as other local dailies and weeklies. Approximately 83% of the paper's daily and 71% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes.

The Baltimore Sun's subsidiaries, Patuxent Publishing and Homestead Publishing, publish 30 community newspapers and magazines throughout the region. The largest of these weekly newspapers are *The Columbia Flier, The Towson Times, The Owings Mills Times* and *The Aegis.* The Baltimore Sun also operates a market-leading website, baltimoresun.com, which is the online version of the newspaper. The Sun and its subsidiaries comprise the The Baltimore Sun Media Group, which reaches 1.4 million readers each week in the Baltimore market, making it the region's most widely read source of news and information.

*Hartford Courant,* founded in 1764, is the oldest continuously published newspaper in the United States. It is the most widely circulated and read newspaper in Connecticut and the strongest medium in the state for advertisers and readers alike. Winner of 2 Pulitzer Prizes and twice named among the best-designed newspapers in the world, *Hartford Courant* is published in the state's capital, Hartford, and serves the state's northern and central regions. The Hartford Courant's primary market is the Hartford market, which includes Hartford, Tolland and Middlesex counties. The Hartford market ranks 44th among U.S. markets in terms of households. Hartford Courant Company, publisher of *Hartford Courant,* has one of the most extensive zoning operations in the country, publishing eight editions of *Hartford Courant* zoned for local news and advertising. The company also operates courant.com, Connecticut's leading online news site, and ctnow.com, a statewide entertainment website. It also owns two subsidiaries: New Mass Media, Inc., a publisher of three weekly alternative newspapers in Connecticut and Massachusetts, and ValuMail, Inc., a shared-mail company that distributes advertising supplements to more than one million households in Connecticut and Massachusetts. Approximately 90% of the paper's daily and 78% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes.

Founded in 1896, the *Daily Press* serves the Virginia Peninsula market, which includes Newport News, Hampton, Williamsburg and eight other cities and counties. This market, together with Norfolk, Portsmouth and Virginia Beach, is the 34th largest U.S. market in terms of population. *Daily Press* is the only major daily newspaper in its primary market, although it competes with other regional and national newspapers, as well as with other media. Approximately 84% of the paper's daily and 80% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes. The Daily Press, Inc., publisher of *Daily Press,* also owns *The Virginia Gazette,* which is published twice weekly and primarily serves Williamsburg, Va., and surrounding counties. The *Daily Press* serves the Internet community through its online affiliates dailypress.com, hrvarsity.com, hrgardening.com and hrtownsquare.com.

*The Morning Call,* published since 1895, is the dominant regional newspaper for nine counties in eastern Pennsylvania and New Jersey. The Morning Call, Inc., publisher of *The Morning Call,* offers free publications serving the recruitment, real estate and automotive markets, and selected high-income households. Subsidiaries of The Morning Call, Inc. offer full service direct marketing and saturation preprint delivery through

13

http://www.sec.gov/Archives/edgar/data/726513/000110465908018845/...

non-subscriber distribution. In addition, The Morning Call Inc. owns and operates the premier regional website, themorningcall.com. Allentown-Bethlehem-Easton is the 60th largest U.S. market in terms of households. Approximately 83% of the paper's daily and 79% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes.

### *Other Publishing Related Businesses*

The Company also owns Tribune Media Services, Inc. ("TMS"), which creates, aggregates and distributes news, information and entertainment content that reaches millions of users through print, online and on-screen media. The TMS Entertainment Products division creates TV and movie guide products for major media companies and consumers, and sells data for entertainment guides to newspapers, cable, satellite operators and consumer electronics manufacturers. The TMS News and Features division licenses content to media companies from more than 600 writers, artists, newspaper and magazine publishers, and wire services.  TMS serves approximately 7,000 media customers worldwide.

14

**Broadcasting and Entertainment**

The broadcasting and entertainment segment represented 28% of the Company's consolidated operating revenues in 2007. At Dec. 30, 2007, the segment included The CW Television Network ("The CW Network") affiliates located in New York, Los Angeles, Chicago, Dallas, Washington, D.C., Houston, Miami, Denver, St. Louis, Portland, Indianapolis, San Diego, Hartford, and New Orleans; the FOX Network television affiliates in Seattle, Sacramento, Indianapolis, Hartford, Grand Rapids and Harrisburg; MyNetworkTV affiliates in Philadelphia and Seattle; an ABC television affiliate in New Orleans; one radio station in Chicago; the Chicago Cubs baseball team; and Tribune Entertainment, a company that distributes its own programming together with programming licensed from third parties.

For 2006 compared to 2005, the additional week increased operating revenues, operating expenses and operating profit by approximately 1%. The following table shows sources of operating revenues for the broadcasting and entertainment segment for the last three years (in thousands):

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Television | $ 1,136,224 | $ 1,178,104 | $ 1,165,821 |
| Radio/entertainment | 262,170 | 247,042 | 248,612 |
| Total | $ 1,398,394 | $ 1,425,146 | $ 1,414,433 |

15

### Television

In 2007, television contributed 81% of the broadcasting and entertainment segment's operating revenues. The Company's television stations compete for audience and advertising with other television and radio stations, cable television and other media serving the same markets. Competition for audience and advertising is based upon various interrelated factors including programming content, audience acceptance and price. Selected data for the Company's television stations are shown in the following table:

| | Market(1) | | | | | Major Over-the-Air Stations in Market(2) | Expiration of FCC License(3) | Year Acquired |
| | National Rank | % of U.S Households | FCC % | Analog Channel | Affiliation | | | |
|---|---|---|---|---|---|---|---|---|
| WPIX—New York, NY | 1 | 6.6 | 6.6 | 11-VHF | CW | 7 | 2015(4) | 1948(5) |
| KTLA—Los Angeles, CA | 2 | 5.0 | 5.0 | 5-VHF | CW | 8 | 2014(4) | 1985 |
| WGN—Chicago, IL | 3 | 3.1 | 3.1 | 9-VHF | CW | 8 | 2013 | 1948(5) |
| WPHL—Philadelphia, PA | 4 | 2.6 | 1.3 | 17-UHF | MNTV | 7 | 2015 | 1992 |
| KDAF—Dallas, TX | 5 | 2.2 | 1.1 | 33-UHF | CW | 9 | 2014 | 1997 |
| WDCW—Washington, D.C. | 9 | 2.0 | 1.0 | 50-UHF | CW | 7 | 2012 | 1999 |
| KHCW—Houston, TX | 10 | 1.8 | 0.9 | 39-UHF | CW | 9 | 2014 | 1996 |
| KCPQ—Seattle, WA | 14 | 1.6 | 1.6 | 13-VHF | FOX | 8 | 2015 | 1999 |
| KMYQ—Seattle, WA | 14 | — | — | 22-UHF | MNTV | 8 | 2015 | 1998 |
| WSFL—Miami, FL | 16 | 1.4 | 0.7 | 39-UHF | CW | 7 | 2013(4) | 1997 |
| KWGN—Denver, CO | 18 | 1.3 | 1.3 | 2-VHF | CW | 7 | 2014 | 1966 |
| KTXL—Sacramento, CA | 20 | 1.2 | 0.6 | 40-UHF | FOX | 7 | 2014 | 1997 |
| KPLR—St. Louis, MO | 21 | 1.1 | 1.1 | 11-VHF | CW | 6 | 2014 | 2003 |
| KRCW—Portland, OR | 23 | 1.0 | 0.5 | 32-UHF | CW | 7 | 2015 | 2003 |
| WTTV—Indianapolis, IN | 26 | 1.0 | 1.0 | 4-VHF | CW | 7 | 2013 | 2002 |
| WXIN—Indianapolis, IN | 26 | — | — | 59-UHF | FOX | 7 | 2013 | 1997 |
| KSWB—San Diego, CA | 27 | 0.9 | 0.5 | 69-UHF | CW | 7 | 2014 | 1996 |
| WTIC—Hartford, CT | 29 | 0.9 | 0.4 | 61-UHF | FOX | 7 | 2015(4) | 1997 |
| WTXX—Hartford, CT | 29 | — | — | 20-UHF | CW | 7 | 2015(4) | 2001 |
| WXMI—Grand Rapids, MI | 39 | 0.7 | 0.3 | 17-UHF | FOX | 7 | 2013 | 1998 |
| WPMT—Harrisburg, PA | 41 | 0.6 | 0.3 | 43-UHF | FOX | 5 | 2015 | 1997 |
| WGNO—New Orleans, LA | 53 | 0.5 | 0.3 | 26-UHF | ABC | 7 | 2013 | 1983 |
| WNOL—New Orleans, LA | 53 | — | — | 38-UHF | CW | 7 | 2013 | 2000 |

(1) Source: Nielsen Station Index (DMA Market and Demographic Rank Report, September 2007). Ranking of markets is based on number of television households in DMA (Designated Market Area).

(2) Source: Nielsen Station Index (Viewers in Profile Reports, 2007). Major over-the-air stations program for a broad, general audience in the market.

(3) See "Governmental Regulation."

(4) See "Governmental Regulation" for discussion of the Federal Communications Commission ("FCC") television/newspaper cross-ownership rule.

(5) Founded by the Company.

Programming emphasis at the Company's stations is placed on network-provided shows, syndicated series, feature motion pictures, local and regional sports coverage, news, and children's programs. These stations acquire most of their programming from outside sources, including The CW Network, the FOX Network and MyNetworkTV, although a significant amount is produced locally. Superstation WGN programming is delivered by cable or satellite outside of the Chicago area and includes syndicated series, movies and first-run programming. Contracts for purchased programming generally cover a period of one to five years, with payment also typically made over several years. The expense for amortization of television broadcast rights in 2007 was $347 million, which represented approximately 31% of total television operating revenues.

Average audience share information for the Company's television stations for the past three years is shown in the following table:

| | | Average Audience Share(1) | | | | | |
| | | Total Market Year Ended December | | | In-Market Stations(2) Year Ended December | | |
| | Affiliation | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 |
|---|---|---|---|---|---|---|---|
| WPIX—New York | CW | 4.1% | 4.4% | 5.1% | 11.2% | 11.1% | 12.4% |
| KTLA—Los Angeles | CW | 3.2 | 3.6 | 4.0 | 9.1 | 9.9 | 10.7 |
| WGN—Chicago | CW | 6.3 | 5.9 | 6.2 | 14.6 | 12.9 | 13.2 |
| WPHL—Philadelphia | MNTV | 3.0 | 3.7 | 4.0 | 7.2 | 8.4 | 8.5 |
| KDAF—Dallas | CW | 4.5 | 4.3 | 4.3 | 9.9 | 9.2 | 9.1 |
| WDCW—Washington | CW | 2.8 | 3.2 | 4.2 | 7.6 | 8.2 | 9.5 |
| KHCW—Houston | CW | 4.6 | 4.5 | 4.8 | 10.9 | 9.9 | 9.8 |
| KCPQ—Seattle | FOX | 5.6 | 5.7 | 6.7 | 13.3 | 12.3 | 13.7 |
| KMYQ—Seattle | MNTV | 1.2 | 2.0 | 2.5 | 2.9 | 4.3 | 5.0 |
| WSFL—Miami | CW | 3.8 | 3.9 | 5.2(3) | 11.0 | 11.0 | 13.9(3) |
| KWGN—Denver | CW | 3.2 | 3.2 | 3.9 | 7.8 | 7.8 | 9.4 |
| KTXL—Sacramento | FOX | 5.7 | 5.2 | 5.7 | 14.2 | 10.3 | 13.3 |
| KPLR—St. Louis | CW | 5.3 | 5.5 | 5.0 | 10.7 | 10.4 | 9.5 |
| KRCW—Portland | CW | 2.8 | 3.3 | 3.7 | 6.5 | 7.2 | 7.9 |
| WTTV—Indianapolis | CW | 2.5 | 2.7 | 3.7 | 5.5 | 5.9 | 7.8 |
| WXIN—Indianapolis | FOX | 6.3 | 5.8 | 6.5 | 13.9 | 12.8 | 13.7 |
| KSWB—San Diego | CW | 2.6 | 2.6 | 3.1 | 7.3 | 6.8 | 7.7 |
| WTIC—Hartford | FOX | 5.2 | 5.4 | 6.3 | 13.2 | 12.6 | 14.5 |
| WTXX—Hartford | CW | 2.1 | 2.1 | 2.1 | 5.3 | 4.9 | 4.7 |
| WXMI—Grand Rapids | FOX | 6.9 | 6.4 | 7.1 | 13.7 | 12.2 | 13.6 |
| WPMT—Harrisburg | FOX | 5.9 | 5.5 | 6.1 | 13.2 | 11.8 | 13.9 |
| WGNO—New Orleans | ABC | 3.6(5) | —(4) | 4.6(3) | 9.3(5) | —(4) | 9.8(3) |
| WNOL—New Orleans | CW | 2.5(5) | —(4) | 3.8(3) | 6.4(5) | —(4) | 8.2(3) |
| 23 Station Unweighted Average (6) | | 4.1 | 4.2 | 4.7 | 9.8 | 9.5 | 10.4 |

(1) Represents the estimated number of television households tuned to a specific station as a percent of total viewing households in a defined area. The percentages shown reflect the average Nielsen ratings shares for the February, May, July and November measurement periods for 7 a.m. to 1 a.m. daily.

(2) Excludes cable, satellite, public broadcasting, foreign language and minor independent channels.

(3) Nielsen did not release November 2005 data for WSFL-TV, WGNO-TV and WNOL-TV as a result of hurricanes in these areas. The 2005 shares for these markets reflect the average of ratings for the February, May and July measurement periods only.

(4) Nielsen did not release 2006 ratings data for WGNO-TV and WNOL-TV as a result of Hurricane Katrina.

(5) Nielsen did not release February or May 2007 data for WGNO-TV and WNOL-TV. The 2007 shares for these markets reflect the average of ratings for the July and November measurement periods only.

(6) 2006 unweighted station average is for 21 stations rather than 23, since New Orleans was not measured in 2006.

Average audience shares are shown on two bases: total market, which includes all channels, and in-market stations, which includes only the major over-the-air stations. Average in-market shares are a more relevant benchmark to determine the stations' performance in their respective markets as they compare the stations' performance to their primary programming and sales competition. In 2007, the average total market share declined slightly versus 2006 while the average in-market share increased. All of the FOX stations increased their in-market positions in 2007 due to stronger FOX network ratings and growing ratings for new syndicated programming ("Two and a Half Men" and "Family Guy"). These strong syndicated programs also helped the majority of the CW stations to maintain or increase their in-market shares despite soft CW network ratings.

17

### *Radio/Entertainment*

In 2007, radio/entertainment operations contributed 19% of the broadcasting and entertainment segment's operating revenues. WGN-AM, Chicago, is the only radio station owned by the Company. Selected information for WGN-AM, Chicago, is shown in the following table:

| WGN-AM, Chicago | Format | Frequency | National Market Rank(1) | Number of Operating Stations in Market(2) | Audience Share(3) |
|---|---|---|---|---|---|
| | Personality/Infotainment/Sports | 720-AM | 3 | 39 | 5.8% |

(1)  Source: Radio markets ranked by Arbitron Metro Survey Area, Arbitron Company 2007.

(2)  Source: Arbitron Company Radio Market Report Fall 2007 (Reporting stations only).

(3)  Source: Average of Winter, Spring, Summer and Fall 2007 Arbitron shares for persons 12 years old and over, 6 a.m. to midnight daily during the period measured.

Entertainment includes Tribune Entertainment Company ("Tribune Entertainment") and the Chicago Cubs baseball team. The Chicago Cubs were acquired in 1981. Cubs games are broadcast on WGN-TV and WGN-AM. Tribune Entertainment is a distributor of programming in the United States syndicated television, cable television and ancillary markets. Tribune Entertainment distributes its own programming together with programming licensed from third parties.

Tribune Entertainment is party to a variety of distribution, marketing, and advertiser sales relationships with major suppliers such as DreamWorks SKG for the exclusive domestic syndication and ad sales of their film library, FremantleMedia, Hearst Entertainment, Rigel Entertainment, Telco Productions, Debmar-Mercury Entertainment, DIC Entertainment and Carlton America. These relationships comprise over 400 television and theatrical motion pictures and more than 1,300 episodes of various television series and specials including "South Park," "Family Feud," "American Idol Rewind," "Soul Train," "The Soul Train Music Awards," and "Ron Hazelton's House Calls." Tribune Entertainment also distributes its television series productions of "Andromeda," "Earth Final Conflict," "Beastmaster," "Mutant X," and "Nightman."

Tribune California Properties, a subsidiary of Tribune Entertainment, owned and maintained a 10.5-acre studio production lot in Hollywood. Tribune Studios, also a subsidiary of Tribune Entertainment, managed the site that included nine state-of-the art digital sound stages and associated production office space which was rented to third parties.  During the third quarter of 2007, the Company commenced a process to sell the real estate and related assets of the studio production lot.  The Company completed the sale on Jan. 30, 2008.

### Investments

The Company has investments in several public and private companies. See Note 9 to the Company's consolidated financial statements in Item 8 for further discussion of the Company's cost and equity method investments.

The Company's principal equity method investments currently include CareerBuilder, Classified Ventures, Television Food Network, G.P. ("TV Food Network"), Comcast SportsNet Chicago, ShopLocal, Topix.net and Metromix, LLC. CareerBuilder, an online recruiting company formed in 2000, is owned 40.8% by the Company, 40.8% by Gannett Co., Inc., 14.4% by The McClatchy Co., Inc. and 4% by Microsoft Corporation.  Classified Ventures is a network of automotive and real estate classified advertising websites. TV Food Network is a 24-hour cable/satellite television network, which began programming in the fall of 2004, focusing on food and entertaining. Comcast SportsNet Chicago is a 24-hour cable/satellite television network focusing on Chicago sports teams, including the Chicago Cubs. ShopLocal transforms traditionally print-based retail promotions into search-based interactive formats. The Company, Gannett Co., Inc. and The McClatchy Co., Inc. each own a 42.5%, 42.5% and 15% interest in ShopLocal, respectively. Topix.net is an online news and information aggregation website that continuously monitors breaking news from over 10,000 online sources and categorizes daily news content into over 300,000 topics, 24 hours a day. The ownership of Topix, LLC is approximately

18

33.7% for both the Company and Gannett Co., Inc., 11.9% for The McClatchy Co., Inc. and 20.7% for management of Topix, LLC. Metromix, LLC, formed in 2007, operates a network of local online entertainment guides targeting young adults in each of the Company's newspaper markets. Metromix, LLC is owned 50% by the Company and 50% by Gannett Co., Inc.

On Sept. 21, 2006, the Company and the Chandler Trusts entered into agreements to restructure TMCT and TMCT II. As a result, the Company's interests in each of TMCT and TMCT II were reduced to approximately 5%. On Sept. 28, 2007, the Company sold its remaining interests in TMCT and TMCT II to the Chandler Trusts. The Company's former investments in TMCT and TMCT II are further discussed in Note 8 to the Company's consolidated financial statements in Item 8.

### Non-Operating Items

The Company reported several non-operating items in 2007, 2006 and 2005, which included changes in the fair values of the Company's PHONES derivatives and related Time Warner investment, gains and losses resulting from investment transactions, strategic transaction expenses, and income tax adjustments, including those related to the Matthew Bender and Mosby income tax case. Non-operating items are further discussed in Note 2 to the Company's consolidated financial statements in Item 8.

### Governmental Regulation

Various aspects of our operations are subject to regulation by governmental authorities in the United States. Our television and radio broadcasting operations are subject to FCC jurisdiction under the Communications Act of 1934, as amended. FCC rules, among other things, govern the term, renewal and transfer of radio and television broadcasting licenses, and limit concentrations of broadcasting control inconsistent with the public interest. Federal law also regulates the rates charged for political advertising and the quantity of advertising within children's programs.

On Nov. 30, 2007, the FCC issued an order (the "Order") granting applications of the Company to transfer control of the Company from the shareholders to the Company's Employee Stock Ownership Plan. In the Order, the FCC granted the Company temporary waivers of the newspaper/broadcast cross-ownership rule in Miami, Florida (WSFL-TV and the *South Florida Sun-Sentinel*); Hartford, Connecticut (WTXX-TV/WTIC-TV and the *Hartford Courant*); Los Angeles, California (KTLA-TV and the *Los Angeles Times*); and New York, New York (WPIX-TV and *Newsday*), for a six-month period beginning Jan. 1, 2008. The six-month waiver could be automatically extended under two conditions: (1) if the Company appeals the Order, the waivers are extended for the longer of two years or six months after the conclusion of the litigation over the Order; or (2) if the FCC adopts a revised newspaper-broadcast cross-ownership rule prior to Jan. 1, 2008, the waivers are extended for a two-year period to allow the Company to come into compliance with any revised rule, provided that in the event the revised rule is the subject of a judicial stay, the waiver is extended until six months after the expiration of any such stay.

The Order also granted the Company a permanent waiver of the newspaper-broadcast cross-ownership rule to permit continued common ownership of WGN-AM, WGN-TV and the Chicago Tribune in Chicago, Illinois; a permanent "failing station" waiver of the television duopoly rule to permit continued common ownership of WTIC-TV and WTXX-TV in Hartford, Connecticut; and granted satellite station status to WTTK-TV, Kokomo, Indiana to permit continued common ownership with WTTV-TV, Bloomington, Indiana.

The Company filed an appeal of the Order in the United States Court of Appeals for the District of Columbia Circuit on Dec. 3, 2007, thus automatically extending the waivers for two years or until six months after the conclusion of that appeal, whichever is longer. Intervenors have filed a motion to dismiss the appeal, as well as a motion to hold the appeal in abeyance; the Company and others have filed oppositions to these motions. Various parties have filed petitions for reconsideration of the Order with the FCC; the Company has filed oppositions to such filings with the FCC.

19

On Dec. 18, 2007, the FCC announced in an FCC news release the adoption of revisions to the newspaper/broadcast cross-ownership rule. The FCC, on Feb. 4, 2008, released the full text of the rule. The revised rule establishes a presumption that the common ownership of a daily newspaper of general circulation and either a television or a radio broadcast station in the top 20 Nielsen Designated Market Areas (''DMAs'') would serve the public interest, provided that, if the transaction involves a television station, (i) at least eight independently owned and operating major media voices (defined to include major newspapers and full-power commercial television stations) would remain in the DMA following the transaction and (ii) the cross-owned television station is not among the top-four ranked television stations in the DMA. Other proposed newspaper/broadcast transactions would be presumed not to be in the public interest, except in the case of a "failing" station or newspaper, or in the event that the proposed transaction results in a new source of news in the market. The FCC did not further relax the television-radio cross-ownership rules, the radio local ownership rules, or the television duopoly rules. Under the rule adopted, the Company would be entitled to a presumption in favor of common ownership in three of the four of the Company's cross-ownership markets (New York, NY, Los Angeles, CA, Miami, FL) not covered by the FCC's grant of a permanent waiver (Chicago, IL). Various parties, including the Company, have sought judicial review of the FCC's order adopting the new rule.

Congress removed national limits on the number of broadcast stations a licensee may own in 1996. However, federal law continues to limit the number of radio and television stations a single owner may own in a local market, and caps the percentage of the national television audience that may be reached by a licensee's television stations in the aggregate at 39%.

Television and radio broadcasting licenses are subject to renewal by the FCC, at which time they may be subject to petitions to deny the license renewal applications. At Dec. 30, 2007, the Company had FCC authorization to operate 23 television stations and one AM radio station. In order to expedite the renewal grants, the Company entered into tolling agreements with the FCC for WPIX-TV, New York, WDCW-TV, Washington, D.C., WGNO-TV, New Orleans, WXIN-TV, Indianapolis, WXMI-TV, Grand Rapids, WGN-TV, Chicago, WPHL-TV, Philadelphia, KWGN-TV, Denver, KHCW-TV, Houston, KTLA-TV, Los Angeles, KTXL-TV, Sacramento, KSWB-TV, San Diego, KCPQ-TV, Seattle/Tacoma, WTIC-TV, and WPMT-TV Harrisburg, Pennsylvania). The tolling agreements would allow the FCC to penalize the Company for rule violations that occurred during the previous license term notwithstanding the grant of renewal applications.

The television industry is in the final stages of the transition to digital television (''DTV''). By law, the transition to DTV is to occur by Feb. 17, 2009. The FCC has issued an order with the final, post-transition DTV channel assignments for every full power television station in the U.S. It also recently completed a proceeding that established the operating rules for DTV stations just before and after the transition in February 2009. Conversion to digital transmission requires all television broadcasters, including those owned by the Company, to invest in digital equipment and facilities. At Dec. 30, 2007, all of the Company's television stations were operating DTV stations in compliance with the FCC's rules.

The FCC still has not resolved a number of issues relating to the operation of DTV stations, including the possible imposition of additional ''public interest'' obligations attached to broadcasters' use of digital spectrum.

From time to time, the FCC revises existing regulations and policies in ways that could affect the Company's broadcasting operations. In addition, Congress from time to time considers and adopts substantive amendments to the governing communications legislation. The Company cannot predict what regulations or legislation may be proposed or finally enacted or what effect, if any, such regulations or legislation could have on the Company's broadcasting operations.

**Employees**

The average number of full-time equivalent employees of the Company in 2007 was approximately 19,600, approximately 1,400 less than the average for 2006 due to employee reductions and the sales of discontinued

operations. The Company eliminated approximately 700 positions at various times during 2007 and approximately 450 positions during 2006. The eliminations in 2006 included approximately 100 positions related to discontinued operations prior to the sales of those businesses (see Note 4 to the Company's consolidated financial statements in Item 8 for additional information on the sales of discontinued operations).

During 2007, the Company's publishing segment employed an average of approximately 16,500 full-time equivalent employees. About 16% of these employees were represented by unions covered under 19 labor contracts. Contracts with unionized employees of the publishing segment expire at various times through June 2012.

The broadcasting and entertainment segment had an average of approximately 3,000 full-time equivalent employees in 2007. Approximately 24% of these employees were represented by unions covered under 20 labor contracts. Contracts with unionized employees of the broadcasting and entertainment segment expire at various times through December 2010.

## Executive Officers of the Company

Information with respect to the executive officers of the Company as of March 20, 2008, is set forth below. Their ages are indicated in parentheses. The descriptions of the business experience of these individuals include the principal positions held by them since March 2003. Unless otherwise indicated, all references to positions are to officers of the Company.

Samuel Zell (66)
Chairman and Chief Executive Officer since December 2007; Director since May 2007. Chairman of Equity Group Investments, L.L.C. since 1999 and President since 2006. Chairman of Equity Office Properties Trust from October 1996 until its acquisition in February 2007; Chief Executive Officer from April 2002 to April 2003; President from April 2002 until November 2002.

Randy Michaels (55)
Executive Vice President and Chief Executive Officer of Tribune Interactive, Inc.* and Tribune Broadcasting Company* since December 2007. Chief Executive Officer of Local TV, LLC from early 2007 until December 2007. Chairman and Chief Executive Officer of Clear Channel Communications from 1999 until 2002. After leaving Clear Channel Communications, Mr. Michaels started several private broadcast firms, including RadioActive and Product 1st. Mr. Michaels then began working with Oak Hill Capital partners in early 2005 on acquisition opportunities, culminating in the creation of Local TV, LLC in 2007.

Gerald A. Spector (61)
Executive Vice President and Chief Administrative Officer since December 2007. Trustee and Executive Vice President of Equity Residential from March 1993 until December 2007; Chief Operating Officer from February 1995 until December 2007.

Donald C. Grenesko (59)
Senior Vice President/Finance and Administration.

Crane H. Kenney (45)
Senior Vice President, General Counsel and Secretary.

Scott C. Smith (57)
President of Tribune Publishing Company* since January 2005 and Publisher of Chicago Tribune Company* since October 2006; Chief Operating Officer of Tribune Publishing Company* from November 2004 until January 2005; President of Chicago Tribune Company* until November 2004.

---

*    A subsidiary or a division of the Company

21

**Available Information**

The Company maintains an Internet website at www.tribune.com where the Company's Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and all amendments to those reports are available without charge, as soon as reasonably practicable following the time that they are filed with or furnished to the Securities and Exchange Commission.

22

## ITEM 1A.  RISK FACTORS.

The foregoing business discussion and the other information included in this Form 10-K should be read in conjunction with the following risks, trends and uncertainties, any of which, either individually or in the aggregate, could materially and adversely affect our business, operating results or financial condition.

### Risks Related to Our Capital Structure

### We currently have significant debt and other financial obligations as a result of the Leveraged ESOP Transactions.

We have significant debt and other financial obligations as a result of the Leveraged ESOP Transactions. As of Dec. 30, 2007, we had approximately $12.8 billion of total debt outstanding. In connection with the Leveraged ESOP Transactions, we entered into the Credit Agreement and the Interim Credit Agreement and, in order to finance the Leveraged ESOP Transactions, we borrowed approximately $9.1 billion under the Credit Agreement and $1.6 billion under the Interim Credit Agreement. As described in more detail in Item 1. Business "Significant Events," the $1.4 billion of borrowings under the Tranche X Facility in the Credit Agreement must be repaid in an aggregate amount of $650 million on Dec. 4, 2008, less any mandatory or other prepayments applied thereto, and the remaining outstanding amount of the Tranche X Facility must be repaid on June 4, 2009. The Credit Agreement also provides for a $750 million revolving credit facility that may be used for general corporate purposes and a $263 million delayed draw facility to be used to refinance medium-term notes which mature in 2008. Borrowings under the Credit Agreement and the Interim Credit Agreement are guaranteed by certain of our direct and indirect U.S. subsidiaries and borrowings under the Credit Agreement are secured by a pledge of the equity interests of Tribune Broadcasting Holdco, LLC and Tribune Finance, LLC, two of our subsidiaries. Audited financial statements of these two subsidiaries are included in Part II, Item 8, hereof. In addition to our borrowings under the Credit Agreement and the Interim Credit Agreement, we also continue to have outstanding approximately $1.4 billion aggregate amount of our debentures and other senior notes and approximately $600 million of PHONES debt.

Our significantly increased debt level and related debt service obligations:

- require us to dedicate a substantial portion of our cash flows to the payment of principal and interest on our debt which will reduce the funds we have available for other purposes;

- limit our liquidity and operational flexibility and our ability to respond to the challenging general and industry-specific economic and business conditions that currently exist or that we may face in the future;

- may require us in the future to defer planned capital expenditures, further reduce the size of our workforce, reduce discretionary spending, dispose of assets or forgo acquisitions or other strategic opportunities, any of which decisions may affect our revenues and place us at a competitive disadvantage compared to our competitors with less debt or with comparable debt at more favorable interest rates and who, as a result, may be better positioned to withstand economic downturns or pursue key acquisitions or other strategic opportunities;

- impose on us additional financial and operational restrictions;

- expose us to increased interest rate risk because a substantial portion of our debt obligations are at variable interest rates; and

23

5/20/2010 9:00 PM

subject us to market and industry speculation as to our financial condition and the effect of our debt level and debt service obligations on our operations, which speculation could be disruptive to our relationships with customers, suppliers, employees, creditors and other third parties.

**We may not be able to generate sufficient cash to service or make required repayments of our indebtedness and we may be forced to take other actions to satisfy our obligations under our indebtedness, which may not be successful.**

We have significant interest expense and principal repayment obligations. Assuming the consummation of the Leveraged ESOP Transactions occurred at the beginning of fiscal year 2007, our pro forma interest expense for the twelve months ended Dec. 30, 2007 would have been approximately $1.0 billion assuming the LIBOR rates as of March 10, 2008. Further, the $1.4 billion of borrowings under the Tranche X Facility in the Credit Agreement must be repaid in an aggregate amount of $650 million on Dec. 4, 2008, less any mandatory or other prepayments applied thereto, and the remaining outstanding amount of the Tranche X Facility must be repaid on June 4, 2009. Our ability to make scheduled payments or prepayments on our debt and other financial obligations will depend on our future financial and operating performance and our ability to dispose of assets on favorable terms. There can be no assurances that our businesses will generate sufficient cash flows from operations or that future borrowings under the revolving credit facility will be available to us in an amount sufficient to enable us to pay our indebtedness or to fund our other liquidity needs or that any such asset dispositions can be completed. Our financial and operating performance is subject to prevailing economic and industry conditions and to financial, business and other factors, some of which are beyond our control. In 2007, publishing operating revenues decreased 9% primarily due to a decrease in advertising revenue. We have experienced accelerating declines in publishing operating revenues in 2008 to date. Our increased leverage exposes us to significant risk during periods of downturns in our businesses (whether through competitive pressures or otherwise), in our industries or in the economy generally, as our cash flows would likely decrease in this scenario, but our required principal payments in respect of indebtedness do not change and our interest expense obligations could increase due to increases in interest rates.

If our cash flows and capital resources are insufficient to fund our debt service obligations, we will likely face increased pressure to reduce or delay capital expenditures, dispose of assets or operations, further reduce the size of our workforce, seek additional capital or restructure or refinance our indebtedness. These actions could have a material adverse effect on our business, financial condition and results of operations. In addition, we cannot assure that we would be able to take any of these actions, that these actions would be successful and permit us to meet our scheduled debt service obligations or that these actions would be permitted under the terms of our existing or future debt agreements, including the Credit Agreement and the Interim Credit Agreement. For example, we may need to refinance all or a portion of our indebtedness on or before maturity. There can be no assurance that we will be able to refinance any of our indebtedness on commercially reasonable terms or at all. In the absence of improved operating results and access to capital resources, we could face substantial liquidity problems and might be required to dispose of material assets or operations to meet our debt service and other obligations. The Credit Agreement and the Interim Credit Agreement restrict our ability to dispose of assets and use the proceeds from the disposition. We may not be able to consummate those dispositions or to obtain the proceeds realized. Additionally, these proceeds may not be adequate to meet the debt service obligations then due.

If we cannot make scheduled payments or prepayments on our debt, we will be in default and, as a result, among other things, our debt holders could declare all outstanding principal and interest to be due and payable and we could be forced into bankruptcy or liquidation or required to substantially restructure or alter our business operations or debt obligations.

24

**Restrictive covenants under the Credit Agreement and the Interim Credit Agreement may adversely affect our operations and liquidity.**

The Credit Agreement and the Interim Credit Agreement contain, and any future indebtedness we incur may contain, various covenants that limit our ability to, among other things:

- incur or guarantee additional indebtedness, including additional secured indebtedness and/or subsidiary indebtedness;
- make certain distributions, investments and other restricted payments;
- dispose of our assets;
- grant liens on our assets;
- engage in transactions with affiliates; and
- merge or consolidate or transfer substantially all of our assets.

As a result of these covenants, we are limited in the manner in which we conduct our business and we may be unable to engage in favorable business activities or finance future operations or capital needs. In addition, the covenants in the Credit Agreement require us to comply with a specified maximum total guaranteed leverage ratio and minimum interest coverage ratio. Our ability to comply with the covenants and restrictions contained in the agreements governing our indebtedness may be affected by economic, financial and industry conditions beyond our control. A breach of any of these covenants or any of the other restrictive covenants could result in a default under the Credit Agreement and the Interim Credit Agreement. Upon the occurrence of an event of default under the Credit Agreement and the Interim Credit Agreement, the lenders:

- will not be required to lend any additional amounts to us;
- could elect to declare all borrowings outstanding thereunder, together with accrued and unpaid interest and fees, to be due and payable;
- could require us to apply all of our available cash to repay these borrowings; or
- could require us to engage in other restructuring transactions that could materially affect our stakeholders' interest in the Company or our business operations;

any of which could also result in an event of default under our indentures governing our existing senior notes or PHONES debt.

**We are a holding company and our ability to make payments on our indebtedness depends on our ability to receive dividends and other distributions from our subsidiaries.**

Tribune Company is a holding company with limited direct operations. Our principal assets are the equity interests that we hold in our operating subsidiaries. As a result, we are dependent on dividends and other distributions from our subsidiaries to generate the funds necessary to meet our financial obligations, including the payment of principal and interest on our outstanding indebtedness. Our subsidiaries may not generate sufficient cash from operations to enable us to make principal and interest payments on our indebtedness. In addition, any payment of dividends, distributions, loans or advances to us by our subsidiaries could be subject to legal or

25

regulatory restrictions on dividends. Payments to us by our subsidiaries will be contingent upon our subsidiaries' cash flows.

**Variable rate indebtedness subjects us to interest rate risk, which could cause our debt service obligations to increase significantly.**

As of Dec. 30, 2007, approximately $10.6 billion of our borrowings, primarily borrowings under the Credit Agreement and the Interim Credit Agreement, were at variable rates of interest and expose us to interest rate risk. If interest rates increase, our debt service obligations on the variable rate indebtedness would increase even though the amount borrowed remained the same. Under the terms of the Credit Agreement discussed in Item 1, Business "Significant Events", we are required to enter into hedge arrangements to offset a percentage of our interest rate exposure under the Credit Agreement and other debt with respect to borrowed money. We are party to three interest rate swaps confirmations with Barclays Bank, which provides for (i) a two-year hedge with respect to $750 million in notional amount, (ii) a three-year hedge with respect to $1 billion in notional amount and (iii) a five-year hedge with respect to $750 million in notional amount. The swaps confirmations effectively converted a portion of the variable rate borrowings under the Tranche B Facility in the Credit Agreement to a weighted average fixed rate of 5.31% plus a margin of 300 basis points. We are also party to an additional interest rate swap agreement related to the $100 million 7.5% debentures due in 2023 which effectively converts the fixed 7.5% rate to a variable rate based on LIBOR. Although we may enter into additional interest rate swaps, involving the exchange of floating for fixed rate interest payments, to reduce interest rate volatility, we cannot provide assurances that we will be able to do so or that such swaps will be effective.

**If we fail to maintain our election to be treated as a subchapter S corporation under the Internal Revenue Code, we will remain subject to federal income tax and, in the future, may be required to obtain a significant investment in the Company.**

The Credit Agreement and the Interim Credit Agreement require that we make and maintain an election to be treated as a subchapter S corporation under the Internal Revenue Code. As discussed in Item 1, Business "Significant Events", on March 13, 2008, we filed an election to be treated as a subchapter S Corporation under the Internal Revenue Code effective for fiscal year 2008 and beyond. Subject to certain limitations (such as the built-in gains tax applicable for ten years to gains accrued prior to the election), as a result of this election we are no longer subject to federal income tax. Instead, our income is required to be reported by our shareholders. The Company's Employee Stock Ownership Plan is generally not taxed on the amount of income that is passed through to it. If we fail to maintain the election, we will once again be subject to federal income tax.

Further, if we fail to maintain the S corporation election for any year beginning with 2009, then we will be required under the Credit Agreement and the Interim Credit Agreement in each such year to obtain an investment in the Company in the form of common stock or subordinated debt of the Company in an amount up to $100 million. If we are unable to keep the S corporation election effective as a result of governmental, regulatory or administrative challenge or change in law, rule or regulation, we will not be required under the Credit Agreement and the Interim Credit Agreement to obtain such an investment for so long as we are diligently contesting in good faith by appropriate proceedings our inability to keep such election effective. However, if after contesting our inability to keep such election effective we are still unable to keep the S corporation election effective, we will be required by the terms of the Credit Agreement and the Interim Credit Agreement to obtain an investment of up to $100 million per year in respect of all applicable years beginning with 2009 for which the S corporation was not effective. There can be no assurance that the Company will be able to obtain such an investment and the failure to obtain such an investment in those circumstances could result in a default under the Credit Agreement and the Interim Credit Agreement and, as a result, among other things, our debt holders could declare all outstanding principal and interest to be due and payable and we could be forced into bankruptcy or liquidation or required to substantially restructure or alter our business operations or debt obligations.

26

http://www.sec.gov/Archives/edgar/data/726513/000110465908018845/...

**Risks Related to Our Business**

**Advertising demand will continue to be impacted by changes in economic conditions and fragmentation of the media landscape.**

Advertising revenue is the primary source of revenue for our publishing and broadcasting businesses. National and local economic conditions, particularly in major metropolitan markets, affect the levels of retail, national and classified newspaper advertising revenue, as well as television advertising revenue. Changes in Gross Domestic Product, consumer spending, auto sales, housing sales, unemployment rates, job creation and circulation levels and rates all impact demand for advertising. Consolidation across various industries, particularly large department store and telecommunications companies, may also reduce our overall advertising revenue.

Competition from other media, including other metropolitan, suburban and national newspapers, broadcasters, cable systems and networks, satellite television and radio, websites, magazines, direct marketing and solo and shared mail programs, affects our ability to retain advertising clients and raise rates. In recent years, Internet sites devoted to recruitment, automobile and real estate have become significant competitors of our newspapers and websites for classified advertising. While we have invested in successful Internet ventures such as CareerBuilder and Classified Ventures to capture some of the advertising dollars that have migrated online, retaining our historical share of classified advertising revenues remains a challenge.

Seasonal variations in consumer spending cause our quarterly advertising revenues to fluctuate. Second and fourth quarter advertising revenues are typically higher than first and third quarter advertising revenues, reflecting the slower economic activity in the winter and summer and the stronger fourth quarter holiday season.

In broadcasting, the proliferation of cable and satellite channels, advances in mobile and wireless technology, the migration of television audiences to the Internet and the viewing public's increased control over the manner and timing of their media consumption through personal video recording devices, have resulted in greater fragmentation of the television viewing audience and a more difficult sales environment.

All of these factors continue to contribute to a difficult sales environment and may further adversely impact our ability to grow or maintain our revenues.

**Circulation and audience share may continue to decline as consumers migrate to other media alternatives.**

Competition for newspaper advertising is based on reader demographics, price, service, advertiser results, and circulation and readership levels, while competition for circulation is based upon the content of the newspaper, service and price. Competition for television advertising is based on audience share and ratings information, audience demographics and price.

The National Do Not Call Registry has impacted the way newspapers sell home-delivery circulation, particularly for the larger newspapers that historically have relied on telemarketing. Similarly, Nielsen's Local People Meters, which capture viewership data in a different manner than historical Nielsen viewership data collection methods, have tended to reduce the overall share of broadcast television compared to cable television and, within the broadcast television universe, disadvantage stations like ours that target younger audiences.

Our advertising and circulation revenues have declined, reflecting general trends in the newspaper industry, including declining newspaper buying by young people and the migration to other available forms of media for news. In order to address declining circulation in certain markets, we may increase marketing designed to retain our existing subscriber base and continue to introduce niche publications targeted at commuters and young adults. We may also increase marketing efforts to drive traffic to our proprietary websites.

27

**Changes in the regulatory landscape could affect our business operations and asset mix.**

Various aspects of our operations are subject to regulation by governmental authorities in the United States. Changes in the current regulatory environment could result in increased operating costs or divestitures of several of our properties.

Our television and radio broadcasting operations are subject to FCC jurisdiction under the Communications Act of 1934, as amended. FCC rules, among other things, govern the term, renewal and transfer of radio and television broadcasting licenses and limit concentrations of broadcasting control inconsistent with the public interest. Federal law also regulates the rates charged for both political advertising and the quantity of advertising within children's programs.

From time to time, the FCC revises existing regulations and policies in ways that could affect our broadcasting operations. In addition, Congress from time to time considers and adopts substantive amendments to governing communications legislation. We cannot predict what regulations or legislation may be proposed, what regulations or legislation may be finally enacted, or what effect, if any, such regulations or legislation could have on our broadcasting operations. See ''Business—Governmental Regulation'' in Item 1, hereof for a discussion of the newly proposed television/newspaper cross-ownership rule and the effect the outcome could have on our business.

**The availability and cost of quality network-provided and syndicated programming may impact television ratings.**

The cost of syndicated programming represents a significant portion of television operating expenses. Programming emphasis at our stations is placed on network-provided programming, syndicated series, feature motion pictures, local and regional sports coverage, news, and children's programs. Most of our stations' programming is acquired from outside sources, including the networks with which our stations are affiliated, and some is produced locally or supplied by Tribune Entertainment Company. Network-provided programming is dependent on our ability to maintain our existing network affiliations and the continued existence of such networks. Syndicated programming costs are impacted largely by market factors, including demand from other stations or cable channels within the market. Availability of syndicated programming depends on the production of compelling programming and the willingness of studios to offer the programming to unaffiliated buyers. Our inability to continue to acquire or produce affordable programming for our stations could adversely affect operating results or our financial condition.

**Events beyond our control may result in unexpected adverse operating results.**

Our results could be affected in various ways by global or domestic events beyond our control, such as wars, political unrest, acts of terrorism, and natural disasters. Such events can quickly result in significant declines in advertising revenues and significant increases in newsgathering costs. Coverage of the war in Iraq and Hurricane Katrina are two examples where newsgathering costs increased and, in the case of Hurricane Katrina, revenues dropped off significantly at our two New Orleans television stations.

**Newsprint prices may continue to be volatile and difficult to predict and control.**

Newsprint is one of the largest expenses of our publishing units. The price of newsprint has historically been volatile and the consolidation of North American newsprint mills over the years has reduced the number of suppliers. We have historically been able to realize favorable newsprint pricing by virtue of our company-wide volume and a long-term contract with a significant supplier. However, recent supplier consolidation has led to increases in newsprint prices. Failure to maintain our current consumption levels, further supplier consolidation or the inability to maintain our existing relationships with our newsprint suppliers could adversely impact newsprint prices in the future.

28

http://www.sec.gov/Archives/edgar/data/726513/000110465908018845/...

**Changes in accounting standards can significantly impact reported earnings and operating results.**

Generally accepted accounting principles and accompanying pronouncements and implementation guidelines for many aspects of our business, including those related to intangible assets, pensions, employee stock ownership plans, income taxes, derivatives, equity-based compensation and broadcast rights, are complex and involve significant judgments. Changes in these rules or their interpretation could significantly change our reported earnings and operating results.

**Adverse results from litigation or governmental investigations can impact our business practices and operating results.**

From time to time, Tribune and its subsidiaries are parties to litigation and regulatory, environmental and other proceedings with governmental authorities and administrative agencies. Adverse outcomes in lawsuits or investigations could result in significant monetary damages or injunctive relief that could adversely affect our operating results or financial condition as well as our ability to conduct our businesses as they are presently being conducted. See Item 3. "Legal Proceedings" for a description of certain of our pending litigation and regulatory matters and other proceedings with governmental authorities.

**We could be faced with additional tax liabilities.**

We are subject to both federal and state income taxes and are regularly audited by federal and state taxing authorities. Significant judgment is required in evaluating our tax positions and in establishing appropriate reserves. We analyze our tax positions and reserves on an ongoing basis and make adjustments when warranted based on changes in facts and circumstances. While we believe our tax positions and reserves are reasonable, the resolution of our tax issues are unpredictable and could negatively impact our effective tax rate, net income or cash flows for the period or periods in question. See "Risk Factors—Risks Related to Our Capital Structure" above for a discussion regarding our election to be treated as a subchapter S Corporation under the Internal Revenue Code effective for fiscal year 2008 and beyond.

**Labor strikes, lock-outs and protracted negotiations can lead to business interruptions and increased operating costs.**

Union employees currently comprise about 17% of our workforce. We are required to negotiate collective bargaining agreements across our business units on an ongoing basis. Complications in labor negotiations can lead to work slowdowns or other business interruptions and greater overall employee costs.

**Acquisitions, investments and divestitures pose inherent financial and other risks and challenges.**

We intend to pursue dispositions of certain assets or businesses or other transactions to enable us to repay a portion of our indebtedness and meet our financial or operating covenants contained in our debt agreements. In addition, we continuously evaluate our businesses and make strategic acquisitions and investments, either individually or with partners, and divestitures as part of our strategic plan. These transactions involve challenges and risks in negotiation, execution, valuation and integration. There can be no assurance that any such dispositions can be completed. Moreover, competition for certain types of acquisitions is significant, particularly in the Interactive space. Even if successfully negotiated, closed and integrated, certain acquisitions or investments may prove not to advance our business strategy and may fall short of expected return on investment targets. In certain of our investments, we take a minority position in a company with limited voting rights and an inability to exert absolute control over the entity.

**ITEM 1B.    UNRESOLVED STAFF COMMENTS.**

None.

29

## ITEM 2.  PROPERTIES.

The corporate headquarters of the Company are located at 435 North Michigan Avenue, Chicago, Illinois. The general character, location and approximate size of the principal physical properties used by the Company on Dec. 30, 2007 are listed below. In total, the Company owns or leases transmitter sites, parking lots and other land aggregating approximately 1,048 acres in 87 separate locations. In addition to those properties listed below, the Company owns or leases an aggregate of approximately 3,011,451 square feet of office and production space in 291 locations. The Company also owns Wrigley Field, the 41,118-seat stadium used by the Chicago Cubs baseball team. The Company considers its various properties to be in good condition and suitable for the purposes for which they are used.

| General Character of Property | Approximate Area in Square Feet | |
| --- | --- | --- |
| | Owned | Leased(1) |
| Publishing: | | |
| Printing plants, business and editorial offices, and warehouse space located in: | | |
| Los Angeles, CA | 656,000 | 1,334,000 |
| Chicago, IL | 1,583,000(2) | 89,000 |
| Melville, NY | — | 719,000 |
| Baltimore, MD | 10,000 | 875,000 |
| Hartford, CT | 173,000 | 337,000 |
| Orlando, FL | 374,000 | 81,000 |
| Deerfield Beach, FL | 320,000 | 44,000 |
| Costa Mesa, CA | 339,000 | 47,000 |
| Irwindale, CA | — | 325,000 |
| Allentown, PA | 222,000 | — |
| Chatsworth, CA | — | 52,000 |
| Newport News, VA | 218,000 | 22,000 |
| Northlake, IL | — | 246,000 |
| Fort Lauderdale, FL | — | 163,000 |
| Oakbrook, IL | — | 99,000 |
| Stamford, CT | 85,000(3) | — |
| Miller Place, NY | 85,000 | — |
| Glens Falls, NY | — | 59,000 |
| Bel Air, MD | 52,000 | — |
| Columbia, MD | 29,000 | 14,000 |
| Greenwich, CT | 24,000(3) | — |
| Washington, DC | — | 41,000 |
| Williamsburg, VA | 25,000 | 3,000 |
| Broadcasting and entertainment: | | |
| Business offices, studios and transmitters located in: | | |
| Los Angeles, CA | 309,000(4) | 65,000 |
| Chicago, IL | 132,000 | 6,000 |
| New York, NY | — | 121,000 |
| Indianapolis, IN | 79,000 | — |
| Seattle, WA | 68,000 | — |
| Greenwood Village, CO | 42,000 | — |
| Maryland Heights, MO | — | 39,000 |
| Houston, TX | 34,000 | — |
| Dallas, TX | 33,000 | — |
| San Diego, CA | — | 26,000 |
| Hartford, CT | — | 22,000 |
| Philadelphia, PA | 21,000 | 4,000 |

30

| General Character of Property | Approximate Area in Square Feet | |
| --- | --- | --- |
| | Owned | Leased(1) |
| Sacramento, CA | 24,000 | — |
| Grand Rapids, MI | 21,000 | — |
| Hollywood, FL | 20,000 | — |
| York, PA | 20,000 | — |
| Beaverton, OR | 14,000 | — |
| Washington, DC | — | 13,000 |

(1) The Company has financed eight real properties, constituting 2,989,000 square feet from TMCT. This property financing arrangement was amended by Tribune and TMCT on Sept. 22, 2006, to extend the properties' current fixed rental rate through Aug. 7, 2021. Under the terms of the amended financing agreement, the Company was granted an accelerated option to acquire the eight properties during the month of January 2008 for $175 million. The Company exercised this option on Jan. 29, 2008 and expects to complete this acquisition in April 2008. See Note 8 to the Company's consolidated financial statements in Item 8 for further discussion.

(2) Includes Tribune Tower, an approximately 630,000 square foot office building in downtown Chicago, and Freedom Center, the approximately 943,000 square foot production center of the *Chicago Tribune*. Tribune Tower houses the Company's corporate headquarters, the Chicago Tribune's business and editorial offices, offices of various subsidiary companies and approximately 41,000 square feet of space leased to unaffiliated tenants. Freedom Center houses the Chicago Tribune's printing, packaging and distribution operations.

(3) The properties in Stamford, CT and Greenwich, CT are included in assets held for sale at Dec. 30, 2007. See Note 4 to the Company's consolidated financial statements in Item 8.

(4) During the third quarter of 2007, the Company commenced a process to sell the real estate and related assets of its studio production lot located in Hollywood, California. The sale of the studio production lot closed on Jan. 30, 2008. In connection with the closing of the sale, the Company entered into a five-year lease for a portion of the studio production lot currently utilized by the Company's KTLA-TV station.

31

## ITEM 3.    LEGAL PROCEEDINGS.

The Company and its subsidiaries are defendants from time to time in actions for matters arising out of their business operations. In addition, the Company and its subsidiaries are involved from time to time as parties in various regulatory, environmental and other proceedings with governmental authorities and administrative agencies.

**Matthew Bender and Mosby Income Tax Liability**—During 1998, Times Mirror, which was acquired by the Company in 2000, disposed of its Matthew Bender and Mosby subsidiaries in separate transactions, which were structured to qualify as tax-free reorganizations under the Internal Revenue Code. The Company believes these transactions were completed on a tax-free basis. However, the Internal Revenue Service ("IRS") audited the transactions and disagreed with the position taken by Times Mirror. In the fourth quarter of 2001, the Company received an IRS adjustment to increase Times Mirror's 1998 taxable income by approximately $1.6 billion. The Company filed a petition in the United States Tax Court in November 2002 to contest the IRS position, and in December 2004, the Company presented its position in Tax Court.

On Sept. 27, 2005, the Tax Court issued an opinion contrary to the Company's position and determined that the Matthew Bender transaction was a taxable sale. In January 2006, the Tax Court extended its opinion in the Matthew Bender case to the Mosby transaction given the similarity of the two transactions. Taxes and related interest for both the Matthew Bender and Mosby transactions totaled approximately $1 billion as of Sept. 27, 2005. Over time, deductions for state taxes and interest were expected to reduce the net cash outlay to approximately $840 million.

The Company appealed the Tax Court ruling to the United States Court of Appeals for the Seventh Circuit. On June 1, 2007, the Company announced that an offer of settlement was pending in its appeal. The Company finalized the settlement during the third quarter of 2007. As a result of the settlement, the Company received refunds of federal income taxes and interest of $4 million on Sept. 26, 2007 and $340 million on Oct. 1, 2007. After consideration of income taxes on the interest received, the net cash proceeds totaled approximately $286 million. These refunds, together with related state income tax benefits of $29 million, were accounted for as a $91 million reduction in 2007 income tax expense and a $224 million reduction in goodwill recorded on the Company's consolidated balance sheet. For further information, see Note 14 to the Company's consolidated financial statements in Item 8.

*Newsday* and *Hoy*, **New York Charge**—In February 2004, a purported class action lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* and *Hoy*, New York, alleging that they were overcharged for advertising as a result of inflated circulation numbers at these two publications. The purported class action also alleges that entities that paid a *Newsday* subsidiary to deliver advertising flyers were overcharged. The Company is vigorously defending this suit. In July 2004, another lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* alleging damages resulting from inflated *Newsday* circulation numbers as well as federal and state antitrust violations. On Feb. 11, 2008, this suit was settled with all defendants.

On June 17, 2004, the Company publicly disclosed that it would reduce its reported circulation for both *Newsday* and *Hoy*, New York for the 12-month period ended Sept. 30, 2003 and the six-month period ended March 31, 2004. The circulation adjustments were the result of a review of reported circulation at *Newsday* and *Hoy*, New York, conducted by the Company's internal audit staff and the Audit Bureau of Circulations. Subsequent to the June 17th disclosure, the Company continued its internal review and found additional misstatements for these time periods, as well as misstatements that impacted the 12-month period ended Sept. 30, 2002. On Sept. 10, 2004, the Company announced additional revisions to the circulation figures for *Newsday* and *Hoy*, New York, for the 12-month period ended Sept. 30, 2003 and the six-month period ended March 31, 2004.

As a result of the misstatements of reported circulation at *Newsday* and *Hoy*, New York, the Company recorded a total pretax charge of $90 million in 2004 as its estimate of the probable cost to settle with advertisers.

http://www.sec.gov/Archives/edgar/data/726513/000110465908018845/...

In the fourth quarter of 2007, the Company recorded an additional pretax charge of $3 million pertaining to *Newsday*. The Company will continue to evaluate the adequacy of the advertiser settlement accrual on an ongoing basis (see Note 5 to the Company's consolidated financial statements in Item 8).

In addition to the advertiser lawsuits, several class action and shareholder derivative suits were filed against the Company and certain of its current and former directors and officers as a result of the circulation misstatements at *Newsday* and *Hoy*, New York. These suits alleged breaches of fiduciary duties and other managerial and director failings under Delaware law, the federal securities laws and the Employee Retirement Income Security Act ("ERISA"). The consolidated shareholder derivative suit filed in Illinois state court in Chicago was dismissed with prejudice on March 10, 2006. The appeal of this dismissal to the Illinois State Court of Appeals was voluntarily dismissed by the plaintiff following the closing of the Company's going private transaction. The consolidated securities class action lawsuit and the consolidated ERISA class action lawsuit filed in Federal District Court in Chicago were both dismissed with prejudice on Sept. 29, 2006, and the dismissals are currently being appealed to the United States Court of Appeals for the Seventh Circuit. Oral arguments of the consolidated securities and ERISA class action appeals were heard on Jan. 23, 2008. The Company continues to believe these suits are without merit and will continue to vigorously defend them.

On May 30, 2006, the Securities and Exchange Commission ("SEC") concluded its inquiry into circulation practices at *Newsday* and *Hoy*, New York. In closing its inquiry, the SEC ordered the Company to cease and desist from violating statutory provisions related to its record keeping and reporting. No fines or other sanctions were levied against the Company. The Company consented to the order without admitting or denying any of the Commission's findings. The SEC acknowledged the prompt internal investigation and remedial acts undertaken by the Company and the cooperation the Company afforded the Commission's staff throughout its investigation.

On Dec. 17, 2007, *Newsday* and *Hoy*, New York reached a non-prosecution agreement with the United States Attorneys' Office for the Eastern District of New York that ended the federal inquiry into the circulation practices of *Newsday* and *Hoy*, New York. The agreement recognized *Newsday's* and *Hoy*, New York's full cooperation with the investigation; the implementation of new practices and procedures to prevent fraudulent circulation practices, the payment of approximately $83 million in restitution to advertisers, and a civil forfeiture payment of $15 million, which is available for additional restitution. The $15 million civil forfeiture payment is included in 2007 non-operating expense (see Note 2 of the Company's consolidated financial statements in Item 8). Nine former employees and contractors of *Newsday* and *Hoy*, New York have pleaded guilty to various criminal charges in connection with the fraudulent circulation practices uncovered by the Company. They are awaiting the imposition of sentence.

**Media Ownership Rules**—On Nov. 30, 2007, the FCC issued an order (the "Order") granting the Company temporary waivers of the newspaper/broadcast cross-ownership rule in Miami, Florida (WSFL-TV and the *South Florida Sun-Sentinel*); Hartford, Connecticut (WTXX-TV/WTIC-TV and the *Hartford Courant*); Los Angeles, California (KTLA-TV and the *Los Angeles Times*); and New York, New York (WPIX-TV and *Newsday*), for a six-month period beginning Jan. 1, 2008. The six-month waiver could be automatically extended under two conditions: (1) if the Company appeals the Order, the waivers are extended for the longer of two years or six months after the conclusion of the litigation over the Order; or (2) if the FCC adopts a revised newspaper-broadcast cross-ownership rule prior to Jan. 1, 2008, the waivers are extended for a two-year period to allow the Company to come into compliance with any revised rule, provided that in the event the revised rule is the subject of a judicial stay, the waiver is extended until six months after the expiration of any such stay.

The Order also granted the Company a permanent waiver of the newspaper-broadcast cross-ownership rule to permit continued common ownership of WGN-AM, WGN-TV and the *Chicago Tribune* in Chicago, Illinois; a permanent "failing station" waiver of the television duopoly rule to permit continued common ownership of WTIC-TV and WTXX-TV in Hartford, Connecticut; and granted satellite station status to WTTK-TV, Kokomo, Indiana to permit continued common ownership with WTTV-TV, Bloomington, Indiana.

33

The Company filed an appeal of the Order in the United States Court of Appeals for the District of Columbia Circuit on Dec. 3, 2007, thus automatically extending the waivers for two years or until six months after the conclusion of that appeal, whichever is longer. Intervenors have filed a motion to dismiss the appeal, as well as a motion to hold the appeal in abeyance; the Company and others have filed oppositions to these motions. Various parties have filed petitions for reconsideration of the Order with the FCC; the Company has filed oppositions to such filings with the FCC.

On Dec. 18, 2007, the FCC announced in an FCC news release the adoption of revisions to the newspaper/broadcast cross-ownership rule. The FCC, on Feb. 4, 2008, released the full text of the rule. The revised rule establishes a presumption that the common ownership of a daily newspaper of general circulation and either a television or a radio broadcast station in the top 20 Nielsen Designated Market Areas (''DMAs'') would serve the public interest, provided that, if the transaction involves a television station, (i) at least eight independently owned and operating major media voices (defined to include major newspapers and full-power commercial television stations) would remain in the DMA following the transaction and (ii) the cross-owned television station is not among the top-four ranked television stations in the DMA. Other proposed newspaper/ broadcast transactions would be presumed not to be in the public interest, except in the case of a ''failing'' station or newspaper, or in the event that the proposed transaction results in a new source of news in the market. The FCC did not further relax the television-radio cross-ownership rules, the radio local ownership rules, or the television duopoly rules. Under the rule adopted, the Company would be entitled to a presumption in favor of common ownership in three of the four of the Company's cross-ownership markets (New York, New York; Los Angeles, California, and Miami, Florida) not covered by the FCC's grant of a permanent waiver (Chicago, Illinois).

Various parties, including the Company, have sought judicial review of the FCC's order adopting the new rule, seeking either to challenge the relaxation of the complete prohibition on cross-ownership or the retention of any restrictions. While the Company remains optimistic that the cross-ownership relief granted in major markets will be upheld, it cannot predict with certainty the timing or the outcome of the FCC's reconsideration proceeding concerning the Nov. 30, 2007 order, the Company's appeal of the Order, or the various challenges to the adoption of the new rule on Dec. 18, 2007.

**PHONES Indenture**—The Company received a letter dated April 9, 2007, (1) stating that it was written on behalf of two hedge funds purporting to hold approximately 37% of the Company's 8,000,000 PHONES Exchangeable Subordinated Debentures due 2029 (the ''PHONES''), (2) purporting to give a ''notice of default'' that the Company has violated the ''maintenance of properties'' covenant in the indenture under which the PHONES were issued (the ''PHONES Indenture'') and (3) informing the Company that failure to remedy such purported violation within 60 days of notice will result in an ''event of default'' under the PHONES Indenture (which could, if properly declared, result in an acceleration of principal and interest payable with respect to the PHONES). On April 27, 2007, the Company received a letter from the law firm purporting to represent the two hedge funds stating that the law firm also purported to represent a third hedge fund, which, together with the first two hedge funds, purported to hold 55% of the Company's PHONES and reiterating the claims set forth in the April 9, 2007 letter.

The particular covenant in question, Section 10.05 of the PHONES Indenture, requires the Company to ''cause all properties used or useful in the conduct of its business or the business of any Subsidiary to be maintained and kept in good condition, repair and working order (normal wear and tear excepted) and supplied with all necessary equipment... all as in the judgment of the Company may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times....'' Section 10.05 of the PHONES Indenture expressly provides that the covenant does not ''prevent the Company from discontinuing the operation and maintenance of any such properties, or disposing of any of them, if such discontinuance or disposal is, in the judgment of the Company or of the Subsidiary concerned, desirable in the conduct of its business or the business of any Subsidiary and not disadvantageous in any material respect to the Holders [of the PHONES].'' The letters suggest that the Company's recent sales of three television stations, announced intention to dispose of an interest in the Chicago Cubs baseball team and recent and proposed

34

http://www.sec.gov/Archives/edgar/data/726513/0001 10465908018845/...

issuances of debt and return of capital to stockholders violated or will violate this maintenance of properties covenant.

On May 2, 2007, the Company sent a letter to the law firm purporting to represent the hedge funds rejecting their purported ''notice of default'' as defective and invalid because the Company was not in default of Section 10.05, the entities the law firm purported to represent were not ''Holders'' as defined in the PHONES Indenture, and because the law firm had provided no evidence that it was an agent duly appointed in writing as contemplated by Section 1.04 of the PHONES Indenture. The law firm sent a letter to the Company on May 8, 2007 responding to the Company's May 2, 2007 letter, reiterating its claim that the Company was in default of Section 10.05 and stating that it had properly noticed a default pursuant to Section 5.01(4) of the Indenture. The Company further responded by letter dated May 18, 2007 reaffirming its rejection of the purported ''notice of default'' and reiterating its position that the Company was not in default of Section 10.05 and that the entities the law firm purported to represent were not entitled to provide a notice of default under Section 5.01(4) of the PHONES Indenture.

On July 23, 2007, the Company received a letter from the law firm purporting to represent the hedge funds, purported to hold 70% of the Company's PHONES, stating that the Company has breached Section 10.05 of the PHONES Indenture, such breach was continuing on the date of such letter, which was more than 60 days after the purported ''notice of default'' had been given, and that pursuant to Section 5.01(4) of the Indenture, an ''event of default'' under the PHONES Indenture had occurred and was continuing. The July 23, 2007 letter further stated that the hedge funds were declaring the outstanding principal of $157 per share of all of the outstanding PHONES, together with all accrued but unpaid interest thereon to be due and payable immediately, and were demanding immediate payment of all such amounts. On July 27, 2007, the Company sent a letter to the trustee under the PHONES Indenture and the law firm purporting to represent the three hedge funds rejecting the allegations made in such law firm's July 23, 2007 letter and reiterating the Company's position that the Company is not in default of Section 10.05 and that such hedge funds are not entitled under the PHONES Indenture to provide the purported notice of default.

On Aug. 10, 2007, the law firm purporting to represent the three hedge fund holders sent a letter to the trustee under the PHONES Indenture stating that the PHONES holders intended to institute proceedings to confirm the alleged covenant default and acceleration notice. On Sept. 17, 2007, the Company received copies of default notices from Cede & Co., the record holder of the PHONES, on behalf of the three hedge fund holders. These purported notices of default indicate that they were issued at the request of each of the hedge funds by Cede & Co., the holder of record for the notes beneficially owned by each of the hedge funds. The letter stated that Tribune was required to remedy the purported default within 60 days of the date of the letter and that failure to do so would constitute an ''Event of Default'' under the PHONES Indenture. On Dec. 26, 2007, the Company received copies of notices of acceleration from Cede & Co., purportedly on behalf of the three hedge fund holders.  These purported notices of acceleration indicate that they were issued at the request of each of the hedge funds by Cede & Co., the holder of record for the notes beneficially owned by each of the hedge funds.  To date, the trustee under the PHONES Indenture has not initiated any action on behalf of the PHONES holders.

The Company continues to believe that the hedge funds' claims are without merit and that the Company remains in full compliance with Section 10.05 of the PHONES Indenture. The Company will enforce and defend vigorously its rights under the PHONES Indenture.

**PHONES Interest**—In connection with the routine examination of the Company's federal income tax returns for 2000 through 2003, the IRS proposed that the Company capitalize the interest on the PHONES as additional tax basis in the Company's 16 million shares of Time Warner common stock, rather than allowing the Company to currently deduct such interest. The National Office of the IRS has issued a Technical Advice Memorandum that supports the proposed treatment. The Company disagrees with the IRS's position and requested that the IRS administrative appeals office review the issue. The effect of the treatment proposed by the IRS would be to increase the Company's tax liability by approximately $189 million for the period 2000 through 2003 and by approximately $245 million for the period 2004 through 2007.

35

5/20/2010 9:00 PM

During the fourth quarter of 2006, the Company reached an agreement with the IRS appeals office regarding the deductibility of the PHONES interest expense. The agreement would apply for the tax years 2000 through the 2029 maturity date of the PHONES. In December of 2006, under the terms of the agreement reached with the IRS appeals office, the Company paid approximately $81 million of tax plus interest for tax years 2000 through 2005. The tax payments were recorded as a reduction in the Company's deferred tax liability, and the interest was recorded as a reduction in the Company's income tax reserves. The agreement reached with the appeals office is being reviewed by the Joint Committee on Taxation. A decision from the Joint Committee on Taxation is expected by the end of the second quarter of 2008.

**Shareholder Derivative Litigation**—On Sept. 19, 2006, a Company stockholder filed a complaint in the United States District Court for the Northern District of Illinois against the Company's directors, with the exception of Messrs. Chandler, Goodan and Stinehart, and the Company as a nominal defendant, alleging direct and derivative claims on behalf of a purported class of Company stockholders for breach of fiduciary duty in connection with the Company's May 2006 share repurchase program and the manner in which the Board was handling its exploration of strategic alternatives. After the judge in that case issued a memorandum questioning whether plaintiff had satisfied the requirements for diversity jurisdiction in order to maintain the case in federal court, plaintiff moved to dismiss the case voluntarily without prejudice. The district court dismissed the case on Sept. 27, 2006.

Approximately seven weeks later, on Nov. 17, 2006, the same plaintiff filed a complaint captioned Garamella v. FitzSimons, et al., No. BC362110, in the Superior Court of California, Los Angeles County, alleging substantially identical direct and derivative claims on behalf of a purported class of Company stockholders against all Company directors, including Messrs. Chandler, Goodan and Stinehart, and the Company as a nominal defendant. After the Company announced the Leveraged ESOP Transactions on April 2, 2007, and before any responsive pleading was due, plaintiff amended the California complaint to include claims alleging that the Company's directors breached their fiduciary duties to stockholders in connection with the negotiation of the Leveraged ESOP Transactions and execution of the related documents. Specifically, plaintiff claimed that the directors' desire to entrench themselves on the Company's Board caused them to breach their fiduciary duties by undertaking the May 2006 share repurchase program which caused the Company to take on additional debt and, according to plaintiff, become less attractive to potential bidders. Plaintiff further alleged that the directors' entrenchment motives caused them to breach their fiduciary duties by rejecting certain strategic alternatives for the Company, such as a sale of individual Company assets or a tax-free spin-off, and by keeping in place certain of the Company's corporate governance mechanisms such as the stockholder rights plan and the staggered structure of the Board. With respect to the Merger Agreement and the auction process that preceded it, plaintiff claimed that the directors breached their fiduciary duties by setting a bid deadline of March 31, 2007 and thereby "cutting short" the bidding process, by structuring the transaction to include an up-front tender offer which plaintiff characterizes as "coercive," and by structuring the transaction so that "insider shareholders" such as the Chandler Trusts and McCormick Tribune Foundation obtain additional unique benefits from the transaction that are not available to other stockholders. Defendants filed motions to dismiss the California complaint on April 20, 2007. On May 4, 2007, the court denied defendants' motions to dismiss. On May 18, 2007, plaintiff filed a motion for a preliminary injunction seeking to enjoin the Company from completing the Tender Offer until the Company (1) took steps to maximize shareholder value, (2) removed the allegedly coercive aspects of the Tender Offer and (3) disclosed all material information about the Tender Offer to stockholders. On May 22, 2007, the court denied plaintiff's motion for a preliminary injunction. On Feb. 26, 2008, plaintiff filed a stipulation and proposed order regarding the voluntary dismissal of this action. The court entered the order dismissing the case on Feb. 27, 2008.

The Company does not believe that any other matters or proceedings presently pending will have a material adverse effect on its consolidated financial position, results of operations or liquidity.

## ITEM 4.    SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.

None.

36

## PART II

### ITEM 5.   MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.

On Dec. 20, 2007, the Company consummated the Merger, as defined and discussed in Part I, Item 1, hereof.  Pursuant to the Merger Agreement, each share of the Company's common stock issued and outstanding immediately prior to the Merger, other than shares held by the Company, the ESOP or Merger Sub immediately prior to the Merger (in each case, other than shares held on behalf of third parties), and shares held by shareholders who validly exercised appraisal rights, was cancelled and automatically converted into the right to receive $34.00, without interest and less any applicable withholding taxes.

The Company notified the New York Stock Exchange (the "NYSE") that the Merger was consummated and requested that the Company's common stock (and associated Series A junior participating preferred stock purchase rights) be suspended from the NYSE, effective as of the close of market on Dec. 20, 2007, and that the NYSE file with the Securities and Exchange Commission an application on Form 25 to report that the shares of the Company's common stock and associated Series A junior participating preferred stock purchase rights are no longer listed on the NYSE.

Prior to the Merger, total cash dividends declared on the Company's common stock were $43 million in 2007 and $195 million for 2006.  The Company ceased paying cash dividends after the first quarter of 2007.

**Common Stock Repurchases**—As defined and discussed in the description of the Leveraged ESOP Transactions contained in Part I, Item 1, hereof, the Company completed two common stock repurchases in 2007.  The following table summarizes the Company's 2007 common stock repurchases (in thousands):

|  | Shares | Cost |
| --- | --- | --- |
| June 4, 2007 Share Repurchase | 126,007 | $  4,289,192 |
| Dec. 20, 2007 Merger consummation | 118,586 | 4,032,081 |
| Total common stock repurchases | 244,593 | $  8,321,273 |

### ITEM 6.   SELECTED FINANCIAL DATA.

Selected financial data for the years 2003 through 2007 is contained under the heading "Five Year Financial Summary" on pages 141 and 142 and is derived from financial statements for those years. The information contained in the "Five Year Financial Summary" is not necessarily indicative of the results of operations to be expected for future years, and should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in Item 7 and the Company's consolidated financial statements and related notes thereto included in Item 8 of this Form 10-K which were audited by the Company's independent registered public accounting firm, PricewaterhouseCoopers LLP.

37

## ITEM 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.

The following discussion presents the significant factors that have affected the businesses of Tribune Company and its subsidiaries (the "Company") over the last three years. This commentary should be read in conjunction with the Company's consolidated financial statements and "Five Year Financial Summary," which are also presented in this Form 10-K. Certain prior year amounts have been reclassified to conform with the 2007 presentation. These reclassifications had no impact on reported prior year total revenues, operating profit or net income.

## FORWARD-LOOKING STATEMENTS

The discussion contained in this Item 7 (including, in particular, the discussion under "Overview"), the information contained in Item 7A, "Quantitative and Qualitative Disclosures About Market Risk," and the information contained in the subsequent notes to the Company's consolidated financial statements, contain certain forward-looking statements that are based largely on the Company's current expectations. Forward-looking statements are subject to certain risks, trends and uncertainties that could cause actual results and achievements to differ materially from those expressed in the forward-looking statements including, but not limited to, the items discussed in Item 1A, "Risk Factors." Such risks, trends and uncertainties, which in some instances are beyond the Company's control, include: our ability to generate sufficient cash to service the significant debt levels and other financial obligations as a result of the Leveraged ESOP Transactions (as defined below in "Significant Events"); potential impacts to operations and liquidity as a result of restrictive covenants under our senior credit facilities; our dependency on dividends and distributions from our subsidiaries to make payments on our indebtedness; increased interest rate risk due to variable rate indebtedness; the ability to maintain subchapter S corporation status; changes in advertising demand, circulation levels and audience shares; regulatory and judicial rulings; availability and cost of broadcast rights; competition and other economic conditions; changes in newsprint prices; changes in accounting standards; adverse results from litigation, governmental investigations or tax related proceedings or audits; the effect of labor strikes, lock-outs and negotiations; the effect of acquisitions, investments and divestitures; the effect of derivative transactions; the Company's reliance on third-party vendors for various services; and other events beyond the Company's control that may result in unexpected adverse operating results.

The words "believe," "expect," "anticipate," "estimate," "could," "should," "intend" and similar expressions generally identify forward-looking statements. Readers are cautioned not to place undue reliance on such forward-looking statements, which are being made as of the date of this filing. The Company undertakes no obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise.

## OVERVIEW

Tribune Company is a media and entertainment company, operating primarily in the United States, that conducts its operations through two business segments: publishing and broadcasting and entertainment. These segments reflect the manner in which the Company sells its products to the marketplace, manages its operations and makes business decisions. The Company's media operations are principally in major metropolitan areas of the United States and compete against similar media and other types of media on both a local and national basis.

Publishing currently consists primarily of nine daily newspapers, which include related businesses such as interactive websites. Publishing represented 72% of the Company's consolidated revenues in 2007. About 78% of publishing revenues were derived from advertising. These revenues were generated from the sale of advertising space in published issues of the newspapers and on interactive websites. Approximately 14% of publishing revenues were generated from the sales of newspapers to individual subscribers or to sales outlets, which re-sell the newspapers. The remaining 8% of revenues came from a variety of activities including the syndication of columns, features, information and comics to newspapers, commercial printing operations, sales of entertainment listings and other publishing-related activities.

38

Publishing advertising revenues are comprised of three basic categories: retail, national and classified. Changes in advertising revenues are heavily correlated with changes in the level of economic activity in the United States. Changes in Gross Domestic Product, consumer spending, auto sales, housing sales, unemployment rates, job creation, circulation levels and rates all impact demand for advertising in the Company's newspapers. The Company's advertising revenues are subject to changes in these factors both on a national level and on a local level in its markets.

Significant expense categories for publishing include compensation, newsprint and ink and other operating expenses. Compensation, which includes benefits expense and stock-based compensation expense in 2007 and 2006, represented 40% of publishing's consolidated operating expenses in 2007. Compensation expense is affected by many factors, including the level of merit increases, the number of full-time equivalent employees and changes in the design and costs of the Company's various employee benefit plans. Newsprint and ink represented 13% of the 2007 operating expenses for publishing. The Company consumed approximately 614,000 metric tons of newsprint in 2007. Newsprint is a commodity and pricing can vary significantly between years. Other expenses comprised 47% of total operating expenses. These expenses are principally for the distribution of the newspaper, promotional activities and other general and administrative expenses.

Broadcasting and entertainment currently consists of 23 television stations, one radio station, the Chicago Cubs and Tribune Entertainment, a company that distributes its own programming together with programming licensed from third parties. Broadcasting and entertainment represented 28% of the Company's consolidated revenues in 2007. About 75% of these revenues came from the sale of advertising spots in its television group. Changes in advertising revenues are heavily correlated with and influenced by changes in the level of economic activity in the United States. Changes in Gross Domestic Product, consumer spending levels, auto sales, programming content, audience share and rates all impact demand for advertising on the Company's television stations. The Company's advertising revenues are subject to changes in these factors both on a national level and on a local level in the markets in which it operates.

Significant expense categories for broadcasting and entertainment include programming expense, compensation and other expenses. Programming expense represented 33% of 2007 expenses. The level of programming expense is affected by the cost of programs available for purchase and the selection of programs aired by the Company's television stations. Compensation expense represented 42% of broadcasting and entertainment's 2007 expenses and is impacted by the same factors as noted for publishing. Other expenses represented 25% of total operating expenses and are for promotional activities and other station operating expenses.

The Company uses revenues and operating profit as ways to measure the financial performance of its business segments. The Company uses average net paid circulation for its newspapers and average audience share for its television stations as a means to measure its publishing and broadcasting and entertainment market shares and performance.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The Company's significant accounting policies are summarized in Note 1 to the Company's consolidated financial statements in Item 8. These policies conform with accounting principles generally accepted in the United States of America and reflect practices appropriate to the Company's businesses. The preparation of the Company's consolidated financial statements requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from these estimates. On an ongoing basis, the Company evaluates its policies and estimates, including those related to income taxes, pension and other postretirement benefits, broadcast rights, goodwill and other intangible assets, self-insurance liabilities, derivative instruments, accounts receivable allowances and stock-based compensation.

Management has discussed with the Audit Committee of the Board of Directors the development, selection and disclosure of the critical accounting policies and estimates and the application of these policies and estimates. In addition, there are other items within the financial statements that require estimation, but are not deemed to be critical accounting policies and estimates. Changes in the estimates used in these and other items could have a material impact on the financial statements.

39

**Income Taxes**

Provisions for federal and state income taxes are calculated on reported pretax earnings based on current tax laws and also include, in the current period, the cumulative effect of any changes in tax rates from those used previously in determining deferred tax assets and liabilities. Taxable income reported to the taxing jurisdictions in which the Company operates often differs from pretax earnings because some items of income and expense are recognized in different time periods for income tax purposes. The Company provides deferred taxes on these temporary differences in accordance with Financial Accounting Standard ("FAS") No. 109, "Accounting for Income Taxes." Taxable income also may differ from pretax earnings due to statutory provisions under which specific revenues are exempt from taxation and specific expenses are not allowable as deductions. The Company establishes reserves for income tax when it is probable that one or more of the taxing authorities will challenge and disallow a position taken by the Company in its income tax returns and the resulting liability is estimable. The consolidated tax provision and related accruals include estimates of the potential taxes and related interest as deemed appropriate. These estimates are reevaluated and adjusted, if appropriate, on a quarterly basis. Although management believes its estimates and judgments are reasonable, the resolutions of the Company's tax issues are unpredictable and could result in tax liabilities that are significantly higher or lower than that which has been provided by the Company.

On Jan. 1, 2007, the Company adopted the provisions of the Financial Accounting Standards Board ("FASB") Interpretation ("FIN") No. 48, "Accounting for Uncertainty in Income Taxes." FIN 48 addresses the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. Under FIN 48, a company may recognize the tax benefit of an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. FIN 48 requires the tax benefit recognized in the financial statements to be measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods and disclosure. See Note 14 to the Company's consolidated financial statements in Item 8 for additional information.

**Pension and Other Postretirement Benefits**

The Company provides defined benefit pension, postretirement health care and life insurance benefits to eligible employees under a variety of plans (see Note 15 to the Company's consolidated financial statements in Item 8). Accounting for pension and other postretirement benefits requires the use of several assumptions.

Weighted average assumptions used in 2007 and 2006 in accounting for pension benefits and other postretirement benefits were:

|  | Pension Plans | | Other Postretirement Plans | |
|---|---|---|---|---|
|  | 2007 | 2006 | 2007 | 2006 |
| Discount rate for expense | 5.75% | 5.50% | 5.75% | 5.50% |
| Discount rate for obligations | 6.65% | 5.75% | 6.30% | 5.75% |
| Increase in future salary levels for expense | 3.50% | 3.50% | — | — |
| Increase in future salary levels for obligations | 3.50% | 3.50% | — | — |
| Long-term rate of return on plans' assets | 8.50% | 8.50% | — | — |

The Company used a building block approach to determine its current 8.5% assumption of the long-term expected rate of return on pension plan assets. Based on historical market studies, the Company's long-term expected returns for equity and fixed income securities approximate 10% and 6%, respectively. As of the date of this report, a 0.5% decrease in the Company's long-term rate of return assumption would result in a $9 million increase in the Company's net pension expense. In 2007, the pension plans' assets earned a return of approximately 6.6%. Prior to Dec. 30, 2007, the Company based the rate used for discounting future benefit

40

obligations and calculating interest cost on an index of Aa-rated corporate bonds. The duration of the bonds in this index approximated the timing of future payments for the Company's benefit obligations. Beginning on Dec. 30, 2007, the Company uses the Citigroup Above Median yield curve for discounting future benefit obligations and calculating interest costs. The Citigroup Above Median yield curve represents yields on high quality corporate bonds that more closely match the cash flows of the estimated payouts for the Company's benefit obligations.

In September 2006, the FASB issued FAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of FASB Statements No. 87, 88, 106 and 132(R)" which requires an employer to recognize the overfunded or underfunded status of a defined benefit postretirement plan (other than a multiemployer plan) as an asset or liability in its statement of financial position and to recognize changes in that funded status in the year in which changes occur through comprehensive income. The Statement also requires an employer to measure the funded status of a plan as of the date of its year-end statement of financial position, with limited exceptions. The Company adopted the provisions of FAS No. 158 as of Dec. 31, 2006. Prior to Dec. 31, 2006, the Company accounted for its defined benefit plans under FAS No. 87, "Employers' Accounting for Pensions" and accounted for its other postretirement benefit plans under FAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions."

In accordance with FAS No. 87, unrecognized net actuarial gains and losses will be recognized in net periodic pension expense over approximately 11 years, representing the estimated average remaining service period of active employees expected to receive benefits, with corresponding adjustments made to accumulated other comprehensive income (loss) in accordance with FAS No. 158. The Company's policy is to incorporate asset-related gains and losses into the asset value used to calculate the expected return on plan assets and into the calculation of amortization of unrecognized net actuarial loss over a four-year period.

In December 2005, the pension benefits for former Times Mirror non-union and non-Newsday employees were frozen. As a result of the plan freeze, a pretax curtailment gain of $18 million ($13 million at publishing, $1 million at broadcasting and entertainment, and $4 million at corporate) was recorded. On March 31, 2006, the pension plan benefits for Newsday union and non-union employees were frozen.

The Company's pension plans' asset allocations at Dec. 30, 2007 and Dec. 31, 2006 were as follows (in millions):

| | Plan Assets | | | |
| Asset Category | Dec. 30, 2007 | | Dec. 31, 2006 | |
| --- | --- | --- | --- | --- |
| Equity securities | $ 1,316 | 72.8% | $ 1,344 | 76.2% |
| Fixed income securities | 405 | 22.4% | 334 | 18.9% |
| Other | 86 | 4.8% | 86 | 4.9% |
| Total | $ 1,807 | 100% | $ 1,764 | 100% |

The Company's current 2008 target allocation for its pension plans' assets are 70% in equity securities and 30% in fixed income securities and other.

For purposes of measuring 2007 postretirement health care costs, a 8.25% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2007. The rate was assumed to decrease gradually to 5% for 2012 and remain at that level thereafter. For purposes of measuring health care obligations at Dec. 30, 2007, a 6.7% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2008. The rate was assumed to decrease gradually to 5% for 2012 and remain at that level thereafter.

Assumed health care cost trend rates have a significant effect on the amounts reported for health care plans. As of the date of this report, a 1% change in assumed health care cost trend rates would have the following effects (in thousands):

| | 1% Increase | 1% Decrease |
| --- | --- | --- |
| Service cost and interest cost | $ 357 | $ (319) |
| Projected benefit obligation | $ 5,559 | $ (4,983) |

The Company contributed $17 million to certain of its union and non-qualified pension plans, including $10 million of contributions made upon consummation of the Merger pursuant to change in control provisions contained in certain of the Company's non-qualified pensions plans (as defined in the description of the Leveraged ESOP Transactions in "Significant Events"), and $15 million to its other postretirement plans in 2007. The Company plans to contribute $6 million to certain of its union and non-qualified pension plans and $13 million to its other postretirement plans in 2008.

During 2008, the Company expects to recognize as part of its net periodic pension benefit cost approximately $25 million of net actuarial losses and $1 million of prior service credits that are included, after taxes, in the accumulated other comprehensive income (loss) component of shareholders' equity (deficit) at Dec. 30, 2007.

The following benefit payments, which reflect expected future service, as appropriate, are expected to be paid (in thousands):

|  | Pension Benefits | Other Postretirement Benefits |
|---|---|---|
| 2008 | $ 87,205 | $ 14,746 |
| 2009 | 91,420 | 14,798 |
| 2010 | 95,207 | 14,804 |
| 2011 | 98,976 | 14,832 |
| 2012 | 102,946 | 14,487 |
| 2013-2017 | 576,314 | 66,598 |

**Broadcast Rights**

Broadcast rights consist principally of rights to broadcast syndicated programs, sports and feature films and are stated at the lower of cost or estimated net realizable value. The total cost of these rights is recorded as an asset and a liability when the program becomes available for broadcast. Syndicated program rights that have limited showings are generally amortized using an accelerated method as programs are aired. Sports and feature film rights are amortized using the straight-line method. The current portion of broadcast rights represents those rights available for broadcast that are expected to be amortized in the succeeding year. At Dec. 30, 2007 and Dec. 31, 2006, the Company had broadcast rights assets of $588 million and $567 million, respectively.

The Company maintains an allowance for programming that is not expected to be aired by the end of the contract period. This allowance for excess programming inventory is based on a program-by-program review of the Company's five-year broadcast plans and historical write-off trends. The total reserve balance at Dec. 30, 2007 and Dec. 31, 2006 was $3 million and $4 million, respectively. Actual write-offs in 2007 and 2006 were $.9 million and $.4 million, respectively. Future write-offs can vary based on changes in consumer viewing trends and the availability and costs of other programming.

**Goodwill and Other Intangible Assets**

The Company reviews goodwill and certain intangible assets no longer being amortized for impairment annually, or more frequently if events or changes in circumstances indicate that an asset might be impaired, in accordance with FAS No. 142, "Goodwill and Other Intangible Assets." Under FAS No. 142, the impairment review of goodwill and other intangible assets not subject to amortization must be based on estimated fair values. At Dec. 30, 2007 and Dec. 31, 2006, goodwill and other intangible assets totaled $8,243 million and $8,683 million, respectively.

The Company performs its annual impairment review in the fourth quarter of each year. The estimated fair values of the reporting units to which goodwill has been allocated is determined using many critical factors, including operating cash flows, revenue and market growth, market multiples, and discount rates. The estimated fair values of other intangible assets subject to the annual impairment review, which include newspaper mastheads and FCC licenses, are generally calculated based on projected future discounted cash flow analyses.

42

The development of market multiples, operating cash flow projections and discount rates used in these analyses requires the use of assumptions, including assumptions regarding revenue and market growth as well as specific economic factors in the publishing and broadcasting industries. These assumptions reflect the Company's best estimates, but these items involve inherent uncertainties based on market conditions generally outside of the Company's control.

In the fourth quarter of 2007, the Company recorded a pretax impairment charge of $130 million ($79 million after taxes) related to one of its masthead intangible assets in connection with its annual impairment review under FAS No. 142 (see Note 7 to the Company's consolidated financial statements in Item 8). This impairment was primarily due to a decrease in actual and projected newspaper advertising revenues as a result of the continued difficult advertising environment.

On March 13, 2008, the Company filed an election to be treated as a subchapter S Corporation under the Internal Revenue Code, which election is effective as of the beginning of the Company's 2008 fiscal year. As a result, essentially all of the Company's net deferred tax liabilities will be eliminated and such adjustment will be recorded as a reduction in the Company's provision for income taxes in the first quarter of 2008. This adjustment will increase the carrying values of the Company's reporting units. The Company has experienced declines in its consolidated financial operating results during 2007 as compared to the prior year, particularly in its publishing unit. Adverse changes in expected operating results and/or unfavorable changes in other economic factors used to estimate fair values could result in additional non-cash impairment charges in the future under FAS No. 142.

**Self-Insurance Liabilities**

The Company self-insures for certain medical and disability benefits, workers' compensation costs and automobile and general liability claims. The recorded liabilities for self-insured risks are calculated using actuarial methods and are not discounted. The liabilities include amounts for actual claims, claim growth and claims incurred but not reported. Actual experience, including claim frequency and severity as well as health care inflation, could result in different liabilities than the amounts currently recorded. The recorded liabilities for self-insured risks totaled $100 million and $115 million at Dec. 30, 2007 and Dec. 31, 2006, respectively.

**Derivative Instruments**

FAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," requires all derivative instruments to be recorded on the balance sheet at fair value. Changes in the fair value of derivative instruments are recognized periodically in income or other comprehensive income (loss) as described below. The provisions of FAS No. 133 affect the Company's accounting for its 8 million Exchangeable Subordinated Debentures due 2029 ("PHONES"), its three interest rate swaps related to a $2.5 billion notional amount of its variable rate borrowings, and its interest rate swap related to its $100 million 7.5% debentures (see Note 10 for further information on the Company's PHONES and interest rate swaps).

Under the provisions of FAS No. 133, the initial value of the PHONES was split into a debt component and a derivative component. Changes in the fair value of the derivative component of the PHONES are recorded in the statement of income. Beginning in the second quarter of 1999, changes in the fair value of the related 16 million Time Warner shares are also recorded in the statement of income and should at least partially offset changes in the fair value of the derivative component of the PHONES. However, there have been, and may continue to be, periods with significant non-cash increases or decreases to the Company's net income pertaining to the PHONES and the related Time Warner shares.

The interest rate swaps related to $2.5 billion of the Company's variable rate borrowings are cash flow hedges. Under FAS No. 133, a cash flow hedge is deemed to be highly effective if it is expected that changes in the cash flows of the hedged item are almost fully offset by changes in the cash flows of the hedging instrument. While there will be some ineffectiveness in the future, the Company's cash flow hedges are deemed to be highly effective, and therefore gains and losses resulting from changes in the fair value of these hedges, other than changes resulting from hedge ineffectiveness, are recorded in other comprehensive income (loss), net of taxes.

43

The Company's interest rate swap on the $100 million 7.5% debentures is a fair value hedge and is used to manage exposure to market risk associated with changes in interest rates. The changes in fair value of the swap agreement and the related debt instrument are recorded in income.

The Company has classified the fair value of its hedging instruments in long-term debt in its consolidated balance sheet.

**Accounts Receivable Allowances**

The Company's accounts receivable are primarily due from advertisers. Credit is extended based on an evaluation of a customer's financial condition and generally collateral is not required. The Company maintains an allowance for uncollectible accounts, rebates and volume discounts. This allowance is determined based on historical write-off experience and any known specific collectibility exposures. At Dec. 30, 2007 and Dec. 31, 2006, the Company's allowance for accounts receivable was $32 million and $34 million, respectively.

**Stock-Based Compensation**

In the first quarter of 2006, the Company adopted FAS No. 123R, "Share-Based Payment," which superseded Accounting Principles Board ("APB") Opinion No. 25, FAS No. 123 and related interpretations. FAS No. 123R requires the Company to expense stock-based compensation in its income statement. Under FAS No. 123R, stock-based compensation cost is measured at the grant date for equity-classified awards and at the end of each reporting period for liability-classified awards based on the estimated fair value of the award.

The Company granted stock options to employees in 2006 and prior years. The Company used the Black-Scholes option-pricing model to determine the fair value of each stock option it granted. The Black-Scholes model included assumptions regarding dividend yields, expected volatility, expected lives and risk-free interest rates. These assumptions reflected the Company's best estimates, but they involved certain risks, trends and uncertainties, which in some instances were outside of the control of the Company. As a result, if other assumptions had been used, stock-based compensation could have been materially impacted. The Company adopted FAS 123R utilizing the modified prospective application method and did not restate prior years. Additional information on the accounting for stock-based compensation in accordance with FAS No. 123R is provided in Note 17 to the Company's consolidated financial statements in Item 8.

Prior to the adoption of FAS No. 123R, the Company accounted for its stock-based compensation plans in accordance with APB No. 25 and related interpretations. Under APB No. 25, no compensation expense was recorded because the exercise price of employee stock options equaled the market price of the underlying stock on the date of grant. Under the provisions of APB No. 25, the Company was not required to recognize compensation expense for its Employee Stock Purchase Plan. Pro forma stock-based compensation expense for 2005, calculated under FAS No. 123, as amended by FAS No. 148, is disclosed in Note 1 to the Company's consolidated financial statements in Item 8.

On June 24, 2005, the Company accelerated the vesting of certain stock options granted on Feb. 11, 2003 and Feb. 10, 2004, totaling 2.4 million in each year. Unvested stock options awarded to the then current executive officers of the Company on these grant dates, which aggregated .8 million and .6 million, respectively, were not accelerated at that time. On Dec. 16, 2005, the Company accelerated the vesting of all stock options granted on Feb. 8, 2005, totaling 3.5 million, and the remaining unvested stock options granted to the then current executive officers of the Company on Feb. 11, 2003 and Feb. 10, 2004, totaling .4 million in both years. No other terms and conditions of the stock option grants were changed.

In accordance with APB No. 25 and related interpretations, the acceleration of vesting of these stock options did not require accounting recognition in the Company's income statement. The exercise prices of the 2003, 2004 and 2005 grants were $45.90, $52.05 and $40.59, respectively, and the Company's closing stock prices on the June 24, 2005 and Dec. 16, 2005 dates of acceleration were $35.64 and $30.80, respectively. The impact of the accelerated vesting was to increase pro forma stock-based compensation by $82 million, or $50 million net of taxes, in 2005. The accelerated vesting of these stock options was one of several actions taken by the Company to reduce stock-based compensation expense with the adoption of FAS No. 123R.

44

http://www.sec.gov/Archives/edgar/data/726513/000110465908018845/...

On Dec. 20, 2007, the Company consummated the Merger, as defined and described in the description of the Leveraged ESOP Transactions below. Pursuant to the Merger Agreement, the Company redeemed for cash all outstanding stock awards, each of which vested in full upon completion of the Merger, with positive intrinsic value relative to $34.00 per share. Accordingly, the Company recorded additional stock-based compensation expense of $53 million, or $35 million net of taxes, in the fourth quarter of 2007 in connection with the cash settlement of its outstanding stock awards. All remaining outstanding stock awards under the Tribune Company Incentive Compensation Plan (the "Incentive Plan") as of Dec. 20, 2007 that were not cash settled pursuant to the Merger Agreement were cancelled. Following the Merger, the Company does not intend to grant any new equity awards under the Incentive Plan.

**New Accounting Standards**

In September 2006, the FASB issued FASB Statement No. 157, "Fair Value Measurements," ("FAS No. 157"), which defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements. In February 2008, the FASB issued Staff Position No. 157-2 which defers the effective date of FAS No. 157 for all nonfinancial assets and liabilities, except those items recognized or disclosed at fair value on an annual or more frequently recurring basis, until one year after the adoption of FAS No. 157. The provisions of FAS No. 157, as amended, are effective for financial statements issued for fiscal years beginning after Nov. 15, 2007 and interim periods beginning within these fiscal years. Accordingly, the Company will be required to adopt FAS No. 157 in the first quarter of 2008. The Company is currently evaluating the impact of adopting FAS No. 157 on its consolidated financial statements.

In February 2007, the FASB issued FASB Statement No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities ("FAS No. 159"). FAS No. 159 permits entities to choose to measure many financial instruments and certain other items at fair value. Unrealized gains and losses on items for which the fair value option has been elected will be recognized in earnings at each subsequent reporting date. The provisions of FAS No. 159 are effective for financial statements issued for fiscal years beginning after Nov. 15, 2007 and interim periods beginning within these fiscal years. Accordingly, the Company will become subject to the provisions of FAS No. 159 in the first quarter of 2008. The Company is currently evaluating the impact of adopting FAS No. 159 on its consolidated financial statements.

In December 2007, the FASB issued FASB Statement No. 160, "Noncontrolling Interests in Consolidated Financial Statements, an Amendment of ARB No. 51" ("FAS No. 160"), which provides accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. It clarifies that an ownership interest in a subsidiary should be reported as a separate component of equity in the consolidated financial statements, requires consolidated net income to be reported at amounts that include the amounts attributable to both the parent and the noncontrolling interest and provides for expanded disclosures in the consolidated financial statements. FAS No. 160 is effective for financial statements issued for fiscal years beginning after Dec. 15, 2008 and interim periods beginning within these fiscal years. The Company is currently evaluating the impact of adopting FAS No. 160 on its consolidated financial statements.

## SIGNIFICANT EVENTS

**Leveraged ESOP Transactions**

On April 1, 2007, the Company's board of directors (the "Board"), based on the recommendation of a special committee of the Board comprised entirely of independent directors, approved a series of transactions (collectively, the "Leveraged ESOP Transactions") with a newly formed Tribune Employee Stock Ownership Plan (the "ESOP"), EGI-TRB, L.L.C., a Delaware limited liability company (the "Zell Entity") wholly owned by Sam Investment Trust (a trust established for the benefit of Samuel Zell and his family), and Samuel Zell. On Dec. 20, 2007, the Company completed the Leveraged ESOP Transactions which culminated in the cancellation of all issued and outstanding shares of the Company's common stock as of that date, other than shares held by the Company or the ESOP, and the Company becoming wholly owned by the ESOP.

45

http://www.sec.gov/Archives/edgar/data/726513/000110465908018845/...

The Leveraged ESOP Transactions consisted of a series of transactions that included the following:

- On April 1, 2007, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust which forms a part of the ESOP, Tesop Corporation, a Delaware corporation wholly owned by the ESOP ("Merger Sub"), and the Zell Entity (solely for the limited purposes specified therein) providing for Merger Sub to be merged with and into the Company, and following such merger, the Company to continue as the surviving corporation wholly owned by the ESOP (the "Merger").

- On April 1, 2007, the ESOP purchased 8,928,571 shares of the Company's common stock from the Company at a price of $28.00 per share. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from the Company to the ESOP and/or distributions paid on the shares of the Company's common stock held by the ESOP. Upon consummation of the Merger (as described below), the 8,928,571 shares of the Company's common stock held by the ESOP were converted into 56,521,739 shares of common stock and represent the only outstanding shares of capital stock of the Company after the Merger. None of the shares held by the ESOP had been committed for release or allocated to employees at Dec. 30, 2007.

- On April 23, 2007, pursuant to a purchase agreement dated April 1, 2007 (the "Zell Entity Purchase Agreement"), the Zell Entity made an initial investment of $250 million in the Company in exchange for (1) 1,470,588 shares of the Company's common stock at a price of $34.00 per share and (2) an unsecured subordinated exchangeable promissory note of the Company in the principal amount of $200 million, which the Company repaid immediately prior to the Merger (as described below).  Pursuant to the Zell Entity Purchase Agreement, on May 9, 2007, Mr. Zell was appointed as a member of the Board.

- On April 25, 2007, the Company commenced a tender offer to repurchase up to 126 million shares of the Company's common stock that were then outstanding at a price of $34.00 per share in cash (the "Share Repurchase"). The tender offer expired on May 24, 2007 and 126 million shares of the Company's common stock were repurchased and subsequently retired on June 4, 2007 utilizing proceeds from the Credit Agreement (as defined in the "New Credit Agreements" section below).

- The Company granted registration rights to Chandler Trust No. 1 and Chandler Trust No. 2 (together, the "Chandler Trusts"), which were significant shareholders of the Company prior to the Company's entry into the Leveraged ESOP Transactions. On April 25, 2007, the Company filed a shelf registration statement in connection with the registration rights granted to the Chandler Trusts.

- On June 4, 2007, the Chandler Trusts entered into an underwriting agreement with Goldman, Sachs & Co. ("Goldman Sachs") and the Company, pursuant to which the Chandler Trusts agreed to sell an aggregate of 20,351,954 shares of the Company's common stock, which represented the remainder of the shares of the Company's common stock owned by them following the Share Repurchase, through a block trade underwritten by Goldman Sachs. The shares were offered pursuant to the shelf registration statement filed by the Company on April 25, 2007. Following the closing of this transaction, the Chandler Trusts no longer owned any shares of the Company's common stock. On June 4, 2007, Jeffrey Chandler, Roger Goodan and William Stinehart, Jr. resigned as members of the Board. Messrs. Chandler, Goodan and Stinehart served on the Board as representatives of the Chandler Trusts, which agreed to cause the resignations of Messrs. Chandler, Goodan and Stinehart effective upon the consummation of the Share Repurchase.

- On Dec. 20, 2007, the Company completed its merger with Merger Sub, with the Company surviving the Merger. Pursuant to the terms of the Merger Agreement, each share of common stock of the Company, par value $0.01 per share, issued and outstanding immediately prior to the Merger, other

46

than shares held by the Company, the ESOP or Merger Sub immediately prior to the Merger (in each case, other than shares held on behalf of third parties) and shares held by shareholders who validly exercised appraisal rights, was cancelled and automatically converted into the right to receive $34.00, without interest and less any applicable withholding taxes, and the Company became wholly owned by the ESOP.

In the Merger, the Zell Entity received cash for the shares of the Company's common stock it had acquired pursuant to the Zell Entity Purchase Agreement and the Company repaid the exchangeable promissory note held by the Zell Entity including approximately $6 million of accrued interest. In addition, the Company paid to the Zell Entity a total of $5 million in legal fee reimbursements, of which $2.5 million was previously paid following the Share Repurchase described above. Following the consummation of the Merger, the Zell Entity purchased from the Company, for an aggregate of $315 million, a $225 million subordinated promissory note and a 15-year warrant. For accounting purposes, the subordinated promissory note and 15-year warrant were recorded at fair value based on the relative fair value method. The warrant entitles the Zell Entity to purchase 43,478,261 shares of the Company's common stock (subject to adjustment), which represents approximately 40% of the economic equity interest in the Company following the Merger (on a fully-diluted basis, including after giving effect to share equivalents granted under a new management equity incentive plan which is described in Note 17 to the Company's consolidated financial statements in Item 8). The warrant has an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years of the warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). Thereafter, the Zell Entity assigned minority interests in the subordinated promissory note and the warrant to certain permitted assignees. See Part III, Items 12 and 13, hereof for further information on the assignment of the minority interests in the subordinated promissory note and the warrant.

On Dec. 20, 2007, the Company notified the New York Stock Exchange (the "NYSE") that the Merger was consummated. The Company requested that the Company's common stock (and associated Series A junior participating preferred stock purchase rights) be suspended from the NYSE, effective as of the close of the market on Dec. 20, 2007, and that the NYSE file with the Securities and Exchange Commission an application on Form 25 to report that the shares of Company's common stock and associated Series A junior participating preferred stock purchase rights are no longer listed on the NYSE.

The Company currently intends to dispose of an interest in the Chicago Cubs and the Company's 25% equity interest in Comcast SportsNet Chicago. The Company currently expects that proceeds from such dispositions will be used to pay down Company debt. The disposition of an interest in the Cubs is subject to the approval of Major League Baseball.

**Common Stock Repurchases**

As defined and discussed in the description of the Leveraged ESOP Transactions above, the Company completed two common stock repurchases in 2007. The following table summarizes the Company's common stock repurchases during 2007 (in thousands):

|  | Shares | Cost |
|---|---|---|
| June 4, 2007 Share Repurchase | 126,007 | $ 4,289,192 |
| Dec. 20, 2007 Merger consummation | 118,586 | 4,032,081 |
| Total common stock repurchases | 244,593 | $ 8,321,273 |

47

The following table summarizes the Company's common stock repurchases during 2006 (in thousands):

|  | Shares | Cost |
|---|---|---|
| Repurchases in the first quarter | 4,604 | $ 137,746 |
| Tender offer repurchases | 45,027 | 1,468,270 |
| Repurchases from the Robert R. McCormick Tribune Foundation and Cantigny Foundation | 10,000 | 325,300 |
| Repurchases subsequent to the tender offer | 11,053 | 330,952 |
| Total common stock repurchases | 70,684 | $ 2,262,268 |

On May 30, 2006, the Company initiated a modified "Dutch Auction" tender offer to repurchase up to 53 million shares of its common stock at a price per share not greater than $32.50 and not less than $28.00. The tender offer closed on June 26, 2006, and the Company acquired 45 million shares of its common stock on July 5, 2006 at a price of $32.50 per share before transaction costs. The Company also acquired 10 million shares of its common stock from the Robert R. McCormick Tribune Foundation and the Cantigny Foundation on July 12, 2006 at a price of $32.50 per share before transaction costs. The Robert R. McCormick Tribune Foundation and the Cantigny Foundation were affiliated non-profit organizations, which together held 13.6% of the Company's outstanding shares when the tender offer was launched. In connection with the tender offer, the Board also authorized the repurchase of an additional 12 million shares of the Company's common stock commencing on the eleventh business day following the completion of the tender offer. In the third quarter of 2006, the Company repurchased an additional 11.1 million shares under that authorization at a weighted average cost of $29.94 per share. In addition, the Company repurchased and retired 4.6 million shares of its common stock in the first quarter of 2006.

During 2005, the Company repurchased and retired 12.2 million shares of its common stock in the open market for $440 million.

**New Credit Agreements**

On May 17, 2007, the Company entered into a $8.028 billion senior secured credit agreement, as amended on June 4, 2007 (collectively, the "Credit Agreement"). The Credit Agreement consists of the following facilities: (a) a $1.50 billion Senior Tranche X Term Loan Facility (the "Tranche X Facility"), (b) a $5.515 billion Senior Tranche B Term Loan Facility (the "Tranche B Facility"), (c) a $263 million Delayed Draw Senior Tranche B Term Loan Facility (the "Delayed Draw Facility") and (d) a $750 million Revolving Credit Facility (the "Revolving Credit Facility"). The Credit Agreement also provided a commitment for an additional $2.105 billion in new incremental term loans under the Tranche B Facility (the "Incremental Facility"). Accordingly, the aggregate amount of the facilities under the Credit Agreement equals $10.133 billion.

On June 4, 2007, proceeds from the Tranche X Facility and the Tranche B Facility were used by the Company in connection with the consummation of the Share Repurchase (as defined in "Leveraged ESOP Transactions" above) and to refinance the Company's former five-year credit agreement and former bridge credit agreement.

The Revolving Credit Facility includes a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million. Borrowings under the Revolving Credit Facility may be used for working capital and general corporate purposes. The Company intends to use the Delayed Draw Facility to refinance approximately $263 million of its medium-term notes as they mature during 2008. In February 2008, the Company refinanced $25 million of such medium-term notes with borrowings under the Delayed Draw Facility.

On Dec. 20, 2007, the Company entered into (i) a $1.6 billion senior unsecured interim loan agreement (the "Interim Credit Agreement") and (ii) a number of increase joinders pursuant to which the Incremental Facility became a part of the Tranche B Facility under the Credit Agreement (the Incremental Facility and Tranche B

48

Facility are hereinafter referred to collectively as the Tranche B Facility). The Interim Credit Agreement contains a $1.6 billion twelve-month bridge facility (the "Bridge Facility"). The total proceeds of $3.705 billion from the Bridge Facility and the Incremental Facility were used by the Company, among other ways, in connection with the consummation of the Merger, and for general corporate purposes.

Prior to the consummation of the Merger, the Tranche X Facility bore interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 150 basis points or LIBOR plus a margin of 250 basis points. Pursuant to the terms of the Credit Agreement, following the closing of the Merger (as defined above in the description of the Leveraged ESOP Transactions), the margins applicable to the Tranche X Facility increased to 175 basis points and 275 basis points, respectively.

The Tranche B Facility, Delayed Draw Facility and Revolving Credit Facility bear interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 200 basis points or LIBOR plus a margin of 300 basis points. All undrawn amounts under the Delayed Draw Facility and the Revolving Credit Facility accrue commitment fees at a per annum rate of 75 basis points and 50 basis points, respectively. With respect to the Revolving Credit Facility only, the margin applicable to base rate advances, the margin applicable to LIBOR advances and the commitment fee applicable to undrawn amounts are subject to decreases based on a leverage-based grid.

On June 29, 2007, the Company repaid $100 million of the $1.5 billion of borrowings under the Tranche X Facility. The remaining principal balance of the Tranche X Facility must be repaid in an aggregate amount of $650 million on Dec. 4, 2008, which amount may be adjusted to reflect additional prepayments or other mandatory prepayments (described below) applied thereto, and the remaining outstanding amount of the Tranche X Facility, if any, must be repaid on June 4, 2009.

The Tranche B Facility is a seven-year facility which matures on June 4, 2014 and also amortizes at a rate of 1.0% per annum (payable quarterly). The Delayed Draw Facility automatically becomes part of the Tranche B Facility as amounts are borrowed and amortizes based upon the Tranche B Facility amortization schedule. The Revolving Facility is a six-year facility and matures on June 4, 2013.

Prior to June 4, 2008, optional prepayments on the Tranche X Facility and the Tranche B Facility with the proceeds of a substantially concurrent issuance of loans under any senior secured credit facilities pursuant to the Credit Agreement must be accompanied by a prepayment fee equal to 1.0% of the aggregate amount of such prepayments if the interest rate spread applicable to such new loans is less than the interest rate applicable to the Tranche X Facility or the Tranche B Facility. Except as described in the immediately preceding sentence, borrowings under the Credit Agreement are prepayable at any time prior to maturity without penalty, and the unutilized portion of the commitments under the Revolving Credit Facility or the Delayed Draw Facility may be reduced at the option of the Company without penalty.

The Bridge Facility bears interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 350 basis points or LIBOR plus a margin of 450 basis points; provided that such margins will increase by 50 basis points per annum each quarter beginning on March 20, 2008, subject to specified caps, a portion of which interest may be payable through an interest payable-in-kind feature. Subject to certain prepayment restrictions contained in the Credit Agreement, the Bridge Facility is prepayable at any time prior to maturity without penalty, including in connection with the issuance of up to $1.6 billion of high-yield notes.

If any loans under the Bridge Facility remain outstanding on Dec. 20, 2008, the lenders thereunder will have the option, subject to the terms of the Interim Credit Agreement, at any time and from time to time to exchange such initial loans for senior exchange notes that the Company will issue under a senior indenture, and the maturity date of any initial loans that are not exchanged for senior exchange notes will, unless a bankruptcy event of default has occurred and is continuing on such date, automatically be extended to Dec. 20, 2015

49

(the "Final Interim Credit Agreement Maturity Date"). The senior exchange notes will also mature on the Final Interim Credit Agreement Maturity Date. Holders of the senior exchange notes will have registration rights.

Loans under the Tranche X Facility, Tranche B Facility and Revolving Loan Facility are required to be repaid with the following proceeds, subject to certain exceptions and exclusions set forth in the Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of debt for borrowed money by the Company or any subsidiary (other than debt permitted to be incurred under the negative covenants contained in the Credit Agreement (with certain exclusions)), (b) certain specified percentages of excess cash flow proceeds based on a leverage-based grid ranging from 50% to 0% and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company's subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Credit Agreement.

Loans under the Bridge Facility are required to be repaid with the following proceeds, in each case after the obligations under the Credit Agreement have been repaid, either as required by the Credit Agreement or repaid at the election of the Company, subject to certain exceptions and exclusions set forth in the Interim Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of certain debt for borrowed money by the Company or any subsidiary, (b) 100% of the net cash proceeds of any equity issuance consummated by the Company and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company's subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Interim Credit Agreement.

Borrowings under the Credit Agreement are guaranteed on a senior basis by certain of the Company's direct and indirect U.S. subsidiaries and secured by a pledge of the equity interests of Tribune Broadcasting Holdco, LLC and Tribune Finance, LLC, two subsidiaries of the Company.  Audited financial statements of these two subsidiaries are included in Part II, Item 8, hereof. The Company's other senior notes and senior debentures are secured on an equal and ratable basis with the borrowings under the Credit Agreement as required by the terms of the indentures governing such notes and debentures. Borrowings under the Interim Credit Agreement are unsecured, but are guaranteed on a senior subordinated basis by certain of the Company's direct and indirect U.S. subsidiaries.

The Credit Agreement and the Interim Credit Agreement contain representations and warranties, affirmative and negative covenants, including restrictions on capital expenditures, and events of default, in each case subject to customary and negotiated exceptions and limitations, as applicable. If an event of default occurs, the lenders under the Credit Agreement and the Interim Credit Agreement will be entitled to take certain actions, including acceleration of all amounts due under the facilities.

Further, pursuant to the Credit Agreement, the Company is required to comply, on a quarterly basis, with a maximum total guaranteed leverage ratio and a minimum interest coverage ratio. For the twelve-month period ending Dec. 30, 2007, the maximum permitted "Total Guaranteed Leverage Ratio" and the minimum permitted "Interest Coverage Ratio" (each as defined in the Credit Agreement) were 9.00 to 1.0 and 1.10 to 1.0, respectively. Both financial covenant ratios are measured on a rolling four-quarter basis and become more restrictive on an annual basis as set forth in the Credit Agreement. At Dec. 30, 2007, the Company was in compliance with these financial covenants. The Company's ability to remain in compliance with these financial covenants will be impacted by a number of factors, including the Company's ability to continue to generate sufficient revenues and cash flows, changes in interest rates, the impact of future purchase, sale, joint venture or similar transactions involving the Company or its business units and the other risks and uncertainties set forth in Part I, Item 1A, "Risk Factors."

The Company filed an election to be treated as a subchapter S corporation under the Internal Revenue Code on March 13, 2008, which election is effective as of the beginning of the Company's 2008 fiscal year. The Credit Agreement and the Interim Credit Agreement contain affirmative covenants which required the Company to make such an election and that the election be effective for fiscal 2008. The Credit Agreement and Interim Credit Agreement further provide that if the Company fails to maintain the S corporation election for any year

50

beginning with 2009, the Company will be required in each such year to obtain an investment in the Company in the form of common stock or subordinated debt in an amount of up to $100 million. There can be no assurance that the Company will be able to obtain such an investment and the failure to obtain such an investment in those circumstances could result in a default under the Credit Agreement and Interim Credit Agreement.

Under the terms of the Credit Agreement, the Company is required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Credit Agreement and other debt with respect to borrowed money. On July 2, 2007, the Company entered into an International Swap and Derivatives Association, Inc. ("ISDA") Master Agreement, a schedule to the 1992 ISDA Master Agreement and, on July 3, 2007, entered into three interest rate swap confirmations (collectively, the "Swap Documents") with Barclays Bank, which Swap Documents provide for (i) a two-year hedge with respect to $750 million in notional amount, (ii) a three-year hedge with respect to $1 billion in notional amount and (iii) a five-year hedge with respect to $750 million in notional amount. The Swap Documents effectively converted a portion of the variable rate borrowings under the Tranche B Facility in the Credit Agreement to a weighted average fixed rate of 5.31% plus a margin of 300 basis points. The Company accounts for these interest rate swaps as cash flow hedges in accordance with FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities" ("FAS No. 133"). Under FAS No. 133, a cash flow hedge is deemed to be highly effective if it is expected that changes in the cash flows of the hedged item are almost fully offset by changes in the cash flows of the hedging instrument. The cash flow hedges covered by the Swap Documents are deemed to be highly effective, and therefore gains and losses resulting from changes in the fair value of these hedges, other than changes resulting from hedge ineffectiveness, are recorded in other comprehensive income (loss), net of taxes.

As of Dec. 30, 2007, the Company had outstanding borrowings of $7.6 billion under the Tranche B Facility, $1.4 billion under the Tranche X Facility, and $1.6 billion under the Bridge Facility. As of Dec. 30, 2007, the applicable interest rate was 7.91% on Tranche B Facility, 7.99% on the Tranche X Facility and 9.43% on the Bridge Facility.

**Matthew Bender and Mosby Tax Liability**

During 1998, Times Mirror, which was acquired by the Company in 2000, disposed of its Matthew Bender and Mosby subsidiaries in separate transactions, which were structured to qualify as tax-free reorganizations under the Internal Revenue Code. The Company believes these transactions were completed on a tax-free basis. However, the Internal Revenue Service ("IRS") audited the transactions and disagreed with the position taken by Times Mirror. In the fourth quarter of 2001, the Company received an IRS adjustment to increase Times Mirror's 1998 taxable income by approximately $1.6 billion. The Company filed a petition in the United States Tax Court in November 2002 to contest the IRS position, and in December 2004, the Company presented its position in Tax Court.

On Sept. 27, 2005, the Tax Court issued an opinion contrary to the Company's position and determined that the Matthew Bender transaction was a taxable sale. In January 2006, the Tax Court extended its opinion in the Matthew Bender case to the Mosby transaction given the similarity of the two transactions. Taxes and related interest for both the Matthew Bender and Mosby transactions totaled approximately $1 billion. Over time, deductions for state taxes and interest were expected to reduce the net cash outlay to approximately $840 million.

The Company appealed the Tax Court ruling to the United States Court of Appeals for the Seventh Circuit. On June 1, 2007, the Company announced that an offer of settlement was pending in its appeal. The Company finalized the settlement during the third quarter of 2007. As a result of the settlement, the Company received refunds of federal income taxes and interest of $4 million on Sept. 26, 2007 and $340 million on Oct. 1, 2007. After consideration of income taxes on the interest received, the net cash proceeds totaled approximately $286 million. These refunds, together with related state income tax benefits of $29 million, were accounted for as a $91 million reduction in 2007 income tax expense and a $224 million reduction in goodwill recorded on the Company's consolidated balance sheet.

51

## TMCT Transactions

As a result of the Company's purchase of Times Mirror in 2000, the Company acquired investment interests in TMCT, LLC ("TMCT") and TMCT II, LLC ("TMCT II"). TMCT and TMCT II were formed in 1997 and 1999, respectively, as a result of transactions involving agreements between Times Mirror and its largest shareholders, Chandler Trust No. 1 and Chandler Trust No. 2 (collectively, the "Chandler Trusts"). The Times Mirror acquisition resulted in the Chandler Trusts becoming significant shareholders of the Company. As a result of the Leveraged ESOP Transactions (see above), the Chandler Trusts are no longer shareholders of the Company. The TMCT and TMCT II LLC agreements had no specific term, and the dissolution, determination of liquidation values and distribution of assets required the mutual consent of the Company and the Chandler Trusts.

The collective assets of TMCT and TMCT II as of Dec. 25, 2005 included approximately 51.4 million shares of the Company's common stock and 1.1 million shares of the Company's preferred stock, representing all of the Company's then issued Series C, D-1 and D-2 preferred stock. The TMCT and TMCT II assets also include a variety of fixed income and equity investments. In addition, TMCT owns eight real properties that are leased to the Company. Additional information pertaining to the Company's investments in TMCT and TMCT II is provided in Note 8 to the Company's consolidated financial statements in Item 8.

On Sept. 21, 2006, the Company and the Chandler Trusts entered into agreements to restructure TMCT and TMCT II. Under the terms of the agreements, the Company received on Sept. 22, 2006, a total of 38.9 million shares of the Company's common stock and all 1.1 million shares of the Company's preferred stock held collectively by TMCT and TMCT II. As a result of the transactions, the Company's interests in each of TMCT and TMCT II were reduced to approximately 5%. The Sept. 21, 2006 agreements also provided for certain put and call options, which were exercisable at fair market value beginning in September 2007, relating to the Company's remaining ownership interests in TMCT and TMCT II. As a result of the transactions, the Company in the third quarter of 2006 recorded a non-operating gain of $48 million, net of tax; increased its common treasury stock by $161 million and its preferred treasury stock by $107 million; and reduced its combined investment in TMCT and TMCT II by $195 million.

On Sept. 22, 2006, the Company and TMCT amended the lease agreement for the eight properties the Company leased from TMCT. Under the terms of the amended lease, the properties' current fixed rental rate was extended through Aug. 7, 2021. In addition, the Company was granted an accelerated option to acquire the eight properties during the month of January 2008 for $175 million. The Company exercised this option on Jan. 29, 2008 and expects to complete this acquisition in April 2008.

On Oct. 20, 2006, the remaining 12.4 million shares of the Company's common stock held by TMCT and TMCT II were distributed to the Company and the Chandler Trusts in accordance with their respective ownership interests. The Company received .6 million shares and the Chandler Trusts received 11.8 million shares.

Prior to the Sept. 22, 2006 transactions, the cash flows from the Tribune common and preferred shares held by TMCT and TMCT II were largely allocated to the Company, while the cash flows from the other assets were largely allocated to the Chandler Trusts. As a result, the Company included in treasury stock 80% of the Tribune common and preferred shares held by TMCT and TMCT II. In addition, 80% of the dividends on the preferred and common shares held by TMCT and TMCT II were effectively eliminated. Following the Sept. 22, 2006 transactions and until the Oct. 20, 2006 distribution, the Company included in treasury stock approximately 5% of the Tribune common shares held by TMCT and TMCT II. In addition, the Company no longer had any shares of its Series C, D-1 and D-2 preferred stock outstanding, and the Company's common shares outstanding increased by 1.6 million.

On Sept. 21, 2007, the Company gave notice of its intent to exercise its put rights with respect to its remaining interests in TMCT and TMCT II. The sale of the Company's remaining interests in TMCT and TMCT II to the Chandler Trusts was consummated on Sept. 28, 2007. The Company received $73.7 million in proceeds from the sale, and recorded a non-operating gain of $5 million, net of tax.

52

**Sales of *Hoy*, New York, SCNI and Recycler**

On Feb. 12, 2007, the Company announced an agreement to sell the New York edition of *Hoy*, the Company's Spanish-language daily newspaper ("*Hoy*, New York"), to ImpreMedia, LLC. The Company completed the sale of *Hoy*, New York on May 15, 2007 and recorded a pretax gain on the sale of $2.5 million ($.1 million after taxes) in the second quarter of 2007. On March 6, 2007, the Company announced an agreement to sell its Southern Connecticut Newspapers—*The Advocate* (Stamford) and *Greenwich Time* (collectively "SCNI") to Gannett Co., Inc. On May 25, 2007, the Company announced the termination of this agreement following an arbitrator's ruling that the Company could not sell SCNI unless Gannett Co., Inc. assumed an existing collective bargaining contract as a condition of the sale, which Gannett Co., Inc. declined to do. The Company simultaneously announced that it would immediately begin the process of soliciting offers for SCNI with the intention of completing a sale as soon as possible. On Oct. 25, 2007, the Company announced an agreement to sell SCNI to Hearst Corporation for $62.4 million. The sale of SCNI closed on Nov. 1, 2007, and excluded the SCNI real estate in Stamford and Greenwich, Connecticut, which the Company plans to sell separately. In the first quarter of 2007, the Company recorded a pretax loss of $19 million ($33 million after taxes) to write down the net assets of SCNI to estimated fair value, less costs to sell. In the third quarter of 2007, the Company recorded a favorable $3 million after-tax adjustment to the loss on the sale of SCNI. During the third quarter of 2007, the Company began actively pursuing the sale of the stock of one of its subsidiaries, EZ Buy & EZ Sell Recycler Corporation ("Recycler"), to Target Media Partners. Recycler publishes a collection of free classified newspapers in Southern California. The sale of Recycler closed on Oct. 17, 2007. The Company recorded a pretax loss on the sale of the stock of Recycler of $1 million in the third quarter of 2007. Due to the Company's high tax basis in the Recycler stock, the sale generated a significantly higher capital loss for income tax purposes. As a result, the Company recorded a $65 million income tax benefit in the third quarter of 2007, resulting in an after-tax gain of $64 million.

These businesses were considered components of the Company's publishing segment as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company. The operations and cash flows of these businesses have been eliminated from the ongoing operations of the Company as a result of the sales, and the Company will not have any significant continuing involvement in their operations. Accordingly, the results of operations of each of these businesses have been reported as discontinued operations in the consolidated statements of income. Prior year consolidated statements of income have been reclassified to conform to the current year presentation of discontinued operations.

**Sales of WATL-TV, Atlanta, WCWN-TV, Albany and WLVI, Boston**

On June 5, 2006, the Company announced the sale of WATL-TV, Atlanta to Gannett Co., Inc. for $180 million. The sale closed on Aug. 7, 2006. On June 19, 2006, the Company announced the sale of WCWN-TV, Albany to Freedom Communications, Inc. for $17 million. The sale closed on Dec. 6, 2006. On Sept. 14, 2006, the Company announced the sale of WLVI-TV, Boston, to Sunbeam Television Corp. for $113.7 million. The sale closed on Dec. 19, 2006.

These businesses were considered components of the Company's broadcasting and entertainment segment as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company. The operations and cash flows of these businesses have been eliminated from the ongoing operations of the Company as a result of the sales, and the Company will not have any significant continuing involvement in their operations. Accordingly, the results of operations of each of these businesses have been reported as discontinued operations in the consolidated statements of income. Prior year consolidated statements of income were reclassified to conform to the presentation of these businesses as discontinued operations.

In conjunction with the sales of WATL-TV, Atlanta and WCWN-TV, Albany, the Company recorded in the second quarter of 2006 a pretax loss totaling $90 million, to write down the net assets of the stations to estimated fair value, less costs to sell. The Company subsequently reduced the pretax loss on the sales of the Atlanta and Albany stations during the third quarter of 2006 by $1 million. In addition, the Company recorded in the fourth

53

quarter of 2006 a pretax gain of $41 million for the sale of the Boston station. The net pretax loss on the sales of the three stations sold during 2006 was $48 million.

**Acquisition of Additional Equity in CareerBuilder, ShopLocal and Topix**

In August 2006, the Company completed its acquisition of additional equity interests in each of CareerBuilder, LLC, ShopLocal, LLC and Topix, LLC for an aggregate purchase price of $155 million. The negotiated equity purchases followed the exercise of call options by the Company and Gannett Co., Inc. on Knight-Ridder, Inc.'s equity ownership in the three online businesses after The McClatchy Co., Inc.'s announcement of its proposed acquisition of Knight-Ridder, Inc. As a result of this transaction, the Company and Gannett Co., Inc. each increased their respective ownership of CareerBuilder, LLC and ShopLocal, LLC to 42.5% with The McClatchy Co., Inc. retaining a 15% interest in both entities. In addition, as a result of this transaction and subsequent funding in 2006, the ownership of Topix, LLC is approximately 33.7% for both the Company and Gannett Co., Inc., 11.9% for The McClatchy Co., Inc. and 20.7% for management of Topix, LLC. In May 2007, Microsoft Corporation acquired a 4% equity interest in CareerBuilder, LLC, thereby reducing the respective ownership interest of the Company and Gannett Co., Inc. to 40.8% and The McClatchy Co., Inc. to 14.4%.

**Network Affiliations**

On Jan. 24, 2006, the Company announced that it had reached a 10-year agreement to affiliate 16 of its television stations which were at that time affiliated with the former WB Network (including those in New York, Los Angeles and Chicago) with a new broadcast network, The CW Network. The new network was launched in September 2006 by Warner Bros. Entertainment and CBS. The new network airs a portion of the programming previously carried on the WB Network and the UPN Network, as well as new programming. The WB Network has shut down. The Company did not incur any costs related to the shutdown of the WB Network.

In the second quarter of 2006, the Company announced that its other three former WB Network affiliates (Philadelphia, Atlanta and Seattle) would become affiliates of the new broadcast network, MyNetworkTV, which was launched in September 2006 by the FOX Television Stations Network Inc. and Twentieth Century Television. The new network airs primarily primetime dramas. The Company subsequently sold its Atlanta station in August 2006 and its Albany and Boston stations in December 2006.

**Consolidation of *Los Angeles Times'* Production Operations**

In December 2005, the *Los Angeles Times* announced it would close its San Fernando Valley printing facility in January 2006 and consolidate production at its remaining three facilities in Los Angeles, Costa Mesa, and Irwindale, California. The closing of the printing facility resulted in the elimination of approximately 120 positions from across the *Los Angeles Times'* production facilities.

As a result of the facility closing, the Company recorded a $2 million pretax charge in the fourth quarter of 2005 to reduce the carrying value of the San Fernando Valley printing facility's land and building to $24 million, representing the estimated fair value of the assets less costs to sell the assets. On Oct. 30, 2006, the Company sold the San Fernando Valley land and building for net proceeds of approximately $24 million.

The Company evaluated the machinery and equipment at the San Fernando Valley printing facility and determined that press and other related equipment with a net book value of $16 million would be abandoned. Therefore, the Company reduced its estimate of the useful life of the press and other related equipment and recorded accelerated depreciation of $16 million in the fourth quarter of 2005. The Company idled the remaining San Fernando Valley machinery and equipment. Since the time of the facility closing, the Company continued to depreciate and evaluate alternative uses for the equipment, which had a net book value of $26 million at Dec. 31, 2006 and $34 million at Dec. 25, 2005. In the fourth quarter of 2006, the Company disposed of and wrote off $4 million of the idled equipment that had previously been designated for redeployment at Dec. 25, 2005. During the second quarter of 2007, the Company decided to dispose of the remaining idled assets and recorded a charge of $24 million to reduce the carrying value of the assets to estimated fair value, less costs to sell. The remaining idled assets were sold in the third quarter of 2007 for net proceeds of approximately $1 million.

54

**Change in Control Payments**

On Dec. 20, 2007, the Company consummated the Merger, as defined and described in the description of the Leveraged ESOP Transactions above. As a result, the Company was required to make payments pursuant to change in control provisions contained in certain of the Company's deferred compensation, incentive compensation and company-sponsored pension plans. The Company recorded a $64 million pretax charge in the fourth quarter of 2007, including $53 million related to the cash settlement of its outstanding stock-based awards and $3 million of early termination payments related to the Company's new management equity incentive plan (see Note 17 to the Company's consolidated financial statements in Item 8), related to these change in control payments.

**Employee Reductions**

The Company reduced its staffing levels by approximately 700 positions in 2007 and recorded a pretax charge of $55 million ($40 million at publishing and $15 million at corporate). In 2006, the Company reduced its staffing levels by approximately 450 positions, primarily at publishing, and recorded a pretax charge of $9 million. The 2006 eliminations included approximately 100 positions and a pretax charge of approximately $1 million related to discontinued operations. In 2005, the Company reduced its staffing levels by approximately 900 positions and recorded a pretax charge of $45 million ($43 million at publishing, $1 million at broadcasting and entertainment and $1 million at corporate). The eliminations in 2005 included 120 positions as a result of closing the *Los Angeles Times'* San Fernando Valley printing facility, as discussed above. The Company had a current liability of approximately $21 million at Dec. 30, 2007 and $7 million at Dec. 31, 2006 related to these employee reductions.

**Non-Operating Items**

Fiscal years 2007, 2006 and 2005 included several non-operating items. Non-operating items for 2007 are summarized as follows (in millions):

| | Proceeds | | Pretax Gain (Loss) | | After-tax Gain (Loss) |
|---|---|---|---|---|---|
| Loss on change in fair values of derivatives and related investments | $ | — | $ | (97) | $ (59) |
| Strategic transaction expenses | | — | | (85) | (77) |
| Gain on TMCT transactions | | 74 | | 8 | 5 |
| Gain on other investment transactions, net | | 3 | | 32 | 5 |
| Other, net | | 11 | | 5 | 1 |
| Income tax adjustment | | — | | — | 91 |
| Total non-operating items | $ | 88 | $ | (137) | $ (34) |

The 2007 change in the fair values of derivatives and related investments pertained entirely to the Company's PHONES and related Time Warner investment. The $97 million non-cash pretax loss resulted primarily from an $82 million decrease in the fair value of 16 million shares of Time Warner common stock and a $12 million increase in the fair value of the derivative component of the Company's PHONES.

Strategic transaction expenses in 2007 included costs related to the Company's strategic review and the Leveraged ESOP Transactions approved by the Board on April 1, 2007. These expenses included a $13.5 million loss from refinancing certain credit agreements (see Note 10 to the Company's consolidated financial statements in Item 8).

The gain on TMCT transactions in 2007 related to the redemption of the Company's remaining interests in TMCT, LLC and TMCT II, LLC (see Note 8 to the Company's consolidated financial statements in Item 8).

55

Other investment transactions resulted in a net pretax gain of $32 million ($5 million after taxes) in 2007. Approximately $28 million of the net pretax gain ($3 million after taxes) resulted from the restructuring of certain investments. These restructured investments were established in 1998 when Times Mirror disposed of its Matthew Bender and Mosby subsidiaries. As a result of the restructuring, the Company will not realize the $25 million of deferred income tax assets relating to tax credits generated by its low income housing investments. The tax credits were available only to offset income taxes of certain affiliates. After the restructuring, those affiliates no longer exist and the tax credits are no longer available. Accordingly, the Company has increased its 2007 consolidated income tax expense by $25 million to write-off these deferred income tax assets. After consideration of the $25 million income tax adjustment, the investment restructuring increased 2007 net income by $3 million.

Other, net in 2007 included an $18 million gain from the settlement of the Company's Hurricane Katrina insurance claim that was largely offset by a $15 million charge for the civil forfeiture payment related to *Newsday* and *Hoy*, New York (see Note 5 to the Company's consolidated financial statements in Item 8). The favorable income tax adjustment in 2007 related to the settlement of the Company's Matthew Bender and Mosby income tax appeal (see Note 14 to the Company's consolidated financial statements in Item 8).

Non-operating items for 2006 are summarized as follows (in millions):

|  | Proceeds | | Pretax Gain (Loss) | | After-tax Gain (Loss) | |
|---|---|---|---|---|---|---|
| Gain on change in fair values of derivatives and related investments | $ | — | $ | 11 | $ | 7 |
| Strategic transaction expenses | | | | (4) | | (2) |
| Gain on TMCT transactions | | — | | 60 | | 48 |
| Gain on other investment transactions, net | | 83 | | 37 | | 22 |
| Other, net | | — | | (1) | | 1 |
| Income tax adjustments | | — | | — | | 34 |
| Total non-operating items | $ | 83 | $ | 103 | $ | 110 |

The 2006 change in the fair values of derivatives and related investments pertained entirely to the Company's PHONES and related Time Warner investment. The $11 million non-cash pretax gain resulted primarily from a $66 million increase in the fair value of 16 million shares of Time Warner common stock, which was partially offset by a $52 million increase in the fair value of the derivative component of the Company's PHONES.

In 2006, the Company recorded a one-time gain of $48 million, net of tax, as a result of transactions related to its investments in TMCT, LLC and TMCT II, LLC (see Note 8 to the Company's consolidated financial statements in Item 8). In addition, the Company sold 2.8 million shares of Time Warner common stock unrelated to the PHONES for net proceeds of $46 million and recorded a pretax gain on sale of $19 million, and sold its investment in BrassRing for a gain of $17 million.

Also in 2006, the Company recorded a favorable $34 million income tax expense adjustment, most of which related to the Company's PHONES as a result of reaching an agreement with the Internal Revenue Service appeals office pertaining to the deduction of interest expense on the PHONES (see Note 14 to the Company's consolidated financial statements in Item 8).

56

Non-operating items for 2005 are summarized as follows (in millions):

| | Proceeds | | Pretax Gain | | After-tax Gain (Loss) |
|---|---|---|---|---|---|
| Gain on change in fair values of derivatives and related investments | $ | — | $ | 62 | $ | 38 |
| Gain on other investment transactions, net | | 17 | | 7 | | 4 |
| Other, net | | 5 | | 1 | | 1 |
| Income tax adjustments | | — | | — | | (139) |
| Total non-operating items | $ | 22 | $ | 70 | $ | (96) |

The 2005 change in the fair values of derivatives and related investments pertained entirely to the Company's PHONES and related Time Warner investment. The $62 million non-cash pretax gain resulted primarily from an $87 million decrease in the fair value of the derivative component of the Company's PHONES, which was partially offset by a $23 million decrease in the fair value of 16 million shares of Time Warner common stock.

As a result of the United States Tax Court opinion issued on Sept. 27, 2005 related to the Matthew Bender tax dispute, the Company recorded additional income tax expense of $150 million in the third quarter of 2005 (see Note 14 to the Company's consolidated financial statements in Item 8). In the first quarter of 2005, the Company reduced its income tax expense and liabilities by a total of $12 million as a result of favorably resolving certain other federal income tax issues.

## OTHER DEVELOPMENTS

In February 2004, a purported class action lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* and *Hoy*, New York, alleging that they were overcharged for advertising as a result of inflated circulation numbers at these two publications. The purported class action also alleges that entities that paid a *Newsday* subsidiary to deliver advertising flyers were overcharged. The Company is vigorously defending this suit. In July 2004, another lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* alleging damages resulting from inflated *Newsday* circulation numbers as well as federal and state antitrust violations. On Feb. 11, 2008, this suit was settled with all defendants.

On June 17, 2004, the Company publicly disclosed that it would reduce its reported circulation for both *Newsday* and *Hoy*, New York for the 12-month period ending Sept. 30, 2003 and the six-month period ending March 31, 2004. The circulation adjustments were the result of a review of reported circulation at *Newsday* and *Hoy*, New York, conducted by the Company's internal audit staff and the Audit Bureau of Circulations ("ABC"). Subsequent to the June 17th disclosure, the Company continued its internal review and found additional misstatements for these time periods, as well as misstatements that impacted the 12-month period ending Sept. 30, 2002. On Sept. 10, 2004, the Company announced additional revisions to the circulation figures for *Newsday* and *Hoy*, New York, for the 12-month period ending Sept. 30, 2003 and the six-month period ending March 31, 2004.

As a result of the misstatements of reported circulation at *Newsday* and *Hoy*, New York, the Company recorded a total pretax charge of $90 million in 2004 as its estimate of the probable cost to settle with advertisers. Approximately $80 million of the charge pertained to *Newsday* and is included in selling, general and administrative expenses in 2004. The remaining $10 million pertained to *Hoy*, New York and is reflected in discontinued operations in 2004. In the fourth quarter of 2007, the Company recorded an additional pretax charge of $3 million pertaining to *Newsday*. The Company will continue to evaluate the adequacy of the advertiser settlement accrual on an ongoing basis (see Note 5 to the Company's consolidated financial statements in Item 8).

In addition to the advertiser lawsuits, several class action and shareholder derivative suits were filed against the Company and certain of its current and former directors and officers as a result of the circulation misstatements at *Newsday* and *Hoy*, New York. These suits alleged breaches of fiduciary duties and other managerial and director failings under Delaware law, the federal securities laws and ERISA. The consolidated

57

shareholder derivative suit filed in Illinois state court in Chicago was dismissed with prejudice on March 10, 2006.  The appeal of this dismissal to the Illinois State Court of Appeals was voluntarily dismissed by the plaintiff following the closing of the Company's going private transaction. The consolidated securities class action lawsuit and the consolidated ERISA class action lawsuit filed in Federal District Court in Chicago were both dismissed with prejudice on Sept. 29, 2006, and the dismissals are currently being appealed to the United States Court of Appeals for the Seventh Circuit.  Oral arguments of the consolidated securities and ERISA class action appeals were heard on Jan. 23, 2008.  The Company continues to believe these suits are without merit and will continue to vigorously defend them.

On May 30, 2006, the Securities and Exchange Commission ("SEC") concluded its inquiry into circulation practices at *Newsday* and *Hoy*, New York. In closing its inquiry, the SEC ordered the Company to cease and desist from violating statutory provisions related to its record keeping and reporting. No fines or other sanctions were levied against the Company. The Company consented to the order without admitting or denying any of the Commission's findings. The SEC acknowledged the prompt internal investigation and remedial acts undertaken by the Company and the cooperation the Company afforded the Commission's staff throughout its investigation.

On Dec. 17, 2007, *Newsday* and *Hoy*, New York reached a non-prosecution agreement with the United States Attorney's Office for the Eastern District of New York that ended the federal inquiry into the circulation practices of *Newsday* and *Hoy*, New York. The agreement recognized *Newsday's* and *Hoy*, New York's full cooperation with the investigation; the implementation of new practices and procedures to prevent fraudulent circulation practices, the payment of approximately $83 million in restitution to advertisers, and a civil forfeiture payment of $15 million, which is available for additional restitution.  The $15 million civil forfeiture payment is included in 2007 non-operating expense (see Note 2 to the Company's consolidated financial statements in Item 8). Nine former employees and contractors of *Newsday* and *Hoy*, New York have pleaded guilty to various criminal charges in connection with the fraudulent circulation practices uncovered by the Company.  They are awaiting the imposition of sentence.

58

## RESULTS OF OPERATIONS

The Company's fiscal year ends on the last Sunday in December. Fiscal years 2007 and 2005 encompassed a 52-week period. **Fiscal year 2006 encompassed 53 weeks. For 2006 compared to 2005, the additional week increased consolidated operating revenues and operating expenses by approximately 1.5% and consolidated operating profit by approximately 2%.**

**Consolidated**

The Company's consolidated operating results for 2007, 2006 and 2005 are shown in the table below.

| (in millions) | 2007 | 2006 | 2005 | Change 07-06 | 06-05 |
|---|---|---|---|---|---|
| Operating revenues | $ 5,063 | $ 5,444 | $ 5,427 | – 7% | — |
| Operating profit(1) | $ 634 | $ 1,085 | $ 1,121 | – 42% | – 3% |
| Net income on equity investments | $ 100 | $ 81 | $ 41 | + 24% | + 96% |
| Net income: | | | | | |
| Income from continuing operations | $ 55 | $ 661 | $ 520 | – 92% | + 27% |
| Income (loss) from discontinued operations, net of tax | 32 | (67) | 15 | * | * |
| Net income | $ 87 | $ 594 | $ 535 | – 85% | + 11% |

(1) Operating profit excludes interest and dividend income, interest expense, equity income and loss, non-operating items and income taxes.

\* Not meaningful

**Operating Revenues and Profit**—Consolidated operating revenues and operating profit by business segment were as follows:

| (in millions) | 2007 | 2006 | 2005 | Change 07-06 | 06-05 |
|---|---|---|---|---|---|
| **Operating revenues** | | | | | |
| Publishing | $ 3,665 | $ 4,019 | $ 4,013 | – 9% | — |
| Broadcasting and entertainment | 1,398 | 1,425 | 1,414 | – 2% | + 1% |
| Total operating revenues | $ 5,063 | $ 5,444 | $ 5,427 | – 7% | — |
| **Operating profit (loss)(1)** | | | | | |
| Publishing | $ 368 | $ 749 | $ 753 | – 51% | – 1% |
| Broadcasting and entertainment | 357 | 392 | 417 | – 9% | – 6% |
| Corporate expenses | (91) | (56) | (49) | – 64% | – 13% |
| Total operating profit | $ 634 | $ 1,085 | $ 1,121 | – 42% | – 3% |

(1) Operating profit (loss) for each segment excludes interest and dividend income, interest expense, equity income and loss, non-operating items and income taxes.

Consolidated operating revenues decreased 7%, or $381 million, in 2007 due to declines in both publishing and broadcasting and entertainment. Consolidated operating revenues were essentially flat at $5.4 billion in 2006 compared to 2005.

Consolidated operating profit decreased 42%, or $451 million, in 2007. Publishing operating profit decreased 51%, or $381 million, in 2007. Publishing operating profit in 2007 was reduced by a $130 million impairment charge to write-down one of the Company's masthead intangible assets to fair value, $40 million of severance and related expenses for the elimination of approximately 700 positions, a $33 million charge for accelerated stock-based compensation expense and certain one-time compensation payments resulting from completion of the Leveraged ESOP Transactions in December 2007, a charge of $24 million for the write-off of plant equipment related to the previously closed *Los Angeles Times* San Fernando Valley printing facility, a $7 million charge related to the Company's new management equity incentive plan, and a $3 million charge to increase the accrual for anticipated advertiser claims at *Newsday*. Broadcasting operating profit decreased 9%, or $35 million, in 2007

59

and was reduced by a $12 million charge for accelerated stock-based compensation expense and certain one-time compensation payments resulting from completion of the Leveraged ESOP Transactions in December 2007, a charge of $6 million for the write-down of program assets at Tribune Entertainment and a $3 million charge related to the Company's new management equity incentive plan. Corporate expenses increased 64%, or $35 million, in 2007 and included a $19 million charge for accelerated stock-based compensation expense and certain one-time compensation payments from completion of the Leveraged ESOP Transactions in December 2007, $15 million of severance and related expenses, and a $5 million charge related to the Company's new management equity incentive plan.

Consolidated operating profit decreased 3%, or $36 million, in 2006. Publishing operating profit decreased 1%, or $4 million, in 2006. Publishing operating profit in 2006 reflected $15 million of stock-based compensation expense, a $20 million charge for severance and other payments associated with the new union contracts at *Newsday*, $8 million of severance expense for the elimination of approximately 300 positions, a $4 million charge for the disposition of a press at the San Fernando Valley printing facility, and a $3 million gain related to a real property sale. Publishing operating profit in 2005 reflected a $22 million charge for the shutdown of the San Fernando Valley printing facility, $43 million of severance expense for the elimination of over 800 positions and a pension curtailment gain of $13 million. In 2006, broadcasting and entertainment operating profit decreased 6%, or $25 million, primarily due to higher programming and compensation expenses, partially offset by higher revenues.

**Operating Expenses**—Consolidated operating expenses were as follows:

| | | | | | | Change | |
|---|---|---|---|---|---|---|---|
| (in millions) | 2007 | | 2006 | | 2005 | 07-06 | 06-05 |
| Cost of sales (exclusive of items shown below) | $ | 2,546 | $ | 2,701 | $ 2,662 | − 6% | + 1% |
| Selling, general and administrative | | 1,525 | | 1,434 | 1,406 | + 6% | + 2% |
| Depreciation and amortization | | 228 | | 224 | 238 | + 2% | − 6% |
| Write-down of intangible assets | | 130 | | — | — | * | — |
| Total operating expenses | $ | 4,429 | $ | 4,359 | $ 4,306 | + 2% | + 1% |

\* Not meaningful

Cost of sales decreased 6%, or $155 million, in 2007 primarily due to reductions in newsprint and ink, compensation, and programming expenses. Newsprint and ink expense decreased 18%, or $88 million, due to an 11% decline in newsprint consumption and a 9% reduction in average newsprint costs. Compensation expense decreased 5%, or $53 million, primarily due to the impact of position eliminations in 2007 and 2006. Programming expenses decreased 2%, or $7 million, primarily due to lower broadcast rights amortization, partially offset by a write-down of $6 million of Tribune Entertainment program assets.

Cost of sales increased 1%, or $39 million, in 2006 primarily due to increases in programming, newsprint and ink, outside services, and circulation distribution expenses, partially offset by a decrease in compensation expense. Programming expenses increased 7%, or $28 million, due to higher broadcast rights amortization and production expenses. Newsprint and ink expense was up 3%, or $17 million. The Company's newspapers transitioned to lighter weight newsprint during 2006 that on a per ton basis, costs more, but yields more pages. On a same-weight basis, average newsprint cost per metric ton increased 10% and consumption declined 6% in 2006. Outside services and circulation distribution expense increased 2%, or $9 million, primarily due to higher affiliate fees and distribution fees. Compensation expense decreased 2%, or $21 million, mainly due to the impact of position eliminations in 2006 and 2005.

Selling, general and administrative expenses ("SG&A") increased 6%, or $91 million, in 2007, primarily due to increased compensation and other expenses and the absence of $10 million in gains from asset sales recorded in 2006. Compensation expense increased by 7%, or $58 million, due to a $64 million charge for accelerated stock-based compensation expense and certain one-time compensation payments resulting from the completion of the Leveraged ESOP Transactions in December 2007, $55 million of severance and related expenses to eliminate

approximately 700 positions, and a charge of $16 million for the Company's new management equity incentive plan (excluding $3 million of early termination payments made pursuant to the Company's new management equity incentive plan, which amount is included in the $64 million charge for accelerated stock-based compensation expense and certain one-time compensation payments described above), partially offset by savings from staff reductions. Other expenses increased by 3%, or $23 million, due to a write-down of $24 million for press equipment at the previously closed *Los Angeles Times* San Fernando Valley printing facility and a charge of $3 million to increase the accrual for anticipated claims for advertisers at *Newsday*.

SG&A expenses were up 2%, or $28 million, in 2006. Compensation expense increased 5%, or $36 million, in 2006. Compensation expense in 2006 included $31 million of stock-based compensation, a $20 million charge for severance and other payments associated with the new union contracts at *Newsday* and $8 million of severance expense for the elimination of approximately 300 positions at publishing. Compensation expense in 2005 included $45 million of severance expense for the elimination of approximately 900 positions and a pension curtailment gain of $18 million. Promotion expense decreased 5%, or $5 million, due to the Company's efforts to reduce costs in 2006. SG&A expense in 2006 also included a $3 million gain on a real property sale in Publishing and a $7 million gain related to the sale of the corporate airplane.

Depreciation and amortization expense increased 2%, or $4 million, in 2007. The decrease of 6%, or $14 million, in depreciation and amortization expense in 2006 was primarily due to $16 million of accelerated depreciation in 2005 related to the shutdown of the *Los Angeles Times* San Fernando Valley printing facility.

In the fourth quarter of 2007, the Company recorded an impairment charge of $130 million to write-down one of its masthead intangible assets to fair value. See Note 7 to the Company's consolidated financial statements in Item 8 for further information.

61

**Publishing**

For 2006 compared to 2005, the additional week increased publishing operating revenues and operating expenses by approximately 1.5% and operating profit by approximately 2%.

**Operating Revenues and Profit**—In 2007, publishing contributed 72% of the Company's revenues and 58% of its operating profits. Daily newspaper revenue is derived principally from advertising and circulation sales, which accounted for 78% and 14%, respectively, of the publishing segment's total revenues in 2007. Advertising revenue is comprised of three basic categories: retail, national and classified. Newspaper advertising volume is categorized as full run inches, part run inches or preprint pieces. Circulation revenue results from the sale of newspapers. Other publications/services revenue accounted for 8% of the segment's total revenues in 2007 and includes syndication of editorial products, advertising placement services, direct mail operations, cable television news programming, distribution of entertainment listings and other publishing-related activities.

Explanations of certain advertising types used in this discussion are as follows:

| | |
|---|---|
| Retail: | Display or preprint advertising from local retailers, such as department stores |
| National: | Display or preprint advertising by national advertisers that promote products or brand names on a nation-wide basis |
| Classified: | Local advertising listed together and organized by type (including help wanted, real estate and automotive) and display advertisements in these same categories |
| Full run inches: | Advertising appearing in all editions of a newspaper |
| Part run inches: | Advertising appearing in only select editions or zones of a newspaper's market |
| Preprint pieces: | Advertising supplements prepared by advertisers and inserted into a newspaper |

The table below presents publishing operating revenues, operating expenses and operating profit. References in this discussion to individual daily newspapers include their related businesses.

| | | | | | Change | |
|---|---|---|---|---|---|---|
| (in millions) | 2007 | 2006 | 2005 | 07-06 | 06-05 |
| Operating revenues | $ 3,665 | $ 4,019 | $ 4,013 | − 9% | — |
| Operating expenses | 3,297 | 3,270 | 3,260 | + 1% | — |
| Operating profit | $ 368 | $ 749 | $ 753 | − 51% | − 1% |

Publishing operating revenues decreased 9%, or $354 million, in 2007, primarily due to a decrease in advertising revenue. The largest declines in advertising revenue were at Los Angeles, South Florida, Chicago, Orlando and Newsday. Publishing operating revenues in 2006 were essentially flat at $4.0 billion as an increase in advertising revenue was offset by a decrease in circulation revenue. The largest increases in advertising revenue were at Orlando, Los Angeles and South Florida, while the largest declines in circulation revenues were at Chicago, Baltimore and Orlando.

Publishing operating profit decreased 51%, or $381 million, in 2007. For 2007, publishing operating profit was reduced by a $130 million impairment charge to write-down one of the Company's masthead intangible assets to fair value, $40 million of severance and related expenses for the elimination of approximately 700 positions, a $33 million charge for accelerated stock-based compensation expense and certain one-time compensation payments resulting from completion of the Leveraged ESOP Transactions in December 2007, a charge of $24 million for the write-off of plant equipment related to the previously closed *Los Angeles Times* San Fernando Valley printing

62

facility, a charge of $7 million related to the Company's new management equity incentive plan, and a $3 million charge to increase the accrual for anticipated advertiser claims at *Newsday*. Publishing operating profit decreased 1%, or $4 million, in 2006. For 2006, publishing operating profit included $15 million of stock-based compensation expense, a $20 million charge for severance and other payments associated with new union contracts at *Newsday*, $8 million of severance expense for the elimination of approximately 300 positions, a $4 million charge for the disposition of a press at the San Fernando Valley printing facility, and a $3 million gain related to a real property sale.

**Operating Revenues**—Total publishing operating revenues decreased 9%, or $354 million, in 2007. In 2006, total operating revenues were essentially flat. Total publishing operating revenues, by classification, were as follows:

| (in millions) | 2007 | 2006 | 2005 | Change 07-06 | | Change 06-05 | |
|---|---|---|---|---|---|---|---|
| Advertising | | | | | | | |
| Retail | $ 1,248 | $ 1,327 | $ 1,307 | – | 6% | + | 2% |
| National | 686 | 730 | 767 | – | 6% | – | 5% |
| Classified | 927 | 1,138 | 1,098 | – | 19% | + | 4% |
| Total advertising | 2,861 | 3,195 | 3,172 | – | 10% | + | 1% |
| Circulation | 527 | 567 | 585 | – | 7% | – | 3% |
| Other | 277 | 257 | 256 | + | 8% | | — |
| Total operating revenues | $ 3,665 | $ 4,019 | $ 4,013 | – | 9% | | — |

**Advertising Revenue and Volume**—Total advertising revenue decreased 10%, or $334 million, in 2007. Retail advertising revenues decreased 6%, or $79 million, primarily due to decreases in the department stores, furniture/home furnishings, electronic and amusement categories, partially offset by increases in the health care and apparel/fashion categories. Preprint revenues, which are primarily included in retail advertising, decreased 3%, or $24 million, due to decreases at Newsday, South Florida and Chicago, partially offset by an increase at Los Angeles. National advertising revenues decreased 6%, or $44 million, primarily due to decreases in the auto, technology and transportation categories, partially offset by an increase in the movies category. Classified advertising revenues decreased 19%, or $211 million, in 2007, due to declines in real estate, help wanted and automotive of 24%, 19% and 13%, respectively. Interactive revenues, which are included in the above categories, increased 12%, or $27 million, in 2007.

Total advertising revenues increased 1%, or $23 million, in 2006. Retail advertising revenues were up 2%, or $20 million, primarily due to increases in the hardware/home improvement stores, amusements and personal services categories, partially offset by a decrease in the department store category. Preprint revenues, which are primarily included in retail advertising, rose 1%, or $8 million, due to increases at Chicago, Los Angeles, Orlando, Baltimore and Hartford, partially offset by a decrease at Newsday. National advertising revenues decreased 5%, or $37 million, primarily due to decreases in the auto, movies and resorts categories, partially offset by increases in the media and health care categories. Classified advertising revenues increased 4%, or $40 million, in 2006, with an increase in real estate of 25%, partially offset by decreases in automotive and help wanted of 10% and 2%, respectively. Interactive revenues, which are included in the above categories, increased 29%, or $51 million, in 2006.

63

Advertising volume data for 2007, 2006 and 2005 was as follows:

| Inches (in thousands) | 2007 | 2006 | 2005 | Change 07-06 | | Change 06-05 | |
|---|---|---|---|---|---|---|---|
| Full run inches | | | | | | | |
|   Retail | 5,263 | 5,466 | 5,380 | − | 4% | + | 2% |
|   National | 2,798 | 3,132 | 3,461 | − | 11% | − | 10% |
|   Classified | 7,874 | 9,437 | 9,236 | − | 17% | + | 2% |
| Total full run inches | 15,935 | 18,035 | 18,077 | − | 12% | | — |
| Part run inches | 18,134 | 21,217 | 20,113 | − | 15% | + | 5% |
| Total inches | 34,069 | 39,252 | 38,190 | − | 16% | + | 3% |
| Preprint pieces (in millions) | 14,500 | 14,814 | 14,818 | − | 2% | | — |

Full run advertising inches decreased 12% in 2007. Full run retail advertising inches decreased 4% primarily due to a decrease at Los Angeles. Full run national advertising inches decreased 11% due to decreases at Chicago, Los Angeles and South Florida. Full run classified advertising inches decreased 17% mainly due to decreases at Orlando, South Florida and Newsday. Part run advertising inches decreased 15% in 2007 mainly due to decreases at South Florida and Chicago. Preprint advertising pieces decreased 2% primarily due to decreases at South Florida, Newsday and Chicago.

Full run advertising inches were flat in 2006. Full run retail advertising inches were up 2% in 2006 mainly due to an increase at Los Angeles, Chicago and Newsday, partially offset by decreases at South Florida, Newport News and Hartford. Full run national advertising inches were down 10% in 2006 primarily due to decreases at Chicago, Los Angeles and South Florida. Full run classified advertising inches rose 2% in 2006 mainly due to increases at Orlando and Los Angeles, partially offset by decreases at Newport News, Chicago and Newsday. Part run advertising inches were up 5% in 2006 due to increases at Chicago and Los Angeles, partially offset by decreases at Newsday and Orlando. Preprint advertising pieces were flat in 2006 as increases at Los Angeles, Orlando and Hartford were offset by a decrease at Newsday.

**Circulation Revenues**—Circulation revenues were down 7% in 2007 and 3% in 2006, primarily due to selective home delivery discounting and volume declines. The largest revenue declines in 2007 were at Los Angeles, Chicago and Newsday. The largest revenue declines in 2006 were at Chicago, Los Angeles and Baltimore.

**Other Revenues**—Other revenues are derived from advertising placement services; the syndication of columns, features, information and comics to newspapers; commercial printing operations; delivery of other publications; direct mail operations; cable television news programming; distribution of entertainment listings; and other publishing-related activities. Other revenues increased by 8% in 2007 compared to 2006 primarily due to increased delivery revenue for third-party publications. In 2006, other revenues were flat compared to 2005.

**Operating Expenses**—Publishing operating expenses for 2007, 2006 and 2005 were as follows:

| (in millions) | 2007 | 2006 | 2005 | Change 07-06 | Change 06-05 |
|---|---|---|---|---|---|
| Compensation | $ 1,311 | $ 1,351 | $ 1,358 | − 3% | — |
| Newsprint and ink | 412 | 501 | 484 | −18% | + 3% |
| Circulation distribution | 482 | 478 | 457 | + 1% | + 4% |
| Outside services | 314 | 308 | 295 | + 2% | + 4% |
| Promotion | 98 | 101 | 106 | − 3% | − 5% |
| Depreciation and amortization | 176 | 172 | 188 | + 2% | − 9% |
| Write-down of intangible assets | 130 | — | — | * | — |
| Other | 374 | 359 | 372 | + 4% | − 3% |
| Total operating expenses | $ 3,297 | $ 3,270 | $ 3,260 | + 1% | — |

---

\*    Not meaningful

   Publishing operating expenses increased 1%, or $27 million, in 2007. Compensation expense decreased 3%, or $40 million, in 2007 primarily due to a 4% reduction in staffing. Compensation expense in 2007 included $40 million of severance and related expenses for the elimination of approximately 700 positions, a $33 million charge for accelerated stock-based compensation expense and certain one-time compensation payments resulting from completion of the Leveraged ESOP Transactions in December 2007, and a $7 million charge related to the Company's new management equity incentive plan. Newsprint and ink expense declined by 18%, or $89 million, for 2007 due to an 11% decline in consumption and a 9% reduction in average newsprint costs. Circulation distribution expense increased 1%, or $4 million, primarily due to commercial delivery initiatives. Outside services expense increased 2%, or $6 million, in 2007 primarily due to additional outsourcing initiatives. Promotion expense decreased 3%, or $3 million, in 2007. Depreciation and amortization expense increased 2%, or $4 million, in 2007. In 2007, the Company recorded a $130 million impairment charge to write-down one of its masthead intangible assets to fair value (see Note 7 to the Company's consolidated financial statements in Item 8). Other expenses for 2007 included a $24 million charge for the disposition of a press at the *Los Angeles Times* San Fernando Valley printing facility and a $3 million charge to increase the accrual for anticipated advertiser claims at *Newsday*.

   Publishing operating expenses were flat in 2006. Compensation expense decreased $7 million in 2006 primarily due to a 5% (900 full-time equivalent positions) reduction in staffing. Compensation expense in 2006 included a $20 million charge related to new union contracts at *Newsday*, $15 million of stock-based compensation expense and $8 million of severance expense for the elimination of 300 positions. Compensation expense in 2005 included $43 million of severance expense for the elimination of over 800 positions and a $13 million pension curtailment gain. Newsprint and ink expense was up 3%, or $17 million, for 2006. The Company's newspapers transitioned to lighter weight newsprint that on a per ton basis costs more, but yields more pages. On a same-weight basis, average newsprint cost per metric ton increased 10% and consumption declined 6% in 2006. Circulation distribution expense increased 4%, or $21 million, primarily due to higher mailed preprint advertising postage expenses resulting from higher postage rates and increased volume. Outside services expense was up 4%, or $13 million, in 2006 due largely to higher outside printing costs. Promotion expense decreased 5%, or $5 million, due to the Company's efforts to reduce costs in 2006. Depreciation and amortization expense decreased 9%, or $16 million, primarily due to $16 million of accelerated depreciation recorded in 2005 related to the shutdown of the *Los Angeles Times* San Fernando Valley printing facility. Other expenses for 2006 included a $4 million charge for the disposition of a press at the San Fernando Valley printing facility and a $3 million gain on a real property sale.

**Broadcasting and Entertainment**

For 2006 compared to 2005, the additional week increased broadcasting and entertainment operating revenues, operating expenses and operating profit by approximately 1%.

**Operating Revenues and Profit**—In 2007, broadcasting and entertainment contributed 28% of the Company's revenues and 56% of its operating profits. The following table presents broadcasting and entertainment operating revenues, operating expenses and operating profit for television and radio/entertainment. The Company's broadcasting operations at the end of 2007 included 23 television stations. Radio/entertainment includes WGN-AM, Chicago, Tribune Entertainment and the Chicago Cubs.

| (in millions) | | 2007 | | 2006 | | 2005 | Change 07-06 | 06-05 |
|---|---|---|---|---|---|---|---|---|
| **Operating revenues** | | | | | | | | |
| Television | $ | 1,136 | $ | 1,178 | $ | 1,165 | − 4% | + 1% |
| Radio/entertainment | | 262 | | 247 | | 249 | + 6% | − 1% |
| Total operating revenues | $ | 1,398 | $ | 1,425 | $ | 1,414 | − 2% | + 1% |
| | | | | | | | | |
| **Operating expenses** | | | | | | | | |
| Television | $ | 814 | $ | 820 | $ | 782 | − 1% | + 5% |
| Radio/entertainment | | 227 | | 213 | | 215 | + 6% | − 1% |
| Total operating expenses | $ | 1,041 | $ | 1,033 | $ | 998 | + 1% | + 4% |
| | | | | | | | | |
| **Operating profit** | | | | | | | | |
| Television | $ | 322 | $ | 358 | $ | 383 | − 10% | − 7% |
| Radio/entertainment | | 35 | | 34 | | 33 | + 5% | + 1% |
| Total operating profit | $ | 357 | $ | 392 | $ | 417 | − 9% | − 6% |

Broadcasting and entertainment revenues decreased 2%, or $27 million, in 2007 due to decreased television revenues, partially offset by higher radio/entertainment revenues. Television revenues decreased 4%, or $42 million, primarily due to declines in advertising revenues of $74 million, partially offset by an additional $23 million of cable copyright royalties. The additional cable copyright royalties primarily related to WGN-TV, Chicago copyrighted programming that aired in prior years on Superstation WGN and was distributed on national cable and satellite television systems. Advertising revenues decreased primarily due to declines in the political, automotive, movies, retail and professional services categories, partially offset by increases in the telecom and food/packaged goods categories. Radio/entertainment revenues increased 6%, or $15 million, due to increased revenues at the Chicago Cubs, partially offset by lower revenues at WGN Radio. Chicago Cubs revenues increased as a result of higher concessions and game receipts, while WGN Radio's revenues declined due to lower advertising revenues.

Broadcasting and entertainment revenues increased 1%, or $11 million, in 2006 due to increased television revenues, partially offset by lower radio/entertainment revenues. Television revenues increased 1%, or $13 million, as declines in the retail, restaurant and fast food, health care and pharmacy and automotive categories were more than offset by increases in the political, telecom, education and movie categories. Radio/entertainment revenues decreased 1%, or $2 million, due to lower revenues at Tribune Entertainment, partially offset by increased revenues at the Chicago Cubs. Tribune Entertainment revenues declined due to lower syndication revenues and Chicago Cubs revenues increased as a result of higher game receipts, marketing revenues and broadcasting revenues.

Operating profit for broadcasting and entertainment decreased 9%, or $35 million, in 2007. Operating profit for 2007 was reduced by a $12 million charge for accelerated stock-based compensation expense and certain one-time compensation payments resulting from completion of the Leveraged ESOP Transactions in December 2007, a charge of $6 million for the write-down of program assets at Tribune Entertainment, and a $3 million charge

66

related to the Company's new management equity incentive plan. Television operating profit declined 10%, or $36 million, in 2007 due to lower revenues and higher compensation costs, partially offset by lower programming expenses. Radio/entertainment operating profit increased 5%, or $1 million, due to higher revenues at the Chicago Cubs, partially offset by lower revenues at WGN Radio and the $6 million write-down of Tribune Entertainment program assets.

Operating profit for broadcasting and entertainment was down 6%, or $25 million, in 2006. Television operating profit declined 7%, or $25 million, in 2006 due to higher programming expenses and stock-based compensation, partially offset by higher operating revenues. Radio/entertainment operating profit increased 1%, or $1 million, due to higher revenues at the Chicago Cubs, partially offset by reduced revenues at Tribune Entertainment.

**Operating Expenses**—Broadcasting and entertainment operating expenses for 2007, 2006 and 2005 were as follows:

| (in millions) | 2007 | | 2006 | | 2005 | | Change 07-06 | 06-05 |
|---|---|---|---|---|---|---|---|---|
| Compensation | $ | 433 | $ | 417 | $ | 412 | +4% | +1% |
| Programming | | 344 | | 352 | | 330 | −2% | +7% |
| Depreciation and amortization | | 51 | | 51 | | 48 | −1% | +6% |
| Other | | 213 | | 213 | | 208 | — | +3% |
| Total operating expenses | $ | 1,041 | $ | 1,033 | $ | 998 | +1% | +4% |

Broadcasting and entertainment operating expenses increased 1%, or $8 million, in 2007, as an increase in compensation expense was largely offset by a decrease in programming expense. Compensation expense increased 4%, or $16 million, in 2007 due to the $12 million charge for accelerated stock-based compensation expense and certain one-time compensation payments resulting from completion of the Leveraged ESOP Transactions in December 2007 and a $3 million charge related to the Company's new management equity incentive plan. Programming expenses decreased 2%, or $8 million, in 2007 due to lower broadcast rights amortization, partially offset by the $6 million write-down of Tribune Entertainment program assets.

Broadcasting and entertainment operating expenses increased 4%, or $35 million, in 2006 primarily due to an increase in compensation, programming and other expenses. Compensation expense increased 1%, or $5 million, due to $5 million of stock-based compensation in 2006. Programming expenses were up 7%, or $22 million, in 2006 due to higher broadcast rights amortization. Other expenses increased 3%, or $5 million, in 2006.

**Equity Results**

| (in millions) | 2007 | | 2006 | | 2005 | | Change 07-06 | 06-05 |
|---|---|---|---|---|---|---|---|---|
| Net income on equity investments | $ | 100 | $ | 81 | $ | 41 | +24% | +96% |

Equity income totaled $100 million in 2007, an increase of $19 million from 2006. The increase primarily reflects improvements at TV Food Network and Comcast SportsNet Chicago.

Equity income totaled $81 million in 2006, an increase of $40 million from 2005. The increase primarily reflects improvements at TV Food Network, CareerBuilder and Classified Ventures and the absence of losses from The WB Network. In addition, equity income for 2006 includes the Company's $6 million share of a one-time favorable income tax adjustment at CareerBuilder.

**Interest and Dividend Income and Interest Expense**

| (in millions) | 2007 | | 2006 | | 2005 | | Change 07-06 | 06-05 |
|---|---|---|---|---|---|---|---|---|
| Interest and dividend income | $ | 22 | $ | 14 | $ | 7 | +54% | +88% |
| Interest expense | $ | (582) | $ | (274) | $ | (155) | +112% | +76% |

Interest and dividend income increased to $22 million in 2007 from $14 million in 2006, due to higher average cash balances, higher interest rates and an increase in Time Warner dividend income. Interest and dividend income increased to $14 million in 2006, from $7 million in 2005, due to higher average cash balances, higher interest rates and an increase in Time Warner dividend income. Time Warner began paying quarterly dividends in September 2005. The Company currently holds 16.2 million shares of Time Warner stock.

Interest expense increased 112%, or $308 million, in 2007 primarily due to higher debt levels as a result of the Leveraged ESOP Transactions and higher interest rates (see Note 10 to the Company's consolidated financial statements in Item 8). Interest expense increased 76%, or $119 million, in 2006 primarily due to higher debt levels from financing common share repurchases in the third quarter of 2006 and higher interest rates. Average debt levels were $9.1 billion in 2007, $4.2 billion in 2006 and $2.6 billion in 2005. Outstanding debt was $12.8 billion at year-end 2007, $5.0 billion at year-end 2006 and $3.3 billion at year-end 2005.

**Other**

Corporate expenses for 2007, 2006 and 2005 were as follows:

| (in millions) | 2007 | 2006 | 2005 | Change 07-06 | Change 06-05 |
|---|---|---|---|---|---|
| Corporate expenses | $ 91 | $ 56 | $ 49 | +64% | +13% |

Corporate expenses increased 64%, or $35 million, in 2007 primarily due to a $19 million charge for accelerated stock-based compensation expense and certain one-time compensation payments resulting from completion of the Leveraged ESOP Transactions in December 2007, a $15 million charge in 2007 for position eliminations, a $5 million charge related to the Company's new management equity incentive plan (excluding $3 million of early termination payments made pursuant to the Company's new management equity incentive plan, which amount is included in the $19 million charge for accelerated stock-based compensation expense and certain one-time compensation payments described above), and the absence of the $7 million corporate airplane gain recorded in 2006. Corporate expenses increased 13%, or $7 million, in 2006 primarily due to $11 million of stock-based compensation expense, partially offset by a $7 million gain related to the sale of the corporate airplane in 2006.

The effective tax rate on income from continuing operations was (49.1%) in 2007, 34.5% in 2006, and 52.1% in 2005. The effective tax rates for all three years were affected by income tax settlements and adjustments, as well as other non-operating items (see Note 2 to the Company's consolidated financial statements in Item 8). See Note 14 to the Company's consolidated financial statements in Item 8 for a reconciliation of income taxes computed at the U.S federal statutory rate to income taxes reported for continuing operations.

On March 13, 2008, the Company filed an election to be treated as a subchapter S Corporation under the Internal Revenue Code, which election is effective as of the beginning of the Company's 2008 fiscal year. As a result, essentially all of the Company's net deferred tax liabilities will be eliminated and such adjustment will be recorded as a reduction in the Company's provision for income taxes in the first quarter of 2008.

## DISCONTINUED OPERATIONS

### Publishing Discontinued Operations

On Feb. 12, 2007, the Company announced an agreement to sell *Hoy,* New York to ImpreMedia, LLC. The Company completed the sale of *Hoy,* New York on May 15, 2007 and recorded a pretax gain on the sale of $2.5 million ($.1 million after taxes) in the second quarter of 2007. On March 6, 2007, the Company announced an agreement to sell SCNI to Gannett Co., Inc. On May 25, 2007, the Company announced the termination of this agreement following an arbitrator's ruling that the Company could not sell SCNI unless Gannett Co., Inc. assumed an existing collective bargaining contract as a condition of the sale, which Gannett Co., Inc. declined to do. The Company simultaneously announced that it would immediately begin the process of soliciting offers for SCNI with the intention of completing a sale as soon as possible. On Oct. 25, 2007, the Company announced an agreement to sell SCNI to Hearst Corporation for $62.4 million. The sale of SCNI closed on Nov. 1, 2007, and

68

---

excluded the SCNI real estate in Stamford and Greenwich, Connecticut, which the Company plans to sell separately. In the first quarter of 2007, the Company recorded a pretax loss of $19 million ($33 million after taxes) to write down the net assets of SCNI to estimated fair value, less costs to sell. In the third quarter of 2007, the Company recorded a favorable $3 million after-tax adjustment to the loss on the sale of SCNI. During the third quarter of 2007, the Company began actively pursuing the sale of the stock of Recycler to Target Media Partners. Recycler publishes a collection of free classified newspapers in Southern California. The sale of Recycler closed on Oct. 17, 2007. The Company recorded a pretax loss on the sale of the stock of Recycler of $1 million in the third quarter of 2007. Due to the Company's high tax basis in the Recycler stock, the sale generated a significantly higher capital loss for income tax purposes. As a result, the Company recorded a $65 million income tax benefit in the third quarter of 2007, resulting in an after-tax gain of $64 million.

These businesses were considered components of the Company's publishing segment as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company. The operations and cash flows of these businesses have been eliminated from the ongoing operations of the Company as a result of the sales, and the Company will not have any significant continuing involvement in their operations. Accordingly, the results of operations for each of these businesses are reported as discontinued operations in the consolidated statements of income. Prior year consolidated statements of income have been reclassified to conform to the current year presentation of discontinued operations.

### Broadcasting and Entertainment Discontinued Operations

On June 5, 2006, the Company announced the sale of WATL-TV, Atlanta to Gannett Co., Inc. for $180 million. The sale closed on Aug. 7, 2006. On June 19, 2006, the Company announced the sale of WCWN-TV, Albany to Freedom Communications, Inc. for $17 million. The sale closed on Dec. 6, 2006. On Sept. 14, 2006, the Company announced the sale of WLVI-TV, Boston, to Sunbeam Television Corp. for $113.7 million. The sale closed on Dec. 19, 2006.

These businesses were considered components of the Company's broadcasting and entertainment segment as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company. The operations and cash flows of these businesses have been eliminated from the ongoing operations of the Company as a result of the sales, and the Company will not have any significant continuing involvement in their operations. Accordingly, the results of operations of each of these businesses have been reported as discontinued operations in the consolidated statements of income. Prior year consolidated statements of income were reclassified to conform to the presentation of these businesses as discontinued operations.

In conjunction with the sales of WATL-TV, Atlanta and WCWN-TV, Albany, the Company recorded in the second quarter of 2006 a pretax loss totaling $90 million to write down the net assets of the stations to estimated fair value, less costs to sell. The Company subsequently reduced the pretax loss on the sales of the Atlanta and Albany stations during the third quarter of 2006 by $1 million. In addition, the Company recorded in the fourth quarter of 2006 a pretax gain of $41 million for the sale of the Boston station. The net pretax loss on the sales of the three stations sold during 2006 was $48 million.

See Note 4 to the Company's consolidated financial statements in Item 8 for summarized financial information related to discontinued operations for 2007, 2006, and 2005.

### LIQUIDITY AND CAPITAL RESOURCES

Cash flow generated from operations is the Company's primary source of liquidity. Net cash provided by operations was $456 million in 2007, down 42% from $788 million in 2006, primarily due to lower operating profit and higher interest expense.

Net cash provided by investments totaled $211 million in 2007 compared to $26 million in 2006. The Company's capital expenditures totaled $146 million in 2007. The Company spent $16 million in cash for acquisitions and $11 million for investments and received $159 million in proceeds from the sales of certain subsidiaries, intangibles, and investments in 2007. Included in the $159 million in proceeds from the sales was

69

$69 million from the sales of discontinued operations (see Note 4 to the Company's consolidated financial statements in Item 8). In addition, the Company recorded a $224 million reduction to goodwill as a result of the Matthew Bender and Mosby income tax liabilities settlement (see Note 14 to the Company's consolidated financial statements in Item 8).

Net cash used for financing activities was $608 million in 2007. Total borrowings under the Credit Agreement were $9.120 billion and borrowings under the Interim Credit Agreement were $1.6 billion in 2007. The Company paid $207 million of debt issuance costs related to these new borrowings in 2007. In June 2007, the Company borrowed $7.015 billion under the Credit Agreement and used the proceeds to repurchase 126 million shares of the Company's common stock for $4.3 billion and to repay $1.5 billion of borrowings under the Company's former five-year term loan and $1.4 billion of borrowings under the Company's former bridge credit facility. In December 2007, the Company borrowed an additional $3.705 billion including $2.105 billion of incremental borrowings under the Credit Agreement and $1.6 billion of borrowings under the Interim Credit Agreement, and primarily used the proceeds to repurchase the remaining shares of the Company's common stock for $4.0 billion and to settle the Company's then outstanding stock-based awards for $135 million in cash. The Company also issued an unsecured $200 million subordinated exchangeable promissory note, including $6 million of payable-in-kind interest, to the Zell Entity and repaid $100 million of the borrowings under the Tranche X Facility and $97 million of commercial paper in 2007. Upon consummation of the Merger, the Company repaid the subordinated exchangeable promissory note using the $315 million of proceeds from the issuance of a new subordinated promissory note and a 15-year warrant to the Zell Entity and certain permitted assignees. Prior to the Merger, in 2007 net proceeds from the sales of common stock to employees totaled $80 million and proceeds from the sale of common stock to the Zell Entity totaled $50 million, while dividends on common stock, which were paid in the first quarter of 2007, totaled $43 million. In connection with the announcement on April 2, 2007 of the Leveraged ESOP Transactions, the Company suspended the payment of quarterly dividends on its common stock. The Credit Agreement contains certain restrictions on the Company's ability to pay dividends.

The Company expects to fund capital expenditures, interest and principal payments due in 2008 and other operating requirements through a combination of cash flows from operations, available borrowings under the Revolving Credit Facility, and, if necessary, disposals of assets or operations. The Company's ability to make scheduled payments or prepayments on its debt and other financial obligations will depend on future financial and operating performance and the ability to dispose of assets on favorable terms. There can be no assurances that the Company's businesses will generate sufficient cash flows from operations or that future borrowings under the Revolving Credit Facility will be available in an amount sufficient to satisfy debt maturities or to fund other liquidity needs or that any such asset dispositions can be completed. The Company's financial and operating performance is subject to prevailing economic and industry conditions and to financial, business and other factors, some of which are beyond the control of the Company.

If the Company's cash flows and capital resources are insufficient to fund debt service obligations, the Company will likely face increased pressure to reduce or delay capital expenditures, dispose of assets or operations, further reduce the size of its workforce, seek additional capital or restructure or refinance its indebtedness. These actions could have a material adverse effect on the Company's business, financial condition and results of operations. In addition, the Company cannot assure the ability to take any of these actions, that these actions would be successful and permit the Company to meet scheduled debt service obligations or that these actions would be permitted under the terms of the Company's existing or future debt agreements, including the Credit Agreement and the Interim Credit Agreement. For example, the Company may need to refinance all or a portion of its indebtedness on or before maturity. There can be no assurance that the Company will be able to refinance any of its indebtedness on commercially reasonable terms or at all. In the absence of improved operating results and access to capital resources, the Company could face substantial liquidity problems and might be required to dispose of material assets or operations to meet its debt service and other obligations. The Credit Agreement and the Interim Credit Agreement restrict the Company's ability to dispose of assets and use the proceeds from the disposition. The Company may not be able to consummate those dispositions or to obtain the proceeds realized. Additionally, these proceeds may not be adequate to meet the debt service obligations then due.

70

If the Company cannot make scheduled payments or prepayments on its debt, the Company will be in default and, as a result, among other things, the Company's debt holders could declare all outstanding principal and interest to be due and payable and the Company could be forced into bankruptcy or liquidation or required to substantially restructure or alter business operations or debt obligations. See Part I, Item 1A. "Risk Factors" for further discussion of the risks associated with the Company's ability to service all of its existing indebtedness. In addition, see the "Significant Events" section herein for additional information regarding the Leveraged ESOP Transactions and a summary of the Company's obligations under the Credit Agreement and the Interim Credit Agreement and for definitions of capitalized terms used in this discussion.

As of March 17, 2008, the Company's corporate credit ratings were as follows: "B-" with negative outlook by Standard & Poor's Rating Services, "B3" with stable outlook by Moody's Investor Service and "B-" with negative outlook by Fitch Ratings.

The Company has for several years maintained active debt shelf registration statements for its medium-term note program and other financing needs. A shelf registration statement was declared effective in July 2006. The shelf registration statement does not have a designated amount, but the Company's Board of Directors has authorized the issuance and sale of up to $3 billion of debt securities. Proceeds from any future debt issuances under the new shelf registration statement would be used for general corporate purposes, including repayment of short-term and long-term borrowings, capital expenditures, working capital and financing of acquisitions, in each case, subject to the terms of the Credit Agreement and the Interim Credit Agreement.

Although management believes its estimates and judgments are reasonable, the resolutions of the Company's tax issues are unpredictable and could result in tax liabilities that are significantly higher or lower than that which has been provided by the Company.

**Off-Balance Sheet Arrangements**—Off-balance sheet arrangements as defined by the SEC include the following four categories: obligations under certain guarantees or contracts; retained or contingent interests in assets transferred to an unconsolidated entity or similar arrangements; obligations under certain derivative arrangements; and obligations under material variable interests. The Company has not entered into any material arrangements, which would fall under any of these four categories, which would be reasonably likely to have a current or future material effect on the Company's financial condition, revenues or expenses, results of operations, liquidity or capital expenditures.

71

**Contractual Obligations**—The table below presents long-term debt maturities, required payments under contractual agreements for broadcast rights recorded in the consolidated balance sheet, future minimum lease payments to be made under non-cancelable operating leases, and other purchase obligations as of Dec. 30, 2007 (in thousands).

| Fiscal Year | Long-term Debt | Broadcast Rights Contracts Payable | Future Minimum Lease Payments | Other Purchase Obligations(1) | Total(2) |
|---|---|---|---|---|---|
| 2008 | $ 1,003,319 | $ 339,909 | $ 62,851 | $ 190,645 | $ 1,596,724 |
| 2009 | 857,222 | 188,748 | 57,941 | 207,602 | 1,311,513 |
| 2010 | 563,074 | 139,270 | 45,000 | 159,670 | 907,014 |
| 2011 | 78,309 | 66,724 | 35,627 | 121,587 | 302,247 |
| 2012 | 118,324 | 20,113 | 27,538 | 90,639 | 256,614 |
| Thereafter | 10,223,277 | 17,538 | 57,191 | 212,966 | 10,510,972 |
| Total | $ 12,843,525 | $ 772,302 | $ 286,148 | $ 983,109 | $ 14,885,084 |

(1) Other purchase obligations include $473 million for commitments for broadcast rights that are not currently available for broadcast (see Note 13 to the Company's consolidated financial statements in Item 8), and $510 million for talent contracts.

(2) In addition to the amounts listed in the table above, the Company had commitments totaling $142 million at Dec. 30, 2007 related to the purchase of inventory and property, plant and equipment. In addition, under its current agreement with AbitibiBowater Inc., the Company has a commitment to purchase 369,000 metric tons of newsprint each year over the next two years, subject to certain limitations, at prevailing market prices at the time of purchase (see Note 13 to the Company's consolidated financial statements in Item 8).

(3) The above table does not include $138 million of liabilities associated with the Company's uncertain tax positions as the Company cannot reliably estimate the timing of the future cash outflows related to these liabilities (see Note 14 to the Company's consolidated financial statements in Item 8).

**Capital Spending**—The Company spent $146 million for capital expenditures during 2007 and $222 million in 2006 (see Note 19 to the Company's consolidated financial statements in Item 8 for capital spending by business segment.)

Major capital projects that were in process during 2007 included the expansion of preprint inserting operations, expansion of color press capacities, web width reductions, and the implementation of new standard advertising, editorial and circulation systems.

Capital spending for the expansion of preprint inserting capacity in Orlando and Chicago totaled $7 million in 2007 and $20 million in 2006. The new inserters in Orlando began production in 2006. The Chicago expansion is scheduled to be completed by mid-2009 with additional capital spending of approximately $6 million expected in 2008. The Company spent $6 million in 2005 for preprint inserting capacity expansions at Los Angeles, South Florida and Orlando.

The Company's Los Angeles, Chicago and South Florida newspapers are increasing their color press capacities. The Los Angeles and South Florida expansions were operational in 2005 and 2006, respectively, while the Chicago expansion is scheduled to be completed by mid-2008. Capital spending for the color expansion at these three newspapers totaled less than $1 million in 2007 and $17 million and $45 million in 2006 and 2005, respectively. Additional capital spending of approximately $4 million is expected for the Chicago color expansion in 2008.

The Company initiated a web width reduction project in 2006 to reduce the printing press widths at seven newspaper markets to reduce printing costs. Capital spending for the web width reduction totaled $8 million in 2007 and $3 million in 2006. Additional capital spending for this project is expected to total approximately $10 million in 2008.

The Company is in the process of enhancing the capabilities of its advertising systems for its newspaper markets. Capital spending for this project totaled $10 million, $22 million, and $12 million in 2007, 2006, and 2005, respectively. Capital spending for this project is expected to be approximately $10 million in 2008.

72

The Company started new projects in 2006 to replace the editorial and circulation systems at all nine of its newspaper markets. The total estimated capital costs for the new editorial and circulation systems are approximately $33 million and $22 million, respectively. The targeted completion dates are mid-2009 for the editorial systems and 2010 for the circulation systems. The editorial systems spending was $6 million in 2007 and $11 million in 2006 while the circulation systems spending was $4 million in 2007 and $13 million in 2006. Capital spending for these projects combined is expected to be approximately $20 million in 2008.

The Company exercised it option on Jan. 29, 2008 to acquire the eight properties the Company leases from TMCT for $175 million. The Company expects to complete this acquisition in April 2008. The Company expects all other 2008 capital expenditures to be somewhat lower than 2007. Management reviews the capital expenditure program periodically and modifies it as required to meet current business needs. It is expected that 2008 capital expenditures will be funded from cash flow generated from operations and dispositions of assets.

73

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.

**Interest Rate Risk**—All of the Company's borrowings are denominated in U.S. dollars. The Company manages interest rate risk by issuing a combination of both fixed and variable rate debt. In addition, the Company enters into hedge arrangements as required under the terms of the Credit Agreement as defined and described in Item 7 "Significant Events".

Information pertaining to the Company's debt at Dec. 30, 2007 is shown in the table below (in thousands).

| Maturities | Fixed Rate Debt | Weighted Avg Interest Rate | Variable Rate Debt | Weighted Avg Interest Rate | Total Debt |
|---|---|---|---|---|---|
| 2008(1) | $ 277,119 | 2.5% | $ 726,200 | 8.0% | $ 1,003,319 |
| 2009(2) | 15,347 | 7.9% | 841,875 | 8.0% | 857,222 |
| 2010(3) | 451,713 | 4.9% | 111,361 | 7.9% | 563,074 |
| 2011 | 2,109 | 9.2% | 76,200 | 7.9% | 78,309 |
| 2012(4) | 2,090 | 9.5% | 116,234 | 7.9% | 118,324 |
| Thereafter (5) | 1,417,112 | 4.1% | 8,806,165 | 8.2% | 10,223,277 |
| Total at Dec. 30, 2007 | $ 2,165,490 | | $ 10,678,035 | | $ 12,843,525 |
| Fair Value at Dec. 30, 2007(6) | $ 1,710,564 | | $ 9,762,567 | | $ 11,473,131 |

(1) Fixed rate debt includes $253 million related to the Company's 2% PHONES which represents the cash exchange value of the PHONES at Dec. 30, 2007. Also included is $22 million of property financing obligation (see Note 8 to the Company's consolidated financial statements in Item 8). Variable rate debt includes $650 million related to the portion of the Tranche X facility due on Dec. 4, 2008 and $76 million related to the Tranche B facility, which is payable in quarterly increments of $19 million until maturity in 2014 when the remaining principal balance is due in full (see Note 10 to the Company's consolidated financial statements in Item 8).

(2) Variable rate debt includes $750 million related to the portion of the Tranche X facility due on June 4, 2009 and $16 million related to an interest rate swap agreement through 2009 on $750 million of the variable rate borrowings under the Tranche B facility effectively converting the variable rate to a fixed rate of 5.25% plus a margin of 300 basis points.

(3) Variable rate debt includes $35 million related to an interest rate swap agreement through 2010 on $1 billion of the variable rate borrowings under the Tranche B facility effectively converting the variable rate to a fixed rate of 5.29% plus a margin of 300 basis points.

(4) Variable rate debt includes $40 million related to an interest rate swap agreement through 2012 on $750 million of the variable rate borrowings effectively converting the variable rate to a fixed rate of 5.39% plus a margin of 300 basis points.

(5) Fixed rate debt includes the remaining $344 million related to the Company's 2% PHONES, due 2029. The Company may redeem the PHONES at any time for the greater of the principal value of the PHONES ($155.99 per PHONES at Dec. 30, 2007) or the then market value of two shares of Time Warner common stock, subject to certain adjustments. Quarterly interest payments are made to the PHONES holders at an annual rate of 2% of the initial principal. The Company records both cash and non-cash interest expense on the discounted debt component of the PHONES (see Note 10 to the Company's consolidated financial statements in Item 8). Fixed rate debt also includes $28 million related to the interest rate swap agreement on the $100 million 7.5% debentures due in 2023 effectively converting the fixed 7.5% rate to a variable rate based on LIBOR. Variable rate debt includes the $1.6 billion Bridge Facility, which has been classified as long-term because the borrowings under the Bridge Facility will be converted into long-term senior exchange notes or similar instruments prior to the Bridge Facility's initial maturity date of Dec. 20, 2008 (see Note 10 to the Company's consolidated financial statements in Item 8). Variable rate debt also includes $7.2 billion related to the amount due in 2014 on the Tranche B facility after all quarterly payments have been made (see Note 10 to the Company's consolidated financial statements in Item 8).

(6) Fair value was estimated based on quoted market prices for similar issues or on current rates available to the Company for debt of the same remaining maturities and similar terms. The carrying value of the Company's derivative instruments approximates fair value. The fair value of the PHONES was determined by reference to the market value resulting from trading on a national securities exchange.

**Variable Interest Rate Debt**—As described in Item 7 herein, on June 4, 2007 and Dec. 20, 2007, the Company entered into borrowings under the Credit Agreement and the Interim Credit Agreement. In general, borrowings under the Credit Agreement bear interest at a variable rate based on LIBOR plus a spread ranging from 2.75% to 3.00%. Borrowings under the Interim Credit Agreement bear interest based on LIBOR plus 4.50%, provided that the aforementioned interest rate will increase by 50 basis points

5/20/2010 9:00 PM

http://www.sec.gov/Archives/edgar/data/726513/000110465908018845/...

per annum each quarter beginning on March 20, 2008, subject to specified caps. As of Dec. 30, 2007, the Company had $10.587 billion of variable rate

74

borrowings outstanding under these credit facilities. At this borrowing level, and before consideration of the Company's existing interest rate swap agreements, a hypothetical one percent increase in the underlying interest rates for the Company's variable rate borrowings under these agreements would result in an additional $106 million of annual pretax interest expense. The Company is currently a party to four interest rate swap agreements. One of the swap agreements relates to the $100 million fixed 7.5% rate debentures due in 2023 and effectively converts the fixed 7.5% rate to a variable rate based on LIBOR. The other three swap agreements were initiated on July 3, 2007, and effectively converted $2.5 billion of the variable rate borrowings to a weighted-average fixed rate of 5.31% plus a margin of 300 basis points.

Information pertaining to the Company's debt at Dec. 31, 2006 is shown in the table below (in thousands).

| Maturities | Fixed Rate Debt | Weighted Avg Interest Rate | Variable Rate Debt | Weighted Avg Interest Rate | Total Debt |
|---|---|---|---|---|---|
| 2007(1)(2) | $ 353,044 | 2.3% | $ 1,407,019 | 6.2% | $ 1,760,063 |
| 2008 | 287,023 | 5.8% | — | — | 287,023 |
| 2009 | 15,851 | 7.7% | — | — | 15,851 |
| 2010 | 451,246 | 4.9% | — | — | 451,246 |
| 2011 | 1,907 | 9.3% | 1,500,000 | 6.2% | 1,501,907 |
| Thereafter(3)(4) | 989,128 | 3.9% | — | — | 989,128 |
| Total at Dec. 31, 2006 | $ 2,098,199 | | $ 2,907,019 | | $ 5,005,218 |
| Fair Value at Dec. 31, 2006(5) | $ 1,997,371 | | $ 2,907,019 | | $ 4,904,390 |

(1) Includes $331 million related to the Company's 2% PHONES (fixed rate debt). This amount was classified as long-term and treated as maturing after 2011 for financial statement presentation purposes because of the Company's ability and intent at Dec. 31, 2006 to refinance these securities, on a long-term basis, in the event that the 2% PHONES were put to the Company in 2007. See Note 10 to the Company's consolidated financial statements in Item 8 for further discussion.

(2) Includes $20 million of property financing obligation (fixed rate debt). See Note 8 to the Company's consolidated financial statements in Item 8 for further discussion.

(3) Includes $242 million related to the Company's 2% PHONES, due 2029. The Company may redeem the PHONES at any time for the greater of the principal value of the PHONES ($156.47 per PHONES at Dec. 31, 2006) or the then market value of two shares of Time Warner common stock, subject to certain adjustments. Quarterly interest payments are made to the PHONES holders at an annual rate of 2% of the initial principal. The Company records both cash and non-cash interest expense on the discounted debt component of the PHONES. See Note 10 to the Company's consolidated financial statements in Item 8 for further discussion.

(4) Includes $25 million related to the interest rate swap agreement on the $100 million 7.5% debentures due in 2023 effectively converting the fixed 7.5% rate to a variable rate based on LIBOR.

(5) Fair value was estimated based on quoted market prices for similar issues or on current rates available to the Company for debt of the same remaining maturities and similar terms. The carrying value of the Company's derivative instruments approximates fair value. The fair value of the PHONES was determined by reference to the market value resulting from trading on a national securities exchange.

**Equity Price Risk**

**Available-For-Sale Securities**—The Company has common stock investments in publicly traded companies that are subject to market price volatility. Except for 16 million shares of Time Warner common stock (see discussion below), these investments are classified as available-for-sale securities and are recorded on the balance sheet at fair value with unrealized gains or losses, net of related tax effects, reported in the accumulated other comprehensive income (loss) component of shareholders' equity (deficit).

75

**2007**—The following analysis presents the hypothetical change at Dec. 30, 2007 in the fair value of the Company's common stock investments in publicly traded companies that are classified as available-for-sale, assuming hypothetical stock price fluctuations of plus or minus 10%, 20% and 30% in each stock's price. As of Dec. 30, 2007, the Company's common stock investments in publicly traded companies consisted primarily of 237,790 shares of Time Warner common stock unrelated to PHONES (see discussion below in "Derivatives and Related Trading Securities") and 3.4 million shares of AdStar, Inc.

| (In thousands) | Valuation of Investments Assuming Indicated Decrease in Stock's Price | | | Dec. 30, 2007 Fair Value | Valuation of Investments Assuming Indicated Increase in Stock's Price | | |
| | -30% | -20% | -10% | | +10% | +20% | +30% |
|---|---|---|---|---|---|---|---|
| Common stock investments in public companies | $ 3,716 | $ 4,246 | $ 4,777 | $ 5,308(1) | $ 5,839 | $ 6,370 | $ 6,901 |

(1) Excludes 16 million shares of Time Warner common stock. See discussion below in "Derivatives and Related Trading Securities."

During the last 12 quarters preceding Dec. 30, 2007, market price movements caused the fair value of the Company's common stock investments in publicly traded companies to change by 10% or more in four of the quarters, by 20% or more in four of the quarters and by 30% or more in three of the quarters.

**2006**—The following analysis presents the hypothetical change at Dec. 31, 2006 in the fair value of the Company's common stock investments in publicly traded companies that are classified as available-for-sale, assuming hypothetical stock price fluctuations of plus or minus 10%, 20% and 30% in each stock's price. As of Dec. 31, 2006, the Company's common stock investments in publicly traded companies consisted primarily of 274,080 shares of Time Warner common stock unrelated to PHONES (see discussion below in "Derivatives and Related Trading Securities") and 3.4 million shares of AdStar, Inc.

| (In thousands) | Valuation of Investments Assuming Indicated Decrease in Stock's Price | | | Dec. 31, 2006 Fair Value | Valuation of Investments Assuming Indicated Increase in Stock's Price | | |
| | -30% | -20% | -10% | | +10% | +20% | +30% |
|---|---|---|---|---|---|---|---|
| Common stock investments in public companies | $ 9,728 | $ 11,117 | $ 12,507 | $ 13,897(1) | $ 15,286 | $ 16,676 | $ 18,066 |

(1) Excludes 16 million shares of Time Warner common stock. See discussion below in "Derivatives and Related Trading Securities."

During the last 12 quarters preceding Dec. 31, 2006, market price movements caused the fair value of the Company's common stock investments in publicly traded companies to change by 10% or more in two of the quarters, by 20% or more in one of the quarters and by 30% or more in one of the quarters.

**Derivatives and Related Trading Securities**—The Company issued 8 million PHONES in April 1999 indexed to the value of its investment in 16 million shares of Time Warner common stock (see Note 10 to the Company's consolidated financial statements in Item 8). Since the second quarter of 1999, this investment in Time Warner has been classified as a trading security, and changes in its fair value, net of the changes in the fair value of the related derivative component of the PHONES, have been recorded in the statement of income.

At maturity, the PHONES will be redeemed at the greater of the then market value of two shares of Time Warner common stock or the principal value of the PHONES ($155.99 per PHONES at Dec. 30, 2007). At Dec. 30, 2007 and Dec. 31, 2006, the PHONES carrying value was approximately $597 million and $573 million, respectively. Since the issuance of the PHONES in April 1999, changes in the fair value of the derivative component of the PHONES have partially offset changes in the fair value of the related Time Warner shares. There have been and may continue to be periods with significant non-cash increases or decreases to the Company's net income pertaining to the PHONES and the related Time Warner shares.

76

**2007**—The following analysis presents the hypothetical change at Dec. 30, 2007, in the fair value of the Company's 16 million shares of Time Warner common stock related to the PHONES assuming hypothetical stock price fluctuations of plus or minus 10%, 20% and 30% in the stock's price.

| (In thousands) | Valuation of Investment Assuming Indicated Decrease in Stock Price | | | Dec. 30, 2007 Fair Value | Valuation of Investment Assuming Indicated Increase in Stock Price | | |
|---|---|---|---|---|---|---|---|
| | -30% | -20% | -10% | | +10% | +20% | +30% |
| Time Warner common stock | $ 186,480 | $ 213,120 | $ 239,760 | $ 266,400 | $ 293,040 | $ 319,680 | $ 346,320 |

During the last 12 quarters preceding Dec. 30, 2007, market price movements have caused the fair value of the Company's 16 million shares of Time Warner common stock to change by 10% or more in two of the quarters, by 20% or more in one of the quarters and by 30% or more in none of the quarters.

**2006**—The following analysis presents the hypothetical change at Dec. 31, 2006, in the fair value of the Company's 16 million shares of Time Warner common stock related to the PHONES assuming hypothetical stock price fluctuations of plus or minus 10%, 20% and 30% in the stock's price.

| (In thousands) | Valuation of Investment Assuming Indicated Decrease in Stock Price | | | Dec. 31, 2006 Fair Value | Valuation of Investment Assuming Indicated Increase in Stock Price | | |
|---|---|---|---|---|---|---|---|
| | -30% | -20% | -10% | | +10% | +20% | +30% |
| Time Warner common stock | $ 243,936 | $ 278,784 | $ 313,632 | $ 348,480 | $ 383,328 | $ 418,176 | $ 453,024 |

During the last 12 quarters preceding Dec. 31, 2006, market price movements have caused the fair value of the Company's 16 million shares of Time Warner common stock to change by 10% or more in two of the quarters, by 20% or more in one of the quarters and by 30% or more in none of the quarters.

77

**ITEM 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.**

### INDEX TO FINANCIAL STATEMENTS
### AND FINANCIAL STATEMENT SCHEDULE

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 79 |
| Consolidated Statements of Income for each of the three fiscal years in the period ended Dec. 30, 2007 | 81 |
| Consolidated Balance Sheets at Dec. 30, 2007 and Dec. 31, 2006 | 82 |
| Consolidated Statements of Shareholders' Equity (Deficit) for each of the three fiscal years in the period ended Dec. 30, 2007 | 84 |
| Consolidated Statements of Cash Flows for each of the three fiscal years in the period ended Dec. 30, 2007 | 86 |
| Notes to Consolidated Financial Statements | |
| Note 1: Summary of Significant Accounting Policies | 87 |
| Note 2: Changes in Operations and Non-Operating Items | 94 |
| Note 3: Leveraged ESOP Transactions | 98 |
| Note 4: Discontinued Operations and Assets Held for Sale | 100 |
| Note 5: *Newsday* and *Hoy*, New York Charge | 102 |
| Note 6: Inventories | 103 |
| Note 7: Goodwill and Other Intangible Assets | 104 |
| Note 8: TMCT and TMCT II | 106 |
| Note 9: Investments | 108 |
| Note 10: Debt | 110 |
| Note 11: Contracts Payable for Broadcast Rights | 117 |
| Note 12: Fair Value of Financial Instruments | 117 |
| Note 13: Commitments and Contingencies | 117 |
| Note 14: Income Taxes | 118 |
| Note 15: Pension and Other Postretirement Benefits | 123 |
| Note 16: Capital Stock | 127 |
| Note 17: Incentive Compensation and Stock Plans | 129 |
| Note 18: Comprehensive Income | 135 |
| Note 19: Business Segments | 136 |
| 2007 Quarterly Results (Unaudited) | 139 |
| 2006 Quarterly Results (Unaudited) | 140 |
| Five Year Financial Summary | 141 |
| Financial Statement Schedule for each of the three fiscal years in the period ended Dec. 30, 2007 | |
| Schedule II Valuation and Qualifying Accounts and Reserves* | 143 |
| Consolidated Financial Statements of Tribune Broadcasting Holdco, LLC and Subsidiaries | 144 |
| Financial Statements of Tribune Finance, LLC | 167 |

---

\*    All other schedules required under Regulation S-X are omitted because they are not applicable or not required.

78

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Shareholders of Tribune Company:

In our opinion, based on our audit and the report of other auditors, the financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Tribune Company and its subsidiaries at December 30, 2007 and December 31, 2006, and the results of their operations and their cash flows for each of the three years in the period ended December 30, 2007 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the accompanying index presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 30, 2007, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements and financial statement schedule, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control over Financial Reporting in Item 9A. Our responsibility is to express opinions on these financial statements, on the financial statement schedule and on the Company's internal control over financial reporting based on our integrated audits. We did not audit the financial statements of Television Food Network, G.P. ("TV Food Network"), an equity method investee of Tribune Company and its subsidiaries, for the year ended December 30, 2007. The Company's consolidated financial statements include income from this equity investment of $82 million for the year ended December 30, 2007. The financial statements of TV Food Network were audited by other auditors whose report thereon has been furnished to us, and our opinion on the financial statements expressed herein, insofar as it relates to the equity income from TV Food Network for the year ended December 30, 2007, is based solely on the report of the other auditors. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits and the report of other auditors provide a reasonable basis for our opinions.

As discussed in Notes 15 and 17 to the consolidated financial statements, the Company changed the manner in which it accounts for defined benefit pension and other postretirement plans effective December 31, 2006 and the manner in which it accounts for share-based compensation in 2006.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that

79

controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP
Chicago, Illinois
March 14, 2008

80

## TRIBUNE COMPANY AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF INCOME
### (In thousands of dollars)

| | Year Ended | | |
| --- | --- | --- | --- |
| | Dec. 30, 2007 | Dec. 31, 2006 | Dec. 25, 2005 |
| **Operating Revenues** | | | |
| Publishing | | | |
| Advertising | $  2,861,019 | $  3,194,968 | $  3,171,776 |
| Circulation | 526,529 | 567,326 | 585,093 |
| Other | 277,042 | 256,124 | 255,544 |
| Total | 3,664,590 | 4,018,418 | 4,012,413 |
| Broadcasting and entertainment | 1,398,394 | 1,425,146 | 1,414,433 |
| Total operating revenues | 5,062,984 | 5,443,564 | 5,426,846 |
| **Operating Expenses** | | | |
| Cost of sales (exclusive of items shown below) | 2,545,554 | 2,700,302 | 2,661,725 |
| Selling, general and administrative | 1,525,443 | 1,434,076 | 1,405,485 |
| Depreciation | 208,237 | 204,662 | 219,539 |
| Amortization of intangible assets | 19,833 | 19,763 | 18,838 |
| Write-down of intangible assets (Note 7) | 130,000 | — | — |
| Total operating expenses | 4,429,067 | 4,358,803 | 4,305,587 |
| **Operating Profit** | 633,917 | 1,084,761 | 1,121,259 |
| Net income on equity investments | 100,219 | 80,773 | 41,209 |
| Interest and dividend income | 21,827 | 14,145 | 7,539 |
| Interest expense | (581,640) | (273,902) | (155,191) |
| Gain (loss) on change in fair values of derivatives and related investments | (96,806) | 11,088 | 62,184 |
| Strategic transaction expenses | (85,131) | (3,466) | — |
| Gain on TMCT transactions | 8,003 | 59,596 | — |
| Gain on other investment transactions, net | 31,578 | 36,732 | 6,780 |
| Other non-operating gain (loss), net | 5,137 | (981) | 897 |
| **Income From Continuing Operations Before Income Taxes** | 37,104 | 1,008,746 | 1,084,677 |
| Income taxes (Note 14) | 18,234 | (347,573) | (565,293) |
| **Income From Continuing Operations** | 55,338 | 661,173 | 519,384 |
| **Income (Loss) from Discontinued Operations, net of tax (Note 4)** | 31,607 | (67,178) | 15,305 |
| **Net Income** | $     86,945 | $   593,995 | $   534,689 |

See Notes to Consolidated Financial Statements.

81

### TRIBUNE COMPANY AND SUBSIDIARIES
### CONSOLIDATED BALANCE SHEETS
#### (In thousands of dollars)

| Assets | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| **Current Assets** | | |
| Cash and cash equivalents | $ 233,284 | $ 174,686 |
| Accounts receivable (net of allowances of $32,230 and $33,771) | 732,853 | 734,871 |
| Inventories | 40,675 | 40,962 |
| Broadcast rights | 287,045 | 271,995 |
| Deferred income taxes | — | 74,450 |
| Prepaid expenses and other | 91,166 | 49,466 |
| Total current assets | 1,385,023 | 1,346,430 |
| **Properties** | | |
| Machinery, equipment and furniture | 2,341,465 | 2,306,400 |
| Buildings and leasehold improvements | 992,390 | 1,014,865 |
| | 3,333,855 | 3,321,265 |
| Accumulated depreciation | (1,998,741) | (1,907,365) |
| | 1,335,114 | 1,413,900 |
| Land | 106,611 | 127,797 |
| Construction in progress | 123,970 | 143,415 |
| Net properties | 1,565,695 | 1,685,112 |
| **Other Assets** | | |
| Broadcast rights | 301,263 | 295,186 |
| Goodwill | 5,579,926 | 5,837,208 |
| Other intangible assets, net | 2,663,152 | 2,846,057 |
| Time Warner stock related to PHONES debt | 266,400 | 348,480 |
| Other investments | 508,205 | 564,750 |
| Prepaid pension costs | 514,429 | 293,455 |
| Assets held for sale | 33,780 | 9,172 |
| Other | 331,846 | 174,922 |
| Total other assets | 10,199,001 | 10,369,230 |
| Total assets | $ 13,149,719 | $ 13,400,772 |

See Notes to Consolidated Financial Statements.

82

## TRIBUNE COMPANY AND SUBSIDIARIES
## CONSOLIDATED BALANCE SHEETS
### (In thousands of dollars)

| Liabilities and Shareholders' Equity (Deficit) | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| **Current Liabilities** | | |
| Borrowings under former bridge credit facility | $        — | $    1,310,000 |
| PHONES debt related to Time Warner stock (Note 10) | 253,080 | — |
| Other debt due within one year (Note 10) | 750,239 | 119,007 |
| Accounts payable | 188,017 | 151,601 |
| Employee compensation and benefits | 129,677 | 185,551 |
| Contracts payable for broadcast rights | 339,909 | 319,822 |
| Deferred income taxes | 100,324 | — |
| Deferred income | 121,239 | 108,607 |
| Other | 307,481 | 354,003 |
| Total current liabilities | 2,189,966 | 2,548,591 |
| **Long-Term Debt** | | |
| PHONES debt related to Time Warner stock (Note 10) | 343,960 | 572,960 |
| Other long-term debt (less portions due within one year) | 11,496,246 | 3,003,251 |
| Total long-term debt | 11,840,206 | 3,576,211 |
| **Other Non-Current Liabilities** | | |
| Deferred income taxes | 1,771,845 | 1,974,672 |
| Contracts payable for broadcast rights | 432,393 | 424,050 |
| Deferred compensation and benefits | 264,480 | 392,187 |
| Other obligations | 164,769 | 165,445 |
| Total other non-current liabilities | 2,633,487 | 2,956,354 |
| **Commitments and Contingent Liabilities (Note 13)** | — | — |
| **Common Shares Held by ESOP, net of Unearned Compensation (Note 17)** | — | — |
| **Shareholders' Equity (Deficit)** | | |
| Series D-1 convertible preferred stock | | |
| Authorized: no shares at Dec. 30, 2007 and 137,643 shares at Dec. 31, 2006; Issued and outstanding: no shares at Dec. 30, 2007 and no shares (net of 137,643 treasury shares) at Dec. 31, 2006 | — | — |
| Common stock ($0.01 par value) | | |
| Authorized: 250,000,000 shares at Dec. 30, 2007 and 1,400,000,000 shares at Dec. 31, 2006; no shares issued other than to ESOP at Dec. 30, 2007 and 387,179,076 shares issued at Dec. 31, 2006 | — | 2,241 |
| Additional paid-in capital | — | 6,834,788 |
| Stock purchase warrants (Note 16) | 255,000 | — |
| Retained earnings (deficit) | (3,474,311) | 3,138,313 |
| Treasury common stock (at cost) no shares at Dec. 30, 2007 and 147,971,659 shares at Dec. 31, 2006 | — | (5,288,341) |
| Accumulated other comprehensive income (loss) | (294,629) | (367,385) |
| Total shareholders' equity (deficit) | (3,513,940) | 4,319,616 |
| Total liabilities and shareholders' equity (deficit) | $   13,149,719 | $   13,400,772 |

See Notes to Consolidated Financial Statements.

83

5/20/2010 9:00 PM

**TRIBUNE COMPANY AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (DEFICIT)**
(In thousands)

| | Total | Retained Earnings (Deficit) | Accumulated Other Comprehensive Income (Loss) | Convertible Preferred Stock | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | Series C(1) | Series D-1(1) | Series D-2(1) |
| **Balance at Dec. 26, 2004** | $ 6,836,844 | $ 2,810,542 | $ 12,830 | $ 44,260 | $ 38,097 | $ 24,510 |
| Comprehensive income: | | | | | | |
| Net income | 534,689 | 534,689 | — | — | — | — |
| Other comprehensive income: | | | | | | |
| Change in unrealized gain on marketable securities, net | (3,463) | — | (3,463) | — | — | — |
| Change in minimum pension liabilities, net | (20,597) | — | (20,597) | — | — | — |
| Change in foreign currency translation adjustments, net | (70) | — | (70) | — | — | — |
| Comprehensive income | 510,559 | — | — | — | — | — |
| Dividends declared: | | | | | | |
| Common | (225,110) | (225,110) | — | — | — | — |
| Series C, D-1 and D-2 preferred | (8,364) | (8,364) | — | — | — | — |
| Shares issued under option and stock plans | 51,102 | — | — | — | — | — |
| Tax benefit on stock options exercised | 5,395 | — | — | — | — | — |
| Shares tendered as payment for options exercised | (1,101) | (769) | — | — | — | — |
| Purchases of treasury stock | (443,774) | — | — | — | — | — |
| Retirement of treasury stock | — | (286,226) | — | — | — | — |
| **Balance at Dec. 25, 2005** | $ 6,725,551 | $ 2,824,762 | $ (11,300) | $ 44,260 | $ 38,097 | $ 24,510 |
| Comprehensive income: | | | | | | |
| Net income | 593,995 | 593,995 | — | — | — | — |
| Other comprehensive income: | | | | | | |
| Change in unrealized gain on marketable securities, net | (9,396) | — | (9,396) | — | — | — |
| Change in minimum pension liabilities, net | 18,987 | — | 18,987 | — | — | — |
| Change in foreign currency translation adjustments, net | 183 | — | 183 | — | — | — |
| Comprehensive income | 603,769 | — | — | — | — | — |
| Adjustments, net of tax, for initial adoption of FAS No. 158 (see Note 1 and Note 15) | (365,859) | — | (365,859) | — | — | — |
| Dividends declared: | | | | | | |
| Common | (194,640) | (194,640) | — | — | — | — |
| Series C, D-1 and D-2 preferred | (6,309) | (6,309) | — | — | — | — |
| Shares issued under option and stock plans | 38,714 | — | — | — | — | — |
| Tax benefits on stock options exercised | 4,256 | — | — | — | — | — |
| Shares tendered as payment for options exercised | (138) | (79) | — | — | — | — |
| Stock-based compensation | 31,645 | — | — | — | — | — |
| TMCT transactions (see Note 8) | (267,978) | — | — | (44,260) | (38,097) | (24,510) |
| Purchases of treasury stock | (2,249,395) | — | — | — | — | — |
| Retirements of treasury stock | — | (79,416) | — | — | — | — |
| **Balance at Dec. 31, 2006** | $ 4,319,616 | $ 3,138,313 | $ (367,385) | $ — | $ — | $ — |
| Comprehensive income: | | | | | | |
| Net income | 86,945 | 86,945 | — | — | — | — |
| Other comprehensive income: | | | | | | |

5/20/2010 9:00 PM

| | | | | | | |
|---|---|---|---|---|---|---|
| Change in unrecognized benefit cost gains and losses, net | 104,560 | — | 104,560 | — | — | — |
| Adjustment for previously unrecognized benefit cost gains and losses included in net income, net | 27,350 | — | 27,350 | — | — | — |
| Change in unrealized gain on marketable securities, net | (5,340) | — | (5,340) | — | — | — |
| Change in unrecognized losses on cash flow hedging instruments, net | (54,398) | — | (54,398) | — | — | — |
| Change in foreign currency translation adjustments, net | 584 | — | 584 | — | — | — |
| Comprehensive income | 159,701 | | | | | |
| Dividends declared: | | — | — | — | — | — |
| Common | (43,247) | (43,247) | — | — | — | — |
| Shares issued under option and stock plans | 92,645 | (30) | — | — | — | — |
| Tax benefits on stock options exercised | 21,307 | | — | — | — | — |
| Shares tendered as payment for options exercised and redeemed | (5,742) | 658 | — | — | — | — |
| Stock-based compensation | 91,967 | — | — | — | — | — |
| Cash redemption of stock-based awards (Note 17) | (134,916) | — | — | — | — | — |
| TMCT transactions adjustment (Note 8) | 1,002 | — | — | — | — | — |
| Sale of common stock to Zell Entity (Note 3) | 50,000 | (98) | — | — | — | — |
| Issuance of stock purchase warrants (Note 16) | 255,000 | — | — | — | — | — |
| Issuance of shares held by ESOP (Note 3) | — | (54,170) | — | — | — | — |
| Reclassification of ESOP shares upon Merger (Note 17) | — | — | — | — | — | — |
| Purchases of treasury stock | (8,321,273) | — | — | — | — | — |
| Retirements of treasury stock | — | (6,602,682) | — | — | — | — |
| **Balance at Dec. 30, 2007** | $(3,513,940) | $ (3,474,311) | $ (294,629) | $ — | $ — | $ — |

(1) Amounts are net of treasury stock.

See Notes to Consolidated Financial Statements.

84

| | Unearned Compensation (ESOP) | Stock Purchase Warrants | Common Stock and Additional Paid-In Capital | | Treasury Common Stock | |
|---|---|---|---|---|---|---|
| | | | Amount (at cost) | Shares | Amount (at cost) | Shares |
| **Balance at Dec. 26, 2004** | — | $ — | $ 6,918,505 | 400,515 | $(3,011,900) | (83,442) |
| Comprehensive income: | | | | | | |
| Net income | — | — | — | — | — | — |
| Other comprehensive income: | | | | | | |
| Change in unrealized gain on marketable securities, net | — | — | — | | — | |
| Change in minimum pension liabilities, net | — | — | — | | — | |
| Change in foreign currency translation adjustments, net | — | — | — | | — | |
| Comprehensive income | — | — | — | | — | |
| Dividends declared: | | | | | | |
| Common | — | — | — | | — | |
| Series C, D-1 and D-2 preferred | — | — | — | | — | |
| Shares issued under option and stock plans | — | — | 51,102 | 1,814 | — | |
| Tax benefit on stock options exercised | — | — | 5,395 | | — | |
| Shares tendered as payment for options exercised | — | — | (332) | (26) | — | |
| Purchases of treasury stock | — | — | — | | (443,774) | (12,181) |
| Retirement of treasury stock | — | — | (153,867) | (12,181) | 440,093 | 12,181 |
| **Balance at Dec. 25, 2005** | $ — | $ — | $ 6,820,803 | 390,122 | $(3,015,581) | (83,442) |
| Comprehensive income: | | | | | | |
| Net income | — | — | — | — | — | — |
| Other comprehensive income: | | | | | | |
| Change in unrealized gain on marketable securities, net | — | — | — | | — | |
| Change in minimum pension liabilities, net | — | — | — | | — | |
| Change in foreign currency translation adjustments, net | — | — | — | | — | |
| Comprehensive income | — | — | — | | — | |
| Adjustments, net of tax, for initial adoption of FAS No. 158 (see Note 1 and Note 15) | — | — | — | | — | |
| Dividends declared: | | | | | | |
| Common | — | — | — | | — | |
| Series C, D-1 and D-2 preferred | — | — | — | | — | |
| Shares issued under option and stock plans | — | — | 38,714 | 1,665 | — | |
| Tax benefits on stock options exercised | — | — | 4,256 | | — | |
| Shares tendered as payment for options exercised | — | — | (59) | (4) | — | |
| Stock-based compensation | — | — | 31,645 | | — | |
| TMCT transactions (see Note 8) | — | — | — | | (161,111) | 1,550 |
| Purchases of treasury stock | — | — | — | | (2,249,395) | (70,684) |
| Retirements of treasury stock | — | — | (58,330) | (4,604) | 137,746 | 4,604 |
| **Balance at Dec. 31, 2006** | $ — | $ — | $ 6,837,029 | 387,179 | $(5,288,341) | (147,972) |
| Comprehensive income: | | | | | | |
| Net income | — | — | — | — | — | — |
| Other comprehensive income: | | | | | | |
| Change in unrecognized benefit cost gains and losses, net | — | — | — | | — | |
| Adjustment for previously unrecognized benefit cost gains and losses included in net income, net | — | — | — | | — | |
| Change in unrealized gain on marketable securities, net | — | — | — | | — | |

| | | | | | |
|---|---|---|---|---|---|
| Change in unrecognized losses on cash flow hedging instruments, net | — | — | — | — | — | — |
| Change in foreign currency translation adjustments, net | — | — | — | — | — | — |
| Comprehensive income | — | — | — | — | — | — |
| Dividends declared: Common | — | — | — | — | — | — |
| Shares issued under option and stock plans | — | — | — | — | — | — |
| Tax benefits on stock options exercised | — | — | 68,561 | 3,400 | 24,114 | 703 |
| Shares tendered as payment for options exercised and redeemed | — | — | 21,307 | — | — | — |
| Stock-based compensation | — | — | — | — | (6,400) | (188) |
| Cash redemption of stock-based awards (Note 17) | — | — | 91,967 | — | — | — |
| TMCT transactions adjustment (Note 8) | — | — | (134,916) | — | — | — |
| Sale of common stock to Zell Entity (Note 3) | — | — | — | — | 1,002 | — |
| Issuance of stock purchase warrants (Note 16) | — | — | — | — | 50,098 | 1,471 |
| Issuance of shares held by ESOP (Note 3) | (250,000) | 255,000 | — | — | — | — |
| Reclassification of ESOP shares upon Merger (Note 17) | 250,000 | — | — | — | 304,170 | 8,929 |
| Purchases of treasury stock | 250,000 | — | (250,000) | (8,929) | — | — |
| Retirements of treasury stock | — | — | — | — | (8,321,273) | (244,593) |
| **Balance at Dec. 30, 2007** | $ — | $ 255,000 | $ (6,633,948) | (381,650) | $ 13,236,630 | 381,650 |

See Notes to Consolidated Financial Statements.

85

of 230

5/20/2010 9:00 PM

# TRIBUNE COMPANY AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CASH FLOWS
### (In thousands of dollars)

| | Year Ended | | |
| --- | ---: | ---: | ---: |
| | Dec. 30, 2007 | Dec. 31, 2006 | Dec. 25, 2005 |
| **Operations** | | | |
| Net income | $ 86,945 | $ 593,995 | $ 534,689 |
| Adjustments to reconcile net income to net cash provided by operations: | | | |
| Stock-based compensation | 92,328 | 31,927 | — |
| Write-off of *Los Angeles Times* plant equipment | 23,782 | 4,146 | — |
| Depreciation | 210,064 | 209,341 | 224,625 |
| Amortization of intangible assets | 19,879 | 20,002 | 19,195 |
| Write-down of intangible assets | 130,000 | — | — |
| Net income on equity investments | (100,219) | (80,773) | (41,209) |
| Distributions from equity investments | 85,412 | 65,302 | 48,883 |
| Amortization of debt issuance costs | 26,266 | 9,662 | 1,654 |
| (Gain) loss on change in fair values of derivatives and related investments | 96,806 | (11,088) | (62,184) |
| Gain on TMCT transactions | (8,003) | (59,596) | — |
| Gain on other investment transactions, net | (31,578) | (36,732) | (6,780) |
| Other non-operating (gain) loss, net | (2,034) | 4,447 | (897) |
| Loss on sales of discontinued operations | 21,220 | 48,238 | — |
| Changes in working capital items excluding effects from acquisitions and dispositions: | | | |
| Accounts receivable | (5,464) | 20,668 | 51,773 |
| Inventories, prepaid expenses and other current assets | (42,842) | 5,310 | 4,293 |
| Deferred income, accounts payable, accrued expenses and other current liabilities | 26,395 | (25,798) | 2,464 |
| Income taxes | (130,006) | 39,707 | 6,177 |
| Deferred compensation | (114,649) | (9,681) | (36,354) |
| Change in broadcast rights, net of liabilities | 7,303 | 2,056 | (16,329) |
| Deferred income taxes | 13,791 | (112,600) | 93,071 |
| Change in Matthew Bender and Mosby tax reserve | — | — | (221,133) |
| Tax benefit on stock options exercised | 21,307 | 4,256 | 5,395 |
| Other, net | 29,078 | 64,975 | 52,020 |
| Net cash provided by operations | 455,781 | 787,764 | 659,353 |
| **Investments** | | | |
| Capital expenditures | (146,001) | (221,907) | (205,945) |
| Acquisitions | (15,801) | (48,144) | (4,207) |
| Investments | (10,718) | (174,085) | (78,071) |
| Matthew Bender and Mosby tax settlement (liability) allocated to goodwill (Note 14) | 224,149 | — | (459,116) |
| Proceeds from sales of subsidiaries, intangibles, investments and real estate | 158,965 | 470,608 | 22,534 |
| Net cash provided by (used for) investments | 210,594 | 26,472 | (724,805) |
| **Financing** | | | |
| Long-term borrowings | 9,120,000 | 1,500,829 | 777,660 |
| Borrowings under new bridge credit facility | 1,600,000 | — | — |
| Issuance of exchangeable promissory note to Zell Entity (Note 3) | 206,419 | — | — |
| Borrowings under former bridge credit facility | 100,000 | 1,600,000 | — |
| Issuance of subordinated promissory note to Zell Entity (Note 3) | 60,315 | — | — |
| Repayments under former bridge credit facility | (1,410,000) | (290,000) | — |
| Repayments of long-term debt | (1,659,138) | (319,055) | (198,880) |
| Repayment of exchangeable promissory note to Zell Entity (Note 3) | (206,419) | — | — |
| (Repayments) issuances of commercial paper, net | (97,019) | (826,513) | 150,326 |
| Long-term debt issuance costs | (207,443) | (29,881) | (4,762) |
| Sales of common stock to employees, net | 79,944 | 37,177 | 41,374 |
| Sale of common stock to Zell Entity (Note 3) | 50,000 | — | — |
| Issuance of 15-year warrant to Zell Entity (Note 3) | 255,000 | — | — |
| Cash settlement of stock-based awards | (134,916) | — | — |

| | | | |
|---|---|---|---|
| Purchases of Tribune common stock | | | |
| Dividends | (8,321,273) | (2,262,268) | (440,093) |
| Net cash provided by (used for) financing | (43,247) | (200,949) | (233,474) |
| **Net Increase in Cash and Cash Equivalents** | (607,777) | (790,660) | 92,151 |
| Cash and cash equivalents, beginning of year | 58,598 | 23,576 | 26,699 |
| Cash and cash equivalents, end of year | 174,686 | 151,110 | 124,411 |
| | $ 233,284 | $ 174,686 | $ 151,110 |

See Notes to Consolidated Financial Statements.

86

TRIBUNE COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The significant accounting policies of Tribune Company and subsidiaries (the "Company"), as summarized below, conform with accounting principles generally accepted in the United States of America and reflect practices appropriate to the Company's businesses.

**Nature of Operations**—The Company is a media and entertainment company. Through its subsidiaries, the Company is engaged in newspaper publishing, television and radio broadcasting and entertainment.

**Fiscal Year**—The Company's fiscal year ends on the last Sunday in December. Fiscal years 2007 and 2005 encompassed a 52-week period. Fiscal year 2006 encompassed a 53-week period.

**Principles of Consolidation**—The consolidated financial statements include the accounts of Tribune Company and all majority-owned subsidiaries. In general, investments comprising 20 to 50 percent of the voting stock of companies and certain partnership interests are accounted for using the equity method. All other investments are generally accounted for using the cost method. All significant intercompany transactions are eliminated.

The Company evaluates its investments and other transactions for consolidation under the provisions of Financial Accounting Standards Board ("FASB") Interpretation No. 46R, "Consolidation of Variable Interest Entities" ("FIN 46R"). The Company holds significant variable interests, as defined by FIN 46R, in Classified Ventures, LLC, ShopLocal, LLC and Topix, LLC, but the Company has determined that it is not the primary beneficiary of these entities. The Company's maximum loss exposure related to these entities is limited to its equity investments in Classified Ventures, LLC, ShopLocal, LLC and Topix, LLC, which were $48 million, $32 million, and $24 million, respectively, at Dec. 30, 2007. At Dec. 31, 2006, the Company's equity investments in Classified Ventures, LLC, ShopLocal, LLC and Topix, LLC were $44 million, $31 million and $26 million, respectively.

**Presentation**—On Dec. 20, 2007, the Company completed the Leveraged ESOP Transactions, as defined and discussed in Note 3. The Company has significant continuing public debt and has accounted for these transactions as a leveraged recapitalization and, accordingly, has maintained a historical cost presentation in its consolidated financial statements.

On Feb. 12, 2007, the Company announced an agreement to sell the New York edition of *Hoy*, the Company's Spanish-language daily newspaper, to ImpreMedia, LLC. The Company completed the sale of *Hoy*, New York on May 15, 2007. On Oct. 25, 2007, the Company announced an agreement to sell its Southern Connecticut Newspapers—*The Advocate* (Stamford) and *Greenwich Time* (collectively "SCNI") to Hearst Corporation. The sale of SCNI closed on Nov. 1, 2007, and excluded the SCNI real estate in Stamford and Greenwich, Connecticut, which the Company plans to sell separately. During the third quarter of 2007, the Company began actively pursuing the sale of the stock of one of its subsidiaries, EZ Buy & EZ Sell Corporation ("Recycler"), to Target Media Partners. Recycler publishes a collection of free classified newspapers in Southern California. The sale of Recycler closed on Oct. 17, 2007. On June 5, 2006, the Company announced the sale of WATL-TV, Atlanta and on June 19, 2006 announced the sale of WCWN-TV, Albany. The sale of WATL-TV, Atlanta closed on Aug. 7, 2006. On Sept. 14, 2006, the Company announced the sale of WLVI-TV, Boston. The Albany and Boston station sales closed on Dec. 6, 2006 and Dec. 19, 2006, respectively. The results of operations of each of these businesses have been reported as discontinued operations in the accompanying consolidated statements of income. Prior year consolidated statements of income have been reclassified to conform to the presentation of these businesses as discontinued operations. See Note 4 for further discussion. In addition, certain other prior year financial information has been reclassified to conform to the current year presentation.

87

**TRIBUNE COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Revenue Recognition**—The Company's primary sources of revenue are from the sales of advertising space in published issues of its newspapers and on interactive websites owned by, or affiliated with, the Company; distribution of preprinted advertising inserts in its newspapers; sales of newspapers to distributors and individual subscribers; and sales of airtime on its television and radio stations. Newspaper advertising revenue is recorded, net of agency commissions, when advertisements are published in newspapers. Website advertising revenue is recognized ratably over the contract period or as services are delivered, as appropriate. Proceeds from subscriptions are deferred and are included in revenue on a pro-rata basis over the term of the subscriptions. Broadcast revenue is recorded, net of agency commissions, when commercials are aired. The Company records rebates when earned as a reduction of advertising revenue.

**Use of Estimates**—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from these estimates.

**Cash and Cash Equivalents**—Cash and cash equivalents are stated at cost, which approximates market value. Investments with original maturities of three months or less at the time of purchase are considered to be cash equivalents.

**Accounts Receivable**—The Company's accounts receivable are primarily due from advertisers. Credit is extended based on an evaluation of each customer's financial condition, and generally collateral is not required. The Company maintains an allowance for uncollectible accounts, rebates and volume discounts. This allowance is determined based on historical write-off experience and any known specific collectibility exposures.

**Inventories**—Inventories are stated at the lower of cost or market. Cost is determined on the last-in, first-out ("LIFO") basis for newsprint and on the first-in, first-out ("FIFO") basis for all other inventories.

**Broadcast Rights**—Broadcast rights consist principally of rights to broadcast syndicated programs, sports and feature films and are stated at the lower of cost or estimated net realizable value. The total cost of these rights is recorded as an asset and a liability when the program becomes available for broadcast. Syndicated program rights that have limited showings are generally amortized using an accelerated method as programs are aired. Sports and feature film rights are amortized using the straight-line method. The current portion of broadcast rights represents those rights available for broadcast that are expected to be amortized in the succeeding year.

The Company maintains an allowance for programming that is not expected to be aired by the end of the contract period. This allowance for excess programming inventory is based on a program-by-program review of the Company's five-year broadcast plans and historical write-off trends. The total reserve balance at Dec. 30, 2007 and Dec. 31 2006 was $3 million and $4 million, respectively. Actual write-offs in 2007 and 2006 were $.9 million and $.4 million, respectively. Future write-offs can vary based on changes in consumer viewing trends and the availability and costs of other programming.

**Properties**—Property, plant and equipment are stated at cost. The Company capitalizes major property, plant and equipment additions, improvements and replacements, as well as interest incurred during construction of major facilities and equipment. Depreciation is computed using the straight-line method over the following estimated useful lives: 10 to 40 years for buildings, 7 to 20 years for newspaper printing presses and 3 to 10 years for all other equipment. Expenditures for repairs and maintenance of existing assets are charged to expense as incurred.

**Goodwill and Other Intangible Assets**—Goodwill and other intangible assets are summarized in Note 7. The Company reviews goodwill and certain intangible assets no longer being amortized for impairment annually, or more frequently if events or changes in circumstances indicate that an asset may be impaired, in accordance with Financial Accounting Standard ("FAS") No. 142, "Goodwill and Other Intangible Assets." Under FAS

88

**TRIBUNE COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

No. 142, the impairment review of goodwill and other intangible assets not subject to amortization must be based on estimated fair values.

The Company performs its annual impairment review in the fourth quarter of each year. The estimated fair values of the reporting units to which goodwill has been allocated is determined using many critical factors, including operating cash flows, revenue and market growth, market multiples, and discount rates. The estimated fair values of other intangible assets subject to the annual impairment review, which include newspaper mastheads and Federal Communications Commission ("FCC") licenses, are generally calculated based on projected future discounted cash flow analyses. The development of market multiples, operating cash flow projections and discount rates used in these analyses requires the use of assumptions, including assumptions regarding revenue and market growth as well as specific economic factors in the publishing and broadcasting industries. These assumptions reflect the Company's best estimates, but these items involve inherent uncertainties based on market conditions generally outside of the Company's control.

In the fourth quarter of 2007, the Company recorded a pretax impairment charge of $130 million ($79 million after taxes) related to one of its masthead intangible assets in connection with its annual impairment review under FAS No. 142. This impairment was primarily due to a decrease in actual and projected newspaper advertising revenues as a result of the continued difficult advertising environment.

On March 13, 2008, the Company filed an election to be treated as a subchapter S Corporation under the Internal Revenue Code, which election is effective as of the beginning of the Company's 2008 fiscal year. As a result, essentially all of the Company's net deferred tax liabilities will be eliminated and such adjustment will be recorded as a reduction in the Company's provision for income taxes in the first quarter of 2008. This adjustment will increase the carrying value of the Company's reporting units. The Company has experienced declines in its consolidated operating results during 2007 as compared to the prior year, particularly in its publishing reporting unit. Adverse changes in expected operating results and/or unfavorable changes in other economic factors used to estimate fair values could result in additional non-cash impairment charges in the future under FAS No. 142.

**Impairment Review of Long-Lived Assets**—In accordance with FAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," the Company evaluates the carrying value of long-lived assets to be held and used whenever events or changes in circumstances indicate that the carrying amount of a long-lived asset or asset group may be impaired. The carrying value of a long-lived asset or asset group is considered impaired when the projected future undiscounted cash flows to be generated from the asset or asset group over its remaining depreciable life are less than its current carrying value.

**Investments**—The Company records its investments in debt and equity securities at fair value, except for debt securities that the Company intends to hold to maturity and equity securities that are accounted for under the equity method or that are issued by private companies. Except for 16 million Time Warner shares (see "Derivative Instruments" below), investments are currently classified as available-for-sale, and accordingly, the difference between cost and fair value, net of related tax effects, is recorded in the accumulated other comprehensive income (loss) component of shareholders' equity (deficit).

**Derivative Instruments**—FAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," requires all derivative instruments to be recorded on the balance sheet at fair value. Changes in the fair value of derivative instruments are recognized periodically in income or other comprehensive income (loss) as described below. The provisions of FAS No. 133 affect the Company's accounting for its 8 million Exchangeable Subordinated Debentures due 2029 ("PHONES"), its three interest rate swaps related to a $2.5 billion notional amount of its variable rate borrowings, and its interest rate swap related to its $100 million 7.5% debentures (see Note 10 for further information on the Company's PHONES and interest rate swaps).

Under the provisions of FAS No. 133, the initial value of the PHONES was split into a debt component and a derivative component. Changes in the fair value of the derivative component of the PHONES are recorded in

**TRIBUNE COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

the statement of income. Beginning in the second quarter of 1999, changes in the fair value of the related 16 million Time Warner shares are also recorded in the statement of income and should at least partially offset changes in the fair value of the derivative component of the PHONES. However, there have been, and may continue to be, periods with significant non-cash increases or decreases to the Company's net income pertaining to the PHONES and the related Time Warner shares.

The interest rate swaps related to $2.5 billion of the Company's variable rate borrowings are cash flow hedges. Under FAS No. 133, a cash flow hedge is deemed to be highly effective if it is expected that changes in the cash flows of the hedged item are almost fully offset by changes in the cash flows of the hedging instrument. While there will be some ineffectiveness in the future, the Company's cash flow hedges are deemed to be highly effective, and therefore gains and losses resulting from changes in the fair value of these hedges, other than changes resulting from hedge ineffectiveness, are recorded in other comprehensive income (loss), net of taxes.

The Company's interest rate swap on its $100 million 7.5% debentures is a fair value hedge and is used to manage exposure to market risk associated with changes in interest rates. The changes in fair value of the swap agreement and the related debt instrument are recorded in income.

The Company has classified the fair value of its hedging instruments in long-term debt in its consolidated balance sheet.

**Pension Plans and Other Postretirement Benefits**—Retirement benefits are provided to employees through pension plans sponsored either by the Company or by unions. Under the Company-sponsored plans, pension benefits are primarily a function of both the years of service and the level of compensation for a specified number of years, depending on the plan. It is the Company's policy to fund the minimum for Company-sponsored pension plans as required by ERISA. Contributions made to union-sponsored plans are based upon collective bargaining agreements.

The Company also provides certain health care and life insurance benefits for retired employees. The expected cost of providing these benefits is accrued over the years that the employees render services. It is the Company's policy to fund postretirement benefits as claims are incurred.

In September 2006, the FASB issued FAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of FASB Statements No. 87, 88, 106 and 132(R)", which requires an employer to recognize the overfunded or underfunded status of a defined benefit pension or other postretirement plan (other than a multiemployer plan) as an asset or liability in its statement of financial position and to recognize changes in that funded status in the year in which changes occur through comprehensive income. The Statement also requires an employer to measure the funded status of a plan as of the date of its year-end statement of financial position, with limited exceptions. The Company adopted the provisions of FAS No. 158 as of Dec. 31, 2006. Additional information pertaining to the Company's pension plans and other postretirement benefits is provided in Note 15.

**Self-Insurance**—The Company self-insures for certain employee medical and disability income benefits, workers' compensation costs and automobile and general liability claims. The recorded liabilities for self-insured risks are calculated using actuarial methods and are not discounted. The recorded liabilities for self-insured risks totaled $100 million and $115 million at Dec. 30, 2007 and Dec. 31, 2006, respectively.

**Deferred Income**—Deferred income arises in the normal course of business from advance subscription payments for newspapers, interactive advertising sales and prepaid ticket revenue related to the Chicago Cubs. Deferred income is recognized in the period it is earned.

**Employee Stock Ownership Plan ("ESOP")**—As defined and described in Note 3, on April 1, 2007, the Company established a new ESOP as a long-term employee benefit plan. On that date, the ESOP purchased 8,928,571 shares of the Company's common stock. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the

90

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

30-year life of the loan through its use of annual contributions from the Company to the ESOP and/or distributions paid on the shares of the Company's common stock held by the ESOP. Upon consummation of the Merger (as defined in Note 3), the 8,928,571 shares of the Company's common stock held by the ESOP were converted into 56,521,739 shares of common stock. None of the shares held by the ESOP had been committed for release or allocated to employees at Dec. 30, 2007.

The Company's policy is to present unallocated shares held by the ESOP at book value, net of unearned compensation, and allocated shares at fair value in the Company's consolidated balance sheet. Pursuant to the terms of the ESOP, following the Merger, participants who receive distributions of shares of the Company's common stock can require the Company to repurchase those shares within a specified time period following such distribution. Accordingly, the shares of the Company's common stock held by the ESOP are classified outside of shareholders' equity (deficit), net of unearned compensation, in the Company's consolidated balance sheet. See Note 17 for further information.

**Stock-Based Compensation**—In the first quarter of 2006, the Company adopted FAS No. 123R, "Share-Based Payment," which superseded Accounting Principles Board ("APB") Opinion No. 25, FAS No. 123 and related interpretations. FAS No. 123R requires the Company to expense stock-based compensation in its income statement. Under FAS No. 123R, stock-based compensation cost is measured at the grant date for equity-classified awards and at the end of each reporting period for liability-classified awards based on the estimated fair value of the award. See Note 17 for further information on the Company's adoption of FAS 123R.

The Company granted stock options to employees in 2006 and prior years. The Company used the Black-Scholes option-pricing model to determine the fair value of each stock option it granted. The Black-Scholes model included assumptions regarding dividend yields, expected volatility, expected lives and risk-free interest rates. These assumptions reflected the Company's best estimates, but they involved certain risks, trends and uncertainties, which in some instances were outside of the control of the Company. As a result, if other assumptions had been used, stock-based compensation could have been materially impacted. The Company adopted FAS No. 123R utilizing the modified prospective application method and did not restate prior years. Additional information on the accounting for stock-based compensation in accordance with FAS No. 123R is provided in Note 17.

Prior to the adoption of FAS No. 123R, the Company accounted for its stock-based compensation plans in accordance with APB No. 25 and related interpretations. Under APB No. 25, no compensation expense was recorded because the exercise price of employee stock options equaled the market price of the underlying stock on the date of grant. Under the provisions of APB No. 25, the Company was not required to recognize compensation expense for its Employee Stock Purchase Plan.

91

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Under FAS No. 123, "Accounting for Stock-Based Compensation," as amended by FAS No. 148, compensation cost was measured at the grant date based on the estimated fair value of the award and was recognized as compensation expense over the vesting period. Had compensation cost for the Company's stock-based compensation plans been determined consistent with FAS No. 123 prior to the adoption of FAS No. 123R in 2006, the Company's 2005 net income would have been reduced to the following pro forma amounts (in thousands):

|  | 2005 |
|---|---|
| Net income, as reported | $ 534,689 |
| Less: Pro forma stock-based employee compensation expense, net of tax: | |
| General options | |
| Replacement options | (89,508) |
| Employee Stock Purchase Plan | (1,242) |
| Total pro forma stock-based employee compensation expense, net of tax | (3,361) |
| Pro forma net income | (94,111) |
|  | $ 440,578 |

In determining the pro forma compensation cost under the fair value method of FAS No. 123, using the Black-Scholes option-pricing model, the following weighted average assumptions were used for general awards and replacement options:

|  | 2005 | |
|---|---|---|
|  | General Awards | Replacement Options |
| Risk-free interest rate | 3.7% | 3.3% |
| Expected dividend yield | 1.8% | 1.8% |
| Expected stock price volatility | 28.1% | 22.8% |
| Expected life (in years) | 5 | 3 |
| Weighted average fair value | $ 10.49 | $ 6.96 |

On June 24, 2005, the Company accelerated the vesting of certain stock options granted on Feb. 11, 2003 and Feb. 10, 2004, totaling 2.4 million in each year. Unvested stock options awarded to the then current executive officers of the Company on these grant dates, which aggregated .8 million and .6 million, respectively, were not accelerated at that time. On Dec. 16, 2005, the Company accelerated the vesting of all stock options granted on Feb. 8, 2005, totaling 3.5 million, and the remaining unvested stock options granted to the then current executive officers of the Company on Feb. 11, 2003 and Feb. 10, 2004, totaling .4 million in both years. No other terms and conditions of the stock option grants were changed.

In accordance with APB No. 25 and related interpretations, the acceleration of vesting of these stock options did not require accounting recognition in the Company's income statement. The exercise prices of the 2003, 2004 and 2005 grants were $45.90, $52.05 and $40.59, respectively, and the Company's closing stock prices on the June 24, 2005 and Dec. 16, 2005 dates of acceleration were $35.64 and $30.80, respectively. The impact of the accelerated vesting was to increase pro forma stock-based compensation by $82 million, or $50 million net of tax, in 2005.

The accelerated vesting of these stock options was one of several actions taken by the Company in 2004 and 2005 to reduce the stock-based compensation expense that would have otherwise been recorded with the adoption of FAS No. 123R. The Company reduced the number of stock options granted in 2004 and 2005 by approximately 45%. Also, beginning in 2004, option grants had 8-year terms, down from 10 years for grants in previous years, and did not have a replacement option feature.

92

## TRIBUNE COMPANY AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**Income Taxes**—Provisions for federal and state income taxes are calculated on reported pretax earnings based on current tax laws and also include, in the current period, the cumulative effect of any changes in tax rates from those used previously in determining deferred tax assets and liabilities. Taxable income reported to the taxing jurisdictions in which the Company operates often differs from pretax earnings because some items of income and expense are recognized in different time periods for income tax purposes. The Company provides deferred taxes on these temporary differences in accordance with FAS No. 109, "Accounting for Income Taxes." Taxable income also may differ from pretax earnings due to statutory provisions under which specific revenues are exempt from taxation and specific expenses are not allowable as deductions. The Company establishes reserves for income tax when it is probable that one or more of the taxing authorities will challenge and disallow a position taken by the Company in its income tax returns and the resulting liability is estimable. The consolidated tax provision and related accruals include estimates of the potential taxes and related interest as deemed appropriate. These estimates are reevaluated and adjusted, if appropriate, on a quarterly basis. Although management believes its estimates and judgments are reasonable, the resolutions of the Company's tax issues are unpredictable and could result in tax liabilities that are significantly higher or lower than that which has been provided by the Company.

On Jan. 1, 2007, the Company adopted the provisions of FASB Interpretation ("FIN") No. 48, "Accounting for Uncertainty in Income Taxes." FIN 48 addresses the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. Under FIN 48, a company may recognize the tax benefit of an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. FIN 48 requires the tax benefit recognized in the financial statements to be measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods and disclosure. See Note 14 for further discussion of the Company's adoption of FIN 48.

**Comprehensive Income**—Comprehensive income consists of net income and other gains and losses affecting shareholders' equity that, under accounting principles generally accepted in the United States of America, are excluded from net income. Prior to 2007, the Company's other comprehensive income (loss) primarily included gains and losses on marketable securities classified as available-for-sale and the change in minimum pension liabilities. Beginning in the Company's 2007 fiscal year, and as a result of the Company's adoption of FAS No. 158 as of Dec. 31, 2006, other comprehensive income (loss) no longer includes the change in minimum pension liabilities, but does include changes in unrecognized benefit cost gains and losses. In addition, beginning in the Company's 2007 third quarter, other comprehensive income (loss) includes gains and losses on cash flow hedging instruments as a result of the interest rate swap agreements the Company entered into in July 2007 (see Note 10 for further information on the Company's interest rate swap agreements). The Company's comprehensive income (loss) is summarized in Note 18.

**New Accounting Standards**—In September 2006, the FASB issued FASB Statement No. 157, "Fair Value Measurements," ("FAS No. 157"), which defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements. In February 2008, the FASB issued Staff Position No. 157-2 which defers the effective date of FAS No. 157 for all nonfinancial assets and liabilities, except those items recognized or disclosed at fair value on an annual or more frequently recurring basis, until one year after the adoption of FAS No. 157. The provisions of FAS No. 157, as amended, are effective for financial statements issued for fiscal years beginning after Nov. 15, 2007 and interim periods beginning within these fiscal years. Accordingly, the Company will be required to adopt FAS No. 157 in the first quarter of 2008. The Company is currently evaluating the impact of adopting FAS No. 157 on its consolidated financial statements.

In February 2007, the FASB issued FASB Statement No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities ("FAS No. 159"). FAS No. 159 permits entities to choose to measure many

93

## TRIBUNE COMPANY AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

financial instruments and certain other items at fair value. Unrealized gains and losses on items for which the fair value option has been elected will be recognized in earnings at each subsequent reporting date. The provisions of FAS No. 159 are effective for financial statements issued for fiscal years beginning after Nov. 15, 2007 and interim periods beginning within these fiscal years. Accordingly, the Company will become subject to the provisions of FAS No. 159 in the first quarter of 2008. The Company is currently evaluating the impact of adopting FAS No. 159 on its consolidated financial statements.

In December 2007, the FASB issued FASB Statement No. 160, "Noncontrolling Interests in Consolidated Financial Statements, an Amendment of ARB No. 51" ("FAS No. 160"), which provides accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. It clarifies that an ownership interest in a subsidiary should be reported as a separate component of equity in the consolidated financial statements, requires consolidated net income to be reported at amounts that include the amounts attributable to both the parent and the noncontrolling interest and provides for expanded disclosures in the consolidated financial statements. FAS No. 160 is effective for financial statements issued for fiscal years beginning after Dec. 15, 2008 and interim periods beginning within these fiscal years. The Company is currently evaluating the impact of adopting FAS No. 160 on its consolidated financial statements.

## NOTE 2: CHANGES IN OPERATIONS AND NON-OPERATING ITEMS

**Acquisitions**—The Company had no significant acquisitions in 2007, 2006 and 2005. The results of acquired companies are included in the consolidated statements of income since their respective dates of acquisition.

**Supplemental Cash Flow Information**—Information for acquisitions made in 2007, 2006 and 2005 is summarized in the table below (in thousands):

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Fair value of assets acquired(1) | $ 15,801 | $ 48,144 | $ 4,207 |
| Liabilities assumed | — | — | — |
| Net cash paid | $ 15,801 | $ 48,144 | $ 4,207 |

(1) Includes intangible assets, net of acquisition-related deferred taxes.

94

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Cash paid (received) for interest and income taxes in 2007, 2006 and 2005 is summarized below (in thousands):

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Interest | $ 511,792 | $ 238,894 | $ 134,955 |
| Income taxes(1) | $ (183,643) | $ 408,507 | $ 1,157,243 |

(1) In 2005, the Company paid $880 million to the Internal Revenue Service, representing the federal tax and interest owed as a result of an unfavorable Tax Court ruling on the Matthew Bender and Mosby transactions. In 2007, the Company received a refund of $344 million of federal tax and interest as a result of settling its appeal of the Tax Court ruling (see Note 14).

**Change in Control Payments**—On Dec. 20, 2007, the Company consummated the Merger, as defined and described in the discussion of the Leveraged ESOP Transactions in Note 3. As a result, the Company was required to make payments pursuant to change in control provisions contained in certain of the Company's deferred compensation, incentive compensation and company-sponsored pension plans. The Company recorded a $64 million pretax charge in the fourth quarter of 2007, including $53 million related to the cash settlement of its outstanding stock-based awards and $3 million of early termination payments made pursuant to the Management Equity Incentive Plan (see Note 17), related to these change in control payments. This $64 million pretax charge is included in selling, general and administrative expenses in the Company's consolidated statement of income for the year ended Dec. 30, 2007.

**Consolidation of *Los Angeles Times'* Production Operations**—In December 2005, the *Los Angeles Times* announced it would close its San Fernando Valley printing facility in January 2006 and consolidate production at its remaining three facilities in Los Angeles, Costa Mesa, and Irwindale, California. The closing of the printing facility resulted in the elimination of approximately 120 positions from across the *Los Angeles Times'* production facilities.

As a result of the facility closing, the Company recorded a $2 million pretax charge in the fourth quarter of 2005 to reduce the carrying value of the San Fernando Valley printing facility's land and building to $24 million, representing the estimated fair value of the assets less costs to sell the assets. On Oct. 30, 2006, the Company sold the San Fernando Valley land and building for net proceeds of approximately $24 million.

The Company evaluated the machinery and equipment at the San Fernando Valley printing facility and determined that press and other related equipment with a net book value of $16 million would be abandoned. Therefore, the Company reduced its estimate of the useful life of the press and other related equipment and recorded accelerated depreciation of $16 million in the fourth quarter of 2005. The Company idled the remaining San Fernando Valley machinery and equipment, which had a net book value of $26 million at Dec. 31, 2006 and $34 million at Dec. 25, 2005. Since the time of the facility closing, the Company continued to depreciate and evaluate alternative uses of the idled assets. In the fourth quarter of 2006, the Company disposed of and wrote off $4 million of the idled equipment that had previously been designated for redeployment at Dec. 25, 2005. During the second quarter of 2007, the Company decided to dispose of the remaining idled assets and recorded a charge of $24 million to reduce the carrying value of the assets to estimated fair value, less costs to sell. The remaining idled assets were sold in the third quarter of 2007 for net proceeds of approximately $1 million.

**Acquisition of Additional Equity in CareerBuilder, ShopLocal and Topix**—In August 2006, the Company completed its acquisition of additional equity interests in each of CareerBuilder, LLC, ShopLocal, LLC and Topix, LLC for an aggregate purchase price of $155 million. The negotiated equity purchases followed the exercise of call options by the Company and Gannett Co., Inc. on Knight-Ridder, Inc.'s equity ownership in the three online businesses after The McClatchy Co., Inc's announcement of its proposed acquisition of Knight-Ridder, Inc. As a result of this transaction, the Company and Gannett Co., Inc. each increased their respective ownership of CareerBuilder, LLC and ShopLocal, LLC to 42.5% with The McClatchy Co., Inc. retaining a 15%

95

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

interest in both entities. In addition, as a result of this transaction and subsequent funding in 2006, the ownership of Topix, LLC is approximately 33.7% for both the Company and Gannett Co., Inc., 11.9% for The McClatchy Co., Inc. and 20.7% for management of Topix, LLC.  In May 2007, Microsoft Corporation acquired a 4% equity interest in CareerBuilder, LLC, thereby reducing the respective ownership interest of the Company and Gannett Co., Inc. to 40.8% and The McClatchy Co., Inc. to 14.4%.

**Employee Reductions**—The Company reduced its staffing levels by approximately 700 positions in 2007 and recorded a pretax charge of $55 million ($40 million at publishing and $15 million at corporate). In 2006, the Company reduced its staffing levels by approximately 450 positions, primarily at publishing, and recorded a pretax charge of $9 million. The eliminations in 2006 included approximately 100 positions and a pretax charge of approximately $1 million related to discontinued operations. In 2005, the Company reduced its staffing levels by approximately 900 positions and recorded a pretax charge of $45 million ($43 million at publishing, $1 million at broadcasting and entertainment and $1 million at corporate). The eliminations in 2005 included 120 positions as a result of closing the *Los Angeles Times'* San Fernando Valley printing facility, as discussed above. The Company had a current liability of approximately $21 million at Dec. 30, 2007 and $7 million at Dec. 31, 2006 related to these employee reductions.

**Non-Operating Items**—Fiscal years 2007, 2006 and 2005 included several non-operating items.

Non-operating items for 2007 are summarized as follows (in thousands):

| | Proceeds | Pretax Gain (Loss) | After-tax Gain (Loss) |
|---|---|---|---|
| Loss on change in fair values of derivatives and related investments | $ — | $ (96,806) | $ (59,051) |
| Strategic transaction expenses | — | (85,131) | (77,184) |
| Gain on TMCT transactions | 73,706 | 8,003 | 4,882 |
| Gain on other investment transactions, net | 3,111 | 31,578 | 5,465 |
| Other, net | 11,557 | 5,137 | 1,183 |
| Income tax adjustment | — | — | 90,704 |
| Total non-operating items | $ 88,374 | $ (137,219) | $ (34,001) |

The 2007 change in the fair values of derivatives and related investments pertained entirely to the Company's PHONES and related Time Warner investment. The $97 million non-cash pretax loss resulted primarily from an $82 million decrease in the fair value of 16 million shares of Time Warner common stock and a $12 million increase in the fair value of the derivative component of the Company's PHONES.

Strategic transaction expenses in 2007 included costs related to the Company's strategic review and the Leveraged ESOP Transactions approved by the Company's board of directors on April 1, 2007.  These expenses included a $13.5 million loss from refinancing certain credit agreements (see Note 10).

The gain on TMCT transactions in 2007 related to the redemption of the Company's remaining interests in TMCT, LLC and TMCT II, LLC (see Note 8).

Other investment transactions resulted in a net pretax gain of $32 million ($5 million after taxes) in 2007. Approximately $28 million of the net pretax gain ($3 million after taxes) resulted from the restructuring of certain investments. These restructured investments were established in 1998 when Times Mirror disposed of its Matthew Bender and Mosby subsidiaries. As a result of the restructuring, the Company will not realize the $25 million of deferred income tax assets relating to tax credits generated by its low income housing investments. The

96

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

tax credits were available only to offset income taxes of certain affiliates. After the restructuring, those affiliates no longer exist and the tax credits are no longer available. Accordingly, the Company has increased its 2007 consolidated income tax expense by $25 million to write-off these deferred income tax assets. After consideration of the $25 million income tax adjustment, the investment restructuring increased 2007 net income by $3 million.

Other, net in 2007 included an $18 million gain from the settlement of the Company's Hurricane Katrina insurance claim that was largely offset by a $15 million charge for the civil forfeiture payment related to *Newsday* and *Hoy*, New York (see Note 5). The favorable income tax adjustment in 2007 related to the settlement of the Company's Matthew Bender and Mosby income tax appeal (see Note 14).

Non-operating items for 2006 are summarized as follows (in thousands):

| | Proceeds | Pretax Gain (Loss) | After-tax Gain (Loss) |
|---|---|---|---|
| Gain on change in fair values of derivatives and related investments | $ — | $ 11,088 | $ 6,764 |
| Strategic transaction expenses | — | (3,466) | (2,520) |
| Gain on TMCT transactions, net | — | 59,596 | 47,988 |
| Gain on other investment transactions, net | 82,903 | 36,732 | 22,339 |
| Other, net | — | (981) | 1,476 |
| Income tax adjustments | — | — | 33,563 |
| Total non-operating items | $ 82,903 | $ 102,969 | $ 109,610 |

The 2006 change in the fair values of derivatives and related investments pertained entirely to the Company's PHONES and related Time Warner investment. The $11 million non-cash pretax gain resulted primarily from a $66 million increase in the fair value of 16 million shares of Time Warner common stock, which was partially offset by a $52 million increase in the fair value of the derivative component of the Company's PHONES.

In 2006, the Company recorded a one-time gain of $48 million, net of tax, as a result of transactions related to its investments in TMCT, LLC and TMCT II, LLC (see Note 8). In addition, the Company sold 2.8 million shares of Time Warner common stock unrelated to the PHONES for net proceeds of $46 million and recorded a pretax gain on sale of $19 million, and sold its investment in BrassRing for net proceeds of $27 million and recorded a pretax gain of $17 million.

Also in 2006, the Company recorded favorable income tax expense adjustments of $34 million, most of which related to the Company's PHONES as a result of reaching an agreement with the Internal Revenue Service appeals office pertaining to the deduction of interest expense on the PHONES (see Note 14).

Non-operating items for 2005 are summarized as follows (in thousands):

| | Proceeds | Pretax Gain | After-tax Gain (Loss) |
|---|---|---|---|
| Gain on change in fair values of derivatives and related investments | $ — | $ 62,184 | $ 37,932 |
| Gain on other investment transactions, net | 17,368 | 6,780 | 4,136 |
| Other, net | 5,166 | 897 | 547 |
| Income tax adjustments | — | — | (138,664) |
| Total non-operating items | $ 22,534 | $ 69,861 | $ (96,049) |

97

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The 2005 change in the fair values of derivatives and related investments pertained entirely to the Company's PHONES and related Time Warner investment. The $62 million non-cash pretax gain resulted primarily from an $87 million decrease in the fair value of the derivative component of the Company's PHONES, which was partially offset by a $23 million decrease in the fair value of 16 million shares of Time Warner common stock.

As a result of the United States Tax Court opinion issued on Sept. 27, 2005 related to the Matthew Bender and Mosby tax dispute, the Company recorded additional income tax expense of $150 million in the third quarter of 2005 (see Note 14). In the first quarter of 2005, the Company reduced its income tax expense and liabilities by a total of $12 million as a result of favorably resolving certain other federal income tax issues.

## NOTE 3: LEVERAGED ESOP TRANSACTIONS

On April 1, 2007, the Company's board of directors (the "Board"), based on the recommendation of a special committee of the Board comprised entirely of independent directors, approved a series of transactions (collectively, the "Leveraged ESOP Transactions") with a newly formed Tribune Employee Stock Ownership Plan (the "ESOP"), EGI-TRB, L.L.C., a Delaware limited liability company (the "Zell Entity") wholly owned by Sam Investment Trust (a trust established for the benefit of Samuel Zell and his family), and Samuel Zell. On Dec. 20, 2007, the Company completed the Leveraged ESOP Transactions which culminated in the cancellation of all issued and outstanding shares of the Company's common stock as of that date, other than shares held by the Company or the ESOP, and the Company becoming wholly owned by the ESOP. The Company has accounted for these transactions as a leveraged recapitalization and, accordingly, has maintained a historical cost presentation in its consolidated financial statements.

The Leveraged ESOP Transactions consisted of a series of transactions that included the following:

- On April 1, 2007, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust which forms a part of the ESOP, Tesop Corporation, a Delaware corporation wholly owned by the ESOP ("Merger Sub"), and the Zell Entity (solely for the limited purposes specified therein) providing for Merger Sub to be merged with and into the Company, and following such merger, the Company to continue as the surviving corporation wholly owned by the ESOP (the "Merger").

- On April 1, 2007, the ESOP purchased 8,928,571 shares of the Company's common stock from the Company at a price of $28.00 per share. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from the Company to the ESOP and/or distributions paid on the shares of the Company's common stock held by the ESOP. Upon consummation of the Merger (as described below), the 8,928,571 shares of the Company's common stock held by the ESOP were converted into 56,521,739 shares of common stock and represent the only outstanding shares of capital stock of the Company after the Merger. None of the shares held by the ESOP had been committed for release or allocated to employees at Dec. 30, 2007.

- On April 23, 2007, pursuant to a purchase agreement dated April 1, 2007 (the "Zell Entity Purchase Agreement"), the Zell Entity made an initial investment of $250 million in the Company in exchange for (1) 1,470,588 shares of the Company's common stock at a price of $34.00 per share and (2) an unsecured subordinated exchangeable promissory note of the Company in the principal amount of $200 million, which the Company repaid immediately prior to the Merger (as described below).  Pursuant to

98

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENT(Continued)**

the Zell Entity Purchase Agreement, on May 9, 2007, Mr. Zell was appointed as a member of the Board.

On April 25, 2007, the Company commenced a tender offer to repurchase up to 126 million shares of the Company's common stock that were then outstanding at a price of $34.00 per share in cash (the "Share Repurchase"). The tender offer expired on May 24, 2007 and 126 million shares of the Company's common stock were repurchased and subsequently retired on June 4, 2007 utilizing proceeds from the Credit Agreement (as defined in the "New Credit Agreements" section contained in Note 10).

The Company granted registration rights to Chandler Trust No. 1 and Chandler Trust No. 2 (together, the "Chandler Trusts"), which were significant shareholders of the Company prior to the Company's entry into the Leveraged ESOP Transactions. On April 25, 2007, the Company filed a shelf registration statement in connection with the registration rights granted to the Chandler Trusts.

On June 4, 2007, the Chandler Trusts entered into an underwriting agreement with Goldman, Sachs & Co. ("Goldman Sachs") and the Company, pursuant to which the Chandler Trusts agreed to sell an aggregate of 20,351,954 shares of the Company's common stock, which represented the remainder of the shares of the Company's common stock owned by them following the Share Repurchase, through a block trade underwritten by Goldman Sachs. The shares were offered pursuant to the shelf registration statement filed by the Company on April 25, 2007. Following the closing of this transaction, the Chandler Trusts no longer owned any shares of the Company's common stock. On June 4, 2007, Jeffrey Chandler, Roger Goodan and William Stinehart, Jr. resigned as members of the Board. Messrs. Chandler, Goodan and Stinehart served on the Board as representatives of the Chandler Trusts, which agreed to cause the resignations of Messrs. Chandler, Goodan and Stinehart effective upon the consummation of the Share Repurchase.

On Dec. 20, 2007, the Company completed its merger with Merger Sub, with the Company surviving the Merger. Pursuant to the terms of the Merger Agreement, each share of common stock of the Company, par value $0.01 per share, issued and outstanding immediately prior to the Merger, other than shares held by the Company, the ESOP or Merger Sub immediately prior to the Merger (in each case, other than shares held on behalf of third parties) and shares held by shareholders who validly exercised appraisal rights, was cancelled and automatically converted into the right to receive $34.00, without interest and less any applicable withholding taxes, and the Company became wholly owned by the ESOP.

In the Merger, the Zell Entity received cash for the shares of the Company's common stock it had acquired pursuant to the Zell Entity Purchase Agreement and the Company repaid the exchangeable promissory note held by the Zell Entity including approximately $6 million of accrued interest. In addition, the Company paid to the Zell Entity a total of $5 million in legal fee reimbursements, of which $2.5 million was previously paid following the Share Repurchase described above. Following the consummation of the Merger, the Zell Entity purchased from the Company, for an aggregate of $315 million, a $225 million subordinated promissory note and a 15-year warrant. For accounting purposes, the subordinated promissory note and 15-year warrant were recorded at fair value based on the relative fair value method. The warrant entitles the Zell Entity to purchase 43,478,261 shares of the Company's common stock (subject to adjustment), which represents approximately 40% of the economic equity interest in the Company following the Merger (on a fully-diluted basis, including after giving effect to share equivalents granted under a new management equity incentive plan which is described in Note 17). The warrant has

99

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENT(Continued)**

an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years of the warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). Thereafter, the Zell Entity assigned minority interests in the subordinated promissory note and the warrant to certain permitted assignees. See Part III, Items 12 and 13, hereof for further information on the assignment of the minority interests in the subordinated promissory note and the warrant.

On Dec. 20, 2007, the Company notified the New York Stock Exchange (the "NYSE") that the Merger was consummated. The Company requested that the Company's common stock (and associated Series A junior participating preferred stock purchase rights) be suspended from the NYSE, effective as of the close of the market on Dec. 20, 2007, and that the NYSE file with the Securities and Exchange Commission an application on Form 25 to report that the shares of the Company's common stock and associated Series A junior participating preferred stock purchase rights are no longer listed on the NYSE.

The Company currently intends to dispose of an interest in the Chicago Cubs and the Company's 25% equity interest in Comcast SportsNet Chicago. The Company currently expects that proceeds from such dispositions will be used to pay down Company debt. The disposition of an interest in the Cubs is subject to the approval of Major League Baseball.

## NOTE 4: DISCONTINUED OPERATIONS AND ASSETS HELD FOR SALE

**Sales of *Hoy*, New York, SCNI and Recycler**—On Feb. 12, 2007, the Company announced an agreement to sell *Hoy*, New York to ImpreMedia, LLC. The Company completed the sale of *Hoy*, New York on May 15, 2007 and recorded a pretax gain on the sale of $2.5 million ($.1 million after taxes) in the second quarter of 2007. On March 6, 2007, the Company announced an agreement to sell SCNI to Gannett Co., Inc. On May 25, 2007, the Company announced the termination of this agreement following an arbitrator's ruling that the Company could not sell SCNI unless Gannett Co., Inc. assumed an existing collective bargaining contract as a condition of the sale, which Gannett Co., Inc. declined to do. The Company simultaneously announced that it would immediately begin the process of soliciting offers for SCNI with the intention of completing a sale as soon as possible. On Oct. 25, 2007, the Company announced an agreement to sell SCNI to Hearst Corporation for $62.4 million. The sale of SCNI closed on Nov. 1, 2007, and excluded the SCNI real estate in Stamford and Greenwich, Connecticut, which the Company plans to sell separately. In the first quarter of 2007, the Company recorded a pretax loss of $19 million ($33 million after taxes) to write down the net assets of SCNI to estimated fair value, less costs to sell. In the third quarter of 2007, the Company recorded a favorable $3 million after-tax adjustment to the loss on the sale of SCNI. During the third quarter of 2007, the Company began actively pursuing the sale of the stock of Recycler to Target Media Partners. Recycler publishes a collection of free classified newspapers in Southern California. The sale of Recycler closed on Oct. 17, 2007. The Company recorded a pretax loss on the sale of the stock of Recycler of $1 million in the third quarter of 2007. Due to the Company's high tax basis in the Recycler stock, the sale generated a significantly higher capital loss for income tax purposes. As a result, the Company recorded a $65 million income tax benefit in the third quarter of 2007, resulting in an after-tax gain of $64 million.

These businesses were considered components of the Company's publishing segment as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company. The operations and cash flows of these businesses have been eliminated from the ongoing operations of the Company as a result of the sales, and the Company will not have any significant continuing involvement in their operations. Accordingly, the results of operations for each of these businesses are reported as discontinued operations in the consolidated statements of income. Prior year consolidated statements of income have been reclassified to conform to the current year presentation of these businesses as discontinued operations.

100

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENT(Continued)**

**Sales of WATL-TV, Atlanta, WCWN-TV, Albany and WLVI-TV, Boston**—On June 5, 2006, the Company announced the sale of WATL-TV, Atlanta to Gannett Co., Inc. for $180 million. The sale closed on Aug. 7, 2006. On June 19, 2006, the Company announced the sale of WCWN-TV, Albany to Freedom Communications, Inc. for $17 million. The sale closed on Dec. 6, 2006. On Sept. 14, 2006, the Company announced the sale of WLVI-TV, Boston, to Sunbeam Television Corp. for $113.7 million. The sale closed on Dec. 19, 2006.

These businesses were considered components of the Company's broadcasting and entertainment segment as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company. The operations and cash flows of these businesses have been eliminated from the ongoing operations of the Company as a result of the sales, and the Company will not have any significant continuing involvement in their operations. Accordingly, the results of operations of each of these businesses have been reported as discontinued operations in the consolidated statements of income. Prior year consolidated statements of income were reclassified to conform to the presentation of these businesses as discontinued operations.

In conjunction with the sales of WATL-TV, Atlanta and WCWN-TV, Albany, the Company recorded in the second quarter of 2006 a pretax loss totaling $90 million to write down the net assets of the stations to estimated fair value, less costs to sell. The Company subsequently reduced the pretax loss on the sales of the Atlanta and Albany stations during the third quarter of 2006 by $1 million. In addition, the Company recorded in the fourth quarter of 2006 a pretax gain of $41 million for the sale of the Boston station. The net pretax loss on the sales of the three stations sold during 2006 was $48 million.

**Summarized Financial Information**—Selected financial information related to discontinued operations for 2007, 2006 and 2005 is summarized as follows (in thousands):

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Operating revenues | $ 49,441 | $ 139,014 | $ 168,771 |
| Operating profit (loss)(1) | $ (2,482) | $ 2,549 | $ 25,564 |
| Loss on sales of discontinued operations | (21,220) | (48,238) | — |
| Income (loss) from discontinued operations before income taxes | (23,702) | (45,689) | 25,564 |
| Income taxes(2) | 55,309 | (21,489) | (10,259) |
| Income (loss) from discontinued operations, net of tax | $ 31,607 | $ (67,178) | $ 15,305 |

(1) Operating profit for 2006 included $6 million of severance and related charges incurred as a result of the sales of the three television stations.

(2) Income taxes for 2007 included a $65 million income tax benefit from the sale of Recycler, as the Company's high tax basis in the Recycler stock generated a significantly higher capital loss for income tax purposes. Income taxes for 2006 included an income tax benefit of only $12 million related to the $89 million pretax loss on sales of the Atlanta and Albany stations. The pretax loss included $80 million of allocated television group goodwill, most of which is not deductible for income tax purposes. Income taxes for 2006 also included a tax expense of $32 million related to the $41 million pretax gain on sale of the Boston station. The pretax gain included $45 million of allocated television group goodwill, most of which is not deductible for income tax purposes.

**Assets Held for Sale**—During the third quarter of 2007, the Company commenced a process to sell the real estate and related assets of its studio production lot located in Hollywood, California. Accordingly, the $23 million carrying value of the land, building and equipment of the studio production lot is included in assets held for sale at Dec. 30, 2007. The sale of the studio production lot closed on Jan. 30, 2008 and the Company received net proceeds of approximately $121 million. Simultaneous with the closing of the sale, the Company entered into a five-year operating lease for a portion of the studio production lot currently utilized by the Company's KTLA-TV station. The sale resulted in a total pretax gain of approximately $98 million. The pretax gain related to the portion of the studio production lot currently utilized by the Company's KTLA-TV station is approximately $13 million and will be amortized as reduced rent expense over the five-year life of the related operating lease. The remaining pretax gain of $85 million will be recorded in income in the first quarter of 2008.

101

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENT(Continued)**

As noted above, the Company plans to sell the SCNI real estate in Stamford and Greenwich, Connecticut and as such, the $5 million carrying value is included in assets held for sale at Dec. 30, 2007. In December 2006, the Company entered into a non-binding agreement to sell the land and building of one of its other facilities. The $5 million carrying value of the land and building approximates fair value less costs to sell and is also included in assets held for sale at Dec. 30, 2007 and at Dec. 31, 2006.

In February 2007, the Company sold its interactive program guide assets, including software and a portfolio of patents (collectively the "IPG intellectual property"). The $4 million carrying value of the intangible assets related to the IPG intellectual property had been included in assets held for sale at Dec. 31, 2006. The Company received net proceeds of approximately $10 million and recorded a pretax gain on sale of approximately $6 million in the first quarter of 2007.

## NOTE 5: *NEWSDAY* AND *HOY*, NEW YORK CHARGE

In February 2004, a purported class action lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* and *Hoy*, New York, alleging that they were overcharged for advertising as a result of inflated circulation numbers at these two publications. The purported class action also alleges that entities that paid a *Newsday* subsidiary to deliver advertising flyers were overcharged. The Company is vigorously defending this suit. In July 2004, another lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* alleging damages resulting from inflated *Newsday* circulation numbers as well as federal and state antitrust violations. On Feb. 11, 2008, this suit was settled with all defendants.

On June 17, 2004, the Company publicly disclosed that it would reduce its reported circulation for both *Newsday* and *Hoy*, New York for the 12-month period ending Sept. 30, 2003 and the six-month period ending March 31, 2004. The circulation adjustments were the result of a review of reported circulation at *Newsday* and *Hoy*, New York, conducted by the Company's internal audit staff and the Audit Bureau of Circulations ("ABC"). Subsequent to the June 17th disclosure, the Company continued its internal review and found additional misstatements for these time periods, as well as misstatements that impacted the 12-month period ending Sept. 30, 2002. On Sept. 10, 2004, the Company announced additional revisions to the circulation figures for *Newsday* and *Hoy*, New York, for the 12-month period ending Sept. 30, 2003 and the six-month period ending March 31, 2004.

As a result of the misstatements of reported circulation at *Newsday* and *Hoy*, New York, the Company recorded a total pretax charge of $90 million in 2004 as its estimate of the probable cost to settle with advertisers. Approximately $80 million of the charge pertained to *Newsday* and is included in selling, general and administrative expenses in 2004. The remaining $10 million pertained to *Hoy*, New York and is reflected in discontinued operations in 2004. In the fourth quarter of 2007, the Company recorded an additional pretax charge of $3 million pertaining to *Newsday*. The Company will continue to evaluate the adequacy of the advertiser settlement accrual on an ongoing basis.

A summary of the activity with respect to the *Newsday* and *Hoy*, New York, advertiser settlement accrual is as follows (in millions):

| | | |
|---|---|---:|
| Advertiser settlement accrual balance at Dec. 26, 2004 | $ | 49 |
| 2005 payments | | (34) |
| Advertiser settlement accrual balance at Dec. 25, 2005 | | 15 |
| 2006 payments | | (8) |
| Advertiser settlement accrual balance at Dec. 31, 2006 | | 7 |
| 2007 accrual increase | | 3 |
| 2007 payments | | (1) |
| Advertiser settlement accrual balance at Dec. 30, 2007 | $ | 9 |

102

http://www.sec.gov/Archives/edgar/data/726513/000110465908018845/...

## TRIBUNE COMPANY AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENT(Continued)

In addition to the advertiser lawsuits, several class action and shareholder derivative suits were filed against the Company and certain of its current and former directors and officers as a result of the circulation misstatements at *Newsday* and *Hoy*, New York. These suits alleged breaches of fiduciary duties and other managerial and director failings under Delaware law, the federal securities laws and ERISA. The consolidated shareholder derivative suit filed in Illinois state court in Chicago was dismissed with prejudice on March 10, 2006. The appeal of this dismissal to the Illinois State Court of Appeals was voluntarily dismissed by the plaintiff following the closing of the Company's going private transaction. The consolidated securities class action lawsuit and the consolidated ERISA class action lawsuit filed in Federal District Court in Chicago were both dismissed with prejudice on Sept. 29, 2006, and the dismissals are currently being appealed to the United States Court of Appeals for the Seventh Circuit. Oral arguments of the consolidated securities and ERISA class action appeals were heard on Jan. 23, 2008. The Company continues to believe these suits are without merit and will continue to vigorously defend them.

On May 30, 2006, the Securities and Exchange Commission ("SEC") concluded its inquiry into circulation practices at *Newsday* and *Hoy*, New York. In closing its inquiry, the SEC ordered the Company to cease and desist from violating statutory provisions related to its record keeping and reporting. No fines or other sanctions were levied against the Company. The Company consented to the order without admitting or denying any of the Commission's findings. The SEC acknowledged the prompt internal investigation and remedial acts undertaken by the Company and the cooperation the Company afforded the Commission's staff throughout its investigation.

On Dec. 17, 2007, *Newsday* and *Hoy*, New York reached a non-prosecution agreement with the United States Attorneys' Office for the Eastern District of New York that ended the federal inquiry into the circulation practices of *Newsday* and *Hoy*, New York. The agreement recognized *Newsday's* and *Hoy*, New York's full cooperation with the investigation; the implementation of new practices and procedures to prevent fraudulent circulation practices, the payment of approximately $83 million in restitution to advertisers, and a civil forfeiture payment of $15 million, which is available for additional restitution. The $15 million civil forfeiture payment is included in 2007 non-operating expense (see Note 2). Nine former employees and contractors of *Newsday* and *Hoy*, New York have pleaded guilty to various criminal charges in connection with the fraudulent circulation practices uncovered by the Company. They are awaiting the imposition of sentence.

### NOTE 6: INVENTORIES

Inventories consisted of the following (in thousands):

|  | Dec. 30, 2007 | | Dec. 31, 2006 | |
|---|---|---|---|---|
| Newsprint | $ | 28,664 | $ | 28,629 |
| Supplies and other | | 12,011 | | 12,333 |
| Total inventories | $ | 40,675 | $ | 40,962 |

Newsprint inventories valued under the LIFO method were less than current cost by approximately $10 million at Dec. 30, 2007 and $15 million at Dec. 31, 2006.

103

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

## NOTE 7: GOODWILL AND OTHER INTANGIBLE ASSETS

Goodwill and other intangible assets at Dec. 30, 2007 and Dec. 31, 2006 consisted of the following (in thousands):

| | Dec. 30, 2007 | | | Dec. 31, 2006 | | |
|---|---|---|---|---|---|---|
| | Gross Amount | Accumulated Amortization | Net Amount | Gross Amount | Accumulated Amortization | Net Amount |
| **Intangible assets subject to amortization** | | | | | | |
| Subscribers (useful life of 15 to 20 years) | $ 189,879 | $ (81,698) | $ 108,181 | $ 190,660 | $ (72,126) | $ 118,534 |
| Network affiliation agreements (useful life of 40 years)(1) | 278,034 | (29,552) | 248,482 | 278,034 | (22,614) | 255,420 |
| Other (useful life of 3 to 40 years) | 25,381 | (11,707) | 13,674 | 25,128 | (8,717) | 16,411 |
| Total | $ 493,294 | $ (122,957) | 370,337 | $ 493,822 | $ (103,457) | 390,365 |
| **Goodwill and other intangible assets not subject to amortization** | | | | | | |
| Goodwill | | | | | | |
| Publishing | | | 4,138,685 | | | 4,395,967 |
| Broadcasting and entertainment | | | 1,441,241 | | | 1,441,241 |
| Total goodwill | | | 5,579,926 | | | 5,837,208 |
| Newspaper mastheads | | | 1,412,937 | | | 1,575,814 |
| FCC licenses | | | 871,946 | | | 871,946 |
| Tradename | | | 7,932 | | | 7,932 |
| Total | | | 7,872,741 | | | 8,292,900 |
| Total goodwill and other intangible assets | | | $ 8,243,078 | | | $ 8,683,265 |

(1)  Network affiliation agreements, net of accumulated amortization, included $174 million related to Fox affiliations, $72 million related to CW affiliations and $3 million related to MyNetworkTV affiliations as of Dec. 30, 2007.

104

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

The changes in the carrying amounts of intangible assets during the years ended Dec. 30, 2007 and Dec. 31, 2006 were as follows (in thousands):

| | Publishing | | Broadcasting and Entertainment | | Total | |
|---|---:|---|---:|---|---:|---|
| **Intangible assets subject to amortization** | | | | | | |
| Balance as of Dec. 25, 2005 | $ | 85,223 | $ | 334,100 | $ | 419,323 |
| Amortization expense | | (8,208) | | (11,555) | | (19,763) |
| Assets held for sale, net (IPG intellectual property) | | (4,002) | | — | | (4,002) |
| Amortizable intangibles acquired during year | | 6,452 | | — | | 6,452 |
| Sales of discontinued operations (see Note 4) | | (50) | | (11,595) | | (11,645) |
| Balance as of Dec. 31, 2006 | $ | 79,415 | $ | 310,950 | $ | 390,365 |
| Amortization expense | | (8,315) | | (11,518) | | (19,833) |
| Amortizable intangibles acquired during year | | 380 | | — | | 380 |
| Sales of discontinued operations (see Note 4) | | (575) | | — | | (575) |
| Balance as of Dec. 30, 2007 | $ | 70,905 | $ | 299,432 | $ | 370,337 |
| | | | | | | |
| **Goodwill** | | | | | | |
| Balance as of Dec. 25, 2005 | $ | 4,380,483 | $ | 1,566,659 | $ | 5,947,142 |
| Goodwill acquired during year | | 45,477 | | — | | 45,477 |
| Sales of discontinued operations (see Note 4) | | — | | (125,418) | | (125,418) |
| Adjustment for tax resolutions(1) | | (28,186) | | — | | (28,186) |
| Other | | (1,807) | | — | | (1,807) |
| Balance as of Dec. 31, 2006 | $ | 4,395,967 | $ | 1,441,241 | $ | 5,837,208 |
| Goodwill acquired during year | | 15,801 | | — | | 15,801 |
| Sales of discontinued operations (see Note 4) | | (48,993) | | — | | (48,993) |
| Adjustment related to settlement of Matthew Bender and Mosby Tax Court appeal (see Note 14) | | (224,149) | | — | | (224,149) |
| Other | | 59 | | — | | 59 |
| Balance as of Dec. 30, 2007 | $ | 4,138,685 | $ | 1,441,241 | $ | 5,579,926 |
| | | | | | | |
| **Other intangible assets not subject to amortization** | | | | | | |
| Balance as of Dec. 25, 2005 | $ | 1,583,746 | $ | 1,084,654 | $ | 2,668,400 |
| Sales of discontinued operations (see Note 4) | | — | | (212,708) | | (212,708) |
| Balance as of Dec. 31, 2006 | $ | 1,583,746 | $ | 871,946 | $ | 2,455,692 |
| Sales of discontinued operations (see Note 4) | | (32,877) | | — | | (32,877) |
| Write-down of newspaper masthead assets | | (130,000) | | — | | (130,000) |
| Balance as of Dec. 30, 2007 | $ | 1,420,869 | $ | 871,946 | $ | 2,292,815 |
| Total goodwill and other intangibles as of Dec. 30, 2007 | $ | 5,630,459 | $ | 2,612,619 | $ | 8,243,078 |

(1) Adjustment for the resolution of uncertain income tax positions related to the Times Mirror Company acquisition.

In the fourth quarter of 2007, the Company recorded a pretax impairment charge of $130 million ($79 million after taxes) related to one of its newspaper masthead intangible assets in connection with its annual impairment review under FAS No. 142. This impairment was primarily due to a decrease in actual and projected newspaper advertising revenues as a result of the continued difficult advertising environment.

On March 13, 2008, the Company filed an election to be treated as a subchapter S Corporation under the Internal Revenue Code, which election is effective as of the beginning of the Company's 2008 fiscal year. As a result, essentially all of the Company's net deferred tax liabilities will be eliminated and such adjustment will be recorded as a reduction in the Company's provision for income taxes in the first quarter of 2008. This adjustment will increase the carrying values of the Company's reporting units. The Company has experienced declines in its

### TRIBUNE COMPANY AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

consolidated operating results during 2007 as compared to the prior year, particularly in its publishing reporting unit. Adverse changes in expected operating results and/or unfavorable changes in other economic factors used to estimate fair values could result in additional non-cash impairment charges in the future under FAS No. 142. See Note 1 for a description of the Company's accounting policy for measuring impairments of its intangible assets in accordance with FAS No. 142.

Estimated annual amortization expense will be approximately $20 million for each of the next five years, excluding the effects of any acquisitions or dispositions subsequent to Dec. 30, 2007.

### NOTE 8: TMCT and TMCT II

As a result of the Company's acquisition of The Times Mirror Company ("Times Mirror") in 2000, the Company acquired investment interests in TMCT, LLC ("TMCT") and TMCT II, LLC ("TMCT II"). TMCT and TMCT II were formed in 1997 and 1999, respectively, as a result of transactions involving agreements between Times Mirror and its largest shareholders, Chandler Trust No. 1 and Chandler Trust No. 2 (collectively, the "Chandler Trusts"). The Times Mirror acquisition resulted in the Chandler Trusts becoming significant shareholders of the Company. As a result of the Leveraged ESOP Transactions, the Chandler Trusts are no longer shareholders of the Company (see Note 3). The TMCT and TMCT II LLC agreements had no specific term, and the dissolution, determination of liquidation values and distribution of assets required the mutual consent of the Company and the Chandler Trusts. On Sept. 28, 2007, the Company sold its remaining interests in TMCT and TMCT II (as described below).

The collective assets of TMCT and TMCT II as of Dec. 25, 2005 included approximately 51.4 million shares of the Company's common stock and 1.1 million shares of the Company's preferred stock, representing all of the Company's then issued Series C, D-1 and D-2 preferred stock. The TMCT and TMCT II assets also include a variety of fixed income and equity investments. In addition, TMCT owns eight real properties that are leased to the Company. Additional financial information pertaining to TMCT and TMCT II is provided below.

**TMCT Transactions**—On Sept. 21, 2006, the Company and the Chandler Trusts entered into agreements to restructure TMCT and TMCT II. Under the terms of the agreements, the Company received on Sept. 22, 2006, a total of 38.9 million shares of the Company's common stock and all 1.1 million shares of the Company's preferred stock held collectively by TMCT and TMCT II. As a result, the Company's interests in each of TMCT and TMCT II were reduced to approximately 5%. The Sept. 21, 2006 agreements also provided for certain put and call options, which were exercisable at fair market value beginning in September 2007, relating to the Company's remaining ownership interests in TMCT and TMCT II. As a result of the transactions, the Company in the third quarter of 2006 recorded a non-operating gain of $48 million, net of tax; increased its common treasury stock by $161 million and its preferred treasury stock by $107 million; and reduced its combined investment in TMCT and TMCT II by $195 million.

On Oct. 20, 2006, the remaining 12.4 million shares of the Company's common stock held by TMCT and TMCT II were distributed to the Company and the Chandler Trusts in accordance with their respective ownership interests. The Company received 0.6 million shares and the Chandler Trusts received 11.8 million shares.

The Company and the Chandler Trusts shared in the cash flows of the various assets held by TMCT and TMCT II. Prior to the Sept. 22, 2006 transactions, the cash flows from the Tribune common and preferred shares held by TMCT and TMCT II were largely allocated to the Company, while the cash flows from the other assets were largely allocated to the Chandler Trusts. As a result, the Company included in treasury stock 80% of the Tribune common and preferred shares held by TMCT and TMCT II. In addition, 80% of the dividends on the preferred and common shares held by TMCT and TMCT II were effectively eliminated. Following the Sept. 22, 2006 transactions and until the Oct. 20, 2006 distribution, the Company included in treasury stock approximately 5% of the Tribune common shares held by TMCT and TMCT II. As a result of the transactions, the Company no longer has any shares of its Series C, D-1 and D-2 preferred stock outstanding, and the Company's common shares outstanding increased by 1.6 million.

106

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

On Sept. 21, 2007, the Company gave notice of its intent to exercise its put rights with respect to its remaining interests in TMCT and TMCT II. The sale of the Company's remaining interests in TMCT and TMCT II to the Chandler Trusts was consummated on Sept. 28, 2007. The Company received $73.7 million in proceeds from the sale and recorded a non-operating gain of $5 million, net of tax.

**TMCT**—At Dec. 31, 2006, the assets of TMCT included eight real properties ("Real Properties") leased to the Company and a portfolio of fixed income and equity investments ("TMCT Portfolio"). The TMCT assets at Dec. 25, 2005 also included 13 million shares of the Company's common stock and 442,596 shares of the Company's Series C preferred stock (collectively, "TMCT Shares"). As discussed above, all of the TMCT Shares were distributed to the Company and the Chandler Trusts in 2006. TMCT has no outstanding debt. The estimated fair market value of the TMCT Portfolio at Dec. 31, 2006 was $265 million.

The Company has accounted for the Real Properties lease as a property financing obligation in its consolidated balance sheet. In connection with the TMCT restructuring discussed above, the Company and TMCT amended the lease agreement on Sept. 22, 2006. Under the terms of the amended lease, the Company was granted an accelerated option to acquire the eight properties during the month of January 2008 for $175 million. The Company exercised this option on Jan. 29, 2008 and expects to complete this acquisition in April 2008.

Summarized income and expense information for TMCT is shown in the following table for the period of Jan. 1, 2007 through Sept. 28, 2007 and for the years ended Dec. 31, 2006 and Dec. 25, 2005 (in thousands):

| | TMCT Income and Expense Information (unaudited) | | |
|---|---|---|---|
| | Jan. 1, 2007 - Sept. 28, 2007 | Dec. 26, 2005 - Dec. 31, 2006 | Dec. 27, 2004 - Dec. 25, 2005 |
| TMCT Shares dividend income | $         — | $   20,030 | $   26,706 |
| Real Properties lease income | 18,124 | 24,166 | 24,166 |
| TMCT Portfolio interest and dividend income | 8,790 | 12,040 | 9,508 |
| TMCT Portfolio net realized gains | 5,971 | 3,943 | 835 |
| Total | $   32,885 | $   60,179 | $   61,215 |
| TMCT operating expenses | $   (6,809) | $   (8,922) | $   (9,301) |

The Company accounted for its investment in the TMCT Portfolio under the equity method. The Company's investment in TMCT totaled $24 million at Dec. 31, 2006. The Company recognized equity income of $.4 million in 2007 and $2 million in 2006 and 2005 related to the TMCT Portfolio.

**TMCT II**—At Dec. 31, 2006, the assets of TMCT II included a portfolio of fixed income investments that were funded with the proceeds from the redemption of six unrelated real estate investment trust interests in 2004 and two in 2005 ("REIT Portfolio"); a portfolio of fixed income and equity investments ("TMCT II Portfolio"); and a portfolio of venture capital and private equity investments ("Venture Capital Portfolio"). The TMCT II assets at Dec. 25, 2005 also included 39 million shares of the Company's common stock, 380,972 shares of the Company's Series D-1 preferred stock and 245,100 shares of the Company's Series D-2 preferred stock (collectively, "TMCT II Shares"). As discussed above, all of the TMCT II Shares were distributed to the Company and the Chandler Trusts in 2006. TMCT II has no outstanding debt. The estimated fair market values of the REIT Portfolio, the TMCT II Portfolio, and the Venture Capital Portfolio at Dec. 31, 2006 were $592 million, $115 million, and $223 million, respectively.

107

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

Summarized income and expense information for TMCT II is shown in the following table for the period of Jan. 1, 2007 through Sept. 28, 2007 and for the years ended Dec. 31, 2006 and Dec. 25, 2005 (in thousands):

| | TMCT II Income and Expense Information (unaudited) | | |
|---|---|---|---|
| | Jan. 1, 2007 – Sept. 28, 2007 | Dec. 26, 2005 – Dec. 31, 2006 | Dec. 27, 2004 – Dec. 25, 2005 |
| TMCT II Shares dividend income | $   — | $  37,203 | $  48,853 |
| REIT Portfolio income | 28,179 | 37,457 | 38,417 |
| TMCT II Portfolio and Venture Capital Portfolio interest and dividend income | 5,269 | 8,849 | 8,244 |
| TMCT II Portfolio, Venture Capital Portfolio and REIT Portfolio net realized gains (losses) | 5,958 | (60,019) | (778) |
| Total | $  39,406 | $  23,490 | $  94,736 |
| TMCT II operating expenses | $  (3,756) | $  (11,169) | $  (11,319) |

The Company accounted for its investments in the REIT Portfolio, the TMCT II Portfolio and the Venture Capital Portfolio under the equity method. The Company's investment in TMCT II totaled $42 million at Dec. 31, 2006 and $196 million at Dec. 25, 2005. The Company recognized equity income related to the REIT Portfolio, TMCT II Portfolio and Venture Capital Portfolio investments of $1 million in 2007, $6 million in 2006, and $8 million in 2005.

**NOTE 9: INVESTMENTS**

Investments consisted of the following (in thousands):

| | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| Time Warner stock related to PHONES debt | $  266,400 | $  348,480 |
| Other cost method investments | 5,642 | 14,150 |
| Equity investments in TMCT and TMCT II(1) | — | 66,016 |
| Other equity method investments | 502,563 | 484,584 |
| Total investments | $  774,605 | $  913,230 |

(1) See Note 8 for further discussion.

Cost method investments in public companies and debt securities were recorded at fair value in the consolidated balance sheets. At Dec. 30, 2007, the Company's cost method investments included public companies, mainly Time Warner, and private companies. In the third quarter of 2006, the Company sold 2.8 million shares of Time Warner common stock unrelated to the PHONES for net proceeds of $46 million and recorded a pretax gain on sale of $19 million. The cost basis of the Time Warner shares sold was determined using the specific identification method. The investment in Time Warner at Dec. 30, 2007 consisted of 16.2 million shares, mostly related to the PHONES (see Notes 1 and 10).

108

### TRIBUNE COMPANY AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

The Company's equity method investments at Dec. 30, 2007 included the following private companies:

| Company | % Owned |
|---|---|
| CareerBuilder, LLC | 41% |
| California Independent Postal Systems | 50% |
| Classified Ventures, LLC | 28% |
| Comcast SportsNet Chicago | 25% |
| Consumer Networks | 17% |
| Legacy.com | 39% |
| Metromix, LLC | 50% |
| ShopLocal, LLC | 43% |
| Topix, LLC | 34% |
| Television Food Network, G.P. | 31% |

The Company does not guarantee any indebtedness or other obligations for any of its investees other than certain immaterial amounts related to its investment in CareerBuilder, LLC. In the third quarter of 2007, the Company recorded a pretax gain of $8 million related to the redemption of its remaining interest in TMCT, LLC and TMCT II, LLC (see Note 8). In the third quarter of 2006, the Company recorded a one-time gain of $48 million, net of tax, as a result of transactions related to its investments in TMCT, LLC and TMCT II, LLC (see Note 8). In the fourth quarter of 2006, the Company sold its 27% interest in BrassRing, resulting in a pretax gain of $17 million. During 2005, the Company sold certain investments resulting in a pretax gain of $7 million.

The Company's investment in Television Food Network, G.P. ("TV Food Network") totaled $148 million, $129 million, and $95 million at Dec. 30, 2007, Dec. 31, 2006 and Dec. 25, 2005, respectively. The Company recognized equity income from TV Food Network of $82 million in 2007, $72 million in 2006 and $55 million in 2005. TV Food Network owns and operates a 24-hour television network focusing on food and entertaining. Its programming is distributed by cable and satellite television systems.

Summarized financial information for selected equity investments is as follows (in thousands):

| | Fiscal Years | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| Revenues, net | $ 1,176,199 | $ 963,823 | $ 737,539 |
| Operating income | $ 323,783 | $ 258,490 | $ 174,632 |
| Net income | $ 336,727 | $ 276,771 | $ 177,395 |

| | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| Current assets | $ 642,277 | $ 482,924 |
| Non-current assets | $ 437,371 | $ 430,503 |
| Current liabilities | $ 225,210 | $ 167,689 |
| Non-current liabilities | $ 14,958 | $ 14,459 |

For investments classified as available-for-sale and recorded at fair value under FAS No. 115, the aggregate cost basis, unrealized gain and fair value were as follows (in thousands):

| | Dec. 30, 2007 | | | Dec. 31, 2006 | | |
|---|---|---|---|---|---|---|
| | Cost Basis | Unrealized Gain | Fair Value | Cost Basis | Unrealized Gain | Fair Value |
| Marketable equity securities | $ 2,332 | $ 2,976 | $ 5,308 | $ 2,335 | $ 11,562 | $ 13,897 |

The difference between cost and fair value, net of related tax effects, is recorded in the accumulated other comprehensive income (loss) component of shareholders' equity (deficit) and amounted to a net gain of $1.8

109

## TRIBUNE COMPANY AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

million at Dec. 30, 2007 and $7 million at Dec. 31, 2006. The cost bases of the investments in the tables above are net of write-downs recorded in the consolidated statements of income.

## NOTE 10: DEBT

Debt consisted of the following (in thousands):

|  | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| Tranche B Facility due 2014, interest rate of 7.91% | $ 7,587,163 | $ — |
| Tranche X Facility due 2008-2009, interest rate of 7.99% | 1,400,000 | — |
| Bridge Facility due 2008, interest rate of 9.43% | 1,600,000 | — |
| Former bridge credit facility due June 19, 2007, interest rate of 6.2% | — | 1,310,000 |
| Former term loan due June 20, 2011, interest rate of 6.2% | — | 1,500,000 |
| Commercial paper, weighted average interest rate of 5.9% | — | 97,019 |
| Medium-term notes due 2008, weighted average interest rate of 5.6% in 2007 and 2006 | 262,585 | 262,585 |
| Property financing obligation, effective interest rate of 7.7%, expiring 2009 (see Note 8) | 35,676 | 55,711 |
| 4.875% notes due 2010, net of unamortized discount of $410 and $564, respectively | 449,589 | 449,436 |
| 7.25% debentures due 2013, net of unamortized discount of $1,794 and $2,137, respectively | 80,289 | 79,946 |
| 5.25% notes due 2015, net of unamortized discount of $1,205 and $1,362, respectively | 328,795 | 328,638 |
| 7.5% debentures due 2023, net of unamortized discount of $3,732 and $3,969, respectively | 95,016 | 94,781 |
| 6.61% debentures due 2027, net of unamortized discount of $2,095 and $2,200, respectively | 82,864 | 82,760 |
| 7.25% debentures due 2096, net of unamortized discount of $17,926 and $18,116, respectively | 130,073 | 129,884 |
| Subordinated promissory note due 2018, effective interest rate of 17%, net of unamortized discount of $165,000 | 60,315 | |
| Interest rate swaps | 119,029 | 24,600 |
| Other notes and obligations | 15,091 | 16,898 |
| Total debt excluding PHONES | 12,246,485 | 4,432,258 |
| 2% PHONES debt related to Time Warner stock, due 2029 | 597,040 | 572,960 |
| Total debt | $ 12,843,525 | $ 5,005,218 |

110

http://www.sec.gov/Archives/edgar/data/726513/000110465908018845/...

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

Debt was classified as follows in the consolidated balance sheets (in thousands):

|  | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| Current Liabilities: | | |
| PHONES debt related to Time Warner stock | $ 253,080 | $ — |
| Other debt due within one year | 750,239 | 1,429,007 |
| Total current debt | 1,003,319 | 1,429,007 |
| Long-Term Debt: | | |
| PHONES debt related to Time Warner stock | 343,960 | 572,960 |
| Other long-term debt | 11,496,246 | 3,003,251 |
| Total long-term debt | 11,840,206 | 3,576,211 |
| Total Debt | $ 12,843,525 | $ 5,005,218 |

**New Credit Agreements**—On May 17, 2007, the Company entered into a $8.028 billion senior secured credit agreement, as amended on June 4, 2007 (collectively, the "Credit Agreement"). The Credit Agreement consists of the following facilities: (a) a $1.50 billion Senior Tranche X Term Loan Facility (the "Tranche X Facility"), (b) a $5.515 billion Senior Tranche B Term Loan Facility (the "Tranche B Facility"), (c) a $263 million Delayed Draw Senior Tranche B Term Loan Facility (the "Delayed Draw Facility") and (d) a $750 million Revolving Credit Facility (the "Revolving Credit Facility"). The Credit Agreement also provided a commitment for an additional $2.105 billion in new incremental term loans under the Tranche B Facility (the "Incremental Facility"). Accordingly, the aggregate amount of the facilities under the Credit Agreement equals $10.133 billion.

On June 4, 2007, proceeds from the Tranche X Facility and the Tranche B Facility were used by the Company in connection with the consummation of the Share Repurchase (as defined in the discussion of the Leveraged ESOP Transactions in Note 3) and to refinance the Company's former five-year credit agreement and former bridge credit agreement.

The Revolving Credit Facility includes a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million. As of Dec. 30, 2007, the Company had $65 million of letters of credit outstanding. Borrowings under the Revolving Credit Facility may be used for working capital and general corporate purposes. The Company intends to use the Delayed Draw Facility to refinance approximately $263 million of its medium-term notes as they mature during 2008. In February 2008, the Company refinanced $25 million of such medium-term notes with borrowings under the Delayed Draw Facility.

On Dec. 20, 2007, the Company entered into (i) a $1.6 billion senior unsecured interim loan agreement (the "Interim Credit Agreement") and (ii) a number of increase joinders pursuant to which the Incremental Facility became a part of the Tranche B Facility under the Credit Agreement (the Incremental Facility and Tranche B Facility are hereinafter referred to collectively as the Tranche B Facility). The Interim Credit Agreement contains a $1.6 billion twelve-month bridge facility (the "Bridge Facility"). The total proceeds of $3.705 billion from the Bridge Facility and the Incremental Facility were used by the Company, among other ways, in connection with the consummation of the Merger (as defined and discussed in Note 3), and for general corporate purposes.

Prior to the consummation of the Merger, the Tranche X Facility bore interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 150 basis points or LIBOR plus a margin of 250 basis points. Pursuant to the terms of the Credit Agreement, following the closing of the Merger, the margins applicable to the Tranche X Facility increased to 175 basis points and 275 basis points, respectively.

The Tranche B Facility, Delayed Draw Facility and Revolving Credit Facility bear interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 200 basis points or

111

## TRIBUNE COMPANY AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

LIBOR plus a margin of 300 basis points. All undrawn amounts under the Delayed Draw Facility and the Revolving Credit Facility accrue commitment fees at a per annum rate of 75 basis points and 50 basis points, respectively. With respect to the Revolving Credit Facility only, the margin applicable to base rate advances, the margin applicable to LIBOR advances and the commitment fee applicable to undrawn amounts are subject to decreases based on a leverage-based grid.

On June 29, 2007, the Company repaid $100 million of the $1.5 billion of borrowings under the Tranche X Facility. The remaining principal balance of the Tranche X Facility must be repaid in an aggregate amount of $650 million on Dec. 4, 2008, which amount may be adjusted to reflect additional prepayments or other mandatory prepayments (described below) applied thereto, and the remaining outstanding amount of the Tranche X Facility, if any, must be repaid on June 4, 2009.

The Tranche B Facility is a seven-year facility which matures on June 4, 2014 and also amortizes at a rate of 1.0% per annum (payable quarterly). The Delayed Draw Facility automatically becomes part of the Tranche B Facility as amounts are borrowed and amortizes based upon the Tranche B Facility amortization schedule. The Revolving Facility is a six-year facility and matures on June 4, 2013.

Prior to June 4, 2008, optional prepayments on the Tranche X Facility and the Tranche B Facility with the proceeds of a substantially concurrent issuance of loans under any senior secured credit facilities pursuant to the Credit Agreement must be accompanied by a prepayment fee equal to 1.0% of the aggregate amount of such prepayments if the interest rate spread applicable to such new loans is less than the interest rate applicable to the Tranche X Facility or the Tranche B Facility. Except as described in the immediately preceding sentence, borrowings under the Credit Agreement are prepayable at any time prior to maturity without penalty, and the unutilized portion of the commitments under the Revolving Credit Facility or the Delayed Draw Facility may be reduced at the option of the Company without penalty.

The Bridge Facility bears interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 350 basis points or LIBOR plus a margin of 450 basis points; provided that such margins will increase by 50 basis points per annum each quarter beginning on March 20, 2008, subject to specified caps, a portion of which interest may be payable through an interest payable-in-kind feature. Subject to certain prepayment restrictions contained in the Credit Agreement, the Bridge Facility is prepayable at any time prior to maturity without penalty, including in connection with the issuance of up to $1.6 billion of high-yield notes.

If any loans under the Bridge Facility remain outstanding on Dec. 20, 2008, the lenders thereunder will have the option, subject to the terms of the Interim Credit Agreement, at any time and from time to time to exchange such initial loans for senior exchange notes that the Company will issue under a senior indenture, and the maturity date of any initial loans that are not exchanged for senior exchange notes will, unless a bankruptcy event of default has occurred and is continuing on such date, automatically be extended to Dec. 20, 2015 (the "Final Interim Credit Agreement Maturity Date"). Accordingly, the Company has classified the borrowings under the Bridge Facility as long-term at Dec. 30, 2007. The senior exchange notes will also mature on the Final Interim Credit Agreement Maturity Date. Holders of the senior exchange notes will have registration rights.

Loans under the Tranche X Facility, Tranche B Facility and Revolving Loan Facility are required to be repaid with the following proceeds, subject to certain exceptions and exclusions set forth in the Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of debt for borrowed money by the Company or any subsidiary (other than debt permitted to be incurred under the negative covenants contained in the Credit Agreement (with certain exclusions)), (b) certain specified percentages of excess cash flow proceeds based on a leverage-based grid ranging from 50% to 0% and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company's subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Credit Agreement.

112

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

Loans under the Bridge Facility are required to be repaid with the following proceeds, in each case after the obligations under the Credit Agreement have been repaid, either as required by the Credit Agreement or repaid at the election of the Company, subject to certain exceptions and exclusions set forth in the Interim Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of certain debt for borrowed money by the Company or any subsidiary, (b) 100% of the net cash proceeds of any equity issuance consummated by the Company and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company's subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Interim Credit Agreement.

Borrowings under the Credit Agreement are guaranteed on a senior basis by certain of the Company's direct and indirect U.S. subsidiaries and secured by a pledge of the equity interests of Tribune Broadcasting Holdco, LLC and Tribune Finance, LLC, two subsidiaries of the Company. Audited financial statements of these two subsidiaries are included in this Item 8. The Company's other senior notes and senior debentures are secured on an equal and ratable basis with the borrowings under the Credit Agreement as required by the terms of the indentures governing such notes and debentures. Borrowings under the Interim Credit Agreement are unsecured, but are guaranteed on a senior subordinated basis by certain of the Company's direct and indirect U.S. subsidiaries.

The Credit Agreement and the Interim Credit Agreement contain representations and warranties, affirmative and negative covenants, including restrictions on capital expenditures, and events of default, in each case subject to customary and negotiated exceptions and limitations, as applicable. If an event of default occurs, the lenders under the Credit Agreement and the Interim Credit Agreement will be entitled to take certain actions, including acceleration of all amounts due under the facilities.

Further, pursuant to the Credit Agreement, the Company is required to comply, on a quarterly basis, with a maximum total guaranteed leverage ratio and a minimum interest coverage ratio. For the twelve-month period ending Dec. 30, 2007, the maximum permitted "Total Guaranteed Leverage Ratio" and the minimum permitted "Interest Coverage Ratio" (each as defined in the Credit Agreement) were 9.00 to 1.0 and 1.10 to 1.0, respectively. Both financial covenant ratios are measured on a rolling four-quarter basis and become more restrictive on an annual basis as set forth in the Credit Agreement. At Dec. 30, 2007, the Company was in compliance with these financial covenants. The Company's ability to remain in compliance with these financial covenants will be impacted by a number of factors, including the Company's ability to continue to generate sufficient revenues and cash flows, changes in interest rates, the impact of future purchase, sale, joint venture or similar transactions involving the Company or its business units and the other risks and uncertainties set forth in Part I, Item 1A, "Risk Factors."

The Company filed an election to be treated as a subchapter S corporation under the Internal Revenue Code on March 13, 2008, which election is effective as the beginning of the Company's 2008 fiscal year. The Credit Agreement and the Interim Credit Agreement contain affirmative covenants which required the Company to make such election and that the election be effective for fiscal 2008. The Credit Agreement and Interim Credit Agreement further provide that if the Company fails to maintain the S corporation election for any year beginning with 2009, the Company will be required in each such year to obtain an investment in the Company in the form of common stock or subordinated debt in an amount of up to $100 million. There can be no assurance that the Company will be able to obtain such an investment and the failure to obtain such an investment in those circumstances could result in a default under the Credit Agreement and Interim Credit Agreement.

Under the terms of the Credit Agreement, the Company is required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Credit Agreement and other debt with respect to borrowed money. On July 2, 2007, the Company entered into an International Swap and Derivatives Association, Inc. ("ISDA") Master Agreement, a schedule to the 1992 ISDA Master Agreement and, on July 3, 2007, entered into three interest rate swap confirmations (collectively, the "Swap Documents") with Barclays Bank, which Swap Documents provide for (i) a two-year hedge with respect to $750 million in notional amount, (ii) a three-year hedge with respect to $1 billion in notional amount and (iii) a five-year hedge with respect to

113

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

$750 million in notional amount. The Swap Documents effectively converted a portion of the variable rate borrowings under the Tranche B Facility in the Credit Agreement to a weighted average fixed rate of 5.31% plus a margin of 300 basis points. The Company accounts for these interest rate swaps as cash flow hedges in accordance with FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities" ("FAS No. 133"). Under FAS No. 133, a cash flow hedge is deemed to be highly effective if it is expected that changes in the cash flows of the hedged item are almost fully offset by changes in the cash flows of the hedging instrument. While there will be some ineffectiveness in the future, the cash flow hedges covered by the Swap Documents are deemed to be highly effective, and therefore gains and losses resulting from changes in the fair value of these hedges, other than changes resulting from hedge ineffectiveness, are recorded in other comprehensive income (loss), net of taxes.

As of Dec. 30, 2007, the Company had outstanding borrowings of $7.6 billion under the Tranche B Facility, $1.4 billion under the Tranche X Facility, and $1.6 billion under the Bridge Facility. As of Dec. 30, 2007, the applicable interest rate was 7.91% on the Tranche B Facility, 7.99% on the Tranche X Facility and 9.43% on the Bridge Facility.

**Former Credit Agreements**—On June 19, 2006, the Company entered into a five-year credit agreement and a 364-day bridge credit agreement, both of which were amended and restated on June 27, 2006. The five-year credit agreement provided for a $1.5 billion unsecured term facility, of which $250 million was used to refinance the medium-term notes that matured on Nov. 1, 2006, and a $750 million unsecured revolving facility. The 364-day bridge credit agreement provided for a $2.15 billion unsecured bridge facility.

The Company entered into these agreements to finance the Company's tender offer initiated on May 30, 2006 ; to repurchase shares of the Company's common stock from the Robert R. McCormick Tribune Foundation and Cantigny Foundation; to repurchase shares of the Company's common stock pursuant to open market or privately negotiated transactions; to refinance certain indebtedness; and to pay fees and expenses incurred in connection with the repurchases. In addition, the revolving facility was available for working capital and general corporate purposes, including acquisitions.

On June 4, 2007, the Company repaid its obligations under the five-year credit agreement and bridge credit agreement with proceeds from the Credit Agreement, the terms of which are described above.

In general, borrowings under the five-year and bridge credit agreements bore interest at a rate equal to LIBOR plus a spread ranging from 35 to 125 basis points. The applicable spread was determined on the basis of the Company's debt ratings by Standard and Poor's ("S&P") and Moody's Investor Services ("Moody's"). The Company's debt ratings were also used in determining the annual facility fee, which ranged from 0.07% to 0.25% of the aggregate unused commitments. In addition, the Company agreed to pay customary fees to the lenders under the five-year and bridge credit agreements.

**Medium-Term Notes**—Notes issued under these programs may not be redeemed by the Company prior to maturity.

**Subordinated Promissory Note**—Following the consummation of the Merger, the Zell Entity purchased from the Company a $225 million subordinated promissory note due Dec. 20, 2018 at a stated interest rate of 4.64%. Thereafter, the Zell Entity assigned minority interests in the subordinated promissory note to certain permitted assignees. The note was recorded at an estimated fair value of $60 million, resulting in a discount of $165 million. The discount will be amortized and included in interest expense over the term of the note using an effective interest rate of 17%. At Dec. 30, 2007, the net book value of the note was $60.3 million and included $.3 million of payable in-kind interest.

**Interest Rate Swaps**—As noted above, the Company is party to three interest rate swaps covered under the Swap Documents. At Dec. 30, 2007, the fair value of these swaps had declined since their inception date of July 3, 2007 by $91 million, which is included in long-term debt. The Company determined that $1.7 million of this

114

## TRIBUNE COMPANY AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

change resulted from hedge ineffectiveness and therefore included the $1.7 million in interest expense. The remaining $89 million change in fair value of these swaps was included, net of taxes, in the accumulated other comprehensive income (loss) component of shareholders' equity (deficit) at Dec. 30, 2007 (see Note 18). The Company is also party to an additional interest rate swap agreement related to the $100 million 7.5% debentures due in 2023 which effectively converts the fixed 7.5% rate to a variable rate based on LIBOR.

**Debt Due Within One Year**—Debt due within one year at Dec. 30, 2007 included $650 million of borrowings under the Tranche X Facility, $76 million of borrowings under the Tranche B Facility, $253 million related to PHONES, and $24 million of property financing and other obligations. The Company expects to fund interest and principal payments due in 2008 through a combination of cash flows from operations, available borrowings under the Revolving Credit Facility, and, if necessary, dispositions of assets or operations. The Company's ability to make scheduled payments or prepayments on its debt and other financial obligations will depend on future financial and operating performance and the ability to dispose of assets on favorable terms. There can be no assurances that the Company's businesses will generate sufficient cash flows from operations or that future borrowings under the Revolving Credit Facility will be available in an amount sufficient to satisfy debt maturities or to fund other liquidity needs or that any such asset dispositions can be completed. The Company's financial and operating performance is subject to prevailing economic and industry conditions and to financial, business and other factors, some of which are beyond the control of the Company.

If the Company's cash flows and capital resources are insufficient to fund debt service obligations, the Company will likely face increased pressure to reduce or delay capital expenditures, dispose of assets or operations, further reduce the size of its workforce, seek additional capital or restructure or refinance its indebtedness. These actions could have a material adverse effect on the Company's business, financial condition and results of operations. In addition, the Company cannot assure the ability to take any of these actions, that these actions would be successful and permit the Company to meet scheduled debt service obligations or that these actions would be permitted under the terms of the Company's existing or future debt agreements, including the Credit Agreement and the Interim Credit Agreement. For example, the Company may need to refinance all or a portion of its indebtedness on or before maturity. There can be no assurance that the Company will be able to refinance any of its indebtedness on commercially reasonable terms or at all. In the absence of improved operating results and access to capital resources, the Company could face substantial liquidity problems and might be required to dispose of material assets or operations to meet its debt service and other obligations. The Credit Agreement and the Interim Credit Agreement restrict the Company's ability to dispose of assets and use the proceeds from the disposition. The Company may not be able to consummate those dispositions or to obtain the proceeds realized. Additionally, these proceeds may not be adequate to meet the debt service obligations then due.

If the Company cannot make scheduled payments or prepayments on its debt, the Company will be in default and, as a result, among other things, the Company's debt holders could declare all outstanding principal and interest to be due and payable and the Company could be forced into bankruptcy or liquidation or required to substantially restructure or alter business operations or debt could be forced into bankruptcy or liquidation or required to substantially restructure or alter business operations or debt obligations.

**Exchangeable Subordinated Debentures due 2029 ("PHONES")**—In 1999, the Company issued 8 million PHONES for an aggregate principal amount of approximately $1.3 billion. The principal amount was equal to the value of 16 million shares of Time Warner common stock at the closing price of $78.50 per share on April 7, 1999. Quarterly interest payments are made to the PHONES holders at an annual rate of 2% of the initial principal. The Company records both cash and non-cash interest expense on the discounted debt component of the PHONES. The PHONES debenture agreement requires principal payments equal to any dividends declared on the 16 million shares of Time Warner common stock. Time Warner declared total dividends of $.24 per share in 2007 and $.21 per share in 2006. The Company records the dividends it receives on its Time Warner common stock as dividend income and accounts for the related payment to the PHONES holders as principal reduction.

The Company may redeem the PHONES at any time for the higher of the principal value of the PHONES ($155.99 per PHONES at Dec. 30, 2007) or the then market value of two shares of Time Warner common stock,

115

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

subject to certain adjustments. At any time, holders of the PHONES may exchange a PHONES for an amount of cash equal to 95% (or 100% under certain circumstances) of the market value of two shares of Time Warner common stock. At Dec. 30, 2007, the market value per PHONES was $52.50, and the market value of two shares of Time Warner common stock was $33.30. The amount PHONES holders could have received if they had elected to exchange their PHONES for cash on Dec. 30, 2007 was $253 million, which is included in current liabilities at Dec. 30, 2007. Deferred income taxes related to the current portion of the PHONES is also included in current liabilities as of Dec. 30, 2007. At Dec. 31, 2006, the PHONES were classified entirely as long-term because if the PHONES were exchanged on that date, the Company had the ability and the intent to refinance the PHONES on a long-term basis through its then existing revolving credit facility.

Under the provisions of FAS No. 133, the PHONES consist of a discounted debt component, which is presented at book value, and a derivative component, which is presented at fair value. Changes in the fair value of the derivative component of the PHONES are recorded in the statement of income. Prior to 2007, the Company calculated the fair value of the derivative component of the PHONES debt as the difference between the quoted market value of the PHONES and the estimated fair value of the discounted debt component of the PHONES. The fair value of the discounted debt component of the PHONES was calculated based on an estimate of the current interest rate available to the Company for debt of the same remaining maturity and similar terms to the PHONES. At Dec. 30, 2007, the Company performed a direct valuation of the derivative component of the PHONES utilizing the Black-Scholes option-pricing model. Had the Company utilized the Black-Scholes option pricing model to value the derivative component of the PHONES at Dec. 31, 2006, the resulting valuation would have been approximately $20 million higher than the $108 million recorded at Dec. 31, 2006. The book value of the discounted debt component is based on the prevailing interest rate (8.125%) at issuance of the PHONES. The market value of the PHONES, which are traded on the New York Stock Exchange, was $420 million and $549 million at Dec. 30, 2007 and Dec. 31, 2006, respectively.

The discounted debt component and derivative component of the PHONES were as follows (in thousands):

|  | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| PHONES Debt: |  |  |
| Discounted debt component (at book value) | $ 477,360 | $ 465,280 |
| Derivative component (at estimated fair value) | 119,680 | 107,680 |
| Total | $ 597,040 | $ 572,960 |
| Time Warner stock related to PHONES (at fair value) | $ 266,400 | $ 348,480 |

**Maturities**—Debt at Dec. 30, 2007 matures as shown below (in thousands):

|  |  |
|---|---|
| 2008 | $ 1,003,319 |
| 2009 | 857,222 |
| 2010 | 563,074 |
| 2011 | 78,309 |
| 2012 | 118,324 |
| Thereafter | 10,223,277 |
| Total | $ 12,843,525 |

116

5/20/2010 9:00 PM

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

## NOTE 11: CONTRACTS PAYABLE FOR BROADCAST RIGHTS

Contracts payable for broadcast rights are classified as current or long-term liabilities in accordance with the payment terms of the contracts. Required payments under contractual agreements for broadcast rights recorded at Dec. 30, 2007 are shown in the table below (in thousands):

|  |  |
|---|---:|
| 2008 | $ 339,909 |
| 2009 | 188,748 |
| 2010 | 139,270 |
| 2011 | 66,724 |
| 2012 | 20,113 |
| Thereafter | 17,538 |
| Total | $ 772,302 |

## NOTE 12: FAIR VALUE OF FINANCIAL INSTRUMENTS

Estimated fair values and carrying amounts of the Company's financial instruments are as follows (in thousands):

|  | Dec. 30, 2007 | | Dec. 31, 2006 | |
|---|---|---|---|---|
|  | Fair Value | Carrying Amount | Fair Value | Carrying Amount |
| Cost method investments | $ 272,042 | $ 272,042 | $ 365,445 | $ 362,630 |
| Debt | $ 11,473,131 | $ 12,843,525 | $ 4,904,390 | $ 5,005,218 |
| Contracts payable for broadcast rights | $ 724,945 | $ 772,302 | $ 696,363 | $ 743,872 |

The following methods and assumptions were used to estimate the fair value of each category of financial instruments.

**Cost Method Investments**—Cost method investments in public companies were recorded at fair value in the consolidated balance sheets (see Notes 1 and 9). Cost method investments in private companies were recorded at cost, net of write-downs, and fair value was generally estimated based on prices recently paid for shares in those companies.

**Debt**—Fair value was estimated based on quoted market prices for the Company's debt securities or similar issues or on current rates available to the Company for debt of the same remaining maturities and similar terms. The carrying value of the Company's derivative instruments approximates fair value. The fair value of the PHONES was determined by reference to the market value resulting from trading on a national securities exchange.

**Contracts Payable for Broadcast Rights**—Fair value was estimated using the discounted cash flow method.

## NOTE 13: COMMITMENTS AND CONTINGENCIES

The Company has entered into commitments for broadcast rights that are not currently available for broadcast and are therefore not included in the financial statements. These commitments totaled $473 million at Dec. 30, 2007. Payments for broadcast rights generally commence when the programs become available for broadcast.

The Company had commitments totaling $652 million at Dec. 30, 2007 related to the purchase of property, plant and equipment and talent contracts. In addition, under its current agreement with AbitibiBowater Inc., the Company has a commitment to purchase 369,000 metric tons of newsprint each year over the next two years based on market prices at the time of purchase. The Company leases certain equipment and office and production

117

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

space under various operating leases. Net lease expense from continuing operations was $57 million in 2007, $55 million in 2006 and $55 million in 2005. The table below presents the future minimum lease payments to be made under non-cancelable operating leases at Dec. 30, 2007 (in thousands):

| | | |
|---|---|---:|
| 2008 | $ | 62,851 |
| 2009 | | 57,941 |
| 2010 | | 45,000 |
| 2011 | | 35,627 |
| 2012 | | 27,538 |
| Thereafter | | 57,191 |
| Total | $ | 286,148 |

The Company and its subsidiaries are defendants from time to time in actions for matters arising out of their business operations. In addition, the Company and its subsidiaries are involved from time to time as parties in various regulatory, environmental and other proceedings with governmental authorities and administrative agencies. See Note 5 for a discussion of potential liability related to *Newsday* and *Hoy*, New York, and see Note 14 for a discussion of potential income tax liabilities. The Company does not believe that any other matters or proceedings presently pending will have a material adverse effect on its consolidated financial position, results of operations or liquidity.

### NOTE 14: INCOME TAXES

The following is a reconciliation of income taxes computed at the U.S. federal statutory rate to income taxes reported for continuing operations in the consolidated statements of income (in thousands):

| | 2007 | 2006 | 2005 |
|---|---:|---:|---:|
| Income from continuing operations before income taxes | $ 37,104 | $ 1,008,746 | $ 1,084,677 |
| Federal income taxes at 35% | $ 12,986 | $ 353,061 | $ 379,637 |
| State and local income taxes, net of federal tax benefit | 6,535 | 30,097 | 37,431 |
| Interest on uncertain tax positions, net of tax | 8,605 | 17,820 | 19,288 |
| Manufacturing and production activities deduction | (4,079) | (5,710) | (2,349) |
| Merger, restructuring and disposition transactions | 18,678 | (10,237) | — |
| Matthew Bender/Mosby adjustment | (90,704) | — | 150,493 |
| Income tax settlements and adjustments | — | (33,563) | (11,829) |
| Deferred income tax asset write-off | 24,699 | — | — |
| Other | 5,046 | (3,895) | (7,378) |
| Income taxes reported | $ (18,234) | $ 347,573 | $ 565,293 |
| Effective tax rate | (49.1%) | 34.5% | 52.1% |

In 2007, the Company recorded a favorable $91 million income tax expense adjustment due to the settlement of its appeal of the Matthew Bender and Mosby Tax Court decision (see "Matthew Bender and Mosby Tax Liability" discussion below). The Company incurred non-deductible expenses and other costs in 2007 in connection with merger, restructuring and disposition transactions. In addition, the Company increased its income tax expense by $25 million in 2007 due to the write-off of tax credit carryforwards related to its low income housing investments (see Note 2). The Company reports interest on uncertain tax positions as part of its income tax expense. After-tax interest on uncertain tax positions increased 2007 income tax expense by $9 million. In 2006, the Company recorded a favorable $34 million income tax expense adjustment, most of which related to the Company's PHONES as a result of reaching an agreement with the Internal Revenue Service appeals office pertaining to the deduction of interest expense on the PHONES (see "PHONES Interest" discussion below). After-tax interest on uncertain tax positions increased income tax expense by $18 million in

118

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

2006. The Company recorded a non-taxable gain in 2006 related to certain restructuring transactions. In 2005, the Company increased its income tax expense by $150 million as a result of the Matthew Bender Tax Court decision and reduced its income tax expense by $12 million as a result of resolving certain federal income tax issues. After-tax interest on uncertain tax positions increased income tax expense by $19 million in 2005.

Components of income tax expense (benefit) charged to income from continuing operations were as follows (in thousands):

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Currently payable: |  |  |  |
| U.S. federal | $ (86,764) | $ 287,600 | $ 434,502 |
| State and local | 4,022 | 43,193 | 44,043 |
| Sub-total | (82,742) | 330,793 | 478,545 |
| Deferred: |  |  |  |
| U.S. federal | 58,476 | 13,639 | 72,716 |
| State and local | 6,032 | 3,141 | 14,032 |
| Sub-total | 64,508 | 16,780 | 86,748 |
| Total | $ (18,234) | $ 347,573 | $ 565,293 |

Significant components of the Company's net deferred tax liabilities were as follows (in thousands):

|  | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| Net properties | $ 196,267 | $ 214,770 |
| Net intangible assets | 1,160,384 | 1,209,999 |
| Pensions | 179,073 | 74,891 |
| Investments | 363,541 | 406,409 |
| PHONES interest | 216,126 | 219,552 |
| Other future taxable items | 23,114 | 18,325 |
| Total deferred tax liabilities | 2,138,505 | 2,143,946 |
| Postretirement and postemployment benefits other than pensions | (50,296) | (54,990) |
| Deferred compensation | (34,245) | (84,288) |
| Other accrued liabilities | (69,780) | (55,270) |
| Federal capital loss and tax credit carryforwards | (41,355) | (24,699) |
| Accounts receivable | (12,281) | (13,211) |
| Other future deductible items | (10,768) | (6,352) |
| Tax benefits from future payments of uncertain tax positions | (42,413) | — |
| State operating loss carryforwards | (46,084) | (42,371) |
| Valuation allowances on state operating loss carryforwards | 40,886 | 37,457 |
| Total deferred tax assets | (266,336) | (243,724) |
| Net deferred tax liability | $ 1,872,169 | $ 1,900,222 |

**Federal Capital Loss and Tax Credit Carryforwards**—At Dec. 30, 2007, the Company had a capital loss of approximately $120 million that will be carried back to offset net capital gains reported in earlier tax years. The Company will file a claim for the refund of previously paid taxes after it files its 2007 federal income tax return. Capital losses can only be used to offset capital gains. As a result of the Recycler disposition (see Note 4), capital losses exceeded capital gains in 2007. At Dec. 31, 2006, the Company had approximately $25 million of tax credit carryforwards relating to its low income housing investments. As a result of restructuring certain investments during the fourth quarter of 2007 (see Note 2), the Company no longer expects to realize any tax benefits from the tax credit carryforwards and therefore wrote off the related deferred tax assets in the fourth quarter of 2007.

119

5/20/2010 9:00 PM

## TRIBUNE COMPANY AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

**Operating Loss Carryforwards**—At Dec. 30, 2007, the Company had approximately $895 million of operating loss carryforwards for state income tax purposes. These carryforwards arose in certain states primarily as a result of intercompany interest expense, royalty expense and management fees allocated to the Company's various subsidiaries, and expire between 2008 and 2027. The deferred tax assets related to these carryforwards totaled approximately $46 million, net of federal taxes, at Dec. 30, 2007. However, the Company believes it is more likely than not that $41 million of the deferred tax assets will not be realized because the related carryforwards will expire before being utilized. Therefore, in accordance with FAS No. 109, "Accounting for Income Taxes," the Company has established valuation allowances of $41 million on the deferred tax assets related to the state carryforwards. The state operating loss carryforwards increased in 2007 because the Company generated additional tax losses in certain states.

**Matthew Bender and Mosby Tax Liability**—During 1998, Times Mirror, which was acquired by the Company in 2000, disposed of its Matthew Bender and Mosby subsidiaries in separate transactions, which were structured to qualify as tax-free reorganizations under the Internal Revenue Code. The Company believes these transactions were completed on a tax-free basis. However, the Internal Revenue Service ("IRS") audited the transactions and disagreed with the position taken by Times Mirror. In the fourth quarter of 2001, the Company received an IRS adjustment to increase Times Mirror's 1998 taxable income by approximately $1.6 billion. The Company filed a petition in the United States Tax Court in November 2002 to contest the IRS position, and in December 2004, the Company presented its position in Tax Court.

On Sept. 27, 2005, the Tax Court issued an opinion contrary to the Company's position and determined that the Matthew Bender transaction was a taxable sale. In January 2006, the Tax Court extended its opinion in the Matthew Bender case to the Mosby transaction given the similarity of the two transactions. Taxes and related interest for both the Matthew Bender and Mosby transactions totaled approximately $1 billion. Over time, deductions for state taxes and interest were expected to reduce the net cash outlay to approximately $840 million.

The Company appealed the Tax Court ruling to the United States Court of Appeals for the Seventh Circuit. On June 1, 2007, the Company announced that an offer of settlement was pending in its appeal. The Company finalized the settlement during the third quarter of 2007. As a result of the settlement, the Company received refunds of federal income taxes and interest of $4 million on Sept. 26, 2007 and $340 million on Oct. 1, 2007. After consideration of income taxes on the interest received, the net cash proceeds totaled approximately $286 million. These refunds, together with related state income tax benefits of $29 million, were accounted for as a $91 million reduction in 2007 income tax expense and a $224 million reduction in goodwill recorded on the Company's 2007 consolidated balance sheet.

Times Mirror established a tax reserve of $180 million in 1998 when it entered into the transactions. The reserve represented Times Mirror's best estimate of the amount the expected IRS and state income tax claims could be settled for based upon an analysis of the facts and circumstances surrounding the issue. In accordance with Emerging Issues Task Force ("EITF") Issue No. 93-7, "Uncertainties Related to Income Taxes in a Purchase Business Combination," the Company treated this item as an uncertain tax position at the time of the Times Mirror acquisition in 2000 and concluded that the estimate determined by Times Mirror was the most appropriate estimate of the exposure. The Company maintained this initial reserve, plus interest, and evaluated the adequacy of the reserve on a periodic basis. At Dec. 26, 2004, the reserve, including pretax interest of $66 million, totaled $246 million ($221 million after considering the tax benefit of the interest). In 2005, prior to the Tax Court ruling, the Company recorded additional after-tax interest of $7 million on the reserve.

As a result of the Tax Court ruling, the Company increased its tax reserve by an additional $609 million in the third quarter of 2005 by recording additional income tax expense of $150 million, representing additional after-tax interest applicable to the post-acquisition period, and goodwill of $459 million. In accordance with EITF No. 93-7, the Company adjusted goodwill because the tax contingencies existed at the time of the Times Mirror acquisition. On Sept. 30, 2005, the Company paid $880 million to the IRS, representing the federal tax and interest owed on the transactions, and financed the payment through the issuance of commercial paper. On Feb. 10, 2006, the Company made a California state tax and interest payment of approximately $86 million ($55

120

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

million after considering the federal tax benefit of the state taxes and interest). The remaining liability was $35 million at Dec. 31, 2006 and consisted of state tax and interest accruals. As a result of the Matthew Bender/Mosby settlement, the liability was adjusted to $24 million at Dec. 30, 2007.

The September and October 2007 refunds of the previously paid income taxes and interest were accounted for in accordance with EITF No. 93-7. The portion of the refunds representing after-tax interest applicable to periods following the acquisition of Times Mirror reduced income tax expense, and the remainder reduced goodwill.

A summary of the activity with respect to the Matthew Bender and Mosby tax liability is as follows (in millions):

| | |
|---|---:|
| Liability at Dec. 26, 2004: | $ 180 |
| Tax | 41 |
| After-tax interest ($66 million pretax) | 221 |
| Liability at Dec. 26, 2004 | |
| After-tax interest recorded in income tax expense in the first three quarters of 2005 ($11 million pretax) | 7 |
| Additional reserve recorded as a result of the Tax Court ruling: | |
| Charged to income tax expense | 150 |
| Additional goodwill | 459 |
| | 837 |
| Liability at Sept. 25, 2005 | |
| Federal tax and interest paid on Sept. 30, 2005: | |
| Federal tax | (542) |
| After-tax interest ($338 million pretax) | (210) |
| After-tax interest recorded in income tax expense in the fourth quarter of 2005 ($3 million pretax) | 2 |
| Liability at Dec. 25, 2005 | 87 |
| After-tax interest ($4 million pretax) | 3 |
| California tax and interest paid in February 2006: | |
| State tax ($55 million pretax) | (36) |
| After-tax interest ($31 million pretax) | (19) |
| Liability at Dec. 31, 2006 (included in "other current liabilities") | $ 35 |
| After-tax interest ($4 million pretax) | 2 |
| Adjustment recorded as a result of settling the appeal of the Tax Court decision | (9) |
| State tax and interest paid in 2007: | |
| State tax ($4 million pretax) | (3) |
| After-tax interest ($2 million pretax) | (1) |
| Liability at Dec. 30, 2007 (included in "other current liabilities") | $ 24 |

**PHONES Interest**—In connection with the routine examination of the Company's federal income tax returns for 2000 through 2003, the IRS proposed that the Company capitalize the interest on the PHONES as additional tax basis in the Company's 16 million shares of Time Warner common stock, rather than allowing the Company to currently deduct such interest. The National Office of the IRS has issued a Technical Advice Memorandum that supports the proposed treatment. The Company disagrees with the IRS's position and requested that the IRS administrative appeals office review the issue. The effect of the treatment proposed by the IRS would be to increase the Company's tax liability by approximately $189 million for the period 2000 through 2003 and by approximately $245 million for the period 2004 through 2007.

During the fourth quarter of 2006, the Company reached an agreement with the IRS appeals office regarding the deductibility of the PHONES interest expense. The agreement will apply for the tax years 2000 through the 2029 maturity date of the PHONES. In December of 2006, under the terms of the agreement reached with the IRS appeals office, the Company paid approximately $81 million of tax plus interest for tax years 2000 through

121

## TRIBUNE COMPANY AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

2005. The tax payments were recorded as a reduction in the Company's deferred tax liability, and the interest was recorded as a reduction in the Company's income tax reserves. The agreement reached with the appeals office is being reviewed by the Joint Committee on Taxation. A decision from the Joint Committee on Taxation is expected by the end of the second quarter of 2008.

**Adoption of New Income Tax Accounting Standard**—On January 1, 2007, the Company adopted the provisions of FIN 48, "Accounting for Uncertainty in Income Taxes." FIN 48 addresses the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. Under FIN 48, a company may recognize the tax benefit of an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. FIN 48 requires the tax benefit recognized in the financial statements to be measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, and disclosure.

Due to the adoption of FIN 48, the Company was required to make certain reclassifications in its consolidated balance sheet as of Jan. 1, 2007. In the aggregate, these reclassifications increased the Company's liability for unrecognized tax benefits by $73 million and decreased its net deferred tax liabilities by $73 million. The adoption of FIN 48 had no impact on the Company's Jan. 1, 2007 consolidated retained earnings.

The amount of unrecognized tax benefits at Jan. 1, 2007 and Dec. 30, 2007, totaled $128 million and $138 million, respectively. If all of the unrecognized tax benefits at Jan. 1, 2007 and Dec. 30, 2007 were recognized, there would be a favorable $48 million and $52 million impact on the Company's effective tax rate respectively, after consideration of the federal effect of state income taxes.

The liability for unrecognized tax benefits at Jan. 1, 2007 and Dec. 30, 2007 included $38 million and $43 million, respectively, related to the PHONES issue discussed in the preceding "PHONES Interest" section. The Company expects to resolve this issue within the next twelve months. If the issue is definitively resolved on the terms agreed to with the appeals office, the $43 million liability at Dec. 30, 2007 would be reclassified to deferred income tax liabilities.

The Company does not expect that changes in the amount for unrecognized tax benefits during the next twelve months will have a significant impact on the Company's consolidated results of operations or financial position.

As allowed by FIN 48 and consistent with the Company's prior accounting policy, the Company recognizes accrued interest and penalties related to uncertain tax positions in income tax expense. As of Jan. 1, 2007 and Dec. 30, 2007, the Company's accrued interest and penalties related to uncertain tax positions totaled $26 million and $36 million, respectively.

The IRS is currently auditing the Company's federal income tax returns for the 2004 and 2005 fiscal years. The IRS has completed its audits of the Company's returns for all fiscal years prior to 2004. With the exception of the PHONES matter discussed above, the Company and the IRS have reached agreement on all issues raised during the prior audits. State income tax returns are generally subject to examination for a period of three to five years after they are filed, although many states often receive extensions of time from the Company. In addition, states may examine the state impact of any federal changes for a period of up to one year after the states are formally notified of the changes. The Company currently has various state income tax returns in the process of examination or administrative appeals.

122

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

The following summarizes the changes in unrecognized tax benefits during 2007 (in thousands):

| | |
|---|---:|
| Uncertain tax benefits at Jan. 1, 2007 | $   127,652 |
| Gross increase as a result of tax positions taken during a prior period | 9,625 |
| Gross increase as a result of tax positions taken during the current period | 5,428 |
| Decreases related to settlements with taxing authorities | (4,624) |
| Uncertain tax benefits at Dec. 30, 2007 | $   138,081 |

Although management believes its estimates and judgments are reasonable, the resolutions of the Company's tax issues are unpredictable and could result in tax liabilities that are significantly higher or lower than that which has been provided by the Company.

On March 13, 2008, the Company filed an election to be treated as a subchapter S Corporation under the Internal Revenue Code, which election is effective as of the beginning of the Company's 2008 fiscal year. As a result, essentially all of the Company's net deferred tax liabilities will be eliminated and such adjustment will be recorded as a reduction in the Company's provision for income taxes in the first quarter of 2008.

## NOTE 15: PENSION AND OTHER POSTRETIREMENT BENEFITS

**Employee Pension Plans**—In connection with the establishment of the Tribune Company ESOP in 1988, Tribune amended its company-sponsored pension plan for employees not covered by a collective bargaining agreement. The Tribune Company pension plan continued to provide substantially the same pension benefits as under the pre-amended plan until December 1998. After that date, Tribune pension benefit credits were frozen in terms of pay and service.

In connection with the Times Mirror acquisition, the Company assumed defined benefit pension plans and various other contributory and non-contributory retirement plans covering substantially all of Times Mirror's former employees. In general, benefits under the Times Mirror defined benefit plans were based on years of service and the employee's compensation during the last five years of employment. In December 2005, the pension plan benefits for former Times Mirror non-union and non-Newsday employees were frozen. As a result of the plan freeze, a pretax curtailment gain of $18 million was recorded in 2005. On March 31, 2006, the pension plan benefits for Newsday union and non-union employees were frozen. Benefits provided by Times Mirror's Employee Stock Ownership Plan ("Times Mirror ESOP") are coordinated with certain pension benefits and, as a result, the defined benefit plan obligations are net of the actuarially equivalent value of the benefits earned under the Times Mirror ESOP. The maximum offset is equal to the value of the benefits earned under the defined benefit plan.

Effective Jan. 1, 2008, the Tribune Company pension plan was amended to include a cash balance plan to provide a tax-qualified, non-contributory guaranteed pension benefit for eligible employees. In addition, effective Dec. 31, 2007, the Tribune Company pension plan was amended to provide a special one-time initial cash balance benefit for eligible employees.

The Company also maintains several small plans for other employees. The Company's portion of assets and liabilities for multi-employer union pension plans is not determinable.

**Postretirement Benefits Other Than Pensions**—The Company provides postretirement health care and life insurance benefits to eligible employees under a variety of plans. The various plans have significantly different provisions for lifetime maximums, retiree cost-sharing, health care providers, prescription drug coverage and other benefits.

**Obligations and Funded Status**—As discussed in Note 1, the Company adopted FAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of FASB

123

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

Statements No. 87, 88, 106 and 132(R)", as of Dec. 31, 2006. FAS No. 158 requires the Company to recognize the overfunded or underfunded status of its defined benefit pension and other postretirement plans as an asset or liability in its statement of financial position and to recognize changes in that funded status in the year in which changes occur through comprehensive income. Prior to Dec. 31, 2006, the Company accounted for its defined benefit pension plans under FAS No. 87, "Employers' Accounting for Pensions" and accounted for its other postretirement benefit plans under FAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions".

Summarized information for the Company's defined benefit pension and other postretirement plans is provided below (in thousands):

|  | Pension Plans | | Other Postretirement Plans | |
| --- | --- | --- | --- | --- |
|  | Dec. 30, 2007 | Dec. 31, 2006 | Dec. 30, 2007 | Dec. 31, 2006 |
| Change in benefit obligations: |  |  |  |  |
| Projected benefit obligations, beginning of year | $ 1,546,911 | $ 1,599,129 | $ 139,832 | $ 140,465 |
| Service cost | 1,957 | 3,934 | 1,291 | 1,335 |
| Interest cost | 83,984 | 84,349 | 7,825 | 7,367 |
| Special termination benefits | 1,067 | 1,382 |  |  |
| Impact of Medicare Reform Act | — | — | 1,200 | 1,200 |
| Actuarial (gain) loss | (190,437) | (57,317) | (4,549) | 3,471 |
| Benefits paid | (92,108) | (84,566) | (14,768) | (14,006) |
| Projected benefit obligations, end of year | 1,351,374 | 1,546,911 | 130,831 | 139,832 |
| | | | | |
| Change in plans' assets: |  |  |  |  |
| Fair value of plans' assets, beginning of year | 1,764,470 | 1,598,398 | — | — |
| Actual return on plans' assets | 116,854 | 243,209 | — | — |
| Employer contributions | 17,322 | 7,429 | 14,768 | 14,006 |
| Benefits paid | (92,108) | (84,566) | (14,768) | (14,006) |
| Fair value of plans' assets, end of year | 1,806,538 | 1,764,470 | — | — |
| Funded (under funded) status of the plans | $ 455,164 | $ 217,559 | $ (130,831) | $ (139,832) |

Amounts recognized in the statement of financial position consisted of (in thousands):

|  | Pension Plans | | Other Postretirement Plans | |
| --- | --- | --- | --- | --- |
|  | Dec. 30, 2007 | Dec. 31, 2006 | Dec. 30, 2007 | Dec. 31, 2006 |
| Prepaid pension costs | $ 514,429 | $ 293,455 | $ — | $ — |
| Employee compensation and benefits | (5,899) | (6,163) |  |  |
| Deferred compensation and benefits | (53,366) | (69,733) | (130,831) | (139,832) |
| Net amount recognized | $ 455,164 | $ 217,559 | $ (130,831) | $ (139,832) |

The accumulated benefit obligation, which excludes the impact of future compensation increases, for all defined benefit pension plans was $1,349 million and $1,543 million at Dec. 30, 2007 and Dec. 31, 2006, respectively. The projected benefit obligation at Dec. 30, 2007 includes $1,292 million related to the Company's qualified pension plans and $59 million related to its non-qualified plans. The Company's non-qualified plans are not funded.

124

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The components of net periodic benefit cost (credit) for Company-sponsored plans were as follows (in thousands):

| | Pension Plans | | | Other Postretirement Plans | | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 |
| Service cost | $ 1,957 | $ 3,934 | $ 25,160 | $ 1,291 | $ 1,335 | $ 1,469 |
| Interest cost | 83,984 | 84,349 | 81,436 | 7,825 | 7,367 | 7,774 |
| Expected return on plans' assets | (139,364) | (128,836) | (127,346) | — | — | — |
| Recognized actuarial loss | 47,080 | 67,018 | 59,095 | 180 | (127) | — |
| Amortization of prior service costs | 220 | 220 | (1,415) | (1,445) | (1,444) | (1,444) |
| Amortization of transition asset | — | (1) | (5) | — | — | (439) |
| Special termination benefits(1) | — | 1,382 | 1,434 | — | — | — |
| Settlement gain(2) | (1,227) | — | — | — | — | — |
| Curtailment gain | — | — | (17,825) | — | — | — |
| Net periodic benefit cost (credit) | $ (7,350) | $ 28,066 | $ 20,534 | $ 7,851 | $ 7,131 | $ 7,360 |

---

(1)  Costs related to position eliminations.
(2)  Gain related to change in control settlement payments made in connection with the consummation of the Merger (see Note 3).

The changes in minimum pension liabilities included in other comprehensive income (loss) for Company-sponsored plans were as follows (in thousands):

| | Pension Plans | | | Other Postretirement Plans | | |
|---|---|---|---|---|---|---|
| | Dec. 30, 2007 | Dec. 31, 2006 | Dec. 25, 2005 | Dec. 30, 2007 | Dec. 31, 2006 | Dec. 25, 2005 |
| Change in minimum pension liabilities included in other comprehensive income, net of tax | $ — | $ 18,987 | $ (20,597) | $ — | $ — | $ — |

Amounts included in the accumulated other comprehensive income (loss) component of shareholders' equity (deficit) for Company-sponsored plans following the adoption of FAS No. 158 were as follows (in thousands):

| | Pension Plans | | Other Postretirement Plans | | Total | |
|---|---|---|---|---|---|---|
| | Dec. 31, 2007 | Dec. 30, 2006 | Dec. 31, 2007 | Dec. 30, 2006 | Dec. 31, 2007 | Dec. 30, 2006 |
| Unrecognized net actuarial gains (losses), net of tax | $ (253,562) | $ (384,859) | $ 8,411 | $ 5,527 | $ (245,151) | $ (379,332) |
| Unrecognized prior service costs, net of tax | (2,790) | (1,400) | 5,078 | 5,959 | 2,288 | 4,559 |
| Total | $ (256,352) | $ (386,259) | $ 13,489 | $ 11,486 | $ (242,863) | $ (374,773) |

In accordance with FAS No. 87, unrecognized net actuarial gains and losses will be recognized in net periodic pension expense over approximately 11 years, representing the estimated average remaining service period of active employees expected to receive benefits, with corresponding adjustments made to accumulated other comprehensive income (loss) in accordance with FAS No. 158. The Company's policy is to incorporate asset-related gains and losses into the asset value used to calculate the expected return on plan assets and into the calculation of amortization of unrecognized net actuarial loss over a four-year period.

During 2008, the Company expects to recognize as part of its net periodic pension benefit cost approximately $25 million of net actuarial losses and $1 million of prior service credits that are included, after

125