# TRIBUNE COMPANY AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

taxes, in the accumulated other comprehensive income (loss) component of shareholders' equity (deficit) at Dec. 30, 2007.

**Assumptions**—Weighted average assumptions used each year in accounting for pension benefits and other postretirement benefits were:

|  | Pension Plans | | Other Postretirement Plans | |
|---|---|---|---|---|
|  | 2007 | 2006 | 2007 | 2006 |
| Discount rate for expense | 5.75% | 5.50% | 5.75% | 5.50% |
| Discount rate for obligations | 6.65% | 5.75% | 6.30% | 5.75% |
| Increase in future salary levels for expense | 3.50% | 3.50% | — | — |
| Increase in future salary levels for obligations | 3.50% | 3.50% | — | — |
| Long-term rate of return on plans' assets | 8.50% | 8.50% | — | — |

The Company used a building block approach to determine its current 8.5% assumption for the long-term expected rate of return on pension plan assets. Based on historical market studies, the Company's long-term expected returns for equity and fixed income securities approximate 10% and 6%, respectively. The Company's current 2008 target asset allocation for pension plan assets is 70% in equity securities and 30% in fixed income securities and other. Prior to Dec. 30, 2007, the Company based the rate used for discounting future benefit obligations and calculating interest cost on an index of Aa-rated corporate bonds. The duration of the bonds in this index approximated the timing of future payments for the Company's benefit obligations. Beginning on Dec. 30, 2007, the Company uses the Citigroup Above Median yield curve for discounting future benefit obligations and calculating interest cost. The Citigroup Above Median yield curve represents yields on high quality corporate bonds that more closely match the cash flows of the estimated payouts for the Company's benefit obligations.

**Plan Assets**—The Company's pension plans' asset allocations at Dec. 30, 2007 and Dec. 31, 2006 were as follows (in millions):

|  | Plan Assets | | | |
|---|---|---|---|---|
| Asset Category | Dec. 30, 2007 | | Dec. 31, 2006 | |
| Equity securities | $ 1,316 | 72.8% | $ 1,344 | 76.2% |
| Fixed income securities | 405 | 22.4% | 334 | 18.9% |
| Other | 86 | 4.8% | 86 | 4.9% |
| Total | $ 1,807 | 100% | $ 1,764 | 100% |

**Health Care Cost Trend Rates**—For purposes of measuring 2007 postretirement health care costs, a 8.25% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2007. The rate was assumed to decrease gradually to 5% for 2012 and remain at that level thereafter. For purposes of measuring health care obligations at Dec. 30, 2007, a 6.7% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2008. The rate was assumed to decrease gradually to 5% for 2012 and remain at that level thereafter.

Assumed health care cost trend rates have a significant effect on the amounts reported for health care plans. As of the date of this report, a 1% change in assumed health care cost trend rates would have the following effects (in thousands):

|  | 1% Increase | 1% Decrease |
|---|---|---|
| Service cost and interest cost | $ 357 | $ (319) |
| Projected benefit obligation | $ 5,559 | $ (4,983) |

126

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Cash Flows**—The Company contributed $17 million to certain of its union and non-qualified pension plans, including $10 million of contributions made pursuant to change in control provisions contained in certain of the Company's non-qualified pensions plans upon consummation of the Merger, and $15 million to its other postretirement plans in 2007. The Company plans to contribute $6 million to certain of its union and non-qualified pension plans and $13 million to its other postretirement plans in 2008.

**Expected Future Benefit Payments**—The following benefit payments, which reflect expected future service, as appropriate, are expected to be paid (in thousands):

|  | Pension Benefits | Other Postretirement Benefits |
|---|---|---|
| 2008 | $   87,205 | $   14,746 |
| 2009 | 91,420 | 14,798 |
| 2010 | 95,207 | 14,804 |
| 2011 | 98,976 | 14,832 |
| 2012 | 102,946 | 14,487 |
| 2013-2017 | $ 576,314 | $   66,598 |

## NOTE 16: CAPITAL STOCK

On Dec. 20, 2007, the Company consummated the Merger Agreement, as defined and discussed in Note 3. Pursuant to the Merger Agreement, each share of the Company's common stock issued and outstanding immediately prior to the Merger, other than shares held by the Company, the ESOP or Merger Sub immediately prior (in each case, other than shares held on behalf of third parties) and shares held by shareholders who validly exercised appraisal rights, was cancelled and automatically converted into the right to receive $34.00, without interest and less any applicable withholding taxes.

The Company notified the New York Stock Exchange (the "NYSE") that the Merger was consummated and requested that the Company's common stock (and associated Series A junior participating preferred stock purchase rights) be suspended from the NYSE, effective as of the close of market on Dec. 20, 2007, and that the NYSE file with the Securities and Exchange Commission an application on Form 25 to report that the shares of the Company's common stock and associated Series A junior participating preferred stock purchase rights are no longer listed on the NYSE.

Following the consummation of the Merger, the Company had no shares of common stock issued other than 56,521,739 shares held by the ESOP. None of the shares held by the ESOP had been committed for release or allocated to employees at Dec. 30, 2007. See Note 17 for further information on the classification of the shares of the Company's common stock held by the ESOP in the Company's consolidated balance sheet at Dec. 30, 2007.

**Series C, D-1 and D-2 Convertible Preferred Stock**—In connection with the June 12, 2000 merger with Times Mirror, outstanding shares of Times Mirror cumulative, non-voting preferred stock were converted into shares of Tribune preferred stock with similar terms. A total of 213,733 shares of the Company's Series C-1, D-1 and D-2 convertible preferred stock, net of treasury stock, were issued due to the conversion. The Series C, D-1 and D-2 convertible preferred stocks related to Times Mirror recapitalization transactions whereby TMCT, LLC and TMCT II, LLC (see Note 8) were formed. In connection with a restructuring of TMCT, LLC and TMCT II, LLC, all of these preferred shares were distributed to the Company on Sept. 22, 2006. As a result, the Company had no preferred shares outstanding effective as of Sept. 22, 2006, other than 137,643 treasury shares of Series D-1 convertible preferred stock held by a subsidiary of the Company. These remaining shares of convertible preferred stock were retired prior to the completion of the Merger.

Series C convertible preferred stock was cumulative, non-voting preferred stock, which was entitled to annual dividends of 8%, based on liquidation value. Dividends for Series D-1 and D-2 preferred stock were paid

127

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

at the annual rate of 6.91% and 6.67% in 2006 and 2005, respectively. The Series C, D-1 and D-2 preferred stocks were convertible into the Company's common stock in 2025 and thereafter. The conversion factor was calculated by dividing $500 plus accrued and unpaid dividends by the average closing prices of the Company's common stock for the 20 trading days immediately preceding the conversion date.

**Common Stock Repurchases**—As defined and discussed in the description of the Leveraged ESOP Transactions in Note 3, the Company completed two common stock repurchases in 2007. The following table summarizes the Company's common stock repurchases during 2007 (in thousands):

|  | Shares | | Cost |
|---|---|---|---|
| June 4, 2007 Share Repurchase | 126,007 | $ | 4,289,192 |
| Dec. 20, 2007 Merger consummation | 118,586 | | 4,032,081 |
| Total common stock repurchases | 244,593 | $ | 8,321,273 |

The following table summarizes the Company's common stock repurchases during 2006 (in thousands):

|  | Shares | | Cost |
|---|---|---|---|
| Repurchases in the first quarter | 4,604 | $ | 137,746 |
| Tender offer repurchases | 45,027 | | 1,468,270 |
| Repurchases from the Robert R. McCormick Tribune Foundation and Cantigny Foundation | 10,000 | | 325,300 |
| Repurchases subsequent to the tender offer | 11,053 | | 330,952 |
| Total common stock repurchases | 70,684 | $ | 2,262,268 |

On May 30, 2006, the Company initiated a modified "Dutch Auction" tender offer to repurchase up to 53 million shares of its common stock at a price per share not greater than $32.50 and not less than $28.00. The tender offer closed on June 26, 2006, and the Company acquired 45 million shares of its common stock on July 5, 2006 at a price of $32.50 per share before transaction costs. The Company also acquired 10 million shares of its common stock from the Robert R. McCormick Tribune Foundation and the Cantigny Foundation on July 12, 2006 at a price of $32.50 per share before transaction costs. The Robert R. McCormick Tribune Foundation and the Cantigny Foundation were affiliated non-profit organizations, which together held 13.6% of the Company's outstanding shares when the tender offer was launched. In connection with the tender offer, the Board also authorized the repurchase of an additional 12 million shares of the Company's common stock commencing on the eleventh business day following the completion of the tender offer. In the third quarter of 2006, the Company repurchased an additional 11.1 million shares under that authorization at a weighted average cost of $29.94 per share. In addition, the Company repurchased and retired 4.6 million shares of its common stock in the first quarter of 2006.

During 2005, the Company repurchased and retired 12.2 million shares of its common stock in the open market for $440 million.

**Stock Purchase Warrants**—As defined and discussed in the description of the Leveraged ESOP Transactions contained in Note 3, following the consummation of the Merger, the Zell Entity purchased from the Company a 15-year warrant. The warrant entitles the Zell Entity to purchase 43,478,261 shares of the Company's common stock (subject to adjustment), which represents approximately 40% of the economic equity interest in the Company following the Merger (on a fully-diluted basis, including after giving effect to the share equivalents granted under the Management Equity Incentive Plan as defined and discussed in Note 17). The warrant has an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years of the warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). Thereafter, the Zell Entity assigned minority interests in the subordinated promissory note and the warrant to certain permitted

128

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

assignees. See Part III, Items 12 and 13, hereof for further information on the assignment of the minority interests in the subordinated promissory note and the warrant. The Company recorded the warrants at an estimated fair value of $255 million, which is presented as a separate component of shareholders' equity (deficit) in the Company's consolidated balance sheet at Dec. 30, 2007.

## NOTE 17: INCENTIVE COMPENSATION AND STOCK PLANS

**Defined Contribution Plans**—The Company maintains various qualified 401(k) savings plans, which permit eligible employees to make voluntary contributions on a pretax basis. The plans allow participants to invest their savings in various investments. In 2004, the Company enhanced its primary 401(k) plan to include a larger Company contribution. This new plan was designed to replace the Company's Employee Stock Ownership Plan that was established in 1988 and fully allocated at the end of 2003. In 2006, the Company amended its primary 401(k) plan to make a portion of the Company's contributions discretionary. Amounts charged to expense for all of the Company's defined contribution plans totaled $35 million in 2007, $65 million in 2006, and $59 million in 2005.

**Employee Stock Purchase Plan**—This plan permitted eligible employees to purchase the Company's common stock at 85% of market price. In April 2007, the Company suspended future contributions to the plan. The Company incurred charges of $.1 million in 2007 and $.2 million in 2006 and 2005 related to the administration of this plan. During 2007, 2006, and 2005, 175,687, 598,186, and 682,624 shares, respectively, were sold to employees under this plan. The weighted average fair value of shares sold in 2007 was $30.70. The Plan was discontinued as of Dec. 20, 2007 following the consummation of the Merger (see Note 3).

**Employee Stock Ownership Plan ("ESOP")**—As defined and described in Note 3, on April 1, 2007, the Company established a new ESOP as a long-term employee benefit plan. On that date, the ESOP purchased 8,928,571 shares of the Company's common stock. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from the Company to the ESOP and/or distributions paid on the shares of the Company's common stock held by the ESOP. Upon consummation of the Merger, the 8,928,571 shares of the Company's common stock held by the ESOP were converted into 56,521,739 shares of common stock.

The ESOP provides for the allocation of the Company's common shares it holds on a noncontributory basis to eligible employees of the Company. None of the shares held by the ESOP had been committed for release or allocated to employees at Dec. 30, 2007. Beginning in fiscal year 2008, as the Company repays the ESOP loan, shares will be released and allocated to eligible employees in proportion to their eligible compensation. The shares that are released for allocation on an annual basis will be in the same proportion that the current year's principal and interest payments bear in relation to the total remaining principal and interest payments to be paid over the life of the $250 million ESOP loan. The Company will recognize compensation expense based on the estimated fair value of the shares of the Company's common stock that are allocated in each annual period.

129

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The Company's policy is to present unallocated shares held by the ESOP at book value, net of unearned compensation, and allocated shares at fair value in the Company's consolidated balance sheet. Pursuant to the terms of the ESOP, following the Merger, participants who receive distributions of shares of the Company's common stock can require the Company to repurchase those shares within a specified time period following such distribution. Accordingly, the shares of the Company's common stock held by the ESOP are classified outside of shareholders' equity (deficit), net of unearned compensation, in the Company's consolidated balance sheet. The amounts at Dec. 30, 2007 were as follows (in thousands):

|  | Dec. 30, 2007 |
|---|---|
| Unallocated ESOP shares (at book value) | $ 250,000 |
| Unearned compensation related to ESOP | (250,000) |
| Common shares held by ESOP, net of unearned compensation | $ — |

At Dec. 30, 2007, the fair value of the unallocated shares held by the ESOP was approximately $593 million. In accordance with the terms of the ESOP, the fair value of the Company's common stock was determined by the trustee of the ESOP.

**Tribune Company Incentive Compensation Plan**—In 1997, the 1992 Long-Term Incentive Plan was replaced with the 1997 Incentive Compensation Plan, which was amended and restated in 2004 as the Tribune Company Incentive Compensation Plan (the "Incentive Plan"). The Incentive Plan provides for the granting of awards to eligible employees in any one or combination of stock options, performance equity program awards and annual management incentive program bonuses.

On Dec. 20, 2007, the Company consummated the Merger, as defined and described in the description of the Leveraged ESOP Transactions in Note 3. Pursuant to the Merger Agreement, the Company redeemed for cash all outstanding stock awards, each of which vested in full upon completion of the Merger, with positive intrinsic value relative to $34.00 per share. Accordingly, the Company recorded additional stock-based compensation expense of $53 million, or $35 million net of taxes, in the fourth quarter of 2007 in connection with the cash settlement of its outstanding stock awards (see below for further discussion of amounts recorded for stock-based compensation following the adoption of FAS 123R). All remaining outstanding stock awards under the Incentive Plan as of Dec. 20, 2007 that were not cash settled pursuant to the Merger Agreement were cancelled. Following the Merger, the Company does not intend to grant any new equity awards under the Incentive Plan.

**Tribune Company Management Equity Incentive Plan**—On Dec. 20, 2007, the Board approved the Company's 2007 Management Equity Incentive Plan (the "Management Equity Incentive Plan"). The Management Equity Incentive Plan provides for phantom units (the "Units") that generally track the value of a share of the Company's common stock after the effective date of the Merger. Awards have been made to eligible members of the Company's management and other key employees at the discretion of the Board. Under the terms of the Management Equity Incentive Plan, awards are classified as First Tranche Units or Second Tranche Units.

The First Tranche Units represent approximately 5% of the Company's fully-diluted outstanding common stock, including after giving effect to the stock purchase warrants (see Note 16) and the First Tranche Units and Second Tranche Units authorized under the Management Equity Incentive Plan (5,434,652 First Tranche Units authorized, subject to customary anti-dilution adjustments). First Tranche Units vest ratably over a three-year period beginning on the date of grant. Unvested First Tranche Units vest upon a change in control of the Company or upon termination of employment due to death or disability. Unvested First Tranche Units will be cancelled upon a termination of a participant's employment for any reason other than death or disability.

The Second Tranche Units represent approximately 3% of the fully-diluted outstanding common stock, including after giving effect to the stock purchase warrants (see Note 16) and the First Tranche Units and Second Tranche Units authorized under the Management Equity Incentive Plan (3,261,000 Second Tranche Units authorized, subject to customary anti-dilution adjustments). Fifty percent of the Second Tranche Units vested upon grant and the remaining fifty percent will vest on the one year anniversary of the grant date. Any unvested

130

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Second Tranche Units will become fully vested upon a change in control of the Company, an involuntary termination of employment or a termination of employment due to a Plan participant's death or disability. Unvested Second Tranche Units will be cancelled upon a termination of a participant's employment for any reason other than an involuntary termination of employment or a termination of employment due to death or disability. Participants receiving Second Tranche Units will be entitled to a gross-up for the payment of excise taxes, if any, in connection with the Merger.

In general, one-third of vested Units subject to an award (whether First Tranche Units or Second Tranche Units) will be payable in cash on each of the fourth, sixth and eighth anniversaries of the grant date or, if sooner, upon the occurrence of a change in control or a termination of employment based on the fair market value of the Company's common stock on the December 31 immediately following the settlement event. With respect to Second Tranche Units only, in the event of a termination of a Plan participant's employment prior to Dec. 20, 2008, such participant will receive his or her pro rata share (based upon the amount of his or her vested Second Tranche Units relative to all Second Tranche Units outstanding and reserved for issuance) of $25 million, payable within ten business days following such termination of employment.

The Company accounts for the Units issued under the Management Equity Incentive Plan as liability-classified awards in accordance with FAS No. 123 (see below for further information regarding the Company's adoption of FAS No. 123R). The Company recorded $19 million of compensation expense in 2007 in connection with the Management Equity Incentive Plan, including $3 million of early termination payments made immediately following the Merger. As required by the terms of the plan, the remaining $16 million of expense was based on the estimated fair value of the Company's common stock as of Dec. 30, 2007 as determined by the trustee of the ESOP and is included in other non-current liabilities on the Company's consolidated balance sheet at Dec. 30, 2007.

**Stock-Based Compensation**—In the first quarter of 2006, the Company adopted FAS No. 123R which requires the Company to expense stock-based compensation in its income statement. Under FAS No. 123R, stock-based compensation cost is measured at the grant date for equity-classified awards and at the end of each reporting period for liability-classified awards based on the estimated fair value of the awards. The Company adopted FAS No. 123R using the modified prospective application method and did not restate prior years. FAS No. 123R requires stock-based compensation expense to be recognized over the period from the date of grant to the date when the award is no longer contingent on the employee providing additional service (the "substantive vesting period"). The Incentive Plan provided that awards generally vested upon the death, disability or retirement of an employee. As a result, stock-based grants issued to retirement eligible employees under the Incentive Plan were required to be expensed immediately. The Units issued under the Management Equity Incentive Plan do not contain a retirement eligibility provision and are therefore expensed ratably over the contractual vesting period of each Unit.

Prior to the adoption of FAS No. 123R, the Company accounted for its stock-based compensation plans in accordance with APB No. 25 and related interpretations. Under APB No. 25, no compensation expense was recorded because the exercise price of employee stock options equaled the market price of the underlying stock on the date of grant. Under the provisions of APB No. 25, the Company was not required to recognize compensation expense for its Employee Stock Purchase Plan. See Note 1 for pro forma stock-based compensation expense calculated under FAS No. 123 for 2005.

131

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The following table summarizes the impact of the adoption of FAS 123R on the Company's consolidated statement of income for the years ended Dec. 30, 2007 and Dec. 31, 2006 (in thousands):

|  | 2007 | 2006 |
|---|---|---|
| Stock-based compensation expense: | | |
| Options (1) | $ 4,935 | $ 8,747 |
| Restricted stock units(1)(2) | 86,392 | 19,975 |
| Management Equity Incentive Plan(2)(3) | 18,568 | — |
| Employee stock purchase plan | 800 | 2,681 |
| Total stock-based compensation expense | 110,695 | 31,403 |
| Income tax benefit | (40,108) | (12,247) |
| Total impact on net income from continuing operations | (70,587) | (19,156) |
| Impact on discontinued operations, net of tax | 11 | (251) |
| Total impact on net income | $ (70,576) | $ (19,407) |

(1)    Option and restricted stock unit expense for 2007 includes accelerated compensation amounts recorded in connection with the consummation of the Merger of $2.5 million and $50.3 million, respectively.

(2)    Expense for restricted stock units and the Management Equity Incentive Plan would have been recorded under APB No. 25.

(3)    Expense for the Management Equity Incentive Plan includes $2.9 million of early termination payments made immediately following the Merger.

Total stock-based compensation costs included $.2 million and $.1 million of capitalized costs and less than $.1 million and $.4 million of costs related to discontinued operations in 2007 and 2006, respectively.

As of Dec. 30, 2007, the Company had not yet recognized compensation cost on the following non-vested awards (in thousands):

|  | Nonvested Compensation | Weighted Average Recognition Period |
|---|---|---|
| Management Equity Incentive Plan | $ 57,623 | 1.48 years |

In determining the fair value of compensation cost for equity-classified awards granted under the Incentive Plan, the Company valued restricted stock unit awards at the quoted closing market price on the date of grant. The fair value of stock option awards was determined using the Black-Scholes option-pricing model, which incorporated the assumptions in the following table for general and replacement awards granted during 2006 and 2005. There were no general awards or replacement awards granted in 2007. The risk-free rate was based on the U.S. Treasury yield curve in effect at the time of grant. Expected volatility was based on actual historical volatility. Expected life was based on historical experience and consideration of changes in option terms.

|  | 2006 | | 2005 | |
|---|---|---|---|---|
|  | General Awards | Replacement Awards | General Awards | Replacement Awards |
| Risk-free interest rate | 4.6% | * | 3.7% | 3.3% |
| Expected dividend yield | 2.5% | * | 1.8% | 1.8% |
| Expected stock price volatility | 22.0% | * | 28.1% | 22.8% |
| Expected life (in years) | 4 | * | 5 | 3 |
| Weighted average fair value | $ 5.96 | * | $ 10.49 | $ 6.96 |

*No replacement awards were granted in 2006.

Under the Incentive Plan, the exercise price of a stock option award could not be less than the market price of the Company's common stock at the time the stock option award was granted. Stock option awards were exercisable not less than six months or more than 10 years after the date the stock option award was granted. General stock option awards granted after 2003 had an 8-year term. General stock option awards granted under the Plan prior to 2006 vested in annual 25% increments beginning one year from the date

of the grant. General

132

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

stock option awards granted under the Plan in 2006 vested in annual 33% increments beginning one year from the date of the grant.

Under certain circumstances, replacement options were granted when a participant paid the exercise price of a stock option and related tax withholding obligations with previously acquired shares of common stock. The number of replacement options granted was equal to the number of shares used to pay the exercise price and related tax withholding obligations. The exercise price of a replacement option was equal to the market price of the underlying stock on the date of grant, and the term was equal to the remaining term of the original option. Replacement options vested one year from the date of grant. Beginning in 2004, general stock option awards did not have a replacement stock option award feature.

A summary of activity and weighted average exercise prices and fair values related to general stock option awards follows (shares in thousands):

| | General Options(1) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2007 | | | 2006 | | | 2005 | | |
| | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value |
| Outstanding, beginning of year | 33,442 | $ 38.30 | $ 14.38 | 34,489 | $ 38.35 | $ 15.03 | 32,991 | $ 37.92 | $ 15.59 |
| Granted | — | — | — | 1,938 | 31.16 | 5.96 | 3,780 | 40.30 | 10.64 |
| Exercised | (3,351) | 22.77 | 20.23 | (1,101) | 21.24 | 20.25 | (993) | 23.96 | 18.40 |
| Canceled/forfeited | (2,470) | 41.38 | 13.56 | (1,884) | 42.13 | 13.57 | (1,289) | 43.57 | 13.68 |
| Cash settled in Merger | (5,254) | 26.31 | 15.12 | — | — | — | — | — | — |
| Canceled in Merger | (22,367) | 43.01 | 13.48 | — | — | — | — | — | — |
| Outstanding, end of year | — | — | — | 33,442 | 38.30 | 14.38 | 34,489 | 38.35 | 15.03 |
| Exercisable, end of year | — | — | — | 31,469 | $ 38.75 | $ 14.93 | 32,993 | $ 38.28 | $ 15.08 |

(1) Includes options assumed in the Times Mirror acquisition.

A summary of activity and weighted average exercise prices and fair values related to replacement options follows (shares in thousands):

| | Replacement Options | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2007 | | | 2006 | | | 2005 | | |
| | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value |
| Outstanding, beginning of year | 7,185 | $ 48.10 | $ 8.04 | 9,520 | $ 47.79 | $ 8.06 | 10,845 | $ 47.79 | $ 8.11 |
| Granted | — | — | — | — | — | — | 13 | 41.83 | 6.96 |
| Exercised | — | — | — | — | — | — | (20) | 42.20 | 8.43 |
| Canceled/forfeited | (4,501) | 47.90 | 8.11 | (2,335) | 46.83 | 8.13 | (1,318) | 47.93 | 8.46 |
| Canceled in Merger | (2,684) | 48.40 | 7.90 | — | — | — | — | — | --- |
| Outstanding, end of year | — | — | — | 7,185 | 48.10 | 8.04 | 9,520 | 47.79 | 8.06 |
| Exercisable, end of year | — | — | — | 7,185 | $ 48.10 | $ 8.04 | 9,507 | $ 47.80 | $ 8.06 |

The total intrinsic value (the excess of the market price over the exercise price) was approximately $49 million for general and replacement stock option awards outstanding and exercisable as of Dec. 31, 2006. The total intrinsic value for stock options exercised in 2007 prior to the Merger and in 2006 was approximately $43 million and $11 million, respectively. The Company realized approximately $21 million of tax benefits from the exercise and cash settlement of stock options in 2007. In addition, the Company received approximately $77 million from the exercise of stock options in 2007. In 2006, the Company realized approximately $4 million of tax benefits and received approximately $22 million from the exercise of stock options. Pursuant to the Merger

133

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Agreement, the Company paid $135 million in connection with the cash settlement of its outstanding stock awards.

The Incentive Plan also allowed the Company to grant restricted stock units. The Company did not grant restricted stock units prior to 2006. In 2006, the Company granted restricted stock units which vested either in annual 33% increments beginning one year from the date of the grant, or 100% three years from the date of grant. Each restricted stock unit represented the Company's obligation to deliver to the holder one share of common stock upon vesting.

Holders of restricted stock also received dividend equivalent units until the restricted stock units vested. The number of dividend equivalent units granted for each restricted stock unit was calculated based on the value of the dividends per share paid on Tribune's common stock and the closing price of Tribune stock on the dividend payment date. The dividend equivalent units vested with the underlying restricted stock units.

A summary of restricted stock unit and dividend equivalent unit activity and weighted average fair values follows (shares in thousands):

| | 2007 | | 2006 | | 2005 | |
| | Shares | Weighted Avg. Fair Value | Shares | Weighted Avg. Fair Value | Shares | Weighted Avg. Fair Value |
|---|---|---|---|---|---|---|
| Outstanding and nonvested, beginning of year | 1,524 | $ 31.18 | — | — | — | — |
| Restricted stock units granted | 1,837 | 30.41 | 1,523 | $ 31.18 | — | — |
| Dividend equivalent units granted | 11 | — | 34 | — | — | — |
| Forfeited | (135) | 30.29 | (33) | $ 31.16 | — | — |
| Vested and issued | (410) | 30.65 | — | — | — | — |
| Cash settled in Merger | (2,827) | 34.00 | — | — | — | — |
| Outstanding and nonvested, end of year | — | — | 1,524 | $ 31.18 | — | — |

As described above, the Company issued Units under the Management Equity Incentive Plan following the consummation of the Merger. The fair value of the Units is based on the estimated fair value of the Company's common stock at the end of each reporting period, other than for Second Tranche Units that are cash settled due to early terminations prior to Dec. 20, 2008.

