the shares being tendered within the meaning of Rule 14e-4 and (2) such tender of shares complies with Rule 14e-4. Our acceptance for payment of shares tendered pursuant to the Tender Offer will constitute a binding agreement between the tendering stockholder and us upon the terms and subject to the conditions of the Tender Offer.

*Determination of Validity; Rejection of Shares; Waiver of Defects; No Obligation to Give Notice of Defects.* All questions as to the number of shares to be accepted, the price to be paid for shares to be accepted and the validity, form, eligibility (including time of receipt) and acceptance for payment of any tender of shares will be determined by us, in our sole discretion, and our determination will be final and binding on all parties. We reserve the absolute right prior to the expiration of the Tender Offer to reject any or all tenders we determine not to be in proper form or the acceptance for payment of or payment for which may, in the opinion of our counsel, be unlawful. We also reserve the absolute right subject to applicable law to waive any conditions of the Tender Offer with respect to all stockholders or any defect or irregularity in any tender with respect to any particular shares or any particular stockholder whether or not we waive similar defects or irregularities in the case of other stockholders. No tender of shares will be deemed to have been validly made until all defects or irregularities relating thereto have been cured or waived. None of us, the Co-Dealer Managers, the Depositary, the Information Agent or any other person will be under any duty to give notification of any defects or irregularities in tenders or incur any liability for failure to give any such notification. Our reasonable interpretation of the terms of and conditions to the Tender Offer, including the Letter of Transmittal and the instructions thereto, will be final and binding on all parties. By tendering shares to us, you agree to accept all decisions we make concerning these matters and waive any right you might otherwise have to challenge those decisions.

*Lost Certificates.* If the share certificates which a registered holder wants to surrender have been lost, destroyed or stolen, the stockholder should promptly notify the Depositary at (800) 245-7630. The Depositary will instruct the stockholder as to the steps that must be taken in order to replace the certificates.

*United States Federal Income Tax Withholding.* Under the United States backup withholding rules, 28% of the gross proceeds payable to a stockholder or other payee pursuant to the Tender Offer must be withheld and remitted to the United States Treasury, unless the stockholder or other payee provides its taxpayer identification number (i.e., its employer identification number or social security number) to the Depositary and certifies that such number is correct or an exemption otherwise applies under applicable Treasury regulations. Therefore, unless an exemption exists and is proven in a manner satisfactory to the Depositary, each tendering stockholder that is a U.S. Holder (as defined in "The Tender Offer—United States Federal Income Tax Consequences") should complete and sign the Substitute Form W-9 included as part of the Letter of Transmittal so as to provide the information and certification necessary to avoid backup withholding. Certain stockholders (including, among others, all corporations and certain foreign individuals) are not subject to these backup withholding and reporting requirements. In order for a foreign stockholder to qualify as an exempt recipient, that stockholder must submit a statement (generally, an IRS Form W-8BEN), signed under penalties of perjury, attesting to that stockholder's exempt status. Such statements can be obtained from the Depositary. See Instruction 10 of the Letter of Transmittal.

ANY TENDERING STOCKHOLDER OR OTHER PAYEE THAT FAILS TO COMPLETE FULLY AND SIGN THE SUBSTITUTE FORM W-9 INCLUDED WITH THE LETTER OF TRANSMITTAL (OR SUCH OTHER IRS FORM AS MAY BE APPLICABLE) MAY BE SUBJECT TO REQUIRED UNITED STATES BACKUP WITHHOLDING AT A RATE EQUAL TO 28% OF THE GROSS PROCEEDS PAID TO SUCH STOCKHOLDER OR OTHER PAYEE PURSUANT TO THE TENDER OFFER.

79

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0522154**

Gross proceeds payable pursuant to the Tender Offer to a foreign stockholder or its agent will be subject to withholding of United States federal income tax at a rate of 30%, unless we determine that a reduced rate of withholding is applicable pursuant to a tax treaty or that an exemption from withholding is applicable because such gross proceeds are effectively connected with the conduct of a trade or business within the United States and, in either case, the foreign stockholder provides the appropriate certification, as described below. For this purpose, a foreign stockholder is any stockholder that is not for United States federal income tax purposes: (a) an individual citizen or resident of the United States, (b) a corporation or a partnership created or organized in or under the laws of the United States, any state thereof or the District of Columbia, (c) an estate the income of which is subject to United States federal income taxation regardless of its source or (d) a trust if a court within the United States can exercise primary supervision of the trust's administration and one or more United States persons have the authority to control all substantial decisions of the trust. A foreign stockholder may be eligible to file for a refund of such tax or a portion of such tax withheld if such stockholder meets the "complete redemption," "substantially disproportionate" or "not essentially equivalent to a dividend" tests described in "The Tender Offer—United States Federal Income Tax Consequences" or if such stockholder is entitled to a reduced rate of withholding pursuant to a tax treaty and we withheld at a higher rate. In order to obtain a reduced rate of withholding under a tax treaty, a foreign stockholder must deliver to the Depositary before the payment a properly completed and executed IRS Form W-8BEN claiming an exemption or reduction. Such forms can be obtained from the Depositary. In order to claim an exemption from withholding on the grounds that gross proceeds paid pursuant to the Tender Offer are effectively connected with the conduct of a trade or business within the United States, a foreign stockholder must deliver to the Depositary a properly completed and executed IRS Form W-8ECI claiming such exemption. Such forms can be obtained from the Depositary. See Instruction 10 of the Letter of Transmittal. Backup withholding generally will not apply to amounts subject to the 30% or a treaty-reduced rate of withholding. We recommend that foreign stockholders consult their own tax advisors regarding the application of United States federal income tax withholding, including eligibility for a withholding tax reduction or exemption and the refund procedure.

**Withdrawal Rights**

Except as this section "The Tender Offer—Withdrawal Rights" otherwise provides, tenders of shares are irrevocable. You may withdraw shares that you have previously tendered in the Tender Offer according to the procedures we describe below at any time prior to the Expiration Time for all shares. You may also withdraw your previously tendered shares at any time after midnight, New York City time, on June 20, 2007, unless such shares have been accepted for payment as provided in the Tender Offer.

For a withdrawal to be effective, a written notice of withdrawal must:

* be received in a timely manner by the Depositary at one of its addresses set forth on the back cover of this Offer to Purchase; and

* specify the name of the person having tendered the shares to be withdrawn, the number of shares to be withdrawn and the name of the registered holder of the shares to be withdrawn, if different from the name of the person who tendered the shares.

If certificates for shares have been delivered or otherwise identified to the Depositary, then, prior to the physical release of those certificates, the serial numbers shown on those certificates must be submitted to the Depositary and, unless an eligible institution has tendered those shares, an eligible institution must guarantee the signatures on the notice of withdrawal.

80

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0522155

If a stockholder has used more than one Letter of Transmittal or has otherwise tendered shares in more than one group of shares, the stockholder may withdraw shares using either separate notices of withdrawal or a combined notice of withdrawal, so long as the information specified above is included.

If shares have been delivered in accordance with the procedures for book-entry transfer described in "The Tender Offer—Procedures for Tendering Shares," any notice of withdrawal must also specify the name and number of the account at the book-entry transfer facility to be credited with the withdrawn shares and otherwise comply with the book-entry transfer facility's procedures.

Withdrawals of tenders of shares may not be rescinded, and any shares properly withdrawn will thereafter be deemed not validly tendered for purposes of the Tender Offer. Withdrawn shares may be retendered at any time prior to the Expiration Time by again following one of the procedures described in "The Tender Offer—Procedures for Tendering Shares."

We will decide, in our sole discretion, all questions as to the form and validity, including time of receipt, of notices of withdrawal, and each such decision will be final and binding on all parties. We also reserve the absolute right to waive any defect or irregularity in the withdrawal of shares by any stockholder, whether or not we waive similar defects or irregularities in the case of any other stockholder. None of us, the Co-Dealer Managers, the Depositary, the Information Agent or any other person will be under any duty to give notification of any defects or irregularities in any notice of withdrawal or incur any liability for failure to give any such notification.

Participants in our Retirement Plans who wish to have the trustee withdraw previously tendered shares attributable to their plan account must follow the procedures set forth in the "Letter from the Northern Trust Company to Participants in the Tribune Company Retirement Plans" sent to each plan participant.

Participants in our Stock Purchase Plan who wish to have the trustee withdraw previously tendered shares attributable to their plan account must follow the procedures set forth in the "Letter from Tribune Company to Participants in the Tribune Company Employee Stock Purchase Plan" sent to each plan participant.

If we extend the Tender Offer, are delayed in our purchase of shares or are unable to purchase shares in the Tender Offer as a result of a failure of a condition disclosed in "The Tender Offer—Conditions of the Tender Offer," then, without prejudice to our rights in the Tender Offer, the Depositary may, subject to applicable law, retain tendered shares on our behalf, and such shares may not be withdrawn except to the extent tendering stockholders are entitled to withdrawal rights as described in this "The Tender Offer—Withdrawal Rights." Our reservation of the right to delay payment for shares which we have accepted for payment is limited by Rule 13e-4(f)(5) promulgated under the Exchange Act, which requires that we must pay the consideration offered or return the shares tendered promptly after termination or withdrawal of a tender offer.

**Purchase of Shares and Payment of Purchase Price**

For purposes of the Tender Offer, we will be deemed to have accepted for payment (and therefore purchased), subject to the "odd lot" priority, proration and conditional tender provisions of this Tender Offer, shares that are properly tendered and not properly withdrawn only when, as and if we give oral or written notice to the Depositary of our acceptance of the shares for payment pursuant to the Tender Offer.

Upon the terms and subject to the conditions of the Tender Offer, we will accept for payment and pay the per share purchase price for all of the shares accepted for payment pursuant to the Tender Offer promptly after the Expiration Time. In all cases, payment for shares tendered and accepted for

81

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0522156

payment pursuant to the Tender Offer will be made promptly, subject to possible delay in the event of proration, but only after timely receipt by the Depositary of:

- certificates for shares, or a timely book-entry confirmation of the deposit of shares into the Depositary's account at the book-entry transfer facility;

- a properly completed and duly executed Letter of Transmittal, or, in the case of a book-entry transfer, an agent's message; and

- any other required documents.

We will pay for shares purchased pursuant to the Tender Offer by depositing the aggregate purchase price for the shares with the Depositary, which will act as agent for tendering stockholders for the purpose of receiving payment from us and transmitting payment to the tendering stockholders.

In the event of proration, we will determine the proration factor and pay for those tendered shares accepted for payment promptly after the Expiration Time. However, we expect that we will not be able to announce the final results of any proration or commence payment for any shares purchased pursuant to the Tender Offer until up to seven business days after the Expiration Time. All shares tendered and not purchased, including shares not purchased due to proration or conditional tender, will be returned or, in the case of shares tendered by book-entry transfer, will be credited to the account maintained with the book-entry transfer facility for the participant who delivered the shares, to the tendering stockholder at our expense promptly after the Expiration Time or termination of the Tender Offer.

**Under no circumstances will we pay interest on the purchase price, including but not limited to, by reason of any delay in making payment. In addition, if certain events occur, we may not be obligated to purchase shares pursuant to the Tender Offer. See "The Tender Offer—Purchase of Shares and Payment of Purchase Price" and "The Tender Offer—Conditions of the Tender Offer."**

We will pay all stock transfer taxes, if any, payable on the transfer to us of shares purchased pursuant to the Tender Offer. If, however, payment of the purchase price is to be made to, or (in the circumstances permitted by the Tender Offer) if unpurchased shares are to be registered in the name of, any person other than the registered holder, or if tendered certificates are registered in the name of any person other than the person signing the Letter of Transmittal, the amount of all stock transfer taxes, if any (whether imposed on the registered holder or the other person), payable on account of the transfer to the person will be deducted from the purchase price unless satisfactory evidence of the payment of the stock transfer taxes, or exemption from payment of the stock transfer taxes, is submitted. See Instruction 7 of the Letter of Transmittal.

**Any tendering stockholder or other payee that fails to complete fully, sign and return to the Depositary the Substitute Form W-9 included with the Letter of Transmittal (or such other IRS form as may be applicable) may be subject to required United States backup withholding at a rate equal to 28% of the gross proceeds paid to the stockholder or other payee pursuant to the Tender Offer. See "The Tender Offer—Procedures for Tendering Shares." Also see "The Tender Offer—United States Federal Income Tax Consequences" regarding U.S. federal income tax consequences for foreign stockholders.**

### Conditional Tender of Shares

Subject to the exception for Odd Lot Holders, in the event of an over-subscription of the Tender Offer, shares tendered prior to the Expiration Time will be subject to proration. See "The Tender Offer—Terms of the Tender Offer." As discussed in "The Tender Offer—United States Federal Income Tax Consequences," the number of shares to be purchased from a particular stockholder may affect the tax treatment of the purchase to the stockholder and the stockholder's decision whether to tender. Accordingly, a stockholder may tender shares subject to the condition that a specified minimum

82

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522157

number of the stockholder's shares tendered pursuant to a Letter of Transmittal must be purchased if any shares tendered are to be purchased. Any stockholder desiring to make a conditional tender must so indicate in the box entitled "Conditional Tender" in the Letter of Transmittal, and, if applicable, in the Notice of Guaranteed Delivery.

Any tendering stockholder wishing to make a conditional tender must calculate and appropriately indicate the minimum number of shares that must be purchased if any are to be purchased. After the Tender Offer expires, if more than 126,000,000 shares (or such greater number of shares as we may elect to accept for payment, subject to applicable law) are properly tendered and not properly withdrawn, so that we must prorate our acceptance of and payment for tendered shares, we will calculate a preliminary proration percentage based upon all shares properly tendered, conditionally or unconditionally. If the effect of this preliminary proration would be to reduce the number of shares to be purchased from any stockholder below the minimum number specified, the tender will automatically be regarded as withdrawn (except as provided in the next paragraph). All shares tendered by a stockholder subject to a conditional tender and regarded as withdrawn as a result of proration will be returned at our expense, promptly after the Expiration Time.

After giving effect to these withdrawals, we will accept the remaining shares properly tendered, conditionally or unconditionally, on a pro rata basis, if necessary. If conditional tenders would otherwise be regarded as withdrawn and would cause the total number of shares to be purchased to fall below 126,000,000 then, to the extent feasible, we will select enough of the conditional tenders that would otherwise have been withdrawn to permit us to purchase 126,000,000 shares. In selecting among the conditional tenders, we will select by random lot, treating all tenders by a particular taxpayer as a single lot, and will limit our purchase in each case to the designated minimum number of shares to be purchased. To be eligible for purchase by random lot, stockholders whose shares are conditionally tendered must have tendered all of their shares.

**Conditions of the Tender Offer**

Notwithstanding any other provision of the Tender Offer, we will not be required to accept for payment, purchase or pay for any shares tendered, and may terminate or amend the Tender Offer or may postpone the acceptance for payment of, or the purchase of and the payment for shares tendered, subject to Rule 13e-4(f)(5) under the Exchange Act (which requires that the issuer making the tender offer shall either pay the consideration offered or return tendered securities promptly after the termination or withdrawal of the tender offer), if at the Expiration Time (whether any shares have theretofore been accepted for payment) any of the following circumstances exist or events have occurred (or shall have been reasonably determined by us to exist or to have occurred) that, in our reasonable judgment and regardless of the circumstances giving rise to the event or events (other than any such event or events that are proximately caused by our action or failure to act), make it inadvisable to proceed with the Tender Offer or with acceptance for payment:

- we have not received the necessary financing for the Tender Offer as contemplated by the First Step Commitment Letter, substantially on the terms contemplated thereby;

- we have not received an opinion from Valuation Research Corporation or another nationally recognized valuation firm satisfactory to us, in form and substance satisfactory to us, as to the solvency of the Company after giving effect to the Tender Offer;

- the agreements relating to the Leveraged ESOP Transactions do not remain in full force and effect or any party to any of those agreements is in material breach thereof, or any condition to the obligation of any party to those agreements has become incapable of satisfaction; or

- a restraining order, injunction or other order by any court or other tribunal of competent jurisdiction is in effect, or any statute, rule or regulation has been promulgated, enforced or

83

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522158

deemed to be applicable, which would prohibit the consummation of the Tender Offer or any of the other Leveraged ESOP Transactions.

