# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

## FORM 8- K

### CURRENT REPORT PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

### DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED):
### December 20, 2007

### Commission file number 1- 8572

## TRIBUNE COMPANY
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **36- 1880355** |
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |

| | |
|---|---|
| **435 North Michigan Avenue** | **60611** |
| **Chicago, Illinois** | (Zip code) |
| (Address of principal executive offices) | |

Registrant's telephone number, including area code: **(312) 222- 9100**

Check the appropriate box below if the Form 8- K filing is intended to simultaneously satisfy the obligation of the registrant under any of the following provisions:

[ ]

[ ] Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a- 12 under the Exchange Act (17 CFR 240.14a- 12)

[ ] Pre- commencement communications pursuant to Rule 14d- 2(b) under the Exchange Act (17 CFR 240.14d- 2(b))

Pre- commencement communications pursuant to Rule 13e- 4(c) under the Exchange Act (17 CFR 240.13e- 4(c))

### Introductory Note

As previously disclosed, on April 1, 2007, Tribune Company (the "Company") entered into an Agreement and Plan of Merger (the "Merger Agreement") with GreatBanc Trust Company (the "Trustee"), not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "ESOP"), Tesop Corporation, a Delaware corporation wholly owned by the ESOP ("Merger Sub"), and, for limited purposes, EGI- TRB, L.L.C., a Delaware limited liability company ("EGI- TRB").

On December 20, 2007 at 12:02 p.m. Eastern Standard Time (the "Effective Time"), the Company completed its merger with Merger Sub (the "Merger"), with the Company surviving the Merger. Pursuant to the terms of the Merger Agreement, at the Effective Time, each share of common stock of the Company, par value $0.01 per share (the "Company Common Stock"), issued and outstanding immediately prior to the Effective Time, other than shares held by the Company, the ESOP or Merger Sub immediately prior to the Effective Time (in each case, other than shares held on behalf of third parties) and shares held by shareholders who validly exercised appraisal rights, was cancelled and automatically converted into the right to receive $34.00, without interest and less any applicable withholding taxes, and the Company became wholly owned by the ESOP.

### ITEM 1.01. ENTRY INTO A MATERIAL DEFINITIVE AGREEMENT.

#### Second Step Credit Facilities

On December 20, 2007, the Company entered into (a) a $1.6 billion Senior Unsecured Interim Loan Agreement (the "Credit Agreement"), by and among the Company, as borrower, the lenders party thereto (the "Lenders"), Merrill Lynch Capital Corporation ("Merrill Lynch"), as administrative agent, JPMorgan Chase Bank, N.A. ("JPMCB"), as syndication agent, Citicorp North America, Inc. ("CNAI") and Bank of America, N.A. ("Bank of America"), as co- documentation agents, and J.P. Morgan Securities Inc. ("JPMorgan"), Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS"), Citigroup Global Markets Inc. ("CGMI") and Banc of America Securities LLC ("BAS"), as joint lead arrangers and joint bookrunners, and (b) Increase Joinders (the "Increase Joinders") with JPMCB, as administrative agent, and various lenders party thereto, which Increase Joinders provide $2.105 billion of incremental term loans referred to in the Senior Secured Credit Agreement (as defined under "Incremental Facility" below). The Credit Agreement and Increase Joinders contain the negotiated terms and conditions of the commitments provided for in the second step commitment letter entered into by the Company on April 1, 2007, as amended and restated on April 5, 2007 (the "Second Step Commitment Letter"), which was attached as Exhibit 10.11 to the Company's Current Report on Form 8- K filed with the Securities and Exchange Commission on April 5, 2007. The Credit Agreement provides for $1.6 billion in senior unsecured bridge loans (the "Interim Loan Facility"), and the Increase Joinders provide for an additional $2.105 billion in new incremental term loans under

2

the Senior Secured Credit Agreement (the "Incremental Facility" and together with the Interim Loan Facility, the "Second Step Credit Facilities"). The proceeds from the Second Step Credit Facilities are being used by the Company, among other ways, in connection with the consummation of the Merger, and for general corporate purposes.

*Interim Loan Facility*

The Credit Agreement provides that the Interim Loan Facility will bear interest per annum at a variable rate equal to, at the Company's election, either the applicable base rate plus a margin of 350 basis points or LIBOR plus a margin of 450 basis points; provided, that the aforementioned margins will increase by 50 basis points per annum on the date that is three calendar months following the closing date of the Credit Agreement and by an additional 50 basis points per annum on each successive date falling three calendar months thereafter, subject to specified caps, a portion of which interest may be payable through a PIK feature. If any loans under the Interim Loan Facility remain outstanding on the one- year anniversary of the closing of the Interim Loan Facility, the lenders thereunder will have the option, subject to the terms of the Credit Agreement, at any time and from time to time to exchange such initial loans for senior exchange notes that the Company will issue under a senior indenture, and the maturity date of any initial loans that are not exchanged for senior exchange notes will, unless a bankruptcy event of default has occurred and is continuing on such date, automatically be extended to December 20, 2015 (the "Final Maturity Date"). The senior exchange notes will also mature on the Final Maturity Date. Holders of the senior exchange notes will have registration rights. Subject to the terms of the Senior Secured Credit Agreement (as defined below), the Interim Loan Facility is prepayable at any time prior to maturity without penalty, other than customary "breakage" costs with respect to LIBOR loans.

Loans under the Interim Loan Facility will be required to be repaid with the following proceeds, in each case after the obligations under the Senior Secured Credit Agreement (as defined below) have been repaid as required by the Senior Secured Credit Agreement or at the election of the Company, subject to certain exceptions and exclusions set forth in the Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of certain debt for borrowed money by the Company or any subsidiary; (b) 100% of the net cash proceeds of any equity issuance consummated by the Company; (c) once the aggregate amount of net cash proceeds from all asset sales, share issuances by the Company's subsidiaries and casualty events exceeds $25 million, 100% of such net cash proceeds, unless the Company reinvests the proceeds pursuant to the terms of the Credit Agreement; and (d) 100% of net cash proceeds from certain dispositions. In addition, loans under the Interim Loan Facility will be required to be repaid in whole or in part upon the occurrence of a change of control to any Lender which elects to have its loans repaid in connection with any such event.

The Interim Loan Facility is guaranteed on a senior subordinated basis by certain of the Company's direct and indirect U.S. subsidiaries. The Credit Agreement contains representations and warranties, affirmative and negative covenants and events of default,

3

in each case subject to customary and negotiated exceptions and limitations, as applicable.

*Incremental Facility*

The Incremental Facility forms part of the Senior Tranche B Term Loan Facility (together with the Incremental Facility, the "Tranche B Facility") under the Credit Agreement entered into by the Company on May 17, 2007 (the "Senior Secured Credit Agreement"), by and among the Company, as borrower, the lenders party thereto, JPMCB, as administrative agent, Merrill Lynch, as syndication agent, CNAI, Bank of America and Barclays Bank plc, as co-documentation agents, and JPMorgan, MLPFS, CGMI and BAS, as joint lead arrangers and joint bookrunners, which was attached as Exhibit 4.1 to the Company's Current Report on Form 8- K filed with the Securities and Exchange Commission on May 17, 2007. The Tranche B Facility bears interest per annum at a variable rate equal to, at the Company's election, either the applicable base rate plus a margin of 200 basis points or LIBOR plus a margin of 300 basis points.

The Tranche B Facility amortizes at a rate of 1.0% per annum (payable quarterly) prior to maturity, on which date the remaining principal amount will be payable in full. Prior to the first anniversary of the closing date of the Senior Secured Credit Agreement, optional prepayments on the Tranche B Facility with the proceeds of a substantially concurrent issuance of loans under any senior secured credit facilities pursuant to the Senior Secured Credit Agreement must be accompanied by a prepayment fee equal to 1% of the aggregate amount of such prepayments if the interest rate spread applicable to such new loans is less than the interest rate applicable to the Tranche B Facility. Except as described in the immediately preceding sentence, the Tranche B Facility is prepayable at any time prior to maturity without penalty, other than customary "breakage" costs with respect to LIBOR loans.

Loans under the Tranche B Facility are required to be repaid with the following proceeds, subject to certain exceptions and exclusions set forth in the Senior Secured Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of debt for borrowed money by the Company or any subsidiary (other than debt permitted to be incurred under the negative covenants contained in the Senior Secured Credit Agreement (with certain exclusions)); (b) certain specified percentages of excess cash flow proceeds based on a leveraged- based grid ranging from 50% to 0%; (c) once the aggregate amount of net cash proceeds from all asset sales, share issuances by the Company's subsidiaries and casualty events exceeds $50 million, 100% of such net cash proceeds unless the Company reinvests the proceeds pursuant to the terms of the Senior Secured Credit Agreement; and (d) 100% of net cash proceeds from certain dispositions.

The Tranche B Facility is guaranteed by certain of the Company's direct and indirect U.S. subsidiaries and secured by a pledge of the capital stock of certain specified subsidiaries of the Company. Certain outstanding senior notes of the Company (the "Existing Notes") are secured on an equal and ratable basis with the facilities under the Senior Secured Credit Agreement, including the Tranche B Facility, as required by the terms of the indentures governing such Existing Notes.

4

The Senior Secured Credit Agreement contains representations and warranties, affirmative and negative covenants and events of default, in each case subject to customary and negotiated exceptions and limitations, as applicable. In addition, the Senior Secured Credit Agreement includes three financial covenants with which the Company must comply, including a maximum total guaranteed leverage ratio, a minimum interest coverage ratio and limitations on capital expenditures.

The foregoing summary of the material terms of the Credit Agreement and the Increase Joinders is qualified in its entirety by the complete terms and conditions of the Credit Agreement and the form of Increase Joinder, respectively, which are attached hereto as Exhibits 4.1 and 4.2, respectively, and incorporated herein by reference. The foregoing summary of the material terms of the Senior Secured Credit Agreement is qualified in its entirety by the complete terms and conditions of the Senior Secured Credit Agreement, which was attached as Exhibit 4.1 to the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on May 17, 2007.

<u>Consummation of the Second Step Purchase Transaction</u>

On December 20, 2007, immediately following the consummation of the Merger, EGI-TRB purchased from the Company, pursuant to a previously disclosed Securities Purchase Agreement (the "EGI Purchase Agreement") dated April 1, 2007 by and among the Company, EGI-TRB and Samuel Zell, for an aggregate purchase price of $315 million, (1) an unsecured subordinated promissory note in the principal amount of $225 million (the "Subordinated Note") and (2) a 15-year warrant (the "Warrant") to purchase 43,478,261 shares of Company Common Stock (subject to adjustment), representing approximately 40% of the economic equity interest in the Company following the Merger (on a fully-diluted basis). Thereafter, EGI-TRB assigned a minority interest in the Subordinated Note and Warrant to certain permitted assignees. The Warrant has an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first ten years of the Warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). The Subordinated Note and the Warrant are attached hereto as Exhibits 10.1 and 10.2, respectively, and incorporated herein by reference.

In addition, immediately prior to the Merger, the Company repaid the $200 million exchangeable promissory note held by EGI-TRB, plus accrued interest thereon.

**ITEM 2.01. COMPLETION OF ACQUISITION OR DISPOSITION OF ASSETS.**

The information set forth above under the heading "Introductory Note" of this Form 8-K is incorporated herein by reference. On December 20, 2007, the Company issued a press release announcing the consummation of the Merger. A copy of the press release is attached hereto as Exhibit 99.1 and incorporated herein by reference.

5

**ITEM 2.03. CREATION OF A DIRECT FINANCIAL OBLIGATION OR AN OBLIGATION UNDER AN OFF-BALANCE SHEET ARRANGEMENT OF A REGISTRANT.**

The information set forth above under the heading "Second Step Credit Facilities" in Item 1.01 of this Form 8- K is incorporated herein by reference.

**ITEM 3.01. NOTICE OF DELISTING OR FAILURE TO SATISFY A CONTINUED LISTING RULE OR STANDARD; TRANSFER OF LISTING.**

On December 20, 2007, the Company notified the New York Stock Exchange (the "NYSE") that the Merger was consummated, pursuant to which each share of Company Common Stock issued and outstanding immediately prior to the Effective Time, other than shares held by the Company, the ESOP or Merger Sub immediately prior to the Effective Time (in each case, other than shares held on behalf of third parties) and shares held by shareholders who validly exercised appraisal rights, was cancelled and automatically converted into the right to receive $34.00, without interest and less any applicable withholding taxes. The Company requested that the Company Common Stock (and associated Series A junior participating preferred stock purchase rights) be suspended from the NYSE, effective as of the close of market on December 20, 2007, and that the NYSE file with the Securities and Exchange Commission an application on Form 25 to report that the shares of Company Common Stock and associated Series A junior participating preferred stock purchase rights are no longer listed on the NYSE.

**ITEM 3.03. MATERIAL MODIFICATION TO RIGHTS OF SECURITY HOLDERS.**

As a result of the Merger, each share of Company Common Stock issued and outstanding immediately prior to the Effective Time, other than shares held by the Company, the ESOP or Merger Sub immediately prior to the Effective Time (in each case, other than shares held on behalf of third parties) and shares held by shareholders who validly exercised appraisal rights, was cancelled and automatically converted into the right to receive $34.00, without interest and less any applicable withholding taxes.

**ITEM 5.01. CHANGES IN CONTROL OF REGISTRANT.**

On December 20, 2007, pursuant to the terms of the Merger Agreement, the Merger of Merger Sub with and into the Company was consummated. The Company was the surviving corporation in the Merger. As a result of the Merger, the Company became wholly owned by the ESOP.

The aggregate consideration paid in respect of the cancelled shares of Company Common Stock was approximately $4.0 billion. The aggregate consideration was funded by the Second Step Credit Facilities, the purchase by EGI- TRB of the Subordinated Note and the Warrant pursuant to the EGI Purchase Agreement, and available cash on hand.

6

A copy of the press release issued by the Company on December 20, 2007 announcing the consummation of the Merger is attached hereto as Exhibit 99.1 and incorporated herein by reference.

## ITEM 5.02. DEPARTURE OF DIRECTORS OR CERTAIN OFFICERS; ELECTION OF DIRECTORS; APPOINTMENT OF CERTAIN OFFICERS; COMPENSATORY ARRANGEMENTS OF CERTAIN OFFICERS.

Pursuant to the terms of the Merger Agreement, the directors of Merger Sub immediately prior to the Effective Time became the directors of the Company, the surviving corporation in the Merger. Accordingly, upon consummation of the Merger, each of Betsy D. Holden, William A. Osborn, William C. Pate, Maggie Wilderotter and Samuel Zell became members of the Board of Directors (the "Board") of the Company. Pursuant to the EGI Purchase Agreement, Samuel Zell was elected to serve as Chairman of the Board, effective as of December 20, 2007.

At the first meeting of the Board following the Effective Time, the Board appointed Samuel Zell as Chief Executive Officer of the Company and Jeffrey S. Berg, Brian L. Greenspun and Frank Wood to serve as directors of the Company. Ms. Wilderotter and Messrs. Greenspun and Pate were appointed to serve on the Compensation Committee. Mr. Wood was appointed to serve on the Audit Committee, along with Ms. Holden and Mr. Osborn.

Pursuant to the assignment by EGI- TRB of a minority interest in the Subordinated Note and Warrant, referenced in Item 1.01 above, Messrs. Greenspun and Pate each acquired an interest in the Subordinated Note and Warrant through limited liability companies for which they each serve as the sole economic member. Concurrently with these assignments, such limited liability companies joined that certain Investor Rights Agreement, dated as of April 1, 2007, by and among the Company, EGI- TRB and the ESOP, and designated EGI- TRB as their representative to the Company for certain purposes under the Subordinated Note. In addition, from time to time, entities in which Mr. Greenspun has an ownership interest have purchased and may continue to purchase, in the ordinary course of business, advertising from Company subsidiaries and affiliates.

On December 20, 2007, the Board also appointed Randy Michaels to serve as Executive Vice President and Chief Executive Officer of Interactive and Broadcasting and Gerald A. Spector as Executive Vice President and Chief Administrative Officer.

Mr. Zell, 66, has been a director of the Company since April 2007. Mr. Zell has served as chairman of Equity Group Investments, L.L.C. ("EGI"), a private investment company, since 1999 and its president since 2006. Mr. Zell was a trustee and chairman of the board of trustees of Equity Office Properties Trust, an equity real estate investment trust primarily focused on office buildings, from October 1996 until its acquisition in February, 2007, its chief executive officer from April 2002 to April 2003, and its president from April 2002 until November 2002. Mr. Zell has been chairman of the board of Covanta Holding Corporation (previously known as Danielson Holding Corporation), a waste- to- energy and specialty insurance services company, since September 2005,

7

served as its president, chairman and chief executive officer from July 2002 until December 2004, and was a director from 1999 until 2004. For more than the past five years, Mr. Zell has been chairman of the board of Equity Lifestyle Properties, Inc. (previously known as Manufactured Home Communities, Inc.), an equity real estate investment trust primarily engaged in the ownership and operation of manufactured home resort communities; chairman of the board of trustees of Equity Residential, an equity real estate investment trust that owns and operates multi- family residential properties; and chairman of the board of Capital Trust, Inc., a specialized finance company. Mr. Zell has been a director of Anixter International Inc. since 1984, and chairman of its board of directors since 1985.

Mr. Michaels, 55, has since early 2007 served as chief executive officer of Local TV, LLC, a company that acquired the television stations formerly owned by The New York Times Company. Beginning in 1986, Mr. Michaels served in various executive capacities at Jacor, later becoming its chief executive officer. When Clear Channel Communications acquired Jacor in 1999, Mr. Michaels became Clear Channel's division president and later chairman and chief executive officer. Mr. Michaels left Clear Channel in 2002 and started several private broadcast firms, including RadioActive and Product 1st. He began working with Oak Hill Capital partners in early 2005 on acquisition opportunities, culminating in the creation of Local TV.

Mr. Spector, 60, served as trustee and executive vice president of Equity Residential, the largest apartment real estate investment trust in the United States, since March 1993, and chief operating officer since February 1995. He was treasurer from March 1993 to February 1995. At the end of 2007, Spector will retire from his operating posts at Equity Residential but remain vice chairman of Equity Residential's board of trustees. From 1988 to 1994, Mr. Spector was chief operating officer of Equity Group Investments. For the last three of those years he was also EGI's executive vice president.

As of the Effective Time, the following individuals ceased to be members of the Board: Dennis J. FitzSimons, Enrique Hernandez, Jr., Robert S. Morrison and Dudley S. Taft. Messrs. Hernandez and Morrison ceased to serve on the Compensation & Organization, Nominating & Governance and Executive Committees of the Board, while Mr. Taft ceased to serve on the Audit Committee of the Board.

As of the Effective Time, Dennis J. FitzSimons, Chief Executive Officer and a member of the Board of Directors of the Company, resigned as a director and officer of the Company. Mr. FitzSimons has been employed by the Company for over 25 years. Mr. FitzSimons will leave the Company at the end of the year. In connection with his departure, Mr. FitzSimons and the Company are entering into a separation agreement that provides for payments consistent with the terms previously disclosed in the Company's Definitive Proxy Statement on Schedule 14A, dated July 13, 2007, and consistent with the Company's Management Equity Incentive Plan, discussed below. On December 19, 2007, the Company issued a press release announcing the intention of Mr. FitzSimons to resign. A copy of the press release is attached hereto as Exhibit 99.2 and incorporated herein by reference.

8

Management Equity Incentive Plan

On December 20, 2007, the Board approved the Company's 2007 Management Equity Incentive Plan (the "Plan"). The Plan provides for phantom units (the "Units") that generally track the value of a share of common stock of the newly private company ("Tribune Common Stock"). Awards will be made to eligible members of Company management and other key employees at the discretion of the Board. Awards under the Plan are classified as First Tranche Units and Second Tranche Units.

The First Tranche Units will represent approximately 5% of the fully- diluted outstanding Tribune Common Stock (subject to customary anti- dilution adjustments) (5,434,652 Units). First Tranche Units will vest ratably over a three- year period beginning on the date of grant. Unvested First Tranche Units will vest upon a change in control of the Company or upon termination of employment due to death or disability. Unvested First Tranche Units will be cancelled upon a termination of a Plan participant's employment for any reason other than death or disability.

The Second Tranche Units will represent approximately 3% of the fully- diluted outstanding Tribune Common Stock (subject to customary anti- dilution adjustments) (3,261,000 Units). Fifty percent of the Second Tranche Units will be fully vested upon grant and the remaining fifty percent will vest on the one year anniversary of the grant date. Any unvested Second Tranche Units will become fully vested upon a change in control of the Company, an involuntary termination of employment or a termination of employment due to a Plan participant's death or disability. Unvested Second Tranche Units will be cancelled upon a termination of a Plan participant's employment for any reason other than an involuntary termination of employment or a termination of employment due to death or disability. Participants receiving Second Tranche Units will be entitled to a gross- up for the payment of excise taxes, if any, in connection with the Merger.

In general, one- third of vested Units subject to an award (whether First Tranche Units or Second Tranche Units) will be payable in cash on each of the fourth, sixth and eighth anniversaries of the grant date or, if sooner, upon the occurrence of a change in control or a termination of employment based on the fair market value of the Tribune Common Stock on the December 31 immediately following the settlement event. With respect to Second Tranche Units only, in the event of a termination of a Plan participant's employment prior to December 20, 2008, such participant will receive his or her pro rata share (based upon the amount of his or her vested Second Tranche Units relative to all Second Tranche Units outstanding and reserved for issuance) of $25.0 million, payable within ten business days following such termination of employment.

9

The Company granted 4,174,080 First Tranche Units and 3,261,000 Second Tranche Units on December 20, 2007, including grants to the following individuals:

| Name | First Tranche Units | Second Tranche Units |
|------|------|------|
| Dennis J. FitzSimons<br>Former Chairman, President and CEO | - | |
| Donald C. Grenesko<br>Senior Vice President, Finance and Administration | 0 | 380,450 |
| Scott C. Smith<br>President, Tribune Publishing Company and Publisher, Chicago Tribune Company | 0 | 271,750 |
| Luis E. Lewin<br>Senior Vice President, Human Resources | 0 | 271,750 |
| John E. Reardon<br>President, Tribune Broadcasting Company | 54,350 | 0 |

**ITEM 5.03. AMENDMENTS TO ARTICLES OF INCORPORATION OR BYLAWS; CHANGE IN FISCAL YEAR.**

In connection with the consummation of the Merger, the Company's certificate of incorporation and by-laws were amended and restated, effective as of the Effective Time, so that they read substantially in the form agreed to pursuant to the Merger Agreement. Copies of the Amended and Restated Certificate of Incorporation of the Company and the Amended and Restated By-laws of the Company are attached hereto as Exhibit 3.1 and 3.2, respectively, and incorporated herein by reference.

