**TRIBUNE COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Non-operating items for 2004 are summarized as follows (in thousands):

| | Proceeds | Pretax Gain (Loss) | After-tax Gain (Loss) |
|---|---|---|---|
| Loss on change in fair values of derivatives and related investments | $ — | $ (18,497) | $ (11,283) |
| Loss on early debt retirement | — | (140,506) | (87,549) |
| Gain on sales of investments, net | 23,973 | 20,347 | 12,412 |
| Loss on investment write-downs and other, net | 16,259 | (6,388) | (3,897) |
| Total non-operating items | $ 40,232 | $ (145,044) | $ (90,317) |

The 2004 change in the fair values of derivatives and related investments pertained entirely to the Company's PHONES and related Time Warner investment. The $18 million non-cash pretax loss resulted from a $39 million increase in the fair value of the derivative component of the Company's PHONES, which was partially offset by a $21 million increase in the fair value of 16 million shares of Time Warner common stock.

In 2004, the Company redeemed all of its outstanding $400 million ($396 million net of unamortized discount) 7.45% debentures due 2009 and retired $66 million ($64 million net of unamortized discount) of its 7.25% debentures due 2013 and $165 million ($160 million net of unamortized discount) of its 6.61% debentures due 2027 through cash tender offers. The Company paid approximately $760 million to retire this debt and, as a result, recorded a one-time, pretax loss of $141 million in 2004. The Company funded these transactions with cash and the issuance of commercial paper.

The 2004 gain on sales of investments related primarily to the sale of the Company's 50% interest in *La Opinión* for $20 million, resulting in a pretax gain of $18 million.

## NOTE 3: DISCONTINUED OPERATIONS AND ASSETS HELD FOR SALE

**Sales of WATL-TV, Atlanta, WCWN-TV, Albany and WLVI-TV, Boston**—On June 5, 2006, the Company announced the sale of WATL-TV, Atlanta to Gannett Co., Inc. for $180 million. The sale closed on Aug. 7, 2006. On June 19, 2006, the Company announced the sale of WCWN-TV, Albany to Freedom Communications, Inc. for $17 million. The sale closed on Dec. 6, 2006. On Sept. 14, 2006, the Company announced the sale of WLVI-TV, Boston, to Sunbeam Television Corp. for $113.7 million. The sale closed on Dec. 19, 2006.

These businesses were considered components of the Company's broadcasting and entertainment segment as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company. The operations and cash flows of these businesses have been eliminated from the ongoing operations of the Company as a result of the sales, and the Company will not have any significant continuing involvement in their operations. Accordingly, the results of operations of each of these businesses have been reported as discontinued operations in the consolidated statements of income. Prior year consolidated statements of income have been reclassified to conform to the current year presentation of discontinued operations.

In conjunction with the sales of WATL-TV, Atlanta and WCWN-TV, Albany, the Company recorded in the second quarter of 2006 a pretax loss totaling $90 million, including $80 million of allocated television group goodwill, to write down the net assets of the stations to estimated fair value, less costs to sell. The Company subsequently reduced the pretax loss on sales of the Atlanta and Albany stations during the third quarter of 2006 by $1 million. In addition, the Company recorded in the fourth quarter of 2006 a pretax

89

Source: TRIBUNE CO, 10-K, February 26, 2007                    Powered by Morningstar® Document Research℠

**TRIBUNE COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

gain of $41 million, including $45 million of allocated television group goodwill, for the sale of the Boston station. In accordance with FAS No. 142, "Goodwill and Other Intangible Assets", the Company aggregates all of its television stations into one reporting unit for goodwill accounting purposes. FAS No. 142 requires the Company to allocate a portion of its total television group goodwill to stations that are to be sold on a relative fair value basis. The net pretax loss on sales of the three stations sold during 2006 was $48 million, including $125 million of allocated television group goodwill.

Selected financial information related to discontinued operations for 2006, 2005 and 2004 is summarized as follows (in thousands, except per share data):

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| Operating revenues | $ 64,870 | $ 84,334 | $ 94,816 |
| Operating profit(1) | $ 2,300 | $ 19,632 | $ 31,011 |
| Loss on sales of discontinued operations | (48,238) | — | — |
| Income (loss) from discontinued operations before income taxes | (45,938) | 19,632 | 31,011 |
| Income taxes(2) | (20,920) | (7,732) | (12,063) |
| Income (loss) from discontinued operations, net of tax. | $ (66,858) | $ 11,900 | $ 18,948 |
| Income (loss) from discontinued operations per share: |  |  |  |
| Basic | $ (.25) | $ .04 | $ .06 |
| Diluted | $ (.24) | $ .04 | $ .06 |

(1) Operating profit for 2006 included $6 million of severance and related charges incurred as a result of the sales of the three television stations.

(2) Income taxes for 2006 included a tax benefit of $12 million related to the $89 million pretax loss on sales of the Atlanta and Albany stations. The $12 million tax benefit was only 13% of the pretax loss because most of the $80 million goodwill allocation, which is included in the loss, is not deductible for income tax purposes. Income taxes for 2006 also included a tax expense of $32 million related to the $41 million pretax gain on sale of the Boston station. The $32 million tax expense was 77% of the pretax gain because most of the $45 million goodwill allocation included in the Boston gain is not deductible for income tax purposes.

**Assets Held for Sale—**In December 2006, the Company entered into a non-binding agreement to sell the land and building of one of its production facilities. The $5 million carrying value of the land and building of this facility approximates fair value less costs to sell and is included in non-current assets held for sale at Dec. 31, 2006. The Company expects to complete this sale sometime during the third quarter of 2007.

In February 2007, the Company sold its interactive program guide assets, including software and a portfolio of patents (collectively the "IPG intellectual property"). Accordingly, the $4 million carrying value of the intangible assets related to the IPG intellectual property is included in non-current assets held for sale at Dec. 31, 2006. The Company received net proceeds of approximately $10 million and will record a pretax gain on sale of approximately $6 million in the first quarter of 2007.

Non-current assets held for sale of $24 million at Dec. 25, 2005 pertained entirely to the Company's San Fernando Valley, California printing facility, which was sold in October 2006 for net proceeds of approximately $24 million. See Note 2 for additional information related to the shutdown and subsequent sale of this facility.

90

Powered by Morningstar® Document Research℠

TRIBUNE COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

## NOTE 4: *NEWSDAY* AND *HOY*, NEW YORK CHARGE

In February 2004, a purported class action lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* and *Hoy*, New York, alleging that they were overcharged for advertising as a result of inflated circulation numbers at these two publications. The purported class action also alleges that entities that paid a *Newsday* subsidiary to deliver advertising flyers were overcharged. In July 2004, another lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* alleging damages resulting from inflated *Newsday* circulation numbers as well as federal and state antitrust violations. The Company is vigorously defending these suits.

On June 17, 2004, the Company publicly disclosed that it would reduce its reported circulation for both *Newsday* and *Hoy*, New York for the 12-month period ending Sept. 30, 2003 and the six-month period ending March 31, 2004. The circulation adjustments were the result of a review of reported circulation at *Newsday* and *Hoy*, New York, conducted by the Company's internal audit staff and the Audit Bureau of Circulations ("ABC"). Subsequent to the June 17th disclosure, the Company continued its internal review and found additional misstatements for these time periods, as well as misstatements that impacted the 12-month period ending Sept. 30, 2002. On Sept. 10, 2004, the Company announced additional revisions to the circulation figures for *Newsday* and *Hoy*, New York, for the 12-month period ending Sept. 30, 2003 and the six-month period ending March 31, 2004.

As a result of misstatements of reported circulation at *Newsday* and *Hoy*, New York, the Company recorded a total pretax charge of $90 million in 2004 as its estimate of the probable cost to settle with advertisers. The Company will continue to evaluate the adequacy of this charge on an ongoing basis.

A summary of the activity with respect to the *Newsday* and *Hoy*, New York, advertiser settlement accrual is as follows (in millions):

| | |
|---|---:|
| Advertiser settlement accrual balance at Dec. 28, 2003 | $ — |
| 2004 provision | 90 |
| 2004 payments | (41) |
| Advertiser settlement accrual balance at Dec. 26, 2004 | 49 |
| 2005 payments | (34) |
| Advertiser settlement accrual balance at Dec. 25, 2005 | 15 |
| 2006 payments | (8) |
| Advertiser settlement accrual balance at Dec. 31, 2006 | $ 7 |

In addition to the advertiser lawsuits, several class action and shareholder derivative suits were filed against the Company and certain of its current and former directors and officers as a result of the circulation misstatements at *Newsday* and *Hoy*, New York. These suits alleged breaches of fiduciary duties and other managerial and director failings under Delaware law, the federal securities laws and ERISA. The consolidated shareholder derivative suit filed in Illinois state court in Chicago was dismissed with prejudice on March 10, 2006, and the dismissal is currently being appealed to the Illinois State Court of Appeals. The consolidated securities class action lawsuit and the consolidated ERISA class action lawsuit filed in Federal District Court in Chicago were both dismissed with prejudice on Sept. 29, 2006, and the dismissals are currently being appealed to the United States Court of Appeals for the Seventh Circuit. The Company believes these suits are without merit and will continue to vigorously defend them.

On May 30, 2006, the Securities and Exchange Commission ("SEC") concluded its inquiry into circulation practices at *Newsday* and *Hoy*, New York. In closing its inquiry, the SEC ordered the Company

91

TRIBUNE COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

to cease and desist from violating statutory provisions related to its record keeping and reporting. No fines or other sanctions were levied against the Company. The Company consented to the order without admitting or denying any of the Commission's findings. The SEC acknowledged the prompt internal investigation and remedial acts undertaken by the Company and the cooperation the Company afforded the Commission's staff throughout its investigation.

The United States Attorney for the Eastern District of New York and the Nassau County District Attorney are continuing their inquiries into the circulation practices at *Newsday* and *Hoy*, New York. To date, nine former employees and contractors of *Newsday* and *Hoy*, New York, have pleaded guilty to various criminal charges in connection with the fraudulent circulation practices uncovered by the Company. The Company is cooperating fully with these inquiries. At the date of this report, the Company cannot predict with certainty the outcome of these inquiries.

**NOTE 5: INVENTORIES**

Inventories consisted of the following (in thousands):

| | Dec. 31, 2006 | Dec. 25, 2005 |
|---|---|---|
| Newsprint | $ 28,629 | $ 32,672 |
| Supplies and other | 12,333 | 11,431 |
| Total inventories | $ 40,962 | $ 44,103 |

Newsprint inventories valued under the LIFO method were less than current cost by approximately $15 million at Dec. 31, 2006 and $14 million at Dec. 25, 2005.

92

Powered by Morningstar® Document Research℠

**TRIBUNE COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

## NOTE 6: GOODWILL AND OTHER INTANGIBLE ASSETS

Goodwill and other intangible assets at Dec. 31, 2006 and Dec. 25, 2005 consisted of the following (in thousands):

| | Dec. 31, 2006 | | | Dec. 25, 2005 | | |
|---|---|---|---|---|---|---|
| | Gross Amount | Accumulated Amortization | Net Amount | Gross Amount | Accumulated Amortization | Net Amount |
| **Intangible assets subject to amortization** | | | | | | |
| Subscribers (useful life of 15 to 20 years) | $ 190,660 | $ (72,126) | $ 118,534 | $ 190,657 | $ (62,110) | $ 128,547 |
| Network affiliation agreements (useful life of 40 years)(1) | 278,034 | (22,614) | 255,420 | 290,320 | (16,330) | 273,990 |
| Other (useful life of 3 to 40 years) | 25,128 | (8,717) | 16,411 | 23,482 | (6,696) | 16,786 |
| Total | $ 493,822 | $ (103,457) | 390,365 | $ 504,459 | $ (85,136) | 419,323 |
| **Goodwill and other intangible assets not subject to amortization** | | | | | | |
| Goodwill | | | | | | |
| Publishing | | | 4,395,967 | | | 4,380,483 |
| Broadcasting and entertainment | | | 1,441,241 | | | 1,566,659 |
| Total goodwill | | | 5,837,208 | | | 5,947,142 |
| Newspaper mastheads | | | 1,575,814 | | | 1,575,814 |
| FCC licenses | | | 871,946 | | | 1,084,654 |
| Tradename | | | 7,932 | | | 7,932 |
| Total | | | 8,292,900 | | | 8,615,542 |
| Total goodwill and other intangible assets | | | $ 8,683,265 | | | $ 9,034,865 |

(1)  Network affiliation agreements, net of accumulated amortization, included $179 million related to Fox affiliations, $74 million related to CW affiliations and $2 million related to MyNetworkTV affiliations as of Dec. 31, 2006.

93

Powered by Morningstar® Document Research℠

TRIBUNE COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The changes in the carrying amounts of intangible assets during the years ended Dec. 31, 2006 and Dec. 25, 2005 were as follows (in thousands):

| | Publishing | Broadcasting and Entertainment | Total |
|---|---|---|---|
| **Intangible assets subject to amortization** | | | |
| Balance as of Dec. 26, 2004 | $ 92,215 | $ 346,064 | $ 438,279 |
| Amortization expense | (7,231) | (11,657) | (18,888) |
| Amortizable intangibles acquired during year | 239 | — | 239 |
| Sales of discontinued operations (see Note 3) | — | (307) | (307) |
| Balance as of Dec. 25, 2005 | $ 85,223 | $ 334,100 | $ 419,323 |
| Amortization expense | (8,258) | (11,555) | (19,813) |
| Assets held for sale, net (IPG intellectual property) | (4,002) | — | (4,002) |
| Amortizable intangibles acquired during year | 6,452 | — | 6,452 |
| Sales of discontinued operations (see Note 3) | — | (11,595) | (11,595) |
| Balance as of Dec. 31, 2006 | $ 79,415 | $ 310,950 | $ 390,365 |
| | | | |
| **Goodwill** | | | |
| Balance as of Dec. 26, 2004 | $ 3,920,720 | $ 1,566,659 | $ 5,487,379 |
| Goodwill acquired during year | 4,147 | — | 4,147 |
| Adjustment for tax resolutions(1) | (3,500) | — | (3,500) |
| Adjustment related to Matthew Bender and Mosby tax liability (see Note 13) | 459,116 | — | 459,116 |
| Balance as of Dec. 25, 2005 | $ 4,380,483 | $ 1,566,659 | $ 5,947,142 |
| Goodwill acquired during year | 45,477 | — | 45,477 |
| Sales of discontinued operations (see Note 3) | — | (125,418) | (125,418) |
| Adjustment for tax resolutions(1) | (28,186) | — | (28,186) |
| Other | (1,807) | — | (1,807) |
| Balance as of Dec. 31, 2006 | $ 4,395,967 | $ 1,441,241 | $ 5,837,208 |
| | | | |
| **Other intangible assets not subject to amortization** | | | |
| Balance as of Dec. 25, 2005 and Dec. 26, 2004 | $ 1,583,746 | $ 1,084,654 | $ 2,668,400 |
| Sales of discontinued operations (see Note 3) | — | (212,708) | (212,708) |
| Balance as of Dec. 31, 2006 | $ 1,583,746 | $ 871,946 | $ 2,455,692 |
| Total goodwill and other intangibles as of Dec. 31, 2006 | $ 6,059,128 | $ 2,624,137 | $ 8,683,265 |

(1) Adjustment for the resolution of uncertain income tax positions related to the Times Mirror Company acquisition.

Estimated annual amortization expense will be approximately $20 million for each of the next five years, excluding the effects of any acquisitions or dispositions subsequent to Dec. 31, 2006.

94

Powered by Morningstar® Document Research℠

TRIBUNE COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

## NOTE 7: TMCT and TMCT II

As a result of the Company's acquisition of The Times Mirror Company ("Times Mirror") in 2000, the Company holds investment interests in TMCT, LLC ("TMCT") and TMCT II, LLC ("TMCT II"). TMCT and TMCT II were formed in 1997 and 1999, respectively, as a result of transactions involving agreements between Times Mirror and its largest shareholders, Chandler Trust No. 1 and Chandler Trust No. 2 (collectively, the "Chandler Trusts"). The Times Mirror acquisition resulted in the Chandler Trusts becoming significant shareholders of the Company. The TMCT and TMCT II LLC agreements have no specific term, and the dissolution, determination of liquidation values and distribution of assets require the mutual consent of the Company and the Chandler Trusts.

The collective assets of TMCT and TMCT II as of Dec. 25, 2005 included approximately 51.4 million shares of the Company's common stock and 1.1 million shares of the Company's preferred stock, representing all of the Company's issued Series C, D-1 and D-2 preferred stock. The TMCT and TMCT II assets also include a variety of fixed income and equity investments. In addition, TMCT owns eight real properties that are leased to the Company. Additional financial information pertaining to TMCT and TMCT II is provided below.

**TMCT Transactions**—On Sept. 21, 2006, the Company and the Chandler Trusts entered into agreements to restructure TMCT and TMCT II. Under the terms of the agreements, the Company received on Sept. 22, 2006, a total of 38.9 million shares of the Company's common stock and all 1.1 million shares of the Company's preferred stock held collectively by TMCT and TMCT II. As a result, the Company's interests in each of TMCT and TMCT II were reduced to approximately 5%. The Sept. 21, 2006 agreements also provided for certain put and call options, which are exercisable at fair market value beginning in September 2007, relating to the Company's remaining ownership interests in TMCT and TMCT II. As a result of the transactions, the Company in the third quarter of 2006 recorded a one-time, non-operating gain of $48 million, net of tax; increased its common treasury stock by $161 million and its preferred treasury stock by $107 million; and reduced its combined investment in TMCT and TMCT II by $195 million.

On Oct. 20, 2006, the remaining 12.4 million shares of the Company's common stock held by TMCT and TMCT II were distributed to the Company and the Chandler Trusts in accordance with their respective ownership interests. The Company received 0.6 million shares and the Chandler Trusts received 11.8 million shares.

The Company and the Chandler Trusts share in the cash flows of the various assets held by TMCT and TMCT II. Prior to the Sept. 22, 2006 transactions, the cash flows from the Tribune common and preferred shares held by TMCT and TMCT II were largely allocated to the Company, while the cash flows from the other assets were largely allocated to the Chandler Trusts. As a result, the Company included in treasury stock 80% of the Tribune common and preferred shares held by TMCT and TMCT II. In addition, 80% of the dividends on the preferred and common shares held by TMCT and TMCT II were effectively eliminated. Following the Sept. 22, 2006 transactions and until the Oct. 20, 2006 distribution, the Company included in treasury stock approximately 5% of the Tribune common shares held by TMCT and TMCT II. As a result of the transactions, the Company no longer has any shares of its Series C, D-1 and D-2 preferred stock outstanding, and the Company's common shares outstanding increased by 1.6 million.

**TMCT**—At Dec. 31, 2006 and Dec. 25, 2005, the assets of TMCT included eight real properties ("Real Properties") leased to the Company and a portfolio of fixed income and equity investments ("TMCT

95

Source: TRIBUNE CO, 10-K, February 26, 2007                    Powered by Morningstar® Document Research℠

**TRIBUNE COMPANY AND SUBSIDIARIES**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

Portfolio"). The TMCT assets at Dec. 25, 2005 also included 13 million shares of the Company's common stock and 442,596 shares of the Company's Series C preferred stock (collectively, "TMCT Shares"). As discussed above, all of the TMCT Shares were distributed to the Company and the Chandler Trusts in 2006. TMCT has no outstanding debt. The estimated fair market values of the TMCT Shares and TMCT Portfolio at Dec. 31, 2006 and Dec. 25, 2005 are shown in the table below (in thousands):

| | TMCT Asset Information (unaudited) | |
| --- | --- | --- |
| | Dec. 31, 2006 | Dec. 25, 2005 |
| TMCT Shares | $  — | $  602,900 |
| TMCT Portfolio | $  265,200 | $  260,800 |

The Company accounts for the Real Properties lease as a property-financing obligation in its consolidated balance sheet. Under the terms of the original lease agreement, the Company had the option to purchase all of the Real Properties for their fair market value on Aug. 8, 2009, the end of the current lease term. In connection with the TMCT restructuring discussed above, the Company and TMCT amended the lease agreement on Sept. 22, 2006. Under the terms of the amended lease, the Company was granted an accelerated option to acquire the eight properties during the month of January 2008 for $175 million. The Company was also granted an option to acquire the leased properties from Feb. 8, 2008 to three months prior to the expiration of the amended lease. If the Company does not elect to purchase the Real Properties, the Company may elect to extend the lease for two additional 12-year lease terms, with fair market value purchase options at the end of each term. The Sept. 22, 2006 lease amendment extended the properties' current fixed rental rate through the first additional 12-year lease term. A fair market rental rate would be payable during the second additional 12-year lease term.

