QuickLinks -- Click here to rapidly navigate through this document

# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 25, 2005

Commission file number 1-8572

# TRIBUNE COMPANY
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **36-1880355** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **435 North Michigan Avenue** **Chicago, Illinois** | **60611** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (312) 222-9100

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | | Name of each exchange on which registered |
|---|---|---|
| Common Stock ($.01 par value) Preferred Share Purchase Rights | } | New York Stock Exchange Chicago Stock Exchange Pacific Stock Exchange |
| 2% Exchangeable Subordinated Debentures Due 2029 | { | New York Stock Exchange |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (check one): Large accelerated filer ☒    Accelerated filer ☐    Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2). Yes ☐ No ☒

Aggregate market value of the Company's voting and non-voting common equity held by non-affiliates on June 24, 2005, based upon the closing price of the Company's Common Stock as reported on the New York Stock Exchange Composite Transactions list for such date: approximately $8,270,000,000.

At February 17, 2006, there were 302,331,899 shares outstanding of the Company's Common Stock ($.01 par value per share), excluding 83,441,765 shares held by subsidiaries and affiliates of the Company (see Note 14 to the Company's Consolidated Financial Statements).

The following document is incorporated by reference, in part:

Definitive Proxy Statement for the registrant's May 2, 2006 Annual Meeting of Shareholders (Part III, to the extent described therein).

INDEX TO TRIBUNE COMPANY
2005 FORM 10-K

| Item No. | | Page |
|---|---|---|
| | **PART I** | |
| 1. | Business | 1 |
| | Significant Events | 1 |
| | Business Segments | 2 |
| | Publishing | 3 |
| | Broadcasting and Entertainment | 9 |
| | Investments | 14 |
| | Non-Operating Items | 15 |
| | Governmental Regulation | 15 |
| | Employees | 17 |
| | Executive Officers of the Company | 17 |
| | Available Information | 18 |
| 1A. | Risk Factors | 19 |
| 1B. | Unresolved Staff Comments | 22 |
| 2. | Properties | 22 |
| 3. | Legal Proceedings | 23 |
| 4. | Submission of Matters to a Vote of Security Holders | 26 |
| | **PART II** | |
| 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 27 |
| 6. | Selected Financial Data | 27 |
| 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 28 |
| 7A. | Quantitative and Qualitative Disclosures About Market Risk | 53 |
| 8. | Financial Statements and Supplementary Data | 57 |
| | Report of Independent Registered Public Accounting Firm | 59 |
| | Management's Responsibility for Financial Statements and Management's Report on Internal Control Over Financial Reporting | 61 |
| | Consolidated Statements of Income for each of the three fiscal years in the period ended Dec. 25, 2005 | 63 |
| | Consolidated Balance Sheets at Dec. 25, 2005 and Dec. 26, 2004 | 64 |
| | Consolidated Statements of Shareholders' Equity for each of the three fiscal years in the period ended Dec. 25, 2005 | 66 |
| | Consolidated Statements of Cash Flows for each of the three fiscal years in the period ended Dec. 25, 2005 | 68 |
| | Notes to Consolidated Financial Statements | |
| | Note 1: Summary of Significant Accounting Policies | 69 |
| | Note 2: Changes in Operations and Non-Operating Items | 77 |
| | Note 3: *Newsday* and *Hoy*, New York Charge | 80 |
| | Note 4: Inventories | 81 |
| | Note 5: Goodwill and Other Intangible Assets | 82 |
| | Note 6: TMCT I and TMCT II | 84 |
| | Note 7: Investments | 87 |
| | Note 8: Long-Term Debt | 88 |
| | Note 9: Contracts Payable for Broadcast Rights | 91 |

**PART II (continued)**

| | |
|---|---|
| Notes to Consolidated Financial Statements (continued) | |
| Note 10: Fair Value of Financial Instruments | 91 |
| Note 11: Commitments and Contingencies | 91 |
| Note 12: Income Taxes | 92 |
| Note 13: Pension and Postretirement Benefits | 96 |
| Note 14: Capital Stock and Share Purchase Plan | 100 |
| Note 15: Incentive Compensation and Stock Plans | 101 |
| Note 16: Comprehensive Income | 105 |
| Note 17: Business Segments | 106 |
| 2005 Quarterly Results | 108 |
| 2004 Quarterly Results | 109 |
| Eleven Year Financial Summary | 110 |
| Financial Statement Schedule for each of the three fiscal years in the period ended Dec. 25, 2005 | |
| Schedule II: Valuation and Qualifying Accounts and Reserves | 112 |
| 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 113 |
| 9A. Controls and Procedures | 113 |

**PART III**

| | |
|---|---|
| 10. Directors and Executive Officers of the Registrant | 113 |
| 11. Executive Compensation | 114 |
| 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 114 |
| 13. Certain Relationships and Related Transactions | 115 |
| 14. Principal Accountant Fees and Services | 115 |

**PART IV**

| | |
|---|---|
| 15. Exhibits and Financial Statement Schedules | 115 |

* * * * *

| | |
|---|---|
| Signatures | 116 |
| Exhibit Index | 117 |
| Consent of Independent Registered Public Accounting Firm | 121 |
| Certifications of Chief Executive Officer and Chief Financial Officer | 122 |

PART I

## ITEM 1. BUSINESS.

Tribune Company ("Tribune" or the "Company") is a media and entertainment company. Through its subsidiaries, the Company is engaged in newspaper publishing, television and radio broadcasting and entertainment. The Company was founded in 1847 and incorporated in Illinois in 1861. As a result of a corporate restructuring in 1968, the Company became a holding company incorporated in Delaware. References in this report to "the Company" include Tribune Company and its subsidiaries, unless the context otherwise indicates. The information in this Item 1 should be read in conjunction with the information contained in Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the Company's consolidated financial statements and related notes thereto included in Item 8. Certain prior year amounts have been reclassified to conform with the 2005 presentation. These reclassifications had no impact on reported prior year total revenues, operating profit or net income.

This Annual Report on Form 10-K ("Form 10-K") contains certain forward-looking statements that are based largely on the Company's current expectations. Forward-looking statements are subject to certain risks, trends and uncertainties that could cause actual results and achievements to differ materially from those expressed in the forward-looking statements including, but not limited to, the items discussed in Item 1A, "Risk Factors." Such risks, trends and uncertainties, which in some instances are beyond the Company's control, include: changes in advertising demand, circulation levels and audience shares; regulatory and judicial rulings; availability and cost of broadcast rights; competition and other economic conditions; changes in newsprint prices; changes in the Company's credit ratings and interest rates; changes in accounting standards; adverse results from litigation, governmental investigations or tax related proceedings or audits; the effect of labor strikes, lock-outs and negotiations; the effect of acquisitions, investments and divestitures; the effect of derivative transactions; and the Company's reliance on third-party vendors for various services. The words "believe," "expect," "anticipate," "estimate," "could," "should," "intend" and similar expressions generally identify forward-looking statements. Readers are cautioned not to place undue reliance on such forward-looking statements, which are being made as of the date of this filing. The Company undertakes no obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise.

### Significant Events

On Jan. 8, 2006, Newsday's six collective bargaining units voted to accept new four-year contracts that include position eliminations, work rule improvements, lower cost retirement plans and an increase in employee health care contributions, resulting in pretax savings of approximately $7 million in 2006 and more than $10 million annually thereafter. The Company expects to record one-time pretax charges of approximately $15 million in the first quarter of 2006 related to severance and other payments associated with the new contracts.

On Jan. 24, 2006, the Company announced that it had reached a 10-year agreement to affiliate 16 of its television stations currently affiliated with the WB Network (including those in New York, Los Angeles and Chicago) with a new broadcast network, The CW Network, being launched in the fall of 2006 by Warner Brothers Entertainment and CBS. The new network will air a portion of the programming currently on the WB Network and the UPN Network, as well as new programming. The WB Network will shut down at that time. The Company will not incur any costs related to the shutdown of The WB Network. Three of Tribune's current WB network affiliates (Philadelphia, Atlanta and Seattle) will become independent stations at that time. When the regulatory approval of the new network is received and the new affiliation agreements become effective, the Company will write-off its WB affiliation agreement intangible assets for Philadelphia, Atlanta and Seattle. This write-off will

1

Source: TRIBUNE CO, 10-K, February 28, 2006

Powered by Morningstar℠ Document Research℠

most likely occur in the second or third quarter of 2006 and will total approximately $15 million before taxes.

**Business Segments**

The Company's operations are divided into two industry segments: publishing and broadcasting and entertainment. These segments operate primarily in the United States. Certain administrative activities are not included in either segment, but are reported as corporate. These segments reflect the way the Company sells its products to the marketplace, manages operations and makes business decisions.

The following table sets forth operating revenues and profit information for each segment of the Company (in thousands):

| | Fiscal Year Ended December | | |
| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Operating revenues: | | | |
| Publishing | $ 4,096,850 | $ 4,129,850 | $ 4,036,920 |
| Broadcasting and entertainment | 1,498,767 | 1,596,397 | 1,557,909 |
| Total operating revenues | $ 5,595,617 | $ 5,726,247 | $ 5,594,829 |
| Operating profit (loss)(1): | | | |
| Publishing | $ 759,713 | $ 726,207 | $ 885,306 |
| Broadcasting and entertainment | 436,523 | 544,300 | 528,519 |
| Corporate expenses | (49,413) | (52,218) | (53,351) |
| Total operating profit | $ 1,146,823 | $ 1,218,289 | $ 1,360,474 |

(1)      Operating profit for each segment excludes interest and dividend income, interest expense, equity income and loss, non-operating items and income taxes.

The following table sets forth asset information for each industry segment (in thousands):

| | Fiscal Year Ended December | |
| | 2005 | 2004 |
|---|---|---|
| Assets: | | |
| Publishing(1) | $ 8,637,176 | $ 8,218,516 |
| Broadcasting and entertainment | 4,425,135 | 4,444,988 |
| Corporate(2) | 1,483,931 | 1,491,928 |
| Total assets | $ 14,546,242 | $ 14,155,432 |

(1)      Publishing assets at Dec. 25, 2005 include $24 million of assets held for sale and $34 million of assets idled (see Note 2 to the Company's consolidated financial statements in Item 8).

(2)      Corporate assets include cash and cash equivalents, marketable securities and other investments.

The Company's results of operations, when examined on a quarterly basis, reflect the seasonality of the Company's revenues. Second and fourth quarter advertising revenues are typically higher than first and third quarter revenues. Results for the second quarter reflect spring advertising revenues, while the fourth quarter includes advertising revenues related to the holiday season. Fiscal years 2005, 2004 and 2003 each comprised 52 weeks.

Source: TRIBUNE CO, 10-K, February 28, 2006      Powered by Morningstar® Document Research℠

## Publishing

The publishing segment represented 73% of the Company's consolidated operating revenues in 2005. Excluding Newsday, for the six months ended September 2005, total average paid circulation for Tribune's 10 metro newspapers averaged 2.6 million copies daily (Mon.-Sat.) and 3.8 million copies Sunday, a decline of 4.2% and 4.1%, respectively, from 2004. Newsday's 2005 circulation data has been withheld pending the results of an Audit Bureau of Circulations ("ABC") audit. The Company's primary daily newspapers are the *Los Angeles Times, Chicago Tribune, Newsday, South Florida Sun-Sentinel, The Baltimore Sun, Orlando Sentinel, The Hartford Courant, The Morning Call, Daily Press, The Advocate* and *Greenwich Time*. The Company's publishing segment manages the websites of the Company's daily newspapers and television stations, as well as other branded sites targeting specific communities of interest. The Company also owns entertainment listings, a newspaper syndication and media marketing company, a Chicago-area cable television news channel and other publishing-related businesses.

Operating revenues for the Company's three largest newspapers, including their related businesses, for the last three years were as follows (in thousands):

| | Fiscal Year Ended December | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| Operating revenues: | | | |
| Los Angeles Times(1) | $ 1,111,052 | $ 1,134,780 | $ 1,129,165 |
| Chicago Tribune(1) | 873,668 | 853,165 | 812,397 |
| Newsday(1) | 574,864 | 614,681 | 604,788 |
| Other newspapers and businesses | 1,537,266 | 1,527,224 | 1,490,570 |
| Total publishing revenues | $ 4,096,850 | $ 4,129,850 | $ 4,036,920 |

*(1)*     Includes the daily newspaper and other related businesses.

The following table provides a breakdown of operating revenues for the publishing segment for the last three years (in thousands):

| | Fiscal Year Ended December | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| Advertising: | | | |
| Retail | $ 1,323,547 | $ 1,330,951 | $ 1,301,543 |
| National | 774,093 | 802,530 | 773,598 |
| Classified | 1,146,460 | 1,095,012 | 1,033,661 |
| Total advertising | 3,244,100 | 3,228,493 | 3,108,802 |
| Circulation | 596,163 | 643,947 | 663,870 |
| Other(1) | 256,587 | 257,410 | 264,248 |
| Total | $ 4,096,850 | $ 4,129,850 | $ 4,036,920 |

*(1)*     Primarily includes revenues from advertising placement services; the syndication of columns, features, information and comics to newspapers; commercial printing operations; delivery of other publications; direct mail operations; cable television news programming; distribution of entertainment listings; and other publishing-related activities.

3

Powered by Morningstar℠ Document Research℠

The following table sets forth information concerning the Company's advertising volume for its daily newspapers (in thousands):

| | Fiscal Year Ended December | | |
| --- | --- | --- | --- |
| | 2005 | 2004 | 2003 |
| **Full run inches:** | | | |
| Los Angeles Times | 2,256 | 2,477 | 2,623 |
| Chicago Tribune | 2,129 | 2,166 | 2,245 |
| Newsday | 1,523 | 1,560 | 1,542 |
| Other daily newspapers(1) | 13,869 | 14,260 | 13,650 |
| Total full run inches | 19,777 | 20,463 | 20,060 |
| **Part run inches:** | | | |
| Los Angeles Times | 5,319 | 5,914 | 5,864 |
| Chicago Tribune | 6,497 | 6,464 | 5,567 |
| Newsday | 2,041 | 1,936 | 1,887 |
| Other daily newspapers(1) | 6,255 | 6,261 | 6,107 |
| Total part run inches | 20,112 | 20,575 | 19,425 |
| **Total advertising inches** | | | |
| **Full run:** | | | |
| Retail | 5,980 | 6,200 | 5,915 |
| National | 3,774 | 3,998 | 3,798 |
| Classified | 10,023 | 10,265 | 10,347 |
| Total full run | 19,777 | 20,463 | 20,060 |
| Part run | 20,112 | 20,575 | 19,425 |
| Total | 39,889 | 41,038 | 39,485 |
| **Preprint pieces:** | | | |
| Los Angeles Times | 3,937,345 | 3,622,143 | 3,060,927 |
| Chicago Tribune | 4,219,676 | 3,989,953 | 3,566,296 |
| Newsday | 2,600,810 | 2,874,383 | 2,837,519 |
| Other daily newspapers(1) | 4,171,216 | 4,193,530 | 4,014,573 |
| Total | 14,929,047 | 14,680,009 | 13,479,315 |

(1)  Other daily newspapers include the *South Florida Sun-Sentinel, The Baltimore Sun, Orlando Sentinel, The Hartford Courant, The Morning Call, Daily Press, The Advocate, Greenwich Time, Hoy,* New York, *Hoy,* Chicago, and *Hoy,* Los Angeles.

4

Powered by Morningstar® Document Research℠

The following table sets forth information concerning the Company's circulation for its primary daily newspapers (in thousands):

| | Average Paid Circulation For the Six Months Ended Sept.(1) | | | | | |
| | Daily(2) | | | Sunday | | |
| | 2005 | 2004 | 2003 | 2005 | 2004 | 2003 |
| Los Angeles Times | 870 | 902 | 953 | 1,248 | 1,292 | 1,358 |
| Chicago Tribune | 577 | 592 | 608 | 951 | 964 | 1,002 |
| Newsday(3) | NA | 447 | 455 | NA | 521 | 569 |
| South Florida Sun-Sentinel | 233 | 235 | 234 | 322 | 337 | 339 |
| The Baltimore Sun | 249 | 272 | 277 | 419 | 454 | 466 |
| Orlando Sentinel | 221 | 248 | 244 | 331 | 364 | 362 |
| Other daily newspapers(4) | 428 | 441 | 445 | 571 | 597 | 608 |

(1)  Circulation data is based on internal records, is subject to audit by the ABC and may be updated in subsequent filings.

(2)  Average daily circulation is based on a six-day (Mon.-Sat.) average.

(3)  Newsday's 2005 circulation data is being withheld pending results of an ABC audit.

(4)  Other daily newspapers include The Hartford Courant, The Morning Call, Daily Press, The Advocate and Greenwich Time.

Each of the Company's newspapers operates independently to most effectively meet the needs of the community it serves. Local management establishes editorial policies. The Company coordinates certain aspects of operations and resources in order to provide greater operating efficiency and economies of scale.

The Company's newspapers compete for readership and advertising with other metropolitan, suburban and national newspapers, and also with television, radio, Internet services and other media. Competition for newspaper advertising is based upon circulation levels, readership demographics, price, service, and advertiser results, while competition for circulation is based upon the content of the newspaper, service and price.

The Chicago Tribune, South Florida Sun-Sentinel, Orlando Sentinel, Daily Press, The Morning Call, The Advocate and Greenwich Time are printed in Company-owned production facilities. The Los Angeles Times, Newsday, The Baltimore Sun and The Hartford Courant are printed on Company-owned presses in production facilities leased from an affiliate (see Note 6 to the Company's consolidated financial statements in Item 8). The principal raw material is newsprint. In 2005, the Company's newspapers consumed approximately 814,000 metric tons of newsprint. Average newsprint prices increased 16% in 2005 from 2004. The Company's newspapers are transitioning to lighter weight newsprint that on a per ton basis costs more but yields more pages. The increase in newsprint cost per ton reflects increased market prices and the higher cost of lighter weight paper. Average newsprint prices increased 12% and 4% in 2004 and 2003, respectively.

The Company is party to an agreement with Abitibi Consolidated Inc., expiring in 2007, to supply newsprint based on market prices. Under the current agreement, the Company purchased approximately 443,000 metric tons of newsprint in 2005, representing 56% of the Company's newsprint purchases and has agreed to purchase 450,000 metric tons in both 2006 and 2007, subject to certain limitations, at prevailing market prices at the time of purchase. The Company is in the process of negotiating an amendment to this agreement, which among other things, would extend the current agreement to 2009.

5

Powered by Morningstar® Document Research℠

### *Los Angeles Times and Related Businesses*

The *Los Angeles Times* has been published continuously since 1881. The newspaper has won 37 Pulitzer Prizes, including two in 2005. It is published every morning and is the largest metropolitan newspaper in the United States in circulation. The Los Angeles market ranks second in the nation in terms of households. In its primary circulation areas of Los Angeles, Orange, Ventura, San Bernardino and Riverside counties, the *Los Angeles Times* competes for advertising and circulation with 16 local daily newspapers and three daily national newspapers, with its largest local competitor having approximately 300,000 in average daily circulation. For the six-month period ended Sept. 30, 2005, the *Los Angeles Times* ranked fourth and third in the country for average daily and Sunday circulation, respectively, according to ABC. Approximately 76% and 79% of the paper's daily and Sunday circulation, respectively, was home delivered in 2005, with the remainder primarily sold at newsstands and vending boxes.

In addition to the daily edition covering the Los Angeles metropolitan area, the *Los Angeles Times* publishes daily Orange County, San Fernando Valley, Inland Empire and Ventura County editions. Daily and semi-weekly community newspapers are either inserted into the paper in selected geographic areas or distributed to homes and through vending machines to provide targeted local news coverage. The company operates latimes.com, an online expanded version of the newspaper featuring 50,000 content pages, which provide entertainment, local, national and international news, and theenvelope.com, a comprehensive year-round awards web site. Through a subsidiary, EZ Buy & EZ Sell Recycler Corporation, the company publishes a collection of 21 alternative classified papers in Southern California including titles such as *Recycler*, *AutoBuys*, *Cycle & BoatBuys*, *Homes and Open Houses* and *Jobs* and also operates recycler.com, an online version of the publications. The company owns 50% of California Independent Postal Systems ("CIPS"), which provides alternative distribution services for advertising preprints. MediaNews Group, Inc. owns the other 50% of CIPS. In December 2005, the *Los Angeles Times* announced it would close its San Fernando Valley printing facility in January 2006 (see Note 2 to the Company's consolidated financial statements in Item 8 for further discussion).

### *Chicago Tribune and Related Businesses*

Founded in 1847, the *Chicago Tribune* is the flagship publication of the Chicago Tribune Company. The newspaper has won 24 Pulitzer Prizes and is the largest circulation paper in Chicago and the Midwest. It ranks eighth among U.S. daily newspapers with an average daily paid circulation of approximately 577,000; and fifth among U.S. Sunday newspapers with an average Sunday paid circulation of approximately 951,000. Approximately 80% of its weekday newspapers and 71% of its Sunday newspapers are home delivered. Considered an industry leader in journalism and innovation, Chicago Tribune Company has grown into a multi-product, multi-channel news and information leader. Together with other media businesses it operates, including chicagotribune.com, *RedEye* and *Chicago Magazine*, Chicago Tribune Company reaches approximately 60% of adults in Chicagoland every week.

Other businesses owned by Chicago Tribune Company include Tribune Direct Marketing, which provides integrated and comprehensive direct mail services, and Chicagoland Publishing Company, which publishes a number of free guides in the real estate, automotive and help wanted categories. Chicagoland Publishing also publishes the monthly magazine *Chicago*, which earned a 2004 National Magazine "Ellie" Award for general excellence.

### *Newsday and Related Businesses*

*Newsday* is published every morning and circulated primarily in Nassau and Suffolk counties on Long Island, New York, and in the borough of Queens in New York City. The paper has been published since 1940 and has won 18 Pulitzer Prizes. The New York metropolitan area ranks first

6

 Powered by Morningstar℠ Document Research℠

among U.S. markets in terms of households. *Newsday* competes with three major metropolitan newspapers, daily regional editions of several national newspapers and numerous daily, weekly and semiweekly local newspapers and free distribution newspapers. Approximately 70% of the paper's daily and 66% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes. See Note 3 to the Company's consolidated financial statements in Item 8 for a discussion of the charge recorded in 2004 related to the anticipated settlement with advertisers regarding misstated circulation at *Newsday*.

Newsday, Inc., publisher of *Newsday*, also publishes *Distinction*, a magazine serving Long Island's households, issued ten times per year; *Long Island Parents & Children*, a magazine for families, issued twelve times per year; and *Long Island Weddings*, a magazine for brides, published two times per year. Newsday, Inc. has several websites including newsday.com and nynewsday.com, which are online versions of the newspaper. Newsday, Inc.'s subsidiary, Star Community Publishing Group, LLC, publishes 181 pennysaver editions in Nassau and Suffolk counties on Long Island, New York, and in the boroughs of Queens, Brooklyn and Staten Island in New York City. Additionally, the results of *amNewYork*, a free daily newspaper in New York City targeting young, urban commuters, are reported as a part of Newsday, Inc.

### Other Newspapers

The Company's other primary daily newspapers are *South Florida Sun-Sentinel*, *The Baltimore Sun*, *Orlando Sentinel*, *The Hartford Courant*, *Daily Press*, *The Morning Call*, *The Advocate* and *Greenwich Time*. Each of these newspapers is published every morning.

The *South Florida Sun-Sentinel* is the major daily newspaper serving the Broward/Palm Beach County market, leading in both circulation and readership. The Miami/Fort Lauderdale/Miami Beach metropolitan area, which includes Broward and Palm Beach counties, ranks 6th in the nation in terms of households. Approximately 74% of the paper's daily and 69% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes.

Sun-Sentinel Company, publisher of the *South Florida Sun-Sentinel*, also serves the news and information needs of South Florida through sun-sentinel.com, its breaking news and information website; southflorida.com, a South Florida entertainment website; *el Sentinel*, a weekly Spanish language newspaper; weekly community newspapers; niche publications; and extensive television and radio partnerships, including its close working relationship with Tribune Broadcasting's WBZL-TV, Miami, the WB Network affiliate serving South Florida.

