### TRIBUNE COMPANY AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF CASH FLOWS
(In thousands of dollars)

| | Year Ended | | |
|---|---|---|---|
| | Dec. 25, 2005 | Dec. 26, 2004 | Dec. 28, 2003 |
| **Operations** | | | |
| Net income | $    534,689 | $    555,536 | $    891,379 |
| Adjustments to reconcile net income to net cash provided by operations: | | | |
| (Gain) loss on change in fair values of derivatives and related investments | (62,184) | 18,497 | (84,066) |
| Loss on early debt retirement | — | 140,506 | — |
| Gain on sales of subsidiaries and investments, net | (6,780) | (20,347) | (147,507) |
| Investment write-downs | — | 5,599 | 9,764 |
| Gain on insurance recoveries | — | — | (22,291) |
| Other non-operating (gain) loss, net | (897) | 789 | 2,853 |
| Cumulative effect of change in accounting principle, net of tax | — | 17,788 | — |
| Depreciation | 224,625 | 214,226 | 214,250 |
| Amortization of intangible assets | 19,195 | 18,863 | 14,136 |
| Net income on equity investments | (41,209) | (17,931) | (5,590) |
| Deferred income taxes | 93,071 | 40,006 | 252,500 |
| Tax benefit on stock options exercised | 5,395 | 32,819 | 52,723 |
| Changes in working capital items excluding effects from acquisitions and dispositions: | | | |
| Accounts receivable | 51,773 | 17,220 | (38,725) |
| Inventories, prepaid expenses and other current assets | 4,293 | (800) | 1,084 |
| Accounts payable, employee compensation and benefits, deferred income and accrued liabilities | 7,531 | 14,656 | (46,038) |
| Income taxes | 6,177 | 2,007 | 58,093 |
| Change in broadcast rights, net of liabilities | (16,329) | 6,558 | (19,417) |
| Change in prepaid pension costs | 13,355 | 7,677 | (27,788) |
| Change in Matthew Bender and Mosby tax reserve | (221,133) | 5,997 | 6,773 |
| Other, net | 47,781 | 13,524 | 46,546 |
| Net cash provided by operations | 659,353 | 1,073,190 | 1,158,679 |
| | | | |
| **Investments** | | | |
| Capital expenditures | (205,945) | (217,348) | (193,535) |
| Acquisitions | (4,207) | (551) | (237,511) |
| Investments | (78,071) | (48,831) | (25,735) |
| Matthew Bender and Mosby tax liability allocated to goodwill (Note 12) | (459,116) | — | — |
| Proceeds from sales of subsidiaries and investments | 22,534 | 40,232 | 223,004 |
| Net cash used for investments | (724,805) | (226,498) | (233,777) |
| | | | |
| **Financing** | | | |
| Issuance of commercial paper, net | 150,326 | 773,206 | — |
| Premium on early debt retirement | — | (137,331) | — |
| Repayments of long-term debt | (198,880) | (823,028) | (427,284) |
| Issuance of long-term debt | 777,660 | — | — |
| Long-term debt issuance costs | (4,762) | — | — |
| Sales of common stock to employees, net | 41,374 | 11,896 | 163,613 |
| Purchases of treasury common stock by Tribune Stock Compensation Fund | — | — | (20,494) |
| Other purchases of Tribune common stock | (440,093) | (731,617) | (338,023) |
| Dividends | (233,474) | (163,010) | (161,042) |
| Net cash provided by (used for) financing | 92,151 | (969,884) | (783,230) |
| | | | |
| Net Increase (Decrease) in Cash and Cash Equivalents | 26,699 | (123,192) | 141,672 |
| Cash and cash equivalents, beginning of year | 124,411 | 247,603 | 105,931 |
| Cash and cash equivalents, end of year | $    151,110 | $    124,411 | $    247,603 |

See Notes to Consolidated Financial Statements.

68

Powered by Morningstar® Document Research℠

TRIBUNE COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The significant accounting policies of Tribune Company and subsidiaries (the "Company"), as summarized below, conform with accounting principles generally accepted in the United States of America and reflect practices appropriate to the Company's businesses.

**Nature of Operations**—The Company is a media and entertainment company. Through its subsidiaries, the Company is engaged in newspaper publishing, television and radio broadcasting and entertainment.

**Fiscal Year**—The Company's fiscal year ends on the last Sunday in December. Fiscal years 2005, 2004 and 2003 each comprised 52 weeks.

**Principles of Consolidation**—The consolidated financial statements include the accounts of Tribune Company and all majority-owned subsidiaries. In general, investments comprising 20 to 50 percent of the voting stock of companies and certain partnership interests are accounted for using the equity method. All other investments are generally accounted for using the cost method. All significant intercompany transactions are eliminated.

The Company evaluates its investments and other transactions for consolidation under the provisions of Financial Accounting Standards Board ("FASB") Interpretation No. 46, "Consolidation of Variable Interest Entities" ("FIN 46"), issued in January 2003. The Company holds significant variable interests, as defined by FIN 46, in CareerBuilder, LLC, Classified Ventures, LLC, ShopLocal, LLC (formerly CrossMedia Services, Inc.) and Topix, LLC, but the Company has determined that it is not the primary beneficiary of these entities. The Company's maximum loss exposure related to these entities is limited to its equity investments in CareerBuilder, LLC, Classified Ventures, LLC, ShopLocal, LLC (formerly CrossMedia Services, Inc.) and Topix, LLC, which were $81 million, $42 million, $25 million and $15 million, respectively, at Dec. 25, 2005. At Dec. 26, 2004, the Company's equity investments in CareerBuilder, LLC, Classified Ventures, LLC and ShopLocal, LLC (formerly CrossMedia Services, Inc.) were $81 million, $8 million and $24 million, respectively.

**Presentation**—Certain prior year financial information has been reclassified to conform to the current year presentation.

**Revenue Recognition**—The Company's primary sources of revenue are from the sales of advertising space in published issues of its newspapers and on interactive websites owned by, or affiliated with, the Company; distribution of preprinted advertising inserts in its newspapers; sales of newspapers to distributors and individual subscribers; and sales of airtime on its television and radio stations. Newspaper advertising revenue is recorded, net of agency commissions, when advertisements are published in newspapers. Website advertising revenue is recognized ratably over the contract period or as services are delivered, as appropriate. Proceeds from subscriptions are deferred and are included in revenue on a pro-rata basis over the term of the subscriptions. Broadcast revenue is recorded, net of agency commissions, when commercials are aired. The Company records rebates when earned as a reduction of advertising revenue.

**Use of Estimates**—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from these estimates.

69

Powered by Morningstar® Document Research℠

**Cash and Cash Equivalents**—Cash and cash equivalents are stated at cost, which approximates market value. Investments with original maturities of three months or less at the time of purchase are considered to be cash equivalents.

**Accounts Receivable**—The Company's accounts receivable are primarily due from advertisers. Credit is extended based on an evaluation of each customer's financial condition, and generally collateral is not required. The Company maintains an allowance for uncollectible accounts, rebates and volume discounts. This allowance is determined based on historical write-off experience and any known specific collectibility exposures.

**Inventories**—Inventories are stated at the lower of cost or market. Cost is determined on the last-in, first-out ("LIFO") basis for newsprint and on the first-in, first-out ("FIFO") basis for all other inventories.

**Broadcast Rights**—Broadcast rights consist principally of rights to broadcast syndicated programs, sports and feature films and are stated at the lower of cost or estimated net realizable value. The total cost of these rights is recorded as an asset and a liability when the program becomes available for broadcast. Syndicated program rights that have limited showings are generally amortized using an accelerated method as programs are aired. Sports and feature film rights are amortized using the straight-line method. The current portion of broadcast rights represents those rights available for broadcast that are expected to be amortized in the succeeding year.

The Company maintains an allowance for programming that is not expected to be aired by the end of the contract period. This allowance for excess programming inventory is based on a program-by-program review of the Company's five-year broadcast plans and historical write-off trends. The total reserve balance at Dec. 25, 2005 and Dec. 26, 2004 was $4 million and $5 million, respectively. Actual write-offs in 2005 and 2004 were $1 million and $12 million, respectively. Future write-offs can vary based on changes in consumer viewing trends and the availability and costs of other programming.

**Properties**—Property, plant and equipment are stated at cost. The Company capitalizes major property, plant and equipment additions, improvements and replacements, as well as interest incurred during construction of major facilities and equipment. Depreciation is computed using the straight-line method over the following estimated useful lives: 10 to 40 years for buildings, 7 to 20 years for newspaper printing presses and 3 to 10 years for all other equipment. Expenditures for repairs and maintenance of existing assets are charged to expense as incurred.

**Goodwill and Other Intangible Assets**—Goodwill and other intangible assets are summarized in Note 5. The Company periodically reviews goodwill and certain intangible assets no longer being amortized for impairment in accordance with Financial Accounting Standard ("FAS") No. 142, "Goodwill and Other Intangible Assets." Under FAS No. 142, the impairment review of goodwill and other intangible assets not subject to amortization must be based generally on fair values.

The estimated fair value of the reporting units to which goodwill is allocated is determined using multiples of operating cash flows for purposes of analyzing goodwill for impairment. The estimated fair values of other assets subject to the annual impairment review, which include newspaper mastheads and FCC licenses, are calculated based on projected future discounted cash flow analyses. The development of market multiples and cash flow projections used in the analyses requires the use of assumptions, including assumptions regarding revenue and market growth. The analyses use discount rates based on specific economic factors in the publishing and broadcasting industries. These assumptions reflect the

70

Powered by Morningstar® Document Research℠

Company's best estimates, but these items involve inherent uncertainties based on market conditions generally outside of the Company's control.

In the fourth quarter of 2004, the Company elected to early adopt the provisions of the FASB's Emerging Issues Task Force Topic No. D-108, which requires the use of a direct valuation method for valuing intangible assets, such as FCC licenses, and reviewing them for impairment. Historically, the Company had been using a residual valuation method to review its FCC licenses for impairment each year. A direct valuation method generally results in a lower valuation than does a residual valuation method. The Company performed an impairment review of its FCC licenses for the years ended Dec. 28, 2003 using a residual method. No impairments were required as a result of the analyses performed in 2003. The effect of changing to a direct valuation method for the 2004 FCC licenses impairment review was a pretax charge of $29 million ($18 million after-tax). The charge was recorded in the fourth quarter of 2004 as a cumulative effect of a change in accounting principle in the consolidated statements of income.

Upon the adoption of FAS No. 142 at the beginning of fiscal 2002, the Company treated the intangible assets associated with network affiliation agreements as having indefinite lives and stopped recording amortization expense on these assets. In December 2003, the staff of the Securities and Exchange Commission provided guidance regarding their accounting position in this area indicating that network affiliation agreements should be amortized. As a result, the Company began amortizing these assets in the fourth quarter of 2003 using a 40-year life. The Company believes the 40-year life is representative of the remaining expected useful life of the network affiliation intangibles. The provisions of FAS No. 142 required the Company to perform an impairment analysis at the time of a change in the estimated useful life of an intangible asset which was previously not being amortized. No adjustment to the network affiliation intangible assets was required as a result of this impairment review performed in the fourth quarter of 2003. Beginning in 2004, the Company no longer performs an annual test of the impairment of its network affiliation agreements under FAS No. 142, but will perform an impairment test if indicators of impairment are present, as required by FAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets."

**Investments**—The Company records its investments in debt and equity securities at fair value, except for debt securities that the Company intends to hold to maturity and equity securities that are accounted for under the equity method or that are issued by private companies. Except for 16 million Time Warner shares (see "Derivative Instruments" below), investments are currently classified as available-for-sale, and accordingly, the difference between cost and fair value, net of related tax effects, is recorded in the accumulated other comprehensive income component of shareholders' equity.

**Derivative Instruments**—FAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," requires all derivative instruments to be recorded in the balance sheet at fair value. Changes in the fair value of derivative instruments are recognized periodically in income. The provisions of FAS No. 133 affect the Company's accounting for its 8 million Exchangeable Subordinated Debentures due 2029 ("PHONES") (see Note 8) and its interest rate swap related to its $100 million 7.5% debentures (see Note 8).

Under the provisions of FAS No. 133, the initial value of the PHONES was split into a debt component and a derivative component. Changes in the fair value of the derivative component of the PHONES are recorded in the statement of income. Beginning in the second quarter of 1999, changes in the fair value of the related 16 million Time Warner shares are also recorded in the statement of income and should at least partially offset changes in the fair value of the derivative component of the PHONES. However, there have been, and may continue to be, periods with significant non-cash

71

Powered by Morningstar® Document Research℠

increases or decreases to the Company's net income pertaining to the PHONES and the related Time Warner shares.

The carrying values of the Company's derivative instruments approximate fair value. The fair values of the PHONES were determined by reference to market values resulting from trading on a national securities exchange.

The Company's interest rate swap is a fair value hedge and is used to manage exposure to market risk associated with changes in interest rates. The changes in fair value of the swap agreement and the related debt instrument are recorded in income. Changes in the fair value of the swap agreement offset changes in the fair value of the related debt (see Note 8).

**Pension Plans**—Retirement benefits are provided to employees through pension plans sponsored either by the Company or by unions. Under the Company-sponsored plans, pension benefits are primarily a function of both the years of service and the level of compensation for a specified number of years, depending on the plan. It is the Company's policy to fund the minimum for Company-sponsored pension plans as required by ERISA. Contributions made to union-sponsored plans are based upon collective bargaining agreements. Additional information is provided in Note 13.

**Postretirement Benefits Other than Pensions**—The Company provides certain health care and life insurance benefits for retired employees. The expected cost of providing these benefits is accrued over the years that the employees render services. It is the Company's policy to fund postretirement benefits as claims are incurred. Additional information is provided in Note 13.

**Self-Insurance**—The Company self-insures for certain employee medical and disability income benefits, workers' compensation costs and automobile and general liability claims. The recorded liabilities for self-insured risks are calculated using actuarial methods and are not discounted. The recorded liabilities for self-insured risks totaled $113 million and $106 million at Dec. 25, 2005 and Dec. 26, 2004, respectively.

**Deferred Income**—Deferred income arises in the normal course of business from advance subscription payments for newspapers, interactive advertising sales and prepaid ticket revenue related to the Chicago Cubs. Deferred income is recognized in the period it is earned.

**Stock-Based Compensation**—The Company accounts for its stock-based compensation plans in accordance with Accounting Principles Board ("APB") Opinion No. 25 and related interpretations. Under APB No. 25, no compensation expense is recorded because the exercise price of employee stock options equals the market price of the underlying stock on the date of grant.

On June 24, 2005, the Company accelerated the vesting of certain stock options granted on Feb. 11, 2003 and Feb. 10, 2004, totaling 2.4 million in each year. Unvested stock options awarded to the then current executive officers of the Company on these grant dates, which aggregated 0.8 million and 0.6 million, respectively, were not accelerated at that time. On Dec. 16, 2005, the Company accelerated the vesting of all stock options granted on Feb. 8, 2005, totaling 3.5 million. Also on Dec. 16, 2005, the Company accelerated the remaining unvested stock options granted to the then current executive officers of the Company on Feb. 11, 2003 and Feb. 10, 2004, totaling 0.4 million in both years. All other terms and conditions of the stock option grants remain unchanged.

In accordance with APB No. 25 and related interpretations, the acceleration of vesting of these stock options did not require accounting recognition in the Company's income statement. The exercise prices of the 2003, 2004 and 2005 grants were $45.90, $52.05 and $40.59, respectively, and the

72

Powered by Morningstar® Document Research℠

Company's closing stock prices on the June 24, 2005 and Dec. 16, 2005 dates of acceleration were $35.64 and $30.80, respectively. The impact of the accelerated vesting was to increase pro forma stock-based compensation by $82 million, or $50 million net of tax, in 2005.

The accelerated vesting of these stock options was one of several actions the Company has recently taken to reduce stock-based compensation expense that will be recorded in future years with the adoption of Financial Accounting Standard ("FAS") No. 123R (see "New Accounting Standards" discussion below). Over the last two years, the Company has reduced the number of stock options granted by approximately 45%. Also, beginning in 2004, option grants have 8-year terms, down from 10 years for grants in previous years, and do not have a replacement option feature.

Under FAS No. 123, "Accounting for Stock-Based Compensation," as amended by FAS No. 148, compensation cost is measured at the grant date based on the estimated fair value of the award and is recognized as compensation expense over the vesting period. Had compensation cost for the Company's stock-based compensation plans been determined consistent with FAS No. 123, the Company's full year net income and EPS would have been reduced to the following pro forma amounts (in thousands, except per share data):

| | Dec. 25, 2005 | Dec. 26, 2004 | Dec. 28, 2003 |
|---|---|---|---|
| Net income, as reported | $      534,689 | $      555,536 | $      891,379 |
| Less: Pro forma stock-based employee compensation expense, net of tax: | | | |
| General options | (89,508) | (49,887) | (56,402) |
| Replacement options | (1,242) | (17,245) | (15,582) |
| Merit options | — | — | (202) |
| Employee Stock Purchase Plan ("ESPP") | (3,361) | (3,808) | (3,640) |
| Total | (94,111) | (70,940) | (75,826) |
| Pro forma net income | 440,578 | 484,596 | 815,553 |
| Preferred dividends, net of tax | (8,364) | (8,308) | (24,441) |
| Pro forma net income attributable to common shares | $      432,214 | $      476,288 | $      791,112 |
| Weighted average common shares outstanding | 312,880 | 322,420 | 311,295 |
| Basic EPS: | | | |
| As reported | $      1.68 | $      1.70 | $      2.78 |
| Pro forma | $      1.38 | $      1.48 | $      2.54 |
| Adjusted weighted average common shares outstanding | 315,338 | 327,237 | 336,243 |
| Diluted EPS: | | | |
| As reported | $      1.67 | $      1.67 | $      2.61 |
| Pro forma | $      1.37 | $      1.46 | $      2.38 |

73

Powered by Morningstar® Document Research℠

In determining the pro forma compensation cost under the fair value method of FAS No. 123, using the Black-Scholes option pricing model, the following weighted average assumptions were used for general awards and replacement options:

| | 2005 | | 2004 | | 2003 | |
|---|---|---|---|---|---|---|
| | General Awards | Replacement Options | General Awards | Replacement Options | General Awards | Replacement Options |
| Risk-free interest rate | 3.7% | 3.3% | 3.2% | 1.7% | 2.8% | 1.5% |
| Expected dividend yield | 1.8% | 1.8% | 1.0% | 1.0% | 1.0% | 1.0% |
| Expected stock price volatility | 28.1% | 22.8% | 31.1% | 25.4% | 32.7% | 28.7% |
| Expected life (in years) | 5 | 3 | 5 | 2 | 5 | 2 |
| Weighted average fair value | $ 10.49 | $ 6.96 | $ 13.45 | $ 7.46 | $ 13.90 | $ 7.89 |

**Income Taxes**—Provisions for federal and state income taxes are calculated on reported pretax earnings based on current tax laws and also include, in the current period, the cumulative effect of any changes in tax rates from those used previously in determining deferred tax assets and liabilities. Taxable income reported to the taxing jurisdictions in which the Company operates often differs from pretax earnings because some items of income and expense are recognized in different time periods for income tax purposes. The Company provides deferred taxes on these temporary differences in accordance with FAS No. 109, "Accounting for Income Taxes." Taxable income also may differ from pretax earnings due to statutory provisions under which specific revenues are exempt from taxation and specific expenses are not allowable as deductions. The Company establishes reserves for income tax when it is probable that one or more of the taxing authorities will challenge and disallow a position taken by the Company in its income tax returns and the resulting liability is estimable. The consolidated tax provision and related accruals include estimates of the potential taxes and related interest as deemed appropriate. These estimates are reevaluated and adjusted, if appropriate, on a quarterly basis. Although management believes its estimates and judgments are reasonable, the resolutions of the Company's tax issues are unpredictable and could result in tax liabilities that are significantly higher or lower than that which has been provided by the Company.

**Comprehensive Income**—Comprehensive income consists of net income and other gains and losses affecting shareholders' equity that, under accounting principles generally accepted in the United States of America, are excluded from net income. Other comprehensive income (loss) primarily includes gains and losses on marketable securities classified as available-for-sale and changes in minimum pension liabilities. The Company's comprehensive income (loss) is summarized in Note 16.

**New Accounting Standards**—In December 2004, the FASB issued FAS No. 123R, "Share-Based Payment." FAS No. 123R supercedes APB No. 25, FAS No. 123, as amended by FAS No. 148, and related interpretations. Under FAS No. 123R, compensation cost is measured at the grant date based on the estimated fair value of the award and is required to be recognized as compensation expense over the vesting period. The Company plans to adopt FAS No. 123R in the first quarter of 2006 using the modified prospective application, which requires the recognition of share-based compensation costs as if the provisions of the standard had been in effect since Dec. 25, 1994 (the beginning of the Company's 1995 fiscal year). The Company expects to record approximately $33 million of pretax compensation expense in 2006 related to equity grants in 2006 and prior years, as well as the Company's ESPP.

**Earnings Per Share ("EPS")**—Basic EPS is computed by dividing net income attributable to common shares by the weighted average number of common shares outstanding during the period. Diluted EPS

Source: TRIBUNE CO, 10-K, February 28, 2006                                    Powered by Morningstar® Document Research℠

for the year ended Dec. 28, 2003 was computed assuming that the Series B convertible preferred shares held by the Company's Employee Stock Ownership Plan ("ESOP") and the Liquid Yield Option Notes ("LYONs") debt securities had been converted into common shares as of the beginning of fiscal year 2003. The Series B convertible preferred shares were converted into approximately 15.4 million shares of common stock on Dec. 16, 2003, and the LYONs were converted into approximately 7.0 million shares of common stock during June 2003. Therefore, weighted average converted shares for the Series B preferred stock and LYONs were used in the 2003 calculation. In addition, weighted average common shares outstanding were adjusted for the dilutive effect of stock options. The Company's stock options and convertible securities are included in the calculation of diluted EPS only when their effects are dilutive. In the 2005, 2004 and 2003 calculations of diluted EPS, 2.9 million, 2.3 million and 2.3 million shares, respectively, of the Company's Series C, D-1 and D-2 convertible preferred stocks, and 35.5 million, 10.6 million and 3.2 million shares, respectively, of the Company's outstanding options, were not reflected because their effects were antidilutive.

