FILED PURSUANT TO RULE 424(b)(2)
REGISTRATION NO. 333-23915

PROSPECTUS SUPPLEMENT TO PROSPECTUS DATED JULY 8, 1997

$250,000,000

THE TIMES MIRROR COMPANY

6.61% DEBENTURES DUE SEPTEMBER 15, 2027

[LOGO OF TIMES MIRROR COMPANY]

------------------

Interest on the 6.61% Debentures due September 15, 2027 (the "1997 Debentures") is payable semi-annually on March 15 and September 15, commencing March 15, 1998. The 1997 Debentures are redeemable, in whole or in part, at the option of the Company at any time after September 15, 2004 at a redemption price equal to the greater of (i) 100% of the principal amount of such 1997 Debentures or (ii) as determined by an Independent Investment Banker (as defined herein), the sum of the present values of the remaining scheduled payments of principal and interest thereon (not including the portion of any such payments of interest accrued as of the date of redemption) discounted to the date of redemption on a semiannual basis (assuming a 360-day year consisting of twelve 30-day months) at the Adjusted Treasury Rate (as defined herein), plus in each case, accrued interest thereon to the date of redemption.

The holder of each 1997 Debenture may elect to have such 1997 Debenture, or any portion of the principal amount thereof that is a multiple of $1,000, repaid on September 15, 2004 at 100% of the principal amount thereof, together with accrued interest to September 15, 2004. Such election, which is irrevocable when made, must be made within the period commencing on July 15, 2004 and ending at the close of business on August 15, 2004.

The 1997 Debentures will be represented by one or more Global Securities registered in the name of the nominee of The Depository Trust Company, which will act as the Depositary (the "Depositary"). Interests in the Global Securities will be shown on, and transfers thereof will be effected only through, records maintained by the Depositary and its participants. Except as described herein, 1997 Debentures in definitive form will not be issued. Settlement for the 1997 Debentures will be made in immediately available funds. The 1997 Debentures will trade in the Depositary's Same-Day Funds Settlement System until maturity, and secondary market trading activity for the 1997 Debentures will therefore settle in immediately available funds. All payments of principal and interest will be made by The Times Mirror Company (the "Company") in immediately available funds. See "Description of the 1997 Debentures—Same-Day Settlement and Payment."

------------------

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS SUPPLEMENT OR THE PROSPECTUS TO WHICH IT RELATES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

------------------

| | PRICE TO PUBLIC(1) | UNDERWRITING DISCOUNT(2) | PROCEEDS TO COMPANY(1)(3) |
|---|---|---|---|
| Per Debenture................... | 99.959% | 0.625% | 99.334% |
| Total........................... | $249,897,500 | $1,562,500 | $248,335,000 |

- --------
(1) Plus accrued interest, if any, from September 9, 1997.

(2) The Company has agreed to indemnify the Underwriters against certain liabilities, including liabilities under the Securities Act of 1933.

(3) Before deducting estimated expenses of $100,000 payable by the Company.

------------------

The 1997 Debentures offered hereby are offered severally by the Underwriters, as specified herein, subject to receipt and acceptance by them and subject to their right to reject any order in whole or in part. It is expected that the 1997 Debentures will be ready for delivery in book-entry form only through the facilities of DTC in New York, New York, on or about

September 9, 1997, against payment therefor in immediately available funds.

GOLDMAN, SACHS & CO.
            CITICORP SECURITIES, INC.
                        MERRILL LYNCH & CO.

                                    MORGAN STANLEY DEAN WITTER

                ------------------
        The date of this Prospectus Supplement is September 4, 1997.

CERTAIN PERSONS PARTICIPATING IN THE OFFERING MAY ENGAGE IN TRANSACTIONS THAT STABILIZE, MAINTAIN, OR OTHERWISE AFFECT THE PRICE OF THE 1997 DEBENTURES, INCLUDING OVER-ALLOTMENT, STABILIZING AND SHORT-COVERING TRANSACTIONS IN SUCH 1997 DEBENTURES, AND THE IMPOSITION OF A PENALTY BID, IN CONNECTION WITH THE OFFERING. FOR A DESCRIPTION OF THESE ACTIVITIES, SEE "UNDERWRITING."

## USE OF PROCEEDS

The net proceeds received by the Company from the sale of the 1997 Debentures, before deducting expenses payable by the Company, will be used for general corporate purposes, including the reduction of the Company's outstanding commercial paper balances (which had a weighted average interest rate of 5.56% at September 4, 1997).

## RECENT DEVELOPMENTS

On August 8, 1997, the Company announced that it had entered into agreements (the "Transaction") with its largest stockholders, Chandler Trust No. 1 and Chandler Trust No. 2 (collectively, the "Chandler Trusts"). The Transaction accelerated and augmented the Company's stock repurchase program, and had the effect of reducing, for financial reporting purposes, the Company's outstanding Series A Common Stock (the "Series A Common Stock") by 6 million shares and the Company's outstanding 8% Preferred Stock, Series A (the "Series A Preferred Stock") by $368 million of stated value. The Transaction consisted of two components: (i) the formation of a new limited liability company by the Company and the Chandler Trusts (the "LLC") and (ii) the merger of Chandis Securities Company, a holding company owned by Chandler Trust No. 2 and affiliated minority investors, with and into a subsidiary of the Company (the "Merger"). The Transaction closed on August 8, 1997. The Company funded its cash contribution to the LLC of $249 million with short-term bank debt which was subsequently refinanced with proceeds from commercial paper issuances. Had the Transaction occurred on January 1, 1996, fully diluted earnings per share for 1996 would have been $1.57 rather than $1.53. The positive impact to earnings per share is due to the lower number of shares of common stock deemed outstanding and the effective net reduction of dividends on preferred stock. In addition, had the Transaction occurred on June 30, 1997, the Company's debt-to-total capitalization ratio would have been 52.7% on a pro forma basis, as compared to 34.4% on a historical basis.

For further information regarding the Transaction, see the Company's Current Report on Form 8-K filed on August 11, 1997, which is incorporated herein by reference.

S-2

RATIO OF EARNINGS TO FIXED CHARGES, RATIO OF EARNINGS TO FIXED CHARGES AND
PREFERRED STOCK DIVIDENDS, PRO FORMA RATIO OF EARNINGS TO FIXED CHARGES AND
PRO FORMA RATIO OF EARNINGS TO FIXED CHARGES AND PREFERRED DIVIDENDS

The following table sets forth the ratio of earnings to fixed charges, the
ratio of earnings to fixed charges and preferred stock dividends, the pro
forma ratio of earnings to fixed charges and the pro forma ratio of earnings
to fixed charges and preferred stock dividends for the Company for the periods
indicated.

| | YEAR ENDED DECEMBER 31 | | | | | SIX MONTHS ENDED |
| | 1992 | 1993 | 1994 | 1995 | 1996 | JUNE 30, 1997 |
|---|---|---|---|---|---|---|
| Ratio of earnings to fixed charges. | (a) | 2.0x | 3.8x | (b) | 9.6x | 7.7x |
| Ratio of earnings to fixed charges and preferred stock dividends..... | N/A | N/A | N/A | (c) | 3.4x | 3.6x |
| Pro forma ratio of earnings to fixed charges...................... | -- | -- | -- | -- | 5.9x | 5.1x |
| Pro forma ratio of earnings to fixed charges and preferred dividends........................ | -- | -- | -- | -- | 3.2x | 3.3x |

- --------

(a) Earnings were approximately $7 million lower than the amount needed to
cover fixed charges in this year, as earnings in 1992 were impacted by
over $200 million in restructuring charges.

(b) Earnings were approximately $451 million lower than the amount needed to
cover fixed charges in this year, as earnings in 1995 were impacted by
approximately $768 million in restructuring charges.

(c) Earnings were approximately $526 million lower than the amount needed to
cover fixed charges and preferred stock dividends in this year, as
earnings in 1995 were impacted by approximately $768 million in
restructuring charges.

The ratio of earnings to fixed charges was computed by dividing earnings
(income from continuing operations before income taxes, adjusted for fixed
charges (net of capitalized interest), equity income or loss from
unconsolidated affiliates and amortization of capitalized interest) by fixed
charges for the periods indicated. Fixed charges include interest incurred on
long-term and other debt, capitalized interest, the interest factor deemed to
be included in rental expense, and certain amortization of debt issuance
costs.

The ratio of earnings to fixed charges and preferred stock dividends was
computed as described above, except that fixed charges were combined with the
preferred stock dividends for the periods indicated. The Company's Series A
Preferred Stock and Series B Preferred Stock (the "Series B Preferred Stock")
were issued in 1995 and began accruing dividends on March 1, 1995. On April 2,
1997, the Company redeemed all of its issued and outstanding Series B
Preferred Stock.

The pro forma ratio of earnings to fixed charges was computed as described
above, except that earnings and fixed charges were adjusted for (i) interest
expense and amortization of debt expense relating to the 1997 Debentures and
(ii) interest expense and equity income resulting from the Transaction,
assuming that both (i) and (ii) had occurred on January 1, 1996.

The pro forma ratio of earnings to fixed charges and preferred dividends was
computed based on the pro forma earnings described above as well as the
historical ratio described above, except that preferred dividends were
adjusted for (i) Preferred Stock, Series C-1 (the "Series C-1 Preferred
Stock") and Preferred Stock, Series C-2 (the "Series C-2 Preferred Stock")
issued in connection with the Merger, assuming that such issuance had resulted
in $313 million of preferred stock with an annual dividend rate of 5.8% and
(ii) elimination of preferred dividends for all Series A Preferred Stock
acquired in the Merger and 80% of the Series A Preferred Stock owned by the
LLC, which is reflected as treasury stock, assuming that both (i) and (ii) had
occurred on January 1, 1996.

S-3

## CAPITALIZATION AND PRO FORMA CAPITALIZATION

The following table sets forth the capitalization and pro forma capitalization of the Company at June 30, 1997 after giving effect to (i) the Transaction (see "Recent Developments") and (ii) the issuance of the 1997 Debentures described herein. This table should be read in conjunction with the Company's historical consolidated financial statements and related notes thereto and the pro forma condensed consolidated financial statements and related notes thereto, both of which are incorporated by reference in the accompanying Prospectus.

|  | JUNE 30, 1997 | |
| --- | --- | --- |
|  | HISTORICAL | PRO FORMA |
|  | (IN THOUSANDS OF DOLLARS) | |
| Debt, including short-term debt, net.................. | $ 639,252 | $ 947,081(1) |
| Shareholders' equity |  |  |
| Series A Preferred Stock, $1 par value; 900,000 shares authorized; 824,000 shares issued and outstanding; stated at liquidation value........................................ | 411,784 | 411,784 |
| Series B Preferred Stock, $1 par value; 8,439,000 shares authorized; no shares issued or outstanding |  |  |
| Series C-1 Preferred Stock, $1 par value; 381,000 shares authorized, issued and outstanding; stated at liquidation value; convertible to Series A Common Stock.................................... |  | 190,486 |
| Series C-2 Preferred Stock, $1 par value; 245,000 shares authorized, issued and outstanding; stated at liquidation value; convertible to Series A Common Stock.................................... |  | 122,550 |
| Preferred stock, $1 par value; 23,661,000 (historical) and 23,035,000 (pro forma) shares authorized; no shares issued or outstanding |  |  |
| Common stock |  |  |
| Series A, $1 par value; 500,000,000 shares authorized; 69,770,000 (historical) and 76,352,000 (pro forma) shares issued and outstanding................................... | 69,770 | 76,352 |
| Series B, $1 par value; 100,000,000 shares authorized; no shares issued or outstanding |  |  |
| Series C, $1 par value; 300,000,000 shares authorized; 25,967,000 (historical) and 35,623,000 (pro forma) shares issued and outstanding; convertible to Series A Common Stock....................................... | 25,967 | 35,623 |
| Additional paid-in capital........................... | 396,133 | 1,203,967 |
| Retained earnings.................................... | 288,443 | 288,443 |
| Net unrealized gain on securities................... | 28,466 | 28,466 |
|  | 1,220,563 | 2,357,671 |
| Less deemed treasury stock: |  |  |
| Series A Common Stock--22,239,000 shares and Series A Preferred Stock--735,000 shares, at cost................................................ |  | (1,508,050) |
| Total shareholders' equity...................... | 1,220,563 | 849,621 |
| Total capitalization............................ | $1,859,815 | $1,796,702 |

(1) Includes lease financing obligations net of original issue discount of $57,829 arising in connection with the Transaction.

