# TRIBUNE

## BOARD OF DIRECTORS MEETING
## February 13, 2007

**Master Copy**

**Confidential**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413501

Crane H. Kenney
Senior Vice President/General Counsel
& Secretary
312/222-2491

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611
fax: 312/222-4206
e-mail: ckenney@tribune.com

# TRIBUNE

February 6, 2007

| | |
|---|---|
| Jeffrey Chandler | William A. Osborn |
| Dennis J. FitzSimons | J. Christopher Reyes |
| Roger Goodan | William Stinehart, Jr. |
| Enrique Hernandez, Jr. | Dudley S. Taft |
| Betsy D. Holden | Miles D. White |
| Robert S. Morrison | |

Set forth below is the tentative schedule for upcoming Special Committee, Board and Committee meetings on Monday and Tuesday, February 12 and 13, 2007.  Given the fluid nature of these meetings, the starting times for the meetings may be adjusted as we progress.

| | | | |
|---|---|---|---|
| Mon., Feb. 12 | Special Committee Meeting | Patterson Room | 3:00 p.m. |
| Mon., Feb. 12 | Board of Directors Dinner Meeting | McCormick Room | 6:00 p.m. |
| Tues., Feb. 13 | Special Committee | Patterson Room | 7:30 a.m. |
| Tues., Feb. 13 | Audit Committee | McCormick Room | 9:30 a.m. |
| Tues., Feb. 13 | Comp. & Org. Committee | Lakeview Room | 9:30 a.m. |
| Tues., Feb. 13 | Nom. & Gov. Committee | Illinois Room | 10:30 a.m. |
| Tues., Feb. 13 | Board of Directors Meeting | Patterson Room | 11:15 a.m. |

The Board of Directors dinner meeting will be held at 6:00 p.m. at Tribune Tower.  An informal lunch will be available in the McCormick Room on the 24th floor of Tribune Tower following the Board meeting and transportation to the airport will be available following the meetings.

A meeting agenda and other materials relating to the meetings will be sent to you arriving no later than February 7, 2007.  Please confirm your attendance at the dinner, meetings and lunch using the enclosed reply form by mail or facsimile.

Please contact me prior to the meeting if you have any questions.  I look forward to seeing you later this month.

Sincerely,

CHK/sf

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413502

Dennis J. FitzSimons
Chairman, President and
Chief Executive Officer
312/222-3373

# TRIBUNE

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611
fax: 312/222-3203
e-mail: dfitzsimons@tribune.com

*Via Federal Express*

February 6, 2007

| | |
|---|---|
| Jeffrey Chandler | William A. Osborn |
| Roger Goodan | J. Christopher Reyes |
| Enrique Hernandez, Jr. | William Stinehart, Jr. |
| Betsy D. Holden | Dudley S. Taft |
| Robert S. Morrison | Miles D. White |

Enclosed is the Board book for our February meeting.

Additionally, here is a brief overview of general business conditions and recent company developments.

Publishing and Interactive

Current business conditions – January advertising revenues were down 7% from last year as soft national trends and print classified advertising declines continued, especially in real estate and automotive. Retail spending in January was also soft, down 4% from last year. On a positive note, there has been a turnaround in the movie category, led by improved performance in Los Angeles following initiatives to boost sales talent and product offerings. Movies were up 19% in January, making it the third month in a row of growth over the previous year. Interactive revenues also performed well, up 24% for the month. We expect advertising trends to improve in February and March, especially in retail.

Abitibi/Bowater merger – On January 29, Abitibi-Consolidated Inc. and Bowater Inc. announced an agreement to merge in the third quarter of 2007. The new company, AbitibiBowater, would control more than 50% of North America's newsprint manufacturing capacity, and consequently, legal challenges are expected in both Canada and the U.S. Abitibi is one of Tribune's low cost suppliers and contractually provides 400,000 metric tons of newsprint annually, which represents approximately 55% of Tribune's total newsprint consumption. Tribune's newsprint supply contract with Abitibi was recently amended to extend through 2009. Tribune does not currently buy any newsprint from Bowater.

No significant change to Tribune's 2007 newsprint pricing is expected due to the current supply surplus, favorable exchange rates and anticipated legal challenges to the proposed merger.

Offshore outsourcing – During the fourth quarter, we completed outsourcing the customer service call centers for our top eight newspapers to a third-party vendor (APAC) in Manila, Philippines. As a result of the project, we have eliminated 236 positions and will eliminate another 14 once the last two business units transition in the first quarter. While still learning,

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Page 2

our vendor is improving steadily and we expect customer service results to be better than our company-operated call centers by the end of the second quarter.

During January, we signed an agreement to outsource our IT help desk operations, comprising 43 FTEs, to IBM Daksh in India. An announcement was made to the impacted employees and the transition will be completed in the second quarter.

Interactive – Tribune Interactive's fourth quarter revenues increased 31% over the same period last year and 29% for the full year. Non-classified revenue was up 49% in the fourth quarter and 44% for the full year. Classified revenue was up 26% in the fourth quarter and for the full year. Tribune Interactive's websites, including 15 news sites, 23 television sites and 8 entertainment and shopping resource sites, drew over 13.9 million average monthly unique visitors during the fourth quarter.

CareerBuilder – Fourth quarter market revenues grew by 29% over the same period last year and 36% for the full year. CareerBuilder continues to be the leading online recruitment site in North America with the most job seeker traffic and revenue. CareerBuilder drew almost 18.4 million average monthly unique visitors in the fourth quarter compared to Monster's nearly 10.1 million and HotJobs' 15.4 million.

*Los Angeles Times* union activity – At the beginning of January, pressroom employees at the *Times* voted in favor of representation by the Graphic Communication Conference of the International Brotherhood of Teamsters by a vote of 140 to 131. Union organizers made the most of the uncertainty surrounding our strategic alternatives review. The union's narrow victory followed five previous unsuccessful organizing attempts over the last two decades. We are challenging the outcome of the vote before the National Labor Relations Board. Additionally, the Newspaper Guild is working to organize newsroom employees. Ownership uncertainty and job insecurity are fueling this drive. We are responding aggressively to head off a formal union petition.

Broadcasting/Entertainment

Current business conditions – January's ad revenue finished down 3% for the group while February is stronger, pacing up 2%. Five of our top ten ad categories are pacing ahead of last year, led by entertainment and telecom. Automotive, particularly domestic, continues to be weak. We project the first quarter will finish flat to down 1%.

The CW Network – The performance of The CW Network's prime time programming continues to be good for our station group, particularly in New York, Chicago and Dallas. Advertiser response remains positive and CW prime time rates are up in the mid-single digits for the group. CBS and Warner Bros. continue to be enthusiastic about current program development for fall 2007.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Page 3

I look forward to seeing you at our dinner on Monday, February 12.  If you have questions prior to the meeting, please feel free to call me.

Sincerely,

Dennis FitzSimons

Enclosure

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413505

TRB0413506

# TRIBUNE COMPANY
## HIGHLIGHTS OF OPERATIONS
### Report to the Board of Directors
### Fourth Quarter, 2006

CONFIDENTIAL

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# TRIBUNE COMPANY
## HIGHLIGHTS OF OPERATIONS
### Report to the Board of Directors
### Fourth Quarter, 2006

## EXECUTIVE SUMMARY

Results of Operations Excluding Special Items,
Non-Operating Items and Discontinued Operations
Fourth Quarter 2006 Highlights .......... 1
Consolidated Income Statements .......... 2
Consolidated Summary of Operating Cash Flow .......... 3
Consolidated Summary of Equity Income/(Loss) .......... 4

## PUBLISHING

Fourth Quarter 2006 Highlights .......... 5
Summary of Operating Revenues .......... 6
Summary of Operating Profit .......... 7
Summary of Advertising Revenues and Volume .......... 8
Summary of Circulation Revenue and Daily Circulation .......... 10
Summary of Sunday Circulation .......... 11
Selected Operating Statistics .......... 12

## BROADCASTING & ENTERTAINMENT

Fourth Quarter 2006 Highlights .......... 13
Summary of Operations .......... 14
Television Group Summaries
Summary of Operating Revenues .......... 15
Summary of Operating Profit .......... 16
Radio and Entertainment/Other
Summary of Operating Profit .......... 17

## OTHER INFORMATION

Capital Expenditures
Overview .......... 18
Summary of Active Projects Over $10 Million .......... 19
Selected Balance Sheet Data .......... 20
Consolidated Income Statements Including Special Items,
Non-Operating Items and Discontinued Operations .......... 21

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413507

TRB0413508

# EXECUTIVE SUMMARY

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

## TRIBUNE COMPANY
## FOURTH QUARTER 2006 HIGHLIGHTS
### Excluding Special Items, Non-Operating Items and Discontinued Operations (1)

**Fourth Quarter Diluted EPS**



| | 2005 | 2006 |
|---|---|---|
| | $.56 | $.68 |

> Fourth quarter includes 14 weeks in 2006 and 13 weeks in 2005. Year to date includes 53 weeks in 2006 and 52 weeks in 2005.

| COMPARISONS TO 2005 | Fourth Qtr. 2006 | Change from 2005 $ | Change from 2005 % |
|---|---|---|---|
| **Diluted EPS:** | $.68 | $.12 | 21% |
| ◆ Higher due to 53rd week in 2006, which increased EPS by approximately $.05, higher equity income and lower average shares outstanding as a result of share repurchases. | | | |
| **Operating Profit:** | | | |
| **Publishing** | $239 M | $14 M | 6% |
| ◆ Higher operating profit due to the 53rd week. Without the extra week, operating profit declined $4 million, mainly due to a decline in revenues (advertising -$22M, circulation -$9M and other +$2M), partially offset by lower compensation and newsprint expenses. | | | |
| **Broadcasting & Entertainment** | $107 | $7 | 7% |
| ◆ Higher mainly due to the 53rd week. Excluding the extra week, operating profit increased $2M (2%). | | | |
| **Corporate Expenses** | -$14 | -$2 | -17% |
| **Stock-Based Compensation** | -$5 | -$5 | NM |
| ◆ Adopted FAS 123R in 2006. | | | |
| **Total Operating Profit** | $327 M | $14 M | 4% |
| **Equity Income** | $29 M | +$9 M | +42% |
| ◆ Increased equity income was primarily due to improved results at TV Food Network ($6M), CareerBuilder ($3M) and Classified Ventures ($2M), partially offset by lower TMCT income ($2M). | | | |
| **Net Interest Expense** | $89 M | +$45 M | +97% |
| ◆ Increase was primarily due to additional debt to finance the share repurchases as well as higher interest rates. | | | |

(1) See page 21 for a consolidated income statement including special items, non-operating items and discontinued operations.

1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413509

## TRIBUNE COMPANY
## CONSOLIDATED INCOME STATEMENTS
### Excluding Special Items, Non-Operating Items and Discontinued Operations (A)
#### (In Millions, Except Per Share Amounts)

| | FOURTH QUARTER | | | | | FULL YEAR | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2006 Actual | 2006 Plan | 2005 Actual | % Variance From Plan | % Variance From 2005 | 2006 Actual | 2006 Plan | 2005 Actual | % Variance From Plan | % Variance From 2005 |
| **Operating revenues** | | | | | | | | | | |
| Publishing | $ 1,111.3 | $ 1,156.8 | $ 1,072.4 | (4) % | 4 % | $ 4,092.6 | $ 4,183.5 | $ 4,096.9 | (2) % | - % |
| Broadcasting & entertainment | 355.6 | 334.6 | 319.6 | 6 | 11 | 1,425.1 | 1,397.5 | 1,414.4 | 2 | 1 |
| Total | $ 1,466.9 | $ 1,491.3 | $ 1,392.0 | (2) | 5 | $ 5,517.7 | $ 5,581.1 | $ 5,511.3 | (1) | - |
| **Operating expenses** | | | | | | | | | | |
| Publishing | $ 872.2 | $ 877.4 | $ 846.9 | (1) | 3 | $ 3,302.4 | $ 3,325.2 | $ 3,285.4 | (1) | 1 |
| Broadcasting & entertainment | 248.9 | 243.1 | 220.0 | 2 | 13 | 1,028.4 | 1,041.8 | 997.3 | (1) | 3 |
| Corporate expenses | 14.1 | 15.1 | 12.0 | (7) | 17 | 52.1 | 56.8 | 52.0 | (8) | - |
| Total excluding stock-based compensation | 1,135.1 | 1,135.7 | 1,078.9 | - | 5 | 4,382.8 | 4,423.8 | 4,334.7 | (1) | 1 |
| Stock-based compensation | 4.8 | 4.9 | - | (2) | NM | 31.6 | 31.9 | - | (1) | NM |
| Total | $ 1,139.9 | $ 1,140.5 | $ 1,078.9 | - | 6 | $ 4,414.4 | $ 4,455.7 | $ 4,334.7 | (1) | 2 |
| **Operating profit** | | | | | | | | | | |
| Publishing | $ 239.0 | $ 279.3 | $ 225.5 | (14) | 6 | $ 790.2 | $ 858.3 | $ 811.4 | (8) | (3) |
| Broadcasting & entertainment | 106.8 | 91.4 | 99.6 | 17 | 7 | 396.8 | 355.8 | 417.2 | 12 | (5) |
| Corporate expenses | (14.1) | (15.1) | (12.0) | 7 | (17) | (52.1) | (56.8) | (52.0) | 8 | - |
| Total excluding stock-based compensation | 331.7 | 355.7 | 313.1 | (7) | 6 | 1,134.9 | 1,157.2 | 1,176.6 | (2) | (4) |
| Stock-based compensation | 4.8 | 4.9 | - | (2) | NM | 31.6 | 31.9 | - | (1) | NM |
| Total | 327.0 | 350.8 | 313.1 | (7) | 4 | 1,103.3 | 1,125.3 | 1,176.6 | (2) | (6) |
| Equity income | 29.5 | 13.4 | 20.8 | 120 | 42 | 74.9 | 36.9 | 41.2 | 103 | 82 |
| Interest and dividend income | 4.8 | 2.3 | 2.4 | 110 | 100 | 14.1 | 8.3 | 7.5 | 70 | 88 |
| Interest expense | (93.5) | (51.9) | (46.1) | (80) | (103) | (273.9) | (199.0) | (155.2) | (38) | (76) |
| Income before income taxes | 267.7 | 314.6 | 290.1 | (15) | (8) | 918.4 | 971.6 | 1,070.1 | (5) | (14) |
| Income taxes | (103.9) | (123.7) | (116.2) | 16 | 11 | (361.7) | (382.1) | (421.0) | 5 | 14 |
| Net Income | $ 163.8 | $ 190.9 | $ 173.9 | (14) | (6) | $ 556.8 | $ 589.5 | $ 649.1 | (6) | (14) |
| Diluted earnings per share | $ 0.68 | $ 0.62 | $ 0.56 | 10 | 21 | $ 2.01 | $ 1.90 | $ 2.03 | 6 | (1) |
| Weighted average diluted shares outstanding (B) | 241.4 | 303.8 | 309.3 | (21) | (22) | 274.4 | 305.7 | 315.3 | (10) | (13) |

(A) The sale of WATL-TV in Atlanta was completed in August 2006. The sales of WLVI-TV in Boston and WCWN-TV in Albany were completed in December 2006.
    Operating results for these stations are excluded herein and reported as discontinued operations.
    See page 21 for a consolidated income statement including special items, non-operating items and discontinued operations.
(B) Diluted average shares outstanding declined versus 2005 due to the purchase in July 2006 of approximately 66 million shares resulting from the Company's stock buyback program.

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413510

## TRIBUNE COMPANY
## CONSOLIDATED SUMMARY OF OPERATING CASH FLOW
### Excluding Special Items, Non-Operating Items and Discontinued Operations (A)
#### (In Millions)

| | FOURTH QUARTER | | | | | FULL YEAR | | | | |
| | 2006 Actual | 2006 Plan | 2005 Actual | % Variance From Plan | 2005 | 2006 Actual | 2006 Plan | 2005 Actual | % Variance From Plan | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Operating cash flow** | | | | | | | | | | |
| Publishing | $ 284.7 | $ 327.9 | $ 268.2 | (13)% | 6 % | $ 984.4 | $ 1,041.2 | $ 986.2 | (7)% | (2)% |
| Broadcasting & entertainment | 120.2 | 105.3 | 111.9 | 14 | 7 | 448.2 | 408.3 | 465.7 | 10 | (4) |
| Corporate expenses | (13.7) | (14.7) | (11.6) | 7 | (18) | (50.7) | (55.2) | (50.4) | 8 | (1) |
| Total excluding stock-based compensation | 391.2 | 418.5 | 368.4 | (7) | 6 | 1,381.9 | 1,394.2 | 1,401.5 | (2) | (3) |
| Stock-based compensation | 4.8 | 4.9 | - | (2) | NM | 31.6 | 31.9 | - | (1) | NM |
| Total | $ 386.5 | $ 413.6 | $ 368.4 | (7) | 5 | $ 1,330.3 | $ 1,362.3 | $ 1,401.5 | (2) | (5) |

(A) The sale of WATL–TV in Atlanta was completed in August 2006. The sales of WLVI–TV in Boston and WCWN-TV in Albany were completed in December 2006. Operating results for these stations are excluded herein and reported as discontinued operations.

### FOURTH QUARTER COMPARISONS TO 2005

- Fourth quarter operating cash flow was up 5% at $386M compared to $368M in 2005. 2006 included a 53rd week, which increased fourth quarter operating cash flow by an estimated $23M ($18M at publishing and $5M at broadcasting and entertainment). Also, stock-based compensation expense of $5M was incurred in 2006. Excluding the effect of the 53rd week and stock-based compensation expense, consolidated operating cash flow was flat.

- On a consolidated basis, fourth quarter operating cash flow margin was 26.3%, down from 26.5% in 2005.



**Fourth Quarter Operating Cash Flow**

| | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| | $446 | $442 | $368 | $386 |
| Operating Cash Flow Margin | 31.0% | 30.3% | 26.5% | 26.3% |

3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413511

**TRIBUNE COMPANY**
**CONSOLIDATED SUMMARY OF EQUITY INCOME/(LOSS) (A)**
**(In Millions)**

| | FOURTH QUARTER | | | | | FULL YEAR | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2006 Actual | 2006 Plan | 2005 Actual | % Variance From Plan | % Variance From 2005 | 2006 Actual | 2006 Plan | 2005 Actual | % Variance From Plan | % Variance From 2005 |
| **Equity Income/(Loss)** | | | | | | | | | | |
| Publishing | | | | | | | | | | |
| BrassRing, Inc. (27%) (B) | $ (0.3) | $ (0.9) | $ (0.6) | 70 % | 53 % | $ (1.0) | $ (1.6) | $ (1.6) | 35 % | 35 % |
| CareerBuilder (42.5%) (C) | 1.9 | 0.2 | (0.6) | NM | NM | (8.1) | (12.0) | (14.7) | 33 | 45 |
| Classified Ventures (28%) | 1.6 | (0.2) | (0.6) | NM | NM | 1.9 | (1.6) | (1.5) | NM | NM |
| ShopLocal (42.5%) | (3.1) | (2.4) | (1.7) | (28) | (80) | (8.6) | (9.7) | (5.0) | 11 | (73) |
| Other | 0.1 | (4.0) | - | NM | NM | 0.9 | (11.7) | 0.3 | NM | NM |
| Sub-total | 0.2 | (7.3) | (3.6) | 103 | 106 | (14.9) | (36.6) | (22.4) | 59 | 34 |
| | | | | | | | | | | |
| Broadcasting & Entertainment | | | | | | | | | | |
| TV Food Network (31%) | 24.6 | 16.3 | 18.7 | 50 | 31 | 72.1 | 58.0 | 54.5 | 24 | 32 |
| Comcast SportsNet Chicago (25%) | 3.9 | 2.6 | 4.0 | 51 | (1) | 10.5 | 8.9 | 10.1 | 18 | 3 |
| The WB Network (22%) (D) | - | - | - | NM | NM | - | - | (7.1) | NM | NM |
| Other | 0.7 | 0.3 | 0.1 | NM | NM | 2.0 | 1.0 | (0.2) | 99 | NM |
| Sub-total | 29.2 | 19.2 | 22.8 | 52 | 28 | 84.6 | 67.9 | 57.3 | 25 | 48 |
| | | | | | | | | | | |
| Corporate | 0.1 | 1.5 | 1.6 | (96) | (96) | 5.2 | 5.6 | 6.3 | (7) | (17) |
| | | | | | | | | | | |
| **Total Equity Income** | $ 29.5 | $ 13.4 | $ 20.8 | 120 | 42 | $ 74.9 | $ 36.9 | $ 41.2 | 103 | 82 |

(A) The Company uses the equity method to account for its investments in 20-50% owned companies and for certain partnership interests.
    Under the equity method, Tribune records its share of each company's net income or loss.
(B) Tribune's investment in BrassRing was sold in November 2006.
(C) Year to date 2006 excludes Tribune's share ($5.9 million) of a one-time favorable income tax adjustment.
(D) The WB Network ceased operations in September 2006.

4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413512

PUBLISHING

TRB0413513

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413514

# PUBLISHING
## FOURTH QUARTER 2006 HIGHLIGHTS
### Excluding Stock-Based Compensation, Special Items and Non-Operating Items

## COMPARISONS TO 2005

**Revenues:**

- Advertising revenues increased $33M (4%) compared to last year. Excluding the additional week, advertising revenues declined $22M (3%).

- Circulation revenues increased $1M (1%). Excluding the extra week, circulation revenues were down $9M (6%), due to volume declines mostly in single copy and selective price discounting in order to stabilize individually paid copies.

**Expenses:**

- Newsprint and ink expenses increased $3M (2%). Excluding the extra week, newsprint and ink expense fell $6M (4%) compared to the prior year as a result of a 9% decline in consumption, partially offset by a 6% increase in price on a same-weight basis. Tribune newspapers have transitioned to a lighter weight newsprint, which, on a per ton basis, costs more, but yields more pages.

- Compensation expense was up $9M (3%). Without the 53rd week, compensation expense was down $15M (4%), primarily due to a 6% reduction in staffing (1,000 full-time equivalent positions).

- Other cash expenses grew $10M (3%). Excluding the 53rd week, other cash expenses were down $7M (2%).

**Operating Cash Flow:**

- Operating cash flow increased $17M (6%). Excluding the 53rd week, operating cash flow declined $1M.

- Operating cash flow margin was 25.6%, compared to 25.0% in 2005.





Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

## PUBLISHING
## SUMMARY OF OPERATING REVENUES
### (Dollars in Millions)

| | FOURTH QUARTER | | | FULL YEAR | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2006 Actual | 2005 Actual | % Change | 2006 Actual | 2005 Actual | % Change |
| **Operating revenues** | | | | | | |
| Los Angeles | $ 312.6 | $ 295.9 | 6 % | $1,116.9 | $1,111.1 | 1 % |
| Chicago | 241.2 | 233.0 | 4 | 862.7 | 873.7 | (1) |
| Newsday | 145.8 | 143.5 | 2 | 541.1 | 574.9 | (6) |
| South Florida | 102.0 | 101.2 | 1 | 403.5 | 392.6 | 3 |
| Orlando | 75.3 | 74.1 | 2 | 296.9 | 280.7 | 6 |
| Baltimore | 79.7 | 78.2 | 2 | 299.3 | 299.5 | - |
| Hartford | 55.5 | 54.5 | 2 | 206.1 | 206.7 | - |
| Allentown | 29.8 | 27.6 | 8 | 107.5 | 108.3 | (1) |
| Newport News | 21.8 | 20.1 | 8 | 80.4 | 77.3 | 4 |
| So. Connecticut Newspapers | 10.3 | 10.6 | (2) | 38.3 | 39.3 | (2) |
| Spanish Language Newspapers | 8.2 | 7.7 | 6 | 29.6 | 34.2 | (14) |
| Tribune Media Services | 27.9 | 26.9 | 4 | 107.8 | 104.9 | 3 |
| Other | 1.1 | (1.0) | NM | 2.5 | (6.1) | NM |
| Total | $ 1,111.3 | $ 1,072.4 | 4 | $4,092.6 | $4,096.9 | - |

## FOURTH QUARTER COMPARISONS TO 2005

**Overall:** Operating revenues increased $39M (4%). Excluding the 53rd week, revenues decreased $29M (3%).

**Los Angeles:** Advertising revenues increased $16M (6%). Retail was up $6M (7%) due to increased preprint revenue from the new ADVO agreement. National increased $8M (10%) due to better movies and transportation. Classified increased $1M (1%), primarily due to higher real estate, partially offset by lower recruitment. Circulation revenue was up slightly due to the extra week.

**Chicago:** Advertising revenues increased $6M (3%). Retail grew $7M (7%). National declined $2M (3%), mainly due to lower auto, financial and telecom/wireless. Classified increased $1M (2%), primarily due to automotive, partially offset by weakness in real estate and recruitment. Circulation revenue was up 1% due to the extra week.

**Newsday:** Advertising revenues increased $2M (1%). Retail was flat. National increased $1M (7%). Classified grew 1% with increased help wanted offset by lower automotive and real estate. Circulation revenue was $1M (3%) higher due to the extra week.

**South Florida:** Advertising revenues were flat. Retail was up $4M (13%) mainly due to higher furniture/home furnishings and general merchandise stores. National declined $3M (15%) primarily due to weakness in financial and auto. Classified was down $2M (5%), due to declines in all categories. Circulation revenue was up 3% due to the extra week.



### Fourth Quarter 2006 Revenues

National 20%
Classified 24%
Circulation 13%
Other 6%
Retail 37%

6

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413515

## PUBLISHING
### SUMMARY OF OPERATING PROFIT
#### Excluding Stock-Based Compensation, Special Items and Non-Operating Items
#### (Dollars in Millions)

| | FOURTH QUARTER | | | FULL YEAR | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2006 Actual | 2005 Actual | % Change | 2006 Actual | 2005 Actual | % Change |
| **Operating profit** | | | | | | |
| Los Angeles | $ 74.2 | $ 61.0 | 22 % | $ 203.3 | $ 189.9 | 7 % |
| Chicago | 61.7 | 63.1 | (2) | 191.0 | 216.1 | (12) |
| Newsday | 25.7 | 22.1 | 16 | 77.0 | 100.0 | (23) |
| South Florida | 28.2 | 29.0 | (3) | 123.8 | 121.0 | 2 |
| Orlando | 18.4 | 20.2 | (9) | 80.4 | 73.3 | 10 |
| Baltimore | 13.6 | 15.2 | (11) | 47.9 | 48.9 | (2) |
| Hartford | 12.2 | 11.8 | 3 | 41.4 | 40.5 | 2 |
| Allentown | 7.3 | 6.1 | 19 | 22.6 | 23.4 | (4) |
| Newport News | 4.7 | 3.9 | 22 | 16.7 | 14.8 | 13 |
| So. Connecticut Newspapers | 1.8 | 1.9 | (4) | 5.0 | 5.9 | (14) |
| Spanish Language Newspapers | (1.6) | (2.5) | 36 | (8.8) | (10.5) | 17 |
| Tribune Media Services | 5.3 | 5.4 | (1) | 20.4 | 20.6 | (1) |
| Other | (12.4) | (11.5) | 8 | (30.5) | (32.4) | (6) |
| | | | Absolute Change | | | Absolute Change |
| Total | $ 239.0 | $ 225.5 | 6 | $ 790.2 | $ 811.4 | (3) |
| **Operating cash flow margin** | | | | | | |
| Los Angeles | 27.8 % | 24.6 % | 3.2 pts. | 22.5 % | 21.8 % | 0.7 pts. |
| Chicago | 29.0 | 30.3 | (1.3) | 25.7 | 28.0 | (2.3) |
| Newsday | 21.6 | 19.0 | 2.6 | 18.7 | 20.8 | (2.1) |
| South Florida | 31.4 | 31.4 | - | 33.8 | 33.8 | - |
| Orlando | 28.6 | 31.2 | (2.6) | 31.0 | 30.3 | 0.7 |
| Baltimore | 22.3 | 24.3 | (2.0) | 21.3 | 21.6 | (0.3) |
| Hartford | 25.3 | 25.1 | 0.2 | 23.5 | 23.4 | 0.1 |
| Allentown | 29.7 | 27.7 | 2.0 | 26.7 | 27.7 | (1.0) |
| Newport News | 26.6 | 24.6 | 2.0 | 26.0 | 25.1 | 0.9 |
| So. Connecticut Newspapers | 21.0 | 21.4 | (0.4) | 17.2 | 19.0 | (1.8) |
| Spanish Language Newspapers | (14.4) | (27.1) | 12.7 | (24.6) | (26.7) | 2.1 |
| Tribune Media Services | 20.5 | 22.4 | (1.9) | 20.9 | 21.9 | (1.0) |
| Total | 25.6 | 25.0 | 0.6 | 23.6 | 24.1 | (0.5) |

**FOURTH QUARTER COMPARISONS TO 2005**

**Overall:** Operating profit increased $14M (6%). Excluding the 53rd week, operating profit declined $4M (2%).

**Los Angeles:** Operating profit grew $13M (22%) due to higher revenues ($17M), partially offset by $3M of higher expenses primarily due to increased preprint postage.

**Chicago:** Operating profit fell $1M (2%) as $8M of higher revenue was offset by $9M of higher cash expenses primarily from volume-related expenses.

**Newsday:** Operating profit grew $4M (16%) due to $2M of higher revenue and $2M of lower cash expenses primarily related to staffing reductions during 2006.

**South Florida:** Operating profit was down $1M (3%) primarily due to increased depreciation expense related to the Sun-Sentinel color press project.

