**Narrative to Summary Compensation Table and Plan-Based Awards Table**

*Employment Agreements*

During 2006, each of the NEOs was an at-will employee and none of them was a party to an employment agreement with the Company.

*Awards*

In February 2006, the Committee established bonus targets for each of our NEOs under the MIP for 2006. The amount of the potential bonus payouts was tied to satisfaction of financial performance targets relating to operating cash flow and income from equity investments as well as the satisfaction of pre-determined individual performance goals. In each case, the MIP bonuses paid to the NEOs are reported as "Non-Equity Incentive Plan Compensation" in the Summary Compensation Table.

On February 14, 2006, the Committee granted restricted stock units to each of our NEOs pursuant to the Incentive Plan. Restricted stock units consist of an award denominated in shares of Tribune common stock. These units convert into shares of our common stock upon vesting. Restricted stock units awarded in 2006 under our Incentive Plan will vest in three annual installments on the first through third anniversaries of the date of grant, except for the grant to Mr. Lewin of 12,000 restricted stock units, which vests on the basis of the passage of time and continued employment in full three years after the grant date. Restricted stock units do not include the right to vote and may not be sold or transferred during the vesting period. Dividend equivalents on restricted stock units will be earned on the same terms and at the same rate as dividends paid to our common shareholders. Dividend equivalents vest at the same rate and at the same time as the underlying restricted stock units.

The Committee granted stock options to each of our NEOs on February 14, 2006 under our Incentive Plan. These stock options vest on the basis of the passage of time and continued employment over a three-year period with 33% vesting on each of the first and second anniversaries of the grant date and 34% vesting on the third anniversary of the grant date. For grants to Messrs. FitzSimons, Grenesko, Smith and Lewin, the entire grant date fair value of each award granted in 2006 was expensed in 2006 because each of these individuals had reached the minimum retirement age.

*Salary and Bonus in Proportion to Total Compensation*

We believe that a meaningful portion of each NEO's compensation should be in the form of equity awards. Our Committee believes that our current compensation program gives our NEOs a substantial alignment with shareholders, while also permitting the Committee to incentivize the NEOs to pursue specific short and long-term performance goals. See "Compensation Discussion and Analysis" beginning on page [   ] for a description of the objectives of our compensation program and overall compensation philosophy.

38

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## 2006 Outstanding Equity Awards at Fiscal-Year-End

The following table summarizes the outstanding equity awards held by the NEOs at the end of 2006.

| Name | Option Awards | | | | Stock Awards | |
|---|---|---|---|---|---|---|
| | Number of Securities Underlying Unexercised Options (#) Exercisable(1) | Number of Securities Underlying Unexercised Options (#) Unexercisable(2) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#)(2) | Market Value of Shares or Units of Stock That Have Not Vested ($) |
| Dennis J. FitzSimons | | 300,000 | $31.16 | 2/14/2014 | 61,393 | $1,889,677 |
| | 200,000 | | $40.59 | 2/8/2013 | | |
| | 29,492 | | $52.19 | 2/15/2010 | | |
| | 46,358 | | $51.99 | 2/13/2011 | | |
| | 53,918 | | $52.38 | 2/12/2012 | | |
| | 200,000 | | $52.05 | 2/10/2012 | | |
| | 15,413 | | $52.63 | 7/29/2007 | | |
| | 19,973 | | $51.55 | 2/16/2009 | | |
| | 15,774 | | $51.30 | 7/29/2007 | | |
| | 20,175 | | $51.30 | 2/16/2009 | | |
| | 54,534 | | $51.30 | 2/12/2012 | | |
| | 20,256 | | $50.37 | 2/16/2009 | | |
| | 95,252 | | $50.23 | 2/13/2011 | | |
| | 30,891 | | $48.66 | 2/15/2010 | | |
| | 21,490 | | $46.23 | 2/16/2009 | | |
| | 275,000 | | $45.90 | 2/11/2013 | | |
| | 61,758 | | $48.69 | 2/15/2010 | | |
| | 22,000 | | $43.39 | 7/28/2008 | | |
| | 21,966 | | $43.52 | 7/28/2008 | | |
| | 125,000 | | $40.50 | 2/12/2012 | | |
| | 53,750 | | $40.18 | 2/13/2011 | | |
| | 21,992 | | $43.63 | 7/28/2008 | | |
| | 17,196 | | $44.03 | 7/29/2007 | | |
| | 21,892 | | $44.03 | 7/28/2008 | | |
| | 17,476 | | $44.03 | 7/29/2007 | | |
| Donald C. Grenesko | | 85,000 | $31.16 | 2/14/2014 | 28,651 | $ 881,878 |
| | 75,000 | | $40.59 | 2/8/2013 | | |
| | 16,853 | | $52.19 | 2/15/2010 | | |
| | 21,563 | | $51.99 | 2/13/2011 | | |
| | 18,333 | | $52.38 | 2/12/2012 | | |
| | 60,000 | | $52.05 | 2/10/2012 | | |
| | 8,563 | | $52.63 | 7/29/2007 | | |
| | 13,443 | | $51.55 | 2/16/2009 | | |
| | 18,542 | | $51.30 | 2/12/2012 | | |
| | 8,763 | | $51.30 | 7/29/2007 | | |
| | 13,612 | | $51.30 | 2/16/2009 | | |
| | 13,634 | | $50.37 | 2/16/2009 | | |
| | 44,304 | | $50.23 | 2/13/2011 | | |
| | 17,652 | | $48.66 | 2/15/2010 | | |
| | 14,507 | | $46.23 | 2/16/2009 | | |
| | 85,000 | | $45.90 | 2/11/2013 | | |
| | 35,290 | | $48.69 | 2/15/2010 | | |
| | 13,200 | | $43.39 | 7/28/2008 | | |
| | 13,179 | | $43.52 | 7/28/2008 | | |
| | 42,500 | | $40.50 | 2/12/2012 | | |
| | 25,000 | | $40.18 | 2/13/2011 | | |
| | 13,195 | | $43.63 | 7/28/2008 | | |
| | 9,101 | | $50.50 | 7/29/2007 | | |
| | 12,249 | | $50.94 | 7/28/2008 | | |
| | 9,140 | | $50.94 | 7/29/2007 | | |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413615

| Name | Option Awards | | | | Stock Awards | |
|---|---|---|---|---|---|---|
| | Number of Securities Underlying Unexercised Options (#) Exercisable(1) | Number of Securities Underlying Unexercised Options (#) Unexercisable(2) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#)(2) | Market Value of Shares or Units of Stock That Have Not Vested ($) |
| Scott C. Smith | | 90,000 | $31.16 | 2/14/2014 | 30,697 | $ 944,854 |
| | 85,000 | | $40.59 | 2/8/2013 | | |
| | 14,747 | | $52.19 | 2/15/2010 | | |
| | 15,134 | | $51.99 | 2/13/2011 | | |
| | 15,137 | | $52.38 | 2/12/2012 | | |
| | 42,000 | | $52.05 | 2/10/2012 | | |
| | 13,436 | | $51.60 | 2/16/2009 | | |
| | 10,482 | | $51.60 | 7/29/2007 | | |
| | 15,305 | | $51.09 | 2/12/2012 | | |
| | 13,536 | | $51.09 | 2/16/2009 | | |
| | 13,634 | | $50.37 | 2/16/2009 | | |
| | 30,714 | | $50.37 | 2/13/2011 | | |
| | 15,391 | | $49.00 | 2/15/2010 | | |
| | 1,870 | | $49.00 | 12/31/2011 | | |
| | 14,485 | | $46.23 | 2/16/2009 | | |
| | 70,000 | | $45.90 | 2/11/2013 | | |
| | 30,878 | | $48.69 | 2/15/2010 | | |
| | 15,399 | | $43.39 | 7/28/2008 | | |
| | 11,500 | | $43.52 | 7/29/2007 | | |
| | 15,376 | | $43.52 | 7/28/2008 | | |
| | 35,000 | | $40.50 | 2/12/2012 | | |
| | 17,500 | | $40.18 | 2/13/2011 | | |
| | 15,394 | | $43.63 | 7/28/2008 | | |
| | 14,095 | | $52.50 | 7/28/2008 | | |
| | 10,543 | | $52.50 | 7/29/2007 | | |
| | 10,838 | | $52.50 | 7/29/2007 | | |
| Luis E. Lewin | | 50,000 | $31.16 | 2/14/2014 | 29,674 | $ 913,366 |
| | 57,000 | | $40.59 | 2/8/2013 | | |
| | 50,000 | | $52.05 | 2/10/2012 | | |
| | 65,000 | | $45.90 | 2/11/2013 | | |
| | 65,000 | | $40.50 | 2/12/2012 | | |
| | 8,000 | | $37.43 | 12/31/2011 | | |
| | 1,610 | | $37.43 | 12/31/2011 | | |
| | 75,000 | | $40.18 | 2/13/2011 | | |
| | 50,000 | | $38.63 | 2/15/2010 | | |
| | 4,034 | | $34.25 | 7/28/2008 | | |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413616

| Name | Option Awards | | | | Stock Awards | |
|---|---|---|---|---|---|---|
| | Number of Securities Underlying Unexercised Options (#) Exercisable(1) | Number of Securities Underlying Unexercised Options (#) Unexercisable(2) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#)(2) | Market Value of Shares or Units of Stock That Have Not Vested ($) |
| John E. Reardon | | 60,000 | $31.16 | 2/14/2014 | 20,465 | $ 629,913 |
| | 40,000 | | $40.59 | 2/8/2013 | | |
| | 5,396 | | $52.19 | 2/15/2010 | | |
| | 7,607 | | $51.99 | 2/13/2011 | | |
| | 8,770 | | $52.38 | 2/12/2012 | | |
| | 38,000 | | $52.05 | 2/10/2012 | | |
| | 5,333 | | $52.63 | 7/29/2007 | | |
| | 6,294 | | $51.60 | 2/16/2009 | | |
| | 5,389 | | $51.60 | 7/29/2007 | | |
| | 8,877 | | $51.09 | 2/12/2012 | | |
| | 6,324 | | $51.09 | 2/16/2009 | | |
| | 1,723 | | $50.37 | 12/31/2011 | | |
| | 1,567 | | $50.37 | 12/31/2011 | | |
| | 6,367 | | $50.37 | 2/16/2009 | | |
| | 15,727 | | $50.23 | 2/13/2011 | | |
| | 2,519 | | $48.57 | 2/15/2010 | | |
| | 5,338 | | $48.66 | 2/15/2010 | | |
| | 6,825 | | $46.23 | 2/16/2009 | | |
| | 45,000 | | $45.90 | 2/11/2013 | | |
| | 15,667 | | $48.69 | 2/15/2010 | | |
| | 11,261 | | $47.98 | 7/29/2007 | | |
| | 7,090 | | $43.39 | 7/28/2008 | | |
| | 7,079 | | $43.52 | 7/28/2008 | | |
| | 20,000 | | $40.50 | 2/12/2012 | | |
| | 8,750 | | $40.18 | 2/13/2011 | | |
| | 14,178 | | $43.63 | 7/28/2008 | | |
| | 2,406 | | $38.63 | 2/15/2010 | | |

(1)  Includes replacement stock options. Prior to 2004, replacement stock options ("replacement options") were granted simultaneously with the exercise of the original stock option if an NEO or other key employee exercised a stock option by surrendering currently owned shares to purchase the shares subject to the original stock options as well as to satisfy related tax withholding obligations. In February 2004, Tribune suspended the practice of issuing new stock options with a replacement feature. Replacement stock options are subject to the same terms and conditions as the original options, including the expiration date, except that the exercise price of a replacement stock option is the fair market value on the date of its grant rather than the exercise price of the original stock option. Also, replacement stock options do not become exercisable until one year after award. Moreover, replacement stock options were not granted unless the closing stock price on the date of exercise exceeded the exercise price by at least 25%. The grant of replacement options did not result in an increase in the total combined number of shares and options held by an employee. Effective since 2005, no replacement stock options will be granted to any Tribune senior executives, including the NEOs, unless the closing stock price on the date of exercise exceeds the exercise price by at least 50%.

(2)  All stock options other than those granted in February 2006 are fully vested. The terms of each of the stock options granted in February 2006 provide that the stock options vest based on the passage of time and continued employment over a three-year period with 33% vesting on each of the first and second anniversaries of the grant date and 34% vesting on the third anniversary of the grant date. In 2005, pursuant to Committee authorization, we accelerated the vesting of each of the stock options then outstanding to the date such action was taken. The accelerated vesting of the then-outstanding stock options was one of several actions taken to reduce stock-based compensation expense that will be recorded in future years pursuant to FAS 123R. Restricted stock units awarded to NEOs in February 2006 vest over a three year period, with restrictions lapsing on 33% of the shares on each of the first two anniversaries of the grant date and 34% of the shares on the third anniversary of the grant date, except for the 12,000 restricted stock units granted to Mr. Lewin and the related dividend equivalents, which vest in full on the basis of the passage of time and continued employment three years after the grant date.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413617

## 2006 Option Exercises and Stock Vested

The following table summarizes for each NEO the number of shares the officer acquired on the exercise of stock options and the number of shares the officer acquired on the vesting of stock awards in 2006.

| | Option Awards | | Stock Awards | |
| Name | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($) |
|---|---|---|---|---|
| Dennis J. FitzSimons | 0 | $0 | 0 | $0 |
| Donald C. Grenesko | 0 | 0 | 0 | 0 |
| Scott C. Smith | 0 | 0 | 0 | 0 |
| Luis E. Lewin | 0 | 0 | 0 | 0 |
| John E. Reardon | 0 | 0 | 0 | 0 |

## 2006 Pension Benefits

| Name | Plan Name | Number of Years Credited Service (#) | Present Value of Accumulated Benefit ($) | Payment During Last Fiscal Year ($) |
|---|---|---|---|---|
| Dennis J. FitzSimons | Tribune Company Pension Plan | 16 | $694,169 | $0 |
| | Tribune Company Supplemental Retirement Plan | 16 | $211,932 | $0 |
| Donald C. Grenesko | Tribune Company Pension Plan | 18 | $676,162 | $0 |
| | Tribune Company Supplemental Retirement Plan | 18 | $ 55,832 | $0 |
| Scott C. Smith | Tribune Company Pension Plan | 21 | $517,851 | $0 |
| | Tribune Company Supplemental Retirement Plan | 21 | $314,809 | $0 |
| Luis E. Lewin | Tribune Company Pension Plan | 11 | $224,449 | $0 |
| | Tribune Company Supplemental Retirement Plan | 11 | $ 7,139 | $0 |
| John E. Reardon | Tribune Company Pension Plan | 13 | $297,730 | $0 |
| | Tribune Company Supplemental Retirement Plan | 13 | $ 41,629 | $0 |

The NEOs participate in the Pension Plan and the Supplemental Pension Plan. Because the Internal Revenue Code places certain limitations on the amount of pension benefits that may be paid under qualified plans, any benefits payable in excess of those limitations will be paid under the Supplemental Pension Plan. These amounts are estimated on the assumption that the executive will commence receiving benefits at age 65 and that the executive will receive pension benefits in the form of a life annuity with no surviving benefits.

Until December 31, 1998, the annual pension benefit under the plans, taken together, was generally determined by the executive's credited years of service (up to a maximum of 35 years) multiplied by a percentage of the executive's final average compensation (compensation during the final five years of

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413618

employment). Compensation for this purpose is generally defined as a participant's base compensation plus commissions, if any. The Pension Plan and the Supplemental Pension Plan were frozen at December 31, 1998 so that participants' service and compensation after that date will not be counted in computing benefits. The NEOs will be entitled to receive under the Pension Plan and the Supplemental Pension Plan annual benefits upon retirement at age 65 until death as follows: Mr. FitzSimons, $108,498; Mr. Grenesko, $79,852; Mr. Smith, $101,107; Mr. Lewin, $25,500 and Mr. Reardon, $49,649.

The Pension Plan covering the NEOs provides for an early retirement subsidy for those individuals who have attained age 55 with ten years of service under the plan. For purposes of early retirement eligibility, attained age and years of service both before and after the "freeze date" are counted. The early retirement subsidy provides for a benefit at age 62 equal to 100% of the benefit payable at age 65; a benefit payable at age 60 equal to 92% of the benefit payable at age 65; and a benefit at age 55 equal to 67% of the benefit payable at age 65. As of December 31, 2006, Messrs. FitzSimons, Grenesko, Smith and Lewin have met the eligibility requirements for the early retirement subsidy. Mr. Reardon has not yet met the age requirement for the early retirement subsidy.

Benefits under the Pension Plan were calculated under separate formulas for service prior to 1988 and for service between January 1, 1988 and December 31, 1998. For service and compensation prior to 1988, the benefit was equal to the participant's years of credited service prior to 1988 multiplied by the sum of (i) 0.8% percent of the participant's highest average earnings for this period up to Social Security covered compensation plus (ii) 1.2% of the participant's highest average earnings in this period in excess of Social Security covered compensation. For service and compensation between January 1, 1988 and December 31, 1998, the benefit was equal to the participant's years of credited service during this period multiplied by the sum of (i) 1.2% percent of the participant's highest average earnings during this period up to Social Security covered compensation plus (ii) 1.6% of the participant's highest average earnings during this period in excess of Social Security covered compensation. Mr. FitzSimons and Mr. Grenesko had additional years of credited service under the formula generally applicable to service between January 1, 1998 and December 31, 1998 as a result of their service at business units where the formula was in effect for a longer period. Years of service under these formulas cannot exceed 35. Contributions to the Pension Plan are made entirely by us and are paid into a trust fund from which the benefits of participants will be paid.

The unfunded Supplemental Pension Plan provides out of our general assets an amount substantially equal to the difference between the amount that would have been payable under the Pension Plan, in the absence of laws or regulations limiting pension benefits and earnings that may be considered in calculating pension benefits, and the amount actually payable under the Pension Plan. Amounts payable under the Supplemental Pension Plan are immediately payable in a lump sum to participants in the event of a change in control of Tribune, as defined in the plan. The NEOs were not to provided with extra years of credited service under the Pension Plan or the Supplemental Pension Plan beyond service actually earned with Tribune.

In the table above, the present value of the current accrued benefits with respect to each NEO under both the Pension Plan and the Supplemental Pension Plan is based on the following assumptions:

- Discount rate: 5.75%

- Mortality Table: RP-2000 Combined Healthy Mortality Table

- Pension Plan Measurement Date: Disclosure of the actuarial present value of the NEO's accumulated benefit under each plan and the number of years of service credited to the NEO under each plan reported in the table is computed as of the same pension plan measurement date for financial statement reporting purposes with respect to the audited financial statements for the Company's last completed fiscal year.

- Normal Retirement Age: 65

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413619

**2006 Nonqualified Deferred Compensation**

| Name | Executive Contributions in Last FY ($) | Registrant Contributions in Last FY(1) ($) | Aggregate Earnings in Last FY(2) ($) | Aggregate Withdrawals/ Distributions ($) | Aggregate Balance at Last FYE ($) |
|---|---|---|---|---|---|
| Dennis J. FitzSimons | | | | | |
| Bonus Deferral | 0 | 0 | 104,131 | 0 | 2,760,751 |
| Supplemental Savings Plan | 0 | 30,392 | 29,811 | 0 | 714,788 |
| Donald C. Grenesko | | | | | |
| Bonus Deferral | 0 | 0 | 64,601 | 0 | 1,446,455 |
| Supplemental Savings Plan | 0 | 13,702 | 16,445 | 0 | 393,283 |
| Scott C. Smith | | | | | |
| Bonus Deferral | 0 | 0 | 25,397 | 0 | 478,862 |
| Supplemental Savings Plan | 0 | 13,854 | 16,250 | 0 | 388,845 |
| Luis E. Lewin | | | | | |
| Bonus Deferral | 0 | 0 | 1,793 | 0 | 77,742 |
| Supplemental Savings Plan | 0 | 5,262 | 6,188 | 0 | 148,680 |
| John E. Reardon | | | | | |
| Bonus Deferral | 0 | 0 | 11,616 | 0 | 309,680 |
| Supplemental Savings Plan | 0 | 11,200 | 12,780 | 0 | 306,138 |

(1) Amounts in this column are included in the "All Other Compensation" column in the Summary Compensation Table.

(2) Amounts in this column are not included in the Summary Compensation Table.

The 2006 Nonqualified Deferred Compensation table presents amounts deferred under our Bonus Deferral Plan, which allows certain employees, including the NEOs, to defer receipt of MIP bonus payments. Participants may defer up to 100% of bonus payments into a cash-based account or into an account that tracks Tribune common stock. The cash-based account appreciates at a rate equal to 120% of the long-term applicable federal rate, compounded quarterly, which is determined periodically by the Internal Revenue Service. The rate is reset by the Company on March 1 of each year and for 2006 was 5.52%. Amounts deferred into Tribune common stock accounts are credited with earnings or losses based on the return on Tribune common stock. The investment alternative is selected by the participants in the plan, and participants may not move an investment out of a Tribune stock return equivalent once it has been selected. We do not "match" amounts that are deferred by employees pursuant to the Bonus Deferral Plan. Distributions are paid in a lump sum distribution or in annual installments on or about March 1 each year commencing in the calendar year following the termination of the employee's employment with the Company.

The table also presents amounts deferred under our Supplemental Savings Plan. Under the Supplemental Savings Plan, participants are credited with an amount substantially equal to the difference between the amount that, in the absence of legislation limiting company contributions to our Savings Plan, would have been allocated to an employee's account as company contributions or profit-sharing contributions, minus the amount actually allocated under the Savings Plan. In this way,

44

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413620

participants receive the same percentage of earnings under the Savings Plan and Supplemental Savings Plan as is provided to participants who are not subject to legislation limiting additions to the Savings Plan. Deferred amounts are credited with earnings or losses under substantially the same terms as are provided under the Deferred Compensation Plan. Distributions are paid in a lump sum distribution or in annual installments on or about March 1 each year commencing in the calendar year following the termination of the employee's employment with the Company.

45

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413621

**Potential Payments Upon Termination or Change-in-Control**

We have not entered into employment or severance agreements with the NEOs and they are generally not contractually entitled to any additional compensation or benefits following termination of employment. However, as noted under "Compensation Discussion and Analysis—Post-Termination Compensation—Transitional Compensation Plan" on page [    ], each of our NEOs is eligible for benefits under a Transitional Compensation Plan, which provides for payments and other benefits if the NEO is terminated under circumstances specified in the Transitional Compensation Plan within three years following a Change in Control of Tribune Company.[3]

Under the Transitional Compensation Plan, an NEO becomes entitled to benefits only if we have undergone a Change in Control during the three-year period prior to the NEO's termination of employment.

For purposes of this plan, a "Change in Control" means:

- the acquisition, other than from Tribune, by a person, entity or group of 20% or more of the combined voting power of Tribune's outstanding voting securities;

- a change in the composition of the Board whereby the incumbent directors cease to constitute at least a majority of the Board without the approval of the Board; or

- consummation of a merger or reorganization of Tribune where the shareholders of Tribune prior to the merger or reorganization do not own more than 50% of the reorganized company or a liquidation or dissolution of Tribune or the sale of all or substantially all of the assets of Tribune.

Under the Transitional Compensation Plan, each NEO is eligible for benefits upon termination of employment within 36 months following a Change in Control. A participant is eligible for benefits for termination prior to a Change in Control if the termination was at the request of any third party participating in or causing the Change in Control or otherwise in anticipation of a Change in Control. In addition, Transitional Compensation Plan benefits will only be available if the participant's termination of employment was not:

- on account of his death;

- on account of a physical or mental condition that would entitle him to long-term disability benefits under the Tribune Company Long-Term Disability Plan;

- for conduct involving dishonesty or willful misconduct which, in either case, is detrimental in a significant way to the business of Tribune Company or any of its subsidiaries; or

- on account of the employee's voluntary resignation.

For purposes of the NEOs covered under the Transitional Compensation Plan, a resignation shall not be considered to be "voluntary": (a) if the resignation by Mr. FitzSimons or Mr. Grenesko occurs during the 30-day period immediately following the first anniversary of the Change in Control; or (b) if the resignation occurs after a successor refuses to assume and agree to perform Tribune Company's obligations under the Plan or (c) if, subsequent to the Change in Control and prior to such resignation, there has been a reduction in the nature or scope of the participant's authority or duties, a reduction in the Participant's compensation or benefits or a change in the city in which he is required to perform his duties.

