(2) During the second quarter of 2001, the Company announced a voluntary employee retirement program. The Company implemented this program as well as various other cost reduction initiatives throughout the remainder of 2001 and the first quarter of 2002. In the aggregate, the restructuring charges related to these programs decreased 2002 full year net income by $17 million and diluted EPS by $.05 and decreased 2001 full year net income by $93 million and diluted EPS by $.29.

(3) The cumulative effect of adopting a new accounting pronouncement for the valuation of certain intangible assets decreased net income by $18 million in 2004. The cumulative effect of adopting a new accounting pronouncement for goodwill and other intangible assets decreased net income by $166 million in 2002. The cumulative effect of adopting a new accounting pronouncement for derivative instruments decreased net income by $3 million in 1999.

(4) Includes after-tax non-operating items as follows: $7 million gain on changes in fair values of derivatives and related investments of $38 million, a $48 million gain on the restructuring of the TMCT and TMCT II partnerships, a gain on sales of subsidiaries and investments of $23 million, an other non-operating loss of $4 million and favorable income tax adjustments primarily related to PHONES income tax reserves totaling $34 million, or $.40 per diluted share, in 2006; gain on changes in fair values of derivatives and related investments of $38 million, a gain on sales of subsidiaries and investments of $4 million, an other non-operating gain of $1 million and an unfavorable income tax adjustment of $139 million ($150 million as a result of the Matthew Bender Tax Court ruling, partially offset by $12 million of favorable income tax settlement adjustments), totaling a loss of $96 million, or $.30 per diluted share, in 2005; loss on changes in fair values of derivatives and related investments of $11 million, loss on early debt retirement of $87 million, gain on sales of subsidiaries and investments of $12 million, and a loss on investment write-downs and other of $4 million, totaling a loss of $90 million, or $.28 per diluted share, in 2004; gain on changes in fair values of derivatives and related investments of $52 million, gain on sales of subsidiaries and investments of $90 million, loss on investment write-downs of $6 million, gain on insurance recoveries of $14 million, an other non-operating loss of $2 million and a favorable income tax settlement adjustment of $25 million, totaling a gain of $173 million, or $.52 per diluted share, in 2003; loss on changes in fair values of derivatives and related investments of $98 million, gain on sales of subsidiaries and investments of $65 million, loss on investment write-downs of $11 million, other non-operating gain of $6 million and a favorable income tax settlement adjustment of $29 million, totaling a loss of $9 million, or $.02 per diluted share, in 2002; loss on changes in fair values of derivatives and related investments of $4 million, gain on sales of investments of $46 million, gain on sale of other investments of $1 million and loss on investment write-downs of $89 million, totaling a loss of $46 million, or $.14 per diluted share, in 2001; loss on changes in fair values of derivatives and related investments of $61 million, gain on sales of investments of $35 million, and loss on investment write-downs of $65 million, totaling a loss of $91 million, or $.31 per diluted share, in 2000; gain on changes in fair values of derivatives and related investments of $131 million, gain on reclassification of investments of $666 million, and gain on sales of subsidiary and investments of $270 million, totaling a gain of $1 billion, or $4.08 per diluted share, in 1999; gain on sales of subsidiary and investments, net of write-downs, totaling $64 million, or $.24 per diluted share, in 1998; gain on sales of investments, net of write-downs, totaling $69 million, or $.26 per diluted share, in 1997; and equity income related to Qwest Broadcasting of $6 million, or $.02 per diluted share, in 1996;

(5) Capital comprises total debt, non-current deferred taxes and shareholders' equity.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413777

| 2004 | 2003 | 2002(1) | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 |
|---|---|---|---|---|---|---|---|---|
| $4,129,850 | $4,036,920 | $3,940,478 | $3,903,431 | $3,485,277 | $1,621,347 | $1,536,684 | $1,472,823 | $1,371,770 |
| 1,501,581 | 1,457,496 | 1,344,799 | 1,258,469 | 1,364,746 | 1,254,675 | 1,120,769 | 1,029,595 | 847,557 |
| $5,631,431 | $5,494,416 | $5,285,277 | $5,161,900 | $4,850,023 | $2,876,022 | $2,657,453 | $2,502,418 | $2,219,327 |
|  |  |  |  |  |  |  |  |  |
| $726,207 | $885,306 | $851,417 | $510,604 | $648,326 | $394,312 | $377,137 | $354,585 | $291,257 |
| 513,289 | 491,733 | 437,008 | 312,303 | 416,319 | 366,660 | 312,927 | 283,614 | 199,661 |
| (52,218) | (53,351) | (45,770) | (41,640) | (64,372) | (39,506) | (35,435) | (34,426) | (30,935) |
| — | — | (27,253) | (151,892) | — | — | — | — | — |
| 1,187,278 | 1,323,688 | 1,215,402 | 629,375 | 1,000,273 | 721,466 | 654,629 | 603,773 | 459,983 |
| 17,931 | 5,590 | (40,825) | (60,813) | (79,374) | (40,083) | (33,980) | (34,696) | (13,281) |
| 3,053 | 6,048 | 8,818 | 8,853 | 33,124 | 47,436 | 6,112 | 26,343 | 32,116 |
| (153,118) | (198,123) | (213,309) | (254,521) | (240,708) | (113,031) | (88,451) | (86,502) | (47,779) |
| (145,044) | 241,247 | (63,211) | (74,905) | (165,301) | 1,756,779 | 119,119 | 111,824 | — |
| 910,100 | 1,378,450 | 906,825 | 247,989 | 548,014 | 2,372,567 | 657,429 | 620,742 | 431,039 |
| (355,724) | (509,214) | (318,218) | (149,563) | (257,341) | (929,289) | (270,837) | (249,325) | (173,478) |
| 554,376 | 869,236 | 588,607 | 98,426 | 290,673 | 1,443,278 | 386,592 | 371,417 | 257,561 |
| 18,948 | 22,143 | 19,972 | 12,710 | 19,728 | 6,684 | 2,605 | 1,342 | 2,277 |
| — | — | — | — | (86,015) | 21,807 | 25,075 | 20,866 | 22,912 |
| — | — | — | — | — | — | — | — | 89,317 |
| (17,788) | — | (165,587) | — | — | (3,060) | — | — | — |
| $555,536 | $891,379 | $442,992 | $111,136 | $224,386 | $1,468,709 | $414,272 | $393,625 | $372,067 |
|  |  |  |  |  |  |  |  |  |
| $1.69 | $2.71 | $1.87 | $0.24 | $0.98 | $6.00 | $1.52 | $1.43 | $0.97 |
| 0.06 | 0.07 | 0.07 | 0.04 | (.24) | .12 | .11 | .09 | .47 |
| (.05) | — | (.55) | — | — | (.01) | — | — | — |
| $1.70 | $2.78 | $1.38 | $0.28 | $0.74 | $6.11 | $1.63 | $1.53 | $1.44 |
|  |  |  |  |  |  |  |  |  |
| $1.67 | $2.54 | $1.73 | $0.24 | $0.92 | $5.47 | $1.40 | $1.32 | $0.92 |
| 0.06 | 0.07 | 0.06 | 0.04 | (.22) | 0.11 | 0.10 | 0.08 | .42 |
| (.05) | — | (.50) | — | — | (.01) | — | — | — |
| $1.67 | $2.61 | $1.30 | $0.28 | $0.70 | $5.56 | $1.50 | $1.40 | $1.32 |
| $0.48 | $0.44 | $0.44 | $0.44 | $0.40 | $0.36 | $0.34 | $0.32 | $0.30 |
| 322,420 | 311,295 | 301,932 | 298,295 | 271,951 | 237,367 | 242,428 | 245,758 | 245,684 |
|  |  |  |  |  |  |  |  |  |
| 21.1% | 24.1% | 23.0% | 12.2% | 20.6% | 25.1% | 24.6% | 24.1% | 20.7% |
| 22% | 22% | 29% | 35% | 34% | 37% | 35% | 41% | 37% |
| 18% | 18% | 26% | 31% | 30% | 23% | 35% | 41% | 37% |
|  |  |  |  |  |  |  |  |  |
| $14,155,432 | $14,280,152 | $13,974,048 | $14,380,587 | $14,668,712 | $8,740,047 | $5,824,037 | $4,665,821 | $3,629,151 |
| 2,317,933 | 2,381,617 | 3,260,795 | 3,699,165 | 4,020,936 | 2,694,073 | 1,615,955 | 1,520,646 | 979,754 |
| 1,733,053 | 1,846,337 | 2,737,355 | 3,015,165 | 3,320,936 | 1,365,593 | 1,615,955 | 1,520,646 | 979,754 |
| 6,836,844 | 7,028,124 | 6,119,235 | 5,642,341 | 5,877,347 | 3,458,617 | 2,356,617 | 1,826,004 | 1,539,506 |
| 217,348 | 193,535 | 186,737 | 266,355 | 302,471 | 125,578 | 128,800 | 98,319 | 87,171 |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413778

**TRIBUNE COMPANY AND SUBSIDIARIES**
**SCHEDULE II—VALUATION AND QUALIFYING ACCOUNTS AND RESERVES**
(In thousands of dollars)

| Description | Balance at Beginning of Period | Additions Charged to Costs and Expenses | Additions Recorded Upon Acquisitions | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| Valuation accounts deducted from assets to which they apply: | | | | | |
| Year ended Dec. 31, 2006 | | | | | |
| Accounts receivable allowances: | | | | | |
| Bad debts................................................ | $29,977 | $49,351 | $(719) | $56,509 | $22,100 |
| Rebates, volume discounts and other......... | 12,581 | 31,353 | 55 | 32,216 | 11,773 |
| Total...................................................... | $42,558 | $80,704 | $(664) | $88,725 | $33,873 |
| Year ended Dec. 25, 2005 | | | | | |
| Accounts receivable allowances: | | | | | |
| Bad debts................................................ | $35,837 | $53,383 | $— | $59,243 | $29,977 |
| Rebates, volume discounts and other......... | 13,670 | 27,131 | — | 28,220 | 12,581 |
| Total...................................................... | $49,507 | $80,514 | $— | $87,463 | $42,558 |
| Year ended Dec. 26, 2004 | | | | | |
| Accounts receivable allowances: | | | | | |
| Bad debts................................................ | $34,024 | $60,072 | $— | $58,259 | $35,837 |
| Rebates, volume discounts and other......... | 15,444 | 33,338 | — | 35,112 | 13,670 |
| Total...................................................... | $49,468 | $93,410 | $— | $93,371 | $49,507 |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413779

**ITEM 9.   CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.**

Not applicable.

## ITEM 9A. CONTROLS AND PROCEDURES

### Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures

Under the supervision and with the participation of the Company's management, including its principal executive officer and principal financial officer, the Company conducted an evaluation of its disclosure controls and procedures, as such term is defined in Exchange Act Rules 13a-15(e) and 15d-15(e), as of Dec. 31, 2006. Based upon that evaluation, the principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures are effective.

### Management's Report on Internal Control Over Financial Reporting

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of the Company's management, including its principal executive officer and principal financial officer, the Company conducted an evaluation of the effectiveness of the design and operation of internal control over financial reporting based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on that evaluation, the Company's management concluded that internal control over financial reporting was effective as of Dec. 31, 2006. Management's assessment of the effectiveness of internal control over financial reporting as of Dec. 31, 2006 has been audited by PricewaterhouseCoopers, LLP, an independent registered public accounting firm, as stated in their report included in Item 8.

The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. Because of the inherent limitations of any internal control system over financial reporting, there is only reasonable assurance that the Company's control over financial reporting will succeed in preventing or detecting misstatements under all potential future conditions.

### Changes in Internal Control Over Financial Reporting

There has been no change in the Company's internal control over financial reporting that occurred during the Company's fiscal quarter ended Dec. 31, 2006 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

### PART III

## ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.

The information contained under the heading "Executive Officers of the Company" in Item 1 hereof, and the information contained under the headings "Stock Ownership—Section 16(a) Beneficial Ownership Reporting Compliance," "Corporate Governance—Overview," "Corporate Governance—Communicating with the Board of Directors" and "Board of Directors" in the definitive Proxy Statement for the Company's May 9, 2007 Annual Meeting of Shareholders is incorporated herein by reference.

## ITEM 11. EXECUTIVE COMPENSATION.

The information contained under the headings "Executive Compensation" and "2006 Non-Employee Director Compensation" in the definitive Proxy Statement for the Company's May 9, 2007 Annual Meeting of Shareholders is incorporated herein by reference.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0413780**

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS.**

The information contained under the headings "Stock Ownership—Management Ownership" and "Stock Ownership—Principal Shareholders" in the definitive Proxy Statement for the Company's May 9, 2007 Annual Meeting of Shareholders is incorporated herein by reference.

**Equity Compensation Plan Information Table**

The following table provides information as of Dec. 31, 2006 regarding the number of shares of Tribune common stock that may be issued under Tribune's equity compensation plans.

| Plan Category(1) | (a)<br>Number of securities to be issued upon exercise of outstanding options, warrants and rights | (b)<br>Weighted-average exercise price of outstanding options, warrants and rights | (c)<br>Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| Equity compensation plans approved by security holders............................................ | [_____](2) | $[____](3) | [_____](4) |
| Equity compensation plans not approved by security holders ................................... | — | — | — |
| Total.................................................... | [_____](2) | $[____](3) | [_____](4) |

(1) The table does not include information regarding the following equity compensation plans:

401(k) Plans: As of Dec. 31, 2006, there were an aggregate of [_____] shares of Tribune common stock outstanding and held in the Tribune Company 401(k) Savings and Profit Sharing Plan, the Times Mirror Savings Plus Plan and the other 401(k) plans available to Tribune employees.

Times Mirror Plans: As of Dec. 31, 2006, there were an aggregate of [_____] shares of Tribune common stock issuable upon exercise of stock options granted under equity compensation plans assumed in connection with the merger of The Times Mirror Company into Tribune on June 12, 2000. The weighted-average exercise price of these shares is $[____]. No grants have been made under these plans since the time of the merger and none will be issued in the future.

(2) Consists of [_____] outstanding stock options, [_____] outstanding restricted stock units and [_____] outstanding dividend equivalent units relating to the restricted stock units, all of which were issued under Tribune equity compensation plans, [_____] outstanding stock equivalents under the Tribune bonus deferral plan (the "Bonus Deferral Plan") and [_____] shares held in deferral accounts under the Tribune Company 1996 Nonemployee Director Stock Compensation Plan (the "Director Plan"). The restricted stock units are credited with dividend equivalent units, and neither the restricted stock units nor the dividend equivalent units have voting rights prior to conversion into shares of common stock. The stock equivalents in deferral accounts under both the Bonus Deferral Plan and the Director Plan do not have voting rights, but are credited with dividend equivalents. The Bonus Deferral Plan permits the deferral of cash or stock awards made under the Tribune Company Incentive Compensation Plan (the "Incentive Plan") into either an interest bearing or stock equivalent account. Deferrals in the stock equivalent account are valued as if each deferral were invested in Tribune common stock as of the deferral date, and are paid out only in shares of Tribune common stock, on a one-for-one basis. Shares issued under this plan are attributed to the Incentive Plan and reduce the number of shares available for issuance under that plan. The Director Plan permits directors to defer stock awards into deferral accounts. The deferred awards and shares acquired upon reinvestment of dividends are distributed to the director after termination of his or her Board service. The stock equivalents in deferral accounts under both the Bonus Deferral Plan and the Director Plan do not have voting rights, but are credited with dividend equivalents.

(3) Measured only with respect to the [_____] stock options included in this table. Restricted stock units and the related dividend equivalent units and the stock equivalents in deferral accounts do not have exercise prices.

(4) Consists of [_____] shares of Tribune common stock available for issuance under Tribune Company equity

111

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413781

compensation plans and [_____] shares available for issuance under the Tribune Company Employee Stock Purchase Plan (the "ESPP"). Under the ESPP, Tribune employees may purchase Tribune common stock through payroll deductions. On the third Wednesday of each month, shares of common stock are purchased for the accounts of participants at a per share price equal to 85% of the fair market value of Tribune common stock on that date. Participants may withdraw from the plan at any time prior to the purchase date.

## ITEM 13. CERTAIN RELATIONSHIPS, RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE.

The information contained under the headings "Board of Directors—Certain Relationships and Related Transactions," "Stock Ownership—Related Transactions" and "Corporate Governance—Director Independence" in the definitive Proxy Statement for the Company's May 9, 2007 Annual Meeting of Shareholders is incorporated herein by reference.

## ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES.

The information contained under the headings "Board of Directors—Board, Board Committees and Meetings—Audit Committee," "Audit Committee—Policy on Audit Committee Pre-Approval of Audit, Audit-Related and Permissible Non-Audit Services of Independent Accountants" and "Audit Committee—Fees Paid to Independent Accountants" in the definitive Proxy Statement for the Company's May 9, 2007 Annual Meeting of Shareholders is incorporated herein by reference.

## PART IV

## ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.

(a)(1)&(2)   Financial Statements and Financial Statement Schedule filed as part of this report

See Index to Financial Statements and Financial Statement Schedule on page 57 hereof.

(a)(3)   Index to Exhibits filed as part of this report

See Exhibit Index on pages 117 to 120 hereof.

(b)   Exhibits

See Exhibit Index on pages 117 to 120 hereof.

(c)   Financial Statement Schedule

See Index to Financial Statements and Financial Statement Schedule on page 57 hereof.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413782

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized, on Feb. 26, 2007.

TRIBUNE COMPANY
(Registrant)

_____
Dennis J. FitzSimons
Chairman, President and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on Feb. 26, 2007.

| Signature | Title |
| --- | --- |
| Dennis J. FitzSimons | Chairman, President, Chief Executive Officer and Director |
| Donald C. Grenesko | Senior Vice President/Finance and Administration (principal financial officer) |
| R. Mark Mallory | Vice President and Controller (principal accounting officer) |
| Jeffrey Chandler | Director |
| Roger Goodan | Director |
| Betsy D. Holden | Director |
| William A. Osborn | Director |
| J. Christopher Reyes | Director |
| Dudley S. Taft | Director |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413783

# TRIBUNE COMPANY

## EXHIBIT INDEX

Exhibits marked with an asterisk (*) are incorporated by reference to documents previously filed by Tribune Company with the Securities and Exchange Commission, as indicated. Exhibits marked with a circle (o) are management contracts or compensatory plan contracts or arrangements filed pursuant to Item 601(b)(10)(iii)(A) of Regulation S-K. All other documents listed are filed with this Report.

| Number | Description |
|---|---|
| 3.1 * | Amended and Restated Certificate of Incorporation of Tribune Company, dated June 12, 2000 (Exhibit 3.1 to Annual Report on Form 10-K for 2001) |
| 3.1a * | Amended Certificate of Designation of Series A Junior Participating Preferred Stock, dated June 12, 2000 (Exhibit 3.1a to Current Report on Form 8-K dated June 12, 2000) |
| 3.1b * | Amended Certificate of Designation of Series D-1 Preferred Stock, dated February 13, 2001 (Exhibit 3.1d to Annual Report on Form 10-K for 2000) |
| 3.2 * | By-Laws of Tribune Company, as amended and in effect on October 19, 2005 (Exhibit 99 to Current Report on Form 8-K dated October 21, 2005) |
| 4.1 * | Rights Agreement between Tribune Company and First Chicago Trust Company of New York, as Rights Agent, dated as of December 12, 1997 (Exhibit 1 to Current Report on Form 8-K dated December 12, 1997) |
| 4.1a * | Amendment No. 1, dated as of June 12, 2000, to the Rights Agreement between Tribune Company and First Chicago Trust Company of New York, as Rights Agent (Exhibit 4.1 to Current Report on Form 8-K dated June 12, 2000) |
| 4.1b* | Amendment No. 2, dated as of September 21, 2006, to the Rights Agreement between Tribune Company and Computershare Trust Company, N.A. (formerly known as EquiServe Trust Company, N.A., formerly known as First Chicago Trust Company of New York), as Rights Agent (Exhibit 4.1 to Current Report on Form 8-K dated September 21, 2006) |
| 4.2 * | Indenture, dated as of March 1, 1992, between Tribune Company and Citibank, N.A. (successor to Bank of New York, Bank of Montreal Trust Company and Continental Bank, N.A.), as Trustee (Exhibit 4.1 to Registration Statement on Form S-3, Registration No. 333-02831) |
| 4.3 * | Indenture, dated as of January 1, 1997, between Tribune Company and Citibank, N.A. (successor to Bank of New York), as Trustee (Exhibit 4 to Current Report on Form 8-K dated January 14, 1997) |
| 4.4 * | Indenture, dated as of April 1, 1999, between Tribune Company and Citibank, N.A. (successor to Bank of New York and Bank of Montreal Trust Company), as Trustee for the PHONES securities (Exhibit 4 to Current Report on Form 8-K dated April 5, 1999) |
| 4.5 * | Indenture, dated January 30, 1995, between Tribune Company (successor to The Times Mirror Company) and Citibank, N.A. (successor to The Bank of New York, Wells Fargo Bank, N.A. and First Interstate Bank of California), as Trustee for the 7 1/4% Debentures due 2013 and 7 1/2% Debentures due 2023 (Exhibit 4.1 to The Times Mirror Company's Annual Report on Form 10-K for 1995) |
| 4.5a * | First Supplemental Indenture, dated as of June 12, 2000, among Tribune Company, The Times Mirror Company and The Bank of New York, as Trustee (Exhibit 4.13 to Current Report on Form 8-K dated June 12, 2000) |
| 4.6 * | Indenture, dated March 19, 1996, between Tribune Company (successor to The Times Mirror Company) and Citibank, N.A., as Trustee for the 6.61% Debentures due 2027 and the 7 1/4% Debentures due 2096 (Exhibit 4.1 to The Times Mirror Company's Current Report on Form 8-K dated March 13, 1996) |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413784

| Number | Description |
|--------|-------------|
| 4.6a * | First Supplemental Indenture, dated as of October 19, 1999, between The Times Mirror Company and Citibank, N.A., as Trustee (Exhibit 4.3 to The Times Mirror Company's Current Report on Form 8-K dated October 19, 1999) |
| 4.6b * | Second Supplemental Indenture, dated as of June 12, 2000, among Tribune Company, The Times Mirror Company and Citibank, N.A., as Trustee (Exhibit 4.12 to Current Report on Form 8-K dated June 12, 2000) |
| 4.7 * | Agreement of Resignation, Appointment and Assumption, dated as of September 4, 2002, among Tribune Company, The Bank of New York and Citibank, N.A., appointing Citibank, N.A. as Trustee under the Indentures dated March 1, 1992, January 30, 1995, January 1, 1997 and April 1, 1999 (Exhibit 4.7 to Annual Report on Form 10-K for 2004) |
| 4.8 * | Form of Exchangeable Subordinated Debenture due 2029 relating to the PHONES securities (Exhibit 4 to Current Report on Form 8-K dated April 13, 1999) |
| 4.9 * | Specimen Note for $7\frac{1}{4}$% Debenture due 2013 (Exhibit 4.2 to The Times Mirror Company's Annual Report on Form 10-K for 1995) |
| 4.10 * | Specimen Note for $7\frac{1}{2}$% Debenture due 2023 (Exhibit 4.3 to The Times Mirror Company's Annual Report on Form 10-K for 1995) |
| 4.11 * | Officers' Certificate, dated November 13, 1996, establishing the terms of the $7\frac{1}{4}$% Debentures due 2096 and attaching the specimen Form of Debenture (Exhibit 4.2 to The Times Mirror Company's Current Report on Form 8-K dated November 7, 1996) |
| 4.12 * | Officers' Certificate, dated September 9, 1997, establishing the terms of the 6.61% Debentures due 2027, and the specimen Form of Debenture (Exhibit 4.2 to The Times Mirror Company's Current Report on Form 8-K dated September 4, 1997) |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413785

4.13 *      Form of Note relating to Tribune Company's 4.875% Notes due 2010 (Exhibit 4.1a to Current Report on Form 8-K dated August 10, 2005)

4.14 *      Form of Note relating to Tribune Company's 5.25% Notes due 2015 (Exhibit 4.1b to Current Report on Form 8-K dated August 10, 2005)

4.15*       Amended and Restated Credit Agreement dated as of June 27, 2006 by and among Tribune Company, as borrower, the lenders party thereto, Citicorp North America, Inc., as administrative agent, Merrill Lynch, Pierce, Fenner & Smith Incorporated, as syndication agent, JPMorgan Chase Bank, N.A., Bank of America, N.A., Morgan Stanley Bank and The Bank of Tokyo-Mitsubishi UFJ, Ltd., Chicago Branch, as co-documentation agents, and Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and J.P. Morgan Securities Inc., as joint lead arrangers and joint bookrunners (Exhibit (b)(5) to Amendment No. 7 to Schedule TO dated June 28, 2006)

4.16*       Amendment No. 1 dated as of July 10, 2006 to the Amended and Restated Credit Agreement dated as of June 27, 2006 by and among Tribune Company, as borrower, the lenders party thereto, Citicorp North America, Inc., as administrative agent, Merrill Lynch, Pierce, Fenner & Smith Incorporated, as syndication agent, JPMorgan Chase Bank, N.A., Bank of America, N.A., Morgan Stanley Bank and The Bank of Tokyo-Mitsubishi UFJ, Ltd., Chicago Branch, as co-documentation agents, and Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and J.P. Morgan Securities Inc., as joint lead arrangers and joint bookrunners (Exhibit 10.2 to Quarterly Report on Form 10-Q for the quarter ended June 25, 2006)

4.17*       Amended and Restated Bridge Credit Agreement dated as of June 27, 2006 by and among Tribune Company, as borrower, the lenders party thereto, Citicorp North America, Inc., as administrative agent, Merrill Lynch, Pierce, Fenner & Smith Incorporated, as syndication agent, JPMorgan Chase Bank, N.A., as documentation agent, and Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and J.P. Morgan Securities Inc., as joint lead arrangers and joint bookrunners (Exhibit (b)(6) to Amendment No. 7 to Schedule TO dated June 28, 2006)

4.18*       Amendment No. 1 dated as of July 10, 2006 to the Amended and Restated Bridge Credit Agreement dated as of June 27, 2006 by and among Tribune Company, as borrower, the lenders party thereto, Citicorp North America, Inc., as administrative agent, Merrill Lynch, Pierce, Fenner & Smith Incorporated, as syndication agent, JPMorgan Chase Bank, N.A., as documentation agent, and Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and J.P. Morgan Securities Inc., as joint lead arrangers and joint bookrunners (Exhibit 10.4 to Quarterly Report on Form 10-Q for the quarter ended June 25, 2006)

