# TRIBUNE COMPANY
## DIRECTOR INDEPENDENCE AND QUALIFICATION REVIEW

**OVERVIEW**

The Nominating & Governance Committee charter requires the Committee to lead the Board in an annual review of the skills and characteristics of individual Board members, as well as the composition of the Board as a whole, including assessments of independence of non-management directors.

The New York Stock Exchange (NYSE) Corporate Governance Standards require that a majority of the Board satisfies the NYSE independence criteria and that there be no more than three management directors. The NYSE Governance Standards also require that each of the Compensation & Organization Committee, the Nominating & Governance Committee and the Audit Committee be composed entirely of independent directors. These independence determinations must be publicly disclosed in the Company's annual proxy statement.

As permitted under the NYSE Governance Standards, the Company has adopted categorical standards to assist the Board in making determinations of independence. The categorical standards adopted by the board track the NYSE independence criteria and address commercial, banking, consulting, legal, accounting, charitable and familial relationships. The current categorical standards adopted by the Board are set forth in Annex I.

Audit Committee members are subject to heightened independence and financial expertise requirements. In order to satisfy the heightened Audit Committee independence criteria, no Audit Committee member can accept directly or indirectly any consulting advisory or other compensatory fee from the Company or any subsidiary. In addition, the Board must determine that each Audit Committee member is financially literate and that at least one member has accounting or related financial management expertise. Finally, the Board must determine that at least one member of the Audit Committee qualifies as an audit committee financial expert. (The definition of audit committee financial expert is set forth in Annex II.) Any director who qualifies as an audit committee financial expert is presumed to have the requisite accounting or related financial management expertise required by the NYSE Standards.

**GENERAL DIRECTOR INDEPENDENCE**

Based on a review of the 2007 Director and Officer Questionnaires, management has concluded that all of the Company's current outside directors are independent within the general independence criteria of the NYSE Governance Standards. None of the commercial relationships between the Company and various entities with which certain outside directors have a relationship, such as The Northern Trust Company and the Chandler Trusts (as a result of the lease arrangements between various Tribune subsidiaries and TMCT, LLC and the restructuring agreements involving TMCT, LLC

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

and TMCT II, LLC effected in September 2006), affect this overall independence finding.  Given that all of the outside directors are independent, it follows that the outside directors comprising the Compensation & Organization Committee and Nominating & Governance Committee are also independent.

Under the more stringent independence criteria of three significant investor advisory services – Institutional Shareholder Services (ISS), GovernanceMetrics International (GMI) and Moody's Investors Services (Moody's) – all of the Company's current outside directors are independent, except for Messrs. Chandler, Goodan and Stinehart, who are classified as not independent by GMI on account of their role as trustees of the Chandler Trusts and the TMCT lease arrangements, and Mr. Osborn, who is classified as not independent because GMI incorrectly characterized the commercial banking and custodial fees paid by the Company to Northern Trust as "professional fees" paid to Mr. Osborn.  Unfortunately, this incorrect "not independent" designation will stand despite our efforts to educate GMI on the nature of the payments.  While such non-independence findings can result in "withhold" recommendations for affected director nominees, to date, the impact on Tribune director voting has been negligible.  This is likely attributable to the fact that all of our current outside directors are classified as independent by ISS, probably the most followed investor advisory firm.  Attached as Annex III is a chart summarizing the independence classifications of our current directors under the independence criteria of the NYSE, ISS, GMI and Moody's.

## AUDIT COMMITTEE INDEPENDENCE AND FINANCIAL EXPERIENCE

Based on a review of the 2007 Director and Officer Questionnaires, management has concluded that each of the current Audit Committee members (i) satisfies the heightened independence criteria for Audit Committee service required by the Securities Exchange Act, (ii) has accounting or related financial management expertise as required by the NYSE Governance Standards and (iii) qualifies as an audit committee financial expert under the Securities Exchange Act.  Included in Annex III are the independence and experience findings for the current Audit Committee members.

MWH
2/06/07

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413891

## CATEGORICAL STANDARDS

To be considered independent under the rules of the New York Stock Exchange, the Board must determine that a director has no direct or indirect material relationship with the Company. The Board has established the following categorical standards to assist it in making this determination. A director is not independent under these categorical standards if:

- The director is, or has been within the last three years, an employee of the Company, or an immediate family member of the director is, or has been within the last three years, an executive officer, of the Company.
- The director has received, or has an immediate family member who has received, during any twelve-month period within the last three years, more than $100,000 in direct compensation from the Company, other than director and committee fees and pension or other forms of deferred compensation for prior service (provided such compensation is not contingent in any way on continued service).
- (i) The director or an immediate family member is a current partner of a firm that is the Company's internal or external auditor; (ii) the director is a current employee of such a firm; (iii) the director has an immediate family member who is a current employee of such a firm and who participates in the firm's audit, assurance or tax compliance (but not tax planning) practice; or (iv) the director or an immediate family member was within the last three years (but is no longer) a partner or employee of such firm and personally worked on the Company's audit within that time.
- The director or an immediate family member is, or has been within the last three years, employed as an executive officer of another company where any of the Company's present executive officers at the same time serves or served on that company's compensation committee.
- The director is a current employee, or an immediate family member is a current executive officer, of a company that has made payments to, or received payments from, the Company for property or services in an amount which, in any of the last three fiscal years, exceeded the greater of $1 million or 2% of such other company's consolidated gross revenues.
- The director is a current employee, or an immediate family member is a current executive officer, of a company which was indebted to the Company, or to which the Company was indebted, where the total amount of either company's indebtedness to the other, in any of the last three fiscal years, exceeded 5% or more of such other company's total consolidated assets.
- The director or an immediate family member is a current officer, director or trustee of a charitable organization where the Company's (or an affiliated charitable foundation's) annual discretionary charitable contributions to the charitable organization, in any of the last three fiscal years, exceeded the

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

greater of $1 million or 5% of such charitable organization's consolidated gross revenues.

Direct or indirect ownership of even a significant amount of Company stock by a director who is otherwise independent as a result of the application of the foregoing standards will not, by itself, bar an independence finding as to such director.