A summary of 2007 activity under the Management Equity Incentive Plan and weighted average fair values follows (Units in thousands):

| | 2007 | |
| | Units | Weighted Avg. Fair Value |
|---|---|---|
| Outstanding, beginning of year | — | |
| First Tranche Units granted | 4,163 | $ 10.50 |
| Second Tranche Units granted | 3,196 | 10.50 |
| Cash settled due to early terminations | (380) | 7.67 |
| Outstanding, end of year | 6,979 | 10.50 |
| Vested, end of year | 1,408 | $ 10.50 |

134

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

## NOTE 18: COMPREHENSIVE INCOME

Comprehensive income reflects all changes in the net assets of the Company during the period from transactions and other events and circumstances, except those resulting from stock issuances, stock repurchases and dividends. The Company's comprehensive income includes net income and other gains and losses. Prior to 2007, the Company's other comprehensive income (loss) primarily included gains and losses on marketable securities classified as available-for-sale and the change in minimum pension liabilities. Beginning in the Company's 2007 fiscal year, and as a result of the Company's adoption of FAS No. 158 as of Dec. 31, 2006, other comprehensive income (loss) no longer includes the change in minimum pension liabilities, but does include changes in unrecognized benefit cost gains and losses. In addition, beginning in the Company's 2007 third quarter, other comprehensive income (loss) includes gains and losses on cash flow hedging instruments as a result of the interest rate swap agreements the Company entered into in July 2007 (see Note 10 for further information on the Company's interest rate swap agreements). The Company's comprehensive income was as follows (in thousands):

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Net income | $    86,945 | $    593,995 | $    534,689 |
| Change in unrecognized benefit cost loss, net of taxes of $66,850 | 104,560 | — | — |
| Adjustment for previously unrecognized benefit cost (gains) and losses included in net income, net of taxes of $17,486 | 27,350 | — | — |
| Change in minimum pension liabilities, net of taxes of $12,139 and ($13,168), respectively | — | 18,987 | (20,597) |
| Unrealized gain (loss) on marketable securities: |  |  |  |
| Unrealized holding gain (loss) arising during the period, net of taxes of ($3,414), $1,234, and ($2,098), respectively | (5,340) | 1,929 | (3,282) |
| Adjustment for gain on investment sales included in net income, net of taxes of ($7,241) and ($116), respectively | — | (11,325) | (181) |
| Unrealized gain (loss) on marketable securities, net of taxes | (5,340) | (9,396) | (3,463) |
| Unrecognized losses on cash flow hedging instruments: |  |  |  |
| Change in losses on cash flow hedging instruments, net of taxes of ($35,440) | (55,431) | — | — |
| Adjustment for losses on cash flow hedging instruments included in net income, net of taxes of $661 | 1,033 | — | — |
| Unrecognized losses on cash flow hedging instruments, net of taxes | (54,398) | — | — |
| Change in foreign currency translation adjustments, net of taxes of $373, $117 and ($45), respectively | 584 | 183 | (70) |
| Other comprehensive income (loss) | 72,756 | 9,774 | (24,130) |
| Comprehensive income | $    159,701 | $    603,769 | $    510,559 |

135

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Accumulated other comprehensive income (loss) is a separate component of shareholders' equity (deficit) on the Company's consolidated balance sheet. A reconciliation of the components of accumulated other comprehensive income (loss) is as follows (in thousands):

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Minimum pension liabilities, net of tax: | | | |
| Balance, beginning of year | $ — | $ (27,901) | $ (7,304) |
| Current year change prior to adoption of FAS No. 158 | — | 18,987 | (20,597) |
| Change due to adoption of FAS No. 158 | — | 8,914 | — |
| Balance, end of year | — | — | (27,901) |
| Unrecognized benefit cost gains and (losses), net of tax: | | | |
| Balance, beginning of year | (374,773) | — | — |
| Current year change | 131,910 | — | — |
| Change due to adoption of FAS No. 158 | — | (374,773) | — |
| Balance, end of year | (242,863) | (374,773) | — |
| Unrealized gain (loss), net of tax, on marketable securities: | | | |
| Balance, beginning of year | 7,051 | 16,447 | 19,910 |
| Current year change | (5,340) | (9,396) | (3,463) |
| Balance, end of year | 1,711 | 7,051 | 16,447 |
| Foreign currency translation adjustments, net of tax: | | | |
| Balance, beginning of year | 337 | 154 | 224 |
| Current year change | 584 | 183 | (70) |
| Balance, end of year | 921 | 337 | 154 |
| Unrecognized losses on cash flow hedging instruments, net of tax: | | | |
| Balance, beginning of year | — | — | — |
| Current year change | (54,398) | — | — |
| Balance, end of year | (54,398) | — | — |
| Accumulated other comprehensive income (loss) | $ (294,629) | $ (367,385) | $ (11,300) |

The adoption of FAS No. 158 resulted in a net increase in accumulated other comprehensive loss, and a corresponding net decrease in shareholders' equity, of $366 million at Dec. 31, 2006 (see Note 15 for additional information on the impact of the adoption of FAS No. 158).

**NOTE 19: BUSINESS SEGMENTS**

Tribune Company is a media and entertainment company that conducts its operations through two business segments: publishing and broadcasting and entertainment. In addition, certain administrative activities are reported and included under corporate. These segments reflect the manner in which the Company sells its products to the marketplace and the manner in which it manages its operations and makes business decisions.

**Publishing**—Tribune Publishing currently operates nine market-leading daily newspapers and related businesses, distributes entertainment listings and syndicated content, operates a 24-hour cable news channel, and manages the websites of Tribune's daily newspapers and television stations, along with other branded sites targeting specific communities of interest. The daily newspapers are the *Los Angeles Times*; *Chicago Tribune*; *Newsday,* serving Nassau and Suffolk counties on Long Island, New York and the borough of Queens, New York; *South Florida Sun-Sentinel*; *Orlando Sentinel*; *The Sun,* serving the metropolitan Baltimore, Maryland market; *Hartford Courant, The Morning Call,* serving Pennsylvania's Lehigh Valley; and *Daily Press,* serving the Virginia Peninsula.

136

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Broadcasting and Entertainment**—The Company's broadcasting operations currently consist of The CW Network affiliates in New York, Los Angeles, Chicago, Dallas, Washington D.C., Houston, Miami, Denver, St. Louis, Portland, Indianapolis, San Diego, Hartford, and New Orleans; FOX television affiliates in Seattle, Sacramento, Indianapolis, Hartford, Grand Rapids and Harrisburg; MyNetwork affiliates in Philadelphia and Seattle; an ABC television affiliate in New Orleans; and one radio station in Chicago. Entertainment operations include Tribune Entertainment, which distributes its own programming together with programming licensed from third parties, and the Chicago Cubs baseball team.

No single customer provides more than 10% of the Company's revenue. In determining operating profit for each segment, none of the following items have been added or deducted: interest and dividend income, interest expense, equity income and loss, non-operating items or income taxes. Assets represent those tangible and intangible assets used in the operations of each segment. Corporate assets include cash and the Company's investment portfolio.

137

## TRIBUNE COMPANY AND SUBSIDIARIES
## BUSINESS SEGMENTS
### (In thousands of dollars)

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| **Operating Revenues** |  |  |  |
| Publishing | $ 3,664,590 | $ 4,018,418 | $ 4,012,413 |
| Broadcasting and entertainment | 1,398,394 | 1,425,146 | 1,414,433 |
| Total operating revenues | $ 5,062,984 | $ 5,443,564 | $ 5,426,846 |
| **Operating Profit(1)** |  |  |  |
| Publishing(2) | $ 368,193 | $ 748,940 | $ 753,781 |
| Broadcasting and entertainment | 357,341 | 391,533 | 416,891 |
| Corporate expenses | (91,617) | (55,712) | (49,413) |
| Total operating profit | $ 633,917 | $ 1,084,761 | $ 1,121,259 |
| **Depreciation** |  |  |  |
| Publishing(3) | $ 167,600 | $ 163,467 | $ 181,081 |
| Broadcasting and entertainment | 39,553 | 39,815 | 36,828 |
| Corporate | 1,084 | 1,380 | 1,630 |
| Total depreciation | $ 208,237 | $ 204,662 | $ 219,539 |
| **Amortization of Intangible Assets** |  |  |  |
| Publishing | $ 8,315 | $ 8,208 | $ 7,181 |
| Broadcasting and entertainment | 11,518 | 11,555 | 11,657 |
| Total amortization of intangible assets | $ 19,833 | $ 19,763 | $ 18,838 |
| **Capital Expenditures** |  |  |  |
| Publishing | $ 104,732 | $ 173,459 | $ 163,317 |
| Broadcasting and entertainment | 38,793 | 42,227 | 36,851 |
| Corporate | 2,476 | 6,221 | 5,777 |
| Total capital expenditures | $ 146,001 | $ 221,907 | $ 205,945 |
| **Assets** |  |  |  |
| Publishing | $ 8,131,591 | $ 8,512,512 | $ 8,637,176 |
| Broadcasting and entertainment | 4,017,255 | 3,987,449 | 4,425,135 |
| Corporate | 1,000,873 | 900,811 | 1,483,931 |
| Total assets | $ 13,149,719 | $ 13,400,772 | $ 14,546,242 |

(1) Operating profit for each segment excludes interest and dividend income, interest expense, equity income and loss, non-operating items and income taxes.

(2) Publishing operating profit for 2007 includes an impairment charge of $130 million to write-down one of its masthead intangible assets to fair value (see Note 7).

(3) Publishing depreciation for 2005 includes $16 million of accelerated depreciation expense related to the shut down of the *Los Angeles Times'* San Fernando Valley printing facility (see Note 2).

138

**TRIBUNE COMPANY AND SUBSIDIARIES**
**2007 QUARTERLY RESULTS (Unaudited)**
**(In thousands of dollars)**

| | Quarters | | | | 2007 |
| | First | Second | Third | Fourth | Total |
|---|---|---|---|---|---|
| **Operating Revenues** | | | | | |
| Publishing | $  926,371 | $  915,052 | $  870,848 | $  952,319 | $ 3,664,590 |
| Broadcasting and entertainment | 283,008 | 392,959 | 406,051 | 316,376 | 1,398,394 |
| Total operating revenues | $ 1,209,379 | $ 1,308,011 | $ 1,276,899 | $ 1,268,695 | $ 5,062,984 |
| **Operating Profit** | | | | | |
| Publishing(1) | $  140,176 | $  102,455 | $  122,543 | $      3,019 | $   368,193 |
| Broadcasting and entertainment | 61,382 | 107,734 | 117,787 | 70,438 | 357,341 |
| Corporate expenses | (19,641) | (13,932) | (11,329) | (46,715) | (91,617) |
| Total operating profit | 181,917 | 196,257 | 229,001 | 26,742 | 633,917 |
| Net income on equity investments | 12,684 | 28,710 | 26,559 | 32,266 | 100,219 |
| Interest and dividend income | 3,154 | 3,830 | 4,924 | 9,919 | 21,827 |
| Interest expense | (83,249) | (115,905) | (186,771) | (195,715) | (581,640) |
| Gain (loss) on change in fair values of derivatives and related investments(2) | (69,780) | (27,395) | (84,969) | 85,338 | (96,806) |
| Strategic transaction expenses(2) | (14,473) | (20,925) | (3,160) | (46,573) | (85,131) |
| Gain on TMCT transactions(2) | — | — | 8,329 | (326) | 8,003 |
| Gain on other investment transactions, net(2) | 73 | 443 | — | 31,062 | 31,578 |
| Other non-operating gain (loss), net(2) | 465 | 5,534 | 1,936 | (2,798) | 5,137 |
| **Income (Loss) from Continuing Operations Before Income Taxes** | 30,791 | 70,549 | (4,151) | (60,085) | 37,104 |
| Income taxes(2) | (19,441) | (34,764) | 89,966 | (17,527) | 18,234 |
| **Income (Loss) from Continuing Operations** | 11,350 | 35,785 | 85,815 | (77,612) | 55,338 |
| **Income (Loss) from Discontinued Operations, net of tax(3)** | (34,645) | 491 | 66,950 | (1,189) | 31,607 |
| **Net Income (Loss)** | $  (23,295) | $   36,276 | $  152,765 | $  (78,801) | $    86,945 |

---

**Notes to Quarterly Results:**

(1) In the fourth quarter of 2007, the Company recorded a $130 million pretax impairment charge related to one of its masthead intangible assets. See Note 7 to the Company's consolidated financial statements for further information.

(2) See Note 2 to the Company's consolidated financial statements for information pertaining to non-operating items recorded in 2007 and 2006.

(3) See Note 4 to the Company's consolidated financial statements for information pertaining to discontinued operations.

139

**TRIBUNE COMPANY AND SUBSIDIARIES**
**2006 QUARTERLY RESULTS (Unaudited)**
**(In thousands of dollars)**

| | Quarters | | | | 2006 |
| | First | Second | Third | Fourth | Total |
|---|---|---|---|---|---|
| **Operating Revenues** | | | | | |
| Publishing | $ 977,534 | $ 1,008,659 | $ 939,614 | $ 1,092,611 | $ 4,018,418 |
| Broadcasting and entertainment | 284,102 | 392,886 | 392,555 | 355,603 | 1,425,146 |
| Total operating revenues | $ 1,261,636 | $ 1,401,545 | $ 1,332,169 | $ 1,448,214 | $ 5,443,564 |
| **Operating Profit** | | | | | |
| Publishing | $ 170,121 | $ 208,603 | $ 143,774 | $ 226,442 | $ 748,940 |
| Broadcasting and entertainment | 67,451 | 110,396 | 107,800 | 105,886 | 391,533 |
| Corporate expenses | (20,363) | (14,020) | (13,718) | (7,611) | (55,712) |
| Total operating profit | 217,209 | 304,979 | 237,856 | 324,717 | 1,084,761 |
| Net income on equity investments | 6,548 | 26,017 | 18,743 | 29,465 | 80,773 |
| Interest and dividend income | 2,180 | 2,472 | 4,678 | 4,815 | 14,145 |
| Interest expense | (48,772) | (47,279) | (84,324) | (93,527) | (273,902) |
| Gain (loss) on change in fair values of derivatives and related investments(2) | (10,317) | (6,121) | (17,746) | 45,272 | 11,088 |
| Strategic transaction expenses(2) | — | — | — | (3,466) | (3,466) |
| Gain on TMCT transactions(2) | — | — | 59,596 | — | 59,596 |
| Gain (loss) on other investment transactions, net(2) | 3,466 | (161) | 17,507 | 15,920 | 36,732 |
| Other non-operating gain (loss), net(2) | (6,846) | (442) | 4,168 | 2,139 | (981) |
| **Income from Continuing Operations Before Income Taxes** | 163,468 | 279,465 | 240,478 | 325,335 | 1,008,746 |
| Income taxes(2) | (64,232) | (116,205) | (75,179) | (91,957) | (347,573) |
| **Income from Continuing Operations** | 99,236 | 163,260 | 165,299 | 233,378 | 661,173 |
| **Income (Loss) from Discontinued Operations, net of tax(3)** | 3,528 | (75,426) | (959) | 5,679 | (67,178) |
| **Net Income** | $ 102,764 | $ 87,834 | $ 164,340 | $ 239,057 | $ 593,995 |

140

**TRIBUNE COMPANY AND SUBSIDIARIES**
**FIVE YEAR FINANCIAL SUMMARY**
**(In thousands of dollars)**

| | 2007 | 2006 |
|---|---|---|
| **Operating Revenues** | | |
| Publishing | $ 3,664,590 | $ 4,018,418 |
| Broadcasting and entertainment | 1,398,394 | 1,425,146 |
| Total operating revenues | $ 5,062,984 | $ 5,443,564 |
| **Operating Profit** | | |
| Publishing | $ 368,193 | $ 748,940 |
| Broadcasting and entertainment | 357,341 | 391,533 |
| Corporate expenses | (91,617) | (55,712) |
| Total operating profit | 633,917 | 1,084,761 |
| Net income on equity investments | 100,219 | 80,773 |
| Interest and dividend income | 21,827 | 14,145 |
| Interest expense | (581,640) | (273,902) |
| Non-operating items(1) | (137,219) | 102,969 |
| **Income from Continuing Operations Before Income Taxes and Cumulative Effect of** | | |
| **Change in Accounting Principle** | 37,104 | 1,008,746 |
| Income taxes(1) | 18,234 | (347,573) |
| **Income from Continuing Operations Before Cumulative Effect of Change in Accounting** | | |
| **Principle** | 55,338 | 661,173 |
| Income (Loss) from Discontinued Operations, net of tax(2) | 31,607 | (67,178) |
| Cumulative effect of changes in accounting principle, net of tax(3) | — | — |
| **Net Income** | $ 86,945 | $ 593,995 |
| | | |
| **Financial Ratios** | | |
| Operating profit margin | 12.5% | 19.9% |
| Debt to capital(4) | 116% | 44% |
| | | |
| **Financial Position and Other Data** | | |
| Total assets | $ 13,149,719 | $ 13,400,772 |
| Long-term debt | 11,840,206 | 3,576,211 |
| Shareholders' equity (deficit) | (3,513,940) | 4,319,616 |
| Capital expenditures | 146,001 | 221,907 |

---

(1) See Note 2 to the Company's consolidated financial statements for information pertaining to non-operating items recorded in 2007, 2006 and 2005. Fiscal year 2004 included the following after-tax non-operating items: loss on early debt retirement of $88 million, loss on changes in fair values of derivatives and related investments of $11 million, gain on sales of investments of $12 million, and an other non-operating loss of $4 million, totaling a loss of $90 million. Fiscal year 2003 included the following after-tax non-operating items: gain on changes in fair values of derivatives and related investments of $52 million, gain on sales of subsidiaries and investments of $90 million, loss on investment write-downs of $6 million, gain on insurance recoveries of $14 million, an other non-operating loss of $2 million and a favorable income tax settlement adjustment of $25 million, totaling a gain of $173 million.

(2) See Note 4 to the Company's consolidated financial statements for information pertaining to discontinued operations.

|  | 2005 | 2004 | 2003 |
|---|---|---|---|
| **Operating Revenues** | | | |
| Publishing | $ 4,012,413 | $ 4,041,014 | $ 3,983,292 |
| Broadcasting and entertainment | 1,414,433 | 1,501,581 | 1,457,496 |
| Total operating revenues | $ 5,426,846 | $ 5,542,595 | $ 5,440,788 |
| **Operating Profit** | | | |
| Publishing | $ 753,781 | $ 729,037 | $ 878,388 |
| Broadcasting and entertainment | 416,891 | 513,289 | 491,733 |
| Corporate expenses | (49,413) | (52,218) | (53,351) |
| Total operating profit | 1,121,259 | 1,190,108 | 1,316,770 |
| Net income on equity investments | 41,209 | 17,931 | 5,590 |
| Interest and dividend income | 7,539 | 3,053 | 6,048 |
| Interest expense | (155,191) | (153,118) | (198,123) |
| Non-operating items(1) | 69,861 | (145,044) | 241,247 |
| **Income from Continuing Operations Before Income Taxes and Cumulative Effect of Change in Accounting Principle** | 1,084,677 | 912,930 | 1,371,532 |
| Income taxes(1) | (565,293) | (356,524) | (506,356) |
| **Income from Continuing Operations Before Cumulative Effect of Change in Accounting Principle** | 519,384 | 556,406 | 865,176 |
| Income (Loss) from Discontinued Operations, net of tax(2) | 15,305 | 16,918 | 26,203 |
| Cumulative effect of changes in accounting principle, net of tax(3) | — | (17,788) | — |
| **Net Income** | $ 534,689 | $ 555,536 | $ 891,379 |
| | | | |
| **Financial Ratios** | | | |
| Operating profit margin | 20.7% | 21.5% | 24.2% |
| Debt to capital(4) | 26% | 22% | 22% |
| | | | |
| **Financial Position and Other Data** | | | |
| Total assets | $ 14,546,242 | $ 14,155,432 | $ 14,280,152 |
| Long-term debt | 2,959,262 | 2,317,933 | 2,381,617 |
| Shareholders' equity (deficit) | 6,725,551 | 6,836,844 | 7,028,124 |
| Capital expenditures | 205,945 | 217,348 | 193,535 |

(3) The cumulative effect of adopting a new accounting pronouncement for the valuation of certain intangible assets decreased net income by $18 million in 2004.

(4) Capital comprises total debt, non-current deferred income taxes and shareholders' equity (deficit).

142

### TRIBUNE COMPANY AND SUBSIDIARIES
### SCHEDULE II—VALUATION AND QUALIFYING ACCOUNTS AND RESERVES
#### (In thousands of dollars)

| Description | Balance at Beginning of Period | | Additions Charged to Costs and Expenses | | Additions Recorded Upon Acquisitions | | Deductions(1) | | Balance at End of Period | |
|---|---|---|---|---|---|---|---|---|---|---|
| Accounts receivable allowances: | | | | | | | | | | |
| Year ended Dec. 30, 2007 | $ | 33,771 | $ | 70,283 | $ | — | $ | 71,824 | $ | 32,230 |
| Year ended Dec. 31, 2006 | $ | 42,558 | $ | 80,553 | $ | 55 | $ | 89,395 | $ | 33,771 |
| Year ended Dec. 25, 2005 | $ | 49,507 | $ | 80,514 | $ | — | $ | 87,463 | $ | 42,558 |

(1)   Deductions for the years ended Dec. 30, 2007 and Dec. 31, 2006 included approximately $.9 million and $.5 million, respectively, due to the sales of discontinued operations. See Note 4 to the Company's consolidated financial statements for additional information on the sales of discontinued operations.

143

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**INDEX TO FINANCIAL STATEMENTS**
**AND FINANCIAL STATEMENT SCHEDULE**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 145 |
| Consolidated Statements of Income for each of the three fiscal years in the period ended Dec. 30, 2007 | 146 |
| Consolidated Balance Sheets at Dec. 30, 2007 and Dec. 31, 2006 | 147 |
| Consolidated Statements of Membership Equity for each of the three fiscal years in the period ended Dec. 30, 2007 | 148 |
| Consolidated Statements of Cash Flows for each of the three fiscal years in the period ended Dec. 30, 2007 | 149 |
| Notes to Consolidated Financial Statements |  |
| Note 1: Description of Business and Basis of Presentation | 150 |
| Note 2: Summary of Significant Accounting Policies | 151 |
| Note 3: Non-Operating Items | 156 |
| Note 4: Transactions with Tribune and Affiliates | 156 |
| Note 5: Debt Due to Affiliates | 159 |
| Note 6: Investments | 159 |
| Note 7: Discontinued Operations and Assets Held for Sale | 159 |
| Note 8: Capital Lease Obligations | 160 |
| Note 9: Contracts Payable for Broadcast Rights | 161 |
| Note 10: Commitments and Contingencies | 161 |
| Note 11: Goodwill and Other Intangible Assets | 162 |
| Note 12: Income Taxes | 163 |
| Note 13: Pledge of Membership Interest | 165 |
| Schedule II Valuation and Qualifying Accounts and Reserves | 166 |

144

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Member of Tribune Broadcasting Holdco, LLC:

In our opinion, based on our audits and the report of other auditors, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Tribune Broadcasting Holdco, LLC and its subsidiaries at December 30, 2007 and December 31, 2006, and the results of their operations and their cash flows for each of the three years in the period ended December 30, 2007 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the accompanying index presents fairly, in all material respects, the information set forth therein when read in conjunction with the consolidated financial statements. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We did not audit the financial statements of TV Food Network, an equity method investee of Tribune Broadcasting Holdco, LLC and its subsidiaries, for the year ended December 30, 2007. The Company's consolidated financial statements include income from this equity investment of $82 million for the year ended December 30, 2007. The financial statements of TV Food Network were audited by other auditors whose report thereon has been furnished to us and our opinion on the financial statements, insofar as it relates to the equity income from TV Food Network for the year ended December 30, 2007, is based solely on the report of the other auditors. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits and the report of other auditors provide a reasonable basis for our opinion.

The Company is a subsidiary of Tribune Company ("Tribune") and consequently, as discussed in Notes 1 and 4, these financial statements have been derived from the accounting records of Tribune and reflect certain assumptions and allocations. Moreover, as discussed in Note 4, the Company relied on Tribune for certain administrative, management and other services. Accordingly, these consolidated financial statements do not necessarily reflect the financial position, results of operations and cash flows of the Company had it been a separate standalone entity, independent of Tribune. Furthermore, as discussed in Notes 4 and 5 to the financial statements, the Company has entered into significant transactions with Tribune and its subsidiaries.

As discussed in Note 2 to the consolidated financial statements, the Company changed the manner in which it accounts for share-based compensation in 2006.

/s/ PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP
Chicago, Illinois
March 14, 2008

145

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF INCOME**
(In thousands of dollars)

| | Year Ended | | |
|---|---|---|---|
| | Dec. 30, 2007 | Dec. 31, 2006 | Dec. 25, 2005 |
| **Operating Revenues** | | | |
| Television: | | | |
| Advertising | $ 976,597 | $ 1,044,146 | $ 1,052,944 |
| Other | 173,408 | 146,160 | 123,862 |
| Total | 1,150,005 | 1,190,306 | 1,176,806 |
| Radio and entertainment | 57,993 | 60,979 | 79,031 |
| Total operating revenues | 1,207,998 | 1,251,285 | 1,255,837 |
| | | | |
| **Operating Expenses** | | | |
| Cost of sales (exclusive of items shown below) | 584,834 | 600,463 | 578,173 |
| Selling, general and administrative | 257,320 | 247,389 | 236,563 |
| Depreciation | 33,808 | 35,111 | 33,209 |
| Amortization of intangible assets | 11,518 | 11,555 | 11,658 |
| Total operating expenses | 887,480 | 894,518 | 859,603 |
| | | | |
| **Operating Profit** | 320,518 | 356,767 | 396,234 |
| Net income on equity investments | 102,075 | 82,596 | 57,410 |
| Interest expense: | | | |
| Related party | (22,306) | (77,065) | (102,077) |
| Other | (1,417) | (1,601) | (1,907) |
| Total | (23,723) | (78,666) | (103,984) |
| Gain on sale of investment | — | — | 5,143 |
| Other non-operating gain (loss), net | 21,538 | — | (318) |
| **Income From Continuing Operations Before Income Taxes** | 420,408 | 360,697 | 354,485 |
| Income taxes | (162,557) | (139,156) | (138,185) |
| **Income from Continuing Operations** | 257,851 | 221,541 | 216,300 |
| **Income (Loss) from Discontinued Operations, net of tax (Note 7)** | (258) | (68,421) | 9,733 |
| **Net Income** | $ 257,593 | $ 153,120 | $ 226,033 |

See Notes to Consolidated Financial Statements.

146

## TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES
### CONSOLIDATED BALANCE SHEETS
(In thousands of dollars)

| Assets | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---:|---:|
| **Current Assets** | | |
| Cash | $ 8,174 | $ 4,434 |
| Accounts receivable (net of allowances of $4,697 and $4,372) | 247,281 | 253,097 |
| Broadcast rights | 287,045 | 271,995 |
| Deferred income taxes | 5,698 | 1,975 |
| Prepaid expenses and other | 27,349 | 28,658 |
| Due from Parent, net | 670,507 | — |
| Total current assets | 1,246,054 | 560,159 |
| **Properties** | | |
| Machinery, equipment, and furniture | 354,970 | 354,335 |
| Buildings and leasehold improvements | 95,675 | 94,131 |
| | 450,645 | 448,466 |
| Accumulated depreciation | (311,596) | (301,158) |
| | 139,049 | 147,308 |
| Land | 11,909 | 14,248 |
| Construction in progress | 21,456 | 10,979 |
| Net properties | 172,414 | 172,535 |
| **Other Assets** | | |
| Broadcast rights | 301,263 | 295,186 |
| Goodwill | 1,440,627 | 1,440,627 |
| Other intangible assets, net | 1,171,376 | 1,182,894 |
| Investments | 165,815 | 146,806 |
| Assets held for sale | 2,540 | — |
| Other | 44,826 | 69,950 |
| Total other assets | 3,126,447 | 3,135,463 |
| Total assets | $ 4,544,915 | $ 3,868,157 |
| **Liabilities and Membership Equity** | | |
| **Current Liabilities** | | |
| Capital lease obligations due within one year | $ 1,137 | $ 1,025 |
| Debt due to affiliates within one year | 15,268 | 199,960 |
| Due to Parent, net | — | 388,953 |
| Accounts payable | 20,675 | 17,040 |
| Employee compensation and benefits | 16,604 | 29,650 |
| Contracts payable for broadcast rights | 339,909 | 319,822 |
| Other | 51,684 | 70,788 |
| Total current liabilities | 445,277 | 1,027,238 |
| **Non-Current Liabilities** | | |
| Contracts payable for broadcast rights | 432,393 | 424,050 |
| Capital lease obligations | 9,529 | 10,644 |
| Deferred income taxes | 528,836 | 508,118 |
| Debt due to affiliates | — | 532,201 |
| Other non-current liabilities | 30,490 | 43,495 |
| Total non-current liabilities | 1,001,248 | 1,518,508 |
| **Commitments and Contingent Liabilities (Note 10)** | — | — |

**Membership Equity**

| | | |
|---|---:|---:|
| Membership paid-in capital | | |
| Retained earnings | 1,863,019 | 344,633 |
| Total membership equity | 1,235,371 | 977,778 |
| Total liabilities and membership equity | 3,098,390 | 1,322,411 |
| | $ 4,544,915 | $ 3,868,157 |

See Notes to Consolidated Financial Statements.