The conditions referred to above are for our sole benefit and may be asserted by us regardless of the circumstances giving rise to any of these conditions (other than conditions that are proximately caused by our action or failure to act), and may be waived by us, in whole or in part, at any time and from time to time in our reasonable discretion before the Expiration Time. Our failure at any time to exercise any of the foregoing rights will not be deemed a waiver of any right, and each such right will be deemed an ongoing right that may be asserted at any time and from time to time prior to the Expiration Time. Any determination by us concerning the events described above will be final and binding on all parties.

**Price Range of the Shares/Dividends**

The shares are traded on the NYSE under the symbol "TRB." The following table sets forth, for each of the periods indicated, the high and low sales prices per share as reported by the NYSE based on published financial sources.

|  | High | Low |
|---|---|---|
| **Year Ending December 30, 2007:** | | |
| First Quarter | $32.30 | $28.59 |
| Second Quarter (through April 24, 2007) | $33.10 | $32.11 |
| **Year Ended December 31, 2006:** | | |
| First Quarter | $31.84 | $27.79 |
| Second Quarter | $32.94 | $27.09 |
| Third Quarter | $34.28 | $28.66 |
| Fourth Quarter | $33.99 | $30.74 |
| **Year Ended December 25, 2005:** | | |
| First Quarter | $42.37 | $38.59 |
| Second Quarter | $40.14 | $35.02 |
| Third Quarter | $39.56 | $34.53 |
| Fourth Quarter | $36.15 | $30.05 |

On March 30, 2007, the last full trading day before we announced our intention to make the Tender Offer, the last reported sales price of the shares reported by the NYSE was $32.11 per share. On April 24, 2007, the last full trading day before commencement of the Tender Offer, the last reported sales price of the shares reported by the NYSE was $32.55 per share. **We recommend that stockholders obtain a current market price for the shares before deciding whether to tender their shares.**

Quarterly cash dividends declared on Company Common Stock were $0.18 per share for each quarter during 2006 and 2005. Total cash dividends declared on Company Common Stock by the Company were $195 million for 2006 and $225 million for 2005. The Company announced in February 2007 that its first quarter 2007 cash dividend would be $0.18 per share. Under the Merger Agreement, we are not permitted to pay further dividends on the shares pending completion of the Merger.

**Source and Amount of Funds**

Assuming that 126,000,000 shares are purchased in the Tender Offer at the purchase price of $34.00 per share, the aggregate purchase price will be approximately $4.3 billion.

Together with our cash on hand, we anticipate that we will pay for the shares tendered in the Tender Offer from a draw-down under the First Step Credit Facilities pursuant to the terms and

84

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0522159

conditions thereof and of the First Step Commitment Letter (as described above under "Special Factors—Financing Commitments"). While we have obtained a financing commitment pursuant to the First Step Commitment Letter, it is contingent on the satisfaction of various conditions. Accordingly, as discussed in "The Tender Offer—Conditions of the Tender Offer," in addition to the other conditions described in this Offer to Purchase, the Tender Offer will be subject to our satisfying the terms and conditions to borrowing under the First Step Commitment Letter and the First Step Credit Facilities. We do not plan to have alternative financing plans in place prior to the expiration of the Tender Offer.

Our ability to repay expected borrowings under the First Step Credit Facilities and to meet our other debt or other contractual obligations (including continued compliance with applicable financial covenants) will depend upon our future performance, our cash flow from operations and our ability to execute our business plan, including completion of the Leveraged ESOP Transactions, all of which are subject to prevailing economic conditions and financial, business and other known and unknown risks and uncertainties, certain of which are beyond our control. These factors include, without limitation, those described in this Offer to Purchase under "Cautionary Note on Forward-Looking Statements."

Management believes that cash flows from operations and amounts available under the proposed First Step Credit Facilities are sufficient to meet the Company's expected liquidity needs with respect to the Tender Offer.

We will incur increased indebtedness in connection with the Tender Offer and, as a result, will be more leveraged. Increased leverage could have certain material adverse effects on us, including, but not limited to, the following: (1) our ability to obtain additional financing in the future for acquisitions, working capital, capital expenditures and general corporate or other purposes could be impaired, or any such financing may not be available, on terms favorable to us; (2) a substantial portion of our cash flow could be required for interest payments and, as a result, might not be available for our operations or other purposes; (3) any substantial decrease in net operating cash flows or any substantial increase in expenses could make it difficult for us to meet our debt service requirements or force us to modify our operations or sell assets; (4) our ability to withstand competitive pressures may be decreased; and (5) our level of indebtedness may make us more vulnerable to economic downturns and reduce our flexibility in responding to changing business, regulatory and economic conditions.

### Certain Financial Information

*Historical Financial Information.* We incorporate by reference the financial statements and notes thereto set forth in Item 8 of our Annual Report on Form 10-K for the year ended December 31, 2006. You should refer to "The Tender Offer—Information About Tribune Company" for instructions on how you can obtain copies of our SEC filings, including filings that contain our financial statements.

*Summary Historical Consolidated Financial Data.* The following table sets forth our summary historical consolidated financial data for the years ended December 31, 2006, December 25, 2005 and December 26, 2004, certain selected ratios for the years ended December 31, 2006, December 25, 2005 and December 26, 2004, and our financial position at December 31, 2006. This financial data has been derived from, and should be read in conjunction with, our audited consolidated financial statements and the related notes filed as part of our Annual Report on Form 10-K for the year ended December 31, 2006. The Company's fiscal year ends on the last Sunday in December. The Company's 2006 fiscal year ended on December 31, 2006 and encompassed a 53-week period. Fiscal years 2005 and 2004 each encompassed a 52-week period.

85

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522160

| | Years Ended | | |
|---|---|---|---|
| | December 31, 2006 | December 25, 2005 | December 26, 2004 |
| | (Dollars in thousands, except per share amounts) | | |
| Operating Revenues .............................. | $5,517,708 | $5,511,283 | $5,631,431 |
| **Operating Expenses** | | | |
| Cost of sales (exclusive of items shown below) ............ | 2,736,411 | 2,695,818 | 2,668,969 |
| Selling, general and administrative .................... | 1,469,274 | 1,447,233 | 1,545,067 |
| Depreciation ..................................... | 207,200 | 222,153 | 211,561 |
| Amortization of intangible assets ..................... | 19,813 | 18,888 | 18,556 |
| Total operating expenses ........................... | 4,432,698 | 4,384,092 | 4,444,153 |
| **Operating Profit** .................................. | 1,085,010 | 1,127,191 | 1,187,278 |
| Net income on equity investments .................... | 80,773 | 41,209 | 17,931 |
| Interest and dividend income ........................ | 14,145 | 7,539 | 3,053 |
| Interest expense .................................. | (273,902) | (155,191) | (153,118) |
| Gain (loss) on change in fair values of derivatives and related investments ................................... | 11,088 | 62,184 | (18,497) |
| Loss on early debt retirement........................ | — | — | (140,506) |
| Gain on TMCT transactions.......................... | 59,596 | — | — |
| Gain on sales of investments, net .................... | 36,732 | 6,780 | 20,347 |
| Other non-operating gain (loss), net .................. | (4,447) | 897 | (6,388) |
| **Income from Continuing Operations Before Income Taxes and Cumulative Effect of Change in Accounting Principle......** | 1,008,995 | 1,090,609 | 910,100 |
| Income taxes..................................... | (348,142) | (567,820) | (355,724) |
| **Income from Continuing Operations Before Cumulative Effect of Change in Accounting Principle** .................... | 660,853 | 522,789 | 554,376 |
| Income (Loss) From Discontinued Operations, net of tax .... | (66,858) | 11,900 | 18,948 |
| **Income Before Cumulative Effect of Change in Accounting Principle** ....................................... | 593,995 | 534,689 | 573,324 |
| Cumulative effect of change in accounting principle, net of tax. | — | — | (17,788) |
| **Net Income**..................................... | 593,995 | 534,689 | 555,536 |
| Preferred dividends ................................ | (6,309) | (8,364) | (8,308) |
| **Net Income Attributable to Common Shares** .............. | $ 587,686 | $ 526,325 | $ 547,228 |
| **Earnings Per Share** | | | |
| **Basic:** | | | |
| Continuing operations before cumulative effect of change in accounting principle............................. | $    2.40 | $    1.64 | $    1.69 |
| Discontinued operations ........................... | (.25) | .04 | .06 |
| Cumulative effect of change in accounting principle, net of tax. | — | — | (.05) |
| Net income..................................... | $    2.16 | $    1.68 | $    1.70 |

86

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0522161

|  | Years Ended | | |
|---|---|---|---|
|  | December 31, 2006 | December 25, 2005 | December 26, 2004 |
|  | (Dollars in thousands, except per share amounts) | | |
| **Diluted:** | | | |
| Continuing operations before cumulative effect of change in accounting principle | $2.39 | $1.63 | $1.67 |
| Discontinued operations | (.24) | .04 | .06 |
| Cumulative effect of change in accounting principle, net of tax. | — | — | (.05) |
| Net income | $2.14 | $1.67 | $1.67 |
| Dividends per common share | $ .72 | $ .72 | $ .48 |

|  | Years Ended | | |
|---|---|---|---|
|  | December 31, 2006 | December 25, 2005 | December 26, 2004 |
| **Selected Ratio:** | | | |
| Ratio of earnings to fixed charges | 4.3x | 7.1x | 6.2x |

|  | At December 31, 2006 |
|---|---|
|  | (Dollars in thousands, except per share amounts) |
| **Financial Position:** | |
| Assets | 13,400,772 |
| Current liabilities | 2,546,714 |
| Long-term debt | 3,576,211 |
| Other non-current liabilities | 2,958,231 |
| Shareholders' equity | 4,319,616 |
| Book value per common share | $      18.06 |

*Summary Unaudited Pro Forma Consolidated Financial Data.* The following unaudited pro forma condensed consolidated financial statements present the Company's pro forma consolidated financial position at December 31, 2006 and its pro forma consolidated results of operations for the year then ended. These unaudited pro forma condensed consolidated financial statements are derived from our historical consolidated financial statements and give effect to the repurchase of shares of Company Common Stock pursuant to the Tender Offer and the related refinancings of certain indebtedness of the Company, as if such repurchase and refinancings had occurred at the beginning of fiscal year 2006 for purposes of the pro forma condensed consolidated statement of income and as if such repurchase and refinancings had occurred at the end of fiscal year 2006 for purposes of the pro forma condensed consolidated balance sheet. In addition, these unaudited pro forma condensed consolidated financial statements give effect to the Step One Purchase Transaction and the ESOP Purchase Agreement as if they had been consummated at the beginning of fiscal year 2006 for purposes of the pro forma condensed consolidated statement of income and as if such agreements had been consummated at the end of fiscal year 2006 for purposes of the pro forma condensed consolidated balance sheet.

The unaudited pro forma condensed consolidated financial statements include adjustments directly attributable to the Tender Offer and related refinancings that are expected to have a continuing impact on the Company. The unaudited pro forma condensed consolidated financial statements do not give effect to the consummation of the Merger, the repayment of the Exchangeable Note held by the Zell Entity or the issuance of the $225 million Subordinated Note or the 15-year Warrant to the Zell Entity in the Step Two Purchase Transaction because the consummation of such transactions is subject to the satisfaction of certain conditions, including stockholder approval, receipt of financing, FCC approval and the receipt of a solvency opinion. The pro forma adjustments are described in the accompanying

87

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

notes to the unaudited pro forma condensed consolidated financial statements. We believe the assumptions used, and pro forma adjustments derived from such assumptions, are reasonable based upon currently available information. However, such adjustments are subject to change based on finalization of the Tender Offer and related refinancings, and the Purchase Agreements. The Tender Offer is subject to a number of conditions, and there can be no assurance that the Tender Offer will be consummated or when such consummation might occur.

These unaudited pro forma condensed consolidated financial statements should be read in conjunction with our audited consolidated financial statements and the related notes filed as part of our Annual Report on Form 10-K for the year ended December 31, 2006 which is incorporated herein by reference. These unaudited pro forma condensed consolidated financial statements are not necessarily indicative of either our financial position or the results of operations that actually would have been attained had the repurchase of shares of Company Common Stock and related refinancings pursuant to the Tender Offer, and consummation of the Step One Purchase Transaction and the ESOP Purchase Agreement had been completed at the dates indicated, or that will be achieved in the future. These unaudited pro forma condensed consolidated financial statements have been included herein for informational and comparative purposes only. Our future results are subject to prevailing economic and industry specific conditions and financial, business and other known and unknown risks and uncertainties, certain of which are beyond our control. These factors include, without limitation, those described in this prospectus under "Cautionary Note on Forward-Looking Statements."

88

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522163

### Pro Forma Condensed Consolidated Statement of Income (Unaudited)

| | Year Ended December 31, 2006 | | |
| | Historical | Pro Forma Adjustments | Pro Forma |
| --- | ---: | ---: | ---: |
| | (In thousands, except per share data) | | |
| Operating Revenues | $5,517,708 | $ — | $5,517,708 |
| **Operating Expenses:** | | | |
| Cost of sales (exclusive of items shown below) | 2,736,411 | — | 2,736,411 |
| Selling, general and administrative | 1,469,274 | — | 1,469,274 |
| Depreciation | 207,200 | — | 207,200 |
| Amortization of intangible assets | 19,813 | — | 19,813 |
| Total operating expenses | 4,432,698 | — | 4,432,698 |
| **Operating Profit:** | 1,085,010 | — | 1,085,010 |
| Net income on equity investments | 80,773 | — | 80,773 |
| Interest and dividend income | 14,145 | — | 14,145 |
| Interest expense | (273,902) | (481,885)(a) | (755,787) |
| Gain on change in fair values of derivatives and related investments | 11,088 | — | 11,088 |
| Gain on TMCT transactions | 59,596 | — | 59,596 |
| Gain on sales of investments, net | 36,732 | — | 36,732 |
| Other non-operating loss, net | (4,447) | — | (4,447) |
| Income From Continuing Operations Before Income Taxes | 1,008,995 | (481,885) | 527,110 |
| Income taxes | (348,142) | 180,707 (b) | (167,435) |
| Income From Continuing Operations | $ 660,853 | $(301,178) | $ 359,675 |
| **Earnings Per Share From Continuing Operations:** | | | |
| Basic | $ 2.40 | | $ 2.39 |
| Diluted | $ 2.39 | | $ 2.31 |
| **Weighted-average Common Shares Outstanding:** | | | |
| Basic | 272,672 | (124,529)(c) | 148,143 |
| Diluted | 274,411 | (118,647)(c) | 155,764 |
| Book value per common share | $ 18.06 | | $ 0.58 |
| Ratio of earnings to fixed charges | 4.3 | | 1.7 |

See "Notes to Unaudited Pro Forma Condensed Consolidated Financial Statements".