**ITEM 9.01. FINANCIAL STATEMENTS AND EXHIBITS**

**(d)**

| Exhibit No. | Description |
|------|------|
| 3.1 | Amended and Restated Articles of Incorporation of Tribune Company |
| 3.2 | Amended and Restated By-laws of Tribune Company |
| 4.1 | Unsecured Interim Loan Agreement, dated as of December 20, 2007, by and among Tribune Company, as borrower, the lenders party thereto, Merrill Lynch Capital Corporation, as administrative agent, JPMorgan Chase Bank, N.A., as syndication agent, Citicorp North America, Inc. and |

|      | Bank of America, N.A., as co- documentation agents, and J.P. Morgan Securities Inc., Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC, as joint lead arrangers and joint bookrunners |
| 4.2  | Form of Increase Joinder, by and among Tribune Company, as borrower, JPMorgan Chase Bank, N.A., as administrative agent, and the various lenders party thereto. |
| 10.1 | Subordinated Promissory Note, dated as of December 20, 2007, issued by Tribune Company to EGI- TRB, L.L.C. (incorporated by reference to Exhibit (d)(45) to the final amendment to Schedule 13E- 3, filed by Tribune Company with the Securities and Exchange Commission on December 20, 2007) |
| 10.2 | Warrant to Purchase Shares of Common Stock, dated December 20, 2007, issued by Tribune Company to EGI- TRB, L.L.C. (incorporated by reference to Exhibit (d)(46) to the final amendment to Schedule 13E- 3, filed by Tribune Company with the Securities and Exchange Commission on December 20, 2007) |
| 99.1 | Press Release of Tribune Company, dated December 20, 2007 (incorporated by reference to Exhibit (a)(5)(Q) to the final amendment to Schedule 13E- 3, filed by Tribune Company with the Securities and Exchange Commission on December 20, 2007) |
| 99.2 | Press Release of Tribune Company, dated December 19, 2007 |

11

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

TRIBUNE COMPANY

By: /s/ Crane H. Kenney

Name: Crane H. Kenney

Title:   Senior Vice President, General
        Counsel and Secretary

Dated: December 28, 2007

## EXHIBIT INDEX

| Exhibit No. | Description |
| --- | --- |
| 3.1 | Amended and Restated Articles of Incorporation of Tribune Company |
| 3.2 | Amended and Restated By-laws of Tribune Company |
| 4.1 | Unsecured Interim Loan Agreement, dated as of December 20, 2007, by and among Tribune Company, as borrower, the lenders party thereto, Merrill Lynch Capital Corporation, as administrative agent, JPMorgan Chase Bank, N.A., as syndication agent, Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, and J.P. Morgan Securities Inc., Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC, as joint lead arrangers and joint bookrunners |
| 4.2 | Form of Increase Joinder, by and among Tribune Company, as borrower, JPMorgan Chase Bank, N.A., as administrative agent, and the various lenders party thereto |
| 10.1 | Subordinated Promissory Note, dated as of December 20, 2007, issued by Tribune Company to EGI-TRB, L.L.C. (incorporated by reference to Exhibit (d)(45) to the final amendment to Schedule 13E-3, filed by Tribune Company with the Securities and Exchange Commission on December 20, 2007) |
| 10.2 | Warrant to Purchase Shares of Common Stock, dated December 20, 2007, issued by Tribune Company to EGI-TRB, L.L.C. (incorporated by reference to Exhibit (d)(46) to the final amendment to Schedule 13E-3, filed by Tribune Company with the Securities and Exchange Commission on December 20, 2007) |
| 99.1 | Press Release of Tribune Company, dated December 20, 2007 (incorporated by reference to Exhibit (a)(5)(Q) to the final amendment to Schedule 13E-3, filed by Tribune Company with the Securities and Exchange Commission on December 20, 2007) |
| 99.2 | Press Release of Tribune Company, dated December 19, 2007 |

**Exhibit 3.1**

AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
of
TRIBUNE COMPANY

**FIRST:** The name of this corporation is Tribune Company (the "Corporation").

**SECOND:** The address of the registered office of the Corporation in the State of Delaware is 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is Corporation Service Company.

**THIRD:** The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

**FOURTH:** The total number of shares of all classes of stock which the Corporation shall have authority to issue is 250,000,000 shares of Common Stock, $.01 par value per share ("Common Stock"). The holders of the Common Stock are entitled to one vote for each share of Common Stock held at all meetings of stockholders (and written actions in lieu of meetings). There shall be no cumulative voting.

**FIFTH:** In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind any or all of the By- laws of the Corporation, provided such repeal, alteration, amendment or rescission is approved by the Board of Directors in accordance with the provisions of that certain Investor Rights Agreement dated April 1, 2007 by and among the Corporation, EGI- TRB, L.L.C., and GreatBanc Trust Company, solely as trustee of the Tribune Employee Stock Ownership Trust which forms part of the Tribune Employee Stock Ownership Plan.

**SIXTH:** Meetings of stockholders may be held within or without the State of Delaware, as the By- laws of the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the By- laws of the Corporation.

**SEVENTH:** To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the General Corporation Law or any other law of the State of Delaware is amended after approval by the stockholders of this Article Seventh to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law as so amended.

Any repeal or modification of the foregoing provisions of this Article Seventh by the stockholders of the Corporation shall not adversely affect any right or protection of a director of

the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director occurring prior to, such repeal or modification.

EIGHTH: The following indemnification provisions shall apply to the persons enumerated below.

1. Right to Indemnification of Directors and Officers. The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person (an "Indemnified Person") who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that such person, or a person for whom such person is the legal representative, is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such Indemnified Person in such Proceeding. Notwithstanding the preceding sentence, except as otherwise provided in Section 3 of this Article Eighth, the Corporation shall be required to indemnify an Indemnified Person in connection with a Proceeding (or part thereof) commenced by such Indemnified Person only if the commencement of such Proceeding (or part thereof) by the Indemnified Person was authorized in advance by the Board of Directors.

2. Prepayment of Expenses of Directors and Officers. The Corporation shall pay the expenses (including attorneys' fees) incurred by an Indemnified Person in defending any Proceeding in advance of its final disposition, provided, however, that, to the extent required by law, such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the Indemnified Person to repay all amounts advanced if it should be ultimately determined that the Indemnified Person is not entitled to be indemnified under this Article Eighth or otherwise.

3. Claims by Directors and Officers. If a claim for indemnification or advancement of expenses under this Article Eighth is not paid in full within 30 days after a written claim therefor by the Indemnified Person has been received by the Corporation, the Indemnified Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim. In any such action the Corporation shall have the burden of proving that the Indemnified Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

4. Indemnification of Employees and Agents. The Corporation may indemnify and advance expenses to any person who was or is made or is threatened to be made or is otherwise involved in any Proceeding by reason of the fact that such person, or a person for whom such person is the legal representative, is or was an employee or agent of the Corporation or, while an employee or agent of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust, enterprise or nonprofit entity, including service with respect to

employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such person in connection with such Proceeding. The ultimate determination of entitlement to indemnification of persons who are non- director or officer employees or agents shall be made in such manner as is determined by the Board of Directors in its sole discretion. Notwithstanding the foregoing sentence, the Corporation shall not be required to indemnify a person in connection with a Proceeding initiated by such person if the Proceeding was not authorized in advance by the Board of Directors.

5. Advancement of Expenses of Employees and Agents. The Corporation may pay the expenses (including attorneys' fees) incurred by an employee or agent in defending any Proceeding in advance of its final disposition on such terms and conditions as may be determined by the Board of Directors.

6. Non- Exclusivity of Rights. The rights conferred on any person by this Article Eighth shall not be exclusive of any other rights which such person may have or hereafter acquire under any statute, provision of this Amended and Restated Certificate of Incorporation, by- laws, agreement, vote of stockholders or disinterested directors or otherwise.

7. Other Indemnification. The Corporation's obligation, if any, to indemnify any person who was or is serving at its request as a director, officer or employee of another corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise shall be reduced by any amount such person may collect as indemnification from such other corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise.

8. Insurance. The Board of Directors may, to the full extent permitted by applicable law as it presently exists, or may hereafter be amended from time to time, authorize an appropriate officer or officers to purchase and maintain, at the Corporation's expense, insurance: (a) to indemnify the Corporation for any obligation which it incurs as a result of the indemnification of directors, officers and employees under the provisions of this Article Eighth; and (b) to indemnify or insure directors, officers and employees against liability in instances in which they may not otherwise be indemnified by the Corporation under the provisions of this Article Eighth.

9. Amendment or Repeal. Any repeal or modification of the foregoing provisions of this Article Eighth shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to the time of such repeal or modification. The rights provided hereunder shall inure to the benefit of any Indemnified Person and such person's heirs, executors and administrators.

NINTH: All of the Corporation's issued stock, exclusive of treasury shares, shall be held by not more than 80 shareholders, as determined for Federal income tax purposes and each such shareholder shall be eligible to hold such shares of stock pursuant to Section 1361 of the Internal Revenue Code of 1986, as amended.

* * *

Exhibit 3.2

**Amended and Restated Bylaws**
**of**
**Tribune Company**

**(a Delaware Corporation)**
ARTICLE I

Offices

The corporation may have offices at such places both within and without the State of Delaware as the board of directors may from time to time determine or the business of the corporation may require.

ARTICLE II

Meetings of Stockholders

Section 1. All meetings of the stockholders shall be held at such place, in or out of the state of Delaware, as may be fixed from time to time by the board of directors and stated in the notice of the meeting or in a duly executed waiver of notice thereof.

Section 2. Annual meetings of stockholders shall be held at such date and time as shall be designated by the board of directors and stated in the notice of the meeting or in a duly executed waiver of notice thereof, at which the stockholders shall elect by a plurality vote a board of directors, and transact such other business as may properly be brought before the meeting. Unless otherwise provided in the certificate of incorporation, voting at all elections for directors need not be by ballot and shall not be cumulative. If the election of directors shall not be held on the day designated for any annual meeting, or at any adjournment thereof, the board of directors shall cause the election to be held at a special meeting of the stockholders as soon thereafter as convenient. At such meeting, the stockholders may elect directors and transact other business with the same force and effect as at an annual meeting.

Section 3. Written notice of the annual meeting stating the place, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting shall be given to each stockholder entitled to vote at such meeting not less than ten (10) nor more than sixty (60) days before the date of the meeting.

Section 4. The officer who has charge of the stock ledger of the corporation shall prepare and make, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical

order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held. The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.

Section 5. Special meetings of the stockholders, for any purpose or purposes, unless otherwise prescribed by statute or by the certificate of incorporation, may be called by the chief executive officer, president or chairman, and shall be called by the president or secretary at the request in writing of a majority of the board of directors, or at the request in writing of stockholders owning ten percent (10%) or more of the entire capital stock of the corporation issued and outstanding and entitled to vote. Such request shall state the purpose or purposes of the proposed meeting.

Section 6. Written notice of a special meeting stating the place, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting and the purpose or purposes for which the meeting is called, shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting, to each stockholder entitled to vote at such meeting.

Section 7. Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

Section 8. The holders of a majority of the stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business except as otherwise provided by statute or by the certificate of incorporation; provided that if a separate class vote is required with respect to any matter, the holders of a majority of the outstanding shares of such class, present in person or by proxy, shall constitute a quorum of such class, and, except as otherwise provided by law or the certificate of incorporation, the affirmative vote of a majority of shares of such class so present shall be the act of such class. If, however, such quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented any business may be transacted which might have been transacted at the meeting as originally notified. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

Section 9. When a quorum is present at any meeting, the vote of the holders of a majority of the stock having voting power present in person or represented by proxy shall decide any question brought before such meeting, unless the question is one upon which by express provision of statute or of the certificate of incorporation a different vote is required, in which case such express provision shall govern and control the decision of such question.

Section 10. Each stockholder shall, at every meeting of the stockholders, be entitled to one vote in person or by proxy for each share of the capital stock having voting power held by such stockholder, but no proxy shall be voted on after three years from its date, unless the proxy provides for a longer period.

Section 11. Any action required to be taken at any annual or special meeting of stockholders of the corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

Section 12. Inspectors. At any meeting of the stockholders, the board of directors may, or upon the request of any one or more stockholders or proxies holding or representing not less than 10 percent of the outstanding shares shall, appoint one or more persons as inspectors for such meeting. Such inspectors shall ascertain and report the number of shares represented at the meeting, based upon their determination of the validity and effect of proxies, count all votes and report the results, and do all such other acts as are proper to conduct the election and voting with impartiality and fairness. Each report of an inspector shall be in writing and signed by the inspector or by a majority of them if there be more than one inspector acting at such meeting. If there is more than one inspector, the report of a majority shall be the report of the inspectors. The report of the inspector or inspectors on the number of shares represented at the meeting and the results of the voting shall be prima facie evidence thereof.

## ARTICLE III

### Directors

Section 1. The number of directors which shall constitute the whole board shall consist of nine directors. Subject to the last sentence of this paragraph, the following qualifications for directors shall apply: two (2) directors shall be persons designated by EGI- TRB, L.L.C. ("EGI- TRB") pursuant to that certain Investor Rights Agreement, dated as of April 1, 2007, by and among Tribune Company, EGI- TRB, L.L.C. and GreatBanc Trust Company, solely as trustee of the Tribune Employee Stock

Ownership Trust which forms a part of the Tribune Employee Stock Ownership Plan (such directors referred to as the "EGI- TRB Designees"); five (5) directors shall be "Independent Directors" as such term is defined below; one (1) director shall be the chief executive officer of the corporation for so long as such person serves in such capacity; and, subject to the immediately following sentence, one (1) director shall be without qualification. Notwithstanding the foregoing, the two (2) EGI- TRB Designees shall become directors without qualification when EGI- TRB and its permitted transferees no longer hold of record and/or beneficially own an aggregate of at least ten percent (10%) of the outstanding shares of common stock, par value $0.01 per share, of the corporation (including shares underlying that certain Warrant initially issued to EGI- TRB by the corporation pursuant to that certain Securities Purchase Agreement, dated as of April 1, 2007, by and among Tribune Company, EGI- TRB and Samuel Zell) on a fully diluted basis. Not more than two (2) directors shall be Affiliates of EGI- TRB and not more than two (2) directors shall be officers or employees of the corporation, it being understood that for these purposes the chairman of the board of directors shall not be deemed to be an officer or employee of the corporation.

For purposes hereof, the term "Independent Director" shall mean a director that has no relationship that may interfere with his, her or its exercise of independent business judgment on behalf of the corporation. Without limiting the foregoing, the following persons shall not be deemed to be Independent Directors: (a) any person that is currently or has served as an employee or officer of the corporation or any Affiliate of the corporation or any stockholder, (b) any person or any Affiliate of a person that has, at the time of determination, a commercial, industrial, banking, consulting, legal, accounting or other business relationship with the corporation, any Affiliate of the corporation or any stockholder, (c) any person or any Affiliate of a person employed, at the time of determination, as an executive officer of any tax exempt organization that is receiving, or within three (3) years prior to the time of determination has received, significant contributions from the corporation or any Affiliate of the corporation or (d) any immediate family member of any individual described in clauses (a), (b) or (c). For purposes hereof, the term "Affiliate" shall mean, with respect to a person, another person who, directly or indirectly, controls, is controlled by or is under common control with such person, including, without limitation, any general partner, officer, director, or manager of such person; provided that no entity for whom the trustee of the corporation's employee stock ownership trust which forms part of the corporation's employee stock ownership plan serves as a trustee shall be deemed to be an Affiliate of such trustee.

Section 2. The directors shall be elected at the annual meeting of the stockholders, and each initial director shall be elected to serve until the next annual meeting of stockholders, until the director's successor is elected and qualified or until the director's earlier resignation or removal. From and after the third annual meeting of the stockholders following the Merger (as such term is defined in that certain Agreement and Plan of Merger, dated as of April 1, 2007, by and among GreatBanc Trust Company, solely as trustee of the Tribune Employee Stock Ownership Trust which forms a part of the Tribune Employee Stock Ownership Plan, Tribune Company and EGI- TRB), the board shall be divided into three classes, with each class consisting of three directors, or

as nearly equal in number as the then total number of directors constituting the entire board permits, to serve for staggered three- year terms. The initial term of office of the first class shall expire at the fourth annual meeting of the stockholders following the Merger. The initial term of office of the second class shall expire at the fifth annual meeting of the stockholders following the Merger. The initial term of office of the third class shall expire at the sixth annual meeting of the stockholders following the Merger. The directors elected at an annual meeting of stockholders to succeed those whose terms then expire shall be identified as being directors of the same class as the directors whom they succeed, and each of them shall hold office until the third succeeding annual meeting of the stockholders and until such director's successor shall have been elected and qualified. Directors need not be stockholders.

Section 3. Vacancies and newly created directorships resulting from any increase in the authorized number of directors may be filled by a majority of the directors then in office, though less than a quorum, or by the sole remaining director, or by the affirmative vote of a majority of stockholders then entitled to vote thereon, and each director so chosen shall hold office in accordance with Section 1 of this Article. If there are no directors in office, then an election of directors may be held in the manner provided by statute.

Section 4. At any duly called and held special meeting of the stockholders, any director or directors may, by the affirmative vote of the holders of a majority of all the shares of stock outstanding and entitled to vote in an election of directors, be removed from office for cause; provided, however, that, if the stockholders of the corporation are entitled under the provisions of the certificate of incorporation to exercise cumulative voting rights in the election of directors, then no removal shall be effective if the holders of that proportion of the shares of stock outstanding and entitled to vote for an election of directors as could elect to the full board as then provided by these bylaws the director or directors sought to be removed shall vote against removal. The successor or successors to any director or directors so removed may be elected by the stockholders at the meeting at which removal was effectuated. The remaining directors may, to the extent vacancies are not filled by election by the stockholders, fill any vacancy or vacancies created by the removal.

Section 5. The business of the corporation shall be managed by or under the direction of the board of directors which may exercise all such powers of the corporation and do all such lawful acts as are not by statute or by the certificate of incorporation or by these bylaws directed or required to be exercised or done by the stockholders.

Section 6. The corporation shall have a standing Audit Committee, Compensation Committee and Nominating Committee of the board, each composed of three members, in each case, with such rights, duties and obligations as are customarily possessed by such committees at similarly situated companies. Each of the Audit, Compensation and Nominating Committees will have at least two Independent Directors as members. At least one member of each of the Audit Committee, Compensation Committee and Nominating Committee shall be an EGI- TRB Designee. The board may,

in its discretion, by the affirmative vote of a majority of the whole board, designate one or more additional committees, each committee to consist of one or more of the directors. The board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. At all committee meetings, a majority of the total number of members shall constitute a quorum for the transaction of business and the act of a majority of the members present at any meeting at which there is a quorum shall be the act of such committee. In the absence or disqualification of any member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether he or they constitute a quorum, may unanimously appoint another member of the board to act at the meeting in the place of the absent or disqualified member provided such member meets the qualification requirements set forth herein. Except as otherwise provided by law or these bylaws, any committee, to the extent provided by resolution of the board, shall have and may exercise all the powers and authority of the board. No committee shall have or exercise the powers and authority of the board with respect to filling vacancies among the directors or in any committee of the directors, amending the certificate of incorporation, adopting an agreement of merger or consolidation, recommending to the stockholders the sale, lease, or exchange of all or substantially all of the corporation's property and assets, recommending to the stockholders a dissolution of the corporation or a revocation of a dissolution, amending the bylaws, or, unless the resolution of the board expressly so provides, declaring a dividend or authorizing the issuance of stock. A majority of the members of a committee may determine its action and fix the time and place of its meetings, unless the board shall otherwise provide. The board shall have the power at any time to fill vacancies in, to change the membership of, or to discharge any committee.

ARTICLE IV

Meetings of the Board of Directors

Section 1. The board of directors of the corporation may hold meetings, both regular and special, either within or without the State of Delaware.

Section 2. The first meeting of each newly elected board of directors shall be held at such time and place as shall be fixed by the vote of the stockholders at the annual meeting and no notice of such meeting shall be necessary to the newly elected directors in order legally to constitute the meeting, provided a quorum shall be present. In the event of the failure of the stockholders to fix the time or place of such first meeting of the newly elected board of directors, or in the event such meeting is not held at the time and place so fixed by the stockholders, the meeting may be held at such time and place as shall be specified in a notice given as hereinafter provided for special meetings of the board of directors, or as shall be specified in a written waiver of notice signed by all of the directors.

Section 3. Regular meetings of the board of directors may be held without notice at such time and at such place as shall from time to time be determined by the board, and no notice need be given as to any regular meeting.

Section 4. Special meetings of the board may be called by the chairman, president or chief executive officer on two (2) days' notice to each director, either personally or by mail or by telegram; special meetings shall be called by the chairman, president or chief executive officer in like manner and on like notice on the written request of two or more directors. Meetings may be held at any time without notice if all the directors are present or if, at any time before or after the meeting, those not present waive notice of the meeting in writing.

Section 5. At all meetings of the board a majority of the total number of directors shall constitute a quorum for the transaction of business and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the board of directors, except as may be otherwise specifically provided by statute or by the certificate of incorporation. If a quorum shall not be present at any meeting of the board of directors the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 6. Unless otherwise restricted by the certificate of incorporation or these bylaws, any action required or permitted to be taken at any meeting of the board of directors or of any committee thereof may be taken without a meeting, if all members of the board or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the board or committee.

Section 7. The directors may be paid their expenses, if any, of attendance at each meeting of the board of directors and may be paid a fixed sum for attendance at each meeting of the board of directors or a stated salary as director. No such payment shall preclude any director from serving the corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings.

Section 8. Unless otherwise restricted by the certificate of incorporation, members of the board of directors or of any committee designated by the board may participate in a meeting of the board or any such committee by means of conference telephone or similar communications equipment whereby all persons participating in the meeting can hear each other. Participation in any meeting by such means shall constitute presence in person at such meeting.

Section 9. A director who is present at a meeting of the board at which action on any corporate matter is taken shall be conclusively presumed to have assented to the action taken unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to the action with the person acting as the secretary of the meeting before the adjournment thereof or shall forward his written dissent by registered

mail to the secretary immediately after the adjournment of the meeting. The right to dissent shall not apply to a director who voted in favor of the action.

## ARTICLE V

### Notices

Section 1. Whenever, under the provisions of the statutes or of the certificate of incorporation or of these bylaws, notice is required to be given to any director or stockholder, it shall not be construed to mean personal notice, but such notice may be given in writing, by mail, addressed to such director or stockholder, at his address as it appears on the records of the corporation, with postage thereon prepaid, and such notice shall be deemed to be given at the time when the same shall be deposited in the United States mail. Notice to directors may also be given by telegram, facsimile or by electronic transmission.

Section 2. Whenever any notice is required to be given under the provisions of the statutes or of the certificate of incorporation or of these bylaws, a waiver thereof in writing, signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto. Attendance by a director or stockholder at a meeting shall constitute a waiver of notice of such meeting except when the director attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting has not been lawfully called or convened.

## ARTICLE VI

### Officers

Section 1. The officers of the corporation shall be chosen by the board of directors and shall be a president, secretary and treasurer. The board of directors may elect a chairman of the board, chief executive officer, a chief operating officer, a chief financial officer, one or more vice presidents and one or more assistant secretaries and assistant treasurers. Any number of offices may be held by the same person, unless the certificate of incorporation or these bylaws otherwise provide.

Section 2. The board of directors at its first meeting and after each annual meeting of stockholders shall choose a president, a secretary and a treasurer and shall choose a chairman of the board.

Section 3. The board of directors may appoint such other officers and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise

such powers and perform such duties as shall be determined from time to time by the board.

Section 4. The salaries of all officers and agents of the corporation shall be fixed by the board of directors.

Section 5. The officers of the corporation shall hold office until their successors are chosen and qualify. Any officer elected or appointed by the board of directors may be removed at any time by the affirmative vote of a majority of the board of directors. Any vacancy occurring in any office of the corporation may be filled by the board of directors.

Section 6. The Chairman of the Board. The chairman of the board, if there be a chairman, shall preside at all meetings of the stockholders, of the board of directors and of the executive committee, if any, and he shall have such other powers and duties as the board of directors may from time to time prescribe. He may execute contracts in the name of the corporation. He may sign, with the secretary, assistant secretary, treasurer or assistant treasurer, certificates for shares of the corporation, and may sign any policies, deeds, mortgages, bonds, contracts, or other instruments which the board of directors have authorized to be executed except in cases where the signing and execution thereof shall be expressly delegated by the board of directors or by these bylaws to some other officer or agent of the corporation, or shall be required by law to be otherwise signed or executed.

Section 7. The Chief Executive Officer. The chief executive officer of the corporation shall have the general direction of the affairs of the corporation except as otherwise prescribed by the board of directors. In the absence of the chairman of the board, he shall preside at all meetings of the stockholders, of the board of directors and of the executive committee, if any, and shall designate the acting secretary for such meetings to take the minutes thereof for delivery to the secretary. He may sign, with the secretary, assistant secretary, treasurer or assistant treasurer, certificates for shares of the corporation, and may sign any policies, deeds, mortgages, bonds, contracts, or other instruments which the board of directors have authorized to be executed except in cases where the signing and execution thereof shall be expressly delegated by the board of directors or by these bylaws to some other officer or agent of the corporation, or shall be required by law to be otherwise signed or executed, appoint and discharge agents and employees of the corporation, and in general, shall perform all duties incident to the office of chief executive officer.

Section 8. The President. The president along with the chief executive officer of the corporation shall have the general direction of the affairs of the corporation except as otherwise prescribed by the board of directors. He may sign, with the secretary, assistant secretary, treasurer or assistant treasurer, certificates for shares of the corporation, and may sign any policies, deeds, mortgages, bonds, contracts, or other instruments which the board of directors have authorized to be executed except in cases where the signing and execution thereof shall be expressly delegated by the board of

directors or by these bylaws to some other officer or agent of the corporation, or shall be required by law to be otherwise signed or executed, appoint and discharge agents and employees of the corporation, and in general, shall perform all duties incident to the office of president. In the absence of the chief executive officer or in the event of his inability or refusal to act, the president, if there be any, shall perform the duties of the chief executive officer, and when so acting, shall have all the powers of and be subject to all the restrictions upon the chief executive officer.