Summarized income and expense information for TMCT is shown in the following table for the years ended Dec. 31, 2006, Dec. 25, 2005 and Dec. 26, 2004 (in thousands):

| | TMCT Income and Expense Information (unaudited) | | |
| --- | --- | --- | --- |
| | 2006 | 2005 | 2004 |
| TMCT Shares dividend income | $  20,030 | $  26,706 | $  23,705 |
| Real Properties lease income | 24,166 | 24,166 | 24,166 |
| TMCT Portfolio interest and dividend income | 12,043 | 9,508 | 9,949 |
| TMCT Portfolio net realized gains | 3,956 | 835 | 2,670 |
| Total | $  60,195 | $  61,215 | $  60,490 |
| TMCT operating expenses | $  (9,629) | $  (9,301) | $  (9,983) |

The Company accounts for its investment in the TMCT Portfolio under the equity method. The Company's investment in TMCT totaled $24 million, $83 million and $82 million at Dec. 31, 2006, Dec. 25, 2005 and Dec. 26, 2004, respectively. In 2006, 2005 and 2004, the Company recognized equity income of $2 million in each year related to the TMCT Portfolio.

**TMCT II**—At Dec. 31, 2006 and Dec. 25, 2005, the assets of TMCT II included a portfolio of fixed income investments that were funded with the proceeds from the redemption of six unrelated real estate investment trust interests in 2004 and two in 2005 ("REIT Portfolio"); a portfolio of fixed income and equity investments ("TMCT II Portfolio"); and a portfolio of venture capital and private equity investments ("Venture Capital Portfolio"). The TMCT II assets at Dec. 25, 2005 also included 39 million

96

Powered by Morningstar® Document Research℠

**TRIBUNE COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

shares of the Company's common stock, 380,972 shares of the Company's Series D-1 preferred stock and 245,100 shares of the Company's Series D-2 preferred stock (collectively, "TMCT II Shares"). As discussed above, all of the TMCT II Shares were distributed to the Company and the Chandler Trusts in 2006. TMCT II has no outstanding debt. The estimated fair market values of the TMCT II assets at Dec. 31, 2006 and Dec. 25, 2005 are shown in the table below (in thousands):

| | TMCT II Asset Information (unaudited) | |
|---|---|---|
| | Dec. 31, 2006 | Dec. 25, 2005 |
| TMCT II Shares | $ — | $ 1,498,800 |
| REIT Portfolio | $ 591,900 | $ 593,300 |
| TMCT II Portfolio | $ 114,600 | $ 112,300 |
| Venture Capital Portfolio | $ 222,500 | $ 260,400 |

Summarized income and expense information for TMCT II is shown in the following table for the years ended Dec. 31, 2006, Dec. 25, 2005 and Dec. 26, 2004 (in thousands):

| | TMCT II Income and Expense Information (unaudited) | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| TMCT II Shares dividend income | $ 37,204 | $ 48,853 | $ 38,809 |
| REIT Portfolio income | 37,409 | 38,417 | 51,520 |
| TMCT II Portfolio and Venture Capital Portfolio interest and dividend income | 8,907 | 8,244 | 5,126 |
| TMCT II Portfolio, Venture Capital Portfolio and REIT Portfolio net realized losses | (7,902) | (778) | (21,192) |
| Total | $ 75,618 | $ 94,736 | $ 74,263 |
| TMCT II operating expenses | $ (9,897) | $ (11,319) | $ (10,286) |

The Company accounts for its investments in the REIT Portfolio, the TMCT II Portfolio and the Venture Capital Portfolio under the equity method. The Company's investment in TMCT II totaled $42 million at Dec. 31, 2006, $196 million at Dec. 25, 2005 and $198 million at Dec. 26, 2004. The Company recognized equity income related to the REIT Portfolio, TMCT II Portfolio and Venture Capital Portfolio investments of $6 million in 2006, $8 million in 2005 and $9 million in 2004.

97

TRIBUNE COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

## NOTE 8: INVESTMENTS

Investments consisted of the following (in thousands):

|  | Dec. 31, 2006 | Dec. 25, 2005 |
|---|---|---|
| Time Warner stock related to PHONES debt | $ 348,480 | $ 282,880 |
| Other cost method investments | 14,150 | 59,355 |
| Equity investments in TMCT and TMCT II(1) | 66,016 | 279,766 |
| Other equity method investments | 484,584 | 293,542 |
| Total investments | $ 913,230 | $ 915,543 |

(1) See Note 7 for further discussion.

Cost method investments in public companies and debt securities were recorded at fair value in the consolidated balance sheets. At Dec. 31, 2006, the Company's cost method investments included public companies, mainly Time Warner, and private companies. In the third quarter of 2006, the Company sold 2.8 million shares of Time Warner common stock unrelated to the PHONES for net proceeds of $46 million and recorded a pretax gain on sale of $19 million. The cost basis of the Time Warner shares sold was determined using the specific identification method. The investment in Time Warner at Dec. 31, 2006 consisted of 16.3 million shares, mostly related to the PHONES (see Notes 1 and 9).

The Company's equity method investments at Dec. 31, 2006 included the following private companies:

| Company | % Owned |
|---|---|
| CareerBuilder, LLC | 43% |
| California Independent Postal Systems | 50% |
| Classified Ventures, LLC | 28% |
| Comcast SportsNet Chicago | 25% |
| Consumer Networks | 17% |
| ShopLocal, LLC | 43% |
| Legacy.com | 40% |
| TMCT, LLC(1) | 5% |
| TMCT II, LLC(1) | 5% |
| Topix, LLC | 34% |
| TV Food Network | 31% |

(1) See Note 7 for further discussion.

The Company does not guarantee any indebtedness for any of its investees. In the third quarter of 2006, the Company recorded a one-time gain of $48 million, net of tax, as a result of transactions related to its investments in TMCT, LLC and TMCT II, LLC (see Note 7). In the fourth quarter of 2006, the Company sold its 27% interest in BrassRing, resulting in a pretax gain of $17 million. During 2005, the Company sold certain investments resulting in a pretax gain of $7 million. During 2004, the Company sold its 50% interest in La Opinion for $20 million and recorded a pretax gain of $18 million.

98

Source: TRIBUNE CO, 10-K, February 26, 2007                    Powered by Morningstar® Document Research℠

**TRIBUNE COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

For investments classified as available-for-sale and recorded at fair value under FAS No. 115, the aggregate cost basis, unrealized gain and fair value were as follows (in thousands):

| | Dec. 31, 2006 | | | Dec. 25, 2005 | | |
| | Cost Basis | Unrealized Gain | Fair Value | Cost Basis | Unrealized Gain | Fair Value |
|---|---|---|---|---|---|---|
| Marketable equity securities | $ 2,335 | $ 11,562 | $ 13,897 | $ 27,521 | $ 26,964 | $ 54,485 |

The difference between cost and fair value, net of related tax effects, is recorded in the accumulated other comprehensive income (loss) component of shareholders' equity and amounted to a net gain of $7 million at Dec. 31, 2006 and $16 million at Dec. 25, 2005. The cost bases of the investments in the tables above are net of write-downs recorded in the consolidated statements of income.

**NOTE 9: DEBT**

Debt consisted of the following (in thousands):

| | Dec. 31, 2006 | Dec. 25, 2005 |
|---|---|---|
| Borrowings under bridge credit facility due 2007, interest rate of 6.2% | $ 1,310,000 | $ — |
| Term loan due 2011, interest rate of 6.2% | 1,500,000 | — |
| Commercial paper, weighted average interest rate of 5.9% in 2006 and 4.4% in 2005 | 97,019 | 923,532 |
| Medium-term notes, weighted average interest rate of 5.6% in 2006 and 6.2% in 2005, due 2006-2008 | 262,585 | 555,585 |
| Property financing obligation, effective interest rate of 7.7%, expiring 2009 (see Note 7) | 55,711 | 60,372 |
| 4.875% notes due 2010, net of unamortized discount of $564 and $718, respectively | 449,436 | 449,282 |
| 7.25% debentures due 2013, net of unamortized discount of $2,137 and $2,478, respectively | 79,946 | 79,605 |
| 5.25% notes due 2015, net of unamortized discount of $1,362 and $1,519, respectively | 328,638 | 328,481 |
| 7.5% debentures due 2023, net of unamortized discount of $3,969 and $4,204, respectively | 94,781 | 94,546 |
| 6.61% debentures due 2027, net of unamortized discount of $2,200 and $2,305, respectively | 82,760 | 82,655 |
| 7.25% debentures due 2096, net of unamortized discount of $18,116 and $18,304, respectively | 129,884 | 129,696 |
| Interest rate swap | 24,600 | 29,714 |
| Other notes and obligations | 16,898 | 18,553 |
| Total debt excluding PHONES | 4,432,258 | 2,752,021 |
| Less debt due within one year | (1,429,007) | (302,460) |
| Long-term debt excluding PHONES | 3,003,251 | 2,449,561 |
| 2% PHONES debt related to Time Warner stock, due 2029 | 572,960 | 509,701 |
| Total long-term debt | $ 3,576,211 | $ 2,959,262 |

**Credit Agreements**—On June 19, 2006, the Company entered into a five-year credit agreement and a 364-day bridge credit agreement, both of which were amended and restated on June 27, 2006. The five-

99

Powered by Morningstar® Document Research℠

**TRIBUNE COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

year credit agreement provides for a $1.5 billion unsecured term facility, of which $250 million was available and used to refinance the medium-term notes that matured on Nov. 1, 2006, and a $750 million unsecured revolving facility. The 364-day bridge credit agreement provided for a $2.15 billion unsecured bridge facility.

The Company entered into these agreements to finance the Company's tender offer initiated on May 30, 2006 (see Note 15); to repurchase shares of the Company's common stock from the Robert R. McCormick Tribune Foundation and Cantigny Foundation (see Note 15); to repurchase shares of the Company's common stock pursuant to open market or privately negotiated transactions; to refinance certain indebtedness; and to pay fees and expenses incurred in connection with the repurchases. In addition, the revolving facility is available for working capital and general corporate purposes, including acquisitions.

In general, borrowings under the credit agreements bear interest at a rate equal to LIBOR plus a spread ranging from 0.35% to 1.25%. The applicable spread is determined on the basis of the Company's debt ratings by S&P and Moody's. The Company's debt ratings are also used in determining the annual facility fee, which may range from 0.07% to 0.25% of the aggregate unused commitments. In addition, the Company has agreed to pay customary fees to the lenders under the credit agreements.

As of Dec 31, 2006, the Company had outstanding borrowings of $1.5 billion and $1.3 billion under the term facility and the bridge facility, respectively, and the Company had no borrowings under the revolving facility. As of Dec. 31, 2006, the applicable interest rate on both the term facility and the bridge facility was 6.2%. The credit agreements contain certain restrictive covenants, including financial covenants that require the Company to maintain a maximum total leverage ratio and a minimum interest coverage ratio. At Dec. 31, 2006, the Company was in compliance with the covenants.

**Other Long-Term Debt Issuance—**In 2005, the Company issued $450 million ($449 million net of unamortized discount) 4.875% notes due 2010 and $330 million ($328 million net of unamortized discount) 5.25% notes due 2015. The proceeds from the issuance were used to repay commercial paper.

**Medium-Term Notes—**Notes issued under these programs may not be redeemed by the Company prior to maturity.

**Interest Rate Swap—The** Company is currently a party to one interest rate swap agreement. This swap agreement relates to the $100 million 7.5% debentures due in 2023 and effectively converts the fixed 7.5% rate to a variable rate based on LIBOR.

**Debt Due Within One Year—Debt** due within one year at Dec. 31, 2006 includes $1.31 billion of borrowings under the 364-day bridge credit agreement, $97 million of commercial paper and $22 million of property financing and other obligations.

**Exchangeable Subordinated Debentures due 2029 ("PHONES")—**In 1999, the Company issued 8 million PHONES for an aggregate principal amount of approximately $1.3 billion. The principal amount was equal to the value of 16 million shares of Time Warner common stock at the closing price of $78.50 per share on April 7, 1999. Quarterly interest payments are made to the PHONES holders at an annual rate of 2% of the initial principal. The Company records both cash and non-cash interest expense on the discounted debt component of the PHONES. The PHONES debenture agreement requires principal payments equal to any dividends declared on the 16 million shares of Time Warner common stock. Time Warner declared total dividends of $.21 per share in 2006 and $.10 per share in 2005. The Company

100

Powered by Morningstar® Document Research℠

TRIBUNE COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

records the dividends it receives on its Time Warner common stock as dividend income and accounts for the related payment to the PHONES holders as principal reduction.

The Company may redeem the PHONES at any time for the higher of the principal value of the PHONES ($156.47 per PHONES at Dec. 31, 2006) or the then market value of two shares of Time Warner common stock, subject to certain adjustments. At any time, holders of the PHONES may exchange a PHONES for an amount of cash equal to 95% (or 100% under certain circumstances) of the market value of two shares of Time Warner common stock. At Dec. 31, 2006, the market value per PHONES was $68.65, and the market value of two shares of Time Warner common stock was $43.56.

Under the provisions of FAS No. 133, the PHONES consist of a discounted debt component, which is presented at book value, and a derivative component, which is presented at fair value. Changes in the fair value of the derivative component of the PHONES are recorded in the statement of income. The fair value of the derivative component of the PHONES debt is calculated as the difference between the quoted market value of the PHONES and the estimated fair value of the discounted debt component of the PHONES. The fair value of the discounted debt component of the PHONES is calculated based on an estimate of the current interest rate available to the Company for debt of the same remaining maturity and similar terms to the PHONES. The book value of the discounted debt component is based on the prevailing interest rate (8.125%) at issuance of the PHONES. The market value of the PHONES, which are traded on the New York Stock Exchange, was $549 million and $592 million at Dec. 31, 2006 and Dec. 25, 2005, respectively.

The discounted debt component and derivative component of the PHONES were as follows (in thousands):

|  | Dec. 31, 2006 | Dec. 25, 2005 |
|---|---|---|
| PHONES Debt: |  |  |
| Discounted debt component (at book value) | $ 465,280 | $ 454,038 |
| Derivative component (at estimated fair value) | 107,680 | 55,663 |
| Total | $ 572,960 | $ 509,701 |
| Time Warner stock related to PHONES (at fair value) | $ 348,480 | $ 282,880 |

If the PHONES are exchanged in the next year, the Company intends to refinance the PHONES, and has the ability to do so on a long-term basis through its existing revolving credit agreements. Accordingly, the PHONES have been classified as long-term.

**Maturities—Debt** at Dec. 31, 2006 matures as shown below (in thousands):

| | |
|---|---|
| 2007 | $1,429,007 |
| 2008 | 287,023 |
| 2009 | 15,851 |
| 2010 | 451,246 |
| 2011 | 1,832,963 |
| Thereafter | 989,128 |
| Total | $5,005,218 |

101

Powered by Morningstar® Document Research℠

**TRIBUNE COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

## NOTE 10: CONTRACTS PAYABLE FOR BROADCAST RIGHTS

Contracts payable for broadcast rights are classified as current or long-term liabilities in accordance with the payment terms of the contracts. Required payments under contractual agreements for broadcast rights recorded at Dec. 31, 2006 are shown in the table below (in thousands):

| | |
|---|---|
| 2007 | $317,945 |
| 2008 | 163,374 |
| 2009 | 123,766 |
| 2010 | 73,052 |
| 2011 | 40,984 |
| Thereafter | 24,751 |
| Total | $743,872 |

## NOTE 11: FAIR VALUE OF FINANCIAL INSTRUMENTS

Estimated fair values and carrying amounts of the Company's financial instruments are as follows (in thousands):

| | Dec. 31, 2006 | | Dec. 25, 2005 | |
|---|---|---|---|---|
| | Fair Value | Carrying Amount | Fair Value | Carrying Amount |
| Cost method investments | $ 365,445 | $ 362,630 | $ 348,791 | $ 342,235 |
| Debt | $ 4,904,390 | $ 5,005,218 | $ 3,369,007 | $ 3,261,722 |
| Contracts payable for broadcast rights | $ 696,363 | $ 743,872 | $ 796,278 | $ 858,808 |

The following methods and assumptions were used to estimate the fair value of each category of financial instruments.

**Cost Method Investments**—Cost method investments in public companies were recorded at fair value in the consolidated balance sheets (see Notes 1 and 8). Cost method investments in private companies were recorded at cost, net of write-downs, and fair value was generally estimated based on prices recently paid for shares in those companies.

**Debt**—Fair value was estimated based on quoted market prices for similar issues or on current rates available to the Company for debt of the same remaining maturities and similar terms. The carrying value of the Company's derivative instruments approximates fair value. The fair value of the PHONES was determined by reference to the market value resulting from trading on a national securities exchange.

**Contracts Payable for Broadcast Rights**—Fair value was estimated using the discounted cash flow method.

## NOTE 12: COMMITMENTS AND CONTINGENCIES

The Company has entered into commitments for broadcast rights that are not currently available for broadcast and are therefore not included in the financial statements. These commitments totaled $682 million at Dec. 31, 2006. Payments for broadcast rights generally commence when the programs become available for broadcast.

The Company had commitments totaling $536 million at Dec. 31, 2006 related to the purchase of property, plant and equipment and talent contracts. In addition, under its current agreement with Abitibi

102

Powered by Morningstar® Document Research℠

**TRIBUNE COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Consolidated Inc., the Company has a commitment to purchase 369,000 metric tons of newsprint each year over the next three years based on market prices at the time of purchase. The Company leases certain equipment and office and production space under various operating leases. Net lease expense from continuing operations was $56 million in 2006, $57 million in 2005 and $55 million in 2004. The table below presents the future minimum lease payments to be made under non-cancelable operating leases at Dec. 31, 2006 (in thousands):

| | |
|---|---|
| 2007 | $ 62,149 |
| 2008 | 55,835 |
| 2009 | 47,350 |
| 2010 | 34,370 |
| 2011 | 23,844 |
| Thereafter | 45,878 |
| Total | $269,426 |

The Company and its subsidiaries are defendants from time to time in actions for matters arising out of their business operations. In addition, the Company and its subsidiaries are involved from time to time as parties in various regulatory, environmental and other proceedings with governmental authorities and administrative agencies. See Note 4 for a discussion of potential liability related to *Newsday* and *Hoy*, New York, and see Note 13 for a discussion of potential income tax liabilities. The Company does not believe that any other matters or proceedings presently pending will have a material adverse effect on its consolidated financial position, results of operations or liquidity.

## NOTE 13: INCOME TAXES

The following is a reconciliation of income taxes computed at the U.S. federal statutory rate to income taxes reported for continuing operations in the consolidated statements of income (in thousands):

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Income from continuing operations before income taxes and cumulative effect of change in accounting principle | $ 1,008,995 | $ 1,090,609 | $ 910,100 |
| Federal income taxes at 35% | $ 353,148 | $ 381,713 | $ 318,535 |
| State and local income taxes, net of federal tax benefit | 30,581 | 37,881 | 31,549 |
| Matthew Bender/Mosby adjustment | | 150,493 | — |
| Income tax settlements and adjustments | (33,563) | (11,829) | — |
| Other | (2,024) | 9,562 | 5,640 |
| Income taxes reported | $ 348,142 | $ 567,820 | $ 355,724 |
| Effective tax rate | 34.5% | 52.1% | 39.1% |

In 2006, the Company recorded a favorable $34 million income tax expense adjustment, most of which related to the Company's PHONES as a result of reaching an agreement with the Internal Revenue Service appeals office pertaining to the deduction of interest expense on the PHONES (see "PHONES Interest" discussion below). In 2005, the Company increased its income tax expense by $150 million as a result of the Matthew Bender Tax Court decision (see "Matthew Bender and Mosby Tax Liability" discussion below) and reduced its income tax expense by $12 million as a result of resolving certain federal income tax issues.

103

Source: TRIBUNE CO, 10-K, February 26, 2007

Powered by Morningstar® Document Research℠

**TRIBUNE COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Components of income tax expense charged to income from continuing operations were as follows (in thousands):

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| Currently payable: |  |  |  |
| U.S. federal | $ 287,455 | $ 436,362 | $ 273,770 |
| State and local | 43,907 | 44,710 | 42,289 |
| Sub-total | 331,362 | 481,072 | 316,059 |
| Deferred: |  |  |  |
| U.S. federal | 13,639 | 72,716 | 32,767 |
| State and local | 3,141 | 14,032 | 6,898 |
| Sub-total | 16,780 | 86,748 | 39,665 |
| Total | $ 348,142 | $ 567,820 | $ 355,724 |

Significant components of the Company's net deferred tax liabilities were as follows (in thousands):

|  | Dec. 31, 2006 | Dec. 25, 2005 |
|---|---|---|
| Net properties | $ 214,770 | $ 239,821 |
| Net intangible assets | 1,209,999 | 1,252,851 |
| Pensions | 74,891 | 316,467 |
| Investments | 406,409 | 417,214 |
| PHONES interest | 219,552 | 267,885 |
| Other future taxable items | 18,325 | 25,880 |
| Total deferred tax liabilities | 2,143,946 | 2,520,118 |
| Broadcast rights | (5,262) | (4,968) |
| Postretirement and postemployment benefits other than pensions | (54,990) | (64,579) |
| Deferred compensation | (84,288) | (76,901) |
| Other accrued liabilities | (55,270) | (89,642) |
| Accrued employee compensation and benefits | (7,462) | (9,731) |
| Accounts receivable | (13,211) | (15,834) |
| Other future deductible items | (18,327) | (15,639) |
| State operating loss carryforwards | (42,371) | (34,391) |
| Valuation allowances on state operating loss carryforwards | 37,457 | 29,926 |
| Total deferred tax assets | (243,724) | (281,759) |
| Net deferred tax liability | $ 1,900,222 | $ 2,238,359 |

**Operating Loss Carryforwards**—At Dec. 31, 2006, the Company had approximately $823 million of operating loss carryforwards for state income tax purposes. These carryforwards arose in certain states primarily as a result of intercompany interest expense, royalty expense and management fees allocated to the Company's various subsidiaries, and expire between 2007 and 2026. The deferred tax assets related to these carryforwards totaled approximately $42 million, net of federal taxes, at Dec. 31, 2006. However, the Company believes it is more likely than not that $37 million of the deferred tax assets will not be realized because the related carryforwards will expire before being utilized. Therefore, in accordance with FAS No. 109, "Accounting for Income Taxes," the Company has established valuation allowances of $37 million

104

Powered by Morningstar® Document Research℠

TRIBUNE COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

on the deferred tax assets related to the state carryforwards. The state operating loss carryforwards increased in 2006 because the Company generated additional tax losses in certain states.