Other publications produced by Sun-Sentinel Company include: *City & Shore*, a bimonthly lifestyle magazine; *City Link*, an alternative weekly newspaper; *Florida New Homes & Condo Guide*, a comprehensive bimonthly guide to South Florida real estate; *Jewish Journal*, a collection of weekly newspapers serving South Florida's Jewish community; and *South Florida Parenting*, a monthly magazine providing parenting information and resources for local families.

*The Baltimore Sun*, Maryland's largest newspaper, has published a daily newspaper since 1837 and has won 15 Pulitzer Prizes. The Baltimore market ranks 20th in the United States in number of households. For the six-month period ending Sept. 25, 2005, *The Baltimore Sun* was ranked the 22nd largest newspaper in the country by Sunday circulation according to ABC. *The Baltimore Sun* competes with *The Washington Post* in Anne Arundel and Howard counties, with *The Annapolis Capital* in Anne Arundel County and with *The Carroll County Times* in Carroll County. It also competes with regional editions of national daily newspapers, as well as other local dailies and weeklies. Approximately 79% of the paper's daily and 64% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes.

7

Powered by Morningstar® Document Research℠

The Baltimore Sun Company's subsidiaries, Patuxent Publishing and Homestead Publishing, publish 17 weekly newspapers throughout Anne Arundel, Baltimore, Carroll, Harford and Howard counties. The largest of these weekly newspapers are *The Columbia Flier, The Towson Times, The Owings Mills Times* and *The Aegis.* The Baltimore Sun Company also operates a market leading website, baltimoresun.com.

The *Orlando Sentinel* primarily serves a six-county area in central Florida. It is the only major daily newspaper in the Orlando market, although it competes with other Florida and national newspapers, as well as with other media. The *Orlando Sentinel* has been published since 1876 and has won three Pulitzer Prizes. The Orlando market ranks 28th among U.S. markets in terms of households. Approximately 81% of the paper's daily and 73% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes.

Orlando Sentinel Communications Company, publisher of the *Orlando Sentinel,* also publishes *Sentinel Express* and *US Express,* free weekly publications used to distribute advertising and content to newspaper non-subscribers. In addition to its newspaper website, orlandosentinel.com, the company operates metromix.com covering Central Florida. The company publishes the weekly, Spanish-language newspaper, *El Sentinel,* and its companion website, elsentinel.com, as well as the *Deltona Forum, DeBary/OrangeCity Forum* and *DeLand Forum* weekly community newspapers. The company's multimedia portfolio also includes several free-distribution, niche products in the central Florida market including *Job Xtra, AutoFinder* and *New Homes* magazine. Orlando Sentinel Communications offers direct marketing/direct mail services and delivery services for other publications.

The *Hartford Courant,* founded in 1764, is the oldest continuously published newspaper in the United States. Published every morning, it is the most widely circulated and read newspaper in Connecticut and the strongest medium in the state for advertisers and readers alike. Winner of two Pulitzer Prizes and twice named one of the five best-designed newspapers in the world, *The Hartford Courant* is published in the state's capital, Hartford, and serves the state's northern and central regions. Hartford Courant Company, publisher of *The Hartford Courant,* has one of the most extensive zoning operations in the country, publishing eight editions of *The Hartford Courant* zoned for local news and advertising. The company also operates courant.com, Connecticut's leading online news site, and ctnow.com, a statewide entertainment website. It also owns two subsidiaries: New Mass. Media, Inc., a publisher of four alternative newspapers in Connecticut and Massachusetts, and ValuMail, Inc., a shared-mail company that distributes advertising supplements to more than two million households in Connecticut, Massachusetts, New York and Rhode Island.

*Daily Press* is published daily, including Sunday, and serves the Virginia Peninsula market. *Daily Press* is the only major daily newspaper in its primary market, although it competes with other regional and national newspapers, as well as with other media. The *Daily Press* market includes Newport News, Hampton, Williamsburg and eight other cities and counties. This market, together with Norfolk, Portsmouth and Virginia Beach, is the 34th largest U.S. market in terms of households. The Daily Press, Inc., publisher of *Daily Press,* also owns *The Virginia Gazette,* which is published twice weekly and primarily serves Williamsburg, Va. and surrounding counties. In addition, The Daily Press, Inc. owns and operates dailypress.com, as well as 7cities.com, an entertainment website targeting young adults aged 18-34 years old.

The *Morning Call,* published since 1895, is the dominant regional newspaper for nine counties in eastern Pennsylvania and New Jersey. The Morning Call, Inc., publisher of *The Morning Call,* offers free publications serving the recruitment and real estate markets, and selected high income households. A free weekly newspaper and a targeted online venture serve the 18-34 year-old audience. Subsidiaries of The Morning Call, Inc. offer full service direct marketing and saturation preprint delivery through non-subscriber distribution. In addition, the company owns and operates the premier regional website, mcall.com. Allentown-Bethlehem-Easton is the 60th largest U.S. market in terms of households.

8

The *Advocate* and *Greenwich Time* primarily serve the Stamford/Greenwich market in southwestern Fairfield County, Conn. *The Advocate* has won a Pulitzer Prize. The newspapers expanded operations in 2003 with an additional edition in neighboring Norwalk.

### Other Publishing Related Businesses

The Company also owns targeted publications, including three editions of the Spanish language newspaper, *Hoy*. *Hoy*, New York, a free publication as of January 2006, was introduced in 1998; *Hoy*, Chicago, is a free publication introduced in September 2003; and *Hoy*, Los Angeles, is a free publication introduced in March 2004. See Note 3 to the Company's consolidated financial statements in Item 8 for a discussion of the charge recorded in 2004 related to the anticipated settlement with advertisers regarding misstated circulation at *Hoy*, New York. The Spanish language newspaper operates hoyinternet.com, a national Spanish language website. *Hoy* provides news and features of interest to Hispanics. *Hoy*, New York, serves the second largest Hispanic market in the U.S. *Hoy*, Chicago, serves the interests of Chicago's 1.7 million Hispanics, the fourth largest Hispanic market in the U.S. *Hoy*, Los Angeles, serves the largest Hispanic market in the U.S.

The Company also owns Tribune Media Services, Inc. ("TMS"), which creates, aggregates and distributes news, information and entertainment content that reaches millions of users through print, online and on-screen media. The TMS News and Features group licenses content from more than 600 writers, artists, newspaper and magazine publishers, and wire services to roughly 4,000 media customers worldwide. The TMS Entertainment Products group creates TV and movie guide products for major media companies and consumers. TMS provides data for interactive program guides to cable and satellite operators. The TMS TV Week Advertising Network represents newspaper TV magazines in 42 of the top 50 U.S. markets, covering 30 million Nielsen metered households in the United States.

The Company also operates CLTV, a regional 24-hour cable news channel serving Chicagoland. CLTV was launched in January 1993 and currently is available to more than 1.8 million cable households in the Chicago market.

### Broadcasting and Entertainment

The broadcasting and entertainment segment represented 27% of the Company's consolidated operating revenues in 2005. At Dec. 25, 2005, the segment included The WB Television Network ("The WB Network") affiliates located in New York, Los Angeles, Chicago, Philadelphia, Boston, Dallas, Washington, D.C., Atlanta, Houston, Seattle, Miami, Denver, St. Louis, Portland, Indianapolis, San Diego, Hartford, New Orleans and Albany; the FOX Network television affiliates in Seattle, Sacramento, Indianapolis, Hartford, Grand Rapids and Harrisburg; an ABC television affiliate in New Orleans; one radio station in Chicago; the Chicago Cubs baseball team; and Tribune Entertainment, a company that distributes its own programming together with programming licensed from third parties. On Jan. 24, 2006, the Company announced that it had reached a 10-year agreement to affiliate 16 of its WB Network affiliates stations with a new broadcast network, The CW Network, being launched in the fall of 2006. The WB Network will shut down at that time. Three of the Company's current WB Network affiliates (Philadelphia, Atlanta and Seattle) will become independent stations at that time. When regulatory approval of the new network is received and the new affiliation agreements become effective, the Company will write-off its WB affiliation agreement intangible assets for Philadelphia, Atlanta and Seattle. This write-off will most likely occur in the second or third quarter of 2006 and will total approximately $15 million before taxes.

9

Powered by Morningstar® Document Research℠

The following table shows sources of operating revenues for the broadcasting and entertainment segment for the last three years (in thousands):

| | Fiscal Year Ended December | | |
| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Television(1) | $ 1,250,155 | $ 1,353,618 | $ 1,323,038 |
| Radio/entertainment | 248,612 | 242,779 | 234,871 |
| Total | $ 1,498,767 | $ 1,596,397 | $ 1,557,909 |

(1)

Includes KPLR-TV, St. Louis and KWBP-TV, Portland, Ore., since their acquisition date in March 2003.

10

Source: TRIBUNE CO, 10-K, February 28, 2006                    Powered by Morningstar® Document Research℠

*Television*

In 2005, television contributed 83% of the broadcasting and entertainment segment's operating revenues. The Company's television stations compete for audience and advertising with other television and radio stations, cable television and other media serving the same markets. Competition for audience and advertising is based upon various interrelated factors including programming content, audience acceptance and price.

Selected data for the Company's television stations are shown in the following table:

| | Market(1) | | | | | | | |
| | National Rank | % of U.S. Households | FCC % | Analog Channel | Affiliation(2) | Major Over-the-Air Stations in Market(3) | Expiration of FCC License(4) | Year Acquired |
|---|---|---|---|---|---|---|---|---|
| WPIX—New York, NY | 1 | 6.7 | 6.7 | 11-VHF | WB | 7 | 2007(5) | 1948(6) |
| KTLA—Los Angeles, CA | 2 | 5.0 | 5.0 | 5-VHF | WB | 8 | 2006(5)(8) | 1985 |
| WGN—Chicago, IL | 3 | 3.1 | 3.1 | 9-VHF | WB | 8 | 2005(7) | 1948(6) |
| WPHL—Philadelphia, PA | 4 | 2.7 | 1.3 | 17-UHF | WB | 7 | 2007 | 1992 |
| WLVI—Boston, MA | 5 | 2.2 | 1.1 | 56-UHF | WB | 7 | 2007(8) | 1994 |
| KDAF—Dallas, TX | 7 | 2.1 | 1.1 | 33-UHF | WB | 9 | 2006(8) | 1997 |
| WBDC—Washington, D.C. | 8 | 2.0 | 1.0 | 50-UHF | WB | 7 | 2004(7) | 1999 |
| WATL—Atlanta, GA | 9 | 1.9 | 1.0 | 36-UHF | WB | 8 | 2005(7) | 2000 |
| KHWB—Houston, TX | 10 | 1.8 | 0.9 | 39-UHF | WB | 9 | 2006(8) | 1996 |
| KCPQ—Seattle, WA | 13 | 1.5 | 1.5 | 13-VHF | FOX | 8 | 2007(8) | 1999 |
| KTWB—Seattle, WA | 13 | — | — | 22-UHF | WB | 8 | 2007(8) | 1998 |
| WBZL—Miami, FL | 17 | 1.4 | 0.7 | 39-UHF | WB | 7 | 2005(5)(7) | 1997 |
| KWGN—Denver, CO | 18 | 1.3 | 1.3 | 2-VHF | WB | 7 | 2006(7) | 1966 |
| KTXL—Sacramento, CA | 19 | 1.2 | 0.6 | 40-UHF | FOX | 7 | 2006(8) | 1997 |
| KPLR—St. Louis, MO | 21 | 1.1 | 1.1 | 11-UHF | WB | 6 | 2006(7) | 2003 |
| KWBP—Portland, OR | 23 | 1.0 | 0.5 | 32-UHF | WB | 7 | 2007(8) | 2003 |
| WTTV—Indianapolis, IN | 25 | 1.0 | 1.0 | 4-VHF | WB | 7 | 2005(7) | 2002 |
| WXIN—Indianapolis, IN | 25 | — | — | 59-UHF | FOX | 7 | 2005(7) | 1997 |
| KSWB—San Diego, CA | 26 | 0.9 | 0.5 | 69-UHF | WB | 7 | 2006(8) | 1996 |
| WTIC—Hartford, CT | 28 | 0.9 | 0.5 | 61-UHF | FOX | 7 | 2007(5)(8) | 1997 |
| WTXX—Hartford, CT | 28 | — | — | 20-UHF | WB | 7 | 2007(5)(8) | 2001 |
| WXMI—Grand Rapids, MI | 39 | 0.7 | 0.3 | 17-UHF | FOX | 7 | 2005(7) | 1998 |
| WPMT—Harrisburg, PA | 41 | 0.6 | 0.3 | 43-UHF | FOX | 5 | 2007 | 1997 |
| WGNO—New Orleans, LA | 43 | 0.6 | 0.3 | 26-UHF | ABC | 7 | 2005(7) | 1983 |
| WNOL—New Orleans, LA | 43 | — | — | 38-UHF | WB | 7 | 2005(7) | 2000 |
| WEWB—Albany, NY | 55 | 0.5 | 0.3 | 45-UHF | WB | 7 | 2007 | 1999 |

(1)   Source: Nielsen Station Index (DMA Market and Demographic Rank Report, September 2005). Ranking of markets is based on number of television households in DMA (Designated Market Area).

(2)   WB affiliation agreements expire in August 2006. On Jan. 24, 2006, the Company announced that it had reached a 10-year agreement to affiliate 16 of its WB Network affiliates with The CW Network, being launched in the fall of 2006. The WB Network will be shut down at that time. WPHL-TV, WATL-TV and KTWB-TV will become independent stations at that time.

(3)   Source: Nielsen Station Index (Viewers in Profile Reports, 2005). Major over-the-air stations program for a broad, general audience and have a large viewership in the market.

(4)   See "Governmental Regulation."

(5)   See "Governmental Regulation" for discussion of the Federal Communications Commission ("FCC") television/newspaper cross-ownership rule.

(6)   Founded by the Company.

11

Powered by Morningstar® Document Research℠

(7)

The WBDC-TV license expired October 2004, the renewal application filed in June 2004 is pending; the WBZL-TV license expired February 2005, the renewal application filed in September 2004 is pending; the WATL-TV license expired April 2005, the renewal application filed in December 2004 is pending; the WGNO-TV and WNOL-TV licenses expired June 2005, the renewal applications filed in February 2005 are pending; the WTTV-TV and WXIN-TV licenses expired August 2005, the renewal applications filed in March 2005 are pending; the WXMI-TV license expired October 2005, the renewal application filed in May 2005 is pending; and the WGN-TV license expired December 2005, the renewal application filed in August 2005 is pending. The KPLR-TV license expired February 2006, the renewal application filed in September 2005 is pending; and the KWGN-TV license expires in April 2006, the renewal application filed in December 2005 is pending.

(8)

The KDAF-TV and KHWB-TV license renewal applications are due by April 1, 2006; the KTLA-TV, KTXL-TV and KSWB-TV license renewal applications are due by August 1, 2006; the KCPQ-TV, KTWB-TV and KWBP-TV license renewal applications are due by October 1, 2006; and the WLVI-TV, WTIC-TV and WTXX-TV license renewal applications are due by December 1, 2006.

Programming emphasis at the Company's stations is placed on network-provided shows, syndicated series, feature motion pictures, local and regional sports coverage, news, and children's programs. These stations acquire most of their programming from outside sources, including The WB Network and the FOX Network, although a significant amount is produced locally. WGN Cable ("WGN Superstation") programming is delivered by cable or satellite outside of the Chicago area and includes movies and first-run programming. Contracts for purchased programming generally cover a period of one to five years, with payment also typically made over several years. The expense for amortization of television broadcast rights in 2005 was $364 million, which represented approximately 29% of total television operating revenues.

12

Average audience share information for the Company's television stations for the past three years is shown in the following table:

| | | Average Audience Share(1) | | | | | |
| | | Total Market Year Ended December | | | In-Market Stations(2) Year Ended December | | |
| | Affiliation | 2005 | 2004 | 2003 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|---|---|
| WPIX—New York, NY | WB | 5.1% | 5.8% | 7.2% | 12.4% | 13.6% | 16.2% |
| KTLA—Los Angeles, CA | WB | 4.0 | 4.6 | 5.8 | 10.7 | 11.4 | 13.2 |
| WGN—Chicago, IL | WB | 6.2 | 7.0 | 7.9 | 13.2 | 13.9 | 14.0 |
| WPHL—Philadelphia, PA | WB | 4.0 | 4.0 | 4.4 | 8.5 | 8.2 | 9.0 |
| WLVI—Boston, MA | WB | 2.9 | 3.5 | 4.7 | 6.9 | 8.2 | 10.4 |
| KDAF—Dallas, TX | WB | 4.3 | 6.4 | 6.0 | 9.1 | 12.4 | 11.1 |
| WBDC—Washington, D.C. | WB | 4.2 | 4.4 | 4.0 | 9.5 | 10.1 | 8.7 |
| WATL—Atlanta, GA | WB | 3.7 | 3.9 | 4.7 | 7.5 | 7.8 | 8.6 |
| KHWB—Houston, TX | WB | 4.8 | 5.1 | 6.7 | 9.8 | 10.3 | 11.7 |
| KCPQ—Seattle, WA | FOX | 6.7 | 5.8 | 6.4 | 13.7 | 11.8 | 12.4 |
| KTWB—Seattle, WA | WB | 2.5 | 2.8 | 2.9 | 5.0 | 5.0 | 5.6 |
| WBZL—Miami, FL | WB | 5.2(3) | 5.2 | 5.7 | 13.9(3) | 13.9 | 14.2 |
| KWGN—Denver, CO | WB | 3.9 | 4.3 | 4.7 | 9.4 | 9.8 | 9.7 |
| KTXL—Sacramento, CA | FOX | 5.7 | 5.8 | 7.0 | 13.3 | 13.2 | 14.3 |
| KPLR—St. Louis, MO | WB | 5.0 | 5.8 | 6.7 | 9.5 | 10.8 | 11.4 |
| KWBP—Portland, OR | WB | 3.7 | 4.0 | 4.2 | 7.9 | 8.2 | 8.1 |
| WTTV—Indianapolis, IN | WB | 3.7 | 3.8 | 4.0 | 7.8 | 7.7 | 7.8 |
| WXIN—Indianapolis, IN | FOX | 6.5 | 5.7 | 6.1 | 13.7 | 11.7 | 11.9 |
| KSWB—San Diego, CA | WB | 3.1 | 3.8 | 4.4 | 7.7 | 9.2 | 10.3 |
| WTIC—Hartford, CT | FOX | 6.3 | 5.8 | 6.1 | 14.5 | 13.1 | 13.6 |
| WTXX—Hartford, CT | WB | 2.1 | 2.4 | 2.2 | 4.7 | 5.5 | 4.9 |
| WXMI—Grand Rapids, MI | FOX | 7.1 | 6.6 | 6.9 | 13.6 | 12.6 | 13.0 |
| WPMT—Harrisburg, PA | FOX | 6.1 | 5.8 | 5.6 | 13.9 | 12.7 | 11.8 |
| WGNO—New Orleans, LA | ABC | 4.6(3) | 4.6 | 5.0 | 9.8(3) | 9.5 | 9.8 |
| WNOL—New Orleans, LA | WB | 3.8(3) | 4.9 | 5.7 | 8.2(3) | 10.0 | 11.0 |
| WEWB—Albany, NY | WB | 2.2 | 2.0 | 2.3 | 4.3 | 3.7 | 4.3 |
| 26 Station Unweighted Average | | 4.5 | 4.8 | 5.3 | 9.9 | 10.2 | 10.7 |

(1)    Represents the estimated number of television households tuned to a specific station as a percent of total viewing households in a defined area. The percentages shown reflect the average Nielsen ratings shares for the February, May, July and November measurement periods for 7 a.m. to 1 a.m. daily.

(2)    Excludes cable, satellite, public broadcasting, foreign language and minor independent channels.

(3)    Nielsen did not release November 2005 data for WBZL-TV, WGNO-TV and WNOL-TV as a result of hurricanes in these areas. The 2005 shares for these markets reflect the average of ratings for the February, May and July measurement periods only.

Average audience shares are shown on two bases: total market, which includes all channels, and in-market stations, which includes only the major over-the-air stations. Average in-market shares are a more relevant benchmark to determine the stations' performance in their respective markets as they compare the stations' performance to their primary programming and sales competition. In 2005, the average total market share and the average in-market share for the 26-station group declined versus 2004. In several of the top 10 largest markets, the ratings decline was due in part to the rollout of Nielsen's Local People Meters ("LPMs"). LPMs have tended to reduce the overall share of broadcast television as compared to cable television and, within the broadcast television universe, disadvantage stations like Tribune's that target younger audiences. The stations were also affected by lower WB

13

Network prime-time ratings and by some audience erosion due to a lack of major new syndicated programming.

*Radio/Entertainment*

In 2005, radio/entertainment operations contributed 17% of the broadcasting and entertainment segment's operating revenues. On March 21, 2003, the Company transferred the remaining assets of the Denver radio station group (KKHK-FM, now known as KQMT-FM), with an estimated fair market value of $55 million, plus $20 million in cash to ACME Communications in exchange for the assets of KWBP-TV, Portland. WGN-AM, Chicago, is the only remaining radio station owned by the Company. Selected information for WGN-AM, Chicago, is shown in the following table:

| Format | Frequency | National Market Rank(1) | Number of Operating Stations in Market(2) | Audience Share(3) |
|---|---|---|---|---|
| WGN-AM, Chicago    Personality/Infotainment/Sports | 720-AM | 3 | 42 | 5.7% |

*(1)*

   Source: Radio markets ranked by Arbitron Metro Survey Area, Arbitron Company 2005.

*(2)*

   Source: Arbitron Company 2005.

*(3)*

   Source: Average of Winter 2004 and Spring, Summer and Fall 2005 Arbitron shares for persons 12 years old and over, 6 a.m. to midnight daily during the period measured.

Entertainment includes Tribune Entertainment Company ("Tribune Entertainment") and the Chicago Cubs baseball team. The Chicago Cubs were acquired in 1981. Cubs games are broadcast on WGN-TV and WGN-AM. Tribune Entertainment is a leading distributor of programming in the United States syndicated television, cable television and ancillary markets. Tribune Entertainment distributes its own programming together with programming licensed from third parties.

In 2005, Tribune Entertainment entered into a variety of distribution, production, and advertiser sales relationships with major suppliers such as DreamWorks SKG for the exclusive domestic syndication and ad sales of their film library, FremantleMedia, Hearst Entertainment, MGM Television, Carlton America, Sony Television and NBC/Universal Television. These arrangements comprise over 384 television and theatrical motion pictures and more than 1,289 episodes of various television series and specials including "South Park," "Family Feud," "Soul Train," "Ron Hazelton's House Calls," "Pet Keeping with Marc Morrone," and "Fine Living: Homes and Hideaways." In 2005, Tribune Entertainment also distributed its television series productions of "Andromeda," "Earth Final Conflict," "Beastmaster," "Mutant X," and "US Farm Report."

In the fall of 2006, the first of the DreamWorks SKG titles become available. In addition, Tribune Entertainment acquired the exclusive domestic broadcast syndication rights to the "American Idol" series. The weekly one-hour series, titled "American Idol Rewind," will include original, never-before-seen episodes.

Tribune Studios, a subsidiary of Tribune Entertainment, manages a 10.5-acre studio production lot in Hollywood. Management of the site includes facilities rental of nine state-of-the art digital sound stages and associated production office space.

**Investments**

The Company has investments in several public and private companies. See Note 7 to the Company's consolidated financial statements in Item 8 for further discussion of the Company's cost and equity method investments.