75

    Powered by Morningstar® Document Research℠

The computations of basic and diluted EPS were as follows (in thousands, except per share data):

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| **Basic EPS** | | | |
| Income before cumulative effect of change in accounting principle | $ 534,689 | $ 573,324 | $ 891,379 |
| Cumulative effect of change in accounting principle, net of tax | — | (17,788) | — |
| | | | |
| Net income | $ 534,689 | $ 555,536 | $ 891,379 |
| Preferred dividends, net of tax | (8,364) | (8,308) | (24,441) |
| | | | |
| Net income attributable to common shares | $ 526,325 | $ 547,228 | $ 866,938 |
| Weighted average common shares outstanding | 312,880 | 322,420 | 311,295 |
| | | | |
| Basic EPS: | | | |
| Before cumulative effect of change in accounting principle | $ 1.68 | $ 1.75 | $ 2.78 |
| Cumulative effect of change in accounting principle, net of tax | — | (.05) | — |
| | | | |
| Total | $ 1.68 | $ 1.70 | $ 2.78 |
| | | | |
| **Diluted EPS** | | | |
| Income before cumulative effect of change in accounting principle | $ 534,689 | $ 573,324 | $ 891,379 |
| Cumulative effect of change in accounting principle, net of tax | — | (17,788) | — |
| | | | |
| Net income | $ 534,689 | $ 555,536 | $ 891,379 |
| Additional ESOP contribution required assuming Series B preferred shares were converted, net of tax | — | — | (9,100) |
| Dividends on Series C, D-1 and D-2 preferred stock | (8,364) | (8,308) | (8,252) |
| LYONs interest expense, net of tax | — | — | 2,884 |
| | | | |
| Adjusted net income | $ 526,325 | $ 547,228 | $ 876,911 |
| | | | |
| Weighted average common shares outstanding | 312,880 | 322,420 | 311,295 |
| Assumed conversion of Series B preferred shares into common shares | — | — | 15,171 |
| Assumed exercise of stock options, net of common shares assumed repurchased with the proceeds | 2,458 | 4,817 | 6,565 |
| Assumed conversion of LYONs debt securities | — | — | 3,212 |
| | | | |
| Adjusted weighted average common shares outstanding | 315,338 | 327,237 | 336,243 |
| | | | |
| **Diluted EPS:** | | | |
| Before cumulative effect of change in accounting principle | $ 1.67 | $ 1.72 | $ 2.61 |
| Cumulative effect of change in accounting principle, net of tax | — | (.05) | — |
| | | | |
| Total | $ 1.67 | $ 1.67 | $ 2.61 |

76

## NOTE 2: CHANGES IN OPERATIONS AND NON-OPERATING ITEMS

**Acquisitions**—The Company had no significant acquisitions in 2005 and 2004. The Company completed acquisitions totaling approximately $275 million in 2003 for cash and other consideration, including the value of the Denver radio station group assets that were divested in an exchange transaction during 2003. The results of the acquired companies are included in the consolidated statements of income since their respective dates of acquisition. None of these acquisitions were material in relation to the Company's consolidated financial statements.

On March 21, 2003, the Company acquired the stock of KPLR-TV, St. Louis, and the assets of KWBP-TV, Portland, Ore., from ACME Communications for a total of $275 million. The Company acquired the stock of KPLR-TV for $200 million in cash. The acquisition of the assets of KWBP-TV was structured as a like-kind asset exchange for income tax purposes. It was funded with the remaining assets of the Denver radio station group (KKHK-FM, now known as KQMT-FM) with an estimated fair market value of $55 million, plus $20 million in cash. The Company allocated $153 million, $42 million and $136 million of the purchase price to FCC licenses, network affiliations and goodwill, respectively.

**Supplemental Cash Flow Information**—Information for acquisitions made in 2005, 2004 and 2003 is summarized in the table below (in thousands):

|  | 2005 | 2004 | 2003 |
|---|---|---|---|
| Fair value of assets acquired(1) | $ 4,207 | $ 854 | $ 349,434 |
| Fair value of assets disposed in exchange transaction | — | — | (51,069) |
| Liabilities assumed | — | (303) | (60,854) |
| Net cash paid | $ 4,207 | $ 551 | $ 237,511 |

(1)      Includes intangible assets, net of acquisition-related deferred taxes.

Cash paid for interest and income taxes in 2005, 2004 and 2003 is summarized below (in thousands):

|  | 2005 | 2004 | 2003 |
|---|---|---|---|
| Interest | $ 134,955 | $ 138,392 | $ 172,524 |
| Income taxes(1) | $ 1,157,243 | $ 286,129 | $ 177,969 |

(1)      In 2005, the Company paid $880 million to the Internal Revenue Service, representing the federal tax and interest owed on the Matthew Bender and Mosby transactions (see Note 12).

On May 22, 2003, the Company issued a notice to the holders of the LYONs that the Company would redeem this debt issue on June 23, 2003. All of the LYONs holders converted their notes, which had a recorded value of $278 million, into approximately 7 million shares of common stock prior to the redemption date.

**Consolidation of Los Angeles Times' Production Operations**

In December 2005, the *Los Angeles Times* announced it would close its San Fernando Valley printing facility in January 2006 and consolidate production at its remaining three facilities in Los Angeles, Costa Mesa, and Irwindale, California. The closing of the printing facility resulted in the elimination of approximately 120 positions from across the *Los Angeles Times'* production facilities.

77

As a result of the facility closing, the Company reclassified the San Fernando Valley printing facility land and building as held for sale at Dec 25, 2005. The Company recorded a $2 million pretax charge in the fourth quarter of 2005 to reduce the carrying value of the San Fernando Valley printing facility's land and building to $24 million, the estimated fair value of the assets less costs to sell the assets. The Company evaluated the machinery and equipment at the San Fernando Valley printing facility and determined that press and other related equipment with a net book value of $16 million will be abandoned. Therefore, the Company reduced its estimate of the useful life of the press and other related equipment and recorded accelerated depreciation of $16 million in the fourth quarter of 2005. The Company has idled the remaining San Fernando Valley machinery and equipment, which had a net book value of $34 million at Dec. 25, 2005. The Company is currently evaluating alternative uses of this equipment. This evaluation is expected to be completed in 2006.

The Company recorded a pretax charge in the fourth quarter of 2005 of $22 million, excluding severance related costs, as a result of its decision to close the San Fernando Valley printing facility. A summary of the significant components of the $22 million pretax charge is as follows (in thousands):

| | |
|---|---:|
| Accelerated depreciation on machinery and equipment | $ 16,109 |
| Impairment of assets held for sale | 2,127 |
| Other | 3,992 |
| Total | $ 22,228 |

### Employee Reductions

The Company reduced its staff by approximately 900 positions in 2005 and recorded a pretax charge of $45 million ($43 million at publishing, $1 million at broadcasting & entertainment and $1 million at corporate). The eliminations included 120 positions as a result of closing the *Los Angeles Times'* San Fernando Valley printing facility, as discussed above. As of Dec. 25, 2005, $7 million had been paid and an accrual of $38 million remained. The Company recorded a pretax charge of $41 million in 2004 related to the elimination of approximately 600 positions in its publishing segment.

**Non-Operating Items**—Fiscal years 2005, 2004 and 2003 included several non-operating items.

Non-operating items for 2005 are summarized as follows (in thousands):

| | Proceeds | Pretax Gain | After-tax Gain (Loss) |
|---|---:|---:|---:|
| Gain on change in fair values of derivatives and related investments | $ — | $ 62,184 | $ 37,932 |
| Gain on sales of subsidiaries and investments, net | 17,368 | 6,780 | 4,136 |
| Other, net | 5,166 | 897 | 547 |
| Income tax adjustments | — | — | (138,664) |
| Total non-operating items | $ 22,534 | $ 69,861 | $ (96,049) |

In 2005, the change in the fair values of derivatives and related investments related entirely to the Company's PHONES and related Time Warner investment. The $62 million non-cash pretax gain resulted from an $85 million decrease in the fair value of the derivative component of the Company's PHONES, which was partially offset by a $23 million decrease in the fair value of 16 million shares of Time Warner common stock.

78

Powered by Morningstar® Document Research℠

As a result of the United States Tax Court opinion issued on Sept. 27, 2005 related to the Matthew Bender tax dispute, the Company recorded additional income tax expense of $150 million in the third quarter of 2005 (see Note 12). In the first quarter of 2005, the Company reduced its income tax expense and liabilities by a total of $12 million as a result of favorably resolving certain other federal income tax issues.

Non-operating items for 2004 are summarized as follows (in thousands):

| | Proceeds | Pretax Gain (Loss) | After-tax Gain (Loss) |
|---|---|---|---|
| Loss on change in fair values of derivatives and related investments | $ — | $ (18,497) | $ (11,283) |
| Loss on early debt retirement | — | (140,506) | (87,549) |
| Gain on sales of subsidiaries and investments, net | 23,973 | 20,347 | 12,412 |
| Loss on investment write-downs and other, net | 16,259 | (6,388) | (3,897) |
| Total non-operating items | $ 40,232 | $ (145,044) | $ (90,317) |

In 2004, the change in the fair values of derivatives and related investments related entirely to the Company's PHONES and related Time Warner investment. The $18 million non-cash pretax loss resulted from a $39 million increase in the fair value of the derivative component of the Company's PHONES, which was partially offset by a $21 million increase in the fair value of 16 million shares of Time Warner common stock.

In 2004, the Company redeemed all of its outstanding $400 million ($396 million net of unamortized discount) 7.45% debentures due 2009 and retired $66 million ($64 million net of unamortized discount) of its 7.25% debentures due 2013 and $165 million ($160 million net of unamortized discount) of its 6.61% debentures due 2027 through cash tender offers. The Company paid approximately $760 million to retire this debt and, as a result, recorded a one-time, pretax loss of $141 million in 2004. The Company funded these transactions with cash and the issuance of commercial paper.

In 2004, the gain on sales of subsidiaries and investments related primarily to the sale of the Company's 50% interest in *La Opinión* for $20 million, resulting in a pretax gain of $18 million.

Non-operating items for 2003 are summarized as follows (in thousands):

| | Proceeds | Pretax Gain (Loss) | After-tax Gain (Loss) |
|---|---|---|---|
| Gain on change in fair values of derivatives and related investments | $ — | $ 84,066 | $ 51,448 |
| Gain on sales of subsidiaries and investments, net | 174,836 | 147,507 | 90,261 |
| Loss on investment write-downs | — | (9,764) | (5,976) |
| Gain on insurance recoveries | 27,000 | 22,291 | 13,642 |
| Other non-operating loss, net | — | (2,853) | (1,746) |
| Income tax adjustments | — | — | 25,034 |
| Total non-operating items | $ 201,836 | $ 241,247 | $ 172,663 |

In 2003, the change in the fair values of derivatives and related investments related entirely to the Company's PHONES and related Time Warner investment. The $84 million non-cash pretax gain resulted from an $86 million increase in the fair value of 16 million shares of Time Warner common stock, which was partially offset by a $2 million increase in the fair value of the derivative component

79

Powered by Morningstar® Document Research℠

of the PHONES. Also in 2003, the Company determined that the decline in fair value of certain public and private investments was other than temporary and wrote down the investments to fair value. The write-downs totaled $10 million in 2003.

In 2003, the gain on sales of subsidiaries and investments resulted primarily from the divestiture of the Company's remaining Denver radio station KKHK-FM and the sale of the Company's investment in The Golf Channel. KKHK-FM, now known as KQMT-FM, plus $20 million in cash, was exchanged for the assets of KWBP-TV, Portland, Ore., and resulted in a pretax gain of $51 million. The sale of the investment in The Golf Channel resulted in a pretax gain of $48 million.

In 2003, the Company recorded a gain of $22 million as a result of settling the business interruption and property damage claims filed by WPIX-TV, New York, as a result of the events of Sept. 11, 2001.

In 2003, the Company reduced its income tax expense and liabilities by a total of $25 million as a result of favorably resolving certain federal and state income tax issues.

## NOTE 3: *NEWSDAY* AND *HOY*, NEW YORK CHARGE

In February 2004, a purported class action lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* and *Hoy*, New York, alleging that they were overcharged for advertising as a result of inflated circulation numbers at these two publications. The purported class action also alleges that entities that paid a *Newsday* subsidiary to deliver advertising flyers were overcharged. In July 2004, another lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* alleging damages resulting from inflated *Newsday* circulation numbers as well as federal and state antitrust violations. The Company intends to vigorously defend these suits.

On June 17, 2004, the Company publicly disclosed that it would reduce its reported circulation for both *Newsday* and *Hoy*, New York for the 12-month period ending Sept. 30, 2003 and the six-month period ending March 31, 2004. The circulation adjustments were the result of a review of reported circulation at *Newsday* and *Hoy*, New York, conducted by the Company's internal audit staff and the Audit Bureau of Circulations ("ABC"). Subsequent to the June 17th disclosure, the Company continued its internal review and found additional misstatements for these time periods, as well as misstatements that impacted the 12-month period ending Sept. 30, 2002. On Sept. 10, 2004, the Company announced additional revisions to the circulation figures for *Newsday* and *Hoy*, New York, for the 12-month period ending Sept. 30, 2003 and the six-month period ending March 31, 2004. In November 2004, ABC released its audit reports for *Newsday* and *Hoy*, New York, for the 12-month period ending Sept. 30, 2003. In March 2005, ABC released its audit reports for *Newsday* for the six-month periods ending March 31, 2004 and Sept. 30, 2004. In May 2005, ABC released its audit reports for *Hoy*, New York, for the six-month periods ending March 31, 2004 and Sept. 30, 2004. Audited circulation figures for both *Newsday* and *Hoy*, New York, for these periods were within the ranges previously disclosed. After releasing these reports, ABC recalled *Newsday's* audit report and Publisher's Statements covering the 12-month period ending Sept. 30, 2002 and all of *Hoy*, New York's audit reports and Publisher's Statements covering the periods ending March 31, 2000 through Sept. 30, 2002, stating that, due to insufficient information, they could not verify circulation for those periods. ABC also withdrew its unqualified opinion as to the material fairness of the circulation reported for *Newsday* for the 12-month periods ending Sept. 30, 2000 and Sept. 30, 2001, again citing insufficient information necessary to confirm the unqualified opinions. ABC's circulation audit at *Newsday* for the six-month period ending March 31, 2005 was issued in October 2005 with no significant adjustments. ABC's circulation audit at *Hoy*, New York, for the six-month period ending March 31, 2005 was issued in January 2006 with no

80

Powered by Morningstar® Document Research℠

significant adjustments. Circulation audits at *Newsday* and *Hoy*, New York, for the period ending September 2005 are ongoing. *Hoy*, New York, converted to free distribution in January 2006. Due to this change, *Hoy*, New York's circulation for the period ending September 2005 and going forward will be audited by the Certified Audit of Circulations.

As a result of the misstatements of reported circulation at *Newsday* and *Hoy*, New York, the Company recorded a pretax charge of $35 million in the second quarter of 2004 as its estimate of the probable cost to settle with advertisers based upon facts available at July 30, 2004, the date of the Company's second quarter 2004 Form 10-Q filing. Subsequent to that date, the Company found additional circulation misstatements, which increased the cost to settle with advertisers. As a result, the Company recorded an additional pretax charge of $55 million in the third quarter of 2004 to increase the estimate of the probable cost to settle with *Newsday* and *Hoy*, New York, advertisers to a total of $90 million. The Company will continue to evaluate the adequacy of this charge on an ongoing basis.

A summary of the activity with respect to the *Newsday* and *Hoy*, New York, advertiser settlement accrual is as follows (in millions):

| | |
|---|---:|
| Advertiser settlement accrual balance at Dec. 28, 2003 | $ — |
| 2004 provision | 90 |
| 2004 payments | (41) |
| Advertiser settlement accrual balance at Dec. 26, 2004 | 49 |
| 2005 payments | (34) |
| Advertiser settlement accrual balance at Dec. 25, 2005 | $ 15 |

In addition to the advertiser lawsuits, several class action and shareholder derivative suits have been filed against the Company and certain of its current and former directors and officers as a result of the circulation misstatements at *Newsday* and *Hoy*, New York. The suits, which are currently pending in Illinois Federal and State Courts, allege breaches of fiduciary duties and other managerial and director failings under Delaware law, the federal securities laws and ERISA. The Company believes the complaints are without merit and intends to vigorously defend the suits.

The Securities and Exchange Commission, the United States Attorney for the Eastern District of New York and the Nassau County District Attorney are conducting inquiries into the circulation practices at *Newsday* and *Hoy*, New York. The Company is cooperating fully with these inquiries. The Company cannot predict with certainty the outcome of these inquiries.

## NOTE 4: INVENTORIES

Inventories consisted of the following (in thousands):

| | Dec. 25, 2005 | Dec. 26, 2004 |
|---|---:|---:|
| Newsprint | $ 32,672 | $ 38,373 |
| Supplies and other | 11,431 | 11,423 |
| Total inventories | $ 44,103 | $ 49,796 |

Newsprint inventories valued under the LIFO method were less than current cost by approximately $14 million at Dec. 25, 2005 and $6 million at Dec. 26, 2004.

81

Powered by Morningstar® Document Research℠

## NOTE 5: GOODWILL AND OTHER INTANGIBLE ASSETS

Goodwill and other intangible assets at Dec. 25, 2005 and Dec. 26, 2004 consisted of the following (in thousands):

| | Dec. 25, 2005 | | | Dec. 26, 2004 | | |
|---|---|---|---|---|---|---|
| | Gross Amount | Accumulated Amortization | Net Amount | Gross Amount | Accumulated Amortization | Net Amount |
| **Intangible assets subject to amortization:** | | | | | | |
| Subscribers (useful life of 15 to 20 years) | $ 190,657 | $ (62,110) | $ 128,547 | $ 190,657 | $ (51,937) | $ 138,720 |
| Network affiliation agreements (useful life of 40 years)(1) | 290,320 | (16,330) | 273,990 | 290,320 | (9,073) | 281,247 |
| Other (useful life of 3 to 40 years) | 23,482 | (6,696) | 16,786 | 23,277 | (4,965) | 18,312 |
| Total | $ 504,459 | $ (85,136) | 419,323 | $ 504,254 | $ (65,975) | 438,279 |
| **Goodwill and other intangible assets not subject to amortization** | | | | | | |
| Goodwill | | | | | | |
| Publishing | | | 4,380,483 | | | 3,920,720 |
| Broadcasting and entertainment | | | 1,566,659 | | | 1,566,659 |
| Total goodwill | | | 5,947,142 | | | 5,487,379 |
| Newspaper mastheads | | | 1,575,814 | | | 1,575,814 |
| FCC licenses | | | 1,084,654 | | | 1,084,654 |
| Tradename | | | 7,932 | | | 7,932 |
| Total | | | 8,615,542 | | | 8,155,779 |
| Total goodwill and other intangible assets | | | $ 9,034,865 | | | $ 8,594,058 |

---

(1)    Network affiliation agreements, net of accumulated amortization, include $184 million related to Fox affiliations and $90 million related to WB affiliations.

82

Source: TRIBUNE CO, 10-K, February 28, 2006                    Powered by Morningstar® Document Research℠

The changes in the carrying amount of intangibles and goodwill during the years ended Dec. 25, 2005 and Dec. 26, 2004 were as follows (in thousands):

| | Publishing | Broadcasting and Entertainment | Total |
|---|---|---|---|
| **Intangible assets subject to amortization** | | | |
| Balance as of Dec. 28, 2003 | $ 99,504 | $ 364,700 | $ 464,204 |
| Amortization expense | (7,427) | (11,436) | (18,863) |
| Amortizable intangibles acquired during year | 138 | — | 138 |
| Adjustments related to finalization of purchase accounting | — | (7,200) | (7,200) |
| Balance as of Dec. 26, 2004 | $ 92,215 | $ 364,064 | $ 438,279 |
| Amortization expense | (7,231) | (11,964) | (19,195) |
| Amortizable intangibles acquired during year | 239 | — | 239 |
| Balance as of Dec. 25, 2005 | $ 85,223 | $ 334,100 | $ 419,323 |
| **Goodwill** | | | |
| Balance as of Dec. 28, 2003 | $ 3,920,158 | $ 1,579,694 | $ 5,499,852 |
| Goodwill acquired during year | 562 | — | 562 |
| Adjustments related to finalization of purchase accounting | — | (13,035) | (13,035) |
| Balance as of Dec. 26, 2004 | $ 3,920,720 | $ 1,566,659 | $ 5,487,379 |
| Goodwill acquired during year | 4,147 | — | 4,147 |
| Adjustment for tax resolutions(1) | (3,500) | | (3,500) |
| Adjustment related to Matthew Bender and Mosby Tax Liability (see Note 12) | 459,116 | | 459,116 |
| Balance as of Dec. 25, 2005 | $ 4,380,483 | $ 1,566,659 | $ 5,947,142 |
| **Other intangible assets not subject to amortization** | | | |
| Balance as of Dec. 28, 2003 | $ 1,583,746 | $ 1,084,814 | $ 2,668,560 |
| Adjustments related to finalization of purchase accounting | — | 29,000 | 29,000 |
| Cumulative effect of change in accounting principle(2) | — | (29,160) | (29,160) |
| Balance as of Dec. 25, 2005 and Dec. 26, 2004 | $ 1,583,746 | $ 1,084,654 | $ 2,668,400 |
| Total goodwill and other intangibles as of Dec. 25, 2005 | $ 6,049,452 | $ 2,985,413 | $ 9,034,865 |

(1)        Adjustment for the resolution of uncertain income tax positions related to the Times Mirror Company acquisition.

(2)        In the fourth quarter of 2004, the Company elected to early adopt the provisions of the Financial Accounting Standards Board's Emerging Issues Task Force Topic No. D-108, which requires the use of a direct valuation method for valuing intangible assets, such as FCC licenses, and reviewing them for impairment (see Note 1).

Estimated annual amortization expense will be approximately $20 million for each of the next five years, excluding the effects of any acquisitions or dispositions subsequent to Dec. 25, 2005.

83

Source: TRIBUNE CO, 10-K, February 28, 2006                    Powered by Morningstar℠ Document Research℠

## NOTE 6: TMCT I AND TMCT II

In connection with the Company's acquisition of Times Mirror in 2000, the Company acquired investments in TMCT I and TMCT II.