## DESCRIPTION OF THE 1997 DEBENTURES

The 1997 Debentures offered hereby will be issued under an Indenture, dated as of March 19, 1996, between the Company and Citibank, N.A., as trustee (the "Trustee"), as supplemented from time to time (the "1996 Indenture"). The 1996 Indenture is incorporated by reference as an exhibit to the Registration Statement of which the accompanying Prospectus is a part. The following summary of certain provisions of the 1996 Indenture and of the 1997 Debentures (referred to in the accompanying Prospectus as the "Debt Securities" or "Securities") supplements, and to the extent inconsistent therewith replaces, the description of the general terms and provisions of the Debt Securities set forth in the accompanying Prospectus, to which reference is hereby made. Such summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, all provisions of the 1996 Indenture, including the definitions therein of certain terms.

The 1997 Debentures offered hereby will be limited to $250,000,000 aggregate principal amount and will mature on September 15, 2027. The 1997 Debentures will bear interest at the rate per annum shown on the cover of this Prospectus Supplement, computed on the basis of a 360-day year of twelve 30-day months, from September 9, 1997, or from the most recent interest payment date to which interest has been paid or provided for, payable semi-annually on March 15 and September 15 of each year, beginning on March 15, 1998. Interest payable on any 1997 Debenture which is punctually paid or duly provided for on any interest payment date shall be paid to holders of record on the 15th day immediately preceding such interest payment date.

The 1997 Debentures will be subject to defeasance and covenant defeasance as provided in the accompanying Prospectus.

The 1997 Debentures will be issued in book-entry form only. See "--Book-Entry System."

### OPTIONAL REDEMPTION

The 1997 Debentures will be redeemable, in whole or in part, at the option of the Company at any time after September 15, 2004 at a redemption price equal to the greater of (i) 100% of the principal amount of such 1997 Debentures or (ii) as determined by an Independent Investment Banker (as defined herein), the sum of the present values of the remaining scheduled payments of principal and interest thereon (not including any portion of such payments of interest accrued as of the date of redemption) discounted to the redemption date on a semiannual basis (assuming a 360-day year consisting of twelve 30-day months) at the Adjusted Treasury Rate, plus, in each case, accrued interest thereon to the date of redemption.

"Adjusted Treasury Rate" means, with respect to any redemption date, the rate per annum equal to the semiannual equivalent yield to maturity of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such redemption date, plus 0.10%.

"Comparable Treasury Issue" means the United States Treasury security selected by an Independent Investment Banker as having a maturity comparable to the remaining term of the 1997 Debentures to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of such 1997 Debentures. "Independent Investment Banker" means one of the Reference Treasury Dealers appointed by the Company.

"Comparable Treasury Price" means, with respect to any redemption date (A) the Reference Treasury Dealer Quotations for such redemption date, after excluding the highest and lowest such Reference Treasury Dealer Quotations, or (B) if the Trustee obtains fewer than three such Reference

S-5

Treasury Dealer Quotations, the average of all such Quotations. "Reference Treasury Dealer Quotations" means, with respect to each Reference Treasury Dealer and any redemption date, the average, as determined by the Trustee, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Trustee by such Treasury Reference Dealer at 5:00 p.m. (New York City time) on the third Business Day preceding such redemption date.

"Reference Treasury Dealer" means each of Goldman, Sachs & Co., Citicorp Securities, Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and Morgan Stanley & Co. Incorporated and their respective successors; provided, however, that if any of the foregoing shall cease to be a primary U.S. Government securities dealer in New York City (a "Primary Treasury Dealer"), the Company shall substitute therefor another Primary Treasury Dealer.

Notice of any redemption will be mailed at least 30 days but not more than 60 days before the redemption date to each holder of the 1997 Debentures to be redeemed.

Unless the Company defaults in payment of the redemption price, on and after the redemption date, interest will cease to accrue on the 1997 Debentures or portions thereof called for redemption.

The 1997 Debentures will not be entitled to the benefit of a sinking fund.

OPTIONAL REPAYMENT

The 1997 Debentures may be repaid on September 15, 2004, at the option of the holders of the 1997 Debentures, at 100% of their principal amount, together with accrued interest to September 15, 2004. In order for a holder to exercise this option, the Company must receive at its office or agency in New York, New York, during the period beginning on July 15, 2004 and ending at 5:00 p.m. (New York City time) on August 15, 2004 (or, if August 15, 2004 is not a Business Day, the next succeeding Business Day), the 1997 Debentures with the form entitled "Option to Elect Repayment on September 15, 2004," on the reverse of the 1997 Debentures duly completed. Any such notice received by the Company during the period beginning on July 15, 2004 and ending at 5:00 p.m. (New York City time) on August 15, 2004 shall be irrevocable. See "-- Book-Entry System." The repayment option may be exercised by a holder of 1997 Debentures for less than the entire principal amount of the 1997 Debentures held by such holder, so long as the principal amount that is to be repaid is equal to $1,000 or an integral multiple of $1,000. All questions as to the validity, form, eligibility (including time of receipt) and acceptance of any 1997 Debentures for repayment will be determined by the Company, whose determination will be final and binding.

As long as the 1997 Debentures are represented by a Global Security, DTC or DTC's nominee will be the registered holder of the 1997 Debentures and therefore will be the only entity that can exercise a right to repayment. See "--Book-Entry System."

RESTRICTIVE COVENANTS

Reference is made to the section entitled "Description of Offered Debt Securities--Restrictive Covenants" in the accompanying Prospectus for a description of the covenants applicable to the 1997 Debentures. In addition, the covenant described below (the "Additional Covenant") shall be applicable to the 1997 Debentures. The following defined terms apply for purposes of the Additional Covenant and the Additional Event of Default (as hereinafter defined) set forth below:

"1995 Debentures" means the Company's 7 1/2% Debentures due July 1, 2023 and the Company's 7 1/4% Debentures due March 1, 2013, both issued under the 1995 Indenture.

"1995 Indenture" means the Indenture, dated January 30, 1995, by and between the Company and The Bank of New York, as successor trustee, as amended, supplemented or otherwise modified from time to time.

S-6

"Principal Property" shall have the meaning set forth from time to time in the 1995 Indenture. Under the 1995 Indenture as in effect on the date hereof, the term "Principal Property" means "any manufacturing plant or facility located within the United States of America (other than its territories or possessions) and owned by the Company or any Subsidiary, except such plant or facility which, in the opinion of the Board of Directors of the Company, is not of material importance to the business conducted by the Company and its Subsidiaries, taken as a whole." There can be no assurance that such definition will not be amended, modified or eliminated in the future.

"Restricted Subsidiary" shall have the meaning set forth from time to time in the 1995 Indenture. Under the 1995 Indenture as in effect on the date hereof, the term "Restricted Subsidiary" means "any Subsidiary which owns or leases a Principal Property." There can be no assurance that such definition will not be amended, modified or eliminated in the future.

"Subsidiary" and "Voting Shares" shall have the meanings set forth from time to time in the 1995 Indenture. Under the 1995 Indenture as in effect on the date hereof, the term "Subsidiary" means "any corporation a majority of the Voting Shares of which is at the time owned directly or indirectly by the Company and its other Subsidiaries" and "Voting Shares" means "outstanding shares of capital stock having voting power for the election of directors, whether at all times or only so long as no senior class of stock has such voting power because of default in dividends or other default." There can be no assurance that such definitions will not be amended, modified or eliminated in the future.

The Additional Covenant is as follows:

Covenant to Secure Notes Equally. The Company will not, nor will it permit any Subsidiary to, secure any of the 1995 Debentures by mortgage, pledge, lien or other encumbrance (mortgages, pledges, liens and other encumbrances being hereinafter called "mortgage" or "mortgages") upon any Principal Property or on any shares of stock or indebtedness of any Restricted Subsidiary (whether such Principal Property, shares of stock or indebtedness is now owned or hereafter acquired) without in any such case effectively providing, concurrently with such mortgage in favor of the 1995 Debentures, that the 1997 Debentures (together with, if the Company shall so determine, any other indebtedness of or guaranteed by the Company or such Restricted Subsidiary ranking equally with the 1997 Debentures then existing or thereafter created) shall be secured equally and ratably with the 1995 Debentures so long as any of the 1995 Debentures shall be so secured; provided, that if the 1995 Debentures are no longer secured by such Principal Property, shares of stock or indebtedness (whether as a result of a repayment of the 1995 Debentures, voluntary release or otherwise), then, upon delivery to the Trustee of an Officers' Certificate to that effect, the mortgage on such Principal Property, shares of stock or indebtedness in favor of the 1997 Debentures shall be reconveyed, released and terminated. In the event that the 1995 Debentures shall no longer be outstanding whether by discharge, defeasance or otherwise, then, upon delivery to the Trustee of an Officers' Certificate to that effect, this covenant shall immediately cease to be applicable to the 1997 Debentures (provided that if this covenant requires the release of any mortgage securing the 1997 Debentures, this covenant shall remain in effect solely for the purpose of effecting such release).

EVENTS OF DEFAULT

Reference is made to the section entitled "Description of Offered Debt Securities--Events of Default" in the accompanying Prospectus for a description of the events of default applicable to the 1997 Debentures. In addition, an event of default (the "Additional Event of Default") shall exist for the 1997 Debentures under the 1996 Indenture if an Event of Default (as defined in the 1995 Indenture) has occurred and is continuing as a result of a breach of any covenant set forth in Section 1006 or Section 1007 of the 1995 Indenture as such covenants are in effect from time to time. Any such Event of Default under the 1995 Indenture which is waived by the requisite holders of the 1995 Debentures, or which is otherwise cured, shall no longer be continuing for purposes of the 1997 Debentures and

S-7

the 1996 Indenture. In the event that the 1995 Debentures shall no longer be outstanding whether by discharge, defeasance or otherwise, or if Section 1006 and Section 1007 are eliminated from the 1995 Indenture, then, upon delivery to the Trustee of an Officers' Certificate to that effect, the Additional Event of Default for the 1997 Debentures under the 1996 Indenture shall thereupon be eliminated.

Section 1006 of the 1995 Indenture, as in effect on the date hereof, provides substantially as follows, although there can be no assurance that such Section shall not be amended, modified or eliminated in the future:

Limitations on Liens. The Company will not, nor will it permit any Subsidiary to, issue, assume or guarantee any debt for money borrowed (herein referred to as "Debt") secured by mortgage, pledge, lien or other encumbrance (mortgages, pledges, liens and other encumbrances being hereinafter called "mortgage" or "mortgages") upon any Principal Property or on any shares of stock or indebtedness of any Restricted Subsidiary (whether such Principal Property, shares of stock or indebtedness is now owned or hereafter acquired) without in any such case effectively providing, concurrently with the issuance, assumption or guaranty of any such Debt, that the 1995 Debentures (together with, if the Company shall so determine, any other indebtedness of or guaranteed by the Company or such Restricted Subsidiary ranking equally with the 1995 Debentures then existing or thereafter created) shall be secured equally and ratably with such Debt; provided, however, that the foregoing restrictions shall not apply to (i) mortgages on property, shares of stock or indebtedness of or guaranteed by any corporation existing at the time such corporation becomes a Restricted Subsidiary; (ii) mortgages on property existing at the time of acquisition of such property by the Company or a Restricted Subsidiary, or mortgages to secure the payment of all or any part of the purchase price of such property upon the acquisition of such property by the Company or a Restricted Subsidiary, or to secure any Debt incurred or guaranteed by the Company or a Restricted Subsidiary prior to, at the time of, or within 120 days after the later of the acquisition, completion of construction (including any improvements on an existing property) or commencement of full operation of such property, which Debt is incurred or guaranteed for the purpose of financing all or any part of the purchase price thereof or construction or improvements thereon; provided, however, that in the case of any such acquisition, construction or improvement the mortgage shall not apply to any property theretofore owned by the Company or a Restricted Subsidiary other than, in the case of any such construction or improvement, any theretofore unimproved real property on which the property so constructed, or improvement, is located; (iii) mortgages securing Debt of a Restricted Subsidiary owing to the Company or to another Restricted Subsidiary; (iv) mortgages on property of a corporation existing at the time such corporation is merged into or consolidated with the Company or a Restricted Subsidiary or at the time of a purchase, lease or other acquisition of the properties of a corporation or firm as an entirety or substantially as an entirety by the Company or a Restricted Subsidiary; (v) mortgages on property of the Company or a Restricted Subsidiary in favor of the United States of America or any State thereof, or any department, agency or instrumentality or political subdivision of the United States of America or any State thereof, or in favor of any other country, or any political subdivision thereof, to secure partial, progress, advance or other payments pursuant to any contract or statute or to secure any indebtedness incurred or guaranteed for the purpose of financing all or any part of the purchase price or the cost of construction of the property subject to such mortgages (including, but not limited to, mortgages incurred in connection with pollution control, industrial revenue or similar financings); (vi) any extension, renewal or replacement (or successive extensions, renewals or replacements), in whole or in part, of any mortgage referred to in the foregoing clauses (i) to (v), inclusive; provided, however, that the principal amount of Debt secured thereby shall not exceed the principal amount of Debt so secured at the time of such extension, renewal or replacement, and that such extension, renewal or replacement shall be limited to all or part of the property which secured the mortgage so extended, renewed or replaced (plus improvements and construction on such property); (vii) liens imposed by law, such as mechanics', workmen's, repairmen's, materialmen's, carriers', warehousemen's, vendors' or other similar liens arising in the ordinary course of business, or