7

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413516

TRB0413517

**PUBLISHING**
**SUMMARY OF ADVERTISING REVENUES AND VOLUME**
**(Dollars in Millions)**

| | FOURTH QUARTER | | | FULL YEAR | | |
|---|---|---|---|---|---|---|
| | 2006 Actual | 2005 Actual | % Change | 2006 Actual | 2005 Actual | % Change |
| **Advertising Revenues** | | | | | | |
| **Retail** | | | | | | |
| Los Angeles | $ 102.2 | $ 95.8 | 7 % | $ 333.9 | $ 321.7 | 4 % |
| Chicago | 96.9 | 90.3 | 7 | 317.1 | 305.3 | 4 |
| Newsday | 60.0 | 60.0 | - | 206.3 | 227.4 | (9) |
| South Florida | 38.5 | 34.1 | 13 | 132.8 | 124.3 | 7 |
| Orlando | 26.9 | 24.6 | 9 | 87.2 | 84.3 | 3 |
| Baltimore | 31.4 | 29.2 | 7 | 104.1 | 102.5 | 2 |
| Hartford | 21.9 | 21.2 | 3 | 72.3 | 72.5 | - |
| Other | 27.9 | 25.2 | 11 | 90.3 | 85.7 | 5 |
| Total | $ 405.7 | $ 380.5 | 7 | $ 1,344.1 | $ 1,323.5 | 2 |
| | | | | | | |
| **National** | | | | | | |
| Los Angeles | $ 91.7 | $ 83.2 | 10 | $ 288.9 | $ 308.3 | (6) |
| Chicago | 50.2 | 51.7 | (3) | 169.2 | 186.1 | (9) |
| Newsday | 23.0 | 21.6 | 7 | 80.5 | 80.1 | - |
| South Florida | 15.4 | 18.2 | (15) | 59.3 | 65.8 | (10) |
| Orlando | 11.7 | 11.1 | 5 | 42.4 | 40.9 | 4 |
| Baltimore | 11.1 | 10.4 | 7 | 40.5 | 37.9 | 7 |
| Hartford | 7.7 | 7.6 | 1 | 27.9 | 27.1 | 3 |
| Other | 7.7 | 7.6 | 2 | 28.1 | 27.9 | 1 |
| Total | $ 218.5 | $ 211.4 | 3 | $ 736.8 | $ 774.1 | (5) |

**FOURTH QUARTER COMPARISONS TO 2005**

♦ Retail revenues grew $25M (7%) due to increases in most categories. Excluding the 53rd week, retail revenues increased $2M (1%).

♦ Preprint revenues, which are primarily included in retail, improved $15M (7%) led by gains in Los Angeles related to the new ADVO preprint distribution agreement. Excluding the extra week, preprint revenues increased $1M (1%).

♦ National revenues increased $7M (3%). Excluding the 53rd week, national revenues declined $11M (5%), mainly due to weakness in auto, resorts and telecom/wireless.

**Preprint Revenues**

| | Fourth Quarter | | |
|---|---|---|---|
| | 2006 | 2005 | % Change |
| Los Angeles | $ 53.5 | $ 47.2 | 13 % |
| Chicago | 59.9 | 55.8 | 7 |
| New York | 25.2 | 26.0 | (3) |
| Total Group | $ 210.5 | $ 196.0 | 7 |

8

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413518

**PUBLISHING**
**SUMMARY OF ADVERTISING REVENUES AND VOLUME**
(Dollars in Millions)

| | FOURTH QUARTER | | | FULL YEAR | | |
|---|---|---|---|---|---|---|
| | 2006 Actual | 2005 Actual | % Change | 2006 Actual | 2005 Actual | % Change |
| **Classified** | | | | | | |
| Los Angeles | $ 68.5 | $ 67.7 | 1 % | $ 298.5 | $ 283.7 | 5 % |
| Chicago | 47.9 | 47.2 | 2 | 203.3 | 205.1 | (1) |
| Newsday | 38.1 | 37.8 | 1 | 160.0 | 168.8 | (5) |
| South Florida | 32.1 | 33.8 | (5) | 151.5 | 143.3 | 6 |
| Orlando | 24.1 | 25.9 | (7) | 118.8 | 105.0 | 13 |
| Baltimore | 21.1 | 22.8 | (7) | 94.3 | 97.3 | (3) |
| Hartford | 13.7 | 13.9 | (2) | 59.4 | 59.7 | - |
| Other | 23.6 | 19.4 | 22 | 93.3 | 83.5 | 12 |
| Total | $ 269.1 | $ 268.5 | - | $ 1,179.1 | $ 1,146.5 | 3 |
| **Total Advertising** | | | | | | |
| Los Angeles | $ 262.4 | $ 246.8 | 6 | $ 921.4 | $ 913.8 | 1 |
| Chicago | 195.0 | 189.2 | 3 | 689.6 | 696.5 | (1) |
| Newsday | 121.1 | 119.4 | 1 | 446.8 | 476.3 | (6) |
| South Florida | 86.0 | 86.0 | - | 343.6 | 333.4 | 3 |
| Orlando | 62.6 | 61.7 | 1 | 248.4 | 230.3 | 8 |
| Baltimore | 63.6 | 62.4 | 2 | 238.9 | 237.7 | 1 |
| Hartford | 43.3 | 42.7 | 1 | 159.6 | 159.2 | - |
| Other | 59.3 | 52.2 | 14 | 211.7 | 197.0 | 7 |
| Total | $ 893.3 | $ 860.4 | 4 | $ 3,260.1 | $ 3,244.1 | - |
| **Advertising Volume (000's)** | | | | | | |
| Inches | | | | | | |
| Full Run | 5,200 | 5,211 | - | 19,730 | 19,777 | - |
| Part Run | 5,450 | 4,897 | 11 | 21,217 | 20,113 | 5 |
| Total | 10,650 | 10,108 | 5 | 40,947 | 39,890 | 3 |
| Preprint Pieces | 4,482,804 | 4,138,538 | 8 | 14,928,728 | 14,929,047 | - |



**Classified Advertising Revenues
Fourth Quarter 2006**

Real Estate 31%

Help Wanted 29%

Automotive 25%

Other 15%

**FOURTH QUARTER COMPARISONS TO 2005**

- Classified revenues were up $1M. Higher real estate ($4M) and other ($1M) were partially offset by lower recruitment ($4M). Excluding the extra week, classified revenues were down $12M (5%).

- Preprint pieces were up 8%. On a 13-week basis, fourth quarter preprint pieces increased 2%. Excluding Newsday and the extra week, preprint pieces grew 2%.

9

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413519

## PUBLISHING
## SUMMARY OF CIRCULATION REVENUE AND DAILY CIRCULATION
### (Dollars in Millions)

| | FOURTH QUARTER | | | FULL YEAR | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2006 Actual | 2005 Actual | % Change | 2006 Actual | 2005 Actual | % Change |
| **Circulation Revenue** | | | | | | |
| Los Angeles | $ 43.9 | $ 43.5 | 1 % | $ 170.0 | $ 173.4 | (2) % |
| Chicago | 30.9 | 30.7 | 1 | 118.1 | 123.3 | (4) |
| Newsday | 22.0 | 21.4 | 3 | 84.3 | 85.8 | (2) |
| South Florida | 8.5 | 8.3 | 3 | 33.1 | 34.8 | (5) |
| Orlando | 9.2 | 9.5 | (3) | 36.2 | 39.2 | (8) |
| Baltimore | 12.3 | 12.7 | (3) | 47.6 | 50.9 | (7) |
| Hartford | 10.7 | 10.3 | 4 | 40.6 | 41.8 | (3) |
| Other (A) | 11.9 | 11.6 | 2 | 45.3 | 46.9 | (4) |
| Total | $ 149.5 | $ 148.1 | 1 | $ 575.0 | $ 596.2 | (4) |
| **Daily (Mon-Fri) Circulation** | | | | | | |
| **Individually Paid Copies (000's) (B)** | | | | | | |
| Los Angeles | 723 | 735 | (2) | 754 | 749 | 1 |
| Chicago | 548 | 559 | (2) | 549 | 551 | - |
| Newsday | 391 | 406 | (4) | 394 | 407 | (3) |
| South Florida | 210 | 212 | (1) | 216 | 215 | - |
| Orlando | 204 | 205 | (1) | 205 | 210 | (2) |
| Baltimore | 231 | 231 | - | 231 | 236 | (2) |
| Hartford | 174 | 180 | (4) | 175 | 180 | (3) |
| Other (A) | 218 | 223 | (2) | 219 | 222 | (1) |
| Total | 2,697 | 2,751 | (2) | 2,743 | 2,771 | (1) |
| **ABC Copies (000's) (C)** | | | | | | |
| Los Angeles | 762 | 843 | (10) | 793 | 860 | (8) |
| Chicago | 571 | 591 | (3) | 572 | 580 | (1) |
| Newsday | 403 | 435 | (7) | 410 | 431 | (5) |
| South Florida | 215 | 234 | (8) | 231 | 239 | (3) |
| Orlando | 220 | 224 | (2) | 221 | 229 | (4) |
| Baltimore | 235 | 236 | (1) | 236 | 242 | (3) |
| Hartford | 179 | 187 | (4) | 180 | 186 | (4) |
| Other (A) | 229 | 238 | (4) | 230 | 237 | (3) |
| Total | 2,813 | 2,989 | (6) | 2,872 | 3,004 | (4) |

**FOURTH QUARTER COMPARISONS TO 2005**

**Overall:** Circulation revenues increased $1M (1%). Excluding the 53rd week, revenues decreased $9M (6%) due to volume declines and continued selective discounting to stabilize individually paid circulation.

**Los Angeles:** Circulation revenue increased 1%. Without the extra week, circulation revenue was down $3M (6%), due to lower single copy volume and converting Recycler to a free publication.

**Chicago:** Circulation revenue increased 1%. On a 13-week basis, circulation revenue was down $2M (7%), due to continued selective home delivery discounting and lower single copy volume.

**Newsday:** Circulation revenue was up $1M (3%). Excluding the extra week, circulation revenue was $1M (4%) lower due to lower home delivery and single copy volumes.

**South Florida:** Circulation revenue improved 3%. Without the additional week, circulation revenues fell 4%, due to continued home delivery selective discounting and lower volume.

**Orlando:** Circulation revenue decreased 3%. Excluding the extra week, circulation decreased 10% as a new subscriber acquisition program with higher discount rates was initiated.

**Baltimore:** Circulation revenue decreased 3%. Excluding the extra week, circulation revenue declined 10% due to continued discounting and a one-time sales tax rebate in the fourth quarter of 2005.

(A) Other includes Allentown, Newport News and Southern Connecticut.
(B) Individually Paid includes home delivery and single copy circulation.
(C) ABC copies include home delivery, single copy and other paid categories, such as hotels and education copies.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# PUBLISHING
## SUMMARY OF SUNDAY CIRCULATION

| | FOURTH QUARTER | | | FULL YEAR | | |
|---|---|---|---|---|---|---|
| | 2006 Actual | 2005 Actual | % Change | 2006 Actual | 2005 Actual | % Change |
| **Sunday Circulation** | | | | | | |
| **Individually Paid Copies (000's) (A)** | | | | | | |
| Los Angeles | 1,160 | 1,207 | (4) % | 1,168 | 1,197 | (2) % |
| Chicago | 921 | 924 | - | 914 | 915 | - |
| Newsday | 466 | 484 | (4) | 469 | 489 | (4) |
| South Florida | 307 | 308 | - | 308 | 316 | (3) |
| Orlando | 320 | 330 | (3) | 320 | 333 | (4) |
| Baltimore | 375 | 392 | (4) | 377 | 397 | (5) |
| Hartford | 254 | 271 | (6) | 258 | 259 | - |
| Other (B) | 290 | 297 | (2) | 288 | 296 | (3) |
| Total | 4,093 | 4,213 | (3) | 4,103 | 4,202 | (2) |
| | | | | | | |
| **ABC Copies (000's) (C)** | | | | | | |
| Los Angeles | 1,173 | 1,245 | (6) % | 1,183 | 1,249 | (5) % |
| Chicago | 951 | 961 | (1) | 945 | 952 | (1) |
| Newsday | 470 | 489 | (4) | 474 | 494 | (4) |
| South Florida | 308 | 329 | (7) | 316 | 338 | (6) |
| Orlando | 328 | 337 | (2) | 327 | 342 | (4) |
| Baltimore | 380 | 404 | (6) | 385 | 421 | (8) |
| Hartford | 259 | 279 | (7) | 264 | 270 | (2) |
| Other (B) | 294 | 304 | (4) | 295 | 304 | (3) |
| Total | 4,163 | 4,348 | (4) | 4,189 | 4,368 | (4) |

(A) Individually Paid includes home delivery and single copy circulation.
(B) Other includes Newport News, Allentown and Southern Connecticut.
(C) ABC copies include home delivery, single copy and other paid categories, such as hotels and education copies.

## FOURTH QUARTER COMPARISONS TO 2005

♦ Total ABC circulation trends are lower than those for individually paid copies as the company continues to reduce "other paid" circulation.

11

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413520

TRB0413521

## PUBLISHING
## SELECTED OPERATING STATISTICS
### (Dollars in Millions, Except Per Ton Amounts)

| | FOURTH QUARTER | | | FULL YEAR | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2006 Actual | 2005 Actual | % Change | 2006 Actual | 2005 Actual | % Change |
| Operating expenses | | | | | | |
| Newsprint & ink expense | $ 133.7 | $ 130.8 | 2 % | $ 508.3 | $ 491.3 | 3 % |
| Compensation expense (A) | 349.8 | 340.6 | 3 | 1,344.1 | 1,367.0 | (2) |
| Other cash expenses | 343.0 | 332.8 | 3 | 1,275.7 | 1,252.3 | 2 |
| Depreciation and amortization | 45.7 | 42.7 | 7 | 174.3 | 174.8 | - |
| Total | $ 872.2 | $ 846.9 | 3 | $3,302.4 | $3,285.4 | 1 |
| Newsprint tons consumed (B) | 183,411 | 187,704 | (2) | 698,519 | 739,371 | (6) |
| Average newsprint cost per ton (B) | $ 637 | $ 601 | 6 | $ 631 | $ 576 | 10 |
| Full time equivalents | 17,837 | 18,895 | (6) | 17,789 | 18,834 | (6) |

(A) Excludes stock-based compensation.
(B) Represents newsprint with amounts adjusted to a same-weight (28 lb.) basis.

### FOURTH QUARTER COMPARISONS TO 2005

♦ Excluding the extra week and on a same-weight basis, newsprint expense fell $6M (4%) compared to 2005 as a result of a 9% decline in consumption, partially offset by a 6% increase in average prices.

♦ Compensation expense increased 3%. Excluding the impact of the 53rd week, compensation decreased $15M (4%), mainly due to a 6% decrease in full time equivalent employees.

♦ Full time equivalents declined by about 1,000 due to the impact of staff reductions in the fourth quarter of 2005, Newsday's renegotiated union contracts in the first quarter of 2006, and other staff reductions in 2006.



**Average Newsprint Cost Per Ton**

12

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# BROADCASTING & ENTERTAINMENT

TRB0413522

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413523

**BROADCASTING AND ENTERTAINMENT**
**FOURTH QUARTER 2006 HIGHLIGHTS**
**Excluding Stock-Based Compensation, Special Items and Discontinued Operations**

## COMPARISONS TO 2005

**Revenues:**

◆ Television revenues were up $29M (10%). Excluding the impact of the 53rd week, television revenues grew $13M (4%).

◆ Tribune Entertainment revenues declined $2M (24%) due to fewer programs in production.

◆ Chicago Cubs revenues increased $7M (83%), mainly due to three more home games in the 2006 fourth quarter.

◆ WGN Radio revenues increased $1M (8%).

**Expenses:**

◆ Television cash operating expenses increased $16M (8%). Without the additional week, television cash operating expenses grew $5M (3%), mainly due to Cable's transition to digital distribution ($4M), and higher compensation expense ($1M).

◆ Cubs expenses increased $7M due to higher player costs.

◆ TEC expenses increased $5M because 2005 included a favorable $5M litigation settlement.

**Operating Cash Flow:**

◆ Total broadcasting and entertainment operating cash flow was up $8M (7%). Excluding the additional week, operating cash flow improved $3M (3%).

◆ Total broadcasting and entertainment operating cash flow margins were 33.8% in 2006, down from 35.0% in 2005.





13

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413524

**BROADCASTING & ENTERTAINMENT**
**SUMMARY OF OPERATIONS**
**Excluding Stock-Based Compensation, Special Items and Discontinued Operations (A)**
**(Dollars in Millions)**



Fourth Quarter 2006
Cash Expenses by Type
(excluding Cubs)

Compensation 33%
Other 23%
Broadcast Rights 44%

| | FOURTH QUARTER | | | FULL YEAR | | |
|---|---|---|---|---|---|---|
| | 2006 Actual | 2005 Actual | % Change | 2006 Actual | 2005 Actual | % Change |
| **Operating revenues** | | | | | | |
| Television (A) | $ 325.2 | $ 295.9 | 10 % | $ 1,178.1 | $ 1,165.8 | 1 % |
| Radio/Entertainment | 30.4 | 23.7 | 28 | 247.0 | 248.6 | (1) |
| Total | $ 355.6 | $ 319.6 | 11 | $ 1,425.1 | $ 1,414.4 | 1 |
| **Operating expenses** | | | | | | |
| Television (A) | $ 217.1 | $ 200.2 | 8 | $ 816.3 | $ 782.1 | 4 |
| Radio/Entertainment | 31.8 | 19.8 | 60 | 212.1 | 215.2 | (1) |
| Total | $ 248.9 | $ 220.0 | 13 | $ 1,028.4 | $ 997.3 | 3 |
| **Operating cash flow** | | | | | | |
| Television (A) | $ 119.8 | $ 106.3 | 13 | $ 406.9 | $ 426.8 | (5) |
| Radio/Entertainment | 0.4 | 5.6 | (92) | 41.3 | 38.9 | 6 |
| Total | $ 120.2 | $ 111.9 | 7 | $ 448.2 | $ 465.7 | (4) |
| **Operating profit (loss)** | | | | | | |
| Television (A) | $ 108.1 | $ 95.7 | 13 | $ 361.8 | $ 383.7 | (6) |
| Radio/Entertainment | (1.3) | 3.9 | NM | 35.0 | 33.4 | 5 |
| Total | $ 106.8 | $ 99.6 | 7 | $ 396.8 | $ 417.2 | (5) |
| **Cash expenses – excluding Cubs** | | | | | | |
| Broadcast Rights | $ 94.2 | $ 95.8 | (2) % | $ 367.7 | $ 350.0 | 5 % |
| Compensation | 70.1 | 64.9 | 8 | 263.5 | 266.4 | (1) |
| Other | 50.6 | 34.3 | 48 | 185.0 | 177.4 | 4 |
| Total | $ 214.9 | $ 195.0 | 10 | $ 816.2 | $ 793.8 | 3 |

(A) The sale of WATL-TV in Atlanta was completed in August 2006.  The sales of WLVI-TV in Boston and WCWN-TV in Albany were completed in December 2006.  For both years, operating results for these stations are excluded herein and reported as discontinued operations.

14

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413525

## TELEVISION
## SUMMARY OF OPERATING REVENUES
### Excluding Discontinued Operations (A)
### (Dollars in Millions)



**Fourth Quarter 2006 Operating Revenues**

- NY/LA/CHI 41%
- Other TV Stations 33%
- Two-Station Clusters 14%
- Cable 12%

| | FOURTH QUARTER | | | FULL YEAR | | |
|---|---|---|---|---|---|---|
| | 2006 Actual | 2005 Actual | % Change | 2006 Actual | 2005 Actual | % Change |
| **Operating revenues** | | | | | | |
| **NY/LA/Chicago** | | | | | | |
| New York | $ 50.0 | $ 48.2 | 4 % | $ 179.4 | $ 187.3 | (4) % |
| Los Angeles | 49.1 | 45.1 | 9 | 161.6 | 152.7 | 6 |
| Chicago | 34.9 | 32.4 | 8 | 135.5 | 140.7 | (4) |
| Sub-total | 134.0 | 125.7 | 7 | 476.4 | 480.7 | (1) |
| **Two-Station Clusters** | | | | | | |
| Seattle | 17.7 | 15.3 | 16 | 62.0 | 56.9 | 9 |
| Indianapolis | 10.9 | 10.6 | 3 | 43.0 | 41.4 | 4 |
| Hartford | 12.1 | 9.3 | 29 | 39.3 | 36.8 | 7 |
| New Orleans | 5.0 | 1.6 | NM | 15.2 | 13.8 | 10 |
| Sub-total | 45.7 | 36.8 | 24 | 159.5 | 148.9 | 7 |
| **All Other TV Stations** | | | | | | |
| Philadelphia | 12.2 | 12.0 | 1 | 45.1 | 45.8 | (1) |
| Dallas | 15.0 | 13.4 | 12 | 55.1 | 61.4 | (10) |
| Washington | 10.5 | 11.4 | (8) | 39.8 | 39.4 | 1 |
| Houston | 11.2 | 9.5 | 19 | 38.3 | 37.5 | 2 |
| Miami | 11.5 | 11.5 | - | 43.0 | 43.4 | (1) |
| Denver | 8.2 | 8.2 | (1) | 30.0 | 31.8 | (6) |
| Sacramento | 12.1 | 11.6 | 5 | 43.6 | 40.3 | 8 |
| St. Louis | 6.5 | 6.0 | 8 | 27.8 | 27.7 | - |
| Portland | 4.3 | 3.6 | 18 | 15.3 | 14.2 | 8 |
| San Diego | 6.0 | 5.5 | 8 | 21.2 | 22.6 | (6) |
| Grand Rapids | 5.9 | 4.9 | 20 | 20.1 | 18.9 | 6 |
| Harrisburg | 3.4 | 3.4 | (1) | 13.8 | 14.0 | (2) |
| Sub-total | 106.9 | 101.2 | 6 | 393.1 | 396.9 | (1) |
| **Cable** | | | | | | |
| Chicago Cable | 27.0 | 24.7 | 10 | 106.7 | 104.0 | 3 |
| WGN Cable Distribution | 12.6 | 8.1 | 56 | 40.3 | 32.4 | 24 |
| Sub-total | 39.6 | 32.8 | 21 | 146.9 | 136.5 | 8 |
| **Total** | $ 325.2 | $ 295.9 | 10 | $1,178.1 | $1,165.8 | 1 |

(A) The sale of WATL-TV in Atlanta was completed in August 2006. The sales of WLVI-TV in Boston and WCWN-TV in Albany were completed in December 2006. Operating results for these stations are excluded herein and reported as discontinued operations.

15

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413526

# TELEVISION
## SUMMARY OF OPERATING PROFIT
### Excluding Stock-Based Compensation, Special Items and Discontinued Operations (A)
#### (Dollars in Millions)

| Operating profit | FOURTH QUARTER | | | FULL YEAR | | |
|---|---|---|---|---|---|---|
| | 2006 Actual | 2005 Actual | % Change | 2006 Actual | 2005 Actual | % Change |
| **NY/LA/Chicago** | | | | | | |
| New York | $ 19.5 | $ 19.2 | 2 % | $ 58.1 | $ 66.2 | (12) % |
| Los Angeles | 17.1 | 17.0 | - | 49.0 | 51.8 | (5) |
| Chicago | 11.7 | 8.7 | 35 | 28.3 | 34.6 | (18) |
| Sub-total | 48.3 | 44.9 | 8 | 135.5 | 152.7 | (11) |
| **Two-Station Clusters** | | | | | | |
| Seattle | 4.3 | 3.7 | 16 | 15.0 | 12.2 | 23 |
| Indianapolis | 0.8 | 0.6 | 27 | 4.9 | 1.5 | 237 |
| Hartford | 3.4 | 2.0 | 72 | 9.3 | 9.2 | - |
| New Orleans | 1.8 | (1.5) | NM | 0.2 | (3.4) | NM |
| Sub-total | 10.3 | 4.8 | 116 | 29.4 | 19.5 | 51 |
| **All Other TV Stations (A)** | | | | | | |
| Philadelphia | 3.0 | 2.4 | 26 | 10.1 | 10.0 | 1 |
| Dallas | 5.6 | 5.0 | 12 | 22.0 | 30.3 | (27) |
| Washington | 3.8 | 5.1 | (25) | 15.4 | 18.8 | (18) |
| Houston | 3.6 | 2.3 | 56 | 11.8 | 13.3 | (11) |
| Miami | 4.6 | 5.3 | (13) | 17.4 | 19.6 | (11) |
| Denver | 1.1 | 1.4 | (22) | 3.1 | 5.7 | (46) |
| Sacramento | 4.0 | 4.2 | (4) | 13.4 | 11.7 | 14 |
| St. Louis | 0.6 | 0.8 | (23) | 3.3 | 4.6 | (28) |
| Portland | 0.1 | 0.1 | 30 | 0.4 | 2.1 | (81) |
| San Diego | 0.4 | 0.2 | 107 | 1.3 | 0.5 | 185 |
| Grand Rapids | 2.1 | 1.6 | 32 | 6.3 | 6.0 | 6 |
| Harrisburg | 0.4 | 0.5 | (16) | 2.1 | 2.4 | (14) |
| Sub-total | 29.4 | 28.8 | 2 | 106.7 | 124.9 | (15) |
| **Cable** | | | | | | |
| Chicago Cable | 15.1 | 13.3 | 14 | 60.7 | 62.0 | (2) |
| WGN Cable Distribution | 8.3 | 5.6 | 50 | 28.1 | 21.6 | 30 |
| Sub-total | 23.5 | 18.8 | 24 | 88.8 | 83.6 | 6 |
| Corporate allocation | (3.4) | (1.6) | NM | 1.5 | 3.1 | (50) |
| Total | $ 108.1 | $ 95.7 | 13 | $ 361.8 | $ 383.7 | (6) |

## FOURTH QUARTER COMPARISONS TO 2005

**Overall:** Television operating profit increased $12M (13%). Excluding the 53rd week, operating profit grew $7M (7%).

**Chicago:** Operating profit was up $3M (35%), due to higher revenues ($2M) from the 53rd week, increased political advertising and lower expenses.

**New Orleans:** Operating profit was up $3M, mainly due to higher revenues. Operating loss incurred in 2005 due to disruption of business caused by Hurricane Katrina.

**Cable:** Operating profit grew $5M (24%), due to higher revenues ($5M) in both ad sales and distribution.

### TV Operating Cash Flow Margins

| | Fourth Quarter | |
|---|---|---|
| | 2006 | 2005 |
| NY/LA/Chicago | 38.1% | 37.6% |
| Two-Station Clusters | 29.9% | 20.4% |
| All Other TV Stations (A) | 31.1% | 32.1% |
| Cable | 62.4% | 61.3% |
| Total Group | 36.8% | 35.9% |

(A) The sale of WATL-TV in Atlanta was completed in August 2006. The sales of WLVI-TV in Boston and WCWN-TV in Albany were completed in December 2006. Operating results for these stations are excluded herein and reported as discontinued operations.

16

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**RADIO AND ENTERTAINMENT/OTHER**
**SUMMARY OF OPERATING RESULTS**
**Excluding Stock-Based Compensation and Special Items**
**(Dollars in Millions)**

| | FOURTH QUARTER | | | FULL YEAR | | |
| | 2006 Actual | 2005 Actual | % Change | 2006 Actual | 2005 Actual | % Change |
|---|---|---|---|---|---|---|
| **Operating Profit/(Loss)** | | | | | | |
| WGN Radio | $ 4.2 | $ 2.9 | 43 % | $ 13.9 | $ 15.7 | (11) % |
| Tribune Entertainment | 0.3 | 6.6 | (95) | 1.3 | 7.0 | (81) |
| Chicago Cubs | (5.2) | (5.5) | 6 | 21.4 | 11.6 | 85 |
| Other | (0.7) | (0.2) | NM | (1.7) | (0.8) | (96) |
| Total | $ (1.3) | $ 3.9 | NM | $ 35.0 | $ 33.4 | 5 |

**FOURTH QUARTER COMPARISONS TO 2005**

WGN Radio:  Operating profit improved $1.2M (43%) due to higher revenues and lower operating expenses.

TEC:  Operating profit declined $6M mainly because 2005 included a $5.4M net recovery of legal fees from a litigation settlement.

17

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413527

TRB0413528

OTHER INFORMATION

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# TRIBUNE COMPANY
## CAPITAL EXPENDITURES OVERVIEW
### At December 31, 2006

### Summary By Group

|  | 2006 Actual | 2006 Plan | 2005 Actual |
|---|---|---|---|
| Publishing [1] | $173M | $170M | $163M |
| Broadcasting [2] | 42 | 40 | 37 |
| Corporate | 6 | 10 | 6 |
| Total | $222M | $220M | $206M |

(1) 2006 actual spending includes $5M of capitalized interest that is not included in the plan.
(2) 2006 actual spending includes $5M of capital spending in New Orleans that was fully funded by insurance proceeds. This spending was not reflected in the plan.

Total spending for the fourth quarter was $103M. Full year spending of $222M was slightly above plan of $220M due to $5M of capitalized interest and $5M of spending at New Orleans that was covered by insurance proceeds related to Hurricane Katrina. Excluding these items, spending was $212M, or $8M below plan.

Publishing spent $173M in 2006. Major projects that continued in 2006 were the classified advertising front-end and billing system replacements at all newspapers ($22M in 2006, $77M total), the color press enhancement projects in Chicago ($13M in 2006, $75M total) and South Florida ($3M in 2006, $35M total), as well as an inserter equipment project in Orlando ($2M in 2006, $13M total). New projects included a packaging project to increase targeting capabilities for preprints in Chicago ($18M in 2006, $39M total), web width reductions at seven newspaper markets ($3M in 2006, $25M total) and the implementation of a common editorial system ($11M in 2006, $33M total) and a common circulation system ($13M, $22M total) across all newspapers. The remaining spending was for system and hardware replacements, refurbishing of production equipment and technology enhancements across the Publishing group.

Broadcasting capital spending totaled $42M in 2006. Major projects at the Cubs in 2006 included the Wrigley Field bleacher expansion ($9M in 2006, $13M total) and the purchase of parking lots ($6M in 2006 and total). Television spent $8M in 2006 on digital transmission equipment and studio equipment. In addition, New Orleans spent $5M on capital projects to rebuild the station after damage resulting from Hurricane Katrina. The New Orleans spending was fully funded by insurance proceeds. The remaining capital spending included various equipment replacements and other smaller projects throughout the group.

Corporate spent $6M in 2006. This included projects at the finance and technology shared service centers, Tribune Properties and Corporate office. The spending included $3M for the purchase of a fractional share of two corporate airplanes.