---

[3]    Will also need to discuss success fee set aside. Level of disclosure will depend on whether allocations have been finalized at time of filing.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0413622**

*Payment Obligations Under Transitional Compensation Plan upon Termination of Employment of NEO*

Upon a termination under the circumstances outlined above, NEOs would be entitled to a lump sum payment equal to three times the sum of (1) the highest annual rate of the executive's base salary in effect within three years of the date of the participant's termination; plus (2) 200% of the participant's target bonus payable for the year in which the change in control occurs. The Transitional Compensation Plan would also provide outplacement benefits [in an amount up to 25% of a participant's base salary] and continuation of medical, life insurance and disability benefits for up to three years. This table shows the amounts that would be paid under those circumstances. It assumes that the termination took place on December 31, 2006 and that benefits costs continue at 2006 levels.

|  | Mr. FitzSimons | Mr. Grenesko | Mr. Smith | Mr. Lewin | Mr. Reardon |
|---|---|---|---|---|---|
| Severance Payment | $10,342,500 | $4,275,000 | $4,485,000 | $2,343,000 | $3,600,000 |
| Outplacement | $ 246,250 | $ 142,500 | $ 143,750 | $ 88,750 | $ 125,000 |
| Benefits Continuation | $ 38,337 | $ 26,422 | $ 26,445 | $ 25,450 | $ 36,143 |

In addition, all outstanding equity awards would be deemed vested and exercisable upon a change in control of Tribune as defined in the applicable plan and in grant agreements evidencing awards. The definitions of change in control are essentially the same as described above. Settlement of outstanding awards as of December 31, 2006 would have resulted in payments of the following amounts based on a price of $30.78, the closing price of Tribune's common stock on that date:

|  | Mr. FitzSimons | Mr. Grenesko | Mr. Smith | Mr. Lewin | Mr. Reardon |
|---|---|---|---|---|---|
| Options | 0 | 0 | 0 | 0 | 0 |
| Restricted Stock Units(1) | $1,889,677 | $881,878 | $944,854 | $913,366 | $629,913 |

(1)  Includes dividend equivalent units

Under the Transitional Compensation Plan, the NEOs would also be eligible to receive a "gross-up" payment from us to the extent that they incur excise taxes under Section 4999 of the Internal Revenue Code and to account for the income tax liability resulting from the "gross-up." Had a payment been made to the NEOs under the Transitional Compensation Plan as a result of termination or pursuant to the vesting of outstanding equity awards as of December 31, 2006, they would have been entitled to receive a "gross-up" payment in the following amounts: Mr. FitzSimons: $3,759,265; Mr. Grenesko: $0; Mr. Smith: $0; Mr. Lewin: $852,541; and Mr. Reardon: $1,498,993.

Upon a Change in Control as defined in Section 409A of the Internal Revenue Code, NEOs are entitled to a lump sum payment of the present value of their accrued benefits in the Tribune Supplemental Pension Plan. This is the same benefit as that which is set forth in the Pension Plan Table on page [ ] as payable to each NEO under the Tribune Supplemental Retirement Plan. Based on calculations using assumptions applicable to a change-in-control effective December 31, 2006, the amounts payable to the NEOs would be: Mr. FitzSimons: $195,550; Mr. Grenesko: $51,027; Mr. Smith: $290,895; Mr. Lewin: $6,529; and Mr. Reardon: $39,339. NEOs would also receive a lump sum distribution of their account balances in the Tribune Bonus Deferral Plan and Supplemental Savings Plan. These amounts are set forth in the 2006 Nonqualified Deferred Compensation Table on page [ ] as of December 31, 2006.

In certain circumstances, we fund trusts established to secure obligations to make payments under the Transitional Compensation Plan. Execution of a release of claims is not a prerequisite to the receipt of payments under the Transitional Compensation Plan. The Transitional Compensation Plan does not include noncompete, nonsolicit, nondisparagement or confidentiality requirements.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413623

## 2006 NON-EMPLOYEE DIRECTOR COMPENSATION

Directors who are our employees receive no additional compensation for service as a director. In 2006, the non-employee directors received a combination of cash payments and equity-based compensation as shown in the table below and were also reimbursed for actual out-of-pocket expenses incurred in attending meetings. Ms. Kathryn C. Turner served on the Board from January 1 through May 2, 2006, but did not receive any compensation for her service during such time.

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($)(1) | Total ($) |
|------|--------------------------------|---------------------|-----------|
| Jeffrey Chandler | $75,000 | $75,000 | $150,000 |
| Roger Goodan | $75,000 | $75,000 | $150,000 |
| Enrique Hernandez, Jr. | $85,000 | $75,000 | $160,000 |
| Betsy D. Holden | $81,000 | $75,000 | $156,000 |
| Robert S. Morrison | $85,000 | $75,000 | $160,000 |
| William A. Osborn | $96,000 | $75,000 | $171,000 |
| J. Christopher Reyes | $81,000 | $75,000 | $156,000 |
| William Stinehart, Jr. | $75,000 | $75,000 | $150,000 |
| Dudley S. Taft | $81,000 | $75,000 | $156,000 |
| Miles D. White | $75,000 | $75,000 | $150,000 |

(1) Following are outstanding stock and stock option awards held by the non-employee directors as of December 31, 2006 (in the case of stock awards, exclusive of dividend equivalent shares):

| Name | Outstanding Stock Awards (#) | Outstanding Stock Options (#) |
|------|------------------------------|-------------------------------|
| Jeffrey Chandler | 10,553 | 19,200 |
| Roger Goodan | 10,550 | 45,200 |
| Enrique Hernandez, Jr. | 9,412 | 15,200 |
| Betsy D. Holden | 7,239 | 7,200 |
| Robert S. Morrison | 8,702 | 11,200 |
| William A. Osborn | 8,959 | 11,200 |
| J. Christopher Reyes | 4,908 | 0 |
| William Stinehart, Jr. | 10,952 | 31,700 |
| Dudley S. Taft | 18,660 | 31,200 |
| Miles D. White | 4,291 | 0 |

The outstanding stock options set forth in the table above represent stock options granted to the directors prior to 2005, including, for Messrs. Goodan and Stinehart, stock options that were granted to them in connection with their service as directors of The Times Mirror Company prior its acquisition by the Company in 2000. Each of the stock options referenced above is fully vested.

48

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413624

## Cash Compensation

*Cash retainer.* In 2006, each non-employee director received a $75,000 cash retainer.

*Attendance Fees.* Directors do not receive fees for attendance at Board or committee meetings.

*Committee Chairs and Membership.* In light of the significant responsibilities imposed on certain Board committee members, in 2006 the Audit Committee chair was paid an additional $15,000 cash retainer and the chairs of each of the Compensation & Organization Committee and the Nominating & Governance Committees were paid an additional $10,000 cash retainer. In addition, in 2006, all Audit Committee members, including the chairman of the Audit Committee, received an additional $6,000 cash retainer.

## Equity-Based Compensation

*Stock Awards.* In 2006, each non-employee director received a $75,000 stock award. The number of shares awarded was based on the closing price of Tribune stock on the date of the annual meeting, May 2, 2006.

*Stock Options.* Beginning in 2005, Directors no longer received stock option grants as part of their overall compensation package.

Directors may defer receipt of all or a portion of their stock awards and cash retainers. Directors who elect to defer amounts are credited with dividend or other deemed income, based on investment alternatives they select. Payment of deferred account balances will be made in one or more installments as elected by participating directors upon termination of Board service.

The Board encourages outside directors to own Tribune common stock to further align their interests with those of Tribune's shareholders. Accordingly, directors are not permitted to transfer the shares of Tribune common stock they receive as stock awards until after they retire from Board service.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413625

## SHAREHOLDER PROPOSALS AND DIRECTOR NOMINATIONS

In order to submit proposals for consideration at an annual meeting, shareholders must comply with the procedures set forth in Tribune's By-Laws and securities laws, rules and regulations. Tribune's By-Laws provide that in order for a shareholder to propose business for consideration at an annual meeting, notice of the proposal must be delivered to Tribune not earlier than the close of business on the 120th day and not later than the close of business on the 90th day prior to the first anniversary of the preceding year's annual meeting. Accordingly, a shareholder proposal intended to be considered at the 2008 annual meeting must be received by Tribune after the close of business on January 9, 2008 and prior to the close of business on February 8, 2008. However, under securities laws, if a shareholder desires to have the proposal included in Tribune's proxy statement for the 2007 annual meeting, notice of the proposal must be delivered to Tribune on or before November 30, 2007.

Shareholders may also nominate a candidate for election as a director. Tribune's By-Laws provide that notice of shareholder nominations for election of directors must be received by Tribune not less than 90 days and not more than 120 days prior to the meeting at which directors are to be elected. As more fully described in Tribune's By-Laws, this notice must include the proposed nominee's name, age, business and residence addresses, and principal occupation, the number of shares of Tribune common stock he or she beneficially owns, and a signed consent of the proposed nominee to serve as a director of Tribune if elected. The advance notice requirement affords the Nominating & Governance Committee the opportunity to consider the qualifications of the proposed nominee and, to the extent deemed necessary or desirable by the Board, inform shareholders about these qualifications.

Proposals and director nominations should be directed to Tribune Company, 435 North Michigan Avenue, Chicago, Illinois 60611, Attention: Corporate Secretary. Only proposals and director nominations that meet the requirements set forth in Tribune's By-Laws will be considered. Tribune's By-Laws and additional information regarding shareholder proposals and director nominations are available on Tribune's website at www.tribune.com.

## PROXY SOLICITATION EXPENSES AND ELECTRONIC DELIVERY

Tribune will pay all expenses incurred in connection with the printing and delivery of proxy materials and the solicitation of proxies. Following the initial printing and delivery of proxy materials and the solicitation of proxies by mail, Tribune directors, officers and other employees may solicit proxies in person or by telephone, but without extra compensation. In addition, Tribune has retained Innisfree M&A Incorporated to assist in the solicitation of proxies for a fee not to exceed $[      ], plus reimbursement of out-of-pocket expenses. This solicitation may be made by mail, email, telephone or in person. Tribune will, upon request, reimburse the reasonable charges and expenses of brokerage houses or other nominees or fiduciaries for forwarding proxy materials to, and obtaining authority to execute proxies from, beneficial owners for whose account they hold Tribune stock.

Shareholders can help save significant printing and mailing expenses by consenting to access the proxy statement, proxy card and annual report for future meetings electronically over the Internet. If you hold shares in your name (instead of through a broker), you can choose this option by following the instructions at the Internet voting website at www.computershare.com/expressvote. If you hold your shares through a broker, you should follow the instructions regarding electronic delivery, if any, provided by your broker.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413626

## ANNUAL REPORT

The Tribune Company 2006 Annual Report, a report to shareholders that includes Tribune's Annual Report on Form 10-K for the fiscal year ended December 31, 2006 (without exhibits), is being distributed with this proxy statement, but neither the Tribune Company 2006 Annual Report nor the information contained in the Annual Report on Form 10-K is incorporated in this proxy statement and neither is part of the proxy soliciting materials. **Requests for additional copies of this proxy statement or the Tribune Company 2006 Annual Report (including the Annual Report on Form 10-K) may be made by contacting the Corporate Relations Department, Tribune Company, 435 North Michigan Avenue, Chicago, Illinois 60611, telephone (800) 757-1694, or through Tribune's website at www.tribune.com.**

By Order of the Board of Directors,

Crane H. Kenney
*Senior Vice President, General Counsel and Secretary*

March 30, 2007

51

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413627

# TRIBUNE

MR A SAMPLE
DESIGNATION (IF ANY)
ADD 1
ADD 2
ADD 3
ADD 4
ADD 5
ADD 6

000004

XXXXXXXXXXXXXX

000000000.000000 ext     000000000.000000 ext
000000000.000000 ext     000000000.000000 ext
000000000.000000 ext     000000000.000000 ext

## Electronic Voting Instructions

**You can vote by Internet or telephone!**
**Available 24 hours a day, 7 days a week!**

Instead of mailing your proxy, you may choose one of the two voting methods outlined below to vote your proxy.

VALIDATION DETAILS ARE LOCATED BELOW IN THE TITLE BAR.

**Proxies submitted by the Internet or telephone must be received by** 1:00 a.m., Central Time, on XXXXXX XX. 20XX.



### Vote by Internet
- Log on to the Internet and go to **www.investorvote.com**
- Follow the steps outlined on the secured website.



### Vote by telephone
- Call toll free 1-800-652-VOTE (8683) within the United States, Canada & Puerto Rico any time on a touch tone telephone. There is **NO CHARGE** to you for the call.
- Follow the instructions provided by the recorded message.

Using a **black ink** pen, mark your votes with an **X** as shown in this example. Please do not write outside the designated areas.   [X]

---

## Annual Meeting Proxy Card          123456      C0123456789      12345

▼ IF YOU HAVE NOT VOTED VIA THE INTERNET **OR** TELEPHONE, FOLD ALONG THE PERFORATION, DETACH AND RETURN THE BOTTOM PORTION IN THE ENCLOSED ENVELOPE. ▼

**A** Proposals — The Board of Directors recommends a vote **FOR** the nominees listed, **FOR** Proposal 2 and **AGAINST** Proposals 3 - 5.

1. Election of Directors:   01 - Jeffrey Chandler      02 - William A. Osborn      03 - Miles D. White      **+**

[ ] **Mark here to vote FOR all nominees**      [ ] **Mark here to WITHHOLD vote from all nominees**      [ ] **For All EXCEPT** - To withhold authority to vote for any nominee(s), write the name(s) of such nominee(s) below.

| | For | Against | Abstain | | | For | Against | Abstain |
|---|---|---|---|---|---|---|---|---|
| 2. Ratification of independent accountants. | [ ] | [ ] | [ ] | 3. Shareholder proposal concerning Tribune's classified board of directors. | | [ ] | [ ] | [ ] |
| 4. Shareholder proposal concerning Tribune's Chairman and CEO positions. | [ ] | [ ] | [ ] | 5. Shareholder proposal concerning Tribune's supermajority voting provisions. | | [ ] | [ ] | [ ] |

6. With discretionary power in the transaction of such other business as may properly come before the meeting or any adjournment thereof.

**B** Non-Voting Items
**Change of Address** — Please print new address below.

**C** Authorized Signatures — This section must be completed for your vote to be counted. — Date and Sign Below

Please sign exactly as name(s) appears hereon. Joint owners should each sign. When signing as attorney, executor, administrator, corporate officer, trustee, guardian, or custodian, please give full title.

| Date (mm/dd/yyyy) — Please print date below. | Signature 1 — Please keep signature within the box. | Signature 2 — Please keep signature within the box. |
|---|---|---|
| / / | | |

C 1234567890      J N T
1 UPX      C O Y # # 1      **+**

‹STOCK#›      0009OB

Dear Shareholder:

Your vote is important! We encourage you to vote your shares promptly and to take advantage of Internet or telephone voting, both of which are available 24 hours a day, seven days a week. If you vote on the Internet or by telephone, please do not mail your proxy card.

**Receive Future Proxy Materials Electronically**

Help us make a difference by eliminating paper proxy mailings to your home or business. With your consent, we will send all future voting materials to you by email, along with a link to Tribune's proxy voting site. To register for electronic delivery of future proxy materials, go to www.computershare.com\us\ecomms and follow the prompts.

---

▼ IF YOU HAVE NOT VOTED VIA THE INTERNET OR TELEPHONE, FOLD ALONG THE PERFORATION, DETACH AND RETURN THE BOTTOM PORTION IN THE ENCLOSED ENVELOPE. ▼

---

# TRIBUNE

---

## Proxy — TRIBUNE

### Proxy for Annual Meeting of Shareholders to be held May 9, 2007
### Solicited by the Board of Directors

I hereby appoint Dennis J. FitzSimons and Crane H. Kenney, or either of them, as proxies to vote all the shares of Tribune Company common stock that I may be entitled to vote at the Annual Meeting of Shareholders to be held on May 9, 2007, or at any adjournment thereof, as specified on the reverse side of this proxy card with respect to:

1. the election of directors — the nominees are Jeffrey Chandler, William A. Osborn and Miles D. White — to serve until the 2010 Annual Meeting;
2. the ratification of the selection of PricewaterhouseCoopers LLP as independent accountants;
3. a shareholder proposal concerning Tribune's classified Board of Directors;
4. a shareholder proposal concerning Tribune's Chairman and CEO positions;
5. a shareholder proposal concerning Tribune's supermajority voting provisions; and
6. discretionary power in the transaction of such other business as may properly come before the meeting or any adjournment thereof.

Please see the instructions below to vote by telephone or on the Internet. To vote by mail, please complete, sign and date this proxy card on the reverse side and mail promptly in the enclosed envelope. Tribune's Board of Directors recommends a vote **FOR** the election of the nominees listed, **FOR** the ratification of independent accountants and **AGAINST** each of three shareholder proposals. **If no direction is given, this proxy will be voted FOR proposals 1 and 2 and AGAINST proposals 3, 4 and 5, and the proxies will vote in their discretion upon such other business as may properly come before the meeting or any adjournment thereof.**

As described in the proxy statement, if there are shares of Tribune Company common stock allocated to you in Tribune's employee benefit plans, the instructions you give on this proxy card or by telephone or on the Internet will be used as instructions to the trustee or nominee of the plans to vote all of your shares in the plans at the annual meeting and any adjournment thereof. Your instructions will also be used to authorize the trustee or nominee to vote in its judgment on such other business as may properly come before the meeting and any adjournment thereof.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413629

# TRIBUNE COMPANY

## PROPOSED BOARD OF DIRECTORS RESOLUTIONS

### (Annual Meeting Matters)

RESOLVED, that the 2007 Annual Meeting of Shareholders of Tribune Company (the "Company") shall be held May 9, 2007 at Tribune Tower, 435 North Michigan Avenue, Chicago, Illinois, in accordance with the resolution adopted by this Board on December 12, 2006, which is hereby affirmed;

FURTHER RESOLVED, that, in the business judgment of this Board, each non-management director is "independent" under the New York Stock Exchange listing standards and the categorical standards for independence set forth in the Company's Board Governance Guidelines;

FURTHER RESOLVED, that in the business judgment of this Board, each of Betsy D. Holden, William A. Osborn, J. Christopher Reyes and Dudley S. Taft is (i) financially literate and meets the current independence and experience requirements of the New York Stock Exchange and applicable securities laws, rules and regulations for audit committee members and (ii) an "audit committee financial expert," as defined in applicable securities laws, rules and regulations;

FURTHER RESOLVED, that Jeffrey Chandler, William A. Osborn and Miles D. White be named in the proxy materials for the 2007 Annual Meeting as the Board of Directors' nominees for election as directors of the Company to hold office until the 2010 Annual Meeting and until their respective successors shall have been elected and qualified, and the Secretary is authorized and instructed to include the requisite information regarding the election of directors in the Board of Directors' proxy soliciting materials;

FURTHER RESOLVED, that the recommendation from the Audit Committee that the audited financial statements for the Company's fiscal year ended December 31, 2006 be included in the Annual Report on Form 10-K for filing with the Securities and Exchange Commission be, and it hereby is, accepted;

FURTHER RESOLVED, that a proposal to ratify the Audit Committee's appointment of PricewaterhouseCoopers LLP as the Company's independent accountants for 2007 be submitted to the stockholders at the 2007 Annual Meeting, and the Secretary is authorized and instructed to include the requisite information regarding this proposal in the Board of Directors' proxy soliciting materials;

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

FURTHER RESOLVED, that a shareholder proposal requesting that the stockholders of the Company recommend that this Board of Directors take the necessary steps to cause the annual election of directors be submitted to the stockholders at the 2007 Annual Meeting in accordance with the rules and regulations of the Securities and Exchange Commission, and the Secretary is authorized and instructed to include the requisite information regarding this shareholder proposal and management's response in opposition in the Board of Directors' proxy soliciting materials;

FURTHER RESOLVED, that a shareholder proposal requesting that the stockholders of the Company recommend that this Board of Directors adopt a policy that the Chairman of this Board of Directors be an independent director who has not previously served as an executive officer of the Company be submitted to the stockholders at the 2007 Annual Meeting in accordance with the rules and regulations of the Securities and Exchange Commission, and the Secretary is authorized and instructed to include the requisite information regarding this shareholder proposal and management's response in opposition in the Board of Directors' proxy soliciting materials;

FURTHER RESOLVED, that a shareholder proposal requesting that the stockholders of the Company recommend that this Board of Directors take all steps necessary, in compliance with applicable law, to remove the supermajority voting requirements in the Company's Amended and Restated Certificate of Incorporation and By-Laws be submitted to the stockholders at the 2007 Annual Meeting in accordance with the rules and regulations of the Securities and Exchange Commission, and the Secretary is authorized and instructed to include the requisite information regarding this shareholder proposal and management's response in opposition in the Board of Directors' proxy soliciting materials;

FURTHER RESOLVED, that the draft forms of notice of meeting and proxy materials submitted to and reviewed by this Board at this meeting are hereby approved; that this Board adopts as its recommendations that the stockholders vote FOR the Board's nominees for director, FOR the ratification of the Audit Committee's appointment of PricewaterhouseCoopers LLP as the Company's independent accountants for 2007, AGAINST the shareholder proposal concerning the Company's classified board of directors, AGAINST the shareholder proposal concerning the Company's Chairman and Chief Executive Officer positions and AGAINST the shareholder proposal concerning the Company's supermajority voting provisions and that the form of notice and proxy materials submitted to and reviewed by this Board at this meeting be forwarded to each stockholder of the Company entitled to notice of the 2007 Annual Meeting, with such changes therein or additions thereto as shall be approved by the Secretary;

FURTHER RESOLVED, that Dennis J. FitzSimons and Crane H. Kenney, or either of them, are designated as proxies for the 2007 Annual Meeting, with full power and authority to vote as described in the proxy materials and as provided by law;

FURTHER RESOLVED, that Thomas G. Caputo, Mark W. Hianik and Tammie Marshall are appointed as inspectors of voting for the 2007 Annual Meeting as provided in Section 2.7 of the Company's By-Laws; and

FURTHER RESOLVED, that the proper officers of the Company are hereby authorized and empowered to take all steps necessary to effect the foregoing resolutions, including executing, filing or delivering such documents as may be required by law or as may be deemed necessary or proper in connection with the matters set forth in these resolutions.

DPE
2/6/07

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413632

8

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only
TRB0413633

# Director independence and qualification review

# See Tab 2 of Nominating & Governance Committee materials

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

9

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413635

# Related person transactions policy

## See Tab 3 of
## Nominating & Governance
## Committee materials

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413636

TRB0413637

AUDIT COMMITTEE

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# TRIBUNE COMPANY
## AUDIT COMMITTEE MEETING
### TUESDAY, FEBRUARY 13, 2007 (9:30 A.M.)
### McCORMICK ROOM
### 24th FLOOR, TRIBUNE TOWER

### AGENDA

|  | Tab No. |
|---|---|
| Approve Minutes of December 12, 2006 and February 1, 2007 Meetings | 1 |
| Audit Committee Responsibility Summary | 2 |
| Internal Controls Certification Project Update | 3 |
| Internal Audit Status Report | 4 |
| Impairment Review of Intangible Assets | 5 |
| Preliminary Draft of 2006 Financial Statements and Form 10-K | 6 |
| PricewaterhouseCoopers Report | 7 |

- Preliminary Integrated Audit Results
- Professional Fees
- Independence Letter
- Quality Control Letter

| | |
|---|---|
| Review of Audit Committee Proxy Statement Disclosures | 8 |

Private Sessions with PwC and Management

Assessment and Re-appointment of Auditors

## PARTICIPANTS

**Audit Committee**
Betsy D. Holden
William A. Osborn, Chair
J. Christopher Reyes
Dudley S. Taft

**Other Board Members**
Jeffrey Chandler
Roger Goodan

**PricewaterhouseCoopers LLP**
Jay Henderson — Chicago Office Managing Partner
Kevin Maguire — Engagement Partner
Stephanie Potter — Engagement Senior Manager

**Management**
Jerry Agema — VP, Corporate Compliance and Risk Management
Tom Caputo — Vice President, Auditing
Dennis FitzSimons — Chairman, President and CEO
Don Grenesko — Sr. Vice President, Finance & Administration
Brian Litman — Assistant Controller
Mark Mallory — Vice President and Controller

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413639

**TRIBUNE COMPANY**
**AUDIT COMMITTEE MEETING**
**DECEMBER 11, 2006**

The Audit Committee met on Monday, December 11, 2006, at 5:00 p.m.  The meeting was held at Tribune Tower in Chicago, Illinois, pursuant to notice.  The meeting was attended by Betsy Holden, William Osborn, J. Christopher Reyes and Dudley Taft of the Audit Committee; Roger Goodan of the board of directors; Jay Henderson and Kevin Maguire of PricewaterhouseCoopers (PwC); and Gerald Agema, Thomas Caputo, Dennis FitzSimons, Donald Grenesko, and Mark Mallory of Tribune Company.

Mr. Osborn acted as Chairman of the meeting and Mr. Caputo as Secretary.

The following business was discussed at the meeting:

1.  The Committee approved the minutes of the October 18, 2006 Audit Committee meeting.

2.  Mr. Mallory provided a preliminary update on the Company's impairment review of goodwill and other intangible assets that are not being amortized.  He noted that at this point no impairment charges are anticipated in 2006 and that the final results of the review will be presented at the February Audit Committee meeting.

   Messrs. Maguire and Mallory answered questions from members of the Committee during the presentation.

3.  Mr. Mallory then provided an update on a tax issue related to the Company's PHONES debt securities.  He indicated that the Internal Revenue Service (IRS) has proposed that the Company capitalize all of the interest on the PHONES as part of the basis in the related Time Warner shares, rather than allowing the Company to currently deduct the interest.  He noted that management is close to reaching a favorable settlement with the IRS appeals office that would allow the Company to deduct about 70% of the interest both historically and going forward.  Mr. Mallory explained that the settlement would result in a $120 million payment that would be partially offset by $45 million of unrelated refunds that the IRS has been holding until this issue is resolved.  He stated that the Company hopes to finalize a settlement with the appeals office this month and fund the net payment by year end.