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413786

| | |
|---|---|
| 4.19* | Amendment No. 2 dated as of July 21, 2006 to the Amended and Restated Bridge Credit Agreement dated as of June 27, 2006, as amended, by and among Tribune Company, as borrower, the lenders party thereto, Citicorp North America, Inc., as administrative agent, Merrill Lynch, Pierce, Fenner & Smith Incorporated, as syndication agent, JPMorgan Chase Bank, N.A., as documentation agent, and Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and J.P. Morgan Securities Inc., as joint lead arrangers and joint bookrunners (Exhibit 10.5 to Quarterly Report on Form 10-Q for the quarter ended June 25, 2006) |
| 4.20 | Amendment No. 3 dated as of January 22, 2007 to the Amended and Restated Bridge Credit Agreement dated as of June 27, 2006, as amended, by and among Tribune Company, as borrower, the lenders party thereto, Citicorp North America, Inc., as administrative agent, Merrill Lynch, Pierce, Fenner & Smith Incorporated, as syndication agent, JPMorgan Chase Bank, N.A., as documentation agent, and Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and J.P. Morgan Securities Inc., as joint lead arrangers and joint bookrunners |
| 10.1 o* | Tribune Company Supplemental Retirement Plan, as amended and restated October 18, 2006 (Exhibit 10.3 to Current Report on Form 8-K dated October 18, 2006) |
| 10.2 o* | Tribune Company Directors' Deferred Compensation Plan, as amended and restated effective as of January 1, 2005 (Exhibit 10.2 to Current Report on Form 8-K dated December 22, 2005) |
| 10.3 o* | The Times Mirror Company Deferred Compensation Plan for Non-Employee Directors (Exhibit 10.7 to The Times Mirror Company's Annual Report on Form 10-K for 1994) |
| 10.4 o* | Tribune Company Bonus Deferral Plan, as amended and restated as of October 18, 2006 (Exhibit 10.1 to Current Report on Form 8-K dated October 18, 2006) |
| 10.5 o* | Tribune Company 1992 Long-Term Incentive Plan, effective as of April 29, 1992, as amended April 19, 1994 (Exhibit 10.11 to Annual Report on Form 10-K for 1994) |
| 10.5a o* | Amendment of Tribune Company 1992 Long-Term Incentive Plan, effective October 24, 2000 (Exhibit 10.6a to Annual Report on Form 10-K for 2000) |
| 10.6 o* | Tribune Company Executive Financial Counseling Plan, effective October 19, 1988, as amended January 1, 1994 (Exhibit 10.13 to Annual Report on Form 10-K for 1993) |
| 10.7 o | Tribune Company Transitional Compensation Plan for Executive Employees, amended and restated effective as of July 19, 2006 |
| 10.8 o* | Tribune Company Supplemental Defined Contribution Plan, as amended and effective as of October 18, 2006 (Exhibit 10.2 to Current Report on Form 8-K dated October 18, 2006) |
| 10.9 o* | Tribune Company Employee Stock Purchase Plan, as amended and restated July 27, 1999 (Exhibit 10.10 to Annual Report on Form 10-K for 1999) |
| 10.9a o* | First Amendment to Tribune Company Employee Stock Purchase Plan, as amended and restated July 27, 1999 (Exhibit 10.10a to Quarterly Report on Form 10-Q for the quarter ended September 24, 2000) |
| 10.9b o* | Second Amendment to Tribune Company Employee Stock Purchase Plan, effective as of May 7, 2002 (Exhibit 10.8b to Annual Report on Form 10-K for 2002) |
| 10.10 o* | Tribune Company 1995 Nonemployee Director Stock Option Plan, as amended and restated effective December 9, 2003 (Exhibit 10.9 to Annual Report on Form 10-K for 2003) |
| 10.11 o* | Tribune Company 1996 Nonemployee Director Stock Compensation Plan, as amended and restated effective January 1, 2005 (Exhibit 10.4 to Current Report on Form 8-K dated December 22, 2005) |
| 10.12 o* | Tribune Company Incentive Compensation Plan, as amended and restated effective May 12, 2004 |

117

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

(Exhibit 10.1 to Quarterly Report on Form 10-Q for the quarter ended June 27, 2004)

| | |
|---|---|
| 10.12a o* | Form of Notice of Grant and Stock Option Term Sheet (Exhibit 10.1 to Current Report on Form 8-K dated February 11, 2005) |
| 10.12b o* | Form of Restricted Stock Unit Award Notice (Exhibit 10.1 to Current Report on Form 8-K dated February 21, 2006) |
| 10.13 o* | The Times Mirror Company 1997 Directors Stock Option Plan (Exhibit 10.15 to The Times Mirror Company's Annual Report on Form 10-K for 1996) |
| 10.14* | Distribution Agreement, dated September 21, 2006, by and among TMCT, LLC, Tribune Company, Candle Holdings Corporation, Fortify Holdings Corporation, Chandler Trust No. 1, and Chandler Trust No. 2 (Exhibit 10.1 to Current Report on Form 8-K dated September 21, 2006) |
| 10.15* | Distribution Agreement, dated September 21, 2006, by and among TMCT II, LLC, Tribune Company, Fortification Holdings Corporation, Wick Holdings Corporation, Eagle New Media Investments, LLC, Eagle Publishing Investments, LLC, Chandler Trust No. 1, and Chandler Trust No. 2 (Exhibit 10.3 to Current Report on Form 8-K dated September 21, 2006) |
| 10.16 * | Amended and Restated Lease Agreement between TMCT, LLC and Tribune Company, dated September 22, 2006 (Exhibit 10.5 to Current Report on Form 8-K dated September 21, 2006) |
| 14 * | Code of Ethics for CEO and Senior Financial Officers (Exhibit 14 to Annual Report on Form 10-K for 2003) |
| 21 | Table of Subsidiaries of Tribune Company |
| 23 | Consent of Independent Registered Public Accounting Firm |
| 31.1 | Rule 13a-14 Certification of Chief Executive Officer |
| 31.2 | Rule 13a-14 Certification of Chief Financial Officer |
| 32.1 | Section 1350 Certification of Chief Executive Officer |
| 32.2 | Section 1350 Certification of Chief Financial Officer |
| 99 | Form 11-K financial statements for the KPLR, Inc. 401(k) Plan, the Times Mirror Savings Plus Plan, the Tribune Broadcasting Retirement Plan, the Tribune Company Defined Contribution Retirement Plan and the Tribune Company 401(k) Savings and Profit Sharing Plan (to be filed by amendment) |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413788

EXHIBIT 23

## CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statement on Form S-3 (File Nos. 333-129313 and 333-135905) and in the Registration Statements on Form S-8 (File Nos. 2-90727, 33-21853, 33-26239, 33-47547, 33-59233, 333-00575, 333-03245, 333-18269, 333-35422, 333-70692, 333-70696, 333-118280, 333-118281, 333-118282, 333-118283 and 333-118284) of Tribune Company of our report dated Feb. 26, 2007, relating to the consolidated financial statements, financial statement schedule, management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal control over financial reporting, which appears in this Form 10-K. We also consent to the reference to us under the heading "Selected Financial Data" in this Form 10-K.

PricewaterhouseCoopers LLP

Chicago, Illinois
February 26, 2007

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413789

EXHIBIT 31.1

**Form 10-K Certification**

I, Dennis J. FitzSimons, certify that:

1.  I have reviewed this annual report on Form 10-K of Tribune Company;

2.  Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of Tribune Company as of, and for, the periods presented in this annual report;

4.  Tribune Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for Tribune Company and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to Tribune Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of Tribune Company's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

    d)  Disclosed in this annual report any change in Tribune Company's internal control over financial reporting that occurred during Tribune Company's most recent fiscal quarter (Tribune Company's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, Tribune Company's internal control over financial reporting; and

5.  Tribune Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to Tribune Company's auditors and the audit committee of Tribune Company's board of directors:

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect Tribune Company's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in Tribune Company's internal control over financial reporting.

                                        Dennis J. FitzSimons
                                        Chairman, President and
Date: February 26, 2007                 Chief Executive Officer

120

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413790

EXHIBIT 31.2

**Form 10-K Certification**

I, Donald C. Grenesko, certify that:

1.  I have reviewed this annual report on Form 10-K of Tribune Company;

2.  Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of Tribune Company as of, and for, the periods presented in this annual report;

4.  Tribune Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for Tribune Company and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to Tribune Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of Tribune Company's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

    d)  Disclosed in this annual report any change in Tribune Company's internal control over financial reporting that occurred during Tribune Company's most recent fiscal quarter (Tribune Company's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, Tribune Company's internal control over financial reporting; and

5.  Tribune Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to Tribune Company's auditors and the audit committee of Tribune Company's board of directors:

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect Tribune Company's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in Tribune Company's internal control over financial reporting.

Date: February 26, 2007

Donald C. Grenesko
Senior Vice President/
Finance and Administration

121

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413791

EXHIBIT 32.1

**CERTIFICATION PURSUANT TO
18 UNITED STATES CODE SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Dennis J. FitzSimons, the Chairman, President and Chief Executive Officer of Tribune Company, certify that (i) Tribune Company's Form 10-K for the year ended Dec. 31, 2006 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and (ii) the information contained in the Form 10-K for the year ended Dec. 31, 2006 fairly presents, in all material respects, the financial condition and the results of operations of Tribune Company.

Dennis J. FitzSimons
Chairman, President and
Chief Executive Officer

February 26, 2007

122

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413792

EXHIBIT 32.2

**CERTIFICATION PURSUANT TO
18 UNITED STATES CODE SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Donald C. Grenesko, the Senior Vice President/Finance and Administration of Tribune Company, certify that (i) Tribune Company's Form 10-K for the year ended Dec. 31, 2006 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and (ii) the information contained in the Form 10-K for the year ended Dec. 31, 2006 fairly presents, in all material respects, the financial condition and the results of operations of Tribune Company.

Donald C. Grenesko
Senior Vice President/
Finance and Administration

February 26, 2007

123

**Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only**

TRB0413793

**7**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413794



# TRIBUNE

Report to the Audit Committee
of the Board of Directors

For the Year Ended December 31, 2006



February 6, 2007

To the Audit Committee of the
  Board of Directors of Tribune Company

Dear Audit Committee Members:

We are in the process of finalizing our integrated audit of the Company's 2006 financial
statements in accordance with the audit plan discussed with the Committee in May 2006.  This
report summarizes required communications between PricewaterhouseCoopers LLP , in our
capacity as the Company's  Independent Auditors and the Audit Committee, including the status
of certain significant accounting and reporting matters that we have addressed with the
Company in connection with our audit.

Our integrated audit will be completed upon the Company filing its 2006 Form 10-K with the
SEC, which is currently planned for February 26, 2007.

We welcome the opportunity to discuss the contents of this report and to complete our required
auditor communications with you at our meeting on February 13, 2007.


Very truly yours,

Kevin Maguire
Engagement Partner
PricewaterhouseCoopers LLP

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413796

**Table of contents**

Status of the Integrated Audit ...................................................................................... 1

Accounting and Reporting Matters................................................................................ 2

Appendix I: Integrated Audit Results Required Communications to the Audit Committee.......... 9

Appendix II: PricewaterhouseCoopers LLP Professional Fees .................................................13

Appendix III: Independence Letter ...............................................................................14

Appendix IV: Quality Control Report ...........................................................................15

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## Status of the Integrated Audit

Our integrated audit of Tribune Company's consolidated financial statements and systems of internal control over financial reporting as of December 31, 2006 and for the year then ended has been performed in accordance with the plan that was discussed at the Audit Committee's May meeting and updated at the December meeting. Our audit was planned and performed to provide reasonable, rather than absolute, assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects.

Our integrated audit will not be complete until management and the Audit Committee of the Board of Directors have finalized their review of the financial statements and management's report on internal control over financial reporting. We are in the midst of evaluating the operating effectiveness of the Company's year-end financial reporting process. Upon completion of our integrated audit, we will issue our opinions as to: 1) the fair presentation of the financial statements in accordance with generally accepted accounting principles, 2) the design and operating effectiveness of internal control over financial reporting and 3) the adequacy of management's assessment of internal control over financial reporting.

Management's assessment process has identified no material weaknesses or significant deficiencies to-date; however, a final evaluation and aggregation of identified control deficiencies is still in process.  We agree with management's conclusions.

**TRIBUNE**

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413798

# Accounting and Reporting Matters

## Corporate

### Income Taxes

The Company establishes tax and interest reserves when management determines it is probable that additional tax will be owed. Management has concluded, and we concur, that the Company has adequately provided for the settlement of all known potential liabilities associated with uncertain tax positions. The most significant change to the reserve balance in 2006 was the release of a substantial portion of the PHONES reserve. In the fourth quarter, the Company recorded a favorable $31 million income tax expense adjustment (including current year interest) as a result of reaching an agreement with the Internal Revenue Service appeals office regarding the deductibility of interest expense on the Company's PHONES debt securities.

The following presents a comparative summary of the components of the Company's tax reserves (in millions):

|  | 12/31/06 | 12/25/05 |
|---|---|---|
| PHONES interest expense | $4 | $26 |
| Income tax uncertainties related to the acquisition of Times Mirror | 27 | 44 |
| Intercompany interest expense | 30 | 22 |
| TMCT distributions | 16 | - |
| All other, net | 7 | 4 |
| Total | $84 | $96 |

### Accounting for Employee Benefit Plans

On December 31, 2006, the Company adopted Statement of Financial Accounting Standards No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans* (FAS 158) which requires an employer to recognize the overfunded or underfunded status of a defined benefit postretirement plan (other than a multiemployer plan) as an asset or liability in its statement of financial position and to recognize changes in funded status through comprehensive income in the year in which changes occur. The Statement also requires an employer to measure the funded status of a plan as of the date of its year-end statement of financial position, with limited exceptions.

The impact on the Company's financial statements of adopting FAS No. 158 includes a decrease in assets of $557 million, a decrease in deferred income tax liabilities of $234 million, an increase in other liabilities of $42 million, and an offsetting reduction in shareholders' equity of $365 million. The shareholders' equity reduction is recorded as an adjustment to accumulated other comprehensive income (loss). The Company's 2006 Form 10-K includes expanded disclosures in the notes to the financial statements as required by the new standard, and our opinion on the financial statements will include a reference to the change in accounting principle as required by the auditing standards.

### Accounting for Stock-Based Compensation

As of the beginning of its 2006 fiscal year, the Company adopted the provisions of FAS 123(R), *Share-Based Payment,* which requires the recognition of compensation expense for stock options, restricted stock units and other grants of share-based compensation to employees. Additional compensation expense of $32 million has been recognized during fiscal 2006, as a result of adopting the new standard. Our opinion in the Company's Form 10-K on the financial

**TRIBUNE**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413799

statements will include a reference to the change in accounting principle as required by auditing standards.

## Annual Impairment Assessment for Intangible Assets

Goodwill and other intangible assets having an indefinite life must be tested for potential impairment on an annual basis, and more frequently if market conditions indicate a potentially significant change in value. Tribune performs its annual assessment for goodwill, newspaper mastheads and broadcasting licenses as of the end of the third quarter each year. Management's 2006 analysis indicates no impairment in the reported value of goodwill, which totals approximately $5.8 billion. The methodology and assumptions used in this analysis are consistent with the prior year and with management's presentation to the Audit Committee at its December 13, 2006 meeting. The methodology utilizes market operating cash flow multiples to estimate the fair values of the reporting units that contain the goodwill. As they have done in past years, management has prepared a separate report summarizing the impairment testing results and will be reviewing the report with the Committee at the meeting on February 13, 2007. As noted in management's report, the estimate of fair value for the newspaper reporting unit has fallen in 2006 due to declines in both operating cash flow and market multiples.  In the newspaper reporting unit, the Company lowered the operating cash flow multiple used to estimate fair value from 9.5 in 2005 to 8.25 in 2006 as a result of continued declines in advertising revenues and profitability throughout the industry.  These declines indicate a significant reduction in the fair value of the newspaper reporting unit from an estimated $9.5 billion in 2005 to $7.3 billion in 2006.  The net book value of the reporting unit is $7.1 billion and accordingly, the Company has asserted that the newspaper reporting unit goodwill is recoverable.

The 2006 estimate of fair value for the television reporting unit is slightly higher than in the prior year as a result of higher than planned operating cash flow  In the television reporting unit, the Company used an operating cash flow multiple of 11, which is consistent with 2005. The estimated fair value of the television reporting unit increased from $3 billion in 2005 to $3.2 billion in 2006.  The net book value of the reporting unit is $2.3 billion and accordingly, the Company has asserted that the television reporting unit goodwill is recoverable.

Management will continue to monitor the realizability of these intangible assets closely as declines in operating cash flow and/or market multiples could lead to goodwill impairment charges in the future.

The methodologies used to prepare the annual valuations of mastheads ($2.8 billion) and FCC licenses ($2.9 billion) are consistent with the methodologies discussed with the Audit Committee at its December 13, 2006 meeting. Management has concluded that no impairment exists. We have reviewed the approach, underlying data, and assumptions used in supporting the valuation models and concur with the conclusions reached. While there is still significant "headroom" between estimated fair value and the net book values of both the mastheads and FCC licenses, management will continue to monitor operating results and assumptions as further declines in the industry could lead to an impairment charge in the future.

## TMCT Transactions

During the third quarter of fiscal 2006, the Company announced the redemption of substantially all of its interest in the TMCT partnerships and recorded a gain of $47.9 million, net of a $16 million tax reserve, representing management's best estimate of a potential tax obligation.  In connection with the transactions, all of the Company's common stock and preferred shares

**TRIBUNE**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413800

previously held by the partnerships were distributed to the partners. As a result, the Company no longer has any Series C, D-1 or D-2 preferred shares outstanding, and common stock outstanding increased by 1.6 million shares. The Company has retained a 5% interest in the partnerships which continues to be accounted for using the equity method.

**Accrual Accounts**

The liability for postretirement health care and life insurance benefits at December 31, 2006 is $139 million as compared to $140 million at December 25, 2005. The year-end 2006 pension and postretirement benefits balances are based upon actuarial valuations performed as of January 1, 2006. We utilized the assistance of our benefits specialists to audit the actuarial valuations, noting no exceptions with the methodology or assumptions used.

Other significant subjective accruals include (in millions):

|  | 12/31/06 | 12/25/05 |
|---|---|---|
| Liability for workers' compensation, general liability and auto liability claims | $51 | $56 |
| Liability for medical insurance claims | 15 | 16 |
| Accrued management incentive program | 42 | 30 |

The liability for workers' compensation, general liability and auto liability self-insurance is based on actuarial analyses provided to the Company by a third party. Generally, the balance for medical insurance claims is recorded using the conservative estimate provided by Mercer, the Company's actuary.

The management incentive program bonus accrual, which is recorded on the ledgers of the Company's individual business units, approximates management's current estimate of the likely amounts to be paid.

## Publishing

**San Fernando Valley Plant**

During the fourth quarter of fiscal 2005, management at Tribune Publishing Company and the Los Angeles Times business unit formulated and announced a plan for the closure of the San Fernando Valley production facility. On October 30, 2006, the Company sold the facility's land and building for net proceeds of $24 million, which approximated book value at date of sale. During the fourth quarter of 2006, the Company concluded that certain press equipment idled in the shut down would not be redeployed elsewhere in the publishing group and therefore, recorded a charge of $4.1 million to dispose of the equipment. As of December 31, 2006, certain remaining press equipment ($26 million net book value) is idle and continues to be depreciated over original useful lives. Management is evaluating alternative uses; however, they have represented that the most likely scenario is that all presses will be redeployed within the publishing group in a fashion consistent with historical uses and accordingly has concluded that as of December 31, 2006 the net book value of these assets is fully recoverable. Management expects to complete its deployment plans in 2007. Subsequent decisions to abandon or sell these assets could result in additional asset-related charges to income.

**Reduction in Force**

In the fourth quarter of 2006, the Company recognized approximately $6.6 million in severance and related charges associated with the elimination of approximately 400 positions in the

**TRIBUNE**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413801

publishing group. The various programs administered at the business units were characterized as one-time severance programs and includes the impact of the Company's outsourcing initiatives in the publishing group. Adequate communication of the program was provided to employees prior to the balance sheet date to satisfy the criteria in GAAP for recognition of the severance liability at December 31, 2006.

### Newsday/Hoy matter

As previously discussed with the Committee, the Company recorded approximately $90 million of charges during fiscal year 2004 as the probable costs of settling pending and anticipated class action litigation with its advertisers. A significant number of advertisers, including all of the publications' largest advertisers, have accepted offers and released the Company from potential litigation. At December 31, 2006, the Company maintains a liability of approximately $7 million, representing its best estimate of the remaining settlement costs. Based upon our audit work, we believe management's estimate is within a range of reasonable alternatives.

## Broadcasting and Entertainment

### Sale of WLVI-Boston

During December 2006, the Company announced that it completed the sale of WLVI-TV, Boston, for $113.7 million in cash and recognized an after tax gain of $9.3 million. Included in the gain is a $45 million allocation of television group goodwill which, is required to be allocated under FAS 142, "Goodwill and Other Intangible Assets", using a relative fair value method. This station sale along with the previously completed sales of WATL-TV, Atlanta and WCWN-TV, Albany have been reported as discontinued operations in the consolidated statements of income for all periods presented.

### Copyright Royalties

The Company earns royalties primarily related to the distribution of WGN programming on national cable and satellite systems and programming developed by Tribune Entertainment. Royalty fees are collected and distributed by the Copyright Royalty Tribunal, a branch of the Library of Congress.  Due to various disputes associated with the distribution of royalties to the various providers, there has historically been a significant time lag between when programming is provided and payment is received. The Company has received $.4 million, $1.9 million and $0.2 million during 2006, 2005 and 2004, respectively.

It is the Company's policy to accrue expected future royalty payments as earned. The methodology for determining the amount earned each period is based upon an analysis of the programming content developed by the Company and an estimate of the Company's expected share of the existing undistributed copyright royalty pool. Because of the time lag between program use and payment and the potential subjectivity in the royalty pool allocation process, the Company records its receivable at approximately 70% of the estimated balance due.

The royalty receivable balance is $32.6 million at December 31, 2006 as compared to $28.7 million at December 25, 2005.  The Company's receivable is comprised of amounts pertaining to broadcasts from 1998 to 2006. The Company received a disbursement of $3 million on January 2, 2007, which was a partial payment of cable royalties earned in 2003.  Management believes the Company will receive approximately $19 million in 2007 relating to royalties earned during

**TRIBUNE**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413802

the period 1998-2002. The Company will continue to monitor collection activity for the open years to assess the recoverability of the receivable.

### Broadcast Rights

The Company maintains a reserve for programming that is not expected to be aired by the end of the contract period. This reserve for excess inventory is based on a program-by-program review of the Company's five-year broadcast plans as well as historical write-off trends. The need to reserve programming purchased for periods beyond the five year broadcast plan is also considered. Management asserts that broadcast rights reserves recorded at December 31, 2006 have been estimated in a fashion consistent with prior years and reasonably adjust the related assets to their net realizable values. We agree with this assertion.

Total broadcast rights assets, commitments and reserves as of December 31, 2006 and December 25, 2005 are as follows (in millions):

|  | 2006 | 2005 |
| --- | --- | --- |
| Broadcast rights assets | $567 | $669 |
| Broadcast rights commitments[1] | $682 | $252 |
| Reserves | $4 | $4 |
| Reserves as a percentage of total broadcast rights assets | .7% | .6% |

[1] Broadcast rights commitments represent contractual commitments to purchase programming that is not yet available for broadcast. The increase over 2005 is due primarily to programming fees associated with the new 10 year CW affiliation agreement, WGN's 10-year extension to air Bulls and White Sox games and commitments for the *Family Guy* and *Two and a Half Men*.

## Internal Controls Attestation

As described in the "Status of the Integrated Audit" section of this report, our testing of the Company's controls over the year-end reporting process and our final evaluation of the significance of control deficiencies are not complete. As of the drafting of this report, neither the Company nor we have identified any material weaknesses or any significant deficiencies. Both management and PwC are satisfied that the significant deficiencies identified in the prior year have been remediated as of December 31, 2006.

Both PwC and management are in the process of evaluating control deficiencies that remain unremediated as of December 31, 2006; however, to date, no significant concerns have been identified. Overall, the Company has made improvements in achieving a sustained control environment and has taken appropriate actions to address the significant deficiencies identified in the prior year.

## Recently Issued Pronouncements and Guidance

### FIN 48

The Company will be required to adopt the provisions of FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes – an interpretation of FAS 109* (FIN 48) in the first quarter of 2007. The accounting model prescribed by FIN 48 permits recognition of a tax benefit only if it is "more likely than not" that the related tax position is sustainable. Furthermore, the amount of the tax benefit that can be recognized is limited to the largest amount that is greater than 50% likely of being realized, assuming there are multiple point estimates and probabilities of outcome. The interpretation also requires increased quantitative and qualitative disclosures

**TRIBUNE**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413803

regarding uncertain tax positions.  Management does not believe the adoption of this new standard will have a material impact on the Company's consolidated financial statements.

New Section 404 Regulatory Releases for Auditors and Management

In December 2006, the PCAOB released a proposed standard, An *Audit of Internal Control Over Financial Reporting That Is Integrated with an Audit of Financial Statements*, ("AS 5") to supersede PCAOB Auditing Standard No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction with An Audit of Financial Statements* ("AS 2"). Additionally, the SEC released proposed interpretive guidance for management regarding its evaluation of internal controls over financial reporting.

Taken as a whole, AS 5 is intended to simplify requirements and make them easier to apply while retaining the core principles necessary for an effective audit of internal control. The level of detail and specificity of the standard has been reduced, which is intended to encourage auditors to apply professional judgment to the individual facts and circumstances. Moreover, the presentation of the proposed standard has been reorganized to better reflect the sequential flow of an audit of internal controls and is articulated in a more understandable manner.

This proposed guidance is not expected to become effective until May or June 2007.  We are currently developing our 2007 audit plan in anticipation of the finalization of AS 5 as currently drafted.

The following are the more significant changes proposed in AS 5 compared to the provisions that currently exist in AS 2.