For purposes of these categorical standards, "immediate family member" includes a director's spouse, parents, children, siblings, mothers and fathers-in-law, sons and daughters-in-law, brothers and sisters-in-law, and anyone (other than domestic employees) who share such director's home.  When applying the three-year look back provision to the foregoing categorical standards, the Company need not consider individuals who are no longer immediate family members as a result of legal separation or divorce, or those who have died or become incapacitated.

For purposes of these categorical standards, "executive officer" means a company's president, principal financial officer, principal accounting officer (or controller), any vice president in charge of a principal business unit, division or function (such as sales, administration or finance), or other officer who performs a policy-making function, or any other person who performs similar policy-making functions for the company. Officers of a company's subsidiaries shall be deemed officers of the company if they perform such policy-making functions for the company.

The Board will annually review all relationships between the Company and its outside directors and publicly disclose whether its outside directors are independent.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

ANNEX II

## DEFINITION OF AUDIT COMMITTEE FINANCIAL EXPERT

An *audit committee financial expert* means a person who has the following attributes:

- (i)    an understanding of generally accepted accounting principles and financial statements;
- (ii)   the ability to assess the general application of such principles in connection with the accounting for estimates, accruals and reserves;
- (iii)  experience preparing, auditing, analyzing or evaluating financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can reasonably be expected to be raised by the Company's financial statements, or experience actively supervising one or more persons engaged in such activities;
- (iv)   an understanding of internal control over financial reporting; and
- (v)    an understanding of audit committee functions.

A person shall have acquired such attributes through:

- (i)    education and experience as a principal financial officer, principal accounting officer, controller, public accountant or auditor or experience in one or more positions that involve the performance or similar functions;
- (ii)   experience actively supervising a principal financial officer, principal accounting officer, controller, public accountant, auditor or person performing similar functions;
- (iii)  experience overseeing or assessing the performance of companies or public accountants with respect to the preparation, auditing or evaluation of financial statements; or
- (iv)   Other relevant experience.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

ANNEX III

TRIBUNE COMPANY
BOARD OF DIRECTORS (February 2007)

| Director | INDEPENDENCE ISSUES | | | | | | | AUDIT COMMITTEE (1) | | |
| | Relationships | | | Independent Under Standards of: | | | | | | |
| | Commercial Relationship(2) | Family Relationship | Charitable Relationship | NYSE | ISS | GMI | Moody's | Independent | Financial Literacy | Financial Expert |
|---|---|---|---|---|---|---|---|---|---|---|
| Jeff Chandler | TMTC | None | None | Yes | Yes | No(3) | Yes | | | |
| Dennis FitzSimons | N/A | N/A | N/A | No | No | No | No | | | |
| Roger Goodan | TMCT | None | (4) | Yes | Yes | No(3) | Yes | | | |
| Rick Hernandez | None | None | None | Yes | Yes | Yes | Yes | | | |
| Betsy Holden | None | None | (4) | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Bob Morrison | None | None | (4) | Yes | Yes | Yes | Yes | | | |
| Bill Osborn | Banking Services | None | (4) | Yes | Yes | No(5) | Yes | Yes | Yes | Yes |
| Chris Reyes | None | None | (4) | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Bill Stinehart | Legal Fees/TMCT | None | None | Yes | Yes | No(3) | Yes | | | |
| Dudley Taft | None | None | None | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Miles White | None | None | (4) | Yes | Yes | Yes | (6) | | | |

**Notes:**

(1) Information presented for current Audit Committee members only.

(2) For amounts >$120K, see full description of relationships under the heading "Board of Directors - Certain Relationships and Related Party Transactions" in the draft proxy statement under Tab 7 of the Board materials.

(3) Deemed not independent by virtue of position as Chandler Trust trustee/TMCT lease arrangement.

(4) Contributions made to charitable organization(s) of which director is affiliated fall below gross revenue threshold.

(5) Reason given by GMI is incorrect characterization of "fees received for professional services."

(6) Last Moody's Corporate Governance Assessment was issued in August 2005, prior to Mr. White joining the Board.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413895

3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413896

# TRIBUNE COMPANY
## NOMINATING & GOVERNANCE COMMITTEE
## CORPORATE GOVERNANCE PROXY DISCLOSURES

## OVERVIEW

Last summer, the Securities and Exchange Commission approved comprehensive amendments to its rules for disclosure of executive compensation and other matters, including related person transactions. These disclosures are required to be made in the Company's proxy statement for its annual meeting of shareholders and incorporated into the Company's Annual Report on Form 10-K. The amendments to the requirements for disclosure of related person transactions raise the disclosure threshold for transactions from $60,000 to $120,000.

Attached are a proposed Related Person Transactions Policy and the Corporate Governance section from this year's proxy statement draft. Other than the new "Policy Regarding Related Party Transactions" section, there were no significant changes made to the Corporate Governance section of the proxy statement.

## RELATED PERSON TRANSACTIONS POLICY

The new related person transactions disclosure rule requires the Company to describe its policies and procedures for the review and approval of related person transactions that are required to be disclosed. The new rule also requires the Company to state whether its related person transactions policies and procedures are in writing and, if not, how such policies and procedures are evidenced. Adoption of the proposed Related Person Transactions Policy (the "Policy") is consistent with good corporate governance and will enable the Company to describe its written policies and procedures, as required by the new rule.

The Policy provides that each related person transaction must be approved or ratified by the Audit Committee of the Board of Directors or, if the Audit Committee determines that the approval or ratification should be considered by all of the disinterested members of the Board of Directors, by majority vote of the disinterested members. The Policy's requirement that the approval or ratification of related person transactions be considered by the Audit Committee is consistent with applicable New York Stock Exchange rules and endorsed by Sidley Austin LLP. The Policy's provision that the Audit Committee may determine that approval or ratification of a particular related person transaction should be considered by all of the disinterested members of the Board of Directors affords the flexibility of consideration by the full Board of Directors where appropriate.