147

5/20/2010 9:00 PM

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF MEMBERSHIP EQUITY**
**(In thousands of dollars)**

| | Total | Retained Earnings | Membership Paid-in Capital |
|---|---|---|---|
| **Balance at Dec. 26, 2004** | $ 1,183,258 | $ 838,625 | $ 344,633 |
| Net income | 226,033 | 226,033 | — |
| Dividends declared | (135,000) | (135,000) | — |
| **Balance at Dec. 25, 2005** | $ 1,274,291 | $ 929,658 | $ 344,633 |
| Net income | 153,120 | 153,120 | — |
| Dividends declared | (105,000) | (105,000) | — |
| **Balance at Dec. 31, 2006** | $ 1,322,411 | $ 977,778 | $ 344,633 |
| Capital contribution from Parent (Note 1) | 1,518,386 | — | 1,518,386 |
| Net income | 257,593 | 257,593 | — |
| **Balance at Dec. 30, 2007** | $ 3,098,390 | $ 1,235,371 | $ 1,863,019 |

See Notes to Consolidated Financial Statements.

148

## TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CASH FLOWS
### (In thousands of dollars)

| | Dec. 30, 2007 | Dec. 31, 2006 | Dec. 25, 2005 |
|---|---|---|---|
| **Operations** | | | |
| Net income | $   257,593 | $   153,120 | $   226,033 |
| Adjustments to reconcile net income to net cash provided by operations: | | | |
| Stock-based compensation | 19,045 | 5,169 | — |
| Depreciation | 33,808 | 37,252 | 35,681 |
| Amortization of intangible assets | 11,518 | 11,744 | 11,966 |
| Net income on equity investments | (102,075) | (82,596) | (57,410) |
| Distributions from equity investments | 80,706 | 53,106 | 38,924 |
| Gain on sales of investments, net | — | — | (5,143) |
| Other non-operating (gain) loss, net | (3,435) | — | 318 |
| Loss on sales of discontinued operations | 67 | 48,238 | — |
| Changes in working capital items excluding effects from dispositions: | | | |
| Accounts receivable | 7,182 | 13,420 | 36,233 |
| Prepaid expenses and other current assets | (59) | (48) | (1,260) |
| Accounts payable, accrued expenses, and other current liabilities | (28,515) | 3,339 | (4,422) |
| Change in broadcast rights, net of liabilities | 7,303 | 2,056 | (16,329) |
| Deferred income taxes | 16,995 | (11,282) | 35,479 |
| Other, net | 16,235 | 8,000 | 5,477 |
| Net cash provided by operations | 316,368 | 241,518 | 305,547 |
| | | | |
| **Investments** | | | |
| Capital expenditures | (34,614) | (24,646) | (27,760) |
| Investments | — | (29) | (1,678) |
| Proceeds from sales of subsidiaries and investments | — | 325,102 | 14,000 |
| Net cash provided by (used for) investments | (34,614) | 300,427 | (15,438) |
| | | | |
| **Financing** | | | |
| Repayments of capital lease obligations | (1,003) | (921) | (816) |
| Dividends paid to Parent | — | (105,000) | (135,000) |
| Repayments of promissory notes due to affiliates | (716,892) | (335,667) | (311,407) |
| Capital contribution from Parent (Note 1) | 1,518,386 | — | — |
| Net change in due to/from Parent | (1,078,505) | (101,909) | 155,717 |
| Net cash used for financing | (278,014) | (543,497) | (291,506) |
| | | | |
| **Net Increase (Decrease) in Cash** | 3,740 | (1,552) | (1,397) |
| Cash, beginning of year | 4,434 | 5,986 | 7,383 |
| Cash, end of year | $   8,174 | $   4,434 | $   5,986 |

See Notes to Consolidated Financial Statements.

149

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 1:  DESCRIPTION OF BUSINESS AND BASIS OF PRESENTATION

**Business Operations**—Tribune Broadcasting Holdco, LLC ("Holdco") is a single member limited liability company wholly owned by Tribune Company ("Tribune" or "Parent"). Holdco was established in 2007 pursuant to a credit agreement for senior secured credit facilities entered into by Tribune on May 17, 2007 and subsequently amended on June 4, 2007 (collectively, the "Credit Agreement"). For further information regarding the terms and conditions of the Credit Agreement, see Note 10 to Tribune's consolidated financial statements in Item 8. Pursuant to the terms of the Credit Agreement, Tribune contributed all the outstanding shares of capital stock in Tribune Broadcasting Company ("TBC") to Holdco. Since the reorganization of TBC was between related parties, Holdco's basis in TBC was the same as Tribune's historical cost basis in TBC at the time of the contribution. During 2007, Tribune contributed $1.5 billion of membership capital to Holdco in order to pay off $739 million of TBC's existing debt due to affiliates (see Note 5) and to settle $779 million of Holdco's intercompany obligations.

Holdco and its subsidiaries (the "Company") consist primarily of (i) twenty-three network affiliated television stations operating in geographically diverse markets in the United States; (ii) Superstation WGN, a television station whose programming is delivered by cable or satellite outside of the Chicago area; (iii) a radio station in Chicago, IL; (iv) a Chicago-area cable television news channel; (v) a company that distributes its own programming together with programming licensed from third parties; and (vi) equity investments.

**Fiscal Year**—The Company's fiscal year ends on the last Sunday in December. Fiscal years 2007 and 2005 encompassed a 52-week period. Fiscal year 2006 encompassed a 53-week period.

**Principles of Consolidation**—The Company's consolidated financial statements have been derived from the accounting records of Tribune and reflect the consolidated results of operations, financial position and cash flows of the Company as it was historically managed. All significant intercompany accounts within the Company have been eliminated. All significant intercompany transactions between the Company and Tribune and its affiliates have been included within the consolidated financial statements and are considered to be effectively settled for cash at the time the transaction is recorded. The total net effect of these intercompany transactions, including the settlement of the Company's debt due to affiliates, is reflected in the consolidated statement of cash flows as a financing activity. The due from Parent, net amount on the Company's consolidated balance sheets represents the accumulated net effect of a variety of intercompany transactions.

Tribune uses a centralized approach to cash management and the financing of its operations. Under this centralized cash management program, Tribune and the Company advance funds to each other. These intercompany net advances are classified as a long-term asset or liability and are non-interest bearing. Accordingly, none of Tribune's cash or cash equivalents have been assigned to the Company in the consolidated financial statements. Cash in the consolidated balance sheets represents either cash not yet swept to Tribune or cash held locally by certain subsidiaries of the Company.

The consolidated financial statements include allocations of Tribune corporate expenses and centralized services, as described further in Note 4. The expense and cost allocations to the Company have been determined on bases that management considers to be a reasonable reflection of the utilization of services provided or the benefit received by the Company during the periods presented. The financial information in these financial statements does not include all expenses that would have been incurred had the Company operated as a separate stand-alone entity and accordingly may not reflect the Company's results of operations, financial position and cash flows had the Company been a stand-alone entity during the periods presented.

150

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

In general, investments held by the Company comprising 20 to 50 percent of the voting stock of companies and certain partnership interests are accounted for using the equity method. All other investments are generally accounted for using the cost method.

The Company evaluates its investments and other transactions for consolidation under the provisions of Financial Accounting Standards Board ("FASB") Interpretation No. 46R, "Consolidation of Variable Interest Entities" ("FIN 46R"). The Company does not hold any significant variable interests, as defined by FIN 46R.

**Presentation**—On June 5, 2006, Tribune announced the sale of WATL-TV, Atlanta and on June 19, 2006 announced the sale of WCWN-TV, Albany. The sale of WATL-TV, Atlanta closed on Aug. 7, 2006. On Sept. 14, 2006, Tribune announced the sale of WLVI-TV, Boston. The Albany and Boston station sales closed on Dec. 6, 2006 and Dec. 19, 2006, respectively. The results of operations of each of these businesses have been reported as discontinued operations in the Company's consolidated statements of income. Prior year consolidated statements of income have been reclassified to conform to the presentation of these businesses as discontinued operations. See Note 7 for further discussion. In addition, certain other prior year financial information has been reclassified to conform to the current year presentation.

## NOTE 2:  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The significant accounting policies of the Company, as summarized below, conform with accounting principles generally accepted in the United States of America and reflect practices appropriate to the Company's businesses.

**Revenue Recognition**—The Company's primary sources of revenue are from sales of airtime on its television and radio stations. Advertising revenue is recorded, net of agency commissions, when commercials are aired.

Other television revenue sources include barter revenue associated with the Company's syndicated programming and distribution fees for carriage rights of Superstation WGN on cable and satellite outside of the Chicago designated market. Barter and distribution revenues are recognized on a straight-line basis over the term of the rights agreements.

Entertainment revenues are primarily from the sale and distribution of syndicated programming and rental of sound stages.

**Use of Estimates**—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from these estimates.

**Accounts Receivable**—The Company's accounts receivable are primarily due from advertisers. Credit is extended based on an evaluation of each customer's financial condition, and generally collateral is not required. The Company maintains an allowance for uncollectible accounts and certain sales allowances. The allowance for uncollectible accounts is determined based on historical write-off experience and any known specific collectibility exposures.

**Broadcast Rights**—Broadcast rights consist principally of rights to broadcast syndicated programs, sports and feature films and are stated at the lower of unamortized cost or estimated net realizable value. The total cost of these rights is recorded as an asset and a liability when the program becomes available for broadcast. Syndicated program rights that have limited showings are generally amortized using an accelerated method as programs are aired. Sports and feature film rights are amortized using the straight-line method.

The current portion of broadcast rights represents those rights available for broadcast that are expected to be amortized in the succeeding year. Broadcast rights amortization expense in 2007 and 2006, excluding barter transactions, was $283 million and $292 million, respectively. Additional rights for programs that became available for broadcast were $372 million in 2007 and $347 million in 2006.

The Company maintains an allowance for programming that is not expected to be aired by the end of the contract period. This allowance for excess programming inventory is based on a program-by-program

151

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

review of the Company's five-year broadcast plans and historical write-off trends. The total reserve balance at Dec. 30, 2007 and Dec. 31 2006 was $3.2 million and $4.0 million, respectively. Actual write-offs in 2007 and 2006 were $.2 million and $.4 million, respectively. Future write-offs can vary based on changes in consumer viewing trends and the availability and costs of other programming.

**Barter and Trade Transactions**—The Company, in the ordinary course of business, enters into barter transactions whereby a portion of the commercial airtime within a syndicated program is exchanged for broadcast rights to that program. Barter program rights and payables are recorded when the program is available for broadcast. Revenue and expenses associated with these barter transactions are generally recorded when the programming is aired at the fair market value of the commercial airtime relinquished. Barter revenues and expenses associated with third parties were $77.3 million, $76.1 million and $67.7 million in fiscal years 2007, 2006 and 2005, respectively, which is included in other television revenue in the consolidated statements of income.

Trade transactions represent the exchange of commercial airtime for merchandise or services. Trade transactions are recorded at the more determinable of the fair market value of services rendered or received. Revenue and expense from trade transactions are recognized when the commercials are aired or the merchandise or services are utilized.

**Properties**—Property, plant and equipment are stated at cost. The Company capitalizes major property, plant and equipment additions, improvements and replacements. Depreciation is computed using the straight-line method over the following estimated useful lives: 10 to 30 years for broadcast towers and buildings, 3 to 15 years for broadcast equipment and 3 to 10 years for all other equipment and furniture. Expenditures for repairs and maintenance of existing assets are charged to expense as incurred.

**Goodwill and Other Intangible Assets**—Goodwill and other intangible assets are summarized in Note 11. The Company reviews goodwill and certain intangible assets no longer being amortized for impairment annually, or more frequently if events or changes in circumstances indicate that an asset may be impaired, in accordance with Financial Accounting Standard ("FAS") No. 142, "Goodwill and Other Intangible Assets." Under FAS No. 142, the impairment review of goodwill and other intangible assets not subject to amortization must be based on estimated fair values.

The Company performs its annual impairment review in the fourth quarter of each year. The estimated fair values of the reporting units to which goodwill has been allocated is determined using many critical factors, including operating cash flows, revenue and market growth, market multiples, and discount rates. The estimated fair values of other intangible assets subject to the annual impairment review, which include Federal Communications Commission ("FCC") licenses, are generally calculated based on projected future discounted cash flow analyses. The development of market multiples, operating cash flow projections and discount rates used in these analyses requires the use of assumptions, including assumptions regarding revenue and market growth as well as specific economic factors in the broadcasting industry. These assumptions reflect the Company's best estimates, but these items involve inherent uncertainties based on market conditions generally outside of the Company's control.

**Impairment Review of Long-Lived Assets**—In accordance with FAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," the Company evaluates the carrying value of long-lived assets to be held and used whenever events or changes in circumstances indicate that the carrying amount of a long-lived asset or asset group may be impaired. The carrying value of a long-lived asset or asset group is considered impaired when the projected future undiscounted cash flows to be generated from the asset or asset group over its remaining depreciable life are less than its current carrying value.

**Advertising Expense**—Advertising costs are expensed as incurred. Advertising expense, net of co-op advertising credits, is included in selling, general and administrative expense within the Company's consolidated statements of income and amounted to $28.6 million, $27.7 million and $28.3 million in fiscal years 2007, 2006 and 2005, respectively.

**Pension Plans and Other Postretirement Benefits**—Retirement benefits are provided to eligible employees of the Company through several pension plans sponsored either by Tribune or by unions. Under Tribune-sponsored plans, pension benefits are primarily a function of both the years of service and the level of compensation for a specified number of years, depending on the plan.

152

http://www.sec.gov/Archives/edgar/data/726513/000110465908018845/...

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

It is Tribune's policy to fund the minimum for Tribune-sponsored pension plans as required by ERISA. Contributions made to union-sponsored plans are based upon collective bargaining agreements.

Tribune also provides certain health care and life insurance benefits for retired Company employees. The expected cost of providing these benefits is accrued over the years that the employees render services. It is Tribune's policy to fund postretirement benefits as claims are incurred.

All obligations pursuant to the Tribune-sponsored pension and post retirement plans have historically been an obligation of Tribune. Therefore, the Company accounts for costs associated with these plans as a participant in multi-employer plans in accordance with FAS No. 87 "Employers' Accounting for Pensions" and FAS No. 106 "Employers' Accounting for Postretirement Benefits Other Than Pensions," respectively, as amended. FAS No. 87 provides that an employer that participates in a multi-employer defined benefit plan is not required to report a liability beyond the contributions currently due and unpaid to the plan. Therefore, no assets or liabilities relative to the obligations under these retirement plans have been included in the consolidated balance sheets.

**Stock-Based Compensation**—The Company's employees have historically been eligible to participate in Tribune's incentive compensation and stock purchase plans. In the first quarter of 2006, Tribune adopted FAS No. 123R, "Share-Based Payment," which superseded Accounting Principles Board ("APB") Opinion No. 25, FAS No. 123 and related interpretations. FAS No. 123R requires the Company to expense stock-based compensation in its income statement. Under FAS No. 123R, stock-based compensation cost is measured at the grant date for equity-classified awards and at the end of each reporting period for liability-classified awards based on the estimated fair value of the award.

Tribune granted stock options to employees in 2006 and prior years. Tribune used the Black-Scholes option-pricing model to determine the fair value of each stock option it granted. The Black-Scholes model included assumptions regarding dividend yields, expected volatility, expected lives and risk-free interest rates. These assumptions reflected Tribune's best estimates, but they involved certain risks, trends and uncertainties, which in some instances were outside of the control of Tribune. As a result, if other assumptions had been used, stock-based compensation could have been materially impacted. The Company adopted FAS No. 123R utilizing the modified prospective application method and did not restate prior years.

Stock-based compensation expense allocated to the Company and included in selling, general and administrative expense in the Company's consolidated statement of income was $19.0 million, or $12.1 million net of tax, for 2007, and $5.0 million, or $3.2 million net of tax, for 2006. The expense for 2007 included a charge related to the cash settlement of the Company's outstanding stock-based awards (see discussion below).

Prior to the adoption of FAS No. 123R, Tribune accounted for its stock-based compensation plans in accordance with APB No. 25 and related interpretations. Under APB No. 25, no compensation expense was recorded because the exercise price of employee stock options equaled the market price of the underlying stock on the date of grant. Under the provisions of APB No. 25, Tribune was not required to recognize compensation expense for its employee stock purchase plan.

Under FAS No. 123, "Accounting for Stock-Based Compensation," as amended by FAS No. 148, compensation cost was measured at the grant date based on the estimated fair value of the award and was recognized as compensation expense over the vesting period.

153

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Had compensation cost for Tribune's stock-based compensation plans been determined consistent with FAS No. 123 prior to the adoption of FAS No. 123R in 2006, the Company's 2005 net income would have been reduced to the following pro forma amount (in thousands):

|  | 2005 |
|---|---|
| Net income, as reported | $  226,033 |
| Less: Pro forma stock-based employee compensation expense, net of tax: |  |
| General options | (20,121) |
| Replacement options | (279) |
| Employee Stock Purchase Plan | (819) |
| Total pro forma stock-based employee compensation expense, net of tax | (21,219) |
| Pro forma net income | $  204,814 |

In determining the pro forma compensation expense under the fair value method of FAS No. 123, using the Black-Scholes option-pricing model, the following weighted average assumptions were used for general awards and replacement options:

|  | 2005 | |
|---|---|---|
|  | General Awards | Replacement Options |
| Risk-free interest rate | 3.7% | 3.3% |
| Expected dividend yield | 1.8% | 1.8% |
| Expected stock price volatility | 28.1% | 22.8% |
| Expected life (in years) | 5 | 3 |
| Weighted average fair value | $  10.49 | $  6.96 |

On June 24, 2005, Tribune accelerated the vesting of certain stock options granted on Feb. 11, 2003 and Feb. 10, 2004, totaling 2.4 million in each year. Unvested stock options awarded to the then current executive officers of Tribune on these grant dates, which aggregated .8 million and .6 million, respectively, were not accelerated at that time. On Dec. 16, 2005, Tribune accelerated the vesting of all stock options granted on Feb. 8, 2005, totaling 3.5 million, and the remaining unvested stock options granted to the then current executive officers of the Company on Feb. 11, 2003 and Feb. 10, 2004, totaling .4 million in both years. No other terms and conditions of the stock option grants were changed. Of these amounts, stock options totaling 1.2 million and .8 million accelerated on June 24, 2005 and Dec. 16, 2005, respectively, were related to Company employees.

In accordance with APB No. 25 and related interpretations, the acceleration of vesting of these stock options did not require accounting recognition in the Company's income statement. The exercise prices of the 2003, 2004 and 2005 grants were $45.90, $52.05 and $40.59, respectively, and Tribune's closing stock prices on the June 24, 2005 and Dec. 16, 2005 dates of acceleration were $35.64 and $30.80, respectively. The impact of the accelerated vesting was to increase the Company's pro forma stock-based compensation expense by $20 million, or $12 million net of tax, in 2005.

On Dec. 20, 2007, Tribune consummated the Merger, as defined and described in the description of the Leveraged ESOP Transactions in Note 3 to Tribune's consolidated financial statements in Item 8. Pursuant to the Merger Agreement, the Company redeemed for cash all outstanding stock awards, each of which vested in full upon completion of the Merger, with positive intrinsic value relative to $34.00 per share. Accordingly, the Company recorded additional stock-based compensation expense of $11.9 million, or $8 million net of taxes, in the fourth quarter of 2007 in connection with the cash settlement of its outstanding stock awards. All remaining outstanding stock awards under the Tribune Company Incentive Compensation Plan (the "Incentive Plan") as of Dec. 20, 2007 that were not cash settled pursuant to the Merger Agreement were cancelled. Following the Merger, Tribune does not intend to grant any new equity awards under the Incentive Plan.

154

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Income Taxes**—The Company has elected to be taxed as a disregarded entity and does not file a separate tax return. The Company's operations are included in Tribune's consolidated United States federal and state income tax returns. The Company has computed income taxes as if it were filing separate returns. Current income taxes payable is settled with Tribune through the "Due to parent, net" account. Deferred income tax assets and liabilities are recorded on the Company's balance sheet.

Provisions for federal and state income taxes are calculated on reported pretax earnings based on current tax laws and also include, in the current period, the cumulative effect of any changes in tax rates from those used previously in determining deferred tax assets and liabilities. Taxable income reported to the taxing jurisdictions in which the Company operates often differs from pretax earnings because some items of income and expense are recognized in different time periods for income tax purposes. The Company provides deferred taxes on these temporary differences in accordance with FAS No. 109, "Accounting for Income Taxes." Taxable income also may differ from pretax earnings due to statutory provisions under which specific revenues are exempt from taxation and specific expenses are not allowable as deductions. The Company establishes reserves for income taxes when it is probable that one or more of the taxing authorities will challenge and disallow a position taken by the Company in its income tax returns and the resulting liability is estimable. The consolidated tax provision and related accruals include estimates of the potential taxes and related interest as deemed appropriate. These estimates are reevaluated and adjusted, if appropriate, on a quarterly basis. Although management believes its estimates and judgments are reasonable, the resolutions of the Company's tax issues are unpredictable and could result in tax liabilities that are significantly higher or lower than that which has been provided by the Company.

On Jan. 1, 2007 the Company adopted the provisions of FASB Interpretation ("FIN") No. 48, "Accounting for Uncertainty in Income Taxes." FIN 48 addresses the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. Under FIN 48, a Company may recognize the tax benefit of an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. FIN 48 requires the tax benefit recognized in the financial statements to be measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods and disclosure. The adoption of FIN 48 had no material effect on the Company's consolidated financial statements.

**New Accounting Standards**—In September 2006, the FASB issued FASB Statement No. 157, "Fair Value Measurements," ("FAS 157"), which defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements. In February 2008, the FASB issued Staff Position No. 157-2 which defers the effective date of FAS No. 157 for all nonfinancial assets and liabilities, except those items recognized or disclosed at fair value on an annual or more frequently recurring basis, until one year after the adoption of FAS No. 157. The provisions of FAS No. 157, as amended, are effective for financial statements issued for fiscal years beginning after Nov. 15, 2007 and interim periods beginning within these fiscal years. Accordingly, the Company will be required to adopt FAS No. 157 in the first quarter of 2008. The Company is currently evaluating the impact of adopting FAS No. 157 on its consolidated financial statements.

In February 2007, the FASB issued FASB Statement No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities ("FAS No. 159"). FAS No. 159 permits entities to choose to measure many financial instruments and certain other items at fair value. Unrealized gains and losses on items for which the fair value option has been elected will be recognized in earnings at each subsequent reporting date. The provisions of FAS No. 159 are effective for financial statements issued for fiscal years beginning after Nov. 15, 2007 and interim periods beginning within these fiscal years. Accordingly, the Company will become subject to the provisions of FAS No. 159 in the first quarter of 2008. The Company is currently evaluating the impact of adopting FAS No. 159 on its consolidated financial statements.

In December 2007, the FASB issued FASB Statement No. 160, "Noncontrolling Interests in Consolidated Financial Statements, an Amendment of ARB No. 51" ("FAS No. 160"), which provides accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. It clarifies that an ownership interest in a subsidiary should be reported as a separate component of equity in the consolidated financial statements, requires consolidated net income

155

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

to be reported at amounts that include the amounts attributable to both the parent and the noncontrolling interest and provides for expanded disclosures in the consolidated financial statements. FAS No. 160 is effective for financial statements issued for fiscal years beginning after Dec. 15, 2008 and interim periods beginning within these fiscal years. The Company is currently evaluating the impact of adopting FAS No. 160 on its consolidated financial statements.

## NOTE 3: NON-OPERATING ITEMS

Fiscal years 2007 and 2005 included certain non-operating items.

Non-operating items for 2007 are summarized as follows (in thousands):

|  | Proceeds | Pretax Gain | After-tax Gain |
|---|---|---|---|
| Settlement of Hurricane Katrina insurance claim | $ — | $ 18,103 | $ 11,043 |
| Other, net |  | 3,435 | 2,094 |
| Total non-operating items | $ — | $ 21,538 | $ 13,137 |

The settlement of the Company's Hurricane Katrina insurance claim in 2007 resulted in an after-tax gain of $11 million. Other, net in 2007 primarily included a non-cash gain on the exchange of certain television broadcasting equipment.

Non-operating items for 2005 are summarized as follows (in thousands):

|  | Proceeds | Pretax Gain (Loss) | After-tax Gain (Loss) |
|---|---|---|---|
| Gain on sale of investment | $ 14,000 | $ 5,143 | $ 3,137 |
| Other, net | — | (318) | (194) |
| Total non-operating items | $ 14,000 | $ 4,825 | $ 2,943 |

In 2005, the Company recorded a one-time gain of $3.1 million, net of tax, as a result of transactions related to one of its equity investments.

## NOTE 4: TRANSACTIONS WITH TRIBUNE AND AFFILIATES

All related party transactions with Tribune are eliminated in the Tribune consolidated financial statements.

**Support Services**—The Company receives allocated charges from Tribune for certain corporate support services, which are principally recorded within selling, general and administrative expenses in the Company's consolidated statements of income. Management believes that the basis used for the allocation is reasonable and reflects the portion of such costs attributed to the Company's operations; however, these amounts may not be representative of the costs necessary for the Company to operate as a separate stand-alone company. These costs are summarized in the following table (in thousands):

|  | Fiscal Years | | |
|---|---|---|---|
|  | 2007 | 2006 | 2005 |
| Corporate management fee | $ 12,420 | $ 12,488 | $ 11,090 |
| Service center support costs | 3,037 | 3,102 | 3,427 |
| General insurance | 2,387 | 2,792 | 3,528 |
| Occupancy | 2,436 | 2,625 | 2,800 |
| Other support costs | 2,138 | 2,754 | 1,747 |
| Total | $ 22,418 | $ 23,761 | $ 22,592 |

The corporate management fee relates to the support the Company receives from Tribune for certain corporate activities including: (i) strategic management, (ii) corporate development, (iii) investor relations, (iv) legal, (v) human resources, (vi) finance and financial reporting, (vii) treasury, and (viii) other Tribune corporate and infrastructure costs. For these services, the Company was charged a management fee based upon the Company's net revenue as a percentage of total Tribune revenue in each fiscal year.

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Service center support costs relates to Tribune service centers, which centrally manage and process (for all Tribune business units) certain (i) financial transactions (e.g. payroll, accounts payable, etc.), (ii) human resources activities (e.g. employee relations, recruitment, etc.), and (iii) technology cost activities (e.g. networks, email, etc.). Allocations of these support service costs were determined using a proportional cost allocation method based on either number of payments processed, headcount or other volume measures, such as the number of information technology department users.

General insurance relates to the Company's participation in Tribune-sponsored risk management plans for (i) general liability, (ii) auto liability, and (iii) other insurance such as property and media. Costs are allocated based on either actuarially determined historical loss experience or, depending upon insurance type, revenue, vehicle count, and headcount.

Occupancy costs are charged to the Company based on actual square footage utilized for facility rent, maintenance, security, and other occupancy related costs incurred to manage the properties.

Other support costs relate to charges to the Company from other Tribune business units for website maintenance costs, audit fees and other support services. Such costs are allocated using a proportional cost method based on percentage of revenue and headcount.

**Medical and Worker's Compensation Benefit Plans**—The Company participates in Tribune-sponsored employee benefit plans including medical and worker's compensation. Allocations of benefit plan costs varies by plan type and are based on actuarial valuations of cost and/or liability, premium amounts and payroll. Total benefit plan costs allocated to the Company and recorded within selling, general and administrative expenses in the consolidated statements of income amounted to $12.8 million, $12.2 million and $13.1 million in 2007, 2006 and 2005, respectively. While management believes the cost allocation methods utilized for the benefit plans are reasonable and reflects the portion of such costs attributed to the Company, the amounts may not be representative of the costs necessary for the Company to operate as a stand-alone company.