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522164

**Pro Forma Condensed Consolidated Balance Sheet (Unaudited)**

| | As of December 31, 2006 | | |
|---|---|---|---|
| | Historical | Pro Forma Adjustments | Pro Forma |
| | | (In thousands of dollars) | |
| **Assets** | | | |
| **Current Assets:** | | | |
| Cash and cash equivalents | $ 174,686 | $ — | $ 174,686 |
| Accounts receivable, net | 765,871 | — | 765,871 |
| Inventories | 40,962 | — | 40,962 |
| Broadcast rights | 271,995 | — | 271,995 |
| Deferred income taxes | 74,450 | — | 74,450 |
| Prepaid expenses and other | 49,466 | — | 49,466 |
| Total current assets | 1,377,430 | — | 1,377,430 |
| **Properties:** | | | |
| Property, plant and equipment | 3,592,477 | — | 3,592,477 |
| Accumulated depreciation | (1,907,365) | — | (1,907,365) |
| Net properties | 1,685,112 | — | 1,685,112 |
| **Other Assets:** | | | |
| Broadcast rights | 295,186 | — | 295,186 |
| Goodwill | 5,837,208 | — | 5,837,208 |
| Other intangible assets, net | 2,846,057 | — | 2,846,057 |
| Time Warner stock related to PHONES debt | 348,480 | — | 348,480 |
| Other investments | 564,750 | — | 564,750 |
| Prepaid pension costs | 293,455 | — | 293,455 |
| Assets held for sale | 9,172 | — | 9,172 |
| Other | 143,922 | 108,857 (d) | 252,779 |
| Total other assets | 10,338,230 | 108,857 | 10,447,087 |
| Total assets | $13,400,772 | $ 108,857 | $13,509,629 |
| **Liabilities and Shareholders' Equity** | | | |
| **Current Liabilities:** | | | |
| Borrowings under bridge credit facility | $ 1,310,000 | $(1,310,000)(e) | $ — |
| Other debt due within one year | 119,007 | (97,019)(e) | 21,988 |
| Contracts payable for broadcast rights | 317,945 | — | 317,945 |
| Deferred income | 108,607 | — | 108,607 |
| Accounts payable, accrued expenses and other current liabilities | 691,155 | (7,929)(d) | 683,226 |
| Total current liabilities | 2,546,714 | (1,414,948) | 1,131,766 |
| **Long-Term Debt:** | | | |
| PHONES debt related to Time Warner stock | 572,960 | — | 572,960 |
| Other long-term debt (less portions due within one year) | 3,003,251 | 5,776,539 (e) | 8,779,790 |
| Total long-term debt | 3,576,211 | 5,776,539 | 9,352,750 |
| **Other Non-Current Liabilities:** | | | |
| Deferred income taxes | 1,974,672 | — | 1,974,672 |
| Contracts payable for broadcast rights | 425,927 | — | 425,927 |
| Compensation and other obligations | 557,632 | — | 557,632 |
| Total other non-current liabilities | 2,958,231 | — | 2,958,231 |
| **Shareholders' Equity:** | | | |
| Common stock and additional paid-in capital | 6,837,029 | (1,784,235)(g) | 5,052,794 |
| Retained earnings | 3,138,313 | (13,214)(d) | 565,526 |
| | | (54,288)(f) | |
| | | (2,505,285)(g) | |
| Treasury common stock (at cost) | (5,288,341) | 354,288 (f) | (4,934,053) |
| Unearned ESOP shares | — | (250,000)(f) | (250,000) |
| Accumulated other comprehensive income (loss) | (367,385) | — | (367,385) |
| Total shareholders' equity | 4,319,616 | (4,252,734) | 66,882 |
| Total liabilities and shareholders' equity | $13,400,772 | $ 108,857 | $13,509,629 |

See "Notes to Unaudited Pro Forma Condensed Consolidated Financial Statements".

90

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522165

**Notes to Unaudited Pro Forma Condensed Consolidated Financial Statements**

On April 1, 2007, our Board, based on the recommendation of the Special Committee, approved the Company's entry into the Leveraged ESOP Transactions. In connection with the Leveraged ESOP Transactions, the Company agreed to launch the Tender Offer to repurchase up to 126,000,000 shares of Company Common Stock that are currently outstanding at a price of $34.00 per share. On April 1, 2007, the Company also entered into the Zell Entity Purchase Agreement and the ESOP Purchase Agreement. The terms of these agreements included the following:

- Pursuant to the ESOP Purchase Agreement, on April 1, 2007, the ESOP purchased from the Company 8,928,571 shares of Company Common Stock at a price of $28.00 per share. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from the Company to the ESOP and/or distributions paid on the shares of Company Common Stock held by the ESOP.

- Pursuant to the Zell Entity Purchase Agreement, on April 23, 2007, the Zell Entity made an initial investment of $250 million in the Company in exchange for (1) 1,470,588 shares of Company Common Stock at $34.00 per share and (2) an unsecured subordinated exchangeable promissory note of the Company in the principal amount of $200 million. The promissory note is exchangeable at the Company's option, or automatically upon termination of the Merger Agreement, into an aggregate of 5,882,353 shares of Company Common Stock, subject to antidilution adjustments.

To finance the Tender Offer and to refinance indebtedness under its existing Credit Facilities, the Company has secured financing commitments from certain lenders.

The unaudited pro forma condensed consolidated statement of income does not reflect material non-recurring charges, which we anticipate will affect income from continuing operations within 12 months following the Tender Offer and related refinancings. The most significant of these charges are costs related to the extinguishment of the Company's existing term facility and bridge credit facility. We currently estimate that the income statement charges related to the extinguishment will be approximately $9 million after-tax. The unaudited pro forma condensed consolidated balance sheet reflects the impact of these non-recurring charges.

The pro forma adjustments for the Tender Offer and related refinancings, and the Purchase Agreements are described below.

(a) The pro forma interest expense adjustment assumes the issuance of approximately $7.1 billion of new variable rate debt to finance the Tender Offer and to refinance the Company's existing term facility, existing bridge credit facility, and outstanding commercial paper. A rate of 7.86%, based on LIBOR (at April 19, 2007) plus a spread of 2.5%, has been used to compute pro forma interest expense on the new borrowings. The pro forma interest expense adjustment is net of the historical interest expense on the Company's term facility, bridge credit facility and commercial paper that were assumed to be refinanced and includes the amortization of estimated debt issuance costs of $130 million using an average life of seven years. A one-eighth percentage point change in the assumed interest rate on the new borrowings would increase or decrease pro forma interest expense by approximately $9 million.

In addition, the pro forma interest expense adjustment also includes interest on the $200 million subordinated exchangeable promissory note assumed to be issued in connection with the Zell Entity Purchase Agreement. A rate of 4.81%, based on the rate specified in the Zell Entity Purchase Agreement, has been used to compute interest expense on the promissory note.

91

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522166

The following table summarizes the pro forma interest expense adjustment.

**Pro forma interest expense adjustment ($ in millions)**

| | |
|---|---:|
| New variable rate debt | $556 |
| $200 million promissory note | 10 |
| Amortization of debt issuance costs | 19 |
| Less: existing term facility | (54) |
| Less: existing bridge credit facility | (44) |
| Less: existing commercial paper | (5) |
| Interest expense adjustment | $482 |

(b) Reflects the income tax effect of the pro forma interest expense adjustment utilizing the applicable statutory tax rate for the year ended December 31, 2006.

(c) The pro forma adjustment to basic weighted-average common shares outstanding reflects the repurchase of 126,000,000 shares of Company Common Stock and the issuance of 1,470,588 shares of Company Common Stock as of the beginning of fiscal year 2006 in connection with the Zell Entity Purchase Agreement. The pro forma adjustment to diluted weighted-average common shares outstanding also reflects the assumed conversion of the $200 million subordinated exchangeable promissory note into 5,882,353 shares of Company Common Stock as of the beginning of fiscal year 2006.

(d) Reflects $130 million of debt issuance costs in connection with the new borrowings and the write-off of $21 million of debt issuance costs ($13 million after-tax) as a result of the extinguishment of the term facility and bridge credit facility.

(e) To record the issuance of the new borrowings and the refinancing of the existing term facility, existing bridge credit facility and $97 million of the Company's outstanding commercial paper.

(f) To record the issuance of shares of Company Common Stock to the ESOP and Zell Entity in connection with the Purchase Agreements. The shares were assumed to have been issued from our existing treasury common stock at the average value of $34.07 per share.

(g) To record the repurchase and subsequent retirement of 126,000,000 shares of Company Common Stock at $34.00 per share in connection with the Tender Offer, including $5.5 million of related transaction costs.

## Certain Projections

The Company does not as a matter of course make public projections as to its future performance, earnings or other results, and is especially wary of making projections for earnings periods due to the unpredictability of the underlying assumptions and estimates. However, in connection with the due diligence review of the Company by the ESOP, the Zell Entity, the Chandler Trusts and other interested parties, the Company provided to the ESOP, the Zell Entity, the Chandler Trusts and to other interested parties certain non-public financial projections. These internal financial projections were also provided to the Board and the Special Committee and their respective financial and legal advisors. We have included below a summary of these projections to give our shareholders access to certain non-public information that was furnished to third parties and was considered by the financial advisors and by our Board and Special Committee for purposes of evaluating the Leveraged ESOP Transactions.

The internal financial projections set forth below were prepared at the dates indicated for internal use and to assist the financial advisors to each of the Board and the Special Committee and other parties in their due diligence investigations of the Company, and not with a view toward public disclosure or toward compliance with U.S. generally accepted accounting principles, the published guidelines of the SEC regarding projections, or the guidelines established by the American Institute of

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0522167

Certified Public Accountants for preparation and presentation of prospective financial information. Neither the Company's independent auditors nor any other independent accountants have compiled, examined or performed any procedures with respect to the prospective financial information contained in the projections, nor have they expressed any opinion or given any form of assurance on the projections or their achievability.

These internal financial projections were based on numerous estimates, variables and assumptions that are inherently subject to economic and competitive uncertainties, all of which are difficult to predict and beyond the control of the Company's management and may not prove to have been, or may no longer be, accurate. Important factors that may affect actual results and result in the forecasted results not being achieved include, but are not limited to: changes in advertising demand, circulation levels and audience shares; regulatory and judicial rulings; availability and cost of broadcast rights; competition and other economic conditions; changes in newsprint prices; changes in the Company's credit ratings and interest rates; changes in accounting standards; adverse results from litigation, governmental investigations or tax-related proceedings or audits; the effect of labor strikes, lock-outs and negotiations; the effect of acquisitions, investments and divestitures; the effect of derivative transactions; the Company's reliance on third-party vendors for various services; the effect of the Leveraged ESOP Transactions, and other risks described in the Company's Annual Report on Form 10-K filed with the SEC for the fiscal year ended December 31, 2006.

Furthermore, the internal financial projections were prepared at the dates indicated below and do not necessarily reflect revised prospects for the Company's business, changes in general business or economic conditions, or any other transaction or event that has occurred or that may occur and that was not anticipated at the time the projections were prepared. Moreover, the projections are not necessarily indicative of future performance, which may be significantly more or less favorable than as contemplated by the projections and accordingly should not be regarded as a representation that they will be achieved. In addition, the projections were prepared prior to the Board's approval of the Leveraged ESOP Transactions and, accordingly, the projections do not reflect the effects of such transactions. Since the date of the projections, the Company has made publicly available the results of operations for the fiscal year ended December 31, 2006 and the fiscal quarter ended April 1, 2007. Stockholders should review the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2006 and the Company's Current Report on Form 8-K dated April 19, 2007 to obtain this information.

The inclusion of the internal financial projections in this document should not be regarded as an indication that the Company or its affiliates, advisors or representatives considered or consider the projections to be predictive of actual future events, and the projections should not be relied upon as such. None of the Company or its affiliates, advisors, officers, directors or representatives can give you any assurance that actual results will not differ from the projections, and none of them undertakes any obligation to update or otherwise revise or reconcile the projections to reflect circumstances existing after the date such projections were generated or to reflect the occurrence of future events even in the event that any or all of the assumptions underlying the projections are shown to be in error. None of the Company, nor, to the knowledge of the Company, the ESOP, the Zell Entity or the Chandler Trusts intends to make publicly available any update or other revisions to the projections. None of the Company or its affiliates, advisors, officers, directors or representatives has made or makes any representation to any shareholder or other person regarding the ultimate performance of the Company compared to the information contained in the projections or that projected results will be achieved. The Company has made no representation to the ESOP, the Zell Entity or the Chandler Trusts in the Merger Agreement or otherwise, concerning the projections.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522168

*Company Projected Financial Information*

*2007 Management Projections*

As described above, in February 2007 the Company provided the following financial projections ("2007 Management Projections") to the Company's Board and the Special Committee and their respective financial advisors as well as to the ESOP, the Zell Entity, the Chandler Trusts and to other interested parties.

### TRIBUNE COMPANY
### SUMMARY CONSOLIDATED INCOME STATEMENT(a)
### ($ in millions)

| | 2006(d) | 2007 | 2008 | 2009 | 2010 | 2011 | '06-'10 4Y CAGR | '07-'11 4Y CAGR | '06-'11 5Y CAGR |
|---|---|---|---|---|---|---|---|---|---|
| **Operating Revenues** | | | | | | | | | |
| Publishing | $4,025 | $3,984 | $4,007 | $4,036 | $4,063 | $4,093 | 0.2% | 0.7% | 0.3% |
| Broadcasting & Entertainment | 1,408 | 1,401 | 1,480 | 1,487 | 1,531 | 1,537 | 2.1% | 2.3% | 1.8% |
| Total Revenues | 5,433 | 5,385 | 5,487 | 5,523 | 5,594 | 5,630 | 0.7% | 1.1% | 0.7% |
| **Operating Cash Expenses(b)** | | | | | | | | | |
| Publishing | 3,094 | 3,069 | 3,072 | 3,089 | 3,104 | 3,123 | 0.1% | 0.4% | 0.2% |
| Broadcasting & Entertainment | 970 | 985 | 1,012 | 1,003 | 1,030 | 1,048 | 1.5% | 1.6% | 1.6% |
| Corporate | 61 | 61 | 65 | 66 | 69 | 71 | 3.0% | 3.8% | 3.0% |
| Total Operating Cash Expenses | 4,125 | 4,115 | 4,149 | 4,158 | 4,203 | 4,242 | 0.5% | 0.8% | 0.6% |
| **Operating Cash Flow (c)** | | | | | | | | | |
| Publishing | 931 | 915 | 935 | 947 | 959 | 970 | 0.7% | 1.5% | 0.8% |
| Broadcasting & Entertainment | 437 | 416 | 468 | 484 | 501 | 490 | 3.5% | 4.2% | 2.3% |
| Corporate | (61) | (61) | (65) | (66) | (69) | (71) | 3.0% | 3.8% | 3.0% |
| Total Operating Cash Flow | 1,308 | 1,270 | 1,339 | 1,364 | 1,391 | 1,389 | 1.6% | 2.3% | 1.2% |
| **Equity Income** | 75 | 67 | 95 | 129 | 159 | 191 | 20.7% | 29.9% | 20.6% |
| **Adjusted Operating Cash Flow** | 1,383 | 1,337 | 1,434 | 1,493 | 1,550 | 1,580 | 2.9% | 4.3% | 2.7% |
| **Capital Expenditures** | | | | | | | | | |
| Publishing | 173 | 165 | 140 | 100 | 100 | 100 | | | |
| Broadcasting & Entertainment | 42 | 28 | 28 | 27 | 27 | 27 | | | |
| Corporate | 6 | 7 | 7 | 3 | 3 | 3 | | | |
| Total Capital Expenditures | 222 | 200 | 175 | 130 | 130 | 130 | | | |
| Investments | 222 | 100 | 275(e) | 100 | 100 | 100 | | | |
| Total Capital Usage | 444 | 300 | 450 | 230 | 230 | 230 | | | |
| | | | | | | | | | |
| **Pre-tax Free Cash Flow** | $ 939 | $1,037 | $ 983 | $1,264 | $1,320 | $1,350 | | | |

**Cumulative FCF ('07-'11)**
$5,954

(a) Excludes non-operating items and discontinued operations (Atlanta, Albany and Boston).

(b) Includes non-cash stock-based compensation and non-cash pension expense.

(c) Operating Cash Flow represents operating revenue less cash expenses, including non-cash stock-based compensation expense and non-cash pension expense. It should be noted that operating cash flow is not a measure of performance under generally accepted accounting principles and should not be considered as an alternative to operating income or net income as a measure of operating performance or cash flows as a measure of liquidity. Further, management's calculation of operating cash flows may differ from that used by others.