Section 9. The Vice- Presidents. In the absence of the chief executive officer or president in the event of his inability or refusal to act, the vice- president, if there be any, (or in the event there be more than one vice- president, the vice-presidents in the order designated, or in the absence of any designation, then in the order of their election) shall perform the duties of the chief executive officer or president, and when so acting, shall have all the powers of and be subject to all the restrictions upon the chief executive officer or president. The vice- presidents shall perform such other duties and have such other powers as the board of directors may from time to time prescribe.

Section 10. The Secretary. The secretary shall attend all meetings of the board of directors and all meetings of the stockholders and record all the proceedings of the meetings of the corporation and of the board of directors in a book to be kept for that purpose and shall perform like duties for the standing committees when required. He shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the board of directors, and shall perform such other duties as may be prescribed by the board of directors or president, under whose supervision he shall be. He shall have custody of the corporate seal of the corporation and he, or an assistant secretary, shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by his signature or by the signature of such assistant secretary. The board of directors may give general authority to any other officer to affix the seal of the corporation and to attest the affixing by his signature.

Section 11. The Assistant Secretary. The assistant secretary, or if there be more than one, the assistant secretaries in the order determined by the board of directors (or if there be no such determination, then in the order of their election) shall, in the absence of the secretary or in the event of his inability or refusal to act, perform the duties and exercise the powers of the secretary and shall perform such other duties and have such other powers as the board of directors may from time to time prescribe.

Section 12. The Treasurer. The treasurer shall be the chief financial officer of the corporation and shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the corporation in such depositories as may be designated by the board of directors.

He shall disburse the funds of the corporation as may be ordered by the board of directors, taking proper vouchers for such disbursements, and shall render to the president and the board of directors, at its regular meetings, or when the board of

directors so requires, an account of all his transactions as treasurer and of the financial condition of the corporation.

If required by the board of directors, he shall give the corporation a bond (which shall be renewed every six (6) years) in such sum and with such surety or sureties as shall be satisfactory to the board of directors for the faithful performance of the duties of his office and for the restoration to the corporation, in case of his death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his possession or under his control belonging to the corporation.

Section 13. The Assistant Treasurer. The assistant treasurer, or if there shall be more than one, the assistant treasurers in the order determined by the board of directors (or if there be no such determination, then in the order of their election), shall, in the absence of the treasurer or in the event of his inability or refusal to act, perform the duties and exercise the powers of the treasurer and shall perform such other duties and have such other powers as the board of directors may from time to time prescribe.

# ARTICLE VII

## Certificates of Stock

Section 1. Every holder of stock in the corporation shall be entitled to have a certificate, signed by, or in the name of the corporation by the chief executive officer or president or a vice president and the treasurer or an assistant treasurer, or the secretary or an assistant secretary of the corporation, certifying the number of shares owned by him in the corporation. In case any such officer who has signed, or whose facsimile signature has been placed upon, a stock certificate shall have ceased to be such before such certificate is issued, it may be issued with the same effect as if such officer had not ceased to be such at the time of its issuance.

If the corporation shall be authorized to issue more than one class of stock or more than one series of any class, the designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate which the corporation shall issue to represent such class or series of stock, provided that, except as otherwise provided in Section 202 of the General Corporation Law of Delaware, in lieu of the foregoing requirements, there may be set forth on the face or back of the certificate which the corporation shall issue to represent such class or series of stock, a statement that the corporation will furnish without charge to each stockholder who so requests the designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

Section 2. Where a certificate is countersigned (i) by a transfer agent other than the corporation or its employee, or (ii) by a registrar other than the corporation or its employee, any of or all the signatures of the officers of the corporation may be a facsimile. In case any officer who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be an officer before such certificate is issued, it may be issued by the corporation with the same effect as if he were such officer at the date of issue.

Section 3. Lost Certificates. The board of directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of the fact by the person claiming the certificate of stock to be lost, stolen or destroyed. When authorizing such issue of a new certificate or certificates, the board of directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate or certificates, or his legal representative, to advertise the same in such manner as it shall require and/or to give the corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the corporation with respect to the certificate alleged to have been lost, stolen or destroyed.

Section 4. Transfers of Stock. Upon surrender to the corporation or the transfer agent of the corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer, it shall be the duty of the corporation to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

Section 5. Fixing Record Date. In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or to express consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the board of directors may fix, in advance, a record date, which shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting, nor more than sixty (60) days prior to any other action. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the board of directors may fix a new record date for the adjourned meeting.

Section 6. Failure to Fix Record Date. If no record date is fixed in accordance with Section 5 of this Article VII:

(a) The record date for determining stockholders entitled to notice or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given or if  the notice is waived, at the close of business on the day next preceding the day on which the meeting is held.

(b) The record date for determining stockholders entitled to express consent to corporate action in writing without a meeting, when no prior action by the board is required by law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the corporation by delivery to the place where the proceedings of the corporation are recorded and the custodian of such proceedings. When prior action by the board is required by law, the record date shall be at the close of business on the day on which the board adopts the resolution taking such prior action.

(c) The record date for determining stockholders for any other purpose shall be at the close of business on the day on which the board adopts the resolution relating thereto.

Section 7. Registered Stockholders. The corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and to hold liable for calls and assessments a person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

## ARTICLE VIII

### Amendments

These bylaws may be amended, altered, or repealed and new bylaws adopted by the affirmative vote of the holders of at least 67% of the voting power of the shares entitled to vote, or at any meeting of the board of directors by a majority vote if the certificate of incorporation shall confer such power to adopt, amend, alter, or repeal the bylaws upon the directors. The fact that the power to adopt, amend, alter, or repeal the bylaws has been conferred upon the board of directors shall not divest the stockholders of the same powers.

## ARTICLE IX

### Fiscal Year

The fiscal year shall be as determined by the board. In the absence of such determination, the fiscal year shall be the calendar year.

# ARTICLE X

## Corporate Seal

The board may provide a suitable seal, including duplicates thereof, containing the name of the corporation.

Exhibit 4.1

Execution Version

**$1,600,000,000**

**SENIOR UNSECURED INTERIM LOAN AGREEMENT**

Dated as of December 20, 2007

Among

**TRIBUNE COMPANY**

as Borrower

**THE INITIAL LENDERS NAMED HEREIN**

as Initial Lenders

**MERRILL LYNCH CAPITAL CORPORATION**

as Administrative Agent

**JPMORGAN CHASE BANK, N.A.**

as Syndication Agent

**CITICORP NORTH AMERICA, INC.**

and

**BANK OF AMERICA, N.A.**

as Co- Documentation Agents

and

**J.P. MORGAN SECURITIES INC.,**

**MERRILL LYNCH & CO.,**

**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,**

**CITIGROUP GLOBAL MARKETS INC.**

and

**BANC OF AMERICA SECURITIES LLC**

as Joint Lead Arrangers and Joint Bookrunners

Cahill Gordon & Reindel LLP

80 Pine Street

New York, New York 10005

894358

# TABLE OF CONTENTS

**Page**

## ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

| | | |
|---|---|---|
| SECTION 1.01. | Certain Defined Terms | 1 |
| SECTION 1.02. | Terms Generally | 30 |
| SECTION 1.03. | Accounting Terms | 30 |

## ARTICLE II

### AMOUNTS AND TERMS OF THE ADVANCES

| | | |
|---|---|---|
| SECTION 2.01. | The Advances | 31 |
| SECTION 2.02. | Making the Advances | 31 |
| SECTION 2.03. | [Intentionally Omitted.] | 32 |
| SECTION 2.04. | Fees | 32 |
| SECTION 2.05. | Termination or Reduction of the Commitments | 32 |
| SECTION 2.06. | Repayment of Advances | 32 |
| SECTION 2.07. | Interest on Advances | 32 |
| SECTION 2.08. | Interest Rate Determination | 33 |
| SECTION 2.09. | Optional Conversion of Advances | 34 |
| SECTION 2.10. | Prepayments of Advances | 34 |
| SECTION 2.11. | Increased Costs | 36 |
| SECTION 2.12. | Illegality | 36 |
| SECTION 2.13. | Payments and Computations; Pro Rata Treatment | 37 |
| SECTION 2.14. | Taxes | 37 |
| SECTION 2.15. | Sharing of Payments, Etc | 39 |
| SECTION 2.16. | Evidence of Debt | 40 |
| SECTION 2.17. | Exchange Notes | 40 |
| SECTION 2.18. | Mitigation Obligations | 41 |

## ARTICLE III

### CONDITIONS TO EFFECTIVENESS AND LENDING

| | | |
|---|---|---|
| SECTION 3.01. | Conditions Precedent to Initial Borrowing | 41 |
| SECTION 3.02. | Initial Maturity Date | 44 |

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| SECTION 4.01. | Representations and Warranties of Borrower | 44 |

-i-

**Page**

ARTICLE V

COVENANTS OF BORROWER

| | | |
|---|---|---|
| SECTION 5.01. | Affirmative Covenants | 49 |
| SECTION 5.02. | Negative Covenants | 54 |

ARTICLE VI

EVENTS OF DEFAULT

| | | |
|---|---|---|
| SECTION 6.01. | Events of Default | 66 |

ARTICLE VII

THE AGENT

| | | |
|---|---|---|
| SECTION 7.01. | Authorization and Action | 68 |
| SECTION 7.02. | Agent's Reliance, Etc | 68 |
| SECTION 7.03. | The Agent and Affiliates | 69 |
| SECTION 7.04. | Lender Credit Decision | 69 |
| SECTION 7.05. | Indemnification | 69 |
| SECTION 7.06. | Successor Agent | 70 |
| SECTION 7.07. | Other Agents | 70 |

ARTICLE VIII

MISCELLANEOUS

| | | |
|---|---|---|
| SECTION 8.01. | Amendments, Etc | 70 |
| SECTION 8.02. | Notices, Etc | 72 |
| SECTION 8.03. | No Waiver; Remedies | 74 |
| SECTION 8.04. | Costs and Expenses; Indemnity; Survival | 74 |
| SECTION 8.05. | Right of Set-off | 76 |
| SECTION 8.06. | Binding Effect | 76 |
| SECTION 8.07. | Assignments and Participations | 76 |
| SECTION 8.08. | Confidentiality | 79 |
| SECTION 8.09. | Governing Law | 80 |
| SECTION 8.10. | Execution in Counterparts | 80 |
| SECTION 8.11. | Jurisdiction, Etc | 80 |
| SECTION 8.12. | [Intentionally Omitted.] | 80 |
| SECTION 8.13. | Patriot Act Notice | 80 |
| SECTION 8.14. | Waiver of Jury Trial | 81 |
| SECTION 8.15. | Replacement of Lenders | 81 |
| SECTION 8.16. | Acknowledgments | 82 |
| SECTION 8.17. | Headings | 82 |
| SECTION 8.18. | Severability | 82 |
| SECTION 8.19. | Reliance | 82 |
| SECTION 8.20. | Releases of Guarantees | 82 |

**Schedules**

| | |
|---|---|
| Schedule I | Commitments; List of Applicable Lending Offices |
| Schedule I-A | Interest Rates |
| Schedule 1.01(a) | Refinancing Debt |
| Schedule 1.01(b) | TMCT Property |
| Schedule 1.01(c) | Pro Forma Basis |
| Schedule 1.01(d) | Certain Intercompany Indebtedness |
| Schedule 1.01(e) | Closing Date Guarantors |
| Schedule 2.04(a) | Fiscal Quarters |
| Schedule 4.01(f) | Litigation |
| Schedule 4.01(p) | Subsidiaries |
| Schedule 5.02(a) | Existing Liens |
| Schedule 5.02(e)(ii) | Existing Debt |
| Schedule 5.02(e) | Asset Sales |

**Exhibits**

| | |
|---|---|
| Exhibit A | Form of Note |
| Exhibit B | Form of Notice of Borrowing |
| Exhibit C | Form of Assignment and Acceptance |
| Exhibit D | Form of Opinion of Counsel for the Company |
| Exhibit E | Form of Solvency Certificate |
| Exhibit F | Form of Senior Subordinated Guarantee |
| Exhibit G | Form of Interim Loan Pledge Agreement |
| Exhibit H | Form of Administrative Questionnaire |
| Exhibit I | Description of Exchange Notes |
| Exhibit J | Form of Registration Rights Agreement |
| Exhibit K-1 | Form of Opinion of Counsel for the Company |
| Exhibit K-2 | Form of Opinion of General Counsel of the Company |

<u>SENIOR UNSECURED INTERIM LOAN AGREEMENT</u>

This SENIOR UNSECURED INTERIM LOAN AGREEMENT ("Agreement") is entered into as of December 20, 2007 among TRIBUNE COMPANY, a Delaware corporation ("Tribune" or "Borrower"), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), MERRILL LYNCH CAPITAL CORPORATION, as administrative agent (the "Agent"), JPMORGAN CHASE BANK, N.A., as syndication agent (in such capacity, the "Syndication Agent"), and CITICORP NORTH AMERICA, INC. and BANK OF AMERICA, N.A. as co- documentation agents (in such capacity, the "Documentation Agents"), J.P. MORGAN SECURITIES INC., MERRILL LYNCH & CO., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, CITIGROUP GLOBAL MARKETS INC. and BANC OF AMERICA SECURITIES LLC (collectively, the "Lead Arrangers") will act as Joint Lead Arrangers and Joint Bookrunners.

Borrower has requested that the Lenders provide an interim loan facility, and the Lenders are willing to do so on the terms and conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01. <u>Certain Defined Terms</u>. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Acquisition" means the merger providing for Merger Sub to be merged with and into Borrower, and following such merger, Borrower to continue as the surviving corporation wholly owned by the ESOP.

"Acquisition Agreement" means the Agreement and Plan of Merger, dated as of April 1, 2007, by and among Tribune, Merger Sub, GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan, and, for the limited purposes set forth therein, EGI- TRB, L.L.C., as the same may be waived, amended, supplemented or otherwise modified from time to time; provided that any such waiver, amendment, supplement or other modification, in each case that is material and adverse to Lenders shall have been approved by the Agent.

"Acquisition Conditions" has the meaning specified in Section 5.02(b)(v).

"Administrative Questionnaire" means an Administrative Questionnaire in substantially the form of Exhibit H.

"Advance" has the meaning set forth in Section 2.01 and shall include any Advance made as a result of the accrual of PIK Interest.

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person. For purposes of this definition, the term "control" (including the terms "controlling", "controlled by" and

"under common control with") of a Person means the possession, direct or indirect, of the power to vote 10% or more of the Voting Stock of such Person or to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by contract or otherwise.

"Agent" has the meaning specified in the preamble.

"Agent's Account" means the account of the Agent maintained by the Agent at Merrill Lynch Capital Corporation at its office at Four World Financial Center, New York, New York.

"Agreement" has the meaning specified in the preamble and includes any subsequent amendments, supplements, amendments and restatements or other modifications from time to time thereto.

"Applicable Lending Office" means, with respect to each Lender, such Lender's Domestic Lending Office in the case of a Base Rate Advance and such Lender's Eurodollar Lending Office in the case of a Eurodollar Rate Advance.

"Applicable Margin" means for any Advance for any period, (i) in the case of any Euro- dollar Rate Advance, 4.50% per annum (the "Initial Eurodollar Spread"); provided that the Initial Euro- dollar Spread shall be increased by 0.50% per annum on the date that is three calendar months following the Closing Date and by an additional 0.50% per annum on each successive date falling three calendar months thereafter and (ii) in the case of any Base Rate Advance, 3.50% per annum (the "Initial Base Rate Spread"); provided that the Initial Base Rate Spread shall be increased by 0.50% per annum on the date that is three calendar months following the Closing Date and by an additional 0.50% per annum on each successive date falling three calendar months thereafter; provided, however, that the interest rate under Section 2.07(a) for any Advance shall not exceed the level set forth on Schedule I- A.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Asset Sale" means (a) any conveyance, sale, lease, sublease, assignment, transfer or other disposition (including by way of merger or consolidation and including any Sale and Lease- Back Transaction and any Disposition) of any property excluding sales of inventory and dispositions of cash and Cash Equivalents in each case, in the ordinary course of business, by Borrower or any of its Subsidiaries and (b) any issuance or sale of any Equity Interests of any Subsidiary of Borrower, in each case to any Person other than (i) Borrower, (ii) any Guarantor or (iii) except for purposes of Section 5.02(e), any other Subsidiary. Notwithstanding anything herein to the contrary, Asset Sales shall not include (x) any conveyance, sale, lease, sublease, assignment, transfer or other disposition of property or any issuance or sale of any Equity Interests of any Subsidiary of Borrower (in a single or series of related transactions) with an aggregate fair market value of less than $10.0 million and (y) any issuance or sale of Junior Capital.

"Asset Sale Prepayment Event" means (x) the receipt of any Net Cash Proceeds from any Asset Sale or series of related Asset Sales; provided that the receipt of Net Cash Proceeds from any transactions expressly permitted by Section 5.02(e), other than transactions consummated in reliance on Sections 5.02(e)(ii) and (vii), shall be excluded for purposes of this clause (x), and (y) pursuant to clause (v) of the definition of "Permitted Disposition Transactions," the receipt of the prepayment amount associated with a Disposition. Notwithstanding the foregoing, any sale of the asset listed in the Side Letter shall not constitute an Asset Sale Prepayment Event if used for the purposes stipulated in the Side Letter.

- 2 -

"Assignment and Acceptance" means an assignment and acceptance entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 8.07 or by the definition of "Eligible Assignee"), and accepted by the Agent and, if applicable, Borrower, in substantially the form of Exhibit C hereto or any other form approved by the Agent.

"Attributable Debt" shall mean, when used with respect to any Sale and Lease- Back Transaction, as at the time of determination, the present value (discounted at a rate equivalent to Borrower's then- current weighted average cost of funds for borrowed money as at the time of determination, compounded on a semi- annual basis) of the total obligations of the lessee for rental payments during the remaining term of the lease included in any such Sale and Lease- Back Transaction.

"Base Rate" means a fluctuating interest rate per annum in effect from time to time, which rate per annum shall at all times be equal to the highest of:

(a) the rate of interest announced publicly by Citibank, N.A. in New York, New York, from time to time, as Citibank, N.A.'s corporate base rate; and

(b) ½ of one percent per annum above the Federal Funds Rate.

"Base Rate Advance" means an Advance that bears interest as provided in Section 2.07(a)(i).

"Board of Directors" means (a) with respect to a corporation, the board of directors of the corporation, (b) with respect to a partnership, the board of directors of the general partner of the partnership and (c) with respect to any other Person, the board or committee of such Person serving a similar function.

"Borrower" has the meaning specified in the preamble.

"Borrower Information" has the meaning specified in Section 8.08.

"Borrower's Account" means the account of Borrower specified by Borrower to the Agent from time to time in writing.

"Borrowing" means a borrowing (other than a Conversion) consisting of simultaneous Advances of the same Type made by the Lenders.

"Broadcasting Holdco Transaction" means the contribution by Borrower of 100% of its equity interests in Tribune Broadcasting Company to its newly formed, direct wholly owned Subsidiary, Tribune Broadcasting Holdco, LLC.

"Business Day" means a day of the year on which banks are not required or authorized by law to close in New York City or Chicago, Illinois and, if the applicable Business Day relates to any Eurodollar Rate Advances, on which dealings are carried on in the London interbank market.

"Capital Expenditures" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capital Lease Obligations) by the Borrower and the Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on a consolidated statement of cash flows of Borrower and its Subsidiaries; provided that the term "Capital Expenditures" shall not include (i), with respect to any purchase or acquisition of all of the Equity Interests of a Person or all or substan-

-3-

tially all of the property or assets of a Person or business line of a Person, (x) the purchase price thereof and (y) any Capital Expenditures expended by the seller or entity to be acquired in connection with such purchase or acquisition prior to the date thereof or (ii) expenditures constituting part of a Permitted Disposition Transaction.

"Capital Lease Obligation" means, of any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation).

"Cash Equivalents" means, as to any Person, (a) securities issued, or directly, unconditionally and fully guaranteed or insured, by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such Person; (b) time deposits and certificates of deposit of any Lender or any commercial bank having, or which is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia having, capital and surplus aggregating in excess of $500.0 million and a rating of "A" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such Person; (c) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (b) above; (d) commercial paper issued by any Person incorporated in the United States rated at least A- 1 or the equivalent thereof by S&P or at least P- 1 or the equivalent thereof by Moody's, and in each case maturing not more than one year after the date of acquisition by such Person; (e) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (a), (b) and (d) above; (f) demand deposit accounts maintained in the ordinary course of business; (g) money market funds that (i) comply with the criteria set forth in SEC Rule 2a- 7 under the Investment Company Act of 1940, as amended from time to time, (ii) are rated AAA by S&P or Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000; (h) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof, maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's; and (i) investments in auction rate securities or similar securities with a rating of AA and a maximum holding period of 90 days, for which the reset date will be used to determine the potential maturity date.

"Cash Management Agreement" means any agreement or arrangement to provide cash management services, including treasury, depository overdraft, credit or debit card, electronic funds transfer and other cash management arrangements.

"Casualty Event" means, with respect to any equipment, fixed assets or real property (including any improvements thereon) of Borrower or any Subsidiary, any loss of or damage to, or any condemnation or other taking by a Governmental Authority of, such property, the date on which Borrower or any of the Subsidiaries receives insurance proceeds, or proceeds of a condemnation award or other compensation to replace or repair such property, in each case, in excess of $10.0 million with respect to any such event.

"Change in Control" means (i) any Person or group of Persons (within the meaning of Sections 13(d) and 14(d) under the Exchange Act), other than, in the aggregate, Zell, EGI- TRB, L.L.C., the ESOP, the ESOP Trust or any Permitted Transferee, shall become the ultimate "beneficial owner" (as defined in Rules 13d- 3 and 13d- 5 under the Exchange Act), directly or indirectly, of Voting Stock representing 40% or more of the Voting Stock of Borrower (or other securities convertible into or exercisable into such Voting Stock) on a fully diluted basis (including common stock equivalents issued pursuant to the Tribune Management Equity Incentive Plan) or shall obtain the power (whether or not exercised) to elect a majority of Borrower's directors or (ii) during any period of 24 consecutive months, individuals who at the beginning of such period constituted the Board of Directors of Borrower (together with any new directors whose election to such board or whose nomination for election by the stockholders of Borrower was approved by a vote of a majority of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors of Borrower then in office; provided that the consummation of the Transactions (including the change in Board of Directors pursuant thereto) shall not constitute a "Change of Control".

"Closing Date" means the date of the initial Advances hereunder.

"Code" means the Internal Revenue Code of 1986, and the regulations thereunder, in each case as amended, reformed or otherwise modified from time to time.

"Collateral" means any and all property owned, leased or operated by a Person from time to time subject to a Lien under the Interim Loan Pledge Agreement or the Senior Secured Pledge Agreement.

"Commitment" means as to any Lender (a) the amount set forth opposite such Lender's name on Schedule I hereto as such Lender's "Commitment" or (b) if such Lender has entered into any Assignment and Acceptance, the amount set forth for such Lender in the Register maintained by the Agent pursuant to Section 8.07(d) as such Lender's "Commitment", as such amount may be reduced pursuant to Section 2.05. The aggregate amount of the Lender's Commitments on the Closing Date is $1,600,000,000.

"Communications" has the meaning specified in Section 8.02(d).

"Companies" means Borrower and its Subsidiaries collectively, and any one of them, a "Company".

"Company Material Adverse Effect" means the definition ascribed thereto in the Acquisition Agreement.

"Consolidated" refers to the consolidation of accounts in accordance with GAAP.