**Matthew Bender and Mosby Tax Liability—During** 1998, Times Mirror, which was acquired by the Company in 2000, disposed of its Matthew Bender and Mosby subsidiaries in separate transactions, which were structured to qualify as tax-free reorganizations under the Internal Revenue Code. The Company believes these transactions were completed on a tax-free basis. However, the Internal Revenue Service ("IRS") audited the transactions and disagreed with the position taken by Times Mirror. In the fourth quarter of 2001, the Company received an IRS adjustment to increase Times Mirror's 1998 taxable income by approximately $1.6 billion. The Company filed a petition in the United States Tax Court in November 2002 to contest the IRS position, and in December 2004, the Company presented its position in Tax Court.

On Sept. 27, 2005, the Tax Court issued an opinion contrary to the Company's position and determined that the Matthew Bender transaction was a taxable sale. In January 2006, the Tax Court extended its opinion in the Matthew Bender case to the Mosby transaction given the similarity of the two transactions. Taxes and related interest for both the Matthew Bender and Mosby transactions totaled approximately $1 billion. Over time, deductions for state taxes and interest are expected to reduce the net cash outlay to approximately $840 million.

The Company has appealed the Tax Court ruling to the United States Court of Appeals for the Seventh Circuit. The Company does not expect a ruling before the second half of 2007. The Company cannot predict with certainty the outcome of this appeal.

Times Mirror established a tax reserve of $180 million in 1998 when it entered into the transactions. The reserve represented Times Mirror's best estimate of the amount the expected IRS and state income tax claims could be settled for based upon an analysis of the facts and circumstances surrounding the issue. In accordance with Emerging Issues Task Force ("EITF") Issue No. 93-7, "Uncertainties Related to Income Taxes in a Purchase Business Combination," the Company treated this item as an uncertain tax position at the time of the Times Mirror acquisition in 2000 and concluded that the estimate determined by Times Mirror was the most appropriate estimate of the exposure. The Company maintained this initial reserve, plus interest, and evaluated the adequacy of the reserve on a periodic basis. At Dec. 26, 2004, the reserve, including pretax interest of $66 million, totaled $246 million ($221 million after considering the tax benefit of the interest). In 2005, prior to the Tax Court ruling, the Company recorded additional after-tax interest of $7 million on the reserve.

As a result of the Tax Court ruling, the Company increased its tax reserve by an additional $609 million in the third quarter of 2005 by recording additional income tax expense of $150 million, representing additional after-tax interest applicable to the post-acquisition period, and goodwill of $459 million. In accordance with EITF No. 93-7, the Company adjusted goodwill because the tax contingencies existed at the time of the Times Mirror acquisition. On Sept. 30, 2005, the Company paid $880 million to the IRS, representing the federal tax and interest owed on the transactions, and financed the payment through the issuance of commercial paper. On Feb. 10, 2006, the Company made a California state tax and interest payment of approximately $86 million ($55 million after considering the federal tax benefit of the state taxes and interest). The Company expects to make the remaining state tax and interest payments during 2007 and 2008.

105

**TRIBUNE COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

A summary of the activity with respect to the Matthew Bender and Mosby tax liability is as follows (in millions):

| | | |
|---|---|---:|
| Liability at Dec. 26, 2004: | | |
| Tax | $ | 180 |
| After-tax interest ($66 million pretax) | | 41 |
| Liability at Dec. 26, 2004 (included in "other obligations") | | 221 |
| After-tax interest recorded in income tax expense in the first three quarters of 2005 ($11 million pretax) | | 7 |
| Additional reserve recorded as a result of the Tax Court ruling: | | |
| Charged to income tax expense | | 150 |
| Additional goodwill | | 459 |
| Liability at Sept. 25, 2005 | | 837 |
| Federal tax and interest paid on Sept. 30, 2005: | | |
| Federal tax | | (542) |
| After-tax interest ($338 million pretax) | | (210) |
| After-tax interest recorded in income tax expense in the fourth quarter of 2005 ($3 million pretax) | | 2 |
| Liability at Dec. 25, 2005 | | 87 |
| After-tax interest ($4 million pretax) | | 3 |
| California tax and interest paid in February 2006: | | |
| State tax ($55 million pretax) | | (36) |
| After-tax interest ($31 million pretax) | | (19) |
| Liability at Dec. 31, 2006 (included in "other current liabilities") | $ | 35 |

**PHONES Interest—**In connection with the routine examination of the Company's federal income tax returns for 2000 through 2003, the IRS proposed that the Company capitalize the interest on the PHONES as additional tax basis in the Company's 16 million shares of Time Warner common stock, rather than allowing the Company to currently deduct such interest. The National Office of the IRS has issued a Technical Advice Memorandum that supports the proposed treatment. The Company disagrees with the IRS's position and requested that the IRS administrative appeals office review the issue. The effect of the treatment proposed by the IRS would be to increase the Company's tax liability by approximately $189 million for the period 2000 through 2003 and by approximately $177 million for the period 2004 through 2006. If the IRS were to prevail in its proposed treatment, there would be no effect on the Company's reported income for any of these periods. The potential tax payments would be recorded as a reduction in the Company's deferred tax liability, and the Company has accrued the interest that would be assessed on these potential payments.

During the fourth quarter of 2006, the Company reached an agreement with the IRS appeals office regarding the deductibility of the PHONES interest expense. The agreement will apply for the tax years 2000 through 2029. Under the terms of the agreement reached with the IRS appeals office, the Company paid approximately $81 million of tax plus interest for tax years 2000 through 2005. The tax payments were recorded as a reduction in the Company's deferred tax liability, and the interest was recorded as a reduction in the Company's income tax reserves. The agreement reached with the appeals office may be reviewed by the Joint Committee on Taxation.

106

Powered by Morningstar® Document Research℠

**TRIBUNE COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Income Tax Reserves—The** Company's liability for estimated federal and state audit adjustments, including after-tax interest, was approximately $84 million and $96 million at Dec. 31, 2006 and Dec. 25, 2005, respectively. These amounts are included in "other obligations" in the Company's consolidated balance sheet. The liability declined in 2006 due to the settlement of certain federal and state income tax audits and the PHONES agreement with the IRS appeals office, partially offset by an increase to the liability related to the TMCT transactions discussed in Note 7.

Although management believes its estimates and judgments are reasonable, the resolutions of the Company's tax issues are unpredictable and could result in tax liabilities that are significantly higher or lower than that which has been provided by the Company.

## NOTE 14: PENSION AND OTHER POSTRETIREMENT BENEFITS

**Employee Pension Plans—In** connection with the establishment of the Tribune Company ESOP in 1988, Tribune amended its company-sponsored pension plan for employees not covered by a collective bargaining agreement. The Tribune Company pension plan continued to provide substantially the same pension benefits as under the pre-amended plan until December 1998. After that date, Tribune pension benefit credits were frozen in terms of pay and service.

In connection with the Times Mirror acquisition, the Company assumed defined benefit pension plans and various other contributory and non-contributory retirement plans covering substantially all of Times Mirror's former employees. In general, benefits under the Times Mirror defined benefit plans were based on years of service and the employee's compensation during the last five years of employment. In December 2005, the pension plan benefits for former Times Mirror non-union and non-Newsday employees were frozen. As a result of the plan freeze, a pretax curtailment gain of $18 million was recorded in 2005. On March 31, 2006, the pension plan benefits for Newsday union and non-union employees were frozen. Benefits provided by Times Mirror's Employee Stock Ownership Plan ("Times Mirror ESOP") are coordinated with certain pension benefits and, as a result, the defined benefit plan obligations are net of the actuarially equivalent value of the benefits earned under the Times Mirror ESOP. The maximum offset is equal to the value of the benefits earned under the defined benefit plan.

The Company also maintains several small plans for other employees. The Company's portion of assets and liabilities for multi-employer union pension plans is not determinable.

**Postretirement Benefits Other Than Pensions—The** Company provides postretirement health care and life insurance benefits to eligible employees under a variety of plans. The various plans have significantly different provisions for lifetime maximums, retiree cost-sharing, health care providers, prescription drug coverage and other benefits.

**Obligations and Funded Status—As** discussed in Note 1, the Company adopted FAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of FASB Statements No. 87, 88, 106 and 132(R)", as of Dec. 31, 2006. FAS No. 158 requires the Company to recognize the overfunded or underfunded status of its defined benefit pension and other postretirement plans as an asset or liability in its statement of financial position and to recognize changes in that funded status in the year in which changes occur through comprehensive income. See Note 1 for a summary of the impact the adoption of FAS 158 had on the Company's consolidated balance sheet as of Dec. 31, 2006. Prior to Dec. 31, 2006, the Company accounted for its defined benefit pension plans under FAS No. 87, "Employers' Accounting for Pensions" and accounted for its other postretirement benefit plans under FAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions".

107

Powered by Morningstar® Document Research℠

## TRIBUNE COMPANY AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

Summarized information for the Company's defined benefit pension and other postretirement plans is provided below (in thousands):

| | Pension Plans | | Other Postretirement Plans | |
| --- | --- | --- | --- | --- |
| | Dec. 31, 2006 | Dec. 25, 2005 | Dec. 31, 2006 | Dec. 25, 2005 |
| Change in benefit obligations: | | | | |
| Projected benefit obligations, beginning of year | $ 1,599,129 | $ 1,461,180 | $ 140,465 | $ 191,540 |
| Service cost | 3,934 | 25,160 | 1,335 | 1,469 |
| Interest cost | 84,349 | 81,436 | 7,367 | 7,774 |
| Plan amendments | — | — | — | 97 |
| Curtailment gain | — | (44,566) | — | — |
| Special termination benefits | 1,382 | 1,434 | — | — |
| Impact of Medicare Reform Act | — | — | 1,200 | — |
| Actuarial (gain) loss | (57,317) | 156,385 | 3,471 | (45,095) |
| Benefits paid | (84,566) | (81,900) | (14,006) | (15,320) |
| Projected benefit obligations, end of year | 1,546,911 | 1,599,129 | 139,832 | 140,465 |
| Change in plans' assets: | | | | |
| Fair value of plans' assets, beginning of year | 1,598,398 | 1,559,351 | — | — |
| Actual return on plans' assets | 243,209 | 113,769 | — | — |
| Employer contributions | 7,429 | 7,178 | 14,006 | 15,320 |
| Benefits paid | (84,566) | (81,900) | (14,006) | (15,320) |
| Fair value of plans' assets, end of year | 1,764,470 | 1,598,398 | — | — |
| Funded (under funded) status of the plans | $ 217,559 | (731) | $ (139,832) | (140,465) |
| Unrecognized net actuarial loss (gain) | | 869,596 | | (12,659) |
| Unrecognized prior service cost | | 2,518 | | (11,213) |
| Unrecognized transition asset | | (1) | | — |
| Prepaid (accrued) benefit cost | | $ 871,382 | | $ (164,337) |

Amounts recognized in the statement of financial position at Dec. 31, 2006 consisted of (in thousands):

| | Pension Plans | Other Postretirement Plans |
| --- | --- | --- |
| Prepaid pension costs | $ 293,455 | $ — |
| Employee compensation and benefits | (6,163) | — |
| Deferred compensation and benefits | (69,733) | (139,832) |
| Net amount recognized | $ 217,559 | $ (139,832) |

108

Powered by Morningstar® Document Research℠

**TRIBUNE COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Amounts included in prepaid (accrued) benefit costs at Dec. 25, 2005 consisted of (in thousands):

| | Pension Plans | Other Postretirement Plans |
|---|---|---|
| Prepaid benefit costs | $   908,895 | $   — |
| Accrued benefit costs | (83,759) | (164,337) |
| Intangible asset | 507 | |
| Accumulated other comprehensive income (loss) | 45,739 | — |
| Net amount recognized | $   871,382 | $   (164,337) |

The accumulated benefit obligation, which excludes the impact of future compensation increases, for all defined benefit pension plans was $1,543 million and $1,566 million at Dec. 31, 2006 and Dec. 25, 2005, respectively. The projected benefit obligation at Dec. 31, 2006 includes $1,473 million related to the Company's qualified pension plans and $74 million related to its non-qualified plans. The Company's non-qualified plans are not funded.

The components of net periodic benefit cost for Company-sponsored plans were as follows (in thousands):

| | Pension Plans | | | Other Postretirement Plans | | |
|---|---|---|---|---|---|---|
| | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 |
| Service cost | $   3,934 | $   25,160 | $   21,177 | $   1,335 | $   1,469 | $   1,752 |
| Interest cost | 84,349 | 81,436 | 80,474 | 7,367 | 7,774 | 10,323 |
| Expected return on plans' assets | (128,836) | (127,346) | (131,118) | — | — | — |
| Recognized actuarial loss | 67,018 | 59,095 | 44,533 | (127) | — | — |
| Amortization of prior service costs | 220 | (1,415) | (1,834) | (1,444) | (1,444) | (1,314) |
| Amortization of transition asset | (1) | (5) | (5) | — | (439) | — |
| Special termination benefits(1) | 1,382 | 1,434 | 1,440 | — | — | — |
| Curtailment gain | — | (17,825) | — | — | — | — |
| Net periodic benefit cost | $   28,066 | $   20,534 | $   14,667 | $   7,131 | $   7,360 | $   10,761 |

(1) Costs related to position eliminations.

The changes in minimum pension liabilities included in other comprehensive income (loss) for Company-sponsored plans were as follows (in thousands):

| | Pension Plans | | | Other Postretirement Plans | | |
|---|---|---|---|---|---|---|
| | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 |
| Change in minimum pension liabilities included in other comprehensive income, net of tax | $   18,987 | $   (20,597) | $   (1,700) | $   — | $   — | $   — |

109

Powered by Morningstar® Document Research℠

**TRIBUNE COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Amounts recognized in the accumulated other comprehensive income (loss) component of shareholders' equity for Company-sponsored plans as a result of the adoption of FAS No. 158 as of Dec. 31, 2006 were as follows (in thousands):

|  | Pension Plans | Other Postretirement Plans | Total |
|---|---|---|---|
| Unrecognized net actuarial gains (losses), net of tax | $    (384,859) | $    5,527 | $    (379,332) |
| Unrecognized prior service costs, net of tax | (1,400) | 5,959 | 4,559 |
| Total | $    (386,259) | $    11,486 | $    (374,773) |

During 2007, the Company expects to recognize as part of its net periodic pension benefit cost approximately $51.3 million of net actuarial losses and $.2 million of prior service costs that are included, after taxes, in the accumulated other comprehensive income (loss) component of shareholders' equity at Dec. 31, 2006.

**Assumptions—Weighted** average assumptions used each year in accounting for pension benefits and other postretirement benefits were:

|  | Pension Plans | | Other Postretirement Plans | |
|---|---|---|---|---|
|  | 2006 | 2005 | 2006 | 2005 |
| Discount rate for expense | 5.50% | 5.75% | 5.50% | 5.75% |
| Discount rate for obligations | 5.75% | 5.50% | 5.75% | 5.50% |
| Increase in future salary levels for expense | 3.50% | 3.50% | — | — |
| Increase in future salary levels for obligations | 3.50% | 3.50% | — | — |
| Long-term rate of return on plans' assets | 8.50% | 8.50% | — | — |

The Company used a building block approach to determine its current 8.5% assumption for the long-term expected rate of return on pension plan assets. Based on historical market studies, the Company's long-term expected returns for equity and fixed income securities approximate 10% and 6%, respectively. The Company's current 2007 target asset allocation for pension plan assets is 75% in equity securities and 25% in fixed income securities and other. The Company bases the rate used for discounting future benefit obligations and calculating interest cost on an index of Aa-rated corporate bonds. The duration of the bonds in the index approximates the timing of future payments for the Company's benefit obligations.

Prior to the adoption of FAS No. 158, the Company's prepaid pension asset at Dec. 31, 2006 and Dec. 25, 2005 included an unrecognized net actuarial loss of $631 million and $870 million, respectively. A significant portion of this net actuarial loss resulted from the difference between the Company's expected returns on plan assets and the actual losses on plan assets in 2002 and 2001. Expected returns on plan assets were $158 million and $176 million in 2002 and 2001, respectively; actual losses were $161 million and $113 million, respectively. Upon adoption of FAS No. 158, the Company recognized the $631 million of actuarial losses, after taxes, in the accumulated other comprehensive income (loss) component of shareholders' equity at Dec. 31, 2006. In accordance with FAS No. 87, the actuarial loss will be recognized in net periodic pension expense over approximately 11 years, representing the estimated average remaining service period of active employees expected to receive benefits, with corresponding adjustments made to accumulated other comprehensive income (loss) in accordance with FAS No. 158. The Company's policy is

110

Powered by Morningstar® Document Research℠

## TRIBUNE COMPANY AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

to incorporate asset-related gains and losses into the asset value used to calculate the expected return on plan assets and into the calculation of amortization of unrecognized net actuarial loss over a four-year period.

**Plan Assets**—The Company's pension plans' asset allocations at Dec. 31, 2006 and Dec. 25, 2005 were as follows (in millions):

| Asset Category | Plan Assets | | | |
| --- | --- | --- | --- | --- |
| | Dec. 31, 2006 | | Dec. 25, 2005 | |
| Equity securities | $ 1,344 | 76.2% | $ 1,186 | 74.2% |
| Fixed income securities | 334 | 18.9% | 329 | 20.6% |
| Other | 86 | 4.9% | 83 | 5.2% |
| Total | $ 1,764 | 100% | $ 1,598 | 100% |

**Health Care Cost Trend Rates**—For purposes of measuring 2006 postretirement health care costs, a 9.0% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2006. The rate was assumed to decrease gradually to 5.0% for 2010 and remain at that level thereafter. For purposes of measuring health care obligations at Dec. 31, 2006, a 9.0% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2007. The rate was assumed to decrease gradually to 5.0% for 2012 and remain at that level thereafter. On Dec. 8, 2003, the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("Act") were signed into law. The Act resulted in a $15 million reduction in the accumulated other postretirement obligations for prior service costs in 2004 and a $1 million reduction in net periodic postretirement benefit costs.

Assumed health care cost trend rates have a significant effect on the amounts reported for health care plans. As of the date of this report, a 1% change in assumed health care cost trend rates would have the following effects (in thousands):

| | 1% Increase | 1% Decrease |
| --- | --- | --- |
| Service cost and interest cost | $ 415 | $ (368) |
| Projected benefit obligation | $ 7,486 | $ (6,624) |

**Cash Flows**—The Company contributed $7 million to certain of its union and non-qualified pension plans and $14 million to its other postretirement plans in 2006. The Company plans to contribute $8 million to certain of its union and non-qualified pension plans and $13 million to its other postretirement plans in 2007.

**Expected Future Benefit Payments**—The following benefit payments, which reflect expected future service, as appropriate, are expected to be paid (in thousands):

| | Pension Benefits | Other Postretirement Benefits |
| --- | --- | --- |
| 2007 | $ 79,967 | $ 14,211 |
| 2008 | 81,579 | 14,233 |
| 2009 | 84,233 | 14,310 |
| 2010 | 87,050 | 14,488 |
| 2011 | 89,421 | 14,619 |
| 2012-2016 | 495,915 | 69,089 |

111

Powered by Morningstar® Document Research℠

TRIBUNE COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

## NOTE 15: CAPITAL STOCK AND SHARE PURCHASE RIGHTS PLAN

Under the Company's Restated Certificate of Incorporation, 12 million shares of preferred stock are authorized. Preferred stock is issuable in series under terms and conditions determined by the Company's Board of Directors.