The Company's principal equity method investments currently include The WB Network, CareerBuilder, Classified Ventures, TV Food Network, Comcast Sports Network, ShopLocal (formerly

14

Powered by Morningstar℠ Document Research℠

CrossMedia Services), Topix.net, TMCT I and TMCT II. The WB Network provides the Company's WB affiliate television stations with original prime-time and children's programming. On Jan. 24, 2006, the Company announced that it had reached a 10-year agreement to affiliate 16 of its television stations with The CW Network, being launched in the fall of 2006. The WB Network will shut down at that time. Three of the Company's current WB Network affiliates (Philadelphia, Atlanta and Seattle) will become independent stations at that time. CareerBuilder, an online recruiting company formed in 2000, is owned equally by the Company, Knight-Ridder, Inc. and Gannett Co., Inc. Classified Ventures is a network of automotive and real estate classified advertising websites. TV Food Network is a 24-hour cable/satellite television network focusing on food and entertaining. Comcast Sports Network is a 24-hour cable/satellite television network formed in 2003, which began programming in the fall of 2004, focusing on Chicago sports teams. ShopLocal was jointly acquired in May 2004 with Gannett Co., Inc. and Knight-Ridder, Inc. ShopLocal transforms traditionally print-based retail promotions into search-based interactive formats. Each partner owns a one-third interest in ShopLocal. Topix.net is an online news and information aggregation website that continuously monitors breaking news from over 10,000 online sources and categorizes daily news content into over 300,000 topics, 24 hours a day. The Company's investments in TMCT I and TMCT II are further discussed in Note 6 to the Company's consolidated financial statements in Item 8.

**Non-Operating Items**

The Company reported several non-operating items in 2005, 2004 and 2003, which included gains and losses resulting from sales of subsidiaries and investments, changes in the fair values of the Company's PHONES derivatives and related investment, the early retirement of debt, settlement of insurance claims related to Sept. 11, 2001, write-downs of investments, and income tax adjustments, including additional tax expense associated with the Matthew Bender and Mosby tax liability. These non-operating items are further discussed in Note 2 to the Company's consolidated financial statements in Item 8.

**Governmental Regulation**

Various aspects of the Company's operations are subject to regulation by governmental authorities in the United States.

The Company's television and radio broadcasting operations are subject to FCC jurisdiction under the Communications Act of 1934, as amended. FCC rules, among other things, govern the term, renewal and transfer of radio and television broadcasting licenses, and limit concentrations of broadcasting control inconsistent with the public interest. Federal law also regulates the rates charged for political advertising and the quantity of advertising within children's programs. The Company is permitted to own both newspaper and broadcast operations in the Chicago market by virtue of "grandfather" provisions in the FCC regulations and in the Fort Lauderdale/Miami market by virtue of a temporary waiver of the television/newspaper cross-ownership rule.

Because the Times Mirror acquisition in 2000 did not involve the transfer of any broadcast station licenses, FCC approval was not required to complete the transaction. Under the television/newspaper cross-ownership rule in effect at the time of the merger, companies were generally prohibited from owning both a newspaper and a broadcast license in the same market. However, it was also the FCC's policy to permit newly created television/newspaper combinations to be held until the next broadcast license renewal. As such, license renewals for three Tribune television properties—KTLA-TV, Los Angeles (renewal in 2006), WPIX-TV, New York (renewal in 2007) and WTIC-TV, Hartford (renewal in 2007)—would be affected by the Times Mirror acquisition under the old FCC media ownership rules. On June 2, 2003, the FCC adopted new media ownership rules, including a new television/newspaper cross-ownership rule. The new rule would eliminate the cross-ownership prohibition entirely in markets with nine or more television stations. Under this rule, the Company would be permitted to retain its

15

Powered by Morningstar® Document Research℠

newspaper and television operations in each of the five markets where it owns both newspaper and television operations—New York, Los Angeles, Chicago, South Florida, and Hartford.

In September 2003, the United States Court of Appeals for the Third Circuit stayed the effectiveness of the new media ownership rules pending the outcome of appeals by advocacy groups challenging the new rules. In June 2004, the Third Circuit remanded the new rules to the FCC for further proceedings while keeping the stay in effect. As a result, the FCC will undertake a new rulemaking proceeding to address the issues raised by the Third Circuit. It is unlikely the new proceeding will be concluded before KTLA-TV's license expires in December 2006 and the Company will seek and expects to receive a waiver to allow continued ownership of both the *Los Angeles Times* and KTLA-TV pending the outcome of the FCC proceeding. The Company has a temporary waiver, pending the outcome of the same rulemaking proceeding, in connection with its 1997 acquisition of WBZL-TV, Miami, which is considered part of the market served by the *South Florida Sun-Sentinel*, published in Fort Lauderdale. The renewal application for WBZL-TV is currently pending before the FCC. Depending on the timing and outcome of the FCC proceedings on the cross-ownership rule, the Company may require waivers to allow continued ownership of its newspapers while it holds broadcast licenses in the New York and Hartford markets.

Congress removed national limits on the number of broadcast stations a licensee may own in 1996. However, federal law continues to limit the number of radio and television stations a single owner may own in a local market, and caps the percentage of the national television audience that may be reached by a licensee's television stations in the aggregate at 39%. The local ownership rules allow, under certain conditions, common ownership of two television stations and certain radio/television combinations. In 2001, the Company acquired television station WTXX-TV, Hartford, pursuant to a so-called "failing station" waiver allowing common ownership of WTIC-TV and WTXX-TV in the same market.

Television and radio broadcasting licenses are subject to renewal by the FCC, at which time they may be subject to petitions to deny the license renewal applications. At Dec. 25, 2005, the Company had FCC authorization to operate 26 television stations and one AM radio station. At Dec. 25, 2005, the Company had twelve television license renewal applications pending before the FCC (WBDC-TV, Washington, D.C., WBZL-TV, Miami, WATL-TV, Atlanta, WGNO-TV and WNOL-TV, New Orleans, WXIN-TV, WTTV-TV and WTTK-TV, Indianapolis (which rebroadcasts the signal of WTTV-TV in its entirety and has a separate license renewal application pending), WXMI-TV, Grand Rapids, WGN-TV, Chicago, KPLR-TV, St. Louis, and KWGN-TV, Denver).

The FCC has approved technical standards and channel assignments for digital television ("DTV") service. DTV permits broadcasters to transmit video images with higher resolution than existing analog signals. Operators of full-power television stations have each been assigned a second channel for DTV while they continue analog broadcasts on the original channel. After the transition is complete, broadcasters will be required to return one of the two channels to the FCC and transmit exclusively in digital format. By law, the transition to DTV is to occur by Dec. 31, 2006, subject to extension if 80% or more of U.S. households do not have a DTV receiver, a benchmark that is not expected to be met. In December 2005, the Senate passed a bill that would, among other things, extend the digital transition deadline to Feb. 17, 2009. Conversion to digital transmission is requiring all television broadcasters, including those owned by the Company, to invest in digital equipment and facilities. At Dec. 25, 2005, all of the Company's television stations were DTV compliant.

The FCC has not yet issued final DTV channel assignments for operation after the transition from analog has ended, and has not resolved a number of issues relating to the operation of DTV stations. These issues include the obligations of DTV stations to broadcast children's programming as well as additional "public interest" obligations that may be imposed on broadcasters' use of digital spectrum.

16

Powered by Morningstar® Document Research℠

From time to time, the FCC revises existing regulations and policies in ways that could affect the Company's broadcasting operations. In addition, Congress from time to time considers and adopts substantive amendments to the governing communications legislation. The Company cannot predict what regulations or legislation may be proposed or finally enacted or what effect, if any, such regulations or legislation could have on the Company's broadcasting operations.

## Employees

The average number of full-time equivalent employees of the Company in 2005 was 22,400, approximately 800 less than the average for 2004, primarily due to the elimination of approximately 900 positions in 2005, primarily in the publishing segment.

During 2005, the Company's publishing segment employed approximately 18,800 full-time equivalent employees, about 16% of whom were represented by unions covered under 19 labor contracts. Contracts with unionized employees of the publishing segment expire at various times through December 2007.

The broadcasting and entertainment segment had an average of 3,370 full-time equivalent employees in 2005. Approximately 23% of these employees were represented by unions covered under 21 labor contracts. Contracts with unionized employees of the broadcasting and entertainment segment expire at various times through July 2007.

## Executive Officers of the Company

Information with respect to the executive officers of the Company as of Feb. 17, 2006, is set forth below. Their ages are indicated in parentheses. The descriptions of the business experience of these individuals include the principal positions held by them since February 2001. Unless otherwise indicated, all references to positions are to officers of the Company.

Dennis J. FitzSimons (55)
Chairman (since January 2004), Chief Executive Officer (since January 2003) and President (since July 2001); Chief Operating Officer from July 2001 until December 2002; Executive Vice President from January 2000 until July 2001; President of Tribune Broadcasting Company* until January 2003.

Donald C. Grenesko (57)
Senior Vice President/Finance and Administration.

Crane H. Kenney (43)
Senior Vice President, General Counsel and Secretary.

Timothy J. Landon (43)
President of Tribune Interactive, Inc.* since March 2004; President of Tribune Classified* from June 2000 until March 2004.

Thomas D. Leach (45)
Senior Vice President/Development since February 2005; Vice President/Development from February 2004 until February 2005; Vice President and Chief Financial Officer of Tribune Broadcasting Company* from March 2001 until January 2004; Vice President/Development until February 2001.

Luis E. Lewin (57)
Senior Vice President/Human Resources.

R. Mark Mallory (55)
Vice President and Controller.

17

Powered by Morningstar® Document Research℠

Ruthellyn Musil (54)
Senior Vice President/Corporate Relations since February 2004; Vice President/Corporate Relations until February 2004.

John E. Reardon (52)
President of Tribune Broadcasting Company* since November 2005; Vice President of Tribune Broadcasting Company* from March 2004 until November 2005; Vice President and General Manager of KTLA-TV, Los Angeles* until March 2004.

Scott C. Smith (55)
President of Tribune Publishing Company* since January 2005; Chief Operating Officer of Tribune Publishing Company* from November 2004 until January 2005; President of Chicago Tribune Company* until November 2004.

*          A subsidiary or a division of the Company

**Available Information**

    The Company maintains an Internet website at www.tribune.com where the Company's Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and all amendments to those reports are available without charge, as soon as reasonably practicable following the time that they are filed with or furnished to the Securities and Exchange Commission.

18

## ITEM 1A. RISK FACTORS.

The foregoing business discussion and the other information included in this Form 10-K should be read in conjunction with the following risks, trends and uncertainties, any of which, either individually or in the aggregate, could materially and adversely affect our business, operating results or financial condition.

### Advertising demand will continue to be impacted by changes in economic conditions and fragmentation of the media landscape

Advertising revenue is the primary source of revenue for our publishing and broadcasting businesses. National and local economic conditions, particularly in major metropolitan markets, affect the levels of retail, national and classified newspaper advertising revenue, as well as television advertising revenue. Changes in Gross Domestic Product, consumer spending, auto sales, housing sales, unemployment rates, job creation and circulation levels and rates all impact demand for advertising. Consolidation across various industries, particularly large department store and telecommunications companies, may also reduce our overall advertising revenue.

Competition from other media, including other metropolitan, suburban and national newspapers, broadcasters, cable systems and networks, satellite television and radio, websites, magazines, direct marketing and solo and shared mail programs, affects our ability to retain advertising clients and raise rates. In recent years, Internet sites devoted to recruitment, automobile and real estate have become significant competitors of our newspapers and websites for classified advertising. While we have invested in successful Internet ventures such as CareerBuilder and Classified Ventures to capture some of the advertising dollars that have migrated online, retaining our historical share of classified advertising revenues remains a challenge.

Seasonal variations in consumer spending cause our quarterly advertising revenues to fluctuate. Second and fourth quarter advertising revenues are typically higher than first and third quarter advertising revenues, reflecting the slower economic activity in the winter and summer and the stronger fourth quarter holiday season.

In broadcasting, the proliferation of cable and satellite channels, advances in mobile and wireless technology, the migration of television audiences to the Internet and the viewing public's increased control over the manner and timing of their media consumption through personal video recording devices, have resulted in greater fragmentation of the television viewing audience and a more difficult sales environment.

### Circulation and audience share may decline as consumers migrate to other media alternatives

Competition for newspaper advertising is based on reader demographics, price, service, advertiser results, and circulation and readership levels, while competition for circulation is based upon the content of the newspaper, service and price. Competition for television advertising is based on audience share and ratings information, audience demographics and price.

The National Do Not Call Registry has impacted the way newspapers sell home-delivery circulation, particularly for the larger newspapers which historically have relied on telemarketing. Similarly, Nielsen's Local People Meters, which capture viewership data in a different manner than historical Nielsen viewership data collection methods, have tended to reduce the overall share of broadcast television compared to cable television and, within the broadcast television universe, disadvantage stations like ours that target younger audiences.

Both advertising and circulation revenues are being affected by consumer trends, including declining newspaper buying by young people and the migration to other available forms of media for news. In order to address declining circulation in certain markets, we may increase marketing designed

19

Powered by Morningstar® Document Research℠

to retain our existing subscriber base and continue to introduce niche publications targeted at commuters and young adults. We may also increase marketing efforts to drive traffic to our proprietary websites.

### Changes in the regulatory landscape could affect our business operations and asset mix

Various aspects of our operations are subject to regulation by governmental authorities in the United States. Changes in the current regulatory environment could result in increased operating costs or divestitures of several of our properties.

Our television and radio broadcasting operations are subject to FCC jurisdiction under the Communications Act of 1934, as amended. FCC rules, among other things, govern the term, renewal and transfer of radio and television broadcasting licenses and limit concentrations of broadcasting control inconsistent with the public interest. Federal law also regulates the rates charged for both political advertising and the quantity of advertising within children's programs.

From time to time, the FCC revises existing regulations and policies in ways that could affect our broadcasting operations. In addition, Congress from time to time considers and adopts substantive amendments to governing communications legislation. We cannot predict what regulations or legislation may be proposed or finally enacted or what effect, if any, such regulations or legislation could have on our broadcasting operations. See "Item 1. Business—Governmental Regulation" for a discussion of the pending FCC review of the television/newspaper cross-ownership rule and the effect the outcome could have on our business.

### The availability and cost of quality syndicated programming may impact television ratings

The cost of syndicated programming represents a significant portion of television operating expenses. Programming emphasis at our stations is placed on network-provided programming, syndicated series, feature motion pictures, local and regional sports coverage, news, and children's programs. Most of our stations' programming is acquired from outside sources, including the networks with which our stations are affiliated, and some is produced locally or supplied by Tribune Entertainment Company. Syndicated programming costs are impacted largely by market factors, including demand from other stations or cable channels within the market. Availability of syndicated programming depends on the production of compelling programming and the willingness of studios to offer the programming to unaffiliated buyers. Our inability to continue to acquire or produce affordable programming for our stations could adversely affect operating results or our financial condition.

### Events beyond our control may result in unexpected adverse operating results

Our results could be affected in various ways by global or domestic events beyond our control, such as wars, political unrest, acts of terrorism, and natural disasters. Such events can quickly result in significant declines in advertising revenues and significant increases in newsgathering costs. Coverage of the war in Iraq and Hurricane Katrina are two examples where newsgathering costs increased and, in the case of Hurricane Katrina, revenues dropped off significantly at our two New Orleans television stations.

### Newsprint prices may continue to be volatile and difficult to predict and control

Newsprint is one of the largest expenses of our publishing units. The price of newsprint has historically been volatile and the consolidation of North American newsprint mills over the years has reduced the number of suppliers. We have historically been able to realize favorable newsprint pricing by virtue of our company-wide volume and a long-term contract with a significant supplier. Failure to maintain our current consumption levels, further supplier consolidation or the inability to maintain our existing relationships with our newsprint suppliers could adversely impact newsprint prices in the future.

20

Source: TRIBUNE CO, 10-K, February 28, 2006                                    Powered by Morningstar® Document Research℠

**Changes in our credit ratings may affect our borrowing costs**

Tribune currently has investment-grade credit ratings for its commercial paper and long-term debt. These investment-grade credit ratings afford us lower borrowing rates in both the commercial paper markets and in connection with senior debt offerings. In order to maintain this investment-grade rating, the credit rating agencies require us to meet certain financial performance ratios. Increased debt levels and/or decreased earnings could result in downgrades in our credit ratings, which, in turn, could reduce the total amount of commercial paper we could issue, raise our commercial paper borrowing costs and/or raise our long-term debt borrowing rates.

**Changes in accounting standards can significantly impact reported earnings and operating results**

Generally accepted accounting principles and accompanying pronouncements and implementation guidelines for many aspects of our business, including those related to intangible assets, pensions, income taxes, derivatives, share-based compensation, and broadcast rights, are complex and involve significant judgments. Changes in these rules or their interpretation could significantly change our reported earnings and operating results. See "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates" and Note 1 in "Item 8. Financial Statements and Supplementary Data."

**Adverse results from litigation or governmental investigations can impact our business practices and operating results**

From time to time, Tribune and its subsidiaries are parties to litigation and regulatory, environmental and other proceedings with governmental authorities and administrative agencies. Adverse outcomes in lawsuits or investigations could result in significant monetary damages or injunctive relief that could adversely affect our operating results or financial condition as well as our ability to conduct our businesses as they are presently being conducted.

**We could be faced with additional tax liabilities**

We are subject to both federal and state income taxes and are regularly audited by federal and state taxing authorities. Significant judgment is required in evaluating our tax positions and in establishing appropriate reserves. We analyze our tax positions and reserves on an ongoing basis and make adjustments when warranted based on changes in facts and circumstances. While we believe our tax positions and reserves are reasonable, the resolution of our tax issues are unpredictable and could negatively impact our effective tax rate, net income or cash flows for the period or periods in question.

**Labor strikes, lock-outs and protracted negotiations can lead to business interruptions and increased operating costs**

Union employees comprise about 20% of our workforce. We are required to negotiate collective bargaining agreements across our business units on an ongoing basis. Complications in labor negotiations can lead to work slowdowns or other business interruptions and greater overall employee costs.

**Acquisitions, investments and divestitures pose inherent financial and other risks and challenges**

We continuously evaluate our businesses and make strategic acquisitions and investments, either individually or with partners, and divestitures as part of our strategic plan. These transactions involve challenges and risks in negotiation, execution, valuation and integration. Moreover, competition for certain types of acquisitions is significant, particularly in the Interactive space. Even if successfully negotiated, closed and integrated, certain acquisitions or investments may prove not to advance our business strategy and may fall short of expected return on investment targets. In certain of our investments, we take a minority position in a company with limited voting rights and an inability to exert absolute control over the entity.

21

Powered by Morningstar® Document Research℠

## ITEM 1B. UNRESOLVED STAFF COMMENTS.

Not applicable.

## ITEM 2. PROPERTIES.

The corporate headquarters of the Company are located at 435 North Michigan Avenue, Chicago, Illinois. The general character, location and approximate size of the principal physical properties used by the Company on Dec. 25, 2005, are listed below. In total, the Company owns or leases transmitter sites, parking lots and other land aggregating approximately 1,100 acres in 97 separate locations. In addition to those properties listed below, the Company owns or leases an aggregate of approximately 3,015,000 square feet of office and production space in 311 locations. The Company also owns Wrigley Field, the 39,620-seat stadium used by the Chicago Cubs baseball team. The Company considers its various properties to be in good condition and suitable for the purposes for which they are used.

| General Character of Property | Approximate Area in Square Feet | |
|---|---|---|
| | Owned | Leased(1) |
| **Publishing:** | | |
| Printing plants, business and editorial offices, and warehouse space located in: | | |
| Los Angeles, CA | 656,000 | 1,375,000 |
| Chicago, IL | 1,582,000(2) | 89,000 |
| Melville, NY | — | 717,000 |
| Baltimore, MD | 10,000 | 909,000 |
| Hartford, CT | 173,000 | 337,000 |
| Orlando, FL | 374,000 | 99,000 |
| Deerfield Beach, FL | 320,000 | 44,000 |
| Costa Mesa, CA | 339,000 | 47,000 |
| Irwindale, CA | — | 325,000 |
| Allentown, PA | 171,000 | 2,000 |
| Newport News, VA | 248,000(3) | 50,000 |
| Northlake, IL | 251,000 | 20,000 |
| Fort Lauderdale, FL | — | 246,000 |
| Oakbrook, IL | — | 224,000 |
| Stamford, CT | 85,000 | — |
| Miller Place, NY | 82,000 | — |
| Glens Falls, NY | — | 59,000 |
| Bel Air, MD | 52,000 | — |
| Columbia, MD | 29,000 | 14,000 |
| Williamsburg, VA | 25,000 | 3,000 |
| Greenwich, CT | 24,000 | — |
| **Broadcasting and entertainment:** | | |
| Business offices, studios and transmitters located in: | | |
| Los Angeles, CA | 309,000 | 65,000 |
| Chicago, IL | 132,000 | 4,000 |
| New York, NY | — | 121,000 |
| Indianapolis, IN | 79,000 | |
| Seattle, WA | 68,000 | |
| Greenwood Village, CO | 42,000 | |
| Maryland Heights, MO | — | 39,000 |

22

Powered by Morningstar® Document Research℠

| | | |
|---|---|---|
| Atlanta, GA | 36,000 | |
| Houston, TX | 35,000 | |
| Dallas, TX | 33,000 | |
| San Diego, CA | — | 26,000 |
| Hartford, CT | — | 22,000 |
| Boston, MA | 47,000 | |
| Philadelphia, PA | 21,000 | 4,000 |
| Sacramento, CA | 24,000 | |
| Grand Rapids, MI | 21,000 | |
| Hollywood, FL | 20,000 | |
| York, PA | 20,000 | |
| Beaverton, OR | 14,000 | |
| Washington, DC | — | 13,000 |

(1)      The Company has financed eight real properties, constituting 2,987,000 square feet from TMCT I, under a property financing arrangement with an initial term of 12 years, which expires August 2009. See Note 6 to the Company's consolidated financial statements in Item 8 for further discussion.

(2)      Includes Tribune Tower, an approximately 630,000 square foot office building in downtown Chicago, and Freedom Center, the approximately 943,000 square foot production center of the Chicago Tribune. Tribune Tower houses the Company's corporate headquarters, the Chicago Tribune's business and editorial offices, offices of various subsidiary companies and approximately 40,000 square feet of space leased to unaffiliated tenants. Freedom Center houses the Chicago Tribune's printing, packaging and distribution operations.

(3)      The *Los Angeles Times'* San Fernando Valley production facility, a 248,000 square foot facility, is held for sale. See Note 2 to the Company's consolidated financial statements in Item 8 for further discussion.

## ITEM 3. LEGAL PROCEEDINGS.

The Company and its subsidiaries are defendants from time to time in actions for matters arising out of their business operations. In addition, the Company and its subsidiaries are involved from time to time as parties in various regulatory, environmental and other proceedings with governmental authorities and administrative agencies.

In February 2004, a purported class action lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* and *Hoy*, New York, alleging that they were overcharged for advertising as a result of inflated circulation numbers at these two publications. The purported class action also alleges that entities that paid a *Newsday* subsidiary to deliver advertising flyers were overcharged. In July 2004, another lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* alleging damages resulting from inflated *Newsday* circulation numbers as well as federal and state antitrust violations. The Company intends to vigorously defend these suits.

On June 17, 2004, the Company publicly disclosed that it would reduce its reported circulation for both *Newsday* and *Hoy*, New York for the 12-month period ending Sept. 30, 2003 and the six-month period ending March 31, 2004. The circulation adjustments were the result of a review of reported circulation at *Newsday* and *Hoy*, New York, conducted by the Company's internal audit staff and the Audit Bureau of Circulations ("ABC"). Subsequent to the June 17th disclosure, the Company continued its internal review and found additional misstatements for these time periods, as well as misstatements that impacted the 12-month period ending Sept. 30, 2002. On Sept. 10, 2004, the Company announced additional revisions to the circulation figures for *Newsday* and *Hoy*, New York, for the 12-month period ending Sept. 30, 2003 and the six-month period ending March 31, 2004. In November 2004, ABC released its audit reports for *Newsday* and *Hoy*, New York, for the 12-month period ending Sept. 30, 2003. In March 2005, ABC released its audit reports for *Newsday* for the six-month periods ending

23

Powered by Morningstar® Document Research℠

March 31, 2004 and Sept. 30, 2004. In May 2005, ABC released its audit reports for *Hoy*, New York, for the six-month periods ending March 31, 2004 and Sept. 30, 2004. Audited circulation figures for both *Newsday* and *Hoy*, New York, for these periods were within the ranges previously disclosed. After releasing these reports, ABC recalled *Newsday's* audit report and Publisher's Statements covering the 12-month period ending Sept. 30, 2002 and all of *Hoy*, New York's audit reports and Publisher's Statements covering the periods ending March 31, 2000 through Sept. 30, 2002, stating that, due to insufficient information, they could not verify circulation for those periods. ABC also withdrew its unqualified opinion as to the material fairness of the circulation reported for *Newsday* for the 12-month periods ending Sept. 30, 2000 and Sept. 30, 2001, again citing insufficient information necessary to confirm the unqualified opinions. ABC's circulation audit at *Newsday* for the six-month period ending March 31, 2005 was issued in October 2005 with no significant adjustments. ABC's circulation audit at *Hoy*, New York, for the six-month period ending March 31, 2005 was issued in January 2006 with no significant adjustments. Circulation audits at *Newsday* and *Hoy*, New York, for the period ending September 2005 are ongoing. *Hoy*, New York, converted to free distribution in January 2006. Due to this change, *Hoy*, New York's circulation for the period ended September 2005 and going forward will be audited by the Certified Audit of Circulations.