**TMCT I**—In 1997, Times Mirror completed a transaction involving agreements with its largest shareholders, Chandler Trust No. 1 and Chandler Trust No. 2 (collectively, the "Chandler Trusts") which resulted in the formation of a new limited liability company, TMCT, LLC ("TMCT I"). As a result of the Company's acquisition of Times Mirror, the Chandler Trusts became significant shareholders of the Company.

At Dec. 25, 2005, the assets of TMCT I included 13 million shares of the Company's common stock and 442,596 shares of the Company's Series C preferred stock (collectively, "TMCT I Shares"); eight real properties ("Real Properties") and a portfolio of fixed income and equity investments ("TMCT I Portfolio"). TMCT I has no outstanding debt. The estimated fair market value of the TMCT I assets at Dec. 25, 2005 and Dec. 26, 2004 is shown in the table below (in thousands):

| | TMCT I Asset Information (unaudited) | |
| --- | --- | --- |
| | Dec. 25, 2005 | Dec. 26, 2004 |
| TMCT I Shares | $ 602,900 | $ 748,200 |
| Real Properties | $ 225,000 | $ 225,000 |
| TMCT I Portfolio | $ 260,800 | $ 259,100 |

Summarized income and expense information for TMCT I is shown in the following table for the years ended Dec. 25, 2005, Dec. 26, 2004 and Dec. 28, 2003 (in thousands):

| | TMCT I Income and Expense Information (unaudited) | | |
| --- | --- | --- | --- |
| | 2005 | 2004 | 2003 |
| TMCT I Shares dividend income | $ 26,706 | $ 23,705 | $ 23,205 |
| Real Properties lease income | 24,166 | 24,166 | 24,166 |
| TMCT I Portfolio interest and dividend income | 10,767 | 9,949 | 11,670 |
| TMCT I Portfolio net realized gains | 392 | 2,670 | 2,537 |
| | $ 62,031 | $ 60,490 | $ 61,578 |
| TMCT I operating expenses | $ (9,317) | $ (9,983) | $ (10,262) |

The Company leases the Real Properties from TMCT I and accounts for the lease as a property financing obligation in its consolidated balance sheet. On Aug. 8, 2009, the end of the lease term, the Company has the option to purchase all of the Real Properties for their fair market value. If the Real Properties are not purchased by the Company, they will remain the assets of TMCT I and may, as provided for under the terms of the lease agreement, be leased by the Company at fair market value rent. The agreement provides for two additional 12-year lease terms with fair market value purchase options at the end of each term.

The Company and the Chandler Trusts share in the cash flows of the various assets held by TMCT I. The cash flows from the Real Properties and the TMCT I Portfolio are largely allocated to the Chandler Trusts, while the cash flows from the TMCT I Shares are largely allocated to the

84

Powered by Morningstar® Document Research℠

Company. Due to the allocations of the economic benefits in TMCT I, for financial reporting purposes 80% of the TMCT I Shares are included in treasury stock, 80% of the preferred stock dividends on the Series C preferred stock are excluded from preferred stock dividends and 80% of the dividends on the common stock are effectively eliminated. The Company accounts for its 20% investment in the TMCT I Portfolio under the equity method.

The Company's investment in TMCT I totaled $83 million, $82 million and $99 million at Dec. 25, 2005, Dec. 26, 2004 and Dec. 28, 2003, respectively. In 2005, 2004 and 2003, the Company recognized equity income of $2 million in each year related to the TMCT I Portfolio. During 2005, 2004 and 2003, the Company recorded net realized gains on the TMCT I Portfolio of $1 million, $4 million and $2 million, respectively. The net realized gains were recorded as non-operating items in each year.

**TMCT II**—In 1999, Times Mirror completed a second transaction involving agreements with the Chandler Trusts, resulting in the formation of another new limited liability company, TMCT II, LLC ("TMCT II").

At Dec. 25, 2005, the assets of TMCT II included 39 million shares of the Company's common stock, 380,972 shares of the Company's Series D-1 preferred stock and 245,100 shares of the Company's Series D-2 preferred stock (collectively, "TMCT II Shares"); a portfolio of fixed income investments that were funded with the proceeds from the redemption of six unrelated real estate investment trust interests in 2004 and two in 2005 ("REIT Portfolio"); a portfolio of fixed income and equity investments ("TMCT II Portfolio"); and a portfolio of venture capital and private equity investments ("Venture Capital Portfolio"). TMCT II has no outstanding debt. The estimated fair market value of the TMCT II assets at Dec. 25, 2005 and Dec. 26, 2004 is shown in the table below (in thousands):

| | TMCT II Asset Information (unaudited) | |
| --- | --- | --- |
| | Dec. 25, 2005 | Dec. 26, 2004 |
| TMCT II Shares | $ 1,498,800 | $ 1,950,300 |
| REIT Portfolio | $ 593,300 | $ 608,800 |
| TMCT II Portfolio | $ 112,300 | $ 11,800 |
| Venture Capital Portfolio | $ 260,400 | $ 294,200 |

85

Powered by Morningstar℠ Document Research℠

Summarized income and expense information for TMCT II is shown in the following table for the years ended Dec. 25, 2005, Dec. 26, 2004 and Dec. 28, 2003 (in thousands):

| | TMCT II Income and Expense Information (unaudited) | | |
| --- | --- | --- | --- |
| | 2005 | 2004 | 2003 |
| TMCT II Shares dividend income | $      48,853 | $      38,809 | $      36,567 |
| REIT Portfolio income | 38,434 | 51,520 | 51,740 |
| TMCT II Portfolio and Venture Capital Portfolio interest and dividend income | 6,474 | 5,126 | 4,812 |
| TMCT II Portfolio, Venture Capital Portfolio and REIT Portfolio net losses | (984) | (21,192) | (12,395) |
| Total | $      92,777 | $      74,263 | $      80,724 |
| TMCT II operating expenses | $      (8,270) | $      (10,286) | $      (8,851) |

The Company and the Chandler Trusts share in the cash flows of the various assets held by TMCT II. The cash flows from the REIT Portfolio, the TMCT II Portfolio and the Venture Capital Portfolio are largely allocated to the Chandler Trusts. The cash flows from the TMCT II Shares are largely allocated to the Company. Due to the allocations of the economic benefits in TMCT II, for financial reporting purposes 80% of the TMCT II Shares are included in treasury stock, 80% of the preferred stock dividends on the Series D-1 and D-2 preferred stock are excluded from preferred stock dividends and 80% of the dividends on the common stock are effectively eliminated. The Company accounts for its 20% investments in the REIT Portfolio, the TMCT II Portfolio and the Venture Capital Portfolio under the equity method.

The Company's investment in TMCT II totaled $196 million at Dec. 25, 2005 and $198 million at Dec. 26, 2004 and Dec. 28, 2003. The Company recognized equity income related to the REIT Portfolio, TMCT II Portfolio and Venture Capital Portfolio investments of $8 million in 2005, $9 million in 2004 and $10 million in 2003. During 2005, 2004 and 2003, the Company recorded net losses of $3 million, $4 million and $8 million, respectively, related to net realized losses and the write-downs of certain investments in the Venture Capital Portfolio. The net losses were recorded as non-operating items in each year.

The TMCT I and TMCT II LLC agreements have no specific term, and the dissolution, determination of liquidation values and distribution of assets require the mutual consent of the Company and the Chandler Trusts.

86

Source: TRIBUNE CO, 10-K, February 28, 2006                    Powered by Morningstar℠ Document Research℠

## NOTE 7: INVESTMENTS

Investments consisted of the following (in thousands):

|  | Dec. 25, 2005 | Dec. 26, 2004 |
|---|---|---|
| Time Warner stock related to PHONES debt | $    282,880 | $    306,240 |
| Other cost method investments | 59,355 | 75,739 |
| Equity investments in TMCT I and TMCT II(1) | 279,766 | 279,856 |
| Other equity method investments | 293,542 | 233,663 |
| Total Investments | $    915,543 | $    895,498 |

(1)      See Note 6 for further discussion.

Cost method investments in public companies and debt securities were recorded at fair value in the consolidated balance sheets. At Dec. 25, 2005, the Company's cost method investments included public companies, mainly Time Warner, and private companies. The investment in Time Warner at Dec. 25, 2005 consisted of 19 million shares, which included 16 million shares related to the PHONES (see Notes 1 and 8). The Company's equity method investments at Dec. 25, 2005 included the following private companies:

| Company | % Owned |
|---|---|
| BrassRing | 27% |
| CareerBuilder | 33% |
| California Independent Postal Systems | 50% |
| Classified Ventures | 28% |
| Comcast Sports Network | 25% |
| Consumer Networks | 17% |
| ShopLocal, LLC (formerly CrossMedia Services) | 33% |
| Legacy.com | 40% |
| TMCT I Portfolio(1) | 20% |
| TMCT II Portfolio(1) | 20% |
| Topix | 25% |
| TV Food Network | 31% |
| The WB Television Network(2) | 22% |

(1)      See Note 6 for further discussion.

(2)      On Jan. 24, 2006, the Company announced that it had reached a 10-year agreement to affiliate 16 of its television stations with The CW Network, which is expected to launch in fall 2006. The WB Network will shut down at that time. The Company will not have an equity interest in the new network.

The Company does not guarantee any indebtedness for any of its investees. During 2005, the Company sold certain investments resulting in a pretax gain of $7 million. During 2004, the Company sold its 50% interest in La Opinion for $20 million and recorded a pretax gain of $18 million. During 2003, the Company sold its equity interest in The Golf Channel, which resulted in a pretax gain of $48 million. Also in 2003, the Company sold several investments resulting in a pretax gain of $6 million.

In 2005, 2004 and 2003, the Company concluded that the decline in the value of certain public and private investments was other than temporary and wrote down the investments to fair value. Non-cash,

87

Powered by Morningstar® Document Research℠

pretax losses totaled $3 million, $6 million and $10 million in 2005, 2004 and 2003, respectively. See Note 2 for further discussion.

For investments classified as available-for-sale and recorded at fair value under FAS No. 115, the aggregate cost basis, unrealized gain and fair value were as follows (in thousands):

| | Dec. 25, 2005 | | | Dec. 26, 2004 | | |
|---|---|---|---|---|---|---|
| | Cost Basis | Unrealized Gain | Fair Value | Cost Basis | Unrealized Gain | Fair Value |
| Marketable equity securities | $ 27,521 | $ 26,964 | $ 54,485 | $ 27,594 | $ 32,641 | $ 60,235 |

The difference between cost and fair value, net of related tax effects, is recorded in the accumulated other comprehensive income component of shareholders' equity and amounted to a net gain of $16 million at Dec. 25, 2005 and $20 million at Dec. 26, 2004. The cost bases of the investments in the tables above are net of write-downs recorded in the consolidated statements of income.

## NOTE 8: LONG-TERM DEBT

Long-term debt consisted of the following (in thousands):

| | Dec. 25, 2005 | Dec. 26, 2004 |
|---|---|---|
| Commercial paper, weighted average interest rate of 4.4% and 2.4%, respectively | $ 923,532 | $ 773,206 |
| Medium-term notes, weighted average interest rate of 6.2% in 2005 and 2004, due 2005-2008 | 555,585 | 733,285 |
| Property financing obligation, effective interest rate of 7.7%, expiring 2009 (see Note 6) | 60,372 | 74,462 |
| 4.875% notes due 2010, net of unamortized discount of $718 | 449,282 | — |
| 7.25% debentures due 2013, net of unamortized discount of $2,478 and $2,818, respectively | 79,605 | 79,265 |
| 5.25% notes due 2015, net of unamortized discount of $1,519 | 328,481 | — |
| 7.5% debentures due 2023, net of unamortized discount of $4,204 and $4,438, respectively | 94,546 | 94,312 |
| 6.61% debentures due 2027, net of unamortized discount of $2,305 and $2,409, respectively | 82,655 | 82,551 |
| 7.25% debentures due 2096, net of unamortized discount of $18,304 and $18,492, respectively | 129,696 | 129,508 |
| Interest rate swap | 29,714 | 31,102 |
| Other notes and obligations | 18,553 | 7,129 |
| | 2,752,021 | 2,004,820 |
| Total debt excluding PHONES | | |
| Less portions due within one year | (302,460) | (271,767) |
| Long-term debt excluding PHONES | 2,449,561 | 1,733,053 |
| 2% PHONES debt related to Time Warner stock, due 2029 | 509,701 | 584,880 |
| Total long-term debt | $ 2,959,262 | $ 2,317,933 |

88

Source: TRIBUNE CO, 10-K, February 28, 2006

Powered by Morningstar℠ Document Research℠

**Long-Term Debt Issuance**—In 2005, the Company issued $450 million ($449 million net of unamortized discount) 4.875% notes due 2010 and $330 million ($328 million net of unamortized discount) 5.25% notes due 2015. The proceeds from the issuance were used to repay commercial paper.

**Medium-Term Notes**—Notes issued under these programs generally have maturities from one to six years and may not be redeemed by the Company prior to maturity.

**Interest Rate Swap**—The Company is currently a party to one interest rate swap agreement. This swap agreement relates to the $100 million 7.5% debentures due in 2023 and effectively converts the fixed 7.5% rate to a variable rate based on LIBOR.

**Current Portion of Long-Term Debt**—The current portion of long-term debt at Dec. 25, 2005 includes $286 million of commercial paper, $15 million of property financing obligation and $2 million of other obligations due within one year.

**Exchangeable Subordinated Debentures due 2029 ("PHONES")**—In 1999, the Company issued 8 million PHONES for an aggregate principal amount of approximately $1.3 billion. The principal amount was equal to the value of 16 million shares of Time Warner common stock at the closing price of $78.50 per share on April 7, 1999. Quarterly interest payments are made to the PHONES holders at an annual rate of 2% of the initial principal. The Company records both cash and non-cash interest expense on the discounted debt component of the PHONES. The PHONES debenture agreement requires principal payments equal to any dividends declared on the 16 million shares of Time Warner common stock. In 2005, Time Warner declared quarterly dividends of $.05 per share. A payment of $.10 per PHONES was made in the fourth quarter of 2005, and a payment of $.10 per PHONES will be due in the first quarter of 2006. The company records the dividends it receives on its Time Warner common stock as dividend income and accounts for the related payment to the PHONES holders as principal reduction.

The Company may redeem the PHONES at any time for the higher of the principal value of the PHONES ($156.84 per PHONES at Dec. 25, 2005) or the then market value of two shares of Time Warner common stock, subject to certain adjustments. At any time, holders of the PHONES may exchange a PHONES for an amount of cash equal to 95% (or 100% under certain circumstances) of the market value of two shares of Time Warner common stock. At Dec. 25, 2005, the market value per PHONES was $74.00, and the market value of two shares of Time Warner common stock was $35.36.

Under the provisions of FAS No. 133, the PHONES consist of a discounted debt component, which is presented at book value, and a derivative component, which is presented at fair value. Changes in the fair value of the derivative component of the PHONES are recorded in the statement of income. The fair value of the derivative component of the PHONES debt is calculated as the difference between the quoted market value of the PHONES and the estimated fair value of the discounted debt component of the PHONES. The fair value of the discounted debt component of the PHONES is calculated based on an estimate of the current interest rate available to the Company for debt of the same remaining maturity and similar terms to the PHONES. The book value of the discounted debt component is based on the prevailing interest rate (8.125%) at issuance of the PHONES. The market value of the PHONES, which are traded on the New York Stock Exchange, was $592 million and $728 million at Dec. 25, 2005 and Dec. 26, 2004, respectively.

89

The discounted debt component and derivative component of the PHONES were as follows (in thousands):

| | Dec. 25, 2005 | Dec. 26, 2004 |
|---|---|---|
| PHONES Debt: | | |
| Discounted debt component (at book value) | $ 454,038 | $ 442,480 |
| Derivative component (at estimated fair value) | 55,663 | 142,400 |
| Total | $ 509,701 | $ 584,880 |
| Time Warner stock related to PHONES (at fair value) | $ 282,880 | $ 306,240 |

If the PHONES are exchanged in the next year, the Company intends to refinance the PHONES, and has the ability to do so on a long-term basis through its existing revolving credit agreements. Accordingly, the PHONES have been classified as long-term.

**Revolving Credit Agreements**—At Dec. 25, 2005, the Company had revolving credit agreements with a number of financial institutions providing for borrowings in an aggregate amount of up to $1.2 billion. Borrowings under these agreements, which expire in December 2008, would be at a rate equal to LIBOR plus 0.35%. The revolving credit agreements allow the Company to elect one-month to twelve-month LIBOR rates, based on the term of the borrowing. At Dec. 25, 2005, the one-month LIBOR rate was 4.38% and the twelve-month LIBOR rate was 4.85%. The agreements contain various interest rate options and provide for annual fees based on a percentage of the commitment. The agreements contain covenants that require the Company to maintain a minimum interest coverage ratio. No amounts were borrowed under the agreements at Dec. 25, 2005, and the Company was in compliance with the covenants. Annual fees totaled approximately $1.1 million in 2005, $0.9 million in 2004 and $1.1 million in 2003. In addition to the exchange value of the PHONES, the Company intends to refinance $638 million of commercial paper and $293 million of medium-term notes scheduled to mature by Dec. 25, 2006, and has the ability to do so on a long-term basis through its existing revolving credit agreements. Accordingly, these notes and commercial paper have been classified as long-term.

**Maturities**—Debt at Dec. 25, 2005 matures as shown below (in thousands):

| | |
|---|---|
| 2006 | $ 302,460 |
| 2007 | 18,550 |
| 2008 | 1,482,247 |
| 2009 | 13,224 |
| 2010 | 451,056 |
| Thereafter | 994,185 |
| Total | $ 3,261,722 |

90

Source: TRIBUNE CO, 10-K, February 28, 2006

## NOTE 9: CONTRACTS PAYABLE FOR BROADCAST RIGHTS

Contracts payable for broadcast rights are classified as current or long-term liabilities in accordance with the payment terms of the contracts. Required payments under contractual agreements for broadcast rights recorded at Dec. 25, 2005 are shown in the table below (in thousands):

| | |
|---|---:|
| 2006 | $ 329,930 |
| 2007 | 195,935 |
| 2008 | 138,731 |
| 2009 | 91,485 |
| 2010 | 45,500 |
| Thereafter | 57,227 |
| Total | $ 858,808 |

## NOTE 10: FAIR VALUE OF FINANCIAL INSTRUMENTS

Estimated fair values and carrying amounts of the Company's financial instruments are as follows (in thousands):

| | Dec. 25, 2005 | | Dec. 26, 2004 | |
|---|---|---|---|---|
| | Fair Value | Carrying Amount | Fair Value | Carrying Amount |
| Cost method investments | $ 348,791 | $ 342,235 | $ 386,625 | $ 381,979 |
| Debt | $ 3,286,708 | $ 3,261,722 | $ 2,723,320 | $ 2,589,700 |
| Contracts payable for broadcast rights | $ 796,278 | $ 858,808 | $ 785,049 | $ 857,926 |

The following methods and assumptions were used to estimate the fair value of each category of financial instruments.

**Cost Method Investments**—Cost method investments in public companies were recorded at fair value in the consolidated balance sheets (see Notes 1 and 7). Cost method investments in private companies were recorded at cost, net of write-downs, and fair value was generally estimated based on prices recently paid for shares in those companies.

**Debt**—Fair value was estimated based on quoted market prices for similar issues or on current rates available to the Company for debt of the same remaining maturities and similar terms. The carrying value of the Company's derivative instruments approximates fair value. The fair value of the PHONES was determined by reference to the market value resulting from trading on a national securities exchange.

**Contracts Payable for Broadcast Rights**—Fair value was estimated using the discounted cash flow method.

## NOTE 11: COMMITMENTS AND CONTINGENCIES

The Company has entered into commitments for broadcast rights that are not currently available for broadcast and are therefore not included in the financial statements. These commitments totaled $252 million at Dec. 25, 2005. Payments for broadcast rights generally commence when the programs become available for broadcast.

91

Source: TRIBUNE CO, 10-K, February 28, 2006

Powered by Morningstar℠ Document Research℠

The Company had commitments totaling $252 million at Dec. 25, 2005 related to the purchase of property, plant and equipment and talent contracts. In addition, under its current agreement with Abitibi Consolidated Inc., the Company has a commitment to purchase 450,000 metric tons of newsprint each year over the next two years at prevailing market prices at the time of purchase. The Company is in the process of negotiating an amendment to this agreement, which among other things, would extend the current agreement to 2009. The Company leases certain equipment and office and production space under various operating leases. Lease expense was $58 million in 2005, $56 million in 2004 and $58 million in 2003. The table below presents the future minimum lease payments to be made under non-cancelable operating leases at Dec. 25, 2005 (in thousands):

| | |
|---|---:|
| 2006 | $ 62,320 |
| 2007 | 55,810 |
| 2008 | 50,000 |
| 2009 | 42,723 |
| 2010 | 29,034 |
| Thereafter | 50,150 |
| Total | $ 290,037 |

The Company and its subsidiaries are defendants from time to time in actions for matters arising out of their business operations. In addition, the Company and its subsidiaries are involved from time to time as parties in various regulatory, environmental and other proceedings with governmental authorities and administrative agencies. See Note 3 for a discussion of potential liability related to *Newsday* and *Hoy*, New York, and see Note 12 for a discussion of potential income tax liabilities. The Company does not believe that any other matters or proceedings presently pending will have a material adverse effect on its consolidated financial position, results of operations or liquidity.

## NOTE 12: INCOME TAXES

The following is a reconciliation of income taxes computed at the U.S. federal statutory rate to income taxes reported in the consolidated statements of income (in thousands):

| | 2005 | 2004 | 2003 |
|---|---:|---:|---:|
| Income before income taxes and cumulative effect of change in accounting principle | $ 1,110,241 | $ 941,111 | $ 1,415,236 |
| Federal income taxes at 35% | $ 388,584 | $ 329,389 | $ 495,333 |
| State and local income taxes, net of federal tax benefit | 38,742 | 32,758 | 49,758 |
| Matthew Bender/Mosby adjustment | 150,493 | — | — |
| Income tax settlement adjustments | (11,829) | — | (25,034) |
| Other | 9,562 | 5,640 | 3,800 |
| Income taxes reported | $ 575,552 | $ 367,787 | $ 523,857 |
| Effective tax rate | 51.8% | 39.1% | 37.0% |

In 2005, the Company increased its income tax expense by $150 million as a result of the Matthew Bender Tax Court decision (see "Matthew Bender and Mosby Tax Liability" discussion below) and reduced income tax expense by $12 million as a result of resolving certain federal income tax issues. In 2003, the Company reduced its income tax expense by $25 million as a result of resolving certain federal and state income tax issues.