S-8

governmental (federal, state or municipal) liens arising out of contracts for the sale of products or services by the Company or any Restricted Subsidiary, or deposits or pledges to obtain the release of any of the foregoing liens; (viii) pledges or deposits under worker's compensation laws or similar legislation and liens of judgments thereunder which are not currently dischargeable, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of money) or leases to which the Company or any Restricted Subsidiary is a party, or deposits to secure public or statutory obligations of the Company or any Restricted Subsidiary, or deposits in connection with obtaining or maintaining self-insurance or to obtain the benefits of any law, regulation or arrangement pertaining to unemployment insurance, old age pensions, social security or similar matters, or deposits of cash or obligations of the United States of America to secure surety, appeal or customs bonds to which the Company or any Restricted Subsidiary is a party, or deposits in litigation or other proceedings such as, but not limited to, interpleader proceedings; (ix) liens created by or resulting from any litigation or other proceeding which is being contested in good faith by appropriate proceedings, including liens arising out of judgments or awards against the Company or any Restricted Subsidiary with respect to which the Company or such Restricted Subsidiary is in good faith prosecuting an appeal or proceedings for review; or liens incurred by the Company or any Restricted Subsidiary for the purpose of obtaining a stay or discharge in the course of any litigation or other proceeding to which the Company or such Restricted Subsidiary is a party; or (x) liens for taxes or assessments or governmental charges or levies not yet due or delinquent, or which can thereafter be paid without penalty, or which are being contested in good faith by appropriate proceedings; landlord's liens on property held under lease; and any other liens or charges incidental to the conduct of the business of the Company or any Restricted Subsidiary or the ownership of the property and assets of any of them which were not incurred in connection with the borrowing of money or the obtaining of advances or credit and which do not, in the opinion of the Company, materially impair the use of such property in the operation of the business of the Company or such Restricted Subsidiary or the value of such property for the purposes of such business. Notwithstanding the foregoing, the Company and any one or more Subsidiaries may issue, assume or guarantee Debt secured by mortgage which would otherwise be subject to the foregoing restrictions in an aggregate amount which, together with all other Debt of the Company and its Restricted Subsidiaries which (if originally issued, assumed or guaranteed at such time) would otherwise be subject to the foregoing restrictions (not including Debt permitted to be secured under clauses (i) through (x) above), does not at the time exceed 10% of the shareholders' equity of the Company and its consolidated Subsidiaries, as shown on the audited consolidated financial statements of the Company as of the end of the fiscal year preceding the date of determination.

Section 1007 of the 1995 Indenture, as in effect on the date hereof, provides substantially as follows, although there can be no assurance that such Section shall not be amended, modified or eliminated in the future:

Limitations on Sale and Leaseback Transactions. The Company will not, nor will it permit any Restricted Subsidiary to, enter into any arrangement with any person providing for the leasing by the Company or any Restricted Subsidiary of any Principal Property of the Company or any Restricted Subsidiary, whether such Principal Property is now owned or hereafter acquired (except for temporary leases for a term of not more than three years, except for leases between the Company and a Restricted Subsidiary or between Restricted Subsidiaries and except for leases of a Principal Property entered into within 120 days after the later of the acquisition, completion of construction or commencement of full operation of such Principal Property), which property has been or is to be sold or transferred by the Company or such Restricted Subsidiary to such person (herein referred to as a "Sale and Leaseback Transaction"), unless (i) the Company or such Restricted Subsidiary would be entitled to issue, assume or guarantee Debt secured by a mortgage upon such property at least equal in amount to the Attributable Debt (as defined) in respect of such Sale and Leaseback Transaction without equally and ratably securing the 1995 Debentures, provided, however, that from and after the

S-9

date on which such Sale and Leaseback Transaction becomes effective, the Attributable Debt in respect of such Sale and Leaseback Transaction shall be deemed for all purposes under Sections 1006 and 1007 of the 1995 Indenture to be Debt subject to the provisions of Section 1006 of the 1995 Indenture; or (ii) the Company shall apply an amount in cash equal to the Attributable Debt in respect of such Sale and Leaseback Transaction to the retirement (other than any mandatory retirement or by way of payment at maturity), within 90 days of the effective date of any such Sale and Leaseback Transaction, of Debt of the Company or any Restricted Subsidiary (other than Debt owned by the Company or any Restricted Subsidiary and other than Debt of the Company which is subordinated to the 1995 Debentures) which by its terms matures at, or is extendible or renewable at the sole option of the obligor without requiring the consent of the obligee to, a date more than twelve months after the date of the creation of such Debt. "Attributable Debt," in respect of any Sale and Leaseback Transaction means, at the time of determination, the present value (discounted at the rate of interest implicit in the lease) of the obligation of the lessee for net rental payments during the remaining term of the lease (including any period for which such lease has been extended or may, at the option of the lessor, be extended).

BOOK-ENTRY SYSTEM

The Depository Trust Company, New York, New York, will act as depositary (the "Depositary") for the 1997 Debentures. The 1997 Debentures will be represented by one or more Global Securities registered in the name of Cede & Co., the nominee of the Depositary. Accordingly, beneficial interests in the 1997 Debentures will be shown on, and transfer thereof will be effected only through, records maintained by the Depositary and its participants.

The Depositary has advised the Company and the Underwriters as follows: the Depositary is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. The Depositary holds securities that its participants ("Direct Participants") deposit with the Depositary. The Depositary also facilitates the settlement among Direct Participants of securities transactions, such as transfers and pledges, in deposited securities through electronic computerized book-entry changes in such Direct Participants' accounts, thereby eliminating the need for physical movement of securities certificates. Direct Participants include securities brokers and dealers (including the Underwriters), banks, trust companies, clearing corporations and certain other organizations. The Depositary is owned by a number of its Direct Participants and by the New York Stock Exchange, Inc., the American Stock Exchange, Inc. and the National Association of Securities Dealers, Inc. Access to the Depositary's book-entry system is also available to others such as securities brokers and dealers, banks and trust companies that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). The rules applicable to the Depositary and its Direct and Indirect Participants are on file with the Securities and Exchange Commission.

Principal and interest payments on the 1997 Debentures registered in the name of the Depositary's nominee will be made in immediately available funds to the Depositary's nominee as the registered owner of the Global Securities. Under the terms of the 1997 Debentures, the Company and the Trustee will treat the persons in whose names the 1997 Debentures are registered as the owners of such 1997 Debentures for the purpose of receiving payment of principal and interest on such securities and for all other purposes whatsoever. Therefore, neither the Company, the Trustee nor any paying agent has any direct responsibility or liability for the payment of principal or interest on the Global Securities to owners of beneficial interests in the Global Securities. The Depositary has advised the Company and the Trustee that its current practice is, upon receipt of any payment of principal or interest, to credit Direct Participants' accounts on the payment date in accordance with their respective

S-10

holdings of beneficial interests in the Global Securities as shown on the Depositary's records, unless the Depositary has reason to believe that it will not receive payment on the payment date. Payments by Direct and Indirect Participants to owners of beneficial interests in the Global Securities will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Direct and Indirect Participants and not of the Depositary, the Trustee or the Company, subject to any statutory requirements that may be in effect from time to time. Payment of principal and interest to the Depositary is the responsibility of the Company or the Trustee; disbursement of such payments to the owners of beneficial interests in the Global Securities shall be the responsibility of the Depositary and Direct and Indirect Participants.

The 1997 Debentures represented by a Global Security will be exchangeable for 1997 Debentures in definitive form of like tenor as such Global Security in denominations of $1,000 and in any greater amount that is an integral multiple if the Depositary notifies the Company that it is unwilling or unable to continue as Depositary for such Global Security or if at any time the Depositary ceases to be a clearing agency registered under applicable law and a successor depositary is not appointed by the Company within 90 days or the Company in its discretion at any time determines not to require all of the 1997 Debentures of such series to be represented by a Global Security and notifies the Trustee thereof. Any 1997 Debentures that are exchangeable pursuant to the preceding sentence are exchangeable for 1997 Debentures issuable in authorized denominations and registered in such names as the Depositary shall direct. Subject to the foregoing, a Global Security is not exchangeable, except for a Global Security or Global Securities of the same aggregate denominations to be registered in the name of the Depositary or its nominee.

So long as the 1997 Debentures are represented by a Global Security, DTC or DTC's nominee will be the only entity that can exercise a right to repayment pursuant to the holder's option to elect repayment of its 1997 Debentures. Notice by participants or by owners of beneficial interests in a Global Security held through such participants of the exercise of the option to elect repayment of beneficial interests in 1997 Debentures represented by a Global Security must be transmitted to DTC in accordance with its procedures on a form required by DTC and provided to participants. In order to ensure that DTC or DTC's nominee will timely exercise a right to repayment with respect to a particular 1997 Debenture, the beneficial owner of such 1997 Debenture must instruct the broker or other participant through which it holds an interest in such 1997 Debenture to notify DTC of its desire to exercise a right to repayment. Different firms have different cut-off times for accepting instructions from their customers and, accordingly, each beneficial owner should consult the broker or other participant through which it holds an interest in a 1997 Debenture in order to ascertain the cut-off time by which such an instruction must be given in order for timely notice to be delivered to DTC. The Company will not be liable for any delay in delivery of such notice to DTC.

SAME-DAY SETTLEMENT AND PAYMENT

Settlement for the 1997 Debentures will be made by the Underwriters in immediately available funds. All payments of principal and interest on the 1997 Debentures will be made by the Company in immediately available funds.

INFORMATION CONCERNING THE TRUSTEE

The Trustee also acts as trustee under the 1996 Indenture in connection with the Company's 7 1/4% Premium Equity Participating Securities due March 15, 2001 and its 7 1/4% Debentures due November 15, 2096. In addition, the Trustee acts as trustee, registrar, paying agent and conversion agent under the Indenture dated as of April 15, 1997 relating to the Company's Liquid Yield Option(TM) Notes due 2017 (Zero Coupon-Subordinated). In the ordinary course of business, the Company maintains deposits with the Trustee and the Trustee has also from time to time provided other banking services to the Company.

## UNDERWRITING

Subject to the terms and conditions set forth in the underwriting agreement (the "Underwriting Agreement"), the Company has agreed to sell to each of the underwriters named below (the "Underwriters"), and each of the Underwriters has severally agreed to purchase, the principal amount of the 1997 Debentures set forth opposite its name below.

| UNDERWRITER | PRINCIPAL AMOUNT OF 1997 DEBENTURES |
|---|---|
| Goldman, Sachs &Co. ........................................... | $ 62,500,000 |
| Citicorp Securities, Inc. ........................................ | 62,500,000 |
| Merrill Lynch, Pierce, Fenner &Smith Incorporated........................................... | 62,500,000 |
| Morgan Stanley &Co. Incorporated................................. | 62,500,000 |
| Total...................................................... | $250,000,000 |

Under the terms and conditions of the Underwriting Agreement, the Underwriters are committed to take and pay for all of the 1997 Debentures if any are taken.