18

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413529

**TRIBUNE COMPANY**
**SUMMARY OF ACTIVE PROJECTS OVER $10 MILLION**
**At December 31, 2006**

| | Status | Amount Spent To Date | Current Estimate at Completion (Millions) | Approved Amount |
|---|---|---|---|---|
| **Publishing** | | | | |
| **Chicago** | | | | |
| **Color Press Expansion Project** - Add a color-printing tower and reconfigure each of the 10 presses in operation to increase color capacity from 16 to 32 pages. | • Installation of the tenth and final press was completed during the fourth quarter of 2006. Training, testing and phased implementation will continue into 2007. Final acceptance of all reconfigured presses and completion of the project is scheduled for the fourth quarter of 2007. | $  71.1 | $  75.0 | $  75.0 |
| **Next Generation Preprint Project** - Replace existing inserting equipment with five new high-capacity inserters. New equipment will increase capacity and improve targeting capabilities. | • Final negotiations and order placement was completed for all major equipment vendors. Specifications for the new inserting system were also finalized. Next steps include planning and engineering activities in preparation for production from the first new inserter. | 17.6 | 39.4 | 39.4 |
| **Publishing Group** | | | | |
| **Advertising Systems Replacement Project** - Replace the classified advertising front-end and advertising billing systems at all 10 Tribune Publishing newspaper markets. | • Full system installations for classified advertising have been completed in five markets. The remaining five markets will be completed by the second quarter of 2007. Web order entry for classified advertising has also been launched in Orlando and Chicago. In-paper advertising, preprint and billing system implementations will follow the classified system launches by approximately one year. | 38.1 | 77.0 | 77.0 |
| **Common Editorial System Project** - Replace the current editorial systems at all 10 Tribune Publishing newspaper markets with a standardized and centralized editorial front-end and pagination system. | • Application software testing by central teams and certain site teams continued in the fourth quarter of 2006. Chicago will be the first market to launch the new system in the first quarter of 2007. System launches for the remaining markets are staggered over 2007 and 2008. | 13.0 | 33.0 | 33.0 |
| **Common Circulation System Project** - Replace the circulation systems at all 10 Tribune Publishing newspaper markets with a standardized and centralized circulation system. | • Newport News was the first market to launch the new circulation system, fully implementing it in November 2006. System launches in the remaining nine markets are staggered throughout 2007. Inbound circulation calls for seven of the markets have been outsourced to Manila, Philippines. | 12.8 | 22.0 | 22.0 |
| **Web Width Reduction Project** - Reduce the printing press widths at seven Tribune Publishing newspaper markets to reduce newsprint costs. | • Web width reductions will be completed on a phased schedule throughout 2007 and 2008. Newsprint savings will be realized immediately as web widths are reduced. | 3.0 | 24.6 | 24.6 |

19

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413530

TRB0413531

## TRIBUNE COMPANY
### SELECTED BALANCE SHEET DATA
(Dollars in Millions)

|  | 12/31/2006 | 12/25/2005 |
|---|---|---|
| **Assets** | | |
| Cash and short-term investments | $ 175 | $ 151 |
| Total current assets | 1,377 | 1,468 |
| Intangible assets | 8,683 | 9,035 |
| Time Warner stock related to PHONES | 348 | 283 |
| Other investments | 565 | 633 |
| Pension asset | 292 | 871 |
| Properties and other | 2,135 | 2,256 |
| Total assets | $ 13,400 | $ 14,546 |
| | | |
| **Liabilities & shareholders' equity** | | |
| Borrowings under bridge credit facility | $ 1,310 | $ - |
| Current portion of long-term debt | 119 | 302 |
| Total current liabilities | 2,616 | 1,446 |
| PHONES debt related to Time Warner stock (A) | 573 | 510 |
| Other long-term debt | 3,003 | 2,449 |
| Deferred income taxes and other long-term liabilities | 2,890 | 3,415 |
| Shareholders' equity | 4,318 | 6,726 |
| Total liabilities and shareholders' equity | $ 13,400 | $ 14,546 |
| | | |
| Intangible assets as a percent of total assets | 65% | 62% |
| | | |
| Debt to Operating Cash Flow: | | |
| Excluding PHONES | 3.3x | 2.0x |
| Including PHONES at book value ($573M) | 3.8x | 2.3x |

(A) Includes $465M and $454M of discounted debt and $108M and $56M of a call option at Dec. 31, 2006 and Dec. 25, 2005, respectively, which gives the holders of the PHONES the upside on Time Warner stock in excess of $78/share.

20

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

## TRIBUNE COMPANY
## CONSOLIDATED INCOME STATEMENTS INCLUDING
## SPECIAL ITEMS, NON-OPERATING ITEMS AND DISCONTINUED OPERATIONS
### (Dollars in Millions, Except Per Share Data)

| | FOURTH QUARTER, 2006 Amount | Diluted EPS | FOURTH QUARTER, 2005 Amount | Diluted EPS | FULL YEAR, 2006 Amount | Diluted EPS | FULL YEAR, 2005 Amount | Diluted EPS |
|---|---|---|---|---|---|---|---|---|
| Net Income from Continuing Operations before Special Items and Non-Operating Items | $ 163.8 | $ .68 | $ 173.9 | $ .56 | $ 556.8 | $ 2.01 | $ 649.1 | $ 2.03 |
| Severance and related charges | (6.6) | (.01) | (44.9) | (.09) | (8.6) | (.02) | (44.9) | (.09) |
| Los Angeles Times plant shut down (A) | (4.2) | (.01) | (22.2) | (.04) | (4.2) | (.01) | (22.2) | (.04) |
| Newsday union related charges | - | - | - | - | (20.0) | (.04) | - | - |
| Gain on sales of properties (B) | - | - | - | - | 7.3 | .02 | - | - |
| Gain on sale of airplane | 7.2 | .02 | - | - | 7.2 | .02 | - | - |
| CareerBuilder income tax adjustment | - | - | - | - | 5.9 | .01 | - | - |
| Pension curtailment gain (C) | - | - | 17.8 | .03 | - | - | 17.8 | .03 |
| Total Special Items before taxes | (3.6) | (.01) | (49.4) | (.10) | (12.4) | (.02) | (49.4) | (.10) |
| Gain/(Loss) on Change in Fair Value of 16M Time Warner shares, net of PHONES | 45.3 | .11 | (24.5) | (.05) | 11.1 | .02 | 62.2 | .12 |
| Gain on TMCT transactions (D) | - | - | - | - | 59.6 | .17 | - | - |
| Gain on Sales of Investments | 16.1 | .04 | 3.9 | .01 | 36.9 | .08 | 6.8 | .01 |
| Gain/(Loss) on Investment Write-Downs and Other | (1.5) | - | 0.2 | - | (4.6) | - | 0.9 | .01 |
| Total Non-Operating Items before taxes | 59.9 | .15 | (20.4) | (.04) | 103.0 | .28 | 69.9 | .14 |
| Income Taxes on Special Items and Non-Operating Items | (21.3) | - | 27.0 | - | (20.0) | - | (8.2) | - |
| Special Income Tax Adjustments (E) | 33.3 | .14 | - | - | 33.6 | .12 | (138.7) | (.44) |
| Net Income from Continuing Operations | 232.1 | .96 | 131.2 | .42 | 660.9 | 2.39 | 522.8 | 1.63 |
| Income (Loss) from Discontinued Operations, net of tax (F) | 7.0 | .03 | 3.3 | .01 | (66.9) | (.24) | 11.9 | .04 |
| Net Income | $ 239.1 | $ .99 | $ 134.5 | $ .43 | $ 594.0 | $ 2.14 | $ 534.7 | $ 1.67 |

(A) Los Angeles Times plant shut down costs in 2006 included a $4 million write-off of press equipment. Costs for 2005 included $16 million of accelerated depreciation, a $2 million impairment on land and building, $2 million of incremental workers' compensation charges, $1 million of asset disposal charges and $1 million of other charges.

(B) 2006 includes one-time gains on property sales of $2.6 million at Baltimore and $4.7 million at Southern Connecticut.

(C) One-time pension curtailment gain as result of freezing the Times Mirror pension plan.

(D) The pre-tax gain on the TMCT transactions is net of an $11.3 million increase in the TMCT property financing obligation (to adjust it from 80% to 100%) and $1.8 million in transaction costs. The after-tax gain was $48 million and reflects a $16 million tax reserve, partially offset by a $4.4 million tax benefit related to the financing obligation adjustment.

(E) Fourth quarter 2006 relates primarily to a reduction in the PHONES tax reserve. 2005 includes a $150 million charge to record additional interest (net of tax benefit) related to the Matthew Bender and Mosby tax liability and a credit totaling $11.8 related to a favorable resolution of federal income tax issues.

(F) Includes the Atlanta, Albany and Boston television stations.

21

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413532

**TRIBUNE COMPANY**
**BOARD OF DIRECTORS MEETING**
**TUESDAY, FEBRUARY 13, 2007 (11:15 A.M.)**
**PATTERSON BOARD ROOM, 24TH FLOOR**
**TRIBUNE TOWER**

## AGENDA

|  | Tab No. |
|---|---|
| Approve minutes of December 12, 2006 and January 20, 2007 meetings | 1 |
| Common and preferred stock dividends | 2 |
| Employee Benefits Committee report | 3 |
| Stock performance report | 4 |
| Operating results | |
| 2007 operating plan | 5 |
| Development update | 6 |
| Annual meeting matters: | 7 |

    - Approve proxy materials
    - Annual meeting resolutions

Audit Committee report

Nominating & Governance Committee report

|  |  |
|---|---|
|     - Director independence and qualification review | 8 |
|     - Related person transactions policy | 9 |

Compensation & Organization Committee report

Executive session

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413533

1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413534

# TRIBUNE COMPANY
## BOARD OF DIRECTORS MEETING
### DECEMBER 12, 2006

The Tribune Company Board of Directors met at 9:40 a.m. on Tuesday, December 12, 2006 at Tribune Tower, Chicago, Illinois, pursuant to notice. The meeting was attended by Jeffrey Chandler, Dennis J. FitzSimons, Roger Goodan, Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, William A. Osborn, J. Christopher Reyes, William Stinehart, Jr., Dudley S. Taft and Miles D. White.

Portions of the meeting were attended by Donald C. Grenesko, Crane H. Kenney, Timothy J. Landon, Thomas D. Leach, Luis E. Lewin, Ruthellyn Musil, John E. Reardon and Scott C. Smith. Tom Cole of Sidley Austin and Chip Mulaney of Skadden Arps also participated in the meeting.

Mr. FitzSimons acted as chairman of the meeting and Mr. Kenney acted as secretary.

Mr. FitzSimons called the meeting to order at 9:40 a.m.

## EXECUTIVE SESSION

The directors met in executive session at the beginning of the meeting. Messrs. Cole and Mulaney were present when the meeting was called to order. At the conclusion of executive session, Messrs. Grenesko, Kenney, Leach, Landon, Lewin, Reardon and Smith and Ms. Musil joined the meeting.

## APPROVAL OF MINUTES

A motion was made, seconded and approved to adopt the minutes of the October 18, 2006 meeting of the Board of Directors.

## 2007 ANNUAL MEETING DATE

Mr. FitzSimons recommended a date and location for the Company's 2007 annual meeting of stockholders. A motion was made, seconded and approved to adopt the following resolution:

> RESOLVED, that the 2007 Annual Meeting of Stockholders of the Company shall be held at 11:00 a.m. on Wednesday, May 9, 2007 at Tribune Tower, 435 North Michigan Avenue, Chicago, Illinois and that the close of business on March 14, 2007 is hereby fixed as the record date for the determination of stockholders of the Company entitled to notice of, and to vote at said meeting.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## COMPANY PERFORMANCE

### 2006 Projected Operating Results and Stock Performance Report

Mr. Grenesko reviewed the projected financial performance of the Company for the fourth quarter and complete fiscal year. Mr. Grenesko reviewed operating profit by line of business and presented information regarding earnings per share and return on invested capital estimates. He then contrasted the Company's projected performance with the consensus estimates of Wall Street investment analysts. A discussion followed Mr. Grenesko's presentation.

### 2007 Operating Projections

Mr. Grenesko next reviewed the Company's preliminary 2007 operating projections. A discussion followed Mr. Grenesko's presentation.

## DEVELOPMENT UPDATE

Mr. Landon discussed the terms of a proposed equity investment by Microsoft in CareerBuilder. Following discussion, a motion was made, seconded and approved to adopt the following resolutions:

WHEREAS, CareerBuilder, LLC ("CareerBuilder") and Microsoft Corporation ("Microsoft") are currently negotiating the terms of (i) an extension of their existing domestic service and distribution arrangement, (ii) a new international service and distribution arrangement and (iii) the purchase by Microsoft (or any affiliate thereof) of a five percent economic interest in the form of membership interests of CareerBuilder (the "Interest");

WHEREAS, it is contemplated that Microsoft will have an option to put the Interest back to CareerBuilder on or around the seven-year anniversary of the equity investment closing date (the "Put Option"); and

WHEREAS, Microsoft has requested that the CareerBuilder equity owners agree to fund the Put Option purchase price, pro rata in accordance with their then current ownership interests, in the event CareerBuilder is unable to do so;

NOW, THEREFORE, BE IT RESOLVED, that the Board of Directors of the Company hereby authorizes the Company (or any affiliate thereof) to make additional cash contributions to CareerBuilder, in one or more transactions and in proportion to its then current ownership interest in CareerBuilder, as may be necessary to enable CareerBuilder to fund the purchase of the Interest from Microsoft in the event Microsoft exercises the Put Option (the "Funding");

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

FURTHER RESOLVED, that the Chairman, President and Chief Executive Officer, any Senior Vice President or any Vice President of the Company, the President, any Senior Vice President or any Vice President of Tribune Publishing Company, the President or any Vice President of Tribune Interactive, Inc., the President or any Vice President of Tribune National Marketing Company or the President or any Vice President of Tribune Media Net, Inc. (the "Authorized Officers"), be and each of them hereby is, authorized (with full power of delegation) in the name and on behalf of the Company (or any affiliate thereof) to negotiate the terms of, document and execute agreements and instruments evidencing the Funding as such Authorized Officer executing the same may approve, such approval to be conclusively evidenced by such officer's execution thereof;

FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized (with full power of delegation) in the name and on behalf of the Company (or any affiliate thereof) to make all such arrangements, to do and perform all such acts and things, to execute and deliver all such agreements, certificates, instruments and documents, to make all governmental, regulatory or other filings, to pay all such amounts, and to take all such actions as they may deem advisable or necessary in connection with the foregoing resolutions and in order to fully effectuate the purposes of the foregoing resolutions; and

FURTHER RESOLVED, that all actions previously taken by or on behalf of the Company (or any affiliate thereof) in connection with the matters that are subject to these resolutions be, and hereby are, ratified, confirmed and approved in all respects.

Mr. Leach discussed a written report submitted to the Board prior to the meeting regarding the status of other current development activities. A discussion followed Mr. Leach's presentation.

## SOUTHERN CONNECTICUT NEWSPAPERS

Mr. Leach presented management's request for authority to sell Southern Connecticut Newspapers, Inc. (SCNI) for at least $70 million. Following discussion, a motion was made, seconded and approved to adopt the following resolutions:

RESOLVED, that the Board of Directors of the Company hereby approves the sale by the Company (or any affiliate thereof) of Southern Connecticut Newspapers, Inc. ("SCNI") for not less than $70 million (exclusive of the real property owned by SCNI) (collectively, the "Transaction");

FURTHER RESOLVED, that the Chairman, President and Chief Executive Officer, any Senior Vice President or any Vice President of the Company, the President, Senior Vice President or any Vice President of Tribune Publishing Company or the President, Senior

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413537

Vice President or any Vice President of SCNI (the "Authorized Officers"), be and each of them hereby is, authorized (with full power of delegation) in the name and on behalf of the Company (or any affiliate thereof) to negotiate, document and execute agreements and instruments evidencing the Transaction as such Authorized Officer executing the same may approve, such approval to be conclusively evidenced by such officer's execution thereof;

FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized (with full power of delegation) in the name and on behalf of the Company (or any affiliate thereof) to make all such arrangements, to do and perform all such acts and things, to execute and deliver all such agreements, certificates, instruments and documents, to make all governmental, regulatory or other filings (including, without limitation, filings pursuant to the Hart-Scott-Rodino Antitrust Improvements Act), to pay all such amounts, and to take all such actions as they may deem advisable or necessary in connection with the matters set forth in these resolutions and in order to fully effectuate the purposes of these resolutions; and

FURTHER RESOLVED, that all actions previously taken by or on behalf of the Company (or any affiliate thereof) in connection with the matters set forth in these resolutions be, and hereby are, ratified, confirmed and approved in all respects.

Messrs. Landon, Leach, Lewin, Reardon and Smith and Ms. Musil departed the meeting.

## AUDIT COMMITTEE REPORT

Mr. Osborn reported on the business discussed at the Audit Committee meeting held on Monday, December 11, 2006.

Mr. Osborn reported that the Committee first reviewed management's annual impairment review of intangible assets. This discussion was followed by an update on the Company's discussions with the Internal Revenue Service regarding an income tax issue related to the Company's PHONES debt securities.

Mr. Osborn then reported that the Committee reviewed the status of the Company's internal controls certification project, the internal audit status report and the status of the Company's business continuity plans.

Mr. Osborn next reported on a management report on enterprise risk management, including a discussion of the results of the Company's annual Code of Business Conduct compliance process. Finally, Mr. Osborn reported that the Committee performed its annual review and reassessment of the Committee charter and that no changes to the charter were proposed.

4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413538

## NOMINATING & GOVERNANCE COMMITTEE REPORT

Mr. Hernandez reported on the business discussed at the Nominating & Governance Committee meeting held earlier in the day.

Mr. Hernandez reported that the Committee reviewed a report summarizing recent developments with respect to majority voting for directors.

Mr. Hernandez next reported that the Committee reviewed the responses to the Board of Director and Committee questionnaires distributed at the May Board meeting.

Mr. Hernandez then reported that the Committee discussed two potential director candidates and reviewed four shareholder proposals submitted for inclusion in the proxy materials for the 2007 annual meeting of shareholders. The Committee noted that the outcome of the pending strategic review process may moot some or all of the shareholder proposals.

## COMPENSATION & ORGANIZATION COMMITTEE REPORT

Mr. Morrison reported on the business discussed at the Compensation & Organization Committee meeting held earlier in the day.

Mr. Morrison reported that the Committee discussed the new SEC executive compensation and related party disclosure rules.

Mr. Morrison next reported that the Committee conducted its annual review of the Committee charter, determined that a few revisions should be made to the charter in light of the new executive compensation disclosure rules and recommended the revisions to the Board for approval. Following discussion, a motion was made, seconded and approved to adopt the following resolution:

> RESOLVED, that the revised Compensation & Organization Committee Charter, substantially in the form presented at this meeting, is hereby adopted and approved.

Mr. Morrison then reported that the Committee reviewed a written report summarizing 2006/2007 compensation and benefit plan recommendations for which management will be seeking approval at the February Committee meeting.

Mr. Morrison next reported that the Committee reviewed a long-standing policy regarding office, parking and administrative support for retired Tribune senior executives who also served as Tribune directors. The Committee requested that management revise the proposed policy for further consideration by the Committee.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413539

**ADJOURNMENT**

There being no further business to come before the Board, the meeting was adjourned at
11:20 a.m.

_____
Secretary

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0413540**

# TRIBUNE COMPANY
## BOARD OF DIRECTORS MEETING
### JANUARY 20, 2007

The Tribune Company Board of Directors met at 2:40 p.m. on Saturday, January 20, 2007, at Skadden, Arps, Slate, Meagher & Flom LLP, Chicago, Illinois, pursuant to notice. The meeting was attended by Dennis J. FitzSimons, Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, William A. Osborn, J. Christopher Reyes, Dudley S. Taft and Miles D. White. Jeffrey Chandler, Roger Goodan and William Stinehart, Jr. participated via telephone.

The meeting was also attended by Crane H. Kenney, Tom Cole of Sidley Austin LLP, Steve Rosenblum of Wachtell Lipton Rosen & Katz and Chip Mulaney of Skadden, Arps, Slate, Meagher & Flom LLP.

Mr. FitzSimons acted as chairman of the meeting and Mr. Kenney acted as secretary.

Mr. FitzSimons called the meeting to order at 2:40 p.m.

## STRATEGIC ALTERNATIVES REVIEW PROCESS

Mr. Osborn, Chairman of the Special Committee, reviewed the status of the Company's strategic review process. Following questions from Mr. Stinehart and answers from Mr. Osborn, the meeting was adjourned at 2:45 p.m.

_____
Secretary

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413542

**TRIBUNE COMPANY**

**PROPOSED BOARD OF DIRECTORS RESOLUTIONS**

**(Common and Preferred Dividends)**

RESOLVED, that there is hereby declared a dividend of $.18 per share on the common stock of the Company payable on March 8, 2007 to stockholders of record at the close of business on February 22, 2007; and

FURTHER RESOLVED, that there is hereby declared a dividend of $8.9375 per share on the Series D-1 Convertible Preferred Stock of the Company payable on March 8, 2007 to stockholders of record at the start of business on March 8, 2007.

DPE
2/6/07

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413544

# TRIBUNE COMPANY
## EMPLOYEE BENEFITS COMMITTEE
## 2006 ANNUAL REPORT TO THE BOARD OF DIRECTORS

The Employee Benefits Committee is responsible for the investment and administration of the Company's retirement and medical benefit plans. This report reviews the status and investment performance of the Company's pension and 401(K) plans. The Company has a total of approximately $4.2 billion of retirement assets which includes $521 million of Tribune stock held in the 401(K) plans. Total retirement

| 2006 Retirement Assets and Expense ($ millions) | | | |
|---|---|---|---|
| | Dec. '06 Assets | Expense* 2006 | Expense* 2005 |
| Pension | $1,764 | $27 | $37 |
| 401(K) | 2,400 | 69 | 60 |
| Total | $4,164 | $96 | $97 |
| *Excludes contributions to multi-employer union pension plans. | | | |

benefit expense was $96 million in 2006, down slightly compared to 2005. This expense included $27 million of primarily non-cash pension expense and $69 million for 401(K) contributions.

## PENSION PLANS

Tribune sponsors defined benefit pension plans that provide retirement benefits to approximately 37,000 plan participants. As of December 31, 2006, our pension plans had assets of $1.76 billion and future benefit obligations of $1.55 billion, resulting in a surplus at year-end 2006 of $217 million. The projected liability includes approximately $74 million of unfunded non-qualified obligations, primarily related to excess supplemental plans for former Times Mirror executives. Excluding these unfunded

| Pension Plan Funded Status ($ millions) | | |
|---|---|---|
| | 2006 | 2005 |
| Plan Assets | $1,764 | $1,598 |
| Projected Liability* | 1,547 | 1,599 |
| Surplus/(Deficit) | $217 | ($1) |
| Funded Ratio | 114% | 100% |
| *Includes approximately $74mm of unfunded non-qualified liability. | | |

obligations, the surplus of the Plan is $291 million, representing an 120% funded ratio.

Pension Plan asset performance was very strong in 2006. The Plan generated a 16% gross return (15% net of fees), placing it in the top quartile of the Northern Trust Universe of 106 pension plans. Over the past three years, the Fund produced annualized gross returns of 12% (11% net), placing it in the second quartile of the Universe. Exhibit I shows our Fund returns for each asset class and investment manager.

In 2006, pension expense was $27 million, down 27% from $37 million in 2005. Of this amount, cash contributions represented only about $7 million, nearly all of which went to fund our non-qualified benefits. The decrease in total pension expense is a result of freezing benefits for participants in the Times Mirror Pension Plan at December 31, 2005 and then freezing benefits for Newsday employees at March 31, 2006. With a frozen plan, we no longer accrue new benefits. Pension expense is now almost entirely a function of interest on the liability, amortization of the unrecognized loss (generated in prior years), offset by the expected return on Plan assets. Offsetting the decline in pension expense, 401(K) contributions increased to $69 million in 2006 from $60 million in 2005 as employees in the frozen plans were moved to 401(K) plans.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

The Company also contributed approximately $6 million to multi-employer, union-sponsored pension plans in 2006, but has no involvement in the management of these plans.

Consistent with 2006, we are assuming an 8.5% long-term projected investment return for 2007. Over the past 10 years, Tribune's Pension Fund has generated annualized returns of 9%.

### Asset Allocation and Investment Performance

The strong performance of equities in 2006 led to an overweight in equities (approximately 5%-6%) and a corresponding underweight in fixed income. Consistent with 2006, we plan to fund our projected $80 million of pension benefit payments from equity assets in 2007. In addition, in order to rebalance to the target investment policy, we plan to move approximately 5% of the assets to a long duration fixed income portfolio in 2007.

| Pension Plan Asset Allocation | | |
|---|---|---|
| | **Target** | **Actual** |
| Large-cap equity | 40 % | 41 % |
| Small-cap equity | 15 | 17 |
| International equity | 15 | 18 |
| Alternative assets | 5 | 5 |
| | 75 % | 81 % |
| Fixed income/cash | 25 | 19 |
| Total | 100 % | 100 % |

### DEFINED CONTRIBUTION PLANS-401(K)

Our 401(K) plans hold assets of $2.4 billion on behalf of approximately 31,000 participants. Approximately 73% of eligible full-time employees contribute to these plans. During 2006, the Company contributed 4% of compensation to participants and plans to make an additional year-end profit sharing contribution in February 2007 equal to 3% of compensation, 0.5% lower than our original budget. Newsday employees receive a fixed 5% contribution throughout the year. In 2006, the Company contributed a total of $69 million to its 401(K) plans, and participants contributed $72 million.

There are currently 20 fund choices in the 401(K), including 11 Target Retirement Funds. The nine other funds represent all of the major asset classes including: money market, fixed income, domestic large-cap stocks, domestic small-cap stocks, international stocks and the Tribune Company Stock Fund. The Target Retirement Funds are managed by Vanguard and were introduced to participants in 2006. Target Retirement Funds are funds of funds that gradually adjust asset allocation between stocks and bonds according to each fund's target retirement date. These funds are designed to become more conservative (higher weight to fixed income) as the expected or target retirement date approaches.

At the end of 2006, 22% of 401(K) assets were invested in Tribune stock, compared with 27% at the end of 2005. This decline was due to a 16% decrease in shares owned as a result of participant diversification out of Tribune stock, offset by the 4% increase in the value of Tribune stock in 2006. The 401(K) plans held 17 million shares of Tribune stock at year-end, representing approximately 7% of total shares outstanding.

Exhibit II summarizes the investment balances and annual returns for the 401(k) investment funds.

NS
2/6/07

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413546

Exhibit I

## TRIBUNE COMPANY PENSION PLANS
## ASSETS & INVESTMENT PERFORMANCE AS OF DECEMBER 31, 2006
*($ millions)*

| | | Assets | | Total Return Net of Fees Annualized | | |
|---|---|---|---|---|---|---|
| | | 2006 | % of Total | 2006 | 3 Year | 5 Year |
| | **Domestic equity:** | | | | | |
| 1 | Northern Trust (S&P 500 index) | $732 | 41 % | 16 % | 11 % | 6 % |
| 2 | DFA 6-10 Fund (small cap) | 186 | 11 | 17 | 15 | 15 |
| 3 | JP Morgan (small cap) | 109 | 6 | 16 | 14 | 13 |
| 4 | Total | 1,028 | 58 | 16 | 12 | 9 |
| | **International equity:** | | | | | |
| 5 | LSV International Value | 120 | 7 | 30 | n/a | n/a |
| 6 | Fidelity Diversified International | 114 | 6 | 23 | n/a | n/a |
| 7 | DFA Emerging Markets | 44 | 3 | 37 | n/a | n/a |
| 8 | Mondrian Emerging Markets | 37 | 2 | 26 | n/a | n/a |
| 9 | Total | 316 | 18 | 28 | 20 | 15 |
| | **Alternative Assets:** | | | | | |
| 10 | Real estate (2 funds) | 58 | 3 | 17 | 17 | 13 |
| 11 | Venture capital (8 funds) | 19 | 1 | 24 | 16 | 4 |
| 12 | Private equity (10 funds) | 9 | 1 | 20 | 20 | 9 |
| 13 | Total | 86 | 5 | 19 | 17 | 9 |
| | **Fixed income:** | | | | | |
| 14 | PIMCO | 103 | 6 | 4 | 4 | n/a |
| 15 | JP Morgan | 80 | 5 | 5 | 4 | 5 |
| 16 | Bank One | 69 | 4 | 4 | 4 | n/a |
| 17 | Prudential Financial | 51 | 3 | 3 | 4 | 6 |
| 18 | Aetna | 23 | 1 | 6 | 6 | 6 |
| 19 | Cash/other | 4 | 0 | 5 | 3 | 2 |
| 20 | Total | 334 | 19 | 4 | 4 | 5 |
| 21 | **Total Assets** | $1,764 | 100 % | 15 % | 11 % | 9 % |
| | **Benchmark returns:** | | | | | |
| 22 | S&P 500 Index | | | 16 % | 10 % | 6 % |
| 23 | Russell 2000 Index (small cap) | | | 18 | 14 | 11 |
| 24 | Russell 2000 Index (mid cap) | | | 16 | 14 | 12 |
| 25 | Morgan Stanley EAFE Index (International) | | | 27 | 20 | 15 |
| 26 | Morgan Stanley Emerging Markets Index | | | 33 | 31 | 27 |
| 27 | Lehman Aggregate Bond Index | | | 4 | 4 | 5 |
| 28 | Northern Trust Pension Universe Median (Gross Returns) | | | 14 | 11 | 9 |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413547

**Exhibit II**

## TRIBUNE 401(K) PLANS
### ASSETS & INVESTMENT PERFORMANCE AS OF DECEMBER 31, 2006
*($ millions)*

| | | Assets | | Total Return Annualized | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2006 | % of Total | 2006 | 3 Year | 5 Year |
| 1 | Tribune Company Stock Fund | $521 | 22 % | 4 % | -14 % | -3 % |
| 2 | Vanguard Money Market Fund | 327 | 14 | 5 | 3 | 3 |
| 3 | Vanguard S&P 500 Index Fund | 315 | 13 | 16 | 11 | 6 |
| 4 | Fidelity International Growth Fund | 308 | 13 | 23 | 20 | 17 |
| 5 | Vanguard Wellington Fund (balanced) | 301 | 13 | 15 | 11 | 9 |
| 6 | Fidelity Growth & Income Fund | 216 | 9 | 3 | 10 | 0 |
| 7 | Fidelity Stable Value Fund | 185 | 8 | 4 | 5 | 5 |
| 8 | Vanguard Explorer Fund (small cap) | 114 | 5 | 9 | 22 | 6 |
| 9 | Vanguard Bond Index Fund | 68 | 3 | 4 | 4 | 5 |
| | Vanguard Target Retirement Funds*: | | | | | |
| 10 | Target Retirement Income | 2 | 0 | 6 | 6 | n/a |
| 11 | Target Retirement - 2005 | 1 | 0 | 8 | 7 | n/a |
| 12 | Target Retirement - 2010 | 6 | 0 | n/a | n/a | n/a |
| 13 | Target Retirement - 2015 | 10 | 0 | 11 | 8 | n/a |
| 14 | Target Retirement - 2020 | 7 | 0 | n/a | n/a | n/a |
| 15 | Target Retirement - 2025 | 8 | 0 | 13 | 10 | n/a |
| 16 | Target Retirement - 2030 | 7 | 0 | n/a | n/a | n/a |
| 17 | Target Retirement - 2035 | 3 | 0 | 15 | 11 | n/a |
| 18 | Target Retirement - 2040 | 1 | 0 | n/a | n/a | n/a |
| 19 | Target Retirement - 2045 | 2 | 0 | 16 | 12 | n/a |
| 20 | Target Retirement - 2050 | 0 | 0 | n/a | n/a | n/a |
| 21 | Total: Target Retirement Funds | 46 | 2 | | | |
| 22 | Total: All Funds | $2,400 | 100 % | | | |
| | Benchmark returns: | | | | | |
| 23 | S&P 500 Index | | | 16 % | 10 % | 6 % |
| 24 | Russell 2000 Index (small cap) | | | 18 | 14 | 11 |
| 25 | Morgan Stanley EAFE Index (International) | | | 27 | 20 | 15 |
| 26 | Lehman Aggregate Bond Index | | | 4 | 4 | 5 |

*Historical returns are not available for five new Target Retirement Funds, introduced in 2006
to provide funds in 5 year increments.*

4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only
TRB0413548

**4**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413549

# TRIBUNE COMPANY
## STOCK PERFORMANCE REPORT
*as of February 6, 2007*



### Total Returns
(price change plus dividends)

| | Annualized through 12/31/06 | | | 2007 |
| | 2006 | 3 year | 5 year | YTD |
|---|---|---|---|---|
| **S&P 500** | 15.8% | 10.5% | 6.2% | 2.2% |
| **Tribune** | 4.2% | -14.3% | -2.4% | 0.6% |
| **Benchmark** | 0.1% | -7.6% | 1.3% | 1.5% |

## STOCK PERFORMANCE

Tribune stock closed 2006 at $30.78, up just over 4% for the year on a total return basis, outperforming Gannett, Washington Post, New York Times, Belo and McClatchy. McClatchy's -26% annualized return follows its acquisition of Knight Ridder, announced in March, 2006.