   Mr. Mallory then noted that the IRS had recently informed management of a complaint the IRS received from a company employee.  The complaint alleges that Newsday, Baltimore Sun, Hartford Courant, Morning Call and SCNI had been consistently making payroll tax deposits two days late during an unspecified prior time period.  The IRS would not disclose the name, work location or current status of the employee and said that it would perform a review of the Company's payroll tax deposits.  Mr. Mallory also indicated that management has no reason to believe that the allegations are true, and that the Company's payroll tax deposits are currently handled by a reputable third party service provider.  He stated that management will thoroughly investigate this matter as it would any other similar complaint.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Messrs. Grenesko and Mallory answered questions from the members of the Committee during the presentation.

4.  Mr. Mallory reviewed the status of the internal controls certification project. He stated that the overall results of this year's review continue to be good and that audits to date have yielded relatively few control deficiencies. He indicated that management and Internal Audit have not identified any significant deficiencies, which would need to be reported to the Audit Committee, or material weaknesses, which must be disclosed publicly.

Mr. Mallory noted that Newsday has stabilized its control environment and that nearly all of the previously identified issues in the Baltimore Sun's information technology area have already been resolved and tested. He also stated that no common issues have emerged across the business units and only a small number of miscellaneous controls deficiencies are expected to be open at year-end.

Mr. Maguire then provided the Committee an update on fees for the annual audit. He indicated that PwC's fee for the integrated audit is tracking above plan by $40,000 due to unplanned work related to the debt registration statement filed in July 2006 and associated comfort letter procedures. He also stated that PwC incurred $130,000 in additional unplanned fees related to the TMCT transactions. After review and discussion, the Committee approved these additional fees.

Messrs. Agema, Caputo, Grenesko, Maguire and Mallory answered questions from the members of the Committee during the presentation.

5.  Mr. Caputo then gave an internal audit status report. He indicated that most of Internal Audit's time since the Committee's October meeting has been devoted to audits related to the internal controls certification process, business continuity plan reviews and analytical reviews. No significant issues were noted. He also updated the Committee on the fraud investigation at Recycler where it appears that the former director of finance crafted several fraud schemes that involved collusion with former Recycler employees, relatives, and acquaintances outside the company in order to circumvent controls and misappropriate approximately $150,000 of Company funds. Mr. Caputo stated that Deloitte and Touche, who was retained by Tribune's legal department, has completed their investigation and did not identify any additional schemes or losses. He noted that a package of evidence has been provided to the Los Angeles Police Department who will be recommending that the Los Angeles District Attorney proceed with prosecution of this former employee.

Messrs. Agema, Caputo and Mallory answered questions from the members of the Committee during the presentation.

6.  Mr. Caputo reviewed with the Committee the status of the Company's business continuity plans. He discussed some initiatives for improvement that are currently in progress, including an Avian flu pandemic plan. He indicated that the plans for all business units and Tribune Tower have been reviewed and updated since last year, and that the plans are

2

adequately designed to minimize the impact of various levels of disaster and stabilize critical functions.

Mr. Caputo answered questions from the members of the Committee during the presentation.

7. Mr. Agema provided a report on enterprise risk management and reviewed how the Company addresses risks to long-term strategic goals and day-to-day operations. He also described procedures for assuring reliable and accurate financial reporting and compliance with all applicable laws and regulations. Mr. Agema stated that management believes that the Company's existing business practices, organization, policies, and procedures address the critical components of good enterprise risk management.

Mr. Agema also discussed the Company's major financial risk areas such as liquidity, income tax judgments, and casualty losses and liability claims. He then reviewed a summary of the Company's key compliance areas, including potential exposures, the Company's compliance systems for those areas, and the members of management responsible for ensuring that those compliance systems are effective. Mr. Agema indicated that this year's compliance program was expanded to include on-line ethics training for all employees required to sign the annual Code of Business Conduct compliance statements. He noted that privacy laws such as the Can-Spam Act as well as a Supplier Code of Conduct were also added to this year's program. Mr. Agema stated that the Company's compliance processes and programs conform to legal requirements and are effective.

Mr. Agema then discussed the results from the annual Code of Business Conduct process and reviewed the Company's Code of Ethics for the CEO and Senior Financial Officers. He indicated that no significant issues or unresolved conflicts of interest were noted, and no waivers to these codes were requested or granted.

Mr. Agema answered questions from the members of the Committee during the presentation.

8. Mr. Caputo reviewed the annual reassessment of the Audit Committee Charter. He noted that the current charter is in compliance with existing New York Stock Exchange and Securities and Exchange Commission rules and, as such, no changes were proposed. After a review and discussion led by Mr. Osborn, the Committee re-approved the current charter.

9. At this point, all Company employees left the meeting, and the Committee met privately with the PwC representatives. Messrs. Henderson and Maguire then left the meeting, and the Committee met privately with Messrs. Agema and Caputo.

There being no further business to come before the Committee, the meeting was adjourned at 5:55 p.m.

_____
Thomas Caputo

3

### TRIBUNE COMPANY
### AUDIT COMMITTEE MEETING
### FEBRUARY 1, 2007

The Audit Committee met on Thursday, February 1, 2007, at 8:00 a.m. The meeting was held via conference call at Tribune Tower, Chicago, Illinois, pursuant to notice. The meeting participants included Betsy Holden, William Osborn, and Christopher Reyes of the Audit Committee; Jeffrey Chandler and Roger Goodan of the Board of Directors; Kevin Maguire and Stephanie Potter of PricewaterhouseCoopers; and Dennis FitzSimons, Donald Grenesko, Brian Litman and Mark Mallory of Tribune Company.

Mr. Osborn acted as Chairman of the meeting and Mr. Litman as Secretary.

The following business was discussed at the meeting:

1. Mr. Grenesko reviewed the Company's fourth quarter and full year 2006 operating results. He commented on changes in revenues, operating expenses, operating profit, equity income, interest expense, and diluted EPS. Mr. Grenesko also discussed the effects of the extra week in 2006, as well as the special charges and non-operating items that were recorded in the fourth quarter.

   Messrs. FitzSimons and Grenesko answered various questions from the members of the Committee during the presentation.

2. Mr. Grenesko then reviewed a draft of the Company's fourth quarter earnings press release and answered questions from the Committee.

3. Mr. Maguire then provided an update regarding the status of the integrated audit. He noted that the audit was still ongoing, but no material weaknesses, significant deficiencies or unadjusted differences had been identified to date. He further commented that there were no disagreements with management or difficulties encountered in performing the audit.

There being no further business to come before the Committee, the meeting was adjourned.

_____
Brian Litman

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**2**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413644

## TRIBUNE COMPANY
## AUDIT COMMITTEE RESPONSIBILITY SUMMARY

Management has prepared the attached summary of Audit Committee responsibilities to aid in planning Audit Committee meetings and to ensure that all responsibilities specified in the Audit Committee charter are fulfilled each year. The summary specifies the expected timetable for discussing each area of responsibility. We have made no changes to the summary since the last Audit Committee meeting.

All topics slated for discussion at this Audit Committee meeting are covered in the remaining sections of the meeting materials. Formal actions required at this meeting include:

- Making a recommendation to the Board regarding inclusion of the financial statements in the 10-K, subject to any changes made to the financial statements and 10-K before they are finalized in late February.

- Evaluating the qualifications, performance, and independence of the independent accountants and presenting the conclusions to the Board.

- Approving PricewaterhouseCoopers' revised 2006 fees and preliminary 2007 fees and services.

- Approving the Audit Committee report and related disclosures to be included in the Company's 2007 proxy statement.

- Deciding whether to reappoint PricewaterhouseCoopers as the Company's independent accountants.

RMM
2/1/07

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# TRIBUNE COMPANY
## AUDIT COMMITTEE RESPONSIBILITY SUMMARY
## AND TIMETABLE

| Responsibility | Charter Reference | Meetings Feb. | May | Oct. | Dec. | Quarterly Calls | As Needed |
|---|---|---|---|---|---|---|---|
| **General:** | | | | | | | |
| 1. Meet periodically and privately with the independent accountants and internal auditors. | * | X | X | X | X | | X |
| 2. Meet periodically and privately with management. | * | X | | | | | X |
| 3. Appoint (after reviewing estimated fees for services to be performed) or replace the independent accountants. | * | X | | | | | |
| 4. Resolve any disagreements between management and the independent accountants regarding financial reporting. | * | | | | | | X |
| 5. Pre-approve all services performed by the independent accountants (including the fees and terms). | * | | X | | | | X |
| 6. Make regular reports to the Board of Directors. | * | X | X | X | X | | |
| 7. Reassess the adequacy of the Audit Committee Charter annually. | * | | | | X | | |
| 8. Self-assess Audit Committee performance (performed each July in conjunction with the overall Board self-assessment). | * | | | | | | |
| 9. Approve the Audit Committee report required by the SEC to be included in Tribune's annual proxy statement. | * | X | | | | | |
| **Financial Statement and Disclosure Matters:** | | | | | | | |
| 10. Meet to review the annual financial statements and disclosures with management and the independent accountants. | 1 | X | | | | | |
| 11. Make a recommendation to the Board regarding inclusion of the financial statements in the Company's 10-K. | 1 | X | | | | | |
| 12. Review the annual Section 404 internal control reports with management and the independent accountants. | 2 | X | | | | | |

\* These items are included in the "Meetings" and "Committee Authority and Responsibilities" sections of the Audit Committee Charter.

**February 2007**

1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413646

# TRIBUNE COMPANY
## AUDIT COMMITTEE RESPONSIBILITY SUMMARY
### AND TIMETABLE

| Responsibility | Charter Reference | Meetings | | | | Quarterly Calls | As Needed |
|---|---|---|---|---|---|---|---|
| | | Feb. | May | Oct. | Dec. | | |
| 13. Review any significant deficiencies or material weaknesses in internal controls, and the steps being taken to resolve them, with management and the independent accountants. | 2 | X | | | | | X |
| 14. Meet to review the quarterly financial statements and disclosures with management and the independent accountants prior to each 10-Q filing. | 3 | | | X (3rd Qtr) | | X (1st and 2nd Qtrs) | |
| 15. Review the results of the independent accountants' quarterly reviews. | 3 | | | X (3rd Qtr) | | X (1st, 2nd & 4th Qtrs) | |
| 16. Review significant financial reporting issues and judgments related to the financial statements with management and the independent accountants. | 4 | X | X | X | X | X | |
| 17. Review reports from the independent accountants regarding material accounting and financial reporting issues. | 5 | X | | | | | X |
| 18. Discuss the quarterly earnings releases with management. | 6 | | | | | X | |
| 19. Discuss financial information and earnings guidance provided to analysts and rating agencies with management. | 6 | | | | | X | X |
| 20. Discuss the effect of regulatory and accounting initiatives and off-balance sheet structures with management and the independent accountants. | 7 | | | | | | X |
| 21. Discuss major financial risk exposures and related risk management policies with management. | 8 | | | | X | | X |
| 22. Discuss with the independent accountants matters related to the annual audit, including any difficulties encountered, scope restrictions, or significant management disagreements. | 9 | X | | | | | |
| 23. Review any disclosures made by the CEO or CFO during the certification process regarding internal control weaknesses and/or fraud. | 10 | X (4th Qtr) | | X (3rd Qtr) | | X (1st and 2nd Qtrs) | |

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## TRIBUNE COMPANY
### AUDIT COMMITTEE RESPONSIBILITY SUMMARY
### AND TIMETABLE

| Responsibility | Charter Reference | Timetable | | | | | |
| | | Meetings | | | | Quarterly Calls | As Needed |
| | | Feb. | May | Oct. | Dec. | | |
|---|---|---|---|---|---|---|---|
| **Oversight of the Company's Relationship with the Independent Accountants:** | | | | | | | |
| 24. Evaluate the independent accountants' lead partner. | 11 | X | | | | | |
| 25. Review the independent accountants' quality control procedures and any material issues raised by recent internal or external reviews. | 12 | X | | | | | |
| 26. Evaluate the qualifications, performance, and independence of the independent accountants and present conclusions to the Board. | 12 | X | | | | | |
| 27. Ensure rotation of the independent accountants' partners as required by law. | 13 | | X | | | | |
| 28. Set and review policies for hiring current and former employees of the independent accountants. | 14 | | | X | | | |
| 29. Discuss the planning and staffing of the independent audit. | 15 | | X | | | | |
| **Oversight of the Company's Internal Audit Function:** | | | | | | | |
| 30. Review the appointment and replacement of the senior internal auditing executive. | 16 | | | | | | X |
| 31. Review significant issues and management's responses raised in internal audit reports. | 17 | X | X | X | X | | X |
| 32. Discuss the internal audit department's responsibilities and planned scope of activities, budget, and staffing with the independent accountants and management. | 18 | | X | | | | |
| **Compliance Oversight Responsibilities:** | | | | | | | |
| 33. Obtain assurance from the independent accountants that they did not become aware of any illegal acts during their audit. | 19 | X | | | | | |
| 34. Review reports from management, internal audit and the chief compliance officer regarding the Company's compliance and ethics program and its Code of Business Conduct. | 20 | | | | X | | |

3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413648

**TRIBUNE COMPANY**
**AUDIT COMMITTEE RESPONSIBILITY SUMMARY**
**AND TIMETABLE**

| Responsibility | Charter Reference | Timetable | | | | Quarterly Calls | As Needed |
|---|---|---|---|---|---|---|---|
| | | Meetings | | | | | |
| | | Feb. | May | Oct. | Dec. | | |
| 35. Advise the Board regarding the effectiveness of the Company's compliance and ethics program. | 20 | | | | X | | |
| 36. Review the procedures for handling complaints and employee concerns regarding accounting and auditing matters. | 21 | | | X | | | |
| 37. Review any significant complaints and employee concerns regarding accounting and auditing matters. | 21 | | | | | | X |
| 38. Discuss the results of the annual review of executive expense reports performed by the independent accountants and the internal auditors. | N/A | | | X | | | |
| 39. Discuss the Company's business continuity plans and the related reviews performed by the internal auditors. | N/A | | | | X | | |
| 40. Discuss with management and the independent accountants correspondence with regulators or governmental agencies regarding material accounting and financial reporting issues. | 22 | | | | | | X |
| 41. Discuss legal matters that may materially affect the Company's financial statements or compliance policies with the Company's General Counsel. | 23 | | | | | | X |

4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413650

# TRIBUNE COMPANY
## INTERNAL CONTROLS CERTIFICATION UPDATE
### AS OF FEBRUARY 6, 2007

PricewaterhouseCoopers and Internal Audit have completed their fieldwork at all significant business units except for the corporate office. For PwC, the significant locations include the Company's six largest newspapers, the three biggest television stations, Tribune Media Services, the Cubs, WGN-Cable, the Finance Service Center, and the corporate and group offices. For management and Internal Audit, the significant locations include those covered by PwC as well as the Hartford Courant, Hoy, Recycler (Los Angeles Times subsidiary that publishes various classified ad publications) and Star Community Publishing (Newsday subsidiary that publishes a number of shoppers). Follow-up audit work has also been completed at these locations to allow management and PwC to attest to the adequacy of controls as of year-end. PwC and Internal Audit are currently finalizing testing at the corporate office, including the consolidation and Form 10-K preparation. This work is expected to be completed by mid-February.

During the year, the business units developed action plans to resolve identified internal control deficiencies. The action plans specified the corrective action required, the person(s) responsible, and the timetable. Internal Audit, the Director of Controls and Compliance and the Internal Control steering committee received regular reports from the business units to monitor the status of the action plans, assess significance and determine the pervasiveness of each deficiency.

A deficiency might not be significant if it applies to just one business unit, but if it is present at several business units, it can become significant or even material. Material weaknesses must be disclosed in the 10-K, while significant deficiencies must only be reported to the Audit Committee. The Public Company Accounting Oversight Board (PCAOB) defines a material weakness as a control deficiency that results in a "more than remote likelihood" that a material misstatement will not be prevented or detected. A significant deficiency is a control deficiency that results in a "more than remote likelihood" that a more than inconsequential misstatement of the company's financial statements will not be prevented or detected. Also, beyond these quantitative factors, there are qualitative factors to consider such as risk assessment, tone at the top, sustainability of controls, etc. Deficiencies in these areas generally would not directly result in a misstatement, but they elevate risk and may contribute to the likelihood of a misstatement at the process level.

## CURRENT ASSESSMENT

At this point, we are confident that we will not have any material weaknesses to report and that PwC will be issuing a clean opinion regarding our internal controls over financial reporting. Management, Internal Audit and PwC have aggregated open deficiencies across the significant business units and are

| *Results as of February 6:* |
| --- |
| ▪ No material weaknesses |
| ▪ No significant deficiencies anticipated |
| ▪ Small number of miscellaneous control deficiencies open at year-end |
| ▪ 2005 significant deficiencies remediated |
| ▪ Stabilized control environment at Newsday |
| ▪ Issues in Baltimore's IT area addressed |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

finalizing their evaluation of the potential impact to the financial statements. No significant deficiencies are anticipated as only a relatively small number of miscellaneous items remained open at year-end. Most of these open items were identified late in the process and not enough instances of the controls exist to properly test that they are operating effectively. To date, the key internal controls over financial reporting at the significant locations appear to be adequate and functioning as intended and the documentation prepared by the Company accurately reflects the manual and automated controls in place. As mentioned above, PwC's and Internal Audit's reviews of year-end financial reporting controls are still in progress; however, no significant issues are anticipated.

**2005 Significant Deficiencies**

As discussed at previous meetings, the 2005 significant deficiency regarding change management controls over the advertising revenue system at Newsday was properly remediated and tested early in 2006. The other significant deficiency pertained to verifying that insertion and distribution of preprints at the major daily newspapers occurs prior to billing. The newspapers have implemented the required new controls in this area. Internal Audit and PwC recently completed testing at the major daily newspapers and have confirmed that these controls are designed and operating properly.

**Newsday and Baltimore Sun**

Near year-end, Internal Audit and PwC performed routine follow-up audit procedures at Newsday. No issues were identified, further confirming that Newsday's control environment has stabilized. Also, as mentioned at the Committee's December meeting, the Baltimore Sun has resolved 11 of the 15 deficiencies identified in their IT general controls area. Internal Audit re-visited Baltimore and validated that these remediated controls were operating properly. Only two of the four remaining deficiencies were open at year-end.

**NEXT STEPS**

Although unlikely, we may need to communicate with the Audit Committee in late February, since a small portion of the remaining testing and assessments will be completed after the February 13th Audit Committee meeting. By that time, the remaining testing by Internal Audit and PwC will be completed, and we will be able to finalize our assessments. Drafts of management's and PwC's reports on internal controls over financial reporting are included in the draft Form 10-K under Tab 6. Again, we are confident that we will not have any material weaknesses to report and no significant deficiencies are anticipated.

Also, the Securities and Exchange Commission continues to evaluate complaints from the business community that the certification process is overly burdensome and expensive. On December 13th, the SEC proposed guidance for management's evaluation of internal control over financial reporting. Their proposal provides direction on how management can better leverage existing internal control processes and procedures and focus only on the controls that are necessary to adequately address the risk of a material misstatement. On December 19th, the PCAOB issued a draft of a proposed new auditing standard (AS 5) for external auditors. Some of the changes in the proposed standard include:

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

- Eliminating the requirement for the external auditor to provide an opinion on management's process for its assessment of internal controls.

- Focusing testing on controls that address the areas of highest risk vs. obtaining a certain level of "coverage" of the company's operations.

- Allowing the auditor the ability to leverage knowledge gained in prior audits.

- Increasing the auditor's ability to use the work of others.

Both proposals are open to public comment until February 26.  The actual effective dates are unclear, but the proposals are currently expected to be finalized and released in May or June and will likely be effective for the 2007 certification.

Management undertook an extensive controls streamlining project in 2006, with the assistance of Deloitte & Touche.  As a result, the Company is currently well positioned to take full advantage of these two proposals.  As previously discussed, the intent of the project was to reduce time-consuming tests of routine, transactional processing controls, increase focus on higher risk areas, and place more reliance on company level controls (like anti-fraud programs, reviews of operating results, etc.).  Results indicate a potential for another 15 - 20% reduction in time going forward.

RMM/TGC
2/6/07

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413653

**4**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# TRIBUNE COMPANY
## INTERNAL AUDIT STATUS REPORT

Internal Audit regularly provides reports to the Audit Committee summarizing the results of recent audits. Significant issues that we report to the Committee typically include:

- Identified and/or unresolved significant deficiencies or material weaknesses in internal controls over financial reporting
- Significant weaknesses in other control areas that could jeopardize material systems, operations or processes
- Significant financial statement adjustments ($500,000 or greater)
- Any fraud committed by an employee with considerable responsibility for internal controls, or a sizeable fraud committed by any level of employee ($25,000 or greater)
- Material circulation adjustments (2% of total circulation or greater)

Since our last report in December, Internal Audit has primarily focused its efforts on analytical reviews and integrated audits of financial statements and internal controls over financial reporting to help support management's year-end assessment. The results are summarized below along with updates on previously identified significant issues, key open senior level financial positions, and fraud investigations. Internal Audit also continued to provide assistance to Newsday and to the internal controls certification streamlining project.

The majority of the audit plan presented to the Audit Committee in May 2006 will be completed by the end of March. Certain low risk audits had to be moved to 2007 due to higher priority special projects such as the broadcasting financial statement audit, assistance at Newsday and fraud investigations. Exhibit I on pages 4, 5 and 6 summarizes the results from all of the audits during the past year. No significant financial adjustments, circulation adjustments or material weaknesses in internal controls were identified. All issues noted during these reviews have been reported to management and are being appropriately addressed.

## INTEGRATED AUDITS (audits of financial statements and internal controls over financial reporting)

Since the last Audit Committee meeting, audits were completed at Recycler (Los Angeles Times subsidiary that publishes various classified ad publications), Orlando Sentinel, and the television stations in Seattle, Portland, New Orleans and Harrisburg. Internal Audit also completed follow-up audit work at the Company's significant locations to allow management to attest to the adequacy of controls at year-end. Testing at the corporate office is still in progress. Results from these audits were covered in the Internal Controls Certification Update under Tab 3.

## ANALYTICAL REVIEWS

In accordance with the audit plan, analytical reviews are being performed remotely from Chicago for any business unit that did not receive an integrated audit during 2006. All but 4 of the 30 reviews are complete at this time. No significant issues or adjustments have been noted to date.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**OTHER REVIEWS/UPDATES**

**Key Open Senior Level Financial Positions**

The controllers for the Los Angeles Times and the Sun-Sentinel resigned in mid-January 2007, and the CFO for the Baltimore Sun resigned in early February. All of them left for opportunities outside of the Company. They were, however, able to stay through year-end processing, and since then, their responsibilities have temporarily been delegated to others within finance. Management at each location has begun to search for a replacement.

**Tribune Broadcasting**

Management has requested that PwC resume its audit of Tribune Broadcasting in preparation for a potential spin-off of the television station operations. Financial statement audits for 2003 – 2005 were performed early last year at several locations; however, audits of the 2006 financial statements need to be performed since the SEC registration statement will require information for the three most recent years. Internal Audit has provided eight resources to assist with this audit work.

**FRAUD INVESTIGATIONS**

**Recycler**

As discussed at the Committee's December meeting, Deloitte & Touche completed its investigation of Recycler's former Director of Finance, Nish Mehta, who apparently crafted several fraud and kickback schemes to circumvent controls and misappropriate approximately $150,000 of Company funds. Documentation from the investigation has been provided to the Los Angeles Police Department who will be recommending that the Los Angeles District Attorney proceed with prosecution of Mr. Mehta. As a follow-up to this investigation, Internal Audit recently completed a comprehensive financial statement audit and review of internal controls at Recycler. No material financial statement adjustments were noted. Additionally, many internal control activities have been migrated to the Los Angeles Times' finance department and appear to be operating effectively.

Various strategic alternatives are being considered for Recycler given the steady decline in its revenues and its operating loss of $4.1 million for 2006. An update on Recycler will be provided during management's development report to the full board.

**Southern Connecticut Newspapers Inc.**

In late 2006, SCNI's finance department was investigating growing unreconciled differences between the classified advertising order entry system and the billing system regarding cash received. After repeated questioning, the Classified Advertising Telephone Sales Manager, Keith Clack, confessed that he was the cause for the differences as he had misappropriated over $10,000 of cash payments from customers over the past year. Mr. Clack was responsible for processing cash receipts collected from walk-up customers that pre-paid for advertisements at SCNI's Greenwich, Norwalk and Stamford locations. For several of the cash orders, he

2

would take the money and then go into the order entry system and change the payment from "cash" to "no charge." This, however, created a variance between cash collected per the order entry system and cash received per the billing system.

While investigating all of his other activities, SCNI and Internal Audit noted that Mr. Clack also had the authority to collect cash payments for a specific problem account. It appears that he may have also misappropriated over $20,000 of cash payments from this customer since 1999. In this case, he would enter the order under one of SCNI's "house accounts" which are used to enter no charge print ads to maintain space for pagination (comics, internal advertisements, etc.). We believe that he then discounted the order for the customer by about 70%, printed a fake receipt and kept the cash. We are still trying to quantify the amount, but since the system doesn't show any cash received it is difficult to tell how much was stolen.