- Incorporates, directly into the proposed standard, a top-down approach which begins with an assessment of company-level controls and financial statement elements, and links them to significant accounts, relevant assertions, and finally to significant processes.
- Emphasizes the importance of the auditor's assessment of the risk of material misstatement due to a control deficiency and the pervasive impact it can have on the conduct of an audit.
- Eliminates the requirement to evaluate the process management used to evaluate its internal control.
- Permits the auditor to use the knowledge gained from previous audits as a factor in determining the nature, timing and extent of testing. Although rotation is not permitted, AS 5 provides the auditor with flexibility to decide to reduce testing in some areas based on that knowledge and its effect on the auditor's assessment of risk.
- Refocuses multi-location testing requirements on risk, rather than coverage. AS 5 omits the provision requiring testing of controls over a "large portion" of a company's operations and financial condition, and instead directs the auditor to use a risk-based approach.
- Requires the auditor to obtain an understanding of the work of others at the company to determine how that work might impact the nature, timing and extent of the auditor's testing. The proposed standard allows reliance on the work of others for testing certain aspects of the control environment when the competence and objectivity of the persons performing the work are sufficiently high.
- Recalibrates the walkthrough requirements. The proposed standard allows the auditor to utilize the direct assistance of others, properly supervised by the auditor, to assist with walkthroughs. AS 2 requires that walkthroughs be performed entirely by the auditor.

**TRIBUNE**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413804

We anticipate that the proposed guidance will result in an overall reduction of the effort necessary to complete an audit of the Company's internal controls over financial reporting. We will develop our 2007 audit plan using AS 5 as currently drafted and coordinating closely with management as they develop their plan. In recognition of this new guidance, we've presented an estimate for the 2007 integrated financial statement audit assuming a reduction in fees.

## PricewaterhouseCoopers LLP Fee Estimate

Included in Appendix II for the Committee's consideration is a preliminary schedule of the fees for all proposed services to be rendered in 2007. The preliminary 2007 fee incorporates an estimate of the anticipated reduction in hours from proposed auditing standard AS 5. However, our estimate is dependent on how management adopts the SEC's proposed interpretive guidance for management regarding its evaluation of internal controls over financial reporting. Furthermore, the estimate does not reflect the culmination of a detailed planning process. Future revisions based on detailed planning will be discussed with management and the Audit Committee.

**Professionals' Eyes Only**                **TRB0413805**
**Highly Confidential -- Attorneys' Eyes Only**

# Appendix I: Required Communications to the Audit Committee

| Matter to Be Communicated | Auditor's Response |
|---|---|
| **The Auditor's Responsibility Under Public Company Accounting Oversight Board Standards** | |
| Level of responsibility assumed for the internal control structure, whether the financial statements are free of material misstatement, the detection of fraud, etc. | We have substantially completed our audit of Tribune Company for the year ended December 31, 2006. Our audit is not complete until the filing of the Form 10-K, which we will review prior to it being filed with the SEC. Our audit opinion for fiscal 2006 contains a consistency reference for the Company's adoption of FAS 123R "*Share-Based Payment*" and FAS 158 "*Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans*", which is generally required when there has been a change in accounting principle that has a material effect on the comparability of the financial statements. |
| | See "Status of the Integrated Audit" on page 1 of this report for a discussion of our responsibility under generally accepted auditing standards. |
| **Consultation by Management with Other Accountants** | |
| When management has consulted with other accountants about significant accounting or auditing matters. | We are not aware of any such consultations. |
| **Major Issues Discussed with Management Prior to Retention** | |
| Any major accounting, auditing or reporting issues discussed with management in connection with our initial or recurring retention. | There were none. |
| **Difficulties Encountered in Performing the Audit** | |
| Serious difficulties encountered in dealing with management that relate to the performance of the audit. | During our audit we were given access to all records, documents and other supporting data and we were furnished with all required information and explanations. No restrictions were imposed on our work. |
| | We received the full cooperation of Company officials and employees and were able to discuss accounting and financial reporting matters with them as needed throughout the year. |

Professionals' Eyes Only                                                      TRB0413806
Highly Confidential -- Attorneys' Eyes Only

| Matter to Be Communicated | Auditor's Response |
|---|---|
| **Significant Accounting Policies, Management Judgments and Accounting Estimates** | |
| The initial selection of and changes in significant accounting policies or their application, methods used to account for significant unusual transactions, and effect of significant policies in controversial or emerging areas for which there is a lack of authoritative guidance or consensus.<br><br>The process used by management in forming particularly sensitive accounting estimates and the basis for the auditor's conclusion regarding the reasonableness of those estimates. | We reviewed with management the methods used to develop significant accounting estimates and the judgments made in the estimation process. The body of this report includes our qualitative evaluation of certain of the policies and their application. Based upon our review, the methods applied and judgments made are consistent with those of prior periods.<br><br>Management has identified the following critical accounting policies and significant accounting estimates:<br><br>- Income taxes<br>- Pension and Other Postretirement Benefits<br>- Broadcast rights<br>- Intangible assets<br>- Self-insured liabilities<br>- Accounts receivable and related allowances<br>- Stock-based compensation<br><br>Expanded disclosures on these policies and estimates are included in the draft financial statements. We concur with management's process for developing the estimates in the areas noted above. In general, reserves are recorded at the conservative end of a range of potential outcomes.<br><br>During the course of our audit, we did not discuss significant alternative accounting treatments, practices, or presentation and disclosures, except as described in the body of our report. |
| **Significant Audit Adjustments** | |
| Each financial report shall reflect all material correcting adjustments that have been identified. | There are no unadjusted differences or audit adjustments. |
| **Other Information in Documents Containing Audited Financial Statements** | |
| The external auditor's responsibility for information in a document containing audited financial statements, as well as any procedures performed and the results. | Our work related to information in documents containing audited financial statements, such as the Annual Report and Form 10-K, is limited to a review of the information to determine that it is not materially inconsistent with the audited financial statements. This work does not include the performance of specified procedures with regard to the disclosures of executive compensation included in the Company's proxy statement. |
| **Disagreements with Management** | |
| Disagreements with management, whether or not satisfactorily resolved, about matters that individually or in the aggregate could be significant to the entity's financial statements or the auditor's report. | All accounting and reporting issues have been resolved without disagreement with management. |

**TRIBUNE**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413807

| Matter to Be Communicated | Auditor's Response |
|---|---|
| **Fraud and Illegal Acts** | |
| Fraud involving senior management or those responsible for internal controls, or causing a material misstatement of the financial statements, where the auditor determines there is evidence that such fraud may exist. Any illegal acts coming to the auditor's attention involving senior management and any other illegal acts, unless clearly inconsequential. | In accordance with Statement on Auditing Standards No. 99, *Consideration of Fraud in a Financial Statement Audit,* which became effective in 2003, our audit included the following additional or expanded procedures with regard to the consideration of fraud:<br><br>- Expanded inquiries of management and other employees within the Company regarding perspectives on fraud risk and their knowledge of any fraud perpetrated within the Company. These inquiries were conducted at multiple levels of responsibility throughout the organization, including corporate executives, segment financial management and business unit management and personnel.<br>- Evaluation of the programs and controls put in place by the entity to address risks of material misstatements due to fraud.<br>- Increased substantive procedures, including increased sample sizes, expanded analytical procedures, and expanded reviews of adjustments made during the closing process.<br>- We did not become aware of any fraud or illegal acts involving senior management during our audit. |
| **Deficiencies in Internal Control** | |
| Any material weaknesses in the design or operation of systems of internal control that came to the auditor's attention during the audit. | No material weaknesses in internal control over financial reporting have been identified to-date.<br><br>See "Status of the Integrated Audit" section of this report for additional information regarding the remaining procedures to be completed. |
| **Significant Risks, Exposures and Material Uncertainties** | |
| Major risks, exposures and uncertainties facing the Company, and how they are disclosed. | SEC regulations require management to provide disclosures regarding Company risks. In connection with our audit testing of the Company's presentation and disclosure in the Form 10-K, we will evaluate the disclosures. |
| **Independence** | |
| Reaffirm our independence of the Company and update the audit committee on all relationships between the auditor and its related entities and the company and its related entities that in the auditor's professional judgment may reasonably be thought to bear on independence. | We have reviewed the scope of services provided over the past year in light of the independence rules. We conclude that all services provided to Tribune during 2006 are within the scope of the independence rules. We have prepared a letter for the Audit Committee discussing the scope of our services and confirming our independence from the Company (see Appendix III on page 14). |

**TRIBUNE**

11    PricewaterhouseCoopers LLP

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413808

| Matter to Be Communicated | Auditor's Response |
|---|---|
| **Interim Reports** | |
| If we believe interim financial information is materially misstated as a result of a departure from generally accepted accounting principles, and management does not respond appropriately, we should inform the audit committee. | We performed interim reviews of quarterly information on a timely basis during the year. During these reviews, we discussed with management the appropriate accounting treatment of significant transactions affecting the consolidated financial statements and participated in the quarterly audit committee conference calls prior to the release of quarterly earnings to the public.<br><br>Based upon our reviews, we did not become aware of any material modifications that should be made to the quarterly information included in the 2006 financial statements for them to be in conformity with generally accepted accounting principles (GAAP). |
| **Other Material Written Communications** | |
| - Schedule of unadjusted differences<br>- Management representation letter<br>- Independence letter | No unadjusted differences were identified.<br>We will obtain the signed letter prior to the 10-K filing and provide the Audit Committee a copy.<br>See Appendix III on page 14 |

**TRIBUNE**

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413809

# Appendix II: PricewaterhouseCoopers LLP Professional Fees

| | 2007 Preliminary Plan | 2006 Actual | December 2006 Approved | 2005 Actual |
|---|---|---|---|---|
| **Audit Services:** | | | | |
| Integrated financial statement audit(1) | $1,890,000 | $2,140,000 | $2,140,000 | $1,958,000 |
| Out-of-pocket expenses | 165,000 | 165,000 | 165,000 | 195,000 |
| TMCT Transactions | - | 130,000 | 130,000 | - |
| **Total audit services** | 2,055,000 | 2,435,000 | 2,435,000 | 2,153,000 |
| **Audit Related Services:** | | | | |
| Employee benefit plan audits | 415,000 | 424,500 | 424,500 | 370,000 |
| Audits of the TMCT LLC's (2) | - | 70,000 | 70,000 | 65,500 |
| Audit of the Chicago Cubs | 52,000 | 50,000 | 50,000 | 47,000 |
| Broadcasting Audit (3) | 450,000 | 998,700 | 1,200,000 | 174,000 |
| Other (4) | - | - | - | 30,000 |
| **Total audit related services** | 917,000 | 1,543,200 | 1,744,500 | 686,500 |
| **Tax Services:** | 10,000 | - | 10,000 | - |
| **Other Services:** | | | | |
| Preparation of employee benefit plan annual reports (Form 5500) (5) | 176,000 | 160,700 | 160,700 | 162,800 |
| License of PwC accounting research software | 1,500 | 1,500 | 1,500 | 1,500 |
| **Total other services** | 177,500 | 162,200 | 162,200 | 164,300 |
| Total All Services | $3,159,500 | $4,140,400 | $4,351,700 | $3,003,800 |

[1] This fee schedule was developed using an estimate of the reduction in hours attributable to PwC's adoption of AS 5 and the Company's adoption of the SEC's interpretative guidance for management, net of a customary rate increase. This fee estimate is not the culmination of a detailed planning process and may change when the 2007 audit planning is completed.

[2] The 2006 audits of the TMCT LLC financial statements will be performed by another firm.

[3] These fees are for a three-year financial audit of Broadcasting in conjunction with a potential spin off of the group. The 2006 fees were for audits of selected locations for 2003, 2004, and 2005. The 2007 fees are for audits of 2006 amounts and for the audit of Broadcasting's consolidated financial statements, including footnotes, to be included in a SEC registration statement.

[4] The 2005 fees were for accounting consultations related to pension matters.

[5] The 2007 fee increase reflects a higher number of filings due to changes in the Company's benefit plan structure during fiscal 2006.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413810

February 6, 2007

To the Audit Committee of the
  Board of Directors of Tribune Company

Dear Audit Committee Members:

We have been engaged to audit the consolidated financial statements and the effectiveness of internal control over financial reporting of Tribune Company (the "Company") for the year ending December 31, 2006.

Pursuant to Rule 3600T of the Public Company Accounting Oversight Board, which adopts on an interim basis Independence Standards Board (ISB) Standard No. 1, *Independence Discussions with Audit Committees,* we communicate at least annually with you regarding all relationships between our Firm and the Company that, in our professional judgment, may reasonably be thought to bear on our independence. We have prepared the following comments to facilitate our discussion with you regarding independence matters arising since February 7, 2006, the date of our last letter.

We are not aware of any relationships between our Firm and the Company that, in our professional judgment, may reasonably be thought to bear on our independence which have occurred since February 7, 2006, the date of our last letter, through the date of this letter.

We hereby confirm that as of the date of this letter, we are independent accountants with respect to the Company, within the meaning of the Securities Acts administered by the Securities and Exchange Commission and the requirements of Rule 3600T of the Public Company Accounting Oversight Board, which adopts on an interim basis the requirements of the Independence Standards Board.

This report is intended solely for the use of the Audit Committee, the Board of Directors, management, and others within the Company and should not be used for any other purposes.

We look forward to discussing with you the matters addressed in this letter as well as other matters that may be of interest to you at our upcoming meeting on February 13, 2007. We will be prepared to answer any questions you may have regarding our independence as well as other matters.

Very truly yours,

PricewaterhouseCoopers LLP

14

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413811

_PRICEWATERHOUSECOOPERS_ 🏛

# A report to the Audit Committee on our quality controls*

*connectedthinking

15

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413812

# I. PricewaterhouseCoopers LLP: Accounting and auditing practice – quality control procedures

The following provides an overview of the quality control procedures maintained by PricewaterhouseCoopers LLP (PwC) in the United States, the Firm that reports on the Company's consolidated financial statements.

### Quality control standards

The standards of the Public Company Accounting Oversight Board (PCAOB) require PwC (and all other accounting firms that audit public companies) to have a system of quality controls over our accounting and auditing practice. PwC's quality control system complies with the PCAOB's standards, as well as the Statements on Quality Control Standards established by the American Institute of Certified Public Accountants. Those standards and requirements, and, therefore, our quality control system, encompass:

- Independence, integrity and objectivity

- Personnel management

- Client acceptance and retention

- Overall risk management and compliance function

- Audit engagement performance

- Monitoring

### Quality control procedures

Our quality control procedures are summarized below in a manner consistent with the COSO (Committee of Sponsoring Organizations of the Treadway Commission) framework.

## A. Control environment

### Tone at the top

PwC leadership is committed to taking all actions required to ensure that our Firm continues to stand for quality, independence and objectivity. Firm leadership regularly sends communications to partners and staff emphasizing the importance of audit quality.

PwC expects its partners and staff to live by our core values—Quality, Trust, Teamwork, Excellence and Leadership—in the course of their professional careers.

A report to the Audit Committee on our quality controls

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413813

Independence, integrity and objectivity

PwC has extensive systems to monitor Firm and individual professional independence. Our independence policies are accessible to our staff. Some notable aspects of our systems and policies are: an independence system that lists restricted investments, encourages professionals to seek pre-approval for transactions and requires professionals to record their investments on a timely basis; systems designed to ensure that non-audit services are evaluated for permissibility and submitted for audit committee approval prior to their provision to public company audit clients, as well as systems that pre-clear and subsequently monitor the Firm's business relationships to ensure compliance with applicable regulatory requirements; monthly alerts regarding recent changes to client relationships; annual confirmation of compliance with investment and banking relationship restrictions by all partners and managers; training; a centralized independence office available for consultations when questions arise; and compliance testing of individual professionals.

Lead audit partners and quality review partners on each public company audit client are rotated every five years in compliance with SEC and PCAOB requirements. There also are separate rotation requirements applicable to other partners who play a significant role on public company audits.

Additionally, no client individually constitutes a material element of the Firm's revenue or earnings to partners. This allows the Firm and its partners to have greater freedom to act with independence, integrity and objectivity.

Consulting protocols

There is a list of matters for which PwC's partners are required to consult with professional and technical experts. Engagement teams are encouraged to consult on other matters as warranted by facts and circumstances. In the event an audit engagement partner disagrees with the advice provided by our National office, a resolution process provides guidance for escalating the discussion through our chain-of-command until the matter is satisfactorily agreed upon and resolved collectively.

PwC has assigned a group of experienced partners and senior managers as Regional and Local Chief Auditors who provide local access to subject-matter expertise on audit policy and methodology, as well as Sarbanes-Oxley Section 404.

Personnel management

PwC maintains stringent hiring standards for both entry-level and experienced recruits, which include not only assessment of academic records, but also interviews and background and reference checks. Once hired, our staff participate in a variety of local and national formal training courses with a curriculum that matches their roles and responsibilities as they progress in their careers. Staff also are trained continuously on the job. PwC partners also receive ongoing training, development and education.

Partner and staff performance is evaluated annually through a review process that includes peers, subordinates and superiors. Partners and staff are recognized and rewarded for performing as competent accountants and auditors. Managers are formally evaluated at least annually by partners for whom they have performed substantial work during the year. Our partner performance evaluation and compensation processes are in accordance with rules prohibiting direct compensation for selling non-audit services to audit clients. The annual assessment process captures information relating to how well each of our people has performed relative to our values, the goals each has set for the year and peers.

17

A report to the Audit Committee on our quality controls

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413814

B. Risk assessment

Risk management

PwC's risk management structure includes more than 75 experienced partners who devote a portion of their time to risk management activities. They play an integral part in the client acceptance and retention process, assessing risk on both a qualitative and quantitative basis. In addition, audit engagement teams are required to consult with risk management partners on issues and judgments, such as materiality and going concern considerations.

Client acceptance and retention

PwC has a proprietary information system to support our client acceptance and retention decisions. It involves the audit engagement team, industry experts and risk management partners determining whether the risks related to existing or potential clients are manageable, and whether PwC should be associated with the particular company and its management. Among the issues we consider:

- ☒ The reputation of the company and its management

- ☒ The effectiveness of its board

- ☒ Any incentives or inclinations for management to manipulate reported results

- ☐ Any unusually aggressive or creative accounting

- ☐ Any current or historical business, professional employment or financial relationships that could impact on the Firm's independence

C. Control activities

Audit engagement performance

Consistent global methodology: To provide uniformity and consistency in approach, PwC has an audit methodology that is applied on a global basis for all audit engagements.

Comprehensive policies and procedures: PwC has comprehensive policies and procedures governing our accounting and auditing practice. We update them to reflect new professional developments and to address emerging issues and needs. These policies and procedures cover professional and regulatory standards, as well as guidance about how best to implement the standards.

Engagement-specific quality controls

A number of quality control procedures are performed specifically with respect to a particular audit. Our public clients have a quality review partner assigned who is responsible for reviewing the key risks identified by the engagement team and responses to those risks, significant engagement team judgments, the audit plan and its execution, the resolution of significant issues, the financial statements, disclosures and the appropriateness of the Firm's report.

Many of our public company clients also have a designated SEC review consultant (a member of our R&Q group, as defined below) whose role is to provide additional expertise with respect to accounting, auditing, financial reporting, SEC compliance and capital markets activities.

A report to the Audit Committee on our quality controls

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413815

### National Professional, Technical, Risk & Quality group

PwC's National Professional, Technical, Risk & Quality group (R&Q) is a separate unit within our accounting and auditing practice, independent from those responsible for revenue generation or management. R&Q has a seat on the leadership team that sets strategic direction for our Assurance practice and drives major Assurance initiatives and decisions. R&Q consists of technical partners and managers who are experts in accounting and auditing. They review and advise on matters involving significant, unusual or complex accounting, auditing and SEC matters, as well as set policies, positions and Firm methodology.

D.  Information and communication

### Professional standards

Information necessary to keep up to date is available to PwC partners and staff regardless of their location. Our system of databases and electronic information ensures that appropriate information is available to the engagement teams when needed.

### Alerts on regulatory, accounting and auditing developments

Regular communications alert our partners and staff to new standards and provide related guidance to assist them in providing high-quality service to clients. Regulatory, accounting and auditing developments are distributed to the Assurance practice through weekly alerts from R&Q.

E.  Monitoring

### Risk and quality reviews

PwC has an internal quality-monitoring program. The program includes inspection of a partner's work and all aspects of our quality control system to ensure that our quality controls are functioning properly and to provide reasonable assurance that we comply with all applicable professional standards and our own Firm policies and procedures. This program is managed and supervised by the Assurance Quality group, which reports to our Chief Compliance Officer.

Audit engagement reviews are conducted by experienced partners and senior managers with appropriate industry experience who are not connected with either the office performing the audit or the audit itself. Reviews are conducted annually, and all partners are subject to review at least once every three years. More timely reviews are performed when there is a possibility of increased risk. Our inspection process also involves periodic testing of the effectiveness of our quality controls in functional areas such as hiring, training, advancement and independence.

Quality monitoring is also an integral part of our continuous improvement program. PwC constantly evaluates inputs from formal programs such as this and a variety of informal sources in an ongoing effort to improve our policies, procedures and the consistency of the quality of our work.

### Professional compliance

PwC has a full-time Chief Compliance Officer. Our compliance program is designed to foster and monitor compliance with all applicable laws and regulations as well as certain internal policies, and to provide guidance for integrity-based decision making in the absence of specific legal or Firm requirements. This includes the integration and enhancement of a number of compliance functions, including Independence, CPA Licensing, and Privacy and Ethics, and the establishment of supporting compliance functions within Assurance and PwC's other lines of service.

A report to the Audit Committee on our quality controls

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413816

## II. Issues raised by most recent quality control reviews and PwC's actions

PCAOB Review

The Public Company Accounting Oversight Board (PCAOB) conducts inspections of the major accounting firms annually, focusing on those portions of the firms' accounting and auditing practices that relate to public companies. The 2005 inspection (for which the report was released in November 2006) generally covered 2004 audit engagements. The inspection included Sarbanes-Oxley Section 404 and PCAOB Auditing Standard No. 2 related to internal controls where applicable, and Auditing Standard No. 3 related to documentation.

In conducting its inspections, the PCAOB reviewed specific engagements selected based on its own criteria. For each engagement, the PCAOB reviewed the issuer's financial statements and certain SEC filings; reviewed the work papers and interviewed engagement personnel regarding selected high-risk areas; analyzed potential adjustments identified during the audit; and reviewed testing of internal controls and related documentation. For certain engagements, the PCAOB reviewed written communications between the audit team and the company's audit committee.

In addition to the specific audit engagement reviews, the PCAOB reviewed eight functional areas, examining both the National Office and selected practice offices for:

- Tone at the top

- Independence implications of non-audit services, business ventures, alliances and arrangements, personal financial interests, and commissions and contingent fees

- Practices for partner evaluation, compensation, admission, assignment of responsibilities, and disciplinary actions

- Client acceptance and continuance policies

- Internal inspection program

- Practices for establishment and communication of audit policies, procedures and methodologies, including training

- Supervision of audit work performed by foreign affiliates on foreign operations of U.S. audit clients

- Practices for consultation on accounting, auditing and SEC matters

A report to the Audit Committee on our quality controls

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413817

The 2005 inspection report comprises the following primary sections:

Part I (together with Appendix B) of the PCAOB's report describes the inspection procedures and lists engagement-specific findings. The audit engagements inspected included thousands of transactions and decision points related to audit procedures and judgments. The inspection scrutinized both auditing and accounting judgments, as well as the related documentation. The findings related to the different functional areas discussed above and several related to the application of sampling techniques, update testing when testing was performed at an interim date, and testing of management's assertions. Appendix C to the report includes our formal response to the findings included in Part I. Part I, Appendix B and Appendix C are publicly available.

Part II of the report includes additional PCAOB observations, including those that relate to the eight functional areas described above. Part II of the report is not and will not be made available to the public by the PCAOB so long as the Firm addresses those findings to the satisfaction of the PCAOB not later than twelve months after the date of the inspection report.

Virtually all of the findings included in Part II of the report are consistent with our own observations and have been, and continue to be, the subject of our ongoing policy, process and training initiatives.

The feedback we receive from the PCAOB, together with the many other inputs we consider in the normal course of business, has played an important role in our continuous improvement efforts. We have updated our policies, conducted training, improved technology, increased internal inspections, hired more resources, communicated leadership expectations related to audit quality and modified our partner evaluation and compensation process. We have made other changes to our audit methodology in response to the requirements of Sarbanes-Oxley Section 404 and PCAOB Auditing Standard No. 2 related to internal controls and Auditing Standard No. 3 related to documentation.

In our view, none of the PCAOB's comments in either Part I or Part II represent an issue that impacts our Firm's ability to provide companies with audits conducted in accordance with the standards of the PCAOB. In addition, we do not believe that any of the comments represent an issue requiring disclosure to an audit committee under New York Stock Exchange Rule 303A.07.

A report to the Audit Committee on our quality controls

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413818

Peer review

The most recently completed peer review was conducted by Deloitte & Touche LLP for the year ended June 30, 2006, for which they issued an unmodified opinion. The review covered audit and attest services performed for private companies. In the peer reviewer's opinion, the system of quality control for the accounting and auditing practice of PwC in effect for the year ended June 30, 2006 was designed to meet the requirements of the quality control standards for an accounting and auditing practice applicable to private companies, and was complied with during the year then ended to provide the Firm with reasonable assurance of complying with professional standards.

It is customary for peer reviewers to issue a letter of comment on certain policies and procedures or compliance with them, and Deloitte & Touche did so for the June 30, 2006 peer review. These matters are not considered to be of such significance as to affect the peer reviewer's opinion. The letter of comment from the peer reviewer includes three items: instances of variation in compliance with the Firm's workpaper documentation policies; instances, while not material in the context of the financial statements taken as a whole, where items were misclassified or where required disclosures were omitted or incomplete; and areas of non-compliance with Firm policies and professional standards in carrying out employee benefit plan engagements.

The peer review conducted by Deloitte & Touche incorporated the results of our internal quality control review conducted for the year ended June 30, 2006. The matters noted are consistent with items identified in our internal quality control review. Each of these matters will be reinforced with our partners and staff in technical updates and training courses.

Deloitte & Touche's report and letter of comment as well as our response are publicly available.

Internal quality control review

PwC conducts an annual internal quality inspection program—also known as Risk and Quality Review, or RQR. The most recent completed RQR covered our fiscal year ended June 30, 2006.

Results of the 2006 RQR are consistent with the findings from our 2006 peer review. We continue to focus on addressing these findings, as described above.