Under the policy, "Related Person Transaction" means any transaction involving an amount in excess of $120,000 in which the Company is a participant and in which a "Related Person" has or will have a direct or indirect material interest, excluding specific types of transactions identified in the Policy which generally are not required to be disclosed. "Related Person" means an executive officer or director of the Company or a nominee for director of the Company, a beneficial owner of more than 5% of any class of voting securities of the Company or an immediate family member of any of such persons.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413897

The Policy includes a procedure to be followed for the approval or ratification of Related Person Transactions. Under the procedure, the General Counsel will advise the Chairman of the Audit Committee of any Related Person Transaction of which the General Counsel becomes aware. The Audit Committee will consider the Related Person Transaction or, at its election, defer consideration to the disinterested members of the Board of Directors. The Company will not enter into a Related Person Transaction unless it has been approved or ratified in accordance with the Policy or is expressly subject to ratification under the Policy.

The Company will disclose all Related Person Transactions as may be required under applicable securities laws and regulations. The Audit Committee will timely advise the Board of Directors of all Related Person Transactions, if any, approved or ratified by the Audit Committee.

A resolution approving the proposed Related Person Transactions Policy is attached. Once the Policy is approved, we will post it to the Corporate Governance Website.

MWH
2/06/07

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413898

## TRIBUNE COMPANY

## PROPOSED BOARD OF DIRECTORS RESOLUTION

### (Approval of Related Person Transactions Policy)

RESOLVED, that the Related Person Transactions Policy, substantially in the form presented at this meeting, is hereby adopted and approved.


MWH
2/06/07

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413899

# TRIBUNE COMPANY
## RELATED PERSON TRANSACTIONS POLICY
### *(Proposed Draft)*

1.    *Policy.* Each Related Person Transaction must be approved or ratified in accordance with the guidelines set forth in this policy (i) by the Audit Committee of the Board of Directors or (ii) if the Audit Committee of the Board of Directors determines that the approval or ratification of such Related Person Transaction should be considered by all of the disinterested members of the Board of Directors, by such disinterested members of the Board of Directors by the vote of a majority thereof.

In considering whether to approve or ratify any Related Person Transaction, the Audit Committee or the disinterested members of the Board of Directors, as the case may be (the "Reviewing Directors"), shall consider all factors that are relevant to the Related Person Transaction, including, without limitation, the following:

- the size of the transaction and the amount payable to a Related Person;

- the nature of the interest of the Related Person in the transaction;

- whether the transaction may involve a conflict of interest; and

- whether the transaction involves the provision of goods or services to the Company that are available from unaffiliated third parties and, if so, whether the transaction is on terms and made under circumstances that are at least as favorable to the Company as would be available in comparable transactions with or involving unaffiliated third parties.

2.    *Procedure.* The General Counsel shall advise the Chairman of the Audit Committee of any Related Person Transaction of which he becomes aware. The Audit Committee shall consider such Related Person Transaction at its next regularly scheduled meeting or, if it deems it advisable, prior thereto at an interim meeting called for such purpose, unless the Audit Committee determines that the approval or ratification of such Related Person Transaction should be considered by all of the disinterested members of the Board of Directors, in which case such disinterested members of the Board of Directors shall consider such Related Person Transaction at its next regularly scheduled meeting or, if it deems it advisable, prior thereto at an interim meeting called for such purpose. Except as set forth below, any Related Person Transaction not approved in advance by the reviewing directors shall not be entered into by the Company unless the consummation of such Related Person Transaction is expressly subject to ratification by the reviewing directors. If the reviewing directors do not ratify such Related Person Transaction, the Company shall not consummate such Related Person Transaction.

If the Company enters into a transaction that (i) the Company was not aware constituted a Related Person Transaction at the time it was entered into but which it subsequently determines is a Related Person Transaction prior to full performance thereof or (ii) did not

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

constitute a Related Person Transaction at the time such transaction was entered into but thereafter becomes a Related Person Transaction prior to full performance thereof, then in either such case the Related Person Transaction shall be presented for ratification in the manner set forth above. If such Related Person Transaction is not ratified by the reviewing directors, then the Company shall take all reasonable actions to attempt to terminate the Company's participation therein.

**3.   *Disclosure.*** The Company shall disclose all Related Person Transactions as may be required under applicable securities laws and regulations, including, without limitation, Item 404 of Regulation S-K. Consideration and approval of any particular transaction by the Reviewing Directors shall not be dispositive in determining whether such transaction requires disclosure under applicable securities laws. The Audit Committee shall timely advise the Board of Directors of all Related Person Transactions, if any, approved or ratified by the Audit Committee.

**4.   *Definitions.*** For purposes of this policy, the following definitions shall apply:

"Executive Officer" means the President, any Vice President in charge of a principal business unit, division or function of the Company or any officer or other person who performs a policy making function for the Company, including any executive officer of a subsidiary of the Company if such person performs policy making functions for the Company.

"Immediate Family Member" means, with respect to any person, any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law of such person, and any individual (other than a tenant or employee) sharing the household of such person.

"Related Person" means any of the following: (i) an Executive Officer or director of the Company or a nominee for director of the Company, (ii) a beneficial owner of more than 5% of any class of voting securities of the Company or (iii) an Immediate Family Member of any of the persons identified in clauses (i) or (ii) hereof.

"Related Person Transaction" means any transaction involving an amount in excess of $120,000 in which the Company is a participant and in which a Related Person has or will have a direct or indirect material interest, including without limitation any financial transaction, arrangement or relationship (including any indebtedness or guarantee of indebtedness) or any series of similar transactions, arrangements or relationships, but excluding: (i) any indebtedness incurred for the purchase of goods and services subject to usual trade terms, for ordinary business travel and expense payments and for other transactions in the ordinary course of business; (ii) any indebtedness incurred with respect to a beneficial owner of more than 5% of any class of voting securities of the Company or any Immediate Family Member thereof; (iii) any transaction in which the rates or charges involved in connection therewith are determined by competitive bids; (iv) any transaction in which a person is deemed a Related Person solely on the basis of such person's equity ownership and all holders of that class of equity receive the same benefit on a pro rata basis; or (v) any transaction involving compensation payable to an Executive Officer or director of the Company for services in such capacity which

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

compensation has been approved by the Compensation & Organization Committee of the Board of Directors or by the Board of Directors on the recommendation of the Compensation & Organization Committee.