**Retirement Plans**—Annual contributions to Tribune-sponsored pension plans, which totaled $.6 million, $2.1 million and $.3 million in fiscal years 2007, 2006 and 2005, respectively, is based upon a specific allocation of actuarially determined service costs plus an allocation of the remaining net periodic pension cost components based upon the Company's proportional share of the pension liability. Annual contributions made to union-sponsored plans, which totaled $2.7 million, $2.8 million and $2.6 million, in fiscal years 2007, 2006 and 2005, respectively are based upon collective bargaining agreements. See also Note 3, "Pension Plans and Other Retirement Benefits."

Tribune also provides certain health care and life insurance benefits for retired employees for which the Company's annual contribution, which totaled $.6 million in 2007, and $.5 million in each of 2006 and 2005, is a specific allocation of actuarially determined service cost and a proportional cost allocation of the remaining expense.

While management believes the cost allocation methods utilized for the Tribune-sponsored pension plans, health care and life insurance benefit plans are reasonable and reflects the portion of such costs attributed to the Company, the amounts may not be representative of the costs necessary for the Company to operate as a stand-alone company.

**Defined Contribution Plans**—Company employees have historically participated in various Tribune qualified 401(k) savings plans, which permit eligible employees to make voluntary contributions on a pretax basis. The plans allow participants to invest their savings in various investments. In 2004, Tribune enhanced its primary 401(k) plan to include a larger Tribune contribution. This new plan was designed to replace the Tribune's Employee Stock Ownership Plan that was fully allocated at the end of 2003. In 2006, Tribune amended its primary 401(k) plan to make a portion of Tribune's contributions discretionary. Amounts charged to expense by the Company for contribution to all of Tribune's 401(k) savings plans totaled $7.5 million, $9.0 million and $11.8 million in fiscal years 2007, 2006 and 2005, respectively.

**Tribune Company Management Equity Incentive Plan**—Certain of the Company's key employees are eligible to participate in Tribune's 2007 Management Equity Incentive Plan (the "Management Equity Incentive Plan"). The Management Equity Incentive Plan provides for phantom units (the "Units") that generally track the value of a share of Tribune's common stock after the effective date of the Merger. Awards were made to eligible members of the Company's management and other key employees at the

157

## TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

discretion of the Board. Under the terms of the Management Equity Incentive Plan, awards are classified as First Tranche Units or Second Tranche Units.

The First Tranche Units represent approximately 5% of Tribune's fully-diluted outstanding common stock, including after giving effect to the stock purchase warrants (see Note 16 to Tribune's consolidated financial statements in Item 8) and the First Tranche Units and Second Tranche Units authorized under the Management Equity Incentive Plan (5,434,652 First Tranche Units authorized, subject to customary anti-dilution adjustments). First Tranche Units vest ratably over a three-year period beginning on the date of grant. Unvested First Tranche Units vest upon a change in control of the Tribune or upon termination of employment due to death or disability. Unvested First Tranche Units will be cancelled upon a termination of a participant's employment for any reason other than death or disability.

The Second Tranche Units represent approximately 3% of Tribune's fully-diluted outstanding common stock, including after giving effect to the stock purchase warrants (see Note 16 to Tribune's consolidated financial statements in Item 8) and the First Tranche Units and Second Tranche Units authorized under the Management Equity Incentive Plan (3,261,000 Second Tranche Units authorized, subject to customary anti-dilution adjustments). Fifty percent of the Second Tranche Units vested upon grant and the remaining fifty percent will vest on the one year anniversary of the grant date. Any unvested Second Tranche Units will become fully vested upon a change in control of Tribune, an involuntary termination of employment or a termination of employment due to a Plan participant's death or disability. Unvested Second Tranche Units will be cancelled upon a termination of a participant's employment for any reason other than an involuntary termination of employment or a termination of employment due to death or disability. Participants receiving Second Tranche Units will be entitled to a gross-up for the payment of excise taxes, if any, in connection with the Merger.

In general, one-third of vested Units subject to an award (whether First Tranche Units or Second Tranche Units) will be payable in cash on each of the fourth, sixth and eighth anniversaries of the grant date or, if sooner, upon the occurrence of a change in control or a termination of employment based on the fair market value of Tribune's common stock on the December 31 immediately following the settlement event. With respect to Second Tranche Units only, in the event of a termination of a Plan participant's employment prior to Dec. 20, 2008, such participant will receive his or her pro rata share (based upon the amount of his or her vested Second Tranche Units relative to all Second Tranche Units outstanding and reserved for issuance) of $25 million, payable within ten business days following such termination of employment.

The Company accounts for the Units issued under the Management Equity Incentive Plan as liability-classified awards in accordance with FAS No. 123R (see Note 2 for further information regarding the Company's adoption of FAS No. 123R). The Company recorded $3.0 million of compensation expense in 2007 in connection with the Management Equity Incentive Plan, which was based on the estimated fair value of Tribune's common stock as of Dec. 30, 2007 as determined by the trustee of Tribune's ESOP (see Note 17 to Tribune's consolidated financial statements in Item 8) and is included in other non-current liabilities on the Company's consolidated balance sheet at Dec. 30, 2007.

**Advertising**—From time to time, the Company's stations have exchanged unsold advertising air time for print advertising with Tribune's wholly-owned publishing affiliates in non-cash barter transactions. The related party advertising revenue and related advertising expense is not recorded in the Company's consolidated statements of income as (i) the exchanged services were not negotiated at arms length, and (ii) Tribune did not historically determine the fair value of the exchange contemporaneous with the occurrence of the transactions. The Company has estimated the approximate value of the advertising provided to Tribune publishing affiliates at $2.5 million, $3.5 million, and $4.3 million in 2007, 2006 and 2005, respectively, which management believes is comparable to the value of the print advertising received.

**Sports Programming**—The Company contracts with the Chicago Cubs baseball team, a wholly-owned subsidiary of Tribune, for certain television and radio broadcast rights for WGN-TV and WGN-AM. The agreement between the Company and the Chicago Cubs is subject to review and approval by Major League Baseball. The amounts paid for the broadcast rights are an immaterial component of the broadcast rights amortization expense in the Company's consolidated statements of income.

158

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

## NOTE 5: DEBT DUE TO AFFILIATES

Tribune and its various affiliates and subsidiaries have provided loans in the form of promissory notes to the Company. On June 4, 2007, simultaneous with the reorganization of TBC as a subsidiary of Holdco, Tribune contributed $739 million of additional capital for the purpose of paying accrued interest of $22.0 million and the principal balance of $716.9 million of outstanding short-term and long-term debt with Tribune and its affiliates. The remaining intercompany note balance of $15.3 million will be settled in 2008 and is classified as a current liability on the Company's consolidated balance sheet at Dec. 30, 2007. Interest on this note was accrued through June 2007 at an average annual rate of 5.35%.

## NOTE 6: INVESTMENTS

Investments consisted of the following (in thousands):

|  | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| Television Food Network, G.P. | $ 148,167 | $ 128,928 |
| Comcast SportsNet Chicago | 17,648 | 17,470 |
| Total equity method investments | 165,815 | 146,398 |
| Cost method investments | — | 408 |
| Total investments | $ 165,815 | $ 146,806 |

The Company's equity method investments at Dec. 30, 2007 included ownership of 31% of Television Food Network, G.P. ("TV Food Network") and 25% of Comcast SportsNet Chicago. Both companies are privately owned. The Company does not guarantee any indebtedness for any of its investees. In 2005, the Company sold, for $14.0 million, an equity method investment. The sale resulted in a $5.1 million gain (after-tax gain of $3.1 million).

The Company's investment in TV Food Network totaled $148 million, $129 million, and $95 million at Dec. 30, 2007, Dec. 31, 2006 and Dec. 25, 2005, respectively. The Company recognized equity income from its investment in TV Food Network of $82 million in 2007, $72 million in 2006 and $55 million in 2005. TV Food Network owns and operates a 24-hour television network focusing on food and entertaining. Its programming is distributed by cable and satellite television systems.

Summarized financial information for selected equity investments is as follows (in thousands):

|  | Fiscal Years | | |
|---|---|---|---|
|  | 2007 | 2006 | 2005 |
| Revenues, net | $ 668,382 | $ 604,233 | $ 504,804 |
| Operating income | $ 320,737 | $ 282,650 | $ 219,212 |
| Net income | $ 327,804 | $ 288,159 | $ 221,179 |

|  | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| Current assets | $ 424,988 | $ 379,095 |
| Non-current assets | $ 134,586 | $ 141,775 |
| Current liabilities | $ 36,063 | $ 26,832 |
| Non-current liabilities | $ 6,751 | $ 11,659 |

## NOTE 7: DISCONTINUED OPERATIONS AND ASSETS HELD FOR SALE

**Sales of WATL-TV, Atlanta, WCWN-TV, Albany and WLVI-TV, Boston**—On June 5, 2006, Tribune announced the sale of WATL-TV, Atlanta to Gannett Co., Inc. for $180 million plus working capital. The sale closed on Aug. 7, 2006. On June 19, 2006, Tribune announced the sale of WCWN-TV, Albany to Freedom Communications, Inc. for $17 million. The sale closed on Dec. 6, 2006. On Sept. 14, 2006, Tribune announced the sale of WLVI-TV, Boston, to Sunbeam Television Corp. for $113.7 million plus working capital. The sale closed on Dec. 19, 2006.

159

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

These businesses were considered components of the Company's business as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company. The operations and cash flows of these businesses have been eliminated from the ongoing operations of the Company as a result of the sales, and the Company will not have any significant continuing involvement in their operations. Accordingly, the results of operations of each of these businesses have been reported as discontinued operations in the Company's consolidated statements of income.

In conjunction with the sales of WATL-TV, Atlanta and WCWN-TV, Albany, the Company recorded in 2006 a pretax loss totaling $89 million to write down the net assets of the stations to estimated fair value, less costs to sell. In addition, the Company recorded in 2006 a pretax gain of $41 million for the sale of WLVI-TV, Boston. The net pretax loss on sales of the three stations sold during 2006 was $48 million.

**Summarized Financial Information**—Selected operating results related to discontinued operations for fiscal years 2007, 2006 and 2005 is summarized as follows (in thousands):

| | Fiscal Years | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| Operating revenues | $ 148 | $ 64,870 | $ 84,334 |
| Operating profit (loss)(1) | $ (340) | $ 2,300 | $ 19,632 |
| Loss on sales of discontinued operations | (67) | (48,238) | — |
| Income (loss) from discontinued operations before interest and income taxes | (407) | (45,938) | 19,632 |
| Interest (2) | (24) | (2,558) | (3,301) |
| Income taxes(3) | 173 | (19,925) | (6,598) |
| Income (loss) from discontinued operations, net of tax | $ (258) | $ (68,421) | $ 9,733 |

(1)  Operating profit for 2006 included $6 million of severance and related charges incurred as a result of the sales of the three television stations.

(2)  Interest was allocated to the discontinued operations in a manner consistent with the allocation of interest expense from Tribune to the Company as described in Note 5.

(3)  Income taxes for 2006 included a tax benefit of $12 million related to the $90 million pretax loss on sales of the Atlanta and Albany stations. The pretax loss included $80 million of allocated television group goodwill, most of which is not deductible for income tax purposes. Income taxes for 2006 also included a tax expense of $32 million related to the $41 million pretax gain on sale of the Boston station. The pretax gain included $45 million of allocated television group goodwill, most of which is not deductible for income tax purposes.

**Assets Held for Sale**—During the third quarter of 2007, the Company commenced a process to sell its studio located in Hollywood, California. Accordingly, the $2.5 million carrying value of the building and equipment of the studio is included in assets held for sale at Dec. 30, 2007. The sale of the studio closed on Jan. 30, 2008 and the Company received net proceeds of approximately $4.4 million and will record a pretax gain on sale of approximately $1.9 million in the first quarter of 2008.

## NOTE 8:  CAPITAL LEASE OBLIGATIONS

The Company had capital lease obligations totaling $10.7 million at Dec. 30, 2007 and $11.7 million at Dec. 30, 2006. The carrying value of the Company's capital lease obligations at Dec. 30, 2007 and Dec. 31, 2006 approximates fair value. The capital lease obligations relate primarily to the lease expiring in 2015 of a transponder used to transmit certain of the Company's television signals. The equipment associated with the capital leases is recorded within property, plant, and equipment and had a net book value of $9.3 million and $10.7 million (net of accumulated depreciation of $3.9 million and $2.6 million) at Dec. 30, 2007 and Dec. 31, 2006, respectively.

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The following are the minimum lease payments to be made in each of the years indicated for the Company's capital lease obligations at Dec. 30, 2007 (in thousands):

| | |
|---|---:|
| 2008 | |
| 2009 | $ 2,200 |
| 2010 | 2,202 |
| 2011 | 2,202 |
| 2012 | 2,175 |
| Thereafter | 2,160 |
| Less: interest | 4,380 |
| | (4,653) |
| Total | $ 10,666 |

## NOTE 9:  CONTRACTS PAYABLE FOR BROADCAST RIGHTS

Contracts payable for broadcast rights are classified as current or long-term liabilities in accordance with the payment terms of the contracts. Required payments under contractual agreements for broadcast rights recorded at Dec. 30, 2007 are shown in the table below (in thousands):

| | |
|---|---:|
| 2008 | |
| 2009 | $ 339,909 |
| 2010 | 188,748 |
| 2011 | 139,270 |
| 2012 | 66,724 |
| Thereafter | 20,113 |
| | 17,538 |
| Total | $ 772,302 |

The fair value of the contracts payable for broadcast rights, as shown in the table below, was estimated using the discounted cash flow method (in thousands):

| | Dec. 30, 2007 | | Dec. 31, 2006 | |
|---|---|---|---|---|
| | Fair Value | Carrying Amount | Fair Value | Carrying Amount |
| Contracts payable for broadcast rights | $ 724,945 | $ 772,302 | $ 696,363 | $ 743,872 |

## NOTE 10:  COMMITMENTS AND CONTINGENCIES

The Company has entered into commitments for broadcast rights that are not currently available for broadcast and are therefore not included in the Company's consolidated financial statements. These commitments totaled $473 million at Dec. 30, 2007. Payments for broadcast rights generally commence when the programs become available for broadcast.

161

5/20/2010 9:00 PM

The Company had commitments totaling $159 million at Dec. 30, 2007 related primarily to talent and other news contracts. The Company leases certain equipment and office and production space, under a number of operating leases, expiring at various dates through 2024. Lease expense from continuing operations, excluding related party lease expense, was $15.5 million, $15.9 million and $16.3 million in fiscal years 2007, 2006 and 2005, respectively. The table below presents the future minimum lease payments to be made under non-cancelable operating leases at Dec. 30, 2007, excluding related party leases (in thousands):

## TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

| | | |
|---|---|---:|
| 2008 | $ | 13,523 |
| 2009 | | 13,210 |
| 2010 | | 9,212 |
| 2011 | | 7,118 |
| 2012 | | 6,892 |
| Thereafter | | 25,117 |
| Total | $ | 75,072 |

The Company and its subsidiaries are defendants from time to time in actions for matters arising out of their business operations. In addition, the Company and its subsidiaries are involved from time to time as parties in various regulatory, environmental and other proceedings with governmental authorities and administrative agencies. See Note 14 for a discussion related to FCC rulemaking and cross-ownership matters. The Company does not believe that any other matters or proceedings presently pending will have a material adverse effect on its consolidated financial position or results of operations.

## NOTE 11:  GOODWILL AND OTHER INTANGIBLE ASSETS

Goodwill and other intangible assets at Dec. 30, 2007 and Dec. 30, 2006, all related to television operations and consisted of the following (in thousands):

| | Dec. 30, 2007 | | | Dec. 31, 2006 | | |
|---|---|---|---|---|---|---|
| | Gross Amount | Accumulated Amortization | Net Amount | Gross Amount | Accumulated Amortization | Net Amount |
| **Intangible assets subject to amortization** | | | | | | |
| Network affiliation agreements (useful life of 40 years)(1) | $ 278,034 | $ (29,552) | $ 248,482 | $ 278,034 | $ (22,614) | $ 255,420 |
| Subscribers (useful life of 20 years) | 66,080 | (22,163) | 43,917 | 66,080 | (18,860) | 47,220 |
| Other (useful life of 10 to 40 years) | 13,550 | (6,519) | 7,031 | 13,550 | (5,242) | 8,308 |
| Total | $ 357,664 | $ (58,234) | $ 299,430 | $ 357,664 | $ (46,716) | $ 310,948 |
| **Goodwill and other intangible assets not subject to amortization** | | | | | | |
| Goodwill | | | 1,440,627 | | | 1,440,627 |
| FCC licenses | | | 871,946 | | | 871,946 |
| Total | | | 2,312,573 | | | 2,312,573 |
| Total goodwill and other intangible assets | | | $ 2,612,003 | | | $ 2,623,521 |

---

(1)   Network affiliation agreements, net of accumulated amortization, included $174 million related to FOX affiliations, $72 million related to CW affiliations and $3 million related to MyNetworkTV affiliations as of Dec. 30, 2007.

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The changes in the carrying amounts of intangible assets during the years ended Dec. 30, 2007 and Dec. 31, 2006 were as follows (in thousands):

**Intangible assets subject to amortization**

| | | |
|---|---|---:|
| Balance as of Dec. 25, 2005 | $ | 334,098 |
| Amortization expense | | (11,555) |
| Sales of discontinued operations (see Note 7) | | (11,595) |
| Balance as of Dec. 31, 2006 | $ | 310,948 |
| Amortization expense | | (11,518) |
| Balance as of Dec. 30, 2007 | $ | 299,430 |

**Goodwill**

| | | |
|---|---|---:|
| Balance as of Dec. 25, 2005 | $ | 1,566,045 |
| Sales of discontinued operations (see Note 7) | | (125,418) |
| Balance as of Dec. 31, 2006 and Dec. 30, 2007 | $ | 1,440,627 |

**Other intangible assets not subject to amortization**

| | | |
|---|---|---:|
| Balance as of Dec. 25, 2005 | $ | 1,084,654 |
| Sales of discontinued operations (see Note 7) | | (212,708) |
| Balance as of Dec. 31, 2006 and Dec. 30, 2007 | $ | 871,946 |
| | | |
| Total goodwill and other intangibles as of Dec. 30, 2007 | $ | 2,612,003 |

Estimated annual amortization expense will be approximately $11.5 million for each of the next five years, excluding the effects of any acquisitions or dispositions subsequent to Dec. 30, 2007.

## NOTE 12: INCOME TAXES

The following table reconciles the Company's income taxes computed at the U.S. federal statutory rate to income taxes reported for continuing operations in the Company's consolidated statements of income (in thousands):

| | Fiscal Years | | | | | |
|---|---|---:|---|---:|---|---:|
| | | 2007 | | 2006 | | 2005 |
| Income from continuing operations before income taxes | $ | 420,408 | $ | 360,697 | $ | 354,485 |
| Federal income taxes at 35% | $ | 147,143 | $ | 126,244 | $ | 124,070 |
| State and local income taxes, net of federal tax benefit | | 14,527 | | 12,017 | | 13,067 |
| Other, net | | 887 | | 895 | | 1,048 |
| Income taxes reported | $ | 162,557 | $ | 139,156 | $ | 138,185 |
| Effective tax rate | | 38.7% | | 38.6% | | 39.0% |

5/20/2010 9:00 PM

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Components of income tax expense charged to income from continuing operations were as follows (in thousands):

| | Fiscal Years | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| Currently payable: | | | |
| U.S. federal | $ 136,050 | $ 108,620 | $ 106,313 |
| State and local | 17,809 | 16,410 | 18,143 |
| Subtotal | 153,859 | 125,030 | 124,456 |
| Deferred: | | | |
| U.S. federal | 6,990 | 12,049 | 11,769 |
| State and local | 1,708 | 2,077 | 1,960 |
| Subtotal | 8,698 | 14,126 | 13,729 |
| Total | $ 162,557 | $ 139,156 | $ 138,185 |

The Company has elected to be taxed as a disregarded entity and does not file a separate tax return. The Company's operations are included in Tribune's consolidated United States federal and state income tax returns. The Company has computed income taxes as if it were filing separate returns. Current income taxes payable is settled with Tribune through the "due to Parent, net" account. On March 13, 2008, Tribune filed an election to be treated as a subchapter S Corporation under the Internal Revenue Code, which election is effective as of the beginning of Tribune's 2008 fiscal year. As a result, essentially all of the Company's net deferred tax liabilities will be eliminated and such adjustment will be recorded as a reduction in the Company's provision for income taxes in the first quarter of 2008.

Significant components of the Company's net deferred tax liabilities were as follows (in thousands):

| | Dec. 30, 2007 | Dec. 31, 2006 |
| --- | --- | --- |
| Net properties | $ 9,506 | $ 11,130 |
| Net intangible assets | 525,648 | 511,373 |
| Other future taxable items | 4,620 | 6,317 |
| Total deferred tax liabilities | 539,774 | 528,820 |
| Broadcast rights | (12,691) | (16,635) |
| Other future deductible items | (3,945) | (6,042) |
| State operating loss carryforwards | (14,454) | (14,454) |
| Valuation allowances on state operating loss carryforwards | 14,454 | 14,454 |
| Total deferred tax assets | (16,636) | (22,677) |
| Net deferred tax liability | $ 523,138 | $ 506,143 |

**Operating Loss Carryforwards**—At Dec. 30, 2007, the Company had operating loss carryforwards for state income tax purposes. These carryforwards arose in certain states primarily as a result of intercompany interest expense and management fees allocated to the Company's various subsidiaries, and expire between 2008 and 2027. The Company believes it is more likely than not that the deferred tax assets will not be realized because the related carryforwards will expire before being utilized. Therefore, in accordance with FAS No. 109, "Accounting for Income Taxes," the Company has established valuation allowances of $14 million on the deferred tax assets related to the state carryforwards. The state operating loss carryforwards increased in 2007 because the Company generated additional tax losses in certain states.

164

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 13:  PLEDGE OF MEMBERSHIP INTEREST**

On June 4, 2007, Tribune pledged 100% of its membership interest in the Company on an equal and ratable basis as security for the payment and performance of Tribune's obligations under the Credit Agreement and its outstanding public notes and debentures (other than the PHONES), including all future advances and re-advances under those borrowings.

165

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**SCHEDULE II—VALUATION AND QUALIFYING ACCOUNTS AND RESERVES**
(In thousands of dollars)

| Description | Balance at Beginning of Period | Additions Charged to Costs and Expenses | Deductions(1) | Balance at End of Period |
|---|---|---|---|---|
| Accounts receivable allowances: | | | | |
| Year ended Dec. 30, 2007 | $ 4,372 | $ 5,599 | $ 5,274 | $ 4,697 |
| Year ended Dec. 31, 2006 | $ 7,785 | $ 6,717 | $ 10,130 | $ 4,372 |
| Year ended Dec. 25, 2005 | $ 7,663 | $ 8,819 | $ 8,697 | $ 7,785 |

(1)    Deductions for the year ended Dec. 31, 2006 included approximately $.5 million due to the sales of discontinued operations. See Note 7 to the Company's consolidated financial statements for additional information on the sales of discontinued operations.

166

## TRIBUNE FINANCE, LLC
## INDEX TO FINANCIAL STATEMENTS

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 168 |
| Statement of Income for the period June 4, 2007 to Dec. 30, 2007 | 169 |
| Balance Sheet at Dec. 30, 2007 | 170 |
| Statement of Membership Equity for the period June 4, 2007 to Dec. 30, 2007 | 171 |
| Statement of Cash Flows for the period June 4, 2007 to Dec. 30, 2007 | 172 |
| Notes to Financial Statements | |
|     Note 1: Description of Business and Basis of Presentation | 173 |
|     Note 2: Summary of Significant Accounting Policies | 173 |
|     Note 3: Transactions with Tribune and Affiliates | 173 |
|     Note 4: Debt Due from Affiliates | 173 |
|     Note 5: Income Taxes | 173 |
|     Note 6: Pledge of Membership Interest | 174 |

167

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Member of Tribune Finance, LLC:

In our opinion, the accompanying balance sheet and the related statements of income, membership equity and cash flows present fairly, in all material respects, the financial position of Tribune Finance, LLC at December 30, 2007, and the results of its operations and its cash flows for the period from June 4, 2007 (formation) to December 30, 2007 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

As discussed in Note 3 and 4 to the financial statements, the Company has entered into significant transactions with Tribune Company and its subsidiaries.

/s/ PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP
Chicago, Illinois
March 14, 2008

168

http://www.sec.gov/Archives/edgar/data/726513/000110465908018845/...

**TRIBUNE FINANCE, LLC**
**STATEMENT OF INCOME**
**For the period June 4, 2007 to Dec. 30, 2007**
**(In thousands of dollars)**

| | | |
|---|---|---:|
| Interest income from related parties | $ | 145,049 |
| **Income Before Income Taxes** | | 145,049 |
| Income taxes | | (57,744) |
| | | |
| **Net Income** | $ | 87,305 |

See Notes to Financial Statements.

169

5/20/2010 9:00 PM

http://www.sec.gov/Archives/edgar/data/726513/000110465908018845/...

**TRIBUNE FINANCE, LLC**
**BALANCE SHEET**
**Dec. 30, 2007**
**(In thousands of dollars)**

| | | |
|---|---|---:|
| **Assets** | | |
| Cash | $ | — |
| Interest receivable from affiliates | | 7,251 |
| Total assets | $ | 7,251 |
| | | |
| **Liabilities and Membership Equity** | | |
| | | |
| **Liabilities** | | |
| Due to Parent | $ | 2,887 |
| Total liabilities | | 2,887 |
| | | |
| **Membership Equity** | | |
| Membership paid-in capital | | 3,000,000 |
| Promissory demand notes due from affiliates | | (3,000,000) |
| Retained earnings | | 4,364 |
| Total membership equity | | 4,364 |
| Total liabilities and membership equity | $ | 7,251 |

See Notes to Financial Statements.

170

**TRIBUNE FINANCE, LLC**
**STATEMENT OF MEMBERSHIP EQUITY**
**For the period June 4, 2007 to Dec. 30, 2007**
**(In thousands of dollars)**

| | Total | | Retained Earnings | | Promissory Demand Notes Due From Affiliates | | Membership Paid-in Capital |
|---|---|---|---|---|---|---|---|
| Capital contribution from Parent | $ | 3,000,000 | $ | — | $ | — | $ | 3,000,000 |
| Loans to affiliates in exchange for promissory demand notes | | (3,000,000) | | — | | (3,000,000) | | — |
| Net income | | 87,305 | | 87,305 | | — | | — |
| Dividends declared | | (82,941) | | (82,941) | | — | | — |
| **Balance at Dec. 30, 2007** | $ | 4,364 | $ | 4,364 | $ | (3,000,000) | $ | 3,000,000 |

See Notes to Financial Statements.

171

**TRIBUNE FINANCE, LLC**
**STATEMENT OF CASH FLOWS**
**For the period June 4, 2007 to Dec. 30, 2007**
**(In thousands of dollars)**

| | | |
|---|---:|---:|
| **Operations** | | |
| Net income | $ | 87,305 |
| Adjustments to reconcile net income to net cash provided by operations: | | |
| Interest receivable from affiliates | | (7,251) |
| Net cash provided by operations | | 80,054 |
| | | |
| **Investments** | | |
| Loans to affiliates in exchange for promissory demand notes | | (3,000,000) |
| Net cash used for investments | | (3,000,000) |
| | | |
| **Financing** | | |
| Capital contribution from Parent | | 3,000,000 |
| Dividends paid to Parent | | (82,941) |
| Net change in due to/from Parent | | 2,887 |
| Net cash provided by financing | | 2,919,946 |
| | | |
| **Net Increase (Decrease) in Cash** | | — |
| Cash, beginning of period | | — |
| Cash, end of year | $ | — |

See Notes to Financial Statements.

172

## TRIBUNE FINANCE, LLC
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 1: DESCRIPTION OF BUSINESS AND BASIS OF PRESENTATION

**Business Operations**—Tribune Finance, LLC ("Tribune Finance") is a single-member limited liability company wholly owned by Tribune Company ("Tribune" or "Parent"). Tribune Finance was established in 2007 pursuant to a credit agreement for senior secured credit facilities entered into by Tribune on May 17, 2007 and subsequently amended on June 4, 2007 (collectively, the "Credit Agreement"). For further information regarding the terms and conditions of the Credit Agreement, see Note 10 to Tribune's consolidated financial statements in Item 8. Pursuant to the terms of the Credit Agreement, Tribune contributed $3 billion to Tribune Finance for the purpose of providing $3 billion of loans to certain of Tribune's subsidiaries.