(d) Excludes fiscal year 2006's additional week. A 53rd week occurs every six years as the Company's fiscal year ends on the last Sunday of the year. 2006 excludes the following special items: approximately $20 million of severance and other payments

94

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0522169

associated with new union contracts at Newsday, $9 million of other severance expense, a $4 million charge for the disposition of a press, $7 million of gains from property sales and a $7 million gain from the sale of the corporate airplane.

(e)  Includes $175 million in 2008 for the purchase of TMCT real estate.

The material assumptions made by the Company in developing the 2007 Management Projections were as follows:

### Publishing

* Revenue decline of 1% in 2007 due to a challenging advertising environment;

* Print advertising revenue decline of 3% in 2007, which will be partially offset by Interactive revenue growth;

* Modest improvement in 2008-2011 revenues as compared to 2007 due to annual Interactive revenue growth of 16% and improvements in classified;

* Circulation revenue declines of 4% annually in years 2007-2011 from modest volume declines and continued selective discounting;

* Expense decline of 1% in 2007 due to more favorable newsprint prices and other cost reductions;

* Continued focus on cost reductions beyond 2007;

* Growth in equity income from CareerBuilder and Classified Ventures; and

* Declining capital expenditures due to the completion of ongoing systems projects by early 2009.

### Broadcasting and Entertainment

* Advertising sales growth of nearly 2% annually in years 2006-2011;

* Base television spot market growth of 1% annually;

* Expected improvements in political spending;

* An expected increase in revenue share to 14.3% in 2011 from a projected 13.3% in 2006;

* Improved ratings for The CW network as compared to The WB network and continued ratings momentum of FOX network programming;

* Increase in revenue share due to debuts of new syndicated programming in fall 2007;

* Continued growth of WGN Superstation distribution (volume and rate) and renewal of carriage agreements;

* Increase in annual operating expenses of approximately 1.6%; and

* Continued growth of the TV Food Network.

The Company subsequently slightly refined the 2007 Management Projections discussed above. The material difference in the revised version of the projections was a decrease of approximately $75 million in capital expenditures and investments in 2007, resulting in an increase of the same amount in pre-tax free cash flow in 2007. These updated projections were shared with the Board, the Special Committee and their respective financial advisors, as well as with the Chandler Trusts and the Zell Entity.

The Board, the Special Committee and their respective financial advisors also considered certain downside sensitivity cases, two of which are described as "Downside Case A" and "Downside Case B" in "Special Factors—Opinion of the Special Committee's Financial Advisor." Downside Case A

95

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522170

assumes a 2% annual decline in publishing revenues and no growth in broadcasting and entertainment operating cash flow, in each case, from 2007 through 2011. Downside Case B assumes a 3% annual decline in publishing revenues and a 1% annual decline in broadcasting and entertainment operating cash flow, in each case, from 2007 through 2011. The downside sensitivity cases were not provided to the Zell Entity; however, they were provided to the ESOP and other interested parties. The Downside Case A and the Downside Case B are described in the April 1, 2007 Presentation to the Committee of Independent Directors of the Board of Directors of Tribune prepared by Morgan Stanley, which was filed by the Company with the SEC as Exhibit (c)(10) to the Schedule TO dated April 25, 2007.

### First Quarter 2007 Results

On April 19, 2007, the Company reported its 2007 first quarter results and furnished such results on a Current Report on Form 8-K. Consolidated operating cash flow for the first quarter of 2007 was 2% lower than planned results factored into the 2007 Management Projections, primarily due to lower publishing revenues, which were partially offset by lower expenses in both the publishing and broadcasting segments. Consolidated operating cash flow for the first quarter of 2007 was down approximately 12% from 2006. Excluding one-time items in 2007 and 2006, consolidated operating cash flow declined by approximately 17%. Stockholders should review the Company's Current Report on Form 8-K dated April 19, 2007 to obtain further information regarding the Company's first quarter results.

### Certain 2006 Management Projections

In October and December 2006, the Company prepared certain other non-public financial projections which, during the strategic review process, were provided or made available to the Board, the Special Committee, the Zell Entity and other interested parties and their respective legal and financial advisors (respectively, the "October 2006 Projections" and the "December 2006 Projections"). The October 2006 Projections and December 2006 Projections were fully superseded by the 2007 Management Projections described above.

The October 2006 Projections included projected financial information for the remainder of the 2006 fiscal year through the 2010 fiscal year and reflected (i) 2006 publishing revenues of $4,042 million, increasing at a five-year compound annual growth rate ("CAGR") of 2.1%, (ii) 2006 broadcasting and entertainment operating revenues of $1,390 million, increasing at a five-year CAGR of 1.7% and (iii) 2006 consolidated operating cash flow of $1,303 million, increasing at a five-year CAGR of 2.9%.

In December 2006, management reviewed the October 2006 Projections in light of the most recent operating results and revised the October 2006 Projections. As compared to the October 2006 Projections, the December 2006 Projections included projected financial information for the remainder of the 2006 fiscal year through the 2010 fiscal year and reflected (i) 2006 publishing operating revenues of $4,022 million, increasing at a five-year CAGR of 2.1%, (ii) 2006 broadcasting and entertainment operating revenues of $1,399 million, increasing at a five-year CAGR of 2.3% and (iii) 2006 consolidated operating cash flow of $1,307 million, increasing at a five-year CAGR of 3.4%.

In February 2007, in connection with the Company's preparation of its 2007 operating plan and in light of the 2006 year-end operating results and Period 1, 2007 operating results, management reviewed and revised the December 2006 Projections and prepared the 2007 Management Projections described above.

### Information About Tribune Company

The Company is a media and entertainment company, operating primarily in the United States, that conducts our operations through two business segments: publishing and broadcasting and

96

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522171

entertainment. In publishing, our leading daily newspapers include the *Los Angeles Times, Chicago Tribune* and *Newsday* (Long Island, NY), *The Sun* (Baltimore), *South Florida Sun-Sentinel, Orlando Sentinel* and *Hartford Courant*. Our broadcasting group operates 23 television stations, Superstation WGN on national cable, Chicago's WGN-AM and the Chicago Cubs baseball team. Popular news and information websites complement our print and broadcast properties and extend our nationwide audience. These segments reflect the manner in which we sell our products to the marketplace, manage our operations and make business decisions. Our media operations are principally in major metropolitan areas of the United States and compete against all types of media on both a local and national basis. We were founded in 1847 and incorporated in Illinois in 1861. As a result of a corporate restructuring in 1968, we became a holding company incorporated in Delaware.

*Prior Public Offerings.*    The Company has for several years maintained active debt shelf registration statements for its medium-term note program and other financing needs. A $1 billion shelf registration statement was declared effective in February 2006. In July 2006, a new shelf registration statement was filed and declared effective, replacing the shelf registration statement declared effective in February 2006. The new shelf registration statement does not have a designated amount, but the Board has authorized the issuance and sale of up to $3 billion of debt securities, inclusive of the $1 billion that was registered pursuant to the February 2006 registration statement.

*Company Common Stock Repurchases.*    The Company's repurchases of shares of Company Common Stock totaled 71 million shares for $2.3 billion in 2006 and 12 million shares for $440 million in 2005. The following table summarizes the Company's 2006 repurchases (in thousands):

|  | Shares | Cost |
|---|---|---|
| Repurchases in first quarter | 4,604 | $ 137,746 |
| May 2006 tender offer repurchases | 45,027 | 1,468,270 |
| Repurchases from the Robert R. McCormick Tribune Foundation and Cantigny Foundation | 10,000 | 325,300 |
| Repurchases subsequent to the May 2006 tender offer | 11,053 | 330,952 |
| Total Company Common Stock repurchases | 70,684 | $2,262,268 |

On May 30, 2006, the Company initiated a modified "Dutch Auction" tender offer to repurchase up to 53 million shares of Company Common Stock at a price per share not greater than $32.50 and not less than $28.00. That tender offer closed on June 26, 2006, and the Company acquired 45 million shares of Company Common Stock on July 5, 2006 at a price of $32.50 per share before transaction costs. The Company also acquired 10 million shares of Company Common Stock from the Foundations on July 12, 2006 at a price of $32.50 per share before transaction costs. The Foundations are affiliated non-profit organizations, which together held 13.6% of the Company's outstanding shares when that tender offer was launched. In connection with that tender offer, the Board also authorized the repurchase of an additional 12 million shares of Company Common Stock commencing on the eleventh business day following the completion of the tender offer. In the third quarter of 2006, the Company repurchased an additional 11.1 million shares under that authorization at a weighted average cost of $29.94 per share. In addition, the Company repurchased and retired 4.6 million shares of Company Common Stock in the first quarter of 2006.

### Certain Relationships and Transactions

*Chandler Trusts.*    Three members of the Board, Jeffrey Chandler, Roger Goodan and William Stinehart, Jr., are trustees of the Chandler Trusts. Mr. Chandler and Mr. Goodan are also beneficiaries of these trusts. The Chandler Trusts were the principal shareholders of The Times Mirror Company prior to the merger of Times Mirror into the Company on June 12, 2000. In connection with the merger, the Chandler Trusts exchanged their Times Mirror common stock for 36,304,135 shares of

97

Company Common Stock and the Company amended its by-laws to grant the Chandler Trusts the right to nominate three directors, one for each of the Board's three classes. As long as the Chandler Trusts have these rights, neither the Board nor any Board committee may nominate any person in opposition to the three Chandler Trust nominees. Jeffrey Chandler, Roger Goodan and William Stinehart, Jr. were the Chandler Trusts' initial nominees and became directors of the Company following the merger. Mr. Chandler and Mr. Goodan are cousins.

As described above in "Special Factors—Other Transaction Agreements—Registration Rights Agreements," the Chandler Trusts have agreed that they will tender into the Tender Offer all shares held by them at the expiration of the Tender Offer, and have also agreed to cause Messrs. Chandler, Goodman and Stinehart, each of whom are currently serving on the Board as a representative of the Chandler Trusts, to resign as directors of the Company, effective upon the purchase of shares of Company Stock in the Tender Offer or earlier in certain circumstances.

In 1997, the Chandler Trusts and Times Mirror entered into a transaction which, through the formation of TMCT, LLC ("TMCT"), enabled Times Mirror to retire for accounting purposes a substantial block of Times Mirror stock. Times Mirror and its affiliates contributed to TMCT real property used in Times Mirror's business operations and cash and the Chandler Trusts contributed Times Mirror stock. Times Mirror leased back the real property under long-term leases. Upon completion of the merger of Times Mirror into the Company, the Company assumed these leases and the Times Mirror stock held by the limited liability company was converted into Company Common Stock. In 2006, $20,300,792 of lease payments and $4,005,936 in dividends received on the Company Common Stock held by TMCT were allocated to the Chandler Trusts.

In 1999, the Chandler Trusts and Times Mirror formed TMCT II, LLC ("TMCT II") and entered into a similar transaction that again enabled Times Mirror to retire for accounting purposes a substantial block of stock. Times Mirror's contribution to TMCT II consisted of cash and securities. The Chandler Trusts again contributed Times Mirror stock that was converted into Company Common Stock upon completion of the merger of Times Mirror into the Company. In 2006, $7,440,746 in dividends received on the Company Common Stock held by TMCT II were allocated to the Chandler Trusts.

On September 21, 2006, the Company and the Chandler Trusts entered into agreements to restructure TMCT and TMCT II. Under the terms of the agreements, the Company received on September 22, 2006, a total of 38.9 million shares of Company Common Stock and all 1.1 million shares of the Company's preferred stock held collectively by TMCT and TMCT II. Following the distributions by TMCT and TMCT II, the Company's interests in each of TMCT and TMCT II were reduced to approximately five percent. The agreements also provided for certain put and call options, which are exercisable at fair market value beginning in September 2007, relating to the Company's remaining ownership interests in TMCT and TMCT II.

In addition, on September 22, 2006, the Company and TMCT amended the lease agreement for the eight properties the Company leases from TMCT. Under the terms of the amended lease, the Company was granted an accelerated option to acquire the eight properties during the month of January 2008 for $175 million. The Company was also granted an option to acquire the leased properties from February 8, 2008 to three months prior to the expiration of the amended lease at the higher of fair market value or $195 million. In addition, the amendment extended the properties' current fixed rental rate through August 7, 2021.

On October 20, 2006, the remaining 12.4 million shares of Company Common Stock held by TMCT and TMCT II were distributed to the Company and the Chandler Trusts in accordance with their respective ownership interests. The Company received 0.6 million shares and the Chandler Trusts received 11.8 million shares. Until October 20, 2007, the trustees of the Chandler Trusts have agreed to vote the 11.8 million shares in the same proportion as all other shares are voted on any matter

98

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

requiring a shareholder vote, including the proposals to be voted on at the 2007 annual meeting. Information pertaining to the Company's investments in TMCT and TMCT II is provided in Note 7 to the consolidated financial statements included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2006.

### Significant Events

*Credit Agreements.*  On June 19, 2006, the Company entered into a five-year credit agreement and a 364-day bridge credit agreement, both of which were amended and restated on June 27, 2006. The five-year credit agreement provides for a $1.5 billion unsecured term facility, of which $250 million was used to refinance the medium-term notes that matured on November 1, 2006, and a $750 million unsecured revolving facility. The 364-day bridge credit agreement provided for a $2.15 billion unsecured bridge facility.

The Company entered into these agreements to finance the Company's tender offer initiated on May 30, 2006; to repurchase shares of the Company Common Stock from the Foundations; to repurchase shares of the Company Common Stock pursuant to open market or privately negotiated transactions; to refinance certain indebtedness; and to pay fees and expenses incurred in connection with the repurchases. In addition, the revolving facility is available for working capital and general corporate purposes, including acquisitions.

In general, borrowings under the credit agreements bear interest at a rate equal to LIBOR plus a spread ranging from 0.35% to 1.25%. The applicable spread is determined on the basis of the Company's debt ratings by S&P and Moody's. The Company's debt ratings are also used in determining the annual facility fee, which may range from 0.07% to 0.25% of the aggregate unused commitments. In addition, the Company has agreed to pay customary fees to the lenders under the credit agreements.

As of December 31, 2006, the Company had outstanding borrowings of $1.5 billion and $1.3 billion under the term facility and the bridge facility, respectively, and the Company had no borrowings under the revolving facility. As of December 31, 2006, the applicable interest rate on both the term facility and the bridge facility was 6.2%.

The credit agreements contain certain restrictive covenants, including financial covenants that require the Company to maintain a maximum total leverage ratio and a minimum interest coverage ratio. At December 31, 2006, the Company was in compliance with the covenants.

*TMCT Transactions.*  As a result of the Company's acquisition of Times Mirror in 2000, the Company holds investment interests in TMCT and TMCT II. TMCT and TMCT II were formed in 1997 and 1999, respectively, as a result of transactions involving agreements between Times Mirror and its largest shareholders, the Chandler Trusts. Additional information pertaining to the Company's investments in TMCT and TMCT II is provided in Note 7 to the consolidated financial statements in Item 8 of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2006. See "Information About Tribune Company—Certain Relationships and Related Transactions—Chandler Trusts."

*Sales of WATL-TV, Atlanta, WCWN-TV, Albany and WLVI-TV, Boston.*  On June 5, 2006, the Company announced the sale of WATL-TV, Atlanta to Gannett Co., Inc. for $180 million. The sale closed on August 7, 2006. On June 19, 2006, the Company announced the sale of WCWN-TV, Albany to Freedom Communications, Inc. for $17 million. The sale closed on December 6, 2006. On September 14, 2006, the Company announced the sale of WLVI-TV, Boston, to Sunbeam Television Corp. for $113.7 million. The sale closed on December 19, 2006.