"Consolidated Interest Expense" means, for any period, the total Consolidated interest expense of Borrower and its Subsidiaries for such period, including without duplication:

(a) imputed interest on Capital Lease Obligations and Attributable Debt of Borrower and its Subsidiaries for such period;

(b) commissions, discounts and other fees and charges owed by Borrower or any of its Subsidiaries with respect to letters of credit securing financial obligations, bankers' acceptance financing and receivables financings for such period;

- 5 -

(c) amortization of debt issuance costs, original issue discount and other financing, legal and accounting fees, costs and expenses (whether or not deferred) and any interest expense on deferred compensation arrangements, in each case incurred by Borrower or any of its Subsidiaries for such period;

(d) cash contributions to any employee stock ownership plan or similar trust made by Borrower or any of its Subsidiaries to the extent such contributions are used by such plan or trust to pay interest or fees to any Person (other than Borrower or a wholly owned Subsidiary) in connection with Debt incurred by such plan or trust for such period;

(e) all interest paid or payable with respect to discontinued operations of Borrower or any of its Subsidiaries for such period;

(f) the interest portion of any deferred payment obligations of Borrower or any of its Subsidiaries for such period; and

(g) all interest on any Debt of Borrower or any of its Subsidiaries of the type described in clause (h) or (i) of the definition of "Debt" for such period to the extent paid by Borrower and its Subsidiaries;

provided that (a) to the extent directly related to the Transactions, debt issuance costs, debt discount or premium and other financing fees, costs and expenses shall be excluded from the calculation of Consolidated Interest Expense and (b) Consolidated Interest Expense shall be calculated after giving effect to Hedge Agreements related to interest rates (including associated costs), but excluding unrealized gains and losses with respect to Hedge Agreements related to interest rates.

Consolidated Interest Expense shall be calculated on a Pro Forma Basis to give effect to any Debt (other than Debt incurred for ordinary course working capital needs under ordinary course revolving credit facilities) incurred, assumed or permanently repaid or extinguished at any time on or after the first day of a Test Period and prior to the date of determination in connection with any Permitted Acquisitions and Asset Sales (other than any dispositions in the ordinary course of business) as if such incurrence, assumption, repayment or extinguishing had been effected on the first day of such period.

"Consolidated Total Assets" means the total of all assets of Borrower and the Subsidiaries determined on a consolidated basis in accordance with GAAP.

"Convert", "Conversion" and "Converted" each refers to a conversion of Advances of one Type into Advances of the other Type pursuant to Section 2.08 or 2.09.

"Debt" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all payment obligations of such Person for the deferred purchase price of property or services (other than trade payables not overdue by more than 120 days incurred in the ordinary course of such Person's business), (c) all payment obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all Purchase Money Obligations, Capital Lease Obligations, Attributable Debt and under synthetic, off- balance sheet or tax retention leases (excluding, however, operating leases), (e) all payment obligations, contingent or otherwise, of such Person in respect of acceptances, standby letters of credit or similar extensions of credit, (f) all net payment obligations of such Person in respect of Hedge Agreements, (g) all payment obligations outstanding to Persons that are not Affiliates of Borrower in connection with a Receivables Facility, (h) all Debt of others referred to in clauses (a) through (g) above or clause (i) below (collectively, "Guaranteed Debt") guaranteed directly or indirectly in any manner by such Person, or in effect guaranteed directly or indirectly by such Person, through an

- 6 -

agreement (1) to pay or purchase such Guaranteed Debt or to advance or supply funds for the payment or purchase of such Guaranteed Debt, (2) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Guaranteed Debt or to assure the holder of such Guaranteed Debt against loss in respect of such Guaranteed Debt, (3) to supply funds to or in any other manner invest funds in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (4) otherwise to assure a creditor against loss in respect of such Guaranteed Debt and (i) all Debt referred to in clauses (a) through (h) above (including Guaranteed Debt) secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Debt; provided that, if such Person has not assumed or otherwise become liable in respect of such Debt, such obligations shall be deemed to be in an amount equal to the lesser of (i) the amount of such Debt and (ii) fair market value of such property at the time of determination (in the Borrower's good faith estimate). The amount of any Guaranteed Debt shall be deemed to be an amount equal to the lesser of (a) the stated or determinable amount of the primary obligation in respect of which such Guaranteed Debt is made and (b) the maximum amount for which such guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Guaranteed Debt, unless such primary obligation and the maximum amount for which such guaranteeing Person may be liable are not stated or determinable, in which case the amount of the Guaranteed Debt shall be such guaranteeing Person's reasonably anticipated liability in respect thereof as determined by the Borrower in good faith. Notwithstanding anything to the contrary, Borrower's obligation to pay Dividends to the ESOP pursuant to Section 6.3(a)(3) of the ESOP Purchase Agreement shall not constitute Debt.

"Debt for Borrowed Money" means, as of any date of determination and without duplication, all items that, in accordance with GAAP, would be classified as debt on Borrower's Consolidated balance sheet; provided that Debt for Borrowed Money shall exclude, to the extent otherwise included the preceding clause, (i) accounts payable and accrued liabilities in the ordinary course of business of Borrower and its Subsidiaries, (ii) to the extent constituting an "effective" hedge in accordance with GAAP, prepaid variable forward derivative instruments and prepaid variable forward contract obligations, (iii) notes, bills and checks presented in the ordinary course of business by Borrower or any of its Subsidiaries to banks for collection or deposit, (iv) all obligations of Borrower and its Subsidiaries of the character referred to in this definition to the extent owing to Borrower or any of its Subsidiaries; provided, further, that, with respect to Hedge Agreements, Debt for Borrowed Money shall include only net payment obligations of such Person in respect of Hedge Agreements and (v) Debt of the type otherwise permitted under clauses (viii) or (xi) of Section 5.02(c); and provided, further, that Debt for Borrowed Money shall include, without duplication, whether or not reflected as debt on Borrower's Consolidated balance sheet, all payment obligations outstanding to Persons that are not Affiliates of Borrower in connection with a Receivables Facility.

"Default" means any Event of Default or any event that, unless cured or waived, would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

"Default Interest" has the meaning specified in Section 2.07(b).

"Deferred Net Cash Proceeds" has the meaning assigned to such term in clauses (a) and (c) of the definition of "Net Cash Proceeds."

"Designated Assets" means those assets listed as items 1 and 2 on Schedule 5.02(e) and those assets listed in the Side Letter.

-7-

"Disposition" has the meaning provided in the definition of "Permitted Disposition Transaction."

"Dividend" means with respect to any Person that such Person has declared or paid a dividend or returned any equity capital to the holders of its Equity Interests or authorized or made any other distribution, payment or delivery of property (other than common stock of such Person) or cash to the holders of its Equity Interests as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for consideration any of its Equity Interests outstanding (or any options or warrants issued by such Person with respect to its Equity Interests), or set aside any funds for any of the foregoing purposes, or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for consideration any of the Equity Interests of such Person outstanding (or any options or warrants issued by such Person with respect to its Equity Interests). Without limiting the foregoing, "Dividends" with respect to any Person shall also include (i) all payments made or required to be made by such Person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes and (ii) contributions to the ESOP.

"Documentation Agents" has the meaning assigned to such term in the preamble hereto.

"Dollars" and the "$" sign each means lawful currency of the United States of America.

"Domestic Lending Office" means, with respect to any Lender, the office of such Lender specified as its "Domestic Lending Office" opposite its name on Schedule I hereto or in the Assignment and Acceptance pursuant to which it became a Lender, or such other office of such Lender as such Lender may from time to time specify to Borrower and the Agent.

"Domestic Subsidiary" means any Subsidiary that is organized or existing under the laws of the United States, any state thereof or the District of Columbia; provided, that the definition of "Domestic Subsidiary" shall exclude any such Subsidiary that is a direct or indirect Subsidiary of a Foreign Subsidiary.

"EBITDA" means, for any period, and with respect to Borrower and its Subsidiaries, Consolidated net income (or net loss) of Borrower and its Subsidiaries, exclusive of, without duplication, (w) the income or loss resulting from extraordinary items for such period, and all losses or gains resulting from non- cash, non- operating items and one- time charges, (x) the income of any PDT Entity and any Person accounted for by Borrower or any of its Subsidiaries on the equity method for such period, but any such income so excluded may be included in such period or any later period to the extent of any cash Dividends or distributions actually paid in the relevant period or any later period to Borrower or any Subsidiary of Borrower, (y) whether or not recurring, non- cash charges and, non- cash stock- based compensation charges determined in accordance with GAAP during such period, and whether or not recurring, non- cash retirement expense, including such expense from ESOP, pension and cash balance plans and (z) expected or actual gains resulting from the disposition of discontinued operations, (excluding in the case of clauses (w) and (y) (i) any non- cash charge representing an accrual or a reserve for potential cash charges in any future period and (ii) the accrual of revenue or recording of receivables in the ordinary course of business), plus the sum of (a) Consolidated Interest Expense of Borrower and its Subsidiaries for such period, (b) Consolidated income tax expense of Borrower and its Subsidiaries for such period, (c) depreciation expense of Borrower and its Subsidiaries for such period, (d) amortization expense of Borrower and its Subsidiaries for such period, in each case determined in accordance with GAAP for such period, (e) transaction fees and costs associated or incurred by Borrower or any of its Subsidiaries in connection with the First Step Transactions, the Second Step Transactions and Borrower's existing credit facilities, (f) for the four quarter periods ending December 30, 2007, March 30, 2008, June 29, 2008 and September 28, 2008, $60.0 million in each such four quarter period consisting of pro forma cash savings resulting

- 8 -

from termination of contributions into the Tribune Company 401(k) Savings and Profit Sharing Plan, (g) expected or actual losses resulting from the disposition of discontinued operations and (h) to the extent deducted in calculating Consolidated net income (or net loss) of Borrower and its Subsidiaries, Dividends by Borrower to the ESOP to the extent the amount so Dividended to the ESOP is used to fund the ESOP Note Repayment Amounts (and to the extent such ESOP Note Repayment Amounts are themselves not included in Consolidated net income (or net loss) of Borrower and its Subsidiaries).

EBITDA shall be calculated on a Pro Forma Basis.

"Eligible Assignee" means (i) a Lender, (ii) an Affiliate of a Lender, (iii) an Approved Fund, and (iv) any other bank or financial institution approved by the Agent and Borrower (such approval not to be unreasonably withheld or delayed); provided, however, that neither Borrower nor an Affiliate of Borrower shall qualify as an Eligible Assignee.

"Employee Benefit Plan" means an employee benefit plan (as defined in Section 3(3) of ERISA) that is maintained or contributed to by a Company or with respect to which a Company could incur liability.

"Environmental Action" means any action, suit, demand, demand letter, claim, notice of non- compliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, Environmental Permit or Hazardous Materials or arising from alleged injury or threat to health, safety or the environment relating to Hazardous Materials, including, without limitation, (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions or damages and (b) by any governmental or regulatory authority or any third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"Environmental Law" means any federal, state, local or foreign statute, law, ordinance, rule, regulation, code, order, judgment, decree or judicial interpretation or any binding agency interpretation, policy or guidance relating to pollution or protection of the environment, health, safety or natural resources, including, without limitation, those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"Equity Interests" means (i) shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person or (ii) any warrants, options or other rights to acquire such shares or interests.

"Equity Issuance" means any issuance and sale of Equity Interests (other than (i) the Warrant or any sale or issuance in connection with the exercise thereof, (ii) any issuance or sale pursuant to the Tribune Management Equity Incentive Plan and (iii) any issuance or sale in connection with the Second Step Transactions) of Borrower in exchange for cash or Cash Equivalents in a registered public offering, Rule 144/Regulation S transaction or private placement of capital stock (including any equity- linked securities).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

- 9-

"ERISA Affiliate" means any Person that is a member of Borrower's controlled group, or under common control with Borrower, within the meaning of Section 414 of the Code.

"ERISA Event" means (a) (i) the occurrence of a reportable event, within the meaning of Section 4043 of ERISA, with respect to any Plan unless the 30- day notice requirement with respect to such event has been waived by the PBGC, or (ii) the requirements of subclause (1) of Section 4043(b) of ERISA (without regard to subclause (2) of such Section) are met with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, of a Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such Plan within the following 30 days; (b) the application for a minimum funding waiver with respect to a Plan; (c) the provision by the administrator of any Plan of a notice of intent to terminate such Plan pursuant to Section 4041(a)(2) of ERISA (including any such notice with respect to a plan amendment referred to in Section 4041(e) of ERISA); (d) the cessation of operations at a facility of Borrower or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (e) the withdrawal by Borrower or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (f) the conditions for the imposition of a lien under Section 302 or Section 303 of ERISA shall have been met with respect to any Plan; (g) the adoption of an amendment to a Plan requiring the provision of security to such Plan pursuant to Section 307 of ERISA; (h) the institution by the PBGC of proceedings to terminate a Plan pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, a Plan or (i) the receipt by a Loan Party, a Subsidiary or a PDT Entity of any notice concerning the imposition of liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part 1 of Subtitle E of Title IV of ERISA, or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"ESOP" means the Tribune Employee Stock Ownership Plan.

"ESOP Documentation" means, collectively (a) the Tribune Employee Stock Ownership Plan, effective as of January 1, 2007, (b) the Tribune Employee Stock Ownership Trust, dated April 1, 2007, (c) the ESOP Loan Agreement, ESOP Loan and ESOP Pledge Agreement, (d) the ESOP Purchase Agreement, (e) Acquisition Agreement, (f) Investor Rights Agreement and (g) all amendments, supplements or other modifications to the foregoing, all schedules, exhibits and annexes thereto and all agreements affecting the terms thereof or entered into in connection therewith.

"ESOP Investment" means the purchase by the ESOP of $250.0 million of Tribune common equity made by the ESOP on April 1, 2007.

"ESOP Loan" means the extension of credit made under the ESOP Note and the ESOP Loan Agreement.

"ESOP Loan Agreement" means the ESOP Loan Agreement, dated as of April 1, 2007, by and between Borrower and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the ESOP Trust, which implements and forms a part of the ESOP, as the same may be supplemented, amended, restated or otherwise modified from time to time.

"ESOP Note" means the ESOP's 30- year amortizing 5.01% note as in effect on the Closing Date.

"ESOP Note Repayment Amounts" means, for any period, the aggregate amount of principal and interest payments due to Borrower in respect of the ESOP Note.

- 10-

"ESOP Pledge Agreement" means the ESOP Pledge Agreement made April 1, 2007, between GreatBanc Trust Company, not in its individual or corporate capacity but solely in its capacity as trustee of the ESOP Trust which forms a part of the ESOP and Borrower, as the same may be supplemented, amended, restated or otherwise modified from time to time.

"ESOP Purchase Agreement" means the ESOP Purchase Agreement made April 1, 2007, between Borrower and GreatBanc Trust Company, as trustee of the ESOP Trust, a separate trust created under the ESOP, as the same may be amended, restated or otherwise modified from time to time.

"ESOP Related Distributions" means payments, loans, advances, distributions or dividends made by Borrower to satisfy its obligations to repurchase Borrower's common stock pursuant to the ESOP Documentation or ERISA (including contributions to the ESOP to enable the ESOP to purchase common stock that Borrower would otherwise be required to purchase under the ESOP Documentation or ERISA).

"ESOP Trust" means the Tribune Employee Stock Ownership Trust, dated April 1, 2007.

"Eurocurrency Liabilities" has the meaning assigned to that term in Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"Eurodollar Lending Office" means, with respect to any Lender, the office of such Lender specified as its "Eurodollar Lending Office" opposite its name on Schedule I hereto or in the Assignment and Acceptance pursuant to which it became a Lender (or, if no such office is specified, its Domestic Lending Office), or such other office of such Lender as such Lender may from time to time specify to Borrower and the Agent.

"Eurodollar Rate" means, for any Interest Period for each Eurodollar Rate Advance comprising part of the same Borrowing, an interest rate per annum equal to the rate per annum obtained by dividing (a) the rate per annum appearing on Reuters LIBOR 01 (or any successor page) as the London interbank offered rate for deposits in U.S. dollars at approximately 11:00 A.M. (London time) two Business Days prior to the first day of such Interest Period for a term comparable to such Interest Period or, if for any reason such rate is not available, the average of the rate per annum at which deposits in U.S. dollars are offered by the principal office of each of the Reference Banks in London, England to prime banks in the London interbank market at 11:00 A.M. (London time) two Business Days before the first day of such Interest Period in an amount substantially equal to such Reference Bank's Eurodollar Rate Advance comprising part of such Borrowing to be outstanding during such Interest Period and for a period equal to such Interest Period by (b) a percentage equal to 100% minus the Eurodollar Rate Reserve Percentage for such Interest Period. If the Reuters LIBOR 01 (or any successor page) is unavailable, the Eurodollar Rate for any Interest Period for each Eurodollar Rate Advance comprising part of the same Borrowing shall be determined by the Agent on the basis of applicable rates furnished to and received by the Agent from the Reference Banks two Business Days before the first day of such Interest Period, subject, however, to the provisions of Section 2.08.

"Eurodollar Rate Advance" means an Advance that bears interest as provided in Section 2.07(a)(ii).

"Eurodollar Rate Reserve Percentage" for any Interest Period for all Eurodollar Rate Advances comprising part of the same Borrowing means the reserve percentage applicable two Business Days before the first day of such Interest Period under regulations issued from time to time by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve re-

- 11 -

quirement) for a member bank of the Federal Reserve System in New York City with respect to liabilities or assets consisting of or including Eurocurrency Liabilities (or with respect to any other category of liabilities that includes deposits by reference to which the interest rate on Eurodollar Rate Advances is determined) having a term equal to such Interest Period.

"Events of Default" has the meaning specified in Section 6.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time.

"Exchange Date" has the meaning assigned to such term in Section 2.17(b).

"Exchange Note Trustee" means the trustee under the Exchange Notes Indenture.

"Exchange Notes" has the meaning assigned to such term in Section 2.17(a).

"Exchange Notes Indenture" means the indenture to be entered into relating to the Exchange Notes, with terms and conditions substantially similar in all material respects with Exhibit I but in no event more restrictive than the terms and conditions set forth in this Agreement with (a) such changes being not materially adverse to the Lenders as the Exchange Note Trustee may require and (b) as otherwise reasonably agreed upon by the Borrower and the Agent, as the same may be amended, supplemented, waived or otherwise modified from time to time.

"Exchange Notes Registration Rights Agreement" means the registration rights agreement to be entered into relating to the Exchange Notes, with terms and conditions substantially similar in all material respects with Exhibit I and as otherwise reasonably agreed upon by Borrower and the Agent, as the same may be amended, supplemented, waived or otherwise modified from time to time.

"Exchange Notice" has the meaning assigned to such term in Section 2.17(a).

"Exchange Trigger Event" shall be deemed to have occurred on each date that the Agent shall have received valid requests in accordance with Section 2.17 to exchange at least an aggregate of $100,000,000 principal amount of Advances (that are outstanding as Advances at such time) for Exchange Notes.

"Exemption Certificate" has the meaning specified in Section 2.14(e)(ii).

"Existing Notes" means the Medium Term Notes and Borrower's 4.875% senior notes due 2010, 7.25% senior debentures due 2013, 5.25% senior notes due 2015, 7.5% senior debentures due 2023, 6.25% series D medium- term notes due 2026, 6.61% senior debentures due 2027 and 7.25% senior debentures due 2096.

"FCC" means the Federal Communications Commission, as established by the Communications Act of 1934.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the aver-

- 12 -

age of the quotations for such day on such transactions received by the Agent from three Federal funds brokers of recognized standing selected by it.

"Final Maturity Date" means the eight year anniversary of the Closing Date.

"First Step Closing Date" means June 4, 2007.

"First Step Transactions" means (i) the Stock Repurchase, (ii) the Refinancing, (iii) the Initial Zell Investment and issuance of the Zell Note, (iv) the formation of the ESOP, (v) the execution and delivery of the Acquisition Agreement, (vi) the ESOP Investment, (vii) the execution, delivery and performance of the Senior Secured Credit Agreement and the documents related thereto (including, without limitation, any guarantee agreements and security documents) and the making of the credit extensions thereunder on the First Step Closing Date, (viii) the ESOP Loan and the pledge of shares by ESOP to secure the ESOP Loan, (ix) the Tribune Finance LLC Transaction and the Broadcasting Holdco Transaction, (x) all other transactions necessary to effect or incidental to the foregoing and (xi) the payment of fees, costs and expenses related to the foregoing.

"Fixed Rate Exchange Note" means a "Fixed Rate Note" as defined in Exhibit I.

"Foreign Subsidiary" shall mean a Subsidiary that is organized under the laws of a jurisdiction other than the United States or any state thereof or the District of Columbia.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" has the meaning specified in Section 1.03.

"Governmental Authority" means the government of the United States, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" means that certain senior subordinated guarantee agreement dated the Closing Date among Borrower, the Guarantors and the Agent substantially in the form of Exhibit F hereto.

"Guaranteed Debt" has the meaning specified in the definition of "Debt".

"Guarantor" means each Domestic Subsidiary of Borrower listed on Schedule 1.01(e) and each other Subsidiary of Borrower that is required to become a Guarantor after the Closing Date pursuant to Section 5.01(l) and any other Subsidiary designated as a Guarantor by Borrower. Borrower will provide to the Agent a supplement to Schedule 1.01(e) such that on the Closing Date, Schedule 1.01(e) lists each Domestic Subsidiary of Borrower existing on the Closing Date other than Tribune License Inc., Multimedia Insurance Company, a captive insurance Subsidiary, and each Immaterial Subsidiary of Borrower.

"Hazardous Materials" means (a) petroleum and petroleum products, byproducts or breakdown products, radioactive materials, asbestos-containing materials, polychlorinated biphenyls and radon gas and (b) any other chemicals, materials or substances designated, classified or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

- 13-

"Hedge Agreements" means interest rate swap, cap or collar agreements, interest rate future or option contracts, currency swap agreements, currency future or option contracts and other similar agreements.

"Hedging Obligations" means obligations under or with respect to Hedge Agreements.

"Immaterial Subsidiary" means, at any time of determination, any Subsidiary of Borrower that (i) has total annual revenues and total assets of less than $10,000,000 for the immediately preceding period of 12 consecutive fiscal months and (ii) does not have any Debt in respect of which the Borrower or any Subsidiary of Borrower shall have any Guaranteed Debt or has not granted or permitted to exist any Lien on any of Borrower's or any of its wholly owned Subsidiaries' assets.

"Increasing Rate Exchange Note" means an "Increasing Rate Note" as defined in Exhibit I.

"Incremental Facility" means the $2,105 million in term loans to be borrowed on or about the Closing Date by the Borrower pursuant to the terms and conditions of the Senior Secured Credit Agreement.

"Indemnified Party" has the meaning specified in Section 8.04(b).

"Initial GAAP" has the meaning specified in Section 1.03.

"Initial Lenders" means those Lenders listed under the heading "Initial Lenders" in the signature pages hereto.

"Initial Maturity Date" means the one year anniversary of the Closing Date.

"Initial Zell Investment" means the investment by EGI- TRB, L.L.C. in Borrower pursuant to the Zell Note and the purchase by EGI- TRB, L.L.C. of $50.0 million of Borrower common equity.

"Intellectual Property" has the meaning specified in Section 4.01(i).

"Intercompany Junior Subordinated Notes" means the junior subordinated notes of certain Guarantors issued to Tribune Finance, LLC on the First Step Closing Date in an aggregate principal amount of not less than $3.0 billion.

"Interest Period" means, for each Eurodollar Rate Advance comprising part of the same Borrowing, the period commencing on the date of such Eurodollar Rate Advance or the date of the Conversion of any Base Rate Advance into such Eurodollar Rate Advance and ending on the last day of the period selected by Borrower pursuant to the provisions below and, thereafter, with respect to Eurodollar Rate Advances, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the last day of the period selected by Borrower pursuant to the provisions below. The duration of each such Interest Period shall be one, two, three or six months or subject to clause (b) of this definition, nine or twelve months, as Borrower may, upon notice received by the Agent not later than 12:00 noon (New York City time) on the third Business Day prior to the first day of such Interest Period, select; provided, however, that:

(a) Interest Periods commencing on the same date for Eurodollar Rate Advances comprising part of the same Borrowing shall be of the same duration;

- 14-

(b) Borrower shall not be entitled to select an Interest Period having duration of nine or twelve months unless, by 2:00 P.M. (New York City time) on the third Business Day prior to the first day of such Interest Period, each Lender notifies the Agent that such Lender will be providing funding for such Borrowing with such Interest Period (the failure of any Lender to so respond by such time being deemed for all purposes of this Agreement as an objection by such Lender to the requested duration of such Interest Period); provided that, if any or all of the Lenders object to the requested duration of such Interest Period, the duration of the Interest Period for such Borrowing shall be one, two, three or six months, as specified by Borrower requesting such Borrowing in the applicable Notice of Borrowing as the desired alternative to an Interest Period of nine or twelve months;

(c) whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day, provided, however, that, if such extension would cause the last day of such Interest Period to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day; and

(d) whenever the first day of any Interest Period occurs on a day of an initial calendar month for which there is no numerically corresponding day in the calendar month that succeeds such initial calendar month by the number of months equal to the number of months in such Interest Period, such Interest Period shall end on the last Business Day of such succeeding calendar month.