**Series C, D-1 and D-2 Convertible Preferred Stock**—In connection with the June 12, 2000 merger with Times Mirror, outstanding shares of Times Mirror cumulative, non-voting preferred stock were converted into shares of Tribune preferred stock with similar terms. A total of 213,733 shares of the Company's Series C-1, D-1 and D-2 convertible preferred stock, net of treasury stock, were issued due to the conversion. The Series C, D-1 and D-2 convertible preferred stocks related to Times Mirror recapitalization transactions whereby TMCT, LLC and TMCT II, LLC (see Note 7) were formed. In connection with a restructuring of TMCT, LLC and TMCT II, LLC, all of these preferred shares were distributed to the Company on Sept. 22, 2006. As a result, the Company has no preferred shares outstanding effective as of Sept. 22, 2006. Series C convertible preferred stock was cumulative, non-voting preferred stock, which was entitled to annual dividends of 8%, based on liquidation value. Dividends for Series D-1 and D-2 preferred stock were paid at the annual rate of 6.91%, 6.67% and 6.44% in 2006, 2005, and 2004, respectively. The Series C, D-1 and D-2 preferred stocks were convertible into the Company's common stock in 2025 and thereafter. The conversion factor was calculated by dividing $500 plus accrued and unpaid dividends by the average closing prices of the Company's common stock for the 20 trading days immediately preceding the conversion date.

**Common and Treasury Stock**—At Feb. 16, 2007, there were 3,787 holders of record. The following table summarizes the Company's common stock repurchases during 2006 (in thousands):

|  | Shares | Cost |
|---|---|---|
| Repurchases in the first quarter | 4,604 | $ 137,746 |
| Tender offer repurchases | 45,027 | 1,468,270 |
| Repurchases from the Robert R. McCormick Tribune Foundation and Cantigny Foundation | 10,000 | 325,300 |
| Repurchases subsequent to the tender offer | 11,053 | 330,952 |
| Total common stock repurchases | 70,684 | $ 2,262,268 |

On May 30, 2006, the Company initiated a modified "Dutch Auction" tender offer to repurchase up to 53 million shares of its common stock at a price per share not greater than $32.50 and not less than $28.00. The tender offer closed on June 26, 2006, and the Company acquired 45 million shares of its common stock on July 5, 2006 at a price of $32.50 per share before transaction costs. The Company also acquired 10 million shares of its common stock from the Robert R. McCormick Tribune Foundation and the Cantigny Foundation on July 12, 2006 at a price of $32.50 per share before transaction costs. The Robert R. McCormick Tribune Foundation and the Cantigny Foundation are affiliated non-profit organizations, which together held 13.6% of the Company's outstanding shares when the tender offer was launched. In connection with the tender offer, the board of directors also authorized the repurchase of an additional 12 million shares of the Company's common stock commencing on the eleventh business day following the completion of the tender offer. In the third quarter of 2006, the Company repurchased an additional 11.1 million shares under that authorization at a weighted average cost of $29.94 per share. In addition, the Company repurchased and retired 4.6 million shares of its common stock in the first quarter of 2006.

112

Powered by Morningstar® Document Research℠

TRIBUNE COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

During 2005, the Company repurchased and retired 12.2 million shares of its common stock in the open market for $440 million. During 2004, the Company repurchased and retired 15.5 million shares of its common stock in the open market for $732 million. At Dec. 31, 2006, 60.7 million treasury shares were held by subsidiaries of the Company.

**Share Purchase Rights Plan**—In December 1997, the Company adopted a Share Purchase Rights Plan that replaced a similar agreement. The plan provides for a dividend of one right on each outstanding share of the Company's common stock. Each right will entitle stockholders to buy one two-hundredth of a share of Series A Junior Participating preferred stock at an exercise price of $125. These rights expire Jan. 5, 2008. The rights have no voting rights and are not exercisable until 10 days after the occurrence of certain triggering events, upon which the holders of the rights are entitled to purchase either the common stock of an acquirer or additional common stock of the Company at a discounted price. The rights are redeemable at the option of the Company for $.005 per right. The Company has established a series of two million shares of Series A Junior Participating Preferred Stock in connection with the plan, none of which have been issued.

## NOTE 16: INCENTIVE COMPENSATION AND STOCK PLANS

**Defined Contribution Plans**—The Company maintains various qualified 401(k) savings plans, which permit eligible employees to make voluntary contributions on a pretax basis. The plans allow participants to invest their savings in various investments including the Company's common stock. In 2004, the Company enhanced its primary 401(k) plan to include a larger Company contribution. This new plan was designed to replace the Company's Employee Stock Ownership Plan that was fully allocated at the end of 2003. In 2006, the Company amended its primary 401(k) plan to make a portion of the Company's contributions discretionary. Amounts charged to expense for all of the Company's defined contribution plans totaled $65 million in 2006, $59 million in 2005 and $60 million in 2004.

**Employee Stock Purchase Plan**—This plan permits eligible employees to purchase the Company's common stock at 85% of market price. The Company incurred charges of $.2 million in 2006, 2005 and 2004 related to the administration of this plan. During 2006, 2005 and 2004, 598,186, 682,624 and 617,651 shares, respectively, were sold to employees under this plan. A total of 16 million shares can be purchased under this plan. As of Dec. 31, 2006, a total of 2.5 million shares remained available for sale. The weighted average fair value of shares sold in 2006 was $30.64.

**Tribune Company Incentive Compensation Plan**—In 1997, the 1992 Long-Term Incentive Plan was replaced with the 1997 Incentive Compensation Plan, which was amended and restated in 2004 as the Tribune Company Incentive Compensation Plan (the "Incentive Plan"). At Dec. 31, 2006, there were no options outstanding under the 1992 plan. The Incentive Plan provides for the granting of awards to eligible employees in any one or combination of stock options, performance equity program awards and annual management incentive program bonuses. At Dec. 31, 2006, options outstanding under the Incentive Plan totaled 35.9 million shares, of which 32.4 million shares were exercisable. At Dec. 31, 2006, a total of 33.9 million shares were available for award under the Incentive Plan. The stock options assumed in the Times Mirror acquisition are fully vested and exercisable. At Dec. 31, 2006, the converted Times Mirror stock options outstanding and exercisable totaled 6.2 million shares. Beginning in 2007, the Company intends to reissue shares from treasury stock for the exercise of its outstanding stock options and the vesting of restricted stock units and dividend equivalent units.

113

Powered by Morningstar® Document Research℠

**TRIBUNE COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

In the first quarter of 2006, the Company adopted FAS No. 123R, "Share-Based Payment," which superseded Accounting Principles Board ("APB") Opinion No. 25, FAS No. 123 and related interpretations. FAS No. 123R requires the Company to expense stock-based compensation in its income statement. Under FAS No. 123R, stock-based compensation cost is measured at the grant date based on the estimated fair value of the award. The Company adopted FAS No. 123R in the first quarter of 2006 using the modified prospective application method and did not restate prior years. FAS No. 123R requires stock-based compensation expense to be recognized over the period from the date of grant to the date when the award is no longer contingent on the employee providing additional service (the "substantive vesting period"). The Incentive Plan provides that awards generally vest upon the death, disability or retirement of an employee. As a result, stock-based grants issued to retirement eligible employees are required to be expensed immediately.

Prior to the adoption of FAS No. 123R, the Company accounted for its stock-based compensation plans in accordance with APB No. 25 and related interpretations. Under APB No. 25, no compensation expense was recorded because the exercise price of employee stock options equaled the market price of the underlying stock on the date of grant. Under the provisions of APB No. 25, the Company was not required to recognize compensation expense for its Employee Stock Purchase Plan. See Note 1 for pro forma stock-based compensation expense calculated under FAS No. 123 for 2005 and 2004.

The following table summarizes the impact of the adoption of FAS 123R on the Company's consolidated statement of income for the year ended Dec. 31, 2006 (in thousands except per share data):

| Stock-based compensation expense: | |
| --- | --- |
| Options | $   8,774 |
| Restricted stock units(1) | 20,117 |
| Employee stock purchase plan | 2,704 |
| Total stock-based compensation expense | 31,595 |
| Income tax benefit | (12,322) |
| Total impact on net income from continuing operations | (19,273) |
| Impact on discontinued operations, net of tax | (134) |
| Total impact on net income | $ (19,139) |
| Impact on earnings per share from continuing operations: | |
| Basic | $     .07 |
| Diluted | $     .07 |

(1)   Expense for restricted stock units would have been recorded under APB No. 25

Total stock-based compensation costs included $.2 million of costs related to discontinued operations and $.1 million of capitalized costs for a total of $31.9 million in 2006. A deferred tax asset of $11 million was recorded related to stock-based compensation costs during 2006.

As of Dec. 31, 2006, the Company had not yet recognized compensation cost on the following non-vested awards (in thousands):

| | Non-vested Compensation | Remaining Recognition Period |
| --- | --- | --- |
| Options | $   5,478 | 2.12 years |
| Restricted stock units | 23,214 | 2.12 years |
| Total | $  28,692 | |

114

Powered by Morningstar® Document Research℠

**TRIBUNE COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

In determining the fair value of compensation cost, the Company values restricted stock unit awards at the quoted closing market price on the date of grant. The fair value of stock option awards is determined using the Black-Scholes option-pricing model, which incorporated the assumptions in the following table for general and replacement awards granted during 2006, 2005 and 2004. The risk-free rate is based on the U.S. Treasury yield curve in effect at the time of grant. Expected volatility is based on actual historical volatility. Expected life is based on historical experience and consideration of changes in option terms.

| | 2006 | | 2005 | | 2004 | |
| | General Awards | Replacement Awards | General Awards | Replacement Awards | General Awards | Replacement Awards |
|---|---|---|---|---|---|---|
| Risk-free interest rate | 4.6% | * | 3.7% | 3.3% | 3.2% | 1.7% |
| Expected dividend yield | 2.5% | * | 1.8% | 1.8% | 1.0% | 1.0% |
| Expected stock price volatility | 22.0% | * | 28.1% | 22.8% | 31.1% | 25.4% |
| Expected life (in years) | 4 | * | 5 | 3 | 5 | 2 |
| Weighted average fair value | $ 5.96 | * | $ 10.49 | $ 6.96 | $ 15.45 | $ 7.46 |

*No replacement awards were granted in 2006

Under the Incentive Plan, the exercise price of a stock option award may not be less than the market price of the Company's common stock at the time the stock option award is granted. Stock option awards are exercisable not less than six months or more than 10 years after the date the stock option award is granted. General stock option awards granted after 2003 have an 8-year term. General stock option awards granted under the Plan prior to 2006 vest in annual 25% increments beginning one year from the date of the grant. General stock option awards granted under the Plan in 2006 vest in annual 33% increments beginning one year from the date of the grant.

Under certain circumstances, replacement options are granted when a participant pays the exercise price of a stock option and related tax withholding obligations with previously acquired shares of common stock. The number of replacement options granted is equal to the number of shares used to pay the exercise price and related tax withholding obligations. The exercise price of a replacement option is equal to the market price of the underlying stock on the date of grant, and the term is equal to the remaining term of the original option. Replacement options vest one year from the date of grant. Beginning in 2004, general stock option awards do not have a replacement stock option award feature.

115

Powered by Morningstar® Document Research℠

TRIBUNE COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

A summary of activity and weighted average exercise prices and fair values related to general stock option awards follows (shares in thousands):

| | General Options(1) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2006 | | | 2005 | | | 2004 | | |
| | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value |
| Outstanding, beginning of year | 34,489 | $ 38.35 | $ 15.03 | 32,991 | $ 37.92 | $ 15.59 | 34,117 | $ 35.76 | $ 15.50 |
| Granted | 1,938 | 31.16 | 5.96 | 3,780 | 40.30 | 10.64 | 4,102 | 51.95 | 15.44 |
| Exercised | (1,101) | 21.24 | 20.25 | (993) | 23.96 | 18.40 | (4,667) | 33.33 | 15.00 |
| Canceled/forfeited | (1,884) | 42.13 | 13.57 | (1,289) | 43.57 | 13.68 | (561) | 43.81 | 14.05 |
| Outstanding, end of year | 33,442 | 38.30 | 14.38 | 34,489 | 38.35 | 15.03 | 32,991 | 37.92 | 15.59 |
| Exercisable, end of year(2) | 31,469 | $ 38.75 | $ 14.93 | 32,993 | $ 38.28 | $ 15.08 | 20,610 | $ 33.13 | $ 16.35 |

(1) Includes options assumed in the Times Mirror acquisition.

(2) In 2005, the Company accelerated the vesting of approximately nine million options granted in 2003, 2004 and 2005 (see Note I).

116

TRIBUNE COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

A summary of activity and weighted average exercise prices and fair values related to replacement options follows (shares in thousands):

| | Replacement Options | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2006 | | | 2005 | | | 2004 | | |
| | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value |
| Outstanding, beginning of year | 9,520 | $ 47.79 | $ 8.06 | 10,845 | $ 47.79 | $ 8.11 | 10,420 | $ 46.08 | $ 8.27 |
| Granted | — | — | — | 13 | 41.83 | 6.96 | 2,428 | 51.16 | 7.46 |
| Exercised | — | — | — | (20) | 42.20 | 8.43 | (1,274) | 41.48 | 8.16 |
| Canceled/forfeited | (2,335) | 46.83 | 8.13 | (1,318) | 47.93 | 8.46 | (729) | 46.48 | 8.14 |
| Outstanding, end of year | 7,185 | 48.10 | 8.04 | 9,520 | 47.79 | 8.06 | 10,845 | 47.79 | 8.11 |
| Exercisable, end of year | 7,185 | $ 48.10 | $ 8.04 | 9,507 | $ 47.80 | $ 8.06 | 8,589 | $ 46.92 | $ 8.29 |

The weighted average remaining contractual term of general and replacement stock option awards was approximately 4.1 years for all outstanding awards and approximately 4.0 years for exercisable awards as of Dec. 31, 2006.

The total intrinsic value (the excess of the market price over the exercise price) was approximately $49 million for general and replacement stock option awards outstanding and exercisable as of Dec. 31, 2006. The total intrinsic value for stock options exercised in 2006 was approximately $11 million. In addition, the Company realized approximately $4 million of tax benefits and received approximately $22 million from the exercise of stock options during 2006.

The following table summarizes information about general options outstanding and general options exercisable at Dec. 31, 2006 (shares in thousands):

| | General Options(1) | | | | |
|---|---|---|---|---|---|
| | Options Outstanding | | | Options Exercisable | |
| Range of Exercise Prices | Number Outstanding | Weighted Avg. Remaining Life | Weighted Avg. Exercise Price | Number Exercisable | Weighted Avg. Exercise Price |
| $12.32-$24.35 | 5,968 | 3.9 | $ 22.60 | 5,968 | $ 22.60 |
| $24.36-$39.93 | 6,105 | 4.5 | $ 34.20 | 4,143 | $ 35.49 |
| $39.94-$40.50 | 8,420 | 4.4 | $ 40.36 | 8,420 | $ 40.36 |
| $40.51-$52.50 | 12,949 | 5.6 | $ 46.13 | 12,938 | $ 46.13 |
| Totals | 33,442 | 4.8 | $38.30 | 31,469 | $ 38.75 |

(1)  Includes options assumed in the Times Mirror acquisition.

117

Powered by Morningstar® Document Research℠

**TRIBUNE COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The following table summarizes information about replacement options outstanding and replacement options exercisable at Dec. 31, 2006 (shares in thousands):

| | Replacement Options | | | | |
|---|---|---|---|---|---|
| | Options Outstanding | | | Options Exercisable | |
| Range of Exercise Prices | Number Outstanding | Weighted Avg. Remaining Life | Weighted Avg. Exercise Price | Number Exercisable | Weighted Avg. Exercise Price |
| $30.44-$42.61 | 497 | 1.7 | $ 41.34 | 497 | $ 41.34 |
| $42.62-$48.70 | 3,149 | 2.0 | $ 45.84 | 3,149 | $ 45.84 |
| $48.71-$60.88 | 3,539 | 3.1 | $ 51.06 | 3,539 | $ 51.06 |
| Totals | 7,185 | 2.5 | $ 48.10 | 7,185 | $ 48.10 |

The Incentive Plan also allows the Company to grant restricted stock units. The Company did not grant restricted stock units prior to 2006. In 2006, the Company granted restricted stock units which vest either in annual 33% increments beginning one year from the date of the grant, or 100% three years from the date of grant. Each restricted stock unit represents the Company's obligation to deliver to the holder one share of common stock upon vesting.

Holders of restricted stock units will also receive dividend equivalent units until the restricted stock units vest. The number of dividend equivalent units granted for each restricted stock unit is calculated based on the value of the dividends per share paid on Tribune's common stock and the closing price of Tribune stock on the dividend payment date. The dividend equivalent units vest with the underlying restricted stock units. In accordance with the provisions of FAS No. 123R, the Company does not record compensation expense for the dividend equivalent units granted. The dilutive effect of the dividend equivalent units is included in the Company's calculation of diluted earnings per share.

A summary of restricted stock unit and dividend equivalent unit activity and weighted average fair values follows (shares in thousands):

| | 2006 | | 2005 | | 2004 | |
|---|---|---|---|---|---|---|
| | Shares | Weighted Avg. Fair Value * | Shares | Weighted Avg. Fair Value * | Shares | Weighted Avg. Fair Value * |
| Outstanding and nonvested, beginning of year | — | — | — | — | — | — |
| Restricted stock units granted | 1,523 | $ 31.18 | — | — | — | — |
| Dividend equivalent units granted | 34 | — | — | — | — | — |
| Forfeited | (33) | $ 31.16 | — | — | — | — |
| Outstanding and nonvested, end of year | 1,524 | $ 31.18 | — | — | — | — |

*Represents weighted average fair value of restricted stock units at date of grant or assumption.

118

Powered by Morningstar® Document Research℠

TRIBUNE COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

## NOTE 17: COMPREHENSIVE INCOME

Comprehensive income reflects all changes in the net assets of the Company during the period from transactions and other events and circumstances, except those resulting from stock issuances, stock repurchases and dividends. The Company's comprehensive income includes net income, the change in minimum pension liabilities, unrealized gains and losses on marketable securities classified as available-for-sale, and foreign currency translation adjustments. Beginning in the Company's 2007 fiscal year, and as a result of the Company's adoption of FAS No. 158 as of Dec. 31, 2006, other comprehensive income (loss) will no longer include the change in minimum pension liabilities, but will include changes in unrecognized benefit cost gains and losses. The Company's comprehensive income was as follows (in thousands):

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| Net income | $  593,995 | $  534,689 | $  555,536 |
| Change in minimum pension liabilities, net of taxes of ($12,139), $13,168 and $1,116, respectively | 18,987 | (20,597) | (1,700) |
| Unrealized gain (loss) on marketable securities: |  |  |  |
| Unrealized holding gain (loss) arising during the period, net of taxes of $1,234, ($2,098), and $612, respectively | 1,929 | (3,282) | 796 |
| Adjustment for (gain) loss on investment sales included in net income, net of taxes of ($7,241), $116 and ($64), respectively | (11,325) | (181) | 100 |
| Unrealized gain (loss) on marketable securities, net of taxes | (9,396) | (3,463) | 896 |
| Change in foreign currency translation adjustments, net of taxes of $117, ($45) and $75, respectively | 183 | (70) | 118 |
| Other comprehensive income (loss) | 9,774 | (24,130) | (686) |
| Comprehensive income | $  603,769 | $  510,559 | $  554,850 |

119

Powered by Morningstar® Document Research℠

TRIBUNE COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

Accumulated other comprehensive income (loss) is a separate component of shareholders' equity on the Company's balance sheet. A reconciliation of the components of accumulated other comprehensive income (loss) is as follows (in thousands):

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Minimum pension liabilities, net of tax: | | | |
| Balance, beginning of year | $ (27,901) | $ (7,304) | $ (5,604) |
| Current year change prior to adoption of FAS No. 158 | 18,987 | (20,597) | (1,700) |
| Change due to adoption of FAS No. 158 | 8,914 | — | — |
| Balance, end of year | — | (27,901) | (7,304) |
| Unrecognized benefit cost gains and (losses), net of tax: | | | |
| Balance, beginning of year | | | |
| Change due to adoption of FAS No. 158 | (374,773) | — | — |
| Balance, end of year | (374,773) | — | — |
| Unrealized gain (loss), net of tax, on marketable securities: | | | |
| Balance, beginning of year | 16,447 | 19,910 | 19,014 |
| Current year change | (9,396) | (3,463) | 896 |
| Balance, end of year | 7,051 | 16,447 | 19,910 |
| Foreign currency translation adjustments, net of tax: | | | |
| Balance, beginning of year | 154 | 224 | 106 |
| Current year change | 183 | (70) | 118 |
| Balance, end of year | 337 | 154 | 224 |
| Accumulated other comprehensive income (loss) | $ (367,385) | $ (11,300) | $ 12,830 |

The adoption of FAS No. 158 resulted in a net increase in accumulated other comprehensive loss, and a corresponding net decrease in shareholders' equity, of $366 million at Dec. 31, 2006 (see Notes 1 and 14 for additional information on the impact of the adoption of FAS No. 158).

## NOTE 18: BUSINESS SEGMENTS

Tribune Company is a media and entertainment company that conducts its operations through two business segments: publishing and broadcasting and entertainment. In addition, certain administrative activities are reported and included under corporate. These segments reflect the manner in which the Company sells its products to the marketplace and the manner in which it manages its operations and makes business decisions.