As a result of misstatements of reported circulation at *Newsday* and *Hoy*, New York, the Company recorded a pretax charge of $35 million in the second quarter of 2004 as its estimate of the probable cost to settle with advertisers based upon facts available at July 30, 2004, the date of the Company's second quarter 2004 Form 10-Q filing. Subsequent to that date, the Company found additional circulation misstatements, which increased the cost to settle with advertisers. As a result, the Company recorded an additional pretax charge of $55 million in the third quarter of 2004 to increase the estimate of the probable cost to settle with *Newsday* and *Hoy*, New York, advertisers to a total of $90 million. The Company will continue to evaluate the adequacy of this charge on an ongoing basis (see Note 3 to the Company's consolidated financial statements in Item 8).

In addition to the advertiser lawsuits, several class action and shareholder derivative suits have been filed against the Company and certain of its current and former directors and officers as a result of the circulation misstatements at *Newsday* and *Hoy*, New York. The suits, which are currently pending in Illinois Federal and State Courts, allege breaches of fiduciary duties and other managerial and director failings under Delaware law, the federal securities laws and ERISA. The Company believes the complaints are without merit and intends to vigorously defend the suits.

The Securities and Exchange Commission, the United States Attorney for the Eastern District of New York and the Nassau County District Attorney are conducting inquiries into the circulation practices at *Newsday* and *Hoy*, New York. The Company is cooperating fully with these inquiries. The Company cannot predict with certainty the outcome of these inquiries.

In March 1997, the Company acquired Renaissance Communications Corp., a publicly traded company that owned six television stations, for $1.1 billion in cash. The stations acquired were KDAF-TV, Dallas, WBZL-TV, Miami, KTXL-TV, Sacramento, WXIN-TV, Indianapolis, WTIC-TV, Hartford, and WPMT-TV, Harrisburg. The FCC granted a 12-month waiver of its rule prohibiting television/newspaper cross-ownership in the same market, which relates to the WBZL-TV, Miami television station and the *South Florida Sun-Sentinel* newspaper. In March 1998, the FCC granted the Company a waiver extension to allow continued ownership of both WBZL-TV, Miami, and the *South Florida Sun-Sentinel* newspaper until the FCC concludes its review of the television/newspaper cross-ownership rule. As discussed below, the new television/newspaper cross-ownership rule adopted by the FCC in June 2003 permits Tribune to own the newspapers and broadcast licenses in all of its current cross-owned markets, including South Florida. However, also as discussed below, the new television/newspaper cross-ownership rule has been remanded to the FCC for further proceedings. Depending on the outcome of the FCC proceedings, the Company may require a waiver to allow continued ownership of both WBZL-TV, Miami, and the *South Florida Sun-Sentinel*.

24

In March 2000, as a result of the Times Mirror merger, the Company acquired the *Los Angeles Times, Newsday, The Baltimore Sun, The Hartford Courant, The Morning Call, The Advocate, Greenwich Time* and several smaller newspapers. Because the Times Mirror acquisition did not involve the transfer of any broadcast station licenses, approval of the FCC was not required to complete the transaction. Under the FCC's television/newspaper cross-ownership rule in effect at the time of the merger, companies were generally prohibited from owning both a newspaper and a broadcast license in the same market. However, it was also the FCC's policy to permit newly created television/newspaper combinations to be held until the next broadcast license renewal. As such, license renewals for three Tribune television properties—KTLA-TV, Los Angeles (renewal in 2006), WPIX-TV, New York (renewal in 2007) and WTIC-TV, Hartford (renewal in 2007), would be affected by the Times Mirror acquisition under the old FCC media ownership rules. It is unlikely that the new proceeding will be concluded before these licenses expire, and the Company will seek and expects to receive waivers to allow continued ownership of both newspapers and broadcast licenses in the Los Angeles, New York and Hartford markets.

In 2001, the Company received FCC authorization to operate television station WTXX-TV, Hartford. The FCC granted a so-called "failing station" waiver to allow common ownership of WTIC-TV, Hartford, and WTXX-TV, Hartford. In addition, the FCC granted a temporary six-month waiver of the newspaper-broadcast ownership prohibition. The temporary waiver has been extended until the FCC has completed its review of the renewal application for WTXX-TV. Should there be no timely relief forthcoming from the FCC's proceeding, the Company will seek and expects to receive a waiver to allow continued ownership of both WTIC-TV, Hartford, and WTXX-TV, Hartford, and *The Hartford Courant*.

On June 2, 2003, the FCC adopted new media ownership rules, including a new television/newspaper cross-ownership rule. The new rule would eliminate the cross-ownership prohibition entirely in markets with nine or more television stations and permit combinations of one newspaper and one television station in markets having from four to eight television stations. Under this rule, the Company would be permitted to retain its newspaper and television operations in each of the five markets where it owns both—New York, Los Angeles, Chicago, South Florida, and Hartford. In September 2003, the United States Court of Appeals for the Third Circuit stayed the effectiveness of the new media ownership rules pending the outcome of appeals by advocacy groups challenging the new rules. In June 2004, the Third Circuit remanded the new rules to the FCC for further proceedings while keeping the stay in effect. On Jan. 28, 2005, the Company and other media companies filed a joint petition seeking United States Supreme Court review of the June 2004 Third Circuit remand. On June 13, 2005, the Supreme Court declined to review the petition, without addressing the Constitutional arguments raised and without foreclosing additional appeals if the Company's interests are not adequately addressed as part of the FCC's remand proceeding. While the Company remains optimistic that the cross-ownership ban will ultimately be loosened in major markets, it cannot predict with certainty the timing or the outcome of the FCC's remand proceeding.

During 1998, Times Mirror, which was acquired by the Company in 2000, disposed of its Matthew Bender and Mosby subsidiaries in separate transactions, which were structured to qualify as tax-free reorganizations under the Internal Revenue Code. The Company believes these transactions were completed on a tax-free basis. However, the Internal Revenue Service ("IRS") audited the transactions and disagreed with the position taken by Times Mirror. In the fourth quarter of 2001, the Company received an IRS adjustment to increase Times Mirror's 1998 taxable income by approximately $1.6 billion. The Company filed a petition in United States Tax Court in November 2002 to contest the IRS position, and in December 2004, the Company presented its position in United States Tax Court.

On Sept. 27, 2005, the United States Tax Court issued an opinion contrary to the Company's position and determined that the Matthew Bender transaction was a taxable sale. In January 2006, the Tax Court extended its opinion in the Matthew Bender case to the Mosby transaction given the

25

similarity of the two transactions. Taxes and related interest for both the Matthew Bender and Mosby transactions total approximately $1 billion. Over time, deductions for state taxes and interest are expected to reduce the net cash outlay to approximately $840 million.

The Company will appeal the Tax Court ruling to the United States Court of Appeals for the Seventh Circuit. The Company does not expect a ruling before the first half of 2007. The Company cannot predict with certainty the outcome of this appeal.

Times Mirror established a tax reserve of $180 million in 1998 when it entered into the transactions. The reserve represented Times Mirror's best estimate of the amount the expected IRS and state income tax claims could be settled for based upon an analysis of the facts and circumstances surrounding the issue. The Company maintained this initial reserve, plus interest, and evaluated the adequacy of the reserve on a periodic basis. As a result of the Tax Court ruling, the Company increased its tax reserve by an additional $609 million in the third quarter of 2005 by recording additional income tax expense of $150 million, representing additional after-tax interest applicable to the post-acquisition period, and goodwill of $459 million. On Sept. 30, 2005, the Company paid $880 million to the IRS, representing the federal tax and interest owed on the transactions, and financed the payment through the issuance of commercial paper. The Company expects to make related state tax and interest payments of approximately $125 million during 2006. See Note 12 to the Company's consolidated financial statements in Item 8.

The Company does not believe that any other matters or proceedings presently pending will have a material adverse effect on its consolidated financial position, results of operations or liquidity.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.

Not applicable.

26

PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.

The Company's common stock is presently listed on the New York, Chicago and Pacific stock exchanges. The high and low sales prices of the common stock by fiscal quarter for the two most recent fiscal years, as reported on the New York Stock Exchange Composite Transactions list, were as follows:

| Quarter | 2005 | | 2004 | |
|---|---|---|---|---|
| | High | Low | High | Low |
| First | $ 42.37 | $ 38.59 | $ 53.00 | $ 48.89 |
| Second | 40.14 | 35.02 | 51.90 | 44.94 |
| Third | 39.56 | 34.53 | 45.85 | 39.20 |
| Fourth | 36.15 | 30.05 | 44.32 | 40.50 |

At Feb. 17, 2006, there were 6,461 holders of record of the Company's common stock. Quarterly cash dividends declared on common stock were $.18 per share for each quarter during 2005 and $.12 per share for each quarter during 2004. Total cash dividends declared on common stock by the Company were $225 million for 2005 and $155 million for 2004. The Company announced in February 2006 that its quarterly cash dividends would be $.18 per share in 2006.

In 2000, the Company's Board of Directors authorized the Company to repurchase $2.5 billion of its common stock. Through Dec. 25, 2005, the Company repurchased 56 million shares of its common stock at a cost of $2.3 billion under this authorization. In December 2005, the Board of Directors authorized additional repurchases of $1 billion (inclusive of $160 million of remaining authority under the 2000 stock repurchase authorization). Repurchases, by fiscal period, for 2005 were as follows (in thousands, except average price):

| | Shares Repurchased | Average Price | Total Number of Shares Repurchased | Value of Shares that May Yet be Repurchased |
|---|---|---|---|---|
| Period 1 (5 weeks ended Jan. 30, 2005) | — | $ — | 44,245 | $ 600,879 |
| Period 2 (4 weeks ended Feb. 27, 2005) | 100 | 41.69 | 44,345 | 596,703 |
| Period 3 (4 weeks ended March 27, 2005) | — | — | 44,345 | 596,703 |
| Period 4 (4 weeks ended April 24, 2005) | 591 | 38.15 | 44,936 | 574,153 |
| Period 5 (4 weeks ended May 22, 2005) | 2,072 | 38.00 | 47,008 | 495,371 |
| Period 6 (5 weeks ended June 26, 2005) | 2,660 | 36.02 | 49,668 | 399,480 |
| Period 7 (5 weeks ended July 31, 2005) | 935 | 35.75 | 50,603 | 366,025 |
| Period 8 (4 weeks ended Aug. 28, 2005) | 317 | 37.64 | 50,920 | 354,084 |
| Period 9 (4 weeks ended Sept. 25, 2005) | 2,311 | 37.84 | 53,231 | 266,561 |
| Period 10 (4 weeks ended Oct. 23, 2005) | 1,575 | 34.26 | 54,806 | 212,547 |
| Period 11 (4 weeks ended Nov. 20, 2005) | 1,170 | 31.75 | 55,976 | 175,369 |
| Period 12 (5 weeks ended Dec. 25, 2005) | 450 | 32.38 | 56,426 | 1,000,000 |

## ITEM 6. SELECTED FINANCIAL DATA.

Selected financial data for the years 1995 through 2005 is contained under the heading "Eleven Year Financial Summary" on pages 110 and 111 and is derived from financial statements for those years. The information contained in the "Eleven Year Financial Summary" is not necessarily indicative of the results of operations to be expected for future years, and should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in Item 7 and the consolidated financial statements and related notes thereto included in Item 8 of this Form 10-K which were audited by the Company's independent registered public accounting firm, PricewaterhouseCoopers LLP.

27

Powered by Morningstar® Document Research℠

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.

The following discussion presents the significant factors that have affected the businesses of Tribune Company and its subsidiaries (the "Company") over the last three years. This commentary should be read in conjunction with the Company's consolidated financial statements and "Eleven Year Financial Summary," which are also presented in this Form 10-K. Certain prior year amounts have been reclassified to conform with the 2005 presentation. These reclassifications had no impact on reported prior year total revenues, operating profit or net income.

### FORWARD-LOOKING STATEMENTS

The discussion contained in this Item 7 (including, in particular, the discussion under "Overview"), the information contained in Item 7A, "Quantitative and Qualitative Disclosures about Market Risk," and the information contained in the subsequent notes to the consolidated financial statements, contain certain forward-looking statements that are based largely on the Company's current expectations. Forward-looking statements are subject to certain risks, trends and uncertainties that could cause actual results and achievements to differ materially from those expressed in the forward-looking statements including, but not limited to, the items discussed in Item 1A, "Risk Factors." Such risks, trends and uncertainties, which in some instances are beyond the Company's control, include: changes in advertising demand; circulation levels and audience shares; regulatory and judicial rulings; availability and cost of broadcast rights; competition and other economic conditions; changes in newsprint prices; changes in the Company's credit ratings and interest rates; changes in accounting standards; adverse results from litigation, governmental investigations or tax-related proceedings or audits; the effect of labor strikes, lock-outs and negotiations; the effect of acquisitions, investments and divestitures; the effect of derivative transactions; and the Company's reliance on third-party vendors for various services. The words "believe," "expect," "anticipate," "estimate," "could," "should," "intend" and similar expressions generally identify forward-looking statements. Readers are cautioned not to place undue reliance on such forward-looking statements, which are being made as of the date of this filing. The Company undertakes no obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise.

### OVERVIEW

Tribune Company is a media and entertainment company, operating primarily in the United States, that conducts its operations through two business segments: publishing and broadcasting and entertainment. These segments reflect the manner in which the Company sells its products to the marketplace, manages its operations and makes business decisions. The Company's media operations are principally in major metropolitan areas of the United States and compete against similar media and other types of media on both a local and national basis.

Publishing currently consists primarily of 11 daily newspapers, which include related businesses such as interactive websites. Publishing represented 73% of the Company's consolidated revenues in 2005. About 79% of publishing revenues were derived from advertising. These revenues were generated from the sale of advertising space in published issues of the newspapers and on interactive websites. Approximately 15% of publishing revenues were generated from the sales of newspapers to individual subscribers or to sales outlets, which re-sell the newspapers. The remaining 6% of revenues came from a variety of activities including the syndication of columns, features, information and comics to newspapers, commercial printing operations, sales of entertainment listings and other publishing-related activities.

Publishing advertising revenues are comprised of three basic categories: retail, national and classified. Changes in advertising revenues are heavily correlated with changes in the level of economic

28

activity in the United States. Changes in Gross Domestic Product, consumer spending, auto sales, housing sales, unemployment rates, job creation, circulation levels and rates all impact demand for advertising in the Company's newspapers. The Company's advertising revenues are subject to changes in these factors both on a national level and on a local level in its markets.

Significant expense categories for publishing include compensation, newsprint and ink and other operating expenses. Compensation, which includes benefits expense, represented 42% of publishing's consolidated operating expenses in 2005. Compensation expense is affected by many factors, including the level of merit increases, the number of full-time equivalent employees and changes in the design and costs of the Company's various employee benefit plans. Newsprint and ink represented 15% of the 2005 operating expenses for publishing. The Company consumed approximately 814,000 metric tons of newsprint in 2005. Newsprint is a commodity and pricing can vary significantly between years. Other expenses comprised 43% of total operating expenses. These expenses are principally for the distribution of the newspaper, promotional activities and other general and administrative expenses. These expenses are typically subject to less variability.

Broadcasting and entertainment currently consists of 26 television stations, one radio station, the Chicago Cubs and Tribune Entertainment, a company that distributes its own programming together with programming licensed from third parties. Broadcasting and entertainment represented 27% of the Company's consolidated revenues in 2005. About 88% of these revenues came from the sale of advertising spots on its television stations. Changes in advertising revenues are heavily correlated with and influenced by changes in the level of economic activity in the United States. Changes in Gross Domestic Product, consumer spending levels, auto sales, programming content, audience share and rates all impact demand for advertising on the Company's television stations. The Company's advertising revenues are subject to changes in these factors both on a national level and on a local level in the markets in which it operates.

Significant expense categories for broadcasting and entertainment include programming expense, compensation and other expenses. Programming expense represented 38% of 2005 expenses. The level of programming expense is affected by the cost of programs available for purchase and the selection of programs aired by the Company's television stations. Compensation expense represented 41% of broadcasting and entertainment's 2005 expenses and is impacted by the same factors as noted for publishing. Other expenses represented 21% of total operating expenses and are for promotional activities and other station operating expenses.

The Company uses revenues and operating profit as ways to measure the financial performance of its business segments. The Company uses average net paid circulation for its newspapers and average audience share for its television stations as a means to measure its publishing and broadcasting and entertainment market shares and performance.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The Company's significant policies are summarized in Note 1 to the Company's consolidated financial statements in Item 8. These policies conform with accounting principles generally accepted in the United States of America and reflect practices appropriate to the Company's businesses. The preparation of the Company's consolidated financial statements requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from these estimates. On an on-going basis, the Company evaluates its policies and estimates, including those related to income taxes, pension and postretirement benefits, broadcast rights, goodwill and other intangible assets, self-insurance liabilities, accounts receivable allowances and stock-based compensation.

Management has discussed with the Audit Committee of the Board of Directors the development, selection and disclosure of the critical accounting policies and estimates and the application of these

29

Powered by Morningstar® Document Research℠

policies and estimates. In addition, there are other items within the financial statements that require estimation, but are not deemed to be critical accounting policies and estimates. Changes in the estimates used in these and other items could have a material impact on the financial statements.

### Income Taxes

Provisions for federal and state income taxes are calculated on reported pretax earnings based on current tax laws and also include, in the current period, the cumulative effect of any changes in tax rates from those used previously in determining deferred tax assets and liabilities. Taxable income reported to the taxing jurisdictions in which the Company operates often differs from pretax earnings because some items of income and expense are recognized in different time periods for income tax purposes. The Company provides deferred taxes on these temporary differences in accordance with Financial Accounting Standard ("FAS") No. 109, "Accounting for Income Taxes." Taxable income also may differ from pretax earnings due to statutory provisions under which specific revenues are exempt from taxation and specific expenses are not allowable as deductions. The Company establishes reserves for income tax when it is probable that one or more of the taxing authorities will challenge and disallow a position taken by the Company in its income tax returns and the resulting liability is estimable. The consolidated tax provision and related accruals include estimates of the potential taxes and related interest as deemed appropriate. These estimates are reevaluated and adjusted, if appropriate, on a quarterly basis. Although management believes its estimates and judgments are reasonable, the resolutions of the Company's tax issues are unpredictable and could result in tax liabilities that are significantly higher or lower than that which has been provided by the Company. See Note 12 to the Company's consolidated financial statements in Item 8.

### Pension and Postretirement Benefits

The Company provides defined benefit pension, postretirement health care and life insurance benefits to eligible employees under a variety of plans (see Note 13 to the Company's consolidated financial statements in Item 8). Accounting for pension and postretirement benefits requires the use of several assumptions.

Weighted average assumptions used each year in accounting for pension benefits and other postretirement benefits were:

|  | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
|  | 2005 | 2004 | 2005 | 2004 |
| Discount rate for expense | 5.75% | 6.25% | 5.75% | 6.25% |
| Discount rate for obligations | 5.50% | 5.75% | 5.50% | 5.75% |
| Increase in future salary levels for expense | 3.50% | 3.75% | — | — |
| Increase in future salary levels for obligations | 3.50% | 3.50% | — | — |
| Long-term rate of return on plans' assets | 8.50% | 8.50% | — | — |

The Company expects to use a long-term rate of return assumption of 8.5% in 2006, consistent with the 2005 assumption. The long-term rate of return assumption is subject to change due to the fluctuation of returns in the overall equity and debt markets. As of the date of this report, a 0.5% decrease in the Company's long-term rate of return assumption would result in an $8 million increase in the Company's net pension expense. In 2005, the pension plans' assets earned a return of approximately 8%. The Company will use a discount rate of 5.5% for expense in 2006.

At Dec. 25, 2005 and Dec. 26, 2004, the Company's prepaid pension asset included an unrecognized net actuarial loss of $870 million and $803 million, respectively. A significant portion of this net actuarial loss resulted from the difference between the Company's expected returns on plan

30

assets and the actual losses on plan assets in 2002 and 2001. Expected returns on plan assets were $158 million and $176 million in 2002 and 2001, respectively; actual losses were $161 million and $113 million, respectively. In accordance with FAS No. 87, "Employers' Accounting for Pensions," the actuarial loss will be recognized in net periodic pension expense over the estimated average remaining service period of active employees expected to receive benefits. The Company's policy is to incorporate asset-related gains and losses into the asset value used to calculate the expected return on plan assets and into the calculation of amortization of unrecognized net actuarial loss over a four-year period.

In December 2005, the pension plan benefits for former Times Mirror non-union and non-Newsday employees were frozen. As a result of the plan freeze, a pretax curtailment gain of $18 million ($13 million at publishing, $1 million at broadcasting and entertainment and $4 million at corporate) was recorded. On March 31, 2006, the pension plan benefits for Newsday union and non-union employees will be frozen.

The Company's pension plans' asset allocations at Dec. 25, 2005 and Dec. 26, 2004, were as follows (in millions):

| Asset Category | Plan Assets | | | |
| | Dec. 25, 2005 | | Dec. 26, 2004 | |
|---|---|---|---|---|
| Equity securities | $ 1,186 | 74.2% | $ 1,146 | 73.5% |
| Fixed income securities | 329 | 20.6% | 332 | 21.3% |
| Other | 83 | 5.2% | 81 | 5.2% |
| Total | $ 1,598 | 100% | $ 1,559 | 100% |

The Company's current 2006 target allocation for pension plans' assets is 75% in equity securities and 25% in fixed income securities and other.

For purposes of measuring 2005 postretirement health care costs, a 9.0% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2005. The rate was assumed to decrease gradually to 5% for 2009 and remain at that level thereafter. For purposes of measuring health care obligations at Dec. 25, 2005, a 9.0% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2005. The rate was assumed to decrease gradually to 5% for 2010 and remain at that level thereafter. On Dec. 8, 2003, the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("Act") was signed into law. The Act resulted in a $15 million reduction in the accumulated other postretirement obligations for prior service costs and a $1 million reduction in net periodic postretirement benefit costs.

Assumed health care cost trend rates have a significant effect on the amounts reported for health care plans. As of the date of this report, a 1% change in assumed health care cost trend rates would have the following effects (in thousands):

| | 1% Increase | | 1% Decrease | |
|---|---|---|---|---|
| Service cost and interest cost | $ | 372 | $ | (329) |
| Projected benefit obligation | $ | 6,218 | $ | (5,510) |

The Company plans to contribute $7 million related to certain of its union and non-qualified pension plans and $13 million to its other postretirement benefit plans in 2006.

31

Powered by Morningstar® Document Research℠

Expected Future Benefit Payments—The following benefit payments, which reflect expected future service, as appropriate, are expected to be paid (in thousands):

|  | Pension Benefits | Other Postretirement Benefits |
|---|---|---|
| 2006 | $ 77,930 | $ 14,416 |
| 2007 | 75,222 | 14,316 |
| 2008 | 75,439 | 14,081 |
| 2009 | 76,342 | 13,823 |
| 2010 | 77,548 | 13,660 |
| 2011-2015 | 408,164 | 64,455 |

**Broadcast Rights**

Broadcast rights consist principally of rights to broadcast syndicated programs, sports and feature films and are stated at the lower of cost or estimated net realizable value. The total cost of these rights is recorded as an asset and a liability when the program becomes available for broadcast. Syndicated program rights that have limited showings are generally amortized using an accelerated method as programs are aired. Sports and feature film rights are amortized using the straight-line method. The current portion of broadcast rights represents those rights available for broadcast that are expected to be amortized in the succeeding year. At Dec. 25, 2005 and Dec. 26, 2004, the Company had broadcast rights assets of $669 million and $652 million, respectively.