92

Powered by Morningstar® Document Research℠

Components of income tax expense charged to income were as follows (in thousands):

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Currently payable: | | | |
| U.S. federal | $ 443,233 | $ 284,623 | $ 265,686 |
| State and local | 45,571 | 43,499 | 5,655 |
| Sub-total | 488,804 | 328,122 | 271,341 |
| Deferred: | | | |
| U.S. federal | 72,716 | 32,767 | 212,870 |
| State and local | 14,032 | 6,898 | 39,646 |
| Sub-total | 86,748 | 39,665 | 252,516 |
| Total | $ 575,552 | $ 367,787 | $ 523,857 |

Significant components of the Company's net deferred tax liabilities were as follows (in thousands):

| | Dec. 25, 2005 | Dec. 26, 2004 |
|---|---|---|
| Net properties | $ 239,821 | $ 275,595 |
| Net intangible assets | 1,252,851 | 1,231,198 |
| Pensions | 316,467 | 340,293 |
| Investments | 417,214 | 388,413 |
| PHONES interest | 267,885 | 218,297 |
| Other future taxable items | 25,880 | 15,006 |
| Total deferred tax liabilities | 2,520,118 | 2,468,802 |
| Broadcast rights | (4,968) | (4,098) |
| Postretirement and postemployment benefits other than pensions | (64,579) | (67,663) |
| Deferred compensation | (76,901) | (84,262) |
| Other accrued liabilities | (89,642) | (106,833) |
| Accrued employee compensation and benefits | (9,731) | (11,445) |
| Accounts receivable | (15,834) | (16,372) |
| Other future deductible items | (15,639) | (11,512) |
| State operating loss carryforwards | (34,391) | (28,600) |
| Valuation allowances on state operating loss carryforwards | 29,926 | 23,968 |
| Total deferred tax assets | (281,759) | (306,817) |
| Net deferred tax liability | $ 2,238,359 | $ 2,161,985 |

**Operating Loss Carryforwards**—At Dec. 25, 2005, the Company had approximately $676 million of operating loss carryforwards for state income tax purposes. These carryforwards arose in certain states primarily as a result of intercompany interest expense, royalty expense and management fees allocated to the Company's various subsidiaries, and expire between 2006 and 2025. The deferred tax assets related to these carryforwards totaled approximately $34 million, net of federal taxes, at Dec. 25, 2005. However, the Company believes it is more likely than not that $30 million of the deferred tax assets will not be realized because the related carryforwards will expire before being utilized. Therefore, in accordance with FAS No. 109, "Accounting for Income Taxes," the Company has established valuation allowances of $30 million on the deferred tax assets related to the state carryforwards. The state operating loss carryforwards increased in 2005 because the Company generated additional tax losses in certain states.

93

Source: TRIBUNE CO, 10-K, February 28, 2006

Powered by Morningstar® Document Research℠

**Matthew Bender and Mosby Tax Liability**—During 1998, Times Mirror, which was acquired by the Company in 2000, disposed of its Matthew Bender and Mosby subsidiaries in separate transactions, which were structured to qualify as tax-free reorganizations under the Internal Revenue Code. The Company believes these transactions were completed on a tax-free basis. However, the Internal Revenue Service ("IRS") audited the transactions and disagreed with the position taken by Times Mirror. In the fourth quarter of 2001, the Company received an IRS adjustment to increase Times Mirror's 1998 taxable income by approximately $1.6 billion. The Company filed a petition in United States Tax Court in November 2002 to contest the IRS position, and in December 2004, the Company presented its position in United States Tax Court.

On Sept. 27, 2005, the United States Tax Court issued an opinion contrary to the Company's position and determined that the Matthew Bender transaction was a taxable sale. In January 2006, the Tax Court extended its opinion in the Matthew Bender case to the Mosby transaction given the similarity of the two transactions. Taxes and related interest for both the Matthew Bender and Mosby transactions total approximately $1 billion. Over time, deductions for state taxes and interest are expected to reduce the net cash outlay to approximately $840 million.

The Company will appeal the Tax Court ruling to the United States Court of Appeals for the Seventh Circuit. The Company does not expect a ruling before the first half of 2007. The Company cannot predict with certainty the outcome of this appeal.

Times Mirror established a tax reserve of $180 million in 1998 when it entered into the transactions. The reserve represented Times Mirror's best estimate of the amount the expected IRS and state income tax claims could be settled for based upon an analysis of the facts and circumstances surrounding the issue. In accordance with Emerging Issues Task Force ("EITF") Issue No. 93-7, "Uncertainties Related to Income Taxes in a Purchase Business Combination," the Company treated this item as an uncertain tax position at the time of the Times Mirror acquisition in 2000 and concluded that the estimate determined by Times Mirror was the most appropriate estimate of the exposure. The Company has maintained this initial reserve, plus interest, and has evaluated the adequacy of the reserve on a periodic basis. At Dec. 26, 2004, the reserve, including pretax interest of $66 million, totaled $246 million ($221 million after including the tax benefit of the interest). In 2005, prior to the Tax Court ruling, the Company recorded additional after-tax interest of $7 million on the reserve.

As a result of the Tax Court ruling, the Company increased its tax reserve by an additional $609 million in the third quarter of 2005 by recording additional income tax expense of $150 million, representing additional after-tax interest applicable to the post-acquisition period, and goodwill of $459 million. In accordance with EITF No. 93-7, the Company adjusted goodwill because the tax contingencies existed at the time of the Times Mirror acquisition. On Sept. 30, 2005, the Company paid $880 million to the IRS, representing the federal tax and interest owed on the transactions, and financed the payment through the issuance of commercial paper. The Company expects to make related state tax and interest payments of approximately $125 million during 2006 ($87 million after including the federal tax benefit of the state taxes and interest).

94

Powered by Morningstar® Document Research℠

A summary of the activity with respect to the Matthew Bender and Mosby tax liability is as follows (in millions):

| | |
|---|---:|
| Liability at Dec. 26, 2004: | |
| Tax | $ 180 |
| After-tax interest ($66 million pretax) | 41 |
| Liability at Dec. 26, 2004 (included in "other obligations") | 221 |
| After-tax interest recorded in income tax expense in the first three quarters of 2005 ($11 million pretax) | 7 |
| Additional reserve recorded as a result of the Tax Court ruling: | |
| Charged to income tax expense | 150 |
| Additional goodwill | 459 |
| Liability at Sept. 25, 2005 | 837 |
| Federal tax and interest paid on Sept. 30, 2005: | |
| Federal tax | (542) |
| After-tax interest ($338 million pretax) | (210) |
| After-tax interest recorded in income tax expense in the fourth quarter of 2005 ($3 million pretax) | 2 |
| Liability at Dec. 25, 2005 (included in "other current liabilities") | $ 87 |

**PHONES**—In connection with the routine examination of the Company's federal income tax returns for 2000 and 2001, the IRS has proposed that the Company capitalize the interest on the PHONES as additional tax basis in the Company's 16 million shares of Time Warner common stock, rather than currently deducting such interest. The National Office of the IRS has issued a Technical Advice Memorandum that supports the proposed treatment. The Company disagrees with the IRS's position and requested that the IRS administrative appeals office review the issue. An appeals officer was appointed in August 2005, and the Company had an initial meeting with the appeals office in December 2005. Discussions with the appeals office regarding this issue are on-going. The effect of the treatment proposed by the IRS would be to increase the Company's tax liability by approximately $88 million for the period 2000-2001 and by approximately $214 million for the period 2002 through 2005. If the IRS were to prevail in its proposed treatment, there would be no effect on the Company's reported income for any of these periods. The potential tax payments would be recorded as a reduction in the Company's deferred tax liability, and the Company has accrued the interest that would be assessed on these potential payments.

**Income Tax Reserves**—The Company's liability for estimated federal and state audit adjustments, including after-tax interest, was approximately $96 million and $326 million at Dec. 25, 2005 and Dec. 26, 2004, respectively. These amounts are included in "other obligations" in the Company's consolidated balance sheet. The liability declined in 2005 primarily because of the United States Tax Court decision regarding the Matthew Bender transaction. As discussed in the "Matthew Bender and Mosby Tax Liability" section above, the Company had an income tax reserve of $221 million at Dec. 26, 2004 for this issue. During the third quarter of 2005, the tax reserve was reclassified to "other current liabilities" in the Company's consolidated balance sheet.

Although management believes its estimates and judgments are reasonable, the resolutions of the Company's tax issues are unpredictable and could result in tax liabilities that are significantly higher or lower than that which has been provided by the Company.

Source: TRIBUNE CO, 10-K, February 28, 2006                    Powered by Morningstar® Document Research℠

**NOTE 13: PENSION AND POSTRETIREMENT BENEFITS**

**Employee Pension Plans**—In connection with the establishment of the Tribune Company ESOP in 1988, Tribune amended its company-sponsored pension plan for employees not covered by a collective bargaining agreement. The Tribune Company pension plan continued to provide substantially the same pension benefits as under the pre-amended plan until December 1998. After that date, Tribune pension benefit credits were frozen in terms of pay and service.

In connection with the Times Mirror acquisition, the Company assumed defined benefit pension plans and various other contributory and non-contributory retirement plans covering substantially all of Times Mirror's former employees. In general, benefits under the Times Mirror defined benefit plans were based on years of service and the employee's compensation during the last five years of employment. In December 2005, the pension plan benefits for former Times Mirror non-union and non-Newsday employees were frozen. As a result of the plan freeze, a pretax curtailment gain of $18 million was recorded. On March 31, 2006, the pension plan benefits for Newsday union and non-union employees will be frozen. Benefits provided by Times Mirror's Employee Stock Ownership Plan ("Times Mirror ESOP") are coordinated with certain pension benefits and, as a result, the defined benefit plan obligations are net of the actuarially equivalent value of the benefits earned under the Times Mirror ESOP. The maximum offset is equal to the value of the benefits earned under the defined benefit plan.

The Company also maintains several small plans for other employees. The Company's portion of assets and liabilities for multi-employer union pension plans is not determinable.

**Postretirement Benefits Other Than Pensions**—The Company provides postretirement health care and life insurance benefits to eligible employees under a variety of plans. The various plans have significantly different provisions for lifetime maximums, retiree cost-sharing, health care providers, prescription drug coverage and other benefits.

96

Powered by Morningstar® Document Research℠

**Obligations and Funded Status**—Summarized information for the Company's defined benefit pension and postretirement plans is provided below (in thousands):

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | Dec. 25, 2005 | Dec. 26, 2004 | Dec. 25, 2005 | Dec. 26, 2004 |
| **Change in benefit obligations:** | | | | |
| Projected benefit obligations, beginning of year | $ 1,461,180 | $ 1,316,215 | $ 191,540 | $ 187,146 |
| Service cost | 25,160 | 21,177 | 1,469 | 1,752 |
| Interest cost | 81,436 | 80,474 | 7,774 | 10,323 |
| Plan amendments | — | 4,616 | 97 | — |
| Curtailment gain | (44,566) | — | — | — |
| Special termination benefits | 1,434 | 1,440 | — | (14,897) |
| Impact of Medicare Reform Act | — | — | (45,095) | 22,453 |
| Actuarial (gain) loss | 156,385 | 112,291 | (15,320) | (15,237) |
| Benefits paid | (81,900) | (75,033) | (15,320) | (15,237) |
| Projected benefit obligations, end of year | 1,599,129 | 1,461,180 | 140,465 | 191,540 |
| | | | | |
| **Change in plans' assets:** | | | | |
| Fair value of plans' assets, beginning of year | 1,559,351 | 1,457,770 | — | — |
| Actual return on plans' assets | 113,769 | 169,598 | — | — |
| Employer contributions | 7,178 | 7,016 | 15,320 | 15,237 |
| Benefits paid | (81,900) | (75,033) | (15,320) | (15,237) |
| Fair value of plans' assets, end of year | 1,598,398 | 1,559,351 | — | — |
| | | | | |
| Funded (under funded) status of the plans | (731) | 98,171 | (140,465) | (191,540) |
| Unrecognized net actuarial loss (gain) | 869,596 | 803,490 | (12,659) | 31,997 |
| Unrecognized prior service cost | 2,518 | (16,918) | (11,213) | (12,754) |
| Unrecognized transition asset | (1) | (6) | — | — |
| Prepaid (accrued) benefit cost | $ 871,382 | $ 884,737 | $ (164,337) | $ (172,297) |

Amounts recognized in the statement of financial position consist of (in thousands):

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | Dec. 25, 2005 | Dec. 26, 2004 | Dec. 25, 2005 | Dec. 26 2004 |
| Prepaid benefit costs | $ 908,895 | $ 950,766 | $ — | $ — |
| Accrued benefit costs | (83,759) | (78,002) | (164,337) | (172,297) |
| Intangible asset | 507 | — | — | — |
| Accumulated other comprehensive income | 45,739 | 11,973 | — | — |
| Net amount recognized | $ 871,382 | $ 884,737 | $ (164,337) | $ (172,297) |

The accumulated benefit obligation, which excludes the impact of future compensation increases, for all defined benefit pension plans was $1,566 million and $1,405 million at Dec. 25, 2005 and Dec. 26, 2004, respectively. The projected benefit obligation at Dec. 25, 2005 includes $1.5 billion related to the Company's qualified pension plans and $77 million related to its non-qualified plans. The Company's non-qualified plans are not funded. The funded status of the Company's qualified plans was $76 million at Dec. 25, 2005. The Newsday employee pension benefit plan will be frozen on March 31,

97

Powered by Morningstar® Document Research℠

2006. The Newsday employee plan freeze is currently expected to reduce the projected benefit obligation by $21 million.

The components of net periodic benefit cost (credit) for Company-sponsored plans were as follows (in thousands):

| | Pension Benefits | | | Other Postretirement Benefits | | |
|---|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2005 | 2004 | 2003 |
| Service cost | $ 25,160 | $ 21,177 | $ 18,270 | $ 1,469 | $ 1,752 | $ 2,595 |
| Interest cost | 81,436 | 80,474 | 78,620 | 7,774 | 10,323 | 11,867 |
| Expected return on plans assets | (127,346) | (131,118) | (137,932) | — | — | — |
| Recognized actuarial loss | 59,095 | 44,533 | 24,308 | — | — | — |
| Amortization of prior service costs | (1,415) | (1,834) | (1,858) | (1,444) | (1,314) | 7 |
| Amortization of transition asset | (5) | (5) | (848) | (439) | — | — |
| Special termination benefits(1) | 1,434 | 1,440 | — | — | — | — |
| Curtailment gain | (17,825) | — | — | — | — | — |
| Net periodic benefit cost (credit) | $ 20,534 | $ 14,667 | $ (19,440) | $ 7,360 | $ 10,761 | $ 14,469 |

(1)  Costs relate to position eliminations.

| | Pension Benefits | | | Other Postretirement Benefits | | |
|---|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2005 | 2004 | 2003 |
| Increase in minimum pension liabilities included in other comprehensive income, net of tax | $ (20,597) | $ (1,700) | $ (1,753) | $ — | $ — | $ |

Assumptions—Weighted average assumptions used each year in accounting for pension benefits and other postretirement benefits were:

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | 2005 | 2004 | 2005 | 2004 |
| Discount rate for expense | 5.75% | 6.25% | 5.75% | 6.25% |
| Discount rate for obligations | 5.50% | 5.75% | 5.50% | 5.75% |
| Increase in future salary levels for expense | 3.50% | 3.75% | — | — |
| Increase in future salary levels for obligations | 3.50% | 3.50% | — | — |
| Long-term rate of return on plans' assets | 8.50% | 8.50% | — | — |

98

Source: TRIBUNE CO, 10-K, February 28, 2006

Powered by Morningstar® Document Research℠

The Company used a building block approach to determine its current 8.5% assumption of the long-term expected rate of return on pension plan assets. Based on historical market studies, the Company's long-term expected returns for equity and fixed income securities approximate 10% and 6%, respectively. The Company's current 2006 target asset allocation for pension plan assets is 75% in equity securities and 25% in fixed income securities and other. The Company bases the rate used for discounting future benefit obligations and calculating interest cost on an index of Aa-rated corporate bonds.

At Dec. 25, 2005 and Dec. 26, 2004, the Company's prepaid pension asset included an unrecognized net actuarial loss of $870 million and $803 million, respectively. A significant portion of this net actuarial loss resulted from the difference between the Company's expected returns on plan assets and the actual losses on plan assets in 2002 and 2001. Expected returns on plan assets were $158 million and $176 million in 2002 and 2001, respectively; actual losses were $161 million and $113 million, respectively. In accordance with FAS No. 87, "Employers' Accounting for Pensions," the actuarial loss will be recognized in net periodic pension expense over the estimated average remaining service period of active employees expected to receive benefits. The Company's policy is to incorporate asset-related gains and losses into the asset value used to calculate the expected return on plan assets and into the calculation of amortization of unrecognized net actuarial loss over a four-year period.

**Plan Assets**—The Company's pension plans' asset allocations at Dec. 25, 2005 and Dec. 26, 2004 were as follows (in millions):

| Asset Category | Plan Assets | | | |
|---|---|---|---|---|
| | Dec. 25, 2005 | | Dec. 26, 2004 | |
| Equity securities | $ 1,186 | 74.2% | $ 1,146 | 73.5% |
| Fixed income securities | 329 | 20.6% | 332 | 21.3% |
| Other | 83 | 5.2% | 81 | 5.2% |
| Total | $ 1,598 | 100% | $ 1,559 | 100% |

**Health Care Cost Trend Rates**—For purposes of measuring 2005 postretirement health care costs, a 9.0% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2005. The rate was assumed to decrease gradually to 5.0% for 2009 and remain at that level thereafter. For purposes of measuring health care obligations at Dec. 25, 2005, a 9.0% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2005. The rate was assumed to decrease gradually to 5.0% for 2010 and remain at that level thereafter. On Dec. 8, 2003, the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("Act") was signed into law. The Act resulted in a $15 million reduction in the accumulated other postretirement obligations for prior service costs and a $1 million reduction in net periodic postretirement benefit costs.

Assumed health care cost trend rates have a significant effect on the amounts reported for health care plans. As of the date of this report, a 1% change in assumed health care cost trend rates would have the following effects (in thousands):

| | 1% Increase | 1% Decrease |
|---|---|---|
| Service cost and interest cost | $ 372 | $ (329) |
| Projected benefit obligation | $ 6,218 | $ (5,510) |

Source: TRIBUNE CO, 10-K, February 28, 2006

Powered by Morningstar® Document Research℠

**Cash Flows**—The Company contributed $7 million to certain of its union and non-qualified pension plans and $15 million to its other postretirement plans in 2005. The Company plans to contribute $7 million to certain of its union and non-qualified pension plans and $13 million to its other postretirement plans in 2006.

**Expected Future Benefit Payments**—The following benefit payments, which reflect expected future service, as appropriate, are expected to be paid (in thousands):

|  | Pension Benefits | Other Postretirement Benefits |
|---|---|---|
| 2006 | $    77,930 | $    14,416 |
| 2007 | 75,222 | 14,316 |
| 2008 | 75,439 | 14,081 |
| 2009 | 76,342 | 13,823 |
| 2010 | 77,548 | 13,660 |
| 2011-2015 | 408,164 | 64,455 |

## NOTE 14: CAPITAL STOCK AND SHARE PURCHASE PLAN

Under the Company's Restated Certificate of Incorporation, 12 million shares of preferred stock are authorized. Preferred stock is issuable in series under terms and conditions determined by the Company's Board of Directors.

**Series B Preferred Stock**—In 1989, the Company established a series of 1.6 million shares of Series B Convertible Preferred Stock and issued 1.59 million shares to the Company's ESOP. In December 2003, the Series B convertible preferred stock was converted into 15.4 million shares of common stock. Each share of the Series B preferred stock paid a cumulative dividend of 7.75% annually, had a liquidation value of $220 per share, was convertible into 16 shares of the Company's common stock and was voted with the common stock with an entitlement to 18.32 votes per preferred share.

**Series C, D-1 and D-2 Convertible Preferred Stock**—In connection with the June 12, 2000 merger with Times Mirror, outstanding shares of Times Mirror cumulative, non-voting preferred stock were converted into shares of Tribune preferred stock with similar terms. An additional 0.2 million shares of preferred stock, net of treasury stock, were issued due to the conversion. Series C convertible preferred stock is cumulative, non-voting preferred stock, which is entitled to annual dividends of 8%, based on liquidation value. Annual dividends for Series D-1 and D-2 were paid at the rate of 6.67%, 6.44% and 6.22% in 2005, 2004, and 2003, respectively, and will be paid at the rate of 6.91% in 2006 based on liquidation value. Dividends on Series D-1 and D-2 preferred stocks will increase ratably from 2006 until 2012 pursuant to a predetermined schedule. Series C, D-1 and D-2 convertible preferred stocks relate to Times Mirror recapitalization transactions whereby TMCT I and TMCT II (see Note 6) were formed. Series C, D-1 and D-2 preferred stocks are convertible into the Company's common stock in 2025 and thereafter. The conversion factor is calculated by dividing $500 plus accrued and unpaid dividends by the average closing prices of the Company's common stock for the 20 trading days immediately preceding the conversion date.

**Common and Treasury Stock**—At Feb. 17, 2006, there were 6,461 holders of record. During 2005, the Company repurchased and retired 12.2 million shares of its common stock in the open market for $440 million. During 2004, the Company repurchased and retired 15.5 million shares of its common stock in the open market for $732 million. During 2003, the Company repurchased 7.5 million shares of

100

Powered by Morningstar® Document Research℠

its common stock in the open market for $356 million. At Dec. 25, 2005, the Company had authorization to repurchase an additional $1 billion of its common stock. At Dec. 25, 2005, 83.4 million treasury shares were held by TMCT I, TMCT II and other affiliates of the Company. During 2003, the Company retired 124.0 million treasury shares.

**Treasury Common Stock Held by Tribune Stock Compensation Fund ("TSCF")**—The TSCF purchased shares of the Company's common stock for the purpose of funding certain existing stock-based compensation plans. In 2003, as a part of the treasury stock repurchase authorization, the TSCF purchased approximately 0.5 million shares of the Company's common stock for $20 million. All shares acquired in 2003 by TSCF were utilized by December 2003. The TSCF was dissolved in the first quarter of 2005.