The Underwriters propose to offer the 1997 Debentures in part directly to the public at the initial public offering price set forth on the cover page of this Prospectus Supplement, and to certain dealers at such price less a concession of 0.375% of the principal amount of the 1997 Debentures. The Underwriters may allow, and such dealers may reallow, a discount not to exceed 0.250% of the principal amount of the 1997 Debentures to certain brokers and dealers. After the 1997 Debentures are released for sale to the public, the offering price and other selling terms may from time to time be varied by the Underwriters.

The 1997 Debentures are a new issue of securities with no established trading market. The Company does not intend to apply for listing of the 1997 Debentures on any securities exchange. The Company has been advised by the Underwriters that the Underwriters intend to make a market in the 1997 Debentures but are not obligated to do so and may discontinue such market making at any time without notice. No assurance can be given as to the liquidity of the trading market for the 1997 Debentures.

In connection with the offering, the Underwriters may purchase and sell the 1997 Debentures in the open market. These transactions may include over-allotment and stabilizing transactions and purchases to cover short positions created by the Underwriters in connection with the offering. Stabilizing transactions consist of certain bids or purchases for the purpose of preventing or retarding a decline in the market price of the 1997 Debentures; and short positions created by the Underwriters involve the sale by the Underwriters of a greater aggregate principal amount of 1997 Debentures than they are required to purchase from the Company in the offering. The Underwriters also may impose a penalty bid, whereby selling concessions allowed to dealers in respect of the 1997 Debentures sold in the offering may be reclaimed by the Underwriters if such 1997 Debentures are repurchased by the Underwriters in stabilizing or covering transactions. These activities may stabilize, maintain or otherwise affect the market price of the 1997 Debentures, which may be higher than the price that might otherwise prevail in the open market; and these activities, if commenced, may be discontinued at any time. These transactions may be effected in the over-the-counter market or otherwise.

The Company has agreed to indemnify the several Underwriters against certain liabilities, including liabilities under the Securities Act of 1933, as amended.

From time to time the Underwriters and their affiliates have provided, and continue to provide, commercial or investment banking services to the Company and its affiliates.

## CERTAIN LEGAL MATTERS

The validity of the 1997 Debentures offered hereby will be passed upon for the Company by Gibson, Dunn & Crutcher LLP, Los Angeles, California. Certain legal matters in connection with the 1997 Debentures offering will be passed upon for the Underwriters by Latham & Watkins, Los Angeles, California.

S-13

PROSPECTUS

THE TIMES MIRROR COMPANY
DEBT SECURITIES
CONVERTIBLE DEBT SECURITIES
EXCHANGEABLE DEBT SECURITIES
PREFERRED STOCK
CONVERTIBLE PREFERRED STOCK
EXCHANGEABLE PREFERRED STOCK
COMMON STOCK
WARRANTS
STOCK PURCHASE CONTRACTS
STOCK PURCHASE UNITS

----------------

The Times Mirror Company, a Delaware corporation (the "Company" or "Times Mirror"), may offer and sell, from time to time, up to an initial aggregate offering price of $250 million, its: (i) unsecured debt securities, which may be either senior ("Senior Debt Securities") or subordinated ("Subordinated Debt Securities") (the Senior Debt Securities and Subordinated Debt Securities being referred to collectively as the "Debt Securities") in one or more series, consisting of debentures, notes or other evidences of indebtedness and having such prices and terms as are determined at the time of sale; (ii) shares of Preferred Stock, par value $1.00 per share ("Preferred Stock"), which may be issued in one or more series; (iii) shares of Series A Common Stock, par value $1.00 per share ("Series A Common Stock"), and shares of Series B Common Stock, par value $1.00 per share ("Series B Common Stock," and collectively with Series A Common Stock, the "Common Stock"), which may be issued in either or both series; (iv) warrants ("Warrants") to purchase Debt Securities, Preferred Stock or Common Stock; (v) stock purchase contracts ("Stock Purchase Contracts") to purchase Preferred Stock or Common Stock; and (vi) stock purchase units ("Stock Purchase Units"), which consist of a Stock Purchase Contract and Debt Securities or debt obligations of third parties, including United States Treasury securities, securing the holder's obligation to purchase the Preferred Stock or Common Stock under the Stock Purchase Contract. The Debt Securities may be convertible into or exchangeable into shares of Common Stock or Preferred Stock of the Company (the "Convertible Debt Securities" and the "Exchangeable Debt Securities," respectively). The Preferred Stock may be convertible into Common Stock (the "Convertible Preferred Stock") and may also be exchangeable for Debt Securities (the "Exchangeable Preferred Stock"). The Debt Securities, Convertible Debt Securities, Exchangeable Debt Securities, Preferred Stock, Convertible Preferred Stock, Exchangeable Preferred Stock, Common Stock, Warrants, Stock Purchase Contracts and Stock Purchase Units are collectively referred to herein as "Securities." The Securities may be issued as units and in any combination.

Specific terms of the Securities ("Offered Securities") in respect of which this Prospectus is being delivered will be set forth in an applicable Prospectus Supplement ("Prospectus Supplement"), together with the terms of the offering of the Offered Securities and the initial price and net proceeds to the Company from the sale thereof. The Prospectus Supplement will set forth with regard to the particular Offered Securities, without limitation, the following: (i) in the case of Debt Securities, Convertible Debt Securities and Exchangeable Debt Securities, the specific designation, aggregate principal amount, purchase price, ranking as senior or subordinated debt, authorized denomination, maturity, rate or rates of interest (or method of calculation thereof) and dates for payment thereof, dates from which interest shall accrue, any exchangeability, conversion, redemption, prepayment or sinking fund provisions, the currency or currencies or currency unit or currency units in which principal, premium, if any, or interest, if any, is payable, and any listing on a national securities exchange; (ii) in the case of Preferred Stock, Convertible Preferred Stock and Exchangeable Preferred Stock, the designation, number of shares, liquidation preference per share, initial public offering price, dividend rate (or method of calculation thereof), dates on which dividends shall be payable and dates from which dividends shall accrue, any redemption or sinking fund provisions, any voting rights, any conversion or exchange rights and any listing on a national securities exchange; (iii) in the case of Common Stock, the series, the voting rights, the number of votes per share, the number of shares of Common Stock and the terms of the offering and sale thereof and any listing on a national securities exchange; (iv) in the case of Warrants, the number and terms thereof, the designation and number of Debt Securities, Preferred Stock or Common Stock issuable upon their exercise, the exercise price, the terms of the offering and sale thereof, where applicable, the duration and detachability thereof, and any listing of the Warrants or the underlying Debt Securities, Preferred Stock or Common Stock on a national securities exchange; (v) in the case of Stock Purchase Contracts, the designation and number of shares of Preferred Stock or Common Stock issuable thereunder, the purchase price of the Preferred Stock or Common Stock, the date or dates on which the Preferred Stock or Common Stock is required to be purchased by the holders of the Stock Purchase Contracts, any periodic payments required to be made by the Company to the holders of the Stock Purchase Contracts or vice-versa, and the terms of the offering and sale thereof; and (vi) in the case of Stock Purchase Units, the specific terms of the Stock Purchase Contracts and any Debt Securities or debt obligations of third parties, including United States Treasury securities, securing the holder's obligation to purchase the

Preferred Stock or Common Stock under the Stock Purchase Contracts, the terms of the offering and sale thereof and any listing on a national securities exchange. The Prospectus Supplement will also contain information, where applicable, about certain federal income tax considerations relating to the Securities covered by the Prospectus Supplement.

----------------

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

----------------

Prior to issuance there will have been no market for the Debt Securities, Convertible Debt Securities, Exchangeable Debt Securities, Preferred Stock, Convertible Preferred Stock, Exchangeable Preferred Stock, Series B Common Stock, Warrants, Stock Purchase Contracts or Stock Purchase Units and there can be no assurance that a secondary market for the Debt Securities, Convertible Debt Securities, Exchangeable Debt Securities, Preferred Stock, Convertible Preferred Stock, Exchangeable Preferred Stock, Series B Common Stock, Warrants, Stock Purchase Contracts or Stock Purchase Units will develop. This Prospectus may not be used to consummate sales of Securities unless accompanied by a Prospectus Supplement. The Securities may be offered through one or more different plans of distribution, including offerings through underwriters. See "Plan of Distribution."

THE DATE OF THIS PROSPECTUS IS JULY 8, 1997

The following is included for compliance with Florida blue sky laws: Jeppesen & Co., GmbH, a wholly owned subsidiary of the Company organized under the laws of Germany, sells airway manuals and revision services to the Cuban government-owned airline, Cubana deAviacion, on an ongoing basis. In 1996, such sales resulted in revenues of approximately $191,000. In 1989, Jeppesen Sanderson, Inc., a wholly owned subsidiary of the Company ("Jeppesen"), obtained a formal ruling from the United States Department of Commerce Bureau of Export Administration that Jeppesen's flight charts and navigational data tapes are eligible for export to any country in the world without restriction or prior clearance pursuant to a general license. The general license operates to license the Company's activities under or to exempt the Company's activities through its affiliates from prohibitions of the Cuban Democracy Act of 1992, the Trading with the Enemy Act, the Cuban Liberty and Democratic Solidarity Act of 1996 and the U.S. Treasury Assets Control Regulations with respect to such flight charts and navigational data. The information provided . in this paragraph is accurate as of the date of this Prospectus. As of the date of this Prospectus the Company has not made any filings with the Florida Department of Banking and Finance pursuant to Florida Statutes Section 517.075(3). The Company intends to make any filings required by such section in the future, and when any such filings are made, current information concerning the dealings of the Company's affiliates with the government of Cuba and other persons or affiliates located in Cuba may be obtained from the Florida Department of Banking and Finance, at 1313 N. Tampa, Tampa, Florida 33602, phone (813) 272-2565. The foregoing filings are required by the Florida blue sky laws.

## AVAILABLE INFORMATION

The Company has filed with the Securities and Exchange Commission (the "Commission") a registration statement (together with all amendments and exhibits thereto, the "Registration Statement") under the Securities Act of 1933, as amended (the "Securities Act"), with respect to the Debt Securities, Convertible Debt Securities, Exchangeable Debt Securities, Preferred Stock, Convertible Preferred Stock, Exchangeable Preferred Stock, Common Stock, Warrants, Stock Purchase Contracts and Stock Purchase Units. This Prospectus, which constitutes part of the Registration Statement, does not contain all of the information set forth in the Registration Statement, certain parts of which are omitted in accordance with the Rules and Regulations of the Commission. For further information with respect to the Company, reference is made to the Registration Statement.

The Company is subject to the informational requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and in accordance therewith, files reports, proxy statements and other information with the Commission. Such Registration Statement and the other reports and information filed by Times Mirror with the Commission can be inspected and copied at the public reference facilities maintained by the Commission at Room 1024, Judiciary Plaza, 450 Fifth Street, N.W., Washington, D.C. 20549; and at its regional offices located at Northwestern Atrium Center, 500 West Madison Street, Suite 1400, Chicago, Illinois 60661-2511, and 7 World Trade Center, 13th Floor, New York, New York 10048. Copies of such material can be obtained from the public reference section of the Commission at 450 Fifth Street, N.W., Washington, D.C. 20549, at prescribed rates. Electronic filings made by the Company through the Commission's Electronic Data Gathering, Analysis and Retrieval System are publicly available through the Commission's world wide web site (http://www.sec.gov). Series A Common Stock of Times Mirror is listed on the New York Stock Exchange (the "NYSE") and on the Pacific Stock Exchange, and reports, proxy and information statements and other information concerning Times Mirror can be inspected at such exchanges. On April 2, 1997, the Company redeemed all of its issued and outstanding Conversion Preferred Stock, Series B, par value $1.00 per share ("Series B Preferred Stock"), and the Company has requested that the Series B Preferred Stock be delisted from the NYSE, on which it was listed.

2

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The following documents heretofore filed by the Company with the Commission (File No. 1-13492) pursuant to the Exchange Act are incorporated by reference and shall be deemed a part hereof:

   (a) Times Mirror's Annual Report on Form 10-K for the year ended December 31, 1996;

   (b) Times Mirror's Quarterly Report on Form 10-Q for the quarter ended March 31, 1997;

   (c) Times Mirror's Current Report on Form 8-K dated April 17, 1997; and

   (d) The descriptions of the Company's Series A Common Stock set forth under the caption "Description of Registrant's Securities to be Registered" in Times Mirror's Registration Statements on Form 8-A dated November 21, 1994 and December 22, 1994, respectively, together with any amendment or report filed with the Commission for the purpose of updating such descriptions.