In the first half of the year, Tribune traded in the $28-31 range. Shares traded up to the $32.50 range in June, during the tender offer that was part of our leveraged recapitalization. On September 21, the company announced the restructuring of the TMCT partnerships and its plan to explore strategic alternatives. Over a two-day period surrounding the announcement, Tribune stock rose more than 10% to $33.99. The stock has since trended down, ending 2006 in the $30-31 range.

To date in 2007, the stock remains in that range as investors await the company's decision regarding strategic alternatives.

## VALUATION

Tribune currently trades at a multiple of 8.2x (enterprise value/2007 operating cash flow), slightly below of the newspaper group average.

Tribune is covered by 17 analysts. Three are currently restricted from rating the stock because their firms are acting as advisors during our strategic review process. Of the remaining group, two rate Tribune "buy," 10 "hold" and two "underperform." Price targets (12-18 months out) range from $21 to $35.

| EV/EBITDA Multiples | |
|---|---|
| | February |
| **Tribune** | **8.2x** |
| Cable | 9.1x |
| Entertainment | 9.9x |
| Newspapers | 8.7x |
| Radio | 10.9x |
| Television | 10.1x |

*Source: Merrill Lynch*
*Based on 2007 estimated operating cash flow.*

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# TRIBUNE COMPANY
## STOCK PERFORMANCE REPORT

## TRADING ACTIVITY

Average daily volume in 2006 was 2 million shares, an increase from the 1.3 million share average daily volume in 2005. The first half of 2006 marked the most active trading period in the company's history, with 114 million shares traded in the first quarter and 281 million shares traded in the second quarter. In addition to the tender offer in the second quarter, this reflects increased activity by hedge funds in TRB and generally higher trading volume on the NYSE.

So far in 2007, average daily volume has declined to about 1.6 million shares.

In 2006, about 25% of outstanding shares (70.7 million) were repurchased through the tender offer and open market purchases.

Short interest was about 6 million shares throughout the first half of 2006, increasing to about 17 million shares in the third quarter and declining to 11 million shares in the first weeks of 2007. This represents about 4% of our shares outstanding, in-line with the broader market and the 5% average of our newspaper peers.

On February 8, we will announce fourth quarter earnings that are 7 cents above analysts' consensus estimates.

## SHAREHOLDER ANALYSIS

The Chandler Trusts currently own 20% of shares outstanding, the McCormick Tribune Foundation owns 13% and employees own 10%. Rounding out the top 15 shareholders are institutions that hold 80 million shares, representing about 34% of ownership based on 239M common shares outstanding.

Significant institutional investor changes in 2006 include:

- T. Rowe Price and Ariel Capital each added about 5M shares to their positions.
- Lord Abbett sold nearly 11M shares.
- Trian Partners, an investment firm headed by Nelson Peltz, established a position of about 4M shares and indicated its intention to acquire additional Tribune stock in a Hart-Scott-Rodino filing in late August.
- Other "event driven hedge funds" that held stock during 2006 include Para Partners and Davidson Kempner. Both have liquidated their positions.

Throughout 2006, management maintained a dialog and met periodically with key institutional shareholders.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413551

# TRIBUNE COMPANY
## STOCK PERFORMANCE REPORT

### TOP 15 SHAREHOLDERS
*As of 12/31/2006*
*(Shares in millions)*

|    |                                      | Shares Held | % of S/O | Style       |
|----|--------------------------------------|-------------|----------|-------------|
| 1. | Chandler Trusts                      | 48.1        | 20.0%    | n/a         |
| 2. | McCormick Tribune Foundation         | 31.3        | 13.0%    | n/a         |
| 3. | Employees                            | 23.3        | 10.0%    | n/a         |
| 4. | T. Rowe Price Associates             | 17.4        | 7.3%     | Active      |
| 5. | Ariel Capital Management             | 15.3        | 6.4%     | Active      |
| 6. | Barclays Global Investors            | 6.6         | 2.8%     | Index/Quant |
| 7. | Morgan Stanley Investment Management | 6.5         | 2.7%     | Active      |
| 8. | The Vanguard Group                   | 5.4         | 2.3%     | Index       |
| 9. | State Street Global Advisors         | 5.2         | 2.2%     | Index       |
| 10.| LSV Asset Management                 | 5.2         | 2.2%     | Quant       |
| 11.| Northern Trust Investments           | 4.2         | 1.8%     | Index       |
| 12.| Nelson Peltz                         | 3.8         | 1.6%     | Activist    |
| 13.| Fidelity Management & Research.      | 3.7         | 1.5%     | Active      |
| 14.| Lord Abbett & Company                | 3.6         | 1.5%     | Active      |
| 15.| GAMCO Investors                      | 3.3         | 1.4%     | Active      |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413552

# TRIBUNE COMPANY
## BENCHMARK COMPANY TOTAL RETURNS

| | | Annualized Returns Through December 31, 2006 | | | | | 2007 |
|---|---|---|---|---|---|---|---|
| | 2006 | | 3-Year | | 5-Year | | YTD |
| Sinclair | 20.2% | Scripps | 2.9% | Scripps | 9.6% | Sinclair | 15.9% |
| Dow Jones | 10.1% | Washington Post | -1.1% | Washington Post | 8.0% | New York Times | 2.7% |
| Hearst-Argyle | 8.2% | Hearst-Argyle | -1.6% | Hearst-Argyle | 4.1% | Hearst-Argyle | 2.6% |
| Scripps | 5.0% | Dow Jones | -6.3% | Sinclair | 4.0% | Washington Post | 1.8% |
| **Tribune** | **4.2%** | Sinclair | -8.4% | Belo | 1.3% | Belo | 1.6% |
| Gannett | 1.9% | Gannett | -10.7% | Gannett | -0.6% | **Tribune** | **0.6%** |
| Washington Post | -1.5% | Belo | -11.8% | McClatchy | -0.7% | Gannett | 0.0% |
| New York Times | -5.3% | McClatchy | -13.3% | **Tribune** | **-2.4%** | Dow Jones | -0.1% |
| Belo | -12.0% | **Tribune** | **-14.3%** | Dow Jones | -4.7% | Scripps | -1.7% |
| McClatchy | -25.5% | New York Times | -18.5% | New York Times | -9.3% | McClatchy | -9.3% |
| | | | | | | | |
| *Benchmark* | *0.1%* | *Benchmark* | *-7.6%* | *Benchmark* | *1.3%* | *Benchmark* | *1.5%* |
| | | | | | | | |
| S&P 500 | 15.8% | | 10.5% | | 6.2% | S&P 500 | 2.2% |
| S&P Pub | 15.3% | | -0.8% | | 4.3% | S&P Pub | 0.6% |

## BENCHMARK COMPONENTS

| | Business | Enterprise Value ($B) |
|---|---|---|
| Gannett* | N, I, B | $ 17.9 |
| **Tribune*** | **N, I, B** | **10.2** |
| Scripps | N, I, B, CN | 9.1 |
| Washington Post | N, I, B, C, E | 7.0 |
| McClatchy | N, I | 5.1 |
| New York Times* | N, I | 5.0 |
| Dow Jones* | N, I | 3.8 |
| Belo | N, I, B | 3.2 |
| Hearst-Argyle | B, I | 3.1 |
| Sinclair | B | 2.3 |

(N) Newspapers, (B) Broadcasting, (I) Interactive, (C) Cable,
(CN) Cable Networks, (E) Education

*Included in the S&P 500 Publishing Index.*

4

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413553

**5**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413554

# TRIBUNE
## 2007 OPERATING PLAN

CONFIDENTIAL                           FEBRUARY 2007

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# 2007 Operating Plan
## Index

Page

Operating Plan Overview ................................................................... 1

Summary of Operations

   • Consolidated ........................................................................ 8

   • Publishing ............................................................................ 9

   • Broadcasting & Entertainment ........................................... 10

Consolidated Cash Flow Summary ................................................... 11

Capital Investments ......................................................................... 12

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413556

**TRIBUNE COMPANY**
**2007 OPERATING PLAN OVERVIEW**

## 2007 FINANCIAL SUMMARY

| **Consolidated Financial Summary** ($ in millions, except per share amounts) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2007 Plan | 2006 Actual 52-Weeks | 2006 Actual 53-Weeks | 2005 Actual | 2004 Actual | 2003 Actual | 2002 Actual |
| Revenues | $ 5,385 | $5,433 | $5,518 | $5,511 | $5,631 | $5,494 | $5,285 |
| Cash Expenses | $ 4,115 | $4,125 | $4,187 | $4,110 | $4,083 | $3,945 | $3,822 |
| Op Cash Flow | $ 1,270 | $1,308 | $1,330 | $1,401 | $1,548 | $1,549 | $1,463 |
| Diluted EPS | $2.00 | $1.97 | $2.01 | $2.03 | $2.19 | $2.03 | $1.81 |

*\* Excludes special items, non-operating items and discontinued operations (Albany, Atlanta and Boston TV stations).*

Key highlights of the 2007 plan compared to 2006 on a comparable 52-week basis follows. Our operating plan does not reflect the implementation of any strategic actions currently under review by the Special Committee.

- Consolidated revenues decrease by $48 million, or 1%, with Publishing down $41 million (1%) and Broadcasting declining by $7 million (0.5%).
- Cash expenses decline by $10 million, or 0.2%, primarily due to lower newsprint expense, partially offset by increases in compensation expense and other cash expenses.
  - ○ Compensation expense will be up only slightly as merit increases and higher stock-based compensation expense will be largely offset by lower retirement expense and the impact of FTE reductions.
    - ▪ Stock-based compensation expense is projected at $42 million in 2007 compared to $32 million in 2006. The increase is due to the 2007 expense including the amortization of both the 2006 and 2007 equity grants. The 2006 expense consisted of primarily just the amortization of the 2006 grant as the 2003, 2004 and 2005 grants were early vested in 2005 prior to adopting the new accounting standard.
    - ▪ Pension expense is projected to decline by $25 million due to strong investment returns in 2006 and a higher discount rate. The 401(k) retirement expense will decline by $4 million due to reducing the target contribution rate to 6.5% from 7.0% in 2006.
- Consolidated operating cash flow decreases by $38 million, or 3%.
- Equity income decreases by $8 million to a total of $67 million in 2007 primarily due to equity losses from potential interactive investments and a lower share of TMCT equity income, partially offset by higher income from TV Food Network and improved results at CareerBuilder.
- Interest expense increases by $57 million, or 21%, due to the additional debt to finance the stock repurchases in 2006.

1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413557

- Diluted earnings per share are projected to be up 3 cents to $2.00 as a decline in operating profit and equity income is more than offset by lower average shares outstanding and a more favorable effective tax rate. Average diluted shares outstanding will be down 12% to 242 million in 2007.

## PUBLISHING

### 53rd Week in 2006

The 53rd week in 2006 added approximately $68 million of revenue, $50 million of cash expenses and $18 million of operating cash flow to Publishing's results. The impact of the 53rd week increased growth rates by just under 2% for advertising revenues, operating revenues, cash expenses, operating cash flow and operating profit in 2006.

The 2007 comparisons to 2006 included in the following discussion are on a 52-week basis.

### Revenue

Publishing's operating revenues are expected to decrease by $41 million, or 1.0%, in 2007 due to the difficult advertising environment and structural changes facing the newspaper industry. Interactive, targeted print and preprint growth will be mostly offset by declines in print advertising and circulation revenue as the newspapers continue selective home delivery discounting in order to stabilize individually paid circulation.

The planned 1% decline in revenue is in the middle of the range of industry analysts' forecasts for publishing. Similar to our industry peers, the first half of 2007 will have more difficult comparables than the second half. We are projecting second half results to be better versus the second half of 2006, which was down 2%. We expect to perform at least as well as the industry due to many of the initiatives we have in place to improve top-line growth.

*Advertising*
- Advertising revenues are projected to decrease by $33 million, or 1.0%, primarily due to a $135 million, or 7%, decline in print advertising at the daily newspapers. This decline will be partially offset by a $49 million, or 22%, increase in Interactive revenues, a $41 million, or 6%, increase in preprints and a $12 million, or 4%, increase in targeted print revenues.
- Structural and cyclical advertising revenue declines will be partially offset by more color ads, as well as innovative and premium ad positions. Chicago and South Florida completed projects in the fourth quarter of 2006 to increase color capacity. Premium ad positions are projected to add approximately $15 million of incremental revenue in 2007.
- Retail advertising is projected to increase $15 million, or 1.1%, as preprint growth of $35 million, including $25 million of incremental revenue from the ADVO distribution agreement, is partially offset by declines in daily newspaper print advertising.
- Local retail categories represent approximately 60% of retail advertising and are the most impacted by local sales force pressure. Local retail was up 2% in 2006 and is projected to be up about the same in 2007. These increases will be mostly offset by declines in

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413558

national retailers in the department store, electronics and food and drug categories due to consolidations within those industries and greater competition from other national media.

- Total preprint growth of $41 million, or 6%, is primarily due to increases from the ADVO agreement in Los Angeles, Chicago's packaging expansion to provide sub-zip code level targeting and improved preprint results at Newsday. Newsday cycled through most of the $25 million in preprint losses as a result of terminating its relationship with its sales agent CBA (Harold Matzner) by the end of 2006. Newsday is working hard to win back additional accounts and is projecting a slight increase in preprint revenue in 2007.

- National is projected to decrease $17 million, or 2.4%. Many of the key national advertisers, including airlines, telecom, movie studios and auto manufacturers are facing cyclical issues within their own industries, which in turn, are putting downward pressure on advertising budgets as they seek to cut costs.

- Classified is projected to decrease $31 million, or 2.7%, as all three major classified categories face difficult trends in 2007. Online classified, which represents approximately 80% of total interactive revenues, will grow $36 million, or 19%.
    - o Real estate became the largest classified category in 2006 after growing $70 million. In 2007, it is projected to decrease $5 million, or 2%. Online growth of $14 million, including $10 million of incremental revenue from the full year of ForSaleByOwner.com, will be more than offset by print declines as the housing market has slowed, especially new home sales, and spending levels are not projected to be sustained at the record levels of 2006.
    - o Recruitment, which fell 3% in 2006, is projected to decrease $14 million, or 4%, in 2007. Online is projected to grow $10 million, or 9%. Declines in print listings will continue as more advertisers move to online only solutions. However, these declines should moderate somewhat as the price of an online posting approaches the price for an average sized print ad in a large market. The newspapers are also testing innovative print pricing models to improve advertiser returns on investment.
    - o Automotive classified advertising is projected to decline $8 million, or 2%, in 2007, an improvement in the trend over the past two years. Online is projected to grow $11 million, or 28%. In many markets, domestic auto dealers are struggling with lower profits and lower shared promotional dollars after the large manufacturer incentives ended in 2005. Additionally, dealership consolidation will continue but at a slower rate. As with recruitment, the newspapers are testing different pricing models to better partner with local dealers who are seeking ways to sell more cars.

*Circulation*

- Circulation revenues are projected to decrease $23 million, or 4%, as the newspapers continue to selectively discount home delivery in order to keep individually paid copies stable and manage subscriber acquisition expenses and churn.
- Daily and Sunday circulation is expected to decrease 1.1% and 1.2%, respectively, as the Group continues to reduce copies in the "other paid" category.
- Daily individually paid circulation is projected to decrease 0.6% in 2007. Home delivery will remain flat with single copy down 3%.

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

- Sunday individually paid circulation is projected to decrease 0.7%. Home delivery will be down 0.4% and single copy will be down 2%.
- These planned circulation results are expected to be better than the results for our newspaper peers in major metropolitan markets.

## Expenses

Cash expenses are projected to decrease $25 million, or 1%, in 2007. Cost savings from approximately 500 fewer FTEs, a reduction in both price and consumption for newsprint, continued outsourcing initiatives, and other structural changes are expected to save approximately $150 million in 2007. These savings will be partially offset by inflationary pressures and funding for continued development initiatives in higher growth interactive and targeted print opportunities. Cash expenses also reflect an increase of $26 million from a full year of ForSaleByOwner.com and the ADVO distribution agreement.

- Newsprint and ink expense is projected to decrease by $41 million, or 8%, in 2007 due to a 4% decrease in average newsprint price and a 5% decline in consumption. The consumption decline will come from initiatives to reduce pages and waste and the projected decrease in circulation. Additionally, throughout 2007 and the first half of 2008, press modifications will be made to reduce the web width at seven of the newspapers. Newsprint savings of $2 million are projected for 2007. Once fully implemented, the reduction in web width is projected to result in annual savings of approximately $11 million.
- Compensation expense is projected to be essentially flat in 2007, as merit increases, incentives at target levels and an increase in stock-based compensation will be largely offset by savings from about 500 fewer employees.
    - Benefits are projected to decrease by $6 million, or 2%, as lower retirement costs will more than offset increases in other fringe benefits.
    - Stock-based compensation is projected to be $5 million higher.
- Other cash expenses are projected to increase by $10 million, or 1%, in 2007, primarily due to increases in postage expense for mailed preprint products and growth in affiliate fees and promotion expenses related to interactive joint ventures and new products, partially offset by savings in other areas.
- The plan assumes the restructuring of Recycler in Los Angeles and the sale of the New York edition of *Hoy* in the first quarter of 2007. These actions improve targeted print operating cash flow by $8 million in 2007.

## Operating Cash Flow and Operating Profit

Publishing operating cash flow is expected to decrease 1.7% to $915 million. Operating cash flow growth in interactive and the targeted print businesses will be offset by modest declines at the daily newspapers. Operating cash flow margin will remain flat at 23%. Operating profit is projected to decrease $32 million, or 4.3%, to $725 million primarily due to a $17 million increase in deprecation expense mostly related to the common advertising, circulation and editorial system projects.

4

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413560

**Interactive Joint Ventures**

Publishing's interactive joint ventures represent investments that allow Tribune to exploit continued market shifts from print to online. Publishing's equity losses are planned to increase by $8 million to $23 million in 2007, primarily due to planned losses of $13 million for start-up losses related to new interactive investments and initiatives with other newspaper partners, including a national online advertising network and new niche content channels. In addition, equity losses at Topix.net will increase by $2 to $3 million in 2007 due to increased promotion and product development. The higher losses will be partially offset by improved results at CareerBuilder, which is projected to be profitable in 2007.

## BROADCASTING

### 53rd Week in 2006

The 53rd week in 2006 added approximately $17 million of revenue, $12 million of cash expenses and $5 million of operating cash flow. The impact of the 53rd week increased Broadcasting's growth rates by 1% for revenues, cash expenses, and operating cash flow in 2006.

The 2007 comparisons to 2006 included in the following discussion are on a 52-week basis.

### Revenue

Broadcasting's operating revenues are planned to decrease by $7 million, or 0.5%, in 2007. Television advertising revenues are projected to be down 1% in 2007 versus industry spot television revenue forecasts showing a decline of 3%. Excluding political revenue, our television advertising revenue is expected to increase 2% versus a non-political, non-Olympic spot market forecast of less than 1%. Our overall television revenue share is expected to increase 0.7% due to the loss of political revenue having a more significant impact on our competitors.

| Big Three Markets Advertising Revenue (Including Political) | | | |
|---|---|---|---|
| | **2007 Plan** | **2006 52-Weeks** | **2005 Actual** |
| **New York** | | | |
| WPIX | +4.3% | -6.5% | -13.4% |
| Market | -2.1% | -3.4% | -3.4% |
| **Los Angeles** | | | |
| KTLA | -4.0% | +3.6% | -11.0% |
| Market | -8.6% | +7.5% | -2.0% |
| **Chicago** | | | |
| WGN | -6.1% | -7.2% | -4.1% |
| Market | -6.0% | +2.3% | -0.1% |

- Declining ratings in key dayparts (Early and Late Fringe) will continue to negatively impact revenue until the rollout of *Two And A Half Men* and *Family Guy* in September 2007. These declines will be partially offset by an increase in primetime revenue on our Fox and CW stations.
- Revenues are expected to decline 2% at our stations with local people meters (LPMs), remain flat at our Fox stations and increase 2% at all other CW stations. Advertising revenues at Superstation WGN are projected to be down 2%.
- Revenues at WGN Radio are expected to fall 2% due to no longer sponsoring the Chicago Flower and Garden Show.

5

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413561

- Tribune Entertainment revenues are expected to increase 17% as a result of a full year of *American Idol Rewind* barter advertising sales and the back-end sale of *Mutant X*.
- Chicago Cubs revenues will fall 4% due to lower planned attendance.

## Expenses

Cash expenses are expected to increase $15 million, or 2%, in 2007. Nielsen costs related to LPMs and the resumption of ratings in New Orleans and costs related to promoting key new shows are planned in 2007. Broadcasting's 2006 FTEs are projected to be down 1% in 2007 as a result of the planned third quarter outsourcing of news production at our Dallas, Houston and St. Louis stations.

- Broadcast rights expense is projected to fall by $2 million, or 1%, due to lower fees paid to The CW network and reduced sports amortization resulting from not renewing Cardinals baseball in St. Louis. These decreases will be partially offset by higher fourth quarter syndicated rights expense related to the premier in fall 2007 of *Two and a Half Men* and *Family Guy*.
- Television compensation is projected to increase 4% due to merit increases and higher stock-based compensation expense. Direct pay is planned up only 1%, as 3% merit increases for non-union personnel will be partially offset by FTE reductions. Stock-based compensation is projected to be $4 million higher.
- Other television cash expenses will increase by $8 million, or 4%, due primarily to the outsourcing of news in the three markets mentioned above ($2 million), increased Nielsen costs related to LPMs and the resumption of ratings in New Orleans ($2 million) and increased promotion costs necessary to build interest in key new shows ($2 million). Excluding these items, other television cash expenses are up 1%.
- Radio cash expenses are projected to fall by 4% due to the discontinuation of the Chicago Flower and Garden Show sponsorship.
- Tribune Entertainment cash expenses will rise 1% while Cubs cash expenses will fall 1%.

## Operating Cash Flow and Operating Profit

Broadcasting and Entertainment's operating cash flow will decrease by $21 million, or 5%, to $416 million. Television's operating cash flow margin is projected at 32.7%, a decline of 1.5 points. Operating profit is projected to decrease by $23 million, or 6%, to $363 million.

## Equity Investments

Income from equity investments is planned at $90 million in 2007, up $5 million, or 6%, due to higher income anticipated from TV Food Network.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413562

## CORPORATE AND FINANCING

Corporate cash expenses are projected to be flat at $61 million, as merit increases and higher stock-based compensation expense will be offset by a full year of savings from the sale of the corporate airplane, lower retirement plan expense and other cost reductions.

Interest expense is expected to increase by $57 million, or 21%, in 2007 due to higher average debt levels as a result of financing the stock repurchases in the second half of 2006. Tribune's debt-to-operating cash flow ratio for 2007 is projected at 3.2x excluding the PHONES (3.6x including PHONES debt at book value). We have $100 million available for acquisitions. The annual dividend will be held flat at $0.72 per share.

7

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413563

# Consolidated
## Summary of Operations [1]
(Amounts in millions, except per share amounts)

| | 2007 Plan | 2006 Actual 52-Weeks | 2006 Actual 53-Weeks | 2005 Actual | % Change '06-'07 52-Wks | % Change '06-'07 53-Wks | % Change '05-'06 52-Wks | 2007 Comments vs. 2006 52-Weeks |
|---|---|---|---|---|---|---|---|---|
| **Operating Revenues** | | | | | | | | |
| 1 Publishing | $3,984 | $4,025 | $4,093 | $4,097 | -1.0% | -2.6% | -1.8% | ◆ Advertising -1%, Circulation -4%, Other +6% |
| 2 Broadcasting | 1,401 | 1,408 | 1,425 | 1,414 | -0.5% | -1.7% | -0.5% | ◆ Aging fringe programming offset by new shows in Q4 |
| 3   Total Revenues | $5,385 | $5,433 | $5,518 | $5,511 | -0.9% | -2.4% | -1.4% | and stronger prime |
| **Operating Cash Expenses** | | | | | | | | |
| 4 Publishing | $3,069 | $3,094 | $3,144 | $3,111 | -0.8% | -2.4% | -0.5% | ◆ Newsprint -8%, compensation flat, other cash +1% |
| 5 Broadcasting | 985 | 970 | 982 | 949 | 1.5% | 0.3% | 2.3% | ◆ More LPMs & promotion for new shows |
| 6 Corporate | 61 | 61 | 62 | 50 | -0.4% | -1.1% | 21.3% | ◆ Higher stock-based compensation offset by lower |
| 7   Total Op. Cash Exp. | $4,115 | $4,125 | $4,187 | $4,110 | -0.2% | -1.7% | 0.4% | pension & other cost-savings |
| | | | | | | | | ◆ Includes stock-based compensation of $42M in '07 |
| **Operating Cash Flow** | | | | | | | | and $32M in '06; none in '05 |
| 8 Publishing | $915 | $931 | $949 | $986 | -1.7% | -3.6% | -5.6% | ◆ Revenue decline partially offset by expense savings |
| 9 Broadcasting | 416 | 437 | 443 | 466 | -4.8% | -6.1% | -6.0% | ◆ Political in '06 and aging product partially offset by |
| 10 Corporate | (61) | (61) | (62) | (50) | 0.4% | 1.1% | -21.3% | outsourced news savings |
| 11   Total Op. Cash Flow | 1,270 | 1,308 | 1,330 | 1,401 | -2.9% | -4.5% | -6.7% | |
| **Operating Profit** | | | | | | | | |
| 12 Publishing | $725 | $757 | $775 | $811 | -4.3% | -6.5% | -6.7% | ◆ Higher depreciation expense due to common |
| 13 Broadcasting | 363 | 386 | 391 | 417 | -5.9% | -7.2% | -7.4% | systems projects |
| 14 Corporate | (62) | (63) | (63) | (52) | 0.2% | 0.9% | -20.1% | |
| 15   Total Op. Profit | 1,026 | 1,081 | 1,103 | 1,177 | -5.1% | -7.0% | -8.2% | ◆ Includes depreciation & amortization of $244M in '07 |
| | | | | | | | | and $227M in '06 |
| 16 Equity Income | 67 | 75 | 75 | 41 | -10.7% | -10.7% | 81.8% | ◆ TVFN +$6M; CB +$9M; ShopLocal -$1M; |
| | | | | | | | | add'l interactive investments -$14M; TMCT -$5M |
| 17 Interest & dividend income | 13 | 14 | 14 | 8 | -6.2% | -8.1% | 83.6% | |
| 18 Interest expense | (324) | (267) | (274) | (155) | 21.2% | 18.1% | 72.0% | ◆ Higher debt levels as a result of stock repurchases |
| | | | | | | | | in 2006 |
| 19 Income before taxes | 782 | 902 | 918 | 1,070 | -13.3% | -14.9% | -15.7% | |
| 20 Income taxes | (299) | (356) | (362) | (421) | -16.0% | -17.3% | -15.4% | ◆ Tax rate 38.25% in '07; 39.5% in '06 |
| 21 Net Income | $483 | $546 | $557 | $649 | -11.6% | -13.3% | -15.9% | |
| 22 Avg. diluted shares outstanding | 242 | 274 | 274 | 315 | -11.8% | -11.8% | -13.0% | ◆ Stock repurchases of $2.3B (70.7M shares) in '06 and $440M (12.2M shares) in '05 |
| **Diluted EPS** | | | | | | | | |
| 23 Tribune Company | $2.00 | $1.97 | $2.01 | $2.03 | 1.5% | -0.5% | -3.0% | |
| 24 Wall Street average | $2.02 | | | | | | | |
| 25   Range of Estimates | $1.87-2.15 | | | | | | | |

(1) Excludes special items, non-operating items and discontinued operations.