Mr. Clack has been terminated and management is seeking full restitution from him. So far, he has paid back over $10,000 for the fraud he confessed to, and is currently being questioned about this other activity. SCNI will also be pressing charges against him. Additionally, new reports and processes have been developed at SCNI to strengthen controls in this area.

## Los Angeles Times

Tribune's General Counsel recently received a letter from a Los Angeles law firm indicating that it is conducting an investigation of the Los Angeles Times based on allegations that the newspaper has been entering into contracts to purchase its own papers in order to inflate circulation numbers. The letter also implies that this conduct has been ongoing for up to a decade. No other meaningful details are provided.

The merits of the allegations are questionable. In recent years, the Audit Bureau of Circulations (ABC) has increased the scope and depth of its audits at all newspapers, and both Internal Audit and ABC have performed circulation audits at the Los Angeles Times without any significant adjustments. Also, most of the newspaper's higher risk circulation programs such as single copy street sales (hawkers), Newspapers in Education, hotel copies and third party bulk sales have either been eliminated or drastically reduced. Regardless, a team including the Senior Vice President, Legal for the Los Angeles Times, Tribune's Vice President, Circulation and Vice President, Auditing has been assembled to investigate the allegations. Internal Audit also just began a circulation audit at the Los Angeles Times and will direct their efforts towards the investigation once more details are obtained. We will provide an update to the Committee at its next meeting.

TGC
2/6/07

3

Exhibit I

## TRIBUNE COMPANY
## 2006 SUMMARY OF AUDITS

| 2006 Revenues (millions) | Location | Type of Audit | | | | |
|---|---|---|---|---|---|---|
| | | Integrated Audit | Analytical Review | Circulation Audit | Other Audits | |
| | **Publishing:** | | | | | |
| | **LA Times Group:** | | | | | |
| $ 1,087 | LA Times | | - | In Progress | Business Continuity Plan | |
| 27 | Recycler Classifieds | | - | (1) | | |
| 36 | California Community News (inserting operation) | - | (2) | - | | |
| | **Chicago Tribune Group:** | | | | | |
| 818 | Chicago Tribune Company | | - | (2) | Business Continuity Plan | |
| 43 | Tribune Direct Marketing, Inc. (direct mail) | - | | - | | |
| 19 | Chicago magazine | - | | - | | |
| 12 | Chicagoland Publishing Company (apartment guides) | (1) | | (1) | | |
| | **Newsday Group:** | | | | | |
| 437 | Newsday, Inc. | | - | | Circulation System Implementation | |
| 69 | Star Community Publishing (weekly shoppers) | (1) | - | (1) | | |
| 5 | Island Publications (magazines) | - | (2) | (1) | | |
| 19 | amNew York (free daily commuter paper) | (2) | - | (1) | | |
| | **Fort Lauderdale Group:** | | | | | |
| 366 | Sun-Sentinel | (3) | - | - | (2) Advertising System Implementation | |
| 24 | Gold Coast Publications, Inc. (weekly shoppers) | - | - | - | | |
| 18 | Forum Publishing Group (weekly/monthly newspapers) | - | - | - | | |
| | **Baltimore Group:** | | | | | |
| 254 | Baltimore Sun | (3) | - | - | (3) Advertising System Implementation | |
| 32 | Patuxent Publishing (weekly newspapers / magazines) | - | - | - | | |
| 18 | Homestead Publishing (weekly newspapers) | - | - | - | | |
| | **Orlando Group:** | | | | | |
| 297 | Orlando Sentinel | | - | - | Business Continuity Plan | |

(1) Audit deferred until 2007 due to change in priorities (broadcasting financial statement audit, assistance for Newsday and fraud investigations).
(2) Audit/review planned for Feb and/or March
(3) High number of deficiencies in Information Technology general controls area.  Issues sufficiently remediated and tested by year-end.



Satisfactory Audit Rating
Needs Improvement Audit Rating
Unsatisfactory Audit Rating

4

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413658

Exhibit I

## TRIBUNE COMPANY
## 2006 SUMMARY OF AUDITS

| 2006 Revenues (millions) | Location | Type of Audit | | | |
|---|---|---|---|---|---|
| | | Integrated Audit | Analytical Review | Circulation Audit | Other Audits |
| | **Hartford Group:** | | | | |
| 188 | Hartford Courant | | | | (2) Circulation System Implementation |
| 11 | New Mass Media (weekly newspapers) | - | (2) | | - |
| 8 | ValuMail (total market coverage product) | - | | | - |
| | **Tribune Media Services Group:** | | | | |
| 20 | Tribune Media Services, Inc. (syndicated content) | | - | - | - |
| 38 | TV Publishing, Inc. (print TV programming guides) | - | | - | - |
| 48 | TV Data (print and interactive TV guides/content) | - | (2) | - | - |
| 4 | Tribune Media Services International (syndicated content) | - | | - | - |
| | **Allentown Group:** | | | | |
| 105 | Morning Call | - | - | - | - |
| 2 | Direct Mail Associates (print, insertion and mail provider) | - | - | - | - |
| | **Daily Press Group:** | | | | |
| 64 | The Daily Press, Inc. | - | - | - | In Progress Circulation System Implementation |
| 12 | Virginia Gazette (weekly newspapers / magazines) | - | - | - | - |
| 38 | **Southern Connecticut Newspapers** | - | | - | - |
| | **Spanish Language Newspaper Group:** | | | | |
| 30 | Hoy - New York, Chicago, Los Angeles | | - | (2) | - |
| - | **Tribune Interactive - Central Office** | | - | | - |
| 12 | **ChicagoLand Television News (CLTV)** | | - | - | - |
| - | Tribune Media Net (national sales organization) | - | | - | - |
| - | **Publishing Group Office** | | - | - | - |

(1) Audit deferred until 2007 due to change in priorities (broadcasting financial statement audit, assistance for Newsday and fraud investigations).
(2) Audit/review planned for Feb and/or March
(3) High number of deficiencies in Information Technology general controls area. Issues sufficiently remediated and tested by year-end.



Satisfactory Audit Rating
Needs Improvement Audit Rating
Unsatisfactory Audit Rating

5

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413659

Exhibit I

## TRIBUNE COMPANY
## 2006 SUMMARY OF AUDITS

| 2006 Revenues (millions) | Location | Type of Audit | | | |
|---|---|---|---|---|---|
| | | Integrated Audit | Analytical Review | Circulation Audit | Other Audits |
| | **Broadcasting & Entertainment:** | | | | |
| | **Television** | | | | |
| 179 | New York | ▨ | - | - | Business Continuity Plan ▨ |
| 162 | Los Angeles | ▨ | - | - | Business Continuity Plan ▨ |
| | **Chicago Group:** | | | | |
| 135 | WGN-TV | - | - | - | Business Continuity Plan ▨ |
| 147 | WGN-Cable, including distribution | ▨ | - | - | - |
| 55 | Dallas | - | ▨ | - | - |
| 62 | Seattle (2 stations) | ▨ | - | - | - |
| 45 | Philadelphia | - | ▨ | - | - |
| 43 | Miami | - | ▨ | - | Business Continuity Plan ▨ |
| 38 | Houston | - | ▨ | - | - |
| 39 | Hartford (2 stations) | ▨ | - | - | - |
| 41 | Indianapolis (2 stations) | - | ▨ | - | - |
| 44 | Sacramento | - | - | - | - |
| 40 | Washington D.C. | - | - | - | - |
| 30 | Denver | - | ▨ | - | - |
| 28 | St. Louis | ▨ | - | - | - |
| 21 | San Diego | - | ▨ | - | - |
| 19 | Grand Rapids | - | - | - | - |
| 15 | New Orleans (2 stations) | - | ▨ | - | - |
| 15 | Portland | ▨ | - | - | - |
| 14 | Harrisburg | ▨ | - | - | - |
| 41 | Chicago Radio | - | ▨ | - | - |
| 201 | Chicago Cubs | ▨ | - | - | - |
| 20 | Tribune Entertainment Company | - | ▨ | - | - |
| - | Broadcasting Group Office | ▨ | - | - | - |
| | **Corporate:** | | | | |
| - | Corporate Office | In Progress | - | - | Business Continuity Plan ▨ |
| - | Finance Service Center | ▨ | - | - | - |



Satisfactory Audit Rating
Needs Improvement Audit Rating
Unsatisfactory Audit Rating

6

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413660

**5**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413661

# TRIBUNE COMPANY
# IMPAIRMENT REVIEW OF GOODWILL AND OTHER INTANGIBLE ASSETS

We presented a preliminary update on this year's impairment review of goodwill and other intangible assets at the December 11, 2006 Audit Committee meeting. We have now completed our review and have confirmed our initial assessment that no write-downs are required in 2006. The following summary covers this year's impairment testing approach, which is essentially unchanged from the prior year.

## BACKGROUND

Goodwill and other intangible assets totaled $8.7 billion and represented about 65% of the Company's total assets at the end of 2006. About 75% of the Company's intangible assets arose from the acquisitions in 2000 of Times Mirror and in 1997 of Renaissance Communications, which owned six television stations. When we acquire a company, we allocate the purchase price first to the tangible assets, such as cash, accounts receivable, and fixed assets, and then to separately identifiable intangible assets, such as newspaper mastheads, FCC licenses, network affiliations, and customer lists. We base these allocations on estimated fair values, which we normally determine with the assistance of outside appraisal firms. We allocate any remaining purchase price to goodwill.

Under current accounting rules that first became effective in 2002, the Company no longer amortizes goodwill and other intangible assets that are considered to have indefinite lives, such as newspaper mastheads and FCC licenses. However, the Company must review these assets for impairment annually by comparing book values to fair values. We perform this review in the fourth quarter of each year.

Our annual impairment reviews have not resulted in any impairment charges, except in the fourth quarter of 2004, when the SEC and FASB issued new rules for valuing FCC licenses. This change in accounting resulted in a $29 million pretax charge related to the St. Louis, Portland, Indianapolis and Grand Rapids television stations. We reflected the charge as a cumulative effect of a change in accounting principle, net of tax, in our 2004 income statement. Without the change to the new method, we would not have had an impairment charge in 2004.

## GOODWILL

Goodwill impairment testing is performed by first aggregating similar business units into "reporting units," as defined by the rules. For example, all of our daily newspapers are treated as one reporting unit and all of our television stations are another reporting unit. The fair value of each of our reporting units is then estimated based upon operating cash flow multiples. This estimation method is consistent with the manner in which media properties are typically valued by financial analysts and investors.

Our newspaper reporting unit, which excludes Tribune Media Services and CLTV, has a net book value of approximately $7.1 billion and planned 2007 operating cash flow of about $890 million. We believe a reasonable estimate of the fair value of our newspaper group, for purposes

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413662

of this impairment review, is $7.3 billion using a multiple of 8.25. This gives us a "cushion" of about $200 million. Public market multiples for our newspaper peers range from 7.5 to 9.

In last year's impairment review, we estimated the newspaper group had a fair value of $9.5 billion, using 2006 planned operating cash flow of $1 billion and a multiple of 9.5, which gave us a cushion of $2.4 billion. Newspaper multiples have declined in 2006 mainly as a result of the uncertain advertising revenue outlook and continued declines in circulation.

Our television reporting unit, which excludes the WGN cable operation, has a net book value of approximately $2.3 billion and planned operating cash flow of about $290 million for 2007. We believe a reasonable estimate of the fair value of our television station group, for purposes of this impairment review, is $3.2 billion using a multiple of 11. This provides us with a cushion of about $900 million. Public market multiples for our television peers range from about 10 to 13.

Last year, we estimated the television group had a fair value of $3.1 billion, using 2006 planned operating cash flow of $280 million and a multiple of 11, which gave us a cushion of $350 million over the group's book value of $2.8 billion. The group's book value dropped by about $500 million in 2006 largely as a result of the sales of the Atlanta, Boston and Albany stations. Television multiples have remained steady this year.

Tribune has been recently trading at an overall operating cash flow multiple of about 8 to 8.5 times. The accounting rules for goodwill impairment specify that fair value should be based on management's estimate of the amount at which the reporting unit could be sold in a current transaction between willing parties, with consideration of both public and private market valuations. We will continue to monitor this area closely because further declines in operating cash flow or multiples could lead to a future impairment charge, especially for the newspaper group.

## OTHER INTANGIBLE ASSETS WITH AN INDEFINITE LIFE

Impairment testing for other intangible assets with an indefinite life is different from the testing for goodwill. Each intangible asset at each business unit must be tested separately to determine if its fair value exceeds its book value. Intangible assets subject to an annual impairment test include newspaper mastheads and FCC licenses.

### Newspaper Mastheads

Mastheads, which are essentially tradenames, are developed and gain value through years of advertising, promotional campaigns and customer satisfaction. The mastheads acquired from Times Mirror have a book value of $1.6 billion. The value of the mastheads was initially determined based upon an independent appraisal performed by Ernst & Young by calculating the benefit of owning, rather than licensing, the mastheads. If Tribune did not own the mastheads, we would have to license them from another entity at significant cost.

The primary variables in the fair value calculations are the royalty rate, projected revenues based on our operating plans and the discount rate. Several factors are considered when selecting royalty rates, including the uniqueness of the product, market share and profit margin. The assumed royalty rates range from 5% to 9%, depending on the newspaper. Projected revenues

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413663

are multiplied by the royalty rate to determine the annual royalty payments. These projected annual royalty payments are then discounted at an interest rate approximating the weighted average cost of capital of likely market participants. We used a discount rate of 6.8% for 2006, representing the average cost of capital for a group of 12 newspaper peers. The total present value of these theoretical future annual royalty payments represents the estimated fair value of the mastheads.

The estimated fair values and book values of our newspaper mastheads at December 31, 2006 were as follows (dollars in millions):

### NEWSPAPER MASTHEADS

|  | Fair Value | Book Value | Excess Fair Value |
|---|---|---|---|
| *1* Los Angeles | $1,177 | $621 | $556 |
| *2* New York | 831 | 510 | 321 |
| *3* Hartford | 324 | 176 | 148 |
| *4* Baltimore | 262 | 150 | 112 |
| *5* Allentown | 168 | 86 | 82 |
| *6* So. Conn. Newspapers | 59 | 33 | 26 |
| *7* Total | $2,821 | $1,576 | $1,245 |

Newspapers not listed above do not have a book value assigned to their masthead. The Company founded its Chicago newspaper, and in accordance with industry practice at the time, we did not assign value to the masthead when the Fort Lauderdale, Orlando and Newport News papers were acquired.

**FCC Licenses**

Broadcast television stations are subject to the jurisdiction of the Federal Communications Commission. The FCC license is the most valuable asset of a television station. The FCC prohibits a station from broadcasting its signal without a FCC license. FCC licenses are granted for a term of up to eight years. Tribune has never had a renewal request denied.

The fair value of a FCC license in each market is determined by estimating the average value of a FCC license in that market. We use a financial model that was developed by Standard & Poors, our outside valuation firm. The model is used to estimate the likely cash flows from start up for a station that would ultimately achieve an average market share and profitability in a particular market. The estimated cash flows are then discounted at an interest rate approximating the average cost of capital of likely buyers of a FCC license. For 2006, we used a discount rate of 7.9%, representing the average cost of capital for 11 television peer companies. As a result, Tribune does not estimate a fair value for its own FCC license in that market, but rather an average value for the market. This means that a poorly performing station that is losing market share may not face an impairment charge if its market is performing satisfactorily. Conversely, a growing station could be required to record a charge if its overall market deteriorates.

3

The estimated fair values and book values of our FCC licenses at December 31, 2006 were as follows (dollars in millions):

### TELEVISION FCC LICENSES

|   |  | Fair Value | Book Value | Excess Fair Value |
|---|---|---|---|---|
| 1 | Los Angeles | $489 | $56 | $433 |
| 2 | Dallas | 286 | 84 | 202 |
| 3 | Washington, D. C. | 332 | 109 | 223 |
| 4 | Houston | 242 | 104 | 138 |
| 5 | Seattle | 242 | 53 | 189 |
| 6 | Miami | 247 | 85 | 162 |
| 7 | Denver | 162 | 1 | 161 |
| 8 | Sacramento | 139 | 29 | 110 |
| 9 | St. Louis | 106 | 82 | 24 |
| 10 | Portland | 82 | 46 | 36 |
| 11 | Indianapolis | 148 | 99 | 49 |
| 12 | San Diego | 143 | 60 | 83 |
| 13 | Hartford | 192 | 31 | 161 |
| 14 | Grand Rapids | 46 | 27 | 19 |
| 15 | New Orleans | 34 | 2 | 32 |
| 16 | Harrisburg | 30 | 4 | 26 |
| 17 | Total | $2,920 | $872 | $2,048 |

Because our stations in Chicago and New York were founded by the Company, they do not have a book value assigned to their FCC license. No value was assigned to the FCC license when the Philadelphia station was acquired.

## SUMMARY

The valuation of intangible assets requires assumptions and estimates of many critical factors, including revenue and market growth, operating cash flow, market multiples, and discount rates. These factors involve inherent uncertainties, and changes in any of them can have a significant impact on our fair value estimates. We will continue to closely monitor the fair values of our intangible assets.

RMM
2/2/07

4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413665

6

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413666

**TRIBUNE COMPANY**

**PRELIMINARY DRAFT OF 2006 ANNUAL REPORT ON FORM 10-K**

Note:  Significant changes in presentation and new items are highlighted in yellow.
The Form 10-K will be finalized in late February.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

### FORM 10-K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 31, 2006**

**Commission file number 1-8572**

### TRIBUNE COMPANY
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **36-1880355** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **435 North Michigan Avenue** **Chicago, Illinois** | **60611** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (312) 222-9100

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock ($.01 par value) | New York Stock Exchange |
| Preferred Share Purchase Rights | Chicago Stock Exchange |
| 2% Exchangeable Subordinated Debentures Due 2029 | New York Stock Exchange |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐  No ☑

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (check one): Large Accelerated Filer ☑  Accelerated Filer ☐  Non-Accelerated Filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2). Yes ☐  No ☑

Aggregate market value of the Company's voting and non-voting common equity held by non-affiliates on June 24, 2006, based upon the closing price of the Company's Common Stock as reported on the New York Stock Exchange Composite Transactions list for such date: approximately $x,xxx,xxx,xxx.

At February 16, 2007, there were xxx,xxx,xxx shares outstanding of the Company's Common Stock ($.01 par value per share), excluding 60,683,388 shares held by subsidiaries of the Company (see Note 15 to the Company's Consolidated Financial Statements).

The following document is incorporated by reference, in part:

Definitive Proxy Statement for the registrant's May 9, 2007 Annual Meeting of Shareholders (Part III, to the extent described therein).

# INDEX TO TRIBUNE COMPANY
## 2006 FORM 10-K

**Item No.**                                                                                   **Page**

### PART I

1.   Business ................................................................................................................   1
    Significant Events ..............................................................................................   1
    Business Segments ............................................................................................   4
    Publishing .........................................................................................................   5
    Broadcasting and Entertainment.......................................................................   9
    Investments........................................................................................................   13
    Non-Operating Items ........................................................................................   14
    Governmental Regulation ..................................................................................   14
    Employees .........................................................................................................   15
    Executive Officers of the Company ..................................................................   15
    Available Information .......................................................................................   16
1A.   Risk Factors .......................................................................................................   16
1B.   Unresolved Staff Comments ..............................................................................   19
2.   Properties ...........................................................................................................   20
3.   Legal Proceedings .............................................................................................   21
4.   Submission of Matters to a Vote of Security Holders........................................   23

### PART II

5.   Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity
    Securities...........................................................................................................   23
6.   Selected Financial Data......................................................................................   24
7.   Management's Discussion and Analysis of Financial Condition and Results of Operations............   25
7A.   Quantitative and Qualitative Disclosures About Market Risk .............................   50
8.   Financial Statements and Supplementary Data ..................................................   54
    Report of Independent Registered Public Accounting Firm ..............................   56
    Management's Responsibility for Financial Statements and Management's Report on Internal
    Control Over Financial Reporting ....................................................................   58
    Consolidated Statements of Income for each of the three fiscal years in the period ended
    Dec. 31, 2006...................................................................................................   60
    Consolidated Balance Sheets at Dec. 31, 2006 and Dec. 25, 2005.....................   61
    Consolidated Statements of Shareholders' Equity for each of the three fiscal years in the period
    ended Dec. 31, 2006.........................................................................................   63
    Consolidated Statements of Cash Flows for each of the three fiscal years in the period ended
    Dec. 31, 2006...................................................................................................   65
    Notes to Consolidated Financial Statements
        Note 1: Summary of Significant Accounting Policies.................................   66
        Note 2: Changes in Operations and Non-Operating Items .........................   72
        Note 3: Discontinued Operations and Assets Held for Sale ........................   75
        Note 4: *Newsday* and *Hoy*, New York Charge ........................................   77
        Note 5: Inventories ....................................................................................   78
        Note 6: Goodwill and Other Intangible Assets...........................................   78
        Note 7: TMCT and TMCT II........................................................................   79
        Note 8: Investments....................................................................................   82
        Note 9: Long-Term Debt.............................................................................   83
        Note 10: Contracts Payable for Broadcast Rights ......................................   85
        Note 11: Fair Value of Financial Instruments ............................................   85
        Note 12: Commitments and Contingencies .................................................   86
        Note 13: Income Taxes................................................................................   86
        Note 14: Pension and Postretirement Benefits ...........................................   88
        Note 15: Capital Stock and Share Purchase Plan .......................................   92
        Note 16: Incentive Compensation and Stock Plans ....................................   93
        Note 17: Comprehensive Income ................................................................   98

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

|  | Note 18: Business Segments | 100 |
|  | 2006 Quarterly Results | 103 |
|  | 2005 Quarterly Results | 105 |
|  | Eleven Year Financial Summary | 106 |
|  | Financial Statement Schedule for each of the three fiscal years in the period ended Dec. 31, 2006 | |
|  | Schedule II Valuation and Qualifying Accounts and Reserves | 109 |
| 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 110 |
| 9A. | Controls and Procedures | 110 |

**PART III**

| 10. | Directors, Executive Officers and Corporate Governance | 110 |
| 11. | Executive Compensation | 110 |
| 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 111 |
| 13. | Certain Relationships, Related Transactions and Directory Independence | 112 |
| 14. | Principal Accountant Fees and Services | 112 |

**PART IV**

| 15. | Exhibits and Financial Statement Schedules | 112 |

* * * * *

|  | Signatures | 113 |
|  | Exhibit Index | 114 |
|  | Consent of Independent Registered Public Accounting Firm | 119 |
|  | Certifications of Chief Executive Officer and Chief Financial Officer | 120 |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413670

DRAFT

## PART I

### ITEM 1. BUSINESS.

Tribune Company ("Tribune" or the "Company") is a media and entertainment company. Through its subsidiaries, the Company is engaged in newspaper publishing, television and radio broadcasting and entertainment. The Company was founded in 1847 and incorporated in Illinois in 1861. As a result of a corporate restructuring in 1968, the Company became a holding company incorporated in Delaware. References in this report to "the Company" include Tribune Company and its subsidiaries, unless the context otherwise indicates. The information in this Item 1 should be read in conjunction with the information contained in Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the Company's consolidated financial statements and related notes thereto included in Item 8. Certain prior year amounts have been reclassified to conform with the 2006 presentation. These reclassifications had no impact on reported prior year total revenues, operating profit or net income.

This Annual Report on Form 10-K ("Form 10-K") contains certain forward-looking statements that are based largely on the Company's current expectations. Forward-looking statements are subject to certain risks, trends and uncertainties that could cause actual results and achievements to differ materially from those expressed in the forward-looking statements including, but not limited to, the items discussed in Item 1A, "Risk Factors." Such risks, trends and uncertainties, which in some instances are beyond the Company's control, include: changes in advertising demand, circulation levels and audience shares; regulatory and judicial rulings; availability and cost of broadcast rights; competition and other economic conditions; changes in newsprint prices; changes in the Company's credit ratings and interest rates; changes in accounting standards; adverse results from litigation, governmental investigations or tax related proceedings or audits; the effect of labor strikes, lock-outs and negotiations; the effect of acquisitions, investments and divestitures; the effect of derivative transactions; the Company's reliance on third-party vendors for various services; and the Company's exploration of alternatives for creating additional value for shareholders. The words "believe," "expect," "anticipate," "estimate," "could," "should," "intend" and similar expressions generally identify forward-looking statements. Readers are cautioned not to place undue reliance on such forward-looking statements, which are being made as of the date of this filing. The Company undertakes no obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise.