In our view, none of the RQR results represent an issue that impacts our Firm's ability to provide companies with audits conducted in accordance with professional standards.

A report to the Audit Committee on our quality controls

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413819

## III. Material issues arising from governmental investigations

From time to time, the U.S. Securities and Exchange Commission (SEC) and/or other U.S. regulatory or professional agencies make confidential fact-finding inquiries of the Firm and/or its personnel. The making of such inquiries does not mean that anyone has concluded that the Firm or its personnel engaged in wrongdoing. Within the preceding five years, inquiries or investigations by governmental or professional authorities have resulted in the following public settlements and/or proceedings. The descriptions are summaries only and not intended to address all aspects of the matter. In connection with each settlement, the Firm and/or the individuals neither admitted nor denied the factual or legal conclusions.

Settled matters:

In July 2006, the SEC approved a consent settlement with the former engagement partner for three investment funds managed by Lipper Holdings LLC. The SEC's consent order found that the former partner, who is retired, had engaged in improper professional conduct within the meaning of SEC Rule 102(e)(1)(iv)(B)(1). The former engagement partner was suspended from practice before the SEC and may apply for reinstatement after one year.

In May 2006, the Japanese Financial Services Agency (FSA) suspended ChouAoyama Audit Corporation from practicing (subject to certain exceptions) for a two-month period beginning on July 1, 2006. ChouAoyama, now known as Misuzu Audit Corporation, is a Japan-based participating firm within the PricewaterhouseCoopers network of firms. The FSA's action arose from charges brought against three partners of ChouAoyama who it was alleged had conspired with former executives of Kanebo Ltd. to falsify the company's accounts. These partners, who are no longer with Misuzu, subsequently pleaded guilty to the charges.

In May 2006, the Arizona State Board of Accountancy entered a consent order arising out of three audits for three clients for the fiscal years ending 1994, 1995 and 2002, respectively, performed by the Phoenix office. Pursuant to the order, the Firm agreed to reimburse expenses incurred by the Board in connection with its investigations, and practice restrictions, including a suspension, were imposed on the engagement partners. One of those partners is appealing the decision.

In March 2006, the SEC approved a consent settlement with the former engagement partner for Aerosonic Corporation, based in Clearwater, Florida. The SEC had alleged that the former engagement partner had failed adequately to plan, supervise and/or execute the Firm's audits of the company's financial statements for fiscal years 1999 through 2002. The former engagement partner was suspended from practice before the SEC and may apply for reinstatement after two years.

A report to the Audit Committee on our quality controls

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413820

In February 2006, the SEC approved a consent settlement with the former engagement partner for Sun Communities. The SEC had alleged that Sun Communities' financial statements for the years ended December 31, 2000 and 2001, and the quarter ended March 31, 2002, were materially inaccurate because the company failed properly to account for its interest in a joint venture. The former engagement partner was suspended from practice before the SEC and may apply for reinstatement after two years.

In August 2004, the SEC filed a consent settlement with the PwC engagement partner for Anicom. The SEC had alleged that the PwC engagement team overlooked improper revenue recognition practices and disregarded other matters in the audit of the company's 1999 financial statements and in the first quarter 2000 interim review. The partner was suspended from practice before the SEC and may apply for reinstatement after three years.

In August 2004, the SEC announced the settlement of a lawsuit it had brought against a former partner and two managers who participated in PwC's audit of the financial statements of Allegheny Health, Education and Research Foundation for the years ended June 30, 1996 and 1997. The SEC's complaint (which did not name the Firm) alleged that the individuals violated the antifraud provisions of the Securities Exchange Act of 1934, and sought injunctive relief and civil penalties. Under the terms of the settlement, the former partner was fined and suspended from practice before the SEC, and the managers were not allowed to participate in audits for two years.

In May 2004, the Firm and the SEC entered into a settlement agreement based upon the SEC's finding that the Firm aided and abetted disclosure violations by Warnaco by failing to object to Warnaco's characterization of a restatement in its 1998 financial statements. PwC neither admitted nor denied the findings, and agreed to a censure pursuant to SEC Rule 102(e) and a monetary payment of $2.4 million.

In August 2003, the former audit engagement partner of Tyco International entered into a settlement with the SEC resulting in the denial of his privilege of appearing or practicing before the SEC as an accountant. The SEC concluded that the engagement partner failed to follow generally accepted auditing standards for each of Tyco's fiscal years ended September 30, 1998 through September 30, 2001, with respect to the evaluation of audit risk with regard to executive compensation and related party transactions and therefore violated the securities laws.

In August 2003, the audit engagement partner for the 1998 and 1999 Microstrategy audits (who is no longer with the Firm) was suspended from practice before the SEC with the right to reapply in two years. The SEC concluded that the engagement partner failed to follow generally accepted accounting principles and generally accepted auditing standards with respect to the audit of Microstrategy's recognition of revenue on a half dozen software licenses.

A report to the Audit Committee on our quality controls

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413821

In July 2003, the SEC determined that the audit engagement partner and manager for the audit of the 1994 financial statements of California Micro Devices, Inc. (who are no longer with the Firm) recklessly failed to comply with generally accepted auditing standards in auditing accounts receivable and sales returns. The former partner and manager were barred from practice before the SEC.

In May 2003, the SEC announced a settlement with PwC and a former partner (who left the Firm in 1998) relating to 1997-1998 matters regarding a former client, SmarTalk, a seller of telephone calling cards. The SEC found that PwC's accounting and auditing decisions concerning a $25 million restructuring reserve were flawed. In addition, the SEC found that PwC—as part of a post-audit review conducted while PwC was considering resigning from the client—revised and otherwise altered workpapers. The settlement involved a suspension of the former partner with the right to reapply in one year, a censure of PwC under section 102(e), payment of $1 million by PwC and engagement of an independent consultant to review PwC's compliance with document retention policies.

In July 2002, PwC and the SEC agreed to resolve three enforcement investigations concerning matters that occurred between 1996 and 2001 involving billing practices at our broker-dealer, PwC Securities, and accounting advice provided to two of our clients, Pinnacle Holdings and Avon. The Firm and PwC Securities agreed to make a payment to the U.S. Treasury of $5 million, to consent to a censure and a cease-and-desist order, and to institute new quality and risk procedures, including special concurring partner review procedures in certain circumstances. As a result, PwC adopted several new policies, including policies relating to independence procedures and independent review partners.

On June 26, 2002, PwC and the Internal Revenue Service (IRS) entered into a settlement agreement to resolve all potential tax shelter registration and list maintenance penalties dating back to 1995. In addition to making a substantial settlement payment to the IRS, PwC agreed to produce for review by the IRS certain of its income tax solutions that might be subject to tax shelter registration or list maintenance requirements, which apply independently from the technical soundness of the tax solution. PwC also agreed to provide additional information about specific tax solutions pursuant to an agreed upon procedure and to work with the IRS to develop processes to ensure ongoing compliance with the Internal Revenue Code and Treasury Regulations for registering tax shelters and maintaining lists of investors in tax shelters.

MC-NY-070521   © 2007 PricewaterhouseCoopers LLP. All rights reserved. "PricewaterhouseCoopers" refers to PricewaterhouseCoopers LLP (a Delaware limited liability partnership) or, as the context requires, the PricewaterhouseCoopers global network or other member firms of the network, each of which is a separate and independent legal entity. *connectedthinking is a trademark of PricewaterhouseCoopers LLP (US).    25

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**8**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413823

**TRIBUNE COMPANY**
**REVIEW OF AUDIT COMMITTEE PROXY STATEMENT DISCLOSURES**

## AUDIT COMMITTEE SECTION OF PROXY STATEMENT

The Securities and Exchange Commission requires the Company to include an Audit Committee report in its proxy statement each year.  The report must disclose whether the Committee has performed the following:

- Assessed the qualifications and independence of Tribune's independent accountants, the performance of Tribune's internal auditors and independent accountants, and Tribune's compliance with legal and regulatory requirements.

- Reviewed the audited financial statements with management and the independent accountants, and discussed the quality and acceptability of the Company's accounting principles.

- Discussed with the independent accountants the matters described in Statement on Auditing Standards No. 61, "Communications with Audit Committees."  These matters include significant management judgments and accounting estimates, new accounting policies, any significant audit adjustments or internal control deficiencies, and any disagreements with management.

- Pre-approved all audit and permissible non-audit services provided by the independent accountants subject to de minimis exceptions for non-audit services.  (The SEC's rules include a de minimis exception that waives the pre-approval requirements for non-audit services that aggregate less than 5% of total fees, provided that they were not recognized as non-audit services at the time of the engagement, and are approved by the Audit Committee prior to the completion of the audit.)

- Reviewed the processes by which the Chief Executive Officer and Chief Financial Officer make the certifications required by the SEC and the Sarbanes-Oxley Act.

- Recommended to the Board of Directors that the audited financial statements be included in the Company's Form 10-K.

The SEC also requires proxy statements to describe the Audit Committee's pre-approval policies related to the independent accountants' services and fees, and to disclose the percentage of fees paid to the independent accountants where the pre-approval de minimis exception was used.  In addition, aggregate fees paid to the independent accountants for the two most recent fiscal years must be disclosed for each of the following categories:  audit services, audit-related services, tax services, and all other services.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

A draft of the Audit Committee section of the 2007 proxy statement, which meets all of the above requirements, is attached as Exhibit I. This section begins with the Audit Committee report, which is followed by the required discussion of the Committee's policy on pre-approval of audit and permissible non-audit services, and the required fee disclosures. No significant changes from last year's disclosures have been made. The Committee will be asked to approve the Audit Committee report and these two related disclosures at its meeting on February 13, 2007.

## OTHER AUDIT COMMITTEE RELATED DISCLOSURES

Existing rules require the Company to disclose in its proxy statement each year whether all of the Audit Committee members are independent and have no relationship to the Company that may interfere with the exercise of their independence from management and the Company. The Company must also disclose whether or not the Audit Committee includes at least one member who is an "audit committee financial expert." The Board of Directors section of the 2007 proxy contains these required disclosures, which are attached as Exhibit II. All of the Committee members are noted as independent within the meaning of the New York Stock Exchange listing standards. Likewise, all of the members are listed as audit committee financial experts.

TGC
02/02/07

2

**Exhibit I**

# TRIBUNE COMPANY
## DRAFT OF AUDIT COMMITTEE SECTION OF
## 2007 PROXY STATEMENT

### AUDIT COMMITTEE

**Report of the Audit Committee**

The Audit Committee is responsible for reviewing and monitoring Tribune's financial reporting and accounting practices. The Audit Committee also assesses the qualifications and independence of Tribune's independent accountants, the performance of Tribune's internal auditors and independent accountants, and the effectiveness of Tribune's compliance and ethics program. In performing its duties, the Audit Committee meets regularly with representatives of Tribune's management, internal auditors, legal counsel and independent accountants. The Audit Committee also reviews with Tribune's internal auditors and independent accountants the overall scope and plans for their respective audits. The independent accountants report directly to the Audit Committee and both the internal auditors and independent accountants have direct access to the Audit Committee.

Management is responsible for the preparation, integrity and fair presentation of Tribune's consolidated financial statements and related financial information. Management is also responsible for establishing, maintaining and assessing a system of internal controls designed to provide reasonable assurance to Tribune's management and the Board regarding the preparation of reliable published financial statements. In fulfilling its responsibilities, the Audit Committee reviewed and discussed with management Tribune's audited consolidated financial statements and the report of management on internal controls over financial reporting for the fiscal year ended December 31, 2006. The Audit Committee also discussed with management the quality, not just the acceptability, of Tribune's financial reporting and accounting practices.

The independent accountants are responsible for expressing an opinion on the conformity of the audited consolidated financial statements with accounting principles generally accepted in the United States of America. The independent accountants are also responsible for expressing an opinion on the effectiveness of Tribune's internal controls over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States) and for issuing a report thereon. The Audit Committee discussed with the internal auditors and independent accountants the results of their examinations and their evaluations of Tribune's internal controls over financial reporting. The Audit Committee also reviewed with the independent accountants their judgments as to the quality, not just the acceptability, of Tribune's financial reporting and discussed the matters described in Statement on Auditing Standards No. 61, as amended, "Communication with Audit Committees." In addition, the Audit Committee discussed with the independent accountants their independence from management and Tribune, and reviewed the accountants' written disclosures required by Independence Standards Board Standard No. 1, "Independence Discussions with Audit Committees."

In addition to conducting the integrated audit of Tribune's consolidated financial statements and internal controls over financial reporting, the independent accountants provided other audit-related and permissible non-audit services to Tribune during fiscal year 2006. The Audit Committee reviewed the audit-related and permissible non-audit services provided by the independent accountants and determined that the provision of these services is compatible with the maintenance of their independence from management and Tribune. The Audit Committee must pre-approve all audit, audit-related and permissible non-audit services to be performed by the independent accountants, subject to certain de minimis exceptions for permissible non-audit services that are approved by the Audit Committee prior to the completion of the audit. The Audit Committee also reviews with Tribune's Chief Executive Officer and Chief Financial Officer the processes by which such officers make certifications required by the Sarbanes-Oxley Act of 2002.

The Board accepted the Audit Committee's recommendation that the audited consolidated financial statements for the fiscal year ended December 31, 2006 be included in the Annual Report on Form 10-K for filing with the Securities and Exchange Commission.

Betsy D. Holden
William A. Osborn, Chairman
J. Christopher Reyes
Dudley S. Taft

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413826

Exhibit I

# TRIBUNE COMPANY
## DRAFT OF AUDIT COMMITTEE SECTION OF
## 2007 PROXY STATEMENT

**Policy on Audit Committee Pre-Approval of Audit, Audit-Related and Permissible Non-Audit Services of Independent Accountants**

The Audit Committee has responsibility for appointing, setting fees, and overseeing the work of the independent accountants. In recognition of this responsibility, the Audit Committee has established a policy to pre-approve all audit, audit-related and permissible non-audit services provided by the independent accountants, subject to de minimis exceptions for non-audit services that are approved by the Audit Committee prior to the completion of the audit. The projects and categories of service that the Audit Committee pre-approves are as follows:

*Audit Services.* Audit services include work performed in connection with the audit of consolidated financial statements, as well as work that is normally provided by the independent accountants in connection with statutory and regulatory filings or engagements. These services include work performed in connection with the audit of internal controls over financial reporting as required by Section 404 of the Sarbanes-Oxley Act of 2002.

*Audit-Related Services.* These services are for assurance and related services that are traditionally performed by the independent accountants and that are reasonably related to the work performed in connection with the audit, including due diligence related to mergers and acquisitions, employee benefit plan audits and audits of subsidiaries and affiliates.

*Tax Services.* These services are related to tax compliance, tax advice and tax planning.

*Other Services.* These services include all other permissible non-audit services provided by the independent accountants and are pre-approved on an engagement-by-engagement basis.

Prior to the engagement of the independent accountants, the Audit Committee pre-approves these services by category of service. The fees are budgeted and the Audit Committee requires the independent accountants and management to report actual fees versus the budget periodically throughout the year by category of service. During the year, circumstances may arise when it may become necessary to engage the independent accountants for additional services not contemplated in the original pre-approval for which advance approval is required. In those instances, the Audit Committee pre-approves the services before engaging the independent accountants.

The Audit Committee has delegated pre-approval authority to the chair of the committee. The chair must report, for informational purposes only, any pre-approval decisions to the Audit Committee at its next scheduled meeting.

4

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Exhibit I

# TRIBUNE COMPANY
## DRAFT OF AUDIT COMMITTEE SECTION OF
## 2007 PROXY STATEMENT

**Fees Paid to Independent Accountants**

The fees for all services provided by the independent accountants for the fiscal years ended
December 31, 2006 and December 25, 2005 are shown below (in thousands):

|  | 2006 | 2005 (1) |
|---|---|---|
| Audit Fees (2) | $ 2,435 | $ 2,153 |
| Audit-Related Fees (3) | 1,543 | 686 |
| Tax Fees | 0 | 0 |
| All Other Fees |  |  |
|    Employee benefit plan filings | 160 | 163 |
|    Accounting research software license | 2 | 2 |
|     Total all services | $ 4,140 | $ 3,004 |

(1) For 2005, $47 thousand of fees which were previously reported as Audit Fees have been
reclassified as Audit-Related Fees to conform to the 2006 presentation.

(2) Fees for the integrated audit of Tribune's annual consolidated financial statements and internal
controls over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act of 2002.
Fees also include reviews of quarterly Forms 10-Q.

(3) Includes audits of Tribune's employee benefit plans, audits of certain Tribune affiliates and audits
of subsidiary financial statements. 2005 also includes accounting consultations related to pension
matters. The increase in 2006 is primarily attributable to additional auditing of subsidiary financial
statements.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413828

**Exhibit II**

# TRIBUNE COMPANY
## DRAFTS OF OTHER AUDIT COMMITTEE RELATED DISCLOSURES
## IN THE 2007 PROXY STATEMENT

### Board, Board Committees and Meetings

The Board has standing Audit, Compensation & Organization, Executive and Nominating & Governance Committees.

The Board held eight meetings during 2006. Under Tribune's Board Governance Guidelines, directors are expected to attend all Board meetings and all meetings of committees on which they serve. Each director attended at least 75% of the total number of meetings of the Board and its committees on which he or she served during 2006.

Tribune's independent directors also meet in executive sessions without management on a regularly scheduled basis and as they otherwise deem appropriate. The Board, by resolution of a majority of the non-employee directors, designates one non-employee director to preside at the executive sessions. William A. Osborn has been so designated to preside at these sessions. The independent directors met in seven executive sessions in 2006.

In addition, on September 21, 2006, the Board established an independent special committee to oversee management's exploration of alternatives for creating additional value for shareholders. The independent special committee consists of Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, William A. Osborn, J. Christopher Reyes, Dudley S. Taft and Miles D. White. The independent special committee met six times in 2006.

*Audit Committee*

The function of the Audit Committee includes reviewing and monitoring Tribune's financial reporting and accounting practices and internal controls, as more fully described in the Report of the Audit Committee on page [ ]. The Audit Committee operates under a written charter that is annually reviewed by the committee. The current charter is available on Tribune's website at www.tribune.com.

Betsy D. Holden, William A. Osborn (chairman), J. Christopher Reyes and Dudley S. Taft currently serve on the Audit Committee. The Board has determined that all members of the Audit Committee are independent within the meaning of the rules of the New York Stock Exchange and under the Board's categorical standards and satisfy the NYSE's financial literacy and financial management or expertise criteria. In addition, the Board has determined that each member of the Audit Committee is an "audit committee financial expert" as defined in applicable securities laws, rules and regulations. The Audit Committee met seven times in 2006.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0413829**

TRB0413830

COMPENSATION & ORGANIZATION
COMMITTTEE

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**TRIBUNE COMPANY**
**COMPENSATION & ORGANIZATION COMMITTEE MEETING**
**TUESDAY, FEBRUARY 13, 2007 (9:30 A.M.)**
**LAKEVIEW ROOM, 24TH FLOOR**
**TRIBUNE TOWER**

**AGENDA**

| | Tab No. |
|---|---|
| Approve minutes of December 12, 2006 meeting | 1 |
| Deferred director stock awards | 2 |
| Committee report for proxy | 3 |
| Management Incentive Plan overview | 4 |
| 2007 long-term equity compensation recommendations | 5 |
| Executive compensation review (top 30) | 6 |
| Compensation worksheets for CEO and proxy named executives | 7 |
| Executive session | |

**Compensation & Organization Committee**
Jeffrey Chandler
Enrique Hernandez, Jr.
Robert S. Morrison, Chairman
Miles D. White

**Tribune Company**
Dennis J. FitzSimons
Donald C. Grenesko
Crane H. Kenney
Luis E. Lewin

**Frederic W. Cook & Co., Inc.**
George B. Paulin (by telephone)

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413831

1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413832

# TRIBUNE COMPANY
## COMPENSATION & ORGANIZATION COMMITTEE MEETING
### DECEMBER 12, 2006

The Compensation & Organization Committee met at 8:30 a.m. on Tuesday, December 12, 2006 at Tribune Tower, Chicago, Illinois, pursuant to notice. The meeting was attended by Jeffrey Chandler, Enrique Hernandez, Jr., Robert S. Morrison and Miles D. White. Dennis J. FitzSimons, Donald C. Grenesko, Crane H. Kenney, Chip Mulaney of Skadden, Arps, Slate, Meagher & Flom LLP and George B. Paulin of Frederic W. Cook & Co., Inc. also participated in the meeting.

Mr. Morrison acted as Chairman of the meeting. Messrs. FitzSimons, Grenesko, Kenney, Lewin, Mulaney and Paulin were present as the meeting was called to order. The following business was discussed by the Committee:

1. The minutes of the October 18 and November 9, 2006 Committee meetings were approved as submitted.

2. The Committee discussed the new SEC executive compensation and related party disclosure rules effective for the 2007 proxy season. The Committee requested that management prepare a draft disclosure document and circulate it prior to the February Committee meeting. The Committee also discussed having an interim meeting to review the preliminary draft.

3. The Committee conducted its annual review of the Committee charter. Management reviewed certain revisions to be made to the charter in light of the new executive compensation disclosure rules. The Committee approved the proposed charter, with amendments, and agreed to submit the proposed charter to the full Board for approval.

4. The Committee reviewed a written report summarizing 2006/2007 compensation and benefit plan recommendations for which management will be seeking approval at the February meeting.

5. The Committee reviewed a long-standing policy regarding office, parking and administrative support for retired Tribune senior executives who also served as Tribune directors. The Committee instructed management to amend the policy so that it (i) only covers four currently retired Tribune senior executive/board members and (ii) adds a 10-year term. The Committee then delegated final review and approval of such revised policy to Mr. Morrison.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

There being no further business to come before the Committee, the meeting was adjourned at 9:40 a.m.

_____

Robert S. Morrison
Chairman

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413834

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRIBUNE COMPANY**
**COMPENSATION & ORGANIZATION COMMITTEE**
**DEFERRED DIRECTOR STOCK AWARDS**

For the past ten years, Director stock awards have been made pursuant to the Tribune Company 1996 Nonemployee Director Stock Compensation Plan (the "1996 Plan"). In accordance with its terms, no additional grants can be made under the 1996 Plan after May 31, 2006. Accordingly, Director Stock Awards for 2007 and subsequent years will be made pursuant to the Tribune Company Incentive Compensation Plan, which was drafted to accommodate Director stock awards when it was last amended in 2004.

The Incentive Compensation Plan allows for the deferral of awards under terms set by the Committee. Management recommends that 2007 and future Director stock awards be eligible for deferral under the same terms and conditions provided under the 1996 Plan. Generally, these terms provide that: (i) a Director may defer receipt of stock awards to February 15 of the calendar year following his or her termination of Board service; (ii) dividends will accrue on all deferred stock awards; (iii) payouts will be in the form of Tribune common stock with fractional shares paid in cash; and (iv) distributions can be made either in a lump sum or in up to 10 equal annual installments at the election of the Director making the deferral.

As a reminder, deferred stock awards are not currently automatically payable on a change in control of Tribune. Deferred cash awards would be automatically payable on change of control.

MMH
2/06/07

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# EXECUTIVE COMPENSATION

## Compensation Discussion and Analysis

This section provides information regarding the 2006 compensation program in place for our principal executive officer, principal financial officer and the three most highly-compensated executive officers other than the principal executive officer and principal financial officer (collectively, the "NEOs"). It includes information regarding, among other things, the overall objectives of our compensation program and each element of compensation that we provide.

## Objectives of Our Compensation Program

The Compensation & Organization Committee of our Board of Directors (the "Committee") has the responsibility to review annually and approve corporate goals and objectives relevant to the compensation of our principal executive officer, to evaluate our principal executive officer's performance in light of those goals and objectives and, based on that evaluation, to determine and approve the principal executive officer's compensation level. The Committee also has the responsibility to review annually with the principal executive officer the compensation for the other senior executive officers, including the NEOs. The Committee acts pursuant to a charter that has been approved by the Board.

The compensation program for our NEOs and other senior executive officers is designed to attract and retain top-quality management employees who can contribute to our long-term success and thereby build value for our shareholders. Elements of the compensation program are designed to reflect the performance of Tribune as a whole, the individual performance of the employee and the competitive conditions in the lines of business and geographic areas in which Tribune operates. Incentive awards are paid pursuant to the Tribune Company Incentive Compensation Plan (the "Incentive Plan"), which was approved by shareholders at the Annual Meeting of Shareholders in 2004.

The program is organized around four fundamental principles:

*A Substantial Portion of NEO Compensation Should Be Performance-Based.* Our compensation program is designed to reward superior performance. It accomplishes this in a number of ways. In terms of cash compensation, annual cash bonus targets for each NEO under the management incentive plan ("MIP") provisions of the Incentive Plan are established based on a percentage of an NEO's base compensation. Whether and to what extent MIP bonuses are paid depends on the extent to which the company-wide, group and/or individual goals set by the Committee are achieved during the year. In addition, annual salary increases or decreases and the size and type of equity awards for NEOs are determined by the Committee in February based on company-wide, group and/or individual performance during the year.

*A Meaningful Portion of NEO Compensation Should Be Delivered in the Form of Equity Awards.* We believe that a meaningful portion of total compensation should be delivered in the form of equity in order to align more directly the interests of our NEOs with the interests of our shareholders. In 2006, the equity compensation provided to each NEO consisted of restricted stock units and stock options that, in each case, vest based on the passage of time and continued employment.

*Our Compensation Program for NEOs Should Enable Us to Compete for and Retain First-Rate Executive Talent.* Shareholders are best served when we can attract and retain talented executives with compensation packages that are competitive and fair. In order to assist in retaining executive talent, the compensation packages for NEOs include both a short- and long-term component, with vesting requirements for equity awards based on the passage of time and continued employment. We strive to create compensation packages for NEOs that deliver total compensation that is between the 50th percentile and the 75th percentile of the total compensation delivered by certain peer companies with which we compete for executive talent. To assist in making this comparison and to ensure that the compensation packages for NEOs are competitive, the Committee utilizes the Towers Perrin Media

25

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413838

Industry Executive Compensation Survey and other executive compensation surveys, which provide data concerning relative compensation of other companies. In addition, the Committee engages Frederic W. Cook, & Co., Inc., a nationally-known compensation consulting firm, to provide information regarding compensation levels and practices of peer companies including, specifically, Belo Corp., Clear Channel Communications, Inc., Dow Jones & Company, Inc., Gannett Co., Inc., Hearst-Argyle Television, Inc., IAC/InterActive Corp., The McClatchy Company, McGraw-Hill Companies, Inc., The New York Times Company, The E.W. Scripps Company and The Washington Post Company (the "Peer Group").