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413902

# CORPORATE GOVERNANCE

## Overview

Tribune's Board of Directors operates within Board Governance Guidelines, which were first adopted in 2001. The Board Governance Guidelines contain general principles regarding the functions of Tribune's Board of Directors and Board committees, addressing such matters as director qualifications and independence, director and committee responsibilities, Board and Board committee composition, director compensation, executive sessions and annual performance evaluations. Together with Tribune's By-Laws and the charters of the Audit Committee, the Compensation & Organization Committee and the Nominating & Governance Committee, Tribune's Board Governance Guidelines serve as the foundation for Tribune's corporate governance practices.

Tribune's employees and directors must comply with a Code of Business Conduct that was first adopted in 1988. The Code of Business Conduct embodies Tribune's long-standing commitment to high standards of ethical conduct and business practices. Tribune also has in place a Code of Ethics for its Chief Executive Officer and Senior Financial Officers that is designed to promote honest and ethical conduct and full, accurate and timely disclosure in public filings and other communications.

Tribune's corporate governance practice is fully compliant with the rules and requirements of the Securities and Exchange Commission ("SEC") and the New York Stock Exchange ("NYSE"). The Board continually reviews Tribune's polices to ensure that Tribune's corporate governance practices remain sound.

All of Tribune's current corporate governance documents and policies, including the Board Governance Guidelines, committee charters, Code of Business Conduct and Code of Ethics described above, are available on Tribune's website at www.tribune.com and in print to any shareholder who requests them. Tribune's website also includes links to Tribune's Certificate of Incorporation, By-Laws and SEC filings (including the CEO and CFO certifications required under the Sarbanes-Oxley Act of 2002 and director and executive officer Section 16 reports). Requests for printed copies of Tribune's corporate governance documents should be directed to our Corporate Relations Department, Tribune Company, 435 North Michigan Avenue, Chicago, Illinois 60611, telephone (800) 757-1694.

## Director Independence

Under Tribune's Board Governance Guidelines, the Board must have a majority of independent directors. A director is "independent" under the NYSE listing standards if the Board affirmatively determines that the director has no material relationship with Tribune directly or as a partner, shareholder or officer of an organization that has a relationship with Tribune. The Board has established categorical standards to assist it in determining director independence, which can be found on Tribune's website at www.tribune.com. According to these standards, a director is not independent if:

- The director is, or has been within the last three years, an employee of Tribune, or an immediate family member of the director is, or has been within the last three years, an executive officer of Tribune.

- The director has received, or has an immediate family member who has received, during any twelve-month period within the last three years, more than $100,000 in direct compensation from Tribune, other than director and committee fees and pension or other forms of deferred compensation for prior service (provided such compensation is not contingent in any way on continued service).

- The director or an immediate family member is a current partner of a firm that is Tribune's internal or external auditor, the director is a current employee of such a firm, the director has an immediate family member who is a current employee of such a firm and who participates in the firm's audit, assurance or tax compliance (but not tax planning) practice, or the director or an immediate family member was within the last three years (but is no longer) a partner or employee of such firm and personally worked on Tribune's audit within that time.

6

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413903

- The director or an immediate family member is, or has been within the last three years, employed as an executive officer of another company where any of Tribune's present executive officers at the same time serves or served on that company's compensation committee.

- The director is a current employee, or an immediate family member is a current executive officer, of a company that has made payments to, or received payments from, Tribune for property or services in an amount which, in any of the last three fiscal years, exceeded the greater of $1 million or 2% of such other company's consolidated gross revenues.

- The director is a current employee, or an immediate family member is a current executive officer, of a company which was indebted to Tribune, or to which Tribune was indebted, where the total amount of either company's indebtedness to the other, in any of the last three fiscal years, exceeded 5% or more of such other company's total consolidated assets.

- The director or an immediate family member is a current officer, director or trustee of a charitable organization where Tribune's (or an affiliated charitable foundation's) annual discretionary charitable contributions to the charitable organization, in any of the last three fiscal years, exceeded the greater of $1 million or 5% of such charitable organization's consolidated gross revenues.

Direct or indirect ownership of even a significant amount of Tribune stock by a director who is otherwise independent as a result of the application of the foregoing standards will not, by itself, bar an independence finding as to such director.

The Board has reviewed the independence of our current non-employee directors and found that each of them, namely Jeffrey Chandler, Roger Goodan, Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, William A. Osborn, J. Christopher Reyes, William Stinehart, Jr., Dudley S. Taft and Miles D. White, is independent within the meaning of the rules of the New York Stock Exchange and under the Board's categorical standards. In making this determination, the Board considered the relationships described under "Board of Directors—Certain Relationships and Related Party Transactions" on page [     ]. In addition, with respect to Mr. Stinehart, the Board considered the fact that he was a partner in the law firm of Gibson, Dunn & Crutcher LLP until his retirement in December 2004. Gibson, Dunn & Crutcher LLP was external corporate counsel to Times Mirror and has, from time to time, provided legal services to Tribune since the merger. The Board has determined that these relationships are not material and do not cause any non-management director to be considered not independent under the rules of the New York Stock Exchange and under the Board's categorical standards. There were no related party transactions, relationships or arrangements involving our directors, other than the matter described above and the matters described under "Certain Relationships and Related Party Transactions" on page [     ]. In addition, the Board reviewed the independence of Kathryn C. Turner, who resigned as a director in May 2006, and found that Ms. Turner was independent within the meaning of the rules of the New York Stock Exchange and under the Board's categorical standards through the date of her resignation

**Policy Regarding Related Party Transactions**

We or one or our subsidiaries may occasionally enter into transactions with certain "related persons." Related persons include our executive officers, directors, 5% or more beneficial owners of our common stock, immediate family members of these persons and entities in which one of these persons has a direct or indirect material interest. We refer to transactions with these related persons as "related party transactions." Beginning in February 2007, the Audit Committee became responsible for the review and approval of each related party transaction exceeding $120,000. The Audit Committee considers all relevant factors when determining whether to approve a related party transaction including, without limitation, whether the terms of the proposed transaction are at least as favorable to us as those that might be achieved with an unaffiliated third party. Among other relevant factors, the Audit Committee considers the following:

- The size of the transaction and the amount payable to a related person.