Tribune Finance has no employees. Tribune provides administrative services to Tribune Finance at no charge. The value of such services is not material.

**Fiscal Year**—Tribune Finance's fiscal year ends on the last Sunday in December. Tribune Finance's 2007 fiscal year encompassed the period June 4, 2007 to Dec. 30, 2007.

### NOTE 2: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The significant accounting policies of Tribune Finance, as summarized below, conform with accounting principles generally accepted in the United States of America and reflect practices appropriate to Tribune Finance.

**Use of Estimates**—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from these estimates.

**Interest Income**—Tribune Finance's primary source of income is interest on promissory notes from affiliated companies, which is computed on a monthly basis.

**Income Taxes**—Tribune Finance has elected to be taxed as a disregarded entity and does not file a separate tax return. Tribune Finance's operations are included in Tribune's consolidated United States federal and state income tax returns. Tribune Finance has computed income taxes as if it were filing separate returns. Current income taxes payable are settled with Tribune through the "due to Parent" account. Tribune Finance's operations generate only current taxable income, therefore no deferred tax assets or liabilities are required.

### NOTE 3: TRANSACTIONS WITH TRIBUNE AND AFFILIATES

All related party transactions with Tribune are eliminated in the Tribune consolidated financial statements.

**Dividends**—Tribune Finance pays dividends to Tribune in an amount equal to the interest income received by Tribune Finance from the affiliated companies under the terms of the promissory notes net of income taxes.

### NOTE 4: DEBT DUE FROM AFFILIATES

On June 4, 2007, pursuant to the terms of the Credit Agreement, Tribune Finance provided loans in the form of promissory demand notes totaling $3 billion to various subsidiaries of Tribune. Tribune Finance presents the promissory demand notes as a separate component of membership equity.

Tribune Finance earns interest income on these promissory notes at a rate equal to the rate on certain of Tribune's borrowings under its senior secured credit facilities. The average interest rate on the promissory notes was 8.29% during the period June 4, 2007 to Dec. 30, 2007 and was 7.91% at Dec 30, 2007.

### NOTE 5: INCOME TAXES

In 2007, the statutory federal income tax rate was 35 percent. For 2007, the effective tax rate differed from the statutory rate due to state income taxes (net of federal benefit).

173

http://www.sec.gov/Archives/edgar/data/726513/000110465908018845/...

**TRIBUNE FINANCE, LLC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Tribune Finance has elected to be taxed as a disregarded entity and does not file a separate tax return. Tribune Finance's operations are included in Tribune's consolidated United States federal and state income tax returns. Tribune Finance has computed income taxes as if it were filing separate returns.   Current income taxes payable are settled with Tribune through the "due to Parent" account. Tribune Finance's operations generate only current taxable income, therefore no deferred tax assets or liabilities are required.

**NOTE 6: PLEDGE OF MEMBERSHIP INTEREST**

On June 4, 2007, Tribune pledged 100% of its membership interest in the Company on an equal and ratable basis as security for the payment and performance of Tribune's obligations under the Credit Agreement and its outstanding public notes and debentures (other than the PHONES), including all future advances and re-advances under those borrowings.

174

### ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.

None.

### ITEM 9A.   CONTROLS AND PROCEDURES

#### Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures

Under the supervision and with the participation of the Company's management, including its principal executive officer and principal financial officer, the Company conducted an evaluation of its disclosure controls and procedures, as such term is defined in Exchange Act Rules 13a-15(e) and 15d-15(e), as of Dec. 30, 2007. Based upon that evaluation, the principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures are effective.

#### Management's Report on Internal Control Over Financial Reporting

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of the Company's management, including its principal executive officer and principal financial officer, the Company conducted an evaluation of the effectiveness of the design and operation of internal control over financial reporting based on criteria established in *Internal Control —Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on that evaluation, the Company's management concluded that internal control over financial reporting was effective as of Dec. 30, 2007.

The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with policies or procedures may deteriorate.

PricewaterhouseCoopers, LLP, the Company's independent registered public accounting firm, has issued an attestation report on the Company's internal control over financial reporting. This report appears on pages 79 and 80.

#### Changes in Internal Control Over Financial Reporting

There has been no change in the Company's internal control over financial reporting that occurred during the Company's fiscal quarter ended Dec. 30, 2007 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

### ITEM 9B.   OTHER INFORMATION

None.

### PART III

### ITEM 10.   DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.

#### Board of Directors of the Company

Information with respect to the directors of the Company as of March 20, 2008, is set forth below.

#### Jeffrey S. Berg

Mr. Berg is Chairman and Chief Executive Officer of International Creative Management, Inc., a talent and literary agency representing clients in the fields of publishing, motion pictures, television, music and theater. Mr. Berg was named President of ICM in 1980 and became Chairman in 1985. Mr. Berg is also a director of Oracle Corporation (NASDAQ: ORCL). Mr. Berg, 60, has been a director of the Company since December 2007.

175

http://www.sec.gov/Archives/edgar/data/726513/000110465908018845/...

**Brian L. Greenspun**

Mr. Greenspun is Chairman and Chief Executive Officer of The Greenspun Corporation, a privately owned firm based in Henderson, Nevada, with interests in media and commercial real estate development. He also is President and Editor of the Las Vegas Sun, the oldest family-owned newspaper in Nevada. Mr. Greenspun, 61, has been a director of the Company since December 2007.

**Betsy D. Holden**

Ms. Holden has been a senior advisor to McKinsey & Company since April 2007. Ms. Holden served as President-Global Marketing and Category Development of Kraft Foods Inc. (NYSE: KFT), a food business unit of Altria Group Inc., from January 2004 through June 2005. Further, Ms. Holden was the Co-Chief Executive Officer of Kraft Foods Inc. from March 2001 until December 2003 and President and Chief Executive Officer of Kraft Foods North America from May 2000 until December 2003. Ms. Holden is also a director of Western Union Company (NYSE: WU). Ms. Holden, 52, has been a director of the Company since 2002.

**William A. Osborn**

Mr. Osborn is Chairman of Northern Trust Corporation (NASDAQ: NTRS), a multibank holding company, and its principal subsidiary, The Northern Trust Company, since October 1995. From October 1995 through Dec. 31, 2007, Mr. Osborn also held the position of Chief Executive Officer of Northern Trust Corporation. Mr. Osborn is also a director of Caterpillar Inc. (NYSE: CAT) and Northern Trust Corporation. Mr. Osborn, 60, has been a director of the Company since 2001.

**William C. Pate**

Mr. Pate is a Managing Director and the Chief Investment Officer for Equity Group Investments, L.L.C. ("EGI"), a privately held investment company controlled by Sam Zell. He has served in various capacities for EGI since 1994, and in his present position since 2000. Mr. Pate is also a director of Covanta Holding Corporation (NYSE: CVA) and Exterran Holdings, Inc. (NYSE: EXH). Mr. Pate, 44, has been a director of the Company since December 2007.

**Mary Agnes Wilderotter**

Ms. Wilderotter is Chairman and Chief Executive Officer of Citizens Communications Company (NYSE: CZN), a full-service communications provider and the second-largest rural local exchange telephone company in the country. Ms. Wilderotter joined Citizens Communications in 2004 as President and Chief Executive Officer and was named Chairman in 2006. Further, Ms. Wilderotter was the Senior Vice President of Worldwide Public Sector, Microsoft Corporation (NASDAQ: MSFT) from 2002-2004 and the President and Chief Executive Officer of Wink Communications Inc. from 1996-2002. Ms. Wilderotter is also a director of Yahoo! Inc. (NASDAQ: YHOO) and Xerox Corporation (NYSE: XRX). Ms. Wilderotter, 53, has been a director of the Company since December 2007.

**Frank E. Wood**

Mr. Wood is Chief Executive Officer of Secret Communications, LLC, a Cincinnati-based venture capital firm. He is a 33-year veteran of the radio broadcast industry. He is Chairman of 8e6 Technologies, an Internet filtering company headquartered in Orange, California. Mr. Wood is also a director of Chemed Corporation (NYSE:CHE). Mr. Wood, 65, has been a director of the Company since December 2007.

**Samuel Zell**

Mr. Zell has served as a director of Tribune Company since May 2007 and as Chairman and Chief Executive Officer since December 2007. Mr. Zell has served as Chairman of EGI since 1999 and its President since 2006. Mr. Zell was a Trustee and Chairman of the Board of Trustees of Equity Office Properties Trust, an equity real estate investment trust primarily focused on office buildings, from October 1996 until its acquisition in February 2007, its Chief Executive Officer from April 2002 to April 2003, and its President from April 2002 until November 2002. Mr. Zell has been Chairman of the Board of Covanta Holding Corporation (NYSE: CVA), a waste-to-energy and specialty insurance services company, since

September 2005, served as its President, Chairman and Chief Executive Officer from July 2002 until December 2004, and was a director from 1999 until 2004. For more than the past five years, Mr. Zell has been Chairman of Equity Lifestyle Properties, Inc. (NYSE: ELS), an equity real estate investment trust primarily engaged in the ownership and operation of manufactured home resort communities; Chairman of the Board of Trustees of Equity Residential (NYSE: EQR), an equity real estate investment trust that owns and operates multi-family residential properties; and Chairman of Capital Trust, Inc. (NYSE: CT), a specialized finance company. Mr. Zell has been a director of Anixter International Inc. (NYSE: AXE) since 1984 and its Chairman since 1985. Mr. Zell is 66.

### Executive Officers of the Company

The information contained under the heading "Executive Officers of the Company" in Item 1 hereof is incorporated herein by reference.

### Code of Ethics

Tribune has in place a Code of Ethics for its chief executive officer, chief financial officer and controller and persons performing similar functions that is designed to promote honest and ethical conduct and full, fair, accurate, timely and understandable disclosure in public filings and other communications. The Code of Ethics is available on Tribune's website at www.tribune.com and in print to any person who requests a copy. Requests for printed copies of the Code of Ethics should be directed to Corporate Relations Department, Tribune Company, 435 Michigan Avenue, Chicago, Illinois 60611, telephone (800) 757-1694.

### Procedures for Security Holders to Recommend Nominees to the Board of Directors

Our governing documents do not set forth procedures pursuant to which security holders may recommend nominees to the Company's Board of Directors. However, the Investor Rights Agreement dated April 1, 2007 among Tribune, EGI-TRB, L.L.C. (the "Zell Entity") and GreatBanc Trust Company (on behalf of the ESOP) provides, among other things, that (1) the Board of Directors will consist of nine members, (2) the initial directors on the Board of Directors following the Merger will serve until the third annual election following the consummation of the Merger, (3) there will be two directors designated by the Zell Entity and (4) there will be one director who shall be the chief executive officer of the Company. Further, our Bylaws provide that five directors shall be independent and one director shall be without qualification. Director independence is discussed in Item 13 of this Annual Report on Form 10-K.

### Audit Committee of the Board of Directors

The Board of Directors has a standing Audit Committee whose function includes reviewing and monitoring Tribune's financial reporting and accounting practices and internal controls. Betsy D. Holden, William A. Osborn (chairman) and Frank E. Wood currently serve on the Audit Committee. The Board has determined each member of the Audit Committee is an "audit committee financial expert" and "independent" as defined in applicable securities laws, rules and regulations.

177

## ITEM 11.  EXECUTIVE COMPENSATION.

**Compensation Discussion and Analysis**

This section provides information regarding the 2007 compensation program for our principal executive officer, our former principal executive officer, our principal financial officer and the three most highly-compensated executive officers other than the principal executive officer and principal financial officer (collectively, the "NEOs"). It includes information regarding, among other things, the overall objectives of our 2007 compensation program and each element of compensation that was provided in 2007.

As required by the rules of the Securities and Exchange Commission ("SEC"), this discussion focuses on our 2007 compensation program. On Dec. 20, 2007, the Company completed the Leveraged ESOP Transactions (as further defined and described in Note 3 to the Company's consolidated financial statements included in Part II, Item 8, hereof), pursuant to which the Company became wholly owned by the ESOP. At that time, the structure and composition of our Board of Directors changed, and Mr. Zell was appointed as Chairman of our Board of Directors and Chief Executive Officer. As a part of such restructuring, Ms. Wilderotter and Messrs. Greenspun and Pate joined our Board of Directors and were appointed to the Compensation Committee (the "Committee"). As such, the current members of the Committee did not participate in or approve the elements or structure of the 2007 compensation program. The current members of the Committee, along with the other members of our current Board of Directors and our executive officers, are currently evaluating our compensation program for 2008 and beyond.

Mr. Zell was appointed Chief Executive Officer on Dec. 20, 2007, has agreed to be paid a salary and bonus of $0.50 per year and does not participate in any of the Company's benefit plans. Accordingly, the discussion below regarding our compensation objectives and the elements of our compensation program do not apply to Mr. Zell.

**Objectives of Our Compensation Program**—The Committee has the responsibility to review annually and approve corporate goals and objectives relevant to the compensation of our principal executive officer, to evaluate our principal executive officer's performance in light of those goals and objectives and, based on that evaluation, to determine and approve the principal executive officer's compensation level. The Committee also has the responsibility to review annually with the principal executive officer and approve the compensation for the other senior executive officers, including the NEOs. The Committee acts pursuant to a charter that has been approved by the Board. As discussed above, the current members of the Committee joined our Board and the Committee on Dec. 20, 2007.

The 2007 compensation program for our NEOs and other senior executive officers was designed to attract and retain top-quality management employees who can contribute to our long-term success and thereby increase the value of our company. Elements of the 2007 compensation program were designed to reflect the performance of Tribune as a whole, the individual performance of the employee and the competitive conditions in the lines of business and geographic areas in which Tribune operates. As stated above, the Committee is evaluating which, if any, of the elements of the 2007 compensation program will be retained.

The 2007 program was organized by the former Committee members around four fundamental principles:

*A Substantial Portion of NEO Compensation Should Be Performance-Based.* The 2007 compensation program was designed to reward targeted performance and to accomplish that goal in a number of ways. In terms of cash compensation, annual cash bonus targets for each NEO under the management incentive plan ("MIP") provisions of the Tribune Company Incentive Compensation Plan (the "Incentive Plan") were established by the former Committee members based on a percentage of an NEO's base compensation. Whether and to what extent MIP bonuses were paid with respect to fiscal 2007 depended on the extent to which the company-wide, group and/or individual goals set by the former Committee members were achieved during the year. Annual salary increases or decreases and the size and type of equity awards for NEOs have typically been determined by the Committee in February based on company-wide, group and/or individual performance during the prior year. In addition, in 2007, as discussed in more detail below, initial awards under the new Management Equity Incentive Plan ("MEIP") were made on Dec. 20, 2007 immediately following the completion of the Leveraged ESOP Transactions.

178

*NEO Compensation Should Motivate Long-Term Value Creation.* With respect to 2007, the former Committee members sought to establish a compensation program for our NEOs that would provide incentives to increase the value of the Company. Prior to the completion of the Leveraged ESOP Transactions, the equity compensation provided to each NEO consisted of restricted stock units and stock options that, in each case, were scheduled to vest based on the passage of time and continued employment. Under our new MEIP, NEOs will be eligible to receive awards of share equivalents pursuant to which they will receive the equivalent value of our common stock (as determined annually by GreatBanc Trust Company, the ESOP trustee) in cash subject to vesting requirements based on the passage of time and continued employment.

*Our Compensation Program for NEOs Should Enable Us to Compete for and Retain First-Rate Executive Talent.* We believe that our Company is most successful when we can attract and retain talented executives with compensation packages that are competitive and fair. For 2007, in order to assist in retaining executive talent, the former Committee members established compensation packages for NEOs that included both a short- and long-term component, with vesting requirements for equity-based awards dependent on the passage of time and continued employment. Further, the former Committee members sought to create compensation packages for NEOs that delivered total compensation that would be competitive with the total compensation delivered by certain peer companies with which the Company competes for executive talent. To ensure that the compensation packages for NEOs were competitive, for 2007, the former Committee members utilized the Towers Perrin Media Industry Executive Compensation Survey and other executive compensation surveys, which provide data concerning relative compensation of other companies. In addition, for 2007, the former Committee members engaged Frederic W. Cook, & Co., Inc., a nationally-known compensation consulting firm, to provide information regarding compensation levels and practices of peer companies including, specifically, Belo Corp., Clear Channel Communications, Inc., Dow Jones & Company, Inc., Gannett Co., Inc., Hearst-Argyle Television, Inc., IAC/InterActive Corp., The McClatchy Co., Inc., McGraw-Hill Companies, Inc., The New York Times Company, The E.W. Scripps Company and The Washington Post Company (the "Peer Group").

*Our Compensation Program for NEOs Should Be Fair and Perceived as Such, Both Internally and Externally.* We endeavor to create a compensation program that is fair and perceived as fair, both internally and externally. For 2007, the former Committee members accomplished this by comparing the compensation to be provided to our NEOs to the compensation provided to officers of the other companies included in the survey data and those in the Peer Group, as a means to measure external fairness. The former Committee members also compared compensation of the NEOs to other senior employees of the Company, as a means to measure internal fairness.

**Elements of Our 2007 Compensation Program**—This section describes the various elements of our 2007 compensation program for NEOs, together with a discussion of various matters relating to those items, including why each item was included in the compensation program. The 2007 compensation program for NEOs was designed by the former Committee members to achieve an appropriate balance with respect to the pursuit of both short and long-term performance goals. Further, the mix of cash and equity-based compensation described below was intended to motivate our NEOs to increase the value of the Company, while also providing the Company with a mechanism for retaining executive talent. As discussed above, following the completion of the Leveraged ESOP Transactions, the Committee, along with the other members of our current Board and our executive officers, is currently evaluating our compensation program for 2008 and beyond.

    *Cash Compensation*

Cash compensation for 2007 was paid in the form of salary and bonuses. Salary has been included in the Company's NEO compensation package so that a portion of the compensation provided to NEOs would be provided in a form that is fixed and liquid. Annual performance-based bonuses, have been paid pursuant to the MIP, were included in the package in order to provide incentives to our NEOs to pursue objectives that are consistent with the overall goals and strategic direction that the Board has set for the Company. The amount of cash compensation for 2007 that was paid in the form of salary as compared to annual performance-based bonuses was determined by the former Committee members in a manner designed to achieve the four fundamental principles set forth above.

179

The components comprising the cash portion of total compensation for 2007 are described below.

Salary. Base salaries for NEOs for any given year have been generally approved by the Committee at its meeting in February. In 2007, the former Committee made its final determination with respect to the other NEOs and other senior executive officers based on the recommendation of, and after discussions with, Mr. FitzSimons, our then-Chairman, President and Chief Executive Officer. For 2007, changes in base salary were dependent on the former Committee's assessment of company-wide, group and/or individual performance and the salary levels of our executives as compared to the other companies included in the survey data and those in the Peer Group.

MIP. The MIP provides cash compensation to NEOs to the extent that performance conditions set by the Committee are met. Target bonuses under the MIP for 2007 were set by the former Committee members in February 2007. Under the terms of the Leveraged ESOP Transactions, payments pursuant to the MIP for 2007 were required to be paid according to the targets established by the former Committee members.

For fiscal 2007, consistent with prior years, the former Committee members considered several factors in determining the amount of target bonuses under the MIP, including:

· the desire to tie a substantial portion of total compensation to company-wide, group and/or individual performance;

· the relative level of cash compensation, at target and actual achievement levels, of our executives as compared to the other companies included in the survey data and Peer Group; and

· the advice of Frederic W. Cook & Co., Inc. as to compensation practices at other companies in the Peer Group.

Performance objectives for the MIP for 2007 were developed through an iterative process. Based on a review of business plans, management, including the NEOs, developed preliminary recommendations for the former Committee members to review. The former Committee members reviewed management's preliminary recommendations and established final goals. In establishing final goals, the former Committee members sought to ensure that the incentives provided pursuant to the MIP were consistent with the strategic goals set by the Board, that the goals set were sufficiently ambitious so as to provide a meaningful incentive and that bonus payments, assuming target levels of performance were attained, would be consistent with the overall NEO compensation program.

In February 2007, the former members of the Committee, based on management's preliminary recommendation, approved the financial performance criteria and the individual performance goals that were used to determine whether and to what extent NEOs received payments under the MIP. For fiscal 2007, the former Committee members selected operating cash flow plus income on equity investments as the relevant financial performance criteria. These measures were selected for fiscal 2007 because operating cash flow is an important indicator of the operational strength and performance of the Company's businesses and equity investment results are important to the future growth of the Company. Target bonuses for NEOs with respect to bonuses paid for fiscal 2007 ranged from 60% to 125% of base salary and were based on the NEO's level of responsibility and ability to affect the Company's results. MIP bonuses for corporate executives, including Messrs. FitzSimons, Grenesko and Kenney, were based on the level of achievement of consolidated goals as set forth below. The MIP bonus for Mr. Smith was based on the level of achievement of the specific goals established for the Chicago Tribune Company and the MIP bonus for Mr. Reardon was based on the level of achievement of the specific goals established for the broadcasting group.

180

For fiscal 2007, the target level of operating cash flow plus equity income established by the former Committee members and the actual level of achievement by the Company, on a consolidated basis, were as follows:

| ($ in millions) | Actual (2) | | Target (2) | | Achievement % |
|---|---|---|---|---|---|
| Consolidated Operating Cash Flow(1) | $ | 1,160 | $ | 1,265 | |
| Net Income on Equity Investments | | 100 | | 67 | |
| **Total** | **$** | **1,260** | **$** | **1,332** | **78%** |

(1)  Operating cash flow is defined as operating profit before depreciation and amortization.

(2)  Actual and target operating cash flow figures exclude the results of Southern Connecticut Newspapers, *Hoy*, New York and EZ Buy & EZ Sell Recycler Corporation, each of which were sold in 2007. Further, actual and target operating cash flow figures exclude certain extraordinary one-time items consistent with the terms of the MIP.

Actual payments under the MIP can range, on the basis of financial performance, from 0% (threshold) to 200% (maximum) of the target bonus established by the Committee as follows:

| Company or Group Performance Level | Payment Level |
|---|---|
| Below 85% of goal | Discretionary |
| At 85% of goal | 40% of target |
| Every 1% increase between 85% and 100% of goal | An additional 4% of target |
| At 100% of goal | 100% of target |
| Every 1% increase between 100% and 115% of goal | An additional $6^2/3$% of target (to a maximum of 200%) |

Awards granted to the NEOs for fiscal 2007 are reflected in the Summary Compensation Table set forth below.

*Equity-Based Compensation*

The Company believes that a meaningful portion of each NEO's compensation should consist of equity-based awards that provide incentives to increase the value of the Company. In addition, in order to assist in retaining executive talent, these equity-based awards include vesting requirements based on the passage of time and continued employment. To this end, effective upon the completion of the Leveraged ESOP Transactions, the Board adopted the MEIP in December 2007. For information on other compensation received by the NEOs in connection with the Leveraged ESOP Transactions, see "Compensation Related to the Leveraged ESOP Transactions" below.

The MEIP, which is administered by the Committee, provides for phantom units (the "Units") that generally track the value of a share of common stock of the Company's common stock. Awards are made to eligible members of Company management and other key employees at the discretion of the Board. Awards under the MEIP are classified as First Tranche Units and Second Tranche Units. All grants to NEOs under the MEIP in 2007 consisted of Second Tranche Units.

The First Tranche Units represent the value of approximately 5% of the fully-diluted outstanding common stock of the Company (subject to customary anti-dilution adjustments), or 5,434,652 Units. First Tranche Units vest ratably over a three-year period beginning on the date of grant. Unvested First Tranche Units will vest upon a change in control of the Company or upon termination of employment due to death or disability (each as defined in the MEIP). Unvested First Tranche Units will be forfeited upon a termination of a participant's employment for any reason other than death or disability. A portion of the First Tranche Units were granted upon the consummation of the Leveraged ESOP Transactions on Dec. 20, 2007, and the remaining portion will be granted in future years.

The Second Tranche Units represent the value of approximately 3% of the fully-diluted outstanding common stock of the Company (subject to customary anti-dilution adjustments), or 3,261,000 Units. Fifty percent of the Second Tranche Units were fully vested upon grant and the remaining fifty percent will vest on the one year anniversary of the grant date. Any unvested Second Tranche Units will become fully vested upon a change in control of the Company, an involuntary termination of employment or a termination of employment due to a participant's death or disability (each as defined in the MEIP). Unvested Second Tranche Units will be forfeited upon a termination of a participant's employment for any reason other than an involuntary termination of employment or a termination of employment due to death or disability. Participants

181

receiving Second Tranche Units will be entitled to a gross-up for the payment of excise taxes, if any, in connection with the Leveraged ESOP Transactions.

In general, one-third of vested Units subject to an award (whether First Tranche Units or Second Tranche Units) will be payable in cash on each of the fourth, sixth and eighth anniversaries of the grant date or, if sooner, upon the occurrence of a change in control or a termination of employment based on the fair market value of our common stock on the December 31 immediately following the settlement event. With respect to Second Tranche Units only, in the event of a termination of a participant's employment prior to Dec. 20, 2008, such participant will receive his or her pro rata share (based upon the amount of his or her vested Second Tranche Units relative to all Second Tranche Units outstanding or reserved for issuance) of $25 million, payable within ten business days following such termination of employment.

*Perquisites*

In 2007, our NEOs received certain perquisites provided by or paid for by the Company. These perquisites included financial planning services, memberships in social and professional clubs, car allowances and gross up payments equal to the taxes payable on certain perquisites.

The former Committee members provided these perquisites because, in many cases, the perquisite was deemed to make our executives more efficient and effective and thereby has been a benefit to the Company. In addition, these perquisites are provided by many companies in the Peer Group to their named executive officers and the former Committee members believed it was necessary for retention and recruitment purposes that the Company do the same. The Committee, along with the other members of our current Board of Directors and our executive officers, is currently evaluating what perquisites, if any, will remain in place as a part of our compensation program for 2008 and beyond.

*Deferred Compensation Plan*

Prior to the completion of the Leveraged ESOP Transactions, our Bonus Deferral Plan allowed certain employees, including the NEOs, to defer receipt of MIP bonus payments. Participants could defer up to 100% of bonus payments into a cash-based account or into an account that tracked Tribune common stock. The cash-based account appreciated at a rate equal to 120% of the long-term applicable federal rate, compounded quarterly, which is determined periodically by the Internal Revenue Service. Amounts deferred into Tribune common stock accounts were credited with earnings or losses based on the return on Tribune common stock. The Company did not "match" amounts that were deferred by employees pursuant to the Bonus Deferral Plan. All amounts that had been deferred pursuant to the Bonus Deferral Plan were paid out in connection with the completion of the Leveraged ESOP Transactions. The Bonus Deferral Plan has been suspended and no deferrals of MIP bonus payments for 2007 were made under the plan. The Committee is currently evaluating whether the Bonus Deferral Plan will remain in place as part of our compensation program for 2008 and beyond.

*Employee Stock Ownership Plan*

The ESOP was formed in connection with the Leveraged ESOP Transactions. It is a tax-qualified retirement plan that currently owns all of our outstanding common stock. The assets of the ESOP are held in a trust within which individual accounts will be maintained for each participating employee, including the NEOs. The Company initially expects to allocate shares of its common stock having a value equal to 5% of eligible pay each year to the individual employee accounts, beginning in 2009 for the 2008 plan year. Participants will vest 20% each year beginning with their second year of service with the Company and vesting fully after their sixth year of service. Participants may take distributions from their ESOP accounts beginning in the year following their retirement (if they retire at age 65 or older) or beginning the later of six years following their termination of service or in 2018 (if they leave the Company prior to retirement). The ESOP is funded solely through company contributions and may borrow funds to purchase additional shares of our common stock.

At the time of a distribution, the Company will purchase the shares of our common stock from the participant's individual ESOP account at their fair market value and make payments in installments over five years with interest. Accordingly, the ESOP provides the opportunity for our employees to share in the value of our common stock, creating a direct link between company interests and employee interests and providing an incentive for participating employees,

182

including the NEOs, to increase the long-term value of our company, even though our common stock is no longer publicly traded.