*Acquisition of Additional Equity in CareerBuilder, ShopLocal and Topix.*  In August 2006, the Company completed its acquisition of additional equity interests in each of CareerBuilder, LLC,

99

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

ShopLocal, LLC (formerly CrossMedia Services, Inc.) and Topix, LLC for an aggregate purchase price of $155 million. The negotiated equity purchases followed the exercise of call options by the Company and Gannett Co., Inc. on Knight-Ridder, Inc.'s equity ownership in the three online businesses after The McClatchy Company's announcement of its proposed acquisition of Knight-Ridder, Inc. As a result of this transaction, the Company and Gannett Co., Inc. each increased their respective ownership of CareerBuilder, LLC and ShopLocal, LLC to 42.5% with The McClatchy Company retaining a 15% interest in both entities. Additionally, each of the Company's and Gannett Co., Inc.'s interest in Topix, LLC increased to 31.9%. As a result of subsequent funding, the current ownership of Topix, LLC is approximately 33.7% for both the Company and Gannett Co., Inc., 11.9% for The McClatchy Company and 20.7% for management of Topix, LLC.

*Network Affiliations.*  On January 24, 2006, the Company announced that it had reached a 10-year agreement to affiliate 16 of its television stations which were at that time affiliated with the former WB Network (including those in New York, Los Angeles and Chicago) with a new broadcast network, the CW Network. The new network was launched in September 2006 by Warner Bros. Entertainment and CBS. The new network airs a portion of the programming previously carried on the WB Network and the UPN Network, as well as new programming. The WB Network has shut down. The Company did not incur any costs related to the shutdown of the WB Network.

In the second quarter of 2006, the Company announced that its other three former WB Network affiliates (Philadelphia, Atlanta and Seattle) would become affiliates of the new broadcast network, MyNetworkTV, which was launched in September 2006 by the FOX Television Stations Network Inc. and Twentieth Century Television. The new network airs primarily primetime dramas. The Company subsequently sold its Atlanta station in August 2006 and its Albany and Boston stations in December 2006.

### Recent Developments

On February 12, 2007, Tribune Publishing, a division of the Company, announced the sale of *Hoy* New York, its Spanish-language daily newspaper, to ImpreMedia, LLC. The sale, which is expected to close during the first quarter of 2007, does not include the *Hoy* publications in Los Angeles and Chicago. On March 6, 2007, Tribune Publishing announced the sale of its Southern Connecticut Newspapers, *The Advocate* (Stamford) and *Greenwich Time*, to Gannett Co., Inc., for $73 million.

### Where You Can Find More Information

We are subject to the informational filing requirements of the Exchange Act, and, accordingly, are obligated to file reports, statements and other information with the SEC relating to our business, financial condition and other matters. Information, as of particular dates, concerning directors and officers, their remuneration, options granted to them, the principal holders of our securities and any material interest of these persons in transactions with us is required to be disclosed in proxy statements distributed to our stockholders and filed with the SEC. We also have filed a Tender Offer Statement and Rule 13e-3 Transaction Statement under cover of Schedule TO with the SEC that includes additional information relating to the Tender Offer.

These reports, statements and other information can be inspected and copied at the public reference facilities maintained by the SEC at 100 F Street, N.E., Room 1580, Washington, DC 20549 and at the library of the NYSE at 20 Broad Street, New York, NY 10005. Copies of this material may also be obtained by mail, upon payment of the SEC's customary charges, from the Public Reference Section of the SEC at 100 F Street, N.E., Washington, DC 20549. The SEC also maintains a web site on the Internet at http://www.sec.gov that contains reports, proxy and information statements and other information regarding registrants that file electronically with the SEC.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522175

*Incorporation by Reference*

The rules of the SEC allow us to "incorporate by reference" information into this Offer to Purchase, which means that we can disclose important information to you by referring you to another document filed separately with the SEC. The Tender Offer incorporates by reference the documents listed below, including the financial statements and the notes related thereto contained in those documents that have been previously filed with the SEC. These documents contain important information about us.

| SEC Filing (File No. 1-8572) | Period or Date Filed |
|---|---|
| *Annual Report on Form 10-K* | *Fiscal Year Ended December 31, 2006, filed February 26, 2007* |
| *Current Reports on Form 8-K* | *February 16, 2007; April 5, 2007; April 24, 2007* |

Any statement contained in this Offer to Purchase or in a document incorporated herein by reference into this Offer to Purchase shall be deemed to be modified or superseded to the extent such statement is modified or superseded in any subsequently filed document. Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Offer to Purchase.

You can obtain any of the documents incorporated by reference in this Offer to Purchase from us or from the SEC's web site at the address described above. Documents incorporated by reference are available from us without charge, excluding any exhibits to those documents. You may request a copy of these filings at no cost, by writing or telephoning us at: Tribune Company, Attention: Corporate Relations Department, 435 North Michigan Avenue, Chicago, Illinois, Telephone: (800) 757-1694. Please be sure to include your complete name and address in your request. If you request any incorporated documents, we will mail them to you by first class mail, or another equally prompt means, within one business day after we receive your request. You can find additional information by visiting our website at: *http://www.tribune.com*. Information contained on our website is not part of, and is not incorporated into, this Tender Offer.

## Information About the ESOP

In connection with the Leveraged ESOP Transactions, the Board adopted the ESOP on April 1, 2007, effective as of January 1, 2007. The ESOP is intended to be a qualified employee benefit plan under Sections 401(a), 409 and 4975 of the Code, and the ESOP Trust is intended to be tax-exempt under Section 501(a) of the Code. The Trustee of the ESOP is GreatBanc Trust Company, 1301 West 22nd Street, Suite 702, Oak Brook, Illinois 60523; telephone (530) 572-5121 or (630) 572-5120. See "Other Transaction Agreements—ESOP Plan Documents."

## Interest of Directors and Executive Officers; Transactions and Arrangements Concerning the Shares

See "Special Factors—Interest of Directors and Executive Officers" for a description of certain benefits and other interests arising out of the Leveraged ESOP Transactions.

As of April 1, 2007, there were 240,573,299 shares of Company Common Stock issued and outstanding, excluding 60,671,319 shares of Company Common Stock held by our subsidiaries and affiliates, 8,928,571 shares of Company Common Stock held by the ESOP. The maximum number of shares we are offering to purchase in the Tender Offer, 126,000,000 shares, represents approximately 52% of the total number of issued and outstanding shares as of April 1, 2007.

As of April 1, 2007, our directors and executive officers as a group (20 persons) beneficially owned an aggregate of approximately 6,891,911 shares, representing approximately 2.8% of the total number of outstanding shares. To the best of the Company's knowledge, all of the Company's directors and

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522176

executive officers intend to tender into the Tender Offer all shares owned of record, other than certain shares subject to options and certain unvested restricted shares.

As of April 1, 2007, the aggregate number and percentage of shares of Company Common Stock that were beneficially owned by our current directors, current executive officers and each person who owns (to our knowledge) 5% or more of our outstanding shares were as appears in the second and third columns of the table below.

Unless otherwise indicated, the address of each person listed is c/o Tribune Company, 435 North Michigan Avenue, Chicago, Illinois 60611.

| Name of Beneficial Owner | Prior to the Tender Offer | | After the Tender Offer |
|---|---|---|---|
| | Amount and Nature of Beneficial Ownership(1)(2) | Percentage of Shares | Percentage of Shares(3) |
| **5% Stockholders:** | | | |
| The Chandler Trusts(4) ........................ 350 West Colorado Boulevard, Suite 230 Pasadena, CA 91105 | 48,753,788 | 20.25% | 20.14% |
| Robert R. McCormick Tribune Foundation Cantigny Foundation(5) ...................... 435 North Michigan Avenue, Room 770 Chicago, IL 60611 | 31,282,788 | 13.00% | 12.94% |
| T. Rowe Price Associates, Inc.(6) ................. 100 E. Pratt Street Baltimore, MD 21202 | 17,655,120 | 7.34% | 7.30% |
| Ariel Capital Management, LLC(7) ............... 200 E. Randolph Drive, Suite 2900 Chicago, IL 60601 | 15,337,568 | 6.38% | 6.34% |
| **Directors and Executive Officers:** | | | |
| Jeffrey Chandler(8) | | | |
| Amount of shares .......................... | 11,187 | | |
| Options exercisable within 60 days ............... | 19,200 | | |
| Total ................................... | 30,387 | * | * |
| Dennis J. FitzSimons(9)(10) | | | |
| Amount of shares .......................... | 498,299 | | |
| Options exercisable within 60 days ............... | 1,561,556 | | |
| Total ................................... | 2,059,855 | * | * |
| Roger Goodan(8) | | | |
| Amount of shares .......................... | 17,246 | | |
| Options exercisable within 60 days ............... | 45,200 | | |
| Total ................................... | 62,446 | * | * |
| Donald C. Grenesko | | | |
| Amount of shares .......................... | 242,188 | | |
| Options exercisable within 60 days ............... | 630,956 | | |
| Total ................................... | 873,144 | * | * |
| Enrique Hernandez, Jr. | | | |
| Amount of shares .......................... | 11,330 | | |
| Options exercisable within 60 days ............... | 15,200 | | |
| Total ................................... | 26,530 | * | * |

102

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522177

| | Prior to the Tender Offer | | After the Tender Offer |
| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership(1)(2) | Percentage of Shares | Percentage of Shares(3) |
|---|---|---|---|
| **Betsy D. Holden** | | | |
| Amount of shares | 8,661 | | |
| Options exercisable within 60 days | 7,200 | | |
| Total | 15,861 | * | * |
| **Crane H. Kenney** | | | |
| Amount of shares | 51,669 | | |
| Options exercisable within 60 days | 485,063 | | |
| Total | 536,732 | * | * |
| **Timothy J. Landon** | | | |
| Amount of shares | 45,982 | | |
| Options exercisable within 60 days | 367,015 | | |
| Total | 412,997 | * | * |
| **Thomas D. Leach(10)** | | | |
| Amount of shares | 50,741 | | |
| Options exercisable within 60 days | 242,408 | | |
| Total | 293,149 | * | * |
| **Luis E. Lewin** | | | |
| Amount of shares | 22,710 | | |
| Options exercisable within 60 days | 392,310 | | |
| Total | 415,020 | * | * |
| **R. Mark Mallory** | | | |
| Amount of shares | 108,234 | | |
| Options exercisable within 60 days | 213,745 | | |
| Total | 321,979 | * | * |
| **Robert S. Morrison** | | | |
| Amount of shares | 13,148 | | |
| Options exercisable within 60 days | 11,200 | | |
| Total | 24,348 | * | * |
| **Ruthellyn Musil** | | | |
| Amount of shares | 65,391 | | |
| Options exercisable within 60 days | 349,379 | | |
| Total | 414,770 | * | * |
| **William A. Osborn** | | | |
| Amount of shares | 11,959 | | |
| Options exercisable within 60 days | 11,200 | | |
| Total | 23,159 | * | * |
| **John E. Reardon(10)** | | | |
| Amount of shares | 63,782 | | |
| Options exercisable within 60 days | 323,487 | | |
| Total | 387,269 | * | * |
| **J. Christopher Reyes** | | | |
| Amount of shares | 14,969 | | |
| Options exercisable within 60 days | 0 | | |
| Total | 14,969 | * | * |
| **Scott C. Smith(9)(10)** | | | |
| Amount of shares | 225,273 | | |
| Options exercisable within 60 days | 577,394 | | |
| Total | 802,667 | * | * |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522178

| Name of Beneficial Owner | Prior to the Tender Offer | | After the Tender Offer |
|---|---|---|---|
| | Amount and Nature of Beneficial Ownership(1)(2) | Percentage of Shares | Percentage of Shares(3) |
| William Stinehart, Jr.(8)(10) | | | |
| Amount of shares | 12,650 | | |
| Options exercisable within 60 days | 31,700 | | |
| Total | 44,350 | * | * |
| Dudley S. Taft(11) | | | |
| Amount of shares | 94,660 | | |
| Options exercisable within 60 days | 31,200 | | |
| Total | 125,860 | * | * |
| Miles D. White | | | |
| Amount of shares | 6,419 | | |
| Options exercisable within 60 days | 0 | | |
| Total | 6,419 | * | * |

\*    Less than 1% of the issued and outstanding Company Common Stock.

(1) "Beneficial ownership" generally means any person who, directly or indirectly, has or shares voting or investment power with respect to a security or has the right to acquire such power within 60 days.

(2) Includes shares of Company Common Stock beneficially owned by executive officers under the Tribune Company 401(k) Savings and Profit Sharing Plan. The executive officers have the right to direct the voting of shares allocated to their accounts. Totals for Ms. Musil and Messrs. FitzSimons, Grenesko, Lewin, Mallory and Smith do not include unvested restricted stock units held by them; however, each such individual has reached the minimum retirement age and the required years of service and, therefore, the restrictions on the unvested restricted stock units held by them lapse upon the executive's retirement. Ms. Musil holds 28,667 unvested restricted stock units and Messrs. FitzSimons, Grenesko, Lewin, Mallory and Smith hold 175,000, 71,417, 33,334, 21,934 and 70,000 unvested restricted stock units, respectively.

(3) Reflects the issuance of 1,470,588 shares of Company Common Stock to the Zell Entity following the consummation of the Step One Purchase Transaction and assumes all issued and outstanding shares of Company Common Stock, other than shares owned by the Zell Entity or the ESOP, will be tendered in the Tender Offer resulting in each of the 5% beneficial holders listed above being limited to selling approximately 52% of the shares of Company Common Stock that it presently holds.

(4) The trustees of Chandler Trust No. 1 share voting and investment power with respect to 22,881,590 shares and the trustees of Chandler Trust No. 2 share voting and investment power with respect to 25,244,751 shares. In addition, certain trustees beneficially own shares of Company Common Stock, as follows: Jeffrey Chandler, 30,387 shares (including 19,200 options exercisable within 60 days of April 1, 2007); Camilla Chandler Frost, 427,662 shares; Roger Goodan, 62,446 shares (including 45,200 options exercisable within 60 days of April 1, 2007); William Stinehart, Jr., 44,350 shares (including 31,700 options exercisable within 60 days of April 1, 2007); and Warren B. Williamson, 62,602 shares (including 25,102 options exercisable within 60 days of April 1, 2007).

(5) The Robert R. McCormick Tribune Foundation ("McCormick") owns 28,023,788 shares and the Cantigny Foundation ("Cantigny") owns 3,259,000 shares. The investment and voting power of each of the Robert R. McCormick Tribune Foundation and the Cantigny Foundation is vested in a

104

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522179

board of five directors, consisting of Dennis J. FitzSimons, David D. Hiller, Scott C. Smith and two former Company officers. Mr. Hiller is the Publisher of the *Los Angeles Times*.

(6) Based upon information contained in a Schedule 13G filed with the Securities and Exchange Commission on February 14, 2007. According to information provided by T. Rowe Price Associates, Inc., these securities are owned by various individual and institutional investors for which T. Rowe Price Associates, Inc. serves as investment adviser with power to direct investments and/or sole power to vote the securities. T. Rowe Price Associates, Inc. has sole voting control over 3,632,545 of the shares and has sole dispositive power over all the shares. For purposes of the reporting requirements of the Securities Exchange Act of 1934, T. Rowe Price Associates, Inc. is deemed to be a beneficial owner of such securities; however, T. Rowe Price Associates, Inc. expressly disclaims that it is, in fact, the beneficial owner of such securities.

(7) Based upon information contained in a Schedule 13G filed with the Securities and Exchange Commission on February 14, 2007. According to the Schedule 13G, the shares are owned by investment advisory clients of Ariel Capital Management, LLC and include 13,688,638 shares over which Ariel Capital Management, LLC has the sole voting control and 15,252,628 shares over which Ariel Capital Management, LLC has sole dispositive power.

(8) Does not include 22,881,590 shares owned by Chandler Trust No. 1 and 25,244,751 shares owned by Chandler Trust No. 2 (see (4) above).