"Interim Loan Pledge Agreement" means the pledge agreement in substantially the form of Exhibit G hereto and any other documents granting a Lien upon the Collateral as security for the Take- Out Securities or any Advances hereunder.

"Investment" has the meaning specified in Section 5.02(h).

"Investment Reduction Amount" means, on any date of determination, the sum of (a) the aggregate amount of Junior Capital (other than the Zell Note, the Initial Zell Investment, the Zell Sub Note as contemplated on the Closing Date or any additional Investments made to finance the Stock Repurchase, the Refinancing, the Acquisition and the payment of related fees and expenses) issued prior to or on such date of determination plus (b) 50% of Special Proceeds received before such date of determination plus (c) the aggregate amount of cash proceeds received by Borrower after April 1, 2007 and prior to such date of determination from the litigation and proceedings listed in the Side Letter and designated (at the time such proceeds are received) by Borrower to be included in the Junior Capital Reduction Amount and Investment Reduction Amount (it being acknowledged and agreed that $100,000,000 of such proceeds has been designated to be included in the Junior Capital Reduction Amount and the Investment Reduction Amount).

"Investor Rights Agreement" means the Investor Rights Agreement dated April 1, 2007 by and among Borrower, EGI- TRB, L.L.C. and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the ESOP Trust, which implements and forms a part of the ESOP, as the same may be supplemented, amended, restated or otherwise modified from time to time.

"Junior Capital" means (i) common equity of Borrower that does not (a) provide for scheduled payments of dividends in cash prior to the date that is one year after the Tranche B Maturity Date or (b) become mandatorily redeemable pursuant to a sinking fund obligation or otherwise prior to the date that is one year after the Tranche B Maturity Date and (ii) Debt of Borrower that (a) is unsecured and not Guaranteed by any Subsidiary, (b) is expressly subordinated to the prior payment in full in cash of

- 15-

the Secured Obligations, (c) has a final maturity date that is not earlier than, and provides for no scheduled payments of principal or mandatory redemption obligations prior to, the date that is one year after the Tranche B Maturity Date and (d) provides for payments of interest solely in- kind until the date that is one year after the Tranche B Maturity Date.

"Junior Capital Reduction Amount" means, on any date of determination, the result of (a) 50% of Special Proceeds received before such date of determination plus (b) the aggregate amount of cash proceeds received by Borrower after April 1, 2007 from the litigations and proceedings listed in the Side Letter and designated (at the time such proceeds are received) by Borrower to be included in the Junior Capital Reduction Amount and Investment Reduction Amount (it being acknowledged and agreed that $100,000,000 of such proceeds has been designated to be included in the Junior Capital Reduction Amount and the Investment Reduction Amount) minus (c) the Investment Reduction Amount (calculated without giving effect to clause (a) thereof) to the extent such amount was actually applied to reduce the Zell Investment Amount minus (d) the amount of dividends previously made of the type described in Section 5.02(g)(viii) minus (e) the principal amount of Junior Capital repurchased pursuant to Section 5.02(j)(i)(w) before such date of determination.

"Lead Arrangers" has the meaning specified in the preamble.

"Lenders" means, at any time, each Lender and, without duplication, each other Person that shall become a party hereto pursuant to Section 8.07.

"Lien" means any lien, security interest or other charge of any kind, or any other type of preferential arrangement intending to have the effect of a lien or security interest, including, without limitation, (x) any lien or retained security title of a conditional vendor, (y) any easement, right of way or other encumbrance on title to real property and (z) any assignment of income or proceeds intended to secure Debt for Borrowed Money.

"Loan Documents" means this Agreement and the Notes, and, if applicable, the Interim Loan Pledge Agreement in each case as the same may be amended, restated or otherwise modified from time to time.

"Loan Parties" means, collectively, Borrower and each Guarantor that is a party to a Loan Document.

"Material Adverse Effect" means (a) prior to the earlier to occur of the consummation of the Acquisition and the termination of the Acquisition Agreement in accordance with its terms (including, without limitation, for purposes of any representation and warranty made, or any condition required to be satisfied, on the Closing Date), except as disclosed in the SEC Reports filed prior to April 1, 2007 (other than risk factors and similar cautionary disclosure contained therein under the headings "Risk Factors" or "Forward- Looking Statements" or under any similar heading), or as disclosed in the "company disclosure schedule" to the Acquisition Agreement, a Company Material Adverse Effect and (b) thereafter, a material adverse effect on (i) the business, operations or financial condition of Borrower and its Subsidiaries taken as a whole (after giving effect to the Transactions), (ii) the rights and remedies of the Agent or any Lender under the Loan Documents or (iii) the ability of Borrower and the other Loan Parties (taken as a whole) to perform its obligations under the Loan Documents.

"Material Debt" means Debt with an outstanding principal amount of $75.0 million or more.

- 16 -

"Medium Term Notes" means the following medium- term notes of Borrower: (i) the 6.35% Series E Medium- Term Notes issued on February 3, 1998 and maturing on February 1, 2008 with an initial face amount of $25,000,000, (ii) the 5.50% Series B Medium- Term Notes issued on October 6, 1998 and maturing on October 6, 2008 with an initial face amount of $167,915,000 and (iii) the 5.67% Series E Medium- Term Notes issued on December 8, 1998 and maturing on December 8, 2008 with an initial face amount of $69,550,000.

"Merger Sub" shall mean Tesop Corporation, a Delaware corporation wholly owned by the ESOP.

"Moody's" means Moody's Investors Service, Inc. or any successor thereto.

"Multiemployer Plan" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which Borrower or any ERISA Affiliate is making or had an obligation to make contributions, has within any of the preceding five plan years made or has an obligation to make contributions or with respect to which Borrower or any ERISA Affiliate could have liability.

"Multiple Employer Plan" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of Borrower or any ERISA Affiliate and at least one Person other than Borrower and the ERISA Affiliates or (b) was so maintained and in respect of which Borrower or any ERISA Affiliate could have liability under Section 4064 or 4069 of ERISA in the event such plan has been or were to be terminated.

"Net Cash Proceeds" means

(a) with respect to any Asset Sale (other than any issuance or sale of Equity Interests), the cash proceeds received by Borrower or any of its Subsidiaries (including cash proceeds subsequently received (as and when received by Borrower or any of its Subsidiaries) in respect of non- cash consideration initially received) net of (i) selling expenses (including reasonable brokers' fees or commissions, legal, accounting and other professional and transactional fees, transfer and similar taxes and Borrower's good faith estimate of income taxes paid or payable in connection with such sale); (ii) amounts provided as a reserve, in accordance with GAAP, against (x) any liabilities under any Indemnification obligations associated with such Asset Sale or (y) any other liabilities retained by Borrower or any of its Subsidiaries associated with the properties sold in such Asset Sale (provided that, to the extent and at the time any such amounts are released from such reserve (other than in satisfaction of any such liabilities), such amounts shall constitute Net Cash Proceeds); (iii) Borrower's good faith estimate of payments required to be made with respect to unassumed liabilities relating to the properties sold within 90 days of such Asset Sale (provided that, to the extent such cash proceeds are not used to make payments in respect of such unassumed liabilities within 90 days of such Asset Sale, such cash proceeds shall constitute Net Cash Proceeds); (iv) the principal amount, premium or penalty, if any, interest and other amounts on any Debt for Borrowed Money which is secured by a Lien on the properties sold in such Asset Sale and which is repaid with such proceeds (other than any such Debt assumed by the purchaser of such properties); and (v) the amount of any proceeds of such Asset Sale that Borrower or any Subsidiary has reinvested (or intends to reinvest within the Reinvestment Period) in the business of Borrower or any of the Subsidiaries; provided that any portion of such proceeds that has not been so reinvested within such Reinvestment Period (with respect to such Prepayment Event, the "Deferred Net Cash Proceeds") shall (x) be deemed to be Net Cash Proceeds of an Asset Sale occurring on the last day of such Reinvestment Period, and (y) be applied to the repayment of Advances in accordance with Section 2.10(b);

- 17 -

(b) with respect to any incurrence of Debt for Borrowed Money or any issuance or sale of Equity Interests by Borrower or any of its Subsidiaries, the cash proceeds thereof, net of customary fees, commissions, costs and other expenses incurred in connection therewith; and

(c) with respect to any Casualty Event, the cash insurance proceeds, condemnation awards and other compensation received in respect thereof, net of all reasonable costs and expenses incurred in connection with the collection of such proceeds, awards or other compensation in respect of such Casualty Event net of any proceeds, awards or other compensation in respect of such Casualty Event that Borrower or any Subsidiary has reinvested (or intends to reinvest within the Reinvestment Period) (with respect to such Prepayment Event, the "Deferred Net Cash Proceeds") in the business of Borrower or any of its Subsidiaries; provided that any portion of such proceeds, awards or other compensation that has not been so reinvested within such Reinvestment Period shall (x) be deemed to be Net Cash Proceeds of a Casualty Event occurring on the last day of such Reinvestment Period, and (y) be applied to the repayment of Advances in accordance with Section 2.10(b).

"Non- Consenting Lender" has the meaning provided in Section 8.01(b).

"Non- Excluded Taxes" means any Taxes other than (i) net income and franchise taxes imposed with respect to the Agent or any Lender by the Governmental Authority under the laws of which the Agent or such Lender, as applicable, is organized or in which it maintains its applicable lending office and (ii) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which Borrower is located.

"Non- U.S. Lender" means any Lender that is not a "United States Person", as defined under Section 7701(a)(30) of the Code.

"Note" means a promissory note of Borrower payable to the order of any Lender with outstanding Advances, delivered pursuant to a request made under Section 2.16 in substantially the form of Exhibit A hereto, evidencing the indebtedness of Borrower to such Lender resulting from the Advances made by such Lender.

"Notice of Borrowing" has the meaning specified in Section 2.02(a).

"Obligations" means all unpaid principal of and accrued and unpaid interest on the Advances made to Borrower, including on behalf of any of its Subsidiaries, all accrued and unpaid fees (including pursuant to Section 2.04 of this Agreement) and all expenses, reimbursements, indemnities and other obligations of the Loan Parties to the Lenders or to any Lender, the Agent or any indemnified party, in each case arising under the Loan Documents (including interest and fees accruing after commencement of any bankruptcy or insolvency proceeding against any Loan Party, whether or not allowed in such proceeding).

"Organizational Documents" means, with respect to any Person, (i) in the case of any corporation, the certificate of incorporation and by- laws (or similar documents) of such Person, (ii) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such Person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such Person, (iv) in the case of any general partnership, the partnership agreement (or similar document) of such Person and (v) in any other case, the functional equivalent of the foregoing.

- 18-

"Other Taxes" means any and all stamp, documentary or similar taxes, or any other excise or property taxes or similar levies that arise on account of any payment being or being required to be made hereunder or under any Note or from the execution, delivery, registration, recording or enforcement of this Agreement or any Note.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107- 56, signed into law October 26, 2001, as amended from time to time.

"PBGC" means the Pension Benefit Guaranty Corporation (or any successor).

"PDT Debt" has the meaning provided in the definition of "Permitted Disposition Transaction."

"PDT Entity" has the meaning provided in the definition of "Permitted Disposition Transaction".

"Permitted Acquisition" means any transaction for the (a) acquisition by a Guarantor of all or substantially all of the property of any Person, or of any business or division of any Person; or (b) acquisition (including by merger or consolidation) of the Equity Interests of any Person that becomes a wholly owned Domestic Subsidiary after giving effect such transaction; provided, that, for any acquisition over $10,000,000, in the case of each of (a) and (b) each of the following conditions shall be met:

(i) no Event of Default then exists or would result therefrom;

(ii) after giving effect to such transaction on a Pro Forma Basis, Borrower shall be in compliance with all covenants set forth in Sections 5.02(i)(A) and (B) (or equivalent sections under any replacement agreement) of the Senior Secured Credit Agreement as of the most recent Test Period (assuming if such transaction is to be consummated prior to the last day of the first Test Period for which the covenants in Sections 5.02(i)(A) and (B) (or equivalent sections under any replacement agreement) under the Senior Secured Credit Agreement are required to be satisfied, the levels required for such first Test Period shall be deemed to apply in determining compliance with such covenants for purposes of this clause (ii));

(iii) no Company (as defined prior to giving effect to such transaction) shall, in connection with any such transaction, assume or remain liable with respect to any Debt of the related seller or the business, Person or properties acquired, except to the extent permitted under Section 5.02(c);

(iv) the Person, property or business to be acquired shall be, or shall be engaged in, a business of the type that Borrower and the Subsidiaries are permitted to be engaged in under Section 5.02(i);

(v) all transactions in connection therewith shall be consummated in accordance with all applicable law;

(vi) with respect to any transaction involving acquisition consideration of more than $100,000,000, unless the Agent shall otherwise agree, Borrower shall have provided the Agent and the Lenders with (A) historical financial statements for the last three fiscal years (or, if less, the number of years since formation) of the person or business to be acquired (audited if available) and unaudited financial statements thereof for the most recent interim period which are

- 19 -

available and (B) reasonably detailed projections for the succeeding five years pertaining to the person or business to be acquired and updated projections for Borrower after giving effect to such transaction to the extent such projections have been provided to Borrower; *provided* that at Borrower's request, such information may instead be provided to the Agent only (who will in turn make such information available to any Lender upon its reasonable request); *provided further* that the information will be deemed to be Borrower Information and will be subject to Section 8.08;

(vii) at least 10 Business Days prior to the proposed date of consummation of the transaction, Borrower shall have delivered to the Agent and the Lenders an officers' certificate certifying that (A) such transaction complies with this definition (which shall have attached thereto reasonably detailed backup data and calculations showing such compliance), and (B) such transaction could not reasonably be expected to result in a Material Adverse Effect; and

(viii) in the case of (b) above, Borrower will cause such new Subsidiary to comply with Section 5.01(l) (if applicable).

"Permitted Disposition Transactions" means (i) any disposition of property by Borrower or any of its Subsidiaries (including, without limitation, any Asset Sale) (a "Disposition") and (ii) any related incurrence of Debt (including any Debt secured by a Lien on such property), merger or consolidation of any Subsidiary of Borrower with or into any other Person (including, without limitation, with or into Borrower), Dividends to Borrower or any of its Subsidiaries, Investments in any other Person, prepayment, acquisition, exchange or other redemption of Debt, in each case in connection with or for the purpose of effecting such Disposition (any such related transaction, a "Related Transaction"); *provided* that, for any such Disposition (or series of related Dispositions) involving property with a fair market value of $10,000,000 or more, each of the following conditions shall be met with respect to the Disposition and all Related Transactions:

(i) after giving effect to any such Disposition and all of its Related Transactions on a Pro Forma Basis (including after giving effect to any prepayment made or required to be made within six months thereafter pursuant to clause (v) of this definition), Borrower shall be in compliance with all covenants set forth in Sections 5.02(i)(A) and (B) (or equivalent sections under any replacement agreement) of the Senior Secured Credit Agreement as of the most recent Test Period (assuming if such transaction is to be consummated prior to the last day of the first Test Period for which the covenants in such Sections 5.02(i)(A) and (B) (or equivalent sections, as applicable) are required to be satisfied, the levels required for such first Test Period shall be deemed to apply in determining compliance with such covenants for purposes of this clause (i)); *provided* that, solely for purposes of the foregoing calculations in determining whether a Disposition and its Related Transactions are permitted, all Debt incurred as a Related Transaction of such Disposition (whether in the form of Guaranteed Debt or otherwise) by Borrower or any of its Subsidiaries regardless of whether it would be included in determining compliance with Sections 5.02(i)(A) and (B) (or equivalent sections under any replacement agreement) of the Senior Secured Credit Agreement shall be included in the calculation required by this clause (i), except that Debt incurred by Borrower and not by any Guarantor that is in the form of either Guaranteed Debt of a third party to which property is being transferred pursuant to the subject Disposition (the "Subject Transferee") or an obligation owed solely to the Subject Transferee shall not be required to be included in the calculation required by this clause (i) if Borrower delivers to the Agent and the Lenders an officers' certificate to the effect that the Subject Transferee is Solvent (determined as of the date of such incurrence, treating the Subject Transferee as if it were Borrower for purposes of the definition of Solvent and disregarding the benefit of Borrower's guarantee or loan) which certificate shall be in form and substance satisfactory to the Agent (with a cor-

- 20 -

responding copy of any notices delivered to the Agent hereunder within a reasonable period of time following delivery to the agent under the Senior Secured Credit Agreement);

(ii) the aggregate fair market value of property subject to Dispositions contemplated by this definition occurring in any fiscal year shall not exceed an amount equal to (a) (1) 25% of Consolidated Total Assets prior to the Tranche X Maturity Date and (2) thereafter, 15% of Consolidated Total Assets, in each case, as disclosed on the face of Borrower's audited financial statements for the immediately preceding fiscal year minus (b) the aggregate fair market value of all Asset Sales (other than Dispositions) permitted under Section 5.02(e)(iii) in the applicable fiscal year; provided that a Disposition of any property referenced in Section 5.02(e)(vii) shall not be subject to the foregoing limitations;

(iii) such Disposition, all Related Transactions and transactions in connection therewith shall be consummated in accordance with all applicable law and all terms and conditions thereof shall be fair and reasonable and no less favorable (on an after- tax basis), taken as a whole, to Borrower and its Subsidiaries and the holders of the Secured Obligations than terms and conditions Borrower and its Subsidiaries otherwise would have obtained in an arm's- length Asset Sale transaction involving the property subject to the Disposition that is effected without any such Related Transactions (other than any Related Transactions that would otherwise be permitted under this Agreement in the absence of this definition and the related concepts);

(iv) at least 10 Business Days prior to the proposed date of consummation of the Disposition, Borrower shall have delivered to the Agent and the Lenders an officers' certificate certifying that (A) such transaction complies with this definition (which shall have attached thereto reasonably detailed backup data and calculations showing such compliance) and (B) such transaction could not reasonably be expected to result in a Material Adverse Effect;

(v) with respect to any such Disposition:

(A) to the extent not involving a Sale and Lease- Back Transaction, Borrower shall be required to apply an amount equal to not less than the greater of (x) 70% of the fair market value of the property subject to such Disposition and (y) the Net Cash Proceeds therefrom, in each case to the prepayment of Advances in accordance with Section 2.10(b)(iii); and

(B) to the extent involving a Sale and Lease- Back Transaction, Borrower may elect to either (i) prepay the Tranche X Advances and the Tranche B Advances under (and as defined in) the Senior Secured Credit Agreement prior to the six- month anniversary of the consummation of such Sale and Lease- Back Transaction from the Net Cash Proceeds received by Borrower or any of its Subsidiaries therefrom or (ii) on or before the thirtieth (30th) day following the consummation of such Sale and LeaseBack Transaction deposit all such Net Cash Proceeds, when received, into an interest bearing cash deposit account to be established and maintained by the Agent, over which the Agent shall have sole dominion and control, upon terms as may be reasonably satisfactory to the Agent, and then on the six- month anniversary of the consummation of such Sale and Lease- Back Transaction, to the extent not otherwise voluntarily prepaid in accordance with clause (v)(B)(i) above, shall apply an amount equal to the Net Cash Proceeds received on or prior to such date and, when received, such additional Net Cash Proceeds in respect of such transaction as and when received to the prepayment of Advances in accordance with Section 2.10(b)(iii); and

- 21-

(vi) any Related Transaction shall be required to comply with the following additional requirements: (a) any Related Transaction involving an incurrence of Debt that is Debt of Borrower or any Subsidiary shall either be (1) if incurred by Borrower or a Guarantor, unsecured and, if incurred by a Guarantor, subordinated in right of payment to the Obligations of such Guarantor in a manner reasonably satisfactory to the Agent, and shall require no cash payments of principal prior to the sixth month following the Tranche B Maturity Date ("PDT Debt") or (2) in an aggregate principal amount, when taken together with all other Debt incurred pursuant to this sub- clause (2) and Section 5.02(c)(xxiii), not exceeding $50.0 million (with amounts incurred pursuant to this sub-clause (2) reducing dollar- for- dollar the amount of Debt permitted to be incurred pursuant to Section 5.02(c)(xxiii)) and, to the extent involving the incurrence of a Lien on any property other than property that is subject to the Disposition or received as consideration in connection with such Disposition, any Lien securing Debt permitted by this sub- clause (2) shall be incurred in compliance with Section 5.02(a)(xi); (b) any Related Transaction involving a merger with, or transfer or other disposition of property to, Borrower shall only be permitted to the extent permitted under Section 5.02(b) (except that this shall not prohibit transfers of Net Cash Proceeds and other transfers as part of cash management or in the ordinary course of business); (c) any Related Transaction involving a transfer or other disposition of property to a Subsidiary that is not a Guarantor (a "PDT Entity") shall only be permitted if all financial attributes of such Subsidiary (including Consolidated EBITDA) are excluded from the pro forma calculations as specified in clause (vi)(c) of the definition of "Permitted Disposition Transaction" set forth in the Senior Secured Credit Agreement; (d) any Related Transaction involving an Investment shall be permitted only to the extent either (1) the Investment is being received as consideration for the Disposition or (2) the Investment shall be pursuant to Section 5.02(h)(vi), (x) or (xvi); (e) any restrictions of the type subject to Section 5.02(d) shall only be permitted to the extent that they impact only a Guarantor or a PDT Entity and do not have a material adverse impact on any Collateral for the obligations under the Senior Secured Credit Agreement and, in the good faith judgment of Borrower, will not materially and adversely affect the ability of such Guarantor to satisfy its Obligations when due; (f) any prepayment or redemption of Debt shall be in compliance with and pursuant to Section 5.02(i) or shall be of Intercompany Junior Subordinated Notes of the Company effecting, or that is the subject of, the Disposition in connection with the Disposition and reasonably related thereto; and (g) restrictions of the type subject to Section 5.02(m) of the Senior Secured Credit Agreement shall be permitted only to the extent they relate to property that is the subject of the relevant Disposition and any Investments received as consideration for the Disposition; provided that, notwithstanding anything to the contrary, this clause (vi) will not prohibit a Related Transaction if it otherwise complies with the requirements of this Agreement other than the definition of "Permitted Disposition Transaction".

"Permitted Liens" means each of the following: (a) Liens for unpaid utilities and for taxes, assessments and governmental charges or levies to the extent not required to be paid under Section 5.01(b) hereof; (b) Liens imposed by law (other than any Lien imposed by ERISA that could reasonably be expected to result in a Material Adverse Effect), such as warehousemen's, landlord's, materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business securing obligations that are not overdue for a period of more than 60 days or which are being contested in good faith by appropriate proceedings and as to which appropriate reserves are being maintained; (c) pledges or deposits to secure obligations under workers' compensation, unemployment insurance and other social security or employment laws or similar legislation or to secure public, statutory or regulatory obligations; (d) deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory or regulatory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business; (e) easements, rights of way covenants, zoning, use restrictions and other encumbrances on title to real property that do not materially adversely affect the use of such property for its present purposes; (f) Liens

- 22-

securing judgments for the payment of money not constituting a Default under Section 6.01(f) or securing appeal or other surety bonds related to such judgments; (g) any interest or title of a lessor, sublessor, licensee or licensor under any operating lease or license agreement entered into in the ordinary course of business and not interfering in any material respect with the rights, benefits or privileges of such lease or licensing agreement, as the case may be; (h) Liens in favor of payor financial institutions having a right of setoff, revocation, refund or chargeback with respect to money or instruments of Borrower or any Subsidiary of Borrower on deposit with or in possession of such financial institution; (i) leases or licenses of Intellectual Property or other assets granted by Borrower or any Subsidiary in the ordinary course of business and not interfering in any material respect with the ordinary conduct of business of Borrower or any Subsidiary and (j) the filing of UCC financing statements solely as a precautionary measure in connection with any transaction not prohibited hereunder.

"Permitted Transferee" means (i) any direct or indirect Affiliate of EGI- TRB, L.L.C., Equity Group Investments, L.L.C. or Zell, (ii) any direct or indirect member of EGI- TRB, L.L.C. and any direct or indirect Affiliate thereof, (iii) Zell or his spouse, lineal ancestors and descendants (whether natural or adopted), or (iv) any trust or retirement account primarily for the benefit of Zell and/or his spouse, lineal ancestors and descendants, any entity formed and wholly owned by any such trust or retirement account and any private foundation formed by Zell and/or any one or more of his descendants.