Publishing—Tribune Publishing operates 11 market-leading daily newspapers and related businesses, distributes entertainment listings and syndicated content, operates a 24-hour cable news channel, and manages the websites of Tribune's daily newspapers and television stations, along with other branded sites targeting specific communities of interest. The daily newspapers are the *Los Angeles Times*; *Chicago Tribune*; *Newsday*; serving Nassau and Suffolk counties on Long Island, New York and the borough of Queens, New York; *South Florida Sun-Sentinel*; *Orlando Sentinel*; *The Sun*; *Hartford Courant*; *The Morning Call*, serving Pennsylvania's Lehigh Valley; *Daily Press*, serving the Virginia Peninsula; and *The Advocate* and *Greenwich Time*, each serving Connecticut's Fairfield County.

120

Powered by Morningstar® Document Research℠

**TRIBUNE COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Broadcasting and Entertainment—The** Company's broadcasting operations currently consist of The CW Network affiliates in New York, Los Angeles, Chicago, Dallas, Washington D.C., Houston, Miami, Denver, St. Louis, Portland, Indianapolis, San Diego, Hartford, and New Orleans; FOX television affiliates in Seattle, Sacramento, Indianapolis, Hartford, Grand Rapids and Harrisburg; MyNetwork affiliates in Philadelphia and Seattle; an ABC television affiliate in New Orleans; and one radio station in Chicago. The Company's affiliates of the CW Network and MyNetworkTV were formerly affiliates of the WB Television Network. On Jan. 24, 2006, the Company announced that it had reached a 10-year agreement to affiliate 16 of its former WB Network affiliated stations with a new broadcast network, The CW Network, which launched in the fall of 2006. The WB Network shut down at that time. In the second quarter of 2006, the Company announced that its other three former WB Network affiliates (Atlanta, Philadelphia and Seattle) would become affiliates of the new broadcast network, MyNetworkTV, which was launched in September 2006 by FOX Television Stations Network Inc. and Twentieth Century Television. The Company subsequently sold its Atlanta affiliate in August 2006 and its CW Network affiliates in Boston and Albany in December 2006 (see Note 3 for additional information on the sales of these stations). Entertainment operations include Tribune Entertainment, which distributes its own programming together with programming licensed from third parties, and the Chicago Cubs baseball team.

No single customer provides more than 10% of the Company's revenue. In determining operating profit for each segment, none of the following items have been added or deducted: interest and dividend income, interest expense, equity income and loss, non-operating items or income taxes. Assets represent those tangible and intangible assets used in the operations of each segment. Corporate assets include cash and the Company's investment portfolio.

121

Powered by Morningstar® Document Research℠

**TRIBUNE COMPANY AND SUBSIDIARIES**
**BUSINESS SEGMENTS**
**(In thousands of dollars)**

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| **Operating Revenues** | | | |
| Publishing | $ 4,092,562 | $ 4,096,850 | $ 4,129,850 |
| Broadcasting and entertainment | 1,425,146 | 1,414,433 | 1,501,581 |
| Total operating revenues | $ 5,517,708 | $ 5,511,283 | $ 5,631,431 |
| **Operating Profit (Loss)(1)** | | | |
| Publishing | $ 749,189 | $ 759,713 | $ 726,207 |
| Broadcasting and entertainment | 391,533 | 416,891 | 513,289 |
| Corporate expenses | (55,712) | (49,413) | (52,218) |
| Total operating profit | $ 1,085,010 | $ 1,127,191 | $ 1,187,278 |
| **Depreciation** | | | |
| Publishing(2) | $ 166,005 | $ 183,695 | $ 171,599 |
| Broadcasting and entertainment | 39,815 | 36,828 | 38,327 |
| Corporate | 1,380 | 1,630 | 1,635 |
| Total depreciation | $ 207,200 | $ 222,153 | $ 211,561 |
| **Amortization of Intangible Assets** | | | |
| Publishing | $ 8,258 | $ 7,231 | $ 7,430 |
| Broadcasting and entertainment | 11,555 | 11,657 | 11,126 |
| Total amortization of intangible assets | $ 19,813 | $ 18,888 | $ 18,556 |
| **Capital Expenditures** | | | |
| Publishing | $ 173,459 | $ 163,317 | $ 171,435 |
| Broadcasting and entertainment | 42,227 | 36,851 | 35,266 |
| Corporate | 6,221 | 5,777 | 10,647 |
| Total capital expenditures | $ 221,907 | $ 205,945 | $ 217,348 |
| **Assets** | | | |
| Publishing | $ 8,512,512 | $ 8,637,176 | $ 8,218,516 |
| Broadcasting and entertainment | 3,987,449 | 4,425,135 | 4,444,988 |
| Corporate | 900,811 | 1,483,931 | 1,491,928 |
| Total assets | $ 13,400,772 | $ 14,546,242 | $ 14,155,432 |

(1)  Operating profit for each segment excludes interest and dividend income, interest expense, equity income and loss, non-operating items and income taxes.

(2)  Publishing depreciation for 2005 includes $16 million of accelerated depreciation expense related to the shut down of the *Los Angeles Times'* San Fernando Valley printing facility (see Note 2).

122

Source: TRIBUNE CO, 10-K, February 26, 2007

Powered by Morningstar® Document Research℠

**TRIBUNE COMPANY AND SUBSIDIARIES**
**2006 QUARTERLY RESULTS (Unaudited)**
**(In thousands of dollars, except per share data)**

| | First | Second | Third | Fourth | 2006 Total |
|---|---|---|---|---|---|
| **Operating Revenues** | | | | | |
| Publishing | $ 996,529 | $ 1,028,303 | $ 956,480 | $ 1,111,250 | $ 4,092,562 |
| Broadcasting and entertainment | 284,102 | 392,886 | 392,555 | 355,603 | 1,425,146 |
| Total operating revenues | $ 1,280,631 | $ 1,421,189 | $ 1,349,035 | $ 1,466,853 | $ 5,517,708 |
| **Operating Profit** | | | | | |
| Publishing | $ 174,222 | $ 208,657 | $ 141,232 | $ 225,078 | $ 749,189 |
| Broadcasting and entertainment | 67,451 | 110,396 | 107,800 | 105,886 | 391,533 |
| Corporate expenses | (20,363) | (14,020) | (13,718) | (7,611) | (55,712) |
| Total operating profit | 221,310 | 305,033 | 235,314 | 323,353 | 1,085,010 |
| Net income on equity investments | 6,548 | 26,017 | 18,743 | 29,465 | 80,773 |
| Interest and dividend income | 2,180 | 2,472 | 4,678 | 4,815 | 14,145 |
| Interest expense | (48,772) | (47,279) | (84,324) | (93,527) | (273,902) |
| Gain (loss) on change in fair values of derivatives and related investments(1) | (10,317) | (6,121) | (17,746) | 45,272 | 11,088 |
| Gain on TMCT transactions(1) | — | — | 59,596 | — | 59,596 |
| Gain (loss) on sales of investments, net(1) | 3,466 | (161) | 17,507 | 15,920 | 36,732 |
| Other non-operating gain (loss), net(1) | (6,846) | (442) | 4,168 | (1,327) | (4,447) |
| **Income from Continuing Operations Before Income Taxes** | 167,569 | 279,519 | 237,936 | 323,971 | 1,008,995 |
| Income taxes(1) | (65,718) | (116,385) | (74,154) | (91,885) | (348,142) |
| Income from Continuing Operations | 101,851 | 163,134 | 163,782 | 232,086 | 660,853 |
| Income (Loss) from Discontinued Operations, net of tax | 913 | (75,300) | 558 | 6,971 | (66,858) |
| Net Income | 102,764 | 87,834 | 164,340 | 239,057 | 593,995 |
| Preferred dividends | (2,103) | (2,103) | (2,103) | — | (6,309) |
| Net Income Attributable to Common Shares | $ 100,661 | $ 85,731 | $ 162,237 | $ 239,057 | $ 587,686 |
| **Earnings Per Share(2)** | | | | | |
| Basic: | | | | | |
| Continuing Operations | $ .33 | $ .53 | $ .65 | $ .97 | $ 2.40 |
| Discontinued Operations | — | (.25) | — | .03 | (.25) |
| Net income | $ .33 | $ .28 | $ .66 | $ 1.00 | $ 2.16 |
| Diluted: | | | | | |
| Continuing Operations | $ .33 | $ .53 | $ .65 | $ .96 | $ 2.39 |
| Discontinued Operations | — | (.25) | — | .03 | (.24) |
| Net income | $ .33 | $ .28 | $ .65 | $ .99 | $ 2.14 |
| Common Dividends Per Share | $ .18 | $ .18 | $ .18 | $ .18 | $ .72 |
| Common Stock Price (High-Low) | $ 27.79-31.84 | $ 27.09-32.94 | $ 28.66-34.28 | $ 30.74-33.99 | |

**Notes to Quarterly Results:**

(1)  See Note 2 to the consolidated financial statements for information pertaining to non-operating items recorded in 2006 and 2005.

123

Source: TRIBUNE CO, 10-K, February 26, 2007

Powered by Morningstar® Document Research℠

**TRIBUNE COMPANY AND SUBSIDIARIES**
**2005 QUARTERLY RESULTS (Unaudited)**
**(In thousands of dollars, except per share data)**

| | First | Second | Third | Fourth | 2005 Total |
|---|---|---|---|---|---|
| | | | Quarters | | |
| **Operating Revenues** | | | | | |
| Publishing | $ 1,005,512 | $ 1,038,624 | $ 980,354 | $ 1,072,360 | $ 4,096,850 |
| Broadcasting and entertainment | 289,593 | 401,855 | 403,349 | 319,636 | 1,414,433 |
| Total operating revenues | $ 1,295,105 | $ 1,440,479 | $ 1,383,703 | $ 1,391,996 | $ 5,511,283 |
| **Operating Profit** | | | | | |
| Publishing | $ 198,539 | $ 217,651 | $ 169,730 | $ 173,793 | $ 759,713 |
| Broadcasting and entertainment | 62,353 | 128,370 | 126,866 | 99,302 | 416,891 |
| Corporate expenses | (13,448) | (13,472) | (13,108) | (9,385) | (49,413) |
| Total operating profit | 247,444 | 332,549 | 283,488 | 263,710 | 1,127,191 |
| Net income on equity investments | 471 | 11,897 | 8,051 | 20,790 | 41,209 |
| Interest and dividend income | 1,082 | 1,165 | 2,888 | 2,404 | 7,539 |
| Interest expense | (35,091) | (35,367) | (38,617) | (46,116) | (155,191) |
| Gain (loss) on change in fair values of derivatives and related investments(1) | (2,253) | 61,803 | 27,120 | (24,486) | 62,184 |
| Gain on sales of investments, net(1) | 1,109 | 1,299 | 487 | 3,885 | 6,780 |
| Other non-operating gain (loss), net(1) | (2,700) | 3,794 | (432) | 235 | 897 |
| **Income from Continuing Operations Before Income Taxes** | 210,062 | 377,140 | 282,985 | 220,422 | 1,090,609 |
| Income taxes(1) | (70,031) | (147,254) | (261,298) | (89,237) | (567,820) |
| **Income from Continuing Operations** | 140,031 | 229,886 | 21,687 | 131,185 | 522,789 |
| **Income from Discontinued Operations, net of tax** | 2,814 | 3,506 | 2,324 | 3,256 | 11,900 |
| Net Income | 142,845 | 233,392 | 24,011 | 134,441 | 534,689 |
| Preferred dividends | (2,090) | (2,090) | (2,090) | (2,094) | (8,364) |
| Net Income Attributable to Common Shares | $ 140,755 | $ 231,302 | $ 21,921 | $ 132,347 | $ 526,325 |
| **Earnings Per Share(2)** | | | | | |
| Basic: | | | | | |
| Continuing Operations | $ .43 | $ .72 | $ .06 | $ .42 | $ 1.64 |
| Discontinued Operations | .01 | .01 | .01 | .01 | .04 |
| Net income | $ .44 | $ .73 | $ .07 | $ .43 | $ 1.68 |
| Diluted: | | | | | |
| Continuing Operations | $ .43 | $ .72 | $ .06 | $ .42 | $ 1.63 |
| Discontinued Operations | .01 | .01 | .01 | .01 | .04 |
| Net income | $ .44 | $ .73 | $ .07 | $ .43 | $ 1.67 |
| Common Dividends Per Share | $ .18 | $ .18 | $ .18 | $ .18 | $ .72 |
| Common Stock Price (High-Low) | $ 42.37-38.59 | $ 40.14-35.02 | $ 39.56-34.53 | $ 36.15-30.05 | |

**Notes to Quarterly Results:**

(2)  The total of the 2006 and 2005 quarters may not equal the respective full year amounts for earnings per share due to differences in the weighted average number of shares outstanding used in the computations for the respective periods. Per share amounts for the respective quarters and years have been computed using the average number of common shares outstanding for each period. Diluted earnings per share is adjusted for the dilutive effect of the Company's common stock equivalents. The calculation may change each quarter depending on whether the common stock equivalents are antidilutive for that period.

124

Source: TRIBUNE CO, 10-K, February 26, 2007

Powered by Morningstar® Document Research℠

(This page has been left blank intentionally.)

125

Powered by Morningstar® Document Research℠

## TRIBUNE COMPANY AND SUBSIDIARIES
### FIVE YEAR FINANCIAL SUMMARY
### (In thousands of dollars, except per share data)

| | 2006 | 2005 |
|---|---|---|
| **Operating Revenues** | | |
| Publishing | $ 4,092,562 | $ 4,096,850 |
| Broadcasting and entertainment | 1,425,146 | 1,414,433 |
| Total operating revenues | $ 5,517,708 | $ 5,511,283 |
| **Operating Profit** | | |
| Publishing | $ 749,189 | $ 759,713 |
| Broadcasting and entertainment | 391,533 | 416,891 |
| Corporate expenses | (55,712) | (49,413) |
| Restructuring charges(1) | — | — |
| Total operating profit | 1,085,010 | 1,127,191 |
| Net income (loss) on equity investments | 80,773 | 41,209 |
| Interest and dividend income | 14,145 | 7,539 |
| Interest expense | (273,902) | (155,191) |
| Non-operating items | 102,969 | 69,861 |
| Income from Continuing Operations Before Income Taxes and Cumulative Effect of Changes in Accounting Principle | 1,008,995 | 1,090,609 |
| Income taxes | (348,142) | (567,820) |
| Income from Continuing Operations Before Cumulative Effect of Changes in Accounting Principle | 660,853 | 522,789 |
| Income (Loss) from Discontinued Operations, net of tax(2) | (66,858) | 11,900 |
| Cumulative effect of changes in accounting principle, net of tax(3) | — | — |
| Net Income(4) | $ 593,995 | $ 534,689 |
| | | |
| **Share Information** | | |
| Basic earnings per share | | |
| Continuing operations before cumulative effect of changes in accounting principle | $ 2.40 | $ 1.64 |
| Discontinued operations | (0.25) | 0.04 |
| Cumulative effect of changes in accounting principle | — | — |
| Net income | $ 2.16 | $ 1.68 |
| Diluted earnings per share | | |
| Continuing operations before cumulative effect of changes in accounting principle | $ 2.39 | $ 1.63 |
| Discontinued operations | (0.24) | 0.04 |
| Cumulative effect of changes in accounting principle | — | — |
| Net income | $ 2.14 | $ 1.67 |
| Common dividends per share | $ 0.72 | $ 0.72 |
| Weighted average common shares outstanding (000's) | 272,672 | 312,880 |
| **Financial Ratios** | | |
| Operating profit margin | 19.7% | 20.5% |
| Debt to capital including PHONES(5) | 44% | 26% |
| Debt to capital excluding PHONES(5) | 41% | 23% |
| **Financial Position and Other Data** | | |
| Total assets | $ 13,400,772 | $ 14,546,242 |
| Long-term debt including PHONES | 3,576,211 | 2,959,262 |
| Long-term debt excluding PHONES | 3,003,251 | 2,449,561 |
| Shareholders' equity | 4,319,616 | 6,725,551 |
| Capital expenditures | 221,907 | 205,945 |

(1)  During the second quarter of 2001, the Company announced a voluntary employee retirement program. The Company implemented this program as well as various other cost reduction initiatives throughout the remainder of 2001 and the first quarter of 2002. The restructuring charges related to these programs decreased 2002 full year net income by $17 million and diluted EPS by $.05.

(2)  Includes income from operations and net loss on sales of WATL-TV, Atlanta, WCWN-TV, Albany, and WLVI-TV, Boston. See Note 3 to the consolidated financial statements for additional information pertaining to discontinued operations.

(3)  The cumulative effect of adopting a new accounting pronouncement for the valuation of certain intangible assets decreased net income by $18 million in 2004. The cumulative effect of adopting a new accounting pronouncement for goodwill and other intangible assets decreased net income by $166 million in 2002.

126

Powered by Morningstar® Document Research℠

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| **Operating Revenues** | | | |
| Publishing | $ 4,129,850 | $ 4,036,920 | $ 3,940,478 |
| Broadcasting and entertainment | 1,501,581 | 1,457,496 | 1,344,799 |
| Total operating revenues | $ 5,631,431 | $ 5,494,416 | $ 5,285,277 |
| **Operating Profit** | | | |
| Publishing | $ 726,207 | $ 885,306 | $ 851,417 |
| Broadcasting and entertainment | 513,289 | 491,733 | 437,008 |
| Corporate expenses | (52,218) | (53,351) | (45,770) |
| Restructuring charges(2) | — | — | (27,253) |
| Total operating profit | 1,187,278 | 1,323,688 | 1,215,402 |
| Net income (loss) on equity investments | 17,931 | 5,590 | (40,875) |
| Interest and dividend income | 3,053 | 6,048 | 8,818 |
| Interest expense | (153,118) | (198,123) | (213,309) |
| Non-operating items and minority interest expense | (145,044) | 241,247 | (63,211) |
| Income from Continuing Operations Before Income Taxes and Cumulative Effect of Changes in Accounting Principle | 910,100 | 1,378,450 | 906,825 |
| Income taxes | (355,724) | (509,214) | (318,218) |
| | 554,376 | 869,236 | 588,607 |
| Discontinued Operations of sold Television Stations, net of tax | 18,948 | 22,143 | 19,972 |
| Cumulative effect of changes in accounting principles, net of tax(3) | (17,788) | — | (165,587) |
| Net Income(4) | $ 555,536 | $ 891,379 | $ 442,992 |
| | | | |
| **Share Information** | | | |
| Basic earnings per share | | | |
| Continuing operations before cumulative effect of changes in accounting principle | $ 1.69 | $ 2.71 | $ 1.87 |
| Discontinued operations | 0.06 | 0.07 | 0.07 |
| Cumulative effect of changes in accounting principle | (.05) | — | (.55) |
| Net income | $ 1.70 | $ 2.78 | $ 1.38 |
| Diluted earnings per share | | | |
| Continuing operations before cumulative effect of changes in accounting principle | $ 1.67 | $ 2.54 | $ 1.73 |
| Discontinued operations | 0.06 | 0.07 | 0.06 |
| Cumulative effect of changes in accounting principle | (.05) | — | (.50) |
| Net income | $ 1.67 | $ 2.61 | $ 1.30 |
| Common dividends per share | $ 0.48 | $ 0.44 | $ 0.44 |
| Weighted average common shares outstanding (000's) | 322,420 | 311,295 | 301,932 |
| **Financial Ratios** | | | |
| Operating profit margin | 21.1% | 24.1% | 23.0% |
| Debt to capital including PHONES(5) | 22% | 22% | 29% |
| Debt to capital excluding PHONES(5) | 18% | 18% | 26% |
| **Financial Position and Other Data** | | | |
| Total assets | $ 14,155,432 | $ 14,280,152 | $ 13,974,048 |
| Long-term debt excluding PHONES | 2,317,933 | 2,381,617 | 3,260,795 |
| Long-term debt excluding PHONES | 1,733,053 | 1,846,337 | 2,737,355 |
| Shareholders' equity | 6,836,844 | 7,028,124 | 6,119,235 |
| Capital expenditures | 217,348 | 193,535 | 186,737 |

(4)  See Note 2 to the consolidated financial statements for information pertaining to non-operating items recorded in 2006, 2005 and 2004. Fiscal year 2003 included the following after-tax non-operating items; gain on changes in fair values of derivatives and related investments of $52 million, gain on sales of subsidiaries and investments of $90 million, loss on investment write-downs of $6 million, gain on insurance recoveries of $14 million, an other non-operating loss of $2 million and a favorable income tax settlement adjustment of $25 million, totaling a gain of $173 million, or $.52 per diluted share. Fiscal year 2002 included the following after-tax non-operating items; loss on changes in fair values of derivatives and related investments of $98 million, gain on sales of subsidiaries and investments of $65 million, loss on investment write-downs of $11 million, other non-operating gain of $6 million and a favorable income tax settlement adjustment of $29 million, totaling a loss of $9 million, or $.02 per diluted share.

(5)  Capital comprises total debt, non-current deferred income taxes and shareholders' equity.