The Company maintains an allowance for programming that is not expected to be aired by the end of the contract period. This allowance for excess programming inventory is based on a program-by-program review of the Company's five-year broadcast plans and historical write-off trends. The total reserve balance at Dec. 25, 2005 and Dec. 26, 2004 was $4 million and $5 million, respectively. Actual write-offs in 2005 and 2004 were $1 million and $12 million, respectively. Future write-offs can vary based on changes in consumer viewing trends and the availability and costs of other programming.

**Goodwill and Other Intangible Assets**

The Company periodically reviews goodwill and certain intangible assets no longer being amortized for impairment in accordance with FAS No. 142, "Goodwill and Other Intangible Assets." Under FAS No. 142, the impairment review of goodwill and other intangible assets not subject to amortization must be based generally on fair values.

The estimated fair value of the reporting units to which goodwill is allocated is determined using multiples of operating cash flows for purposes of analyzing goodwill for impairment. The estimated fair values of other assets subject to the annual impairment review, which include newspaper mastheads and FCC licenses, are calculated based on projected future discounted cash flow analyses. The development of market multiples and cash flow projections used in the analyses requires the use of assumptions, including assumptions regarding revenue and market growth. The analyses use discount rates based on specific economic factors in the publishing and broadcasting industries. These assumptions reflect the Company's best estimates, but these items involve inherent uncertainties based on market conditions generally outside of the Company's control.

In the fourth quarter of 2004, the Company elected to early adopt the provisions of the Financial Accounting Standards Board's Emerging Issues Task Force Topic No. D-108, which requires the use of a direct valuation method for valuing intangible assets, such as FCC licenses, and reviewing them for impairment. Historically, the Company had been using a residual valuation method to review its FCC licenses for impairment each year. A direct valuation method generally results in a lower valuation than

32

does a residual valuation method. The Company performed an impairment review of its FCC licenses for the year ended Dec. 28, 2003 using a residual method. No impairments were required as a result of the analyses performed in 2003. The effect of changing to a direct valuation method for the 2004 FCC licenses impairment review was a pretax charge of $29 million ($18 million after-tax). The charge was recorded in the fourth quarter of 2004 as a cumulative effect of a change in accounting principle in the consolidated statements of income.

Upon the adoption of FAS No. 142 at the beginning of fiscal 2002, the Company treated the intangible assets associated with network affiliation agreements as having indefinite lives and stopped recording amortization expense on these assets. In December 2003, the staff of the Securities and Exchange Commission provided guidance regarding their accounting position in this area indicating that network affiliation agreements should be amortized. As a result, the Company began amortizing these assets in the fourth quarter of 2003 using a 40-year life. The Company believes the 40-year life is representative of the remaining expected useful life of the network affiliation intangibles. The provisions of FAS No. 142 required the Company to perform an impairment analysis at the time of a change in the estimated useful life of an intangible asset which was previously not being amortized. No adjustment to the network affiliation intangible assets was required as a result of this impairment review performed in the fourth quarter of 2003. Beginning in 2004, the Company no longer performs an annual test of the impairment of its network affiliation agreements under FAS No. 142, but will perform an impairment test if indicators of impairment are present, as required by FAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets."

The Company's goodwill and other intangible assets at Dec. 25, 2005 consisted of the following (in thousands):

|  | Dec. 25, 2005 | | |
|---|---|---|---|
|  | Gross Amount | Accumulated Amortization | Net Amount |
| **Intangible assets subject to amortization** |  |  |  |
| Subscribers (useful life of 15 to 20 years) | $ 190,657 | $ (62,110) | $ 128,547 |
| Network affiliation agreements (useful life of 40 years)(1) | 290,320 | (16,330) | 273,990 |
| Other (useful life of 3 to 40 years) | 23,482 | (6,696) | 16,786 |
| Total | $ 504,459 | $ (85,136) | 419,323 |

| **Goodwill and other intangible assets not subject to amortization** | |
|---|---|
| Goodwill | |
| Publishing | 4,380,483 |
| Broadcasting and entertainment | 1,566,659 |
| Total goodwill | 5,947,142 |
| Newspaper mastheads | 1,575,814 |
| FCC licenses | 1,084,654 |
| Tradename | 7,932 |
| Total | 8,615,542 |
| Total goodwill and other intangible assets | $ 9,034,865 |

(1)        Network affiliation agreements, net of accumulated amortization, include $184 million related to Fox affiliations and $90 million related to WB affiliations.

As a result of the United States Tax Court opinion issued on Sept. 27, 2005 related to the Matthew Bender tax dispute, the Company recorded additional goodwill of $459 million (see Note 12 to the Company's consolidated financial statements in Item 8).

33

Source: TRIBUNE CO, 10-K, February 28, 2006                    Powered by Morningstar® Document Research℠

#### Self-Insurance Liabilities

The Company self-insures for certain medical and disability benefits, workers' compensation costs and automobile and general liability claims. The recorded liabilities for self-insured risks are calculated using actuarial methods and are not discounted. The liabilities include amounts for actual claims, claim growth and claims incurred but not reported. Actual experience, including claim frequency and severity as well as health care inflation, could result in different liabilities than the amounts currently recorded. The recorded liabilities for self-insured risks totaled $113 million and $106 million at Dec. 25, 2005 and Dec. 26, 2004, respectively.

#### Accounts Receivable Allowances

The Company's accounts receivable are primarily due from advertisers. Credit is extended based on an evaluation of a customer's financial condition and generally collateral is not required. The Company maintains an allowance for uncollectible accounts, rebates and volume discounts. This allowance is determined based on historical write-off experience and any known specific collectibility exposures. At Dec. 25, 2005 and Dec. 26, 2004, the Company's allowance for accounts receivable was $43 million and $50 million, respectively.

#### Stock-Based Compensation

The Company accounts for its stock-based compensation plans in accordance with Accounting Principles Board ("APB") Opinion No. 25 and related interpretations. Under APB No. 25, no compensation expense is recorded because the exercise price of employee stock options equals the market price of the underlying stock on the date of grant.

On June 24, 2005, the Company accelerated the vesting of certain stock options granted on Feb. 11, 2003 and Feb. 10, 2004, totaling 2.4 million in each year. Unvested stock options awarded to the then current executive officers of the Company on these grant dates, which aggregated 0.8 million and 0.6 million, respectively, were not accelerated at that time. On Dec. 16, 2005, the Company accelerated the vesting of all stock options granted on Feb. 8, 2005, totaling 3.5 million. Also, on Dec. 16, 2005, the Company accelerated the remaining unvested stock options granted to the current executive officers of the Company on Feb. 11, 2003 and Feb. 10, 2004, totaling 0.4 million in both years. All other terms and conditions of the stock option grants remain unchanged.

In accordance with APB No. 25 and related interpretations, the acceleration of vesting of these stock options did not require accounting recognition in the Company's income statement. The exercise prices of the 2003, 2004 and 2005 grants were $45.90, $52.05 and $40.59, respectively, and the Company's closing stock prices on the June 24, 2005 and Dec. 16, 2005 dates of acceleration were $35.64 and $30.80, respectively. The impact of the accelerated vesting was to increase pro forma stock-based compensation by $82 million, or $50 million net of tax, in 2005.

The accelerated vesting of these stock options was one of several actions the Company has recently taken to reduce stock-based compensation expense that will be recorded in future years with the adoption of Financial Accounting Standard ("FAS") No. 123R (see discussion below). Over the last two years, the Company has reduced the number of stock options granted by approximately 45%. Also, beginning in 2004, option grants have 8-year terms, down from 10 years for grants in previous years, and do not have a replacement option feature.

Under FAS No. 123, "Accounting for Stock-Based Compensation," as amended by FAS No. 148, compensation cost is measured at the grant date based on the estimated fair value of the award and is recognized as compensation expense over the vesting period. For purposes of the disclosure required by FAS No. 123, as amended by FAS No. 148, the Company uses the Black-Scholes option pricing model to determine the fair value of each option grant. The Black-Scholes model includes assumptions regarding dividend yields, expected volatility, expected lives and risk-free interest rates. These

34

Powered by Morningstar® Document Research℠

assumptions reflect the Company's best estimates, but these items involve inherent uncertainties based on market conditions generally outside of the control of the Company. As a result, if other assumptions had been used in the current period, pro forma stock-based compensation, as calculated and disclosed under FAS No. 123, could have been materially impacted. Furthermore, if the Company uses different assumptions in future periods, share-based compensation expense could be materially impacted.

In December 2004, the Financial Accounting Standards Board ("FASB") issued FAS No. 123R, "Share-Based Payment." FAS No. 123R supercedes APB No. 25, FAS No. 123, as amended by FAS No. 148, and related interpretations. Under FAS No. 123R, compensation cost is measured at the grant date based on the estimated fair value of the award and is required to be recognized as compensation expense over the vesting period. The Company is required to adopt the standard in the first quarter of 2006. The Company plans to use the modified prospective application, which requires the recognition of share-based compensation as if the provisions of the standard had been in effect since Dec. 25, 1994 (the beginning of the Company's 1995 fiscal year). The Company expects to record approximately $33 million of pretax compensation expense in 2006 related to equity grants in 2006 and prior years, as well as the Company's Employee Stock Purchase Plan.

## SIGNIFICANT EVENTS

On Jan. 8, 2006, Newsday's six collective bargaining units voted to accept new four-year contracts that include position eliminations, work rule improvements, lower cost retirement plans and an increase in employee health care contributions, resulting in pretax savings of approximately $7 million in 2006 and more than $10 million annually thereafter. The Company expects to record one-time pretax charges of approximately $15 million in the first quarter of 2006 related to severance and other payments associated with the new contracts.

On Jan. 24, 2006, the Company announced that it had reached a 10-year agreement to affiliate 16 of its television stations currently affiliated with the WB Network (including those in New York, Los Angeles and Chicago) with a new broadcast network, The CW Network, being launched in the fall of 2006 by Warner Brothers Entertainment and CBS. The new network will air a portion of the programming currently on the WB Network and the UPN Network, as well as new programming. The WB Network will shut down at that time. The Company will not incur any costs related to the shutdown of The WB Network. Three of Tribune's current WB network affiliates (Philadelphia, Atlanta and Seattle) will become independent stations at that time. When regulatory approval of the new network is received and the new affiliation agreements become effective, the Company will write-off the WB affiliation agreement intangible assets for Philadelphia, Atlanta and Seattle. This write-off will most likely occur in the second or third quarter of 2006 and will total approximately $15 million before taxes.

### Acquisitions

The Company had no significant acquisitions in 2005 and 2004. The Company completed acquisitions totaling approximately $275 million in 2003 for cash and other consideration, including the value of the Denver radio station group assets that were divested in an exchange transaction during 2003. The results of the acquired companies are included in the consolidated statements of income since their respective dates of acquisition. None of these acquisitions were material in relation to the Company's consolidated financial statements.

On March 21, 2003, the Company acquired the stock of KPLR-TV, St. Louis, and the assets of KWBP-TV, Portland, Ore., from ACME Communications for a total of $275 million. The Company acquired the stock of KPLR-TV for $200 million in cash. The acquisition of the assets of KWBP-TV was structured as a like-kind asset exchange for income tax purposes. It was funded with the remaining assets of the Denver radio station group (KKHK-FM, now known as KQMT-FM) with an estimated fair market value of $55 million, plus $20 million in cash. The Company allocated $153 million, $42 million and $136 million of the purchase price to FCC licenses, network affiliations and goodwill, respectively.

35

Powered by Morningstar® Document Research℠

**Consolidation of Los Angeles Times' Production Operations**

In December 2005, the *Los Angeles Times* announced it would close its San Fernando Valley printing facility in January 2006 and consolidate production at its remaining three facilities in Los Angeles, Costa Mesa, and Irwindale, California. The closing of the printing facility resulted in the elimination of approximately 120 positions from across the *Los Angeles Times'* production facilities.

As a result of the facility closing, the Company reclassified the San Fernando Valley printing facility land and building as held for sale at Dec 25, 2005. The Company recorded a $2 million pretax charge in the fourth quarter of 2005 to reduce the carrying value of the San Fernando Valley printing facility's land and building to $24 million, the estimated fair value of the assets less costs to sell the assets. The Company evaluated the machinery and equipment at the San Fernando Valley printing facility and determined that press and other related equipment with a net book value of $16 million will be abandoned. Therefore, the Company reduced its estimate of the useful life of the press and other related equipment and recorded accelerated depreciation of $16 million in the fourth quarter of 2005. The Company has idled the remaining San Fernando Valley machinery and equipment, which had a net book value of $34 million at Dec. 25, 2005. The Company is currently evaluating alternative uses of this equipment. This evaluation is expected to be completed in 2006.

The Company recorded a pretax charge in the fourth quarter of 2005 of $22 million, excluding severance related costs, as a result of its decision to close the San Fernando Valley printing facility. A summary of the significant components of the $22 million pretax charge is as follows (in millions):

| | |
|---|---:|
| Accelerated depreciation on machinery and equipment | $ 16.1 |
| Impairment of assets held for sale | 2.1 |
| Other | 4.0 |
| Total | $ 22.2 |

**Employee Reductions**

The Company reduced its staff by approximately 900 positions in 2005 and recorded a pretax charge of $45 million ($43 million at publishing, $1 million at broadcasting and entertainment and $1 million at corporate). The eliminations included 120 positions as a result of closing the *Los Angeles Times'* San Fernando Valley printing facility, as discussed above. As of Dec. 25, 2005, $7 million had been paid and an accrual of $38 million remained. The Company recorded a pretax charge of $41 million in 2004 related to the elimination of approximately 600 positions in its publishing segment.

**Non-Operating Items**

Fiscal years 2005, 2004 and 2003 included several non-operating items. Non-operating items for 2005 are summarized as follows (in millions, except per share data):

| | Proceeds | Pretax Gain | After-tax Gain (Loss) | Diluted EPS |
|---|---:|---:|---:|---:|
| Gain on change in fair values of derivatives and related investments | $ — | $ 62 | $ 38 | $ .12 |
| Gain on sales of subsidiaries and investments, net | 17 | 7 | 4 | .01 |
| Other, net | 5 | 1 | 1 | .01 |
| Income tax adjustments | — | — | (139) | (.44) |
| Total non-operating items | $ 22 | $ 70 | $ (96) | $ (.30) |

In 2005, the change in the fair values of derivatives and related investments related entirely to the Company's PHONES and related Time Warner investment. The $62 million non-cash pretax gain

36

resulted from an $85 million decrease in the fair value of the derivative component of the Company's PHONES, which was partially offset by a $23 million decrease in the fair value of 16 million shares of Time Warner common stock.

As a result of the United States Tax Court opinion issued on Sept. 27, 2005 related to the Matthew Bender tax dispute, the Company recorded additional income tax expense of $150 million in the third quarter of 2005 (see Note 12 to the Company's consolidated financial statements in Item 8). In the first quarter of 2005, the Company reduced its income tax expense and liabilities by a total of $12 million as a result of favorably resolving certain other federal income tax issues.

Non-operating items for 2004 are summarized as follows (in millions, except per share data):

| | Proceeds | Pretax Gain (Loss) | After-tax Gain (Loss) | Diluted EPS |
|---|---|---|---|---|
| Loss on change in fair values of derivatives and related investments | $ — | $ (18) | $ (11) | $ (.03) |
| Loss on early debt retirement | | (141) | (87) | (.26) |
| Gain on sales of subsidiaries and investments, net | 24 | 20 | 12 | .03 |
| Loss on investment write-downs and other, net | 16 | (6) | (4) | (.02) |
| Total non-operating items | $ 40 | $ (145) | $ (90) | $ (.28) |

In 2004, the change in the fair values of derivatives and related investments related entirely to the Company's PHONES and related Time Warner investment. The $18 million non-cash pretax loss resulted from a $39 million increase in the fair value of the derivative component of the Company's PHONES, which was partially offset by a $21 million increase in the fair value of 16 million shares of Time Warner common stock.

In 2004, the Company redeemed all of its outstanding $400 million ($396 million net of unamortized discount) 7.45% debentures due 2009 and retired $66 million ($64 million net of unamortized discount) of its 7.25% debentures due 2013 and $165 million ($160 million net of unamortized discount) of its 6.61% debentures due 2027 through cash tender offers. The Company paid approximately $760 million to retire this debt and, as a result, recorded a one-time, pretax loss of $141 million in 2004. The Company funded these transactions with cash and the issuance of commercial paper.

In 2004, the gain on sales of subsidiaries and investments related primarily to the sale of the Company's 50% interest in *La Opinión* for $20 million, resulting in a pretax gain of $18 million.

Non-operating items for 2003 are summarized as follows (in millions, except per share data):

| | Proceeds | Pretax Gain (Loss) | After-tax Gain (Loss) | Diluted EPS |
|---|---|---|---|---|
| Gain on change in fair values of derivatives and related investments | $ — | $ 84 | $ 52 | $ .16 |
| Gain on sales of subsidiaries and investments, net | 175 | 148 | 90 | .27 |
| Loss on investment write-downs | | (10) | (6) | (.02) |
| Gain on insurance recoveries | 27 | 22 | 14 | .04 |
| Other non-operating loss, net | — | (3) | (2) | — |
| Income tax adjustments | — | — | 25 | .07 |
| Total non-operating items | $ 202 | $ 241 | $ 173 | $ .52 |

In 2003, the change in the fair values of derivatives and related investments related entirely to the Company's PHONES and related Time Warner investment. The $84 million non-cash pretax gain

37

Powered by Morningstar® Document Research℠

resulted from an $86 million increase in the fair value of 16 million shares of Time Warner common stock, which was partially offset by a $2 million increase in the fair value of the derivative component of the PHONES. Also in 2003, the Company determined that the decline in fair value of certain public and private investments was other than temporary and wrote down the investments to fair value. The write-downs totaled $10 million in 2003.

In 2003, the gain on sales of subsidiaries and investments resulted primarily from the divestiture of the Company's remaining Denver radio station KKHK-FM and the sale of the Company's investment in The Golf Channel. KKHK-FM, now known as KQMT-FM, plus $20 million in cash, was exchanged for the assets of KWBP-TV, Portland, Ore. and resulted in a pretax gain of $51 million. The sale of the investment in The Golf Channel resulted in a pretax gain of $48 million.

In 2003, the Company recorded a gain of $22 million as a result of settling the business interruption and property damage insurance claims filed by WPIX-TV, New York, as a result of the events of Sept. 11, 2001.

In 2003, the Company reduced its income tax expense and liabilities by a total of $25 million as a result of favorably resolving certain state income tax issues.

## OTHER DEVELOPMENTS

In February 2004, a purported class action lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* and *Hoy*, New York, alleging that they were overcharged for advertising as a result of inflated circulation numbers at these two publications. The purported class action also alleges that entities that paid a *Newsday* subsidiary to deliver advertising flyers were overcharged. In July 2004, another lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* alleging damages resulting from inflated *Newsday* circulation numbers as well as federal and state antitrust violations. The Company intends to vigorously defend these suits.

On June 17, 2004, the Company publicly disclosed that it would reduce its reported circulation for both *Newsday* and *Hoy*, New York for the 12-month period ending Sept. 30, 2003 and the six-month period ending March 31, 2004. The circulation adjustments were the result of a review of reported circulation at *Newsday* and *Hoy*, New York, conducted by the Company's internal audit staff and the Audit Bureau of Circulations ("ABC"). Subsequent to the June 17th disclosure, the Company continued its internal review and found additional misstatements for these time periods, as well as misstatements that impacted the 12-month period ending Sept. 30, 2002. On Sept. 10, 2004, the Company announced additional revisions to the circulation figures for *Newsday* and *Hoy*, New York, for the 12-month period ending Sept. 30, 2003 and the six-month period ending March 31, 2004. In November 2004, ABC released its audit reports for *Newsday* and *Hoy*, New York, for the 12-month period ending Sept. 30, 2003. In March 2005, ABC released its audit reports for *Newsday* for the six-month periods ending March 31, 2004 and Sept. 30, 2004. In May 2005, ABC released its audit reports for *Hoy*, New York, for the six-month periods ending March 31, 2004 and Sept. 30, 2004. Audited circulation figures for both *Newsday* and *Hoy*, New York, for these periods were within the ranges previously disclosed. After releasing these reports, ABC recalled *Newsday's* audit report and Publisher's Statements covering the 12-month period ending Sept. 30, 2002 and all of *Hoy*, New York's audit reports and Publisher's Statements covering the periods ending March 31, 2000 through Sept. 30, 2002, stating that, due to insufficient information, they could not verify circulation for those periods. ABC also withdrew its unqualified opinion as to the material fairness of the circulation reported for *Newsday* for the 12-month periods ending Sept. 30, 2000 and Sept. 30, 2001, again citing insufficient information necessary to confirm the unqualified opinions. ABC's circulation audit at *Newsday* for the six-month period ending March 31, 2005 was issued in October 2005 with no significant adjustments. ABC's circulation audit at *Hoy*, New York, for the six-month period ending March 31, 2005 was issued in January 2006 with no significant adjustments. Circulation audits at *Newsday* and *Hoy*, New York, for the period ending

38

Powered by Morningstar® Document Research℠

September 2005 are ongoing. *Hoy*, New York, converted to free distribution in January 2006. Due to this change, *Hoy*, New York's circulation for the period ending September 2005 and going forward will be audited by the Certified Audit of Circulations.

As a result of the misstatements of reported circulation at *Newsday* and *Hoy*, New York, the Company recorded a pretax charge of $35 million in the second quarter of 2004 as its estimate of the probable cost to settle with advertisers based upon facts available at July 30, 2004, the date of the Company's second quarter 2004 Form 10-Q filing. Subsequent to that date, the Company found additional circulation misstatements, which increased the cost to settle with advertisers. As a result, the Company recorded an additional pretax charge of $55 million in the third quarter of 2004 to increase the estimate of the probable cost to settle with *Newsday* and *Hoy*, New York, advertisers to a total of $90 million. The Company will continue to evaluate the adequacy of this charge on an ongoing basis (see Note 3 to the Company's consolidated financial statements in Item 8).

In addition to the advertiser lawsuits, several class action and shareholder derivative suits have been filed against the Company and certain of its current and former directors and officers as a result of the circulation misstatements at *Newsday* and *Hoy*, New York. The suits, which are currently pending in Illinois Federal and State Courts, allege breaches of fiduciary duties and other managerial and director failings under Delaware law, the federal securities laws and ERISA. The Company believes the complaints are without merit and intends to vigorously defend the suits.

The Securities and Exchange Commission, the United States Attorney for the Eastern District of New York and the Nassau County District Attorney are conducting inquiries into the circulation practices at *Newsday* and *Hoy*, New York. The Company is cooperating fully with these inquiries. The Company cannot predict with certainty the outcome of these inquiries.

On June 2, 2003, the FCC adopted new media ownership rules, including a new television/newspaper cross-ownership rule. The new rule would eliminate the cross-ownership prohibition entirely in markets with nine or more television stations and permit combinations of one newspaper and one television station in markets having from four to eight television stations. Under this rule, the Company would be permitted to retain its newspaper and television operations in each of the five markets where it owns both—New York, Los Angeles, Chicago, South Florida and Hartford. In September 2003, the United States Court of Appeals for the Third Circuit stayed the effectiveness of the new media ownership rules pending the outcome of appeals by advocacy groups challenging the new rules. In June 2004, the Third Circuit remanded the new rules to the FCC for further proceedings while keeping the stay in effect. On Jan. 28, 2005, the Company and other media companies filed a joint petition seeking United States Supreme Court review of the June 2004 Third Circuit remand. On June 13, 2005, the Supreme Court declined to review the petition, without addressing the Constitutional arguments raised and without foreclosing additional appeals if the Company's interests are not adequately addressed as part of the FCC's remand proceeding. While the Company remains optimistic that the cross-ownership ban will ultimately be loosened in major markets, it cannot predict with certainty the outcome of the FCC's remand proceeding. See Item 3, "Legal Proceedings" for a discussion of pending FCC rule review.