**Share Purchase Rights Plan**—In December 1997, the Company adopted a Share Purchase Rights Plan that replaced a similar agreement. The plan provides for a dividend of one right on each outstanding share of the Company's common stock. Each right will entitle stockholders to buy one two-hundredth of a share of Series A Junior Participating preferred stock at an exercise price of $125. These rights expire Jan. 5, 2008. The rights have no voting rights and are not exercisable until 10 days after the occurrence of certain triggering events, upon which the holders of the rights are entitled to purchase either the common stock of an acquirer or additional common stock of the Company at a discounted price. The rights are redeemable at the option of the Company for $.005 per right. The Company has established a series of two million shares of Series A Junior Participating Preferred Stock in connection with the plan, none of which have been issued.

## NOTE 15: INCENTIVE COMPENSATION AND STOCK PLANS

**Defined Contribution Plans**—The Company maintains various qualified 401(k) savings plans, which permit eligible employees to make voluntary contributions on a pretax basis. The plans allow participants to invest their savings in various investments including the Company's common stock. The Company enhanced its primary 401(k) plan to include a larger Company contribution in 2004. This new plan was designed to replace the Company's ESOP that was fully allocated at the end of 2003. Company contributions to all of its defined contribution plans were $33 million in 2005, $32 million in 2004 and $17 million in 2003. In 2005, the Company contributed an additional $26 million to these plans, which related to and was charged to expense in 2004. In 2006, the Company will contribute to these plans an additional $26 million, which relates to and was charged to expense in 2005. In 2006, the Company amended its primary 401(k) plan to make a portion of the Company's contributions discretionary.

**Employee Stock Purchase Plan**—This plan permits eligible employees to purchase the Company's common stock at 85% of market price. The Company incurred charges of $0.2 million in 2005, 2004 and 2003 related to the administration of this plan. During 2005, 2004 and 2003, 682,624, 617,651, and 568,718 shares, respectively, were sold to employees under this plan. A total of 16 million shares can be purchased under this plan. As of Dec. 25, 2005, a total of 3.1 million shares remained available for sale. The weighted average fair value of shares sold in 2005 was $36.37. The Company plans to adopt FAS No. 123R in the first quarter of 2006 (see Note 1). FAS 123R requires that the discount on purchases of the Company's common stock provided to eligible employees under the plan be expensed. The Company expects to record approximately $3.7 million of expense in 2006 related to the plan.

**Employee Stock Ownership Plan ("ESOP")**—In 1988, the Company established an ESOP as a long-term employee benefit plan. In connection therewith, the ESOP purchased, in 1988 and 1989,

101

Powered by Morningstar® Document Research℠

approximately 3.2 million common shares and 1.59 million Series B convertible preferred shares of the Company at an aggregate cost of $375 million. The ESOP provided for the awarding of shares of the Company's preferred and common stock on a noncontributory basis to eligible employees of the Company not covered by a collective bargaining agreement. At Dec. 28, 2003, all of the preferred and common stock had been allocated to employees, and the preferred stock had been converted into common shares.

Shares of stock held by the ESOP were placed with the ESOP Trustee and were allocated to eligible employees annually. These common and preferred shares were allocated in the same proportion that the current year's principal and interest payments bore to the total principal and interest to be paid over the lives of the related borrowings. Each preferred share was convertible into 16 shares of the Company's common stock. The ESOP Trustee was required to convert the preferred shares when making distributions to participants upon their withdrawal from the ESOP. If at the time of such conversion the price of the Company's common stock was below $13.75 per share, the Company was required, at its option, to either pay the difference in cash or issue additional common stock.

The Company recognized expense for this plan based upon cash contributions it made to the ESOP. The ESOP serviced its debt requirements with amounts received from preferred dividends and Company contributions. ESOP debt service activity is summarized as follows (in thousands):

|  | 2003 |
|---|---|
| **Debt Requirements:** | |
| Principal | $ 33,772 |
| Interest | 2,837 |
| **Total** | $ 36,609 |
| **Debt Service:** | |
| Dividends | $ 16,683 |
| Company cash contributions | 19,926 |
| **Total** | $ 36,609 |

**1997 Incentive Compensation Plan**—In 1997, the 1992 Long-Term Incentive Plan was replaced with the 1997 Incentive Compensation Plan. At Dec. 25, 2005, remaining options outstanding under the 1992 plan totaled 60,000 shares, all of which were exercisable. The 1997 plan provides for the granting of awards to eligible employees in any one or combination of stock options, performance equity program awards and annual management incentive program bonuses. At Dec. 25, 2005, options outstanding under the 1997 plan totaled 36.7 million shares, of which 35.2 million shares were exercisable. At Dec. 25, 2005, a total of 32.2 million shares were available for award under the 1997 plan. The stock options assumed in the Times Mirror acquisition are fully vested and exercisable. At Dec. 25, 2005, the converted Times Mirror stock options outstanding and exercisable totaled 7.2 million shares.

Under the stock option portion of the 1997 plan, the option price may not be less than the market value of the Company's common stock at the time the option is granted. Options are exercisable not less than six months or more than 10 years after the date the option is granted. General awards granted under the 1997 plan vest in annual 25% increments beginning one year from the date of the grant. Under certain circumstances, replacement options are granted when a participant pays the exercise price of a stock option and related tax withholding obligations with previously acquired shares of common stock. The number of replacement options granted is equal to the number of shares used to pay the exercise price and related tax withholding obligations. The exercise price of a replacement

102

Powered by Morningstar® Document Research℠

option is equal to the market price of the underlying stock on the date of grant, and the term is equal to the remaining term of the original option. Replacement options vest one year from the date of grant.

A summary of stock option activity and weighted average prices related to general options follows (shares in thousands):

| | General Options(1) | | | | | |
|---|---|---|---|---|---|---|
| | 2005 | | 2004 | | 2003 | |
| | Shares | Weighted Avg. Exercise Price | Shares | Weighted Avg. Exercise Price | Shares | Weighted Avg. Exercise Price |
| Outstanding, beginning of year | 32,991 | $ 37.92 | 34,117 | $ 35.76 | 36,019 | $ 33.25 |
| Granted | 3,780 | 40.30 | 4,102 | 51.95 | 6,675 | 45.92 |
| Exercised | (993) | 23.96 | (4,667) | 33.33 | (8,073) | 32.60 |
| Canceled/forfeited | (1,289) | 43.57 | (561) | 43.81 | (504) | 41.36 |
| Outstanding, end of year | 34,489 | $ 38.35 | 32,991 | $ 37.92 | 34,117 | $ 35.76 |
| Exercisable, end of year(2) | 32,993 | $ 38.28 | 20,610 | $ 33.13 | 18,247 | $ 29.91 |

(1)    Includes options assumed in the Times Mirror acquisition.

(2)    In 2005, the Company accelerated the vesting of approximately nine million options granted in 2003, 2004 and 2005 (see Note 1).

A summary of stock option activity and weighted average prices related to replacement options follows (shares in thousands):

| | Replacement Options | | | | | |
|---|---|---|---|---|---|---|
| | 2005 | | 2004 | | 2003 | |
| | Shares | Weighted Avg. Exercise Price | Shares | Weighted Avg. Exercise Price | Shares | Weighted Avg. Exercise Price |
| Outstanding, beginning of year | 10,845 | $ 47.79 | 10,420 | $ 46.08 | 8,550 | $ 44.46 |
| Granted | 13 | 41.83 | 2,428 | 51.16 | 3,190 | 48.77 |
| Exercised | (20) | 42.20 | (1,274) | 41.48 | (1,118) | 40.42 |
| Canceled/forfeited | (1,318) | 47.93 | (729) | 46.48 | (202) | 51.61 |
| Outstanding, end of year | 9,520 | $ 47.79 | 10,845 | $ 47.79 | 10,420 | $ 46.08 |
| Exercisable, end of year | 9,507 | $ 47.80 | 8,587 | $ 46.92 | 7,248 | $ 44.90 |

103

Powered by Morningstar® Document Research℠

The following table summarizes information about general options outstanding and general options exercisable at Dec. 25, 2005 (shares in thousands):

| | General Options(1) | | | | |
| | Options Outstanding | | | Options Exercisable | |
| Range of Exercise Prices | Number Outstanding | Weighted Avg. Remaining Life | Weighted Avg. Exercise Price | Number Exercisable | Weighted Avg. Exercise Price |
|---|---|---|---|---|---|
| $12.32-$24.35 | 7,089 | 3.1 | $ 22.27 | 7,089 | $ 22.27 |
| $24.36-$39.93 | 4,494 | 4.2 | 35.99 | 4,446 | 35.98 |
| $39.94-$40.50 | 9,153 | 5.4 | 40.36 | 7,744 | 40.33 |
| $40.51-$52.50 | 13,753 | 6.6 | $ 46.15 | 13,714 | $ 46.15 |

(1)    Includes options assumed in the Times Mirror acquisition.

The following table summarizes information about replacement options outstanding and replacement options exercisable at Dec. 25, 2005 (shares in thousands):

| | Replacement Options | | | | |
| | Options Outstanding | | | Options Exercisable | |
| Range of Exercise Prices | Number Outstanding | Weighted Avg. Remaining Life | Weighted Avg. Exercise Price | Number Exercisable | Weighted Avg. Exercise Price |
|---|---|---|---|---|---|
| $33.13-$42.61 | 827 | 2.2 | $ 41.42 | 814 | $ 41.42 |
| $42.62-$48.70 | 4,401 | 2.7 | 45.68 | 4,401 | 45.68 |
| $48.71-$60.88 | 4,292 | 3.9 | 51.19 | 4,292 | 51.19 |

104

## NOTE 16: COMPREHENSIVE INCOME

Comprehensive income reflects all changes in the net assets of the Company during the period from transactions and other events and circumstances, except those resulting from stock issuances, stock repurchases and dividends. The Company's comprehensive income includes net income, the change in the minimum pension liabilities, unrealized gains and losses on marketable securities classified as available-for-sale, and foreign currency translation adjustments. The Company's comprehensive income was as follows (in thousands):

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Net income | $ 534,689 | $ 555,536 | $ 891,379 |
| Change in minimum pension liabilities, net of taxes of $13,168, $1,116 and $1,111, respectively | (20,597) | (1,700) | (1,753) |
| Unrealized gain (loss) on marketable securities: | | | |
| Unrealized holding gain (loss) arising during the period, net of taxes of ($2,098), $612 and $6,791, respectively | (3,282) | 796 | 10,712 |
| Add adjustment for loss on investment write-downs included in net income, net of taxes of ($114) | — | — | 181 |
| Less adjustment for (gain) loss on investment sales included in net income, net of taxes of $116, ($64) and $2,115, respectively | (181) | 100 | (3,336) |
| Change in net unrealized (gain) loss on securities, net of taxes | (3,463) | 896 | 7,557 |
| Change in foreign currency translation adjustments, net of taxes of $45, $75 and $67, respectively | (70) | 118 | 106 |
| Other comprehensive income (loss) | (24,130) | (686) | 5,910 |
| Comprehensive income | $ 510,559 | $ 554,850 | $ 897,289 |

Accumulated other comprehensive income (loss) is a separate component of shareholders' equity on the Company's balance sheet. A reconciliation of the components of accumulated other comprehensive income (loss) is as follows (in thousands):

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Minimum pension liabilities, net of tax: | | | |
| Balance, beginning of year | $ (7,304) | $ (5,604) | $ (3,851) |
| Current year change | (20,597) | (1,700) | (1,753) |
| Balance, end of year | (27,901) | (7,304) | (5,604) |
| Unrealized gain, net of tax, on marketable securities: | | | |
| Balance, beginning of year | 19,910 | 19,014 | 11,457 |
| Current year change | (3,463) | 896 | 7,557 |
| Balance, end of year | 16,447 | 19,910 | 19,014 |
| Foreign currency translation adjustments, net of tax: | | | |
| Balance, beginning of year | 224 | 106 | — |
| Current year change | (70) | 118 | 106 |
| Balance, end of year | 154 | 224 | 106 |
| Accumulated other comprehensive income (loss) | $ (11,300) | $ 12,830 | $ 13,516 |

105

## NOTE 17: BUSINESS SEGMENTS

Tribune Company is a media and entertainment company that conducts its operations through two business segments: publishing and broadcasting and entertainment. In addition, certain administrative activities are reported and included under corporate. These segments reflect the manner in which the Company sells its products to the marketplace and the manner in which it manages its operations and makes business decisions.

**Publishing**—Tribune Publishing operates 11 market-leading daily newspapers and related businesses, distributes entertainment listings and syndicated content, operates a 24-hour cable news channel, and manages the websites of Tribune's daily newspapers and television stations, along with other branded sites targeting specific communities of interest. The daily newspapers are the *Los Angeles Times; Chicago Tribune; Newsday*, serving Nassau and Suffolk counties on Long Island, New York and the borough of Queens, New York; *South Florida Sun-Sentinel; Orlando Sentinel; The Baltimore Sun; The Hartford Courant; The Morning Call*, serving Pennsylvania's Lehigh Valley; *Daily Press*, serving the Virginia Peninsula; and *The Advocate* and *Greenwich Time*, each serving Connecticut's Fairfield County.

**Broadcasting and Entertainment**—The Company's broadcasting operations consist of The WB Television Network affiliates in New York, Los Angeles, Chicago, Philadelphia, Boston, Dallas, Washington D.C., Atlanta, Houston, Seattle, Miami, Denver, St. Louis, Portland, Indianapolis, San Diego, Hartford, New Orleans, and Albany; FOX television affiliates in Seattle, Sacramento, Indianapolis, Hartford, Grand Rapids and Harrisburg; an ABC television affiliate in New Orleans; and one radio station in Chicago. On Jan. 24, 2006, the Company announced that it had reached a 10-year agreement to affiliate 16 of its WB Network affiliates stations with a new broadcast network, The CW Network, being launched in the fall of 2006. The WB Network will shut down at that time. Three of the Company's current WB Network affiliates (Philadelphia, Atlanta and Seattle) will become independent stations at that time. Entertainment operations include Tribune Entertainment which distributes its own programming together with programming licensed from third parties.

No single customer provides more than 10% of the Company's revenue. In determining operating profit for each segment, none of the following items have been added or deducted: interest and dividend income, interest expense, equity income and loss, non-operating items or income taxes. Assets represent those tangible and intangible assets used in the operations of each segment. Corporate assets include cash and the Company's investment portfolio.

106

Powered by Morningstar® Document Research℠

TRIBUNE COMPANY AND SUBSIDIARIES
BUSINESS SEGMENTS
(In thousands of dollars)

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| **Operating Revenues** | | | |
| Publishing | $ 4,096,850 | $ 4,129,850 | $ 4,036,920 |
| Broadcasting and entertainment | 1,498,767 | 1,596,397 | 1,557,909 |
| Total operating revenues | $ 5,595,617 | $ 5,726,247 | $ 5,594,829 |
| **Operating Profit (Loss)(1)** | | | |
| Publishing | $ 759,713 | $ 726,207 | $ 885,306 |
| Broadcasting and entertainment | 436,523 | 544,300 | 528,519 |
| Corporate expenses | (49,413) | (52,218) | (53,351) |
| Total operating profit | $ 1,146,823 | $ 1,218,289 | $ 1,360,474 |
| **Depreciation** | | | |
| Publishing(2) | $ 183,695 | $ 171,599 | $ 169,194 |
| Broadcasting and entertainment | 39,300 | 40,992 | 42,997 |
| Corporate | 1,630 | 1,635 | 2,059 |
| Total depreciation | $ 224,625 | $ 214,226 | $ 214,250 |
| **Amortization of Intangible Assets** | | | |
| Publishing | $ 7,231 | $ 7,430 | $ 7,089 |
| Broadcasting and entertainment | 11,964 | 11,433 | 7,047 |
| Total amortization of intangible assets | $ 19,195 | $ 18,863 | $ 14,136 |
| **Capital Expenditures** | | | |
| Publishing | $ 163,317 | $ 171,435 | $ 134,551 |
| Broadcasting and entertainment | 36,851 | 35,266 | 47,481 |
| Corporate | 5,777 | 10,647 | 11,503 |
| Total capital expenditures | $ 205,945 | $ 217,348 | $ 193,535 |
| **Assets** | | | |
| Publishing | $ 8,637,176 | $ 8,218,516 | $ 8,216,160 |
| Broadcasting and entertainment | 4,425,135 | 4,444,988 | 4,452,605 |
| Corporate | 1,483,931 | 1,491,928 | 1,611,387 |
| Total assets | $ 14,546,242 | $ 14,155,432 | $ 14,280,152 |

(1)    Operating profit for each segment excludes interest and dividend income, interest expense, equity income and loss, non-operating items and income taxes.

(2)    Publishing depreciation for 2005 includes $16 million of accelerated depreciation expense related to the shut down of the *Los Angeles Times'* San Fernando Valley printing facility (see Note 2).

107

Source: TRIBUNE CO, 10-K, February 28, 2006

Powered by Morningstar® Document Research℠

### TRIBUNE COMPANY AND SUBSIDIARIES
### 2005 QUARTERLY RESULTS (Unaudited)
#### (In thousands of dollars, except per share data)

| | Quarters | | | | 2005 |
| | First | Second | Third | Fourth | Total |
|---|---|---|---|---|---|
| **Operating Revenues** | | | | | |
| Publishing | $ 1,005,512 | $ 1,038,624 | $ 980,354 | $ 1,072,360 | $ 4,096,850 |
| Broadcasting and entertainment | 310,232 | 423,444 | 422,456 | 342,635 | 1,498,767 |
| Total operating revenues | $ 1,315,744 | $ 1,462,068 | $ 1,402,810 | $ 1,414,995 | 5,595,617 |
| **Operating Profit** | | | | | |
| Publishing | $ 198,539 | $ 217,651 | $ 169,730 | $ 173,793 | $ 759,713 |
| Broadcasting and entertainment | 66,966 | 134,121 | 130,689 | 104,747 | 436,523 |
| Corporate expenses | (13,448) | (13,472) | (13,108) | (9,385) | (49,413) |
| Total operating profit | 252,057 | 338,300 | 287,311 | 269,155 | 1,146,823 |
| Net income on equity investments | 471 | 11,897 | 8,051 | 20,790 | 41,209 |
| Interest and dividend income | 1,082 | 1,163 | 2,888 | 2,404 | 7,539 |
| Interest expense | (35,091) | (35,367) | (38,617) | (46,116) | (155,191) |
| Gain (loss) on change in fair values of derivatives and related investments(1) | (2,253) | 61,803 | 27,120 | (24,486) | 62,184 |
| Gain on sales of subsidiaries and investments, net(2) | 1,109 | 1,299 | 487 | 3,885 | 6,780 |
| Other non-operating gain (loss), net | (2,700) | 3,794 | (452) | 235 | 897 |
| Income Before Income Taxes | 214,675 | 382,891 | 286,808 | 225,867 | 1,110,241 |
| Income taxes | (71,830) | (149,499) | (262,797) | (91,426) | (575,552) |
| Net Income | 142,845 | 233,392 | 24,011 | 134,441 | 534,689 |
| Preferred dividends | (2,090) | (2,090) | (2,090) | (2,094) | (8,364) |
| Net Income Attributable to Common Shares | $ 140,755 | $ 231,302 | $ 21,921 | $ 132,347 | $ 526,325 |
| **Earnings Per Share(3)** | | | | | |
| Basic | $ .44 | $ .73 | $ .07 | $ .43 | $ 1.68 |
| Diluted | $ .44 | $ .72 | $ .07 | $ .43 | $ 1.67 |
| Common Dividends Per Share | $ .18 | $ .18 | $ .18 | $ .18 | $ .72 |
| Common Stock Price (High-Low) | $ 42.37-38.59 | $ 40.14-35.02 | $ 39.56-34.43 | $ 36.15-30.05 | |

**Notes to Quarterly Results:**

(1) In the aggregate, changes in the fair values of the Company's derivatives, net of changes in the fair values of the related investments, increased full year 2005 pretax income by $62 million and diluted EPS by $.12 and decreased full year 2004 pretax income by $18 million and diluted EPS by $.03. For 2005 by quarter, the effect on diluted EPS was as follows: no impact in the first quarter, increase of $.12 in second quarter, increase of $.05 in the third quarter and decrease of $.05 in the fourth quarter. For 2004 by quarter, the effect on diluted EPS was as follows: decrease of $.09 in the first quarter, increase of $.04 in second quarter, decrease of $.04 in the third quarter and increase of $.06 in the fourth quarter.

(2) During 2005 and 2004, the Company sold certain subsidiaries and investments. For 2005, the gain on sales of subsidiaries and investments resulted in the pretax gain of $7 million in the aggregate, increasing diluted EPS by $.01. For 2004, the gain on sales of subsidiaries and investments related primarily to the sale of the Company's 50% interest in La Opinión. The sale of La Opinión resulted in a pretax gain of $18 million, increasing diluted EPS by $.03 in the first quarter of 2004.

(3) During 2004, the Company recorded investment write-downs, which in the aggregate, decreased full year pretax income by $6 million and diluted EPS by $.01. For 2004 by quarter, the effect on diluted EPS was a decrease of $.01 in both the second and third quarters.