All other reports filed by Times Mirror pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this Prospectus and prior to the termination of the offering of the Securities hereby are incorporated herein by reference and shall be deemed a part hereof when filed.

Any statement contained in a document incorporated or deemed to be incorporated by reference herein shall be deemed to be modified or superseded for purposes of this Prospectus to the extent that a statement contained herein, or in any other subsequently filed document that also is incorporated or deemed to be incorporated by reference herein, modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Prospectus. Subject to the foregoing, all information appearing in this Prospectus is qualified in its entirety by the information appearing in the documents incorporated by reference.

This Prospectus may not be used to consummate sales of Offered Securities unless accompanied by a Prospectus Supplement. The delivery of this Prospectus together with a Prospectus Supplement relating to particular Offered Securities in any jurisdiction shall not constitute an offer in the jurisdiction of any other securities covered by this Prospectus.

THIS PROSPECTUS INCORPORATES DOCUMENTS BY REFERENCE WITH RESPECT TO THE COMPANY THAT ARE NOT PRESENTED HEREIN OR DELIVERED HEREWITH. THESE DOCUMENTS ARE AVAILABLE WITHOUT CHARGE TO ANY PERSON, INCLUDING ANY BENEFICIAL OWNER, TO WHOM THIS PROSPECTUS IS DELIVERED, UPON WRITTEN OR ORAL REQUEST TO CORPORATE SECRETARY, THE TIMES MIRROR COMPANY, TIMES MIRROR SQUARE, LOS ANGELES, CALIFORNIA 90053, TELEPHONE (213) 237-3700.

## THE COMPANY

Times Mirror is engaged principally in the newspaper publishing, professional information and magazine publishing businesses. Times Mirror publishes the Los Angeles Times, Newsday, The Baltimore Sun, The Hartford Courant, The Morning Call, The (Stamford) Advocate, Greenwich Time, and several smaller newspapers. Through its subsidiaries, the Company also provides professional information to the legal, aviation and health science and consumer health markets, publishes books, journals, and magazines and also provides training information and services. Times Mirror was incorporated in the State of Delaware in June 1994 for the purpose of owning and operating these businesses after a reorganization of Times Mirror's predecessor which was completed in February 1995. Times Mirror's predecessor was incorporated in 1884 in the State of California and was reincorporated in the State of Delaware in 1986. All references herein to the Company and Times Mirror shall include Times Mirror's predecessor, Times Mirror's subsidiaries and Times Mirror, collectively, unless the context suggests otherwise.

Times Mirror's principal executive offices are located at Times Mirror Square, Los Angeles, California 90053 and its telephone number is (213) 237-3700.

## USE OF PROCEEDS

Unless otherwise set forth in the applicable Prospectus Supplement, the net proceeds from the sale of all Securities will be used for general corporate purposes.

## RATIO OF EARNINGS TO FIXED CHARGES AND RATIO OF EARNINGS TO FIXED CHARGES AND PREFERRED STOCK DIVIDENDS

The following table sets forth the ratio of earnings to fixed charges and the ratio of earnings to fixed charges and preferred stock dividends for the Company for the periods indicated.

| | YEAR ENDED DECEMBER 31 | | | | | THREE MONTHS ENDED |
|---|---|---|---|---|---|---|
| | 1992 | 1993 | 1994 | 1995 | 1996 | MARCH 31, 1997 |
| Ratio of earnings to fixed charges........................... | (a) | 2.0x | 3.8x | (b) | 9.6x | 6.7x |
| Ratio of earnings to fixed charges and preferred stock dividends.... | N/A | N/A | N/A | (c) | 3.4x | 2.9x |

(a) Earnings were approximately $7 million lower than the amount needed to cover fixed charges in this year, as earnings in 1992 were impacted by over $200 million in restructuring charges.

(b) Earnings were approximately $451 million lower than the amount needed to cover fixed charges in this year, as earnings in 1995 were impacted by approximately $768 million in restructuring charges.

(c) Earnings were approximately $526 million lower than the amount needed to cover fixed charges and preferred stock dividends in this year, as earnings in 1995 were impacted by approximately $768 million in restructuring charges.

The ratio of earnings to fixed charges was computed by dividing earnings (income from continuing operations before income taxes, adjusted for fixed charges (net of capitalized interest), equity income or loss from unconsolidated affiliates and amortization of capitalized interest) by fixed charges for the periods indicated. Fixed charges include interest incurred on long-term and other debt, capitalized interest, the interest factor deemed to be included in rental expense, and certain amortization of debt issuance costs.

The ratio of earnings to fixed charges and preferred stock dividends was computed as described above, except that fixed charges were combined with the preferred stock dividends for the periods indicated. The Company's Series A Preferred Stock and Series B Preferred Stock were issued in 1995 and began accruing dividends on March 1, 1995.

4

### DESCRIPTION OF OFFERED DEBT SECURITIES

The following description of the Debt Securities, Convertible Debt Securities and Exchangeable Debt Securities sets forth certain general terms and provisions of such securities, whether Senior Debt Securities or Subordinated Debt Securities unless a distinction is otherwise made below, to which any Prospectus Supplement may relate ("Offered Debt Securities"). Offered Debt Securities may be issued from time to time in one or more series. The particular terms of each series of Offered Debt Securities will be described in the Prospectus Supplement or Prospectus Supplements relating to such series.

The Offered Debt Securities will be issued under an Indenture (the "Indenture") between Times Mirror and a trustee chosen by Times Mirror and qualified to act as such under the Trust Indenture Act of 1939, as amended (the "Trustee"), the form of which has been filed as an exhibit to the Registration Statement of which this Prospectus is a part. The following summaries of certain provisions of the Indenture describe all of the material terms of the Indenture but do not purport to be complete and are subject to, and are qualified in their entirety by reference to, all of the provisions of the Indenture, including the definitions therein of certain terms capitalized in this Prospectus. Wherever particular sections, articles or defined terms of the Indenture are referred to herein or in a Prospectus Supplement, such sections, articles or defined terms are incorporated herein or therein by reference.

GENERAL

The Indenture does not limit the aggregate amount of Offered Debt Securities that may be issued thereunder, and Offered Debt Securities may be issued thereunder from time to time in one or more separate series up to the aggregate principal amount from time to time authorized by Times Mirror for each series. The Senior Debt Securities, if any, will be unsecured and unsubordinated obligations of Times Mirror and will rank equally and ratably with other unsecured and unsubordinated indebtedness of Times Mirror. The Subordinated Debt Securities, if any, will be unsecured obligations of Times Mirror and will be subject to such subordination provisions as are established in accordance with the terms of the Indenture.

The applicable Prospectus Supplement or Prospectus Supplements will describe, to the extent applicable, each of the following terms of the series of Offered Debt Securities in respect of which this Prospectus is being delivered: (i) the title of the Offered Debt Securities; (ii) any limit on the aggregate principal amount of the Offered Debt Securities; (iii) whether any of the Offered Debt Securities are to be issuable in certificated, book-entry or permanent global form and, if issuable in global form, the terms and conditions, if any, upon which interests in such Offered Debt Securities in global form may be exchanged, in whole or in part, for the individual Offered Debt Securities represented thereby; (iv) the person to whom any interest on any Offered Debt Security of the series will be payable if other than the person in whose name the Offered Debt Security is registered on the Regular Record Date; (v) the date or dates on which the Offered Debt Securities will mature; (vi) the rate or rates per annum at which the Offered Debt Securities will bear interest (or the method by which such rate or rates will be determined), if any; (vii) the date or dates from which any such interest will accrue, the Interest Payment Dates on which any such interest on the Offered Debt Securities will be payable and the Regular Record Date for any interest payable on any Interest Payment Date; (viii) each office or agency where the principal of, premium, if any, and interest, if any, on the Offered Debt Securities will be payable; (ix) the period or periods within which, the events upon the occurrence of which, and the price or prices at which, the Offered Debt Securities may, pursuant to any optional or mandatory provisions, be redeemed or purchased, in whole or in part, by Times Mirror and any terms and conditions relevant thereto; (x) the denominations in which any Offered Debt Securities will be issuable, if other than denominations of $1,000 and any integral multiple thereof; (xi) the currency or currencies, including composite currencies, of payment of principal of, and any premium and interest on, the Offered Debt Securities if other than United States dollars; (xii) any index or formula used to determine the amount of payments of principal of and any premium and any interest on the Offered Debt Securities; (xiii) if other than the principal amount thereof, the portion of the principal amount of the Offered Debt Securities of the series that will be payable upon declaration of the acceleration of the maturity thereof; (xiv) the applicability of the provisions described under "Restrictive Covenants"; (xv) any Events of Default with respect to the Securities of such series, if not otherwise set forth under "Events of Default"; (xvi) the applicability of the

provisions described under "Defeasance and Discharge"; (xvii) whether the Offered Debt Securities are convertible or exchangeable into shares of Common Stock or Preferred Stock of the Company and the terms of any such conversion or exchange; (xviii) the specific terms and conditions, if any, upon which the Offered Debt Securities may be subordinated to other indebtedness of the Company; and (xix) any other terms of the Offered Debt Securities not inconsistent with the provisions of the Indenture.

Offered Debt Securities may be issued at a discount from their principal amount. Certain federal income tax considerations and other special considerations applicable to any such original issue discount securities will be described in the applicable Prospectus Supplement.

EXCHANGE, REGISTRATION, TRANSFER AND PAYMENT

Unless otherwise indicated in the applicable Prospectus Supplement, payment of principal, premium, if any, and interest, if any, on the Offered Debt Securities will be payable, and the exchange of and the transfer of Offered Debt Securities will be registrable, at the office or agency of Times Mirror maintained for such purpose and at any other office or agency maintained for such purpose. Unless otherwise indicated in the applicable Prospectus Supplement, the Offered Debt Securities will be issued in denominations of $1,000 or integral multiples thereof. No service charge will be made for any registration of transfer or exchange of the Offered Debt Securities, but Times Mirror may require payment of a sum sufficient to cover any tax or other governmental charge imposed in connection therewith.

GLOBAL SECURITIES

If the Offered Debt Securities are represented by one or more global securities ("Global Securities"), the applicable Prospectus Supplement will describe the terms of the depositary arrangement with respect to such Global Securities.

RESTRICTIVE COVENANTS

Affirmative Covenants. In addition to such other covenants, if any, as may be described in the applicable Prospectus Supplement and except as may otherwise be set forth therein, the Indenture for the Offered Debt Securities will require the Company, subject to certain limitations described therein, to, among other things, do the following: (i) deliver to the Trustee copies of all reports filed with the Commission; (ii) deliver to the Trustee annual officers' certificates with respect to the Company's compliance with its obligations under the Indenture; (iii) maintain its corporate existence subject to the provisions described below relating to mergers and consolidations; and (iv) pay all taxes when due except where such taxes are being contested in good faith. Except as may be set forth in the applicable Prospectus Supplement, the Indenture will not restrict the business or operations of the Company or its subsidiaries, limit their indebtedness or prohibit any liens, charges or other encumbrances on any properties or other assets they may have from time to time.

REDEMPTION

If and to the extent set forth in the applicable Prospectus Supplement, the Company will have the right to redeem the Offered Debt Securities, from time to time, in whole or in part, after the date and at the redemption prices set forth in the applicable Prospectus Supplement.

CONSOLIDATION, MERGER AND SALE OR LEASE OF ASSETS

Except as may otherwise be set forth in the applicable Prospectus Supplement, Times Mirror, without consent of any holders of outstanding Offered Debt Securities, may consolidate with or merge into, or transfer or lease its assets substantially as an entirety to any Person, and any Person may consolidate with or merge into, or transfer or lease its assets substantially as an entirety to Times Mirror, provided that (i) the Person (if other than Times Mirror) formed by such consolidation or into which Times Mirror is merged or the Person which acquires

6

or leases the assets of Times Mirror substantially as an entirety is a corporation, partnership or trust organized and existing under the laws of any United States jurisdiction and expressly assumes Times Mirror's obligations on the Offered Debt Securities and under the Indenture, (ii) immediately after giving effect to such transaction no Event of Default (as defined below), and no event which, after notice or lapse of time or both, would become an Event of Default, happened and is continuing, and (iii) certain other conditions are met, such as securing the Offered Debt Securities equally and ratably with any otherwise impermissible encumbrance resulting from such consolidation, merger, transfer or lease of Times Mirror's assets substantially as an entirety, which conditions shall be described in the applicable Prospectus Supplement. Unless Times Mirror provides otherwise in the applicable Prospectus Supplement, holders of Offered Debt Securities will not be given any protections such as the right of redemption in the event of any sale or lease of all or any substantial part of Times Mirror's assets or any merger, consolidation, change in control, liquidation or dissolution of Times Mirror.