8

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413564

# Publishing
## Summary of Operations [1]
($ in millions)

| | | 2007 Plan | 2006 52-Week Actual | 2005 Actual | % Chg (52-Wk) '06-'07 | % Chg (52-Wk) '05-'06 | 2007 Comments vs. 2006 52-Weeks |
|---|---|---|---|---|---|---|---|
| | **Operating Revenues** | | | | | | |
| | Advertising | | | | | | |
| 1 | Retail | $1,336 | $1,321 | $1,324 | 1.1% | -0.2% | ♦ Preprint +6%, Targeted +5%, ROP -6%, ADVO +$25M |
| 2 | National | 701 | 718 | 774 | -2.4% | -7.2% | ♦ ROP -5%, preprint +6% |
| 3 | Classified | 1,135 | 1,166 | 1,146 | -2.7% | 1.7% | ♦ Recruitment -4%, Real estate -2%, Auto -2% |
| 4 | Total Advertising | 3,172 | 3,205 | 3,244 | -1.0% | -1.2% | ♦ ADVO adds $25M of growth |
| 5 | Circulation | 542 | 565 | 596 | -4.0% | -5.3% | ♦ Continued discounting to stabilize individually paid circulation |
| 6 | Other | 270 | 255 | 257 | 6.0% | -0.7% | ♦ TMS +4%, commercial delivery and national direct mail |
| 7 | **Total Revenues** | $3,984 | $4,025 | $4,097 | -1.0% | -1.8% | |
| | **Operating Cash Expenses** | | | | | | |
| 8 | Newsprint & Ink | $459 | $500 | $491 | -8.2% | 1.7% | ♦ 5% lower consumption and 4% average price decrease |
| 9 | Compensation | 1,341 | 1,335 | 1,367 | 0.4% | -2.3% | ♦ 490 FTE reduction, partially offset by merit increases |
| 10 | Other Cash | 1,269 | 1,259 | 1,252 | 0.8% | 0.5% | ♦ Mailed preprint postage +$18M |
| 11 | **Total Cash Expenses** | 3,069 | 3,094 | 3,111 | -0.8% | -0.5% | |
| 12 | **Operating Cash Flow** | 915 | 931 | 986 | -1.7% | -5.6% | ♦ '06 down 4% excluding stock-based compensation |
| 13 | Depreciation & Amortization | 191 | 174 | 175 | 9.3% | -0.3% | ♦ Color projects and new circ / ad systems |
| 14 | **Total Operating Profit** | $725 | $757 | $811 | -4.3% | -6.7% | |
| | **Equity Investments** | | | | | | |
| 15 | CareerBuilder (43%) | $1 | ($8) | ($15) | NM | 45.0% | ♦ Higher revenues in 2007 |
| 16 | Classified Ventures (28%) | 1 | 2 | (2) | -49.4% | NM | |
| 17 | ShopLocal.com (43%) | (9) | (9) | (5) | -7.1% | -73.2% | ♦ Continued promotion and product development |
| 18 | Topix.net (34%) | (3) | (1) | (1) | -163% | -71.3% | ♦ Promotion and product development |
| 19 | Other | (13) | 1 | (1) | NM | NM | ♦ Start-up losses for interactive ad network and niche channels |
| 20 | **Total Equity Loss** | ($23) | ($15) | ($22) | -52.4% | 33.6% | and additional investments |
| 21 | Total Group Profit | $702 | $742 | $789 | -5.4% | -6.0% | |
| 22 | **Operating Cash Flow Margin** | 23.0% | 23.1% | 24.1% | | | |
| | **Newsprint and FTE information:** | | | | | | |
| 23 | Avg. 28-lb. Newsprint Price/Ton | $606 | $631 | $576 | -4.0% | 9.5% | |
| 24 | Tons Consumed (000's) | 704 | 737 | 814 | -4.5% | -9.5% | ♦ Fewer "other" copies printed and less pages |
| 25 | Average FTEs | 17,300 | 17,789 | 18,834 | -2.7% | -5.5% | ♦ Savings from efficiency initiatives |

(1) Excludes special charges and property sales gains in 2006, special charges for severance, a plant shutdown and a one-time pension curtailment gain in 2005.

| Advertising Revenues | 2007 | % | 2006 | % |
|---|---|---|---|---|
| ROP | $1,898 | -7% | $2,033 | -4% |
| Preprints | 721 | 6% | 680 | -1% |
| Targeted Print | 278 | 4% | 266 | 1% |
| Interactive | 275 | 22% | 226 | 28% |
| Total | $3,172 | -1% | $3,205 | -1% |

| Classified Advertising Revenue | 2007 | % | 2006 | % |
|---|---|---|---|---|
| Recruitment | $ 336 | -4% | $ 350 | -3% |
| Real Estate | 377 | -2% | 382 | 22% |
| Auto | 263 | -2% | 271 | -12% |
| Other | 159 | -2% | 163 | -2% |
| Total | $1,135 | -3% | $1,166 | 2% |

9

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413565

# Broadcasting & Entertainment
## Summary of Operations [1]
### ($ in millions)

| | | 2007 Plan | 2006 52-Week Actual | 2005 Actual | % Chg (52-Wk) '06-'07 | % Chg (52-Wk) '05-'06 | 2007 Comments vs. 2006 52-Weeks |
|---|---|---|---|---|---|---|---|
| | **Operating Revenues** | | | | | | |
| | Television | | | | | | |
| 1 | Advertising | $1,108 | $1,114 | $1,126 | -0.5% | -1.0% | ◆ TV ad sales +2% excl. political |
| 2 | Subscriber Fees | 42 | 40 | 32 | 3.3% | 24.1% | ◆ Subscribers up to 70 million and key deals completed |
| 3 | Copyright Royalties & Other | 8 | 7 | 8 | 18.2% | -10.8% | ◆ '06 down due to $2M TV ratings reserve |
| 4 | Total Television | 1,158 | 1,161 | 1,166 | -0.3% | -0.4% | |
| 5 | Radio | 40 | 41 | 45 | -1.8% | -7.9% | ◆ Flower & Garden Show sponsorship dropped |
| 6 | Entertainment | 23 | 20 | 34 | 17.3% | -40.8% | ◆ FY *American Idol Rewind* ad sales; *Mutant X* distribution |
| 7 | Chicago Cubs | 194 | 202 | 189 | -3.9% | 7.0% | ◆ Lower attendance |
| 8 | Eliminations & Other | (15) | (17) | (19) | 11.2% | 10.9% | |
| 9 | **Total Revenues** | $1,401 | $1,408 | $1,414 | -0.5% | -0.5% | |
| | **Operating Cash Expenses** | | | | | | |
| | Television | | | | | | |
| 10 | Broadcast Rights Amortization | $353 | $355 | $335 | -0.6% | 5.8% | ◆ FY *According to Jim*, Q4 premier of *2 1/2 Men*, *Family Guy* offset by lower CW network fees (-$3M) and loss of Cardinals (-$4M) |
| 11 | Compensation | 252 | 242 | 243 | 4.3% | -0.3% | ◆ 3% avg merit increase offset by news outsourcing; favorable benefit adjustments of $5M in '06 |
| 12 | Other Cash | 175 | 167 | 162 | 4.3% | 3.2% | ◆ Outsourced news +$2M; promotion +$2M for key new shows; Nielsen +$2M LPMs, New Orleans back online; all other +1% |
| 13 | Total Television | 779 | 764 | 740 | 2.0% | 3.2% | |
| 14 | Radio | 26 | 27 | 29 | -3.7% | -5.2% | ◆ Flower & Garden Show discontinued |
| 15 | Entertainment | 19 | 19 | 25 | 1.2% | -26.2% | |
| 16 | Chicago Cubs | 175 | 177 | 174 | -0.8% | 1.6% | |
| 17 | Eliminations & Other | (15) | (17) | (20) | 10.4% | 16.4% | |
| 18 | **Total Cash Expenses** | 985 | 970 | 949 | 1.5% | 2.3% | |
| | **Operating Cash Flow** | | | | | | |
| 19 | NY / LA / CHI | $135 | $143 | $164 | -5.6% | -12.8% | ◆ Access/Late Fringe dayparts remain ratings challenged until Q4 |
| 20 | All Other TV Stations | 155 | 161 | 173 | -3.9% | -7.1% | ◆ Share gains in most markets offset by political revenue drop |
| 21 | Cable TV | 89 | 93 | 90 | -5.0% | 4.3% | ◆ Soft cable mkt; research up; digital distribution upgrade complete |
| 22 | Total Television | 378 | 397 | 427 | -4.8% | -6.9% | |
| 23 | Radio | 14 | 14 | 16 | 1.9% | -12.9% | ◆ Market firming |
| 24 | Entertainment | 5 | 1 | 8 | 263.3% | -85.2% | ◆ Back-end sale of *Mutant X* |
| 25 | Chicago Cubs | 19 | 25 | 15 | -25.2% | 71.7% | ◆ Lower attendance |
| 26 | **Total Operating Cash Flow** | 416 | 437 | 466 | -5.0% | -6.0% | |
| 27 | Depreciation & Amortization | 52 | 51 | 48 | 2.0% | 6.0% | |
| 28 | **Total Operating Profit** | $363 | $386 | $417 | -5.9% | -7.4% | |
| | **Equity Investments** | | | | | | |
| 29 | TV Food Network (31%) | 78 | 72 | 55 | 7.5% | 32.2% | ◆ Continued growth |
| 30 | Comcast SportsNet (25%) | 10 | 10 | 10 | 0.0% | 3.4% | |
| 31 | Other | 2 | 2 | (7) | -11.0% | NM | ◆ '05 includes final WB equity loss |
| 32 | **Total Equity Income** | $90 | $85 | $57 | 6.1% | 47.5% | |
| 33 | Total Group Profit | $453 | $471 | $474 | -3.7% | -0.8% | |
| | **Operating Cash Flow Margins:** | | | | | | ◆ Includes stock-based compensation expense in '06 & '07 |
| 34 | Total Television | 32.7% | 34.2% | 36.6% | | | |
| 35 | Total Group | 29.7% | 31.1% | 32.9% | | | |
| 36 | **Average FTEs** | 3,013 | 3,050 | 3,173 | -1.2% | -3.9% | |

(1) Excludes discontinued operations in all years, and special charges & non-operating items in 2006 & 2005.

10

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413566

# Consolidated Cash Flow Summary

($ in millions)

|  |  | 2007 Plan | 2006 Actual | 2005 Actual | % Change '06-'07 |
|---|---|---|---|---|---|
|  | **Operating Cash Flow** [1] |  |  |  |  |
| 1 | Publishing | $915 | $949 | $986 | -3.6% |
| 2 | Broadcasting & Entertainment | 416 | 443 | 477 | -6.1% |
| 3 | Corporate | (61) | (62) | (50) | 1.1% |
| 4 | **Total Operating Cash Flow** | 1,270 | 1,330 | 1,401 | -4.5% |
| 5 | Net Cash Interest | (287) | (237) | (135) | 20.9% |
| 6 | Cash Taxes | (235) | (293) | (320) | -19.8% |
| 7 | Capital Expenditures | (200) | (222) | (206) | -9.9% |
| 8 | Cash Flow from Equity Investments | 90 | 65 | 49 | 37.8% |
| 9 | Stock-based Compensation | 42 | 32 | - | 33.1% |
| 10 | Working Capital and Other | (20) | (20) | (24) | 0.0% |
| 11 | **Free Cash Flow** | 660 | 655 | 765 | 0.8% |
| 12 | Tax Settlements | (13) | (5) | (800) | NM |
| 13 | Dividends | (173) | (201) | (233) | -13.9% |
| 14 | Stock Repurchases | 0 | (2,262) | (440) | -100.0% |
| 15 | Acquisitions and Investments | (100) | (222) | (82) | -55.0% |
| 16 | Proceeds from Asset Sales, Net of Tax | 70 | 407 | 23 | NM |
| 17 | Sale of Stock and Other | (14) | (52) | 20 | -72.8% |
| 18 | **Repayment (Issuance) of Debt** | $430 | ($1,680) | ($749) | NM |

(1) Excludes special items in all years.

---

### Key Financial Assumptions

(Dollar amounts in millions, except per share amounts)

|  | Debt | 2007 Plan | 2006 Actual | 2005 Actual | 2007 Comments |
|---|---|---|---|---|---|
|  | Year-end Debt |  |  |  |  |
| 19 | Variable Rate / CP | $2,500 | $2,907 | $ 924 |  |
| 20 | Fixed Rate | 1,502 | 1,525 | 1,828 |  |
| 21 | Debt (excluding PHONES) | $4,002 | $4,432 | $2,752 | • Debt/Total Capital ratio is 37% (41% in '06; 23% in '05). |
| 22 | PHONES at book value | $573 | $573 | $510 |  |
| 23 | Debt (including PHONES) | $4,575 | $5,005 | $3,262 |  |
| 24 | Debt (excl. PHONES) / OCF | 3.2x | 3.3x | 2.0x |  |
| 25 | Debt (incl. PHONES) / OCF | 3.6x | 3.8x | 2.3x |  |
| 26 | OCF / Interest Expense | 3.9x | 4.9x | 9.0x | • Includes PHONES |
|  | Interest Rates on Debt |  |  |  |  |
| 27 | Variable Rate / CP | 6.3% | 6.2% | 4.4% | • End-of-year rates |
| 28 | New 10-Year Notes | 7.5% | 7.5% | 5.6% | • End-of-year rates |
| 29 | Existing Fixed Rate Debt | 6.6% | 5.8% | 5.8% | • End-of-year rates excluding PHONES |
|  | **Stock Activity** |  |  |  |  |
|  | Shares |  |  |  |  |
| 30 | Repurchases | 0.0 | (70.7) | (12.2) |  |
| 31 | Issues | 1.6 | 3.2 | 1.8 | • Includes ESPP issuances, stock options and restricted |
| 32 | Net | 1.6 | (67.5) | (10.4) |  |
|  | Cost |  |  |  |  |
| 33 | Repurchases | $0 | $(2,262) | $(440) |  |
| 34 | Issue Proceeds | 20 | 37 | 41 |  |
| 35 | Net | $20 | $(2,225) | $(399) |  |
| 36 | Common Dividends/Share | $.72 | $.72 | $.72 | • Diluted EPS payout ratios: 36% in '07 and '06 |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413567

# Capital Investments

| Summary by Group | | | |
|---|---|---|---|
| ($ in millions) | 2007 Plan | 2006 Actual | 2005 Actual |
| Publishing | $165 | $173 | $163 |
| Broadcasting (1) | 28 | 42 | 37 |
| Corporate | 7 | 6 | 6 |
| Total | $200 | $222 | $206 |

(1) 2006 includes $5M of capital spending in New Orleans that was fully funded by insurance proceeds.

| Capital Investments as a % of Op. Cash Flow: | | | |
|---|---|---|---|
| | 2007 Plan | 2006 Actual | 2005 Actual |
| Publishing | 18% | 18% | 17% |
| Broadcasting | 7% | 10% | 8% |
| Total | 16% | 17% | 15% |

| Capital Investments as a % of Depreciation: | | | |
|---|---|---|---|
| Total | 90% | 106% | 99% |

## Consolidated

Capital investments are planned to total $200M in 2006. The chart to the right categorizes capital investments into two classifications. Class I projects are profit adding with a projected return on investment of at least 12%. Class II projects are profit maintaining investments.

| Capital Investment by Classification | | |
|---|---|---|
| ($ in millions) | 2007 Plan | 2006 Actual |
| **Class I Projects** | | |
| Packaging projects | $32 | $30 |
| Advertising systems | 29 | 22 |
| Circulation system | 10 | 13 |
| Web width reduction | 10 | 3 |
| Editorial system | 9 | 11 |
| Color press expansions | 1 | 17 |
| Cubs bleachers | - | 9 |
| All other | 11 | 28 |
| Total | 102 | 133 |
| **Class II Projects** | 98 | 89 |
| Total | $200 | $222 |

## Publishing

Publishing plans to invest $165M in 2007. Major system replacement projects for all newspaper markets that continue in 2007 are the advertising billing system ($29M in 2007, $77M total), the common circulation system ($10M in 2007, $22M total) and the common editorial system ($9M in 2007, $33M total). Packaging projects to enable sub-zip code zoning continue in Chicago ($13M in 2007, $39M total) and will begin in 2007 in New York ($15M in 2007, $40M total). Web width reductions at seven of the newspaper markets continue in 2007 ($10M in 2007, $25M total). The remaining planned spending is for system and hardware replacements, refurbishing production equipment and technology enhancements across the Publishing group.

## Broadcasting

Broadcasting expects to spend $28M in 2007. Approximately $9M is planned spending for digital transmission and studio equipment projects, including $4M to continue the transition to high-definition news in the New York, Los Angeles and Chicago markets. The remaining planned spending includes news equipment and various smaller projects throughout the station group. The 2007 plan does not include anticipated spending at New Orleans to replace assets damaged by Hurricane Katrina, as this spending will be fully funded by insurance proceeds.

## Corporate

Corporate anticipates spending $7M in 2007 including structural repairs and improvements to Tribune Tower ($3M in 2007) and various software and hardware upgrades ($4M in 2007) at the technology and finance shared service centers.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413568

6

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413569

# TRIBUNE COMPANY
## DEVELOPMENT UPDATE

This report summarizes the status of current development activities.

## PUBLISHING AND INTERACTIVE

### CareerBuilder

Consistent with the terms discussed at the December board meeting, CareerBuilder and Microsoft have reached an agreement in principle to (i) extend their existing domestic distribution agreement through 2013, (ii) enter into a new international distribution agreement through 2013, and (iii) have Microsoft acquire a 5% equity stake in CareerBuilder for approximately $80 million (a $1.55 billion valuation). The terms of a definitive agreement are being negotiated and are expected to be completed by the end of February.

### New Interactive Joint Ventures

Tribune, Gannett and McClatchy continue to evaluate ways to more effectively use our combined Internet assets, with the current focus on creating an online advertising network and launching new national content channels. The ad network would include each of our companies' newspaper.com websites and, hopefully, the sites of other newspaper groups, and would establish a standard online advertising platform across a large segment of the newspaper industry. The new content channels would likely cover areas such as entertainment, travel and parenting.

Through December we were making good progress with Gannett and McClatchy towards the creation of an ad network and were targeting a first quarter 2007 launch. Our discussions have slowed recently, as our potential partners, particularly Gannett, are waiting to see the outcome of Tribune's strategic alternatives review process before moving forward. We are now targeting a launch in the second quarter of this year.

Tribune, Gannett and McClatchy are also continuing discussions with Yahoo, Google, Microsoft and AOL regarding possible alliances or business relationships with our ad network and new content channels. Having one of these major Internet companies as a partner could aid our efforts, as each potential partner has a sophisticated technology platform that could run our network and each could provide strong distribution for new national content channels.

### Hoy

We are finalizing an agreement to sell the assets of *Hoy* New York to ImpreMedia LLC for $7.5 million in cash. ImpreMedia publishes Spanish language newspapers in six markets, including daily newspapers *El Diario La Prensa* in New York and *La Opinion* in Los Angeles, and weekly newspaper *La Raza* in Chicago. The transaction is expected to close within the next few weeks. After-tax proceeds from this sale will be approximately $5.4 million.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TMS Interactive Program Guide Assets**

Tribune Media Services ("TMS") is finalizing an agreement to sell its interactive program guide assets ("IPG Assets") to JLB Ventures, LLC ("JLB") for approximately $10.5 million in cash. This price is subject to a potential downward adjustment of up to $1 million depending on the results of JLB's due diligence review. JLB is a joint venture comprised of three anonymous parties, self-described as "well-funded U.S. corporations, including a major telecommunications services provider and two consumer electronics companies."

The IPG Assets being sold consist of a patent portfolio (16 U.S. patents, 50 U.S. patent applications and 10 foreign patent applications), a collection of software and a database. TMS acquired most of these assets in June 2003 from iSurfTV for $4.9 million. TMS managed, operated and enhanced these assets until the fall of 2006, when it ceased operations of its IPG business.

After-tax proceeds from this transaction are projected to be $7.4 million. Pre-tax book gain is estimated at $6.0 million and the earnings per share impact is estimated at $.01.

**SCNI**

In December, the board approved the sale of Southern Connecticut Newspapers ("SCNI") for at least $70 million. Since that time, we have been negotiating a sale to Gannett for $73 million in cash. The Gannett transaction would not include SCNI's real estate, which we expect to sell separately for $20-25 million.

Gannett has completed their due diligence and we are negotiating definitive agreements. The final negotiations are taking longer than expected due to issues related to the newspaper's collective bargaining agreement with the United Auto Workers that covers approximately 40 editorial employees. We believe we will be able to resolve these issues within the next week and be able to announce a transaction by the end of February. The transaction will require Hart-Scott-Rodino clearance prior to closing.

**Recycler**

The Los Angeles Times is reviewing strategic options for its Recycler classifieds business. Recycler produces over 25 weekly classified ad publications that are distributed through thousands of retail outlets in the Los Angeles area and also operates the Recycler.com website. Times Mirror purchased the Recycler business in 1998 for $189 million. Since the acquisition, revenues have declined steadily from $45 million in 1999 to $27 million in 2006. Recycler had an operating loss in 2006 of $4.4 million.

Given our high tax basis in the Recycler business (approximately $180 million), our preferred alternative is to sell the business. Due to the decline in the business and market conditions, we believe any proceeds from the transaction would be minimal; however, a sale would trigger a capital loss and result in a tax benefit of approximately $65 million. The former owner of

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413571

Recycler has expressed interest in buying the business and we are currently in discussions with him.

**The View Newspapers**

The Baltimore Sun closed on its acquisition of *The View* newspapers for $1 million on January 12. *The View*, which consists of two weekly and two monthly publications, has a free, controlled circulation of approximately 30,000 and covers Howard County, Maryland. We expect *The View* to generate approximately $235,000 of operating cash flow on revenues of $1.5 million in 2007. *The View* will be operated by Patuxent Publishing, the Sun's niche publication subsidiary.

**BROADCASTING**

**WLVI-Boston**

We closed on our sale of WLVI-Boston to Sunbeam Television Corp. for $113.7 million on December 19.

TL/DGK
2/6/07

3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413572

**7**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413573

# TRIBUNE

March 30, 2007

Dear Shareholder:

You are invited to attend the 2007 Annual Meeting of Shareholders of Tribune Company. The meeting will be held on Wednesday, May 9, 2007, at 11:00 a.m., Central time, at Tribune Tower, 435 North Michigan Avenue, Chicago, Illinois.

At the meeting, we will report on Tribune's 2006 performance and address questions and comments from shareholders. We will also consider the formal items of business described in the accompanying notice and proxy statement.

Regardless of your plans for attending the meeting in person, it is important that your shares be represented at the meeting. Voting your shares by proxy will enable you to vote on the business to be transacted at the meeting whether or not you attend.

We look forward to seeing you at the meeting.

Sincerely,

Dennis J. FitzSimons
*Chairman, President and Chief Executive Officer*

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# TRIBUNE

## NOTICE OF THE 2007
## ANNUAL MEETING OF SHAREHOLDERS

The 2007 Annual Meeting of Shareholders of Tribune Company will be held at Tribune Tower, 435 North Michigan Avenue, Chicago, Illinois at 11:00 a.m., Central time, on Wednesday, May 9, 2007, for the purpose of considering and voting on the following matters:

1. Election of three directors;

2. Ratification of the selection of PricewaterhouseCoopers LLP as independent accountants;

3. Three shareholder proposals, which proposals are opposed by the Board of Directors; and

4. Other matters that may properly come before the meeting or any adjournment thereof.

Only shareholders of record at the close of business on March 14, 2007 are entitled to vote at the meeting or any adjournment thereof. Although an admission ticket is not required, you will be asked to confirm your identity and stock ownership prior to entering the meeting. If you hold your shares through a broker, please bring a copy of a brokerage statement reflecting your stock ownership as of March 14, 2007.

Whether or not you plan to attend the meeting in person, we urge you to vote your shares on the Internet, by telephone or by returning the enclosed proxy card in the envelope provided. The proxy card contains instructions regarding all three methods of voting.

Shareholders will be admitted to the meeting on a first-come, first-served basis, starting at 10:30 a.m., Central time.

By Order of the Board of Directors,

Crane H. Kenney
*Senior Vice President, General Counsel*
*and Secretary*

March 30, 2007

---

**WEBCAST OF ANNUAL MEETING**
A live Webcast of the meeting will be available at www.tribune.com

---

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

## TABLE OF CONTENTS

| | |
|---|---|
| About the Meeting | 1 |
| Stock Ownership | 4 |
| Management Ownership | 4 |
| Section 16(a) Beneficial Ownership Reporting Compliance | 5 |
| Principal Shareholders | 5 |
| Corporate Governance | 6 |
| Overview | 6 |
| Director Independence | 6 |
| Policy Regarding Related Party Transactions | 7 |
| Communicating with the Board of Directors | 8 |
| Board of Directors | 9 |
| Board, Board Committees and Meetings | 11 |
| Certain Relationships and Related Party Transactions | 13 |
| Proposals to be Voted Upon | 16 |
| Proposal One—Election of Directors | 16 |
| Proposal Two—Ratification of the Selection of Independent Accountants | 16 |
| Proposal Three—Shareholder Proposal Concerning Tribune's Classified Board of Directors | 16 |
| Proposal Four—Shareholder Proposal Concerning Tribune's Chairman and Chief Executive Officer Positions | 18 |
| Proposal Five—Shareholder Proposal Concerning Tribune's Supermajority Voting Provisions | 20 |
| Audit Committee | 22 |
| Report of the Audit Committee | 22 |
| Policy on Audit Committee Pre-Approval of Audit, Audit-Related and Permissible Non-Audit Services of Independent Accountants | 23 |
| Fees Paid to Independent Accountants | 24 |
| Executive Compensation | 25 |
| Compensation Discussion and Analysis | 25 |
| Compensation & Organization Committee Report | 33 |
| 2006 Summary Compensation Table | 34 |
| 2006 Grants of Plan-Based Awards | 36 |
| Narrative to Summary Compensation Table and Plan-Based Awards Table | 38 |
| 2006 Outstanding Equity Awards at Fiscal Year-End | 39 |
| 2006 Option Exercises and Stock Vested | 42 |
| 2006 Pension Benefits | 42 |
| 2006 Nonqualified Deferred Compensation | 44 |
| Potential Payments Upon Termination or Change-in-Control | 46 |
| 2006 Non-Employee Director Compensation | 48 |
| Cash Compensation | 49 |
| Equity-Based Compensation | 49 |
| Shareholder Proposals and Director Nominations | 50 |
| Proxy Solicitation Expenses and Electronic Delivery | 50 |
| Annual Report | 51 |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# TRIBUNE

**435 North Michigan Avenue**
**Chicago, Illinois 60611**

---

## PROXY STATEMENT

---

This proxy statement contains information relating to the 2007 Annual Meeting of Shareholders of Tribune Company to be held at Tribune Tower, 435 North Michigan Avenue, Chicago, Illinois on Wednesday, May 9, 2007 at 11:00 a.m., Central time, or any adjournment thereof, for the purposes set forth in the accompanying notice. This proxy statement and the accompanying proxy card are being delivered to shareholders on or about March 30, 2007. The Tribune Board of Directors is making this proxy solicitation.

## ABOUT THE MEETING

### What is the purpose of the annual meeting?

At the annual meeting, shareholders will be asked to vote on the election of three directors, the ratification of the selection of PricewaterhouseCoopers LLP to serve as Tribune's independent accountants for 2007 and three shareholder proposals, each as outlined in the accompanying notice. In addition, management will report on Tribune's 2006 performance and respond to questions and comments from shareholders.

Shareholders may also be asked to consider other matters that may properly come before the meeting or any adjournment thereof. As of the date of this proxy statement, the Board of Directors is not aware of any other matters that will be presented at the meeting.

### Who can attend the meeting?

All shareholders as of the record date, March 14, 2007, or their duly appointed proxies, can attend the meeting. Seating, however, is limited and admission to the meeting will be on a first-come, first-served basis. Shareholders will be admitted to the meeting, starting at 10:30 a.m., Central time. Please note that if you hold your shares through a broker, you will not be admitted to the meeting unless you bring a copy of a brokerage statement reflecting your stock ownership as of March 14, 2007.

### Who is entitled to vote at the meeting?

All common shareholders of record at the close of business on the record date, March 14, 2007, are entitled to vote at the meeting. On that date there were [          ] shares of Tribune common stock outstanding. With regard to all matters submitted to a vote at the meeting, holders of common stock are entitled to one vote per share. Holders of shares of any series of Tribune's preferred stock are not entitled to vote at the meeting.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413577

## What constitutes a quorum?

The annual meeting will only be held if a quorum is present. The presence, in person or by proxy, of shareholders having a majority of the votes entitled to be cast at the meeting will constitute a quorum to conduct business. Abstentions and broker non-votes are counted as present for establishing a quorum. A broker non-vote occurs when a broker cannot vote on a matter because the broker has not received instructions from the beneficial owner and lacks discretionary voting authority with respect to that matter. At this year's meeting, in accordance with the rules and regulations of the New York Stock Exchange, brokers will have discretionary voting authority with respect to the election of directors and the ratification of the selection of independent accountants, but will not have discretionary voting authority with respect to each of the three shareholder proposals.

## How do I vote?

Shareholders of record can vote in person, on the Internet, by telephone or by mail. To vote by mail, complete, sign and date the enclosed proxy card and return it in the enclosed postage-paid envelope. To vote by telephone or on the Internet, follow the instructions on the proxy card. You may specify whether your shares should be voted for all, some or none of the nominees for director, whether your shares should be voted for or against the proposal to ratify the selection of independent accountants and whether your shares should be voted for or against each of the three shareholder proposals. Your shares will be voted as you indicate. Unless you give other instructions on your proxy card, the persons named as proxy holders on the proxy card will vote your shares in accordance with the Board's recommendations.

You have the right to revoke your proxy at any time before the meeting by:

- delivering a written notice of revocation to Tribune's corporate secretary;
- voting in person by ballot at the meeting;
- returning a later-dated proxy card; or
- entering a new vote by telephone or on the Internet.

If you hold shares through a broker, your broker will instruct you as to how your shares may be voted by proxy, including whether telephonic or Internet voting options are available, and as to how your proxy may be revoked. If you would like to vote in person at the meeting, you must obtain a proxy from your broker and bring it to the meeting.