### Significant Events

**Common Stock Repurchases** – The Company's common stock repurchases were 71 million shares for $2.3 billion in 2006 and 12 million shares for $440 million in 2005. The following table summarizes the Company's 2006 common stock repurchases (in thousands):

|  | Shares | Cost |
|---|---|---|
| Repurchases prior to the tender offer | 4,604 | $ 137,746 |
| Tender offer | 45,027 | 1,468,270 |
| Repurchases from the Robert R. McCormick Tribune Foundation and Cantigny Foundation | 10,000 | 325,300 |
| Repurchases subsequent to the tender offer | 11,053 | 330,952 |
| Total common stock repurchases | 70,654 | $2,262,268 |

On May 30, 2006, the Company initiated a modified "Dutch Auction" tender offer to repurchase up to 53 million shares of its common stock at a price per share not greater than $32.50 and not less than $28.00. The tender offer closed on June 26, 2006, and the Company acquired 45 million shares of its common stock on July 5, 2006 at a price of $32.50 per share before transaction costs. The Company also acquired 10 million shares of its common stock from the Robert R. McCormick Tribune Foundation and the Cantigny Foundation on July 12, 2006 at a price of $32.50 per share before transaction costs. The Robert R. McCormick Tribune Foundation and the Cantigny Foundation are affiliated non-profit organizations, which together held 13.6% of the Company's outstanding shares when the tender offer was launched. In connection with the tender offer, the board of directors also authorized the repurchase of an additional 12 million shares of the Company's common stock commencing on the eleventh business day following the completion of the tender offer. In the third quarter of 2006, the Company repurchased an additional 11.1 million shares under that authorization at a weighted average cost of $29.94 per share. In addition, the Company repurchased and retired 4.6 million shares of its common stock in the first quarter of 2006.

1

TRB0413671

**Credit Agreements** – On June 19, 2006, the Company entered into a five-year credit agreement and a 364-day bridge credit agreement, both of which were amended and restated on June 27, 2006. The five-year credit agreement provides for a $1.5 billion unsecured term facility, of which $250 million was available and used to refinance the medium-term notes that matured on Nov. 1, 2006, and a $750 million unsecured revolving facility. The 364-day bridge credit agreement provides for a $2.15 billion unsecured bridge facility.

The Company entered into these agreements to finance the Company's tender offer initiated on May 30, 2006; to repurchase shares of the Company's common stock from the Robert R. McCormick Tribune Foundation and Cantigny Foundation; to repurchase shares of the Company's common stock pursuant to open market or privately negotiated transactions; to refinance certain indebtedness; and to pay fees and expenses incurred in connection with the repurchases. In addition, the revolving facility is available for working capital and general corporate purposes, including acquisitions.

In general, borrowings under the credit agreements bear interest at a rate equal to LIBOR plus a spread ranging from 0.35% to 1.25%. The applicable spread is determined on the basis of the Company's debt ratings by S&P and Moody's. The Company's debt ratings are also used in determining the annual facility fee, which may range from 0.07% to 0.25% of the aggregate unused commitments. In addition, the Company has agreed to pay customary fees to the lenders under the credit agreements.

As of Dec. 31, 2006, the Company had outstanding borrowings of $1.5 billion and $1.3 billion under the term facility and the bridge facility, respectively, and the Company had no borrowings under the revolving facility. As of Dec. 31, 2006, the applicable interest rate on both the term facility and the bridge facility was 6.2%.

The credit agreements contain certain restrictive covenants, including financial covenants that require the Company to maintain a maximum total leverage ratio and a minimum interest coverage ratio. At Dec. 31, 2006, the Company was in compliance with the covenants.

**TMCT Transactions** – As a result of the Company's acquisition of The Times Mirror Company ("Times Mirror") in 2000, the Company holds investment interests in TMCT, LLC ("TMCT") and TMCT II, LLC ("TMCT II"). TMCT and TMCT II were formed in 1997 and 1999, respectively, as a result of transactions involving agreements between Times Mirror and its largest shareholders, Chandler Trust No. 1 and Chandler Trust No. 2 (collectively, the "Chandler Trusts"). The Times Mirror acquisition resulted in the Chandler Trusts becoming significant shareholders of the Company. The TMCT and TMCT II LLC agreements have no specific term, and the dissolution, determination of liquidation values and distribution of assets require the mutual consent of the Company and the Chandler Trusts.

The collective assets of TMCT and TMCT II as of Dec. 25, 2005 included approximately 51.4 million shares of the Company's common stock and 1.1 million shares of the Company's preferred stock, representing all of the Company's issued Series C, D-1 and D-2 preferred stock. The TMCT and TMCT II assets also include a variety of fixed income and equity investments. In addition, TMCT owns eight real properties that are leased to the Company. Additional information pertaining to the Company's investments in TMCT and TMCT II is provided in Note 7 to the Company's consolidated financial statements in Item 8.

On Sept. 21, 2006, the Company and the Chandler Trusts entered into agreements to restructure TMCT and TMCT II. Under the terms of the agreements, the Company received on Sept. 22, 2006, a total of 38.9 million shares of the Company's common stock and all 1.1 million shares of the Company's preferred stock held collectively by TMCT and TMCT II. Following the distribution by TMCT and TMCT II, the Company's interests in each of TMCT and TMCT II were reduced to approximately 5%. The Sept. 21, 2006 agreements also provided for certain put and call options, which are exercisable at fair market value beginning in September 2007, relating to the Company's remaining ownership interests in TMCT and TMCT II. As a result of the transactions, the Company in the third quarter of 2006 recorded a one-time gain of $48 million, net of tax; increased its common treasury stock by $161 million and its preferred treasury stock by $107 million; and reduced its combined investment in TMCT and TMCT II by $195 million.

On Sept. 22, 2006, the Company and TMCT amended the lease agreement for the eight properties the Company leases from TMCT. Under the terms of the amended lease, the Company was granted an accelerated option to acquire the eight properties during the month of January 2008 for $175 million. The Company was also granted an option to acquire the leased properties from Feb. 8, 2008 to three months prior to the expiration of the amended lease at the higher of fair market value or $195 million. In addition, the amendment extended the properties' current fixed rental rate through Aug. 7, 2021.

On Oct. 20, 2006, the remaining 12.4 million shares of the Company's common stock held by TMCT and TMCT II were distributed to the Company and the Chandler Trusts in accordance with their respective ownership interests. The

2

DRAFT

Company received 0.6 million shares and the Chandler Trusts received 11.8 million shares.

The Company and the Chandler Trusts share in the cash flows of the various assets held by TMCT and TMCT II. Prior to the Sept. 22, 2006 transactions, the cash flows from the Tribune common and preferred shares held by TMCT and TMCT II were largely allocated to the Company, while the cash flows from the other assets were largely allocated to the Chandler Trusts. As a result, the Company included in treasury stock 80% of the Tribune common and preferred shares held by TMCT and TMCT II. In addition, 80% of the dividends on the preferred and common shares held by TMCT and TMCT II were effectively eliminated. Following the Sept. 22, 2006 transactions, the Company has included in treasury stock approximately 5% of the Tribune common shares held by TMCT and TMCT II, and will continue to account for its investments in the other assets of TMCT and TMCT II under the equity method. As a result of the transactions, the Company no longer has any shares of its Series C, D-1 and D-2 preferred stock outstanding, and the Company's common shares outstanding increased by 1.6 million.

**Sales of WATL-TV, Atlanta, WCWN-TV, Albany and WLVI-TV, Boston** – On June 5, 2006, the Company announced the sale of WATL-TV, Atlanta to Gannett Co., Inc. for $180 million. The sale closed on Aug. 7, 2006. On June 19, 2006, the Company announced the sale of WCWN-TV, Albany to Freedom Communications, Inc. for $17 million. The sale closed on Dec. 6, 2006. On Sept. 14, 2006, the Company announced the sale of WLVI-TV, Boston, to Sunbeam Television Corp. for $113.7 million. The sale closed on Dec. 19, 2006.

These businesses were considered components of the Company's broadcasting and entertainment segment as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company. The operations and cash flows of these businesses have been eliminated from the ongoing operations of the Company as a result of the sales, and the Company will not have any significant continuing involvement in their operations. Accordingly, the results of operations of each of these businesses are now reported as discontinued operations in the consolidated statements of income. Prior year consolidated statements of income have been restated to conform to the current year presentation of discontinued operations.

In conjunction with the sales of WATL-TV, Atlanta and WCWN-TV, Albany, the Company recorded in the second quarter of 2006 a pretax loss totaling $90 million, including $80 million of allocated television group goodwill, to write down the net assets of the stations to estimated fair value, less costs to sell. The Company subsequently reduced the pretax loss on sale of the Atlanta and Albany stations during the third quarter of 2006 by $1 million. In addition, the Company recorded in the fourth quarter of 2006 a pretax gain of $41 million, including $45 million of allocated television group goodwill, for the sale of the Boston station. In accordance with FAS No. 142, "Goodwill and Other Intangible Assets" ("FAS No. 142"), the Company aggregates all of its television stations into one reporting unit for goodwill accounting purposes. Although less than $0.1 million of goodwill was recorded when the Atlanta and Boston stations were acquired and only $0.3 million of goodwill was recorded for the Albany station acquisition, FAS No. 142 requires the Company to allocate a portion of its total television group goodwill to stations that are to be sold based on the fair value of the stations, relative to the fair value of the Company's remaining stations. The net pretax loss on sale of the three stations sold during 2006 was $48 million, including $125 million of allocated television group goodwill.

**Acquisition of Additional Equity in CareerBuilder, ShopLocal and Topix** – In August 2006, the Company completed its acquisition of additional equity interests in each of CareerBuilder, LLC, ShopLocal, LLC (formerly CrossMedia Services, Inc.) and Topix, LLC for an aggregate purchase price of $155 million. The negotiated equity purchases followed the exercise of call options by the Company and Gannett Co., Inc. on Knight-Ridder, Inc.'s equity ownership in the three online businesses after The McClatchy Company's announcement of its proposed acquisition of Knight-Ridder, Inc. As a result of this transaction, the Company and Gannett Co., Inc. each increased their respective ownership of CareerBuilder, LLC and ShopLocal, LLC to 42.5% with The McClatchy Company retaining a 15% interest in both entities. Additionally, each of the Company's and Gannett Co., Inc.'s interest in Topix, LLC increased to 31.9%. As a result of subsequent funding, the current ownership of Topix, LLC is approximately 33.7% for both the Company and Gannett Co., Inc., 11.9% for The McClatchy Company and 20.7% for management of Topix, LLC.

**Network Affiliations** – On Jan. 24, 2006, the Company announced that it had reached a 10-year agreement to affiliate 19 of its television stations which were at that time affiliated with the former WB Network (including those in New York, Los Angeles and Chicago) with a new broadcast network, the CW Network. The new network was launched in September 2006 by Warner Bros. Entertainment and CBS. The new network airs a portion of the programming previously carried on the WB Network and the UPN Network, as well as new programming. The WB Network has shut down. The Company did not incur any costs related to the shutdown of the WB Network.

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413673

In the second quarter of 2006, the Company announced that its other three WB Network affiliates (Philadelphia, Atlanta and Seattle) would become affiliates of the new broadcast network, MyNetworkTV, which was launched in September 2006 by the FOX Television Stations Inc. and Twentieth Television.  The new network airs primarily primetime dramas.  The Company subsequently sold its Atlanta station in August 2006.

**Business Segments**

The Company's operations are divided into two industry segments: publishing and broadcasting and entertainment. These segments operate primarily in the United States. Certain administrative activities are not included in either segment, but are reported as corporate. These segments reflect the way the Company sells its products to the marketplace, manages operations and makes business decisions.

Fiscal year 2006 comprised 53 weeks, while fiscal years 2005 and 2004 comprised 52 weeks. The following table sets forth operating revenues and profit information for each segment of the Company (in thousands):

| | Fiscal Year Ended December | | |
| | 2006 | 2005 | 2004 |
| --- | --- | --- | --- |
| Operating revenues: | | | |
| Publishing | $4,092,562 | $4,096,850 | $4,129,850 |
| Broadcasting and entertainment | 1,425,146 | 1,414,433 | 1,501,581 |
| Total operating revenues | $5,517,708 | $5,511,283 | $5,631,431 |
| | | | |
| Operating profit (loss)(1): | | | |
| Publishing | $749,189 | $759,713 | $726,207 |
| Broadcasting and entertainment | 391,533 | 416,891 | 513,289 |
| Corporate expenses | (55,712) | (49,413) | (52,218) |
| Total operating profit | $1,085,010 | $1,127,191 | $1,187,278 |

(1)  Operating profit for each segment excludes interest and dividend income, interest expense, equity income and loss, non-operating items and income taxes.

The following table sets forth asset information for each industry segment (in thousands):

| | Fiscal Year Ended December | |
| | 2006 | 2005 |
| --- | --- | --- |
| Assets: | | |
| Publishing(1) | $8,512,512 | $8,637,176 |
| Broadcasting and entertainment | 3,987,449 | 4,425,135 |
| Corporate(2) | 900,811 | 1,483,931 |
| Total assets | $13,400,772 | $14,546,242 |

(1)  Publishing assets at Dec. 31, 2006 and Dec. 25, 2005 include $9 million and $24 million of assets held for sale and $26 million and $34 million of assets idled, respectively (see Note 3 to the Company's consolidated financial statements in Item 8).

(2)  Corporate assets include cash and cash equivalents, marketable securities and other investments.

The Company's results of operations, when examined on a quarterly basis, reflect the seasonality of the Company's revenues. Second and fourth quarter advertising revenues are typically higher than first and third quarter revenues. Results for the second quarter reflect spring advertising revenues, while the fourth quarter includes advertising revenues related to the holiday season.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413674

**Publishing**

The publishing segment represented 74% of the Company's consolidated operating revenues in 2006. For the six months ended September 2006, total average paid circulation for Tribune's 11 metro newspapers averaged 2.8 million copies daily (Mon.-Fri.) and 4.1 million copies Sunday, a decline of 4.5% and 4.4%, respectively, from 2005. The Company's primary daily newspapers are the *Los Angeles Times, Chicago Tribune, Newsday, South Florida Sun-Sentinel, Orlando Sentinel, The Sun, Hartford Courant, The Morning Call, Daily Press, The Advocate* and *Greenwich Time*. The Company's publishing segment manages the websites of the Company's daily newspapers and television stations, as well as other branded sites targeting specific communities of interest. The Company also owns entertainment listings, a newspaper syndication and media marketing company, a Chicago-area cable television news channel and other publishing-related businesses.

Operating revenues for the Company's three largest newspapers, including their related businesses, for the last three years were as follows (in thousands):

|  | Fiscal Year Ended December | | |
|---|---|---|---|
|  | **2006** | **2005** | **2004** |
| Operating revenues: |  |  |  |
| Los Angeles Times(1) | $1,116,858 | $1,111,052 | $1,134,780 |
| Chicago Tribune(1) | 862,660 | 873,668 | 853,165 |
| Newsday(1) | 541,074 | 574,864 | 614,681 |
| Other newspapers and businesses | 1,571,970 | 1,537,266 | 1,527,224 |
| Total publishing revenues | $4,092,562 | $4,096,850 | $4,129,850 |

(1)   Includes the daily newspaper and other related businesses.

The following table provides a breakdown of operating revenues for the publishing segment for the last three years (in thousands):

|  | Fiscal Year Ended December | | |
|---|---|---|---|
|  | **2006** | **2005** | **2004** |
| Advertising: |  |  |  |
| Retail | $1,344,124 | $1,323,547 | $1,330,951 |
| National | 736,808 | 774,093 | 802,530 |
| Classified | 1,179,128 | 1,146,460 | 1,095,012 |
| Total advertising | 3,260,060 | 3,244,100 | 3,228,493 |
| Circulation | 575,043 | 596,163 | 643,947 |
| Other(1) | 257,459 | 256,587 | 257,410 |
| Total | $4,092,562 | $4,096,850 | $4,129,850 |

(1)   Primarily includes revenues from advertising placement services; the syndication of columns, features, information and comics to newspapers; commercial printing operations; delivery of other publications; direct mail operations; cable television news programming; distribution of entertainment listings; and other publishing-related activities.

The following table sets forth information concerning the Company's advertising volume for its daily newspapers (in thousands):

|  | Fiscal Year Ended December | | |
|---|---|---|---|
|  | **2006** | **2005** | **2004** |
| Total advertising inches: |  |  |  |
| Full run: |  |  |  |
| Retail | 6,119 | 5,980 | 6,200 |
| National | 3,457 | 3,774 | 3,998 |
| Classified | 10,154 | 10,023 | 10,265 |
| Total full run | 19,730 | 19,777 | 20,463 |
| Part run | 21,217 | 20,112 | 20,575 |
| Total | 40,947 | 39,889 | 41,038 |
| Preprint pieces (in thousands) | 14,928,728 | 14,929,047 | 14,680,009 |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413675

The following table sets forth information concerning the Company's circulation for its primary daily newspapers (in thousands):

| | Average Paid Circulation For the Six Months Ended Sept.(1) | | | | | |
|---|---|---|---|---|---|---|
| | Daily(2) | | | Sunday | | |
| | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 |
| Los Angeles Times | 776 | 843 | 877 | 1,172 | 1,248 | 1,292 |
| Chicago Tribune | 576 | 586 | 601 | 938 | 951 | 964 |
| Newsday | 411 | 432 | 459 | 475 | 496 | 521 |
| South Florida Sun-Sentinel | 222 | 227 | 232 | 305 | 322 | 337 |
| Orlando Sentinel | 214 | 220 | 247 | 317 | 331 | 364 |
| The Sun | 236 | 247 | 270 | 381 | 419 | 454 |
| Other daily newspapers(3) | 408 | 422 | 436 | 559 | 571 | 597 |

(1)     Circulation data is based on internal records, is subject to audit by the ABC and may be updated in subsequent filings.

(2)     Average daily circulation is based on a five-day (Mon.-Fri.) average.

(3)     Other daily newspapers include *Hartford Courant, The Morning Call, Daily Press, The Advocate* and *Greenwich Time*.

Each of the Company's newspapers operates independently to most effectively meet the needs of the community it serves. Local management establishes editorial policies. The Company coordinates certain aspects of operations and resources in order to provide greater operating efficiency and economies of scale.

The Company's newspapers compete for readership and advertising with other metropolitan, suburban and national newspapers, and also with television, radio, Internet services and other media. Competition for newspaper advertising is based upon circulation levels, readership demographics, price, service, and advertiser results, while competition for circulation is based upon the content of the newspaper, service and price.

The *Chicago Tribune, South Florida Sun-Sentinel, Orlando Sentinel, Daily Press, The Morning Call, The Advocate* and *Greenwich Time* are printed in Company-owned production facilities. The *Los Angeles Times, Newsday, The Sun* and *Hartford Courant* are printed on Company-owned presses in production facilities leased from an affiliate (see Note 7 to the Company's consolidated financial statements in Item 8). The principal raw material is newsprint. In 2006, the Company's newspapers consumed approximately 749,000 metric tons of newsprint. Average newsprint prices increased 13% in 2006 from 2005. The Company's newspapers have transitioned to lighter weight newsprint that on a per ton basis costs more but yields more pages. The increase in newsprint cost per ton reflects increased market prices and the higher cost of lighter weight paper. Average newsprint prices increased 16% and 12% in 2005 and 2004, respectively.

The Company is party to an agreement with Abitibi Consolidated Inc., expiring in 2009, to supply newsprint based on market prices. Under the current agreement, the Company purchased approximately 400,000 metric tons of newsprint in 2006, representing 54% of the Company's newsprint purchases and has agreed to purchase 400,000 metric tons in 2007, 2008 and 2009, subject to certain limitations, at prevailing market prices at the time of purchase.

### *Los Angeles Times and Related Businesses*

The *Los Angeles Times* has been published continuously since 1881. The newspaper has won 37 Pulitzer Prizes. It is published every morning and is the largest metropolitan newspaper in the United States in circulation. The Los Angeles market ranks second in the nation in terms of households. In its primary circulation areas of Los Angeles, Orange, Ventura, San Bernardino and Riverside counties, the *Los Angeles Times* competes for advertising and circulation with 16 local daily newspapers and three daily national newspapers, with its largest local competitor having almost 300,000 in average daily circulation. For the six-month period ended September 2006, the *Los Angeles Times* ranked fourth and second in the country for average daily and Sunday circulation, respectively, according to ABC. Approximately 78% and 81% of the paper's daily and Sunday circulation, respectively, was home delivered in 2006, with the remainder primarily sold at newsstands and vending boxes.

In addition to the daily edition covering the Los Angeles metropolitan area, the *Los Angeles Times* publishes Orange County, San Fernando Valley, Inland Empire and Ventura County editions. Daily and semi-weekly community newspapers

6

DRAFT

are either inserted into the paper in selected geographic areas or distributed to homes and through vending machines to provide targeted local news coverage. The company operates latimes.com, an online expanded version of the newspaper featuring 50,000 content pages, which provide entertainment, local, national and international news, and theenvelope.com, a comprehensive year-round entertainment awards web site. Through a subsidiary, EZ Buy & EZ Sell Recycler Corporation, the company publishes a collection of eight alternative classified papers in Southern California including titles such as *Recycler*, *AutoBuys*, *Truck Buys*, *Cycle & BoatBuys*, and *Jobs*, and also operates recycler.com, an online version of the publications. The company owns 50% of California Independent Postal Systems ("CIPS"), which provides alternative distribution services for advertising preprints. MediaNews Group, Inc. owns the other 50% of CIPS. In December 2005, the *Los Angeles Times* announced it would close its San Fernando Valley printing facility. The facility was closed in January 2006 (see Note 2 to the Company's consolidated financial statements in Item 8 for further discussion).

### Chicago Tribune and Related Businesses

Founded in 1847, the *Chicago Tribune* is the flagship publication of the Chicago Tribune Company. The newspaper has won 24 Pulitzer Prizes and is the largest circulation paper in Chicago and the Midwest. It ranks eighth among U.S. daily newspapers with an average daily paid circulation of approximately 576,000; and third among U.S. Sunday newspapers with an average Sunday paid circulation of approximately 938,000. Approximately 84% of its weekday newspapers and 74% of its Sunday newspapers are home delivered with the remainder primarily sold at newsstands and vending boxes. Considered an industry leader in journalism and innovation, Chicago Tribune Company has grown into a multi-product, multi-channel news and information leader. Together with other media businesses it operates, including chicagotribune.com, *RedEye* and *Chicago Magazine*, Chicago Tribune Company reaches approximately 57% of adults in Chicagoland every week.

Other businesses owned by Chicago Tribune Company include Tribune Direct which provides integrated and comprehensive direct mail services, and Chicagoland Publishing Company, which publishes a number of free guides in the real estate, automotive and help wanted categories. Chicagoland Publishing also publishes the monthly magazine *Chicago*, which earned a 2004 National Magazine "Ellie" Award for general excellence.

### Newsday and Related Businesses

*Newsday* is published every morning and circulated primarily in Nassau and Suffolk counties on Long Island, New York, and in the borough of Queens in New York City. The paper has been published since 1940 and has won 18 Pulitzer Prizes. The New York metropolitan area ranks first among U.S. markets in terms of households. *Newsday* competes with three major metropolitan newspapers, daily regional editions of several national newspapers and numerous daily, weekly and semiweekly local newspapers and free distribution newspapers. Approximately 70% of the paper's daily and 66% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes. See Note 4 to the Company's consolidated financial statements in Item 8 for a discussion of the charge recorded in 2004 related to the anticipated settlement with advertisers regarding misstated circulation at Newsday.

Newsday, Inc., publisher of *Newsday*, also publishes *Distinction*, a magazine serving Long Island's households, issued ten times per year; Newsday's *Parents & Children*, a magazine for Long Island families, issued twelve times per year; *Long Island Weddings*, a magazine for brides-to-be, published two times per year; and *Wellness*, a magazine serving Long Island's 40+ health and fitness market, published six times per year. Newsday, Inc.'s subsidiary, Star Community Publishing Group, LLC, publishes 183 pennysaver editions in Nassau and Suffolk counties on Long Island, New York, and in the boroughs of Queens, Brooklyn and Staten Island in New York City. Additionally, the results of *amNewYork*, a free daily - newspaper in New York City targeting young, urban commuters, are reported as a part of Newsday, Inc. Newsday, Inc. also has several websites including newsday.com and amny.com, which are online versions of the newspaper.

### Other Newspapers

The Company's other primary daily newspapers are *South Florida Sun-Sentinel*, *Orlando Sentinel*, *The Sun*, *Hartford Courant*, *Daily Press*, *The Morning Call*, *The Advocate* and *Greenwich Time*. Each of these newspapers is published every morning.

The *South Florida Sun-Sentinel* is the major daily newspaper serving the Broward/Palm Beach County market, leading in both circulation and readership. The Miami/Fort Lauderdale/Miami Beach metropolitan area, which includes Broward and Palm Beach counties, ranks 6th in the nation in terms of households. Approximately 75% of the paper's daily and 71% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413677

DRAFT

Sun-Sentinel Company, publisher of the *South Florida Sun-Sentinel*, also serves the news and information needs of South Florida through sun-sentinel.com, its breaking news and information website; southflorida.com, a South Florida entertainment website; *el Sentinel*, a weekly Spanish language newspaper; *Teenlink*, a weekly newspaper distributed in Broward County high schools; weekly community newspapers; niche publications; and television and radio partnerships, including its close working relationship with Tribune Broadcasting's WSFL-TV, Miami, the CW Network affiliate serving South Florida.