*Our Compensation Program for NEOs Should Be Fair and Perceived as Such, Both Internally and Externally.* We endeavor to create a compensation program that is fair and perceived as fair, both internally and externally. This is accomplished by comparing the compensation that is provided to our NEOs to the compensation provided to officers of the other companies included in survey data and those in the Peer Group, as a means to measure external fairness. We also compare compensation of the NEOs to other senior employees of the Company, as a means to measure internal fairness.

## Elements of Our Compensation Program

This section describes the various elements of our compensation program for NEOs, together with a discussion of various matters relating to those items, including why each item is included in the compensation program. The Committee believes that its current compensation program for NEOs achieves an appropriate balance with respect to the pursuit of both short and long-term performance goals. The mix of equity and cash compensation described below gives our NEOs a substantial alignment with shareholders, while also providing the Company with a mechanism for retaining executive talent.

*Cash Compensation*

Cash compensation is paid in the form of salary and bonuses. Salary is included in the Company's NEO compensation package because the Committee believes it is appropriate that some portion of the compensation that is provided to NEOs be provided in a form that is fixed and liquid. Annual performance-based bonuses, which are paid pursuant to the MIP, are included in the package in order to provide incentives to our NEOs, in any particular year, to pursue particular objectives that the Committee believes are consistent with the overall goals and strategic direction that the Board has set for the Company. The amount of cash compensation that is paid in the form of salary as compared to annual performance-based bonuses is determined by the Committee in a manner designed to achieve the four fundamental principles set forth above.

The components comprising the cash portion of total compensation are described below.

Salary. Base salaries for NEOs for any given year are generally approved by the Committee at its meeting in February. With respect to the other NEOs and other senior executive officers, the Committee makes its final determination based on the recommendation of, and after discussions with, Mr. FitzSimons, our Chairman, President and Chief Executive Officer. Increases or decreases in base salary on a year-over-year basis are dependent on the Committee's assessment of company-wide, group and/or individual performance and the salary levels of our executives as compared to the other companies included in the survey data and those in the Peer Group.

MIP. The MIP provides cash compensation to NEOs to the extent that performance conditions set by the Committee are met. Target bonuses under the MIP are set each year by the Committee in February.

26

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413839

In determining the amount of target bonuses under the MIP, the Committee considers several factors, including:

- the desire to tie a substantial portion of total compensation to company-wide, group and/or individual performance;

- the relative level of cash compensation, at target and actual achievement levels, of our executives as compared to the other companies included in the survey data and those in the Peer Group; and

- the advice of Frederic W. Cook & Co., Inc. as to compensation practices at other companies in the Peer Group.

Performance objectives for the MIP are developed through an iterative process. Based on a review of business plans, management, including the NEOs, develops preliminary recommendations for Committee review. The Committee reviews management's preliminary recommendations and establishes final goals. In establishing final goals, the Committee seeks to ensure that the incentives provided pursuant to the MIP are consistent with the strategic goals set by the Board, that the goals set are sufficiently ambitious so as to provide a meaningful incentive and that bonus payments, assuming target levels of performance are attained, will be consistent with the overall NEO compensation program established by the Committee.

The Committee, based on management's preliminary recommendation, approves the financial performance criteria and the individual performance goals that will be used to determine whether and to what extent NEOs will receive payments under the MIP. For fiscal 2006, the Committee selected operating cash flow plus income from equity investments as the relevant financial performance criteria. The Committee selected these measures because it believes that operating cash flow is an important indicator of the operational strength and performance of the Company's businesses and that equity investment results are important to the future growth of the Company. Target bonuses for NEOs with respect to bonuses paid for 2006 ranged from 60% to 125% of base salary and were based on the NEO's level of responsibility and ability to affect the Company's results. MIP bonuses for corporate executives, including Messrs. FitzSimons, Grenesko and Lewin, were based on the achievement of consolidated goals, while the MIP bonuses for Messrs. Smith and Reardon were based on achievement of the goals for the publishing group and the broadcasting group, respectively.

Actual payments under the MIP can range, on the basis of financial performance, from 0% (threshold) to 200% (maximum) of the target bonus established by the Committee as follows:

| Company or Group Performance Level | Payment Level |
| --- | --- |
| Below 85% of plan | Discretionary |
| At 85% of plan | 40% of target |
| Every 1% increase between 85% and 100% of goal | An additional 4% of target |
| At 100% of plan | 100% of target |
| Every 1% increase between 100% and 115% of goal | An additional 6⅔% of target (to a maximum of 200%) |

For fiscal 2006, [the Company and the broadcasting group met or exceeded all of their respective financial performance goals, while the publishing group did not meet all of its financial performance goals.]

At each payment level specified above, the Committee may elect to grant an MIP award to an NEO in an amount at or above the specified level based on an NEO's achievement of the pre-determined individual performance goals established by the Committee. The individual performance goals consist of specific strategic and operational goals for the Company and for the publishing and broadcasting groups which are designed to maximize revenue opportunities and aggressively manage resources. In addition, the Committee reserves the discretion to reduce or not pay bonuses under the MIP even if

27

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413840

the relevant financial performance targets are met and the relevant individual performance goals are achieved.

Awards granted to the NEOs for fiscal 2006 are reflected in the Summary Compensation Table on page [   ] of this Proxy Statement. No award was granted to an NEO that was not related to the achievement of the financial performance goals or pre-determined individual performance goals.

*Equity Compensation*

The Committee believes that a meaningful portion of each NEO's compensation should be in the form of equity awards, as such awards serve to align more directly the interests of NEOs and our shareholders. In addition, in order to assist in retaining executive talent, the equity awards include vesting requirements based on the passage of time and continued employment. Equity awards to our NEOs are made pursuant to the Incentive Plan. The Incentive Plan allows for the use of a wide variety of equity-based awards, including stock options, restricted stock and restricted stock units.

Prior to 2006, equity grants were provided to NEOs solely in the form of non-qualified stock options. In 2006, NEOs received their equity awards in stock options and in restricted stock units that, in each case, vest based on the passage of time and continued employment. In granting equity awards for 2006, including the grants to the NEOs, the Committee considered each of the following primary factors related to equity grants from prior years. These primary factors contributed to the Committee's decision to grant a combination of stock options and restricted stock units to each NEO.

- The substantial reduction in the size and value of all stock option grants in the three years prior to 2006. The total number of all stock options granted in February 2005 was 49% lower than the total number of stock options granted in February 2002, and the aggregate grant date fair value of the stock options granted in February 2005 was 61% less than the aggregate grant date fair value of the stock options granted in February 2002.

- The elimination of the replacement feature for all stock options awarded after 2003 and the reduction in the term of stock options from ten to eight years in 2005 and after, which in each case reduced the grant date fair value of such stock options.

- Peer company practice with respect to the grant of "full-value" stock awards such as restricted stock or restricted stock units.

- The Company's competitive position with respect to executive compensation and the fact that all outstanding annual Tribune stock option awards granted since 1998 were out-of-the-money and thereby did not provide any retention incentives for executive talent.

The amount of equity compensation that is provided to each NEO in a given year is generally determined by reference to survey data for the prior year. That is, the Committee each year approves an equity award or awards for each NEO that would provide total compensation, taking into account base salary and MIP as well as equity compensation, that is between the 50th percentile and the 75th percentile when compared to the other companies included in the survey data and those in the Peer Group. The percentage that the Committee selects for these purposes in a given year is dependent on the Committee's assessment, for that year, of the appropriate balance between cash and equity compensation.

A description of the form of equity awards that have been made to NEOs under the Incentive Plan follows:

Stock Options. Stock options granted under the Incentive Plan may vest on the basis of the satisfaction of performance conditions established by the Committee or on the basis of the passage of time and continued employment. Stock options that vest on the basis of the passage of time and continued employment generally vest in equal annual installments over a period of four years from the

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413841

grant date for options granted prior to February 2006 and over a period of three years from the grant date for the annual grants made on or after February 2006. The stock options awarded in February 2006 and 2005 were for eight-year terms, two years shorter than the ten-year terms of the stock options awarded in prior years. The two-year reduction in term reduced stock-based compensation expense with respect to those stock options. The Committee has the ability to modify both the term and vesting schedule for new stock option grants within the parameters of the Incentive Plan. All options are granted with an exercise price equal to the closing market price of a share of our common stock on the date of grant, and stock option re-pricing is expressly prohibited by the Incentive Plan's terms without shareholder approval.

Restricted Stock Units.  Restricted stock units ("RSUs") convert into shares of our common stock if the recipient is still employed by us on the date that specified restrictions lapse. Restricted stock units granted under the Incentive Plan may vest on the basis of the satisfaction of performance conditions established by the Committee or on the basis of the passage of time and continued employment. Outstanding restricted stock units that vest on the basis of the passage of time and continued employment vest over a three-year period. For grants made to the NEOs in 2006, the restrictions lapse in stages, with restrictions lapsing on 33% of the shares on each of the first two anniversaries of the grant date and 34% of the shares on the third anniversary of the grant date. However, with respect to the grant of 12,000 restricted stock units made to Mr. Lewin, the restrictions lapse all at once, with 100% vesting following the third anniversary of continued employment. Recipients of restricted stock units receive dividend equivalents on RSUs which vest at the same time as the RSUs on which they were granted and which are paid in additional shares. RSUs do not contain voting rights with respect to Company stock prior to conversion into shares of common stock.

*Practices Regarding the Grant of Options*

The Committee has generally followed a practice of making all annual option grants to its executive officers on a single date each year and at a time when material information regarding our performance for the preceding year has been disclosed. Since February 1999, the Committee has granted these annual awards at its regularly-scheduled meeting in February. The February meeting date generally occurs within four weeks after the issuance of the release reporting the Company's earnings for the previous fiscal year. We do not otherwise have any program, plan or practice to time annual option grants in coordination with the release of material non-public information.

While the vast majority of our option awards to NEOs have historically been made pursuant to our annual grant program, we retain the discretion to make additional awards to NEOs or other employees at other times, in connection with the initial hiring of a new officer, in connection with promotions, for retention purposes or otherwise. No such awards have been made to any of the NEOs.

Prior to 2004, replacement stock options ("replacement options") were granted simultaneously with the exercise of the original stock option if an NEO or other key employee exercised a stock option by surrendering currently owned shares to purchase the shares subject to the original stock options as well as to satisfy related tax withholding obligations. In February 2004, Tribune suspended the practice of issuing new stock options with a replacement feature. Replacement stock options are subject to the same terms and conditions as the original options, including the expiration date, except that the exercise price of a replacement stock option is the fair market value on the date of its grant rather than the exercise price of the original stock option. Also, replacement stock options do not become exercisable until one year after award. Moreover, replacement stock options were not granted unless the closing stock price on the date of exercise exceeded the exercise price by at least 25%. The grant of replacement options did not result in an increase in the total combined number of shares and options held by an employee. Effective since 2005, no replacement stock options will be granted to any Tribune senior executives, including the NEOs, unless the closing stock price on the date of exercise exceeds the

29

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413842

exercise price by at least 50%. No replacement options were granted to NEOs in 2006 because no NEO exercised a stock option.

All stock option awards made to our NEOs, or any of our other employees, are made pursuant to our Incentive Plan. As noted above, all stock options under the Incentive Plan are granted with an exercise price equal to the fair market value of our common stock on the date of grant. Fair market value is defined under the Incentive Plan to be the closing market price of a share of our common stock on the date of grant. We do not have any program, plan or practice of awarding stock options and setting the exercise price based on the stock's price on a date other than the grant date. We do not have a practice of determining the exercise price of stock option grants by using average prices (or lowest prices) of our common stock in a period preceding, surrounding or following the grant date. While the Committee's charter permits delegation of the Committee's authority to grant stock options in certain circumstances, all grants to NEOs have been made by the Committee itself and not pursuant to delegated authority.

### Perquisites

Our NEOs receive certain perquisites provided by or paid for by the Company. These perquisites include financial planning services, memberships in social and professional clubs, car allowances and gross up payments equal to the taxes payable on certain perquisites.

We provide these perquisites because, in many cases, the perquisite makes our executives more efficient and effective and thereby is a benefit to us. In addition, these perquisites are provided by many companies in the Peer Group to their named executive officers and it is therefore necessary for retention and recruitment purposes that we do the same.

### Deferred Compensation Plans

Our Bonus Deferral Plan allows certain employees, including the NEOs, to defer receipt of MIP bonus payments.

Participants may defer up to 100% of bonus payments into a cash-based account or into an account that tracks Tribune common stock. The cash-based account appreciates at a rate equal to 120% of the long-term applicable federal rate, compounded quarterly, which is determined periodically by the Internal Revenue Service. The rate is reset by the Company on March 1 of each year and for 2006 was 5.52%. Amounts deferred into Tribune common stock accounts are credited with earnings or losses based on the return on Tribune common stock. The investment alternative is selected by the participants in the plan, and participants may not move an investment out of a Tribune stock return equivalent once it has been selected. We do not "match" amounts that are deferred by employees pursuant to the Bonus Deferral Plan. Distributions are paid in a lump sum distribution or in annual installments on or about March 1 each year commencing in the calendar year following the termination of the employee's employment with the Company.

The Bonus Deferral Plan is not funded by us, and participants have an unsecured contractual commitment from us to pay the amounts due under the Bonus Deferral Plan. When such payments are due, the cash will be distributed from our general assets.

We provide this benefit because the Committee wishes to permit our employees to defer the obligation to pay taxes on certain elements of their compensation. The Bonus Deferral Plan permits them to do this while also receiving interest on deferred amounts, as described above. Deferral of amounts into Tribune stock equivalents also further aligns the interests of management and shareholders and assists the executive with meeting ownership guideline requirements described below. We believe that this benefit is important as a retention and recruitment tool as many if not all of the companies with which we compete for executive talent provide a similar plan to their senior employees.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413843

*Post-Termination Compensation*

Transitional Compensation Plan.  The NEOs do not have employment agreements and are considered "at-will" employees who may be terminated at any time by the Company. While we have not entered into formal severance agreements with any of the NEOs, we do maintain a Transitional Compensation Plan for Executive Employees (the "Transitional Compensation Plan") under which all the NEOs are covered. The Transitional Compensation Plan provides for benefits, upon a qualifying event or circumstances after there has been a "change-in-control" (as defined in the Transitional Compensation Plan) of the Company. Additional information regarding the Transitional Compensation Plan, including a definition of key terms and a quantification of benefits that would have been received by our NEOs had termination occurred on December 31, 2006, is found under the heading "Potential Payments upon Termination or Change-in-Control" beginning on page [   ].

The Committee believes that the Transitional Compensation Plan is an important part of overall compensation for our NEOs, and the Committee believes that it helps to secure the continued employment and dedication of our NEOs, notwithstanding any concern that they might have at such time regarding their own continued employment, prior to or following a change in control. The Committee also believes that the Transitional Compensation Plan is important as a recruitment and retention device, as all or nearly all of the companies with which we compete for executive talent have severance or transitional compensation agreements in place for their senior employees.

Pension Plan and Supplemental Pension Plan.  The Tribune Company Pension Plan (the "Pension Plan") is a funded, tax-qualified, noncontributory defined-benefit pension plan that covers all non-union employees who had met the relevant age and service requirements, including the NEOs. We also maintain The Tribune Company Supplemental Retirement Pension Plan (the "Supplemental Pension Plan"), an unfunded plan that provides payments substantially equal to the difference between the amount that would have been payable under the Pension Plan, in the absence of legislation limiting pension benefits and earnings that may be considered in calculating pension benefits, and the amount actually payable under the Pension Plan.

Both plans were "frozen" on December 31, 1998 (the "freeze date"), and no additional service and compensation credit has accrued since the freeze date. Benefits payable under the Pension Plan are based upon the employee's years of service (up to a maximum of 35 years) and the employee's highest average earnings for a five calendar-year period with us and our affiliated companies as of the freeze date. Benefits are payable after retirement in the form of an annuity or a lump sum. Earnings, for purposes of the calculation of benefits under the Pension Plan, include base salary and commissions, if any. The amount of annual earnings considered in calculating benefits under the Pension Plan is limited by law. Contributions to the Pension Plan are made entirely by us and are paid into a trust fund from which the benefits of participants will be paid. Additional information regarding the Pension Plan and the Supplemental Pension Plan is found under the heading "2006 Pension Benefits" beginning on page [   ].

Savings Plan and Supplemental Savings Plan.  Under the Tribune Company 401(k) Savings and Profit Sharing Plan (the "Savings Plan"), a tax-qualified retirement savings plan, non-union employees, including our NEOs, may contribute eligible base compensation on a before-tax basis, up to Internal Revenue Service limits. For calendar year 2006, the maximum contribution by employees to the Savings Plan was $15,000, plus an additional $5,000 for those employees who had attained age 50 years. In addition, the Company provides a regular company contribution equal to 4% of eligible compensation (generally, base compensation). We also provide an annual profit-sharing contribution of between 2% and 5% of base compensation depending on the financial performance of the Company for the year with a target of 3.5% of base compensation. For 2006, the profit-sharing contribution was [3.0%] of compensation. Amounts held in Savings Plan accounts may not be withdrawn except in the event of hardship prior to the employee's termination of employment, or such earlier time as the employee

31

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413844

reaches the age of 59½ years, subject to certain exceptions set forth in Internal Revenue Service regulations.

Pursuant to Internal Revenue Service rules, effective for 2006, the Savings Plan limits the "annual additions" that can be made to a participating employee's account to $44,000 per year. "Annual additions" include company contributions and profit-sharing contributions made by us at the request of the participating employee under Section 401(k) of the Internal Revenue Code. In addition, no more than $220,000 of annual compensation may be taken into account in computing benefits under the Savings Plan.

We have a Supplemental Defined Contribution Plan (the "Supplemental Savings Plan") paid out of the Company's general assets, which credits eligible Savings Plan participants with an amount substantially equal to the difference between the amount that, in the absence of legislation limiting company contributions to the Savings Plan, would have been allocated to an employee's company contributions and profit-sharing contributions and the amount actually allocated under the Savings Plan.

We maintain the Savings Plan for our employees, including our NEOs, because we wish to encourage our employees to save some percentage of their cash compensation for their eventual retirement. The Savings Plan permits employees to make such savings in a manner that is relatively tax efficient. We maintain the Supplemental Savings Plan because we believe that it is not equitable to limit the Company contribution portion of the program on the basis of a limit that is established by the Internal Revenue Service for purposes of federal tax policy. The Supplemental Savings Plan permits a participant to receive the same percentage of compensation in the form of company contributions as participants not subject to these limits.

*Stock Ownership Guidelines.*

The Company has established stock ownership guidelines for executive officers and other key employees. The Committee believes that stock ownership guidelines have the positive effect of further aligning the interests of management with those of Tribune's shareholders. The guidelines generally range from a high of ten times annual salary, in the case of Mr. FitzSimons, to one times annual salary. Individuals are expected to achieve the suggested ownership level over a six-year period. Shares held in Tribune benefit plans are counted in satisfying the guidelines, but unexercised stock options and unvested shares of restricted stock and restricted stock units are not counted. All of the NEOs named in the summary compensation table have achieved their suggested stock ownership levels. For 2006, the stock ownership guidelines applied to approximately 95 individuals.

We have a policy that prohibits our directors and executive officers from engaging in selling short our common stock or engaging in hedging or offsetting transactions regarding our common stock.

*Compliance*

Section 162(m) of the Internal Revenue Code imposes a $1 million limit on the tax deduction for certain executive compensation payments. Performance-based compensation meeting specified requirements is exempt from this deduction limit. In 2006, the Committee granted performance-based compensation awards pursuant to the Incentive Plan that were subject to the deduction limit as well as awards that were not subject to the limit. The Committee believes that shareholders are best served by preserving the Committee's discretion and flexibility to approve non-deductible awards in appropriate circumstances consistent with corporate performance objectives.

Incentive Plan awards for February 2006 and February 2007 include express "claw-back" provisions under which awards or gains from awards may be forfeited if a participant engages in any act of fraud, insider trading or other securities law violation.

32

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413845

**Compensation & Organization Committee Report**

The Compensation & Organization Committee of the Board of Directors of Tribune Company (the "Committee") oversees Tribune Company's compensation program on behalf of the Board. In fulfilling its oversight responsibilities, the Committee reviewed and discussed with management the Compensation Discussion and Analysis set forth in this Proxy Statement.

In reliance on the review and discussions referred to above, the Committee recommended to the Board that the Compensation Discussion and Analysis be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2006 and the Company's Proxy Statement to be filed in connection with the Company's 2007 Annual Meeting of Shareholders, each of which will be filed with the Securities and Exchange Commission.

Jeffrey Chandler
Enrique Hernandez, Jr.
Robert S. Morrison, Chairman
Miles D. White

\*\*\*

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413846

**4**

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0413847**

# TRIBUNE COMPANY
## MANAGEMENT INCENTIVE PLAN

## BACKGROUND

Operating cash flow plus income from our equity investments is the measure used to determine Management Incentive Plan (MIP) bonus pools that are earned by the publishing and broadcasting groups, as well as corporate. Operating cash flow and equity income targets are set each year based upon the operating plan approved by the Board. Our equity investment results, which include CareerBuilder, Classified Ventures and ShopLocal in Publishing, and TV Food Network and Comcast SportsNet in Broadcasting, are important to the future growth of Tribune. Therefore, the performance of these investments against our plans is measured in determining the company's bonus achievement.

Target bonus pools are established at each business unit based on participants' salaries and their respective target bonus percentages. The bonus pool that can be earned generally ranges from 40% to 200% of the target pool. Minimum and maximum operating cash flow/equity ranges are established at each business unit. Generally, smaller business units will have greater variability in their results, as a percentage of plan, because of size and relative margins. Therefore, ranges expand as the size of the entity decreases. The larger business units have narrower operating cash flow ranges (85% to 120% of plan) while the smaller units have wider ranges (75% to 140%). If a business unit does not meet its minimum operating cash flow target, the bonus pool, if any, is discretionary.

Specific payouts to participants are based on a combination of operating cash flow, revenue growth, market share and cash expenses along with a discretionary component. Shown below is a diagram that depicts how the MIP bonus pools are calculated and allocated to individual participants.



## 2006 OPERATING CASH FLOW AND EQUITY RESULTS

Total consolidated operating cash flow of $1,362 million for 2006 was $32 million below plan and $39 million lower than 2005.  Consolidated revenues were $5,518 million, or 1%, below plan as Publishing revenues were 2% below plan, partially offset by higher than planned Broadcasting revenues driven by strong political advertising.

| | 2006 Results | | |
|---|---|---|---|
| | ($ in millions) | | |
| | **2006** | | |
| | **Actual** | **Plan** | **2005** |
| **Op. Cash Flow (1)** | | | |
| Publishing | $965 | $1,041 | $986 |
| Broadcasting (2) | 448 | 408 | 466 |
| Corporate | (51) | (55) | (50) |
| **Total OCF** | **$1,362** | **$1,394** | **$1,401** |
| Equity Income | 75 | 37 | 41 |
| **Total** | **$1,437** | **$1,431** | **$1,442** |

(1) Excludes non-operating items, special items, stock-based compensation and discontinued operations.
(2) Both 2006 and 2005 exclude the operating results for the Atlanta, Albany and Boston TV stations, which are reported as discontinued operations.

Consolidated cash expenses were 1% below plan as compensation expense was 3% lower than plan, partially offset by higher than planned newsprint prices and direct mail postage expense in Publishing.  Additional cost saving initiatives were also implemented in 2006.

Equity income exceeded plan by $38 million primarily due to favorable results at TV Food Network, CareerBuilder, Classified Ventures, and Comcast SportsNet Chicago.  Additionally, we did not incur planned losses from additional Interactive investments.  Actual 2006 results exclude the Company's $6 million share of a one-time favorable income tax adjustment at CareerBuilder.

The Company's Incentive Compensation Plan allows for adjustments to operating cash flow for "extraordinary items."  The severance charges for position eliminations and outsourcing of call centers that occurred late in the year ($9 million) and the union settlement at Newsday ($20 million) were considered one-time extraordinary items, and were therefore excluded from operating cash flow for purposes of determining bonus achievement.  In addition, the charge for the disposition of a press related to the Los Angeles Times plant shutdown ($4 million), the gain on sale of the corporate aircraft ($7 million) and gains on sales of real estate in Southern Connecticut and Baltimore in Publishing ($7 million) were also excluded.

On a consolidated basis, the Company's 2006 operating cash flow and equity income totaled $1,437 million, which was above plan and only slightly below last year.  This was an excellent achievement given the difficult advertising environment.

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0413849**

## 2006 BONUS SUMMARY

**2006 Bonus Summary by Group**
($ in 000's)

|  | Target Amount | Achieved Amount | Achieved % * | Proposed Amount | Proposed % * | 2005 Paid |
|---|---|---|---|---|---|---|
| Publishing | $24,865 | $19,580 | 79% | $19,504 | 78% | $15,466 |
| Broadcasting | 10,745 | 13,858 | 129% | 11,111 | 103% | 5,073 |
| Corporate | 6,250 | 6,438 | 103% | 6,386 | 102% | 1,985 |
| Consolidated | $41,860 | $39,876 | 95% | $37,001 | 88% | $22,524 |

\* Compared to target amount.
Note:  Excludes discontinued operations (Albany, Atlanta and Boston TV stations).

In accordance with the MIP formula, the Company achieved a total bonus pool in 2006 of $40 million.  The Company proposes a bonus payout of $37 million, which is approximately $3 million below achieved MIP.

The proposed bonus payout of $37 million is equal to approximately 2.7% of operating cash flow with 1,010 participants.  This is in line with the historical payouts, which have generally ranged from 1.6% to 3.3%.