7

TRB0413904

- The nature of the interest of the related person.
- Whether the transaction may involve a conflict of interest.
- Whether the transaction involves the provision of goods or services to us that are available from unaffiliated third parties and, if so, whether the proposed transaction is on terms and made under circumstances that are at least as favorable to us as would be available in comparable transactions with or involving unaffiliated third parties.

The policies and procedures relating to the Audit Committee approval of related party transactions are available on our website at www.tribune.com. All of the related party transactions occurring during 2006 and described under the heading "Certain Relationships and Related Party Transactions" beginning on page [    ] would have been permissible under, and would have been approved by the Audit Committee pursuant to, these policies and procedures had they been in effect in 2006.

### Communicating with the Board of Directors

The annual meeting provides an opportunity each year for shareholders to ask questions of and communicate directly with members of Tribune's Board of Directors on matters relevant to Tribune. Pursuant to the Board Governance Guidelines, each director is expected to attend the annual meeting. Each of the eleven directors serving at the time of the 2006 annual meeting of shareholders and continuing in office following the annual meeting was in attendance.

In addition, shareholders and other interested parties may, at any time, communicate with the Chairman of the Nominating & Governance Committee, or non-management directors as a group, by writing to them at the following address:

> Chairman, Nominating & Governance Committee or
> Non-Management Directors of the Board of Directors of Tribune Company
> c/o Tribune Company
> 435 North Michigan Avenue
> 6th Floor
> Chicago, Illinois 60611
> 312-222-4206 (fax)

Copies of written communications received by Tribune at the above address will be provided to the Chairman of the Nominating & Governance Committee or the non-management directors as a group unless they are considered, in the reasonable judgment of the Corporate Secretary, to be improper for submission to the intended recipients. Examples of shareholder communications that would be considered improper for submission include customer complaints, solicitations, communications that do not relate directly or indirectly to Tribune or its businesses or communications that relate to improper or irrelevant topics.

Tribune also maintains a telephone hotline through which investors, employees and other interested parties may submit confidential and anonymous complaints regarding suspected illegal or unethical behavior or other violations of Tribune policy, including complaints regarding accounting or auditing matters and alleged violations of Tribune's Code of Business Conduct. All reports are reviewed and investigated under the direction of an internal compliance committee comprised of representatives from Tribune's legal, internal audit and human resources departments. Any significant complaints regarding Tribune's accounting, internal accounting controls or auditing matters are reported to the Audit Committee of the Board of Directors. The telephone number for this hotline is (800) 216-1772.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413905

**4**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413906

January 31, 2007

<u>**VIA FEDEX**</u>

Mr. Crane H. Kenney
Senior Vice President, General Counsel and Secretary
Tribune Company
435 North Michigan Ave.
Chicago, IL 60611

Dear Mr. Kenney:

      Chandler Trust No. 1 and Chandler Trust No. 2 are stockholders of Tribune Company (the "**Company**"). As of the date hereof, the Chandler Trusts are the holders of record of an aggregate of 48,126,341 shares of the Company's common stock. This letter serves to provide notice, in accordance with Article II, Section 2.5 of the Bylaws of the Company, that in the event the Non-Disclosure Agreement referred to below shall have expired, the Chandler Trusts propose to bring before the 2007 Annual Meeting the enclosed proposals.

      We are submitting this notification to comply with the deadline for notice of matters to be brought before the Company's 2007 annual meeting of stockholders set forth in the Company's Bylaws. We recognize, however, that the process of the Board of Directors of the Company for considering strategic alternatives for the Company is ongoing. If the process results in a successful outcome, there may be no need to bring these proposals before the stockholders at the Company's 2007 annual meeting. If there is no satisfactory conclusion, however, we believe stockholders should have the opportunity to consider actions that would:

- increase the accountability of the Board to the Company's stockholders, and

- remove impediments to an acquisition of the Company if desired by holders of a majority of the Company's shares.

      The proposals described herein are intended to serve these purposes.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413907

Mr. Crane H. Kenney
January 31, 2007
Page 2

The Chandler Trusts are cognizant of the restrictions set forth in the letter agreement by and between the Trusts and the Company dated December 1, 2006 (the "**Non-Disclosure Agreement**") not to initiate "any stockholder proposal or tender offer for any securities of the Company" prior to the expiration of the Non-Disclosure Agreement. While it is unclear whether the quoted phrase applies to a proposal which is not "for any securities of the Company" we do not intend to submit the proposals described herein unless and until the Non-Disclosure Agreement has expired in accordance with its terms.

Set forth below is the information required to be furnished to the Secretary of the Company pursuant to Article II, Section 2.5 of the Bylaws in connection with the Proposals.

    (a)    **A brief description of the business desired to be brought before the annual meeting and the reasons for conducting such business at the annual meeting.**

The two Chandler Trust proposals are described below and set forth in the accompanying attachments:

    I.    <u>Annual Election of Directors.</u>

If submitted, this proposal will request that the Board take the necessary steps to eliminate the classification of the Board and require that all directors stand for election annually, effective no later than the Company's 2008 Annual Meeting of stockholders, with all directors standing for election at that time. Please note that the time recommended for implementation of annual elections amends that set forth in the notification we provided to the Company on November 22, 2006.

    II.    <u>Rights Plan.</u>

If submitted, this proposal will request that the Board amend the Company's Rights Agreement with First Chicago Trust Company of New York (as amended, the "**Rights Agreement**") so that it contains a qualifying offer provision which gives stockholders the right to vote on whether or not to redeem poison pills in the face of bona fide offers for the Company's common stock. The Trusts believe that this amendment provides an important check and balance on the Company's management and the Board by permitting stockholders to accept an offer by a potential bidder under certain circumstances.