*Post-Termination Compensation*

    Transitional Compensation Plan. The NEOs do not have employment agreements and are considered "at-will" employees who may be terminated at any time by the Company. While the Company has not entered into formal severance agreements with any of the NEOs, the former Committee established a Transitional Compensation Plan for Executive Employees (the "Transitional Compensation Plan") under which all the NEOs, other than Mr. Zell, are covered. The Transitional Compensation Plan provides for benefits, upon a qualifying event or circumstances after there has been a "change-in-control" (as defined in the Transitional Compensation Plan) of the Company. The Leveraged ESOP Transactions qualified as a change-in-control under the Transitional Compensation Plan. Additional information regarding the Transitional Compensation Plan, including a definition of key terms and a quantification of benefits that would have been received by our NEOs had termination occurred on Dec. 31, 2007 (or, in the case of Messrs. FitzSimons and Reardon, the benefits actually received under the Transitional Compensation Plan), is found below under the heading "Potential Payments upon Termination or Change-in-Control."

    Pension Plan and Supplemental Pension Plan. The Tribune Company Pension Plan (the "Pension Plan") is a funded, tax-qualified, noncontributory defined-benefit pension plan that covers all non-union employees who had met the relevant age and service requirements, including the NEOs. The Company also maintains The Tribune Company Supplemental Retirement Pension Plan (the "Supplemental Pension Plan"), an unfunded plan that provides payments substantially equal to the difference between the amount that would have been payable under the Pension Plan, in the absence of legislation limiting pension benefits and earnings that may be considered in calculating pension benefits, and the amount actually payable under the Pension Plan.

    Both plans were "frozen" on Dec. 31, 1998 (the "freeze date"), and no additional service and compensation credit has accrued since the freeze date. Benefits payable under the Pension Plan are based upon the employee's years of service (up to a maximum of 35 years) and the employee's average earnings for a five calendar-year period with us and our affiliated companies as of the freeze date. Benefits are payable after retirement in the form of an annuity or a lump sum. Earnings, for purposes of the calculation of benefits under the Pension Plan, include base salary and commissions, if any. The amount of annual earnings considered in calculating benefits under the Pension Plan is limited by law. Contributions to the Pension Plan are made entirely by us and are paid into a trust fund from which the benefits of participants will be paid. Additional information regarding the Pension Plan and the Supplemental Pension Plan is found under the heading "2007 Pension Benefits." As a result of the completion of the Leveraged ESOP Transactions, amounts accrued under the Supplemental Pension Plan were paid as a lump sum at the end of fiscal 2007.

    Effective Jan. 1, 2008, the Pension Plan was amended and restated as the Tribune Company Cash Balance Pension Plan (the "Cash Balance Plan"). Under the Cash Balance Plan, existing benefits under the Pension Plan will remain frozen. However, the Company plans to utilize surplus funding from the Pension Plan in order to provide for accruals on behalf of eligible employees, including the NEOs, under the Cash Balance Plan. In March 2008, the Company provided for an initial Cash Balance Plan accrual, effective as of Dec. 31, 2007, on behalf of eligible employees, including the NEOs, equal to two percent of the employees' eligible compensation. Further, beginning in 2009 with respect to the 2008 plan year, the Company plans to provide for accruals on behalf of eligible employees, including the NEOs, equal to three percent of the employees' eligible compensation. The Company is currently evaluating whether it will maintain a Supplemental Pension Plan in connection with the Cash Balance Plan.

    Savings Plan and Supplemental Savings Plan. Under the Tribune Company 401(k) Savings and Profit Sharing Plan (the "Savings Plan"), a tax-qualified retirement savings plan, non-union employees, including our NEOs, may contribute eligible base compensation on a before-tax basis, up to Internal Revenue Service limits. For calendar year 2007, the maximum contribution by employees to the Savings Plan was $15,500, plus an additional $5,000 for those employees who had attained age 50. In 2007, the Company provided a regular company contribution equal to 4% of eligible compensation (generally, base compensation). In prior years, the Company also provided an annual profit-sharing contribution of between 2% and 5% of base compensation depending on the financial performance of the Company for the year. No profit-sharing contributions were made for 2007. Amounts held in Savings Plan accounts may not be withdrawn

183

except in the event of hardship prior to the employee's termination of employment, or such earlier time as the employee reaches the age of 59$^1$/2 years, subject to certain exceptions set forth in Internal Revenue Service regulations.

Pursuant to Internal Revenue Service rules, effective for 2007, the Savings Plan limits the "annual additions" that can be made to a participating employee's account to $45,000 per year. "Annual additions" include company contributions, profit-sharing contributions and salary reduction contributions made by us under Section 401(k) of the Internal Revenue Code. In addition, no more than $225,000 of annual compensation may be taken into account in computing benefits under the Savings Plan. For 2007 and prior years, the Company previously maintained a Supplemental Defined Contribution Plan (the "Supplemental Savings Plan") paid out of the Company's general assets, which credited eligible Savings Plan participants with an amount substantially equal to the difference between the amount that, in the absence of legislation limiting company contributions to the Savings Plan, would have been allocated to an employee's company contributions and profit-sharing contributions and the amount actually allocated under the Savings Plan.

For 2008 and beyond, the Company will no longer make regular annual or profit-sharing contributions pursuant to the Savings Plan. These benefits have been replaced by the benefits under the Cash Balance Plan and the ESOP. The Company is currently evaluating whether to provide a supplemental plan in connection with the ESOP.

The Company maintained and will continue to maintain the 401(k) portion of the Savings Plan for our employees, including our NEOs, in order to encourage our employees to save some percentage of their cash compensation for their eventual retirement. The Savings Plan permits employees to make such savings in a manner that is relatively tax efficient.

## Compensation Related to the Leveraged ESOP Transactions

### Cash Transaction Bonus Pool and MEIP

In connection with the Board's review of strategic alternatives for the Company beginning in September 2006, the former Board members authorized certain compensation awards to motivate management to seek a transaction that would provide the maximum return to the Company's shareholders despite the risks such a transaction would pose to management's continued employment. In connection with the approval of the Leveraged ESOP Transactions, on April 1, 2007, the former Board members approved a cash transaction bonus pool in an aggregate amount of $6,500,000 for 32 individuals. Subsequently, management increased the number of recipients to 40 and reduced the bonus pool to $5,400,000. Payment of these cash bonuses was conditioned upon the consummation of the Leveraged ESOP Transactions and such amounts were paid to a select group of management and other key employees who played a critical role in overseeing the completion of the Leveraged ESOP Transactions (not including Messrs. FitzSimons and Smith, who each voluntarily elected not to participate in this cash bonus pool).

In addition to the cash transaction bonus pool, the Board also adopted the MEIP, as discussed above under "Equity-Based Compensation."

### Stock Options, Restricted Stock and Other Equity Awards

Prior to the completion of the Leveraged ESOP Transactions, a meaningful portion of each NEO's compensation was in the form of equity awards, as such awards served to align more directly the interests of NEOs and our shareholders. Equity awards to our NEOs were made pursuant to the Incentive Plan, which allowed for the use of a wide variety of equity-based awards, including stock options, restricted stock and restricted stock units. In February 2007, the former Committee members approved equity awards for each NEO, each of which is disclosed in the 2007 Grants of Plan-Based Awards Table. As further detailed in the section below entitled "Narrative to the Summary Compensation Table and 2007 Grants of Plan-Based Awards Table," pursuant to the terms of the Incentive Plan and individual equity awards, upon the completion of the Leveraged ESOP Transactions, all outstanding equity awards immediately vested and were settled in cash.

184

**Compensation Committee Report**

The Compensation Committee of the Board of Directors of Tribune Company (the "Committee") oversees Tribune Company's compensation program on behalf of the Board. As described above, the 2007 compensation program was administered by the former Committee members until Dec. 20, 2007, at which time the Leveraged ESOP Transactions were completed and the new Committee members were appointed. In fulfilling its oversight responsibilities, the Committee reviewed and discussed with management the Compensation Discussion and Analysis included in this Annual Report on Form 10-K.

In reliance on the review and discussions referred to above, the Committee recommended to the Board that the Compensation Discussion and Analysis be included in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007 filed with the Securities and Exchange Commission.

Brian L. Greenspun
William C. Pate
Mary Agnes Wilderotter

185

## Summary Compensation Table

The following table summarizes compensation awarded to, earned by or paid to the NEOs in fiscal 2007 and 2006, except for Messrs. Zell and Kenney, who were not NEOs in 2006. Accordingly, only amounts for fiscal 2007 are reported for Messrs. Zell and Kenney. The above section entitled "Compensation Discussion and Analysis" describes in greater detail the information reported on this table.

| Name and Principal Position | Year | Salary (1)($) | Stock Awards (2)($) | Option Awards (3)($) | Non-Equity Incentive Plan Compensation ($)(4) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($)(5) | All Other Compensation ($)(6) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Samuel Zell Chairman & Chief Executive Officer | 2007 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Dennis J. FitzSimons Former Chairman, President and Chief Executive Officer | 2007 | 1,026,346 | 7,687,826 | 0 | 989,625 | 0 | 16,269,848 | 25,973,645 |
| | 2006 | 999,327 | 1,869,600 | 1,942,707 | 1,400,000 | 17,790 | 106,983 | 6,336,407 |
| Donald C. Grenesko Senior Vice President/Finance and Administration | 2007 | 606,721 | 3,345,646 | 0 | 743,454 | 0 | 91,546 | 4,787,367 |
| | 2006 | 574,346 | 872,480 | 559,200 | 440,325 | 17,197 | 55,616 | 2,519,164 |
| Crane H. Kenney Senior Vice President, General Counsel and Corporate Secretary | 2007 | 486,779 | 3,092,412 | 258,934 | 821,130 | 0 | 40,292 | 4,699,547 |
| Scott C. Smith President, Tribune Publishing and Publisher, Chicago Tribune Company | 2007 | 612,087 | 3,256,668 | 0 | 293,781 | 0 | 351,211 | 4,513,747 |
| | 2006 | 578,365 | 934,800 | 579,718 | 425,000 | 15,865 | 73,281 | 2,607,029 |
| John E. Reardon Former President, Tribune Broadcasting Company | 2007 | 532,212 | 2,546,787 | 257,193 | 560,500 | 0 | 76,114 | 3,972,806 |
| | 2006 | 509,615 | 185,745 | 131,336 | 525,000 | 3,829 | 69,697 | 1,425,222 |

(1) For 2007, the amounts represent base salary for the 52 week fiscal year beginning Jan. 1, 2007 through Dec. 30, 2007 and for 2006, the amounts represent base salary for the 53 week fiscal year beginning Dec. 26, 2005 through Dec. 31, 2006. Mr. Zell will earn a salary and bonus of $0.50 in fiscal 2008.

(2) For fiscal 2007, the amounts shown in this column include the compensation expense recorded by the Company with respect to restricted stock unit awards under the Incentive Plan and awards under the MEIP, each as determined pursuant to Financial Accounting Standards Board Statement of Financial Accounting Standards No. 123 (revised 2004), "Share-Based Payment" ("FAS No. 123R"). For fiscal 2006, the amounts shown in this column include the expense recorded by the Company with respect to restricted stock unit awards as determined pursuant to FAS No. 123R. See Note 17 to the Company's consolidated financial statements included in Part II, Item 8, hereof for a discussion of the relevant assumptions used in calculating compensation expense pursuant to FAS No. 123R.

*Restricted Stock Units*: The 2007 amounts shown in this column for each NEO include the entire grant date fair value of the restricted stock units awarded in 2007 plus an adjustment to reflect the fact that each grant awarded in 2007, the unvested portion of each grant awarded in 2006 and related dividend equivalent units were each settled in cash for a per share amount which was higher than the grant date fair value in connection with the completion of the Leveraged ESOP Transactions. For fiscal 2007, compensation expense recorded by the Company pursuant to FAS No. 123R with respect to all such restricted stock unit awards was as follows: Mr. Zell: $0; Mr. FitzSimons: $4,771,159; Mr. Grenesko: $1,875,962; Mr. Kenney: $1,622,728; Mr. Smith: $1,786,984; and Mr. Reardon: $1,488,615. The 2006 amounts shown in this column for Messrs. FitzSimons, Grenesko and Smith include the entire grant date fair value of the restricted stock units granted to them in 2006, without regard to vesting requirements, because the entire grant date fair value of such awards was expensed in the year it was awarded due to the fact that each of these individuals had reached the minimum retirement age and the required years of service and therefore the award

would vest in full upon the NEO's retirement at any time. The 2006 amount shown in this column for Mr. Reardon includes the compensation expense recorded in 2006 with respect to the restricted stock units granted to Mr. Reardon in 2006, plus an assumed forfeiture amount which was subtracted from the full fair value of the award when determining

186

5/20/2010 9:00 PM

the required expense. For further information on the 2007 restricted stock unit awards, see the 2007 Grants of Plan-Based Awards table.

*MEIP Second Tranche Unit Awards*: The 2007 amounts shown in this column for each NEO include fifty percent of the fair value at Dec. 30, 2007 of each unit awarded under the MEIP to such NEO, to reflect the fact that fifty percent of each NEO's units were vested on such date, plus an additional 1.5 percent of the fair value at Dec. 30, 2007 of each such unit to record the ratable expense related to their unvested units. With respect to Mr. FitzSimons, the amount includes an adjustment to reflect the fact that the entire award was settled in cash pursuant to the terms of the MEIP in connection with the termination of his employment. For fiscal 2007, the expense recorded by the Company pursuant to FAS No. 123R with respect to the MEIP awards granted to the NEOs was as follows: Mr. Zell: $0; Mr. FitzSimons: $2,916,667; Mr. Grenesko: $1,469,684; Mr. Kenney: $1,469,684; Mr. Smith: $1,469,684; and Mr. Reardon: $1,058,172. For further information on the 2007 MEIP awards, see the 2007 Grants of Plan-Based Awards table.

(3) The amounts shown in this column represent the compensation expense recorded by the Company with respect to stock option awards determined pursuant to FAS No. 123R. See Note 17 to the Company's consolidated financial statements included in Part II, Item 8, hereof for a discussion of the relevant assumptions used in calculating compensation expense pursuant to FAS No. 123R, including the calculation of the grant date fair value of stock options. No stock option awards were granted to NEOs in respect of fiscal 2007. The amounts shown in this column for Messrs. FitzSimons, Grenesko and Smith for 2006 include the entire grant date fair value of the stock options granted to them in 2006 under the Incentive Plan, without regard to vesting requirements, because the entire grant date fair value of such awards was expensed in 2006 due to the fact that each of these individuals had reached the minimum retirement age and the required years of service and therefore the award would vest in full upon the NEO's retirement at any time. The amounts shown in this column for Messrs. Kenney and Reardon for 2007 include the compensation expense recorded in such year with respect to the stock options granted to them in 2006 plus an adjustment to reflect the fact that each stock option awarded in 2006 was settled in cash in connection with the completion of the Leveraged ESOP Transactions. The amount shown in this column for Mr. Reardon for 2006 includes the compensation expense recorded in that year with respect to stock options granted to Mr. Reardon in 2006 plus an assumed forfeiture amount which is subtracted from the full grant date fair value of the award when determining the required compensation expense. For further information on the 2007 stock option awards, see the 2007 Grants of Plan-Based Awards table.

(4) The amounts shown in this column constitute payments made under the MIP and awards under the cash transaction bonus pool. The cash transaction bonus pool awards for Messrs. Grenesko, Kenney and Reardon were $400,000, $600,000 and $200,000, respectively. Messrs. FitzSimons and Smith declined to receive cash transaction bonus awards. For further information regarding the MIP and the cash transaction bonus awards, see "Compensation Discussion and Analysis."

(5) The amounts shown in this column include the aggregate of the increase in actuarial values of the benefits for Messrs. FitzSimons, Grenesko, Kenney, Smith and Reardon under the Pension Plan and Supplemental Pension Plan. Because the Pension Plan and Supplemental Pension Plan were frozen with respect to continued service and compensation credits effective as of Dec. 31, 1998, any increase in actuarial values results solely from the reduction in the period of discounting over the prior year and the change in the required discount rate. For 2007, the changes in actuarial values for each NEO were as follows (amounts in parentheses indicate negative numbers): Mr. FitzSimons: ($248,522); Mr. Grenesko: ($82,361); Mr. Kenney: ($8,132); Mr. Smith: ($343,143); and Mr. Reardon: ($65,758). Because these amounts were negative, they are reflected as zeros in this column in accordance with SEC rules. None of the NEOs earned above-market or preferential earnings on deferred compensation in 2006 or 2007.

(6) The amounts shown in this column consist of perquisites, reimbursement for the payment of taxes, payments under Supplemental Pension Plan and company contributions under Tribune's qualified and non-qualified defined contribution plans. For 2007, perquisites for the NEOs included: (i) an automobile allowance to Messrs. Grenesko, Kenney, Smith and Reardon; (ii) a club allowance to Messrs. FitzSimons, Kenney and Smith and (iii) personal financial counseling for Mr. FitzSimons. For fiscal 2007, the following NEOs received the following tax reimbursements with respect to certain perquisites: Mr. FitzSimons: $17,410; Mr. Grenesko: $204; and Mr. Kenney: $874. Upon completion of the Leveraged ESOP Transactions, the present value of the accrued benefit under the Supplemental Pension Plan was paid to all participants, including the NEOs, pursuant to the terms of the plan in the following amounts: Mr. Zell: $0; Mr. FitzSimons: $206,824; Mr. Grenesko: $53,976; Mr. Kenney: $674; Mr. Smith: $307,639; and Mr. Reardon: $41,618. Each NEO, other than Mr. Zell, received a company contribution of $9,000 under the Tribune Company 401(k) Savings and Profit Sharing Plan, a qualified defined contribution plan. The company

187

contributions credited to the NEOs under Tribune's non-qualified defined contribution plan were: Mr. Zell: $0; Mr. FitzSimons: $31,369; Mr. Grenesko: $14,366; Mr. Kenney: $9,744; Mr. Smith: $14,572; and Mr. Reardon: $11,496. In the case of Mr. FitzSimons, the amount shown also includes a cash payment under the Tribune Transitional Compensation Plan of $15,978,121. For more information regarding this payment, see "Potential Payments Upon Termination or Change in Control" below.

188

**2007 Grants of Plan-Based Awards**

The following table summarizes 2007 awards granted to the NEOs under the MIP, Incentive Plan and MEIP. Each NEO participates in the MIP, a cash incentive plan, and the annual cash incentive award actually earned by each NEO is included in the Summary Compensation Table under the "Non-Equity Incentive Plan Compensation" column. The MIP, Incentive Plan and MEIP are each described in greater detail above in the section entitled "Compensation Discussion and Analysis."

| Name | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards (1) | | | All Other Stock Awards: Number of Shares of Stock or Units (#)(2) | Grant Date Fair Value ($)(3) |
|---|---|---|---|---|---|---|
| | | Threshold ($) | Target ($) | Maximum ($) | | |
| Samuel Zell | | $         0 | $          0 | $          0 | 0 | $          0 |
| Dennis J. FitzSimons | | 0 | 1,268,750 | 2,537,500 | | |
| | 2/13/2007 | | | | 135,000 | 4,104,000 |
| | 3/8/2007 | | | | 1,058.0427 | 31,667 |
| | 12/20/2007 | | | | 380,450 | 2,916,667 |
| Donald C. Grenesko | | 0 | 440,325 | 880,650 | | |
| | | 0 | 400,000 | 400,000 | | |
| | 2/13/2007 | | | | 52,750 | 1,603,600 |
| | 3/8/2007 | | | | 432.1143 | 12,933 |
| | 12/20/2007 | | | | 271,750 | 2,853,375 |
| Crane H. Kenney | | 0 | 283,500 | 567,000 | | |
| | | 0 | 600,000 | 600,000 | | |
| | 2/13/2007 | | | | 40,000 | 1,216,000 |
| | 3/8/2007 | | | | 322.6167 | 9,656 |
| | 12/20/2007 | | | | 271,750 | 2,853,375 |
| Scott C. Smith | | 0 | 473,840 | 947,680 | | |
| | 2/13/2007 | | | | 50,000 | 1,520,000 |
| | 3/8/2007 | | | | 423.7728 | 12,684 |
| | 12/20/2007 | | | | 271,750 | 2,853,375 |
| John E. Reardon | | 0 | 360,500 | 721,000 | | |
| | | 0 | 200,000 | 200,000 | | |
| | 2/13/2007 | | | | 40,000 | 1,216,000 |
| | 3/8/2007 | | | | 322.6167 | 9,656 |
| | 12/20/2007 | | | | 195,660 | 2,054,430 |

(1)  The amounts in the first row for each NEO set forth cash bonus award parameters under the MIP. The amount set forth as the maximum bonus payable under the MIP to each NEO equals 200% of the NEO's target bonus. For Messrs. Grenesko, Kenney and Reardon, the amounts in the second row set forth the cash transaction awards paid to them in connection with the consummation of the Leveraged ESOP Transactions. In each case, the amount actually earned by each NEO is reported as Non-Equity Incentive Plan Compensation in the Summary Compensation Table.

(2)  The grants made on Feb. 13, 2007 and March 8, 2007 consist of restricted stock units and dividend equivalent units awarded under the Incentive Plan. The dividend equivalents accumulated in 2007 were granted on March 8, 2007 and are reflected immediately following the related restricted share unit grant. Also consists of grants of Second Tranche Units under the Tribune MEIP effective Dec. 20, 2007. The terms of the restricted stock units and grants under the

189

MEIP are described in more detail below in the section entitled "Narrative to Summary Compensation Table and 2007 Grants of Plan-Based Awards Table."

(3)  Amounts in this column consist of (i) the grant date fair value of the restricted stock units and the related dividend equivalent units or (ii) the fair value as of Dec. 30, 2007 of the Second Tranche Units under the MEIP, each determined pursuant to FAS No. 123R.

## Narrative to Summary Compensation Table and 2007 Grants of Plan-Based Awards Table

*Employment Agreements*

During 2007, each of the NEOs was an at-will employee and none of them was a party to an employment agreement with the Company.

*Awards*

In February 2007, the former Committee members established 2007 MIP bonus targets for Messrs. FitzSimons, Grenesko, Kenney, Smith and Reardon. The amount of the potential bonus payouts was tied to satisfaction of financial performance goals relating to operating cash flow and income from equity investments as well as the satisfaction of pre-determined individual performance goals. Under the terms of the Leveraged ESOP Transactions, payments pursuant to the MIP for 2007 were required to be paid according to the targets established by the former Committee members. In each case, the MIP bonuses paid to the NEOs are reported as "Non-Equity Incentive Plan Compensation" in the Summary Compensation Table.

On Feb. 13, 2007, the former Committee members granted restricted stock units to each of our NEOs, other than Mr. Zell, pursuant to the Incentive Plan. Dividend equivalents on the restricted stock units were earned on the same terms and at the same rate as dividends paid to our common shareholders. Pursuant to the terms of the Incentive Plan and individual equity awards, upon completion of the Leveraged ESOP Transactions, all outstanding equity awards immediately vested and were settled in cash.

In connection with the approval of the Leveraged ESOP Transactions, the former Board members approved a cash transaction bonus pool for a select group of management and other key employees who played a critical role in overseeing the completion of the Leveraged ESOP Transactions. As described in the Summary Compensation Table, upon completion of the Leveraged ESOP Transactions, Messrs. Grenesko, Kenney and Reardon received payments pursuant to the cash transaction bonus pool. Messrs. FitzSimons and Smith voluntarily elected not to participate in this cash bonus pool. See "Compensation Discussion and Analysis" for a more detailed discussion of the cash transaction bonus pool.

Further, on Dec. 20, 2007 in connection with the completion of the Leveraged ESOP Transactions, Messrs. FitzSimons, Grenesko, Kenney, Smith and Reardon each received grants of Second Tranche Units under the MEIP. Fifty percent of the Second Tranche Units were fully vested upon grant and the remaining fifty percent will vest on the one year anniversary of the grant date (Dec. 20, 2008). In general, one-third of vested units will be payable in cash on each of the fourth, sixth and eighth anniversaries of the grant date. However, any unvested Second Tranche Units will become fully vested upon a change in control of the Company, an involuntary termination of employment or a termination of employment due to a participant's death or disability (each as defined in the MEIP). Unvested Second Tranche Units will be forfeited upon a termination of a participant's employment for any reason other than an involuntary termination of employment or a termination of employment due to death or disability. With respect to Second Tranche Units only, in the event of a termination of a participant's employment prior to Dec. 20, 2008, such participant will receive his or her pro rata share (based upon the amount of his or her vested Second Tranche Units relative to all Second Tranche Units outstanding or reserved for issuance) of $25 million, payable within ten business days following such termination of employment.

*Salary and Bonus in Proportion to Total Compensation*

The former Committee members believed that a meaningful portion of each NEO's compensation should be in the form of equity awards. The 2007 compensation program was designed by the former Committee members to motivate long-term value creation, while also providing incentives to the NEOs to pursue specific short and long-term performance goals. See "Compensation Discussion and Analysis" for a description of the objectives of our 2007 compensation program and overall

190

compensation philosophy. As discussed above, the current Committee members, along with the other members of our Board of Directors and our executive officers, are currently evaluating our compensation program for 2008 and beyond.

191

## 2007 Outstanding Equity Awards at Fiscal-Year-End

The following table summarizes the outstanding equity awards held by the NEOs at the end of 2007. As noted above, pursuant to the terms of the Incentive Plan and individual equity awards, upon completion of the Leveraged ESOP Transactions, all equity awards outstanding at that time immediately vested and were settled in cash.

| | Stock Awards | |
| | Number of Shares or Units of Stock That Have Not Vested (1)(#) | Market Value of Shares or Units of Stock That Have Not Vested ($) |
| Name | | |
| --- | --- | --- |
| Samuel Zell | 0 | $ 0 |
| Dennis J. FitzSimons | 0 | 0 |
| Donald C. Grenesko | 135,875 | 1,426,687 |
| Crane H. Kenney | 135,875 | 1,426,687 |
| Scott C. Smith | 135,875 | 1,426,687 |
| John E. Reardon | 97,830 | 1,027,215 |

(1) Amounts shown in this column consist of the unvested portion of the Second Tranche Units granted on Dec. 20, 2007 to the NEOs under the MEIP. All of the Second Tranche Units that were granted to Mr. FitzSimons were settled in cash pursuant to the terms of the MEIP in connection with the termination of his employment in December 2007. In addition, all of the Second Tranche Units that were granted to Mr. Reardon, including those set forth in the table above, were settled in cash pursuant to the terms of the MEIP in connection with the termination of his employment in February 2008. The terms of the grants under the MEIP are described in more detail above in the section entitled "Narrative to Summary Compensation Table and 2007 Grants of Plan-Based Awards Table."

## 2007 Option Exercises and Stock Vested

| | Option Awards | | Stock Awards | |
| | Number of Shares Acquired on Exercise (1)(#) | Value Realized on Exercise (1)($) | Number of Shares Acquired on Vesting (2)(#) | Value Realized on Vesting (3)($) |
| Name | | | | |
| --- | --- | --- | --- | --- |
| Samuel Zell | 0 | $ 0 | 0 | $ 0 |
| Dennis J. FitzSimons | 0 | 0 | 197,451 | 6,646,222 |
| Donald C. Grenesko | 0 | 0 | 81,832 | 2,750,977 |
| Crane H. Kenney | 0 | 0 | 60,787 | 2,044,388 |
| Scott C. Smith | 0 | 0 | 81,120 | 2,724,531 |
| John E. Reardon | 0 | 0 | 60,787 | 2,044,388 |

(1) As noted above, pursuant to the terms of the Incentive Plan and individual equity awards, upon completion of the Leveraged ESOP Transactions, all equity awards outstanding at that time immediately vested and were settled in cash. No options were exercised and no shares were received, however, outstanding stock options granted to NEOs in 2006 were settled for the difference between the grant price of the option and $34 multiplied by the number of options outstanding. This resulted in cash payments as follows: Mr. FitzSimons: $852,000; Mr. Grenesko: $241,400; Mr. Kenney: $170,400; Mr. Smith: $255,600; and Mr. Reardon: $170,400. All other outstanding options held by the NEOs prior to completion of the Leveraged ESOP Transactions had exercise prices in excess of $34 per share and were canceled without payment of any consideration.