(9) Does not include 28,023,788 shares owned by the Robert R. McCormick Tribune Foundation and 3,259,000 shares owned by the Cantigny Foundation (see (5) above).

(10) Includes shares held by family members or in family trusts, as follows: Mr. FitzSimons, 7,299 shares; Mr. Leach, 222 shares; Mr. Reardon, 177 shares; Mr. Smith, 800 shares; and Mr. Stinehart, 7,002 shares.

(11) Includes 71,209 shares held by Taft Broadcasting Company. Mr. Taft is the sole shareholder of Taft Broadcasting Company.

*Other Agreements Involving the Company's Securities.*   Except as otherwise described herein and for the outstanding stock options, stock awards and other restricted equity interests granted to our directors, executive officers and other employees pursuant to the Company's various equity benefits plans, which are described in Note 16 to the financial statements contained in our Annual Report on Form 10-K for the year ended December 31, 2006, which descriptions are incorporated herein by reference, neither the Company nor any affiliate nor, to the Company's knowledge, any of the Company's executive officers or directors, nor associate of the foregoing persons, is a party to any agreement, arrangement, understanding or relationship with the Company or any other person relating, directly or indirectly, to any of the Company's securities. For more information regarding the terms of our equity incentive plans and certain other agreements, we refer you to the entire text of the documents filed as Exhibits (d)(20) through (d)(37) to the Schedule TO filed by the Company on April 25, 2007, as the same may be amended from time to time, which are incorporated herein by reference.

*Recent Securities Transactions*

Based on our records and on information provided to us by our directors, executive officers, affiliates, and subsidiaries, neither we nor any of our affiliates, subsidiaries, directors, or executive officers have effected any transactions involving shares of our Company Common Stock during the 60 days prior to April 20, 2007, except that on April 17, 2007, Dudley S. Taft acquired 4,000 shares of Company Common Stock upon the exercise of a stock option that was scheduled to expire on May 6, 2007.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522180

**Effects of the Tender Offer on the Market for Shares; Registration under the Exchange Act**

The purchase by us of shares in the Tender Offer will reduce the number of shares that might otherwise be traded publicly and may reduce the number of stockholders. As a result, the trading of the shares after consummation of the Tender Offer may have a greater impact on trading prices than would be the case prior to consummation of the Tender Offer.

We believe that there will be a sufficient number of shares outstanding and publicly traded following completion of the Tender Offer to ensure a continued trading market for the shares. Based upon published guidelines of the NYSE, we do not believe that our purchase of shares in the Tender Offer will cause the remaining outstanding shares to be delisted from the NYSE.

Shares are currently "margin securities" under the rules of the Federal Reserve Board. This has the effect, among other things, of allowing brokers to extend credit to their customers using such shares as collateral. We believe that, following the purchase of shares in the Tender Offer, the shares will continue to be "margin securities" for purposes of the Federal Reserve Board's margin rules and regulations.

The shares are registered under the Exchange Act, which requires, among other things, that we furnish certain information to our stockholders and the SEC and comply with the SEC's proxy rules in connection with meetings of our stockholders. We believe that our purchase of shares in the Tender Offer pursuant to the terms of the Tender Offer will not result in the shares becoming eligible for deregistration under the Exchange Act.

**Legal Matters; Regulatory Approvals**

*Legal Matters.*   On September 19, 2006, a Company stockholder filed a complaint in the Northern District of Illinois against the Company's directors, with the exception of Messrs. Chandler, Goodan and Stinehart, and the Company as a nominal defendant, alleging direct and derivative claims on behalf of a purported class of Company stockholders for breach of fiduciary duty in connection with the Company's May 2006 share repurchase program and the manner in which the Board was handling its exploration of strategic alternatives. After the judge in that case issued a memorandum questioning whether plaintiff had satisfied the requirements for diversity jurisdiction in order to maintain the case in federal court, plaintiff moved to dismiss the case voluntarily without prejudice. The district court dismissed the case on September 27, 2006.

Approximately seven weeks later, on November 17, 2006, the same plaintiff filed a complaint captioned *Garamella v. FitzSimons, et al.*, No. BC362110, in the Superior Court of California, Los Angeles County, alleging substantially identical direct and derivative claims on behalf of a purported class of Company stockholders against all Company directors, including Messrs. Chandler, Goodan and Stinehart, and the Company as a nominal defendant. After the Company announced the Leveraged ESOP Transactions on April 2, 2007, and before any responsive pleading was due, plaintiff amended the California complaint to include claims alleging that the Company's directors breached their fiduciary duties to stockholders in connection with the negotiation of the Leveraged ESOP Transactions and execution of the related documents. Specifically, plaintiff claims that the directors' desire to entrench themselves on the Company's Board caused them to breach their fiduciary duties by undertaking the May 2006 share repurchase program which caused the Company to take on additional debt and, according to plaintiff, become less attractive to potential bidders. Plaintiff further alleges that the directors' entrenchment motives caused them to breach their fiduciary duties by rejecting certain strategic alternatives for the Company, such as a sale of individual Company assets or a tax-free spin-off, and by keeping in place certain of the Company's corporate governance mechanisms such as the shareholder rights plan and the staggered structure of the Board. With respect to the Merger Agreement, plaintiff claims that the directors breached their fiduciary duties by setting a bid deadline of March 31, 2007 and thereby "cutting short" the bidding process, by structuring the transaction to include an up-front tender offer which plaintiff characterizes as "coercive," and by structuring the

106

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0522181

transaction so that "insider shareholders" such as the Chandler Trusts and McCormick Tribune Foundation obtain additional unique benefits from the transaction that are not available to other stockholders. Among other things, the California complaint seeks to enjoin the impending Tender Offer and the consummation of the Merger. Defendants filed motions to dismiss the California complaint on April 20, 2007, and those motions currently are pending before the court. As of this date, plaintiff has not filed a motion for preliminary injunction and the court has not set any schedule for preliminary injunction proceedings. The foregoing description does not purport to be complete and is qualified in its entirety by reference to Exhibit (a)(5)(A), which is incorporated herein by reference.

On April 5, 2007, a Company stockholder filed a complaint captioned *Simpson v. Tribune Co., et al.*, No. 07CH9519, in the Chancery Division of the Circuit Court of Cook County, Illinois, against the Company and each of the Company's directors. The *Simpson* complaint alleges that the Company's directors breached their fiduciary duties in negotiating and executing the Merger Agreement which unfairly favors the Company's management and major insider stockholders at the expense of the Company's public stockholders. The foregoing description does not purport to be complete and is qualified in its entirety by reference to Exhibit (a)(5)(B), which is incorporated herein by reference.

These actions will be defended vigorously.

The Company received a letter dated April 9, 2007, (1) stating that it was written on behalf of two hedge funds purporting to hold approximately 37% of the Company's 8,000,000 PHONES[SM] Exchangeable Subordinated Debentures due 2029 (the "PHONES"), (2) purporting to give a "notice of default" that the Company has violated the "maintenance of properties" covenant in the indenture under which the PHONES were issued (the "PHONES Indenture") and (3) informing the Company that failure to remedy such purported violation within 60 days of notice will result in an "event of default" under the PHONES Indenture (which could, if properly declared, result in an acceleration of principal and interest payable with respect to the PHONES).

The particular covenant in question, Section 10.05 of the PHONES Indenture, requires the Company to "cause all properties used or useful in the conduct of its business or the business of any Subsidiary to be maintained and kept in good condition, repair and working order (normal wear and tear excepted) and supplied with all necessary equipment . . . all as in the judgment of the Company may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times . . . ." Section 10.05 of the PHONES Indenture expressly provides that the covenant does not "prevent the Company from discontinuing the operation and maintenance of any such properties, or disposing of any of them, if such discontinuance or disposal is, in the judgment of the Company or of the Subsidiary concerned, desirable in the conduct of its business or the business of any Subsidiary and not disadvantageous in any material respect to the Holders [of the PHONES]." The letter suggests that the Company's recent sales of three television stations, announced intention to sell the Chicago Cubs baseball team and recent and proposed issuances of debt and return of capital to stockholders violated or will violate this maintenance of properties covenant.

The Company believes that the hedge funds' claims are without merit and that the Company remains in full compliance with Section 10.05 of the PHONES Indenture. The Company will enforce and defend vigorously its rights under the PHONES Indenture.

*Regulatory Approvals.* We are not aware of any license or regulatory permit that is material to our business that might be adversely affected by our acquisition of shares as contemplated by the Tender Offer or of any approval or other action by any government or governmental, administrative or regulatory authority or agency, domestic, foreign or supranational, that would be required for the acquisition or ownership of shares by us as contemplated by the Tender Offer that is material to the success of the Tender Offer. Should any such approval or other action be required, we presently contemplate that we will seek that approval or other action where practicable within the time period

107

contemplated by the Tender Offer. We are unable to predict whether we will be required to delay the acceptance for payment of or payment for shares tendered in the Tender Offer pending the outcome of any such matter. There can be no assurance that any such approval or other action, if needed, would be obtained, or would be obtained without substantial cost or conditions, or that the failure to obtain the approval or other action might not result in adverse consequences to its business and financial condition. Our obligations in the Tender Offer to accept for payment and pay for shares is subject to conditions. See "The Tender Offer—Conditions of the Tender Offer."

In connection with the Leveraged ESOP Transactions, the parties to the Merger Agreement and the Zell Entity Purchase Agreement will be required to file applications with the FCC for consent to the transfer of control of the Company from its public shareholders to the ESOP, the Zell Entity and Zell. The parties will also request that the FCC waive its rule prohibiting the common ownership of daily English language newspapers and broadcast stations (the "cross-ownership rule") in the five markets where the Company owns such combinations. The applications will also require that the FCC address the Company's pending license renewal applications. The FCC can address the pending license renewal applications by taking action on the renewal applications themselves in connection with the transfer application or, alternatively by accepting the transferee's willingness to be bound by the FCC's subsequent action on the pending license renewal applications following the completion of the current FCC rulemaking process. The parties will also request a "failing station waiver" to permit the continued common ownership of the Company's two television stations in Hartford, Connecticut, as well as a "satellite waiver" to permit the continued common ownership and operation of WTTK, Kokomo, Indiana, as a satellite station of WTTV, Indianapolis, Indiana.

The Company is currently permitted to own its five cross-ownerships as follows:

- In New York, the Company acquired *Newsday* after the grant of its last renewal application for WPIX(TV), and is permitted to own both until the FCC acts on the next renewal application for WPIX(TV), which is currently pending, under the FCC's applicable policy, known as the "note 25 exception."

- In Chicago, the Company's common ownership of WGN-TV, WGN(AM), and the *Chicago Tribune* was grandfathered when the FCC adopted its cross-ownership rule in 1975.

- In Los Angeles, the Company owns both the *Los Angeles Times* and KTLA under the note 25 exception. An application for renewal of KTLA's license is pending before the FCC.

- In Miami-Ft. Lauderdale, in 1998 the Company was granted a waiver to permit it to own WSFL-TV and the *South Florida Sun-Sentinel* until six months after the FCC completes its still-pending rulemaking proceeding addressing the cross-ownership rule.

- In Hartford, the Company was granted a permanent waiver of the rules to permit it to own both WTIC-TV and WTXX(TV) because it had shown WTXX to be a "failing station." The Company is permitted to own both WTIC and the Hartford Courant under the note 25 exception, and it is permitted to own both WTXX and the Hartford Courant under a waiver permitting such common ownership until after the FCC acts on WTXX's currently pending renewal application.

The Company has filed renewal applications for all twenty-four of its television stations and for WGN(AM) during the recently concluded renewal cycle. Renewal applications have been granted for WGN(AM), for WSFL-TV, Miami, Florida, and for five other television stations. The renewal applications for the other eighteen television stations remain pending before the FCC. The pending renewal applications for the New York, Los Angeles and Hartford stations each contain a request for permanent waiver of the cross-ownership rule or, in the alternative, a waiver pending the outcome of the rulemaking. Those requests were opposed in Los Angeles and Hartford. The date for oppositions in New York is May 1, 2007.

108

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522183

None of the cross-ownership waivers can be transferred under a transfer of control application. New waivers will be required in each of the five markets, including Chicago, which was otherwise grandfathered. Because there is a rulemaking proceeding pending in which, on remand from the United States Court of Appeals for the Third Circuit, the FCC is reviewing its ownership rules, including the cross-ownership rule, and because in that proceeding the FCC has previously adopted a rule which would have permitted each of the cross-ownerships, the parties will request waivers of the cross-ownership rule pending the outcome of that rulemaking proceeding. In connection with this pending rulemaking, we anticipate that certain parties may file petitions to deny or other objections with the FCC which will oppose the grant of cross-ownership waivers to us in connection with our transfer of control application. The FCC may also grant a cross-ownership waiver that could require us to come into compliance with the cross-ownership rule within a specified time period, which might require us to divest either our newspaper or broadcast assets in one or more of the five cross-ownership markets.

The FCC also generally will not act on a transfer of control application for a broadcast station when a license renewal application is pending for such station. While the FCC could accelerate the processing of the pending renewal applications and act upon them at the same time it acts on the transfer of control applications, in the event that it does not elect to do so, there is a possibility that these renewal applications could remain pending until after the FCC completes its current rulemaking process.

The "failing station waiver" permitting the common ownership of the two television stations in Hartford does not transfer. In order to obtain a new "failing station waiver," the parties will be required to show that WTXX is in financial distress, that it has poor viewership ratings, that it cannot be sold to an out of market buyer, and that the grant of the waiver would be in the public interest. The "satellite waiver" in the Indianapolis market, permitting the common ownership of WTTK and WTTV, similarly cannot be transferred but must be requested again by the parties. The Company has previously made the necessary showing to obtain the "satellite waiver" when it acquired these stations and currently believes that the parties will be able to make the necessary showing to obtain a new "satellite waiver."

Neither the Tender Offer nor the Merger is subject to the filing and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

## United States Federal Income Tax Consequences

*Circular 230.* Any discussions of United States federal tax matters set forth in this Offer to Purchase and in the related Letter of Transmittal were written in connection with the promotion and marketing by the Company and the Co-Dealer Managers of the Tender Offer. Such discussions were not intended or written to be legal or tax advice to any person and were not intended or written to be used, and they cannot be used, by any person for the purpose of avoiding any United States federal tax penalties that may be imposed on such person. Each holder should seek advice based on its particular circumstances from an independent tax advisor.

*Discussion.* The following describes material United States federal income tax consequences relevant to the Tender Offer for U.S. Holders (as defined below). This discussion is based upon the Internal Revenue Code of 1986, as amended (the "Code"), existing and proposed Treasury Regulations, administrative pronouncements and judicial decisions, changes to which could materially affect the tax consequences described herein and could be made on a retroactive basis.

This discussion deals only with shares held as capital assets and does not deal with all tax consequences that may be relevant to all categories of holders (such as dealers in securities or commodities, traders in securities that elect to mark their holdings to market, financial institutions, regulated investment companies, real estate investment trusts, holders whose functional currency is not

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0522184

the United States dollar, insurance companies, tax-exempt organizations or persons who hold shares as part of a hedging, integrated, conversion or constructive sale transaction or as a position in a straddle). In particular, different rules may apply to shares acquired as compensation (including shares acquired upon the exercise of employee stock options or otherwise as compensation). This discussion does not address the state, local or foreign tax consequences of participating in the Tender Offer. Holders of shares should consult their tax advisors as to the particular consequences to them of participation in the Tender Offer.

As used herein, a "U.S. Holder" means a beneficial holder of shares that is for United States federal income tax purposes: (a) an individual citizen or resident of the United States, (b) a corporation or a partnership created or organized in or under the laws of the United States, any state thereof or the District of Columbia, (c) an estate the income of which is subject to United States federal income taxation regardless of its source, or (d) a trust if a court within the United States can exercise primary supervision of the trust's administration and one or more United States persons have the authority to control all substantial decisions of the trust.