"Person" means an individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company or other entity, or a government or any political subdivision or agency thereof.

"PHONES" means the Exchangeable Subordinated Debentures of Borrower due 2029 and outstanding as of the Closing Date.

"PIK Interest" shall have the meaning set forth on Schedule I- A.

"Plan" means a Single Employer Plan or a Multiple Employer Plan.

"Platform" has the meaning specified in Section 8.02(d).

"Prepayment Event" means any Asset Sale Prepayment Event or Casualty Event.

"Pro Forma Basis" means, with respect to compliance with any test or covenant hereunder, to the extent consummated on or after the first day of a Test Period, the First Step Transactions, the Second Step Transactions, any Permitted Acquisition, an Asset Sale (including any anticipated disposition, transfer or assignment of specific assets listed on Schedule 1.01(c) in connection with which a definitive acquisition or other agreement has been entered into, including where such sale remains subject to certain customary approvals), the incurrence, permanent repayment or extinguishment of Debt (other than Debt incurred for working capital needs under ordinary course revolving credit facilities) or any cost savings realized or to be realized as a result of any of the foregoing (each a "Specified Transaction") and the following transactions in connection therewith shall be deemed to have occurred as of the first day of the applicable Test Period in such test or covenant: income statement items (whether positive or negative) attributable to the property or Person subject to such Specified Transaction, (i) in the case of a sale, transfer or other disposition of all or substantially all Capital Stock in any Subsidiary or any division, product line, or facility used for operations of Borrower or any of its Subsidiaries, shall be excluded, and (ii) in the case of Debt described in the definition of "Specified Transaction", if such Debt has a floating or formula rate, such Debt shall have an implied rate of interest for the applicable period for purposes of this definition determined by utilizing the rate that is or would be in effect with respect to such Debt as at the relevant date of determination); provided that the foregoing pro forma adjustments may be applied to any

such test or covenant solely to the extent that such adjustments are consistent with the definition of EBITDA and Regulation S- X.

"Purchase Money Obligation" shall mean, for any Person, the obligations of such Person in respect of Debt (including Capital Lease Obligations) incurred for the purpose of financing all or any part of the purchase price of any property (including Equity Interests of any Person) or the cost of installation, construction or improvement of any property and any refinancing thereof; provided, however, that (i) such Debt is incurred within one year after such acquisition, installation, construction or improvement of such property by such Person and (ii) the amount of such Debt does not exceed 100% of the unamor- tized cost of such acquisition, installation, construction or improvement, as the case may be.

"Ratably" has the meaning specified in Section 7.05(a).

"Receivables Facility" one or more receivables financing facilities, in each case, as amended, supplemented, modified, extended, renewed, restated, refunded, replaced or refinanced from time to time, the Debt of which is non- recourse (except for Standard Receivables Facility Undertakings) to Borrower and its Subsidiaries, other than any Receivables Subsidiary, pursuant to which Borrower or any of its Subsidiaries sells its accounts, payment intangibles and related assets to either (a) a Person that is not a Guarantor or (b) a Receivables Subsidiary.

"Receivables Facility Repurchase Obligation" means any obligation of Borrower or a Subsidiary that is a seller of assets in a Receivables Facility to repurchase the assets it sold thereunder as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, offset or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"Receivables Subsidiary" means any Subsidiary formed solely for the purpose of engaging, and that engages only, in one or more Receivables Facilities.

"Reference Banks" means JPMorgan Chase Bank, N.A. and Citibank, N.A.

"Refinancing" means the refinancing of Borrower's existing indebtedness listed on Schedule 1.01(a).

"Regulation S- X" means Regulation S- X promulgated under the Securities Act.

"Register" has the meaning specified in Section 8.07(d).

"Reinvestment Period" means 15 months following the date of an Asset Sale Prepayment Event or Casualty Event (or, if later, 180 days after the date Borrower or a Subsidiary has entered into a binding commitment to reinvest the proceeds of any such Asset Sale Prepayment Event or Casualty Event prior to the expiration of such 15 months).

"Related Funds" shall mean with respect to any Lender that is an Approved Fund, any other Approved Fund that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"Related Transaction" has the meaning provided in the definition of "Permitted Disposition Transaction."

- 24-

"Required Lenders" means at any time Lenders owed or holding at least a majority of the aggregate principal amount of the Advances outstanding at such time.

"Retained Amount" shall have the meaning set forth in the Senior Secured Credit Agreement as in effect on the Closing Date (whether or not such Senior Secured Credit Agreement is in effect on any date of calculation of the Retained Amount).

"S Corp Election" means Borrower has qualified and elected to be treated as an "S Corporation" under Subchapter S of the Code, and shall have filed all forms and taken all other actions necessary to qualify and elect that each Domestic Subsidiary of Borrower (other than (x) Immaterial Subsidiaries, (y) any other Subsidiaries for which Borrower reasonably determines the failure to be treated as a "qualified subchapter S subsidiary" for U.S. federal income tax purposes would not result in material adverse tax consequences to Borrower and (z) any such Subsidiary that is an "Ineligible Corporation" under Section 1361(b)(2) of the Code) be treated as a "qualified subchapter S subsidiary" for U.S. federal income tax purposes, in each case in accordance with all requirements of law.

"S&P" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., or any successor thereto.

"Sale and Lease-Back Transaction" means any arrangement with any Person providing for the leasing by Borrower or any Subsidiary of any real or tangible personal property, which property has been or is to be sold or transferred by Borrower or such Subsidiary to such Person in contemplation of such leasing.

"Sarbanes-Oxley Act" means the United States Sarbanes-Oxley Act of 2002, as amended from time to time, and all rules and regulations promulgated thereunder.

"Schedule TO" means Borrower's Schedule TO filed on April 25, 2007 with the Securities and Exchange Commission, as the same has been and shall be amended from time to time.

"SEC Reports" means (i) the Annual Report of Borrower on Form 10-K for the year ended December 31, 2006 filed with the Securities and Exchange Commission, (ii) Borrower's Quarterly Reports on Form 10-Q for the quarters ended April 1, 2007, July 1, 2007 and September 30, 2007 filed with the Securities and Exchange Commission, (iii) Borrower's current Reports on Form 8-K filed with the Securities and Exchange Commission prior to the Closing Date (but subsequent to filing of the SEC Report described in clause (i) above) and (iv) Borrower's Schedule TO.

"Second Step Fee Letter" means that certain Amended and Restated Second Step Fee Letter dated as of April 5, 2007 (as the same may at any time be amended, supplemented or otherwise modified from time to time), in each case, among J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation, Citigroup Global Markets Inc., Bank of America, N.A., Banc of America Securities LLC and Banc of America Bridge LLC and Borrower.

"Second Step Transactions" means (i) the consummation of the Acquisition pursuant to the Acquisition Agreement (including the purchase of common stock owned by EGI-TRB, L.L.C.), (ii) the making of advances under the Incremental Facility and/or the execution, delivery and performance by Borrower and its Subsidiaries party thereto of the documents related to the Incremental Facility, the Loan Documents, this Agreement, (iii) the making of Advances hereunder and/or issuance of Take-Out Securities, if any (iv) the issuance of the Zell Sub Note and the repayment of the Zell Note, (v) the purchase by EGI-TRB, L.L.C. of the Warrant, (vi) entry into the Zell Investment Agreement, (vii) all other transac-

- 25 -

tions necessary to effect or incidental to the foregoing and (viii) the payment of fees, costs and expenses related to the foregoing.

"Secured Cash Management Obligations" means all obligations owing by Borrower or any Subsidiary to the Agent (as defined in the Senior Secured Credit Agreement), a Lead Arranger (as defined in the Senior Secured Credit Agreement) or a co- arranger, any Affiliate, of any of the foregoing or a Person that was a Lender (as defined in the Senior Secured Credit Agreement) or an Affiliate of a Lender (as defined in the Senior Secured Credit Agreement) on the First Step Closing Date or at the time the Cash Management Agreement giving rise to such obligations was entered into to the extent Borrower elects to treat such obligations as "Secured Cash Management Obligations".

"Secured Hedging Obligations" means all obligations owing by Borrower or any Subsidiary to the Agent (as defined in the Senior Secured Credit Agreement), a Lead Arranger (as defined in the Senior Secured Credit Agreement) or any Affiliate of any of the foregoing or a Person that is or, at the time such obligation arose, was a Lender (as defined in the Senior Secured Credit Agreement) or an Affiliate of a Lender (as defined in the Senior Secured Credit Agreement), in each case under a Hedge Agreement.

"Secured Obligations" means all Obligations under (and as defined in) the Senior Secured Credit Agreement and the related loan documents (including the Senior Secured Pledge Agreement and any guarantee in respect thereof), together with all Secured Hedging Obligations and Secured Cash Management Obligations.

"Securities Act" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"Senior Secured Credit Agreement" means that certain Credit Agreement, dated as of May 17, 2007, among Borrower, the guarantors party thereto, JPMorgan Chase Bank, N.A., as administrative agent, the lenders party thereto, Merrill Lynch Capital Corporation, as syndication agent, Citicorp North America, Inc. and Bank of America, N.A., as co- documentation agents, and J.P. Morgan Securities Inc., Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC, as joint bookrunners and joint lead arrangers, together with the related documents thereto (including, without limitation, any guarantee agreements and security documents) and, in each case, any amendments, supplements, modifications, extensions, renewals or restatements thereof including any such replacement, refunding or refinancing facility or indenture that increases the amount permitted to be borrowed thereunder or alters the maturity thereof (provided that such increase in borrowings is permitted under Section 5.02(c)) or adds Subsidiaries as additional borrowers or guarantors thereunder and whether by the same or any other agent, lender or group of lenders.

"Senior Secured Pledge Agreement" means the pledge agreement and any other documents granting a Lien upon the Collateral as security for the payment of the Secured Obligations.

"Side Letter" means that certain side letter provided by Borrower to the Lenders under this Agreement that will be made available to any Lender upon reasonable request; provided that such letter and its contents shall be deemed Borrower Information and will be subject to Section 8.08.

"Single Employer Plan" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of Borrower or any ERISA Affiliate and no Person other than Borrower and the ERISA Affiliates or (b) was so maintained and in respect of which Borrower or any ERISA Affiliate could have liability, including, under Section 4069 of ERISA, in the event such plan has been or were to be terminated.

- 26 -

"Solvent" and "Solvency" mean, with respect to Borrower on the Closing Date, that on such date (a) the fair value and present fair saleable value of the aggregate assets (including goodwill) of Borrower exceeds its liabilities (including stated liabilities, identified contingent liabilities and the new financing), and such excess is in an amount that is not less than the capital of Borrower (as determined pursuant to Section 154 of the Delaware General Corporate Law), (b) Borrower will be able to pay its debts (including the stated liabilities, the identified contingent liabilities and the new financing), as such debts mature or otherwise become absolute or due and (c) Borrower does not have unreasonably small capital. As used in this definition:

"fair value" means the amount at which the aggregate or total assets of Borrower (including goodwill) would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, neither being under any compulsion to act and, on the Closing Date, in a transaction having a similar structure;

"present fair saleable value" means the amount that may be realized by a willing seller from a willing buyer if Borrower's aggregate or total assets (including goodwill) are sold with reasonable promptness and, on the Closing Date, in a transaction having a similar structure;

"does not have unreasonably small capital" relates to the ability of Borrower to continue as a going concern and not lack sufficient capital for the business in which it is engaged, and will be engaged, as management has indicated such businesses are now conducted and are proposed to be conducted;

"stated liabilities" means recorded liabilities of Borrower as presented on the most recent balance sheet of Borrower provided to the Agent prior to the Closing Date;

"identified contingent liabilities" means the reasonably estimated contingent liabilities that may result from, without limitation, threatened or pending litigation, asserted claims and assessments, environmental conditions, guaranties, indemnities, contract obligations, uninsured risks, purchase obligations, taxes, and other contingent liabilities as determined by Borrower;

"new financing" means, on the Closing Date, the indebtedness incurred, assumed or guaranteed by Borrower in connection with the Transactions; and

"similar structure" means a structure similar to the structure contemplated in the Transactions (an S Corporation (under Subchapter S of the Code), owned entirely by an Employee Stock Ownership Plan, which receives favorable federal income tax treatment), or another structure resulting in equivalent favorable federal income tax treatment.

"Special Contribution" means an Investment in Junior Capital of Borrower made pursuant to Section 5.01(n).

"Special Proceeds" means any aggregate Net Cash Proceeds received by Borrower or any Subsidiary from, and all tax savings directly associated with, the sale, transfer or disposition of Designated Assets in excess of the aggregate amount disclosed in the Side Letter.

"Standard Receivables Facility Undertakings" means representations, warranties, covenants and indemnities entered into by Borrower or any Subsidiary that Borrower has determined in good faith to be customary in financings similar to a Receivables Facility, including, without limitation, those relating to the servicing of the assets of a Receivables Facility Subsidiary, it being understood that any

- 27 -

"Subsidiary" means, with respect to any Person, any corporation, partnership, joint venture, limited liability company, trust, estate or other business entity of which (or in which) more than 50% of (a) the issued and outstanding Capital Stock having ordinary voting power to elect a majority of the Board of Directors of such corporation (irrespective of whether at the time Capital Stock of any other class or classes of such corporation shall or might have voting power upon the occurrence of any contingency), (b) the interest in the capital or profits of such limited liability company, partnership or joint venture or (c) the beneficial interest in such trust or estate or other business entity is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more of its other Subsidiaries or by one or more of such Person's other Subsidiaries, in each case, with respect to Borrower; provided that neither any PDT Entity nor any entity disclosed in the Side Letter shall be deemed a "Subsidiary" for purposes of the Loan Documents. Unless expressly stated otherwise or the context otherwise requires, any reference to "Subsidiary" shall mean a Subsidiary of Borrower.

"Syndication Agent" has the meaning specified in the preamble hereto.

"Take- Out Securities" means debt securities issued to refinance (in whole or in part) or replace Advances under this Agreement.

"Taxes" means any and all income, stamp or other taxes, duties, levies, imposts, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, and all interest, penalties or similar liabilities with respect thereto.

"Test Period" means, for any determination hereunder, the four consecutive fiscal quarters most recently then last ended.

"TMCT Real Property" means the real property owned in fee by TMCT, LLC that is leased to Borrower on the Closing Date and listed on Schedule 1.01(b) hereto.

"Total Guaranteed Leverage Ratio" means, at any date, the ratio of (x) the aggregate principal amount of Debt for Borrowed Money of Borrower that is Guaranteed by any of the Guarantors and the aggregate principal amount of Debt for Borrowed Money of the Guarantors (on a Consolidated basis) to (y) EBITDA for the period of four fiscal quarters most recently then ended.

"Tranche B Maturity Date" means the date that is the earlier of (x) June 4, 2014 and (y) the date that the Tranche B Advances (as defined in the Senior Secured Credit Agreement) are paid in full pursuant to the Senior Secured Credit Agreement.

"Tranche X Maturity Date" means the date that is the earlier of (x) June 4, 2009 and (y) the date that the Tranche X Advances (as defined in the Senior Secured Credit Agreement) are paid in full pursuant to the Senior Secured Credit Agreement.

"Transaction Documents" means all documents, instruments and agreements executed and/or delivered in connection with the Transactions, including without limitation the Loan Documents, the Guarantee, the Interim Loan Pledge Agreement (if any), the documents entered into in connection with the Take- Out Securities (if any), the Acquisition Agreement, the Senior Secured Credit Agreement,

the Senior Secured Pledge Agreement, the ESOP Loan Agreement, the ESOP Note, the ESOP Purchase Agreement, any other ESOP Documentation, the Intercompany Junior Subordinated Notes, the Zell Investment Agreement, the Zell Note and the Zell Sub Note.

"Transactions" means the First Step Transactions and the Second Step Transactions.

"Tribune" has the meaning specified in the preamble.

"Tribune Finance LLC Transaction" means (a) the satisfaction of the intercompany indebtedness owed by certain Subsidiaries and listed on Schedule 1.01(d) hereto, (b) the contribution by Borrower of not less than $3.0 billion to its newly- formed, direct wholly owned subsidiary, Tribune Finance, LLC, (c) the issuance by certain Subsidiaries of the Intercompany Junior Subordinated Notes to Tribune Finance, LLC and (d) the direct or indirect dividend or other distribution by such Subsidiaries of the aggregate amount of such loaned funds to Borrower.

"Tribune Management Equity Incentive Plan" means the Tribune Management Equity Incentive Plan as in effect on the Closing Date.

"Trust Indenture Act" has the meaning specified in Section 7.03.

"Type" means a Base Rate Advance or a Eurodollar Rate Advance.

"UCC" means the Uniform Commercial Code as in effect from time to time (except as otherwise specified) in any applicable state or jurisdiction.

"Voting Stock" means capital stock issued by a corporation, or equivalent interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or Persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

"Warrant" means that certain 15- year warrant of Borrower issued to EGI- TRB, L.L.C. evidencing rights to purchase 43,478,261 shares (subject to adjustment) of Borrower's common stock.

"Zell" means Samuel Zell, a natural person.

"Zell Investment Agreement" means that certain agreement among Zell, as guarantor, EGI- TRB, L.L.C. and Borrower dated November 1, 2007. (It being acknowledged and agreed that the Zell Investment Agreement has been duly executed and delivered and has terminated in accordance with its terms.)

"Zell Investment Amount" means (x) $100.0 million minus (y) the Investment Reduction Amount on the date any Investment is made pursuant to the Zell Investment Agreement. (It being acknowledged and agreed that the Zell Investment Amount is equal to zero.)

"Zell Note" means that certain $200.0 million aggregate principal amount unsecured subordinated exchangeable promissory note of Borrower issued to EGI- TRB, L.L.C., its Permitted Transferees and/or any senior employee of Equity Group Investments, L.L.C. or of any direct or indirect Affiliates thereof.

"Zell Sub Note" means an 11- year $225.0 million initial principal amount pay- in- kind subordinated note of Borrower issued to EGI- TRB, L.L.C., its Permitted Transferees and/or any senior employee of Equity Group Investments, L.L.C. or any direct or indirect Affiliates thereof.

SECTION 1.02. Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding", (b) any definition of or reference to any Loan Document, agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (c) any reference herein to any Person shall be construed to include such Person's successors and assigns, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, this Agreement, (f) any reference to any law or regulation herein shall refer to such law or regulation as amended, modified or supplemented from time to time and (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.03. Accounting Terms. Except as otherwise expressly provided herein, all accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles as in effect in the United States from time to time ("GAAP"); provided that (a) if there is any material change in GAAP from such principles applied in the preparation of the financial statements as in effect on the Closing Date ("Initial GAAP") that is material in respect of the calculation of compliance with the covenants set forth in Section 5.02(i) of the Senior Secured Credit Agreement, Borrower shall give prompt notice of such change to the Agent and (b) if Borrower notifies the Agent that Borrower requests an amendment of any provision hereof to eliminate the effect of any change in GAAP (or the application thereof) from Initial GAAP (or if the Agent or the Required Lenders request an amendment of any provision hereof for such purpose), regardless of whether such notice is given before or after such change in GAAP (or the application thereof), then such provision shall be applied on the basis of generally accepted accounting principles as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision is amended in accordance herewith.

- 30-

## ARTICLE II

### AMOUNTS AND TERMS OF THE ADVANCES

SECTION 2.01. The Advances. Each Lender severally agrees, on the terms and conditions hereinafter set forth, to make advances (each, an "Advance") to Borrower on the Closing Date in an amount not to exceed such Lender's Commitment at such time. Any Borrowing shall consist of Advances made on the same day by the Lenders ratably according to their Commitments. Amounts borrowed under this Section 2.01 and repaid or prepaid may not be reborrowed.

SECTION 2.02. Making the Advances.

(a) The Borrowing shall be made on notice, given not later than (x) 12:00 noon (New York City time) two (2) Business Days prior to the Closing Date in the case of a Borrowing consisting of Eurodollar Rate Advances or (y) 3:00 P.M. (New York City time) one (1) Business Day prior to the Closing Date in the case of a Borrowing consisting of Base Rate Advances, in each case, by Borrower to the Agent, which shall give to each Lender prompt notice thereof by telecopier. Each such notice of such a Borrowing (a "Notice of Borrowing") shall be by telephone, confirmed immediately in writing, or telecopier in substantially the form of Exhibit B hereto, specifying therein the requested (i) date of such Borrowing, (ii) Type of Advances comprising such Borrowing, (iii) aggregate amount of such Borrowing, and (iv) in the case of a Borrowing consisting of Eurodollar Rate Advances, initial Interest Period for each such Advance. Each Lender shall, before 10:00 A.M. (New York City time) on the Closing Date, make available for the account of its Applicable Lending Office to the Agent at the Agent's Account, in same day funds, such Lender's ratable portion of such Borrowing. After the Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article III, the Agent will promptly, and in any event on the date of such Borrowing, make such funds available to Borrower by wire transfer to Borrower's Account.

(b) [Intentionally Omitted.]

(c) Each Notice of Borrowing shall be irrevocable and binding on Borrower. In the case of any Borrowing that the related Notice of Borrowing specifies is to be comprised of Eurodollar Rate Advances, Borrower shall indemnify each Lender against any loss (but excluding lost profits), cost or expense incurred by such Lender as a result of any failure to fulfill on or before the date specified in such Notice of Borrowing for such Borrowing the applicable conditions set forth in Article III, including, without limitation, any loss (but excluding lost profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to fund the Advance to be made by such Lender as part of such Borrowing when such Advance, as a result of such failure, is not made on such date.

(d) Unless the Agent shall have received notice from a Lender prior to the Closing Date that such Lender will not make available to the Agent such Lender's ratable portion of such Borrowing, the Agent may assume that such Lender has made such portion available to the Agent on the Closing Date in accordance with clause (a) of this Section 2.02 and the Agent may, in reliance upon such assumption, make available to Borrower on such date a corresponding amount. If and to the extent that such Lender shall not have so made such ratable portion available to the Agent, such Lender and Borrower severally agree to repay to the Agent promptly following demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to Borrower until the date such amount is repaid to the Agent, at (i) in the case of Borrower, the higher of (A) the interest rate applicable at the time to Advances comprising such Borrowing and (B) the cost of funds incurred by the Agent in respect of such amount and (ii) in the case of such Lender, the Federal Funds Rate. If Borrower and

- 31 -

such Lender shall pay such interest to the Agent for the same or an overlapping period, the Agent shall promptly remit to Borrower the amount of such interest paid by the Lender for such period. If such Lender shall repay to the Agent such corresponding amount, such amount so repaid shall constitute such Lender's Advance as part of such Borrowing for purposes of this Agreement.

(e) The failure of any Lender to make the Advance to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Advance on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Advance to be made by such other Lender on the date of any Borrowing.

SECTION 2.03. [Intentionally Omitted.]

SECTION 2.04. Fees.

(a) [Intentionally Omitted.]

(b) [Intentionally Omitted.]

(c) Agent's Fees; Lead Arrangers' Fees. Borrower shall pay to (i) the Agent for its own account such fees as may from time to time be agreed between Borrower and the Agent and (ii) the Lead Arrangers for their respective own accounts such fees as agreed to between Borrower and each such Lead Arranger (including pursuant to the Second Step Fee Letter).

SECTION 2.05. Termination or Reduction of the Commitments.

(a) [Intentionally Omitted.]

(b) The Commitments shall automatically terminate at 5:00 p.m. New York City time, on the Closing Date.

SECTION 2.06. Repayment of Advances.

(a) [Intentionally Omitted.]

(b) [Intentionally Omitted.]

(c) [Intentionally Omitted.]

(d) Advances. Borrower hereby unconditionally promises to pay to the Agent for the account of each Lender the then unpaid principal amount of each Advance on the Initial Maturity Date; provided that, notwithstanding the foregoing, unless an Event of Default under clause (e) of Section 6.01 with respect to Borrower has occurred and is continuing on the Initial Maturity Date, the unpaid principal amount of each Advance shall not be required to be repaid pursuant to this Section 2.06 until the Final Maturity Date.

SECTION 2.07. Interest on Advances.