127

Powered by Morningstar® Document Research℠

## TRIBUNE COMPANY AND SUBSIDIARIES
## SCHEDULE II—VALUATION AND QUALIFYING ACCOUNTS AND RESERVES
### (In thousands of dollars)

| Description | Balance at Beginning of Period | Additions Charged to Costs and Expenses | Additions Recorded Upon Acquisitions | Deductions(1) | Balance at End of Period |
|---|---|---|---|---|---|
| Valuation accounts deducted from assets to which they apply: | | | | | |
| **Year ended Dec. 31, 2006** | | | | | |
| Accounts receivable allowances: | | | | | |
| Bad debts | $ 29,977 | $ 49,143 | $ — | $ 57,179 | $ 21,941 |
| Rebates, volume discounts and other | 12,581 | 31,410 | 55 | 32,216 | 11,830 |
| Total | $ 42,558 | $ 80,553 | $ 55 | $ 89,395 | $ 33,771 |
| **Year ended Dec. 25, 2005** | | | | | |
| Accounts receivable allowances: | | | | | |
| Bad debts | $ 35,837 | $ 53,383 | $ — | $ 59,243 | $ 29,977 |
| Rebates, volume discounts and other | 13,670 | 27,131 | — | 28,220 | 12,581 |
| Total | $ 49,507 | $ 80,514 | $ — | $ 87,463 | $ 42,558 |
| **Year ended Dec. 26, 2004** | | | | | |
| Accounts receivable allowances: | | | | | |
| Bad debts | $ 34,024 | $ 60,072 | $ — | $ 58,259 | $ 35,837 |
| Rebates, volume discounts and other | 15,444 | 33,338 | — | 35,112 | 13,670 |
| Total | $ 49,468 | $ 93,410 | $ — | $ 93,371 | $ 49,507 |

(1) Deductions for the year ended Dec. 31, 2006 included approximately $521 due to the sales of discontinued operations. See Note 3 for additional information on the sales of discontinued operations.

128

Source: TRIBUNE CO, 10-K, February 26, 2007

Powered by Morningstar® Document Research℠

**ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.**

None.

**ITEM 9A.    CONTROLS AND PROCEDURES**

**Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures**

Under the supervision and with the participation of the Company's management, including its principal executive officer and principal financial officer, the Company conducted an evaluation of its disclosure controls and procedures, as such term is defined in Exchange Act Rules 13a-15(e) and 15d-15(e), as of Dec. 31, 2006. Based upon that evaluation, the principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures are effective.

**Management's Report on Internal Control Over Financial Reporting**

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of the Company's management, including its principal executive officer and principal financial officer, the Company conducted an evaluation of the effectiveness of the design and operation of internal control over financial reporting based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on that evaluation, the Company's management concluded that internal control over financial reporting was effective as of Dec. 31, 2006. Management's assessment of the effectiveness of internal control over financial reporting as of Dec. 31, 2006 has been audited by PricewaterhouseCoopers, LLP, an independent registered public accounting firm, as stated in their report included in Item 8.

The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with policies or procedures may deteriorate.

**Changes in Internal Control Over Financial Reporting**

There has been no change in the Company's internal control over financial reporting that occurred during the Company's fiscal quarter ended Dec. 31, 2006 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

**ITEM 9B.    OTHER INFORMATION**

None.

## PART III

**ITEM 10.    DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.**

The information contained under the heading "Executive Officers of the Company" in Item 1 hereof, and the information contained under the headings "Stock Ownership—Section 16(a) Beneficial Ownership Reporting Compliance," "Corporate Governance—Overview," "Corporate Governance—Communicating with the Board of Directors" and "Board of Directors" in the definitive Proxy Statement for the Company's May 9, 2007 Annual Meeting of Shareholders is incorporated herein by reference.

129

## ITEM 11.  EXECUTIVE COMPENSATION.

The information contained under the headings "Executive Compensation", "2006 Non-Employee Director Compensation" and "Board of Directors—Certain Relationships and Related Party Transactions—Compensation Committee Interlocks and Insider Participation" in the definitive Proxy Statement for the Company's May 9, 2007 Annual Meeting of Shareholders is incorporated herein by reference.

## ITEM 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS.

The information contained under the headings "Stock Ownership—Management Ownership" and "Stock Ownership—Principal Shareholders" in the definitive Proxy Statement for the Company's May 9, 2007 Annual Meeting of Shareholders is incorporated herein by reference.

### Equity Compensation Plan Information Table

The following table provides information as of Dec. 31, 2006 regarding the number of shares of Tribune common stock that may be issued under Tribune's equity compensation plans.

| Plan Category(1) | (a) Number of securities to be issued upon exercise of outstanding options, warrants and rights | (b) Weighted-average exercise price of outstanding options, warrants and rights | (c) Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 36,391,398(2) | $   43.18(3) | 36,453,519(4) |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | 36,391,398(2) | $   43.18(3) | 36,453,519(4) |

(1)  The table does not include information regarding the following equity compensation plans:

401(k) Plans: As of Dec. 31, 2006, there were an aggregate of 16,996,624 shares of Tribune common stock outstanding and held in the Tribune Company 401(k) Savings and Profit Sharing Plan, the Times Mirror Savings Plus Plan and the other 401(k) plans available to Tribune employees.

Times Mirror Plans: As of Dec. 31, 2006, there were an aggregate of 6,228,104 shares of Tribune common stock issuable upon exercise of stock options granted under equity compensation plans assumed in connection with the merger of The Times Mirror Company into Tribune on June 12, 2000. The weighted-average exercise price of these shares is $22.64. No grants have been made under these plans since the time of the merger and none will be issued in the future.

(2)  Consists of 34,398,769 outstanding stock options, 1,490,625 outstanding restricted stock units and 33,189 outstanding dividend equivalent units relating to the restricted stock units, all of which were issued under Tribune equity compensation plans, 367,273 outstanding stock equivalents under the Tribune bonus deferral plan (the "Bonus Deferral Plan") and 101,542 shares held in deferral accounts under the Tribune Company 1996 Nonemployee Director Stock Compensation Plan (the "Director Plan"). The restricted stock units are credited with dividend equivalent units, and neither the restricted stock units nor the dividend equivalent units have voting rights prior to conversion into shares of common stock. The stock equivalents in deferral accounts under both the Bonus Deferral Plan and the Director Plan do not have voting rights, but are credited with dividend equivalents. The Bonus Deferral Plan permits the deferral of cash or stock awards made under the Tribune Company Incentive Compensation Plan (the "Incentive Plan") into either an interest bearing or stock equivalent account. Deferrals in the stock equivalent account are valued as if each deferral were invested in Tribune common stock as of the deferral date, and are paid out only in shares of Tribune common stock, on a one-for-one basis. Shares issued under this plan are attributed to the Incentive Plan and reduce the number of shares available for issuance under that plan. The Director Plan permits directors to defer stock awards and defer dividend accounts. The deferred awards and shares acquired upon reinvestment of dividends are distributed to the director after termination of his or her Board service. The stock equivalents in deferral accounts under both the Bonus Deferral Plan and the Director Plan do not have voting rights, but are credited with dividend equivalents.

130

(3) Measured only with respect to the 34,398,769 stock options included in this table. Restricted stock units and the related dividend equivalent units and the stock equivalents in deferral accounts do not have exercise prices.

(4) Consists of 33,967,498 shares of Tribune common stock available for issuance under Tribune Company equity compensation plans and 2,486,021 shares available for issuance under the Tribune Company Employee Stock Purchase Plan (the "ESPP"). Under the ESPP, Tribune employees may purchase Tribune common stock through payroll deductions. On the third Wednesday of each month, shares of common stock are purchased for the accounts of participants at a per share price equal to 85% of the fair market value of Tribune common stock on that date. Participants may withdraw from the plan at any time prior to the purchase date.

## ITEM 13.  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.

The information contained under the headings "Board of Directors—Certain Relationships and Related Party Transactions," and "Corporate Governance—Director Independence and Policy Regarding Related Party Transactions" in the definitive Proxy Statement for the Company's May 9, 2007 Annual Meeting of Shareholders is incorporated herein by reference.

## ITEM 14.  PRINCIPAL ACCOUNTANT FEES AND SERVICES.

The information contained under the headings "Board of Directors—Board, Board Committees and Meetings—Audit Committee," "Audit Committee—Policy on Audit Committee Pre-Approval of Audit, Audit-Related and Permissible Non-Audit Services of Independent Accountants" and "Audit Committee—Fees Paid to Independent Accountants" in the definitive Proxy Statement for the Company's May 9, 2007 Annual Meeting of Shareholders is incorporated herein by reference.

## PART IV

## ITEM 15.  EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.

| | |
|---|---|
| (a)(1)&(2) | Financial Statements and Financial Statement Schedule filed as part of this report |
| | See Index to Financial Statements and Financial Statement Schedule on page 55 hereof. |
| (a)(3) | Index to Exhibits filed as part of this report |
| | See Exhibit Index on pages 134 to 138 hereof. |
| (b) | Exhibits |
| | See Exhibit Index on pages 134 to 138 hereof. |
| (c) | Financial Statement Schedule |
| | See Index to Financial Statements and Financial Statement Schedule on page 65 hereof. |

131

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on Feb. 26, 2007.

TRIBUNE COMPANY
(Registrant)

/s/ DENNIS J. FITZSIMONS
Dennis J. FitzSimons
Chairman, President and Chief
Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on Feb. 26, 2007.

| Signature | Title |
|---|---|
| /s/ DENNIS J. FITZSIMONS<br>Dennis J. FitzSimons | Chairman, President, Chief Executive Officer and Director |
| /s/ DONALD C. GRENESKO<br>Donald C. Grenesko | Senior Vice President/Finance and Administration (principal financial officer) |
| /s/ R. MARK MALLORY<br>R. Mark Mallory | Vice President and Controller (principal accounting officer) |
| /s/ JEFFREY CHANDLER<br>Jeffrey Chandler | Director |
| /s/ ROGER GOODAN<br>Roger Goodan | Director |
| /s/ BETSY D. HOLDEN<br>Betsy D. Holden | Director |

132

Powered by Morningstar® Document Research℠

| | |
|---|---|
| /s/ WILLIAM A. OSBORN | Director |
| William A. Osborn | |

| | |
|---|---|
| /s/ J. CHRISTOPHER REYES | Director |
| J. Christopher Reyes | |

| | |
|---|---|
| /s/ DUDLEY S. TAFT | Director |
| Dudley S. Taft | |

133

Source: TRIBUNE CO, 10-K, February 26, 2007

Powered by Morningstar® Document Research℠

# TRIBUNE COMPANY

## EXHIBIT INDEX

Exhibits marked with an asterisk (*) are incorporated by reference to documents previously filed by Tribune Company with the Securities and Exchange Commission, as indicated. Exhibits marked with a circle (o) are management contracts or compensatory plan contracts or arrangements filed pursuant to Item 601(b)(10)(iii)(A) of Regulation S-K. All other documents listed are filed with this Report.

| Number | Description |
| --- | --- |
| 3.1 * | Amended and Restated Certificate of Incorporation of Tribune Company, dated June 12, 2000 (Exhibit 3.1 to Annual Report on Form 10-K for 2001) |
| 3.1a * | Amended Certificate of Designation of Series A Junior Participating Preferred Stock, dated June 12, 2000 (Exhibit 3.1a to Current Report on Form 8-K dated June 12, 2000) |
| 3.1b * | Amended Certificate of Designation of Series D-1 Preferred Stock, dated February 13, 2001 (Exhibit 3.1d to Annual Report on Form 10-K for 2000) |
| 3.2 * | By-Laws of Tribune Company, as amended and in effect on October 19, 2005 (Exhibit 99 to Current Report on Form 8-K dated October 21, 2005) |
| 4.1 * | Rights Agreement between Tribune Company and First Chicago Trust Company of New York, as Rights Agent, dated as of December 12, 1997 (Exhibit 1 to Current Report on Form 8-K dated December 12, 1997) |
| 4.1a * | Amendment No. 1, dated as of June 12, 2000, to the Rights Agreement between Tribune Company and First Chicago Trust Company of New York, as Rights Agent (Exhibit 4.1 to Current Report on Form 8-K dated June 12, 2000) |
| 4.1b* | Amendment No. 2, dated as of September 21, 2006, to the Rights Agreement between Tribune Company and Computershare Trust Company, N.A. (formerly known as EquiServe Trust Company, N.A., formerly known as First Chicago Trust Company of New York), as Rights Agent (Exhibit 4.1 to Current Report on Form 8-K dated September 21, 2006) |
| 4.2 * | Indenture, dated as of March 1, 1992, between Tribune Company and Citibank, N.A. (successor to Bank of New York, Bank of Montreal Trust Company and Continental Bank, N.A.), as Trustee (Exhibit 4.1 to Registration Statement on Form S-3, Registration No. 333-02831) |
| 4.3 * | Indenture, dated as of January 1, 1997, between Tribune Company and Citibank, N.A. (successor to Bank of New York), as Trustee (Exhibit 4 to Current Report on Form 8-K dated January 14, 1997) |
| 4.4 * | Indenture, dated as of April 1, 1999, between Tribune Company and Citibank, N.A. (successor to Bank of New York and Bank of Montreal Trust Company), as Trustee for the PHONES securities (Exhibit 4 to Current Report on Form 8-K dated April 5, 1999) |

134

| | |
|---|---|
| 4.5 * | Indenture, dated January 30, 1995, between Tribune Company (successor to The Times Mirror Company) and Citibank, N.A. (successor to The Bank of New York, Wells Fargo Bank, N.A. and First Interstate Bank of California), as Trustee for the 7$\frac{1}{4}$% Debentures due 2013 and 7$\frac{1}{2}$% Debentures due 2023 (Exhibit 4.1 to The Times Mirror Company's Annual Report on Form 10-K for 1995) |
| 4.5a * | First Supplemental Indenture, dated as of June 12, 2000, among Tribune Company, The Times Mirror Company and The Bank of New York, as Trustee (Exhibit 4.13 to Current Report on Form 8-K dated June 12, 2000) |
| 4.6 * | Indenture, dated March 19, 1996, between Tribune Company (successor to The Times Mirror Company) and Citibank, N.A., as Trustee for the 6.61% Debentures due 2027 and the 7$\frac{1}{4}$% Debentures due 2096 (Exhibit 4.1 to The Times Mirror Company's Current Report on Form 8-K dated March 13, 1996) |
| 4.6a * | First Supplemental Indenture, dated as of October 19, 1999, between The Times Mirror Company and Citibank, N.A., as Trustee (Exhibit 4.3 to The Times Mirror Company's Current Report on Form 8-K dated October 19, 1999) |
| 4.6b * | Second Supplemental Indenture, dated as of June 12, 2000, among Tribune Company, The Times Mirror Company and Citibank, N.A., as Trustee (Exhibit 4.12 to Current Report on Form 8-K dated June 12, 2000) |
| 4.7 * | Agreement of Resignation, Appointment and Assumption, dated as of September 4, 2002, among Tribune Company, The Bank of New York and Citibank, N.A., appointing Citibank, N.A. as Trustee under the Indentures dated March 1, 1992, January 30, 1995, January 1, 1997 and April 1, 1999 (Exhibit 4.7 to Annual Report on Form 10-K for 2004) |
| 4.8 * | Form of Exchangeable Subordinated Debenture due 2029 relating to the PHONES securities (Exhibit 4 to Current Report on Form 8-K dated April 13, 1999) |
| 4.9 * | Specimen Note for 7$\frac{1}{4}$% Debenture due 2013 (Exhibit 4.2 to The Times Mirror Company's Annual Report on Form 10-K for 1995) |
| 4.10 * | Specimen Note for 7$\frac{1}{2}$% Debenture due 2023 (Exhibit 4.3 to The Times Mirror Company's Annual Report on Form 10-K for 1995) |
| 4.11 * | Officers' Certificate, dated November 13, 1996, establishing the terms of the 7$\frac{1}{4}$% Debentures due 2096 and attaching the specimen Form of Debenture (Exhibit 4.2 to The Times Mirror Company's Current Report on Form 8-K dated November 7, 1996) |
| 4.12 * | Officers' Certificate, dated September 9, 1997, establishing the terms of the 6.61% Debentures due 2027, and the specimen Form of Debenture (Exhibit 4.2 to The Times Mirror Company's Current Report on Form 8-K dated September 4, 1997) |
| 4.13 * | Form of Note relating to Tribune Company's 4.875% Notes due 2010 (Exhibit 4.1a to Current Report on Form 8-K dated August 10, 2005) |

135

Powered by Morningstar® Document Research℠

4.14 *          Form of Note relating to Tribune Company's 5.25% Notes due 2015 (Exhibit 4.1b to Current Report on Form 8-K dated August 10, 2005)

4.15*           Amended and Restated Credit Agreement dated as of June 27, 2006 by and among Tribune Company, as borrower, the lenders party thereto, Citicorp North America, Inc., as administrative agent, Merrill Lynch, Pierce, Fenner & Smith Incorporated, as syndication agent, JPMorgan Chase Bank, N.A., Bank of America, N.A., Morgan Stanley Bank and The Bank of Tokyo-Mitsubishi UFJ, Ltd., Chicago Branch, as co-documentation agents, and Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and J.P. Morgan Securities Inc., as joint lead arrangers and joint bookrunners (Exhibit (b)(5) to Amendment No. 7 to Schedule TO dated June 28, 2006)

4.16*           Amendment No. 1 dated as of July 10, 2006 to the Amended and Restated Credit Agreement dated as of June 27, 2006 by and among Tribune Company, as borrower, the lenders party thereto, Citicorp North America, Inc., as administrative agent, Merrill Lynch, Pierce, Fenner & Smith Incorporated, as syndication agent, JPMorgan Chase Bank, N.A., Bank of America, N.A., Morgan Stanley Bank and The Bank of Tokyo-Mitsubishi UFJ, Ltd., Chicago Branch, as co-documentation agents, and Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and J.P. Morgan Securities Inc., as joint lead arrangers and joint bookrunners (Exhibit 10.2 to Quarterly Report on Form 10-Q for the quarter ended June 25, 2006)

4.17*           Amended and Restated Bridge Credit Agreement dated as of June 27, 2006 by and among Tribune Company, as borrower, the lenders party thereto, Citicorp North America, Inc., as administrative agent, Merrill Lynch, Pierce, Fenner & Smith Incorporated, as syndication agent, JPMorgan Chase Bank, N.A., as documentation agent, and Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and J.P. Morgan Securities Inc., as joint lead arrangers and joint bookrunners (Exhibit (b)(6) to Amendment No. 7 to Schedule TO dated June 28, 2006)

4.18*           Amendment No. 1 dated as of July 10, 2006 to the Amended and Restated Bridge Credit Agreement dated as of June 27, 2006 by and among Tribune Company, as borrower, the lenders party thereto, Citicorp North America, Inc., as administrative agent, Merrill Lynch, Pierce, Fenner & Smith Incorporated, as syndication agent, JPMorgan Chase Bank, N.A., as documentation agent, and Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and J.P. Morgan Securities Inc., as joint lead arrangers and joint bookrunners (Exhibit 10.4 to Quarterly Report on Form 10-Q for the quarter ended June 25, 2006)

4.19*           Amendment No. 2 dated as of July 21, 2006 to the Amended and Restated Bridge Credit Agreement dated as of June 27, 2006, as amended, by and among Tribune Company, as borrower, the lenders party thereto, Citicorp North America, Inc., as administrative agent, Merrill Lynch, Pierce, Fenner & Smith Incorporated, as syndication agent, JPMorgan Chase Bank, N.A., as documentation agent, and Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and J.P. Morgan Securities Inc., as joint lead arrangers and joint bookrunners (Exhibit 10.5 to Quarterly Report on Form 10-Q for the quarter ended June 25, 2006)