39

Powered by Morningstar® Document Research℠

## RESULTS OF OPERATIONS

The Company's fiscal year ends on the last Sunday in December. Fiscal years 2005, 2004 and 2003 each comprised 52 weeks.

**Consolidated**

The Company's consolidated operating results for 2005, 2004 and 2003 are shown in the table below.

| (In millions, except per share data) | 2005 | 2004 | 2003 | Change 05-04 | 04-03 |
|---|---|---|---|---|---|
| Operating revenues | $ 5,596 | $ 5,726 | $ 5,595 | - 2% | + 2% |
| Operating profit(1) | $ 1,147 | $ 1,218 | $ 1,361 | - 6% | - 11% |
| Net income on equity investments | $ 41 | $ 18 | $ 6 | + 130% | + 221% |
| Net income: | | | | | |
| Before cumulative effect of change in accounting principle | $ 535 | $ 573 | $ 891 | - 7% | - 36% |
| Cumulative effect of change in accounting principle, net of tax(2) | — | (18) | — | * | * |
| Net income | $ 535 | $ 555 | $ 891 | - 4% | - 38% |
| Diluted earnings per share: | | | | | |
| Before cumulative effect of change in accounting principle | $ 1.67 | $ 1.72 | $ 2.61 | - 3% | - 34% |
| Cumulative effect of change in accounting principle, net of tax(2) | — | (.05) | — | * | * |
| Net income | $ 1.67 | $ 1.67 | $ 2.61 | — | - 36% |

*(1)*  Operating profit excludes interest and dividend income, interest expense, equity income and loss, non-operating items and income taxes. Operating profit in 2005 includes $22 million of expenses related to the shutdown of the *Los Angeles Times'* San Fernando Valley printing facility, $45 million of severance charges for the elimination of approximately 900 positions, primarily in publishing, and a pension curtailment gain of $18 million. Operating profit in 2004 includes $90 million of charges related to anticipated settlements with advertisers regarding misstated circulation at *Newsday* and *Hoy*, New York, for the periods September 2001 through March 2004 and $41 million of charges related to the elimination of approximately 600 publishing positions.

*(2)*  Refer to Note 5 to the Company's consolidated financial statements in Item 8 for further discussion.

*   Not meaningful

**Earnings Per Share ("EPS")**—Diluted EPS in 2005 was $1.67, flat with 2004. The 2005 results included a net non-operating loss of $.30 per diluted share, a charge of $.04 per diluted share for the shutdown of the *Los Angeles Times'* San Fernando Valley printing facility, severance charges of $.09 per diluted share for the elimination of approximately 900 positions, primarily in publishing, and a pension curtailment gain of $.03 per diluted share as a result of the Company's replacement of certain defined benefit plans with a defined contribution plan. Diluted EPS in 2004 was $1.67, down from $2.61 in 2003. The 2004 results included a net non-operating loss of $.28 per diluted share, a charge of $.17 per diluted share related to the anticipated settlement with advertisers regarding misstated circulation at *Newsday* and *Hoy*, New York, a charge of $.07 per diluted share for the elimination of approximately 600 positions in the publishing group and a one-time charge of $.05 per diluted share for the cumulative effect of a change in accounting principle related to early adoption of FASB's Emerging

40

Issues Task Force Topic No. D-108, which covers the use of a direct valuation method for intangible assets such as FCC licenses. In 2003, the Company recorded a net non-operating gain of $.52 per diluted share.

**Operating Revenues and Profit**—Consolidated operating revenues, depreciation and amortization expense, and operating profit by business segment were as follows:

| (In millions) | 2005 | 2004 | 2003 | Change 05-04 | | Change 04-03 | |
|---|---|---|---|---|---|---|---|
| Operating revenues | | | | | | | |
| Publishing | $ 4,097 | $ 4,130 | $ 4,037 | - | 1% | + | 2% |
| Broadcasting and entertainment | 1,499 | 1,596 | 1,558 | - | 6% | + | 2% |
| Total operating revenues | $ 5,596 | $ 5,726 | $ 5,595 | - | 2% | + | 2% |
| Depreciation and amortization expense | | | | | | | |
| Publishing(1) | $ 191 | $ 179 | $ 176 | + | 7% | + | 2% |
| Broadcasting and entertainment | 51 | 52 | 50 | - | 2% | + | 5% |
| Corporate expenses | 2 | 2 | 2 | — | - | | 21% |
| Total depreciation and amortization expense | $ 244 | $ 233 | $ 228 | + | 5% | + | 2% |
| Operating profit (loss)(2) | | | | | | | |
| Publishing | $ 760 | $ 726 | $ 885 | + | 5% | - | 18% |
| Broadcasting and entertainment | 436 | 544 | 529 | - | 20% | + | 3% |
| Corporate expenses | (49) | (52) | (53) | + | 5% | + | 2% |
| Total operating profit | $ 1,147 | $ 1,218 | $ 1,361 | - | 6% | - | 11% |

(1)
    Depreciation and amortization expense for 2005 includes $16 million of accelerated depreciation related to the shutdown of the *Los Angeles Times'* San Fernando Valley printing facility.

(2)
    Operating profit (loss) for each segment excludes interest and dividend income, interest expense, equity income and loss, non-operating items and income taxes.

Consolidated operating revenues decreased 2%, or $130 million, in 2005 due to declines in publishing and broadcasting and entertainment revenues. Consolidated operating revenues increased 2%, or $131 million, in 2004 due to growth in publishing and broadcasting and entertainment revenues. Excluding all acquisitions and divestitures that affect comparability in the period presented ("on a comparable basis"), revenues were up 2%, or $117 million, in 2004, as a result of improvements at both segments.

Consolidated operating profit decreased 6%, or $71 million, in 2005. Publishing operating profit rose 5%, or $34 million, in 2005. Publishing operating profit in 2005 included a $22 million pretax charge for the shutdown of the *Los Angeles Times'* San Fernando Valley printing facility, pretax severance charges of $43 million for the elimination of over 800 positions and a pretax pension curtailment gain of $13 million. In 2004, publishing operating profit included a $90 million pretax charge related to the anticipated settlement with advertisers regarding misstated circulation at *Newsday* and *Hoy*, New York and a $41 million pretax charge for the elimination of approximately 600 positions. Excluding these charges, publishing operating expenses increased $13 million in 2005 primarily due to increases in newsprint and ink and outside services expenses, partially offset by lower circulation distribution expense. Publishing advertising revenues increased $16 million in 2005, while publishing circulation revenues declined 7%, or $48 million. Broadcasting and entertainment operating profit decreased 20%, or $108 million, in 2005 primarily due to decreased television revenues and increased compensation and programming expenses, partially offset by a rise in Chicago Cubs revenues.

41

Source: TRIBUNE CO, 10-K, February 28, 2006                    Powered by Morningstar℠ Document Research℠

Consolidated operating profit decreased 11%, or $143 million, in 2004. On a comparable basis, consolidated operating profit fell 11%, or $146 million, in 2004. Publishing operating profit fell 18%, or $159 million, in 2004. Publishing operating profit included a $90 million pretax charge related to the anticipated settlement with advertisers regarding misstated circulation at *Newsday* and *Hoy*, New York and a $41 million pretax charge for the elimination of approximately 600 positions. Excluding these charges, publishing operating expenses increased 4% primarily due to increases in compensation and newsprint and ink expense. Publishing advertising revenues increased 4%, or $120 million, in 2004. Broadcasting and entertainment operating profit increased 3%, or $15 million, in 2004 primarily due to increased television revenues and decreased programming expenses, partially offset by higher benefits expense.

**Operating Expenses**—Consolidated operating expenses were as follows:

| (In millions) | 2005 | 2004 | 2003 | Change 05-04 | | Change 04-03 | |
|---|---|---|---|---|---|---|---|
| Cost of sales | $ 2,737 | $ 2,708 | $ 2,636 | + | 1% | + | 3% |
| Selling, general and administrative | 1,468 | 1,567 | 1,370 | - | 6% | + | 14% |
| Depreciation and amortization | 244 | 233 | 228 | + | 5% | + | 2% |
| Total operating expenses | $ 4,449 | $ 4,508 | $ 4,234 | - | 1% | + | 6% |

Cost of sales increased 1%, or $29 million, in 2005 primarily due to higher newsprint and ink, programming and outside services expenses, partially offset by a decline in circulation distribution expense. Compensation expense was flat compared with 2004. Newsprint and ink expense was up 3%, or $14 million, in 2005, due to a 16% increase in newsprint costs per ton, partially offset by an 11% drop in consumption. The Company's newspapers are transitioning to lighter weight newsprint that on a per ton basis costs more but yields more pages. The increase in newsprint cost per ton reflects increased market prices and the higher cost of lighter weight paper. Programming expenses increased 1%, or $6 million, in 2005 due to more program additions in 2005 compared to 2004. Outside services expense increased 11%, or $18 million, in 2005 due largely to higher printing costs. Circulation distribution expense declined 1%, or $5 million, primarily due to lower payments to outside contractors as a result of circulation volume declines.

Cost of sales increased 3%, or $72 million, in 2004. On a comparable basis, cost of sales was up 3%, or $66 million, primarily due to higher compensation and newsprint and ink expense, partially offset by a decline in programming expenses. Compensation expense rose 8%, or $77 million, in 2004 due to higher retirement plan and other benefit expenses. On a comparable basis, compensation expense increased 8%, or $76 million, in 2004. Newsprint and ink expense rose 8%, or $35 million, in 2004 as average newsprint cost per ton was up 12%, while consumption declined 3% in 2004. Programming expenses decreased 6%, or $25 million, in 2004 due to a decline in broadcast rights amortization expense related to fewer program additions in 2004 compared to 2003. On a comparable basis, programming expenses declined 7%, or $30 million, in 2004.

Selling, general and administrative ("SG&A") expenses were down 6%, or $99 million, in 2005. Compensation expense decreased 1%, or $5 million, in 2005. Compensation expense in 2005 included a severance charge of $45 million for the elimination of approximately 900 positions and a pension curtailment gain of $18 million, while 2004 compensation expense included a severance charge of $41 million for the elimination of about 600 positions in the publishing segment. Circulation expense decreased 6%, or $7 million, in 2005. Other SG&A expenses declined $81 million in 2005. Other SG&A expenses in 2004 included a charge of $90 million related to the anticipated settlement with advertisers regarding misstated circulation at *Newsday* and *Hoy*, New York.

42

Powered by Morningstar® Document Research℠

SG&A expenses were up 14%, or $197 million, in 2004. On a comparable basis, SG&A expenses increased 14%, or $193 million, in 2004. The increases were primarily due to higher compensation and other SG&A expenses. Compensation expense increased 7%, or $53 million, in 2004 due to higher retirement plan and other benefit expenses and a pretax charge of $41 million for the elimination of about 600 positions in the publishing group in 2004. On a comparable basis, compensation expense rose 7%, or $51 million, in 2004. Other SG&A expenses included a pretax charge of $90 million in 2004 related to the anticipated settlement with advertisers regarding misstated circulation at *Newsday* and *Hoy*, New York.

The increase in depreciation and amortization of intangible assets in 2005 is primarily due to $16 million of accelerated depreciation related to the shutdown of the *Los Angeles Times'* San Fernando Valley printing facility. The increase in depreciation and amortization of intangible assets in 2004 primarily reflects capital expenditures.

**Publishing**

**Operating Revenues and Profit**—In 2005, publishing contributed 73% of the Company's revenues and 66% of its operating profits. Daily newspaper revenue is derived principally from advertising and circulation sales, which accounted for 79% and 15%, respectively, of the publishing segment's total revenues in 2005. Advertising revenue is comprised of three basic categories: retail, national and classified. Newspaper advertising volume is categorized as full run inches, part run inches or preprint pieces. Circulation revenue results from the sale of newspapers. Other publications/services revenue accounted for 6% of the segment's total revenues in 2005 and includes syndication of editorial products, advertising placement services, direct mail operations, cable television news programming, distribution of entertainment listings and other publishing-related activities.

Explanations of certain advertising types used in this discussion are as follows:

| | |
|---|---|
| Retail: | Display or preprint advertising from local retailers, such as department stores |
| National: | Display or preprint advertising by national advertisers that promote products or brand names on a nation-wide basis |
| Classified: | Local advertising listed together and organized by type (including help wanted, real estate and automotive) and display advertisements in these same categories |
| Full run inches: | Advertising appearing in all editions of a newspaper |
| Part run inches: | Advertising appearing in only select editions or zones of a newspaper's market |
| Preprint pieces: | Advertising supplements prepared by advertisers and inserted into a newspaper |

The table below presents publishing operating revenues, operating expenses and operating profit:

| (In millions) | 2005 | 2004 | 2003 | Change 05-04 | 04-03 |
|---|---|---|---|---|---|
| Operating revenues | $ 4,097 | $ 4,130 | $ 4,037 | - 1% | + 2% |
| Operating expenses | 3,337 | 3,404 | 3,152 | - 2% | + 8% |
| Operating profit | $ 760 | $ 726 | $ 885 | + 5% | - 18% |

43

Powered by Morningstar® Document Research℠

Publishing operating revenues in 2005 decreased 1% to $4.10 billion, down from $4.13 billion in 2004, due mainly to lower circulation revenue in Los Angeles, Chicago and New York. In 2004, publishing operating revenues were up 2%, or $93 million, compared with 2003, primarily due to increases in advertising revenue in Chicago, New York, Hartford, Los Angeles and for the Spanish language newspaper, *Hoy*.

Operating profit increased 5%, or $34 million, in 2005 primarily due to lower one-time charges as described below. Operating profit decreased 18%, or $159 million, in 2004 primarily due to the charges described in the following paragraph, higher retirement plan and other benefit expenses, an increase in newsprint and ink expense and the impact of new publications.

For 2005, publishing operating profit included a pretax charge of $22 million for the shutdown of the *Los Angeles Times'* San Fernando Valley printing facility, $43 million of severance charges for the elimination of over 800 positions and a pension curtailment gain of $13 million, as a result of changes to the retirement programs at the Company. For 2004, publishing operating profit included a pretax charge of $90 million related to the anticipated settlement with advertisers regarding misstated circulation at *Newsday* and *Hoy*, New York, for the periods of September 2001 through March 2004. Operating profit for 2004 also included a pretax charge of $41 million for the elimination of about 600 positions.

**Operating Revenues**—Total operating revenues decreased 1% in 2005 compared to 2004 and increased 2% in 2004 compared to 2003. Total publishing operating revenues, by classification, were as follows:

| (in millions) | 2005 | 2004 | 2003 | Change 05-04 | 04-03 |
|---|---|---|---|---|---|
| Advertising | | | | | |
|   Retail | $ 1,324 | $ 1,331 | $ 1,302 | – 1% | + 2% |
|   National | 774 | 803 | 774 | – 4% | + 4% |
|   Classified | 1,146 | 1,095 | 1,034 | + 5% | + 6% |
| Total advertising | 3,244 | 3,229 | 3,110 | – + | 4% |
| Circulation | 596 | 644 | 664 | – 7% | – 3% |
| Other | 257 | 257 | 263 | – | 2% |
| Total operating revenues | $ 4,097 | $ 4,130 | $ 4,037 | – 1% | + 2% |

**Advertising Revenue and Volume**—Total advertising revenues were essentially flat in 2005 compared to 2004. Retail advertising revenue was down 1%, or $7 million, for the year as decreases in department stores, food & drug stores, electronics and furniture/home furnishings categories, were partially offset by increases in hardware/home improvement and other retail categories. Preprint revenues, which are primarily included in retail advertising, rose 2%, or $15 million, due to increases at Los Angeles and Chicago, partially offset by a decrease at Newsday. National advertising revenue decreased 4%, or $29 million, in 2005 as decreases in wireless, transportation, technology and movies categories were offset by an increase in the financial category. Classified advertising revenues increased 5%, or $51 million, in 2005 due to increases in real estate and help wanted of 15% and 13%, respectively, partially offset by an 8% decrease in auto. Interactive revenues, which are included in the above categories, increased 43%, or $53 million, in 2005.

Total advertising revenues increased 4% in 2004 compared to 2003. Retail advertising revenue was up 2%, or $29 million, for the year as increases in specialty merchandise, furniture/home furnishings, food & drug stores, hardware/home improvement and health care were partially offset by a decline in general merchandise and department stores. Preprint revenues, which were the primary contributor to retail advertising growth, rose 9%, or $52 million. Preprint revenue in Los Angeles and Chicago was up 19% and 8%, respectively. National advertising revenue increased 4%, or $29 million, in 2004 as

44

Source: TRIBUNE CO, 10-K, February 28, 2006                    Powered by Morningstar® Document Research℠

increases in financial and package goods categories were offset by decreases in movies/entertainment and resorts. Classified advertising revenues increased 6%, or $61 million, in 2004 due to increases in help wanted and real estate of 10% and 12%, respectively, partially offset by a 2% decrease in auto.

Advertising volume data for 2005, 2004 and 2003 was as follows:

| | | | | Change | |
|---|---|---|---|---|---|
| Inches (in thousands) | 2005 | 2004 | 2003 | 05-04 | 04-03 |
| Full run inches | | | | | |
| Retail | 5,980 | 6,200 | 5,915 | - 4% + | 5% |
| National | 3,774 | 3,998 | 3,798 | - 6% + | 5% |
| Classified | 10,023 | 10,265 | 10,347 | - 2% - | 1% |
| Total full run inches | 19,777 | 20,463 | 20,060 | - 3% + | 2% |
| Part run inches | 20,112 | 20,575 | 19,425 | - 2% + | 6% |
| Total inches | 39,889 | 41,038 | 39,485 | - 3% + | 4% |
| Preprint pieces (in millions) | 14,929 | 14,680 | 13,479 | + 2% + | 9% |

Full run advertising inches were down 3% in 2005 due to decreases in all three major advertising categories. Full run retail advertising inches were down 4% mainly due to decreases at Southern Connecticut and Baltimore, partially offset by increases at Orlando and *Hoy*. Full run national advertising inches were down 6% in 2005 primarily due to decreases at Los Angeles, Orlando, Hartford and Baltimore. Full run classified advertising inches fell 2% for the year due to declines at South Florida, Baltimore, *Hoy* and Los Angeles, partially offset by an increase at Orlando. Part run advertising inches were down 2% in 2005 due to a decrease at Los Angeles, partially offset by an improvement at Newsday. Preprint advertising pieces rose 2% for the year due to increases at Los Angeles and Chicago, partially offset by a decrease at Newsday.

Full run advertising inches were up 2% in 2004 primarily due to increases in retail and national advertising inches. Full run retail advertising inches were up 5% mainly due to increases related to the new Chicago and Los Angeles editions of *Hoy*. Full run national advertising inches were up 5% in 2004 primarily due to increases related to *Hoy*. Full run classified advertising inches fell 1% for the year due to declines at South Florida, Los Angeles and Orlando, partially offset by increases related to *Hoy*. Part run advertising inches were up 6% in 2004 due to increases at Chicago and *Hoy*. Preprint advertising pieces rose 9% for the year due to increases at Chicago, Los Angeles, *Hoy* and South Florida.

**Circulation Revenues**—Circulation revenues were down 7% in 2005, primarily due to volume declines, as well as selectively higher discounting. The largest revenue declines were at Los Angeles, Chicago and Newsday. Circulation revenues were down 3% in 2004, primarily due to declines at Los Angeles and Newsday.

**Other Revenues**—Other revenues are derived from advertising placement services; the syndication of columns, features, information and comics to newspapers; commercial printing operations; delivery of other publications; direct mail operations; cable television news programming; distribution of entertainment listings; and other publishing-related activities. Other revenues were flat in 2005 compared to 2004. Other revenues decreased 2%, or $6 million, in 2004 mainly due to decreases at New York and Orlando.

45

    Powered by Morningstar® Document Research℠

**Operating Expenses**—Operating expenses for 2005, 2004 and 2003 were as follows:

| | | | | | Change | |
|---|---|---|---|---|---|---|
| (In millions) | 2005 | 2004 | 2003 | 05-04 | | 04-03 |
| Compensation | $ 1,396 | $ 1,410 | $ 1,315 | - | 1% + | 7% |
| Circulation distribution | 462 | 474 | 458 | - | 2% + | 3% |
| Newsprint and ink | 491 | 477 | 441 | + | 3% + | 8% |
| Outside services | 310 | 289 | 280 | + | 7% + | 3% |
| Promotion | 109 | 110 | 107 | - | 1% + | 3% |
| Depreciation and amortization | 191 | 179 | 176 | + | 7% + | 2% |
| Newsday and Hoy, New York charge | — | 90 | — | * | | * |
| Other | 378 | 375 | 375 | + | 1% | — |
| Total operating expenses | $ 3,337 | $ 3,404 | $ 3,152 | - | 2% + | 8% |

\*    Not meaningful

Publishing operating expenses decreased 2%, or $67 million, in 2005 primarily due to the absence of the *Newsday* and *Hoy*, New York charge and a decrease in compensation and circulation distribution expenses, partially offset by increases in newsprint and ink, outside services and depreciation and amortization expense. Publishing operating expenses in 2004 included a charge of $90 million related to the anticipated settlement with advertisers regarding misstated circulation at *Newsday* and *Hoy*, New York. Compensation expense decreased 1%, or $14 million, in 2005, primarily due to the $13 million pension curtailment gain. The Company recorded $43 million of severance charges for the elimination of over 800 positions in 2005 and $41 million of severance charges in for the elimination of about 600 positions in 2004. Circulation distribution expense declined 2%, or $12 million, due to lower payments to outside contractors primarily as a result of circulation volume declines. Newsprint and ink expense was up 3%, or $14 million, in 2005, as newsprint cost per ton increased 16%, while consumption decreased 11%. The Company's newspapers are transitioning to lighter weight newsprint that on a per ton basis costs more but yields more pages. The increase in newsprint cost per ton reflects increased market prices and the higher cost of lighter weight paper. Outside services expense rose 7%, or $21 million, in 2005 due largely to higher legal fees and outside printing costs. Depreciation and amortization expense increased 7%, or $12 million, primarily due to $16 million of accelerated depreciation as a result of the decision to shutdown the *Los Angeles Times'* San Fernando Valley printing facility.

Publishing operating expenses rose 8%, or $252 million, in 2004 primarily due to higher compensation expense, increased newsprint and ink expense and the *Newsday* and *Hoy*, New York, charge, as well as an increase in expenses related to new publications. Compensation expense rose 7%, or $95 million, in 2004 primarily due to higher retirement plan and other benefit expenses and the $41 million charge related to the elimination of approximately 600 positions. Newsprint and ink expense was up 8%, or $36 million, in 2004, as average newsprint prices increased 12%, while consumption decreased 3%. The Company recorded a $90 million charge for the estimated cost to settle with advertisers as a result of the reduced reported circulation at *Newsday* and *Hoy*, New York. The increase in operating expenses associated with new publications, included in the above categories, totaled about $32 million in 2004.