108

## TRIBUNE COMPANY AND SUBSIDIARIES
### 2004 QUARTERLY RESULTS (Unaudited)
#### (In thousands of dollars, except per share data)

| | First | Second | Third | Fourth | 2004 Total |
|---|---|---|---|---|---|
| **Operating Revenues** | | | | | |
| Publishing | $ 1,003,583 | $ 1,045,864 | $ 981,457 | $ 1,098,946 | $ 4,129,850 |
| Broadcasting and entertainment | 328,734 | 450,067 | 432,394 | 385,202 | 1,596,397 |
| Total operating revenues | $ 1,332,317 | $ 1,495,931 | $ 1,413,851 | $ 1,484,148 | $ 5,726,247 |
| | | | | | |
| **Operating Profit** | | | | | |
| Publishing | $ 189,548 | $ 171,051 | $ 131,780 | $ 233,828 | $ 726,207 |
| Broadcasting and entertainment | 96,619 | 160,411 | 138,555 | 148,915 | 544,500 |
| Corporate expenses | (12,892) | (12,705) | (12,481) | (14,140) | (52,218) |
| Total operating profit | 273,275 | 318,757 | 257,854 | 368,603 | 1,218,289 |
| Net income (loss) on equity investments | (4,373) | 4,385 | (1,586) | 19,505 | 17,931 |
| Interest and dividend income | 1,276 | 1,023 | 271 | 483 | 3,053 |
| Interest expense | (46,677) | (36,247) | (35,131) | (35,063) | (153,118) |
| Gain (loss) on change in fair value of derivatives and related investments(1) | (45,501) | 20,229 | (20,839) | 27,614 | (18,497) |
| Loss on early debt retirement(4) | | (140,506) | | | (140,506) |
| Gain (loss) on sales of subsidiaries and investments, net(2) | 21,518 | (2,644) | (238) | 1,711 | 20,347 |
| Loss on investment write-downs(3) | (2,981) | (2,259) | (359) | | (5,599) |
| Other non-operating gain (loss), net | 385 | (2,221) | 969 | 78 | (789) |
| | | | | | |
| Income Before Income Taxes and Cumulative Effect of Change in Accounting Principle | 196,922 | 160,517 | 200,741 | 382,931 | 941,111 |
| Income taxes | (76,241) | (64,131) | (79,085) | (148,330) | (367,787) |
| | | | | | |
| Income Before Cumulative Effect of Change in Accounting Principle | 120,681 | 96,386 | 121,656 | 234,601 | 573,324 |
| Cumulative effect of change in accounting principle, net of tax | | | | (17,788) | (17,788) |
| | | | | | |
| Net Income | 120,681 | 96,386 | 121,656 | 216,813 | 555,536 |
| Preferred dividends | (2,077) | (2,077) | (2,077) | (2,077) | (8,308) |
| | | | | | |
| Net Income Attributable to Common Shares | $ 118,604 | $ 94,309 | $ 119,579 | $ 214,736 | $ 547,228 |
| | | | | | |
| **Earnings (Loss) Per Share(5)** | | | | | |
| **Basic:** | | | | | |
| Before cumulative effect of change in accounting principle, net | $ .36 | $ .29 | $ .38 | $ .73 | $ 1.75 |
| Cumulative effect of change in accounting principle, net | | | | (.05) | (.05) |
| Total | $ .36 | $ .29 | $ .38 | $ .68 | $ 1.70 |
| | | | | | |
| **Diluted:** | | | | | |
| Before cumulative effect of change in accounting principle, net | $ .35 | $ .29 | $ .37 | $ .72 | $ 1.72 |
| Cumulative effect of change in accounting principle, net | | | | (.05) | (.05) |
| Total | $ .35 | $ .29 | $ .37 | $ .67 | $ 1.67 |
| | | | | | |
| Common Dividends Per Share | $ .12 | $ .12 | $ .12 | $ .12 | $ .48 |
| Common Stock Price (High-Low) | $ 53.00-48.89 | $ 51.90-44.94 | $ 45.85-39.20 | $ 44.32-40.50 | |

**Notes to Quarterly Results:**

(4)  Loss on early debt retirement relates to the retirement of $620 million of debt in the second quarter of 2004 at a cash premium of $137 million, reducing full year 2004 pretax income by $141 million and diluted EPS by $.26.

(5)  The total of the 2005 and 2004 quarters may not equal the respective full year amounts for earnings per share due to differences in the weighted average number of shares outstanding used in the computations for the respective periods. Per share amounts for the respective quarters and years have been computed using the average number of common shares outstanding for each period. Diluted earnings per share is adjusted for the the dilutive effect of the Company's common stock equivalents. The calculation may change each quarter depending on whether the common stock equivalents are antidilutive for that period.

109

Powered by Morningstar® Document Research℠

## TRIBUNE COMPANY AND SUBSIDIARIES
### ELEVEN YEAR FINANCIAL SUMMARY
(In thousands of dollars, except per share data)

| | 2005 | 2004 |
|---|---:|---:|
| **Operating Revenues** | | |
| Publishing | $ 4,096,850 | $ 4,129,850 |
| Broadcasting and entertainment | 1,498,767 | 1,596,397 |
| Total operating revenues | $ 5,595,617 | $ 5,726,247 |
| | | |
| **Operating Profit** | | |
| Publishing | $ 759,713 | $ 726,207 |
| Broadcasting and entertainment | 436,523 | 544,300 |
| Corporate expenses | (49,413) | (52,218) |
| Restructuring charges(2) | | |
| Total operating profit | 1,146,823 | 1,218,289 |
| | | |
| Net income (loss) on equity investments | 41,209 | 7,931 |
| Interest and dividend income | 7,539 | 3,053 |
| Interest expense | (155,191) | (153,118) |
| Non-operating items and minority interest expense | 69,861 | (145,044) |
| Income from Continuing Operations Before Income Taxes and Cumulative Effect of Changes in Accounting Principle | 1,110,241 | 941,111 |
| Income taxes | (575,552) | (367,787) |
| Income from Continuing Operations Before Cumulative Effect of Changes in Accounting Principle | 534,689 | 573,324 |
| Discontinued Operations of Education Segment, net of tax | | |
| Discontinued Operations of QUNO, net of tax | — | (17,788) |
| Cumulative effect of changes in accounting principles, net of tax(3) | | |
| Net Income(4) | $ 534,689 | $ 555,536 |
| | | |
| **Share Information** | | |
| **Basic earnings per share** | | |
| Continuing operations before cumulative effect of changes in accounting principle | $ 1.68 | $ 1.75 |
| Discontinued operations | — | (.05) |
| Cumulative effect of changes in accounting principle | | |
| Net income | $ 1.68 | $ 1.70 |
| | | |
| **Diluted earnings per share** | | |
| Continuing operations before cumulative effect of changes in accounting principle | $ 1.67 | $ 1.72 |
| Discontinued operations | | (.05) |
| Cumulative effect of changes in accounting principle | | |
| Net income | $ 1.67 | $ 1.67 |
| | | |
| Common dividends per share | $ 0.72 | $ 0.48 |
| Weighted average common shares outstanding (000's) | 312,880 | 322,422 |
| **Financial Ratios** | | |
| Operating profit margin | 20.5% | 21.3% |
| Debt to capital including PHONES(5) | 26% | 22% |
| Debt to capital excluding PHONES(5) | 23% | 18% |
| **Financial Position and Other Data** | | |
| Total assets | $ 14,546,242 | $ 14,155,432 |
| Long-term debt including PHONES | 2,939,262 | 2,317,933 |
| Long-term debt excluding PHONES | 2,449,561 | 1,733,053 |
| Shareholders' equity | 6,725,551 | 6,836,844 |
| Capital expenditures | 205,945 | 217,348 |

(1)    The Company adopted the provisions of FAS No. 142, "Goodwill and Other Intangible Assets", at the beginning of fiscal year 2002. Under FAS No. 142, goodwill and certain other intangible assets are no longer amortized to earnings.

(2)    During the second quarter of 2001, the Company announced a voluntary employee retirement program. The Company implemented this program as well as various other cost reduction initiatives throughout the remainder of 2001 and the first quarter of 2002. In the aggregate, the restructuring charges related to these programs decreased 2002 full year net income by $17 million and diluted EPS by $.05 and decreased 2001 full year net income by $93 million and diluted EPS by $.29.

(3)    The cumulative effect of adopting a new accounting pronouncement for the valuation of certain intangible assets decreased net income by $18 million in 2004. The cumulative effect of adopting a new accounting pronouncement for goodwill and other intangible assets decreased net income by $166 million in 2002. The cumulative effect of adopting a new accounting pronouncement for derivative instruments decreased net income by $3 million in 1999.

(4)    Includes after-tax non-operating items as follows: gain on changes in fair values of derivatives and related investments of $38 million, a gain on sales of subsidiaries and investments of $4 million, an other non-operating gain of $1 million and an unfavorable income tax adjustment of $139 million ($150 million as a result of the Matthew Bender Tax Court ruling, partially offset by $12 million of favorable income tax settlement adjustments), totaling a loss of $96 million, or $.30 per diluted share, in 2005; loss on changes in fair

Powered by Morningstar® Document Research℠

values of derivatives and related investments of $11 million, loss on early debt retirement of $87 million, gain on sales of subsidiaries and investments of $12 million, and a loss on investment write-downs and other of $4 million, totaling a loss of $90 million, or $.28 per diluted share, in 2004; gain on changes in fair values of derivatives and related investments of $52 million, gain

110

Powered by Morningstar℠ Document Research℠

| 2003 | 2002(1) | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 | 1995 |
|---|---|---|---|---|---|---|---|---|
| $ 4,036,920 | $ 3,940,478 | $ 3,903,431 | $ 3,485,277 | $ 1,621,347 | $ 1,536,684 | $ 1,472,823 | $ 1,371,770 | $ 1,350,204 |
| 1,557,909 | 1,443,950 | 1,349,935 | 1,465,553 | 1,302,058 | 1,153,006 | 1,057,529 | 876,750 | 828,806 |
| $ 5,594,829 | $ 5,384,428 | $ 5,253,366 | $ 4,950,830 | $ 2,923,405 | $ 2,689,690 | $ 2,530,352 | $ 2,248,520 | $ 2,179,010 |
| $ 885,306 | $ 851,417 | $ 510,604 | $ 648,326 | $ 394,312 | $ 377,137 | $ 354,585 | $ 291,257 | 272,093 |
| 528,519 | 470,138 | 333,265 | 449,057 | 378,036 | 317,355 | 285,896 | 203,531 | 171,618 |
| (53,351) | (45,770) | (41,640) | (64,372) | (39,506) | (35,435) | (34,426) | (30,935) | (29,899) |
|  | (27,253) | (151,892) |  |  |  |  |  |  |
| 1,360,474 | 1,248,532 | 650,337 | 1,033,011 | 732,842 | 659,057 | 606,055 | 463,853 | 413,812 |
| 5,590 | (40,875) | (60,813) | (79,374) | (40,083) | (33,980) | (34,696) | (13,281) | (13,209) |
| 6,048 | 8,818 | 8,853 | 33,124 | 47,436 | 6,112 | 26,343 | 32,116 | 14,465 |
| (198,121) | (213,309) | (254,521) | (240,708) | (113,031) | (88,451) | (86,502) | (47,779) | (21,816) |
| 241,247 | (63,211) | (74,905) | (165,301) | 1,756,779 | 119,119 | 111,824 | — | 7,772 |
| 1,415,236 | 939,955 | 268,951 | 580,752 | 2,383,943 | 661,857 | 623,024 | 434,909 | 401,026 |
| (523,857) | (331,376) | (157,815) | (270,351) | (933,981) | (272,660) | (250,265) | (175,071) | (162,347) |
| 891,379 | 608,579 | 111,136 | 310,401 | 1,449,962 | 389,197 | 372,759 | 259,838 | 238,679 |
|  |  |  | (86,015) | 21,807 | 25,075 | 20,866 | 22,912 | 6,779 |
|  |  |  |  |  |  |  | 89,317 | 32,707 |
|  | (165,587) |  |  | (3,060) |  |  |  |  |
| $ 891,379 | $ 442,992 | $ 111,136 | $ 224,386 | $ 1,468,709 | $ 414,272 | $ 393,625 | $ 372,067 | $ 278,165 |
| $ 2.78 | $ — | $ 0.28 | $ 0.74 | $ 6.03 | $ 1.53 | $ 1.44 | $ 0.98 | $ 0.85 |
|  |  |  | (.32) | .09 | .10 | .09 | .46 | .15 |
|  | (.35) |  |  | (.01) |  |  |  |  |
| $ 2.78 | $ 1.38 | $ 0.28 | $ 0.74 | $ 6.11 | $ 1.63 | $ 1.53 | $ 1.44 | $ 1.00 |
| $ 2.61 | $ 1.80 | $ 0.28 | $ 0.99 | $ 5.49 | $ 1.41 | $ 1.33 | $ 0.91 | $ 0.78 |
|  |  |  | (.29) | .09 | .09 | .07 | .41 | .14 |
|  | (.50) |  |  | (.01) |  |  |  |  |
| $ 2.61 | $ 1.30 | $ 0.28 | $ 0.70 | $ 5.56 | $ 1.50 | $ 1.40 | $ 1.32 | $ 0.92 |
| $ 0.44 | $ 0.44 | $ 0.44 | $ 0.40 | $ 0.36 | $ 0.34 | $ 0.32 | $ 0.30 | $ 0.28 |
| 311,295 | 301,932 | 298,295 | 271,951 | 237,367 | 242,428 | 245,758 | 245,684 | 259,160 |
| 24.2% | 23.2% | 12.4% | 20.9% | 25.1% | 24.5% | 24.0% | 20.6% | 19.0% |
| 22% | 29% | 35% | 34% | 37% | 35% | 41% | 37% | 33% |
| 18% | 26% | 31% | 30% | 23% | 33% | 41% | 37% | 33% |
| $ 4,280,152 | $ 13,974,048 | $ 14,380,587 | $ 14,596,712 | $ 8,740,047 | $ 5,824,037 | $ 4,665,821 | $ 3,629,151 | $ 3,270,386 |
| 2,381,617 | 3,260,795 | 3,699,165 | 4,020,936 | 2,694,073 | 1,615,995 | 1,520,646 | 979,754 | 757,433 |
| 1,866,327 | 2,737,355 | 3,015,165 | 3,220,936 | 1,565,593 | 1,615,995 | 1,520,646 | 979,754 | 757,433 |
| 7,028,124 | 6,119,235 | 5,642,341 | 5,877,347 | 3,458,617 | 2,356,617 | 1,826,004 | 1,539,506 | 1,379,909 |
| 193,535 | 186,737 | 266,355 | 302,471 | 125,578 | 128,800 | 98,319 | 87,171 | 112,980 |

on sales of subsidiaries and investments of $90 million, loss on investment write-downs of $6 million, gain on insurance recoveries of $14 million, an other non-operating loss of $2 million and a favorable income tax settlement adjustment of $25 million, totaling a gain of $173 million, or $.52 per diluted share, in 2003; loss on changes in fair values of derivatives and related investments of $98 million, gain on sales of subsidiaries and investments of $65 million, loss on investment write-downs of $11 million, other non-operating gain of $6 million and a favorable income tax settlement adjustment of $29 million, totaling a loss of $9 million, or $.02 per diluted share, in 2002; loss on changes in fair values of derivatives and related investments of $4 million, gain on sales of investments of $46 million, gain on sale of other investments of $1 million and loss on investment write-downs of $89 million, totaling a loss of $46 million, or $.14 per diluted share, in 2001; loss on changes in fair values of derivatives and related investments of $61 million, gain on sales of investments of $35 million, and loss on investment write-downs of $65 million, totaling a loss of $91 million, or $.31 per diluted share, in 2000; gain on changes in fair values of derivatives and related investments of $131 million, gain on reclassification of investments of $666 million, and gain on sales of subsidiary and investments of $270 million, totaling a gain of $1 billion, or $4.08 per diluted share, in 1999; gain on sales of subsidiary and investments, net of write-downs, totaling $64 million, or $.24 per diluted share, in 1998; gain on sales of investments, net of write-downs, totaling $69 million, or $.26 per diluted share, in 1997; equity income related to Qwest Broadcasting of $6 million, or $.02 per diluted share, in 1996; and gain on sale of investment and subsidiary totaling $5 million, or $.01 per diluted share, in 1995.

(3)

Capital comprises total debt, non-current deferred taxes and shareholders' equity.

Powered by Morningstar℠ Document Research℠

Powered by Morningstar® Document Research℠

**TRIBUNE COMPANY AND SUBSIDIARIES**

**SCHEDULE II—VALUATION AND QUALIFYING ACCOUNTS AND RESERVES**
**(In thousands of dollars)**

| Description | Balance at Beginning of Period | Additions Charged to Costs and Expenses | Additions Recorded Upon Acquisitions | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| Valuation accounts deducted from assets to which they apply: | | | | | |
| **Year ended Dec. 25, 2005** | | | | | |
| Accounts receivable allowances: | | | | | |
| Bad debts | $ 35,837 | $ 53,383 | $ — | $ 59,243 | $ 29,977 |
| Rebates, volume discounts and other | 13,670 | 27,131 | — | 28,220 | 12,581 |
| Total | $ 49,507 | $ 80,514 | $ — | $ 87,463 | $ 42,558 |
| **Year ended Dec. 26, 2004** | | | | | |
| Accounts receivable allowances: | | | | | |
| Bad debts | $ 34,024 | $ 60,072 | $ — | $ 58,259 | $ 35,837 |
| Rebates, volume discounts and other | 15,444 | 33,338 | — | 35,112 | 13,670 |
| Total | $ 49,468 | $ 93,410 | $ — | $ 93,371 | $ 49,507 |
| **Year ended Dec. 28, 2003** | | | | | |
| Accounts receivable allowances: | | | | | |
| Bad debts | $ 51,173 | $ 51,241 | $ 87 | $ 68,477 | $ 34,024 |
| Rebates, volume discounts and other | 16,195 | 37,646 | — | 38,397 | 15,444 |
| Total | $ 67,368 | $ 88,887 | $ 87 | $ 106,874 | $ 49,468 |

112

Powered by Morningstar® Document Research℠

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.**

Not applicable.

## ITEM 9A. CONTROLS AND PROCEDURES

### Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures

Under the supervision and with the participation of the Company's management, including its principal executive officer and principal financial officer, the Company conducted an evaluation of its disclosure controls and procedures, as such term is defined in Exchange Act Rules 13a-15(e) and 15d-15(e), as of Dec. 25, 2005. Based upon that evaluation, the principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures are effective.

### Management's Report on Internal Control Over Financial Reporting

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of the Company's management, including its principal executive officer and principal financial officer, the Company conducted an evaluation of the effectiveness of the design and operation of internal control over financial reporting based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on that evaluation, the Company's management concluded that internal control over financial reporting was effective as of Dec. 25, 2005. Management's assessment of the effectiveness of internal control over financial reporting as of Dec. 25, 2005 has been audited by PricewaterhouseCoopers, LLP, an independent registered public accounting firm, as stated in their report included in Item 8.

The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. Because of the inherent limitations of any internal control system over financial reporting, there is only reasonable assurance that the Company's control over financial reporting will succeed in preventing or detecting misstatements under all potential future conditions.

### Changes in Internal Control Over Financial Reporting

There has been no change in the Company's internal control over financial reporting that occurred during the Company's fiscal quarter ended Dec. 25, 2005 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

## PART III

## ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT.

The information contained under the heading "Executive Officers of the Company" in Item 1 hereof, and the information contained under the headings "Stock Ownership—Section 16(a) Beneficial Ownership Reporting Compliance," "Corporate Governance—Overview," "Corporate Governance—Communicating with the Board of Directors" and "Board of Directors" in the definitive Proxy Statement for the Company's May 2, 2006 Annual Meeting of Shareholders is incorporated herein by reference.

113

Powered by Morningstar® Document Research℠

## ITEM 11. EXECUTIVE COMPENSATION.

The information contained under the headings "Board of Directors—Director Compensation" and "Executive Compensation" in the definitive Proxy Statement for the Company's May 2, 2006 Annual Meeting of Shareholders is incorporated herein by reference.

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS.

The information contained under the headings "Stock Ownership—Management Ownership" and "Stock Ownership—Principal Shareholders" in the definitive Proxy Statement for the Company's May 2, 2006 Annual Meeting of Shareholders is incorporated herein by reference.

### Equity Compensation Plan Information Table

The following table provides information as of Dec. 25, 2005 regarding the number of shares of Tribune common stock that may be issued under Tribune's equity compensation plans.

| Plan Category(1) | (a) Number of securities to be issued upon exercise of outstanding options, warrants and rights | (b) Weighted-average exercise price of outstanding options, warrants and rights | (c) Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 37,294,743(2) $ | 43.91(3) | 35,418,365(4) |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | 37,294,743(2) $ | 43.91(3) | 35,418,365(4) |

(1)   The table does not include information regarding the following equity compensation plans:
401(k) Plans: As of Dec. 25, 2005, there were an aggregate of 20,199,211 shares of Tribune common stock outstanding and held in the Tribune Company 401(k) Savings and Profit Sharing Plan, the Times Mirror Savings Plus Plan and the other 401(k) plans available to Tribune employees.
Times Mirror Plans: As of Dec. 25, 2005, there were an aggregate of 7,205,412 shares of Tribune common stock issuable upon exercise of stock options granted under equity compensation plans assumed in connection with the merger of The Times Mirror Company into Tribune on June 12, 2000. The weighted-average exercise price of these shares is $22.42. No grants have been made under these plans since the time of the merger and none will be issued in the future.

(2)   Consists of 36,828,222 outstanding stock options issued under Tribune equity compensation plans, 361,062 outstanding stock equivalents under the Tribune bonus deferral plan (the "Bonus Deferral Plan") and 105,459 shares held in deferral accounts under the Tribune Company 1996 Nonemployee Director Stock Compensation Plan (the "Director Plan"). The Bonus Deferral Plan permits the deferral of cash or stock awards made under the Tribune Company 1997 Incentive Compensation Plan (the "Incentive Plan") into either an interest bearing or stock equivalent account. Deferrals in the stock equivalent account are valued as if each deferral were invested in Tribune common stock as of the deferral date, and are paid out only in shares of Tribune common stock, on a one-for-one basis. Shares issued under this plan are attributed to the Incentive Plan and reduce the number of shares available for issuance under that plan. The Director Plan permits directors to defer stock awards into deferral accounts. The deferred awards and shares acquired upon reinvestment of dividends are distributed to the director after termination of his or her Board service. The stock equivalents in deferral accounts under both the Bonus Deferral Plan and the Director Plan do not have voting rights, but are credited with dividend equivalents.

(3)   Measured only with respect to the 36,828,222 stock options included in this table. Stock equivalents in deferral accounts do not have exercise prices.

(4)   Consists of 32,334,158 shares of Tribune common stock available for issuance under Tribune Company equity compensation plans and 3,084,207 shares available for issuance under the Tribune Company Employee Stock Purchase Plan (the "ESPP"). Under the ESPP, Tribune employees may purchase Tribune common stock through payroll deductions. On the third Wednesday of each month, shares of common stock are purchased for the accounts of participants at a per share price equal to 85% of the fair market value of Tribune common stock on that date. Participants may withdraw from the plan at any time prior to the purchase date.

114

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS.

The information contained under the headings "Board of Directors—Certain Relationships and Related Transactions" and "Stock Ownership—Related Transactions" in the definitive Proxy Statement for the Company's May 2, 2006 Annual Meeting of Shareholders is incorporated herein by reference.

## ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES.

The information contained under the headings "Board of Directors—Board, Board Committees and Meetings—Audit Committee," "Audit Committee—Policy on Audit Committee Pre-Approval of Audit, Audit-Related and Permissible Non-Audit Services of Independent Accountants" and "Audit Committee—Fees Paid to Independent Accountants" in the definitive Proxy Statement for the Company's May 2, 2006 Annual Meeting of Shareholders is incorporated herein by reference.

## PART IV

## ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.

(a)(1)&(2)    Financial Statements and Financial Statement Schedule filed as part of this report

See Index to Financial Statements and Financial Statement Schedule on page 57 hereof.

(a)(3)    Index to Exhibits filed as part of this report

See Exhibit Index on pages 117 to 120 hereof.

(b)    Exhibits

See Exhibit Index on pages 117 to 120 hereof.

(c)    Financial Statement Schedule

See Index to Financial Statements and Financial Statement Schedule on page 57 hereof.

115

Powered by Morningstar® Document Research℠

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized, on Feb. 28, 2006.

TRIBUNE COMPANY
(Registrant)

/s/ DENNIS J. FITZSIMONS

Dennis J. FitzSimons
Chairman, President and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on Feb. 28, 2006.

| Signature | Title |
| --- | --- |
| /s/ DENNIS J. FITZSIMONS | Chairman, President, Chief Executive Officer and Director |
| Dennis J. FitzSimons | |
| /s/ DONALD C. GRENESKO | Senior Vice President/Finance and Administration (principal financial officer) |
| Donald C. Grenesko | |
| /s/ R. MARK MALLORY | Vice President and Controller (principal accounting officer) |
| R. Mark Mallory | |
| /s/ JEFFREY CHANDLER | Director |
| Jeffrey Chandler | |
| /s/ BETSY D. HOLDEN | Director |
| Betsy D. Holden | |
| /s/ WILLIAM A. OSBORN | Director |
| William A. Osborn | |
| /s/ ROGER GOODAN | Director |
| Roger Goodan | |
| /s/ DUDLEY S. TAFT | Director |
| Dudley S. Taft | |
| /s/ KATHRYN C. TURNER | Director |
| Kathryn C. Turner | |

116

Powered by Morningstar® Document Research℠

## TRIBUNE COMPANY

### EXHIBIT INDEX

Exhibits marked with an asterisk (*) are incorporated by reference to documents previously filed by Tribune Company with the Securities and Exchange Commission, as indicated. Exhibits marked with a circle (o) are management contracts or compensatory plan contracts or arrangements filed pursuant to Item 601(b)(10)(iii)(A) of Regulation S-K. All other documents listed are filed with this Report.

| Number | Description |
|---|---|
| 3.1 * | Amended and Restated Certificate of Incorporation of Tribune Company, dated June 12, 2000 (Exhibit 3.1 to Annual Report on Form 10-K for 2001) |
| 3.1a * | Amended Certificate of Designation of Series A Junior Participating Preferred Stock, dated June 12, 2000 (Exhibit 3.1a to Current Report on Form 8-K dated June 12, 2000) |
| 3.1b * | Amended Certificate of Designation of Series C Preferred Stock, dated February 13, 2001 (Exhibit 3.1c to Annual Report on Form 10-K for 2000) |
| 3.1c * | Amended Certificate of Designation of Series D-1 Preferred Stock, dated February 13, 2001 (Exhibit 3.1d to Annual Report on Form 10-K for 2000) |
| 3.1d * | Amended Certificate of Designation of Series D-2 Preferred Stock, dated February 13, 2001 (Exhibit 3.1e to Annual Report on Form 10-K for 2000) |
| 3.2 * | By-Laws of Tribune Company, as amended and in effect on October 19, 2005 (Exhibit 99 to Current Report on Form 8-K dated October 21, 2005) |
| 4.1 * | Rights Agreement between Tribune Company and First Chicago Trust Company of New York, as Rights Agent, dated as of December 12, 1997 (Exhibit 1 to Current Report on Form 8-K dated December 12, 1997) |
| 4.1a * | Amendment No. 1, dated as of June 12, 2000, to the Rights Agreement between Tribune Company and First Chicago Trust Company of New York, as Rights Agent (Exhibit 4.1 to Current Report on Form 8-K dated June 12, 2000) |
| 4.2 * | Indenture, dated as of March 1, 1992, between Tribune Company and Citibank, N.A. (successor to Bank of New York, Bank of Montreal Trust Company and Continental Bank, N.A.), as Trustee (Exhibit 4.1 to Registration Statement on Form S-3, Registration No. 333-02831) |
| 4.3 * | Indenture, dated as of January 1, 1997, between Tribune Company and Citibank, N.A. (successor to Bank of New York), as Trustee (Exhibit 4 to Current Report on Form 8-K dated January 14, 1997) |
| 4.4 * | Indenture, dated as of April 1, 1999, between Tribune Company and Citibank, N.A. (successor to Bank of New York and Bank of Montreal Trust Company), as Trustee for the PHONES securities (Exhibit 4 to Current Report on Form 8-K dated April 5, 1999) |
| 4.5 * | Indenture, dated January 30, 1995, between Tribune Company (successor to The Times Mirror Company) and Citibank, N.A. (successor to The Bank of New York, Wells Fargo Bank, N.A. and First Interstate Bank of California), as Trustee for the 7 $^{1}/_{4}$% Debentures due 2013 and 7 $^{1}/_{2}$% Debentures due 2023 (Exhibit 4.1 to The Times Mirror Company's Annual Report on Form 10-K for 1995) |
| 4.5a * | First Supplemental Indenture, dated as of June 12, 2000, among Tribune Company, The Times Mirror Company and The Bank of New York, as Trustee (Exhibit 4.13 to Current Report on Form 8-K dated June 12, 2000) |

117

Powered by Morningstar® Document Research℠

| 4.6 * | Indenture, dated March 19, 1996, between Tribune Company (successor to The Times Mirror Company) and Citibank, N.A., as Trustee for the 6.61% Debentures due 2027 and the 7 1/4% Debentures due 2096 (Exhibit 4.1 to The Times Mirror Company's Current Report on Form 8-K dated March 19, 1996) |
|---|---|
| 4.6a * | First Supplemental Indenture, dated as of October 19, 1999, between The Times Mirror Company and Citibank, N.A., as Trustee (Exhibit 4.3 to The Times Mirror Company's Current Report on Form 8-K dated October 19, 1999) |
| 4.6b * | Second Supplemental Indenture, dated as of June 12, 2000, among Tribune Company, The Times Mirror Company and Citibank, N.A., as Trustee (Exhibit 4.12 to Current Report on Form 8-K dated June 12, 2000) |
| 4.7 * | Agreement of Resignation, Appointment and Assumption, dated as of September 4, 2002, among Tribune Company, The Bank of New York and Citibank, N.A., appointing Citibank, N.A. as Trustee under the Indentures dated March 1, 1992, January 30, 1995, January 1, 1997 and April 1, 1999 (Exhibit 4.7 to Annual Report on Form 10-K for 2004) |
| 4.8 * | Form of Exchangeable Subordinated Debenture due 2029 relating to the PHONES securities (Exhibit 4 to Current Report on Form 8-K dated April 13, 1999) |
| 4.9 * | Specimen Note for 7 1/4% Debenture due 2013 (Exhibit 4.2 to The Times Mirror Company's Annual Report on Form 10-K for 1995) |
| 4.10 * | Specimen Note for 7 1/2% Debenture due 2023 (Exhibit 4.3 to The Times Mirror Company's Annual Report on Form 10-K for 1995) |
| 4.11 * | Officers' Certificate, dated November 13, 1996, establishing the terms of the 7 1/4% Debentures due 2096 and attaching the specimen Form of Debenture (Exhibit 4.2 to The Times Mirror Company's Current Report on Form 8-K dated November 13, 1996) |
| 4.12 * | Officers' Certificate, dated September 9, 1997, establishing the terms of the 6.61% Debentures due 2027, and the specimen Form of Debenture (Exhibit 4.2 to The Times Mirror Company's Current Report on Form 8-K dated September 9, 1997) |
| 4.13 * | Form of Note relating to Tribune Company's 4.875% Notes due 2010 (Exhibit 4.1a to Current Report on Form 8-K dated August 15, 2005) |
| 4.14 * | Form of Note relating to Tribune Company's 5.25% Notes due 2015 (Exhibit 4.1b to Current Report on Form 8-K dated August 15, 2005) |
| 10.1 o* | Tribune Company Supplemental Retirement Plan, as amended and restated January 1, 1989 (Exhibit 10.6 to Annual Report on Form 10-K for 1988) |
| 10.1a o* | First Amendment to Tribune Company Supplemental Retirement Plan, effective January 1, 1994 (Exhibit 10.4b to Annual Report on Form 10-K for 1993) |
| 10.1b o* | Second Amendment to Tribune Company Supplemental Retirement Plan, effective October 24, 2000 (Exhibit 10.2b to Annual Report on Form 10-K for 2000) |
| 10.2 o* | Tribune Company Directors' Deferred Compensation Plan, as amended and restated effective as of January 1, 2005 (Exhibit 10.2 to Current Report on Form 8-K dated December 22, 2005) |
| 10.3 o* | The Times Mirror Company Deferred Compensation Plan for Non-Employee Directors (Exhibit 10.7 to The Times Mirror Company's Annual Report on Form 10-K for 1994) |

118

Powered by Morningstar® Document Research℠

10.4 o*    Tribune Company Bonus Deferral Plan, as amended and restated as of January 1, 2005 (Exhibit 10.3 to Current Report on Form 8-K dated December 22, 2005)

10.5 o*    Tribune Company 1992 Long-Term Incentive Plan, effective as of April 29, 1992, as amended April 19, 1994 (Exhibit 10.11 to Annual Report on Form 10-K for 1994)

10.5a o*   First Amendment to Tribune Company 1992 Long-Term Incentive Plan, effective October 24, 2000 (Exhibit 10.6a to Annual Report on Form 10-K for 2000)

10.6 o*    Tribune Company Executive Financial Counseling Plan, effective October 19, 1988, as amended January 1, 1994 (Exhibit 10.13 to Annual Report on Form 10-K for 1993)

10.7 o*    Tribune Company Transitional Compensation Plan for Executive Employees, amended and restated effective as of January 1, 2005 (Exhibit 10.1 to Current Report on Form 8-K dated December 22, 2005)

10.8 o*    Tribune Company Supplemental Defined Contribution Plan, as amended and effective as of January 1, 2004 (Exhibit 10.8 to Annual Report on Form 10-K for 2004)

10.9 o*    Tribune Company Employee Stock Purchase Plan, as amended and restated July 27, 1999 (Exhibit 10.10 to Annual Report on Form 10-K for 1999)

10.9a o*   First Amendment to Tribune Company Employee Stock Purchase Plan, as amended and restated July 27, 1999 (Exhibit 10.10a to Quarterly Report on Form 10-Q for the quarter ended September 24, 2000)

10.9b o*   Second Amendment to Tribune Company Employee Stock Purchase Plan, effective as of May 7, 2002 (Exhibit 10.8 to Annual Report on Form 10-K for 2002)

10.10 o*   Tribune Company 1995 Nonemployee Director Stock Option Plan, as amended and restated effective December 9, 2003 (Exhibit 10.9 to Annual Report on Form 10-K for 2003)

10.11 o*   Tribune Company 1996 Nonemployee Director Stock Compensation Plan, as amended and restated effective January 1, 2005 (Exhibit 10.4 to Current Report on Form 8-K dated December 22, 2005)

10.12 o*   Tribune Company Incentive Compensation Plan, as amended and restated effective May 12, 2004 (Exhibit 10.1 to Quarterly Report on Form 10-Q for the quarter ended June 27, 2004)

10.12a o*  Form of Notice of Grant and Stock Option Term Sheet (Exhibit 10.1 to Current Report on Form 8-K dated February 11, 2005)

10.12b o*  Form of Restricted Stock Unit Award Notice (Exhibit 10.1 to Current Report on Form 8-K dated February 21, 2006)

10.13 o*   The Times Mirror Company 1997 Directors Stock Option Plan (Exhibit 10.15 to The Times Mirror Company's Annual Report on Form 10-K for 1996)

10.14 *    Limited Liability Company Agreement of TMCT, LLC, dated August 8, 1997 (Exhibit 10.1 to The Times Mirror Company's Current Report on Form 8-K dated August 8, 1997)

10.15 *    Lease Agreement between TMCT, LLC and Times Mirror, dated August 8, 1997 (Exhibit 10.4 to The Times Mirror Company's Current Report on Form 8-K dated August 8, 1997)

119

Powered by Morningstar® Document Research℠

| | |
|---|---|
| 10.16 * | Amended and Restated Limited Liability Company Agreement of TMCT II, LLC, dated September 3, 1999 (Exhibit 10.1 to The Times Mirror Company's Current Report on Form 8-K dated September 3, 1999) |
| 10.16a * | First Amendment to Amended and Restated Limited Liability Agreement of TMCT II, LLC, dated as of August 14, 2000 (Exhibit 10.17a to Annual Report on Form 10-K for 2000) |
| 10.16b * | Second Amendment to Amended and Restated Limited Liability Agreement of TMCT II, LLC, dated as of August 1, 2002 (Exhibit 10.14b to Annual Report on Form 10-K for 2002) |
| 10.17 o | Mutual Separation Agreement by and between Patrick Mullen and Tribune Broadcasting Company dated October 21, 2005 |
| 14 * | Code of Ethics for CEO and Senior Financial Officers (Exhibit 14 to Annual Report on Form 10-K for 2003) |
| 21 | Table of Subsidiaries of Tribune Company |
| 23 | Consent of Independent Registered Public Accounting Firm |
| 31.1 | Rule 13a-14 Certification of Chief Executive Officer |
| 31.2 | Rule 13a-14 Certification of Chief Financial Officer |
| 32.1 | Section 1350 Certification of Chief Executive Officer |
| 32.2 | Section 1350 Certification of Chief Financial Officer |
| 99 | Form 11-K financial statements for the KPLR, Inc. 401(k) Plan, the Times Mirror Savings Plus Plan, the Tribune Broadcasting Retirement Plan, the Tribune Company Defined Contribution Retirement Plan and the Tribune Company 401(k) Savings and Profit Sharing Plan (to be filed by amendment) |

120

QuickLinks

INDEX TO TRIBUNE COMPANY 2005 FORM 10-K
PART I

ITEM 1. BUSINESS.

ITEM 1A. RISK FACTORS.
ITEM 1B. UNRESOLVED STAFF COMMENTS.
ITEM 2. PROPERTIES.
ITEM 3. LEGAL PROCEEDINGS.
ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.
PART II

ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY
SECURITIES.
ITEM 6. SELECTED FINANCIAL DATA.
ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.

ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.

ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.
TRIBUNE COMPANY AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF INCOME (In thousands of dollars, except per share data)
TRIBUNE COMPANY AND SUBSIDIARIES CONSOLIDATED BALANCE SHEETS (In thousands of dollars, except share data)
TRIBUNE COMPANY AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (In thousands, except per share data)
TRIBUNE COMPANY AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF CASH FLOWS (In thousands of dollars)

ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.
ITEM 9A. CONTROLS AND PROCEDURES
PART III

ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT.
ITEM 11. EXECUTIVE COMPENSATION.
ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS.
ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS.
ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES.
PART IV

ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.
SIGNATURES
TRIBUNE COMPANY EXHIBIT INDEX

QuickLinks -- Click here to rapidly navigate through this document

Exhibit 10.17

## MUTUAL SEPARATION AGREEMENT

This Mutual Separation Agreement ("Agreement") is entered into by and between Patrick Mullen, on behalf of himself, his agents, assignees, successors, heirs, executors, administrators, beneficiaries, trustees, and personal and legal representatives (collectively, Mr. Mullen), and Tribune Broadcasting Company ("TBC"), on behalf of itself, its parents, including, without limitation, Tribune Company ("Tribune"), subsidiaries, predecessors, successors, affiliates, officers, directors, agents, shareholders, attorneys, employees, employee benefit plans, plan administrators, insurers, assignees, fiduciaries, administrators, trustees, and legal representatives, both past and present (collectively, the "Company"). Mr. Mullen and the Company acknowledge and agree as follows:

1. *Separation.* Mr. Mullen's employment with the Company shall end effective as of the close of business on October 10, 2005 (the "Separation Date"). After the Separation Date, he shall not have authority to represent or bind the Company, and he shall not act or convey the impression that he is acting on the Company's behalf.

2. *Separation Payment and Benefits.* In consideration of the covenants set forth herein, and subject to Paragraph 7 below, provided that on or within twenty-one days of the Separation Date (*but not before the Separation Date*) Mr. Mullen returns a signed and dated copy of this Agreement to the Company and does not revoke this Agreement following his execution and delivery of the Agreement, the Company shall provide Mr. Mullen with the following:

(a)

*Separation Payment:* a separation payment of $808,500, less all applicable deductions and taxes, representing 78 weeks of pay, said payment to be made within ten business days of the date he returns a signed, dated and not revoked copy of this Agreement to the Company; and,

(b)

*Benefits:* excluding only short-term disability, long-term disability, business travel accident, and survivor support, and participation in the Company 401(k) plan and flexible spending accounts, Mr. Mullen will continue to participate in benefits in which he participates as of the Separation Date through October 10, 2008 (the "Benefits Termination Date"), under the same terms and conditions as are then applicable to other employees of the Company, provided that Mr. Mullen continues to timely pay any required contributions for these benefits by submitting checks for the employee portion of his benefits to Tribune.

The payment and benefits set forth in this Paragraph exceed any amounts otherwise due to Mr. Mullen upon the separation of his employment with the Company.

3. *Exercise of Options.* Pursuant to the terms of the Tribune Company Incentive Compensation Plan and the applicable award agreements governing the outstanding options held by Mr. Mullen under such plan, such options shall continue to become and remain exercisable through the Benefits Termination Date or, if earlier, the date he is otherwise removed from the Company payroll pursuant to Paragraphs 6(a) or 21, provided the applicable option has not expired, and the exercise otherwise complies with the prerequisites, terms, and conditions of such option.

4. *Vacation Payment.* Mr. Mullen will not accrue vacation pay after the Separation Date. Earned but unused vacation as of the Separation Date, if any, will be paid to Mr. Mullen separate and apart from this Agreement and will not be contingent on signing this Agreement.

5. *Complete Agreement.* Other than as set forth in this Agreement or in a defined benefit plan, if applicable, Mr. Mullen will not be entitled to any salary, bonuses, including, without limitation, Management Incentive Program (MIP) payments, benefits, perquisites, or other compensation whatsoever after the Separation Date. This Agreement constitutes the entire agreement and understanding between Mr. Mullen and the Company regarding the termination of his employment with the Company. This Agreement totally replaces and supersedes any and all prior agreements, arrangements, representations and understandings between him and the Company, written or oral,

Powered by Morningstar® Document Research℠

express or implied. This Agreement cannot be amended, modified, supplemented or altered except by written amendment signed by him and an authorized representative of the Company.

6.  *Discontinuance of Separation Payment and Benefits Continuation.*    (a) If, prior to the Benefits Termination Date, the Company in good faith believes that Mr. Mullen engaged in illegal or unethical business practices while employed by the Company, it shall have the right, upon one (1) week written notice, to discontinue the benefit continuation, to not pay out the separation payment as provided for in Paragraph 2 above, and remove Mr. Mullen from its payroll.

(b)  If, prior to the Benefits Termination Date, Mr. Mullen accepts employment with another employer or provides consulting services of any kind, he shall so notify the Company in writing not less than ten (10) days prior to commencing such employment or consulting arrangement. Such notification shall inform the Company of the date on which his employment will begin, whether he is eligible for coverage under a group medical plan, and the identity of the entity employing him. Upon such notification from Mr. Mullen, if Mr. Mullen is eligible for coverage under a group medical plan, he shall cease receiving benefits continuation.

(c)  The Restrictive Agreements set forth in Paragraph 8 below (and in each subparagraph thereof) shall remain in full force and effect even if Mr. Mullen is removed from the Company's payroll under Paragraphs 6(a) of 21.

7.  *Waiver and General Release of Claims:*    (a) In exchange for the promises made by the Company in this Agreement, Mr. Mullen unconditionally waives and releases all known and unknown, suspected and unsuspected, accrued and unaccrued, fixed and contingent claims and causes of action of any kind that he has or may have against the Company, from the beginning of time through and including the date he signs this Agreement, including but not limited to all claims and causes of action related to or in any way growing out of Mr. Mullen's dealings with the Company, his employment with the Company and/or the termination of his employment with the Company. The claims and causes of action Mr. Mullen is releasing and waiving include, but are not limited to, any and all claims and causes of action that the Company:

- has violated any type of written or unwritten contract, agreement, understanding, policy, benefit, retirement and/or pension plan, promise and/or covenant of any kind, including any covenant of good faith and fair dealing;

- has discriminated against Mr. Mullen on the basis of any characteristic or trait protected under any law, including but not limited to race, color, sex, sexual orientation, national origin, ancestry, disability, religion, marital or parental status, citizenship, age, source of income, or entitlement to benefits, in violation of any of the following statutes, as amended, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Age Discrimination in Employment Act, the Employee Retirement Income Security Act, the Americans With Disabilities Act, the Family and Medical Leave Act, the Fair Labor Standards Act, the Illinois Human Rights Act, the Cook County Human Rights Ordinance, the Chicago Human Rights Ordinance, and any other federal, state or local human rights, civil rights, wage and hour, pension or labor law, rule and/or regulation;

- has violated public policy or common law, including but not limited to claims for: personal injury; invasion of privacy; retaliatory discharge; negligent hiring, retention or supervision; defamation; intentional or negligent infliction of emotional distress and/or mental anguish; intentional interference with contract; negligence; detrimental reliance; loss of consortium to Mr. Mullen or any member of his family; and/or promissory estoppel; and/or

- is in any way obligated for any reason to pay Mr. Mullen damages, expenses, litigation costs (including attorneys' fees), wages, bonuses, severance pay, separation pay, termination pay, any type of payments or benefits based on Mr. Mullen's separation from employment, incentive pay,

2

Source: TRIBUNE CO, 10-K, February 28, 2006

Powered by Morningstar® Document Research℠

commissions, disability benefits or sick pay, compensatory damages, punitive damages, and/or interest. Nothing in this Agreement shall preclude Mr. Mullen from exercising his rights to receive (i) any sums or benefits to be paid or provided under this Agreement, or (ii) any vested, accrued benefits to which he is (or becomes) otherwise entitled.