EVENTS OF DEFAULT

Except as may be described in the applicable Prospectus Supplement, an "Event of Default" will be defined under the Indenture for the Offered Debt Securities as being any one of the following events: (i) default for 30 days in payment of any interest on the Offered Debt Securities; (ii) default in payment of any principal of (or premium, if any, on) the Offered Debt Securities, either at maturity, upon redemption or otherwise; (iii) default for 90 days after written notice in the performance of, or breach of, any covenant or warranty of Times Mirror in the Indenture; and (iv) certain events of bankruptcy, insolvency or reorganization.

The Indenture for the Offered Debt Securities will provide that if an Event of Default (other than an Event of Default due to certain events of bankruptcy, insolvency or reorganization) has occurred and is continuing, either the Trustee or the holders of not less than 50% in principal amount of the Offered Debt Securities outstanding under the Indenture for the Offered Debt Securities, or such other amount as may be specified in the Prospectus Supplement, may declare the principal amount of all Offered Debt Securities under that Indenture to be due and payable immediately.

The Indenture will provide that the Trustee shall, within 90 days after the occurrence of a default under the Indenture with respect to Offered Debt Securities of any series, mail to all holders of Offered Debt Securities of such series notice of such default known to the Trustee, unless such default shall have been cured or waived; provided that, except in the case of default in the payment of principal of or interest on any of such series, the Trustee may withhold such notice if it in good faith determines that the withholding of such notice is in the interest of the holders.

The Indenture will provide that Times Mirror is required to furnish to the Trustee annually a statement of certain officers of Times Mirror to the effect that, to the best of their knowledge, Times Mirror is not in default in the performance and observance of any of the terms of the Indenture or, if they have knowledge that Times Mirror is in default, specifying such default.

The Indenture will provide that the holders of not less than a majority in aggregate principal amount of all outstanding Offered Debt Securities of any series will have the right, on behalf of the holders of all outstanding Offered Debt Securities of such series, to rescind a declaration of acceleration of the principal amount if the underlying default is cured and/or to waive certain defaults and, subject to certain limitations, to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee with respect to Offered Debt Securities of that series. The Indenture will also provide that in case an Event of Default with respect to Offered Debt Securities of any series has occurred and is continuing, the Trustee shall exercise, with respect to such series, such of the rights and powers vested in it under the Indenture, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs. Subject to such provisions, the Trustee will be under no obligation to exercise any of its rights or powers under the Indenture at the request or direction of any of the holders unless such holders shall have offered to the Trustee reasonable security or indemnity.

7

DEFEASANCE AND DISCHARGE

Except as may otherwise be provided in the applicable Prospectus Supplement, the Company can discharge or defease its obligations under the Indenture for the Offered Debt Securities as set forth below.

Under terms satisfactory to the Trustee, the Company may discharge certain obligations to holders of the Offered Debt Securities that have not already been delivered to the Trustee for cancellation and that have either become due and payable or are by their terms due and payable within one year (or scheduled for redemption within one year) by irrevocably depositing with the Trustee funds as trust funds in an amount certified to be sufficient to pay at maturity (or upon redemption) the principal of and premium, if any, and interest on such Offered Debt Securities.

The Company may also discharge any and all of its obligations to holders of the Offered Debt Securities at any time ("defeasance"), but may not thereby avoid its duty to register the transfer or exchange of the Offered Debt Securities, to replace any temporary, mutilated, destroyed, lost or stolen Offered Debt Securities or to maintain an office or agency in respect of such Offered Debt Securities and certain other obligations. Alternatively, the Company may be released with respect to the Offered Debt Securities from the obligations imposed by specific sections of the Indenture for the Offered Debt Securities (including the covenant described above limiting consolidations, mergers, asset sales and leases) and cease to comply with such provisions without creating an Event of Default ("covenant defeasance"). Defeasance or covenant defeasance may be effected only if, among other things: (i) the Company irrevocably deposits with the Trustee cash or U.S. Government Obligations, or a combination thereof, as trust funds in an amount certified to be sufficient to pay at maturity the principal of and premium, if any, and interest on all such outstanding Offered Debt Securities; (ii) no Event of Default under the Indenture for such Offered Debt Securities has occurred and is then continuing; (iii) the defeasance or covenant defeasance will not result in a breach or violation of, or constitute a default under, any agreement to which the Company is a party or by which it is bound; and (iv) the Company delivers to the Trustee an opinion of counsel to the effect that the holders of such Offered Debt Securities will not recognize income, gain or loss for federal income tax purposes as a result of such defeasance or covenant defeasance and that such defeasance or covenant defeasance will not otherwise alter such holders' federal income tax treatment of principal and interest payments on the Offered Debt Securities.

MODIFICATIONS TO THE INDENTURE

Except as may otherwise be set forth in the applicable Prospectus Supplement, the Indenture for the Offered Debt Securities will provide that the Company and the Trustee may enter into supplemental indentures without the consent of the holders of Offered Debt Securities to, among other things: (i) add covenants, conditions and restrictions for the protection of the holders of Offered Debt Securities; (ii) surrender any right of or power conferred upon the Company; (iii) cure any ambiguity or correct any inconsistency in the Indenture for the Offered Debt Securities; (iv) make any change that does not adversely affect the legal rights of holders of Offered Debt Securities; (v) modify, eliminate or add to the provisions of the Indenture for the Offered Debt Securities to the extent necessary to qualify that Indenture under applicable federal statutes; or (vi) make any other changes in the Indenture before Offered Debt Securities are issued thereunder, provided that such changes are not prohibited by the Trust Indenture Act.

Except as may otherwise be set forth in the applicable Prospectus Supplement, the Indenture for the Offered Debt Securities also will contain provisions permitting the Company and the Trustee, with the consent of the holders of not less than a majority in principal amount of Offered Debt Securities outstanding affected by such supplemental indenture, to enter into supplemental indentures in order to add any provision to, change in any manner or eliminate any of the provisions of the Indenture for the Offered Debt Securities or modify in any manner the rights of the holders of the Offered Debt Securities so affected; provided that no such supplemental indenture shall, among other things, without the consent of the holder of each outstanding Offered Debt Security affected thereby: (i) reduce the percentage in principal amount of Offered Debt Securities whose holders must consent to an amendment to the Indenture for the Offered Debt Securities or supplemental indenture or waiver

with respect to such Indenture; (ii) reduce the rate of or change the time for payment of interest on any Offered Debt Security; (iii) reduce the principal of or change the fixed maturity of any Offered Debt Security; or (iv) waive a default in the payment of the principal of, or interest on, any Offered Debt Security. The holders of at least a majority in principal amount of Offered Debt Securities outstanding of any series may, on behalf of the holders of all Offered Debt Securities of that series, waive any past default under the Indenture with respect to that series, except a default in the payment of the principal of, or premium, if any, or interest on, any Offered Debt Security of that series or in respect of a covenant or provision that under the Indenture for the Offered Debt Securities cannot be modified or amended without the consent of the holder of each Offered Debt Security outstanding of the series affected.

SENIOR DEBT SECURITIES

The particular terms of the Senior Debt Securities, if any, offered by any Prospectus Supplement or Prospectus Supplements and the extent, if any, to which the general provisions described above may apply to the Senior Debt Securities so offered, will be described in the applicable Prospectus Supplement relating to such Senior Debt Securities.

SUBORDINATED DEBT SECURITIES

The particular terms of the Subordinated Debt Securities, if any, offered by any Prospectus Supplement or Prospectus Supplements and the extent, if any, to which the general provisions described above may apply to the Subordinated Debt Securities so offered, will be established in accordance with the terms of the Indenture and will be described in the applicable Prospectus Supplement relating to such Subordinated Debt Securities.

REGARDING THE TRUSTEE

The Indenture contains certain limitations on the right of the Trustee, should it become a creditor of Times Mirror, to obtain payment of claims in certain cases, or to realize for its own account on certain property received in respect of any such claim as security or otherwise. The Trustee will be permitted to engage in certain other transactions; provided, however, that if it acquires any conflicting interest, it must eliminate such conflict or resign.

GOVERNING LAW

Unless otherwise specified in the applicable Prospectus Supplement, the Indenture for the Offered Debt Securities and the Offered Debt Securities will be governed by New York law.

## DESCRIPTION OF CAPITAL STOCK

The Company is authorized to issue: (i) 500,000,000 shares of Series A Common Stock ("Series A Common Stock"), of which 69,763,051 shares were issued and outstanding at June 23, 1997; (ii) 100,000,000 shares of Series B Common Stock, par value $1.00 per share ("Series B Common Stock"), none of which is outstanding; (iii) 300,000,000 shares of Series C Common Stock, par value $1.00 per share ("Series C Common Stock"), of which 25,966,591 shares were issued and outstanding at June 23, 1997; and (iv) 33,000,000 shares of Preferred Stock, of which (a) 900,000 shares are designated Preferred Stock, Series A, par value $1.00 per share ("Series A Preferred Stock"), of which 823,568 shares were issued and outstanding at June 23, 1997 and (b) 25,000,000 shares are designated Conversion Preferred Stock, Series B ("Series B Preferred Stock"), none of which is outstanding. On April 2, 1997, the Company redeemed all of its issued and outstanding Series B Preferred Stock.

COMMON STOCK

General

The following description of the Series A Common Stock and the Series B Common Stock sets forth general terms and provisions of the Common Stock to which any Prospectus Supplement may relate, including a Prospectus Supplement providing that Common Stock will be issuable upon conversion of Convertible Debt Securities or Convertible Preferred Stock, upon exchange of Exchangeable Debt Securities, upon exercise of Warrants or under the terms of the Stock Purchase Contracts, as the case may be. No shares of the Series C Common Stock described below are covered by this Prospectus. This Prospectus covers, and a Prospectus Supplement may be delivered with respect to, the exercise by a permitted transferee of stock options to acquire Series A Common Stock initially granted by the Company to eligible employees and the subsequent resale of such shares of Series A Common Stock by a charitable transferee, if required.

The following description sets forth all of the material terms of the Series A Common Stock, Series B Common Stock and Series C Common Stock and is summarized from, and qualified in its entirety by reference to, the Amended and Restated Certificate of Incorporation of the Company (the "Restated Certificate"), filed as an exhibit to the Registration Statement of which this Prospectus constitutes a part. The Series A Common Stock is listed on the NYSE and the Pacific Stock Exchange.

Rights to Designate Series B Common Stock

Pursuant to the Restated Certificate, the Board of Directors of the Company is entitled to designate certain rights, powers and preferences of a class of Series B Common Stock in addition to the outstanding Series A Common Stock and the Series C Common Stock, as discussed below. First, the Board may determine the exact number of votes per share of Series B Common Stock at not less than one-tenth ( 1/10) nor more than one (1). Second, the Board may also make other changes in the rights, powers and preferences of the Series B Common Stock, provided that in no such case may the rights, powers and preferences of any such series be greater than those described herein. Subject to the foregoing, it is anticipated that Series B Common Stock, if authorized by the Board of Directors, will be identical in all respects to the Series A Common Stock currently outstanding, except with respect to voting. Specifically, it is anticipated that each share of Series B Common Stock will be entitled to one-tenth ( 1/10) of a vote rather than one vote per share.

The description herein of the rights, powers and preferences of the Series B Common Stock is subject to the discretionary authority of the Board as described above. The Board presently has no intention of issuing any shares of Series B Common Stock or of utilizing such authority to vary the terms of the Series B Common Stock from those described herein unless it determines that such change is necessary in light of legal developments or in order to comply with, or establish an exemption from, any applicable law, regulation or rule of any governmental authority, national securities exchange or national market system.