## How do I vote my shares in Tribune's Employee Benefit Plans?

If you hold shares in a Tribune employee benefit plan, such as the Tribune Company Employee Stock Purchase Plan or a 401(k) savings plan, you are entitled to instruct the appropriate plan trustee or nominee how to vote the shares you hold under these plans. Plan participants may give instructions to the appropriate plan trustee or nominee by mail, by telephone or on the Internet by following the procedures described on the proxy card.

Any participant may revoke or modify such instructions prior to May 7, 2007 by delivering written notice to the trustee or nominee. The trustee or nominee will vote shares under Tribune's employee benefit plans in accordance with instructions that it receives by May 7, 2007. Shares held in a 401(k) savings plan for which no instructions are received by May 7, 2007 will be voted in the same proportion as the shares in each plan for which instructions are received. Shares held in the Employee Stock Purchase Plan for which no instructions are received by May 7, 2007 will not be voted.

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413578

**How many shares are held by Tribune's Employee Benefit Plans?**

Computershare Trust Company Inc. is the nominee of the Tribune Company Employee Stock Purchase Plan. The Northern Trust Company is the trustee of each of Tribune's 401(k) savings plans. As of the record date, March 14, 2007, the following shares were held in these plans:

| | |
|---|---|
| Tribune Company Employee Stock Purchase Plan | [    ] shares |
| Tribune Company 401(k) Savings and Profit Sharing Plan | [    ] shares |
| Times Mirror Savings Plus Plan | [    ] shares |
| All other Tribune 401(k) savings plans | [    ] shares |

**Who will count the vote?**

Computershare Trust Company, N.A., Tribune's transfer agent and registrar, will tabulate the votes and act as inspectors of election.

**What vote is required to approve each matter to be voted on?**

- *Election of Directors.* Directors are elected by a plurality of all votes cast at the meeting. This means that the three nominees receiving the highest number of votes cast will be elected. A properly executed proxy marked "WITHHELD" with respect to the election of one or more directors will not be voted with respect to the director or directors indicated.

- *Ratification of Selection of Independent Accountants and the Shareholder Proposals.* Ratification of the selection of PricewaterhouseCoopers LLP to serve as Tribune's independent accountants for 2007 and adoption of each of the three shareholder proposals each require the affirmative vote of the holders of a majority of the shares represented in person or by proxy and entitled to vote. A properly executed proxy marked "ABSTAIN" with respect to the ratification of the selection of independent accountants or adoption of a shareholder proposal will not be voted with respect to such proposal, although it will be counted for purposes of determining the number of shares represented in person or by proxy and entitled to vote. Accordingly, an abstention will have the same effect as a vote against such matters.

- *Other Proposals.* The required vote for approval of any other matter that may be properly presented at the annual meeting will depend on the nature of the proposal.

**What are the Board's recommendations?**

The Board of Directors recommends a vote FOR the election of the three nominees for director, FOR the ratification of the selection of PricewaterhouseCoopers LLP to serve as Tribune's independent accountants for 2007 and AGAINST each of the three shareholder proposals. Detailed discussions of the reasons for the Board's recommendation against each of the three shareholder proposals are contained on pages [    ] through [    ]. With respect to any other matter that properly comes before the meeting or any adjournment thereof, the proxy holders will vote as recommended by the Board of Directors or, if no recommendation is given, in their own discretion.

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# STOCK OWNERSHIP

## Management Ownership

The following table shows the beneficial ownership of Tribune stock by each director, each executive officer named in the summary compensation table and by all directors and executive officers as a group, in each case as of December 31, 2006.[1] Except as otherwise noted, the persons named in the table below have sole voting and investment power with respect to all shares shown as beneficially owned by them.

| Name | Shares of Common Stock Beneficially Owned(1)(2) | Options Exercisable within 60 days |
|---|---|---|
| Jeffrey Chandler | 11,120(3) | 19,200 |
| Dennis J. FitzSimons | 483,528(4)(5) | 1,560,556 |
| Roger Goodan | 17,221(3) | 45,200 |
| Donald C. Grenesko | 234,577 | 630,673 |
| Enrique Hernandez, Jr. | 11,271 | 15,200 |
| Betsy D. Holden | 8,616 | 7,200 |
| Luis E. Lewin | 18,264 | 392,144 |
| Robert S. Morrison | 13,094 | 11,200 |
| William A. Osborn | 11,959 | 11,200 |
| John E. Reardon | 58,796(5) | 323,287 |
| J. Christopher Reyes | 14,953 | 0 |
| Scott C. Smith | 217,478(4)(5) | 577,094 |
| William Stinehart, Jr. | 12,617(3)(5) | 31,700 |
| Dudley S. Taft | 94,660(6) | 31,200 |
| Miles D. White | 6,393 | 0 |
| Directors and Executive Officers as a group (20 persons) | 1,523,189 | 5,312,883 |

(1) On December 31, 2006, there were 239,207,417 shares of common stock outstanding. Each director and executive officer beneficially owns less than 1% of the common stock outstanding. The directors and executive officers as a group beneficially own approximately 2.8% of the common stock outstanding.

(2) Includes shares of common stock beneficially owned by executive officers under the Tribune Company 401(k) Savings and Profit Sharing Plan. The executive officers have the right to direct the voting of shares allocated to their accounts. Totals for Messrs. FitzSimons, Grenesko, Smith and Lewin do not include unvested restricted stock units held by them; however, each such individual has reached the minimum retirement age and the restrictions on the unvested restricted stock units held by them lapse upon the executive's retirement.

(3) Does not include 22,881,590 shares owned by Chandler Trust No. 1 and 25,244,751 shares owned by Chandler Trust No. 2 (see "Principal Shareholders").

(4) Does not include 28,023,788 shares owned by the Robert R. McCormick Tribune Foundation and 3,259,000 shares owned by the Cantigny Foundation (see "Principal Shareholders").

(5) Includes shares held by family members or in family trusts, as follows: Mr. FitzSimons, 4,965 shares; Mr. Reardon, 177 shares; Mr. Smith, 800 shares; and Mr. Stinehart, 7,002 shares.

(6) Includes 71,209 shares held by Taft Broadcasting Company. Mr. Taft is the sole shareholder of Taft Broadcasting Company.

---

[1] Stock ownership is shown as of December 31, 2006 for this draft. The final proxy statement will include stock ownership as of the record date, including the restricted stock units which vest on February 14, 2007.

4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413580

## Section 16(a) Beneficial Ownership Reporting Compliance

Based upon a review of filings with the Securities and Exchange Commission and written representations that no other filings were required to be made, all of Tribune's directors and executive officers complied during fiscal 2006 with the reporting requirements of Section 16(a) of the Securities Exchange Act of 1934.

## Principal Shareholders

The following table sets forth information with respect to each person or entity who is known to Tribune management to be the beneficial owner of more than 5% of Tribune common stock. All information is as of December 31, 2006.

| | Number of Shares | Percent of Class(1) |
|---|---|---|
| The Chandler Trusts(3)<br>350 West Colorado Boulevard, Suite 230<br>Pasadena, CA 91105 | 48,719,907 | 20.36% |
| Robert R. McCormick Tribune Foundation<br>Cantigny Foundation(2)<br>435 North Michigan Avenue, Room 770<br>Chicago, IL 60611 | 31,282,788 | 13.08% |

(1) On December 31, 2006, there were 239,207,417 shares of common stock outstanding.

(2) The Robert R. McCormick Tribune Foundation owns 28,023,788 shares and the Cantigny Foundation owns 3,259,000 shares. The investment and voting power of each of the Robert R. McCormick Tribune Foundation and the Cantigny Foundation is vested in a board of five directors, consisting of Dennis J. FitzSimons, David D. Hiller, Scott C. Smith and two former Tribune officers. Mr. Hiller is the Publisher of the *Los Angeles Times*. See "Board of Directors—Certain Relationships and Related Party Transactions" for a description of certain transactions involving Tribune and the Robert R. McCormick Tribune Foundation and the Cantigny Foundation.

(3) The trustees of Chandler Trust No. 1 share voting and investment power with respect to 22,881,590 shares and the trustees of Chandler Trust No. 2 share voting and investment power with respect to 25,244,751 shares. In addition, certain trustees beneficially own shares of common stock, as follows: Gwendolyn Garland Babcock, 3,744 shares; Jeffrey Chandler, 30,320 shares; Camilla Chandler Frost, 427,662 shares; Roger Goodan, 62,421 shares; William Stinehart, Jr., 44,317 shares; and Warren B. Williamson, 25,102 shares. Until October 20, 2007, the trustees of the Chandler Trusts have agreed to vote 11,822,206 of the shares reported above in the same proportion as all other shares are voted on any matter requiring a shareholder vote, including the proposals to be voted on at the 2007 annual meeting. See "Board of Directors—Certain Relationships and Related Party Transactions" for a description of this voting agreement and certain other transactions involving Tribune and the Chandler Trusts.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413581

# CORPORATE GOVERNANCE

**Overview**

Tribune's Board of Directors operates within Board Governance Guidelines, which were first adopted in 2001. The Board Governance Guidelines contain general principles regarding the functions of Tribune's Board of Directors and Board committees, addressing such matters as director qualifications and independence, director and committee responsibilities, Board and Board committee composition, director compensation, executive sessions and annual performance evaluations. Together with Tribune's By-Laws and the charters of the Audit Committee, the Compensation & Organization Committee and the Nominating & Governance Committee, Tribune's Board Governance Guidelines serve as the foundation for Tribune's corporate governance practices.

Tribune's employees and directors must comply with a Code of Business Conduct that was first adopted in 1988. The Code of Business Conduct embodies Tribune's long-standing commitment to high standards of ethical conduct and business practices. Tribune also has in place a Code of Ethics for its Chief Executive Officer and Senior Financial Officers that is designed to promote honest and ethical conduct and full, accurate and timely disclosure in public filings and other communications.

Tribune's corporate governance practice is fully compliant with the rules and requirements of the Securities and Exchange Commission ("SEC") and the New York Stock Exchange ("NYSE"). The Board continually reviews Tribune's polices to ensure that Tribune's corporate governance practices remain sound.

All of Tribune's current corporate governance documents and policies, including the Board Governance Guidelines, committee charters, Code of Business Conduct and Code of Ethics described above, are available on Tribune's website at www.tribune.com and in print to any shareholder who requests them. Tribune's website also includes links to Tribune's Certificate of Incorporation, By-Laws and SEC filings (including the CEO and CFO certifications required under the Sarbanes-Oxley Act of 2002 and director and executive officer Section 16 reports). Requests for printed copies of Tribune's corporate governance documents should be directed to our Corporate Relations Department, Tribune Company, 435 North Michigan Avenue, Chicago, Illinois 60611, telephone (800) 757-1694.

**Director Independence**

Under Tribune's Board Governance Guidelines, the Board must have a majority of independent directors. A director is "independent" under the NYSE listing standards if the Board affirmatively determines that the director has no material relationship with Tribune directly or as a partner, shareholder or officer of an organization that has a relationship with Tribune. The Board has established categorical standards to assist it in determining director independence, which can be found on Tribune's website at www.tribune.com. According to these standards, a director is not independent if:

- The director is, or has been within the last three years, an employee of Tribune, or an immediate family member of the director is, or has been within the last three years, an executive officer of Tribune.

- The director has received, or has an immediate family member who has received, during any twelve-month period within the last three years, more than $100,000 in direct compensation from Tribune, other than director and committee fees and pension or other forms of deferred compensation for prior service (provided such compensation is not contingent in any way on continued service).

- The director or an immediate family member is a current partner of a firm that is Tribune's internal or external auditor, the director is a current employee of such a firm, the director has an immediate family member who is a current employee of such a firm and who participates in the firm's audit, assurance or tax compliance (but not tax planning) practice, or the director or an immediate family member was within the last three years (but is no longer) a partner or employee of such firm and personally worked on Tribune's audit within that time.

6

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413582

- The director or an immediate family member is, or has been within the last three years, employed as an executive officer of another company where any of Tribune's present executive officers at the same time serves or served on that company's compensation committee.

- The director is a current employee, or an immediate family member is a current executive officer, of a company that has made payments to, or received payments from, Tribune for property or services in an amount which, in any of the last three fiscal years, exceeded the greater of $1 million or 2% of such other company's consolidated gross revenues.

- The director is a current employee, or an immediate family member is a current executive officer, of a company which was indebted to Tribune, or to which Tribune was indebted, where the total amount of either company's indebtedness to the other, in any of the last three fiscal years, exceeded 5% or more of such other company's total consolidated assets.

- The director or an immediate family member is a current officer, director or trustee of a charitable organization where Tribune's (or an affiliated charitable foundation's) annual discretionary charitable contributions to the charitable organization, in any of the last three fiscal years, exceeded the greater of $1 million or 5% of such charitable organization's consolidated gross revenues.

Direct or indirect ownership of even a significant amount of Tribune stock by a director who is otherwise independent as a result of the application of the foregoing standards will not, by itself, bar an independence finding as to such director.

The Board has reviewed the independence of our current non-employee directors and found that each of them, namely Jeffrey Chandler, Roger Goodan, Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, William A. Osborn, J. Christopher Reyes, William Stinehart, Jr., Dudley S. Taft and Miles D. White, is independent within the meaning of the rules of the New York Stock Exchange and under the Board's categorical standards. In making this determination, the Board considered the relationships described under "Board of Directors—Certain Relationships and Related Party Transactions" on page [   ]. In addition, with respect to Mr. Stinehart, the Board considered the fact that he was a partner in the law firm of Gibson, Dunn & Crutcher LLP until his retirement in December 2004. Gibson, Dunn & Crutcher LLP was external corporate counsel to Times Mirror and has, from time to time, provided legal services to Tribune since the merger. The Board has determined that these relationships are not material and do not cause any non-management director to be considered not independent under the rules of the New York Stock Exchange and under the Board's categorical standards. There were no related party transactions, relationships or arrangements involving our directors, other than the matter described above and the matters described under "Certain Relationships and Related Party Transactions" on page [   ]. In addition, the Board reviewed the independence of Kathryn C. Turner, who resigned as a director in May 2006, and found that Ms. Turner was independent within the meaning of the rules of the New York Stock Exchange and under the Board's categorical standards through the date of her resignation

**Policy Regarding Related Party Transactions**

We or one or our subsidiaries may occasionally enter into transactions with certain "related persons." Related persons include our executive officers, directors, 5% or more beneficial owners of our common stock, immediate family members of these persons and entities in which one of these persons has a direct or indirect material interest. We refer to transactions with these related persons as "related party transactions." Beginning in February 2007, the Audit Committee became responsible for the review and approval of each related party transaction exceeding $120,000. The Audit Committee considers all relevant factors when determining whether to approve a related party transaction including, without limitation, whether the terms of the proposed transaction are at least as favorable to us as those that might be achieved with an unaffiliated third party. Among other relevant factors, the Audit Committee considers the following:

- The size of the transaction and the amount payable to a related person.

7

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413583

- The nature of the interest of the related person.
- Whether the transaction may involve a conflict of interest.
- Whether the transaction involves the provision of goods or services to us that are available from unaffiliated third parties and, if so, whether the proposed transaction is on terms and made under circumstances that are at least as favorable to us as would be available in comparable transactions with or involving unaffiliated third parties.

The policies and procedures relating to the Audit Committee approval of related party transactions are available on our website at www.tribune.com. All of the related party transactions occurring during 2006 and described under the heading "Certain Relationships and Related Party Transactions" beginning on page [   ] would have been permissible under, and would have been approved by the Audit Committee pursuant to, these policies and procedures had they been in effect in 2006.

## Communicating with the Board of Directors

The annual meeting provides an opportunity each year for shareholders to ask questions of and communicate directly with members of Tribune's Board of Directors on matters relevant to Tribune. Pursuant to the Board Governance Guidelines, each director is expected to attend the annual meeting. Each of the eleven directors serving at the time of the 2006 annual meeting of shareholders and continuing in office following the annual meeting was in attendance.

In addition, shareholders and other interested parties may, at any time, communicate with the Chairman of the Nominating & Governance Committee, or non-management directors as a group, by writing to them at the following address:

> Chairman, Nominating & Governance Committee or
> Non-Management Directors of the Board of Directors of Tribune Company
> c/o Tribune Company
> 435 North Michigan Avenue
> 6th Floor
> Chicago, Illinois 60611
> 312-222-4206 (fax)

Copies of written communications received by Tribune at the above address will be provided to the Chairman of the Nominating & Governance Committee or the non-management directors as a group unless they are considered, in the reasonable judgment of the Corporate Secretary, to be improper for submission to the intended recipients. Examples of shareholder communications that would be considered improper for submission include customer complaints, solicitations, communications that do not relate directly or indirectly to Tribune or its businesses or communications that relate to improper or irrelevant topics.

Tribune also maintains a telephone hotline through which investors, employees and other interested parties may submit confidential and anonymous complaints regarding suspected illegal or unethical behavior or other violations of Tribune policy, including complaints regarding accounting or auditing matters and alleged violations of Tribune's Code of Business Conduct. All reports are reviewed and investigated under the direction of an internal compliance committee comprised of representatives from Tribune's legal, internal audit and human resources departments. Any significant complaints regarding Tribune's accounting, internal accounting controls or auditing matters are reported to the Audit Committee of the Board of Directors. The telephone number for this hotline is (800) 216-1772.

8

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413584

# BOARD OF DIRECTORS

The following descriptions of the business experience of our nominees and continuing directors include the principal positions they have held from March 2002 to the date of this proxy statement.



**Jeffrey Chandler (Nominee)**
President and Chief Executive Officer of Chandler Ranch Co., one of the largest growers of avocados in California, since 1984. *Age: 65. Director since 2000.*



**Dennis J. FitzSimons**
Chairman (since January 2004), Chief Executive Officer (since January 2003), President (since July 2001), Chief Operating Officer (from July 2001 until December 2002) and Executive Vice President (from January 2000 until July 2001) of Tribune Company; President of Tribune Broadcasting Company, a subsidiary of Tribune Company, from May 1997 until January 2003. *Class of 2009. Age: 56. Director since 2000.*



**Roger Goodan**
Consultant to various global energy services firms, since December 2001; Vice President of Schlumberger Oilfield Services, a services and technology supplier to the international petroleum industry, from December 2000 until his retirement in December 2001; Executive in operations, engineering and finance positions throughout Schlumberger from 1973 until December 2000. Director of Hydril Company. *Class of 2008. Age: 61. Director since 2000.*



**Enrique Hernandez, Jr.**
Chairman and Chief Executive Officer of Inter-Con Security Systems, Inc., an international provider of high-end security and facility support services to government, utilities and industrial customers, since 1986; Co-founder and principal partner of Interspan Communications, a television broadcasting company serving Spanish-speaking audiences, since 1998. Director of McDonald's Corporation and Wells Fargo & Company. Director and Chairman of Nordstrom, Inc. *Class of 2008. Age: 51. Director since 2001.*

9

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413585



**Betsy D. Holden**
President-Global Marketing and Category Development of Kraft Foods Inc., a food business unit of Altria Group Inc., from January 2004 through June 2005; Co-Chief Executive Officer of Kraft Foods Inc. from March 2001 until December 2003; President and Chief Executive Officer of Kraft Foods North America from May 2000 until December 2003. Director of Western Union Company. *Class of 2009. Age: 51. Director since 2002.*



**Robert S. Morrison**
Interim Chairman and Chief Executive Officer of 3M Company, a diversified technology company, from June 2005 until December 2005. Vice Chairman of PepsiCo, Inc., a processor of packaged foods and beverages, and Chairman of PepsiCo Beverages and Foods North America from August 2001 until his retirement in February 2003; Chairman, President and Chief Executive Officer of The Quaker Oats Company from October 1997 until its merger with PepsiCo in August 2001. Director of 3M Company, Aon Corporation and Illinois Tool Works, Inc. *Class of 2009. Age: 64. Director since 2001.*



**William A. Osborn (Nominee)**
Chairman and Chief Executive Officer of Northern Trust Corporation, a multibank holding company, and its principal subsidiary, The Northern Trust Company, since October 1995. Director of Caterpillar Inc. and Northern Trust Corporation. *Age: 59. Director since 2001.*



**J. Christopher Reyes**
Chairman of Reyes Holdings, LLC, a food and beverage distribution company, since 1997. Director of The Allstate Corporation and Wintrust Financial Corporation. *Class of 2008. Age 53. Director since 2005.*

10

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413586



**William Stinehart, Jr.**
Partner in the law firm of Gibson, Dunn & Crutcher LLP from 1977 until his retirement in December 2004. *Class of 2009. Age: 63. Director since 2000.*



**Dudley S. Taft**
President and Director of Taft Broadcasting Company, an investor in media and entertainment companies, since 1987. Director of Duke Energy Corporation, Fifth Third Bancorp and UNIFI Mutual Holding Company. *Class of 2008. Age: 66. Director since 1996.*



**Miles D. White (Nominee)**
Chairman and Chief Executive Officer of Abbott Laboratories, a broad-based medical products and pharmaceutical company, since 1999. Chairman of the Federal Reserve Bank of Chicago. Director of Abbott Laboratories and Motorola, Inc. *Age: 52. Director since 2005.*

### Board, Board Committees and Meetings

The Board has standing Audit, Compensation & Organization, Executive and Nominating & Governance Committees.

The Board held eight meetings during 2006. Under Tribune's Board Governance Guidelines, directors are expected to attend all Board meetings and all meetings of committees on which they serve. Each director attended at least 75% of the total number of meetings of the Board and its committees on which he or she served during 2006.

Tribune's independent directors also meet in executive sessions without management on a regularly scheduled basis and as they otherwise deem appropriate. The Board, by resolution of a majority of the non-employee directors, designates one non-employee director to preside at the executive sessions. William A. Osborn has been so designated to preside at these sessions. The independent directors met in seven executive sessions in 2006.

In addition, on September 21, 2006, the Board established an independent special committee to oversee management's exploration of alternatives for creating additional value for shareholders. The independent special committee consists of Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, William A. Osborn, J. Christopher Reyes, Dudley S. Taft and Miles D. White. The independent special committee met six times in 2006.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413587

*Audit Committee*

The function of the Audit Committee includes reviewing and monitoring Tribune's financial reporting and accounting practices and internal controls, as more fully described in the Report of the Audit Committee on page [    ]. The Audit Committee operates under a written charter that is annually reviewed by the committee. The current charter is available on Tribune's website at www.tribune.com.

Betsy D. Holden, William A. Osborn (chairman), J. Christopher Reyes and Dudley S. Taft currently serve on the Audit Committee. The Board has determined that all members of the Audit Committee are independent within the meaning of the rules of the New York Stock Exchange and under the Board's categorical standards and satisfy the NYSE's financial literacy and financial management or expertise criteria. In addition, the Board has determined that each member of the Audit Committee is an "audit committee financial expert" as defined in applicable securities laws, rules and regulations. The Audit Committee met seven times in 2006.

*Compensation & Organization Committee*

The function of the Compensation & Organization Committee includes (i) discharging the Board's responsibilities relating to the compensation of directors and officers of the Company; (ii) annually reviewing and approving corporate goals and objectives relevant to the compensation of the chief executive officer and, after consulting with the chief executive officer, other senior executive officers, evaluating the performance of the chief executive officer and other senior executives in light of those goals and objectives, and determining and approving the chief executive officer's and other senior executive officer's compensation levels based on this evaluation; (iii) overseeing all salary and incentive compensation plans for senior executive officers and other key employees; (iv) granting equity awards to employees under equity plans and taking other actions permitted or required under the plans; (v) reviewing and making recommendations to the Board with respect to the compensation of independent directors; (vi) reviewing and making recommendations to the Board with respect to stock ownership guidelines applicable to employees and independent directors; (vii) participating in the annual management development and succession planning; (viii) forming and delegating authority to subcommittees when appropriate; and (ix) regularly reporting activities of the committee to the Board and reviewing issues with the Board as the Board or the committee deems appropriate.

In 2006, the Compensation & Organization Committee retained Frederic W. Cook as compensation consultants to the committee. Frederic W. Cook engaged in a study of our employee benefit arrangements, particularly those which were relevant to our senior executive officers, and advised whether any changes would be recommended in order to ensure that our compensation arrangements with our senior executive officers are appropriate. The study included comparisons of our existing compensation arrangements to those of other comparable firms in our industry. During the committee's review of the chief executive officer's and other management's compensation levels, the committee considered the advice it received from Frederic W. Cook; however, the committee was responsible for determining the form and amount of our compensation programs as more fully described under "Compensation Discussion and Analysis" beginning on page [    ].

The Compensation & Organization Committee operates under a written charter that is annually reviewed by the committee. The current charter is available on Tribune's website at www.tribune.com.

Jeffrey Chandler, Enrique Hernandez, Jr., Robert S. Morrison (chairman) and Miles D. White currently serve on the Compensation & Organization Committee. The Board has determined that all members of the Compensation & Organization Committee are independent within the meaning of the rules of the New York Stock Exchange and under the Board's categorical standards. The Compensation & Organization Committee met five times in 2006.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413588

*Nominating & Governance Committee*

The function of the Nominating & Governance Committee includes serving as Tribune's nominating committee for all directors other than those nominated by the Chandler Trusts (see "Certain Relationships and Related Party Transactions" on page [   ]), and in that capacity identifies and recommends Board candidates. In performing this function, the Nominating & Governance Committee seeks nominees from diverse professional backgrounds who combine a broad spectrum of experience and expertise with a reputation for integrity. Directors should have experience in positions with a high degree of responsibility, be leaders in the organizations with which they are affiliated, be selected based upon contributions they can make to the Board and management and be free from relationships or conflicts of interest that could interfere with the director's duties to Tribune and its shareholders. The committee also considers the independence of the candidates in order to ensure that Tribune's Board satisfies applicable independence criteria. Although the committee considers the views of Tribune's chief executive officer, it makes its own determination as to whether the candidates under consideration satisfy the above director qualifications and are otherwise suitable director candidates.

The Nominating & Governance Committee also considers director candidates recommended by shareholders, who are evaluated using the same criteria applied to other director candidates. See "Shareholder Proposals and Director Nominations" for a description of the procedures that must be followed in order for a shareholder to nominate a director.

The Nominating & Governance Committee has sole authority to retain and terminate any search firm used to identify director candidates, including approving its fees and other retention terms. In this regard, from time to time the committee has retained a director search firm, whose function is to bring specific director candidates to the attention of the committee.

In addition, the Nominating & Governance Committee, in conjunction with the presiding non-management director, leads the Board in an annual performance evaluation. The committee also periodically reviews and makes recommendations to the Board with respect to the size, structure and meeting frequency of the Board and Board committees and periodically reviews and reassesses the adequacy of the Board's Governance Guidelines.

The Nominating & Governance Committee operates under a written charter that is annually reviewed by the committee. The current charter is available on Tribune's website at www.tribune.com.

Roger Goodan, Enrique Hernandez, Jr. (chairman), Robert S. Morrison, J. Christopher Reyes and William Stinehart, Jr. currently serve on the Nominating & Governance Committee. The Board has determined that all members of the Nominating & Governance Committee are independent within the meaning of the rules of the New York Stock Exchange and under the Board's categorical standards. The Nominating & Governance Committee met three times in 2006.

*Executive Committee*

The Executive Committee exercises the authority of the Board on such matters as are delegated to it by the Board from time to time and exercises the authority of the Board between meetings. Dennis J. FitzSimons (chairman), Enrique Hernandez, Jr., Robert S. Morrison, William A. Osborn and William Stinehart, Jr. currently serve on the Executive Committee. The Executive Committee met one time in 2006.

## Certain Relationships and Related Party Transactions

*Chandler Trusts.* Three members of the Board, Jeffrey Chandler, Roger Goodan and William Stinehart, Jr., are trustees of two trusts known as the "Chandler Trusts." Mr. Chandler and Mr. Goodan are also beneficiaries of these trusts. The Chandler Trusts were the principal shareholders of The Times Mirror Company prior to the merger of Times Mirror into Tribune on June 12, 2000. In connection with the

13

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

merger, the Chandler Trusts exchanged their Times Mirror common stock for 36,304,135 shares of Tribune common stock and Tribune amended its By-Laws to grant the Chandler Trusts the right to nominate three directors, one for each class of Tribune's Board of Directors. The Chandler Trusts' nominating rights will end on the earlier of the termination of the trusts or the sale of 15% or more of the shares of Tribune common stock they received at the time of the merger. As long as the Chandler Trusts have these rights, neither the Board of Directors nor any Board committee may nominate any person in opposition to the three Chandler Trust nominees. Jeffrey Chandler, Roger Goodan and William Stinehart, Jr. were the Chandler Trusts' initial nominees and became directors of Tribune following the merger. Mr. Chandler and Mr. Goodan are cousins (see "Stock Ownership—Principal Shareholders").

In 1997, the Chandler Trusts and Times Mirror entered into a transaction which, through the formation of TMCT, LLC ("TMCT"), enabled Times Mirror to retire for accounting purposes a substantial block of Times Mirror stock. Times Mirror and its affiliates contributed to TMCT real property used in Times Mirror's business operations and cash and the Chandler Trusts contributed Times Mirror stock. Times Mirror leased back the real property under long-term leases. Upon completion of the merger of Times Mirror into Tribune, Tribune assumed these leases and the Times Mirror stock held by the limited liability company was converted into Tribune stock. In 2006, $20,300,792 of lease payments and $4,005,936 in dividends received on the Tribune stock held by TMCT were allocated to the Chandler Trusts.

In 1999, the Chandler Trusts and Times Mirror formed TMCT II, LLC ("TMCT II") and entered into a similar transaction that again enabled Times Mirror to retire for accounting purposes a substantial block of stock. Times Mirror's contribution to TMCT II consisted of cash and securities. The Chandler Trusts again contributed Times Mirror stock that was converted into Tribune stock upon completion of the merger of Times Mirror into Tribune. In 2006, $7,440,746 in dividends received on the Tribune stock held by TMCT II were allocated to the Chandler Trusts.

On September 21, 2006, Tribune and the Chandler Trusts entered into agreements to restructure TMCT and TMCT II. Under the terms of the agreements, Tribune received on September 22, 2006, a total of 38.9 million shares of Tribune common stock and all 1.1 million shares of Tribune's preferred stock held collectively by TMCT and TMCT II. Following the distributions by TMCT and TMCT II, Tribune's interests in each of TMCT and TMCT II were reduced to approximately five percent. The agreements also provided for certain put and call options, which are exercisable at fair market value beginning in September 2007, relating to Tribune's remaining ownership interests in TMCT and TMCT II.