Other publications produced by Sun-Sentinel Company include: *City & Shore*, a bimonthly lifestyle magazine; *City Link*, an alternative weekly newspaper; *Florida New Homes & Condo Guide*, a comprehensive bimonthly guide to South Florida real estate; *Jewish Journal*, a collection of weekly newspapers serving South Florida's Jewish community; and *South Florida Parenting*, a monthly magazine providing parenting information and resources for local families.

The *Orlando Sentinel* primarily serves a six-county area in central Florida. The newspaper is the only major daily newspaper in the Orlando market, although it competes with other Florida and national newspapers, as well as with other media. The *Orlando Sentinel* has been published since 1876 and has won three Pulitzer Prizes. The Orlando market ranks 27th among U.S. markets in terms of households. Approximately 80% of the paper's daily and 73% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes.

Orlando Sentinel Communications Company, publisher of the *Orlando Sentinel* and orlandosentinel.com, also publishes *ShopLocal*, a free weekly publication used to distribute advertising and content to newspaper non-subscribers. In addition to orlandosentinel.com, the company operates metromix.com covering central Florida. The company publishes the weekly, Spanish-language newspaper, *El Sentinel*, and its companion website, elsentinel.com, as well as six weekly Forum community newspapers. The company's multimedia portfolio also includes free-distribution, niche products in the central Florida market including *Job Xtra* and *AutoFinder* magazines. Orlando Sentinel Communications offers direct marketing/direct mail services through Tribune Direct/Orlando in addition to distribution services for other publications.

The *Sun*, Maryland's largest newspaper, has won 15 Pulitzer Prizes since it began publishing a daily newspaper in 1837. The Baltimore market ranks 20th in the United States in number of households. For the six-month period ending Sept. 25, 2006, *The Sun* was ranked the 22nd largest newspaper in the country by Sunday circulation according to ABC. *The Sun* competes with *Baltimore Examiner* as well as *The Washington Post* in Anne Arundel and Howard counties, with *The Annapolis Capital* in Anne Arundel County and with *The Carroll County Times* in Carroll County. It also competes with regional editions of national daily newspapers, as well as other local dailies and weeklies. Approximately 79% of the paper's daily and 64% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes.

The Baltimore Sun's subsidiaries, Patuxent Publishing and Homestead Publishing, publish 17 weekly newspapers throughout Anne Arundel, Baltimore, Carroll, Harford and Howard counties. The largest of these weekly newspapers are *The Columbia Flier, The Towson Times, The Owings Mills Times* and *The Aegis*. The Sun also operates a market-leading website, baltimoresun.com, as well as baltimore.metromix.com, a local entertainment site targeted at users in the 18-34 demographic.

*Hartford Courant*, founded in 1764, is the oldest continuously published newspaper in the United States. Published every morning, it is the most widely circulated and read newspaper in Connecticut and the strongest medium in the state for advertisers and readers alike. Winner of two Pulitzer Prizes and twice named one of the five best-designed newspapers in the world, *Hartford Courant* is published in the state's capital, Hartford, and serves the state's northern and central regions. - Hartford Courant Company, publisher of *Hartford Courant*, has one of the most extensive zoning operations in the country, publishing eight editions of *Hartford Courant* zoned for local news and advertising. The company also operates courant.com, Connecticut's leading online news site, and ctnow.com, a statewide entertainment website. It also owns two subsidiaries: New Mass. Media, Inc., a publisher of four weekly alternative newspapers in Connecticut and Massachusetts, and ValuMail, Inc., a shared-mail company that distributes advertising supplements to more than two million households in Connecticut, Massachusetts, New York and Rhode Island.

Founded in 1896, the *Daily Press* is published daily, including Sunday, and serves the Virginia Peninsula market, which includes Newport News, Hampton, Williamsburg and eight other cities and counties. This market, together with Norfolk, Portsmouth and Virginia Beach, is the 40th largest U.S. market in terms of households. *Daily Press* is the only major daily newspaper in its primary market, although it competes with other regional and national newspapers, as well as with other media. Approximately 84% of the paper's daily and 80% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes. The Daily Press, Inc., publisher of *Daily Press*, also owns *The Virginia Gazette*, which is published twice weekly and primarily serves Williamsburg, Va. and surrounding

8

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

DRAFT

counties. The *Daily Press* serves the Internet community through its online affiliates dailypress.com, 7cities.com and hrtownsquare.com.

*The Morning Call*, published since 1895, is the dominant regional newspaper for nine counties in eastern Pennsylvania and New Jersey. The Morning Call, Inc., publisher of *The Morning Call*, offers free publications serving the recruitment and real estate markets, and selected high income households. A free weekly newspaper and a targeted online venture serve the 18-34 year-old audience. Subsidiaries of The Morning Call, Inc. offer full service direct marketing and saturation preprint delivery through non-subscriber distribution. In addition, the company owns and operates the premier regional website, mcall.com. Allentown-Bethlehem-Easton is the 60th largest U.S. market in terms of households. Approximately 83% of the paper's daily and 79% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes.

*The Advocate* and *Greenwich Time* primarily serve the Stamford/Greenwich market in southwestern Fairfield County, Conn. *The Advocate* has won a Pulitzer Prize. The newspapers expanded operations in 2003 with an additional edition in neighboring Norwalk.

### Other Publishing Related Businesses

The Company also owns targeted publications, including three editions of the Spanish language newspaper, *Hoy*. *Hoy*, New York, a free publication as of January 2006, was introduced in 1998; *Hoy*, Chicago, is a free publication introduced in September 2003; and *Hoy*, Los Angeles, is a free publication introduced in March 2004. See Note 3 to the Company's consolidated financial statements in Item 8 for a discussion of the charge recorded in 2004 related to the anticipated settlement with advertisers regarding misstated circulation at *Hoy*, New York. *Hoy* provides local, national and international news and features of interest to Hispanics. *Hoy*, New York, serves the second largest Hispanic market in the U.S., *Hoy*, Los Angeles serves the largest Hispanic market in the U.S. and *Hoy*, Chicago serves the fourth largest Hispanic market in the U.S. The Spanish language daily newspaper also operates hoyinternet.com, a national Spanish language website.

The Company also owns Tribune Media Services, Inc. ("TMS"), which creates, aggregates and distributes news, information and entertainment content that reaches millions of users through print, online and on-screen media. The TMS Entertainment Products group creates TV and movie guide products for major media companies and consumers. TMS provides data for interactive program guides to cable, satellite operators and consumer electronics manufacturers. The TMS News and Features group licenses content from more than 600 writers, artists, newspaper and magazine publishers, and wire services to roughly 4,000 media customers worldwide.

The Company also operates CLTV, a regional 24-hour cable news channel serving Chicagoland. CLTV was launched in January 1993 and currently is available to more than 1.6 million cable households in the Chicago market.

### Broadcasting and Entertainment

The broadcasting and entertainment segment represented 26% of the Company's consolidated operating revenues in 2006. At Dec. 31, 2006, the segment included The CW Television Network ("The CW Network") affiliates located in New York, Los Angeles, Chicago, Dallas, Washington, D.C., Houston, Miami, Denver, St. Louis, Portland, Indianapolis, San Diego, Hartford, and New Orleans; the FOX Network television affiliates in Seattle, Sacramento, Indianapolis, Hartford, Grand Rapids and Harrisburg; MyNetworkTV affiliates in Philadelphia and Seattle; an ABC television affiliate in New Orleans; one radio station in Chicago; the Chicago Cubs baseball team; and Tribune Entertainment, a company that distributes its own programming together with programming licensed from third parties. On Jan. 24, 2006, the Company announced that it had reached a 10-year agreement to affiliate 19 of its former WB Network affiliates stations with a new broadcast network, the CW Network. The new network was launched in September 2006 by Warner Bros. Entertainment and CBS. The Company subsequently sold its Albany and Boston station in December 2006. The new network airs a portion of the programming previously carried on the WB Network and the UPN Network, as well as new programming. The WB Network has shut down. The Company did not incur any costs related to the shutdown of the WB Network.

In the second quarter of 2006, the Company announced that its other three WB Network affiliates (Philadelphia, Atlanta, and Seattle) would become affiliates of the new broadcast network, MyNetworkTV, which was launched in September of 2006 by the Fox Television Stations Inc. and Twentieth Television. The new network airs primarily primetime dramas. The Company subsequently sold its Atlanta station in August 2006.

9

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

The following table shows sources of operating revenues for the broadcasting and entertainment segment for the last three years (in thousands):

| | Fiscal Year Ended December | | |
| --- | --- | --- | --- |
| | 2006 | 2005 | 2004 |
| Television | $1,178,104 | $1,165,821 | $1,258,802 |
| Radio/entertainment | 247,042 | 248,612 | 242,779 |
| Total | $1,425,146 | $1,414,433 | $1,501,581 |

### Television

In 2006, television contributed 83% of the broadcasting and entertainment segment's operating revenues. The Company's television stations compete for audience and advertising with other television and radio stations, cable television and other media serving the same markets. Competition for audience and advertising is based upon various interrelated factors including programming content, audience acceptance and price.  Selected data for the Company's television stations are shown in the following table:

| | Market(1) | | | | | Major Over-the Air Stations in Market(2) | Expiration of FCC License(3) | Year Acquired |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | National Rank | % of U.S. Households | FCC % | Analog Channel | Affiliation | | | |
| WPIX—New York, NY | 1 | 6.6 | 6.6 | 11-VHF | CW | 7 | 2007(4)(6) | 1948(5) |
| KTLA—Los Angeles, CA | 2 | 5.0 | 5.0 | 5-VHF | CW | 8 | 2006(4)(6) | 1985 |
| WGN—Chicago, IL | 3 | 3.1 | 3.1 | 9-VHF | CW | 8 | 2005(6) | 1948(5) |
| WPHL—Philadelphia, PA | 4 | 2.6 | 1.3 | 17-UHF | MNTV | 7 | 2007(7) | 1992 |
| KDAF—Dallas, TX | 6 | 2.1 | 1.1 | 33-UHF | CW | 9 | 2006(6) | 1997 |
| WDCW—Washington, D.C. | 8 | 2.0 | 1.0 | 50-UHF | CW | 7 | 2004(6) | 1999 |
| KHCW—Houston, TX | 10 | 1.8 | 0.9 | 39-UHF | CW | 9 | 2006(6) | 1996 |
| KCPQ—Seattle, WA | 14 | 1.5 | 1.5 | 13-VHF | FOX | 8 | 2007(6) | 1999 |
| KMYQ—Seattle, WA | 14 | — | — | 22-UHF | MNTV | 8 | 2007(6) | 1998 |
| WSFL—Miami, FL | 16 | 1.4 | 0.7 | 39-UHF | CW | 7 | 2013 (4) | 1997 |
| KWGN—Denver, CO | 18 | 1.3 | 1.3 | 2-VHF | CW | 7 | 2006(6) | 1966 |
| KTXL—Sacramento, CA | 20 | 1.2 | 0.6 | 40-UHF | FOX | 7 | 2006(6) | 1997 |
| KPLR—St. Louis, MO | 21 | 1.1 | 1.1 | 11-VHF | CW | 6 | 2014 | 2003 |
| KRCW—Portland, OR | 23 | 1.0 | 0.5 | 32-UHF | CW | 7 | 2007(6) | 2003 |
| WTTV—Indianapolis, IN | 25 | 1.0 | 1.0 | 4-VHF | CW | 7 | 2013 | 2002 |
| WXIN—Indianapolis, IN | 25 | — | — | 59-UHF | FOX | 7 | 2005(6) | 1997 |
| KSWB—San Diego, CA | 27 | 0.9 | 0.5 | 69-UHF | CW | 7 | 2006(6) | 1996 |
| WTIC—Hartford, CT | 28 | 0.9 | 0.5 | 61-UHF | FOX | 7 | 2007(4)(6) | 1997 |
| WTXX—Hartford, CT | 28 | — | — | 20-UHF | CW | 7 | 2007(4)(6) | 2001 |
| WXMI—Grand Rapids, MI | 39 | 0.7 | 0.3 | 17-UHF | FOX | 7 | 2005(6) | 1998 |
| WPMT—Harrisburg, PA | 41 | 0.6 | 0.3 | 43-UHF | FOX | 5 | 2007(7) | 1997 |
| WGNO—New Orleans, LA | 54 | 0.5 | 0.3 | 26-UHF | ABC | 7 | 2005(6) | 1983 |
| WNOL—New Orleans, LA | 54 | — | — | 38-UHF | CW | 7 | 2013 | 2000 |

(1)    Source: Nielsen Station Index (DMA Market and Demographic Rank Report, September 2006). Ranking of markets is based on number of television households in DMA (Designated Market Area).

(2)    Source: Nielsen Station Index (Viewers in Profile Reports, 2006). Major over-the-air stations program for a broad, general audience in the market.

(3)    See "Governmental Regulation."

(4)    See "Governmental Regulation" for discussion of the Federal Communications Commission ("FCC") television/newspaper cross-ownership rule.

(5)    Founded by the Company.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413680

DRAFT

(6)    The WDCW-TV license expired October 2004, the renewal application filed in June 2004 is pending; the WGNO-TV license expired June 2005, the renewal application filed in February 2005 is pending; the WXIN-TV license expired August 2005, the renewal application filed in March 2005 is pending; the WXMI-TV license expired October 2005, the renewal application filed in May 2005 is pending; the WGN-TV license expired December 2005, the renewal application filed in August 2005 is pending; the KWGN-TV license expired in April 2006, the renewal application filed in December 2005 is pending; the KDAF-TV license expired August 2006, the renewal application filed in March 2006 is pending; the KHCW-TV license expired August 2006, the renewal application filed in March 2006 is pending; the KTLA-TV license expired December 2006, the renewal application filed in August 2006 is pending; the KTXL-TV license expired December 2006, the renewal application filed in August 2006 is pending; and the KSWB-TV license expired December 2006, the renewal application filed in August 2006 is pending.  The KCPQ-TV license expired in February 2007, the renewal application filed in October 2006 is pending; the KMYQ-TV license expired in February 2007, the renewal application filed in October 2006 is pending; the KRCW-TV license expired in February 2007, the renewal application filed in October 2006 is pending; the WTIC-TV license expires in April 2007, the renewal application filed in December 2006 is pending; the WTXX-TV license expires in April 2007, the renewal application filed in December 2006 is pending; and the WPIX-TV license expires in June 2007, the renewal application filed in February 2007 is pending.

(7)    The WPHL-TV and WPMT-TV license renewal applications are due by April 1, 2007.

     Programming emphasis at the Company's stations is placed on network-provided shows, syndicated series, feature motion pictures, local and regional sports coverage, news, and children's programs. These stations acquire most of their programming from outside sources, including The CW Network, the FOX Network and MyNetworkTV, although a significant amount is produced locally.  Superstation WGN programming is delivered by cable or satellite outside of the Chicago area and includes syndicated series, movies and first-run programming.  Contracts for purchased programming generally cover a period of one to five years, with payment also typically made over several years. The expense for amortization of television broadcast rights in 2006 was $361 million, which represented approximately 31% of total television operating revenues.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413681

DRAFT

Average audience share information for the Company's television stations for the past three years is shown in the following table:

| | | Average Audience Share(1) | | | | | |
|---|---|---|---|---|---|---|---|
| | | Total Market Year Ended December | | | In-Market Stations(2) Year Ended December | | |
| | Affiliation | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 |
| WPIX—New York | CW | 4.4% | 5.1% | 5.8% | 11.1% | 12.4% | 13.6% |
| KTLA—Los Angeles | CW | 3.6 | 4.0 | 4.6 | 9.9 | 10.7 | 11.4 |
| WGN—Chicago | CW | 5.9 | 6.2 | 7.0 | 12.9 | 13.2 | 13.9 |
| WPHL—Philadelphia | MNTV | 3.7 | 4.0 | 4.0 | 8.4 | 8.5 | 8.2 |
| KDAF—Dallas | CW | 4.3 | 4.3 | 6.4 | 9.2 | 9.1 | 12.4 |
| WDCW—Washington | CW | 3.2 | 4.2 | 4.4 | 8.2 | 9.5 | 10.1 |
| KHCW—Houston | CW | 4.5 | 4.8 | 5.1 | 9.9 | 9.8 | 10.3 |
| KCPQ—Seattle | FOX | 5.7 | 6.7 | 5.8 | 12.3 | 13.7 | 11.8 |
| KMYQ—Seattle | MNTV | 2.0 | 2.5 | 2.5 | 4.3 | 5.0 | 5.0 |
| WSFL—Miami | CW | 3.9 | 5.2(3) | 5.2 | 11.0 | 13.9(3) | 13.9 |
| KWGN—Denver | CW | 3.2 | 3.9 | 4.3 | 7.8 | 9.4 | 9.8 |
| KTXL—Sacramento | FOX | 5.2 | 5.7 | 5.8 | 10.3 | 13.3 | 13.2 |
| KPLR—St. Louis | CW | 5.5 | 5.0 | 5.8 | 10.4 | 9.5 | 10.8 |
| KRCW—Portland | CW | 3.3 | 3.7 | 4.0 | 7.2 | 7.9 | 8.2 |
| WTTV—Indianapolis | CW | 2.7 | 3.7 | 3.8 | 5.9 | 7.8 | 7.7 |
| WXIN—Indianapolis | FOX | 5.8 | 6.5 | 5.7 | 12.8 | 13.7 | 11.7 |
| KSWB—San Diego | CW | 2.6 | 3.1 | 3.8 | 6.8 | 7.7 | 9.2 |
| WTIC—Hartford | FOX | 5.4 | 6.3 | 5.8 | 12.6 | 14.5 | 13.1 |
| WTXX—Hartford | CW | 2.1 | 2.1 | 2.4 | 4.9 | 4.7 | 5.5 |
| WXMI—Grand Rapids | FOX | 6.4 | 7.1 | 6.6 | 12.2 | 13.6 | 12.6 |
| WPMT—Harrisburg | FOX | 5.5 | 6.1 | 5.8 | 11.8 | 13.9 | 12.7 |
| WGNO—New Orleans | ABC | (4) | 4.6(3) | 4.6 | (4) | 9.8(3) | 13.9 |
| WNOL—New Orleans | CW | (4) | 3.8(3) | 4.9 | (4) | 8.2(3) | 10.0 |
| **23 Station Unweighted Average  (5)** | | **4.2** | **4.7** | **5.0** | **9.5** | **10.4** | **10.6** |

(1)    Represents the estimated number of television households tuned to a specific station as a percent of total viewing households in a defined area. The percentages shown reflect the average Nielsen ratings shares for the February, May, July and November measurement periods for 7 a.m. to 1 a.m. daily.

(2)    Excludes cable, satellite, public broadcasting, foreign language and minor independent channels.

(3)    Nielsen did not release November 2005 data for WSFL-TV, WGNO-TV and WNOL-TV as a result of hurricanes in these areas. The 2005 shares for these markets reflect the average of ratings for the February, May and July measurement periods only.

(4)    Nielsen did not release 2006 ratings data for WGNO-TV and WNOL-TV as a result of Hurricane Katrina.

(5)    2006 unweighted station average is for 21 stations rather than 23, since New Orleans was not measured in 2006.

Average audience shares are shown on two bases: total market, which includes all channels, and in-market stations, which includes only the major over-the-air stations. Average in-market shares are a more relevant benchmark to determine the stations' performance in their respective markets as they compare the stations' performance to their primary programming and sales competition. In 2006, the average total market share and the average in-market share for the 23-station group declined versus 2005. Ratings for stations in the larger markets continued to be affected by the introduction of Nielsen's Local People Meters ("LPMs"). LPMs have tended to reduce the overall share of broadcast television as compared to cable television and, within the broadcast television universe, disadvantage stations like Tribune's that target younger audiences. The stations were also affected by some audience erosion due to a lack of major new syndicated programming and by lower WB Network prime-time ratings.  The WB ceased operations in September 2006. Fourteen of Tribune's WB stations became affiliates of the CW network, a joint venture between CBS Corporation, owner of the UPN Network, and Warner Bros. Entertainment.  The remaining two Tribune WB stations became affiliates of MyNetworkTV, a new television network owned by News Corp.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413682

*Radio/Entertainment*

In 2006, radio/entertainment operations contributed 17% of the broadcasting and entertainment segment's operating revenues. WGN-AM, Chicago, is the only radio station owned by the Company. Selected information for WGN-AM, Chicago, is shown in the following table:

| | Format | Frequency | National Market Rank(1) | Number of Operating Stations in Market(2) | Audience Share(3) |
|---|---|---|---|---|---|
| WGN-AM, Chicago.................................. | Personality/Infotainment/Sports | 720-AM | 3 | 39 | 5.5% |

(1)    Source: Radio markets ranked by Arbitron Metro Survey Area, Arbitron Company 2006.

(2)    Source: Arbitron Company 2006.

(3)    Source: Average of Winter 2005 and Spring, Summer and Fall 2006 Arbitron shares for persons 12 years old and over, 6 a.m. to midnight daily during the period measured.

Entertainment includes Tribune Entertainment Company ("Tribune Entertainment") and the Chicago Cubs baseball team. The Chicago Cubs were acquired in 1981. Cubs games are broadcast on WGN-TV and WGN-AM. Tribune Entertainment is a distributor of programming in the United States syndicated television, cable television and ancillary markets. Tribune Entertainment distributes its own programming together with programming licensed from third parties.

Tribune Entertainment is party to a variety of distribution, marketing, and advertiser sales relationships with major suppliers such as DreamWorks SKG for the exclusive domestic syndication and ad sales of their film library, FremantleMedia, Hearst Entertainment, Rigel Entertainment, Telco Productions, Debmar-Mercury Entertainment, DIC Entertainment, Carlton America, New Line Television. These relationships comprise over 408 television and theatrical motion pictures and more than 1,300 episodes of various television series and specials including "South Park," "Family Feud," "Soul Train," "The Soul Train Music Awards," and "Ron Hazelton's House Calls." Tribune Entertainment also distributes its television series productions of "Andromeda," "Earth Final Conflict," "Beastmaster," "Mutant X," and "Nightman."

In the fall of 2006, the first of the DreamWorks SKG titles became available. In addition, Tribune Entertainment launched "American Idol Rewind," in domestic syndication. The weekly one-hour series, includes original, never-before-seen episodes of the highly successful "American Idol" franchise.

Tribune California Properties, a subsidiary of Tribune Entertainment, owns and maintains the 10.5-acre studio production lot in Hollywood. Tribune Studios, also a subsidiary of Tribune Entertainment, manages the site which includes facilities rental of nine state-of-the art digital sound stages and associated production office space.

**Investments**

The Company has investments in several public and private companies. See Note 8 to the Company's consolidated financial statements in Item 8 for further discussion of the Company's cost and equity method investments.

The Company's principal equity method investments currently include CareerBuilder, Classified Ventures, TV Food Network, Comcast Sports Network, ShopLocal, Topix.net, TMCT and TMCT II. CareerBuilder, an online recruiting company formed in 2000, is owned 42.5 % by the Company, 42.5% by Gannett Co., Inc. and 15% by The McClatchy Co., Inc. Classified Ventures is a network of automotive and real estate classified advertising websites. TV Food Network is a 24-hour cable/satellite television network focusing on food and entertaining. Comcast Sports Network is a 24-hour cable/satellite television network formed in 2003, which began programming in the fall of 2004, focusing on Chicago sports teams. ShopLocal transforms traditionally print-based retail promotions into search-based interactive formats. The Company, Gannett Co., Inc. and McClatchy Co., each own a 42.5%, 42.5% and 15% interest in ShopLocal, respectively. Topix.net is an online news and information aggregation website that continuously monitors breaking news from over 10,000 online sources and categorizes daily news content into over 300,000 topics, 24 hours a day. The ownership of Topix, LLC is approximately 33.7% for both the Company and Gannett Co., Inc., 11.9% for the McClatchy Co. and 20.7% for management of Topix, LLC. On Sept. 21, 2006, the Company and the Chandler Trusts entered into agreements to restructure TMCT and TMCT II. As a result, the Company's interests in each of TMCT and TMCT II were reduced to approximately 5%. The Company's

13

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413683

investments in TMCT and TMCT II are further discussed in Note 7 to the Company's consolidated financial statements in Item 8.

## Non-Operating Items

The Company reported several non-operating items in 2006, 2005 and 2004, which included gains and losses resulting from sales of investments, changes in the fair values of the Company's PHONES derivatives and related investment, the TMCT and TMCT II restructuring, the early retirement of debt, settlement of insurance claims related to Sept. 11, 2001, write-downs of investments, and income tax adjustments, including additional tax expense associated with the Matthew Bender and Mosby tax liability. These non-operating items are further discussed in Note 2 to the Company's consolidated financial statements in Item 8.

## Governmental Regulation

Various aspects of the Company's operations are subject to regulation by governmental authorities in the United States.

The Company's television and radio broadcasting operations are subject to FCC jurisdiction under the Communications Act of 1934, as amended. FCC rules, among other things, govern the term, renewal and transfer of radio and television broadcasting licenses, and limit concentrations of broadcasting control inconsistent with the public interest. Federal law also regulates the rates charged for political advertising and the quantity of advertising within children's programs. The Company is permitted to own both newspaper and broadcast operations in the Chicago market by virtue of "grandfather" provisions in the FCC regulations and in the Fort Lauderdale/Miami market by virtue of a temporary waiver of the television/newspaper cross-ownership rule.