**Comparison of Bonus Paid vs. Earned**
($ in millions)

|  | Bonus Earned | % of Target | Bonus Paid | % of OCF |
|---|---|---|---|---|
| 2006 | $39.9 | 95% | $37.0 | 2.7% |
| 2005 | 18.9 | 48% | 22.5 | 1.6% |
| 2004 | 26.8 | 71% | 27.5 | 1.7% |
| 2003 | 36.3 | 97% | 41.6 | 2.6% |
| 2002 | 52.1 | 150% | 45.1 | 3.0% |
| 2001 | 1.0 | - | 1.0 | - |
| 2000 | 23.0 | 93% | 24.7 | 1.8% |
| 1999 | 31.2 | 127% | 27.1 | 2.9% |
| 1998 | 22.5 | 95% | 21.9 | 2.6% |
| 1997 | 28.1 | 129% | 25.0 | 3.3% |

Management believes the proposed 2006 bonus is appropriate given the Company's efforts to control costs and manage through a continued difficult advertising environment.  The table to the right summarizes the bonus pool distribution for all of our business units.  Exhibit I on pages 4-5 summarizes each business unit's performance and bonus recommendation.

**Bonus Pool Distribution**

|  | Number of Business Units | |
|---|---|---|
| Bonus Pool Range | 2006 Proposed | 2005 Actual |
| 150% to 200% | 1 | 0 |
| 100% to 150% | 14 | 1 |
| 40% to 100% | 24 | 31 |
| Below 40% | 1 | 8 |
| Total | 40 | 40 |

## 2007 MIP TARGETS

The operating cash flow and equity income used to establish the 2007 MIP target are consistent with the operating plan.  Operating cash flow is planned to decrease by $60 million to $1,270 million primarily due to a continued decline in revenues.  Excluding the 53rd week in 2006, planned operating cash flow is $38 million below the prior year.  Equity income is projected to decrease by $8 million primarily due to planned losses from additional interactive investments.  The 2007 MIP target includes projected stock-based compensation expense.  See Exhibit II on page 6 for MIP targets and ranges by group.

**2007 MIP Target**
($ in millions)

|  | 2007 Plan | 2006 Actual (2) |
|---|---|---|
| Operating Cash Flow (1) | $1,270 | $1,330 |
| Equity Income | 67 | 75 |
| Total | $1,337 | $1,405 |

(1) Includes stock-based compensation of $42 million in 2007 and $32 million in 2006.
(2) Excludes special items and discontinued operations (Albany, Atlanta and Boston TV stations).

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413850

Exhibit I

TRB0413851

## TRIBUNE COMPANY
### 2006 MIP BONUS SUMMARY
($ in millions)

| | | Operating Cash Flow (1) | | | % of Target Bonus Pool | | | Participants | | Bonus ($ in 000's) | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2006 | | 2005 | 2006 | | 2005 | | | 2006 | 2005 |
| | | Actual | Plan | Actual (2) | Achieved | Proposed | Actual | 2006 | 2005 | Proposed | Paid |
| | **BROADCASTING** | | | | | | | | | | |
| | Television | | | | | | | | | | |
| 1 | New York | $ 62.1 | $ 67.2 | $ 69.8 | 70% | 82% | 34% | 17 | 17 | $ 696 | $ 264 |
| 2 | Los Angeles | 52.2 | 41.5 | 54.9 | 200% | 118% | 34% | 22 | 22 | 1,198 | 321 |
| 3 | Chicago Cable | 93.9 | 90.4 | 88.6 | 119% | 115% | 80% | 7 | 8 | 528 | 356 |
| 4 | Chicago Television | 31.1 | 30.5 | 37.7 | 111% | 92% | 51% | 20 | 21 | 848 | 492 |
| | Two-Station Clusters | | | | | | | | | | |
| 5 | Seattle | 18.1 | 10.9 | 15.0 | 200% | 154% | 72% | 9 | 9 | 503 | 212 |
| 6 | Indianapolis | 9.5 | 8.1 | 6.1 | 168% | 142% | 61% | 7 | 6 | 380 | 131 |
| 7 | Hartford | 12.5 | 11.6 | 12.2 | 132% | 112% | 35% | 8 | 8 | 218 | 66 |
| 8 | New Orleans | 2.4 | (6.4) | (2.3) | 200% | 96% | 99% | 8 | 8 | 227 | 193 |
| | All Other TV Stations | | | | | | | | | | |
| 9 | Philadelphia | 11.1 | 6.3 | 11.2 | 200% | 135% | 44% | 5 | 5 | 320 | 90 |
| 10 | Dallas | 23.1 | 21.4 | 31.4 | 132% | 130% | 53% | 6 | 6 | 265 | 105 |
| 11 | Washington | 16.2 | 12.2 | 19.5 | 200% | 143% | 99% | 5 | 5 | 273 | 160 |
| 12 | Houston | 12.8 | 9.8 | 14.6 | 200% | 135% | 43% | 5 | 7 | 258 | 72 |
| 13 | Miami | 18.1 | 19.2 | 20.4 | 82% | 81% | 59% | 4 | 5 | 137 | 87 |
| 14 | Sacramento | 15.9 | 13.6 | 14.2 | 166% | 115% | 78% | 8 | 8 | 240 | 132 |
| 15 | St. Louis | 5.1 | 4.4 | 6.2 | 169% | 108% | 36% | 6 | 6 | 188 | 61 |
| 16 | Portland | 1.5 | 0.5 | 2.8 | 200% | 101% | 33% | 2 | 5 | 98 | 36 |
| 17 | San Diego | 2.0 | 1.7 | 1.3 | 150% | 97% | 38% | 4 | 5 | 132 | 53 |
| 18 | Grand Rapids | 8.1 | 7.7 | 7.5 | 112% | 99% | 59% | 7 | 7 | 140 | 70 |
| 19 | Harrisburg | 3.3 | 4.3 | 3.6 | 43% | 44% | 55% | 7 | 7 | 60 | 62 |
| 20 | Chicago Radio | 14.3 | 16.7 | 16.1 | 56% | 48% | 83% | 8 | 8 | 153 | 254 |
| 21 | Chicago Cubs | 25.6 | 20.4 | 14.9 | 80% | 80% | 58% | 14 | 15 | 756 | 658 |
| 22 | Group Office (3) | | | | 179% | 137% | 44% | 26 | 26 | 3,051 | 785 |
| 23 | **Subtotal** | 439.0 | 392.2 | 445.8 | 144% | 110% | 52% | 207 | 214 | 10,666 | 4,656 |
| | Discretionary Bonuses (4): | | | | | | | | | | |
| 24 | Denver | 4.5 | 6.1 | 7.1 | 0% | 48% | 40% | 8 | 8 | 122 | 100 |
| 25 | Tribune Entertainment | 2.9 | 7.1 | 8.5 | 0% | 39% | 32% | 11 | 15 | 324 | 317 |
| 26 | **Subtotal** | 9.2 | 16.2 | 19.9 | 0% | 41% | 39% | 19 | 23 | 445 | 417 |
| 27 | Equity Income/(Loss) | 84.6 | 67.9 | 57.3 | | | | | | | |
| 28 | **Total Broadcasting** | $ 532.7 | $ 476.3 | $ 523.0 | 129% | 103% | 49% | 226 | 237 | $ 11,111 | $ 5,073 |

(1) Excludes operating results from discontinued operations (Atlanta, Albany and Boston).
(2) Excludes special charges for severance ($1 million) and a one-time pension curtailment gain ($1 million).
(3) Group office bonuses are based on total Broadcasting results.
(4) Proposed bonuses for the business units that did not meet operating cash flow objectives were based on consideration of other factors, including individual achievements and market conditions.

4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Exhibit I

TRB0413852

**TRIBUNE COMPANY**
**2006 MIP BONUS SUMMARY**
($ in millions)

| | Operating Cash Flow (1) | | | % of Target Bonus Pool | | | Participants | | Bonus ($ in 000's) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | | 2005 | 2006 | | 2005 | | | 2006 | 2005 |
| | Actual | Plan | Actual | Achieved | Proposed | Actual | 2006 | 2005 | Proposed | Paid |
| **PUBLISHING** | | | | | | | | | | |
| 1 Los Angeles | $ 250.9 | $ 262.1 | $ 241.9 | 83% | 76% | 42% | 135 | 137 | $ 4,296 | $ 2,232 |
| 2 Chicago | 222.0 | 241.3 | 244.4 | 68% | 72% | 70% | 116 | 120 | 2,680 | 2,677 |
| 3 New York | 101.0 | 141.4 | 119.9 | 66% | 69% | 65% | 50 | 53 | 1,568 | 1,359 |
| 4 Ft. Lauderdale | 136.3 | 145.2 | 132.8 | 76% | 80% | 80% | 52 | 56 | 1,480 | 1,423 |
| 5 Orlando | 92.0 | 93.4 | 85.1 | 94% | 93% | 93% | 59 | 62 | 1,706 | 1,820 |
| 6 Baltimore | 63.7 | 69.9 | 64.8 | 65% | 72% | 58% | 49 | 51 | 1,284 | 961 |
| 7 Hartford | 48.5 | 51.1 | 48.3 | 80% | 83% | 69% | 44 | 46 | 1,175 | 874 |
| 8 Allentown | 28.8 | 30.7 | 30.0 | 75% | 74% | 74% | 39 | 43 | 600 | 584 |
| 9 Newport News | 20.9 | 20.8 | 19.4 | 103% | 98% | 82% | 27 | 28 | 451 | 429 |
| 10 So. Connecticut | 6.6 | 7.1 | 7.5 | 70% | 74% | 89% | 6 | 8 | 184 | 261 |
| 11 CLTV News | 2.5 | 1.4 | 1.2 | 200% | 105% | 99% | 3 | 4 | 102 | 162 |
| 12 Tribune Media Services | 22.5 | 24.1 | 23.0 | 73% | 77% | 71% | 27 | 29 | 659 | 593 |
| 13 Interactive Group (2) | | | | 100% | 89% | 91% | 50 | 29 | 1,669 | 1,010 |
| 14 Publishing Group Office (3) | | | | 78% | 88% | 57% | 27 | 26 | 1,419 | 822 |
| 15 Subtotal | 971.7 | 1,026.3 | 995.4 | 79% | 79% | 66% | 684 | 692 | 19,272 | 15,208 |
| **Discretionary Bonuses:** | | | | | | | | | | |
| 16 Spanish Language Newspapers (4) | (7.3) | (6.6) | (9.1) | 62% | 60% | 65% | 9 | 8 | 232 | 258 |
| 17 Equity Income/(Loss) | (14.9) | (15.0) | (22.4) | | | | | | | |
| 18 Total Publishing | 949.6 | 1,004.6 | 963.8 | 79% | 78% | 66% | 693 | 700 | 19,504 | 15,466 |
| 19 CORPORATE OFFICE (5) | | | | 103% | 102% | 37% | 91 | 93 | 6,386 | 1,985 |
| 20 CONSOLIDATED | $ 1,436.8 | $ 1,431.4 | $ 1,442.7 | 103% | 88% | 58% | 1,010 | 1,030 | $ 37,001 | $ 22,524 |

(1) 2006 excludes charges for severance ($9 million), union settlement at Newsday ($20 million) and the write-off of a press related to the LA Times plant shutdown ($4 million).
    2005 excludes charges for severance ($43 million) and $1 million at Publishing and $1 million at Corporate), cash expenses related to the LA Times plant shutdown ($6 million) and
    a one-time pension curtailment gain ($13 million at Publishing and $4 million at Corporate).
(2) Interactive cash flows are included at each respective newspaper. Increase in 2006 participants is due to hiring of additional management positions.
(3) Publishing group office bonuses are based on total Publishing results and include Tribune Media Net.
(4) Bonus is discretionary because Hoy is in a loss position. Their bonus achievement is calculated using other financial measures.
(5) Corporate office bonuses are based on consolidated achievement.

5

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413853

Exhibit II

## TRIBUNE COMPANY
## 2007 MIP TARGETS BY GROUP
($ in millions)

| | Operating Cash Flow (1) + Equity Income | | | | | |
|---|---|---|---|---|---|---|
| | **2007 Ranges** | | | **Actual (2)** | | |
| | *Minimum* | *Plan* | *Maximum* | **2006** | **2005** | |
| Publishing | $758 | **$892** | $1,026 | $934 | $964 | |
| *% of Plan* | *85%* | | *115%* | | | |
| Broadcasting (3) | 430 | **506** | 582 | 527 | 523 | |
| *% of Plan* | *85%* | | *115%* | | | |
| Corporate (4) | | **(61)** | | (56) | (44) | |
| **Consolidated** | $1,136 | **$1,337** | $1,537 | $1,405 | $1,443 | |
| *% of Plan* | *85%* | | *115%* | | | |

(1)  Includes stock-based compensation expense of $42 million in 2007 and $32 million in 2006.
(2)  2006 excludes special items for severance ($9 million), the union settlement at Newsday ($20 million), a charge for the
      disposition of a press related to the LA plant shutdown ($4 million) and gains from the sale of Publishing properties
      ($7 million) and the corporate airplane ($7 million).
      2005 excludes special charges for severance ($45 million), cash expenses related to the LA plant shutdown ($6 million)
      and a one-time pension curtailment gain ($18 million).
(3)  Excludes discontinued operations (Atlanta, Albany and Boston) in all years.
(4)  There is not a range for Corporate expenses since corporate staff bonuses are based on consolidated results.

6

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**5**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413854

# TRIBUNE COMPANY
## 2007 EQUITY COMPENSATION RECOMMENDATIONS

**2007 Annual Grant**

In October, the Committee agreed that 2007 awards would total up to 2 million restricted share units, equal to the February 2006 restricted stock units and options (assuming a 4 to 1 conversion ratio). In terms of value conveyed by the equity grants, the Company's investment bankers indicate that Tribune's unaffected share price (absent the strategic alternative process) would likely be in the $27-$28 range compared to its current $30 trading price. As a result, the value and associated accounting expense of this award is between $54-$60 million.

The chart below illustrates recent equity grant experience. From 2001 through 2006, the Company dramatically reduced equity expense, first in anticipation of the need to expense stock options, and then as the Company shifted from 100% options to a mix of options and restricted stock units in 2006.

| Equity Grant Summary (000's except per share data) | | | | |
|---|---|---|---|---|
| | **Options** | **RSUs** | **Grant Price** | **Total Grant Expense\*** |
| 2001 | 7,540 | | $40.18 | $103,997 |
| 2002 | 7,220 | | 40.50 | 98,120 |
| 2003 | 6,635 | | 45.90 | 92,227 |
| 2004 | 4,052 | | 52.05 | 62,725 |
| 2005 | 3,648 | | 40.59 | 38,340 |
| 2006 | 1,953 | | 31.16 | 11,631 |
|    Annual | | 1,065 | 31.16 | 33,183 |
|    Supplemental | | 432 | 31.16 | 13,452 |
| 2006 Total | | 1,497 | | $58,266 |
| 2007 P | | 2,000 | $27-$30 | $54,000-$60,000 |

\*Options expense based on Black-Scholes value. Expense is recognized over a 36-month vesting period for the 2006 and 2007 awards. Prior year awards have been fully expensed because of accelerated vesting.

**Background**

In February 2006, approximately 1 million restricted stock units were granted in lieu of stock options based on a 4 to1 conversion ratio. To address competitive compensation inequities and retention issues, the Committee also approved a supplemental grant of 432,000 restricted stock units to 87 employees. The CEO and the other four executives in the proxy statement elected to forgo their supplemental award in 2006, as Management did not want to indicate any weakness in their commitment to the Company.

Proposed terms and allocations for restricted stock units granted in 2007 are attached as Exhibits I and II. This year Management recommends equity awards be granted to 778

employees totaling approximately 2 million shares versus 3.4 million shares (including both options and restricted stock units) to 669 employees in February 2006.

The recommendation of 2 million shares is equal to 0.8% of Tribune's equity market capitalization which is in the $6.5-7 billion range. According to a November 2006 Frederic Cook report, this places Tribune between their definition of middle and large capitalization companies. Equity awards of 0.8% of equity market capitalization would be between the 50-75[th] percentile for large capitalization companies and between the 25-50[th] percentile for middle capitalization companies.

**Key Hire and Retention Pool**

In prior years, Management has been granted a discretionary option and restricted stock unit pool to attract and retain key employees through the upcoming year. These option and restricted stock unit grants are approved by Dennis FitzSimons as needed. During 2006, 28,000 of the discretionary 100,000 option pool and 30,000 of the 50,000 restricted stock unit pool were granted. The remaining grants will expire.

Management recommends that the Committee approve a pool of 100,000 restricted stock units for allocation during the next year. However, in the event of a change in control of Tribune, this pool would be cancelled.

**Accelerated Vesting of Equity Awards**

In the event of a change in control of Tribune, the Incentive Compensation Plan and individual term sheets provide that all restricted stock units and stock options would fully vest at the close of a transaction. If a business unit is sold or if a position within Tribune Company is eliminated between the announcement and close of a change in control transaction of Tribune, Management recommends that all restricted stock units and stock options for these employees also be fully vested.

If there is not a transaction involving a change in control of Tribune Company, Management recommends that we grant one additional year of vesting credit for positions eliminated or for business units that are sold during 2007. This is consistent with our general practice in the past. Stock options and annual restricted stock unit grants normally vest over a 3-year period. The 2006 supplemental restricted stock award had 3-year cliff vesting. We propose to convert this supplemental award to match the normal 3-year graded vesting schedule for employees in positions eliminated or business units that are sold in 2007. For instance, an eligible individual who holds a 2006 award and is terminated in 2007 would become 2/3 vested in that award.

An additional year of vesting credit would also be provided for Broadcast employees in the event of a sale of the Broadcast Group in 2007. However, in the event of a spin-off of Broadcasting, equity grants would be converted to equity in the new public broadcasting company and vesting would not be affected.

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**Full Vesting of 401(k) Contributions**

Management requests the authority to fully vest non-union employees in their 401(k) company contribution account in the event of both (1) a change in control of Tribune Company and (2) involuntary or constructive termination of the individual's employment following the change in control. Currently, plan participants become 100% vested in company contributions after three years of service. There is no cash cost associated with full vesting since the contributions have already been made to the plans. We would propose that this protection remain in place for one year following a change in control.

**Potential Spin-Off of Broadcasting**

In the event of a spin-off of the Broadcasting Group, adjustments will be made to all outstanding equity grants according to formulas defined in the Internal Revenue Code. Conversion ratios ensure existing value is retained post-spin. For Tribune employees who will be employed by the new broadcasting company, equity will be converted into equity of the new publicly-traded company while those employees who remain with Tribune will receive adjusted equity in the post-spin Tribune Company. Treatment is the same for both stock options and restricted stock units. According to George Paulin of Frederic Cook, this is typical practice unless the result is excessive stock option overhang with either the parent or spin off company. If Tribune distributes a significant dividend, the adjustment to stock options would be sizable and probably creates an excessive option overhang for the parent company. We are studying this issue and will have a recommendation prior to the close of a spin, if any.

**Extraordinary Dividend**

In the event Tribune pays an extraordinary cash dividend, our investment bankers expect the value of Tribune common stock, and therefore the corresponding value of any equity awards, to decline by the amount of the dividend. For instance, after payment of a dividend of $20 per share, the price of Tribune stock would be reduced two-thirds from the current $30 stock price to approximately $10. Restricted stock units entitle holders to receive "regular" dividends, but do not address the impact of "extraordinary" dividends. Management recommends that the Committee authorize payment of any dividend (ordinary, extraordinary or stock) to restricted stock unit holders in order to keep the economic value of restricted stock units commensurate with the value conveyed at grant date.

Currently, regular cash dividends are reinvested in additional restricted stock units. The payment of a $20 per share extraordinary dividend will dramatically increase the leverage of the Company to below investment-grade status, with a corresponding increase in equity risk. Management recommends that a one-time extraordinary dividend be held in a cash account rather than reinvested in restricted stock units. This will put employees in the same position as other stockholders. Importantly, the vesting schedule for the dividend will remain intact, therefore promoting employee retention. The cash component will be credited with interest at the same rate as the company's Deferred Bonus Plan (5.7%).

The total dividend (assuming $20 per share) for the non-vested 2006 restricted stock units, including dividend equivalents, and the proposed 2007 grant is approximately $63 million.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413857

The annual interest expense for this amount at 5.7% would be approximately $2 million in 2007 and about $2.4 million in 2008. If the $20 dividend were distributed immediately, the Company would have to borrow the $63 million at around 9%.

The Incentive Compensation Plan allows the Committee to provide for such a cash payment under the adjustment provisions of the plan. Management also proposes that the extraordinary dividend payable to individuals with company stock holdings in the Deferred Bonus Plan and Supplemental 401(k) be credited to the cash accounts under the respective plans.

### Adverse Tax Impact/Stock Ownership Guidelines

The payment of the extraordinary dividend could also result in adverse tax consequences to individuals who have a high tax basis in Tribune stock. The majority of individuals subject to ownership guidelines have acquired shares from stock option exercises above current trading levels. If these individuals sell their Tribune shares ahead of an extraordinary dividend, they will generate a capital loss and incur no tax. If, instead, they hold the stock and receive the extraordinary dividend, they will be required to pay the normal 15% tax on the dividend.

For example, an individual who acquired stock with a basis of $50 currently has a $20 unrealized capital loss which could be realized by a sale of the stock and offset against other capital gain income. If the stock is retained and a $20 extraordinary dividend is paid, the individual will instead immediately be taxed on the amount of the dividend. The potential adverse tax impact ranges from $15,000 to over a million dollars for Dennis FitzSimons.

As a result, we believe that employees subject to stock ownership guidelines should be allowed to sell their direct holdings in Tribune shares after announcement of a transaction involving an extraordinary dividend. Assuming a highly levered company, ownership guidelines should also be appropriately adjusted. Management will propose new ownership guidelines to the Committee for approval.

### Employee Stock Purchase Plan

At the last Committee meeting, there were a number of questions concerning the Employee Stock Purchase Plan (ESPP). The ESPP has been in place for over 20 years and was designed to encourage employee stock ownership. It provides employees with an opportunity to purchase Tribune shares at a 15% discount through regular payroll deductions. Purchases are made monthly. Approximately 3,800 employees are currently contributing to the ESPP, compared to 4,900 employees a year ago. Total shares purchased were 600,000 in 2006 compared to 682,600 in 2005. Administrative costs are about $220,000 annually.

If ESPP stock is sold within two years of the purchase date, participants pay ordinary income tax on the entire 15% discount no matter what the selling price is. If the shares are sold after two years, the participant pays ordinary income taxes on the difference between the selling price and actual purchase price. There can also be complicated capital gains or losses.

Shares purchased under the ESPP are generally held by our employees rather than sold immediately, but there is no required holding period. During 2006, approximately 241,000

4

shares were sold that had been held under the plan for less than 2 years. This equals 7% of total shares held under the ESPP or 19% of the shares purchased during that two-year period.

Management recommends that the 15% discount be lowered to 5% beginning with the April 2007 purchase. By lowering the discount to 5%, under current accounting rules, there would no longer be an expense to the Company (current expense to the Company is approximately $2.8 million). If there is a change in control, the ESPP would probably be eliminated completely.

2/6/07
MMH

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413859

Exhibit I

## Tribune Company
## Proposed Equity Terms

**Restricted Stock Units**

| | |
|---|---|
| Date of Grant: | February 13, 2007 |
| Clawback: | Restricted stock units may be suspended, cancelled or forfeited and gains may be forfeited if participant engages in any act of fraud, insider trading or other securities law violation |
| Retirement, death or disability | Immediate vesting |
| Authorization: | Tribune currently has shareholder authority to issue 33.9 million stock options and restricted stock units |
| Vesting: | Annual Grant:  33% per year (34% in third year) |
| Dividends: | Dividend equivalents accumulated in stock and paid at vesting |
| Voting rights: | None, prior to vesting |
| Change in Control: | All equity grants under Incentive Compensation Plan vest immediately on change in control.  For purposes of the Incentive Compensation Plan, change in control is defined as: |

- Acquisition of 20% of stock value or combined voting power;
- Reorganization or merger resulting in dilution of more than 50% in existing shareholder voting power;
- Liquidation or dissolution of company or sale of substantially all company assets; or
- Turnover of a majority of the Board without the approval of the Board.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413860

Exhibit II

# TRIBUNE COMPANY
## EQUITY COMPENSATION BY GROUP
### 2005 - 2007

| | 2005 | 2006 | | | 2007 PROPOSED |
| | OPTIONS/ EMPLOYEES | OPTIONS/ EMPLOYEES | RESTRICTED SHARES/ EMPLOYEES | INCENTIVE SHARES/ EMPLOYEES | RESTRICTED SHARES |
|---|---|---|---|---|---|
| Publishing | 1,860,800 | 710,400 | 498,500 | 326,500 | 964,100 |
| | *356* | *77* | *410* | *72* | *526* |
| Broadcasting | 902,800 | 504,200 | 268,750 | 0 | 469,800 |
| | *153* | *56* | *168* | *0* | *163* |
| Corporate | 884,400 | 737,900 | 297,275 | 105,200 | 566,100 |
| | *80* | *18* | *91* | *15* | *89* |
| TOTALS | 3,648,000 | 1,952,500 | 1,064,525 | 431,700 | 2,000,000 [1] |
| Employees | *589* | *151* | *669* | *87* | *778* |
| Avg Awards | **6,194** | **12,930** | **1,591** | **4,962** | **2,571** |

## TOTAL COST/VALUE

| | 2005 | 2006 | | | | 2007 PROPOSED |
| | | OPTIONS | RESTRICTED SHARES | INCENTIVE AWARD | TOTAL | |
|---|---|---|---|---|---|---|
| Publishing | $19,557,008 | $4,227,594 | $15,525,035 | $10,173,740 | $29,926,369 | $26,000,000-29,000,000 |
| Broadcasting | 9,488,428 | 3,005,032 | 8,374,250 | 0 | 11,379,282 | 13,000,000-14,000,000 |
| Corporate | 9,295,044 | 4,397,884 | 9,283,639 | 3,278,032 | 16,959,555 | 15,000,000-17,000,000 |
| TOTALS | **$38,340,480** | **$11,630,510** | **$33,182,924** | **$13,451,772** | **$58,265,206** | **$54,000,000-60,000,000** |

[1] Plus an additional 100,000 RSUs for the Chariman's pool.

7

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**6**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413862

## TRIBUNE COMPANY
## EXECUTIVE COMPENSATION

To assist the Committee in determining compensation for the five named executives in the proxy, included in this section are Executive Compensation Reports providing pay history and competitive information. In the graphs, the far two left bars show Tribune executive information and the three right bars represent market data with base salary in blue, bonus in yellow and long-term incentive in green. Data represent 2006 salary and long-term incentive along with bonus paid in 2006 for 2005 performance.