    (b)    **The name and address, as they appear on the Company's books, of the stockholders proposing such business.**

Chandler Trust No. 1 and Chandler Trust No. 2
350 West Colorado Blvd., Suite 230
Pasadena, California 91105

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Mr. Crane H. Kenney
January 31, 2007
Page 3

    **(c)**    **The class and number of shares of the Company which are beneficially owned by the stockholder.**

The Trusts are the record and beneficial holders of an aggregate of 48,126,341 shares of the Company's Common Stock.

    **(d)**    **Any material interest of the stockholder in such business.**

Except with respect to their ownership of Common Stock, the Trusts have no material interest in these Proposals.

As we interpret the Company's Bylaws, the deadline for providing notice of shareholder proposals is February 1, 2007. In addition, we believe that the deadline for providing notice of director nominees under the Bylaws is February 8, 2007. If you disagree with the preceding statements, if you believe that this notice does not satisfy the Bylaw requirements for a shareholder proposal to be considered at the 2007 Annual Meeting or if you have any questions or require further information, please do not hesitate to contact me at (310) 552-8557. Copies of any correspondence should be forwarded to me at Gibson, Dunn & Crutcher LLP, 2029 Century Park East, Los Angeles, CA 90067 with a copy to Andrew Bogen, Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue, Los Angeles, CA 90071.

Sincerely,

William Stinehart, Jr., Co-Trustee
Chandler Trust No. 1 and Chandler Trust No. 2

Enclosures

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Mr. Crane H. Kenney
January 31, 2007
Page 4

## I.    SHAREHOLDER PROPOSAL TO ELECT DIRECTORS ANNUALLY

**Resolved**, that the stockholders of the Company urge the Board to: (i) approve an amendment to the Company's certificate of incorporation to eliminate the classification of the Company's Board and to require that all directors stand for election annually to take effect immediately upon approval by the Company's stockholders, and (ii) submit such amendment to the Company's stockholders for approval at the 2008 Annual Meeting.  If such amendment is approved by the stockholders, it shall take effect immediately and all directors elected at the 2008 Annual Meeting shall serve for a term of one year.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Mr. Crane H. Kenney
January 31, 2007
Page 5

## II.    SHAREHOLDER PROPOSAL TO AMEND THE RIGHTS PLAN

**Resolved,** that the stockholders of the Company urge the Board to amend the Company's Rights Agreement so that the Rights Agreement contains provisions for stockholder voting relating to poison pills. Specifically, the Stockholders recommend that the Rights Agreement be amended as follows:

(1)    The Board should amend the Rights Agreement to include a stockholder redemption feature following the making of a qualified tender offer by a bona fide purchaser. If the board refuses to redeem or amend the Rights Agreement to exempt such qualified offer, within 90 days after the qualified offer is announced, the board shall call a special meeting at the request of stockholder(s) holding 10% or more of Company stock to permit stockholders to vote on whether to redeem the rights. Such redemption of the rights would require the vote of a majority of the shares represented at the meeting in person or by proxy. A qualified offer is deemed to include any bona fide offer for all of the Company's outstanding stock for cash or an exchange offer for all of the Company's outstanding stock in exchange for securities or a combination of cash and securities, which is being made pursuant to the federal securities laws and for which the offeror has sufficient cash on hand or committed by one or more reputable financial institutions.

(2)    The Board should amend the Rights Agreement such that the Rights Agreement would require acquisition of beneficial ownership of at least 20% of the common stock in order for a Person to be deemed an Acquiring Person and trigger "flip-in" provisions of the Rights Agreement. Such 20% threshold should replace all references to "ten percent" or "10%" in the Rights Agreement.

(3)    The Board should remove the "no-hand" feature that limits the ability of a future board to redeem the Rights Agreement at any time. The Board shall not have the ability alone, without a vote of the stockholders, to amend the Rights Agreement.

The stockholders also recommend that the Board refrain from extending the expiration date of the Rights Agreement beyond January 5, 2008 without the prior approval of the Company's stockholders, and that the Board refrain from adopting in the future any similar "poison pill" rights agreement or plan without the prior approval of the Company's stockholders.

100151907_10.DOC

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Crane H. Kenney
Senior Vice President/General Counsel
& Secretary
 ?/222-2491

# TRIBUNE

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611
fax: 312/222-4206
e-mail: ckenney@tribune.com

January 31, 2007

*Via Fax*
Chandler Trust No. 1 and Chandler Trust No. 2
c/o William Stinehart, Jr., Trustee
Gibson Dunn & Crutcher LLP
2029 Century Park East
Los Angeles, CA 90071

Dear Mr. Stinehart:

This will serve to acknowledge receipt of today's letter which attempts to provide notification of two proposals for consideration at the 2007 annual meeting of stockholders. We do not believe the attempted notification is effective under the terms of the Company's existing Confidentiality Agreement with the Chandler Trusts as supplemented by yesterday's extension notice.

Sincerely,

Crane H. Kenney

CHK/sf

cc:    Andrew Bogen (via fax)

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413912

5

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRIBUNE COMPANY**
**NOMINATING & GOVERNANCE COMMITTEE**
**PROXY SOLICITOR RESUME**

Redacted

MWH
2/06/07

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413914

BIOGRAPHY

**ALAN M. MILLER**

Alan M. Miller is Co-Chairman of Innisfree M&A Incorporated of New York and President of Lake Isle M&A Incorporated, its wholly-owned UK subsidiary. Innisfree is a proxy solicitation/investor relations firm specializing in mergers and acquisitions, proxy contests and corporate governance consulting. With three decades of experience in contested M&A, Mr. Miller has been involved in thousands of proxy solicitations, more than 300 proxy contests and hundreds of tender and exchange offers. He has been involved in many of the significant transactions of the past thirty years, including: Lockheed/Simmons, Texaco/Icahn, Norfolk Southern/Conrail, Glaxo/Wellcome, Viacom/Paramount Communications, Northrop/Grumman, Ingersoll Rand/Clark Equipment, Johnson & Johnson/Cordis, Great Western/Ahmanson, Phelps Dodge/Cyprus Amax, Pfizer/Warner-Lambert, Weyerhaeuser/Willamette and Hewlett-Packard/Compaq. Recent representations include Chevron/Unocal, Verizon/MCI and MTFG/UFJ. Within the past year he has represented Boston Scientific, BASF and Lafarge SA in their respective successful bids for Guidant, Engelhard and Lafarge North America, as well as the Trian Group in its proxy contest at HJ Heinz. He is currently representing Caremark in its contested merger with CVS as well as Blackstone in its proposed acquisition of Equity Properties.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# Sound Advice
# For Extraordinary
# Circumstances