(2) Consists of the gross number of restricted stock units and dividend equivalent units for each NEO that vested on Feb. 14, 2007 and Dec. 20, 2007. As noted above and as discussed further in footnote 3 below, pursuant to the terms of the Incentive Plan and individual equity awards, upon completion of the Leveraged ESOP Transactions, all restricted stock units and dividend equivalent units outstanding at that time immediately vested and were settled in cash.

192

(3) For purposes of this table, restricted stock units and dividend equivalent units that vested on Feb. 14, 2007 are valued at $30.72 per share, the closing trading price on such date. As noted above, on Dec. 20, 2007, in connection with the completion of the Leveraged ESOP Transactions, all other restricted stock units and dividend equivalent units granted to NEOs in 2006 and 2007 were settled for an amount equal to $34 multiplied by the number of restricted stock units and dividend equivalent units outstanding at that time. This resulted in cash payments as follows:  Mr. FitzSimons: $6,017,559; Mr. Grenesko: $2,457,626; Mr. Kenney: $1,834,865; Mr. Smith $2,410,184; and Mr. Reardon: $1,834,865. The amounts in this column do not include the value of the vested Second Tranche Units under the MEIP which are settled in cash. As discussed above, fifty percent of the Second Tranche Units were fully vested upon grant and the remaining fifty percent will vest on the one year anniversary of the grant date. Other than with respect to Messrs. FitzSimons and Reardon, the value realized by the NEOs upon the grant of the Second Tranche Units was as follows: Mr. Zell: $0; Mr. Grenesko: $1,426,687; Mr. Kenney: $1,426,687; and Mr. Smith: $1,426,687. All of the Second Tranche Units that were granted to Messrs. FitzSimons and Reardon were settled in cash pursuant to the terms of the MEIP in connection with the termination of their employment.

193

---

**2007 Pension Benefits**

| Name | Plan Name | Number of Years Credited Service (#) | Present Value of Accumulated Benefit ($) | Payment During Last Fiscal Year (1)($) |
|---|---|---|---|---|
| Samuel Zell | Tribune Company Pension Plan | 0 | $ 0 | $ 0 |
| | Tribune Company Supplemental Retirement Plan | 0 | 0 | 0 |
| Dennis J. FitzSimons | Tribune Company Pension Plan | 16 | 657,579 | 0 |
| | Tribune Company Supplemental Retirement Plan | 16 | 0 | 206,824 |
| Donald C. Grenesko | Tribune Company Pension Plan | 18 | 649,633 | 0 |
| | Tribune Company Supplemental Retirement Plan | 18 | 0 | 53,976 |
| Crane H. Kenney | Tribune Company Pension Plan | 4 | 43,231 | 0 |
| | Tribune Company Supplemental Retirement Plan | 4 | 0 | 674 |
| Scott C. Smith | Tribune Company Pension Plan | 21 | 489,517 | 0 |
| | Tribune Company Supplemental Retirement Plan | 21 | 0 | 307,639 |
| John E. Reardon | Tribune Company Pension Plan | 13 | 273,601 | 0 |
| | Tribune Company Supplemental Retirement Plan | 13 | 0 | 41,618 |

(1)  Upon completion of the Leveraged ESOP Transactions, the present value of the accrued benefit under the Supplemental Pension Plan was paid to all participants in a lump sum in accordance with the terms of the plan. These amounts are included in the "All Other Compensation" column in the Summary Compensation Table.

The NEOs, other than Mr. Zell, participate in the Pension Plan and the Supplemental Pension Plan. Because the Internal Revenue Code places certain limitations on the amount of pension benefits that may be paid under qualified plans, any benefits payable in excess of those limitations were paid under the Supplemental Pension Plan. These amounts were estimated on the assumption that the executive will commence receiving benefits at age 62, the executive's unreduced retirement age, and that the executive will receive pension benefits in the form of a life annuity with no surviving benefits.

Until Dec. 31, 1998, the annual pension benefit under the plans, taken together, was generally determined by the executive's credited years of service (up to a maximum of 35 years) multiplied by a percentage of the executive's final average compensation (compensation during the final five years of employment). Compensation for this purpose is generally defined as a participant's base compensation plus commissions, if any. The Pension Plan and the Supplemental Pension Plan were frozen at Dec. 31, 1998 so that participants' service and compensation after that date will not be counted in computing benefits. The NEOs, other than Mr. Zell, will be entitled to receive under the Pension Plan annual benefits upon retirement at age 65 until death as follows: Mr. FitzSimons: $83,121; Mr. Grenesko: $73,761; Mr. Kenney: $12,220; Mr. Smith: $62,881; and Mr. Reardon: $43,558.

The Pension Plan covering the NEOs provides for an early retirement subsidy for those individuals who have attained age 55 with ten years of service under the plan. For purposes of early retirement eligibility, attained age and years of service both before and after the "freeze date" are counted. The early retirement subsidy provides for a benefit at age 62 equal to 100% of the benefit payable at age 65; a benefit payable at age 60 equal to 92% of the benefit payable at age 65; and a benefit at age 55 equal to 67% of the benefit payable at age 65. As of Dec. 31, 2007, Messrs. FitzSimons, Grenesko and Smith had met the eligibility requirements for the early retirement subsidy. Messrs. Kenney and Reardon had not yet met the age requirement for the early retirement subsidy.

Benefits under the Pension Plan were calculated under separate formulas for service prior to 1989 and for service between Jan. 1, 1989 and Dec. 31, 1998. For service and compensation prior to 1989, the benefit was equal to the participant's years of credited service prior to 1989 multiplied by the sum of (i) 0.8% percent of the participant's average earnings for the five-year period prior to Dec. 31, 1998 up to Social Security covered compensation plus (ii) 1.2% of the participant's average earnings in that period in excess of Social Security covered compensation. For service and compensation between Jan. 1, 1989 and Dec. 31, 1998, the benefit was equal to the participant's years of credited service during that period multiplied by the sum of (i) 1.2% percent of the participant's average earnings during that period up to Social Security covered compensation plus (ii) 1.6% of the participant's final five year average earnings during that period

194

in excess of Social Security covered compensation. Mr. FitzSimons and Mr. Grenesko had more credited service under the formula generally applicable to service between Jan. 1, 1989 and Dec. 31, 1998 as a result of their service at business units where the formula was in effect for a longer period. Years of service under these formulas cannot exceed 35. Contributions to the Pension Plan are made entirely by us and are paid into a trust fund from which the benefits of participants will be paid.

The unfunded Supplemental Pension Plan provided out of our general assets an amount substantially equal to the difference between the amount that would have been payable under the Pension Plan, in the absence of laws or regulations limiting pension benefits and earnings that may be considered in calculating pension benefits, and the amount actually payable under the Pension Plan. The NEOs were not provided with extra years of credited service under the Pension Plan or the Supplemental Pension Plan beyond service actually earned with Tribune. Upon completion of the Leveraged ESOP Transactions, the present value of the accrued benefit under the Supplemental Pension Plan was paid to all participants in a lump sum in accordance with the terms of the plan.

In the table above, the present value of the current accrued benefits with respect to each NEO under both the Pension Plan and the Supplemental Pension Plan is based on the following assumptions:

- Discount rate: 6.65%

- Mortality Table: RP-2000 Combined Healthy Mortality Table

- Pension Plan Measurement Date: Disclosure of the actuarial present value of the NEO's accumulated benefit under each plan and the number of years of service credited to the NEO under each plan reported in the table is computed as of the same pension plan measurement date for financial statement reporting purposes with respect to the audited financial statements for the Company's last completed fiscal year.

- Early Retirement Age: 62

195

**2007 Nonqualified Deferred Compensation**

| Name | Plan Name | Executive Contributions in Last FY ($) | Registrant Contributions in Last FY (1)($) | Aggregate Earnings in Last FY (2)($) | Aggregate Withdrawals/ Distributions (3)($) | Aggregate Balance at Last FYE (4)($) |
|---|---|---|---|---|---|---|
| Samuel Zell | Bonus Deferral | $        0 | $        0 | $        0 | $        0 | $        0 |
| | Supplemental Savings Plan | 0 | 0 | 0 | 0 | 0 |
| Dennis J. FitzSimons | Bonus Deferral | 0 | 0 | 67,991 | 2,977,451 | 0 |
| | Supplemental Savings Plan | 0 | 31,369 | 32,259 | 799,647 | 1,563 |
| Donald C. Grenesko | Bonus Deferral | 0 | 0 | 48,491 | 1,537,542 | 0 |
| | Supplemental Savings Plan | 0 | 14,366 | 17,570 | 434,591 | 904 |
| Crane H. Kenney | Bonus Deferral | 0 | 0 | 22,228 | 524,524 | 0 |
| | Supplemental Savings Plan | 0 | 9,744 | 9,442 | 235,344 | 728 |
| Scott C. Smith | Bonus Deferral | 0 | 0 | 21,191 | 500,053 | 0 |
| | Supplemental Savings Plan | 0 | 14,572 | 17,386 | 430,281 | 912 |
| John E. Reardon | Bonus Deferral | 0 | 0 | 7,544 | 334,132 | 0 |
| | Supplemental Savings Plan | 0 | 11,496 | 13,682 | 338,923 | 793 |

(1) Amounts in this column are included in the "All Other Compensation" column in the Summary Compensation Table.

(2) Amounts in this column are not included in the Summary Compensation Table.

(3) Pursuant to the terms of the Tribune Bonus Deferral Plan and the Tribune Supplemental Savings Plan, upon completion of the Leveraged ESOP Transactions, the account balances in the plans were paid to all plan participants in a lump sum and the plans were suspended.

(4) Amounts in this column are included in the "Registrant Contributions in Last FY" column in this table.

The 2007 Nonqualified Deferred Compensation table presents amounts that were deferred under the Company's Bonus Deferral Plan, which allowed certain employees, including the NEOs, to defer receipt of MIP bonus payments. Prior to the completion of the Leveraged ESOP Transactions, participants could defer up to 100% of bonus payments into a cash-based account or into an account that tracked Tribune common stock. The cash-based account appreciated at a rate equal to 120% of the long-term applicable federal rate, compounded quarterly, which is determined periodically by the Internal Revenue Service. The rate was reset by the Company on March 1 of each year and for 2007 was 5.9%. Amounts deferred into Tribune common stock accounts were credited with earnings or losses based on the return on Tribune common stock. The investment alternative was selected by the participants in the plan, and participants who elected the Tribune stock return equivalent could not move an investment out of a Tribune stock return equivalent once it had been selected. The Company did not "match" amounts that were deferred by employees pursuant to the Bonus Deferral Plan. Distributions were paid in a lump sum distribution or in annual installments on or about March 1 each year commencing in the calendar year following the termination of the employee's employment with the Company.

The table also presents amounts deferred under our Supplemental Savings Plan. Under the Supplemental Savings Plan, participants were credited with an amount substantially equal to the difference between the amount that, in the absence of legislation limiting company contributions to our Savings Plan, would have been allocated to an employee's account as company contributions or profit-sharing contributions, minus the amount actually allocated under the Savings Plan. In this way, participants received the same percentage of earnings under the Savings Plan and Supplemental Savings Plan as were provided to participants not subject to legislation limiting additions to the Savings Plan. Deferred amounts were credited with earnings or losses under substantially the same terms as were provided under the Deferred Compensation Plan.

196

**Potential Payments upon Termination or Change-in-Control**

The Company has not entered into employment or severance agreements with the NEOs and they are generally not contractually entitled to any additional compensation or benefits following termination of employment. However, as noted under "Compensation Discussion and Analysis—Post-Termination Compensation—Transitional Compensation Plan," each of our NEOs, other than Mr. Zell who does not participate in the plan, is eligible for benefits under a Transitional Compensation Plan, which was approved by the former Committee and provides for payments and other benefits if the NEO is terminated under circumstances specified in the Transitional Compensation Plan within three years following a Change in Control of Tribune Company.

Under the Transitional Compensation Plan, NEOs covered by the plan become entitled to benefits only if the Company has undergone a Change in Control during the three-year period prior to the NEO's termination of employment. The Leveraged ESOP Transactions triggered a Change in Control for purposes of the Transitional Compensation Plan. Under the Transitional Compensation Plan, each NEO covered by the plan is eligible for benefits upon termination of employment within 36 months following a Change in Control. A participant is eligible for benefits for termination prior to a Change in Control if the termination was at the request of any third party participating in or causing the Change in Control or otherwise in anticipation of a Change in Control. In addition, Transitional Compensation Plan benefits will only be available if the participant's termination of employment was not:

· on account of his death;

· on account of a physical or mental condition that would entitle him to long-term disability benefits under the Tribune Company Long-Term Disability Plan;

· for conduct involving dishonesty or willful misconduct which, in either case, is detrimental in a significant way to the business of Tribune Company or any of its subsidiaries; or

· on account of the employee's voluntary resignation.

For purposes of the NEOs covered under the Transitional Compensation Plan, a resignation shall not be considered to be "voluntary": (a) if the resignation by Mr. Grenesko occurs during the 30-day period immediately following the first anniversary of the Change in Control; or (b) if the resignation occurs after a successor refuses to assume and agree to perform Tribune Company's obligations under the Plan or (c) if, subsequent to the Change in Control and prior to such resignation, there has been a reduction in the nature or scope of the participant's authority or duties, a reduction in the participant's compensation or benefits or a change in the city in which he is required to perform his duties.

Mr. FitzSimons received a payment under the Transitional Compensation Plan in 2007 as a result of his termination of employment in December 2007. Mr. Reardon received a payment under the Transitional Compensation Plan in 2008 as a result of his termination of employment in February 2008. The amounts paid to Messrs. FitzSimons and Reardon under the Transitional Compensation Plan are described in more detail below.

197

**Payment Obligations under Transitional Compensation Plan upon Termination of Employment of NEO**

Upon a termination under the circumstances outlined above, NEOs covered by the Transitional Compensation Plan would be entitled to a lump sum payment equal to three times the sum of (1) the highest annual rate of the executive's base salary in effect within three years of the date of the participant's termination; plus (2) 200% of the participant's target bonus payable for the year in which the change in control occurs. The Transitional Compensation Plan would also provide outplacement benefits and continuation of medical, life insurance and disability benefits for up to three years. This table shows the amounts that would be paid under those circumstances to Messrs. Grenesko, Kenney and Smith and shows the amounts that were actually paid to Messrs. FitzSimons and Reardon in connection with the termination of their employment. For Messrs. Grenesko, Kenney and Smith, the amounts in the table are based on an assumption that the terminations took place on Dec. 31, 2007 and that benefits costs continue at 2007 levels.

|  | Mr. FitzSimons | Mr. Grenesko | Mr. Kenney | Mr. Smith | Mr. Reardon |
|---|---|---|---|---|---|
| Severance Payment | $ 10,657,500 | $ 4,403,250 | $ 3,118,500 | $ 4,619,940 | $ 3,708,000 |
| Outplacement | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| Benefits Continuation | 40,827 | 28,168 | 38,473 | 28,190 | 38,658 |

Under the Transitional Compensation Plan, the NEOs covered by the Transitional Compensation Plan would also be eligible to receive a "gross-up" payment from us to the extent that they incur excise taxes under Section 4999 of the Internal Revenue Code and to account for the income tax liability resulting from the "gross-up." Had a payment been made to the NEOs under the Transitional Compensation Plan as a result of termination as of Dec. 31, 2007, they would have been entitled to receive a "gross-up" payment in the following amounts: Mr. Grenesko: $2,747,914; Mr. Kenney: $2,632,387; and Mr. Smith: $2,565,866. Messrs. FitzSimons and Reardon received gross-up payments of $5,308,621 and $2,410,449, respectively.

In addition, upon a termination under the circumstances outlined above as of Dec. 31, 2007, Messrs. Grenesko, Kenney and Smith would each be entitled to receive $2,083,333 in respect of the Second Tranche Units held by them under the MEIP. Mr. Zell does not hold any units under the MEIP. In connection with their respective terminations, all MEIP Second Tranche Units held by Messrs. FitzSimons and Reardon were settled in cash for $2,916,667 and $1,500,000, respectively. Further, as noted above, pursuant to the terms of the Incentive Plan and individual equity awards, upon completion of the Leveraged ESOP Transactions, all outstanding equity awards immediately vested and were settled in cash.

As noted above, pursuant to their terms and as a result of the Leveraged ESOP Transactions, accrued amounts under the Supplemental Pension Plan, Supplemental Savings Plan, and Deferred Bonus Plan were paid in a lump sum to all plan participants, including the NEOs.

Execution of a release of claims is not a prerequisite to the receipt of payments under the Transitional Compensation Plan. The Transitional Compensation Plan does not include noncompete, nonsolicit, nondisparagement or confidentiality requirements.

198

**2007 Non-Employee Director Compensation**

Directors who are our employees receive no additional compensation for service as a director. In 2007, the non-employee directors received a combination of cash payments and equity-based compensation as shown in the table below and were also reimbursed for actual out-of-pocket expenses incurred in attending meetings. For 2008, non-employee directors will receive a $100,000 cash retainer. Further, the Audit Committee chair will be paid an additional $15,000 cash retainer and each member of the Audit Committee, including the chair, will be paid an additional $6,000 cash retainer. The current members of the Committee are currently evaluating the non-employee director compensation program for future years. The Company does not expect to pay any equity compensation to our non-employee directors.

| Name (1)(2) | Fees Earned or Paid in Cash ($) | Stock Awards (3)($) | Total ($) |
|---|---|---|---|
| Jeffrey S. Berg* | $ 0 | $ 0 | $ 0 |
| Jeffrey Chandler | 0 | 0 | 0 |
| Roger Goodan | 0 | 0 | 0 |
| Brian L. Greenspun* | 0 | 0 | 0 |
| Enrique Hernandez, Jr. | 85,000 | 75,000 | 160,000 |
| Betsy D. Holden* | 81,000 | 75,000 | 156,000 |
| Robert S. Morrison | 85,000 | 75,000 | 160,000 |
| William A. Osborn* | 96,000 | 75,000 | 171,000 |
| William C. Pate* | 0 | 0 | 0 |
| J. Christopher Reyes | 81,000 | 75,000 | 156,000 |
| William Stinehart, Jr. | 0 | 0 | 0 |
| Dudley S. Taft | 81,000 | 75,000 | 156,000 |
| Miles D. White | 75,000 | 75,000 | 150,000 |
| Mary Agnes Wilderotter* | 0 | 0 | 0 |
| Frank E. Wood* | 0 | 0 | 0 |
| Samuel Zell* (4) | 75,000 | 75,000 | 150,000 |

(1) Current members of the Board of Directors are noted with an asterisk (*).

(2) Messrs. Chandler, Goodan and Stinehart served on the Board of Directors from Jan. 1 through June 4, 2007. Mr. Zell joined the Board on May 9, 2007 and was appointed Chairman and Chief Executive Officer of the Company on Dec. 20, 2007. Mr. Reyes served on the Board until July 18, 2007. Mr. White served on the Board until Aug. 6, 2007. On Dec. 20, 2007, Messrs. Hernandez, Morrison and Taft resigned from the Board and Ms. Wilderotter and Messrs. Berg, Greenspun, Pate and Wood were elected to serve on the Board along with Ms. Holden and Messrs. Osborn and Zell, who each continued as directors.

(3) The amounts shown in this column include the compensation expense recorded by the Company with respect to the stock awards as determined pursuant to FAS No. 123R. Such amounts also equal the grant date fair value of these awards. No director held any stock or options as of Dec. 30, 2007.

(4) Amounts shown in this table for Mr. Zell were paid to Mr. Zell solely in his capacity as a member of the Board of Directors and prior to his appointment as Chairman and Chief Executive Officer of the Company. Accordingly, these amounts are not reflected in the Summary Compensation Table.

**2007 Director Compensation**

*Cash retainer.* In 2007, each non-employee director received a $75,000 cash retainer.

*Attendance Fees.* Directors did not receive fees for attendance at Board or committee meetings in 2007.

*Committee Chairs and Membership.* In light of the significant responsibilities imposed on certain Board committee members, in 2007 the Audit Committee chair was paid an additional $15,000 cash retainer and the chairs of each of the former Compensation & Organization Committee and the former Nominating & Governance Committee were paid an

additional $10,000 cash retainer. In addition, in 2007, all Audit Committee members, including the chairman of the Audit Committee, received an additional $6,000 cash retainer.

*Stock Awards*.  In 2007, each non-employee director received a $75,000 stock award. The number of shares awarded was based on the closing price of Tribune stock on the date of the annual meeting, May 9, 2007.

**Compensation Committee Interlocks and Insider Participation**—Jeffrey Chandler is a trustee and a beneficiary of the Chandler Trusts. The Chandler Trusts and the Company engaged in certain transactions in connection with the Leveraged ESOP Transactions, which are described in further detail in "Item 1. Business – Significant Events" and "Item 13. Transactions with Related Persons, Promoters and Certain Control Persons." Mr. Chandler served on Tribune's Compensation & Organization Committee in 2007 through June 4, 2007.

200

## ITEM 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS.

**Security Ownership of Certain Beneficial Owners and Management**

The following table shows the beneficial ownership of Tribune common stock by each director, each current and former executive officer named in the summary compensation table included in Item 11 hereof, and by all directors and executive officers as a group, in each case as of March 20, 2008. Unless otherwise indicated, the address of each person listed is c/o Tribune Company, 435 North Michigan Avenue, Chicago, Illinois 60611. Except as otherwise noted, the persons named in the table below have sole voting and investment power with respect to all shares shown as beneficially owned by them.

| Name of Beneficial Owner | Shares of Common Stock (1) | Warrants Exercisable within 60 days (2) | Percentage of Shares (3) |
|---|---|---|---|
| **5% Shareholders:** | | | |
| Tribune Employee Stock Ownership Plan | | | |
| c/o GreatBanc Trust Company | | | |
| 801 Warrenville Road, Suite 500 | | | |
| Lisle, IL 60532 | 56,521,739 | 0 | 100% |
| EGI-TRB, L.L.C. (2) | | | |
| 2 North Riverside Plaza | | | |
| Chicago, IL 60606 | 0 | 30,997,777 | 35.42% |
| **Directors and Executive Officers:** | | | |
| Jeffrey S. Berg | 0 | 0 | * |
| Dennis J. FitzSimons | 0 | 0 | * |
| Brian L. Greenspun (4) | 0 | 6,901,311 | 10.88% |
| Donald C. Grenesko | 0 | 0 | * |
| Betsy D. Holden | 0 | 0 | * |
| Crane H. Kenney | 0 | 0 | * |
| William A. Osborn | 0 | 0 | * |
| William C. Pate (5) | 0 | 941,965 | 1.64% |
| John E. Reardon | 0 | 0 | * |
| Scott C. Smith | 0 | 0 | * |
| Mary Agnus Wilderotter | 0 | 0 | * |
| Frank E. Wood | 0 | 0 | * |
| Samuel Zell (6) | 0 | 0 | * |
| Directors and Executive Officers as a group (15 persons) | 0 | 7,843,276 | 12.19% |

---

\*      Less than 1% of the issued and outstanding common stock.

(1)     As of March 20, 2008, there were 56,521,739 shares of common stock issued and outstanding, all of which were held by the Tribune Employee Stock Ownership Plan (the "ESOP"). On Dec. 20, 2007, the Board approved the Company's Management Equity Incentive Plan which provides for 8,695,652 phantom units (the "Units") that may be awarded to eligible members of Company management and other key employees at the discretion of the Board. In the aggregate, the Units represent approximately 8% of the fully diluted outstanding our common stock (subject to customary anti-dilution adjustments). Although the value of the Units is based on the value of our common stock, the Units do not give the holder the right to acquire any common stock, or other securities of the Company, at any time. Accordingly, the Units are disregarded for purposes of determining the figures that appear under the column headings "Shares of Common Stock" and "Percentage of Shares."

(2)     On Dec. 20, 2007, immediately following the consummation of the Merger, the Zell Entity purchased from the Company, pursuant to the Securities Purchase Agreement dated April 1, 2007 by and among the Company, the Zell Entity and Mr. Zell, a 15-year warrant to purchase 43,478,261 shares of common stock (subject to adjustment). Immediately thereafter, the Zell Entity transferred interests in the initial warrant, totaling warrants to purchase 12,480,484 shares, to certain permitted assignees, including entities controlled by each of Mr. Greenspun, Mr. Pate and

201

certain senior employees of EGI, an affiliate of the Zell Entity. The warrants are exercisable, in whole or in part, at any time from Dec. 20, 2007 through Dec. 20, 2022 and have an initial aggregate exercise price of $500 million ($11.50 per share), increasing by $10 million per year, up to a maximum aggregate price of $600 million ($13.80 per share), in each case, subject to adjustment. The Company, the ESOP, the Zell Entity and each holder of a warrant is party to the Investor Rights Agreement, which is described in further detail in, and filed as an exhibit to, this Annual Report on Form 10-K.

(3)    These figures have been calculated in accordance with SEC rules by dividing (i) the number of shares of common stock beneficially owned by such person or entity, including shares that may be acquired by exercise of the warrant held by such person or entity, by (ii) the number of common shares held by the ESOP *plus* the number of shares of common stock that may be purchased in connection with the exercise of the warrant held by such person or entity. If all of the warrants were deemed exercised and all of the underlying shares were deemed outstanding, the percentages in this column would be as follows: ESOP: 56.52%; EGI-TRB, L.L.C.: 31%; Mr. Greenspun: 6.9%; Mr. Pate: 0.94%; and all directors and executive officers as a group: 7.84%.

(4)    As described in footnote 2, following the Merger, the Zell Entity transferred warrants representing the right to acquire 6,901,311 shares of common stock to an entity controlled by Mr. Greenspun.

(5)    As described in footnote 2, following the Merger, the Zell Entity transferred warrants representing the right to acquire 941,965 shares of common stock to an entity controlled by Mr. Pate.

(6)    Samuel Zell is the chairman and chief executive officer of the Company. As disclosed in the table above and described in footnote 2, the Zell Entity holds a warrant pursuant to which it may purchase 30,997,777 shares of our common stock. Sam Investment Trust ("SIT"), the sole member of the Zell Entity, is a trust established for the benefit of Mr. Zell and his family. Chai Trust Company, LLC, an Illinois limited liability company ("Chai Trust"), is the trustee of SIT and has investment control with respect to SIT. Mr. Zell is not a managing director or officer of Chai Trust, and does not otherwise exercise investment control with respect to SIT or the Zell Entity. As such, the amount of shares indicated as beneficially owned by Mr. Zell does not include the securities of the Company beneficially owned by the Zell Entity.

**Equity Compensation Plan Information Table**

The following table provides information as of Dec. 30, 2007 regarding the number of shares of Tribune common stock that may be issued under Tribune's equity compensation plans.

| Plan Category | (a)<br>Number of securities to be issued upon exercise of outstanding options, warrants and rights | (b)<br>Weighted-average exercise price of outstanding options, warrants and rights | (c)<br>Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| Equity compensation plans approved by security holders | — | N/A | — |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | — | N/A | — |

202

## ITEM 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.

**Policy Regarding Related Person Transactions**

We or one of our subsidiaries may occasionally enter into transactions with certain "related persons." Related persons include our executive officers, directors, 5% or more beneficial owners of our common stock, immediate family members of these persons and entities in which one of these persons has a direct or indirect material interest. We refer to transactions with these related persons as "related person transactions." Beginning in February 2007, the Audit Committee became responsible for the review and approval of each related person transaction exceeding $120,000. The Audit Committee considers all relevant factors when determining whether to approve a related party transaction including, without limitation, whether the terms of the proposed transaction are at least as favorable to us as those that might be achieved with an unaffiliated third party. Among other relevant factors, the Audit Committee considers the following:

· The size of the transaction and the amount payable to a related person.

· The nature of the interest of the related person.

· Whether the transaction may involve a conflict of interest.

· Whether the transaction involves the provision of goods or services to us that are available from unaffiliated third parties and, if so, whether the proposed transaction is on terms and made under circumstances that are at least as favorable to us as would be available in comparable transactions with or involving unaffiliated third parties.

The policies and procedures relating to the Audit Committee approval of related person transactions are available on our website at www.tribune.com. All of the related person transactions occurring during 2007 and described below under the heading "Transaction with Related Persons, Promoters and Certain Control Persons" were approved by the Audit Committee or by the full Board of Directors.