Holders of shares that are not U.S. Holders ("foreign stockholders") should consult their tax advisors regarding the United States federal income tax consequences and any applicable foreign tax consequences of the Tender Offer and also should see "The Tender Offer—Procedures for Tendering Shares" for a discussion of the applicable United States withholding rules and the potential for obtaining a refund of all or a portion of any tax withheld.

If a partnership holds shares, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. Holders that are partners of a partnership holding shares should consult their own tax advisors.

*Non-Participation in the Tender Offer.*   U.S. Holders that do not participate in the Tender Offer will not incur any tax liability as a result of the consummation of the Tender Offer.

*Exchange of Shares Pursuant to the Tender Offer.*   An exchange of shares for cash pursuant to the Tender Offer will be a taxable transaction for United States federal income tax purposes. A U.S. Holder that participates in the Tender Offer will be treated, depending on such U.S. Holder's particular circumstances, either as recognizing gain or loss from the disposition of the shares or as receiving a dividend distribution from us.

Under Section 302 of the Code, a U.S. Holder will recognize gain or loss on an exchange of shares for cash if the exchange (a) results in a "complete termination" of all such U.S. Holder's equity interest in us, (b) results in a "substantially disproportionate" redemption with respect to such U.S. Holder, or (c) is "not essentially equivalent to a dividend" with respect to the U.S. Holder. In applying the Section 302 tests, a U.S. Holder must take into account stock that such U.S. Holder constructively owns under attribution rules, pursuant to which the U.S. Holder will be treated as owning our shares owned by certain family members (except that in the case of a "complete termination," a U.S. Holder may waive, under certain circumstances, attribution from family members) and related entities and our stock that the U.S. Holder has the right to acquire by exercise of an option. An exchange of shares for cash will be a substantially disproportionate redemption with respect to a U.S. Holder if the percentage of the then-outstanding shares owned by such U.S. Holder in us immediately after the exchange is less than 80% of the percentage of the shares owned by such U.S. Holder in us immediately before the exchange. If an exchange of shares for cash fails to satisfy the "substantially disproportionate" test, the U.S. Holder nonetheless may satisfy the "not essentially equivalent to a dividend" test. An exchange of shares for cash will satisfy the "not essentially equivalent to a dividend" test if it results in a "meaningful reduction" of the U.S. Holder's equity interest in us. An exchange of shares for cash that results in a reduction of the proportionate equity interest in us of a U.S. Holder whose relative equity interest in us is minimal (an interest of less than 1% should satisfy this requirement) and that does not exercise any control over or participate in the management of our corporate affairs should be treated

110

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0522185

as "not essentially equivalent to a dividend." U.S. Holders should consult their tax advisors regarding the application of the rules of Section 302 in their particular circumstances.

If a U.S. Holder is treated as recognizing gain or loss from the disposition of the shares for cash, such gain or loss will be equal to the difference between the amount of cash received and such U.S. Holder's adjusted tax basis in the shares exchanged therefor. Any such gain or loss will be capital gain or loss and will be long-term capital gain or loss if the holding period of the shares exceeds one year as of the date of the exchange.

If a U.S. Holder is not treated under the Section 302 tests as recognizing gain or loss on an exchange of shares for cash, the entire amount of cash received by such U.S. Holder pursuant to the exchange will be treated as a dividend to the extent of the portion of our current and accumulated earnings and profits allocable to such shares. Provided certain holding period requirements are satisfied, non-corporate holders generally will be subject to United States federal income tax at a maximum rate of 15% on amounts treated as dividends, i.e., the entire amount of cash received without reduction for the tax basis of the shares exchanged. To the extent that cash received in exchange for shares is treated as a dividend to a corporate U.S. Holder, (1) it will be eligible for a dividends-received deduction (subject to applicable limitations) and (2) it will be subject to the "extraordinary dividend" provisions of the Code. Corporate U.S. Holders should consult their tax advisors concerning the availability of the dividends-received deduction and the application of the "extraordinary dividend" provisions of the Code in their particular circumstances.

To the extent that amounts received pursuant to the Tender Offer exceed a U.S. Holder's allocable share of our current and accumulated earnings and profits, the distribution will first be treated as a non-taxable return of capital, causing a reduction in the adjusted tax basis of such U.S. Holder's shares, and any amounts in excess of the U.S. Holder's adjusted tax basis will constitute capital gain. Any remaining adjusted tax basis in the shares tendered will be transferred to any remaining shares held by such U.S. Holder.

We cannot predict whether or the extent to which the Tender Offer will be oversubscribed. If the Tender Offer is oversubscribed, proration of tenders pursuant to the Tender Offer will cause us to accept fewer shares than are tendered. Therefore, a U.S. Holder can be given no assurance that a sufficient number of such U.S. Holder's shares will be purchased pursuant to the Tender Offer to ensure that such purchase will be treated as a sale or exchange, rather than as a dividend, for United States federal income tax purposes pursuant to the rules discussed above.

See "The Tender Offer—Procedures for Tendering Shares" with respect to the application of United States federal income tax withholding and backup withholding.

## Extension of the Tender Offer; Termination; Amendment

We expressly reserve the right, in our sole discretion, at any time and from time to time, and regardless of whether or not any of the events set forth in "The Tender Offer—Conditions of the Tender Offer" shall have occurred or shall be deemed by us to have occurred, to extend the period of time during which the Tender Offer is open and thereby delay acceptance for payment of, and payment for, any shares by giving oral or written notice of such extension to the Depositary and making a public announcement of such extension. We also expressly reserve the right, in our sole discretion, if any event set forth in "The Tender Offer—Conditions of the Tender Offer" has not occurred or has occurred or is deemed by us to have occurred, to terminate the Tender Offer and reject for payment and not pay for any shares not theretofore accepted for payment or paid for or, subject to applicable law, to postpone payment for shares by giving oral or written notice of such termination or postponement to the Depositary and making a public announcement of such termination or postponement. Our reservation of the right to delay payment for shares which we have accepted for payment is limited by Rule 13e-4(f)(5) promulgated under the Exchange Act, which requires that we must pay the consideration offered or return the shares tendered promptly after termination or withdrawal of a

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522186

tender offer. Subject to compliance with applicable law, we further reserve the right, in our sole discretion, and regardless of whether any of the events set forth in "The Tender Offer—Conditions of the Tender Offer" shall have occurred or shall be deemed by us to have occurred, to amend the Tender Offer in any respect, including, without limitation, by decreasing or increasing the consideration offered in the Tender Offer to holders of shares or by decreasing or increasing the number of shares being sought in the Tender Offer. Amendments to the Tender Offer may be made at any time and from time to time effected by public announcement, such announcement, in the case of an extension, to be issued no later than 9:00 a.m., New York City time, on the next business day after the last previously scheduled or announced Expiration Time. Any public announcement made in the Tender Offer will be disseminated promptly to stockholders in a manner reasonably designed to inform stockholders of such change. Without limiting the manner in which we may choose to make a public announcement, except as required by applicable law, we shall have no obligation to publish, advertise or otherwise communicate any such public announcement other than by making a release through PR Newswire or another comparable service. In addition, we would file such press release as an exhibit to the Schedule TO.

If we materially change the terms of the Tender Offer or the information concerning the Tender Offer, we will extend the Tender Offer to the extent required by Rules 13e-4(d)(2), 13e-4(e)(3) and 13e-4(f)(1) promulgated under the Exchange Act. These rules and certain related releases and interpretations of the Commission provide that the minimum period during which a tender offer must remain open following material changes in the terms of the Tender Offer or information concerning the Tender Offer (other than a change in price or a change in percentage of securities sought) will depend on the facts and circumstances, including the relative materiality of such terms or information; however, in no event will the Tender Offer remain open for fewer than five business days following such a material change in the terms of, or information concerning, the Tender Offer. If (1)(A) we increase or decrease the price to be paid for shares, (B) decrease the number of shares being sought in the Tender Offer, or (C) increase the number of shares being sought in the Tender Offer by more than 2% of our outstanding shares (or six million shares) and (2) the Tender Offer is scheduled to expire at any time earlier than the expiration of a period ending on the tenth business day from, and including, the date that such notice of an increase or decrease is first published, sent or given to stockholders in the manner specified in this "The Tender Offer—Extension of the Tender Offer; Termination; Amendment," the Tender Offer will be extended until the expiration of such period of ten business days.

### Fees and Expenses

As set forth under "Special Factors—Background of the Transactions," the Company retained Merrill Lynch and Citi to act as the Company's co-financial advisors and the Special Committee retained Morgan Stanley to act as its financial advisor. In addition, affiliates of Merrill Lynch and Citi will provide a portion of the financing for the Tender Offer and the Merger, subject to specified conditions. The fees payable to Morgan Stanley for its advisory services and to Merrill Lynch for its advisory and financing services are described under "Special Factors—Opinion of the Special Committee's Financial Advisor" and "Special Factors—Opinion of the Company's Financial Advisor," respectively. Total advisory and financing fees payable to Citi (before syndication costs, capital allocation costs and financing credits) aggregate approximately $68.9 million, of which approximately $35.8 million are contingent on the Merger closing and approximately $33.1 million relate to financing the Tender Offer.

We have retained Merrill Lynch, Citi, JPMorgan and BAS to act as the Co-Dealer Managers in connection with the Tender Offer. The Co-Dealer Managers may contact brokers, dealers and similar entities and may provide information regarding the Tender Offer to those that it contacts or persons that contact it. The Co-Dealer Managers will receive reasonable and customary compensation. We also have agreed to reimburse the Co-Dealer Managers for reasonable out-of-pocket expenses incurred in

112

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

connection with the Tender Offer, including reasonable fees and expenses of counsel, and to indemnify the Co-Dealer Managers against certain liabilities in connection with the Tender Offer, including certain liabilities under the federal securities laws.

The Co-Dealer Managers and their affiliates have provided, and may in the future provide, various investment banking and other services to us for which future services we would expect they would receive customary compensation from us. In the ordinary course of business, including in their trading and brokerage operations and in a fiduciary capacity, the Co-Dealer Managers and their affiliates may hold positions, both long and short, for their own accounts and for those of their customers, in our securities.

Merrill Lynch & Co., Citigroup Global Markets Inc., J.P. Morgan Securities Inc. and Banc of America Securities LLC and their affiliates have undertaken to provide financing for the Tender Offer subject to the terms and conditions of the Credit Facilities Commitment Letter described in "The Tender Offer—Source and Amount of Funds" hereof, and will receive customary fees in connection therewith.

We have retained Innisfree M&A Incorporated to act as Information Agent and Computershare Trust Company, N.A. to act as Depositary in connection with the Tender Offer. The Information Agent may contact holders of shares by mail, facsimile and personal interviews and may request brokers, dealers and other nominee stockholders to forward materials relating to the Tender Offer to beneficial owners. The Information Agent and the Depositary will each receive reasonable and customary compensation for their respective services, will be reimbursed by us for reasonable out-of-pocket expenses and will be indemnified against certain liabilities in connection with the Tender Offer, including certain liabilities under the federal securities laws.

We will not pay any fees or commissions to brokers, dealers or other persons (other than fees to the Co-Dealer Managers and the Information Agent as described above) for soliciting tenders of shares in the Tender Offer. We recommend that stockholders holding shares through brokers or banks consult the brokers or banks to determine whether transaction costs may apply if stockholders tender shares through the brokers or banks and not directly to the Depositary. We will, however, upon request, reimburse brokers, dealers and commercial banks for customary mailing and handling expenses incurred by them in forwarding the Tender Offer and related materials to the beneficial owners of shares held by them as a nominee or in a fiduciary capacity. No broker, dealer, commercial bank or trust company has been authorized to act as our agent or the agent of the Co-Dealer Manager, the Information Agent or the Depositary for purposes of the Tender Offer. We will pay or cause to be paid all stock transfer taxes, if any, on our purchase of shares, except as otherwise provided in Instruction 7 in the Letter of Transmittal.

## Miscellaneous

Pursuant to Rule 13e-4(c)(2) and Rule 13e-3(d) under the Exchange Act, we have filed a Tender Offer Statement and Rule 13E-3 Transaction Statement under cover of Schedule TO with the SEC, which contain additional information with respect to the Tender Offer. These materials, including the exhibits and any amendments and supplements thereto, may be examined, and copies may be obtained, at the same places and in the same manner as is set forth in "The Tender Offer—Information About Tribune Company" with respect to information concerning us.

Under the Merger Agreement and the Securities Purchase Agreement with the Zell Entity, we are not permitted to repurchase shares before we close the Merger, other than the shares we are offering to purchase in the Tender Offer, without the consent of the ESOP and the Zell Entity. In addition, Rule 13e-4(f) under the Exchange Act prohibits us from purchasing any shares other than in the Tender Offer until at least ten business days after the Expiration Time. We have no plans to purchase any such additional shares other than pursuant to the Tender Offer.

113

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0522188

This Offer to Purchase and Letter of Transmittal do not constitute an offer to purchase securities in any jurisdiction in which such offer is not permitted or would not be permitted. If we become aware of any jurisdiction where the making of the Tender Offer or the acceptance of shares pursuant thereto is not in compliance with applicable law, we will make a good faith effort to comply with the applicable law where practicable. If, after such good faith effort, we cannot comply with the applicable law, the Tender Offer will not be made to (nor will tenders be accepted from or on behalf of) the holders of shares in such jurisdiction.

You should only rely on the information contained in this Offer to Purchase or to which we have referred to you. We have not authorized any person to make any recommendation on behalf of us as to whether you should tender or refrain from tendering your shares in the Tender Offer. We have not authorized any person to give any information or to make any representation in connection with the Tender Offer other than those contained in this Offer to Purchase or in the Letter of Transmittal. If given or made, any recommendation or any such information or representation must not be relied upon as having been authorized by us, the Co-Dealer Managers, the Depositary or the Information Agent.

Tribune Company

April 25, 2007

114

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0522189

Annex I

April 1, 2007

# Morgan Stanley

1585 Broadway
New York, NY 10026

Special Committee of the Board of Directors
Board of Directors
Tribune Company
435 North Michigan Avenue
Chicago, IL 60611

Members of the Special Committee of the Board and the Board of Directors:

We understand that Tribune Company (the "Company"), GreatBanc Trust Company ("GreatBanc"), not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "Buyer"), Tesop Corporation, a wholly owned subsidiary of the Buyer (the "Merger Sub"), and EGI-TRB, L.L.C. (solely for the limited purposes of Section 8.12 thereof) (the "Investor") propose to enter into an Agreement and Plan of Merger, substantially in the form of the draft dated April 1, 2007 (the "Merger Agreement"), which provides, among other things, for the merger (the "Merger") of the Merger Sub with and into the Company. Pursuant to the Merger, the Company will become a wholly owned subsidiary of the Buyer and each outstanding share of common stock, par value $0.01 per share, of the Company (the "Common Stock"), other than shares of Common Stock held by the Company as treasury stock, shares of Common Stock owned by the Buyer or the Merger Sub immediately prior to the effective time of the Merger or shares of Common Stock as to which dissenters' rights have been perfected, will be converted into the right to receive $34.00 in cash plus the Additional Per Share Consideration (as defined in the Merger Agreement). The terms and conditions of the Merger are more fully set forth in the Merger Agreement. We further understand that the Investor will invest in debt and equity securities of the Company prior to the Merger and debt and equity securities of the surviving corporation following the Merger pursuant to a Securities Purchase Agreement, substantially in the form of the draft dated April 1, 2007 and related agreements, each entered into in connection with the Merger (together, the "Investor Agreements"). In addition, we understand that the Buyer will invest in equity securities of the Company prior to the Merger pursuant to an ESOP Purchase Agreement, substantially in the form of the draft dated April 1, 2007 and related agreements, each entered into in connection with the Merger (together, the "ESOP Purchase Agreements"). Furthermore, we understand that in the event that Eagle New Media Investments, LLC or Eagle Publishing Investments, LLC (together, the "Eagle Entities") own or hold any shares of Common Stock or Series D-1 preferred stock of the Company (the "Preferred Stock") shortly before the consummation of the Merger, the Company and the Eagle Entities will enter into a Stock Exchange Agreement, substantially in the form of the draft dated April 1, 2007 (the "Stock Exchange Agreement"), pursuant to which the Eagle Entities will exchange the shares of Common Stock and Preferred Stock owned or held by them for shares of Series E preferred stock, without par value, of the Company prior to the consummation of the Merger.