(a) Scheduled Interest. Borrower shall pay interest on the unpaid principal amount of each Advance owing to each Lender from the date of such Advance until such principal amount shall be paid in full, at the following rates per annum:

- 32-

(i) <u>Base Rate Advances</u>. During such periods as such Advance is a Base Rate Advance, a rate per annum equal at all times to the lesser of (A) sum of (x) the Base Rate in effect from time to time <u>plus</u> (y) the Applicable Margin in effect from time to time and (B) the applicable per annum rate set forth on Schedule I- A, payable in arrears quarterly on the last day of each fiscal quarter of Borrower ending on or about the last day of each March, June, September and December as set forth on <u>Schedule 2.04(a)</u> hereof and on the date such Base Rate Advance shall be Converted or paid in full.

(ii) <u>Eurodollar Rate Advances</u>. During such periods as such Advance is a Eurodollar Rate Advance, a rate per annum equal at all times to the lesser of (A) during each Interest Period for such Advance to the sum of (x) the Eurodollar Rate for such Interest Period for such Advance <u>plus</u> (y) the Applicable Margin in effect from time to time and (B) the applicable per annum rate set forth on Schedule I- A, payable in arrears on the last day of such Interest Period and, if such Interest Period has a duration of more than three months, on each day that occurs during such Interest Period every three months from the first day of such Interest Period and on the date such Eurodollar Rate Advance shall be Converted or paid in full.

(b) <u>Default Interest</u>. Upon the occurrence and during the continuance of an Event of Default under <u>Section 6.01(a)</u>, Borrower will pay interest ("<u>Default Interest</u>") on (i) the overdue principal amount of each Advance owing to each Lender, payable in arrears on the dates referred to in clause (a)(i) or (a)(ii) above, at a rate per annum equal at all times to 2% per annum above the rate per annum required to be paid on such Advance pursuant to clause (a)(i) or (a)(ii) above and (ii) to the fullest extent permitted by law, the amount of any interest, fee or other amount payable hereunder that is not paid when due, from the date such amount shall be due until such amount shall be paid in full, payable in arrears on the date such amount shall be paid in full and promptly following demand, at a rate per annum equal at all times to 2% per annum above the rate per annum required to be paid on Base Rate Advances pursuant to clause (a)(i) above; <u>provided</u>, <u>however</u>, that following acceleration of the Advances pursuant to <u>Section 6.01</u>, Default Interest shall accrue and be payable hereunder whether or not previously required by the Agent.

SECTION 2.08. <u>Interest Rate Determination</u>.

(a) Each Reference Bank agrees, if requested by the Agent, to furnish to the Agent timely information for the purpose of determining each Eurodollar Rate. If any one or more of the Reference Banks shall not furnish such timely information to the Agent for the purpose of determining any such interest rate, the Agent shall determine such interest rate on the basis of timely information furnished by the remaining Reference Banks. The Agent shall give prompt notice to Borrower and the Lenders of the applicable interest rate determined by the Agent for purposes of <u>Section 2.07(a)(i)</u> or <u>(ii)</u>, and the rate, if any, furnished by each Reference Bank for the purpose of determining the interest rate under <u>Section 2.07(a)(ii)</u>.

(b) If, with respect to any Eurodollar Rate Advances, the Lenders owed at least a majority of the aggregate principal amount thereof notify the Agent that the Eurodollar Rate for any Interest Period for such Advances will not adequately reflect the cost to such Lenders of making, funding or maintaining their respective Eurodollar Rate Advances for such Interest Period, the Agent shall forthwith so notify Borrower and the Lenders, whereupon (i) each Eurodollar Rate Advance will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Advance, and (ii) the obligation of the Lenders to make, or to Convert Advances into, Eurodollar Rate Advances shall be suspended until the Agent shall notify Borrower and the Lenders that the circumstances causing such suspension no longer exist.

- 33 -

(c) If Borrower shall fail to select the duration of any Interest Period for any Eurodollar Rate Advances in accordance with the provisions contained in the definition of "Interest Period" in Section 1.01, the Agent will forthwith so notify Borrower and the Lenders and such Advances will automatically, on the last day of the then existing Interest Period therefor, Convert into Base Rate Advances.

(d) On the date on which the aggregate unpaid principal amount of Eurodollar Rate Advances comprising any Borrowing shall be reduced, by payment or prepayment or otherwise, to less than $5,000,000, such Advances shall automatically Convert into Base Rate Advances.

(e) Upon the occurrence and during the continuance of any Event of Default under Section 6.01(a), (i) each Eurodollar Rate Advance will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Advance and (ii) the obligation of the Lenders to make, or to Convert Advances into, Eurodollar Rate Advances shall be suspended.

(f) If Reuters LIBOR 01 page (or any successor page) is unavailable and fewer than two Reference Banks furnish timely information to the Agent for determining the Eurodollar Rate for any Eurodollar Rate Advances,

(i) the Agent shall forthwith notify Borrower and the Lenders that the interest rate cannot be determined for such Eurodollar Rate Advances,

(ii) each such Advance will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Advance (or if such Advance is then a Base Rate Advance, will continue as a Base Rate Advance), and

(iii) the obligation of the Lenders to make Eurodollar Rate Advances or to Convert Advances into Eurodollar Rate Advances shall be suspended until the Agent shall notify Borrower and the Lenders that the circumstances causing such suspension no longer exist.

SECTION 2.09. Optional Conversion of Advances. Borrower may on any Business Day, upon notice given to the Agent not later than 1:00 p.m. (New York City time) on the (x) third Business Day prior to the date of the proposed Conversion of Advances from Base Rate Advances to Eurodollar Rate Advances and (y) the first Business Day prior to the date of the proposed Conversion of Advances from Eurodollar Rate Advances to Base Rate Advances, and subject to the provisions of Sections 2.08 and 2.12, Convert all or any portion of Advances of one Type comprising the same Borrowing into Advances of the other Type; provided, however, that (a) Borrower shall pay any amounts owing pursuant to Section 8.04(c) in connection with any Conversion of Eurodollar Rate Advances into Base Rate Advances, and any Conversion of Base Rate Advances into Eurodollar Rate Advances shall be in an amount not less than the minimum amount specified in Section 2.01 and (b) no portion of any Advance may be Converted into a Eurodollar Rate Advance if any Event of Default has occurred and is continuing. Each such notice of a Conversion shall, within the restrictions specified above, specify (i) the date of such Conversion, (ii) the Advances to be Converted and (iii) if such Conversion is into Eurodollar Rate Advances, the duration of the initial Interest Period for each such Advance. Each notice of Conversion shall be irrevocable and binding on Borrower.

SECTION 2.10. Prepayments of Advances.

(a) Optional. Borrower may at any time and from time to time prepay the Advances in whole or in part, without premium or penalty, upon notice at least three Business Days' prior to the date of such prepayment, in the case of Eurodollar Rate Advances, and not later than 12:00 noon (New York City time) on the date of such prepayment, in the case of Base Rate Advances, to the Agent stating

-34-

the proposed date and aggregate principal amount of the prepayment, and if such notice is given Borrower shall, prepay the outstanding principal amount of the Advances comprising part of the same Borrowing in whole or ratably in part, together with accrued interest to the date of such prepayment on the principal amount prepaid; provided, however, that (x) each partial prepayment shall be in an aggregate principal amount of $10,000,000 or an integral multiple of $1,000,000 in excess thereof and (y) in the event of any such prepayment of a Eurodollar Rate Advance, Borrower shall be obligated to reimburse the Lenders for any additional amounts in respect thereof pursuant to Section 8.04(c). Prepayments under this Section 2.10(a) shall be applied as determined by Borrower in its sole discretion.

(b) Mandatory.

(i) If (x) any Debt for Borrowed Money shall be issued or incurred by Borrower or any Subsidiary under Section 5.02(c)(iii)(B), (xx), or (xxii) (y) Borrower consummates an Equity Issuance, in each case, an amount equal to 100% of the Net Cash Proceeds thereof shall be applied on the date of such issuance or incurrence in accordance with clause (v) below; provided that any such Net Cash Proceeds shall first be applied to the repayment of Borrower's "Obligations" under (and as defined in) the Senior Secured Credit Agreement to the extent required by Section 2.10(b) thereof or at the election of Borrower pursuant to Section 2.10(a) thereof.

(ii) [Intentionally Omitted.]

(iii) On each occasion that a Prepayment Event occurs, Borrower shall within five Business Days after the occurrence of such Prepayment Event (or, in the case of Deferred Net Cash Proceeds, within five Business Days after the last day of the Reinvestment Period relating to such Prepayment Event), make prepayments, in accordance with clause (v) below in an aggregate amount equal to 100% of the Net Cash Proceeds from such Prepayment Event; provided that (x) up to 50% of the Net Cash Proceeds that constitute Special Proceeds may be applied to Junior Capital that is being repurchased, redeemed or repaid pursuant to Section 5.02(g)(viii) and (y) no prepayment shall be required as a result of any Asset Sale Prepayment Event and Casualty Event until the aggregate amount of Net Cash Proceeds from all Asset Sale Prepayment Events and Casualty Events following the Closing Date that have not previously been applied to prepay Advances in accordance with this Section 2.10 exceeds $25,000,000 with respect to such Asset Sale Prepayment Events and Casualty Events; provided further that any Net Cash Proceeds from such Prepayment Event shall first be applied to the repayment of Borrower's Obligations under and as defined in the Senior Secured Credit Agreement to the extent required by Section 2.10(b) thereof or at the election of the Borrower pursuant to Section 2.10(a) thereof.

(iv) Upon the occurrence of a Change in Control, if any Lender notifies the Agent of the exercise of such Lender's right to require prepayment of its Advances (in whole or in part as specified in a written notice from such Lender to Borrower but in the case of any partial prepayment, in minimum increments of $500,000) pursuant to this subclause (iv) during the 20- day period commencing on the date Borrower provides notice of such Change in Control, such notice to be within five (5) Business Days of the occurrence of a Change in Control, the Borrower shall prepay the Advances of such Lender subject to such election within three Business Days following the last day of such 20- day period.

(v) The application of any prepayment pursuant to this Section 2.10(b) shall be made, first, to Base Rate Advances and, second, to Eurodollar Rate Advances. Each prepayment of the Advances under this Section 2.10(b) shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid.

Notwithstanding the foregoing, to the extent that (x) a mandatory prepayment of the type described in Section 2.10(b)(iii) would be required to be made with Net Cash Proceeds received by For-

- 35 -

eign Subsidiaries of Borrower, (y) Borrower or any Guarantor requires a dividend or distribution of such Net Cash Proceeds from such Foreign Subsidiaries in order to make such prepayment and (z) such dividend or distribution would result in material adverse tax consequence to Borrower, then no such prepayment shall be required to until such time as either such dividend or distribution is no longer required to make such prepayment or such dividend or distribution would no longer have a material adverse tax consequence to Borrower.

(vi) The Agent shall give prompt notice of any prepayment required under this Section 2.10(b) to Borrower and the Lenders.

SECTION 2.11. Increased Costs. If, due to either (i) the introduction of or any change in or in the interpretation of any law or regulation after the later of the Closing Date or the date a Lender shall become a Lender hereunder, or (ii) the compliance with any guideline or request from any central bank or other governmental authority (whether or not having the force of law) after the later of the Closing Date or the date a Lender shall become a Lender hereunder, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining Eurodollar Rate Advances (excluding for purposes of this Section 2.11 any such increased costs resulting from (A) Taxes or Other Taxes and (B) changes in the basis of taxation of overall net income or overall gross income by the United States or by the foreign jurisdiction or state under the laws of which such Lender is organized or has its Applicable Lending Office or any political subdivision thereof), then Borrower shall from time to time, promptly following demand by such Lender (with a copy of such demand to the Agent), pay to the Agent for the account of such Lender additional amounts sufficient to compensate such Lender for such increased cost; provided that Borrower's obligations under this Section 2.11 shall be limited to amounts accruing not more than 90 days prior to the invoice thereof by such Lender (such time period to be extended as necessary to take into account any retroactive application of a change in law giving rise to such obligations); provided, further, that each Lender claiming additional amounts under this Section 2.11 agrees to use commercially reasonable efforts (in its own judgment, consistent with its internal policy and legal and regulatory restrictions) to designate a different Applicable Lending Office if the making of such a designation would avoid the need for, or reduce the amount of, such increased cost that may thereafter accrue and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender. A certificate as to the amount of such increased cost, submitted to Borrower and the Agent by such Lender, shall be conclusive and binding for all purposes, absent manifest error.

SECTION 2.12. Illegality. Notwithstanding any other provision of this Agreement, if any Lender shall notify the Agent and Borrower that the introduction of or any change in or in the interpretation of any law or regulation occurring after the later of the Closing Date or the date a Lender shall become a Lender hereunder makes it unlawful, or any central bank or other governmental authority asserts that it is unlawful, for such Lender or its Eurodollar Lending Office to perform its obligations hereunder to make Eurodollar Rate Advances or to fund or maintain Eurodollar Rate Advances hereunder, (a) each Eurodollar Rate Advance will automatically, upon such demand, Convert into a Base Rate Advance and (b) the obligation of such Lender to make Eurodollar Rate Advances or to Convert Advances into Eurodollar Rate Advances shall be suspended until the Agent shall notify Borrower and the Lenders that the circumstances causing such suspension no longer exist; provided, however, that, before making any such demand, such Lender agrees to use commercially reasonable efforts (in its own judgment, consistent with its internal policy and legal and regulatory restrictions) to designate a different Eurodollar Lending Office if the making of such a designation would allow such Lender or its Eurodollar Lending Office to continue to perform its obligations to make Eurodollar Rate Advances or to continue to fund or maintain Eurodollar Rate Advances and would not, in the judgment of such Lender, be otherwise disadvantageous to such Lender.

- 36 -

SECTION 2.13. Payments and Computations; Pro Rata Treatment.

(a) Borrower shall make each payment hereunder, irrespective of any right of counterclaim, set- off, rescission or defense (other than defense of payment) (all of which are hereby waived) not later than 12:00 noon (New York City time) on the day when due in Dollars to the Agent at the Agent's Account in same day funds. The Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal or interest, fees or commissions fees ratably (other than amounts payable pursuant to Section 2.04, 2.11, 2.14 or 8.04(c) or (d)) to the Lenders for the account of their respective Applicable Lending Offices, and like funds relating to the payment of any other amount payable to any Lender to such Lender for the account of its Applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement. Upon its acceptance of an Assignment and Acceptance and recording of the information contained therein in the Register pursuant to Section 8.07(c), from and after the effective date specified in such Assignment and Acceptance, the Agent shall make all payments hereunder and under the Notes in respect of the interest assigned thereby to the Lender assignee thereunder, and the parties to such Assignment and Acceptance shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves.

(b) Borrower hereby authorizes each Lender, if and to the extent payment owed to such Lender by Borrower is not made when due hereunder or under the Note held by such Lender, to charge from time to time against any or all of Borrower's accounts with such Lender any amount so due.

(c) All computations of interest based on clause (a) of the definition of Base Rate shall be made by the Agent on the basis of a year of 365 or 366 days, as the case may be, and all computations of interest based on the Eurodollar Rate or the Federal Funds Rate and of commitment fees shall be made by the Agent on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest, fees or commissions are payable. Each determination by the Agent of an interest rate hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d) Whenever any payment hereunder or under the Notes shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest, fee or commissions, as the case may be; provided, however, that, if such extension would cause payment of interest on or principal of Eurodollar Rate Advances to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

(e) Unless the Agent shall have received notice from Borrower prior to the time on which any payment is due to the Lenders hereunder that Borrower will not make such payment in full, the Agent may assume that Borrower has made such payment in full to the Agent on such date and the Agent may, in reliance upon such assumption, cause to be distributed to each Lender on such due date an amount equal to the amount then due such Lender. If and to the extent Borrower shall not have so made such payment in full to the Agent, each Lender shall repay to the Agent forthwith on demand such amount distributed to such Lender together with interest thereon, for each day from the date such amount is distributed to such Lender until the date such Lender repays such amount to the Agent, at the Federal Funds Rate.

SECTION 2.14. Taxes.

(a) Any and all payments by Borrower under this Agreement and each Note shall be made without setoff, counterclaim or other defense, and free and clear of, and without deduction or withholding for or on account of, any Taxes, except to the extent such Taxes are imposed by law. In the event

-37-

that any Taxes are imposed and required by law to be deducted or withheld from any payment required to be made by Borrower to or on behalf of the Agent or any Lender hereunder then:

(i) subject to clause (f) below, if such Taxes are Non- Excluded Taxes, the amount of such payment shall be increased as may be necessary such that such payment is made, after withholding or deduction for or on account of such Taxes, in an amount that is not less than the amount provided for herein; and

(ii) Borrower shall withhold the full amount of such Taxes from such payment (as increased pursuant to clause (a)(i)) and shall pay such amount to the Governmental Authority imposing such Taxes in accordance with applicable law.

(b) In addition, Borrower shall pay any and all Other Taxes imposed to the relevant Governmental Authority imposing such Other Taxes in accordance with applicable law.

(c) As promptly as practicable after the payment of any Taxes or Other Taxes, Borrower shall furnish to the Agent a copy of an official receipt (or a certified copy thereof) evidencing the payment of such Taxes or Other Taxes. The Agent shall make copies thereof available to any Lender upon request therefor.

(d) Subject to clause (f), Borrower shall indemnify the Agent and each Lender for any Non- Excluded Taxes and Other Taxes levied, imposed or assessed on (and whether or not paid directly by) the Agent or such Lender (and whether or not such Non- Excluded Taxes or Other Taxes are correctly or legally asserted by the relevant Governmental Authority). Promptly upon having knowledge that any such Non- Excluded Taxes or Other Taxes have been levied, imposed or assessed, and promptly upon notice thereof by the Agent or any Lender, Borrower shall pay such Non- Excluded Taxes or Other Taxes directly to the relevant Governmental Authority (provided, however, that neither the Agent nor any Lender shall be under any obligation to provide any such notice to Borrower). In addition, Borrower shall indemnify the Agent and each Lender for any incremental Non- Excluded Taxes and Other Taxes that may become payable by the Agent or any Lender as a result of any failure of Borrower to pay any Taxes when due to the appropriate Governmental Authority or to deliver to the Agent, pursuant to clause (c), documentation evidencing the payment of Taxes or Other Taxes. With respect to indemnification for Non- Excluded Taxes and Other Taxes actually paid by the Agent or any Lender or the indemnification provided in the immediately preceding sentence, such indemnification shall be made within 30 days after the date the Agent or such Lender, as the case may be, makes written demand therefor. Borrower acknowledges that any payment made to the Agent or any Lender or to any Governmental Authority in respect of the indemnification obligations of Borrower provided in this clause shall constitute a payment in respect of which the provisions of clause (a) and this clause shall apply.

(e) Each Non- U.S. Lender, on or prior to the date on which such Non- U.S. Lender becomes a Lender hereunder (and from time to time thereafter upon the request of Borrower or the Agent, but only for so long as such non- U.S. Lender is legally entitled to do so), shall deliver to Borrower and the Agent either:

(i) two duly completed copies of either (x) Internal Revenue Service Form W- 8BEN claiming eligibility of the Non- U.S. Lender for benefits of an income tax treaty to which the United States is a party or (y) Internal Revenue Service Form W- 8ECI, or in either case an applicable successor form; or

(ii) in the case of a Non- U.S. Lender that is not legally entitled to deliver either form listed in clause (e)(i), (x) a certificate of a duly authorized officer of such Non- U.S. Lender to the

- 38 -

effect that such Non- U.S. Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a controlled foreign corporation receiving interest from a related Person within the meaning of Section 881(c)(3)(C) of the Code (such certificate, an "Exemption Certificate") and (y) two duly completed copies of Internal Revenue Service Form W- 8BEN or applicable successor form.

(f) Borrower shall not be obligated to pay any additional amounts to any Lender pursuant to clause (a)(i), or to indemnify any Lender pursuant to clause (d), in respect of United States federal withholding taxes to the extent imposed as a result of (i) the failure of such Lender to deliver to Borrower the form or forms and/or an Exemption Certificate, as applicable to such Lender, pursuant to clause (e), (ii) such form or forms and/or Exemption Certificate not establishing a complete exemption from U.S. federal withholding tax or the information or certifications made therein by the Lender being untrue or inaccurate on the date delivered in any material respect, or (iii) the Lender designating a successor lending office at which it maintains its Loans which has the effect of causing such Lender to become obligated for tax payments in excess of those in effect immediately prior to such designation; provided, however, that Borrower shall be obligated to pay additional amounts to any such Lender pursuant to clause (a)(i), and to indemnify any such Lender pursuant to clause (d), in respect United States federal withholding taxes if (i) any such failure to deliver a form or forms or an Exemption Certificate or the failure of such form or forms or Exemption Certificate to establish a complete exemption from U.S. federal withholding tax or inaccuracy or untruth contained therein resulted from a change in any applicable statute, treaty, regulation or other applicable law or any interpretation of any of the foregoing occurring after the date such Lender becomes a Lender hereunder, which change rendered such Lender no longer legally entitled to deliver such form or forms or Exemption Certificate or otherwise ineligible for a complete exemption from U.S. federal withholding tax, or rendered the information or certifications made in such form or forms or Exemption Certificate untrue or inaccurate in a material respect, (ii) the redesignation of the Lender's lending office was made at the request of Borrower or (iii) the obligation to pay any additional amounts to any such Lender pursuant to clause (a)(i) or to indemnify any such Lender pursuant to clause (d) is with respect to a Lender that becomes a Lender as a result of an assignment made at the request of Borrower.

SECTION 2.15. Sharing of Payments, Etc. If any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set- off, or otherwise) on account of the Advances owing to it (other than pursuant to Section 2.11, 2.14 or 8.04(c) or (d)) in excess of its ratable share of payments on account of the Advances obtained by all the Lenders, such Lender shall forthwith purchase from the other Lenders such participations in the Advances owing to them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided, however, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and such Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered; provided, further, that, so long as the obligations under this Agreement shall not have been accelerated, any excess payment received by any Lender shall be shared on a pro rata basis only with the other Lenders. Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this Section 2.15 may, to the fullest extent permitted by applicable law, exercise all its rights of payment (including the right of set- off) with respect to such participation as fully as if such Lender were the direct creditor of Borrower in the amount of such participation.

- 39 -

SECTION 2.16. Evidence of Debt.

(a) Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of Borrower to such Lender resulting from each Advance owing to such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder in respect of Advances. Borrower agrees that upon notice by any Lender to Borrower (with a copy of such notice to the Agent) to the effect that a Note is required or appropriate in order for such Lender to evidence (whether for purposes of pledge, enforcement or otherwise) the Advances owing to, or to be made by, such Lender, Borrower shall promptly execute and deliver to such Lender the applicable Note payable to the order of such Lender in a principal amount up to the Advance of such Lender.

(b) The Register maintained by the Agent pursuant to Section 8.07(d) shall include a control account, and a subsidiary account for each Lender, in which accounts (taken together) shall be recorded (i) the date and amount of each Borrowing made hereunder, the Type of Advances comprising such Borrowing and, if appropriate, the Interest Period applicable thereto, (ii) the terms of each Assignment and Acceptance delivered to and accepted by it, (iii) the amount of any principal (including any PIK Interest) or interest due and payable or to become due and payable from Borrower to each Lender hereunder and (iv) the amount of any sum received by the Agent from Borrower hereunder and each Lender's share thereof.

(c) Entries made in good faith by the Agent in the Register pursuant to clause (b) above, and by each Lender in its account or accounts pursuant to clause (a) above, shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement, absent manifest error; provided, however, that the failure of the Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of Borrower under this Agreement.

SECTION 2.17. Exchange Notes.

(a) Subject to satisfaction of the provisions of this Section 2.17 and in reliance upon the representations and warranties of Borrower herein set forth, on and after the 5th Business Day prior to the Initial Maturity Date, each Lender will have the option to notify (an "Exchange Notice") the Agent in writing of its request for senior unsecured exchange notes (individually, an "Exchange Note" and collectively, the "Exchange Notes") in exchange for a like principal amount of all or a portion of its outstanding Advances hereunder. Each Lender's Exchange Notice shall be irrevocable and shall specify the aggregate principal amount of outstanding Advances that such Lender desires to exchange for Exchange Notes pursuant to this Section 2.17, which shall be in a minimum amount of $1,000,000 (and integral multiples of $1,000 in excess thereof) and whether such Exchange Notes are to be Increasing Rate Exchange Notes or, subject to the limitations set forth under the heading "- Principal, maturity and interest; Conversion of Increasing Rate Notes to Fixed Rate Notes" in Exhibit I, Fixed Rate Exchange Notes. Advances subject to an Exchange Notice shall be deemed to have been repaid for all purposes of this Agreement upon issuance of a like principal amount of Exchange Notes to such Lender in accordance with clause (c) below.