Source: TRIBUNE CO, 10-K, February 26, 2007                                    Powered by Morningstar® Document Research℠

| | |
|---|---|
| 4.20 | Amendment No. 3 dated as of January 22, 2007 to the Amended and Restated Bridge Credit Agreement dated as of June 27, 2006, as amended, by and among Tribune Company, as borrower, the lenders party thereto, Citicorp North America, Inc., as administrative agent, Merrill Lynch, Pierce, Fenner & Smith Incorporated, as syndication agent, JPMorgan Chase Bank, N.A., as documentation agent, and Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and J.P. Morgan Securities Inc., as joint lead arrangers and joint bookrunners |
| 10.1 o* | Tribune Company Supplemental Retirement Plan, as amended and restated October 18, 2006 (Exhibit 10.3 to Current Report on Form 8-K dated October 18, 2006) |
| 10.2 o* | Tribune Company Directors' Deferred Compensation Plan, as amended and restated effective as of January 1, 2005 (Exhibit 10.2 to Current Report on Form 8-K dated December 22, 2005) |
| 10.3 o* | The Times Mirror Company Deferred Compensation Plan for Non-Employee Directors (Exhibit 10.7 to The Times Mirror Company's Annual Report on Form 10-K for 1994) |
| 10.4 o* | Tribune Company Bonus Deferral Plan, as amended and restated as of October 18, 2006 (Exhibit 10.1 to Current Report on Form 8-K dated October 18, 2006) |
| 10.5 o* | Tribune Company 1992 Long-Term Incentive Plan, effective as of April 29, 1992, as amended April 19, 1994 (Exhibit 10.11 to Annual Report on Form 10-K for 1994) |
| 10.5a o* | Amendment of Tribune Company 1992 Long-Term Incentive Plan, effective October 24, 2000 (Exhibit 10.6a to Annual Report on Form 10-K for 2000) |
| 10.6 o* | Tribune Company Executive Financial Counseling Plan, effective October 19, 1988, as amended January 1, 1994 (Exhibit 10.13 to Annual Report on Form 10-K for 1993) |
| 10.7 o | Tribune Company Transitional Compensation Plan for Executive Employees, amended and restated effective as of July 19, 2006 |
| 10.8 o* | Tribune Company Supplemental Defined Contribution Plan, as amended and effective as of October 18, 2006 (Exhibit 10.2 to Current Report on Form 8-K dated October 18, 2006) |
| 10.9 o* | Tribune Company Employee Stock Purchase Plan, as amended and restated July 27, 1999 (Exhibit 10.10 to Annual Report on Form 10-K for 1999) |
| 10.9a o* | First Amendment to Tribune Company Employee Stock Purchase Plan, as amended and restated July 27, 1999 (Exhibit 10.10a to Quarterly Report on Form 10-Q for the quarter ended September 24, 2000) |
| 10.9b o* | Second Amendment to Tribune Company Employee Stock Purchase Plan, effective as of May 7, 2002 (Exhibit 10.8b to Annual Report on Form 10-K for 2002) |
| 10.10 o* | Tribune Company 1995 Nonemployee Director Stock Option Plan, as amended and restated effective December 9, 2003 (Exhibit 10.9 to Annual Report on Form 10-K for 2003) |

137

   Powered by Morningstar® Document Research℠

| | |
|---|---|
| 10.11 o* | Tribune Company 1996 Nonemployee Director Stock Compensation Plan, as amended and restated effective January 1, 2005 (Exhibit 10.4 to Current Report on Form 8-K dated December 22, 2005) |
| 10.12 o* | Tribune Company Incentive Compensation Plan, as amended and restated effective May 12, 2004 (Exhibit 10.1 to Quarterly Report on Form 10-Q for the quarter ended June 27, 2004) |
| 10.12a o* | Form of Notice of Grant and Stock Option Term Sheet (Exhibit 10.1 to Current Report on Form 8-K dated February 11, 2005) |
| 10.12b o* | Form of Restricted Stock Unit Award Notice (Exhibit 10.1 to Current Report on Form 8-K dated February 21, 2006) |
| 10.13 o* | The Times Mirror Company 1997 Directors Stock Option Plan (Exhibit 10.15 to The Times Mirror Company's Annual Report on Form 10-K for 1996) |
| 10.14* | Distribution Agreement, dated September 21, 2006, by and among TMCT, LLC, Tribune Company, Candle Holdings Corporation, Fortify Holdings Corporation, Chandler Trust No. 1, and Chandler Trust No. 2 (Exhibit 10.1 to Current Report on Form 8-K dated September 21, 2006) |
| 10.15* | Distribution Agreement, dated September 21, 2006, by and among TMCT II, LLC, Tribune Company, Fortification Holdings Corporation, Wick Holdings Corporation, Eagle New Media Investments, LLC, Eagle Publishing Investments, LLC, Chandler Trust No. 1, and Chandler Trust No. 2 (Exhibit 10.3 to Current Report on Form 8-K dated September 21, 2006) |
| 10.16 * | Amended and Restated Lease Agreement between TMCT, LLC and Tribune Company, dated September 22, 2006 (Exhibit 10.5 to Current Report on Form 8-K dated September 21, 2006) |
| 14 * | Code of Ethics for CEO and Senior Financial Officers (Exhibit 14 to Annual Report on Form 10-K for 2003) |
| 21 | Table of Subsidiaries of Tribune Company |
| 23 | Consent of Independent Registered Public Accounting Firm |
| 31.1 | Rule 13a-14 Certification of Chief Executive Officer |
| 31.2 | Rule 13a-14 Certification of Chief Financial Officer |
| 32.1 | Section 1350 Certification of Chief Executive Officer |
| 32.2 | Section 1350 Certification of Chief Financial Officer |
| 99 | Form 11-K financial statements for the KPLR, Inc. 401(k) Plan, the Times Mirror Savings Plus Plan, the Tribune Broadcasting Retirement Plan, the Tribune Company Defined Contribution Retirement Plan and the Tribune Company 401(k) Savings and Profit Sharing Plan (to be filed by amendment) |

138

Powered by Morningstar® Document Research℠

Exhibit 4.20

EXECUTION VERSION

AMENDMENT NO. 3

This AMENDATORY AGREEMENT, dated as of January 22, 2007 (this "Amendment"), is among TRIBUNE COMPANY, a Delaware corporation (the "Borrower"), the Agent and certain of the Lenders (capitalized terms used herein have the meanings set forth in, or are defined by reference in, Article I below).

W I T N E S S E T H:

WHEREAS, the Borrower, the Initial Lenders and Citicorp North America, Inc., as the administrative agent (the "Agent"), are parties to an Amended and Restated Bridge Credit Agreement, dated as of June 27, 2006 (as amended, supplemented, amended and restated or otherwise modified prior to the date hereof, the "Existing Bridge Credit Agreement", and as amended by this Amendment and as the same may be further amended, supplemented, amended and restated or otherwise modified from time to time, the "Bridge Credit Agreement");

WHEREAS, the Borrower has requested that the Lenders amend certain provisions of the Existing Bridge Credit Agreement and the Lenders are willing, on the terms and subject to the conditions hereinafter set forth, to amend such provisions of the Existing Bridge Credit Agreement as set forth below;

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein contained, the Borrower, the Lenders and the Agent hereby agree as follows.

ARTICLE I

DEFINITIONS

SECTION 1.1.  Certain Definitions.  The following terms (whether or not underscored) when used in this Amendment shall have the following meanings (such meanings to be equally applicable to the singular and plural forms thereof):

"Agent" is defined in the first recital.

"Amendment" is defined in the preamble.

"Amendment No. 3 Effective Date" is defined in Article III hereof.

"Borrower" is defined in the preamble.

"Bridge Credit Agreement" is defined in the first recital.

"Existing Bridge Credit Agreement" is defined in the first recital.

*Amendment No. 3 —*
*A&R Bridge Credit Agreement*

1

Powered by Morningstar® Document Research℠

SECTION 1.2.  Other Definitions.  Terms for which meanings are provided in the Existing Bridge Credit Agreement are, unless otherwise defined herein or the context otherwise requires, used in this Amendment with such meanings.

ARTICLE II

AMENDMENT

Effective on and subject to the occurrence of the Amendment No. 3 Effective Date, the Existing Bridge Credit Agreement is hereby amended as set forth below in this Article II.

SECTION 2.1.  Amendment to Section 1.01.  Section 1.01 of the Existing Bridge Credit Agreement is hereby amended by adding the following new defined terms in their respective alphabetically appropriate places:

"Amendment No. 3" means the Amendatory Agreement dated as of January 22, 2007 among the Borrower, the Agent and the Lenders party thereto.

"Amendment No. 3 Effective Date" means January 22, 2007.

SECTION 2.2.  Amendment to Section 2.16.  Section 2.16 of the Existing Bridge Credit Agreement is hereby amended and restated in its entirety to read as follows:

The proceeds of the Advances shall be available (and the Borrower agrees that it shall use such proceeds) solely to finance (i) a portion of the Stock Repurchase and the Refinancing and to pay fees and expenses related thereto and (ii) the repayment of an aggregate amount of up to $100,000,000 of Debt for Borrowed Money consisting of commercial paper incurred by the Borrower or any of its Subsidiaries and outstanding as of the Amendment No. 3 Effective Date.

ARTICLE III

CONDITIONS PRECEDENT

This Amendment shall become effective on the date (the "Amendment No. 3 Effective Date") when each of the conditions set forth in this Article III shall have been fulfilled to the satisfaction of the Agent.

SECTION 3.1.  Execution of Counterparts.  The Agent shall have received counterparts of this Amendment, duly executed and delivered on behalf of (i) the Borrower, (ii) the Agent, and (iii) the Required Lenders.

SECTION 3.2.  Fees and Expenses.  The Agent shall have received all reasonable and documented fees and expenses, if any, due and payable pursuant to the Bridge Credit Agreement.

2

Powered by Morningstar® Document Research℠

ARTICLE IV

REPRESENTATIONS AND WARRANTIES

In order to induce the Lenders and the Agent to enter into this Amendment, the Borrower hereby represents and warrants as follows:

(a)     The representations and warranties contained in Section 4.01 of the Existing Bridge Credit Agreement (except the representations set forth in the last sentence of clause (e)(i) thereof and in clause (f) thereof) are correct in all material respects, before and after giving effect to this Amendment (unless stated to relate solely to an earlier date, in which case such representations and warranties are correct as of such earlier date).

(b)     As of the date hereof, no Default exists or has occurred and is continuing.

ARTICLE V

MISCELLANEOUS PROVISIONS

SECTION 5.1.  Full Force and Effect; Limited Amendment.  Except as expressly provided herein, all of the representations, warranties, terms, covenants, conditions and other provisions of the Existing Bridge Credit Agreement and the Notes shall remain in full force and effect in accordance with their respective terms and are in all respects hereby ratified and confirmed.  The amendments set forth herein shall be limited precisely as provided for herein to the provisions expressly amended hereby and shall not be deemed to be an amendment to or modification of any other term or provision of the Existing Bridge Credit Agreement, any Note or of any transaction or further or future action on the part of the Borrower which would require the consent of any of the Lenders under the Existing Bridge Credit Agreement or the Notes.

SECTION 5.2.  Loan Document.  This Amendment is executed pursuant to the Existing Bridge Credit Agreement and shall (unless otherwise expressly indicated herein) be construed, administered and applied in accordance with the terms and provisions thereof, including, without limitation, Article VIII thereof.

SECTION 5.3.  Fees and Expenses.  The Borrower agrees to pay those reasonable and documented fees payable to the Agent in connection with this Amendment and all other reasonable and documented out-of-pocket expenses incurred by the Agent in connection with the preparation, negotiation, execution and delivery of this Amendment and the documents and transactions contemplated hereby, including the reasonable and documented fees and disbursements of Mayer, Brown, Rowe & Maw LLP, as counsel for the Agent.

SECTION 5.4.  Headings.  The various headings of this Amendment are inserted for convenience only and shall not affect the meaning or interpretation of this Amendment or any provisions hereof.

3

Source: TRIBUNE CO, 10-K, February 26, 2007

Powered by Morningstar® Document Research℠

SECTION 5.5.  <u>Execution in Counterparts</u>.  This Amendment may be executed by the parties hereto in several counterparts, each of which shall be deemed to be an original and all of which shall constitute together but one and the same agreement.

SECTION 5.6.  <u>Cross-References</u>.  References in this Amendment to any Article or Section are, unless otherwise specified or otherwise required by the context, to such Article or Section of this Amendment.

SECTION 5.7.  <u>Successors and Assigns</u>.  This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

SECTION 5.8.  <u>Governing Law</u>.  THIS AMENDMENT SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

4

Source: TRIBUNE CO, 10-K, February 26, 2007                    Powered by Morningstar® Document Research℠

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their respective partners or officers thereunto duly authorized as of the day and year first above written.

TRIBUNE COMPANY

By: /s/ Chandler Bigelow
    Name: Chandler Bigelow
    Title: Treasurer

CITICORP NORTH AMERICA, INC., as Agent

By: /s/ Anish M. Shah
    Name: Anish M. Shah
    Title: Vice President

5

Powered by Morningstar® Document Research℠

**LENDERS**

**BANK OF AMERICA, N.A.**

By:  /s/ Todd Shipley
     Name: Todd Shipley
     Title: Senior Vice President

6

Powered by Morningstar® Document Research℠

**LENDERS**

**CITICORP NORTH AMERICA, INC.**

By:    /s/ Anish M. Shah
       Name: Anish M. Shah
       Title: Vice President

7

**LENDERS**

**JPMORGAN CHASE BANK, N.A.**

By:    /s/ Tracy Navin Ewing
        Name:  Tracy Navin Ewing
        Title:  Vice President

8

**LENDERS**

**MERRILL LYNCH CAPITAL CORPORATION**

By:  /s/ Nancy Meadows
     Name:  Nancy Meadows
     Title: Vice President

9

Powered by Morningstar® Document Research℠

**LENDERS**

**MORGAN STANLEY BANK**

By:  /s/ Daniel Twenge
     Name:  Daniel Twenge
     Title:   Vice President

10

Powered by Morningstar® Document Research℠

Exhibit 10.7

**Tribune Company**

**Transitional Compensation Plan for Executive Employees**

Tribune Company, by resolution of its Board of Directors, adopted the Tribune Company Transitional Compensation Plan for Executive Employees (the "Plan") on December 9, 1985, to attract and retain executives of outstanding competence and to provide additional assurance that they will remain with Tribune Company and its subsidiaries on a long-term basis. The following provisions constitute an amendment and restatement of the Plan effective as of July 19, 2006.

1.  **Participation.** Any full-time, key executive employee of Tribune Company or of any of its subsidiaries shall be eligible to participate in the Plan in one of three separate tiers, if at the time his employment terminates he has been designated by the Committee as being covered by the Plan within a specific tier, and such designation has not been revoked; provided, however, that no revocation of such designation shall be effective if made: (a) on the day of, or within 36 months after, occurrence of a "Change in Control," as such term is hereinafter defined; or (b) prior to a Change in Control, but at the request of any third party participating in or causing the Change in Control; or (c) otherwise in connection with or in anticipation of a Change in Control.

    For the purposes of the Plan, the term "subsidiary" shall mean any corporation, more than 50 percent of the outstanding, voting stock in which is owned by Tribune Company or by a subsidiary.

2.  **Administration.** The Plan shall be administered by the Compensation & Organization Committee of the Board of Directors of Tribune Company (the "Committee") or by a successor committee. The Committee shall have the authority to make rules and regulations governing the administration of the Plan, to designate executive employees to be covered by the Plan, to revoke such designations, and to make all other determinations or decisions, and to take such actions, as may be necessary or advisable for the administration of the Plan. The Committee's determinations need not be uniform, and may be made selectively among eligible employees, whether or not they are similarly situated.

3.  **Eligibility for Transitional Compensation.** An executive who is a Participant in the Plan shall be eligible to receive transitional compensation, in the amounts and at the times described in paragraph 5, if:

    (a)  His employment with the Company and all of its subsidiaries is terminated:

    (i)  On the day of, or within 36 months (24 months in the case of Tier II Participants and 18 months in the case of Tier III Participants) after, occurrence of a "Change in Control," as such term is hereinafter defined;

Powered by Morningstar® Document Research℠

(ii)      Prior to a Change in Control, but at the request of any third party participating in or causing the Change in Control; or

(iii)     Otherwise in connection with or in anticipation of a Change in Control; and

(b)     The Participant's termination of employment was not:

(i)      On account of his death;

(ii)      On account of a physical or mental condition that would entitle him to long-term disability benefits under the Tribune Company Long Term Disability Plan, as then in effect (whether or not he is actually a Participant in such plan);

(iii)     For conduct involving dishonesty or willful misconduct which, in either case, is detrimental in a significant way to the business of Tribune Company or any of its subsidiaries; or

(iv)     On account of the employee's voluntary resignation; provided that a resignation shall not be considered to be "voluntary" for the purposes of the Plan in the following situations: (x) if the resignation by Tribune Company's Chairman & Chief Executive Officer or a Participant designated as a Tier I Participant as of December 13, 1994, occurs during the 30-day period immediately following the first anniversary of the Change in Control (i.e., this provision is not available for Tier II or Tier III Participants or other Tier I Participants); or (y) if the resignation occurs under the circumstances described in paragraph 14(a) of the Plan; or (z) if, subsequent to the Change in Control and prior to such resignation, there has been a reduction in the nature or scope of the Participant's authority or duties, a reduction in the Participant's compensation or benefits or a change in the city in which he is required to perform his duties.

4.     **Change in Control.** For the purposes of the Plan, a "Change in Control" shall mean:

(a)     The acquisition, other than from Tribune Company, by any person, entity, or "group" (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934 (the "Exchange Act")), excluding for this purpose the Company, the Robert R. McCormick Tribune Foundation, the Cantigny Foundation, (or any charitable trust, foundation, organization, or similar entity or entities succeeding to one or both of those Foundations or any substantial part thereof) and any employee benefit plan or trust of Tribune Company or its subsidiaries, of beneficial ownership (within the

2

meaning of Rule 13d-3 promulgated under the Exchange Act) of 20 percent or more of either the then outstanding shares of common stock or the combined voting power of Tribune Company's then outstanding voting securities entitled to vote generally in the election of directors;

(b)     Individuals who, as of January 1, 2005, constitute the Board of Directors of Tribune Company (as of January 1, 2005 the "Incumbent Board" and, generally, the "Board") cease for any reason to constitute at least a majority of the Board, provided that any person becoming a director subsequent to the date hereof whose election, or nomination for election, by the shareholders of Tribune Company was approved by a vote of at least a majority of the directors then comprising the Incumbent Board (other than an election or nomination of an individual whose initial assumption of office is in connection with an actual or threatened election contest relating to the election of the members of the Board of Tribune Company, as such terms are used in Rule 14a-11 of Regulation 14A promulgated under the Exchange Act) shall be considered as though such person were a member of the Incumbent Board; or

(c)     Consummation of a reorganization, merger, consolidation or other transaction involving Tribune Company, in each case, with respect to which persons who were the shareholders of Tribune Company immediately prior to such reorganization, merger, consolidation or other transaction do not, immediately thereafter, own, directly or indirectly, 50% or more of the combined voting power of the then outstanding securities entitled to vote generally in the election of directors of the reorganized, merged or consolidated company, or a liquidation or dissolution of Tribune Company, or the sale of all or substantially all of the assets of Tribune Company.

5.     **Amount and Payment of Transitional Compensation.**  A Participant who is eligible for transitional compensation shall receive:

(a)     Subject to paragraph 6, a lump-sum cash payment, payable within 30 calendar days after the date on which his employment terminates, in an amount equal to the sum of:

(i)     For Tier I Participants, three (3) multiplied by the sum of (x) the Participant's highest annual rate of Base Salary in effect within the three years prior to or upon the effective date of termination and (y) two hundred percent (200%) of the Participant's target bonus payable for the year in which the Change in Control occurs under the Tribune Company Incentive Compensation Plan (As Amended and Restated Effective May 12, 2004), as now or hereafter amended, or any replacement or successor plan;

3

Source: TRIBUNE CO, 10-K, February 26, 2007

Powered by Morningstar® Document Research℠

    (ii)     For Tier II Participants, two (2) multiplied by the sum of (x) the Participant's highest annual rate of Base Salary in effect within the three years prior to or upon the effective date of termination and (y) two hundred percent (200%) of the Participant's target bonus payable for the year in which the Change in Control occurs under the Tribune Company Incentive Compensation Plan (As Amended and Restated Effective May 12, 2004), as now or hereafter amended, or any replacement or successor plan; or

    (iii)     For Tier III Participants, one (1) multiplied by the sum of (x) the Participant's highest annual rate of Base Salary in effect within the three years prior to or upon the effective date of termination and (y) one hundred percent (100%) of the Participant's target bonus payable for the year in which the Change in Control occurs under the Tribune Company Incentive Compensation Plan (As Amended and Restated Effective May 12, 2004), as now or hereafter amended, or any replacement or successor plan;

(b)     Outplacement services at a qualified agency selected by Tribune Company; and

(c)     Continuation of coverage under his employer's group medical, group life, and group long-term disability plans, if any, and under any policy or policies of "split dollar" life insurance maintained by his employer, until the earliest to occur of:

    (i)     The expiration of 36 months for Tier I Participants, the expiration of 24 months for Tier II Participants and the expiration of 12 months for Tier III Participants, from the date on which his employment terminates; or

    (ii)     The date on which he obtains comparable coverage provided by a new employer.

For purposes of this paragraph 5, a Participant's annual rate of base salary shall be determined prior to any reduction for deferred compensation, "401(k)" plan contributions, and similar items, provided that any reduction in a Participant's annual rate of salary, group insurance or split dollar coverage, occurring within 36 months after a Change in Control shall be disregarded, and the payments and coverage under this paragraph shall be governed by the annual salary, group insurance and split dollar coverage, provided to such Participant immediately prior to such reduction.

6.     **Certain Distributions**. Notwithstanding any provision of the Plan to the contrary, a Participant who is a "specified employee" as defined in Section 409A(a)(2)(B)(i) of the Internal Revenue Code of 1986, as amended (the "Code")

4

Source: TRIBUNE CO, 10-K, February 26, 2007

Powered by Morningstar® Document Research℠

may not receive a distribution under the Plan prior to the date which is 6 months after the date of the Participant's termination of employment, or, if earlier, the date of death of the Participant.