**Broadcasting and Entertainment**

**Operating Revenues and Profit**—In 2005, broadcasting and entertainment contributed 27% of the Company's revenues and 38% of its operating profits. The following table presents broadcasting and entertainment operating revenues, operating expenses and operating profit for television and radio/entertainment. The Company's broadcasting operations at the end of 2005 included 26 television

46

stations. Radio/entertainment includes WGN-AM, Chicago, Tribune Entertainment and the Chicago Cubs.

| (In millions) | 2005 | 2004 | 2003 | Change 05-04 | 04-03 |
|---|---|---|---|---|---|
| **Operating revenues** | | | | | |
| Television | $ 1,250 | $ 1,353 | $ 1,323 | - 8% | + 2% |
| Radio/entertainment | 249 | 243 | 235 | + 2% | + 3% |
| Total operating revenues | $ 1,499 | $ 1,596 | $ 1,558 | - 6% | + 2% |
| **Operating expenses** | | | | | |
| Television | $ 847 | $ 827 | $ 816 | + 2% | + 1% |
| Radio/entertainment | 215 | 225 | 213 | - 4% | + 5% |
| Total operating expenses | $ 1,062 | $ 1,052 | $ 1,029 | + 1% | + 2% |
| **Operating profit** | | | | | |
| Television | $ 403 | $ 526 | $ 507 | - 23% | + 4% |
| Radio/entertainment | 33 | 18 | 22 | + 80% | - 13% |
| Total operating profit | $ 436 | $ 544 | $ 529 | - 20% | + 3% |

Broadcasting and entertainment revenues decreased 6%, or $97 million, in 2005 due mainly to lower television revenues, partially offset by an increase in radio/entertainment revenues. Television revenues decreased 8%, or $103 million, in 2005 due to lower advertising revenues. Television advertising revenues reflected weakness in the telecom, automotive, and food categories, partially offset by increases in the financial and education categories. In addition, station revenues in New York, Los Angeles, Chicago and Boston were impacted by lower audience ratings due in part to the use of Nielsen's Local People Meters ("LPMs") in these markets. Compared to Nielsen's previous measurement methodology, LPMs have tended to reduce the overall share of broadcast television in relation to cable television and, within the broadcast television universe, disadvantage stations like Tribune's that target younger audiences. Radio/entertainment revenues increased 2%, or $6 million, in 2005 due to an increase at the Chicago Cubs, partially offset by lower revenues at Tribune Entertainment. Chicago Cubs revenues increased primarily as a result of growth in marketing and broadcasting revenues, while Tribune Entertainment revenues declined due to lower syndication revenues.

Broadcasting and entertainment revenues rose 2%, or $38 million, in 2004 due mainly to increased television revenues. Excluding the acquisitions of KPLR-TV, St. Louis (March 2003), and KWBP-TV, Portland, Ore. (March 2003) ("on a comparable basis"), broadcasting and entertainment revenues increased 2%, or $24 million. Television revenues increased 2%, or $30 million, in 2004. Television advertising growth was driven by gains in the telecom, education and fast food/restaurant categories, offset by softness in movies, retail and automobiles. On a comparable basis, television revenues were up 1%, or $16 million, due to higher advertising revenues.

Operating profit for broadcasting and entertainment was down 20%, or $108 million, in 2005. Television operating profit declined 23%, or $123 million, in 2005 due to lower operating revenues and increased compensation and programming expenses. Radio/entertainment operating profit increased 80%, or $15 million, in 2005 due to higher revenues at the Chicago Cubs and lower operating expenses primarily due to fewer programs in production at Tribune Entertainment.

Operating profit for broadcasting and entertainment was up 3%, or $15 million, in 2004 due to increased television operating profit. On a comparable basis, operating profit was up 2%, or

47

$12 million. Television operating profit rose 4%, or $19 million, in 2004 due to increased television revenues and lower programming expenses, partially offset by increased benefits expense. On a comparable basis, television operating profit increased 3%, or $15 million. The 2004 decline in radio and entertainment operating profit primarily reflects the absence of post-season revenues reported by the Chicago Cubs in 2003.

Operating Expenses—Operating expenses for 2005, 2004 and 2003 were as follows:

| | | | | Change | |
|---|---|---|---|---|---|
| (In millions) | 2005 | 2004 | 2003 | 05-04 | 04-03 |
| Compensation | $ 431 | $ 421 | $ 385 | + 2% | + 9% |
| Programming | 406 | 400 | 425 | + 1% | - 6% |
| Depreciation and amortization | 51 | 52 | 50 | - 2% | + 5% |
| Other | 174 | 179 | 169 | - 2% | + 5% |
| Total operating expenses | $ 1,062 | $ 1,052 | $ 1,029 | + 1% | + 2% |

Broadcasting and entertainment operating expenses increased 1%, or $10 million, in 2005 due to an increase in compensation and programming expenses, partially offset by a decrease in other expenses. Compensation expense increased 2%, or $10 million, in 2005 due to higher player compensation at the Chicago Cubs and increases in television. Programming expenses were up 1%, or $6 million, in 2005 due to higher broadcast rights amortization. Other expenses dropped 2%, or $5 million, in 2005.

Broadcasting and entertainment operating expenses increased 2%, or $23 million, in 2004. On a comparable basis, broadcasting and entertainment operating expenses were up 1%, or $12 million, due to an increase in compensation and other expenses, partially offset by a decrease in programming expenses. Compensation expense increased 9%, or $36 million, in 2004 due to higher retirement plan and other benefit expenses. On a comparable basis, compensation costs rose 9%, or $33 million. Other expenses were up 5%, or $10 million, in 2004 due to higher selling and administrative costs. On a comparable basis, other expenses increased 4%, or $7 million. Programming expenses dropped 6%, or $25 million, in 2004 due to a decline in broadcast rights amortization expense related to fewer program additions in 2004 compared to 2003. On a comparable basis, programming expenses decreased 7%, or $30 million.

Equity Results

| | | | | Change | |
|---|---|---|---|---|---|
| (In millions) | 2005 | 2004 | 2003 | 05-04 | 04-03 |
| Net income on equity investments | $ 41 | $ 18 | $ 6 | + 130% | + 221% |

Equity income totaled $41 million in 2005, an increase of $23 million from 2004. The increase primarily reflects improvements at TV Food Network and Comcast SportsNet Chicago. In addition, the Company is no longer recording losses for The WB Network as the Company's recorded investment has been reduced to zero and has no future funding commitments.

Equity income totaled $18 million in 2004, an increase of $12 million from 2003. The increase was primarily due to additional equity income from TV Food Network and the recognition of equity income from Comcast SportsNet Chicago, partially offset by increased equity losses from The WB Network.

See Note 6 to the Company's consolidated financial statements in Item 8 for discussion of the Company's investments in TMCT I and TMCT II which involve agreements with two of the Company's largest shareholders, Chandler Trust No. 1 and Chandler Trust No. 2.

48

**Interest and Dividend Income and Interest Expense**

| (In millions) | 2005 | 2004 | 2003 | Change 05-04 | 04-03 |
|---|---|---|---|---|---|
| Interest and dividend income | $ 7 | $ 3 | $ 6 | + 147% | - 50% |
| Interest expense | $ (155) | $ (153) | $ (198) | + 1% | - 23% |

Interest and dividend income increased to $7 million in 2005, from $3 million in 2004, due to higher cash balances and $1.9 million of dividend income related to the Company's investment in 19 million Time Warner shares. In September 2005, Time Warner paid a quarterly dividend of $.05 per share. In 2004, interest and dividend income declined $3 million compared to 2003.

Interest expense increased 1% in 2005 primarily due to new long-term notes issued in August 2005 and the issuance of commercial paper in September 2005 to pay the federal portion of the Matthew Bender and Mosby tax liabilities (see Note 8 to the Company's consolidated financial statements in Item 8). Interest expense decreased 23% in 2004 primarily due to the retirement of higher interest rate debt, which was replaced with commercial paper. Excluding the PHONES, the average debt level was $2.1 billion in 2005, $2.1 billion in 2004 and $2.4 billion in 2003. Including the PHONES, average debt levels were $2.6 billion in 2005, $2.6 billion in 2004 and $2.9 billion in 2003. Excluding the PHONES, outstanding debt was $2.8 billion at year-end 2005, $2.0 billion at year-end 2004 and $2.0 billion at year-end 2003. Including the PHONES, outstanding debt was $3.3 billion at year-end 2005, $2.6 billion at year-end 2004 and $2.6 billion at year-end 2003.

**Other**

Corporate expenses for 2005, 2004 and 2003 were as follows:

| (In millions) | 2005 | 2004 | 2003 | Change 05-04 | 04-03 |
|---|---|---|---|---|---|
| Corporate expenses | $ (49) | $ (52) | $ (53) | 5% | 2% |

Corporate expenses decreased 5%, or $3 million, in 2005 compared to 2004 primarily due to a pension curtailment gain of approximately $4 million as a result of changes to the retirement programs at the Company. Corporate expenses decreased 2%, or $1 million, in 2004 compared to 2003 due to lower compensation expense.

The effective tax rate in 2005 was 51.8%, compared with a rate of 39.1% in 2004 and 37.0% in 2003. In the third quarter of 2005, the Company recorded additional income tax expense of $150 million related to the Matthew Bender and Mosby tax liabilities (see Note 12 to the Company's consolidated financial statements in Item 8). In the first quarter of 2005, the Company reduced its income tax expense and liabilities by $12 million as a result of favorably resolving certain other federal income tax issues. The Company reduced its income tax expense and liabilities by a total of $25 million in 2003 as a result of favorably resolving certain state and federal income tax issues.

<u>**LIQUIDITY AND CAPITAL RESOURCES**</u>

Cash flow generated from operations is the Company's primary source of liquidity. Net cash provided by operations was $659 million in 2005, down from $1.1 billion in 2004. The decrease was mainly due to the payment of the federal portion of the Matthew Bender and Mosby tax liabilities. The Company expects to fund dividends, capital expenditures and other operating requirements with net cash provided by operations. Funding required for share repurchases and acquisitions is financed by available cash flow from operations and, if necessary, by the issuance of debt and proceeds from the issuance of stock related to stock option exercises.

49

Net cash used for investments totaled $725 million in 2005 compared with $226 million in 2004. The Company spent $206 million for capital expenditures during 2005. The Company spent $78 million in cash for investments and received $23 million from the sale of investments in 2005. As a result of the United States Tax Court opinion issued on September 27, 2005 related to the Matthew Bender tax dispute, the Company recorded additional goodwill of $459 million (see Note 12 to the Company's consolidated financial statements in Item 8).

Net cash provided by financing activities was $92 million in 2005 and included net proceeds from the issuance of commercial paper and long-term debt and from sales of stock to employees, partially offset by repayments of long-term debt, repurchases of common stock and payments of dividends. The Company repaid $199 million of long-term debt in 2005. During 2005, the Company repurchased 12.2 million shares of its common stock in the open market for $440 million. Under the new 2005 stock repurchase authorization, the Company may buy back an additional $1 billion of its common stock. Dividends paid on common and preferred shares totaled $233 million in 2005. Quarterly dividends per share on common stock were $.18 in 2005, up from $.12 in 2004.

At Dec. 25, 2005, the Company had revolving credit agreements with a number of financial institutions providing for borrowings in an aggregate amount of up to $1.2 billion. The revolving credit agreements allow the Company to elect one-month to twelve-month LIBOR rates, based on the term of the borrowing. At Dec. 25, 2005, the one-month LIBOR rate was 4.38% and the twelve-month LIBOR rate was 4.85%. The agreements contain covenants which require the Company to maintain a minimum interest coverage ratio. No amounts were borrowed under the agreements at Dec. 25, 2005, and the Company was in compliance with the covenants.

The Company regularly issues commercial paper for cash requirements and maintains revolving credit agreements equal to or in excess of any commercial paper outstanding. As of Dec. 25, 2005, the Company had $924 million of commercial paper outstanding. On Sept. 30, 2005, the Company paid $880 million to the Internal Revenue Service ("IRS"), representing the federal tax and interest owed on the Matthew Bender and Mosby transactions, and financed the payment through the issuance of commercial paper. The Company expects to make related state tax and interest payments of approximately $125 million by mid 2006 (see Note 12 to the Company's consolidated financial statements in Item 8).

The Company's commercial paper is rated "A-2," "P-2," "F-2" and "R-1 (low)" by Standard & Poor's ("S&P"), Moody's Investors Services ("Moody's"), Fitch Ratings ("Fitch") and Dominion Bond Rating Service ("Dominion"), respectively. The Company's senior unsecured long-term debt is rated "A-" by S&P, "A3" by Moody's, "A-" by Fitch and "A (low)" by Dominion. In addition, S&P and Moody's have "stable" outlooks on the Company while Fitch has a "negative" outlook.

The Company has for several years maintained active debt shelf registration statements for its medium-term note program and other financing needs. The $778 million debt financing completed in the third quarter of 2005 used the remaining capacity under these shelf registration statements. A new $1 billion shelf registration statement was declared effective in February 2006. Proceeds from any future debt issuances under the new shelf would be used for general corporate purposes, including repayment of debt, capital expenditures, working capital, financing of acquisitions and stock repurchase programs.

The notes issued by the Employee Stock Ownership Plan ("ESOP") matured on Dec. 16, 2003 and were fully repaid. The notes were unconditionally guaranteed by the Company as to payment of principal and interest (see Note 15 to the Company's consolidated financial statements in Item 8).

**Off-Balance Sheet Arrangements**—Off-balance sheet arrangements as defined by the Securities and Exchange Commission include the following four categories: obligations under certain guarantees or contracts; retained or contingent interests in assets transferred to an unconsolidated entity or similar

50

arrangements; obligations under certain derivative arrangements; and obligations under material variable interests. The Company has not entered into any material arrangements, which would fall under any of these four categories, which would be reasonably likely to have a current or future material effect on the Company's financial condition, revenues or expenses, results of operations, liquidity or capital expenditures.

**Contractual Obligations**—The table below presents long-term debt maturities, required payments under contractual agreements for broadcast rights recorded in the consolidated balance sheets and future minimum lease payments to be made under non-cancelable operating leases as of Dec. 25, 2005 (in thousands).

| Fiscal Year | Long-term Debt | Broadcast Rights Contracts Payable(1) | Future Minimum Lease Payments(2) | Total |
|---|---|---|---|---|
| 2006 | $ 302,460 | $ 329,930 | $ 62,320 | $ 694,710 |
| 2007 | 18,550 | 195,935 | 55,810 | 270,295 |
| 2008 | 1,482,247 | 138,731 | 50,000 | 1,670,978 |
| 2009 | 13,224 | 91,485 | 42,723 | 147,432 |
| 2010 | 451,056 | 45,500 | 29,034 | 525,590 |
| Thereafter | 994,185 | 57,227 | 50,150 | 1,101,562 |
| Total | $ 3,261,722 | $ 858,808 | $ 290,037 | $ 4,410,567 |

(1)
The Company has entered into commitments for broadcast rights that are not currently available for broadcast and are therefore not included in the financial statements (see Note 11 to the Company's consolidated financial statements in Item 8) or in the table above. These commitments totaled $252 million at Dec. 25, 2005. Payments for broadcast rights generally commence when the programs become available for broadcast.

(2)
The Company had commitments totaling $252 million at Dec. 25, 2005 related to the purchase of inventory, property, plant and equipment, and talent contracts. In addition, under its current agreement with Abitibi Consolidated Inc., the Company has a commitment to purchase 450,000 metric tons of newsprint each year over the next two years at prevailing market prices at the time of purchase. The Company is in the process of negotiating an amendment to this agreement, which among other things, would extend the current agreement to 2009. (See Note 11 to the Company's consolidated financial statements in Item 8).

**Capital Spending**—The Company spent $206 million for capital expenditures during 2005 and $217 million in 2004 (see Note 17 to the Company's consolidated financial statements in Item 8 for capital spending by business segment.) The Company classifies capital expenditures that are expected to provide a rate of return on investment above an internally set minimum rate as growth expenditures. The Company spent $87 million in 2005 and $119 million in 2004 on growth expenditures, primarily in publishing.

Major capital projects that were in process during 2005 included the expansion of preprint inserting operations and color press capacities and the implementation of a new standard advertising system.

Capital spending for the expansion of preprint inserting capacity in Los Angeles, South Florida and Orlando totaled $6 million in 2005. During 2004 and 2003, the Company spent $7 million and $12 million, respectively. The Los Angeles and South Florida expansions were operational in 2004. As of Dec. 25, 2005, the installation of additional equipment and systems at Orlando was in progress. The Orlando expansion is scheduled to be completed by mid-2006 with additional capital spending of approximately $4 million in 2006.

The Company's Los Angeles, Chicago and South Florida newspapers are increasing their color press capacities. The Los Angeles expansion was operational in 2005, while the Chicago and South Florida expansions are scheduled to be completed in late 2006. Capital spending for the color

51

expansion at these three newspapers totaled $45 million, $78 million and $8 million in 2005, 2004 and 2003, respectively. Additional capital spending of $15 million is expected for the color expansions in 2006.

With respect to the advertising systems project, the Company is in the process of implementing a new standard advertising system in all ten of its newspaper markets at a total estimated capital cost of approximately $80 million. The project began in 2004 and is expected to be completed by early 2008. Capital spending for this project totaled $12 million in 2005 and $4 million in 2004. Capital spending for this project is expected to be approximately $35 million in 2006.

The Company expects 2006 capital expenditures to be somewhat higher than 2005. Management reviews the capital expenditure program periodically and modifies it as required to meet current business needs. It is expected that 2006 capital expenditures will be funded from cash flow generated from operations.

**Effects of Inflation**—The Consumer Price Index, a widely used measure of the impact of changing prices, has increased only moderately in recent years, up between 2% and 3% each year since 1991. This level of inflation has not impacted the Company's operations significantly, nor have historically higher inflation levels that prevailed prior to 1991. The principal effect of inflation on the Company's operating results is to increase costs. Subject to normal competitive conditions, the Company generally has demonstrated an ability to raise sales prices to offset these cost increases.

52

Powered by Morningstar® Document Research℠

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.

**Interest Rate Risk**—All of the Company's borrowings are denominated in U.S. dollars. The Company's policy is to manage interest rate risk by issuing long-term debt and medium-term notes at fixed interest rates and short-term promissory notes.

Information pertaining to the Company's debt at Dec. 25, 2005 is shown in the table below (in thousands).

| Maturities | Fixed Rate Debt | Weighted Avg. Interest Rate | Variable Rate Debt | Weighted Avg. Interest Rate | Total Debt |
|---|---|---|---|---|---|
| 2006(1)(2) | $    578,928 | 4.6% | $    923,532 | 4.4% | $  1,502,460 |
| 2007 | 18,550 | 7.7% | — | | 18,550 |
| 2008 | 282,247 | 5.8% | — | | 282,247 |
| 2009 | 13,224 | 7.7% | — | | 13,224 |
| 2010 | 451,056 | 4.9% | — | | 451,056 |
| Thereafter(3)(4) | 994,185 | 3.9% | — | — | 994,185 |
| Total at Dec. 25, 2005 | $  2,338,190 | | $    923,532 | | $  3,261,722 |
| Fair Value at Dec. 25, 2005(5) | $  2,363,176 | | $    923,532 | | $  3,286,708 |

(1)  Includes $638 million related to the Company's commercial paper (variable rate debt), $269 million related to the Company's 2% PHONES (fixed rate debt) and $293 million related to the Company's medium-term notes (fixed rate debt). These amounts were classified as long-term and treated as maturing in 2008 for financial statement presentation purposes because of the Company's ability and intent to refinance these securities, on a long-term basis, as the commercial paper and medium-term notes mature in 2006 or, in the case of the 2% PHONES, if put to the Company in 2006. See Note 8 to the Company's consolidated financial statements in Item 8 for further discussion.

(2)  Includes $15 million of property financing obligation (fixed rate debt). See Note 8 to the Company's consolidated financial statements in Item 8 for further discussion.

(3)  Includes $241 million related to the Company's 2% PHONES, due 2029. The Company may redeem the PHONES at any time for the greater of the principal value of the PHONES ($156.84 per PHONES at Dec. 25, 2005) or then market value of two shares of Time Warner common stock, subject to certain adjustments. Quarterly interest payments are made to the PHONES holders at an annual rate of 2% of the initial principal. The Company records both cash and non-cash interest expense on the discounted debt component of the PHONES. See Note 8 to the Company's consolidated financial statements in Item 8 for further discussion.

(4)  Includes $30 million related to the interest rate swap agreement on the $100 million 7.5% debentures due in 2023 effectively converting the fixed 7.5% rate to a variable rate based on LIBOR.

(5)  Fair value was determined based on quoted market prices for similar issues or on current rates available to the Company for debt of the same remaining maturities and similar terms. The carrying value of the Company's derivative instruments approximates fair value. The fair value of the PHONES was determined by reference to the market value resulting from trading on a national securities exchange.

53

Information pertaining to the Company's debt at Dec. 26, 2004 is shown in the table below (in thousands).

| Maturities | Fixed Rate Debt | Weighted Avg. Interest Rate | Variable Rate Debt | Weighted Avg. Interest Rate | Total Debt |
|---|---|---|---|---|---|
| 2005(1)(2) | $    485,767 | 3.7% | $    773,206 | 2.4% | $  1,256,973 |
| 2006 | 309,268 | 6.8% | — | — | 309,268 |
| 2007 | 17,545 | 7.7% | — | — | 17,545 |
| 2008 | 281,135 | 5.8% | — | — | 281,135 |
| 2009 | 12,020 | 7.7% | — | — | 12,020 |
| Thereafter(3)(4) | 712,759 | 3.6% | — | — | 712,759 |
| Total at Dec. 26, 2004 | $  1,816,494 | | $    773,206 | | $  2,589,700 |
| Fair Value at Dec. 26, 2004(5) | $  1,950,114 | | $    773,206 | | $  2,723,320 |

(1) Includes $694 million related to the Company's commercial paper (variable rate debt) and $291 million related to the Company's 2% PHONES (fixed rate debt). These amounts were classified as long-term and treated as maturing in 2008 for financial statement presentation purposes because of the Company's ability and intent to refinance these securities, on a long-term basis, as the commercial paper matures in 2005 or, in the case of the 2% PHONES, if put to the Company in 2005. See Note 8 to the Company's consolidated financial statements in Item 8 for further discussion.

(2) Includes $14 million of property financing obligation (fixed rate debt). See Note 8 to the Company's consolidated financial statements in Item 8 for further discussion.

(3) Includes $294 million related to the Company's 2% PHONES, due 2029. The Company may redeem the PHONES at any time for the greater of the principal value of the PHONES ($157 per PHONES at Dec. 26, 2004) or the then market value of two shares of Time Warner common stock, subject to certain adjustments. Quarterly interest payments are made to the PHONES holders at an annual rate of 2% of the initial principal. The Company records both cash and non-cash interest expense on the discounted debt component of the PHONES. See Note 8 to the Company's consolidated financial statements in Item 8 for further discussion.

(4) Includes $31 million related to the interest rate swap agreement on the $100 million 7.5% debentures due in 2023 effectively converting the fixed 7.5% rate to a variable rate based on LIBOR.

(5) Fair value was determined based on quoted market prices for similar issues or on current rates available to the Company for debt of the same remaining maturities and similar terms. The carrying value of the Company's derivative instruments approximates fair value. The fair value of the PHONES was determined by reference to the market value resulting from trading on a national securities exchange.

**Equity Price Risk**

**Available-For-Sale Securities**—The Company has common stock investments in publicly traded companies that are subject to market price volatility. Except for 16 million shares of Time Warner common stock (see discussion below), these investments are classified as available-for-sale securities and are recorded on the balance sheet at fair value with unrealized gains or losses, net of related tax effects, reported in the accumulated other comprehensive income component of shareholders' equity.

**2005**—The following analysis presents the hypothetical change at Dec. 25, 2005 in the fair value of the Company's common stock investments in publicly traded companies that are classified as available-for-sale, assuming hypothetical stock price fluctuations of plus or minus 10%, 20% and 30% in each stock's price. As of Dec. 25, 2005, the Company's common stock investments in publicly traded

54

Powered by Morningstar® Document Research℠

companies consisted primarily of 3.1 million shares of Time Warner common stock unrelated to PHONES (see discussion below in "Derivatives and Related Trading Securities").

| (In thousands) | Valuation of Investments Assuming Indicated Decrease in Stock's Price | | | Dec. 25, 2005 Fair Value | Valuation of Investments Assuming Indicated Increase in Stock's Price | | |
|---|---|---|---|---|---|---|---|
| | -30% | -20% | -10% | | +10% | +20% | +30% |
| Common stock investments in public companies | $ 38,139 | $ 43,588 | $ 49,036 | $ 54,485(1) | $ 59,933 | $ 65,382 | $ 70,830 |

(1)        Excludes 16 million shares of Time Warner common stock. See discussion below in "Derivatives and Related Trading Securities."

During the last 12 quarters preceding Dec. 25, 2005, market price movements caused the fair value of the Company's common stock investments in publicly traded companies to change by 10% or more in three of the quarters, by 20% or more in one of the quarters and by 30% or more in one of the quarters.