**MR. MULLEN UNDERSTANDS AND AGREES THAT, OTHER THAN CLAIMS WHICH CANNOT BE WAIVED BY LAW, HE IS WAIVING AND RELEASING ANY AND ALL CLAIMS AGAINST THE COMPANY TO THE DATE HE SIGNS THIS AGREEMENT IN EXCHANGE FOR CONSIDERATION TO WHICH HE IS NOT OTHERWISE ENTITLED.**

(b)  Mr. Mullen further agrees that his waiver and release of rights under this Agreement is knowing and voluntary and in compliance with the Older Workers Benefit Protection Act of 1990, and he covenants and agrees that:

1.  He has been given at least twenty one (21) days in which to consider, sign and return this Agreement to the Company;

2.  He has hereby been advised in writing to consult with an attorney concerning this Agreement; and

3.  He will have seven (7) days from the date of signing to revoke this Agreement if he so desires. Any revocation must be in writing, signed by Mr. Mullen and must be received by Luis Lewin, Senior Vice President, Human Resources, Tribune Company, 435 N. Michigan Avenue, Chicago, IL 60611, fax 312. 222.4971, within the revocation period to be deemed effective.

(c)  Mr. Mullen represents and warrants to the Company that, to the date he signs this Agreement, he has not instituted any complaints, charges, grievances or other proceedings against the Company with any governmental agency, any court, or any arbitration agency or tribunal.

8.  *Restrictive Agreements.*  (a) During his employment with the Company, Mr. Mullen was privy to the highest level of the Company's confidential and proprietary business information, not generally known by the general public or within the industry, including, but not limited to, the Company's assets, finances, business development, operations, customer lists, marketing and advertising strategies, plans and pricing and/or labor relations information, strategies and plans ("Confidential Information"). Mr. Mullen agrees that he shall not, directly or indirectly, divulge, disclose or communicate such Confidential Information to or for the benefit of any person, entity, firm, corporation, or other third party for any purpose whatsoever, nor make use of any Confidential Information for his own purposes, at any time hereafter, unless and until such Confidential Information is published and becomes public knowledge other than through acts by or on behalf of Mr. Mullen, or as required by law.

(b)  Mr. Mullen further agrees that, for twelve (12) months after the Separation Date, he will not employ, either directly or indirectly, any person previously employed by the Company unless at such time such person has not been employed by the Company for at least six (6) months, or in any way solicit, entice, persuade or induce any person to terminate or refrain from renewing or extending their employment with the Company.

(c)  Mr. Mullen acknowledges and agrees that the restrictions in Paragraphs 8(a) and 8(b) above are necessary to protect the legitimate business interests of the Company and are reasonable in time, purpose, area, scope, geography and duration. The amount of actual or potential damages resulting from Mr. Mullen's breach of any of the restrictive agreements set forth in Paragraphs 8(a) and 8(b) above will be inherently difficult to determine with precision and, further, any breach could not be reasonably or adequately compensated in money damages. Accordingly, any breach by Mr. Mullen of the restrictive agreements set forth in paragraphs 8(a) and 8(b) above will result in immediate and irreparable injury and harm to the Company for which the Company will have no adequate remedy at

3

Source: TRIBUNE CO, 10-K, February 28, 2006

law. The Company thus will be entitled to injunctive or other equitable relief to prevent any such breach of the Restrictive Agreements set forth in restrictive agreements set forth in Paragraphs 8(a) and 8(b) above. The Company's resort to such equitable relief will not waive any other rights it may have to damages or other relief and the Company shall be entitled to its reasonable attorney's fees and costs incurred in pursuing such an action should it prevail.

(d)  If any court or agency of competent jurisdiction determines that any phrase, clause or obligation of the restrictive agreements set forth in Paragraphs 8(a) and 8(b) above is unenforceable as drafted, it shall not be stricken in its entirety or held void or unenforceable, but rather shall be modified by the court or agency to make it enforceable to the maximum extent legally permissible.

9.   *Confidentiality.*   Except as may be required by law, neither Mr. Mullen nor any person acting by, through, or in concert with him, shall directly or indirectly, publish, disseminate, disclose, or cause or permit to be published, disseminated, or disclosed to any individual or entity, any information relating to the existence or content of this Agreement or the circumstances and discussions that led up to it, including, without limitation, the fact or amount of payment provided herein. This Paragraph shall not be construed, however, to prevent Mr. Mullen from disclosing information to any attorney, accountant or tax advisor with whom he may consult for the purpose of obtaining professional advice or services, or to any governmental taxing authority, or to his spouse.

10.   *Cooperation.*   Mr. Mullen will continue to reasonably cooperate with the Company in connection with any and all matters that have arisen or may arise out of events that occurred during his employment.

11.   *Severability.*   If any provision of this Agreement is held invalid or unenforceable for any reason by a court or other tribunal of competent jurisdiction, this Agreement shall be deemed modified to the extent necessary to make it enforceable by such court or tribunal.

12.   *Company Property.*   On or before the Separation Date, Mr. Mullen will return all equipment and other property in his possession belonging to the Company, including, without limitation, all cellular telephones, computers, pagers, keys, key cards, tangible proprietary information, documents, books, records, reports, contracts, lists, computer equipment, credit cards, telephone cards, computer disks (or other computer-generated files or data), software, or copies thereof, created on any medium, prepared or obtained by him or the Company in the course of or incident to his employment with the Company.

13.   *No Re-Employment.*   Mr. Mullen will not apply for or otherwise seek employment or re-employment or contract with the Company in the future. The Company shall not be under any obligation to employ him, to re-employ him, or to consider him for future employment or re-employment.

14.   *Non-Disparagement.*   Mr. Mullen agrees that he shall not, directly or indirectly, individually or in concert with others, take any actions or make any communications which would or would likely have the effect of undermining, disparaging or otherwise reflecting negatively upon the Company, or its operations, reputation, goodwill, services, business practices and/or customers.

15.   *Non-Admissions.*   Nothing in this Agreement constitutes or shall be interpreted as an admission of liability or wrongdoing on the part of either party.

16.   *Drafting and Construction.*   Mr. Mullen and the Company acknowledge that each party had an equal opportunity to review and/or modify the provisions set forth in this Agreement. Thus, in the event of any misunderstanding, ambiguity or dispute concerning this Agreement's provisions or their interpretation, no rule of construction shall be applied that would result in having this Agreement interpreted against either party.

4

Source: TRIBUNE CO, 10-K, February 28, 2006

Powered by Morningstar® Document Research℠

17.  *Non-Use.*   This Agreement may not be used as evidence in any subsequent proceeding of any kind (without the written consent of all other parties) except one which any party institutes alleging a breach of this Agreement.

18.  *Prevailing Party.*   In the event that there is any litigation arising out of or relating to this Agreement, the prevailing party shall recover, in addition to any and all other relief, his or its attorneys' fees and costs.

19.  *Choice of Law.*   This Agreement shall be governed by the laws of the state of Illinois.

20.  *Knowing and Voluntary Execution.*   Mr. Mullen covenants that he is legally and mentally competent to enter into this Agreement, and that he is entering into this Agreement knowingly, voluntarily and with full knowledge of its significance and the rights he is waiving, that no other promises or representations whatsoever have been made to induce Mr. Mullen to sign this Agreement and that he has not been coerced, threatened, or intimidated into signing the Agreement.

21.  *Right to Resign from Payroll.*   If, prior to the Benefits Termination Date, Mr. Mullen desires to resign from the Company's payroll, Mr. Mullen shall so notify the Company in writing. Upon such notification, the Company shall remove him from its payroll.

PATRICK MULLEN                                           TRIBUNE BROADCASTING COMPANY

/s/ PATRICK MULLEN                               By      /s/ LUIS E. LEWIN

10/17, 2005                                                     10/21, 2005

5

Source: TRIBUNE CO, 10-K, February 28, 2006

Powered by Morningstar® Document Research℠

QuickLinks

MUTUAL SEPARATION AGREEMENT

Powered by Morningstar® Document Research℠

QuickLinks — Click here to rapidly navigate through this document

Exhibit 21

## TRIBUNE COMPANY—LIST OF SUBSIDIARIES

| | Jurisdiction of Incorporation | Other names under which subsidiary does business |
|---|---|---|
| **PUBLISHING** | | |
| Tribune Publishing Company | Delaware | |
| The Baltimore Sun Company | Maryland | The Sun; baltimoresun.com |
| Homestead Publishing Co. | Maryland | |
| Patuxent Publishing Company | Maryland | The Aegis; Arbutus Times; Baltimore Messenger; Cantonsville Times; Columbia Flier; Fifty-Plus; Howard County Times; Jubilee; Male and Family; Maryland Job Market; Owings Mills Times; North County News; Northeast Reporter; Northeast Booster; Towson Times |
| Baltimore Newspaper Networks, Inc. | Maryland | |
| Chicago Tribune Company | Illinois | Chicago Tribune; chicagotribune.com; RedEye |
| Chicagoland Publishing Company | Delaware | AutoFinder; Chicago Magazine; JobFinder; Mature Adult; New Homes Guide; Relcon |
| Chicago Tribune Newspapers, Inc. | Illinois | Chicago Tribune |
| Chicago Tribune Press Service, Inc. | Illinois | Tribune Newspaper Network |
| Newspaper Readers Agency, Inc. | Illinois | |
| Tribune Direct Marketing, Inc. | Delaware | Tribune Direct Marketing |
| The Daily Press, Inc. | Delaware | Daily Press; dailypress.com |
| Virginia Gazette Companies, LLC | Delaware | Virginia Gazette |
| Virginia Community Shoppers, LLC | Delaware | |
| B Z Buy & E Z Sell Recycler Corporation | Delaware | |
| E Z Buy & E Z Sell Recycler Corporation of Southern California | Delaware | AutoBuys; AutoPix; AutoSeller; AutoTruckBuys; Big Truck & Equipment; BoatBuys; Car Buys; Caravan Express; CycleBuys; Desert Auto Buys; EZ-Ads; Greater South Bay Real Estate Weekly; Homes & Open Houses; Inland Empire Jobs; Orange County Jobs; Recycler; Recycler.com; The Renter; RV Buys; San Fernando Valley Jobs; TruckBuys |
| The Renter, Inc. | Delaware | |
| Forum Publishing Group, Inc. | Delaware | Jewish Journal |
| The Hartford Courant Company | Connecticut | Hartford Courant; ctnow.com |
| Courant Specialty Products, Inc. | Connecticut | |
| New Mass. Media, Inc. | Massachusetts | Fairfield Weekly; Hartford Advocate; New Haven Advocate; Valley Advocate; Westchester Weekly |

Powered by Morningstar® Document Research℠

| Company | State | Brands |
|---|---|---|
| Heart & Crown Advertising, Inc. | Connecticut | |
| TMLH 2, Inc. | California | |
| Hoy Publications, LLC | Delaware | Hoy; Hola Hoy; holahoy.com |
| Orlando Sentinel Communications Company | Delaware | Orlando Sentinel; orlandosentinel.com; Black Family Today; Central Florida Family; Central Florida Family Guide; Family Journal Publications; O'Arts; Orlando City Book; Relcon of Florida; US/Express |
| Neocomm, Inc. | Delaware | Neocomm of Delaware, Inc. |
| Sentinel Communications News Ventures, Inc. | Delaware | |
| The Morning Call, Inc. | Pennsylvania | Morning Call; mcall.com |
| Direct Mail Associates, Inc. | Pennsylvania | |
| Southern Connecticut Newspapers, Inc. | Connecticut | The Advocate; stamfordadvocate.com; Greenwich Time; greenwichtime.com |
| TMLS I, Inc. | California | |
| Sun-Sentinel Company | Delaware | Sun-Sentinel; sun-sentinel.com; Florida New Homes And Condominiums Guide; Gold Coast Labeling |
| Gold Coast Publications, Inc. | Delaware | City Link; Gold Coast Shopper; South Florida Parenting; Vital Signs |
| TMD, Inc. | Delaware | |
| Newsday, Inc. | New York | Newsday; newsday.com |
| Distribution Systems of America, Inc. | New York | Huntington Pennysaver; Results Media; Shopper's Guide; This Week; Yankee Trader |
| Star Community Publishing Group, LLC | Delaware | |
| Hoy, LLC | New York | Hoy |
| Tribune Interactive, Inc. | Delaware | chicagosports.com; go2orlando.com; metromix.com |
| Tribune Los Angeles, Inc. | Delaware | Angeles Publications |
| Los Angeles Times Communications LLC | Delaware | The Burbank Leader; latimes.com; The Foothill Leader; Glendale-News Press; Huntington Beach/Fountain Valley Independent; Newport Beach/ Costa Mesa Daily Pilot; Our Times; Times Community News |
| Los Angeles Times Newspapers, Inc. | Delaware | |
| Tribune Manhattan Newspaper Holdings, Inc. | Delaware | |
| Tribune New York Newspaper Holdings, LLC | Delaware | amNewYork |

Powered by Morningstar® Document Research℠

| | | |
|---|---|---|
| Tribune Media Services, Inc. | Delaware | Tribune Media Services International; tms.tribune.com; Zap2It |
| TMS Entertainment Guides, Inc. | Delaware | |
| TMS Entertainment Guides Canada Corp | Canada | |
| Tribune Media Services, BV | Netherlands | |
| Tribune Media Net, Inc. | Delaware | |
| Tribune National Marketing Company | Delaware | |
| **BROADCASTING AND ENTERTAINMENT** | | |
| Tribune Broadcasting Company | Delaware | Tribune Cable; Tribune Creative Services Group; Tribune Plus; Tribune Plus Corporate Sales; Tribune Television |
| ChicagoLand Microwave Licensee, Inc. | Delaware | |
| ChicagoLand Television News, Inc. | Delaware | ChicagoLand Television/CLTV News; cltv.com |
| KHWB Inc. | Delaware | KHWB-TV; khwbtv.com |
| KSWB Inc. | Delaware | KSWB-TV; kswbtv.com |
| KPLR, Inc. | Missouri | KPLR-TV; kplrtv.com |
| KTLA Inc. | California | KTLA-TV; ktla.com |
| KWGN Inc. | Delaware | KWGN-TV; wb2.com |
| Oak Brook Productions, Inc. | Delaware | |
| Tower Distribution Company | Delaware | WGN Cable; Superstation WGN; wgncable.com |
| Tribune Broadcasting News Network, Inc. | Delaware | TribNet |
| Tribune Broadcast Holdings, Inc. | Delaware | KWBP-TV; WTTV-TV; wb4.com; WTTK-TV |
| Tribune Entertainment Company | Delaware | |
| Magic T Music Publishing Company | Delaware | |
| Tribune Entertainment Production Company | Delaware | |
| 435 Production Company | Delaware | |
| 5800 Sunset Productions Inc. | Delaware | |
| Chicago River Production Company | Delaware | |
| North Michigan Production Company | Delaware | |
| Towering T Music Publishing Company | Delaware | |
| Tribune (FN) Cable Ventures, Inc. | Delaware | |
| Tribune Network Holdings Company | Delaware | |
| Tribune Television Company | Delaware | WPMT-TV; wpmt.com; WXIN-TV; fox59.com; WTIC-TV; fox61.com; KDAF-TV; wb33.com WPHL-TV; wb17.com |
| Channel 20, Inc. | Delaware | |
| Channel 40, Inc. | Delaware | KTXL-TV; fox40.com |

| | | |
|---|---|---|
| Channel 39, Inc. | Delaware | WBZL-TV; wb39.com |
| Tribune Television Holdings, Inc. | Delaware | WXMI-TV, wxmi..com; KTWB-TV; ktwbtv.com |
| Tribune Television New Orleans, Inc. | Delaware | WGNO-TV; wgno.com; WNOL-TV; wnol.com |
| Tribune Television Northwest, Inc. | Delaware | KCPQ-TV; q13.com |
| WATL, LLC | Delaware | WATL-TV; wb36.com |
| WBDC Broadcasting, Inc. | Delaware | WBDC-TV; wb50.com |
| WEWB, L.L.C. | Delaware | WEWB-TV; wb45.com |
| WGN Continental Broadcasting Company | Delaware | WGN-TV; wgntv.com; WGN Radio; wgnradio.com; Tribune Radio Network |
| Tribune Sports Network Holdings, LLC | Delaware | |
| WLVI Inc. | Delaware | WLVI-TV; wb56.com |
| WPIX, Inc. | Delaware | WPIX-TV, wb11.com |
| WTXX Inc. | Delaware | WTXX-TV; wtxx.xom |
| Chicago National League Ball Club, Inc. | Delaware | Chicago Cubs; cubs.com |
| Diana-Quentin, Inc. | Illinois | |
| Tribune California Properties, Inc. | Delaware | |

**MISCELLANEOUS**

| | |
|---|---|
| California Community News Corporation | Delaware |
| Chicago Avenue Construction Company | Illinois |
| Eagle New Media Investments, LLC | Delaware |
| Newport Media, Inc. | Connecticut |
| ValuMail, Inc. | Delaware |
| Eagle Publishing Investments, LLC | Delaware |
| GreenCo, Inc. | California |
| Los Angeles Times International, Ltd. | Vermont |
| Multimedia Insurance Company | Florida (Partnership) |
| Riverwalk Center I Joint Venture | Delaware |
| Tribune License, Inc. | Delaware |
| TMCT, LLC | Delaware |
| TMCT II, LLC | Delaware |
| Tribune Finance Service Center, Inc. | Delaware |
| Wrigley Field Premium Ticket Services, Inc. | Delaware |

QuickLinks

Exhibit 21

QuickLinks — Click here to rapidly navigate through this document

EXHIBIT 23

### CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statement on Form S-3 (File No. 333-129313) and in the Registration Statements on Form S-8 (File Nos. 2-90727, 33-21853, 33-26239, 33-47547, 33-59233, 333-00575, 333-03245, 333-18269, 333-35422, 333-70692, 333-70696, 333-118280, 333-118281, 333-118282, 333-118283 and 333-118284) of Tribune Company of our report dated Feb. 21, 2006, relating to the consolidated financial statements, financial statement schedule, management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal control over financial reporting, which appears in this Form 10-K. We also consent to the reference to us under the heading "Selected Financial Data" in this Form 10-K.

/s/ PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP

Chicago, Illinois
February 28, 2006

121

Powered by Morningstar® Document Research℠

QuickLinks

<u>EXHIBIT 23</u>

Powered by Morningstar® Document Research℠

QuickLinks -- Click here to rapidly navigate through this document

EXHIBIT 31.1

**Form 10-K Certification**

I, Dennis J. FitzSimons, certify that:

1.

I have reviewed this annual report on Form 10-K of Tribune Company;

2.

Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.

Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of Tribune Company as of, and for, the periods presented in this annual report;

4.

Tribune Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for Tribune Company and have:

a)

Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to Tribune Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b)

Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)

Evaluated the effectiveness of Tribune Company's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

d)

Disclosed in this annual report any change in Tribune Company's internal control over financial reporting that occurred during Tribune Company's most recent fiscal quarter (Tribune Company's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, Tribune Company's internal control over financial reporting; and

5.

Tribune Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to Tribune Company's auditors and the audit committee of Tribune Company's board of directors:

a)

All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect Tribune Company's ability to record, process, summarize and report financial information; and

b)

Any fraud, whether or not material, that involves management or other employees who have a significant role in Tribune Company's internal control over financial reporting.

Date: February 28, 2006

/s/ DENNIS J. FITZSIMONS

Dennis J. FitzSimons
Chairman, President and
Chief Executive Officer
122

Powered by Morningstar℠ Document Research℠

QuickLinks

EXHIBIT 31.1

Powered by Morningstar® Document Research℠

QuickLinks -- Click here to rapidly navigate through this document

EXHIBIT 31.2

**Form 10-K Certification**

I, Donald C. Grenesko, certify that:

1.

I have reviewed this annual report on Fonn 10-K of Tribune Company;

2.

Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.

Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of Tribune Company as of, and for, the periods presented in this annual report;

4.

Tribune Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for Tribune Company and have:

a)

Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to Tribune Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b)

Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)

Evaluated the effectiveness of Tribune Company's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

d)

Disclosed in this annual report any change in Tribune Company's internal control over financial reporting that occurred during Tribune Company's most recent fiscal quarter (Tribune Company's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, Tribune Company's internal control over financial reporting; and

5.

Tribune Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to Tribune Company's auditors and the audit committee of Tribune Company's board of directors:

a)

All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect Tribune Company's ability to record, process, summarize and report financial information; and

b)

Any fraud, whether or not material, that involves management or other employees who have a significant role in Tribune Company's internal control over financial reporting.

Date: February 28, 2006                          /s/ DONALD C. GRENESKO

Donald C. Grenesko
Senior Vice President/
Finance and Administration
123

QuickLinks

EXHIBIT 31.2

QuickLinks — Click here to rapidly navigate through this document

EXHIBIT 32.1

**CERTIFICATION PURSUANT TO
18 UNITED STATES CODE SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Dennis J. FitzSimons, the Chairman, President and Chief Executive Officer of Tribune Company, certify that (i) Tribune Company's Form 10-K for the year ended Dec. 25, 2005 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and (ii) the information contained in the Form 10-K for the year ended Dec. 25, 2005 fairly presents, in all material respects, the financial condition and the results of operations of Tribune Company.

/s/ DENNIS J. FITZSIMONS

Dennis J. FitzSimons
Chairman, President and
Chief Executive Officer

February 28, 2006

124

QuickLinks

EXHIBIT 32.1

Powered by Morningstar® Document Research℠

QuickLinks -- Click here to rapidly navigate through this document

EXHIBIT 32.2

**CERTIFICATION PURSUANT TO
18 UNITED STATES CODE SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Donald C. Grenesko, the Senior Vice President/Finance and Administration of Tribune Company, certify that (i) Tribune Company's Form 10-K for the year ended Dec. 25, 2005 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and (ii) the information contained in the Form 10-K for the year ended Dec. 25, 2005 fairly presents, in all material respects, the financial condition and the results of operations of Tribune Company.

/s/ DONALD C. GRENESKO

Donald C. Grenesko
Senior Vice President/
Finance and Administration

February 28, 2006

125

QuickLinks

EXHIBIT 32.2

---

Created by Morningstar® Document Research℠
http://documentresearch.morningstar.com