10

Voting

Except as set forth below, all actions submitted to a vote of the Company's stockholders will be voted on by holders of Series A Common Stock, Series B Common Stock, Series C Common Stock and Series B Preferred Stock voting together as a single class. The affirmative vote of the holders of a majority of the outstanding shares of Series A Common Stock, Series B Common Stock and/or Series C Common Stock, voting separately as a class, is required (i) to approve any amendment to the Restated Certificate that would alter or change the powers, preferences or special rights of such series so as to affect it adversely and (ii) to approve such other matters as may require class votes under the General Corporation Law of the State of Delaware. The Series A Common Stock is entitled to 1 vote per share, and the Series C Common Stock is entitled to 10 votes per share.

Dividends and Other Distributions (including Distributions upon Liquidation or Sale of the Company)

Unless otherwise determined by the Board in the resolutions providing for the issuance of Series B Common Stock, each share of Series A Common Stock, Series B Common Stock and Series C Common Stock is equal in respect of dividends and other distributions in cash, stock or property (including distributions upon liquidation of the Company and consideration to be received upon a merger or consolidation of the Company or a sale of all or substantially all of the Company's assets), except that in the case of dividends or other distributions payable on the Series A Common Stock, Series B Common Stock or Series C Common Stock in shares of such stock, including distributions pursuant to stock splits or dividends, only Series A Common Stock is to be distributed with respect to Series A Common Stock; only Series B Common Stock is to be distributed with respect to Series B Common Stock; and only Series C Common Stock is to be distributed with respect to Series C Common Stock. In no event will either Series A Common Stock, Series B Common Stock or Series C Common Stock be split, divided or combined unless each other class is proportionately split, divided or combined.

Termination and Conversion of Series B and/or Series C Common Stock

Either or both the Series B Common Stock and Series C Common Stock will automatically be converted into Series A Common Stock on a share-for-share basis (i) at any time the Board and the holders of a majority of the outstanding shares of the series approve the conversion of all of such series into Series A Common Stock, (ii) if, as a result of the existence of the series, the Series A Common Stock becomes excluded from trading on the NYSE, the American Stock Exchange and all other national securities exchanges and is also excluded from quotation on NASDAQ or any other national quotation system then in use, (iii) if the Board, in its sole discretion, elects to effect a conversion of such series in connection with its approval of any sale or lease of all or any substantial part of the Company's assets or any merger, consolidation, liquidation or dissolution of the Company, or (iv) if the Board, in its sole discretion, elects to effect a conversion of such series after a determination that there has been a material adverse change in the liquidity, marketability or market value of the outstanding Series A Common Stock, considered in the aggregate (a) due to the exclusion of the Series A Common Stock from trading on a national securities exchange or the exclusion of the Series A Common Stock from quotation on NASDAQ, or such other national quotation system then in use, or (b) due to requirements of federal or state law, in any such case, as a result of the existence of such series. To the extent that the Board has discretion, the decision whether or not to exercise its authority to effect a conversion of Series B Common Stock or Series C Common Stock would be made in light of all the existing facts and circumstances affecting the interests of the Company and its stockholders, including the effect such conversion could have on the Company's vulnerability to an unsolicited hostile takeover attempt and any of the other factors referred to herein.

In the event of any such termination of Series B Common Stock or Series C Common Stock, certificates formerly representing outstanding shares of that series shall thereafter be deemed to represent a like number of shares of Series A Common Stock. If both Series B Common Stock and Series C Common Stock are terminated, all outstanding shares of Series A Common Stock shall again be denominated Common Stock and all certificates representing outstanding shares of Series A Common Stock shall thereafter be deemed to represent a like number of shares of Common Stock.

Preemptive Rights

None of the Series A Common Stock, the Series B Common Stock or the Series C Common Stock carries any preemptive right enabling a holder to subscribe for or receive shares of stock of the Company of any class or any other securities convertible into shares of stock of the Company. The Board will continue to possess the power to issue shares of authorized but unissued Series A Common Stock, Series B Common Stock, Series C Common Stock and Preferred Stock without further stockholder action.

PREFERRED STOCK

The following summary contains a description of certain general terms of the Company's Preferred Stock to which any Prospectus Supplement may relate. Certain terms of any series of Preferred Stock, including Convertible Preferred Stock and Exchangeable Preferred Stock, offered by any Prospectus Supplement will be described in the applicable Prospectus Supplement relating thereto. Convertible Preferred Stock may be converted into Common Stock. Exchangeable Preferred Stock may be exchangeable, at the option of the Company, for Debt Securities (see "Description of Debt Securities"). If Preferred Stock or Warrants exercisable for Preferred Stock are being offered, if Preferred Stock is to be issued under Stock Purchase Contracts, or if Exchangeable Preferred Stock or Convertible Preferred Stock is being offered, the applicable Prospectus Supplement will describe the rights, privileges, preferences and restrictions of such Preferred Stock, Exchangeable Preferred Stock or Convertible Preferred Stock, including, without limitation, (i) the designation, (ii) the number of authorized shares of the series in question, (iii) the dividend rate (or method of calculation), (iv) any voting rights, conversion rights, anti-dilution protections, exchangeability provisions and terms of any Debt Securities that are exchangeable for Preferred Stock, (v) any redemption provisions, liquidation preferences and (vi) any sinking fund provisions. If fractional interests in shares of Preferred Stock may be issued, there will be a depositary for the shares of Preferred Stock involved and the applicable Prospectus Supplement will describe the terms of the depositary arrangement and related matters.

Upon issuance, against full payment of the purchase price therefor, shares of Preferred Stock will be fully paid and nonassessable. Preferred Stock issuable upon exercise of any Warrants exercisable for Preferred Stock (upon payment in full of the Warrant exercise price), conversion of any Convertible Debt Securities or exchange of any Exchangeable Debt Securities or under the Stock Purchase Contracts will be fully paid and nonassessable when issued in accordance with the terms of such Convertible Debt Securities, Exchangeable Debt Securities or Stock Purchase Contracts. No shares of the Series A Preferred Stock or the Series B Preferred Stock are covered by this Prospectus.

CERTAIN PROVISIONS IN THE RESTATED CERTIFICATE AND BYLAWS

The Restated Certificate and Bylaws provide for indemnification of directors and officers to the fullest extent permitted by applicable law and contain various antitakeover provisions intended to (i) promote stability of the Company's stockholder base and (ii) render more difficult certain unsolicited or hostile attempts to take over the Company which could disrupt the Company, divert the attention of the Company's directors, officers and employees and adversely affect the independence and integrity of the Company's media operations. A summary of the principal antitakeover provisions is set forth below.

Classified Board of Directors, Removal of Directors and Related Matters

Pursuant to the Restated Certificate, the Company's Board of Directors is divided into three classes, each class to consist as nearly as possible of one-third of the Directors. The term of office of each class of Directors expires three years from the year of election. The Restated Certificate also provides that Directors may be removed only for cause and only by a majority of the votes entitled to be cast by the holders of all shares of capital stock entitled to vote generally in the election of Directors (the "Voting Interests"). Additionally, if the proposal to remove a Director is made by or on behalf of a Related Person (as defined below), removal will also require the affirmative vote of a majority of the Voting Interests held by persons other than such Related Person. Thus, a third party seeking to gain control of the Board of Directors may be forced to wait until the expiration of the respective terms of incumbent Directors, unless there were cause and sufficient voting strength to remove a particular Director or Directors.

12

Increased Stockholder Vote Required in Certain Business Combinations

The Restated Certificate requires, subject to certain exceptions summarized below, that any Business Combination (as defined below), be approved by (i) an affirmative vote of the holders of not less than 80% of the Voting Interests (the "80% Voting Requirement") and (ii) the affirmative vote of the holders of a majority of the Disinterested Shares (as defined below). Business Combinations include generally the following: (i) mergers or reorganizations of the Company or its subsidiaries with or into a Related Person or of a Related Person with or into the Company or a subsidiary; (ii) reorganizations that would have the effect of increasing the voting power of a Related Person; (iii) certain acquisitions by the Company or any subsidiary of the Company of securities issued by or assets of a Related Person; and (iv) liquidations, sales or transfers to a Related Person of assets of the Company or one or more of its subsidiaries constituting a substantial part of the Company.

A Business Combination does not need to satisfy the foregoing approval requirements if the Business Combination has been approved by a majority of the Directors who are unaffiliated with the Related Person and who were members of the Board of Directors before the Company was incorporated in the State of Delaware, or who became a member of the Board before the Related Person became a Related Person (the "Continuing Directors"). Business Combinations in which the stockholders of the Company are to receive cash, securities or other property in exchange for their shares of capital stock do not need to satisfy the 80% Voting Requirement if (i) the value of the consideration meets certain thresholds of fairness, as specified in the Restated Certificate, and (ii) the Business Combination is approved by the affirmative vote of the holders of a majority of the Disinterested Shares.

As used in the Restated Certificate, a "Related Person" is a person or entity, or an affiliate or associate (as defined in Rule 12b-2 under the Exchange Act) of such person or entity, that beneficially owns, in the aggregate, five percent or more of the outstanding voting interests of the Company; provided, however, the term Related Person does not include (i) any person or entity that beneficially owned five percent or more of the common stock of the Company on the date upon which the Company was incorporated in the State of Delaware, or (ii) any employee benefit plan established to provide benefits for employees of the Company or its subsidiaries, any trust plan thereto, or any trustee or fiduciary when acting in such capacity with respect to any such plan or trust. The term "Disinterested Shares" means, as to any Related Person, shares of the Company's voting stock held by stockholders other than such Related Person.

Restriction on a Stockholder's Power to Call Stockholders' Meetings and Elimination of Right to Act Without a Meeting

The Restated Certificate provides that a special meeting of stockholders may be called only by the Board of Directors. Furthermore, if a proposal requiring stockholder approval is made by or on behalf of a Related Person or a Director affiliated with a Related Person, the affirmative vote of a majority of the Continuing Directors is also required to call a special meeting of stockholders. The principal effect of this provision is to prevent stockholders from forcing a special meeting to consider a proposal opposed by the Board of Directors.

The Restated Certificate provides that any action taken by the stockholders of the Company must be effected at an annual or special meeting of stockholders and may not be taken by written consent.

Procedures for Stockholder Nominations and Proposals

The Restated Certificate provides that a stockholder must furnish written notice to the Secretary of the Company of any nomination or business proposal to be brought before a stockholders meeting not less than 30 nor more than 60 days prior to the meeting as originally scheduled. In the event that less than 40 days public notice of a meeting date is given by the Company, a stockholder must furnish notice of a nomination or business proposal not later than the close of business on the tenth day following the notice or the public disclosure of the meeting date. These procedures prohibit last-minute attempts by any stockholder to nominate a Director or present a business proposal at an annual stockholders meeting, even if such a nomination or proposal might be desired by a majority of the stockholders.

13

Relevant Factors to be Considered by the Board of Directors

The Restated Certificate provides that, in evaluating certain proposed business transactions and the best interests of the Company and its stockholders, the Board of Directors shall consider all relevant factors, including but not limited to freedom of the press, the independence and integrity of the Company's media operations, the social and economic effects of the transactions on stockholders, employees, customers, suppliers and other constituents of the Company and its subsidiaries, as well as the effects on the communities in which they operate.

In providing the Board of Directors with a broader basis for determining the advisability of a proposed transaction, the Restated Certificate gives the Board authority to reject, among other transactions, a proposed acquisition of the Company notwithstanding the fact that the proposal may include favorable economic benefits for the Company's stockholders.

Amendment of Certain Charter and Bylaw Provisions

The Restated Certificate provides that any alteration, amendment, repeal or recission (any "Change") of the provisions contained in the Restated Certificate must be approved by a majority of the Directors then in office and by the affirmative vote of the holders of a majority of the Voting Interests, provided however that if the proposed Change relates to certain provisions specified in the Certificate, then any such Change must also be approved either (a) by a majority of the authorized number of Directors and, if one or more Related Persons exist, by a majority of the Directors who are Continuing Directors with respect to all Related Persons, or (b) by the affirmative vote of the holders of not less than 80% of the Voting Interests and, if the Change is proposed by or on behalf of a Related Person or a Director affiliated with a Related Person, by affirmative vote of a majority of the Voting Interests represented by Disinterested Shares.