In addition, on September 22, 2006, Tribune and TMCT amended the lease agreement for the eight properties Tribune leases from TMCT. Under the terms of the amended lease, Tribune was granted an accelerated option to acquire the eight properties during the month of January 2008 for $175 million. Tribune was also granted an option to acquire the leased properties from February 8, 2008 to three months prior to the expiration of the amended lease at the higher of fair market value or $195 million. In addition, the amendment extended the properties' current fixed rental rate through August 7, 2021.

On October 20, 2006, the remaining 12.4 million shares of Tribune common stock held by TMCT and TMCT II were distributed to Tribune and the Chandler Trusts in accordance with their respective ownership interests. Tribune received 0.6 million shares and the Chandler Trusts received 11.8 million shares. Until October 20, 2007, the trustees of the Chandler Trusts have agreed to vote the 11.8 million shares in the same proportion as all other shares are voted on any matter requiring a shareholder vote, including the proposals to be voted on at the 2007 annual meeting. Information pertaining to Tribune's investments in TMCT and TMCT II is provided in Note 7 to the consolidated financial statements included in the Tribune's Annual Report on Form 10-K for the fiscal year ended December 31, 2006.

14

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413590

*Compensation Committee Interlocks and Insider Participation.* As described above, Jeffrey Chandler is a trustee and a beneficiary of the Chandler Trusts. The Chandler Trusts and Tribune are members of TMCT, LLC and TMCT II, LLC, which were restructured during 2006 pursuant to the transactions described above. Mr. Chandler served as a member of Tribune's Compensation & Organization Committee in 2006.

*Robert R. McCormick Tribune Foundation and Cantigny Foundation.* On May 30, 2006, Tribune initiated a modified "Dutch Auction" tender offer pursuant to which it acquired 45,026,835 shares of its common stock at a price of $32.50 per share on July 5, 2006. Tribune also acquired 10 million shares of its common stock, in the aggregate, from the Robert R. McCormick Tribune Foundation and the Cantigny Foundation on July 12, 2006 at a price of $32.50 per share.

In connection with Tribune's publicly announced exploration of strategic alternatives, the Robert R. McCormick Tribune Foundation and the Cantigny Foundation have taken the following actions: (i) established an Advisory Committee of its Board of Directors consisting of two directors who are not employed by Tribune to analyze and evaluate the course of action that the Foundations should take with respect to their shares of Tribune's common stock, (ii) engaged a financial advisor and (iii) executed a non-disclosure agreement with Tribune to obtain access to certain of Tribune's confidential information.

Tribune and its subsidiary, Chicago Tribune Company, lease office space and space for the McCormick Tribune Freedom Museum to the Robert R. McCormick Tribune Foundation and, together with other Tribune business units, provide services to the Robert R. McCormick Tribune Foundation. During 2006, the Foundation paid $2,860,793 to Tribune business units for the leased space and services.

*Northern Trust Corporation.* [Disclosure to come.]

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413591

## PROPOSALS TO BE VOTED UPON

### PROPOSAL ONE—ELECTION OF DIRECTORS

The Board currently consists of eleven members and is divided into three classes. Directors for each class are elected at the annual meeting held in the year in which the term for their class expires. Three directors will be elected at this year's annual meeting for terms expiring at the 2010 annual meeting. The nominees receiving the highest number of votes cast at the meeting will be elected.

Unless contrary instructions are given, all proxies will be voted for the election of Jeffrey Chandler, William A. Osborn and Miles D. White to hold office until the 2010 annual meeting. Information regarding each of the nominees and the other directors continuing in office is set forth on pages [   ]-[   ].

Each of the nominees is an incumbent director. If any of the nominees becomes unavailable for election, an event that is not now anticipated, proxy holders will vote for the election of a substitute nominee as may be selected by the Board.

**The Board recommends a vote FOR the election of Jeffrey Chandler, William A. Osborn and Miles D. White as Tribune directors.**

### PROPOSAL TWO—RATIFICATION OF THE SELECTION OF INDEPENDENT ACCOUNTANTS

The Audit Committee has selected PricewaterhouseCoopers LLP to serve as Tribune's independent accountants for the 2007 fiscal year. Representatives of PricewaterhouseCoopers LLP will be present at this year's annual meeting and will be available to respond to appropriate questions and to make a statement if they desire to do so.

**The Board and the Audit Committee recommend a vote FOR ratification of the selection of PricewaterhouseCoopers LLP as Tribune's independent accountants.**

### PROPOSAL THREE—SHAREHOLDER PROPOSAL CONCERNING TRIBUNE'S CLASSIFIED BOARD OF DIRECTORS

Mrs. Evelyn Y. Davis, Watergate Office Building, 2600 Virginia Ave. N.W. Suite 215, Washington, D.C. 20037, owner of 250 shares of Tribune common stock, has given notice that she intends to present at the 2007 Annual Meeting the following proposal, which is OPPOSED by the Board of Directors.

**Shareholder Proposal**

RESOLVED: That the stockholders of TRIBUNE CO. recommend that the Board of Directors take the necessary steps to instate the election of directors ANNUALLY, instead of the stagger system which was recently adopted.

**Supporting Statement**

REASONS: The great majority of New York Stock Exchange listed corporations elect all their directors each year.

This insures that ALL directors will be more accountable to ALL shareholders each year and to a certain extent prevents the self-perpetuation of the Board.

Many companies in recent years have adopted MY resolution to end the stagger system including: Starwood, Marriott, Host Marriott, Goldman Sachs, Lehman Bros, Morgan Stanley, Dow Jones, Carr America, Merck, Bristol Myers Squibb, Federated, P&G and others.

Last year the owners of 115,602,172 shares, representing approximately 46.8% of shares voting, voted for this proposal.

If you AGREE, please vote YOUR shares FOR this proposal.

16

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**Board of Directors Statement Against Shareholder Proposal**

**The Board of Directors[2] recommends a vote AGAINST this proposal for the following reasons:**

The Board and the Nominating & Governance Committee have given this proposal careful consideration and believe that it should not be implemented. Under Tribune's Certificate of Incorporation, the Board is divided into three classes with directors elected to staggered terms. This classified structure has been in place since 1974 and has been and continues to be an integral part of Tribune's overall governance structure.

The Board and the Nominating & Governance Committee review Tribune's selected corporate governance practices annually and have each concluded that Tribune's classified board structure continues to be in the best interests of Tribune and its shareholders.

The Board and the Nominating & Governance Committee believe that a classified board is more advantageous to, and serves the best interests of, Tribune and its shareholders than a board that would be elected annually for the following reasons:

- *Protection Against Unfair and Abusive Takeover Tactics.* A classified board is designed to safeguard the corporation against the efforts of a third party intent on quickly taking control of, and not paying fair value for, the business and assets of the corporation. The classified board structure enhances the ability of the Board to negotiate the best results for all shareholders in these circumstances. It would not preclude a takeover, but it would afford Tribune time to evaluate the adequacy and fairness of any takeover proposal, negotiate with the sponsor on behalf of all shareholders and weigh alternatives, including the continued operation of Tribune's businesses, to provide maximum value for all shareholders.

- *Stability and Continuity.* The three-year staggered terms are designed to provide stability, enhance mid- and long-term planning and ensure that a majority of Tribune's directors at any given time have prior experience as directors of Tribune. This ensures that the Board has solid knowledge of Tribune's business and strategy. Directors who have experience with Tribune and knowledge about its business and affairs are a valuable resource and are better positioned to make the fundamental decisions that are best for Tribune and its shareholders. At the same time, Tribune shareholders have an opportunity each year to vote on several directors and to shape the decision-making of the Board accordingly.

- *Accountability to Shareholders.* The Board further believes that annual elections for each director are not necessary to promote accountability. All directors are required to uphold their fiduciary duties to Tribune and its shareholders, regardless of how often they stand for election. The Board believes that directors elected to three-year terms are not insulated from this responsibility and are as accountable to shareholders as directors elected annually.

- *Corporate Governance.* The Board is committed to corporate governance practices that will benefit Tribune's shareholders and regularly examines these practices in light of the changing environment. Tribune's Board Governance Guidelines focus on the independence and quality of the members of the Board and its effective functioning. The Board notes that numerous well respected U.S. corporations and institutional investors have classified boards.

It is also important to note that approval of this proposal by shareholders would not in itself effectuate the changes contemplated by the proposal. Further action by shareholders and the Board would be required to amend the Company's Amended and Restated Certificate of Incorporation.

At the 2006 Annual Meeting, this proposal was defeated by Tribune's shareholders.

---

[2]    The Chandler Trust directors submitted a similar proposal. Accordingly, this may be revised based on how they vote with respect to the recommendation.

17

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0413593**

## PROPOSAL FOUR—SHAREHOLDER PROPOSAL CONCERNING TRIBUNE'S CHAIRMAN AND CHIEF EXECUTIVE OFFICER POSITIONS

The International Brotherhood of Teamsters General Fund, 25 Louisiana Avenue, NW, Washington, D.C. 20001, owner of 160 shares of Tribune common stock, has given notice that it intends to present at the 2007 Annual Meeting the following proposal, which is OPPOSED by the Board of Directors.

**Shareholder Proposal**

RESOLVED: That stockholders of Tribune Company ("Tribune" or "the Company") ask the Board of Directors to adopt a policy that the Board's chairman be an independent director who has not previously served as an executive officer of the Company. The policy should be implemented so as not to violate any contractual obligation. The policy should also specify (a) how to select a new independent chairman if a current chairman ceases to be independent during the time between annual meetings of shareholders; and, (b) that compliance with the policy is excused if no independent director is available and willing to serve as chairman.

**Supporting Statement**

It is the responsibility of the Board of Directors to protect shareholders' long-term interests by providing independent oversight of management, including the Chief Executive Officer (CEO), in directing the corporation's business and affairs. Mr. Dennis FitzSimons currently holds both the position of Chairman of the Board and CEO at Tribune. We believe this arrangement compromises the ability of the Board to have true independent oversight of management at our Company.

Shareholders of Tribune require an independent leader to ensure that management acts strictly in the best interests of the Company. Recently, under FitzSimons' leadership, the Tribune Company admitted to overstating circulation at certain publications instigating a class action lawsuit by advertisers, sanctions from the Audit Bureau of Circulation (ABC) and investigations from both the Securities and Exchange Commission (SEC) and New York State's Attorney General, Elliot Spitzer.

We believe that ensuring that the Chairman of the Board of our Company is independent, will enhance Board leadership at Tribune, and protect shareholders from future management actions that can potentially harm shareholders. Other corporate governance experts support this type of reform. As a Commission of The Conference Board stated in a 2003 report, "The ultimate responsibility for good corporate governance rests with the Board of Directors. Only a strong, diligent and independent board of directors that understands the key issues, provides wise counsel, and asks management the tough questions, is capable of ensuring that the interests of shareowners as well as other constituencies are being properly served."

Though William Osborn serves as a lead director on the Tribune Board, his ability to provide independent leadership may be compromised by other related transactions between our Company and the Northern Trust Corporation where he serves as Chairman and CEO. In 2005, Tribune and certain of its employee benefit plans paid Northern Trust and its subsidiaries $710,449 for trust and custody services, cash management and related services, and bank credit facility fees. And effective January 1, 2006, Tribune retained the Northern Trust Company, the principal subsidiary of Northern Trust Corporation, as the trustee of each of Tribune's 401(k) savings plans.

With or without an independent lead director, however, we believe a Board is less able to provide independent oversight of the officers if the Chairman of that Board is also the CEO of the Company.

We, therefore, urge shareholders to vote FOR this important corporate governance reform.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413594

**Board of Directors Statement Against Shareholder Proposal**

**The Board of Directors recommends a vote AGAINST this proposal for the following reasons:**

The Board believes that it is in the Company's best interests to allow the Board to make the determination as to whether the roles of Chairman of the Board ("Chairman") and Chief Executive Officer ("CEO") should be separated or should be held by the same person. As stated in Tribune's Board Governance Guidelines (the "Guidelines"), the Board has no rigid policy with respect to the separation or combination of the offices of Chairman and CEO and considers this issue to be part of the succession planning process. The Board does not believe that requiring the separation of these offices is necessary in order to ensure that the Board will provide independent oversight of management and believes that combining the two positions currently provides the most efficient and effective leadership model for the Company. As a result, we believe the adoption of the shareholder proposal would not be in the best interest of Tribune's shareholders.

Tribune's corporate governance structures and practices already include several effective oversight mechanisms, some of which are described below.

First, the Guidelines require that a majority of the Board be comprised of independent directors. Currently, the Chairman and CEO is the only member of management who is also a member of the Board. The other ten members of the Board are non-management directors, each of whom meets the independence requirements of the New York Stock Exchange and the Company's categorical independence standards.

Second, as described in the Guidelines, the outside directors meet in executive session on a regularly scheduled basis without the Chairman and CEO present to review, among other things, the CEO's performance. The Board elects annually one independent director to serve as the presiding director at executive sessions, currently Mr. William A. Osborn. The presiding director provides leadership to the independent directors, thereby enhancing their effectiveness in providing oversight of management. The presiding director's responsibilities include:

- Presiding at all meetings of the Board at which the Chairman is not present, including executive sessions of the outside directors;
- Providing the agenda for executive sessions; and
- Calling meetings of the outside directors.

Third, various Committees of the Board perform oversight functions independent of management. The Audit, Compensation & Organization and Nominating & Governance Committees are each comprised entirely of independent directors. This means that independent directors directly oversee critical matters such as the integrity of the Company's financial statements, the compensation of senior executives, including the Chairman and CEO, and the selection and evaluation of directors. The committee charters, which are available on the Company's web site, provide a complete description of the responsibilities of each of these Committees.

Finally, the Board believes that its current governance structure, in which a single individual holds the offices of Chairman and CEO, while an independent director serves as presiding director, is the most effective structure, from a business perspective, for the Company at this point in time. Combining the roles of Chairman and CEO ensures that the Company will have clear and consistent leadership on critical strategic objectives. The Board believes that the current structure maximizes the likelihood that these objectives will be attained, while eliminating any risk of a distracting clash on these issues between a Chairman and CEO. The danger that combining these roles will lead to an unhealthy concentration of authority in the hands of a single individual is minimized in our structure by the role of the presiding director, who, as described above, provides leadership to the independent directors thereby enhancing their effectiveness in providing management oversight.

19

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413595

The Board continues to believe that it is in the best interests of the Company and its shareholders to allow the positions of Chairman and CEO to be held by the same individual. Our current leadership model strikes an appropriate balance between strong executive leadership and independent oversight of management's performance. Eliminating the Board's ability to determine whether the Company's interests are best served by separating or combining the roles of Chairman and CEO could have the effect of weakening our leadership structure. Accordingly, we do not believe that implementation of the proposal would be in the best interests of Tribune shareholders.

## PROPOSAL FIVE—SHAREHOLDER PROPOSAL CONCERNING TRIBUNE'S SUPERMAJORITY VOTING PROVISIONS

The California Public Employees' Retirement System, P.O. Box 942707, Sacramento, California 94229-2707, owner of approximately 940,000 shares of Tribune common stock, has given notice that it intends to present at the 2007 Annual Meeting the following proposal, which is OPPOSED by the Board of Directors.

**Shareholder Proposal**

RESOLVED, that the shareowners of the Tribune Company ("Company") urge the Company to take all steps necessary, in compliance with applicable law, to remove the supermajority requirements in its Certificate of Incorporation and by-laws, including but not limited to those supermajority requirements related to the approval of certain business combinations and changes of the by-laws.

**Supporting Statement**

Is accountability by the Board of Directors important to you as a shareowner of the Company? As a trust fund with more than 1.4 million participants, and as the owner of approximately 940,000 shares of the Company's common stock, the California Public Employees' Retirement System (CalPERS) thinks accountability is of paramount importance. This is why we are sponsoring this proposal which, if passed, would make the Company more accountable to shareowners by removing supermajority requirements that, among other things, make it very difficult to approve certain business combinations or amend the company's bylaws.

As it currently stands, the affirmative vote of 80% of the outstanding shares of the Company are required for shareowners to amend the Company's by-laws and approve certain business combinations. When you consider abstentions and broker non-votes, such a supermajority vote can be almost impossible to obtain. For example, a proposal to declassify the board of directors filed at Goodyear Tire & Rubber Company failed to pass even though approximately 90% of votes cast were in favor of the proposal. While it is often stated by corporations that the purpose of supermajority requirements is to provide corporations the ability to protect minority shareholders, supermajority requirements are most often used, in CalPERS' opinion, to block initiatives opposed by management and the board of directors but supported by most shareowners. The Goodyear Tire & Rubber Company vote is a perfect illustration.

CalPERS believes that corporate governance procedures and practices, and the level of accountability they impose, are closely related to financial performance. CalPERS also believes that shareholders are willing to pay a premium for shares of corporations that have excellent corporate governance, as illustrated by a recent study by McKinsey & Co. If the Company were to remove its supermajority requirements, it would be a strong statement that this Company is committed to good corporate governance and its long-term financial performance.

We urge your support FOR this proposal.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413596

## Board of Directors Statement Against Shareholder Proposal

**The Board of Directors recommends a vote AGAINST this proposal for the following reasons:**

If the changes contemplated by the proposal were effectuated, Tribune's shareholders would lose the protection of various supermajority provisions that were included in the Company's Amended and Restated Certificate of Incorporation and By-laws to preserve and maximize shareholder value and protect all shareholders against self-interested actions by one or a few large shareholders.

Most matters submitted to a vote of the Company's shareholders, whether by management or shareholders, are, pursuant to Section 2.10 of the Company's By-laws, subject to a majority vote standard. The Company's Amended and Restated Certificate of Incorporation and By-laws, however, specify certain matters for which a higher vote is required. These include the approval of (1) a merger or consolidation to which the company is a party but not the surviving party (requires the affirmative vote of 66⅔% of our outstanding shares), (2) a sale, lease or exchange of all or substantially all of the Company's assets (requires the affirmative vote of 66⅔% of our outstanding shares), (3) certain types of significant transactions with holders of greater than 10% of any class of our stock (requires the affirmative vote of 80% of our outstanding shares), (4) amendment by the shareholders of the provisions of our By-laws that relate to the ability of representatives of the Chandler Trusts to nominate individuals for election to our Board of Directors (requires the vote of 100% of our outstanding shares) and (5) amendment by the stockholders of any other provision of our By-laws (requires the affirmative vote of 80% of our outstanding shares).

The proposal makes no distinction among the Company's supermajority provisions, each of which serves a somewhat different purpose. It asks shareholders to simply approve a resolution urging management to eliminate them all. The proposal also fails to recognize the value to shareholders of certain of these supermajority provisions.

While the Board generally believes it is unwise to treat these disparate provisions as a single group, it is fair to say that many of them are intended to preserve and maximize shareholder value and to provide protection for all shareholders against self-interested actions by one or a few shareholders. Provisions such as these are included in the governing documents of many public companies. It is important to note that such provisions are not designed to prohibit or preclude takeover proposals, but rather are intended to help ensure that certain types of takeover proposals will be approved only if they are acceptable to a broad range of our shareholders as well as to our Board.

The Board owes a fiduciary duty to all of the Company's shareholders. It recommends that shareholders vote against this proposal because it believes that the supermajority provisions that are the subject of the proposal assist it in discharging this fiduciary duty and, accordingly, are in the best interests of the Company and its shareholders.

It is also important to note that approval of this proposal by shareholders would not in itself effectuate the changes contemplated by the proposal. Further action by shareholders and the Board would be required to amend the Company's Amended and Restated Certificate of Incorporation and By-Laws.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413597

# AUDIT COMMITTEE

**Report of the Audit Committee**

The Audit Committee is responsible for reviewing and monitoring Tribune's financial reporting and accounting practices. The Audit Committee also assesses the qualifications and independence of Tribune's independent accountants, the performance of Tribune's internal auditors and independent accountants, and the effectiveness of Tribune's compliance and ethics program. In performing its duties, the Audit Committee meets regularly with representatives of Tribune's management, internal auditors, legal counsel and independent accountants. The Audit Committee also reviews with Tribune's internal auditors and independent accountants the overall scope and plans for their respective audits. The independent accountants report directly to the Audit Committee and both the internal auditors and independent accountants have direct access to the Audit Committee.

Management is responsible for the preparation, integrity and fair presentation of Tribune's consolidated financial statements and related financial information. Management is also responsible for establishing, maintaining and assessing a system of internal controls designed to provide reasonable assurance to Tribune's management and the Board regarding the preparation of reliable published financial statements. In fulfilling its responsibilities, the Audit Committee reviewed and discussed with management Tribune's audited consolidated financial statements and the report of management on internal controls over financial reporting for the fiscal year ended December 31, 2006. The Audit Committee also discussed with management the quality, not just the acceptability, of Tribune's financial reporting and accounting practices.

The independent accountants are responsible for expressing an opinion on the conformity of the audited consolidated financial statements with accounting principles generally accepted in the United States of America. The independent accountants are also responsible for expressing an opinion on the effectiveness of Tribune's internal controls over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States) and for issuing a report thereon. The Audit Committee discussed with the internal auditors and independent accountants the results of their examinations and their evaluations of Tribune's internal controls over financial reporting. The Audit Committee also reviewed with the independent accountants their judgments as to the quality, not just the acceptability, of Tribune's financial reporting and discussed the matters described in Statement on Auditing Standards No. 61, as amended, "Communication with Audit Committees." In addition, the Audit Committee discussed with the independent accountants their independence from management and Tribune, and reviewed the accountants' written disclosures required by Independence Standards Board Standard No. 1, "Independence Discussions with Audit Committees."

In addition to conducting the integrated audit of Tribune's consolidated financial statements and internal controls over financial reporting, the independent accountants provided other audit-related and permissible non-audit services to Tribune during fiscal year 2006. The Audit Committee reviewed the audit-related and permissible non-audit services provided by the independent accountants and determined that the provision of these services is compatible with the maintenance of their independence from management and Tribune. The Audit Committee must pre-approve all audit, audit-related and permissible non-audit services to be performed by the independent accountants, subject to certain de minimis exceptions for permissible non-audit services that are approved by the Audit Committee prior to the completion of the audit. The Audit Committee also reviews with Tribune's Chief Executive Officer and Chief Financial Officer the processes by which such officers make certifications required by the Sarbanes-Oxley Act of 2002.

The Board accepted the Audit Committee's recommendation that the audited consolidated financial statements for the fiscal year ended December 31, 2006 be included in the Annual Report on Form 10-K for filing with the Securities and Exchange Commission.

Betsy D. Holden
William A. Osborn, Chairman
J. Christopher Reyes
Dudley S. Taft

22

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413598

## Policy on Audit Committee Pre-Approval of Audit, Audit-Related and Permissible Non-Audit Services of Independent Accountants

The Audit Committee has responsibility for appointing, setting fees, and overseeing the work of the independent accountants. In recognition of this responsibility, the Audit Committee has established a policy to pre-approve all audit, audit-related and permissible non-audit services provided by the independent accountants, subject to de minimis exceptions for non-audit services that are approved by the Audit Committee prior to the completion of the audit. The projects and categories of service that the Audit Committee pre-approves are as follows:

*Audit Services.* Audit services include work performed in connection with the audit of consolidated financial statements, as well as work that is normally provided by the independent accountants in connection with statutory and regulatory filings or engagements. These services include work performed in connection with the audit of internal controls over financial reporting as required by Section 404 of the Sarbanes-Oxley Act of 2002.

*Audit-Related Services.* These services are for assurance and related services that are traditionally performed by the independent accountants and that are reasonably related to the work performed in connection with the audit, including due diligence related to mergers and acquisitions, employee benefit plan audits and audits of subsidiaries and affiliates.

*Tax Services.* These services are related to tax compliance, tax advice and tax planning.

*Other Services.* These services include all other permissible non-audit services provided by the independent accountants and are pre-approved on an engagement-by-engagement basis.

Prior to the engagement of the independent accountants, the Audit Committee pre-approves these services by category of service. The fees are budgeted and the Audit Committee requires the independent accountants and management to report actual fees versus the budget periodically throughout the year by category of service. During the year, circumstances may arise when it may become necessary to engage the independent accountants for additional services not contemplated in the original pre-approval for which advance approval is required. In those instances, the Audit Committee pre-approves the services before engaging the independent accountants.

The Audit Committee has delegated pre-approval authority to the chair of the committee. The chair must report, for informational purposes only, any pre-approval decisions to the Audit Committee at its next scheduled meeting.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413599

**Fees Paid to Independent Accountants**

The fees for all services provided by the independent accountants for the fiscal years ended December 31, 2006 and December 25, 2005 are shown below (in thousands):

|  | 2006 | 2005(1) |
|---|---|---|
| Audit Fees (2) | $ 2,435 | $2,153 |
| Audit-Related Fees (3) | 1,543 | 686 |
| Tax Fees | 0 | 0 |
| All Other Fees |  |  |
|     Employee benefit plan filings | 160 | 163 |
|     Accounting research software license | 2 | 2 |
|     Total all services | $ 4,140 | $3,004 |

(1)  For 2005, $47 thousand of fees which were previously reported as Audit Fees have been reclassified as Audit-Related Fees to conform to the 2006 presentation.

(2)  Fees for the integrated audit of Tribune's annual consolidated financial statements and internal controls over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act of 2002. Fees also include reviews of quarterly Forms 10-Q.

(3)  Includes audits of Tribune's employee benefit plans, audits of certain Tribune affiliates and audits of subsidiary financial statements. 2005 also includes accounting consultations related to pension matters. The increase in 2006 is primarily attributable to additional auditing of subsidiary financial statements.

24

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# EXECUTIVE COMPENSATION

## Compensation Discussion and Analysis

This section provides information regarding the 2006 compensation program in place for our principal executive officer, principal financial officer and the three most highly-compensated executive officers other than the principal executive officer and principal financial officer (collectively, the "NEOs"). It includes information regarding, among other things, the overall objectives of our compensation program and each element of compensation that we provide.

## Objectives of Our Compensation Program

The Compensation & Organization Committee of our Board of Directors (the "Committee") has the responsibility to review annually and approve corporate goals and objectives relevant to the compensation of our principal executive officer, to evaluate our principal executive officer's performance in light of those goals and objectives and, based on that evaluation, to determine and approve the principal executive officer's compensation level. The Committee also has the responsibility to review annually with the principal executive officer the compensation for the other senior executive officers, including the NEOs. The Committee acts pursuant to a charter that has been approved by the Board.

The compensation program for our NEOs and other senior executive officers is designed to attract and retain top-quality management employees who can contribute to our long-term success and thereby build value for our shareholders. Elements of the compensation program are designed to reflect the performance of Tribune as a whole, the individual performance of the employee and the competitive conditions in the lines of business and geographic areas in which Tribune operates. Incentive awards are paid pursuant to the Tribune Company Incentive Compensation Plan (the "Incentive Plan"), which was approved by shareholders at the Annual Meeting of Shareholders in 2004.

The program is organized around four fundamental principles:

*A Substantial Portion of NEO Compensation Should Be Performance-Based.* Our compensation program is designed to reward superior performance. It accomplishes this in a number of ways. In terms of cash compensation, annual cash bonus targets for each NEO under the management incentive plan ("MIP") provisions of the Incentive Plan are established based on a percentage of an NEO's base compensation. Whether and to what extent MIP bonuses are paid depends on the extent to which the company-wide, group and/or individual goals set by the Committee are achieved during the year. In addition, annual salary increases or decreases and the size and type of equity awards for NEOs are determined by the Committee in February based on company-wide, group and/or individual performance during the year.

*A Meaningful Portion of NEO Compensation Should Be Delivered in the Form of Equity Awards.* We believe that a meaningful portion of total compensation should be delivered in the form of equity in order to align more directly the interests of our NEOs with the interests of our shareholders. In 2006, the equity compensation provided to each NEO consisted of restricted stock units and stock options that, in each case, vest based on the passage of time and continued employment.

*Our Compensation Program for NEOs Should Enable Us to Compete for and Retain First-Rate Executive Talent.* Shareholders are best served when we can attract and retain talented executives with compensation packages that are competitive and fair. In order to assist in retaining executive talent, the compensation packages for NEOs include both a short- and long-term component, with vesting requirements for equity awards based on the passage of time and continued employment. We strive to create compensation packages for NEOs that deliver total compensation that is between the 50th percentile and the 75th percentile of the total compensation delivered by certain peer companies with which we compete for executive talent. To assist in making this comparison and to ensure that the compensation packages for NEOs are competitive, the Committee utilizes the Towers Perrin Media

25

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0413601**

Industry Executive Compensation Survey and other executive compensation surveys, which provide data concerning relative compensation of other companies. In addition, the Committee engages Frederic W. Cook, & Co., Inc., a nationally-known compensation consulting firm, to provide information regarding compensation levels and practices of peer companies including, specifically, Belo Corp., Clear Channel Communications, Inc., Dow Jones & Company, Inc., Gannett Co., Inc., Hearst-Argyle Television, Inc., IAC/InterActive Corp., The McClatchy Company, McGraw-Hill Companies, Inc., The New York Times Company, The E.W. Scripps Company and The Washington Post Company (the "Peer Group").

*Our Compensation Program for NEOs Should Be Fair and Perceived as Such, Both Internally and Externally.* We endeavor to create a compensation program that is fair and perceived as fair, both internally and externally. This is accomplished by comparing the compensation that is provided to our NEOs to the compensation provided to officers of the other companies included in survey data and those in the Peer Group, as a means to measure external fairness. We also compare compensation of the NEOs to other senior employees of the Company, as a means to measure internal fairness.

## Elements of Our Compensation Program

This section describes the various elements of our compensation program for NEOs, together with a discussion of various matters relating to those items, including why each item is included in the compensation program. The Committee believes that its current compensation program for NEOs achieves an appropriate balance with respect to the pursuit of both short and long-term performance goals. The mix of equity and cash compensation described below gives our NEOs a substantial alignment with shareholders, while also providing the Company with a mechanism for retaining executive talent.

*Cash Compensation*

Cash compensation is paid in the form of salary and bonuses. Salary is included in the Company's NEO compensation package because the Committee believes it is appropriate that some portion of the compensation that is provided to NEOs be provided in a form that is fixed and liquid. Annual performance-based bonuses, which are paid pursuant to the MIP, are included in the package in order to provide incentives to our NEOs, in any particular year, to pursue particular objectives that the Committee believes are consistent with the overall goals and strategic direction that the Board has set for the Company. The amount of cash compensation that is paid in the form of salary as compared to annual performance-based bonuses is determined by the Committee in a manner designed to achieve the four fundamental principles set forth above.