Because the Times Mirror acquisition in 2000 did not involve the transfer of any broadcast station licenses, FCC approval was not required to complete the transaction. Under the television/newspaper cross-ownership rule in effect at the time of the merger, companies were generally prohibited from owning both a newspaper and a broadcast license in the same market. However, it was also the FCC's policy to permit newly created television/newspaper combinations to be held until the next broadcast license renewal. As such, license renewals for three Tribune television properties—KTLA-TV, Los Angeles (renewal in 2006), WPIX-TV, New York (renewal in 2007) and WTIC-TV, Hartford (renewal in 2007)—are affected by the Times Mirror acquisition under the old FCC media ownership rules. In June 2003, the FCC adopted new media ownership rules, including a new television/newspaper cross-ownership rule. The new rule would eliminate the cross-ownership prohibition entirely in markets with nine or more television stations. Under this rule, the Company would be permitted to retain its newspaper and television operations in each of the five markets where it owns both newspaper and television operations—New York, Los Angeles, Chicago, South Florida and Hartford.

In September 2003, the United States Court of Appeals for the Third Circuit stayed the effectiveness of the new media ownership rules pending the outcome of appeals by advocacy groups challenging the new rules. In June 2004, the Third Circuit remanded the new rules to the FCC for further proceedings while keeping the stay in effect. In January 2005, the Company and other media companies filed a joint petition seeking United States Supreme Court review of the June 2004 Third Circuit remand. In June 2005, the Supreme Court declined to review the petition, without addressing the Constitutional arguments raised and without foreclosing additional appeals if the Company's interests are not adequately addressed as part of the FCC's remand proceeding. In June 2006, the FCC adopted a Further Notice of Proposed Rulemaking seeking comment on the issues raised by the Third Circuit in its stay and remand, including those relating to the FCC's new television/newspaper cross-ownership rule. In October 2006, the Company filed comments in response to the FCC's Further Notice of Proposed Rulemaking. While the Company remains optimistic that the cross-ownership ban will ultimately be loosened in major markets, it cannot predict with certainty the outcome of the FCC's remand proceeding. Accordingly, in its FCC license renewal applications, the Company has sought and expects to receive waivers to allow continued ownership of both the *Los Angeles Times* and KTLA-TV, both *Hartford Courant* and WTIC-TV/WTXX-TV and both *Newsday* and WPIX-TV pending the outcome of the FCC proceeding. The Company has a temporary waiver, pending the outcome of the same rulemaking proceeding, in connection with its 1997 acquisition of WSFL-TV, Miami, which is considered part of the market served by the *South Florida Sun-Sentinel*, published in Fort Lauderdale.

Congress removed national limits on the number of broadcast stations a licensee may own in 1996. However, federal law continues to limit the number of radio and television stations a single owner may own in a local market, and caps the percentage of the national television audience that may be reached by a licensee's television stations in the aggregate at 39%. The local ownership rules allow, under certain conditions, common ownership of two television stations and certain

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413684

DRAFT

radio/television combinations. In 2001, the Company acquired television station WTXX-TV, Hartford, pursuant to a so-called "failing station" waiver allowing common ownership of WTIC-TV and WTXX-TV in the same market.

Television and radio broadcasting licenses are subject to renewal by the FCC, at which time they may be subject to petitions to deny the license renewal applications. At Dec. 31, 2006, the Company had FCC authorization to operate 23 television stations and one AM radio station. At Dec. 31, 2006, the Company had sixteen television license renewal applications pending before the FCC (WDCW-TV, Washington, D.C., WGNO-TV, New Orleans, WXIN-TV, Indianapolis, WXMI-TV, Grand Rapids, WGN-TV, Chicago, KWGN-TV, Denver, KDAF-TV, Dallas, KHCW-TV, Houston, KTLA-TV, Los Angeles, KTXL-TV, Sacramento, KSWB-TV, San Diego, KRCW-TV, Portland, KCPQ-TV, KMYQ-TV, Seattle/Tacoma, and WTIC-TV and WTXX-TV, Hartford/Waterbury).

The FCC has approved technical standards and channel assignments for digital television ("DTV") service. DTV permits broadcasters to transmit video images with higher resolution than existing analog signals. Operators of full-power television stations have each been assigned a second channel for DTV while they continue analog broadcasts on the original channel. After the transition is complete, broadcasters will be required to return one of the two channels to the FCC and transmit exclusively in digital format. By law, the transition to DTV was to occur by Dec. 31, 2006, subject to extension if 80% or more of U.S. households did not have a DTV receiver, a benchmark that was not met. In December 2005, the Senate passed a bill that would, among other things, extend the digital transition deadline to Feb. 17, 2009. Conversion to digital transmission is requiring all television broadcasters, including those owned by the Company, to invest in digital equipment and facilities. At Dec. 31, 2006, all of the Company's television stations were DTV compliant.

The FCC has not yet issued final DTV channel assignments for operation after the transition from analog has ended, and has not resolved a number of issues relating to the operation of DTV stations. These issues include the obligations of DTV stations to broadcast children's programming as well as additional "public interest" obligations that may be imposed on broadcasters' use of digital spectrum.

From time to time, the FCC revises existing regulations and policies in ways that could affect the Company's broadcasting operations. In addition, Congress from time to time considers and adopts substantive amendments to the governing communications legislation. The Company cannot predict what regulations or legislation may be proposed or finally enacted or what effect, if any, such regulations or legislation could have on the Company's broadcasting operations.

**Employees**

The average number of full-time equivalent employees of the Company in 2006 was 21,000, approximately 1,200 less than the average for 2005, primarily due to the elimination of approximately 600 positions that took place throughout 2006 and the impact of approximately 900 positions eliminated near the end of 2005, primarily in the publishing segment.

During 2006, the Company's publishing segment employed approximately 17,770 full-time equivalent employees, about 13% of whom were represented by unions covered under 19 labor contracts. Contracts with unionized employees of the publishing segment expire at various times through April 2012.

The broadcasting and entertainment segment had an average of 3,050 full-time equivalent employees in 2006. Approximately 19% of these employees were represented by unions covered under 20 labor contracts. Contracts with unionized employees of the broadcasting and entertainment segment expire at various times through December 2009.

**Executive Officers of the Company**

Information with respect to the executive officers of the Company as of Feb. xx, 2007, is set forth below. Their ages are indicated in parentheses. The descriptions of the business experience of these individuals include the principal positions held by them since February 2002. Unless otherwise indicated, all references to positions are to officers of the Company.

Dennis J. FitzSimons (56)
Chairman (since January 2004), Chief Executive Officer (since January 2003) and President (since July 2001); Chief Operating Officer from July 2001 until December 2002; Executive Vice President from January 2000 until July 2001; President of Tribune Broadcasting Company* from May 1997 until January 2003.

Donald C. Grenesko (58)
Senior Vice President/Finance and Administration.

15

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413685

Crane H. Kenney (44)
Senior Vice President, General Counsel and Secretary.

Timothy J. Landon (44)
President of Tribune Interactive, Inc.* since March 2004; President of Tribune Classified* from June 2000 until March 2004.

Thomas D. Leach (46)
Senior Vice President/Development since February 2005; Vice President/Development from February 2004 until
February 2005; Vice President and Chief Financial Officer of Tribune Broadcasting Company* from March 2001 until
January 2004.

Luis E. Lewin (58)
Senior Vice President/Human Resources.

R. Mark Mallory (56)
Vice President and Controller.

Ruthellyn Musil (55)
Senior Vice President/Corporate Relations since February 2004; Vice President/Corporate Relations until February 2004.

John E. Reardon (53)
President of Tribune Broadcasting Company* since November 2005; Vice President of Tribune Broadcasting Company*
from March 2004 until November 2005; Vice President and General Manager of KTLA-TV, Los Angeles* until March 2004.

Scott C. Smith (56)
President of Tribune Publishing Company* since January 2005; Chief Operating Officer of Tribune Publishing Company*
from November 2004 until January 2005; President of Chicago Tribune Company* until November 2004.

---

\*        A subsidiary or a division of the Company

**Available Information**

        The Company maintains an Internet website at www.tribune.com where the Company's Annual Report on Form 10-
K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and all amendments to those reports are available without
charge, as soon as reasonably practicable following the time that they are filed with or furnished to the Securities and
Exchange Commission.

## ITEM 1A. RISK FACTORS.

        The foregoing business discussion and the other information included in this Form 10-K should be read in
conjunction with the following risks, trends and uncertainties, any of which, either individually or in the aggregate, could
materially and adversely affect our business, operating results or financial condition.

**Advertising demand will continue to be impacted by changes in economic conditions and fragmentation of the media
landscape**

        Advertising revenue is the primary source of revenue for our publishing and broadcasting businesses. National and
local economic conditions, particularly in major metropolitan markets, affect the levels of retail, national and classified
newspaper advertising revenue, as well as television advertising revenue. Changes in Gross Domestic Product, consumer
spending, auto sales, housing sales, unemployment rates, job creation and circulation levels and rates all impact demand for
advertising. Consolidation across various industries, particularly large department store and telecommunications companies,
may also reduce our overall advertising revenue.

        Competition from other media, including other metropolitan, suburban and national newspapers, broadcasters, cable
systems and networks, satellite television and radio, websites, magazines, direct marketing and solo and shared mail
programs, affects our ability to retain advertising clients and raise rates. In recent years, Internet sites devoted to recruitment,
automobile and real estate have become significant competitors of our newspapers and websites for classified advertising.
While we have invested in successful Internet ventures such as CareerBuilder and Classified Ventures to capture some of the

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413686

DRAFT

advertising dollars that have migrated online, retaining our historical share of classified advertising revenues remains a challenge.

Seasonal variations in consumer spending cause our quarterly advertising revenues to fluctuate. Second and fourth quarter advertising revenues are typically higher than first and third quarter advertising revenues, reflecting the slower economic activity in the winter and summer and the stronger fourth quarter holiday season.

In broadcasting, the proliferation of cable and satellite channels, advances in mobile and wireless technology, the migration of television audiences to the Internet and the viewing public's increased control over the manner and timing of their media consumption through personal video recording devices, have resulted in greater fragmentation of the television viewing audience and a more difficult sales environment.

**Circulation and audience share may decline as consumers migrate to other media alternatives**

Competition for newspaper advertising is based on reader demographics, price, service, advertiser results, and circulation and readership levels, while competition for circulation is based upon the content of the newspaper, service and price. Competition for television advertising is based on audience share and ratings information, audience demographics and price.

The National Do Not Call Registry has impacted the way newspapers sell home-delivery circulation, particularly for the larger newspapers which historically have relied on telemarketing. Similarly, Nielsen's Local People Meters, which capture viewership data in a different manner than historical Nielsen viewership data collection methods, have tended to reduce the overall share of broadcast television compared to cable television and, within the broadcast television universe, disadvantage stations like ours that target younger audiences.

Both advertising and circulation revenues are being affected by consumer trends, including declining newspaper buying by young people and the migration to other available forms of media for news. In order to address declining circulation in certain markets, we may increase marketing designed to retain our existing subscriber base and continue to introduce niche publications targeted at commuters and young adults. We may also increase marketing efforts to drive traffic to our proprietary websites.

**Changes in the regulatory landscape could affect our business operations and asset mix**

Various aspects of our operations are subject to regulation by governmental authorities in the United States. Changes in the current regulatory environment could result in increased operating costs or divestitures of several of our properties.

Our television and radio broadcasting operations are subject to FCC jurisdiction under the Communications Act of 1934, as amended. FCC rules, among other things, govern the term, renewal and transfer of radio and television broadcasting licenses and limit concentrations of broadcasting control inconsistent with the public interest. Federal law also regulates the rates charged for both political advertising and the quantity of advertising within children's programs.

From time to time, the FCC revises existing regulations and policies in ways that could affect our broadcasting operations. In addition, Congress from time to time considers and adopts substantive amendments to governing communications legislation. We cannot predict what regulations or legislation may be proposed or finally enacted or what effect, if any, such regulations or legislation could have on our broadcasting operations. See "Item 1. Business— Governmental Regulation" for a discussion of the pending FCC review of the television/newspaper cross-ownership rule and the effect the outcome could have on our business.

**The availability and cost of quality syndicated programming may impact television ratings**

The cost of syndicated programming represents a significant portion of television operating expenses. Programming emphasis at our stations is placed on network-provided programming, syndicated series, feature motion pictures, local and regional sports coverage, news, and children's programs. Most of our stations' programming is acquired from outside sources, including the networks with which our stations are affiliated, and some is produced locally or supplied by Tribune Entertainment Company. Syndicated programming costs are impacted largely by market factors, including demand from other stations or cable channels within the market. Availability of syndicated programming depends on the production of compelling programming and the willingness of studios to offer the programming to unaffiliated buyers. Our inability to continue to acquire or produce affordable programming for our stations could adversely affect operating results or our financial condition.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413687

**Events beyond our control may result in unexpected adverse operating results**

Our results could be affected in various ways by global or domestic events beyond our control, such as wars, political unrest, acts of terrorism, and natural disasters. Such events can quickly result in significant declines in advertising revenues and significant increases in newsgathering costs. Coverage of the war in Iraq and Hurricane Katrina are two examples where newsgathering costs increased and, in the case of Hurricane Katrina, revenues dropped off significantly at our two New Orleans television stations.

**Newsprint prices may continue to be volatile and difficult to predict and control**

Newsprint is one of the largest expenses of our publishing units. The price of newsprint has historically been volatile and the consolidation of North American newsprint mills over the years has reduced the number of suppliers. We have historically been able to realize favorable newsprint pricing by virtue of our company-wide volume and a long-term contract with a significant supplier. Failure to maintain our current consumption levels, further supplier consolidation or the inability to maintain our existing relationships with our newsprint suppliers could adversely impact newsprint prices in the future.

**Changes in our credit ratings may affect our borrowing costs**

Interest rates for our borrowings are affected by our credit ratings. Increased debt levels and/or decreased earnings could result in downgrades in these ratings, which could increase our borrowing costs under our exisiting credit agreements and could raise our other borrowing rates.

**We have exposure to interest rate risk**

Borrowings under our credit agreements bear interest at variable rates based on LIBOR plus a spread determined on the basis of the Company's credit ratings. Accordingly, changes in interest rates may adversely affect our cost of borrowings. For additional discussion of interest rate risk, see Part II, Item 7A, "Quantitative and Qualitative Disclosure About Market Risk."

**Changes in accounting standards can significantly impact reported earnings and operating results**

Generally accepted accounting principles and accompanying pronouncements and implementation guidelines for many aspects of our business, including those related to intangible assets, pensions, income taxes, derivatives, share-based compensation, and broadcast rights, are complex and involve significant judgments. Changes in these rules or their interpretation could significantly change our reported earnings and operating results. See "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates" and Note 1 in "Item 8. Financial Statements and Supplementary Data."

**Adverse results from litigation or governmental investigations can impact our business practices and operating results**

From time to time, Tribune and its subsidiaries are parties to litigation and regulatory, environmental and other proceedings with governmental authorities and administrative agencies. Adverse outcomes in lawsuits or investigations could result in significant monetary damages or injunctive relief that could adversely affect our operating results or financial condition as well as our ability to conduct our businesses as they are presently being conducted.

**We could be faced with additional tax liabilities**

We are subject to both federal and state income taxes and are regularly audited by federal and state taxing authorities. Significant judgment is required in evaluating our tax positions and in establishing appropriate reserves. We analyze our tax positions and reserves on an ongoing basis and make adjustments when warranted based on changes in facts and circumstances. While we believe our tax positions and reserves are reasonable, the resolution of our tax issues are unpredictable and could negatively impact our effective tax rate, net income or cash flows for the period or periods in question.

18

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413688

DRAFT

**Labor strikes, lock-outs and protracted negotiations can lead to business interruptions and increased operating costs**

Union employees comprise about 14% of our workforce. We are required to negotiate collective bargaining agreements across our business units on an ongoing basis. Complications in labor negotiations can lead to work slowdowns or other business interruptions and greater overall employee costs.

**Acquisitions, investments and divestitures pose inherent financial and other risks and challenges**

We continuously evaluate our businesses and make strategic acquisitions and investments, either individually or with partners, and divestitures as part of our strategic plan. These transactions involve challenges and risks in negotiation, execution, valuation and integration. Moreover, competition for certain types of acquisitions is significant, particularly in the Interactive space. Even if successfully negotiated, closed and integrated, certain acquisitions or investments may prove not to advance our business strategy and may fall short of expected return on investment targets. In certain of our investments, we take a minority position in a company with limited voting rights and an inability to exert absolute control over the entity.

**The effects and results of our exploration of strategic alternatives are uncertain**

On Sept. 21, 2006, we announced that our board of directors established an independent special committee to oversee management's exploration of alternatives for creating additional value for shareholders. It is not certain what alternatives may be available to us or whether we will elect to pursue any such alternatives, and there can be no assurance that the exploration of alternatives will result in a transaction. Further, it is not certain what impact any particular alternative, or lack thereof, may have on our stock price, operating results or financial condition.

## ITEM 1B. UNRESOLVED STAFF COMMENTS.

Not applicable.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413689

DRAFT

## ITEM 2. PROPERTIES.

The corporate headquarters of the Company are located at 435 North Michigan Avenue, Chicago, Illinois. The general character, location and approximate size of the principal physical properties used by the Company on Dec. 31, 2006, are listed below. In total, the Company owns or leases transmitter sites, parking lots and other land aggregating approximately 1,100 acres in 92 separate locations. In addition to those properties listed below, the Company owns or leases an aggregate of approximately 2,732,000 square feet of office and production space in 289 locations. The Company also owns Wrigley Field, the 41,118-seat stadium used by the Chicago Cubs baseball team. The Company considers its various properties to be in good condition and suitable for the purposes for which they are used.

| General Character of Property | Approximate Area in Square Feet | |
|---|---|---|
| | Owned | Leased(1) |
| Publishing: | | |
| Printing plants, business and editorial offices, and warehouse space located in: | | |
| Los Angeles, CA | 656,000 | 1,353,000 |
| Chicago, IL | 1,583,000(2) | 89,000 |
| Melville, NY | — | 719,000 |
| Baltimore, MD | 10,000 | 875,000 |
| Hartford, CT | 173,000 | 337,000 |
| Orlando, FL | 374,000 | 81,000 |
| Deerfield Beach, FL | 320,000 | 44,000 |
| Costa Mesa, CA | 339,000 | 47,000 |
| Irwindale, CA | — | 325,000 |
| Allentown, PA | 222,000 | — |
| Chatsworth, CA | — | 52,000 |
| Newport News, VA | 251,000 | 22,000 |
| Northlake, IL | — | 246,000 |
| Fort Lauderdale, FL | — | 163,000 |
| Oakbrook, IL | — | 150,000 |
| Stamford, CT | 85,000 | — |
| Miller Place, NY | 85,000 | — |
| Glens Falls, NY | — | 59,000 |
| Bel Air, MD | 52,000 | — |
| Columbia, MD | 29,000 | 14,000 |
| Greenwich, CT | 24,000 | — |
| Washington, DC | — | 497,000 |
| Williamsburg, VA | 25,000 | 3,000 |
| | | |
| Broadcasting and entertainment: | | |
| Business offices, studios and transmitters located in: | | |
| Los Angeles, CA | 309,000 | 65,000 |
| Chicago, IL | 132,000 | — |
| New York, NY | — | 121,000 |
| Indianapolis, IN | 79,000 | — |
| Seattle, WA | 68,000 | — |
| Greenwood Village, CO | 42,000 | — |
| Maryland Heights, MO | — | 39,000 |
| Houston, TX | 35,000 | — |
| Dallas, TX | 33,000 | — |
| San Diego, CA | — | 26,000 |
| Hartford, CT | — | 22,000 |
| Philadelphia, PA | 21,000 | 4,000 |
| Sacramento, CA | 24,000 | — |
| Grand Rapids, MI | 21,000 | — |
| Hollywood, FL | 20,000 | — |
| York, PA | 20,000 | — |
| Beaverton, OR | 14,000 | — |
| Washington, DC | — | 13,000 |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413690

(1)    The Company has financed eight real properties, constituting 2,989,000 square feet from TMCT. This property financing arrangement was amended by Tribune and TMCT on Sept. 22, 2006, to extend the properties' current fixed rental rate through Aug. 7, 2021. Under the terms of the amended financing agreement, the Company was granted an accelerated option to acquire the eight properties during the month of January 2008 for $175 million. The Company was also granted an option to acquire the leased properties from Feb. 8, 2008 to three months prior to the expiration of the amended lease at the higher of the fair market value or $195 million. See Note 7 to the Company's consolidated financial statements in Item 8 for further discussion.

(2)    Includes Tribune Tower, an approximately 630,000 square foot office building in downtown Chicago, and Freedom Center, the approximately 943,000 square foot production center of the Chicago Tribune. Tribune Tower houses the Company's corporate headquarters, the Chicago Tribune's business and editorial offices, offices of various subsidiary companies and approximately 40,000 square feet of space leased to unaffiliated tenants. Freedom Center houses the Chicago Tribune's printing, packaging and distribution operations.

## ITEM 3. LEGAL PROCEEDINGS.

The Company and its subsidiaries are defendants from time to time in actions for matters arising out of their business operations. In addition, the Company and its subsidiaries are involved from time to time as parties in various regulatory, environmental and other proceedings with governmental authorities and administrative agencies.

In February 2004, a purported class action lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* and *Hoy*, New York, alleging that they were overcharged for advertising as a result of inflated circulation numbers at these two publications. The purported class action also alleges that entities that paid a *Newsday* subsidiary to deliver advertising flyers were overcharged. In July 2004, another lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* alleging damages resulting from inflated *Newsday* circulation numbers as well as federal and state antitrust violations. The Company is vigorously defending these suits.

On June 17, 2004, the Company publicly disclosed that it would reduce its reported circulation for both *Newsday* and *Hoy*, New York for the 12-month period ending Sept. 30, 2003 and the six-month period ending March 31, 2004. The circulation adjustments were the result of a review of reported circulation at *Newsday* and *Hoy*, New York, conducted by the Company's internal audit staff and the Audit Bureau of Circulations ("ABC"). Subsequent to the June 17th disclosure, the Company continued its internal review and found additional misstatements for these time periods, as well as misstatements that impacted the 12-month period ending Sept. 30, 2002. On Sept. 10, 2004, the Company announced additional revisions to the circulation figures for *Newsday* and *Hoy*, New York, for the 12-month period ending Sept. 30, 2003 and the six-month period ending March 31, 2004.

As a result of misstatements of reported circulation at *Newsday* and *Hoy*, New York, the Company recorded a pretax charge of $90 million in 2004 as its estimate of the probable cost to settle with advertisers. The Company will continue to evaluate the adequacy of this charge on an ongoing basis (see Note 4 to the Company's consolidated financial statements in Item 8).

In addition to the advertiser lawsuits, several class action and shareholder derivative suits were filed against the Company and certain of its current and former directors and officers as a result of the circulation misstatements at *Newsday* and *Hoy*, New York. These suits alleged breaches of fiduciary duties and other managerial and director failings under Delaware Law, the federal securities laws and ERISA. The consolidated shareholder derivative suit filed in Illinois state court in Chicago was dismissed with prejudice on March 10, 2006, and the dismissal is currently being appealed to the Illinois State Court of Appeals. The consolidated securities class action lawsuit and the consolidated ERISA class action lawsuit filed in Federal District Court in Chicago were both dismissed with prejudice on Sept. 29, 2006, and the dismissals are currently being appealed to the United States Court of Appeals for the Seventh Circuit. The Company believes these suits are without merit and will continue to vigorously defend them.

On May 30, 2006, the Securities and Exchange Commission ("SEC") concluded its inquiry into circulation practices at *Newsday* and *Hoy*, New York. In closing this inquiry, the SEC ordered the Company to cease and desist from violating statutory provisions related to its record keeping and reporting. No fines or other sanctions were levied against the Company. The Company consented to the order without admitting or denying any of the Commission's findings. The SEC acknowledged the prompt internal investigation and remedial acts undertaken by the Company and the cooperation the Company afforded the Commission's staff throughout its investigation.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413691

The United States Attorney for the Eastern District of New York and the Nassau County District Attorney are continuing their inquiries into the circulation practices at *Newsday* and *Hoy*, New York. To date, nine former employees and contractors of *Newsday* and *Hoy*, New York, have pleaded guilty to various criminal charges in connection with the fraudulent circulation practices uncovered by the Company. The Company is cooperating fully with these inquiries. At the date of this report, the Company cannot predict with certainty the outcome of these inquiries.