George Paulin of Frederic Cook has also prepared the attached report comparing the pay of the five named executives in the proxy to that of our peer companies as reported in proxy data. While the Towers Perrin data compares pay on a comparable position basis, the Frederic Cook report compares pay based on placement in the proxy (i.e. second highest paid at Tribune versus second highest paid within the peer group).

In addition, a compensation summary table presenting top executives along with their salary, bonus and restricted stock unit (RSU) recommendations is provided.

## SURVEY SOURCE – EXECUTIVE COMPENSATION

### Towers Perrin Media Industry Compensation Survey

- Uses regression analysis to establish appropriate market comparisons for Corporate Office positions based on $5.6 billion in revenues. For Publishing Group president and Broadcasting Group president positions, regression is based on $4.1 and $1.5 billion, respectively.
- Covers the corporate office and industries such as newspaper, television, radio, cable TV, magazine, and publishing.
- Includes approximately 95 survey participants such as Belo, CBS, Comcast Cable, Dow Jones, Gannett, Media General, NBC, New York Times, Scripps, Thomson, Time Warner, Viacom, Walt Disney and Washington Post.
- Survey data include 2006 salary and 2005 bonus.
- Value of Long Term Incentives was calculated by Towers Perrin using the Binomial option-pricing model. For Tribune, 2006 stock options were valued at $5.01 per share.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413863

**TRIBUNE COMPANY**
Executive Compensation Report

**DENNIS FITZSIMONS**
Chairman, President and CEO

| Date of Employment: | 07/12/82 | Date of Birth: | 06/26/50 | Age: | 56 |

## BASE SALARY

| YEAR | INCREASE AMOUNT | INCREASE % | ANNUAL SALARY |
|---|---|---|---|
| 2007 P | $30,000 | 3.0 %* | $1,015,000 |
| 2006 | 30,000 | 3.1 | 985,000 |
| 2005 | 30,000 | 3.2 | 955,000 |
| 2004 | 50,000 | 5.7 | 925,000 |
| 2003 | 162,500 | 22.8 | 875,000 |
| 2002 | (37,500) | -5.0 | 712,500 |

*3% used for illustrative purposes.

Base Salary chart (Thousands): FITZSIMONS 2006 $985, FITZSIMONS 2007 P $1,015, TP MEDIA 25th $984, TP MEDIA 50th $1,320, TP MEDIA 75th $1,770

## ANNUAL BONUS

| YEAR | % OF PAY TARGET | PAID | AMOUNT |
|---|---|---|---|
| 2006 P | 125 % | 129 %* | $1,268,188 |
| 2005 | 100 | 26 | 250,000 |
| 2004 | 100 | 28 | 260,000 |
| 2003 | 100 | 137 | 1,200,000 |
| 2002 | 80 | 124 | 885,000 |
| 2001 | 80 | 0 | 0 |

*Bonus based on 103% company achievement for illustrative purposes.

Annual Bonus chart (Thousands): FITZSIMONS 2005 $250, FITZSIMONS 2006 P $1,268, TP MEDIA 25th $1,042, TP MEDIA 50th $1,806, TP MEDIA 75th $3,052

## LONG-TERM INCENTIVE

| YEAR | SHARES | PRICE | BS | VALUE* |
|---|---|---|---|---|
| 2007 P (RSU) | 135,000** | $31.00 | N/A | $4,185,000 |
| 2006 | 300,000 | 31.16 | $5.96 | 1,788,000 |
| 2006 (RSU) | 60,000 | 31.16 | N/A | 1,869,600 |
| 2006 TOTAL | | | | 3,657,600 |
| 2005 | 200,000 | 40.59 | 10.51 | 2,101,900 |
| 2004 | 200,000 | 52.05 | 15.48 | 3,095,420 |
| 2003 | 275,000 | 45.90 | 13.90 | 3,821,593 |
| 2002 | 250,000 | 40.50 | 13.81 | 3,453,500 |

* Black Scholes Value used for stock options and stock price at date of grant used for restricted stock.
**Equal to 2006 RSU's plus 4 to 1 conversion of 2006 stock options for illustrative purposes.

Long-Term Incentive chart (Thousands): FITZSIMONS 2006 $3,658 ($1,788 OPTIONS*, $1,870 RSUs), FITZSIMONS 2007 P $4,185 RSUs, TP MEDIA 25th $2,106, TP MEDIA 50th $3,442, TP MEDIA 75th $5,618. *Currently underwater.

2

TRB0413864

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413865



DENNIS FITZSIMONS
COMPETITIVE MARKET DATA CHART

*3% used for illustrative purposes.
**Bonus based on 103% company achievement for illustrative purposes.
***Equal to 2006 RSU's plus 4 to 1 conversion of 2006 stock options for illustrative purposes.

Notes: Bar 2006 reflects 2006 base salary and long-term incentive, and 2005 bonus paid in 2006. Bar 2007 P reflects proposed 2007 base salary and long-term incentive, and proposed 2006 bonus paid in 2007. Market data is based upon regression from the Towers Perrin Media survey which includes approximately 95 participants such as Belo, CBS, Comcast Cable, Dow Jones, Gannett, Media General, NBC, NY Times, Scripps, Thomson, Time Warner, Viacom, Walt Disney and Washington Post.

3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only



# TRIBUNE COMPANY
Executive Compensation Report

**SCOTT SMITH**
President/Tribune Publishing

| Date of Employment: | 11/09/77 | Date of Birth: | 09/13/50 | Age: | 56 |

## BASE SALARY

| YEAR | INCREASE AMOUNT | INCREASE % | ANNUAL SALARY |
|---|---|---|---|
| 2007 P | $17,300 | 3.0 % | $592,300 |
| 2006 | 50,000 | 9.5 | 575,000 |
| 2005 | 0 | 0.0 | 525,000 |
| 2004 | 103,000 | 24.4 | 525,000 |
| 2003 | 12,600 | 3.0 | 422,000 |
| 2002 | (21,600) | -5.0 | 409,400 |

## ANNUAL BONUS

| YEAR | % OF PAY TARGET | PAID | AMOUNT |
|---|---|---|---|
| 2006 P | 80 % | 74 % | $425,000 |
| 2005 | 60 | 29 | 154,000 |
| 2004 | 60 | 45 | 235,000 |
| 2003 | 50 | 59 | 250,000 |
| 2002 | 50 | 67 | 275,000 |
| 2001 | 50 | 0 | 0 |

## LONG-TERM INCENTIVE

| YEAR | SHARES | PRICE | BS | VALUE* |
|---|---|---|---|---|
| 2007 P (RSU) | 60,000 | $31.00 | N/A | $1,860,000 |
| 2006 | 90,000 | 31.16 | $5.96 | 536,400 |
| 2006 (RSU) | 30,000 | 31.16 | N/A | 934,800 |
| 2006 TOTAL | | | | 1,471,200 |
| 2005 | 85,000 | 40.59 | 10.51 | 893,308 |
| 2004 | 42,000 | 52.05 | 15.48 | 650,038 |
| 2003 | 70,000 | 45.90 | 13.90 | 972,769 |
| 2002 | 70,000 | 40.50 | 13.81 | 965,980 |

* Black Scholes Value used for stock options and stock price at date of grant used for restricted stock.

**BASE SALARY** — SMITH 2006 $575, SMITH 2007 P $592, TP MEDIA 25th $737, TP MEDIA 50th $1,012, TP MEDIA 75th $1,390

**ANNUAL BONUS** — SMITH 2005 $154, SMITH 2006 P $425, TP MEDIA 25th $724, TP MEDIA 50th $1,075, TP MEDIA 75th $1,593

**LONG-TERM INCENTIVE** — SMITH 2006 (OPTIONS* $536, RSUs $935, $1,471), SMITH 2007 P (RSUs $1,860), TP MEDIA 25th $1,057, TP MEDIA 50th $1,367, TP MEDIA 75th $1,758
*Currently underwater.

4

TRB0413866

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413867

## SCOTT SMITH
## COMPETITIVE MARKET DATA CHART



Legend: ▦ Base  ☐ Bonus  ☐ LTI

**SMITH 2006** — $2,200: $536 OPTIONS / $935 RSUs / $154 / $575

**SMITH 2007 P** — $2,877: $1,860 / $425 / $592

**TP MEDIA 25th** — $2,518: $1,057 / $724 / $737

**TP MEDIA 50th** — $3,454: $1,367 / $1,075 / $1,012

**TP MEDIA 75th** — $4,741: $1,758 / $1,593 / $1,390

Y-axis (Thousands): $0, $1,000, $2,000, $3,000, $4,000, $5,000

Notes: Bar 2006 reflects 2006 base salary and long-term incentive, and 2005 bonus paid in 2006. Bar 2007 P reflects proposed 2007 base salary and long-term incentive, and proposed 2006 bonus paid in 2007. Market data is based upon regression from the Towers Perrin Media survey which includes approximately 95 participants such as Belo, CBS, Comcast Cable, Dow Jones, Gannett, Media General, NBC, NY Times, Scripps, Thomson, Time Warner, Viacom, Walt Disney and Washington Post.

5

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only



# TRIBUNE COMPANY
Executive Compensation Report

**DONALD GRENESKO**
SVP/Finance & Administration

| Date of Employment: 05/31/80 | Date of Birth: 10/31/48 | Age: 58 |

## BASE SALARY

| YEAR | INCREASE AMOUNT | INCREASE % | ANNUAL SALARY |
|---|---|---|---|
| 2007 P | $17,100 | 3.0 % | $587,100 |
| 2006 | 43,000 | 8.2 | 570,000 |
| 2005 | 15,000 | 2.9 | 527,000 |
| 2004 | 47,000 | 10.1 | 512,000 |
| 2003 | 13,800 | 3.1 | 465,000 |
| 2002 | (23,800) | -5.0 | 451,200 |

## ANNUAL BONUS

| YEAR | % OF PAY TARGET | PAID | AMOUNT |
|---|---|---|---|
| 2006 P | 75 % | 77 % | $440,325 |
| 2005 | 50 | 20 | 102,800 |
| 2004 | 50 | 24 | 125,000 |
| 2003 | 50 | 66 | 305,000 |
| 2002 | 50 | 78 | 350,000 |
| 2001 | 50 | 0 | 0 |

## LONG-TERM INCENTIVE

| YEAR | SHARES | PRICE | BS | VALUE* |
|---|---|---|---|---|
| 2007 P (RSU) | 52,750 | $31.00 | N/A | $1,635,250 |
| 2006 | 85,000 | 31.16 | $5.96 | 506,600 |
| 2006 (RSU) | 28,000 | 31.16 | N/A | 872,480 |
| 2006 TOTAL | | | | 1,379,080 |
| 2005 | 75,000 | 40.59 | 10.51 | 788,213 |
| 2004 | 60,000 | 52.05 | 15.48 | 928,626 |
| 2003 | 85,000 | 45.90 | 13.90 | 1,181,220 |
| 2002 | 85,000 | 40.50 | 13.81 | 1,174,190 |

* Black Scholes Value used for stock options and stock price at date of grant used for restricted stock.

9

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413868

TRB0413869



DONALD GRENESKO
COMPETITIVE MARKET DATA CHART

Notes: Bar 2006 reflects 2006 base salary and long-term incentive, and 2005 bonus paid in 2006. Bar 2007 P reflects proposed 2007 base salary and long-term incentive, and proposed 2006 bonus paid in 2007. Market data is based upon regression from the Towers Perrin Media survey which includes approximately 95 participants such as Belo, CBS, Comcast Cable, Dow Jones, Gannett, Media General, NBC, NY Times, Scripps, Thomson, Time Warner, Viacom, Walt Disney and Washington Post.

7

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# TRIBUNE COMPANY
Executive Compensation Report

**JOHN REARDON**
President/Tribune Broadcasting

| Date of Employment: | 01/28/85 | Date of Birth: | 01/26/54 | Age: | 53 |
|---|---|---|---|---|---|



**BASE SALARY**

| YEAR | INCREASE AMOUNT | INCREASE % | ANNUAL SALARY |
|---|---|---|---|
| 2007 P | $15,000 | 3.0 % | $515,000 |
| 2006 | 0 | 0.0 | 500,000 |
| 2005 | 100,000 | 25.0 | 500,000 |
| 2004 | 25,000 | 6.7 | 400,000 |
| 2003 | 29,000 | 8.4 | 375,000 |
| 2002 | (18,200) | -5.0 | 346,000 |

**ANNUAL BONUS**

| YEAR | % OF PAY TARGET % | % OF PAY PAID % | AMOUNT |
|---|---|---|---|
| 2006 P | 70 % | 105 % | $525,000 |
| 2005 | 50 | 18 | 90,000 |
| 2004 | 50 | 36 | 145,000 |
| 2003 | 50 | 73 | 275,000 |
| 2002 | 50 | 75 | 260,000 |
| 2001 | 50 | 0 | 0 |

**LONG-TERM INCENTIVE**

| YEAR | SHARES | PRICE | BS | VALUE* |
|---|---|---|---|---|
| 2007 P (RSU) | 35,000 | $31.00 | N/A | $1,085,000 |
| 2006 | 60,000 | 31.16 | $5.96 | 357,600 |
| 2006 (RSU) | 20,000 | 31.16 | N/A | 623,200 |
| 2006 TOTAL | | | | 980,800 |
| 2005 | 40,000 | 40.59 | 10.51 | 420,380 |
| 2004 | 38,000 | 52.05 | 15.48 | 588,130 |
| 2003 | 45,000 | 45.90 | 13.90 | 625,352 |
| 2002 | 40,000 | 40.50 | 13.81 | 552,560 |

* Black Scholes Value used for stock options and stock price at date of grant used for restricted stock.

8

TRB0413870

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413871



JOHN REARDON
COMPETITIVE MARKET DATA CHART

Notes: Bar 2006 reflects 2006 base salary and long-term incentive, and 2005 bonus paid in 2006. Bar 2007 P reflects proposed 2007 base salary and long-term incentive, and proposed 2006 bonus paid in 2007. Market data is based upon regression from the Towers Perrin Media survey which includes approximately 95 participants such as Belo, CBS, Comcast Cable, Dow Jones, Gannett, Media General, NBC, NY Times, Scripps, Thomson, Time Warner, Viacom, Walt Disney and Washington Post.

9

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only



10

TRB041872

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413873



LUIS LEWIN
COMPETITIVE MARKET DATA CHART

Notes: Bar 2006 reflects 2006 base salary and long-term incentive, and 2005 bonus paid in 2006. Bar 2007 P reflects proposed 2007 base salary and long-term incentive, and proposed 2006 bonus paid in 2007. Market data is based upon regression from the Towers Perrin Media survey which includes approximately 95 participants such as Belo, CBS, Comcast Cable, Dow Jones, Gannett, Media General, NBC, NY Times, Scripps, Thomson, Time Warner, Viacom, Walt Disney and Washington Post. Market data does not take into consideration Employment Law, ERISA Law, Properties and Securities responsibilities.

11

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413874

Tribune Top 5 Upside
2/6/2007 11:56 AM

## Tribune Co.
### Chief Executive Officer -- Pay Comparisons

| Chief Executive Officer ($000): FitzSimons | Title / Position | Total Annual Comp. (TAC) | | | | Long-Term Incentives (LTI) | | | | Overall Total Comp. |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Base Salary | Annual Bonus $ Amt. | % Sal. | Total | Stock Options | Restricted Stock | Perf. Awards | Total | |
| Belo | COB, Pres., CEO | $ 915 | $ 494 | 54% | $ 1,409 | $ 667 | $ 421 | $ 811 | $ 1,899 | $ 3,308 |
| Clear Channel | COB | $ 781 | $ - | 0% | $ 781 | $ 4,252 | $ 1,168 | $ - | $ 5,419 | $ 6,200 |
| Dow Jones | COB & CEO | $ 1,035 | $ 955 | 92% | $ 1,990 | $ 475 | $ - | $ 2,748 | $ 3,223 | $ 5,213 |
| Gannett | COB | $ 1,600 | $ 2,350 | 147% | $ 3,950 | $ 2,926 | $ 1,383 | $ - | $ 4,309 | $ 8,259 |
| Hearst-Argyle | Pres. & CEO | $ 998 | $ 208 | 21% | $ 1,206 | $ 913 | $ - | $ - | $ 913 | $ 2,119 |
| IAC/InterActive Corp | Chmn. & CEO | $ 967 | $ 3,952 | 409% | $ 4,919 | $ 10,471 | $ - | $ - | $ 10,471 | $ 15,391 |
| McClatchy | Chmn., Pres. & CEO | $ 1,050 | $ 1,950 | 186% | $ 3,000 | $ 913 | $ - | $ 990 | $ 1,903 | $ 4,903 |
| McGraw-Hill | COB, Pres., CEO | $ 1,219 | $ 1,901 | 156% | $ 3,119 | $ 2,441 | $ - | $ 1,100 | $ 3,541 | $ 6,660 |
| New York Times | COB & Publisher, NYT | $ 1,098 | $ 583 | 53% | $ 1,681 | $ 739 | $ 818 | $ 548 | $ 2,105 | $ 3,786 |
| Scripps | Pres. & CEO | $ 1,092 | $ 1,150 | 105% | $ 2,242 | $ 1,506 | $ 4,863 | $ - | $ 6,369 | $ 8,611 |
| Washington Post | CEO | $ 416 | $ - | 0% | $ 416 | $ - | $ - | $ 309 | $ 309 | $ 725 |
| 75th Percentile | | $ 1,095 | $ 1,965 | 179% | $ 3,060 | | | | $ 4,400 | $ 7,460 |
| Mean | | $ 1,016 | $ 1,231 | 121% | $ 2,247 | $ 2,300 | $ 787 | $ 591 | $ 3,678 | $ 5,925 |
| Median | | $ 1,035 | $ 955 | 92% | $ 1,990 | | | | $ 3,223 | $ 5,213 |
| 25th Percentile | | $ 941 | $ 366 | 39% | $ 1,308 | | | | $ 2,239 | $ 3,547 |
| Summary Statistics Excluding Washington Post | | | | | | | | | | |
| 75th Percentile | | $ 1,096 | $ 1,993 | 182% | $ 3,090 | | | | $ 4,770 | $ 7,859 |
| Mean | | $ 1,076 | $ 1,354 | 126% | $ 2,430 | $ 2,530 | $ 865 | $ 620 | $ 4,015 | $ 6,445 |
| Median | | $ 1,042 | $ 1,073 | 103% | $ 2,116 | | | | $ 3,591 | $ 5,707 |
| 25th Percentile | | $ 975 | $ 502 | 51% | $ 1,477 | | | | $ 2,588 | $ 4,065 |
| Tribune - FY 2006 Actual    COB, Pres., CEO | | $ 985 | $ 250 | 25% | $ 1,235 | $ 1,788 | $ 1,870 | $ - | $ 3,658 | $ 4,893 |
| -- Percentile Rank | | 36% | | | 21% | | | | | 40% |
| Tribune - FY 2007 Proposed    COB, Pres., CEO | | $ 1,015 | $ 1,268 | 125% | $ 2,283 | $ - | $ 4,185 | $ - | $ 4,185 | $ 6,468 |
| -- Percentile Rank | | 45% | | | 61% | | | | | 66% |

-- Stock options valued using Black-Scholes valuation methodology
-- Competitive cash compensation data are aged to January 1, 2007 at a 4 percent; annual growth rate; competitive LTI data are not aged
-- Annual bonus and LTI statistics are "derived" so that percentiles "add across"

12

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413875

Tribune Top-5 Update
2/6/2007 11:56 AM

## Tribune Co.
## 2nd Highest Paid Executive - Pay Comparisons

| Second Highest Paid Officer ($000): | | Base | Total Annual Comp. (TAC) | | | Long-Term Incentives (LTI) | | | | Overall |
|---|---|---|---|---|---|---|---|---|---|---|
| Smith | Title / Position | Salary | Annual Bonus $ Amt. | % Sal. | Total | Stock Options | Restricted Stock | Perf. Awards | Total | Total Comp. |
| Belo | Vice Chairman | $ 624 | $ 260 | 42% | $ 884 | $ 298 | $ 345 | $ - | $ 643 | $ 1,527 |
| Clear Channel | Pres. & CEO | $ 931 | $ - | 0% | $ 931 | $ 2,154 | $ 2,102 | $ - | $ 4,256 | $ 5,187 |
| Dow Jones | EVP & COO | $ 787 | $ 664 | 84% | $ 1,450 | $ 470 | $ - | $ 1,633 | $ 2,103 | $ 3,554 |
| Gannett | Pres. & CEO | $ 1,000 | $ 1,200 | 120% | $ 2,200 | $ 2,277 | $ - | $ - | $ 2,277 | $ 4,477 |
| Hearst-Argyle | EVP | $ 705 | $ 125 | 18% | $ 830 | $ 380 | $ - | $ - | $ 380 | $ 1,210 |
| IAC/InterActive Corp | Vice Chairman | $ 676 | $ 3,120 | 462% | $ 3,796 | $ - | $ 486 | $ - | $ 486 | $ 4,282 |
| McClatchy | VP, Ops. (CA/NC/SC) | $ 536 | $ 343 | 64% | $ 879 | $ 390 | $ - | $ 94 | $ 483 | $ 1,362 |
| McGraw-Hill | EVP & CFO | $ 810 | $ 1,087 | 134% | $ 1,897 | $ 685 | $ - | $ 468 | $ 1,153 | $ 3,050 |
| New York Times | Pres. & CEO | $ 936 | $ 497 | 53% | $ 1,433 | $ 734 | $ 1,028 | $ 541 | $ 2,303 | $ 3,736 |
| Scripps | EVP | $ 650 | $ 360 | 55% | $ 1,010 | $ 723 | $ 860 | $ - | $ 1,583 | $ 2,593 |
| Washington Post | VP & CFO | $ 572 | $ 336 | 59% | $ 908 | $ - | $ 98 | $ 206 | $ 304 | $ 1,212 |
| 75th Percentile | | $ 870 | $ 803 | 92% | $ 1,674 | $ -- | $ -- | $ -- | $ 2,336 | $ 4,009 |
| Mean | | $ 748 | $ 727 | 97% | $ 1,474 | $ 737 | $ 447 | $ 267 | $ 1,452 | $ 2,926 |
| Median | | $ 705 | $ 305 | 43% | $ 1,010 | $ -- | $ -- | $ -- | $ 2,040 | $ 3,050 |
| 25th Percentile | | $ 637 | $ 259 | 41% | $ 896 | $ -- | $ -- | $ -- | $ 548 | $ 1,444 |
| Tribune - FY 2006 Actual | Pres., Publishing | $ 575 | $ 154 | 27% | $ 729 | $ 536 | $ 935 | $ - | $ 1,471 | $ 2,200 |
| -- Percentile Rank | | 11% | -- | -- | 0% | -- | -- | -- | -- | 36% |
| Tribune - FY 2007 Proposed | Pres., Publishing | $ 621 | $ 425 | 68% | $ 1,046 | $ - | $ 1,860 | $ - | $ 1,860 | $ 2,906 |
| -- Percentile Rank | | 19% | -- | -- | 51% | -- | -- | -- | -- | 47% |

-- Stock options valued using Black-Scholes valuation methodology

-- Competitive cash compensation data are aged to January 1, 2007 at a 4 percent; annual growth rate; competitive LTI data are not aged

-- Annual bonus and LTI statistics are "derived" so that percentiles "add across"

13

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413876

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Tribune Top-5 Update
2/6/2007 11:56 AM

## Tribune Co.
## 3rd Highest Paid Executive - Pay Comparisons

**Third Highest Paid Officer ($000):**

| Grenesko | Title / Position | Base Salary | Total Annual Comp. (TAC) | | | Long-Term Incentives (LTI) | | | | Overall Total Comp. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Annual Bonus $ Amt. | % Sal. | Total | Stock Options | Restricted Stock | Perf. Awards | Total | |
| Belo | EVP, Media Ops. | $ 494 | $ 208 | 42% | $ 702 | $ 179 | $ - | $ 324 | $ 680 | $ 1,382 |
| Clear Channel | Pres. & CEO, Outdoor | $ 589 | $ 957 | 162% | $ 1,546 | $ - | $ 377 | $ - | $ 377 | $ 1,923 |
| Dow Jones | SVP, Elec. Pub. | $ 523 | $ 322 | 62% | $ 846 | $ 235 | $ - | $ 708 | $ 942 | $ 1,788 |
| Gannett | Pres., Newspaper Div. | $ 569 | $ 416 | 73% | $ 985 | $ 1,013 | $ 166 | $ - | $ 1,179 | $ 2,164 |
| Hearst-Argyle | SVP, CLO & Dev. | $ 550 | $ 125 | 23% | $ 675 | $ 380 | $ - | $ - | $ 380 | $ 1,055 |
| IAC/InterActive Corp | EVP & CFO | $ 560 | $ 2,600 | 464% | $ 3,160 | $ - | $ 6,474 | $ - | $ 6,474 | $ 9,634 |
| McClatchy | VP, Finance & CFO | $ 442 | $ 437 | 99% | $ 879 | $ 317 | $ - | $ 62 | $ 379 | $ 1,258 |
| McGraw-Hill | EVP, HR | $ 588 | $ 806 | 137% | $ 1,394 | $ 398 | $ - | $ 326 | $ 724 | $ 2,118 |
| New York Times | Vice Chmn & Pub., Intl. Herald | $ 633 | $ 243 | 38% | $ 876 | $ 296 | $ 327 | $ 290 | $ 913 | $ 1,789 |
| Scripps | SVP & CFO | $ 550 | $ 337 | 61% | $ 887 | $ 512 | $ 599 | $ - | $ 1,111 | $ 1,998 |
| Washington Post | VP, Plan. & Dev. | $ 395 | $ 186 | 47% | $ 581 | $ - | $ 74 | $ 144 | $ 218 | $ 799 |
| 75th Percentile | | $ 578 | $ 611 | 106% | $ 1,189 | $ - | $ - | $ - | $ 869 | $ 2,058 |
| Mean | | $ 536 | $ 603 | 113% | $ 1,139 | $ 303 | $ 745 | $ 169 | $ 1,216 | $ 2,355 |
| Median | | $ 550 | $ 329 | 60% | $ 879 | $ - | $ - | $ - | $ 910 | $ 1,789 |
| 25th Percentile | | $ 509 | $ 265 | 52% | $ 774 | $ - | $ - | $ - | $ 546 | $ 1,320 |
| Tribune - FY 2006 Actual | SVP, Fin., Admin. | $ 570 | $ 103 | 18% | $ 673 | $ 507 | $ 872 | $ - | $ 1,379 | $ 2,052 |
| -- Percentile Rank | | 71% | -- | -- | 10% | | | | -- | 74% |
| Tribune - FY 2007 Proposed | SVP, Fin., Admin. | $ 600 | $ 440 | 73% | $ 1,040 | $ - | $ 1,635 | $ - | $ 1,635 | $ 2,675 |
| -- Percentile Rank | | 92% | -- | 73% | 71% | | | | -- | 91% |