Shareholder Identification

Proxy Solicitation

Tender and Exchange Offers

Corporate Governance/Executive Remuneration Advice

Investor Relations

    *Perception Studies*

    *Investor Targeting*

    *Trading Analysis/Surveillance*

    *Roadshows and Ongoing Investor Relations Support*

Corporate Restructurings/Bondholder Services



| **Innisfree** | **Lake Isle** |
|---|---|
| M&A Incorporated | M&A Incorporated |
| New York | London |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413916

We provide clients with sound advice and results-oriented implementation in proxy solicitations, tender and exchange offers, mergers, rights offerings, restructurings and other corporate actions — friendly or contested, domestic or cross-border. In addition, we provide consulting services on strategic management issues, such as corporate governance, executive remuneration and investor relations.

Capital markets are driven by an increasingly diverse global investment community, and the governance of corporations has grown into a sophisticated set of rules and practices. Understanding these key elements underlying the relationship between companies and their security holders has become vital to achieving corporate goals, meeting internal and external challenges and ensuring continued access to global investors.

Our knowledge of world markets and of continually evolving governance rules and practices has been fundamental to the successful outcome of our clients' transactions.

Innisfree M&A Incorporated (New York)
and its wholly-owned subsidiary
Lake Isle M&A Incorporated (London)

**A Full Service Investor Relations and Proxy Solicitation Firm**

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413917

**A reputation based on an outstanding record in merger and acquisition transactions.**

The experience gained and the relationships developed during our involvement in most of the major corporate battles of the last two decades have proven invaluable to our clients.

**A contact network extending deep into the global investor community.**

Our relationships with key players in the global markets permit us to develop superior insight about diverse investment strategies and investor expectations, as well as applicable regulatory schemes. Outstanding communication skills guarantee an information flow that delivers results.

**Services responsive to the needs of our clients.**

Each client's specific requirements are individually considered. Our services are case-specific, and based on in-depth research and a highly refined analytical approach.

Our senior executives provide hands-on expertise throughout each assignment.

**Key to our success is the ability to identify and understand the shifting dynamics of a company's security holder base.**

Sound Advice for Extraordinary Circumstances

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413918



**Services**

### Shareholder Identification

Our Shareholder Identification programmes are based on an in-depth knowledge of investors, investment practices and custody regulations in specific markets. We tailor each identification report to address the client's needs. Our methodology and data sources ensure that information provided is accurate and timely, whether for an annual or extraordinary shareholder meeting, the launch of an investor relations programme, a friendly transaction or a hostile takeover battle.

We rely on multiple information sources, including public information, company data, global custodians' reports, listings and other market intelligence. But these are only the starting points. The identification of current beneficial holders is a thorough, multi-layered process, made possible by our excellent relationships with investors worldwide, including hedge funds and arbitrageurs. We provide clients with the knowledge necessary to understand and communicate effectively with the actual investment and voting decision makers.

### Proxy Solicitation

Whether a transaction is friendly or unsolicited, the shareholder meeting routine or challenging, Innisfree M&A and Lake Isle M&A can help clients obtain the support of security holders. Through a precise analysis of the composition of the shareholder base and accurate vote projections, we enable clients to determine the most effective course of action. We communicate with shareholders, closely monitor the solicitation progress, analyse and report back voting results throughout the solicitation period, and ensure not only that investors vote their shares, but that the shares are validly represented at the meeting.

### Tender and Exchange Offers

Extraordinary corporate events require clear communications with security holders. We provide strategic, tactical and content-related advice, coordinate timing and mechanics. We oversee the production and distribution of materials to security holders, as well as banks, brokers, and other intermediaries. Through our call centres, we

2 Sound Advice for Extraordinary Circumstances

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413919

contact investors and respond to inquiries using a worldwide network of free-phone numbers. Long-standing relationships with leading investment banks and legal and financial public relations firms ensure a well executed, successful transaction.

### Corporate Governance and Executive Remuneration Advice

Corporate governance has become an important component of investment decision making. Governance topics regularly appear on AGM agendas and new regulatory provisions encourage shareholder activism. Companies must consider these issues while preparing for shareholder meetings, formulating their investor relations strategy or undertaking a significant corporate action. Innisfree M&A and Lake Isle M&A advise on management and shareholder proposals, executive remuneration plans and changes in the client's governance practices. Our analysis of security ownership enables us to anticipate investor response.

### Investor Relations Consulting

Sound investor relations are essential to achieving corporate goals. Applying our ability to analyse shareholder structures and the impact of real-time trading developments, we assist clients in the strategic management of their shareholder base.

- Perception Studies

    Perception studies enable investor relations officers to provide vital information to board members and senior management on how their company is viewed by the investor community. The studies allow investors to discuss opinions freely on such matters as share valuation, management strengths and weaknesses, corporate governance practices, capital utilization, performance benchmarks and investor relations. We conduct comprehensive interviews with a diverse group of investment decision-makers and analysts, to whom we guarantee anonymity. Our final report offers a complete presentation of participants' feedback and recommendations to help focus our clients' investor relations strategy.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413920

- **Investor Targeting**

  Targeting services help clients to actively manage their shareholder base by gener-
  ating an increased level of interest that can reduce volatility and enhance market
  performance. Based on the company's strategic goals and investment fundamentals,
  targeting programmes are designed to identify institutional investors inappropriately
  weighted in our client's securities. We design the selection protocols based on
  financial, quantitative and qualitative measures. Through direct contact with portfolio
  managers and analysts, we help confirm the interest of potential shareholders.