**Transactions with Related Persons, Promoters and Certain Control Persons**

*Chandler Trusts.* Jeffrey Chandler, Roger Goodan and William Stinehart, Jr., formerly members of our Board, are trustees of Chandler Trust No. 1 and Chandler Trust No. 2 (the "Chandler Trusts"). Mr. Chandler and Mr. Goodan are also beneficiaries of these trusts. The Chandler Trusts were the principal shareholders of The Times Mirror Company ("Times Mirror") prior to the merger of Times Mirror into the Company on June 12, 2000. In connection with the merger in 2000, the Chandler Trusts exchanged their Times Mirror common stock for 36,304,135 shares of the Company's common stock and the Company amended its bylaws to grant the Chandler Trusts the right to nominate three directors, one for each of the Board's three classes. Jeffrey Chandler, Roger Goodan and William Stinehart, Jr. were the Chandler Trusts' initial nominees and became directors of the Company following the merger. Mr. Chandler and Mr. Goodan are cousins.

Pursuant to the terms of a Registration Rights Agreement dated April 1, 2007 among the Company and the Chandler Trusts, the Chandler Trusts tendered into the Company's tender offer commenced on April 25, 2007 (the "Tender Offer") all shares of the Company's common stock held by them at the expiration of the Tender Offer, and caused Messrs. Chandler, Goodan and Stinehart, each of whom were serving on the Board as a representative of the Chandler Trusts, to resign as directors of the Company, effective June 4, 2007. On June 4, 2007, the Chandler Trusts entered into an underwriting agreement with Goldman Sachs and the Company, pursuant to which the Chandler Trusts agreed to sell an aggregate of 20,351,954 shares of the Company's common stock, the remainder of the shares owned by them following the Tender Offer, through a block trade underwritten by Goldman Sachs. The shares were offered pursuant to a shelf registration statement that the Company filed with the Securities and Exchange Commission that became effective on April 25, 2007. Following the closing of this transaction on June 7, 2007, the Chandler Trusts no longer owned any shares of the Company's common stock.

In 1997, the Chandler Trusts and Times Mirror entered into a transaction which, through the formation of TMCT, LLC ("TMCT"), enabled Times Mirror to retire for accounting purposes a substantial block of Times Mirror stock. Times Mirror and its affiliates contributed to TMCT real property used in Times Mirror's business operations and cash and the Chandler Trusts contributed Times Mirror stock. Times Mirror leased back the real property under long-term leases. Upon completion

203

of the merger of Times Mirror into the Company, the Company assumed these leases, and the Times Mirror stock held by the limited liability company was converted into shares of the Company's common stock.

In 1999, the Chandler Trusts and Times Mirror formed TMCT II, LLC ("TMCT II") and entered into a similar transaction that again enabled Times Mirror to retire for accounting purposes a substantial block of stock. Times Mirror's contribution to TMCT II consisted of cash and securities. The Chandler Trusts again contributed Times Mirror stock that was converted into shares of the Company's common stock upon completion of the merger of Times Mirror into the Company.

On Sept. 21, 2006, the Company and the Chandler Trusts entered into agreements to restructure TMCT and TMCT II. Under the terms of the agreements, the Company received on Sept. 22, 2006, a total of 38.9 million shares of the Company's common stock and all 1.1 million shares of the Company's preferred stock held collectively by TMCT and TMCT II. Following the distributions by TMCT and TMCT II, the Company's interests in each of TMCT and TMCT II were reduced to approximately five percent. The agreements also provided for certain put and call options relating to the Company's then remaining ownership interests in TMCT and TMCT II. In September 2007, the Company exercised these put rights and sold its remaining interests in TMCT and TMCT II to the Chandler Trusts.

In addition, on Sept. 22, 2006, the Company and TMCT amended the lease agreement for the eight properties the Company leases from TMCT. Under the terms of the amended lease, the Company was granted an accelerated option to acquire the eight properties during the month of January 2008 for $175 million. The Company was also granted an option to acquire the leased properties from Feb. 8, 2008 to three months prior to the expiration of the amended lease at the higher of fair market value or $195 million. In addition, the amendment extended the properties' current fixed rental rate through Aug. 7, 2021. The Company exercised the option to acquire the eight properties for $175 million on Jan. 29, 2008 and expects to close on the acquisition in April 2008. In 2007, the Company made $23.181 million of lease payments to TMCT.

The remaining 12.4 million shares of the Company's common stock held by TMCT and TMCT II were distributed on October 20, 2006 to the Company and the Chandler Trusts in accordance with their respective ownership interests. The Company received 0.6 million shares and the Chandler Trusts received 11.8 million shares. Information pertaining to the Company's investments in TMCT and TMCT II is provided in Note 8 to the Company's consolidated financial statements in Part II, Item 8, hereof.

*EGI-TRB, L.L.C. and Equity Group Investments, L.L.C.* EGI-TRB, L.L.C. (the "Zell Entity") was formed solely for purposes of entering into and consummating the Leveraged ESOP Transactions and is wholly owned by Sam Investment Trust ("SIT"), a trust established for the benefit of Sam Zell and his family. The trustee of SIT is Chai Trust Company, LLC, an Illinois limited liability company ("Chai Trust"). Equity Group Investments, L.L.C. ("EGI") is a private corporate and real estate investment firm co-founded by Mr. Zell in 1968, and is owned by trusts established for the benefit of Mr. Zell and his family, but not SIT. EGI provides investment advisory services to Chai Trust, however, EGI does not have investment control over Chai Trust or the assets held by the trusts controlled by Chai Trust. As such, EGI has no ownership or beneficial interest in either the Zell Entity or SIT, is not a party to any of the agreements entered into in connection with the Leveraged ESOP Transactions and has no beneficial interest therein.

In connection with the Leveraged ESOP Transactions, Sam Zell was appointed to the Company's Board of Directors on May 9, 2007 and elected to serve as Chairman of the Board and Chief Executive Officer on Dec. 20, 2007. Mr. Zell is the President of the Zell Entity and the President and Chairman of EGI. Further, William C. Pate was also appointed to the Company's Board of Directors on Dec. 20, 2007. Mr. Pate is a Vice President of the Zell Entity and the Chief Investment Officer and a Managing Director of EGI.

As more fully described in "Item 1. Business – Significant Events," the Zell Entity made certain investments in the Company. The Zell Entity is also party to certain of the agreements entered into in connection with the Leveraged ESOP Transactions and had an interest in the Leveraged ESOP Transactions. In particular, on Dec. 20, 2007, immediately following the consummation of the Merger, the Zell Entity purchased from the Company, pursuant to the Securities Purchase Agreement (the "Securities Purchase Agreement") dated April 1, 2007 by and among the Company, the Zell Entity and Mr. Zell, a $225 million subordinated promissory note and a 15-year warrant to purchase 43,478,261 shares of the Company's common stock (subject to adjustment). Immediately thereafter, the Zell Entity transferred interests in the initial subordinated promissory note and warrant, totaling approximately $64.6 million of the aggregate principal amount of the subordinated promissory note and warrants to purchase 12,480,484 shares, to certain permitted assignees, including entities controlled by each of Mr. Greenspun, a member of the Company's Board of Directors, Mr. Pate and certain senior

204

employees of EGI, an affiliate of the Zell Entity. The warrants are exercisable, in whole or in part, at any time from Dec. 20, 2007 through Dec. 20, 2022 and have an initial aggregate exercise price of $500 million ($11.50 per share), increasing by $10 million per year, up to a maximum aggregate price of $600 million ($13.80 per share), in each case, subject to adjustment. Pursuant to the Securities Purchase Agreement, the Company also reimbursed the Zell Entity for $5 million of expenses incurred in connection with the Leveraged ESOP Transactions.

*Investor Rights Agreement.* Each of the Zell Entity and the Trustee (on behalf of the ESOP) are a party to that certain Investor Rights Agreement (the "Investor Rights Agreement") dated as of April 1, 2007 to which each of the Zell Entity and the Trustee (on behalf of the ESOP) have agreed to vote their shares such that (i) the initial directors on the Board following the Merger shall serve until the third annual election following the consummation of the Merger, (ii) there shall be two directors designated by the Zell Entity and (iii) there shall be one director who shall be the chief executive officer of the Company. The Investor Rights Agreement also contains provisions governing the transfer of the shares of Company common stock held by the Zell Entity and the ESOP, preemptive rights granted to the Zell Entity and the ESOP by the Company, and specified actions requiring the approval of a majority of the entire Board, including a majority of the independent directors and one designee of the Zell Entity. The parties to the Investors Rights Agreement also have agreed to take all actions necessary to enable the Company to maintain its election for subchapter S status under the Internal Revenue Code.

*The ESOP and the Trustee.* Pursuant to the terms of the ESOP Purchase Agreement, on April 1, 2007, the Company sold 8,928,571 shares of Company Common Stock to the ESOP at a price of $28.00 per share. The ESOP paid for this purchase with a promissory note of the ESOP executed by GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee (the "Trustee") in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through the ESOP's use of annual contributions from the Company to the ESOP or distributions paid on the shares of Company Common Stock held by the ESOP. On the same date, the Company and the Trustee, on behalf of the ESOP, entered into the ESOP Loan Agreement, which documents the extension of credit from the Company to the ESOP evidenced by the ESOP Note. The ESOP Note contemplates payment by the ESOP to the Company in 30 annual installments with an annual interest rate of approximately 5%. The Trustee, on behalf of the ESOP, also entered into the ESOP Pledge Agreement with the Company whereby the ESOP has agreed to pledge the shares of Company Common Stock acquired by the ESOP from the Company as collateral for the Company's extension of credit to the ESOP.

## Director Independence

Pursuant to the Company's Amended and Restated Bylaws, the Board of Directors must have five independent directors. The Bylaws provide that a director shall be deemed "independent" if such director would be independent under the New York Stock Exchange listing standards. Further, a director is "independent" under the New York Stock Exchange listing standards if the Board affirmatively determines that the director has no material relationship with Tribune directly or as a partner, shareholder or officer of an organization that has a relationship with Tribune.

The Board has reviewed the independence of our current non-employee directors and found that each of them, namely Jeffrey S. Berg, Brian L. Greenspun, Betsy D. Holden, William A. Osborn, William C. Pate, Mary Agnes Wilderotter and Frank E. Wood, is independent within the meaning of the rules of the New York Stock Exchange. In making these determinations, the Board considered the relationships described above under "Transactions with Related Person, Promoters and Certain Control Persons." With respect to Mr. Greenspun, the Board considered the fact that, from time to time, entities in which Mr. Greenspun has an ownership interest have purchased and may continue to purchase, in the ordinary course of business, advertising from the Company's subsidiaries and affiliates. With respect to Mr. Osborn, the Board considered the fact that he is the Chairman of Northern Trust Corporation, which in 2007, together with its subsidiaries, provided trust, custody, cash management and related services to Tribune and certain of its employee benefit plans and was one of several lenders under Tribune's former credit facilities. The Board has determined that these relationships are not material and do not cause any non-employee director to be considered not independent under the rules of the New York Stock Exchange.

In addition, the Board reviewed the independence of Jeffrey Chandler, Roger Goodan, Enrique Hernandez, Jr., Robert S. Morrison, J. Christopher Reyes, William Stinehart, Jr., Dudley S. Taft and Miles D. White, who each resigned their directorships in 2007, and found that each of them was independent within the meaning of the rules of the New York Stock Exchange through the date of his or her resignation. In making these determinations, the Board considered the relationships

205

described above under "Transactions with Related Persons, Promoters and Certain Control Persons." With respect to Mr. Stinehart, the Board considered the fact that he was a partner in the law firm of Gibson, Dunn & Crutcher LLP until his retirement in December 2004. Gibson, Dunn & Crutcher LLP was external corporate counsel to Times Mirror and has, from time to time, provided legal services to Tribune since the merger. The Board has determined that these relationships were not material and do not cause any such former non-employee director to be considered not independent under the rules of the New York Stock Exchange through the date of his or her resignation.

Other than the matters described above and the matters described under "Transactions with Related Persons, Promoters and Certain Control Persons," there were no related person transactions, relationships or arrangements involving our current or former directors that were considered by the Board in evaluating and determining the independence of the current and former non-employee directors named above.

### ITEM 14.   PRINCIPAL ACCOUNTANT FEES AND SERVICES.

#### Policy on Audit Committee Pre-Approval of Audit, Audit-Related and Permissible Non-Audit Services of Independent Accountants

The Audit Committee has responsibility for appointing, setting fees, and overseeing the work of the independent accountants. In recognition of this responsibility, the Audit Committee has established a policy to pre-approve all audit, audit-related and permissible non-audit services provided by the independent accountants, subject to de minimis exceptions for non-audit services that are approved by the Audit Committee prior to the completion of the audit. The projects and categories of service that the Audit Committee pre-approves are as follows:

*Audit Services.* Audit services include work performed in connection with the audit of the consolidated financial statements, as well as work that is normally provided by the independent accountants in connection with statutory and regulatory filings or engagements. These services include work performed in connection with the audit of internal controls over financial reporting as required by Section 404 of the Sarbanes-Oxley Act of 2002.

*Audit-Related Services.* These services are for assurance and related services that are traditionally performed by the independent accountants and that are reasonably related to the work performed in connection with the audit, including due diligence related to mergers and acquisitions, employee benefit plan audits and audits of subsidiaries and affiliates.

*Tax Services.* These services are related to tax compliance, tax advice and tax planning.

*Other Services.* These services include all other permissible non-audit services provided by the independent accountants and are pre-approved on an engagement-by-engagement basis.

Prior to the engagement of the independent accountants, the Audit Committee pre-approves these services by category of service. The fees are budgeted and the Audit Committee requires the independent accountants and management to report actual fees versus the budget periodically throughout the year by category of service. During the year, circumstances may arise when it may become necessary to engage the independent accountants for additional services not contemplated in the original pre-approval for which advance approval is required. In those instances, the Audit Committee pre-approves the services before engaging the independent accountants.

The Audit Committee has delegated pre-approval authority to the chair of the committee. The chair must report, for informational purposes only, any pre-approval decisions to the Audit Committee at its next scheduled meeting.

206

**Fees Paid to Independent Accountants**

The fees for all services provided by the independent accountants for the fiscal years ended Dec. 30, 2007 and Dec. 31, 2006 are shown below (in thousands):

|  | 2007 | | 2006 |
|---|---|---|---|
| Audit fees (1) | $ | 2,225 | $ | 2,435 |
| Audit-related fees (2) | | 1,487 | | 1,543 |
| Tax fees | | — | | — |
| All other fees: | | | | |
|    Employee benefit plan filings | | 172 | | 160 |
|    Accounting research software license | | 2 | | 2 |
| Total all services | $ | 3,886 | $ | 4,140 |

(1) Fees for the integrated audit of Tribune's annual consolidated financial statements and internal controls over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act of 2002. Fees also include reviews of quarterly Forms 10-Q.

(2) Includes audits of Tribune's employee benefit plans, audits of certain Tribune affiliates and audits of subsidiary financial statements.

**PART IV**

**ITEM 15.   EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.**

(a)(1)&(2)    Financial Statements and Financial Statement Schedule filed as part of this report. Also included are the financial statements and related notes of Tribune Broadcasting Holdco, LLC and Tribune Finance, LLC, two subsidiaries of the Company whose equity interests collateralize certain registered securities of the Company, and the related reports of the independent registered public accounting firm.

See Index to Financial Statements and Financial Statement Schedule on page 78 hereof.

(a)(3)    Index to Exhibits filed as part of this report

See Exhibit Index on pages 209 to 212 hereof.

(b)    Exhibits

See Exhibit Index on pages 209 to 212 hereof.

(c)    Financial Statement Schedule

See Index to Financial Statements and Financial Statement Schedule on page 78 hereof.

207

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on March 20, 2008.

TRIBUNE COMPANY
(Registrant)

/s/ SAMUEL ZELL
Samuel Zell
Chairman and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on March 20, 2008.

| Signature | Title |
|---|---|
| /s/ SAMUEL ZELL<br>Samuel Zell | Chairman, Chief Executive Officer and Director |
| /s/ DONALD C. GRENESKO<br>Donald C. Grenesko | Senior Vice President/Finance and Administration (principal financial officer) |
| /s/ R. MARK MALLORY<br>R. Mark Mallory | Vice President and Controller (principal accounting officer) |
| /s/ BETSY D. HOLDEN<br>Betsy D. Holden | Director |
| /s/ WILLIAM A. OSBORN<br>William A. Osborn | Director |
| /s/ WILLIAM C. PATE<br>William C. Pate | Director |
| /s/ FRANK E. WOOD<br>Frank E. Wood | Director |

208

# TRIBUNE COMPANY

## EXHIBIT INDEX

Exhibits marked with an asterisk (*) are incorporated by reference to documents previously filed by Tribune Company with the Securities and Exchange Commission, as indicated. Exhibits marked with a circle (o) are management contracts or compensatory plan contracts or arrangements filed pursuant to Item 601(b)(10)(iii)(A) of Regulation S-K. All other documents listed are filed with this Report.

| Number | Description |
|---|---|
| 3.1(i) * | Amended and Restated Certificate of Incorporation of Tribune Company (Exhibit 3.1 to Current Report on Form 8-K dated Dec. 20, 2007) |
| 3.1(ii) | Amended and Restated Bylaws of Tribune Company (as amended and in effect as of Feb. 12, 2008) |
| 4.1 * | Indenture, dated as of March 1, 1992, between Tribune Company and Citibank, N.A. (successor to Bank of New York, Bank of Montreal Trust Company and Continental Bank, N.A.), as Trustee (Exhibit 4.1 to Registration Statement on Form S-3, Registration No. 333-02831) |
| 4.2 * | Indenture, dated as of Jan. 1, 1997, between Tribune Company and Citibank, N.A. (successor to Bank of New York), as Trustee (Exhibit 4 to Current Report on Form 8-K dated Jan. 14, 1997) |
| 4.3 * | Indenture, dated as of April 1, 1999, between Tribune Company and Citibank, N.A. (successor to Bank of New York and Bank of Montreal Trust Company), as Trustee for the PHONES securities (Exhibit 4 to Current Report on Form 8-K dated April 5, 1999) |
| 4.4 * | Indenture, dated Jan. 30, 1995, between Tribune Company (successor to The Times Mirror Company) and Citibank, N.A. (successor to The Bank of New York, Wells Fargo Bank, N.A. and First Interstate Bank of California), as Trustee for the $7^1/4\%$ Debentures due 2013 and $7^1/2\%$ Debentures due 2023 (Exhibit 4.1 to The Times Mirror Company's Annual Report on Form 10-K for 1995) |
| 4.5 * | First Supplemental Indenture, dated as of June 12, 2000, among Tribune Company, The Times Mirror Company and The Bank of New York, as Trustee (Exhibit 4.13 to Current Report on Form 8-K dated June 12, 2000) |
| 4.6 * | Indenture, dated March 19, 1996, between Tribune Company (successor to The Times Mirror Company) and Citibank, N.A., as Trustee for the 6.61% Debentures due 2027 and the $7^1/4\%$ Debentures due 2096 (Exhibit 4.1 to The Times Mirror Company's Current Report on Form 8-K dated March 13, 1996) |
| 4.7 * | First Supplemental Indenture, dated as of Oct. 19, 1999, between The Times Mirror Company and Citibank, N.A., as Trustee (Exhibit 4.3 to The Times Mirror Company's Current Report on Form 8-K dated Oct. 19, 1999) |
| 4.8 * | Second Supplemental Indenture, dated as of June 12, 2000, among Tribune Company, The Times Mirror Company and Citibank, N.A., as Trustee (Exhibit 4.12 to Current Report on Form 8-K dated June 12, 2000) |
| 4.9 * | Agreement of Resignation, Appointment and Assumption, dated as of Sept. 4, 2002, among Tribune Company, The Bank of New York and Citibank, N.A., appointing Citibank, N.A. as Trustee under the Indentures dated March 1, 1992, Jan. 30, 1995, Jan. 1, 1997 and April 1, 1999 (Exhibit 4.7 to Annual Report on Form 10-K for 2004) |

209

| Number | Description |
|--------|-------------|
| 4.10 * | Form of Exchangeable Subordinated Debenture due 2029 relating to the PHONES securities (Exhibit 4 to Current Report on Form 8-K dated April 13, 1999) |
| 4.11 * | Specimen Note for $7\frac{1}{4}$% Debenture due 2013 (Exhibit 4.2 to The Times Mirror Company's Annual Report on Form 10-K for 1995) |
| 4.12 * | Specimen Note for $7\frac{1}{2}$% Debenture due 2023 (Exhibit 4.3 to The Times Mirror Company's Annual Report on Form 10-K for 1995) |
| 4.13 * | Officers' Certificate, dated Nov. 13, 1996, establishing the terms of the $7\frac{1}{4}$% Debentures due 2096 and attaching the specimen Form of Debenture (Exhibit 4.2 to The Times Mirror Company's Current Report on Form 8-K dated Nov. 7, 1996) |
| 4.14 * | Officers' Certificate, dated Sept. 9, 1997, establishing the terms of the 6.61% Debentures due 2027, and the specimen Form of Debenture (Exhibit 4.2 to The Times Mirror Company's Current Report on Form 8-K dated Sept. 4, 1997) |
| 4.15 * | Form of Note relating to Tribune Company's 4.875% Notes due 2010 (Exhibit 4.1a to Current Report on Form 8-K dated Aug. 10, 2005) |
| 4.16 * | Form of Note relating to Tribune Company's 5.25% Notes due 2015 (Exhibit 4.1b to Current Report on Form 8-K dated Aug. 10, 2005) |
| 4.17 * | Credit Agreement, dated as of May 17, 2007, by and among Tribune Company, as borrower, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, Merrill Lynch Capital Corporation, as syndication agent, Citicorp North America, Inc., Bank of America, N.A., and Barclay's Bank plc, as co-documentation agents and J.P. Morgan Securities Inc., Merrill Lynch, Pierce, Fenner and Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC, as joint lead arrangers and joint bookrunners (Exhibit 4.1 to Current Report on Form 8-K dated May 17, 2007) |
| 4.18 * | Amendment No. 1 to Credit Agreement, dated as of June 4, 2007, by and among Tribune Company, as borrower, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, Merrill Lynch Capital Corporation, as syndication agent, Citicorp North America, Inc., Bank of America, N.A., and Barclays Bank PLC, as co-documentation agents, and J.P. Morgan Securities Inc., Merrill Lynch, Pierce, Fenner and Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC, as joint lead arrangers and joint bookrunners (Exhibit 4.1 to Current Report on Form 8-K dated June 4, 2007) |
| 4.19 * | Form of Increase Joinder, by and among Tribune Company, as borrower, JPMorgan Chase Bank, N.A., as administrative agent, and the various lenders party thereto (Exhibit 4.2 to Current Report on Form 8-K dated Dec. 20, 2007) |
| 4.20 * | Unsecured Interim Loan Agreement, dated as of Dec. 20, 2007, by and among Tribune Company, as borrower, the lenders party thereto, Merrill Lynch Capital Corporation, as administrative agent, JPMorgan Chase Bank, N.A., as syndication agent, Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, and J.P. Morgan Securities Inc., Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC, as joint lead arrangers and joint bookrunners (Exhibit 4.1 to Current Report on Form 8-K dated Dec. 20, 2007) |

210

| Number | Description |
| --- | --- |
| 10.1 o* | Tribune Company Directors' Deferred Compensation Plan, as amended and restated effective as of Jan. 1, 2005 (Exhibit 10.2 to Current Report on Form 8-K dated Dec. 22, 2005) |
| 10.2 o* | The Times Mirror Company Deferred Compensation Plan for Non-Employee Directors (Exhibit 10.7 To The Times Mirror Company's Annual Report on Form 10-K for 1994) |
| 10.3 o* | Tribune Company Bonus Deferral Plan, as amended and restated as of Oct. 18, 2006 (Exhibit 10.1 to Current Report on Form 8-K dated Oct. 18, 2006) |
| 10.4 o* | Tribune Company Transitional Compensation Plan for Executive Employees, amended and restated effective as of July 19, 2006 (Exhibit 10.7 to Annual Report on Form 10-K for 2006) |
| 10.5 o* | Tribune Company Supplemental Defined Contribution Plan, as amended and effective as of Oct. 18, 2006 (Exhibit 10.2 to Current Report on Form 8-K dated Oct. 18, 2006) |
| 10.6 o | Tribune Company 1996 Nonemployee Director Stock Compensation Plan, as amended and restated effective as of Dec. 20, 2007 |
| 10.7 o* | Tribune Company Incentive Compensation Plan, as amended and restated effective May 12, 2004 (Exhibit 10.1 to Quarterly Report on Form 10-Q for the quarter ended June 27, 2004) |
| 10.8 * | Amended and Restated Lease Agreement between TMCT, LLC and Tribune Company, dated Sept. 22, 2006 (Exhibit 10.5 to Current Report on Form 8-K dated Sept. 21, 2006) |
| 10.9 o | Tribune Company's 2007 Management Equity Incentive Plan, effective as of Dec. 20, 2007 |
| 10.10 * | Subordinated Promissory Note, dated as of Dec. 20, 2007, issued by Tribune Company to EGI-TRB, L.L.C. (Exhibit (d)(45) to the final amendment to Schedule 13E-3 filed by Tribune Company with the Securities and Exchange Commission on Dec. 20, 2007) |
| 10.11 * | Warrant to Purchase Shares of Common Stock, dated Dec. 20, 2007, issued by Tribune Company to EGI-TRB, L.L.C. (Exhibit (d)(46) to the final amendment to Schedule 13E-3 filed by Tribune Company with the Securities and Exchange Commission on Dec. 20, 2007) |

211

| Number | Description |
|--------|-------------|
| 10.12 * | ESOP Purchase Agreement, dated as of April 1, 2007, by and between Tribune Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust created under the Tribune Employee Stock Ownership Plan (Exhibit 10.6 to Current Report on Form 8-K dated April 1, 2007) |
| 10.13 * | ESOP Loan Agreement, dated as of April 1, 2007, by and between Tribune Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which implements and forms a part of the Tribune Employee Stock Ownership Plan (Exhibit 10.7 to Current Report on Form 8-K dated April 1, 2007) |
| 10.14 * | ESOP Note, dated as of April 1, 2007, executed by GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which implements and forms a part of the Tribune Employee Stock Ownership Plan in favor of Tribune Company (Exhibit 10.8 to Current Report on Form 8-K dated April 1, 2007) |
| 10.15 * | ESOP Pledge Agreement, dated as of April 1, 2007, between the Company and GreatBanc Trust Company, not in its individual or corporate capacity but solely in its capacity as trustee of the Tribune Employee Stock Ownership Trust which forms a part of the Tribune Employee Stock Ownership Plan (Exhibit 10.9 to Current Report on Form 8-K dated April 1, 2007) |
| 10.16 * | Investor Rights Agreement, dated as of April 1, 2007, by and among Tribune Company, EGI-TRB, L.L.C. and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which implements and forms a part of the Tribune Employee Stock Ownership Plan (Exhibit 10.12 to Current Report on Form 8-K dated April 1, 2007) |
| 10.17 * | Tribune Employee Stock Ownership Plan (Exhibit 10.14 to Current Report on Form 8-K dated April 1, 2007) |
| 10.18 * | Tribune Employee Stock Ownership Trust, dated as of April 1, 2007, by and between Tribune Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust (Exhibit 10.15 to Current Report on Form 8-K dated April 1, 2007) |
| 14 * | Code of Ethics for CEO and Senior Financial Officers (Exhibit 14 to Annual Report on Form 10-K for 2003) |
| 21 | Table of Subsidiaries of Tribune Company |
| 23 | Consent of Independent Registered Public Accounting Firm |
| 31.1 | Rule 13a-14 Certification of Chief Executive Officer |
| 31.2 | Rule 13a-14 Certification of Chief Financial Officer |
| 32.1 | Section 1350 Certification of Chief Executive Officer |
| 32.2 | Section 1350 Certification of Chief Financial Officer |
| 99.1 | Report of Deloitte & Touche, LLP, Independent Registered Public Accounting Firm, dated March 11, 2008, on the financial statements of Television Food Network, G.P., a subsidiary of the E.W. Scripps Company, as of and for the year ended Dec. 31, 2007. |

212