You have asked for our opinion as to whether the consideration to be received by the holders of shares of Common Stock (other than the Investor, the Eagle Entities, the Buyer and the Merger Sub) pursuant to the Merger Agreement is fair from a financial point of view to such holders.

For purposes of the opinion set forth herein, we have:

(i) reviewed certain publicly available financial statements and other information of the Company;

I-1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522190

# Morgan Stanley

(ii) reviewed certain internal financial statements and other financial and operating data concerning the Company prepared by the management of the Company;

(iii) analyzed certain financial projections prepared by the management of the Company;

(iv) discussed the past and current operations and financial condition and the prospects of the Company with senior executives of the Company;

(v) reviewed the reported prices and trading activity for shares of the Common Stock;

(vi) compared the financial performance of the Company and the prices and trading activity of shares of the Common Stock with that of certain other comparable publicly-traded companies and their securities;

(vii) reviewed the financial terms, to the extent publicly available, of certain comparable acquisition transactions;

(viii) participated in discussions and negotiations among representatives of the Special Committee, the Company, the Buyer, the Investor and their financial and legal advisors;

(ix) reviewed the Merger Agreement; drafts of the debt financing commitments provided to the Company by certain lending institutions dated April 1, 2007 (the "Commitment Letters"); drafts of the Investor Agreements dated April 1, 2007; the Stock Exchange Agreement; drafts of the ESOP Purchase Agreements dated April 1, 2007; a draft of the Voting Agreement, dated April 1, 2007, by and between the Company and each of Chandler Trust No. 1 and Chandler Trust No. 2 and certain other related documents; and

(x) performed such other analyses and considered such other factors as we have deemed appropriate.

We have assumed and relied upon, without independent verification, the accuracy and completeness of the information reviewed by us for purposes of this opinion. With respect to the financial projections, we have assumed that they have been reasonably prepared on bases reflecting the best currently available estimates and judgments of the future financial performance of the Company. We have also assumed that the Merger will be consummated in accordance with the terms set forth in the Merger Agreement without any waiver, amendment or delay of any terms or conditions including, among other things, that the transactions contemplated by the Investor Agreements, the ESOP Purchase Agreements and the Stock Exchange Agreement (if entered into pursuant to the terms of the Merger Agreement) will be consummated in accordance with their terms. We are not legal, tax or regulatory advisors. We are financial advisors only and have relied upon, without independent verification, the assessment of the Company and its legal, tax or regulatory advisors with respect to such matters.

This opinion does not address the fairness of any consideration to be received by the Buyer, the Investor or the Eagle Entities pursuant to the Merger Agreement, the ESOP Purchase Agreements, the Investor Agreements or the Stock Exchange Agreement (if entered into pursuant to the terms of the Merger Agreement), the relative fairness of any portion of the consideration to holders of any series of common or preferred stock of the Company, the relative merits of the Merger as compared to alternative transactions or strategies that might be available to the Company, or the underlying business decision of the Company to enter into the Merger Agreement. We have not made any independent valuation or appraisal of the assets or liabilities of the Company nor have we been furnished with any such valuations or appraisals. Our opinion is necessarily based on financial, economic, market and other conditions as in effect on, and the information made available to us as of, the date hereof. Events occurring after the date hereof may affect this opinion and the assumptions used in preparing it, and we do not assume any obligation to update, revise or reaffirm this opinion.

I-2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0522191

# Morgan Stanley

We acted as financial advisor to the Special Committee of the Board of Directors of the Company in connection with this transaction and will receive a fee for our services, a substantial portion of which became payable at the time we advised the Special Committee of the Board of Directors that we were prepared to deliver this opinion. In the past, Morgan Stanley & Co. Incorporated and its affiliates have provided financial advisory and financing services for the Company and affiliates of the Investor and have received fees for the rendering of these services. In addition, we and our affiliates, directors or officers, including individuals working with the Company in connection with this transaction, may have committed and may commit in the future to invest in investment funds managed by affiliates of the Investor. In the ordinary course of our trading, brokerage, investment management and financing activities, we and our affiliates may at any time hold long or short positions, and may trade or otherwise effect transactions, for our own account or the accounts of our customers, in debt or equity securities or senior loans of the Company or any other company or any currency or commodity that may be involved in this transaction.

It is understood that this letter is for the information of the Special Committee of the Board of Directors of the Company and the Board of Directors of the Company and may not be used for any other purpose without our prior written consent, except that a copy of this opinion may be included in its entirety in any filing the Company is required to make with the Securities and Exchange Commission in connection with this transaction if such inclusion is required by applicable law. In addition, we express no opinion or recommendation as to how the shareholders of the Company should vote at the shareholders' meeting to be held in connection with the Merger.

Based on the foregoing, we are of the opinion on the date hereof that the consideration to be received by the holders of shares of the Common Stock (other than the Investor, the Eagle Entities, the Buyer and the Merger Sub) pursuant to the Merger Agreement is fair from a financial point of view to such holders.

Very truly yours,

MORGAN STANLEY & CO. INCORPORATED

By:   /s/ THOMAS F. WHAYNE

Thomas F. Whayne
Managing Director

I-3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

(This page has been left blank intentionally.)

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522193

**Annex II**

**Global Markets & Investment
Banking Group**

 **Merrill Lynch**

4 World Financial Center
North Tower 30th Floor
New York, New York 10080
212 449 1000

April 1, 2007

Board of Directors
Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611

Members of the Board of Directors:

Tribune Company ("Company"), the Tribune Employee Stock Ownership Trust ("Acquiror"), which forms a part of the Tribune Employee Stock Ownership Plan, and Tesop Corporation, a Delaware corporation all of the common stock of which is owned by the Acquiror ("Acquisition Sub"), propose to enter into an Agreement and Plan of Merger dated as of April 1, 2007 ("Merger Agreement"), pursuant to which Acquisition Sub would be merged with and into the Company ("Merger"), with the Company surviving the merger and becoming wholly owned by the Acquiror. In the Merger, each share of Company common stock, par value $0.01 per share ("Company Shares", which term shall also apply to the common stock of the surviving corporation following the Merger), other than any shares held by the Acquiror and other than shares with respect to which dissenters rights are perfected, would be converted into the right to receive $34.00 per share in cash, such amount to be adjusted upward at an 8% annualized rate from January 1, 2008 to and including the closing date if the Merger does not close by January 1, 2008 (the "Consideration"). As part of the transaction, the Company and EGI-TRB, L.L.C., a Delaware limited liability company ("EGI-TRB") and Samuel Zell as guarantor of EGI-TRB ("Guarantor"), have entered into a Securities Purchase Agreement dated April 1, 2007 ("Securities Purchase Agreement") by which EGI-TRB has agreed to purchase 1,470,588 newly issued Company Shares at $34.00 per Company Share and an unsecured subordinated exchangeable note in the principal amount of $200.0 million which shall be exchangeable at the option of the Company, or automatically in certain circumstances, into 5,882,353 Company Shares (the "Subordinated Exchangeable Note") prior to consummation of the Merger. In addition, GreatBanc Trust Company ("ESOP Trustee"), not in its individual or corporate capacity, but solely as trustee of Acquiror, has entered into an ESOP Purchase Agreement with the Company dated April 1, 2007, by which the Acquiror has agreed to purchase 8,928,571 Company Shares at $28.00 per share immediately following execution of the Merger Agreement. As soon as practicable following the execution of the Merger Agreement, the Company will commence a self-tender share repurchase ("Self-Tender") of up to approximately 126 million Company Shares at $34.00 per share. Immediately prior to the Merger, the Company will repay the Subordinated Exchangeable Note, and immediately following consummation of the Merger, EGI-TRB will purchase from the Company an unsecured subordinated promissory note in the principal amount of $225.0 million (the "Subordinated Note") and purchase a 15-year warrant (the "Warrant") to purchase 43,478,261 Company Shares (subject to adjustment). The purchase price of the Warrant will be $90 million, and the initial aggregate exercise price of the Warrant will be $500 million, increasing by $10 million per year for the first 10 years of the Warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment).

II-1

**Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only**

TRB0522194

We understand that the Company has entered into a Voting Agreement (the "Voting Agreement") with Chandler Trust No. 1 and Chandler Trust No. 2, pursuant to which Chandler Trust No. 1 and Chandler Trust No. 2 have agreed, among other things, to vote in favor of the Merger Agreement and the Merger. We further understand that the Company has entered into separate Registration Rights Agreements (the "Registration Rights Agreements") with (a) Chandler Trust No. 1 and Chandler Trust No. 2 (the "Chandler Registration Rights Agreement") and (b) a Registration Rights Agreement with EGI-TRB and the Acquiror (the "EGI-TRB/Acquiror Registration Rights Agreement").

You have asked us whether, in our opinion, the Consideration to be received by the holders of the Company Shares pursuant to the Merger is fair from a financial point of view to such holders, other than the Acquiror and its affiliates and the Guarantor and his affiliates.

In arriving at the opinion set forth below, we have, among other things:

(1) Reviewed certain publicly available business and financial information relating to the Company that we deemed to be relevant;

(2) Reviewed certain information, including financial forecasts, relating to the business, earnings, cash flow, assets, liabilities and prospects of the Company furnished to us by the Company;

(3) Conducted discussions with members of senior management and representatives of the Company concerning the matters described in clauses 1 and 2 above;

(4) Reviewed the market prices and valuation multiples for the Company Shares prior to the Merger and compared them with those of certain publicly traded companies that we deemed to be relevant;

(5) Reviewed the results of operations of the Company and compared them with those of certain publicly traded companies that we deemed to be relevant;

(6) Compared the proposed financial terms of the Merger with the financial terms of certain other transactions that we deemed to be relevant;

(7) Participated in certain discussions and negotiations among representatives of the Company and the Acquiror and the Guarantor and their financial and legal advisors;

(8) Reviewed a draft dated as of April 1, 2007 of the Merger Agreement (it being understood that such draft was, in all material respects, in the form to be executed); and

(9) Reviewed such other financial studies and analyses and took into account such other matters as we deemed necessary, including our assessment of general economic, market and monetary conditions.

In preparing our opinion, we have assumed and relied on the accuracy and completeness of all information supplied or otherwise made available to us, discussed with or reviewed by or for us, or publicly available, and we have not assumed any responsibility for independently verifying such information or undertaken an independent evaluation or appraisal of any of the assets or liabilities of the Company or been furnished with any such evaluation or appraisal, nor have we evaluated the solvency or fair value of the Company under any state or federal laws relating to bankruptcy, insolvency or similar matters. In addition, we have not assumed any obligation to conduct any physical inspection of the properties or facilities of the Company. With respect to the financial forecast information furnished to or discussed with us by the Company, we have assumed that they have been reasonably prepared and reflect the best currently available estimates and judgment of the Company's management as to the expected future financial performance of the Company. We have also assumed that the final form of the Agreement will be substantially similar to the last draft reviewed by us.

II-2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Our opinion is necessarily based upon market, economic and other conditions as they exist and can be evaluated on, and on the information made available to us as of, the date hereof. We have reviewed drafts dated as of April 1, 2007 (it being understood that such drafts were, in all material respects, in the form to be executed) of the Securities Purchase Agreement, the Subordinated Exchangeable Note, the ESOP Purchase Agreement, the Subordinated Note, the Warrant, the Voting Agreement, the Chandler Registration Rights Agreement and the EGI-TRB/Acquiror Registration Rights Agreement, however we express no opinion on any aspect of such agreements, or on any other document referred to in the Merger Agreement to be entered into in connection with the transaction.

We are acting as financial advisor to the Company in connection with the Merger, and will assist the Company in arranging a portion of the financing for the Merger, and will receive fees from the Company for our services, significant portions of which are contingent upon the consummation of the Merger and such financing. In addition, the Company has agreed to indemnify us for certain liabilities arising out of our engagement. We are a participant in the Company's credit facilities which will be refinanced in connection with the transaction and anticipate that we will be a participant in such refinancing. We have, in the past, provided financial advisory and financing services to the Company and/or its affiliates and the Guarantor and/or his affiliates and may continue to do so and have received, and may receive, fees for the rendering of such services. In addition, in the ordinary course of our business, we may actively trade the Company Shares and other securities of the Company for our own account and for the accounts of customers and, accordingly, may at any time hold a long or short position in such securities.

This opinion is for the use and benefit of the Board of Directors of the Company. Our opinion does not address the merits of the underlying decision by the Company to engage in the Merger and transactions related thereto and does not constitute a recommendation to any shareholder as to whether such shareholder should tender any Company Shares pursuant to the Self-Tender and how such shareholder should vote on the proposed Merger or any matter related thereto. In addition, you have not asked us to address, and this opinion does not address, the fairness to, or any other consideration of, the holders of any class of securities, creditors or other constituencies of the Company, other than the holders of the Company Shares (excluding the Acquiror and its affiliates and the Guarantor and his affiliates).

On the basis of and subject to the foregoing, we are of the opinion that, as of the date hereof, the Consideration to be received by the holders of the Company Shares pursuant to the Merger is fair from a financial point of view to the holders of such shares, other than the Acquiror and its affiliates and the Guarantor and his affiliates.

Very truly yours,

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522196

(This page has been left blank intentionally.)

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0522197

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0522198

The Letter of Transmittal, certificates for shares and any other required documents should be sent or delivered by each stockholder of the Company or his or her bank, broker, dealer, trust company or other nominee to the Depositary as follows:

*The Depositary for the Tender Offer is:*
Computershare Trust Company, N.A.

|  |  |
|---|---|
| *By Mail:* | *By Hand or Overnight Courier:* |
| Computershare Trust Company, N.A. | Computershare Trust Company, N.A. |
| Attention: Corporate Actions | Attention: Corporate Actions |
| P.O. Box 859208 | 161 Bay State Drive |
| Braintree, MA 02185-9208 | Braintree, MA 02184 |

**Delivery of the letter of transmittal to an address other than as set forth above will not constitute a valid delivery to the Depositary.**

Questions and requests for assistance may be directed to the Information Agent, or to the Co-Dealer Managers, at their addresses and telephone numbers set forth below. Requests for additional copies of this Offer to Purchase, the related Letter of Transmittal or the Notice of Guaranteed Delivery should be directed to the Information Agent.

*The Information Agent for the Tender Offer is:*

**Innisfree M&A Incorporated**
501 Madison Avenue
New York, NY 10022
Stockholders Call Toll-free: (877) 825-8621
Banks and Brokerage Firms Call Collect: (212) 750-5833

*The Co-Dealer Managers for the Tender Offer are:*

|  |  |
|---|---|
| Merrill Lynch & Co. | Citigroup Global Markets Inc. |
| **Special Equity Transactions** | **Special Equity Transactions Group** |
| **4 World Financial Center** | **390 Greenwich Street, 5th Floor** |
| **New York, NY 10080** | **New York, NY 10013** |
| **(609) 818-8000 (collect)** | **(212) 723-7838 (collect)** |
| **(877) 653-2948 (toll free)** | **(877) 531-8365 (toll free)** |
| | |
| J.P. Morgan Securities Inc. | Banc of America Securities LLC |
| **Special Equities Group** | **9 West 57th Street** |
| **277 Park Avenue, 9th Floor** | **New York, NY 10019** |
| **New York, NY 10172** | **Tel: (212) 583-8426** |
| **(212) 622-2922 (collect)** | **Toll Free: (888) 583-8900 ext. 8426** |
| **(877) 371-5947 (toll free)** | |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**