(b) Notwithstanding the foregoing, such Lender's Advances shall only be exchanged for Exchange Notes hereunder upon the occurrence of an Exchange Trigger Event, notice of which shall be provided to Borrower and all such Lenders by the Agent. Upon receipt of notice of an Exchange Trigger Event, Borrower shall set a date (each an "Exchange Date") for the exchange of Advances for Exchange Notes, which date shall be no less than 10 Business Days and no more than 20 Business Days (or,

- 40-

in the case of the initial issuance of Exchange Notes, 45 Business Days) after its receipt of notice of an Exchange Trigger Event.

(c) On each Exchange Date, Borrower shall execute and deliver, and cause the Exchange Note Trustee to authenticate and deliver, to each Lender or as directed by such Lender that exchanges Advances, an Exchange Note in the principal amount equal to 100% of the aggregate outstanding principal amount (including any accrued and unpaid interest not required to be paid in cash) of such Advance (or portion thereof) for which each such Exchange Note is being exchanged. The Exchange Notes shall be governed by the Exchange Notes Indenture. Upon issuance of the Exchange Notes to a Lender in accordance with this Section 2.17, a corresponding amount of the Advances of such Lender shall be deemed to have been repaid.

(d) Borrower shall, as promptly as practicable after being requested to do so by the Lenders pursuant to the terms of this Agreement at any time following the first Exchange Trigger Event, (i) select a bank or trust company to act as Exchange Note Trustee, (ii) enter into the Exchange Notes Registration Rights Agreement and the Exchange Notes Indenture, and (iii) cause counsel to Borrower and the General Counsel of the Company to deliver to the Agent executed legal opinions substantially in the form attached hereto as Exhibit K-1 and Exhibit K-2. The Exchange Note Trustee shall at all times be a corporation organized and doing business under the laws of the United States or any State thereof, in good standing, which is authorized under such laws to exercise corporate trust powers and is subject to supervision or examination by federal or state authority and which has a combined capital and surplus of not less than $500,000,000.

SECTION 2.18. Mitigation Obligations. If any Lender requests compensation under Section 2.11, or if Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.14, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Advances hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.11 or 2.14, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment to the extent requested within 180 days of such designation or assignment pursuant to an invoice setting forth such costs and expenses in reasonable detail.

## ARTICLE III
## CONDITIONS TO EFFECTIVENESS AND LENDING

SECTION 3.01. Conditions Precedent to Initial Borrowing. The obligation of each Lender to make an Advance on the Closing Date shall be subject to the occurrence and satisfaction or waiver of the following conditions precedent (other than clause (m), which shall be a simultaneous condition):

(a) Interim Loan Agreement and Loan Documents. The Agent (or its counsel) shall have received (I) from each party hereto either (A) a counterpart of this Agreement signed on behalf of such party or (B) written evidence satisfactory to the Agent (which may include facsimile or .pdf transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement and (ii) fully executed copies of the other Loan Documents to be entered into on the Closing Date, including any Notes requested by a Lender pursuant to Section 2.16(a) prior to the Closing Date.

- 41 -

(b) The Lenders shall have received:

(i) a solvency certificate duly executed and delivered by the chief financial or accounting officer of Borrower authorized to sign such certificate, dated as of the Closing Date, substantially in the form of Exhibit E hereto;

(ii) favorable written opinions (or reliance letters) of (A) Sidley Austin LLP, special counsel for the Loan Parties, in a form reasonably acceptable to the Agent and (B) Crane H. Kenney, General Counsel of the Loan Parties, in a form reasonably acceptable to the Agent, in each case dated the Closing Date and addressed to the Agent and Lenders;

(iii) copies of (A) the unaudited consolidated balance sheets and related statements of income, stockholder's equity and cash flows of Borrower for the fiscal quarter ended September 30, 2007, (B) a consolidated balance sheet of Tribune as of September 30, 2007 on a Pro Forma Basis after giving effect to the Transactions and (C) a consolidated balance sheet of Tribune as of September 30, 2007on a Pro Forma Basis after giving effect to the Transactions;

(iv) a certificate, dated the Closing Date and signed by the President, a Vice President or a financial officer of the Company, confirming that the following statements shall be true (and each of the giving of the Notice of Borrowing, and the acceptance by Borrower of the proceeds of such Borrowing shall constitute a representation and warranty by Borrower that on the date of such Borrowing such statements are true):

(A) the representations and warranties contained in Section 4.01 (other than, on the Closing Date, the last sentence of Section 4.01(e)(i)) are correct in all material respects (except to the extent such representation and warranty is already qualified by materiality or Material Adverse Effect, in which case such representation or warranty shall be correct in all respects) on and as of such date, before and after giving effect to such Borrowing and to the application of the proceeds therefrom, as though made on and as of such date, except to the extent any such representation or warranty, by its terms, refers to a different specific date other than the date of such Borrowing, in which case as of such specific date, and

(B) no event has occurred and is continuing, or would result from such Borrowing or from the application of the proceeds therefrom, that would result in a Default.

(v) a certificate of each Loan Party, dated the Closing Date and executed by its Secretary, Assistant Secretary or director, which shall (A) certify the resolutions of its Board of Directors, members or other body authorizing the execution, delivery and performance of the Loan Documents to which it is a party, (B) identify by name and title and bear the signatures of the other officers of such Loan Party authorized to sign the Loan Documents to which it is a party, and (C) contain appropriate attachments, including the certificate or articles of incorporation or organization of each Loan Party (certified by the relevant authority of the jurisdiction of organization of such Loan Party), and a true and correct copy of its by- laws, memorandum and articles of incorporation or operating, management, partnership or equivalent agreement to the extent applicable and a good standing certificate for each Loan Party from its jurisdiction of organization to the extent such concept exists in such jurisdiction.

- 42-

(c) Financial Projections. The Lead Arrangers shall have received (i) reasonably detailed consolidated financial projections on behalf of Tribune for Tribune and its consolidated entities for the five fiscal year period after the Closing Date on a Pro Forma Basis after giving effect to the Transactions and (ii) reasonably detailed consolidated financial projections on behalf of Tribune for Tribune and its consolidated entities for the five fiscal year period after the Closing Date on a Pro Forma Basis after giving effect to the Transactions.

(d) Closing Date Material Adverse Effect. (i) Since December 31, 2006 through September 30, 2007, except as otherwise contemplated, disclosed or permitted by the Acquisition Agreement, the Tribune Purchase Agreement, as defined in the Acquisition Agreement, or the ESOP Purchase Agreement or the documents ancillary thereto, there has not been any event, development or state of circumstances that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (ii) since September 30, 2007, there has not been any event, development or state of circumstances that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Since Septem-ber 30, 2007 through the Closing Date, there has not occurred and does not exist any event that could reasonably be expected to have a material adverse effect on the ability of Borrower or the other Loan Parties (taken as a whole) to perform its obligations under any Loan Document.

(e) [Intentionally Omitted.]

(f) Fees. Borrower shall have paid all accrued fees and expenses (including the reasonable fees and expenses of Cahill Gordon & Reindel LLP) of the Lead Arrangers in connection with this Agreement and the transactions contemplated hereby to the extent that such fees and expenses shall have been invoiced at least two Business Days prior to the Closing Date.

(g) [Intentionally Omitted.]

(h) Acquisition. The Acquisition Agreement shall have been executed and delivered and no provision thereof shall have been waived, amended, supplemented or otherwise modified and no action by Tribune prohibited by the Acquisition Agreement shall have been consented to, in each case in a manner material and adverse to the Lenders without the consent of the Lead Arrangers.

(i) [Intentionally Omitted.]

(j) ESOP. The Lead Arrangers shall be reasonably satisfied that there shall not have been any changes or waivers to the ESOP Documentation (including the provisions of the ESOP relating to redemptions and distributions) since September 30, 2007 that are material and adverse to Lenders.

(k) [Intentionally Omitted.]

(l) [Intentionally Omitted.]

(m) Incremental Facility. The Borrower shall have received $2,105 million in gross cash proceeds from the borrowing under the Incremental Facility substantially contemporaneously with the borrowings hereunder and no default or event of default shall occur under the Senior Secured Credit Agreement as a result thereof.

(n) [Intentionally Omitted.]

- 43 -

(o) <u>Zell Investment Agreement</u>. The Lead Arrangers shall have received an executed copy of the Zell Investment Agreement.

(p) The Total Guaranteed Leverage Ratio shall not exceed 9.00:1.00 when measured on a Pro Forma Basis as of the last day of the fiscal quarter ending immediately prior to the date of the Acquisition (giving effect to the Transactions and other customary and appropriate pro forma adjustment events, including any acquisitions or dispositions after the beginning of the relevant determination period but prior to or simultaneous with the consummation of the Acquisition).

(q) The Warrant shall be issued concurrent with the consummation of the Acquisition.

SECTION 3.02. <u>Initial Maturity Date</u>.

(a) Subject to no Event of Default under clause (e) of Section 6.01 with respect to Borrower or any Guarantor that is not an Immaterial Subsidiary existing on the Initial Maturity Date, the unpaid principal amount of each Advance (including any accrued interest not required to be paid in cash) may be exchanged in accordance with Section 2.17 or, if not so exchanged, shall continue as Advances hereunder, and in either case, shall not be required to be repaid until the Final Maturity Date or otherwise in accordance with the Exchange Notes hereunder or the terms hereof.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

SECTION 4.01. <u>Representations and Warranties of Borrower</u>. Borrower represents and warrants as follows:

(a) Each Loan Party and each Subsidiary is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, is duly qualified to do business and is in good standing as a foreign entity in each jurisdiction where the nature of its business requires such qualification, and has full power and authority and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, holds all requisite governmental licenses (including, without limitation, all licenses such Loan Party or such Subsidiary is required to hold or maintain which are issued by the FCC), permits and other approvals required for (i) the ownership and operation of its businesses and assets in the ordinary course and (ii) the due execution, delivery and performance by such Loan Party of the Loan Documents to which it is a party.

(b) The execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party, and the consummation of the First Step Transactions and the Second Step Transactions, are or will be within such corporate or other powers, have been or will be duly authorized by all necessary action, and (i) do not contravene such Loan Party's Organizational Documents, (ii) do not contravene any law applicable to such Loan Party, except as could reasonably be expected to have a Material Adverse Effect, and (iii) will not violate or result in a default or require any consent or approval under any agreement or instrument evidencing Material Debt binding upon any Loan Party or any Subsidiary or its property, or give rise to a right thereunder to require any payment to be made by such Loan Party or such Subsidiary, except for such

- 44-

violations, defaults, requirements, or the creation of such rights that could not reasonably be expected to result in a Material Adverse Effect.

(c) Except (i) as have been obtained by the Closing Date, (ii) for such authorizations, approvals or other actions as may be required by the FCC in connection with the disposal of the membership interest of Tribune Broadcasting Holdco and (iii) as could not reasonably be expected to result in a Material Adverse Effect, no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or any other third party is required for the due execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party.

(d) Each of the Loan Documents to be delivered by a Loan Party when delivered hereunder will have been, duly executed and delivered by such Loan Party. This Agreement is, and each Loan Documents to which each Loan Party is a party when delivered hereunder will be, the legal, valid and binding obligation of such Loan Party enforceable against such Loan Party in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(e) (i) The audited Consolidated balance sheet of Borrower and its Subsidiaries as of December 31, 2006 and the related audited Consolidated statements of income, shareholders' equity and cash flows of Borrower and its Subsidiaries for the fiscal year ended December 31, 2006, accompanied by an opinion of PricewaterhouseCoopers LLP, independent public accountants, copies of which have been made available to each Lender, fairly present in all material respects the Consolidated financial condition of Borrower and its Subsidiaries as at such date and the Consolidated results of the operations of Borrower and its Subsidiaries for the period ended on such date, all in accordance with GAAP as in effect on the date of preparation thereof. Since December 31, 2006 through September 30, 2007, except as otherwise contemplated, disclosed or permitted by the Acquisition Agreement, the Tribune Purchase Agreement, as defined in the Acquisition Agreement, or the ESOP Purchase Agreement, as defined in the Acquisition Agreement or the documents ancillary thereto, there has not been any event, development or state of circumstances that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and since September 30, 2007, there has not been any event, development or state of circumstances that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(ii) The unaudited Consolidated balance sheet of Borrower and its Subsidiaries as of September 30, 2007 and the related Consolidated statements of income, shareholders' equity and cash flows of Borrower and its Subsidiaries for the fiscal quarter ended September 30, 2007, copies of which have been furnished to each Lender, fairly present in all material respects the Consolidated financial condition of Borrower and its Subsidiaries as at such date and the Consolidated results of the operations of Borrower and its Subsidiaries for the period ended on such date, all in accordance with GAAP as in effect on the date of preparation thereof.

(iii) The unaudited pro forma condensed Consolidated balance sheet of Borrower and its Subsidiaries as of September 30, 2007, and the related unaudited pro forma combined statements of operations of Borrower and its Subsidiaries for the fiscal quarter then ended, copies of which have been furnished to each Lender, fairly present in all material respects the Consolidated pro forma financial condition of Borrower and its Subsidiaries as at such date and the Consolidated pro forma results of operations of Borrower and its Subsidiaries for the period ended on such date, after giving effect to both the First Step Transactions and the Second Step Transac-

-45-

tions, all in accordance with GAAP as in effect on the date of preparation thereof. Such pro forma financial statements have been prepared in good faith by Borrower, based on the assumptions believed by Borrower to be reasonable at the time such pro forma financial statements were prepared and accurately reflect the adjustments described therein.

(f) Except as set forth in Schedule 4.01(f) or in the SEC Reports, there is no pending or to the knowledge of Borrower, threatened action, suit, investigation, litigation, proceeding or labor controversy, including, without limitation, any Environmental Action, affecting Borrower, any of its Subsidiaries or any PDT Entity before any court, governmental agency or arbitrator that (i) could reasonably be expected to have a Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of the Loan Documents or the consummation of the First Step Transactions and, solely to the extent the Acquisition is consummated, the Second Step Transactions, and no conditions exist at, on or under any property now or previously owned or leased by Borrower which, with the passage of time, or the giving of notice or both, would give rise to material liability under any Environmental Laws and that could reasonably be expected to have a Material Adverse Effect.

(g) Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System), and no proceeds of any Advance will be used for any purpose that violates, or which is inconsistent with, the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve of the United States, as in effect from time to time.

(h) Each of Borrower and each of its Subsidiaries has good fee simple title to, or valid leasehold interests in, or easements or other limited property interests in, all its real properties and has good and marketable title to its personal property and assets, in each case, except for defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes and except where the failure to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. On the Closing Date all such properties and assets are free and clear of Liens, other than Liens permitted by Sections 5.02(a)(i), (iii), (v), (vi) and (x).

(i) Borrower or its Subsidiaries (a) owns, or is licensed to use the trademarks, trade-names and copyrights and (b) owns, or is licensed to use or reasonably believes it has the right to use the technology, know-how and processes, in each case, necessary for the conduct of its business as currently conducted except for those the failure to own or license which could not reasonably be expected to have a Material Adverse Effect (the "Intellectual Property"). No claim has been asserted and is pending by any Person challenging any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does such Borrower know of any valid basis for any such claim, except, in either case, for such claims that in the aggregate could not reasonably be expected to have a Material Adverse Effect. The use of such Intellectual Property by Borrower and its Subsidiaries does not infringe on the intellectual property rights of any Person, except for such claims and infringements that, in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(j) No Loan Party is an "investment company" within the meaning of the Investment Company Act of 1940, as amended from time to time.

(k) The other information, exhibits or reports (including the SEC Reports) (other than financial projections (such projections being prepared in good faith and based upon assumptions Borrower believes to have been reasonable at the time made) and information of a general

- 46 -

economic or industry specific nature) furnished by or on behalf of Borrower or otherwise made available to the Agent or any Lender in connection with the negotiation and syndication of this Agreement or pursuant to the terms of this Agreement taken as a whole as of the date furnished or otherwise made available to the Agent or any Lender, do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein not materially misleading in the light of the circumstances under which such statements were made.

(l) As of the Closing Date, immediately after giving effect to the Second Step Transactions, Borrower is Solvent.

(m) Borrower, each of its Subsidiaries and each PDT Entity have filed, have caused to be filed or have been included in all material tax returns and reports required by law to have been filed by it and has paid all Taxes thereby shown to be due and owing, except any such Taxes which are not yet delinquent or are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books.

(n) Except as set forth in the SEC Reports, Borrower, each of its Subsidiaries and each PDT Entity are in compliance with all applicable laws, rules, regulations and orders that are material to the conduct of the business of Borrower and its Subsidiaries taken as a whole, including, without limitation, compliance with ERISA, Environmental Laws and the Patriot Act, except for any failure to comply which could not reasonably be expected to have a Material Adverse Effect.

(o) Borrower, each of its Subsidiaries and each PDT Entity maintain insurance with responsible and reputable insurance companies or associations (including affiliated companies) in such amounts and covering such risks as is customarily carried by companies engaged in similar businesses and owning similar properties as Borrower and its Subsidiaries; provided, however, that Borrower and its Subsidiaries may self- insure to the extent it determines in its good faith reasonable business judgment that such insurance is consistent with prudent business practices.

(p) As of the Closing Date, Schedule 4.01(p) sets forth (a) a correct and complete list of the name and relationship to Borrower of each and all of Borrower's Subsidiaries, (b) a true and complete listing of each class of Borrower's authorized Equity Interests, of which all of such issued shares are validly issued, outstanding, fully paid and non- assessable, and (c) the type of entity of Borrower and each of its Subsidiaries. On the Closing Date, all of the issued and outstanding Equity Interests of the Subsidiaries owned by any Loan Party have been (to the extent such concepts are relevant with respect to such ownership interests) duly authorized and issued and are fully paid and non- assessable free and clear of all Liens (other than Liens created under the Loan Documents, the Senior Secured Pledge Agreement, Permitted Liens and Liens permitted by Section 5.02(a)(vi)).

(q) Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect, there are no strikes, lockouts or slowdowns against any Loan Party currently occurring or, to the knowledge of Borrower, threatened. Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect, the consummation of the Transactions will not give rise to a right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which Borrower or any of its Subsidiaries (or any predecessor) is a party or by which Borrower or any of its Subsidiaries (or any predecessor) is bound.

(r) [Intentionally Omitted.]

- 47 -

(s) [Intentionally Omitted.]

(t) (i) No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, would reasonably be expected to have a Material Adverse Effect. Except as would not reasonably be expected to have a Material Adverse Effect, each of the Loan Parties and their Subsidiaries are in compliance with the applicable provisions of ERISA and the Code with respect to each Employee Benefit Plan.

(ii) Neither any Loan Party nor any Subsidiary, PDT Entity, trustee, administrator, or fiduciary of any Employee Benefit Plan, has (i) engaged in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code for which there is no exemption under Section 408 of ERISA or Section 4975 of the Code, respectively, which could directly or indirectly subject any Loan Party or any Subsidiary to any liability for a tax or penalty imposed by Section 4975 of the Code or Section 502(i) of ERISA, or (ii) committed a breach of its fiduciary duties (as defined in Section 404 of ERISA) which could directly or indirectly subject any Loan Party nor any Subsidiary to any liability under Section 502 of ERISA except for a liability under (i) or (ii) which would not reasonably be expected to have a Material Adverse Effect.

(iii) [Intentionally Omitted.]

(iv) The purchase of the Capital Stock by the ESOP Trust from Borrower, the execution and performance of this Agreement, the Loan Documents, the Acquisition Agreement, and the ESOP Documentation, and the consummation of the transactions contemplated by this Agreement and by the Loan Documents, the Acquisition Agreement, and the ESOP Documentation did not and will not (i) involve a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code for which there is no exemption under Section 408 of ERISA or Section 4975 of the Code, respectively; (ii) constitute a violation of the fiduciary responsibility standards imposed by Section 404 of ERISA; or (iii) adversely affect the qualified status of the ESOP under Sections 401(a) or 4975(e)(7) of the Code.

(v) (A) The ESOP is an "employee stock ownership plan" within the meaning of Section 4975(e)(7) of the Code and the ESOP is qualified under Section 401(a) of the Code; (B) the ESOP has been duly established in accordance with and under applicable law and the ESOP's trust is a tax-exempt trust under Section 501(a) of the Code; (C) the terms of the Acquisition Agreement, and the ESOP Documentation comply with the applicable provisions of Title I of ERISA; (D) the shares of Capital Stock acquired by the ESOP Trust are "employer securities," within the meaning of Section 409(l) of the Code; (E) the purchase price paid by the ESOP Trust to Borrower for the Capital Stock under the ESOP Purchase Agreement as of April 1, 2007 did not exceed "adequate consideration," as defined in Section 3(18) of ERISA; and (F) all of the information provided by, or on behalf of, Borrower to the independent appraiser for the ESOP Trust, in connection with the transactions contemplated by the Acquisition Agreement and the ESOP Documentation, were true and accurate in all material respects and there was no failure by, or on behalf of Borrower to disclose any material information to the independent appraiser for the ESOP Trust.

- 48 -

### ARTICLE V

### COVENANTS OF BORROWER

SECTION 5.01. <u>Affirmative Covenants</u>. So long as any Advance shall remain unpaid, any Lender shall have any Commitment hereunder or any other Obligation shall remain outstanding (other than contingent obligations for unassessed claims), Borrower will, unless the Required Lenders shall otherwise consent in writing:

(a) <u>Compliance with Laws. Etc.</u> Comply, and cause each of its Subsidiaries and any PDT Entities to comply, in all material respects, with all applicable laws, rules, regulations and orders that are material to the conduct of the business of Borrower and its Subsidiaries taken as a whole, such compliance to include, without limitation, compliance with ERISA, Environmental Laws and the Patriot Act except to the extent failure to comply could not reasonably be expected to have a Material Adverse Effect.

(b) <u>Payment of Taxes. Etc.</u> Pay and discharge, and cause each of its Subsidiaries to pay and discharge, before the same shall become delinquent, (i) all material taxes, assessments and governmental charges or levies imposed upon it or upon its property and (ii) all lawful claims that, if unpaid, might by law become a Lien upon any property of Borrower and its Subsidiaries that would be material to them taken as a whole; <u>provided</u>, <u>however</u>, that neither Borrower nor any of its Subsidiaries shall be required to pay or discharge any such tax, assessment, charge or claim that is being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained.

(c) <u>Maintenance of Insurance</u>. Maintain, and cause each of its Subsidiaries and any PDT Entities to maintain, insurance with responsible and reputable insurance companies or associations (including affiliated companies) in such amounts and covering such risks, and with such deductibles or, subject to the proviso set forth below, self- insurance retentions, as is usually carried by companies engaged in similar businesses and owning similar properties in the same general areas in which Borrower or such Subsidiary operates; <u>provided</u>, <u>however</u>, that Borrower and its Subsidiaries may self- insure to the extent it determines in its good faith reasonable business judgment that such insurance is consistent with prudent business practices.

(d) <u>Conduct of Business; Preservation of Corporate Existence. Etc.</u> Continue to engage in business of the same general type as now conducted by it and preserve and maintain, and cause each of its Subsidiaries (other than Immaterial Subsidiaries) to preserve and maintain, (i) its existence and (ii) its rights (charter and statutory) and franchises to the extent material to the conduct of the business of Borrower and its Subsidiaries taken as a whole; <u>provided</u>, <u>however</u>, that Borrower and its Subsidiaries may consummate any transaction permitted under <u>Section 5.02(b)</u> and <u>provided</u> <u>further</u> that neither Borrower nor any of its Subsidiaries shall be required to preserve any right or franchise if Borrower or such Subsidiary shall determine that the preservation thereof is no longer desirable in the conduct of the business of Borrower or such Subsidiary, as the case may be, and that the loss thereof is not disadvantageous in any material respect to Borrower, such Subsidiary or the Lenders.

(e) <u>Visitation Rights; Annual Meetings</u>.

(i) At any reasonable time and from time to time upon reasonable notice, permit the Agent or any of the Lenders (subject to the provisos below) or any agents or representatives thereof, to examine and make copies of and abstracts from the records and books of account of,

- 49 -