7.  **Taxes.** If, for any reason, any part or all of the amounts payable to a Tier I or Tier II Participant pursuant to the Plan (or otherwise, if such amounts are paid by Tribune Company or any of its subsidiaries in connection with a Change in Control) are deemed to be "excess parachute payments" within the meaning of Section 280G(b)(1) of the Code , Tribune Company shall pay to such Participant, in addition to any other amounts that he may be entitled to receive pursuant to the Plan, an amount which, after all federal, state, and local taxes (of whatever kind) imposed on the Participant with respect to such amount are subtracted therefrom, is equal to the excise taxes imposed on such excess parachute payments pursuant to Section 4999 of the Code.

8.  **No Funding of Transitional Compensation.** Nothing herein contained shall require or be deemed to require Tribune Company or a subsidiary to segregate, earmark, or otherwise set aside any funds or other assets to provide for any payments required to be made hereunder, and the rights of a terminating Participant to transitional compensation hereunder shall be solely those of a general, unsecured creditor of Tribune Company. However, Tribune Company may, in its discretion, deposit cash or property, or both, equal in value to all or a portion of the amounts anticipated to be payable hereunder for any or all Participants into a trust, the assets of which are to be distributed at such times as are provided for in the Plan; provided that such assets shall be subject at all times to the rights of Tribune Company's general creditors.

9.  **Death.** In the event of a Participant's death, any amount or benefit payable or distributable to him pursuant to paragraph 5(a) and paragraph 7 shall be paid to the beneficiary designated by such Participant for such purpose in the last written instrument received by the Committee prior to the Participant's death, if any, otherwise, to the Participant's estate.

10. **Rights in the Event of Dispute.** If a claim or dispute arises concerning the rights of a Participant or beneficiary to benefits under the Plan, regardless of the party by whom such claim or dispute is initiated, Tribune Company shall, upon presentation of appropriate vouchers, pay all legal expenses, including reasonable attorneys' fees, court costs, and ordinary and necessary out-of-pocket costs of attorneys, billed to and payable by the Participant or by anyone claiming under or through the Participant (such person being hereinafter referred to as the Participant's "claimant"), in connection with the bringing, prosecuting, defending, litigating, negotiating, or settling such claim or dispute; provided that:

(a)     The Participant or the Participant's claimant shall repay to Tribune Company any such expenses theretofore paid or advanced by Tribune Company if and to the extent that the party disputing the Participant's

5

Source: TRIBUNE CO, 10-K, February 26, 2007                                        Powered by Morningstar® Document Research℠

rights obtains a judgment in its favor from a court of competent jurisdiction from which no appeal may be taken, whether because the time to do so has expired or otherwise, and it is determined that such expenses were not incurred by the Participant or the Participant's claimant while acting in good faith; provided further that

(b)     In the case of any claim or dispute initiated by a Participant or the Participant's claimant, such claim shall be made, or notice of such dispute given, with specific reference to the provisions of this Plan, to the Committee within one year after the occurrence of the event giving rise to such claim or dispute.

11.     **Amendment or Termination.**  Subject to Section 409A of the Code, the Board of Directors of Tribune Company reserves the right to amend, modify, suspend, or terminate the Plan at any time; provided that:

(a)     Without the consent of the Participant, no such amendment, modification, suspension, or termination shall reduce or diminish his right to receive any payment or benefit which becomes due and payable under the Plan as then in effect by reason of his termination of employment prior to the date on which such amendment, modification, suspension, or termination becomes effective; and

(b)     No such amendment, modification, suspension, or termination which has the effect of reducing or diminishing the right of any Participant to receive any payment or benefit under the Plan will become effective prior to the expiration of the 36 consecutive month period commencing on the date of a Change in Control, if such amendment, modification, suspension, or termination was effected: (i) on the day of or subsequent to the Change in Control; (ii) prior to the Change in Control, but at the request of any third party participating in or causing the Change in Control; or (iii) otherwise in connection with or in anticipation of a Change in Control.

12.     **No Obligation to Mitigate Damages.**  In the event a Participant becomes eligible to receive benefits hereunder, the Participant shall have no obligation to seek other employment in an effort to mitigate damages. To the extent a Participant shall accept other employment after his termination of employment, the compensation and benefits received from such employment shall not reduce any compensation and benefits due under this Plan, except as provided in paragraph 5(c).

13.     **Other Benefits.**  The benefits provided under the Plan shall, except to the extent otherwise specifically provided herein, be in addition to, and not in derogation or diminution of, any benefits that a Participant or his beneficiary may be entitled to receive under any other plan or program now or hereafter maintained by Tribune Company or by any of its subsidiaries.

6

Powered by Morningstar® Document Research℠

14.    **Successors.**

(a)    Tribune Company will require any successor (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to all or substantially all of the business and/or assets of Tribune Company, to expressly assume and agree to perform Tribune Company's obligations under this Plan in the same manner and to the same extent that Tribune Company would be required to perform them if no such succession had taken place unless, in the opinion of legal counsel mutually acceptable to a majority of the Participants, such obligations have been assumed by the successor as a matter of law. Failure of Tribune Company to obtain such agreement prior to the effectiveness of any such succession (unless the foregoing opinion is rendered to the Participants) shall entitle each Participant to terminate his employment and to receive the payments provided for in paragraphs 5 and 7 above. As used in this Plan, "Tribune Company" shall mean such company, as presently constituted, and any successor to its business and/or assets which executes and delivers the agreement provided for in this paragraph 14 or which otherwise becomes bound by all the terms and provisions of the Plan as a matter of law.

(b)    A Participant's rights under this Plan shall inure to the benefit of, and shall be enforceable by, the Participant's legal representative or other successors in interest, but shall not otherwise be assignable or transferable.

15.    **Notices.** Any notices referred to herein shall be in writing and shall be sufficient if delivered in person or sent by U.S. registered or certified mail to the Participant at his address on file with his employer (or to such other address as the Participant shall specify by notice), or to Tribune Company at 435 North Michigan Avenue, Chicago, Illinois 60611, Attention: Compensation & Organization Committee.

16.    **Waiver.** Any waiver of any breach of any of the provisions of the Plan shall not operate as a waiver of any other breach of such provisions or any other provisions, nor shall any failure to enforce any provision of the Plan operate as a waiver of any party's right to enforce such provision or any other provision.

17.    **Severability.** If any provision of the Plan or the application thereof is held invalid or unenforceable by a court of competent jurisdiction, the invalidity or unenforceability thereof shall not affect any other provisions or applications of this Plan which can be given effect without the invalid or unenforceable provision or application.

18.    **Governing Law.** The validity, interpretation, construction, and performance of the Plan shall be governed by the laws of the state of Illinois.

7

Powered by Morningstar® Document Research℠

19.    **Headings.** The headings and paragraph designations of the Plan are included solely for convenience of reference and shall in no event be construed to effect or modify any provisions of the Plan.

20.    **Gender and Number.** In the Plan where the context admits, words in any gender shall include the other gender, words in the plural shall include the singular, and words in the singular shall include the plural.

IN WITNESS WHEREOF, the Tribune Company Employee Benefits Committee has caused the foregoing to be executed on behalf of Tribune Company by the undersigned duly authorized Chairman of the Committee as of the 19th day of July, 2006.

TRIBUNE COMPANY

By: /s/ Donald C. Grenesko
     Chairman of Tribune Company
     Employee Benefits Committee

8

Source: TRIBUNE CO, 10-K, February 26, 2007                    Powered by Morningstar® Document Research℠

Exhibit 21

# TRIBUNE COMPANY—LIST OF SUBSIDIARIES

| PUBLISHING | Jurisdiction of Incorporation | Other names under which subsidiary does business |
|---|---|---|
| Tribune Publishing Company | Delaware | |
| The Baltimore Sun Company | Maryland | The Sun; baltimoresun.com |
| Homestead Publishing Company | Maryland | The Aegis; The Record; APG News; The Weekenders; Harford Magazine; Harford Business Ledger; TheAegis.com; harfordledger.com |
| Patuxent Publishing Company | Maryland | Eldersburg Eagle; Westminster Eagle; Howard County Times; Columbia Flier; Laurel Leader; SoundOff; Catonsville Times; Arbutus Times; Owings Mills Times; Baltimore Messenger; Towson Times; Northeast Booster; Northwest Reporter; North County News; Jeffersonian; The View — Ellicott City; The View — West Howard County; The View — Catonsville; The View — Elkridge; Maryland Family; ChesapeakeHome Magazine; Howard/Columbia Magazine |
| Baltimore Newspaper Network, Inc. | Maryland | |
| Chicago Tribune Company | Illinois | Chicago Tribune; chicagotribune.com; RedEye |
| Chicagoland Publishing Company | Delaware | Apartments.com Magazine; AutoFinder; Chicago Tribune Cars Magazine; Chicago Fashion Magazine; Chicago Home Magazine; Chicago Magazine; JobFinder; New Homes Guide; Relcon |
| Chicago Tribune Newspapers, Inc. | Illinois | Chicago Tribune |
| Chicago Tribune Press Service, Inc. | Illinois | Tribune Newspaper Network |
| Newspaper Readers Agency, Inc. | Illinois | |
| Tribune Direct Marketing, Inc. | Delaware | Tribune Direct Marketing |
| The Daily Press, Inc. | Delaware | Daily Press; dailypress.com |
| Virginia Gazette Companies, LLC | Delaware | Virginia Gazette; vagazette.com |
| Virginia Community Shoppers, LLC | Delaware | |

Powered by Morningstar® Document Research℠

| | | |
|---|---|---|
| E Z Buy & E Z Sell Recycler Corporation | Delaware | |
| E Z Buy & E Z Sell Recycler Corporation of Southern California | Delaware | AutoBuys; AutoPix; AutoSeller; AutoTruckBuys; Big Truck & Equipment; Car Buys; Cycle&Boat Buys; EZ-Ads; Recycler; Recycler.com; RV Buys; Jobs; TruckBuys |
| The Renter, Inc. | Delaware | |
| Forum Publishing Group, Inc. | Delaware | Jewish Journal |
| The Hartford Courant Company | Connecticut | Hartford Courant; courant.com; ctnow.com |
| Courant Specialty Products, Inc. | Connecticut | |
| New Mass Media, Inc. | Massachusetts | Fairfield Weekly; Hartford Advocate; New Haven Advocate; Valley Advocate; Westchester Weekly |
| Heart & Crown Advertising, Inc. | Connecticut | |
| TMLH2, Inc. | California | |
| Hoy Publications, LLC | Delaware | Hoy; Hola Hoy; hoyinternet.com |
| Orlando Sentinel Communications Company | Delaware | Orlando Sentinel; orlandosentinel.com; Orlando City Book; El Sentinel; Sentinel Express; elsentinel.com |
| Neocomm, Inc. | Delaware | Neocomm of Delaware, Inc. |
| Sentinel Communications News Ventures, Inc. | Delaware | |
| The Morning Call, Inc. | Pennsylvania | Morning Call; mcall.com |
| Direct Mail Associates, Inc. | Pennsylvania | |
| Southern Connecticut Newspapers, Inc. | Connecticut | The Adovcate; stamfordadvocate.com; Greenwich Time; greenwichtime.com |
| TMLS1, Inc. | California | |
| Sun-Sentinel Company | Delaware | Sun-Sentinel; sun-sentinel.com |
| Gold Coast Publications, Inc. | Delaware | City Link; City & Shore; Teen Link; Sun-Sentinel Direct; Sentinel; South Florida Parenting; Florida New Homes Guide |

Powered by Morningstar® Document Research℠

| | | |
|---|---|---|
| TMD, Inc. | Delaware | |
|   Newsday, Inc. | New York | Newsday; newsday.com |
|     Distribution Systems of America, Inc. | New York | |
|       Star Community Publishing Group, LLC | Delaware | Huntington Pennysaver; Results Media; Shopper's Guide; This Week; Yankee Trader |
|   Hoy, LLC | New York | Hoy |
| Tribune Interactive, Inc. | Delaware | chicagosports.com; go2orlando.com; metromix.com |
| Tribune Los Angeles, Inc. | Delaware | |
|   Los Angeles Times Communications LLC | Delaware | The Burbank Leader; latimes.com; Glendale-News Press; La Canada Valley Sun; La Crescenta Valley Sun; Laguna Beach Coastline; Newport Beach/ Costa Mesa Daily Pilot; Times Community News |
|     Los Angeles Times Newspapers, Inc. | Delaware | |
|     Tribune Manhattan Newspaper Holdings, Inc. | Delaware | |
|     Tribune New York Newspaper Holdings, LLC | Delaware | amNewYork |
| Tribune Media Services, Inc. | Delaware | Tribune Media Services International; tms.tribune.com; Zap2It |
|     TMS Entertainment Guides, Inc. | Delaware | |
|     TMS Entertainment Guides Canada Corp | Canada | |
|     Tribune Media Services, BV | Netherlands | |
| Tribune Media Net, Inc. | Delaware | |
| Tribune National Marketing Company | Delaware | |

## BROADCASTING AND ENTERTAINMENT

| | | |
|---|---|---|
| Tribune Broadcasting Company | Delaware | Tribune Cable; Tribune Creative Services Group; Tribune Plus; Tribune Plus Corporate Sales; Tribune Television |
|   ChicagoLand Microwave Licensee, Inc. | Delaware | |
|   ChicagoLand Television News, Inc. | Delaware | ChicagoLand Television/CLTV News; cltv.com |
|   KHCW Inc. | Delaware | KHCW-TV; khcw.com |
|   KSWB Inc. | Delaware | KSWB-TV; sandiegocw.com |
|   KPLR, Inc. | Missouri | KPLR-TV; cw11tv.com |
|   KTLA Inc. | California | KTLA-TV; ktla.com |
|   KWGN Inc. | Delaware | KWGN-TV; cw2.com |
|   Oak Brook Productions, Inc. | Delaware | |
|   Tower Distribution Company | Delaware | WGN Cable; Superstation WGN; wgncable.com |

Powered by Morningstar® Document Research℠

| | | |
|---|---|---|
| Tribune Broadcasting News Network, Inc. | Delaware | TribNet |
| Tribune Broadcast Holdings, Inc. | Delaware | KRCW-TV; WTTV-TV; thecw4.com; WTTK-TV |
| Tribune Entertainment Company | Delaware | |
|   Magic T Music Publishing Company | Delaware | |
|   Tribune Entertainment Production Company | Delaware | |
|   435 Production Company | Delaware | |
|   5800 Sunset Productions Inc. | Delaware | |
|   Chicago River Production Company | Delaware | |
|   North Michigan Production Company | Delaware | |
|   Towering T Music Publishing Company | Delaware | |
| Tribune (FN) Cable Ventures, Inc. | Delaware | |
| Tribune Network Holdings Company | Delaware | |
| Tribune Television Company | Delaware | WPMT-TV; wpmt.com; WXIN-TV; fox59.com; WTIC-TV; fox61.com; KDAF-TV; cw33.com WPHL-TV; myphl17.com |
|   Channel 20, Inc. | Delaware | |
|   Channel 40, Inc. | Delaware | KTXL-TV; fox40.com |
|   Channel 39, Inc. | Delaware | WSFL-TV; cwsfl.com |
|   Tribune Television Holdings, Inc. | Delaware | WXMI-TV, wxmicom; KMYQ-TV; myq2.com |
|   Tribune Television New Orleans, Inc. | Delaware | WGNO-TV; wgno.com; WNOL-TV; wnol.com |
|   Tribune Television Northwest, Inc. | Delaware | KCPQ-TV; q13.com |
|   WDCW Broadcasting, Inc. | Delaware | WDCW-TV; thecwdc.com |
|   WGN Continental Broadcasting Company | Delaware | WGN-TV; wgntv.com; WGN Radio; wgnradio.com; Tribune Radio Network |
|   Tribune Sports Network Holdings, LLC | Delaware | |
|   WPIX, Inc. | Delaware | WPIX-TV; cw11.com |
|   WTXX Inc. | Delaware | WTXX-TV; wtxx.xom |
| Chicago National League Ball Club, Inc. | Delaware | Chicago Cubs; cubs.com |
| Chicago Cubs Dominican Baseball Operations, Inc. | Delaware | |
| Diana-Quentin, Inc. | Illinois | |
| Tribune California Properties, Inc. | Delaware | |

Powered by Morningstar® Document Research℠

## MISCELLANEOUS

| | |
|---|---|
| California Community News Corporation | Delaware |
| Chicago Avenue Construction Company | Illinois |
| Eagle New Media Investments, LLC | Delaware |
| Stemweb, Inc. | New York |
| ForSaleByOwner.com | New York |
| Homeowners Realty, Inc. | Utah |
| Internet Foreclosure Service, Inc. | New York |
| Newport Media, Inc. | Delaware |
| ValuMail, Inc. | Connecticut |
| Eagle Publishing Investments, LLC | Delaware |
| GreenCo, Inc. | Delaware |
| Los Angeles Times International, Ltd. | California |
| JuliusAir II, LLC | Delaware |
| Multimedia Insurance Company | Vermont |
| Riverwalk Center I Joint Venture | Florida (Partnership) |
| Tribune License, Inc. | Delaware |
| Tribune Finance Service Center, Inc. | Delaware |
| Wrigley Field Premium Ticket Services, Inc. | Delaware |

Powered by Morningstar® Document Research℠

EXHIBIT 23

## CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statement on Form S-3 (File No. 333-135905) and in the Registration Statements on Form S-8 (File Nos. 2-90727, 33-21853, 33-26239, 33-47547, 33-59233, 333-00575, 333-03245, 333-18269, 333-35422, 333-70692, 333-70696, 333-118280, 333-118281, 333-118282, 333-118283 and 333-118284) of Tribune Company of our report dated Feb. 21, 2007, relating to the consolidated financial statements, financial statement schedule, management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal control over financial reporting, which appears in this Form 10-K. We also consent to the reference to us under the heading "Selected Financial Data" in this Form 10-K.

/s/ PRICEWATERHOUSECOOPERS LLP
PricewaterhouseCoopers LLP

Chicago, Illinois
February 21, 2007

139

**EXHIBIT 31.1**

### Form 10-K Certification

I, Dennis J. FitzSimons, certify that:

1.  I have reviewed this annual report on Form 10-K of Tribune Company;

2.  Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of Tribune Company as of, and for, the periods presented in this annual report;

4.  Tribune Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for Tribune Company and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to Tribune Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of Tribune Company's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

    d)  Disclosed in this annual report any change in Tribune Company's internal control over financial reporting that occurred during Tribune Company's most recent fiscal quarter (Tribune Company's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, Tribune Company's internal control over financial reporting; and

5.  Tribune Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to Tribune Company's auditors and the audit committee of Tribune Company's board of directors:

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect Tribune Company's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in Tribune Company's internal control over financial reporting.

|  |
|---|
| /s/ DENNIS J. FITZSIMONS |

Date: February 26, 2007

Dennis J. FitzSimons
Chairman, President and
Chief Executive Officer

140

Powered by Morningstar® Document Research℠

**EXHIBIT 31.2**

**Form 10-K Certification**

I, Donald C. Grenesko, certify that:

1.   I have reviewed this annual report on Form 10-K of Tribune Company;

2.   Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.   Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of Tribune Company as of, and for, the periods presented in this annual report;

4.   Tribune Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for Tribune Company and have:

   a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to Tribune Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   Evaluated the effectiveness of Tribune Company's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

   d)   Disclosed in this annual report any change in Tribune Company's internal control over financial reporting that occurred during Tribune Company's most recent fiscal quarter (Tribune Company's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, Tribune Company's internal control over financial reporting; and

5.   Tribune Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to Tribune Company's auditors and the audit committee of Tribune Company's board of directors:

   a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect Tribune Company's ability to record, process, summarize and report financial information; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in Tribune Company's internal control over financial reporting.

/s/ DONALD C. GRENESKO
Donald C. Grenesko
Senior Vice President/
Finance and Administration

Date: February 26, 2007

141

EXHIBIT 32.1

## CERTIFICATION PURSUANT TO
## 18 UNITED STATES CODE SECTION 1350,
## AS ADOPTED PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

I, Dennis J. FitzSimons, the Chairman, President and Chief Executive Officer of Tribune Company, certify that (i) Tribune Company's Form 10-K for the year ended Dec. 31, 2006 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and (ii) the information contained in the Form 10-K for the year ended Dec. 31, 2006 fairly presents, in all material respects, the financial condition and the results of operations of Tribune Company.

/s/ DENNIS J.
FITZSIMONS
Dennis J. FitzSimons
Chairman, President and
Chief Executive Officer

February 26, 2007

142

Powered by Morningstar® Document Research℠

**EXHIBIT 32.2**

**CERTIFICATION PURSUANT TO**
**18 UNITED STATES CODE SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Donald C. Grenesko, the Senior Vice President/Finance and Administration of Tribune Company, certify that (i) Tribune Company's Form 10-K for the year ended Dec. 31, 2006 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and (ii) the information contained in the Form 10-K for the year ended Dec. 31, 2006 fairly presents, in all material respects, the financial condition and the results of operations of Tribune Company.

/s/ DONALD C.
GRENESKO
Donald C. Grenesko
Senior Vice President/
Finance and Administration

February 26, 2007

143

Created by Morningstar® Document Research℠
http://documentresearch.morningstar.com