2004—The following analysis presents the hypothetical change at Dec. 26, 2004 in the fair value of the Company's common stock investments in publicly traded companies that are classified as available-for-sale, assuming hypothetical stock price fluctuations of plus or minus 10%, 20% and 30% in each stock's price. As of Dec. 26, 2004, the Company's common stock investments in publicly traded companies consisted primarily of 3.1 million shares of Time Warner common stock unrelated to PHONES (see discussion below in "Derivatives and Related Trading Securities").

| (In thousands) | Valuation of Investments Assuming Indicated Decrease in Stock's Price | | | Dec. 26, 2004 Fair Value | Valuation of Investments Assuming Indicated Increase in Stock's Price | | |
|---|---|---|---|---|---|---|---|
| | -30% | -20% | -10% | | +10% | +20% | +30% |
| Common stock investments in public companies | $ 41,890 | $ 47,875 | $ 53,859 | $ 59,843(1) | $ 65,828 | $ 71,812 | $ 77,796 |

(1)        Excludes 16 million shares of Time Warner common stock. See discussion below in "Derivatives and Related Trading Securities."

During the last 12 quarters preceding Dec. 26, 2004, market price movements caused the fair value of the Company's common stock investments in publicly traded companies to change by 10% or more in six of the quarters, by 20% or more in three of the quarters and by 30% or more in two of the quarters.

**Derivatives and Related Trading Securities**—The Company issued 8 million PHONES in April 1999 indexed to the value of its investment in 16 million shares of Time Warner common stock (see Note 8 to the Company's consolidated financial statements in Item 8). Beginning in the second quarter of 1999, this investment in Time Warner is classified as a trading security, and changes in its fair value, net of the changes in the fair value of the related derivative component of the PHONES, are recorded in the statement of income.

At maturity, the PHONES will be redeemed at the greater of the then market value of two shares of Time Warner common stock or the principal value of the PHONES ($156.84 per PHONES at Dec. 25, 2005). At Dec. 25, 2005 and Dec. 26, 2004, the PHONES carrying value was approximately $510 million and $585 million, respectively. Since the issuance of the PHONES in April 1999, changes in the fair value of the derivative component of the PHONES have partially offset changes in the fair value of the related Time Warner shares. There have been and may continue to be periods with significant non-cash increases or decreases to the Company's net income pertaining to the PHONES and the related Time Warner shares.

55

Source: TRIBUNE CO, 10-K, February 28, 2006                    Powered by Morningstar® Document Research℠

**2005**—The following analysis presents the hypothetical change at Dec. 25, 2005, in the fair value of the Company's 16 million shares of Time Warner common stock related to the PHONES assuming hypothetical stock price fluctuations of plus or minus 10%, 20% and 30% in the stock's price.

| (In thousands) | Valuation of Investment Assuming Indicated Decrease in Stock Price | | | Dec. 25, 2005 Fair Value | Valuation of Investment Assuming Indicated Increase in Stock Price | | |
|---|---|---|---|---|---|---|---|
| | -30% | -20% | -10% | | +10% | +20% | +30% |
| Time Warner common stock | $ 198,016 | $ 226,304 | $ 254,592 | $ 282,880 | $ 311,168 | $ 339,456 | $ 367,744 |

During the last 12 quarters preceding Dec. 25, 2005, market price movements have caused the fair value of the Company's 16 million shares of Time Warner common stock to change by 10% or more in three of the quarters, by 20% or more in one of the quarters and by 30% or more in one of the quarters.

**2004**—The following analysis presents the hypothetical change at Dec. 26, 2004, in the fair value of the Company's 16 million shares of Time Warner common stock related to the PHONES assuming hypothetical stock price fluctuations of plus or minus 10%, 20% and 30% in the stock's price.

| (In thousands) | Valuation of Investment Assuming Indicated Decrease in Stock Price | | | Dec. 26, 2004 Fair Value | Valuation of Investment Assuming Indicated Increase in Stock Price | | |
|---|---|---|---|---|---|---|---|
| | -30% | -20% | -10% | | +10% | +20% | +30% |
| Time Warner common stock | $ 214,368 | $ 244,992 | $ 275,616 | $ 306,240 | $ 336,864 | $ 367,488 | $ 398,112 |

During the last 12 quarters preceding Dec. 26, 2004, market price movements have caused the fair value of the Company's 16 million shares of Time Warner common stock to change by 10% or more in six of the quarters, by 20% or more in three of the quarters and by 30% or more in two of the quarters.

56

Powered by Morningstar® Document Research℠

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.**

## INDEX TO FINANCIAL STATEMENTS
## AND FINANCIAL STATEMENT SCHEDULE

|  | Page |
|---|---|
|  | 59 |
| Report of Independent Registered Public Accounting Firm | 61 |
| Management's Responsibility for Financial Statements and Management's Report on Internal Control Over Financial Reporting | 63 |
| Consolidated Statements of Income for each of the three fiscal years in the period ended Dec. 25, 2005 | 64 |
| Consolidated Balance Sheets at Dec. 25, 2005 and Dec. 26, 2004 | 66 |
| Consolidated Statements of Shareholders' Equity for each of the three fiscal years in the period ended Dec. 25, 2005 | 68 |
| Consolidated Statements of Cash Flows for each of the three fiscal years in the period ended Dec. 25, 2005 | 69 |
| Notes to Consolidated Financial Statements | 77 |
|     Note 1: Summary of Significant Accounting Policies | 77 |
|     Note 2: Changes in Operations and Non-Operating Items | 80 |
|     Note 3: Newsday and Hoy, New York Charge | 81 |
|     Note 4: Inventories | 82 |
|     Note 5: Goodwill and Other Intangible Assets | 84 |
|     Note 6: TMCT I and TMCT II | 87 |
|     Note 7: Investments | 88 |
|     Note 8: Long-Term Debt | 91 |
|     Note 9: Contracts Payable for Broadcast Rights | 91 |
|     Note 10: Fair Value of Financial Instruments | 92 |
|     Note 11: Commitments and Contingencies | 96 |
|     Note 12: Income Taxes | 100 |
|     Note 13: Pension and Postretirement Benefits | 101 |
|     Note 14: Capital Stock and Share Purchase Plan | 103 |
|     Note 15: Incentive Compensation and Stock Plans | 106 |
|     Note 16: Comprehensive Income | 108 |
|     Note 17: Business Segments | 109 |
| 2005 Quarterly Results | 110 |
| 2004 Quarterly Results | |
| Eleven Year Financial Summary | |
| Financial Statement Schedule for each of the three fiscal years in the period ended Dec. 25, 2005 | 112 |
|     Schedule II Valuation and Qualifying Accounts and Reserves | |

&bull;    All other schedules required under Regulation S-X are omitted because they are not applicable or not required.

(This page has been left blank intentionally.)

58

Powered by Morningstar® Document Research℠

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Shareholders of Tribune Company:

We have completed integrated audits of Tribune Company's 2005 and 2004 consolidated financial statements and of its internal control over financial reporting as of December 25, 2005, and an audit of its 2003 consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below.

### Consolidated financial statements and financial statement schedule

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Tribune Company and its subsidiaries at December 25, 2005 and December 26, 2004, and the results of their operations and their cash flows for each of the three years in the period ended December 25, 2005 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the accompanying index presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 1 to the consolidated financial statements, the Company changed the manner in which it evaluates certain indefinite-lived intangible assets for impairment.

### Internal control over financial reporting

Also, in our opinion, management's assessment, included in the accompanying Management's Report on Internal Control Over Financial Reporting, that the Company maintained effective internal control over financial reporting as of December 25, 2005 based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 25, 2005, based on criteria established in *Internal Control—Integrated Framework* issued by the COSO. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

59

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

*PricewaterhouseCoopers LLP*

PricewaterhouseCoopers LLP
Chicago, Illinois
February 21, 2006

60

Powered by Morningstar℠ Document Research℠

## MANAGEMENT'S RESPONSIBILITY FOR FINANCIAL STATEMENTS AND
## MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING

**Management's Responsibility for Financial Statements**

Management is responsible for the preparation, integrity and fair presentation of the Company's consolidated financial statements and related financial information included in this Annual Report on Form 10-K to shareholders. The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America and necessarily include certain amounts that are based on management's best estimates and judgments.

The system of internal control over financial reporting is periodically assessed for its effectiveness and is augmented by written policies and procedures, the careful selection and training of qualified personnel and a program of internal audit.

The consolidated financial statements were audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, and their report is shown on pages 59 and 60. PricewaterhouseCoopers LLP was given unrestricted access to all financial records and related data, including minutes of all meetings of shareholders, the Board of Directors and committees of the Board. The Company believes that all representations made to the independent accountants during their audits were valid and appropriate.

The Audit Committee of the Board of Directors is responsible for reviewing and monitoring the Company's financial reporting and accounting practices. The Audit Committee consists of four independent directors. The Committee meets with representatives of management, the independent registered public accounting firm and internal auditors to discuss financial reporting, accounting and internal control matters. PricewaterhouseCoopers LLP and the internal auditors have direct access to the Audit Committee.

**Management's Report on Internal Control Over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting, designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. As of Dec. 25, 2005, the Company's management conducted an evaluation of the effectiveness of the design and operation of the Company's internal control over financial reporting based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and concluded that the Company's internal control over financial reporting was effective as of that date. Our management's assessment of the effectiveness of the Company's internal control over financial reporting as of Dec. 25, 2005 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein.


Dennis J. FitzSimons
Chairman, President and Chief Executive Officer

Donald C. Grenesko
Senior Vice President/Finance and
Administration

61

(This page has been left blank intentionally.)

62

Powered by Morningstar® Document Research℠

## TRIBUNE COMPANY AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF INCOME
(In thousands of dollars, except per share data)

| | Year Ended | | |
|---|---|---|---|
| | Dec. 25, 2005 | Dec. 26, 2004 | Dec. 28, 2003 |
| **Operating Revenues** | | | |
| Publishing | | | |
| Advertising | $ 3,244,100 | $ 3,228,493 | $ 3,108,802 |
| Circulation | 596,163 | 643,947 | 663,870 |
| Other | 256,587 | 257,410 | 264,248 |
| Total | 4,096,850 | 4,129,850 | 4,036,920 |
| Broadcasting and entertainment | 1,498,767 | 1,596,397 | 1,557,909 |
| Total operating revenues | 5,595,617 | 5,726,247 | 5,594,829 |
| **Operating Expenses** | | | |
| Cost of sales (exclusive of items shown below) | 2,736,998 | 2,708,394 | 2,635,538 |
| Selling, general and administrative | 1,467,976 | 1,566,475 | 1,370,431 |
| Depreciation | 224,625 | 214,226 | 214,250 |
| Amortization of intangible assets | 19,195 | 18,863 | 14,136 |
| Total operating expenses | 4,448,794 | 4,507,958 | 4,234,355 |
| **Operating Profit** | 1,146,823 | 1,218,289 | 1,360,474 |
| Net income on equity investments | 41,209 | 17,931 | 5,590 |
| Interest and dividend income | 7,539 | 3,053 | 6,048 |
| Interest expense | (155,191) | (153,118) | (198,123) |
| Gain (loss) on change in fair values of derivatives and related investments | 62,184 | (18,497) | 84,066 |
| Loss on early debt retirement | — | (140,506) | — |
| Gain on sales of subsidiaries and investments, net | 6,780 | 20,347 | 147,507 |
| Loss on investment write-downs | — | (5,599) | (9,764) |
| Gain on insurance recoveries | — | — | 22,291 |
| Other non-operating gain (loss), net | 897 | (789) | (2,853) |
| **Income Before Income Taxes and Cumulative Effect of Change in Accounting Principle** | 1,110,241 | 941,111 | 1,415,236 |
| Income taxes (Note 12) | (575,552) | (367,787) | (523,857) |
| **Income Before Cumulative Effect of Change in Accounting Principle** | 534,689 | 573,324 | 891,379 |
| Cumulative effect of change in accounting principle, net of tax (Note 1) | — | (17,788) | — |
| **Net Income** | 534,689 | 555,536 | 891,379 |
| Preferred dividends, net of tax | (8,364) | (8,308) | (24,441) |
| **Net Income Attributable to Common Shares** | $ 526,325 | $ 547,228 | $ 866,938 |
| **Earnings Per Share (Note 1)** | | | |
| **Basic:** | | | |
| Before cumulative effect of change in accounting principle | $ 1.68 | $ 1.75 | $ 2.78 |
| Cumulative effect of change in accounting principle, net of tax | | (.05) | |
| Total | $ 1.68 | $ 1.70 | $ 2.78 |
| **Diluted:** | | | |
| Before cumulative effect of change in accounting principle | $ 1.67 | $ 1.72 | $ 2.61 |
| Cumulative effect of change in accounting principle, net of tax | | (.05) | |
| Total | $ 1.67 | $ 1.67 | $ 2.61 |

Powered by Morningstar℠ Document Research℠

See Notes to Consolidated Financial Statements.

63

Powered by Morningstar® Document Research℠

**TRIBUNE COMPANY AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(In thousands of dollars, except share data)**

| | Dec. 25, 2005 | Dec. 26, 2004 |
|---|---|---|
| **Assets** | | |
| | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 151,110 | $ 124,411 |
| Accounts receivable (net of allowances of $42,558 and $49,507) | 798,441 | 850,214 |
| Inventories | 44,103 | 49,796 |
| Broadcast rights (net of allowances of $3,000 and $3,000) | 308,011 | 260,527 |
| Deferred income taxes | 114,274 | 116,438 |
| Assets held for sale (Note 2) | 24,436 | — |
| Prepaid expenses and other | 52,458 | 51,058 |
| | | |
| Total current assets | 1,492,833 | 1,452,444 |
| | | |
| **Properties** | | |
| Machinery, equipment and furniture | 2,314,085 | 2,299,585 |
| Buildings and leasehold improvements | 992,083 | 984,876 |
| | 3,306,168 | 3,284,461 |
| Accumulated depreciation | (1,853,914) | (1,812,453) |
| | 1,452,254 | 1,472,008 |
| Land | 127,167 | 135,808 |
| Construction in progress | 152,506 | 174,552 |
| | | |
| Net properties | 1,731,927 | 1,782,368 |
| | | |
| **Other Assets** | | |
| Broadcast rights (net of allowances of $1,004 and $2,226) | 361,376 | 391,249 |
| Goodwill | 5,947,142 | 5,487,379 |
| Other intangible assets, net | 3,087,723 | 3,106,679 |
| Time Warner stock related to PHONES debt | 282,880 | 306,240 |
| Other investments | 632,663 | 589,258 |
| Prepaid pension costs | 871,382 | 884,737 |
| Other | 138,316 | 155,078 |
| | | |
| Total other assets | 11,321,482 | 10,920,620 |
| | | |
| Total assets | $ 14,546,242 | $ 14,155,432 |

See Notes to Consolidated Financial Statements.

64

Powered by Morningstar® Document Research℠

### TRIBUNE COMPANY AND SUBSIDIARIES
### CONSOLIDATED BALANCE SHEETS
(In thousands of dollars, except share data)

| | Dec. 25, 2005 | Dec. 26, 2004 |
|---|---|---|
| **Liabilities and Shareholders' Equity** | | |
| **Current Liabilities** | | |
| Debt due within one year | $ 302,460 | $ 271,767 |
| Accounts payable | 168,205 | 162,117 |
| Employee compensation and benefits | 244,156 | 159,214 |
| Contracts payable for broadcast rights | 329,930 | 319,425 |
| Deferred income | 101,065 | 96,841 |
| Other | 300,842 | 308,597 |
| Total current liabilities | 1,446,658 | 1,357,961 |
| | | |
| **Long-Term Debt** | | |
| PHONES debt related to Time Warner stock | 509,701 | 584,880 |
| Other long-term debt (less portions due within one year) | 2,449,561 | 1,733,053 |
| Total long-term debt | 2,959,262 | 2,317,933 |
| | | |
| **Other Non-Current Liabilities** | | |
| Deferred income taxes | 2,352,633 | 2,278,423 |
| Contracts payable for broadcast rights | 528,878 | 538,101 |
| Deferred compensation and benefits | 356,612 | 392,966 |
| Other obligations | 176,648 | 433,204 |
| Total other non-current liabilities | 3,414,771 | 3,642,694 |
| | | |
| **Commitments and Contingent Liabilities (Note 11)** | — | — |
| | | |
| **Shareholders' Equity** | | |
| Series C convertible preferred stock | | |
| Authorized: 823,568 shares; Issued and outstanding: 88,519 shares (net of 354,077 treasury shares) (liquidation value $500 per share) | 44,260 | 44,260 |
| Series D-1 convertible preferred stock | | |
| Authorized: 380,972 shares; Issued and outstanding: 76,194 shares (net of 304,778 treasury shares) (liquidation value $500 per share) | 38,097 | 38,097 |
| Series D-2 convertible preferred stock | | |
| Authorized: 245,100 shares; Issued and outstanding: 49,020 shares (net of 196,080 treasury shares) (liquidation value $500 per share) | 24,510 | 24,510 |
| Common stock ($0.01 par value) | | |
| Authorized: 1,400,000,000 shares; 390,122,134 shares outstanding at Dec. 25, 2005 and 400,514,576 shares outstanding at Dec. 26, 2004 | 2,270 | 2,373 |
| Additional paid-in capital | 6,818,533 | 6,916,132 |
| Retained earnings | 2,824,762 | 2,810,542 |
| Treasury common stock (at cost) 83,441,765 shares in 2005 and 2004 | (3,015,581) | (3,011,900) |
| Accumulated other comprehensive income (loss) | (11,300) | 12,830 |
| Total shareholders' equity | 6,725,551 | 6,836,844 |
| Total liabilities and shareholders' equity | $ 14,546,242 | $ 14,155,432 |

See Notes to Consolidated Financial Statements.

65

Source: TRIBUNE CO, 10-K, February 28, 2006

Powered by Morningstar® Document Research℠

## TRIBUNE COMPANY AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
### (In thousands, except per share data)

| | Total | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Series B | Series C(1) | Series D-1(1) | Series D-2(1) |
|---|---|---|---|---|---|---|---|
| Balance at Dec. 29, 2002 | $ 6,119,235 $ | 4,516,291 $ | 7,606 $ | 227,408 $ | 44,260 $ | 38,097 $ | 24,510 |
| Comprehensive income: | | | | | | | |
| Net income | 891,379 | 891,379 | | | | | |
| Other comprehensive income: | | | | | | | |
| Change in unrealized gain on securities, net | 7,557 | — | 7,557 | | | | |
| Change in minimum pension liabilities, net | (1,753) | — | (1,753) | | | | |
| Change in foreign currency translation adjustments, net | 106 | — | 106 | | | | |
| Comprehensive income | 897,289 | | | | | | |
| Dividends declared: | | | | | | | |
| Common ($.44 per share) | (136,601) | (136,601) | | | | | |
| Series B preferred ($1.03 per share) | (16,683) | (16,683) | | | | | |
| Series C, D-1 and D-2 preferred | (8,252) | (8,252) | | | | | |
| Tax benefit on dividends paid to the ESOP(2) | 494 | 494 | | | | | |
| Redemptions of convertible preferred stock | | | | (227,408) | | | |
| Conversions of LYONs debt securities | 277,240 | | | | | | |
| Shares issued under option and stock plans | 330,101 | | | | | | |
| Tax benefit on stock options exercised | 52,723 | | | | | | |
| Shares tendered as payment for options exercised | (163,178) | | | | | | |
| Purchases of treasury stock | (358,516) | | | | | | |
| Retirement of treasury stock | | (2,238,168) | | | | | |
| Repayment of ESOP debt | 33,772 | | | | | | |
| Balance at Dec. 28, 2003 | $ 7,028,124 $ | 3,008,460 $ | 13,516 $ | — $ | 44,260 $ | 38,097 $ | 24,510 |
| Comprehensive income: | | | | | | | |
| Net income | 555,536 | 555,536 | | | | | |
| Other comprehensive income: | | | | | | | |
| Change in unrealized gain on securities, net | 896 | — | 896 | | | | |
| Change in minimum pension liabilities, net | (1,700) | — | (1,700) | | | | |
| Change in foreign currency translation adjustments, net | 118 | — | 118 | | | | |
| Comprehensive income | 554,850 | | | | | | |
| Dividends declared: | | | | | | | |
| Common ($.48 per share) | (154,702) | (154,702) | | | | | |
| Series C, D-1 and D-2 preferred | (8,308) | (8,308) | | | | | |
| Shares issued under option and stock plans | 242,820 | | | | | | |
| Tax benefit on stock options exercised | 32,819 | | | | | | |
| Shares tendered as payment for options exercised | (139,733) | (51,879) | | | | | |
| Purchases of treasury stock | (734,086) | | | | | | |
| Retirement of treasury stock | | (538,565) | | | | | |
| Balance at Dec. 26, 2004 | $ 6,836,844 $ | 2,810,542 $ | 12,830 $ | — $ | 44,260 $ | 38,097 $ | 24,510 |
| Comprehensive income: | | | | | | | |
| Net income | 534,689 | 534,689 | | | | | |
| Other comprehensive income: | | | | | | | |
| Change in unrealized gain on securities, net | (3,463) | — | (3,463) | | | | |
| Change in minimum pension liabilities, net | (20,597) | — | (20,597) | | | | |
| Change in foreign currency translation adjustments, net | (70) | — | (70) | | | | |
| Comprehensive income | 510,559 | | | | | | |
| Dividends declared: | | | | | | | |
| Common ($.72 per share) | (225,110) | (225,110) | | | | | |
| Series C, D-1 and D-2 preferred | (8,364) | (8,364) | | | | | |
| Shares issued under option and stock plans | 51,100 | | | | | | |
| Tax benefit on stock options exercised | 5,395 | | | | | | |
| Shares tendered as payment for options exercised | (1,101) | (769) | | | | | |
| Purchases of treasury stock | (443,774) | | | | | | |
| Retirement of treasury stock | | (286,226) | | | | | |
| Balance at Dec. 25, 2005 | $ 6,725,551 $ | 2,824,762 $ | (11,300) $ | — $ | 44,260 $ | 38,097 $ | 24,510 |

(1) Amounts are net of treasury stock.

(2) Excludes the tax benefit on allocated preferred shares held by the ESOP, which was credited to income tax expense.

See Notes to Consolidated Financial Statements.

Powered by Morningstar® Document Research℠

Source: TRIBUNE CO, 10-K, February 28, 2006

Powered by Morningstar® Document Research℠

| Common Stock and Additional Paid-In Capital | | Treasury Common Stock | | Treasury Common Stock Held by Tribune Stock Compensation Fund | | Unearned Compensation (ESOP) |
|---|---|---|---|---|---|---|
| Amount (at cost) | Shares | Amount (at cost) | Shares | Amount (at cost) | Shares | |
| $ 8,342,505 | 536,887 | $ (7,047,670) | (230,978) | $ — | — | $ (33,772) |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| (109,718) | | 407,186 | 16,598 | | | |
| 117,565 | | 160,175 | 6,964 | | | |
| 93,073 | 39 | 209,979 | 9,068 | 27,049 | 583 | |
| 52,723 | | | | | | |
| | | (156,623) | (3,211) | (6,555) | (135) | |
| | | (338,022) | (7,070) | (20,494) | (448) | |
| (1,501,401) | (124,556) | 3,739,774 | 124,556 | — | — | 33,772 |
| | | | | | | |
| $ 6,924,484 | 412,370 | $ (3,025,203) | (84,073) | $ — | — | $ — |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| 167,563 | 5,006 | 73,057 | 1,726 | | | |
| 32,819 | | | | | | |
| (13,309) | (1,335) | (59,285) | (1,095) | | | |
| | | (734,086) | (15,526) | | | |
| (193,052) | (15,526) | 731,617 | 15,526 | — | — | |
| | | | | | | |
| $ 6,918,505 | 400,515 | $ (3,011,900) | (83,442) | $ — | — | $ — |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| 51,102 | 1,814 | — | | | | |
| 5,395 | | — | | | | |
| (332) | (26) | — | | | | |
| | | (443,774) | (12,181) | | | |
| (153,867) | (12,181) | 440,093 | 12,181 | | | |
| | | | | | | |
| $ 6,820,803 | 390,122 | $ (3,015,581) | (83,442) | $ — | — | $ — |

67

Source: TRIBUNE CO, 10-K, February 28, 2006

Powered by Morningstar® Document Research℠