DESCRIPTION OF WARRANTS

The Company may issue Warrants, including Warrants to purchase Debt Securities ("Debt Warrants") and Warrants to purchase Common Stock or Preferred Stock ("Stock Warrants"). Warrants may be issued independently of or together with any other Securities and may be attached to or separate from such Securities. Each series of Warrants will be issued under a separate Warrant Agreement (each a "Warrant Agreement") to be entered into between the Company and a Warrant Agent ("Warrant Agent") the form of which will be filed as an exhibit to the Registration Statement of which this Prospectus is a part. The Warrant Agent will act solely as an agent of the Company in connection with the Warrants of such series and will not assume any obligation or relationship of agency for or with holders or beneficial owners of Warrants. The following sets forth certain general terms and provisions of the Warrants offered hereby. Further terms of the Warrants and the applicable Warrant Agreement will be set forth in the applicable Prospectus Supplement.

DEBT WARRANTS

The applicable Prospectus Supplement will describe the terms of any Debt Warrants, including the following: (i) the title of such Debt Warrants; (ii) the offering price for such Debt Warrants, if any; (iii) the aggregate number of such Debt Warrants; (iv) the designation and terms of the Debt Securities purchasable upon exercise of such Debt Warrants; (v) if applicable, the designation and terms of the Securities with which such Debt Warrants are issued and the number of such Debt Warrants issued with each such Security; (vi) if applicable, the date from and after which such Debt Warrants and any Securities issued therewith will be separately transferable; (vii) the principal amount of Debt Securities purchasable upon exercise of a Debt Warrant and the price at which such principal amount of Debt Securities may be purchased upon exercise; (viii) the date on which the right to exercise such Debt Warrants shall commence and the date on which such right shall expire; (ix) if applicable, the minimum or maximum amount of such Debt Warrants that may be exercised at any one time; (x) whether the Debt Warrants represented by the Debt Warrant certificates or Debt Securities that may be issued upon exercise of the Debt Warrants will be issued in registered or bearer form; (xi) information with

14

respect to book-entry procedures, if any; (xii) the currency, currencies or currency units in which the offering price, if any, and the exercise price are payable; (xiii) if applicable, a discussion of certain United States federal income tax considerations; (xiv) the antidilution provisions of such Debt Warrants, if any; (xv) the redemption or call provisions, if any, applicable to such Debt Warrants; and (xvi) any additional terms of the Debt Warrants, including terms, procedures and limitations relating to the exchange and exercise of such Debt Warrants.

STOCK WARRANTS

The applicable Prospectus Supplement will describe the terms of any Stock Warrants, including the following: (i) the title of such Stock Warrants; (ii) the offering price of such Stock Warrants, if any; (iii) the aggregate number of such Stock Warrants; (iv) the designation and terms of the Common Stock or Preferred Stock purchasable upon exercise of such Stock Warrants; (v) if applicable, the designation and terms of the Securities with which such Stock Warrants are issued and the number of such Stock Warrants issued with each such Security; (vi) if applicable, the date from and after which such Stock Warrants and any Securities issued therewith will be separately transferable; (vii) the number of shares of Common Stock or Preferred Stock purchasable upon exercise of a Stock Warrant and the price at which such shares may be purchased upon exercise; (viii) the date on which the right to exercise such Stock Warrants shall commence and the date on which such right shall expire; (ix) if applicable, the minimum or maximum amount of such Stock Warrants that may be exercised at any one time; (x) the currency, currencies or currency units in which the offering price, if any, and the exercise price are payable; (xi) if applicable, a discussion of certain United States federal income tax considerations; (xii) the antidilution provisions of such Stock warrants, if any; (xiii) the redemption or call provisions, if any, applicable to such Stock Warrants; and (xiv) any additional terms of such Stock Warrants, including terms, procedures and limitations relating to the exchange and exercise of such Stock Warrants.

### DESCRIPTION OF STOCK PURCHASE CONTRACTS AND STOCK PURCHASE UNITS

The Company may issue Stock Purchase Contracts, including contracts obligating holders to purchase from the Company, and the Company to sell to the holders, a specified number of shares of Common Stock or Preferred Stock at a future date or dates. The price per share of Preferred Stock or Common Stock may be fixed at the time the Stock Purchase Contracts are issued or may be determined by reference to a specific formula set forth in the Stock Purchase Contracts. The Stock Purchase Contracts may be issued separately or as a part of the Stock Purchase Units consisting of a Stock Purchase Contract and Debt Securities or debt obligations of third parties, including United States Treasury securities, securing the holders' obligations to purchase the Preferred Stock or the Common Stock under the Stock Purchase Contracts. The Stock Purchase Contracts may require the Company to make periodic payments to the holders of the Stock Purchase Contracts or vice-versa, and such payments may be unsecured or prefunded on some basis. The Stock Purchase Contracts may require holders to secure their obligations thereunder in a specified manner. The Stock Purchase Contracts may provide the Company the option to deliver cash in lieu of Preferred Stock or Common Stock.

The applicable Prospectus Supplement will describe the terms of any Stock Purchase Contracts or Stock Purchase Units, including, without limitation, the following: (i) the title of the Stock Purchase Contracts or Stock Purchase Units; (ii) the stated amount of the Stock Purchase Units and the principal amount of any Debt Securities, or debt obligations of third parties, including United States Treasury securities, constituting a component of a Stock Purchase Unit; (iii) the number of shares of Common Stock or Preferred Stock that shall be purchased upon settlement under the Stock Purchase Contracts; (iv) the right, if any, of the Company to deliver cash in lieu of Preferred Stock or Common Stock and the manner of calculating such cash amount; (v) the amount of any fees payable, whether to Times Mirror or to holders with respect to the Stock Purchase Contracts; (vi) the interest rate applicable to any Debt Securities or debt securities of third parties, including United States Treasury securities, constituting a component of a Stock Purchase Unit; (vii) the rights, if any, of the holders to settle Stock Purchase Contracts early and the terms upon which such early settlement may be effected; (viii) the date on which, subject to the rights of the holders to settle Stock Purchase Contracts early and termination of the

15

Stock Purchase Contracts, the Stock Purchase Contracts will be settled; (ix) the events that may cause a termination of the Stock Purchase Contracts prior to the date of settlement; and (x) any other terms of the Stock Purchase Contracts or Stock Purchase Units not inconsistent with the provisions of the instrument or instruments pursuant to which such Stock Purchase Contracts or Stock Purchase Units are issued. The description in the Prospectus Supplement will not purport to be complete and will be qualified in its entirety by reference to the Stock Purchase Contracts, and, if applicable, collateral arrangements and depositary arrangements, relating to such Stock Purchase Contracts or Stock Purchase Units.

## PLAN OF DISTRIBUTION

The Company may sell the Securities to one or more underwriters for public offering and sale by them or may sell the Securities to investors directly or through agents. Any such underwriter or agent involved in the offer and sale of the Securities will be named in the applicable Prospectus Supplement. The Company may sell Securities directly to investors on its own behalf in those jurisdictions where it is authorized to do so.

Underwriters may offer and sell the Securities at a fixed price or prices, which may be changed, at market prices prevailing at the time of sale, at prices related to such prevailing market prices or at negotiated prices. The Company also may offer and sell the Securities in exchange for one or more of its outstanding debt securities or other securities. The Company also may, from time to time, authorize dealers, acting as Company agents, to offer and sell the Securities upon such terms and conditions as may be set forth in the applicable Prospectus Supplement. In connection with the sale of the Securities, underwriters may receive compensation from the Company in the form of underwriting discounts, concessions or commissions and may also receive commissions from purchasers of the Securities for whom they may act as agent. Underwriters may sell the Securities to or through dealers, and such dealers may receive compensation in the form of discounts, concessions or commissions from the underwriters or commissions from the purchasers for whom they may act as agents.

Any underwriting compensation paid by the Company to underwriters or agents in connection with the offering of the Securities, and any discounts or concessions or commissions allowed by underwriters to participating dealers, will be set forth in the applicable Prospectus Supplement. Dealers and agents participating in the distribution of the Securities may be deemed to be underwriters, and any discounts and commissions received by them and any profit realized by them on resale of the Securities may be deemed to be underwriting discounts and commissions. Underwriters, dealers and agents may be entitled, under agreements entered into with the Company, to indemnification against and contribution toward certain civil liabilities.

Certain of the underwriters, dealers and agents and their associates may engage in transactions with, and perform services for, the Company in the ordinary course of business.

The Debt Securities, Convertible Debt Securities, Exchangeable Debt Securities, Preferred Stock, Convertible Preferred Stock, Exchangeable Preferred Stock, Series B Common Stock, Warrants, Stock Purchase Contracts and Stock Purchase Units will be new issues of securities with no established trading market. Any underwriters or agents to or through which Securities are sold by the Company for public offering and sale may make a market in such Securities, but such underwriters or agents will not be obligated to do so and any of them may discontinue any market making at any time without notice. No assurance can be given as to the liquidity of or trading market for any Debt Securities, Convertible Debt Securities, Exchangeable Debt Securities, Preferred Stock, Convertible Preferred Stock, Exchangeable Preferred Stock, Series B Common Stock, Warrants, Stock Purchase Contracts or Stock Purchase Units.

## CERTAIN LEGAL MATTERS

Gibson, Dunn & Crutcher LLP has rendered an opinion (filed as an exhibit to the Registration Statement of which this Prospectus is a part) with respect to the validity of the Securities covered by this Prospectus. Certain legal matters in connection with offerings made by this Prospectus may be passed on for any underwriters, agents or dealers by counsel named in the Prospectus Supplement.

16

## EXPERTS

The consolidated financial statements of The Times Mirror Company appearing in The Times Mirror Company's Annual Report (Form 10-K) for the year ended December 31, 1996, have been audited by Ernst & Young LLP, independent auditors, as set forth in their report thereon included therein and incorporated herein by reference. Such consolidated financial statements are incorporated herein by reference in reliance upon such report given upon the authority of such firm as experts in accounting and auditing.

17

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRE-
SENTATIONS OTHER THAN THOSE CONTAINED IN THIS PROSPECTUS SUPPLEMENT OR THE
PROSPECTUS, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST
NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED. THIS PROSPECTUS SUPPLEMENT AND
THE PROSPECTUS DO NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN
OFFER TO BUY ANY SECURITIES OTHER THAN THE SECURITIES DESCRIBED IN THIS PRO-
SPECTUS SUPPLEMENT OR AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY
SUCH SECURITIES IN ANY CIRCUMSTANCES IN WHICH SUCH OFFER OR SOLICITATION IS
UNLAWFUL. NEITHER THE DELIVERY OF THIS PROSPECTUS SUPPLEMENT OR THE PROSPECTUS
NOR ANY SALE MADE HEREUNDER OR THEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CRE-
ATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COM-
PANY SINCE THE DATE HEREOF OR THAT THE INFORMATION CONTAINED HEREIN OR THEREIN
IS CORRECT AS OF ANY TIME SUBSEQUENT TO ITS DATE.

------------

## TABLE OF CONTENTS

|  | PAGE |
|---|---|
| **PROSPECTUS SUPPLEMENT** | |
| Use of Proceeds | S- 2 |
| Recent Developments | S- 2 |
| Ratio of Earnings to Fixed Charges, Ratio of Earnings to Fixed Charges and Preferred Stock Dividends, Pro Forma Ratio of Earnings to Fixed Charges and Pro Forma Ratio of Earnings to Fixed Charges and Preferred Dividends. | S- 3 |
| Capitalization and Pro Forma Capitalization | S- 4 |
| Description of the 1997 Debentures | S- 5 |
| Underwriting | S-12 |
| Certain Legal Matters | S-13 |
| **PROSPECTUS** | |
| Available Information | 2 |
| Incorporation of Certain Documents by Reference | 3 |
| The Company | 4 |
| Use of Proceeds | 4 |
| Ratio of Earnings to Fixed Charges and Ratio of Earnings to Fixed Charges and Preferred Stock Dividends | 4 |
| Description of Offered Debt Securities | 5 |
| Description of Capital Stock | 10 |
| Description of Warrants | 14 |
| Description of Stock Purchase Contracts and Stock Purchase Units | 15 |
| Plan of Distribution | 16 |
| Certain Legal Matters | 16 |
| Experts | 17 |

$250,000,000
[LOGO OF TIMES MIRROR COMPANY]

THE TIMES MIRROR
COMPANY

6.61% DEBENTURES DUE
SEPTEMBER 15, 2027

------------

PROSPECTUS SUPPLEMENT

------------

GOLDMAN, SACHS & CO.

CITICORP SECURITIES, INC.

MERRILL LYNCH & CO.

MORGAN STANLEY DEAN WITTER

```
</TEXT>
</DOCUMENT>
```

Created by 10KWizard    www.10KWizard.com