The components comprising the cash portion of total compensation are described below.

Salary. Base salaries for NEOs for any given year are generally approved by the Committee at its meeting in February. With respect to the other NEOs and other senior executive officers, the Committee makes its final determination based on the recommendation of, and after discussions with, Mr. FitzSimons, our Chairman, President and Chief Executive Officer. Increases or decreases in base salary on a year-over-year basis are dependent on the Committee's assessment of company-wide, group and/or individual performance and the salary levels of our executives as compared to the other companies included in the survey data and those in the Peer Group.

MIP. The MIP provides cash compensation to NEOs to the extent that performance conditions set by the Committee are met. Target bonuses under the MIP are set each year by the Committee in February.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413602

In determining the amount of target bonuses under the MIP, the Committee considers several factors, including:

- the desire to tie a substantial portion of total compensation to company-wide, group and/or individual performance;

- the relative level of cash compensation, at target and actual achievement levels, of our executives as compared to the other companies included in the survey data and those in the Peer Group; and

- the advice of Frederic W. Cook & Co., Inc. as to compensation practices at other companies in the Peer Group.

Performance objectives for the MIP are developed through an iterative process. Based on a review of business plans, management, including the NEOs, develops preliminary recommendations for Committee review. The Committee reviews management's preliminary recommendations and establishes final goals. In establishing final goals, the Committee seeks to ensure that the incentives provided pursuant to the MIP are consistent with the strategic goals set by the Board, that the goals set are sufficiently ambitious so as to provide a meaningful incentive and that bonus payments, assuming target levels of performance are attained, will be consistent with the overall NEO compensation program established by the Committee.

The Committee, based on management's preliminary recommendation, approves the financial performance criteria and the individual performance goals that will be used to determine whether and to what extent NEOs will receive payments under the MIP. For fiscal 2006, the Committee selected operating cash flow plus income from equity investments as the relevant financial performance criteria. The Committee selected these measures because it believes that operating cash flow is an important indicator of the operational strength and performance of the Company's businesses and that equity investment results are important to the future growth of the Company. Target bonuses for NEOs with respect to bonuses paid for 2006 ranged from 60% to 125% of base salary and were based on the NEO's level of responsibility and ability to affect the Company's results. MIP bonuses for corporate executives, including Messrs. FitzSimons, Grenesko and Lewin, were based on the achievement of consolidated goals, while the MIP bonuses for Messrs. Smith and Reardon were based on achievement of the goals for the publishing group and the broadcasting group, respectively.

Actual payments under the MIP can range, on the basis of financial performance, from 0% (threshold) to 200% (maximum) of the target bonus established by the Committee as follows:

| Company or Group Performance Level | Payment Level |
| --- | --- |
| Below 85% of plan | Discretionary |
| At 85% of plan | 40% of target |
| Every 1% increase between 85% and 100% of goal | An additional 4% of target |
| At 100% of plan | 100% of target |
| Every 1% increase between 100% and 115% of goal | An additional 6⅔% of target (to a maximum of 200%) |

For fiscal 2006, [the Company and the broadcasting group met or exceeded all of their respective financial performance goals, while the publishing group did not meet all of its financial performance goals.]

At each payment level specified above, the Committee may elect to grant an MIP award to an NEO in an amount at or above the specified level based on an NEO's achievement of the pre-determined individual performance goals established by the Committee. The individual performance goals consist of specific strategic and operational goals for the Company and for the publishing and broadcasting groups which are designed to maximize revenue opportunities and aggressively manage resources. In addition, the Committee reserves the discretion to reduce or not pay bonuses under the MIP even if

27

TRB0413603

the relevant financial performance targets are met and the relevant individual performance goals are achieved.

Awards granted to the NEOs for fiscal 2006 are reflected in the Summary Compensation Table on page [   ] of this Proxy Statement. No award was granted to an NEO that was not related to the achievement of the financial performance goals or pre-determined individual performance goals.

*Equity Compensation*

The Committee believes that a meaningful portion of each NEO's compensation should be in the form of equity awards, as such awards serve to align more directly the interests of NEOs and our shareholders. In addition, in order to assist in retaining executive talent, the equity awards include vesting requirements based on the passage of time and continued employment. Equity awards to our NEOs are made pursuant to the Incentive Plan. The Incentive Plan allows for the use of a wide variety of equity-based awards, including stock options, restricted stock and restricted stock units.

Prior to 2006, equity grants were provided to NEOs solely in the form of non-qualified stock options. In 2006, NEOs received their equity awards in stock options and in restricted stock units that, in each case, vest based on the passage of time and continued employment. In granting equity awards for 2006, including the grants to the NEOs, the Committee considered each of the following primary factors related to equity grants from prior years. These primary factors contributed to the Committee's decision to grant a combination of stock options and restricted stock units to each NEO.

- The substantial reduction in the size and value of all stock option grants in the three years prior to 2006. The total number of all stock options granted in February 2005 was 49% lower than the total number of stock options granted in February 2002, and the aggregate grant date fair value of the stock options granted in February 2005 was 61% less than the aggregate grant date fair value of the stock options granted in February 2002.

- The elimination of the replacement feature for all stock options awarded after 2003 and the reduction in the term of stock options from ten to eight years in 2005 and after, which in each case reduced the grant date fair value of such stock options.

- Peer company practice with respect to the grant of "full-value" stock awards such as restricted stock or restricted stock units.

- The Company's competitive position with respect to executive compensation and the fact that all outstanding annual Tribune stock option awards granted since 1998 were out-of-the-money and thereby did not provide any retention incentives for executive talent.

The amount of equity compensation that is provided to each NEO in a given year is generally determined by reference to survey data for the prior year. That is, the Committee each year approves an equity award or awards for each NEO that would provide total compensation, taking into account base salary and MIP as well as equity compensation, that is between the 50th percentile and the 75th percentile when compared to the other companies included in the survey data and those in the Peer Group. The percentage that the Committee selects for these purposes in a given year is dependent on the Committee's assessment, for that year, of the appropriate balance between cash and equity compensation.

A description of the form of equity awards that have been made to NEOs under the Incentive Plan follows:

Stock Options.   Stock options granted under the Incentive Plan may vest on the basis of the satisfaction of performance conditions established by the Committee or on the basis of the passage of time and continued employment. Stock options that vest on the basis of the passage of time and continued employment generally vest in equal annual installments over a period of four years from the

28

TRB0413604

grant date for options granted prior to February 2006 and over a period of three years from the grant date for the annual grants made on or after February 2006. The stock options awarded in February 2006 and 2005 were for eight-year terms, two years shorter than the ten-year terms of the stock options awarded in prior years. The two-year reduction in term reduced stock-based compensation expense with respect to those stock options. The Committee has the ability to modify both the term and vesting schedule for new stock option grants within the parameters of the Incentive Plan. All options are granted with an exercise price equal to the closing market price of a share of our common stock on the date of grant, and stock option re-pricing is expressly prohibited by the Incentive Plan's terms without shareholder approval.

<u>Restricted Stock Units.</u>   Restricted stock units ("RSUs") convert into shares of our common stock if the recipient is still employed by us on the date that specified restrictions lapse. Restricted stock units granted under the Incentive Plan may vest on the basis of the satisfaction of performance conditions established by the Committee or on the basis of the passage of time and continued employment. Outstanding restricted stock units that vest on the basis of the passage of time and continued employment vest over a three-year period. For grants made to the NEOs in 2006, the restrictions lapse in stages, with restrictions lapsing on 33% of the shares on each of the first two anniversaries of the grant date and 34% of the shares on the third anniversary of the grant date. However, with respect to the grant of 12,000 restricted stock units made to Mr. Lewin, the restrictions lapse all at once, with 100% vesting following the third anniversary of continued employment. Recipients of restricted stock units receive dividend equivalents on RSUs which vest at the same time as the RSUs on which they were granted and which are paid in additional shares. RSUs do not contain voting rights with respect to Company stock prior to conversion into shares of common stock.

*Practices Regarding the Grant of Options*

The Committee has generally followed a practice of making all annual option grants to its executive officers on a single date each year and at a time when material information regarding our performance for the preceding year has been disclosed. Since February 1999, the Committee has granted these annual awards at its regularly-scheduled meeting in February. The February meeting date generally occurs within four weeks after the issuance of the release reporting the Company's earnings for the previous fiscal year. We do not otherwise have any program, plan or practice to time annual option grants in coordination with the release of material non-public information.

While the vast majority of our option awards to NEOs have historically been made pursuant to our annual grant program, we retain the discretion to make additional awards to NEOs or other employees at other times, in connection with the initial hiring of a new officer, in connection with promotions, for retention purposes or otherwise. No such awards have been made to any of the NEOs.

Prior to 2004, replacement stock options ("replacement options") were granted simultaneously with the exercise of the original stock option if an NEO or other key employee exercised a stock option by surrendering currently owned shares to purchase the shares subject to the original stock options as well as to satisfy related tax withholding obligations. In February 2004, Tribune suspended the practice of issuing new stock options with a replacement feature. Replacement stock options are subject to the same terms and conditions as the original options, including the expiration date, except that the exercise price of a replacement stock option is the fair market value on the date of its grant rather than the exercise price of the original stock option. Also, replacement stock options do not become exercisable until one year after award. Moreover, replacement stock options were not granted unless the closing stock price on the date of exercise exceeded the exercise price by at least 25%. The grant of replacement options did not result in an increase in the total combined number of shares and options held by an employee. Effective since 2005, no replacement stock options will be granted to any Tribune senior executives, including the NEOs, unless the closing stock price on the date of exercise exceeds the

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413605

exercise price by at least 50%. No replacement options were granted to NEOs in 2006 because no NEO exercised a stock option.

All stock option awards made to our NEOs, or any of our other employees, are made pursuant to our Incentive Plan. As noted above, all stock options under the Incentive Plan are granted with an exercise price equal to the fair market value of our common stock on the date of grant. Fair market value is defined under the Incentive Plan to be the closing market price of a share of our common stock on the date of grant. We do not have any program, plan or practice of awarding stock options and setting the exercise price based on the stock's price on a date other than the grant date. We do not have a practice of determining the exercise price of stock option grants by using average prices (or lowest prices) of our common stock in a period preceding, surrounding or following the grant date. While the Committee's charter permits delegation of the Committee's authority to grant stock options in certain circumstances, all grants to NEOs have been made by the Committee itself and not pursuant to delegated authority.

*Perquisites*

Our NEOs receive certain perquisites provided by or paid for by the Company. These perquisites include financial planning services, memberships in social and professional clubs, car allowances and gross up payments equal to the taxes payable on certain perquisites.

We provide these perquisites because, in many cases, the perquisite makes our executives more efficient and effective and thereby is a benefit to us. In addition, these perquisites are provided by many companies in the Peer Group to their named executive officers and it is therefore necessary for retention and recruitment purposes that we do the same.

*Deferred Compensation Plans*

Our Bonus Deferral Plan allows certain employees, including the NEOs, to defer receipt of MIP bonus payments.

Participants may defer up to 100% of bonus payments into a cash-based account or into an account that tracks Tribune common stock. The cash-based account appreciates at a rate equal to 120% of the long-term applicable federal rate, compounded quarterly, which is determined periodically by the Internal Revenue Service. The rate is reset by the Company on March 1 of each year and for 2006 was 5.52%. Amounts deferred into Tribune common stock accounts are credited with earnings or losses based on the return on Tribune common stock. The investment alternative is selected by the participants in the plan, and participants may not move an investment out of a Tribune stock return equivalent once it has been selected. We do not "match" amounts that are deferred by employees pursuant to the Bonus Deferral Plan. Distributions are paid in a lump sum distribution or in annual installments on or about March 1 each year commencing in the calendar year following the termination of the employee's employment with the Company.

The Bonus Deferral Plan is not funded by us, and participants have an unsecured contractual commitment from us to pay the amounts due under the Bonus Deferral Plan. When such payments are due, the cash will be distributed from our general assets.

We provide this benefit because the Committee wishes to permit our employees to defer the obligation to pay taxes on certain elements of their compensation. The Bonus Deferral Plan permits them to do this while also receiving interest on deferred amounts, as described above. Deferral of amounts into Tribune stock equivalents also further aligns the interests of management and shareholders and assists the executive with meeting ownership guideline requirements described below. We believe that this benefit is important as a retention and recruitment tool as many if not all of the companies with which we compete for executive talent provide a similar plan to their senior employees.

30

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

*Post-Termination Compensation*

Transitional Compensation Plan.   The NEOs do not have employment agreements and are considered "at-will" employees who may be terminated at any time by the Company. While we have not entered into formal severance agreements with any of the NEOs, we do maintain a Transitional Compensation Plan for Executive Employees (the "Transitional Compensation Plan") under which all the NEOs are covered. The Transitional Compensation Plan provides for benefits, upon a qualifying event or circumstances after there has been a "change-in-control" (as defined in the Transitional Compensation Plan) of the Company. Additional information regarding the Transitional Compensation Plan, including a definition of key terms and a quantification of benefits that would have been received by our NEOs had termination occurred on December 31, 2006, is found under the heading "Potential Payments upon Termination or Change-in-Control" beginning on page [    ].

The Committee believes that the Transitional Compensation Plan is an important part of overall compensation for our NEOs, and the Committee believes that it helps to secure the continued employment and dedication of our NEOs, notwithstanding any concern that they might have at such time regarding their own continued employment, prior to or following a change in control. The Committee also believes that the Transitional Compensation Plan is important as a recruitment and retention device, as all or nearly all of the companies with which we compete for executive talent have severance or transitional compensation agreements in place for their senior employees.

Pension Plan and Supplemental Pension Plan.   The Tribune Company Pension Plan (the "Pension Plan") is a funded, tax-qualified, noncontributory defined-benefit pension plan that covers all non-union employees who had met the relevant age and service requirements, including the NEOs. We also maintain The Tribune Company Supplemental Retirement Pension Plan (the "Supplemental Pension Plan"), an unfunded plan that provides payments substantially equal to the difference between the amount that would have been payable under the Pension Plan, in the absence of legislation limiting pension benefits and earnings that may be considered in calculating pension benefits, and the amount actually payable under the Pension Plan.

Both plans were "frozen" on December 31, 1998 (the "freeze date"), and no additional service and compensation credit has accrued since the freeze date. Benefits payable under the Pension Plan are based upon the employee's years of service (up to a maximum of 35 years) and the employee's highest average earnings for a five calendar-year period with us and our affiliated companies as of the freeze date. Benefits are payable after retirement in the form of an annuity or a lump sum. Earnings, for purposes of the calculation of benefits under the Pension Plan, include base salary and commissions, if any. The amount of annual earnings considered in calculating benefits under the Pension Plan is limited by law. Contributions to the Pension Plan are made entirely by us and are paid into a trust fund from which the benefits of participants will be paid. Additional information regarding the Pension Plan and the Supplemental Pension Plan is found under the heading "2006 Pension Benefits" beginning on page [    ].

Savings Plan and Supplemental Savings Plan.   Under the Tribune Company 401(k) Savings and Profit Sharing Plan (the "Savings Plan"), a tax-qualified retirement savings plan, non-union employees, including our NEOs, may contribute eligible base compensation on a before-tax basis, up to Internal Revenue Service limits. For calendar year 2006, the maximum contribution by employees to the Savings Plan was $15,000, plus an additional $5,000 for those employees who had attained age 50 years. In addition, the Company provides a regular company contribution equal to 4% of eligible compensation (generally, base compensation). We also provide an annual profit-sharing contribution of between 2% and 5% of base compensation depending on the financial performance of the Company for the year with a target of 3.5% of base compensation. For 2006, the profit-sharing contribution was [3.0%] of compensation. Amounts held in Savings Plan accounts may not be withdrawn except in the event of hardship prior to the employee's termination of employment, or such earlier time as the employee

31

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413607

reaches the age of 59½ years, subject to certain exceptions set forth in Internal Revenue Service regulations.

Pursuant to Internal Revenue Service rules, effective for 2006, the Savings Plan limits the "annual additions" that can be made to a participating employee's account to $44,000 per year. "Annual additions" include company contributions and profit-sharing contributions made by us at the request of the participating employee under Section 401(k) of the Internal Revenue Code. In addition, no more than $220,000 of annual compensation may be taken into account in computing benefits under the Savings Plan.

We have a Supplemental Defined Contribution Plan (the "Supplemental Savings Plan") paid out of the Company's general assets, which credits eligible Savings Plan participants with an amount substantially equal to the difference between the amount that, in the absence of legislation limiting company contributions to the Savings Plan, would have been allocated to an employee's company contributions and profit-sharing contributions and the amount actually allocated under the Savings Plan.

We maintain the Savings Plan for our employees, including our NEOs, because we wish to encourage our employees to save some percentage of their cash compensation for their eventual retirement. The Savings Plan permits employees to make such savings in a manner that is relatively tax efficient. We maintain the Supplemental Savings Plan because we believe that it is not equitable to limit the Company contribution portion of the program on the basis of a limit that is established by the Internal Revenue Service for purposes of federal tax policy. The Supplemental Savings Plan permits a participant to receive the same percentage of compensation in the form of company contributions as participants not subject to these limits.

*Stock Ownership Guidelines.*

The Company has established stock ownership guidelines for executive officers and other key employees. The Committee believes that stock ownership guidelines have the positive effect of further aligning the interests of management with those of Tribune's shareholders. The guidelines generally range from a high of ten times annual salary, in the case of Mr. FitzSimons, to one times annual salary. Individuals are expected to achieve the suggested ownership level over a six-year period. Shares held in Tribune benefit plans are counted in satisfying the guidelines, but unexercised stock options and unvested shares of restricted stock and restricted stock units are not counted. All of the NEOs named in the summary compensation table have achieved their suggested stock ownership levels. For 2006, the stock ownership guidelines applied to approximately 95 individuals.

We have a policy that prohibits our directors and executive officers from engaging in selling short our common stock or engaging in hedging or offsetting transactions regarding our common stock.

*Compliance*

Section 162(m) of the Internal Revenue Code imposes a $1 million limit on the tax deduction for certain executive compensation payments. Performance-based compensation meeting specified requirements is exempt from this deduction limit. In 2006, the Committee granted performance-based compensation awards pursuant to the Incentive Plan that were subject to the deduction limit as well as awards that were not subject to the limit. The Committee believes that shareholders are best served by preserving the Committee's discretion and flexibility to approve non-deductible awards in appropriate circumstances consistent with corporate performance objectives.

Incentive Plan awards for February 2006 and February 2007 include express "claw-back" provisions under which awards or gains from awards may be forfeited if a participant engages in any act of fraud, insider trading or other securities law violation.

32

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**Compensation & Organization Committee Report**

The Compensation & Organization Committee of the Board of Directors of Tribune Company (the "Committee") oversees Tribune Company's compensation program on behalf of the Board. In fulfilling its oversight responsibilities, the Committee reviewed and discussed with management the Compensation Discussion and Analysis set forth in this Proxy Statement.

In reliance on the review and discussions referred to above, the Committee recommended to the Board that the Compensation Discussion and Analysis be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2006 and the Company's Proxy Statement to be filed in connection with the Company's 2007 Annual Meeting of Shareholders, each of which will be filed with the Securities and Exchange Commission.

Jeffrey Chandler
Enrique Hernandez, Jr.
Robert S. Morrison, Chairman
Miles D. White

\*\*\*

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## 2006 Summary Compensation Table

The following table summarizes compensation awarded to, earned by or paid to the NEOs in 2006. The section of this Proxy Statement entitled "Compensation Discussion and Analysis" describes in greater detail the information reported on this table.

| Name and Principal Position | Year | Salary (1)($) | Stock Awards (2)($) | Option Awards (3)($) | Non-Equity Incentive Plan Compensation (4)($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings (5)($) | All Other Compensation (6)($) | Total($) |
|---|---|---|---|---|---|---|---|---|
| Dennis J. FitzSimons Chairman, President and Chief Executive Officer | 2006 | $999,327 | $1,869,600 | $1,942,707 | [   ] | $17,790 | $77,589 | $4,907,013 |
| Donald C. Grenesko Senior Vice President/ Finance and Administration | 2006 | 574,346 | 872,480 | 559,200 | [   ] | 17,197 | 38,739 | 2,061,962 |
| Scott C. Smith President, Tribune Publishing Company | 2006 | 578,365 | 934,800 | 579,718 | [   ] | 15,865 | 56,291 | 2,165,039 |
| Luis E. Lewin Senior Vice President Human Resources | 2006 | 358,750 | 903,640 | 338,224 | [   ] | 5,352 | 28,061 | 1,634,027 |
| John E. Reardon President, Tribune Broadcasting Company | 2006 | 509,615 | 185,745 | 131,336 | [   ] | 3,829 | 53,537 | 884,062 |

(1)  The amounts represent base salary for 53 week fiscal year beginning December 26, 2005 through December 31, 2006.

(2)  The amounts shown in this column for Messrs. FitzSimons, Grenesko, Smith and Lewin constitute the entire grant date fair value of the restricted stock units granted to them in 2006 under the Incentive Plan, without regard to vesting requirements, because the entire grant date fair value of such awards was expensed in 2006 due to the fact that each of these individuals had reached the minimum retirement age. The amount shown in this column for Mr. Reardon constitutes the expense taken in 2006 with respect to the restricted stock units granted to Mr. Reardon in 2006 plus an assumed forfeiture amount which is subtracted from the full fair value of the award when determining the required expense. The expense taken by the Company in 2006 with respect to each of these awards was determined pursuant to Financial Accounting Standards Board Statement of Financial Accounting Standards No. 123 (revised 2004), *Share-Based Payment* (which we refer to as FAS 123R). See Note 16 to the Consolidated Financial Statements included in our Annual Report on Form 10-K for the year ended December 31, 2006 for a discussion of the relevant assumptions used in calculating grant date fair value pursuant to FAS 123R. For further information on these awards, see the 2006 Grants of Plan-Based Awards table beginning on page [   ].

(3)  The amounts shown in this column for Messrs. FitzSimons, Grenesko, Smith and Lewin, constitute the entire grant date fair value of the stock options granted to them in 2006 under the Incentive Plan, without regard to vesting requirements, because the entire grant date fair value of such awards was expensed in 2006 due to the fact that each of these individuals had reached the minimum retirement age. The amount shown in this column for Mr. Reardon constitutes the expense taken in 2006 with respect to the stock options granted to Mr. Reardon in 2006 plus an assumed forfeiture amount which is subtracted from the full fair value of the award when determining the required expense. As of December 31, 2006, the exercise price of each stock option granted to the NEOs in 2006 exceeded the trading price of Tribune's common stock and, as a result, the stock option had no actual value. The expense taken by the Company in 2006 with respect to each of these awards was determined pursuant to FAS 123R. See Note 16 to the Consolidated Financial Statements included in our Annual Report on Form 10-K for the year ended December 31, 2006 for a discussion of the relevant assumptions used in calculating grant date fair value pursuant to FAS 123R. For further information on these awards, see the 2006 Grants of Plan-Based Awards table beginning on page [   ].

(4)  The amounts shown in this column constitute payments made under the MIP. For further information regarding these performance criteria, see the discussion beginning on page [   ].

(5)  The amounts shown in this column include the aggregate of the increase in actuarial values of each of the NEO's benefits under the Pension Plan and Supplemental Pension Plan. Because the Pension Plan and Supplemental Pension Plan were

34

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413610

frozen with respect to continued service and compensation credits effective as of December 31, 1998, the increase in actuarial values results solely from the reduction in the period of discounting over the prior year and the change in the required discount rate. None of the NEOs earned above-market or preferential earnings on deferred compensation in 2006.

(6)   The amounts shown in this column consist of perquisites, reimbursement for the payment of taxes and company contributions under Tribune's qualified and non-qualified defined contribution plans. For 2006, perquisites for the NEOs included: (i) an automobile allowance to each of the NEOs; (ii) a club allowance to Messrs. FitzSimons, Grenesko, Smith and Reardon and (iii) personal financial counseling for Messrs. FitzSimons, Smith and Reardon. For fiscal 2006, the following NEOs received the following tax reimbursements with respect to certain perquisites: Mr. FitzSimons: $6,819; Mr. Smith: $3,357; and Mr. Reardon: $7,300. Each NEO received a company contribution of $[      ] under the Tribune Company 401(k) Savings and Profit Sharing Plan, a qualified defined contribution plan. The company contributions credited to each NEO under Tribune's non-qualified defined contribution plan were: Mr. FitzSimons: $[   ]; Mr. Grenesko: $[   ]; Mr. Smith: $[   ]; Mr. Lewin: $[   ]; and Mr. Reardon: $[   ].

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413611

**2006 Grants of Plan-Based Awards**

The following table summarizes awards granted to the NEOs under the MIP and the Incentive Plan in 2006. Each of the NEOs participates in the MIP, a cash incentive plan, and the annual cash incentive award actually earned by each NEO is shown on the Summary Compensation Table under the "Non-Equity Incentive Plan Compensation" column. The MIP and the Incentive Plan are each described in greater detail in the section of this Proxy Statement entitled, "Compensation Discussion and Analysis" beginning on page [   ].

| Name | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards(1) | | | All Other Stock Awards: Number of Shares of Stock or Units (#)(2) | All Other Option Awards: Number of Securities Underlying Options (#)(3) | Exercise or Base Price of Option Awards ($/Sh) | Grant Date Fair Value ($)(4) |
|---|---|---|---|---|---|---|---|---|
| | | Threshold ($) | Target ($) | Maximum ($) | | | | |
| Dennis J. FitzSimons | | $0 | $1,231,250 | $2,462,500 | | | | |
| | 2/14/2006 | | | | | 300,000 | $31.16 | $1,788,000 |
| | 2/14/2006 | | | | 60,000 | | | $1,869,600 |
| | 3/9/2006 | | | | 355 | | | $    10,800 |
| | 6/8/2006 | | | | 344 | | | $    10,864 |
| | 9/14/2006 | | | | 350 | | | $    10,926 |
| | 12/14/2006 | | | | 344 | | | $    10,989 |
| Donald C. Grenesko | | $0 | $  427,500 | $  855,000 | | | | |
| | 2/14/2006 | | | | | 85,000 | $31.16 | $  506,600 |
| | 2/14/2006 | | | | 28,000 | | | $  872,480 |
| | 3/9/2006 | | | | 166 | | | $    5,040 |
| | 6/8/2006 | | | | 161 | | | $    5,070 |
| | 9/14/2006 | | | | 163 | | | $    5,099 |
| | 12/14/2006 | | | | 161 | | | $    5,128 |
| Scott C. Smith | | $0 | $  460,000 | $  920,000 | | | | |
| | 2/14/2006 | | | | | 90,000 | $31.16 | $  536,400 |
| | 2/14/2006 | | | | 30,000 | | | $  934,800 |
| | 3/9/2006 | | | | 178 | | | $    5,400 |
| | 6/8/2006 | | | | 172 | | | $    5,432 |
| | 9/14/2006 | | | | 175 | | | $    5,463 |
| | 12/14/2006 | | | | 172 | | | $    5,494 |
| Luis E. Lewin | | $0 | $  213,000 | $  426,000 | | | | |
| | 2/14/2006 | | | | | 50,000 | $31.16 | $  298,000 |
| | 2/14/2006 | | | | 17,000 | | | $  529,720 |
| | 3/9/2006 | | | | 101 | | | $    3,060 |
| | 6/8/2006 | | | | 97 | | | $    3,078 |
| | 9/14/2006 | | | | 99 | | | $    3,096 |
| | 12/14/2006 | | | | 98 | | | $    3,113 |
| | 2/14/2006 | | | | 12,000 | | | $  373,920 |
| | 3/9/2006 | | | | 71 | | | $    2,160 |
| | 6/8/2006 | | | | 69 | | | $    2,173 |
| | 9/14/2006 | | | | 70 | | | $    2,185 |
| | 12/14/2006 | | | | 69 | | | $    2,198 |
| John E. Reardon | | $0 | $  350,000 | $  700,000 | | | | |
| | 2/14/2006 | | | | | 60,000 | $31.16 | $  357,600 |
| | 2/14/2006 | | | | 20,000 | | | $  623,200 |
| | 3/9/2006 | | | | 118 | | | $    3,600 |
| | 6/8/2006 | | | | 115 | | | $    3,621 |
| | 9/14/2006 | | | | 117 | | | $    3,642 |
| | 12/14/2006 | | | | 115 | | | $    3,663 |

(1) Sets forth cash bonus award parameters under the MIP. In each case, the amount actually earned by each NEO is reported as Non-Equity Incentive Plan Compensation in the Summary Compensation Table. The amount set forth as the maximum bonus payable under the MIP to each NEO equals 200% of the NEO's target bonus. In addition, in order to ensure that awards satisfy the requirements for "performance-based compensation" under Section 162(m) of the Internal Revenue Code, the terms of the MIP provide that the maximum amount payable in any year to any participant in the MIP shall not exceed

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413612

0.2% of the Company's operating cash flow for that year. In 2006, 0.2% of Tribune's operating cash flow was approximately $2.6 million.

(2)  Consists of restricted stock units and dividend equivalent units awarded under the Incentive Plan. Except as set forth in the following two sentences, restricted stock units vest on the basis of the passage of time and continued employment over a three-year period, with restrictions lapsing on 33% of the shares on each of the first two anniversaries of the grant date and 34% on the third anniversary. The grant of 12,000 restricted stock units to Mr. Lewin was a special grant made to certain executives and key employees who were not named in the summary compensation table for the 2005 proxy statement. The special award vests in full on the basis of the passage of time and continued employment after three years from the grant date. With respect to each restricted share unit, during the vesting period, dividend equivalents accumulate and are paid in additional shares in the year in which the award vests. The dividend equivalents accumulated in 2006 are reflected immediately following the related restricted share unit grant.

(3)  Consists of options to purchase shares of our common stock awarded under the Incentive Plan. Options vest on the basis of the passage of time and continued employment over a three-year period, with 33% of the shares vesting on each of the first two anniversaries of the grant date and 34% vesting on the third anniversary.

(4)  Amounts in this column consist of the grant date fair value of the stock option or restricted stock unit award determined pursuant to FAS 123R.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413613