In March 1997, the Company acquired Renaissance Communications Corp., a publicly traded company that owned six television stations, for $1.1 billion in cash. The stations acquired were KDAF-TV, Dallas, WSFL-TV, Miami, KTXL-TV, Sacramento, WXIN-TV, Indianapolis, WTIC-TV, Hartford, and WPMT-TV, Harrisburg. The FCC granted a 12-month waiver of its rule prohibiting television/newspaper cross-ownership in the same market, which relates to the WSFL-TV, Miami television station and the *South Florida Sun-Sentinel* newspaper. In March 1998, the FCC granted the Company a waiver extension to allow continued ownership of both WSFL-TV, Miami, and the *South Florida Sun-Sentinel* newspaper until the FCC concludes its review of the television/newspaper cross-ownership rule. As discussed below, the new television/newspaper cross-ownership rule adopted by the FCC in June 2003 permits Tribune to own the newspapers and broadcast licenses in all of its current cross-owned markets, including South Florida. However, also as discussed below, the new television/newspaper cross-ownership rule has been remanded to the FCC for further proceedings. Depending on the outcome of the FCC proceedings, the Company may require a waiver to allow continued ownership of both WSFL-TV, Miami, and the *South Florida Sun-Sentinel*.

In March 2000, as a result of the Times Mirror merger, the Company acquired the *Los Angeles Times*, *Newsday*, *The Sun*, *Hartford Courant*, *The Morning Call*, *The Advocate*, *Greenwich Time* and several smaller newspapers. Because the Times Mirror acquisition did not involve the transfer of any broadcast station licenses, approval of the FCC was not required to complete the transaction. Under the FCC's television/newspaper cross-ownership rule in effect at the time of the merger, companies were generally prohibited from owning both a newspaper and a broadcast license in the same market. However, it was also the FCC's policy to permit newly created television/newspaper combinations to be held until the next broadcast license renewal. As such, license renewals for three Tribune television properties—KTLA-TV, Los Angeles (renewal in 2006), WPIX-TV, New York (renewal in 2007) and WTIC-TV, Hartford (renewal in 2007), are affected by the Times Mirror acquisition under the old FCC media ownership rules. Accordingly, in its FCC license renewal applications, the Company has sought and expects to receive waivers to allow continued ownership of both the *Los Angeles Times* and KTLA-TV, both *Hartford Courant* and WTIC-TV/WTXX-TV and both *Newsday* and WPIX-TV pending the outcome of the FCC proceeding.

In 2001, the Company received FCC authorization to operate television station WTXX-TV, Hartford. The FCC granted a so-called "failing station" waiver to allow common ownership of WTIC-TV, Hartford, and WTXX-TV, Hartford. In addition, the FCC granted a temporary six-month waiver of the newspaper-broadcast ownership prohibition. The temporary waiver has been extended until the FCC has completed its review of the renewal application for WTXX-TV. Should there be no timely relief forthcoming from the new television/newspaper cross-ownership rule, the Company will seek and expects to receive a waiver to allow continued ownership of both WTIC-TV, Hartford, and WTXX-TV, Hartford, and *Hartford Courant*.

In June 2003, the FCC adopted new media ownership rules, including a new television/newspaper cross-ownership rule. The new rule would eliminate the cross-ownership prohibition entirely in markets with nine or more television stations and permit combinations of one newspaper and one television station in markets having from four to eight television stations. Under this rule, the Company would be permitted to retain its newspaper and television operations in each of the five markets where it owns both—New York, Los Angeles, Chicago, South Florida, and Hartford. In September 2003, the United States Court of Appeals for the Third Circuit stayed the effectiveness of the new media ownership rules pending the outcome of appeals by advocacy groups challenging the new rules. In June 2004, the Third Circuit remanded the new rules to the FCC for further proceedings while keeping the stay in effect. In January 2005, the Company and other media companies filed a joint petition seeking United States Supreme Court review of the June 2004 Third Circuit remand. In June 2005, the Supreme Court declined to review the petition, without addressing the Constitutional arguments raised and without foreclosing additional appeals if the Company's interests are not adequately addressed as part of the FCC's remand proceeding. In June 2006, the FCC adopted a Further Notice of Proposed Rulemaking seeking comment on the issues raised by the Third Circuit in its stay and remand, including those relating to the FCC's new television/newspaper cross-ownership rule. In October 2006, the Company filed comments in response to the FCC's Further Notice of Proposed Rulemaking. While the Company remains optimistic that the cross-ownership ban will ultimately be loosened in major markets, it cannot predict with certainty the timing or the outcome of the FCC's remand proceeding.

During 1998, Times Mirror, which was acquired by the Company in 2000, disposed of its Matthew Bender and Mosby subsidiaries in separate transactions, which were structured to qualify as tax-free reorganizations under the Internal

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413692

Revenue Code. The Company believes these transactions were completed on a tax-free basis. However, the Internal Revenue Service ("IRS") audited the transactions and disagreed with the position taken by Times Mirror. In the fourth quarter of 2001, the Company received an IRS adjustment to increase Times Mirror's 1998 taxable income by approximately $1.6 billion. The Company filed a petition in United States Tax Court in November 2002 to contest the IRS position, and in December 2004, the Company presented its position in Tax Court.

In September 2005, the Tax Court issued an opinion contrary to the Company's position and determined that the Matthew Bender transaction was a taxable sale. In January 2006, the Tax Court extended its opinion in the Matthew Bender case to the Mosby transaction given the similarity of the two transactions. Taxes and related interest for both the Matthew Bender and Mosby transactions total approximately $1 billion. Over time, deductions for state taxes and interest are expected to reduce the net cash outlay to approximately $840 million.

The Company has appealed the Tax Court ruling to the United States Court of Appeals for the Seventh Circuit. The Company does not expect a ruling before the second half of 2007. The Company cannot predict with certainty the outcome of this appeal.

Times Mirror established a tax reserve of $180 million in 1998 when it entered into the transactions. The reserve represented Times Mirror's best estimate of the amount the expected IRS and state income tax claims could be settled for based upon an analysis of the facts and circumstances surrounding the issue. The Company maintained this initial reserve, plus interest, and evaluated the adequacy of the reserve on a periodic basis. As a result of the Tax Court ruling, the Company increased its tax reserve by an additional $609 million in the third quarter of 2005 by recording additional income tax expense of $150 million, representing additional after-tax interest applicable to the post-acquisition period, and goodwill of $459 million. On Sept. 30, 2005, the Company paid $880 million to the IRS, representing the federal tax and interest owed on the transactions, and financed the payment through the issuance of commercial paper. The Company made related state tax and interest payments of approximately $86 million during 2006 and expects to make approximately $35 million of such payments during 2007 and 2008. See Note 13 to the Company's consolidated financial statements in Item 8.

The Company does not believe that any other matters or proceedings presently pending will have a material adverse effect on its consolidated financial position, results of operations or liquidity.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.

Not applicable.

## PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.

The Company's common stock is presently listed on the New York and Chicago stock exchanges. The high and low sales prices of the common stock by fiscal quarter for the two most recent fiscal years, as reported on the New York Stock Exchange Composite Transactions list, were as follows:

| Quarter | 2006 | | 2005 | |
| --- | --- | --- | --- | --- |
| | High | Low | High | Low |
| First | $31.84 | $27.79 | $42.37 | $38.59 |
| Second | 32.94 | 27.09 | 40.14 | 35.02 |
| Third | 34.28 | 28.66 | 39.56 | 34.53 |
| Fourth | 33.99 | 30.74 | 36.15 | 30.05 |

At Feb. 16, 2007, there were x,xxx holders of record of the Company's common stock. Quarterly cash dividends declared on common stock were $.18 per share for each quarter during 2006 and 2005. Total cash dividends declared on common stock by the Company were $195 million for 2006 and $225 million for 2005. The Company announced in February 2007 that its quarterly cash dividends would be $.xx per share in 2007.

**Stock Repurchase Program** – In 2000, the Company's Board of Directors authorized the Company to repurchase $2.5 billion of its common stock. Through Dec. 31, 2006, the Company repurchased 56 million shares of its common stock at a cost of $2.3 billion under this authorization. In December 2005, the Board of Directors authorized additional repurchases of $1 billion (inclusive of $160 million of remaining authority under the 2000 stock repurchase authorization). As of Dec. 31,

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413693

2006, the Company may repurchase an additional $862 million of its common stock pursuant to this authorization.

**Modified "Dutch-Auction" Tender Offer** – On May 30, 2006, the Company initiated a modified "Dutch Auction" tender offer to repurchase up to 53 million shares of its common stock at a price per share not greater than $32.50 and not less than $28.00. The tender offer closed on June 26, 2006, and the Company acquired 45,026,835 shares of its common stock at a price of $32.50 per share on July 5, 2006 before transaction costs. The Company also acquired 10 million shares of its common stock from the Robert R. McCormick Tribune Foundation and the Cantigny Foundation on July 12, 2006 at a price of $32.50 per share before transaction costs. In connection with the tender offer, the board of directors, in May 2006, also authorized the repurchase of an additional 12 million shares of the Company's common stock commencing on the eleventh business day following the completion of the tender offer. In the third quarter of 2006, the Company repurchased an additional 11.1 million shares in the open market at a weighted average cost of $29.94 per share pursuant to this authorization. The Company does not intend to repurchase any additional shares of its common stock in the open market pursuant to the May 2006 authorization.

Repurchases during 2006, by fiscal period, were as set forth below (in thousands, except average cost). All repurchases during Period 7 and Period 8 were made in connection with the tender offer and pursuant to the May 2006 authorization.

| | Shares Repurchased | Average Cost | Total Number of Shares Repurchased | Value of Shares that May Yet be Repurchased (1) |
|---|---|---|---|---|
| Period 1 (5 weeks ended Jan. 29, 2006) | 1,000 | $ 30.46 | 57,426 | $ 969,520 |
| Period 2 (4 weeks ended Feb. 26, 2006) | 3,604 | 29.74 | 61,030 | 862,254 |
| Period 3 (4 weeks ended March 26, 2006) | - | - | 61,030 | 862,254 |
| Period 4 (4 weeks ended April 23, 2006) | - | - | 61,030 | 862,254 |
| Period 5 (4 weeks ended May 21, 2006) | - | - | 61,030 | 862,254 |
| Period 6 (5 weeks ended June 25, 2006) | - | - | 61,030 | 862,254 |
| Period 7 (5 weeks ended July 30, 2006) | 61,124 | 32.25 | 122,154 | 862,254 |
| Period 8 (4 weeks ended Aug. 27, 2006) | 4,956 | 29.79 | 127,110 | 862,254 |
| Period 9 (4 weeks ended Sept. 24, 2006) | - | - | 127,110 | 862,254 |
| Period 10 (4 weeks ended Oct. 22, 2006) | - | - | 127,110 | 862,254 |
| Period 11 (4 weeks ended Nov. 19, 2006) | - | - | 127,110 | 862,254 |
| Period 12 (6 weeks ended Dec. 31, 2006) | - | - | 127,110 | 862,254 |

(1) Value of shares that may yet be repurchased at the end of Periods 6, 7, 8, 9, 10, 11 and 12 excludes the value of the additional 12 million shares of the Company's common stock that the board of directors authorized for repurchase in May 2006 and that remained available for repurchase at the end of such period.

## ITEM 6. SELECTED FINANCIAL DATA.

Selected financial data for the years 1996 through 2006 is contained under the heading "Eleven Year Financial Summary" on pages 110 and 111 and is derived from financial statements for those years. The information contained in the "Eleven Year Financial Summary" is not necessarily indicative of the results of operations to be expected for future years, and should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in Item 7 and the consolidated financial statements and related notes thereto included in Item 8 of this Form 10-K which were audited by the Company's independent registered public accounting firm, PricewaterhouseCoopers LLP.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413694

DRAFT

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

The following discussion presents the significant factors that have affected the businesses of Tribune Company and its subsidiaries (the "Company") over the last three years. This commentary should be read in conjunction with the Company's consolidated financial statements and "Eleven Year Financial Summary," which are also presented in this Form 10-K. Certain prior year amounts have been reclassified to conform with the 2006 presentation. These reclassifications had no impact on reported prior year total revenues, operating profit or net income.

## FORWARD-LOOKING STATEMENTS

The discussion contained in this Item 7 (including, in particular, the discussion under "Overview"), the information contained in Item 7A, "Quantitative and Qualitative Disclosures about Market Risk," and the information contained in the subsequent notes to the consolidated financial statements, contain certain forward-looking statements that are based largely on the Company's current expectations. Forward-looking statements are subject to certain risks, trends and uncertainties that could cause actual results and achievements to differ materially from those expressed in the forward-looking statements including, but not limited to, the items discussed in Item 1A, "Risk Factors." Such risks, trends and uncertainties, which in some instances are beyond the Company's control, include: changes in advertising demand, circulation levels and audience shares; regulatory and judicial rulings; availability and cost of broadcast rights; competition and other economic conditions; changes in newsprint prices; changes in the Company's credit ratings and interest rates; changes in accounting standards; adverse results from litigation, governmental investigations or tax-related proceedings or audits; the effect of labor strikes, lock-outs and negotiations; the effect of acquisitions, investments and divestitures; the effect of derivative transactions; the Company's reliance on third-party vendors for various services; and the Company's exploration of alternatives for creating additional value for shareholders. The words "believe," "expect," "anticipate," "estimate," "could," "should," "intend" and similar expressions generally identify forward-looking statements. Readers are cautioned not to place undue reliance on such forward-looking statements, which are being made as of the date of this filing. The Company undertakes no obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise.

## OVERVIEW

Tribune Company is a media and entertainment company, operating primarily in the United States, that conducts its operations through two business segments: publishing and broadcasting and entertainment. These segments reflect the manner in which the Company sells its products to the marketplace, manages its operations and makes business decisions. The Company's media operations are principally in major metropolitan areas of the United States and compete against similar media and other types of media on both a local and national basis.

Publishing currently consists primarily of 11 daily newspapers, which include related businesses such as interactive websites. Publishing represented 74% of the Company's consolidated revenues in 2006. About 80% of publishing revenues were derived from advertising. These revenues were generated from the sale of advertising space in published issues of the newspapers and on interactive websites. Approximately 14% of publishing revenues were generated from the sales of newspapers to individual subscribers or to sales outlets, which re-sell the newspapers. The remaining 6% of revenues came from a variety of activities including the syndication of columns, features, information and comics to newspapers, commercial printing operations, sales of entertainment listings and other publishing-related activities.

Publishing advertising revenues are comprised of three basic categories: retail, national and classified. Changes in advertising revenues are heavily correlated with changes in the level of economic activity in the United States. Changes in Gross Domestic Product, consumer spending, auto sales, housing sales, unemployment rates, job creation, circulation levels and rates all impact demand for advertising in the Company's newspapers. The Company's advertising revenues are subject to changes in these factors both on a national level and on a local level in its markets.

Significant expense categories for publishing include compensation, newsprint and ink and other operating expenses. Compensation, which includes benefits expense and stock-based compensation expense in 2006, represented 41% of publishing's consolidated operating expenses in 2006. Compensation expense is affected by many factors, including the level of merit increases, the number of full-time equivalent employees and changes in the design and costs of the Company's various employee benefit plans. Newsprint and ink represented 15% of the 2006 operating expenses for publishing. The Company consumed approximately 749,000 metric tons of newsprint in 2006. Newsprint is a commodity and pricing can vary significantly between years. Other expenses comprised 44% of total operating expenses. These expenses are principally for the distribution of the newspaper, promotional activities and other general and administrative expenses. These expenses are typically subject to less variability.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413695

Broadcasting and entertainment currently consists of 23 television stations, one radio station, the Chicago Cubs and Tribune Entertainment, a company that distributes its own programming together with programming licensed from third parties. Broadcasting and entertainment represented 26% of the Company's consolidated revenues in 2006. About 83% of these revenues came from the sale of advertising spots on its television stations. Changes in advertising revenues are heavily correlated with and influenced by changes in the level of economic activity in the United States. Changes in Gross Domestic Product, consumer spending levels, auto sales, programming content, audience share and rates all impact demand for advertising on the Company's television stations. The Company's advertising revenues are subject to changes in these factors both on a national level and on a local level in the markets in which it operates.

Significant expense categories for broadcasting and entertainment include programming expense, compensation and other expenses. Programming expense represented 34% of 2006 expenses. The level of programming expense is affected by the cost of programs available for purchase and the selection of programs aired by the Company's television stations. Compensation expense represented 40% of broadcasting and entertainment's 2006 expenses and is impacted by the same factors as noted for publishing. Other expenses represented 26% of total operating expenses and are for promotional activities and other station operating expenses.

The Company uses revenues and operating profit as ways to measure the financial performance of its business segments. The Company uses average net paid circulation for its newspapers and average audience share for its television stations as a means to measure its publishing and broadcasting and entertainment market shares and performance.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The Company's significant policies are summarized in Note 1 to the Company's consolidated financial statements in Item 8. These policies conform with accounting principles generally accepted in the United States of America and reflect practices appropriate to the Company's businesses. The preparation of the Company's consolidated financial statements requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from these estimates. On an on-going basis, the Company evaluates its policies and estimates, including those related to income taxes, pension and postretirement benefits, broadcast rights, goodwill and other intangible assets, self-insurance liabilities, accounts receivable allowances and stock-based compensation.

Management has discussed with the Audit Committee of the Board of Directors the development, selection and disclosure of the critical accounting policies and estimates and the application of these policies and estimates. In addition, there are other items within the financial statements that require estimation, but are not deemed to be critical accounting policies and estimates. Changes in the estimates used in these and other items could have a material impact on the financial statements.

**Income Taxes**

Provisions for federal and state income taxes are calculated on reported pretax earnings based on current tax laws and also include, in the current period, the cumulative effect of any changes in tax rates from those used previously in determining deferred tax assets and liabilities. Taxable income reported to the taxing jurisdictions in which the Company operates often differs from pretax earnings because some items of income and expense are recognized in different time periods for income tax purposes. The Company provides deferred taxes on these temporary differences in accordance with Financial Accounting Standard ("FAS") No. 109, "Accounting for Income Taxes." Taxable income also may differ from pretax earnings due to statutory provisions under which specific revenues are exempt from taxation and specific expenses are not allowable as deductions. The Company establishes reserves for income tax when it is probable that one or more of the taxing authorities will challenge and disallow a position taken by the Company in its income tax returns and the resulting liability is estimable. The consolidated tax provision and related accruals include estimates of the potential taxes and related interest as deemed appropriate. These estimates are reevaluated and adjusted, if appropriate, on a quarterly basis. Although management believes its estimates and judgments are reasonable, the resolutions of the Company's tax issues are unpredictable and could result in tax liabilities that are significantly higher or lower than that which has been provided by the Company. See Note 13 to the Company's consolidated financial statements in Item 8.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413696

**Pension and Postretirement Benefits**

The Company provides defined benefit pension, postretirement health care and life insurance benefits to eligible employees under a variety of plans (see Note 14 to the Company's consolidated financial statements in Item 8). Accounting for pension and postretirement benefits requires the use of several assumptions.

Weighted average assumptions used each year in accounting for pension benefits and other postretirement benefits were:

|  | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
|  | 2006 | 2005 | 2006 | 2005 |
| Discount rate for expense | 5.50% | 5.75% | 5.75% | 5.75% |
| Discount rate for obligations | 5.75% | 5.50% | 5.50% | 5.50% |
| Increase in future salary levels for expense | 3.50% | 3.50% | — | — |
| Increase in future salary levels for obligations | 3.50% | 3.50% | — | — |
| Long-term rate of return on plans' assets | 8.50% | 8.50% | — | — |

The Company used a building block approach to determine its current 8.5% assumption of the long-term expected rate of return on pension plan assets. Based on historical market studies, the Company's long-term expected returns for equity and fixed income securities approximate 10% and 6%, respectively. As of the date of this report, a 0.5% decrease in the Company's long-term rate of return assumption would result in an $8 million increase in the Company's net pension expense. In 2006, the pension plans' assets earned a return of approximately 15%. The Company bases the rate used for discounting future benefit obligations and calculating interest cost on an index of Aa-rated corporate bonds.

Prior to the adoption of FAS No. 158, the Company's prepaid pension asset at Dec. 31, 2006 and Dec. 25, 2005 included an unrecognized net actuarial loss of $631 million and $870 million, respectively. A significant portion of this net actuarial loss resulted from the difference between the Company's expected returns on plan assets and the actual losses on plan assets in 2002 and 2001. Expected returns on plan assets were $158 million and $176 million in 2002 and 2001, respectively; actual losses were $161 million and $113 million, respectively. Upon adoption of FAS No. 158, the Company reclassified $614 million of these unrecognized actuarial losses into accumulated other comprehensive income at Dec. 31, 2006. In accordance with FAS No. 87, the actuarial loss will be recognized in net periodic pension expense over the estimated average remaining service period of active employees expected to receive benefits, with corresponding adjustments made to accumulated other comprehensive income in accordance with FAS No. 158. The Company's policy is to incorporate asset-related gains and losses into the asset value used to calculate the expected return on plan assets and into the calculation of amortization of unrecognized net actuarial loss over a four-year period.

In December 2005, the pension benefits for former Times Mirror non-union and non-Newsday employees were frozen. As a result of the plan freeze, a pretax curtailment gain of $18 million ($13 million at publishing, $1 million at broadcasting and entertainment, and $4 million at corporate) was recorded. On March 31, 2006, the pension plan benefits for Newsday union and non-union employees were frozen.

The Company's pension plans' asset allocations at Dec. 31, 2006 and Dec. 25, 2005 were as follows (in millions):

|  | Plan Assets | | | |
|---|---|---|---|---|
| Asset Category | Dec. 31, 2006 | | Dec. 25, 2005 | |
| Equity securities | $1,344 | 76.2% | $1,186 | 74.2% |
| Fixed income securities | 334 | 18.9% | 329 | 20.6% |
| Other | 86 | 4.9% | 83 | 5.2% |
| Total | $1,764 | 100% | $1,598 | 100% |

The Company's current 2007 target allocation for pension plans' assets is 75% in equity securities and 25% in fixed income securities and other.

For purposes of measuring 2006 postretirement health care costs, a 9.0% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2006. The rate was assumed to decrease gradually to 5% for 2010 and remain at that level thereafter. For purposes of measuring health care obligations at Dec. 31, 2006, a 9.0% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2006. The rate was assumed to decrease

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413697

DRAFT

gradually to 5% for 2012 and remain at that level thereafter. On Dec. 8, 2003, the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("Act") was signed into law. The Act resulted in a $15 million reduction in the accumulated other postretirement obligations for prior service costs and a $1 million reduction in net periodic postretirement benefit costs in 2004.

Assumed health care cost trend rates have a significant effect on the amounts reported for health care plans. As of the date of this report, a 1% change in assumed health care cost trend rates would have the following effects (in thousands):

|  | 1% Increase | 1% Decrease |
|---|---|---|
| Service cost and interest cost | $415 | $(368) |
| Projected benefit obligation | $7,486 | $(6,624) |

**Cash Flows**—The Company contributed $8 million to certain of its union and non-qualified pension plans and $14 million to its other postretirement plans in 2006. The Company plans to contribute $8 million to certain of its union and non-qualified pension plans and $13 million to its other postretirement plans in 2007.

**Expected Future Benefit Payments**—The following benefit payments, which reflect expected future service, as appropriate, are expected to be paid (in thousands):

|  | Pension Benefits | Other Postretirement Benefits |
|---|---|---|
| 2007 | $79,967 | $14,211 |
| 2008 | 81,579 | 14,233 |
| 2009 | 84,233 | 14,310 |
| 2010 | 87,050 | 14,488 |
| 2011 | 89,421 | 14,619 |
| 2012-2016 | 495,915 | 69,089 |

## Broadcast Rights

Broadcast rights consist principally of rights to broadcast syndicated programs, sports and feature films and are stated at the lower of cost or estimated net realizable value. The total cost of these rights is recorded as an asset and a liability when the program becomes available for broadcast. Syndicated program rights that have limited showings are generally amortized using an accelerated method as programs are aired. Sports and feature film rights are amortized using the straight-line method. The current portion of broadcast rights represents those rights available for broadcast that are expected to be amortized in the succeeding year. At Dec. 31, 2006 and Dec. 25, 2005, the Company had broadcast rights assets of $567 million and $669 million, respectively.

The Company maintains an allowance for programming that is not expected to be aired by the end of the contract period. This allowance for excess programming inventory is based on a program-by-program review of the Company's five-year broadcast plans and historical write-off trends. The total reserve balance at Dec. 31, 2006 and Dec. 25, 2005 was $4 million. Actual write-offs in 2006 and 2005 were $.4 million and $1 million, respectively. Future write-offs can vary based on changes in consumer viewing trends and the availability and costs of other programming.

## Goodwill and Other Intangible Assets

The Company periodically reviews goodwill and certain intangible assets no longer being amortized for impairment in accordance with FAS No. 142, "Goodwill and Other Intangible Assets." Under FAS No. 142, the impairment review of goodwill and other intangible assets not subject to amortization must be based generally on fair values.

The estimated fair value of the reporting units to which goodwill is allocated is determined using multiples of operating cash flows for purposes of analyzing goodwill for impairment. The estimated fair values of other assets subject to the annual impairment review, which include newspaper mastheads and FCC licenses, are calculated based on projected future discounted cash flow analyses. The development of market multiples and cash flow projections used in the analyses requires the use of assumptions, including assumptions regarding revenue and market growth. The analyses use discount rates based on specific economic factors in the publishing and broadcasting industries. These assumptions reflect the Company's best estimates, but these items involve inherent uncertainties based on market conditions generally outside of the Company's control.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413698