-- Stock options valued using Black-Scholes valuation methodology
-- Competitive cash compensation data are aged to January 1, 2007 at a 4 percent; annual growth rate; competitive LTI data are not aged
-- Annual bonus and LTI statistics are "derived" so that percentiles "add across"

14

Tribune Co.
Chief Financial Officer - Pay Comparisons

| Chief Financial Officer ($000): Greneska | Title / Position | Total Annual Comp. (TAC) | | | | Long-Term Incentives (LTI) | | | | Overall |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Base Salary | Annual Bonus | | Total | Stock Options | Restricted Stock | Perf. Awards | Total | Total Comp. |
| | | | $ Amt. | % Sal. | | | | | | |
| Belo | EVP, CFO | $ 447 | $ 156 | 35% | $ 603 | $ 161 | $ 93 | $ 216 | $ 470 | $ 1,073 |
| Clear Channel | CFO | $ 819 | $ - | 0% | $ 819 | $ 2,154 | $ 2,102 | $ - | $ 4,256 | $ 5,075 |
| Gannett | SVP & CFO | $ 499 | $ 390 | 78% | $ 889 | $ 581 | $ 166 | $ - | $ 746 | $ 1,636 |
| Hearst-Argyle | EVP & CFO | $ 536 | $ 125 | 23% | $ 660 | $ 380 | $ - | $ - | $ 380 | $ 1,041 |
| IAC/InterActive Corp | EVP & CFO | $ 560 | $ 2,600 | 464% | $ 3,160 | $ - | $ 6,474 | $ - | $ 6,474 | $ 9,634 |
| McClatchy | VP, Finance & CFO | $ 442 | $ 437 | 99% | $ 879 | $ 317 | $ - | $ 62 | $ 379 | $ 1,258 |
| McGraw-Hill | EVP & CFO | $ 810 | $ 1,087 | 134% | $ 1,897 | $ 685 | $ - | $ 468 | $ 1,153 | $ 3,050 |
| New York Times | EVP & CFO | $ 619 | $ 248 | 40% | $ 867 | $ 296 | $ 327 | $ 290 | $ 913 | $ 1,780 |
| Scripps | SVP & CFO | $ 550 | $ 337 | 61% | $ 887 | $ 512 | $ 599 | $ - | $ 1,111 | $ 1,998 |
| Washington Post | VP & CFO | $ 572 | $ 336 | 59% | $ 906 | $ - | $ 98 | $ 206 | $ 304 | $ 1,212 |
| 75th Percentile | | $ 608 | $ 296 | 49% | $ 903 | $ - | $ - | $ - | $ 1,884 | $ 2,787 |
| Mean | | $ 585 | $ 572 | 98% | $ 1,157 | $ 508 | $ 986 | $ 124 | $ 1,619 | $ 2,776 |
| Median | | $ 555 | $ 328 | 59% | $ 883 | $ - | $ - | $ - | $ 825 | $ 1,708 |
| 25th Percentile | | $ 508 | $ 323 | 63% | $ 831 | $ - | $ - | $ - | $ 392 | $ 1,223 |
| Tribune - FY 2006 Actual | SVP, Fin., Admin. | $ 570 | $ 103 | 18% | $ 673 | $ 507 | $ 872 | $ - | $ 1,379 | $ 2,052 |
| -- Percentile Rank | | 65% | -- | | 18% | | | | -- | 67% |
| Tribune - FY 2007 Proposed | SVP, Fin., Admin. | $ 600 | $ 440 | 73% | $ 1,040 | $ - | $ 1,635 | $ - | $ 1,635 | $ 2,675 |
| -- Percentile Rank | | 73% | -- | | 79% | | | | -- | 74% |

-- Stock options valued using Black-Scholes valuation methodology
-- Competitive cash compensation data are aged to January 1, 2007 at a 4 percent; annual growth rate; competitive LTI data are not aged
-- Annual bonus and LTI statistics are "derived" so that percentiles "add across"

15

Tribune Top-5 Update
2/6/2007  11:56 AM

TRB0413877

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413878

Tribune Top 5 Update
2/6/2007 11:56 AM

## Tribune Co.
### 4th Highest Paid Executive - Pay Comparisons

| Fourth Highest Paid Officer ($000): Reardon | Title / Position | Total Annual Comp. (TAC) | | | | Long-Term Incentives (LTI) | | | | Overall Total Comp. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Base Salary | Annual Bonus $ Amt. | % Sal. | Total | Stock Options | Restricted Stock | Perf. Awards | Total | |
| Belo | EVP, CFO | $ 447 | $ 156 | 35% | $ 603 | $ 161 | $ 93 | $ 216 | $ 470 | $ 1,073 |
| Clear Channel | CEO, Int'l | $ 851 | $ 463 | 54% | $ 1,314 | $ 166 | $ 126 | $ - | $ 292 | $ 1,606 |
| Dow Jones | SVP, Wall St. Journal | $ 552 | $ 225 | 41% | $ 777 | $ 235 | $ - | $ 708 | $ 942 | $ 1,719 |
| Gannett | SVP & CFO | $ 499 | $ 390 | 78% | $ 889 | $ 581 | $ 166 | $ - | $ 746 | $ 1,636 |
| Hearst-Argyle | SVP | $ 525 | $ 153 | 29% | $ 678 | $ 342 | $ - | $ - | $ 342 | $ 1,021 |
| IAC/InterActive Corp | EVP, Gen. Cnsl. & Sec. | $ 460 | $ 2,080 | 452% | $ 2,540 | $ - | $ 5,976 | $ - | $ 5,976 | $ 8,516 |
| McClatchy | VP, Ops. (NW/Twin Cities) | $ 536 | $ 322 | 60% | $ 858 | $ 390 | $ - | $ 94 | $ 483 | $ 1,341 |
| McGraw-Hill | EVP, Gbl. Strat. | $ 588 | $ 676 | 115% | $ 1,264 | $ 398 | $ - | $ 326 | $ 724 | $ 1,988 |
| New York Times | EVP & CFO | $ 619 | $ 248 | 40% | $ 867 | $ 296 | $ 327 | $ 290 | $ 913 | $ 1,780 |
| Scripps | VP, Newspapers Ops. | $ 475 | $ 393 | 83% | $ 868 | $ 181 | $ 403 | $ - | $ 584 | $ 1,452 |
| Washington Post | VP, HR | $ 374 | $ 176 | 47% | $ 550 | $ - | $ - | $ 144 | $ 218 | $ 768 |
| 75th Percentile | | $ 570 | $ 506 | 89% | $ 1,076 | -- | -- | -- | $ 673 | $ 1,749 |
| Mean | | $ 539 | $ 480 | 89% | $ 1,019 | $ 250 | $ 651 | $ 162 | $ 1,063 | $ 2,082 |
| Median | | $ 525 | $ 342 | 65% | $ 867 | -- | -- | -- | $ 739 | $ 1,606 |
| 25th Percentile | | $ 468 | $ 260 | 56% | $ 728 | -- | -- | -- | $ 479 | $ 1,207 |
| Tribune - FY 2006 Actual | Pres., Broadcast | $ 500 | $ 90 | 18% | $ 590 | $ 358 | $ 623 | $ - | $ 981 | $ 1,571 |
| -- Percentile Rank | | 40% | -- | -- | 8% | -- | -- | -- | -- | 48% |
| Tribune - FY 2007 Proposed | Pres., Broadcast | $ 515 | $ 525 | 102% | $ 1,040 | $ - | $ 1,085 | $ - | $ 1,085 | $ 2,125 |
| -- Percentile Rank | | 46% | -- | -- | 74% | -- | -- | -- | -- | 90% |

-- Stock options valued using Black-Scholes valuation methodology

-- Competitive cash compensation data are aged to January 1, 2007 at a 4 percent; annual growth rate; competitive LTI data are not aged

-- Annual bonus and LTI statistics are "derived" so that percentiles "add across"

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413879

Tribune Top-5 Update
2/6/2007 11:56 AM

## Tribune Co.
## 5th Highest Paid Executive - Pay Comparisons

| Fifth Highest Paid Officer ($000): Lewin | Title / Position | Base Salary | Total Annual Comp. (TAC) | | | Long-Term Incentives (LTI) | | | | Overall Total Comp. |
| | | | Annual Bonus $ Amt. | % Sal. | Total | Stock Options | Restricted Stock | Perf. Awards | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Belo | Pub. & CEO, Dallas Morn News | $ 489 | $ 102 | 21% | $ 591 | $ 164 | $ 98 | $ 216 | $ 478 | $ 1,069 |
| Clear Channel | CFO | $ 819 | $ - | 0% | $ 819 | $ 2,154 | $ 2,102 | $ - | $ 4,256 | $ 5,075 |
| Dow Jones | Mng. Ed., Wall St. Journal | $ 549 | $ 208 | 38% | $ 757 | $ 85 | $ - | $ 490 | $ 575 | $ 1,332 |
| Gannett | Pres. & Pub., USA Today | $ 538 | $ 307 | 57% | $ 845 | $ 524 | $ 151 | $ - | $ 674 | $ 1,519 |
| Hearst-Argyle | EVP & CFO | $ 536 | $ 125 | 23% | $ 660 | $ 380 | $ - | $ - | $ 380 | $ 1,041 |
| IAC/InterActive Corp | Pres. & COO | $ 416 | $ 624 | 150% | $ 1,040 | $ - | $ 996 | $ - | $ 996 | $ 2,036 |
| McClatchy | VP, News | $ 359 | $ 255 | 71% | $ 614 | $ 195 | $ - | $ 49 | $ 244 | $ 857 |
| McGraw-Hill | EVP & GC | $ 505 | $ 530 | 105% | $ 1,036 | $ 419 | $ - | $ 228 | $ 647 | $ 1,683 |
| New York Times | Pres. & Gen. Mgr., NYT | $ 520 | $ 183 | 35% | $ 703 | $ 296 | $ 327 | $ 290 | $ 913 | $ 1,615 |
| Scripps | SVP & Chrmn., SSP Networks | $ 577 | $ 312 | 54% | $ 889 | $ 482 | $ 564 | $ - | $ 1,046 | $ 1,935 |
| Washington Post | VP, GC & Sec | $ 359 | $ 169 | 47% | $ 527 | $ - | $ 61 | $ 70 | $ 131 | $ 659 |
| 75th Percentile | | $ 544 | $ 323 | 59% | $ 867 | $ - | $ - | $ - | $ 942 | $ 1,809 |
| Mean | | $ 515 | $ 256 | 50% | $ 771 | $ 427 | $ 391 | $ 122 | $ 940 | $ 1,711 |
| Median | | $ 520 | $ 237 | 46% | $ 757 | $ - | $ - | $ - | $ 762 | $ 1,519 |
| 25th Percentile | | $ 452 | $ 185 | 41% | $ 637 | $ - | $ - | $ - | $ 418 | $ 1,055 |
| Tribune - FY 2006 Actual | SVP, HR | $ 355 | $ 65 | 18% | $ 420 | $ 298 | $ 904 | $ - | $ 1,202 | $ 1,622 |
| -- Percentile Rank | | 0% | | | 0% | | | | | 61% |
| Tribune - FY 2007 Proposed | SVP, HR | | | | | | | | | |
| -- Percentile Rank | | | | | | | | | | |

*Redacted*

-- Stock options valued using Black-Scholes valuation methodology
-- Competitive cash compensation data are aged to January 1, 2007 at a 4 percent; annual growth rate; competitive LTI data are not aged
-- Annual bonus and LTI statistics are "derived" so that percentiles "add across"

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413880

## TRIBUNE COMPANY
## COMPENSATION SUMMARY
## TOP EXECUTIVES

| Name | Salary 12/31/2006 | Salary % | Salary 2007 Proposed | MIP 2005 | MIP Target | MIP % | MIP $ | MIP % Tgt | MIP % Ach | TAC 2005 | TAC 2006 | TAC % Chg 06/05 | Stock Options 2006 | Incentive Award 2006 | Restr. Stock 2006 | Restr. Stock 2007 Proposed | Restr. Stock % Chg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Redacted | $353,700 | 3% | $364,311 | 80,000 | 60% | 104% | 230,000 | | 70% (1) | 401,500 | $573,700 | 43% | 24,000 | 10,000 | 8,000 | 14,000 | 0% |
| Redacted | 349,700 | 3 | 360,200 | 50,000 | 55 | 83 | 160,000 | | 80 | 389,500 | 509,700 | 31 | 19,000 | | 5,000 | 10,000 | 3 |
| Redacted | 375,000 | 0 | 375,000 | 70,980 | 60 | 125 | 281,250 | | 103 | 330,960 | 656,250 | 98 | 21,700 | | 20,300 | 12,000 | (53) |
| Redacted | 310,000 | 4 | 322,000 | 140,000 | 70 | 71 | 155,000 (2) | | 68 | 430,000 | 465,000 | 8 | 12,000 | | 3,200 | 9,000 | 45 |
| Redacted | 300,000 | 3 | 309,000 | 75,000 | 60 | 100 | 180,000 | | 111 | 358,250 | 480,000 | 34 | 18,000 | 9,000 | 6,000 | 10,500 | 0 |
| Redacted | 230,000 | | 240,000 | 100,000 | 50 | 91 | 105,000 | | 76 | 316,300 | 336,000 | 6 | 8,000 | 5,000 | 2,300 | 7,000 | 63 |
| Redacted | 400,000 | | 412,000 | 150,000 | 65 | 79 | 205,000 | | 76 | 513,000 | 605,000 | 18 | 24,000 | 15,000 | 6,000 | 22,000 | 83 |
| Grenesko, Donald C — SVP, Finance & Admin | 570,000 | 3 | 587,100 | 102,800 | 75 | 103 | 440,325 | | 83 (3) | 629,800 | 1,010,325 | 60 | 85,000 | 19,000 | 28,000 | 52,750 | 7 |
| Redacted | 500,000 | 10 | 550,000 | 160,000 | 70 | 74 | 200,000 | | 83 | 612,000 | 760,000 | 24 | 34,000 | | 8,500 | 35,000 | 106 |
| Redacted | 230,000 | 4 | 240,000 | 50,000 | 55 | 79 | 100,000 | | 75 | 241,500 | 330,000 | 37 | 10,000 | 6,000 | 2,500 | 7,000 | 40 |
| Redacted | 235,000 | 4 | 245,000 | 120,000 | 50 | 102 | 120,000 | | 100 | 335,000 | 355,000 | 6 | 12,000 | 7,000 | 3,000 | 8,000 | 33 |
| Kenney, Crane H — SVP, Gen Counsel & Corp Secy | 450,000 | 5 | 472,500 | 78,000 | 60 | 103 | 278,100 | | 103 | 478,000 | 728,100 | 52 | 60,000 | 12,000 | 20,000 | 40,000 | 14 |
| Redacted | 200,000 | 3 | 206,000 | 82,000 | 45 | 98 | 88,000 | | 94 | 272,000 | 288,000 | 6 | 8,000 | | 2,000 | 5,000 | 25 |
| Redacted | 420,000 | 5 | 440,000 | 110,000 | 60 | 75 | 190,000 | | 66 | 472,000 | 610,000 | 29 | 30,000 | 16,000 | 7,500 | 25,000 | 67 |
| Landon, Timothy J — Pres, Tribune Interactive | 400,000 | 4 | 416,000 | 130,000 | 60 | 88 | 210,000 | | 100 | 446,310 | 610,000 | 37 | 30,000 | 14,000 | 7,500 | 22,000 | 47 |
| Redacted | 310,000 | 8 | 334,800 | 55,600 | 50 | 103 | 191,580 | | 103 | 340,680 | 501,580 | 47 | 35,000 | 12,000 | 12,000 | 30,000 | 45 |
| Lewin, Luis E — SVP, Human Resources | 355,000 | 3 | 316,931 | Redacted | 60 | 103 | 219,390 | | 103 | 326,500 | 574,390 | 56 | 50,000 | 12,000 | 17,000 | Redacted | 0 |
| Redacted | 280,000 | 0 | 300,000 | 75,000 | 45 | 79 | 100,000 | | 68 | | 380,000 | 8 | 12,000 | 8,000 | 3,000 | 10,500 | 0 |
| Redacted | 307,700 | 2 | 337,000 | 290,000 | 60 | 149 | 275,000 | | 200 (4) | 378,000 | 582,700 | 53 | 18,000 | 6,000 | 6,000 | 8,000 | 33 |
| Redacted | 290,000 | 0 | 300,000 | 93,000 | 55 | 83 | 120,000 | | 100 (5) | 314,000 | 410,000 | | 12,000 | 4,000 | 3,000 | 12,000 | 118 |
| Redacted | 330,000 | | 300,000 | 300,000 | 50 | 100 | 150,000 | | 80 | 262,100 | 480,000 | | 10,000 | | 3,300 | 8,000 | 129 |
| Redacted | 300,000 | | | | | | 150,000 | | | | 450,000 | 72 | | | | | |
| Redacted | 351,000 | 3 | 302,000 | 80,000 | 60 | 85 | 180,000 | | 83 | 420,000 | 531,000 | 26 | 16,000 | 9,000 | 4,000 | 10,000 | 25 |
| Redacted | 245,000 | 3 | 252,350 | 44,900 | 60 | 103 | 151,410 | | 103 | 274,900 | 396,410 | 44 | 30,000 | 8,000 | 10,000 | 19,000 | 0 |
| Redacted | 320,000 | 0 | 320,000 | 49,000 | 45 | 56 | 80,000 | | 83 | 248,000 | 400,000 | 61 | | | 3,500 | 3,000 (7) | (14) (7) |
| Redacted | 254,424 | 5 | 262,135 | 70,000 | 50 | 149 | 190,000 | | 200 (6) | 317,013 | 444,424 | 40 | 14,000 | | 4,000 | 7,500 | 0 |
| Redacted | 500,000 | 3 | 515,000 | 90,000 | 70 | 150 | 525,000 | | 179 | 580,000 | 1,025,000 | 74 | 60,000 | | 20,000 | 35,000 | 0 |
| Smith, Scott C — Pres, Publishing | 676,000 | 3 | 592,300 | 154,000 | 80 | 92 | 425,000 | | 78 | 670,000 | 1,000,000 | 47 | 90,000 | | 30,000 | 60,000 | 14 |
| Redacted | 205,000 | 7 | 220,000 | 63,400 | 50 | 63 | 65,000 | | 62 | 298,440 | 270,000 | 4 | 6,000 | 2,000 | 1,800 | 5,000 | 52 |
| Redacted | 418,200 | 4 | 430,750 | 80,000 | 65 | 150 | 407,745 | | 176 | 490,000 | 825,945 | 69 | 32,600 | | 10,000 | 25,000 | 38 |
| Redacted | 360,000 | 3 | 372,000 | 165,000 | 60 | 97 | 210,000 | | 94 | 476,000 | 570,000 | 20 | 20,000 | 12,000 | 5,000 | 13,000 | 30 |
| Redacted | 262,500 | 4 | 272,000 | 90,000 | 50 | 84 | 110,000 | | 73 | 345,000 | 372,500 | 8 | 7,500 | 4,500 | 2,000 | 6,000 | 55 |
| Totals | | | | | | | | | | | | | 808,800 | 182,500 | 267,600 | 555,250 | 0 |

(1)
(2)
(3)
(4)
(5)
(6)
(7)
(8)

*Redacted*

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**7**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413881

# TRIBUNE COMPANY
## SALARY & MANAGEMENT INCENTIVE PLAN (MIP) PAYOUT WORKSHEET

| | |
|---|---|
| Name: | Dennis J. FitzSimons |
| Salary: | $985,000 |
| Bonus: | |
| 2006 MIP Target: | 125% of salary or $1,231,250 |
| 2005 MIP: | $250,000 |
| 2004 MIP: | $260,000 |
| 2003 MIP: | $1,200,000 |

### I. 2006 Salary Increase

**Performance Guidelines**

| | |
|---|---|
| Unsatisfactory | 0% |
| Needs Improvement | 0 - 2 |
| Meets Standards | 1 - 3 |
| Exceeds Standards | 3 - 5 |
| Exceptional | 4 - 8 |
| 2006 Company Avg. | 3% |

**Salary**

| | |
|---|---|
| Current | $985,000 |
| Change | $ |
| New | $ |
| % Change | % |

### II. 2006 MIP

To provide flexibility to the Committee in adjusting MIP payouts and to ensure the availability of tax deductions for all such compensation, the 1997 Incentive Compensation Plan (approved by shareholders) established distinct performance criteria. Mr. FitzSimons' annual MIP under the Plan is limited to 0.2 percent of the Company's EBITDA (estimated at $1.33 billion) or $2.66 million for the fiscal year. The Committee may use its discretion and alternative performance measures to establish Mr. FitzSimons' MIP within the $2,660,000 limit. Amounts in excess of $2.66 million must be paid outside of the Plan in the form of deferred compensation. Amounts paid as deferred compensation will be tax deductible in the year paid.

The Company's 2006 consolidated achievement was 103%. The following formula is provided to assist in calculating this year's payout.

| | Weighting | | % Achieved | | % Target Achieved | | Target MIP | | 2006 MIP |
|---|---|---|---|---|---|---|---|---|---|
| Consolidated Cash Flow | 60% | x | 103% | = | 62% | = x | $1,231,250 | = | $ |
| Discretionary | 40% | x | % (0 - 385%)* | = | | | | | |
| Total | 100% | x | | | x | | $1,231,250 | = | $ |

\* Relates to MIP limit of $2,660,000

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413882

## TRIBUNE COMPANY
## BONUS WORKSHEET FOR TOP EXECUTIVES IN PROXY

| | Weighting | | % Achieved | | % Target Achieved | Target Bonus | | 2006 Recommended Bonus |
|---|---|---|---|---|---|---|---|---|
| **Scott Smith** | | | | | | | | |
| Publishing Group Achievement | 60% | x | 78% | = | 47% | | | |
| Individual Performance | 40 | x | 114% | = | 46% | | | |
| Total | 100% | | | | 92% | x | $460,000 | = | $425,000 |
| **John Reardon** | | | | | | | | |
| Broadcasting Group Achievement | 60% | x | 179% | = | 107% | | | |
| Individual Performance | 40 | x | 107% | = | 43% | | | |
| Total | 100% | | | | 150% | x | $350,000 | = | $525,000 |
| **Don Grenesko** | | | | | | | | |
| Consolidated Achievement | 60% | x | 103% | = | 62% | | | |
| Individual Performance | 40 | x | 103% | = | 41% | | | |
| Total | 100% | | | | 103% | x | $427,500 | = | $440,325 |
| **Luis Lewin** | | | | | | | | |
| Consolidated Achievement | 60% | x | 103% | = | 62% | | | |
| Individual Performance | 40 | x | 103% | = | 41% | | | |
| Total | 100% | | | | 103% | x | $213,000 | = | $219,390 |

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413883

TRB0413884

NOMINATING & GOVERNANCE
COMMITTEE

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**TRIBUNE COMPANY**
**NOMINATING & GOVERNANCE COMMITTEE MEETING**
**TUESDAY, FEBRUARY 13, 2007 (10:30 A.M.)**
**ILLINOIS ROOM, 24TH FLOOR**
**TRIBUNE TOWER**

**AGENDA**

|                                                    | Tab No. |
|----------------------------------------------------|---------|
| Approve minutes of December 12, 2006 meeting       | 1       |
| Director independence and qualification review     | 2       |
| Corporate governance proxy disclosures             | 3       |
|     - Related person transactions policy<br>    - Proxy excerpts | |
| Shareholder proposals update                       | 4       |
| Proxy solicitor resume                             | 5       |
| Proposed committee appointments                    | 6       |

**Nominating & Governance Committee**
Roger Goodan
Enrique Hernandez, Jr., Chairman
Robert S. Morrison
J. Christopher Reyes
William Stinehart, Jr.

**Tribune Company**
Dennis J. FitzSimons
Crane H. Kenney

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413885

1

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0413886**

**TRIBUNE COMPANY**
**NOMINATING & GOVERNANCE COMMITTEE MEETING**
**DECEMBER 12, 2006**

The Nominating & Governance Committee met at 7:30 a.m. on Tuesday, December 12, 2006, at Tribune Tower, Chicago, Illinois, pursuant to notice. The meeting was attended by Roger Goodan, Enrique Hernandez, Jr., Robert S. Morrison, J. Christopher Reyes and William Stinehart, Jr. Thomas A. Cole of Sidley Austin LLP also attended the meeting. Dennis J. FitzSimons and Crane H. Kenney attended a portion of the meeting.

Mr. Hernandez acted as Chairman of the meeting. Messrs. Cole, FitzSimons and Kenney were present as the meeting was called to order. The following business was discussed by the Committee:

1.  The minutes of the July 19, 2006 Committee meeting were approved following amendment.

2.  The Committee next reviewed four shareholder proposals submitted for inclusion in the 2007 proxy statement – two seeking declassification of the staggered board, one seeking separation of the offices of Chairman and CEO and one seeking the removal of the supermajority voting requirements from the Company's charter and by-laws. The Committee requested that management respond to the Teamsters proposal and seek their withdrawal of the proposal. The Committee also noted that the outcome of the pending strategic review process may moot some or all of the shareholder proposals.

3.  The Committee reviewed a report prepared by management summarizing developments since the July 2006 Board meeting with respect to the majority election of directors. Following discussion, the Committee agreed to monitor developments in regard to majority voting during the upcoming proxy season and further consider adopting a majority voting standard following that review.

4.  The Committee discussed the responses to the Board and Committee performance questionnaires distributed at the May Board meeting. The sense of the Committee was that the Board and Committees were functioning well and that the level of candor among members had improved over time. All members of the Committee also felt the Special Committee was duly formed and functioning well.

5.  The Committee then discussed two potential director candidates and elected to defer further action until the conclusion of the pending strategic review process.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

There being no further business to come before the Committee, the meeting was adjourned at 8:30 a.m.

_____
Enrique Hernandez, Jr.
Chairman

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0413888**

**2**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413889