- **Trading Analysis/Surveillance**

  We provide timely information on trading activity by accurately identifying shifts
  in ownership. In the event of unusual trading activity, we can typically identify the
  causes. This capability is especially important before or after corporate actions or
  other extraordinary events, or in times of market instability, when a clear under-
  standing of market activity can be of considerable value.

- **Roadshows and Ongoing Investor Relations Support**

  We organize one-on-one or group meetings with potential and current investors,
  covering all logistical aspects. Our knowledge of investment strategies and concerns
  enables us to brief our clients thoroughly in preparation for meetings and presen-
  tations. Our senior executives are available for continuing consultation regarding the
  background and strategies of investors.

### Corporate Restructurings and Bondholder Services

The management of increasingly complex, regulated and global corporate restructurings
demands specific knowledge and experience. Our executives guide clients through
these transactions with sound and detailed advice. A firm grasp of the nuances
of "street-name" registration and voting practices, and the capability to identify
and communicate with security holders around the world, allow us to conduct
effective restructuring campaigns. We utilize our knowledge of market regulations
and procedures, together with our close working relationships with international
depositories and custodians, to ensure that our clients' needs are fully met.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413921



## The Firm

Innisfree M&A Incorporated was founded in 1997 and established its UK subsidiary, Lake Isle M&A Incorporated, in 2001. Today the combined firm employs a professional staff of over 50 in New York, London, Pittsburgh and Montreal.

The firm maintains flexible, multi-lingual call centres, state-of-the-art tabulation systems and efficient mailing and distribution facilities.

Innisfree M&A and Lake Isle M&A have represented hundreds of companies in over 20 countries.

## Contacts

New York
**Innisfree M&A Incorporated**
Arthur Crozier, Co-Chairman
+1 212 750 5837
acrozier@innisfreema.com

London
**Lake Isle M&A Incorporated**
Julie Selby, Director, UK/Europe
+44 (0)20 7710 9962
jselby@lakeislema.com

Lake Isle M&A Incorporated, a Delaware (USA) corporation, Registration Number 2766167 with head offices at 50, Madison Avenue, New York, NY 10022 is registered in England and Wales, Registration No. BR0065 1J. The liability of the members is limited.

"Lake Isle M&A" is recorded as a Community Trade Mark (CTM) by the OHIM (Office for Harmonisation in the Internal Market) Register and is also registered in accordance with the laws and regulations of Switzerland and Australia.

"Innisfree" is registered as a trademark on the Principal Register of the United States Patent and Trademark Office and is also registered in accordance with the laws and regulations of Australia.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**



**Innisfree**
M&A Incorporated

501 Madison Avenue
New York, NY 10022
Tel +1 212 750 5833
Fax +1 212 750 5799
Email info@innisfreema.com

**Lake Isle**
M&A Incorporated

Windsor House
39 King Street
London EC2V 8DQ
Tel +44 (0)20 7710 9960
Fax +44 (0)20 7710 9961
Email info@lakeislema.com

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

6

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0413924

# TRIBUNE COMPANY
## BOARD OF DIRECTORS
### 2007 PROPOSED COMMITTEE APPOINTMENTS

The appointment of members to committees of the Board of Directors expires at the Annual Meeting each year. The proposed 2007 committee structure set forth below retains the current committee composition:

**Audit Committee**
Betsy D. Holden
William A. Osborn, Chair
J. Christopher Reyes
Dudley S. Taft

*Observers*
Jeffrey Chandler
Roger Goodan

**Nominating & Governance Committee**
Roger Goodan
Enrique Hernandez, Jr., Chair
Robert S. Morrison
J. Christopher Reyes
William Stinehart, Jr.

**Executive Committee**
Dennis J. FitzSimons, Chair
Enrique Hernandez, Jr.
Robert S. Morrison
William A. Osborn
William Stinehart, Jr.

**Compensation & Organization  Committee**
Jeffrey Chandler
Enrique Hernandez, Jr.
Robert S. Morrison, Chair
Miles D. White

The Committee assignments will be formalized at the May Board meeting.

MWH
2/06/07

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0413925

# TRIBUNE COMPANY
## BOARD OF DIRECTORS
## RETIREMENT POLICY AND SCHEDULE

A director who is not an officer of the Company is eligible to serve as a director until the annual meeting occurring after the director's 72nd birthday. A director who is an officer of the Company is eligible to serve as a director until either (i) the officer's resignation as an officer of the Company or (ii) the annual meeting next occurring after the officer's retirement (By-law §3.1).

| TERM EXPIRES 2007 | BIRTH DATE | AGE* | SERVED SINCE | RETIREMENT REQUIRED** | YEARS WILL HAVE SERVED |
|---|---|---|---|---|---|
| Chandler | 01/18/42 | 65 | 2000 | 2014 | 14 |
| Osborn | 10/14/47 | 59 | 2001 | 2020 | 19 |
| White | 03/10/55 | 52 | 2005 | 2027 | 22 |
| **TERM EXPIRES 2008** | | | | | |
| Goodan | 07/17/45 | 61 | 2000 | 2018 | 18 |
| Hernandez | 11/2/55 | 51 | 2001 | 2028 | 27 |
| Reyes | 12/29/53 | 53 | 2005 | 2026 | 21 |
| Taft | 04/24/40 | 66 | 1996 | 2012 | 16 |
| **TERM EXPIRES 2009** | | | | | |
| FitzSimons | 06/26/50 | 56 | 2000 | *** | *** |
| Holden | 10/19/55 | 51 | 2002 | 2028 | 26 |
| Morrison | 04/4/42 | 64 | 2001 | 2014 | 13 |
| Stinehart | 12/15/43 | 63 | 2000 | 2016 | 16 |

*Age as of expected mailing date of 2007 Proxy (March 30, 2007).
**Assumes Annual Meeting occurs in May.
***Retirement at Annual Meeting following retirement as officer of the Company.

CHK/bad
2/06/07

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**